# TAB 72

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

1998 CarswellNfld 224
Newfoundland Court of Appeal

Imperial Oil Ltd. v. Young

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65, 513 A.P.R. 280

# James Young and King's Bridge Service Station Limited, Appellants and Imperial Oil Limited, Respondent

O'Neill, Cameron, Green JJ.A.

Heard: May 26, 1997
Judgment: September 18, 1998
Docket: 96/129

Proceedings: affirming (1996), 8 R.P.R. (3d) 214 (Nfld. T.D.)

Counsel: *Michael Crosbie* , for the Appellants.
*Janet Henley Andrews* , for the Respondent.

Subject: Property

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

**Easements --- Creation of easements — Express grant — General**

Garage owner and gas company owned adjoining lands — Settlement agreement granted garage owner permission to continue parking vehicles on gas company's land — Year later, garage owner given 30 days notice to remove vehicles — Application for order directing removal granted and counter-application for removal of barrier dismissed — Parties had not intended to create easement — Contractual licence created — Garage owner's appeal was dismissed.

**Easements --- Definitions — Licence**

Garage owner and gas company owned adjoining lands — Settlement agreement granted garage owner permission to continue parking vehicles on gas company's land — Year later, garage owner given 30 days notice to remove vehicles — Application for order directing removal granted and counter-application for removal of physical barrier dismissed — Parties had not intended to create easement — Contractual licence created — Agreement terms were to continue only so long as mutually satisfactory — Licence revocable by gas company at any time and reasonable notice had been given — Garage owner's appeal was dismissed.

**Estoppel --- Estoppel in pais — Elements — Detrimental reliance — Necessity for prejudice**

Garage owner and gas company owned adjoining lands — Settlement agreement granted garage owner permission to continue parking vehicles on gas company's land — Year later, garage owner given 30 days notice to remove vehicles — Application for order directing removal granted and counter-application for removal of physical barrier dismissed — No evidence of detrimental reliance on part of garage owner or encouragement by gas company — Garage owner's appeal was dismissed — Neither doctrine of estoppel nor doctrine of licence acted upon applicable.

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

Adjoining commercial properties were owned by a garage owner and a gas company. The garage owner leased the gas company's property and operated a gas bar for it. The contractual arrangement and the lease were terminated. The settlement granted the garage owner permission to continue to park vehicles on the property. The gas company erected a barrier diminishing the parking area after tearing down the gas bar, removing the gas tanks and decontaminating the soil. One year later, the garage owner was given 30 days notice to cease parking vehicles on the property. The gas company brought an application for an order directing the garage owner to remove the vehicles after he refused. The garage owner brought a counter-application for an order directing the gas company to remove the barrier and provide an area for parking. The application was granted by the trial judge and the counter-application was dismissed. The garage owner appealed the decision.

**Held:** The appeal was dismissed.

Per Cameron J.A. (O'Neill J.A. concurring): The trial judge correctly found that there was no intention to create an easement based on the lack of precision and vagueness of terms in the agreement and that the language used suggested a personal right or licence rather than a right attached to the land. A contractual licence was created by the agreement. There was no property right associated with the licence and an obligation not to revoke the licence could not be implied from the nature of the parking arrangement. The licence was not irrevocable by application of the doctrine of estoppel. There was no evidence that the garage owner was requested or encouraged to spend money on the occupancy of the land or that there was a reasonable understanding by the gas company that any money spent on the land was done so in expectation of being able to remain on the land. The parking was a repetitive act, not a permanent one. The doctrine of licence acted upon was also not applicable.

References in the document to businesses on both properties indicated an intention by the parties to continue their symbiotic relationship as long as both businesses were in existence. After this, the relationship could be terminated upon reasonable notice. The termination by the gas company was permitted and the notice period specified by the trial judge was acceptable.

Per Green J.A. (dissenting): The trial judge correctly rejected the arguments for characterizing the arrangement as an easement or supportable by the doctrine of estoppel. The parking privileges were in the nature of a contractual licence. However, the trial judge incorrectly interpreted the settlement agreement by deciding that the agreement was one which could be unilaterally changed and terminated by one party to the prejudice of the other.

The use of the phrase "mutually satisfactory" did not lead to the conclusion that the gas company could unilaterally decide to terminate the parking privileges if it chose not to agree on an alteration of terms. It is clear that the parties intended to make a contract. They intended to settle all outstanding matters existing between them and create new legal rights by the termination of the lease, the payment of money and creation of a right of first refusal. It was not reasonable to assume that they did not intend to finalize their legal position respecting parking. The only reasonable interpretation of the agreement was that the garage owner had agreed in part in return for the continuation of the parking privileges. The parking privileges were not regarded as something trifling or capable of being eliminated in a perfunctory manner. The nature of the arrangement was that there was to be a mutual accommodation of each party's respective interests. The notion of good faith performance and a duty to cooperate in the accommodation of the mutual interests of the parties gave meaning to the "mutually satisfactory" requirement. It required each party to attempt to accommodate in good faith before exercising any right to terminate. This interpretation arose naturally out of the express language of the clause, was supported by the surrounding background circumstances and was not inconsistent with the words of the agreement. The gas company had not acted in good faith in its dealings with the garage owner and made no attempt to accommodate. The gas company was in breach of the agreement and the appeal should be allowed with remedies as set out.

## Table of Authorities

**Cases considered by *Cameron J.A.* (*O'Neill J.A.* concurring):**

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

*Armstrong v. Sheppard & Short Ltd.*, [1959] 2 Q.B. 384 (Eng. Q.B.) — considered

*Chandler v. Kerley*, [1978] 2 All E.R. 942 (Eng. C.A.) — referred to

*Coniagas Reduction Co. v. Ontario Hydro-Electric Power Commission*, [1933] 3 W.W.R. 134, [1933] 3 D.L.R. 337 (Ontario P.C.) — distinguished

*E.R. Ives Investments Ltd. v. High*, [1967] 2 Q.B. 379, [1967] 1 All E.R. 504 (Eng. C.A.) — referred to

*Errington v. Errington*, [1952] 1 All E.R. 149, [1952] 1 K.B. 290 (Eng. C.A.) — referred to

*Fort Frances (Town) v. Boise Cascade Canada Ltd.*, *(sub nom. Boise Cascade Canada Ltd. v. R.)* [1983] 1 S.C.R. 171, 143 D.L.R. (3d) 193, 46 N.R. 108 (S.C.C.) — referred to

*Gill Brothers v. Mission Sawmills Ltd.*, [1945] 2 W.W.R. 337, [1945] 3 D.L.R. 506 (B.C. C.A.) — considered

*Gypsum Carrier Inc. v. R.* (1977), [1978] 1 F.C. 147, 78 D.L.R. (3d) 175 (Fed. T.D.) — referred to

*Hopgood v. Brown*, [1955] 1 W.L.R. 213, [1955] 1 All E.R. 550 (Eng. C.A.) — distinguished

*Hurst v. Picture Theatres Ltd.*, [1915] 1 K.B. 1 (Eng. K.B.) — considered

*Inwards v. Baker*, [1965] 2 Q.B. 29, [1965] 1 All E.R. 446 (Eng. C.A.) — referred to

*Liggins v. Inge* (1831), [1824-34] All E.R. 754, 7 Bing. 682, 5 Moo. & P. 712 (Eng. C.P.) — distinguished

*Llanelly Railway & Dock Co. v. London & North Western Railway* (1873), 8 Ch. App. 942, 29 L.T. 357, 42 L.J. Ch. 884, 21 W.R. 889 (Eng. C.A.) — considered

*Llanelly Railway & Dock Co. v. London & North Western Railway* (1875), L.R. 7 H.L. 550 (U.K. H.L.) — referred to

*London Borough of Hounslow v. Twickenham Garden Developments Ltd.*, [1970] 3 All E.R. 326, [1971] 1 Ch. 233, [1970] 3 W.L.R. 538, 114 Sol. Jo. 603 (Eng. Ch.) — considered

*Plimmer v. Wellington Corp.* (1884), 9 App. Cas. 699 (New Zealand P.C.) — referred to

*Robinson v. Galt Chemical Products Ltd.*, [1933] O.W.N. 502 (Ont. C.A.) — referred to

*Spenborough (Borough) v. Cooke Sons & Co.*, [1968] 1 Ch. 139 (Eng. Ch. Div.) — applied

*Stiles v. Tod Mountain Development Ltd.* (1992), 22 R.P.R. (2d) 143, 64 B.C.L.R. (2d) 366, 88 D.L.R. (4th) 735 (B.C. S.C.) — referred to

*Vaughan v. Hampson* (1875), 33 L.T. 15 — referred to

*Ward v. Kirkland* (1965), [1967] Ch. 194, [1966] 1 All E.R. 609 (Eng. Ch. Div.) — referred to

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

*Winter v. Brockwell* (1807), 103 E.R. 359 (Eng. K.B.) — distinguished

*Winter Garden Theatre (London) Ltd. v. Millenium Productions Ltd.* (1947), [1948] A.C. 173, [1947] 2 All E.R. 331 (U.K. H.L.) — considered

*Wyatt v. Franklin* (1993), 122 N.S.R. (2d) 252, 338 A.P.R. 252 (N.S. S.C.) — referred to

**Cases considered by *Green J.A.* (dissenting):**

*Atlific (Nfld.) Ltd. v. Hotel Buildings Ltd.* (1994), 120 Nfld. & P.E.I.R. 91, 373 A.P.R. 91 (Nfld. C.A.) — referred to

*Atlific (Nfld.) Ltd. v. Hotel Buildings Ltd.* (1995), 185 N.R. 400 (note), 139 Nfld. & P.E.I.R. 90 (note), 433 A.P.R. 90 (note) (S.C.C.) — referred to

*Bank of New Zealand v. Simpson*, [1900] A.C. 182, 48 W.R. 591 (New South Wales P.C.) — considered

*Beer v. Bowden* (1976), [1981] 1 W.L.R. 522, [1981] 1 All E.R. 1070 (Eng. C.A.) — considered

*Canada Law Book Co. v. Boston Book Co.* (1922), 64 S.C.R. 182, 66 D.L.R. 209 (S.C.C.) — referred to

*Canada Square Corp. v. Versafood Services Ltd.* (1981), 34 O.R. (2d) 250, 15 B.L.R. 89, 130 D.L.R. (3d) 205 (Ont. C.A.) — considered

*Dahl v. Nelson, Donkin & Co.* (1881), 6 App. Cas. 38, [1881-5] All E.R. Rep. 572, 29 W.R. 543, 4 Asp. Mar. Law Cas. 392 (U.K. H.L.) — considered

*Empress Towers Ltd. v. Bank of Nova Scotia* (1990), 50 B.C.L.R. (2d) 126, [1991] 1 W.W.R. 537, 14 R.P.R. (2d) 115, 48 B.L.R. 212, 73 D.L.R. (4th) 400 (B.C. C.A.) — considered

*Foley v. Classique Coaches Ltd.*, [1934] 2 K.B. 1 (Eng. C.A.) — considered

*Fort Frances (Town) v. Boise Cascade Canada Ltd.*, *(sub nom. Boise Cascade Canada Ltd. v. R.)* [1983] 1 S.C.R. 171, 143 D.L.R. (3d) 193, 46 N.R. 108 (S.C.C.) — distinguished

*Gill Brothers v. Mission Sawmills Ltd.*, [1945] 2 W.W.R. 337, [1945] 3 D.L.R. 506 (B.C. C.A.) — referred to

*Gill Brothers v. Mission Sawmills Ltd.*, [1945] S.C.R. 766, [1945] 4 D.L.R. 449 (S.C.C.) — referred to

*Greenberg v. Meffert* (1985), 50 O.R. (2d) 755, 18 D.L.R. (4th) 548, *(sub nom. Greenberg v. Montreal Trust Co.)* 9 O.A.C. 69, 7 C.C.E.L. 152, 37 R.P.R. 74 (Ont. C.A.) — considered

*Greenberg v. Meffert*, 64 N.R. 156 (note), 56 O.R. (2d) 320 (note), 30 D.L.R. (4th) 768 (note), 14 O.A.C. 240 (note), [1985] 2 S.C.R. ix (note) (S.C.C.) — referred to

*Hillas & Co. v. Arcos Ltd.*, 38 Com. Cas. 23, [1932] All E.R. Rep. 494, 147 L.T. 503, 40 Lloyd's Rep. 307 (U.K. H.L.) — considered

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 6 of 378

Imperial Oil Ltd. v. Young, 1998 CarswellNfld 224

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

*Hurst v. Picture Theatres Ltd.*, [1915] 1 K.B. 1 (Eng. K.B.) — referred to

*Labrador Inuit Assn. v. Newfoundland (Minister of Environment & Labour)* (1997), 152 D.L.R. (4th) 50, 155 Nfld. & P.E.I.R. 93, 481 A.P.R. 93, 25 C.E.L.R. (N.S.) 232 (Nfld. C.A.) — considered

*Llanelly Railway & Dock Co. v. London & North Western Railway* (1873), 8 Ch. App. 942, 29 L.T. 357, 42 L.J. Ch. 884, 21 W.R. 889 (Eng. C.A.) — referred to

*Llanelly Railway & Dock Co. v. London & North Western Railway* (1875), L.R. 7 H.L. 550 (U.K. H.L.) — referred to

*London Borough of Hounslow v. Twickenham Garden Developments Ltd.*, [1970] 3 All E.R. 326, [1971] 1 Ch. 233, [1970] 3 W.L.R. 538, 114 Sol. Jo. 603 (Eng. Ch.) — referred to

*McKinlay Motors Ltd. v. Honda Canada Inc.* (1989), 46 B.L.R. 62, 80 Nfld. & P.E.I.R. 200, 249 A.P.R. 200 (Nfld. T.D.) — considered

*"Moorcock" (The)* (1889), 14 P.D. 64 (Eng. C.A.) — referred to

*Newfoundland (Attorney General) v. Churchill Falls (Labrador) Corp.* (1983), 49 Nfld. & P.E.I.R. 181, 145 A.P.R. 181 (Nfld. T.D.) — referred to

*Reardon Smith Line v. Hansen-Tangen*, [1976] 1 W.L.R. 989, [1976] 3 All E.R. 570 (U.K. H.L.) — considered

*Shirlaw v. Southern Foundries (1926) Ltd.*, [1939] 2 K.B. 206, [1939] 2 All E.R. 113 (Eng. C.A.) — referred to

*Spenborough (Borough) v. Cooke Sons & Co.*, [1968] 1 Ch. 139 (Eng. Ch. Div.) — considered

*Trentham Ltd. v. Archital Luxfer Ltd.*, [1993] 1 Ll. L. Rep. 25 (Eng. C.A.) — considered

*Winter Garden Theatre (London) Ltd. v. Millenium Productions Ltd.* (1947), [1948] A.C. 173, [1947] 2 All E.R. 331 (U.K. H.L.) — considered

*Wyatt v. Franklin* (1993), 122 N.S.R. (2d) 252, 338 A.P.R. 252 (N.S. S.C.) — considered

**Statutes considered by *Green J.A.* (dissenting):**

*Judicature Act*, R.S.N. 1990, c. J-4
　　Generally — referred to

APPEAL from judgment reported at (1996), 8 R.P.R. 214 , 142 Nfld. & P.E.I.R. 280, 445 A.P.R. 280 (Nfld. T.D.) granting application for order directing removal of vehicles from property.

***Cameron J.A.* (O'Neill J.A. concurring):**

1　　This is an appeal from a decision of Puddester J. of the Trial Division in which he held that an arrangement for parking of vehicles contained in a Settlement Agreement between the parties was, at most, a contractual licence for an indefinite period, which could be terminated upon reasonable notice. Though the trial judge held that reasonable notice had been given by the respondent to the appellants, he granted the appellants 60 days from the date of the formal order to remove vehicles and other

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

equipment parked on the respondent's land. The appellants were also enjoined from further parking or otherwise using the respondent's land following the expiration of the 60 day period.

**Background**

2    The appellants [1] and the respondent are owners of adjoining lands on King's Bridge Road, St. John's, Newfoundland. For a number of years Young leased the neighbouring Imperial property and operated the gas bar at that location, selling, of course, Imperial products. At the same time Young had a garage and tire sales business on the "Young property." During the time the gas bar was operated by him, Young began parking vehicles associated with the garage (i.e., customers' or employees' vehicles) on the "Imperial property". This arrangement worked well as long as Young was controlling the activities on both parcels of land.

3    About June of 1985, Imperial and Young agreed to terminate their contractual relationship, including the lease of the Imperial property. This agreement to terminate was arrived at in the context of an ongoing dispute between the parties respecting amounts owned by the one to the other for products sold. The interpretation of the Settlement Agreement signed by the parties at that time is central to this appeal and therefore it is reproduced in full.

THIS AGREEMENT made the 18th day of June, Anno Domini, One thousand nine hundred and eight-five

BETWEEN JAMES YOUNG of St. John's, in the Province of Newfoundland Company Director, and KING'S BRIDGE SERVICE STATION COMPANY LIMITED, (hereinafter collectively called "Young") of the one part

AND IMPERIAL OIL LIMITED , a body corporate incorporated under the laws of Canada and having an office at St. John's, in the Province of Newfoundland, (hereinafter called "Imperial") of the other part

WHEREAS pursuant to an Esso Dealer Service Station Lease dated May 1, 1977, (the "Lease") made between Imperial as the Lessor of the one part and James Young as Lessee of the other part, Imperial leased to Young certain premises for the purpose of the retail sale of gasoline and other motor fuels at King's Bridge Road, St. John's, Newfoundland, subject to the terms and conditions set forth therein;

AND WHEREAS Imperial and Young have mutually agreed to sever their relationship subject to the terms and conditions hereinafter appearing with the objective that another party will operate the said facilities commencing on or about June 15, 1985;

NOW THEREFORE THIS AGREEMENT WITNESSETH that for and in consideration of the mutual covenants and conditions hereinafter appearing, the parties hereto mutually covenant and agree as follows:

1. Imperial shall pay to Young on or before the execution of this Agreement the sum of Forty thousand dollars ($40,000.00) in full and final settlement of any and all severance entitlement which Young has in respect of the termination of his retail motor fuel sales outlet at King's Bridge Road, St. John's, Newfoundland.

2. Young agrees to surrender the Lease to Imperial and to release Imperial from any claims, demands, actions or suits of any kind whatsoever in any way connected with or in any way arising form the relationship between Young and Imperial in respect of the said outlet at St. John's, Newfoundland.

3. Imperial acknowledges that Young has enjoyed certain parking privileges on the property subject to the Lease in respect of Young's tire sales operation on property of Young immediately adjacent to the property described in the Lease. Imperial undertakes to continue these parking privileges beyond the termination of the Lease on a basis mutually satisfactory to Imperial and Young.

4. In respect of the service station building owned by Young immediately adjacent to the property subject to the Lease, Young agrees to grant Imperial the right of first refusal to purchase or lease the said building of Young and the land thereon on the terms of any bona fide written offer received by Young which Young is willing to accept. Young shall send such written offer to Imperial and Imperial shall have thirty (30) days within which to notify Young that it elects

**WestlawNext** CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Imperial Oil Ltd. v. Young, 1998 CarswellNfld 224

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

to purchase or lease the property on the terms of such offer. If the offer does not consist wholly of cash, Imperial shall have the right to meet the terms of such offer with a reasonable equivalent in cash. In the event that Imperial does not exercise its right to purchase or lease the said property, Young shall be at liberty at the expiration of the said period of thirty (30) days to sell or lease the property on the terms and conditions contained in the bona fide written offer.

IN WITNESS WHEREOF the parties hereto have hereunto their hands and seals subscribed and set the day and year first before written.

SIGNED SEALED AND DELIVERED
by JAMES YOUNG in the presence of:                        "JAMES YOUNG"
"WILLIAM ROWE"                                                          (SEAL)
A Barrister
THE CORPORATE SEAL of KING'S BRIDGE SERVICE          KING'S BRIDGE SERVICE STATION
STATION                                                             COMPANY LIMITED
COMPANY LIMITED was hereunto affixed in the presence of:  "JAMES YOUNG"
WILLIAM N. ROWE"                                            "GERALDINE YOUNG"
                                                                              (SEAL)
SIGNED SEALED AND DELIVERED                            IMPERIAL OIL LIMITED
by IMPERIAL OIL LIMITED in the presence of:

                                                            PER: "R. W. SMITH"
                                                            Retail Area Manager - Newfoundland


[illegible ]

4    The 1977 lease referred to in the Settlement Agreement was for three years from May 1, 1977. Imperial's position is that effective May 1, 1980 the proper characterization of the lease of the Imperial property was a "month to month tenancy" and consequently on relatively short notice, Imperial could have terminated the lease. Unfortunately the lease was not placed in evidence and the trial judge was unable to make a finding on that point. At para. 172 he said:

I do not think significant weight can be placed on this aspect, for or against the position of either party here. The most that can be said is that there would presumably have been some contractual right under the previous arrangement by which the defendants' right to occupy the plaintiff's land could have been brought to an end. (Whether such a step would have resulted in a claim for ancillary damages by or against either party is another issue.)

5    Between June 1985 and December 1993, when another person operated the gas bar for Imperial, Young was able to continue to use the Imperial property for parking, essentially as he had done before. Young, in turn, permitted patrons of the gas bar to use the washroom at the garage. In December 1993 Imperial ceased operating a gas bar at its King's Bridge property. Thereafter buildings were removed, as were storage tanks (both above and underground) and contaminated soil. Young continued to use the Imperial property for parking, or, more accurately, that portion of the Imperial property that was outside a barrier erected by Imperial in February 1994. (It is Young's position that prior to the erection of the barrier there was room to park up to 25 vehicles, now there is room for only up to 7 vehicles.)

6    An environmental assessment of the Imperial property carried out in 1994 identified two areas of residual soil contamination. One of those areas is near the land which continues to be used by Young for parking. Imperial claims that to complete the efforts to remove contamination it needs access to the area on Imperial property, currently being used by Young for parking vehicles, and also that once the clean-up is completed, it does not want further use of Imperial property by Young for parking of vehicles, thereby risking recontamination of the soil.

7    In August 1994, solicitors for Imperial gave notice to the solicitors for Young that parking privileges would cease in thirty days. Young took the position that Imperial had no right to terminate its parking privileges. Imperial brought an application in Trial Division for an order directing Young to remove vehicles parked by Young or at Young's direction on the Imperial property and requested an injunction prohibiting further use of the land by Young. Young, in turn, sought an order directing Imperial

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

to remove the barrier erected by Imperial which interfered with Young's ability to park vehicles on the Imperial property and other directions regarding the future use of the property.

8    Before this Court and the Trial Division, the argument centred around the interpretation of the Settlement Agreement. The trial judge, as noted above, held that the arrangement between the parties respecting parking amounted, at most, to a contractual licence for an indefinite period, which was terminable upon reasonable notice and further that reasonable notice had been given in this case.

**Arguments of the appellants**

*(1) presumption of irrevocability*

9      In support of the position that the trial judge is in error, Young makes several submissions, some intertwined, some independent of each other. The first submission, based on *Llanelly Railway & Dock Co. v. London & North Western Railway* (1873), 8 Ch. App. 942 (Eng. C.A.) , and *Gill Brothers v. Mission Sawmills Ltd.*, [1945] 2 W.W.R. 337 (B.C. C.A.) , is that *prima facie* every contract is irrevocable, in the absence of something in the contract itself or in the nature of the contract from which it can be inferred that it was not intended to be permanent and perpetual, that is the way contracts will be interpreted.

10    There is no specific reference in the Settlement Agreement to a method of terminating the parking arrangement. However, I believe that the appellant states the principles, if indeed it can be described as a principle, too broadly. The House of Lords affirmed the *Llanelly* decision ((1875), L.R. 7 H.L. 550 (U.K. H.L.)). Lord Selbourne said at p. 567:

> ...an agreement *de futuro* , extending over a tract of time which, on the face of the instrument, is indefinite and unlimited, must (in general) throw upon anyone alleging that it is not perpetual, the burden of proving that allegation, either from the nature of the subject, or from some rule of law applicable thereto.

Lord Selbourne's statement may be at best limited support for the proposition put by the appellants. He appears to acknowledge, at least, that certain types of contract would not be considered perpetual.

11    *Winter Garden Theatre (London) Ltd. v. Millenium Productions Ltd.* (1947), [1948] A.C. 173 (U.K. H.L.) concerned the right of one party to terminate a licence to use a theatre for producing stage plays, the right of the other to do so having been specified in the contract. In that case Lord MacDermott, in finding a right to terminate, expressed the view that the above quote from Lord Selbourne in *Llanelly* was not a universal rule of construction and doubted that it was intended to deal with situations such as occurred in *Winter Garden* . Lord Porter, at p. 195 of *Winter Garden* , went so far as to express the opinion that, prima facie, licences are revocable. [2]  In *Spenborough (Borough) v. Cooke Sons & Co.*, [1968] 1 Ch. 139 (Eng. Ch. Div.) at p. 147 Buckley J. concluded that there is no presumption one way or the other.

12    In Canada, there has been similar controversy respecting the application of a presumption. In *Gill* , cited by the appellants, while the Supreme Court of Canada appears, in dicta, to accept that contracts with no stipulation as to duration are prima facie perpetual, the Supreme Court proceeds upon the basis that no appeal was taken from the trial judge's decision that the contract was terminable upon reasonable notice.

13    In the context of this case, I see no need to rely on any presumption. I find myself in agreement with the statement of Buckley J in *Spenborough* when he said at pp.146-47:

> Authority establishes that, where an agreement does not in terms confer on the parties or one of them a power to determine the agreement, whether such a power should be inferred is a question of construction of the agreement to be determined in accordance with the ordinary principles applicable to such a question. ...Since ex hypothesi such an agreement contains no provision expressly dealing with determination by the party who asserts that this should be inferred, the question is not one of construction in the narrow sense of putting a meaning on language which the parties have used, but in the wider sense of ascertaining, in the light of all the admissible evidence and in the light of what the parties have said or omitted to say in the agreement, what the common intention of the parties was in the relevant respect when they entered into the agreement.

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

...An agreement which is silent about determination will not be determinable unless the facts of the case, such as the subject of the agreement, the nature of the contract or the circumstances in which the agreement was made support a finding that the parties intended that it should be determinable, ....

### (2) easement

14     The appellants did not argue, nor is there a factual basis to support the creation of an easement for parking by prescription or an easement of necessity. The trial judge while holding that it was possible to have an easement for parking of motor vehicles, particularly by means of a written agreement, rejected the submission that one existed in this case.

15     The trial judge's examination of the parking arrangement was based on the generally stated elements required for an easement: the existence of both a dominant and servient tenement, the absence of unity of ownership or occupancy of both tenements, the nature of the use in question being to benefit or improve the enjoyment of the dominant tenement, and the use being a type which is capable of being granted at law. Further, the use in question cannot be totally inconsistent with the continuing possessory rights of the owner of the servient property over its land. However, the trial judge also noted, quoting *Gypsum Carrier Inc. v. R.* (1977), 78 D.L.R. (3d) 175 (Fed. T.D.) , that the presence of all of the elements is not determinative of the issue as that question must, particularly in the case of a written agreement, be determined on the basis of the intent of the parties. I agree with the trial judge that in deciding this case one must look to the intention of the parties both as to the characterization of the parking arrangement and to ascertain if the agreement may be terminated. There are, of course, a number of interests or rights that resemble easements. Indeed, Bruce Ziff, in *Principles of Property Law* (2d ed.) (1996), illustrates this point by saying at p. 333:

> Think of a simple agreement between landowners to allow B's car to be parked on A's driveway. This arrangement could take the form of a lease of a parking space, an easement, a licence, or a bailment.

So then, although the elements of an easement may be present one must still look to the intent of the parties to determine if they intended to create an easement or some other type of arrangement for parking. The analysis which follows of the settlement agreement is directed to determining just what type of interest, if any, was acquired by the appellants. That same analysis becomes important again when examining the question of termination of any rights which the appellants might have acquired.

### (3) the settlement agreement

16     The trial judge looked to the wording of Clause 3 which said:

> Imperial acknowledges that Young has enjoyed certain privileges on the property subject to the Lease in respect of Young's tire sales operation on property of Young immediately adjacent to the property described in the Lease. Imperial undertakes to continue these parking privileges beyond the termination of the Lease on a basis mutually satisfactory to Imperial and Young.

> (Emphasis added)

The argument of the appellants includes a submission that the conclusions of the trial judge respecting the wording used in Clause 3 were in error.

### (a) wording of Clause 3

17     Young argues that words and phrases such as "acknowledges", "Imperial undertakes to continue", "parking privileges", "on a basis mutually satisfactory to Imperial and Young" all indicate the intention of the parties that the arrangement be continued perpetually, or at least do not indicate the contrary.

18     The submission of the appellants regarding the word "acknowledge" merely asks the question why use "acknowledge" if parking was not intended to be something of permanence? (In fact, both parties could use this approach respecting the language

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

used in the Agreement as there certainly were better and more precise methods of creating an easement, if that was intended, or being more specific about notice of termination, if the parties intended that the parking arrangement could be terminated by either party.) As to "acknowledge", I am unable to conclude that that word signifies permanence. The fact is that the appellants had been using the Imperial property for parking for some time prior to the signing of the Settlement Agreement because the appellants had possession of both the Young and the Imperial properties, one as owner and the other as lessee. Neither that fact, nor the acknowledgement that parking privileges existed in the past, aid in determining the nature of the parking arrangement under the Settlement Agreement.

19    The appellants argue that the use of the word "undertakes" connotes not just a covenant to continue but a solemn vow to continue - a personal bond or guarantee. The "tone" of the word "undertakes" in the appellant's submission, is that the parties intended something of permanence. The trial judge agreed that "undertakes" seemed stronger than "will" or "shall" but he was not prepared to accept that the use of the word itself implied non-revocability. I see no error in that conclusion.

20    The appellants, quoting from Black's Law Dictionary (6th ed) (1990), state that privilege means:

> Particular and peculiar benefit or advantage enjoyed by a person, company or class, beyond the common advantages of other citizens. An exceptional or extraordinary power or exemption, a peculiar right, advantage, exemption, power, franchise or immunity held by a person or class, not generally possessed by others.

The respondent does not quarrel with this definition. The appellants argue that the use of the words "parking privileges" are "descriptive of the situation in 1985 and do not derogate from the connotation of permanence created by the other words used in the parking clause."

21    Prior to the Settlement Agreement the parking privileges which had been exercised were those given by James Young, as lessee of the Imperial property, to himself or the corporate appellant which he controlled. Such an arrangement could only last during the currency of the lease. Under such an arrangement it was easy, and beneficial, for Young to ensure that the parking related to the tire sales business did not interfere with this operation of the gas bar. As there had been unity of occupancy of both tenements prior to the Settlement Agreement, there could be no easement prior to 1985 and if the parties intended to "*continue these parking privileges* " in the same form as had existed prior to the Agreement, they did not intended an easement.

22    The appellants argue that the phrase "on a basis mutually satisfactory to Imperial and Young" indicates the intention of the parties that any change to the parking privileges must be agreed to by both parties; that had it been intended that Imperial be able to terminate the arrangements, Clause 3 would have contained an undertaking to continue the parking privileges until notice by Imperial or on a basis solely satisfactory to Imperial. However, the appellants seem to acknowledge that this is not a completely subjective decision when they say "the meaning of those words is that Imperial has to provide parking on its property of a nature and type that would be satisfactory to two people in the objective circumstances of Imperial and the Appellants acting reasonably and in good faith."

23    The respondent submits that "on a basis mutually satisfactory to Imperial and Young" makes it clear that it was not intended that a specific right be granted but that the parking arrangement would continue on a basis which, from time to time, was satisfactory not only to the appellants but also to the respondent. In other words, the parking would continue as long as it was agreeable to both parties. This of course is in direct contradiction to the view of the appellants which is that to change the parking arrangements the agreement of both parties was required.

24    Interestingly, the written argument of the appellants illustrates, I believe, the error in the logic of their submission on this point. In the factum there is a passage which says:

> If parking is satisfactory to only one party, then it is not mutually satisfactory; it is only self-satisfactory and self-satisfactory is not what the Settlement Agreement requires. It is a breach of the Settlement Agreement if the parking privileges are discontinued on a basis satisfactory only to Imperial. In order for the parking privileges to be discontinued, discontinuance of the parking privileges has to be on a basis mutually satisfactory to the Appellants and Imperial.

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

In the second sentence of the quote the focus switches from continuing the parking privileges and the requirement that the basis for the continuance be the satisfaction of both parties, to the requirement that both parties must agree before any change is made.

25      The trial judge found the lack of precision and vagueness of the terms of the Settlement Agreement was support for the view that the parties did not intend to create an easement, but something less than a "formal" interest in land by way of an easement. The appellants submit that failure to be specific was not an indication of some desire for a less formal arrangement but an indication that the parties wanted an easement rather than a deed of grant which might have been the nature of the arrangement had the parties detailed the number and location of the parking spots. The trial judge further concluded that the language used - referring to the existence of a parking privilege connected with Young's business - suggests a personal right (licence) rather than a right which attaches to the land itself. The appellants argue that, contrary to the trial judge's reasoning, the fact that there was a reference to the location of Young's business indicates that it was not intended that there be a personal right but that the parking right be associated with Young's business which was located next door. I would agree with the trial judge's assessment on this point - the references to Young's having enjoyed privileges and to Young's tire sales are indicative of personal permission being granted rather than some right attaching to the land.

26      The appellants further submit that the words "Imperial undertakes to continue" contain an express or, alternatively, an implied obligation not to revoke the parking privileges. As support for this submission *Hurst v. Picture Theatres Ltd.*, [1915] 1 K.B. 1 (Eng. K.B.) ; *London Borough of Hounslow v. Twickenham Garden Developments Ltd.* (1970), [1971] 1 Ch. 233 (Eng. Ch.) ; and *Coniagas Reduction Co. v. Ontario Hydro-Electric Power Commission*, [1933] 3 D.L.R. 337 (Ontario P.C.) are cited. The first two cases, along with *Vaughan v. Hampson* (1875), 33 L.T. 15 , are also cited for the alternative argument that if the interest created by the Settlement Agreement is a licence then it is a licence coupled with an interest, which is irrevocable. The analysis of the Settlement Agreement as an instrument creating a licence will be discussed below and I found the cases cited helpful in that context but of no benefit in determining the meaning of "Imperial undertakes to continue." I have already indicated that the use of the word continue could be said to support the view that the parking arrangement was not to be an easement.

*(b) nature of the settlement agreement*

27      The appellants also argue that the nature of the Settlement Agreement itself indicates the intention of the parties to create an irrevocable arrangement for parking. The factors cited by the appellants in support of this interpretation are as follows: (i) the agreement severed a long relationship; (ii) the nature of settlement agreements is that they are intended to be permanent; (iii) it is not logical to think that the appellants would enter into an agreement where three covenants are permanent and one can be terminated upon notice, particularly it is illogical to construe the agreement so that Imperial gets a perpetual right of first refusal on the sale of the Young property but Young gets only a licence to park revocable upon notice; (iv) the parking privileges were given not for periodic payments but for permanent surrender of the lease; and (v) the covenants are mutual and interdependent and cannot be severed the one from the other but Imperial is seeking to terminate only one of them.

28      Before this Court, as they had in their submissions to the trial judge, the appellants argue, that aside from the common sense of the argument that the parties intended that all of the covenants be perpetual, the Settlement Agreement specifically provides that the undertakings and covenants by one side are the consideration for the undertakings and covenants by the other. [3] The appellants note that they were permanently surrendering a lease to Imperial, were permanently granting a first right of refusal in respect of the Young property and were permanently releasing Imperial from any claims arising out of the relationship between the parties in respect of the motor fuel sales outlet located on Imperial property. They submit it would be illogical for them to accept a parking arrangement which could be terminated at any time.

29      In fact, when one examines the document itself, the payment of $40,000 is said to be "in full and final settlement of any and all severance entitlement which Young has in respect of the termination of this retail motor fuel sales outlet at King's Bridge Road, St. John's, Newfoundland." So then, by Clause 1 of the Settlement Agreement it is the payment of the $40,000 which settled the matter of the money owing between the parties. There is no mention of other consideration, or the other covenants in that Clause.

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

30      However, the trial judge appeared to accept that the covenants were mutual and this review of his conclusion proceeds on the premise that he was right in that conclusion. The trial judge quoted from *Odgers' Construction of Deeds and Statutes* , (5th ed) (1997) at p. 210:

> Where the dependency arises from the *nature* of the covenants, if A is the *sole* consideration for B, A must be done or be offered to be done before suing for B. That is to say, the covenants are dependent; but if A is only *part* of the consideration for B and the non-performance of A can be compensated by damages, an action can be brought in respect of B without averring performance or offer of performance of A. In other words, the covenants are independent.
>
> . . . . .
>
> Lord Mansfield said in **Boone v. Eyre** (1779), 1 H.B. 1 . 273 said:
>
> The distinction is very clear: where mutual covenants go to the whole of the consideration on both sides, they are mutual covenants, the one precedent to the other. But where they go only to a part, where a breach may be paid for in damages, it is a different thing.

31      As to the argument that the parking privileges must be perpetual because the other "mutual" convenants are perpetual, the trial judge said:

> ... it is not correct to say that in a negotiated contract, because the consideration granted by one side is 'permanent', the consideration granted in return is implied as being of the same duration. It is quite logical that in this, and in any other, contractual arrangement a party may agree to exchange certain permanent and irrevocable consideration, in return in whole or in part for some benefit itself of a fixed term, or indeed which is determinable by mutual agreement, or even by a failure to be able to reach agreement on its continuation.

Later he notes that the appellants acknowledged that, in principle, circumstances could occur under which it would be unreasonable to expect that Imperial continue to permit parking, though of course, the appellants deny that such circumstances are present in this case.

32      In *Spenborough* , as noted above, Buckley J. takes the position that there is no presumption either in favour or against permanence of a licence. He also takes into consideration whether the interpretations proposed by the parties are commercially sensible.

33      The appellants argue that Imperial is not seeking termination of the whole Settlement Agreement, but just the clause respecting parking privileges. In light of the fact that Young cannot be restored to its original position, it is submitted that Imperial should not be permitted to be relieved of its bargain while retaining contractual benefits. The appellants rely on *Fort Frances (Town) v. Boise Cascade Canada Ltd.*, [1983] 1 S.C.R. 171 (S.C.C.) at p. 191 in support of that position. It should be noted that the Supreme Court of Canada did not have to decide whether a contract of indefinite duration was terminable unilaterally, the parties having agreed that termination in the circumstances of the case was not possible. That case, described by one author as "highly idiosyncratic", [4] concerned a 1905 agreement to supply the electrical requirements of a town at a certain rate. The context of the case included a legislative scheme for development of hydro-electric power. Interestingly, *Fort Francis* is a case where the payment of money periodically supports an undertaking to perform in perpetuity.

34      There appears to be an acceptance that for certain kinds of cases courts are generally unwilling to accept that the parties intended that they be perpetually bound. I would include in that class, *ordinary* business relationships. See *Robinson v. Galt Chemical Products Ltd.*, [1933] O.W.N. 502 (Ont. C.A.) at p. 504. *Fort Frances (Town)* would not fall into that class; neither would *Llanelly* which concerned a contract between two railway companies. The court considered provisions of the agreement and surrounding circumstances, including loan arrangements between the parties and the fact that the railways were subject to regulation which could have ordered one company to have running rights on the other's line in concluding the agreement was intended to be a perpetual one.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

35     Indeed, the nature of the relationship was a factor considered by the trial judge in this case when he said:

> The case here, on the other hand, is one of a purely commercial, business relationship, with each party having commercial value to its own use of the land in question. In such circumstances the cases suggest it is more difficult to imply perpetuity, or even long term duration. From another viewpoint, it might well be expected that in a commercial setting, if a 'minimum' duration was anticipated it would be specified, and that the absence of such specification should tell against such an 'extended term'.

36     On considering all the arguments the trial judge concluded that the appellants had not established the 1985 agreement constitutes an easement in the appellant's favour. I agree with that conclusion.

*(4) licence*

37     On rejecting the argument that an easement had been created by the Settlement Agreement, the trial judge had little difficulty characterizing the arrangement between the parties as that of licensor - licensee. The issue then became what kind of licence. The trial judge found it to be a contractual licence.

38     The appellants argue that if the interest created by the Settlement Agreement is a licence, it is a licence coupled with an interest, which is irrevocable. The *Hydro-Electric* case was concerned with the interpretation of an agreement for supply and purchase of power where one party had been expressly given the power of termination and the other had not. It does not contain similar wording to this case and the fact that termination was addressed for one party distinguishes the circumstances from those in this case. The *Hurst* case concerned a ticket for a seat at a cinema. The court found that the right to see the performance amounted to a grant or interest. As Megarry J. pointed out in *Hounslow*, *Hurst* has been criticised on the basis that for the purpose of deciding whether there is a licence coupled with an interest or grant, the right to see a performance cannot fairly be described as an interest or be the subject-matter of a grant. Megarry J. added: "No authoritative definition of what suffices as an interest for this purpose ever seems to have been given. The examples usually put forward are proprietary in nature, such as the rights that I have mentioned to enter and sever growing timber or crops, to take away timber or crops already severed, and so on." There was, however, an alternative reasoning in both *Hounslow* and *Hurst* : if there is a licence with an agreement not to revoke the licence, that, if given for value, is an enforceable right. *Hounslow* and *Hurst* accepted the idea that if the contract specifies specific rights for specific events there must be at least an implied negative obligation not to revoke the licence (otherwise than in accordance with the contract) while the period is still running. (In that same case Megarry J. expresses doubt about *Vaughan v. Hampson* which suggests that an interest in attending a meeting is sufficient.)

39     In *Megarry's Manual of The Law of Real Property* (7th ed) (1993) at p. 428 a licence coupled with an interest is described as follows:

> A licence may be coupled with an interest in the land or chattels thereon. Thus the right to enter another man's land to hunt and take away the deer killed, or to cut down a tree and remove it, involves the grant of an interests in the deer or tree and also a licence annexed to it to come on the land. The interest must be a recognised interest in property, and it must have been validly created. Thus at law a right to take game or minerals, being a profit à prendre, must have been created by deed or prescription, whereas no formalities are required for the grant of a right to take away chattels, such as felled timber or cut hay....

> A licence coupled with an interest is irrevocable and also assignable, though only with the interest with which it is coupled. It binds successors in title to the land in the same way as that interest.

In his submissions, counsel for the appellants states that the right to park vehicles - the ability to bail vehicles - is a property right.

40     The licence is to park vehicles upon the Imperial land. There is no property right associated with it. Imperial does not have an interest in the vehicles parked and does not attempt to give Young any right in any land or chattel in addition to the parking privilege. Further, unlike the licence to see a cinema show or for access to a property for the purpose of performing a

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

contract, an obligation not to revoke the licence cannot be implied from the nature of a parking arrangement which lacks the limited time frame for the licence which is evident in the examples given above.

41     I agree with the trial judge that the agreement creates a licence and that the nature of the licence is contractual. I shall return later to the interpretation of that licence.

### (5) estoppel and licence acted upon

42     The appellants argue, in the alternative, that if they have a licence to park on Imperial property by virtue of the Settlement Agreement, then that licence is irrevocable either by application of the doctrine of estoppel or pursuant to the doctrine of a licence acted upon. These arguments are similar and are based on the submission that the appellants acted to their own detriment by granting a right of first refusal to Imperial, by giving up the right to sue Imperial and by building up its tire and sales business on the Young property, and that it would be "unjust and unfair and against good conscience to allow Imperial to revoke the parking privileges without returning the Appellants to their original position."

43     The appellants cite, in particular, *Hopgood v. Brown,* [1955] 1 All E.R. 550 (Eng. C.A.) at p. 561:

There was, therefore, something in the nature of mutual licences and it seems to me, as a matter of plain justice and of law, that a person who is enjoying one part of such reciprocal licences cannot at the same time purport to revoke the other part which imposes a burden on him.

In this submission the appellants attempt to draw an analogy between the mutual licences in *Hopgood* and the mutual and reciprocal covenants in the Settlement Agreement. Certainly there are no mutual licences here: the analogy is not appropriate.

44     The trial judge considered six of the eight cases cited by the appellants in support of their position respecting the application of the doctrine of estoppel. (See *Plimmer v. Wellington Corp.* (1884), 9 App. Cas. 699 (New Zealand P.C.) ; *Hopgood v. Brown* , supra; *Inwards v. Baker,* [1965] 1 All E.R. 446 (Eng. C.A.) ; *Chandler v. Kerley,* [1978] 2 All E.R. 942 (Eng. C.A.) ; *Stiles v. Tod Mountain Development Ltd.* (1992), 22 R.P.R. (2d) 143 (B.C. S.C.) and *Wyatt v. Franklin* (1993), 122 N.S.R. (2d) 252 (N.S. S.C.) .) The other two, *Errington v. Errington,* [1952] 1 All E.R. 149 (Eng. C.A.) and *E.R. Ives Investments Ltd. v. High,* [1967] 1 All E.R. 504 (Eng. C.A.) , in my view, add nothing to the principles enunciated in the six specifically dealt with by the trial judge. In *Errington* , the court of appeal held that the arrangement under consideration was a licence with a contractual right to remain on the property. *E.R. Ives* followed, on the issue of estoppel and acquiescence, *Inwards v. Baker* .

45     As to Young building up the tire and sales business on the ability to park on Imperial property, the trial judge was unable to make the factual findings to support such a position. He held:

While it is indeed a fair implication from the affidavits as a whole respecting the "history" of the matter, that the defendants have made use of the plaintiff's land for parking, that is substantially different from asserting, much less establishing, that on the basis of reliance on such parking arrangements, either as they were prior to the agreement or more particularly as at the date of execution of the agreement itself, the defendants have taken any step to their prejudice in "building up" their business or otherwise. As I see it, on this aspect the facts establish that the defendants have indeed historically used the plaintiff's land for parking customer vehicles in connection with the defendant's ongoing business - nothing more and nothing less.

Later he said:

Even if it occurred, increased business operations can hardly be said to be a detriment; rather it may be properly viewed as a benefit derived by the defendants. Beyond this, there is no evidence of the expenditure of funds or similar 'detriment' other than the argued presumed 'increase in business' itself.

In respect of this argument the trial judge held:

**Imperial Oil Ltd. v. Young, 1998 CarswellNfld 224**

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

In summary with respect to the defendants' arguments based on estoppel, in all of the circumstances here I am not persuaded that the facts of this case establish an estoppel operating in favour of the defendants against the plaintiff, precluding revocation of the contractual licence on reasonable notice. I find no evidence of either positive representation, or acquiescence, beyond the terms of the contractual agreement itself, which must be separately considered. I conclude that there is no proof of detrimental conduct following the execution of the agreement, and certainly none as would reasonably bring to the attention of the plaintiff the fact that the defendants must be proceeding on the basis of a perpetual, or even long term, right of use. Similarly, I find no 'estoppel by convention' to arise on the facts of this case.

46     The trial judge conducted a very thorough examination of the estoppel issue. I see no error in his reasoning in rejecting it as a basis for finding an irrevocable licence in this case. First, he found that there was no evidence that the appellants were requested or encouraged by Imperial to spend money on or with respect to their occupancy of Imperial's land, nor that they spent such money, let alone showing a reasonable understanding with Imperial that any money which may have been spent was expended in the expectation of being able to remain permanently. In this analysis the trial judge examined only the actions of the parties subsequent to the Settlement Agreement. I agree with this approach. The Settlement Agreement was analysed in the context of whether the agreement itself created an easement or an irrevocable licence and should not be part of the analysis under the estoppel issue.

47     The appellants also argue, citing *Winter v. Brockwell* (1807), 103 E.R. 359 (Eng. K.B.) ; *Liggins v. Inge* (1831), [1824-34] All E.R. 754 (Eng. C.P.) ; *Armstrong v. Sheppard & Short Ltd.*, [1959] 2 Q.B. 384 (Eng. Q.B.) ; *Ward v. Kirkland* (1965), [1966] 1 All E.R. 609 (Eng. Ch. Div.) and *London Borough of Hounslow v. Twickenham Garden Developments Ltd.* (1970), [1971] 1 Ch. 233 (Eng. Ch.) that they, by entering into the covenants they did under the Settlement Agreement, acted upon Imperial's covenant to continue the parking privileges and Imperial cannot now revoke those privileges.

48     I see no application of those cases here. *Hounslow* , though referring to it, did not apply the doctrine of licence acted upon. In *Liggins* the owner of a dominant tenement authorized an act of a permanent nature (to cut down and lower a bank and to erect a weir) on the servient tenement. The act having been done and the expense having been incurred, the plaintiff could not retract his consent. Indeed, *Liggins* may be said to be a case of abandonment of a right rather than acquisition of one. The same is true of *Winter* where the plaintiff gave the defendant parol licence to put a sky light over the defendant's area, which interfered with light entering the plaintiff's house. The sky light having been completed at the defendant's expense, the plaintiff could not "recall" the licence, or now assert a right to light which he had abandoned.

49     In *Armstrong* , Lord Evershed M.R. summarized the law as follows, at p. 399:

It is, I think, true to say ... that if A gives authority to B for the doing of an act on A's land, and the act is done and completed, then, whatever be the strict description of the authority, whether it be called a permission or a licence, it is, generally speaking at any rate, too late for A who gave the authority, to complain of it.

In each of the cases cited it is the completion of an act such as building a wall or installing pipe, an act of a relatively permanent nature, which had been done with the consent or licence of the person now complaining, which leads the law to deny the complainant the right to revoke a licence or enforce a right. Here the nature of the right granted - to park different vehicles at different times in different places and so as not to interfere with the use of the land by Imperial - is not permanent but repetitive in nature. Entering into the covenants under the Settlement Agreement are not acts by Young pursuant to the licence given by Imperial under Clause 3. The doctrine of licence acted upon has no application to this case.

**Termination of the Licence**

50     Historically, at common law, of the three types of licence - bare licence, licence coupled with a grant and contractual licence - a licence coupled with a grant could be irrevocable, while a bare licence or a contractual licence could be revoked at any time, even though in the latter case the revocation might amount to breach of contract. However, equity has changed that - or at least has made available equitable remedies in appropriate cases to prevent revocation in breach of contracts.

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

51      The current position is described in *Cheshire and Burn's Modern Law of Real Property* (13th ed.) at p. 555 as follows:

> The matter was authoritatively settled by the House of Lords in ***Winter Garden Theatre (London) Ltd. v. Millennium Productions*** . This case finally established that the rights of the parties to a contractual licence must be determined upon the proper construction of the contract. Their Lordships favoured the argument that, if on its construction a contractual licence is irrevocable, then, even though it is not coupled with a grant, its revocation in breach of the contract should be prevented where possible by the grant of an injunction. In other words, equity does what it can by means of a decree of injunction to preserve the sanctity of a bargain and by that remedy it is prepared to restrain a revocation that would derogate from the right of occupation conferred by the contract. If the contract does not expressly state the time for which the licence is to last, a promise by the licensor must be implied that he will not revoke the permission in a manner contrary to the intention of the parties. The exact scope of the implied promise, if any, must be ascertained in each case, for it will, of course, vary with the circumstances.

While I adopt this concise and clear statement of the law, I recognize that the position of the contractual licence has been the subject of much discussion. (See, for example, *Equity Doctrines & Remedies* (3rd ed.) by Meagher, Gummow and Lehane at pp. 576-582).

52      Green, J.A. and I agree with the trial judge that this case is concerned with a contractual licence. We also agree on the generally applicable principles to interpretation of contractual licences. However, we differ with each other and with the trial judge on the result of the application of this principle to this case.

53      The trial judge concluded that the agreement provided "that all of the terms respecting parking including the duration of the arrangement itself required the plaintiff's [respondent's] agreement as time progresses. Parking is to continue only as long as indeed satisfactory to both parties, including the [respondent]." As a result of this interpretation the parking licence could be terminated upon reasonable notice, as presumably could have been done as soon as the ink was dry on the agreement. One gets the view from the decision of the trial judge that this case was argued before him on an all or nothing basis with one party submitting the licence was irrevocable and the other that it could be revoked at any time, albeit on reasonable notice.

54      Green, J.A., on the other hand, interprets the undertaking in terms of the ability (objectively determined) of the respondent to accommodate the appellant's parking requirements whatever the respondent's use or non use of the land and requires the respondent to establish that it can no longer accommodate the appellant's parking vehicles on its property.

55      The appellants acknowledge that there might be a requirement to adjust the parking arrangements from time to time on the basis of business decisions, for example, if there were an increase in the number of pumps. In the context of this agreement, termination at will of the parking arrangement does not make commercial sense for Young. By the same token a grant of an irrevocable licence does not make sense for Imperial. However, the references in the document to the continuation of the gas bar, to be operated by another party, and continuation of "those parking privileges" associated with the tire sales business would indicate that the parties intended to continue this symbiotic relationship as long as the gas bar and tire sales were both in existence. Thereafter the relationship could be terminated upon reasonable notice. So then, while the trial judge and I see the duration of the parking arrangement somewhat differently, in the result the action of Imperial in terminating the licence is permitted under the contract and the period of notice specified by the trial judge is acceptable.

56      I would therefore deny the appeal with costs to the respondent.

***Green J.A.* (dissenting):**

57      This appeal raises questions concerning the approach to be taken to the construction and application of a written agreement in which parking privileges were conferred on the appellant (Young) arising out of a prior commercial dispute between Young and the respondent (Imperial), who were adjacent land owners. The legal characterization of the rights purportedly conferred by the agreement and the nature, duration and manner of their exercise are central to the disposition of this case.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    16

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

58    The trial judge held that the arrangement between Young and Imperial was in the nature of a contractual licence which could be terminated unilaterally by Imperial on reasonable notice, notwithstanding the fact that the parking privileges were expressed in the agreement to continue "on a basis mutually satisfactory to Imperial and Young".

59    In my view, with the greatest respect, the solution arrived at by the trial judge does violence to the reasonable expectations of the parties and effectively converts an agreement which had as its touchstone the requirement for mutual cooperation and good faith accommodation for its application and alteration, into an arrangement that could be unilaterally changed and terminated by one party to the prejudice of the other. I have concluded that a true construction of the language of the agreement, according to proper principles of contractual interpretation, does not lead to such an inappropriate result.

**Background**

60    Since 1941, Young, either directly or through his corporate alter ego, King's Bridge Service Station Limited, owned and operated a service station on land on King's Bridge Road in St. John's. For some time Young had also leased the adjacent property owned by Imperial and had operated a "gas bar" from that location, selling gasoline supplied by Imperial. From his own property he operated a general garage and tire sales business. The operation of the gas bar provided an integrated operation for services to the motoring public. Young's own property was very cramped. The garage building occupied most of the site. Accordingly, Young began parking vehicles (both customer and employee) on the leased gas bar property. He was able to achieve this result by virtue of his control of the use of the Imperial property as tenant. There was, apparently, no objection from Imperial.

61    The business relationship between Young and Imperial began to deteriorate. Accusations were made from time to time by both sides, alleging that the other had failed to comply with the gas bar lease arrangement. Matters came to a head in 1984-1985. Young made certain approaches to Imperial offering to sell his interest in the gas lease and/or his service station property to Imperial. Imperial responded with an offer to buy out the lease of the gas bar for an amount that was not acceptable to Young. This led to an exchange of letters in the spring of 1985 whereby Young reiterated his previous allegation that Imperial had been attempting to downgrade the gas bar property by failing to honour its obligations under the lease while at the same time attempting to acquire certain other properties in the area to set up another operation in competition with Young. He threatened legal action. In response, by letter dated April 2, 1985, Imperial purported to terminate the gas bar lease arguing that it was merely a month to month tenancy terminable on one month's notice. Young, through his solicitor, replied taking issue with the right of Imperial to terminate the lease, referring to certain other "clear obligations" which Imperial had allegedly covenanted to perform under the lease. He also held out the possibility of a negotiated settlement.

62    It should be noted at this point that the lease documents were not placed in evidence nor was there any evidence presented that could confirm Imperial's assertion, made in its factum on appeal, that the tenancy arrangement was simply a month to month tenancy. Indeed, the trial judge refused to make such a factual finding on the evidence, and pointed out that Young both in correspondence and in argument had challenged Imperial's rights to terminate the tenancy on the basis that it was from month to month.

63    Discussions towards settlement of the dispute ensued. On May 31, 1985 Young's solicitor wrote the solicitor for Imperial with reference to a previous "counter offer" that had apparently been made by telephone four days earlier. It described the basis of the offer with which Young "reluctantly agreed" as:

   (a) $40,000 from your client to mine as severance settlement respecting my client's operation of your client's petroleum product outlet on your client's property on King's Bridge Road;

   (b) A reasonable arrangement regarding parking spaces on your client's property in conjunction with my client's present operation on my client's adjoining property;

   (c) Your client to have a first right of refusal in the event of my client's contemplated acceptance of a bonafide offer to purchase my client's adjoining property.

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

Young's counsel also assured Imperial that: "my client is prepared to operate the adjoining business in a spirit of friendly, neighbourly cooperation with your client".

64    Imperial's counsel responded with a draft settlement agreement "formalizing the arrangements between the parties". He stated:

> In particular, the agreement calls for a surrender of the lease and a release of all claims of Imperial. The agreement also calls for the payment of $40,000 and also provides for reasonable parking arrangements in favour of Mr. Young.

> Finally, the agreement provides for a right of first refusal in respect of Mr. Young's adjacent service station building.

65    The agreement, as ultimately executed, after referring to the existence of the gas bar lease, provided in pertinent part as follows:

> AND WHEREAS Imperial and Young have mutually agreed to sever their relationship subject to the terms and conditions hereinafter appearing with the objective that another party will operate the said facilities commencing on or about June 15, 1985.

> NOW THEREFORE THIS AGREEMENT WITNESSETH that for and in consideration of the mutual covenants and conditions hereinafter appearing, the parties hereto mutually covenant and agree as follows:

> (1) Imperial shall pay to Young on or before the execution of this agreement the sum of forty thousand dollars ($40,000) in full and final settlement of any and all severance entitlement which Young has in respect of the termination of his retail motor fuel sales outlet at King's Bridge Road, St. John's, Newfoundland.

> (2) Young agrees to surrender the Lease to Imperial and to release Imperial from all claims, demands, actions or suits of any kind whatsoever in any way connected with or in any way arising from the relationship between Young and Imperial in respect of the said outlet at St. John's, Newfoundland.

> (3) Imperial acknowledges that Young has enjoyed certain parking privileges on the property subject to the lease in respect of Young's tire sales operation on property of Young immediately adjacent to the property described in the lease. Imperial undertakes to continue these parking privileges beyond the termination of the lease on a basis mutually satisfactory to Imperial and Young.

> (4) In respect of the service station building owned by Young immediately adjacent to the property subject to the Lease, Young agrees to grant Imperial the right of first refusal to purchase or lease the said building of Young and the land thereon on the terms of any bonafide written offer received by Young which Young is willing to accept....

66    The reference to "Young" in the agreement was defined to include King's Bridge Service Station Limited. In like manner, references to Young in these Reasons should be taken, unless the context indicates otherwise, as including the corporate entity as well.

67    Imperial paid the $40,000 contemplated by the agreement and, following the termination of the gas bar lease, entered into a new arrangement with another tenant to operate the gas bar. Young continued to use the gas bar property, without objection from the new tenant, for the parking of vehicles associated with his garage and tire sales business. It was conceded by Imperial in its written argument that the new operator was operating the gas bar *for* Imperial. Allowing Young to continue to use the land for parking was therefore consistent with the obligation undertaken by Imperial in the settlement agreement. Young's uncontradicted evidence was that both before and after the settlement agreement, upwards of twenty-five cars could be and were parked from time to time on the gas bar property, mostly around the rear perimeter of the property, so as not to interfere with the gas bar operations. The relationship between Young and the successive dealers installed in the gas bar premises by Imperial was very amicable and Young in fact permitted patrons of the gas bar to use the washrooms in the garage.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 20 of 378

Imperial Oil Ltd. v. Young, 1998 CarswellNfld 224
1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

68      In late 1993, Young became aware of plans by Imperial to cease operating a gas bar on the property and of a rumour that Imperial intended to fence the property to prevent any parking thereon. Young, through his counsel, wrote Imperial to remind them about the parking privileges conferred by the settlement agreement and stated that he did not wish to have its business interrupted "due to a lack of parking on your property." Imperial did not respond. Instead it commenced decommissioning the property by digging up and removing the gas tanks. Some soil contamination was apparently discovered. This activity caused some disruption to the continued use of the property for parking but Young was able to accommodate this problem by continuing to park in areas which were not being actively dug up.

69      In February 1994 Imperial, without consulting Young, fenced off most of the property leaving Young with a cramped narrow area which could accommodate no more than seven vehicles. Young complained to Imperial that they had restricted him to too small a parking area. From December of 1993 to August of 1994 Young made approaches to Imperial suggesting that they attempt to agree on revisions to the original parking arrangement to accommodate the new events which had occurred, namely, the closing of the gas bar, cleanup of the site and restriction of the general public from it. Young characterized these as "reasonable wishes" and stated "King's Bridge was prepared to see an adjustment to the parking privileges from the perimeter of the property to a specific area adjacent to King's Bridges' own property." At one point, Imperial had responded with the suggestion that the discussion as to a new arrangement should address issues of parking lot size, the erection of a gate on the property, insurance coverage and a provision to cancel the agreement if Imperial sold the property. Young's solicitor asserted that it had an irrevocable easement over the property.

70      Young continued to assert a right to park and alleged that the area delineated by Imperial for this purpose was too small. In a letter dated June 30, 1994, his counsel wrote: "our client is not seeking very much additional space and we fail to understand how the granting of additional space would be inconvenient or unsatisfactory to your client".

71      Imperial's counsel responded with allegations that Young had wrongfully removed part of the fencing and commenced to park on a larger portion of the property than had been identified by Imperial for Young's use. It was also alleged that cars being repaired at the garage were dripping oil and gasoline on the property and that this could have an eventual impact on the environmental condition of the site. Imperial went on to advise that if environmental remediation of the site were required, it might be necessary for Imperial to have access to the complete site, including the area currently designated for parking. Young's counsel responded with the offer that Young would be "prepared at any time to discuss a movement of the parking area so that Imperial can remediate the area currently parked upon by King's Bridge".

72      On August 19, 1994, Imperial gave Young thirty days notice of termination of the parking privileges. The stated reason for the termination was given as:

> In order to remediate the property and bring it to a standard acceptable to the Department of Environment and Lands, our client needs access to the entire property. Once the remediation has been completed, our client will determine what it wishes to do with the property. However, at the present time, Imperial Oil has no intention of permitting uses of the property which have the potential to contaminate it once it has been remediated.

73      The only evidence provided to the trial judge of the need for environmental remediation was in the form of certain statements in the Originating Application which were verified, in the usual form, by affidavit of an official of Imperial. Imperial had previously refused to provide Young with a copy of the environmental assessment report submitted by Imperial to the Department of Environment and Lands, nor was that report provided to the court. The only evidence before the court consisted of statements from Imperial that early in 1994 the Environment Department had requested a thorough environmental assessment of the property and that as a result of the assessment, Imperial had determined that two areas had residual soil contamination. One of the areas was "near" the area then being used by Young for parking and Imperial needed access to the rest of the property to remediate that area. Imperial further stated:

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

Once the cleanup is completed, which could take several years, the plaintiff wishes to fence or post all of the plaintiff's property and to preclude further parking by the defendants to avoid any risk of new contamination of the property from vehicles which could leak oil or gasoline onto the surface of the land.

No evidence was presented as to whether there was in fact any risk of contamination of the property as a result of continued parking by Young.

74    Young refused to vacate the property, taking the position that Imperial had no right to terminate the parking privileges. He also stated in a letter dated August 23, 1994:

King's Bridge does not understand why Imperial has such an antagonistic attitude in this matter. King's Bridge can appreciate that Imperial has a contamination problem which it wishes to deal with, but surely Imperial can appreciate that King's Bridge has a right to park on Imperial's property and has to have somewhere to park its customers vehicles. King's Bridge simply does not understand why Imperial has refused to meet to discuss these matters and why there has been no attempt to look for a solution which would satisfy the concerns of both parties.

75    Imperial then made application to the Trial Division for an order directing Young to remove vehicles from the property and prohibiting further use. Young responded by seeking an order directing Imperial to remove the barrier which reduced the parking area which Young had previously enjoyed.

**The Trial Decision (1996), 142 NFLD. & P.E.I.R. 280 (Nfld. T.D.)**

76    The essential question that had to be resolved by the trial judge was whether or not Imperial could, of its own motion and without considering the interests of Young, revoke the parking privileges. The position of Imperial was that it could. The position taken by Young was at the other end of the continuum, namely, that the parking privileges could be enjoyed in perpetuity. Young sought to justify this position by reference to concepts of easement, estoppel, irrevocable licence and contractual right.

77    It is apparent from the reasons of the trial judge that he was concerned about two "preliminary" matters one of which had not been raised by the parties. The first related to the reference in Clause 3 to the continuation of parking privileges on a basis "mutually satisfactory" to the parties. At the outset of the trial he raised with counsel the question as to whether or not the agreement merely amounted to an "agreement to agree" and was hence unenforceable. The result of such analysis would have meant that Imperial could have revoked the parking privileges with impunity. The judge having raised the issue, both parties addressed it. (Indeed, it surfaced again as an argument on appeal). In the result, however, the trial judge determined that it was not necessary to rule on the issue for the purpose of his decision although, as will become apparent later in these Reasons, I believe his concerns as to this matter may have unduly influenced him in respect of his interpretation of the effect of the settlement agreement on the scope of the parking privileges in issue.

78    The second preliminary matter addressed by the trial judge involved the use that could be made of the background history of the relationship between the parties, including the discussions and negotiations leading up to the termination of the lease and the signing of a settlement agreement for the purpose of giving meaning and content to the language used in the agreement. Imperial took the position that the dispute fell to be determined solely by reference to the written agreement which, it said, was not ambiguous and that therefore the parol evidence rule excluded any reference to extrinsic evidence. Young, understandably, took the opposite view. The parties agreed, however, that all of the evidence concerning the background of the matter would be placed before the court subject to objection by Imperial that certain portions of it should not be considered by the trial judge for the purpose of interpreting the agreement.

79    After noting that parol evidence could be admitted as an aid to interpretation of a written document where there is some ambiguity in the language used, the trial judge concluded that there was a "basic and patent ambiguity" with respect to the "crucial question" of whether the continuation of parking privileges was to be in essence perpetual, "leaving only the scope of those privileges to be mutually agreed" or whether "the 'mutually agreeable basis' referred to in the agreement is to include the duration of the parking privileges per se". [I note at this point that the judge is talking in terms of a requirement

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

for "mutual agreement" whereas the agreement itself talks in terms of the continuation of the parking privileges "on a basis mutually satisfactory" to the parties. The significance of this misreading of language of the agreement will be dealt with later in these Reasons]. The judge noted, however, that even in the case of ambiguity, direct evidence as to the actual intentions of the parties, as distinct from evidence of the surrounding factual background and circumstances under which they operated, would still not be admissible. Accordingly he ruled that:

> ...the uses to which the affidavits may be put in resolving ambiguity within that part of the agreement relating to parking is ... limited to the portions setting out as background facts known to the parties, and excluding evidence of actual negotiations and other 'abstract' statements of the parties' intentions.

80    The trial judge then proceeded to deal with the legal bases advanced on behalf of Young in support of the argument that the parking privileges could be enjoyed in perpetuity. He concluded that the agreement did not create an easement because: (i) considering the wording of the agreement in light of the surrounding circumstances, including the fact that the parking "privileges" were a continuation of a pre-existing informal arrangement that resulted from the fact that Young had control of both parcels of land, there was no intention to create a proprietary right in the nature of an easement; (ii) the vagueness of the description as to the nature and scope of the privileges did not meet the requirements of precision and certainty for an easement; and (iii) the nature of the privileges conferred, which were for the enhancement of Young's business, and not for the enhancement of the land itself, suggested that it was intended to be a personal right of use instead of the attachment of a right to the realty.

81    Having concluded that the right conferred did not and was not intended to constitute an easement, the trial judge nevertheless acknowledged that the agreement,

> ...did intend to create at least a permission for the defendants to use the plaintiff's land for parking customer vehicles, albeit a permission which was subject to "mutual" agreement.

[Again, note is taken of the fact that the requirement of mutuality was expressed by the judge in terms of "agreement" as opposed to "satisfactory" and that the permission to park was "subject to" that agreement].

82    The judge then went on to consider whether the right was a species of licence. Recognizing that consideration had been furnished, he rejected the notion that what Young had was a bare licence. He also summarily disposed of the argument that the right could be a licence coupled with a grant of an interest. Although no analysis was undertaken by the judge, I would observe in passing that there is no evidence that the permission to enter the land and park vehicles thereon was to enable Young to exercise some other right in relation to Imperial's land.

83    Having disposed of those species of licence, that left the categories of contractual licence and licence by estoppel. He rejected the argument that the licence was irrevocable by virtue of the operation of the doctrine of estoppel because: (i) there was no evidence that Young had been requested or encouraged by Imperial to spend money on or with respect to Young's occupancy of Imperial's land, or that in reliance thereon Young did in fact expend money; and (ii) there was no evidence showing acts by Imperial, outside of the terms of the agreement itself, amounting to representations or acquiescence in the face of mistaken assumptions by Young as to the duration of the parking rights, which Young relied or acted on to his detriment.

84    He concluded that the matter fell to be considered on the basis of a contractual licence. In light of the fact that the agreement contained no express provision dealing with the duration of the parking privileges, he characterized Young's "main argument" that Imperial had granted a perpetual licence as being that the agreement, properly construed, contained an implied term that it would not be revoked.

85    Without doing justice to the full flavour of the trial judge's thorough and extensive reasons, I hope I am not being unfair in giving, as an outline of his reasoning process, the following brief analysis. In essence, the trial judge ruled that: (i) where a contract by its terms is for an indefinite duration, it is *prima facie* terminable on reasonable notice, rather than perpetual; (ii) the language of the agreement could not be construed to indicate that the parking privileges were intended to be perpetual; (iii) no term could be implied to the effect that the parking privileges were to be co-extensive in duration with the operation of Young's

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

business on the adjoining land; (iv) the licence to park being indefinite as to duration, it was terminable on reasonable notice; (v) given the lapse of time between the giving of notice of termination by Imperial and the date of trial, a reasonable time had already expired, but it was nevertheless fair to extend a further "grace period" to Young to vacate the property.

86      In the result, Young was ordered to remove the vehicles from Imperial's property and to vacate it within sixty days of the entry of judgment.

**Issues on Appeal**

87      As is evident, the case at trial, and on appeal, was argued on a number of different bases. Young variously submitted that the case could be decided in his favour by characterizing the rights conferred by the agreement as an easement, a contractual licence to be enjoyed in perpetuity, or a right protected by the doctrine of promissory estoppel. Regardless of whether the facts fit neatly into one or the other of any of these, or any other, pigeon holes, however, the key to the determination of the nature and extent of Young's rights depends upon a proper construction and application of the settlement agreement.

88      It is sufficient for me to state that I agree with the rejection by the trial judge of the arguments in favour of characterizing the arrangement as an easement or as supportable by the doctrine of estoppel. My colleague, Cameron, J.A. has also examined these issues in some detail in her reasons for decision and I am also in essential agreement with her analysis and conclusions in that regard.

89      I also agree that the parking privileges enjoyed by Young were, inasmuch as they were conferred by agreement, in the nature of a contractual licence. The question therefore resolves itself into a determination as to the nature and extent of the parking privileges conferred by the express or implied terms of the contract, as properly interpreted.

90      The construction of written instruments involves a question of mixed law and fact: *Atlific (Nfld.) Ltd. v. Hotel Buildings Ltd.* (1994), 120 Nfld. & P.E.I.R. 91 (Nfld. C.A.) at p. 101 (leave to appeal to S.C.C. refused (1995), 139 Nfld. & P.E.I.R. 90 (note) (S.C.C.) ). Here, there is no dispute as to the facts leading up or subsequent to the execution of the agreement. In any event, much of the evidence is in documentary form and there was no cross-examination on the affidavit evidence submitted. As emphasised in *Atlific* , an appellate court is in as good a position as the trial judge to examine all the evidence in such circumstances and to reach its own conclusions as to the proper interpretation of the agreement. See also *Labrador Inuit Assn. v. Newfoundland (Minister of Environment & Labour)* (1997), 152 D.L.R. (4th) 50 (Nfld. C.A.) at p. 67.

91      Furthermore, insofar as the implication of terms is engaged, it is also well-recognized that the implication of a term is a matter of law for the court. See *Chitty On Contracts* (25th ed.) Volume 1, p. 451.

92      Accordingly, the rulings of the trial judge as to the meaning and effect of the settlement agreement and whether or not terms ought to be implied therein are amenable to appellate review.

93      I would therefore re-state the issue to be considered on this appeal as:

Did the learned trial judge err in his interpretation of the settlement agreement as to the nature and extent of the parking privileges conferred by the agreement?

**Analysis**

*(a) The Agreement*

94      For ease of reference, I will repeat the clause in question, which was one of four paragraphs in an agreement that expressed the consideration to be "the mutual covenants and conditions hereinafter appearing", as follows:

Imperial **acknowledges** that Young has enjoyed certain **parking privileges** on the property subject to the lease **in respect of Young's tire sales operation** on property of Young immediately adjacent to the property described in the Lease. Imperial

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

undertakes *to continue* **these parking privileges** *beyond the termination of the Lease* **on a basis mutually satisfactory** to Imperial and Young.

The words and phrases in *bold* and *italicized* type received special attention in argument and are relevant to a determination of the true meaning and effect of the clause.

95    Although clearly providing that certain parking privileges were intended to extend "beyond the termination of the lease", the clause does not, as already noted, expressly define the period of time during which the privileges were to be enjoyed (if, indeed - which is a matter of dispute - any limitation was intended). Nor does it give any indication as to how, if at all, such privileges could be brought to an end. Furthermore, and what is equally important, the nature and extent of the parking privileges, during their period of enjoyment, whatever that might be, are not defined.

*(b) Arguments in Favour of Perpetual Parking Privileges*

*(i) Presumptions as an Aid to Interpretation*

96    Appellants' counsel argued that, as a starting point, interpretation of the settlement agreement should be approached on the basis that agreements of indefinite duration are *prima facie* perpetual and that in such case it lies on the party saying the agreement is revocable to show either some expression in the contract or something in the circumstances from which it can reasonably be implied that it was not intended to be perpetual. In support, he cites *Llanelly Railway & Dock Co. v. London & North Western Railway* (1875), L.R. 7 H.L. 550 (U.K. H.L.) ; aff'g (1873), 8 Ch. App. 942 (Eng. C.A.); and *Gill Brothers v. Mission Sawmills Ltd.*, [1945] 4 D.L.R. 449 (S.C.C.) ; aff'g [1945] 3 D.L.R. 506 (B.C. C.A.) .

97    The respondent counters with the submission that the true principle is that agreements which on their face are of indefinite duration are generally subject to an implied term that they are terminable on reasonable notice.

98    As general statements, neither of these propositions is very helpful in concrete situations. It must be remembered that we are not dealing here with the termination of an agreement as such, merely the potential termination of one of the benefits conferred by the agreement. Furthermore, to determine whether an agreement is indefinite involves a contextual examination of the language used in the contract. Usually this process will result in a determination, by means of a purposive interpretation, or the operation of the doctrine of implied terms, as to what was intended by the parties. Once the intentions are ascertained, the appropriate result follows. I agree with the observations of Buckley, J. in *Spenborough (Borough) v. Cooke Sons & Co.*, [1968] 1 Ch. 139 (Eng. Ch. Div.) at p. 147 as stating the modern approach:

   ...the question is not one of contruction in the narrow sense of putting a meaning on language which the parties have used, but in the wider sense of ascertaining, in the light of all the admissible evidence and in light of what the parties have said or omitted to say in the agreement, what the common intention of the parties was in the relevant respect when they entered into the agreement.

   ... there is ... no presumption one way or the other.

99    This approach is exemplified by the House of Lords' decision in *Winter Garden Theatre (London) Ltd. v. Millenium Productions Ltd.* (1947), [1948] A.C. 173 (U.K. H.L.) , a contractual licence case, where Lord MacDermott, doubting the applicability of the *Llanelly* principle as a general rule of construction, refused, on a construction of the contract, "ascertained in conformity with the ordinary principles applicable to the interpretation of written instruments", to hold that the licence was perpetual; rather, he concluded that it was a fair implication from the "whole tenor" of the contractual relationship that the licence to occupy the theatre was not revocable instantly but only after a period of reasonable notice. Viscount Simon expressed agreement with the result in *Hurst v. Picture Theatres Ltd.*, [1915] 1 K.B. 1 (Eng. K.B.) and regarded it as standing for the proposition that the contractual licence to attend a theatre production was implicitly subject to the term that it was irrevocable for the duration of the performance contemplated by the contract. The discussion of the law in *Winter Garden* illustrates quite well that the choice, in construing the incidents of the licence, is rarely the stark one of chosing in the abstract between perpetuity and unilateral revocability. There may well be an intermediate position which is dictated by the reasonable expectations of

Imperial Oil Ltd. v. Young, 1998 CarswellNfld 224

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

the parties, as disclosed not only by the words used but the background context. This position may be able to be effectuated by implication of an appropriate term that protects the licencee from unilateral termination and at the same time avoids the imposition of a perpetual restriction on the licensor's future rights.

100     In my respectful view, the trial judge fell into error in his approach to resolution of the revocation issue. He appears to have accepted the view that, as a matter of principle, an indefinite contract is terminable on reasonable notice. Having concluded that the language of the agreement did not indicate perpetuity and that the specific arguments of Young could be rejected, he concluded that it automatically followed that Imperial could unilaterally decide to revoke on reasonable notice. The following passages illustrate this reasoning:

   ...the duration of the parking arrangements is indeed truly "indefinite" rather than either fixed or perpetual.

   This being so , as noted in the cited authorities, the issue then becomes what is the reasonable notice period required to terminate the arrangement [paras. 169-170]

   [Emphasis Added]

and:

   ...the matter falls to be considered simply on the basis of the existence of a contractual licence which, as the authorities cited by both parties clearly show, is terminable on the giving of reasonable notice. [para. 237]

101     Aside from a brief excursus into the question of whether there might be an implied term that the parking privileges could be enjoyed, if not in perpetuity, at least for so long as Young continued to operate his business on the adjoining land, the judge did not engage in a full interpretative exercise as to what the contract, as disclosed by the words and its context, actually meant, uninfluenced by any presumption one way or the other. Instead, he appears to have made the analytical jump from a conclusion that the licence was not perpetual to the conclusion that it necessarily followed that Imperial's position in favour of unilateral revocability must therefore be sustained.

*(ii) Language*

102     Young argues that the words chosen by the parties in Clause 3, far from suggesting revocability, in fact imply permanence. Counsel fastens on the words "acknowledges" (one would not acknowledge the existence of something transitory), "undertakes" (a solemn vow of permanence) and "privileges" (a particular or peculiar benefit enjoyable beyond the advantages of other citizens), as supporting his interpretation.

103     While, as will be apparent from these reasons, I agree that this choice of words, read in context, does in fact suggest something that is more than of a merely transient nature and indicates something other than a right to terminate unilaterally, it does not follow that they necessarily or even reasonably imply permanence. I am not persuaded that such language is a signpost for an intention to make the parking privileges perpetual.

104     Counsel for Young also relied on the phrase "on a basis mutually satisfactory to Imperial and Young" as indicating that it was intended to make the parking privileges perpetual unless the parties subsequently agreed on another mutually satisfactory arrangement. Imperial, on the other hand, relied on these same words for the opposite argument that it was intended that the parking could only continue if it remained satisfactory to Imperial as well as Young. The trial judge in effect accepted Imperial's interpretation by reading the phrase as making the duration of the privileges "subject to mutual agreement" [para. 125].

105     Inasmuch as I have concluded - for reasons to be given later - that this phrase relates to the manner of exercise of the parking privileges and not their duration, I will pass over this argument here, except to say that because the phrase has a different function than that argued for by either party, it does not assist Young with respect to his argument of irrevocability, nor does it assist Imperial with its argument that its continued satifaction is a pre-condition to the continuation of the parking arrangement.

*(iii) Structure of The Agreement*

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

106    The appellants also stress the mutuality of the obligations contained in the agreement ("in consideration of the mutual covenants and conditions") and argue that because the consideration flowing from Young was of a one-time or permanent nature (perpetual release, right of first refusal, one-time payment in "full and final settlement", and permanent surrender of lease) it was a reasonable conclusion that the parking privileges "continued" by Imperial were intended to be permanent also.

107    The trial judge concluded, correctly in my view, that just because the consideration given by one party to a contract is of a "permanent" nature, it does not follow that the reciprocal consideration must necessarily have the same quality. The nature of the particular arrangement may make it quite logically reasonable for a permanent consideration to be exchanged for some other type of a fixed or subsequently terminable type.

108    Young argued that it would not be reasonable to assume that he would, in the circumstances, have intended to exchange the permanent rights he gave up for parking rights that could be terminated at any time by Imperial. That would be tantamount to taking a gamble on Imperial's good nature. He relied on the statement of Buckley, J. in *Re: Spenborough* at p. 149:

> If, as in *Llanelly Railway & Dock Co. v. London and North-Western Railway Co.* , the consideration moving from the licencee or a substantial part of it consists of an immediate benefit conferred on the licensor, this may afford a strong reason for inferring that the licensor was not intended to have a right to determine the licence.

109    Even accepting, as I do, the principle as stated, it does not lead to the conclusion that the rights conferred were to be perpetual. It would be equally consistent with some other arrangement that did not place Young solely at Imperial's mercy. It might simply mean that Imperial was not intended to have a right of unilateral termination, which is not the same thing as saying that the right is perpetual.

110    Counsel for Young also argues, relying on *Fort Frances (Town) v. Boise Cascade Canada Ltd.* (1983), 46 N.R. 108 (S.C.C.) , that it could not have been intended that Imperial could unilaterally terminate Young's parking privileges when, because of the nature of the other consideration, Imperial could not restore Young to the position it enjoyed prior to execution of the agreement. In *Fort Francis* , the courts below had held that an agreement to supply the electrical requirements of a town without termination date could not be terminated unilaterally by notice. Estey, J. noted that the issue was not argued at length before the Supreme Court, and that both parties had conceded:

> ...that it is difficult to contemplate the termination of an agreement where the terminating party cannot restore the other party to the position enjoyed prior to the execution of the agreement.

Estey, J. also observed that:

> ...the parties have specified the extent of the company's obligation to the Town in the terms of the agreement. It cannot be said, therefore, that they did not agree to be bound in the circumstances that have arisen.

111    The *Fort Francis* case proceeded on the basis that the contract, by its terms, excluded the possibility of unilateral termination. That is not the case here, where the issue is what in fact is the nature of the right conferred. If on a true construction it is determined that the privileges conferred do not contemplate perpetuity, then effect should be given to that conclusion. The result of termination of the privileges would not be the complete unravelling of the agreement, only a contemplated cessation of one of the benefits created thereunder. I conclude that the *Fort Francis* case is irrelevant to a determination of the present appeal.

*(iv) Effect of No Finding of Perpetuity*

112    It follows from the foregoing that I do not accept the appellant's argument that the parking privileges were intended to be exercisable in perpetuity. However I do not accept that it necessarily follows that Imperial's position of being able to terminate the licence unilaterally on reasonable notice should be accepted.

113    The trial judge, faced with the question as to what was the nature and extent of the parking privileges conferred by the agreement, was under a duty to construe the agreement to determine the true nature of the rights involved. He did not do

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

this except in the context of determining whether the specific arguments by Young in favour of perpetuity were appropriate. He fell into error in adopting this approach.

114    It is therefore necessary for this Court to complete the analysis and it is to that process which I now turn.

*(c) Agreement to Agree*

115    Both parties on the appeal dealt with the issue as to whether the clause with respect to parking privileges was unenforceable on the grounds of incompleteness or uncertainty, resulting from the use of the phrase "on a basis mutually satisfactory to Imperial and Young", suggesting that what the parties had agreed to do was simply to negotiate in the future. Imperial's position, advanced in the alternative to its main argument that any licence conferred by the agreement was revocable on reasonable notice, was that:

> ...clause 3 of the Agreement is unenforceable since it leaves an essential term in relation to the parking privileges, namely, the term of those privileges, to be negotiated between the parties.

116    As indicated, this issue also surfaced at the trial as a result of the trial judge raising it. Although the judge ultimately concluded that he did not have to deal with the issue, it is apparent that his concern about whether the parties had merely agreed to agree in the future on the issue of parking was never far from his mind.

117    He appears consistently to have read the phrase "mutually satisfactory" as requiring "mutual agreement". For example, when discussing the admission of extrinsic evidence on the basis of the existence of an ambiguity, he refers to the fact that one interpretation was that only the scope of the parking privileges was to be "mutually agreed" and that another interpretation was that the "'mutually agreeable basis' referred to in the agreement" was to include the duration of the parking privileges as well. (para. 26) Both possible interpretations were couched in terms of there being a requirement for future agreement. Again, at a later point in his judgment, in describing Young's position with respect to the meaning and effect of the phrase "mutually satisfactory", he characterized the argument as being that there was a "requirement for 'agreement'" with respect to the terms of exercise of the licence and not its duration. [para. 151] Furthermore, and perhaps most tellingly, in concluding that the parking privileges conferred by the agreement amounted to a licence, he described the permission as one which was nevertheless "subject to 'mutual' agreement". [para. 125] The injection of the conditional phrase "subject to" brings his analysis closely in line with the phraseology, "subject to contract", which is often regarded as the hallmark of an unenforceable agreement to agree.

118    Finally, the judge also commented at paragraph [167] of his judgment:

> Overall, I find persuasive the very language of the provision itself. Recognizing the existence of past parking arrangements in connection with the defendants' business, in brief words it obliges [Imperial] to continue such privileges, but only on such terms as are satisfactory to <u>it</u> ...

> [Emphasis added]

This passage makes clear the transmutation in the thinking of the judge in his reading of the phrase "mutually satisfactory". Now, the effect of the clause is that it simply required the terms to be individually satisfactory to Imperial, not mutually satisfactory to both. In effect, Imperial could terminate unilaterally. The subtle progression in analysis is as follows: "mutually satisfactory" means "mutual agreement"; "mutual agreement" means that the obligations are "subject to" future agreement; and, finally, the requirement for future agreement means simply that all terms must be satisfactory to Imperial.

119    Although not the explicit reason for upholding Imperial's right to terminate the parking privileges, I am satisfied that the judge was nevertheless influenced by his perception of the effect of the language used on the interpretation of the agreement.

120    In my respectful view, the notion of contractual uncertainty, epitomized by the judge's discussion of the issue in terms of "agreement to agree" was a brooding, behind-the-scenes presence in his interpretation and analysis of the agreement and certainly coloured the result. It is therefore both appropriate and important to address this issue to determine what effect, if any, it ought properly to have either directly on the disposition of this appeal or indirectly with respect to the interpretation of the language used by the parties.

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

121    In my view, the use of the phrase "mutually satisfactory" does not, either as a matter of the law relating to incompleteness or uncertainty of agreement or as a matter of interpretation in the context of the agreement, lead to the conclusion that Imperial could unilaterally decide to terminate the parking privileges, if it chose not to agree on an alteration of terms.

122    The notions of uncertainty and incompleteness in contract law are conceptually distinct, but in practice the arguments as to their application often shade into one another. Incompleteness refers to the notion of putative contractual parties failing to express or otherwise indicate adequately by their words or actions, objectively determined, that they have completed an agreement. Uncertainty, on the other hand, presupposes that the parties have in principle reached an agreement but it is impossible for the court, within the rules of evidence, to give any clear or substantial meaning to the agreement which is sought to be enforced, with the result that the court has no choice but to declare the agreement or a particular clause void and unenforceable. In practical terms, however, whether the use of vague language is indicative of uncertainty as to what is meant by the agreement or is indicative of a failure to be complete enough to convince the court that a meeting of the minds on the essentials of the agreement has occurred, really does not matter to the end result. In either case, it is the infelicitous use or non-use of language which creates the problem for enforce ability, leading the court to conclude that it cannot make a contract for the parties where they have not sufficiently indicated what their intentions and expectations are.

123    What is clear from the cases is that the courts are very reluctant to hold a putative contract void or unenforceable on the basis of uncertainty or incompleteness. Having apparently attempted to make a contract, the parties' reasonable expectations, if they can be gleaned at all, ought to be allowed to be fulfilled. In the words of Morden, J.A. in *Canada Square Corp. v. Versafood Services Ltd.* (1981), 130 D.L.R. (3d) 205 (Ont. C.A.) at p.218, "A court should not be too astute to hold that there is not that degree of uncertainty in any of its essential terms which is the requirement of a binding contract". In *Hillas & Co. v. Arcos Ltd.*, [1932] All E.R. Rep. 494 (U.K. H.L.) Lord Wright observed at p.503 that: "It is ... the duty of the court to construe such documents fairly and broadly, without being too astute or subtle in finding defects".

124    While it is true that before enforcing putative contractual obligations, the court must first satisfy itself that the parties intended to make a contract in the broad sense of intending to create legal relations, that general intention can often be gleaned from the general circumstances surrounding the discussions and actions of the parties. One factor that will likely lead the court to conclude that the parties intended to contract is the fact that the putative contract has been executed and performed either in whole or in part by either one or both of the parties. The matter was well expressed by Steyn, L. J. in *Trentham Ltd. v. Archital Luxfer Ltd.*, [1993] 1 Ll. L. Rep. 25 (Eng. C.A.) at p.27:

> The fact that the transaction was performed on both sides will often make it unrealistic to argue that there was no intention to enter into legal relations. It will often make it difficult to submit that the contract is void for vagueness or uncertainty. Specifically, the fact that the transaction is executed makes it easier to imply a term resolving any uncertainty.... Clearly, similar considerations may sometimes be relevant in partly executed transactions.

125    The earlier English Court of Appeal decision in *Foley v. Classique Coaches Ltd.*, [1934] 2 K.B. 1 (Eng. C.A.) illustrates the same idea. The owner of a gas station sold adjoining land to a bus company. The sale was made subject to the bus company agreeing to purchase from the gas station all gas required for their business "at a price to be agreed by the parties in writing and from time to time". For three years, the bus company purchased its gas from the gas station but thereafter repudiated the agreement, alleging that it had no binding force because it was simply an agreement to agree. The Court of Appeal nevertheless enforced the agreement, holding that it was a binding contract, by implying a term that the bus company would purchase fuel at a reasonable price. Scrutton, L.J. stated at pp. 7 and 8:

> It is quite clear that unless the [bus company] had agreed to this [the purchase of fuel] they would never have got the land... It is quite clear that the parties intended to make an agreement, and for the space of three years no doubt entered the mind of the [bus company] that they had a business agreement, for they acted on it during that time .

[Emphasis added]

Maugham, L.J. observed at p. 13:

...it is quite plain from the surrounding circumstances that the agreement as to the sale and purchase of the petrol was intended to be a binding contract and it formed part of the inducement for the sale of the land.

126      While it is true that the court in *Foley* was assisted, in coming to its conclusion that the parties intended an agreement and that a term must be implied to pay a reasonable price, by the fact that the parties had inserted a clause in the agreement that disputes as to the construction of the agreement should be submitted to arbitration, the existence of such a clause is not essential for the court to reach the type of result that occurred in *Foley* . In *Beer v. Bowden* (1976), [1981] 1 W.L.R. 522 (Eng. C.A.) Goff, L.J. noted at p. 526:

> It is fair to say that if one looks only at the judgement of Maugham, L.J. at p. 16 [in **Foley** ], he did appear to be relying substantially upon the arbitration clause in arriving at his conclusion. But I do not think that is the true ratio of the case. Where you have got an arbitration clause, then if you imply a term that there shall be a reasonable price (as it was in that case) or a fair rent (as it would be in this), any dispute as to what is reasonable or fair falls within the arbitration clause; and, if you have not got one, it falls to be resolved by the court. But, in my judgement, the presence or absence of an arbitration clause does not matter ... So, again, one implies a term on general principles, and then only turns to the arbitration clause to resolve any dispute arising from the implied term.

127      In *Foley* , as in the instant case, the obligation in issue was part of a larger enforceable transaction. That fact in itself made it much more difficult to argue that the clause relating to agreement "from time to time" was not intended to have binding effect. Once that hurdle is overcome, and the court is satisfied that the parties intended something more than a right of unilateral repudiation by either of them, the court becomes the arbiter of what a reasonable solution should be.

128      Applying these principles to the instant case, it is clear that the parties did intend to make a contract. They intended to affect their respective legal positions and claims by settling all outstanding matters existing between them. They intended to alter their respective positions and to create new legal rights by the termination of the lease, the payment of money and the creation of a right of first refusal as well as the release of other claims. In the circumstances, it is not reasonable to assume that given the evident intent to formalize their legal affairs on so many issues, they nevertheless intended not to finalize their legal position respecting parking but to leave it to future agreement. As the correspondence passing between their solicitors during the negotiations leading up to the agreement indicates, the continuation of parking privileges was important to Young, and Imperial, through its counsel, knew this.

129      In *Foley* , it is significant that the court laid emphasis upon the fact that the agreement to purchase gasoline was part of the inducement for the sale of the land and that without it, the bus company could never have been able to acquire the land. Greer, L.J. specifically described the consideration for the purchase of the land as consisting of two parts: money and the promise of future gas purchases. Waddams in his text *The Law of Contracts* (3d ed.) at pp. 32-33, in his discussion of *Foley* emphasises the connection between the part of the agreement sought to be enforced and the rest of the overall transaction and suggests that, in such circumstances, reliance on the alleged agreement by the person seeking to enforce it is an important factor in convincing the court not to refuse enforcement. He similarly interprets *Hillas & Co. v. Arcos Ltd.* , noting at p. 33 footnote 89 "the agreement to be enforced was an option that was part of a larger transaction. The plaintiff might never have agreed to the transaction as a whole had it not believed that the option in question was enforceable".

130      In the instant case, there were four clauses, two of which could broadly be said to be for Young's benefit and two of which could be said to be for Imperial's benefit. The opening sentence of the operative part of the agreement stated the consideration to be "the mutual covenants and conditions hereinafter appearing". There can be no other reasonable interpretation than that the agreement of Young to settle the severance entitlement, surrender the lease and release Imperial from any other claims as well as to grant Imperial a right of first refusal to purchase Young's land were given in part in return for the continuation of the parking privileges. While it is true that in Clause 1 of the agreement, the payment by Imperial of $40,000 to Young was expressed to be given in return for settlement of only severance entitlement (and therefore could be said not to be part of the consideration for the remainder of the agreement) that does not affect the conclusion that the making of that portion of the agreement was in itself a consideration for the other clauses. In any event, the other clauses involving Young's surrender of the lease and other

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

claims to Imperial and the granting of a right of first refusal to Imperial are clearly expressed to be, by the opening words of the operative part of the agreement, the mutual consideration for the continuation of Young's parking privileges.

131      Accordingly, I conclude that the fact that Young purported to act under the agreement by continuing to park vehicles on Imperial's land in the same way as before and Imperial agreed and acquiesced in this is a strong factor in concluding that the parties intended to enter into legal relations with respect to parking and that, accordingly, the language used by the parties is not indicative of an agreement to agree and ought not to be relied upon in construing what the parties intended their agreement to be. This conclusion is buttressed by the fact that the granting of the parking privileges was part of a larger transaction and that from the construction of the agreement, as well as the negotiations leading up to the agreement (which indicated that parking was important to Young), Young would not have entered into the transaction unless his basic concerns respecting parking formed part of the deal.

132      There is also a further reason why the use of the phrase "mutually satisfactory" should not influence the court to come to a conclusion that what was intended was that Imperial could unilaterally terminate the arrangement. There were two fundamental issues involved in the parking arrangement. One was the duration of the arrangement and the second involved the size of the area that could be used to accommodate Young's vehicles. Having "acknowledged" the existence of the parking privileges, the obligation of Imperial was expressed in terms of an undertaking "to continue these parking privileges beyond the termination of the lease on a basis mutually satisfactory to Imperial and Young." The undertaking was "to continue" the existing parking privileges "beyond the termination of the lease". Thus, notwithstanding the removal of Young's rights to the land as tenant (which up to that time, supported his ability to park cars on the land), Imperial undertook to continue the arrangement in any event.

133      Given the importance of parking to Young and Imperial's knowledge of this through its solicitor and otherwise, it is not reasonable to assume that it was intended by the parties that the extent of Imperial's obligation in terms of the duration of continuation of the arrangement was to be left solely to Imperial's whim. The use of the word "continue" without more, indicates an indefinite duration. As indicated earlier in the discussion of the *Llanelly, Spenborough* and *Winter Garden* cases, there is no presumption either in favour of perpetuity or unilateral revocability flowing from language importing indefiniteness; rather the court must attempt to ascertain in the light of all admissible evidence what the common intention of the parties was. The determination of what the parties agreed to with respect to "continuation" of parking privileges on an indefinite basis must be resolved by a contextual and circumstantial interpretation of the language aided by the doctrine of implied terms. The phrase "mutually satisfactory" relates more to the basis upon which the parking privileges were to be enjoyed, namely, the portion or portions of Imperial's land that was to be affected and the number of cars that could be parked thereon. In like manner, the reference in Clause 3 to "*these* parking privileges" serves to identify the physical extent of the continued parking, in terms of number of cars and their location (by basing it on what had previously existed).

134      The use of the terminology "mutually satisfactory" does not therefore, by any affinity with the notion of "agreement to agree", assist an interpretation that leads to the conclusion that it must have been intended that Imperial was to have a right unilaterally to choose to terminate the parking privileges.

135      What then can it be said the parties actually agreed to?

### (d) Approaches to Interpretation

136      The purpose of the law of contract is to facilitate the achievement of the reasonable expectations of the parties (or to provide substitutional remedies in lieu thereof) as manifested in their voluntary agreements, objectively determined. This is to be initially achieved by an examination of the words used, considered in their context, both in relation to the other language of the agreement and the factual background surrounding the making of the agreement.

137      The time is long passed when the courts applied (if they ever did) a literalist approach to ascertaining the meaning of the words used in a written agreement, buttressed by a strict application of the parol evidence rule. As Waddams in his text, *The Law of Contracts* , 3d ed. (1993) observes at p. 215: "words do not have immutable or absolute meanings; they take their

Imperial Oil Ltd. v. Young, 1998 CarswellNfld 224

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

meaning from their context." Context is not limited to the written document but includes the circumstances surrounding the making of the agreement insofar as those circumstances indicate what the parties were attempting to achieve by their bargain. As O'Neill, J.A., speaking for the Court in *Atlific (Nfld.) Ltd. v. Hotel Buildings Ltd.* , said at p. 109:

> Where ... a term used in an agreement has no accepted or specific meaning in law, and is not defined in the agreement in which it is used, it is permissible for a court to have regard to extrinsic evidence to discover the intention of the parties by interpreting the words of the agreement in the light of the circumstances in which they were used. Further, a court can look to the history of the transaction and to the commercial setting in which the agreement evolved, in order to discover the real intention of the parties from the words used in the agreement.

Earlier, he referred to the process as seeking the meaning within "the factual matrix surrounding the agreement."

138      The reconciliation of this approach with the parole evidence rule is illustrated by the comments of Lord Wilberforce in *Reardon Smith Line v. Hansen-Tangen*, [1976] 3 All E.R. 570 (U.K. H.L.) at p. 574:

> It is often said that, in order to be admissible in aid of construction, these extrinsic facts must be within the knowledge of both parties to the contract, but this requirement should not be stated in too narrow a sense. When one speaks of the intention of the parties to the contract, one is speaking objectively - the parties cannot themselves give direct evidence of what their intention was - and what must be ascertained is what is to be taken as the intention which reasonable people would have had if placed in the situation of the parties. Similarly, when one is speaking of aim, or object, or commercial purpose, one is speaking objectively of what reasonable persons would have in mind in the situation of the parties.

139      It is often said that the court may not have reference to the prior negotiations of the parties leading up to the conclusion of the final agreement as a means of interpreting the words that were ultimately chosen. For example, in *Labrador Inuit Assn. v. Newfoundland (Minister of Environment & Labour)* (1997), 152 D.L.R. (4th) 50 (Nfld. C.A.) , the Court stated at para. 48:

> There is considerable danger in having regard to positions taken, and statements of prior intention made by the parties, as well as to prior negotiating drafts as compared with the final document, for the purpose of interpreting particular language in an agreement. The addition or dropping of a particular word or phrase in a later draft may have many motivations, spoken and unspoken. One can never be sure whether a stated position leading to language change is truly reflective of a party's intent. The choice of final language may well be the result of a reconsideration of that party's understanding of the implication and importance of the use or non-use of a word that was regarded as crucial previously.

As an indication of a party's actual intent, therefore, negotiating history is often regarded as being irrelevant. One reason for this is that the process of interpretation is based on an objective theory of contract formation, as emphasised in *Reardon Smith* , and does not involve a search for the parties' actual expressions of intent.

140      The trial judge ruled that extrinsic evidence of "background facts known to the parties" was admissible to assist in the interpretation of the agreement relating to parking privileges which he regarded as being ambiguous in its language. He ruled, however, that "evidence of actual negotiations and other "abstract statements of the parties' intentions" should be excluded. He was certainly right in excluding evidence of actual statements of the parties' intentions and of the negotiating history leading up to the conclusion of the agreement, insofar as those negotiations involved actual statements of the parties' understanding of the meaning of the words used. However, general evidence of the nature of the negotiations of the parties is nevertheless relevant in assisting the court in determining the background of the transaction - its factual matrix. In that sense, it assists in helping the court to discern the genesis and aim of the transaction and thereby become informed as to what the reasonable expectations of the parties were. To that extent, the negotiations of the parties were relevant to the interpretative process.

141      The words chosen by the parties to express their agreement must therefore be read against the court's understanding of the reasonable expectations of the parties gleaned from the extrinsic evidence forming the factual matrix of the transaction. It is that information which breathes life into the express language of the agreement and allows the court to interpret that language in a way which will facilitate, not frustrate, the reasonable expectations of the parties.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

142    In *Canada Law Book Co. v. Boston Book Co.* (1922), 64 S.C.R. 182 (S.C.C.) , Duff, J. quoted Lord Davie in *Bank of New Zealand v. Simpson*, [1900] A.C. 182 (New South Wales P.C.) to the effect that "extrinsic evidence is always admissible not to contradict or vary the contract but to apply it to the facts which the parties ... were negotiating about."

143    The achievement of the reasonable expectations of the parties provides one of the justifications for the implication of terms. As Waddams states at p. 100:

A reasonable expectation need not mean that all the implications must be spelled out in the mind of the promisee. All promises, even those we call express promises, contain elements of implication. So it is a proper part of the objective theory of contract formation that reasonable expectations will be protected even though the promisee had not subjectively directed her mind to the particular circumstances that in fact arise.

144    The traditional tests for implication of terms, namely the test of business efficacy stemming from *"Moorcock" (The)* (1889), 14 P.D. 64 (Eng. C.A.) and the test of the obvious inference, judged by the officious bystander, who would answer "of course" to a question as to whether a particular arrangement not expressed was intended to be part of the arrangement (*Shirlaw v. Southern Foundries (1926) Ltd.*, [1939] 2 K.B. 206 (Eng. C.A.) ) are, in a sense, manifestations of a desire to facilitate the achievement of the reasonable expectations of the parties, objectively determined from the language used in the context of their negotiations. It is, of course, not the subjective expectations of one party which should be protected: rather it is the reasonable expectations shared by the parties or held by one party and of which the other was aware or ought to have been aware was the basis of the conclusion of the transaction. This determination is judged on the basis of what reasonable persons in the contracting milieu facing the parties could be said to have expected.

145    By definition, implication of terms only becomes necessary where the parties have failed, by their express language, to deal with the matter in issue, leaving their objectively-determined intentions unascertained. Once the court is satisfied that there was an intention to do something more than to agree to agree in the future but, instead to enter into a legal relationship, it will be reluctant to refuse enforcement on the basis of uncertainty unless, in the words of Goodridge, J. in *Newfoundland (Attorney General) v. Churchill Falls (Labrador) Corp.* (1983), 49 Nfld. & P.E.I.R. 181 (Nfld. T.D.) at p. 270, the terms are not only "unascertained" but also "unascertainable" by the use of interpretive techniques such as the implication of terms.

146    Applying this approach to the interpretation of Clause 3 of the agreement, containing Imperial's acknowledgment that Young had enjoyed certain parking privileges in the past in respect of Young's tire sales operation, and Imperial's undertaking to continue those privileges beyond the termination of the lease on a basis mutually satisfactory to Imperial and Young, the question is what reasonable interpretation can be placed upon the language used bearing in mind the surrounding circumstances leading up to the conclusion of the agreement and bearing in mind that: (i) the lack of an expressed definitive duration for the "continued" parking privileges does not necessarily lead to a presumption of irrevocability or unilateral termination on reasonable notice or otherwise; and (ii) the use of the phrase "mutually satisfactory" does not in itself lead to the conclusion that the lack of satisfaction by either party would entitle that party unilaterally to terminate.

147    I agree with the trial judge's conclusion that the language used in Clause 3 is ambiguous. The surrounding circumstances, other than express statements of actual intention, are admissible to assist in the construction of the language used.

### (e) True Effect of the Agreement

148    The first thing to note is that in the recital to the agreement the parties acknowledge that they were severing their relationship "subject to" the terms of the agreement. There was an express recognition, therefore, that the relationship between them was to continue beyond termination of the lease in certain respects. The creation of the right of first refusal in favour of Imperial over Young's land would be one example. The other example would be the continuation of the parking privileges. Of interest is that the language in the agreement does not expressly deal with the duration of either of these rights. The recital also states the objective of the severance of the relationship to be that "another party" will commence operating the gas bar facilities. It is clear that both parties recognized that Imperial intended to lease the gas bar to another tenant and then Imperial's land would continue to receive the same sort of use as it had in the past. That being so, in principle, it could continue to accommodate

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 33 of 378

**Imperial Oil Ltd. v. Young, 1998 CarswellNfld 224**

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

Young's use as a parking lot so long as it did not interfere with the future contemplated use of the land by Imperial. The insertion of Clause 3 relating to continuation of parking privileges was therefore not inconsistent with Imperial's immediate objectives. Imperial's interests could continue to be advanced notwithstanding the use of part of the land for parking because the uses were not incompatible.

149    A second thing to note is that Clause 3 itself relates the parking privileges to "Young's tire sales operations *on* property of Young". It is the existing tire sales business operated by Young which appears to be intended to benefit from the parking arrangement, and not the land itself, whether owned by Young or not. The parking arrangement was therefore personal to the business being operated by Young.

150    It is also not without significance that although Clause 3 appears to tie the continuation of the parking privileges to the continued operation of Young's tire sales business, there is nothing in the clause itself which purports referentially to tie the parking to the continued operation of a gas bar on Imperial's land. The reference to operation of a gas bar by "another party" is relegated to a recital, thereby merely recognizing the existing plan once Young's lease was terminated. It must be remembered that Young had previously accused Imperial of trying to set up in the area in competition with Young. The reference to continued gas bar operation in the recital at least brought home to Young that there was no commitment by Imperial that it would not continue gas bar operations on the site through another operator.

151    A third point to note is that in the correspondence passing between the solicitors for the parties the emphasis in relation to parking was on reasonableness and cooperation. In Young's solicitor's letter of May 31st, 1985, in which he purported to summarize a previous offer made by Imperial's solicitor, he talked in terms of "a reasonable arrangement regarding parking spaces" and emphasised that Young was prepared to operate his adjoining business "in a spirit of friendly, neighbourly cooperation" with Imperial. Imperial's solicitor's correspondence in reply, which included the settlement agreement for signing, noted specifically that the agreement provided for "reasonable parking arrangements" in favour of Young. Whilst these expressions of view might not be able to be relied upon in themselves to read the word "reasonable" directly into the agreement, they represent the background circumstances and knowledge by the parties of the other's respective position which led up to the formalization of the agreement with the words "mutually satisfactory" included therein.

152    The history of the negotiations clearly indicates that the continuation of parking privileges was a significant matter in the final settlement. The emphasis on "reasonableness" demonstrates that the parking privileges were regarded as something that would not be trifling or capable of being eliminated in a perfunctory manner. The reasonable expectations of the parties, gleaned from an objective consideration of the evidence is that Young believed that he was getting something of substance with Imperial's agreement to continue the parking privileges and Imperial knew that Young so regarded it and that in agreeing to the continuation of the parking privileges, it was an inducement to Young to complete the overall settlement transaction.

153    On the position advanced by Imperial in argument, the requirement that the parking privileges be "mutually satisfactory" means that both must agree and that if one does not agree, it can effectively block any agreement, thereby leading to the conclusion that Imperial could terminate at any time unilaterally. On that interpretation, before the ink was dry on the agreement, Imperial could have given notice to Young that it intended to withdraw the parking privileges and then, following expiration of a period of reasonable notice (or perhaps even no notice) walk away from that part of the arrangement. Viewed objectively, I cannot conceive that if the parties were asked immediately before appending their signatures to the agreement whether Imperial could act in such a manner, either would have asserted that that was what was intended. Knowing that the continuation of parking was important for the operation of Young's business, it is not reasonable to impute an intention to the parties that the parking arrangements could be terminated immediately and unilaterally by Imperial.

154    Although I have previously concluded (see paras. [102]-[105]) that the language used by the parties to the agreement does not imply perpetuity in the exercise by Young of his parking privileges, I have also concluded that the words "acknowledges," "undertakes" and "continue" do imply, especially when read against the factual matrix of the transaction, something that is more than of a transient nature capable of being withdrawn unilaterally at the whim of the other party. As a sign post of the parties' reasonable expectations, therefore, the language used militates against any interpretation that would accord Imperial such a unilateral right and supports an interpretation that accords to Young a degree of greater protection.

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

155    The nature of the arrangement was that there was to be a mutual accommodation of each party's respective interests. Imperial needed to be able to continue to deal with the land, and proposed to do so in the same manner as before and which was not inconsistent with Young's continued use of part of it for parking. Young, for his part, needed additional parking to facilitate his business. An officious bystander cognizant of the background and of the interests of the parties would conclude that the reasonable expectations of the parties embodied in the agreement were that neither side was to be held hostage to the whims of the other. The opportunity of Young to use the land for parking and the opportunity of Imperial to use the property for other purposes that would be manifestly inconsistent with continued parking were to be accommodated to the extent possible.

156    Once it is concluded that the requirement that the parking privileges be "mutually satisfactory" does not mean that Imperial could unilaterally walk away from the parking arrangement and that, equally, Young could not indefinitely hold Imperial hostage in a relationship regardless of the impact on Imperial's future needs for the property, it follows that an obligation of reasonable accommodation by both sides must have been part of the reasonable expectations of the parties.

157    The problem in this case is to give an appropriate alternative meaning to the phrase "mutually satisfactory" while at the same time defining, based upon the reasonable expectations of the parties, the duration of the parking privileges and the means whereby they were to be exercised and ultimately brought to an end. The answer to this conundrum is, I believe, to be found in notions of good faith, implemented by the doctrine of implied terms.

158    While many would doubt the existence of a general doctrine of good faith performance in Canadian contract law, there are nevertheless instances where notions of good faith have been used to supplement contractual obligations. This is usually accomplished, not by way of enunciation of a general legal obligation, but by the use of implied terms as the exigencies of a particular case require to give business efficacy to contractual relationships. As Waddams points out at p. 329, "the cases implying terms into contracts often also conceal a judicial control over agreements that would otherwise be unfair. The power to imply terms into contracts is a flexible judicial tool". In *Dahl v. Nelson, Donkin & Co.* (1881), 6 App. Cas. 38 (U.K. H.L.) Lord Watson observed at p. 59 that a court:

> must assume that the parties intended to stipulate for that which is fair and reasonable, having regard to their mutual interests and to the main objects of the contract.

159    Increasingly, in recent years express contractual provisions that appear to permit a decision seriously affecting a party to be made at the other party's sole discretion require that other party to act reasonably, honestly and in good faith. For example, in *Greenberg v. Meffert* (1985), 18 D.L.R. (4th) 548 (Ont. C.A.) ; (leave to appeal refused (1985), 30 D.L.R. (4th) 768 (note) (S.C.C.) ) the terms of an agreement between a defendant real estate company and a plaintiff sales person provided that in the event that a listed property was sold after the agent's employment was terminated, any commission receivable by the agent "will be at the sole discretion of the company". The Ontario Court of Appeal held that those words meant that the defendant must act reasonably in exercising its discretion and must also act honestly and in good faith. Robins, J.A. stated at pp. 554-555:

> In my opinion, the company's discretion in this matter is not unbridled, firstly, because the nature of this contract and the subject matter of the discretion are such that the company's decision should be construed as being controlled by objective standards; and secondly, because the exercise of the discretion whether measured by subjective or objective standards, is subject to a requirement of honesty and good faith.

> ... if this provision is to have purpose and substance, the discretion must be exercised in a reasonable way, not arbitrarily or capriciously but for good reason.

160    In *McKinlay Motors Ltd. v. Honda Canada Inc.* (1989), 80 Nfld. & P.E.I.R. 200 (Nfld. T.D.) Wells, J. held that provisions in an automobile dealer franchise agreement allowing for the discretionary allocation of vehicles by the manufacturer to a particular dealer was subject to an implied term that the parties act towards each other in their business dealings in good faith.

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    33

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

161      Thus, even where the language of an agreement appears to give an unfettered discretion to one party to act with reference solely to his or her own interests, such a discretion may be circumscribed by obligations of good faith once the language is construed in the context of the relationship of the parties.

162      The notion of good faith surfaces in other areas as well. The notion of an implied duty of cooperation to facilitate the performance of a contract has been noted. See *Burrows* , "*Contractual Cooperation and the Implied Term* (1968), 31 Mod. L.R. 390; *Stoljar* , "*Prevention and Cooperation in the Law of Contract* " (1953), 31 Can.B.Rev. 231.

163      Furthermore, the notion of an obligation to negotiate in good faith and not to withhold agreement unreasonably has been recognized in some cases where the parties have stipulated for mutual agreement in the future in situations where the court holds that the agreement is not void for uncertainty or incompleteness. In *Empress Towers Ltd. v. Bank of Nova Scotia* (1990), 73 D.L.R. (4th) 400 (B.C. C.A.) a tenant had an option to renew a lease at market value "as mutually agreed" between the tenant and the landlord. The lease also provided if the parties could not agree, either could terminate the agreement. Prior to the expiration of the term, the tenant proposed a new and higher rent for the option term and indicated a willingness to negotiate. The landlord did not respond until the day of expiry of the term, stating it wanted to renew on a month to month basis with advance payment of a substantial sum of money. On the tenant's refusal, the landlord sought possession. A majority of the British Columbia Court of Appeal held that the option agreement was not an agreement to agree and that it was not void for uncertainty. The majority further held that the requirement for mutual agreement on the renewal market rent meant that it should not be construed as giving the landlord a unilateral right to stipulate whatever arrangement it wished and, if not agreed to by the other side, to walk away from the arrangement; rather the agreement was subject to an implied term that the landlord would negotiate in good faith and that agreement would not be unreasonably withheld.

164      Lambert, J.A. stated, for the majority, at pp. 404-405:

> ...the courts will try, wherever possible, to give the proper legal effect to any clause that the parties understood and intended was to have legal effect.
>
> In this case, if the parties had intended simply to say that if the tenant wished to renew it could only do so at a rent set by or acceptable to the landlord, then they could have said so. Instead, they said that if the tenant wished to renew it could do so at the market rental prevailing at the commencement of the renewal term. If nothing more had been said then the market rental could have been determined on the basis of valuations and, if necessary, a court could have made the determination. It would have been an objective matter. But the clause goes on to say that not only must the renewal rental be the prevailing market rental but also it must be the prevailing market rental as mutually agreed between the landlord and the tenant. It could be argued that the additional provision for mutual agreement meant only that the first step was to try to agree but if that step failed then other steps should be adopted to set the market rental. However, the final sentence of cl. 23, which contemplates a failure to agree giving rise to a right of termination, precludes the acceptance of that argument. In my opinion, the effect of the requirement for mutual agreement must be that the landlord cannot be compelled to enter into a renewal tenancy at a rent which it has not accepted as the market rental. But, in my opinion, that is not the only effect of the requirement of mutual agreement. It also carries with it, first, an implied term that the landlord will negotiate in good faith with the tenant with the objective of reaching an agreement on the market rental rate and, secondly, that agreement on a market rental will not be unreasonably withheld. Those terms are to be implied under the officious bystander and business efficacy principles in order to permit the renewal clause, which was clearly intended to have legal effect, from being struck down as uncertain. The key to implying the terms that I have set out is that the parties agreed that there should be a right of renewal at the prevailing market rental.

165      Whilst the circumstances under which an implied duty of good faith performance arises are many and varied, and the extent to which such a duty can be said to be implied as a matter of law into all contractual relationships is still a matter of debate, the fact remains that the courts in individual cases are prepared to imply such duties as the individual circumstances require so as to ensure that the reasonable expectations of the parties otherwise ascertainable are not frustrated and rendered nugatory.

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

166    In the instant case this notion of good faith performance and a duty to cooperate in the accommodation of the mutual interests of the parties so as to facilitate the achievement of the main objects of the contract, gives meaning to the requirement in Clause 3 that the continuation of the parking privileges shall be on a basis "mutually satisfactory" to both parties. It requires each party in good faith to attempt to accommodate the interests of the other with respect to the use of the land for parking before being in a position to exercise any right to terminate or arbitrarily to insist on continuation.

167    As in the *Empress Towers* case, if Imperial and Young had intended simply to say that if Young wished to continue his existing parking privileges beyond the termination of the gas bar lease it could only do so if the nature and extent of those privileges were acceptable to Imperial, they could have said so. Instead, they provided that the nature and extent of the future arrangement was to be "mutually" satisfactory. Furthermore, the parties stipulated, either expressly or by implication, the standard to be applied in defining the nature and extent of the future parking arrangement: the existing parking arrangement (i.e. approximately 25 cars, parked around the perimeter of the property) was to be "continued" subject to future adjustment based on mutual accommodation of the parties' reasonable changed requirements.

168    That having been said, the question then arises as to whether there are any outside parameters which in any event would limit the period of time during which this duty of cooperation would be operative. This brings us back to the question of duration. Although Clause 3 does not expressly deal with the matter, it is appropriate to imply terms into the agreement that will have the effect of fulfilling the objectively determined reasonable expectations of the parties, as previously described. Any implied terms so derived should arise out of the provisions of Clause 3, viewed against the background circumstances, and not be inconsistent with that clause.

169    In *Wyatt v. Franklin* (1993), 122 N.S.R. (2d) 252 (N.S. S.C.) in a dispute between an uncle and his nephew as to the ownership and use of certain land occupied by the uncle, Goodfellow, J. held that the agreement between the parties was an indefinite licence to use the land. Noting that the terms of the licence were not spelled out, he nevertheless rejected the suggestion that the licence was terminable on six months notice because "it completely overlooks the true nature of the licence agreement between the parties" (p. 262). Nevertheless, taking account of the nature of the relationship between the parties and the circumstances under which the arrangement was entered into, the judge drew the inference that the licence was to be of considerable duration upon terms which included provisions that the licence: was to terminate on the death of either or both parties (because the licence was personal in nature); was to terminate on the retirement or departure of the licensee from his construction business (because the foundation of the licence was the use of the land in the carrying out of the business), would continue until such time as the licensor had a bona fide alternate use for the property; and would be defeated by either party selling or disposing of his respective property. Goodfellow, J. observed at p. 263:

> While it is clear that the parties never expressed the terms that I have inferred in their licence, they are clearly established by the relationship of the parties and represent what they clearly intended and would have expressed had they done so in 1976.

170    What is significant about the *Wyatt* case is that the court was prepared to imply terms concerning the duration of an indefinite licence in order to give meaning and effect to the reasonable expectations of the parties which were gleaned from the surrounding circumstances.

171    In like manner, similar terms can be implied in this case.

172    The key factors affecting the continued use of Imperial's property for parking can be said to be the following:

> (1) The continued operation of Young's tire sale business from the adjacent property.

> (2) The future use of Imperial's property for a purpose that was incompatible with the continued use of the property by Young for parking cars.

> (3) Because a licence is personal to the parties and does not constitute an interest in the land, the contemplated bona fide sale of the property by Imperial to a third party at arm's length.

Imperial Oil Ltd. v. Young, 1998 CarswellNfld 224

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

With respect to the nature and extent of the parking rights, as to the number of cars to be parked and the area to be occupied, inasmuch as the parking privileges which Imperial undertook to "continue" were "these parking privileges", i.e., those which Young had previously enjoyed, the area and the number of cars would be generally the same as had existed previously; but because of the need to limit parking to circumstances where Imperial does not have a bona fide use which is incompatible with parking, the areal extent of the privileges would be subject to adjustment (and potentially elimination) as may be required by bona fide future uses of the property by Imperial.

173     It may be said that the reference in the recitals of the settlement agreement to the continued operation of the gas bar by another party implies that the licence to park was intended only to last so long as the land was used as a gas bar. The reference to continued gas bar use, however, is significant not as an indication that the parties intended to terminate parking when the gas bar ceased to operate but, rather, as a signpost that Imperial was content to allow the parking to continue so long as the parking could be accommodated with respect to future use. Imperial was prepared to agree to continued parking because it did not interfere with future plans for the property. So long as that situation obtained, there would be no need for Imperial to change its position, provided of course any future bona fide use (including a proposed sale) that became incompatible with continuation of the existing parking arrangement, in whole or in part, would not be frustrated.

174     The tying of the duration of the licence strictly to the continued existence of the gas bar is much too arbitrary, if the essence of the arrangement is the good faith accommodation of the parties' changed circumstances. What if the use was changed from a gas bar to, say, a car wash, but the new use could equally accommodate parking? Could it be said, applying the officious bystander test at the time the agreement was signed, that Imperial if asked, would necessarily say that the closing of the gas bar would allow for unilateral termination of parking even though Young's interests were not incompatible with the new use? I do not believe so. It is more likely, given the concept of reasonable accommodation underlying the arrangement, that the response would be more along the lines that Young could continue to park so long as it did not interfere with Imperial.

175     Indeed, the cessation of the gas bar use as a termination point for the parking licence might also be too long, rather than too short. It might well have been, for example, that a major expansion of the gas bar might have made operation in its extended format incompatible with continued parking. The notion of reasonable accommodation should equally apply in such circumstances to require Young to limit, move or perhaps even cease, parking as the circumstances of the change and expanded use dictated.

176     Furthermore, as previously noted, it is not without significance that although Clause 3 expressly references the continuation of Young's tire sales business, it does not do so in relation to the continuation of a gas bar but, instead relegates that reference to a recital. An implied term that would limit future parking privileges to the duration of future gas bar use could not therefore be said to arise out of the clause itself.

177     It follows, therefore, that the notion of reasonable accommodation underlying the arrangement means that the duration of the licence is not limited by any specific use, such as a gas bar operation, but by the concept of incompatibility of conflicting uses whatever they may be. It is the principle of future incompatibility which is the touchstone for an understanding of the arrangement which best reflects the reasonable expectations of the parties, objectively determined.

178     On this analysis, a proper construction of the agreement leads to the conclusion that Imperial and Young agreed, for consideration, that:

A. Young would have the right, not terminable unilaterally by Imperial or enjoyable in perpetuity by Young, to park cars associated with Young's business on Imperial's property for such period of time which was the shorter of:

(i) The date upon which Young or his family, either directly or through the alter ego of Kings Bridge Service Station Limited, ceased to operate a tire sales operation on the adjacent property;

(ii) The date upon which Imperial bona fide decided to sell the property to a third party at arms length to Imperial; and

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Imperial Oil Ltd. v. Young, 1998 CarswellNfld 224**

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

(iii) The date upon which Imperial bona fide decided to use the property for a use that was incompatible with the continued use of the property by Young for parking cars, and so reasonably notified Young of that intention.

B. The nature and extent of the parking rights as to the number of cars to be parked and the area to be occupied by them, would generally be that which was previously enjoyed by Young, but subject to adjustment on the basis of discussions of the parties, acting in good faith, or as may reasonably be required by subsequent changes by Imperial in the use of the property.

In the event that the parties could not, after good faith discussion, agree on appropriate accommodations with respect to any revised circumstance, the court could break the deadlock based on an objective standard of reasonableness. Unlike the *Empress Tower* case, where the parties expressly stipulated for the right to terminate in the event there was no mutual agreement arrived at following good faith negotiations, the possibility of judicial resolution in the face of lack of agreement between the parties remains an option in the instant case because they did not stipulate for the right to terminate in such an eventuality.

179    On this interpretation, the phrase "mutually satisfactory," imports into the agreement the notion of good faith, cooperation and accommodation in the future with respect to adjustment of the areal extent of the parking privileges to accommodate any good faith changes by Imperial in the use of the property. The fulfilment of this obligation would require the parties to keep each other informed of their future plans and to discuss in good faith alternative means whereby parking could still be accommodated without impairing, in a material way, Imperial's proposed alternative use of the property.

180    This interpretation of the phrase "mutually satisfactory" best accords with the reasonable expectations of the parties and does not subject one party either to the threat of unilateral termination or the other to the possibility of perpetual interference with proprietary rights. It subjects the future relationship of the parties to a continuation of the nature of the existing parking arrangement, imposes on them a requirement to make true efforts at mutual accommodation and requires the parties to discuss and reach a solution varying the existing agreement that is truly mutually satisfactory. It arises naturally out of the express language of Clause 3, is supported by the surrounding background circumstances, and is not inconsistent with the words of the parties' agreement.

*(f) Application to the Facts*

181    As of the date of trial, Young still owned and operated his tire sale business on the adjacent property and Imperial had not sold or disposed of the property. What had happened, however, was that Imperial, having closed the gas bar operation, commenced to environmentally remediate the property. Imperial claimed that it was required to do this by the Department of the Environment. It did not, however, provide, either to Young or to the court, information as to the extent of the problem or the specific requirements for remediation.

182    As indicated earlier, Imperial unilaterally fenced off most of the property leaving Young with a narrow area which could accommodate no more than seven vehicles. Despite approaches by Young suggesting that the two sides attempt to agree on revisions to the original arrangement to accommodate the new events which had occurred, ie. the closing of the gas bar and cleanup of the site, Imperial did not engage in any meaningful discussion with Young with respect to these matters. Instead, it unilaterally purported to terminate the parking privileges. It took the position that once the cleanup of the area was completed, it wished to fence all of the property and to prevent any further parking "to avoid any risk of new contamination of the property from vehicles which could leak oil or gasoline onto the surface of the land". No evidence was presented as to whether there was in fact any risk of contamination that would have been of any concern to the Department of Environment from the leaking of oil or gasoline from parked vehicles. The singular absence of any evidence of the nature of the problem identified by the Department of Environment and whether the complete exclusion of any further vehicles from the property would have been necessary to avoid the risk of any further contamination, was noteworthy.

183    I conclude from this that Imperial did not act in good faith in its dealings with Young with respect to whether or not the new (or restricted) usages contemplated by Imperial could nevertheless accommodate some or all of the originally contemplated continued parking by Young. It would have been incumbent upon Imperial to discuss with Young the possibility of using other

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

areas of the property for parking at a time when it was necessary to excavate the original parking area as part of the environmental remediation, and, after the remediation was completed, to determine whether or not some arrangement could be reached to allow continued parking in a manner that would not have future environmental repercussions. The mere assertion of an inability to accommodate further parking and the unilateral taking of action by Imperial to restrict Young does not fulfill this obligation.

184    I recognize, of course, that the trial judge made a finding of fact that the parties acted in good faith towards one another. This finding does not conflict with the inference that I draw. The trial judge's use of the notion of good faith essentially embodied a conclusion that Imperial did not act in bad faith, and in that sense, maliciously, to harm Young. In the sense in which it is used in this judgment, however, good faith refers to the obligation to take account of the interests of the other party and to attempt to reach an accommodation where those interests conflict with one's own interest before asserting one's own strict legal rights. In that sense, Imperial did not act in good faith. Young continuously held out the possibility of discussions leading to a possible accommodation of their mutual interests. Imperial's response was to attempt to terminate the parking rights. There was no attempt at good faith negotiations. It appears that Young was regarded simply as a nuisance who could be dealt with and disposed of by refusing any accommodation.

185    Accordingly, I conclude that Imperial was in breach of its agreement with Young and, not having, as of the date of trial, attempted to work out a reasonable accommodation, was still in breach.

186    At common law a contractual licence could effectively by revoked at any time by the licensor, with any remedy for wrongful revocation being limited to a claim for damages for breach of contract. With the fusion of the administration of law and equity by the *Judicature Acts* , however, came the possibility of the grant of an injunction to restrain the revocation of the licence before expiration of its intended duration, on the basis of an implied obligation not to revoke it, except in accordance with the contract, while the licence period was still running. See, *London Borough of Hounslow v. Twickenham Garden Developments Ltd.* (1970), [1971] 1 Ch. 233 (Eng. Ch.) , per Megarry, J. at pp. 245-248, who found support in *Hurst* and *Winter Garden* for this position.

187    The contract in this case is subject to an implied term that the parking privileges will continue until the occurrence of certain events, including a future use of the land by Imperial for a purpose inconsistent with continued parking. Applying *Hounslow* , there is also an implied negative obligation not to revoke before the happening of that event. Young is thereby entitled to an injunction restraining Imperial from revoking the parking privileges except in accordance with rights conferred by the agreement.

**Disposition**

188    Accordingly, I would grant the following remedies:

1. It is declared that James Young and Kings Bridge Service Station Limited have the right, not terminable unilaterally by Imperial or enjoyable in perpetuity by Young, to park vehicles associated with Young's business on Imperial's adjacent property for such period of time which is the shorter of:

(i) The date upon which Young or his family, either directly or through the medium of Kings Bridge Service Station Limited, cease to operate a tire sales business on the adjacent property;

(ii) The date upon which Imperial bona fide decides to sell, and does sell, the property to a third party at arms length from Imperial; and

(iii) The date upon which Imperial bona fide decides to use the property for a use that is incompatible with the continued use of all of the property by Young and/or Kings Bridge Service Station Limited for parking cars, and so reasonably notifies Young of that intention.

2. It is further declared that the nature and extent of the parking rights as to the number of vehicles to be parked and the area to be occupied by them shall be the same as that which was previously enjoyed by Young and/or Kings Bridge Service

1998 CarswellNfld 224, [1998] N.J. No. 248, 167 Nfld. & P.E.I.R. 280, 21 R.P.R. (3d) 65...

Station Limited prior to termination of the gas bar lease, but subject to adjustment on the basis of mutual agreement of the parties acting in good faith, or as may reasonably be required by subsequent changes by Imperial in the use of the property. In the event of disagreement after good faith discussion, as to how the interests of the parties can be accommodated as a result of changed circumstances, the court may determine whether: (a) future use bona fide proposed by Imperial is in fact incompatible in whole or in part with continued use of the land for parking; (b) the area and extent, if at all, which the land with its new use can accommodate any parking; (c) any reasonable adjustment of parking should be ordered; (d) future parking should be terminated.

3. It is ordered that Imperial, its servants and agents and any one acting on their behalf be and are hereby enjoined from interfering with or preventing the exercise of the parking rights enjoyed by James Young and/or Kings Bridge Service Station Limited on property of Imperial adjacent to the service station property of Kings Bridge Service Station Limited, except in accordance with the rights of the parties as declared in paragraphs 1 and 2.

4. It is ordered that Imperial shall forthwith remove any and all barriers and obstructions presently existing on the property that prevent the present exercise by James Young and/or Kings Bridge Service Station Limited of car parking in any manner that is less extensive in area than that which was enjoyed immediately prior to the termination of the Imperial lease.

5. It is ordered that Imperial pay to James Young and/or Kings Bridge Service Station Limited, as their interests may appear, damages for trespass in an amount to be assessed.

6. Imperial shall pay the costs of the appellants on this appeal and at trial, on a party and party basis, to be taxed.

*Appeal dismissed.*

## Footnotes

1     Before the trial judge the parties made no distinction between the corporate appellant and James Young, nor will one be made in this decision. Both, collectively and separately are referred to as Young unless otherwise noted.

2     I shall return later in this decision to the principle espoused in *Winter Garden* respecting construction of contractual licences.

3     The preamble to the covenants states, in part, "*NOW THEREFORE THIS AGREEMENT WITNESSETH* that for and in consideration of the mutual covenants and conditions hereinafter appearing, the parties hereto mutually covenant and agree as follows:"

4     The Supreme Court Law Review, Vol. 6, p. 131

---

**End of Document**        Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 73

55 Collier Bankr.Cas.2d 789, 45 Bankr.Ct.Dec. 222, Bankr. L. Rep. P 80,434

432 F.3d 507
United States Court of Appeals,
Third Circuit.

In re ARMSTRONG WORLD
INDUSTRIES, INC., Appellant.

No. 05–1881.    |    Argued Oct.
24, 2005.    |    Dec. 29, 2005.

**Synopsis**

**Background:** Objections were filed to confirmation of Chapter 11 debtor's proposed reorganization plan. The United States District Court for the District of Delaware, Eduardo C. Robreno, United States District Judge for the Eastern District of Pennsylvania, sitting by designation, 320 B.R. 523, denied confirmation, and debtor appealed.

**[Holding:]** The Court of Appeals, Anne E. Thompson, District Judge, sitting by designation, held that plan violated absolute priority rule.

Affirmed.

West Headnotes (10)

[1]    **Bankruptcy**
          Finality

         In bankruptcy cases, finality, for purpose of taking appeal, is construed more broadly than for other types of civil cases. 28 U.S.C.A. § 1291.

         1 Cases that cite this headnote

[2]    **Bankruptcy**
          Finality

         Factors appellate court considers in determining whether district court's decision in a bankruptcy case is final are as follows: (1) impact on assets of bankruptcy estate; (2) need for further fact-finding on remand; (3) preclusive effect of decision on merits; and (4) interests of judicial economy. 28 U.S.C.A. § 1291.

8 Cases that cite this headnote

[3]    **Bankruptcy**
          Finality

         Order denying confirmation of proposed Chapter 11 plan, on ground it violated absolute priority rule, was sufficiently final to warrant appellate review; order would likely affect distribution of assets between different creditor classes, and issue on appeal raised discrete question of law that would have preclusive effect on certain provisions of plan. 11 U.S.C.A. § 1129(b)(2); 28 U.S.C.A. § 1291.

         9 Cases that cite this headnote

[4]    **Bankruptcy**
          Conclusions of law;  de novo review

         Whether proposed Chapter 11 reorganization plan violates absolute priority rule is question of law, reviewed de novo. 11 U.S.C.A. § 1129(b)(2).

         6 Cases that cite this headnote

[5]    **Statutes**
          Plain language;  plain, ordinary, common, or literal meaning
         **Statutes**
          Relation to plain, literal, or clear meaning;  ambiguity

         If meaning of statute is plain, construing court will make no further inquiry unless literal application of the statute will end in result that conflicts with Congressional intentions, which are controlling.

         8 Cases that cite this headnote

[6]    **Bankruptcy**
          Preservation of priority

         Proposed Chapter 11 plan provision, issuing new stock warrants to unsecured senior class of creditors for automatic transfer to junior class of equity holders if co-equally senior impaired class rejected plan, violated absolute priority rule; rule



Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 43 of 378

In re Armstrong World Industries, Inc., 432 F.3d 507 (2005)

55 Collier Bankr.Cas.2d 789, 45 Bankr.Ct.Dec. 222, Bankr. L. Rep. P 80,434

could not be evaded through fiction that creditor was free to transfer its distribution, and value of warrants far exceeded value of any intercompany claims given up by equity holders. 11 U.S.C.A. § 1129(b)(2)(B)(ii).

16 Cases that cite this headnote

**[7]** **Bankruptcy**
☞ Equitable powers and principles

**Bankruptcy**
☞ Preservation of priority

Equitable considerations did not warrant approval of proposed Chapter 11 plan that violated absolute priority rule by issuing new stock warrants to equity holders over objection of senior impaired class of creditors, even though numerical majority of senior class's members had accepted plan and warrant issuance would not negatively affect distribution to senior class. 11 U.S.C.A. § 1129(b)(2)(B)(ii).

14 Cases that cite this headnote

**[8]** **Bankruptcy**
☞ Preservation of priority

**Estoppel**
☞ Claim inconsistent with previous claim or position in general

Senior class of unsecured creditors was not judicially estopped from raising absolute priority rule objection to proposed Chapter 11 plan, even though it had participated in plan negotiations, initially endorsed plan, and subsequently withdrawn its support of plan for unrelated reason. 11 U.S.C.A. § 1129(b)(2)(B)(ii).

7 Cases that cite this headnote

**[9]** **Estoppel**
☞ Claim inconsistent with previous claim or position in general

"Judicial estoppel" can be applied when party asserts certain position in legal proceeding and prevails, only to assert contrary position later on because of changed interests; its purpose is to protect judicial process by preventing parties

from deliberately changing positions according to exigencies of moment.

12 Cases that cite this headnote

**[10]** **Estoppel**
☞ Claim inconsistent with previous claim or position in general

In deciding whether to apply judicial estoppel, court considers such factors as whether party's position is clearly inconsistent with its earlier position and whether party changing position would gain unfair advantage over opposing party.

10 Cases that cite this headnote

**Attorneys and Law Firms**

***508** Gregory S. Coleman (Argued), Weil, Gotshal & Manges LLP, Austin, TX, Stephen Karotkin, Debra A. Dandeneau, Weil, Gotshal & Manges LLP, New York, NY, Mark D. Collins, Rebecca L. Booth, Richards, Layton & Finger, P.A., Wilmington, DE, for Appellant Armstrong World Industries, Inc.

Mark E. Felger, Jeffrey R. Waxman, Cozen & O'Connor, Wilmington, DE, Stephen J. Shimshak (Argued), Andrew N. Rosenberg, Curtis J. Weidler, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, for Appellee Official Committee of Unsecured Creditors of Armstrong World Industries, Inc.

Marla R. Eskin, Campbell & Levine, LLC, Wilmington, DE, Elihu Inselbuch, Caplin & Drysdale, Chartered, New York, NY, Peter Van N. Lockwood, Nathan D. Finch, Caplin & Drysdale, Chartered, Washington, D.C., for Appellee Official Committee of Asbestos Claimants of Armstrong World Industries, Inc.

James L. Patton, Jr., Sharon M. Zieg, Edwin J. Harron, Young, Conaway, Stargatt & Taylor, LLP, Wilmington, DE, Michael J. Crames, Andrew A. Kress, Kaye Scholer, LLP, New York, NY, for Appellee Dean M. Trafelet, Legal Representative for Future Asbestos Personal Injury Claimants of Armstrong World Industries, Inc.

55 Collier Bankr.Cas.2d 789, 45 Bankr.Ct.Dec. 222, Bankr. L. Rep. P 80,434

Before SLOVITER and FISHER, Circuit Judges, and THOMPSON, [*] District Judge.

**Opinion**

### OPINION OF THE COURT

ANNE E. THOMPSON, [*] District Judge.

This matter is before the Court on Armstrong Worldwide Industries, Inc.'s **\*509** ("AWI") appeal of the District Court's decision to deny confirmation of AWI's bankruptcy reorganization plan. In its decision, the District Court concluded that the plan could not be confirmed because the distribution of warrants to AWI's equity interest holders over the objection of the class of unsecured creditors violated the absolute priority rule, as codified in 11 U.S.C. § 1129(b)(2)(B). AWI filed a timely appeal, contending that (1) the issuance of warrants does not violate the absolute priority rule, and (2) an equitable exception to the absolute priority rule applies. For the following reasons, we affirm the judgment of the District Court.

### I.

### FACTS AND PROCEDURAL HISTORY

AWI designs, manufactures, and sells flooring products, kitchen and bathroom cabinets, and ceiling systems. Due to asbestos litigation liabilities, AWI and two of its subsidiaries filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware on December 6, 2000. The United States Trustee for the District of Delaware appointed two committees to represent AWI's unsecured creditors: (1) the Official Committee of Asbestos Personal Injury Claimants ("APIC"), and (2) the Official Committee of Unsecured Creditors ("UCC"). The Bankruptcy Court appointed Dean M. Trafelet as the Future Claimants' Representative ("FCR").

After holding negotiations with APIC, UCC, and FCR, AWI filed its Fourth Amended Plan of Reorganization (the "Plan") and Amended Disclosure Statement with the Bankruptcy Court in May 2003. Under the Plan, AWI's creditors were divided into eleven classes, and AWI's equity interest holders were placed into a twelfth class. Relevant to this appeal are Class 6, a class of unsecured creditors; Class 7, a

class of present and future asbestos-related personal injury claimants; and Class 12, the class of equity interest holders who own AWI's common stock. (App. at 1146–47, 1151.) The only member of Class 12 is Armstrong Worldwide, Inc. ("AWWD"), the parent company of AWI, which is in turn wholly owned by Armstrong Holdings, Inc. ("Holdings"). Classes 6 and 7 hold equal priority, and have interests senior to those of Class 12. (App. at 0019.) All three are impaired classes because their claims or interests would be altered by the Plan. 11 U.S.C. § 1124.

The Plan provided that AWI would place approximately $1.8 billion of its assets into a trust for Class 7 pursuant to 11 U.S.C. § 524(g). (App. at 1147–49.) Class 7's members would be entitled to an initial payment percentage from the trust of 20% of their allowed claims. (App. at 1177.) Meanwhile, Class 6 would recover about 59.5% of its $1.651 billion in claims. (App. at 1146–47.) The Plan would also issue new warrants to purchase AWI's new common stock, estimated to be worth $35 to $40 million, to AWWD or Holdings (Class 12). If Class 6 rejected the Plan, then the Plan provided that Class 7 would receive the warrants. (App. at 1149.) However, the Plan also provided that Class 7 would automatically waive receipt of the warrants, which would then be issued to AWWD or Holdings (Class 12).

The Bankruptcy Court set September 22, 2003 as the deadline for voting on the Plan and for the parties to object to the Plan's confirmation. Because the Plan would distribute property to AWI's equity interest holders without fully paying off the unsecured creditors' claims, all impaired unsecured creditor classes were required to approve the Plan under 11 U.S.C. § 1129(a)(8). If any impaired class objected to the Plan, then the Plan could only be "crammed down" if it was "fair and **\*510** equitable" to the objecting class. See 11 U.S.C. § 1129(b)(1).

UCC represented all of the classes of unsecured creditors, including Class 6, during the negotiations that led to the Plan. Although UCC initially approved of the Plan in May 2003, it later filed a conditional objection to the Plan's confirmation on September 22, 2003 based on (1) the greater potential distribution to creditors that would result if federal asbestos legislation was passed (namely, the FAIR Act), and (2) the possible applicability of the absolute priority rule, as codified in 11 U.S.C. § 1129(b), if the Plan was not accepted by all classes.

As indicated in its conditional objection, UCC's reservations about the Plan were prompted in part by the proposal of the

55 Collier Bankr.Cas.2d 789, 45 Bankr.Ct.Dec. 222, Bankr. L. Rep. P 80,434

FAIR Act, which was reported out of the Senate Judiciary Committee in July 2003. [1] If passed, the FAIR Act would remove asbestos-related personal injury claims from the courts and absolve asbestos defendants of liability in return for mandatory contributions to a federally supervised trust. (App. at 0017–18.) AWI's contribution to the FAIR Act trust was estimated to range from $520 to $805 million, far less than the $1.8 billion it would put in trust for the Class 7 asbestos claimants under the Plan. Thus, if the FAIR Act passed, approximately $1 billion could be freed up for distribution among AWI's other creditors, including the class of unsecured creditors.

In response to UCC's concerns about the FAIR Act, the Bankruptcy Court extended the final deadline for voting to October 31, 2003. (App. at 0018.) To accept the Plan, class members holding at least fifty percent of the number of claims and two-thirds of the amount of the claims would need to vote for the Plan. *See* 11 U.S.C. § 1126(c). Although 88.03% of Class 6 claim holders voted for the Plan, only 23.21% of the amount of the claims voted to accept the Plan. (App. at 1456.) As a result, Class 6 rejected the Plan. Classes 7 and 12 accepted the Plan, but Class 12's acceptance was rescinded under the Plan due to Class 6's rejection. (App. at 0020.)

Following a hearing on November 17 and 18, 2003, the Bankruptcy Court recommended confirmation of the Plan to the District Court in its December 19, 2003 Proposed Findings and Conclusions. (App. at 1430.) The Bankruptcy Court found that the absolute priority rule, as codified in section 1129(b)(2) of the Bankruptcy Code, was satisfied because the warrants were distributed to the holder of equity interests because of the waiver by Class 7, citing *In re Genesis Health Ventures, Inc.,* 266 B.R. 591 (Bkrtcy. D.Del.2001), and *In re SPM Mfg. Corp.,* 984 F.2d 1305 (1st Cir.1993). In addition, the Bankruptcy Court found that UCC had waived its right to object to the Plan when it "entered into a consensual plan encompassing" the Plan provisions. (App. at 1502–03.) Because the Plan included a channeling injunction under section 524(g) of the Bankruptcy Code, the District Court was required to affirm the Bankruptcy Court's Proposed Findings and Conclusions before the Plan could go into effect. (App. at 1468.)

UCC filed objections to the Bankruptcy Court's Proposed Findings and Conclusions with the United States District Court for the District of Delaware. The District Court held a hearing on the objections on December 15, 2004 and issued a memorandum and order on February 23, 2005 denying **\*511**

confirmation of the Plan. The District Court found that (1) the issuance of warrants to the equity interest holders violated the absolute priority rule, and (2) no equitable exception to the absolute priority rule applied. *In re Armstrong World Indus., Inc.,* 320 B.R. 523 (D.Del.2005).

AWI now appeals the District Court's decision, and is joined by Appellees APIC and FCR, who jointly submitted a brief adopting and supporting AWI's arguments.

## II.

### *DISCUSSION*

#### A. *Jurisdiction*

[1] [2] This Court has jurisdiction to hear appeals of "all *final* decisions of the district courts." 28 U.S.C. § 1291 (emphasis added); *Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). In bankruptcy cases, finality is construed more broadly than for other types of civil cases. *In re Marvel Entm't Group, Inc.,* 140 F.3d 463, 470 (3d Cir.1998). Because bankruptcy proceedings are often protracted, and time and resources can be wasted if an appeal is delayed until after a final disposition, our policy is to quickly resolve issues central to the progress of a bankruptcy. *See In re Owens Corning,* 419 F.3d 195, 203 (3d Cir.2005). We consider four factors to determine whether a district court's decision in a bankruptcy case is final: (1) the impact on the assets of the bankruptcy estate; (2) the need for further fact-finding on remand; (3) the preclusive effect of a decision on the merits; and (4) the interests of judicial economy. *See id.* (citing *Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV,* 229 F.3d 245, 250 (3d Cir.2000)).

[3] Although Appellee UCC contends that we cannot hear this appeal because it involves an interlocutory order rather than a final order, we find jurisdiction after considering the above four factors. First, the District Court's denial of confirmation will likely affect the distribution of assets between the different creditor classes. *See Buncher Co.,* 229 F.3d at 250. Second, the issue presented here requires no additional fact-finding. Third, this appeal would require us to address a discrete question of law that would have a preclusive effect on certain provisions of the Plan. Lastly, practical considerations in the interests of judicial economy require that we hear this appeal now. Because we find

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 46 of 378

In re Armstrong World Industries, Inc., 432 F.3d 507 (2005)
55 Collier Bankr.Cas.2d 789, 45 Bankr.Ct.Dec. 222, Bankr. L. Rep. P 80,434

jurisdiction under 28 U.S.C. § 1291, we will not address whether we also have jurisdiction under 28 U.S.C. § 158(d).

## B. *Standard of Review*

**[4]** We review the District Court's decision using a de novo standard for conclusions of law, and a clearly erroneous standard for findings of fact. *In re PWS Holding Corp.,* 228 F.3d 224, 235 (3d Cir.2000). Whether a reorganization plan violates the absolute priority rule is a question of law. *See In re Johnston,* 21 F.3d 323, 328–29 (9th Cir.1994).

## C. *Confirmation of a Reorganization Plan*

Confirmation of a proposed Chapter 11 reorganization plan is governed by 11 U.S.C. § 1129. A court will confirm a plan if it meets all of the requirements set out in section 1129(a). Only one of these requirements concerns us in this appeal, and that is the requirement that the plan be consensual, with unanimous acceptance by all of the impaired classes.[2] 11 U.S.C. § 1129(a)(8). If the plan is not consensual, **\*512** a court may still confirm as long as the plan meets the other requirements of section 1129(a), and "does not discriminate unfairly, and is fair and equitable" as to any dissenting impaired class. 11 U.S.C. § 1129(b)(1); *see Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,* 526 U.S. 434, 441, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999) [hereinafter *LaSalle* ]. The latter type of confirmation is also called a "cram down," as the court can cram a plan down over the objection of an impaired class. *See generally* Kenneth N. Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code,* 53 Am. Bankr.L.J. 133 (1979).

### 1. *The Absolute Priority Rule*

The issues in this case require us to examine the "fair and equitable" requirement for a cram down, which invokes the absolute priority rule. The absolute priority rule is a judicial invention that predated the Bankruptcy Code. It arose from the concern that because a debtor proposed its own reorganization plan, the plan could be "too good a deal" for that debtor's owners. *LaSalle,* 526 U.S. at 444, 119 S.Ct. 1411. In its initial form, the absolute priority rule required that "creditors ... be paid before the stockholders could retain [equity interests] for any purpose whatever." *Id.* (quoting *N. Pac. Ry. Co. v. Boyd,* 228 U.S. 482, 508, 33 S.Ct. 554, 57 L.Ed. 931 (1913)) (emphasis added).

The absolute priority rule was later codified as part of the "fair and equitable" requirement of 11 U.S.C. § 1129(b). Under the

statute, a plan is fair and equitable with respect to an impaired, dissenting class of unsecured claims if (1) it pays the class's claims in full, or if (2) it does not allow holders of any junior claims or interests to receive or retain any property under the plan "on account of" such claims or interests. 11 U.S.C. § 1129(b)(2)(B)(i)-(ii); *LaSalle,* 526 U.S. at 441–42, 119 S.Ct. 1411.

At the heart of this appeal is the Plan provision that distributes warrants to AWI's equity interest holders (Class 12) through Class 7 in the event that Class 6 rejects the Plan. Appellant AWI argues that this provision does not violate the absolute priority rule because (1) legislative history and historical context indicate that the rule does not prohibit the transfer of warrants to the equity interest holders under the current circumstances; (2) case law establishes that Class 7 can transfer part of its distribution under the Plan to another claimant; and (3) the Plan did not give the warrants to Class 12 "on account of" its equity interests. We address each of these contentions in turn.

#### a. *Interpreting the Absolute Priority Rule*

**[5]** First, AWI suggests that this Court should apply a flexible interpretation of the absolute priority rule based on its legislative history and historical context. Because the absolute priority rule is now codified as part of the Bankruptcy Code, we will interpret it using standard principles of statutory construction. We begin by looking at the plain language of the statute. *See United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). If the meaning is plain, we will make no further inquiry unless the literal application of the statute will end in a result that conflicts with Congress's intentions. *Id.* at 242–43, 109 S.Ct. 1026. In such a case, the intentions of Congress will control. *Id.*

**[6]** AWI contends that application of the absolute priority rule would be contrary to Congress's intentions because the rule was designed to prevent the " 'squeezing out' [of] *intermediate* unsecured creditors." *See In re Wabash Valley Power Ass'n,* 72 F.3d 1305, 1314 (7th Cir.1995) (citing *N.* **\*513** *Pac. Ry. Co.,* 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931) (emphasis added). AWI supports its claim with floor statements by Representative Don Edwards and Senator Dennis DeConcini, key legislators of the Bankruptcy Code. *See Begier v. I.R.S.,* 496 U.S. 53, 64 n. 5, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990) (considering these remarks as "persuasive evidence of congressional intent"). These statements indicate that "a senior class will not be able to give

55 Collier Bankr.Cas.2d 789, 45 Bankr.Ct.Dec. 222, Bankr. L. Rep. P 80,434

up value to a junior class over the dissent of an *intervening class* unless the *intervening class* receives the full amount, as opposed to value, of its claims or interests." 124 Cong. Rec. 32,408 & 34,007 (1978) (remarks of Rep. Edwards on Sept. 28, 1978 and remarks of Sen. DeConcini on Oct. 5, 1978, respectively) (emphasis added). AWI argues that this language demonstrates that the absolute priority rule was not meant to apply to the situation before us because Class 6 is not an intervening (or intermediate) class, and is not being squeezed out by Class 7's transfer of warrants to Class 12 under the Plan.

The absolute priority rule, as codified, ensures that "the holder of any claim or interest that is junior to the claims of [an impaired dissenting] class will not receive or retain under the plan on account of such junior claim or interest any property." 11 U.S.C. § 1129(b)(2)(B)(ii). The plain language of the statute makes it clear that a plan cannot give property to junior claimants over the objection of a more senior class that is impaired, but does not indicate that the objecting class must be an intervening class.

We find that the plain meaning of the statute does not conflict with Congress's intent. The legislative history shows that section 1129(b) was at least designed to address "give-up" situations where a senior class gave property to a class junior to the dissenting class. Other statements in the legislative history of section 1129(b), however, appear to apply the statute more broadly. For example, the House Report for H.R. 8200, the bill that was eventually enacted, states that section 1129(b) "codifies the absolute priority rule from the dissenting class on down." H.R.Rep. No. 95–595, at 413 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6369. Despite amendments to the original version of H.R. 8200, the House Report has been considered an authoritative source of legislative history for section 1129(b). *See* 124 Cong. Rec. 32,408 & 34,007 (1978) (remarks of Rep. Edwards on Sept. 28, 1978 and remarks of Sen. DeConcini on Oct. 5, 1978, respectively) ("[T]he House report remains an accurate description of confirmation of section 1129(b)."). In addition, the floor statements of Representative Edwards and Senator DeConcini do not rule out the possibility that an impaired class may object to a co-equal class's distribution of property to a junior class. *See id.* ("As long as senior creditors have not been paid more than in full, and classes of equal claims are being treated so that the dissenting class of impaired unsecured claims is not being discriminated against unfairly, the plan may be confirmed if the impaired class of unsecured claims receives less than 100 cents on the dollar (or nothing at

all) as long as no class junior to the dissenting class receives anything at all."). As a result, we will apply the plain meaning of the statute. Under this reading, the statute would be violated because the Plan would give property to Class 12, which has claims junior to those of Class 6. This finding does not end our consideration of this appeal, as AWI makes further arguments regarding exceptions to the absolute priority rule.

**b.** *Transfers of Bankruptcy Distributions Between Creditors and Equity Interest Holders*

Second, AWI contends that Class 7 may distribute the property it will receive under **\*514** the Plan to Class 12 without violating the absolute priority rule. AWI derives this result from application of the so-called *"MCorp–Genesis"* rule, which is based on a line of cases where creditors were allowed to distribute their proceeds from the bankruptcy estate to other claimants without offending section 1129(b). *See SPM*, 984 F.2d 1305 (permitting senior secured creditors to share bankruptcy proceeds with junior unsecured creditors while skipping over priority tax creditors in a Chapter 7 liquidation); *Genesis Health,* 266 B.R. at 602, 617–18 (allowing senior secured lenders to (1) give up a portion of their proceeds under the reorganization plan to holders of unsecured and subordinated claims, without including holders of punitive damages claims in the arrangement, and (2) allocate part of their value under the plan to the debtor's officers and directors as an employment incentive package); *In re MCorp Fin., Inc.,* 160 B.R. 941, 948 (S.D.Tex.1993) (permitting senior unsecured bondholders to allocate part of their claim to fund a settlement with the FDIC over the objection of the junior subordinated bondholders).

The District Court rejected this argument, and found that the *MCorp–Genesis* line of cases was distinguishable. It began its analysis with *SPM*, a First Circuit opinion cited by both the *MCorp* and *Genesis Health* courts to support the legality of the distribution schemes presented to them. *SPM,* 984 F.2d 1305. The District Court differentiated *SPM* from the current case in three ways: (1) *SPM* involved a distribution under Chapter 7, which did not trigger 11 U.S.C. § 1129(b)(2)(B)(ii); (2) the senior creditor had a perfected security interest, meaning that the property was not subject to distribution under the Bankruptcy Code's priority scheme; and (3) the distribution was a "carve out," a situation where a party whose claim is secured by assets in the bankruptcy estate allows a portion of its lien proceeds to be paid to others. *Armstrong,* 320 B.R. at 539; *see generally* Richard B. Levin, *Almost All You Ever Wanted to Know About Carve Out,* 76 Am.

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 48 of 378

In re Armstrong World Industries, Inc., 432 F.3d 507 (2005)

55 Collier Bankr.Cas.2d 789, 45 Bankr.Ct.Dec. 222, Bankr. L. Rep. P 80,434

Bankr.L.J. 445 (2002). Similarly, *Genesis Health* involved property subject to the senior creditors' liens that was "carved out" for the junior claimants. *Armstrong,* 320 B.R. at 539. In addition, the District Court found *MCorp* distinguishable on its facts because the senior unsecured creditor transferred funds to the FDIC to settle pre-petition litigation. *Id.*

We adopt the District Court's reading of these cases, and agree that they do not stand for the unconditional proposition that creditors are generally free to do whatever they wish with the bankruptcy proceeds they receive. Creditors must also be guided by the statutory prohibitions of the absolute priority rule, as codified in 11 U.S.C. § 1129(b)(2)(B). Under the plan at issue here, an unsecured creditor class would receive and automatically transfer warrants to the holder of equity interests in the event that its co-equal class rejects the reorganization plan. We conclude that the absolute priority rule applies and is violated by this distribution scheme.

In addition, the structure of the Plan makes plain that the transfer between Class 7 and Class 12 was devised to ensure that Class 12 received the warrants, with or without Class 6's consent. The distribution of the warrants was only made to Class 7 if Class 6 rejected the Plan. In turn, Class 7 automatically waived the warrants in favor of Class 12, without any means for dissenting members of Class 7 to protest. Allowing this particular type of transfer would encourage parties to impermissibly sidestep the carefully crafted strictures of the Bankruptcy Code, and would undermine Congress's intention to give unsecured creditors bargaining power **515** in this context. *See* H.R.Rep. No. 95–595, at 416, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6372 ("[Section 1129(b)(2)(B)(ii) ] gives intermediate creditors a great deal of leverage in negotiating with senior or secured creditors who wish to have a plan that gives value to equity.").

### c. *On Account of*

Third, AWI argues that the warrants would not be distributed to Class 12 on account of their equity interests, but rather would be given as consideration for settlement of their intercompany claims. UCC disputes the existence of any such settlement, alleging that such an arrangement should have been brought to the attention of the Bankruptcy Court. In response, AWI indicates that the settlement was detailed in the Plan's Disclosure Statement, which the Bankruptcy Court approved on June 2, 2003. (Appellee's Br. 4.) The relevant portion of the Disclosure Statement reads as follows:

In the ordinary course of business, such intercompany claims have been recorded on the books and records of Holdings, AWWD and AWI and, assuming that all such intercompany claims are valid, the *net intercompany claim so recorded is in favor of Holdings in the approximate amount of $12 million.* In consideration of, among other things, AWI's agreement under the Plan to fund the reasonable fees and expenses associated with the Holdings Plan of Liquidation, the treatment of Holdings, AWWD, and their respective officers and directors as PI Protected Parties under the Asbestos PI Permanent Channeling Injunction, the simultaneous release by AWI of any claims (known and unknown) AWI has against Holdings and AWWD, and the *issuance of the New Warrants to AWWD,* and to avoid potentially protracted and complicated proceedings to determine the exact amounts, nature and status under the Plan of all such claims and to facilitate the expeditious consummation of the Plan and the completion of Holdings' winding up, Holdings and AWWD will, effective upon and subject to the occurrence of the Effective Date, release all such intercompany claims (known and unknown) against AWI or any of AWI's subsidiaries[.]

(App. at 1138) (emphasis added).

As stated earlier, section 1129(b)(2)(B)(ii) provides that holders of junior claims or interests "will not receive or retain [any property] under the plan *on account of* such junior claim or interest." 11 U.S.C. § 1129(b)(2)(B)(ii) (emphasis added). In *LaSalle,* the Supreme Court interpreted "on account of" to mean "because of," or a "causal relationship between holding the prior claim or interest and receiving and retaining property." 526 U.S. at 450–51, 119 S.Ct. 1411. Although the Supreme Court did not decide what degree of causation would be necessary, its discussion on that topic revealed that the absolute priority rule, as codified, was not in fact absolute. First, it indicated that the "on account of" language would

be redundant if section 1129(b) was read as a categorical prohibition against transfers to prior equity. *Id.* at 452–53, 119 S.Ct. 1411. Second, it noted that a "less absolute prohibition" stemming from the "on account of language" would "reconcile the two recognized policies underlying Chapter 11, of preserving going concerns and maximizing property available to satisfy creditors." *Id.* at 453–54, 119 S.Ct. 1411.

In keeping with these observations, we noted in *PWS* that the "on account of" language "confirms that there are some cases in which property can transfer to junior interests not 'on account of' those interests but for other reasons." 228 F.3d at 238 (discussing *LaSalle,* 526 U.S. at 451–52, 119 S.Ct. 1411). In *PWS,* the **\*516** debtors released their legal claims against various parties to facilitate their reorganization, including an avoidance claim that would have allowed them to avoid certain aspects of a previous recapitalization. *Id.* at 232–35. The appellants in *PWS* argued that releasing the avoidance claim resulted in a prohibited transfer of value to equity interest holders who had participated in the recapitalization. We held that "without direct evidence of causation, releasing potential claims against junior equity does not violate the absolute priority rule in the particular circumstance [where] the claims are of only marginal viability and could be costly for the reorganized entity to pursue." *Id.* at 242.

AWI would analogize AWWD and Holdings's release of intercompany claims in exchange for warrants to the release of claims in *PWS.* [3] We disagree. According to the Disclosure Statement, the warrants have an estimated value of $35 to $40 million. (App. at 1157.) In contrast, the intercompany claims were valued at approximately $12 million. This settlement would amount to a substantial benefit for Class 12, especially as the warrants were only part of the consideration for which the intercompany claims were released. Among other things, the intercompany claims were also ostensibly released in exchange for the simultaneous release of any claims by AWI against AWWD or Holdings and facilitation of the reorganization process. (App. at 1138.) AWI gives no adequate explanation for this difference in value, leading us to conclude that AWWD or Holdings (Class 12) would receive the warrants on account of their status as equity interest holders. *See LaSalle,* 526 U.S. at 456, 119 S.Ct. 1411.

**D.** *Equity*

**1.** *Applicability of Penn Central*

**[7]**    Appellant AWI further contends that this Court should apply equitable considerations to allow an exception to the absolute priority rule. It finds such an exception in the case of *In re Penn Central Transportation Co.,* 596 F.2d 1127, 1142 (3d Cir.1979), and points to language in *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988), that indicates that exceptions to the absolute priority rule may indeed exist. *See id.* at 206, 108 S.Ct. 963 (stating that the enactment of section 1129(b) "bar[s] any expansion of any exception to the absolute priority rule beyond that recognized" in pre–1978 Bankruptcy Code cases).

*Penn Central* involved a "monumental [reorganization] plan designed to resolve what [at the time was] the most complex set of interrelated and conflicting claims ever addressed under ... the Bankruptcy Act." 596 F.2d at 1129. Penn Central Transportation Company, which was formed in 1968 by the merger of the Pennsylvania Railroad Company and the New York Central Railroad Company, filed a petition for reorganization under the Bankruptcy Code in 1970. *Id.* at 1133. Thereafter, to prevent a rail transportation crisis and to address the particular difficulties of that reorganization, Congress passed the Regional Rail Reorganization Act of 1973, which directed that major portions of Penn Central's rail assets be conveyed to Conrail, a new company formed under the Act to continue operation of some of the routes served by Penn Central. *Id.* at 1134. In light of these exceptional circumstances, we found that "[o]ur construction and application of precedents **\*517** such as the absolute priority rule must necessarily take account of the unique facts of this Plan and proceed in an environment pervaded more by relativity than by absolutes." *Id.* at 1142.

AWI argues that the facts of the case before us are similarly unique, and also warrant a more equitable and flexible application of the absolute priority rule. (Appellant's Br. 36.) Among the facts that AWI finds unique are: (1) the involvement of UCC in the negotiation and drafting of the Plan; (2) UCC's endorsement of the Plan, as indicated by its signature on the cover letter accompanying the disclosure statement; (3) the lack of a negative effect on Class 6's distribution from the granting of warrants to Class 7; (4) the relatively small value of the warrants compared to the entire bankruptcy estate; (5) the acceptance of the Plan by the majority in number of UCC's constituents; and (6) the delay caused by UCC's objection, which was primarily lodged in anticipation of the passage of the FAIR Act. We do not find these facts to be as compelling as those that led us to

55 Collier Bankr.Cas.2d 789, 45 Bankr.Ct.Dec. 222, Bankr. L. Rep. P 80,434

apply a more flexible absolute priority rule in the past. AWI's bankruptcy due to asbestos liabilities simply does not involve the kind of exigent circumstances present in *Penn Central,* where Congress intervened in the reorganization process to avoid a rail transportation crisis of national import.

In addition, our application of equitable considerations in *Penn Central* did not mean that the absolute priority rule was abandoned. Rather, we held firm to the idea that the rule still "required ... that provision be made for satisfaction of senior claims prior to satisfaction of junior claims." *Id.* at 1153.

**2. *Judicial Estoppel***

[8]    AWI also argues that UCC waived its right to object to the Plan because of its conduct during the reorganization process, specifically referring to UCC's role in shaping the Plan, its initial endorsement of the Plan, and then its subsequent objections to the Plan based on the possible passage of the FAIR Act. The Bankruptcy Court agreed with this argument and found that UCC waived its right to object to the Plan because its behavior was "too sharp even for a bankruptcy case." (App. at 1503–04.) The District Court took a different view, noting that

> [e]ven if the Unsecured Creditors changed their minds based on political calculus that the FAIR Act would be passed, this was their prerogative. In the absence of bad faith, which was not alleged here, and particularly in light of the changed circumstances, until a party consents and the consent is final, that party may walk away from the table for a good or bad reason or no reason at all.

*Armstrong,* 320 B.R. at 534 n. 24 (citing *In re Huckabee Auto. Co.,* 33 B.R. 141, 149 (Bankr.M.D.Ga.1981)).

[9]    [10]    We agree with the District Court, but recast the issue of waiver as an issue of judicial estoppel. Judicial estoppel can be applied when a party asserts a certain position in a legal proceeding and prevails, only to assert a contrary position later on because of changed interests. *See New Hampshire v. Maine,* 532 U.S. 742, 749–51, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). Its purpose is to protect the judicial process by preventing parties from "deliberately changing positions according to the exigencies of the moment." *Id.* at 750, 121 S.Ct. 1808 (quoting *United States v. McCaskey,* 9

F.3d 368, 378 (5th Cir.1993)). In deciding whether to apply judicial estoppel, a court considers various factors, including whether the party's position is clearly inconsistent with its earlier position and whether the party changing position would gain an unfair advantage over **\*518** the opposing party. *Id.* at 750–51, 121 S.Ct. 1808.

UCC clearly changed its position when it lodged a conditional objection to the Plan after it had endorsed the disclosure statement and recommended acceptance of the Plan to its constituents. The confirmation process, however, entitled UCC to lodge an objection against the Plan before the objection deadline. *See* 11 U.S.C. § 1129(a)(8). We recognize that an objection based on speculation that legislation will be passed can be cause for concern. *See EEOC v. Bethlehem Steel Corp.,* 727 F.Supp. 952, 955 & n. 1 (E.D.Pa.1990) (commenting on the problems that stem from delaying judgment because of pending legislation). UCC's objection, however, was not based solely on the impact of the pending FAIR Act, but was also based on a violation of section 1129(b).

Furthermore, UCC's change in position could not be entirely prejudicial to AWI because the Plan and its disclosure statement were conditioned on the approval of all impaired classes. In fact, Class 6, one of UCC's constituents, did not accept the Plan. While the voting outcome of Class 6 raises the troubling possibility that a small number of hold-outs owning a large percentage of claims were causing costly delay in the reorganization process, this is contemplated by the Bankruptcy Code, which requires at least a majority vote for the number of claims and a supermajority vote for the amount of claims for a class to accept a plan. *See* 11 U.S.C. § 1126(c). In consideration of these factors, we will not apply judicial estoppel to silence UCC's objection merely because it was an active participant in the reorganization process.

### III.

### *CONCLUSION*

We recognize that the longer that the reorganization process takes, the less likely that the purposes of Chapter 11 (preserving the business as a going concern and maximizing the amount that can be paid to creditors) will be fulfilled. Nevertheless, we conclude that the absolute priority rule applies in this case. We will accordingly affirm the District Court's decision to deny confirmation of AWI's Plan.

55 Collier Bankr.Cas.2d 789, 45 Bankr.Ct.Dec. 222, Bankr. L. Rep. P 80,434

**Parallel Citations**

55 Collier Bankr.Cas.2d 789, 45 Bankr.Ct.Dec. 222, Bankr. L. Rep. P 80,434

Footnotes

\*      Honorable Anne E. Thompson, United States District Judge for the District of New Jersey, sitting by designation.

1      *See generally* Patrick M. Hanlon, *Asbestos Legislation: The FAIR Act Two Years On,* 1 Pratt's J. Bankr.L. 207 (2005). As it happened, the FAIR Act did not pass, but similar bills have been reintroduced in subsequent sessions of Congress. (Appellant's Br. 15; App. at 1243.)

2      A class is impaired if its legal, equitable, or contractual rights are altered under the reorganization plan. 11 U.S.C. § 1124.

3      Because AWI does not assert any argument regarding a new value exception to the absolute priority rule, we do not address that issue.

---

**End of Document**                                        © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 74

311 B.R. 456
United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

In re Clyde J. BIPPERT, Jr. and
Sandra Kay Bippert, Debtors.

No. 03–53086–C.    |    May 27, 2004.

**Synopsis**
**Background:** Chapter 13 trustee objected to debtors' claimed exemption in personal injury claim.

**Holdings:** The Bankruptcy Court, Leif M. Clark, J., held that:

[1] federal exemption for personal injury payment did not allow debtor-husband to claim exemption in personal injury claim belonging only to debtor-wife under state law;

[2] under state law, debtor-husband's estate potentially had property interest in debtor-wife's personal injury recovery;

[3] under Bankruptcy Code, debtor-husband could claim as exempt portion of debtor-wife's personal injury claim in which his estate had property interest; and

[4] in exercising exemption rights under exemption for personal injury claims, debtor-husband could not simply "double" debtor-wife's exemption claim.

Objection overruled.

West Headnotes (17)

**[1]    Statutes**
  Plain Language;  Plain, Ordinary, or Common Meaning

If the statutory language is plain, court's inquiry into its meaning will be complete.

Cases that cite this headnote

**[2]    Bankruptcy**

  Joint Cases

Although Bankruptcy Code provision dealing with joint cases contemplates one case involving joint debtors, it recognizes legal fiction of two estates which are not necessarily consolidated, as opposed to jointly administered. Bankr.Code, 11 U.S.C.A. § 302;  Fed.Rules Bankr.Proc.Rule 1015(b), 11 U.S.C.A.

1 Cases that cite this headnote

**[3]    Bankruptcy**
  Legal or equitable interests in general

**Bankruptcy**
  Interests in joint, entireties, or community property

Estate of debtor in a community property state consists of debtor's property, or all legal or equitable interests of debtor in property as of the commencement of the case, plus "their" property, consisting of all interests of debtor and debtor's spouse in community property as of the commencement of the case. Bankr.Code, 11 U.S.C.A. § 541(a).

2 Cases that cite this headnote

**[4]    Bankruptcy**
  Joint Cases
**Bankruptcy**
  Interests in joint, entireties, or community property

In a joint case, community property swept into each debtor's estate, consisting of property under the sole, equal, or joint management and control of that debtor as well as community property that is liable for an allowable claim against debtor, or liable for a claim against both spouses jointly, to the extent of debtor's interest in such property, will of necessity overlap; excluded from each debtor's estate, however, is the separate property of the other spouse, as well as the sole management community property of the other spouse not otherwise liable for an allowable claim against that spouse. Bankr.Code, 11 U.S.C.A. § 541(a)(2).

2 Cases that cite this headnote

**[5]** **Bankruptcy**
👉 Property Exempt

**Bankruptcy**
👉 Awards or amounts due on judgments

Under Bankruptcy Code's exemption scheme, property sought to be exempted, first and foremost, had to be part of debtor's estate, and therefore provision allowing for exemption of debtor's right to receive payment on account of personal bodily injury of debtor or individual of whom debtor was dependent did not allow debtor-husband to claim exemption in personal injury claim if, under state law, claim belonged only to debtor-wife. Bankr.Code, 11 U.S.C.A. § 522(b), (d)(11)(D).

1 Cases that cite this headnote

**[6]** **Bankruptcy**
👉 Property Exempt

Bankruptcy Code provisions setting forth categories of property that may be claimed as exempt do not furnish to debtor an independent source of entitlement to claim exemptions, but rather only furnish basis for exempting, from property of debtor's estate, certain property fitting within exemption definitions set out in such provisions. Bankr.Code, 11 U.S.C.A. § 522(d)(11)(D).

1 Cases that cite this headnote

**[7]** **Bankruptcy**
👉 Tort claims

Debtor's prepetition personal injury cause of action is "property of the estate," even if it is not yet liquidated, and even if the lawsuit to recover on the claim has not yet been filed. Bankr.Code, 11 U.S.C.A. § 541.

Cases that cite this headnote

**[8]** **Husband and Wife**
👉 Damages for injuries to husband or wife

Personal injury damages that constitute separate property of injured spouse under Texas law include damages for disfigurement and for physical pain and suffering in the past and in the future. V.T.C.A., Family Code § 3.001(3).

Cases that cite this headnote

**[9]** **Husband and Wife**
👉 Damages for injuries to husband or wife

Under Texas law, personal injury damages which are attributable to an injury to the marital partnership are community property; thus, portions of a personal injury award may belong to the community estate, including damages for lost wages of injured spouse, medical expenses incurred by the community estate, and other expenses associated with injury to the community estate. V.T.C.A., Family Code §§ 3.001(3), 3.002.

Cases that cite this headnote

**[10]** **Husband and Wife**
👉 Damages for injuries to husband or wife

Damages paid on personal injury claim for non-injured spouse's loss of consortium are, under Texas law, the separate property of non-injured spouse.

1 Cases that cite this headnote

**[11]** **Bankruptcy**
👉 Interests in joint, entireties, or community property

**Bankruptcy**
👉 Tort claims

**Bankruptcy**
👉 Awards or amounts due on judgments

Pursuant to Texas law, Chapter 13 estate of debtor-husband had property interest in debtor-wife's personal injury recovery, for purposes of debtor-husband's claim of exemption therein under Bankruptcy Code, to the extent that marital estate suffered injury, such as medical expenses incurred by marital estate and loss of debtor-wife's earning capacity, and to the extent that personal injury claim

supported recovery for debtor-husband's loss of consortium. Bankr.Code, 11 U.S.C.A. §§ 522(d)(11)(D), 541(a)(2)(A); V.T.C.A., Family Code § 3.003(a).

Cases that cite this headnote

**[12]    Bankruptcy**
👉 Interests in joint, entireties, or community property

**Bankruptcy**
👉 Tort claims

**Bankruptcy**
👉 Awards or amounts due on judgments

Under Texas law, for purposes of exemption claimed therein pursuant to Bankruptcy Code's exemption for personal injury claims, Chapter 13 estate of debtor-wife had separate property interest in her personal injury claim arising from slip-and-fall accident, and also had property interest in claim to the extent that marital estate had suffered injury, including medical expenses incurred by marital estate and any loss of debtor-wife's earning capacity. Bankr.Code, 11 U.S.C.A. §§ 522(d)(11)(D), 541(a)(2)(A); V.T.C.A., Family Code § 3.001(3).

Cases that cite this headnote

**[13]    Bankruptcy**
👉 Awards or amounts due on judgments

In the context of federal exemption under Bankruptcy Code for payment on account of personal injury claim, which prohibits exemption of personal injury award if it is "compensation for actual pecuniary loss" of debtor, payment for loss of earning capacity is an "actual pecuniary loss" and thus does not qualify for exemption. Bankr.Code, 11 U.S.C.A. § 522(d)(11)(D).

Cases that cite this headnote

**[14]    Bankruptcy**
👉 Awards or amounts due on judgments

Pursuant to Bankruptcy Code provision allowing debtor to exempt right to receive, or property traceable to, payment on account of personal

bodily injury of debtor or individual of whom debtor was dependent, Chapter 13 debtor-husband could claim as exempt part of debtor-wife's personal injury claim arising from slip-and-fall accident, even though debtor-husband suffered no physical injury, given that, as spouse, debtor-husband qualified under Code as debtor-wife's dependent, and, as member of marital estate under Texas community property laws, debtor-husband had right to receive payment on account of personal bodily injury to debtor-wife when payment represented damages for losses suffered by marital estate; alternatively, damages attributable to marital estate's losses were property traceable to payment "on account of personal bodily injury" of debtor-wife. Bankr.Code, 11 U.S.C.A. § 522(d)(11)(D); V.T.C.A., Family Code § 3.001(2).

Cases that cite this headnote

**[15]    Bankruptcy**
👉 Awards or amounts due on judgments

Any damages to which Chapter 13 debtor-husband was entitled for loss of consortium as a result of debtor-wife's personal injury claim could be exempted by debtor-husband, up to statutory dollar cap, under Bankruptcy Code provision creating exemption for payment arising from personal injury claim, inasmuch as damages constituted debtor-husband's right to receive payment on account of debtor-wife's personal bodily injury. Bankr.Code, 11 U.S.C.A. § 522(d)(11)(D).

Cases that cite this headnote

**[16]    Bankruptcy**
👉 Co-debtors; stacking

In exercising exemption rights under Bankruptcy Code provision creating exemption for right to receive payment on account of personal bodily injury of debtor or individual of whom debtor was dependent, debtor-husband could not simply "double" debtor-wife's exemption claim, in that stacking or doubling of exemptions was permitted only with respect to community property that belonged to both

debtor-husband's estate and debtor-wife's estate, and not as to property belonging solely to either debtor-husband or debtor-wife. Bankr.Code, 11 U.S.C.A. §§ 522(d)(11)(D), (m), 541(a)(2)(A).

Cases that cite this headnote

**[17]    Bankruptcy**

👉 Co-debtors; stacking

Joint debtors can effectively "double" the value of Bankruptcy Code exemption for right to receive payment on account of personal bodily injury of debtor or individual of whom debtor is dependent, but only when debtors are seeking to exempt property that belongs to both of their bankruptcy estates. Bankr.Code, 11 U.S.C.A. § 522(d)(11)(D).

Cases that cite this headnote

**Attorneys and Law Firms**

**\*459** Callan M. Billingsley, San Antonio, TX, for Debtors.

James Bailey, for Marion A. Olson, Chapter 13 Trustee.

**Opinion**

### MEMORANDUM DECISION ON TRUSTEE'S OBJECTION TO EXEMPTIONS

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for hearing the foregoing matter. The debtors, Clyde J. Bippert, Jr. and Sandra Kay Bippert, filed a chapter 13 petition (Doc. # 1) on June 2, 2003. Marion A. Olson, Jr., chapter 13 Trustee, timely filed his Trustee's Objection to Exemptions on (# 19) on August 19, 2003. The Trustee's Objection to Exemptions was set for hearing on October 9, 2003. After consideration of the pleadings and hearing the arguments of counsel, the court took this matter under advisement. This Memorandum Decision constitutes the court's findings of fact and conclusions of law. *See* FED.R.BANKR.P. 7052. For the reasons that follow, the court denies (in part) the Trustee's Objection to Exemptions.

### Facts

The facts are not in dispute. The debtors, Clyde J. Bippert, Jr. and Sandra Kay Bippert ("Bipperts"), filed their joint Voluntary Petition under Chapter 13 on June 2, 2003. The Bipperts filed their schedules and Statement of Financial Affairs on June 17, 2003 (Doc. # 7). The Debtors, in both their original and amended Schedules B and C filed on July 29, 2003 (# 16), elected to exempt property under 11 U.S.C. § 522(b)(1) (the federal exemptions). The only contested exemption involves a "premises liability claim against Discount Tire Co. for personal injuries" claimed as exempt under § 522(d)(11)(D) on both their original and amended Schedule C. The Bipperts claimed a total of $30,000.00 as the value of their claimed exemption for this personal injury claim. The claim had not been reduced to judgment or otherwise settled as of the date of the filing of the schedules.

The Trustee timely filed an objection to this particular exemption claim on August **\*460** 19, 2003. [1] *See* Trustee's Obj. to Exemptions ("Trustee's Obj."). The Trustee objected because the debtors had testified at the § 341 meeting that it was Sandra Kay Bippert who had sustained the injury that resulted in the premises liability claim against Discount Tire Co. *See* Trustee's Obj. ¶ 6. The Trustee requested that the debtors' joint exemption for this personal injury claim be disallowed to the extent that it exceeds $17,425.00, because only Sandra Kay Bippert had suffered the injury (which occurred during a "slip and fall" accident at a Discount Tire Co. store). *See id.* The Trustee contended in his Objection that the Bipperts were improperly "stacking" [2] Clyde's § 522(d)(11)(D) exemption to get a total $30,000.00 [3] exemption for Sandra Kay's personal injury claim, even though he himself had not been injured.

The Trustee's argument is simple. He claims that Clyde cannot take an exemption for an asset in which he has no property interest. The Texas Family Code, he argues, states that a recovery for a personal injury claim such as this is the "separate property" of the spouse who is injured. *See* TEX. FAM. CODE ANN. § 3.001(3) (Vernon 1997) ("[a] spouse's separate property consists of: ... (3) the recovery for personal injuries sustained by the spouse during marriage, except any recovery for loss of earning capacity during marriage"). Because the personal injury claim is, according to the Trustee, only the separate property of Sandra, and goes only into her

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

estate, Clyde cannot claim any part of it as exempt, regardless what section 522(d)(11)(D) says, because the *sine qua non* for claiming an exemption is that the item must first be property of *the debtor's* **\*461** estate. Clyde being the debtor with respect to his estate, cannot claim as exempt property that is only property of Sandra's estate.

The Debtors, in response, [4] rely on what they say is the plain meaning of the statute: there are two people who have the right to claim an exemption under § 522(d)(11)(D): (1) the debtor and (2) an individual of whom the debtor is a dependent. *See* 11 U.S.C. § 522(d)(11)(D). Section 522(a)(1) defines "dependent" as including "spouse, whether or not actually dependent." [5] Thus, say the Debtors, Sandra can claim an exemption because she was the debtor who was injured, and Clyde can claim an exemption because he is an "individual of whom the debtor is a dependent." The Debtors claim that section 522(d)(11)(D) does not require that the dependent have a property interest in the personal injury claim. They also argue that it is irrelevant whether the personal injury claim is community property or separate property (Texas is a community property state). [6] Claim the Debtors, the phrase "an individual of whom the debtor is a dependent" in § 522(d)(11)(D) would be superfluous if the non-injured spouse could not claim the exemption.

Both parties agreed that joint debtors are allowed to "stack" or "double" their exemption claims in some kinds of assets under the federal exemption scheme, such as their homestead, vehicles, and other personal property. *See* 11 U.S.C. § 522(m) (section 522 applies separately with respect to each debtor in a joint case). However, the Trustee argued that there is normally no real dispute with respect to the debtors' joint ownership of these items. It's not the "doubling" that's troubling to the Trustee, it's the claiming what's not Clyde's to claim. The Debtors counter that the federal exemption scheme contains some exemption categories that *are* explicitly keyed to property interest, but some that are not. Section 522(d)(2), for example, contains the words "[t]he debtor's *interest*, not to exceed $2,775 in value, in one motor vehicle." 11 U.S.C. § 522(d)(2) (emphasis added). Section 522(d)(11)(D), by contrast, does not contain a reference to "the debtor's interest." The statute only refers to "[t]he debtor's right to receive, or property that is traceable to–(D) a payment, not to exceed $17,425, on account of personal bodily injury … of the debtor or an individual of whom the debtor is a dependent." Thus, say the Debtors, Congress knew how to key an exemption to a property interest and how not to, and chose not to with respect to the kinds of property eligible

for exemption under section 522(d)(11)(D). They argue that the court need not consider whether a debtor or a dependent has a property interest in the payment on account of personal bodily injury because the plain meaning of the statute does not require it.

Because of the dearth of relevant case law at the time of the hearing, as well as the apparent ambiguity in § 522(d)(11)(D) regarding the words "right to receive, or property that is traceable to—a payment," **\*462** the court took the matter under advisement. This is the decision on the issue.

### Analysis

**[1]** There is no factual dispute surrounding the essential issue presented here. [7] Thus, we have only to resolve the legal issue presented. We begin that process by closely examining the language and structure of section 522, and how that section works with other relevant sections of the Code. If the statutory language is plain, then our inquiry will be complete. *See, e.g., Lamie v. U.S. Trustee,* 540 U.S. 526, 534, 124 S.Ct. 1023, 1030, 157 L.Ed.2d 1024 (2004) (stating that, " 'when the statute's language is plain, the sole function of the courts— at least where the disposition required by the text is not absurd —is to enforce it according to its terms.' " (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A.,* 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000))).

Section 522(b) states that:

> Notwithstanding section 541 [which generally defines the scope of "property of the estate"], an *individual debtor* may exempt *from property of the estate* the property listed in either paragraph (1) or, in the alternative, paragraph (2) of this subsection.

11 U.S.C. § 522(b) (emphasis added). This is the operative portion of the exemption statute, the express authorization to claim property as exempt. Section 522(m) then addresses the issue of joint cases:

> Subject to the limitation in subsection (b) [*i.e.,* the limitation on "stacking" state and federal exemptions], this section shall apply *separately* with respect to *each debtor* in a joint case.

11 U.S.C. § 522(m). This is the section which expressly authorizes *each* debtor to claim their own exemptions, even though the debtors are married and so filed under a single case number. These two sections, read together, immediately pose a question for resolution: when section 522(b), the operative portion of the statute, authorizes "an individual debtor" to exempt "from property of the estate," does that phrase mean, in the context of a joint case, the property of *each* debtor, or does it mean rather the property of both debtors together?

**I. *Whether "Property of the Estate" Under Section 522(b) in a Joint Case Filed Under Section 302 Means the Property of Each Debtor or the Property of Both Debtors***

 [2]   To help address this question, we next examine section 302, which deals with joint cases. That section provides as follows:

> (a) A joint case under a chapter of this title is commenced by the filing with the bankruptcy court of *a single petition* under such chapter by an individual that may be a debtor under such chapter and such individual's spouse....

> (b) After the commencement of a joint case, the court shall determine the extent, if any, to which the debtors' *estates* shall be consolidated.

11 U.S.C. § 302 (emphasis added). Thus, though section 302 contemplates *one* case involving joint debtors, it still recognizes the legal fiction of *two* estates, which are not necessarily *consolidated* (as opposed to jointly administered under Rule 1015(b)). [8]

 **\*463**  That is what the Eleventh Circuit held in *Reider v. FDIC (In re Reider),* 31 F.3d 1102, 1108–09 (11th Cir.1994). Mr. Reider guaranteed a loan for the purchase of a stud horse. The loan was made by a bank to Mr. and Mrs. Reider's horse breeding business and to one Jack Johnson, a ne'er-do-well involved in numerous fraudulent schemes with the bank's president. Johnson failed to pay on the loan, the bank went bust, the FDIC took over the bank's "bad loans" in a purchase and assumption transaction, and promptly began to chase Mr. Reider on the guaranty. The Reiders filed a joint bankruptcy petition, pursuant to section 302. During the course of the case, the chapter 7 trustee sold the farm land where the horse breeding business had been located. The FDIC (an unsecured creditor in the case) insisted that the proceeds of the sale should be used to satisfy their guaranty claim, but they ran into resistance. Seems this farm land had been inherited by

*Mrs.* Reider from her mother, and so was never the property of *Mr.* Reider under state law. *See Reider,* 31 F.3d at 1103–04; *see also* 11 U.S.C. §§ 541(a)(1), (2). [9]  And under state law, Mrs. Reider was not liable on the guaranty.

The FDIC in *Reider* responded to these arguments by asking the court to *substantively consolidate* the debtors' cases. The bankruptcy court granted that request, and the district court affirmed. On appeal to the circuit however, the lower courts were reversed.

The Eleventh Circuit, in a careful analysis, noted first and foremost that substantive consolidation is not presumed, not even in a joint case filed by a married couple pursuant to section 302. Instead, it can only be ordered when, after an examination of the evidence, the court finds that there is a substantial identity between the assets, liability, and handling of financial  **\*464**  affairs between the spouses, and that, based on the equities, harm would result if consolidation were not ordered that would outweigh the harm that would occur as a result of the consolidation. Issues such as fraud or bad faith on the part of the debtors may enter into the calculus, but so also would prejudice to creditors if consolidation were ordered (or not ordered). The court described the burden on the moving party as "exacting" and warned that substantive consolidation should be invoked "sparingly" if the request is met with opposition from either a creditor or a debtor. *Reider,* 31 F.3d at 1108–09. Finally, the court underscored that "[g]reat care must be taken to avoid confusion between the attributes of joint administration and indicia supporting substantive consolidation. *The filing of a joint petition by a husband and wife does not result in the automatic substantive consolidation of the two debtors' estates.*" *Id.* at 1109 (emphasis added). The conduct of joint spouses in jointly administering their estate in bankruptcy should, in the view of the court, be accorded "relatively little weight." *Id.*

In *Reider,* the application of these principles had a dramatic impact. The farm land could not be included among the assets of Mr. Reider to which the FDIC could look for a recovery. As they had no claim against Mrs. Reider, neither did they have any right to a distribution out of her separate estate. How the debtors had scheduled the asset was held to be irrelevant to the inquiry, said the court. The fact that only one trustee is appointed in a joint case, and that *that* trustee sold the property was also irrelevant. These, said the court, were but incidents of joint administration, and said nothing about whether the estates should be combined into one. *See id.* at 1110–12. [10]

*Reider,* of course, does not directly interpret section 522(b). The Fourth Circuit, however, followed *Reider* in the context of joint debtors claiming exemptions. *See Bunker v. Peyton (In re Bunker),* 312 F.3d 145, 153 (4th Cir.2002). The Fourth Circuit noted that, when spouses file a joint bankruptcy case, separate bankruptcy estates are created, from which each debtor may exempt eligible property. Said the court (in the context of a dispute regarding entireties property), "Joint administration of the married couple's estates does not affect their claims to [an] entireties exemption [available under section 522(b)(2)(B) ]." *See id.* at 153. [11]

[3]  [4]  Under section 541(a), the estate of *each* debtor in a community property state consists of *his* or *her* property, *i.e.,* all legal or equitable interests of *him* or *her* in property as of the commencement of the case, plus *their* property, *i.e.,* all interests of the debtor (him or her) and that debtor's spouse in community property as of the commencement of the case. *See* 11 U.S.C. § 541(a). In a joint case, the community property swept into each debtor's estate, consisting of property under the sole, equal or joint management and control of that debtor as well as community property that is liable for an allowable claim against the debtor, or liable for a claim against both spouses jointly (to the extent of the debtor's interest in that property) will of necessity overlap. 11 U.S.C. § 541(a)(2). [12] *Excluded* from each debtor's **\*465** estate, however, is the *separate property* of the *other* spouse, as well as the sole management community property of the other spouse not otherwise liable for an allowable claim against that spouse. [13]

## II. *Section 522(d) as a Subset of Section 522(b)*

[5]  The Debtors here have argued that, even assuming two estates, section 522(d)(11)(D), by its plain language, nonetheless permits one spouse to lay claim to a category of property that, under state law, belongs only to the other spouse. That argument, however, misapprehends the function of the federal exemption scheme within the larger context of section 522 as a whole.

Again, section 522(b) is the operative part of the exemption statute. It permits an individual debtor to exempt from property of that individual's estate property listed under one of two exemption schemes. Here the debtors have selected the federal exemption scheme, so we turn to section 522(d). That section in turn lists the *kinds* or *categories* of property that may be exempted. *See* 11 U.S.C. § 522(d). By virtue of the way section 522(b) is worded, however, whatever categories of property are listed in subdivision

(d) must first and foremost be a *subset* of property of that debtor's estate. The statute permits the individual debtor to "exempt[,] from property of the estate[,] *the property listed* in ... paragraph (1) [of section 522(b)]." 11 U.S.C. § 522(b) (emphasis and clarifying punctuation added); *see also In re Reider, supra.* The words "property listed," following directly the phrase "from property of the estate," refers then to one of two alternative locations for a listing—and both listings (federal or state) consist of *categories* of property *capable* of qualifying for exemption. That approach is in turn consistent with the way exemption statutes under state law have traditionally operated. [14] *See, e.g., In re Mitchell,* 103 B.R. 819, 823 (Bankr.W.D.Tex.1989) ("[debtors] must pick items off an approved list of items which, according to the legislature, are the sort of things sufficiently important for a Texas debtor to keep regardless of the claims of creditors"). The *entitlement* to exemption is conferred by subsection (b) of section 522. All that subsection (d) supplies is the approved list of items from which the debtor may select in *exercising* the entitlement in subsection (b). In no event can the set of exemptible items in **\*466** subsection (d) be larger than the set of items available for exemption, *i.e.,* property of the debtor's estate, as provided in subsection (b).

[6]  The categories in subsection (d) thus do not furnish to the debtor an independent source of entitlements. They only furnish the basis for exempting, *from property of the estate,* certain property fitting within the definitions set out in subsection (d). A given item might be described in a category listed in subsection (d), but nonetheless not be available for exemption because the item is not included as part of that debtor's estate. Conversely, an item might be part of the debtor's estate, but not fit within any of the available categories. Or an item might be part of the debtor's estate and fit within a category, but still not be available because the total dollar amount allowed in that category may already have been used up selecting other items. *See Mitchell,* 103 B.R. at 823. [15]

With this backdrop, we can move on to the next two questions. First, could any portion of this personal injury action be property of Clyde's bankruptcy estate? Second, if some portion is, is that property eligible for exemption under section 522(d)(11)(D)? We turn to the property interest question first.

## III. *The Personal Injury Claim as Property of the Estate Under § 541*

[7]    Property of the estate includes "all legal and equitable interests of the debtor as of the commencement of the case." 11 U.S.C. § 541(a)(1); *see also United States v. Whiting Pools, Inc.,* 462 U.S. 198, 204–05, 103 S.Ct. 2309, 2313–14, 76 L.Ed.2d 515 (1983). A debtor's pre-petition personal injury cause of action is property of the estate, even if it is not yet liquidated (indeed, even if the lawsuit to recover on the claim has not yet been filed). *See In re Wischan,* 77 F.3d 875, 877–78 (5th Cir.1996).

As we have earlier noted, property of the estates of joint debtors can be subclassified as *his* property, *her* property, and *their* property, with the last class overlapping (*i.e.,* both estates have the same interest in this last class of property).[16] Section 541(a)(2) includes as part of property of the estate "all interests of the debtor and the debtor's spouse in community property as of the commencement of    **\*467**    the case that is (A) under the sole, equal, or joint management and control of the debtor ..." 11 U.S.C. § 541(a)(2)(A). Three classes or "baskets" of property are created in a joint case, with each debtor's estate consisting of all of the property in *two* of those baskets. In our case, for example, Clyde's estate consists of *his* property and *their* property. Sandra's estate consists of *her* property and *their* property. The fact that both Clyde's and Sandra's estates claim the same interest in all of the property in the *their* basket does not lessen the fact that *both* of them, when it comes to exemptions, can draw from property in that basket (a feature that comes into play when we discuss how "stacking" works later in this opinion).

Using this "three basket" analytical tool, we turn next to the personal injury cause of action to see how, under Texas law, portions of the overall cause of action can fall into each of the three baskets. To do this, we turn to the community property law of the state of Texas (the residence of these debtors).

## IV. *Community and Separate Property for Personal Injury Claims in Texas*

[8]    Under the Texas Family Code, a "spouse's separate property consists [*inter alia*] of: ... the recovery for personal injuries sustained by the spouse during marriage, *except any recovery for loss of earning capacity during marriage.*" TEX. FAM. CODE ANNN. § 3.001(3) (Vernon 1997) (emphasis added). Community property in general "consists of the property, *other than* separate property, acquired by either spouse during marriage." TEX. FAM. CODE ANN.. § 3.002 (Vernon 1997) (emphasis added). Thus, under section 3.001(3), a direct recovery on account of personal injury

damages suffered by a spouse is the separate property of that spouse. *See* TEX. FAM. CODE ANN. § 3.001(3) (Vernon 1997); *see also Lester v. United States,* 487 F.Supp. 1033, 1039 (N.D.Tex.1980). The damages that constitute the separate property of the injured spouse in Texas include those for disfigurement and for physical pain and suffering in the past and in the future. *See Osborn v. Osborn,* 961 S.W.2d 408, 414 (Tex.App.—Houston [1st Dist.] 1997, reh'g of pet. for rev. overruled).[17]

[9]    By the same token, however, damages which are attributable to an injury to the *marital partnership* are community property. *See Osborn v. Osborn,* 961 S.W.2d at 414. Thus, portions of a personal injury award may belong to the community estate, including damages for lost wages of the injured spouse, medical expenses incurred by the estate, and other expenses associated with injury to the community estate. *See* TEX. FAM. CODE ANN. §§ 3.001(3) & 3.002 (Vernon 1997); *see also Wilson v. Wilson,* 132 S.W.3d 533 (Tex.App.—Houston [1st Dist.] 2004); *Cottone v. Cottone,* 122 S.W.3d 211 (Tex.App.—Houston [1st Dist.] 2003) (stating that, although a recovery for personal injuries sustained by a spouse during marriage is generally that spouse's separate property, portions of the personal injury award belong to the community estate, including damages for lost wages, medical expenses, and other injury-related community expenses); *Osborn,* 961 S.W.2d at 414 (same).

**\*468**    [10]    Damages that the non-injured spouse suffered for loss of consortium are, under Texas law, the separate property of the non-injured spouse. *See Osborn,* 961 S.W.2d at 414; *see also Whittlesey v. Miller,* 572 S.W.2d 665, 669 (Tex.1978).[18]    With this general background in Texas community property law as it applies to personal injury claims, we can see how each bankruptcy estate has a piece of the cause of action.

## A. *Clyde Bippert's Property Interest in the Personal Injury Claim*

[11]    In this case, the bankruptcy estate of Clyde, the non-injured spouse, first has a property interest in Sandra's personal injury recovery to the extent that the marital estate has suffered injury, including medical expenses incurred by the marital estate and loss of earning capacity on the part of Sandra (earnings during a marriage are presumed to be community property). *See* 11 U.S.C. § 541(a)(2)(A); *see also* TEX. FAM. CODE ANN. § 3.003(a) (Vernon 1997); *Watson v. Beaty,* 370 S.W.2d 790, 791 (Tex.Civ.App.—Eastland

1963, writ ref. n.r.e.); *In re Norton,* 180 B.R. 168, 170 (Bankr.E.D.Tex.1995). This property goes into the "their" basket. Clyde also has a property interest in the personal injury claim to the extent that it is attributable to loss of consortium. *See Osborn v. Osborn,* 961 S.W.2d 408, 414 (Tex.App.—Houston [1st Dist.] 1997, reh'g of pet. for rev. overruled). This property goes into the "his" basket. Thus, included in Clyde's bankruptcy estate is property attributable to the personal injury claim arising from injuries to Sandra, even though Clyde was not the party who actually suffered the physical injury. This answers the first question posed earlier: does Clyde's estate have any property interest in the personal injury claim, such that he could satisfy the first prerequisite under section 522(b)? The answer is, yes he does. [19]

**B.** *Sandra Bippert's Property Interest in the Personal Injury Claim*

 **[12]**    As for Sandra Bippert, under the Texas Family Code, she clearly has a separate property interest in the recovery "... for personal injuries sustained by the spouse during marriage, except any recovery for loss of earning capacity during marriage." TEX. FAM. CODE ANN. § 3.001(3) (Vernon 1997). This would include damages for disfigurement, as well as damages for pain and suffering. *See Osborn,* 961 S.W.2d at 414. This interest falls into the "her" basket of property. But Sandra's estate also has a property interest in property in the "their" basket, which we have already noted consists of any recovery for damages to the marital estate. *See* 11 U.S.C. § 541(a)(2)(A). Because it is included in the "their property" category of Sandra's property interests, it also overlaps **\*469** with Clyde's estate. [20]

**V.** *Applying § 522(d)(11)(D)*

The foregoing analysis has established, under the framework we have laid out for handling exemption claims in joint cases, that the bankruptcy estates of both Clyde and Sandra could have, as a matter of law, a property interest in the personal injury claim, such that the first prerequisite for claiming an exemption under section 522(b) is satisfied. The next step is to determine whether those interests are eligible for exemption under the federal exemption scheme chosen by the debtors.

**A.** *Sandra's Exemption Claim*

With respect to Sandra, she is permitted to claim, out of property of her estate, property of a value not to exceed a total of $17,425, so long as it fits within the categorization described in section 522(d)(11)(D). She at least conceivably

has, first of all, a property interest in the personal injury claim for direct injuries to her, which property is found in the "her" basket.

Only a portion of the property in the "her" basket is actually eligible for exemption, however. The federal exemption scheme does not permit her to keep for herself as exempt that part of her separate property personal injury claim that is attributable to pain and suffering. *See* 11 U.S.C. § 522(d)(11)(D). [21] Thus, even though a recovery attributable to pain and suffering comes *into* her estate, and falls into the "her" basket, it cannot be taken back out as exempt, because of the restriction on exemptibility in section 522(d)(11)(D).

In the *their* basket are losses suffered by the marital estate, including loss of earning capacity, medical expenses incurred by the marital estate, and any other losses ascribable to the marital estate, suffered as a result of the injury. To the extent that Sandra has not already exhausted the $17,425 allowed to her by withdrawing property from the "her" basket, she can take property out of the *their* category of estate property, though again subject to the limitations in section 522(d)(11)(D) itself.

 **[13]**    The statute prohibits exemption of the personal injury award if it is "compensation for actual pecuniary loss" of the debtor. A payment for loss of earning capacity is an actual pecuniary loss, [22] and so does not qualify for exemption under section 522(d)(11)(D). [23] Thus, even though **\*470** Sandra has a property interest in this element of damages, it is nonetheless not eligible for exemption under the express language of section 522(d)(11)(D). Other losses suffered by the marital estate, however, including medical expenses, might not be so limited and so could conceivably be claimed (again, up to the dollar cap). [24]

**B.** *Clyde's Exemption Claim*

As earlier noted, Clyde has a separate property interest under state law for loss of consortium, which falls into the *his* basket. Clyde also has a community property interest in the losses suffered by the marital estate, just as Sandra does. This pulls the selfsame community property that was in Sandra's estate into his estate as well (*i.e.,* they overlap). This is property in the "their" basket.

 **[14]**    Contrary to the position of the Trustee, section 522(d)(11)(D) in fact *does* permit Clyde to claim as exempt part of Sandra's personal injury claim, because Clyde has (or at

least potentially has) a property interest in the personal injury claim. To see why this is the case, it is helpful to restate the statute, substituting the word "Clyde" for the word "debtor." Clyde can, when he chooses the federal exemptions, claim the following property as exempt: "[Clyde's] right to receive, or property that is traceable to a payment ... on account of personal bodily injury ... of [Clyde] or an individual of whom [Clyde] is a dependent." 11 U.S.C. § 522(d)(11)(D) (as restated). As we have seen, Clyde, as a member of the marital estate, could have a right to receive payment on account of a personal bodily injury to Sandra to the extent that payment is damages for losses suffered by the marital estate. *See* TEX. FAM. CODE, § 3.001(2) (Vernon 1997). Under the federal exemption scheme, that right to receive payment is exemptible (assuming it does not count as a payment for actual pecuniary loss) even though the personal injury was suffered by Sandra, not him ("on account of personal bodily injury ... of an individual of whom [Clyde] is a dependent,") *i.e.* Sandra (by virtue of section 522(a)(1)). Alternatively, the damages attributable to the **\*471** marital estate's losses are "property that is traceable to-a payment ... on account of personal bodily injury ... of ... [Sandra]." 11 U.S.C. § 522(d)(11)(D) (as restated). This is how the term "dependent" functions in section 522(d)(11)(D) to afford the non-injured spouse the ability to claim an exemption in a personal injury claim arising from an injury to Sandra. Thus, both the Debtors and Trustee got this wrong. The term "dependent" here does not give Clyde the right to "expand" his exemptions beyond what is includable within his estate (as the Debtors had argued). However, the term *does* permit Clyde to exempt property that is already in his estate, even though he was not the person directly injured (countering the Trustee's argument).

The same limitation that applied to Sandra also applies to Clyde. When Clyde claims an exemption under this section to property in the *their* category, consisting of injuries suffered by the marital estate, he cannot claim as exempt losses suffered by the marital estate for lost earning capacity, because that would be "compensation for actual pecuniary loss." Again, we will presume, for the sake of this opinion only, that he could make an exemption claim for medical expenses incurred by the estate, with the same caveat that we are not deciding here whether, as a matter of law, such expenses are or are not in fact exemptible. *See* note 24 *supra.*

 [15]    Clyde can also exempt (up to the dollar cap permitted in the statute) qualified property out of the "his" basket. In this case, that could include any claim for loss of consortium.

These damages constitute "[Clyde's] right to receive ... a payment ... on account of personal bodily injury ... of ... [Sandra]." *See* 11 U.S.C. § 522(d)(11)(D) (as restated).

## C. *The Overlap Between Clyde's Estate and Sandra's Estate*

 [16]    As has been previously noted, the Trustee does not contest, as a general matter, the Debtors' right to "stack" their exemptions—here using stacking in the sense of "doubling."[25]  The Trustee appears to be troubled by the Debtors' stacking exemptions with respect to a personal injury claim that belongs only to Sandra. The Debtors counter that the statute is plain and that they can. As should now be clear, the Debtors are wrong to rely on section 522(d)(11)(D) for their assertion that Clyde can simply "double" Sandra's exemption claim. Stacking (or doubling) is permitted, true enough, but only with respect to property withdrawn from the *their* basket.[26]  Clyde cannot "double" Sandra's exemption claim to property that she withdrew from the *her* basket, because **\*472** that belongs only to Sandra's estate, not Clyde's.

To see how this works, a hypothetical may be helpful. Let's suppose that Clyde had a $5,000 damages award for loss of consortium, and Sandra had a damages award for actual injury in the amount of $15,000. Both of these interests are separate property interests—Sandra's estate would have no interest in Clyde's $5,000, and Clyde's estate would have no interest in Sandra's $15,000. Property in the *his* basket is not in Sandra's estate. Property in the *her* basket is not in Clyde's estate.

Lets then further suppose that there is an additional award for $40,000 for medical expenses, which we will presume for purposes of this opinion would otherwise qualify as exemptible. This award would, under Texas law, be community property, and so would, under section 541(a)(2)(A), be property of *both* estates, Clyde's and Sandra's. The estates' interest simply overlap. The entire $40,000 would be in the *their* basket. We need not split up this money between the two estates, because both estates own whatever is in the *their* basket. For exemption purposes, then, *each* debtor can dip into the *same* basket and take out as much as is available, up to their respective dollar limits. And this is where the "stacking" or "doubling" takes place.

In our hypothetical, Clyde has used up $5,000 of his $17,425 personal injury exemption to shelter his separate property interest in the loss of consortium award. He can then dip

into the *their* basket to withdraw another $12,425 from the $40,000 worth of damages for medical expenses. That will leave $27,675 in the *their* basket.

Sandra, meanwhile, has used up $15,000 of her exemption sheltering her separate property personal injury award. She has only $2,425 worth of exemption left. She also can dip into the *their* basket, withdrawing that much out of the remaining $27,675 to complete her exemption claim. That will leave $25,250 in the *their* basket, not claimed as exempt, and so available for distribution to creditors by the trustee for the jointly administered estates.

Of course, Sandra and Clyde made choices in the foregoing hypothetical. They could have made different choices. Sandra and Clyde might have decided to each dip into the *their* basket first, using all of their respective $17,425 worth of exemptions. *See* 11 U.S.C. § 522(m). Between them, they could have sheltered $34,850 in damages attributable to medical losses. If they made this choice, they would have effectively "doubled" the section 522(d)(11)(D) exemption, simply because there was enough property in the *their* basket for both of them to satisfy their respective exemption entitlement. If they made this choice, neither would have anything left with which to shelter their respective separate property interests, which would then stay with the bankruptcy estate (or, more properly, estates) for distribution to creditors.

[17]   This is the sort of stacking that is permissible. Joint debtors can effectively "double" the value of the exemption in section 522(d)(11)(D), as they can in other subsections of section 522(d), but only when they are seeking to exempt property coming out of the *their* basket of property. What is *not* permissible, however, is for Clyde to "double" Sandra's exemption claim in her separate property. Suppose, for example, that we were to change the foregoing hypothetical to eliminate the damage claim for medical expenses for $40,000. Clyde has only his $5,000. Sandra has only her $15,000. Clyde could not "double" Sandra's $15,000, even though Clyde is a dependent of Sandra. Why? Because, in the first instance, Clyde cannot **\*473** exempt what he does not have, and he would not, in this hypothetical, have a property interest in Sandra's $15,000. Property in the *her* basket is not property in Clyde's estate.

### Conclusion

For the reasons stated, the Trustee's objection to exemption is overruled and the Debtors' exemptions in the personal injury action are allowed, up to the $30,000 amount listed by the Debtors in Schedule C.

An order consistent with this Memorandum Decision will be filed separately.

Footnotes

1   *See* FED.R.BANKR.P. 4003(b). The Trustee had to bring this objection even though the debtors in chapter 13 would not have to turn over any of their exempt property for estate administration anyway (by virtue of section 1306(b)). *See* FED.R.BANKR.P. 1019(1)(A) (when a chapter 13 case is converted to chapter 7, the schedules that were originally filed remain operative in the converted case unless the court orders otherwise); *see also Zibman v. Tow (In re Zibman),* 268 F.3d 298, 302 (5th Cir.2001) (the relevant date for evaluating the extent of the estate and the scope of exemptions is the date of the petition); *Lowe v. Sandoval (In re Sandoval),* 103 F.3d 20 (5th Cir.1997) (debtor's exemptions are determined as of the date the petition was filed, regardless whether it is later converted); *see also Taylor v. Freeland & Kronz,* 503 U.S. 638, 112 S.Ct. 1644, 118 L.Ed.2d 280, 26 C.B.C.2d 487 (1992) (the failure of a trustee to file a timely objection results in the allowance of the debtor's claimed exemption, even if the value of the exempt property would exceed the amount that would otherwise be available to be exempt under the applicable exemption law).

2   Before 1984, when a married couple filed a joint bankruptcy case, one spouse could choose the federal exemptions and the other the state exemptions. *See In re Graham,* 64 B.R. 469, 472 n. 3 (Bankr.S.D.Tex.1986); *see also In re Allen,* 725 F.2d 290, 292 (5th Cir.1984). This version of "stacking" was no longer allowed after amendments to section 522(b) made by the Bankruptcy Amendments And Federal Judgeship Act of 1984. *See Graham,* 64 B.R. at 472 n. 3. Since 1984, the expression "stacking" has taken on a new and different meaning, now referring to the practice of one joint debtor taking an exemption in the same asset as his or her joint debtor, though both choose (as they must) the same exemption scheme. The practice, now termed "stacking," ought better be referred to as "doubling." For better or for worse, however, the case law and treatises discussing this practice use the term "stacking." In this opinion, when the word "stacking" is used, it refers to the practice of "doubling."

3   At the time the debtors filed their petition, § 522(d)(11)(D) permitted an exemption for a payment not to exceed $17,425 on account of personal bodily injury of the debtor or an individual of whom the debtor is a dependent. Under the debtors' "stacking" argument

then, they could together conceivably have exempted up to $34,850.00 if they each claimed the same exemption up to the maximum allowed.

4    Debtors did not file a formal responsive pleading. These arguments were made on the record in court.

5    *See* 11 U.S.C. § 522(a)(1); *see also* 4 ALAN N. RESNICK ET AL., COLLIER ON BANKRUPTCY ¶ 522.03[1], at 522–18 (15th ed., rev.2003) [hereinafter COLLIER ON BANKRUPTCY] (stating that the special definition of "dependent" applies only to section 522(d)'s federal exemptions and may have an important effect in the determination of which property is exempt in the eleven clauses granting exemptions under section 522(d)).

6    *See* TEX. FAM. CODE ANN. § 3.002 (Vernon 1997).

7    The Trustee did not challenge the basis for the exemption beyond the "property interest" legal argument outlined above, nor did the Trustee challenge the amount claimed as exempt, even though the actual recovery has yet to be realized. By the same token, the debtor has *ipso facto* capped its exemption at $30,000.

8    The bankruptcy rules distinguish between consolidation and joint administration of estates. According to the Advisory Committee Note to Rule 1015,

> ... This rule does not deal with the consolidation of cases involving two or more separate debtors.... Consolidation, as distinguished from joint administration, is neither authorized nor prohibited by this rule since the propriety of consolidation depends on substantive considerations and affects the substantive rights of the creditors of different estates....
>
> ... Joint administration, as distinguished from consolidation, may include combining the estates by using a single docket for the matters occurring in the administration, including the listing of filed claims, the combining of notices to creditors of the different estates, and the joint handling of other purely administrative matters that may aid in expediting the cases and rendering the process less costly.
>
> ...
>
> ... A joint petition of husband and wife, requiring the payment of a single filing fee, is permitted by § 302 of the Code. Consolidation of such a case, however, rests in the discretion of the court. See § 302(b) of the Code.
>
> FED.R.BANKR.P. 1015, Advisory Committee Note (1983), *reprinted in* NORTON BANKR. L. & PRAC. 2ND, BANKR. RULES, at 49 (Thomson–West, 2003–2004 ed.).

9    Sections 541(a)(1) & (2) state:

> (a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
>
> (1) Except as provided in subsections (b) and (c)(2) of this section, all legal and equitable interests of the debtor in property as of the commencement of the case.
>
> (2) All interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is—
>
> (A) under the sole, equal, or joint management and control of the debtor; or
>
> (B) liable for an allowable claim against the debtor, or for both an allowable claim against the debtor and an allowable claim against the debtor's spouse, to the extent that such interest is so liable.
>
> 11 U.S.C. §§ 541(a)(1), (2).

10   *See also* In re McKenzie Energy Corp., 228 B.R. 854, 874 (Bankr.S.D.Tex.1998) (joint administration was designed to promote procedural convenience and cost efficiencies, but does not affect the substantive rights of claimants or the respective debtor estates).

11   *See also* In re Knobel, 167 B.R. 436, 439–440 (Bankr.W.D.Tex.1994).

12   The property in this category is *de facto* substantially consolidated already under state law in community property states, such as Texas. The property is jointly owned, and is not severable short of a divorce action, and is, by law, jointly liable for all debts incurred by the community. *See* TEX. FAM. CODE ANN. §§ 3.002, 3.003(a), 3.202(d) (Vernon 1997) (sections on community property, presumption of community property, and rules of marital property liability); *see also* In re Knobel, 167 B.R. 436, 440 (Bankr.W.D.Tex.1994) (in community property states, such as Texas, "property owned by one or both of the spouses may include the separate property of the wife, the separate property of the husband, 'special' or sole management community property of the wife and of the husband which is liable for the individual debts of the non-manager spouse, and jointly owned community property").

13   *See* 11 U.S.C. § 541(a)(2)(B).

14   Recall that, under the Bankruptcy Act, there was no scheme of federal exemptions. A debtor seeking to claim property as exempt was forced to rely on such exemptions as were otherwise available under non-bankruptcy law—usually the law of the state of the debtor's principal residence as of filing. *See* 2 EPSTEIN ET AL., BANKRUPTCY § 8–1, at 451 (West 1992) (noting that under the old Bankruptcy Act, a debtor could only exempt property under local law and non-bankruptcy federal law); *see also* 4 COLLIER ON BANKRUPTCY ¶ 522.02[1], at 522–12–522–13 (15th ed., rev.2003) (stating that debtors under the Bankruptcy Act were limited to the exemptions available under the state of their domicile).

15    And that is the error of Debtors' argument. It rests on a faulty premise. When the Debtors argue that Clyde can claim an exemption in Sandra's personal injury right to payment, that argument necessarily starts by reading subsection (11) of section 522(d) in isolation. The Debtors read "[t]he debtor's right to receive ... a payment ... on account of personal bodily injury ... of ... an individual of whom the debtor is a dependent" as though the words "right to receive" created an entitlement. If the statutory phrase is read in context with section 522(b), however, the error becomes clear. Clyde, one debtor, can claim as exempt *from property of his estate*, property fitting within the categories listed in subsection (d) of section 522. Subsection (d) says that 11 categories and subcategories of property (from property of Clyde's estate) are *available* for exemption See 11 U.S.C. § 522(d) ("may be exempted"). Subsection 11 then lists one subcategory of property that might be capable of being exempted: Clyde's right to receive, or property that is traceable to, a payment on account of personal bodily injury of an individual of whom Clyde is a dependent (that would be Sandra). If Clyde is allowed to claim some part of the personal injury award as exempt, it will only be because some part of the award is first and foremost part of his bankruptcy estate.

16    *See, e.g., In re Knobel,* 167 B.R. 436, 440 & n. 9 (Bankr.W.D.Tex.1994) (when a joint petition is filed, there are two estates each consisting of each spouse's respective separate property and sole management community property, plus the marital community's interest in joint community property).

17    It is worth a note here to explain that we are only discussing at this point what comes *into* the estate (and into which basket it might fall). We are not yet ready to deal with what comes *out of* the estate by virtue of an exemption under section 522(d)(11)(D). The court recognizes that, though Texas makes damages for pain and suffering the separate property of the injured spouse, the federal exemptions do not permit the debtor to *exempt* that particular right of recovery. See discussion *infra* at Pt. V. A.

18    The loss of spousal (as opposed to a parent-child loss of companionship) consortium includes the loss of affection, solace, companionship, society, assistance, and sexual relations necessary to a successful marriage, 28 TEX. JUR. 3D DAMAGES § 304 (2004). Even though "loss of consortium" is sometimes referred to as a cause of action, it is actually just an element of noneconomic damages that can be proven. *See* 39 TEX. JUR. 3D FAM. LAW § 107 (2004).

19    Unfortunately, the personal injury claim has not yet been liquidated, much less allocated. Fortunately (for the Debtors), the Trustee did not raise an objection to the Bipperts' claim beyond the legal claim discussed in this decision. Therefore, the court is free to presume that some portion of the total damage award is attributable to each of these categories of assets. As such, they would at least potentially be eligible for exemption under section 522(d)(11)(D).

20    Once again, we note that, because the Trustee did not object to the categorization of the property interests in question here, we do not need to actually break down the $30,000 worth of exemption value claimed by Clyde and Sandra. It is enough for our purposes here to conclude that some portion (albeit unknown in amount) of the personal injury claim could be included as a matter of law in Sandra's estate, part in the "her" basket, and part in the "their" basket.

21    The statutory sentence, elided for clarity, reads as follows: "The following property may be exempted under subsection (b)(1) of this section: ... (11) The debtor's right to receive ... (D) a payment ... on account of personal bodily injury, *not including pain and suffering* ...."

22    *See* 11 U.S.C. § 522(d)(11)(D). The statutory sentence, again elided for clarity, reads as follows: "The following property may be exempted under subsection (b)(1) of this section: ... (11) The debtor's right to receive ... (D) a payment ... on account of personal bodily injury, *not including ... compensation for actual pecuniary loss* ..."

23    It might be exemptible under § 522(d)(11)(E) (loss of future earnings), subject to the restrictions there stated, or under § 522(d)(5) ("wild card") if it has not already been used. *Compare In re Rockefeller,* 100 B.R. 874, 876–77 (Bankr.E.D.Mich.1989) (allowing an injured chapter 12 debtor to take a § 522(d)(11)(E) exemption, but not a § 522(d)(11)(D) exemption, for a personal injury recovery because the entire payment was compensation for loss of future earnings) *with In re Russell,* 148 B.R. 564, 566 (Bankr.E.D.Ark.1992) (in a chapter 13 case, because of the disjunctive nature of § 522(d)(11), a debtor must elect between §§ 522(d) (11)(D) or (E) with regard to a personal injury award). However, in this case the Debtors did not make a claim for an exemption under § 522(d)(11)(E), so we do not reach that issue.

24    There is some dispute over whether medical expenses incurred by the marital estate may also be excluded from exemption as "compensation for actual pecuniary loss." *See, e.g. In re Claude,* 206 B.R. 374, 376–77, 381 (Bankr.W.D.Pa.1997) (compensation for medical expenses could not be claimed under § 522(d)(11)(D) because it constituted an actual pecuniary loss); *see also* 4 COLLIER ON BANKRUPTCY ¶ 522.09[11], at 522–67 (15th ed., rev.2003) (according to the legislative history, it would not be necessary to allow exemption for reimbursement for medical expenses because Congress presumed that medical providers already had a constructive trust on any personal injury award for their expenses, and the constructive trust would not be property of the estate anyway). Congress' underlying presumption about constructive trusts may have been flawed, however. *See Haber Oil Co., Inc. v. Swinehart (In re Haber Oil Co., Inc.),* 12 F.3d 426, 435–37 (5th Cir.1994) (warning that constructive trust is a court-ordered remedy, not an interest in property). It is unnecessary for the court to resolve this difficult issue in this opinion because the Trustee's objection

does not raise that challenge. For the analytical purposes of this decision, we assume that such expenses *are* capable of being claimed as exempt, with the caveat that we do not actually decide the question here (because we do not have to).

25    "Stacking" (or more properly, doubling) exemptions is clearly permissible. Section 522(m) gives express statutory authorization for doubling in joint cases, by allowing each debtor to apply the same exemption scheme to the same item of property, so long as that item is included in each estate. *See* 11 U.S.C. § 522(m); *see also In re Gallo,* 49 B.R. 28, 30 (Bankr.N.D.Tex.1985).

26    *See, e.g.,* 4 COLLIER ON BANKRUPTCY ¶ 522.09[1], at 522–50 (stating that, if a homestead is owned jointly by a husband and wife, additional exemption protection is provided by § 522(m), which states that § 522 applies separately with respect to each debtor in a joint case, subject to the prohibition on mixing and matching of federal and state exemptions); *see also In re Gallo,* 49 B.R. 28, 30 (Bankr.N.D.Tex.1985) (holding that the husband and wife joint chapter 7 debtors were allowed to "stack" their federal homestead, automobile, and household furnishings exemptions); 28 TEX. PRAC., CONSUMER RIGHTS AND REMEDIES § 16.6 n. 56–60 (3d ed.2003) (stating that a husband and wife filing jointly can double the amounts of the equity in such personal property as one vehicle, personal jewelry, tools of the trade, and unmatured life insurance policies, for exemption purposes).

---

End of Document                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 75

438 B.R. 471
United States Bankruptcy Court,
D. Delaware.

In re CAPMARK FINANCIAL
GROUP INC., et al., Debtors.

No. 09–13684 (CSS).    |    Nov. 1, 2010.

**Synopsis**

**Background:** Chapter 11 debtors moved for approval of settlement that they had negotiated with secured lenders, and unsecured creditors' committee objected on theory that settlement involved an impermissible payment of prepetition secured claims outside plan, was impermissible sub rosa plan, and was not fair and equitable to unsecured creditors.

**Holdings:** The Bankruptcy Court, Christopher S. Sontchi, J., held that:

[1] use of unencumbered cash assets of jointly administered Chapter 11 estates in order to fund settlement between debtors and secured lenders that would eliminate lenders' claims against estate at discount and result in release of their security interests in securitized pool of mortgages that collateralized their claims was not prohibited payment of prepetition secured debt outside plan;

[2] proposed settlement was not improper sub rosa plan; and

[3] court would approve settlement as not falling below lowest point in range or reasonableness.

Motion granted; settlement approved.

West Headnotes (26)

**[1]    Bankruptcy**
👉 Judicial authority or approval

Burden was on Chapter 11 debtors, as parties seeking approval of proposed settlement, to demonstrate that settlement satisfied necessary prerequisites for approval, and debtors had to satisfy burden by preponderance of evidence. Fed.Rules Bankr.Proc.Rule 9019, 11 U.S.C.A.

Cases that cite this headnote

**[2]    Bankruptcy**
👉 Construction, execution, and performance

There is no per se rule against paying prepetition secured claims in Chapter 11 case outside plan of reorganization.

Cases that cite this headnote

**[3]    Bankruptcy**
👉 Construction, execution, and performance

Whether Chapter 11 debtor should be allowed to pay prepetition secured claims outside plan of reorganization depends on facts and circumstances of particular case.

Cases that cite this headnote

**[4]    Bankruptcy**
👉 Judicial authority or approval

While bankruptcy court had to give particular weight to interests of unsecured creditors in deciding whether to approve settlement that would result in payment of prepetition debt of creditors who appeared to be not just secured but oversecured, outside plan of reorganization, from the unencumbered assets of estate, court was not required to defer completely to unsecured creditors' representatives. Fed.Rules Bankr.Proc.Rule 9019, 11 U.S.C.A.

1 Cases that cite this headnote

**[5]    Bankruptcy**
👉 Judicial authority or approval
**Bankruptcy**
👉 Construction, execution, and performance

Use of unencumbered cash assets of jointly administered Chapter 11 estates in order to fund settlement between debtors and secured lenders that would eliminate lenders' claims against estate at discount and result in release of their security interests in securitized pool of

mortgages that collateralized their claims was not prohibited payment of prepetition secured debt outside plan, such as bankruptcy court lacked authority to approve, given evidence that value of mortgage pool, under even a conservative valuation, was well in access of unencumbered cash for which it was being swapped. Fed.Rules Bankr.Proc.Rule 9019, 11 U.S.C.A.

Cases that cite this headnote

**[6]     Bankruptcy**

    ☞ Judicial authority or approval

"Best interests of creditors" test did not apply outside Chapter 11 plan confirmation context to decision whether to approve settlement between Chapter 11 debtors and secured lenders. 11 U.S.C.A. § 1129(a)(7).

Cases that cite this headnote

**[7]     Bankruptcy**

    ☞ Judicial authority or approval

Settlement constitutes improper sub rosa Chapter 11 plan where settlement has effect of dictating terms of prospective plan.

1 Cases that cite this headnote

**[8]     Bankruptcy**

    ☞ Judicial authority or approval

For settlement to dictate terms of prospective Chapter 11 plan, so as to constitute improper sub rosa plan, settlement must either (1) dispose of all claims against estate, or (2) restrict creditors' rights to vote.

1 Cases that cite this headnote

**[9]     Bankruptcy**

    ☞ Judicial authority or approval

Proposed settlement between Chapter 11 debtors and secured lenders, whereby lenders relinquished their interest in collateral that more than fully secured their claims and waived any claims they had against estate in exchange for immediate payment of 91% of principal

balance of loans and release of debtors' potential avoidance claims against them, did not dispose of all claims against jointly administered Chapter 11 estates or restrict creditors' right to vote, and was not an impermissible sub rosa plan. Fed.Rules Bankr.Proc.Rule 9019, 11 U.S.C.A.

Cases that cite this headnote

**[10]     Bankruptcy**

    ☞ Judicial authority or approval

Unsecured creditors had no right to any specific property to fund their recoveries, and mere fact that Chapter 11 debtors proposed to use unencumbered assets of estate to fund settlement with secured lenders, whereby lenders relinquished their existing security interests and claims against estate for immediate cash payment, did not violate any rights that unsecured creditors possessed.

Cases that cite this headnote

**[11]     Bankruptcy**

    ☞ Judicial authority or approval

Mere fact that settlement between Chapter 11 debtors and secured lenders provided for release of any avoidance claims which debtors had against lenders did not transform it into improper sub rosa plan; releases were necessary and expected term of settlement agreement.

Cases that cite this headnote

**[12]     Bankruptcy**

    ☞ Judicial authority or approval

Bankruptcy court may approve settlement that is fair and equitable. Fed.Rules Bankr.Proc.Rule 9019, 11 U.S.C.A.

1 Cases that cite this headnote

**[13]     Bankruptcy**

    ☞ Judicial authority or approval

In deciding whether to approve proposed settlement of claims, bankruptcy court must apprise itself of all facts necessary to form an intelligent and objective opinion of probabilities

of ultimate success should claims be litigated, and estimate complexity, expense and likely duration of such litigation and other factors relevant to full and fair assessment of claims. Fed.Rules Bankr.Proc.Rule 9019, 11 U.S.C.A.

Cases that cite this headnote

**[14]    Bankruptcy**
👉 Judicial authority or approval

In determining whether to approve proposed settlement of claims, bankruptcy court need not decide the numerous questions of law or fact raised by litigation of claims, but rather should canvas the issues to determine whether settlement falls above lowest point in range of reasonableness. Fed.Rules Bankr.Proc.Rule 9019, 11 U.S.C.A.

2 Cases that cite this headnote

**[15]    Bankruptcy**
👉 Judicial authority or approval

In determining whether settlement falls above lowest point in range of reasonableness, as required for court to approve it, court must consider the following: (1) probability of success in litigation; (2) likely difficulties in collection; (3) complexity of litigation involved, and expense, inconvenience and delay necessarily attending it; and (4) paramount interest of creditors. Fed.Rules Bankr.Proc.Rule 9019, 11 U.S.C.A.

2 Cases that cite this headnote

**[16]    Bankruptcy**
👉 Judicial authority or approval

Decision whether to approve or deny a particular compromise or settlement involving bankruptcy estate lies within sound discretion of court. Fed.Rules Bankr.Proc.Rule 9019, 11 U.S.C.A.

Cases that cite this headnote

**[17]    Bankruptcy**
👉 Judicial authority or approval

In deciding whether to approve proposed settlement, bankruptcy court should exercise its discretion in light of general public policy favoring settlements. Fed.Rules Bankr.Proc.Rule 9019, 11 U.S.C.A.

Cases that cite this headnote

**[18]    Bankruptcy**
👉 Judicial authority or approval

Bankruptcy court is not required to conduct full evidentiary hearing as prerequisite to approving compromise. Fed.Rules Bankr.Proc.Rule 9019, 11 U.S.C.A.

1 Cases that cite this headnote

**[19]    Bankruptcy**
👉 Judicial authority or approval

Bankruptcy court would approve, as not falling below lowest point in range of reasonableness, proposed settlement between Chapter 11 debtors and secured lenders whereby lenders relinquished their interest in collateral that more than fully secured their claims and waived any claims they had against estate in exchange for immediate payment of 91% of principal balance of loans and release of debtors' potential avoidance claims against them; settlement, which was product of extensive, contentious and very difficult negotiations between debtors and ad hoc committee of creditors, secured various important benefits for debtors besides 9% discount in principal amount of secured debt, such as paving the way for Chapter 11 plan and early exit from bankruptcy that would eliminate between $45 and $60 million in professional fees and costs and eliminating costs of litigating avoidance claims which offered only a low probability of success, and did not prejudice unsecured creditors, even though settlement payment was to come from unencumbered assets of estate, since value of securitized pool of mortgages that collateralized lenders' claims was well in excess of debtors' payment to lenders, even under conservative valuation of asset pool. Fed.Rules Bankr.Proc.Rule 9019, 11 U.S.C.A.

**[20]  Bankruptcy**

  👈 Consideration

**Fraudulent Conveyances**

  👈 Payment or Satisfaction

**Fraudulent Conveyances**

  👈 Security

Paying or collateralizing antecedent debt constitutes "value" and "fair consideration" under constructive fraudulent transfer provisions of the Bankruptcy Code and New York law. 11 U.S.C.A. § 548(d)(2)(A); N.Y.McKinney's Debtor and Creditor Law § 272(b).

1 Cases that cite this headnote

**[21]  Guaranty**

  👈 Nature of Liability

**Guaranty**

  👈 Time of accrual of liability

Guarantees are contingent obligations and inchoate prior to default by principal obligor.

Cases that cite this headnote

**[22]  Bankruptcy**

  👈 Insolvency of debtor

Guarantees are liquidated, for purpose of estimating debtor's solvency or insolvency at time of alleged fraudulent transfer, based upon probabilities of their being called. 11 U.S.C.A. § 548.

Cases that cite this headnote

**[23]  Bankruptcy**

  👈 Fraudulent conveyances in general

Debtor may prefer one creditor over another without running afoul of fraudulent transfer laws. 11 U.S.C.A. § 548.

Cases that cite this headnote

**[24]  Bankruptcy**

  👈 Consideration

Where a bona fide antecedent debt exists, debtor's payment on account of that debt, even if it has effect of preferring one creditor over others, is not by itself a fraudulent transfer. 11 U.S.C.A. § 548.

2 Cases that cite this headnote

**[25]  Bankruptcy**

  👈 Judicial authority or approval

There is no per se rule that views of committee or other creditors are dispositive on reasonableness of proposed settlement, and debtor may seek approval of settlement over major creditor objections as long as it carries its burden of establishing that balance of pertinent factors, including paramount interests of creditors, weighs in favor of settlement. Fed.Rules Bankr.Proc.Rule 9019, 11 U.S.C.A.

3 Cases that cite this headnote

**[26]  Bankruptcy**

  👈 Judicial authority or approval

While proposed settlement between Chapter 11 debtors and secured lenders, whereby lenders relinquished their interest in collateral that more than fully secured their claims and waived any claims they had against estate in exchange for immediate payment of 91% of principal balance of loans and release of debtors' potential avoidance claims against them, certainly affected debtors' unsecured creditors, inasmuch as debtors' payment was to come from unencumbered assets of estate, there was no requirement that unsecured creditors had to be actively involved in settlement negotiations, and it was within debtors' prerogative to exclude them. Fed.Rules Bankr.Proc.Rule 9019, 11 U.S.C.A.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*474** Jason M. Madron, Lee E. Kaufman, Mark D. Collins, Richards, Layton & Finger, P.A., Wilmington, DE, for Debtors.

Craig E. Rubin, Michele L. Angell, Kasowitz, Benson, Torres & Friedman LLP, Craig L. Siegel, Gregory A. Horowitz, Joshua K. Brody, Kara F. Headley, Kramer Levin Naftalis & Frankel, LLP, New York, NY, Daniel A. O'Brien, Evan T. Miller, GianClaudio Finizio, Jamie Lynne Edmonson, Justin R. Alberto, Bayard, **\*475** P.A., Wilmington, DE, for Creditor Committee.

**Opinion**

*AMENDED FINDINGS OF FACT*
*AND CONCLUSIONS OF LAW* [1]

CHRISTOPHER S. SONTCHI, Bankruptcy Judge.

**I. INTRODUCTION**

1. Before the court are competing motions relating to the claims of the Debtors' secured lenders as well as potential claims against those lenders. The Debtors' secured lenders assert a secured claim in the amount of approximately $1.1 billion plus interest, fees and charges. Their collateral consists of $200 million in cash and a pool of commercial mortgage loans that the Debtors value between $1.3 and $1.5 billion.

2. The Debtors have filed a motion seeking Court approval of a settlement that may be briefly summarized as follows: the Debtors release potential fraudulent transfer actions and objections to the secured lenders' claims in return for an immediate, pre-plan payment to the lenders of cash equal to 91 percent of the original principal amount of the claims in addition to post-petition interest and fees of approximately $75 million that the secured lenders have already received. Of the total $975 million in cash to be paid under the settlement approximately $775 million is not pledged to the secured banks.

3. Basically, the settlement provides for a "cash for collateral" swap where the secured lenders are foregoing their collateral, which the Debtors value between $1.3 and $1.5 billion, in exchange for an upfront cash payment. Under the settlement, the secured lenders are receiving a full release. The Debtors

believe that the settlement will save the Debtors' estate no less than $300 million.

4. The Official Committee opposes the settlement. It asserts that the Court **cannot** approve the settlement because there is no basis in the law to allow for the payment through a settlement and outside of a plan of reorganization of a secured creditors' pre-petition claim, especially in a liquidating case where the payment is being made from unencumbered cash and the unsecured creditors oppose the payment.

5. The Official Committee further argues that the Court **should not** approve the settlement. It believes there are valid causes of action that can be asserted against the secured lenders relating both to the initial issuance of the debt in 2006 and the granting of liens in 2009. Because of the asserted strength of those litigation claims, the Official Committee believes that the Debtor has settled too cheaply. In addition, the Official Committee disputes that the collateral being left behind—the pool of commercial mortgage loans —is worth anywhere near the $1.3 billion to $1.5 billion figure asserted by the Debtors and that risk associated with the collateral's value is unfairly being transferred to the unsecured creditors. Finally, the Official Committee believes the settlement should not be approved because it was achieved through an unfair process in which the unsecured creditors were not allowed to participate.

6. The law governing settlements under Bankruptcy Rule 9019 is well-settled. The Court may approve a settlement that is "fair and equitable." To determine whether a settlement is fair and equitable, the Court need only canvas the issues to determine whether the settlement falls **\*476** above the lowest point in the range of reasonableness. Whether a settlement is above the lowest point in the range of reasonableness, in turn, is determined by considering the *Martin* factors: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." Of course, the Court may not approve a settlement that would violate applicable law, regardless of whether it is a "good deal" for a debtor.

7. Based upon the extensive record developed in a four-day evidentiary hearing and over 200 pages of briefing, the Court believes it has adequately canvassed the issues and finds that it **can** approve the settlement in this case. The Court disagrees with the Official Committee's assertion that there

is no basis in the law to allow for the payment through a settlement and outside of a plan of reorganization of a secured creditor's pre-petition claim. There is ample authority under the Bankruptcy Code for such payment. Nonetheless, there is no per se rule—it depends on the facts and circumstances of the case. While this settlement certainly tests the limits of that authority, the Court finds that payment of the pre-petition secured claim in this instance does not violate the Bankruptcy Code. A key element in the Court's ruling is its finding, based upon the evidence submitted at the Hearing, that the value of the collateral being left behind is well in excess of the unencumbered cash for which it is being swapped.

8. In addition, the Court finds that it **should** approve the settlement. Litigation over the secured lenders' claim would be complicated, time consuming and expensive. Despite the Official Committee's assertions otherwise, the Court finds that the litigation claims against the secured lenders have a low probability of being successful. Given the prohibitive cost and the low likelihood of success, it is certainly within the lowest range of reasonableness for the Debtors to enter this settlement. Moreover, as noted above, the Court finds that the value of the collateral being left behind is well in excess of the cash for which it is being swapped. Finally, the Court believes that the settlement was a result of arm's length bargaining and the process was fair and equitable. While it is usually desirable to involve an official committee in these types of negotiations it is certainly not required. Thus, applying the *Martin* factors, the Court will approve the settlement.

9. In addition to opposing the settlement, the Official Committee seeks authority to sue the secured lenders to avoid the secured lenders' liens as preferential or fraudulent. The Court will deny that motion as moot.

## II. PROCEDURAL HISTORY

10. On October 25, 2009 (the "Petition Date"), Capmark Financial Group Inc. ("CFGI") and its subsidiaries and affiliates (collectively, the "Debtors," "Company," or "Capmark") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. [2] The Debtors continue to operate their businesses and manage their properties as debtors in possession as authorized by sections 1107(a) and 1108 of the Bankruptcy Code. These cases are being jointly administered pursuant to Rule 1015(b) **\*477** of the Federal Rules of Bankruptcy Procedure and Rule 1015–1 of the Local Bankruptcy Rules for the District of Delaware.

11. On November 2, 2009, the Official Committee of Unsecured Creditors ("Official Committee") was appointed pursuant to section 1102 of the Bankruptcy Code.

## A. The Motions

12. On August 10, 2010, the Official Committee filed the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting it Leave, Standing, and Authority to Prosecute Causes of Action on Behalf of the Debtors' Estates* [Docket No. 1526] (the "Standing Motion"), in which the Official Committee seeks entry of an order authorizing it to sue the secured lenders to avoid as fraudulent and preferential the Debtors' May 2009 grant of $1.5 billion of liens and, in the alternative, to limit the amount of the lenders' secured claims on fraudulent transfer theories. [3] The Ad Hoc Group of Holders of Capmark's Unsecured Bank Debt (the "Ad Hoc Unsecured Committee") filed a statement in support of the Standing Motion. [Docket No. 1611]. The Debtors and the Ad Hoc Committee of Prepetition Secured Lenders (the "Ad Hoc Secured Committee"), among others, oppose the Standing Motion.

13. On September 3, 2010, the Debtors filed the *Debtors' Motion, Pursuant to Bankruptcy Rule 9019 and Bankruptcy Code Section 363(b) and 549(a)(2)(B), for Order Approving Settlement Between Debtors and their Prepetition Secured Credit Facility Lenders,* [Docket No. 1636] (the "Settlement Motion"), requesting approval of a settlement with their secured lenders compromising and settling the secured claims arising under the $1.5 billion Secured Credit Facility (the "Settlement"). The Ad Hoc Secured Committee and others support the motion. The Official Committee and the Ad Hoc Unsecured Committee oppose the Settlement Motion.

## B. Hearing and Witnesses

14. The Court held a hearing to consider the Settlement Motion and the Standing Motion (the "Hearing") on October 14, 15, 18, 19, and 26, 2010. At the Hearing, the Court heard opening and closing statements from all parties and testimony from five witnesses called by the Debtors in support of the Settlement: (i) Thomas L. Fairfield, Executive Vice President, General Counsel, and Secretary of CFGI; (ii) Mohsin Meghji, Chief Restructuring Officer of the Debtors and a principal and managing director of Loughlin Meghji & Co. ("LM+Co"); (iii) Edwin Litolff, a real estate consultant and Senior Adviser to Duff & Phelps, LLC ("D & P"); (iv) William Gallagher, Chief Risk Officer of CFGI and Capmark Finance Inc. ("CFI"); and (v) Dr. Timothy Luehrman, a

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

professor at Harvard Business School and Senior Advisor to D & P. The Official Committee called one witness in opposition to the Settlement, Bradley Geer of Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan"). The parties also propounded numerous exhibits admitted into evidence during the Hearing.

## III. FINDINGS OF FACT

### A. THE TRANSACTIONS

15. The Settlement Motion and Standing Motion implicate three key transactions.

16. On March 23, 2006, a group of four private equity investors (the "Investors") acquired an approximate 78% controlling interest in what is now CFGI from CFGI's former parent, GMAC Mortgage LLC ("GMAC"), for $1.5 billion (the "2006 Transaction"). *See* Hr'g Tr. 54:4–16 (Fairfield); Debtors' Demonstrative Ex. A (2006 Transaction Chart). GMAC retained just over 21% of CFGI's equity following the 2006 Transaction. At the same time, the debt of CFGI was substantially refinanced with new bank debt that replaced the existing debt of CFGI. *See* Hr'g Tr. 55:17–20; 56:6–16 (Fairfield). The key features of the 2006 Transaction are illustrated below. *See* Hr'g Tr. 55:17–56:20 (Fairfield); Debtors' Demonstrative Ex. A.

*478  **(i) The 2006 Transaction**



17. As depicted above, in connection with the 2006 Transaction, CFGI and certain of its subsidiaries entered into two unsecured debt facilities: (a) a $5.5 billion credit facility (the "Credit Facility"), consisting of both a term loan and revolving credit line, with a final maturity date of March 23, 2011; and (b) a $5.25 billion bridge loan facility (the "Bridge Loan"), with an original maturity date of March 23, 2008, with an option to extend for one year through March 23, 2009. *See* Hr'g Tr. 55:3–16 (Fairfield). The terms of the Credit Facility are governed by a Credit Agreement dated as

of March 23, 2006 (as amended, the "Credit Agreement"). *See* Debtors' Ex. 4(a); Hr'g Tr. 54:4–55:16 (Fairfield). The terms of the Bridge Loan are governed by a Bridge Loan Agreement dated as of March 23, 2006 (as amended, the "Bridge Loan Agreement"). *See* Debtors' Ex. 2(a); Hr'g Tr. 54:4–55:16; 57:13–58:2 (Fairfield); Debtors' Ex. 1, at 11 (CFGI Form S–4, dated Mar. 14, 2008).

18. *Borrowings and Payments.* At the closing of the 2006 Transaction, CFGI borrowed approximately $8.357 billion

under the Credit Facility and Bridge Loan. *See* **\*479** Hr'g Tr. 56:10–20 (Fairfield); Debtors' Ex. 48, App'x 1 (Expert Report of Timothy A. Luehrman [hereinafter "Luehrman Rep."] ). The proceeds of these borrowings were used to pay approximately $7.8 billion of preexisting indebtedness and closing costs and expenses of the 2006 Transaction and for general corporate purposes. *See* Hr'g Tr. 56:10–20 (Fairfield).

19. *The Guaranties.* Nine of CFGI's direct (including CFI) and indirect subsidiaries (collectively, the "Guarantors") guaranteed CFGI's obligations under both the Credit Agreement and Bridge Loan Agreement in separate respective guaranty agreements (the "Credit Agreement Guaranty," (Debtors' Ex. 5), and the "Bridge Loan Guaranty," (Debtors' Ex. 3)). *See* Hr'g Tr. 57:4–12; 59:10–15; 61:15–22 (Fairfield).

20. Section 1(a) of the Credit Agreement Guaranty, (Debtors' Ex. 5), provides:

> Each Guarantor hereby guarantees, as primary obligor and not merely as surety, to each Lender and the Agent and their respective successors and assigns the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise) of the principal of and interest on the Borrowings made by the Lenders to and the Notes (if any) held by each Lender of, the Company, all obligations owing from time to time by the Company under any Hedge Agreement entered into by any Lender or Affiliate of any Lender (or any Person that was a lender at the time such Hedge Agreement was entered into) (collectively, "Guaranteed Hedge Agreements"), and all other amounts from time to time owing to the Lenders or the Agent by the Company under the Credit Agreement, the Notes or any of the other Loan Documents, in each case strictly in accordance with the terms thereof (such obligations being herein collectively called the "Guaranteed Obligations"). Each Guarantor hereby further agrees that if the Company shall fail to pay in full when

due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, such Guarantor will promptly pay the same without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

A substantially identical provision can be found at Section 1(a) of the Bridge Loan Guaranty. *See* Debtors' Ex. 3.

21. The Credit Agreement Guarantors and Bridge Loan Guarantors are jointly and severally liable for their guarantee obligations and the Guarantors agreed that, in the event payment shall be required under the Guaranties, each Guarantor will contribute the maximum amount permitted by law "so as to maximize the aggregate amount of the Guaranteed Obligations paid to the Lenders ... under or in respect of the Loan Documents." Debtors' Ex. 5 (Credit Agreement Guaranty), at § 1(c); Debtors' Ex. 3 (Bridge Loan Guaranty), at § 1(c).

22. *The Savings Clauses.* Additionally, both the Credit Agreement Guaranty and Bridge Loan Guaranty contain "savings clauses" limiting the obligations of each Guarantor to the maximum amount allowable under governing fraudulent transfer laws. The language of the Credit Agreement Guaranty's savings clause is as follows:

> Each Guarantor, and by its acceptance of this Guaranty, the Agent and each Lender hereby confirms that it is the intention of all such Persons that this **\*480** Guaranty and the obligations of each Guarantor hereunder not constitute a fraudulent transfer or conveyance for purposes of Bankruptcy Law (as hereinafter defined), the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar foreign, federal or state law to the extent applicable to this Guaranty and the obligations of each Guarantor

hereunder. To effectuate the foregoing intention, the Agent, the Lenders and the Guarantors hereby irrevocably agree that the obligations of each Guarantor under this Guaranty at any time shall be limited to the maximum amount as will result in the obligations of such Guarantor under this Guaranty not constituting a fraudulent transfer or conveyance. For purposes hereof, "Bankruptcy Law" means any proceeding of the type referred to in subsection 7.l(f) of the Credit Agreement or Title 11 U.S.Code, or any similar foreign, federal or state law for the relief of debtors.

Debtors' Ex. 5, at 1. A substantially identical provision can be found at Section 1(b) of the Bridge Loan Guaranty. *See* Debtors' Ex. 3.

23. *Credit Ratings.* In connection with the closing of the 2006 Transaction, CFGI's long term unsecured debt was rated Baa3 by Moody's Investors Services Inc., BBB- by Standard & Poor's Financial Services LLC, and BBB by Fitch Inc. Each of these ratings categorized the debt as "investment grade," albeit at the low range of the spectrum. *See* Hr'g Tr. 63:2–5 (Fairfield); Debtors' Ex. 1, at 11 (Form S–4); Debtors' Ex. 48 (Luehrman Rep.), at 72–73.

24. *2006 Financial Condition.* The parties have stipulated that, at the time of the 2006 Transaction, CFGI could have sold or caused the sale of its assets and businesses and used the proceeds to satisfy all of its debts and the debts of its subsidiaries. Hr'g Tr. 460:15–462:5 (Bienenstock) ("[W]hen the guarantees were issued on March 23, 2006, by the Capmark subsidiaries, that on that day Capmark Financial Group, Inc., the holding company, could have, if it wanted to, have caused the sale of its assets and businesses to pay off all creditors at all levels in full."); Hr'g Tr. 462:12–15 (Mayer's agreement); *see also id.* at 931:24–932:2 (Horowitz) ("[T]he Committee is not challenging the conclusions with regard to CFGI's solvency.").

25. *Voidability of Subsequently Incurred Obligations.* The parties agree that all claims replacing debt or guaranties issued in 2006 must be tested by whether the debt or guaranties were voidable in 2006. Hr'g Tr. 36:4–10 (Mayer) ("[E]verybody's claim has to be measured as of 2006, and

if you take out somebody who was there in 2006, you step into their shoes. That's our argument."); Hr'g Tr. 37:10–38:14 (Mayer) ("There's no real argument that the bonds are going to be at war with the banks, because the bonds refunded out previous bank claims.").

26. *CFGI's Solvency, Capital Adequacy, Ability to Pay Debts.* Capmark's financial condition at the time of the 2006 Transaction was strong. *See* Hr'g Tr. 62:5–10 (Fairfield). The Company had very good earnings in the prior year and had stockholders' equity of approximately $2 billion. *Id.* at 62:21–63:1. In connection with the closing of the 2006 Transaction, CFGI was required to apply purchase accounting to 79 percent of its closing date balance sheet, which included adjusting all of the assets and liabilities to their fair values as of March 23, 2006 to the extent of 79 percent. *See* Debtors' Ex. 1 (Form S–4 Statement), at F–13–F–14. The March 23, 2006 balance sheet was audited by Deloitte & Touche, CFGI's independent public accountants. *See id.* at F–2.

**\*481** 27. In connection with CFGI's audited consolidated financial statements for year ending December 31, 2007, CFGI presented balance sheets as of March 22, 2006—prior to the consummation of the 2006 Transaction—and March 23, 2006, adjusted to take account of the 2006 Transaction. *See* Debtors' Ex. 1 (Form S–4), at F–14. On a book value basis, the consolidated net worth of the Capmark enterprise —*i.e.,* the amount its assets exceeded its liabilities without taking into account "mezzanine equity" or securities that are conditionally redeemable—was $1.972 billion the day before the 2006 Transaction and $2.029 billion as of the date the 2006 Transaction closed. *Id.* Thus, on a book value basis, the consolidated positive net worth of the CFGI enterprise was enhanced by the 2006 Transaction. *See* Debtors' Ex. 48 (Luehrman Rep), at 5–6.

28. At the time of the 2006 Transaction, CFGI was solvent, adequately capitalized, and able to pay its debts as they matured. *See* Hr'g Tr. 940:3–13 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at 1–7, 23–65 (solvency), 66–71 (adequate capital), 72–76 (ability to pay debts). Moreover, at the time of the 2006 Transaction, CFGI had the ability to pay in full all the liabilities of CFGI and its subsidiaries (including the Credit Facility and Bridge Loan) by selling its assets or businesses (including subsidiaries) for their fair values. *See* Hr'g Tr. 943:19–944:10 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at 5–7; *see also* Hr'g Tr. 931:24– 932:2 (Luehrman) ("[T]he Committee is not challenging [Dr. Luehrman's] conclusions with regard to CFGI's solvency.").

29. *CFI's Solvency.* At the time of the 2006 Transaction, CFI was solvent, adequately capitalized, and able to pay its debts as they matured. *See* Hr'g Tr. 956:6–21 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at 1–2, 7, 42 (solvency), 70 (adequate capital), 76 (ability to pay debts). CFI's assets exceeded its liabilities by $1.1 billion upon the closing of the 2006 Transaction. *See* Hr'g Tr. 941:3–11 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at 43. The Guaranties had a low likelihood of being called and, therefore, should not be included as a liability at fair value in an amount that would render CFI insolvent on a balance sheet basis. *See* Hr'g Tr. 944:11–15 (Luehrman). If called upon to pay on its Guaranty, CFI could have recovered in full from CFGI upon its subrogation claim. *Id.* at 944:3–10; Debtors' Ex. 48 (Luehrman Rep.), at 5–7. As of March 23, 2006, CFGI had more than $5 billion in intercompany payables to CFI, which would have allowed CFI, in the event it had to pay on its guaranty, to offset the payable against its guaranty liability. *See* Hr'g Tr. 951:9–17 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at App'x 3, p. 3 n. 5.

### (ii) The 2007 Transaction

30. Slightly more than a year after consummating the 2006 Transaction, in May 2007, CFGI accessed the credit markets again and issued $2.55 billion of senior unsecured notes (the "2007 Transaction"). *See* Hr'g Tr. 64:4–65:14 (Fairfield); Debtors' Ex. 10 (Offering Circular). The notes consisted of: (i) $850 million of Floating Rate Senior Notes Due May 10, 2010; (ii) $1.2 billion of 5.875% Senior Notes Due May 10, 2012; and (iii) $500 million of 6.300% Senior Notes Due May 10, 2017 (collectively, the "*Notes* "). *See id.* The purpose of the Notes offering was to convert bridge (short-term) debt into medium to longer term debt. *See* Hr'g Tr. 63:17–64:3 (Fairfield). The key features of the 2007 Transaction are illustrated below. Debtors' Demonstrative Ex. B.

**\*482**



31. The Notes were offered pursuant to an offering circular (the "Offering Circular") prepared by CFGI's outside counsel, Simpson Thacher & Bartlett LLP ("STB"). *See* Hr'g Tr. 67:3–8, 67:23–68:2 (Fairfield); Debtors' Ex. 10 (Offering Circular). Each series of Notes was issued pursuant to a separate indenture (the "Indentures") between CFGI, the Guarantors, and Deutsche Bank Trust Company Americas ("DBTCA"), as Indenture Trustee. *See* Hr'g Tr. 66:6–19 (Fairfield); Debtors' Ex. 10 (Offering Circular). The Indentures (Debtors' Exs. 7–9) were drafted by counsel for the underwriters,

Shearman & Sterling LLP ("*S & S*"). *See* Hr'g Tr. 68:3–6 (Fairfield). The same subsidiary Guarantors of CFGI's obligations under the Credit Agreement and Bridge Loan Agreement guaranteed CFGI's obligations under the Notes. *See* Hr'g Tr. 57:4–10 (Fairfield); Debtors' Exs. 7–9, art. 10, § 10.01.

32. *The Savings Clauses.* As with the then-existing Credit Agreement Guaranties and Bridge Loan Guaranties, the guaranties on the Notes are subject to a "savings clause," limiting each Guarantor's liability to the maximum amount allowable under applicable fraudulent transfer laws. *See* Debtors' Exs. 7–9. Section 10.02(a) of each Indenture provides:

> Any term or provision of this Indenture to the contrary notwithstanding, the maximum aggregate amount of the Guaranteed Obligations guaranteed hereunder by any Guarantor shall not exceed the maximum amount that can be hereby guaranteed without rendering this Indenture, as it relates to such Guarantor, voidable under applicable Bankruptcy Laws or laws relating to fraudulent conveyance or fraudulent transfer or similar laws affecting the rights of creditors generally.

33. *Use of Proceeds.* The proceeds from the issuance of the Notes (approximately **\*483** $2.50 billion in total) were used as follows: (i) approximately $2.017 billion was used to repay principal under the Bridge Loan; (ii) approximately $449.3 million was used to repay two third-party debt facilities on which CFI was a principal obligor (and CFGI was a guarantor); and (iii) approximately $34.6 million was used to repay a Canadian swing line facility with Capmark Canada Ltd. *See* Hr'g Tr. 63:4–66:3 (Fairfield). Thus, virtually all of the proceeds of the 2007 Transaction were used to pay antecedent debt. *Id.*

34. *The Guaranties.* Pursuant to Article 10 of each Indenture, the Guarantors jointly and severally guaranteed CFGI's obligations under the Notes. *See* Hr'g Tr. 64:18–23 (Fairfield); Debtors' Exs. 7–9 (Indentures), 10 (Offering Circular). Section 10.01 of each Indenture provides, in relevant part:

(a) Each Guarantor hereby jointly and severally, irrevocably and unconditionally guarantees, as a primary obligor and not merely as a surety on a senior basis, to each Holder and to the Trustee and its successors and assigns (i) the full and punctual payment when due, whether at Stated Maturity, by acceleration, by redemption or otherwise, of all obligations of the Issuer under this Indenture ... and the Notes and (ii) the full punctual performance ... of all other obligations of the Issuer ... under this Indenture and the Notes (all the foregoing being hereinafter collectively called the "Guaranteed Obligations").

\* \* \*

(g) In furtherance of the foregoing ... upon the failure of the Issuer to pay the principal of or interest on any Guaranteed Obligation when and as the same shall become due ... each Guarantor hereby promises to and shall, upon receipt of written demand by the Trustee, forthwith pay, or cause to be paid ... all ... obligations of the Issuer to the Holders an the Trustee.

35. *Credit Ratings.* Both before and after the 2007 Transaction, CFGI's long-term unsecured debt maintained its "investment grade" rating from the three major ratings agencies. *See* Hr'g Tr. 68:7–15, 22 to 69:2 (Fairfield); Debtors' Ex. 1 (Form S–4), at 103; Debtors' Ex. 10 (Offering Circular), at 95.

36. *CFGI's Solvency, Capital Adequacy, Ability to Pay Debts.* At the time of the 2007 Transaction, Capmark's financial condition was strong. *See* Hr'g Tr. 69:3–9 (Fairfield). Capmark's earnings in 2006 had been positive, and the first quarter of 2007 was extremely profitable. *Id.* The net worth of Capmark on a consolidated basis as of March 31, 2007, was approximately $2.5 billion. *Id.* at 68:16–21. At the time of the 2007 Transaction, CFGI was solvent, adequately capitalized, and able to pay its debts as they matured. *See* Debtors' Ex. 48 (Luehrman Rep.), at 1–7, 23–65 (solvency), 66–71 (adequate capital), 72–76 (ability to pay debts). Moreover, CFGI had the ability to pay in full all the liabilities of CFGI and its subsidiaries (including the Notes) by selling its assets or businesses (including subsidiaries) for their fair values as of the date of the 2007 Transaction. *See id.;* Hr'g Tr. 931:24–932:2 (Luehrman) ("[T]he Committee is not challenging [Dr. Luehrman's] conclusions with regard to CFGI's solvency.").

37. *CFI's Solvency.* At the time of the 2007 Transaction, CFI was solvent, adequately capitalized, and able to pay its

debts as they matured. *See* Hr'g Tr. 956:6–21 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at 1–2, 7, 42 (solvency), 70 (adequate capital), 76 (ability to pay debts). CFI's assets exceeded its liabilities by $1.1 billion upon the closing of the 2007 Transaction. *See* Debtors' Ex. 48 (Luehrman Rep.), at 43. The Guaranties **\*484** had a low likelihood of being called and, therefore, should not be included as a liability at fair value in an amount that would render CFI insolvent on a balance sheet basis. *See* Hr'g Tr. 944:11–15 (Luehrman). If called upon to pay on its Guaranty, CFI could have recovered in full from CFGI upon its subrogation claim. *Id.* at 944:3–10; Debtors' Ex. 48 (Luehrman Rep.), at 5–7. As of March 31, 2007, CFGI had more than $2.6 billion in intercompany payables to CFI, which would have allowed CFI, in the event it had to pay on its guaranty, to offset the payable against its guaranty liability. *See* Debtors' Ex. 48 (Luehrman Rep.), at App'x 3, p. 3 n. 5.

### (iii) The 2009 Transaction

#### a. Events Leading Up to Entry into the 2009 Transaction

38. As a result of the turmoil in the credit markets and a decline in the value of its mortgage-related assets, Capmark found itself in an increasingly challenging financial situation at the end of 2008. *See* Hr'g Tr. 69:10–70:8, 87:8–88:3 (Fairfield). Markets in which Capmark operated its businesses had experienced significant stress and disruptions beginning in July 2007, as the credit markets began to deteriorate. *Id.* That stress and disruption accelerated significantly in the fall of 2008 with the Lehman bankruptcy, which created a great deal of uncertainty and fear in the market, causing asset values to decline and liquidity to dry up. *Id.* In addition, although Capmark had not experienced significant losses prior to the fourth quarter of 2008, it expected to incur a substantial loss in the fourth quarter (which ultimately exceeded $1 billion). *Id.* at 71:15–23 (Fairfield); 758:18–759:3 (Gallagher); AHG Ex. 2 at 32. In response, the Company took steps to limit new commitments, cut expenses, and preserve liquidity. *See* Hr'g Tr. 71:15–23 (Fairfield).

39. In the fall of 2008, as conditions worsened, Capmark began to consider other options and, at the beginning of 2009, retained several professional advisors, including LM +Co, Lazard Frères & Co. LLC ("Lazard"), and Dewey & LeBoeuf LLP ("D & L"), to assist the Debtors in a potential restructuring of the balance sheet. *See* Hr'g Tr. 70:16–71:1

(Fairfield); Debtors' Exs. 11(a), (c)-(d) (Board Minutes). The Company began exploring a variety of alternatives aimed at extending maturities, preserving liquidity, and potentially converting a meaningful amount of debt to equity to resize and stabilize the balance sheet for the longer term. *See* Hr'g Tr. 71:15–72:3 (Fairfield). These included, *inter alia,* different types of recapitalizations, debt for equity swaps, the exchange of smaller amounts of secured debt for larger amounts of unsecured debt, dividing the company into a "good bank" (holding good assets) and a "bad bank" (holding distressed assets), and converting to a bank holding company to obtain access to TARP and other federal funding programs. *See* Hr'g Tr. 72:3–21; 78:23–79:21; 125:21–126:5 (Fairfield); Debtors Exs. 11(a), (b), (d), (f), & (g) (Board Minutes). The Company hoped that by taking a proactive role, it could head off the various pressures facing the Company and ensure its own long-term viability. *Id.*

40. This was not an easy task. Tom Fairfield, Capmark's General Counsel and an Executive Vice President, testified that the Company was "under pressure from virtually every corner of its businesses." Hr'g Tr. 131:7–10 (Fairfield). [4] These included pressure from: (i) the Federal Deposit Insurance Corporation ("FDIC"); (ii) Government–Sponsored Entities ("GSEs"), including Fannie Mae, Freddie Mac, and **\*485** HUD, for which Capmark acted as servicer; (iii) the credit and servicer rating agencies; and (iv) others, such as the SEC and derivatives counterparties. *Id.* at 73:22, 75:23, 106:12–108:18, 109:6–131:10; *see also* Debtors' Exs. 11(e)-(g), (i)-(k), (t)-(u), and (w) (Board Minutes); Debtors' Exs. 12–15 (Credit Rating Downgrades), 18 (Servicer Rating Downgrade), and 19 (E-mail from Jay Levine, dated Apr. 28, 2009).

41. The Company's most pressing financial challenge in early 2009 was the March 23, 2009 due date for the $833 million remaining principal balance on the Bridge Loan. *See* Hr'g Tr. 73:22–74:6, 77:18–22, 88:6–19, 149:22–150:10, 153:11–24 (Fairfield); Debtors' Exs. 11(a)-(aa) (Board Minutes). Additionally, the Company's 2008 losses posed a significant risk that it would breach the leverage ratio covenant in the Credit Agreement, *see* Debtors' Ex. 4(a), at 65, which would immediately throw $6.3 billion of bank debt into default and give the banks (and the noteholders) the right to accelerate that debt. *See* Hr'g Tr. 76:12–77:17 (Fairfield). Capmark's corporate debt ratings, which had been downgraded earlier, were again downgraded by all three of the major ratings agencies. *See* Hr'g Tr. 75:24–76:11 (Fairfield); Debtors' Exs. 12–15 (Credit Rating Downgrades). In addition, in

light of the substantial loss incurred by Capmark in the fourth quarter of 2008 and the potential breach of the leverage ratio covenant, Capmark's independent auditors, Deloitte & Touche, indicated that it was considering a going concern qualification with respect to Capmark's year-end 2008 financial statements, which would have exacerbated the problems with, and increased the pressure from, virtually all of Capmark's constituencies. *See* Hr'g Tr. 76:12, 77:17, 115:15–22 (Fairfield).

42. Moreover, as the default rate on mortgages serviced by Capmark increased, it was obligated to advance money to cover those shortfalls at a net monthly rate of between $100 and $150 million. *See* Hr'g Tr. 74:7–75:23 (Fairfield). If those advances were not paid, Capmark risked termination of its servicing contracts with the GSEs and commercial mortgaged-backed securities ("CMBS") counterparties. *Id.* Any further downgrades to Capmark's servicer ratings (which had already been downgraded, *see* Debtors' Ex. 18 (Servicer Downgrade)), would likely have led to the termination of such servicing contracts. *See* Hr'g Tr. 109:2–112:11 (Fairfield).

43. The GSEs were concerned about Capmark's financial stability as potentially impacting their servicing portfolios and insisted that if Capmark did not quickly deal with potential defaults under the bank debt and enhance its long-term financial position, the GSEs would be compelled to terminate their contracts with the Debtors. *See* Hr'g Tr. 111:3–11, 113:24–122:10 (Fairfield); Debtors' Exs. 11(s)-(u) (Board Minutes), 19 (E-mail from Jay Levine dated Apr. 28, 2009). Any termination would have been a major blow to Capmark, not merely because its contracts with GSEs were a major source of revenue, but also because they would have likely triggered further terminations by CMBS counterparties. *Id.* As Jay Levine, Capmark's CEO, reported to the Board of Directors: "[I]f the GSE and HUD contracts are terminated, the company's servicer rating may be lowered and the trustees of the CMBS servicing may terminate the associated pooling and servicing agreements, resulting in a significant loss to the company." Hr'g Tr. 119:7–21 (Fairfield); *see also* Debtors' Ex. 11(t) (Board Minutes).

44. During this same period, the Company also faced increased scrutiny by the FDIC in connection with its banking **\*486** business. *See* Hr'g Tr. 112:11, 113:11–19, 117:4–21, 122:11–129:13 (Fairfield). Because the FDIC considered CFGI the primary financial support for Capmark Bank as well as the obligor on the Bank's capital maintenance agreement, Capmark's management thought it crucial to

address proactively the Company's financial stability issues and to avoid bankruptcy. *See* Hr'g Tr. 122:20–127:10 (Fairfield). The Company, which was being advised in its dealings with the FDIC by regulatory counsel at Sullivan & Cromwell LLP ("S & C"), including the former general counsel of the FDIC, as well as regulatory advisors at Promontory Financial Group, LLC, viewed seizure of Capmark Bank by the FDIC as a significant risk. *Id.; see also* Hr'g Tr. 79:22–80:12, 122:11 (Fairfield); Debtors' Exs. 11(f)-(g), (i), (*l* ), (p)-(q).

45. Faced with this set of circumstances, Capmark made a critical decision in the beginning of 2009: it would not make the $833 million Bridge Loan payment due on March 23, 2009, despite having approximately $1.5 billion in cash on hand. *See* Hr'g Tr. 78:8–22 (Fairfield). As both Mr. Fairfield and Mr. Levine testified, the Debtors' primary goal at this point was to effect a holistic restructuring of the balance sheet, maintaining their core businesses and continuing as a going concern. *Id.; see also* Hr'g Tr. 1084:16–1086:24 (Levine). The Company believed that using up so much of its liquidity to pay a short-term debt would negatively impact the company's ability to restructure itself successfully, and would eventually force the company to file for bankruptcy. *Id.*

46. Among the restructuring alternatives being considered in early 2009 was a chapter 11 filing. *See* Hr'g Tr. 84:3–7 (Fairfield). Capmark was extremely averse to the idea of filing for bankruptcy. *Id.* at 84:8–85:23. As Mr. Fairfield explained:

> We were trying to achieve a restructuring of the company ... that would allow it to continue and retain its businesses and operate into the future.

\* \* \*

> [T]he company believed that filing a bankruptcy at that point would essentially destroy the businesses, that we would not be able to continue to retain them or operate them. These kinds of businesses don't typically do well in a bankruptcy. And that was our view and the view of our advisors, so we used a lot of efforts to try to avoid that.

*Id.* at 84:11–85:2. In particular, the Company believed that the GSEs, CMBS trustees, and large insurance counterparties would not have been willing to continue doing business with the Company in bankruptcy. *Id.* Mr. Fairfield testified that in the March, April, and May 2009 timeframe, a Capmark bankruptcy was neither inevitable nor highly likely and

that the best alternative for all of the stakeholders was to maintain the core businesses, restructure the debt, and continue to operate as a going concern. *See* Hr'g Tr. 85:24–86:13 (Fairfield).

47. Capmark began negotiating with the Bridge Loan Lenders (who also held a large percentage of the outstanding debt under the Credit Agreement) in February 2009. *See* Hr'g Tr. 89:4–90:7, 92:3–95:21, 104:10–106:4 (Fairfield); Debtors' Exs. 11(d)-(s) (Board Minutes). At first, the banks were completely unwilling to compromise. *See* Hr'g Tr. 92:3–95:21 (Fairfield); Debtors' Exs. 11(d)-(f) (Board Minutes). On February 23rd, the bank steering committee (which was responsible for negotiating on the banks' behalf) presented Capmark with a term sheet requiring "repayment in full of the $833 million Bridge Loan due March 23, 2009, **\*487** and the extension of additional liquidity to the company pursuant to new secured credit facilities secured by substantially all assets of the company." Hr'g Tr. 92:12–23 (Fairfield); Debtors' Ex. 11(e) (Board Minutes). The bank steering committee added that it was not prepared to provide the company with any extension of the bridge loan maturity. *Id.* On March 6th, the bank steering committee communicated the same message to the Company's financial advisors, informing Lazard that it would not agree to any meeting regarding a Capmark restructuring until the Company "agreed to repay the $833 million bridge loan due March 23, 2009 in full." Hr'g Tr. 94:20–96:1 (Fairfield); Debtors' Ex. 11(g) (Board Minutes). On March 15th, the bank steering committee again told Lazard that it would not budge. *See* Hr'g Tr. 96:6–97:4 (Fairfield); Debtors' Ex. 11(i) (Board Minutes). Indeed, as late as March 17th—just six days before the Bridge Loan came due—the lenders were demanding full cash payment of the Bridge Loan on March 23rd, or a short-term extension of the loan maturity in return for collateral on *all* of the Capmark group's assets. *See* Hr'g Tr. 97:1–98:22 (Fairfield); Debtors' Ex. 11(j) (Board Minutes).

48. The banks' demand for full payment of the Bridge Loan was unacceptable to the Company. *See* Hr'g Tr. 98:2–100:4 (Fairfield); Debtors' Exs. 11(e)-(g), (i)-(j) (Board Minutes). Capmark refused to pay down the debt or grant liens on all its assets; the Company believed that doing so would not be "prudent, and in the interests of the company and the stakeholders given the liquidity needs and other issues" described above. *See* Hr'g Tr. 99:4–9 (Fairfield). Having spent enormous time reviewing and evaluating different potential restructuring alternatives, Capmark believed it was necessary to accomplish a holistic solution to retain as much

of the Company's assets and liquidity as possible to both fund the ongoing businesses and keep counterparties comfortable, and to retain consideration for future debt exchanges or other recapitalization transactions. *See* Hr'g Tr. 99:10–24 (Fairfield); Debtors' Exs. 11(g), (i)-(j) (Board Minutes). As a result, Capmark refused to back down in the face of the banks' demands and even made contingent plans to file for bankruptcy in the event no resolution was reached with the banks, and the Company found itself in default (a position Capmark adopted as a negotiation tactic as well). *See* Hr'g Tr. 100:1–16; 153:11–24 (Fairfield).

49. Finally, on March 19th, the banks "blinked." Hr'g Tr. 100:17–19 (Fairfield). The banks "finally accepted the fact that [the Company was] not going to repay [the Bridge Loan], and then indicated that they would accept something less than full repayment of the bridge loan, and indicated a willingness to grant an extension of a couple of weeks to engage in further discussions...." Hr'g Tr. 100:19–101:2 (Fairfield). Capmark's Board approved the extension. *See id.* at 101:3–23; Debtors' Ex. 11(k) (Board Minutes). The next two months were characterized by extensive arm's length, hard-fought, and often contentious negotiations. *See* Hr'g Tr. 131:11–23 (Fairfield). There were numerous disagreements between Capmark and the Bridge Lenders, as well as disagreements within the Bridge Lender group. *See* Hr'g Tr. 104:10–106:4 (Fairfield). The most difficult issues involved (i) the amount of the repayment of the Bridge Loan, (ii) the amount of collateral to secure any bank debt going forward, (iii) the Company's ability to use unencumbered cash in connection with a bond exchange or bond buy-back, (iv) whether there should be financial covenants going forward **\*488** and (v) the amount of fees and interest payable to the banks. *Id.* Talks threatened to break down on several occasions, and the Board met seventeen times between March 6 and May 7, 2009, the date on which the parties reached an agreement in principle. [5] *See* Hr'g Tr. 86:21–88:20; 98:7–100:16; 104:14–106:11 (Fairfield); Debtors' Exs. 11(f)-(w) (Board Minutes). Finally, on May 29th, the parties executed a $1.5 billion secured credit facility that, along with just $75 million of the Debtors' cash, would be used to pay down $1.575 billion of existing debt, including a large part of the remaining balance on the Bridge Loan. *See* Hr'g Tr. 131:24–136:8 (Fairfield).

### b. Terms of the 2009 Transaction

50. Specifically, CFGI, the Guarantors, the Additional Guarantors, and certain of CFGI's existing bank lenders

entered into a $1.5 billion secured term loan facility (the "Secured Credit Facility"), secured by a pledge and grant of security interest on all of Capmark's U.S. and Canadian mortgage loan assets and foreclosed real estate (excluding assets held by Capmark Bank) and the proceeds of such assets (the "2009 Transaction"). *Id.* The terms of the Secured Credit Facility are governed by a term facility credit and guaranty agreement, dated as of May 29, 2009 (the "Secured Term Loan Agreement"), *see* Debtors' Ex. 21, and a separate security agreement dated May 29, 2009. *See* Debtors' Ex. 22; Debtors' Ex. 23 (Press Release, dated May 29, 2009).

51. As part of the 2009 Transaction, the parties entered into amendments to both the Credit Agreement and Bridge Loan Agreement to, among other things, (i) terminate any borrowing capacity under the revolving credit portion of the Credit Facility and convert any outstanding borrowings thereunder to term loans, *see* Debtors' Ex. 4(d); (ii) eliminate the leverage ratio covenant, *see* Debtors' Exs. 2(j), 4(d); (iii) create an express exception to the "limitation on liens" covenants in both the Credit Agreement and Bridge Loan Agreement to permit Capmark to enter into the secured Credit Facility, *see id.;* and (iv) add three new guarantors (the "Additional Guarantors") as guarantors of CFGI's obligations, *see id.; see also* Hr'g Tr. 132:13–135:1 (Fairfield). The amendments also extended the maturities of all facilities (including the remainder of the Bridge Loan, which had matured) to coincide with the maturity of the secured Credit Facility—*i.e.,* to at least April 15, 2010, with the possibility to extend further to March 23, 2011. *See*

Hr'g Tr. 149:22–150:10 (Fairfield); Debtors' Exs. 2(j), at 10–11; 4(d), at 11–13 (Amendment No. 9 to the Bridge Loan Agreement and Amendment No. 3 to the Credit Agreement). In addition, the 2009 Transaction limited the collateral to the North American commercial mortgage loan pool; permitted Capmark to use up to $150 million in cash in connection with bond repurchases or other recapitalization transactions; and granted Capmark the right to pledge collateral to other creditors, including bondholders (under certain conditions) to facilitate potential future restructurings. *See* Hr'g Tr. 133:13–134:11 (Fairfield).

52. Nicholas Leone of Blackstone Advisory Partners L.P., an expert witness for the Ad Hoc Secured Committee, examined the key terms of the Secured Credit Facility, and concluded that those terms—namely, the loan-to-value ratio of the secured **\*489** transaction, the interest rate spread, the borrower's credit quality, and the maturity date—were consistent with terms that would have been required by third-party financing sources in 2009. *See* Hr'g Tr. 524:20–525:2 (Leone). As such, the key terms of the 2009 Secured Credit Facility were "market terms" that would be expected in an arm's length transaction between a company comparable to Capmark and third-party financing sources in 2009. *Id.* These facts were stipulated among the parties. *Id.*

53. The key features of the 2009 Transaction are illustrated in Debtors' Demonstrative Ex. C.



54. *Perfection.* The secured lenders' security interests in the pledged collateral were validly perfected as a condition to closing the Secured Credit Facility. See Debtors' Ex. 21, at 40 (Secured Credit Facility). The maturity date of the Secured Credit Facility is March 23, 2011. *Id.* at 16.

55. *The Guaranties and Additional Guarantors.* The same Guarantors that guaranteed CFGI's obligations under the Credit Agreement and Bridge Loan Agreement, together with the newly added Additional Guarantors, jointly and severally guaranteed the obligations of CFGI under or in respect of the Secured Credit Facility. *See* Hr'g Tr. 134:19–22, 135:7–11 (Fairfield). Section 8.01 of the Secured Credit Facility provides, in relevant part:

> Each Guarantor, jointly and severally, unconditionally and irrevocably guarantees ... the punctual payment when due ... of all of the Obligations of each of the other Loan Parties now or hereafter existing under or in respect of the Loan Documents....

56. *The Savings Clause.* The Secured Credit Facility also contains a "savings clause" limiting the maximum amount guaranteed by each Guarantor under the applicable guaranty to the maximum amount allowable under the governing

**\*490** fraudulent transfer laws. Section 8.09 of the Secured Credit Facility (Debtors' Ex. 21) provides, in relevant part:

> Each Guarantor ..., and by its acceptance of this Guaranty, the Agents and each Secured Party, hereby confirms that it is the intention of all such Persons that this Guaranty ... not constitute a fraudulent transfer or conveyance for purposes of U.S. bankruptcy laws, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar foreign, federal or state law to the extent applicable to this Guaranty and the Guaranteed Obligations of such Guarantor hereunder. To effectuate the foregoing intention, ... [the parties] hereby irrevocably agree that the Guaranteed Obligations ... under this Guaranty at any time shall be limited to the maximum amount as will not result in the Guaranteed Obligations ... constituting a fraudulent transfer or conveyance. Each Guarantor hereby unconditionally and irrevocably agrees that in the event any payment shall be required to be made ... under

this Guaranty ..., such Guarantor will contribute, to the maximum extent permitted by law ... so as to maximize the aggregate amount paid to such Lender or Secured Party under or in respect of the Loan Documents.

57. *The Indenture Amendments.* In connection with the closing of the Secured Credit Facility, CFGI, the Guarantors, and the Indenture Trustee also executed an amendment to the Indentures to correct an "ambiguity, omission, defect, or inconsistency" in the "limitation on liens" covenant in each Indenture. Hr'g Tr. 139:3–149:5 (Fairfield). The covenant limited (and was intended to limit) the amount of secured debt CFGI could incur to $1.5 billion, unless CFGI provided the noteholders with an equal and ratable share in any collateral securing indebtedness above $1.5 billion. *See id.*

58. Due to a scrivener's error, the words "secured by Liens," highlighted below, were omitted from Section 4.04 of each Indenture. Hr'g Tr. 139:13–142:11 (Fairfield). As explained by Mr. Fairfield: "The original bond indenture omitted several words in the exception to the restriction on liens that were properly reflected, accurately reflected in the offering circular, but were not contained in the final indenture." *Id.* at 139:15–20 (Fairfield). Following review of the issue and consultation with both STB (counsel for CFGI and the drafter of the offering circular) and S & S (underwriters' counsel and the drafter of the Indentures) it was unanimously concluded that the omission of the words "secured by Liens" in the indentures was a drafting error that did not reflect the business deal, which was accurately reflected in the offering circular. *Id.* at 139:21–140:4; *see also* Debtors' Ex. 11(x), at 1 (May 18, 2009 CFGI Board Minutes) ("Mr. Fairfield stated that in the course of negotiating the bank loan transaction, the parties have become aware of a drafting error in Section 4.04 of the bond Indenture under which the collateral grant contemplated by the bank loan term sheet would be made. Mr. Fairfield stated that the Company's outside counsel [STB] had brought this matter to bank counsel's attention prior to the execution of the term sheet and that bank counsel [S & S], which was also underwriter counsel in the bond issuance transaction, agreed with the Company's position on the intended meaning of the provision."); Debtors' Ex. 33 (Giove email) (S & S's S. Giove agreeing that "the Basket Provision as set forth in the Offering Circular accurately reflects the mutual intention and agreement of the parties with respect to that provision."); Hr'g Tr. 141:24–142:11; 148:7–149:5 (Fairfield). Mr. Fairfield further explained that a literal **\*491** reading of the indentures

without the words "secured by Liens" would have rendered the lien basket meaningless given that Capmark already had approximately $8 billion unsecured indebtedness. In effect, there would have been no lien basket at all, in contrast with the terms of the existing credit facilities which permitted the incurrence of secured debt in terms similar to that described in the offering circular. *See* Hr'g Tr. 140:11–141:11 (Fairfield). Moreover, when CFGI registered new Notes to exchange for the original Notes in 2008 pursuant to a Form S–4 registration statement (as required by the original Note Indentures), the prospectus contained the correct description of the lien basket provision. *See* Debtors' Ex. 1 (Form S–4), at 222.

59. The Offering Circular for the Notes correctly stated the language of the covenant by including the words "secured by Liens" and the Indenture amendments conformed to what the Offering Circular disclosed. *See* Hr'g Tr. 139:3–20 (Fairfield); Debtors' Ex. 10 (Offering Circular), at 191.

60. Capmark was advised that the indentures contained provisions which allowed for the correction of omissions or defects without the need for prior notice and consent of the noteholders. *See* Hr'g Tr. 142:14–22, 288:12–19 (Fairfield); *see also* Debtors' Exs. 7–9, § 9.01. Capmark thereafter followed the procedures set forth in the indentures for amending the indentures via the issuance of supplemental indentures. *Id.* Sections 4.04 of the Indentures were thus amended as of May 20, 2009, to add the words "secured by liens" (as emphasized below):

> Notwithstanding the foregoing, the restrictions set forth in this "Limitation on Liens" covenant will not apply to the incurrence of any Liens securing Indebtedness which, together with other outstanding Indebtedness of ours or our Guarantors **secured by Liens** (not including Indebtedness secured by Liens otherwise permitted under the foregoing numbered exceptions) does not exceed the greater of (i) 10% of Consolidated Net Tangible Assets and (ii) $1.5 billion.

61. In accordance with the procedures set forth in the indentures, CFGI advised the indenture trustee, DBTCA, of the drafting error. DBTCA was also presented with Officers' Certificates executed by officers of CFGI and Opinions of Counsel executed by STB (on which the

CFGI board of directors was also permitted to rely), each certifying that the Supplemental Indentures were valid pursuant to the terms of each Indenture. *See* Debtors' Exs. 24–26 (Officers' Certificates); Debtors' Exs. 27–29 (STB Opinions of Counsel); Hr'g Tr. 143:20–144:7 (Fairfield). Upon presentation of the Officers' Certificates and Opinions of Counsel, DBTCA executed the First Supplemental Indentures (the "Supplemental Indentures"). *See* Debtors' Exs. 30–32 (First Supplemental Indentures). DBTCA executed the Supplemental Indentures on or about May 20, 2009 and thereafter provided notice of the amendments to the bondholders. *See* Hr'g Tr. 149:14–17 (Fairfield). DBTCA and CFGI acted in good faith and in compliance with the obligations of the Indenture Trustee and issuer under the Indentures and in all other respects in executing the Supplemental Indentures. *See* Hr'g Tr. 139:3–149:5 (Fairfield).

62. *Use of Proceeds.* The proceeds from the Secured Credit Facility, together with $75 million from CFGI, were used to pay antecedent debt of CFGI and the subsidiary Guarantors, as follows: (i) approximately $984.4 million was used to pay a portion of the amounts owed under the Credit Facility, *see* Debtors' Ex. 4(d); and (ii) the balance, approximately $590.6 million, **\*492** was used to pay a portion of the amounts owed under the Bridge Loan. *See* Debtors' Ex. 2(j); Hr'g Tr. 132:13–24 (Fairfield).

63. *Solvency, Capital Adequacy, Ability to Pay Debts.* Following the 2009 Transaction, neither CFGI nor its subsidiary Guarantors were solvent, adequately capitalized, or able to pay their debts as they matured. See Debtors' Ex. 48 (Luehrman Rep.), at 1–8.

### c. Benefits of the 2009 Transaction

64. In addition to the value received as a result of the paydown of $1.5 billion in antecedent debt, elimination of the Debtors' near-term loan defaults and an extension of the maturity dates of the Bridge Loan and the Credit Facility also provided the Debtors with a host of other direct and indirect benefits. *See* Hr'g Tr. 140:22; 154:11 (Fairfield).

65. The success of the Debtors' negotiating team in limiting the amount of collateral granted to the banks allowed the Debtors to retain enough unencumbered assets to work towards their primary goal—effecting a holistic restructuring and maintaining the company's core businesses over the long

term. *Id.* Stated differently, entry into the Secured Credit Facility "averted what had would likely have been a bankruptcy filing," *id.,* which would have been "very, very detrimental to value." *Id.* at 154:12–155:24 (Fairfield).

66. Entry into the Secured Credit Facility headed off further downgrades to the Debtors' servicer ratings and significantly alleviated the risk of servicing contract terminations by the GSEs and the CMBS trustees. *See* Hr'g Tr. 154:12–159:19 (Fairfield). Had the Debtors not been able to push off the Bridge Loan maturity, their belief—based on their communications with GSEs and others, what had actually happened to other distressed servicers, and the professional advice the Debtors received—was that the major CMBS servicing counterparties and the GSEs would have moved very aggressively to terminate their relationships with the Debtors. Hr'g Tr. 156:12–159:19 (Fairfield). Instead, the Debtors continued to maintain their working relationship with the GSEs and the vast majority of their CMBS counterparties until they sold the servicing business for roughly $1 billion in the fall of 2009. *See* Hr'g Tr. 163:14–164:13 (Fairfield).

67. The sale of the servicing business for a favorable price was another major benefit of the Secured Credit Facility. *See* Hr'g Tr. 152:10–153:10 (Fairfield). Had the Debtors not obtained the Bridge Loan extension and averted other loan defaults, they would have risked termination of the servicing and pooling agreements, and likely would have been forced into a quick sale of that business, for which the Debtors would not have been able to obtain as much value as they later did. *See* Hr'g Tr. 156:12–159:19 (Fairfield). With the Secured Credit Facility in place, the Debtors had the time to explore a sale of the servicing business in an orderly and organized manner. *See* Hr'g Tr. 162:8–163:18 (Fairfield). The Debtors hired advisors, solicited bids from some twenty companies, and eventually entered into a put agreement with Berkadia on September 2, 2009, which not only gave the Debtors the option to sell at a favorable price, but also allowed them to retain the business in the event they were able to effectuate the holistic restructuring they were still working towards at that time. *See* Hr'g Tr. 159:20–164:13 (Fairfield). Before entering into the Secured Credit Facility, by contrast, the Debtors had had no time to organize an auction and had received only one vague expression of "interest" in the servicing business, made before any due diligence had occurred and **\*493** without any reference to price. *See* Hr'g Tr. 159:20–161:19 (Fairfield).

68. The 2009 Transaction also relieved the significant pressure the Debtors had been receiving from the FDIC

in connection with Capmark Bank. *See* Hr'g Tr. 151:5–10 (Fairfield). It allowed the Debtors to head off what they believed, based on advice from William Kroener of S & C, the former General Counsel of the FDIC, would have been adverse regulatory action by the FDIC, including a potential seizure of Capmark Bank. *See* Hr'g Tr. 155:4–24 (Fairfield); Debtors' Exs. 11(p)-(q) (Board Minutes). The Debtors were able to continue negotiations with the FDIC throughout the Summer and Fall and ultimately succeeded in heading off what might have been a devastating bank seizure or, in the event of an immediate bankruptcy, a significant priority claim against assets of CFI. *See* Hr'g Tr. 174:12–175:12 (Fairfield).

69. In short, by entering into the Secured Credit Facility, Capmark avoided what likely would have been a bankruptcy filing. *See* Hr'g Tr. 154:1–2 (Fairfield). Capmark's objective at this time was to stay out of bankruptcy and proceed if at all possible with a holistic restructuring plan which would enable it to operate its businesses as a going concern. *See id.* at 151:16–21, 154:3–11 (Fairfield).

#### d. Claims Against The Secured Lenders

70. The Official Committee and the Ad Hoc Unsecured Committee assert that substantial claims exist against the secured lenders. These actions include claims for: (i) avoiding and/or recovering the payments, obligations, guaranties, liens and security interests that were granted in favor of the secured lenders without reasonably equivalent consideration, and/or for the purpose of hindering, delaying and defrauding the Debtors' unsecured creditors, and (ii) avoiding and/or recovering the payments, obligations, guaranties, liens and security interests that were granted in favor of insiders of the Debtors, or affiliates of such insiders that were incurred or transferred during the statutory preference period.

71. The Official Committee also asserts that the amount of the secured lenders' secured claim is limited by reason of operation of the "savings clause" contained in the 2006 Guaranty.

## B. DEBTORS' DECISION TO COMMENCE CHAPTER 11 CASES

72. Having secured an extension of their short-term debt obligations while holding on to a large percentage of unencumbered assets, the Debtors spent the Summer and early Fall of 2009 attempting to negotiate a comprehensive

restructuring with all of their creditors. *See* Hr'g Tr. 167:8–168:1 (Fairfield). Members of the Debtors' management, as well as their outside advisors, met repeatedly with representatives of the various secured and unsecured groups and discussed a variety of potential resolutions. *See id.;* Hr'g Tr. 172:24–174:11 (Fairfield).

73. The Debtors were aware they would have to file for bankruptcy on or before August 27, 2009 to preserve a bankruptcy preference action against the secured lenders. *See* Hr'g Tr. 168:24–172:23 (Fairfield). In the days and weeks prior to that date, both management and the Board of CFGI discussed the benefits and drawbacks of such an approach. *See id.; see also* Debtors' Ex. 35 (Board Minutes); Official Committee Ex. 16 (E-mail from Jay Levine, dated Aug. 26, 2009); Hr'g Tr. 1094:10–1096:22 (Olson).

74. Ultimately, the Debtors decided not to commence chapter 11 cases before the expiration of the preference period for several reasons. First, negotiations with **\*494** both secured and unsecured lenders over a consensual and comprehensive out-of-court restructuring were continuing and remained the primary goal of the Debtors and their stakeholders. *See* Hr'g Tr. 169:16–174:11; 176:6–21; 187:8–189:11; 248:7–13 (Fairfield); Debtors' Ex. 35 (Board Minutes). Notably, none of the bondholders ever contacted the Debtors to suggest or demand they file for bankruptcy to preserve potential preference claims. *See* Hr'g Tr. 171:24–172:23 (Fairfield). Second, the Debtors were currently engaged in delicate negotiations with Berkadia over the servicing business, and had not yet entered into the put agreement which would ultimately allow it to realize almost a billion dollars for the sale of the servicing business. *See* Hr'g Tr. 175:13–176:5 (Fairfield). The Debtors were concerned that a precipitous bankruptcy filing would irreparably damage their relationship with the GSEs and servicing counterparties, resulting in substantial loss of value to their chapter 11 estates. *See* Hr'g Tr. 169:5–15 (Fairfield); Debtors' Ex 35 (Board Minutes). Finally, the Debtors were engaged in ongoing discussions with the FDIC regarding CFGI's capital maintenance agreement. *See* Hr'g Tr. 173:12–175:12 (Fairfield). The Debtors believed that filing for bankruptcy without a consensual and amicable resolution with the FDIC could result in a priority claim for the FDIC under section 365(*o*) of the Bankruptcy Code. *See* Hr'g Tr. 174:17–175:12 (Fairfield). In addition, Capmark was able to terminate substantially all of its derivative contracts prior to filing for bankruptcy. *See* Hr'g Tr. 176:22–177:4 (Fairfield).

75. The Debtors eventually commenced their chapter 11 cases in October 2009, and did so only after satisfying themselves that a holistic restructuring was not possible outside chapter 11.

## C. EXPERT TESTIMONY REGARDING SOLVENCY OF THE DEBTORS DURING THE 2006, 2007, AND 2009 TRANSACTIONS

76. Through their counsel, Debtors retained Dr. Timothy Luehrman, a corporate finance and valuation professor at Harvard Business School, to provide an independent analysis of CFGI's solvency, capital adequacy, and ability to pay debts as they mature (as a consolidated entity), as well as that of the subsidiary Guarantors as of the dates of the 2006, 2007, and 2009 Transactions. *See* Hr'g Tr. 930:21–931:22 (Luehrman). Dr. Luehrman has over twenty years of experience in the areas of business valuations and corporate finance. *See* Hr'g Tr. 917:11–920:8 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at Ex. 2 (Luehrman CV). At the Settlement Hearing, Dr. Luehrman was certified as an expert in solvency determinations and corporate finance without objection. *See* Hr'g Tr. 933:13–934:11 (Luehrman). Dr. Luehrman testified that he was never instructed by the Debtors or D & L as to what solvency conclusions they thought preferable. *See* Hr'g Tr. 932:14–23; 1038:14–20 (Luehrman). As such, Dr. Luehrman's sole mission was to formulate his best opinions. [6] *Id.*

### (i) Dr. Luehrman's Opinions: 2006 and 2007

77. As of the dates of the 2006 and 2007 Transactions, Dr. Luehrman determined that on an enterprise basis, CFGI was solvent, adequately capitalized, and able to pay debts as they matured. *See* Hr'g Tr. 940:9–13; 941:3–14 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at 5–8, 42, 56, 59, 70, 76. Dr. Luehrman similarly found the subsidiary Guarantors as a **\*495** whole, and CFI in particular, were solvent, adequately capitalized, and able to pay debts as they matured on that date. Hr'g Tr. 940:10–13; 941:3–14 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at 5–8, 42–47, 55–56, 70–71, 76.

78. Based on the foregoing determinations, Dr. Luehrman explained the savings clauses in the guarantees were not triggered and had no effect on the amount guaranteed. Hr'g Tr. 940:14–941:2 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.) at 5–8, 42, 45.

79. Dr. Luehrman was also asked to determine whether CFGI, at the time of each Transaction, could have sold or caused the sale of its assets and businesses and used the proceeds to satisfy all its debts and those of its subsidiaries. *See* Hr'g Tr. 931:12–16 (Luehrman). He determined CFGI could have satisfied all liabilities of the enterprise as of the dates of the 2006 and 2007 Transactions by selling its assets and businesses. *See* Hr'g Tr. 951:18–952:1 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at 5–7, 61.

80. Moreover, had CFI been called upon to make payment on its guaranty of CFGI's 2006 debt, CFGI would have been able under its subrogation obligation to reimburse CFI completely for any such payment. *See* Hr'g Tr. 944:3–10; 951:1–17 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at 44–45. Accordingly, CFI's entering into its Guaranty at the time of the 2006 Transaction could not possibly have rendered it insolvent, inadequately capitalized, or unable to pay its debts as they matured. Hr'g Tr. 944:11–15 (Luehrman). Dr. Luehrman also testified that, at the time of the 2006 Transaction, it would have been possible to structure a sale of CFI on a standalone basis even if it still held the Guaranty of CFGI's 2006 debt as one of its contingent liabilities. *See* Hr'g Tr. 945:9–23 (Luehrman). Dr. Luehrman reached the same conclusions with respect to the 2007 Transaction. *See* Debtors' Ex. 48 (Luehrman Rep.), at 44–45.

81. Dr. Luehrman testified that his conclusions concerning the solvency of CFGI and the subsidiary Guarantors at the 2006 and 2007 transaction dates were not close calls. Hr'g Tr. 940:3–941:23 (Luehrman). A conservative estimate of CFGI's equity cushion at the time of the 2006 Transaction ranged from $2.1 billion to more than $3.8 billion. *See* Hr'g Tr. 941:15–23; 942:22–943:17 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at 25 (Figure 3–1.A.). Accordingly, CFGI could have paid its liabilities and those of its subsidiaries and still have had at least $2.1 billion in remaining value at the time of the 2006 Transaction. *See* Debtors' Ex. 48 (Luehrman Rep.), at 25 (Figure 3–1.A.). The results for 2007 were even higher. A conservative estimate of CFGI's equity cushion at the time of the 2007 Transaction ranged from $2.6 billion to over $8.8 billion, thus ensuring CFGI could have paid all its and its subsidiaries' liabilities at the time of the 2007 Transaction. Debtors' Ex. 48 (Luehrman Rep.), at 25 (Figure 3–1.B.). In neither transaction, therefore, were any of CFGI's or the subsidiary Guarantors' creditors harmed by the guaranties they issued.

#### (ii) Dr. Luehrman's Opinions: 2009

82. Dr. Luehrman also analyzed the solvency of CFGI and the subsidiary Guarantors as of the date of the 2009 Transaction and found that CFGI was insolvent, inadequately capitalized, and unable to pay debts as they matured as of the date of the 2009 Transaction. Debtors' Ex. 48 (Luehrman Rep.), at 5–7. Dr. Luehrman also found that CFI and the remaining subsidiary Guarantors were likewise insolvent **\*496** at the time of, or rendered insolvent by, the 2009 Transaction. *Id.* at 7–8.

#### (iii) Dr. Luehrman's Methodology

83. Dr. Luehrman testified he employed several methodologies to reach his conclusions. *See* Hr'g Tr. 945:24–947:17 (Luehrman). Each methodology is designed to determine the *fair value* of the assets of CFGI or the subsidiary Guarantors, which is then compared to the *face amount* of the entity's liabilities to determine whether the entity is solvent. *See* Hr'g Tr. 934:13–16; 945:24–947:17 (Luehrman).

84. The first methodology employed by Dr. Luehrman is the "adjusted balance sheet approach." *See* Hr'g Tr. 946:7–16 (Luehrman); Debtors' Ex 48 (Luehrman Rep.), at 26–27, 29–47. Dr. Luehrman reviewed each entities' assets and liabilities as of the date of the key transactions, including assets and liabilities not included on GAAP balance sheets. Hr'g Tr. 946:7–16 (Luehrman); Debtors' Ex 48 (Luehrman Rep.), at 26–27, 29–47. Dr. Luehrman then adjusted the on-and-off balance sheet assets to reflect their fair market value. *See* Hr'g Tr. 946:7–16 (Luehrman); Debtors' Ex 48 (Luehrman Rep.), at 26–27, 29–47. On-and-off balance sheet liabilities are left at their stated values pursuant to the adjusted balance sheet approach. *See* Hr'g Tr. 946:7–16 (Luehrman); Debtors' Ex 48 (Luehrman Rep.), at 26–27, 29–47.

85. Dr. Luehrman's second methodology for assessing solvency was the "market approach," which involved identifying a group of comparable companies (as determined by contemporary actors in the marketplace) and examining how those comparable companies were trading at the relevant dates to arrive at a fair value of the assets or the enterprise. *See* Hr'g Tr. 946:17–947:1; 947:22–948:11 (Luehrman); Debtors' Ex 48 (Luehrman Rep.), at 27, 48–56. Again, the market approach fixes liabilities at their face value. *See* Hr'g Tr.

946:17–947:1 (Luehrman); Debtors' Ex 48 (Luehrman Rep.), at 27, 48–56.

86. Dr. Luehrman's third and final solvency methodology was the "discounted cash flow" analysis, whereby the present value of the projected net cash flow is determined to estimate the fair value of the entity's assets. Hr'g Tr. 947:2–11 (Luehrman); Debtors' Ex 48 (Luehrman Rep.), at 28, 57–60. Under this approach as well, each entity's liabilities are left at their face value. Hr'g Tr. 947:2–11 (Luehrman); Debtors' Ex 48 (Luehrman Rep.), at 28, 57–60.

87. All three methodologies performed by Dr. Luehrman concurred in their results for each of the three dates of measure. *See* Hr'g Tr. 947:12–17 (Luehrman); Debtors' Ex 48 (Luehrman Rep.), at 23. Dr. Luehrman also stress-tested each methodology and the inputs used therein to ensure that his conclusions were accurate and not biased toward any particular result. Hr'g Tr. 952:2–953:22; 977:21–978:11 (Luehrman).

88. Dr. Luehrman took great pains to use conservative assumptions throughout his analysis and performed stress testing to ensure that his conclusions were correct and not biased. Hr'g Tr. 952:2–953:22 (Luehrman).

89. As one cross check of solvency, Dr. Luehrman studied the value of the 2006 Credit Agreement and Bridge Loan Guaranties to determine if those Guaranties would impact his conclusion that the CFGI consolidated entities, the subsidiary Guarantors, and CFI individually were solvent in 2006 after the Credit Agreement and Bridge Loan were executed. Hr'g Tr. **\*497** 954:18–955:11 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at 62, App'x 6.

90. Dr. Luehrman determined a conservative estimate of the value of the Guaranties by likening the Guaranties to put options and used standard option pricing models to estimate their value. *See* Hr'g Tr. 957:20–958:12; 986:12–15; 989:17–24 (Luehrman) ("[T]he idea there was to use conservative inputs ... to lead to a value which I could then compare with some confidence to the solvency cushion that was computed...."); Hr'g Tr. 990:1–5 (Luehrman). Valuing a guaranty as a put option is consistent with the majority practice in corporate finance courses. *See id.* at 921:6–11 (Luehrman) ("It's become fairly standard in most corporate finance courses to convey an understanding of a financial guaranty as a contingent claim; namely, some type of an option, a put option most often that can sometimes be valued

using standard models."); Hr'g Tr. 921:20–922:5 (Luehrman) ("The basic principle is that a guaranty is like a put option in the sense that the beneficiary of the guaranty has the right to put the debt, if it's debt that's being guaranteed, to the guarantor for the face value, and has the right to do that even if, and especially if, the value of the underlying assets is less than the face amount of the debt. And so that's exactly analogous to a put option."). Dr. Luehrman's put option approach is also consistent with the Financial Accounting Standard Board's Interpretation No. 45 ("FIN 45"), which requires that certain non-exempt companies put guaranties on their balance sheet at fair value at the inception of the guarantee. See Hr'g Tr. 922:12–923:9 (Luehrman). Dr. Luehrman has considerable experience working with clients to interpret FIN 45, and has valued guarantees pursuant to FIN 45 by employing a put option analysis. See Hr'g Tr. 923:13–924:11 (Luehrman).

91. Employing this put option analysis, Dr. Luehrman concluded a conservative estimate of the cost to the entire CFGI enterprise of a put option to replace the subsidiary Guaranties at the time of the 2006 Transaction was approximately $878 million, which is higher than what the fair value of the Guaranties would be. See Hr'g Tr. 965:16–21 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at App'x 6 (Figure 6–6). As the Guaranties are a joint and several liability of these subsidiary Guarantors, Dr. Luehrman matched the liability to the collective assets, which were $1.368 billion, and concluded that there were ample assets to cover the value of the Guaranties. See Debtors' Ex. 48 (Luehrman Rep.), at App'x 6 (Figure 6–17). One reason why $878 million was higher than the fair value of the guaranties is that Dr. Luehrman computed the cost of a put option to offload approximately $10.75 billion of guaranteed debt rather than the actual $8.4 billion outstanding because the credit facilities allowed for additional advances. Hr'g Tr. 960:7–961:1 (Luehrman). Other reasons why the $878 million figure was too high are that Dr. Luehrman used extra high volatility estimates and average tenure estimates. Id. at 960:7–965:21 (Luehrman). Notably, even the inflated $878 million value of the Guaranty is lower than the net worth of even a single subsidiary Guarantor CFI, which was $1.098 billion at the time of the 2006 Transaction. See Debtors' Ex. 48 (Luehrman Rep.), at 32 (Figure 4–1B).

92. Dr. Luehrman's put value equivalent of the 2006 Guaranties of the subsidiary Guaranties only corroborates and does not change his conclusions that in 2006 and 2007, the CFGI enterprise, the subsidiary Guarantors, and CFI were

each solvent even after the key financings. Hr'g Tr. 951:18–952:1 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at 5–7, App'x 6. Moreover, **\*498** Dr. Luehrman's put option analysis was designed to result in a biased-high value of the Guaranties, as it was created using the highest of the range of reasonable volatility assumptions.[7] See Hr'g Tr. 965:16–21 (Luehrman); Debtors' Ex. 48 (Luehrman Rep.), at App'x 6.

93. In response to the Official Committee's argument that it is necessary to record CFI's 2006 Guaranties as an absolute liability for full face value, Dr. Luehrman testified logically and credibly that it would be inappropriate to do so. Hr'g Tr. 965:22–966:4 (Luehrman). This is because it is inappropriate to record the full face value of a liability that is contingent. Id. Rather, it is necessary to determine the fair value of the liability that should be recorded based on the likelihood of it being called and in what amount. Id. In addition, in assessing solvency, it is necessary to take into account various offsets to that liability, including the fact that multiple Guarantors guaranteed CFGI's obligations jointly and severally and the liability would be offset by enforceable subrogation or reimbursement claims. See Hr'g Tr. 965:22–968:13 (Luehrman); see also Hr'g Tr. 324:2–325:11 (Fairfield). As Dr. Luehrman explained, just as one would not put a $1 lottery ticket on a balance sheet for the amount of the jackpot, one would not put a guaranty on the balance sheet for its maximum liability if there are contingent assets such as subrogation and contribution rights. Hr'g Tr. 966:5–968:13 (Luehrman).

### (iv) Testimony of Bradley C. Geer: 2009

94. In response to the Debtors' assertion that Capmark received $1.5 billion dollars of value for the liens granted to the Lenders in connection with the Secured Credit Facility, the Official Committee called Bradley C. Geer, an expert on restructuring and related valuation. Mr. Geer testified that from the standpoint of unsecured creditors the Debtors did not receive anywhere near $1.5 billion in value for the $1.5 billion security interest granted the Lenders in the Secured Credit Facility. Hr'g Tr. 877:11–22, 885:21–886:5. (Geer). Mr. Geer further testified that unsecured creditors would have received a 44.4% recovery had Capmark not entered into the Secured Credit Facility and that unsecured creditors are now projected to receive a 33% recovery in this case. Hr'g Tr. 885:3–11, 883:3–9 (Geer).

95. Thus, Mr. Geer testified that the Debtors' unsecured creditors lost 25% of their recovery as a result of the liens granted to the Lenders through the Secured Credit Facility. Hr'g Tr. 878:14–22 (Geer). [8]

**\*499 D. THE SECURED CREDIT FACILITY IS SIGNIFICANTLY OVERSECURED**

### (i) Composition of the Pledged Pool

96. The assets granted as collateral to secure the Secured Credit Facility (the "Pledged Pool") consist of U.S. and Canadian commercial mortgage loans, real-estate-owned assets ("REO"), loans originated as part of the Debtors' New Markets Tax Credit transactions, and cash proceeds of the foregoing. *See* Hr'g Tr. 629:7–17 (Gallagher); Debtors' Exs. 43 & 45, at 6 (Sept. 2 Pledged Pool Presentation). As of June 30, 2010, there were approximately 127 loans and 18 properties in the Pledged Pool. *See* Debtors' Ex. 45, at 6; *see also* Hr'g Tr. 628:7–13 (Gallagher).

97. A "large percentage" of the Pledged Pool is "distressed." Hr'g Tr. 623:17–19 (Gallagher). Specifically, nearly 60% of the Pledged Pool is classified as "non-performing," and over 77% of the Pledged Pool is on the Debtors' "watchlist." (Debtors' Ex. 45, at 854.)

98. Loans classified by the Debtors as "non-performing" have not paid interest in 90 days, or might still be paying, but management has "decided that it would be inappropriate to take interest income or interest into income," and thus payments received are "appl[ied] against principal." Hr'g Tr. 690:24–691:7 (Gallagher).

99. Likewise, "watchlist" loans "are still paying but we don't think will be for that long a period of time or where we think the probability of having a problem is more pronounced, or loans that are not paying." Hr'g Tr. 689:11–21 (Gallagher).

100. According to the Debtors, the Pledged Pool's "[c]redit characteristics have declined severely since September 2008." Debtors Ex. 45 at 869. In a less than two-year period beginning September 2008, the portion of the Pledged Pool loans on the watchlist (based on unpaid principal balance) nearly tripled, climbing from 26.8% to 77.1%, and the portion of the Pledged Pool loans classified as non-performing (also based on unpaid principal balance) grew more than six-fold from 9.5% to 59.4%. Debtors Ex. 45 at 869.

101. The Debtors' risk rating system classifies loan risk from 1 through 12, with 1 signifying the least amount of risk, and 12 the most. Hr'g Tr. 692:15–695:5 (Gallagher); Official Committee Ex. 55 at 898. A loan classified as 11 under the risk rating system is on the watchlist and may be subject to default, protracted or unlikely resolution, or impairment. Official Committee Ex. 55 at 898. As of June 2010, the Pledged Pool's weighted average "risk rating" was 10.8. Debtors Ex. 45 at 868.

### (ii) Management of the Pledged Pool

102. William Gallagher, the Debtors' Chief Risk Officer and a member of the Debtors' Executive Committee, is the senior executive responsible for managing and monetizing the assets of the Pledged Pool. [9] *See* Hr'g Tr. 623:7–14, 627:6–9 (Gallagher). Mr. Gallagher joined the Debtors in March 2009 after working for approximately twenty years at Greenwich Capital/Royal Bank of Scotland ("*RBS*"), where he served as Chief Credit Officer. *See* Hr'g Tr. 617:17–18; 618:9–13; 619:12–15 (Gallagher). In his role at Greenwich Capital, Mr. Gallagher managed similar (albeit less distressed) pools of commercial mortgage loans, ranging from several billions of dollars to $10 billion. *See* Hr'g Tr. 619:16–622:3 (Gallagher).

103. Mr. Gallagher oversees a staff of nineteen asset managers whose sole responsibility is reviewing and monetizing **\*500** the Pledged Pool. *See* Hr'g Tr. 627:15–628:16 (Gallagher). The Debtors' asset managers review each asset on a discrete basis, and based on such review, employ a variety of strategies to maximize value from the assets in the Pledged Pool. *See* Hr'g Tr. 624:10–630:9; 655:13–657:8 (Gallagher). The strategies include (i) restructuring loans with borrowers or sponsors, (ii) achieving full payment or partial payment of the loans, (iii) achieving discounted payoffs at a premium to the underlying real estate collateral, (iv) foreclosing on the collateral, (v) selling the foreclosed assets, and (vi) engaging in short sales. *See* Hr'g Tr. 623:7–626:9, 629:18–630:9, 665:17–668:15 (Gallagher).

### (iii) Historical Performance and Value of the Pledged Pool

104. Since soon after the October 25, 2009 Commencement Date, the Debtors have been providing information and periodic updates to the Official Committee and the Ad Hoc

Unsecured Committee regarding the value and monetization of the Pledged Pool, including monthly updates beginning in February 2010. *See* Hr'g Tr. 634:6–24 (Gallagher); *see also* Debtors' Exs. 43 & 45; Official Committee Exs. 56–58; AHG Ex. 1. After entering into the Settlement Agreement, the Debtors submitted an updated report, dated September 2, 2010 (the "September 2 Report"), to the Official Committee and the Ad Hoc Unsecured Committee. *See* Debtors Exs. 43 & 45.

105. As detailed in the September 2 Report, at its inception in May 2009, the Pledged Pool's aggregate unpaid principal balance was $2.615 billion and its net book value was $2.166 billion. *See* Hr'g Tr. 630:10–18 (Gallagher); Debtors' Exs. 43 & 45, at 6. As of July 31, 2010, the aggregate unpaid principal balance of the Pledged Pool was $1.725 billion and its net book value was $1.284 billion, excluding $161 million in cash proceeds generated by the assets and maintained in a cash collateral account. *See* Hr'g Tr. 645:8–21 (Gallagher); Debtors' Exs. 43 & 45, at 6. The difference between book value and unpaid principal balance of the Pledged Pool is equal to Pledged Pool-related loss reserves on the Debtors' books, thereby reflecting the distressed nature of the non-performing and under-performing loans in the Pool. *See* Hr'g Tr. 630:19–631:17 (Gallagher). As a result of further asset recoveries since July 31, 2010, the Debtors now have nearly $200 million in Pledged Pool cash collateral. *See* Hr'g Tr. 645:5–7 (Gallagher).

106. Since May 2009, the Pledged Pool assets have suffered an average loss severity [10] of approximately 28% for loans in default and 27% overall, in line with the Debtors' projections. *See* Hr'g Tr. 639:21–640:10; 647:6–648:18 (Gallagher); Debtors' Exs. 43 & 45, at 7, 9. In total, the Pledged Pool generated approximately $710 million in recoveries (including interest payments) from its inception in May 2009 through August 2010, also in line with projections. *See* Hr'g Tr. 638:5–640:6 (Gallagher); Debtors' Exs. 43 & 45, at 5, 7.

#### (iv) Projected Performance of the Pledged Pool

107. The evidence adduced at the Hearing overwhelmingly established the Debtors reasonably expect to recover an additional approximate $1.457 billion from the Pledged Pool for the period from September 2010 to December 2013. *See* Hr'g Tr. 638:18–639:9 (Gallagher); Debtors' Exs. 43 & 45, at 5, 10. Seventy-five percent of such recoveries ($1.098 billion) will come from payments of principal and interest on loans

and the sale of REO properties, **\*501** and the remaining 25% ($358 million) from the disposition of loans and cash relating to the New Markets Tax Credit program. *See* Hr'g Tr. 649:10–652:8 (Gallagher); Debtors' Exs. 43 & 45, at 9.

108. The Debtors' recovery projections are based on continued asset-by-asset analyses performed by the Debtors' asset management team. *See* Hr'g Tr. 655:13–656:20 (Gallagher); Debtors' Exs. 43 & 45, at 13–16. For each asset, the asset managers have determined a strategy to monetize the asset, the anticipated resolution date, and the expected recovery on the asset. *See* Hr'g Tr. 657:9–665:11 (Gallagher); Debtors' Exs. 43 & 45, at 13–16. In doing so, the Debtors assumed a greater loss severity than that already suffered by the Pledged Pool, ranging from 36% on defaulted loans to 29% on all Pledged Pool assets. [11] *See* Hr'g Tr. 652:9–24 (Gallagher); Debtors' Ex. 45, at 9.

109. The more time the asset management team devotes to specific asset resolutions, the more confident it is that the Company will recover the projected $1.457 billion. *See* Hr'g Tr. 671:8–672:13 (Gallagher). While individual Pledged Pool assets have been monetized for amounts other than those originally projected, taken as a whole, monetization of Pledged Pool assets has resulted in recoveries consistent with the Debtors' projections. Hr'g Tr. 800:16–801:17 (Gallagher). Indeed, the Debtors' recovery projections have increased by approximately 5% overall since November 2009. Hr'g Tr. 672:14–21 (Gallagher).

#### (v) The Secured Credit Facility is Oversecured

110. The testimony and exhibits introduced at the Hearing which were essentially uncontested establishes that the Secured Credit Facility is oversecured by a significant margin. The current balance of the Secured Term Loan is approximately $1.1 billion. *See* Hr'g Tr. 638:18–639:9 (Gallagher). The Debtors' July 31, 2010, numbers, as set forth in the September 2 Report, establish the expected collections from the Pledged Pool are projected to be approximately $1.6 billion, including $161 million in cash collateral (now $200 million) and $1.457 of additional recoveries the Debtors anticipate realizing by the end of 2012. *See* Hr'g Tr. 638:3–639:9; 643:5–19 (Gallagher); Debtors' Exs. 43 & 45, at 5, 9–10. As a result, the Pledged Pool has a projected cushion of almost $500 million over the outstanding balance of the Secured Credit Facility, and $625 million over the

discounted balance of the Secured Credit Facility under the Settlement. [12] *See* Hr'g Tr. 643:5–644:2 (Gallagher).

111. Mr. Gallagher testified he is "very confident" the Debtors will collect the $1.457 of additional recoveries by the end of 2013, *see* Hr'g Tr. 672:8–13 (Gallagher), and he believes the chances the Debtors' projections will not be met on a magnitude which could affect unsecured creditor recoveries (*i.e.,* as much as $500 million to **\*502** $625 million) is "extremely unlikely" and "very remote." *See* Hr'g Tr. 806:15–807:4 (Gallagher). Indeed, using the Debtors' uncontroverted projections, which utilize more conservative severity rates than those historically experienced by the Pledged Pool, the Debtors anticipate the $975 million in cash payments to be paid under the Settlement will be recouped in full through monetization of the Pledged Pool by the first or second quarter of 2012, with 91% of the collections by the end of 2013. *See* Hr'g Tr. 640:11–641:16 (Gallagher); Debtors' Exs. 43 & 45, at 5, 9–10.

### (vi) Duff and Phelps' Independent Valuation of the Pledged Pool

112. Through their counsel, Debtors retained D & P in March 2009 to conduct an independent valuation of the Pledged Pool to ensure the Debtors' valuation, based on estimated recoveries, is consistent with market projections. *See* Hr'g Tr. 190:3–8, 196:12–197:15, 199:9–201:20 (Fairfield), 444:17–22 (Litolff). The D & P valuation team was led by Edwin Litolff, a real estate consultant and senior adviser at D & P with thirty-three years of experience in appraising real estate and promissory notes secured by real estate. *See* Hr'g Tr. 433:15–439:6, 444:8–16 (Litolff). Mr. Litolff's complete resume and qualifications are set forth in Debtors' Exhibit 46, at CAPMARK193571–80. At the Hearing, Mr. Litolff was qualified without objection as an expert in real estate valuation and appraisal. [13] *See* Hr'g Tr. 439:7–11 (Litolff).

113. In analyzing the value of the Pledged Pool, the D & P team conferred with the Debtors' asset managers on numerous occasions and collected a voluminous amount of underlying documentation regarding the assets in the pool. *See* Hr'g Tr. 445:1–446:15 (Litolff). The Debtors provided all information requested by D & P and D & P had all of the information and data necessary for it to prepare its valuation. *Id.* The D & P team employed methodologies typically used in valuing promissory notes secured by real estate, including the discounted cash-flow method and comparisons to similar

real estate. *See* Hr'g Tr. 446:16–449:2 (Litolff). Notably, Mr. Litolff and others testified that D & P was never instructed by the Debtors on whether a high or low valuation of the Pledged Pool would be preferable. *See* Hr'g Tr. 200:1–201:1 (Fairfield); 450:6–16 (Litolff); 743:6–744:12 (Gallagher).

114. Based on its independent analysis, D & P found the market value of the Pledged Pool was $1.52 billion and the liquidation value was $1.35 billion as of July 31, 2010, and the market value was $1.77 billion and the liquidation value was $1.55 billion as of October 31, 2009. *See* Hr'g Tr. 450:17–452:7 (Litolff); Debtors' Ex 46, at 9–10. The outstanding balance under the Secured Credit Facility was $1.5 billion at October 31, 2004, and $1.110 billion at July 31, 2010. *Id.* D & P first reported these conclusions to the Debtors **\*503** in the second half of July 2010 and executed a final copy of its report on October 12, 2010. *See* Hr'g Tr. 452:11–453:18 (Litolff); Debtors' Ex. 46, at 3–4. The valuation findings in the final report were consistent with the valuation findings in the earlier working copies provided to the Debtors and their counsel. *See* Hr'g Tr. 453:7–11 (Litolff). *Cf.* Ex. 42, at 9–10, *with* Ex. 46, at 9–10.

115. Although D & P reached the same general conclusion as the Debtors, D & P's methodology differed from the Debtors' in two ways. First, D & P utilized a three-tiered system for classifying the assets based on nominally different risk profiles and then applied three separate discount rates based on those profiles, *see* Hr'g Tr. 517:14–518:17 (Litolff); Debtors' Ex. 46, at 31–34, whereas the Debtors employed twelve risk ratings and applied various severity rates to the assets. The uncontroverted testimony of Mr. Litolff, however, revealed that regardless of designation, the D & P analysis relied on the same asset-by-asset analysis applied by the Debtors in reviewing expected recoveries from the assets. *See* Hr'g Tr. 447:5–18 (Litolff); Debtors' Ex 46.

116. Second, D & P applied its discount rates to a different (and higher) unpaid principal balance than that utilized by the Debtors. *See* Debtors' Ex. 46, at 34. Specifically, D & P used $1.877 billion as the unpaid principal balance in computing the discounted expected total recovery, whereas Mr. Gallagher and his team used only $1.664 billion. *Id.;* Hr'g Tr. 604:19–606:17 (Litolff). As Mr. Litolff explained, however, the Debtors' numbers reflected the net book value of the Pledged Pool as of July 31, 2010, after loss write-downs. *See* Hr'g Tr. 605:13–21 (Litolff). The unpaid principal balance used by the Debtors was not an appropriate number to utilize in an economic valuation analysis of the type

undertaken by D & P because the D & P analysis begins with un-discounted numbers and then calculates write-downs from the gross unpaid principal balances. *See* Hr'g Tr. 575:21–577:4; 604:19–605:21 (Litolff). In any event, Mr. Litolff testified, even if D & P's discount rates were applied to the Debtors' already-discounted unpaid principal balance of $1.664 billion, the expected total recovery would still be $1.074 billion for the remaining life of the Pledged Pool, excluding the existing $200 million of cash collateral. *See* Hr'g Tr. 606:1–17 (Litolff). Thus, even if the Debtors' already-discounted principal balance had been used in D & P's valuation, after factoring in the cash collateral, the Pledged Pool would be worth $1.274 billion in the aggregate, or approximately $165 million more than the current unpaid principal balance of the Secured Term Facility, and approximately $300 million more than the amount to be paid under the Settlement. *See* Hr'g Tr. 606:17–607:7 (Litolff).

117. There are, however, significant issues with Mr. Litolff's report. Cross-examination revealed that there are material unexplained discrepancies between the portion Mr. Litolff described and the real Pledged Pool portfolio—both measured at the same July 31, 2010 date, both in terms of absolute size and quality of assets.

118. First, the D & P valuation report shows a portfolio of performing loans, non-performing loans and REO with a total unpaid principal value ("UPB") as of July 31, 2010 of $1.877 billion—Debtors Ex. 46 at p. 34; Hr'g Tr. 532:3–22, 539:9–14 (Litolff)—while on the Capmark's books the total UPB of the loan portfolio and REO as of that same date was only $1.685 billion—a difference of nearly $200 million. Debtors' Ex. 45 at p. 6, 19; Hr'g Tr. 539:2–8 (Litolff).

119. Second, Mr. Litolff describes a remarkably high-quality portfolio in which **\*504** almost two-thirds of the loans are classified as "performing", the majority of which he projected would be paid off in full at maturity for a realization of full value on UPB. Hr'g Tr. 547:6–12 (Litolff). Capmark's own documents tell a very different story, revealing that 50 to 60% of the portfolio was non-performing as of the July 31, 2010 valuation date. Hr'g Tr. 545:20–546:3 (Litolff); *compare* Debtors' Ex. 45 at 13–16 *with* Debtors' Ex. 46 at 12–14. In fact, Mr. Gallagher, testified that the Debtors expect that fully 75% of the Pledged Pool loans will eventually default.

120. Mr. Litolff did nothing to educate himself about Capmark's classification system before he performed the Pledged Pool valuation and did not put any weight on Capmark's classification system in doing the valuation. Hr'g Tr. 545:3–10 (Litolff). Prior to his cross-examination, Mr. Litolff had never even seen a description of the Capmark risk rating system. Hr'g Tr. 549:17–19 (Litolff).

121. D & P moved 20 loans classified by Capmark as non-performing to performing. and 27 loans classified by Capmark as non-performing to performing with balloon issues. Hr'g Tr. 557:12–19 (Litolff); Hr'g Tr. 565:20–566:11 (Litolff). These actions by themselves created a loan portfolio very distant from the reality of the Capmark loans.

122. Third, Mr. Litolff assumes that if a loan has a loan to value ("LTV") of 100% or less, the loan is performing and Capmark will recover in full at maturity. Hr'g Tr. 561:17–22 (Litolff). Mr. Litolff does not take make any determination as to how the recovery would occur—if it would be through refinancing or foreclosure and sale. Hr'g Tr. 562:7–11 (Litolff). Mr. Litolff's belief that all loans with UPB approaching or equal to current market value of the collateral will perform to maturity and then be paid off in full cannot be reconciled with his admissions that (a) it is impossible to refinance property on a non-recourse basis at anything approaching 100% LTV, and (b) on foreclosure sales, Capmark realizes substantially less than 100% of the market value of the property. Hr'g Tr. 563:16–564:3, 564:4–8 (Litolff).

123. Fourth, the comparable transactions chosen by D & P are not particularly comparable. The D & P Valuation Report at page 29 lists twelve "selected transactions" that were relied upon by D & P to reach its conclusion about the appropriate discount rate to use to value performing loans and performing loans with balloon issues. Debtors Ex. 46. None of these transactions are similar to the Pledged Pool, and there is strong reason to believe that the assets at issue in those sales were of higher quality than the Pledged Pool. For example, the majority of the loans in the Capmark portfolio are of a vintage between 2005 and 2007, when real estate values were at the highest levels in history, and therefore have higher loss severities than loans from other periods. Hr'g Tr. 589:8–20 (Litolff) Mr. Litolff did not make any adjustments to reflect differences in vintages between the loans purchased in the comparables and the Capmark loans. Hr'g Tr. 590:1–7 (Litolff).

124. Mr. Litolff failed to consider and adjust for other significant differences as well. For example, the only loan transaction the report includes as "Tier 2" is an Apollo transaction consisting of a portfolio of 55 loans for the total amount of $50 million, which had LTV of 73.6% and an equity cushion of more than 25%. These loans had a weighted average life of 120 months, which is significantly more than the Capmark portfolio. Mr. Litolff does not know whether there are make-whole provisions in those loans. Hr'g Tr. 592:3–16, 593:6–594:7 (Litolff); Debtors' Ex. 46, **\*505** p. 30; Official Committee Ex. 53. For "Tier 3" the only comparable used by D & P is an acquisition of a participation in a first lien position on an office building in Manhattan by Colony Capital, which Mr. Litolff admitted might well have been oversecured and reasonably expected to realize full recovery. Debtors' Ex. 46, p. 30; Official Committee Ex. 53; Hr'g Tr. 592:17–593:5 (Litolff).

125. Based on what Mr. Litolff considered to be comparable market transactions, he used an indicative percentage of UPB as a guideline value. For the performing loans, Mr. Litolff used 80%. For the non-performing loans, he used 50%, and for the REO he used 75%. Debtors' Ex. 46, p. 34; Hr'g Tr. 576:8–577:4 (Litolff). For the reasons stated above, it is likely that these values are too high. Even accepting those values, when Mr. Litolff's indicative percentages of UPB are applied to the actual breakdown of Capmark's Pledged Pool, the result of the valuation of the Pledged Pool would be approximately $282 million lower that the value concluded by D & P. Debtors Ex. 45, p. 6, 19 Hr'g Tr. 580:6–16 (Litolff).

126. As noted above, there are significant problems with Mr. Litolff's testimony. Nonetheless, the court will consider Mr. Litolff's testimony as a "backup" or "stress tests" to Mr. Gallagher's much more credible testimony.

## E. THE SETTLEMENT

### (i) *Settlement Negotiations*

127. Beginning in April 2010, the various creditor groups began settlement negotiations over the banks' secured claims. *See* Hr'g Tr. 178:3–11 (Fairfield). There were four principal groups involved in these negotiations: (i) the Debtors, advised by D & L, Lazard, and LM+Co; (ii) the Ad Hoc Secured Committee, advised by Kirkland & Ellis LLP and The Blackstone Group L.P.; (iii) the Official Committee, advised by Kramer Levin Naftalis & Frankel LLP and Houlihan;

and (iv) the Ad Hoc Unsecured Committee, represented by Milbank, Tweed, Hadley & McCloy LLP. *See* Hr'g Tr. 179:5–180:11 (Fairfield); 358:21–362:2 (Meghji).

128. Throughout this process, the Debtors' goal was to achieve a consensual settlement of the banks' secured claims involving all the parties. *See* Hr'g Tr. 180:17–181:2 (Fairfield); 362:3–18 (Meghji). In an effort to achieve that consensual settlement with all parties, the Debtors met with each constituent group on a number of occasions and conferred by telephone many times. *See* Hr'g Tr. 178:12–180:21, 184:17–185:2, 234:3–23 (Fairfield); 358:21–361:4 (Meghji). However, the Debtors also informed all three of the other groups that they were not averse to reaching a reasonable settlement with any one group if they were unable to reach a universal agreement. *See* Hr'g Tr. 181:3–182:6 (Fairfield), 362:19–364:17 (Meghji). As part of their negotiations, the Debtors circulated to the Ad Hoc Secured Committee a draft declaratory judgment motion regarding the various avoidance claims to convey the message that, were a settlement not reached, the Debtors would throw open the avoidance claims to litigation (and, presumably, the Official Committee would seek to intervene in the action). *See* Hr'g Tr. 181:22–182:16 (Fairfield); Official Committee Ex. 13.

129. Negotiations between the Debtors and the Ad Hoc Secured Committee were extensive, contentious, and very difficult. *See* Hr'g Tr. 184:17–185:2 (Fairfield); 364:18–22 (Meghji). There was a lot of back-and-forth, and a wide variety of structures were discussed over the course of the negotiations. *See* Hr'g Tr. 365:23–366:8 (Meghji). Some of the key sticking points of the negotiations included the value **\*506** of the potential avoidance actions, the value of the Pledged Pool, the interest rate on any note emerging from the bankruptcy, the payment of interest and fees, and the grant of an unsecured deficiency claim to the secured lenders in the event they gave back some of their collateral. *See* Hr'g Tr. 185:19–189:4 (Fairfield), 364:23–366:8 (Meghji).

130. With regard to the value of the avoidance actions, the Debtors' management and Board of Directors sought counsel from D & L, which advised them continuously during the negotiations and provided an exhaustive memorandum of about 100 pages, analyzing the potential avoidance actions. *See* Hr'g Tr. 189:12–196:4 (Fairfield). Management also reviewed a memorandum drafted and provided by counsel to the Official Committee, and held several meetings with both counsel for the Official Committee and D & L, at which the relative merits of the potential avoidance actions were

discussed. *See* Hr'g Tr. 218:9–219:15 (Fairfield). Both Mr. Fairfield and Mr. Meghji testified they could not recall a single claim raised in the Official Committee's various briefs regarding the Debtors' Settlement Motion or the Official Committee's Standing Motion that they had not been apprised of and advised about during these meetings with D & L and counsel for the Official Committee, or that they had not considered in ultimately deciding to enter into the Settlement Agreement. *See* Hr'g Tr. 219:16–23 (Fairfield); 387:8–388:7 (Meghji). In addition, Capmark requested its counsel to prepare a fact memorandum describing all of the material facts relating to the 2006, 2007, and 2009 Transactions, copies of which were provided to management and the Board of Capmark, as well as the Official Committee, the Ad Hoc Secured Committee, and the Ad Hoc Unsecured Committee. *See* Hr'g Tr. 182:17–183:18, 185:3–10 (Fairfield); Debtors' Ex. 38 (D & L Fact Memorandum).

131. Eventually, it was the Debtors and the Ad Hoc Secured Committee that first reached tentative agreement, deciding to pursue a structure involving a cash payment at an absolute discount off the original principal amount of the secured lenders' claim. *See* Hr'g Tr. 187:12–16, 187:23, 189:4 (Fairfield). One of the reasons why the Debtors pursued an absolute discount, as opposed to collateral sharing, was feedback they had received from the unsecured creditors expressing a preference for a discount structure. *See* Hr'g Tr. 188:16–20 (Fairfield). Moreover, given the strong likelihood that the secured lenders were oversecured, the Debtors believed that if they entered into a settlement that merely provided for a reduction or give-back of collateral, the secured lenders would receive payment in full and the estate would reap no benefit. *See* Hr'g Tr. 188:6–15, 189:5–11 (Fairfield).

132. It turned out that the Debtors would benefit more by repaying the secured claim in cash at a discount, than by repaying the secured claim with a new debt instrument in a discounted amount. *See* Hr'g Tr. 188:21–189:4 (Fairfield). The reason was that the Debtors were paying 4.75% interest on the debt, while only earning 0.25% interest on the monies held by the Debtors' estates. *See* Hr'g Tr. 379:23–380:6 (Meghji), 224:3–225:5 (Fairfield). Although representatives of the Debtors initially had some concerns about such a structure, these concerns—which centered around liquidity, the value of the Pledged Pool, and the unsecured creditors' reaction to a cash settlement—were allayed over the course of the negotiations. *See* Hr'g Tr. 187:23–189:4 (Fairfield); 367:23–368:4 (Meghji).

**\*507** 133. First, the Debtors investigated the liquidity projections for the Company, and satisfied themselves that the Company had enough cash to pay the Settlement and meet its obligations as they come due. *See* Hr'g Tr. 366:20–367:23 (Meghji).

134. Second, the Debtors' management and Board spent a significant amount of time with the Company's asset management team to review their projections for the Pledged Pool and concluded that the secured lenders were oversecured. *See* Hr'g Tr. 367:24–369:12 (Meghji). In addition, the D & P report confirmed the Company's internal conclusion that the Pledged Pool was worth quite a bit more than the secured loan. *See* Hr'g Tr. 200:1–201:2, 202:12, 220:3–221:11, 222:20, 223:7 (Fairfield); 643:5–644:2, 806:20–807:4 (Gallagher); Debtors' Exs. 43 & 45 (Sept. 2 Pledged Pool Presentation).

135. Finally, management was concerned about how the unsecured lenders would react to the idea of a cash settlement. As a result, they asked Mr. Bienenstock of D & L, who was heading up negotiations with the other parties, to approach Mr. Mayer, representing the Official Committee, to sound him out about the Official Committee's reaction to a cash settlement between the Debtors and the Ad Hoc Secured Committee. *See* Hr'g Tr. 188:16–20 (Fairfield). After that conversation took place, the Debtors no longer had any concerns about the structure of the Settlement. *Id.;* Hr'g Tr. 369:13–370:1, 376:24–377:2 (Meghji).

136. Management and the Board also sought legal advice concerning the Settlement, and, in particular, the value of the avoidance actions which were to be released. Debtors' Exs. 40(a)-(f). Counsel reviewed the D & L legal memorandum, the Official Committee legal memorandum, and the D & L fact memorandum with the Debtors' Board and management team. *See* Hr'g Tr. 192:3–193:11, 195:20–196:4, 218:9–219:23, 221:12–222:19, 241:5–242:21 (Fairfield). Management and the Board also reviewed the benefits of the Settlement, as described below in paragraphs 139–146. *See* Hr'g Tr. 223:8–229:8 (Fairfield); 377:9–388:7 (Meghji).

137. Ultimately, management and the Board concluded that the chances they could successfully avoid the secured lenders' claims and collateral were "very low." Hr'g Tr. 222:12–19 (Fairfield); 382:13–22 (Meghji). Despite this fact, the Debtors bargained hard with the secured lenders, and used the threat of avoidance actions (in the form of the

draft declaratory judgment complaint and e-mail exchanges between counsel), a potential cramdown plan, and a dispute over what interest rate would apply to the secured claims to negotiate a settlement they thought "fair and reasonable" for all stakeholders. *See* Hr'g Tr. 181:22–182:16, 184:8–189:11 (Fairfield); Official Committee Ex. 13 (E-mail attaching Draft Declaratory Judgment Complaint).

138. The Debtors, RBS, JP Morgan Chase, and the members of the Ad Hoc Secured Committee executed the Settlement Agreement on September 2, 2010. *See* Hr'g Tr. 210:4–10, 211:1–14 (Fairfield); Debtors' Ex. 39(a) (Settlement Agreement). Its key terms are (a) a 9% discount off the original principal balance of $1.5 billion, which is worth $135 million if none of the secured lenders opt out of the Settlement (none did); (b) cash payment, in two installments, of the discounted remaining principal amount; (c) release of all avoidance claims against the settling lenders (except for insider preference claims against several Goldman and Dune lending entities); (d) release of the liens on the Pledged Pool, freeing it up for the benefit of the estate; and (e) payment of the secured lenders' postpetition fees and **\*508** interest, which total around $77 million. *See* Hr'g Tr. 208:15–210:3 (Fairfield); 356:7–357:11 (Meghji); Debtors' Exs. 39(a) & 40(e)-(f).

#### (ii) Benefits of the Settlement

139. Throughout this period, the Board and management held extensive discussions about the settlement negotiations. The Board and the Board's Special Committee overseeing the settlement negotiations met repeatedly to discuss where negotiations stood, as well as various proposed terms. *See* Hr'g Tr. 211:12–215:13 (Fairfield); Debtors' Exs. 40(a)-(f) (Board Minutes), 44 (E-mail from Tom Fairfield to Board, dated July 8, 2010).

140. As negotiations progressed, management asked LM +Co. to analyze the financial benefits and effects of various proposed settlement structures upon the Debtors and their estates. *See* Hr'g Tr. 223:8–224:2 (Fairfield), 377:9–378:13 (Meghji). Mr. Meghji, who had been appointed the Debtors' CRO in June 2009 and was also intimately involved in negotiations over the Settlement, led this effort, and was primarily responsible for reporting back to management and the Board on LM+Co.'s conclusions. He attended every Board meeting during this period, and discussed his analysis with the members of the Board on numerous occasions. *See* Hr'g

Tr. 377:9–378:13 (Meghji); Debtors' Exs. 40(a)-(f) (Board Minutes).

141. LM+Co.'s analysis showed the Settlement Agreement is worth between $270 and $310 million to the Debtors' estates. *See* Hr'g Tr. 380:10–12 (Meghji). First, the 9% discount on the original principal amount of the claim is worth exactly $135 million, as no settling lenders exercised their right to opt out of the Settlement. *See* Hr'g Tr. 208:18–20, 224:3–5 (Fairfield), 378:14–19 (Meghji). If postpetition fees and interest—which are part of the secured lenders' claim—are added to the $1.5 billion principal balance for the purpose of doing this calculation, the percentage value of the discount is closer to 8.6%, but the total dollar discount of $135 million remains the same. *See* Hr'g Tr. 385:23–387:7, 408:18–411:3 (Meghji).

142. Second, LM+Co. concluded, based on discussions with both in-house and outside counsel, that if the Settlement is approved, "it paves the way for the company to do a plan of reorganization and exit from bankruptcy much sooner." Hr'g Tr. 378:2–23 (Meghji). The current cost to the estates for professional fees and costs in these cases is in the range of $6 million to $7 million per month. *See* Hr'g Tr. 379:13–22 (Meghji). Taking a conservative position, LM+Co. estimated that "once the company gets out of bankruptcy, it will save at least $5 million a month of those costs." *Id.; see also* Hr'g Tr. 226:8–21 (Fairfield). Given its expectation that emergence will accelerate by nine to twelve months if the Settlement is approved, the Settlement will result in between $45 and $60 million in savings in professional fees and costs. *See* Hr'g Tr. 379:19–22, 380:6 (Meghji).

143. The third quantifiable benefit of the Settlement is the avoidance of a prolonged, full-blown litigation between the Debtors and unsecured creditors on one hand, and secured creditors on the other hand, if the Settlement is not approved. *See* Hr'g Tr. 221:23–222:19, 225:10–226:11, 247:10–258:8, 317:13–318:4 (Fairfield); 378:20–379:7 (Meghji). LM+Co. assumed—again, based on discussions with counsel—that this litigation would continue for nine to twelve months, and cost the estate between $50 and $75 million, *see id.;* Mr. Fairfield estimated a broader range of between $50 and $100 million, *see* Hr'g Tr. 226:4–7 (Fairfield).

144. Fourth, LM+Co. calculated the Settlement will save the estate approximately **\*509** $65 million in continuing interest payments, $40 million within the first 12 months. *See* Hr'g Tr. 379:23–380:6 (Meghji), 224:3–225:5 (Fairfield). This is

because the estate is currently paying 4.75% annual interest on the balance of the secured loan, while the cash it will use to pay off that loan if the Settlement is approved is earning only 0.25% interest per year. *Id.*

145. In addition, Mr. Meghji testified that the Settlement also brings with it other, less quantifiable benefits. First, the Settlement would result in a simplified governance structure, both pre-emergence and post-emergence, where monetization decisions would be made by only one set of decision-makers, presumably resulting in a more efficient and cost-effective process. *See* Hr'g Tr. 380:18–381:5 (Meghji). Second, although the Debtors are liquidating many of their assets, certain businesses (such as Capmark Bank) continue to function as going concerns, and the increased certainty that would come about as a result of emergence from bankruptcy would help retain key employees, especially in an improving business environment. *See* Hr'g Tr. 381:18–382:1 (Meghji). Third, Mr. Meghji expects the Settlement and quicker emergence from bankruptcy will reduce pressure from the FDIC, which is uncomfortable dealing with bankrupt parent companies of regulated banks. *See* Hr'g Tr. 381:6–17 (Meghji). Finally, there is a real monetary benefit (though one which is ultimately unquantifiable) to selling assets outside of bankruptcy rather than in bankruptcy. *See* Hr'g Tr. 382:2–12 (Meghji).

146. It is exceedingly unlikely that the Pledged Pool will lose the hundreds of millions of dollars it would have to lose for it to be outweighed by the amount of the cash settlement. *See* Hr'g Tr. 806:20–807:4 (Gallagher). As a result, the fact that they will be paid from the monetized collateral rather than from the Debtors' cash reserves in the short term does not impose any real risk on the unsecured claimholders. *See* Hr'g Tr. 672:8–13, 673:3–674:1 (Gallagher). Moreover, the Debtors currently estimate that all $975 million to be paid under the Settlement Agreement will be recouped by the first or second quarter of 2012. *See* Hr'g Tr. 220:24–221:20 (Fairfield); 650:1–5 (Gallagher); Debtors' 43 & 45, at 5, 9. It is based on these facts, as well as the avoidance actions' low likelihood of success, that Mr. Fairfield and Mr. Meghji, along with the rest of the Debtors' management and its Board of Directors, concluded unanimously that the Settlement was fair and reasonable to all stakeholders. *See* Hr'g Tr. 216:21–217:17, 221:12–222:19, 226:22–229:8, 241:5–242:21 (Fairfield); 377:3–8, 382:15–22 (Meghji).

**IV. CONCLUSIONS OF LAW**

**A. JURISDICTION AND VENUE**

147. This Court has jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**B. BURDEN OF PROOF**

[1] 148. To obtain approval of a settlement, the Debtors must demonstrate the settlement satisfies, by a preponderance of the evidence, the requirements imposed by Bankruptcy Rule 9019 and the Third Circuit's decision in *Myers v. Martin (In re Martin),* 91 F.3d 389, 393 (3d Cir.1996). *See Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Velde v. First Int'l Bank & Trust (In re Y–Knot Constr., Inc.),* 369 B.R. 405, 408 (8th Cir. BAP 2007)* ("Trustee, as the party seeking the approval of the Settlement **\*510** Agreement, has the burden of showing by a preponderance of the evidence that the proposed settlement is in the best interest of the estate.") (citation omitted); *In re Retz,* No. 04–60302–7, 2005 Bankr.LEXIS 3121, at *26 (Bankr.D. Mont. June 20, 2005). As specified below, the Debtors have satisfied that burden by demonstrating that the *Martin* factors support approval of the Settlement.

**C. THE RELIEF SOUGHT IS APPROPRIATE UNDER RULE 9019**

149. As a threshold matter, the Official Committee and Ad Hoc Secured Committee argue that there is no legal authority authorizing the Court to approve this settlement under Rule 9019 because the settlement (i) fixes the treatment of a secured lender's claims, including its entitlement to post-petition interest and fees, without a finding that the lender is over-secured, (ii) nearly exhausts the debtor's unencumbered cash, thus severely limiting its options with respect to any future plan treatment for unsecured claims, and (iii) releases causes of action that would otherwise constitute a significant source of plan funding.

150. First, the Official Committee and Ad Hoc Secured Committee argue that, as a general matter, prepetition claims cannot be paid prior to proposal and confirmation of a chapter 11 plan absent a showing that such payments are necessary to preserve a debtor's business. *Official Committee of Unsecured Creditors v. Motor Coach Indus., Int'l, Inc. (In re Motor Coach Indus., Int'l, Inc.),* Bankr.No. 08–12136, Civ. No. 09–078, 2009 WL 330993, at *2 (D.Del. Feb. 10, 2009). They assert that no such showing has been made here.

151. Second, they argue that the settlement would improperly deprive the unsecured creditors of the protections established under *section 1129 of the Bankruptcy Code. Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC),* 478 F.3d 452 (2d Cir.2007); *Contrarian Funds, LLC v. Westpoint Stevens, Inc. (In re Westpoint Stevens, Inc.),* 333 B.R. 30, 51 (S.D.N.Y.2005), *rev'd on other grounds,* 600 F.3d 231 (2d Cir.2010).

152. Third, they argue that the settlement is an improper *sub rosa* plan because it dictates the form and substance of a chapter 11 plan because this "exceeds the boundaries of a Rule 9019 compromise." *In re Louise's,* 211 B.R. 798, 801 (D.Del.1997).

153. Finally, they argue that the secured lenders are not entitled to an award of post-petition interest and fees until it is determined that such creditor is oversecured in accordance with *section 506(b) of the Bankruptcy Code.*

154. As set forth below, the Court disagrees with each of these arguments.

## D. UNDER THE FACTS AND CIRCUMSTANCES OF THIS CASE, PAYMENT OF THE SECURED CLAIMS IS APPROPRIATE

155. As part of the Settlement, the Debtors are required to satisfy the secured claims in cash prior to confirmation of a chapter 11 plan. The Official Committee and the Ad Hoc Unsecured Committee argue that there is no basis in the law to allow for the payment through a settlement and outside of a plan of reorganization of a secured creditors' pre-petition claim, especially in a liquidating case where the payment is being made from unencumbered cash and the unsecured creditors oppose the payment. The Court disagrees.

 [2]    156. There is no *per se* rule against paying pre-petition secured claims outside of a plan of reorganization. Indeed, **\*511** such payments are routinely made in a number of different contexts. For example, post-petition refinancing of unencumbered *secured* debt through a DIP loan may be authorized by *section 363(b) of the Bankruptcy Code* as a use of estate property outside the ordinary course of business. *See Law Debenture Trust Co. v. Calpine Corp. (In re Calpine Corp.),* 356 B.R. 585, 589 (S.D.N.Y.2007); *HSBC Bank USA v. Calpine Corp.,* No. 07 Civ. 3088, 2010 WL 3835200, at \*10, 2010 U.S. Dist. LEXIS 96792, at \*32–34 (S.D.N.Y. Sept. 14, 2010); *United States ex rel. Rural Electrification*

*Admin. v. Wabash Valley Power Ass'n (In re Wabash Valley Power Ass'n),* 167 B.R. 885, 889 (S.D.Ind.1994); *In re Indus. Office Bldg. Corp.,* 171 F.2d 890, 893 (3d Cir.1949). Such refinancing can be accomplished through an existing lender or a new "take out" lender.

157. Similarly, prepetition secured claims can be paid off through a "roll-up." Most simply, a is the payment of a pre-petition debt with the proceeds of a post-petition loan. Roll-ups most commonly arise where a pre-petition secured creditor is also providing a post-petition DIP loan under section 364(c) and/or (d) of the Bankruptcy Code. The proceeds of the DIP loan are used to pay off or replace the pre-petition debt, resulting in a post-petition debt equal to the pre-petition debt plus any new money being lent to the debtor. [14] As a result, the entirety of the pre-petition and post-petition debt enjoys the post-petition protection of section 364(c) and/or (d) as well as the terms of the DIP order. [15] In both a refinancing and a roll-up, the pre-petition secured claim is paid through the issuance of new debt rather than from unencumbered cash. For present purposes, however, there is no difference. The point is that a pre-petition secured claim can be paid outside of a plan of reorganization.

158. In addition, a secured creditor may be granted relief from the automatic stay to proceed against its collateral to satisfy its prepetition claim. Section 362 the of the Bankruptcy Code specifically provides for stay relief both for "cause, including the lack of adequate protection of an interest in property" and if "(A) the debtor does not have equity in such property; and (B) such property is not necessary to effect of reorganization." The effect of *section 362(d)* is, in a somewhat roundabout way, to allow for a secured creditor to be paid on its prepetition claim in appropriate circumstances through taking possession of its collateral. Moreover, the alternative to stay relief— providing adequate protection—may involve the payment of the claim to protect the secured creditor from diminution of the value of its collateral during the chapter 11 cases. *See* 11 U.S.C. §§ 361, 363(e).

 **\*512**  159. Also, secured creditors are often paid in connection with a sale of all or substantially all of a debtor's assets under *section 363* the Bankruptcy Code. A sale of assets under *section 363* can be thought of as nothing more than conversion of assets from a "going concern" to cash. After such a conversion or "liquidation" of a debtor's assets, one can argue that a motion for stay relief would almost certainly be granted to allow the secured creditor to proceed against the cash. Rather than requiring the filing of a stay

relief motion, the order approving the sale often allows for the immediate payment of all or part of the secured creditor's claim.

[3]    160. These are just a few examples of ways in which a secured creditor may be paid all or part of its prepetition secured claim other than through a plan of reorganization. The point is that there is ample authority for such a payment. The question is whether making the payment is justified by the facts and circumstances of a particular case.

161. Although the unsecured committees argued otherwise in their briefing and during the evidentiary portion of the hearing, they acknowledged as much in closing argument:

> THE COURT: You just put the rabbit in the hat by saying "under these circumstances." I think [Debtors' counsel] is responding to arguments that have been made which implied you can never pay a prepetition secured debt on a post-petition basis, other than through a plan. That's wrong.

> MR. BARR: Well, off in full? Not out of their own collateral?

> THE COURT: See, you're putting the rabbit in the hat again. That's different. He's ... responding, I think fairly, to at least the implication in some of the papers from your side that say look, you can never pay a secured creditor its prepetition secured debt post-petition except through a plan. That's not true. Under certain circumstances and facts you can.

> MR. BARR: Correct, Your Honor.

> THE COURT: So the issue is does this meet the facts and circumstances where it would be appropriate.

> MR. BARR: Right.

Hr'g. Tr. 1270:2–24.

[4]    162. So, the court turns to whether the payment of the secured claims through the Settlement is appropriate in this case. It is true that this is a liquidating case where the settlement payment is being made from unencumbered cash and the unsecured creditors oppose the payment. This raises a number of concerns. For example, in such a case where it appears that the secured creditor is oversecured, the interests of unsecured creditors should be given particular weight. In doing so, however, the Court is not required to defer completely to the unsecured creditors' representatives.

Rather, the Court must exercise its independent judgment to the issue before it.

[5]    163. This Settlement certainly tests the limits of the authority to pay prepetition secured claims outside a plan. Nonetheless, the Court finds that payment of the pre-petition secured claim in this instance does not violate the Bankruptcy Code. A key element in the Court's ruling is its finding, based upon the evidence submitted at the Hearing, that the value of the collateral being left behind is well in excess of the unencumbered cash for which it is being swapped. In short, based upon the evidence adduced at the Hearing, the Court finds that the unsecured creditors are not harmed in any way by the Settlement. Indeed, just the opposite.

*513    164. For example, the evidence at the Hearing established that the Debtors currently pay 4.75% interest on the secured claims, while earning approximately 0.25% interest on their cash deposits. Thus, the Debtors are experiencing a negative interest spread of approximately 4.5%. Repayment of the secured claims will thus save the Debtors' estates in the range of $40 and $65 million, as the difference between interest charges saved as offset by the interest on deposits to be lost by using cash to complete the Settlement. The Settlement will also save the estates approximately $50 to $75 million in estimated litigation costs and expenses that would be incurred in litigating the avoidance actions and the oversecured status of the secured claims, and an estimated $60 to $70 million in professional fees and costs to be saved by an earlier emergence from bankruptcy under a settlement scenario. The total savings of approximately $320 million places this Settlement at minimum above the lowest point in the range of litigation outcomes. This Court also heard un-rebutted testimony that the Debtors will have sufficient cash to satisfy the secured claims (at the compromised amount), while continuing to operate their businesses, and to confirm chapter 11 plans. The Settlement provides both tangible and intangible benefits that flow directly to the unsecured creditors.

165. Thus, the court finds, under the facts and circumstances of this case, that the payment of the secured lenders' prepetition claims under the Settlement is appropriate and authorized under the Bankruptcy Code.

## E. SECTION 1129(a)(7) IS INAPPLICABLE TO THE SETTLEMENT

[6]    166. As a matter of law, section 1129(a)(7) does not apply to the decision whether to approve a settlement outside

of a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(7) ("The court shall confirm a *plan* only if all of the following requirements are met....") (emphasis added). No party has cited any authority for such a proposition and it is rejected on its face.

167. Significantly, approval of the Settlement outside a chapter 11 plan also does not deprive unsecured claimholders of any protection they have from section 1129(a)(7) if the Settlement were embodied in a chapter 11 plan. The reason is that if a claim is settled in a chapter 11 plan, once the court determines that the settlement should be approved, the court will assume the same settlement would be made in chapter 7 for purposes of applying section 1129(a)(7). *See In re Enron Corp.,* Ch. 11 Case No. 01–16034, 2004 Bankr.LEXIS 2549, at *117–20 (Bankr.S.D.N.Y. July 15, 2004) (observing that section 1129(a)(7) requires an "apples to apples" comparison that contains the same settlement, and "assuming common legal issues are resolved the same way [in chapter 7 and chapter 11]").

## F. THE SETTLEMENT IS NOT AN IMPERMISSIBLE SUB ROSA PLAN

**[7]   [8]   [9]**   168. A settlement constitutes a *sub rosa* plan when the settlement has the effect of dictating the terms of a prospective chapter 11 plan. *See Official Comm. of Unsecured Creditors of Tower Auto. v. Debtors & Debtors in Possession (In re Tower Auto. Inc.),* 241 F.R.D. 162, 168 (S.D.N.Y.2006). To be found to dictate the terms of a plan, the settlement must either (i) dispose of all claims against the estate or (ii) restrict creditors' rights to vote. *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.),* 119 F.3d 349, 354–55 (5th Cir.1997); *In re Tower Auto.* **\*514** *Inc.,* 241 F.R.D. at 169; *Debenedictis v. Truesdell (In re Global Vision Prods., Inc.),* No. 09 Cv. 347(BSJ), 2009 WL 2170253, at *7, 2009 U.S. Dist. LEXIS 64213, at *20 (S.D.N.Y. July 13, 2009). Neither of these categories applies to the Settlement, and no evidence was adduced at the Settlement Hearing to support a contrary finding.

169. Further, pre-confirmation approval of the Settlement does not deprive any party of critical protections in a chapter 11 confirmation process as the Settlement could have been proposed in the context of a chapter 11 plan process, and the confirmation hearing would have been conducted (and the Settlement would have been considered) in exactly the same manner as it was at the Hearing.

**[10]**   170. Moreover, the use of unencumbered cash to satisfy the secured claims is not improper, as unsecured claimholders do not have a right to any specific property to fund their recoveries.

**[11]**   171. Also, the releases contained in the Settlement do not transform it into a *sub rosa* plan. *See* Settlement Agreement at § 2. Releases are a necessary and expected term in a settlement agreement, as the point of settlement is to finally and fully resolve outstanding disputes between the parties. Without such releases, a settlement would be ineffective. Additionally, the Settlement neither releases direct claims held by any third parties nor any claims held by the Debtors against their officers and directors.

## G. THE SECURED CLAIMS ARE OVERSECURED UNDER SECTION 506(b) OF THE BANKRUPTCY CODE

172. As stated in the Findings of Fact, the current value of the collateral exceeds the outstanding amount of the secured claims. Accordingly, under section 506(b) of the Bankruptcy Code, the secured lenders are oversecured and entitled to interest and reasonable fees, costs, or charges provided under the Secured Credit Facility.

## H. THE SETTLEMENT IS FAIR AND EQUITABLE, IS IN THE BEST INTEREST OF THE ESTATES, AND MEETS THE STANDARDS UNDER *MARTIN*

173. Having discussed whether the Court **can** approve the settlement, we turn to the question of whether the Court **should** approve the settlement.

**[12]**   174. Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr.P. 9019(a). This Court may approve a settlement that is "fair and equitable." *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968); *In re Nutraquest, Inc.,* 434 F.3d 639, 644, 646 (3d Cir.2006); *In re Ionosphere Clubs, Inc.,* 156 B.R. 414, 426 (S.D.N.Y.1993), *aff'd,* 17 F.3d 600 (2d Cir.1994).

**[13]**   175. In determining the fairness and equity of a compromise in bankruptcy, the Third Circuit requires a bankruptcy court to "apprise[ ] itself of all facts necessary to form an intelligent and objective opinion of the probabilities of ultimate success should the claims be litigated, and

estimate [ ] the complexity, expense and likely duration of such litigation, and other factors relevant to a full and fair assessment of the [claims]." *In re Penn Cent. Transp. Co.,* 596 F.2d 1127, 1146 (3d Cir.1979); *see also In re Marvel Entm't Grp., Inc.,* 222 B.R. 243, 249 (D.Del.1998) ("the ultimate inquiry ... [is] whether 'the compromise **\*515** is fair, reasonable, and in the interest of the estate.' ") (quoting *In re Louise's Inc.,* 211 B.R. 798, 801 (D.Del.1997)).

 **[14]** 176. The court need not decide the numerous questions of law or fact raised by litigation, but rather should canvas the issues to determine whether the settlement falls above the lowest point in the range of reasonableness. *See In re W.T. Grant Co.,* 699 F.2d 599, 608 (2d Cir.1983) (citing *Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.1972)); *see also In re World Health Alt., Inc.,* 344 B.R. 291, 296 (Bankr.D.Del.2006) ( "the court does not have to be convinced that the settlement is the best possible compromise. Rather, the court must conclude that the settlement is within the reasonable range of litigation possibilities.") (internal citations and quotation marks omitted); *In re Key3Media Grp.,* 336 B.R. 87, 92–93 (Bankr.D.Del.2005) (citing *In re Jasmine, Ltd.,* 258 B.R. 119, 123 (D.N.J.2000)); *Official Unsecured Creditors' Comm. of Pa. Truck Lines, Inc. v. Pa. Truck Lines, Inc. (In re Pa. Truck Lines, Inc.),* 150 B.R. 595, 598 (E.D.Pa.1992), *aff'd,* 8 F.3d 812 (3d Cir.1993); *In re Grant Broad. of Phila., Inc.,* 71 B.R. 390, 396 (Bankr.E.D.Pa.1987).

 **[15]** 177. In determining whether the Settlement is above the lowest point in the range of reasonableness, this Court must consider the following four factors: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *In re Martin,* 91 F.3d at 393; *accord In re Nutraquest, Inc.,* 434 F.3d at 644–45.

 **[16]**    **[17]** 178. Subject to undertaking the inquiries described above, the decision to approve or deny a particular compromise or settlement involving a bankruptcy estate lies within the sound discretion of the court. *See In re World Health Alt.,* 344 B.R. at 296; *see also In re Neshaminy Office Bldg. Assocs.,* 62 B.R. 798, 803 (E.D.Pa.1986); *Nellis v. Shugrue,* 165 B.R. 115, 122–23 (S.D.N.Y.1994). In addition, the Court should exercise its discretion "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co.,* 217 B.R. 41, 46 (Bankr.S.D.N.Y.1998); *see also Martin,* 91 F.3d at 393; *Shugrue,* 165 B.R. at 123 (noting that "the

general rule [is] that settlements are favored and, in fact, encouraged by the approval process....").

179. Pursuant to Bankruptcy Code section 544(b), New York law applies in analyzing aspects of the 2009 Transaction that relate back to 2006. The transaction was negotiated and closed in New York, the secured and unsecured creditors' agents are located in New York, and the parties chose New York as the governing law.

 **[18]**    **[19]** 180. Under Bankruptcy Rule 9019(a), the Court is not required to conduct a full evidentiary hearing as a prerequisite to approving a compromise. *Jasmine,* 258 B.R. at 123 (stating that when deciding whether to approve a proposed compromise in a bankruptcy, the court is not to conduct a "mini-trial on the merits") (citations omitted); *In re Purofied Down Prods. Corp.,* 150 B.R. 519, 522 (S.D.N.Y.1993) (noting that the court "need not conduct a 'mini-trial' to determine the merits of the underlying litigation" being settled). In this case, a substantial evidentiary record was presented by the Debtors that facilitates this Court's consideration of the issues and of the fairness and reasonableness of the Settlement.

### *Probability of Success in Litigation*

181. For the reasons stated below, based on the evidence adduced at the **\*516** Hearing and this Court's Findings of Fact, the Debtors have demonstrated that an action against the secured lenders to avoid the liens or guaranties granted in the 2009 Transaction or to challenge the oversecured status of the secured claims is unlikely to succeed. Liens were granted more than ninety days before the Petition Date, and the guaranties replaced guaranties issued in 2006 which did not harm any creditor of any subsidiary because in 2006 CFGI could have paid in full in cash all its debt that was guaranteed. This evidence, when compared with the expense, inconvenience, and delay inherent in litigating such disputes weighs in favor of approving the Settlement. The Settlement: (a) provides a reasonable and substantial discount on the secured claims, (b) eliminates the cash drain on the estate that would result from protracted, hard-fought litigation, and likely delays in confirming plans for the Debtors or delays in distributions under those plans, including the incurrence of professional fees, and (c) will save the estates substantial interest charges on the secured claims. The Settlement falls comfortably above the lowest point in the range of reasonableness.

182. To prevail on a charge of constructive fraud under sections 544 or 548 of the Bankruptcy Code, a plaintiff must prove that (a) the debtor (i) was insolvent or rendered insolvent by the transaction, (ii) was left with an unreasonably small capital, or (iii) believed it would incur debts beyond its ability to pay, *and* (b) "fair consideration" or "a reasonably equivalent value" was lacking. 11 U.S.C. §§ 544(b), 548(a) (1); N.Y. Debt. & Cred. Law § 272.

**[20]**  183. As to (a), above, the Debtors concede insolvency at the time of the closing of the 2009 Transaction. But, the 2009 guaranties replaced guaranties issued in 2006. While the Debtors contend the replacement is reasonably equivalent value, the Official Committee contends the Court must consider the totality of the circumstances in 2009. Suffice it to say, there is considerable authority that the replacement of one guaranty by another constitutes reasonably equivalent value and the instances in which the appellate courts have looked to the totality of the circumstances are quite different than the facts here. [16] Therefore, it is reasonable **\*517** for the Debtors to have settled on the assumption the substitution of the 2009 guaranties for the 2006 guaranties would be reasonably equivalent value. Accordingly, the validity of the 2009 guaranties will turn on the validity of the 2006 guaranties.

184. In the case of the 2009 Transaction, all proceeds of the secured Credit Facility were used to repay or prepay antecedent bank debt. CFGI and the remaining Guarantors received in return for their new obligations and guaranties a reduction of their exposure of existing bank debt in an equivalent amount. Accordingly, the economics of the 2009 Transaction were balance sheet neutral—collectively, the Debtors had no more debt following the transaction than they had before.

185. Based on the findings above, there is a high likelihood that CFI's issuance of its guaranty in 2006 would not be voidable because it appears no creditor of CFI or any other subsidiary guarantor could have been harmed by the 2006 guaranties of CFGI's bank debt. Therefore, the benefits of the Settlement outweigh the probability of success on the avoidance actions.

**[21]**  186. Further, the claims secured in the 2009 Transaction were not limited by the savings clauses contained in the 2006 Guarantees. The 2006 Guarantees were likely not fraudulent transfers because no creditors were harmed, given that CFGI owned assets and businesses at the time which,

if sold at fair market values, could have paid off all CFGI's debts. Guarantees are contingent obligations and inchoate until a default by the principal obligor (*i.e.,* CFGI). *See New York City Dep't of Fin. v. Twin Rivers, Inc.,* 920 F.Supp. 50, 52 (S.D.N.Y.1996)* ("A guaranty is a collateral promise to answer for the payment of a debt or obligation of another, in the event the first person liable to pay or perform the obligation fails."); *Michaels v. Chem. Bank,* 110 Misc.2d 74, 441 N.Y.S.2d 638, 640 (N.Y.Sup.Ct.1981)* ("A guaranty ... is collateral, and only meaningful in relation to, the independent obligation to pay ... of the primary obligor, and is contingent upon his default.... It is but an inchoate obligation since the condition precedent to its operation (*viz.,* default by the debtor) may never occur.") (emphasis added); *see also Robbins Int'l, Inc. v. Robbins MBW Corp. (In re Robbins Int'l, Inc.),* 275 B.R. 456, 468 (S.D.N.Y.2002)* ("When a secondary obligor is bound to pay for the debt or answer for the default of the principal obligor to the obligee, the secondary obligor is said to have suretyship status.") (internal quotation marks omitted) (citing *Chem. Bank v. Meltzer,* 93 N.Y.2d 296, 690 N.Y.S.2d 489, 712 N.E.2d 656, 660 (1999)).

**[22]**  187. The Settlement on the assumption the 2006 guaranties were likely not voidable is also vindicated on other theories. The well-settled jurisprudence shows that guarantees are liquidated **\*518** based upon their probabilities of being called. *See, e.g., Mellon Bank v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L. Inc.),* 92 F.3d 139, 156 (3d Cir.1996)* (holding a contingent asset or liability must be valued to "take into consideration the likelihood of that event occurring from an objective standpoint."); *see also In re Hall,* 304 F.3d 743, 748 (7th Cir.2002); *Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.),* 134 F.3d 188, 197–98 (3d Cir.1998); *In re Xonics Photochemical, Inc.,* 841 F.2d 198, 199–200 (7th Cir.1988); *cf. Mellon Bank v. Metro Commc'ns, Inc.,* 945 F.2d 635, 648 (3d Cir.1991)* ("In valuing the cost of [the debtor's] guaranty, the right of contribution from co-guarantors needs to be balanced against the amount of debt for which [the debtor] is liable.... 'If there are multiple guarantors of the same obligation, the right of contribution entitles a paying guarantor to have its co-guarantors pay it their proportionate share of the principal debt it paid.' ") (citations omitted).

188. In light of the well-settled jurisprudence regarding the contingent nature of guarantees and the listing of the probability of the guarantees being called on the Debtors' balance sheet, the Official Committee's and Ad Hoc

Unsecured Committee's arguments to the contrary do not appear to have plausible likelihood of success.

189. Based on the established facts surrounding the 2006 and 2009 Transactions, the elements of a constructively fraudulent transfer would be exceedingly difficult to establish by a preponderance of the evidence. Accordingly, in weighing the Settlement against the Debtors' likelihood of prevailing against the secured lenders on a constructive fraudulent transfer charge, and taking into account the costs, risks, and uncertainty that would arise from denying the Settlement Motion in favor of pursuing litigation, the Court concludes the first prong of the *Martin* test weighs in favor of approving the Settlement.

 **[23]**    190. The 2009 Transaction was not a preference within the meaning of Bankruptcy Code section 547(b) because more than 90 days had passed after the transaction and before Debtors commenced their chapter 11 cases. A debtor may prefer one creditor over another without running afoul of the fraudulent conveyance laws. *Champion Enters.,* 2010 WL 3522132, at *19–20, 2010 Bankr.LEXIS 2720, at *62; *Brown v. GE Capital Corp. (In re Foxmeyer Corp.),* 296 B.R. 327, 337 (Bankr.D.Del.2003) (analyzing both Bankruptcy Code section 548 and New York law); *see also In re Kaplan Breslaw Ash, LLC,* 264 B.R. 309, 330 (Bankr.S.D.N.Y.2001) ("If a debtor gives a mortgage to secure a debt it already has—an antecedent debt—the giving of that mortgage may be a preference, but it is not a fraudulent conveyance.").

 **[24]**    191. Where a bona fide antecedent debt exists, a debtor's payment on account of that creditor's claim, even if it has the result of preferring that creditor over others, is not by itself a fraudulent transfer. By extension, where payment on account of an antecedent debt can be made without running afoul of the fraudulent transfer laws, a debtor may take the lesser step of granting an interest in collateral to secure an antecedent debt. *In re Champion Enters.,* 2010 WL 3522132, at *17–18, 2010 Bankr.LEXIS 2720, at *55–56; *Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.),* 361 B.R. 369, 398–99 (Bankr.S.D.N.Y.2007) (citing, *inter alia, Cuevas v. Hudson United Bank (In re M. Silverman Laces, Inc.),* No. 01 Civ. 6209(DC), 2002 WL 31412465, at *6 (S.D.N.Y.2002) (stating that debtor "received 'value' when its antecedent debt was **\*519** extended and collateralized," and affirming dismissal of fraudulent transfer complaint where grant of collateral worth more than twice the value of the existing debt exchanged for forbearance and extension of existing loan because creditor could only collect against

collateral up to the amount defaulted, remainder preserved by the debtor)); *Official Comm. of Unsecured Creditors of M. Fabrikant & Sons, Inc. v. JP Morgan Chase Bank (In re M. Fabrikant & Sons, Inc.),* 394 B.R. 721, 734 n. 13 (Bankr.S.D.N.Y.2008) ("[T]he delivery of collateral to secure a non-avoidable debt or obligation constitutes a transfer supported by 'fair consideration' that cannot be set aside under the NYDCL.") (citing *Silverman v. Paul's Landmark, Inc. (In re Nirvana Rest. Inc.),* 337 B.R. 495, 502 (Bankr.S.D.N.Y.2006)).

### *Likely Difficulties in Collection*
192. The Court concludes there would be no difficulties in collection.

### *Complexity, Expense, Inconvenience, and Delay*
The complexity of the facts and law surrounding the 2009 Transaction (and, by extension, the 2006 and 2007 Transactions), and the related expense also strongly favors approval of the Settlement. The diversion of additional valuable time and resources to pursue the avoidance action, which, as set forth above, has low and uncertain probabilities of success, will further deplete the Debtors' estates by material amounts in the tens of millions of dollars as a result of protracted and expensive costs of litigation, and the incurrence of additional costs that would be incurred in extending the duration of these chapter 11 cases.

### *Paramount Interest of Creditors*
194. The Debtors have satisfied this element of the *Martin* test by demonstrating the numerous tangible and intangible benefits provided by the Settlement.

 **[25]**    195. There is no *per se* rule that the views of a committee or other creditors are dispositive on the reasonableness of a settlement. A *per se* rule would unduly expose the Debtors to the demands of creditors preferring to risk estate assets in a litigation lottery under blackmail or strong-arm strategies. Instead, a debtor may seek approval of a settlement over major creditor objections as long as it carries its burden of establishing that the balance of the *Martin* factors, including the paramount interests of creditors, weighs in favor of settlement. *See, e.g., In re Key3Media Grp., Inc.,* 336 B.R. at 97 (approving settlement of avoidance claims by debtor over objection of largest creditors in case and noting that while creditors' interests should be accorded proper deference, their objections "cannot

be permitted to predominate over the best interests of the estates as whole"); *In re Matco Elecs. Grp., Inc.,* 287 B.R. 68, 77–79 (Bankr.N.D.N.Y.2002) (finding that court could approve the debtor's settlement over the objection of the creditors' committee, but declining to do so because of "red flags" surrounding the settlement, including that debtor's officer who signed the settlement was a shareholder of the settling counterparty, debtor's counsel had taken no part in the settlement, and all signatories had been granted releases for no consideration); *see also In re Sea Containers, Ltd.,* No. 06–11156(KJC), 2008 WL 4296562, at *11 (Bankr.D.Del. Sept.19, 2008) (approving settlement over objection of creditors most impacted by settlement where creditors failed to convince court "the settlement so affects their position as to be unfair.").

196. The Official Committee and the Ad Hoc Unsecured Committee argue that the Settlement is not the paramount interests of creditors because it is the result of a flawed process in which the unsecured creditors did not participate. The Debtors **\*520** counter that they kept the unsecured committees fully apprised of developments.

 **[26]** 197. There can be no question that the Official Committee and Ad Hoc Unsecured Committee did not substantively participate in the settlement negotiations. Those negotiations were primarily between the secured lenders and Debtors' counsel. Nonetheless, there is nothing in the record to reflect that anything untoward occurred. While it is certainly true that the settlement affects the Debtors' unsecured creditors, there is no requirement that those creditors be actively involved in the settlement negotiations. Certainly it is within the debtors prerogative to exclude them. Moreover, there is no support for the Official Committee's insinuation that the Debtors' professionals were conflicted in their negotiations with the secured lenders.

198. Finally, the court disagrees with the assertion that the Settlement is unfair because the unsecured committees were

not given a reasonable opportunity to prepare for the Hearing. The parties engaged in extensive discovery, albeit on an expedited basis. Moreover, the Official Committee has had access to virtually all the information necessary to value the Pledge Pool for several months. That they chose not to perform a formal valuation of those assets during that time is neither a shortfall on their part nor a reason to delay the Hearing.

199. In short, the Debtors engaged in arm's length good-faith negotiation with the secured lenders and the Official Committee and Ad Hoc Unsecured Committee were given appropriate notice and an ample opportunity to conduct discovery in preparation for the Hearing.

## I. THE OFFICIAL COMMITTEE'S STANDING MOTION IS MOOT

200. In light of the Court's ruling approving the Settlement, the Court determines the Official Committee's Standing Motion is moot.

## J. CONCLUSION

201. In sum, based on the established facts surrounding the 2006, 2007, and 2009 Transactions, and having applied the well-settled jurisprudence regarding whether the proposed Settlement satisfies the standard for approving settlements presented under Bankruptcy Rule 9019, the Court concludes the Settlement is (i) above the lowest point of the range of litigation outcomes, (ii) fair and reasonable, (iii) satisfies each element of the *Martin* test, and (iv) serves the best interests of the Debtors, their estates, and all parties in interest. Accordingly, the Court will approve the Settlement Motion and will deny the Standing Motion as moot.

202. Debtors' counsel is instructed to submit a proposed order under certification of counsel.

Footnotes

1    This constitutes the Court's findings of fact and conclusions of law under Bankruptcy Rules 7052 and 9014.

2    On January 15, 2010, Capmark Investments LP, a wholly owned subsidiary of CFGI, commenced its voluntary case under chapter 11 of the Bankruptcy Code. On July 29, 2010, Protech Holdings C, LLC, an Ohio single member limited liability company and an affiliate of the Debtors commenced its voluntary case under chapter 11 of the Bankruptcy Code.

3    On the same day, the Official Committee filed its *Motion of the Official Committee of Unsecured Creditors Seeking Entry of an Order Terminating the Requirement that Additional Principal Payments be Made Subject to the Cash Collateral Order* [Docket No. 1527] (the "Payment Termination Motion"). The Official Committee subsequently withdrew the Payment Termination Motion without prejudice.

4    The court found Mr. Fairfield's testimony credible.

5    The resolution was approved by all Board Members other than representatives of Dune and Goldman, who abstained from the vote because affiliates of each of them were lenders under the Credit Facility. *See* Hr'g Tr. 137:15–139:19 (Fairfield); Debtors' Ex. 11(w) (Board Minutes).

6    The court found Dr. Luehrman's testimony credible.

7    By way of example, the Official Committee, in its cross-examination of Dr. Luehrman, sought to demonstrate that using higher "volatility" figures would result in a higher put option value for the 2006 Guaranties. Hr'g Tr. 1010:24–1014:3 (Luehrman). In sum, greater volatility would lead to a higher overall value for the put option. Hr'g Tr. 963:9–14; 1010:24–1011:3 (Luehrman). However, as Dr. Luehrman testified, the relevant volatility is asset volatility, but because asset volatility is not readily ascertainable from capital market data, he used an assumed equity volatility (which is higher than asset volatility). Hr'g Tr. 963:3–14 (Luehrman). Moreover, the equity volatility Dr. Luehrman used was higher than the expected equity volatility determined by CFGI as of the date of the 2006 Transaction and as reported in SEC filings. *Compare* Debtors' Ex. 48 (Luehrman Rep.) at App'x 6 (Figure 6–6: assuming a 24% asset volatility rate) *with* Debtors' Ex. 10 at F–69 (using 23.25% expected stock price volatility for valuing stock options as of March 23, 2006).

8    The Court, Mr. Geer's testimony credible but very limited in scope and utility.

9    The Court found Mr. Gallagher's testimony to be particularly credible.

10    Average loss severity is the amount of loss as a percentage of principal balance.

11    The Debtors' projected recoveries through the second quarter of 2011 assume the Debtors will sell the assets in their New Markets Tax Credit program. *See* Hr'g Tr. at 650:11–22 (Gallagher). But even if the anticipated transaction does not occur, the Debtors' projections actually go up over long term since a proposed sale of the New Markets Tax Credits assets assumes a discount in price to achieve a quicker sale. *See* Hr'g Tr. at 650:23–652:8; 805:4–806:9 (Gallagher).

12    These numbers do not include an additional $40 million in cash proceeds that relate to the New Market Tax Credit loans. *See* Hr'g Tr. 644:4–645:3 (Gallagher). Although these amounts are not currently available because of reinvestment requirements of the New Markets Tax Credit program, the funds will likely become available in the future. *See* Hr'g Tr. 644:21–645:2, 650:11–14, 805:4–806:5 (Gallagher).

13    The court finds Mr. Litoloff's testimony to be of limited utility. Mr. Litoloff misunderstands the role of an expert witness. He testified that it is not necessary for an expert witness to show all the work performed to arrive at the expert's conclusion, because in his view his opinion should be accorded weight solely by virtue of his experience and credentials. Hr'g Tr. 515:14–516:11, 522:8–17 (Litoloff). Moreover, Mr. Litoloff's report does not explain how he reached certain of his conclusions. Hr'g Tr. 517:1–5 (Litoloff). For example, the D & P valuation report does not explain how the performing loans were categorized into different tiers of quality nor which loans were placed into which tier. Hr'g Tr. 521:13–20 (Litoloff). Nor, he admits, can the rationale for placing loans into certain categories —which he admits was largely based on personal judgment—be found in the D & P work papers. Hr'g Tr. 522:1–7 (Litoloff).

14    In reality, actual money rarely changes hands. The pre-petition loan is deemed satisfied and the post-petition loan includes the amount of the pre-petition debt.

15    A "creeping roll-up" is identical to a roll-up except that the payment of the pre-petition debt occurs over time. Creeping roll-ups are most commonly used with revolving lines of credit or "revolvers." In a typical revolver, the debtor has a zero-balance account. As payments are received by the debtor from third parties they are deposited in an account with the lender and applied, usually daily, to reduce the debt. As payments are made by the debtor to third parties the debt increases. Thus, the amount of the debt rises and falls on an almost daily basis. In a creeping roll-up, payments received post-petition by the debtor are used to reduce the pre-petition debt. In addition, the debtor's post-petition payments to third parties serve to increase the post-petition debt. Thus, the pre-petition revolver is gradually "paid off" and replaced with the post-petition revolver—often before the final DIP hearing. Again, actual money rarely changes hands.

16    Paying or collateralizing antecedent debt constitutes 'value' and 'fair consideration' under the Bankruptcy Code and New York law. 11 U.S.C. § 548(d)(2)(A) (" 'value' means property, or satisfaction or securing of a present or antecedent debt"); N.Y. Debt. & Cred. Law § 272(b) (providing "fair consideration" includes securing antecedent debt, provided the debt is not "disproportionately small as compared with the value of the property, or obligation obtained."); *see also Official Comm. of Unsecured Creditors of Champion Enters. v. Credit Suisse (In re Champion Enters.),* No. 09–14014, 2010 WL 3522132, at *17–18, 2010 Bankr.LEXIS 2720, at *55– 56 (Bankr.D.Del. Sept. 1, 2010); *Walker v. Sonafi Pasteur (In re Aphton Corp.),* 423 B.R. 76, 89 (Bankr.D.Del.2010) (Sontchi, J.) ("Courts have held that when a transfer is made to pay an antecedent debt, the transfer may not be set aside as constructively fraudulent.") (citing, *inter alia, In re APF Co.,* 308 B.R. 183); *In re AppliedTheory Corp.,* 330 B.R. 362, 364 (S.D.N.Y.2005) (satisfaction or securing of antecedent debt is fair consideration as a matter of law); *In re APF Co.,* 308 B.R. at 187 (Trustee could not state § 548 constructive fraud claim because "the payments [made on the promissory note] were made for value ... satisfaction of an antecedent debt[.]") (citations and internal quotation marks omitted); *Anand v. Nat'l Republic Bank of Chicago,* 239 B.R. 511,

517–18 (N.D.Ill.1999) (affirming bankruptcy court finding following factual analysis that securing equivalent amount of antecedent debt in exchange for forbearance, among other things, constituted reasonably equivalent value); *B.Z. Corp. v. Cont'l Bank (In re B.Z. Corp.),* 34 B.R. 546, 548 (Bankr.E.D.Pa.1983) ("The loan payments made [by the debtor] are not avoidable since under § 548(d)(2)(A) the payments were made for value, *i.e.,* 'the satisfaction of ... [an] antecedent debt of the debtor.' "); *see also In re Aphton Corp.,* 423 B.R. at 89 ("Courts have held that when a transfer is made to pay an antecedent debt, the transfer may not be set aside as constructively fraudulent.") (citing cases); *Atlanta Shipping Corp. v. Chem. Bank,* 818 F.2d 240, 249 (2d Cir.1987) ("In general, repayment of an antecedent debt constitutes fair consideration unless the transferee is an [insider]...."); *Rosen v. Gratton (In re Rosen Auto Leasing, Inc.),* 346 B.R. 798, 805 (8th Cir. BAP 2006) ("For purposes of fraudulent transfer analysis, value includes the satisfaction of antecedent debt."); *Sierra Invs., LLC v. SHC, Inc. (In re SHC, Inc.),* 329 B.R. 438, 446 (Bankr.D.Del.2005) (holding that overpayment of taxes due constituted reasonably equivalent value); *In re First Alliance Mortg. Co.,* 298 B.R. 652, 665–66 (C.D.Cal.2003) ("Repayments of fully secured obligations ... do not hinder, delay, or defraud creditors ... and therefore cannot be fraudulent.").

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 76

124 B.R. 169
United States District Court,
D. Delaware.

In re DELAWARE & HUDSON
RAILWAY CO., Debtor.
Appeals of GUILFORD TRANSPORTATION
INDUSTRIES, INC., Boston & Maine Corporation,
and Maine Central Railway Company,
Mellon Bank, N.A., Xtra, Inc., Appellants.

Civ. A. Nos. 90–332 LON, 90–333 LON
and 90–334 LON.    |    Jan. 14, 1991.

Secured creditors brought actions seeking to have reversed Bankruptcy Court order authorizing sale of substantially all of assets of Chapter 11 debtor railroad. The District Court, Longobardi, Chief Judge, held that: (1) under either valid business justification or compelling circumstances test, debtor railroad's proposed preconfirmation sale of substantially all of its assets, which essentially consisted of 1,500 route mile rail line, for price of $25 million, leaving property and estate valued at approximately $17 million, was justified despite estimate that estate would receive at least $67 million if debtor were to liquidate it for scrap, and (2) order granting contingent, superpriority lien of up to $2 million in favor of proposed purchaser of assets from Chapter 11 debtor railroad in preconfirmation sale, based on determination that lien would prime secured creditors only if sale agreement were not consummated and that debtor would be in liquidation if sale did not occur, was not clearly erroneous.

Affirmed.

West Headnotes (9)

**[1]** **Bankruptcy**
👉 Plan

Reorganization plan for Chapter 11 debtor railroad need only provide each claimant with at least as much value as claimant would receive if railroad lines were sold in pieces rather than value claimant would receive if railroad were liquidated for scrap; in addition, reorganization plan of railroad differs from ordinary debtor in that it must be consistent with public interest. Bankr.Code, 11 U.S.C.A. §§ 1161–1174, 1170(b), 1173.

Cases that cite this headnote

**[2]** **Bankruptcy**
👉 Notice

**Bankruptcy**
👉 Manner and Terms

**Bankruptcy**
👉 Adequacy of Price;  Appraisal

Once bankruptcy court is satisfied that there is sound business reason or emergency justifying preconfirmation sale of Chapter 11 debtor's assets, court must also determine that trustee has provided interested parties with adequate and reasonable notice, that sale price is fair and reasonable, and that purchaser has proceeded in good faith. Bankr.Code, 11 U.S.C.A. § 363.

6 Cases that cite this headnote

**[3]** **Bankruptcy**
👉 Sale or Assignment of Property

**Bankruptcy**
👉 Adequate Protection;  Sale Free of Liens

Bankruptcy court should prohibit or modify preconfirmation sale of Chapter 11 debtor's assets at request of parties with security interests in property if court finds it is necessary to ensure that parties are adequately protected. Bankr.Code, 11 U.S.C.A. §§ 363, 363(e).

Cases that cite this headnote

**[4]** **Bankruptcy**
👉 Operation of Railroad and Abandonment or Sale of Lines and Property

Under either valid business justification or compelling circumstances test, Chapter 11 debtor railroad's proposed preconfirmation sale of substantially all of its assets, which essentially consisted of 1,500 route mile rail line, for price of $25 million, leaving property and estate valued at approximately $17 million, was justified despite estimate that estate would receive at

least $67 million if debtor were to liquidate assets for scrap; estate was losing $100,000 each month, initial shutdown costs would be in excess of $1 million, disclosure statement and reorganization plan preparation would be complex and litigation-filled process, and it was uncertain whether liquidation of debtor for scrap would be viable option. Bankr.Code, 11 U.S.C.A. §§ 363, 1161–1174.

Cases that cite this headnote

**[5]**    **Bankruptcy**
   👉 Operation of Railroad and Abandonment or Sale of Lines and Property

Bankruptcy court's finding that proposed purchase price for Chapter 11 debtor railroad's assets in preconfirmation sale, which assets consisted primarily of 1,500 route mile rail line, of $25 million was fair and reasonable was supported by evidence, including extensive solicitation of bids by trustee, negotiations with several prospective purchasers, and trustee's testimony that such price was best offer for assets. Bankr.Code, 11 U.S.C.A. §§ 363, 1161–1174.

3 Cases that cite this headnote

**[6]**    **Bankruptcy**
   👉 Operation of Railroad and Abandonment or Sale of Lines and Property

Creditors, which were challenging proposed preconfirmation sale of substantially all of Chapter 11 debtor railroad's assets and which received copies of sale agreement and were able to cross-examine trustee about agreement and why it was in best interests of estate, received sufficient notice of sale, despite contention that they were entitled to notice that was functional equivalent of disclosure statement; creditors did not receive notice of unliquidated claims, but notice did disclose accurately the full terms of sale. Bankr.Code, 11 U.S.C.A. §§ 363, 1161–1174.

1 Cases that cite this headnote

**[7]**    **Bankruptcy**
   👉 Notice

Notice of preconfirmation sale of substantially all of Chapter 11 debtor's assets is not required to include all information that would accompany a disclosure statement. Bankr.Code, 11 U.S.C.A. § 363.

Cases that cite this headnote

**[8]**    **Bankruptcy**
   👉 Operation of Railroad and Abandonment or Sale of Lines and Property

Preconfirmation sales price of $25 million for substantially all of assets of Chapter 11 debtor railroad would provide adequate protection to creditors, which allegedly held security interests of $18 million, despite contention of creditors that unliquidated damages of unknown magnitude and unknown priority were not estimated. Bankr.Code, 11 U.S.C.A. §§ 363, 363(f)(3), 1161–1174.

Cases that cite this headnote

**[9]**    **Bankruptcy**
   👉 Particular Cases and Issues

Bankruptcy court's order granting contingent, superpriority lien of up to $2 million in favor of proposed purchaser of assets from Chapter 11 debtor railroad in preconfirmation sale, based on determination that lien would prime secured creditors only if sale agreement were not consummated and that debtor would be in liquidation if sale did not occur, was not clearly erroneous; contingent lien was based on proposed purchaser's making of arrangements for continued emergency services over lines while purchase agreement was being considered. Bankr.Code, 11 U.S.C.A. §§ 363, 502(a), 1161–1174.

9 Cases that cite this headnote

**Attorneys and Law Firms**

**\*171** Eduard F. von Wettberg, III, Joanne B. Wills, Thaddeus J. Weaver, and John D. Demmy of Morris, James, Hitchens & Williams, Wilmington, Del. (Stanley J. Samorajczyk, Linda S. Broyhill, and Robert M. Marino of Hazel & Thomas, Washington, D.C., of counsel), for appellee Dicello, Trustee, Delaware & Hudson Ry. Co.

Jeffrey Goddess, and Mark Minuti of Saul, Ewing, Remick & Saul, Wilmington, Del. (John H. Broadley, and David A. Handzo of Jenner & Block, Washington, D.C., of counsel), for appellants Guilford Transp. Industries, Inc., Boston and Maine Corp. and Maine Central R. Co.

Stephen W. Spence of Phillips & Snyder, Wilmington, Del. (John K. Maser III of Donelan, Cleary, Wood & Maser, Washington, D.C., of counsel), for GE Silicones and Quad/ Graphics, Inc.

Edward D. Greenberg, of Galland, Kharasch, Morse & Garfinkle, Washington, D.C., for International Paper Co.

Francis J. Murphy of Ashby, McKelvie & Geddes, Wilmington, Del. (Carmine J. Clemente, Leona D. Jochnowitz of New York State Dept. of Transp., Albany, N.Y., of counsel), for New York State Dept. of Transp.

Palmer L. Whisenant, and William H. Sudell, Jr. of Morris, Nichols, Arsht & Tunnell, Wilmington, Del. (Paul M. Singer, Edward A. Bittner, Jr., and Paul J. Kegaly of Reed Smith Shaw & McClay, Pittsburgh, Pa., of counsel), for appellant Mellon Bank, N.A.

Melvyn I. Monzack, and Francis A. Monaco, Jr. of Walsh & Monzack, Wilmington, Del. (Paul R. Duke, Philip R. Stansbury, and Dennis B. Auerbach of Covington & Burling, Washington, D.C., of counsel), for appellant Xtra, Inc.

**Opinion**

## OPINION

LONGOBARDI, Chief Judge.

The Appellants in these three related actions have asked this Court to reverse the Bankruptcy Court's order of June 8, 1990, which authorized the sale of substantially all of the Debtor's assets pursuant to 11 U.S.C. § 363(b) and authorized the establishment of a super priority lien on the Debtor's assets in accordance with 11 U.S.C. § 364(d). Because it is probable

that any appeal would be moot after the completion of the sale or establishment of the lien, the Appellants have also filed motions for a stay of the Bankruptcy Court's order pending appeal. The Court has considered the appeal on an expedited basis in order to complete its review prior to the proposed sale date of January 16, 1991.

## PROCEDURAL HISTORY

**1.** *The Parties on Appeal*

The Debtor and Appellee in all of these actions is the Delaware and Hudson Railway ("D & H" or "the Debtor"), a Delaware corporation. D & H links Eastern Canada and New England to the Southern and Midwestern United States. The primary assets of D & H consist of a 1,500 route mile rail line. [1]

Guilford Transportation Industries, Inc., Boston & Maine Corporation and Maine Central Railway Company ("the Rails"), the Appellants in Civil Action Number 90– **\*172** 332 LON, represent secured and unsecured creditors of D & H. D & H is a wholly-owned subsidiary of Guilford Transportation Industries, Inc. ("Guilford"). The Rails have filed claims against D & H of approximately 62 million dollars and the Rails assert that approximately 13 million dollars of this amount is secured. [2] Civil Action No. 90–332 LON, Docket Item 4 at 2 ("332 D.I. 4 at 2").

Mellon Bank, N.A. ("Mellon") is the Appellant in Civil Action No. 90–333 LON. Mellon asserts secured claims against the estate in the amount of approximately 19 million dollars, a portion of which is secured by a lien on substantially all of D & H's operating assets and a further portion is secured by a lien on identified accounts receivable. 333 D.I. 4 at 3. Apparently, the amount of the debt secured by the operating assets is approximately 15 million dollars. 333 D.I. 7 at 6.

Xtra, Inc. ("Xtra") is the Appellant in Civil Action No. 90–334 LON. Xtra asserts a claim of approximately 3 million dollars secured by the operating assets of D & H.

New York State Department of Transportation ("NYSDOT") has filed briefs in support of the Debtor. NYSDOT asserts that beginning in 1974, New York State has contracted with D & H to provide for capital project improvements and maintenance and service obligations. New York State has claimed an ownership interest in the property it provided to D & H in the amount of approximately 67 million dollars.

New York State also claims defaults in the amount of approximately 6 million dollars. 332 D.I. 10 at 5. NYSDOT asserts that New York's interests in D & H's assets are senior to the interests of the Rails, Mellon and Xtra ("the Appellants"). *Id.* at 6.

In addition, a collection of companies who use D & H ("the D & H shippers") have filed briefs in support of D & H. [3] The D & H shippers assert that dependable rail service along D & H's lines is essential to their viability. They argue that the public interest dictates that the reorganization of D & H provides for continued rail service. 332 D.I. 6 at 5–7.

## 2. *The Proceedings in the Bankruptcy Court*

The Bankruptcy Court's order of June 8, 1990, Exhibit G in the record on appeal, provides a comprehensive outline of the proceedings related to D & H's petition for reorganization.

D & H filed a voluntary petition for reorganization under Subchapter IV of Chapter 11 of the Bankruptcy Code on June 20, 1988. On June 23, 1988, the Interstate Commerce Commission ("ICC") ordered the New York, Susquehanna, and Western Railroad ("NYS & W") to operate D & H. On June 27, 1988, Francis P. Dicello was appointed as Trustee for D & H. The Trustee attempted to assume direct operation of D & H. After extensive negotiations with regulatory agencies, other railroads, shippers and labor representatives, the Trustee concluded that resumption of service by the estate would not be possible at that time.

The Trustee negotiated with NYS & W and CSX Transportation, Inc. ("CSX") to solicit continued service over D & H's lines from NYS & W and financial support for the continued service from CSX. The Bankruptcy Court approved the Trustee's authority to enter into a Memorandum of Understanding which provided that CSX would provide up to 3 million dollars in working capital to NYS & W and would provide indemnification to NYS & W against loss during the operation over D & H's lines for a period of 18 months after February 13, 1989. The memorandum also provided that if the losses exceeded 1 million dollars, CSX would withdraw its support and indemnification 15 days after providing notice to the Trustee and the ICC.

On February 13, 1989, and March 14, 1989, the ICC invoked its emergency jurisdiction to order NYS & W to continue providing replacement service over the D & H's lines.

**\*173** On June 23, 1989, the Bankruptcy Court entered an order authorizing the trustee to solicit bids for the sale of assets and/or reorganization of the Debtor. Pursuant to the order, the Trustee solicited and received six proposals for the purchase of the assets and reorganization of D & H. After extensive negotiations with the parties submitting proposals and after substantial revisions of at least one of the proposals, the Trustee concluded that in his business judgment the proposal of Canadian Pacific Limited ("CP") provided the most favorable terms.

By October 1989, the losses NYS & W incurred by operating the D & H's lines substantially exceeded 1 million dollars and CSX gave notice of its intent to withdraw support and indemnification. On November 17, 1989, the Bankruptcy Court entered an order authorizing D & H to provide limited and specific financial assistance to NYS & W to continue service. Based upon this assistance from D & H, CSX agreed to continue to indemnify NYS & W for losses in excess of D & H's assistance. This modified agreement required that NYS & W notify D & H and CSX when it had reason to believe that the losses incurred after November 1, 1989, reached or exceeded 1.6 million dollars.

On January 9, 1990, the Trustee entered into an agreement with CP for the purchase of substantially all of D & H's assets ("the initial CP agreement"). On January 10, 1990, NYS & W gave notice that the post-November, 1989, losses reached or exceeded 1.6 million dollars. CSX automatically gave notice of its intent to withdraw its financial support and indemnification of NYS & W and CSX's indemnification expired on January 30, 1990.

On January 30, 1990, the Bankruptcy Court authorized the execution of another indemnification agreement, this time between the Trustee, NYS & W, CSX and CP to provide for assistance and indemnification until the expiration of the interim period of service ordered by the ICC. The parties contemplated that after the interim service expired on February 14, 1990, CP would provide indemnification pursuant to the initial CP agreement.

After a hearing on February 9, 1990, the Bankruptcy Court approved the initial CP agreement. A condition precedent to closing the initial CP agreement was that CP and Conrail reach an agreement regarding a grant from Conrail to CP for certain trackage rights. CP and Conrail were unable to reach an agreement, consequently the initial CP agreement was terminated.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Following the termination of the initial CP agreement, the Trustee assumed direct operation of D & H's lines to preserve the value of D & H's estate. The Trustee pursued other options for the sale of D & H or for an orderly reorganization of service over the lines and liquidation. The Trustee considered selling D & H's lines as a whole and selling discrete pieces of the lines. The Trustee re-solicited proposals for the purchase and reorganization of D & H and received three proposals. Again, extensive negotiations and revisions of the proposals ensued.

The Trustee concluded that in his business judgment the new proposal of CP provided the most favorable terms, was in the best interest of the Debtor, its estate and the creditors and was consistent with the public interest by insuring viable, continuing, competitive rail service in the region served by D & H.

The new agreement dated May 15, 1990, ("the CP agreement") provided that subject to complying with the relevant provisions of the Bankruptcy Code, CP would purchase substantially all of D & H's property for a 25 million dollar cash purchase price at closing plus the assumption of certain liabilities. The property to be purchased was outlined in detail in the agreement. The property includes D & H's operating assets securing the Appellants' and NYSDOT's claims and would be purchased free of any existing lien.

In order to minimize operating losses to D & H and to provide for continued service over D & H's lines while the CP agreement was being considered, the CP agreement provided that subject to certain contingencies being satisfied or waived, CP would **\*174** make arrangements for continued emergency services over D & H's lines. The funds CP expended for this purpose were to be considered a super priority lien against most of D & H's assets. [4] The agreement provided for a 2 million dollar cap on this super priority loan. If the sale was consummated or if CP breached the agreement, this loan would be deemed forgiven.

Following notice to the interested parties, the Bankruptcy Court held a hearing on the CP agreement on June 7, 1990. Guilford, Xtra, Mellon and Interline Railways objected to the CP agreement. The United States, Rail Labor and FELA personal injury claimants entered support in favor of the CP agreement. NYSDOT, the Commonwealth of Pennsylvania and the D & H shippers vigorously supported the Trustee's motion to sell the assets and incur a super priority loan. The Bankruptcy Court made extensive findings of fact and issued

an order on June 8, 1990, granting and approving the Trustee's motions.

### 3. *The Appeals*

The Appellants commenced three separate actions in District Court by filing notices of appeal on July 2, 1990. These motions have been fully briefed by the Appellants, the Debtor, NYSDOT and the D & H shippers. Subsequently, the Appellants moved this Court to consider the appeals on an expedited basis. The Debtor opposed the motions for expedited appeals. In a letter dated December 26, 1990, the Court informed the parties that the motion for expedited consideration was under advisement and that a decision on the appeals would be made sometime in January.

On January 2, 1991, the Appellants filed motions with the Bankruptcy Court for a stay of the June 8, 1990, order pending disposition of the appeal. In an order dated January 4, 1991, the Bankruptcy Court denied the motions on two grounds: the motions were untimely filed and the Bankruptcy Court's jurisdiction was not clear; and the Appellants had failed to meet their burden of proving that they were entitled to a stay.

On January 3, 4 and 7, 1991, the Appellants filed motions to stay the order of the Bankruptcy Court pending this Court's review. In a telephone conference on January 7, 1991, the counsel for the Debtor informed the Court that the CP agreement was likely to close on January 16, 1991. The Court ordered the Debtor to formally respond to the motions. The Debtor has filed briefs in opposition to the Appellants' motions for a stay of the June 8, 1990, order.

The Court will deny the motions for a stay because the Court has completed its analysis of the issues on appeal.

### REORGANIZATION UNDER CHAPTER 11

Before beginning an analysis of the specific issues on appeal, it is helpful to review the statutory framework and case law governing the reorganization of debtors and railroads under Chapter 11 of the Bankruptcy Code.

### 1. *The General Procedure*

A proceeding in Chapter 11 begins when a debtor files a petition with the Bankruptcy Court. 11 U.S.C. § 1121. After filing a petition, the debtor has an opportunity to file a reorganization plan. *Id.* Section 1123 of Title 11 governs what

must be included in a plan of reorganization. A proponent of a plan must also submit a disclosure statement. 11 U.S.C. § 1125. Before a proponent of a reorganization plan can solicit approval of the plan from creditors, the Bankruptcy Court must determine that the information disclosure statement is adequate after conducting an information disclosure hearing. In order for a plan to be confirmed, the Bankruptcy court must hold a confirmation hearing. 11 U.S.C. § 1128.

The Bankruptcy Court shall confirm a plan only if certain conditions are met. 11 U.S.C. § 1129. Section 1129(a)(7) requires **\*175** the Bankruptcy Court to find that each creditor in a class of creditors has (1) accepted the plan; or (2) will receive value under the plan that is not less than the amount the creditor would receive if the estate of the debtor were liquidated under chapter 7. [5]

### 2. *Modifications for Railroads*

 [1]    When the debtor is a railroad, sections 1161 through 1174 apply to the reorganization. Section 1161 provides that certain other sections of the Code, including section 1129(a) (7), do not apply in a case concerning a railroad. 11 U.S.C. § 1161. Section 1165 requires that the Bankruptcy Court and the trustee consider the public interest in addition to the interests of the debtor, creditors and equity security holders. 11 U.S.C. § 1165. Section 1170 provides that after a hearing the Bankruptcy Court may authorize the abandonment of a railroad line if it is (1) in the best interest of the estate or essential to the formulation of a plan; and (2) consistent with the public interest. 11 U.S.C. § 1170(b).

Section 1173 governs the confirmation of plans for reorganizations of railroads. The Bankruptcy Court shall confirm such a plan if (1) the applicable requirements of section 1129 have been met; (2) each claimant will receive or retain under the plan property of a value that is not less than the value of property that each claimant would receive or retain if all of the operating lines of the debtor were sold and the proceeds of the sale and other property were distributed under Chapter 7; (3) prospective earning of the debtor will adequately cover fixed charges provided for by the plan; and (4) the plan is consistent with the public interest. 11 U.S.C. § 1173(a). Section 1174 provides that a Chapter 11 proceeding can be converted to a liquidation proceeding under Chapter 7 if certain conditions are met.

Thus, a reorganization plan for a debtor railroad need only provide each claimant with at least as much value as the

claimant would receive if the railroad lines were sold in pieces rather than the value the claimant would receive if the railroad was liquidated for scrap. *See* H.R. 95–595, 95th Cong., 1st Sess. 425 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787 (test is similar to test for ordinary corporate reorganizations but, because railroads cannot liquidate assets and sell them for scrap to satisfy creditors, test focuses on the value of railroad as a going concern). In addition, the reorganization plan of a debtor railroad differs from an ordinary corporate debtor in that it must be consistent with the public interest.

### 3. *Sales of Assets Without a Confirmed Plan*

If a trustee wishes to sell assets of a debtor outside of the ordinary course of business of the debtor and prior to obtaining a confirmed reorganization plan, the trustee must comply with section 363. Section 363 provides that the trustee must provide notice of the sale and the Bankruptcy Court must conduct a hearing. 11 U.S.C. § 363(b). At the request of any party with an interest in the property to be sold, the Bankruptcy Court shall prohibit the sale or condition the sale as necessary to provide for adequate protection of the party's interest. 11 U.S.C. § 363(e). The Trustee bears the burden of showing that the sale is adequate. *Id.* Section 363 also provides that if a Bankruptcy Court orders a sale of the property and that order is not stayed pending appeal, then a reversal of the order on appeal will not effect the validity of the sale if the purchase was made in good faith. 11 U.S.C. § 363(m).

In addition to the notice, hearing and adequate protection requirements specified in section 363, courts have developed several factors to consider in cases where a trustee wishes to conduct a pre-confirmation sale of substantially all of the debtor's assets. The Second and Sixth Circuit Courts of Appeal require that the trustee show there is a sound business purpose for **\*176** conducting the sale prior to confirmation of a plan. *Stephens Indus., Inc. v. McClung,* 789 F.2d 386, 390 (6th Cir.1986); *In re Lionel Corp.,* 722 F.2d 1063, 1068–69 (2nd Cir.1983). A non-exhaustive list of factors to consider in determining if there is a sound business purpose for the sale include: the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future; the effect of the proposed disposition of the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value. *In re Lionel,* 722 F.2d at 1071.

In a case decided under the 1898 Bankruptcy Act, the Court of Appeals for the Third Circuit held that a pre-confirmation sale could be authorized only upon a showing of emergency. *In re Solar Mfg. Corp.,* 176 F.2d 493, 495 (3rd Cir.1949). In *Solar* the Court of Appeals held that where the debtor's position was improving under the trustee's management, the fact that real estate values were deteriorating did not warrant a pre-confirmation sale of the businesses assets. The fact that the purchase offer was conditioned upon an almost immediate acceptance did not create an emergency which required a pre-conformation sale either.

The issue of whether or not an emergency is required has not been squarely before the Third Circuit since that case. However, in *In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143 (3rd Cir.1986), the Court of Appeals examined a pre-confirmation sale to determine if it had been made in good faith. In *Abbotts Dairies* the debtor sought a pre-confirmation sale. The debtor was one day away from ceasing operations because its inventory was exhausted. The trustee testified that if the debtor ceased operations its trademarks and customer list would lose substantially all of their value resulting in a loss of 3 to 4 million dollars to the estate. *Id.* at 145. The Court of Appeals did not hold that this was an insufficient reason for the sale; rather, the Court of Appeals determined that the bankruptcy judge made no implicit or explicit finding of good faith. The Court of Appeals held that "when a bankruptcy court authorizes a sale of assets pursuant to section 363(b)(1), it is required to make a finding with respect to the 'good faith' of the purchaser." *Id.* at 149–50.

The Court of Appeals did not mention the *Solar* decision which has led at least two bankruptcy courts to the conclusion that the Third Circuit follows the "sound business purpose" rather than the "emergency" rule. *See In re Indus. Valley Refrigeration and Air Conditioning Supplies, Inc.,* 77 B.R. 15, 20 (Bankr.E.D.Pa.1987); *In re Coastal Indus., Inc.,* 63 B.R. 361, 366–67 (Bankr.N.D.Ohio 1986).

**[2]    [3]** Once a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the purchaser is proceeding in good faith. *Valley Refrigeration,* 77 B.R. at 21. Finally, a court should prohibit or modify the sale at the request of parties with security interests in the property if the court finds that it is necessary

to ensure that the parties are adequately protected. 11 U.S.C. § 363(e).

**4.** *Establishment of Super Priority Liens*

Section 364(d)(1) provides after notice and a hearing, senior or equal liens may be established on property of the debtor already subject to a lien only if (1) the trustee is unable to obtain credit otherwise; and (2) there is adequate protection of the interest of the party already holding a lien on the encumbered property. 11 U.S.C. § 364(d)(1). The Trustee has the burden of proof on the issue of adequate protection. If the court orders the establishment of a senior lien and that order is not stayed pending appeal, then reversal of the order on appeal will not effect the lien of an  **\*177**  entity who extended credit in good faith. 11 U.S.C. § 364(e).

### THE BANKRUPTCY COURT'S DECISION

In reviewing the record on appeal, the Court notes that the Bankruptcy Court's June 8, 1990, order authorizing the section 363 sale and section 364 lien contains extensive findings of fact. The order also incorporates findings of fact made by the Bankruptcy Court at the June 7, 1990, and February 9, 1990, hearings.

With regard to the section 363 sale, The Bankruptcy Court found that the Trustee has sound business reasons for assigning the pre-petition assumed contracts and for selling the assets pursuant to the CP agreement. Record on Appeal Item ("R.A.I.") G at ¶ 38. The Bankruptcy Court also found that it is a reasonable exercise of the Trustee's business judgment for the Trustee to enter into the CP agreement. *Id.*

The Bankruptcy Court found that the CP agreement had been negotiated in good faith and was reached as a result of an arm's length transaction. *Id.* at ¶¶ 31, 37. Furthermore, the Trustee made reasonable and good faith efforts to identify and solicit offers from potential good faith purchasers. *Id.* at ¶ 35. The Bankruptcy Court also found that CP is a purchaser acting in good faith as that term is defined in the Bankruptcy Code. *Id.* at ¶ 36.

With regard to the purchase price, the Bankruptcy Court found that CP's offer to purchase D & H's assets and pre-petition assumed contracts is the highest and best offer received by the Trustee. *Id.* at ¶ 35. In addition, the Bankruptcy Court found that a reasonable opportunity has

been afforded any person or entity to make a higher and better offer. *Id.* at ¶ 18. The Bankruptcy Court found that CP's purchase offer of 25 million dollars plus other consideration is not subject to any financing contingencies and is backed by 19 billion dollars in net assets. *Id.* at ¶ 24. In addition, the Bankruptcy Court found the total consideration to be realized by the Trustee is fair and reasonable and the sale is in the best interests of the D & H estate, its creditors and the public. *Id.* at ¶ 39.

The Bankruptcy Court found that the State of New York would waive any claims to cash payments from the sale of D & H's assets in exchange for CP undertaking a continuation and maintenance of D & H's service. *Id.* at ¶ 29. The Bankruptcy Court found that the objecting secured creditors were adequately protected because the cash price of 25 million dollars is more than sufficient to cover their alleged interests of 18 million dollars in the property to be sold. *Id.* at ¶ 34.

The Bankruptcy Court found that the notice accurately disclosed the full terms of the sale. *Id.* at ¶ 32. Adequate and sufficient disclosure has been made of any benefits accruing to insiders as a result of the purchase. *Id.* at ¶ 42. The Bankruptcy Court also found that the uncontroverted evidence is that D & H would be in liquidation mode if required to delay a sale until after filing a disclosure statement and obtaining approval for a reorganization plan. *Id.* at ¶ 32. Finally, the Bankruptcy Court found that compelling circumstances exist to approve the sale of substantially all of D & H's assets without a disclosure statement and plan. *Id.* at ¶ 43.

With regard to the establishment of the super priority lien, the Bankruptcy Court found that the lien had a cap of 2 million dollars and would come into existence only if the CP purchase agreement is not consummated and then only to the extent that CP has used the funds to operate D & H's lines. The loan would be deemed forgiven upon consummation of the sale. *Id.* at ¶ 33. The Bankruptcy Court found that the Trustee was not in default or had provided adequate protection that he would cure any default prior to closing the CP agreement. *Id.* at ¶ 40.

The Bankruptcy Court found that NYSDOT has asserted a claim against the estate in an amount of 67 to 68 million dollars. *Id.* at ¶ 29. The Bankruptcy Court further found that NYSDOT would assert its claim in the event of liquidation. *Id.* The Bankruptcy Court found that the indenture agreements between Mellon, Xtra **\*178** and D &

H recognize that their liens are subordinate to the claims of New York State. R.A.I. A at 7. Noting that the NYSDOT claim must be assumed to be valid, the Bankruptcy Court found that other creditors with security interests in the property would be relegated to unsecured status if D & H were liquidated. R.A.I. G at ¶ 30. Therefore, in the event of liquidation, these parties would have no interest entitled to adequate protection. R.A.I. A at 8.

### ISSUES ON APPEAL

All of the Appellants challenge the Bankruptcy Court's order approving the sale to CP pursuant to section 363(b). Mellon also appeals the establishment of the super priority lien in favor of CP. [6] D & H, NYSDOT and the D & H shippers all argue that the Bankruptcy Court properly ordered the sale and the lien.

### 1. *The Section 363 Sale*

Mellon and Xtra contend that the Bankruptcy Court erred in finding that the sale was supported by a valid business justification. 333 D.I. 4 at 1–2; 334 D.I. 4 at 1–2. The Rails object to the sale on the grounds that the Bankruptcy Court erred in finding that the price CP is paying for the assets of D & H is fair and reasonable. 332 D.I. 4 at 1–2. All of the Appellants argue that the Bankruptcy Court erred in finding that the creditors had received adequate disclosure concerning the proposed sale. 332 D.I. 4 at 2–3; 333 D.I. 4 at 2; 334 D.I. 4 at 1. Finally, the Appellants dispute the Bankruptcy Court's finding that the secured creditors would be adequately protected by the sale.

### 2. *The Section 364 Lien*

Mellon objects to the lien on the ground that the Trustee has not shown that the creditors would receive adequate protection within the meaning of section 364(d). 333 D.I. 4 at 2.

### ANALYSIS

This Court has jurisdiction to hear the appeals from the Bankruptcy Court pursuant to 28 U.S.C. § 158(a). Findings of fact made by a Bankruptcy Court may not be set aside unless clearly erroneous. *See* Bankruptcy Rule 8013; *In re Spada, 903 F.2d 971, 975 (3rd Cir.1990).* Thus, a reviewing court

will affirm the Bankruptcy Court's findings unless "on the entire evidence [the court] is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Conclusions of law are subject to *de novo* review. *Abbotts Dairies,* 788 F.2d at 147; *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 103 n. 6 (3rd Cir.1981).

### 1. *The Sale*

 [4]    Mellon and Xtra argue that the Bankruptcy Court erred in finding there was a valid business justification or compelling circumstances for selling substantially all of D & H's assets pursuant to section 363(b). This Court need not determine whether the sound business reasons test of *Lionel* or the compelling circumstances test of *Solar* applies in order to affirm the Bankruptcy Court because the Court finds that the evidence supports the Bankruptcy Court's findings that each test has been satisfied.

Given that the debtor is a railroad, it is uncertain whether liquidation of D & H for scrap is a viable option. There is ample evidence in the record from the State of New York and the D & H shippers that if the Trustee were to pursue this option it could not be ordered by the Bankruptcy Court because it would not be consistent with the public interest. Therefore, the Trustee's decision to attempt to sell D & H as a going concern represents an exercise of reasonable business judgment. There is evidence in the record which shows that shutting down the railroad while preparing a disclosure statement and reorganization **\*179** plan would result in significant costs to the estate. The Trustee testified that initial shutdown costs would be in excess of 1 million dollars and each month the estate would incur an additional 500 thousand dollars in costs to preserve D & H's assets. 332 D.I. 5A at 69–70. Running the railroad while attempting to sell it costs the estate approximately 100 thousand dollars a month. *Id.* at 76. The Trustee also testified that preparing a disclosure statement and reorganization plan was going to be a lengthy, complex and litigation filled process. *Id.* at 67–68. There is also evidence in the record indicating that the uncertainty about the future of D & H resulted in a loss of business because shippers were reluctant to enter new contracts with D & H.

In summary, the evidence shows that prior to entering the CP agreement, the estate was losing 100 thousand dollars each month and would lose more if the railroad were not operating, D & H was losing customers due to the

uncertainty of its future and the Trustee would not be able to prepare a disclosure statement and plan for some extended period of time. The Court finds that this evidence satisfies both the *Lionel* and *Solar* tests. Therefore, the Bankruptcy Court was not clearly erroneous in finding that there are compelling circumstances and a valid business purpose for selling substantially all of D & H's assets pursuant to section 363(b).

 [5]    The Rails and Xtra argue that the Bankruptcy Court erred in finding that the sale price is fair and reasonable. The sale of the assets to CP would bring 25 million dollars to the estate and leave property in the estate valued at approximately 17 million dollars, for a total of approximately 42 million dollars. *Id.* at 58. The Appellants argue that if D & H were liquidated for scrap the estate would receive between 67 and 80 million dollars. They state that the difference between the appraised value of the assets and the sale value precludes a finding of fair and reasonable price. The Court notes that the cases the Appellants cite for this proposition do not involve reorganization of railroads. *See In re Snyder,* 74 B.R. 872, 873 (Bankr.E.D.Pa.1987); *Valley Refrigeration,* 77 B.R. at 17.

The Trustee argues that because it is unclear whether or not D & H could be liquidated for scrap, it is more appropriate to compare the sale price to the value of the railroad as a going concern. The Trustee testified that a piecemeal sale of D & H's assets would not bring the estate as much cash as the proposed CP agreement. *Id.* at 63.

The Court does not believe that the decisions in *Snyder* and *Valley Refrigeration* require this Court to find that the Bankruptcy Court erred in finding that the consideration offered by CP is fair and reasonable. The 67 to 80 million dollar value is speculative because it is not clear whether or not D & H could be liquidated for scrap. Furthermore, in *Snyder* and *Valley Refrigeration,* insiders were receiving benefits as a result of proposed purchases which gave the courts reason to doubt that the purchase prices were fair. Improper insider benefit is not an issue in this case.

The evidence supporting a fair and reasonable purchase price in this case includes: the extensive solicitation of bids by the Trustee; the negotiations with several prospective purchasers; and the Trustee's testimony that the CP offer was the best offer for D & H's assets. The Court concludes that the Bankruptcy Court's finding of fair and reasonable purchase price was not clearly erroneous.

[6]    All of the Appellants argue that the Bankruptcy Court erred in finding that they had received adequate notice. They contend that they are entitled to notice that is the functional equivalent of a disclosure statement. They cite *In re Naron & Wagner, Chartered,* 88 B.R. 85 (Bankr.D.Md.1988), for this proposition. The Appellants are especially concerned about the amount and priority of post-petition labor claims and pre-petition personal injury claims against D & H.

The Trustee argues that notice of unliquidated claims is not required under section 363. The Trustee also claims that these claims are currently being negotiated and **\*180** their amounts and relative priorities is not yet known.

[7]    The Court understands the Appellants' concern. However, the Court has found no authority for the proposition that a notice pursuant to section 363 must include all the information which would accompany a disclosure statement. Although there is language in *Naron* which states that appropriate notice should be a functional substitute for the information in a disclosure statement, the *Naron* court holds only that four pieces of information must be presented to the creditors. The notice should: place all parties on notice that the Debtor is liquidating his business; disclose accurately the full terms of the sale; explain the effect of the sale as terminating the debtor's ability to continue in business; and explain why the proposed price is reasonable and why the sale is in the best interest of the estate. *Id.* at 89.

The Appellants received copies of the CP agreement and were able to cross-examine the Trustee about the agreement and why it was in the best interest of the estate and the creditors. The Appellants were provided with all of the information required under *Naron*. The problem of assessing the magnitude of the unliquidated labor and personal injury claims and their relative priorities is complex and time consuming. There is no precedent which dictates that the Bankruptcy Court must require that this information be included in the notice of the sale. Therefore, the Bankruptcy Court was not clearly erroneous in finding that the parties had received sufficient notice.

[8]    The Rails and Xtra argue that the Bankruptcy Court erred in finding that the 25 million dollar purchase price is more than sufficient to adequately protect the Appellants' alleged security interests of 18 million dollars. Although they do not dispute that the value of the unsold assets and the sales price is greater than their claims and other currently known expenses, the Rails and Xtra claim that the Bankruptcy Court cannot make a finding of adequate protection until the magnitude and priority of the labor and personal injury claims is known.

They also argue that the Bankruptcy Court erred in finding that in the event of liquidation the New York State claim would relegate other creditors to unsecured status. Xtra claims that there is evidence in the record which shows that New York's claim in the secured assets can be no more than 22.6 million dollars. 334 D.I. 4 at 12–13. From this calculation, Xtra argues that it is better off if the railroad is liquidated because then the labor and personal injury loans could prime Xtra's lien by 24.2 million dollars and Xtra would still be made whole. Xtra argues that under the CP agreement, it will lose money if the unliquidated claims prime its loan by more than 7.9 million dollars.

The Trustee argues that he has satisfied the requirements of section 363(f)(3) which provide that a Trustee may sell property of the estate free and clear of liens in such property provided that "the price at which such property is to be sold is greater than the aggregate value of all liens on such property." 11 U.S.C. § 363(f)(3). Citing *In re Saco Local Development Corp.,* 19 B.R. 119 (Bankr. 1st Cir.1982), the Trustee maintains that the Bankruptcy Court is not required to determine the disposition of sale proceeds prior to confirming the sale.

The Court believes that Appellants are requesting "better" protection, not adequate protection. Xtra and the Rails have introduced no precedent which convinces the Court that the Bankruptcy Court's finding of adequate protection was erroneous because it did not include estimations of unliquidated damages of unknown magnitude and unknown priority. D & H's administrative costs, real estate taxes, employee back wages, employee retirement benefits and the amounts claimed by the objecting creditors is less than the sum of the net sale price plus the unencumbered assets that will not be sold to CP. Therefore, the Bankruptcy Court was not clearly erroneous in concluding the Appellants were adequately protected.

Xtra advances its calculations to argue that the cushion or margin of safety would be bigger in a liquidation scenario, therefore selling D & H's assets to CP does not **\*181** provide adequate protection. The Court begins by noting that it does not believe adequate protection requires a comparison of safety margins under various reorganization schemes. Even if the Court thought such a calculation were appropriate, it is not convinced by Xtra's calculation. Xtra's calculation is

premised on several assumptions which the Court questions. In order to argue inadequate protection Xtra must assume that the unliquidated claims will prime its claim. The Appellants concede that this is an unknown factor. Second, Xtra must assume that these claims will be in excess of 7.9 million dollars. Again, the amount of the unliquidated claims is unknown. In order to argue that liquidation is preferable, Xtra assumes that D & H could be legally liquidated for scrap. As the Court has previously mentioned, the evidence indicates that it is unlikely that this would be consistent with the public interest. Finally, in determining that New York State's interest could be no more than 22.6 million dollars, Xtra assumes that each mile of track is worth approximately the same amount of money. Given the testimony that the Trustee received bids for certain portions of track and not others, it is not likely that the track sections are fungible. Xtra's calculation does not convince the Court that the Appellants are not adequately protected or that they would be better off under a liquidation scenario.

The Court concludes that the Bankruptcy Court did not err in ordering the sale of substantially all of D & H's assets to CP pursuant to section 363(b).

### 2. *The Lien*

 [9]    Mellon objects to the Bankruptcy Court's order granting the super priority lien on the ground that the Bankruptcy Court erroneously assumed that the Appellants would be relegated to unsecured status in the event D & H were liquidated. This finding, Mellon argues, precluded the Bankruptcy Court from making the appropriate finding of adequate protection under section 364(d). Mellon asserts that the New York State claim would not be more than 28.8 million dollars and this claim would not prime lenders with security in assets to which New York State has no title.

The Trustee argues that the Bankruptcy Court's finding is correct. The Trustee also argues that section 502(a) of the Bankruptcy Code requires that a claim be deemed allowed unless a party in interest objects.

Although this Court might have reached a different conclusion about the inevitability of the Appellants becoming unsecured in the event that D & H is liquidated for scrap, it would be improper for the Court to conclude that the Bankruptcy Court's finding is clearly erroneous.

The Bankruptcy Court found that the lien would prime the Appellants only if the CP agreement were not consummated.

The Bankruptcy Court also found that D & H would be in some form of liquidation if the sale did not occur. New York has submitted a detailed proof of its claim. The Bankruptcy Court found that New York would assert its claim in the event of liquidation. In the February, 1990, hearing, the Bankruptcy Court informed the parties in interest that New York's claim must be deemed valid absent any objection to the claim. The Trustee testified that he did not intend to file an objection to the proof of claim submitted by New York. Although Mellon has standing to file an objection to the claim, it did not.

This Court will not overturn the Bankruptcy Court's finding of facts based upon calculations by the Appellants which were not part of the record before the Bankruptcy Court. The Bankruptcy Court's finding that the Appellants would be unsecured if D & H were liquidated is not clearly erroneous. Nor was the Bankruptcy Court's finding that the Appellants were not entitled to adequate protection under section 364 clearly erroneous.

Mellon also argues that the Bankruptcy Court impermissibly considered the public interest in determining whether the Trustee's motions for the lien should be granted. Mellon argues that the public interest is not a factor listed in section 364 and, therefore, it should not be considered. The Appellants  **182  cite *In re Chicago, Missouri & Western Ry. Co.,* 109 B.R. 308 (N.D.Ill.1989), *appeal dismissed as moot,* 899 F.2d 17 (7th Cir.1990).

The Trustee argues that consideration of the public interest is essential because D & H is a railroad and must be reorganized in a manner consistent with the public interest.

The Bankruptcy Court found that the holding in *Chicago* was not controlling in this case and this Court agrees. In *Chicago,* a Bankruptcy Court had found that secured creditors would not be adequately protected if the court ordered a super priority lien but determined that the public interest in keeping the railroad operating should be weighed into the analysis. The Bankruptcy Court authorized the lien. *Id.* at 310. The District Court reversed the Bankruptcy Court, reasoning that section 364 did not leave room for consideration of the public interest. *Id.* at 314. In contrast, the Bankruptcy Court has found that the Appellants will not be secured in the event of liquidation and are therefore not entitled to adequate protection.

However, the Court did not have to consider this issue in affirming the Bankruptcy Court. The Court's review of

the record indicated that the Bankruptcy Court referred to the public interest only when weighing the likelihood of certain reorganization scenarios proposed by the Appellants. Specifically, the Bankruptcy Court noted that liquidation of D & H for scrap might not be a viable reorganization option because of the public interest in maintaining the railroad. The record does not reflect any findings by the Bankruptcy Court, as the Appellants suggest, that the public interest was

weighed as additional consideration for the CP agreement at the expense of the secured creditors.

In conclusion, the Bankruptcy Court's order authorizing a contingent super priority lien of up to 2 million dollars in favor of CP is affirmed.

Footnotes

1    Approximately 524 route miles are owned by D & H. Approximately 43 miles are leased from subsidiaries and the balance are trackage rights over tracks owned by Conrail.

2    Apparently, the Rails are guarantors of a secured debt owed by D & H to Mellon Bank, N.A.

3    The shippers are: GE Silicones, International Paper and Quad/Graphics, Inc.

4    The property securing the lien would not include specified cash collateral of the Debtor securing a portion of Mellon's loan and Xtra's loan.

5    If section 1111(b)(2) applies to the class of creditors, then section 1129(a)(7) will be satisfied if each creditor will receive or retain value under the plan that is not less than the value of the creditor's interest in the estate's interest in the property that secures the creditor's claims. 11 U.S.C. § 1129(a)(7)(B).

6    In their motions, all of the Appellants objected to the super priority lien but only Mellon briefed that issue.

---

**End of Document**                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 77

2014 WL 1713416
Only the Westlaw citation is currently available.
United States Bankruptcy Court, D. Delaware.

In re Filene's Basement, LLC., et al.,[1] Debtors

Case No. 11–13511 (KJC)    |    Signed April 29, 2014

**Attorneys and Law Firms**

William M. Alleman, Jr., Ann C. Cordo, Donna L. Culver, Matthew B. Harvey, Justin K. Houser, Curtis S. Miller, Tamara K. Minott, Morris, Nichols, Arsht & Tunnell LLP, Ryan M. Bartley, Young Conaway Stargatt & Taylor, LLP, Mark S. Chehi, Christopher M. DiVirgilio, Jason M. Liberi, Robert Alan Weber, Skadden Arps Slate Meagher & Flom LLP, David R. Hurst, Cole, Schotz, Meisel, Forman & Leonard, Wilmington, DE, Shana A. Elberg, Meagher & Flom, LLP, Daniel F.X. Geoghan, Young Conaway Stargatt & Taylor, LLP, Jay M. Goffman, Suzanne D.T. Lovett, David M. Truetsky, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, for Debtor Filene's Basement, LLC.

**Opinion**

**CHAPTER 11**

**(Re: 1247, 2733, 2802, 2864, 2877)**

*MEMORANDUM REGARDING COMPETING MOTIONS RELATED TO THE LEASE OF NON–RESIDENTIAL REAL PROPERTY LOCATED IN SECAUCUS, NEW JERSEY*[2]

KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

**\*1**  Currently before the Court are two competing motions regarding the Reorganized Debtors' interest in a lease of non-residential real property located at One Syms Way, Secaucus, New Jersey:

(1) The Reorganized Debtors' Motion for an Order Pursuant to 11 U.S.C. §§ 105(a), 363 and 365, Bankruptcy Rule 9019, the Plan and Confirmation Order for an Order (i) Approving Settlement; (ii) Authorizing Assumption and Assignment to ASG Equities Secaucus

LLC of Unexpired Lease of Non–Residential Real Property and Related Property Located at One Syms Way, Secaucus, New Jersey; and (iii) Granting Related Relief (the "ASG Motion") (D.I. 2864); and

(2) The Motion to Enforce Settlement Agreement filed by 99 Hudson TIC II LLC and Hartz Mountain Industries, Inc. (the "Hartz Motion to Enforce Settlement") (D.I. 2877).

Hartz Mountain Industries, Inc. and 99 Hudson TIC II, LLC (jointly, "Hartz"), who succeeded to the landlord's interest under the Lease (defined below) sometime after January 8, 2014, filed an objection to the ASG Motion.[3] The Reorganized Debtors filed an objection to the Hartz Motion to Enforce Settlement. Alan Cohen, the Series A Preferred Trustee and Creditors' Board Representative (the "Creditors' Representative") filed a joinder to the ASG Motion and an objection to the Hartz Motion to Enforce Settlement. An evidentiary hearing on the ASG Motion and the Hartz Motion to Enforce Settlement was held on April 2, 2014 and April 9, 2014.

For the reasons set forth herein, the ASG Motion will be granted, in part, and the Hartz Motion to Enforce Settlement will be denied.

*Background*

On May 8, 1986, Syms Corp. assumed the rights as tenant to what is known as Severance Lease No. 5 (the "Lease") for use of real property located at One Syms Way, Secaucus, New Jersey (the "Property"). The Lease is one of many "severance leases" created as part of a larger ground lease. The Lease is for a term of 299 years. The Property previously served as the headquarters for the Debtors; it now serves as the headquarters for Trinity Place Holdings, Inc. ("Trinity"), one of the Reorganized Debtors. (Tr. 1/8/2014 at 26:6–26:11).

On November 2, 2011, Syms Corp. and related entities filed chapter 11 bankruptcy petitions. The Prior Landlord filed two proofs of claim in the bankruptcy case: (1) a general unsecured claim for no less than $17,000 (the "Unsecured Claim") for Additional Rent, as that term is defined in the Lease, that was unpaid as of the Petition Date; and (2) an administrative expense claim (the "Administrative Claim") for (a) no less than $3.51 million for Percentage Rent, as that term is defined in the Lease, that the landlord claimed

was due and payable as of February 12, 2012; and (b) an amount owed pursuant to Article 16 of the Ground Lease for indemnification obligations. On or about April 30, 2012, the Debtors filed an objection to the Administrative Claim (the "Claim Objection") arguing that it owed no liability for Percentage Rent or otherwise.

**\*2** On August 30, 2012, the Court entered the Findings of Fact, Conclusions of Law and Order (D.I. 1983) (the "Confirmation Order") confirming the Modified Second Amended Joint Chapter 11 Plan of Reorganization of Syms Corp. and its Subsidiaries (the "Plan").

### (A) *The Original Assumption Motion and the Cure Reserve*

On May 8, 2012, the Debtors filed a Motion for Order Pursuant to 11 U.S.C. §§ 105(a) and 365(a) and Fed.R.Bankr.P. 6006 and 9014 Authorizing Syms Corp. To Assume Unexpired Lease of Non–Residential Real Property for Property Located at One Syms Way, Secaucus, New Jersey (D.I. 1247) (the "Assumption Motion"). [4] In the Assumption Motion, the Debtors sought authorization to assume the Lease upon payment of a cure claim in the amount of $5,026.55. The Prior Landlord informally objected to the Assumption Motion, asserting that the proper Cure Amount was at least $3.627 million. The Prior Landlord and the Debtors agreed to consolidate the Claim Objection and the Assumption Motion into one litigation (the "Cure Dispute").

The Plan and Confirmation Order provided that assumption and ultimate disposition of the Lease would be determined by this Court following the Plan's Effective Date. Confirmation Order, ¶¶ 28 and 31; Plan §§ IX.A. and XIII.

On September 14, 2012, the Debtors and the Prior Landlord each filed a motion for summary judgment regarding the Cure Dispute. On February 19, 2013, this Court issued a Memorandum and Order (D.I. 2441 and D.I. 2442) (the "Summary Judgment Decision") granting, in part, and denying, in part, the Summary Judgment Motions by determining that:

(1) the Prior Landlord was entitled to a claim for Percentage Rent based upon a leasehold mortgage (that was capped at the amount of $23.4 million) granted by the Debtors in favor of Bank of America, N.A., although calculation of the Percentage Rent claim would be limited to a percentage of the loan proceeds the Debtors actually received under the leasehold mortgage in the amount of

$10 million, thus decreasing the Percentage Rent claim from approximately $3.5 million to $1.5 million, less fees and expenses;

(2) the cross-motions for summary judgment were denied with respect to the Prior Landlord's claims for "Additional Rent," due to outstanding issues of material fact; and

(3) the Court reserved ruling on the issue of whether the Prior Landlord was entitled to reimbursement of attorney fees as part of its cure claim.

On March 5, 2013, the Reorganized Debtors filed a motion for reconsideration of the Summary Judgment Decision (D.I. 2450). This Court entered a third stipulated order modifying the scheduling order related to the Assumption Motion (D.I. 2463) (the "Third Modified Scheduling Order") on or about March 15, 2013. Although previous versions of the Scheduling Order required the Reorganized Debtors to fund a reserve for the cure amount, the Reorganized Debtors did not do so. The Third Modified Scheduling Order provided, in part, that the Reorganized Debtors would establish a reserve for the "full Cure Amount on or before June 30, 2013." In July 2013, the parties agreed that the Reorganized Debtors should fund a reserve account in the amount of $1.5 million, less fees and expenses. Thereafter, the Reorganized Debtors placed $1.25 million in an account (the "Cure Reserve") and sent the Prior Landlord confirmation of the account posting on July 9, 2013.

**\*3** On January 15, 2014, this Court issued a Memorandum and Order denying the Reorganized Debtors' motion for reconsideration of the Summary Judgment Decision (D.I. 2777, D.I. 2778).

### (B) *The Supplemental Assumption Motion*

On December 18, 2013, after receiving expressions of interest related to the assignment of the Lease and the Debtors' related improvements to the leased premises (the "Leasehold Interests"), [5] and while the Motion for Reconsideration was pending, the Reorganized Debtors filed the Supplemental Motion pursuant to 11 U.S.C. §§ 105(a) and 365(a) and Fed.R.Bankr.P. 6006 and 9014 Authorizing the Assumption of the Lease (the "Supplemental Motion") (D.I. 2733), restating its request that the Court authorize assumption of the Lease upon determining that the Reorganized Debtors satisfied the requirements of Bankruptcy Code § 365(b)(1). The Prior Landlord objected to the Supplemental Motion

arguing, among other things, that the Reorganized Debtors failed to provide adequate assurance of their ability to pay the disputed cure claim or adequate assurance of future performance.

On January 8, 2014, an evidentiary hearing was held on the Supplemental Motion, at which time Matthew Messinger, the president and CEO of Trinity, testified that the Reorganized Debtors' had provided adequate assurance of their ability to pay the cure amount upon resolution of the Cure Dispute, and adequate assurance of the Reorganized Debtors' future performance under the Lease. (Tr. 1/8/2014 at 28:12–29:19). Also, the Reorganized Debtors represented that they were in serious negotiations with a prospective purchaser for the Leasehold Interests, but the prospective purchaser was not identified. (Tr. 1/8/2014 at 27:5–28:11).

At the February 20, 2014 status hearing, and at continued hearing dates thereafter, the Reorganized Debtors and Hartz advised the Court that, although the parties were often frustrated, settlement discussions were ongoing. The Court encouraged the parties to keep negotiating.

**(C)** *The Hartz Settlement Motion*

At a hearing on March 14, 2014, the Reorganized Debtors and Hartz announced their agreement to resolve the Cure Dispute litigation and to transfer, sell and assign the Leasehold Interests to an entity designated by Hartz. (Tr. 3/14/2014 at 6:1–6:7). The parties asked the Court to enter a proposed form of order approving the settlement that day. The Reorganized Debtors noted that the proposed form of order preserved whatever claims the Reorganized Debtors may have held against a potential purchaser of the Lease (*i.e.,* ASG Equities Secaucus LLC ("ASG")). Further, the proposed form of order included a settlement bar order, prohibiting certain "Barred Persons" from asserting non-contractual indemnity or contribution claims against Hartz arising out of the claims that were being settled between Hartz and the Reorganized Debtors. ASG objected to the proposed form of order, particularly the settlement bar relief in favor of Hartz. The Court required the Reorganized Debtors to file a motion seeking approval of their settlement with Hartz under Fed.R.Bankr.P. 9019 to provide ASG the opportunity to be heard on its objection.

**\*4** On March 18, 2014, the Reorganized Debtors filed a motion for approval of the settlement agreement with and assignment of Leasehold Interests to Hartz (D.I. 2858) (the "Hartz Settlement Motion"), The Hartz Settlement Motion

sought approval of a settlement (the "Hartz Settlement") in which the Reorganized Debtors would assume, assign and sell the Leasehold Interests to One Emerson Lane Leasehold LLC or such other entity as designated by Hartz (the "Hartz Assignee") in exchange for (i) a payment of $24 million from the Hartz Assignee; (ii) the release of the Cure Reserve in the amount of $1.25 million to the Reorganized Debtors; (iii) a payment from the Reorganized Debtors to Hartz of $250,000 to resolve all issues related to the Cure Dispute; and (iv) mutual releases between Hartz and the Reorganized Debtors of any and all claims related to the Lease, the Leasehold Interests, the Hartz Settlement Motion, the Cure Dispute, and/or Potential Claims (as defined in the Hartz Settlement Motion).

**(D)** *The ASG Motion*

While the Reorganized Debtors and Hartz were negotiating, ASG continued to make offers for the Lease. On March 17, 2014, ASG made another offer by email to the Reorganized Debtors, but, believing that the Hartz Settlement was still the best offer, the Reorganized Debtors filed the Hartz Settlement Motion on March 18, 2014. (Tr. 4/2/2014 at 47:18–49:23; Ex. D–8.) Counsel for Hartz was listed as a recipient of the ASG email.

On March 21, 2014, ASG made another offer to the Reorganized Debtors that was more than $2.5 million higher than the Hartz Settlement, which was enough to cover the Reorganized Debtors' exposure on the Cure Dispute. (Tr. 4/2/2014 at 53:4–55:2). The Reorganized Debtors and the Creditors' Representative deliberated and concluded that ASG's offer provided materially greater value to the creditors and the shareholders. On March 24, 2014, the Reorganized Debtors withdrew the Hartz Settlement Motion (D.I. 2863) and filed the ASG Motion. The terms of the March 24, 2014 ASG offer included, in pertinent part, (i) ASG's payment of $28.02 million for the Leasehold Interests, with 20% of the purchase price deposited into escrow; (ii) retention of the Cure Reserve in escrow; (iii) the Reorganized Debtors' release of ASG from claims related to the Lease, the Leasehold Interests, the Cure Dispute and discovery requests related to the motion seeking an examination of Hartz under Bankruptcy Rule 2004, filed on February 10, 2014 (D.I. 2802) (the "Rule 2004 Motion"). Hartz filed an objection to the ASG Motion (D.I. 2891). The Creditors' Representative filed a joinder in support of the ASG Motion (D.I. 2902).

On March 27, 2014, Hartz submitted another offer to the Reorganized Debtors for the Leasehold Interests, which

increased the purchase price ($27 million), and completely released the Cure Reserve and settled the Cure Dispute. (Tr. 56:25–59:7; Ex. D–4). The new Hartz offer also required the Reorganized Debtors' agreement that the offer would not be subject to higher or better offers. (*Id.*).

Later on March 27, 2014, and continuing through early March 28, 2014 (prior to the next hearing before this Court), ASG again increased its offer to the Reorganized Debtors for the Leasehold Interests. (Tr. 4/2/2014 at 59:8–59:22; Ex. D–5). ASG's offer raised the purchase price to $30.25 million (*i.e.,* $29 million plus the release of the Cure Reserve of $1.25 million). (*Id.*). The Cure Reserve would be replaced with a letter of credit in the amount of $4.017 million to cover the Reorganized Debtors' exposure on the Cure Dispute. (*Id.*). ASG agreed that this offer, identified by the Reorganized Debtors as the "ASG Baseline Bid," could be subject to overbidding. (Tr. 4/2/2014 at 61:15–61:17). ASG agreed to have an auction related to the Leasehold Interest, subject to a minimum overbid of $100,000, with no break-up fee or expense reimbursement. (Tr. 4/2/2014 at 61:18–61:24). At the evidentiary hearing, Hartz indicated that it would not participate in an auction for the Leasehold Interests.

**\*5** The Reorganized Debtors ask the Court to grant the relief requested in the ASG Motion, as modified by the ASG Baseline Bid. The Reorganized Debtors' board of directors supports the ASG Baseline Bid. (Tr. 4/2/2014 at 65:10–65:12). Further, the Reorganized Debtors kept the Creditors' Representative and other stakeholders informed of the offers received for the Leasehold Interests and those stakeholders support the Reorganized Debtors' efforts in this informal, but competitive, process and their request for approval of the ASG Baseline Bid. (Tr. 4/2/2014 at 65:24–66:22).

**(E)** *The Hartz Motion to Enforce* **Settlement**
On March 28, 2014, Hartz filed the Hartz Motion to Enforce Settlement. The Reorganized Debtors and the Creditors' Representative filed objections to the Hartz Motion to Enforce Settlement (D.I. 2898, D.I. 2900). [6]

*Discussion*

**(1)** *The Hartz Motion to Enforce Settlement*
Hartz argues that the Hartz Settlement is binding upon the Reorganized Debtors and must be enforced by this Court. Hartz relies upon non-bankruptcy case law regarding the

enforceability of settlement agreements and public policy favoring them. *See, e.g., Green v. John H. Lewis & Co.,* 436 F.2d 389, 390 (3d Cir.1970) ("An agreement to settle a lawsuit, voluntarily entered into, is binding upon the parties, whether or not made in the presence of the Court, and even in the absence of a writing."); *Rosso v. Foodsales, Inc.,* 500 F.Supp. 274, 276 (E.D.Pa.1980) ("The authority of the trial court to enforce a settlement agreement has as its foundation the policy favoring the amicable adjustment of disputes and the avoidance of costly and time-consuming litigation.").

The Reorganized Debtors also rely upon non-bankruptcy law to argue that the Hartz Settlement was not binding under state law, arguing that the failure to deliver unconditionally a signed writing precludes formation of an enforceable written contract. *Tallent v. Meredith,* 1988 WL 40182, \*2 (Del.Super.Ct. Apr. 25, 1988); *Barbetta Agency v. Sciaraffa,* 135 N.J.Super. 488, 495, 343 A.2d 770, 774 (N.J.Super.Ct.App.Div.1975). The Reorganized Debtors point out that Hartz's counsel sent an email advising that she was holding the bill of sale executed by her client in escrow "until the entry of the order authorizing closing." (*See* Ex. D–6).

Neither of these positions is dispositive to resolution of the specific matter before me, which requires consideration of settlements and compromises made in connection with this bankruptcy case. Compromises are favored in bankruptcy to "minimize litigation and expedite the administration of a bankruptcy estate." *Myers v. Martin (In re Martin),* 91 F.3d 389, 393 (3d Cir.1996) quoting COLLIER ON BANKRUPTCY ¶ 9019.03[1] (15th ed. 1993). However, settlements often involve the disposition of assets of the estate, which may be subject to provisions of the Bankruptcy Code. [7] Pursuant to Bankruptcy Rule 9019, a court may approve a compromise or settlement "[o]n motion by the trustee and after notice and a hearing." Fed.R.Bankr.P. 9019(a).

> These requirements afford due process protections to parties interested in the disposition of the estate but who did not themselves enter into the settlement agreement. "[T]his schema [of notice, a hearing, and approval] is intended to protect both debtors and creditors (as well as trustees) by subjecting a trustee's actions to complete disclosure and review by the creditors of the estate and by the bankruptcy court."

**\*6** *Northview Motors, Inc. v. Chrysler Motors Corp.,* 186 F.3d 346, 351 (3d Cir.1999) quoting *Martin,* 91 F.3d at 395.

Hartz argues that court approval under Bankruptcy Rule 9019 is not necessary for the Hartz Settlement because the parties seeking approval are reorganized debtors, not trustees or debtors-in-possession subject to the restrictions of the Bankruptcy Code and Bankruptcy Rules. Moreover, the Plan specifically provides that:

> On or after the Effective Date, the Reorganized Company may operate its businesses and may use, acquire and dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order.

Plan, Art. VII.A.1. Hartz's argument against the need for court approval must be rejected, however, for three reasons: (1) the Reorganized Debtors and Hartz specifically made court approval a condition of the Hartz Settlement; (2) the Hartz Settlement included resolution of the Assumption Motion, which was pending prior to confirmation and is specifically referenced as outstanding in the Confirmation Order (¶ 28); and (3) Hartz required inclusion of the Bar Order as part of the Hartz Settlement, which could not be granted by this Court without notice and opportunity for a hearing to affected parties.

"Courts are divided on the issue of whether an agreement is binding on the parties pending approval by the Bankruptcy Court." *Pineo v. Turner (In re Turner),* 274 B.R. 675, 679 (Bankr.W.D.Pa.2002) (collecting cases and recognizing that some courts reason that the absence of court approval does not mean that the parties did not reach an agreement, while other courts have determined that an agreement cannot be binding until court approval). *See also Rinehart v. Stroud Ford, Inc. (In re Stroud Ford, Inc.),* 205 B.R. 722, 724 (Bankr.M.D.Pa.1996) (same). The Court of Appeals for the Third Circuit specifically indicated in *Martin* and *Northview* that it was not deciding that particular issue. *Turner,* 274 B.R. at 679.

In this case, the Reorganized Debtors argue that they no longer support the Hartz Settlement Motion due to the higher offer from ASG and, therefore, leaving the Hartz Settlement Motion pending before this Court would have

been "an exercise in futility." Hartz argues that it is not appropriate to consider the changed circumstances in this matter—*i.e.,* ASG's higher offer for the Lease—because the Hartz Settlement did not provide that it was subject to higher and better offers. The Hartz Settlement was silent on the issue of higher or better offers, even though the record before me indicates that (1) Hartz knew that the Reorganized Debtors had been negotiating with ASG for the Leasehold Interests at the time they agreed to the Hartz Settlement, and (2) Hartz continued to engage actively in further bidding even *after* submission of the Hartz Settlement Motion.

**\*7** In *Martin,* the Third Circuit Court of Appeals determined that a trustee is not required to champion a motion for approval of a settlement if circumstances change and the trustee no longer believes the settlement is in the best interest of the estate. *Martin,* 91 F.3d at 394. The *Martin* Court recognized that a trustee's duties of good faith and fair dealing with the settlement party may conflict with the trustee's fiduciary relationship with *all* creditors of the estate that requires the trustee to maximize the value of the estate. *Id.* When such a conflict occurs, the trustee should inform the court of any changed circumstances since entry of the settlement agreement and the court will determine whether to approve the settlement. *Id. See also Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.),* 283 F.3d 159, 165 (3d Cir.2002) (deciding that the bankruptcy court should examine the settlement in light of the present circumstances).

To determine whether the Hartz Settlement should be enforced, I must decide whether, in light of the changed circumstances, the Hartz Settlement should be approved.[8]

"[T]he decision whether to approve a compromise under Rule 9019 is committed to the sound discretion of the Court, which must determine if the compromise is fair, reasonable, and in the interest of the estate." *In re Louise's, Inc.,* 211 B.R. 798, 801 (D.Del.1997). "Under the 'fair and equitable' standard, [the court looks] to the fairness of the settlement to the other persons, *i.e.,* the parties who did not settle." *Will v. Northwestern Univ. (In re Nutraquest, Inc.),* 434 F.3d 639, 645 (3d Cir.2006).

A court's evaluation of a settlement is based upon a review of the four *Martin* factors: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors. *Martin,* 91 F.3d at 393

citing *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424–25, 88 S.Ct 1157, 1163–64, 20 L.Ed.2d 1 (1968). [9]

**\*8**  If the Hartz Settlement is not approved, the Reorganized Debtors will continue to incur the expense, inconvenience and delay of resolving the Cure Dispute. The main piece of the Cure Dispute (the "Percentage Rent Issue"), however, has already been decided in favor of Hartz. The Reorganized Debtors have placed the amount determined by the Court to be owing on the Percentage Rent Issue in escrow. Whether the Reorganized Debtors choose to incur the time and cost of pursuing an appeal of the Percentage Rent Issue is within their control. The remaining unresolved Cure Dispute issues should not involve a great expense for the Reorganized Debtors.

Although settlement with Hartz of the Cure Dispute would have provided value to the Reorganized Debtors, the ASG Baseline Bid eliminates the Reorganized Debtors' exposure for the Cure Dispute by providing for the posting of a letter of credit to pay for Hartz's cure claim. Further, the ASG Baseline Bid is more than $5 million higher than the Hartz Settlement and $2 million higher than the increased offer made by Hartz on March 27, 2014. The Reorganized Debtors, the Creditors' Representative, and Esopus prefer the ASG Baseline Bid over the Hartz Settlement. The higher offer for the Leasehold Interests and the letter of credit protection for the Reorganized Debtors' liability (and potential liability) on the Claim Dispute, together with the preference of the Reorganized Debtors and the stakeholders, lead me to conclude that the Hartz Settlement should not be approved under Bankruptcy Rule 9019.

The Hartz Motion to Enforce Settlement will be denied.

### (2) *The ASG Motion*

Also pending before this Court is the ASG Motion, in which the Reorganized Debtors seek court approval of the ASG Baseline Bid. Hartz objects to the ASG Motion, arguing that: (i) the Lease cannot be assumed because it was terminated when it was not assumed within the time period set forth in Bankruptcy Code § 365(d)(4) for unexpired leases of nonresidential real property; (ii) alternatively, if the Lease was not terminated, the Reorganized Debtors have not met the requirements for assumption of the Lease under Bankruptcy Code § 365(b)(1) or for assignment of the Lease under Bankruptcy Code § 365(f)(2); and (iii) the Reorganized

Debtors have not demonstrated that they are entitled to a waiver of Bankruptcy Rules 6004(h) and 6006(d), which provide that an order assuming, assigning or selling property under Bankruptcy Code §§ 365 and/or 363 shall not be effective for fourteen days after entry.

### (A) *Whether the Lease was terminated under Bankruptcy Code § 365(d)(4)?*

Hartz argues that the Lease was deemed rejected pursuant to Bankruptcy Code § 365(d)(4), which provides in pertinent part:

> (A) Subject to subparagraph (B), an unexpired lease of nonresidential real property under which the debtor is the lessee shall be deemed rejected, and the trustee shall immediately surrender that nonresidential real property to the lessor, if the trustee does not assume or reject the unexpired lease by the earlier of—
>
> (i) the date that is 120 days after the date of the order for relief; or
>
> (ii) the date of the entry of an order confirming a plan.
>
> (B)(i) The court may extend the period determined under subparagraph (A), prior to the expiration of the 120–day period, for 90 days on the motion of the trustee or lessor for cause.
>
> (ii) If the court grants an extension under clause (i), the court may grant a subsequent extension only upon prior written consent of the lessor in each instance.

11 U.S.C. § 365(d)(4). Since the enactment of the Bankruptcy Abuse and Prevention and Consumer Protection Act ("BAPCPA") in 2005, which amended § 365(d)(4), at least one court has held that filing a motion to assume an unexpired lease satisfies the deadline of Bankruptcy Code § 365(d)(4) and prevents deemed rejection of the lease. *Cousins Properties, Inc. v. Treasure Isles HC, Inc. (In re Treasure Isles EC, Inc.),* 462 B.R. 645 (B.A.P. 6th Cir.2011). [10]  The *Treasure Isles* Court reasoned:

> **\*9**  [T]he deadline provisions of 11 U.S.C. § 365(d)(4) are intended to set a "bright line" regarding how much time the trustee has to decide whether to assume or reject a lease. Congress does not specify the manner in which the trustee is to announce the decision,

although case law consistently holds that the mere filing of a motion to assume is sufficient. If we were to adopt the Appellant's interpretation of 11 U.S.C. § 365(d)(4), such certainty would be destroyed. The period within which the trustee could consider assumption or rejection would vary widely, depending on the vagaries of a particular bankruptcy court's caseload and local procedures.

*Treasure Isles,* 462 B.R. at 650. Moreover, when Congress intends to set a time by which the court must act, it says so explicitly. [11]

Here, on February 29, 2012, the Court entered an order approving the Debtors' request for an extension of time for the Debtors to decide whether to assume or reject the Lease (D.I. 886). The extended deadline was May 30, 2012. On May 8, 2012, the Debtors filed the original Assumption Motion. The Prior Landlord and Hartz have known that the Debtors intended to assume the Lease since the Assumption Motion was filed, despite the ongoing litigation over the Cure Dispute. The Prior Landlord and Hartz have accepted rent payments from the Debtors and Reorganized Debtors following May 2012. (Tr. 4/2/2014 at 64:8–64:10). Although the Prior Landlord and Hartz have argued that the Debtors or Reorganized Debtors have failed to meet the requirements to assume the Lease, they have never before asserted that the Lease had been deemed rejected. (Tr. 4/2/2014 at 64:4–64:7). The Plan and Confirmation Order provided for the rejection of certain unexpired leases, but specifically excepted the Lease from rejection, due to the pending Assumption Motion and the pending contested matter to determine the outstanding cure obligation. (*See* Confirmation Order (D.I. 1983), ¶ 31; Plan § IX.A).

Based on the record before me and the reasoning of the *Treasure Isles* Court, I conclude that the Lease has not been deemed rejected.

**(B) *Whether the Reorganized Debtors have met the requirements for assumption of the Lease under Bankruptcy Code § 365(b)(1) and for assignment under Bankruptcy Code § 365(f)(2)?***

Hartz objects to the Reorganized Debtors' efforts to assume and assign the Lease to ASG because, they argue, the

Reorganized Debtors have not met the requirements of Bankruptcy Code § 365(b)(1) for assumption of the Lease or the requirements of Bankruptcy Code § 365(f)(2) for assignment of the Lease.

**\*10** "Section 365 enables the trustee to maximize the value of the debtor's estate by assuming executory contracts and unexpired leases that benefit the estate and rejecting those that do not." *L.R.S.C. Co. v. Rickel Home Centers, Inc. (In re Rickel Home Centers, Inc.),* 209 F.3d 291, 298 (3d Cir.2000). The Third Circuit further noted: "[b]ecause executory contracts and unexpired leases involve a continuing relationship between the debtor and other parties, section 365 'gives special treatment to rights and liabilities flowing from these contracts and leases.' " *Id.* quoting 2 NORTON BANKRUPTCY LAW & PRACTICE 2d § 39:1, at 39–6 (William L. Norton, Jr. ed., 1997).

Initially, a debtor must show a sound business purpose for assuming an unexpired lease. *Androse Assoc. of Allaire, LLC v. Great Atlantic & Pacific Tea Co., Inc. (In re Great Atlantic & Pacific Tea Co., Inc.),* 472 F.3d 666, 672 (S.D.N.Y.2012); *In re ANC Rental Corp., Inc.,* 278 B.R. 714, 723 (Bankr.D.Del.2002). The *Great Atlantic & Pacific Tea Co.* Court determined:

> [I]n reviewing a debtor's decision to assume a lease, the bankruptcy court places itself in the position of the debtor-in-possession and determines whether assuming it would be a good business decision or a bad one.... The Code does not condition the right to assume on lack of prejudice to the non-debtor party and the disruption of non-debtors' expectations of profitable business arrangements is common in bankruptcy proceedings. Thus, as long as assumption of a lease appeals to enhance a debtor's estate, Court approval of a debtor in possession's decision to assume the lease should only be withheld if the debtor's judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code,

*Great Atlantic & Pacific Tea Co.,* 472 B.R. at 672–73 (internal punctuation and citations omitted). The Reorganized Debtors have shown that they will receive millions of dollars

in value from the assumption and assignment of this long-term, advantageous Lease. This value, together with the Reorganized Debtors' obligation under the Plan to maximize the value of the assets, provide a sound business purpose for assuming the Lease.

Pursuant to § 365(b)(1)(A), if there has been a default in an unexpired lease of the debtor, the trustee may not assume such lease unless, at the time of assumption, the trustee: (1) cures or provides adequate assurance that it will promptly cure the default; (2) compensates or provides adequate assurance of prompt future compensation for actual pecuniary loss resulting from the default; and (3) provides adequate assurance of future performance under the lease. *Rickel,* 209 F.3d at 298; 11 U.S.C. § 365(b)(1).

Section 365 also authorizes assignment of an or unexpired lease, if (1) the trustee has properly assumed the lease, and (2) adequate assurance of future performance by the assignee is provided. 11 U.S.C. § 365(f)(2). "This requirement provides needed protection to the non-debtor party because the assignment relieves the trustee and the bankruptcy estate from liability for breaches arising after the assignment." *Cinicola v. Scharffenberger,* 248 F.3d 110, 120 (3d Cir. 2001).

In order to assume the Lease, Hartz argues that Reorganized Debtors must provide adequate assurance of the Reorganized Debtors' ability to cure the defaults under the Lease by: (i) paying $1.25 million to cure the Percentage Rent default that this Court has already determined is owing, and (ii) establishing an escrow reserve in the amount of $517,000 for the remaining two components of the Cure Dispute (*i.e.,* Additional Rent and attorneys fees). The Reorganized Debtors argue, in response, that the Code does not specifically require payment or a reserve account, but "adequate assurance" of their ability to promptly cure the defaults, once the cure claim is finalized.

**\*11** The term "adequate assurance" is not defined in the Bankruptcy Code. The phrase is adopted from the Uniform Commercial Code and courts have recognized that what constitutes "adequate assurance of future performance" must be determined by consideration of the facts of the proposed assumption. *Cinicola,* 248 F.3d at 120 n.10 quoting *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 3109–10 (5th Cir.1985); *Great Atlantic & Pacific Tea,* 472 B.R. at 674 ("The term 'adequate assurance of future performance' is not statutorily defined, but courts have determined that '[w]hether "adequate assurance of future performance" has

been provided is determined by the facts and circumstances of each case.' "). A non-exclusive list of factors that a court may review to determine whether a landlord is adequately assured includes "the debtor's payment history, the extent and history of defaults, presence of a guarantee and/or a security deposit, evidence of profitability, a plan with earmarked funds exclusively for the landlord, the general outlook in the debtor's industry, and whether the lease is at or below the prevailing market rate." *Great Atlantic & Pacific Tea Co.,* 472 B.R. at 675 (citations omitted). Section 365, however, "does not give a landlord the right to improve its position upon the bankruptcy of a tenant. The statute affords no relief to a landlord simply because it might seek to escape the bargain it made." *Id.* quoting *In re Rock 49th Rest. Corp.,* No. 08–14557, 2010 WL 1418863, at \*7 (Bankr.S.D.N.Y. Apr. 7, 2010).

To provide evidence of their adequate assurance obligations, the Reorganized Debtors provided the testimony of Ezra Sultan, the executive vice president of ASG, and chief financial office of an affiliated company, Century 21 Department Stores, a position he has held for about 35 years. (Tr. 4/2/2014 at 109:24–111:4). Mr. Sultan explained that ASG was affiliated with other companies (including ASG Equities, LLC and Century 21 Department Stores) which were commonly owned by members of the Gindi family. [12] (*Id.*). His positions with those companies gave him familiarity with the finances of the companies and experience in other real estate transactions the companies have undertaken. (*Id.*).

Mr. Sultan testified that ASG has already provided the deposit of approximately $6 million to the Reorganized Debtors, which is being held in escrow, for the ASG Baseline Bid, and which will be forfeited if the transaction does not close due to ASG's fault. (Tr. 4/2/2014 at 111:20–112:9). Further, ASG has been pre-approved for the letter of credit. (Tr. 4/2/2014 at 118:10–118:18).

The Reorganized Debtors argue that the ASG letter of credit in the amount of $4 million provides adequate assurance that any defaults under the Lease will be promptly cured when the cure claim is settled or determined by a final order of this Court. The letter of credit amount exceeds amount of the disputed cure claim, which is composed of a Percentage Rent claim (already determined by this Court to be in the amount of $1.5 million, less costs and expenses, or $1.25 million, the "Percentage Rent Claim"), the Additional Rent claim of approximately $17,000, and the claim for indemnification of the landlord's attorney fees of approximately $500,000. [13]

The Reorganized Debtors also argue that they have satisfied the requirements of § 365(f)(2) by providing adequate assurance of future performance by the assignee, ASG. Mr. Sultan testified that he had reviewed the tenant's obligations under the Lease and that ASG will have the financial ability to satisfy those obligations going forward through funding by the owners' equity contributions. (Tr. 4/2/2014 at 111:5–113:16). He testified that the owners have a collective net worth of in excess of $500 million. (Tr. 4/2/2014 at 115:17–115:21). ASG will be owned by five family members: two will hold a 25% interest each, and three will hold a 162/3% interest each. (Tr. 4/2/2014 at 116:7–117:17). Mr. Sultan's testimony was credible, and Hartz provided neither evidence nor testimony on cross-examination to suggest otherwise.

**\*12** Based on the record in this case, I conclude that, to meet the requirement of Bankruptcy Code § 365(b)(1) that the Reorganized Debtors provide adequate assurance that they will *promptly* cure any defaults at the time the Lease is assumed, the Reorganized Debtors must (i) pay the Percentage Rent Claim of $1.25 million; and (ii) obtain the ASG letter of credit to cover the remaining claims of the Cure Dispute. The Percentage Rent Claim must be *paid* because this Court has already decided that the Percentage Rent is due in the Summary Judgment Decision and a decision denying the Reorganized Debtors' motion for reconsideration of the Summary Judgment Decision. Hartz will not be required to wait indefinitely for the remaining components of the cure claim to be resolved.[14] I am satisfied by the testimony of Mr. Sultan that ASG has been preapproved for the letter of credit and will provide it at closing of the ASG Baseline Bid.

Upon satisfaction of the foregoing adequate assurance obligations for assumption of the Lease, the Debtors can assign the Lease to ASG under Bankruptcy Code 365(f)(2). The testimony of Mr. Sultan provides evidence that ASG is ready, willing and able to provide the funds to close on the ASG Baseline Bid and has the financial ability to perform the Lease obligations going forward. Mr. Sultan testified that the owners of ASG would not fail to perform the tenant's obligations under the Lease and risk losing their $34 million dollar investment. (Tr. 4/2/2014 at 113:9–113:16).

### (C) *Whether the ASG Motion should be approved?*
Upon concluding that the Reorganized Debtors can meet the requirements for assumption and assignment of the Lease, the Court must determine whether the ASG Motion should be approved. As stated by the Court in *Cinicola* :

> For sales in bankruptcy, § 363 authorizes the trustee to use, sell, or lease property of the estate outside the ordinary course of business after providing notice and hearing. 11 U.S.C. § 363(b)(1). The Bankruptcy Code broadly defines the property of the bankruptcy estate to include "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Executory contracts and leases also fall under this definition.

*Cinicola,* 248 F.3d at 121 citing *Rickel,* 209 F.3d at 303. Transactions under § 363 must be based upon the sound business judgment of the debtor or trustee. *In re MF Global, Inc.,* 467 B.R. 726, 730 (Bankr.S.D.N.Y.2012) citing *In re Chateaugay Corp.,* 973 B.2d 141 (2d Cir. 1992); *Comm. Of Equity Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2d Cir.1983).

> Generally, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns–Manville Corp.,* 60 B.R. 612, 616 (Bankr.S.D.N.Y.1986). If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate; the burden of rebutting that presumption falls to parties opposing the transaction. *See In re Integrated Res., Inc.,* 147 B.R. 650, 656 (S.D.N.Y.1992). Once a court determines that a sound business justification exists, the court must determine whether (i) the debtor has provided all interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *See In re Del. & Hudson Ry. Co.,* 124 B.R. 169, 176 (D.Del.1991).

**\*13** *MF Global,* 467 B.R. at 730. Here, the Reorganized Debtors have articulated a reasonable basis for their decision to accept the ASG Baseline Bid. As demonstrated by the record before me, the ASG Baseline Bid was the highest offer received for the Leasehold Interests. The price is fair and reasonable because, although a formal auction was not held, the Reorganized Debtors marketed the Leasehold Interests and the ASG Baseline Bid was received after two parties made competing offers to the Reorganized Debtors. Further, the loss of the Cure Dispute settlement is justified, since the Reorganized Debtors' exposure on the Cure Dispute is

covered by the $4 million letter of credit that will be posted by ASG. Moreover, the reasonableness of the ASG Baseline Bid is shown by the support of the Creditors' Representative and Esopus.

Hartz asserts a lack of good faith by both the Reorganized Debtors and ASG in connection with the ASG Baseline Bid. The record describes the ongoing negotiations between the Reorganized Debtors and ASG and shows that Hartz was aware that ASG continued to submit offers to the Reorganized Debtors for the Leasehold Interests and, further, that Hartz, in response to the offers made by ASG after the Hartz Settlement Motion was filed, increased its own offer and requested that the Reorganized Debtors agree to put an end to the competitive bidding. The record before me shows two parties interested in obtaining the Leasehold Interests and the Reorganized Debtors engaging in arms-length negotiations with those parties. There is nothing in the record which would support a finding that either the Reorganized Debtors or ASG has not acted in good faith.

Finally, I also conclude that the ASG Motion should be approved based on a review of the four *Martin* factors: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors. *Martin, 91 F.3d at 393*. Factors (1), (2), and (3) are essentially taken out of play by the posting of the letter of credit. Here, it is factor (4) which provides the most important benchmark. The settlement piece of the ASG Motion involving the release of claims between ASG and the Reorganized Debtors is justified by the higher price being paid by ASG for the Leasehold Interests. Further, as shown by the support of those most directly affected—the Creditors' Representative and Esopus —the settlement is in the best interest of the creditors.[15]

**(D)** *Whether the fourteen-day stay of Bankruptcy Rules 6004(h) and 6006(d) may be waived?*

In the ASG Motion, the Reorganized Debtors ask this Court to waive the 14–day stay found in Bankruptcy Rules 6004(h) and 6006(d) of bankruptcy court orders authorizing the use, sale or lease of property or the assignment of executory contracts or unexpired leases.

Bankruptcy Rule 6004(h) provides: "An order authorizing the use, sale or lease of property other than cash collateral is

stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."

Bankruptcy Rule 6006(d) provides: "An order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."

 **\*14** The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to "provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented. A short period of time is often needed and essential to an objecting party intending to appeal because, if the sale [or assignment] is closed in the absence of a stay, any appeal by an objecting party may well be moot." 10 COLLIER ON BANKRUPTCY ¶ 6004.11, ¶ 6006.04 (16th ed. 2014). The treatise further provides:

> Neither the rule nor the Advisory Committee Note addresses the question of when a court should order otherwise and either eliminate or reduce the 14–day stay period. First, because the purpose of the rule is to protect the rights of an objecting party, the court should eliminate the 14–day stay period and allow the sale or other transaction to close immediately in all cases where there has been no objection to the procedure. Second, *if an objection has been filed and is being overruled, the court should eliminate or reduce the 14–day stay period only upon a showing that there is a sufficient business need to close the transaction within the 14–day period and that the interests of the objecting party, taking into account the likelihood of success on appeal, are sufficiently protected.* If the objecting party informs the court that it intends to appeal and seek a stay, then the stay period should not be reduced to less than an amount of time sufficient to allow the objecting party to seek a stay, unless the court determines that the need to proceed sooner outweighs the objecting party's interests.

*Id.* (emphasis added).

The Reorganized Debtors argue that a waiver of the 14–day stay is necessary and appropriate here to expedite and remove uncertainty regarding the proposed assignment and sale of the Leasehold Interests. They further state: "A fourteen-day stay of the effectiveness of the Proposed Order may unnecessarily delay, complicate, or jeopardize the assignment and sale and the benefits to the Reorganized Debtors' stakeholders." (ASG Motion, ¶ 35).

While I understand the Reorganized Debtors' and ASG's desire to close quickly and, thereby, eliminate uncertainty regarding transfer of the Lease, a waiver of the entire 14–day period is not appropriate here. The Reorganized Debtors have not articulated an urgent business need requiring immediate closing. Hartz has objected to the assignment and sale of the Lease, and they are entitled to a reasonable period of time to file an appeal and request a stay from the District Court to prevent its appeal from possibly becoming moot. [16] However, to balance the competing interests, and as a courtesy to the District Court, I will reduce the stay of Bankruptcy Rules 6004(h) and 6006(d) to seven days from the date of entry of an order.

### Conclusion

For the reasons set forth above, the Hartz Motion to Enforce Settlement (D.I. 2877) will be denied, and the ASG Motion (D.I. 2864) will be granted, in part, as follows:

(1) The Reorganized Debtors will be permitted to assign the Lease upon providing adequate assurance of their ability to cure promptly the defaults under the Lease by (i) paying the Percentage Rent Claim of $1.25 million at closing of the ASG Baseline Bid, and (ii) obtaining the ASG letter of credit in an appropriate amount to cover the Reorganized Debtor's exposure on the remaining cure claims;

(2) The Reorganized Debtors' proposed sale of the Leasehold Interests to ASG in accordance with the terms of the ASG Baseline Bid is approved; and

**\*15** (3) The 14–day stay imposed by Bankruptcy Rules 6004(h) and 6006(d) is reduced to a 7–day stay, effective from the date of entry of the Order to be submitted by the Reorganized Debtors, as stated below.

Further, because the relief requested by the Reorganized Debtors in the Original Assumption Motion (D.I. 1247) and the Supplemental Assumption Motion (D.I. 2733) has been superseded by the relief sought in the ASG Motion, the Original Assumption Motion and the Supplemental Assumption Motion are determined to be moot. The Rule 2004 Motion (D.I. 2802) will be marked as withdrawn.

The Reorganized Debtors shall submit a proposed form of Order, under certification, consistent with this Memorandum.

### Footnotes

1   The Reorganized Debtors in this case are: Filene's Basement, LLC; Trinity Place Holdings, Inc. f/k/a Syms Corp.; Syms Clothing, Inc.; and Syms Advertising, Inc. (collectively, the "Reorganized Debtors").

2   This Memorandum constitutes the findings of fact and conclusions of law required by Fed.R.Bankr.P. 7052. This Court has jurisdiction to decide the matters before it pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and (b)(2)(N).

3   U.S. Bank, National Association, in its capacity as trustee under the Metropolitan Trust Agreement, previously represented the interest of the successor landlord under the Lease ("US Bank" or the "Prior Landlord").

4   On February 22, 2012, the Debtors filed a Motion for Order Under 11 U.S.C. §§ 105 and 365 and Fed.R.Bankr.P. 9006 Extending Time Within Which Debtors may Assume or Reject Unexpired Leases of Nonresidential Real Property (the "Motion for Extension") (D.I. 844) which sought to extend the deadline for assumption of certain leases, including the Lease, under Bankruptcy Code § 365(d)(4). The Motion for Extension was granted by Order dated February 29, 2012 (D.I. 886), which extended the time for the Debtors to request court approval to assume the Lease to May 30, 2012.

5   The improvements include a building, parking areas, other structures and improvements located on the Property. (*See* Ex. D–5).

6   Esopus Creek Value Series Fund, LP ("Esopus"), a pre-petition shareholder of Syms Corp., chairman of the Official Committee of Equity Holders formed in the Syms Corp. bankruptcy case, one of the backstop parties under the Plan, and a shareholder of Trinity, filed a joinder to the Creditors' Representative's Objection (D.I. 2903).

7   For example, section 363(b)(1) provides, in pertinent part, that "[t]he trustee, *after notice and a hearing,* may use, sell, or lease, other than in the ordinary course of business, property of the estate...." 11 U.S.C. § 363(b)(1) (emphasis added).

8   Perhaps the Reorganized Debtors should not have withdrawn the Hartz Settlement Motion, even in light of the changed circumstances in the form of the higher offer for the Lease from ASG. One party to a settlement should not be permitted to unilaterally withdraw or revoke a settlement agreement while the motion for bankruptcy court approval is pending. *Turner,* 274 B.R. at 681. In *Turner,* the chapter 7 trustee settled litigation arising from a debtor's claim for false arrest, false imprisonment and related damages. Before the trustee filed the motion for approval of the settlement, the district court granted the defendants' summary judgment motion, and the defendants withdrew the settlement offer. The *Turner* Court determined that, based on principles of contract law, the parties reached an agreement that was binding on the parties pending court approval. *Turner,* 274 B.R. at 681. Court approval was a condition subsequent to the contract, which the trustee had sought promptly. *Id.* The *Turner* Court noted that the settlement was not conditioned upon whether a decision was rendered on the summary judgment motion. *Id.* The Court concluded that it would be inequitable to allow a party to an otherwise enforceable agreement to revoke an offer merely because the court had not yet heard the motion to approve it. *Id.* citing *In re Frye,* 216 B.R. 166, 174 (Bankr.E.D.Va.1997).

    However, I need not determine whether the Hartz Settlement is enforceable prior to court approval because, as a practical matter and despite any procedural irregularities, the issue of whether to approve the Hartz Settlement is now before me via the Hartz Motion to Enforce Settlement.

9   In *RFE Industries*, the Third Circuit noted that consideration of the paramount interest of shareholders, rather than creditors, was consistent with the purpose of the *Martin* test, *i.e.,* to maximize recovery of those to whom the company may have obligations. *RFE Indus.,* 283 F.3d at 165. The creditors in *RFE Industries* had already received full payment at the time the Court considered approval of a settlement agreement. In this case, I consider the paramount interests of both creditors and shareholders of the Reorganized Debtors, since the Plan provides for full payment to unsecured creditors (except for landlords). It is the expectation of all parties that there will be distributions to shareholders.

10  The *Treasure Isles* Court noted that "almost every pre-BAPCPA case addressing this issue holds that a trustee need only file its motion to assume the lease prior to the deadline under 11 U.S.C. § 365(d)(4) and does not have to obtain court approval of the same prior to the deadline to avoid having its executory contract deemed rejected." *Treasure Isles,* 462 B.R. at 649 (listing cases).

11  *See, e.g.,* 11 U.S.C. § 362(e)(1) providing, in pertinent part: "Thirty days after a request under subsection (d) of this section for relief from the stay of any act against property of the estate under subsection (a) of this section, such stay is terminated with respect to the party in interest making such request, unless the court, after notice and a hearing, orders such stay continued in effect pending the conclusion of, or as a result of, a final hearing and determination under subsection (d) of this section.... If the hearing under this subsection is a preliminary hearing, then such final hearing shall be concluded not later than thirty days after the conclusion of such preliminary hearing, unless a 30–day period is extended with the consent of the parties in interest or for a specific time which the court finds is required by compelling circumstances."

12  The members of the Gindi family and their respective interests in ASG were identified at the hearing. (Tr. 4/2/2014 at 116:7–117:17).

13  The Prior Landlord asserted that the total amount of the Percentage Rent claim was "no less than $3,510,000," but in the Summary Judgment Decision, I determined that the Percentage Rent Claim was $1.5 million, less expenses. The letter of credit provides further adequate assurance of payment for the full amount of the Percentage Rent Claim, as asserted by the Prior Landlord, which could be owed if Hartz successfully appeals the Summaiy Judgment Decision.

14  The Reorganized Debtors point out, however, that the Plan provides that "[N]o payments or Distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim." Plan, § VIII.l.2. The objection to the Percentage Rent Claim has been resolved by two court orders. To provide adequate assurance of prompt payment, the Percentage Rent Claim must be paid.

15  Hartz also objected to language in a revised proposed form of order approving the ASG Motion that enjoined Hartz from asserting claims against the Reorganized Debtors based upon the withdrawal of the Hartz Settlement. This relief was not requested in the ASG Motion; moreover, there is nothing in the record that would support the inclusion of an injunction to prevent Hartz from asserting such claims.

16  I do not opine on whether any such Order is immediately appealable.

---

**End of Document**                                        © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 78

2014 WL 2724129
United States Court of Appeals,
Third Circuit.

In re G–I HOLDINGS, INC., formerly
known as GAF Corporation, Debtor
United States Gypsum Company,
Appellant No. 13–3335
Quigley Company, Inc., Appellant No. 13–3336.

Nos. 13–3335, 13–3336.    |    Argued
April 8, 2014.    |    Filed: June 17, 2014.

**Synopsis**
**Background:** Chapter 11 debtors in jointly administered cases objected to proofs of claim filed by former members of corporate claims handling facility that administered asbestos-related personal injury claims asserted against its members, which previously included debtor, alleging that debtor had breached producer agreement establishing facility by failing to pay its percentage share of liability payments associated with facility's settlement of claims. The Bankruptcy Court, Rosemary Gambardella, J., 477 B.R. 542, granted debtors' motions for summary judgment. Former members appealed. The United States District Court for the District of New Jersey, Dennis M. Cavanaugh, J., 2013 WL 3285271, affirmed. Former members appealed.

**Holdings:** The Court of Appeals, Fisher, Circuit Judge, held that:

[1] former members could bring breach of contract claim;

[2] direct or derivative claim inquiry did not apply to issue of whether former members could bring breach of contract claim; and

[3] settlement agreement between debtor and facility did not bar former members from bringing breach of contract claim.

Vacated and remanded.

West Headnotes (19)

[1] **Bankruptcy**
    Rights of Action Against Trustee or Debtor

**Corporations and Business Organizations**
    Actions

Former members of corporate claims handling facility that administered asbestos-related personal injury claims asserted against its members, which previously included Chapter 11 debtor, could bring breach of contract claim under Delaware law against debtor on allegations that debtor had breached producer agreement that established facility by not paying its percentage share of liability payments associated with facility's settlement of claims after former members were required to make additional payments to cover shortfall caused by debtor's nonpayment, since members' right to bring breach of contract action was consistent with purpose of agreement.

Cases that cite this headnote

[2] **Contracts**
    Language of Contract

When interpreting a contract under Delaware law, a court will give priority to the parties' intentions as reflected in the four corners of the agreement.

Cases that cite this headnote

[3] **Contracts**
    Construction as a Whole

In upholding the intentions of the parties, a court under Delaware law must construe an agreement as a whole, giving effect to all provisions therein.

Cases that cite this headnote

[4] **Contracts**
    Construction as a Whole

Under Delaware law, a court should interpret the contract in such a way as to not render any of its provisions illusory or meaningless.

Cases that cite this headnote

**[5]**    **Contracts**
        🗝 **Language of Instrument**

Under Delaware law, clear and unambiguous terms in a contract are interpreted according to their ordinary meaning.

Cases that cite this headnote

**[6]**    **Contracts**
        🗝 **Separate Clauses**

Under Delaware law, the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan.

Cases that cite this headnote

**[7]**    **Contracts**
        🗝 **Grounds of Action**

For a successful breach of contract claim under Delaware law, a party must prove: (1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) a resulting damage to the plaintiff.

Cases that cite this headnote

**[8]**    **Contracts**
        🗝 **Scope of Contractual Relation in General**

Under Delaware law, either party to an agreement may enforce its terms for breach thereof.

Cases that cite this headnote

**[9]**    **Contracts**
        🗝 **Language of Instrument**

Under Delaware law, a court may examine a heading in the contract as additional evidence

tending to support the contract's substantive provisions.

Cases that cite this headnote

**[10]**    **Contracts**
        🗝 **Language of Instrument**

Under Delaware law, contract headings do not constitute controlling evidence of a contract's substantive meaning.

Cases that cite this headnote

**[11]**    **Contracts**
        🗝 **Construction as a Whole**

Under Delaware law, a court must give each provision and term effect, so as not to render any part of the contract mere surplusage.

Cases that cite this headnote

**[12]**    **Contracts**
        🗝 **Terms Implied as Part of Contract**

Under Delaware law, a court should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it.

Cases that cite this headnote

**[13]**    **Contracts**
        🗝 **General and Specific Words and Clauses**

Under Delaware law, when interpreting an entire agreement, specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.

Cases that cite this headnote

**[14]**    **Corporations and Business Organizations**
        🗝 **Derivative Actions; Suing or Defending on Behalf of Corporation**

Direct or derivative claim inquiry under Delaware law did not apply to issue of whether former members of corporate claims

handling facility that administered asbestos-related personal injury claims asserted against its members, which previously included Chapter 11 debtor, could bring breach of contract claim against debtor on allegations that debtor had breached producer agreement that established facility by not paying its percentage share of liability payments associated with facility's settlement of claims, since facility as non-profit, non-stock corporation, did not have any shareholders and former members and debtor were in contractual privity with one another but not with facility via producer agreement.

Cases that cite this headnote

[15]    **Corporations and Business Organizations**
            👉 Derivative or Direct Action

Generally, under Delaware law, if a cause of action belongs to a corporation, only the corporation may bring that action.

Cases that cite this headnote

[16]    **Corporations and Business Organizations**
            👉 Nature and Form of Remedy
        **Corporations and Business Organizations**
            👉 Recovery to Corporation Rather Than Shareholder

In some circumstances, under Delaware law, a shareholder may bring a "derivative" claim on behalf of a corporation for harm done to the corporation with recovery going to the corporation.

Cases that cite this headnote

[17]    **Corporations and Business Organizations**
            👉 Derivative or Direct Action

Under Delaware law, when a shareholder is injured in a way that affects his or her legal rights as a shareholder, the shareholder retains the right to bring a "direct" claim, with recovery going directly to shareholders.

Cases that cite this headnote

[18]    **Corporations and Business Organizations**

👉 Nature and Form of Remedy

Even if direct or derivative claim inquiry under Delaware law applied, breach of contract claim against Chapter 11 debtor was a direct claim, which had been brought by former members of corporate claims handling facility that administered asbestos-related personal injury claims asserted against its members that previously included debtor, alleging that debtor had breached producer agreement that established facility by not paying its percentage share of liability payments associated with facility's settlement of claims, since former members, not facility, suffered harm by having to pay additional amounts to cover for debtor's nonpayment, facility did not suffer any harm, and former members would receive benefit of any recovery.

Cases that cite this headnote

[19]    **Bankruptcy**
            👉 Compromises, Releases, and Stipulations

Settlement agreement between Chapter 11 debtor and corporate claims handling facility that administered asbestos-related personal injury claims asserted against its members that previously included debtor did not bar former members under Delaware law from bringing breach of contract claim against debtor on allegations that debtor had breached producer agreement that established facility by not paying its percentage share of liability payments associated with facility's settlement of claims, since former members' claims based on their payment after debtor failed to pay were not part of settlement agreement, facility had its own separate claims against debtor, former members were not parties to settlement agreement, and apportionment of liability did not bar former members' right to bring cause of action.

Cases that cite this headnote

**Attorneys and Law Firms**

Rachel S. Bloomekatz, Esq., Argued, Jones Day, Columbus, OH, Brad B. Erens, Esq., Brian J. Murray, Esq., Jones Day, Chicago, IL, Counsel for Appellant United States Gypsum Co.

John P. DiIorio, Esq., Shapiro Croland, Hackensack, NJ, Stephen D. Hoffman, I, Esq., Argued, Wilk Auslander, New York, NY, Counsel for Appellant Quigley Co. Inc.

Mark E. Hall, Esq., Dennis J. O'Grady, Esq., Riker, Danzig, Scherer, Hyland & Perretti, Morristown, NJ, Andrew J. Rossman, Esq., Argued, Scott C. Shelley, Esq., Jacob J. Waldman, Esq., Quinn, Emanuel, Urquhart & Sullivan, New York, NY, Counsel for Appellees.

Before: FISHER and SCIRICA, Circuit Judges, and MARIANI,[*] District Judge.

**Opinion**

## OPINION OF THE COURT

FISHER, Circuit Judge.

 **\*1**  Due to the rising number of asbestos-related personal injury lawsuits filed in the 1980s, a group of producers of asbestos and asbestos-containing products ("Members" or "Participating Producers") joined together and formed the Center for Claims Resolution (the "Center") to administer asbestos personal injury claims on behalf of the Members. The Members negotiated and signed the Producer Agreement Concerning Center for Claims Resolution (the "Producer Agreement"), which established and set forth the mechanics of the Center and the obligations of the Members. Appellants United States Gypsum Company ("U.S. Gypsum") and Quigley Company, Inc. ("Quigley") and the predecessor-in-interest of Appellee G-I Holdings, Inc. ("G-I") were among the roughly twenty asbestos producers who signed the Producer Agreement, thereby becoming Members of the Center.

After G-I failed to pay its contractually-calculated share due to pay out personal injury settlements and cover Center expenses, U.S. Gypsum and Quigley were obligated to pay additional sums to cover G-I's payment obligations. G-I filed for bankruptcy and the Center, U.S. Gypsum, and Quigley each filed a proof of claim in the Bankruptcy Court seeking to recover for G-I's nonpayment under the Producer Agreement. The Center eventually settled its claim with G-I.

Although arising in the context of a bankruptcy proceeding, this case concerns claims for breach of contract under Delaware law. We are asked to decide whether, under the Producer Agreement, U.S. Gypsum and Quigley (together, the "Former Members") may maintain a breach of contract action against G-I. We hold that the Producer Agreement permits the Former Members to pursue a breach of contract action against G-I for its failure to pay contractually-obligated sums due to the Center, in light of the Former Members' payment of G-I's share. We therefore vacate the District Court's order affirming the Bankruptcy Court's grant of summary judgment in G-I's favor.

## I.

## A.

Facing a growing number of asbestos-related personal injury lawsuits, a group of producers of asbestos and asbestos-containing products joined together to form the Center in order to more effectively defend against and resolve the lawsuits. The Center was incorporated as a non-profit, non-stock Delaware corporation in September 1988 to "administer and arrange for the evaluation, settlement, payment, and defense of asbestos-related bodily injury claims." (A–684).

The Producer Agreement sets forth the Members' purposes in entering the agreement and establishing the Center. The Members stated that they "believe it is important to establish an organization that will, on behalf of all Participating Producers, resolve meritorious asbestos-related claims in a fair and expeditious manner and, where necessary, defend asbestos-related claims efficiently and economically." (A–715). They also sought to "enter into a constructive relationship with one another and to resolve any cross or counter claims that they may have against each other." (*Id.*).

 **\*2**  The Center was governed by a five-person Board of Directors. A producer became a Member of the Center by signing the Producer Agreement, and membership could be terminated by a Member's written notice, by a Member's bankruptcy, or by resolution of the Board of Directors. However, even after termination of membership, the former Member would "continue to have and to honor all of the obligations incurred by it [under the Producer Agreement] or

on its behalf as a member prior to the effective date of its membership termination." (A–720).

The Producer Agreement designates the Center as each Member's "sole agent to administer and arrange on its behalf for the evaluation, settlement, payment or defense of all asbestos-related claims against such Participating Producer." (A–721). The Producer Agreement defines "asbestos-related claims" as "claims or lawsuits against any Participating Producers or the Center ... seeking monetary relief ... for bodily injury, sickness, disease or death, alleged to have been caused in whole or in part by any asbestos or asbestos-containing product." (A–716). After settling or otherwise resolving claims on behalf of the Members, the Center would bill and collect each Member's allocated share of liability payments and expenses based upon a formula set forth in an attachment to the Producer Agreement.

If a Member failed to pay its share of liability payments or expenses in a timely manner, the Producer Agreement provides that "the Center's Board of Directors may direct the Center to institute an ADR on behalf of the Center's Participating Producers against such Participating Producer to enforce payment of such obligations." (A–731–32). With respect to claims between Members, the Producer Agreement provides that "[s]o long as it is a member of the Center each Participating Producer shall forego with respect to asbestos-related claims for contribution or indemnity (other than for contribution or indemnity assumed under written agreement) against all other Participating Producers that are members of the Center." (A–730–31).

Finally, the Producer Agreement sets forth that it is "not intended to confer any rights or benefits upon any other persons" aside from Members, the Center, and some of the Members' insurers. (A–727). Other than the Center, a signatory Member, or a Member's insurer, "[n]o person ... shall have any legally enforceable rights under the Agreement." (*Id* ). "All rights of action for any breach of this Agreement by any signatory hereto are hereby reserved to the Center, Participating Producers and to Supporting Insurers that are paying unallocated expenses incurred by the Center." (*Id.*).

G–I is the successor-in-interest to GAF Corporation, which was named in a large number of asbestos-related lawsuits. G–I's membership in the Center was terminated by the Center's Board of Directors after the Board determined that G–I had breached the Producer Agreement by failing to pay its share

of settlements and expenses. G–I's termination was effective January 17, 2000. Shortly after the termination of G–I's membership, the Center notified G–I that it owed the Center almost $300 million and commenced an ADR for payment. The ADR was stayed once G–I filed for bankruptcy in January of 2001. The Center sought additional payments from the remaining Members to satisfy G–I's share of settlements and expenses.

**\*3** U.S. Gypsum and Quigley were Members of the Center at the same time as G–I. On February 1, 2001, Quigley withdrew from the Center, thereby terminating its membership. On June 25, 2001, U.S. Gypsum filed for Chapter 11 bankruptcy, which terminated its membership. U.S. Gypsum and Quigley assert that they made payments to the Center to cover the shortfall caused by G–I's failure to pay. B.

G–I filed for Chapter 11 bankruptcy on January 5, 2001. The Bankruptcy Court fixed October 15, 2008 as the date by which all proofs of claim against any interest in the debtor had to be filed. On October 9, 2008, the Center filed a proof of claim alleging that G–I was liable to the Center for a total of $254.7 million due to its breach of the Producer Agreement. [1] The Center alleged that it paid out $29.5 million to asbestos claimants on G–I's behalf before it stopped paying out G–I's share of the settlements to asbestos claimants. It also asserted that G–I owed it $2.6 million for G–I's share of the Center's expenses. Finally, the Center claimed damages for settlement agreements that asbestos claimants had voided after G–I's membership terminated. Although the Center had not paid out any of these settlements, it claimed that G–I owed it $222.6 million as damages for the settlements that would not have been voided but for G–I's breach. In its proof of claim, the Center did not state whether it had sought reimbursement from the remaining Members of the Center for the $29.5 million it paid on G–I's behalf.

Both of the Former Members filed a separate proof of claim seeking to recover sums paid to the Center to cover G–I's obligations. U.S. Gypsum filed its proof of claim on October 15, 2008, asserting a breach of contract claim. U.S. Gypsum maintained that in November 2000, the Center sought reimbursement from the remaining Members of the Center, including U.S. Gypsum, for the Center's payment of $30 million to asbestos claimants on G–I's behalf. U.S. Gypsum paid roughly $6.3 million to the Center to reimburse the Center for the payments made on G–I's behalf. Quigley filed a proof of claim on October 13, 2008 seeking unliquidated

damages for G–I's breach of the Producer Agreement. G–I filed objections to the proofs of claim.

The Center and G–I settled the Center's claim against G–I seeking $254.7 million for a cash payment of $9.9 million. On September 4, 2009, G–I moved for approval of the Settlement Agreement in the Bankruptcy Court. The Former Members objected to the settlement and sought clarification that the Settlement Agreement would not affect or release their claims against G–I. The Bankruptcy Court added language to the Order approving the Settlement Agreement, which was entered on September 24, 2009, providing that the Settlement Agreement was "binding on all entities asserting claims against G–I that derive from [the Center] or depend upon [the Center's] rights." (A–476). However, "[f]or the avoidance of doubt, nothing in this Order or the [ ] Settlement Agreement shall release, prejudice, compromise or otherwise affect the claims, if any, that Former Members ... have or may have against the G–I Plan Parties...." (*Id.*).

**\*4** The District Court and Bankruptcy Court approved G–I's Eighth Amended Joint Plan of Reorganization on November 12, 2009. In the Eighth Amended Plan, G–I maintained that the Former Members' claims were derivative of the Center's settled claim, and should therefore be considered settled. But the Plan set forth that to the extent that the Former Members' claims would be allowed, they would receive cash equal to 8.6% of the allowed claim amount.

G–I filed for summary judgment on the Former Members' claims on July 15, 2010. After briefing, the Bankruptcy Court issued an opinion on August 13, 2012 granting the motion for summary judgment in G–I's favor. The Bankruptcy Court concluded that the Center was authorized to resolve G–I's breach by nonpayment, and the Producer Agreement barred the Former Members from pursuing claims, including for breach of contract, against G–I. The Bankruptcy Court also determined that the Former Members' claims were derivative of the Center's claim, which provided an additional reason that Former Members could not maintain their claims against G–I.

U.S. Gypsum and Quigley appealed to the District Court, which affirmed the Bankruptcy Court's decision on June 26, 2013. The District Court agreed with the Bankruptcy Court that the Former Members were contractually barred from pursuing an independent breach of contract action against G–I, reasoning that the Producer Agreement sought to avoid all litigation between Members. The District Court explained

that, when read in the context of Section X's title ("Third–Party Rights") and the rest of the Producer Agreement, language reserving rights of action for breach to the Members did not create a right to bring breach of contract claims. It also concluded that the section permitting the Center to bring an ADR for a Member's failure to pay did not "leav[e] open the option for independent members to bypass the sole authority of the [Center] to remedy [the breach] on their own." (A–7). The District Court did not reach the issue of whether the Former Members' claims were direct or derivative. U.S. Gypsum and Quigley both filed a timely notice of appeal.

## II.

The Bankruptcy Court had jurisdiction over this core matter in G–I's bankruptcy proceeding pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157. The Former Members timely appealed the Bankruptcy Court's final order to the District Court, which exercised its jurisdiction under 28 U.S.C. § 158(a)(1) and Bankruptcy Rule 8001(a). We have jurisdiction to review the District Court's final order under 28 U.S.C. § 158(d)(1) and 28 U.S.C. § 1291.

"We review a district court's grant of summary judgment *de novo,* applying the same standard the district court applied." *Viera v. Life Ins. Co. of N. Am.,* 642 F.3d 407, 413 (3d Cir.2011). "We also review the legal interpretation of contractual language *de novo." Id.*

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. Cnty. of Bucks,* 455 F.3d 418, 423 (3d Cir.2006) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In conducting our review, we view the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Bowers v. Nat'l Collegiate Athletic Ass'n,* 475 F.3d 524, 535 (3d Cir.2007). A motion for summary judgment is properly denied if "a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505.

### III.

**\*5** **[1]** The Former Members argue that the District Court erred in holding that the Producer Agreement bars them from pursuing a breach of contract claim against G–I. They also urge us not to adopt the Bankruptcy Court's conclusions that the Former Members' claims are derivative of the Center's claim and that allowing Former Members' claims would lead to a double recovery. We will address each issue in turn.

### A.

**[2]** **[3]** **[4]** **[5]** **[6]** In determining whether the Former Members may maintain a breach of contract action against G–I under the Producer Agreement, we must heed the guidance of the Delaware courts [2] and "give priority to the parties' intentions as reflected in the four corners of the agreement." *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.,* 36 A.3d 776, 779 (Del.2012). "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.,* 498 A.2d 1108, 1113 (Del.1985). A court should interpret the contract "in such a way as to not render any of its provisions illusory or meaningless." *Sonitrol Holding Co. v. Marceau Investissements,* 607 A.2d 1177, 1183 (Del.1992). "[C]lear and unambiguous terms" in a contract are interpreted according to their ordinary meaning. *GMG Capital Invs.,* 36 A.3d at 780. However, "the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." *E.I. du Pont de Nemours,* 498 A.2d at 1113.

**[7]** We also must keep in mind the elements that a plaintiff must prove for breach of contract. For a successful breach of contract claim, a party must prove: "1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff." *H–M Wexford LLC v. Encorp, Inc.,* 832 A.2d 129, 140 (Del.Ch.2003).

With these principles in mind, we turn to the terms of the Producer Agreement. We will first address the language that most relevant to Former Members' ability to sue G–I for its breach by nonpayment, which is found in Section X. We will then address whether allowing Former Members to bring a breach of contract action under Section X is consistent with

the purpose of the Producer Agreement and with its other provisions and overall scheme.

The third sentence of Section X provides: "All rights of action for any breach of this Agreement by any signatory hereto are hereby reserved to the Center, Participating Producers and to Supporting Insurers...." (A–727). G–I and Former Members were signatories to the Agreement and Participating Producers at the time of G–I's alleged breach. For the purposes of this appeal, we will assume that G–I did breach the Producer Agreement by failing to make required payments. [3] If this case involved only G–I's nonpayment of its obligations to the Center, the Former Members would be unable to maintain a breach of contract action against G–I because they would not yet have suffered damages. But once the Former Members were required to make additional payments to cover the shortfall caused by G–I's nonpayment, they suffered damages and accrued a cause of action for breach of contract. Section X reserves the right of the Former Members—Participating Producers at the time of G–I's breach—to maintain an action for breach of the Producer Agreement against G–I—a signatory.

**\*6** **[8]** Section X makes explicit a basic contract law principle. "It is axiomatic that either party to an agreement may enforce its terms for breach thereof." *Triple C Railcar Serv., Inc. v. City of Wilmington,* 630 A.2d 629, 633 (Del.1993) (citing Richard A. Lord, *Williston on Contracts,* § 1:1 (4th ed.1990)). Section X expands the universe of entities that may bring a breach of contract action under the Producer Agreement beyond the Members (who were the only signatories to the Producer Agreement) to include the Center and some of the Members' insurers. It was not necessary for the Producer Agreement to acknowledge the Members' ability to sue for breach because such an ability is inherent in contract law. But because the Producer Agreement does clearly provide for such a suit, we should not lightly overlook Section X as it is the most relevant provision to the issue at hand.

**[9]** **[10]** G–I argues—and both the Bankruptcy and District Courts agreed—that this language merely limits third party rights under the Producer Agreement. Section X is titled "Third–Party Rights." But we will not discount the plain language of the third sentence of that section merely because of the title. A court "may examine the [contract] heading 'as additional evidence tending to *support* the contract's substantive provisions.' " *Fulkerson v. MHC Operating Ltd.,* 01C–07–020, 2002 WL 32067510, at \*5 (Del.Super.Ct. Sept.

24, 2002) (emphasis added) (quoting *Cantor Fitzgerald, L.P. v. Cantor,* 724 A.2d 571, 582 n. 35 (Del.Ch.1998)). The title of a section cannot contradict or rewrite the plain language of the contractual provisions within that section. "Contract headings do not constitute controlling evidence of a contract's substantive meaning." *Id.*

**[11]**  G–I also relies upon the other provisions in Section X to write off the third sentence. The first two sentences of Section X make it clear that the Producer Agreement does not confer rights or benefits upon third parties, and that the only entities with legally enforceable rights under the Agreement are the Center, signatories to the Producer Agreement, and certain insurers. G–I would read the third sentence to merely reiterate what the first two already make express—that unnamed parties are prevented from enforcing the contract.[4] But this reading would drain the third sentence of meaning and would "render a provision or term"—i.e., the language reserving rights of action for breach of contract—"meaningless or illusory." *Osborn ex rel. Osborn v. Kemp,* 991 A.2d 1153, 1159 (Del.2010) (internal quotation marks omitted). This would violate the rule of contract interpretation that we must "give each provision and term effect, so as not to render any part of the contract mere surplusage." *Id.* (internal quotation marks omitted) (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.,* 990 A.2d 393, 396–97 (Del.2010)). We therefore decline G–I's invitation to read the third sentence of Section X as a reiteration of or further clarification on the preclusion of third party rights under the Producer Agreement. Unless the language of Section X regarding breach of contract actions is irreconcilably inconsistent with the Producer Agreement's purpose, other provisions, or overall contractual scheme, we should give effect to the "clear and unambiguous" language reserving the Former Members' right to bring a breach of contract action against G–I. *GMG Capital Invs.,* 36 A.3d at 780.

**\*7**  We believe that the plain language of Section X is perfectly consistent with the overall purpose of the Producer Agreement. We consider the purpose of the Producer Agreement because we must "give priority to the parties' intentions," *id.* at 779, and because we do not allow the meaning of a particular provision in an agreement to control the meaning of the agreement as a whole where that meaning "runs counter to the agreement's overall scheme or plan." *E.I. du Pont de Nemours,* 498 A.2d at 1113.

**[12]**  The introductory statements to the Producer Agreement set forth its purposes. One statement provides that the

Members "desire to enter into a constructive relationship with one another and to resolve any cross or counter claims that they may have against each other." (A–715). The courts below relied in part upon this statement in concluding that the purpose of the Producer Agreement was to prevent "internecine" litigation—i.e. *all* litigation occurring between Members. (A–5, A–51). This goes too far and assumes intent to avoid a lawsuit such as this one where no such intent was expressed. The Producer Agreement states that the Members sought to resolve cross and counterclaims that they might have against one another. Cross and counterclaims refer to claims that Members could have against one another in the thousands of asbestos-related personal injury lawsuits that were the main concern of the Producer Agreement. The words crossclaim and counterclaim presume the existence of an *underlying* claim already being litigated. *See Black's Law Dict.* 433 (9th ed.2009) (defining crossclaim as "[a] claim asserted between codefendants or coplaintiffs in a case and that relates to the subject of the original claim or counterclaim"); *Black's Law Dict.* 402 (9th ed.2009) (defining counterclaim as "[a] claim for relief asserted against an opposing party after an original claim has been made"). If the Members sought to avoid *all* litigation—as the courts below concluded—they could have drafted the Producer Agreement to provide that they sought to resolve *any claims* that they might have against each other, instead of *any cross or counterclaims.* "[C]ourts should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it." *Allied Capital Corp. v. GC–Sun Holdings, L.P.,* 910 A.2d 1020, 1035 (Del.Ch.2006).

Unlike the courts below, we cannot say that allowing Former Members to pursue a breach of contract action against G–I for its nonpayment is inconsistent with the overall purpose of the Producer Agreement. The Producer Agreement sought to avoid litigation over the allocation of liability in the thousands of asbestos-related personal injury suits that inspired the creation of the Center in the first place. The desire to resolve these cross and counterclaims says nothing about the type of claim here—a claim among Members for breach of contract, unrelated to any individual asbestos-related claim. The expansive reading of purpose endorsed by the courts below—preventing internecine litigation—colored their analysis of the entire Producer Agreement, leading them to conclude that the Former Members' suit against G–I was barred. We will not adopt such a broad interpretation and instead conclude that the Former Members' right to bring a

breach of contract action is consistent with the purpose of the Producer Agreement.

**\*8**  **[13]**  We turn now to consider whether allowing the Former Members to sue G–I for its breach under Section X is consistent with the other provisions of the Producer Agreement. "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours,* 498 A.2d at 1113. If a meaning that arises from one portion of the agreement conflicts with the agreement's "overall scheme or plan," it cannot control. *Id.* In interpreting the entire agreement, "[s]pecific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one." *DCV Holdings, Inc. v. ConAgra, Inc.,* 889 A.2d 954, 961 (Del.2005). Section X is a general provision, broadly setting forth the right to bring a breach of contract action. If this provision conflicts with a more specific provision elsewhere in the Producer Agreement or with its overall scheme or plan, we should not allow Section X to control.

We turn first to Section IV's designation of the Center as the Members' "sole agent." By signing the agreement, "each Participating Producer hereby designates the Center as its sole agent to administer and arrange on its behalf for the evaluation, settlement, payment or defense of all asbestos-related claims against such Participating Producer." (A–720–21). This provision does not conflict with Former Members' ability to bring a breach of contract claim against G–I, because the Center's role as "sole agent" applies only to "asbestos-related claims." "Asbestos-related claims" are specifically defined in the Producer Agreement as lawsuits against Participating Producers or the Center "seeking monetary relief ... for bodily injury, sickness, disease or death, alleged to have been caused in whole or in part by any asbestos or asbestos-containing product." (A–716). The Former Members' claims are breach of contract claims made by one party to an agreement against another party seeking remuneration for the breaching party's failure to pay its contractually-allocated share of payments to settle asbestos-related claims. Their claims are not themselves "asbestos-related claims." Allowing the Former Members to sue G–I for its nonpayment does not interfere with the Center's role as "sole agent" for the purposes of administering and settling these asbestos personal injury claims.

Next we turn to the first paragraph of Section XIV ("Section XIV.1"), which provides that during its membership, "each Participating Producer shall forego with respect to asbestos-related claims for contribution or indemnity (other than for contribution or indemnity assumed under written agreement) against all other Participating Producers that are members of the Center." (A–730–31). Like the "sole agent" provision in Section IV discussed above, because Section XIV.1 qualifies its application to "asbestos-related claims" only, it does not conflict with Section X. In limiting suits for contribution and indemnity in asbestos personal injury lawsuits, this provision implements the Producer Agreement's stated purpose of resolving cross and counterclaims among the Members. Asbestos-related claims for contribution or indemnity seek to reapportion damages based upon each tortfeasor's proportionate share of liability in the underlying personal injury lawsuits. *See e.g., Black's Law Dict.* 378 (9th ed.2009) (defining contribution as "[o]ne tortfeasor's right to collect from joint tortfeasors when—and to the extent that—the tortfeasor has paid more than his or her proportionate share to the injured party, the shares being determined as percentages of causal fault"). The Former Members' breach of contract actions seek to recover a set amount of money that they paid to cover G–I's obligation as calculated under a contractual formula. These claims are not based upon G–I's share of the "fault" in the asbestos personal injury actions; rather, they are based upon the Producer Agreement. We cannot read Section XIV.1, which limits suits for contribution and indemnity for asbestos-related claims, as being in conflict with the Former Members' ability to bring suit for breach of the Producer Agreement under Section X.

**\*9**  Finally, we turn to the fourth paragraph of Section XIV ("Section XIV.4"), which addresses a Member's nonpayment. This section provides: "In the event that any Participating Producer's percentage shares of liability payments or allocated expenses are not paid in a timely manner, the Center's Board of Directors may direct the Center to institute an ADR on behalf of the Center's Participating Producers against such Participating Producer to enforce payment of such obligations." (A–731–32). Allowing Former Members to maintain their breach of contract actions against G–I does not conflict with this provision for several reasons. Most notably, Section XIV.4 provides that in the event of nonpayment, the Center's Board *may* direct the Center to institute an ADR. This language is permissive, not mandatory or exclusive. Language in Section IV clearly articulates the Center's "exclusive authority" and role as the Members' "sole agent" in administering asbestos-related claims brought

against Members. The drafting parties therefore knew how to draft a provision giving the Center "sole" or "exclusive" authority. In concluding that the Center had the exclusive right to bring an action for G–I's nonpayment, the courts below changed "may" into "exclusively has the authority to." We will not read "exclusive authority" into the contract "when the contract could easily have been drafted to expressly provide for it." *Allied Capital Corp.,* 910 A.2d at 1035.

Consideration of the third element of a breach of contract claim—damages—is the key to understanding why the Former Members' right to pursue a breach of contract action is consistent with Section XIV.4. The Former Members suffered damages once they were required to make additional payments to cover the shortfall caused by G–I's breach. Before the Former Members were required to cover the shortfall, the harm G–I caused fell upon the Center, as the Center was unable to collect payments and therefore fulfill its settlement obligations to asbestos plaintiffs. In such a situation, the Center would rely upon Section XIV.4 to enforce the nonpaying Member's obligations. But once the other Members paid G–I's share, the harm to the Center was remedied—the Center fulfilled its obligations to asbestos plaintiffs—and became a harm to the Members who paid more than their share due under the Producer Agreement. Sections X and XIV.4 are particularly consistent with one another when viewed in light of the timing considerations outlined above. Section XIV.4 allows the Center to "enforce payment" *before* the Center has required others to cover the breaching signatory's share, when the Center is responsible for the money due to asbestos plaintiffs. Section X allows Members to bring a breach of contract action *after* the Center has required them to cover and pay the breaching signatory's share, when the Center has fulfilled its obligations to asbestos plaintiffs and the damage caused by the breach has shifted onto those Members.[5]

**\*10** We therefore conclude that the Former Members' right to bring a breach of contract action for G–I's nonpayment under Section X does not conflict with "the agreement's overall scheme or plan." *E.I. du Pont de Nemours,* 498 A.2d at 1113. Indeed, reading the Producer Agreement to allow such an action when one Member pays another Member's share is the only way to give all of its provisions meaning. The way that the courts below read the Producer Agreement renders meaningless the third sentence in Section X, writes out the qualifying phrase "with respect to asbestos-related claims" in Section XIV.1, and turns "may" into "exclusively has the authority to" in Section XIV.4. We eschew their

reading in favor of one that "gives effect to every term of the instrument." *Council of Dorset Condo. Apartments v. Gordon,* 801 A.2d 1, 7 (Del.2002). We will therefore vacate the District Court's order affirming the Bankruptcy Court's order granting summary judgment to G–I, as the Producer Agreement allows Former Members to pursue a breach of contract action against G–I.

## B.

**[14]** We will briefly address the argument that the Former Members cannot pursue their breach of contract action against G–I because their claims are not direct claims, but are instead derivative of the Center's claim. The District Court did not reach this argument, but the Bankruptcy Court did, holding in the alternative that even if the Producer Agreement did not prevent the Former Members' claims, they were barred due to their derivative nature.

**[15]** **[16]** **[17]** Generally, if a cause of action belongs to a corporation, only the corporation may bring that action. Under some circumstances, a shareholder may bring a "derivative" claim on behalf of a corporation for harm done to the corporation with recovery going to the corporation. *Tooley v. Donaldson, Lufkin & Jenrette,* 845 A.2d 1031, 1036 (Del.2004). When a shareholder is injured in a way that affects his or her legal rights as a shareholder, however, the shareholder retains the right to bring a "direct" claim, with recovery going directly to shareholders. *Id.* The Supreme Court of Delaware has set forth a standard—the *Tooley* standard—to use in determining whether a shareholder's claim is direct or derivative. The inquiry "turn[s] *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Id.* at 1033.

We can see no reason why the direct/derivative inquiry should apply in this situation. Under the case law, the distinction applies to claims brought by shareholders in a corporation. *See id.* ("We set forth in this Opinion the law to be applied henceforth in determining whether a stockholder's claim is derivative or direct."). G–I and the Former Members were not shareholders or investors in the Center, which, as a non-profit, non-stock corporation, has no shareholders. G–I has not brought to light any cases bearing any similarity to the situation here. Cases applying the

distinction elsewhere in corporate and partnership law—such as to limited partnerships and LLCs—are inapplicable, as the Center's structure and relationship with its Members is not similar to those corporate forms. *See, e.g., Metro. Life Ins. Co. v. Tremont Grp. Holdings, Inc.,* No. 7092, 2012 WL 6632681, at *9 (Del.Ch. Dec. 20, 2012) (holding that claims brought by partners and investors in a limited partnership were derivative where the injury was suffered by the limited partnership); *Matthew v. Laudamiel,* No. 5957, 2012 WL 605589, at *21 (Del.Ch. Feb. 21, 2012) (holding that claims brought by LLC members were still derivative even after the dissolution of the LLC).

**\*11** The Former Members and G–I are in contractual privity with one another but *not* with the Center via the Producer Agreement. It seems illogical to inquire whether one contract signatory's breach of contract claim against another signatory is derivative of a non-signatory's claim. While the Center was granted rights under the Producer Agreement, this does not make the Former Members' claims derivative. Once the Former Members were required to make additional payments to cover the shortfall in amounts due to asbestos plaintiffs caused by G–I's nonpayment, the Former Members suffered damages and had a straightforward breach of contract claim.

**[18]** Even if we were to consider whether the Former Members' claims are derivative or direct under the *Tooley* rubric, it is clear that their claims are direct. As to the first question, the Former Members, not the Center, suffered the harm caused by G–I's breach. The Former Members, and any other Members who were required to pay additional amounts to cover for G–I's nonpayment, suffered a harm when they paid amounts beyond what was contractually required. The Center, on the other hand, suffered no harm once it required the other Members to cover for G–I's nonpayment and made the payments due to asbestos plaintiffs. As to the second question, the Former Members would receive the benefit of any recovery in the breach of contract action between two signatories to the contract. The Bankruptcy Court erred in concluding that the Former Members' claims are derivative of the Center's claim, and we conclude that this issue does not present a barrier to the Former Members' actions for breach of contract against G–I.

## C.

**[19]** The Bankruptcy Court further concluded that permitting the Former Members to recover on claims that the

Center had already asserted and resolved under the Settlement Agreement would allow "an impermissible double recovery" against G–I. (A–70). The District Court declined to reach this issue. G–I asserts that it "understood the [Center's] Settlement Agreement to govern all [Center]-related claims, and the payment amount was the exclusive source of recovery for such claims." (G–I Br., at 39). But such a belief is in direct conflict with the explicit terms of both the Order and the Settlement Agreement. We reject G–I's argument and the Bankruptcy Court's conclusion for several reasons.

The Order approving the Settlement Agreement between the Center and G–I provided: "For the avoidance of doubt, nothing in this Order or the [Center's] Settlement Agreement shall release, prejudice, compromise or otherwise affect the claims, if any, that Former Members ... have or may have against the G–I Plan Parties." (A–476). This language clearly reserves the Former Members' right to bring a breach of contract action and suggests that the Settlement Agreement did not cover the Former Members' claims.

Indeed, the terms of the Settlement Agreement itself show that the Former Members' claims were not a part of the Center's settlement recovery. The Settlement Agreement provides that the settlement payment that G–I pays to the Center represents "G–I's entire liability *to the [Center]* for its share of liability payments and allocated expenses under the terms of the Producer Agreement and Attachment A thereto." (A–428) (emphasis added). The Settlement Agreement states that upon the Center's receipt of the settlement payment, the Center and "the Members" release all claims and causes of action that they had or may have against G–I, including claims for any alleged breach of the Producer Agreement. (A–430). The Settlement Agreement defines "Members" as "the present members of [the Center]," listing eight companies specifically. (A–423). The Former Members are not included in the eight companies listed as "Members" under the Settlement Agreement, nor were they "present members of [the Center]" on the date of the Settlement Agreement.

**\*12** The Center had its own claim for damages based upon the settlement agreements worth $222 million that were voided due to G–I's breach. And the Former Members were not the only Members of the Center required to pay additional sums to cover G–I's share of asbestos settlements. To the extent that some of these companies are still Members of the Center, the Center could bring these claims against G–I on their behalf. Under the terms of the Settlement Agreement

and the Order approving it, these were the claims that the Settlement Agreement resolved, not the Former Members' claims.

Further, the issue of "impermissible double recovery" goes to apportionment of liability, not to the Former Members' right to bring a cause of action under the Producer Agreement. G–I seems to recognize this point, by arguing that the Center's agreement to indemnify G–I against the Former Members' breach of contract claims, memorialized in the Settlement Agreement, has no bearing on the construction of the Producer Agreement. While we maintain that the Former Members' claims were not included in the Settlement Agreement, even if they were, this would not affect our reading of the Former Members' ability to bring a breach of contract action against G–I, because the terms of a settlement agreement to which the Former Members were not parties cannot change the construction of the Producer Agreement. In conclusion, we are not concerned, as the Bankruptcy Court was, that allowing the Former Members to assert breach of contract claims against G–I would lead to an impermissible double recovery. The Center's recovery for its own claims and claims it brought on behalf of *present* Members of the Center have no bearing on the Former Members' claims,

particularly when they were explicitly excluded from the Settlement Agreement between the Center and G–I.

## IV.

For the foregoing reasons, we vacate the District Court's order affirming the Bankruptcy Court's grant of summary judgment in G–I's favor and remand to the District Court. The District Court should vacate its opinion and remand to the Bankruptcy Court for further proceedings consistent with this opinion. We have determined that the Producer Agreement does not prohibit the Former Members' breach of contract actions against G–I. The merits of the Former Members' claims—whether G–I breached the Producer Agreement, whether they can show damages, and whether G–I has any valid defenses—are not before this Court and we make no comment on their likelihood of success. On remand, the Bankruptcy Court may allow discovery and additional summary judgment motions on the merits of these claims or proceed to trial.

**Parallel Citations**

59 Bankr.Ct.Dec. 170

---

Footnotes

\*    The Honorable Robert D. Mariani, District Judge for the United States District Court for the Middle District of Pennsylvania, sitting by designation.

1    The amount of the Center's claim as of the date of G–I's bankruptcy filing differs from the amount of the claim as of the date of filing the proof of claim. *See* A–775 ("As of January 6, 2001 (the "Petition Date"), the [Center] had a claim against G–I Holdings, Inc. (the "Debtor") in the aggregate principal amount of $299,510,764 plus interest and attorneys' fees. As of the date of the filing of this Proof of Claim, the [Center] has a claim against the Debtor in the aggregate principal amount of $254,705,373 plus interest, fees, and expenses."). The Center had sought the $299.5 million figure from G–I shortly after its membership terminated. We use the $254.7 million figure because that is the amount stated as presently owed in the proof of claim that G–I and the Center eventually settled.

2    The parties agree that the law of the state of Delaware governs the Producer Agreement.

3    The District Court ruled on summary judgment that the Agreement barred Former Members from bringing a breach of contract action against G–I as a matter of law. It did not reach the merits of the breach of contract claim—i.e. whether G–I failed to make required payments and thereby breached the Producer Agreement. G–I disputes the breach; however, as Former Members are the non-moving parties, we will construe the facts in their favor and assume G–I's breach through nonpayment.

4    G–I also takes a different tack by arguing that even if the third sentence can be read as allowing Participating Producers to bring breach of contract actions, it need not be read to allow actions for nonpayment, and instead should be read as reserving the right to remedy breaches *other* than for nonpayment. But this runs counter to the plain language of the provision, which specifically reserves "all" rights to bring actions for "any" breach of the Agreement. (A–727). These words imply that actions for breach due to nonpayment are included.

5    If the Center were to bring and carry through to judgment an ADR on behalf of *all* Members harmed by one Member's breach, it is possible that Section XIV.4 would foreclose those Members' ability to sue under Section X even if the non-breaching Members had covered and paid the breaching Member's share. Under these circumstances, the Center would have recovered on behalf of *all* Members who covered and paid, and their right to recovery would be foreclosed as their injury would have been remedied by the

59 Bankr.Ct.Dec. 170

Center, acting on their behalf. Since the Center would have obtained this recovery, perhaps adjustments would be made to these Members' future obligations to the Center.

But that is not what happened here. While the Center did institute an ADR in 2000, that ADR was stayed after G–I declared bankruptcy. Ultimately, the Center resolved its own claims and claims on behalf of *present* members of the Center in 2009 through a settlement approved by the Bankruptcy Court. As further discussed below, this settlement did not include Former Members' claims—it explicitly stated that the settlement covered only the Center's claims and the claims of eight listed "Members," not including U.S. Gypsum or Quigley. Therefore, the Center's ADR right under Section XIV.4 and the Former Members' right to bring a breach of contract action under Section X do not conflict under the events that have transpired here.

---

**End of Document**
© 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 79

407 B.R. 463
United States Bankruptcy Court,
S.D. New York.

In re GENERAL MOTORS CORP., et at., Debtors.

No. 09–50026 (REG).    |    July 5, 2009.

**Synopsis**

**Background:** Motion was filed for approval of proposed sale of assets of bankrupt automobile manufacturer outside the ordinary course of its business to government-sponsored purchaser. Variety of objections were raised, including objection that sale amounted to improper sub rosa Chapter 11 plan.

**Holdings:** The Bankruptcy Court, Robert E. Gerber, J., held that:

[1] "good business reason" existed for allowing debtor to sell its assets immediately to purchaser sponsored by government, rather than having to wait for confirmation of plan;

[2] government-sponsored purchaser had to be deemed as acting in "good faith";

[3] proposed sale was not an impermissible "sub rosa plan";

[4] "debt" that debtor owed to government, for financing that government had made available in order to keep manufacturer afloat until it could enter bankruptcy and to assist it with its reorganization, could not be restructured as "equity," so as to prevent government from credit-bidding amount of debt;

[5] government's claim could not be equitably subordinated;

[6] debtor's assets could be sold free and clear of successor liability claims;

[7] Chapter 11 plan confirmation requirement, which prevented court from confirming proposed plan unless it provided for "continuation after its effective date of payment of all retiree benefits," was not implicated in connection with sale outside the ordinary course;

[8] debtor did not have to choose between either assuming its dealer agreements and assigning them to purchaser or rejecting them outright but could seek to ameliorate effects of immediate rejection and to provide dealers with softer landing by negotiating deferred termination agreements;

[9] court could not utilize its equitable power to enter "necessary or appropriate" orders, in order to force purchaser to assume certain liabilities of the old debtor-manufacturer based on court's notions of equity;

[10] any objection to use of Troubled Asset Relief Program (TARP) funds in connection with financing that government had provided to debtor was moot; and

[11] debtor's shareholders were not parties aggrieved, with ability to challenge proposed sale.

Sale approved.

West Headnotes (48)

**[1]    Bankruptcy**
☞ Time for sale; emergency and sale outside course of business

Sale outside the ordinary course of business may be used to dispose of all or the bulk of Chapter 11 debtor's assets, outside context of Chapter 11 reorganization plan. 11 U.S.C.A. §§ 363(b), 1123(b)(4).

1 Cases that cite this headnote

**[2]    Courts**
☞ Particular questions or subject matter

While opinion of one bankruptcy judge in judicial district is not, strictly speaking, binding on another, it is practice of bankruptcy court to grant great respect to earlier bankruptcy court precedents from same district.

2 Cases that cite this headnote

**[3]    Bankruptcy**
☞ Time for sale; emergency and sale outside course of business

Even entirety of Chapter 11 debtor's business may be sold, without waiting for plan confirmation, in connection with sale outside the ordinary course of business, if there is good business reason for doing so. 11 U.S.C.A. § 363(b).

2 Cases that cite this headnote

**[4]    Bankruptcy**

👉 Time for sale; emergency and sale outside course of business

In deciding whether there is "good business reason" for allowing Chapter 11 debtor to sell all or substantially all of its assets prior to confirmation of plan, in connection with sale outside the ordinary course of business, bankruptcy court should consider all of the salient factors pertaining to proceeding and act to further diverse interests of debtor, creditors and equity holders. 11 U.S.C.A. § 363.

1 Cases that cite this headnote

**[5]    Bankruptcy**

👉 Time for sale; emergency and sale outside course of business

In deciding whether there is "good business reason" for allowing Chapter 11 debtor to use, sell or lease the bulk of its assets prior to confirmation of plan, in connection with sale outside the ordinary course of business, bankruptcy court may consider the following nonexclusive factors: (1) proportionate value of assets to estate as whole; (2) amount of elapsed time since the filing; (3) likelihood that plan of reorganization will be proposed and confirmed in near future; (4) effect of proposed disposition on future plans of reorganization; (5) proceeds to be obtained from the disposition vis-a-vis any appraisals of property; (6) which of the alternatives of use, sale or lease the proposal envisions; (7) whether property is increasing or decreasing in value; (8) whether estate has the liquidity to survive until confirmation of plan; (9) whether the sales opportunity will still exist at time of plan confirmation and, if not, the likelihood of satisfactory alternative sales

opportunities or a stand-alone plan alternative that is equally desirable, or better, for creditors; and (10) whether there is material risk that, if court defers the sale, the patient will die on operating table. 11 U.S.C.A. § 363(b).

2 Cases that cite this headnote

**[6]    Bankruptcy**

👉 Time for sale; emergency and sale outside course of business

In deciding whether there is "good business reason" for allowing Chapter 11 debtor to sell all or substantially all of its assets prior to confirmation of plan, in connection with sale outside the ordinary course of business, bankruptcy court must consider whether those opposing the sale have produced some evidence that sale is not justified. 11 U.S.C.A. § 363(b).

Cases that cite this headnote

**[7]    Bankruptcy**

👉 Time for sale; emergency and sale outside course of business

Chapter 11 debtor, as part of sale outside the ordinary course of business, may not enter into transaction that would amount to a *sub rosa* plan of reorganization or an attempt to circumvent Chapter 11 requirements for confirmation of plan of reorganization. 11 U.S.C.A. § 363(b).

1 Cases that cite this headnote

**[8]    Bankruptcy**

👉 Time for sale; emergency and sale outside course of business

If proposed sale of Chapter 11 debtor's assets outside the ordinary course of its business has proper business justification which has potential to lead toward confirmation of plan and is not to evade plan confirmation process, then transaction may be authorized. 11 U.S.C.A. § 363(b).

1 Cases that cite this headnote

**[9]    Bankruptcy**

🔑 Time for sale;  emergency and sale outside course of business

**Bankruptcy**
🔑 Sale or liquidation

Under bankruptcy statute dealing with sales outside the ordinary course of business, Chapter 11 debtor may sell substantially all of its assets as going concern and later submit plan of liquidation providing for distribution of proceeds of the sale, where, for example, there is need to preserve "going concern" value because revenues are not sufficient to support continued operation of debtor's business and there are no viable sources for financing. 11 U.S.C.A. § 363(b).

1 Cases that cite this headnote

**[10]** **Bankruptcy**
🔑 Time for sale;  emergency and sale outside course of business

"Good business reason" existed for allowing automobile manufacturer that had filed for Chapter 11 relief to sell its assets immediately to purchaser sponsored by the United States government as transaction outside the ordinary course, rather than having to wait for confirmation of plan, where government financing that allowed manufacturer to operate was set to expire if sale was not completed, where there were no other available sources of financing, and where only alternative was liquidation of manufacturer's business in which unsecured creditors would receive nothing. 11 U.S.C.A. § 363(b).

Cases that cite this headnote

**[11]** **Bankruptcy**
🔑 Time for sale;  emergency and sale outside course of business

After determining that requisite sound business justification existed for a proposed sale of all or substantially all of Chapter 11 debtor's assets outside the ordinary course of its business, court's inquiry then turned to whether the routine requirements for any sale outside the ordinary course were met, and to whether "business

judgment rule" had been satisfied. 11 U.S.C.A. § 363(b).

1 Cases that cite this headnote

**[12]** **Bankruptcy**
🔑 Time for sale;  emergency and sale outside course of business

**Bankruptcy**
🔑 Notice

**Bankruptcy**
🔑 Adequacy of price;  appraisal

In order to authorize sale outside the ordinary course of business, court must be satisfied (1) that notice has been given to all creditors and interested parties; (2) that sale contemplates a fair and reasonable price; and (3) that purchaser is proceeding in good faith. 11 U.S.C.A. § 363(b).

Cases that cite this headnote

**[13]** **Bankruptcy**
🔑 Time for sale;  emergency and sale outside course of business

**Bankruptcy**
🔑 Notice

**Bankruptcy**
🔑 Adequacy of price;  appraisal

Proposed sale outside the ordinary course of assets of bankrupt automobile manufacturer to purchaser sponsored by the United States government complied with statutory requirements that such a sale could be approved only on appropriate "notice" and on "fair and reasonable" terms, where proposed sale was extensively publicized and notice was given to interested parties, where no other, much less a better, offer had been received, and where proponents of sale had obtained fairness opinion from reputable advisors. 11 U.S.C.A. § 363(b).

Cases that cite this headnote

**[14]** **Bankruptcy**
🔑 Time for sale;  emergency and sale outside course of business

**Bankruptcy**
👉 Effect of want of stay;  conclusiveness of sale

Government-sponsored purchaser of assets of bankrupt automobile manufacturer had to be seen as acting in "good faith," not only for purpose of deciding whether sale could proceed as sale outside the ordinary course of debtor-manufacturer's business but for purpose of triggering statutory protection for purchaser's expectations in finality of sale, where proposed sale was the result of intense arm's-length negotiations, and there was no evidence of any efforts to take advantage over other bidders, of whom there were none. 11 U.S.C.A. § 363(b, m).

1 Cases that cite this headnote

[15] **Bankruptcy**
👉 Sale or Assignment of Property

**Bankruptcy**
👉 Effect of want of stay;  conclusiveness of sale

"Good faith" of purchaser of debtor's assets is shown by integrity of his conduct during course of sales proceedings; when there is lack of such integrity, "good faith" finding may not be made, for purpose of triggering statutory protection for good faith purchaser's expectations in finality of sale. 11 U.S.C.A. § 363(m).

Cases that cite this headnote

[16] **Bankruptcy**
👉 Effect of want of stay;  conclusiveness of sale

Purchaser of debtor's assets cannot be found to have acted in "good faith," for purpose of bankruptcy statute protecting good faith purchaser's expectations in finality of sale, if purchaser has engaged in fraud, colluded with other bidders or trustee, or attempted to take grossly unfair advantage of other bidders. 11 U.S.C.A. § 363(m).

1 Cases that cite this headnote

[17] **Bankruptcy**

**Bankruptcy**
👉 Time for sale;  emergency and sale outside course of business

Decision by bankrupt automobile manufacturer's board of directors to accept offer to sell debtor-manufacturer's assets to government-sponsored purchaser on terms offered, which were only terms available to it, and to avoid only other alternative of Chapter 7 liquidation, in which it was estimated that debtor's assets would be sold for less than 10% of $82 billion at which they were booked, an amount woefully inadequate to satisfy its roughly $172 billion in debt, not only passed muster under the business judgment test applicable to such transactions outside the ordinary course, but would withstand ab initio review. 11 U.S.C.A. § 363(b).

Cases that cite this headnote

[18] **Bankruptcy**
👉 Time for sale;  emergency and sale outside course of business

Requirements of business judgment rule, as applied in connection with proposed sale of debtor's assets outside the ordinary course of its business, entail the following: (1) a business decision; (2) disinterestedness; (3) due care; (4) good faith; and possibly (5) no abuse of discretion or waste of corporate assets. 11 U.S.C.A. § 363(b).

Cases that cite this headnote

[19] **Bankruptcy**
👉 Time for sale;  emergency and sale outside course of business

Proposed sale outside the ordinary course of assets of bankrupt automobile manufacturer to purchaser sponsored by the United States government was not an impermissible "sub rosa plan"; sales agreement did not dictate terms of Chapter 11 plan of reorganization by attempting to restructure rights of creditors of estate, but merely brought in value. 11 U.S.C.A. § 363(b).

Cases that cite this headnote

[20] **Bankruptcy**

👉 Time for sale; emergency and sale outside course of business

Chapter 11 debtor and bankruptcy court should not be able to short circuit requirements for confirmation of Chapter 11 plan by establishing terms of plan sub rosa in connection with sale of debtor's assets outside ordinary course of its business. 11 U.S.C.A. § 363(b).

2 Cases that cite this headnote

[21] **Bankruptcy**
👉 Time for sale; emergency and sale outside course of business

Proposed sale outside the ordinary course of debtor's business may be objectionable when aspects of transaction dictate terms of ensuing plan or constrain parties in exercising their confirmation rights, such as by placing restrictions on creditors' rights to vote on plan. 11 U.S.C.A. § 363(b).

1 Cases that cite this headnote

[22] **Bankruptcy**
👉 Time for sale; emergency and sale outside course of business

Proposed sale outside ordinary course of Chapter 11 debtor's business may be objectionable as "sub rosa plan" if the sale itself seeks to allocate or dictate distribution of sale proceeds among different classes of creditors. 11 U.S.C.A. § 363(b).

2 Cases that cite this headnote

[23] **Bankruptcy**
👉 Time for sale; emergency and sale outside course of business

Proposed sale of Chapter 11 debtor's assets outside ordinary course of its business does not "dictate terms" of subsequent plan, so as to be objectionable as "sub rosa plan," simply because sales proceeds are insufficient to permit dividend to certain class of creditors. 11 U.S.C.A. § 363(b).

Cases that cite this headnote

[24] **Bankruptcy**
👉 Time for sale; emergency and sale outside course of business

Proposed sale of Chapter 11 debtor's assets outside ordinary course of its business is not objectionable as "sub rosa plan" based solely on fact that purchaser is to assume some, but not all, of debtor's liabilities, or because some contract counterparties' contracts will not be assumed. 11 U.S.C.A. § 363(b).

Cases that cite this headnote

[25] **Bankruptcy**
👉 Claims by insiders and by attorneys in excess of value

Factors that bankruptcy courts consider in deciding whether secured debt should be recharacterized as equity are as follows: (1) names given to the instruments, if any, evidencing indebtedness; (2) presence or absence of fixed maturity date and schedule of payments; (3) presence or absence of a fixed rate of interest and interest payments; (4) source of repayments; (5) adequacy or inadequacy of capitalization; (6) identity of interest between creditor and stockholder; (7) security, if any, for the advances; (8) corporation's ability to obtain financing from outside lending institutions; (9) extent to which advances were subordinated to claims of outside creditors; (10) extent to which advances were used to acquire capital assets; and (11) presence or absence of sinking fund to provide repayments.

Cases that cite this headnote

[26] **Bankruptcy**
👉 Claims by insiders and by attorneys in excess of value

**Bankruptcy**
👉 Manner and Terms

"Debt" that bankrupt automobile manufacturer owed to the federal government, for financing that government had made available in order

to keep manufacturer afloat until it could enter bankruptcy and to assist it with its reorganization, could not be restructured as "equity," so as to prevent government from credit-bidding amount of that debt in connection with sale of debtor-manufacturer's assets outside the ordinary course to purchaser sponsored by government, where financing was fully documented as a secured loan, complete with intercreditor agreements to address priority issues with other secured lenders, had interest terms, albeit at better than market rates, and maturity terms, and had separate equity features, providing for warrants to accompany the debt instruments.

Cases that cite this headnote

**[27]    Bankruptcy**
🔑  Inequitable conduct

Party seeking to equitably subordinate a claim must first prove the following: (1) that holder of claim engaged in inequitable conduct; (2) that this inequitable conduct resulted in injury to creditors or conferred an unfair advantage on claimant; and (3) that equitable subordination is not inconsistent with provisions of the Bankruptcy Code. 11 U.S.C.A. § 510.

Cases that cite this headnote

**[28]    Bankruptcy**
🔑  Inequitable conduct

**Bankruptcy**
🔑  Manner and Terms

Federal government's claim against bankrupt automobile manufacturer, for financing that government had made available in order to keep manufacturer afloat until it could enter bankruptcy and to assist it with its reorganization, could not be equitably subordinated to other debt, so as to prevent government from credit-bidding amount of that debt in connection with sale of debtor-manufacturer's assets outside the ordinary course to purchaser sponsored by government, given complete lack of evidence of any inequitable conduct by government in advancing funds to

help thousands of creditors, citizens, employees of manufacturer and employees of suppliers that depended on manufacturer. 11 U.S.C.A. § 510.

Cases that cite this headnote

**[29]    Corporations and Business Organizations**
🔑  Exceptions to Successor Non-Liability

As general rule, purchaser of assets does not assume liabilities of the seller unless the purchaser expressly agrees to do so or an exception to this rule exists.

2 Cases that cite this headnote

**[30]    Corporations and Business Organizations**
🔑  Assumption of or Succession to Transferor's Debts and Liabilities

Successor liability is equitable exception to general rule that purchaser of assets does not assume liabilities of the seller.

2 Cases that cite this headnote

**[31]    Bankruptcy**
🔑  Adequate protection;  sale free of liens

Term "interest," as used in bankruptcy statute providing for sale of estate assets free and clear of any interest in such assets possessed by entity other than estate, was broad enough to include successor liability claims, so as to authorize assets of a bankrupt automobile manufacturer to be sold free and clear of successor liability claims. 11 U.S.C.A. § 363(f).

3 Cases that cite this headnote

**[32]    Bankruptcy**
🔑  Adequate protection;  sale free of liens

Term "interest," as it is used in bankruptcy statute providing for sale of estate assets free and clear of any interest in such assets possessed by an entity other than estate, includes more than just liens. 11 U.S.C.A. § 363(f).

Cases that cite this headnote

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 154 of 378

**[33]  Bankruptcy**

    🔑 Adequate protection;  sale free of liens

Congress's use of the word "interest," in bankruptcy statute providing for sale of estate assets free and clear of any interest in such assets possessed by entity other than estate, while elsewhere providing in Chapter 11 provision that "property dealt with by the plan is free and clear of all claims and interests," was not indication that term "interest," as used in the former provision, should not be interpreted to include claims; provisions were disparate provisions, and no conclusion could be drawn from this variance in terminology between them. 11 U.S.C.A. §§ 363(f), 1141(c).

Cases that cite this headnote

**[34]  Courts**

    🔑 Particular questions or subject matter

Bankruptcy judge presiding over Chapter 11 case of automobile manufacturer would follow the decisions of other bankruptcy judges in the same district, in absence of plain error, in recognition of the importance of predictability in commercial bankruptcy cases.

3 Cases that cite this headnote

**[35]  Courts**

    🔑 Previous Decisions as Controlling or as Precedents

Stare decisis is particularly important in commercial bankruptcy cases.

1 Cases that cite this headnote

**[36]  Bankruptcy**

    🔑 Order of court and proceedings therefor in general

Language in order approving proposed sale of assets of bankrupt automobile manufacturer to government-sponsored purchaser free and clear of successor liability claims would be modified, for benefit of holders of future asbestos claims that had not yet sustained any injuries due to their exposure to asbestos, to clarify that injunction against pursuit of successor liability claims against purchaser of debtor's assets would be enforceable only "to the fullest extent constitutionally permissible." 11 U.S.C.A. § 363(f).

3 Cases that cite this headnote

**[37]  Bankruptcy**

    🔑 Adequate protection;  sale free of liens

**Bankruptcy**

    🔑 Rights and liabilities of purchasers, and right to purchase

While, pursuant to order approving proposed sale of assets of bankrupt automobile manufacturer to government-sponsored purchaser free and clear of successor liability claims, purchaser could not be held liable, as successor in interest, for the environmental liabilities of the old debtor-manufacturer, purchaser would be liable from day that it received any such properties for its own environmental responsibilities going forward. 11 U.S.C.A. § 363(f).

4 Cases that cite this headnote

**[38]  Bankruptcy**

    🔑 Time for sale;  emergency and sale outside course of business

**Bankruptcy**

    🔑 Rights and liabilities of purchasers, and right to purchase

**Bankruptcy**

    🔑 Collective bargaining agreements

Bankruptcy statute dealing with responsibilities of Chapter 11 trustee or debtor-in-possession with respect to retiree benefits of debtor's retired workers imposed such responsibilities only on trustee or debtor-in-possession, not on purchaser outside the ordinary course of Chapter 11 debtor's assets, which had no liability to retirees unless it assumed them. 11 U.S.C.A. §§ 363(b), 1114.

1 Cases that cite this headnote

**[39]  Bankruptcy**

🔑 Time for sale; emergency and sale outside course of business

Chapter 11 plan confirmation requirement, which prevented court from confirming proposed plan unless it provided for "continuation after its effective date of payment of all retiree benefits," was not implicated in connection with sale outside the ordinary course of assets of bankrupt car manufacturer, where court had already determined that proposed sale was not sub rosa plan. 11 U.S.C.A. §§ 363(b), 1129(a)(13).

2 Cases that cite this headnote

[40]    **Bankruptcy**
🔑 Order of court and proceedings therefor in general

Automobile dealers' association which did not represent any of dealers with which debtor/ car manufacturer had relationships, but which actually represented competing dealers and which had filed amicus brief opposing proposed sale of debtor's assets outside the ordinary course to government-sponsored purchaser, lacked standing to have its comments deemed an objection to proposed sale. 11 U.S.C.A. § 363(b).

Cases that cite this headnote

[41]    **Bankruptcy**
🔑 Debtor's Contracts and Leases

**Bankruptcy**
🔑 Assumption, Rejection, or Assignment

Chapter 11 debtor, in connection with a proposed sale of its automobile manufacturing business to purchaser sponsored by federal government, did not have to choose between either assuming its dealer agreements and assigning them to purchaser or rejecting them outright but could seek to ameliorate effects of immediate rejection and to provide dealers with softer landing by negotiating deferred termination agreements, without fear that these deferred termination agreements would be subject to collateral attack based upon claims of coercion. 11 U.S.C.A. §§ 363(b), 365.

3 Cases that cite this headnote

[42]    **Bankruptcy**
🔑 Equitable powers and principles

**Bankruptcy**
🔑 Time for sale; emergency and sale outside course of business

**Bankruptcy**
🔑 Rights and liabilities of purchasers, and right to purchase

Bankruptcy court, in connection with proposed sale outside the ordinary course of assets of bankrupt automobile manufacturer to purchaser sponsored by the United States government, could not utilize its equitable power to enter "necessary or appropriate" orders, in order to force purchaser to assume certain liabilities of the old debtor-manufacturer based on court's notions of equity. 11 U.S.C.A. § 105(a).

3 Cases that cite this headnote

[43]    **Bankruptcy**
🔑 Equitable powers and principles

Bankruptcy court is not free to use its equitable powers to circumvent the Bankruptcy Code. 11 U.S.C.A. § 105(a).

Cases that cite this headnote

[44]    **Bankruptcy**
🔑 Carrying out provisions of Code

Bankruptcy judges, in exercise of their power to enter "necessary or appropriate" orders, are not free to do whatever feels right. 11 U.S.C.A. § 105(a).

Cases that cite this headnote

[45]    **Bankruptcy**
🔑 Amount secured; partial security

"Equal and ratable" provision in indenture for bonds, which provided for enhancement of status of unsecured bondholders to that of secured creditors if liens were thereafter placed on certain manufacturing facilities owned by

bankrupt issuer of bonds, was not triggered, in connection with prepetition secured financing that issuer received from federal government where, pursuant to terms of financing agreement, transaction did not place lien on certain excluded collateral, which was defined to include anything that would trigger "equal and ratable" provision; accordingly, bondholders were not entitled to be treated as secured creditors in issuer's Chapter 11 case.

Cases that cite this headnote

[46]  **Bankruptcy**

 👉 Time for sale; emergency and sale outside course of business

**Bankruptcy**

 👉 Manner and Terms

**Federal Courts**

 👉 Government property, facilities, and funds

Any objection to use of Troubled Asset Relief Program (TARP) funds in connection with financing that government had provided to troubled automobile manufacturer was moot after government had used such TARP funds to provide financing, not only before, but after commencement of manufacturer's Chapter 11 case pursuant to post-petition financing order of bankruptcy court; party who had raised no objection to use of TARP funds in connection with post-petition financing order could not belatedly raise issue as basis to object to government's being able to credit-bid the debt associated with financing that it had previously provided in connection with sale of debtor-manufacturer's assets outside ordinary course to purchaser sponsored by government. 11 U.S.C.A. § 363(b).

Cases that cite this headnote

[47]  **Bankruptcy**

 👉 Order of court and proceedings therefor in general

Unsecured creditor opposed to proposed sale of assets of bankrupt automobile manufacturer outside the ordinary course of business on credit bid by federal government did not have standing to object to government's use of Troubled Asset Relief Program (TARP) funds in connection with financing that underlay its credit bid; even assuming that proposed sale somehow injured unsecured creditor, despite undisputed evidence that manufacturer's assets were worth tens of billions of dollars less than its liabilities, and that alternative to proposed sale would be Chapter 7 liquidation in which creditor would receive nothing, creditor could not show that any such injury was fairly traceable to government's use of TARP funds. 11 U.S.C.A. § 363(b).

Cases that cite this headnote

[48]  **Bankruptcy**

 👉 Order of court and proceedings therefor in general

Bankrupt automobile manufacturer's shareholders were not parties aggrieved, with ability to challenge proposed sale of manufacturer's assets outside the ordinary course of business to government-sponsored purchaser, where only alternative to proposed sale was Chapter 7 liquidation, in which it was estimated that debtor's assets would be sold for less than 10% of $82 billion at which they were booked, an amount woefully inadequate to satisfy its roughly $172 billion in debt. 11 U.S.C.A. § 363(b).

1 Cases that cite this headnote

**Attorneys and Law Firms**

*471 Appearances: [1]

Weil, Gotshal & Manges LLP, by Harvey R. Miller (argued), Stephen Karotkin (argued), Joseph H. Smolinsky (argued), New York, NY, for Debtors and Debtors in Possession.

Kramer Levin Naftalis & Frankel LLP, by Kenneth H. Eckstein (argued), Thomas Moers Mayer (argued), Robert Schmidt, Jeffrey S. Trachtman, New York, NY, for the Official Committee of Unsecured Creditors.

Lev L. Dassin, Acting United States Attorney for the Southern District of New York, by David S. Jones (argued), Jeffrey

S. Oestericher, Matthew L. Schwartz (argued), Joseph N. Cordaro, and Cadwalader, Wickersham & Taft LLP, by John J. Rapisardi, New York, NY, Counsel to the United States of America.

Cleary Gottlieb Steen & Hamilton, by James L. Bromley (argued), Avram E. Luft, Cohen, Weiss and Simon LLP, by Babette A. Ceccotti (argued), New York, NY, for The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, AFL–CIO.

Patton Boggs LLP, by Michael P. Richman (argued), Mark A. Salzberg (pro hac vice) (argued), James C. Chadwick (pro hac vice), Melissa Iachan, New York, NY, for The Unofficial Committee Of Family & Dissident GM Bondholders.

The Coleman Law Firm, by Steve Jakubowski (argued), Elizabeth Richert, Chicago, IL, for Individual Tort Litigants Callan Campbell, Kevin Junso, Edwin Agosto, Kevin Chadwick, and Joseph Berlingieri.

Schnader Harrison Segal & Lewis LLP, by Barry E. Bressler (pro hac vice) (argued), Richard A. Barkasy (pro hac vice), Benjamin P. Deutsch. New York, NY, for Ad Hoc Committee of Consumer Victims of General Motors.

Stutzman, Bromberg, Esserman & Plifka P.C. by Sander L. Esserman (pro hac vice) (argued), Robert T. Brousseau (pro hac vice), Peter D'Apice, Jo E. Hartwick (argued), Dallas, TX, for Ad Hoc Committee of Asbestos Personal Injury Claimants.

Orrick, Herrington & Sutcliffe LLP, by Roger Frankel (argued), Richard H. Wyron, Washington, D.C., by Lorraine S. McGowen, Alyssa D. Englund, New York, NY, counsel to the Unofficial GM Dealers Committee.

Kennedy, Jennik & Murray, P.C., by Thomas M. Kennedy (argued), Susan M. Jennik, New York, NY, for IUE–CWA.

Nebraska Attorney General Jon Bruning, by Leslie C. Levy, Karen Cordry (argued), Lincoln, NE, for the State of Nebraska and on behalf of the Ad Hoc Committee of State Attorneys General.

Oliver Addison Parker, Lauderdale By The Sea, FL, pro se.

N.W. Bernstein & Associates, LLC, by: Norman W. Bernstein (argued), Rye Brook, NY, for the Trustees of Environmental Conservation and Chemical Corporation Site Trust Fund.

Caplin & Drysdale Chartered, by Elihu Inselbuch, Esq., Rita C. Tobin, Esq., New York, NY, by Peter Van N. Lockwood, Esq., Ronald E. Reinsel, Esq. (pro hac vice) (argued), Washington, D.C., for Mark Buttita, personal representative of Salvatore Buttita.

Vedder Price P.C., by Michael J. Edelman, Michael L. Schein (argued), Erin Zavalkoff–Babej, New York, NY, for Export Development Canada.

**\*472** Robinson Brog Leinwand Greene, Genovese & Gluck, P.C., by Russell P. McRory (argued), Fred B. Ringel, Mitchell Greene, Robert R. Leinwand, New York, NY, and Myers & Fuller P.A., by Richard Sox (pro hac vice), Shawn Mercer (pro hac vice), Robert Byerts (pro hac vice), Tallahassee, FL, for the Greater New York Automobile Dealers Association.

Gibson, Dunn & Crutcher LLP, by David Feldman (argued), Matthew J. Williams, Adam H. Offenhartz, New York, NY, for Wilmington Trust Company, Indenture Trustee.

Kelley, Drye & Warren LLP, by David E. Retter, Pamela Bruzzese–Szczygiel, Jennifer A. Christian (argued), New York, NY, for Law Debenture Trust Company of New York, as Proposed Successor Indenture Trustee.

New York State Department of Law by Susan Taylor (argued). Albany, NY, for Environmental Protection Bureau.

Levy Ratner, P.C., New York, NY, by Suzanne Hepner, for United Steelworkers.

Gorlick Kravitz & Listhaus P.C., by Barbara Mehlsack, New York, NY, for International Union of Operating Engineers Locals 18S, 101S, and 832S.

Farella Braun & Martel LLP, by Neil A. Goteiner (argued), Dean M. Gloster (pro hac vice), Nan E. Joesten (pro hac vice), San Francisco, CA, for General Motors Retirees Association.

Public Citizen Litigation Group, by Adina H. Rosenbaum, Allison M. Zieve, Washington, DC, for Center for Auto Safety, Consumer Action, Consumers for Auto Reliability and Safety, National Association of Consumer Advocates, and Public Citizen.

Otterbourg, Steindler, Houston & Rosen, P.C., by Jonathan N. Helfat, Steven B. Soll, New York, NY, for GMAC LLC.

Attorneys for the State of Texas, by J. Casey Roy (argued), Austin, TX, on behalf of the Texas Dep't of Transportation, Motor Vehicle Division.

Diana G. Adams, by Diana G. Adams, Linda A. Riffkin, Tracy Hope Davis, Andrew D. Velez–Rivera, Brian Shoichi Masumoto, New York, NY, United States Trustee.

**Opinion**

**DECISION ON DEBTORS' MOTION FOR APPROVAL OF (1) SALE OF ASSETS TO**

**VEHICLE ACQUISITION HOLDINGS LLC; (2) ASSUMPTION AND ASSIGNMENT OF RELATED EXECUTORY CONTRACTS; AND (3) ENTRY INTO UAW RETIREE SETTLEMENT AGREEMENT**

ROBERT E. GERBER, Bankruptcy Judge.

## TABLE OF CONTENTS

Findings of Fact....................................................................................................... ........ 475

   1.   Background.................................................................................................. 475

   2.   GM's Dealer Network................................................................................. 475

   3.   GM's Suppliers........................................................................................... 476

   4.   GM's Financial Distress.......................................................................... 476

   5.   U.S. Government Assistance.................................................................... 476

   6.   GM's First Quarter Results....................................................................... 479

   7.   The 363 Transaction............................................................................ 479

   8.   The Liquidation Alternative....................................................... ........ 481

   9.   Fairness of the Transaction...................................................................... 481

   10.  Specifics of the Transaction..................................................................... 481

      (a)  Acquired and Excluded Assets................................................. ............481

      (b)  Assumed and Excluded Liabilities................................................................481

      (c)  Consideration..................................................................................482

      (d)  Ownership of New GM.....................................................................482

      (e)  Other Aspects of Transaction..........................................................483

      (f)  The Proposed Sale Order................................................................483

   11.  Contingent Liabilities................................................................... ........ 483

   12.  Agreement with UAW............................................................................... 484

   13.  Need for Speed........................................................................................... 484

   14.  Ultimate Facts........................................................................... ........ 485

Discussion........................................................................................................ 486

1.    Sale Under Section 363................................................................................................486

       (a)    Utilization of Section 363.......................................................................................486

       (b)    Compliance with Standards for Approval of Section 363 Sales....................................493

       (c)    "Sub Rosa" Plan..................................................................................................495

       (d)    Recharacterization or Subordination of U.S. Treasury Debt.......................................498

       (e)    Asserted Inability to Credit Bid..............................................................................499

2.    Successor Liability Issues...........................................................................................499

       (a)    Textual Analysis...................................................................................................501

       (b)    Caselaw..............................................................................................................503

3.    Asbestos Issues..........................................................................................................506

4.    Environmental Issues..................................................................................................507

5.    Splinter Union Retiree Issues.......................................................................................509

6.    Dealer Issues..............................................................................................................512

7.    ECC Trust...................................................................................................................516

8.    "Equally and Ratably" Issues.......................................................................................517

9.    Unauthorized Use of TARP Funds Issues......................................................................518

10.   Cure Objections..........................................................................................................519

11.   UAW Settlement Objections.........................................................................................519

12.   Stockholder Objections................................................................................................520

13.   Miscellaneous Objections.............................................................................................520

Conclusion....................................................................................................................520

**\*473**  In this contested matter in the jointly administered chapter 11 cases of Debtors General Motors Corporation and certain of its subsidiaries (together, "**GM**"), the Debtors move for an order, pursuant to section 363 of the Bankruptcy Code, approving GM's sale of the bulk of its assets (the "**363 Transaction**"), pursuant to a "Master Sale and Purchase Agreement" and related documents (the "**MPA**"), to Vehicle Acquisitions Holdings LLC (the "**Purchaser**") [2] —a purchaser sponsored by the U.S. Department of the Treasury

(the "**U.S. Treasury**")—free and clear of liens, claims, encumbrances, and other interests. The Debtors also seek approval of the assumption and assignment of the executory contracts that would be needed by the Purchaser, and of a settlement with the United Auto Workers ("**UAW**") pursuant to an agreement (the "**UAW Settlement Agreement**") under which GM would satisfy obligations to an estimated 500,000 retirees.

GM's motion is supported by the Creditors' Committee; the U.S. Government (which has advanced approximately $50 billion to GM, and is GM's largest pre–and post-petition creditor); the Governments of Canada and Ontario (which ultimately will have advanced about $9.1 billion); the UAW (an affiliate of which is GM's single largest unsecured creditor); **\*474** the indenture trustees for GM's approximately $27 billion in unsecured bonds; and an ad hoc committee representing holders of a majority of those bonds.

But the motion has engendered many objections and limited objections, by a variety of others. The objectors include, among others, a minority of the holders of GM's unsecured bonds (most significantly, an ad hoc committee of three of them (the "**F & D Bondholders Committee**"), holding approximately .01% of GM's bonds), [3] who contend, among other things, that GM's assets can be sold only under a chapter 11 plan, and that the proposed section 363 sale amounts to an impermissible "*sub rosa*" plan.

Objectors and limited objectors also include tort litigants who object to provisions in the approval order limiting successor liability claims against the Purchaser; asbestos litigants with similar concerns, along with concerns as to asbestos ailments that have not yet been discovered; and non-UAW unions ("**Splinter Unions**") speaking for their retirees, concerned that the Purchaser does not plan to treat their retirees as well as the UAW's retirees.

On the most basic issue, whether a 363 sale is proper, GM contends that this is exactly the kind of case where a section 363 sale is appropriate and indeed essential—and where under the several rulings of the Second Circuit and the Supreme Court in this area, GM's business can be sold, and its value preserved, before the company dies. The Court agrees. GM cannot survive with its continuing losses and associated loss of liquidity, and without the governmental funding that will expire in a matter of days. And there are no options to this sale—especially any premised on the notion that the company could survive the process of negotiations and litigation that characterizes the plan confirmation process.

As nobody can seriously dispute, the only alternative to an immediate sale is liquidation—a disastrous result for GM's creditors, its employees, the suppliers who depend on GM for their own existence, and the communities in which GM operates. In the event of a liquidation, creditors now trying to increase their incremental recoveries would get nothing.

Neither the Code, nor the caselaw—especially the caselaw in the Second Circuit—requires waiting for the plan confirmation process to take its course when the inevitable consequence would be liquidation. Bankruptcy courts have the power to authorize sales of assets at a time when there still is value to preserve—to prevent the death of the patient on the operating table.

Nor can the Court accept various objectors' contention that there here is a *sub rosa* plan. GM's assets simply are being sold, with the consideration to GM to be hereafter distributed to stakeholders, consistent with their statutory priorities, under a subsequent plan. Arrangements that will be made by the Purchaser do not affect the distribution of the *Debtor's* property, and will address wholly different needs and concerns—arrangements that the Purchaser needs to create a new GM **\*475** that will be lean and healthy enough to survive.

Issues as to how any approval order should address *successor liability* are the only truly debatable issues in this case. And while textual analysis is ultimately inconclusive and caselaw on a nationwide basis is not uniform, the Court believes in *stare decisis;* it follows the caselaw in this Circuit and District in holding that to the extent the Purchaser has not voluntarily agreed to accept successor liability, GM's property—like that of Chrysler, just a few weeks ago—may be sold free and clear of claims.

Those and other issues are addressed below. GM's motion is granted. The following are the Court's Findings of Fact, Conclusions of Law, and bases for the exercise of its discretion in connection with this determination.

### *Findings of Fact* [4]

After an evidentiary hearing, [5] the Court makes the following Findings of Fact.

### 1. Background

GM is primarily engaged in the worldwide production of cars, trucks, and parts. It is the largest Original Equipment Manufacturer ("**OEM**") in the U.S., and the second largest in the world.

GM has marketed cars and trucks under many brands—most of them household names in the U.S.—including

Buick, Cadillac, Chevrolet, Pontiac, GMC, Saab, Saturn, HUMMER, and Opel. It operates in virtually every country in the world.

GM maintains its executive offices in Detroit, Michigan, and its major financial and treasury operations in New York, New York. As of March 31, 2009, GM employed approximately 235,000 employees worldwide, of whom 163,000 were hourly employees and 72,000 were salaried. Of GM's 235,000 employees, approximately 91,000 are employed in the U.S. Approximately 62,000 (or 68%) of those U.S. employees were represented by unions as of March 31, 2009. The UAW represents by far the largest portion of GM's U.S. unionized employees, representing approximately 61,000 employees.

As of March 31, 2009, GM had consolidated reported global assets and liabilities of approximately $82 billion, and $172 billion, respectively. However, its assets appear on its balance sheet at book value, as contrasted to a value based on any kind of valuation or appraisal. And if GM had to be liquidated, its liquidation asset value, as discussed below, would be less than 10% of that $82 billion amount.

While GM has publicly traded common stock, no one in this chapter 11 case has seriously suggested that GM's stock is "in the money," or anywhere close to that. By any standard, there can be no doubt that GM is insolvent. In fact, as also discussed below, if GM were to liquidate, its unsecured creditors would receive nothing on their claims.

### 2. GM's Dealer Network

Substantially all of GM's worldwide car and truck deliveries (totaling 8.4 million vehicles in 2008) are marketed through independent retail dealers or distributors. **\*476** GM relies heavily on its relationships with dealers, as substantially all of its retail sales are through its network of independent retail dealers and distributors.

The 363 Transaction contemplates the assumption by GM and the assignment to New GM of dealer franchise agreements relating to approximately 4,100 of its 6,000 dealerships, modified in ways to make GM more competitive (as modified, "**Participation Agreements**"). But GM cannot take all of the dealers on the same basis. At the remaining dealer's option, GM will either reject those agreements, or assume modified agreements, called "**Deferred Termination Agreements.**"

The Deferred Termination Agreements will provide dealers with whom GM cannot go forward a softer landing and orderly termination. GM is providing approximately 17 months' notice of termination.

As of the time of the hearing on this motion, approximately 99% of the continuing dealers had signed Participation Agreements and 99% of the dealers so affected had signed Deferred Termination Agreements.

The agreements of both types include waivers of rights that dealers would have in connection with their franchises. In accordance with a settlement with the Attorneys General of approximately 45 states (the "**AGs**"), the Debtors and the Purchaser agreed to modifications to the Purchase Agreement and the proposed approval order under which (subject to the more precise language in the proposed order) the Court makes no finding as to the extent any such modifications are enforceable, and any disputes as to that will be resolved locally.

### 3. GM's Suppliers

As the nation's largest automobile manufacturer, GM uses the services of thousands of suppliers—resulting in approximately $50 billion in annual supplier payments. In North America alone, GM uses a network of approximately 11,500 suppliers. In addition, there are over 600 suppliers whose sales to GM represent over 30% of their annual revenues. Thus hundreds, if not thousands, of automotive parts suppliers depend, either in whole or in part, on GM for survival.

### 4. GM's Financial Distress

Historically, GM was one of the best performing OEMs in the U.S. market. But with the growth of competitors with far lower cost structures and dramatically lower benefit obligations, GM's leadership position in the U.S. began to decline. At least as a result of that lower cost competition and market forces in the U.S. and abroad (including jumps in the price of gasoline; a massive recession (with global dislocation not seen since the 1930s); a dramatic decline in U.S. domestic auto sales; and a freeze-up in consumer and commercial credit markets), GM suffered a major drop in new vehicle sales and in market share—from 45% in 1980 to a forecast 19.5% in 2009.

The Court does not need to make further factual findings as to the many causes for GM's difficulties, and does not do so.

Observers might differ as to the causes or opine that there were others as well, and might differ especially with respect to which causes were most important. But what is clear is that, especially in 2008 and 2009, GM suffered a steep erosion in revenues, significant operating losses, and a dramatic loss of liquidity, putting its future in grave jeopardy.

### 5. U.S. Government Assistance

By the fall of 2008, GM was in the midst of a severe liquidity crisis, and its ability to continue operations grew more and more **\*477** uncertain with each passing day. As a result, in November 2008, GM was compelled to seek financial assistance from the U.S. Government.

The U.S. Government understood the draconian consequences of the situation—one that affected not just GM, but also Chrysler, and to a lesser extent, Ford (the "**Big Three**"). And the failure of any of the Big Three (or worse, more than one of them) might well bring grievous ruin on the thousands of suppliers to the Big Three (many of whom have already filed their own bankruptcy cases, in this District, Delaware, Michigan and elsewhere); other businesses in the communities where the Big Three operate; dealers throughout the country; and the states and municipalities who looked to the Big Three, their suppliers and their employees for tax revenues.

The U.S. Government's fear—a fear this Court shares, if GM cannot be saved as a going concern—was of a systemic failure throughout the domestic automotive industry and the significant harm to the overall U.S. economy that would result from the loss of hundreds of thousands of jobs [6] and the sequential shutdown of hundreds of ancillary businesses if GM had to cease operations.

Thus in response to the troubles plaguing the American automotive industry, the U.S. Government, through the U.S. Treasury and its Presidential Task Force on the Auto Industry (the "**Auto Task Force**"), implemented various programs to support and stabilize the domestic automotive industry—including support for consumer warranties and direct loans. Thus at GM's request in late 2008, the U.S. Treasury determined to make available to GM billions of dollars in emergency secured financing in order to sustain GM's operations while GM developed a new business plan. At the time that the U.S. Treasury first extended credit to GM, there was absolutely no other source of financing available. No

party other than Treasury conveyed its willingness to loan funds to GM and thereby enable it to continue operating.

The first loan came in December 2008, after GM submitted a proposed viability plan to Congress. That plan contemplated GM's shift to smaller, more fuel-efficient cars, a reduction in the number of GM brand names and dealerships, and a renegotiation of GM's agreement with its principal labor union. As part of its proposed plan, GM sought emergency funding in the form of an $18 billion federal loan.

But the U.S. Government was not of a mind to extend a loan that large, and after negotiations, the U.S. Treasury and GM entered into a term loan agreement on December 31, 2008 (the "**Treasury Prepetition Loan**"), that provided GM up to $13.4 billion in financing on a senior secured basis. Under that facility, GM immediately borrowed $4 billion, followed by $5.4 billion less than a month later, and the remaining $4 billion on February 17, 2009.

At the time this loan was made, GM was in very weak financial condition, and the loan was made under much better terms than could be obtained from any commercial lender—if any lender could have been found at all. But the Court has no doubt whatever, and finds, that the Treasury Prepetition Loan was intended to be, and was, a loan and not a contribution of equity. As contrasted with other TARP transactions that involved the U.S. Treasury making direct investments in troubled **\*478** companies in return for common or preferred equity, the U.S. Treasury structured the Treasury Prepetition Loan as a loan with the only equity received by the U.S. Treasury being in the form of two warrants. The agreement had terms and covenants of a loan rather than an equity investment. The U.S. Treasury sought and received first liens on many assets, and second liens on other collateral. The transaction also had separate collateral documents. And the U.S. Treasury entered into intercreditor agreements with GM's other senior secured lenders in order to agree upon the secured lenders' respective prepetition priorities.

The Court further finds, as a fact or mixed question of fact and law, looking at the totality of the circumstances, that there was nothing inequitable about the way the U.S. Treasury behaved in advancing these funds. Nor did the U.S. Treasury act inequitably to GM's creditors, who were assisted, and not injured, by the U.S. Treasury's efforts to keep GM alive and to forestall a liquidation of the company.

GM had provided a business plan to Congress under which GM might restore itself to profitability, but it was widely perceived to be unsatisfactory. The U.S. Treasury required GM to submit a proposed business plan to demonstrate its future competitiveness that went significantly farther than the one GM had submitted to Congress. As conditions to the U.S. Treasury's willingness to provide financing, GM was to:

> (i) reduce its approximately $27 billion in unsecured public debt by no less than two-thirds;

> (ii) reduce its total compensation to U.S. employees so that by no later than December 31, 2009, such compensation would be competitive with Nissan, Toyota, or Honda in the U.S.;

> (iii) eliminate compensation or benefits to employees who had been discharged, furloughed, or idled, other than customary severance pay;

> (iv) apply, by December 31, 2009, work rules for U.S. employees in a manner that would be competitive with the work rules for employees of Nissan, Toyota, or Honda in the U.S.; and

> (v) make at least half of the $20 billion contribution that GM was obligated to make to a VEBA [7] Trust for UAW retirees ("**VEBA Trust**") in the form of common stock, rather than cash.

Thereafter, in March 2009, Treasury indicated that if GM was unable to complete an effective out-of-court restructuring, it should consider a new, more aggressive, viability plan under an expedited Court-supervised process to avoid further erosion of value. In short, GM was to file a bankruptcy petition and take prompt measures to preserve its value while there was still value to save.

The Treasury Prepetition Loan agreement (whose formal name was "Loan and Security Agreement," or "**LSA**") provided that, if, by March 31, 2009, the President's designee hadn't issued a certification that GM had taken all steps necessary to achieve long-term viability, then the loans due to Treasury would become due and payable 30 days thereafter. And on March 30, the President announced that the viability plan proposed by GM was not **\*479** satisfactory, and didn't justify a substantial new investment of taxpayer dollars.

But rather than leaving GM to simply go into liquidation, the President stated that the U.S. Government would provide

assistance to avoid such a result, *if* GM took the necessary additional steps to justify that assistance—including reaching agreements with the UAW, GM's bondholders, and the VEBA Trust. The conditions to federal assistance required substantial debt reduction and the submission of a revised business plan that was more aggressive in both scope and timing.

As an alternative to liquidation, the President indicated that the U.S. Treasury would extend to GM adequate working capital for a period of another 60 days to enable it to continue operations. And as GM's largest secured creditor, the U.S. Treasury would negotiate with GM to develop and implement a more aggressive and comprehensive viability plan. The President also stated that GM needed a "fresh start to implement the restructuring plan," which "may mean using our [B]ankruptcy [C]ode as a mechanism to help [it] restructure quickly and emerge stronger." The President explained:

> What I'm talking about is using our existing legal structure as a tool that, with the backing of the U.S. Government, can make it easier for General Motors ... to *quickly* clear away old debts that are weighing [it] down so that [it] can get back on [its] feet and onto a path to success; a tool that we can use, even as workers stay on the job building cars that are being sold.

> What I'm not talking about is a process where a company is simply broken up, sold off, and no longer exists. We're not talking about that. And what I'm *not talking about is a company that's stuck in court for years, unable to get out.* [8]

The U.S. Treasury and GM subsequently entered into amended credit agreements for the Treasury Prepetition Loan to provide for an additional $2 billion in financing that GM borrowed on April 24, 2009, and another $4 billion that GM borrowed on May 20, 2009. The funds advanced to GM under the Treasury Prepetition Loan—ultimately $19.4 billion in total (all on a senior secured basis)—permitted GM to survive through the date of the filing of its bankruptcy case.

On June 1, 2009 (the "**Filing Date**"), GM filed its chapter 11 petition in this Court.

### 6. GM's First Quarter Results

On May 8, 2009, about three weeks before the Filing Date, GM announced its first quarter 2009 results. They presented a grim financial picture, and equally grim trends. Specifically:

(a) GM's total net revenue decreased by $20 billion (or 47.1%) in the first three months of 2009, as compared to the corresponding period in 2008;

(b) Operating losses increased by $5.1 billion from the prior quarter;

(c) During this same period, GM had negative cash flow of $9.4 billion;

(d) Available liquidity deteriorated by $2.6 billion; and

(e) Sales by GM dealers in the U.S. fell to approximately 413,000 vehicles in that first quarter—a decline of approximately 49% as compared to the corresponding period in 2008.

### 7. The 363 Transaction

As noted above, in connection with providing financing, Treasury advised GM **\*480** that, if an out-of-court restructuring was not possible, [9] GM should consider the bankruptcy process. That would enable GM to implement a transaction under which substantially all GM's assets would be purchased by a Treasury-sponsored purchaser (subject to any higher or better offer), in an expedited process under section 363 of the Code.

Under this game plan, the Purchaser would acquire the purchased assets; create a New GM; and operate New GM free of any entanglement with the bankruptcy cases. If the sale could be accomplished quickly enough, before GM's value dissipated as a result of continuing losses and consumer uncertainty, the 363 sale would thereby preserve the going concern value; avoid systemic failure; provide continuing employment; protect the many communities dependent upon the continuation of GM's business, and restore consumer confidence.

To facilitate the process, the U.S. Treasury and the governments of Canada and Ontario (through their Export Development Canada ("**EDC**")) [10] agreed to provide DIP financing for GM through the chapter 11 process. But they would provide the DIP financing *only* if the sale of the purchased assets occurred on an *expedited* basis. That condition was imposed to:

(i) preserve the value of the business;

(ii) restore (or at least minimize further loss of) consumer confidence;

(iii) mitigate the increasing damage that GM itself, and the industry, would suffer if GM's major business operations were to remain in bankruptcy; and

(iv) avoid the enormous costs of financing a lengthy chapter 11 case.

Treasury also agreed to provide New GM with adequate post-acquisition financing.

Importantly, the DIP financing to be furnished by the U.S. Treasury and EDC is the only financing that is available to GM. The U.S. Treasury (with its Canadian EDC co-lender) is the only entity that is willing to extend DIP financing to GM. Other efforts to obtain such financing have been unsuccessful. Absent adequate DIP financing, GM will have no choice but to liquidate. But the U.S. Government has stated it will not provide DIP financing without the 363 Transaction, and the DIP financing will come to an end if the 363 Transaction is not approved by July 10. Without such financing, these cases will plunge into a liquidation.

Alternatives to a sale have turned out to be unsuccessful, and offer no hope of success now. In accordance with standard section 363 practice, the 363 Transaction was subject to higher and better offers, but none were forthcoming. The Court finds this hardly surprising. Only the U.S. and Canadian Governmental authorities were prepared to invest in GM—and then not so much by reason of the economic merit of the purchase, but rather to address the underlying societal interests in preserving jobs and the North American auto industry, the thousands of suppliers to that industry, and the health of the communities, in the U.S. and Canada, in which GM operates.

In light of GM's substantial secured indebtedness, approximately $50 billion, the only entity that has the financial wherewithal and is qualified to purchase the **\*481** assets—and the only entity that has stepped forward to make such a purchase—is the U.S. Treasury-sponsored Purchaser. But the Purchaser is willing to proceed only under an expedited sale process under the Bankruptcy Code.

### 8. The Liquidation Alternative

In connection with its consideration of alternatives, GM secured an analysis (the "**Liquidation Analysis**"), prepared by AlixPartners LLP, of what GM's assets would be worth

in a liquidation. The Liquidation Analysis concluded that the realizable value of the assets of GM (net of the costs of liquidation) would range between approximately $6 billion and $10 billion. No evidence has been submitted to the contrary. This was in the context of an assumed $116.5 billion in general unsecured claims, though this could increase with lease and contract rejection claims and pension termination claims.

While the Liquidation Analysis projected some recoveries for secured debt and administrative and priority claims, it concluded that there would be *no recovery whatsoever* for unsecured creditors. The Court has no basis to doubt those conclusions. The Court finds that in the event of a liquidation, unsecured creditors would recover nothing.

### 9. Fairness of the Transaction

Before the 363 Transaction was presented for Court approval, GM's Board of Directors (the "**Board**") (all but one of whose members were independent, and advised by the law firm of Cravath, Swaine & Moore), received a fairness opinion, dated May 31, 2009 (the "**Fairness Opinion**"), from Evercore Group L.L.C. ("**Evercore**").

The Fairness Opinion's conclusion was that the purchase price was fair to GM, from a financial point of view. No contrary evidence has been submitted to the Court.

### 10. Specifics of the Transaction

The sale transaction, as embodied in the MPA and related documents, is complex. Its "deal points" can be summarized as follows:

### (a) Acquired and Excluded Assets

Under the Sale, New GM will acquire all of Old GM's assets, with the exception of certain assets expressly excluded under the MPA (respectively, the "**Purchased Assets**" and the "**Excluded Assets**"). The Excluded Assets chiefly consist of:

(i) $1.175 billion in cash or cash equivalents;

(ii) equity interests in certain Saturn and other entities;

(iii) certain real and personal property;

(iv) bankruptcy avoidance actions;

(v) certain employee benefit plans; and

(vi) certain restricted cash and receivables.

### (b) Assumed and Excluded Liabilities

Old GM will retain all liabilities except those defined in the MPA as "**Assumed Liabilities.**" The Assumed Liabilities include:

(i) product liability claims arising out of products delivered at or after the Sale transaction closes (the "***Closing***");

(ii) the warranty and recall obligations of both Old GM and New GM;

(iii) all employment-related obligations and liabilities under any assumed employee benefit plan relating to employees that are or were covered by the UAW collective bargaining agreement;

and—by reason of an important change that was made in the MPA after the filing of the motion—

> **\*482** (iv) broadening the first category substantially, *all* product liability claims arising from accidents or other discrete incidents arising from operation of GM vehicles occurring subsequent to the closing of the 363 Transaction, *regardless of when the product was purchased.*

The liabilities being retained by Old GM include:

(i) product liability claims arising out of products delivered prior to the Closing (to the extent they weren't assumed by reason of the change in the MPA after the filing of objections);

(ii) liabilities for claims arising out of exposure to asbestos;

(iii) liabilities to third parties for claims based upon "[c]ontract, tort or any other basis";

(iv) liabilities related to any implied warranty or other implied obligation arising under statutory or common law; and

(v) employment-related obligations not otherwise assumed, including, among other obligations, those arising out of the employment, potential employment, or termination of any individual (other than an employee

covered by the UAW collective bargaining agreement) prior to or at the Closing.

### (c) Consideration

Old GM is to receive consideration estimated to be worth approximately $45 billion, plus the value of equity interests that it will receive in New GM. It will come in the following forms:

(i) a credit bid by the U.S. Treasury and EDC, who will credit bid the majority of the indebtedness outstanding under their DIP facility and the Treasury Prepetition Loan;

(ii) the assumption by New GM of approximately $6.7 billion of indebtedness under the DIP facilities, plus an additional $1.175 billion to be advanced by the U.S. Treasury under a new DIP facility (the "**Wind Down Facility**") whose proceeds will be used by Old GM to wind down its affairs;

(iii) the surrender of the warrant that had been issued by Old GM to Treasury in connection with the Treasury Prepetition Loan;

(iv) 10% of the post-closing outstanding shares of New GM, plus an additional 2% if the estimated amount of allowed prepetition general unsecured claims against Old GM exceeds $35 billion;

(v) two warrants, each to purchase 7.5% of the post-closing outstanding shares of New GM, with an exercise price based on a $15 billion equity valuation and a $30 billion equity valuation, respectively; and

(vi) the assumption of liabilities, including those noted above.

### (d) Ownership of New GM

Under the terms of the Sale, New GM will be owned by four entities.

(i) Treasury will own 60.8% of New GM's common stock on an undiluted basis. It also will own $2.1 billion of New GM Series A Preferred Stock;

(ii) EDC will own 11.7% of New GM's common stock on an undiluted basis. It also will own $400 million of New GM Series A Preferred Stock;

(iii) A New Employees' Beneficiary Association Trust ("**New VEBA**") will own 17.5% of New GM's common stock on an undiluted basis. It also will own $6.5 billion of New GM's Series A Preferred Stock, and a 6–year warrant to acquire 2.5% of New GM's common stock, with an exercise price based on $75 billion total equity value; and

**\*483** (iv) Finally, if a chapter 11 plan is implemented as contemplated under the structure of the Sale transaction, Old GM will own 10% of New GM's common stock on an undiluted basis. In addition, if the allowed prepetition general unsecured claims against Old GM exceed $35 billion, Old GM will be issued an additional 10 million shares, amounting to approximately 2% of New GM's common stock. Old GM will also own the two warrants mentioned above.

### (e) Other Aspects of Transaction

New GM will make an offer of employment to all of the Sellers' non-unionized employees and unionized employees represented by the UAW. Substantially all of old GM's executory contracts with direct suppliers are likely to be assumed and assigned to New GM.

After the Closing, New GM will assume all liabilities arising under express written emission and limited warranties delivered in connection with the sale of new vehicles or parts manufactured or sold by Old GM.

One of the requirements of the U.S. Treasury, imposed when the Treasury Prepetition Loan was put in place, was the need to negotiate a new collective bargaining agreement which would allow GM to be fully competitive, and "equitize"—*i.e.,* convert to equity—at least one half of the obligation GM had to the UAW VEBA. Ultimately GM did so. New GM will make future contributions to the New VEBA that will provide retiree health and welfare benefits to former UAW employees and their spouses. Also, as part of the 363 Transaction, New GM will be the assignee of revised collective bargaining agreements with the UAW, the terms of which were recently ratified—though contingent upon the approval of the entirety of these motions.

### (f) The Proposed Sale Order

Though GM's request has been narrowed, as noted above, to provide that New GM will assume liability for product liability claims arising from operation of GM vehicles

occurring after the closing of the 363 Transaction (regardless of when the product was purchased), GM asks this Court, as in the *Chrysler* case, to authorize the Sale free and clear of all other "liens, claims, encumbrances and other interests," including, specifically, "all successor liability claims."

To effectuate this result, GM has submitted a proposed order to the Court (the "**Proposed Sale Order**") that contains provisions directed at cutting off successor liability except in the respects where successor liability was contractually assumed.

First, the Proposed Sale Order contains a finding—and a decretal provision to similar effect—that the Debtors may sell the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability.

Second, the Proposed Sale Order would enjoin all persons (including "litigation claimants") holding liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability, from asserting them against New GM or the Purchased Assets. [11]

### *11. Contingent Liabilities*

Certain types of GM liabilities are contingent and difficult to quantify. GM's most recent quarterly report noted present valued contingent liabilities of $934 million for product liability, $627 million **\*484** for asbestos liability, $307 million for other litigation liability, and $294 million for environmental liability.

### *12. Agreement with UAW*

Workers in the U.S. do not have government provided healthcare benefits of the type that the employees of many of GM's foreign competitors do. Over the years, GM and the other members of the Big Three committed themselves to offer many of those healthcare benefits, resulting in decreased competitiveness and enormous liabilities. GM tried to reduce the costs of healthcare benefits for its employees, but these costs continued to substantially escalate. Many of these costs were in the form of obligations to pay healthcare costs of union employees on retirement.

In 2007 and 2008, GM settled various controversies with respect to its healthcare obligations by entering into an agreement (the "**2008 UAW Settlement Agreement**"), generally providing that responsibility for providing retiree

healthcare would permanently shift from GM to a new plan that was independent of GM. GM would no longer have to pay for the benefits themselves, but instead would have to make specified contributions aggregating approximately $20.56 billion to be made by GM into the VEBA Trust. The 2008 UAW Settlement Agreement, therefore, fixed and capped GM's obligations—but in a very large amount.

As part of the 363 Transaction, the Purchaser and the UAW have reached a resolution addressing the ongoing provision of those benefits. New GM will make contributions to the New VEBA, which will have the obligation to fund the UAW retiree health and welfare benefits. And under the "**UAW Retiree Settlement Agreement,**" New GM will put value into the New VEBA, which will then have the obligation to fund retiree medical benefits for the Debtors' retirees and surviving spouses represented by the UAW (the "**UAW– Represented Retirees**").

New GM will also assume modified and duly ratified collective bargaining agreements entered into by and between the Debtors and the UAW.

### *13. Need for Speed*

GM and the U.S. Treasury say that the 363 Transaction must be approved and completed quickly. The Court finds that they are right.

Absent prompt confirmation that the sale has been approved and that the transfer of the assets will be implemented, GM will have to liquidate. There are no realistic alternatives available.

There are no merger partners, acquirers, or investors willing and able to acquire GM's business. Other than the U.S. Treasury and EDC, there are no lenders willing and able to finance GM's continued operations. Similarly, there are no lenders willing and able to finance GM in a prolonged chapter 11 case.

The continued availability of the financing provided by Treasury is expressly conditioned upon approval of this motion by July 10, and prompt closing of the 363 Transaction by August 15. Without such financing, GM faces immediate liquidation.

The Court accepts as accurate and truthful the testimony by GM CEO Fritz Henderson at the hearing:

Q. Now, if the U.S. Treasury does not fund on July 10th and the sale order is not entered by that date, what options are there for GM at that point?

A. Well, if they don't continue, we would liquidate. [12]

**\*485** The July 10 deadline is important because the U.S. Treasury, like GM itself, has been very concerned about the business status of the company in a bankruptcy process. [13] GM did worse than expected in fleet sales in June, as fleet sales customers pulled back their orders because they didn't know their status in the bankruptcy. Although the company did *better* on retail sales than expected in June, it did so for a number of reasons, one of which was the expectation that the chapter 11 case would move quickly, and that the company, in the 363 process, would be successful. [14] And results were "still terrible." [15]

Even if funding were available for an extended bankruptcy case, many consumers would not consider purchasing a vehicle from a manufacturer whose future was uncertain and that was entangled in the bankruptcy process.

Thus the Court agrees that a lengthy chapter 11 case for the Debtors is not an option. It also agrees with the Debtors and the U.S. Government that it is not reasonable to expect that a reorganization plan could be confirmed in the next 60 days (*i.e.*, 90 days from the Filing Date).

The Auto Task Force talked to dozens of experts, industry consultants, people who had observed General Motors for decades, management, and people who were well versed in the bankruptcy process as part of its planning and work on this matter. None of them felt that GM could survive a traditional chapter 11 process. The Auto Task Force learned of views by one of the leading commentators on GM that GM would be making a tragic mistake by pursuing a bankruptcy filing. It became clear to the Auto Task Force that a bankruptcy with a traditional plan confirmation process would be so injurious to GM as to not allow for GM's viability going forward. [16]

The Court accepts this testimony, and so finds. A 90 day plan confirmation process would be wholly unrealistic. In fact, the notion that a reorganization with a plan confirmation could be completed in 90 days in a case of this size and complexity is ludicrous, especially when one is already on notice of areas of likely controversy.

### 14. Ultimate Facts

The Court thus makes the following findings of ultimate facts:

1. There is a good business reason for proceeding with the 363 Transaction now, as contrasted to awaiting the formulation and confirmation of a chapter 11 plan.

2. There is an articulated business justification for proceeding with the 363 Transaction now.

3. The 363 Transaction is an appropriate exercise of business judgment.

4. The 363 Transaction is the only available means to preserve the continuation of GM's business.

5. The 363 Transaction is the only available means to maximize the value of GM's business.

6. There is no viable alternative to the 363 Transaction.

7. The only alternative to the 363 Transaction is liquidation.

8. No unsecured creditor will here get less than it would receive in a liquidation.

9. The UAW Settlement is fair and equitable, and is in the best interests **\*486** of both the estate and UAW members.

10. The secured debt owing to the U.S. Government and EDC (both post-petition and, to the extent applicable, prepetition) is not subject to recharacterization as equity or equitable subordination, and could be used for a credit bid.

11. The Purchaser is a purchaser in good faith.

### *Discussion*

The substantive objections break down into a number of categories by concept, and the Court thus considers them in that fashion.

### 1. Sale Under *Section 363*

Determining the propriety of the 363 Transaction requires confirming that section 363 can be utilized for the sale of this much of GM's assets before confirmation of a reorganization plan; that the necessary showings for approval of any section 363 sale have been made; that the 363 Transaction is not a

"*sub rosa* " plan; and that various related issues have been satisfactorily resolved. The Court considers these in turn.

### (a) Utilization of Section 363

[1]    The F & D Bondholders, bondholder Oliver Addison Parker ("**Parker**") and several other objectors contend that by disposing of so much of its assets in a single section 363 sale, GM improperly utilizes section 363. Implicit in that argument is the contention that even under the facts here, section 363 cannot be used to dispose of all or the bulk of a debtor's assets, and that such can be achieved only by means of a reorganization plan. The Court disagrees.

As usual, the Court starts with textual analysis. With exceptions not relevant here, section 363 of the Bankruptcy Code provides, in relevant part:

> (b)(1) The trustee, [17] after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate....

Notably, section 363 has no carveouts from its grant of authority when applied in cases under chapter 11. Section 363 does not provide, in words or substance, that it may not be used in chapter 11 cases for dispositions of property exceeding any particular size, or where the property is of such importance that it should alternatively be disposed of under a plan. Nor does any other provision of the Code so provide.

Then, section 1123 of the Code—captioned "Contents of plan," a provision in chapter 11 which sets forth provisions that a chapter 11 reorganization plan *must* do or contain, and *may* do or contain—provides, as one of the things that a plan *may* do:

> provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests.... [18]

But neither section 363 nor section 1123(b)(4) provides that resort to 1123(b)(4) is the *only* way by which all or substantially all of the assets can be sold in  **\*487** a chapter 11 case. Most significantly, neither section 1123(b)(4) nor any other section of the Code trumps or limits section 363, which by its plain meaning permits what GM here proposes to do.

[2]    However, the issue cannot be addressed by resort to "plain meaning" or textual analysis alone. GM's ability to sell the assets in question under section 363 is governed by an extensive body of caselaw. Bankruptcy courts in this Circuit decide issues of the type now before the Court under binding decisions of the U.S. Supreme Court and the Second Circuit Court of Appeals, each of which (particularly the latter) has spoken to the issues here. And bankruptcy courts also look to other bankruptcy court decisions, which, in this District and elsewhere, have dealt with very similar facts. While an opinion of one bankruptcy judge in this District is not, strictly speaking, binding on another, it is the practice of this Court to grant great respect to the earlier bankruptcy court precedents in this District, [19] particularly since they frequently address issues that have not been addressed at the Circuit level.

Here this Court has the benefit of the decisions of Bankruptcy Judge Gonzalez in the *Chrysler* chapter 11 cases [20]—affirmed by the Second Circuit, for substantially the reasons Judge Gonzalez set forth in his opinion—on facts extraordinarily similar to those here. [21] Even more importantly, this Court also has the benefit of the Second Circuit's decisions in *Lionel,* [22] *LTV,* [23] *Financial News Network,* [24] *Gucci,* [25] and *Iridium,*  **\*488**  [26] which confirm that section 363 sales of major assets may be effected before confirmation, and lay out the circumstances under which that is appropriate. And this Court also can draw upon the Supreme Court's decision in *Piccadilly Cafeterias,* [27] which, while principally addressing other issues, recognized the common practice in chapter 11 cases of selling the bulk of a debtor's assets in a section 363 sale, to be followed by confirmation of a liquidating plan.

In *Chrysler,* Judge Gonzalez discussed at great length the evolution of the law in this area and its present requirements, [28] and this Court need not do so in comparable length. Judge Gonzalez, and the Second Circuit affirming him, dealt with the exact issue presented here: whether under Bankruptcy Code section 363, the bulk of the assets of an estate can be sold before confirmation. As Judge Gonzalez noted, *Lionel*—upon whose standards all of the cases considering pre-confirmation section 363 sales have been based—speaks directly to whether assets of a bankruptcy estate can be sold "out of the ordinary course of business and prior to acceptance and outside of any plan of reorganization." [29]

The *Lionel* court expressly recognized that section 363(b) "seems on its face to confer upon the bankruptcy judge virtually unfettered discretion" to authorize sales out of the ordinary course.[30] And the *Lionel* court further declared that "a bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the Code,"[31] and that:

> To further the purposes of Chapter 11 reorganization, a bankruptcy judge must have substantial freedom to tailor his orders to meet differing circumstances. This is exactly the result a liberal reading of § 363(b) will achieve.[32]

Nevertheless, the Circuit considered it inappropriate to authorize use of section 363(b) to the full extent that section 363(b)'s plain language—with its absence of any express limitations—would suggest. Instead, the Circuit established a standard that was in substance one of common law, but grounded in the overall structure of the Bankruptcy Code. The Second Circuit "reject[ed] the requirement that only an emergency permits the use of § 363(b)."[33] But it also "reject[ed] the view that § 363 grants the bankruptcy judge carte blanche."[34] Concerned that such a construction would "swallow[ ] up Chapter 11's safeguards,"[35] the *Lionel* court established the more nuanced balancing test that the lower courts in this Circuit have applied for more than 25 years. The Circuit declared:

> The history surrounding the enactment in 1978 of current Chapter 11 and the logic underlying it buttress our conclusion that *there must be some articulated business justification,* other than appeasement **\*489** of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b).[36]

It went on to say that:

> Resolving the apparent conflict between Chapter 11 and § 363(b) does not require an all or nothing approach. Every sale under § 363(b) does not automatically short-circuit or side-step Chapter 11; nor are these two statutory provisions to be read as mutually exclusive. Instead, if a

bankruptcy judge is to administer a business reorganization successfully under the Code, then ... some play for the operation of both § 363(b) and Chapter 11 must be allowed for.[37]

And it went on to set forth the rule for which *Lionel* is remembered:

> The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing *a good business reason* to grant such an application.[38]

**[3]**  With no less than five decisions from the Circuit holding similarly[39]—not counting the Circuit's recent affirmance of *Chrysler*—it is plain that in the Second Circuit, as elsewhere,[40] even the entirety of a debtor's business may be sold without waiting for confirmation when there is a good business reason for doing so. Likewise, in *Piccadilly Cafeterias,* the Supreme Court, while principally addressing a different issue,[41] recognized the use of **\*490** section 363 sales under which all or substantially all of a debtor's assets are sold. The Supreme Court stated:

> Chapter 11 bankruptcy proceedings ordinarily culminate in the confirmation of a reorganization plan. *But in some cases, as here, a debtor sells all or substantially all its assets under § 363(b)(1) before seeking or receiving plan confirmation.* In this scenario, the debtor typically submits for confirmation a plan of liquidation (rather than a traditional plan of reorganization) providing for the distribution of the proceeds resulting from the sale.[42]

**[4]   [5]   [6]**  In making the determination as to whether there is a good business reason to effect a 363 sale before confirmation, the *Lionel* court directed that a court should consider all of the "salient factors pertaining to the proceeding" and "act to further the diverse interests of the debtor, creditors and equity holders."[43] It then set forth a nonexclusive list to guide a court in its consideration of the issue:

> (a) the proportionate value of the asset to the estate as a whole;

(b) the amount of elapsed time since the filing;

(c) the likelihood that a plan of reorganization will be proposed and confirmed in the near future;

(d) the effect of the proposed disposition on future plans of reorganization;

(e) the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property;

(f) which of the alternatives of use, sale or lease the proposal envisions; and "most importantly perhaps," [44]

(g) whether the asset is increasing or decreasing in value. [45] Importantly, the *Lionel* court also declared that a bankruptcy court must consider if those opposing the sale produced some evidence that the sale was not justified. [46]

As the *Lionel* court expressly stated that the list of salient factors was not exclusive, [47] this Court might suggest a few more factors that might be considered, along with the preceding factors, in appropriate cases:

(h) Does the estate have the liquidity to survive until confirmation of a plan?

(i) Will the sale opportunity still exist as of the time of plan confirmation?

(j) If not, how likely is it that there will be a satisfactory alternative sale opportunity, or a stand-alone plan alternative that is equally desirable (or better) for creditors? And

(k) Is there a material risk that by deferring the sale, the patient will die on the operating table?

Each of the factors that the *Lionel* court listed, and the additional ones that this Court suggests, go to the ultimate questions that the *Lionel* court identified: Is there an "articulated business justification" and a "good business reason" for proceeding with the sale without awaiting the final confirmation of a plan.

**\*491** **[7]** **[8]** **[9]**  As discussed in Section 1(c) below, a debtor cannot enter into a transaction that "would amount to a *sub rosa* plan of reorganization" or an attempt to circumvent the chapter 11 requirements for confirmation of a plan of reorganization. [48] If, however, the transaction has "a

proper business justification" which has the potential to lead toward confirmation of a plan and is not to evade the plan confirmation process, the transaction may be authorized. [49] Thus as observed in *Chrysler:*

> A debtor may sell substantially all of its assets as a going concern and later submit a plan of liquidation providing for the distribution of the proceeds of the sale. This strategy is employed, for example, when there is a need to preserve the going concern value because revenues are not sufficient to support the continued operation of the business and there are no viable sources for financing. [50]

As further observed in *Chrysler,* several sales seeking to preserve going concern value have recently been approved in this district, and going back further, many more have been, as debtors not infrequently could not survive until a plan could be confirmed. In addition to *BearingPoint,* which Judge Gonzalez expressly noted, many other 363 sales have been approved in chapter 11 cases on this Court's watch, after appropriate consideration of *Lionel* and its progeny. In *Our Lady of Mercy Hospital,* [51] for example, the hospital was sold as a going concern before it ran out of money, saving about 2,300 jobs and a critical supplier of medical services in the Bronx.

In *Adelphia,* [52] a sale under a *plan* was originally proposed by the debtors, but a section 363 sale had to be effected instead, when intercreditor disputes made it impossible to confirm a plan in time to save the sale opportunity, and more than $17 billion in sale proceeds nearly was lost. [53] Anyone with a knowledge of chapter 11 cases in this District can well understand why none of Harry Wilson's advisors thought that GM could survive a normal plan confirmation process.

**[10]**  After *Lionel, LTV, FNN, Gucci, Iridium* and, of course, *Chrysler,* it is now well established that a chapter 11 debtor may sell all or substantially all its assets pursuant to section 363(b) prior to confirmation of a chapter 11 plan, when the court finds a good business reason for doing so. And here the Court has made exactly such a finding. In fact, it is hard to imagine circumstances that could more strongly justify an immediate 363 sale. As the Court's Findings of Fact set forth at length, GM, with no liquidity of its own and the need to quickly address consumer and fleet owner doubt, does not have the luxury of selling its business under a plan.

And if that is not by itself enough, the U.S. Treasury's willingness to fund GM is contingent upon the approval of the 363 Transaction by July 10. The Court fully understands the unwillingness of the Government to keep funding GM indefinitely—especially to await the resolution of disputes amongst creditors trying to maximize their recoveries. If the 363 Transaction is disapproved, GM will lose its funding **\*492** and its liquidity on July 10, and its only alternative will be liquidation.[54]

In its summation, the F & D Bondholders Committee stated that it was not inclined to second guess *GM's* view that it had to proceed with a 363 sale, given GM's lack of alternatives, but that the *Court* should step in to tell everyone that a 363 sale was unacceptable. The premise underlying this contention was that the U.S. Government's July 10 deadline was just posturing, and that the Court should assume that the U.S. Government cares so much about GM's survival that the U.S. Government would never let GM die.

The Court declines to accept that premise and take that gamble. The problem is not that the U.S. Treasury would walk away from GM if this Court took an extra day or so to reach its decision. The problem is that if the 363 Transaction got off track, especially by the disapproval the F & D Bondholders Committee seeks, the U.S. Government would see that there was no means of early exit for GM; that customer confidence would plummet; and that the U.S. Treasury would have to keep funding GM while bondholders (and, then, perhaps others) jousted to maximize their individual incremental recoveries. The Court fully takes Harry Wilson at his word.

In another matter in the *Adelphia* cases, this Court was faced with quite similar circumstances. The Government had the ability to effect a forfeiture of Adelphia assets, and even to indict Adelphia (as a corporation, in addition to the Rigases), which would destroy most, if not all, of Adelphia's value. The Government had indicted Arthur Andersen, with those exact consequences, but many Adelphia creditors argued that the Government would never do it again. And they objected to an Adelphia settlement that paid $715 million to the Government, to forestall all of those potential consequences, among others. This Court approved the settlement, and its determination was affirmed on appeal. This Court stated:

> Would the DoJ have indicted Adelphia, with the threat to the recoveries for innocent stakeholders that such an indictment would have

entailed? One would think not, but the DoJ had done **\*493** exactly that to Arthur Andersen, with those exact consequences. It was at least prudent for Adelphia's Board to protect the entity under its stewardship from its destruction, and to avoid taking such a gamble.[55]

This Court further stated that "[o]nce more, the Adelphia Board cannot be faulted for declining to bet the company on what would be little more than a guess as to the decision the DoJ would make."[56]

GM's counsel noted in summation that the F & D Bondholders Committee was expecting this Court to play Russian Roulette, and the comparison was apt. So that the F & D Bondholders Committee could throw GM into a plan negotiation process, the Court would have to gamble on the notion that the U.S. Government didn't mean it when it said that it would not keep funding GM. There is no reason why any fiduciary, or any court, would take that gamble. This is hardly the first time that this Court has seen creditors risk doomsday consequences to increase their incremental recoveries, and this Court—which is focused on preserving and maximizing value, allowing suppliers to survive, and helping employees keep their jobs—is not of a mind to jeopardize all of those goals.

Thus there is more than "good business reason" for the 363 Transaction here. The Creditors' Committee in this case put it better than this Court could:

> The simple fact is that there are no other viable bids—indeed no serious expressions of interest—to purchase GM's assets and no other feasible way for GM to restructure its business to remain viable. The current transaction is the only option on the table. The Court is thus faced with a clear choice: to approve the proposed sale transaction, preserve the going-concern value of the Debtors' businesses, and maximize substantial value for stakeholders (despite the pain that this course will inflict on numerous innocent parties), or reject the transaction and precipitate the dismantling and liquidation of GM

*to the detriment of all involved. Preventing this harm serves the core purposes of the Bankruptcy Code and constitutes a strong business justification under* Section 363 *of the Code to sell the debtors' assets outside of a plan process.* [57]

While because of the size of this case and the interests at stake, GM's chapter 11 case can hardly be regarded as routine, GM's proposed section 363 sale breaks no new ground. This is exactly the type of situation where under the Second Circuit's many holdings, there is good business reason for an immediate sale. GM does not have the luxury to wait for the ultimate confirmation of a plan, and the only alternative to an immediate sale is liquidation.

### (b) Compliance with Standards for Approval of Section 363 Sales

**[11]** **[12]** With the Court having concluded that the requisite sound business justification exists for a proposed sale of the type proposed here, the inquiry turns to whether the routine requirements for any section 363 sale, and appropriate exercise of the business judgment rule, have been satisfied. The court must be satisfied that (i) notice has been given to all **\*494** creditors and interested parties; (ii) the sale contemplates a fair and reasonable price; and (iii) the purchaser is proceeding in good faith. [58]

**[13]** These factors are all satisfied here. Notice was extensively given, and it complied with all applicable rules. As to the sufficiency of the purchase price, the Court is equally satisfied. No other, much less better, offer was received, and the GM Board even secured a fairness opinion from reputable advisors, expressing the opinion that the consideration was, indeed, fair.

**[14]** Finally, the Court has found that the Purchaser has acted in good faith, and as mixed questions of fact and law, the Court now determines (i) that this legal requirement for a sale has been satisfied, and (ii) that the Purchaser is entitled to a good faith purchaser finding—matters that are relevant to the determination under *Betty Owens Schools* and the other cases articulating like requirements, and also to the section 363(m) finding that the U.S. Government understandably desires. In ruling that the U.S. Government has indeed acted in good faith, for both of the purposes for which that ruling is relevant,

the Court sees no basis for finding material differences in the standard.

**[15]** **[16]** While the Bankruptcy Code does not define the "good faith" that protects transactions pursuant to section 363(m) (or, for that matter, the "good faith" that courts require in approving section 363 sales in the first place), the Second Circuit has explained that:

> Good faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made. A purchaser's good faith is lost by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.' [59]

Here there is no proof that the Purchaser (or its U.S. and Canadian governmental assignors) showed a lack of integrity in any way. To the contrary, the evidence establishes that the 363 Transaction was the product of intense arms'—length negotiations. And there is no evidence of any efforts to take advantage of other bidders, or get a leg up over them. In fact, the sad fact is that there *were no* other bidders.

Thus, the Court finds that the Purchaser is a good faith purchaser, for sale approval purposes, and also for the purpose of the protections section 363(m) provides.

**[17]** **[18]** The Court additionally determines that it finds GM to be in compliance with the requirements of the business judgment rule, commonly used in consideration of 363 sales in this District and elsewhere. [60] As noted in this Court's decision in *Global Crossing*, and Judge Mukasey's decision in *Integrated Resources*, that rule **\*495** entails "(1) a business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and commentators, no abuse of discretion or waste of corporate assets." [61]

Here the Court finds it unnecessary to state, one more time, all of the facts that support a finding that such requirements have been satisfied. The GM Board's decision would withstand *ab initio* review, far more than the business judgment test requires. [62]

### (c) "Sub Rosa" Plan

**[19]** The F & D Bondholders, Parker and other objectors also contend that by proposing the 363 Transaction, GM has

proposed the implementation of a forbidden "*sub rosa*" plan. The Court disagrees.

**[20]** **[21]** **[22]** While neither section 363 nor any other provision of the Code defines or otherwise mentions "*sub rosa*" plans, or provides that they are impermissible, caselaw (including caselaw in this Circuit and District) recognizes the impropriety of *sub rosa* plans in instances in which they genuinely exist.[63] The idea underlying the prohibition against *sub rosa* plans appears in *Braniff,* the case from which the prohibition emerged. It is that "the debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets."[64] A proposed 363 sale may be objectionable, for example, when aspects of the transaction dictate the terms of the ensuing plan or constrain parties in exercising their confirmation rights,[65] such as by placing restrictions on creditors' rights to vote on a plan.[66] A 363 sale may also may be objectionable as a *sub rosa* plan if the sale itself seeks to allocate or dictate the distribution of sale proceeds among different classes of creditors.[67]

But none of those factors is present here. The MPA does not dictate the terms of a plan of reorganization, as it does not attempt to dictate or restructure the rights of the creditors of this estate. It merely brings in value. Creditors will **\*496** thereafter share in that value pursuant to a chapter 11 plan subject to confirmation by the Court. A transaction contemplating that does not amount to a *sub rosa* plan.[68]

**[23]** In the *TWA* chapter 11 case,[69] substantially all of the airline's assets were sold to American Airlines, in a 363 sale. There too the contention was made that the 363 sale was a *sub rosa* plan. Judge Walsh rejected the contention. He explained:

> It is true, of course, that TWA is converting a group of volatile assets into cash. It may also be true that the value generated is not enough for a dividend to certain groups of unsecured creditors. *It does not follow, however, that the sale itself dictates the terms of TWA's future chapter 11 plan.* The value generated through the Court approved auction process reflects the market value of TWA's assets and the conversion of the assets into cash is the contemplated result under § 363(b).[70]

Here the objectors principally base their arguments on things the *Purchaser* intends to do. They complain of the Purchaser's intention, in connection with the 363 Transaction, to

> (i) be assigned substantially all executory contracts with direct suppliers,
>
> (ii) make offers of employment to all of the Debtors' nonunionized employees and employees represented by the UAW, and
>
> (iii) be assigned a modified collective bargaining agreement with the UAW, including an agreement to contribute to the New VEBA to fund retiree medical benefits for UAW members and their surviving spouses.

But these do not give rise to a *sub rosa* plan when the first is merely an example of an element of almost *every* 363 sale (where purchasers designate the contracts to be assumed and assigned), and the second and third are actions by the *Purchaser.*

The Court senses a disappointment on the part of dissenting bondholders that the Purchaser did not choose to deliver consideration to them in any manner other than by the Purchaser's delivery of consideration to GM as a whole, pursuant to which bondholders would share like other unsecured creditors—while many supplier creditors would have their agreements assumed and assigned, and new GM would enter into new agreements with the UAW and the majority of the dealers. But that does not rise to the level of establishing a *sub rosa* plan. The objectors' real problem is with the decisions of the Purchaser, not with the Debtor, nor with any violation of the Code or caselaw.

**[24]** Caselaw also makes clear that a section 363(b) sale transaction is not objectionable as a *sub rosa* plan based on the fact that the purchaser is to assume *some,* but not all, of the debtor's liabilities, or because some contract counterparties' contracts would not be assumed. As Judge Walsh observed in *TWA:*

> [N]othing in § 363 suggests that disparate treatment of creditors, such as is likely to occur here, disqualifies a transaction from court approval. The purpose of a § 363(b) sale is to transform **\*497** assets ... into cash in an effort to maximize value. *Distribution of the value generated in accordance with § 1129 and other*

> priority provisions occurs and is intended to occur subsequent to the sale.

He further stated:

> The treatment of creditors in a § 363(b) context is dictated by the fair market value of those assets of the debtor that the purchaser in its business judgment elects to purchase. A purchaser cannot be told to assume liabilities that do not benefit its purchase objective. *Thus, the disparate treatment of creditors occurs as a consequence of the sale transaction itself and is not an attempt by the debtor to circumvent the distribution scheme of the Code.* [71]

Last, but hardly least, the *sub rosa* plan contention was squarely raised, and rejected, in *Chrysler,* [72] which is directly on point and conclusive here.

The *Chrysler* transaction was structured in a fashion very similar to that here, with a combination of sale proceeds to be provided to the seller, assignments of contracts with suppliers, taking on seller employees, and contribution to a VEBA. Judge Gonzalez rejected the contention that the transaction amounted to a *sub rosa* plan. He noted that:

> (i) there was no attempt to allocate sale proceeds away from the objectors (there, first lien lenders); [73]

> (ii) the fact that counterparties whose executory contracts were being assumed and assigned under section 365, at the election of the purchaser, gave counterparties a *Code-authorized* "more favorable treatment," which neither violated the priority rules nor transformed the sale into a *sub rosa* plan; [74]

> (iii) the purchaser's ability to choose which contracts it considered valuable did not change that result; [75]

> (iv) in negotiating with groups essential to its viability (such as its workforce) the purchaser was free to provide ownership interests in the new entity as it saw fit; [76] and that

> (v) the purchaser's allocation of value in its own enterprise did not elevate its measures into a *sub rosa* plan. [77]

In connection with the last two points, Judge Gonzalez made a critically important point—that the allocation of value by the purchaser did not affect the *debtor's* interest. In that connection, Judge Gonzalez observed:

> In negotiating with those groups essential to its viability, New Chrysler made certain agreements and provided ownership interests in the new entity, which was neither a diversion of value from the Debtors' assets nor an allocation of the proceeds from the sale of the Debtors' assets. *The allocation of ownership interests in the new enterprise is irrelevant to the estates' economic interests.* [78]

Similarly, Judge Gonzalez noted that what the UAW, the VEBA and the U.S. Treasury would be getting in New Chrysler was not on account of any entitlements any of them might have in the case before him. He observed:

> *\*498* In addition, the UAW, VEBA, and the Treasury are not receiving distributions on account of their prepetition claims. Rather, consideration to these entities is being provided under separately-negotiated agreements with New Chrysler. [79]

As in *Chrysler* and *TWA,* the Court rules that the 363 Transaction does not constitute an impermissible *sub rosa* plan.

### (d) Recharacterization or Subordination of U.S. Treasury Debt

The F & D Bondholders and Bondholder Parker contend that some or all of the U.S. Government's secured debt should be recharacterized as equity—or, alternatively, equitably subordinated to unsecured debt—as a predicate for their next contention that it cannot be used as the basis for a credit bid. The Court disagrees with each contention.

In another of its decisions in the *Adelphia* chapter 11 cases, [80] this Court likewise considered allegations that a secured

lender's debt should be recharacterized as equity. In doing so, the Court applied standards articulated by the Fourth Circuit and Sixth Circuit in the *Dornier Aviation* [81] and *AutoStyle Plastics* [82] cases, which in turn had been based on tax law precedent.

[25]    Factors listed in those cases are:

(1) the names given to the instruments, if any, evidencing the indebtedness;

(2) the presence or absence of a fixed maturity date and schedule of payments;

(3) the presence or absence of a fixed rate of interest and interest payments;

(4) the source of repayments;

(5) the adequacy or inadequacy of capitalization;

(6) the identity of interest between the creditor and the stockholder;

(7) the security, if any, for the advances;

(8) the corporation's ability to obtain financing from outside lending institutions;

(9) the extent to which the advances were subordinated to the claims of outside creditors;

(10) the extent to which the advances were used to acquire capital assets; and

(11) the presence or absence of a sinking fund to provide repayments. [83]

[26]    Here the Court finds that GM was inadequately capitalized at the time the loans were made; that GM could not obtain financing from outside lending institutions, and that the record does not show the presence of a sinking fund to provide repayments—three of the eleven factors that would suggest recharacterization. But of the remainder, every single factor supports finding that this was genuine debt. Among other factors, as noted in the Court's Findings of Fact above, this **\*499** transaction was fully documented as a loan; was secured debt, complete with intercreditor agreements to address priority issues with other secured lenders; had interest terms (albeit at better than market rate) and maturity terms, and, significantly, had *separate* equity features—providing for warrants to accompany the debt instruments. The Court

has previously found, as a fact and mixed question of fact and law, that the Prepetition Secured Debt was, in fact, debt, and the Court now determines that as a conclusion of law. [84]

[27]    [28]    Likewise, the Court disagrees with contentions (principally by bondholder Parker) that the secured debt held by the U.S. Treasury (and, presumably, EDC) should be equitably subordinated. The Court addressed the development of the law of equitable subordination (and its first cousin, equitable disallowance) in its decision in *Adelphia–Bank of America,* and need not discuss it in comparable length here. It is sufficient for the purposes of this decision to say that as originally stated in the famous case of *Mobile Steel,* [85] a party seeking to establish equitable subordination must prove that (i) the holder of the claim being subordinated engaged in inequitable conduct; (ii) the inequitable conduct resulted in injury to creditors or conferred an unfair advantage on the claimant; and (iii) equitable subordination is not inconsistent with the provisions of the Bankruptcy Code. [86] None of those factors has been established here.

First the Court finds that none of the U.S. Treasury, the Government of Canada, the Government of Ontario, or EDC acted inequitably in any way. They advanced funds to help thousands of creditors, citizens, employees of GM, and employees of suppliers and others. Their efforts to ensure that they were not throwing their money away in a useless exercise, and were expecting GM to slim down so it could survive without governmental assistance, are hardly inequitable; they were common sense.

Similarly, the Court finds no harm to creditors; without the challenged efforts, GM would have had to liquidate. Nor was there any special benefit to any of the Government entities.

Finally, treating the governmental lenders as lenders is hardly inconsistent with the provisions of the Bankruptcy Code. There is, in short, no basis for equitable subordination here.

### (e) Asserted Inability to Credit Bid

In light of the conclusions reached in the preceding section, the U.S. Treasury and EDC may, if they choose, assign their secured debt to the Purchaser, and there is then no reason why the Purchaser may not credit bid.

### 2. Successor Liability Issues

Many objectors—including the Ad Hoc Committee of Consumer Victims (the "**Consumer Victims Committee**"), individual accident litigants ("the **Individual Accident Litigants**"), and attorneys for asbestos victim litigants (collectively, "the **Asbestos Litigants**") object to provisions in the proposed sale order that would limit any "successor liability" that New GM might have. Successor liability claims normally are for money damages—as, for example, **\*500** the claims by the Individual Accident Litigants are. If permitted, such claims would be asserted against the successor in ownership of property that was transferred from the entity whose alleged wrongful acts gave rise to the claim.

 **[29]**    **[30]**    "As a general rule, a purchaser of assets does not assume the liabilities of the seller unless the purchaser expressly agrees to do so or an exception to the rule exists." [87]  Successor liability is an equitable exception to that general rule. [88]  Successor liability depends on state law, and the doctrines vary from state to state, [89]  but generally successor liability will not attach unless particular requirements imposed by that state have been satisfied. [90]

If a buyer cannot obtain protection against successor liability, "it may pay less for the assets because of the risk." [91]  When the transfer of property takes place in a 363 sale, and the buyer has sought and obtained agreement from the debtor that the sale will be free and clear, the bankruptcy court is invariably asked to provide, in its approval order, that the transferee does not assume liability for the debtor's pre-sale conduct.

Such a request was likewise made here. Under the proposed order, in its latest form, New GM would voluntarily assume liability for warranty claims, and for product liability claims asserted by those injured after the 363 Transaction—even if the vehicle was manufactured before the 363 Transaction. But New GM would not assume any Old GM liabilities for injuries or illnesses that arose before the 363 Transaction. And the proposed order has a number of provisions making explicit findings that New GM is not subject to successor liability for such matters, and that claims against New GM of that character are enjoined. [92]

 **[31]**    The issues as to the successor liability provisions in the approval order are the most debatable of the issues now before  **\*501** the Court. Textual analysis is ultimately inconclusive as to the extent to which a 363 order can bar successor liability claims premised upon the transfer of property, and cases on a nationwide basis are split. But principles of *stare decisis*

dictate that under the caselaw in this Circuit and District, the Court should, and indeed must, rule that property can be sold free and clear of successor liability claims.

*(a) Textual Analysis*
As before, the Court starts with textual analysis. Section 363(f) provides, in relevant part:

> The trustee may sell property under subsection (b) ... of this section free and clear of any interest in such property of an entity other than the estate, only if—
>
> > (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> >
> > (2) such entity consents;
> >
> > (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> >
> > (4) such interest is in bona fide dispute; or
> >
> > (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

Application of section 363(f)'s authority to issue a "free and clear" order with respect to a successor liability claim turns, at least in the first instance, on whether such a claim is an "interest in property." But while "claim" is defined in the Code, [93]  neither "interest" nor "interest in property" is likewise defined.

So in the absence of statutory definitions of either "interest" or "interest in property," what can we discern from the text of the Code as to what those words mean?

 **[32]**    First, we know that "interest" includes more than just a lien. Subsection (f)(3) makes clear that "interest" is broader, as there otherwise would be no reason for (f)(3) to deal with the subset of interests where "such interest is a lien." *Collier* observes that:

> Section 363(f) permits the bankruptcy court to authorize a sale free of "any interest" that an entity has in property of the estate. Yet the Code does not define the concept of "interest," of which the property may be sold free.

Certainly a lien is a type of "interest" of which the property may be sold free and clear. This becomes apparent in reviewing section 363(f)(3), which provides for particular treatment when "such interest is a lien." *Obviously there must be situations in which the interest is something other than a lien;* otherwise, section 363(f)(3) would not need to deal explicitly with the case in which the interest is a lien.[94]

Second, we know that an "interest" is something that may accompany the transfer of the underlying property, and where bankruptcy policy, as implemented by the drafters of the Code, requires specific provisions to ensure that it *will not* follow the transfer.

The Individual Accident Litigants contend that here the Court should presume that "equivalent words have equivalent meaning when repeated in the same statute."[95] But while that is often a useful aid **\*502** to construction, we cannot do so here. That is because "interest" has wholly different meanings as used in various places in the Code,[96] and assumptions that they mean the same thing here are unfounded.

Thus, those in the bankruptcy community know, upon considering the usage of "interest" in any particular place in the Code, that "interest" means wholly different things in different contexts:

(i) a nondebtor's *collateral*—as used, for example, in consideration of adequate protection of an interest under sections 361 and 362(d)(1), use of cash collateral under section 363(c)(2), or in many 363(f) situations, such as where a creditor has a lien;

(ii) *a legal or equitable ownership of property*—as used, for example, in section 541 of the Code, or in other section 363(f) situations, where a nondebtor asserts competing ownership, a right to specific performance, or the like—or, quite differently,

(iii) *stock* or other equity in the debtor, *as contrasted to debt*—as used, for example, in section 1111 ("[a] proof of claim or interest is deemed filed under section 501"), or where a reorganization plan is to establish classes of claims and interests, under sections 1122 and 1123.

[33]    The Individual Accident Litigants place particular emphasis on section 1141(c) of the Code, asking this Court to compare and contrast it. They argue that

> In contrast, § 1141(c) of the Bankruptcy Code provides that "property dealt with by the plan is free and clear of all *claims and interests ... in* the debtor." (Emphasis added). Section 363 and 1141(c) are two mechanisms for transfer of estate property (one through a sale, the other through a plan). The difference between the words chosen by Congress in these two closely related sections shows that Congress did not intend a sale under § 363(f) to be free and clear of "*claims,*" but only of "*interests in* such property" because " 'it is generally presumed that Congress actions intentionally and purposely' when it 'includes particular language in one section of a statute but omits it in another.' ".[97]

But this is not an apt comparison, since when "interests" is used in section 1141(c), it is used with the wholly different definition of (iii) above—*i.e.,* as stock or another type of equity—in contrast to the very different definitions in (i) and (ii) above, which are ways by which "interests in property" may be used in section 363(f).

Thus, as Lubben suggests, and the Court agrees, in section 1141 "interest" matches up with "equity," and "claim" matches up with debt.[98] Section 1141 is of no assistance in determining whether litigation rights transmitted through transfers **\*503** of property fall within the meaning of "interests in property." Section 1141 does not provide a yardstick by which section 363(f)'s meaning can be judged.

So where does textual analysis leave us? It tells us that "interest" means more than a lien, but it does not tell us how much more. Textual analysis does not support or foreclose the possibility that an "interest in property" covers a right that exists against a new party solely by reason of a transfer of property to that party. Nor does textual analysis support or foreclose the idea that an "interest" is a right that travels with the property—or that it would do so unless the Code cut it off. Ultimately textual analysis is inconclusive. Neither the Code nor interpretive aids tells us how broadly or narrowly—in the particular context of section 363(f)—"interest in property" should be deemed to be defined.[99]

*(b) Caselaw*

Therefore, once again—as in the Court's earlier consideration of *Lionel* and its progeny and the cases establishing the judge-made law of *sub rosa* plans—the Court must go beyond the words of the Code to the applicable caselaw.

Viewed nationally, the caselaw is split in this area, both at the Circuit Court level and in the bankruptcy Courts. Some courts have held that section 363(f) provides a basis for selling free and clear of successor liability claims, [100] and others have held that it does not. [101]

**\*504** But the caselaw is *not* split in this Circuit and District. In *Chrysler,* Judge Gonzalez expressly considered and rejected the efforts to impose successor liability. And more importantly, the Second Circuit, after hearing extensive argument on this issue along with others, affirmed Judge Gonzalez's *Chrysler* order for substantially the reasons Judge Gonzalez set forth in his *Chrysler* decision.

This Court has previously noted how *Chrysler* is so closely on point, and this issue is no exception. Judge Gonzalez expressly considered it. In material reliance on the Third Circuit's decision in *TWA,* "the leading case on this issue," Judge Gonzalez held that *TWA:*

> makes clear that such tort claims are interests in property such that they are extinguished by a free and clear sale under section 363(f)(5) and are therefore extinguished by the Sale Transaction. The Court follows *TWA* and overrules the objections premised on this argument.... [I]n personam claims, including any potential state successor or transferee liability claims against New Chrysler, as well as in rem interests, are encompassed by section 363(f) and are therefore extinguished by the Sale Transaction. [102]

**[34]** **[35]** This Court has already noted its view of the importance of *stare decisis* in this district, [103] and feels no differently with respect to this issue. This Court follows the decisions of its fellow bankruptcy judges in this district, in the absence of plain error, because the interests of predictability in commercial bankruptcy cases are of such great importance. Apart from the underlying reasons that have caused *stare*

*decisis* to be embedded in American decisional law, *stare decisis* is particularly important in commercial bankruptcy cases because of the expense and trauma of any commercial bankruptcy, and the need to deal with foreseeable events, by pre-bankruptcy planning, to the extent they can be addressed. Likewise, litigation, while a fact of life in commercial bankruptcy cases, takes money directly out of the pockets of creditors, and predictability fosters settlements, since with predictability, parties will have an informed sense as to how any disputed legal issues will be decided.

Though for all of these reasons, this Court would have followed *Chrysler* even if that case had no subsequent history, we here have a hugely important additional fact. The Circuit affirmed *Chrysler, and* for "substantially for the reasons stated in the opinion below."

Those two matters are somewhat different, and each merits attention. Appellate courts review judgments (or orders), not statements in opinions. [104] With the Circuit having affirmed, application of that principle would not, in the absence of more, necessarily suggest agreement with any reasoning Judge Gonzalez utilized in reaching his conclusion. But it would necessarily support agreement with his bottom line—at least on matters that were argued to the Circuit on appeal. Otherwise, the Circuit would not have affirmed.

Here, of course, there is more—because the Circuit did not simply affirm without opinion, but it stated, as part of its order, that Judge Gonzalez's decision was affirmed "for substantially the reasons stated in the opinions below." While that might hint that the Circuit generally agreed with Judge Gonzalez's reasoning as **\*505** well, it does not compel that conclusion. At this point, the Court concludes merely that the Circuit agreed with Judge Gonzalez's successor liability issues bottom line.

But that alone is very important. One of the matters argued at length before the Circuit on the appeal was successor liability, both with respect to present claims [105] and unknown future claims. [106] They were hardly trivial elements of the appeal, and were a subject of questioning by members of the panel. [107] If the Circuit did not agree with Judge Gonzalez's conclusions on successor liability, after so much argument on that exact issue, it would not have affirmed.

Thus the Court has, at the least, a judgment by the Second Circuit that 363(f) may appropriately be invoked to sell free

and clear of successor liability claims. The claims sought to be preserved here are identical to those in *Chrysler.* And *Chrysler* is not distinguishable in any legally cognizable respect. [108] On this issue, it is not just that the Court feels that it *should* follow *Chrysler.* It *must* follow *Chrysler.* The Second Circuit's *Chrysler* affirmance, even if reduced solely to affirmance of the judgment, is controlling authority. [109]

This Court fully understands the circumstances of tort victims, and the fact that if they prevail in litigation and cannot look to New GM as an additional source of recovery, they may recover only modest amounts on any allowed claims —if, as is possible, they do not have other defendants who can also pay. [110] But the law in this Circuit and District is clear; the Court will permit GM's assets to pass to the purchaser free and clear of successor liability claims, and in that connection, will issue the requested findings and associated **\*506** injunction. [111]

### 3. Asbestos Issues

[36]    The Asbestos Litigants raise the same successor liability issues just addressed, and additionally advance the interests of future victims of asbestos ailments (though their counsel do not represent any); *future* victims would not yet know that they have any asbestos ailments, or to whom they might look to bring litigation, if necessary. The Asbestos Litigants' concerns as to a sale free and clear of asbestos liability claims, like those of tort litigants, have already been discussed, and the Court, while also sympathetic to asbestos victims, must rule similarly.

But the Court must separately address the separate issues concerning asbestos ailments, in light of the reality that those ailments may take many years to be discovered, during which asbestos victims would not know that they should be filing claims.

The Asbestos Litigants object to GM's effort to "channel all present and future asbestos personal injury claims to Old GM and to shield New GM from 'successor liability' claims ... without the appointment of a future claims representative and the other express requirements mandated by Congress in 11 U.S.C. § 524(g)." [112] But that overstates, in material part, what GM is trying to do. It is unnecessary to "channel" present asbestos injury claims to GM, as that is where they already are, and belong. And New GM has not yet done anything wrong, if it ever will. So the bulk of the Asbestos

Litigants' contention is simply a variant of the successor liability issues that the Court just addressed, and must be decided the same way.

Where there *is* a separate issue is claims for *future* injuries that people exposed to asbestos might suffer when they don't yet know of their ailments or the need to sue or assert a claim. The Court refers to those as "**Future Claims,**" while noting that they are not yet "claims" as defined in the Bankruptcy Code. Efforts to deal with such circumstances led to the enactment of section 524(g) of the Code, which *inter alia* authorizes injunctions, under a reorganization plan, to enjoin actions against nondebtors by those who have a right of recovery from a trust created to address their claims, in accordance with more detailed provisions set out in section 524(g). (Those provisions also include the appointment of a future claims representative.)

The Debtors ask for findings that New GM will not be deemed to be a successor of Old GM, and ask for an injunction barring those holding Future Claims, like others, from pursuing New GM. The Asbestos Litigants contend that such an injunction would walk, talk and quack like a section 524(g) injunction, and that it thus is impermissible. The Debtors respond that we do not yet have a request to approve a plan, and that these issues are now premature—better to be considered if and when they ever ask for a 524(g) injunction.

The Court does not have to decide these issues now, except in a modest way. The Asbestos Litigants' counsel represent only individuals with *present* asbestos ailments, and do not represent future claimants. Thus the Court has material difficulty in seeing how they have standing to assert *other's* needs and concerns, or how they **\*507** would be persons aggrieved, on any appeal, if the Court ruled adversely to them on future claims issues.

By the same token, the Court fully recognizes that the notice given on this motion was not fully effective, since without knowledge of an ailment that had not yet manifested itself, any recipient would be in no position to file a present claim. [113]

This objection raises classic standing *and* ripeness issues. And, in addition, the Court does not know if anyone in the future would have a legally valid objection as to the requested injunction—especially if Old GM were still in existence, and a claim could be filed with Old GM. The Court is doubtful that it should be erecting barriers to GM's ability to

reorganize by creating hurdles at the behest of people who lack standing, but at the same time, is not of a mind to do anything that might be constitutionally suspect. The Future Claims issues, in the Court's view, are best addressed here by adding language to the injunction paragraph to which objection has been made, applicable (only) to asbestos claims and demands, making the injunction enforceable "to the fullest extent constitutionally permissible." That limitation should address both sides' legitimate future claims concerns. The Court's order will read accordingly.

### 4. Environmental Issues

 [37]   Certain objectors—most notably, New York's Attorney General (the "**New York AG**"), who enforces New York's environmental laws, and the St. Regis Mohawk Tribe (the "**Tribe**") in upstate New York (together, the "**Environmental Matters Objectors**")—have voiced concerns as to whether any approval order would too broadly release either Old GM or New GM from their respective duties to comply with environmental laws and cleanup obligations. Objections of this character were a matter of concern to this Court as well, but they were addressed —very well, in this Court's view—by amendments to the proposed order that were made after objections were due. The additional language provides that:

> Nothing in this Order or the MPA releases, nullifies, or enjoins the enforcement of any Liability to a governmental unit under Environmental Laws or regulations (or any associated Liabilities for penalties, damages, cost recovery, or injunctive relief) that any entity would be subject to as the owner, lessor, or operator of property after the date of entry of this Order. Notwithstanding the foregoing sentence, nothing in this Order shall be interpreted to deem the Purchaser as the successor to the Debtors under any state law successor liability doctrine with respect to any Liabilities under Environmental Laws or regulations for penalties for days of violation prior to entry of this Order. Nothing in this paragraph should be construed to create for any governmental unit any

> substantive right that does not already exist under law. [114]

Another paragraph goes on to say:

> Nothing contained in this Order or in the MPA shall in any way (i) diminish the obligation of the Purchaser to comply with Environmental Laws, or (ii) diminish the obligations of the Debtors to comply with Environmental Laws consistent with their rights and obligations  **\*508** as debtors in possession under the Bankruptcy Code. The definition of Environmental Laws in the MPA shall be amended to delete the words "in existence on the date of the Original Agreement." For purposes of clarity, the exclusion of asbestos liabilities in section 2.3(b)(x) of the MPA shall not be deemed to affect coverage of asbestos as a Hazardous Material with respect to the Purchaser's remedial obligations under Environmental Laws. [115]

Especially collectively, they make it quite clear that neither Old GM nor New GM will be relieved of its duty to comply with environmental laws.

Those changes deal with much, but not all, of the Environmental Matters Objectors' concerns. The remaining objections, however, must be overruled.

The Environmental Matters Objectors understandably would like New GM to satisfy cleanup obligations that were the responsibility of Old GM, on theories of successor liability. For reasons articulated in the Court's "Successor Liability Issues" discussion in Section 2 above, however, the property may be sold free and clear of such claims.

Indeed, further reinforcing that view (as well as the Court's decision to follow *Chrysler* ) is this Court's decision, seven years ago, in *Mag. Corp.* [116] There, upon the sale of property with substantial environmental issues, this Court was faced with the exact same issue—to what extent could that property be sold free and clear of environmental claims under 363(f). This Court ruled that one had to make a distinction. Under section 363(f), there could be no successor liability imposed on the purchaser for the seller MagCorp's monetary obligations related to cleanup costs, or any other obligations that were obligations of the seller. But the purchaser would have to comply with its environmental responsibilities starting with the day it got the property, and if the property required remediation as of that time, any such remediation would be the buyer's responsibility:

When you are talking about free and clear of liens, it means you don't take it subject to claims which, in essence, carry with the property. It doesn't absolve you from compliance with the law going forward. [117]

Those same principles will be applied here. Any Old GM properties to be transferred will be transferred free and clear of successor liability, [118] but New GM will be liable from the day it gets any such properties for its environmental responsibilities going forward. And if the State of New York (or, to the extent it has jurisdiction, the Tribe) feels a need to cause any acquirer of Old GM property to engage in remedial action because of environmental issues existing even at the outset of the acquirer's ownership, nothing in this Court's order will stand in its way.

**\*509  5. Splinter Union Retiree Issues**

Three unions—the IUE, the Steelworkers, and the Operating Engineers (referred to by all parties as the "**Splinter Unions**") also have filed an objection. The Splinter Unions submit affidavits from many of their retirees, describing, in moving detail, their difficulties in getting by, and how decreased medical benefits would directly impact them. The hardship would be particularly great on those not yet eligible for Medicare, as the U.S. does not yet have comparable medical insurance for those below the qualifying age, if it ever will.

 [38]    But fully acknowledging, as one must, the hardship that the Splinter Union Retirees would suffer, the legal issue before this Court is whether section 1114 of the Code applies to a transaction of the type we have here, and whether a purchaser of assets must assume liabilities that it does not want to voluntarily assume. The answer to each of those questions must be "no."

The Splinter Unions understandably rely on section 1114 of the Code, a provision that was added to the Code to provide additional rights as to retiree insurance benefits, most significantly, medical and life insurance (for the purposes of this discussion, "**Retiree Benefits**"). Generally speaking, section 1114 attempts to balance the needs and concerns of retirees with the reality that large legacy Retiree Benefits obligations not infrequently can impair debtors' ability to reorganize, and that chapter 11 debtors often cannot afford to pay Retiree Benefits as they were previously offered.

While section 1114 is too long to quote here in full, it provides, in substance, for a procedure that must be complied with before a chapter 11 debtor can modify or not pay Retiree Benefits. Modifying or ending benefits requires a motion to be approved by the bankruptcy court. Prior to filing such a motion, the debtor or trustee must first make a proposal to the retirees' representative—usually their union, if there is one, or alternatively a committee to act on their behalf.

The proposal is supposed to provide "for those necessary modifications in the retiree benefits that are necessary to permit the reorganization of the debtor and assure [ ] that all creditors, the debtor and all of the affected parties are treated fairly and equitably...." The parties are then "to confer in good faith in attempting to reach mutually satisfactory modifications of such retiree benefits."

If agreement is not forthcoming, the motion may proceed further. Under section 1114(g) (with exceptions and provisos not relevant here):

The court shall enter an order providing for modification in the payment of retiree benefits if the court finds that—

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (f);

(2) the authorized representative of the retirees has refused to accept such proposal without good cause; and

(3) such modification is necessary to permit the reorganization of the debtor and assures that all creditors, the debtor, and all of the affected parties are treated fairly and equitably, and is clearly favored by the balance of the equities....

Here GM has stated that before Old GM stops paying or modifies Retiree Benefits, it will comply with section 1114. But as a practical matter, Old GM will be liquidating, and it will not be able to keep making these payments very much longer. After that, even if Old GM makes a proposal in good faith (as the Court assumes it will), **\*510** the Splinter Union retirees may well be left with unsecured claims, with the relatively low recoveries on their unsecured claims that all other unsecured creditors will receive, and with the delays in getting distributions on allowed claims that are an unfortunate reality of the bankruptcy process.

And New GM has not agreed to assume liability for the Splinter Union Retiree Benefits. [119] It declined to do so,

while going further for other unions, especially the UAW, because with very limited exceptions, the Splinter Unions no longer have active employees working for GM, and the U.S. Treasury—triaging its ability to undertake obligations, and trying to make New GM as lean and as viable as possible—allocated its available money to spend it only where necessary to build a new and stronger GM. [120]

With that by way of backdrop, the Court considers the legal issues. The Splinter Unions argue in substance, that the 363 Transaction constitutes a forbidden *sub rosa* plan. But this contention has previously been addressed. The remaining issue is the extent, if any, to which special 1114 rights for retirees make an otherwise permissible transaction impermissible.

Once more the Court starts with textual analysis, and looks to the words of the statute. The most relevant portions of section 1114 are the portions that impose the continuing duties to pay retiree benefits; not to end or modify them; and to negotiate with unions or other retiree representatives before changing them. Apropos the first (the continuing duty to pay), section 1114(e) is relevant. It provides, in relevant part:

> (e)(1) Notwithstanding any other provision of this title, *the debtor in possession, or the trustee if one has been appointed under the provisions of this chapter (hereinafter in this section "trustee" shall include a debtor in possession),* shall timely pay and shall not modify any retiree benefits, except that—
>
>> (A) the court, on motion of the trustee or authorized representative, and after notice and a hearing, may order modification of such payments, pursuant to the provisions of subsections (g) and (h) of this section, or
>>
>> (B) the trustee and the authorized representative of the recipients of those benefits may agree to modification of such payments,
>
> after which such benefits as modified shall continue to be paid by the *trustee.* [121]

Thus, under the words of the statute, these are duties imposed upon the trustee (which includes, by express reference, the debtor in possession)—not anyone else.

With respect to the second (the duty not to end or modify), the relevant portion is that same section 1114(e) ("the debtor in **\*511** possession, or the trustee if one has been appointed ...

shall not modify any retiree benefits"). Once more, the duty not to end or modify is not statutorily imposed on anyone else.

With respect to the third (the duty to negotiate before filing a motion to modify benefits) the relevant portion is 1114(f):

> (f)(1) Subsequent to filing a petition and prior to filing an application seeking modification of the retiree benefits, the *trustee* shall—
>
>> (A) make a proposal to the authorized representative of the retirees....

Here too, by the words of the Code, the duty is imposed upon the trustee.

Finally, the Court notes that section 363 is silent with respect to any need to first comply with section 1114 before effecting a section 363 sale.

Turning beyond textual analysis to the caselaw, the Court has seen nothing to establish a violation of law. The Splinter Unions cite no authority holding or suggesting that a purchaser of assets from an entity with section 1114 obligations must assume the debtor seller's duty to comply with section 1114's provisions. Nor do they cite such law considering section 1113 of the Code, which, while dealing with collective bargaining agreements, imposes similar duties.

On the other hand, *Chrysler* is helpful, though it did not expressly address this issue. In considering a closely similar transaction, Judge Gonzalez did not find there to be section 1114 impediments, even for non-UAW retirees. [122]

The Splinter Unions argue that "section 1114 cannot be ignored in the § 363 process," [123] but that is not what GM is asking the Court to do. GM acknowledges its duties to comply with section 1114, and so far as the record reflects, has not failed in any of its duties in that respect so far. If, in the future, GM does not comply with its section 1114 duties (or is perceived to be failing to comply in that regard), the Splinter Unions, or anyone else with standing, could of course bring that to the Court's attention. But the Splinter Union's real objection is that the Purchaser is not volunteering to comply with section 1114, and under the words of the statute, the Purchaser is not within the zone of persons upon whom section 1114 places duties.

**[39]**   The Splinter Unions note that there is another arguably relevant provision of the Code that must be considered, section 1129(a)(13). Section 1129 sets forth the requirements for confirmation of a chapter 11 plan, and the provisions in its subsection (a) include a list of requirements for confirmation of any chapter 11 plan. Section 1129(a) provides, in relevant part:

   **\*512**   (a) The court shall confirm a plan only if all of the following requirements are met:

   ...

   (13) The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of this title, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

There can be no doubt that compliance with section 1129(a)(13), along with the other 15 subsections of section 1129(a), is a requirement for confirmation of a plan. But the Court has already addressed arguments of this character, as raised by bondholders in different contexts. The Court is not here considering confirmation of a plan; it is considering a section 363 transaction, and because there is a good business reason for selling the assets now, and there is not here a *sub rosa* plan, requirements of section 1129, including section 1129(a)(13), do not apply.

The Court fully realizes that UAW retirees will get a better result, after all is said and done, than Splinter Union Retirees will, but that is not by reason of any violation of the Code or applicable caselaw. It is because as a matter of reality, the Purchaser needs a properly motivated workforce to enable New GM to succeed, requiring it to enter into satisfactory agreements with the UAW—which includes arrangements satisfactory to the UAW for UAW retirees. And the Purchaser is not similarly motivated, in triaging its expenditures, to assume obligations for retirees of unions whose members, with little in the way of exception, no longer work for GM.

The Court has also considered the Splinter Unions' point that in pre-bankruptcy planning, GM and the U.S. Treasury focused on the duties to Splinter Union Retirees, and made a conscious decision that Splinter Union retirees would not be offered as good a deal as others. But the Court cannot find that there was any "conspiracy" in that regard, nor that

there was any intention to disregard applicable law. The U.S. Treasury, in making hard decisions about where to spend its money and make New GM as viable as possible, made business decisions that it was entitled to make, and the fact that there were so few Splinter Union employees still working for GM was an understandable factor in that decision. The Court's responsibility is not to make fairness judgments as to those decisions, but merely to gauge those decisions under applicable law.

The Splinter Unions' objection must be overruled.

### 6. Dealer Issues

As noted, the 363 Transaction contemplates that GM's present dealer network of about 6,000 dealers will be made more efficient, continuing approximately 4,100 of its dealers, and ending its relationship, though not instantly, with approximately 1,900 others. [124]   In cooperation with State AGs, and the Unofficial Dealers Committee [125] (the "**Dealer Committee**"), GM and the Purchaser agreed on additional language   **\*513**   in the sale order for the protection of dealers, and the AGs and the Dealer Committee withdrew their objections to the sale. However, a local dealers association, the Greater New York Automobile Dealers Association (the "**New York Dealers Association**"), seeking to be heard as an *amicus,* filed a brief contending that the Participation Agreements and Deferred Termination Agreements that more than 99% of GM dealers entered into were coerced and unlawful.

**[40]**   Initially, the Court deals with a matter of standing, to which it became more sensitive, after oral argument, upon rereading the New York Dealers Association's *amicus* brief. The New York Dealers Association does not purport to speak for a single identified GM dealer. It does not seek standing under section 1109. It speaks only as an *amicus.* And in addition, the main thrust of the New York Dealers Association *amicus* brief is not the protection of *GM* dealers. It is the protection of their *competitors.* The interests of *GM* dealers were the subject of the negotiations with the Dealer Committee and the AGs, and resolved to their satisfaction. While the New York Dealers Association objection professes to be speaking for the interests of GM dealers, its principal thrust is very different; it is to protect the interests of others who are competing with GM and (especially since it is a dealers' organization), competing with GM dealers. [126]

Under these circumstances, the Court must note the lack of standing and that the New York Dealers Association may be heard as nothing more than as an *amicus;* note that the New York Dealers Association does not have section 1109 rights; and note that at least seemingly, if not plainly, the New York Dealers Association has interests largely adverse to those whom it is professing to help. [127]

**[41]**   Then, turning to the merits of the New York Dealers Association arguments (assuming that, as *amicus,* it has any standing to make them), any objection that the New York Dealers Association might make—though it never says that it is making an "objection"—would have to be overruled, and to the extent it is making an objection, it *is* overruled. While the Court understands the unattractive choices that many dealers had to face, the Court cannot go so far as to hold that these agreements were "coerced" or are unlawful—even if (as the Court assumes, without deciding) those dealer rights could not be so modified outside of bankruptcy.

Implementation of federal bankruptcy policy permits debtors, for the benefit of the creditor body as a whole, to alter creditors' and contract counterparties' contractual rights. Corporate reorganization, by its nature, requires parties in interest to consider unattractive choices. One of the relevant rights in bankruptcy is the right of a debtor to reject an executory contract with its contract counterparty, for the benefit of the debtor's other creditors. All concerned with GM's future knew that GM had to slim down and improve its dealer network, and that this required modifying dealer agreements before they were assumed and assigned —a process **\*514** that led to the Participation Agreements. Similarly, as an alternative to simply leaving dealers who would otherwise be terminated in the lurch, GM proposed giving them a soft landing, in exchange for waivers of other rights—a process that led to the Deferred Termination Agreements. Those offers secured widespread acceptance; 99% of the continuing dealers accepted, and 99% of the dealers who eventually would be terminated took the offer.

The alternative, in each case was rejection. Contract counterparties do not have to accept what they are offered, and they may elect to stand on their rights. But here GM was not obligated, as a matter of law, to choose between leaving its dealer contracts unmodified or rejecting them. It could, if it wished, offer its contract counterparties deals that would more appropriately meet each side's needs and concerns, without fear that such deals would be subject to collateral attack by reason of assertions of coercion.

Directly on point are comments this Court made at the bankruptcy court level, and Judge Kaplan made at the district court level, in the *Adelphia* chapter 11 cases. There, in connection with the DoJ Settlement discussed above, [128] Adelphia agreed to provide $715 million to the United States Government (on behalf of both the DoJ and the SEC) in exchange for dropping threats of indictment and forfeiture, and settling claims that might otherwise have been pursued by the SEC. The settlement was attacked by Adelphia creditors, who charged that it was the result of unlawful coercion. In the same decision to which this Court previously referred, this Court disagreed, and on appeal, so did Judge Kaplan.

This Court stated:

> [W]here the "coercion" results from differences in bargaining power, as a consequence of law or fact, or governmentally granted authority and discretion (such as the authority and discretion we grant to prosecutors, to achieve a common good), that is a wholly different kind of "coercion." As one of the banks' counsel aptly noted in argument on this motion, it is what we call "leverage." [129]

Judge Kaplan, affirming, agreed—even going so far as to quote the language this Court just used—and continued:

> What the appellants characterize as coercion was no different in principle than the pressure that leads the overwhelming majority of defendants in criminal cases to plead guilty— the risk that a conviction after trial will result in a harsher sentence than is likely to be imposed following a guilty plea. Yet guilty pleas in such circumstances rightly are considered voluntary and uncoerced in any relevant sense. [130]

For decades, counterparties to executory contracts with bankruptcy debtors have known that their agreements could be rejected, and debtors and contract counterparties have negotiated deals as alternatives to that scenario. When they have been so negotiated (with all knowing that the

debtor has the option to reject if the existing deal is not modified to its satisfaction), that has never been regarded as unlawful coercion. Rather, it has been recognized as an appropriate use of the leverage that Congress has given to debtors for the benefit of all of the other creditors who are not contract counterparties, **515** and for whom the restructuring of contractual arrangements is important to any corporate restructuring.

The Court's observation in questioning at oral argument, with respect to dealer contract modifications, that "no good deed goes unpunished" (perhaps naively thinking at the time that the New York Dealers Association was advocating the interests of *GM* dealers) was, as it probably sounded, an indication of frustration with the New York Dealers Association's argument. And what the Court could have said then, and what it is saying now, is that the *last* thing bankruptcy courts should be doing is to be forcing debtors and their contract counterparties into situations where rejection is the only lawful alternative, subjecting other creditors to dilution on their recoveries by running up rejection damages, and subjecting contract counterparties to the full hardships of an executory contract rejection. There is no basis in law or fact for holding that these contractual modifications were unlawfully "coerced." Disapproving contractual modifications of the type here would be squarely inconsistent with the goals of corporate reorganization.

As a practical matter, modifications negotiated by the Dealers Committee and the AGs mooted out many, if not all, of the New York Auto Dealers' complaints about the loss of dealer protection laws. To the extent they did not, however, the Court notes that Judge Gonzalez dealt with these same contentions in another decision in *Chrysler*. After concluding that Chrysler's rejection of dealership agreements constituted a valid exercise of business judgment, Judge Gonzalez found that the state franchise laws at issue, like those at issue here, frustrated the purposes of (and, thus, were preempted by) section 365.[131] To the extent that laws of the type relied upon by the New York Dealers Association—either state or federal—impair the ability to reject, or to assume and assign, they must be trumped by federal bankruptcy law. And to the extent that nonbankruptcy law prohibits debtors and their contract counterparties from finding mutually satisfactory less draconian alternatives to rejection, it likewise must be trumped.

As Judge Gonzalez explained:

Specifically and by no means exclusively, statutory notice periods of, *e.g.,* 60 or 90 days before termination clearly frustrate § 365's purpose to allow a debtor to reject a contract as soon as the debtor has the court's permission (and there is no waiting period under the Bankruptcy Rules). Buy-back requirements also frustrate § 365's purpose to free a debtor of obligations once the debtor has rejected the contract. Good cause hearings frustrate § 365's purpose of giving a bankruptcy court the authority to determine whether a contract may be assumed or rejected. Strict limitations on grounds for nonperformance frustrate § 365's purpose of allowing a debtor to exercise its business judgment and reject contracts when the debtor determines rejection benefits the estate. So-called "blocking rights," which impose limitations on the power of automobile manufacturers to relocate dealers or establish new dealerships or modify existing dealerships over a dealer's objection, frustrate § 365's purpose of giving a debtor the power to decide which contracts **516** it will assume and assign or reject by allowing other dealers to restrict that power.[132]

Judge Gonzalez also made clear that 28 U.S.C. § 959(b), on which the New York Dealers Association's *amicus* brief heavily relies, did not alter the Court's "preemption analysis," because that provision "does not de-limit the precise conditions on contract rejection"—particularly where, as in *Chrysler* and here, the pertinent state laws concern "consumer convenience and costs and the protection of local businesses, rather than a concern over public safety."[133]

To the extent that the New York Auto Dealers Association complains that GM gets a "competitive advantage over others not in bankruptcy,"[134] that likewise is a complaint with respect to federal bankruptcy policy, which gives companies a chance to reorganize and shed burdensome obligations to

achieve a greater good. That GM's reorganization will make New GM and GM dealers more competitive is not a bad thing; it is exactly the point.

The New York Auto Dealers' Association lacks standing to have its comments deemed to be an objection. To the extent that its *amicus* comments can be deemed to constitute an objection, any such objection is overruled.

### 7. ECC Trust

The Environmental Conservation and Chemical Corporation Site Trust Fund (the "**ECC Trust**") has also filed a limited objection. The ECC Trust was created as a means to implement a consent decree that GM and other parties entered into with the United States and the State of Indiana to clean up hazardous materials at the EnviroChem Superfund Site in Zionsville, Indiana (the "**Zionsville Site**"). The consent decree was approved in 1991 by the United States District Court for the Southern District of Indiana. Under the authority of the consent decree, the Trustee for the ECC Trust issued an assessment on April 20, 2009, requiring GM to pay approximately $63,000 into the ECC Trust. Shortly before the due date, GM notified the ECC Trust that it would not be paying its share, and filed its chapter 11 petition shortly thereafter.

The ECC Trust requests that this Court, using its "equitable powers," require that the Purchase Agreement be modified such that the ECC Trust's claim be designated an "Assumed Liability." Unfortunately, the Court cannot do that.

This Court need not, at this juncture, decide the vast majority of the issues presented by the parties at oral argument—including, especially, whether a consent decree is considered a contract or a judicial decree for enforcement purposes, and **\*517** whether this particular consent decree created a monetary obligation, which would be regarded like any other unsecured claim, or was in fact a mandatory injunction to clean up the Site.

For now it is sufficient to note that the ECC Trust's present rights are against *Old GM*. Under the ECC Trust's best case scenario, as argued, the ECC Trust may be able to secure equitable relief against Old GM. But whether the ECC Trust can enforce an injunction against Old GM, or must instead live with an unsecured claim, is an issue for another day.

 **[42]**   **[43]**   **[44]**   Whatever the ECC Trust's rights are against Old GM, there is no basis for this Court to use its

"equitable powers" to force the Purchaser to assume this liability. This Court has found that the Purchaser is entitled to a free and clear order. The Court cannot create exceptions to that by reason of this Court's notions of equity. As this Court noted in another of its *Adelphia* decisions, it is not free to use its equitable powers to circumvent the Code. [135] Decisions of the Second Circuit make it clear that, even with the presence of section 105(a), bankruptcy judges are not free to do whatever feels right. [136]

Insufficient justification has been provided for this Court to force the Purchaser to assume this liability, in the face of section 363(f)'s explicit language allowing the sale of property "free and clear" of such liabilities. The Court is aware that the requested relief would have a very modest impact on the Purchaser, but is nevertheless required to issue a principled decision.

### 8. "Equally and Ratably" Issues

 **[45]**   Pro se unsecured bondholders Parker and Radha R.M. Narumanchi raise objections that they should be treated as secured creditors, and have not been. They contend that the indenture for their bonds (the 1995 issue, whose indenture trustee, represented by skilled counsel, did not raise a similar objection) had an "equal and ratable clause," boosting their bonds to secured debt status if liens were involuntarily put on certain manufacturing facilities. They then contend that when the 2008 Prepetition Financing was put in place, it triggered their equal and ratable clauses, making them secured.

The Court agrees that the bonds have an equal and ratable clause. But it cannot agree that it was triggered. The 2008 Prepetition Financing Documents expressly carved out from the grant of the security interest under those documents any instance **\*518** where it would trigger, *inter alia,* the equal and ratable clause.

The 2008 Prepetition Financing granted the U.S. Treasury a lien, subject to exceptions not applicable here, on a wide array of property. But it expressly did not put a lien on what it called "**Excluded Collateral.**" [137] Excluded Collateral included, among other things:

> (v) any Property, including any debt or Equity Interest and any manufacturing plan or facility which is located within the continental United States, to the extent that the grant of a security interest therein to secure the Obligations *will*

*result in a lien, or an obligation to grant a lien, in such Property to secure any other obligation.* [138]

Thus when liens were granted in favor of the U.S. Treasury in December 2008, the U.S. Treasury was not granted a lien on any of the Excluded Collateral—including, as relevant here, anything that would trigger the equal and ratable clause. [139]

### 9. Unauthorized Use of TARP Funds Issues

Bondholder Parker (so far as the Court can tell, the only one of the 850 objectors) objects to the 363 Transaction on the additional ground that the U.S. Government was not authorized to use TARP funds to assist the auto industry, and hence that the 363 Transaction is unlawful. The Court agrees with the United States Attorney that the issue of the U.S. Treasury's lending authority now is moot, and that Mr. Parker lacks standing to raise the issue. Thus the Court does not need to reach the third issue.

 [46]    First, the Court agrees that the objection is moot. The 363 Transaction does not involve any expenditure of TARP funds. It simply involves a credit bid by the Purchaser—as an assignee of secured debt held by EDC (as to whom no objection is made) and the U.S. Treasury—of amounts due on previous loans under the U.S. Treasury Prepetition Loan and the DIP Financing Facility.

No party objected to the use of TARP funds in connection with the DIP Financing Facility, or when GM got the assistance it did before the filing of GM's chapter 11 case. And the Court approved the DIP Financing Facility after full hearing and notice. It was *then* that the U.S. Treasury became a lender, not now. Complaints that the U.S. Treasury should not have lent the money to GM are now moot.

 [47]    Second, the Court once more agrees with the United States Attorney that Mr. Parker lacks standing to challenge the U.S. Government's lending authority here. Judge Gonzalez addressed this exact issue in *Chrysler–Standing,* [140] the second of the two decisions that were affirmed by the Circuit.

The Court does not need to repeat all of the elements of Judge Gonzalez's analysis in *Chrysler–Standing,* nor what this Court has stated previously with respect to the importance of *stare decisis,* or its compliance  **\*519**  with decisions of the Second Circuit. Here, as in *Chrysler–Standing,* an unsecured creditor like Mr. Parker does not establish the injury-in-fact necessary to establish constitutional standing under Article III

because "all holders of unsecured claims are receiving no less than what they would receive in a liquidation." [141]  And even assuming that the 363 Transaction itself injured bondholders like Mr. Parker (though it is difficult to see how, since without the 363 Transaction, GM would have to liquidate), Mr. Parker cannot demonstrate standing because he cannot show that any such injury is "fairly traceable" to the Government's use of TARP funds, as opposed to the 363 Transaction itself.

As Judge Gonzalez explained in *Chrysler–Standing,* "[i]f a non-governmental entity were providing the funding in this case, the [objectors] would be alleging the same injury.... In this light, it is not the actions of the lender that the [objectors] are challenging but rather the transaction itself. Specifically, the [objectors'] alleged injury is not fairly traceable to the U.S. Treasury's actions because the [objectors] would suffer the same injury regardless of the identity of the lender." [142]

Under these circumstances, the Court need not address Mr. Parker's third point. This objection is overruled.

### 10. Cure Objections

Many contract counterparties—more than 500—voiced objections to GM's estimated cure amounts, generally expressing different perceptions as to the exact amounts GM owes them. These differences would eventually have to be resolved, since to assume an executory contract (and GM is assuming thousands of them), most prepetition defaults would have to be cured.

GM proposed a mechanism for fixing the cure amount entitlements—an amalgam of exchanges of information, negotiation, ADR, and court determination, if needed. Significantly, while many parties had differing views as to the amounts to which they were entitled, none voiced objections to the method GM proposed. As those counterparties will remain eligible for their full legal entitlements, the Court finds the proposed mechanism fully satisfactory, and it is unnecessary and inappropriate to rule on all of the cure amount issues here.

### 11. UAW Settlement Objections

Approximately 56 UAW retirees—somewhat numerous in number, but a miniscule portion of the estimated 500,000 covered under the UAW Settlement Agreement—object to the UAW Settlement Agreement. In general, they express (understandable) disappointment with a settlement that

results in a reduction of their health benefits. But they do not articulate objections legally cognizable under the law.

The Curson testimony, in particular, evidences the sensitivity to member and retiree needs and concerns of the UAW leadership. As discussed at considerable length above, the UAW had to make very hard decisions as to concessions it would make on behalf of its members and retirees to preserve GM's viability—and to avoid a liquidation that would be disastrous for the people the UAW was trying to help. The UAW was successful in preserving an acceptable level of core medical benefits. And as the UAW properly observes in its brief, if the UAW had not done as well as it did, its agreement would not have been ratified.

 **\*520**  Given the alternatives, it is easy to find that the UAW settlement is fair and equitable, from the perspective of both the GM estate and UAW members. It falls well within the range of reasonableness from GM's perspective, and is fair, reasonable and in the best interest of the UAW retirees.

### 12. Stockholder Objections

 [48]  Many GM stockholders, understandably disappointed that the 363 Transaction will leave them with no recovery, have voiced objections. Once again, the Court is sensitive to their concerns, but cannot help them. GM is hopelessly insolvent, and there is nothing for stockholders now. And if GM liquidates, there will not only be nothing for stockholders; there will be nothing for unsecured creditors.

Under those circumstances, GM stockholders cannot claim to be aggrieved by the transactions before the Court here.

### 13. Miscellaneous Objections

The Court cannot lengthen this decision further by specifically addressing any more of the approximately 850 objections that were raised on this motion. The Court has canvassed them and satisfied itself that no material objections other than those it has specifically addressed were raised and have merit. To the extent those objections were not expressly addressed in this decision, they are overruled.

### Conclusion

The 363 Transaction is approved. The Court is entering an order in accordance with this Decision.[143]

### Parallel Citations

51 Bankr.Ct.Dec. 225

Footnotes

1    Principal participants are shown here. A full listing will be posted when practicable.

2    When discussing the mechanics of the 363 Transaction, the existing GM will be referred to as "**Old GM,**" and the Purchaser will be referred to as "**New GM.**"

3    When it filed its objection, the F & D Bondholders Committee, identifying itself as the "Family & Dissident" Bondholders Committee, said it was "representing the interests of" 1,500 bondholders, with bond holdings "believed to exceed $400 million." (F & D Bondholder Comm. Obj. at 1). But even after it filed the second of its Fed.R.Bankr.P.2019 statements, it identified no other bondholders for whom it was speaking, or provide the holdings, purchases and sales information for any others that Rule 2019 requires. Under these circumstances, the Court must consider that the committee speaks for just those three bondholders.

4    To avoid making this lengthy decision even longer, the Court has limited its citations in its Findings of Fact to those matters where they are most useful.

5    In accordance with the Court's Case Management Order # 1, direct testimony was presented by affidavit and cross-examination and subsequent questioning proceeded live. After cross-examination, the Court found all witnesses credible, and takes their testimony as true.

6    More than 500,000 workers are employed by companies in the U.S. that manufacture parts and components used by automakers.

7    GM has used trusts qualified as "voluntary employee beneficiary associations" under the Internal Revenue Code (each, a "**VEBA**"), to hold reserves to meet GM's future obligations to provide healthcare and life insurance benefits ("**OPEB**") to its salaried and hourly employees upon retirement. In substance, the employer makes contributions to the VEBA, and the VEBA funds the health benefits to the retirees.

8    Emphasis added.

9    GM tried to accomplish an out-of-court restructuring, as suggested, but was unsuccessful.

10    The Canadian EDC participation was sizeable—approximately $3 billion with approximately an additional $6 billion to be provided later.

11    Proposed Sale Order ¶ 8.

12    Audio Recording of Testimony of June 30, 2009.

13    *Id.* at 85.

14    *Id.* at 85–86.

15    *Id.* at 103.

16    Audio Recording of Testimony of July 1, 2009.

17    In all respects relevant here, where (as here, and as is the norm) the debtor remains in possession and the court has not ordered otherwise, the debtor has the rights of the trustee. *See* Bankruptcy Code section 1107(a) ("Subject to ... such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation ... of a trustee serving in a case under this chapter.").

18    Section 1123(b)(4).

19    *See, e.g., In re Adelphia Communications Corp.,* 359 B.R. 65, 72 n. 13 (Bankr.S.D.N.Y.2007) ("This Court has been on record for many years as having held that the interests of predictability in this District are of great importance, and that where there is no controlling Second Circuit authority, it follows the decisions of other bankruptcy judges in this district in the absence of clear error.").

20    *See In re Chrysler LLC,* 405 B.R. 84 (Bankr.S.D.N.Y.2009) ( "*Chrysler* "), and 405 B.R. 79 (Bankr.S.D.N.Y.2009) ("*Chrysler–Standing* ") (Gonzalez, J.), *aff'd for substantially the reasons stated in the opinions below,* No. 09–2311–bk (2d Cir. Jun. 5, 2009) ("*Chrysler–Circuit* "), *temporary stay vacated and further stay denied,* ––– U.S. ––––, 129 S.Ct. 2275, 173 L.Ed.2d 1285 (2009).

21    Though the similarities between this case and *Chrysler* are many, there is a noteworthy difference, as that case had one issue not before the Court here. In *Chrysler,* Judge Gonzalez had to analyze rights of participants in a secured lending facility who quarreled with their administrative agent's decision to consent to a sale free and clear of secured creditor claims and interests. *See Chrysler,* 405 B.R. at 100–104. Here there was no objection by secured creditors, other than a single timid objection by a secured creditor with a lien on property to be transferred, looking for adequate protection as part of the sale. Here the objecting bondholders are holders of *unsecured* debt, and thus lack the greater rights that secured creditors have in bankruptcy cases. Of course, the *Chrysler* case never really concerned, as some asserted, an assault on secured creditors' rights; it merely involved dissident minority participants in a secured lending facility being bound by the actions of their agent, pursuant to contractual agreements with the agent that they or their predecessors had agreed to.

22    *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, (2d Cir.1983) ("*Lionel* ").

23    *Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV Corp. (In re Chateaugay Corp.),* 973 F.2d 141 (2d Cir.1992) ("*LTV* ").

24    *Consumer News & Bus. Channel P'ship v. Fin. News Network Inc. (In re Fin. News Network Inc.),* 980 F.2d 165 (2d Cir.1992) ( "*FNN* ").

25    *Licensing By Paolo, Inc. v. Sinatra (In re Gucci),* 126 F.3d 380 (2d Cir.1997) ("*Gucci* ").

26    *Motorola v. Comm. of Unsecured Creditors (In re Iridium Operating LLC),* 478 F.3d 452 (2d Cir.2007) ("*Iridium* ").

27    *Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.,* 554U.S. 33, 128 S.Ct. 2326, 2331 n. 2, 171 L.Ed.2d 203 (2008) ( "*Piccadilly Cafeterias* ").

28    *See Chrysler,* 405 B.R. at 94–96.

29    *Id.* at 94.

30    722 F.2d at 1069.

31    *Id.*

32    *Id.*

33    *Id.*

34    *Id.*

35    *Id.*

36    *Id.* at 1070 (emphasis added).

37    *Id.* at 1071,

38    *Id.* (emphasis added).

39    *See Lionel; LTV,* 973 F.2d at 143–44 ("In *Lionel,* we adopted a rule that 'requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application,' " and, quoting *Lionel,* reiterating that "First and foremost is the notion that a bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the Code," and that "a bankruptcy judge must

have substantial freedom to tailor his orders to meet differing circumstances."); *FNN, 980 F.2d at 169* (in considering sale outside of a plan of reorganization, "a bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the [Bankruptcy] Code"); *Gucci, 126 F.3d at 387* ("A sale of a substantial part of a Chapter 11 estate ... may be conducted if a good business reason exists to support it."); *Iridium, 478 F.3d at 466* ("In this Circuit, the sale of an asset of the estate under § 363(b) is permissible if the judge determining [the] § 363(b) application expressly find[s] from the evidence presented before [him or her] at the hearing [that there is] a good business reason to grant such an application.").

40    *See, e.g., In re Decora Indus.,* No. 00–4459, 2002 WL 32332749, at *3 (D.Del. May 20, 2002) (Farnan, J.) (approving a 363 sale, finding a "sound business purpose" where "the Court understands the precarious financial and business position of Debtors"; their only source of outside financing was a DIP facility that would soon expire, with no source of alternative financing, and where the alternatives were either the proposed sale transaction or termination of business operations and liquidation).

       *See also* 3 COLLIER ON BANKRUPTCY ¶ 363.02[3] (15th ed. rev.2009) ( "*Collier* ") (While sales of substantial portions of a debtor's assets under section 363 must be scrutinized closely by the court, "[i]t is now generally accepted that section 363 allows such sales in chapter 11, as long as the sale proponent demonstrates a good, sound business justification for conducting the sale before confirmation (other than appeasement of the loudest creditor), that there has been adequate and reasonable notice of the sale, that the sale has been proposed in good faith, and that the purchase price is fair and reasonable.").

41    There the issue involved the debtor's entitlement to the "stamp-tax" exemption of Bankruptcy Code section 1146, after a 363 sale of the entirety of the debtor's assets and confirmation of a plan distributing the proceeds of the earlier 363 sale.

42    128 S.Ct. at 2331 n. 2 (emphasis added).

43    722 F.2d at 1071.

44    *Id.*

45    *Id.* at 1071.

46    *Id.*

47    *Id.* ("This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge."); *accord Iridium, 478 F.3d at 466 n. 21.*

48    *See Chrysler,* 405 B.R. at 95–96.

49    *Id.* at 96.

50    *Id.* (citations omitted).

51    No. 07–10609(REG), ECF # 284.

52    No. 02–41729(REG).

53    *See In re Adelphia Commc'ns Corp.,* 368 B.R. 140, 169 (Bankr.S.D.N.Y.2007) ("Adelphia–Confirmation") (describing the history).

54    Thus the Court needn't spend extensive time in individualized discussion of each of the more specific factors articulated in *Lionel,* and by this Court, as aids in determining "good business reason." Where the proportionate value of the assets being sold is high, as they are here, Factor (a) (proportionate value of the assets to the estate as a whole) suggests that the situation be given close factual scrutiny—which the Court has attempted to do, in its rather lengthy Findings of Fact above—but at most Factor (a) tips only mildly against approval here. The same is true with respect to Factor (b) (elapsed time since the filing)—since where the need is most pressing, it would be foolhardy to wait. Factors (d) (effect on reorganization), (e) (proceeds to be realized), and (f) (which alternative is proposed) are inapplicable or favor immediate sale, as the Court finds that a standalone plan of reorganization is not possible, that the sale would not change distribution priorities in any ultimate plan, and there are no opportunities to realize greater value. And all of the other factors weigh *heavily* in favor of approval. Factor (g) (whether the asset is increasing or decreasing in value), expressly stated by the Circuit to be most important, *compels* and not just favors immediate sale. So do Factors (h) (lack of liquidity); (i) (no alternative sale opportunity later); (j) (same, along with no stand-alone plan alternative); and (k) the certainty or near certainty that in the absence of this sale, the patient will indeed die on the operating table. (If it matters, the same conclusion follows even if one does not consider the additional factors this Court suggested.)

       The Court also notes the critically important absence of proof tending to support a contrary finding, as also required by *Lionel.* *See Lionel,* 722 F.2d at 1071. Opponents of the sale have produced no evidence that the sale is *not* justified.

55    *In re Adelphia Commc'ns Corp.,* 327 B.R. 143, 166 (Bankr.S.D.N.Y.2005) ("Adelphia Settlement–Bankruptcy "), *aff'd* 337 B.R. 475 (S.D.N.Y.2006) (Kaplan, J.)("*Adelphia Settlement–District* "), *appeal dismissed,* 222 Fed.Appx. 7 (2d Cir.2006), *cert. denied,* 552 U.S. 941, 128 S.Ct. 114, 169 L.Ed.2d 244 (2007).

56    *Adelphia Settlement–Bankruptcy,* 327 B.R. at 167.

57    Creditors' Comm. Ltd. Obj. ¶ 3 (emphasis added).

58   *See, e.g., In re Betty Owens Sch., Inc.,* 1997 WL 188127, at *4 (S.D.N.Y. Apr.17, 1997) (Leisure, J.), citing *In re Del. & Hudson Ry. Co.,* 124 B.R. 169, 176 (D.Del.1991) (Longobardi, J.). *See also* Judge Farnan's more recent decision *in Decora Industries,* 2002 WL 32332749, at *2.

59   *Gucci,* 126 F.3d at 390 (quoting *In re Rock Indus. Mach. Corp.,* 572 F.2d 1195, 1198 (7th Cir.1978)); *accord id.* (noting also that the relevant fraudulent, collusive actions are those "specifically intended to affect the sale price or control the outcome of the sale."); *Chrysler,* 405 B.R. at 106 (same).

60   *See In re Global Crossing Ltd.,* 295 B.R. 726, 742–44 (Bankr.S.D.N.Y.2003), relying heavily on *Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.),* 147 B.R. 650 (S.D.N.Y.1992) (Mukasey, C.J.).

61   *Global Crossing,* 295 B.R., at 743.

62   When the Court considers "disinterestedness," it looks to the disinterestedness of GM's Board and management, and particularly its Board, which is the ultimate decision maker for any corporation. The Court heard no evidence that either the Board or management chose the sale opportunity over any other alternative either because of a conflict of interest, or because the Government told them to. The Court finds instead that GM's Board and management took the pending opportunity to save the company because it was the only responsible alternative available.

    Finally, the U.S. and Canadian governments did not become "insiders" skewing any disinterestedness analysis by reason of their assistance to GM. *See Chrysler,* 405 B.R. at 107 ("Nor did the Governmental Entities control the Debtors in that regard [with respect to the *Chrysler* sale transaction] or become 'insiders' of the Debtors.").

63   *See Iridium,* 478 F.3d at 466 (citing *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.),* 700 F.2d 935, 940 (5th Cir.1983); *Chrysler,* 405 B.R. at 95–96).

64   700 F.2d at 940.

65   *See Abel v. Shugrue (In re Ionosphere Clubs, Inc.),* 184 B.R. 648, 654 & n. 6 (S.D.N.Y.1995).

66   *See Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.),* 119 F.3d 349, 354 (5th Cir.1997).

67   *See Contrarian Funds, LLC v. Westpoint Stevens Inc. (In re Westpoint Stevens Inc.),* 333 B.R. 30, 51 (S.D.N.Y.2005) (Swain, J.).

68   *See In re Naron & Wagner, Chartered,* 88 B.R. 85, 88 (Bankr.D.Md.1988) (the "sale proposed here is not a *sub rosa* plan because it seeks only to liquidate assets, and the sale will not restructure [the] rights of creditors.").

69   *See In re Trans World Airlines, Inc.,* 2001 WL 1820326, at *11 (Bankr.D.Del. Apr.2, 2001) (Walsh, J.).

70   2001 WL 1820326, at *12 (emphasis added).

71   2001 WL 1820326, at *11 (emphasis added).

72   *See* 405 B.R. at 97–100.

73   *Id.* at 98.

74   *Id.* at 99.

75   *Id.*

76   *Id.*

77   *Id.* at 99–100.

78   *Id.* at 99 (emphasis added).

79   *Id.* As he further observed, the UAW in *Chrysler* was providing substantial consideration to New Chrysler in the form of "unprecedented modifications" to the UAW's collective bargaining agreement. *Id.* at 100. The record supports a similar finding here.

80   *See Adelphia Commc'ns Corp. v. Bank of America (In re Adelphia Commc'ns Corp.),* 365 B.R. 24, 73–75 (Bankr.S.D.N.Y.2007) ( "*Adelphia–Bank of America* "), *aff'd as to all but an unrelated issue, 390 B.R. 80* (S.D.N.Y.2008) (McKenna, J.).

81   *In re Official Comm. of Unsecured Creditors for Dornier Aviation (North America), Inc.,* 453 F.3d 225, 233–34 (4th Cir.2006).

82   *In re AutoStyle Plastics, Inc.,* 269 F.3d 726, 749–50 (6th Cir.2001).

83   *See Adelphia–Bank of America,* 365 B.R. at 74 (citing, inter alia, *Dornier Aviation* and *AutoStyle* ).

84   There is no basis for recharacterizing the $33 billion that was the subject of the DIP loans provided by the U.S. Treasury and EDC. These were presented to the Court as loans, seeking approval for post-petition financing under section 364 of the Code.

85   *Benjamin v. Diamond (In re Mobile Steel Co.),* 563 F.2d 692 (5th Cir.1977).

86   *Id.* at 700.

87   3 *Collier* at ¶ 363.06[7].

88   *Id.*

89   *Id.*

90   *See id.*

91    *Id.* Whether the U.S. and Canadian Governments would have lent and ultimately bid a lesser amount here is doubtful, but this consideration provides the context for deciding legal issues that presumably will extend beyond this case.

92    The principal provisions in the proposed order provide, in relevant part:

> Except for the Assumed Liabilities, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Assets shall be transferred to the Purchaser in accordance with the MPA, and, upon the Closing, shall be free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever ... including rights or claims based on any successor or transferee liability....

> Proposed Order ¶ 7.

> ... [A]ll persons and entities ... holding liens, claims, encumbrances, and other interests of any kind or nature whatsoever, including rights or claims based on any successor or transferee liability, against or in a Seller or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Sellers, the Purchased Assets, the operation of the Purchased Assets prior to the Closing, or the 363 Transaction, are forever barred, estopped, and permanently enjoined from asserting against the Purchaser, its successors or assigns, its property, or the Purchased Assets, such persons' or entities' liens, claims, encumbrances, and other interests, including rights or claims based on any successor or transferee liability.

> Proposed Order ¶ 8. Similar provisions are in the MPA.

93    *See* Section 101(5) of the Code.

94    3 *Collier* at ¶ 363.06[1] (emphasis added).

95    Indiv. Accident Litigants Br. 4, *quoting Cohen v. de la Cruz,* 523 U.S. 213, 220, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998).

96    *See* Postings of Stephen Lubben, Professor at Seton Hall Law School, to Credit Slips, *http://www.creditslips. org/creditslips/2009/06/ claim-or-interest.html* (June 13, 2009, 8:25 PM EST); and *http://www.creditslips.org/creditslips/2009/06/claim–or–interest–part– 2.html* (June 14, 2009, 6:42 PM EST). Blogs are a fairly recent phenomenon in the law, providing a useful forum for interchanges of ideas. While comments in blogs lack the editing and peer review characteristics of law journals, and probably should be considered judiciously, they may nevertheless be quite useful, especially as food for thought, and may be regarded as simply another kind of secondary authority, whose value simply turns on the rigor of the analysis in the underlying ideas they express.

97    Indiv. Accident Litigants Br. 4.

98    *See* Posting of Stephen Lubben, Professor at Seton Hall Law School, to Credit Slips, *http://www.creditslips. org/creditslips/2009/06/ claim-or-interest.html* (June 13, 2009, 8:25 PM EST).

99    The Individual Accident Litigants also place heavy reliance on *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), *see* Indiv. Accident Litigants Br. 8, suggesting that *Butner* requires deference to state law that might impose successor liability and that this would require excluding successor liability damages claims from any definition of "interest." But the Court cannot agree. First, when quoted in full, *Butner* (whose bottom line was that the issue of whether a security interest extended to rents derived from the property was governed by state law) stated:

> The Bankruptcy Act does include provisions invalidating certain security interests as fraudulent, or as improper preferences over general creditors. Apart from these provisions, however, Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.

> 440 U.S. at 54, 99 S.Ct. 914. *Butner* further stated (in language the Individual Accident Litigants did not quote):

> Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.

> *Id.* at 55, 99 S.Ct. 914. But the *Butner* court laid out principles by which we determine what is property of the estate; it did not address the different issue of whether a state may impose liability on a transferee of estate property by reason of something the debtor did before the transfer. Moreover, *Butner* noted that provisions of the Code can and do sometimes trump state law. And section 363(f), for as much or as little as it covers, is exactly such a provision. In fact, 363(f) is a classic example of an instance where a "federal interest requires a different result." *Butner* neither supports nor defeats either party's position here.

100   *See, e.g., Chrysler,* 405 B.R. at 111; *In re Trans World Airlines, Inc.,* 322 F.3d 283, 288–90 (3d Cir.2003) ("*TWA* "); *United Mine Workers of Am.1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.),* 99 F.3d 573, 581–82 (4th Cir.1996).

101   *See, e.g., Michigan Empl. Sec. Comm. v. Wolverine Radio Co., Inc. (In re Wolverine Radio Co.),* 930 F.2d 1132, 1147–48 (6th Cir.1991); *Precision Indus., Inc. v. Qualitech Steel SBQ, LLC (In re Qualitech Steel Corp.),* 327 F.3d 537, 545–46 (7th Cir.2003); *Fairchild Aircraft Corp. v. Cambell (In re Fairchild Aircraft Corp.),* 184 B.R. 910, 918 (Bankr.W.D.Tex.1995), *vacated as moot on equitable grounds,* 220 B.R. 909 (Bkrtcy.W.D.Tex.1998).

102    *See also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.),* 75 B.R. 944, 948 (Bankr.N.D.Ohio 1987) (concluding that 363(f) could not be utilized, but that section 105(a) could be used to effect 363 sale free and clear of claims).

102    405 B.R. at 111.

103    *See* 486–87, n. 19 above.

104    *See, e.g., O'Brien v. State of Vermont (In re O'Brien),* 184 F.3d 140, 142 (2d Cir.1999); *Mangosoft, Inc. v. Oracle Corp.,* 525 F.3d 1327, 1330 (Fed.Cir.2008).

105    *See* Tr. of Arg. before Second Circuit, No. 09–2311 (2d Cir. June 5, 2009) ("2d Cir. Arg. Tr.") at 17–22 (current tort claims); 47–49 (current tort claims); 60–62 (current tort claims).

106    2d Cir. Arg. Tr. at 22–26 (future and, to a limited extent, current, product liability claims); 26–29 (current and future asbestos claims); 45–46 (future asbestos and tort claims); 62–64 (future asbestos claims).

107    This Court has previously noted that it is hesitant to draw too much from the questions judges ask in argument. *See In re Adelphia Commc'ns Corp.,* 336 B.R. 610, 636 n. 44 ("Thoughts voiced by judges in oral argument do not always find their way into final decisions, often intentionally and for good reason.") Thus the Court does not rely on anything that was said in the way of questions in the *Chrysler* appeal for the purpose of trying to predict the Circuit's thinking or leanings. This Court looks to the *Chrysler* argument questioning solely for the purpose of noting the issues that were before the Circuit, and that got its substantive attention.

108    The Court cannot agree with the suggestion that *Chrysler* is distinguishable because the purchaser there, Fiat, was a commercial entity, and that the purchaser here is an entity formed by the U.S. and Canadian Governments. We are talking about an issue of statutory interpretation here, and the Code makes no distinction in that regard.

109    *Collier* states that "[a]lthough some courts have limited the term ["interest in property," as used in section 363(f) ] to *in rem* interests in the property, the trend seems to be in favor of a broader definition that encompasses other obligations that may flow from ownership of the property." 3 *Collier* at ¶ 363.06[1]. Though *Collier* is of course consistent with this Court's conclusion, the Court regards the caselaw holdings in this Circuit and District as more important.

110    They may have resort to dealers, and the proposed sale motion also contemplates that New GM will indemnify dealers for losses of this type, whenever the claims arose. While this would seemingly greatly reduce the number of instances where a plaintiff cannot recover meaningful amounts if liability is established, the Court does not suggest that it will cover all of them.

111    Findings and an injunction of the character requested were issued in each of *Chrysler* and *TWA. See Chrysler,* No. 09–50002 (Bankr.S.D.N.Y. June 1, 2009) (Order Granting 363 Sale ¶¶ W–BB, 9–23); *TWA,* 322 F.3d at 286–87.

112    Asbestos Br. at 2.

113    *See Chrysler* Arg. Tr. at 46, 47, 72–73 (colloquy, principally with Judge Sack, with respect to this issue). Once more, the Court does not read those questions as telegraphing any views or decision of the Circuit as to these issues, but rather as helping this Court focus on matters worthy of consideration.

114    Proposed Order ¶ 61

115    *Id.* ¶ 62.

116    Tr. of Hr'g, *In re Magnesium Corporation of America,* No. 01–14312, 2002 WL 32772333 (Bankr.S.D.N.Y. June 4, 2002) (ECF # 290).

117    *Id.* at 129.

118    The Court understands that the Purchaser does not want the Massena site and that it will not be transferred to New GM, but it is unclear to the Court whether Old GM will want to sell the Massena site to someone else or abandon it. Certainly, if the Purchaser does not wish to take the Massena site, it does not have to. If Old GM wishes to abandon the Massena site, the Environmental Matters Objectors, or some of them, will have rights to be heard, and may have substantive future rights. The Court does not decide any of those additional issues at this time.

119    New GM has offered to assume the liability to provide Retiree Benefits to a certain extent, but in, dramatically reduced amount. Its proposal in that regard was unacceptable to the Splinter Unions and a counterproposal by the Splinter Unions has not been accepted. On July 2, the Court approved settlements between GM and other non-UAW unions under which New GM would assume Retiree Benefits for them, but again in dramatically reduced amounts.

120    The obligations in question are very sizeable—more than $3 billion in retiree health care and hundreds of millions more for retirement life insurance. Splinter Union Obj. ¶ 4. Those large figures show why the Splinter Unions care about the issue, and why New GM feels that it cannot assume those obligations when such a small number of Splinter Union members will be working for New GM.

121    Section 1114(e) (emphasis added).

122    With respect to section 1114 matters and related issues, he stated:

The objecting retirees represented by the UAW objected to the modification of retiree benefits under the settlement agreement between New Chrysler and the UAW, but those objections are overruled because the UAW was the objectors' authorized

representative under section 1114, and the modifications were negotiated in good faith pursuant to that section. The objecting retirees not represented by the UAW whose benefits are adversely impacted may have unsecured claims against the Debtors' estates, but the purchased assets are sold free and clear of those potential unsecured claims. For those reasons, their objections to the Sale Motion are overruled. Further, the Court finds that if the Sale Motion were not approved, which would likely result in the Debtors' liquidation, there would likely be no value to distribute any retirees, all of whom would be unsecured creditors. 405 B.R.at 110.

123  Splinter Union Obj. ¶ 79.

124  Henderson Decl. ¶¶ 92–93.

125  The Unofficial GM Dealers Committee was formed prior to the filing of GM's chapter 11 case by the GM National Dealer Council in coordination with the National Automobile Dealers Association. It was formed to act as a voice for the dealer body's collective interests in connection GM's restructuring efforts. Its members sell and service vehicles under GM brands in locations all over the country.

126  *See, e.g.,* N.Y. Auto Dealers Obj. at ¶¶ 19, 20 ("GM seeks, through this proceeding, to gain advantage over other manufacturers."); *id.* ("Permitting GM in bankruptcy, to ignore state dealer laws upsets the competitive balance among GM and every other automotive manufacturer.").

127  It also at least seemingly would not be a person aggrieved with standing to appeal, but that is an issue for the appellate courts.

128  *See* discussion at 492–93, above.

129  *Adelphia Settlement–Bankruptcy,* 327 B.R. at 166.

130  *Adelphia Settlement–District,* 337 B.R. at 477.

131  *See In re Old Carco LLC,* 406 B.R. 180, 199–206 (Bankr.S.D.N.Y.2009); *see also id.* at 205–06 ("Where a state law 'unduly impede[s] the operation of federal bankruptcy policy, the state law [will] have to yield' ") (quoting *In re City of Vallejo,* 403 B.R. 72, 77 (Bankr.E.D.Cal.2009)).

132  406 B.R. at 205–06; *see also Vallejo,* 403 B.R. at 77 (holding that "Congress enacted section 365 to provide debtors the authority to reject executory contracts. This authority preempts state law by virtue of the Supremacy Clause [and] the Bankruptcy Clause.") (internal citation omitted).

133  406 B.R. at 202–05. *See also* 406 B.R. at 204 ("In sum, the Dealer Statutes ... are concerned with protecting economic or commercial interests and are thus preempted by the Bankruptcy Code notwithstanding 28 U.S.C. § 959(b)") (citing *In re Baker & Drake, Inc.,* 35 F.3d 1348, 1353 (9th Cir.1994)); *id.* at 206 n. 32 (stating that "state law protections cannot be used to negate the Debtors' rejection powers under § 365.... 'The requirement that the debtor in possession continue to operate *according to* state law requirements imposed on the debtor in possession (i.e., § 959(b)) does not imply that its powers under the Code are *subject to* the state law protections.' ") (quoting *In re PSA, Inc.,* 335 B.R. 580, 587 (Bankr.D.Del.2005) (emphasis in original)).

134  N.Y. Auto Dealers Obj. ¶ 20.

135  *See In re Adelphia Commc'ns Corp.,* 336 B.R. 610, 664 (Bankr.S.D.N.Y.2006).

136  *See, e.g., In re Momentum Mfg. Corp.,* 25 F.3d 1132, 1136 & n. 4 (2d Cir.1994) ("It is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process.... We have repeatedly emphasized the importance of the bankruptcy court's equitable power." But "[t]his power is not unlimited. Thus, a bankruptcy court may not exercise this power in contravention of provisions of the Code."); *In re Joint Eastern & Southern District Asbestos Litig.,* 982 F.2d 721, 751 (2d Cir.1992) ("*Asbestos Litigation* ") ("[A] reorganization is assuredly governed by equitable considerations, but that guiding principle is not a license to courts to invent remedies that overstep statutory limitations."); *see also In re Aquatic Dev. Group, Inc.,* 352 F.3d 671, 680 (2d Cir.2003) (Straub, J., concurring) ("*Aquatic Development* ") ("[T]his Court has repeatedly cautioned that 105(a) 'does not "authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity." ' "), quoting *In re Dairy Mart Convenience Stores, Inc.,* 351 F.3d 86, 92 (2d Cir.2003) ("*Dairy Mart* "), in turn quoting *U.S. v. Sutton,* 786 F.2d 1305, 1308 (5th Cir.1986).

137  *See* 2008 Prepetition Agreement Section 4.01 (proviso generally providing that collateral would not include "Excluded Collateral," a term defined elsewhere in that agreement).

138  *Id.* Section 1.01—"Excluded Collateral" (v) ( "Definitions") (emphasis added).

139  It does not matter if, as Parker suggested but did not prove, the U.S. Treasury unintentionally or even intentionally recorded a mortgage or UCC–1 covering the property mentioned in the equal and ratable clause. Doing so would only have *perfected* a lien, assuming that one was granted in the first place. Here there was no grant of any lien, and perfecting such a nonexistent lien would be meaningless.

140  *See* 405 B.R. at 83.

141  *Chrysler–Standing,* 405 B.R. at 83.

142  *Id.*

143    The order entered by the Court differs from the revised proposed order submitted by the Debtors in a few respects: The order entered by the Court adds this Decision to the places where Findings of Fact are set forth and where Conclusions of Law may be found. It adds "to the fullest extent constitutionally permissible" in connection with the injunction as to successor liability claims, to address notice or other due process issues that might otherwise exist with respect to future asbestos claims or "demands" as discussed above. And like the order entered by Judge Gonzalez in *Chrysler,* the order shortens the Fed.R.Bankr.P. 6004(h) and 6006(d) periods, but still provides 4 days, so as to avoid effectively precluding any appellate review.

---

**End of Document**                                          © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 80

426 B.R. 84
United States Bankruptcy Court,
D. Delaware.

In re NORTEL NETWORKS
CORPORATION, et al., Debtors.

No. 09−10138(KG).  |  March 9, 2010.

**Synopsis**

**Background:** Chapter 11 debtors moved for order enforcing automatic stay with respect to foreign pension fund protection proceedings.

**Holdings:** The Bankruptcy Court, Kevin Gross, J., held that:

[1] foreign pension fund protection proceedings were subject to automatic stay;

[2] foreign pension fund protection proceedings did not satisfy pecuniary purpose test for applicability of police and regulatory power exception to automatic stay; and

[3] foreign pension fund protection proceedings did not pass public policy test for applicability of police and regulatory power exception to automatic stay.

Motion granted.

West Headnotes (10)

[1]     **Bankruptcy**
          👈 Proceedings, Acts, or Persons Affected

Any acts to "assess" a claim that arose before debtor's bankruptcy case commenced are barred by the automatic stay. 11 U.S.C.A. § 362(a)(1).

Cases that cite this headnote

[2]     **Bankruptcy**
          👈 Pension or benefit proceedings

Foreign pension fund protection proceedings were subject to automatic stay arising in Chapter 11 debtors' cases where foreign proceedings,

which were based on "financial insufficiency" of related foreign debtor to fully fund its foreign pension plan as of date preceding debtors' petition filings, could have been commenced prior to filing of those cases, and were subject of proofs of claim filed against Chapter 11 debtors. 11 U.S.C.A. § 362(a)(1), (a)(6).

Cases that cite this headnote

[3]     **Bankruptcy**
          👈 Assertion of claim against estate

Claimants submitted to bankruptcy court's jurisdiction by filing proofs of claim against Chapter 11 debtors.

1 Cases that cite this headnote

[4]     **Bankruptcy**
          👈 Proceedings, Acts, or Persons Affected

Postpetition attempts to assess, impose, and/or liquidate a debt against a Chapter 11 debtor outside of the bankruptcy court go to the essence of the Chapter 11 claims process, and are the very reason why there is an automatic stay. 11 U.S.C.A. § 362(a)(1).

Cases that cite this headnote

[5]     **Bankruptcy**
          👈 Pension or benefit proceedings

Neither trustee for foreign pension plan nor board for foreign pension protection fund qualified as "governmental unit," as defined by Bankruptcy Code, for purposes of determining whether police and regulatory power exception to automatic stay applied with respect to trustee or board since trustee was private party and board, which exercised trustee's rights and powers during assessment period in foreign pension fund protection proceedings, stood in trustee's shoes. 11 U.S.C.A. §§ 101(27), 362(b)(4).

2 Cases that cite this headnote

[6]     **Bankruptcy**

Administrative Proceedings and Governmental Action

Police and regulatory power exception to automatic stay is to be narrowly construed. 11 U.S.C.A. § 362(b)(4).

Cases that cite this headnote

[7] Bankruptcy
Pension or benefit proceedings

Foreign pension fund protection proceedings, the stated purpose of which was to address alleged financial shortfall in private pension plan through after-the-fact determination of which entities should be financially responsible for funding pension shortfall, did not qualify as matter of public safety or welfare, despite importance of matter to pension plan's private trustee, and thus did not pass pecuniary purpose test for applicability of police and regulatory power exception to automatic stay. 11 U.S.C.A. § 362(b)(4).

Cases that cite this headnote

[8] Bankruptcy
Administrative Proceedings and Governmental Action

Under the pecuniary purpose test used to determine whether police and regulatory power exception to automatic stay applies, the issue is whether the governmental action or proceeding relates primarily to the protection of the government's pecuniary or financial interest in the debtor's property, as opposed to a matter of public safety or welfare. 11 U.S.C.A. § 362(b)(4).

1 Cases that cite this headnote

[9] Bankruptcy
Administrative Proceedings and Governmental Action

Under public policy test used to determine whether police and regulatory power exception to automatic stay applies, issue is whether the governmental action is taken in furtherance of a matter of public policy, or instead is

intended primarily to adjudicate private rights. 11 U.S.C.A. § 362(b)(4).

1 Cases that cite this headnote

[10] Bankruptcy
Pension or benefit proceedings

Foreign pension fund protection proceedings did not pass public policy test for applicability of police and regulatory power exception to automatic stay, given that foreign pensions regulator did not seek to protect public safety or welfare, but to obtain financial support for benefit of private parties consisting of members of pension plan, and any recovery obtained would be used to reduce debt owed by foreign debtor to pension plan trustee. 11 U.S.C.A. § 362(b)(4).

Cases that cite this headnote

Opinion

*86 *MEMORANDUM OPINION* [1]

KEVIN GROSS, Bankruptcy Judge.

The Court conducted an evidentiary hearing on February 26, 2010, on Debtors' [2] Motion for Entry of an Order Enforcing the Automatic Stay Against Certain Claimants With Respect to the U.K. Pension Proceedings (D.I. 2441) (the "Motion"). The Court was faced with an impending deadline of March 1, 2010 (the next business day), by which Debtors would have to take substantial action in the absence of the relief Debtors were seeking in the Motion. The Court granted the Motion based upon an oral ruling and entered an Order (D.I. 2576) with the understanding that it would issue a written opinion given the significance of the issues. Time does not permit the detailed opinion which the matter warrants but the Court will address the issues sufficiently to provide a reviewing court, if any, with the substance of the Court's findings and its rationale for granting the Motion and thereby enforcing the automatic stay.

### A. *The Motion*

The Debtors seek an order pursuant to sections 362(a)(1) and (a)(6) of the Bankruptcy Code, enforcing the automatic stay against two parties, Nortel Networks UK Pension Trust Limited (the "Trustee") and The Board of the Pension Protection Fund (the "PPF") (collectively, the "Claimants"), with respect to certain U.K. Administrative Proceedings (the "U.K. Proceedings") initiated by the U.K. Pensions Regulator ("TPR"). The U.K. Proceedings relate to **\*87** Nortel Networks Corporation ("NNI") and Nortel Networks (CALA) Inc. ("NN CALA"). The U.K. Proceedings will determine whether to issue a financial support direction ("FSD") against NNI, NN CALA, and the non-U.S. Nortel Entities that are identified by TPR as targets of the U.K. Proceedings. The result may be to impose financial responsibility of as much as $3.1 billion on the targets for the statutory liability of Nortel Networks UK Limited ("NNUK") to the Trustee under section 75 of the U.K. Pensions Act 1995. The Motion seeks to enforce the stay against the Claimants, who previously filed proofs of claim and thereby submitted the U.K. Pension Claim to the Court.

### B. *Relevant Background*

On January 14, 2009 (the "Petition Date"), the Debtors (except for NN CALA, which filed on July 14, 2009) filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Also on the Petition Date, the Debtors' ultimate corporate parent, Nortel Networks Corporation ("NNC"), NNI's direct corporate parent, Nortel Networks Limited ("NNL") (together with NNC and their affiliates, including the Debtors, "Nortel"), and certain of their Canadian affiliates (collectively, the "Canadian Debtors") filed an application with the Ontario Superior Court of Justice (the "Canadian Court") under the Companies' Creditors Arrangement Act (Canada) (the "CCAA"), seeking relief from their creditors (collectively, the "Canadian Proceedings").

On January 14, 2009, the Canadian Court entered an order recognizing these Chapter 11 proceedings as a foreign proceeding under section 18.6 of the CCAA. On February 27, 2009, this Court entered an order recognizing the Canadian Proceedings as foreign main proceedings under chapter 15 of the Bankruptcy Code.

In addition, on January 14, 2009, after the filing by the U.S. Nortel Entities, the High Court of Justice in England placed nineteen of Nortel's European affiliates, including NNUK (collectively, the "EMEA Debtors") into administration. On June 8, 2009, NNUK filed petitions in this Court for recognition of the English insolvency proceedings as foreign main proceedings under Chapter 15 of the Bankruptcy Code. The need for coordination in the proceedings caused the Court to enter an order on June 26, 2009, recognizing the English Proceedings as foreign main proceedings under Chapter 15 of the Bankruptcy Code.

On June 9, 2009, to resolve, on an interim basis, certain allocation and post-petition cross-affiliate claims issues, pending the final allocation of the proceeds of the planned sales of their businesses, the Canadian Debtors, the U.S. Debtors, and the EMEA Debtors, including NNUK (by the Joint Administrators), entered into an Interim Funding and Settlement Agreement (the "IFSA"). The Court approved the IFSA on June 29, 2009. Pursuant to section 12 of the IFSA, the parties agreed that the proceeds of any sale of their material assets (less taxes and costs) would be held in escrow until the parties either reached a consensual allocation of the proceeds, or:

> "in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol ... applicable to the Sale Proceeds ... which Protocol shall provide binding procedures for the allocation of Sales Proceeds...."

On September 30, 2009, NNUK, on behalf of itself, the Joint Administrators, and the other EMEA Debtors, filed proofs of claim against NNI and the other U.S. Debtors "in respect of any heretofore unknown, unliquidated, or unmatured claim **\*88** or claims ... against Nortel Networks Inc. or its affiliated debtors in these cases".

### *The U.K. Pension Claim*

NNUK is the employer under the Nortel Networks U.K. Pension Plan (the "NNUK Pension Plan"), a defined benefit occupational final salary pension scheme. (Declaration of Richard Hitchcock, dated February 18, 2010 (the "Hitchcock Dec.") ¶ 5.4.) On both November 21, 2006 and December

21, 2007, NNL executed guarantees regarding the NNUK Pension Plan. No U.S. Nortel Entity provided any guarantee with respect to the NNUK Pension Plan.

The PPF is a U.K. statutory body established under the U.K. Pensions Act 2004 (the "U.K. Pensions Act"). NNUK's commencement of proceedings in the U.K. led to the NNUK Pension Plan entering a PPF "assessment period" pursuant to the U.K. Pensions Act. (*See* Hitchcock Dec. ¶ 5.5; Exhibit A to the Declaration of John Ray, dated February 18, 2010). ("Ray Dec.") An "assessment period" means that the PPF is working with the Trustee to determine the NNUK Pension Plan's funding position. To the best of the Debtors' understanding, the NNUK Pension Plan remains in an "assessment period."

On or about September 30, 2009, and January 25, 2010, the Trustee and the PPF jointly filed proofs of claim against the U.S. Nortel Entities. The U.K. Pension Claim is based on allegations that (i) the NNUK Pension Plan is under-funded by an estimated amount alternatively stated to be £2.1 billion or $3.1 billion; and (ii) TPR may seek to require certain of the Debtors, as well as certain non-U.S. Nortel entities, to provide financial support for the NNUK Pension Plan.

According to the U.K. Pension Claim, by the time it was filed, TPR had concluded that grounds existed to issue certain warning notices ("Warning Notices") and to seek a FSD against certain members of the Nortel Group worldwide, including NNI and NN CALA, as companies allegedly "connected with or associates of" NNUK, with respect to the allegation that NNUK was "insufficiently resourced" on June 30, 2008, a date selected by TPR. (*See* Exhibit A to Ray Dec.) The U.K. Pension Claim also states that the indebtedness or liability of the relevant U.S. Nortel Entities arose no later than June 30, 2008, a date well prior to the Petition Date. In addition, the U.K. Pension Claim asserts that if a FSD is issued against any of the U.S. Nortel Entities, such entity could then be instructed under the U.K. Pensions Act to procure financial support for the NNUK Pension Plan, either alone or with other members of the Nortel Group. The U.K. Pension Claim further asserts that if a U.S. Nortel Entity receives a FSD, but fails to put or keep in place financial support for the NNUK Pension Plan approved by TPR, then TPR could also exercise its power to impose on that U.S. Nortel Entity a liability to pay a specific amount, which could be all or some portion of the deficit in the NNUK Pension Plan. (*See* Exhibit A to Ray Dec.)

### *The U.K. Pensions Act*

Under the U.K. Pensions Act, TPR has, in relation to a pension plan, a stated pecuniary purpose: to protect the plan benefits of members and to reduce the risk that compensation would be required from the PPF. (Hitchcock Dec. ¶ 41.) Under the U.K. Pensions Act, the PPF imposes a levy like a private insurance premium on eligible pension plans as one of the ways of funding such compensation.

In furtherance of that pecuniary purpose, TPR may conduct an administrative process whereby it may issue, through TPR's Determinations Panel (the "Determinations Panel"), a FSD under section 43 **\*89** of the U.K. Pensions Act, if it believes that the employer funding the pension plan (the "Employer") is either (a) a service company, or (b) "insufficiently resourced." (*See* Hitchcock Dec. ¶¶ 37–38, 50 & Schedule 2.)

A FSD, which is preceded by a "Warning Notice," is a direction, issued to certain persons following a decision of the Determinations Panel to issue it, to secure financial support for a pension plan. A FSD may only be issued against a person who is either the Employer, or is "connected and/or associated with" the employer (the "Non–Employers"). The FSD specifies a certain time period during which the financial support is to be put in place, and directs that this support is to continue for as long as the pension plan is in existence. A FSD may only be issued if the Determinations Panel believes that it is reasonable to do so. (*See* Hitchcock Dec. ¶¶ 37.3–37. 4, 50 & Schedule 2.)

In deciding whether it is reasonable to issue a FSD against a Non–Employer, the Determinations Panel must consider such matters as it considers relevant, including: (a) the relationship between the Non–Employer and the Employer, including whether the Non–Employer controlled the Employer; (b) the value of any benefits received directly or indirectly by the Non–Employer from the Employer; (c) any connection or involvement of the Non–Employer with the pension plan; and (d) the financial circumstances of the Non–Employer. (Hitchcock Dec. ¶¶ 37.4, 50.)

In addition to its ability to issue a FSD, where the target has not complied with the FSD, and TPR believes that it is reasonable to do so, it is authorized to issue a CN. (Hitchcock Dec. ¶ 43.) A CN states that the persons to whom it is issued are under a liability to pay to the trustee of the pension plan

the sum specified therein. The CN may be for all or part of the amount by which the pension plan is under-funded. This amount is treated as a debt due to the trustee of the pension plan. (U.K. Pensions Act, s. 49(3).) While TPR can exercise such powers as the trustee of the pension plan to recover the debt under the CN, during the assessment period (which the NNUK Pension Plan has been in since it entered administration proceedings), only the PPF may exercise the trustee's rights and powers. (Hitchcock Dec. ¶¶ 5.5, 46 & Schedule 2.)

If a party to whom a FSD or CN is issued disputes that issuance, it may make a reference to the TPR Tribunal (the "Tribunal") within 28 days from the date of the issuance. The Tribunal will decide the appropriate action, if any, to take, including possibly revoking, confirming, or varying the FSD or CN. After receiving the Tribunal's decision, the party may, with permission of the Tribunal or the U.K. Court of Appeal, appeal to the Court of Appeal on a point of law arising from a decision of the Tribunal. (U.K. Pensions Act, s. 103; Hitchcock Dec. ¶¶ 54–58.)

### *FSD Warning Notice Addressed to NNI and NN CALA*

By letters dated January 13, 2010 and addressed to NNI and NN CALA (along with certain non-U.S. Nortel entities), TPR issued a Warning Notice initiating an administrative proceeding regarding the alleged shortfall in the funding of the NNUK Pension Plan; the other U.S. Nortel Entities were not referred to in the Warning Notice. The Warning Notice provides, in summary, that TPR believes it is reasonable to issue a FSD against the addressees (the "Targets") and references certain documents and witness statements as support for this determination, some of which were provided by NNUK, and others of which are publicly available information. It further provides, *inter alia,* that (i) the "relevant time" on which to measure the NNUK Pension Plan's funding position **\*90** for the purpose of deciding whether to issue a FSD is June 30, 2008; and (ii) TPR believes it is reasonable to issue a FSD against the Targets, including NNI and NN CALA, for various reasons including TPR's analysis of certain benefits conveyed among affiliates. The Warning Notice also reviews TPR's conclusion that benefits provided by certain affiliates to certain other affiliates provides a basis for issuing a FSD. (Ray Dec. ¶ 10.)

TPR indicated that the Targets, as well as the U.K. Trustee and PPF, should respond in writing to the Warning Notice by

midday on March 1, 2010, and that the Determinations Panel will consider all responses. (Ray Dec. ¶ 12.) [3]

### *Canadian Debtors' Motion to Stay U.K. Proceedings*

On February 17, 2010, the Monitor filed an application with the Canadian Court seeking to stay the U.K. Proceedings on the ground that they violate the stay imposed by the Initial Order issued by the Canadian Court. That application was heard on February 25, 2010. The Canadian Court issued the stay on February 26, 2010.

### *JURISDICTION AND VENUE*

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue over the Debtors' Chapter 11 cases and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

The statutory bases for the relief requested herein are sections 362(a)(1) and (a)(6) of the Bankruptcy Code and Rule 9014 of the Federal Rules of Bankruptcy Procedure.

### *DISCUSSION*

 **[1]**   **[2]**   11 U.S.C. § 362(a)(1), provides, in part, that a "judicial, administrative, or other proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title," is stayed. *Constitution Bank v. Tubbs,* 68 F.3d 685, 691 (3d Cir.1995) ("[t]he automatic stay is of broad scope, directing that 'all judicial actions against a debtor seeking recovery on a claim that were or could have been brought before commencement of a bankruptcy case, are automatically stayed' ") (citation omitted); *In re Spansion, Inc.,* 418 B.R. 84, 92 (Bankr.D.Del.2009) ("the automatic stay applies ... because the claims asserted ... 'could have been brought' and were, in fact, brought, prepetition"). Any acts to "assess" a claim that arose before the case commenced are similarly barred by the automatic stay. *See, e.g., Glenshaw Glass Co. v. Ontario Grape Growers' Mktg. Bd.,* 67 F.3d 470, 477 (3d Cir.1995).

52 Bankr.Ct.Dec. 249

Here, TPR has issued a Warning Notice to NNI and NN CALA, as well as to a number of non-U.S. Nortel entities, triggering the U.K. Proceedings, on the basis of what is described in the NNUK Pension Claim as the "financial insufficiency" of NNUK to fully fund the NNUK Pension Plan as of June 30, 2008, six months before NNI filed its Chapter 11 petition, and over a year before the filing of NN CALA's Chapter 11 petition. Accordingly, the FSD proceeding, and any future proceedings by TPR or the Determinations Panel, could have been commenced prior to the filing of these Chapter 11 cases, and are **\*91** subject to the automatic stay. *See* 11 U.S.C. §§ 362(a)(1), (a)(6); *see also ACandS, Inc. v. Travelers Cas. and Surety Co.,* 435 F.3d 252, 260 (3d Cir.2006); *Constitution Bank v. Tubbs,* 68 F.3d 685, 693 (3d Cir.1995).

**[3]** **[4]** Moreover, the Claimants have submitted to this Court's jurisdiction by filing proofs of claim against the Debtors, including NNI and NN CALA, and the subject of the U.K. Pension Claim is the very subject of the U.K. Proceedings. *See Langenkamp v. Culp,* 498 U.S. 42, 44, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990) (filing a claim against a bankruptcy estate subjects the claimant to the bankruptcy court's equitable jurisdiction). Post-petition attempts to assess, impose and/or liquidate a debt against a Chapter 11 debtor outside of the bankruptcy court go to the essence of the Chapter 11 claims process, and are the very reason why there is an automatic stay. *See, e.g., Maritime Elec. Co. v. United Jersey Bank,* 959 F.2d 1194, 1207 (3d Cir.1991).

### *The Police Power Exception to the Automatic Stay Does Not Apply*

**[5]** An exercise of a governmental unit's police or regulator power exempts them from the automatic stay pursuant to Section 362(b)(4) of the Bankruptcy Code.[4] Here, neither of the Claimants is a "governmental unit," as defined in Section 101(27) of the Bankruptcy Code. The Trustee is a private party, and the PPF, while defined as "a statutory body" in paragraph 1.4 of the U.K. Pension Claim, during an assessment period exercises the rights and powers of the Trustee. PPF thus stands in the shoes of the Trustee, a private party. (*See* Exhibit A to the Ray Dec.; Hitchcock Dec. ¶ 22, 46.)

**[6]** The police power exception is to be "narrowly construed," as reflected in the standards courts apply in determining whether or not a governmental unit's action or proposed action constitutes an exercise of its police power. There are two objective tests upon which courts rely in considering if the Section 362(b)(4) exception is applicable.

**[7]** **[8]** First, under the "pecuniary purpose" test, the issue is whether the governmental action or proceeding relates primarily to the protection of the government's pecuniary or financial interest in the debtor's property, as opposed to a matter of public safety or welfare. *See, e.g., Missouri v. U.S. Bankr. Court,* 647 F.2d 768, 776 (8th Cir.1981) (denying Section 362(b)(4) defense where plaintiff sought to enforce state grain laws that "primarily relate to the protection of the pecuniary interest in the debtors' property and not to matters of public safety and health"); *In re Fairchild Corp.,* 2009 WL 4546581, at \*4, 2009 Bankr.LEXIS 3815, at \*15 (Bankr.D.Del. Dec. 1, 2009) (concluding that agency's action sought solely to promote its pecuniary interest in being reimbursed for expenditures, and thus did not qualify as an exercise of police or regulatory power).

The U.K. Proceedings do not pass the "pecuniary purpose" test. The stated purpose of the U.K. Proceedings is to address **\*92** an alleged financial shortfall in a private pension plan, first by determining whether the Targets should provide financial support to the Trustee, and, then potentially by imposing and fixing a claim against NNI and NN CALA through a CN. This is purely an issue of determining which, if any, entities, on an after-the-fact basis, should be financially responsible for funding a pension shortfall. It is clearly a pecuniary matter, and, notwithstanding the importance of the financial matter to the private Trustee, under the case law does not qualify as a matter of public safety or welfare. *See, e.g., Brock v. Morysville Body Works,* 829 F.2d 383 (3rd Cir.1987) (holding that an order to abate violations of health and safety standards was enforceable by the Secretary of Labor under section 362(b)(4)'s exception to the automatic stay); *Penn Terra Ltd. v. Dep't of Envtl. Res.,* 733 F.2d 267 (3rd Cir.1983) (police power exception applicable to allow a state court to issue an injunction ordering debtor to clean up environmental hazards); *see also In re James (James v. Draper),* 940 F.2d 46 (3rd Cir.1991) (civil forfeiture proceeding for alleged proceeds of drug sales falls within the police power exception to the automatic stay).

Further illustrative of the appropriate application of the police—regulatory exception and, by contrast, its inapplicability here, are several cases. First, in *Safety–Kleen, Inc. (Pinewood) v. Wyche,* 274 F.3d 846 (4th Cir.2001), the appeals court

affirmed the ruling that the automatic stay did not bar action by South Carolina's Department of Health and Environmental Control to close a commercial hazardous waste site. The court based its ruling on the finding that the primary purpose of South Carolina's statute was to deter pollution, a health and safety concern.

Next, the Claimants rely heavily on Equal Employment Opportunity Commission ("EEOC") cases to argue that a pecuniary purpose does not extinguish the automatic stay exception. *EEOC v. McLean Trucking Company,* 834 F.2d 398 (4th Cir.1987) is an example of a case in which the court found that the governmental exception applied even though the suit at issue included a pecuniary benefit, back pay. The court of appeals rejected the bankruptcy court's finding that because the debtor was in liquidation, the subject litigation was merely an action to recover back wages, an adjudication of private rights. *Id.* at 400. *McLean* and similar equal employment cases emphasize the significance of eliminating discrimination through injunctive relief and the imposition of penalties—deterrents—and, coincidentally, private causes of action. Here, the Claimants can obtain complete monetary relief in this Court at the appropriate time.

Finally, a recent decision of the Bankruptcy Court from the Eastern District of Virginia discusses the issue posed here clearly and concisely. In *In re Qimonda AG,* 425 B.R. 256, 2010 WL 595654 (Bankr.E.D.Va.2010), the debtor was seeking a Section 362 stay of an International Trade Commission ("ITC") proceeding in which debtor was accused of patent infringement. The matter was ready for trial. The bankruptcy court precisely stated the issues as follows:

> Is the action pending before the ITC
> the continuation of an action **by** the
> ITC? Is the action an enforcement of
> the ITC's police and regulatory power?

*Id.* at 258. The court answered "no" to both questions because the action was being prosecuted before, not by, the ITC. *Id.* at 260. As the *Qimonda* court explained,

> The reality is that the ITC and its administrative law judges are the forum before whom the action was brought by [the claimants] ... and who are seeking **\*93** the protection of their property rights. The proceeding is adversarial and subject to the adjudicative provisions of the Administrative Procedure Act, 5 U.S.C. §§ 551, et seq. The administrative law judge makes an initial determination which contains

findings of fact and conclusions of law with respect to the issues in controversy.

\* \* \*

Rather than being the governmental unit that is enforcing the patents, the ITC is the forum before which private litigants are enforcing their patents.
Similarly, the TPR is the forum for the dispute in the UK Proceedings, in which private parties are seeking to protect their property rights.

The bankruptcy court also analyzed the legislative history of Section 362(b)(4) and concluded that the exception was explicitly limited to true governmental entities, "not to organizations acting in a governmental capacity." *Id.* at 259. The Claimants are such organizations acting in a governmental capacity.

What we have here are creditors who have filed claims in this Court and who are seeking to litigate those claims clear of the Court's jurisdiction and the automatic stay. Their effort to do so is inimical to the Debtors' effort and those of non-U.S. debtors in a highly complex liquidation to assemble the assets, reduce them to money, allocate those assets among numerous entities in many countries and then distribute the assets. The Claimants' pecuniary interest does not warrant the extraordinary standing above all others they seek. The Claimants who implore this Court to give comity to the U.K. Proceedings are themselves ignoring comity. They as much as say, "give the proceedings of our choice the respect we are unwilling to show to other proceedings in which many debtors and creditors are working tirelessly to formulate a coherent, equitable plan."

**[9]**    **[10]**    The U.K. Proceedings also fail the "public policy test." The issue under this test is whether the governmental action is taken in furtherance of a matter of public policy, or instead is intended primarily to adjudicate private rights. *See, e.g., Fairchild Corp.,* 2009 WL 4546581, at \*4, 2009 Bankr.LEXIS 3815, at \*15 (action akin to private action to collect money damages does not qualify as an exercise of police power under section 362(b)(4)); *Spansion,* 418 B.R. at 95 (administrative patent proceeding against debtors, prosecuted on behalf of the public by staff attorney of the U.S. International Trade Commission, was primarily an adjudication of private rights, only incidentally serving a public interest, and thus was not an exercise of police or regulatory power exempt from automatic stay).

Here, TPR seeks not to protect the "safety or welfare" of the public in the U.K., but rather to obtain financial support for the benefit of private parties—the members of the NNUK Pension Plan, represented by the Trustee—and if that fails, to assert and liquidate a claim to the property of the Debtors, on the Trustee's behalf. Any sum paid as a result of the U.K. Proceedings would not go to benefit the public, but would be used to reduce the debt owed by NNUK to the Trustee. The Trustee as intended beneficiary, and PPF, filed the proofs of claim to recover from the Debtors the same financial support that is the subject of the U.K. Proceedings.

The provisions of the U.K. Pensions Act establish that the purpose of the FSD and CN proceedings is to vindicate the rights of private parties, that a FSD is a demand that financial support be provided for the benefit of a private pension plan (s. 43(3)); that in the event of non-compliance with the FSD, TPR can issue a CN requiring **\*94** the payment of a specified sum that is "to be treated as a debt due from the person to the trustees or managers of the scheme" (s. 49(2), (3)); and that this debt can be enforced either directly by the trustees or by TPR on behalf of the trustees of the scheme (s. 49(4)) (emphasis supplied). (*See* Hitchcock Dec. ¶¶ 41, 46.)

The U.K. Pension Claim also shows that the focus of the U.K. Proceedings is to procure a pecuniary benefit, for a private party—the Trustee. The Claim recites the process under the U.K. Pensions Act, and that, if necessary, the TPR will attempt to impose and liquidate an enforceable debt, to be enforced by or on behalf of the Trustee, for an amount to be paid to the Trustee. (*See* Exhibit A to Ray Dec.)

### *"Sea Containers" Decision*

The Claimants argue that the decision in *In re Sea Containers Ltd., 2008 WL 4296562, 2008 Bankr.LEXIS 2363 (Bankr.D.Del. Sept. 19, 2008)* supports their defense to the Motion. In *Sea Containers,* the Determinations Panel issued a FSD against a single debtor, on the grounds that: (i) the U.S. debtor against which the FSD was sought was a U.K. chartered company which, together with its subsidiary, the plan sponsor, operated primarily out of the U.K.; (ii) the debtor had a clear control relationship with the employer-affiliate; (iii) the debtor had substantial assets in the U.K.; and (iv) the Determinations Panel held a hearing on the FSD request, without a motion by the U.S. debtor to invoke or to lift the protections of the automatic stay, and at which one of the two U.S. creditors' committees encouraged the Panel to issue a FSD so that the plan trustee could rely on it to pursue their claims in the Chapter 11 proceedings.

Following the issuance of the FSD, a settlement was entered into among the debtors, affiliates, one of the creditors' committees and the pension trustee, and was approved by TPR, granting the trustee an allowed claim in the bankruptcy case. The matter never reached the CN stage. The case came before the court on a motion under Bankruptcy Rule 9019 for approval of the settlement.

The court approved the settlement. In so doing, it overruled a number of objections by the second creditors' committee, one of which was that the FSD proceeding had violated the automatic stay. In this regard, the court did not treat the FSD as determinative but only ruled that the FSD "should not be ignored as invalid," because it "provide[d] guidance as to the ... pertinent considerations in valuing the Schemes' claims." *Id., 2008 WL 4296562 at \*9, 2008 Bankr.LEXIS 2363 at \*\*26–27.* The court also relied on the fact that the Determinations Panel, as one would expect, did not view itself as being constrained by the automatic stay, not surprising given that the U.S. debtor had not sought an order of the bankruptcy court enforcing the stay in connection with the proceeding.

In short, the court's ruling that the FSD proceeding did not violate the automatic stay was issued in an entirely different procedural context—a Rule 9019 motion by the debtor to approve a settlement with TPR, where the debtor had not sought to invalidate the FSD—and on entirely different facts. Furthermore, the facts reveal that the objecting creditors' committee never sought to enforce the automatic stay or formally objected to the proceedings in the U.K. Unlike in *Sea Containers,* the Debtors and the creditors' representatives here object to the U.K. Proceedings, and dispute TPR's right to proceed against the Debtors in the absence of relief from the automatic stay. Further, in contrast to *Sea Containers,* which involved only a FSD proceeding, here TPR is attempting to secure financial support for the benefit of the Plan Trustee through a FSD proceeding and, if necessary, a CN proceeding, **\*95** which creates an enforceable debt. Also, the Trustee has already submitted to the jurisdiction of the Court for determination and liquidation of contingent and unliquidated claims for the very same financial support TPR seeks to obtain for them in the U.K. Proceedings. And here, unlike in *Sea Containers,* the Warning Notice makes plain that TPR is asserting a contingent claim, whereas in *Sea*

*Containers,* integral to the court's ruling that there was no stay violation was its determination that there was no assertion of a claim. *Id.,* 2008 WL 4296562 at *9, 2008 Bankr.LEXIS 2363 at *26. Accordingly, *Sea Containers* is confined to its facts and is not controlling.

### *Prejudice*

An overriding issue in these cases—as well as in the related insolvency proceedings in Canada and the U.K.—is the allocation of the billions of dollars in proceeds of the post-petition asset sales. This allocation will determine the amounts available for distribution to the creditors located in the various jurisdictions, in part based on the factual issue of the respective contributions of the various Nortel entities to the value of the assets sold. (Ray Dec. ¶ 14.)

In recognition of this fundamental question, the U.S. Debtors, the Canadian Debtors, and the EMEA Debtors (including NNUK) entered into the IFSA, pursuant to which they agreed, *inter alia,* (a) that all such sales proceeds will be held in escrow until the parties either agree on a consensual allocation, or, in the absence of such an agreement, obtain a binding determination on the allocation pursuant to an agreed upon allocation protocol; and (b) that they would negotiate in good faith to attempt to reach agreement on the terms that would govern the allocation protocol process. (IFSA §§ 12(b)-(c), Exhibit B to the Schweitzer Dec.)

In accordance with the IFSA, the parties have engaged in extensive negotiations regarding the terms of the allocation protocol. The purpose of the protocol (called the "Protocol For Resolving Disputes Concerning Allocation of Sale Proceeds") is to ensure a fair allocation, to be determined (absent a consensual agreement) in a single cross-jurisdictional forum. (Ray Dec. ¶ 16.)

The Court is satisfied that the Claimants seek to litigate, in the context of an administrative proceeding before a U.K. administrative body whose sole focus is the financial protection of U.K. pension plan members and an insurance vehicle, the question of whether NNUK's contributions to the "global" Nortel business received inadequate financial recognition pre-filing so that now it is "reasonable" to impose financial responsibility on its affiliates. That issue overlaps

heavily with the issues in the allocation dispute. The question of whether and to what extent affiliates of NNUK should be responsible for NNUK's obligations is part and parcel of the entire cross-affiliate benefit and contribution issue and the allocation process. (Ray Dec. ¶ 14.)

Indeed, the resolution of the issues Claimants seek to litigate in the U.K. Proceedings may involve consideration of the same factors—including Nortel's transfer pricing arrangements, Nortel's Master Research and Development Agreement, the value of certain research and development, ownership rights to Nortel's intellectual property, and individual corporate assets and revenues—as those that may be significant to the allocation process. (Ray Dec. ¶ 17.)

The Nortel debtors in Canada, the U.S., and the U.K. have agreed that these issues must be resolved, on a global basis, in a single cross-jurisdictional forum. They should not be decided, even in part, by an administrative body in a single jurisdiction with a single constituency.

 **\*96** Moreover, the very premise for the U.K. Proceedings is that NNUK does not have the resources to fund the NNUK Pension Plan, and one of the key elements in determining the "reasonableness" of imposing a FSD and a CN against a Non–Employer under the U.K. Pensions Act is the financial condition of the Non–Employer. (U.K. Pensions Acts. 42(5); s. 47(3); *see* Hitchcock Dec. ¶¶ 37, 44.) Until the allocation procedure is completed, however, the financial condition of the Employer, NNUK, and the Non–Employers, including the Debtors, cannot be determined. (Ray Dec. ¶ 19.)

### *CONCLUSION*

The Court finds that the automatic stay applies to the efforts of the Trustees and the PPF to "grab" at Debtors' assets when there is already a procedure in place for the allocation of the multi-national Debtors' assets. The U.K. Proceedings are premature and prejudice the ultimate literally global resolution of these bankruptcy cases. An order has already issued.

**Parallel Citations**

52 Bankr.Ct.Dec. 249

Footnotes

1       This Opinion constitutes the findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent any of the following findings of fact are determined to be conclusions of law, they are adopted, and shall be construed and deemed, conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted, and shall be construed and deemed, as findings of fact.

2       The Debtors in these Chapter 11 cases, which are jointly administered, are: Nortel Networks Inc., Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc.

3       The Claimants indicated the Determinations Panel may have been amenable to an extension of the March 1 response date. However, the Determinations Panel was statutorily required to rule by June 28, 2010, thus maintaining the time pressure on Debtors.

4       Section 362(b)(4) provides, in pertinent part: "The filing of a petition under section 301, 302, or 303 of this title, ... does not operate as a stay: (4) under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit ... to enforce such governmental unit's ... police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's ... police or regulatory power."

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

# TAB 81

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 209 of 378

In re Plassein Intern. Corp., 377 B.R. 126 (2007)

377 B.R. 126
United States Bankruptcy Court,
D. Delaware.

In re PLASSEIN INTERNATIONAL
CORPORATION, et al., (n/k/a
PL Liquidation Corp.), Debtors.

No. 03–11489 (KG).    |    Oct. 17, 2007.

**Synopsis**
**Background:** In case converted from Chapter 11 to Chapter 7, after debtors were more successful than expected in recovering preferences for distribution to creditors, dispute arose concerning interpretation of court-approved settlement agreement between Chapter 7 trustee and agent representing group of lenders that provided postpetition financing to debtors during their Chapter 11 proceedings. Lenders' agent moved for summary judgment on its interpretation of the settlement agreement.

**Holdings:** The Bankruptcy Court, Kevin Gross, J., held that:

[1] under Delaware law, trustee's position on the preference recoveries was correct, that is, the estate was entitled to retain the first $1.1 million of preference recoveries, and preference recoveries in excess of $1.1 million were to be distributed to lenders' agent after deduction of the fees and expenses incurred in recovering the preference payments;

[2] trustee was not required to reserve the $270,000.00 escrow held to indemnify lenders' agent for claims of asset purchaser; and

[3] "cash on hand" was not a "recovery" subject to distribution pursuant to the settlement agreement.

So ordered.

West Headnotes (9)

**[1]** **Compromise and Settlement**
👉 Construction of Agreement

Under Delaware law, in interpreting a settlement agreement, the court must determine the parties' intention from the express language of the agreement and construe their intention from the entire agreement, giving effect to all of the provisions.

Cases that cite this headnote

**[2]** **Contracts**
👉 Existence of ambiguity

Under Delaware law, a contract is "ambiguous" only when the provisions in controversy are fairly susceptible to different interpretations or may have two or more different meanings.

Cases that cite this headnote

**[3]** **Contracts**
👉 Application to Contracts in General

Under Delaware law, in the absence of an ambiguity, a court should not look outside the four corners of the contract and the contract's clear and unequivocal language.

Cases that cite this headnote

**[4]** **Contracts**
👉 Intention of Parties

Under Delaware law, the objective intent of the parties is a court's paramount consideration in construing a contract.

Cases that cite this headnote

**[5]** **Contracts**
👉 Subject, object, or purpose as affecting construction
**Contracts**
👉 Language of contract
**Contracts**
👉 Extrinsic circumstances

Under Delaware law, in ascertaining the intent of the parties to a contract, the court considers not only the language in the contract, but also the circumstances surrounding the making of

In re Plassein Intern. Corp., 377 B.R. 126 (2007)

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 210 of 378

the contract, the motives of the parties, and the purposes which they sought to accomplish.

Cases that cite this headnote

[6]    **Contracts**
   🔑 Language of contract

**Contracts**
   🔑 Extrinsic circumstances

Under Delaware law, the intention of the parties to a contract is to be determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction.

Cases that cite this headnote

[7]    **Bankruptcy**
   🔑 Compromises, Releases, and Stipulations

Under Delaware law, pursuant to court-approved settlement agreement between Chapter 7 trustee and lenders' agent, the estate was entitled to retain the first $1.1 million of trustee's preference recoveries, and recoveries in excess of $1.1 million were to be distributed to lenders' agent after deduction of fees and expenses incurred in recovering preferences; though lenders' agent would have imposed all costs and expenses on trustee's portion of recoveries, such interpretation resulted in an unworkable and clearly unintended result, as settlement agreement was definitive that trustee was first entitled to receive "up to ... $1,100,000 of gross recoveries," and if lenders' agent were correct, trustee would not receive $1.1 million, bulk of settlement proceeds would be paid instead to lenders' agent, and court would have to ignore plain language providing that lenders' agent's receipt of up to $3.1 million, after trustee's receipt of $1.1 million, was "of net recoveries."

Cases that cite this headnote

[8]    **Bankruptcy**
   🔑 Compromises, Releases, and Stipulations

Under Delaware law, pursuant to court-approved settlement agreement between Chapter 7 trustee and lenders' agent, trustee was no longer

required to reserve the $270,000.00 escrow held to indemnify lenders' agent for claims of asset purchaser; given the execution of general releases by and among the estate, asset purchaser, and certain taxing authorities, any and all claims that asset purchaser had against the estate, including those claims regarding asset purchaser's obligation to pay certain tax liabilities, were released, there were no claims left that could be subject to the indemnification, and there were thus no circumstances for which the estate would be required to provide indemnification to lenders' agent.

Cases that cite this headnote

[9]    **Bankruptcy**
   🔑 Compromises, Releases, and Stipulations

Under Delaware law, lenders' agent was not entitled to the "cash on hand" held by Chapter 7 trustee at the time of the parties' court-approved settlement agreement; although lenders' agent asserted an interest in the "cash on hand" pursuant to the security interest granted it pre- and postpetition, following court's approval of the settlement agreement the right of lenders' agent to distribution from the estate was governed by the settlement agreement, not any preexisting security interests, and "cash on hand" was not a "recovery" subject to distribution pursuant to the settlement agreement, as the right of lenders' agent to receive distribution from "recoveries" only included the proceeds from future recoveries.

Cases that cite this headnote

**Attorneys and Law Firms**

  **\*128** Kerri K. Mumford, Adam G. Landis, Landis Rath & Cobb LLP, Richard H. Cross, Jr., Cross & Simon, LLC, Wilmington, DE, for Debtors.

**Opinion**

*MEMORANDUM OPINION* [1]

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 211 of 378

In re Plassein Intern. Corp., 377 B.R. 126 (2007)

KEVIN GROSS, Bankruptcy Judge.

The Court has been asked to resolve a dispute involving the interpretation of a settlement agreement which the Court previously approved. The decision will determine the funds available for distribution to creditors.

## I. BACKGROUND [2]

Plassein International Corp. and affiliated companies ("Debtors" or "Estate") [3] **\*129** filed these cases in May 2003. In connection with the filing, Debtors filed a motion to sell substantially all of their assets to Exopack–Ontario, Inc. ("Exopack"). Fleet Capital Corporation, as agent for a group of lenders ("Fleet") [4] agreed to finance the Debtors during their Chapter 11 proceedings to effectuate the sale to Exopack. [5] Consummating a sale with Exopack was difficult and highly contentious, with numerous revisions to the Purchase and Sale Agreement ("APA"), resulting in a substantial reduction in the purchase price from approximately $60,000,000 to approximately $20,000,000. Ultimately, in September 2003, the Court entered an Order approving the sale to Exopack and authorizing the Debtors to pay all of the proceeds of the sale to Fleet. [Docket No. 635]. In October 2003, the cases were converted to cases under Chapter 7, and the Court appointed an interim trustee. [Docket No. 729]. The Estate was administratively insolvent. Fleet was asserting a priority administrative claim in the approximate amount of $16,000,000, and there were unpaid Chapter 11 professional fees aggregating almost $3,000,000. [Affidavit of William A. Brandt, Jr., Trustee, dated July 24, 2007] ("Trustee Affidavit"), ¶ 2. [Docket No. 1632]

In December 2003, the creditors elected William A. Brandt, Jr., as Trustee. His election was disputed, and the Court resolved the disputed election by Order, dated February 4, 2004, confirming the election [Docket No. 915]. The Trustee inherited a bitter dispute among Fleet, the Estate and the Estate's professionals over the amount of Chapter 11 professional fees and whether the proceeds of the sale paid to Fleet could be surcharged for the professional fees. [Trustee Affidavit ¶ 3]. In addition, the purchaser, Exopack, was making claims ("the Exopack Claim") under the APA for alleged breaches of various representations and warranties and was asserting a claim to certain proceeds of the sale that were held in escrow and additional claims for damages above

the holdback against the Estate and Fleet. [Docket No. 1028; Trustee Affidavit ¶ 2].

Upon his appointment, the Trustee assumed the obligation to pursue the Section 506(c) claim against Fleet and to resolve the professional fees disputes. Ultimately, the Trustee, through mediation, resolved the objections to fees and the Section 506(c) claim relating to those fees. Through the Trustee's efforts, a compromise was reached whereby the professionals agreed to certain reductions in their fees and Fleet agreed to pay those fees from the proceeds of the sale. [Trustee Affidavit ¶ 3]. The Trustee then addressed the Exopack Claim, and negotiated a compromise among the Estate, Exopack and Fleet whereby Exopack released certain claims against Fleet, and the Estate and **\*130** Fleet released certain of the holdback funds to Exopack. When Exopack refused to honor its obligations under the settlement terms to pay certain taxes, the Trustee commenced an adversary proceeding. [6] The parties settled the adversary proceeding with Exopack paying the Trustee the amount due for taxes, thereby enabling the Trustee to pay all outstanding taxes. Fleet compensated the Trustee in the sum of $50,000 for his expenses in obtaining the recovery from Exopack.

Having resolved the unpaid professional fees issues and the Exopack Claim, the Trustee then entered into discussions with Fleet to resolve the Trustee's potential claims against Fleet, including a claim that Fleet's liens could be avoided as fraudulent conveyances. Those negotiations ultimately resulted in the settlement agreement that is the subject matter of the present dispute. *See infra*, at pp. 130–32.

On January 23, 2007, the Trustee filed a motion seeking authority to make an interim distribution to creditors other than Fleet ("Interim Distribution Motion") [D.I. 1557], which proposed to pay the expenses of administration and to make an interim distribution to unsecured creditors. On February 21, 2007, Fleet filed an objection to the Interim Distribution Motion ("Objection") [D.I. 1573]. In addition, Fleet filed a Motion to Compel Trustee to Perform Under the Settlement Agreement ("Motion to Compel") [D.I. 1574]. On March 14, 2007, the Trustee and the Agent entered into a Consent Order, partially resolving the Motion to Compel, pursuant to which the Trustee paid Fleet $1 million and Fleet adjourned the Motion to Compel. [D.I. 1595].

### *The Settlement Agreement between the Trustee and Fleet*

In re Plassein Intern. Corp., 377 B.R. 126 (2007)

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 212 of 378

At the time the cases were converted, several contested matters and adversary proceedings were pending against Fleet. On March 3, 2005, all of the pending matters were settled pursuant to a settlement agreement between the Trustee and Fleet ("Settlement Agreement") which the Court approved. [D.I. 1132]. The Settlement Agreement provided that Fleet waive its priority administrative claim, waive any secured claim, and the Estate agreed to grant Fleet an allowed unsecured claim of $23,675,045.65. Fleet further agreed to pay the Estate the sum of $3,100,000 and waive any right to any distribution as an unsecured creditor from the $3,100,000 [7] paid, plus waive any right to a distribution from the first $1.1 million of preference recoveries. [Settlement Agreement ¶ 4(b)]. In exchange and after it received the $1.1 million, the Estate agreed to pay Fleet any net recoveries up to $3,100,000, [8] and then share equally any subsequent net recoveries above $3.1 million.

The relevant provisions of the Settlement Agreement are as follows:

### Section 2.

**Scope of Settlement.** [T]his [Settlement] Agreement is intended to globally settle with prejudice any and all claims (pre-petition and post-petition) the Trustee and the Debtors' estates **\*131** have or may have.... Without limiting the generality of the foregoing, this [Settlement] Agreement will completely resolve and be deemed as a settlement with prejudice of ... claims for ... the liquidation, collection and disbursement of other estate assets, No further claims can be asserted, whether direct or indirect, against any or all of Agent, Lenders and Heller, their respective professionals and advisors, or against any proceeds received by any of them from any Plassein entity, and/or any representative thereof. [9]

### Section 3.

**Settlement Payment.** Lenders shall pay to the Trustee the amount of Three Million and 00/100 Dollars ($3,000,000.00) and Heller shall pay to the Trustee the amount of One Hundred Thousand and 00/100 Dollars ($100,000.00) in cash upon approval of the Agreement by the Court by a final order (together, the "Settlement Payment").

### Section 4.

**Distribution of Estate Property.** Distribution of property of the Debtors' estates by the Trustee shall be as follows:

a. the Settlement Payment plus any amounts to be retained by the Debtors' estates described in Paragraphs 4.b, 4.c, 4.d, 4.e and 13.d below shall be used to pay allowed administrative claims of the Debtors' estates and creditors other than the Lenders and Heller in the order of priority pursuant to Bankruptcy Code § 726 or other order of the Court that is not inconsistent herewith;

b. up to One Million One Hundred Thousand and 00/100 Dollars ($1,100,000.00) of gross preference recoveries pursuant to Bankruptcy Code §§ 547 and 550 shall be distributed to creditors of the Debtors' estates other than Lenders and Heller in the order of priority pursuant to Bankruptcy Code § 726 or other order of this Court that is not inconsistent herewith. Gross preference recoveries in excess of $1,100,000.00 shall be distributed to the Lenders pursuant to 4(c) below;

c. subject to 4(a) and above, the Agent on behalf of the Lenders shall receive the sum of Three Million One Hundred Thousand and 00/100 Dollars ($3,100,000.00) of net recoveries from any source. Recoveries by the Trustee in excess of the amount payable to the Lenders in accordance with the sub-section (c) shall be distributed to creditors of the Debtors' estates and to the Lenders as provided below;

d. after the Lenders have received the sum of Three Million One Hundred Thousand and 00/100 Dollars ($3,100,000.00) (and subject to 4(b) above), except as provided in paragraph 4(g) hereof, all further net recoveries (funds available for distribution to creditors pursuant to Bankruptcy Code § 726(a)(2)) shall be divided and distributed by the Trustee 50% to the Lenders and the remaining 50% to the creditors of the Debtors' estates other than Lenders and Heller, or in accordance with other order of the Court that is not inconsistent herewith; and

e. once allowed claims of unsecured creditors of the Debtors, other than the Lenders' and Heller, are paid in full, including, without limitation, the allowed claims of the Senior Sub–Debt and Junior Sub–Debt, as defined below, the balance **\*132** of any funds available for

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 213 of 378

In re Plassein Intern. Corp., 377 B.R. 126 (2007)

distribution pursuant to Bankruptcy Code § 726(a)(2) shall be paid to the Lenders. Conversely, once the Lenders' Allowed Unsecured Claim, and Heller Unsecured Claim, both as defined below, are paid in full, any funds available for distribution pursuant to Bankruptcy Code § 726(a)(2) shall be distributed to allowed claims of the other unsecured creditors until paid in full, and then to equity.

Fleet paid $3.1 million to the Trustee, constituting the full Settlement Payment. As a result of the Settlement Agreement, the Debtors' estates had a potential fund of $4.2 million, with $3.1 million in hand, plus the first preference recoveries of $1.1 million to be collected, available to pay allowed administrative claims and to make distributions to creditors.

### Preference Recoveries

The Trustee collected $2,445,519 from preference actions. In collecting the preferences, Debtors incurred counsel fees of approximately $593,852, plus costs (including mediators' fees). The Trustee also incurred the fees and expenses of his consultant, Development Specialists, Inc., in excess of $200,000 in fees, plus expenses.

### Jurisdiction and Venue

The Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. This Court is the proper venue for this motion under 28 U.S.C. §§ 1408 and 1409. This motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The statutory predicates for the relief Fleet seeks is Bankruptcy Code § 105(a).

## II. DISCUSSION

The parties find themselves in a good faith disagreement over the interpretation of terms of the Settlement Agreement they negotiated to resolve a highly contentious relationship. As is not uncommon, the dispute over the Settlement Agreement arose when the Debtors were more successful than expected in recovering funds for distribution and the meaning of provisions of the Settlement Agreement was no longer merely an academic exercise. The parties agree that at the time they negotiated the Settlement Agreement, everyone believed that there would be little, if any, money from preference recoveries to be distributed and therefore the provisions of the Settlement Agreement at issue here would not come into play. Instead, the Trustee's vigorous efforts resulted in funds worth a fight.

Fleet has moved for summary judgment on its interpretation of the Settlement Agreement. The Trustee in its opposition to the Motion argued that if the Court were to determine that there was an ambiguity in the Settlement Agreement, the Court should deny the Motion because genuine issues of material fact would exist. Nonetheless, at oral argument both parties agreed that an evidentiary hearing would be wasteful of time and money and, in effect, have asked the Court to resolve the dispute by interpreting the Settlement Agreement. Fleet and the Trustee therefore agree that disposition of their dispute by summary judgment is both useful and appropriate.

The Trustee and Fleet agree on the applicable legal precepts, namely: [10]

[1]    (a) The Court must determine the parties' intention from the express language of the agreement. *133 *E.I. du Pont de Nemours and Co. v. Shell Oil Co.*, 498 A.2d 1108 (Del.1985); *Radio Corp. of America v. Philadelphia Storage Battery Co.*, 6 A.2d 329 (Del.1939); *Pennwalt Corp. v. Plough Inc.*, 676 F.2d 77, 80 (3d. Cir.1982); and construe their intention from the entire agreement, giving effect to all of the provisions. *State v. Dabson*, 217 A.2d 497 (Del.1966); *Bamdad Mechanic Co. v. United Technologies Corp.*, 586 F.Supp. 551 (D.Del.1984).

[2]    [3]    A contract is ambiguous only when the provisions in controversy are fairly susceptible to different interpretations or may have two or more different meanings. *See Rhone–Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.*, 616 A.2d 1192 (Del.1992). The Court should not look outside the four corners of the contract and the clear and unequivocal language in the absence of an ambiguity. Here, the parties agree the Settlement Agreement is not ambiguous. They disagree, however, on what it means and ask the Court to tell them.

The parties' interpretations of the Settlement Agreement leave little, if any, middle ground, as the following recitations of the parties' respective interpretations of the Settlement Agreement reveal the gulf between them.

### Preference Recoveries

### Fleet's Position

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 214 of 378

In re Plassein Intern. Corp., 377 B.R. 126 (2007)

The Settlement Agreement required the Trustee to distribute to Fleet gross preference recoveries in excess of $1.1 million. Paragraph 4 of the Settlement Agreement is the distribution mechanism to which Fleet points to support its argument [11]:

> **Distribution of Estate Property.** Distribution of property of the Debtors' estates by the Trustee shall be as follows:
>
> a. The Settlement Payment plus any amounts to be retained by the Debtors' estates ... shall be used to pay allowed administrative claims of the Debtors' estates and creditors other than [Fleet] ...;
>
> b. Up to One Million One Hundred Thousand and 00/100 Dollars ($1,100,000.00) of gross preference recoveries ... shall be distributed to creditors of the Debtors' estates other than [Fleet]....Gross preference recoveries in excess of $1,100,000.00 shall be distributed to the Lenders pursuant to 4(c) below [limited to the sum of $3.1 million from gross preference recoveries and net proceeds from any other source];
>
> c. Subject to 4(a) [excluding amounts to be retained by the estate] and (b) [limited to gross preference recoveries in excess of $1.1 million] [Fleet] shall receive the sum of Three Million One Hundred Thousand and 00/100 Dollars ($3,100,000.00) of net recoveries from any source.
>
> d. after [Fleet] has received the sum of Three Million One Hundred Thousand and 00/100 Dollars ($3,100,000.00) ... all further net recoveries (funds available for distribution to creditors pursuant to

Fleet therefore is entitled to gross preference recoveries in excess of $1.1 million in the amount of not less than $1,345,519, other net recoveries and proceeds in an amount to be determined, funding of a reserve in the amount of $270,000 (see discussion of the Exopack Settlement, below) pursuant to paragraphs 7 and 8 of the Settlement Agreement, and accounting for expenses.

Bankruptcy Code § 726(a)(2)) shall be divided and distributed by the Trustee 50% to [Fleet] and the remaining 50%, to the creditors of the Debtors' estates other than [Fleet].

The Settlement Agreement allocates the risk of administrative expenses, including, without limitation, the costs of collection of the preference recoveries, to the Estate. If the Trustee collects in excess of $1.1 million of gross preference recoveries, then the Estate has a fund of $4.2 million to "pay allowed administrative claims of the **\*134** Debtors' estates and creditors other than [Fleet] in the order of priority pursuant to Bankruptcy Code § 726 or other order of the Court that is not inconsistent" with the Settlement Agreement.

The Trustee collected $2,445,519 of gross preference recoveries. Pursuant to the Settlement Agreement the Trustee retains for the estates the first $1.1 million of the gross preference recoveries. Settlement Agreement at ¶ 4(b). The Trustee disburses "gross preference recoveries in excess of $1,100,000.00 ... to [Fleet]." Settlement Agreement at ¶ 4.b. This leaves $1,345,519 in gross preference recoveries that belong to [Fleet] under the Settlement Agreement in excess of the $1.1 million allocated to the Estate.

In addition to the gross preference recoveries to which Fleet is entitled, the Settlement Agreement obligates the Trustee to disburse to Fleet the net recoveries from all other sources, including a $50,000 escrow relating to the insurance retainage, described more fully in Paragraph 13(a) of the Settlement Agreement. In addition to the insurance retainage escrow, Fleet is entitled to distribution from the following sources:

| | |
|---|---:|
| Refunds | $ 78,899 |
| Turnover from prior trustee | $ 45,014 |
| Bank accounts | $142,563 |
| Interest | $ 59,009 |

### *Trustee's Position*

Fleet asserts it is entitled to the gross preference recoveries in excess of $1.1 million. In support of that position, Fleet relies upon Paragraph 4(b) of the Settlement Agreement. However, Fleet's reading of Paragraph 4(b) is far too narrow and fails to give effect to all language of the paragraph. Paragraph 4(b) of the Settlement Agreement provides that

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 215 of 378

In re Plassein Intern. Corp., 377 B.R. 126 (2007)

gross preference recoveries in excess of $1.1 million are to be distributed to Fleet "**pursuant to Paragraph 4(c).**" *(emphasis added).* Paragraph 4(c) provides that Fleet receives net recoveries from any source up to the first $3.1 million. Reading Paragraphs 4(b) and 4(c) together, it is clear that the gross preference recoveries in excess of $1.1 million are to be distributed pursuant to Paragraph 4(c) after the costs to the Estate are deducted. From that net recovery, the first $3.1 million is disbursed to Fleet.

The reason the term "gross preference recoveries" is used in Paragraph 4(b) is because if net recoveries were provided for in Paragraph 4(b) and the net balance was then disbursed pursuant to Paragraph 4(c), those net recoveries would be subject to a second charge for expenses of the Estate. Thus, Paragraph 4(b) used the term "net recoveries" to avoid a double assessment against gross recoveries in excess of $1.1 million. [Trustee Affidavit ¶ 12].

Fleet's reading of Paragraph 4(b) of the Settlement Agreement ignores the words "pursuant to 4(c) below." Fleet incorrectly interprets Paragraph 4(b) as independently requiring disbursement of gross proceeds to Fleet without regard to Paragraph 4(c). Such an interpretation is inconsistent with the language and fails to give full effect and meaning to the language.

As noted, when the Settlement was being negotiated, it was the parties' expectation that preference recoveries would be less than $1.1 million. [Trustee Affidavit ¶ 9]. It was only through the extraordinary **\*135** effort of the Trustee and his counsel that the Estate recovered $2,345,519. [Trustee Affidavit ¶ 10]. In order to make this recovery, the Estate incurred expenses for counsel fees of $593,852, plus costs. In addition, DSI provided services to the Trustee with a fair value in excess of $200,000 by providing all the financial analysis needed to successfully prosecute the preference claims. [Trustee Affidavit ¶ 11]. The Estate, if Fleet prevails, loses the fees and associated costs incurred to recover $2,345,519. Paragraphs 4(b) and 4(c) must be read together in which case the Settlement Agreement clearly and unambiguously provides that the preference recoveries in excess of $1.1 million are to be distributed to Fleet after deduction of expenses.

Therefore, the distribution due Fleet for the preference recoveries is $1,345,519, less the interim distribution to Fleet of $1,100,000, less costs and expenses.

## II. RULING

The Trustee and Debtors agree on one thing, namely, that there are no disputes on the facts and an evidentiary hearing would be a wasteful exercise. The Court agrees with the parties that there are no disputed facts and summary judgment is appropriate. F.R. Civ. P. 56(c); *In re LaRoche Industries, Inc.,* 284 B.R. 406, 408 (Bankr.D.Del.2002). Instead, they have asked the Court to tell them what their Settlement Agreement means. The parties also agree that the Settlement Agreement is unambiguous and, therefore, the Court may properly interpret the Settlement Agreement using the rules of construction of contracts: applying the express language, determining the parties' agreement from the entirety of the agreement, and giving effect to each term so no provision is useless.

[4]  [5]  [6]   In this case, in addition to the rules of construction discussed earlier (pp. 9–10) the Court will employ another rule of construction to determine the objective intent of the parties which is, as the Third Circuit Court of Appeals has indicated, "a court's paramount consideration" in construing a contract. *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1009 (3d Cir.1980). In *Mellon,* the Third Circuit, quoting from *O'Bryan v. O'Bryan,* 67 Conn.App. 51, 787 A.2d 15, 18 (2001), stated:

> In ascertaining intent, we consider not only the language in the contract but also the circumstances surrounding the making of the contract, the motives of the parties and the purposes which they sought to accomplish.... The intention of the parties to a contract is to be determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction.

The Court's interpretation of the Settlement Agreement is necessarily premised upon the circumstances and situation extant when the parties settled their differences.

Discussions between the Trustee and Fleet to resolve the Trustee's potential claims against Fleet, including a fraudulent conveyance claim to avoid Fleet's liens, resulted in the Settlement Agreement. The specific terms of the Settlement Agreement make it clear that the Trustee and Fleet intended to

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 216 of 378

In re Plassein Intern. Corp., 377 B.R. 126 (2007)

settled all of their claims against one another. See Settlement Agreement, ¶ 2, which provides:

> 2. Scope of Settlement. Except as specifically provided below, this Agreement is intended to globally settle with prejudice any and all claims (pre-petition and post-petition) the Trustee and the Debtors' estates have or may have against: [Fleet].... Without limiting **\*136** the generality of the foregoing, this Agreement will completely resolve and be deemed as a settlement with prejudice of the Avoidance Action and Surcharge Motion, all adversary proceedings, contested matters and other core case issues and claims among the parties and their respective professionals and advisors, which includes, without limitation, objections to the allowance of claims of the Agent and Lenders....

The foregoing "release" language clearly evidences that Fleet was buying peace for all lenders for any claims by Debtors whatsoever. Of further significance in determining the intent behind the Settlement Agreement is that at the time they were negotiating the Settlement Agreement, Debtors and Fleet thought that preference recoveries would be less than $1.1 million. Instead, the Trustee's efforts led to the recovery of more than double the expected amount, or $2,345,519. In achieving the larger than anticipated recovery, the Trustee incurred attorney's fees of $593,852, costs and $200,000 in fees payable to DSI for its analysis of preference claims.

Therefore, the Court's determination of the intent of the parties which leads to the interpretation of the Settlement Agreement flows from a relatively few salient facts.

1. The Trustee was preparing to challenge Fleet's liens as avoidable fraudulent conveyances.

2. The Trustee and Fleet entered into settlement negotiations to settle completely the Trustee's potential claims against Fleet.

3. The negotiations resulted in the Settlement Agreement which, in addition to the economic terms, provided for the Trustee's release of Fleet on very broad terms. Settlement Agreement, ¶ 5.

4. The settlement negotiations took place when the preference recoveries were expected to be substantially less than $1.1 million.

The Settlement Agreement provided significant benefits to Fleet. In addition to a potential distribution at issue here, Fleet received a release from liability, avoided litigation over its liens and obtained an allowed unsecured claim of $23,675,045.65. Fleet also received indemnification and the turn over of funds held in escrow totaling approximately $256,000.

### a. Preference Recoveries

[7]    In achieving the greater than expected preference recoveries, the Trustee incurred attorneys' fees of $593,852, plus costs, including mediator fees. Trustee Affidavit ¶ 11. If Fleet's position on the Settlement Agreement is correct, the distribution from the preference recoveries would be as follows:

| | |
|---|---|
| Preference Recoveries | $2,345,519 |
| Creditors' Gross Share | $1,100,000 |
| Less Expenses [12] | {$ 593,852  } |
| Creditors' Net Share | $ 506,148 |
| Fleet's Share | $1,245,519 |

On the other hand, if the Trustee is correct, the distribution would be:

| | |
|---|---|
| Preference Recoveries | $2,345,519 |

In re Plassein Intern. Corp., 377 B.R. 126 (2007)

| | |
|---|---|
| Creditors' Share | $1,100,000 |
| Less Expenses | {$ 593,852  } |
| Fleet's Share | $ 651,667 |

The difference in recovery is substantial depending on against whom the costs and expenses are applied. Fleet would impose all of the costs and expenses on the Trustee's portion of the preference recoveries, i.e., the $1,100,000 payable under the Settlement Agreement, meaning that Fleet rather than the creditors would enjoy the gross recovery amount.

 **\*137** Fleet's interpretation results in an unworkable and clearly unintended result. The Settlement Agreement is definitive that the Trustee is first entitled to receive "up to ... $1,100,000 of *gross* recoveries". Settlement Agreement ¶ 4(b) *[emphasis added]*. If Fleet is correct, the Trustee would not receive $1.1 million and the bulk of the settlement proceeds would be paid, really refunded, to Fleet. In order to adopt Fleet's suggested interpretation, the Court would have to ignore the plain language in the Settlement Agreement that Fleet's receipt of up to $3.1 million—after the Trustee's receipt of $1.1 million "of *gross* preference recoveries" (Settlement Agreement ¶ 4(b)) is "of *net* recoveries...." *Id.* at ¶ 4(c) *[emphasis added]*.

It is therefore clear from the Settlement Agreement itself that the Trustee's position on the preference recoveries is correct.

### b. *Exopack*

 **[8]**   The Court earlier in this decision *(see* Background at pp. 1–4) referred to the asset sale to Exopack and the litigation that resulted from the sale. When Fleet and the Trustee entered into the Settlement Agreement (i.e., March 3, 2005), the litigation between the Estate and Exopack was pending. In the Settlement Agreement, the Trustee and Fleet addressed the possibility that Exopack would recover on its claim against the Estate. Paragraph 7 of the Settlement Agreement requires the Trustee to reserve $270,000 to secure the Trustee's indemnification of Fleet with respect to certain claims by Exopack. The indemnification provided for in Paragraph 8 of the Settlement Agreement [13] is only for claims which are not direct claims by Exopack against Fleet. Thus,

the indemnification is only for those claims Exopack may have against the Debtors and indirectly against Fleet. [14]

On September 11, 2006, the Court approved a settlement among the Estate, certain Taxing Authorities and Exopack [Docket No. 1538] which resulted in an exchange of general releases by and among the Estate, Exopack and the taxing authorities fully and completely releasing any and all claims that Exopack had against the Estate, including those claims regarding Exopack's obligation to pay certain tax liabilities. [Docket No. 1538].

Fleet received notice of the settlement with Exopack and did not file an objection. Additionally, Fleet was a party to an appeal which was settled as part of the Exopack settlement, and Fleet joined in the dismissal of that appeal. Notwithstanding Fleet's participation, Fleet did not seek to participate in the settlement or request a release, nor did Fleet raise any issues with the Trustee with respect to the release until after the Court approved the Exopack settlement. [15]

 **\*138**   Accordingly, there are no claims left that could be subject to the indemnification. The Trustee has fully and completely resolved all disputes with Exopack as evidenced by the exchanges of the general releases. The only Exopack claims that could exist would be direct claims between Exopack and Fleet, and for such claims the Trustee did not provide indemnification.

Therefore, the Trustee is not required to maintain the reserve to secure the indemnification because there are no circumstances for which the Estate would be required to provide indemnification to Fleet.

### c. *Cash on Hand*

 **[9]**   Fleet has identified additional sum to which it believes it is entitled.

| | |
|---|---|
| Refunds | $ 78,889 |
| Turnover from prior trustee | $ 45,014 |

In re Plassein Intern. Corp., 377 B.R. 126 (2007)

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 218 of 378

| | |
|---|---|
| Bank accounts | $142,563 |
| Interest | $ 59,000 |
| Total | $325,466 |

The primary issue which Fleet's claim to the foregoing amounts raises is its entitlement to "Cash on Hand" which the Trustee held at the time the parties entered into the Settlement Agreement ("Cash on Hand"). The Trustee counters that Fleet is entitled under the Settlement Agreement only to its portion of proceeds from future recoveries. The Cash on Hand is not a "recovery" according to the Trustee and therefore is not payable under the Settlement Agreement.

Before entering into the Settlement Agreement, the Estate held Cash on Hand of $266,476, plus $73,525 that had been paid by Fleet to make professional fee payments in connection with certain settlements the Trustee had reached with some of the professionals who had been employed while the cases were pending under Chapter 11. [Trustee Affidavit ¶ 5]. Fleet asserted an interest in the Cash on Hand pursuant to the security interest granted Fleet pre—and post-petition. [Trustee Affidavit ¶ 5]. Upon the approval of the Settlement Agreement, Fleet's right to distribution from the Estate was governed by the Settlement Agreement and not preexisting security interests. The Settlement Agreement clearly contemplated that it was to be a global resolution of all claims by Debtors against Fleet and Fleet against the Estate. Thus, the Settlement Agreement provided that "[e]xcept as specifically provided below, this [Settlement] Agreement is intended to globally settle with prejudice any and all claims (pre-petition and post-petition) ... (c) [Fleet's] Claims against the several [Debtors'] Estates arising or relating to such financial accommodations or otherwise...." Settlement Agreement at ¶ 2. Fleet waived any additional secured and priority claim it may have had. Fleet's rights to receive distributions were to be governed solely by the Settlement Agreement. Settlement Agreement, ¶ 6. [16]

"Net recoveries" as used in Paragraph 4(c) of the Settlement Agreement does not include the Cash on Hand because the Cash on Hand did not constitute a recovery. Fleet's right to receive a distribution from "recoveries" only includes the proceeds from future recoveries.

**\*139** The Cash on Hand is to be available to pay the expenses of the Estate, including professional fees incurred. The Cash on Hand was not as a result of actions taken by the

Trustee to "recover" an asset [Trustee Affidavit ¶ 5], and the parties never contemplated that the Estate would pay over to Fleet the Cash on Hand. [Trustee Affidavit ¶ 8]. Construing the Settlement Agreement as having Fleet pay the Estates $3.1 million while maintaining a claim against the Cash on Hand is illogical. The correct reading of the Settlement Agreement and that which gives effect to the intent of the parties is that the Cash on Hand was an asset of the Debtors free and clear of the claims of Fleet and not a "recovery" subject to distribution pursuant to Paragraph 4 of the Settlement Agreement. [Trustee Affidavit ¶ 8].

The Court agrees with the Trustee. If Fleet is correct, its $3.1 million payment was, in part, merely an advance to be reimbursed in the future from sums certain. Fleet exchanged its lien on the "Cash on Hand" for the benefits of the Settlement Agreement. Those benefits included the possibility of recoveries, not the certainty of "Cash on Hand." Fleet is therefore not entitled to "Cash on Hand."

### d. *Miscellaneous Issues and Rulings*

Fleet also seeks the following payments from the Trustee:

a. An accounting of a $50,000 escrow the Trustee collected. The Trustee shall provide the accounting.

b. Release from San Bernadino of $ 80,000 held in escrow by the taxing authority, and payment to Fleet. Settlement Agreement, ¶ 13(b). The Trustee has received $81,005.69 and shall pay to Fleet the released escrow funds.

c. Recovery from Europackaging. The Settlement Agreement requires the Trustee to pay Fleet from any recovery against Europackaging. Settlement Agreement, ¶ 13(d). The Trustee collected $91,483, and is entitled to reimbursement of fees and expenses. It is unclear what amount of fees and expenses are appropriate. The Trustee shall provide Fleet with an accounting of the fees and expenses attributable to the Europackaging matter and if the Trustee and Fleet are unable to agree on an appropriate amount, the dispute shall be submitted to the Court to resolve.

In re Plassein Intern. Corp., 377 B.R. 126 (2007)

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 219 of 378

#### e. *Accounting*

The Court's decision that the Settlement Agreement results in a payment of net preference recoveries means that Fleet is entitled to an accounting of the professional fees and expenses attributable to the gross recoveries. The Court directs the parties to confer about a schedule for the accounting, any objections for fees and expenses and a hearing, if necessary, to present those objections, and to submit an agreed upon scheduling order.

The Court will issue an Order in conformity with the rulings in this Opinion.

### *ORDER*

The Court having carefully considered the Motion of Fleet Capital Corporation, Agent, to Compel Trustee to Perform Under Settlement Agreement (D.I. 1574), Motion of Fleet Capital Corporation for Summary Judgment Granting Motion to Compel Trustee to Perform Under Settlement Agreement (D.I. 1629), ("the Motions"), the Trustee's Memorandum in Opposition to the Motions (D.I. 1632), the related pleadings and documents, and having heard oral argument, for the reasons stated in the accompanying written opinion ("the Opinion"), IT IS ORDERED that the Motions are granted in part and denied in part, and more specifically as follows:

**\*140** 1. Fleet Capital Corporation's (for itself and as agent) ("Fleet") share of preference recoveries, after the Estate retains the first $1.1 million of preference recoveries, is net of the Estate's fees and expenses incurred in recovering the preference payments.

2. The Trustee is not required to reserve the $270,000 escrow held to indemnify Fleet for claims of Exopack–Ontario, Inc.

3. Fleet is entitled to receive "Cash on Hand" only to the extent it is distributed to general unsecured creditors and on a *pari passu* basis with other unsecured creditors.

4. The Trustee shall pay to Fleet $81,005.69 released by the San Bernadino taxing authority.

5. The Trustee shall pay to Fleet the recovery from Exopackaging, less fees and expenses incurred, and shall provide an accounting of such fees and expenses.

6. The Trustee shall account to Fleet for the fees and expenses incurred in the recovery of preference payments on a schedule the parties will negotiate.

7. The Trustee shall make the foregoing payments when he makes the next distribution to other unsecured creditors.

Footnotes

1    This Memorandum Opinion constitutes the findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052, made applicable to this matter by Federal Rule of Bankruptcy Procedure 9014.

2    The cases were assigned to the author of this Opinion on April 18, 2006, subsequent to most of the recited significant events.

3    The Debtors are PL Liquidation Corp., f/k/a Plassein International Corp., PL Liquidation of Martin, Inc., f/k/a Plassein International Martin, Inc., PL Liquidation of Ontario, LLC, f/k/a Plassein International of Ontario, LLC, PL Liquidation of Salem, Inc., f/k/a Plassein International of Salem, Inc., PL Liquidation of Spartanburg, Inc., f/k/a Plassein International of Spartanburg, Inc., PL Liquidation of Thomasville, Inc., f/k/a Plassein International of Thomasville, Inc., and PL Liquidation of Tfilms, Inc., f/k/a Teno Films, Inc., a wholly-owned subsidiary of Thomasville, Inc.

4    The group of lenders consisted of Fleet Capital Corporation, Fleet National Bank, Heller Financial, Inc., Wachovia Bank, N.A., and Citizens Bank of New Hampshire. The Court's reference to "Fleet" will include the group of lenders including Fleet, for itself and as agent.

5    On May 16, 2003, the Court entered an interim order ("Interim Order") granting the Debtors authority to incur post-petition secured debt (Interim Order at ¶ 1), and granting Fleet liens on all property of the estates other than avoidance actions (Interim Order at ¶ 5), deemed such liens perfected (Interim Order at ¶ 7), acknowledged the Debtors' pre-petition obligations to, and liens of, the Agent under the pre-petition credit documents (Interim Order at ¶¶ F–1, M, 5, 9, 12, 14, 15, 20 and 23), and granted the Agent super-priority administrative claims (Interim Order at ¶ 10). Thereafter, the Court entered a series of eleven additional interim orders, all of which granted Fleet the same or similar relief provided in the Interim Order.

6    *William A. Brandt, Jr., as the Chapter 7 Trustee v. Exopack–Ontario, Inc., et al.*, Adv. Proc. No. 05–30165(KG).

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

7       The payment was $3,000,000 from Fleet and $100,000 from Heller Financial to resolve certain related claims against Heller Financial. For the sake of clarity, the Court will refer only to "Fleet."

8       At the time of the Settlement, the best estimate of likely preference recoveries was less than $1,100,000. Thus, it was contemplated that any distribution to Fleet would be first from recoveries from non-preference claims. [Trustee Affidavit ¶ 9].

9       The Settlement Agreement provides that all claims against Fleet are settled. It does not constitute a waiver and release of claims against the Estate or the assertion of liens against property of the Estate.

10      The Settlement Agreement provides that Delaware law governs in any dispute. Settlement Agreement, ¶ 18.

11      The recitation of Paragraph 4 is lifted from Fleet's submission and with Fleet's editing states Fleet's interpretation.

12      The expenses are an estimate at this time. The Court's calculations are for illustrative purposes and do not represent findings or a conclusion of the actual amount.

13      Paragraph 8 provides, in part, that:

        8. Indemnification by Trustee. The Trustee shall indemnify, defend and hold [Fleet] ... harmless of and from any and all claims, causes, suits, proceedings and appeals asserted or commenced or continued by Exopack, ...; provided, however, that the Trustee shall not be liable or obligated to indemnify or defend [Fleet], with respect to any direct claim (as opposed to an indirect or derivative claim by or through the Debtors' estates) asserted by [Fleet] ...; provided however, if any such alleged direct claim is determined to be derivative or otherwise within the scope of the indemnity above, then the Trustee and Debtors' estates shall then be liable to indemnify for any amount finally determined to be due to Exopack....

14      At the closing on the sale of the Debtors' assets, all the proceeds were paid to Fleet. Thus, if any senior lien was established, the payment would have to be made by Fleet.

15      Despite the Trustee's request that Exopack release Fleet, Exopack has yet to do so. The Court has reviewed the docket and it appears that Fleet has not taken any action to determine if it has any accountability to Exopack.

16      Paragraph 6 provides:

        6. Waiver of Priority, Net Claim. [Fleet] hereby waives the priority of any claim [Fleet] may have, with all of [Fleet's] remaining claims being allowed general unsecured claim having priority in distribution pursuant to Bankruptcy Code § 726(a)(2) in the amount of $23,675,045.65 ("Lenders Allowed Unsecured Claim").

---

End of Document                                          © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 82

90 B.R. 575
United States Bankruptcy Court,
D. New Hampshire.

In re PUBLIC SERVICE COMPANY
OF NEW HAMPSHIRE, Debtor.

Bankruptcy No. 88–00043.  |  Sept. 2, 1988.

Matter came before court on notice of debtor of proposal to enter into transactions out of ordinary course of business pursuant to which debtor would transfer management and operational control of nuclear plant to separate corporation. The Bankruptcy Court, James E. Yacos, J., held that debtor made insufficient showing of good cause for court to approve transaction.

Motion denied.

West Headnotes (2)

**[1]    Bankruptcy**
　　🔑 Operation of Business;  Contracts

Appropriate standard for approval or disapproval of restructuring of entity in reorganization is whether good cause has been shown to implement transaction; that is, does transaction have valid business reasons supporting it and does it make good sense in overall context of reorganization process.

4 Cases that cite this headnote

**[2]    Bankruptcy**
　　🔑 Operation of Business;  Contracts

Debtor made insufficient showing of good cause for court to approve transaction whereby debtor would transfer management and operational control of nuclear power plant to separate corporation; court questioned urgency of bringing matter before court other than in conjunction with plan of reorganization.

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*575**  Don Willenburg, Richard Levin, Los Angeles, Cal., for Public Service co.

Geoffrey M. Kalmus, New York City, J. Michael Deasy, Nashua, N.H., for the unsecured creditors committee.

Howard J. Berman, for the Equity Committee.

Larry M. Smukler, Concord, Sr. Asst. Atty. Gen., Mark W. Vaughn, Daniel J. Callaghan, Manchester, for the State of N.H.

Stephen A. Jonas, Asst. Atty. Gen., Joel B. Rosenthal, Boston, for the Com. of Massachusetts.

Robert A. Backus, Manchester, N.H., for Seacoast Anti–Pollution Group, Citizens within the 10–Mile Radius, Campaign for Rate–Payers' Rights.

George J. Wade, New York City, David J. Dunfey, Hampton, N.H., for Citicorp and Consol. Utilities & Communications, Inc. (CUC).

Christopher T. Katucki, for United Illuminating, New England Power, EUA Power Corp., Canal Elec. Co., Connecticut Light & Power Co., and Montaup Elec. Co.

Connie L. Rakowsky, Concord, N.H., for New England Elec. Service.

**Opinion**

**MEMORANDUM OPINION RE PROPOSED
RESTRUCTURING RELATING TO
OPERATION OF SEABROOK NUCLEAR
POWER GENERATING STATION**

JAMES E. YACOS, Bankruptcy Judge.

On July 21, 1988 the debtor in this reorganization proceeding filed a "Notice Of Intention To Enter Into Transactions Out Of The Ordinary Course (New Hampshire Yankee Electric Corporation)" under which the debtor gave notice that it proposed to enter into several related transactions under which the management and operational control with regard to the Seabrook nuclear plant would be transferred from a division of the debtor, i.e., the New Hampshire Yankee Division ("Division") of Public Service, to a separate corporation, i.e., the New Hampshire Yankee Electric

Corporation, which corporation had been formed in 1984 in contemplation of the ultimate transfer of those powers and responsibilities to a separate corporation to be controlled by a board of directors representing each of the joint owners of the Seabrook plant. [1]

**\*576** The Notice of Intention succinctly summarizes the existing situation regarding the Seabrook plant as follows:

> At present, Seabrook is owned by Public Service and eleven other New England utilities (the "Joint Owners"). Among the Joint Owners, only Public Service is designated as "technically qualified" under the licenses and permits from the United States Nuclear Regulatory Commission ("NRC") relating to Seabrook (the "NRC Licenses"). Since 1984, the New Hampshire Yankee Division (the "Division") of Public Service, as agent for certain purposes for all the Joint Owners, has conducted the day-to-day operations and management of Seabrook. The Joint Owners supervise the Division's activities both directly (as a group) and through an executive committee composed of representatives of certain Joint Owners.

The Notice of Intention further summarizes the proposed changes to be made in the existing situation as follows:

> Under the proposed restructuring, the Division will be reconstituted as an independent corporation, the New Hampshire Yankee Electric Company ("NHYEC"), which will replace the Division as managing agent for the Seabrook project. NHYEC was formed by the Joint Owners for this purpose in 1984. NHYEC will employ those personnel the Division presently employs, so there will be no disruption of operations. Various licenses and permits necessary to operate Seabrook Station will be amended to include NHYEC and to designate NHYEC

> as the sole licensee "technically qualified" to operate Seabrook Station. Finally, each Joint Owner will be represented on the NHYEC Board of Governors by a representative having a vote weighted in proportion to its ownership share and, when the restructuring is fully implemented, each will own shares of NHYEC stock in the same proportion.

The proposed restructuring would be accomplished by the following specific actions: (1) Shareholder Agreement; (2) Managing Agent Operating Agreement; (3) Amendment of the Joint Ownership Agreement; (4) Issuance and purchase of stock in NHYEC; and (5) Split of Public Service's employee pension plan and transfer of funds to an NHYEC employee pension fund. However, the Notice of Intention covered only items 1 through 4 set forth above. It is contemplated that a subsequent notice and proposal would address the split of the employee pension plan and fund.

## THE RECORD BEFORE THE COURT

No evidence was proffered by the debtor or any other party at the hearing held by this court on August 26, 1988 upon the proposed restructuring. The entire evidentiary record in support of the restructuring is contained in a declaration of Robert J. Harrison, president and chief executive officer of PSNH, which was filed in conjunction with the Notice of Intention on July 21, 1988. After a number of paragraphs summarizing the terms and details of the proposed restructuring, the declaration contains the following recitation of the benefits of the proposal to "both Public Service and the Seabrook project as a whole" as follows:

9.1. Instability in the willingness or ability of Public Service and other Joint Owners to meet their financial responsibilities to the Seabrook project jeopardizes the confidence and morale of the existing staff at Seabrook Station. The existence of NHYEC as the longterm operator of Seabrook Station will likely improve that confidence and morale, retaining the loyalty of the existing personnel and attracting new employees as necessary.

9.2. The existence of NHYEC as a separate corporate entity will permit continuity of the direct management of the Seabrook project, independent of changes in

ownership of Seabrook or in the status of individual owners. Such continuity is important to perceptions of continued management dependability and prudence.

9.3. The existence of NHYEC as a corporate entity devoted solely to Seabrook Station will permit the Joint Owners to isolate in NHYEC all activities directed **\*577** to that and, thus segregating them from other utility business activities of the Joint Owners.

9.4. Because NHYEC will be owned *pro rata* by the Joint Owners, and because the Joint Owners will have a direct voice proportionate to their ownership shares through representation on the NHYEC Board of Governors, the Joint Owners will share certain Seabrook responsibilities to a greater degree than under the present structure.

The declaration of Mr. Harrison goes on further to summarize and conclude as to the "particular benefit to Public Service, as distinct from the other Joint Owners" as follows:

10.1. The assumption of Seabrook management responsibilities by NHYEC would relieve Public Service and its Division of the primary ultimate responsibility for the safe operation of Seabrook Station and the implementation of its quality assurance programs. Assumption of these responsibilities by NHYEC, the personnel of which now perform such operation and implementation, would place Public Service in a position on par with the other Joint Owners by making it responsible for operations in proportion to its ownership share.

10.2. Employment by NHYEC of the personnel currently employed through the Division would reduce Public Service's personnel record keeping responsibilities, remove the pension and benefit obligations associated with those employees, and reduce future risk of employment-related claims.

10.3. The Seabrook restructuring would permit Public Service greater flexibility in devising and implementing reorganization proposals. The NRC Licenses currently contain certain unique obligations and responsibilities relating to Seabrook management which attach only to Public Service. These are in addition to Public Service's *pro rata* obligations as a Joint Owner of Seabrook Station. Any change in the NRC Licenses requires specific NRC authorization, which could be time consuming if contested. Any reorganization proposal which might contemplate a transfer of Public Service's license obligations or responsibilities could be delayed while such authorization

was contested. Therefore, it would be advantageous to Public Service and all parties interested in the pending Chapter 11 proceeding to separate and expedite regulatory proceedings relating to the transfer of Seabrook management responsibilities so as to remove that issue from future consideration of potential future reorganization proposals.

Under the special motion and notice procedural orders entered in this proceeding, any objections to the notice of intention filed July 21, 1988 were required to be filed on or before August 5, 1988. An objection was filed by the Attorney General for the Commonwealth of Massachusetts. Objection was also filed by three citizen groups, i.e., the Campaign For Ratepayers Rights, The Seacoast Antipollution League, and the Citizens Within The Ten Mile Radius, hereinafter referred to jointly as the "citizen groups" for convenience.

A response constituting a "non-objection" of sorts was filed by Consolidated Utilities And Communications, Inc. ("CUC") and Citicorp, holders of third mortgage debenture bonds who have been active in these proceedings. This response notes that CUC and Citicorp do not object to the Notice of Intention but recites further immediately after that statement:

Based upon various representations of PSNH and its professionals, it is the understanding of CUC and Citicorp that the creation by PSNH and others of NHYEC:

(1) will not affect in any way the jurisdiction of this Court over PSNH's Seabrook-related assets; and

(2) will not affect in any way the necessity on the part of PSNH to receive this Court's approval prior to operating Seabrook pursuant to a low power operating license granted by the Nuclear Regulatory Commission.

Based upon the above-mentioned representations and understanding, CUC and **\*578** Citicorp do not object to the creation by PSNH and others of NHYEC.

Responses to the Notice of Intention supporting the proposed restructuring were filed by the Official Unsecured Creditors' Committee; by the Official Equity Holders' Committee; by the State of New Hampshire, and by a group of utilities constituting owners of approximately fifty percent of the Seabrook nuclear project commonly referred to as the "Fifty–Percent Joint Owners" group in these proceedings.

The objection by the Commonwealth of Massachusetts notes that whereas the State of New Hampshire in 1984 and 1985 approved the purchase of stock in NHYEC by PSNH, [2] the Commonwealth of Massachusetts has never granted that authorization, and in fact requests have been pending before the Massachusetts Department Of Public Utilities since 1984 regarding the five Massachusetts utilities involved as joint owners of the Seabrook project. However, the terms of the proposed restructuring before this court specifically obviate the need for the Massachusetts utilities to purchase NHYEC stock, in that the other joint owners have agreed to give the Massachusetts utilities pro rata representation on the board of governors of NHYEC based on their ownership interest in the Seabrook project notwithstanding their interim non-stockholder status with regard to NHYEC.

The Commonwealth objects further that the restructuring proposed by the debtor, in advance of a complete reorganization plan, should be disapproved on the grounds that it is premature:

> The proposal seeks to reorganize one division of PSNH and place it permanently and irrevocably in another corporate entity. It appears to be a piecemeal reorganization of PSNH submitted in advance of the complete reorganization plan. The consideration to PSNH for the assets to be transferred is unclear, as is the impact on pre- and post-petition creditors of the New Hampshire Yankee Division. PSNH was recently given an extension of the time to submit a complete reorganization plan until December 27, 1988. The present proposal by PSNH could be evaluated more usefully by all parties and the court in the context of the complete forthcoming reorganization plan being prepared by the company.

The Commonwealth also argued that the record put forth by the debtor to support the proposal was insufficient:

> The grounds advanced for the proposal are largely speculative and conjectural. There is little record support for assertions that the

PSNH proposal provides the claimed benefits. For example, indications that this proposal "might enhance" certain aspects of the licensing proceedings or "might realize" cost benefits provide little detail for the court or parties in evaluating the proposal. Beyond broad assertions, the proposal and affidavit filed by the Debtor provide little information or support as to the need for this reconstitution at this time.

The three citizen groups objected primarily out of a concern that the proposed restructuring would result in a loss of bankruptcy court jurisdiction to prevent low-power testing of the Seabrook plant, in advance of a determination that it is likely that PSNH's reorganization plan will provide, and can guarantee, the ultimate full operation of Seabrook and production of electric power from the plant on a commercial basis. The citizen groups note some interrelated economic questions and Nuclear Regulatory Commission procedures that could result very shortly in presenting the question of whether low-power operation of Seabrook should be authorized:

> The NRC.... has a rule permitting low power operation of nuclear plans up to 5 percent of rated power, even though radiological emergency plans for a ten-mile area around the reactors, required **579** for a full power operation, have not been yet reviewed or approved. (10 CFR 50.47(d)) It is pursuant to this regulation that the Shoreham nuclear plant, on Long Island in New York, was permitted to commence low power operation in July of 1985, although it now seems unlikely that this plant will ever produce commercial power.

The citizen groups point to the record of prior proceedings in this case indicating that radioactive contamination of the Seabrook plant, by introduction of nuclear fuel and low-power testing, followed by an ultimate decision not to put Seabrook into commercial operation, would convert the plant from an asset, having a positive salvage value, to a substantial liability, due to the high costs of decontamination and disposal of radioactive materials. One indication in that

record is that the "swing" in value could be as high as $138 million dollars. [2a] They also argue that contamination of the plant would preclude—due to the costs involved—the option of converting the plant to non-nuclear fuel operation.

The court heard several hours of oral argument from all parties present at the August 26, 1988 hearing on the debtor's proposed action, and took the matter under advisement to better review the record in this matter. Having reviewed that record, it is now necessary to consider the status of the parties objecting, the appropriate legal standard for the court's decision on such a matter, and the result to be obtained by applying that standard to these facts.

### THE STATUS OF THE OBJECTORS

The debtor and the official committees have objected to the "standing" of the Commonwealth and the citizen groups to object to the intended action. While this objection was made in the pleadings, no party at the August 26th hearing orally objected to the Commonwealth and the citizen groups being "heard" by the court. I have previously noted that "standing" has to do with the right to appeal an order in a reorganization proceeding—a far different matter than the question of status to be heard during the course of a hearing *in the reorganization court* as an entity having an arguable interest in a particular matter before the court under § 1109 of the Bankruptcy Code. See *In re PSNH*, 88 B.R. 546, 557 (Bankr.N.H.1988).

The reorganization court I believe has sufficient discretion to "hear" any entity at any hearing to the extent that the entity may be able to provide an aid to the court in understanding the matter before it. [3] Accordingly, whatever an appellate court might decide as to "standing" for appeal purposes, this court sees no reason not to glean from the objections of the Commonwealth and the citizen groups such help as it may find in evaluating the matter for decision, inasmuch as said objectors did not attempt to delay or overburden these proceedings with extensive presentations not germane to the issue before court.

The court is aware that the Commonwealth and the citizen groups are committed to blocking the operation of the Seabrook nuclear plant for various noneconomic reasons relating to asserted environmental and safety dangers posed by the operation of the plant. The debtor and the committees argue credibly that these objectors may be expected to oppose any decision in this reorganization case which has the prospect of advancing the day upon which Seabrook may become operational. [4]

**\*580** Nonetheless, the objectors do raise, regardless of motives, a considerable "economic" question posed by the intended action of the debtor, i.e., will this action if approved lead to the possibility of a diminution in the value of the assets of this estate by *an unwise and premature* activation of the nuclear chain reaction at the Seabrook plant which will be beyond any effective control which this court arguably now may have under its present jurisdiction in these reorganization proceedings? It is also relevant that at least one "economic" party in these proceedings, i.e., CUC and Citicorp, have echoed the same concern in their responsive pleading set forth above.

Accordingly, I find and conclude that the Commonwealth and the citizen groups have raised a pertinent question for consideration by the court on this matter and are not precluded from being "heard" in that sense. In so doing I have no need to express any opinion as to their general standing, if any, to appeal any orders entered by this court during the course of these reorganization proceedings. That is a matter appropriately left to the appellate courts.

### THE LEGAL STANDARD

The debtor seeks to portray the matter before the court as simply a matter of "business judgment" on a "business operational matter" as to which the court should give its approval simply upon a surface showing of a "good faith business judgment" on the part of the debtor in making the decision to put forth the proposed restructuring. The debtor cites in this regard the decision in *In re Curlew Valley Associates,* 14 B.R. 506 (Bankr.D.Utah 1981). The court there actually expressed its standard in terms of a business operational matter that "involves a business judgment *made in good faith, upon a reasonable basis,* and within the scope of his [chapter 11 trustee's] authority under the Code." 14 B.R. at 513–514 (footnotes omitted) (emphasis added). It *is* fair to state that the court in *Curlew* did exhibit considerable deference to the business judgment of the chapter 11 trustee as to the particular manner of his operation of the debtor's farm business in that case—to the extent of refusing to even *hear* the evidence proffered by the debtor who sought injunctive relief against the methods employed in the trustee's operation as being economically unwise. 14 B.R. at 508.

What needs to be noted about the *Curlew* decision in the present context, however, is that it was a case that clearly involved an activity that was an "*ordinary course*" matter involved in the business operation, i.e., whether the trustee in operating the debtor's farm should "bale" hay rather than "cube" the same. [5] The present case before this court on the contrary involves a proposed restructuring of the debtor which clearly *is* out of the ordinary course of the debtor's activity for reorganization purposes. Accordingly, I refuse to accept the debtor's invitation to accept the *Curlew* decision as persuasive on the present matter. [6]

 **\*581** In my judgment the labeling of a particular proposed transaction occurring out of the ordinary course of a reorganization debtor's business, as simply a "business judgment" by the debtor, does not insulate the proposed transaction from a more searching view as to its wisdom and reasonableness than was given the hay-harvesting transaction in the *Curlew* case which occurred in the *ordinary* course of the business operation there involved.

I note that the Court of Appeals for the Fifth Circuit, in *Richmond Leasing Company v. Capital Bank, N.A.,* 762 F.2d 1303; 49 B.R. (222) (5th Cir.1985), while citing the *Curlew* case on the § 365 point, in affirming an order approving an assumption of a lease proposed by a debtor in reorganization, expressed the appropriate standard in terms of a "valid exercise of.... business judgment" [762 F.2d at 1308] and summarized the extensive testimony taken by the court below with regard to the economic factors involved which indicated an enhancement of the debtor's estate. 762 F.2d at 1309. [7]

Moreover, while the court in *Richmond Leasing* also considered the business judgment standard to apply even in the context of §§ 1107 and 1108—to the extent that the assumption of the lease there involved might be argued to represent "a true renegotiation" of the lease, the court in that context found it necessary to go further and consider whether the amended lease might be deemed to be a "Sub Rosa Plan Of Reorganization" before that attack upon the proposed action was also considered to be insufficient. 762 F.2d at 1311–1312. *See also, In re Lionel Corporation,* 722 F.2d 1063, 1071 (2nd Cir.1983) (proposed sale transaction subject to "sound business judgment" standard which requires a showing of "a good business reason" other than appeasement of major creditors).

 **[1]** Considering the particular business transaction here involved, i.e., a restructuring of the very entity in reorganization, I believe that an appropriate standard for approval or disapproval of the transaction by the reorganization court is whether good cause has been shown to implement the transaction of this stage of this proceeding i.e., does it have valid business reasons supporting it and does it make good sense in the overall context of the reorganization process? Phrased negatively, the standard might be whether the proposed transaction might improperly and indirectly lock the estate into any particular plan mode prematurely, and without the protection afforded by the procedures surrounding a disclosure statement and confirmation hearing, in a plan of reorganization. **\*582** [7a]

In my view it is simplistic to borrow from relatively simple assumption-rejection cases (or a hay-harvesting case) a broad, unitary surface standard to be applied to the continuum of transactions that can be encompassed under the rubric of an "out-of-the-ordinary course" business transaction in a complex reorganization case. The degree of scrutiny necessarily must be elastic—becoming more strict and searching the nearer the transaction gets to the heart of the reorganization plan process in terms of channeling that process toward any particular plan option.

### THE PROPOSED TRANSACTION

 **[2]** Without approval of the intended action pending before the court the debtor PSNH will remain the "technically qualified" utility entitled to operate the Seabrook nuclear plant when fully-authorized to do so by the NRC. PSNH would operate Seabrook itself, acting by one of its corporate divisions, and acting on behalf of itself and the other joint owners of this Seabrook project.

Under the proposed transaction the entity directly responsible for Seabrook operation would become a separate corporation not a debtor in these reorganization proceedings. The change in operational responsibilities would require NRC approval of the transfer of PSNH's license obligations and responsibilities to that extent to the new separate corporate entity. It would also require that the NHYEC entity also be determined to be a "technically qualified" party to operate the Seabrook project. If that approval is given, and NHYEC becomes the direct operator in control of the Seabrook nuclear plant, the question of its putting the plant into the low-power testing mode when authorized by NRC arguably would not need to be brought

to this court for approval, with regard to the timing and the effect of any such action upon the ongoing process of plan formulation.

It is not necessary for this court at this time to determine whether such a transfer of operational responsibilities for the Seabrook project would defeat subject-matter jurisdiction of this court, for injunctive relief to prevent low-power testing operation, if such injunctive relief were determined to be appropriate on the facts and circumstances then existing. It also unnecessary for the court to determine whether in fact it has any such jurisdiction now. It is sufficient to note that the transfer of operational control to a separate non-debtor corporate entity raises an *additional* question as to the existence of that subject-matter jurisdiction.[8]

Since the debtor has been given an extension until December 27, 1988 of its exclusive period to file a plan of reorganization in this case, by my order of June 22, 1988, the "business judgment" of the debtor in advancing the NHYEC proposal at this time raises the obvious question as to what urgency there is to bring this matter before the court other than in conjunction with its plan of reorganization. If the matter is considered in the plan context then all ramifications of the transaction in terms of reorganization prospects could be evaluated in that specific context.

The debtor points to various improvements in morale of the employees dealing **\*583** with the Seabrook operation, from being part of a separate entity, and the relieving of the debtor from some costs and over-involvement in Seabrook operations as opposed to the other joint owners, as benefits from the proposed transaction. The debtor notes that "The joint owners will share under certain Seabrook responsibilities to a greater degree than under the present structure." However, the debtor and the other joint owners have operated under the present structure since 1984, with no apparent problems, and there is nothing to indicate that a plan of reorganization could not be put forward even if the operation of Seabrook plant continues to be the direct responsibility of a corporate division of PSNH. It is difficult for this court to believe that the improvements in morale adverted to, and the savings of some undefined, unquantified costs to this debtor between now and December, are of sufficient importance to justify approval of this transaction prior to the filing of the reorganization plan, if that were sole ground in support of the transaction.

The debtor adds however, that a particular benefit to PSNH itself would include, as quoted above, the rather cryptic comment by Mr. Harrison in his declaration to the effect that:

> Any change in the NRC Licenses requires specific NRC authorization, which could be time consuming if contested. Any reorganization proposal which might contemplate a transfer of Public Service's license obligations or responsibilities could be delayed while such authorization was contested. Therefore, it would be advantageous to Public Service and all parties interested in the pending Chapter 11 proceeding to separate and expedite regulatory proceedings relating to the transfer of Seabrook management responsibilities so as to remove that issue from future consideration of potential future reorganization proposals.

Mr. Harrison was not called to testify at the hearing on August 26, 1988. The debtor's motion and memorandum with regard to this point sheds no further illumination upon this point and simply parrots the recitation by Mr. Harrison. Debtor's counsel did make it clear during the course of the hearing that they do not agree with any implication from the CUC/Citicorp statements that they concede that the question of initiating low-power testing at the Seabrook plant is a question which would have to be brought before this court if the NHYEC transaction were to go into effect.[9]

The court is left with the conviction that it was not presented the "whole story" with regard to the underlying reasons and anticipated effects of the proposed transaction at the August 26, 1988 hearing. It would appear that the debtor and its counsel were operating under an assumption that this court would mechanically apply the surface-judgment approach employed in the *Curlew* decision. For the reasons stated above, however, I decline to use that approach to a matter of this importance in the context of this reorganization case. It may well be that the debtor for good and sufficient tactical reasons does not wish to telegraph at this stage its game plan with regard to a plan of reorganization. However that may be, the result is to leave this court in the quandary of trying to evaluate the proposed transaction without a full picture of its effects and ramifications.[10]

## *584 CONCLUSION

It is a daunting task for any reorganization court to rule contra to a proposed action that is supported by all the major economic and regulatory interests directly involved in this case. [11] Upon a better evidentiary record this court might well have been in a position to approve the intended action. However, on the present record I do not believe that the court has a sufficient basis and showing of good cause to approve the intended action at this stage of this case, in light of the substantial question as to possible loss of jurisdiction with regard to the low-power testing matter discussed above. Debtor's counsel was given the opportunity by the court during the hearing to explain and amplify how denial of this approval might delay or impair the flexibility of the debtor in plan formulation. Counsel declined to take up that invitation. Accordingly, I can only go upon the recitations made in the Harrison declaration and, as indicated, I find them insufficient on balance to justify approval of the proposed transaction. In reaching this conclusion I express no opinion as to the merits of any potential future controversy as to low-power testing or any related matter.

A word should be added as to the "understanding" between CUC/Citicorp and the debtor, to the effect that the debtor would not seek to use the approval of this transaction in any further hearing in which jurisdiction of this court to prevent implementation of low-power testing might be raised. While that understanding might give some comfort to CUC/Citicorp, and perhaps to the committees, it does not give any relevant comfort to this court as to preserving the existing jurisdictional situation. It is elementary that federal courts, being courts of limited jurisdiction, may have their subject-matter jurisdiction challenged at any stage of the proceedings by any party, and by the court itself when the issue is apparent. *See* 20 Am.Jur.2d COURTS § 95 (1965), *citing Gainesville v. Brown–Crummer Invest. Co.,* 277 U.S. 54, 48 S.Ct. 454, 72 L.Ed. 781 (1928), *Panhandle Eastern Pipe Line Co. v. Federal Power Com.,* 324 U.S. 635, 65 S.Ct. 821, 89 L.Ed. 1241 (1945), *Grubb v. Ohio Public Utilities Com.,* 281 U.S. 470, 50 S.Ct. 374, 74 L.Ed. 972 (1930). Parties to proceedings in the federal court cannot "stipulate jurisdiction" if in fact there is no subject-matter jurisdiction in the federal court as to a particular matter. Accordingly, while tempting, I do not believe that an attempt to "preserve jurisdiction" by some such understanding, or even a provision in this court's order approving the transaction, would be effectual.

A separate order in accordance with this opinion will be entered denying approval of the intended action under the debtor's Notice of Intention filed July 21, 1988.

Footnotes

1   The debtor in this reorganization proceeding, PSNH, holds a 36.57 percent share of the plant under the joint ownership agreement.

2   *See Re New Hampshire Yankee Electric Corporation,* 69 N.H.P.U.C. 590 (1984) (ordering *inter alia* that NHYEC is authorized to engage in business as a public utility solely for the purpose of managing the construction of Seabrook); *Re New Hampshire Yankee Electric Corporation,* 70 N.H.P.U.C. 563 (1985) (ordering *inter alia* that NHYEC's authority be enlarged to include the purpose of managing the operation of Seabrook.

2a   The court does not accept that prior record as establishing the exact costs of decontamination and a subsequent cleanup for present purposes. There is no serious question however that such costs are very substantial.

3   As noted at the hearing this court will look for the truth wherever it can find it. "Even the devil may speak truth"—as someone once said.

4   Indeed, the objection by the citizen groups by implication indicates as much:

"We recognize that the Court has indicated that it does not want to make Seabrook licensing decisions on matters pertaining to public health and safety and hence might conclude this is not a matter within its area of concern. (See Memorandum Opinion on Plan Exclusivity Extension, page 38) *However, the issues of public health and safety at Seabrook are inextricably bound up with the financial and valuation issues that this Court must decide.* The interrelationship of health and safety issues, and the necessity for the Court's continuing jurisdiction over New Hampshire Yankee, may shortly come up in a very specific context: whether or not low power operation of Seabrook should be authorized." [Emphasis supplied]

The highlighted statement is erroneous to the extent that it implies that it would be relevant for this court to consider public health and the safety issues as factors in the financial reorganization determinations necessary in this chapter 11 proceeding, other than to assure that the reorganized debtor is able to meet health and safety operational requirements prescribed by the appropriate public agencies. Cf. *In re PSNH,* 88 B.R. 558, 562 fn. (Bankr.N.H.1988). Likewise, the province of the NRC in my judgment is to determine

whether those requirements are presently satisfied or—if not—what additional assurances will be required of PSNH or any other party involved in the reorganization plan. It obviously is not a permitted function of the NRC to deny approvals simply because PSNH is in reorganization. See, *Bankruptcy Code, § 525* (11 U.S.C. § 525).

5  The opinion in *Curlew* makes it clear that the court did not consider it necessary to its analysis that the business practice in question might be considered out of the ordinary course of the debtor's business. 14 B.R. at 514, n. 13.

6  It may be noted that prior to the *Curlew* decision the "business judgment" standard for decisions by a bankruptcy court was applied almost exclusively in terms of a debtor's decision to accept or reject an executory contract under what is now § 365 of the Bankruptcy Code. As with so many other interesting twists and developments of legal doctrine, the deference to business judgment or discretion stemmed from the decision of the U.S. Supreme Court in A *Group Of Institutional Investors v. Milwaukee Railway Co.,* 318 U.S. 523, 550–551, 63 S.Ct. 727, 742–743, 87 L.Ed. 959 (1943), in which the "party" to whose discretion deference was given, on a lease assumption/rejection issue, was the Interstate Commerce Commission, as an administrative agency given special powers with regard to railroad reorganizations under § 77 of the Bankruptcy Act of 1898. It is also noted that the cases cited by the debtor as following the *Curlew* decision for present purposes, *In re Airlift Intern., Inc.,* 18 B.R. 787 (Bankr.S.D.Fla.1982); *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.,* 756 F.2d 1043, 1047 (4th Cir.1985), *cert. denied,* 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592; *In re Afco Enterprises, Inc.,* 35 B.R. 512 (Bankr.D.Utah 1983), actually did not involve the §§ 1107–1108 context, but rather the narrower question of lease assumption/rejections, in the first two cases cited, and a narrow question of surcharge against a secured creditor under § 506(c) of the Code, in the third case. None of these decisions, other than the *Curlew* case, stand for the broad proposition that a proposed action by the debtor *out of the ordinary course* of its normal business operations must be approved by a bankruptcy court simply upon a surface showing of business judgment, notwithstanding an arguably unwise impact upon the reorganization process in the particular case.

7  The court in *Richmond Leasing* also noted, in footnote 11, that it saw no essential difference between its "valid" or "proper" standard and the "economic soundness" standard employed in *Matter of Southern Biotech, Inc.,* 37 B.R. 318 (Bankr.M.D.Fla.1983).

7a  I cannot believe that when Congress removed the court and a mandatory disinterested trustee from the plan formulation process in reorganization cases, in the 1978 Bankruptcy Code, with the more extensive disclosure statement requirements under § 1125 as a necessary substitute for the former supervisory protections, Congress could have intended that this remaining safeguard could easily be avoided by indirection and use of the "business operation" and "business judgment" labels.

8  There is an unresolved question in these proceedings regarding the power of the majority of the joint owners of the Seabrook project to direct actions with regard to the project contrary to the wishes of PSNH without first securing approval of this court for such action. It would be highly inappropriate to unnecessarily precipitate a decision on that question before and if it is necessary to do so in these reorganization proceedings. That is the whole point of the underlying rationale of chapter 11 to promote the prospects for a "consensual" plan of reorganization to eliminate needless and time consuming litigation contrary to the interests of all involved.

9  To be fair, the debtor's counsel also does not concede that that question necessarily has to be brought before this court in the existing situation.

10  The declaration of Mr. Harrison could be read as setting the stage for one of the plan options set forth by the debtor in its exclusivity motion, i.e., creating a separate entity that ultimately could be made a "wholesaler" subject only to FERC regulation rather than the present state-based regulatory control of consumer rates. Cf. *Mississippi Power & Light Co., v. Mississippi,* 487 U.S. 354, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988). The present transaction by itself would not lead to that result, since the actions by the New Hampshire Public Utility Commission in 1984 and 1985, cited above, specifically precludes the new corporate entity NHYEC from having authority to sell electricity. There was no request for that enlargement of authority in the applications then pending before the NHPUC. In its 1984 decision the PUC specifically noted that "New Hampshire Yankee would not be involved in the application for rates or the selling of power. New Hampshire Yankee would not sell Seabrook energy to PSNH on a wholesale basis." It could be that this possibility represents the real time urgency in submitting the proposed transaction to the court at this time, rather than the matter of low-power testing, which was the focus of discussion at the hearing, but the fact is that the court simply has no basis for evaluating the latter justification, if it exists, on the present record.

11  But Cf. *In re Lionel Corporation, supra,* at 1071.

End of Document    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 83

64 Collier Bankr.Cas.2d 1542, 53 Bankr.Ct.Dec. 270

439 B.R. 637
United States Bankruptcy Court,
W.D. Pennsylvania.

In re SHUBH HOTELS PITTSBURGH, LLC, Debtor.

No. 10–26337JAD.    |    Nov. 23, 2010.

**Synopsis**

**Background:** Chapter 11 debtor-hotel owner moved for authority to execute 15–year franchise agreement with operator of large hotel franchise, so as to re-flag hotel following termination of debtor's previous franchise. Secured lender objected.

**Holdings:** The Bankruptcy Court, Jeffery A. Deller, J., held that:

[1] proposed agreement was appropriate exercise of debtor's business judgment;

[2] approval of franchise agreement would not amount to prohibited sub rosa or de facto plan of reorganization; and

[3] assuming that transaction violated loan documents, lender was entitled only to adequate protection for transaction.

Motion granted.

West Headnotes (9)

[1]    **Bankruptcy**
        👉 Possession, Use, Sale, or Lease of Assets
        **Bankruptcy**
        👉 Order of court and proceedings therefor in general
        **Bankruptcy**
        👉 Lease

        When debtor seeking to use, sell, or lease estate property outside ordinary course of business establishes a prima facie case supporting contemplated transaction, an objector to the proposed transaction is required to produce some evidence supporting its objection; mere

argument or conclusory allegation is not enough. 11 U.S.C.A. § 363(b)(1).

Cases that cite this headnote

[2]    **Bankruptcy**
        👉 Possession, Use, Sale, or Lease of Assets
        **Bankruptcy**
        👉 Time for sale; emergency and sale outside course of business
        **Bankruptcy**
        👉 Lease

        In reviewing debtor's exercise of its business judgment, in deciding motion for authorization to use, sell, or lease estate property outside ordinary course of business, court looks at whether the proposed transaction (1) represents a business decision, (2) is made with disinterestedness, (3) is made with due care, (4) is made in good faith, and (5) does not constitute an abuse of discretion or waste of corporate assets. 11 U.S.C.A. § 363(b)(1).

Cases that cite this headnote

[3]    **Bankruptcy**
        👉 Possession, Use, Sale, or Lease of Assets

        Chapter 11 debtor-hotel owner's proposed 15-year franchise agreement with large hotel franchisor, which would result in re-flagging of debtor's hotel following termination of its previous franchise, was appropriate exercise of debtor's business judgment; transaction did not involve self-dealing with any insider of debtor, transaction was closely scrutinized by debtor's management, creditors committee, United States Trustee (UST), and court, transaction represented good-faith effort to re-flag debtor's hotel, and transaction was not abuse of discretion or waste of corporate assets, but would benefit estate and reorganization efforts. 11 U.S.C.A. § 363(b)(1).

Cases that cite this headnote

[4]    **Bankruptcy**
        👉 Possession, Use, Sale, or Lease of Assets

Court's approval of transaction in which Chapter 11 debtor-hotel owner sought to enter into 15-year franchise agreement with operator of large hotel franchise would not amount to prohibited sub rosa or de facto plan of reorganization, inasmuch as agreement did not articulate terms for plan of reorganization, agreement did not require secured lender or other creditor to vote in favor of any reorganization plan, terms of agreement did not dictate priority scheme or timing and amount of money to be paid to creditors, and adoption of franchise would not require lender or other entities to release their claims against debtor or its officers or directors. 11 U.S.C.A. § 363(b)(1).

Cases that cite this headnote

[5]     **Bankruptcy**
        👉 Possession, Use, Sale, or Lease of Assets

Where a transaction has the effect of dictating the terms of a prospective Chapter 11 plan, it will constitute a prohibited sub rosa plan.

1 Cases that cite this headnote

[6]     **Bankruptcy**
        👉 Possession, Use, Sale, or Lease of Assets

Transaction amounts to prohibited sub rosa Chapter 11 plan of reorganization if it (1) specifies the terms of any future reorganization plan, (2) restructures creditors' rights, and (3) requires that all parties release claims against the debtor, its officers and directors, and its secured creditors.

1 Cases that cite this headnote

[7]     **Bankruptcy**
        👉 Possession, Use, Sale, or Lease of Assets

That a transaction affects Chapter 11 debtor's reorganization does not automatically convert the contemplated transaction into prohibited sub rosa plan.

Cases that cite this headnote

[8]     **Bankruptcy**

👉 Adequate protection in general

Assuming that Chapter 11 debtor-hotel owner's entry into proposed franchise agreement with large hotel franchisor violated secured lender's loan documents, lender was entitled only to adequate protection for transaction. 11 U.S.C.A. § 363(b)(1), (e).

Cases that cite this headnote

[9]     **Bankruptcy**
        👉 Adequate protection in general

Secured lender was adequately protected with respect to Chapter 11 debtor's proposed franchise agreement with operator of large hotel franchise by equity cushion that existed in value of debtor's hotel and by debtor's willingness to make periodic interest payments to lender. 11 U.S.C.A. § 363(b)(1), (e).

Cases that cite this headnote

**Attorneys and Law Firms**

**\*639** David K. Rudov, Rudov & Stein, Scott M. Hare, Pittsburgh, PA, for Debtor.

Joseph M. Fornari Jr., Norma Hildenbrand, Pittsburgh, PA, for U.S. Trustee.

Christopher A. Boyer, David W. Lampl, John M. Steiner, Leech Tishman Fuscaldo & Lampl, LLC, Pittsburgh, PA, for Creditor Committee.

**Opinion**

*MEMORANDUM OPINION* [1]

JEFFERY A. DELLER, Bankruptcy Judge.

The matter before the Court is Shubh Hotels Pittsburgh, LLC's motion to execute a Franchise Agreement with Wyndham Hotels and Resorts, LLC. This matter is a core proceeding over which this Court has jurisdiction pursuant to 28 U.S.C. §§ 157(b)(2)(M), 157(b)(2)(O), and 1334(b).

Shubh Hotels Pittsburgh, LLC (the "Debtor") is the current owner of a 713 room hotel located at or near Pittsburgh's

64 Collier Bankr.Cas.2d 1542, 53 Bankr.Ct.Dec. 270

Point State Park. The Debtor acquired the hotel, which is Pittsburgh's largest and arguably most recognizable given its location, in 2006. The hotel had operated as Hilton Hotel since the time of its construction in 1959 until September of 2010 when the Hilton company terminated the Debtor's franchise. Since the termination of the Hilton flag, the Debtor has operated the hotel as an independent hotel with no prominent flag.

By the motion, the Debtor wants to enter into a fifteen year franchise agreement with Wyndham Hotels and Resorts, LLC. By this non-ordinary course transaction, the Debtor will re-flag the hotel as a "Wyndham Grand," which is a quality full service hotel brand sponsored by Wyndham.

 [1]  Section 363(b)(1) of the United States Bankruptcy Code provides that a debtor "may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts have held that in determining whether to authorize a debtor's use, sale or lease of property of the estate under Section 363(b)(1), the debtor-in-possession is required to show that a sound business purpose justifies the debtor's contemplated actions. In re Montgomery Ward Holding Corp., 242 B.R. 142, 147 (D.Del.1999); see also In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir.1983); In re Continental Air Lines, Inc., 780 F.2d 1223, 1226 (5th Cir.1986); and *640 In re Titusville Country Club, 128 B.R. 396, 399 (Bankr.W.D.Pa.1991). Courts have also held that a court should accept a debtor's business judgment, unless there is evidence of bad faith. In re: Grand Prix Associates, Inc., No. 09–16545DHS, 2009 WL 1850966, *5 (Bankr.D.N.J. June 26, 2009) (citing In re Sycom Enterprises, L.P., 310 B.R. 669, 675 (Bankr.D.N.J.2004), In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr.D.Mass.2001) and In re Logical Software, Inc., 66 B.R. 683, 686 (Bankr.D.Mass.1986)). Of course, when the debtor establishes a prima facie case supporting its contemplated transaction, an objector to the proposed transaction is also required to produce some evidence supporting its objection as mere argument or conclusory allegation is not enough. See Lionel, supra, at 1071.

The Wyndham transaction proposed by the Debtor is supported by the Official Committee of Unsecured Creditors. The Debtor's secured lender, Carbon Capital Real Estate II CDO–2005–1 Ltd. through its servicer Black Rock Financial Management, Inc. (collectively, the "Lender") has objected to the proposed franchise transaction. A fair reading of the Lender's objection is that the secured creditor contends that the Wyndham transaction has been proposed by the Debtor in bad faith and as a litigation tactic to stall the Lender's foreclosure efforts. The Lender also complains that the Wyndham franchise should not be approved because the Lender (pursuant to its loan documents with the Debtor) has some sort of veto power over the re-flagging of the hotel. The Lender also contends that the hotel is better off as a Hilton franchise, as opposed to being re-flagged as a Wyndham Grand.

The record reflects that Dr. Kiran Patel directly or indirectly owns and controls the Debtor. While the documentation formally turning over control of the Debtor to Dr. Patel provides that he acquired his interest after the filing of this bankruptcy for little or no consideration, the record reflects that Dr. Patel had a fair amount of involvement with the Debtor in the year or so leading up to the Debtor's bankruptcy filing. In terms of bad faith, the Lender contends that the franchise motion is part of a scheme by Dr. Patel and his associates (including Mr. Jai Lalwani and Mr. Lalwani's companies known as Black Diamond Hospitality, Black Diamond Super Group and Fuel Group) to "kill" the Lender's interests.

The Court has previously noted that the Debtor's transactions with Dr. Patel and his affiliates "raise some eyebrows." The evidence introduced throughout these proceedings reflects that Dr. Patel and his associates appeared to control hotel operations prior to the Debtor's bankruptcy filing and thereafter as "one team." From time to time, Dr. Patel and his associates diverted hotel revenues away from the hotel (and the Lender's security interest) for their own benefit all the while trade vendors of the hotel remained unpaid. The diversion of funds also occurred all the while major construction and renovation projects remained uncompleted and protracted at the hotel (which, in turn, was one of the reasons why Hilton terminated the Debtor's flag). The record also includes evidence of the fact that hotel revenues were improperly diverted to other Patel/Lalwani projects in other parts of the country.

Dr. Patel, however, defended these transactions by claiming that he has been duped by Mr. Lalwani. But, the record reflects that Dr. Patel has not immediately disassociated himself from Mr. Lalwani. In fact, the record reflects that Mr. Lalwani was permitted to continue to interject himself into the Debtor's affairs post-petition as the hotel sought out a new flag. In addition, the record reflects that immediately after the bankruptcy filing, the Debtor *641 remitted unauthorized post-petition payments to or for the benefit of Mr. Lalwani

or his companies. The Debtor also remitted funds to Mr. Lalwani's "legal quarterback," Jonathan Kamin, Esq. [2]

All of the questionable transactions provided the Court with ample cause pursuant to 11 U.S.C. § 1104 to both appoint an examiner in this case to monitor the Debtor's receipts and disbursements and to terminate the Debtor's exclusive period to propose a plan of reorganization pursuant to 11 U.S.C. § 1121. Indeed, this Court did so by way of bench order on November 4, 2010, which was later memorialized by way of written Order dated November 8, 2010. But for the fact that this case has a very active Official Committee of Unsecured Creditors that is represented by competent legal counsel, [3] the Court may have appointed a trustee. Instead, the Court elected to exercise its discretion and defer inserting a trustee at this time. Notwithstanding the short shrift given in the pleadings filed by the Debtor and Dr. Patel with respect to the questionable transactions, the Court cautions such parties that if any more shenanigans occur, the Court will appoint a trustee.

Now, does all of this background mean that the Wyndham transaction is a bad faith litigation tactic? The Court concludes that it is not.

The fact is Hilton terminated the Debtor's flag, which in-turn resulted in this bankruptcy case. By summarizing the events this way, the Court is not suggesting that Hilton's termination of the Debtor's franchise was wrong. That decision (either positively or negatively) is potentially left for another day. The record nonetheless, reflects that the Debtor, its officers and its agents have a significant amount of responsibility for the Debtor's state of affairs. No matter what has occurred, the undisputed record is that this hotel needs a new flag.

In determining whether the Debtor has exercised its sound business judgment in proposing the Wyndham franchise, the question is not whether the Court would rather have the hotel be a Hilton (or some other hotel franchise for that matter) or a Wyndham Grand. The question also is not whether the Court or any individual creditor (such as the Lender) would make a better business decision. Rather, the question is whether the Debtor, when it chose to enter into the Wyndham transaction, appropriately exercised *its* business judgment.

[2] [3] In reviewing the Debtor's exercise of its business judgment, the Court looks at whether the proposed transaction (1) represents a business decision, (2) is made with disinterestedness, (3) is made with due care, (4) is made

in good faith, and (5) does not constitute an abuse of discretion or waste of corporate assets. *See e.g. In re Adelphia Communications Corp.,* No. 02–41729REG, 2004 WL 1634538, *2 (Bankr.S.D.N.Y. June 22, 2004).* [4]

**\*642** It is undisputed that the transaction proposed with Wyndham is a business decision—so the first factor is met. As to the second factor—disinterestedness—this element is met because there is no evidence that the Wyndham transaction constitutes any self-dealing with any insider of the Debtor. The third criterion—due care—appears to be challenged by the Lender. In this regard, the Lender complains that the Wyndham transaction is moving along with "light speed." The Lender also complains regarding: (a) the due diligence, or lack thereof, conducted by Wyndham, and (b) the fact the Dr. Patel never met face-to-face with Wyndham executives.

With respect to the speed of the transaction, it has not been at light speed. The Motion was filed on September 20th— more than a month ago. In fact, the delay occasioned by the intervening litigation has caused this transaction to be closely scrutinized not only by the Debtor's management, but also by the Official Committee of Unsecured Creditors, the U.S. Trustee, and all of the professionals involved in this case. Of course, the Court has scrutinized the transaction closely as well. It therefore appears that this transaction has had more than a sufficient amount of, and time for, deliberation.

With respect to due diligence, Wyndham's due diligence is irrelevant as there is no dispute that the transaction is an arm's length transaction in which Wyndham has proceeded in good faith. To the extent Wyndham's due diligence is relevant, the Court would note that Jeff Wagoner—the President of Wyndham Hotels and Resorts—was present at much of the trial of this matter and counsel of Wyndham was present throughout. If Wyndham's eyes were not open at the outset of these proceedings, they surely are now. [5]

As to the Debtor's deliberations, it also is not material that Dr. Patel never met Mr. Wagoner personally. The record reflects the Dr. Patel's surrogates undertook due diligence on his behalf, and both Dr. Patel and the Debtor are represented by sophisticated counsel. In addition, the Court is not convinced that Dr. Patel never met with Wyndham executives, as both Mr. Wagoner and Dr. Patel spent several days together in this Court's courtroom.

With respect to the fourth criterion—good faith—this Court has already determined above that the Wyndham transaction

has not been proposed for an improper purpose. The transaction represents a good faith effort to re-flag the hotel.

As to the fifth criterion, this Court finds that the contemplated Wyndham transaction does not constitute an abuse of discretion or waste of corporate assets. Throughout the evidentiary hearing on this matter, the Debtor has highlighted the importance of re-flagging the hotel; that is, re-flagging is key to the Debtor recapturing of lost revenue and mitigating the concerns of existing reservation holders and employees regarding the long-term viability of the hotel. Specifically, the evidence shows that re-flagging the hotel as a Wyndham Grand will eliminate the continuing **\*643** harm to the Debtor and this bankruptcy estate resulting from continued operation of the hotel as an "independent" unbranded guest lodging facility. In this regard, the evidence of record indicates:

(i) The Debtor has been without a national reservation system and has been deprived of 21% to 25% of its historic revenue for almost three months. That circumstance has significantly harmed the Debtor. A representative of Wyndham testified that it is prepared to immediately provide the hotel with access to its national reservation system once the Wyndham Franchise Agreement is authorized. The Debtor's witnesses testified that participation in the Wyndham national reservation system will enhance revenue and profitability.

(ii) A significant percentage of hotel revenue is derived from conference/convention business; and brand affiliation and resources play a large role in attracting that business. The absence of a national flag and the present uncertainty surrounding the Debtor's desire to a become a Wyndham Grand places the Debtor at a disadvantage to compete for the 2011 conference/convention business. Wyndham's representative testified at trial about Wyndham's extensive contacts with some of the largest corporations and organizations in both this market and nationally and further testified that it would immediately provide the Debtor with assistance from Wyndham's group sales team with respect to conference/convention business.

(iii) Since the termination of its former franchise agreement, the Debtor has gone without significant marketing campaigns. The absence of marketing traditionally provided by its franchisor has harmed the Debtor's business. Wyndham's representative has testified as to Wyndham's commitment to implement a marketing campaign for the hotel once the Wyndham Franchise Agreement is authorized.

(iv) Additional improvements to the hotel are needed. The Wyndham Franchise Agreement contains a list of property improvements and provides for a loan of up to $1,000,000 by Wyndham to the Debtor which would fund the agreed upon improvements to the hotel. Wyndham's representatives have also represented that Wyndham is prepared to make the improvement loan immediately available to the hotel, pursuant to the terms of the Franchise Agreement and related agreements, once same are approved and effectuated.

(v) Since the termination by its former franchisor, the Debtor has operated without: (i) the support of famous trademarks or copyrights, (ii) access to customer loyalty or referral programs, or (iii) centralized franchisor support functions such as a proprietary property management system, promotional programs, management and personnel training and/or operational standards, procedures and techniques. The lack of these privileges, which have been traditionally enjoyed by the hotel through Hilton, have been and remain harmful to the Debtor's business. Wyndham has represented that it will provide all of these benefits to the hotel, as set forth in the Franchise Agreement, once the Wyndham Franchise Agreement is authorized.

(vi) The hotel is more valuable as a Wyndham Grand. The only appraisal and expert value testimony presented to the Court valued the hotel at $54 million as of September 7, 2010 and this appraisal further valued the hotel at $58 million as of December 31, 2010 *if* the property is franchised as a Wyndham Grand.

**\*644** (vii) The absence of a national flag and present uncertainty surrounding approval of the Debtor's business judgment to become a Wyndham Grand is jeopardizing existing business and causing instability in the marketplace. The Debtor contends that concern about the viability of events already planned (or to be planned) and the drop off in group sales which has occurred while the hotel has operated as an independent hotel, is largely attributable to the lack of affiliation with a quality national brand. The evidence submitted by the Debtor supports the conclusion that approval of the Wyndham Franchise Agreement would restore confidence, stabilize and improve this situation.

(viii) Many of the Debtor's employees have expressed concern over the lack of a quality flag for the hotel. Association with one of the largest franchisors in the world

would provide a level of comfort for over 300 employees of the Debtor and would help the Debtor retain key employees due to flag stability.

Based on the record before the Court, the preponderance of the evidence is that the Debtor's reorganization efforts and the estate are benefitted by the Debtor's election to enter into the Wyndham Franchise Agreement. The evidence and testimony presented throughout the evidentiary hearing on this matter demonstrates that Wyndham is "a reputable and experienced franchisor." Specifically, the Lender's expert admitted that Wyndham is not only "a reputable franchisor," but also that Wyndham has experience in flagging hotel properties in similar "size, scope, use and value" as the hotel property in question. [6] Based on this admission and the testimony presented by Wyndham and various experts before the Court, the Debtor's selection of Wyndham as a franchisor appears to be neither a waste of corporate assets nor an abuse of discretion. [7]

**[4]** This Court must also reject the Lender's allegation that approval of the Wyndham Franchise Agreement would amount to a *sub rosa* or *de facto* plan of reorganization.

**[5]** **[6]** Where a transaction has the effect of dictating the terms of a prospective chapter 11 plan, it will constitute a prohibited *sub rosa* plan. *See In re Capmark Fin. Group Inc.,* 438 B.R. 471, 513 (Bankr.D.Del.2010) (citing *Official Comm. of Unsecured Creditors of Tower Auto. v. Debtors & Debtors in Possession (In re Tower Auto. Inc.),* 241 F.R.D. 162, 168 (S.D.N.Y.2006)). As articulated by the United States Court of Appeals for the Fifth Circuit, a transaction would amount to such a *sub rosa* plan of reorganization if it: 1) specifies the terms of any future reorganization plan; 2) restructures creditors' rights; and 3) requires that all parties release claims against the Debtor, its officers and directors, and its secured creditors. *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. by & through Mabey (In re Cajun Elec. Power Coop.),* 119 F.3d 349, 354 (5th Cir.1997) (citing *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways,* **\*645** *Inc.),* 700 F.2d 935, 940 (5th Cir.1983)).

The contemplated Wyndham transaction does not appear to be a *sub rosa* plan. The Court reaches this conclusion because the Wyndham Franchise Agreement does not articulate terms for a plan of reorganization; nor does it require the Lender (or any other creditor) to vote in favor of any reorganization plan. Further, the terms of the Franchise Agreement do not

dictate the priority scheme or dictate the timing and amount of money to be paid to creditors. Finally, adoption of the franchise would not require the Lender or other entities to release their claims against the Debtor, or the Debtor's officers or directors.

**[7]** All that will be accomplished through the Wyndham transaction is the adoption of a franchise flag for the hotel. While it is true that this transaction affects the Debtor's reorganization, it is also true that many transactions are done in bankruptcy that affect a debtor's ability to reorganize. For example, as the Debtor correctly points out in its legal memoranda, prior to plan confirmation a debtor may change a marketing strategy, close unprofitable locations, open more desirable locations, reduce inventory, or enter into agreements with different vendors, franchisors or suppliers. The fact that a transaction affects a debtor's reorganization does not automatically convert the contemplated transaction into a *sub rosa* plan. [8] To hold otherwise would impede a debtor's ability to successfully reorganize, keep a bankrupt debtor in a constant state of limbo, and possibly negatively impact the going concern value of the bankruptcy estate. All of these consequences are exactly what the Bankruptcy Code is designed to avoid.

**[8]** **[9]** Lastly, the Lender complains that the Wyndham transaction violates the Lender's loan documents. This allegation may be true; however, bankruptcy causes certain provisions of a loan document to be suspended. This is one of those instances. All that Lender is entitled to here is adequate protection for the contemplated transaction. *See* 11 U.S.C. § 363(e). The evidence and testimony presented to date indicate that the Wyndham transaction does not harm the Lender's collateralized position. The record reflects that the Lender is owed approximately $50 million **\*646** on its pre-petition claim, [9] and the collateral is presently worth $54 million. [10] Furthermore, there is no evidence indicating that the collateral is declining in value and the evidence of record suggests that re-branding the hotel as a Wyndham Grand would result in an increase in the value of the hotel to $58 million. Under these circumstances, the Court finds that the Lender is more than adequately protected by the equity cushion and by the fact that the Debtor has been agreeable to making periodic interest payments to the Lender. [11] *See* Doc. # 13 *(Cash Collateral Motion)* para. 21(c).

**WHEREFORE,** for the reasons stated above, the Court shall approve the Debtor's request for authority to execute the

64 Collier Bankr.Cas.2d 1542, 53 Bankr.Ct.Dec. 270

proposed Franchise Agreement with Wyndham Hotels and Resorts, LLC.

### ORDER OF COURT

**AND NOW,** this **23rd** day of **November, 2010,** for the reasons expressed in the accompanying *Memorandum Opinion,* the court hereby **ORDERS, ADJUDGES** and **DECREES** as follows:

1. The Debtor's request for authority to execute the proposed Franchise Agreement with Wyndham Hotels and Resorts, LLC is **GRANTED.**

2. To the extent there is a concern that competing plans could be prejudiced by having the Wyndham Franchise Agreement approved (because a competing plan proponent may desire to subsequently reject the Franchise Agreement thereby giving rise to a large termination claim), it is hereby **ORDERED** that any debt or obligation due Wyndham arising out of, or relating to termination or rejection of the Franchise Agreement is subordinated. Specifically, any termination claim, debt or other obligation that could be asserted by Wyndham arising out of or relating to termination at or before plan confirmation in this bankruptcy case shall be subordinate to any and all allowed unsecured claims in this case (including any allowed unsecured claim that may be asserted by the "Lender" as such term is defined in the Memorandum Opinion). Any such termination charges, debts or other obligations that could be asserted by Wyndham as a result of such termination is also subordinate to any and all allowed priority claims and allowed administrative expenses, and that the termination charges or termination related debts or obligations that may become due to Wyndham (if any) will only be senior to both the interests of equity and creditor claims, if any, that are (under principles of equitable subordination) adjudicated to be subordinate by the Court.

**\*647** 3. Nothing in this Order or the Franchise Agreement should be deemed or construed to prevent a competing plan proponent from seeking the rejection and/or termination of the Wyndham Franchise Agreement at or before confirmation of a plan in this case.

4. To the extent any provisions of the Wyndham Franchise Agreement or related documents conflict with the terms of this Order, this Order shall control in all respects.

### Parallel Citations

64 Collier Bankr.Cas.2d 1542, 53 Bankr.Ct.Dec. 270

Footnotes

1    This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Bankr.P. 7052.

2    Attorney Kamin had entered his appearance in this bankruptcy case as "special counsel" for the Debtor. But, no formal application has ever been filed pursuant to 11 U.S.C. § 327. Nor has any affidavit of disinterestedness or disclosure of compensation been filed as required by 11 U.S.C. § 329 and Fed.R.Bankr.P. 2014, 2016 and 2017. The Court notes that the Office of the U.S. Trustee has been present at various hearings on this matter. The Court assumes that the Office of the U.S. Trustee, whose duties include monitoring a debtor's transactions with attorneys, is undertaking whatever investigation it deems appropriate with respect to the transactions that have come to light in these proceedings.

3    *See* 11 U.S.C. § 1103(c).

4    In the sale context, some courts examine (1) whether there is a sound business purpose for the sale; (2) whether the proposed sale price is fair; (3) whether the debtor has provided adequate and reasonable notice of the transaction; and (4) whether the buyer has acted in good faith. *See Lionel,* 722 F.2d at 1071. There is no dispute that notice of the proposed Wyndham transaction has been adequate. As to the remaining factors set forth in *Lionel,* they are subsumed in the five-part examination set forth above in the body of this Memorandum Opinion.

5    Mr. Wagoner also testified that Wyndham representatives visited the hotel, and as part of its due diligence inspected it, met with the hotel's manager, and obtained various financial information.

6    The evidence presented also included testimony to the effect that Wyndham has agreed to provide the Debtor with favorable pricing terms under its Franchise Agreement.

7    The Court is not suggesting or holding that the Lender has acted unreasonably, arbitrarily or capriciously in not approving Wyndham as a qualified franchisor. At trial, the Lender articulated a number of justifications as to why it preferred Hilton over Wyndham as

the franchisor of the Debtor's hotel. Notwithstanding these justifications, the fact remains it is the Debtor's business judgment, and not the Lender's business judgment, that is at issue.

**8**  The record reflects that the Debtor has a plan of reorganization on file. However, exclusivity has been terminated thus enabling competing plans to be filed by the Debtor's creditors. To the extent there is a concern that competing plans would be prejudiced by having the Wyndham Franchise Agreement approved (because a competing plan proponent may desire to subsequently reject the Franchise Agreement thereby giving rise to a large termination claim), the Debtor and Committee have successfully negotiated with Wyndham for the subordination of any termination claim that may be asserted by Wyndham in this bankruptcy case. Specifically, while the language of the Wyndham documents may differ to a degree, Counsel to the Debtor and Counsel to the Committee have represented to the Court that any termination claim that could be asserted by Wyndham shall be subordinate to any and all allowed unsecured claims in this case (including any allowed unsecured claim that may be asserted by the Lender). The Court understands this representation to mean that in essence any termination charges or debt asserted by Wyndham is subordinate to any and all priority claims and administrative expenses, and that the termination charges or debt of Wyndham (if any) would only be senior to both the interests of equity and creditor claims, if any, that are (under principles of equitable subordination) adjudicated to be subordinate. Thus, a competing plan proponent who seeks to place another flag on the hotel will not be faced with an additional multi-million dollar administrative expense claim which could impede reorganization of the hotel assets and business.

**9**  The Lender is also a post-petition lender. The record does not contain the exact amount of post-petition advances made by the Lender, if any. However, it is believed that such sums, if there are any that are due, are less than $2 million.

**10**  The Lender's own internal documents suggest that the hotel is worth $56 million.

**11**  The Court recognizes that the Lender contends that the Debtor's proposed plan of reorganization does not provide the Lender with the "indubitable equivalent" of its legal and equitable interests under its loan documents. The Court further recognizes that the Debtor's proposed plan seeks to re-write many of the other terms and conditions of the Debtor's loan documents. The Court does not address today whether the provisions of the Debtor's plan of reorganization provides, or fails to provide, the Lender with the indubitable equivalent of the Lender's interests. Rather, all that the Court is deciding today is that the Lender is adequately protected by the equity cushion that exists in the value of the hotel.

**End of Document**  © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 84

54 Collier Bankr.Cas.2d 1709, 45 Bankr.Ct.Dec. 78, Bankr. L. Rep. P 80,353

423 F.3d 166
United States Court of Appeals,
Second Circuit.

In Re SMART WORLD TECHNOLOGIES,
LLC, Freewwweb, LLC, and Smart
World Communications, Inc., Debtors.
Smart World Technologies, LLC,
Freewwweb, LLC, and Smart World
Communications, Inc., Debtors–Appellants,
v.
Juno Online Services, Inc., Official Committee of
Unsecured Creditors, Worldcom Technologies,
Inc., and UUNET Technologies, Inc., Appellees.

Docket No. 04–3497–BK.    |    Argued
March 8, 2005.    |    Decided Sept. 12, 2005.

**Synopsis**
**Background:** Order was entered by the United States
Bankruptcy Court for the Southern District of New York,
Cornelius Blackshear, J., granting creditors' motion to settle
cause of action brought by Chapter 11 debtor-in-possession
over debtor's objection, and debtor appealed. The District
Court, Denise L. Cote, J., 2004 WL 1118328, affirmed.

**[Holding:]** On further appeal, the Court of Appeals, John
M. Walker, Jr., Chief Judge, held that bankruptcy court
should not have granted derivative standing to creditors to
settle cause of action over objection of Chapter 11 debtor-in-
possession.

Vacated and remanded.

West Headnotes (17)

**[1]**    **Bankruptcy**
       👉 Conclusions of law;  de novo review
       **Bankruptcy**
       👉 Clear error
       On appeal in bankruptcy case, Court of Appeals
       exercises plenary review over bankruptcy court's
       decision;  it considers legal issues de novo

and reviews factual findings for clear error.
Fed.Rules Bankr.Proc.Rule 8013, 11 U.S.C.A.

Cases that cite this headnote

**[2]**    **Bankruptcy**
       👉 Compromises, Releases, and Stipulations
       **Bankruptcy**
       👉 Debtor in possession, in general
       It is Chapter 11 debtor-in-possession, as legal
       representative of estate, that is vested with power
       to settle estate's claims. 11 U.S.C.A. § 323(a);
       Fed.Rules Bankr.Proc.Rule 9019, 11 U.S.C.A.

2 Cases that cite this headnote

**[3]**    **Bankruptcy**
       👉 Debtor in possession, in general
       In making Chapter 11 debtor-in-possession
       accountable for estate property, including
       estate's legal claims, Congress vested debtor with
       responsibility to determine how best to handle
       such claims. 11 U.S.C.A. § 1106(a)(1).

3 Cases that cite this headnote

**[4]**    **Bankruptcy**
       👉 Debtor in possession, in general
       Duty on part of Chapter 11 debtor-in-possession
       to wisely manage estate's legal claims is implicit
       in debtor's role as estate's only fiduciary.

5 Cases that cite this headnote

**[5]**    **Bankruptcy**
       👉 Debtor in possession, in general
       As fiduciary of the estate, Chapter 11 debtor-in-
       possession bears burden of maximizing value of
       estate, including value of any legal claims.

1 Cases that cite this headnote

**[6]**    **Bankruptcy**
       👉 Compromises, Releases, and Stipulations
       **Bankruptcy**
       👉 Debtor in possession, in general

Case 09-10138-MEW    Doc 14225-47    Filed 08/15/14    Page 242 of 378

In re Smart World Technologies, LLC, 423 F.3d 166 (2005)
54 Collier Bankr.Cas.2d 1709, 45 Bankr.Ct.Dec. 78, Bankr. L. Rep. P 80,353

It is Chapter 11 debtor-in-possession who controls estate property, including estate's legal claims, and it is debtor-in-possession who has legal obligation to pursue claims or to settle them, based on best interests of estate.

3 Cases that cite this headnote

**[7]** **Bankruptcy**

   🗝 Judicial authority or approval

Under certain circumstances, settlement of cause of action which belongs to bankruptcy estate may be approved over objections of Chapter 11 debtor-in-possession, as where aggrieved creditors and other parties dissatisfied with debtor-in-possession's conduct seek appointment of trustee or examiner. 11 U.S.C.A. § 1104.

12 Cases that cite this headnote

**[8]** **Bankruptcy**

   🗝 Necessity or grounds

Standard for appointment of Chapter 11 trustee or examiner is very high, and requires the party seeking appointment to show either: (1) cause, including fraud, dishonesty, incompetence, or gross mismanagement of affairs of debtor; or (2) that appointment is in interests of creditors, any equity security holders and other interests of estate. 11 U.S.C.A. § 1104.

3 Cases that cite this headnote

**[9]** **Bankruptcy**

   🗝 In general; standing

Derivative standing in bankruptcy context is analogous to derivative standing in shareholder suits; it arises when debtor unjustifiably refuses to pursue cause of action.

6 Cases that cite this headnote

**[10]** **Bankruptcy**

   🗝 Judicial authority or approval

While it is conceivable that, in certain rare cases, unjustifiable behavior on part of Chapter 11 debtor-in-possession may warrant a grant of authority to creditor to settle estate claim

over debtor's objection, party seeking to displace debtor with respect to settlement of estate claim that debtor desires to pursue will face heavier burden than party who seeks derivative standing to prosecute claim which debtor is unwilling to pursue; it is more likely that debtor will be operating under conflict of interest with respect to initial decision to pursue claim, as when claim is against its principals or other insider, than in settlement context.

4 Cases that cite this headnote

**[11]** **Bankruptcy**

   🗝 Judicial authority or approval

Bankruptcy court should not have granted derivative standing to creditors to settle cause of action over objection of Chapter 11 debtor-in-possession, especially given complete lack of evidence that court, in approving settlement, had considered merits of claims, and especially where debtor had found counsel willing to pursue claims on contingency basis.

12 Cases that cite this headnote

**[12]** **Bankruptcy**

   🗝 Judicial authority or approval

Where Chapter 11 debtor-in-possession seeking to litigate cause of action on behalf of estate has found counsel willing to pursue claim on a contingency basis, it will be even more difficult for party seeking derivative standing to settle this cause of action to demonstrate that estate will be better off settling.

8 Cases that cite this headnote

**[13]** **Bankruptcy**

   🗝 Construction and Operation

**Bankruptcy**

   🗝 Rules

If Bankruptcy Rule and bankruptcy statute conflict, court must apply the statutory provision.

9 Cases that cite this headnote

**[14]** **Bankruptcy**

Case 09-10138-MEW    Doc 14225-47    Filed 08/15/14    Page 243 of 378

In re Smart World Technologies, LLC, 423 F.3d 166 (2005)

54 Collier Bankr.Cas.2d 1709, 45 Bankr.Ct.Dec. 78, Bankr. L. Rep. P 80,353

Compromises, Releases, and Stipulations

Bankruptcy statute granting parties in interest, such as creditors, an unconditional right to intervene in bankruptcy proceedings did not give creditors the right to take ownership of cause of action brought by Chapter 11 debtor-in-possession, by settling it over debtor's objection. 11 U.S.C.A. § 1109(b).

1 Cases that cite this headnote

[15]     **Bankruptcy**
    Carrying out provisions of Code

Bankruptcy court's power to enter "necessary or appropriate" orders, in order to fill the gaps in statutory language, is plainly limited by provisions of the Bankruptcy Code. 11 U.S.C.A. § 105(a).

10 Cases that cite this headnote

[16]     **Bankruptcy**
    Equitable powers and principles

Bankruptcy court's equitable power to enter "necessary or appropriate" orders must and can be exercised only within confines of the Bankruptcy Code, and does not authorize court to create substantive rights that are otherwise unavailable under applicable law or constitute a roving commission to do equity. 11 U.S.C.A. § 105(a).

10 Cases that cite this headnote

[17]     **Bankruptcy**
    Equitable powers and principles

    **Bankruptcy**
    Judicial authority or approval

Bankruptcy court's equitable power to enter "necessary or appropriate" orders did not provide independent basis upon which to grant standing to creditors to settle cause of action over objection of Chapter 11 debtor-in-possession. 11 U.S.C.A. § 105(a).

12 Cases that cite this headnote

**Attorneys and Law Firms**

*168  J. Alex Kress (Dennis J. O'Grady and Glenn D. Curving, of counsel; Stephen J. Amoriello III and Ryan G. Foley, on the brief), Riker, Danzig, Scherer, Hyland & Perretti LLP, Morristown, NJ, for Debtors–Appellants.

Lawrence P. Gottesman, Bryan Cave LLP, New York, NY, (Rebecca Tapie and Karine Louis, of counsel, Brown Raysman Millstein Felder & Steiner LLP, New York, NY), for Appellee Juno Online Services, Inc.

Laurence May (Rochelle R. Weisburg, of counsel, and Leonard H. Gerson, on the brief), Angel & Frankel, P.C., New York, NY, for Appellee Official Committee of Unsecured Creditors.

Thomas R. Califano (Eric B. Miller, of counsel), Piper Rudnick LLP, Baltimore, MD, for Appellees WorldCom Technologies, Inc. and UUNET Technologies, Inc.

G. Eric Brunstad, Jr., Bingham McCutchen LLP, Hartford, CT, Amicus Curiae urging reversal.

Before: WALKER, Chief Judge, NEWMAN and JACOBS, Circuit Judges.

**Opinion**

JOHN M. WALKER, JR., Chief Judge.

Debtors-appellants Smart World Technologies, LLC, Freewwweb, LLC, and Smart World Communications, Inc. (collectively, "Smart World") appeal from an unreported decision and order of the United States District Court for the Southern District of New York (Denise L. Cote, *Judge* ), *Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Techs., LLC),* No. 03 Civ. 9467, 2004 WL 1118328 (S.D.N.Y. May 19, 2004) ("*Smart World* "), which affirmed the judgment of the bankruptcy court (Cornelius Blackshear, *Bankruptcy Judge* ). The bankruptcy court granted Smart World's creditors standing to pursue settlement, under Federal Rule of Bankruptcy Procedure 9019, of an adversary proceeding between Smart World and appellee Juno Online Services, Inc. ("Juno"), despite Smart World's strenuous objections. [1] Following a hearing, the bankruptcy court approved the settlement.

On appeal, Smart World argues that as debtor-in-possession, it alone was entitled *169 to bring a Rule 9019 motion.

54 Collier Bankr.Cas.2d 1709, 45 Bankr.Ct.Dec. 78, Bankr. L. Rep. P 80,353

Smart World also raises a number of specific challenges to the bankruptcy court's approval of the settlement. [2] Because we find that the bankruptcy court erred in granting WorldCom and the Committee standing, we vacate the judgment of the district court affirming the bankruptcy court's approval of the settlement and remand for further proceedings consistent with this opinion.

## BACKGROUND

### I. The Sale

Smart World began providing free internet service in 1996. As of June 2000, it had approximately 1.7 million registered subscribers, 750,000 of whom actively used its internet services. Smart World, however, was unable to run its business profitably and sought a purchaser for its most valuable asset, its list of subscribers. On June 29, 2000, it entered into an agreement with Juno, a competing internet service provider who was the sole bidder. Under the agreement, terms of which were set forth in a "Term Sheet," Smart World agreed to sell its subscriber list to Juno and to continue referring subscribers to Juno through its distribution network. As part of the transaction, Juno required Smart World to file for bankruptcy and to conduct the sale under § 363 of the Bankruptcy Code. [3] At Juno's request, Smart World filed for bankruptcy on the very day that the Term Sheet was signed.

Under the Term Sheet, Juno was not required to pay Smart World for subscribers unless the subscribers were deemed "qualified." [4] Compensation for qualified subscribers was to be paid partly in cash and partly in Juno stock, with the percentage to be paid in stock increasing with the number of qualified subscribers referred. [5]

The bankruptcy court approved the sale on July 19, 2000.

### II. The Good–Faith Hearing and the Adversary Proceeding

Soon after the sale was approved, relations between the parties soured. According to Smart World, Juno circumvented the process established in the agreement for tracking subscribers referred to Juno by causing a "database dump" on the very day the sale was approved. The database dump allegedly prevented Smart World from identifying how many of its subscribers became qualified subscribers, and, thus,

how much Juno owed Smart World. When Smart World raised these allegations before the bankruptcy court, the court scheduled a hearing for September **170** 6, 2000 on the issue of Juno's good faith in the § 363 sale.

Juno's response to the scheduling of the good-faith hearing was twofold. First, Juno refused to respond to Smart World's discovery requests, complaining that they were overly broad and burdensome. When the bankruptcy court ordered Juno to expedite discovery, Juno dumped tens of thousands of documents on Smart World's counsel just days before the hearing. [6] Second, Juno commenced a declaratory action in an adversary proceeding, which subsumed the good-faith allegations raised by Smart World.

Specifically, Juno's complaint, filed just days after the bankruptcy court decided to hold the good-faith hearing, addressed the precise issues regarding implementation of the Term Sheet raised by Smart World. Juno denied that it had engaged in a database dump and instead asserted that Smart World had "concoct[ed] false claims relating to the implementation of the Term Sheet ... in an effort to extract additional and unearned consideration from Juno." According to Juno, it was Smart World, and not Juno, who had impeded implementation of the agreement. In fact, Juno argued, Smart World had not only "failed to fully implement critical elements [of the Term Sheet]," but in addition Smart World's three most senior officers had in effect extorted Juno, "threaten[ing] to immediately resign ... unless Juno immediately paid [them] salaries in excess of the amounts previously authorized by the Court," a demand to which Juno allegedly felt that it had to yield. In short, Juno maintained, Smart World's accusations of wrongdoing were part of a wholesale "effort to extract additional consideration from Juno ... and to obtain other modifications to the Term Sheet."

### III. Delays in the Adversary Proceeding

Between August 2000, when Juno commenced the declaratory action, and September 2003, when the bankruptcy court approved settlement, the adversary proceeding stalled, essentially because Juno repeatedly represented to the bankruptcy court that settlement was imminent and because the court openly supported settlement rather than litigation. From the beginning, Smart World's efforts to prosecute its own claims and to engage in discovery were frustrated.

In October 2000, Smart World applied to the bankruptcy court for retention of special litigation counsel on a contingency

In re Smart World Technologies, LLC, 423 F.3d 166 (2005)
54 Collier Bankr.Cas.2d 1709, 45 Bankr.Ct.Dec. 78, Bankr. L. Rep. P 80,353

basis. Juno opposed the application and instead asked the court for a "standstill agreement," which would allow settlement negotiations to proceed. The court granted Juno's request, giving the parties until November 8, 2000, to come to an agreement. With the acquiescence of Smart World's creditors, Juno deliberately excluded Smart World from the ensuing negotiations.

When the parties failed to settle by November 2000, litigation resumed, and the bankruptcy court approved Smart World's request to retain litigation counsel on a contingency basis. Soon after, Smart World filed its answer and counterclaims [7] **\*171** and commenced discovery. In the meantime, Juno continued to negotiate settlement with Smart World's creditors, without Smart World's participation. Smart World's lawyers had just begun reviewing documents produced by Juno in January 2001 when, according to Smart World, Juno's lawyers told Smart World that a settlement had been reached and immediately terminated all further discovery.

On February 7, 2001, the bankruptcy court held a hearing on the purported settlement at which Smart World's principal creditor, WorldCom, characterized the settlement as a "confidential" agreement between Juno and WorldCom:

> I think we need to be fair here. World Com [and Juno] started settlement discussions just with themselves in early December. [Counsel for Juno] had previously uniformly taken the position that [Smart World] has no economic stake and he didn't want to include [Smart World] in any settlement negotiations.

WorldCom's lawyer further asserted:

> We don't have a fiduciary duty to anyone else and we don't want to have that handle put upon us .... [W]e were not motivated by the merits of the claims. We were motivated by what we see as a deteriorating situation both in this case and at Juno, and we felt a settlement that we could get paid upon quickly was better than nothing. That was our motivating factor. We didn't need discovery because of the way we approached it. Other people may need

confirmatory discovery, but that was not our approach to this matter.

Juno's earlier claim that a settlement had been reached proved to be inaccurate; however, promising the bankruptcy court that settlement was imminent, Juno requested another "standstill of the [adversary] litigation," to allow negotiations to continue and to avoid further discovery by Smart World. When the court indicated its intention to grant a thirty-day stay, Smart World argued that the case could not "settle ... without discovery," to which the court responded that it would allow "discovery as to the settlement proposal only," but "not [as it pertains to] the adversary [proceeding]." The court also expressed its strong preference for settlement and its deep reluctance to allow the adversary suit to continue.

The thirty-day standstill stretched into months. In October 2001, nearly eight months later, with no settlement reached, Smart World moved to recommence prosecution of the adversary proceeding. Juno opposed the motion. The bankruptcy court repeatedly adjourned the motion.

Five months later, on March 26, 2002, the bankruptcy court held a hearing at which it summarily denied Smart World's motion to recommence the adversary proceeding. The bankruptcy judge's explanation was that "I have been on the bench about 17 years, [and] I know when we should have a settlement and when we should have a litigation." Relying on the assurances of counsel for Juno and the creditors that a settlement would soon be reached, the bankruptcy court agreed to "one more adjournment" until June 2002. The court stated unequivocally that if no settlement was reached by June, it would "turn [Smart World's counsel] loose" to conduct discovery and litigate the adversary claims.

**\*172** Despite this pronouncement, June came and went, and the standstill continued. In September 2002, nineteen months after the bankruptcy court had first stayed the adversary proceeding, the parties again informed the court that settlement had not been achieved. Nevertheless, the court once more rejected Smart World's efforts to recommence the adversary proceeding. Stating that Smart World "really does not have a pecuniary interest," the bankruptcy court dismissed Smart World's assertion that, if it won the adversary case on the merits, "there would be value for all Creditors." The bankruptcy court also paid scant attention to evidence suggesting that WorldCom might have been pursuing a quick and easy settlement with Juno, under which it would receive the bulk of the settlement payment, for reasons antithetical

54 Collier Bankr.Cas.2d 1709, 45 Bankr.Ct.Dec. 78, Bankr. L. Rep. P 80,353

to interests of the estate.[8] Instead, the bankruptcy court adjourned the case yet again, until October 23, 2002, calling it a date "etched in granite," meaning that if settlement were not reached, the court would definitely allow Smart World to recommence the adversary proceeding.

When that date arrived, however, and the parties still had not settled, the bankruptcy court lost its strong resolve. Instead, the bankruptcy court ordered mediation, which proved unsuccessful.

### IV. The Rule 9019 Motion

In May 2003, almost three years after Juno had commenced its adversary suit, and over two years after proceedings, including any meaningful discovery, had been stayed, Juno and Smart World's creditors filed a motion pursuant to Federal Rule of Bankruptcy Procedure 9019 to settle the adversary proceeding between Juno and Smart World. Under the terms of the settlement, Smart World's claims would be settled and released in exchange for Juno's payment of $5.5 million to WorldCom.[9] It also called for broad releases and injunctive relief from any claim arising out of the adversary proceeding, Smart World's bankruptcy, and Juno's ancillary dispute with WorldCom.

Smart World objected to the settlement. Smart World contended, *inter alia,* (1) that the settlement was not reasonable because it did not require Juno to pay even its admitted liability to Smart World; (2) that the settlement improperly recognized a substantial secured claim in favor of WorldCom, though "the liens securing the WorldCom claim are highly suspect and its claim is overstated"; (3) that the settlement was premature because Smart World—absent meaningful discovery—had not been able adequately to evaluate the likely success of its claims against Juno; and (4) that the court should not approve a settlement of Smart World's claims by the creditors because Smart World was actively pursuing them. Finally, and most pertinent on appeal, Smart World challenged appellees' "standing to pursue settlement over debtors' objection."

The bankruptcy court conducted a Rule 9019 hearing on August 19, 2003, at which, in substance, it dismissed all of Smart World's objections. The bankruptcy court **\*173** was openly hostile to Smart World's claim that it had not been able to conduct meaningful discovery because of the repeated stays imposed by the bankruptcy court and thus could not properly evaluate the proposed settlement, at one point even threatening to cite counsel for contempt if he referred again to the lack of discovery.

When Smart World attempted to argue the merits of its claims against Juno—for example, by trying to demonstrate the number of qualified subscribers Juno had obtained from Smart World and the ways in which Juno had breached the Term Sheet—the court again displayed its hostility to Smart World's position by refusing to hear Smart World. At one point, the court explicitly disallowed any argument as to the merits of Smart World's claims:

> [COUNSEL FOR SMART WORLD]: Our position is to evaluate the merits of the claim—
>
> THE COURT: You know what? That is what I warned your ... colleague about. I don't need for you all to do that. Right now we're looking at the reasonableness of the settlement.

Having concluded that any discussion, and presumably meaningful evaluation, of the merits of Smart World's claims were unnecessary, the bankruptcy court announced its intention to approve the settlement. The bankruptcy court stated that it would allow Smart World to pursue its claims only upon a condition Smart World was unable to meet: the posting of a supersedeas bond securing the amount of the settlement for the estate.

### V. Rulings Below

In September 2003, the bankruptcy court approved the Rule 9019 settlement. It found that the "Debtors' estates are insolvent," that Smart World's refusal to join in the settlement was "unreasonable in view of the risks, expense and delay that would be posed by further litigation of the Action, as well as in view of the insolvency of the Debtors' estates," that "[c]ontinuation of the Action would amount to equity gambling with the recovery that would otherwise go to the creditors," and that the settlement was in the "best interests of the Debtors, their estates and their creditors and equity holders." As to the creditors' standing to pursue the settlement over Smart World's objection, the bankruptcy court found a legal basis in various provisions of the Bankruptcy Code giving creditors the right to intervene and endowing the bankruptcy court with equitable powers.

The district court affirmed. While recognizing that the creditors' standing to pursue a Rule 9019 settlement over the objections of the debtor-in-possession raised an issue of first impression, the district court found that under 11 U.S.C.

54 Collier Bankr.Cas.2d 1709, 45 Bankr.Ct.Dec. 78, Bankr. L. Rep. P 80,353

§ 105(a) and this court's derivative standing doctrine, the bankruptcy court was within its equitable powers in allowing WorldCom and the Committee to settle Smart World's claims over Smart World's objection. *Smart World,* 2004 WL 1118328, at *3. It characterized Smart World's position as "an unrealistic hope that continued litigation would be so wildly successful that it might yield some recovery for its equity holders." *Id.* It further held that the terms of the settlement at $5.5 million were "reasonable," noting that if Smart World lost the adversary proceeding, Juno would not have to pay anything, whereas if Smart World won, the proceeds might be as little as $4 million. *Id.* at *2.

This appeal followed.

## DISCUSSION

[1]    The primary issue before us raises a question of first impression, as both lower courts recognized. Did the bankruptcy **\*174** court err in granting Smart World's creditors standing to settle the adversary proceeding between Smart World and Juno, without Smart World's participation and over Smart World's objections? We have jurisdiction to decide this question under 28 U.S.C. §§ 158(d) and 1291, and we exercise plenary review of the bankruptcy court's decision, considering legal issues *de novo,* and reviewing factual findings for clear error. *Licensing by Paolo, Inc. v. Sinatra (In re Gucci),* 126 F.3d 380, 390 (2d Cir.1997). We conclude that while authority to pursue a Rule 9019 motion may, in certain limited circumstances, be vested in parties to the bankruptcy proceeding other than the debtor-in-possession, those circumstances are not present here. Accordingly, we vacate and remand for further proceedings.

## I. *Rule 9019 and the Role of the Debtor–in–Possession*

We begin with the language of Rule 9019, which authorizes only the trustee, or debtor-in-possession, [10] to bring a motion for settlement: "On motion by the [debtor-in-possession] and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr.P. 9019(a). The rule provides for notice to other interested parties, including creditors, *id.,* but as one court has noted, "the right to notice normally accorded all 'parties in interest' ... *does not entail party status* in the adversary proceeding to be settled." *Kowal v. Malkemus (In re Thompson),* 965 F.2d 1136, 1140 n. 5 (1st Cir.1992) (emphasis added); *see also In re Masters, Inc.,* 141 B.R. 13, 16 (Bankr.E.D.N.Y.1992) (same).

That the Rule vests authority to settle or compromise solely in the debtor-in-possession is hardly surprising in light of the numerous provisions in the Bankruptcy Code establishing the debtor's authority to manage the estate and its legal claims. For instance, when a chapter 11 case is filed, an automatic stay applies that enjoins all entities from, *inter alia,* engaging in "any act[s] ... to exercise control over property of the estate." 11 U.S.C. § 362(a)(3); *see also* 3 Collier ¶ 362.03[5] (explaining purpose of § 362(a)(3)). This provision allows the debtor-in-possession to take control of the estate's property in order to "assure an equitable distribution of the property among creditors," *id.,* and it evinces Congress's desire to leave administration of the chapter 11 estate solely in the hands of the debtor-in-possession.

[2]    Rule 9019 is also consistent with the debtor-in-possession's role as legal representative of the bankruptcy estate, set forth in 11 U.S.C. § 323(a). [11] As legal representative, the debtor-in-possession has the power to sue and be sued on the estate's behalf, *id.* § 323(b); *see also* 7 *Collier* ¶ 1107.02[3][a], which presumably **\*175** includes the derivative power to settle suits. In other words, § 323 implies what Rule 9019 expressly states—that it is the debtor-in-possession, as legal representative of the estate, who is vested with the power to settle the estate's claims.

[3]    Indeed, the Code not only authorizes the chapter 11 debtor to manage the estate's legal claims, but in fact requires the debtor to do so in a way that maximizes the estate's value. Under the Code, the debtor-in-possession is held "accountable for all property [of the estate] received." 11 U.S.C. § 1106(a)(1) (incorporating § 704(2)). Property of the estate for which the debtor is held accountable includes, *inter alia,* "all legal or equitable interests of the debtor ... as of the commencement of the case," *id.* § 541(a)(1), such as valuable causes of action, *see United States v. Whiting Pools, Inc.,* 462 U.S. 198, 205 & n. 9, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983), as well as "[p]roceeds, product, offspring, rents, or profits of or from property of the estate," 11 U.S.C. § 541(a)(6). Courts therefore have interpreted § 1106(a)(1) to include "the duty to appear and prosecute, or defend against, any cause of action on behalf of the estate" that may benefit or adversely affect the property of the debtor's estate. 7 *Collier* ¶ 1107.02 [1][a]; *see also Gramil Weaving Corp. v. Raindeer Fabrics, Inc.,* 185 F.2d 537, 540 (2d Cir.1950) (directing debtor-in-possession to defend against claims against the estate). In making the debtor-in-possession accountable for

In re Smart World Technologies, LLC, 423 F.3d 166 (2005)

54 Collier Bankr.Cas.2d 1709, 45 Bankr.Ct.Dec. 78, Bankr. L. Rep. P 80,353

the estate's legal claims, Congress vested the debtor with the responsibility to determine how best to handle those claims.

[4]  [5]  Similarly, the debtor's duty to wisely manage the estate's legal claims is implicit in the debtor's role as the estate's only fiduciary. [12]  *See Wolf v. Weinstein, 372 U.S. 633, 649–50, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963)* (observing that debtor-in-possession has fiduciary duty to the estate). As fiduciary, the debtor bears the burden of "maximiz[ing] the value of the estate," *Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 352, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985),* including the value of any legal claims. Courts have thus concluded that in some instances, fiduciary duty requires the chapter 11 debtor to pursue a cause of action, *see Louisiana World Exposition v. Fed. Ins. Co., 858 F.2d 233, 246 (5th Cir.1988),* but in other instances may require settlement, *see In re Energy Coop., Inc., 886 F.2d 921, 927 (7th Cir.1989).*

[6]  In short, Rule 9019, which by its terms permits only the debtor-in-possession to move for settlement, is in complete harmony with the provisions of the Bankruptcy Code delineating the chapter 11 debtor's role. It is the debtor-in-possession who controls the estate's property, including its legal claims, and it is the debtor-in-possession who has the legal obligation to pursue claims or to settle them, based upon the best interests of the estate.

[7]  [8]  Despite the plain language of Rule 9019 and the clear policy of the Code, appellees nevertheless maintain that Rule 9019 need not be strictly followed. We agree with appellees that under certain circumstances, settlement of an estate's claim could be approved over the objections of a debtor-in-possession. For example, the Code provides that aggrieved creditors and other parties dissatisfied with a debtor-in-possession's conduct may seek appointment of a trustee or examiner under the Code, *see 29 U.S.C. § 1104,* who could then presumably bring a Rule 9019 *176 motion. As Smart World points out, however, the standard for § 1104 appointment is very high, requiring the party seeking appointment to show either (1) cause, "including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor," or (2) that appointment is "in the interests of creditors, any equity security holders, and other interests of the estate." *Id. § 1104(a)(1), (2); see also 7 Collier* ¶ 1104.02[2][a] (describing occasions for appointment of a trustee as "extraordinary cases"). In any event, appellees have not sought appointment of a trustee or examiner, nor did they do so below, but instead seek to ground their standing in

principles of derivative standing and various Code provisions. As we explain below, we reject appellees' arguments for various reasons, though we do not foreclose altogether the possibility of creditor standing in the Rule 9019 context.

## II. Derivative Standing

[9]  Appellees argue that their standing to bring a Rule 9019 motion was supported by the doctrine of derivative standing, which was first recognized by this court in *Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.), 779 F.2d 901 (2d Cir.1985)* ("STN "). In that case, we held that although "no explicit authority for creditors' committees to initiate adversary proceedings" exists in the Bankruptcy Code, creditors have an implied, qualified right to bring suit on behalf of the estate under 11 U.S.C. §§ 1103(c)(5) [13] and 1109(b). [14]  *Id.* at 904. We found that derivative standing "to initiate suit with the approval of the bankruptcy court" exists when the "debtor in possession [has] unjustifiably failed to bring suit." *Id. STN* thus makes clear that derivative standing in the bankruptcy context is analogous to derivative standing in shareholder suits; it arises when the debtor unjustifiably refuses to pursue a cause of action. [15]  *See also Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 579 (3d Cir.2003)* (en banc) ("Cybergenics ") (finding derivative standing appropriate where a "debtor unreasonably refuses to pursue" a fraudulent transfer action); *Canadian Pac. Forest Prods. Ltd. v. J.D. Irving, Ltd. (In re The Gibson Group, Inc.), 66 F.3d 1436, 1438 (6th Cir.1995)* ("Gibson Group ") (requiring, *inter alia,* that the debtor-in-possession have unjustifiably refused a demand to sue); *Louisiana World Exposition, 858 F.2d at 247* (same); *In re Xonics Photochem., Inc., 841 F.2d 198, 203 (7th Cir.1988)* (suggesting that derivative standing was appropriate only where a "debtor was shirking his statutory responsibilities"); *cf. Ross v. Bernhard, 396 U.S. 531, 534, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970)* (noting a requirement in derivative shareholder suits that the corporation "refused to proceed after suitable demand").

[10]  Until now, derivative standing has been sought only in cases where the debtor refused to sue; here, we are faced with *177 the converse situation. It is the debtor-in-possession who wishes to pursue the estate's legal claims, and the creditors who seek to prevent the debtor from doing so. Appellees' position is, presumably, that derivative standing is appropriate in the Rule 9019 context where the debtor unjustifiably refuses to settle a claim, or unjustifiably insists on pursuing a claim. We do not rule out that in certain, rare

54 Collier Bankr.Cas.2d 1709, 45 Bankr.Ct.Dec. 78, Bankr. L. Rep. P 80,353

cases, unjustifiable behavior by the debtor-in-possession may warrant a settlement over the debtor's objection, but this is not such a case.

As an initial matter, we note that derivative standing in the Rule 9019 context is not merely the mirror image of a typical derivative standing case, but is conceptually distinguishable. In our view, there is an important difference between pursuing an otherwise neglected claim and settling a claim that the estate is trying to pursue. The former usually involves a claim against the debtor's principals themselves, who refuse to litigate out of self interest. *See, e.g., Cybergenics,* 330 F.3d at 573; *STN,* 779 F.2d at 902. Derivative standing in such a case may be necessary to avoid the inherent conflict of interest that exists when those with the power to pursue a claim are those who may be the target of such a claim. In the Rule 9019 context, by contrast, it is the debtor and its principals who seek to pursue a claim on behalf of the estate, which is precisely the role of the debtor-in-possession envisioned by the Code. In such circumstances, we think it less likely that the debtor's principals will be motivated by reasons that conflict with the best interests of the estate. On the contrary, it is more likely that allowing creditors and other parties to bring Rule 9019 motions over a debtor's objection will encourage parties against whom the estate has a valid claim to delay and obstruct litigation, in the hopes that a creditor with a small interest in the estate will eventually propose a settlement disposing of the estate's valuable causes of action at a low price. The possibility of such perverse dynamics suggests that derivative standing will be appropriate much less frequently in the Rule 9019 context than in the usual case (*i.e.,* where the would-be derivative plaintiff wishes to pursue a claim). We thus emphasize that a debtor-in-possession pursuing litigation is much less likely to be acting for reasons antithetical to the interests of the estate than a debtor-in-possession who refuses to sue its own principals; accordingly, a party who seeks to displace the debtor faces a heavier burden in the former case than in the latter.

 **[11]**    That burden plainly was not satisfied here. Indeed, appellees' showing was insufficient even under the usual standard for derivative standing. As we stated in *STN,* in a typical derivative standing case, "[t]he court's inquiries will involve in the first instance ... a determination of probabilities of legal success and financial recovery in event of success." 779 F.2d at 905. While we noted that "the court need [not] undertake a mini-trial," we nevertheless emphasized that the court "should assure itself that there is a sufficient likelihood of success to justify the anticipated delay and expense to

the bankruptcy estate that the initiation and continuation of litigation will likely produce." *Id.* at 906. [16]   Although both appellees and the lower courts were quick to characterize Smart **\*178** World's position as unjustifiable, [17] we find that no such inquiry into the "likelihood of success" of settlement versus litigation took place here.

Indeed, having searched the record in vain for anything more than a conclusory statement from the bankruptcy court as to the merits of Smart World's claims against Juno, we find it difficult to understand how the lower courts could have formed such a firm opinion that Smart World's claims lacked viability. At the Rule 9019 hearing, for instance, Smart World's counsel stated "[w]e think Your Honor needs to make a record here, and make findings as to the range of reasonableness as to the settlement." [18]   Counsel further offered to provide testimony as to "the factual circumstances underlying the various claims" and a "calculation based on [the witness's] knowledge of the potential value of the claims." The bankruptcy court brushed the offer aside, stating "[t]here's no need for him to do that." Even WorldCom's counsel pointed out to the bankruptcy court that it had not heard Smart World's explanation of its "theory of recoveries, claims and damages," a fact that the court found untroubling. Indeed, at one point in the hearing, the court actually refused to listen to any argument on the merits:

> [COUNSEL FOR SMART WORLD]: Our position is to evaluate the merits of the claim—
>
> > THE COURT: You know what? That is what I warned your ... colleague about. I don't need for you all to do that. Right now we're looking at the reasonableness of the settlement.

The bankruptcy court's written decision similarly fails to seriously evaluate the merits of Smart World's claims. Nowhere in its decision does the bankruptcy court discuss Smart World's contentions (1) that Juno had prevented Smart World from identifying subscribers referred to Juno by Smart World, (2) that Juno had deliberately tried to get out of the sale transaction because it had received a better offer, and (3) that, based on Juno's concessions alone, Smart World was entitled to a minimum of $5 million. [19]   The bankruptcy court's assessment of Smart World's position is instead confined to a few sentences, stating cursorily (1) that Smart World's position **\*179** was "unreasonable in view of the risks, expense and delay [of] further litigation," (2) that litigation "would amount to equity gambling with the recovery that

54 Collier Bankr.Cas.2d 1709, 45 Bankr.Ct.Dec. 78, Bankr. L. Rep. P 80,353

would otherwise go to the creditors of the Debtors' estates" and would "result in substantial delay and pose[ ] a material risk [of] substantially [reduced recovery]." Such bald and unsupported assertions, with no explanation of why the debtor's position is unjustifiable or unlikely to succeed, could not have sustained a grant of derivative standing under *STN,* nor can they in the Rule 9019 context, which, as discussed above, imposes a heavier burden.

Other aspects of the proceedings below further persuade us that derivative standing was not appropriate. First, the bankruptcy judge from the beginning repeatedly and frankly expressed his strong preference for settlement over litigation, suggesting that his evaluation of Smart World's claims may have been colored by his own desire to "get this matter out of [his] hair" and to "eliminate the litigation."

Second, the repeated stays and adjournments imposed by the court prevented Smart World from conducting any meaningful discovery. As detailed in the history recited above, discovery was stayed in October 2000, briefly recommenced in December 2000, terminated by Juno's lawyers in January 2001, and thereafter never resumed. The bankruptcy court was apparently under the impression that settlement was possible without discovery, but as Smart World's lawyers tried to point out at the first settlement hearing in February 2001, the case could not easily "settle ... without discovery." In the absence of a more fully developed record, we fail to see how the bankruptcy court, let alone Smart World, could have weighed the proposed settlement against the potential value of its claims.

Third, and of more serious consequence, the bankruptcy court seems to have ignored several signs that the interests of the settling parties were in conflict with those of the estate, thereby rendering creditor derivative standing inappropriate. Juno's interests plainly conflicted with those of the estate, since it presumably wanted to pay out as little as possible in settlement. WorldCom, the other main proponent of settlement, likewise had considerable incentive to swiftly end the bankruptcy proceedings. The challenge by other creditors to WorldCom's status as the only secured creditor was cause for it to want to quickly settle and thereby avoid having its share diluted by a full and possibly adverse determination of priority. [20] WorldCom's counsel candidly admitted that WorldCom did not view the settlement as a fiduciary, that it was primarily concerned with getting money from Juno quickly, [21] and that it had not evaluated the merits of Smart World's claims against Juno. It is also undisputed that Smart

World was excluded from certain settlement negotiations between Juno and Smart World's creditors, who at one point referred to the settlement as a "confidential agreement." In short, this case is a poster child for why the Code and Rule 9019 authorize only the debtor-in-possession to pursue or settle the estate's legal claims and why the derivative-standing exception **\*180** to that policy is narrow: As a general matter, other parties to a bankruptcy proceeding have interests that differ from those of the estate and thus are not suited to act as the estate's legal representative.

[12] Finally, we think it significant that Smart World's counsel was retained on a contingency basis. In derivative standing cases, courts often view favorably the willingness of the party seeking derivative standing to absorb the costs of litigation, since such willingness not only demonstrates a belief in the merits of the claim, but also spares the bankruptcy estate from absorbing any further costs. *See STN,* 779 F.2d at 906 (noting that under contingent fee arrangement, pursuit of litigation would not "impose a net burden on the bankruptcy estate"); *see also Louisiana World Exposition,* 858 F.2d at 248 n. 15 (noting that contingent fee arrangement indicated "a limited cost factor"); *cf. In re Housecraft,* 310 F.3d at 71 (observing that estate "incurred no risk of loss" by consenting to derivative standing of creditor because creditor agreed to "pay for all litigation expenses, regardless of whether the lawsuit was successful"). Here, Smart World's counsel was retained on a contingency basis, meaning that Smart World's pursuit of its adversary claims would have subjected the bankruptcy estate to no risk, while allowing the estate to reap any potential award. Where a debtor-in-possession seeks to litigate and its counsel has been retained on a contingency basis, it will be even more difficult for a party seeking derivative standing to demonstrate that the estate would be better off settling the claim.

Our decision today does not foreclose the possibility that in rare circumstances derivative standing might be appropriate in the Rule 9019 context. But we think that such circumstances will be rare, and we find that none are present in this case. Accordingly, we reject appellees' claim that the doctrine of derivative standing entitled WorldCom and the Committee to settle Smart World's claims against Juno.

### III. *Section 1109(b)*

Appellees also maintain that Smart World's creditors have standing to bring a Rule 9019 motion under 11 U.S.C. § 1109(b). [22] They argue that under this court's decision

Case 09-10138-MEW    Doc 14225-47    Filed 08/15/14    Page 251 of 378

In re Smart World Technologies, LLC, 423 F.3d 166 (2005)

54 Collier Bankr.Cas.2d 1709, 45 Bankr.Ct.Dec. 78, Bankr. L. Rep. P 80,353

in *Term Loan Holder Committee v. Ozer Group, LLC (In re Caldor Corp.),* 303 F.3d 161 (2d Cir.2002) ("*Caldor* "), the creditors had an unconditional right to intervene in the adversary proceeding between Smart World and Juno. The right to intervene, they maintain, "clearly encompasses an intervening party's right to propose a settlement of the dispute in which it has intervened." Citing the Rules Enabling Act [23] and the Supreme Court's decision in *Tennessee Student Assistance Corp. v. Hood,* 541 U.S. 440, 124 S.Ct. 1905, 158 L.Ed.2d 764 (2004), [24] appellees further contend that to **\*181** the extent Rule 9019 limits standing to the debtor-in-possession, it conflicts with § 1109(b), and therefore must give way. We disagree.

[13]    Where a conflict between a Rule and a statutory provision exists, of course, the Rules Enabling Act requires that we apply the statutory provision. But unfortunately for appellees, no such conflict exists between § 1109(b) and Rule 9019. Section 1109(b) on its face permits only intervention; properly construed, it does not authorize creditors to pursue settlement under Rule 9019, which makes that remedy available to only the debtor-in-possession.

[14]    The text of § 1109(b) states that a "party in interest, including ... a creditors' committee ... [or] a creditor ... may raise[,] and may appear and be heard on[,] any issue in a case under this chapter." 11 U.S.C. § 1109(b). In *Caldor,* this court held that § 1109(b) provides parties in interest with "an unconditional right to intervene" in adversary proceedings under chapter 11, [25] pursuant to Fed.R.Civ.P. 24(a)(1). [26] *Caldor,* 303 F.3d at 176. This case requires us to decide whether the creditors' § 1109(b) "right to intervene" in the Juno–Smart World adversary proceeding includes the right to settle that proceeding over Smart World's objection. *See Adelphia Commc'ns Corp. v. Rigas (In re Adelphia Commc'ns Corp.),* 285 B.R. 848, 850 (Bankr.S.D.N.Y.2002) (noting that after *Caldor,* it remains unclear "what are [the] rights [of parties in interest] as intervenors"); *see also Iridium India Telecom Ltd. v. Motorola, Inc. (In re Iridium Operating, LLC),* No. 04 Civ. 8687, 2005 WL 696792, at \*2 (S.D.N.Y. Mar.23, 2005) (suggesting that "the scope of the unconditional intervention right of a party in interest as enunciated by the Second Circuit in *Caldor* " remains unclear). We conclude that § 1109(b) does not extend that far.

First and foremost, the Supreme Court in *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000) ("*Hartford Underwriters* "), construed § 1109(b) narrowly. That case

concerned 11 U.S.C. § 506(c), which provides "an important exception to the rule that secured claims are superior to administrative claims." *Id.* at 5, 120 S.Ct. 1942. Section 506(c), like Rule 9019, however, allows only the "trustee," or debtor-in-possession, to take advantage of this exception. *Id.* at 6, 120 S.Ct. 1942. In holding that an administrative claimant was not entitled to recover property under § 506(c), the Supreme Court specifically held that § 1109(b) could not overrule the express language of § 506(c): "[W]e do not read § 1109(b)'s general provision of a right to be heard as broadly allowing a creditor to pursue substantive remedies that other Code provisions make available only to other specific parties." *Id.* at 8, 120 S.Ct. 1942; *see also id.* at 8–9, 120 S.Ct. 1942 (noting that § 1109 " 'does not bestow any right to usurp the trustee's **\*182** role as representative of the estate with respect to the initiation of certain types of litigation that belong exclusively to the estate' " (quoting 7 *Collier* ¶ 1109.05)). We read *Hartford Underwriters* to stand for the proposition that § 1109(b) does not entitle parties in interest, such as Smart World's creditors, to usurp the debtor-in-possession's role as legal representative of the estate. *See also Cybergenics,* 330 F.3d at 561–62 (noting the Court's concern in *Hartford Underwriters* with the debtor-in-possession's ability to "act as a gatekeeper, weighing the potential benefits of litigation against the costs it might incur").

Our view of § 1109(b) is also consistent with circuit court decisions that have discussed § 1109(b) intervention. In *Official Unsecured Creditors' Committee v. Michaels (In re Marin Motor Oil, Inc.),* 689 F.2d 445, 454–55 (3d Cir.1982), the Third Circuit recognized that § 1109(b) afforded an unconditional right to intervene in adversary proceedings, and gave intervenors broader participation rights than those generally granted amici. However, that court also expressly distinguished between "an absolute right to intervene in adversary proceedings already initiated by a ... debtor in possession" and "[the right to bring] new causes of action in favor of creditors and committees," and limited its holding to the former, without reaching the latter. *Id.* at 456 & n. 11 (internal quotation marks omitted).

Similarly, a distinction can be drawn between the right to intervene in an adversary proceeding, to which appellees are plainly entitled, and the right to take ownership of the debtor's claims in that adversary proceeding. The former does not equate to the latter. Intervenors' claims are generally understood to be separate from those of the original parties to a proceeding. *Cf. Local No. 93, Int'l Ass'n of Firefighters*

Case 09-10138-MEW    Doc 14225-47    Filed 08/15/14    Page 252 of 378

In re Smart World Technologies, LLC, 423 F.3d 166 (2005)
54 Collier Bankr.Cas.2d 1709, 45 Bankr.Ct.Dec. 78, Bankr. L. Rep. P 80,353

*v. City of Cleveland,* 478 U.S. 501, 528–29, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986) (noting, in context of consent decree, that "[i]t has never been supposed that one party—whether an original party, a party that was joined later, *or an intervenor*—could preclude other parties from settling their own disputes and thereby withdrawing from litigation" (emphasis added)).

Two lower courts within this circuit have addressed precisely the question faced here: whether the unconditional § 1109(b) right to intervene we announced in *Caldor* includes the right to take ownership of the debtor's legal claims. Both courts have answered the question in the negative. In *Official Committee of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co. (In re Sunbeam Corp.),* 287 B.R. 861, 862 (S.D.N.Y.2003), the court distinguished between the "creditor's right to intervene" and "the right, in essence, to take ownership of the [estate's] causes of action," and held that the former did not include the latter. *Id.* Similarly, in *In re Adelphia Communications Corp.,* the bankruptcy court granted the creditors' committees' motion to intervene, but "took under advisement exactly what the Committees' rights as a consequence of [*Caldor* ] would be." 285 B.R. at 850. After observing that *Caldor* had not overruled *STN,* the court ultimately concluded that § 1109(b) entitled the creditors to "standing to raise issues and to appear and be heard," but that the right did "not equate to ownership of the causes of action in question." *Id.* at 851. In order to "secure the latter," the court noted that the creditors would have to meet the standard for derivative standing under *STN. Id.*

We agree with the reasoning of *Adelphia* and *Sunbeam.* If § 1109(b) were construed as giving creditors the unilateral right to take control of the estate's legal causes, it would conflict not only with the **\*183** plain text of Rule 9019, but also with those provisions of the Bankruptcy Code assigning the debtor-in-possession the duty to act as the estate's legal representative, *see* 11 U.S.C. §§ 323, 1107, and holding the debtor-in-possession accountable for the estate's property, including its valuable legal claims, *see* 11 U.S.C. § 1106(a)(1). Reading the Code as a whole, we decline to construe § 1109(b) in a manner that would place it in conflict with other provisions. *See Cybergenics,* 330 F.3d at 560 (discussing the importance of construing Bankruptcy Code as a whole); *see also Auburn Hous. Auth. v. Martinez,* 277 F.3d 138 (2d Cir.2002) ("Statutory construction is a holistic endeavor.... [T]he preferred meaning of a statutory provision is one that is consonant with the rest of the statute." (internal citations and quotation marks omitted)). In creating the § 1109(b) right "to appear and to be heard on any issue," Congress cannot

have intended to override the Code provisions in which it carved out an exclusive role for the debtor-in-possession as legal representative and fiduciary of the estate. Were we to hold otherwise, we would be reading § 1109(b) as an open-ended license to creditors to take over the estate's litigation, far exceeding the role envisioned for them by Congress.

Contrary to appellees' contention, the Rules Enabling Act does not require us to ignore Rule 9019 in favor of § 1109(b). The Rule and the Code provision can easily be harmoniously construed: Rule 9019 grants the debtor-in-possession the sole authority to bring a motion to settle or compromise, and § 1109(b), properly read, does not purport to extend that power to other parties.

### *IV. Section 105*

Finally, we turn to 11 U.S.C. § 105, on which both the bankruptcy court and the district court, *Smart World,* 2004 WL 1118328, at *2, relied in granting appellees standing. [27] Section 105 grants the bankruptcy court equitable powers to implement the provisions of the Bankruptcy Code:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

> 11 U.S.C. § 105(a). Relying on this grant of equitable power to the bankruptcy court, the district court found that approval of the settlement was warranted, "even without any motion from or the consent of the debtor-in-possession." *Smart World,* 2004 WL 1118328, at *3.

[15]    [16]    While there is some disagreement among the circuit courts as to how broadly to construe the bankruptcy court's § 105(a) power to "fill the gaps left by the statutory language," § 105(a)'s equitable scope is plainly limited by the provisions of the Code. 2 *Collier* ¶ 105.01[2]; *see also id.* **\*184** (noting that even proponents of broader view of bankruptcy court's § 105(a) power must recognize that it "should not be employed as a panacea for all ills confronted"). We recently made the same point:

> This Court has long recognized that Section 105(a) limits the bankruptcy court's equitable powers, which must and can only be exercised within the confines of the Bankruptcy

Code. It does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity.

The statutory language supports this limit on the equitable powers of the bankruptcy court. The equitable power conferred ... by section 105(a) is the power to exercise equity in carrying out the *provisions* of the Bankruptcy Code, rather than to further the purposes of the Code generally, or otherwise to do the right thing. This language suggests that an exercise of section 105 power be tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective.

*New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.),* 351 F.3d 86, 91–92 (2d Cir.2003) (internal quotation marks and citations omitted); *see id.* at 92 (finding § 105(a) inapplicable where no provision of the Bankruptcy Code could be invoked to support appellant's claim for relief); *see also Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206–07, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988) ("[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.").

[17] In light of our holding in *Dairy Mart* and the Supreme Court's pronouncement in *Ahlers,* we hold that the bankruptcy court's power to act pursuant to § 105(a) does not provide an independent basis upon which to grant appellees standing.

Section 1109(b), as we have explained, does not entitle appellees to take over Smart World's legal claims, and various other provisions of the Code assign to Smart World alone the role of legal representative of, and fiduciary to, the bankruptcy estate. These are statutory limitations that the bankruptcy court cannot overstep simply by invoking § 105(a).

In sum, we conclude that the bankruptcy court erred in granting standing to Smart World's creditors to settle Smart World's claims against Juno over Smart World's objections. Accordingly, we vacate the decision of the district court affirming the bankruptcy court's approval of the settlement and remand for further proceedings. Smart World's remaining objections to the settlement proceedings before the bankruptcy court are therefore moot.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is VACATED and the case is REMANDED for further proceedings consistent with this opinion.

### Parallel Citations

54 Collier Bankr.Cas.2d 1709, 45 Bankr.Ct.Dec. 78, Bankr. L. Rep. P 80,353

Footnotes

1    There are two groups of creditors: The Official Committee of Unsecured Creditors of Smart World Technologies, LLC ("the Committee"), and MCI WorldCom Network Services, Inc. and UUNET Technologies, Inc. (collectively, "WorldCom"), an alleged secured creditor. Juno, WorldCom, and the Committee are all appellees.

2    Smart World (1) challenges the bankruptcy court's discovery and evidentiary rulings as an abuse of discretion; (2) asserts that the bankruptcy court's review of the settlement was inadequate; and (3) objects to the bankruptcy court's approval of the settlement as circumventing the procedural protections provided in 11 U.S.C. §§ 501–03, 1125, and 1129.

3    Section 363 permits sales of assets free and clear of claims and interests. *See* 11 U.S.C. § 363(f). It thus allows purchasers, like Juno, to acquire assets without any accompanying liabilities.

4    To qualify, subscribers had to use Juno's service for a certain number of minutes in the applicable month and to have been a user for a certain number of days.

5    Juno's stock has apparently increased drastically since 2000 due to its merger in September 2001 with Net Zero. Smart World contends not only that it is entitled to payment for referring qualified subscribers, but also, and more importantly, that under the Term Sheet, Juno is required to pay in stock. Specifically, Smart World asserts that the increase in Juno's stock price translates into a 490% increase in the value of Smart World's claims against Juno. Unsurprisingly, Juno disagrees.

6    Five days before the hearing, Juno advised Smart World that it had approximately 188,000 documents available for review. One day before the scheduled hearing, Juno sent Smart World's counsel a CD–Rom containing 88,000 documents. These documents were, according to Smart World, "useless and nonsensical and ... not responsive."

In re Smart World Technologies, LLC, 423 F.3d 166 (2005)

54 Collier Bankr.Cas.2d 1709, 45 Bankr.Ct.Dec. 78, Bankr. L. Rep. P 80,353

7   Smart World alleged (1) that Juno had agreed to pay the three officers' salaries at the time of sale, but then refused to do so; (2) that Juno had filed its declaratory action in an effort to get out of the sale because it had received an offer from a party purportedly offering to refer Smart World subscribers to Juno for free; and (3) that Juno had, in fact, received a large number of Smart World subscribers without compensating Smart World according to the terms of the agreement. Smart World sought declaratory judgment and sued for damages for breach of contract and fiduciary duty, tortious inference with business relations, and unjust enrichment.

8   Specifically, the court ignored the Committee's allegations that WorldCom's liens might be subject to avoidance. If those allegations were true, then WorldCom, which was due to receive the bulk of the settlement amount, might have had to accept a lesser share. The Committee's claims thus indicated that WorldCom had considerable incentive, unrelated to the merits of Smart World's claims, to avoid litigation over its own priority status.

9   The funds would be used (1) to resolve an ancillary dispute between WorldCom and Juno, (2) to pay WorldCom's alleged secured claim, and (3) to pay various other expenses and claims, including $1.8 million to the Committee.

10  In a chapter 11 case, such as this one, a trustee is not normally appointed. *See* 7 *Collier on Bankruptcy* ¶ 1107.01 (15th ed. rev.1996) ("*Collier*") (noting that debtors-in-possession are the norm in a chapter 11 case); *see also* 11 U.S.C. § 1104 (providing for appointment of trustee in chapter 11 proceeding only in certain circumstances). Instead, the debtor usually remains in control of the estate as the "debtor in possession." *See id.* § 1101. To that end, Congress has vested debtors-in-possession, such as Smart World, with the rights, powers, and duties of a trustee. *See id.* § 1107. We use the term debtor-in-possession throughout to refer to the party in control of the bankruptcy estate, although the Bankruptcy Rules and Code provisions to which we refer may discuss only the rights and powers of the trustee. *See also* 7 *Collier* ¶ 1107.02[1] (§ 1107 must be read in conjunction with other Code sections specifying rights and duties of trustees).

11  "The [debtor-in-possession] in a case under this title is the representative of the estate." 11 U.S.C. § 323(a).

12  A creditors' committee owes a fiduciary duty to the class it represents, but not to the debtor, other classes of creditors, or the estate. *See* 7 *Collier* ¶ 1103.05[2] & n. 20.

13  Creditors' committees appointed under 11 U.S.C. § 1102 may "perform such ... services as are in the interest of those represented." 11 U.S.C. § 1103(c)(5).

14  "A party in interest, including ... a creditors' committee [or] a creditor ... may raise and may appear and be heard on any issue in a case under [chapter 11]." 11 U.S.C. § 1109(b).

15  We have also recognized that derivative standing may be appropriate where the debtor-in-possession consents. *See Commodore Int'l Ltd. v. Gould (In re Commodore Int'l Ltd.),* 262 F.3d 96, 100 (2d Cir.2001) ("*Commodore*"); Glinka v. Murad *(In re Housecraft Indus. USA, Inc.),* 310 F.3d 64, 70 (2d Cir.2002). The *Commodore* exception, however, is inapplicable here, as Smart World obviously does not consent to appellees' standing.

16  Indeed, in the Sixth Circuit, the bankruptcy court must undertake a "cost-benefit analysis" to determine whether the claim raised by the creditor seeking standing is likely to benefit the estate and, therefore, whether the debtor's refusal to sue is unjustified. *Gibson Group,* 66 F.3d at 1438.

17  Appellees have variously called Smart World's legal claims "fanciful," "perilously uncertain," and "highly speculative," while the bankruptcy court referred to Smart World's desire to continue litigation as "equity gambling." *See also Smart World,* 2004 WL 1118328, at *3 (calling Smart World's position "an unrealistic hope that continued litigation would be ... wildly successful").

18  Counsel was referring to the reasonableness review that a bankruptcy court must conduct before approving a Rule 9019 settlement. *See, e.g., In Fry's Metals, Inc. v. Gibbons (In re RFE Indus., Inc.),* 283 F.3d 159, 165 (3d Cir.2002). Because a review of the settlement's reasonableness requires the court to consider the merits of the underlying claims, *see id.,* the bankruptcy court's failure to adequately review the settlement's reasonableness is relevant to whether it adequately investigated the "likelihood of success" of litigation versus settlement for derivative standing purposes.

19  We decline to resolve the dispute between the parties as to whether Smart World would, in the event of a victory on the merits, be entitled to the increase in Juno's stock price. We are unable, on the record before us, to determine whether, if Juno did breach the Term Sheet, it would be barred from electing to pay in cash, as Smart World claims. If Smart World were entitled to the increase in stock price, the potential value of its claims (and the range of reasonableness for any proposed settlement) would change significantly. The dispute over Smart World's entitlement to the current Juno stock price is thus a question properly considered by the bankruptcy court in the first instance when it evaluates the merits of Smart World's claims and, specifically, Smart World's likelihood of substantial recovery.

20  Indeed, the dispute between WorldCom and the unsecured creditor who filed an objection to WorldCom's priority remained outstanding at the time of the settlement and was, by stipulation, to be resolved after the court granted its approval.

21  Juno and WorldCom were parties to service contracts unrelated to the Smart World bankruptcy litigation. The settlement was in part Juno's payment on those other obligations.

54 Collier Bankr.Cas.2d 1709, 45 Bankr.Ct.Dec. 78, Bankr. L. Rep. P 80,353

**22**   The bankruptcy court relied in part on § 1109(b) in holding that appellees had standing to bring a Rule 9019 motion, but the district court did not.

**23**   "[R]ules [established by the Supreme Court, such as the Rules governing practice and procedure under title 11,] shall not abridge, enlarge, or modify any substantive right." 28 U.S.C. § 2075.

**24**   In that case, the Supreme Court held that where adhering to Bankruptcy Rule 7001(6), which requires service of a summons, would have precluded the debtor's statutory right to an undue hardship determination, the Rule's requirement could not be given "dispositive weight," for to do so would abridge a statutory right, thereby giving the Rule "impermissible effect." *See Tenn. Student Assistance Corp.,* 541 U.S. at 454, 124 S.Ct. 1905 (citing 28 U.S.C. § 2075).

**25**   Not all courts have taken this position. *See Fuel Oil Supply & Terminaling v. Gulf Oil Corp.,* 762 F.2d 1283, 1286–87 (5th Cir.1985); *see also Caldor,* 303 F.3d at 167 (discussing contrary cases); *Phar–Mor, Inc. v. Coopers & Lybrand,* 22 F.3d 1228, 1232 (3d Cir.1994) (same); 6 Moore's Fed. Prac. § 24.12[2][a] (3d ed.2005) (noting that § 1109(b) provides for permissive intervention, and that Rule 2018(a), which implements § 1109, is captioned "Permissive Intervention"). *But see* 7 Collier ¶ 1109.04[2][c] (arguing that under 28 U.S.C. § 2075, courts cannot resort to rules, such as Rule 2018(a), to define the scope of statutory provisions, such as § 1109(b)).

**26**   Fed.R.Civ.P. 24(a)(1) provides that upon timely application, "anyone shall be permitted to intervene in an action ... when a statute of the United States confers an unconditional right to intervene."

**27**   The bankruptcy court also relied in part on 11 U.S.C. § 1103(c)(5), which provides that a creditors' committee may "perform such ... services as are in the interest of those represented." This court has previously recognized that § 1103(c)(5) provides a statutory basis for granting derivative standing in some cases. *See STN,* 779 F.2d at 904 (citing §§ 1103(c)(5) and 1109(b) as implying qualified right to derivative standing for creditors); *see also* 7 Collier ¶ 1103.05[6][a] (arguing that § 1103(c)(5) supports derivative standing where the debtor-in-possession has unjustifiably failed to act). Our consideration of § 1103(c)(5) as a potential basis for appellees' standing is thus subsumed by our discussion of derivative standing, *supra.*

---

End of Document                                         © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 85

46 S.Ct. 166

Supreme Court of the United States.

INDEPENDENT WIRELESS TELEGRAPH CO.

v.

RADIO CORPORATION OF AMERICA.

No. 87.    |    Argued Oct. 23,
1925.    |    Decided Jan. 11, 1926.

On a Writ of Certiorari to the United States Circuit Court of Appeals for the Second Circuit.

Suit by the Radio Corporation of America against the Independent Wireless Telegraph Company, wherein the De Forest Radio Telephone & Telegraph Company was made coplaintiff without its consent. Decree of District Court (297 F. 518), dismissing bill, was reversed by Circuit Court of Appeals (297 F. 521), and defendant brings certiorari. Affirmed.

**Attorneys and Law Firms**

**167   *460  Mr. Wm. H. Davis, of New York City, for petitioner.

Mr. John W. Davis, of New York City, for respondent.

**Opinion**

Mr. Chief Justice TAFT delivered the opinion of the Court.

The Radio Corporation, a corporation of Delaware, filed a bill in equity in the Southern district of New York, joining with itself the De Forest Radio Telephone & Telegraph Company, also of Delaware, as coplaintiff, against the Independent Wireless Telegraph Company of Delaware and the American Telephone & Telegraph Company of New York. The case made in the bill was this:

*461  Lee De Forest invented and received patents Nos. 841,387 and 879,532, dated in 1908 and 1909, for devices for amplifying feeble electric currents and certain new and useful improvements in space telegraphy. After giving limited licenses of the American Telephone & Telegraph Company, he assigned the patents to the De Forest Radio Telephone & Telegraph Company. On March 16, 1917, the De Forest Company, by writing duly recorded, gave an exclusive license to make, use, and sell the devices for the

life of the patents to the Western Electric Company, reserving to itself nonexclusive, nontransferable, and personal rights to make, use, and sell them for defined purposes. The Western Electric Company then assigned all that it thus received from the De Forest Company to the American Telephone Company. The American Telephone Company, on July 1, 1920, made a contract with the General Electric Company, by which they exchanged rights in various patents owned or controlled by each, including these rights in the De Forest patents. Some seven months prior, on November 20, 1919, the General Electric Company had granted to the Radio Corporation, the plaintiff, an exclusive license to use and sell for 'radio purposes'-i. e., 'for transmission or reception of communication by what are known as electric magnetic waves except by wire'-all inventions owned by the General Electric Company or thereafter acquired by it. The American Telephone Company subsequently confirmed in the Radio Corporation these after-acquired rights in the De Forest patents. Thus there came from the De Forest Company to the Radio Corporation exclusive rights to use and sell in the United States, for radio purposes, apparatus for transmission of messages, and especially for use between ship and shore for pay.

The defendant, the Independent Wireless Company, has bought the same apparatus, with the lawful right to use it in the amateur and experimental field only. The *462  apparatus thus bought bears a label with such a limitation on its use. The charge in the bill is that the Independent Company is using the apparatus, or the part of it called 'radio tubes,' in the commercial radio field between ship and shore for pay, and thus is violating the Radio Corporation's rights in this field. An injunction is prayed, and an accounting of profits and all damages to the plaintiffs and the American Telephone Company, as their interests shall appear.

The twenty-fifth averment of the bill is:
'That 'the plaintiff, the De Forest Radio Telephone & Telegraph Company, as hereinbefore alleged, has certain rights in the patents in suit herein; that before filing this bill of complaint, said De Forest Radio Telephone & Telegraph Company, was requested to consent to join, as a coplaintiff, herein, but declined; that said De Forest Radio Telephone & Telegraph Company is not within the jurisdiction of the court and therefore cannot be made a defendant herein; and that therefore to prevent a failure of justice, and to enable the plaintiff Radio Corporation of America to protect its exclusive rights under the patents in suit, said De Forest Radio Telephone & Telegraph Company is made a plaintiff herein without its consent.'

46 S.Ct. 166, 70 L.Ed. 357

After securing an order for a bill of particulars, compliance with which disclosed the various agreements referred to in the bill and and facts relevant thereto, the Independent Wireless Telegraph Company, defendant, moved that the court dismiss the bill of complaint, upon the following ground:

> 'That the De Forest Radio Telephone & Telegraph Company, the owner of the patent in suit, has not joined in this litigation as a party plaintiff by duly signing and verifying the bill of complaint herein, and the plaintiff Radio Corporation of America is not such a licensee under the patents as to permit it to sue alone in its own name, in the name of the owner of the patents in suit, or to **\*463** sue in the name of the owner of the patents, joining itself as a licensee under the patents.'

The District Court sustained the motion and dismissed the bill, in the view that it was bound by decisions of this court to hold that the De Forest Company was the owner of the patent and an indispensable party, and, being out of the jurisdiction, could not be made a party defendant by service or joined as a party plaintiff against its will. 297 F. 518. The Circuit Court of Appeals, on appeal, reversed the District Court, held that the De Forest Company was properly made coplaintiff by the Radio Corporation, and remanded the case for further proceedings. 297 F. 521. We have brought the case here on certiorari. Section 240, Judicial Code (Comp. St. s 1217).

The respondent, in its argument to sustain the ruling of the Circuit Court of Appeals, presses two points. The first is that by the contract between the De Forest Company and the Western Electric Company title to the patent was vested in the Western Electric Company, and from it by assignment in the American Telephone & Telegraph Company; that the latter is a party defendant, **\*\*168** having declined to be a plaintiff, and so satisfies the requirement of the presence in such a suit as a party of the owner of the patent. The difficulty the respondent meets in this suggestion is that its bill avers that what the American Telephone Company acquired from the De Forest Company was a license, so called in the contract creating it, and the making of the De Forest Company a party plaintiff to the bill was necessarily on the theory that it, and not the American Telephone Company, is the owner of the patent. The contracts between the corporations involved in the

transfer of rights under the patent are long and complicated, and in order to be fully understood require some knowledge of the new radio field. The court is loath to depart, if it could, from the theory on which the bill was framed and both courts have acted, unless required to do so.

**\*464** The question for our consideration then is: Can the Radio Company make the De Forest Company a coplaintiff against its will under the circumstances of the case?

Section 4919, R. S. (Comp. St. s 9464), is as follows:

> 'Damages for the infringement of any patent may be recovered by action on the case, in the name of the party interested, either as pattentee, assignee, or grantee. And whenever in any such action a verdict is rendered for the plaintiff, the court may enter judgment thereon for any sum above the amount found by the verdict as the actual damages sustained, according to the circumstances of the case, not exceeding three times the amount of such verdict, together with the costs.'

In Goodyear v. Bishop, 10 Fed. Cas. 642, No. 5,558, a suit for damages for infringement had been brought in the name of the patentee by a licensee under the fourteenth section of the Patent Act of 1836 (5 Stat. 357, c. 357), which contained language similar to section 4919. The defendant moved with the consent of the patentee to discontinue the suit. It was contended that, as the patentee had stipulated with the licensee to sue infringers, his remedy was on the covenant. Mr. Justice Nelson, at the circuit, denied the motion. He said that a suit at law to protect the patent right was properly brought in the name of the patentee, that the license was sufficient to give the protection sought, and that the covenant by the patentee did not take from the licensee the remedy by use of the patentee's name to proceed directly against the wrongdoer. The same ruling was made in Goodyear v. McBurney, 10 Fed. Cas. 699, No. 5,574.

These cases were decided in 1860 by a justice of this court, and no case is cited to us questioning their authority. Indeed, the cases have been since referred to a number of times with approval by distinguished patent judges. **\*465** Mr. Justice Blatchford, while Circuit Judge, in Nelson v. McMann, 17 Fed. Cas. 1325, 1329, No. 10,109; Mr. Justice Gray, while Chief Justice of the Supreme Judicial Court of Massachusetts,

46 S.Ct. 166, 70 L.Ed. 357

in Jackson v. Allen, 120 Mass. 64, 77; Judge Lowell, in Wilson v. Chickering (C. C.) 14 F. 917, 918; Judge Shipman, in Brush-Swan Co. v. Thomson Co. (C. C.) 48 F. 224, 226. The term 'action on the case' and the phrase 'in the name of the party interested, either as patentee, assignee, or grantee' in section 4919 were evidently construed to constitute a remedy at law like the suit at common law on a chose in action in the name of the assignor in which the assignment gave the assignee the right as attorney of the assignor to use the latter's name. Lectures on Legal History, Ames, 213. See, also, Eastman v. Wright, 6 Pick. 316; Pickford v. Ewington, 4 Dowling, P. C. 458; McKinney v. Alvis, 14 Ill. 33.

But section 4919 applied by its terms only to actions on the case at law to which the licensee was not a necessary and hardly a proper party. This is a bill in equity. The remedy for violation of an exclusive licensee's interest in equity under the patent laws is found in section 4921, R. S., which is as follows:

'The several courts vested with jurisdiction of cases arising under the patent laws shall have power to grant injunctions according to the course and principles of courts of equity, to prevent the violation of any right secured by patent, on such terms as the court may deem reasonable; and upon a decree being rendered in any such case for an infringement, the complainant shall be entitled to recover, in addition to the profits to be accounted for by the defendant, the damages the complainant has sustained thereby; and the court shall assess the same or cause the same to be assessed under its direction. And the court shall have the same power to increase such damages, in its discretion, as is given to increase the damages **\*466** found by verdicts in actions in the nature of actions of trespass upon the case.' [1]

[1] There is no express authority given to the licensee to use the name of the patent owner in equity as we have seen that he can under section 4919 in suits at law. The presence of the patentee or his assignee in the equity suit, however, it has been held, is just as essential to obtaining an injunction, or an accounting of profits or damages, under the patent laws, as it is in an action on the case for damages at law. Indeed both the owner and the exclusive licensee are generally necessary parties in the equity suit. Waterman v. Mackenzie, 138 U. S. 252, 11 S. Ct. 334, 34 L. Ed. 923; Littlefield v. Perry, 21 Wall. 205, 223, 22 L. Ed. 577; Paper Bay Cases, 105 U. S. 766, 26 L. Ed. 959; **\*\*169** Birdsell v. Shaliol, 112 U. S. 485, 486, 5 S. Ct. 244, 28 L. Ed. 768.

[2] It is urged on behalf of the respondent that in equity the real party in interest, the exclusive licensee whose contract rights are being trespassed upon by the infringer, should be able without the presence of the owner of the patent to obtain an injunction and damages directly against the infringer. We recognize that there is a tendency in courts of equity to enjoin the violation of contract rights which are invaded by strangers in a direct action by the party injured, instead of compelling a roundabout resort to a remedy through the covenant, express or implied, of the other contracting party. But such a short cut, however desirable, is not possible in a case like this. A suit without the owner of the patent as a plaintiff, if maintainable, would not be a suit under section 4921 of the patent laws, but only an action in equity, based on the contract rights of the licensee under the license and a **\*467** stranger's violation of them. There would be no jurisdiction in courts of the United States to entertain it, unless by reason of diverse citizenship of the parties, which does not exist in this case. Hill v. Whitcomb, 12 Fed. Cas. 182, 185, No. 6,502; Wilson v. Sandford, 10 How, 99, 101, 13 L. Ed. 344; Albright v. Teas, 106 U. S. 613, 1 S. Ct. 550, 27 L. Ed. 295, and cases cited.

[3] What remedies, then, can equity afford in a case like this? Waterman v. Mackenzie, 138 U. S. 252, 11 S. Ct. 334, 34 L. Ed. 923, involved the question whether a grant from the owner of the patent of the exclusive right to make and sell, but not to use, was an assignment under the statute, entitling the grantee in his own name to sue an infringer in equity, and it was held that it was not. Mr. Justice Gray, speaking for the court, at page 255 (11 S. Ct. 335), said:

'In equity, as at law, when the transfer amounts to a license only, the title remains in the owner of the patent; and suit must be brought in his name, and never in the name of the licensee alone, unless that is ncessary to prevent an absolute failure of justice, as where the patentee is the infringer, and cannot sue himself. Any rights of the licensee must be enforced through or in the name of the owner of the patent, and perhaps, if necessary to protect the rights of all parties, joining the licensee with him as a plaintiff. Rev. Stat. s 4921; Littlefield v. Perry, 21 Wall. 205, 223 (22 L. Ed. 577); Paper Bag Cases, 105 U. S. 766, 771 (26 L. Ed. 959); Birdsell v. Shaliol, 112 U. S. 485-487 (5 S. Ct. 244, 28 L. Ed. 768).

And see Renard v. Levinstein, 2 Hem. & Mil. 628.'

Littlefield v. Perry, 21 Wall. 205, 22 L. Ed. 577, was a suit for infringement by one to whom was granted an exclusive right to make, use, and vend by the patent owner. The court held that it was an assignment under the statute, but further held that even if it were only an exclusive license, the suit might be maintained under the patent laws, because the patentee who had been privy to the alleged **\*468** infringement had been made a party defendant with the infringer. This court said at page 223:

> 'A mere licensee cannot sue strangers who infringe. In such case redress is obtained through or in the name of the patentee or his assignee. Here, however, the patentee is the infringer, and, as he cannot sue himself, the licensee is powerless, so far as the courts of the United States are concerned, unless he can sue in his own name. A court of equity looks to substance rather than form. When it has jurisdiction of parties, it grants the appropriate relief, without regard to whether they come as plaintiff or defendant. In this case the person who should have protected the plaintiff against all infringements has become himself the infringer. He held the legal title to his patent in trust for his licensees. He has been faithless to his trust, and courts of equity are always open for the redress of such a wrong. This wrong is an infringement. Its redress involves a suit, therefore, arising under the patent laws, and of that suit the Circuit Court has jurisdiction.'

The presence of the owner of the patent as a party is indispensable, not only to give jurisdiction under the patent laws, but also in most cases to enable the alleged infringer to respond in one action to all claims of infringement for his act, and thus either to defeat all claims in the one action, or by satisfying one adverse decree to bar all subsequent actions.

[4] If the owner of a patent, being within the jurisdiction, refuses or is unable to join an exclusive licensee as coplaintiff,

the licensee may make him a party defendant by process, and he will be lined up by the court in the party character which he should assume. This is the necessary effect of the decision in littlefield v. Perry, supra. See, also, Brammer v. Jones, 4 Fed. Cas. 11, No. 1,806; Gamewell Telegraph Co. v. Brooklyn (C. C.) 14 F. 255; Waterman v. Shipman, 55 F. 982, 986, 5 C. C. A. 371; **\*469** Libbey Glass Co. v. McKee Glass Co. (D. C.) 216 F. 172, affirmed Id. (C. C. A.) 220 F. 672; Hurd v. Goold, 203 F. 998, 122 C. C. A. 298. This would seem to be in accord with general equity practice. Waldo v. Waldo, 52 Mich. 91, 17 N. W. 709; Id., 52 Mich. 94, 17 N. W. 710. A cestui que trust may make an unwilling trustee a defendant in a suit to protect the subject of the trust. Porter v. Sabin, 149 U. S. 473, 478, 13 S. Ct. 1008, 37 L. Ed. 815; Brun v. Mann, 151 F. 145, 153, 80 C. C. A. 513, 12 L. R. A. (N. S.) 154; Monmouth Co. v. Means, 151 F. 159, 165, 80 C. C. A. 527; Eastman v. Wright, 6 Pick. 312, 316.

It seems clear, then, on principle and authority, that the owner of a patent, who grants to another the exclusive right to make, use, or vend the invention, which does not constitute a statutory assignment, holds the title to the patent in trust for such a licensee, to the extent that he must allow the use **\*\*170** of his name as plaintiff in any action brought at the instance of the licensee in law or in equity to obtain damages for the injury to his exclusive right by an infringer, or to enjoin infringement of it. Such exclusive licenses frequently contain express covenants by the patent owner and licensor to sue infringers, that expressly cast upon the former the affirmative duty of initiating and bearing the expense of the litigation. But, without such express covenants, the implied obligation of the licensor to allow the use of his name is indispensable to the enjoyment by the licensee of the monopoly which by personal contract the licensor has given. Inconvenience and possibly embarrassing adjudication in respect to the validity of the licensor's patent rights, as the result of suits begun in aid of the licensee, are only the equitable and inevitable sequence of the licensor's contract, whether express or implied.

But suppose the patentee and licensor is hostile, and is out of the jurisdiction where suit for infringement must be brought, what remedy is open to the exclusive licensee? The matter has been given attention by courts dealing with patent cases. In Wilson v. Chickering, supra, at page 918, an exclusive licensee brought a bill in equity to **\*470** enjoin infringement without joining the owner of the patent. A demurrer was sustained, with 30 days to amend. Judge Lowell, after saying that a mere licensee cannot generally, in equity, sue in equity without joining the patentee, said:

46 S.Ct. 166, 70 L.Ed. 357

'I do not, however, intend to be understood that the plaintiff will be without remedy if he cannot find the patentee, or if the latter is hostile. The statute does not abridge the power of a court of equity to do justice to the parties before it, if others who cannot be found are not absolutely necessary parties, as in this case the patentee is not. At law the plaintiff could use the name of a patentee in an action, and perhaps he may have the right in equity under some circumstances. The bill gives no explanation of his absence; but it was said in argument that he is both out of the jurisdiction and hostile. If so, no doubt there are methods known to a court of equity by which the suit may proceed for the benefit of the only person who is entitled to damages.'

In Renard v. Levinstein, 2 Hem. & Mil. 628, before Vice Chancellor Page Wood, afterwards Lord Hatherly, an exclusive licensee brought suit to enjoin infringement by a stranger, and made the patentees who were a foreign firm coplaintiffs. There was no objection to this action. No specific authority for this appeared, but it seems to have been implied from the relation of the exclusive licensee and the owner of the patent. It has some significance here in the fact that it was apparently referred to by Mr. Justice Gray, in Waterman v. Mackenzie, supra, as indicating what could be done in an English court of equity to enable the licensee to secure protection in the name of the owner of the patent.

In the case of Brush-Swan Electric Co. v. Thomson-Houston (C. C.) 48 F. 224, the Brush-Swan Company in Connecticut sued the Thomson-Houston Company in equity for infringing the former's rights as an exclusive *471 licensee for the sale of a device made under a patent owned by the Brush Electric Company of Cleveland, Ohio. The Brush-Swan Company made the Brush Electric Company a coplaintiff. The Cleveland company appeared for the purpose of asking that its name be stricken out as a party complainant, because the bill had been filed without its consent. The motion to strike out the coplaintiff's name was denied by Judge Shipman, on the ground that as the patent owner, being without the jurisdiction, could not be served with process, there would otherwise be absolute failure of justice. The judge said that

prima facie there was an implied power in the exclusive licensee under such circumstances to make the patent owner a party plaintiff. The same conclusion was approved by the Ninth Circuit Court of Appeals in Brush Electric Co. v. California Electric Co., 52 F. 945, 3 C. C. A. 368, before McKenna and Gilbert, Circuit Judges, and Knowles, the District Judge, affirming the same case in 49 F. 73, and by the same court in Excelsior Co. v. Allen, 104 F. 553, 44 C. C. A. 30, and in Excelsior Co. v. The City of Seattle, 117 F. 140, 143, 144, 55 C. C. A. 156. In Hurd v. Goold Co., 203 F. 998, 122 C. C. A. 298, before the Circuit Court of Appeals of the Second Circuit (Lacombe, Coxe, and Noyes, Judges), Hurd, who was the exclusive licensee, joined with himself two corporations who held the legal title to the patent. The corporations had been enjoined in the Sixth circuit from maintaining suits for infringement. The Second Circuit Court of Appeals held that Hurd was entitled to present his licensors, that is, the owners of the patent-as coplaintiffs, even against their will and in spite of their protects. This doctrine was approved by the same court in Radio Corporation v. Emerson, 296 F. 51, 54. See, also, McKee Glass Co. v. Libbey Glass Co., 220 F. 672, 136 C. C. A. 314 (3d C. C. A.), affirming same (D. C.) 216 F. 172; Chisholm v. Johnson, 106 F. 191, 212; Owatonna Mfg. Co. v. Fargo (C. C.) 94 F. 519, 520.

*472 It is objected to the relevancy of these authorities that not one of them actually presents the case here. In all of them it is said the owner or patentee was within the jurisdiction of the court and could be served, or else had come into the jurisdiction voluntarily to move for leave to withdraw as a party. As the court had the owner before it, and the owner was in duty bound to become a party, the court could prevent the withdrawal. Here the owner is not in the jurisdiction and does not come in. It is the defendant, **171 the alleged infringer, which objects to using the name of the owner as plaintiff without its consent.

We think the cases cited go beyond the defendant's interpretation of them, and do hold that, if there is no other way of securing justice to the exclusive licensee, the latter may make the owner without the jurisdiction a coplaintiff without his consent in the bill against the infringer. Equity will not suffer a wrong without a remedy. 1 Pomeroy's Equity Jurisprudence (4th Ed.) ss 423, 424. While this maxim is, of course, not of universal application, it justifies the short step needed to hold that in an equity suit under section 4921, where otherwise justice to the exclusive licensee would fail, he may make the owner of the patent a coplaintiff in his bill under section 4921, in analogy to the remedy given him in an action

46 S.Ct. 166, 70 L.Ed. 357

on the case at law for damages under section 4919, for the two sections are plainly in pari materia.

In so doing, equity does no more than courts of law did, at one period in their history, as we have seen, in implying in the assignee of a chose in action a power of attorney to maintain an action in the name of the assignor in order to assure to the assignee the benefits of his assignment. Where the assignor attempted to interfere with the exercise of the power of attorney by collection of the assignee's claim, or where for any technical reason the remedy through the exercise of implied power of attorney **\*473** was unavailable, equity intervened to lend aid to the assignee and secure a recovery for his benefit. See Lenox v. Roberts, 2 Wheat. 373, 4 L. Ed. 264; Hammond v. Messenger, 9 Sim. 327; Roberts v. Lloyd, 1 De G. & J. 208; Hodge v. Cole, 140 Mass. 116, 2 N. E. 774; Hughes v. Nelson, 29 N. J. Eq. 547; Hayes v. Hayes, 45 N. J. Eq. 461, 17 A. 634.

The objection by the defendant that the name of the owner of the patent is used as a plaintiff in this suit without authority is met by the obligation the owner is under to allow the use of his name and title to protect all lawful exclusive licensees and sublicensees against infringers, and by the application of the maxim that equity regards as done which ought to be done. Camp v. Boyd, 229 U. S. 530, 559, 33 S. Ct. 785, 57 L. Ed. 1317; United States v. Colorado Anthracite Co., 225 U. S. 219, 223, 32 S. Ct. 617, 56 L. Ed. 1063; Craig v. Leslie, 3 Wheat. 563, 578, 4 L. Ed. 460. The court should on these grounds refuse to strike out the name of the owner as coplaintiff, put in the bill under proper averment by the exclusive licensee.

The owner beyond the reach of process may be made coplaintiff by the licensee, but not until after he has been requested to become such voluntarily. If he declines to take any part in the cause, though he knows of its imminent pendency and of his obligation to join, he will be bound by the decree which follows. We think this result follows from the general principles of res judicata. In american Bell Telephone Co. v. National Telephone Co. (C. C.) 27 F. 663, heard before Judges Pardee and Billings, the question was whether the National Telephone Company was bound by a decree in favor of the Bell Company for infringement against a Pittsburgh company claiming under a license from the National Company. The National Company, under a contract upon notice to defend its license, took control of the case, but, becoming dissatisfied with a preliminary ruling of the court, withdrew its counsel and evidence from the case. The National Company was held bound on the authority **\*474**

of the case of Robbins v. Chicago, 4 Wall. 657, 18 L. Ed. 427. When Robbins was building a store in Chicago by an independent contractor, an areaway adjoining the street was left open. A passer-by fell in and was injured. He sued the city, and recovered judgment for $15,000. Robbins had been previously warned by the city of the danger of the unprotected area, and had notice of the accident and of the pendency of the suit, but did not become a party. The city then sued Robbins, and was given a judgment against him for the amount of the recovery against the city. This court, in sustaining the result, held that parties bound by the judgment in such a case included all who were directly interested in the subject-matter, who had knowledge of the pendency of the suit and a right to take part therein, even if they refused or neglected to appear and avail themselves of this right. Lovejoy v. Murray, 3 Wall. 1, 19, 18 L. Ed. 129; Plumb v. Goodnow, 123 U. S. 560, 8 S. Ct. 216, 31 L. Ed. 268; Robertson v. Hill, 20 Fed. Cas. 944, No. 11,925; Miller v. Liggett (C. C.) 7 F. 91.

By a request to the patent owner to join as coplaintiff, by notice of the suit after refusal and the making of the owner a coplaintiff, he is given a full opportunity, by taking part in the cause, to protect himself against any abuse of the use of his name as plaintiff, while, on the other hand, the defendant, charged with infringement, will secure a decree saving him from multiplicity of suits for infringement. Of course, a decree in such a case would constitute an estoppel of record against the patent owner, if challenged, only after evidence of the exclusive license, the request to join as coplaintiff, and the notice of the suit.

There is nothing in the case of Crown Co. v. Nye Tool Works, 261 U. S. 24, 43 S. Ct. 254, 67 L. Ed. 516, which conflicts with this conclusion. That case was brought by the plaintiff, a licensee, to establish as a principle of patent practice that a transfer by an owner of a patent to another, conferring only the right to sue a third for past and future infringements **\*475** of the patent, without the right to make, use, and vend the patented article was an assignment of the patent under **\*\*172** section 4898, R. S. (Comp. St. s 9444). We declined so to hold. There was no offer to make the owner of the patent a party, nor were there any facts showing that the owner would not join as coplaintiff or was not in the jurisdiction. The appellant stood solely upon his right to sue as an assignee of the patent and was defeated.

We hold that the De Forest Company was properly joined as a coplaintiff by the Radio Corporation upon the twenty-fifth averment of the bill. This makes it unnecessary for us to consider the argument on behalf of the appellee that the

46 S.Ct. 166, 70 L.Ed. 357

American Telephone Company was the owner of the patent, instead of the De Forest Company.

Decree affirmed.

**Parallel Citations**

46 S.Ct. 166, 70 L.Ed. 357

Footnotes

1    Section 4921 was amended by Act March 3, 1897, c. 391, s 6, 29 Stat. 694 (Comp. St. s 9467), adding a six-year limitation on actions
     under it, and by Act Feb. 18, 1922, c. 58, s 8, 42 Stat. 392 (Comp. St. Ann. Supp. 1923, s 9467), allowing expert evidence as to
     damages and requiring notice of litigation to Commissioner of Patents for record by indorsement on file wrapper of patents involved.
     The amendments do not affect the question here.

**End of Document**                                          © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 86

2013 WL 3354390

2013 WL 3354390
Only the Westlaw citation is currently available.
United States District Court, N.D. California
San Jose Division

Innovus Prime, LLC, Plaintiff,

v.

Panasonic Corporation and Panasonic
Corporation of North America, Inc., Defendant.

Case No. C–12–00660–RMW    |    July 2, 2013

**Attorneys and Law Firms**

John Wade Carpenter, Law Offices of John W. Carpenter,
LLC, New Orleans, LA, for Plaintiff

Adam C. Hemlock, David L. Yohai, Weil Gotshal and
Manges LLP, New York, NY, Christopher J. Cox, Weil
Gotshal & Manges, Redwood Shores, CA, for Defendants

**Opinion**

**ORDER GRANTING PLAINTIFF'S MOTION
TO STRIKE AND GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

**[Re Docket Nos. 53, 64]**

RONALD M. WHYTE, United States District Judge

*1  Defendants Panasonic Corporation and Panasonic
Corporation of North America, Inc. (collectively
"Panasonic") move for summary judgment that they do not
infringe U.S. Patent No. 5,280,350 ( "#350 Patent"). Plaintiff
Innovus Prime, LLC ("Innovus") acquired the #350 Patent on
April 17, 2011, as the fourth owner in a chain of assignees.
Panasonic relies on a 1982 non–assertion agreement between
itself and the original owner of the # 350 Patent ("1982
Agreement") as the basis for its authority to practice the
invention of the #350 Patent for the duration of the patent's
term. Because the court concludes that the 1982 Agreement
authorized Panasonic to practice the patented invention for
the life of the #350 Patent (which is now expired), and for
the reasons explained below, the court GRANTS Panasonic's
motion for summary judgment of noninfringement.

## I. BACKGROUND

The United States Patent and Trademark Office issued the
#350 Patent on January 18, 1994 to U.S. Philips Corporation,
a subsidiary of N.V. Philips Gloeilampenfabrieken, currently
doing business as Koninklijke Philips Electronics ("Philips").
The #350 Patent relates to an apparatus for processing picture
signals for television.

On December 20, 1982, Philips entered into an agreement
with Panasonic whereby each party agreed not to assert
against the other any patents relevant to "audio and video
products" that were filed (or entitled to priority) before
January 1, 2005. [1] Watanabe Decl., Ex. 1 at 1, Dkt. No. 53–4
("1982 Agreement"). There is no dispute that the #350 Patent
is relevant to a video product and was filed before 2005, and
thus was subject to the 1982 Agreement between Philips and
Panasonic (at least before the patent was assigned). In 2007,
Philips and Panasonic entered into a new agreement in which
they clarified the definitions of "audio and video products" in
the 1982 Agreement (to include six new products that did not
exist in 1982). Watanabe Decl., Ex. 2 at 1, 6 Dkt. No. 53–5
("2007 Agreement").

On February 1, 2008, Philips assigned its interest in the
#350 Patent to NXP B.V., "subject to all existing rights,
commitments, licenses, non-assertion agreements and the like
made by Assignor, [Philips] and/or its affiliates under said
Patent Rights and to any extensions of term and/or renewal
thereof." Yohai Decl., Ex. 3 at Reel 021411, Frame 0447,
Dkt. No. 53–9 ("1st Assignment"). On February 7, 2010,
approximately two years following the assignment from
Philips, NXP B.V. assigned all rights to the #350 Patent to
NXP Holding 1 B.V. (Now Trident Microsystems (Far East)
LTD). Yohai Decl., Ex. 4 at Reel 023928, Frame 0496, 0502–
0506, Dkt. No. 53–10 ("2nd Assignment"). In April 2011,
Trident Microsystems (Far East) assigned all its rights to the
#350 Patent to plaintiff Innovus Prime, LLC ("Innovus").
Yohai Decl., Ex. 5 at Reel 026156, Frame 0365–59, Dkt. No.
53–11 ("3rd Assignment"). The #350 Patent expired shortly
thereafter, in August 2011. 35 U.S.C. § 154(c) (twenty years
from the filing date).

*2  In August 2011, Innovus initially brought a patent
infringement action against Panasonic and three other
defendants alleging infringement of the #350 Patent.
However, the court dismissed Panasonic from the case on
misjoinder grounds. On February 9, 2012, Innovus filed

2013 WL 3354390

the instant patent infringement action against Panasonic. Panasonic moves for summary judgment of noninfringement based on its non-assertion rights under the 1982 and 2007 Agreements.

## II. ANALYSIS

### A. Evidentiary Rulings on Innovus's Motions to Strike

Innovus moves to strike portions of the declarations submitted by Panasonic in support of their motion for summary judgment on the basis that they contain parol evidence, are not supported by personal knowledge, and make legal conclusions. [2] Dkt. Nos. 56 and 64. [3] Innovus also moved for an expedited hearing on the motion to strike in conjunction with the present motion for summary judgment. Dkt. No. 65. [4]

Civil Local Rule 7–3(a) provides that "[a]ny evidentiary and procedural objections to the motion must be contained within the brief or memorandum" filed in opposition to the motion. Innovus improperly filed its motion separately on two occasions, Dkt. Nos. 56 and 64, but the court nevertheless considers the motions under Federal Rule of Civil Procedure ("Rule") 56(e) because the court agrees that the contested portions of the declarations make impermissible legal conclusions and are improper.

Under Rule 56(e), an affidavit "must be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Any affidavit which does not conform to these specifics must be stricken. Civil Local Rule 7–5(b) further provides that

> [a]n affidavit or declaration may contain only facts, must conform as much as possible to the requirements of FRCivP 56(e), and must avoid conclusions and argument. Any statement made upon information or belief must specify the basis therefore. An affidavit or declaration not in compliance with this rule may be stricken in whole or in part.

Civ. L.R. 7–5(b). An affidavit is conclusory if the facts contained are speculative or in the form of legal conclusions, but not if they are based on the affiant's recollection of the

events. See *Orsini v. O/S SeaBrooke O.N.*, 247 F.3d 953, 960 n.4 (9th Cir. 2001).

Those who participate in the negotiations of contracts are entitled to testify as to their interpretation of ambiguous terms, however their testimony "must be grounded in ... the parties' expressed intent and understanding during the course of negotiations, rather than simply the witness's own subjective interpretation of the contract." *Onyx Pharma., Inc. v. Bayer Corp.*, 863 F.Supp.2d 894, 897–98 (N.D. Cal. 2011). The court finds that the contested portions of the declarations are nothing more than impermissible subjective interpretations of the meaning of the 1982 and 2007 Agreements. The Agreements speak for themselves, and the court strikes the contested portions of the declarations.

### B. Choice of Law

**\*3** The parties disagree on whether this dispute should be governed by the laws of the United States or the laws of England and Wales. Innovus contends that English law applies because Article 6.10 of the 2007 Agreement provides that "the applicable substantive law of the Agreement shall be the laws of England and Wales." Panasonic asserts that the #350 Patent is governed exclusively by the 1982 Agreement which contains no choice of law language. Panasonic further argues that this is a question of patent licensing and exhaustion which is to be governed exclusively by United States federal law.

The interpretation of contracts for rights under patents and patent licenses is "generally governed by state law." *Rhone–Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 284 F.3d 1323, 1327–28 (Fed. Cir. 2002); *see also Int'l Nutrition Co. v. Horphag Research LTD*, 257 F.3d 1324, 1329 (Fed. Cir. 2001) ("A contractual agreement to apply French law as to ownership is just as valid as an agreement to apply the law of a particular state."); *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1341 (Fed. Cir. 2001) (resolving a contractual licensing dispute under Ontario law).

In contrast to issues of pure contract interpretation, however, federal law applies to both substantive and procedural issues "intimately involved in the substance of enforcement of the patent right." *Arma Refrigeration, Inc. v. Quadlus, Inc.*, 172 F.3d 852, 855 (Fed. Cir. 1999). The Federal Circuit has explained that the effect of *a patent assignment* under a contract, as opposed to the interpretation of contract terms themselves, is an issue unique to patent law that is governed by federal law. *See Sky Tech v. SAP AG*, 576 F.3d 1374, 1379

Innovus Prime, LLC v. Panasonic Corporation, Not Reported in F.Supp.2d (2013)

2013 WL 3354390

Fed. Cir. 2009) ("Usually, federal law is used to determine the validity and terms of an assignment...."); DDB Tech., LLC v. MLB Adv. Media, LP, 517 F.3d 1284, 1290 (Fed. Cir. 2008) (The determination of whether a patent assignment clause creates automatic assignment or obligation to assign is treated as a matter of federal law.).

Here, the parties do not dispute whether the #350 Patent is an audio-video product subject to the 1982 Agreement, or the meaning of any other terms in the 1982 Agreement. Instead, the parties' dispute whether the mutual non-assertion agreement between Philips and Panasonic affected later assignees' patent rights. The effect of the assignments in this case on Panasonic's non-assertion rights is an issue unique to patent law that is "intimately involved in the substance of the enforcement" of the #350 Patent. See Sky Tech, 576 F.3d at 1379. Therefore, this dispute is governed by United States federal law.

The court does not agree with Innovus that the choice of law provision in the 2007 Agreement requires this dispute to be resolved under the laws of England and Wales. As discussed *infra,* the 2007 Agreement does not expressly limit or supersede the rights provided in the 1982 Agreement.[5] Regardless of whether the 2007 Agreement affects the 1982 Agreement, however, this dispute centers on the effect of Philip's *assignment* as opposed to general contract interpretation, and United States federal law applies.

## C. Effect of the Assignments of the #350 Patent on Panasonic's Non–Assertion Rights

**\*4** The relevant inquiry is whether the covenant not to sue between Philips and Panasonic affected later assignees' patent rights. After examining the 1982 Agreement, the 2007 Agreement, and the chain of assignments, this court concludes that Innovus is bound by the terms of the 1982 Agreement.

### 1. The parties' arguments

Panasonic asserts that the unambiguous language of the 1982 Agreement and the long history of the parties' operations under the agreement illustrate that the parties both created and intended to create an unconditional covenant not to sue for all audio and video patents issued before January 1, 2005, which extended for the full lives of the patents covered. Panasonic argues that, under *TransCore, LLC v. Electric Transaction*

*Consultants Corporation,* 563 F.3d 271 (Fed. Cir. 2009), unconditional covenants not to sue are equivalent to a non-exclusive license, and that all assignees of patents are bound by prior licenses. Therefore, Panasonic insists that Innovus, a subsequent assignee of the #350 Patent covered by the 1982 Agreement, does not possess the right to sue Panasonic for infringing the #350 Patent.

Innovus counters that the 2007 Agreement is controlling and expressly limits the effect of the non-assertion agreement to the first assignment. According to Innovus, the 2007 Agreement creates nothing more than a conditional covenant not to sue (conditioned on the patent being an audio or video patent issued before January 1, 2005), which is not equivalent to a license, and *is not transferable* to subsequent assignees. At oral argument, Innovus relied on *Hilgraeve Corp. v. Symantec Corp.* to support this proposition. 265 F.3d 1346 (concluding that a covenant-not-to sue "does not grant a *transferable* license to the patent."). Innovus attempts to distinguish this case from *TransCore* on the grounds that the parties in *TransCore* were the initial signatories of the covenant not to sue, whereas Innovus is the fourth assignee after the agreement. Finally, Innovus contends that the terms of the 2007 Agreement indicate that Panasonic's non-assertion rights were not automatically transferable by assignment because: (1) the 2007 Agreement did not expressly provide that the non-assertion agreement would be automatically binding on future assignees, but rather (2) provided for indemnification in the event that the non-assertion agreement was not *contractually extended* to future assignees.

In response, Panasonic argues that the 2007 Agreement supplements, but does not supersede, the 1982 Agreement, to include six new products not at issue here. Under the 1982 Agreement, as modified by the 2007 Agreement, Panasonic contents that it obtained the unconditional right not to be sued for the full life of the #350 Patent. Panasonic further rebukes Innovus's attempts to distinguish *TransCore,* asserting that the principle in *TransCore*—that a license and a covenant not to sue are both "authorizations"—is not negated by an assignment. Finally, Panasonic replies that any contractual clause expressly providing for automatic assignment of the covenant not to sue would be redundant because the #350 Patent could not be transferred free of the covenant as a matter of law.

2013 WL 3354390

## 2. Unconditional covenants not to sue
## are equivalent to non-exclusive licenses

**\*5** Under federal law, there is no substantive difference between an unconditional covenant not to sue and a non-exclusive license. *TransCore,* 563 F.3d at 1276 ("The real question, then, is not whether an agreement is framed in terms of a 'covenant not to sue' or a 'license.' That difference is one of form, not substance–both are properly viewed as 'authorizations.' "). In *TransCore,* the Federal Circuit held that the patentee's covenant-not-to sue authorized the covenantee, Mark IV, to sell the patented invention to the defendant, Electronic Transaction Consultants ("ETC"). *Id.* at 1274. The court reasoned that the covenant not to sue "authorize[d] all acts that would otherwise be infringements: making, using, offering for sale, selling, or importing." *Id.* Thus, for the purposes of patent exhaustion, the court held that the patentee's rights were exhausted with respect to the patented articles sold to ETC by the Mark IV. *Id.*

A patent license is nothing more than a promise by the patent owner not to sue the licensee. *See TransCore,* 536 F.3d at 1276; *see also De Forest Radio Tel. & Tel. Co. v. United States,* 273 U.S. 236, 242 (1927) ("As a license passes no interest in the monopoly, it has been described as a mere waiver of the right to sue by the patentee."). No particular language or form is necessary to give a license its effect, "[a]ny language ... from which [one] may properly infer that the owner consents to his use of the patent in making or using it, or selling it ... constitutes a license." *De Forest Radio,* 273 U.S. at 241. Here, although Philip's "authorization" to Panasonic was in the form of a covenant not to sue, it had the same substantive effect of a non-exclusive license. *See TransCore,* 526 F.3d at 1274; *De Forest Radio,* 273 U.S. at 241–42. The issue is whether Philips could assign the # 350 Patent free and clear of the covenant not to sue Panasonic.

It is a longstanding principle that an assignee of a patent takes the patent subject to prior licenses. *Keystone Type Foundry v. Fastpress Co.,* 272 F. 242, 245 (2d Cir. 1921); *see also L.L. Brown Paper Co. v. Hydroiloid, Inc.,* 118 F.2d 674, 677 (2d Cir. 1941) ("The assignee of a patent taking title subsequent to the granting of a license under patent receives no more than the former owner's interest, including the usual rights of a patent owner diminished by the licensee's right to use the patented process within scope of its license."). Patent owners cannot transfer an interest greater than what they possess, so assignees "take[ ] a patent subject to the legal encumbrances

thereon." *Datatreasury Corp. v. Wells Fargo & Co.,* 522 F.3d 1368, 1372–72 (Fed. Cir. 2008) (explaining that agreements involving the actual use of the patent "run with the patent" and are binding on subsequent owners, but holding that arbitration clauses in license agreements do not involve actual use and do not run with the patent). Thus, assignment results in the assignee "stepping into the shoes with regard to the rights that the assignor held and not in an expansion of those rights." *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.,* 247 F.3d 44, 60 (3d Cir. 2001); *see also Epistar Corp. v. Int'l Trade Comm'n,* 566 F.3d 1321, 1333 (Fed. Cir. 2009) ("Black letter contract law states that the assignment of a contract to an assignee ... only changes the obligated party, not the scope of the obligation."). Assignment transfers assignor's contract rights, "leaving them in full force and effect." *Medtronic,* 247 F.3d at 60. In sum, "one cannot convey what one does not own." *TransCore,* 563 F.3d at 1275.

This occurs whether or not an assignee had notice. A subsequent assignee "takes title to the patent subject to such licenses, of which he must inform himself as best he can at his own risk." *Jones v. Berger,* 58 F. 1006, 1007 (C.C.D. Md. 1893); *see also V–Formation, Inc. v. Benetton Group SpA,* No. 02–2259, 2006 WL 650374, at \*7 (D.Colo. Mar. 10, 2006) (extending this reasoning to covenants not to sue). In *V–Formation,* K–2 Corporation entered into a covenant not to sue with defendant Benetton Group, which included the two patents at issue. *Id.* at \* 1. K–2 later *assigned* all of its rights to those two patents to V–Formation, Inc. (to settle a separate litigation). *Id.* at \*2. V–Formation was unaware of K–2's covenant not to sue Benetton. *Id.* The issue, like the issue here, was whether V–Formation (assignee) could sue Benetton (recipient of covenant not to sue). The court held that V–Formation could not sue Benetton for infringement, because K–2 did not possess the right to sue Benetton, and K–2 *could not have assigned this right* to V–Formation. *Id.* at \*5. The court reasoned that "upholding the covenant not to sue ... does not deprive V–Formation of its ownership interest in the patents; it merely limits its right to sue one entity (Benetton) for infringement." *Id.* at \*8. The court also held that V–Formation's lack of knowledge of the covenant not to sue did not entitle it to bring suit. *Id.* at \*7 ("The court does not agree that that the doctrine of 'bona fide purchaser' as urged by V–Formation precludes Benetton from asserting the covenant not to sue as a defense in this case."). This case is analogous to the situation here.

### 3. *Hilgraeve*

**\*6** At oral argument, Innovus relied on *Hilgraeve* for the proposition that the covenant not to sue in this case is *not transferable* in the same way as a license would be. In *Hilgraeve,* the patent owner, Hilgraeve Corp., granted a covenant not to sue to covenantee Delrina, Corp. with respect to patents for software. 265 F.3d at 1345. The covenant was contained in a Technology Transfer Agreement transferring Hilgraeve's *copyrights* in that software to Delrina. *Id.* at 1340, 1345. Delrina subsequently licensed its intellectual property rights to defendant Symantec Corp. *Id.* at 1340. Hilgraeve sued Symantec for patent infringement, and Symantec argued as one of its defenses to infringement that it had obtained a license to the patent at issue from Delrina. *Id.* at 1344. The Federal Circuit rejected Symantec's argument on the grounds that "Delrina ... itself never acquired a transferable license to practice the [patent in suit], and Delrina ... therefore could not sub-license the [patent in suit]." *Id.*The court first concluded that the Technology Transfer Agreement did not transfer any rights to the patent, only the copyrights. *Id.* at 1345. The court also held that the covenant not to sue with respect to the patents did "not grant a *transferable* license to the patent." *Id.* at 1346 (emphasis in original).

Unlike the situation in *Hilgraeve,* here, Panasonic is not attempting to convey a license to anyone. Instead, Panasonic is merely seeking *not to be sued,* the right which is possesses under the 1982 and 2007 Agreements. While it is true that Panasonic may not be able to *grant a license* to the # 350 Patent to a third party, it is not attempting to do so. The question is whether Philips can convey the right to sue Panasonic, a right which it does not possess, to *assignees.*

### 4. Application

The 1982 Agreement between the Panasonic and Philips was a mutual agreement that neither party would assert patent rights for video and audio patents filed or entitled to a priority date before January 1, 2005 against the other. 1982 Agreement at 1 ("It has always been understood between us that ... neither [Panasonic] nor Philips shall assert against the other any patent rights."). The language of the 1982 Agreement is clear that the covenant not to sue extended "for the respective full lives of the patent rights concerned." 1982 Agreement at 2. The #350 Patent issued to Philips on January 18, 1994, and is thus a covered patent under the Agreements.

The agreement between the parties, regardless of the formal language used, unconditionally authorized Panasonic to make, use, or sell the invention of the #350 Patent for the full life of the patent, and thus has the same effect as a license. *See TransCore,* 563 F.3d at 1276; *De Forest Radio,* 273 U.S. at 241–42. Nothing in the 2007 Agreement affects Panasonic's non-assertion rights with respect to the #350 Patent. The 2007 Agreement, by its terms, is a formal supplement to the 1982 Agreement, to aid the parties in the interpretation of the term "audio and video products" under the 1982 Agreement with respect to six new product categories. 2007 Agreement at 1 ("WHEREAS, the Parties have been engaged in a dispute regarding the interpretation of the term 'audio and video products' under the Original Agreement with respect to the Six Product Categories."). Nothing in the 2007 Agreement explicitly alters or is inconsistent with the scope of the rights defined in the 1982 Agreement. [6] The #350 Patent was issued in 1994, under the first five year continuation of the 1982 Agreement, it was not one of the six disputed products, and it is therefore covered by the 1982 Agreement. Thus, the covenant not to sue with respect to the #350 Patent began on its issuance in 1994 and extended for the life of the patent.

**\*7** In addition to the unambiguous language of the contract, the parties have operated for years as if consenting to each other's use, without any objection. *See also Old Colony Trust Co. v. Omaha,* 23 U.S. 100, 118 (1913) ("The practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed to have great, if not controlling influence."). The parties' conduct bolsters what the plain and unambiguous language of the contract creates: an implied non-exclusive license.

While this court understands the unfairness that may arise from an assignee not being on notice of a prior covenant not to sue or license, it is well settled that assignees take a patent subject to any prior licenses. *See In re Cybernetic Servs.,* 252 F.3d 1039, 1052 (9th Cir. 2001). And licenses are not required to be recorded any more than covenants not to sue. *See id.* (holding that security interests that do not involve transfers of rights do not need to be recorded as they are "a 'mere license' ... [and] not an 'assignment, grant or conveyance' within the meaning of 25 U.S.C. § 261"; *see also Keystone,* 272 F. at 245 (" [I]t had long passed into the text-books that ... an assignee acquired title subject to prior licenses of which the assignee must inform himself as best he can, and at his own risk."). The assignee's duty to inform himself of encumbrances on the patent rights exists regardless of the

formal definition of the agreement as a covenant not to sue. As such, the fact that Innovus is a fourth generation assignee does not change the fact that Innovus did not acquire the right to sue Panasonic under the #350 Patent because neither Philips nor any later assignee could "convey what [it] does not own." *TransCore,* 563 F.3d at 1275.

Moreover, the first assignment, from Philips to NXP B.V., specifically states that the Assignee, NXP B.V., took the patent

> subject to Assignor [Philips] retaining a royalty free, world wide, nonexclusive, irrevocable and unrestricted license ... and further subject to all existing rights, licenses, non-assertion agreements and the like made by the Assignor ... and/or its affiliates under said Patent Rights and to any extension of term and/or renewals thereof.

1st Assignment at Reel 021411, Frame 0447. Thus, NXP B.V. expressly took the patent subject not only to Philip's continued license, but also subject to Panasonic's non-assertion rights. A patent owner cannot transfer an interest greater than what it possesses. *TransCore,* 563 F.3d at 1275; *Epistar,* 566 F.3d at 1321. Because Philips never possessed the right to sue Panasonic, Philips could not convey that right to NXP B.V., NXP B.V. could not convey that right to NXP Holdings, and NXP Holdings could not convey that right to Innovus. All of these assignments are available as a matter of public record, including the first assignment from Philips to NXP B.V., which contains the express limitations on the rights transferred and should have put Innovus on notice of the non–assertion rights (although notice is not required, as explained *supra*).

The court is also not persuaded that the analysis changes in view of: (1) the absence of an explicit clause in the 1982 or 2007 Agreements binding all future assignees; (2) Article 6.5.4 of the 2007 Agreement; or (3) Article 4 of the 2007 Agreement. First, the court agrees with Panasonic that any explicit clause in the 1982 or 2007 Agreements binding all future assignees to the non-assertion agreement would be redundant because, as explained, Philips could not convey the right to sue Panasonic in any event.

 **\*8** Second, Article 6.5.4 of the 2007 Agreement only confirms that Philips did not possess the right to sue

Panasonic. The provision states that nothing in either Agreement "shall be construed as: conferring by implication, estoppel or otherwise, upon any Party hereunder, any license or other right under any Patent, except the *non-assertion rights* expressly granted herein." 2007 Agreement, Article 6.5.4 (emphasis added). This plain language is clear that the clause was not intended to limit the continued application of the covenant not to sue.

Finally, neither does Article 4 of the 2007 Agreement—which refers to what should be done in the event of acquisition of subsidiaries, divestiture of business, and transfer of patent rights falling within the scope of the agreement—change the analysis. Article 4.4 requires that, in the event of transfer of rights, each party should

> contractually require the entity acquiring said Patents to continue to provide the rights granted under the [1982] Agreement and this Agreement to the other Party. In the event that a Party transfers one or more of the Patents but fails to comply with the requirements of this ... said Party shall indemnify and hold harmless the other Party.

This clause merely reiterates what the law already requires: subsequent parties are bound by the existing agreement. At most, this clause provides a guarantee of notice to the future assignee, ideally to avoid lawsuits like the instant one. [7] Similarly, the letter from NXP B.V., the first assignee, to Panasonic merely acknowledged that they would continue to honor the non-assertion agreement with respect to the #350 Patent. Watanabe Decl., Ex. 3 Dkt. No. 53–3 ("NXP B.V. Letter"). As explained, however, this acknowledgment does not change the fact that Philips could not convey the right to sue Panasonic, a right which it did not possess.

Therefore, whether the Philips–Panasonic agreement is referred to as a "non-exclusive license" or a "covenant not to sue," under either name, it took away Philip's right to exclude Panasonic from practicing the invention of the #350 Patent. Philips, then, could not convey the right to exclude Philips to NXP B.V. and so on, to Innvus. Innovus does not possess the right to sue Panasonic for infringement of the #350 Patent. [8]

Innovus Prime, LLC v. Panasonic Corporation, Not Reported in F.Supp.2d (2013)

2013 WL 3354390

### III. ORDER

For the foregoing reasons, defendant's motion for summary judgment is GRANTED.

Footnotes

1    The original agreement initially covered patents filed or entitled to priority before January 1, 1990, but pursuant to its terms, the agreement automatically extended for five year periods until one party elected not to extend and gave the requisite notice. On October 22, 2003, Philips elected not to renew the 1982 Agreement and it thus expired as of January 1, 2005.

2    Specifically, with regard to the Watanabe Declaration, Innovus asks the court to strike the second sentence of ¶ 5, the entirety of ¶ 6, the second and third sentences of ¶ 7, and the entirety of ¶ 8. With regard to the Peters Declaration, Innovus asks the court to strike the first sentence of ¶ 3 and the entirety of ¶¶ 4–7.

3    Innovus filed the same motion on two occasions: (1) once in conjunction with its opposition brief, and (2) again one week later accompanied by a motion to expedite.

4    The court considers Innovus's motion to strike in conjunction with the present motion for summary judgment.

5    The plain language of the 2007 Agreement makes clear that the choice of law provision only applies to the 2007 Agreement. *Compare* 2007 Agreement, Article 6.10 ("The applicable substantive law of *the Agreement* shall be the laws of England and Wales") (emphasis added) *with* 2007 Agreement, Articles 6.2–6.9 (all of which contain either "of *this* Agreement *and* the [1982] Agreement" or "of *this* Agreement *or* the [1982] Agreement") (emphases added).

6    Specifically, Article 5 of the 2007 Agreement refers to "Interpretation of the Original Agreement," and Article 2 states: "[t]he parties confirm and agree that the Six Product Categories are within the scope ... [of] the [1982] Agreement." This clearly indicates that the 2007 Agreement acknowledges the Original Agreement to still be in effect and not superseded. Moreover, nothing in Article 5 alters any of the parties' non-assertion rights.

7    Innovus alleges that under English law's purposive interpretation of contracts, it would be a breach of contract for Philips or any later assignee transfer the patent without a limitation written into the assignment. Whether Philips is in breach of contract, however, does not change the fact that the Philips could not convey the right to sue Panasonic.

8    Panasonic also argues that Innovus's patent rights were exhausted. The court concludes that a patent exhaustion analysis is not required to reach the conclusion that Innovus does not possess the right to sue Panasonic.

**End of Document**                          © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 87

173 F.Supp.2d 201
United States District Court,
D. Delaware.

INTEL CORPORATION, Plaintiff,

v.

BROADCOM CORPORATION, Defendant.

No. 00−796−RRM.   |   Nov. 20, 2001.

Patentee brought action against company that sold products to patentee's licensees, alleging infringement of various patents relating to semiconductor technology. Company asserted license defenses. On cross-motions for summary judgment, the District Court, McKelvie, J., held that: (1) scope of patent license in joint development agreement was governed by section explicitly addressing patent rights; (2) license did not extend to patents at issue; (3) subsidiary of party to separate license and cooperation agreement with patentee was not covered by license in that agreement; and (4) fact issues existed as to whether company made accused products pursuant to requests from licensees, such that company's sales were encompassed within licensees' "have made" rights.

Granted in part and denied in part.

West Headnotes (30)

**[1]**   **Patents**
          👉 **License**

Party asserting affirmative license defenses to claims of patent infringement would bear the burden of proving each of those defenses at trial.

3 Cases that cite this headnote

**[2]**   **Contracts**
          👉 **Questions for Jury**

Contract interpretation is treated as a question of law.

Cases that cite this headnote

**[3]**   **Federal Courts**
          👉 **Contracts, Sales, and Assignments**

A license agreement is a contract governed by state law.

1 Cases that cite this headnote

**[4]**   **Contracts**
          👉 **Questions for Jury**

Under California law, contract interpretation is a matter of law that is to be decided by the court.

Cases that cite this headnote

**[5]**   **Contracts**
          👉 **Ambiguity in general**

Under California law, the determination of whether a written contract is ambiguous is a question of law that must be decided by the court.

Cases that cite this headnote

**[6]**   **Contracts**
          👉 **Intention of Parties**
          **Contracts**
          👉 **Language of contract**

Under California law, a contract must be interpreted so as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful, and such intent is to be inferred, if possible, solely from the written provisions of the contract. West's Ann.Cal.Civ.Code §§ 1636, 1639.

1 Cases that cite this headnote

**[7]**   **Contracts**
          👉 **Application to Contracts in General**
          **Contracts**
          👉 **Existence of ambiguity**
          **Evidence**
          👉 **Grounds for admission of extrinsic evidence**

In construing a contract under California law, no term shall be considered uncertain or ambiguous if its meaning can be ascertained by fair inference from the terms of the agreement and, thus, if the contractual language is clear and explicit, it governs; if, however, the contract is ambiguous,

extrinsic evidence regarding the parties' intent is admissible to help interpret the contract terms.

1 Cases that cite this headnote

**[8]**    **Contracts**
  👈 Existence of ambiguity
  **Contracts**
  👈 Ambiguity in general

Under California law, the mere fact of disagreement between the parties as to the correct interpretation of specific terms or sections of an agreement does not render it ambiguous; rather, the determination of whether a contract is ambiguous is the court's to make.

Cases that cite this headnote

**[9]**    **Evidence**
  👈 Grounds for admission of extrinsic evidence

Under California law, a court may provisionally receive extrinsic evidence to aid in its determination of whether the contract at issue is ambiguous; if, after considering all of the evidence, the court determines that the contract is unambiguous, any extrinsic evidence that has been submitted for the purpose of demonstrating an ambiguity in the contract is no longer relevant, but when the court finds that a contract is ambiguous, the extrinsic evidence may be used by the court to interpret the ambiguous terms.

Cases that cite this headnote

**[10]**    **Contracts**
  👈 Construction as a whole
  **Contracts**
  👈 Conflicting clauses in general

Under California law, where two clauses of an agreement appear to be in direct conflict, it is the duty of the court to reconcile such clauses so as to give effect to the whole of the instrument.

Cases that cite this headnote

**[11]**    **Patents**
  👈 Construction and Operation of Licenses

Under California law, scope of patent license contained in joint development agreement between parties who sought to develop an Ethernet silicon chip was governed by section of agreement that explicitly set forth a mutual patent license, not by broader section dealing with other intellectual property rights, in view of parties' stated intent, language of agreement, and extrinsic evidence.

1 Cases that cite this headnote

**[12]**    **Patents**
  👈 Implied licenses

Under California law, although patent licenses may be implied by language or conduct of the owner, where an agreement contains a specific provision expressly defining the scope of the patent license implied licenses dealing with the same subject matter are not generally recognized.

1 Cases that cite this headnote

**[13]**    **Patents**
  👈 Construction and Operation of Licenses

Under California law, mutual patent license in joint development agreement for semiconductor technology, which licensed patents owned by patentee on effective date of agreement as well as later-issued related patents, did not extend to patent that was not owned by patentee on effective date of agreement; subsequent amendment to agreement did not change effective date for purposes of patent license.

Cases that cite this headnote

**[14]**    **Patents**
  👈 Construction and Operation of Licenses

Under California law, even if effective date in patent license contained in joint development agreement for semiconductor technology was modified by amendment to agreement, patentee did not own patent at issue at time of amendment's later effective date, and patent was thus not subject to license, because patent was owned at time of later effective date by wholly

owned subsidiary of patentee, and patentee did not acquire patent rights until subsidiary was subsequently dissolved and its assets transferred to patentee.

Cases that cite this headnote

**[15]  Patents**
    👈 Construction and Operation of Licenses

Under California law, even if patent license contained in joint development agreement for semiconductor technology was governed by agreement's section granting broader license to intellectual property rights, rather than section explicitly relating to patent rights, patent relating to a "ball grid array" semiconductor package that carried an integrated circuit was not included within scope of license, because technology embodied in the patent was not among the "deliverables" referenced in the broader license.

Cases that cite this headnote

**[16]  Patents**
    👈 Construction and Operation of Licenses

Under Delaware law, the interpretation of a patent license agreement is a question of law.

1 Cases that cite this headnote

**[17]  Contracts**
    👈 Construction as a whole
**Contracts**
    👈 Construing whole contract together

Under Delaware law, contracts must be construed as a whole, to give effect to the intentions of the parties.

Cases that cite this headnote

**[18]  Contracts**
    👈 Language of Instrument

Under Delaware law, where the contract language is clear and unambiguous, the parties' intent is ascertained by giving the language of the contract its ordinary meaning.

2 Cases that cite this headnote

**[19]  Contracts**
    👈 Construction as a whole
**Contracts**
    👈 Construing whole contract together

Under Delaware law, in upholding the intentions of the parties, a court must construe an agreement as a whole, giving effect to all provisions therein, and the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan.

Cases that cite this headnote

**[20]  Evidence**
    👈 Grounds for admission of extrinsic evidence

Under Delaware law, the court will consider extrinsic evidence to interpret an agreement only if there it finds that is ambiguity in the contract.

Cases that cite this headnote

**[21]  Patents**
    👈 Construction and Operation of Licenses

Under Delaware law, sales of products by manufacturer of video chips to purchaser were not covered by license in cooperation agreement between purchaser's parent company and patentee, which licensed particular business units of parent company to use and have made certain defined licensed semiconductor products; although purchaser was wholly-owned subsidiary of parent, there was no evidence that purchaser assumed obligations of parent pursuant to the agreement, namely, the obligation to extend patentee a mutual license to purchaser's own patents.

Cases that cite this headnote

**[22]  Patents**
    👈 Rights and powers of patentees as to making, use, or sale of invention

A patent confers upon its owner a bundle of rights relating to the patented invention, including the rights to exclude others from making, using, or selling the subject of the patent. 35 U.S.C.A. § 271(a).

Cases that cite this headnote

[23]    **Patents**
    Licensees

Patent license agreements allow third-party licensees to have partial or complete access to the patented invention by providing immunity from an infringement suit on the licensed patent.

Cases that cite this headnote

[24]    **Patents**
    Licensees

A patent license is essentially a waiver of the patent owner's right to sue; the parties agree that the patent owner will allow the licensee either to make, to use, to sell (or some combination of, or derivative of, these three rights) without subjecting the licensee to an infringement suit.

1 Cases that cite this headnote

[25]    **Patents**
    Licensees

A valid license is a complete defense to patent infringement.

1 Cases that cite this headnote

[26]    **Patents**
    As to third persons

A "have made" right, which is a right carved from the right "to make" a patented invention, provides a licensee with the right to request an unlicensed third party to manufacture a licensed good for the licensee. 35 U.S.C.A. § 271(a).

4 Cases that cite this headnote

[27]    **Patents**
    Particular cases

Genuine issues of material fact as to whether alleged patent infringer made accused products pursuant to requests from patentee's licensees, such that sales of products to licensees were encompassed within licensees' "have made" rights, precluded summary judgment for either patentee or alleged infringer on alleged infringer's license defense to claim of patent infringement.

2 Cases that cite this headnote

[28]    **Patents**
    As to third persons

An unlicensed third party that makes an allegedly infringing device is afforded the protections of a license for the patented invention if those protections are conveyed by a licensee to the third party as an exercise of the licensed party's "have made" rights.

5 Cases that cite this headnote

[29]    **Patents**
    As to third persons

Patentee's granting of "have made" rights to licensee does not give the licensee the inherent right to in some way immunize prior acts of infringement through its subsequent purchase of off-the-shelf goods; to the extent that the "have made" right allows the licensee to purchase the licensed products off of the shelf of an unlicensed third party, that right may shield the licensee from subsequent liability for using or selling that product, but the "have made" right in that situation does not immunize the unlicensed third party.

7 Cases that cite this headnote

[30]    **Patents**
    Original utility

4,823,201,   4,975,830,   5,079,630,   5,134,478, 5,894,410. Cited.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*204** J. Andrew Huffman, Fish & Richardson P.C., Wilmington, Delaware; John E. Gartman, and Juanita Brooks, Fish & Richardson P.C., San Diego, California; for plaintiff.

Richard H. Morse, and John W. Shaw, Young, Conaway, Stargatt & Taylor, LLP, Wilmington, Delaware; Ron E. Shulman, and Rodney Strickland, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, California; Raphael L. Lupo, Terrance McMahon and Vera Elson, McDermott, Will & Emery, Menlo Park, California; for defendant.

**Opinion**

**MEMORANDUM OPINION**

McKELVIE, District Judge.

This is a patent case. Plaintiff Intel Corporation is a Delaware corporation with its principal place of business in Santa Clara, California. Intel owns U.S. Patent Nos. 4,823,201 (the '201 patent); 4,975,830 (the '830 patent); 5,894,410 (the '410 patent); 5,079,630 (the '630 patent); and 5,134,478 (the '478 patent). Defendant Broadcom Corporation is a California corporation with its principal place of business in Irvine, California.

**\*205** On August 30, 2000, Intel filed its complaint in this case alleging that Broadcom is infringing, inducing infringement of, or committing acts of contributory infringement of one or more claims of the '201 patent, the '830 patent, the '410 patent, the '630 patent, and the '478 patent. In order to simplify the issues before the jury and to shorten the length of the jury trial, the court has since required that the trial proceed in two parts. The first trial is scheduled to begin on November 28, 2001, and will cover the '201 and the '830 patents. A subsequent trial will cover the remaining three patents.

On October 10, 2000, Broadcom moved to dismiss Intel's complaint or, in the alternative, to transfer the action to the United States District Court for the Northern District of California. After eleven months of discovery, the court heard oral argument on Broadcom's motion on September 24, 2001. In a memorandum opinion dated October 9, 2001, the court denied Broadcom's motion. Broadcom subsequently answered Intel's complaint on October 23, 2001. As Broadcom had indicated in earlier interrogatory responses,

the answer included a number of affirmative defenses relating to license agreements.

In anticipation of these affirmative defenses, Intel has filed three sets of partial summary judgment motions relating to Broadcom's license defenses. Broadcom has cross-moved for summary judgment on the latter two of these motions.

On September 21, 2001, Intel moved for summary judgment that Broadcom's allegedly infringing products are not licensed under the '830 or '410 patents. Intel argues that the scope of the January 22, 1995 Intel Product Development and License Agreement (the "Joint Development Agreement") between Intel and Broadcom does not include a license for Broadcom to make, sell, or use the accused products in this suit under either the '830 or '401 patent. Broadcom filed its answering brief on October 12, 2001 and later filed a corrected answering brief on October 18, 2001. Intel filed its reply brief in support of its summary judgment motion on October 22, 2001.

On September 28, 2001, Intel moved for summary judgment that Broadcom's allegedly infringing products are not licensed under an Intel–Motorola license agreement (the "Motorola Agreement"). This motion relates to Broadcom's affirmative defense that its products accused of infringing the asserted claims of the '478, '201, and '630 patents are licensed by Intel to the extent those products were made for or sold to General Instrument Corporation, a wholly owned subsidiary of Motorola, Inc, pursuant to a June 9, 1997 license agreement between Intel and Motorola that gives Motorola the right to "have [Licensed Products] made" for it. On October 18, 2001 Broadcom cross-moved for summary judgment that the accused products it sells or has sold to General Instrument Corporation are licensed under the Motorola Agreement. On the same day, Broadcom filed its answering brief in opposition to Intel's motion and opening brief in support of its cross-motion for partial summary judgment. On October 25, 2001, Intel filed its reply brief in support of its motion and answering brief in opposition to Broadcom's cross-motion. On November 1, 2001, Broadcom replied to Intel's answering brief.

On October 16, 2001, Intel moved for summary judgment that Broadcom's accused products are not licensed under Intel license agreements with Sony Corporation, NEC Corporation, Samsung Corporation, Siemens AG, and Compaq Corporation to the extent those products were made for or sold to those companies. On October

30, 2001, Broadcom **206** cross-moved for summary judgment that Broadcom's sales to various Intel licensees of accused products that qualify as "Licensed Products" under the individual terms of the license agreements are licensed by Intel and are therefore noninfringing. The Intel licensees listed by Broadcom are the five companies referred to in Intel's summary judgment motion and the following seven additional companies: AT & T Corporation, Hayes Microcomputer Products, Inc., Hewlett–Packard Corporation, Hitachi Ltd., Hyundai Electronics Industries Co., Ltd., Mitsubishi Electric Corporation, and N.V. Phillips Gloeilampenfabrieken. Also on October 30, Broadcom filed its answering brief in opposition to Intel's summary judgment motion and its opening brief in support of its cross-motion. On November 6, 2001, Intel filed a reply brief in support of its motion and answering Broadcom's cross-motion. Broadcom filed its reply brief in support of its cross-motion on November 13, 2001.

These five motions for partial summary judgment on license defenses are now fully briefed. This is the courts decision on those motions.

## I. *DISCUSSION*

### A. *Standard for Decision*

 **[1]**    At trial, as the party asserting certain affirmative license defenses, Broadcom would bear the burden of proving each of these defenses. *See McCoy v. Mitsuboshi Cutlery, Inc., 67 F.3d 917, 920 (Fed.Cir.1995).* Acts can be infringements only if they are carried out "without authority." 35 U.S.C. § 271(a), (f), (g). Thus for each of the license defenses it asserts, Broadcom must prove at trial either that it has a license from Intel that authorizes it to make, use, and sell its accused products or that its development and subsequent sale of accused products to Intel licensees was authorized under those licensees' licenses with Intel.

Federal Rule of Civil Procedure 56 provides for summary judgment in a party's favor on "all or any part" of a claim when, upon reviewing the factual record developed by the parties, there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P 56(a), (c).

Under Rule 56, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).* The movant may

meet this burden by "showing—that is, pointing out to the [ ] court—that there is an absence of evidence to support [the non-moving party's] case." *Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).*

Once the moving party has made the required showing, the non-moving party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).* A genuine issue for trial is present when the record would enable a reasonable trier of fact to find in favor of the non-moving party. *Anderson, 477 U.S. at 248, 106 S.Ct. 2505.*

 **[2]**    Many of the issues presented in the parties' motions are essentially questions of contract interpretation. Contract interpretation is treated as a question of law. *Klair v. Reese, 531 A.2d 219, 222 (Del.1987)* (applying Delaware law); *see also United States v. King Features Entmn't, Inc., 843 F.2d 394, 398 (9th Cir.1988)* (applying California law). When necessary, the court will determine whether, as a matter of the applicable law under each **207** agreement, extrinsic evidence may be considered by a fact finder to interpret ambiguous sections of a license agreement or whether the agreement at issue is unambiguous.

In this case, in order for the court to grant summary judgment in favor of Intel on Broadcom's license defenses, Intel must show that no reasonable fact finder could return a verdict in Broadcom's favor on its license defense. In order to grant summary judgment in favor of Broadcom on its license defenses, Broadcom must show that no reasonable fact finder could return a verdict in Intel's favor on Broadcom's license defenses. With these standards in mind, the court will turn to the substance of the parties' motions.

### B. *Should the Court Grant Intel's Motion for Summary Judgment That Broadcom's Accused Products Are Not Licensed Under the '830 and '410 Patents?*

### 1. *The Intel–Broadcom Joint Development Agreement*
On January 22, 1995, Intel and Broadcom entered into a joint development agreement entitled "Intel Product Development and License Agreement." While the parties dispute the intended and ultimate scope of the agreement, according to the agreement itself, the Joint Development Agreement contemplates each party exchanging proprietary technology to jointly develop a specific 100 Mbps Ethernet silicon chip ("the Product").

In order to accomplish this goal, pursuant to the agreement, Intel agreed to deliver certain of its hardware and software technologies to Broadcom (the "Intel Deliverables") and Broadcom agreed to deliver certain of its digital signaling technology to Intel (the "Broadcom Deliverables"). That much is clear from the Joint Development Agreement's section entitled "Recitals," which states in full that:

> Broadcom is a developer of certain digital signaling technology; and

> Intel is a developer of certain hardware and software technologies. Intel desires to license Broadcom's above technology for use in jointly developing with Broadcom a 100 Mbps Ethernet silicon chip.

> Intel also desires to grant a limited license to its foregoing technologies to Broadcom for Broadcom to manufacture the foregoing chip and for each Party to make, use, market, sell, and distribute such chip subject to this Agreement.

> The Parties also desire that Intel use the above license from Broadcom to create a 100 Mbps Ethernet adapter card based on such chip for Intel to exclusively market and distribute subject to the terms herein and market other software and hardware Intel products related thereto.

In section 1.15, the Joint Development Agreement defines the jointly developed "Product" as "only the silicon chip defined by the Product Specifications developed pursuant to this Agreement, which chip is derived from Broadcom Deliverables and includes certain Intel Deliverables and Upgrades." The "Product Specifications" are defined as "the specifications in PHY 100 EAS Release Revision 1.3 (October 1994) and Data Sheet for the Product," both of which were attached to the Joint Development Agreement as Exhibit B.

The most relevant sections of the Joint Development Agreement to the parties' dispute are sections 5.2 and 5.4, which are respectively entitled "License to Broadcom" and "Patent Covenant." The court will reproduce each section below.

Section 5.2 states:

> Intel grants to Broadcom a royalty-free, nonexclusive, perpetual, worldwide, nontransferable, **\*208** revocable for material breach license

to make, use, sell, reproduce, modify for internal and external use, advertise, market, make and have made by third parties to supply Broadcom hereunder and not for any such third parties to compete, directly or indirectly, with Intel, Broadcom Developments of, make and have made by third parties to supply Broadcom hereunder and not for any such third parties to compete, with Intel, incorporate, or license, and distribute the Intel Deliverables in physical form solely as an integral part of or incorporated in products to end users directly or indirectly through Broadcom's distribution channel of, without limitation, distributors, resellers, OEMS and representatives, subject to the exclusivity requirements and limitations set forth in Exhibit F.

Section 1.3 of the Joint Development Agreement indicates that the defined term "Broadcom Developments" means "hardware, derivative works, updates, enhancements, translations, and/or revisions of Intel Deliverables which incorporate or are derivatives of Intel Deliverables, developed by or for Broadcom and subject to the exclusivity requirements and limitations set forth in Exhibit F." Section 5.1 of the agreement grants an identical license to Intel with respect to Intel Developments of the Broadcom Deliverables. Thus these two sections, taken together, demonstrate that the agreement contains a mutual license between the parties to effectuate the parties' joint development effort.

Section 5.4, the patent covenant section, states:

> Each Party agrees that with respect to any patent which, as of the Effective Date, it owns or under which it has the right to grant licenses of the scope of the licenses granted in this Agreement, or any patent which may later issue which is related to the Product and based, in whole or part, on the IEEE 802.3 100 BaseT specification, it will not assert against the other Party to restrict its rights under this Agreement, nor against such Party's subsidiaries, licensees, or vendees, mediate or immediate, with respect to the Product,

any claims for infringement based on the manufacture, use, or sale of any apparatus made of sold by, for or under license from that Party.

Section 5.5 further qualifies the intellectual property license. It contains a provision that states that "the license grants in this Agreement do not include any right ... to Intel component level microprocessor technology ... including, but not limited to, the Intel X86 microprocessor chip series ...."

## 2. The Parties' Positions

### a. Intel's Position

Intel argues that the Joint Development Agreement does not grant to Broadcom any license to the '830 or '410 patents based on two limitations in section 5.4 (the patent covenant section) of the agreement. Under section 5.4, the patent license is limited to (i) patents that were owned by a party at the time of the agreement (January 22, 1995), or later issued; and (ii) patents that relate to the Product defined by the agreement and are based on the IEEE 802.3 100 BaseT specification. The IEEE 802.3 100 BaseT specification is the networking standard for 100 Mbps Fast Ethernet that has been agreed upon by the 802.3 working group of Institute of Electrical and Electronics Engineers.

Intel argues that because the '830 patent issued in 1990, but was not acquired by Intel until December 28, 1998, the '830 patent is not licensed under the patent covenant section of the agreement. The '830 patent was acquired by Intel **209** through the merger with, and later liquidation of, Dayna Communications, Inc. The '830 patent issued on December 4, 1990 and listed Dayna Communications as the Assignee. On October 10, 1997, Intel and Dayna entered into a Plan of Merger under which Dayna Communications would continue as a wholly owned subsidiary of Intel. On December 28, 1998, Dayna Communications was dissolved, giving Intel "all assets of Dayna, tangible and intangible, real and personal ...." The transfer of the '830 patent was recorded with the U.S. Patent and Trademark Office on that same day. The '830 patent automates the process by which devices on a network that can communicate by multiple formats select the optimal format for communication. Intel alleges in this lawsuit that the '830 patent covers the process known as "auto-negotiation" that is used in Broadcom's ethernet devices and described in the IEEE 802.3 standard.

Intel's '410 patent is entitled "Perimeter Matrix Ball Grid Array Circuit Package with a Populated Center." The '410 patent relates to a type of ball-grid-array semiconductor package that carries an integrated circuit; this technology is not described in the Joint Development Agreement's specifications defining "the Product" and is unrelated to the IEEE 802.3 BaseT specification. Therefore, Intel argues that the '410 patent is not licensed under the patent covenant in the agreement.

Intel further argues that even if the court were to find that the patent covenant grants Broadcom a license to the '830 and '410 patent, summary judgment would still be appropriate on a separate ground. The Agreement between Intel and Broadcom only grants a license "with respect to the Product" jointly developed by the parties, which is defined in the agreement as only the specific silicon chip jointly developed by Intel and Broadcom in accordance with the specifications set forth in the agreement. Intel contends that because Broadcom cannot demonstrate that any of the accused products are the "Product" jointly developed by Intel and Broadcom, partial summary judgment in its favor is appropriate.

### b. Broadcom's Position

Broadcom takes issue with Intel's interpretation of the agreement, and argues that section 5.2, entitled "License to Broadcom," and not section 5.4 defines the scope of the license. As noted above, section 5.2 provides Broadcom with a perpetual, worldwide license to make, use, sell, reproduce, modify, and market "Broadcom Developments" of the "Intel Deliverables." Intel Deliverables is defined in the agreement to include the VHDL hardware description code for "auto-negotiation," a key feature of the allegedly infringing products sold by Broadcom.

According to Broadcom, section 5.2 confers a license to all Intel patents (and other rights) with respect to "Broadcom Developments of ... Intel Deliverables." Broadcom bases this argument on the meaning of Broadcom Developments, which is defined as "hardware, derivative works, updates, enhancements, translations, and/or revisions of the Intel Deliverables which incorporate or are derivatives of Intel Deliverables, developed by or for Broadcom ...." Broadcom contends that this definition demonstrates that the Joint Development Agreement did not only grant patent rights relating to the defined "Product," but instead granted a broad

set of rights to make future products that are derived from the chip that is the subject of the agreement. Broadcom thus claims that Intel provided Broadcom with the allegedly infringing auto-negotiation technology along with an express license to modify Intel's technology and make derivative **\*210** works to be incorporated into Broadcom's products. Therefore, the products accused of infringing the '830 and '410 patents cannot infringe because they are expressly licensed by Intel.

In Broadcom's view, section 5.4 does not limit, but rather supplements, Intel's license grant to Broadcom. Section 5.4 complements section 5.2 by extending the license of section 5.2 to vendees and remote users who might otherwise be subject to patent infringement claims. Accordingly, Broadcom opposes Intel's motion for summary judgment on the Joint Development Agreement, arguing that there is a material issue of fact as to the scope of the license in the agreement.

### 3. *The Court's Decision*

#### a. *Principles of Applicable Law*

[3]   A license agreement is a contract governed by state law. *See Power Lift, Inc. v. Weatherford Nipple–Up Systems, Inc.,* 871 F.2d 1082, 1085 (Fed.Cir.1989). Pursuant to Section 25 of the Joint Development Agreement, which states that "[the] Agreement will be governed and interpreted by the laws of the State of California," the court will interpret the agreement under California law.

[4]   [5]   Under California law, contract interpretation is a matter of law that is to be decided by the court. *King Features,* 843 F.2d at 398 ("Interpretation of a contract is a matter of law ...."); *see also Shaw v. Regents of University of California,* 58 Cal.App.4th 44, 67 Cal.Rptr.2d 850, 855 (1997). Moreover, "the determination of whether a written contract is ambiguous is a question of law that must be decided by the court." *Brobeck, Phleger & Harrison v. Telex Corp.,* 602 F.2d 866, 871 (9th Cir.1979); *see also King Features,* 843 F.2d at 398.

[6]   [7]   In California, "[a] contract must be interpreted so as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ.Code § 1636; *see also AIU Ins. Co. v. Superior Ct.,* 51 Cal.3d 807, 274 Cal.Rptr. 820, 799

P.2d 1253, 1264 (1990) ("the mutual intention of the parties at the time the contract is formed governs interpretation"). "Such intent is to be inferred, if possible, solely from the written provisions of the contract." *AIU Ins. Co.,* 274 Cal.Rptr. 820, 799 P.2d at 1264 (citing Cal. Civ.Code § 1639). In construing a contract, "no term shall be considered uncertain or ambiguous if its meaning can be ascertained by fair inference from the terms of the agreement." *Ellis v. McKinnon Broadcasting Co.,* 18 Cal.App.4th 1796, 1802, 23 Cal.Rptr.2d 80 (1993). Thus, " '[i]f contractual language is clear and explicit, it governs.' " *Foster–Gardner, Inc. v. National Union Fire Ins. Co.,* 18 Cal.4th 857, 77 Cal.Rptr.2d 107, 959 P.2d 265, 272 (1998) (quoting *Bank of the West v. Superior Ct.,* 2 Cal.4th 1254, 10 Cal.Rptr.2d 538, 833 P.2d 545, 552 (1992) (citing Cal. Civ.Code § 1638)); *see also Marek v. Napa Community Redevelopment Agency,* 46 Cal.3d 1070, 251 Cal.Rptr. 778, 761 P.2d 701, 710 n. 11 (1988) ("[I]t is axiomatic that where, as here, the contract is clear and unambiguous, the intention of the parties should be ascertained from the writing itself and in such an instance extrinsic evidence is inadmissible."). If, however, the contract is ambiguous, extrinsic evidence regarding the parties' intent is admissible to help interpret the contract terms.

[8]   The mere fact of disagreement between the parties as to the correct interpretation of specific terms or sections of the agreement does not render it ambiguous. *See, e.g., Klamath Water Users Protective* **\*211** *Ass'n v. Patterson,* 204 F.3d 1206, 1210 (9th Cir.1999) ("The fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous"). Rather, the determination of whether a contract is ambiguous is the court's to make.

[9]   California law allows the court to provisionally receive extrinsic evidence to aid in its determination of whether the contract at issue is ambiguous. *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 40, 69 Cal.Rptr. 561, 442 P.2d 641 (1968). If, after considering all of the evidence, the court determines that the contract is unambiguous, any extrinsic evidence that has been submitted for the purpose of demonstrating an ambiguity in the contract is no longer relevant. *See Brobeck,* 602 F.2d at 871 (explaining that under *Pacific Gas,* extrinsic evidence "cannot be received" if "after considering [the] preliminary evidence" the court finds the language of the contact to be unambiguous); *City of Manhattan Beach v. Superior Ct.,* 13 Cal.4th 232, 52 Cal.Rptr.2d 82, 914 P.2d 160 (1996) ("If the intent of the parties is clear, that will control. If not, extrinsic evidence may be considered to the extent that it

informs that intent."); *Olsen v. Breeze, Inc.,* 48 Cal.App.4th 608, 55 Cal.Rptr.2d 818, 830 n. 5 (1996) ("[P]arol evidence is inadmissible if the contract terms are unambiguous"). However, when the court finds that a contract is ambiguous, the extrinsic evidence may be used by the court to interpret the ambiguous terms. *See Pacific Gas,* 69 Cal.2d at 40, 69 Cal.Rptr. 561, 442 P.2d 641; *Morey v. Vannucci,* 64 Cal.App.4th 904, 912, 75 Cal.Rptr.2d 573 (1998).

 **[10]**   California law also requires that the court construe the contract as a whole. Cal. Civ.Code § 1641; *Sy First Family, Ltd. v. Cheung,* 70 Cal.App.4th 1334, 83 Cal.Rptr.2d 340, 345 (1999) ("[W]here practicable, the meaning of an agreement must be derived from a reading of the whole contract."). Accordingly, in interpreting a contract, "[t]he whole of the contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." *Id.* "Where two clauses of an agreement appear to be in direct conflict, it is the duty of the court to reconcile such clauses so as to give effect to the whole of the instrument." *Ellis,* 18 Cal.App.4th at 1802, 23 Cal.Rptr.2d 80; *see also Brobeck,* 602 F.2d at 872 (contracts should be interpreted to be "internally consistent"); Restatement of Contracts § 235(c) (1932) ("A writing is interpreted as a whole").

### b. *Which Section Controls the Scope of Broadcom's License?*

 **[11]**   As noted above, the key dispute between the parties is which section of the Joint Development Agreement controls the extent of Intel's patent licenses to Broadcom. Intel contends that the Section 5.4 Patent Covenant defines the patent license granted by Intel to Broadcom, while the Section 5.2 License to Broadcom deals with the rest of Intel's intellectual property rights in the Intel Deliverables. Broadcom contends that section 5.2 provides the basic grant of patent rights to Broadcom, while section 5.4 grants Broadcom additional patent rights above beyond those granted in section 5.2. According to Broadcom these additional patent rights were granted to ensure that Intel could not frustrate the license grant of section 5.2 by asserting patent rights against Broadcom or its vendees which would have the effect of impairing the manufacture and sale of the products licensed by section 5.2.

Section 5 of the Joint Development Agreement is entitled "License Grants." The subsections within section 5 relate to

**\*212**  distinct intellectual property rights. The court briefly reviews these sections below.

In section 5.1 and 5.2, Intel and Broadcom mutually license certain of each other's proprietary technologies, defined as Intel Deliverables and Broadcom Deliverables. Exhibit B.2 lists and defines the Intel and Broadcom Deliverables. Under Exhibit B.2, Broadcom is to provide to Intel a specified data base, full chip hierarchical netlists, data sheets and design specifications, and simulation and performance evaluation results. Intel is to provide to Broadcom VHDL source code, simulation programs for certain functional design blocks, design reports, certain production test packages, product schematics, and certain Intel network interface card products. According to the definitions section, both parties' Deliverables were based on proprietary Technology that included a number of different types intellectual property rights, such as patents, copyrights, mask works, trade secrets, know-how, trademarks. See ¶¶ 1.3, 1.4, 1.8, 1.9. Sections 5.1 and 5.2 do not expressly set forth a patent license grant. Rather the license provided for by these two sections allows Intel to make, use, sell, and modify Intel Developments of the Broadcom Deliverables and allows Broadcom to make, use, sell, and modify Broadcom Developments of the Intel Deliverables.

Section 5.4 sets forth a mutual patent license with respect to any patent owned by a party as of January 22, 1995 or any patent which may later issue "which is related to the Product and based, in whole or in part, on the IEEE 802.3 100 BaseT specification." It is the only section in the Joint Development Agreement that expressly addresses patent rights.

While neither section 5.3 or 5.5 are central to the parties' dispute, for the sake of completeness, the court lists them here. Section 5.3 states that the parties must maintain any copyright notices that exist on the deliverables that they receive from each other and that the other party's copyright notice must be included in all marketing and end user documentation for the foregoing products. Section 5.5 expressly excludes from any license, any intellectual property right to Intel's component level microprocessor technology.

These sections, taken together, memorialize the parties' statements of intent from the Recitals section, which states that "Intel desires to license Broadcom's above technology for use in jointly developing with Broadcom a 100 Mbps Ethernet silicon chip" and that "Intel ... desires to grant a limited license to its foregoing technologies to Broadcom for

Broadcom to manufacture the foregoing chip and for each Party to make, use, market, sell, and distribute such chip subject to this Agreement." Section 4.2, in the Ownership section of the agreement, makes it clear that sections 5.2 and 5.4 are the only relevant sections in which Intel "license[s], offer[s], or otherwise make[s] available to Broadcom the Intel Developments or Intel Technology." ¶ 4.2.

Given that section 5.2 and 5.4 are the sections of the agreement that convey license rights to Broadcom, it is essential that they be interpreted consistently with each other and with the intent of the parties. The primary issue before the court is to determine whether section 5.4 unambiguously defines the scope of the patent license, whether section 5.2 unambiguously defines the scope of the patent license, or whether the agreement is ambiguous as to which section defines the scope of the patent license. For the reasons set forth below, the court finds that section 5.4 unambiguously defines the scope of Broadcom's patent license.

The agreement contemplates a joint development effort accomplished through the **\*213** exchange of proprietary technology that includes the following intellectual property rights: patents, copyrights, mask works, trade secrets, know-how, trademarks. See ¶¶ 1.3, 1.4, 1.8, 1.9. Licenses and restrictions on those licenses are provided for by the subsections of section 5. Section 5.2, unlike section 5.4, contains no mention of patent rights, but rather deals with the rest of Intel's intellectual property rights in the Intel Deliverables. Section 5.4 is the only section of the agreement that relates to patent rights. It explicitly sets forth the terms of patent licenses exchanged between the parties.

A plain reading of the agreement demonstrates that the express patent grant in section 5.4, rather than section 5.2, controls the extent of Intel's patent licenses to Broadcom. This interpretation of the license is buttressed by recent Federal Circuit authority. *See State Contracting & Eng'g Corp. v. Florida,* 258 F.3d 1329, 1339–40 (Fed.Cir.2001) (noting that because patent rights and trade secret rights are distinct rights, the right to use proprietary technology does not necessarily convey any patent rights and the omission of an express provision providing for the licensing of patent rights demonstrated that the contract did not provide a license for patent rights); *Hilgraeve Corp. v. Symantec Corp.,* 265 F.3d 1336, (Fed.Cir.2001) (holding that no patent license was conferred where plaintiff transferred all copyright, know-how, and technical expertise with respect to software to defendant).

[12]    Broadcom nonetheless asserts that section 5.2 implicitly contains a patent license that is broader than the express patent license of section 5.4. While it is true that patent licenses may be implied by language or conduct of the owner, *see De Forest Radio Telephone & Telegraph Co. v. United States,* 273 U.S. 236, 241, 47 S.Ct. 366, 71 L.Ed. 625 (1927), where an agreement contains a specific provision expressly defining the scope of the patent license implied licenses dealing with the same subject matter are not generally recognized. *See, e.g., Atlas Corp. v. United States,* 895 F.2d 745, 754 (Fed.Cir.1990) ("The existence of an express contract precludes the existence of an implied contract dealing with the same subject, unless the implied contract is entirely unrelated to the express contract"); *Wal–Noon Corp. v. Hill,* 45 Cal.App.3d 605, 119 Cal.Rptr. 646, 650 (1975) ("There cannot be a valid express contract and an implied contract, each embracing the same subject matter, existing at the same time.").

In asserting that section 5.2 grants Broadcom a broad license to all of Intel's patents that are related to the Intel Deliverables and Broadcom Development of those deliverables, Broadcom claims that section 5.4 supplements section 5.2. Broadcom contends that the purpose of section 5.4 is to extend the licenses of section 5.2 to provide protection to Broadcom's third party customers. In support of this reading, Broadcom argues that section 5.2 "only grant[s] licenses that extend to the parties," so section 5.4 was necessary to provide "protection to the parties' 'licensees or vendees, mediate or immediate.' "

The plain language of sections 5.2 and 5.4 contradicts Broadcom's argument. Section 5.2, by its terms, applies to products sold or distributed "to end users directly or indirectly through Broadcom's distribution channel of, without limitation, distributors, resellers, OEMS and representatives." ¶ 5.2. Therefore it is incorrect that section 5.2 only extends its license protections to Broadcom. Similarly, section 5.4 states that each party will not assert patent claims for the specified licensed patents "against the other Party ... nor against the Party's subsidiaries, **\*214** licensees, or vendees ... any claims for infringement ...." ¶ 5.4. Therefore, section 5.4 cannot fairly be interpreted as a necessary extension of the protections of section 5.2 to the end users and distributors of Broadcom's products. Rather, the two sections are coextensive as to the third parties that they cover.

Broadcom asserts that an additional and unique purpose of section 5.4 is to extend the licenses of section 5.2 to include not only chip products, but larger products in which licensed chips are included. This assertion cannot be correct. Section 5.2, by its terms, licenses Broadcom Developments "in physical form solely as an integral part of or incorporated in products to end users." Therefore, according to the plain language of the agreement, section 5.2 already grants a license to intellectual property rights that covers larger products in which the chips are placed. In addition to being contradicted by the plain language of the agreement, Broadcom's construction is inherently self-contradictory. Section 5.4, cannot, as Broadcom asserts, cover additional products, if as Broadcom also asserts, section 5.2 already licenses all products that include, or are in any way derived from, or include a derivative of, Intel's Deliverables. Accordingly, section 5.4 cannot be fairly interpreted as extending the protections of section 5.2 to "additional products."

The proper interpretation of the Joint Development Agreement must give effect to each section of the contract. In light of the above analysis, if the court were to adopt Broadcom's interpretation of the agreement, section 5.4 would be rendered extraneous and unnecessary. Broadcom's reading would also create two patent licenses (the implied patent license in section 5.2 and the express patent license in section 5.4) within the same agreement whose scopes are in conflict. The implied license of section 5.2 is unbounded, while the express license of section 5.4 is broad, but has limits. If the court were to find that section 5.2 confers to Broadcom a broad patent license that covers all products that are derived from the Intel Deliverables, the court would effectively be ignoring the specific limitations of the express patent license in section 5.4, which limits its scope to patents "related to the Product and based, in whole or part, on the IEEE 802.3 BaseT specification." ¶ 5.4. The only consistent reading of the provisions of the Agreement is to give full effect to the language of 5.4 as to the scope of the patent license that is conveyed within.

Reading section 5.4 as the section that defines the scope of the patent license that is granted in the Joint Development Agreement is consistent with both the parties stated intent in the recitals section, the clear language of the agreement, and the extrinsic evidence that has been submitted by the parties. Broadcom argues that while the agreement was structured to jointly develop one particular semiconductor product ("the Product"), the agreement further provided for

and licensed, the ability of both Intel and Broadcom to sell derivatives developed by Broadcom from the technology that Intel provided to it. The patent grant of section 5.4 is not inconsistent with this reading. Section 5.4 *does* grant a broad patent cross-license to the parties. That license includes any patents owned as of the effective date of the contract or any patents which may later issue, "which [are] related to the Product and based, in whole or part, on the IEEE 802.3 100 BaseT specification." While the patent license of the Joint Development Agreement is limited to this related set of patents, this provision is not inconsistent with the parties' intent to enter into a cross-license that allows Broadcom to make the specific chip and derivatives **\*215** thereof which relate to the 802.3 BaseT specification.

Broadcom argues that if the court were to interpret section 5.4 as the governing patent license in the agreement, section 5.4 would be inconsistent with various warranty and indemnification provisions within the agreement. *See, e.g.,* ¶¶ Exhibit A 4.3, 13.1, 17.2.1, 17.2.3.1. The court sets forth these provision below.

In Exhibit A Section 4.3, Intel warrants that it:

> has all right, title and ownership to the Intel Technology and Intel Deliverables including any patents, copyrights, mask works, trade secrets, trademarks, and other intellectual property rights pertaining to the Intel Technology and Intel Deliverables including, without limitation, the right to grant the license herein to Broadcom and ... it will take no action which would in any way impair the foregoing.

In Section 13.1, entitled "Exceptions to Intel Releases," of the Second Amendment to the Joint Development Agreement, Intel warranted that "it has no claim or knowledge of facts that could give rise to a claim, against Broadcom under any such agreements or relationships." Section 17.2.3.1, entitled "Obligation to Assist," states that "Intel shall use commercially reasonable efforts to attempt to procure for Broadcom ... the right to continue using the Intel Technology and Intel Deliverables ...." In section 17.2.1, entitled "Indemnification," Intel warrants that it will "indemnify Broadcom based on a claim that the Intel Technology or Intel Deliverables, respectively, alone and not in combination

with any other products, infringe any patent, copyright, trade secret, or other intellectual property right of a third party."

The court disagrees that a construction finding that section 5.4 is the controlling section of the grant of patent rights in the agreement is inconsistent with the foregoing provisions. Broadcom's argument presupposes that the purpose of the agreement was to provide Broadcom with a broad license to all of Intel's patents that relate to any Broadcom developed derivative of the Intel Deliverables. Nothing in the interpretation that 5.4 is the controlling provision of the patent license is inconsistent with these provisions. Given that the agreement contemplated the parties using each other's technology to develop a chip product, the warranty of section 4.3 sought to assure Broadcom that as of the effective date of the agreement, Intel actually owned rights to the technology and deliverables. Intel's grant to Broadcom of the specific patents encompassed by section 5.4 is not inconsistent with this warranty that Intel "has all right, title and ownership to the Intel Technology and Intel Deliverables."

Broadcom also argues that if 5.4 is read to be the controlling patent license it is inconsistent with sections 17.2.3.1 and 17.2.1. This argument fails for the same reason. The Broadcom rights that the indemnification and warranty provision are intended to cover are defined in section 5.4. These sections are intended to warrant that those rights, *as defined by the patent grant of section 5.4,* will not be impaired in any way.

For the reasons set forth in the preceding analysis, the court finds that it is clear from the Joint Development Agreement, that section 5.4 alone defines the scope of the patent license grant between the parties therein. This interpretation of the contract is the only interpretation that is consistent with the other terms of the contract and that gives effect to all sections of the contract.

### *216  c. *Does the Section 5.4 Grant Broadcom a License Under the '830 and '410 Patents?*

[13]    Having determined, as a matter of law, that section 5.4 is the controlling patent license provision in the Joint Development Agreement, the court must next determine whether section 5.4 grants to Broadcom a License under either the '830 and '410 patents. Section 5.4, in relevant portion, grants a license to Broadcom for:

any patent which, as of the Effective Date, [Intel] owns or under which [Intel] has the right to grant licenses of the scope of the licenses granted in this Agreement, or any patent which may later issue which is related to the Product and based, in whole or part, on the IEEE 802.3 100 BaseT specification

The scope of the license conferred in section 5.4 (i.e. which patents are included in the license) is limited by the two requirements stated within that section. Those patents that do not meet both requirements are not included within the license. First, the patent must be owned by Intel as of January 22, 1995 or must be issued after January 22, 1995. Second, the patent must be "related to the Product and based, in whole or part, on the IEEE 802.3 BaseT specification."

Intel submits that because the '410 and '830 patents each fail to meet one of these two requirements, they are not licensed to Broadcom under the Joint Development Agreement. As set forth in more detail above in the section outlining the parties' arguments, Intel contends that the '830 patent is not included in the section 5.4 patent license because it was neither owned by Intel as of January 22, 1995, nor issued after January 22, 1995. Rather, the '830 patent issued on December 4, 1990, to Dayna Communications, a company that was later acquired by Intel on October 10, 1997. The '830 patent was subsequently transferred to Intel on December 28, 1998.

Broadcom does not dispute that section 5.4, as originally executed, did not include any license to the '830 patent because Intel did not own the '830 patent on the Effective Date. Rather, Broadcom argues that because the Joint Development Agreement was amended on December 17, 1997, after Intel's acquisition of Dayna Communications, and that amendment modified the agreement, "incorporat[ing] by reference the terms, conditions, and covenants set forth in the Agreement," December 17, 1997, the date of the execution of the amendment, replaces January 22, 1995 as the Effective Date of the agreement. Broadcom contends that because the '830 patent was owned by Intel prior to this new effective date, the '830 patent is included in the set of patents that is licensed under section 5.4. The parties do not appear to dispute that the '830 patent relates to the IEEE 802.3 BaseT specification and thus satisfies the second requirement of the patent license.

The court finds that Broadcom's argument that section 5.4 was republished with a new effective date of December 17, 1997 is contrary to the plain language of the amendment. Section 1 of the December 17, 1997 amendment states that original terms of the Joint Development Agreement, such as Effective Date, are incorporated by reference and retain "the respective meanings as set forth and assigned in the [Joint Development] Agreement." This means that the term Effective Date retained its meaning of January 22, 1995. While the amendment introduced the term "Amendment Effective Date," it did not amend the language of section 5.4. Because after the amendment, section 5.4 continues to use the term "Effective Date" and not the new term "Amendment Effective **\*217** Date," the scope of section 5.4 remains limited to patents owned by Intel as of January 22, 1995.

 **[14]**    Moreover, even if Broadcom's interpretation of the amendment were correct, the '830 patent would still not be included in the scope of section 5.4 because Intel did not own the '830 patent as of the Amendment Effective Date. It is undisputed that although Intel and Dayna merged on October 10, 1997, pursuant to section 1.1(d) of the Plan of Merger, that after the merger Dayna Communications would continue as a wholly owned subsidiary of Intel. Therefore, Dayna Communications—not Intel-owned the '830 patent as of the Amendment Effective Date. Intel did not acquire the rights to the '830 patent until December 28, 1999, when Dayna Communications was dissolved and its assets were transferred to Intel. Section 5.4 does not extend the scope of the license to patents owned by Intel subsidiaries; it refers only to patents owned by or issued to Intel itself. While Broadcom again argues that this interpretation is contrary to Intel's section 4.3 warranty that it would take no action which would in any way impair its grant of license to Broadcom, this warranty in no way precludes suing Broadcom for infringement for a patent, such as the '830 patent, that is not covered by Intel's license grant to Broadcom. While Broadcom argues that the circumstances by which Intel acquired the '830 patent wrongly takes advantage of an unintended loophole in the agreement, the clear language of section 5.4, which the court may not ignore, excludes the '830 patent from the license grant.

The court now turns to the '410 patent. It is undisputed that the '410 patent, which relates to a "ball grid array" semiconductor package that carries an integrated circuit, is not related to the 100 Mbps chip that is the defined "Product" of the Joint Development Agreement. It is also undisputed that the '410 patent is not based on the IEEE 802.3 100 BaseT

specification, which, as described above, relates to Ethernet networks. The '410 patent is therefore not included in the patent license in section 5.4, which includes only patents that are related "to the Product and based, in whole or part, on the IEEE 802.3 100 BaseT specification."

 **[15]**    Broadcom argues that pursuant to section 5.2, to the extent Broadcom packages its products that are Broadcom Developments of Intel Deliverables, it has the right to "make, use, sell [and] market ..." those products "solely as an integral part of or incorporated to end users directly or indirectly through Broadcom's distribution channel." Because the court has determined that section 5.4, and not section 5.2, governs the scope of Broadcom's patent license, the court finds Broadcom's reliance on section 5.2 as the source of broad patent rights to be unavailing. Even if the court were to construe section 5.2 as granting a broader patent license than section 5.4 that extends to any product derived from the Intel Deliverables, the above language of section 5.2 would not give Broadcom the right to use infringing packaging technology, such as that embodied in the '410 patent, that was not among the Intel Deliverables.

Intel has met its burden of demonstrating that Broadcom's allegedly infringing products are not licensed under the '830 and '410 patents. Because the court concludes that the '830 and '410 patents are excluded from the license grant of the Joint Development Agreement, the court will grant partial summary judgment in favor of Intel on this issue.

 **\*218  C. *Should the Court Grant Either Parties' Motions for Summary Judgment Regarding Whether Broadcom's Accused Products Sold to General Instrument Are Licensed Under the Motorola Agreement?***

**1. *The Motorola Agreement***
On June 9, 1997, Motorola, Inc. and Intel Corporation entered into a "License and Cooperation Agreement" ("the Motorola Agreement") in which they granted to each other "a non-exclusive, non-transferable license throughout the world" to certain defined licensed products, "to make, use, sell, import, offer for sale and otherwise dispose of LICENSED PRODUCTS, and to have made LICENSED PRODUCTS by another manufacturer for supply to MOTOROLA for use, import, offer for sale, sale or other disposition by MOTOROLA ...." ¶¶ 3.1, 3.2, 3.3. The term LICENSED PRODUCT is defined in section 1.5 to include one or more of the following defined terms: SEMICONDUCTOR MATERIAL,    SEMICONDUCTOR    STRUCTURE,

SEMICONDUCTOR DIE, SEMICONDUCTOR PACKAGE, SEMICONDUCTOR DEVICE, and SEMICONDUCTOR CIRCUIT. Moreover, in the agreement, the term "LICENSED PRODUCT, when used alone, means LICENSED PRODUCT of MOTOROLA or LICENSED PRODUCT of INTEL as the case may be."

The specific license provision at issue is section 3.3, which is reproduced in full in the following paragraphs:

> 3.3 INTEL hereby grants to MOTOROLA for the lives of the INTEL PATENTS a non-exclusive, non-transferable license throughout the world under the INTEL PATENTS, without the right to sub-license, for MOTOROLA SEMICONDUCTOR PRODUCT SECTOR:

> 3.3.1 to make, use, sell, import, offer for sale and otherwise dispose of LICENSED PRODUCTS, and

> 3.3.2 to have made LICENSED PRODUCTS by another manufacturer for supply to MOTOROLA for use, import, offer for sale, sale of other disposition by MOTOROLA, and

> 3.3.3 to make, use and have made MANUFACTURING APPARATUS and to practice any process or method involved in the use thereof in furtherance of the license grants of Section 3.3.1 and 3.3.2.

The term "INTEL PATENTS" is defined in section 1.2 to mean:

> all classes or type of patents and utility models, other than design patents, and applications for the aforementioned of all countries of the world, which are issued, published or filed or entitled to a priority filing date prior to the date of expiration or termination of this Agreement, which are owned by or licensed to INTEL and under which ... INTEL may have, as of the EFFECTIVE DATE of this Agreement, or may thereafter during the term of this Agreement acquire ....

The EFFECTIVE DATE of the Motorola Agreement is June 9, 1997. The duration of the agreement is 10 years.

The term "MOTOROLA SEMICONDUCTOR PRODUCT SECTOR" is defined in section 1.12 to mean:

> a MOTOROLA existing business unit manufacturing and developing products falling within the definition of LICENSED PRODUCTS (as hereinafter defined), now consisting of [a set of named semiconductor groups and divisions within Motorola]. This definition of the MOTOROLA SEMICONDUCTOR **\*219 PRODUCTS SECTOR also includes the predecessor MOTOROLA business unit of said Groups and/or said Divisions taken singularly or in combination and any MOTOROLA future business unit acquired or derived from, by separation or merger, irrespective or appellation, said Groups and/or said Divisions taken singularly or in combination.

Under section 3.12,

> MOTOROLA shall have the right to extend the release and grants of Sections 2 and 3, respectively, to any MOTOROLA SUBSIDIARY if such SUBSIDIARY assumes the same obligations as MOTOROLA hereunder (other than Section 4) as if such entity was named in place of MOTOROLA.

## 2. *The Parties' Positions*

The parties have both moved for summary judgment on this license defense. Intel has moved for summary judgment that Broadcom's products accused of infringing the asserted claims of Intel's '478, '201, and '630 patents are not licensed under the Motorola Agreement. Broadcom has cross-moved for summary judgment of noninfringement of those same patents for those accused products sold by Broadcom to General Instrument Corporation ("GI")[1], a Motorola subsidiary, based on the patent license in the Motorola Agreement. Broadcom states that sales of the following products ("the Video Chips") from Broadcom to GI are licensed pursuant to the "have made" provisions of the Motorola Agreement: BCM3033, BCM3036, BCM3037, BCM3115, BCM3116, BCM3120, BCM3137, BCM3250, BCM3300, BCM3350, BCM3900, BCM4100, BCM4210, BCM7010, BCM7015, BCM7020, BCM7030, and BCM7031.

### a. *Intel's Position*

Intel attacks Broadcom's license defense under the Motorola Agreement on two grounds. Intel first contends that sales by Broadcom to GI cannot be licensed under the Motorola

Agreement, because section 3.3 of the agreement expressly limits Motorola's rights to the Motorola Semiconductor Product Section, which is defined in section 1.12 as being limited to existing Motorola business units as of June 9, 1997. GI is not within the scope of section 3.3 because it was not an existing business unit at the time the license became effective in 1997; GI because a new sector of Motorola when it was acquired on January 5, 2000. Second, Intel argues that while Broadcom premises its Motorola license defense on "have made" rights, Motorola's "have made" rights do not extend to the purchase of chips not designed by Motorola.

### b. *Broadcom's Position*

Addressing each of Intel's bases for summary judgment in turn, Broadcom first argues that the Motorola Agreement is not restricted to then-existing business units, because section 3.12 of the agreement extends Motorola's rights under the license to all Motorola subsidiaries, including those acquired after the execution of the Motorola Agreement. Effectively, Broadcom argues that section 3.12 means that the patent license granted by Intel extends to Motorola and its subsidiaries, and is not limited to then-existing business units of Motorola. Broadcom reasons that the Motorola Agreement extends the license **\*220** terms to GI, because GI is a wholly owned subsidiary of Motorola.

With respect to the scope of the "have made" right that is granted within the Motorola Agreement, Broadcom argues that any sales to GI are licensed because Intel expressly granted to Motorola and its subsidiaries the right to "have made" by another manufacturer semiconductor material and semiconductor circuits for use, sale, or other disposition by Motorola and its subsidiaries without violating any patent issued to, or acquired by, Intel during the term of the Motorola Agreement. Thus, according to Broadcom, because GI is merely exercising its "have made" rights by purchasing the Video Chip products from Broadcom, Broadcom's manufacture and sale of Video Chips for GI cannot infringe Intel's patents.

### 3. *The Court's Decision*

In order to satisfy its burden on summary judgment, Broadcom must prove that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law as to both of the following legal issues: (1) whether GI is covered by the Motorola Agreement, and (2) whether

the "have made" rights granted by Intel in the Motorola Agreement authorize Broadcom's manufacture and sale of Video Chips for GI. Broadcom must therefore prove that GI is covered by the Motorola Agreement *and* that the "have made" rights granted by Intel authorize Broadcom's Video Chip sales to GI. If Broadcom fails to prove that both of these legal issues must be answered in its favor as a matter of law, the court must deny its summary judgment motion.

In contrast, because Intel is seeking summary judgment that Broadcom's license defense under the Motorola Agreement fails as a matter of law, it may succeed either by proving that GI is not covered by the Motorola Agreement *or* by proving that even if GI is covered, the "have made" rights granted by Intel to GI do not authorize Broadcom's Video Chip sales to GI. Intel may thus succeed in its summary judgment motion by proving that one of the two legal issues listed above must be resolved in its favor as a matter of law.

### a. *Has either party proven that no genuine issue of material fact exists as to whether GI is licensed under the Motorola Agreement?*

**[16]**    As section 8.2 of the Motorola Agreement expressly provides that the agreement is governed by, and to be construed under the laws of the State of Delaware, the court applies Delaware law in interpreting the agreement. Under Delaware law, the interpretation of a patent license agreement is a question of law. *Klair*, 531 A.2d at 222.

**[17]    [18]    [19]    [20]**    The principles of contract interpretation are well settled. Contracts must be construed as a whole, to give effect to the intentions of the parties. *E.I. duPont de Nemours and Co. v. Shell Oil Co.,* 498 A.2d 1108, 1113 (Del.1985). Where the contract language is clear and unambiguous, the parties' intent is ascertained by giving the language of the contract its ordinary meaning. *Rhone–Poulenc Basic Chem. Co. v. American Motorists Ins. Co.,* 616 A.2d 1192, 1195 (Del.1992). "In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein. Moreover, the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." *E.I. duPont,* 498 A.2d at 1113. The court will consider extrinsic evidence to interpret the agreement **\*221** only if there it finds that is ambiguity in the contract. *Pellaton v. Bank of New York,* 592 A.2d 473, 478 (Del.1991).

**[21]** Intel argues that interpreting the agreement as extending Motorola's rights to its subsidiaries, reads out the explicit limitation of the grant in section 3.3 to the MOTOROLA SEMICONDUCTOR PRODUCT SECTOR, which is limited to an enumerated set of then-existing business unit by that terms definition in section 1.12. Broadcom, however, argues that interpreting the agreement as not being extended to Motorola's subsidiaries, reads out the explicit right of section 3.12 that gives Motorola the right to extend the license grants to any MOTOROLA SUBSIDIARY, which is defined by section 1.21 to include after-acquired wholly owned subsidiaries such as GI.

The court declines to accept either of these assertions. Rather, having considered the parties' arguments and read the Motorola Agreement, the court finds that the agreement is unambiguous. There is no reason to adopt a construction that "reads out" the rights expressly granted in either section 3.3 or section 3.12. Rather, the court must interpret the agreement in a manner that gives effect to all of its provisions. The two sections can and therefore must be read consistently and in consideration of the overall purpose of the cross-license agreement.

In Section 3.7, Motorola grants to Intel "a non-exclusive, non-transferable license throughout the world under MOTOROLA SEMICONDUCTOR PRODUCTS SECTOR PATENTS...." This term is defined, in section 1.13, as the subset of patents owned by Motorola that "arise out of inventions made by one or more employees of the MOTOROLA SEMICONDUCTOR PRODUCTS SECTOR; or which are acquired by MOTOROLA and become part of the MOTOROLA SEMICONDUCTOR PRODUCTS SECTOR patent portfolio" before or during the duration of the Motorola Agreement. Thus, Motorola did not grant to Intel rights to all of its patents in section 3.7, but limited the license to the subset of patents relating to the MOTOROLA SEMICONDUCTOR PRODUCTS SECTOR.

Throughout the Motorola Agreement, each of the license grants between Intel and Motorola are mutual. The minor image license section that grants rights from Intel to Motorola is section 3.3. Given that Motorola's patent license grant was limited to patents in the MOTOROLA SEMICONDUCTOR PRODUCTS SECTOR, it is not surprising that the license Intel granted to Motorola in consideration of Motorola's grant in section 3.7 was also limited to the MOTOROLA SEMICONDUCTOR PRODUCTS SECTOR.

The plain language of section 3.12 demonstrates that parties' intent to allow Motorola some flexibility regarding its ability to extend the "releases and grants of Sections 2 and 3," the Mutual Releases and Grants sections, to its subsidiaries. Intel is given the same flexibility in section 3.13, the mirror-image section of 3.12, which states that "INTEL shall have the right to extend the release and grants of Sections 2 and 3, respectively, to any INTEL SUBSIDIARY if such SUBSIDIARY assumes the same obligations as INTEL hereunder ... as if such entity was named in the place of INTEL."

According to its plain language, Section 3.12 does not, as Broadcom argues, *automatically* extend the grants of section 3 to all Motorola subsidiaries. It is therefore incorrect that section 3.12 mandates replacing all occurrences of the name "Motorola" in the agreement with the name of its after-acquired subsidiary, "GI." Section 3.12 gives Motorola "the right to extend" **\*222** the Intel patent licenses to its subsidiary. Motorola must affirmatively exercise this right. Moreover, the Intel patent license grants may only be extended to a subsidiary "if such SUBSIDIARY assumes the same obligations as MOTOROLA hereunder ... as if such entity were named in place of MOTOROLA." Thus, under 3.12, in order for a subsidiary to obtain rights under the Motorola Agreement, that subsidiary must agree to assume the same obligations as Motorola under the Motorola Agreement. This means the license that Intel granted to Motorola with respect to its patents may only be extended to GI if GI agrees to extend to Intel a mutual license to GI's patents.

In sum, the Motorola Agreement, in sections 3.12 and 3.13, gives both parties the right to extend each other's license grants to each parties' subsidiaries. This extension is not automatic, nor is it unconditional. The contemplated quid pro quo for extending Intel's license to a Motorola subsidiary is that the subsidiary must license back its own patents to the Intel.

Instead of setting forth the necessary facts that demonstrate that GI is licensed under the terms of the Motorola Agreement, Broadcom argues in its briefs that "Section 3.12 of the Agreement extends Motorola's rights under the Agreement to any 'MOTOROLA SUBSIDIARY,' including those acquired after the execution of the Agreement ... General Instrument is a Motorola subsidiary ... As such, pursuant to Section 3.12, General Instrument is entitled to

the rights conveyed by Intel to Motorola pursuant to the Agreement ...." This theory is not correct as a matter of law. GI acquires no rights under section 3.12 of the Motorola Agreement simply because it is a Motorola subsidiary.

Broadcom has not provided any documents or declarations that support the propositions that Motorola affirmatively exercised its "right to extend" its license of the Intel patents to GI, or that GI has agreed to extend to Intel a license of its own patents on the same terms as and "as if it were named in place of MOTOROLA" in the Motorola Agreement. Factual support for both of these propositions is required, if the court is to find that GI is covered by the Motorola Agreement. By simply pointing to section 3.12, Broadcom has identified a conditional right that Motorola holds. However, because Broadcom has not shown that Motorola and GI exercised their rights in accordance with section 3.12, the limitations of section 3.3 exclude GI from the license grants within the Motorola Agreement. Without such a showing, the court finds that GI was not licensed under the Motorola Agreement. Therefore, the court finds that Broadcom has failed to meet its burden of proving that it is entitled to judgment as a matter of law that its sales to GI do not infringe Intel's '478, '201, and 630 patents because such sales were covered by the Motorola Agreement. Accordingly, the court will deny Broadcom's motion.

Intel may satisfy its burden on summary judgment by demonstrating that there is an absence of evidence to support the case of the nonmoving party. *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).* Intel has met this burden by demonstrating Broadcom's failure to come forward with factual support that shows that GI is covered by the Motorola Agreement. Instead of coming forward with facts that demonstrate that Motorola exercised its 3.12 right in accordance with its terms, Broadcom simply argues that because GI is a Motorola subsidiary, it is covered by section 3.12. According to the court's interpretation of the Motorola Agreement, that proposition is incorrect. The court will therefore grant summary judgment for Intel **\*223** that Broadcom's sales to GI are not licensed under the Motorola Agreement. Because the court finds that GI is not entitled to the rights conveyed by Intel to Motorola in the Motorola Agreement, the court need not reach Intel's second independent ground for summary judgment regarding the scope of the "have made" rights granted by Intel to Motorola and whether those rights confer protections upon Broadcom.

**D. *Should the Court Grant Either Parties' Motions for Summary Judgment Regarding Whether Broadcom's Accused Products Sold to Intel Licensees Are Licensed Under Intel License Agreements with Those Licensees?***
In order to buy peace in the semiconductor industry, Intel has entered into patent cross-license agreements with a number of companies. Broadcom has moved for summary judgment on the theory that "have made" rights conferred by Intel to Intel licensees in those license agreements shield Broadcom from infringement for sales made to those licensees.

**1. *The Intel License Agreements***
In Intel's opening brief in support of its summary judgment motion Intel directs it arguments to a number of license agreements under which Broadcom had asserted affirmative license defenses. The agreements addressed in Intel's brief are: (i) the Intel/Sony License Agreement (1/1/93); (ii) the Intel/Sony License Agreement—3 Year Term relating to memory technology (4/9/90) ("the Intel/Sony Memory Agreement"); (iii) the Intel/NEC Patent Cross License Agreement (7/9/92); (iv) the Intel/Samsung Patent Cross License Agreement (2/8/93); (v) the Intel/Siemens Agreement (2/2/76); (vi) the Intel/Siemens Cooperation Agreement (2/2/76); (vii) the Intel/Compaq Patent Cross License Agreement (1/10/96); (viii) the Intel/Compaq Extended Industrial Standard Architecture Patent License Agreement (4/26/01) ("the Intel/Compaq EISA Agreement"); and, (ix) the Intel/Compaq PCI Agreement (2/26/93).

In Broadcom's answering brief, Broadcom clarified its position on certain of the licenses addressed by Intel. Broadcom stated that its opposition and cross-motion with regard to Broadcom sales to Sony are based on the Intel/Sony License Agreement and not on the Intel/Sony Memory Agreement. Broadcom Answering Br. at 2 n. 1. Broadcom also stated that its opposition and cross-motion with regard to Broadcom sales to Compaq are based on the Intel/Compaq Patent Cross License Agreement and are not based on the Intel/Compaq EISA Agreement or the Intel/Compaq PCI Agreement *Id.* at 2 n. 2. Finally, Broadcom stated that it does not contend that Intel granted "have made" rights to Siemens pursuant to either of the Intel/Siemens Agreements discussed in Intel's opening brief. *Id.* at 2 n. 3. Based on these concessions and because four of the above mentioned license agreements do not confer "have made" rights to the Intel licensees and the fifth (the Intel/Sony Memory Agreement) does not license the technology covered by the five patents at issue in this lawsuit, the court will grant

Intel Corp. v. Broadcom Corp., 173 F.Supp.2d 201 (2001)

summary judgment in favor of Intel that the Broadcom's sales to Intel licensees are not licensed under the Intel/Sony Memory Agreement, the Intel/Compaq EISA Agreement, the Intel/Compaq PCI Agreement, the Intel/Siemens Agreement, or the Intel/Siemens Cooperation Agreement.

In addition to clarifying its affirmative defenses as to the patent licenses raised in Intel's motion, Broadcom cross-moved for summary judgment on Intel's claim for patent infringement asserting that, as a **\*224** matter of law, Broadcom's manufacture and sale of certain products to Sony, NEC, Samsung, Compaq, and in addition, AT &

T, Digital, Hayes, HP, Hitachi, Hyundai, Mitsubishi, and Phillips (collectively the "Licensed Customers") constitute a valid exercise of the Licensed Customers' "have made" rights, as authorized by their respective license agreements with Intel. Broadcom contends that the sale of any products that fit within each of the License Agreements' definition of "Licensed Product" is thus licensed and noninfringing.

For clarity, the court will list the twelve license agreements that remain at issue and highlight the key terms of the license agreements at issue in the table that follows:

| Licensee | Title of License Agreement | License Grant Language | Intel Patents Included in License Grant | Term of License |
|---|---|---|---|---|
| AT & T | Patent License Agreement between AT & T and Intel (1/1/90) | "Intel grants to AT & T ... nonexclusive, royalty-free and non-transferable licenses for (i) INFORMATION HANDLING SYSTEMS ... The licenses granted herein are licenses to (i) make, **have made**, use, lease, sell and import LICENSED PRODUCTS." | All patents, excluding design patents, owned or acquired prior to 1/1/94. | Terminated on 12/31/98 |
| Compaq | Patent Cross-license Agreement (1/10/96) | "Intel ... grants to Compaq ... a worldwide, nonexclusive, royalty-free nontransferable license ... to make, **have made for Compaq**, use, lease, sell, import, have developed for Compaq and to otherwise transfer or dispose of the Compaq Licensed Products." | All patents with effective filing date prior to 12/31/05 except design and semiconductor manufacturing process patents | Life of patents |
| Digital | Patent Cross License Agreement (5/16/98) | "Intel hereby grants to Digital ... a non-exclusive, non-transferable, royalty-free, worldwide license, without the right to sublicense, under the Intel Patents to ... **have made** Digital Licensed Products." | All patents having first effective filing date before 5/16/08. | Life of patents. |
| Hayes | Systems Patent License Agreement (1/1/94) | "Intel ... hereby grant[s] to Hayes ... a nonexclusive, worldwide, irrevocable, perpetual, royalty-free | All Intel patents issued or acquired as of 1/1/99 | Life of patents. |

| | | license under all of Intel's patents for the entire term thereof, to make, manufacture, use or sell Hayes Licensed Products, **to have Hayes Licensed Products made for Hayes' use or sale** ..." | | | |
|---|---|---|---|---|---|
| Hewlett Packard | Cross–License Agreement (1/10/83) | "Intel hereby grants HP an irrevocable, retroactive, nonexclusive, world-wide, royalty-free license under all patents and patent applications owned and controlled by INTEL having a first effective filing date prior to January 1, 2001." | All patents having a first effective filing date prior to 1/1/00 | Life of Patents | |
| Hitachi | Patent Cross License Agreement (3/10/92) | "Intel hereby grants and agrees to grant to Hitachi non-exclusive, non-transferable, royalty-free, worldwide licenses without the right to sublicense under Intel Patents to make, **to have made**, to use, and to sell ... Hitachi Licensed Products." | All patents pertaining to semiconductor materials, semiconductor devices, integrated circuits, or integrated circuit modules and that have a first effective filing date prior to 12/31/99 | Life of Patents | lines |
| | | " 'A license to have made shall mean a license permitting the licensee to use a third party ... to make, in whole, or in part, a Licensed Product ... but such license has effect only if design and manufacturing specifications to manufacture the Licensed Product ... are provided by the licensee." | | | |
| Hyundai | Patent Cross License Agreement (4/25/96) | "Intel ... hereby grants to Hyundai a non-exclusive, non-transferable, worldwide license, without the right to sublicense, under the Intel Patents to ... make, **have made**, use Hyundai Licensed Products." | All patents having a first effective filing date prior to 12/31/02 | Life of patents. | |
| Mitsubishi | Agreement (10/16/79) | "INTEL grants and agrees to grant MITSUBISHI non-exclusive, non-transferable, royalty-free, world-wide licenses under INTEL PATENTS and INTEL PATENT | All patents having a first effective filing date prior to 10/16/89. | Life of patents. | |

Intel Corp. v. Broadcom Corp., 173 F.Supp.2d 201 (2001)

| | | APPLICATIONS to make, **to have made**, to use, to sell (either directly or indirectly), to lease and to otherwise dispose of LICENSED PRODUCTS." | | |
|---|---|---|---|---|
| NEC | Patent Cross License Agreement with NEC (7/29/92) | "INTEL hereby grants to NEC non-exclusive, non-transferable, royalty-free worldwide licenses under INTEL patents, without the right to sub-license, to make, **to have made**, to use, to import, to sell (either directly or indirectly), to lease and otherwise dispose of NEC Licensed Products ...." | All patents having a first effective filing date prior to 5/31/02. | Life of patents. |
| Phillips | Agreement (7/15/90) | "INTEL hereby grants and agrees to PHILLIPS ... a non-exclusive, indivisible, royalty-free license under INTEL Patents ... to make, **to have made**, to use, to lease and to sell or otherwise dispose of Semiconductor Devices ...." | All patents having a first effective filing date prior to 7/15/00. | Life of patents. |
| Samsung | Patent Cross License Agreement (2/8/93) | "INTEL hereby grants to SAMSUNG non-exclusive, non-transferable, worldwide licenses under INTEL Patents to make, **to have made**, to use, to sell (either directly or indirectly) to have developed exclusively for SAMSUNG, to lease and to otherwise dispose of SAMSUNG LICENSED PRODUCTS ...." | All patents having a first effective filing date prior to 12/31/02. | Life of patents. |
| Sony | License Agreement (4/28/94) | "Intel hereby grants to Sony non-exclusive, non-transferable, worldwide licenses, without right to sublicense, under Intel Patents to make, **to have made**, to use, to sell (directly or indirectly), to have developed exclusively for Sony to please and otherwise dispose of Sony Licensed Products." | All patents having a first effective filing date prior to 12/31/02. | Life of patents. |

**\*226** Before turning to the parties' positions and the court's decision on the issue of the scope of the "have made" rights in the licenses, the court will first address some areas of

disagreement with respect to which patents are covered by certain of the licenses at issue.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Both parties agree that the Intel/AT & T Patent License Agreement was terminated on December 31, 1998. Therefore, this license agreement cannot cover sales to AT & T made after that date. Regardless of the scope of the "have made" rights within, any sales to AT & T made by Broadcom on or after January 1, 1999 cannot be licensed. Intel additionally argues that the Intel/AT & T license does not cover the '830 and '410 patents because the license is limited to inventions owned or controlled during the period January 1, 1990 through January 1, 1994. This is stated in the Definitions Appendix of that agreement, which defines "Corporation's Patents" as "all patents ... owned or controlled at any time during the LIMITED PERIOD by the CORPORATION." The term "LIMITED PERIOD" means "the period commencing on the effective date of this agreement and having a duration of four years." The court finds that Intel is correct. The '410 patent was filed on October 24, 1997, well after January 1, 1994. Therefore, the '410 patent is not one of the patents licensed under the Intel/AT & T Patent License Agreement. Similarly, as discussed above in section I.B.2.a., the '830 patent was not acquired by Intel until December 28, 1998. Therefore, the '830 patent is not one of the patents licensed under the Intel/AT & T Patent License Agreement. For the same reasons, the '410 and '830 patents are also not licensed under the Intel/Mitsubishi Agreement, which only includes patents with an effective filing date prior to October 16, 1989.

**\*227** The court now turns to the parties' respective positions on the scope of "have made" rights.

### 2. The Parties' Positions

#### a. Intel's Position

Intel contends that each of the license grants at issue expressly excludes a third party, such as Broadcom, from manufacturing or selling products not designed by the Intel licensee. Intel argues that each of the license agreements have one or both of the following similar limitations. First, "have made" rights cover only Licensee-designed products manufactured by a third party. Therefore Broadcom is only covered by the license if it was acting as a "foundry" (i.e. it was manufacturing products from designs provided by the Licensee, and not designing the products itself). See *Cyrix Corp. v. Intel Corp.,* 803 F.Supp. 1200, 1204 (E.D.Tex.1992) ("*Cyrix I* "). Foundry work, or custom manufacturing refers to arrangements in which a semiconductor company (the

foundry) makes and sells semiconductor products to its customers, the designs for which were developed or owned by the customers. *See generally,* Leonard J. Hope, The Licensed–Foundry Defense In Patent Infringement Cases: Time to Take Some of the Steam Out of Patent Exhaustion?, 11 Ga. St. U.L.Rev. 621, 628 (1995) ("Hope: Licensed Foundry Defense") (discussing how and why semiconductor companies typically out-source the manufacture of chips to foundries).

Similarly, Intel argues that its licenses are limited to "[Licensee] Products" and that each of the licenses are limited in this manner to only cover products designed by the Licensee. Under this interpretation, Intel licensees' do not have the authority to have *Broadcom* products made; they only have the authority to have *Licensee* products made. Thus Intel concludes that because Broadcom and not the licensee designed the products sold to the licensees, the Broadcom products are not licensed. *See Intel v. U.S. Intern. Trade Comm'n,* 946 F.2d 821, 828 (Fed.Cir.1991) ("*Intel Corp. v. ITC* ").

#### b. Broadcom's Position

In response, Broadcom first contends that nothing inherent in "have made" rights requires the licensee to provide the unlicensed third party with designs. Rather, unrestricted "have made" rights provide a licensee with a right to request any third-party to manufacture a licensed good. *Cyrix Corp. v. Intel Corp.,* 77 F.3d 1381, 1386 (Fed.Cir.1996) ("*Cyrix II* " [2] ). Therefore, Broadcom argues, it follows that any manufacture of a licensed good by a third-party for the licensed party cannot constitute an act of infringement by that third party. In support of its position, Broadcom points to other Intel licenses not at issue in this case that confer "have made" rights that are restricted by the further requirement that "designs, specification and working drawings for the manufacture thereof are furnished by, and originate with," the licensee. *See, e.g.,* Intel/IBM Agreement (October 1, 1989); Intel/Bull Patent Cross License Agreement (July 6, 1998); Intel/S3 Patent Cross License Agreement (December 16, 1998). [3]

**\*228** Broadcom also argues that Intel's reliance on *Intel Corp. v. ITC* for the proposition that the phrase "[Licensee] Products" constitutes a limitation that precludes unlicensed third-party's from manufacturing the products for the licensee is misplaced, because in analyzing other license agreements,

subsequent Federal Circuit cases have held that placing the licensee company's name before the word "Products" when referring to what is licensed, is not necessarily a substantive limitation but can simply be a modifying term. *See Cyrix II,* 77 F.3d at 1384–1386 (the term "IBM Licensed Products" in the IBM–Intel agreement did not limit the products it was licensed to sell to those designed by IBM); *cf. Intel Corp. v. ULSI Sys. Tech., Inc.,* 995 F.2d 1566, 1570 (Fed.Cir.1993) ("*ULSI* ") (discussing *Intel Corp. v. ITC:* "In determining whether the licensing agreement provided for foundry rights, the court focused on what was meant by the "Sanyo limitation" in the agreement. The court concluded that the limitation precluded Sanyo from serving as a foundry for non-Sanyo EPROMs because Sanyo was only permitted to sell Sanyo products ... In contrast, the licensing agreement between Intel and HP here contains no restriction on HP's right to sell or serve as a foundry.").

### 3. *The Court's Decision*

[22] [23] [24] [25]   The patent law defines infringement as making, using, or selling any patented invention without authority of the patent owner. 35 U.S.C. § 271(a). A patent therefore confers upon its owner a bundle of rights relating to the patented invention including the rights to exclude others from making, using, or selling the subject of the patent. Patent license agreements allow third party licensees to have partial or complete access to the patented invention by providing immunity from an infringement suit on the licensed patent. A patent license is essentially a waiver of the patent owner's right to sue; the parties agree that the patent owner will allow the licensee either to make, to use, to sell (or some combination of, or derivative of, these three rights) without subjecting the licensee to an infringement suit. It is thus well settled that a valid license is a complete defense to infringement. *Unidisco, Inc. v. Schattner,* 824 F.2d 965, 968 (Fed.Cir.1987) (resale of a patented product is not infringing when it was purchased from a party licensed to sell the products); *Lisle Corp. v. Edwards,* 777 F.2d 693, 695 (Fed.Cir.1985) (sale by authorized licensee to a third party bars a finding of infringement against the licensee and the third party)

[26]   A "have made" right, which is a right carved from the term "to make" in 35 U.S.C. § 271(a), provides a licensee with the right to request an unlicensed third-party to manufacture a licensed good for the licensee. *See Cyrix II,* 77 F.3d at 1386. The key issues in this dispute by the parties relate to the mechanics of how a "have made" right is exercised and the scope of its coverage. That is, (i) did the Intel licensees'

exercise their "have made" rights by purchasing allegedly infringing products from Broadcom?, and if so (ii) does the fact that Broadcom sold allegedly infringing products to Intel licensees insulate Broadcom from liability for infringement based on those sales?

Because the parties seek to draw support from Federal Circuit cases involving some combination of license defenses, foundry rights, and "have made" rights, **\*229** the court will begin by reviewing the facts and holdings of those cases.

### a. *Review of pertinent case law; license defenses*

The intersection of cross-licenses and foundry agreements to create viable implied license defenses for unlicensed third parties have been the subject of a number of judicial opinions and of considerable scholarly debate in the past decade. *See Cyrix II,* 77 F.3d 1381 (addressing separate license defenses of Cyrix with respect to the Intel/IBM agreement and the Intel/Mostek agreement); *Cyrix I,* 803 F.Supp. 1200; *ULSI,* 995 F.2d 1566; *Intel Corp. v. ITC,* 946 F.2d 821; *see also* David K. Barr, Recent Federal Court Decisions on Interpretation of Agreements Relating to Patents, 477 PLI/Pat. 1085, 1092–1099 (1997); Hope: Licensed Foundry Defense, 11 Ga. St. U.L.Rev. 621.

There are two well-understood factual circumstances where unlicensed parties can attain rights that shield their actions from infringement based on the third parties' interaction with a licensee. First, the unlicensed third party can give its designs to a licensee and ask that licensee to use its rights "to make" and "to sell" under its license to manufacture the product for the third party (i.e. to act as a foundry for the unlicensed third party), who then resells that product to its customers. The Federal Circuit has held that because the products were made and sold by a licensed party, the licensor/patent owner cannot sue the third party for infringement. *See Cyrix II,* 77 F.3d at 1387; *ULSI,* 995 F.2d at 1570. Second, a licensed party that has the right to "have [products] made," can exercise that right by requesting an unlicensed third party to make and sell products for it, which the licensee either uses or ultimately sells to its customers. *See Cyrix II,* 77 F.3d at 1387–88. Under that arrangement, to the extent the unlicensed party makes products for the licensee, the licensor/patent owner cannot sue the unlicensed party for patent infringement.

#### (i) *The Intel Foundry Cases*

The foundry cases arise under similar sets of facts and relationships between the parties, which Judge Plager summarized in his dissenting opinion in *ULSI,* as follows:

> Company A and Company B are major competitors .... A and B both maintain large [research] & [development] operations, and obtain patents on their various inventions ... [B]oth companies ... agree that it is in their mutual interest to avoid spending resources litigating with each other over patent rights rather than inventing .... [Therefore,] they cross-license each other in such a way that each is free to innovate and market their own similar products, without fear of infringing upon the patent rights of the other ...
>
> Company C, a small company seeking to break in to the same market [as A and B], approaches Company B with a proposition. C will provide B with details of its (C's) invention (a design similar to that patented by A). C will provide complete ... specifications, and warrants to B in writing that C rightfully obtained the design involved and that it does not infringe the patent rights of others. Using its manufacturing facilities, B is to manufacture the item to C's specifications. B will provide the raw materials, and will be paid on a per completed unit basis. B agrees, and ... delivers the item to C ...
>
> Later, C markets its product ... A examines C's product, concludes that it is so much like A's product that it infringes one of A's patents, and sues C. C then defends on the grounds, that since B manufactured the item that infringes A's patent, and since B is immune from liability for infringement of A's patents **\*230** under the A–B cross-license, C also is immune under the doctrine of ... 'patent exhaustion.'

*ULSI,* 995 F.2d at 1571 (Plager, J. Dissent). Such was the scenario in *Intel Corp. v. ITC, Cyrix I, Cyrix II,* and *ULSI.*

In *Intel Corp. v. ITC,* Intel and Sanyo entered into a broad patent cross-licensing agreement. *Intel Corp. v. ITC,* 946 F.2d at 826. Subsequently, Sanyo acted as a foundry for Atmel Corp. *Id.* Sanyo manufactured Erasable Programmable Read–Only Memories (EPROMs) for Atmel Corp. to sell as Atmel's own product, which were designed by Atmel Corp. but allegedly infringed Intel's patents. *Id.* Intel initiated a patent infringement action against Atmel. In response Atmel argued that its EPROMs were noninfringing because they

were manufactured by Sanyo under the broad cross-license agreement between Intel and Sanyo. *Id.* Essentially this defense was grounded in the patent law doctrine of 'patent exhaustion' (also called the 'first sale doctrine') which states that:

> [W]hen the patentee ... sells a machine or instrument whose sole value is in its use, he receives the consideration for its use and he parts with the right to restrict that use. The article ... passes without the limit of the monopoly.

*Adams v. Burke,* 17 Wall. 453, 84 U.S. 453, 456, 21 L.Ed. 700 (1873); *see also Bloomer v. McQuewan,* 55 U.S. (14 How.) 539, 549, 14 L.Ed. 532 (1852). The rationale underlying the doctrine as applied to licenses is that once the patentee has received consideration for releasing the article from the monopoly, by virtue of the license agreement, he can no longer limit or charge for its use. *See U.S. v. Univis Lens Co.,* 316 U.S. 241, 250, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942) (a patent owners monopoly ends with the first sale or disposition by a patentee, or his licensee acting within the scope of the license, or an article embodying the invention of the patent).

In *Intel Corp. v. ITC,* the Federal Circuit declined to accept Atmel's argument. Rather, it based its decision on its interpretation of the language of the Intel–Sanyo cross-license agreement. The court interpreted the agreement to mean that Intel licensed only *Sanyo* products. Based on this 'Sanyo limitation,' because Sanyo manufactured Atmel-designed EPROMs for Atmel Corp., the court held that the EPROMs were beyond the scope of the Intel–Sanyo license. The court held that, based on the language in the license, Intel could not have possibly intended that any company in the world could get an Intel licensee like Sanyo to manufacture its infringing parts without having to get its own license from Intel. *Intel Corp. v. ITC,* 946 F.2d at 827–28.

While the structural relationship was the same in *Cyrix* and *ULSI,* the license agreements at issue were interpreted not to have such 'Sanyo limitations.' Therefore, in those two cases, the Federal Circuit held, based on a straightforward application of the doctrine of patent exhaustion, that the Intel licensees (SGS–Thompson and HP, respectively) were allowed to act as foundries for unlicensed third parties (Cyrix and ULSI) and that because the products were manufactured by licensees, the unlicensed third parties could not be liable for patent infringement. *See Cyrix II,* 77 F.3d at 1386 (affirming district court's finding that the definition of "IBM

Licensed Products" in IBM–Intel agreement did not limit the products it was licensed to sell to those designed by IBM and finding that because IBM therefore had a right to act as a foundry for Cyrix, Intel's rights with respect to Cyrix were exhausted); *Cyrix I,* 803 F.Supp. at 1213–15 (finding that because Intel licensee, ST sold the finished products it manufactured **\*231** for Cyrix to Cyrix, Intel's rights with respect to Cyrix are exhausted); *ULSI,* 995 F.2d at 1569–71 (finding that patent exhaustion applied to bar Intel's suit against ULSI by Intel licensee HP's manufacture and sale of the allegedly infringing to ULSI as per foundry agreement between HP and ULSI). In sum, because the Intel licensees were validly exercising their Intel-granted rights "to make" and "to sell," once those products were "sold" from the licensee/foundry to the third party, the doctrine of patent exhaustion precluded Intel from suing the third party for infringement based on the third party's subsequent sale of the product to its customers.

While this case presents a different structural relationship between the licensed and unlicensed parties and a different type of transaction than the Intel foundry cases, both parties analogize to different foundry cases to support their arguments regarding the presence or lack of contractual limitations. Intel argues that the license agreements contain limiting "Sanyo-type limitations," citing *Intel v. ITC,* while Broadcom argues that they do not, citing *Cyrix II* and *ULSI.*

### (ii) *"Have made" rights*

While none of the licenses at issue granted to the licensee the right to sublicense its rights to a third party and in fact are restricted in that regard, it is well settled that rights to a third party can nonetheless be conferred through the valid exercise of a licensee's "have made rights." *See Southwire Co. v. United States Int. Trade Comm.,* 67 C.C.P.A. 141, 629 F.2d 1332, 1339 (1980) (quoting *Carey v. United States,* 164 Ct.Cl. 304, 326 F.2d 975, 979–80 (1964) ("have made" rights are distinguishable from rights to sublicense: if "production is ... for the use of the original licensee," it is an exercise of a have made right, but if the production is for the unlicensed third party itself, it is a sublicense)). "Have made" rights stem from the basic rights to make, use, and sell that are typically granted in a patent license. "The [have-made] license permits [the licensee] to engage others to do all the work connected with the production of the [licensed] article for him." *Carey,* 326 F.2d at 979.

Thus, while the foundry cases described above implicate the patent exhaustion doctrine because the first sale is made by the licensee to the unlicensed party, in "have made" cases the first sale is not by a licensee, but to a licensee. The issue is whether the scope of the "have made" license immunizes those sales from being infringing sales.

In another portion of the *Cyrix II* opinion, the Federal Circuit addressed this license defense issue and construed the effect of "have made" rights. In addition to the two party foundry arrangement between IBM and Cyrix, *Cyrix II* also involved a three-way foundry arrangement involving Cyrix, SGS–Thomson ("ST"), and a foreign subsidiary of SGS–Thomson, known as ST–Italy. While the right of SGS–Thompson to act as a foundry for Cyrix had been resolved by the Intel foundry cases, in this arrangement, ST subcontracted the manufacture of a portion of Cyrix's microprocessors to an unlicensed manufacturer, ST–Italy. ST argued that this was a valid exercise of its "have made" and "sell" rights under its license with Intel. ST exercised that right by asking ST–Italy to make products, which it sold back to ST and ST ultimately sold to Cyrix. Intel, in response, argued that the transaction was in effect a sublicense which violated the license's prohibition against sublicensing because the licensee, ST, was a mere "pass-through": ST–Italy was in reality producing the microprocessors for Cyrix and not for ST. *See* **\*232** *E.I. du Pont de Nemours & Co. v. Shell Oil Co.,* 498 A.2d 1108 (Del.1985)) (holding that in "sham" transaction where sales merely passed through licensee; licensee exceeded "have made" rights).

The Federal Circuit disagreed with Intel and found that the transaction between ST and ST–Italy was a proper exercise of ST's "have made" rights. More specifically, the court stated that:

> the third party (ST–Italy) properly manufactured microprocessors under ST's 'have made' rights, and ST then properly sold the products to a different entity, Cyrix. The two agreements, one permitting ST–Italy to manufacture microprocessors for ST and the other providing for ST's sale of microprocessors to Cyrix, were separate business transactions ... We accordingly conclude that the district court did not err in holding that the arrangements among ST, ST–Italy, and Cyrix were a valid exercise of

ST's "have made" rights under its
agreement with Intel.

*Cyrix II,* 77 F.3d at 1387–88.

### (iii) *summary foundry rights and "have made" rights*

In sum, the foundry cases stand for the proposition that
unless the licensor contractually limits the licensees' rights,
by exercising their rights to "make" and "sell" licensed
products, licensees can shield an unlicensed reseller from
infringement liability. In each of those cases, the unlicensed
reseller was shielded from liability because they purchased
the allegedly infringing product from the licensee, under the
doctrine of patent exhaustion. The "have made" cases stand
for the separate proposition that by exercising their rights
to "have [licensed products] made," licensees can shield the
unlicensed manufacturer who makes the products for
them and subsequently sells the products to the them from
infringement liability by impliedly licensing the otherwise
infringing actions.

### b. *Is Broadcom insulated from liability for sales to Intel Licensees that have the right to "have [licensed products] made" by a third party?*

**[27]**    In the present case, Broadcom is an unlicensed third
party that makes allegedly infringing products. As a partial
defense to Intel's patent infringement allegations, Broadcom
argues that to the extent it sells those infringing products
to an Intel licensee, its actions fall under the umbrella of
that licensee's "have made" rights, and Broadcom is therefore
shielded from infringement liability for its actions.

The only case cited by the parties that discusses a transaction
that is somewhat structurally analogous to the present
transaction is *Cyrix II,* which analyzes the above described
arrangement between ST and ST Italy. According to the
holding of that case, ST validly exercised its have made rights
by requesting ST–Italy, an unlicensed party, to make licensed
products for it. Although ST Italy's liability was not at issue in
that case, it is apparent from the *Cyrix II* holding that ST Italy
would have no patent infringement liability for its actions of
making and selling allegedly infringing products to ST. This
is because ST's exercise of its "have made" right gave rise to
an implied license that shielded ST–Italy from infringement.

Broadcom argues that it, like ST Italy, is an unlicensed
third party that makes licensed products for Intel licensees.
Broadcom claims that it cannot be liable for infringement for
the acts of making and selling for sales of licensed products
to Intel licensees, because it sells accused products to Intel
licensees with "have made" rights. The issue here is what
protection, if any, is afforded to Broadcom by virtue of selling
to Intel licensees' **\*233** whose licenses with Intel contain
"have made" rights.

**[28]**    Unlicensed third party manufacturers can be
immunized in this fashion where their otherwise infringing
actions were performed pursuant to the exercise of a licensee's
"have made" right. However, it is not clear that Broadcom's
actions in this case were conducted under the licenses. An
unlicensed third party in the position of Broadcom only is
afforded the protections of a license if those protections are
conveyed by the licensee to the third party as an exercise
of the licensed party's "have made" rights. Broadcom cannot
lay claim to those protections if they were never conveyed to
Broadcom.

For example, assume that a licensor grants to a licensee the
rights to "make, use, sell, and have made" certain licensed
products. The effect of the license is to prevent the licensor
from suing the licensee for infringement for making, using,
selling, or having made the covered products. The unfettered
"have made" right gives the licensee the right to designate a
third party to make the product for it. Thus, when exercised,
the "have made" right passes on certain protections to the
third party. That third party's actions in making the product
and selling the product back to the licensee become impliedly
licensed.

Based on the facts thus far presented, Broadcom's actions are
different from the preceding example because it is unclear
whether Broadcom *made* the products pursuant to a request
from the licensee, in which case the making and selling
would be authorized to the extent that licensee's license
allows it to be, or whether Broadcom simply *sold* allegedly
infringing off-the-shelf products to parties that happen to be
Intel licensees. The ST–ST Italy transaction in *Cyrix II* is
an example of the former case. In the latter case, however,
the Intel licensees cannot be said to be exercising their
"have made" rights, because they are not taking protections
that they have under the license and conveying them to
Broadcom. Rather, when Broadcom makes an allegedly
infringing product, that act itself constitutes an act of potential
infringement. Subsequent sales of such off-the-shelf products

to licensees do not convert that act of infringement into noninfringement.

This court came to the same conclusion when it previously addressed the issue of whether "have made" rights confer protections to manufacturers of "off-the-shelf" parts in *Thorn EMI North America, Inc. v. Hyundai Elec. Indus. Co.,* CA 94–332–RRM, 1996 U.S. Dist. LEXIS 21170 (D.Del. July 12, 1996). There, this court found that "a foundry commissioned by IBM to manufacture IHS products would have the protection of the licensed agreement ... [but that] a manufacturer of 'off the shelf' products is not a foundry ... [and] therefore, whether or not it sold the products to IBM, would not be protected by the agreement." *Thorn EMI.* 1996 U.S. Dist. LEXIS 21170 at * 15.

 **[29]**   The Intel licensees have the right to "have [products] made." This right, which is derived from the language of the patent infringement statute, supplements the licensee's right "to make" products for itself, by allowing the licensee to request a third party to make the product for it. The implied right to grant to the otherwise unlicensed third party the right "to make" and "to sell" the product for the licensed party (i.e. to act as a foundry) is an intrinsic part of that licensees "have made" right. Intel's granting of "have made" rights to licensees does not, however, give the licensee the inherent right to in some way immunize prior acts of infringement through its subsequent purchase of off-the-shelf goods. To the extent that the "have **\*234** made" right allows the licensee to purchase the licensed products off of the shelf of an unlicensed third party, that right may shield the licensee from subsequent liability for using or selling that product. However, the "have made" right in that situation does not immunize the unlicensed third party.

The legal effect of licensees exercising their "have made" rights by commissioning a third party to make licensed products is very different from the legal effect of licensees purchasing allegedly infringing products from a third party. In the first situation, the third party's acts are noninfringing (if the "have made" rights conveyed to the licensee are unrestricted), because there is a flow of rights that authorizes the unlicensed party's otherwise infringing acts (i.e. making, selling, or using the patented invention). These rights flow from Intel to the licensees and down to the third party manufacturer before the third party engages in any of those otherwise infringing acts. Without an agreement between each Intel licensee and Broadcom demonstrating that the products were made, pursuant to rights that flowed from the

licensee to Broadcom, Broadcom's sales to the Intel licensees cannot be said to be non-infringing. Based on the facts thus far provided, no such rights flow to Broadcom in this set of sale transactions. Broadcom cannot unilaterally rely on the rights of the licensees who purchase its products, when none of those licensees' rights have been conferred onto Broadcom.

Both parties' briefs focus on the scope of the rights that Intel granted to its licensees in the twelve license agreements at issue. Focusing on the agreements, the parties dispute whether the "have made" rights contain limitations that require the licensees to provide designs to unlicensed manufacturers that they ask to make the products and whether the products that the licensee may "have made" are limited to exclude products made by Broadcom. Determining whether Broadcom's sales to the licensees are licensed requires a two part inquiry; before the scope of the rights granted by Intel to its licensees become relevant, the court must first determine whether the licensees granted any of its rights to Broadcom. Because there is no discussion of evidence or lack of evidence of agreements between the licensees and Broadcom that demonstrates that the licensees' exercised their right to ask Broadcom to make a licensed product for them, the court need not reach the disputed issues of contract interpretation relating to the license agreements in denying each parties request for summary judgment.

The court finds that neither Intel or Broadcom has satisfied its burden in demonstrating that no genuine issues of material facts exist as to this license defense. Neither party presented facts or pointed to the absence of facts relating to whether Broadcom's production of the allegedly infringing products was done under the cover of an Intel licensee's exercise of its "have made" rights. Without knowing whether facts relating to this threshold issue exist, it would be improper for the court to grant summary judgment. Therefore the court will deny both Intel and Broadcom's motions.

## II. *CONCLUSION*

With respect to Intel's motion for partial summary judgment that Broadcom is not licensed under the '830 and '410 patents under license grants of the Intel–Broadcom Joint Development Agreement, the court finds that the '830 and '410 patents are excluded from the coverage of that agreement. Accordingly, the court will grant Intel's motion.

 **\*235**   With respect to the parties' cross-motions for partial summary judgment with respect to whether Broadcom's sales to General Instrument Corporation are licensed under the

Motorola Agreement, the court finds that General Instrument Corporation is not a licensee under the Motorola Agreement, and therefore grants summary judgment in favor of Intel.

As to the parties' cross-motions for partial summary judgment with respect to whether Broadcom's sales to various Intel licensees are licensed under Intel license agreements, the court finds that genuine issues of material fact remain as to whether the sale transactions to Intel licensees conveyed any of those licensees' rights to Broadcom. Accordingly, the court will deny both parties' summary judgment motions. Should Broadcom be unable, at trial or through documents submitted with post-trial briefing, to set forth any such facts, this license defense will be without legal merit. However, should Broadcom set forth facts that indicate that Broadcom was indeed making these allegedly infringing products in response to requests by Intel licensees "to make" them, Broadcom may pursue this defense.

Regardless of the ultimate scope of protections, if any, afforded by the "have made" rights the court makes the following findings as a matter of law: (i) The Intel/AT & T Patent License Agreement cannot cover any sales made after its termination date of December 31, 1998; (ii) the Intel/AT & T Patent License Agreement does not license the '830 or '410 patents; (iii) the Intel/Mitsubishi Agreement does not license the '830 or '410 patents. Additionally, the court makes no findings at this time as to whether certain Broadcom products sold to the Intel licensees constitute "Licensed Products" under the individual Intel-licensee agreements.

The court will enter an order in accordance with this memorandum opinion.

Footnotes

1    General Instrument Corporation was formerly known as "NextLevel Systems, Inc." On January 30, 1998, NextLevel Systems, Inc. changed its name to General Instrument Corporation. For the sake of clarity, this opinion consistently will refer to both General Instrument Corporation and NextLevel Systems, Inc. by the shorthand abbreviation, GI.

2    While there are a number of Cyrix cases that have been designated Cyrix I–IV in different articles and opinions, this opinion uses the designations *Cyrix I* and *Cyrix II* to refer, respectively, to the E.D. of Texas District Court opinion and the appeal of that decision to the Federal Circuit.

3    Intel notes that the Intel–Hitachi Patent Cross License Agreement, that is at issue in this case, does, however, contain such a limitation on Hitachi's have made rights: "such license [to have made] has effect only if design and manufacturing specifications to manufacture the Licensed Product ... are provided by the licensee." It is true, however, that none of the other "have made" rights at issue contain any such limitation.

**End of Document**                                                © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 88

58 U.S.P.Q.2d 1681

248 F.3d 1333
United States Court of Appeals,
Federal Circuit.

INTELLECTUAL PROPERTY
DEVELOPMENT, INC., Plaintiff–Appellee,
v.
TCI CABLEVISION OF CALIFORNIA,
INC., Defendant–Appellant.

No. 00–1236.   |   Decided May 7, 2001.

Exclusive licensee of patent for certain wired broadcasting systems brought patent infringement suit against telecommunications firm, and firm counterclaimed, seeking declaratory judgment on issues of noninfringement, invalidity, and unenforceability. After motion to dismiss initial complaint based on lack of standing was denied, and complaint was amended to add patentee as a party plaintiff, the United States District Court for the Central District of California, Mariana R. Pfaelzer, J., granted motion by licensee and patentee to voluntarily dismiss their claims with prejudice, and to dismiss counterclaims without prejudice. Firm appealed. The Court of Appeals, Gajarsa, Circuit Judge, held that: (1) firm had standing to appeal dismissal; (2) statement of non-liability filed in connection with motion for voluntary dismissal divested court of jurisdiction to consider declaratory judgment claims; (3) licensee, who had been granted fewer than all rights in patent, had standing to bring patent infringement suit individually; and (4) licensee was properly allowed to join patentee as party plaintiff.

Affirmed.

West Headnotes (30)

[1]   **Federal Courts**
        👉 Standing
        Whether a party has standing to sue is a question of law that Court of Appeals reviews de novo.

        2 Cases that cite this headnote

[2]   **Federal Courts**

        👉 Persons Entitled to Seek Review or Assert Arguments; Parties; Standing
        A party that receives all it has sought generally is not aggrieved by the judgment and cannot appeal from it.

        1 Cases that cite this headnote

[3]   **Patents**
        👉 Parties entitled to allege error
        District court order granting exclusive patent licensee's motion to dismiss its patent infringement claims against telecommunications firm with prejudice, and counterclaims asserted by telecommunications firm without prejudice, did not address fully all avenues of potential infringement liability on part of telecommunications firm, and thus, telecommunications firm had standing to appeal district court's dismissal of complaint and counterclaims, and decision to allow licensee to add patentee as a party plaintiff.

        13 Cases that cite this headnote

[4]   **Federal Civil Procedure**
        👉 Label or theory of motions
        A motion's substance, rather than its linguistic form, determines its nature and thus its legal effect.

        Cases that cite this headnote

[5]   **Declaratory Judgment**
        👉 Counterclaim for declaratory relief in other action
        A declaratory judgment counterclaim may only be brought to resolve an actual controversy, which must be extant at all stages of review, and not merely at the time the complaint is filed. 28 U.S.C.A. § 2201(a).

        7 Cases that cite this headnote

[6]   **Declaratory Judgment**
        👉 Claim of infringement as condition precedent

Statement of non-liability filed by patentee, and exclusive patent licensee, in connection with their motion to voluntarily dismiss patent infringement claims against telecommunications firm, estopped patentee, licensee, and any successors in interest from asserting liability against firm for infringement of patent in question, and thus divested court of jurisdiction to consider telecommunications firm's counterclaim for declaratory judgment on issues of noninfringement, invalidity, and unenforceability, even though firm could be required to indemnify an entity that potentially could be held liable in a different case for infringing patent.

20 Cases that cite this headnote

[7]    **Declaratory Judgment**
       👉 Infringement of patents

       **Declaratory Judgment**
       👉 Claim of infringement as condition precedent

In suits for declaratory judgments regarding patent rights, a two-part justiciability test applies, under which there must be both (1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity.

10 Cases that cite this headnote

[8]    **Patents**
       👉 Nature of ownership of patents

       **Patents**
       👉 Assignability of patents

A patent is a bundle of rights which may be divided and assigned, or retained in whole or in part.

1 Cases that cite this headnote

[9]    **Patents**
       👉 Construction and Operation of Assignments and Grants

To determine whether a patent transfer agreement conveys all substantial rights under a patent to a transferee, or fewer than all of those rights, a court must assess the substance of the rights transferred and the intention of the parties involved; in making such a determination, it is helpful to consider rights retained by the grantor in addition to rights transferred to the grantee.

4 Cases that cite this headnote

[10]   **Patents**
       👉 Construction and Operation of Licenses

Agreement under which patentee granted "exclusive license" to make, use, and sell invention claimed in patent, but patentee retained right in certain circumstances to require licensee to obtain patentee's consent to proceed with litigation, right in other circumstances to be fully informed and consulted with regard to litigation, and right to prevent licensee from assigning its benefit under agreement without prior written consent, effected a transfer of fewer than all substantial rights in patent.

20 Cases that cite this headnote

[11]   **Patents**
       👉 Rights and liabilities of assignees and grantees

Title of agreement transferring rights under a patent is not determinative of the nature of the rights transferred under the agreement, and actual consideration of the rights transferred is the linchpin of such a determination.

2 Cases that cite this headnote

[12]   **Patents**
       👉 Rights and liabilities of assignees and grantees

A transferee that receives all substantial patent rights from a transferor would never need consent from the transferor to file suit, because such an assignment essentially transfers title in the patent to the transferee. 35 U.S.C.A. § 100(d).

4 Cases that cite this headnote

58 U.S.P.Q.2d 1681

**[13]    Patients**

🔑  Persons entitled to sue

Exclusive licensee of fewer than all rights in patent for certain wired broadcasting systems had standing under Patent Act, and thus under Article III, to bring patent infringement suit; alleged infringement resulted in injury directly traceable to competitor's allegedly infringing conduct, and was redressable in an infringement suit. U.S.C.A. Const. Art. 3, § 2, cl. 1; 35 U.S.C.A. § 281.

2 Cases that cite this headnote

**[14]    Patients**

🔑  Construction and Operation of Assignments and Grants

**Patients**

🔑  Persons entitled to sue

A grant of all substantial rights in a patent amounts to an assignment–that is, a transfer of title in the patent–which confers constitutional standing on the assignee to sue another for patent infringement in its own name. 35 U.S.C.A. § 261.

12 Cases that cite this headnote

**[15]    Patients**

🔑  Persons entitled to sue

A nonexclusive license or "bare" license in a patent–a covenant by the patent owner not to sue the licensee for making, using, or selling the patented invention and under which the patent owner reserves the right to grant similar licenses to other entities–confers no constitutional standing on the licensee under the Patent Act to bring suit, or even to join a suit with the patentee because a nonexclusive or bare licensee suffers no legal injury from infringement. 35 U.S.C.A. § 261.

41 Cases that cite this headnote

**[16]    Patients**

🔑  Rights, Remedies, and Liabilities of Licensees

An exclusive licensee receives more substantial rights in a patent than a nonexclusive licensee, but receives fewer rights than an assignee of all substantial patent rights.

3 Cases that cite this headnote

**[17]    Federal Civil Procedure**

🔑  In general;  injury or interest

The actual or threatened injury required by Article III to confer standing may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing. U.S.C.A. Const. Art. 3, § 2, cl. 1.

Cases that cite this headnote

**[18]    Federal Civil Procedure**

🔑  In general;  injury or interest

**Federal Civil Procedure**

🔑  Causation;  redressability

Article III standing requires a party invoking federal jurisdiction to establish three elements: first, plaintiff must have suffered an injury in fact, which is an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical, there must be a causal connection between the injury and the conduct complained of, in that the injury is fairly traceable to the challenged action and not the result independent action of some third party not before the court, and finally, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. U.S.C.A. Const. Art. 3, § 2, cl. 1.

3 Cases that cite this headnote

**[19]    Patients**

🔑  Complainants

A patentee who grants the exclusive right to make, use, or vend, which does not constitute a statutory assignment, must allow the use of his name as plaintiff in any action brought by the licensee to obtain damages for the injury to his exclusive right.

13 Cases that cite this headnote

**[20]    Patents**

🔑    Complainants

Exclusive licensee which had been granted fewer than all rights in patent for certain wired broadcasting systems, and which had initially brought patent infringement suit in its own name, could properly add patentee as a party plaintiff in infringement suit.

Cases that cite this headnote

**[21]    Patents**

🔑    Nature of license

**Patents**

🔑    Complainants

Owner of a patent, who grants to another the exclusive right to make, use, or vend the invention, which does not constitute a statutory assignment, holds title to the patent in trust for such licensee, to the extent that he must allow the use of his name as plaintiff in any action brought at the instance of the licensee in law or in equity to obtain damages for the injury to his exclusive right by an infringer, or to enjoin infringement of it.

15 Cases that cite this headnote

**[22]    Patents**

🔑    Complainants

As a general rule, patent owner should be joined, either voluntarily or involuntarily, in any patent infringement suit brought by an exclusive licensee having fewer than all substantial patent rights.

9 Cases that cite this headnote

**[23]    Patents**

🔑    Complainants

Unlike a patent assignee that may sue in its own name, an exclusive licensee having fewer than all substantial patent rights who seeks to enforce its

rights in a patent generally must sue jointly with the patent owner.

6 Cases that cite this headnote

**[24]    Patents**

🔑    Complainants

General principle that a patent owner must be joined, either voluntarily or involuntarily, in any infringement suit brought by an exclusive licensee having fewer than all substantial rights, is prudential rather than constitutional.

28 Cases that cite this headnote

**[25]    Federal Civil Procedure**

🔑    In general;  injury or interest

In addition to the three-prong Article III standing test, standing doctrine embraces judicially self-imposed limits, known as prudential limits, on the exercise of jurisdiction. U.S.C.A. Const. Art. 3, § 2, cl. 1.

1 Cases that cite this headnote

**[26]    Patents**

🔑    Persons entitled to sue

**Patents**

🔑    Complainants

As a prudential principle, an exclusive licensee having fewer than all substantial patent rights possesses standing under the Patent Act to bring infringement action as long as it sues in the name of, and jointly with, the patent owner and meets the Article III standing requirements; this principle holds true except in extraordinary circumstances, such as where the infringer is the patentee and cannot sue itself. U.S.C.A. Const. Art. 3, § 2, cl. 1; 35 U.S.C.A. § 281.

30 Cases that cite this headnote

**[27]    Patents**

🔑    Complainants

A patent owner's agreement to be bound by judgments cannot circumvent general rule that a

58 U.S.P.Q.2d 1681

patent owner must ordinarily be joined with an exclusive licensee in a patent infringement suit.

1 Cases that cite this headnote

[28]   **Patents**
        👉 **Complainants**

When an exclusive licensee files a patent infringement suit, the presence of the owner of a patent as a party is indispensable to give jurisdiction under the patent laws.

1 Cases that cite this headnote

[29]   **Patents**
        👉 **Complainants**

A patent owner may be joined as a party by an exclusive licensee under the patent who has brought an infringement suit.

7 Cases that cite this headnote

[30]   **Patents**
        👉 **Original utility**

4,135,202. Cited.

2 Cases that cite this headnote

**Attorneys and Law Firms**

*1336 David Zaslowsky, and Robin L. Filion, Baker & McKenzie, of New York, NY, argued for plaintiff-appellee. On the brief were David Zaslowsky, and James David Jacobs. Of counsel was Frank M. Gasparo.

Scott F. Partridge, Baker Botts L.L.P., of Houston, Texas, argued for defendant-appellant. With him on the brief was Roger S. Donley. Also on the brief were Neil P. Sirota, of New York, NY; and David G. Willie, and Samir A. Bhavsar, of Dallas, TX.

Before LOURIE, SCHALL, and GAJARSA, Circuit Judges.

**Opinion**

GAJARSA, Circuit Judge.

TCI Cablevision of California, Inc. ("TCI–California") appeals the January 27, 2000 order of the United States District Court for the Central District of California, No. 99–CV–2982 (C.D.Cal. Jan. 27, 2000). The district court granted the motion filed by Intellectual Property Development, Inc. ("IPD") and Communications Patents Ltd. ("CPL") to dismiss its complaint against TCI–California with prejudice and to dismiss TCI–California's counterclaims without prejudice. We affirm.

**BACKGROUND**

CPL, a United Kingdom limited company, is the assignee of United States Patent No. 4,135,202 ("the #202 patent"), which issued in 1979. The #202 patent covers certain wired broadcasting systems. CPL entered liquidation on May 12, 1993. On June 30, 1993, acting through a liquidator, CPL and IPD entered into an agreement that granted IPD numerous rights in the #202 patent.

The agreement accords IPD "an exclusive license, to make, use, and sell the inventions, the right to grant sublicenses, the right to collect monies, damages and/or royalties for past infringement and the right to bring legal action to collect the same." Further, the agreement provides:

> [IPD] shall be entitled to take action under the ['202 patent] in [IPD's] own name to prevent infringement, or to collect damages for past infringement, or to defend proceedings for revocation in circumstances where [CPL] is not a necessary party to that action (a "Sole Action") *1337 provided that [IPD] notifies [CPL] in writing.... [IPD] shall keep [CPL] fully informed and consult with [CPL] about the conduct of the Sole Action. [IPD] shall not without the prior written consent of [CPL], which shall not be unreasonably withheld, settle or agree to any compromise.... In the event that [CPL] may be a necessary party to any litigation or legal action under the ['202 patent] (a "Joint Action") [IPD] shall not proceed with the Joint Action without the prior written consent of [CPL].

[CPL] reserves the right to withdraw consent to the Joint Action proceeding at any time up to termination of the Joint Action.... [IPD] further agrees to pay [CPL] fifty percent (50%) of the net profit of [IPD] derived from ... realisations [sic] realised [sic] such as but not limited to litigation.

The rights CPL granted to IPD are subject to a nonexclusive license in the # 202 patent that CPL previously granted to Cabletime Limited, Cabletime Systems Ltd., and their customers (collectively "Cabletime") on October 3, 1991. Additionally, the agreement provides that CPL maintains the right to "assign all [of its] rights and obligations" under the agreement and further allows CPL to prevent IPD from assigning its benefits under the agreement to a third party without prior written consent from CPL.

On September 1, 1994, IPD filed a suit against UA–Columbia Cablevision of Westchester, Inc. ("UA–Westchester") and Tele Communications, Inc. ("TCI") in the United States District Court for the Southern District of New York (the "New York case"). IPD asserted that UA Westchester and TCI infringed the # 202 patent prior to its expiration on January 16, 1996. TCI is the parent company of both UA–Westchester and the appellant in the case at issue-TCI-California. On May 15, 1995, TCI filed a motion to dismiss the New York case on the grounds that IPD lacked standing, or alternatively, because CPL was an indispensable party. Subsequently, by letter, CPL agreed to be bound by any judgment in the New York case. On September 8, 1995, the judge in the New York case determined that IPD maintained standing to bring the suit in its own name. A *Markman* hearing, construing the claims of the patent, was held in the New York case in June, 1997. *Intellectual Prop. Dev., Inc. v. UA–Columbia Cablevision of Westchester, Inc.,* No. 94–6296, 1998 WL 142346 (S.D.N.Y. Mar.26, 1998).

Prior to filing the suit at issue, IPD offered, and TCI declined to accept, an agreement to toll the damage limitation period for all TCI subsidiaries. Subsequently, IPD filed suit against twelve TCI subsidiaries (the "1999 cases"), alleging infringement of the #202 patent. This case is one of the twelve 1999 cases; it was filed in the United States District Court for the Central District of California on March 4, 1999. In this action, TCI–California counterclaimed, seeking declaratory judgment on the issues of noninfringement, invalidity, and unenforceability of the #202 patent.

On April 6, 1999, IPD filed a motion with the Judicial Panel for Multi-district Litigation ("JPML") to consolidate the 1999 cases and the New York case. On April 19, 1999, while the motion to consolidate was pending before the JPML, TCI–California moved to dismiss this case pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, or alternatively, based on IPD's failure to join an indispensable party-CPL-under Federal Rule of Civil Procedure 19(b). On May 26, 1999, the district court issued an order (the "May 26, 1999 order") in which it granted TCI California's motion to dismiss for "lack of standing." The court, however, delayed signing the order to allow IPD to amend its complaint to add *1338 CPL as a party plaintiff and thereby rectify its "lack of standing." On May 28, 1999, TCI–California brought a motion for reconsideration of the May 26, 1999 order. Thereafter, IPD amended its complaint to add CPL as a party on June 21, 1999.

The district court, on June 28, 1999, denied TCI–California's motion for reconsideration and also clarified its May 26, 1999 order. The court stated that in the May 26, 1999 order, it had not held "that [IPD] lacked any element of constitutional standing so as to deprive the [c]ourt of jurisdiction over this case." It explained that "IPD made an adequate showing on the three elements required by the Constitution for standing to exist: a legally cognizable injury, a causal connection between the injury and the conduct and redressability of the injury." The court also indicated that it "found IPD to be an exclusive licensee that alleged a legally cognizable injury" and therefore noted that "[t]he [c]ourt's use of the words 'lack of standing' in the May 26 [, 1999] Order referred to a prudential limitation on IPD's right to bring suit without joining the patentee." That is, the court determined that the rights retained by the patent owner, CPL, are "of the type that make a patent owner who granted an exclusive license a necessary party to an infringement action brought by the licensee." Therefore, the court concluded by indicating that in its May 26, 1999 order it recognized that as an exclusive licensee, IPD did not have standing to sue in its own name and consequently the court required joinder of the patent owner, CPL.

On August 19, 1999, the JPML consolidated the 1999 cases and the New York case and transferred them to the United States District Court for the Central District of California, where this case was pending, for joint pretrial proceedings. IPD subsequently entered into tolling agreements with several

TCI subsidiaries, which resulted in the stipulated dismissal of all of the 1999 cases other than the case at bar. [1]

IPD and CPL, on December 27, 1999, filed a motion to voluntarily dismiss this case with prejudice pursuant to Federal Rule of Civil Procedure 41(a) and to dismiss TCI–California's counterclaims for lack of subject matter jurisdiction. IPD and CPL attached a "Statement of Non Liability" to this motion, which provides: "[TCI–California] has no liability to CPL or IPD or any successors-in-interest to the #202 patent for infringement of the # 202 patent and CPL and IPD and any successors-in-interest to the #202 patent will not sue [TCI–California] for infringement of the #202 patent." IPD and CPL further requested, in accordance with JPML Rule 7.6, that the district court suggest to the JPML that it remand the New York case to the United States District Court for the Southern District of New York. [2]

On January 27, 2000, the district court granted IPD and CPL's motion for voluntary dismissal, which effected the dismissal of its complaint with prejudice and the dismissal of TCI–California's counterclaims for lack of subject matter jurisdiction without prejudice. TCI–California appeals the district court's failure to dismiss the initial complaint-filed solely by IPD-for lack of standing and its subsequent grant of the motion for voluntary dismissal.

### *1339 DISCUSSION

#### A. Standard of Review

[1]    Whether a party has standing to sue is a question of law that this court reviews de novo. Prima Tek II L.L.C. v. A–Roo Co., 222 F.3d 1372, 1376, 55 USPQ2d 1742, 1745 (Fed.Cir.2000). The legal effect of an agreement transferring patent rights is an issue of law that we review de novo. Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA, 944 F.2d 870, 873, 20 USPQ2d 1045, 1047 (Fed.Cir.1991).

#### B. TCI–California's Standing to Appeal

IPD contends that TCI–California lacks standing to bring this appeal. It asserts that TCI–California was not aggrieved by the district court's grant of IPD and CPL's motion to dismiss this case. That is, IPD suggests that TCI–California seeks reversal of the district court's decision to grant IPD

leave to add CPL as a party, and based on such a reversal, seeks dismissal of this case predicated on a theory that IPD lacked adequate standing to bring suit against TCI–California without having filed jointly with CPL. Therefore, IPD contends that TCI–California seeks a judgment identical to the judgment effected by the district court's grant of the motion for voluntary dismissal, but for a different reason. [3]

[2]    [3]    A party that receives all it has sought generally is not aggrieved by the judgment and cannot appeal from it. [4] Deposit Guar. Nat.'l Bank v. Roper, 445 U.S. 326, 333, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980); Zenith Elecs. Corp. v. United States, 875 F.2d 291, 293 (Fed.Cir.1989). The district court dismissed IPD and CPL's complaint alleging patent infringement with prejudice. TCI–California contends that this dismissal failed to redress fully its infringement liability concerns based on, inter alia, indemnity and direct liability to potential transferees of the patent rights. [5] TCI–California argues that it possesses these liability concerns because the district court's order failed to address the merits of TCI–California's counterclaims for declaratory judgment on the issues of invalidity and unenforceability. We determine that the district court's order dismissing the complaint with prejudice and TCI–California's counterclaims *1340 without prejudice fails to address fully all avenues of potential infringement liability. Therefore, TCI–California has standing to appeal the district court's dismissal of IPD and CPL's complaint with prejudice, its decision to allow IPD to amend its complaint to add CPL as a party plaintiff, and its dismissal without prejudice of TCI–California's counterclaims.

#### C. Statement of Non–Liability

[4]    On January 27, 2000, the district court granted IPD and CPL's motion to voluntarily dismiss this case. This motion was filed pursuant to Federal Rule of Civil Procedure 41(a) and included a statement of non-liability. The court's order granting the motion for voluntary dismissal fails to state explicitly whether it granted the motion based on Rule 41(a) or based on the statement of non-liability. [6] A motion's substance rather than its linguistic form determines its nature and thus its legal effect. Registration Control Sys., Inc. v. Compusystems, Inc., 922 F.2d 805, 808, 17 USPQ2d 1212, 1214 (Fed.Cir.1990); Super Sack Mfg. Corp. v. Chase Packaging Corp., 57 F.3d 1054, 1057, 35 USPQ2d 1139, 1142 (Fed.Cir.1995) (determining that Federal Rule of Civil

Procedure 41(a)(2), which the district court based its decision on, was inapplicable, but nevertheless determining that the trial court dismissed the case for lack of an actual controversy as required by Article III based on a statement of nonliability).

[5]  [6]  A declaratory judgment counterclaim may only be brought to resolve an "actual controversy." 28 U.S.C. § 2201(a) (1994). The actual controversy "must be extant at all stages of review, not merely at the time the complaint is filed." *Preiser v. Newkirk,* 422 U.S. 395, 401, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975). The burden rests on TCI–California in this case to establish "that jurisdiction over its declaratory judgment action existed at, and has continued since, the time the [counterclaim] was filed." *International Med. Prosthetics Research Assocs. v. Gore Enter. Holdings, Inc.,* 787 F.2d 572, 575, 229 USPQ 278, 281 (Fed.Cir.1986).

In *Super Sack,* Super Sack sued Chase for allegedly infringing two of its patents. 57 F.3d at 1055, 35 USPQ2d at 1140. Chase denied infringement and filed a counterclaim seeking declaratory judgment on the issues of noninfringement and invalidity. Subsequently, in a motion to dismiss, Super Sack's counsel provided a statement indicating that "Super Sack will unconditionally agree not to sue Chase for infringement as to any claim of the patents-in-suit based upon the products currently manufactured and sold by Chase." *Id.* at 1056, 35 USPQ2d at 1141. In *Super Sack,* this court first determined that the promise not to sue extended only to products that Chase made, used, or sold on or before July 8, 1994–the date that Super Sack filed its motion to dismiss. *Id.* at 1056–57, 35 USPQ2d at 1141.

[7]  The *Super Sack* court then recognized that in suits for declarations of patent rights, a two-part justiciability test applies:

> There must be both (1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) **\*1341** present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity.

*Id.* at 1058, 57 F.3d 1054, 35 USPQ2d at 1142 (quoting *BP Chems. Ltd. v. Union Carbide Corp.,* 4 F.3d 975, 978, 28 USPQ2d 1124, 1126 (Fed.Cir.1993)).

The *Super Sack* court stated with respect to the patents at issue in the statement of non-liability, "Super Sack is forever estopped by its counsel's statement of non-liability ... from asserting liability against Chase in connection with any products that Chase made, sold, or used on or before July 8, 1994." *Id.* at 1059, 35 USPQ2d at 1143. It continued, providing: "This estoppel, in turn, removes from the field any controversy sufficiently actual to confer jurisdiction over this case." *Id.* Consequently, the court determined, "[b]ecause Chase can have no reasonable apprehension that it will face an infringement suit on [the patents at issue] with respect to past and present products, it fails to satisfy the first part of our two-part test of justiciability." *Id.*

The *Super Sack* court then addressed Chase's assertion that Super Sack's promise failed to cover products Chase could make, use, or sell in the future. *Id.* at 1059–60, 35 USPQ2d at 1143–44. The court pointed out that the second part of the declaratory justiciability test for patent rights requires that the putative infringer's "present activity" place it at risk of infringement liability. *Id.* at 1059, 35 USPQ2d at 1143. Because Chase's present activity failed to place it at risk of infringement liability, the court determined that "[t]he residual possibility of a future infringement suit based on Chase's future acts is simply too speculative a basis for jurisdiction over Chase's counterclaim of invalidity." *Id.* at 1060, 35 USPQ2d at 1144. Therefore, the *Super Sack* court affirmed the district court's grant of Super Sack's motion to dismiss for lack of jurisdiction with prejudice. *Id.*

Like the statement of counsel in *Super Sack,* the statement of non-liability filed by IPD and CPL estops IPD, CPL, and any successors in interest to the # 202 patent from asserting liability against TCI–California for infringement of the #202 patent. Therefore, because TCI–California maintains no "reasonable apprehension" that it will face an infringement suit from IPD, CPL, or any successor in interest to the #202 patent, it fails to satisfy the first part of the justiciability test with respect to assertions of infringement by those parties.

TCI–California also contends that it could be required to indemnify an entity that potentially could be held liable in a different case for infringing the # 202 patent. If TCI–California's interests are affected by a different suit regarding the #202 patent, then TCI–California should join that action as a party, for example, pursuant to Federal Rule of Civil Procedure 19(a)(2)(i). [7] Further, part one of the declaratory justiciability test for patent rights requires action by the patent

58 U.S.P.Q.2d 1681

owner that creates "reasonable apprehension" on the part of the declaratory plaintiff that it will face an infringement suit.[8] A suit filed against a different party, even if TCI– **\*1342** California could potentially be required to indemnify that party, is not a suit that TCI–California itself faces. Therefore, the district court correctly determined that it lacked jurisdiction despite TCI–California's indemnity concerns.

In sum, similar to the resolution in *Super Sack,* the statement of non-liability divested the district court of Article III jurisdiction, and therefore the district court properly granted the motion to dismiss IPD and CPL's complaint with prejudice and TCI–California's counterclaims without prejudice.[9] *See also Spectronics Corp. v. H.B. Fuller Co., Inc.,* 940 F.2d 631, 19 USPQ2d 1545 (Fed.Cir.1991) (affirming the district court's dismissal of an action filed by Spectronics under the Declaratory Judgment Act, 28 U.S.C. § 2201 (1988), alleging, *inter alia,* invalidity and non-infringement of a patent owned by Fuller because Fuller filed a covenant not to sue Spectronics for infringement of the patent at issue and therefore Fuller was "forever estopped from asserting the [patent at issue] against Spectronics").

### D. IPD's Standing in the District Court

While the district court correctly dismissed IPD and CPL's complaint with prejudice and TCI–California's counterclaims without prejudice, we possess jurisdiction to review the district court's decision to allow IPD to amend its complaint to add CPL as a party plaintiff.

### 1. Rights Transferred from CPL to IPD

[8] [9] A patent is "a bundle of rights which may be divided and assigned, or retained in whole or in part." *Vaupel,* 944 F.2d at 875, 20 USPQ2d at 1049. To determine whether a patent transfer agreement conveys all substantial rights under a patent to a transferee or fewer than all of those rights, a court must assess the substance of the rights transferred and the intention of the parties involved. *Id.* at 874, 20 USPQ2d at 1048.

[10] In making such a determination, it is helpful to consider rights retained by the grantor in addition to rights transferred to the grantee. *Id.* at 875, 20 USPQ2d at 1049. In the case at issue, under the CPL–IPD agreement, while IPD possesses an "exclusive license to make, use, and sell" the invention claimed in the #202 patent, CPL retains: (1) the right in

certain circumstances (when CPL is a "necessary" party) to require IPD to obtain its consent to proceed with litigation (which can be withdrawn "at any time" until termination of the litigation); (2) the right in other circumstances (when CPL is not a "necessary" party) to be fully informed and to be consulted with regard to litigation; (3) the right to assign "all [of its] rights and obligations" under the agreement; (4) the right to prevent IPD from assigning its benefit under the agreement to a third party without prior written consent from CPL; (5) the right to require its consent to settlements (which shall not be "unreasonably withheld"); and (6) the right to collect fifty percent of profits realized from litigation.

This court has addressed the issue of whether an agreement transfers all or fewer than all substantial patent rights on several occasions. In *Abbott Laboratories v. Diamedix Corp.,* 47 F.3d 1128, 33 USPQ2d 1771 (Fed.Cir.1995), this court determined that a transfer of certain, but not all, patent rights from Diamedix to Abbott constituted an exclusive license of fewer than all substantial patent rights rather than an assignment of all such rights. In that case, Diamedix retained the right to make and use the products **\*1343** claimed in the patents for its own benefit and the right to sell those products to parties with whom Diamedix maintained pre-existing contracts and licenses. *Id.* at 1132, 33 USPQ2d at 1774. While Abbott was given the right of first refusal to sue alleged infringers, Diamedix retained the right to bring its own infringement actions. That is, although Abbott possessed the right to initiate suit for infringement, it could not "indulge" or permit an infringement, which the *Abbott* court indicated normally accompanies a complete conveyance of the right to sue. *Id.* Diamedix also retained the right to prevent Abbott from assigning its rights under the license to any party other than a successor in business. *Id.* at 1132, 33 USPQ2d at 1775. Finally, the *Abbott* court noted that it appeared that Diamedix retained the right to participate in a suit brought by Abbott because the agreement provided that Diamedix is "entitled to be represented therein by counsel of its own selection at its own expense." *Id.* at 1132, 33 USPQ2d at 1774. For these reasons, the *Abbott* court held that Abbott was granted fewer than all substantial rights under the patents. *Id.* at 1133, 33 USPQ2d at 1775.

Conversely, in *Vaupel,* this court determined that an agreement transferring certain patent rights from Markowsky to Vaupel constituted an assignment of all substantial rights in the patent at issue. 944 F.2d 870, 20 USPQ2d 1045. Markowsky retained: (1) a veto right on sublicensing by Vaupel; (2) the right to obtain patents on the invention in other

countries; (3) a reversionary right to the patent in the event of bankruptcy or termination of production by Vaupel; and (4) a right to receive infringement damages. *Id.* at 875, 944 F.2d 870, 20 USPQ2d at 1049. The *Vaupel* court stated that it found "particularly dispositive" the agreement provision that transferred the right to sue for infringement of the patent at issue subject only to the obligation to *inform* Markowsky. *Id.*

This court recently determined in *Speedplay, Inc. v. Bebop, Inc.,* 211 F.3d 1245, 53 USPQ2d 1984 (Fed.Cir.2000), that an agreement transferring certain patent rights constituted an assignment of all substantial rights in the patents at issue. The agreement in *Speedplay* effected a transfer from Bryne and Zoumaras to Speedplay of the exclusive right to manufacture, have manufactured, distribute, market, use and sell products covered by the patents at issue. 211 F.3d at 1250, 53 USPQ2d at 1987. Bryne and Zoumaras, however, retained the option to initiate legal action against an alleged infringer in their own name, but only if Speedplay failed to bring such a suit within three months. *Id.* at 1251, 53 USPQ2d at 1987. Yet, the agreement at issue in *Speedplay* did not grant Bryne and Zoumaras the right to participate in an infringement action brought by Speedplay, nor did it limit Speedplay's management of any such action. *Id.* at 1251, 53 USPQ2d at 1988. This court determined that Bryne and Zoumaras's right to sue an infringer was illusory because Speedplay could render that right nugatory by granting the alleged infringer a royalty-free sublicense. *Id.* Indeed, the *Speedplay* court concluded, "Speedplay ... controls enforcement of [the patent at issue] for all practical purposes." *Id.* Finally, while Speedplay could not assign its interest without consent from Bryne and Zoumaras, the agreement provided that such consent "shall not be withheld unreasonably." The court deemed this provision not significantly restrictive of the scope of Speedplay's patent rights. [10] *Id.* at 1252, **1344** 53 USPQ2d at 1988.

[11] Guided by the aforementioned jurisprudence, we must assess the agreement at issue in this case, weighing the rights in the #202 patent transferred to IPD against those retained by CPL, to determine whether CPL assigned all substantial rights in the #202 patent to IPD or conveyed fewer than all such rights. The title of the agreement at issue, which uses the term "license" rather than the term "assignment," is not determinative of the nature of the rights transferred under the agreement; actual consideration of the rights transferred is the linchpin of such a determination. *See Speedplay,* 211 F.3d at 1250, 53 USPQ2d at 1986 ("A party that has been granted all substantial rights under the patent is considered the owner

regardless of how the parties characterize the transaction that conveyed those rights.").

Under the agreement at issue, IPD is granted the right to "make, use, and sell" the invention claimed in the #202 patent. The agreement fails to suggest that CPL continues to possess similar rights as this court found salient in *Abbott.* While this right transferred to IPD is substantial, every other pertinent factor weighs in favor of finding that the agreement is an exclusive license of fewer than all substantial rights in the #202 patent. [11]

In both *Vaupel* and *Speedplay,* contrary to *Abbott,* the transferees effectively obtained the sole right to sue other parties for infringement. The right to sue in *Vaupel,* which was deemed "particularly dispositive," was only subject to an obligation to *inform* the transferor of any impending litigation. 944 F.2d at 875, 20 USPQ2d at 1049. In *Speedplay,* this court determined that the transferors' right to sue an infringer was illusory. 211 F.3d at 1251, 53 USPQ2d at 1988. Further, in *Mentor H/S, Inc. v. Medical Device Alliance,* 240 F.3d 1016, 1018, 57 USPQ2d 1819, 1820 (Fed.Cir.2001), this court deemed the transferee of patent rights to be an exclusive licensee of fewer than all substantial rights rather than an assignee of all of those rights in large part because the transferor retained the first opportunity to sue alleged infringers; that is, the transferee could only file such suits if the transferor failed to file a suit.

[12] Pursuant to the agreement in the case at bar, CPL retains differing rights depending on whether it is a "necessary" party. The agreement fails to elucidate cogently the definition of "necessary." Yet, it suffices to recognize that in certain circumstances-when CPL is a "necessary" party-CPL must consent to litigation and can withdraw that consent at any time. That is, CPL can permit infringement when it is a "necessary" party, which is relevant to a finding that CPL granted IPD fewer than all substantial rights in the #202 patent. Indeed, a transferee that receives all substantial patent rights from a transferor would never need consent from the transferor to file suit because such an assignment essentially transfers title in the patent to the transferee. 35 U.S.C. § 100(d) (1994). Further, even if CPL is not a "necessary party" to a suit, IPD must keep CPL fully informed, and consult with CPL, as to any litigation pertaining to the patents at issue in the agreement. [12]

**1345** CPL also retains the right to prevent IPD from assigning its benefits to a third party without first receiving

CPL's consent. The *Abbott* court indicated that limits on a transferee's assignment rights weigh in favor of finding that an agreement constitutes a transfer of fewer than all substantial rights in a patent. 47 F.3d at 1132, 33 USPQ2d at 1775. Similarly, while the *Vaupel* court found that the agreement at issue in that case constituted an assignment of all substantial patent rights, it nevertheless recognized that a restriction on a transferee's right to assign is a substantial right reserved by the transferor. 944 F.2d at 875–76, 20 USPQ2d at 1049–50; *see also Prima Tek II,* 222 F.3d at 1380, 55 USPQ2d at 1748 ("A licensee's right to sub-license is an important consideration in evaluating whether a license agreement transfers all substantial rights."). We also recognize that limits on the assignment of rights are a factor weighing in favor of finding a transfer of fewer than all substantial rights in the #202 patent.

In light of CPL's right to permit infringement in certain cases, the requirement that CPL consent to certain actions and be consulted in others, and the limits on IPD's right to assign its interests in the #202 patent, we find that the CPL IPD agreement at issue transfers fewer than all substantial rights in the #202 patent from CPL to IPD.

## 2. Article III and Prudential Standing Requirements

[13]    Standing in a patent infringement case is derived from the Patent Act, which provides: "A patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281 (1994). The term "patentee" comprises "not only the patentee to whom the patent was issued but also the successors in title to the patentee." 35 U.S.C. § 100(d) (1994).

[14]    [15]    [16]    A grant of all substantial rights in a patent amounts to an assignment-that is, a transfer of title in the patent-which confers constitutional standing on the assignee to sue another for patent infringement in its own name. 35 U.S.C. § 261 (1994); *Waterman v. Mackenzie,* 138 U.S. 252, 256, 11 S.Ct. 334, 34 L.Ed. 923 (1891); *Ortho Pharm. Corp. v. Genetics Inst., Inc.,* 52 F.3d 1026, 1030, 34 USPQ2d 1444, 1446 (Fed.Cir.1995). Conversely, a nonexclusive license or "bare" license-a covenant by the patent owner not to sue the licensee for making, using, or selling the patented invention and under which the patent owner reserves the right to grant similar licenses to other entities-confers no constitutional standing on the licensee under the Patent Act to bring suit or even to join a suit with the patentee because a nonexclusive (or "bare") licensee suffers no legal injury from infringement. *Ortho,* 52 F.3d at 1031, 34 USPQ2d at 1447; *Rite–Hite Corp. v. Kelley Co., Inc.,* 56 F.3d 1538, 1552, 35 USPQ2d 1065,

1074–75 (Fed.Cir.1995). It is clear that IPD is an exclusive licensee rather than a non-exclusive or "bare" licensee. An exclusive licensee receives more substantial rights in a patent than a nonexclusive licensee, but receives fewer rights than an assignee of all substantial patent rights. For example, an exclusive licensee could receive the exclusive right to practice an invention within a given limited territory. *Rite–Hite,* 56 F.3d at 1552, 35 USPQ2d at 1074 (citing *Independent Wireless Tel. Co. v. Radio Corp. of Am.,* 269 U.S. 459, 468–69, 46 S.Ct. 166, 70 L.Ed. 357 (1926)).

As stated earlier, IPD is an exclusive licensee that has some, but fewer than all, substantial rights in the #202 patent. **\*1346** TCI–California argues that CPL should have been a required party to the district court suit at the outset of the litigation. That is, TCI–California contends that as an exclusive licensee having fewer than all substantial rights in the #202 patent, IPD lacked Article III standing to bring suit in its own name and could not create standing, and thus jurisdiction, by simply joining CPL rather than by dismissing the case and refiling jointly with CPL. Therefore, TCI California asserts that the district court judge improperly allowed IPD to amend its complaint to add CPL as a party plaintiff.

[17]    TCI–California points out that the Supreme Court has stated: "The actual or threatened injury required by Article III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing....' " *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (quoting *Linda R.S. v. Richard D.,* 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973)). Because the Patent Act creates the sole remedy for infringement of a patent and because the Patent Act indicates that only "patentees" and "assignees" shall have a remedy for patent infringement, *see* 35 U.S.C. §§ 281 and 100(d), TCI California contends that, under *Warth,* only a "patentee" or an "assignee" (and not an "exclusive licensee" having fewer than all substantial patent rights) possesses Article III standing to bring a patent infringement suit. Further, TCI–California cites a footnote in *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 571 n. 4, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), for the proposition that a constitutional standing defect cannot be cured by joinder. That is, TCI–California asserts that federal jurisdiction must exist at the time an action is filed.

[18]    Article III standing requires a party invoking federal jurisdiction to establish three elements. *Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130. First, the plaintiff "must have

58 U.S.P.Q.2d 1681

suffered an injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not conjectural or hypothetical.' " *Id.* at 560 (citations omitted). Second, "there must be a causal connection between the injury and the conduct complained of-the injury has to be 'fairly ... trace [able] to the challenged action of the defendant and not ... th[e] result [of] the independent action of some third party not before the court.' " *Id.* (citations omitted). Third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " *Id.* (citation omitted).

TCI–California is correct in its assertion that Article III standing to sue in this case derives solely from the Patent Act. Section 281 of title 35 of the United States Code provides: "A patentee shall have remedy by civil action for infringement of his patent." A "patentee" includes "not only the patentee to whom the patent was issued but also the successors in title [assignees] to the patentee." 35 U.S.C. § 100(d). This statutory language, however, fails to limit Article III standing to patentees and assignees. As discussed above, IPD is an exclusive licensee having fewer than all substantial rights in the #202 patent. To determine whether IPD possesses constitutional standing, we must consider whether IPD meets each *Lujan* factor.

[19]   A party such as IPD that has the right to exclude others from making, using, and selling an invention described in the claims of a patent is constitutionally injured by another entity that makes, uses, or sells the invention. Indeed, the Supreme Court has stated that a patent owner that grants "the exclusive right to make, use, or vend [a patented invention], which does not constitute a statutory assignment **\*1347** ... must allow the use of his name as plaintiff in any action brought by the licensee ... to obtain damages for the *injury to his exclusive right*." *Independent Wireless,* 269 U.S. at 469, 46 S.Ct. 166 (emphasis added).

Further, IPD's injury is directly related to the allegedly infringing conduct of TCI–California. This relationship meets the "fairly traceable" standard for causation described in *Lujan.* Finally, IPD's injury is redressable because, if successful in an infringement suit against TCI California, IPD could recover damages pursuant to 35 U.S.C. § 284 and could prohibit TCI–California from further making, using and selling its allegedly infringing products under 35 U.S.C. § 283. Indeed, this court has awarded damages to exclusive licensees as compensation for patent infringement injuries. *Weinar v. Rollform, Inc.,* 744 F.2d 797, 807–08, 223 USPQ

369, 374–75 (Fed.Cir.1984). In sum, IPD meets the three-pronged *Lujan* test for Article III standing.

[20]   Moreover, it was proper for IPD, as an exclusive licensee of fewer than all substantial rights in the #202 patent, to add CPL as a party plaintiff. The Supreme Court addressed the right to sue for patent infringement under a predecessor patent statute in *Independent Wireless,* a case involving an exclusive licensee (as distinguished from an assignee) that sought to obtain an injunction and damages against an alleged patent infringer without joining the patent owner to the suit. 269 U.S. at 466, 46 S.Ct. 166. The Court stated:

> The presence of the owner of the patent as a party is indispensable, not only to give jurisdiction under patent laws, but also in most cases to enable the alleged infringer to respond in one action to all claims of infringement for his act, and thus either to defeat all claims in the one action, or by satisfying one adverse decree to bar all subsequent actions.

*Id.* at 468, 46 S.Ct. 166.

The *Independent Wireless* Court recognized an exception to this rule in circumstances where a patent owner refuses, or is unable, to be joined as a co-plaintiff with an exclusive licensee. *Id.* In such cases, "the licensee may make [the patent owner] a party defendant by process [that is, involuntarily], and he will be lined up by the court in the party character he should assume." *Id.*

[21]   The *Independent Wireless* Court then explained that:

> [T]he owner of a patent, who grants to another the exclusive right to make, use, or vend the invention, which does not constitute a statutory assignment, holds title to the patent in trust for such licensee, to the extent that he must allow the use of his name as plaintiff in any action brought at the instance of the licensee in law or in equity to obtain damages for the injury to his exclusive right by an infringer, or to enjoin infringement of it.

*Id.* at 469, 46 S.Ct. 166.

58 U.S.P.Q.2d 1681

**[22]**    **[23]**    As a general rule, in accordance with *Independent Wireless,* this court adheres to the principle that a patent owner should be joined, either voluntarily or involuntarily, in any patent infringement suit brought by an exclusive licensee having fewer than all substantial patent rights. *Prima Tek II,* 222 F.3d at 1377, 55 USPQ2d at 1746; *Abbott Labs.,* 47 F.3d at 1131, 33 USPQ2d at 1774; *Rite–Hite,* 56 F.3d at 1552, 35 USPQ2d at 1074; *Mentor H/S,* 240 F.3d at 1017, 57 USPQ2d at 1820; *Textile Prods.,* 134 F.3d at 1484, 45 USPQ2d at 1635. That is, unlike an assignee that may sue in its own name, an exclusive licensee having fewer than all substantial patent rights (that is not subject to an exception) that seeks to enforce **\*1348** its rights in a patent generally must sue jointly with the patent owner. *Ortho,* 52 F.3d at 1030, 34 USPQ2d at 1447.

**[24]**    **[25]**    The general principle set forth in *Independent Wireless* requiring that a patent owner be joined, either voluntarily or involuntarily, in any infringement suit brought by an exclusive licensee having fewer than all substantial rights is prudential rather than constitutional. *Prima Tek II,* 222 F.3d at 1377, 55 USPQ2d at 1746. In addition to the three-prong Article III standing test delineated in *Lujan,* standing doctrine embraces judicially self-imposed limits, known as prudential limits, on the exercise of jurisdiction. [13] *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).

**[26]**    **[27]**    **[28]**    As a prudential principle, an exclusive licensee having fewer than all substantial patent rights possesses standing under the Patent Act as long as it sues in the name of, and jointly with, the patent owner and meets the *Lujan* requirements. *Prima Tek II,* 222 F.3d at 1377, 55 USPQ2d at 1746; *Abbott,* 47 F.3d at 1131, 33 USPQ2d at 1774. This principle holds true except in extraordinary circumstances, such as where the infringer is the patentee and cannot sue itself. *Ortho,* 52 F.3d at 1030, 34 USPQ2d at 1447 (citing *Waterman,* 138 U.S. at 255, 11 S.Ct. 334). [14] Indeed, the Supreme Court in *Independent Wireless* recognized that when an exclusive licensee files a patent infringement suit, "the presence of the owner of a patent as a party is indispensable ... to give jurisdiction under the patent laws...." 269 U.S. at 468, 46 S.Ct. 166.

### 3. IPD's Joinder of CPL

**[29]**    TCI–California argues that because IPD, an exclusive licensee having fewer than all substantial rights in the #202

patent, initially filed this suit in its own name, the district court lacked jurisdiction and therefore could not grant IPD leave to amend its complaint to add CPL as a party. However, this court has recognized the principle that a patent owner may be joined by an exclusive licensee. For example, in *Abbott,* an exclusive licensee having fewer than all substantial patent rights brought a patent infringement suit in its own name. 47 F.3d at 1129, 33 USPQ2d 1771. Thereafter, the patent owner filed a motion to intervene. *Id.* at 1130, 33 USPQ2d at 1773. This court determined that the patent owner's "joinder [was] required as a matter of statutory standing." *Id.* at 1133, 33 USPQ2d at 1775. Yet, the court did not dismiss the case for lack of jurisdiction and require that the patent owner and exclusive licensee jointly refile. Rather, the court reversed the district court's denial of the motion to intervene. [15] *Id.* at 1134, 33 USPQ2d at 1776.

**\*1349**    TCI–California cites footnote four of the Supreme Court's *Lujan* decision for the proposition that a standing defect cannot be cured by joinder of a party to a suit. TCI California's reliance on this footnote is misplaced. In *Lujan,* the Supreme Court determined that the plaintiffs lacked constitutional standing because they failed to assert a sufficiently imminent injury and because their claimed injury was not redressable. *Id.* at 563–71, 112 S.Ct. 2130. As discussed above, IPD met the constitutional requirements for standing from the outset of its suit. Therefore, the cited portion of *Lujan* is inapposite.

### CONCLUSION

For the reasons set forth in this opinion, we affirm the district court's order, which effected dismissal of the complaint filed by IPD and CPL with prejudice and dismissal of TCI–California's counterclaims without prejudice.

*AFFIRMED.*

### COSTS

Each party shall bear its own costs.

### Parallel Citations

58 U.S.P.Q.2d 1681

58 U.S.P.Q.2d 1681

Footnotes

1    IPD and TCI–California did not enter into a tolling agreement.

2    On June 12, 2000, the district court granted IPD's request to suggest to the JPML that it remand the New York case to the United States District Court for the Southern District of New York.

3    A judgment vacating this decision and ordering the district court to dismiss this case for inadequate standing in the first instance, when IPD filed the suit alone, would require IPD and CPL to refile jointly a suit against TCI–California. The filing date of a patent infringement suit against TCI–California affects potential damages recovery. 35 U.S.C. § 286 (1994) ("[N]o recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action.").

4    If this court determined, which it does not, that the district court should have dismissed this case in the first instance for lack of standing when the suit was brought by IPD alone, then that dismissal would likely have been without prejudice. *Textile Prods. Inc. v. Mead Corp.,* 134 F.3d 1481, 1486, 45 USPQ2d 1633, 1637 (Fed.Cir.1998). That is, IPD could have subsequently jointly filed a suit against TCI–California with CPL. The district court's grant of the motion for voluntary dismissal filed by IPD and CPL effected a prejudicial dismissal with respect to infringement. Therefore, TCI–California seeks a judgment effectuating a non-prejudicial dismissal of the infringement claims against it rather than a prejudicial dismissal of those claims. While dismissal of a patent infringement suit without prejudice would generally be considered "worse" for a party that is an alleged patent infringer than dismissal of such claims with prejudice, circumstances such as the ones at issue fail to automatically divest this court of jurisdiction.

5    This case differs from *Penda Corp. v. United States,* 44 F.3d 967, 33 USPQ2d 1200 (Fed.Cir.1994), which concerned indirect third-party indemnity liability.

6    Federal Rule of Civil Procedure 41(a)(2) provides that if a counterclaim has been pled by a defendant prior to service upon the defendant of the plaintiff's motion to dismiss, the action shall not be dismissed against the defendant's objection unless the counterclaim can remain pending for independent adjudication by the court. Fed.R.Civ.P. 41(a)(2). The record in this case fails to indicate whether the strictures of this rule were met in this case. Regardless, this case turns on the statement of non-liability, not on dismissal pursuant to Rule 41.

7    Federal Rule of Civil Procedure 19(a)(2)(i) provides: "A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if ... the person claims an interest relating to the subject matter of the action and is so situated that the disposition of the action in the person's absence may [ ] as a practical matter impair or impede the person's ability to protect that interest...."

8    We recognize that "apprehension" also may apply to a declaratory plaintiff's customers as discussed in *Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 6 USPQ2d 1685 (Fed.Cir.1988).

9    It is of no consequence to the case at issue that *Super Sack* concerned a declaratory counterclaim for noninfringement and invalidity while TCI–California counterclaimed for declaratory judgment on the issues of noninfringement, invalidity, and unenforceability.

10   Other rights retained by Bryne and Zoumaras in *Speedplay* are not relevant to the case at issue.

11   As discussed in *Vaupel,* CPL's right to receive infringement damages is "merely a means of compensation under the agreement." 944 F.2d at 875, 20 USPQ2d at 1049. We consider CPL's right to receive infringement damages a neutral factor.

12   While CPL must consent to settlement of a litigation by IPD, that consent cannot be "unreasonably withheld." In *Speedplay,* a consent requirement pertaining to assignment rights that could not be "unreasonably withheld" was deemed not significantly restrictive of the scope of Speedplay's patent rights. 211 F.3d at 1251–52, 53 USPQ2d at 1988. Therefore, we find this factor to be neutral.

13   For example, the Supreme Court has held that a "plaintiff must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth,* 422 U.S. at 499, 95 S.Ct. 2197. Additionally, even in circumstances where a plaintiff has alleged a constitutionally redressable injury, the Supreme Court has refrained from "adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances' ... most appropriately addressed in the representative branches." *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 475, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (quoting *Warth,* 422 U.S. at 499–500, 95 S.Ct. 2197). The Supreme Court has also required a plaintiff's complaint to fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

14   It is noted that a patent owner's agreement to be bound by judgments cannot circumvent the rule of *Independent Wireless* that the patent owner must ordinarily be joined with an exclusive licensee in a patent infringement suit. *Prima Tek II,* 222 F.3d at 1380–81, 55 USPQ2d at 1748–49.

15   This court has indicated that even appellate-level amendments to correct jurisdictional defects may be appropriate to allow an exclusive licensee to join the patent owner. *Mentor H/S,* 240 F.3d at 1019, 57 USPQ2d at 1821 (citing *Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 836, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989), for the proposition that "appellate-level amendments to correct jurisdictional defects" are appropriate under rare circumstances).

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 89

Ivaco Inc., Re, 2006 CarswellOnt 6292

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 318 of 378

2006 CarswellOnt 6292, 2006 C.E.B. & P.G.R. 8218, [2006] W.D.F.L. 3681...

2006 CarswellOnt 6292
Ontario Court of Appeal

Ivaco Inc., Re

2006 CarswellOnt 6292, 2006 C.E.B. & P.G.R. 8218, [2006] W.D.F.L. 3681, [2006] O.J. No.
4152, 25 C.B.R. (5th) 176, 26 B.L.R. (4th) 43, 275 D.L.R. (4th) 132, 56 C.C.P.B. 1, 83 O.R. (3d) 108

# IN THE MATTER OF the Companies' Creditors
Arrangement Act, R.S.C. 1985, c. C-36.

AND IN THE MATTER OF A Plan or Plans of Compromise or
Arrangement of Ivaco Inc. and the Applicants listed in Schedule "A"

J. Laskin, M. Rosenberg, J. Simmons JJ.A.

Heard: February 22, 2006
Judgment: October 17, 2006
Docket: CA C44455

Proceedings: affirming *Ivaco Inc., Re* (2005), 2005 CarswellOnt 3445, 47 C.C.P.B. 62, 12 C.B.R. (5th) 213 (Ont. S.C.J.
[Commercial List])

Counsel: Frederick L. Myers, Jason Wadden for Appellant, Superintendent of Finance Services (Ontario)
Andrew Hatnay for Respondent, Quebec Pension Committee of Ivaco Inc.
Jeffrey S. Leon, Richard B. Swan for Respondent, National Bank of Canada
Dan V. MacDonald for Respondent, Bank of Nova Scotia
Geoff R. Hall for Respondent, QIT-Fer et Titane Inc.
Robert W. Staley, Evangelia Kriaris for Respondent, Informal Committee of Noteholders
Peter F.C. Howard for Monitor, Ernst & Young Inc.

Subject: Insolvency; Estates and Trusts; Family; Property; Corporate and Commercial; Civil Practice and Procedure

### Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

### Headnote

#### Bankruptcy and insolvency --- Property of bankrupt — Trust property — General principles

Pension funds — I Inc. and related companies, collectively I Group, had established various registered pension plans for
their employees — I Group became insolvent in 2003, and obtained protection under Companies' Creditors Arrangement
Act ("CCAA") — To facilitate restructuring of I Group, order was issued suspending unpaid past-service payments and
special contributions I Group had been making to certain underfunded pension plans — Restructuring was unsuccessful —
I Group's assets were sold — Superintendent brought unsuccessful motion for order directing that portions of sale proceeds
be used to satisfy unpaid pension obligations, which companies are deemed to hold in trust for beneficiaries of pension
plans under Pension Benefits Act ("PBA"), or alternatively, for order segregating that amount in separate account — Some
of I Group's financial creditors brought partially successful motions for order lifting stay under CCAA and petitioning I
Group into bankruptcy — Stay was lifted, and bankruptcy petitions were allowed to proceed — Superintendent appealed
from dismissal of its motion — Appeal dismissed — Motions judge did not err in law in refusing to order immediate
payment of amount of deemed trusts under PBA or in refusing to segregate that amount — Combination of wording of s.
57 of PBA, paragraph 4 of pension stay order, and limited role of Monitor refuted Superintendent's argument that funds

2006 CarswellOnt 6292, 2006 C.E.B. & P.G.R. 8218, [2006] W.D.F.L. 3681...

should have been segregated — CCAA itself did not require motions judge to execute deemed trusts — Because Federal legislative regime under CCAA and Bankruptcy and Insolvency Act determines claims of creditors of insolvent company, if rights of pension claimants are to be given greater priority, Parliament, not courts, must do so.

### Pensions --- Payment of pension — Bankruptcy or insolvency of employer — Registered plans

I Inc. and related companies, collectively I Group, had established various registered pension plans for their employees — I Group became insolvent in 2003, and obtained protection under Companies' Creditors Arrangement Act ("CCAA") — To facilitate restructuring of I Group, order was issued suspending unpaid past-service payments and special contributions I Group had been making to certain underfunded pension plans — Restructuring was unsuccessful — I Group's assets were sold — Superintendent brought unsuccessful motion for order directing that portions of sale proceeds be used to satisfy unpaid pension obligations, which companies are deemed to hold in trust for beneficiaries of pension plans under Pension Benefits Act ("PBA") or, alternatively, for order segregating this amount in separate account — Some of I Group's financial creditors brought partially successful motions for order lifting stay under CCAA and petitioning I Group into bankruptcy — Stay was lifted, and bankruptcy petitions were allowed to proceed — Superintendent appealed from dismissal of its motion — Appeal dismissed — Motions judge did not err in law in refusing to order immediate payment of amount of deemed trusts under PBA or in refusing to segregate that amount — Combination of wording of s. 57 of PBA, paragraph 4 of pension stay order, and limited role of Monitor refuted Superintendent's argument that funds should have been segregated — Because Federal legislative regime under CCAA and Bankruptcy and Insolvency Act determines claims of creditors of insolvent company, if rights of pension claimants are to be given greater priority, Parliament, not courts, must do so — Motions judge did not err in exercising his discretion to lift stay under CCAA and permit bankruptcy petition to proceed — Superintendent's unfairness argument was not accepted.

### Bankruptcy and insolvency --- Bankruptcy petitions for receiving orders — Stay of petition — General principles

I Inc. and related companies, collectively I Group, had established various registered pension plans for their employees — I Group became insolvent in 2003, and obtained protection under Companies' Creditors Arrangement Act ("CCAA") — To facilitate restructuring of I Group, order was issued suspending unpaid past-service payments and special contributions I Group had been making to certain underfunded pension plans — Restructuring was unsuccessful — I Group's assets were sold — Superintendent brought unsuccessful motion for order directing that portions of sale proceeds be used to satisfy unpaid pension obligations, which companies are deemed to hold in trust for beneficiaries of pension plans under Pension Benefits Act ("PBA") or, alternatively, for order segregating this amount in separate account — Some of I Group's financial creditors brought partially successful motions for order lifting stay under CCAA and petitioning I Group into bankruptcy — Stay was lifted, and bankruptcy petitions were allowed to proceed — Superintendent appealed from dismissal of its motion — Appeal dismissed — Motions judge did not err in exercising his discretion to lift stay under CCAA and permit bankruptcy petition to proceed — Motion judge's order lifting stay was discretionary order, and appellate review of discretionary order under CCAA is justified only for error in principle or unreasonable exercise of discretion — Superintendent's unfairness argument was not accepted — Numerous conditions supported motions judge's decision to lift stay and permit bankruptcy petitions to proceed — Motions judge would have gone beyond his role as referee in CCAA proceedings if he had given effect to Superintendent's claim.

### Bankruptcy and insolvency --- Practice and procedure in courts — Orders — Miscellaneous issues

I Inc. and related companies, collectively I Group, had established various registered pension plans for their employees — I Group became insolvent in 2003, and obtained protection under Companies' Creditors Arrangement Act ("CCAA") — To facilitate restructuring of I Group, order was issued suspending unpaid past-service payments and special contributions I Group had been making to certain underfunded pension plans — Restructuring was unsuccessful and I Group's assets were sold — Superintendent brought unsuccessful motion for order directing that portions of sale proceeds be used to satisfy unpaid pension obligations, which companies are deemed to hold in trust for beneficiaries of pension plans under Pension Benefits Act ("PBA") or, alternatively, for order segregating this amount in separate account — Some of I Group's financial creditors brought partially successful motions for order lifting stay under CCAA and petitioning I Group into bankruptcy — Stay was lifted, and bankruptcy petitions were allowed to proceed — Motions judge made ancillary order to facilitate

Ivaco Inc., Re, 2006 CarswellOnt 6292

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 320 of 378

2006 CarswellOnt 6292, 2006 C.E.B. & P.G.R. 8218, [2006] W.D.F.L. 3681...

bankruptcy petitions, which ordered that head offices of two I Group companies be transferred from cities in Quebec to Toronto — Superintendent appealed from ancillary order on basis that motions judge lacked jurisdiction under CCAA to make such order or, alternatively, improperly exercised his discretion in doing so — Appeal dismissed — Motions judge did not err in ordering that head offices of companies in question be transferred from Quebec to Toronto — Argument that CCAA did not give motions judge jurisdiction to order transfer was accepted, but it was also accepted that transfer was not made to facilitate CCAA restructuring; instead, it was made to facilitate future bankruptcy proceedings — Nonetheless, motions judge did not need to resort to CCAA because he had express authority to order transfer under Canada Business Corporations Act ("CBCA") — Section 191 of CBCA gives court express authority to order transfer of head office of company that is subject to order under CCAA — Motions judge properly exercised his discretion in ordering transfer.

## Table of Authorities

### Cases considered by *J. Laskin J.A.*:

*Abraham v. Canadian Admiral Corp. (Receiver of)* (1998), 2 C.B.R. (4th) 243, 1998 CarswellOnt 1475, 158 D.L.R. (4th) 65, *(sub nom. Abraham v. Canadian Admiral Corp. (Receivership))* 109 O.A.C. 36, 39 O.R. (3d) 176, 37 C.C.E.L. (2d) 276, 19 C.C.P.B. 1, 13 P.P.S.A.C. (2d) 334 (Ont. C.A.) — referred to

*Air Canada, Re* (2003), 43 C.B.R. (4th) 1, 66 O.R. (3d) 257, 229 D.L.R. (4th) 687, 174 O.A.C. 201, 2003 CarswellOnt 2925 (Ont. C.A.) — referred to

*Algoma Steel Inc. v. Union Gas Ltd.* (2003), 169 O.A.C. 89, 39 C.B.R. (4th) 5, 2003 CarswellOnt 115, 63 O.R. (3d) 78 (Ont. C.A.) — referred to

*Bank of Montreal v. Scott Road Enterprises Ltd.* (1989), 36 B.C.L.R. (2d) 118, 73 C.B.R. (N.S.) 273, [1989] 4 W.W.R. 566, 57 D.L.R. (4th) 623, 1989 CarswellBC 337 (B.C. C.A.) — referred to

*Beatrice Foods Inc., Re* (1996), 43 C.B.R. (4th) 10, 1996 CarswellOnt 5598 (Ont. Gen. Div. [Commercial List]) — referred to

*British Columbia v. Henfrey Samson Belair Ltd.* (1989), 1989 CarswellBC 711, [1989] 1 T.S.T. 2164, 75 C.B.R. (N.S.) 1, [1989] 2 S.C.R. 24, 34 E.T.R. 1, [1989] 5 W.W.R. 577, 59 D.L.R. (4th) 726, 97 N.R. 61, 38 B.C.L.R. (2d) 145, 2 T.C.T. 4263, 1989 CarswellBC 351 (S.C.C.) — considered

*Dallas/North Group Inc., Re* (1999), 17 C.B.R. (4th) 56, 1999 CarswellOnt 4720, 46 O.R. (3d) 602 (Ont. Gen. Div.) — referred to

*General Chemical Canada Ltd., Re* (2005), 51 C.C.P.B. 297, 2005 CarswellOnt 7306, C.E.B. & P.G.R. 8179 (Ont. S.C.J.) — considered

*GMAC Commercial Credit Corp. - Canada v. TCT Logistics Inc.* (2005), *(sub nom. TCT Logistics Inc. (Bankrupt), Re)* 194 O.A.C. 360, 2005 CarswellOnt 636, 7 C.B.R. (5th) 202, 74 O.R. (3d) 382 (Ont. C.A.) — distinguished

*Harrop of Milton Inc., Re* (1979), 1979 CarswellOnt 185, 92 D.L.R. (3d) 535, 29 C.B.R. (N.S.) 289, 22 O.R. (2d) 239 (Ont. Bktcy.) — referred to

Ivaco Inc., Re, 2006 CarswellOnt 6292

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 321 of 378

2006 CarswellOnt 6292, 2006 C.E.B. & P.G.R. 8218, [2006] W.D.F.L. 3681...

*Husky Oil Operations Ltd. v. Minister of National Revenue* (1995), 1995 CarswellSask 739, 1995 CarswellSask 740, 188 N.R. 1, 24 C.L.R. (2d) 131, 35 C.B.R. (3d) 1, 128 D.L.R. (4th) 1, 137 Sask. R. 81, 107 W.A.C. 81, [1995] 3 S.C.R. 453, [1995] 10 W.W.R. 161 (S.C.C.) — referred to

*Ivaco Inc., Re* (2004), 2004 CarswellOnt 3561 (Ont. S.C.J. [Commercial List]) — referred to

*Lambert, Re* (2002), *(sub nom. Lambert (Bankrupt), Re)* 162 O.A.C. 132, 216 D.L.R. (4th) 330, 2002 CarswellOnt 2659, 36 C.B.R. (4th) 256, *(sub nom. Buth-na-bodhiaga Inc. v. Lambert)* 60 O.R. (3d) 787 (Ont. C.A.) — referred to

*Royal Crest Lifecare Group Inc., Re* (2004), 2004 CarswellOnt 190, 181 O.A.C. 115, 46 C.B.R. (4th) 126, *(sub nom. Canadian Union of Public Employees, Locals 1712, 3009, 2225-05, 2225-06 & 2225-12 v. Ernst & Young Inc. (as trustee for Royal Crest Lifecare Group Inc.))* 2004 C.L.L.C. 220-014, *(sub nom. C.U.P.E., Locals 1712, 3009, 2225-05, 2225-06, 22512 v. Royal Crest Lifecare Group Inc. (Trustee of))* 98 C.L.R.B.R. (2d) 210 (Ont. C.A.) — referred to

*Stelco Inc., Re* (2005), 253 D.L.R. (4th) 109, 75 O.R. (3d) 5, 2 B.L.R. (4th) 238, 9 C.B.R. (5th) 135, 2005 CarswellOnt 1188, 196 O.A.C. 142 (Ont. C.A.) — distinguished

*Toronto Dominion Bank v. Usarco Ltd.* (1991), 42 E.T.R. 235, 1991 CarswellOnt 540 (Ont. Gen. Div.) — distinguished

*United Maritime Fishermen Co-op., Re* (1988), 68 C.B.R. (N.S.) 170, 1988 CarswellNB 20, 87 N.B.R. (2d) 333, 221 A.P.R. 333 (N.B. Q.B.) — referred to

**Statutes considered:**

*Bank Act*, S.C. 1991, c. 46
    s. 427 — referred to

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3
    Generally — referred to

    s. 11(3) — referred to

    s. 11(4) — referred to

    s. 43(5) — referred to

    s. 43(7) — referred to

    s. 67(1)(a) — referred to

*Canada Business Corporations Act*, R.S.C. 1985, c. C-44
    s. 109(1) — referred to

    s. 173 — referred to

    s. 173(1)(b) — considered

    s. 191 — considered

Ivaco Inc., Re, 2006 CarswellOnt 6292

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 322 of 378

2006 CarswellOnt 6292, 2006 C.E.B. & P.G.R. 8218, [2006] W.D.F.L. 3681...

     s. 191(1) — considered

     s. 191(1)(c) — considered

     s. 191(2) — considered

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36
     Generally — considered

     s. 2 "debtor company" — referred to

     s. 11 — referred to

     s. 11.7(1) [en. 1997, c. 12, s. 124] — referred to

     s. 11.7(3) [en. 1997, c. 12, s. 124] — referred to

     s. 13 — referred to

*Pension Benefits Act, 1987*, S.O. 1987, c. 35
     Generally — referred to

*Pension Benefits Act*, R.S.O. 1990, c. P.8
     Generally — referred to

     s. 57 — referred to

     s. 57(3) — considered

     s. 57(4) — considered

     s. 57(5) — considered

*Wage Earner Protection Program Act*, S.C. 2005, c. 47
     Generally — referred to

**Regulations considered:**

*Truck Transportation Act*, R.S.O. 1990, c. T.22
     *Load Brokers*, O. Reg. 556/92

     s. 15 — referred to

     s. 15(2) — referred to

APPEAL by Superintendent from judgment, reported at *Ivaco Inc., Re* (2005), 2005 CarswellOnt 3445, 47 C.C.P.B. 62, 12 C.B.R. (5th) 213 (Ont. S.C.J. [Commercial List]), dismissing Superintendent's motion for order.

*J. Laskin J.A.*:

**A. Introduction**

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 323 of 378

Ivaco Inc., Re, 2006 CarswellOnt 6292
2006 CarswellOnt 6292, 2006 C.E.B. & P.G.R. 8218, [2006] W.D.F.L. 3681...

1    This appeal arises out of a priorities dispute between two groups of creditors of an insolvent company, Ivaco Inc., and its related group of companies. The dispute is over the sale proceeds of the assets of Ivaco. On one side of the dispute are the employees and retirees in Ivaco's underfunded non-union pension plans. They claim under the deemed trust and lien provisions of Ontario's *Pension Benefits Act*, R.S.O. 1990, c. P.8, ss. 57(3), (4) ("PBA"), and seek to recover unpaid contributions to the plans outside of bankruptcy. On the other side of the dispute are Ivaco's financial and trade creditors. They wish to put Ivaco into bankruptcy in order to take advantage of the scheme of distribution under the federal *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 ("BIA"). The dispute arises because provincial deemed trusts do not, by virtue of that legislative designation, enjoy priority under the federal bankruptcy statute.

2    Ivaco and its related group of companies (collectively "the Companies") became insolvent in 2003. In September 2003, the Companies sought and obtained court-ordered protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("CCAA"). All claims of creditors were stayed. A later order stayed the Companies' obligation to pay the outstanding past service contributions and special payments to the non-union pension plans. (Past service contributions are monies due to fund benefits or benefit enhancements for pension members' past service; special payments are extraordinary payments made because a pension plan is underfunded).

3    The main purpose of CCAA proceedings is to facilitate the restructuring of an insolvent company so that it may stay in business. The Companies, however, were unable to restructure. In late 2004, virtually all of their assets were sold. All that remains is a pool of money: the proceeds of sale. All that remains to be done is to distribute this pool of money among the creditors.

4    The Superintendent of Financial Services, representing the employees and retirees, brought a motion for an order that part of the sale proceeds be used to satisfy the unpaid past service and special contributions, which the Companies are deemed to hold in trust for the beneficiaries of the pension plans under the PBA. Alternatively, the Superintendent sought an order segregating this amount in a separate account. The Quebec Pension Committee ("QPC"), the administrator of the largest non-union plan, supported the Superintendent's motion. Two of the Companies' lenders, the Bank of Nova Scotia and the National Bank, brought motions for an order lifting the stay under the CCAA and petitioning the Companies into bankruptcy.

5    Farley J., who had supervised these CCAA proceedings for over two and a half years, heard all three motions. By order dated July 18, 2005 he dismissed the Superintendent's motion and partly granted the banks' motions. He lifted the stay and permitted the bankruptcy petitions to proceed, but he did not put the Companies into bankruptcy.

6    The Superintendent appeals. She argues that the motions judge erred either in law or in the exercise of his discretion. The Superintendent submits that the motions judge erred in law by failing to order immediate payment of the amount of the deemed trusts or in failing to segregate this amount. The Superintendent contends that the PBA legally required that the deemed trusts for unpaid past service contributions and special payments be executed or protected before bankruptcy.

7    Alternatively, the Superintendent submits that the motions judge erred by exercising his discretion to lift the stay under the CCAA and permit the bankruptcy petitions to proceed without first protecting the claims of the pension beneficiaries. The Superintendent contends that the motions judge exercised his discretion on a wrong principle because he ignored the unfairness and prejudice to the Companies' most vulnerable creditors.

8    The Superintendent also appeals an ancillary order made by the motions judge. To facilitate the bankruptcy petitions, the motions judge ordered that the head offices of two of the Companies be transferred from cities in Quebec to Toronto. The Superintendent and the QPC submit that the motions judge had no jurisdiction under the CCAA to do so, or alternatively, improperly exercised his discretion in doing so.

9    This court granted leave to appeal under s. 13 of the CCAA. The court also stayed the two orders in favour of the banks pending the disposition of the appeal.

**B. Relevant Facts and Chronology**

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Ivaco Inc., Re, 2006 CarswellOnt 6292

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 324 of 378

2006 CarswellOnt 6292, 2006 C.E.B. & P.G.R. 8218, [2006] W.D.F.L. 3681...

*a) The Companies*

10      Six related corporations were granted protection under the CCAA: Ivaco Inc., Ivaco Rolling Mills Ltd. ("IRM"), Ifastgroupe Inc., Docap (1985) Corporation, Florida Sub One Holdings Inc. and 3632610 Canada Inc. Four of these corporations — Ivaco, IRM, Ifastgroupe and Docap — established the non-union pension plans in issue on this appeal.

11      Ivaco, IRM and Ifastgroupe ceased operations after their assets were sold. Only Docap now has any operating assets. Its assets consist mainly of inventory and accounts receivable that have not yet been sold. Docap is a small entity. Neither restructuring it nor selling it as a going concern seems a viable option. The National Bank, Docap's principal secured creditor, wishes to put the company into bankruptcy and liquidate its assets.

*b) The non-union pension plans*

12      The Companies had both a unionized and non-unionized workforce. They established various registered pension plans for their employees. These included four non-union plans: the Ivaco Salaried Plan, which is registered in Quebec and has both Quebec and Ontario members, the Designated Employees Plan, the Ingersoll Plan and the Docap Plan, all registered in Ontario.

13      The QPC administers the Ivaco Salaried Plan, which is the largest of the four plans. Ivaco formerly administered the other three plans. However, the Superintendent appointed PricewaterhouseCoopers Inc. as administrator of the Designated Employees Plan and the Ingersoll Plan. A former Ivaco employee administers the Docap Plan for Ivaco.

*c) The initial stay under the CCAA*

14      After their operations became financially troubled, the Companies sought and were granted protection from their creditors under the CCAA. On September 16, the motions judge granted a comprehensive stay of all creditor claims up to that time. He appointed Ernst & Young Inc. as Monitor. As a result of the stay, debts of the Companies existing on the date of the initial stay order have not been paid.

15      During the CCAA proceedings the Companies continued to pay the wages and benefits of all active employees. The Companies also continued to pay their current contributions to their various pension plans.

*d) The pension stay order*

16      When the Companies began CCAA proceedings, the non-union pension plans were underfunded. Before the initial stay order the Companies had been making both special payments and past services contributions to rectify this underfunding. Under the PBA, past service contributions accrue daily and are to be paid monthly.

17      Early in the CCAA proceedings, the Monitor concluded that the Companies would jeopardize their ability to restructure if they were required to continue making past service contributions and special payments. Because of the magnitude of these payments, the creditors would not agree to permit the DIP (debtor in possession) loan to be used for funding the pension plans. In their view, and in the view of the Monitor, doing so would imperil the possibility of restructuring. Relying on the Monitor's opinion, the Companies sought, and on November 28, 2003, were granted a pension stay order.

18      The motions judge relieved the Companies from making past service contributions or special payments to the underfunded non-union pension plans during the CCAA stay. No interested party, including both the Superintendent and the QPC, opposed the order. All parties thought that relieving the Companies from making these payments would assist their restructuring efforts. The Companies still remained obligated to make current contributions to the non-union plans.

19      Paragraph 4 of the pension stay order stipulated that none of the Companies would incur any obligation because of the failure to make these past service contributions and special payments during the stay period:

Ivaco Inc., Re, 2006 CarswellOnt 6292

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 325 of 378

2006 CarswellOnt 6292, 2006 C.E.B. & P.G.R. 8218, [2006] W.D.F.L. 3681...

THIS COURT ORDERS that none of the Applicants or Partnerships, or their respective officers or directors shall incur any obligation, whether by way of debt, damages for breach of any duty, whether statutory, fiduciary, common law or otherwise, or for breach of trust, nor shall any trust be recognized, whether express, implied, constructive, resulting, deemed or otherwise, as a result of the failure of any person to make any contribution or payments other than current cost contribution obligations ("Current Contributions") during the Stay Period that they might otherwise have become required to make to any pension plans maintained by an Applicant or Partnership.

20    Paragraph 5 of the pension stay order expressly recognized that statutory deemed trust, liens or other charges may arise because the Companies were relieved from paying past service contributions but that they would not have priority over the charges in the initial stay order:

THIS COURT ORDERS that if any claim, lien, charge or trust arises as a result of the failure of any Person to make any contribution or payment (other than Current Contributions) during the Stay Period that such Person might otherwise have become required to make to any pension plans maintained by an Applicant or Partnership but for the stay provided for herein, no such claim, lien, charge or trust shall be recognized in this proceeding or in any subsequent receivership, interim receivership or bankruptcy of any of the Applicants or Partnerships as having priority over the claims of the Charges as set out in the Amended and Restated order.

21    Paragraph 6 of the order recognized that the pension stay did not compromise the Companies' obligations under their non-union pension plans:

Nothing in this Order shall be taken to extinguish or compromise the obligations of the Applicants and Partnerships, if any, regarding payments under the Pension Plans.

*e) The sale to Heico*

22    As the Companies were unable to restructure, they began to pursue a second option: selling their assets in a going concern sale. On August 18, 2004, the motions judge approved the sale of the assets of Ivaco, Ifastgroupe and IRM to the Heico Companies. As part of the transaction, the purchaser hired the Companies' unionized workforce and assumed the Companies' obligations to their unionized pension plans. The purchaser also hired almost all of the Companies' non-unionized workforce, but it was unwilling to assume the Companies' obligations to the four non-union pension plans. These obligations remained with the Companies.

23    Nonetheless, the Monitor supported the sale. In the Monitor's view, the sale gave the creditors and workers greater recovery and benefits than they would obtain in either a bankruptcy or a liquidation. Again, no party, including both the Superintendent and the QPC, opposed the sale.

24    The motions judge made two orders — on August 18, 2004 [2004 CarswellOnt 3561 (Ont. S.C.J. [Commercial List])] and November 30, 2004 — vesting the assets in the purchaser. These orders expressly preserved all claims that might have been made against the assets by providing that these claims could be made against the sale proceeds. In accordance with these orders, the Monitor is holding the sale proceeds in various trust accounts.

25    In December 2004, Ivaco, IRM and Ifastgroupe wound-up their non-union pension plans. Under the PBA, they are obligated to fund the wind-up liabilities of these plans.

*f) The pension claims*

26    The Companies' non-union pension plans have been severely underfunded and the deficit has increased during the stay period. At the beginning of the CCAA proceedings in September 2003, unpaid past service contributions to the non-union plans totalled about $1.4 million and the solvency deficiency amounted to approximately $11.1 million. By December 2004 these

Ivaco Inc., Re, 2006 CarswellOnt 6292

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 326 of 378

2006 CarswellOnt 6292, 2006 C.E.B. & P.G.R. 8218, [2006] W.D.F.L. 3681...

figures had grown to approximately $11.6 million and $29.1 million respectively. They continued to grow while the pension stay order remained in place.

27       The potential loss of benefits for each pensioner is significant. Counsel for the Superintendent advised the court that the average pensioner in the non-union plans is sixty-seven years old and earns a pension of $14,000 per year. These pensioners will receive their full pension only if the full wind-up deficit is paid. For example, if the plans do not recover the past service contributions suspended by the pension stay order, the average monthly pension will be reduced by 26 per cent from approximately $1,200 to $888. If only unpaid contributions are recovered, and not the full solvency deficiency, the average pension will be reduced by 17 per cent to $996 monthly.

### g) The claims of the financial creditors

28       The outstanding claims of the financial creditors of the Companies are also significant. We were told that the sale proceeds of the Companies' assets are insufficient to satisfy all claims, and are certainly insufficient to satisfy the unsecured claims.

29       The Bank of Nova Scotia was the lender to IRM. By October 2003, IRM owed the Bank about $40 million. IRM had ceased to meet its liabilities generally as they became due, and had given notice to its creditors that it had suspended payment of its debts. On October 3, 2003 the Bank issued a petition for a receiving order against IRM. The issuance of the petition was permitted by the initial stay order, but that proceeding was otherwise stayed. The order under appeal lifted the stay and permitted the Bank of Nova Scotia to proceed with its petition.

30       The National Bank lent money to Ivaco, Ifastgroupe and Docap. As of March 2005 it had a secured claim against Ivaco for $17 million, [1] and against Docap for $55,622 U.S. and $4.2 million Canadian. It also had an unsecured claim against Ifastgroupe for $45.5 million Canadian. Ifastgoupe is also indebted to La Caisse for $14.9 million.

31       A large number of other creditors also have claims against the Companies: Ivaco has 792 creditors with claims totalling $554.9 million; Docap has 82 creditors with claims totalling $111.1 million; and Ifastgroupe has 645 creditors with claims totalling $253.3 million.

## C. Analysis

### a) What is in issue on this appeal

32       The scope of this appeal is quite narrow. There are three issues:

> 1) Did the motions judge err in law in failing to order immediate payment of the amount of the deemed trusts under the PBA or in failing to segregate this amount in a separate account?

> 2) Did the motions judge err in the exercise of his discretion by lifting the stay and permitting the bankruptcy petitions to proceed, without protecting the claims of the pension beneficiaries?

> 3) Did the motions judge err in law or in the exercise of his discretion by ordering the transfer of Ivaco's and Ifastgroupe's head offices from Quebec to Toronto?

### b) What is not in issue on this appeal

33       There are also three issues raised by the parties that do not need to be decided on this appeal: (1) whether, outside of bankruptcy, the deemed trusts under the PBA have priority over the Bank of Nova Scotia's security under s. 427 of the *Bank Act*, S.C. 1991, c.46; (2) whether the Superintendent can show "sufficient cause" under s. 43(7) of the BIA to deny the application for a bankruptcy order; and, (3) whether the deemed trusts under the PBA also meet the requirements for a common law trust and thus on bankruptcy should be excluded from the property of the Companies under s. 67(1)(a) of the BIA.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 327 of 378

Ivaco Inc., Re, 2006 CarswellOnt 6292

2006 CarswellOnt 6292, 2006 C.E.B. & P.G.R. 8218, [2006] W.D.F.L. 3681...

34    On my view of the appeal, the first of these issues does not have to be resolved. It may become relevant at the bankruptcy hearing, and, if so, should be dealt with by the bankruptcy judge. See *Abraham v. Canadian Admiral Corp. (Receiver of)* (1998), 39 O.R. (3d) 176 (Ont. C.A.). The second and third issues, I assume, will be dealt with at the hearing of the bankruptcy petitions. Admittedly, the motions judge made some observations on these two issues. However, he also said, at para. 20 of his reasons, that he was not deciding either one:

> However, in the circumstances, I do not find it appropriate to allow (indeed direct) that there be an assignment in bankruptcy on a "voluntary basis" as there is the s. 43(7) issue to be determined. Similarly with respect to the balance of declarations requested by the National Bank, while I have made some general observations as to reversing priorities, it would not be appropriate to determine with finality the priorities of various claims on the record before me at this time.

35    In their written and oral submissions, the Superintendent and the QPC argued that some of the motions judge's general observations on these issues were wrong. I do not propose to consider these arguments because, as the motions judge recognized, they should be addressed at the hearing of the bankruptcy petitions. Instead, I will make a few brief observations of my own.

36    In my view, the motions judge appropriately considered what would likely happen at the bankruptcy hearing. He did so because the likely implications of lifting the stay were relevant considerations to the exercise of his discretion.

37    The motions judge observed, at para. 14, that the discretion to refuse to make a bankruptcy order under s. 43(7) typically is exercised in two categories of cases: where the petitioner has an ulterior motive in seeking the order, or where the order would not serve any meaningful purpose. This observation reflects the current state of the case law under s. 43(7). See for example *Dallas/North Group Inc., Re* (1999), 46 O.R. (3d) 602 (Ont. Gen. Div.); *Lambert, Re* (2002), 60 O.R. (3d) 787 (Ont. C.A.). Although the motions judge added that the Superintendent's claim does not appear to come within either category, he left the final determination of that question for the bankruptcy judge.

38    The motions judge also observed, at para. 11 of his reasons, that a provincially created deemed trust does not by that fact alone enjoy priority under the BIA. This is not a contentious proposition. In a series of cases, the Supreme Court of Canada has repeatedly said that a province cannot, by legislating a deemed trust, alter the scheme of priorities under the federal statute. See for example *British Columbia v. Henfrey Samson Belair Ltd.*, [1989] 2 S.C.R. 24 (S.C.C.); *Husky Oil Operations Ltd. v. Minister of National Revenue*, [1995] 3 S.C.R. 453 (S.C.C.). Indeed, it is this jurisprudence that undoubtedly prompted the Superintendent's original motion and appeal to this court.

39    The motions judge also correctly observed, at para. 11 of his reasons, that a provincial deemed trust will retained its priority in bankruptcy only if it also meets the three attributes — the three certainties — of a common law trust: certainty of intent; certainty of subject matter; and certainty of object. Only a trust that has these three attributes is a "true trust" that will be exempt from the bankrupt's estate under s. 67(1)(a) of the BIA. See for example *Henfrey Sampson*, *supra*. Whether the Superintendent can establish a true trust for unpaid past service contributions, even though the proceeds of the Heico sale have been commingled, will be decided at the bankruptcy hearing.

40    I now turn to the issues that do arise on this appeal.

### c) Did the motions judge err in law in failing to order immediate payment of the amount of the deemed trusts or in failing to segregate this amount?

41    The Superintendent's principal submission is that the motions judge erred in law in failing to order payment of the amount of the deemed trusts before bankruptcy or in failing to order the Monitor to segregate this amount during the CCAA proceedings. The submission that the motions judge was legally required to order payment or segregation of the amount of the deemed trusts was not advanced before him. The Superintendent advanced this submission for the first time in this court. I do not agree with it.

42    I will deal first with whether the motions judge should have required the Monitor, Ernst & Young, to segregate the amount of the deemed trusts. The Superintendent contends that the Companies, and in their place the Monitor, had a statutory

Ivaco Inc., Re, 2006 CarswellOnt 6292

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 328 of 378

2006 CarswellOnt 6292, 2006 C.E.B. & P.G.R. 8218, [2006] W.D.F.L. 3681...

and fiduciary obligation to segregate. As the Monitor was an officer of the court, the motions judge should have compelled it to fulfill these duties. This contention faces three obstacles: the language of the PBA; the terms of the pension stay order; and the status and role of the Monitor.

43    The deemed trusts for unpaid past service and special contributions are found in ss. 57(3) and (4) of the PBA. Subsection (3) is the basic provision that creates a deemed trust for unpaid employer contributions. Subsection (4) stipulates that on the wind up of a pension plan, employer contributions accrued but not yet due because of the timing of the wind up are also deemed to be held in trust:

s. 57(3) An employer who is required to pay contributions to a pension fund shall be deemed to hold in trust for the beneficiaries of the pension plan an amount of money equal to the employer contributions due and not paid into the pension fund.

s. 57(4) Where a pension plan is wound up in whole or in part, an employer who is required to pay contributions to the pension fund shall be deemed to hold in trust for the beneficiaries of the pension plan an amount of money equal to employer contributions accrued to the date of the wind up but not yet due under the plan or regulations.

44    At para. 11 of his decision, the motions judge said that both unpaid contributions and wind-up liabilities are deemed to be held in trust under s. 57(3). In his earlier decision in *Toronto Dominion Bank v. Usarco Ltd.* (1991), 42 E.T.R. 235 (Ont. Gen. Div.), Farley J. said, at para. 25, that the equivalent legislation then in force under the *Pension Benefits Act, 1987*, S.O. 1987, c.35 referred only to unpaid contributions, not to wind-up liabilities. I think that the statement in *Usarco Ltd.* is correct, but I do not need to resolve the issue on this appeal.

45    Under s. 57(5) of the PBA the plan administrator has a lien and charge on the assets of the employer for the amount of any deemed trust. The lien and charge permit the administrator to enforce the deemed trust.

s. 57(5) The administrator of the pension plan has a lien and charge on the assets of the employer in an amount equal to the amounts deemed to be held in trust under subsections (1), (3) and (4).

46    The Superintendent argues that these provisions required the Companies, and in their place the Monitor, to keep the unpaid contributions in a separate account. However, the language of s. 57 does not require the employer to hold the contributions separately. A "deemed trust" is, in a sense, a legal fiction. Outside of bankruptcy it does create a priority for pension contributions, a priority that would not exist but for the designation. Yet, as I have already said, this legislative designation by itself does not create a true trust. If the province wants to require an employer to keep its unpaid contributions to a pension plan in a separate account it must legislate that separation. It has not done so.

47    The Superintendent argues that the pension stay order supports her position because para. 5 the order, *supra*, recognized that a deemed trust for unpaid contributions may arise during the stay period and that para. 6 of the stay order, *supra*, did not compromise the Companies' obligation to make these contributions. This argument fails to take account of para. 4 of the pension stay order. Paragraph 4 stipulates that during the stay the Companies will not incur any obligation — statutory, fiduciary or otherwise — for failing to make contributions to the plan. In my view, the Superintendent's argument amounts to an impermissible collateral attack on para. 4 of the pension stay order.

48    The Superintendent also tries to buttress her position by arguing that the Monitor stands in the shoes of the Companies, and like the Companies, has a fiduciary duty to the pension beneficiaries. I disagree.

49    The Monitor was appointed under s. 11.7(1) of the CCAA to "monitor the business and financial affairs" of the Companies, and was given the functions set out in s. 11.7(3) of that statute: to examine the Companies' property, report to the court on the Companies' business and financial affairs and keep the creditors informed. Although the motions judge gave the Monitor additional powers, they were limited. The Monitor was given authority to deal with day-to-day administrative matters, to finalize the sale to Heico and to receive and control the proceeds of sale. I do not think it can be fairly said that the Monitor "stands in the shoes of the Companies".

Ivaco Inc., Re, 2006 CarswellOnt 6292

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 329 of 378

2006 CarswellOnt 6292, 2006 C.E.B. & P.G.R. 8218, [2006] W.D.F.L. 3681...

50    Equally important, the Monitor does not owe a fiduciary duty to the pension beneficiaries. The Superintendent's attempt to impose an obligation on the Monitor to segregate the contributions to the non-union plans depends at least on establishing that the Monitor acts as a fiduciary of the employees in those plans. Both the role of the Monitor and the initial stay order preclude the Superintendent's assertion.

51    Pension plan administrators do owe a fiduciary duty to plan members. See E.E. Gillese, *The Fiduciary Liability of the Employer as Pension Plan Administrator* (Toronto: The Canadian Institute, November 18, 1996, pp. 1-25). But the Monitor was not given that role. It is not an administrator of any of the four non-union plans. Indeed, the Superintendent never asked the court to give the Monitor responsibility for administering these plans.

52    Moreover, para. 59 of the initial stay order expressly states that the Monitor is not to be considered either a successor or related employer.

THIS COURT ORDERS that nothing in this Order shall result in the Monitor being or being deemed or considered to be a successor or related employer, sponsor or payor with respect to any Applicant or any employees or former employees of any Applicant under any legislation, including ... the *Pension Benefits Act* (Ontario) ... or under any other provincial or federal legislation, regulation or rule of law or equity applicable to employees *or pensions*, or otherwise.

[Emphasis added].

As the Monitor was neither a plan administrator nor a successor employer, it can owe no fiduciary duty to the members of the four plans.

53    Therefore, the combination of the wording of s. 57 of the PBA, para. 4 of the pension stay order and the limited role of the Monitor, refute the Superintendent's segregation argument. The Superintendent, however, submits that two cases, the decision of this court in *GMAC Commercial Credit Corp. - Canada v. TCT Logistics Inc.* (2005), 74 O.R. (3d) 382 (Ont. C.A.) [hereinafter *TCT Logistics*] and an earlier decision of the motions judge in *Usarco Ltd.*, *supra*, support the argument for segregation. In my view, both cases are distinguishable.

54    In *TCT Logistics*, this court held that an interim receiver, who was both an officer of the court and stood in the shoes of the debtor, had a statutory duty under the legislation then in force, s. 15 of the *Load Brokers Regulation*, O.Reg. 556/92 (passed under the *Truck Transportation Act*, R.S.O. 1990, c. T.-22) to hold carriers' fees that it had collected in a separate trust account. *TCT Logistics* and this case differ in three critical ways.

55    First, the interim receiver in *TCT Logistics*, was not just an officer of the court, it stood in the place of the debtor company. Here, although the Monitor is an officer of the court, it does not stand in the place of the Companies. For the reasons outlined in para. 49 its role is far more limited.

56    Second, in *TCT Logistics* the court order authorized the interim receiver to hold the carriers' fees in a separate bank account until entitlement to that money was decided. Here, the pension stay order prohibited the Companies from making any past service or special contributions during the stay period.

57    Third, and perhaps most important, the applicable legislation in *TCT Logistics*, s. 15(2) of the *Load Brokers Regulation* required the debtor company to maintain a separate trust account and to keep the fees it collected for the carriers in that account. Here, s. 57 of the PBA does not similarly require an employer to keep its unpaid contributions in a separate trust account. Moreover, in *TCT Logistics*, despite s. 15(2) of the Regulation, this court held that the carrier fees previously collected by the debtor company lost their character as trust money because they had been commingled with other funds. *TCT Logistics* thus does not support the Superintendent's position.

58    In *Usarco Ltd.*, *supra*, at para. 16, Farley J. commented that the deemed trust provisions of the PBA "implied a fiduciary obligation on the part of Usarco", and that "a trustee in bankruptcy stepping into the shoes of Usarco must deal with that fiduciary

Ivaco Inc., Re, 2006 CarswellOnt 6292

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 330 of 378

2006 CarswellOnt 6292, 2006 C.E.B. & P.G.R. 8218, [2006] W.D.F.L. 3681...

obligation". These comments do not apply to this case. The Monitor here, unlike the trustee in bankruptcy in *Usarco Ltd.*, did not step into the shoes of the debtor. Thus, *Usarco Ltd.* does not assist the Superintendent.

59    For these reasons, I reject the Superintendent's argument that the motions judge was required in law to order the segregation of the amount of the deemed trusts during the CCAA proceeding. I now turn to the Superintendent's other submission: that the motions judge was required in law to order that the amount of the deemed trust be paid at the end of the CCAA proceedings, but before bankruptcy.

60    The CCAA itself did not require the motions judge to execute the deemed trusts. The Superintendent cannot point to any section of the statute where a legal obligation to order payment of the past service contributions can be found. Moreover, in my view, absent an agreement, I doubt that the CCAA even authorized the motions judge to order this payment. Once restructuring was not possible and the CCAA proceedings were spent, as the motions judge found and all parties acknowledged, I question whether the court had any authority to order a distribution of the sale proceeds. See for example *United Maritime Fishermen Co-op., Re* (1988), 68 C.B.R. (N.S.) 170 (N.B. Q.B.), at 173.

61    The Superintendent's submission that the motions judge was required to order payment of the outstanding contributions rests on the proposition that a gap exists between the CCAA and the BIA in which the provincial deemed trusts can be executed. This proposition runs contrary to the federal bankruptcy and insolvency regime and to the principle that the province cannot reorder priorities in bankruptcy.

62    The federal insolvency regime includes the CCAA and the BIA. The two statutes are related. A debtor company under the CCAA is defined in s. 2 by the company's bankruptcy or insolvency. Section 11(3) authorizes a thirty-day stay of any current or prospective proceedings under the BIA, and s. 11(4) authorizes an extension of the initial thirty-day period. During the stay period, creditor claims and bankruptcy proceedings are suspended. Once the stay is lifted by court order or terminates by its own terms, simultaneously the creditor claims and bankruptcy proceedings are revived and may go forward.

63    For the Superintendent's position to be correct, there would have to be a gap between the end of the CCAA period and bankruptcy proceedings, in which the pension beneficiaries' rights under the deemed trusts crystallize before the rights of all other creditors, including their right to bring a bankruptcy petition. That position is illogical. All rights must crystallize simultaneously at the end of the CCAA period. There is simply no gap in the federal insolvency regime in which the provincial deemed trusts alone can operate. That is obviously so on the facts in this case because the Bank of Nova Scotia had already commenced a petition for bankruptcy, which was stayed by the initial order under the CCAA. Once the motions judge lifted the stay, the petition was revived. In my view, however, the situation would be the same even if no bankruptcy petition was pending.

64    Where a creditor seeks to petition a debtor company into bankruptcy at the end of CCAA proceedings, any claim under a provincial deemed trust must be dealt with in bankruptcy proceedings. The CCAA and the BIA create a complementary and interrelated scheme for dealing with the property of insolvent companies, a scheme that occupies the field and ousts the application of provincial legislation. Were it otherwise, creditors might be tempted to forgo efforts to restructure a debtor company and instead put the company immediately into bankruptcy. That would not be a desirable result.

65    Also, giving effect to the Superintendent's position, in substance, would allow a province to do indirectly what it is precluded from doing directly. Just as a province cannot directly create its own priorities or alter the scheme of distribution of property under the BIA, neither can it do so indirectly. See *Husky Oil*, *supra*, at paras. 32 and 39. At bottom the Superintendent seeks to alter the scheme for distributing an insolvent company's assets under the BIA. It cannot do so.

66    The Superintendent relies on one authority in support of its position: the decision of the motions judge in *Usarco Ltd.*, *supra*. In that case, although a bankruptcy petition had been brought, Farley J. nonetheless ordered the receiver to pay to the pension plan administrator the amount of the deemed trusts under the PBA. However, the facts in *Usarco Ltd.* differed materially from the facts in this case.

67    In *Usarco Ltd.*, CCAA proceedings did not precede the bankruptcy petition. Moreover, in *Usarco Ltd.* the petitioning creditor was not proceeding with its bankruptcy petition because its principal had died, and no other creditor took steps to

Ivaco Inc., Re, 2006 CarswellOnt 6292

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 331 of 378

2006 CarswellOnt 6292, 2006 C.E.B. & P.G.R. 8218, [2006] W.D.F.L. 3681...

advance the petition. Thus, unlike in this case, in *Usarco Ltd.* it was unclear whether bankruptcy proceedings would ever take place.

68     Recently in *General Chemical Canada Ltd., Re* (Ont. S.C.J.), Campbell J. relied on this distinction, followed the motions judge's decision in the present case and refused to order payment of the amount of the deemed trusts under the PBA. He wrote at para. 35:

> To conclude otherwise (absent improper motive on the part of Company or a major creditor) would be to negate both CCAA proceedings and bankruptcy proceedings by preventing creditors from pursuing a process of equitable distribution of the debtor's property as they believe it to be when making their decisions.

I agree. The factual differences between *General Chemical Canada Ltd.* and this case on the one hand, and *Usarco Ltd.* on the other, render *Usarco Ltd.* of no assistance to the Superintendent on this appeal.

69     Because the federal legislative regime under the CCAA and the BIA determines the claims of creditors of an insolvent company, if the rights of pension claimants are to be given greater priority, Parliament, not the courts, must do so. And Parliament has at least signalled its intention to do so. Last year it passed the *Wage Earner Protection Program Act*, S.C. 2005 c.47. That Act would amend the BIA and give special priority to unpaid pension contributions of a bankrupt employer. This statute, however, has not been proclaimed in force. That it was passed perhaps shows that under the existing legislative regime, claims like that of the Superintendent must fail. I would reject this ground of appeal.

### d) Did the motions judge err in the exercise of his discretion by lifting the stay and permitting the bankruptcy petitions to proceed?

70     In my view, the motions judge's order lifting the stay was a discretionary order. He summarized his reasons for rejecting the Superintendent's position and exercising his discretion to allow the bankruptcy petitions to proceed at para. 18 of his decision:

> In the end result I do not see that the Superintendent has made a compelling case to the effect that the petitions in bankruptcy should not be allowed to proceed in the ordinary course. I have reached that conclusion by weighing the factors pro and con as discussed above, including the relative benefits to all stakeholders (including workers and pensioners) to maintaining the CCAA proceedings (with the benefit of the suspension of past contributions as per the unopposed and un-reconsidered order of November 28, 2003), the fact that no reorganization is now possible as all Ivaco Companies (except Docap) have ceased operations and are without operational assets and that the Ivaco Companies are now essentially in a distribution of proceeds mode.

71     Appellate review of a discretionary order under the CCAA is limited. See *Air Canada, Re* (2003), 66 O.R. (3d) 257 (Ont. C.A.) at para. 25; *Royal Crest Lifecare Group Inc., Re* (2004), 46 C.B.R. (4th) 126 (Ont. C.A.) at para. 23; *Algoma Steel Inc. v. Union Gas Ltd.* (2003), 63 O.R. (3d) 78 (Ont. C.A.) at para. 16. Appellate intervention is justified only for an error in principle or the unreasonable exercise of discretion. The Superintendent submits that the motions judge exercised his discretion improperly — on a wrong principle — because he ignored the "unfair and prejudicial" effects of his order on the Companies' most vulnerable class of creditors: the pension beneficiaries. I disagree.

72     The Superintendent argues that the motions judge's order was unfair to the pension beneficiaries in three related ways. First, she points out that the pension beneficiaries agreed to a stay of the past service contributions to keep the Companies afloat, which in turn permitted the going concern sale to Heico. That sale greatly enhanced the return to the creditors. The Superintendent contends that now permitting the bankruptcy petitions to proceed, which would potentially deprive the pension beneficiaries of their rights, produces an unfair outcome.

73     Undoubtedly, and regrettably, the pension beneficiaries stand to suffer from the insolvency of the Companies. However, the Superintendent's argument implicitly assumes that the pension beneficiaries alone made sacrifices to maximize the recovery for all creditors. The motions judge rejected this assumption, which he said at para. 2 of his reasons, "somewhat overstates the situation". The motions judge accurately concluded:

Ivaco Inc., Re, 2006 CarswellOnt 6292

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 332 of 378

2006 CarswellOnt 6292, 2006 C.E.B. & P.G.R. 8218, [2006] W.D.F.L. 3681...

[O]ther stakeholders (such as the financial and trade creditors) as a result of the stay also contributed to the financial stability of the Ivaco Companies, fragile as their financial situation was, by not being paid interest as such became due nor for pre-filing indebtedness which was due.

In short, all creditors gave up something to permit the Companies to stay in business so that they could either reorganize or sell their assets in a going concern sale.

74    Second, the Superintendent contends that the motions judge's order undermined his earlier pension stay order, which had expressly preserved the pension beneficiaries' deemed trust rights. I do not accept this contention. Although the pension stay order did not take away these deemed trust rights, it did not provide that the deemed trusts would be paid out of any sale proceeds. Instead, para. 4 of the pension stay order provided that the Companies would not incur any obligation because of their failure to pay past service contributions during the stay period. Moreover, even though the Superintendent and the QPC knew that a petition for bankruptcy (by the Bank of Nova Scotia) was pending when they agreed to the pension stay order, they did not ask that the order be conditional on payment of the amount of the deemed trusts when the stay was lifted.

75    The third aspect of unfairness on which the Superintendent relies is that the motions judge's order fails to take account of the law's "special solicitude" for pensioners. Certainly provincial pension legislation has shown this solicitude. It has recognized the importance of ensuring that retirees have income security. Thus, it has legislated statutory trusts and liens to protect their pension claims. But federal insolvency law has not shown the same solicitude. It does not accord the claims of "sympathetic" creditors more weight than the claims of "unsympathetic" ones. Subject to specified exceptions, the BIA aims to distribute a bankrupt debtor's estate equitably among all of the estate's creditors. There are undoubtedly compelling policy reasons to protect pension rights in an insolvency. But, as I have said, it is for Parliament, not the courts, to do so.

76    Therefore, I do not accept the Superintendent's unfairness argument. Also, in my view, numerous considerations supported the motions judge's decision to lift the stay and permit the bankruptcy petitions to proceed. These considerations include the following:

• The CCAA proceedings are spent. There are no entities to reorganize and no further compromises can be negotiated between the Companies and their creditors. There remains only a pool of money to distribute. The BIA is the regime Parliament has chosen to effect this distribution.

• The petitioning creditors have met the technical requirements for bankruptcy. And their desire to use the BIA to alter priorities is a legitimate reason to seek a bankruptcy order. See for example *Bank of Montreal v. Scott Road Enterprises Ltd.* (1989), 57 D.L.R. (4th) 623 (B.C. C.A.), at 627, 630-631; *Harrop of Milton Inc., Re* (1979), 22 O.R. (2d) 239 (Ont. Bktcy.), at 244-245.

• The Superintendent and the QPC agreed to the CCAA process. They recognized that it benefitted the pension claimants. Thus, they did not oppose either the pension stay order or the sale to Heico. They did not ask to have the deemed trusts satisfied or an amount to satisfy them set aside, though they knew that bankruptcy was pending. They likely recognized that if they had insisted on a segregation order, the other creditors may not have agreed to the sale. It is now too late for the Superintendent and the QPC to ask for relief that they never sought during the entire CCAA process.

• The motions judge would have gone beyond his role as a referee in the CCAA proceedings if he had given effect to the Superintendent's claim. The Superintendent wants to jump ahead of all the other creditors by obtaining an extraordinary payment at the end of a long CCAA process. If the motions judge had ordered this payment, he would have upset the ground rules that all stakeholders agreed to and that he supervised for over two years.

77    The motions judge took into account the likely result of the Superintendent's claims if the Companies are put into bankruptcy. He recognized that bankruptcy would potentially reverse the priority accorded to the pension claims outside bankruptcy. Nonetheless, having weighed all the competing considerations, he exercised his discretion to lift the stay and permit

Ivaco Inc., Re, 2006 CarswellOnt 6292

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 333 of 378

2006 CarswellOnt 6292, 2006 C.E.B. & P.G.R. 8218, [2006] W.D.F.L. 3681...

the bankruptcy petitions to proceed. In my view, he exercised his discretion properly. I would not give effect to this ground of appeal.

### e) Did the motions judge err by ordering the transfer of Ivaco and Ifastgroupe's head offices from Quebec to Toronto?

78     Ivaco's head office was in Montreal; Ifastgroupe's head office was in Marieville, Quebec. The motions judge ordered that these head offices be transferred to Toronto. He did so in the light of s. 43(5) of the BIA, which states that an application for a bankruptcy petition shall be filed in the court having jurisdiction in the judicial district of the locality of the debtor. The Superintendent, supported by the QPC, submits that the motions judge had no jurisdiction to make this order, or that he improperly exercised his discretion in doing so. I disagree with both submissions.

79     The Superintendent and the QPC contend that the CCAA does not expressly authorize a judge to transfer the location of the head office of a debtor company. And, although a judge in CCAA proceedings has inherent jurisdiction to control the court's processes, the judge does not have a similar jurisdiction to do what the motions judge did here: control the debtor Companies' or the creditors' processes. See *Stelco Inc., Re* (2005), 75 O.R. (3d) 5 (Ont. C.A.) at para. 38.

80     I accept the Superintendent's and the QPC's contention that the CCAA did not give the motions judge jurisdiction to order the transfer. I also accept that the transfer was not made to facilitate a restructuring under the CCAA. Instead it was made to facilitate future bankruptcy proceedings. Nonetheless, in my view, the motions judge did not need to resort to the CCAA because he had express authority to order the transfer in s. 191 of the *Canada Business Corporations Act*, R.S.C. 1985, c. C-44. Sections 191(1) and (2) provide:

s. 191(1) In this section, "reorganization" means a court order made under;

(a) section 241;

(b) the *Bankruptcy and Insolvency Act* approving a proposal; or

(c) any other Act of Parliament that affects the rights among the corporation, its shareholders and creditors.

s. 191(2) If a corporation is subject to an order referred to in subsection (1), its articles may be amended by such order to effect any change that might be lawfully be made by an amendment under section 173.

81     The applicable section here is section 191(1)(c). The stay order is an order under an Act of Parliament, the CCAA, that affects the rights among the Companies, its shareholders and its creditors. See *Beatrice Foods Inc., Re* (1996), 43 C.B.R. (4th) 10 (Ont. Gen. Div. [Commercial List]). Therefore, as both Ivaco and Ifastgroupe were subject to an order under s. 191(1)(c) of the CBCA, under s. 191(2) each of its articles may be amended to effect any change that might be made by an amendment under s. 173. Section 173(1)(b) of the statute permits a corporation to change the location of its head office:

s. 173(1) Subject to sections 176 and 177, the articles of a corporation may by special resolution be amended to

. . . . .

(b) change the province in which its registered office is situated;

82     On my reading of the statute, s. 191 is a stand-alone section that gave the motions judge authority to order the transfer. Provided a corporation is subject to an order under s. 191(1), its articles may be amended. The amending order under s. 191(2) need not serve the purpose of the triggering statute in s. 191(1), in this case the CCAA. If Parliament had wanted to limit amendments to those that would facilitate a reorganization, it could have said so. Thus, the combination of ss. 191(1)(c), 191(2) and 173(1)(b) gave the motions judge the jurisdiction to order the transfer of Ivaco and Ifastgroupe's head offices from Quebec to Toronto. Resort to the CCAA was unnecessary.

83     The Superintendent and the QPC rely on this court's decision in *Stelco Inc., Re* in support of their argument. However, that case differs from the present case in a material way. In *Stelco Inc., Re* the issue was whether a motions judge in CCAA

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 334 of 378

Ivaco Inc., Re, 2006 CarswellOnt 6292
2006 CarswellOnt 6292, 2006 C.E.B. & P.G.R. 8218, [2006] W.D.F.L. 3681...

proceedings could order the removal of two members of the company's board of directors under s. 109(1) of the CBCA. The power to remove directors is vested in the shareholders. Blair J.A. held that the motions judge could not rely on the court's discretion under s. 11 of the CCAA to override or supplant the specific power in s. 109(1) of the CBCA. The discretion under s. 11 must be used to control the court's processes, not the company's processes.

84    By contrast, in the present case, s. 191 of the CBCA gives the court express authority to order the transfer of the head office of a company that is subject to an order under the CCAA. Thus, to make a transfer order, the court need not rely on its discretion under s. 11 of the CCAA.

85    However, the jurisdiction in s. 191(2) is discretionary, as evidenced by the use of the word "may". Therefore, the remaining question on this ground of appeal is whether the motions judge properly exercised his discretion in ordering the transfer. I think that he did.

86    Ivaco and Ifastgroupe had not actively carried on business since the sale of their assets to Heico was completed in December 2004. The Monitor holds the proceeds of the sales in bank accounts in Toronto. Because of the lengthy and complex CCAA proceedings, the Ontario Superior Court — Commercial List is familiar with the affairs of Ivaco and Ifastgroupe. Having all the issues common to all the Companies administered at the same time before the court familiar with these issues will facilitate the most efficient, consistent and just administration and distribution of their estates.

87    The QPC, in particular, objects to these head office transfers. It argues that the motions judge's order will enable the creditors to defeat a future motion to transfer to the Quebec Superior Court the question whether the Companies participating in the Ivaco Salaried Plan are "solidarily liable", that is jointly and severally liable, under Quebec law for satisfying the obligation to fund the plan.

88    The underpinning of the QPC's argument is as follows: the "solidarily liable" provision is unique to Quebec law and therefore should be decided by a Quebec court. Whether the Quebec or the Ontario Superior Court presides over this future motion will turn on the application of the *forum conveniens* principle. One relevant factor in assessing the *forum conveniens* is the residence or place of business of the parties. According to the QPC, transferring Ivaco's and Ifastgroupe's head offices to Toronto will tip the scales in favour of the Ontario Superior Court hearing the "solidarily liable" motion.

89    It seems to me that this is a weak argument. The QPC has not yet brought this motion. When it does, the Ontario Superior Court can assess the relevant considerations affecting the appropriate forum. Now, however, the motions judge's transfer order just makes good sense. He, therefore, exercised his discretion properly. I would not give effect to this ground of appeal.

**D. Conclusion**

90    The motions judge did not err in law in refusing to order the immediate payment of the amount of the deemed trusts under the *Pension Benefits Act* or in refusing to segregate that amount. Nor did he err in exercising his discretion to lift the stay under the CCAA and permit the bankruptcy petitions to proceed. Finally, the motions judge did not err in ordering that the head offices of Ivaco and Ifastgroupe be transferred from Quebec to Toronto. Accordingly, I would dismiss the Superintendent's appeal.

91    If the parties cannot agree on the costs of the appeal, they may make written submissions to the court. These submissions should be delivered within 30 days of the release of these reasons.

*M. Rosenberg J.A.*:

I agree.

*J. Simmons J.A.*:

I agree.

*Appeal dismissed.*

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Ivaco Inc., Re, 2006 CarswellOnt 6292**

2006 CarswellOnt 6292, 2006 C.E.B. & P.G.R. 8218, [2006] W.D.F.L. 3681...

Footnotes

1      Taking into account a $12 million distribution to the National Bank permitted by the motions judge in December 2004.

---

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# TAB 90

```
Citation:  Jacobsen et al v. Bergman et al      Date: 20020208
           2002 BCCA 102                      Docket:  CA026069
                                            Registry:  Vancouver
```

# COURT OF APPEAL FOR BRITISH COLUMBIA

**ORAL REASONS FOR JUDGMENT**

```
Before:

The Honourable Chief Justice Finch        February 8, 2002
The Honourable Mr. Justice Lambert
The Honourable Mr. Justice Low
                                           Vancouver, B.C.



BETWEEN:
```

**SHEL N. JACOBSEN and**
**473359 BRITISH COLUMBIA LTD.**

```
                                        PLAINTIFFS
                                       (APPELLANTS)
                         (RESPONDENTS BY CROSS-APPEAL)
AND:
```
**DONALD BERGMAN, TERRY D. FAY, RICHARD PERDUE,**
**JOHN D. SHELLING, SECTOR FINANCIAL SERVICES LTD.,**
**and SECTOR SECURITIES INC.**

```
                                        DEFENDANTS
                                      (RESPONDENTS)
                         (APPELLANTS BY CROSS-APPEAL)



T.G. Keast                    appearing for the Appellants

J.S. Forstrom                          appearing for the
                                               Respondents
```

2002 BCCA 102 (CanLII)

2002 BCCA 102 (CanLII)

[1]   **LAMBERT, J.A.**: The principal point in this appeal is
about the interpretation and application of an option clause
in a shareholders agreement.

[2]   This proceeding is fact specific.  It is about the
interpretation of a unique agreement, prepared in unique
circumstances, to cover a unique relationship.  In my opinion
it raises no disputed general principles of law.  It involves
the application of well-understood principles to the
particular facts.

[3]   The applicable principles may be stated in this way.  It
is not sufficient in interpreting a clause in an agreement to
look only at the wording of the clause in order to decide on
its meaning and application; instead the clause must be
examined in its place in the agreement as a whole.  Further,
the agreement as a whole, and the clause in particular, must
be examined in the context of the factual matrix which gave
rise to the agreement and against which the agreement and the
clause were intended to operate.

[4]   Just as in statutory interpretation, so also in contract
interpretation.  The fact that the section or clause seems to
have a plain enough meaning when viewed in isolation does not
preclude, but indeed requires, an examination of the whole
text of the statute or agreement, and a consideration of the

section or clause in their place in the whole text and in the
factual matrix in which they were intended to operate.  That
process is required in every case of interpretation of either
a statute or an agreement.

[5]  Of course the process I have described does not detract
in any measure from the importance of the words chosen to
express the mutual intention of the parties.  It merely
underlines the view that it is the mutual intention of the
party that is being sought and not simply the lexical
possibilities inherent in the words chosen to express that
mutual intention, perhaps by a third party advisor.

[6]  It must always be borne in mind that the function of an
interpreting court is to give effect to the mutual intention
of the parties and not to create an agreement or an obligation
that the parties did not intend, merely because they might
well have intended it.

[7]  As I have said, this agreement and clause are fact
specific.  The trial judge, Mr. Justice Burnyeat, reserved
judgment after a seven day trial devoted in large measure to
evidence about the factual matrix of the agreement.  He wrote
a careful and detailed judgment giving a close analysis of the
clause and its place in the agreement as a whole and in the
factual matrix of the developing relationship between the

2002 BCCA 102 (CanLII)

parties.   Those reasons are available on Quick Law at [1999]
B.C.J. No. 1356.   I do not propose to summarize them.

[8]   Clause 10.1 (e) of the ***Shareholders Agreement*** reads:

>   DEFAULT
>
>   10.1 It is an event of default (a "Default") if a
>        Shareholder (the "Defaulting Shareholder") (the
>        other Shareholders being the "Non-Defaulting
>        Shareholders"):
>   …
>   (e)  fails to observe, perform or carry out any of
>        his obligations under any employment contract
>        made between the Company and such Shareholder.

[9]   "Company" and "Shareholder" are defined but it is
significant that the definition section says that the
definition will apply "unless the context is inconsistent
therewith" thereby mandating an examination of the context
before applying the definitions.

[10] Mr. Justice Burnyeat made that examination.  He applied
the principles of interpretation that I have described.  He
made no error in principle.  This is what he said:

>   [42] Accordingly, I am satisfied that it was the
>   intention of the original signatories to the
>   Shareholders' Agreement and it was the intention of
>   the plaintiffs when they executed the Amendment
>   Agreement acknowledging that they were bound by the
>   terms and provisions of the Shareholders' Agreement
>   that paragraph 10.1(e) of the Shareholders'
>   Agreement would be interpreted by all parties as
>   including references to employment by both Financial
>   and Securities even though only employment by

> Financial is set out in that paragraph.  To
> interpret this paragraph otherwise requires the
> unacceptable interpretation that the default
> provision dealing with employment was not intended
> by any of the parties to have any meaning and was
> not intended to be an event of default.  In fact, a
> strict interpretation of the provisions of paragraph
> 10.1 might well require that any defaults relating
> to the affairs of Securities would not be a default
> under the Shareholders' Agreement.  That was clearly
> not what was intended by the parties to the
> Shareholders' Agreement, the provisions of which the
> plaintiffs agreed to be bound.

[11] With respect, in my opinion, Mr. Justice Burnyeat reached

the right result for the right reasons.  I would not accede to

this ground of appeal.


[12] The second ground appeal is that it was said to be an

error to grant the remedy of specific performance, a

discretionary remedy, in circumstances where it was said that

the conduct of the defendants disentitled them to the benefits

of an equitable remedy.


[13] It is not clear that this point was argued at trial, but

in any event the moral and legal rectitude of the parties are

not to be determined against absolute standards but against

the conduct of each other and the conduct of rational people

in their business.


[14] Having regard to the nature of the breach of Clause

10.1(e) by the plaintiff, I think that it was well within the

discretion of the trial judge to grant the remedy of specific

2002 BCCA 102 (CanLII)

performance.  If it may be thought that he did not address this issue squarely I would do so and decide that the defendants were not disentitled to the remedy of specific performance.

[15] The third ground of appeal is said to be that it was in error to treat the plaintiff as disentitled to profits of the company in the period from when he started to work within the company structure and the date of 1 September 1995 when he completed his purchase of fully paid up shares in the company and when he adopted the shareholders' agreement.

[16] In my opinion, having regard to the plaintiff being compensated as a principal with one hundred percent of commissions and overrides from when he started work within the corporate structure until 1 September 1995, and having regard to the fact that the formal arrangements were not completed until 1 September 1995, there was no error, palpable or otherwise, in the trial judge concluding that the plaintiff was not entitled to a share of the profits prior to 1 September 1995.

[17] I would not accede to any of the three grounds argued by the plaintiff, appellant.  It follows that I would dismiss the appeal.

[18] **FINCH, C.J.B.C.**: I agree.

[19] **LOW, J.A.**: I agree.

[20] **FINCH, C.J.B.C.**: The appeal is dismissed.

                         "The Honourable Mr. Justice Lambert"

Correction: March 14, 2002
Pg. 4, par. 7 – Quik Law should be Quick Law

TAB 91

34 Fed.Appx. 858
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued
on or after Jan. 1, 2007. See also Third Circuit
LAR, App. I, IOP 5.7. (Find CTA3 App. I, IOP 5.7)
United States Court of Appeals,
Third Circuit.

Victor JOHNSON,

v.

VANGUARD MANUFACTURING, INC.;
and Lynn Ladder and Scaffolding Co., Inc.

No. 01–1589, 01–1742.   |   Submitted
Under Third Circuit LAR 34.1(a) Feb.
25, 2002.   |   Filed May 8, 2002.

Worker brought products liability action in state court against
manufacturer and seller of allegedly defective scaffold that
collapsed, resulting in injuries. Upon removal, the United
States District Court for the Eastern District of Pennsylvania,
Berle M. Schiller, J., entered judgment in favor of defendants.
Worker appealed. The Court of Appeals, Roth, Circuit
Judge, held that trial court did not abuse its discretion
in excluding part of worker's expert's testimony regarding
whether defective ladder caused worker's injury.

Affirmed.

West Headnotes (1)

[1]    **Federal Civil Procedure**
          👉 Failure to respond; sanctions

          Trial court did not abuse its discretion in
          excluding part of worker's expert's testimony
          regarding whether defective ladder caused
          worker's injury; it was within the court's
          discretion to find that the testimony that worker
          attempted to elicit from expert was properly
          excluded since it was not provided in his expert
          report, and moreover, evidentiary exclusion did
          not preclude expert from testifying on the issue
          of causation, and expert presented testimony as

to causation later in his testimony. Fed.Rules
Civ.Proc.Rule 26(a)(2)(B), 28 U.S.C.A.

3 Cases that cite this headnote

**\*858**  Appeal from the United States District Court for the
Eastern District of Pennsylvania (D.C. Civil Action No. 98–
cv–03171) District Judge: Honorable Berle M. Schiller.

Before ROTH and FUENTES, Circuit Judges GIBSON [*],
Circuit Judge.

**Opinion**

OPINION

ROTH, Circuit Judge.

Plaintiff Victor Johnson appeals the judgment of the United
States District Court for the Eastern District of Pennsylvania.
Johnson sought damages in a products liability action
against Vanguard Manufacturing, Inc., and Lynn Ladder
and Scaffolding Co., Inc. Johnson's claim arose from a
construction accident that occurred on June 4, 1996. Johnson
and a co-worker, each standing on his own scaffold, were
engaged in the demolition of a wall. They successfully
toppled the wall, but a few moments after the wall gave
way, Johnson's scaffold collapsed. As a result, Johnson fell
and was injured. Johnson originally filed a complaint in the
Court of Common Pleas of Philadelphia County, claiming
that the scaffold was defectively designed and manufactured
by defendant Vanguard Manufacturing, Inc., and sold by
defendant Lynn Ladder and Scaffolding Co., Inc. On June 19,
1998, the defendants removed the case to the United States
**\*859**  District Court for the Eastern District of Pennsylvania.
After a two day trial, the jury returned a verdict in favor of
Vanguard. This appeal followed.

At trial, Johnson presented his testimony, the testimony of his
co-worker, and that of a single expert. The expert was Dr.
Campbell Laird, a metallurgist and accident reconstructionist
from the University of Pennsylvania School of Engineering
and Applied Science. Based on his investigations, Dr. Laird
testified that a pin on the scaffold fractured from fatigue in the
course of normal operations, that the pin was manufactured
from the wrong type of iron, and that the fracture of the pin
and resulting instability of the scaffold was the direct cause
of Johnson's injury. While Johnson was prepared to call an

expert in the field of accident reconstruction, he rested his case at the conclusion of Dr. Laird's testimony.

The defense called several expert witnesses. The defense metallurgist explained that the normal use of the scaffold would not cause a fatigue fracture of the pin, contradicting Laird's testimony. The accident reconstructionist employed by the defense explained that the accident occurred as a result of the scaffold tipping as Johnson pushed on the wall. He testified that the pin fracture might have resulted from falling scaffold but that the fracture itself did not cause the collapse.

The jury concluded that while the scaffold was defective, the defect was not a substantial factor in causing Johnson's accident, and found in favor of Vanguard.

Johnson contends that the District Court abused its discretion in excluding part of Dr. Laird's testimony as to accident causation, and that this exclusion prevented Johnson from properly presenting his case. During Johnson's direct examination of Dr. Laird, Vanguard objected when he was questioned as to observations made in the preparation of his report. The objection was based on the fact that the observations were not recorded in Dr. Laird's report. Pursuant to Fed.R.Civ.P. 26(a)(2)(B), an expert witness's report must contain a complete statement of all opinions to be expressed

and the data or other information considered by the witness in forming those opinions. A party that fails to disclose evidence required by Rule 26(a) will not be allowed to use that evidence unless the failure to disclose the evidence is harmless. See Fed.R.Civ.P. 37(c)(1).

After reviewing the record, we find that the trial court did not abuse its discretion in excluding part of Dr. Laird's testimony. It was within the court's discretion to find that the testimony that Johnson attempted to elicit from Dr. Laird was properly excluded since it was not provided in his expert report as required by Fed.R.Civ.P. 26(a)(2)(B). Moreover, this evidentiary exclusion did not preclude Dr. Laird from testifying on the issue of causation. The record shows that Dr. Laird presented his testimony as to causation later in his testimony.

For the foregoing reasons, we will affirm the judgment of the District Court. We will, however, deny appellee's request for an award of sanctions and costs under Fed. R.App. P. 38 and 28 U.S.C. § 1927.

**Parallel Citations**

2002 WL 957330 (C.A.3 (Pa.))

Footnotes
*      Honorable John R. Gibson, Senior Circuit Court Judge for the Eighth Circuit, sitting by designation.

TAB 92

Kannankeril v. Terminix Intern., Inc., 128 F.3d 802 (1997)

28 Envtl. L. Rep. 20,219, 47 Fed. R. Evid. Serv. 1376, Prod.Liab.Rep. (CCH) P 15,089

128 F.3d 802
United States Court of Appeals,
Third Circuit.

Charles KANNANKERIL; Mary Kannankeril,
individually and as next friend of Charlene
and Crystal Kannankeril; Charlene
Kannankeril; Crystal Kannankeril
v.
TERMINIX INTERNATIONAL, INC.; TM
Special Partners, Inc.; Terminix MGP, Inc.,
General Partners of the Terminix International
Company Limited Partnership; Terminix
International; Dow Chemical U.S.A.; Whitmire
Research Laboratories, Inc.; Ford Chemical
& Service, Inc.; Dennis Buttimore, c/
o Terminix International; The Terminix
International Company Limited Partnership
Mary Kannankeril, Individually and as Next
Friend of Charlene Kannankeril, Appellant.

No. 96–5818.   |   Argued July
17, 1997.   |   Decided Oct. 17,
1997.   |   As Amended Dec. 12, 1997.

Homeowners sued pest exterminator, seeking damages for injuries allegedly arising out of application of pesticides to their residence. After excluding testimony by plaintiffs' medical expert, the United States District Court for the District of New Jersey, John C. Lifland, J., granted summary judgment for exterminator. Plaintiffs appealed. The Court of Appeals, Roth, Circuit Judge, held that plaintiffs' expert's proffered testimony as to his opinion of causation of plaintiff's illness was admissible.

Vacated and remanded.

West Headnotes (16)

[1]   **Evidence**
        👉 Certainty of testimony; probability, or
        possibility
        Under New Jersey law, medical expert testimony must be made with reasonable degree of certainty.

Cases that cite this headnote

[2]   **Federal Courts**
        👉 Expert evidence and witnesses
        District court's ruling on admissibility of expert testimony is reviewed for abuse of discretion. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

2 Cases that cite this headnote

[3]   **Federal Courts**
        👉 Evidence
        To extent that district court's ruling turns on interpretation of Federal Rules of Evidence, Court of Appeals' review is plenary.

1 Cases that cite this headnote

[4]   **Federal Courts**
        👉 "Clearly erroneous" standard of review in
        general
        District court's findings of fact are reviewed under clearly erroneous standard. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

[5]   **Federal Civil Procedure**
        👉 Reception of Evidence
        Federal Rules of Evidence embody strong and undeniable preference for admitting any evidence which has potential for assisting trier of fact.

28 Cases that cite this headnote

[6]   **Evidence**
        👉 Matters involving scientific or other special
        knowledge in general
        Federal rule that governs admissibility of expert testimony has liberal policy of admissibility. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

42 Cases that cite this headnote

[7]   **Evidence**

28 Envtl. L. Rep. 20,219, 47 Fed. R. Evid. Serv. 1376, Prod.Liab.Rep. (CCH) P 15,089

🗝 Matters involving scientific or other special knowledge in general

**Evidence**

🗝 Necessity of qualification

Major requirements of federal rule that governs admissibility of expert testimony are that proffered witness must be expert, expert must testify about matters requiring scientific, technical or specialized knowledge, and expert's testimony must assist trier of fact. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

82 Cases that cite this headnote

**[8]    Evidence**

🗝 Necessity and sufficiency

Expert's testimony is admissible so long as process or technique expert used in formulating opinion is reliable; to be "reliable," testimony must be based on methods and procedures of science, rather than on subjective belief or unsupported speculation. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

61 Cases that cite this headnote

**[9]    Evidence**

🗝 Necessity and sufficiency

Decisions concerning admissibility of expert testimony focus on expert's methods and reasoning; credibility decisions arise after admissibility has been determined. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

19 Cases that cite this headnote

**[10]    Evidence**

🗝 Necessity and sufficiency

Factors that district court should take into account in evaluating whether particular scientific methodology is reliable, so that expert testimony based on that methodology may be admitted into evidence, include whether method consists of testable hypothesis, whether method has been subject to peer review, known or potential rate of error, existence and maintenance of standards controlling technique's operation, whether method is generally accepted,

relationship of technique to methods which have been established to be reliable, qualifications of expert witness testifying based on methodology, and nonjudicial uses to which method has been put; however, these factors are neither exhaustive nor applicable in every case. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

120 Cases that cite this headnote

**[11]    Evidence**

🗝 Medical testimony

Fact that medical expert did not himself perform any diagnostic medical tests did not require exclusion of his testimony that diminution in plaintiff homeowner's cognitive abilities was caused by defendant pest exterminator's application of pesticides to homeowner's residence; expert reviewed records of homeowner's medical history, and also relied on physician's report of homeowner's neuropsychological complaints and of her cognitive impairment. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

16 Cases that cite this headnote

**[12]    Evidence**

🗝 Experiments and results thereof

Fact that cholinesterase blood test performed on plaintiff homeowner did not produce abnormal results did not require exclusion of her medical expert's testimony that diminution in plaintiff's cognitive abilities was caused by defendant pest exterminator's application of pesticides to plaintiff's residence; that test was not only clinical test performed on plaintiff, as neuropsychologist confirmed diminution in plaintiff's cognitive abilities. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

2 Cases that cite this headnote

**[13]    Evidence**

🗝 Medical testimony

In concluding that diminution in plaintiff homeowner's cognitive abilities was caused by defendant pest exterminator's application of

28 Envtl. L. Rep. 20,219, 47 Fed. R. Evid. Serv. 1376, Prod.Liab.Rep. (CCH) P 15,089

pesticides to homeowner's residence, medical expert was entitled to make determination of extent of plaintiff's exposure to chemical by reviewing exterminator's application records, showing when, how much, and where pesticide had been applied; expert was not required to rely solely on analysis performed by New Jersey Department of Environmental Protection (DEP), performed nine months after last application of pesticide, which indicated nondetectable levels of pesticides. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

19 Cases that cite this headnote

[14]    Evidence
        👉 Necessity and sufficiency

Although district court can take peer-review and publication into account in assessing reliability of expert's testimony, they may not in every case be necessary conditions of reliability. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

19 Cases that cite this headnote

[15]    Evidence
        👉 Medical testimony

Fact that plaintiff homeowner's proffered medical expert had not produced any publication on organophosphates did not require exclusion of his testimony that plaintiff exhibited signs and symptoms of chronic toxicity related to exposure to organophosphates that defendant exterminator applied to plaintiff's residence; expert's opinion was supported by widely accepted scientific knowledge of harmful nature of organophosphates. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

26 Cases that cite this headnote

[16]    Evidence
        👉 Knowledge, experience, and skill in general

It is abuse of discretion to exclude testimony simply because trial court does not deem proposed expert to be best qualified or because proposed expert does not have specialization that court considers most appropriate; if expert meets

liberal minimum qualifications, then level of expert's expertise goes to credibility and weight, not admissibility. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

30 Cases that cite this headnote

**Attorneys and Law Firms**

*804  Evan T. Lawson (argued), Christopher N. Cook, Lawson & Weitzen, Boston, MA, for Appellants.

Kevin E. Wolff (argued), Robert W. Muilenburg, McElroy, Deutsch & Mulvaney, Morristown, NJ, for Appellee Terminix International.

Before: SLOVITER, Chief Judge, ROTH and MICHEL,[1] Circuit Judges.

**Opinion**

**OPINION OF THE COURT**

ROTH, Circuit Judge.

The Kannankerils, Dr. Mary Kannankeril, her husband, Charles, and their children, Charlene and Crystal, sued a pest exterminator, the Terminix International Company L.P. ("Terminix"), seeking damages for injuries allegedly arising out of the application of pesticides to their residence. The district court found the opinion of Dr. Benjamin Gerson, the medical expert of Dr. Mary Kannankeril, to be unreliable and unsupported by facts. Having excluded Dr. Gerson's opinion, the district court held that Dr. Kannankeril had failed to produce any evidence that her cognitive impairment had been caused by exposure to pesticides applied by Terminix. The court granted summary judgment in favor of Terminix. The admissibility of Dr. Gerson's opinion is the sole issue on which the Kannankerils have appealed. They argue that the district court erroneously excluded the testimony of Dr. Gerson.

We conclude that the district court improperly exercised its gatekeeping role by excluding Dr. Gerson's testimony.

Accordingly, we will vacate that portion of the order of the district court, granting summary judgment against Dr. Mary

Kannankeril v. Terminix Intern., Inc., 128 F.3d 802 (1997)

Case 09-10138-MFW   Doc 14225-47   Filed 08/15/14   Page 351 of 378

28 Envtl. L. Rep. 20,219, 47 Fed. R. Evid. Serv. 1376, Prod.Liab.Rep. (CCH) P 15,089

Kannankeril on this point, and we will remand this case for further proceedings consistent with this opinion. [2]

# I. BACKGROUND

The Kannankerils entered into a one-year contract with Terminix on May 30, 1989, for the control of carpenter ants through the application of pesticides to certain interior **\*805** portions and the outside deck of the Kannankerils' residence. From May 31, 1989, through October 5, 1990, Terminix treated the Kannankeril residence on at least twenty occasions at intervals ranging from once a month to twice in a three day period. Terminix applied pesticides, containing Dursban, until the Kannankerils canceled the service on October 5, 1990.

Dursban, the active ingredient in certain pesticides used by Terminix, is a formulation of chlorpyrifos, an organophosphate poison. The organophosphates kill insects by inhibiting the normal breakdown of acetylcholine, which functions as a neurotransmitter in several life forms, including humans. The Kannankerils argue that despite the well-known chronic effects of chlorpyrifos, Dursban was sprayed excessively and improperly in their home. For example, Dursban was sprayed on the cooking range, around the dishwasher, and on the baseboard heater. Dursban was also sprayed in cupboards where pots and pans were stored. Terminix, however, claims that any liquid pesticide that was applied consisted almost entirely of water, with minute concentrations of liquid pesticide added to make the final active solution.

The Kannankerils' suit against Terminix involved alleged injury to Dr. Mary Kannankeril, a former Medical Director of Psychiatric Emergency Services at Saint Mary's Hospital in Passaic, New Jersey. Dr. Kannankeril claims to suffer wide-ranging physiological and cognitive symptoms from exposure to the pesticides, including Dursban, applied by Terminix. [3] The symptoms first appeared in August 1990, over one year after Terminix began its service. The Kannankerils did not relate Dr. Kannankeril's symptoms with Terminix's ongoing pesticide applications until October 1990. After the entire family developed a rash, the Kannankerils began to suspect Dursban as the cause of their problems. When the Kannankerils complained of a strong odor in their home after the last application, Terminix sent Service Master to clean the Kannankerils' residence. In July 1991, nine months after the last application of pesticide, the Kannankerils requested

that the New Jersey Department of Environmental Protection ("DEP") test their residence for the existence of pesticides. The DEP collected air samples from the residence on July 10, 1991. An analysis of the samples indicated nondetectable levels of pesticides.

Dr. Kannankeril allegedly developed chronic toxicity related to exposure to chlorpyrifos and became sensitized to multiple other chemicals so that further exposure to organophosphates would result in disabling physical problems. As a result of her ill health, she gave up her hospital position in March, 1993, and now sees patients only in an office at home.

[1]    Plaintiffs named Dr. Benjamin Gerson, M.D., to testify as a medical expert to establish that exposure to Dursban caused Dr. Kannankeril's injury. [4] Dr. Gerson provided the following opinion:

> The temporal relationship and the nature of her complaints lead me to conclude that with reasonable medical certainty, the cause of Dr. Kannankeril's Central Nervous System manifestations of toxicity is exposure to Dursban in 1989 to 1990.

**\*806** App. at 51.[5] Dr. Gerson is the only medical expert proffered by the Kannankerils on causation and his opinion is limited to the causation of Dr. Kannankeril's cognitive impairment. His findings are based on Dr. Kannankeril's account of her cognitive symptoms and on a report prepared by Dr. Ellen Grober, a neuropsychologist who examined Dr. Kannankeril. Dr. Gerson also relied on a summary report of the times and amounts of Dursban applications to the Kannankeril home as well as on his general experience and readings, general medical knowledge, standard textbooks, and standard references.

## II. STANDARD OF REVIEW

[2]    [3]    [4]    A district court's ruling on admissibility of expert testimony is reviewed for abuse of discretion. *Government of the Virgin Islands v. Sanes,* 57 F.3d 338, 341 (3d Cir.1995); *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 749 (3d Cir.1994). To the extent that the district court's ruling turns on interpretation of the Federal Rules of Evidence, our review is plenary. *United States v. Velasquez,* 64 F.3d 844, 848 (3d Cir.1995); *Paoli,* 35 F.3d at 749. We review the district court's findings of fact under a clearly erroneous standard. *Velasquez,* 64 F.3d at 848.

28 Envtl. L. Rep. 20,219, 47 Fed. R. Evid. Serv. 1376, Prod.Liab.Rep. (CCH) P 15,089

## III. DISCUSSION

### A. Standard of Admissibility for Expert Testimony

**[5]**  **[6]**  Under the Federal Rules of Evidence, it is the role of the trial judge to act as a "gatekeeper" to ensure that any and all expert testimony or evidence is not only relevant, but also reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 2794–95, 125 L.Ed.2d 469. (1993). The Rules of Evidence embody a strong and undeniable preference for admitting any evidence which has the potential for assisting the trier of fact. *See Holbrook v. Lykes Bros. S.S. Co.,* 80 F.3d 777, 780 (3d Cir.1996). Rule 702, which governs the admissibility of expert testimony, has a liberal policy of admissibility. *See Holbrook,* 80 F.3d at 780; *Paoli,* 35 F.3d at 741.

**[7]**  **[8]**  **[9]**  Rule 702 has three major requirements: (1) the proffered witness must be an expert; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact. *See Paoli,* 35 F.3d at 741–42. The issue of this appeal involves the second requirement of the expert's testimony. In interpreting this second requirement, we have concluded that "an expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable." *Id.* at 742 (citing *Daubert,* 509 U.S. at 589, 113 S.Ct. at 2794–95). In order for the expert testimony to be "reliable," we have required that the testimony be based on the "methods and procedures of science," rather than on "subjective belief or unsupported speculation." *Paoli,* 35 F.3d at 744. Moreover, *Daubert* does not set up a test of which opinion has the best foundation, but rather whether any particular opinion is based on valid reasoning and reliable methodology. Admissibility decisions focus on the expert's methods and reasoning; credibility decisions arise after admissibility has been determined. *See Paoli,* 35 F.3d at 743–46.

**[10]**  There are several factors that a district court should take into account in evaluating whether a particular scientific methodology is reliable. *See Paoli,* 35 F.3d at 742.[6] Although these factors are neither exhaustive **\*807** nor applicable in every case, they provide a convenient starting point for analyzing the opinion of Dr. Gerson. Our inquiry focuses on principles and methodology and not on the conclusions they generate. *Id.* at 744. The analysis of the conclusions themselves is for the trier of fact when the expert is subjected to cross-examination. *Id.* The Kannankerils needed to demonstrate by a preponderance of evidence only that Dr. Gerson's opinion was based on "good grounds." *Id.*

### B. Reliability of Dr. Gerson's Testimony

The district court refused to admit Dr. Gerson's testimony because of insufficient factual foundation to prove that the cause of Dr. Kannankeril's cognitive impairment was exposure to Dursban. We conclude, however, that Dr. Gerson's opinion meets the requirements for the admission of expert testimony under Rule 702 of the Federal Rules of Evidence, as set forth in *Daubert* and interpreted by us in *Paoli.*

### 1. Differential Diagnosis

**[11]**  In its opposition to Dr. Gerson's testimony, Terminix has emphasized that Dr. Gerson did not himself perform any diagnostic medical tests. Terminix argues that Dr. Gerson did not employ sufficient diagnostic techniques to have good grounds for his conclusions or to have properly performed a differential diagnosis. We have recognized "differential diagnosis" as a technique that involves assessing causation with respect to a particular individual. *Paoli,* 35 F.3d at 758. Differential diagnosis is defined for physicians as "the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings." STEDMAN'S MEDICAL DICTIONARY 428 (25th ed.1990). The elements of a differential diagnosis may consist of the performance of physical examinations, the taking of medical histories, and the review of clinical tests, including laboratory tests. A doctor does not have to employ all of these techniques in order for the doctor's diagnosis to be reliable. *See Paoli,* 35 F.3d at 759. A differential diagnosis may be reliable with less than all the types of information set out above. *See id.* Indeed, as we held in *Paoli,* "to the extent that the district court concluded otherwise [*i.e.,* that a differential diagnosis made on less than all types of information cannot be reliable], we hold that it abused its discretion." *Id.*

Depending on the medical condition at issue and on the clinical information already available, a physician may reach a reliable differential diagnosis without himself

28 Envtl. L. Rep. 20,219, 47 Fed. R. Evid. Serv. 1376, Prod.Liab.Rep. (CCH) P 15,089

performing a physical examination, particularly if there are other examination results available. In fact, it is perfectly acceptable, in arriving at a diagnosis, for a physician to rely on examinations and tests performed by other medical practitioners.

These principles are applicable to the admissibility of Dr. Gerson's expert opinion regarding Dr. Kannankeril. The district court found that Dr. Gerson never performed any clinical tests to support his opinion of causation. Dr. Gerson did not "examine, or even speak to" Dr. Kannankeril. Instead, Dr. Gerson reviewed the records of Dr. Kannankeril's medical history. Dr. Gerson also relied on Dr. Grober's report of Dr. Kannankeril's neuropsychological complaints and of her cognitive impairment. Terminix does not claim that the medical records relied upon by Dr. Gerson were incomplete or inaccurate. As noted by this Court in *Paoli,* "evaluation of the patient's medical records is a reliable method of concluding that a patient is ill even in the absence of a physical examination." *Id.* at 762. A doctor needs only one reliable source of information showing that a plaintiff is ill; either a physical test or medical records will suffice for this. *Id.* at 762. For these reasons, the reliability of Dr. Gerson's opinion is not necessarily diminished by the fact that he himself did not perform a physical examination.

 [12]    Moreover, in making his evaluation, Dr. Gerson was aware that one test, the cholinesterase blood test, did not produce abnormal results. The district court noted that the blood test for cholinesterase levels is "the most accepted test method for determining **\*808** exposure to Dursban." However, the cholinesterase test result is but one of the factors considered by Dr. Gerson. Despite the negative results from this test, Dr. Gerson still opined that, as a matter of reasonable medical certainty, Dursban had caused Dr. Kannankeril's cognitive impairment. It is for the jury to decide whether a single cholinesterase test, yielding results within normal limits, outweighs the other factors relied upon by Dr. Gerson and undermines his opinion. This is an issue of credibility, not of admissibility.

Furthermore, we do not agree with the trial court's finding that "every" objective medical test showed normal results. The cholinesterase test was not the only clinical test performed on Dr. Kannankeril. Dr. Grober, the neuropsychologist at the Albert Einstein Medical Center, confirmed a diminution in Dr. Kannankeril's cognitive abilities.

In attacking the differential diagnosis performed by the plaintiff's expert, the defendant may point to a plausible cause of the plaintiff's illness other than the defendant's actions. It then becomes necessary for the plaintiff's expert to offer a good explanation as to why his or her conclusion remains reliable. *Paoli,* 35 F.3d at 762. Dr. Gerson, however, was never challenged by the presentation of alternate diagnoses by other physicians. Moreover, Terminix, in challenging Dr. Gerson's opinion, has not raised any other theory of causation for Dr. Kannankeril's cognitive impairment.[7] The record in this case is devoid of any alternate diagnosis which Dr. Gerson ignored or failed to consider.

Furthermore, we reject Terminix's argument that Dr. Gerson admitted to alternate causes other than exposure to Dursban for Dr. Kannankeril's condition. Dr. Gerson had testified at his deposition that something other than exposure to organophosphates "could" have caused each of the *individual* symptoms displayed by Dr. Kannankeril. While, however, an alternate explanation for each of Dr. Kannankeril's individual symptoms may exist separately, Dr. Gerson concluded with reasonable medical certainty that Dursban was the most likely cause of her condition as a whole. Terminix's exploration of the cause of each individual symptom goes not to the admissibility of the evidence but to its weight.

## 2. Degree of Exposure

 [13]    The Kannankerils also contend that the district erred in finding that Dr. Gerson had no knowledge of Dr. Kannankeril's degree of exposure to Dursban. According to the district court, Dr. Gerson did not know the levels of Dursban at the Kannankerils' home at the time of exposure, and he did not know the amount of time plaintiffs spent in the home. We conclude, however, that the district court erred when it failed to recognize that Dr. Gerson had sufficient knowledge of exposure from his review of Terminix's application records, showing when, how much, and where pesticide had been applied.

Terminix asserts, however, that these application records are "unreliable as a matter of law as a tool" to determine Dr. Kannankeril's exposure. The trial court agreed and ruled that the only information reviewed by Dr. Gerson which addressed actual levels of pesticides in the Kannankeril home was the analysis performed by the DEP in July 1991, nine months after the last application of Dursban. The results of that sampling indicated nondetectable levels of pesticides.

Kannankeril v. Terminix Intern., Inc., 128 F.3d 802 (1997)

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 354 of 378

28 Envtl. L. Rep. 20,219, 47 Fed. R. Evid. Serv. 1376, Prod.Liab.Rep. (CCH) P 15,089

We find that Terminix's assertion is without merit. First, there is no expert opinion in the record to establish that an ambient air test, particularly an ambient air test performed nine months after the final application of Dursban, is the only appropriate way in this case to gauge exposure to the organophosphate. Moreover, the plaintiffs were prepared to offer into evidence the Dursban product label which contained warnings such as: "HARMFUL IF SWALLOWED. HARMFUL IF ABSORBED THROUGH SKIN. CAUSES EYE AND SKIN IRRITATION" and "Thoroughly wash dishes and food handling utensils with soap and water if they become contaminated by application of this product. Do not allow children or pets to contact treated surfaces until spray has dried." App. at 241–43. Under the facts as **\*809** presented in this case, the district judge erred in ruling that an expert may rely only on the ambient air test to determine whether Dr. Kannankeril had been exposed to Dursban. Instead, all factual evidence of the presence of the chemicals in the residence should be relevant in forming an expert opinion of causation.

We conclude that it is for the trier of fact to determine what weight to give the ambient air test results as an indication of exposure. *See Joiner v. General Elec. Co.,* 78 F.3d 524, 534 (11th Cir.1996) (reversing exclusion of expert opinions that plaintiffs' exposure to certain chemicals caused his lung cancer where there were issues of fact whether plaintiff was actually exposed to the chemicals so that summary judgment based on a finding of no exposure was inappropriate). The issue whether an ambient air test should be given more weight than pesticide application records goes to the weight rather than the admissibility of evidence. *See United States v. Velasquez,* 64 F.3d 844, 848 (3d Cir.1995) (citing *United States v. Jakobetz,* 955 F.2d 786, 800 (2d Cir.1992)). The trial judge must be careful not to mistake credibility questions for admissibility questions.

### 3. Peer Review and Publication

 **[14]**    **[15]**   Two other factors that a district court can take into account in assessing reliability are peer-review and publication. They may not, however, in every case be necessary conditions of reliability. *See Daubert,* 509 U.S. at 593, 113 S.Ct. at 2796–97; *Paoli,* 35 F.3d at 742. In the instant case, Dr. Gerson admitted that he has not produced any publication on organophosphates. Because the toxic effects of organophosphates on humans are well recognized by the scientific community, however, Dr. Gerson's opinion is

not a novel scientific theory regarding organophosphates.[8] Instead, Dr. Gerson merely reported that Dr. Kannankeril exhibited the "signs and symptoms of chronic toxicity related to exposure to chlorpyrifos (Dursban)." Thus, although Dr. Gerson did not write on the topic, his opinion is supported by widely accepted scientific knowledge of the harmful nature of organophosphates. *See also McCulloch v. H.B. Fuller Co.,* 61 F.3d 1038, 1042 (2d Cir.1995) (holding that peer review and publication or general acceptance of an expert's theory goes to the weight of the testimony rather than its admissibility).

Based on the record before us, we conclude that Dr. Gerson's opinion on causation has a factual basis and supporting scientific theory. Dr. Gerson based his opinion on Dr. Kannankeril's medical records, Dr. Grober's reports confirming her medical condition, and Terminix's application receipts. He also relied on general experience and readings, general medical knowledge, standard textbooks, and standard references. After considering all the relevant facts, Dr. Gerson reported that "[t]he temporal relationship and the nature of her complaints lead me to conclude that with reasonable medical certainty, the cause of Dr. Kannankeril's Central Nervous System manifestations of toxicity is exposure to Dursban in 1989 to 1990." App. at 51. Dr. Gerson's testimony is neither conjecture nor speculation. His opinion was clearly stated to a reasonable degree of medical certainty.

 **[16]**   Whether the appellants' expert might have done a better job is not the test. We have stated that "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Holbrook,* 80 F.3d at 782. If the expert meets liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility. *See Paoli,* 35 F.3d at 741. The Second Circuit addressed a similar issue and commented that the expert's alleged shortcomings were raised properly on cross-examination and went to the credibility, not the admissibility, of his testimony. *McCulloch v. H.B. Fuller Co.,* 61 F.3d 1038, 1043 (2d Cir.1995). Consequently, we reject Terminix's suggestion that Dr. Gerson must be a specialist in Dursban to provide expert testimony on the causation of Dr. Kannankeril's injury.

The Kannankerils' burden is only to provide an expert opinion that is relevant and   **\*810** reliable and that will assist the trier of fact. As we have repeated above, issues of credibility arise after the determination of admissibility. Credibility is for the

Kannankeril v. Terminix Intern., Inc., 128 F.3d 802 (1997)

28 Envtl. L. Rep. 20,219, 47 Fed. R. Evid. Serv. 1376, Prod.Liab.Rep. (CCH) P 15,089

jury. We conclude that, under the facts presented here, the district court erred in ruling that Dr. Gerson's expert testimony on causation was inadmissible.

## IV. CONCLUSION

For the foregoing reasons, we hold that the district court erred as a matter of law in refusing to permit Dr. Gerson to testify as to his opinion of the causation of Dr. Kannankeril's

illness. Accordingly, we will vacate that portion of the district court order which granted summary judgment against Dr. Mary Kannankeril, and we will remand this case for further proceedings consistent with this opinion.

### Parallel Citations

28 Envtl. L. Rep. 20,219, 47 Fed. R. Evid. Serv. 1376, Prod.Liab.Rep. (CCH) P 15,089

Footnotes

1   Honorable Paul R. Michel, United States Court of Appeals for the Federal Circuit, sitting by designation.

2   Our decision, vacating the summary judgment against Dr. Kannankeril, is without prejudice to any motion for summary judgment on other grounds which Terminix may bring.

3   Only the causation of Dr. Kannankeril's cognitive impairment remains an issue in the case. These cognitive deficits include memory loss, concentration loss, sleeplessness, general anxiety, and headaches. Her other alleged physical symptoms included insomnia, numbness, muscle twitching, pain in muscles and joints, vaginal bleeding, urinary incontinence, nausea, skin rashes, and depigmentation patches throughout her body.

4   Dr. Gerson's qualifications included: Physician certified by the American Board of Toxicology and the American Board of Pathology; Director of the Boston University School of Medicine's Laboratory of Analytical Toxicology and Director of the Research Data Worldwide Clinical Laboratory; Consultant to the Food and Drug Administration's Center for Devices and Radiological Health; Professor of Pathology and a Professor of Pharmacology & Experimental Therapeutics at Boston University; Instructor in Pathology, Harvard Medical School; Special Lecturer in Clinical Laboratory Science, Northeastern University; Assistant Professor of Pathology, Harvard Medical School; Associate Professor of Pathology, Harvard Medical School; Director of Clinical Chemistry and Toxicology at Veterans Affairs Medical Center in Boston, Massachusetts.

5   Under New Jersey law, medical expert testimony must be made with a reasonable degree of certainty. *See Bondi v. Pole,* 246 N.J.Super. 236, 587 A.2d 285 (App.Div.1991); *Vuocolo v. Diamond Shamrock Chemicals Co.,* 240 N.J.Super. 289, 573 A.2d 196 (1990); *Johnesee v. The Stop & Shop Companies,* 174 N.J.Super. 426, 416 A.2d 956 (App.Div.1980). New Jersey's rule should govern in the present case since it is a substantive law that is part of the appellants' burden of proof. *See In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 752 (3d Cir.1994).

6   These nonexclusive guidelines, drawn from *Daubert* and this Court's opinion in *United States v. Downing,* 753 F.2d 1224 (3d Cir.1985), include:

     (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

     *Paoli,* 35 F.3d at 742 n. 8.

7   Terminix had, of course, no obligation to present an alternate theory of causation in its effort to have Dr. Gerson's opinion excluded. However, in determining whether a proper differential diagnosis was conducted, a consideration of other diagnoses may be relevant.

8   In his opinion letter to plaintiffs' attorney, Dr. Gerson described chlorpyrifos, the active ingredient in Dursban, as an organophosphate insecticide, and he set out summaries of a number of reports of the delayed and chronic effects of exposure to organophosphates and of the effects on humans of organophosphate poisoning. A–47–51.

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 93

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

1998 CarswellOnt 4170
Ontario Court of Appeal

Kentucky Fried Chicken Canada v. Scott's Food Services Inc.

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

# Kentucky Fried Chicken Canada, a Division of Pepsi-Cola Canada Ltd., Plaintiff (Respondent) and Scott's Food Services Inc. and Scott's Hospitality Inc., Defendants (Appellants)

Moldaver, Goudge JJ.A., Ferrier J. (ad hoc)

Heard: May 4-5, 1998
Judgment: November 2, 1998
Docket: CA C28208

Proceedings: reversing (1997), 35 B.L.R. (2d) 21 (Ont. Gen. Div.); additional reasons at (November 5, 1997), Doc. 96-CU-103096 (Ont. Gen. Div.)

Counsel: *Dennis R. O'Connor, Q.C.*, *David Stockwood, Q.C.*, *Nancy J. Spies* and *Timothy H. Mitchell*, for the appellants. *David R. Byers*, *Katherine L. Kay* and *Christopher J. Cosgriffe*, for the respondent.

Subject: Intellectual Property; Corporate and Commercial; Contracts; Torts; Property; Civil Practice and Procedure; Evidence

## Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

## Headnote

### Contracts --- Franchising contracts — Construction and interpretation — General

Corporation's subsidiary and licensor entered into license agreement for operation of franchise outlets — Agreement restrained licensee from transferring or assigning agreement or rights without consent of licensor — Corporation subsequently entered into transaction which included transfer of shares in subsidiary to newly formed corporation, without consent of licensor — Licensee brought application for interpretation of licence agreement, and licensor brought action for breach of contract — Action allowed — Trial judge held that corporation was obligated to seek approval and consent of licensor to any sale of majority control of voting shares of corporation or licensee — Failure to obtain such approval was breach of licence agreement — Appeal by licensee allowed — Agreement did not give licensor right to approve change in controlling shareholder of licensee — Ordinary meaning of language in agreement suggested licensor had right on entering franchise agreement to know and approve shareholders of licensee — Nothing in agreement suggested right to approve change in shareholders seven years later — Throughout relationship licensee had made it clear that it would not agree to any restriction on changes of ownership of licensee — Deemed transfer provisions which gave rise to licensor's right to approve change in shareholders of other franchisees under standard franchise agreements were absent from agreement between licensee and licensor — It would lead to commercial absurdity to interpret right of approval as continuing right — Provision in agreement requiring licensee to give licensor information about shareholders of prospective purchaser would be superfluous if licensor had continuing right to approve shareholders of licensee — Given history of parties, it could not be said that it did not make good business sense to restrict right of approval to time parties entered into agreement — Strong bargaining position of licensee made generally accepted industry practice of little use in interpreting agreement — Change in shareholders of licensee did not constitute licensee dealing with its interest under license agreement — Licensor did not have right to prior written consent to corporation's sale of assets — Corporation's transaction did not give rise to right of first refusal on part of licensor as there was no offer to licensee.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

**Corporations --- Nature of corporation — Distinct existence — From owner — Lifting the corporate veil**

Corporation's subsidiary and licensor entered into license agreement for operation of franchise outlets — Agreement restrained licensee from transferring or assigning agreement or rights without consent of licensor — Corporation subsequently entered into transaction which included transfer of shares in subsidiary to newly formed corporation, without consent of licensor — Licensee brought application for interpretation of licence agreement, and licensor brought action for breach of contract — Licensor argued parent corporation was bound by terms of agreement because subsidiary executed it as alter ego, and agreement gave licensor control over transfer of shares of subsidiary and parent corporation — Subsidiary not alter ego of parent corporation — Both parties knew licence agreement was between licensor and subsidiary — Parent corporation completely controlled subsidiary for primary purposes of licence agreement, but took no part in its daily management — Appeal by licensee allowed on other grounds.

**Agency --- General principles**

Corporation's subsidiary and licensor entered into license agreement for operation of franchise outlets — Agreement restrained licensee from transferring or assigning agreement or rights without consent of licensor — Corporation subsequently entered into transaction which included transfer of shares in subsidiary to newly formed corporation, without consent of licensor — Licensee brought application for interpretation of licence agreement, and licensor brought action for breach of contract — Licensor argued parent corporation was bound by terms of agreement because subsidiary executed it as agent, and agreement gave licensor control over transfer of shares of subsidiary and parent corporation — Subsidiary not agent of parent corporation — Both parties knew licence agreement was between licensor and subsidiary — Parent corporation completely controlled subsidiary for purposes of licence agreement, but took no part in its daily management — Fact that parent corporation made major policy and financial decisions carried out by subsidiary not determinative — Profits of subsidiary were treated as profits of parent corporation on consolidated balance sheet only — Profits of subsidiary not directly traceable to skill and direction of parent corporation — Appeal by licensee allowed on other grounds.

**Evidence --- Parol evidence rule — Interpretation — Usage, custom, course of dealings — General**

Parties entered into franchise licence agreement — Licensor brought action involving interpretation of agreements and moved to exclude extrinsic parol evidence — Motion allowed in part — Extrinsic evidence admissible to enable court to determine latent ambiguity in written agreement and to construe true intention of parties — Evidence of subjective intention with respect to agreement, and of negotiations and drafts leading to execution of agreement, was not admissible — Relationship between parties and custom in industry were part of factual matrix that must be looked at to interpret agreement — Evidence of licence agreements between licensor and other franchisees in Canada, and between licensor's associated companies and franchisees in other countries, were admissible as relevant to custom in industry — Appeal by licensee allowed on other grounds — Agreement to be interpreted objectively, in accordance with sound commercial principles and good business sense.

**Equity --- Equitable doctrines — Relief against penalty and forfeiture — General**

Corporation's subsidiary and licensor entered into license agreement for operation of franchise outlets — Agreement restrained licensee from transferring or assigning agreement or rights without consent of licensor — Corporation subsequently entered into transaction which included transfer of shares in subsidiary to newly formed corporation, without consent of licensor — Licensee brought application for interpretation of licence agreement, and licensor brought action for breach of contract — Action allowed — Transactions were in breach of licence agreement and gave licensor right to terminate agreement, subject to claim for relief from forfeiture — Licensee knowingly committed breach of licence agreement — Relief from forfeiture not insurance policy for party taking chance on interpretation of essential term of its contractual rights and losses — Conduct of licensor in vigorously opposing what it considered to be breach of licence agreement was not exceptional or unconscionable — No valid reason to grant relief from forfeiture — Appeal by licensee allowed on other grounds.

**Contracts --- Franchising contracts — Performance or breach — Duty of franchisees — General**

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

License agreement provided licensor could require renovations and remodelling of franchise outlets to its standards — Agreement required licensee to upgrade all outlets in accordance with "world image" standards and obtain "outlet certification agreements" for each outlet — Development agreement provided for annual enhancement program covering at least 10 per cent of outlets — Licensee upgraded more than 10 per cent of outlets each year from 1990 to 1996, except for 1991, but failed to have 10 per cent of outlets certified every year — Licensee admitted 69 outlets were not upgraded to "world wide image" standards, but were upgraded within its interpretation of agreements — At end of 1996, 28 per cent of outlets did not comply with upgrade provisions of development agreement — Trial judge held that licensee was in substantial breach of development agreement, and provided licensee with three months to remedy default — Licensee brought appeal against finding that licensee must enhance all of its outlets within three months and not just sufficient number so that failure becomes less than material and substantive — Appeal allowed — License agreement permitted licensor to terminate if licensee failed in "material and substantive manner" to meet enhancement obligations — Trial judge held that licensee was in substantive breach where more than five to ten percent of outlets fell below required standard — To correct failure, licensee was only required to ensure that no more than five percent of its outlets were substandard.

### Practice --- Costs — Jurisdiction and discretion as to costs

In written submissions at end of trial both parties referred to provision of license agreement between them and claimed full indemnity of their costs — Law was clear that contractual right should be followed by court unless there are special circumstances or where there had been inequitable conduct — In present case had been no inequitable conduct nor special circumstances relating to action — Trial judge ordered there be no costs of trial on basis of provision in license agreement — Appeal of judgment by licensee allowed — Trial judge's order as to costs affirmed — Licensee entitled to costs of appeal.

### Practice --- Judgments and orders — Amending or varying — General

From notes it could be seen that counsel had conceded that plaintiff had not called any evidence regarding monetary damages, not as mistakenly put into reasons that plaintiff had not suffered any monetary damages — Reasons for judgment were amended to take this into account — Appeal of judgment allowed on other grounds.

## Table of Authorities

### Cases considered by *Goudge J.A.*:

*Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), (sub nom. *Exportations Consolidated-Bathurst Ltée c. Mutual Boiler & Machinery Insurance Co.)* [1980] 1 S.C.R. 888, 112 D.L.R. (3d) 49, 32 N.R. 488, [1980] I.L.R. 1-1176 (S.C.C.) — applied

*GATX Corp. v. Hawker Siddeley Canada Inc.* (1996), 1 O.T.C. 322, 27 B.L.R. (2d) 251 (Ont. Gen. Div. [Commercial List]) — distinguished

*Reardon Smith Line v. Hansen-Tangen,* [1976] 1 W.L.R. 989, [1976] 3 All E.R. 570 (U.K. H.L.) — applied

*Scanlon v. Castlepoint Development Corp.* (1992), 29 R.P.R. (2d) 60, 59 O.A.C. 191, 11 O.R. (3d) 744, 99 D.L.R. (4th) 153 (Ont. C.A.) — applied

*Toronto (City) v. W.H. Hotel Ltd.,* [1966] S.C.R. 434, 56 D.L.R. (2d) 539 (S.C.C.) — applied

APPEAL by licensee from judgment reported at (1997), 35 B.L.R. (2d) 21 (Ont. Gen. Div.), allowing licensor's action for breach of license agreement.

## The judgment of the court was delivered by *Goudge J.A.*:

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1    This appeal was heard on May 4 and 5, 1998. This court's reasons for judgment were ready for release on July 9, 1998 when the parties contacted the court to request that this not be done. On the basis of the reasons given by the parties for this request, the court agreed to refrain from releasing its judgment until November 1, 1998 but made clear that the judgment would then be released unless prior to October 31, 1998 both parties notified the court in writing that the matter had been fully and finally settled and that the appellant wished to withdraw the appeal. This has not happened and these reasons are therefore being released.

2    The appellant Scott's Food is the largest Kentucky Fried Chicken ("KFC") franchisee in the world. Its franchise agreement (the "license agreement") with the respondent covers some four hundred outlets, approximately half of all KFC outlets in Canada.

3    Up until 1996, Scott's Food was owned by the appellant Scott's Hospitality whose other major business was a school bus operation. At that point, as part of a transaction with Laidlaw Inc. ("Laidlaw") in which Laidlaw acquired the school bus business, the shareholders of Scott's Hospitality replaced it as the sole shareholder of the franchisee with a new company, Scott's Restaurants. As a result, these shareholders then owned Scott's Restaurants which in turn owned Scott's Food. This change was made without the respondent's consent.

4    There were two main issues at trial. The second, which the parties call the enhancement issue, was whether, apart altogether from the corporate changes entailed by the Laidlaw transaction, Scott's Food had upgraded its outlets as required by its contract. At trial, Steele J. found that it had not. I will come in due course to the limited appeal taken from the judgment below on this issue.

5    The first and indeed the fundamental issue at trial, called the transfer issue, was whether the license agreement required the appellants (to whom I will refer jointly as "Scott's") to obtain the respondent's consent to the change in ownership of the franchisee failing which the respondent could terminate the agreement. Steele J. interpreted the contract as requiring consent, thereby giving the respondent the right to terminate since no consent was obtained. For the reasons that follow, I have come to the opposite conclusion and I would therefore allow the appeal on the transfer issue.

## The Transfer Issue

### The Relevant Facts

6    The license agreement that is the subject of this litigation was signed on June 9, 1989, effective January 1, 1989. The respondent was the franchisor and the appellant Scott's Food the franchisee. The latter was a wholly-owned subsidiary of Scott's Hospitality which was not a party to the agreement.

7    At the time the license agreement was made, Scott's operated about one-half of all the KFC outlets in Canada and more than ten times as many as the next largest franchisee in the country. Unlike most franchisees, Scott's had very significant bargaining power in the negotiations which led up to the agreement.

8    For the purposes of the transfer issue, the critical paragraphs of the license agreement are the following:

### 16. Transfer

16.1 The grant of the License hereunder is personal to Licensee. The grant of the License hereunder is based upon full disclosure in writing by the Licensee to KFC, and approval by KFC, of all directors and holders of majority control of the voting shares of Licensee and of any corporation or corporations which directly or indirectly (whether by means of any intermediate corporations or otherwise) own or control or have an interest in the shares of the Licensee. Licensee acknowledges that the restrictions provided in this Paragraph 16 are reasonable and necessary to protect the KFC System and the KFC Marks and are for the benefit and protection of all KFC licensees as well as KFC.

16.2 Licensee agrees that it shall not sell, transfer, assign, encumber, sub-license or otherwise deal with this Agreement or its rights or interest hereunder (hereinafter referred to as "transfer"), without KFC's prior written consent and Licensee's

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

compliance in all respects with the terms and conditions of this Paragraph 16. Any transfer or any attempt to do so, contrary to Paragraph 16 shall be a breach of this Agreement and shall be void but shall give KFC the right of termination as provided in Paragraph 17.2(d).

9    Paragraph 17.2(d) reads as follows:

17.2 KFC may, without prejudice to any other rights or remedies contained in this Agreement or at law or in equity, terminate the License upon immediate notice (or in the event advance notice is required by law, upon the giving of such notice) in the event that:

. . . . .

(d) Licensee makes or permits a transfer contrary to the provision of Paragraph 16;

10    The history of Scott's as a KFC franchisee predates the license agreement by twenty years. It goes back to 1969 when Scott's Hospitality entered into an agreement to become a franchisee operating KFC outlets in Canada. The franchisor then was Col. Sanders Kentucky Fried Chicken Limited ("Colonel Sanders"), the owner of the KFC trademarks in Canada. This agreement was to run until January 1, 1994. It is noteworthy that it contained no clause like the current paragraph 16.1. It did not specify that the rights of Scott's Hospitality were personal to it, nor were there any provisions restricting the transfer of its shares. There was, however, a provision restricting the transfer of the license without the prior written consent of the franchisor.

11    By 1985, the franchisor had developed a standard franchise agreement ("the 1985 Agreement") containing certain restrictions on the transfer of shares in the franchisee which, at that point, were standard in all KFC franchise agreements in Canada except that with Scott's Hospitality.

12    While paragraph 16.1 of the 1985 Agreement reads identically to paragraph 16.1 in the license agreement, paragraph 16.2 of the 1985 Agreement when coupled with paragraph 16.4 contains significant differences. These two paragraphs are reproduced below, highlighting the words that do not appear in the license agreement:

16.2 The Franchisee agrees that it shall not sell, transfer, assign, encumber, sub-license or otherwise deal with this Agreement or its rights or interest hereunder (hereinafter referred to as "transfer"), **and shall not suffer or permit any deemed sale, transfer or assignment of this Agreement or its rights or interest hereunder (hereinafter referred to as "deemed transfer" and more particularly defined in paragraph 16.4)**, without KFC's prior written consent and **Franchisee's** compliance in all respects with the terms and conditions of this Paragraph 16. Any transfer **or deemed transfer**, or any attempt to do so, contrary to this Paragraph 16 shall be a breach of this Agreement and shall be void but shall give KFC the right of termination as provided in paragraph 17.2(d).

**16.4 For the purposes of this Paragraph 16, a deemed transfer of this Agreement or the rights and interest hereunder shall include**:

(a) ...

**(b) in the event that Franchisee is a corporation, any change (including but without limitation any issuance, sale, assignment, transfer, redemption or cancellation of, or conversion of any securities into, voting shares of the corporate Franchisee or any other corporation referred to in paragraph 16.1, or any amalgamation, merger or other reorganization of the corporate Franchisee or any such other corporation) in any of the holdings of voting shares referred to in paragraph 16.1; provided that, in the case of any such corporation the voting shares of which are listed and publicly traded on a stock exchange, no such change in any of the holdings of its voting shares shall constitute a deemed transfer unless, in the sole opinion of KFC, direct or indirect control of the corporate Franchisee would thereby be changed.**

13    In 1987, Col. Sanders sold its entire interest in the KFC trademarks in Canada to Kentucky Fried Chicken's corporation ("KFC Corp." or "KFC") which held those rights for the rest of the world.

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

14      Just prior to this sale, by letter agreement dated July 16, 1987, KFC Corp. agreed that when the sale from Col. Sanders was concluded, it would grant Scott's Hospitality a ten-year renewal of the 1969 agreement. This letter agreement suggested no constraint on the transfer of shares of the franchisee.

15      Pursuant to the 1987 letter agreement, negotiations ensued between KFC and Scott's Hospitality. In these negotiations, Scott's Hospitality refused to agree to terms in the language of the 1985 agreement, just as it had previously refused to do with Col. Sanders. The Scott's representative made clear to KFC that Scott's would not agree to any restrictions on changes of ownership in the licensee.

16      The relative bargaining power of Scott's and KFC in these negotiations was the subject of some considerable attention at trial. The chief KFC negotiator testified that Scott's was at least the equal of KFC in bargaining power. The leading expert for KFC testified that it was unusual for a franchisee to be in such a position.

17      Because of these unique circumstances, the trial judge concluded that the evidence of the experts as to the usual practice in the franchising industry must be applied with caution. Ultimately, he found that Scott's had sufficient bargaining power to negotiate a contract in which there would be no restriction on the transferability of shares. The question he had to decide was whether the resulting license agreement contained such a restriction.

18      The first of the two Laidlaw transactions, which triggered the need to answer this question, began in January 1996 with an unsolicited offer from Laidlaw to purchase all of the shares of Scott's Hospitality. Laidlaw's intention was that following a successful takeover, it would sell off Scott's Food and retain the school bus business operated by Scott's Hospitality. Laidlaw's offer contained a condition that it be satisfied that there was no impediment to its disposing of the shares of Scott's Food to a third party without affecting the franchisee's rights under the license agreement. KFC was not prepared to give its consent to this transaction and indeed commenced this litigation in response. As a result, this Laidlaw proposal could not be completed within its time frame and hence it did not proceed.

19      Rather, a second Laidlaw transaction was structured in which Scott's Restaurants was incorporated as a subsidiary of Scott's Hospitality. Scott's Hospitality then transferred its shares in Scott's Food to Scott's Restaurants in exchange for shares of Scott's Restaurants which were dividended out to the shareholders of Scott's Hospitality. The shareholders of Scott's Hospitality thereby became the owners of Scott's Restaurants which, in turn, became the owner of the franchisee, Scott's Food. Laidlaw then purchased the shares of Scott's Hospitality thereby acquiring the school bus business.

20      KFC was kept fully informed of this transaction but continuously opposed it. Indeed, its consent was never expressly sought. The simple question at trial was whether that consent was required.

*The Judgment Below*

21      The trial judge found that while Scott's Food as franchisee was bound by the license agreement, Scott's Hospitality was not bound by its terms. He concluded that Scott's Food was neither the alter ego nor the agent of Scott's Hospitality. The respondent does not contest this conclusion.

22      He then went on to his core finding on the transfer issue, namely, the construction of paragraph 16.1 of the license agreement. He construed that paragraph to contain a continuing obligation on the part of the franchisee to obtain approval of KFC to any transfer of the shares of either Scott's Food or its controlling shareholder. He put his findings in these terms:

In my opinion the disclosure and approval of the directors and holders of majority control would be meaningless unless it was a continuing obligation and not merely at the time of execution. Based on good business sense section 16.1 must be construed as being a continuing obligation.

. . . . .

In my opinion there is nothing in section 16 that prohibits or gives the right of approval to KFC of trading of shares of Scott's Food or Hospitality provided that there is no issue of a change of control.

WestlawNext® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

There are no clearly expressed words requiring the approval of KFC to any transfer of the shares of Scott's Food or its controlling shareholders. However section 16.1 referring to the grant being personal and the reference to the directors and holders of majority control of the shares of Scott's Food and the broad reference to any other corporations with control make it clear that any transfer of the controlling shares of Scott's Food or Hospitality are subject thereto. To interpret the section otherwise would defeat the personal aspect and not make good business sense and would be contrary to the generally accepted practice in the franchise industry.

23      He then moved directly and without elaboration to a finding that paragraph 16.2 prohibits a transfer or an attempted transfer of the license agreement without consent and since the first Laidlaw proposal was an attempted transfer and the second was an actual transfer, each breached paragraph 16.2 and gave KFC the right to terminate the license agreement pursuant to paragraph 17.2(d).

*Analysis*

24      The question to be determined on the transfer issue is one of contractual interpretation: properly construed, does either paragraph 16.1 or paragraph 16.2 of the license agreement require KFC's consent to either Laidlaw transaction? The trial judge determined that this was not a case of ambiguity and on this basis, he declined to consider evidence of the subjective intentions of the parties which were not communicated to each other. Equally he excluded the various draft documents leading up to the license agreement. He did, however, consider the relationship between the parties and the custom of the industry, including the license agreements between the respondent and other franchisees in Canada, as part of the factual matrix that must be looked at in interpreting the agreement.

25      I agree with this approach. While the task of interpretation must begin with the words of the document and their ordinary meaning, the general context that gave birth to the document or its "factual matrix" will also provide the court with useful assistance. In the famous passage in *Reardon Smith Line v. Hansen-Tangen*, [1976] 1 W.L.R. 989 (U.K. H.L.) at 995-96 Lord Wilberforce said this:

No contracts are made in a vacuum: there is always a setting in which they have to be placed. The nature of what is legitimate to have regard to is usually described as "the surrounding circumstances" but this phrase is imprecise: it can be illustrated but hardly defined. In a commercial contract it is certainly right that the court should know the commercial purpose of the contract and this in turn presupposes knowledge of the genesis of the transaction, the background, the context, the market in which the parties are operating.

26      The scope of the surrounding circumstances to be considered will vary from case to case but generally will encompass those factors which assist the court "... to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract.": *Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888 (S.C.C.) at 901.

27      Where, as here, the document to be construed is a negotiated commercial document, the court should avoid an interpretation that would result in a commercial absurdity [1] . Rather, the document should be construed in accordance with sound commercial principles and good business sense [2] . Care must be taken, however, to do this objectively rather than from the perspective of one contracting party or the other, since what might make good business sense to one party would not necessarily do so for the other.

28      With these broad principles of interpretation in mind, I turn first to the construction to be given to paragraph 16.1 of the license agreement. Properly construed, does it give KFC the right to approve a change in the controlling shareholder of the franchisee? It is the second Laidlaw transaction that requires this question to be answered. Given that the first Laidlaw transaction was not proceeded with, KFC did not argue at trial or on appeal that it breached paragraph 16.1.

29      It is helpful at this point to set out the provision again:

16.1 The grant of the License hereunder is personal to Licensee. The grant of the License hereunder is based upon full disclosure in writing by the Licensee to KFC, and approval by KFC, of all directors and holders of majority control of the voting shares of Licensee and of any corporation or corporations which directly or indirectly (whether by means of any intermediate corporations or otherwise) own or control or have an interest in the shares of the Licensee. Licensee acknowledges that the restrictions provided in this Paragraph 16 are reasonable and necessary to protect the KFC System and the KFC Marks and are for the benefit and protection of all KFC licensees as well as KFC.

30     I have concluded that this clause does not give KFC a right to approve a change in the controlling shareholder of its franchisee Scott's Food. In other words, paragraph 16.1 does not extend to the second Laidlaw transaction. I say this for a number of reasons.

31     First, the license agreement was signed in 1989. The Laidlaw transactions occurred in 1996. The ordinary meaning of the language used in paragraph 16.1 suggests that the franchisor KFC had the right on entering the contract to know and approve the shareholders of the franchisee. There is nothing to suggest a right to approve a change in those shareholders some seven years later.

32     Second, such a right would mean a significant change from the agreement which had governed this franchise relationship since 1969 which clearly contained no such right. Moreover, Scott's had refused to enter into an agreement like the 1985 standard franchise agreement which did provide the franchisor with this right. The trial judge found that prior to executing the license agreement, KFC knew this and had been told that Scott's would not agree to any restriction on changes of ownership in the franchisee.

33     Third, the language of the 1985 standard franchise agreement is revealing. In 1989, when the license agreement was concluded, every other KFC franchise agreement in Canada expressly provided for the franchisor's right to approve a change in the shareholders of the franchisee. This was done not by means of paragraph 16.1 but rather through the "deemed transfer" language of paragraphs 16.2 and 16.4. Paragraph 16.1 in the license agreement ought not to be construed to provide the franchisor with this right where the identical language in the 1985 standard franchise agreement was clearly not intended to have that effect. The corollary to this is that the deemed transfer language which does provide this right to the franchisor in the 1985 standard franchise agreement is conspicuously absent from the license agreement.

34     Fourth, paragraph 16.1 extends the right of approval to the holders of majority control of the franchisee and any corporation which has an interest in the shares of the franchisee. If this language is read to give KFC a right to approve any subsequent change in the majority shareholder of the franchisee, it must also give KFC the right to approve a subsequent change in shareholder control of any corporation which owns any interest in the franchisee, even if it is only a single share. In argument, the respondent conceded that this would be a commercial absurdity. To find, as the trial judge did, that the franchisor's right of approval is limited to a change of control in the franchisee is, in my opinion, to read out of paragraph 16.1 the phrase "have an interest in". By contrast, to extend this right of approval to the majority shareholder and also to shareholders who have an interest in the shares of the franchisee does not create a commercial absurdity if that right applies simply at the point of entering the license agreement.

35     Fifth, paragraph 16.4 provides support for this interpretation. It requires the franchisee to seek KFC's consent to a transfer to a third party of the franchisee's interest under the license agreement. To allow an informed consent, this paragraph expressly obliges the franchisee to give KFC the same information about the shareholders of the third party that paragraph 16.1 provided concerning the franchisee. However, if paragraph 16.1 contained an ongoing right of KFC to be informed of and approve the shareholders of the party holding the franchise, paragraph 16.4 would be superfluous.

36     Finally, and with respect, it is my view that the three reasons offered by the trial judge for the opposite interpretation of paragraph 16.1 do not withstand scrutiny.

37     The first reason given by the trial judge was that the meaning I would accord to paragraph 16.1 would defeat the personal aspect of the license agreement. That paragraph certainly makes clear that the grant of the license is personal to the licensee.

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

However, that licensee is clearly and expressly Scott's Food, not its controlling shareholder. A change in the latter leaves the licensee unchanged. Following the second Laidlaw transaction, the license is still granted personally to Scott's Food.

38      The second reason was that it would not make good business sense to read paragraph 16.1 so that it did not extend to a change in the shareholders of the franchisee. While this might not make good business sense from the perspective of the franchisor, it might well make good business sense for the franchisee. In my view, neither of these is helpful in the required task of contractual interpretation. Rather, in applying objectively the interpretive principle of what accords with sound commercial principles and good business sense, the key fact is that for twenty years, from 1969 to 1989, this franchise relationship operated with apparent viability without the right of approval contended for by the respondent. In light of this history, it cannot be concluded that the meaning I give to paragraph 16.1 would not make good business sense.

39      Finally, it was said that reading paragraph 16.1 as I do would be contrary to the generally accepted practice in the franchise industry. The fallacy in this reasoning is that, as the trial judge recognized, this was a very unusual franchising relationship. This franchisee appeared to have bargaining power at least equal to that of KFC and certainly sufficient power to achieve a contract with no restriction on the transferability of shares. By contrast, the trial judge found the industry standard to be that the franchisor has control over the franchisee. In these circumstances, the generally accepted industry practice is of little use in interpreting this particular license agreement.

40      Hence, I conclude that paragraph 16.1 of the license agreement cannot be construed to give KFC the right to approve a change in the shareholders of Scott's Food. This paragraph, therefore, was not breached when Scott's did not obtain KFC's approval of the second Laidlaw transaction.

41      It is next necessary to consider the proper interpretation to be given to paragraph 16.2 of the license agreement. It is helpful to reproduce this provision a second time:

> 16.2 Licensee agrees that it shall not sell, transfer, assign, encumber, sub-license or otherwise deal with this Agreement or its rights or interest hereunder (hereinafter referred to as "transfer"), without KFC's prior written consent and Licensee's compliance in all respects with the terms and conditions of this Paragraph 16. Any transfer or any attempt to do so, contrary to Paragraph 16 shall be a breach of this Agreement and shall be void but shall give KFC the right of termination as provided in Paragraph 17.2(d).

42      The respondent's primary argument was that the second Laidlaw transaction engaged the last sentence of this paragraph. It was said to be a transfer contrary to paragraph 16.1 which, because of paragraph 16.2, triggered the right of termination in paragraph 17.2(d). Given the conclusion I have reached concerning paragraph 16.1, this argument must fail.

43      Apart altogether from paragraph 16.1, however, the respondent also argues that for the purposes of paragraph 16.2, the first Laidlaw transaction was an attempted transfer and the second was an actual transfer and that KFC's prior written consent was therefore required.

44      In my view, this argument also must fail. On the ordinary meaning of the words used in paragraph 16.2, it is the licensee Scott's Food that is constrained from dealing with its interest under the license agreement. Once the alter ego argument is dismissed, this paragraph simply cannot reach Scott's Hospitality, the shareholder of the franchisee. Nor does it reach the shareholders of Scott's Hospitality. Neither an attempted change nor an actual change in the shareholders of the franchisee constitutes the franchisee dealing with its interest under the license agreement.

45      This conclusion is assisted by examining the language of the counterpart paragraph 16.2 in the 1985 standard franchise agreement. The two Laidlaw transactions would be encompassed by that provision only because of the inclusion of the "deemed transfer" concept. As I have said, this concept is conspicuously absent from paragraph 16.2 of this license agreement.

46      The respondent argues that its proposed reading of paragraph 16.2 is consistent with good business sense and industry practice. However, as I have indicated in connection with the argument on paragraph 16.1, in the circumstances of this case,

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

neither of these aids to interpretation requires that paragraph 16.2 be read to give KFC the right to consent to a change in the shareholders of its franchisee.

47    Finally, the respondent relies on *GATX Corp. v. Hawker Siddeley Canada Inc.* (1996), 27 B.L.R. (2d) 251 (Ont. Gen. Div. [Commercial List]) to assert a broad meaning for the phrase "or otherwise deal with" as found in paragraph 16.2. That case is different from this one in that, there, the contracting party was clearly dealing indirectly with its interest under the agreement. Here, neither Laidlaw transaction involved the franchisee dealing in any way with its interest under the license agreement.

48    I therefore find that, properly construed, paragraph 16.2 does not give KFC the right to prior written consent to either Laidlaw transaction.

49    Given my conclusions about paragraphs 16.1 and 16.2 of the license agreement, it is unnecessary to deal with the appellant's alternative arguments: that paragraph 16.1 is limited to a change in ultimate control of the franchisee; that KFC could not have reasonably refused its approval of the second Laidlaw transaction; that a breach of paragraph 16.1 entitles KFC to terminate only if it was a fundamental breach of the license agreement; but in any event, for KFC to terminate would be a breach of its good faith duty under the license agreement; and finally, that the appellants are entitled to relief from forfeiture. Nor is it necessary to deal with the respondent's alternative argument that a breach of paragraph 16.1 allows it to terminate through direct resort to paragraph 17.3 of the license agreement.

50    Before leaving the transfer issue, the remaining matter required to be dealt with arises from the finding below that pursuant to paragraph 16.3 of the license agreement, KFC had a right of first refusal in the circumstances of both Laidlaw transactions. That paragraph reads in part as follows:

> 16 3 In the event that **Licensee receives** a bona fide offer, which **licensee is willing to accept**, from a third party to purchase or otherwise acquire any of the Licensee's rights and interest in this Agreement, ..., Licensee shall first offer to sell the same to KFC at the same price and on the same terms and conditions as in the third party's offer... In the event that KFC so accepts such offer to sell, a binding agreement of purchase and sale shall thereby be constituted between Licensee and KFC at the said price and upon the said terms and conditions....

> [Emphasis added.]

51    The reasons below reveal no analysis of the language in this paragraph by the trial judge in reaching his conclusion.

52    In my opinion, the ordinary meaning of the words used in the paragraph dictates the opposite conclusion -- that neither Laidlaw transaction triggered a right of first refusal. Neither an offer to purchase the shares of Scott's Hospitality nor an offer to change the controlling shareholder of Scott's Food is an offer which the franchisee receives or one which the franchisee can accept. The licensee cannot receive a takeover bid for the licensee's parent or for the licensee itself.

53    In summary, therefore, the appellant did not breach either paragraph 16.1 or paragraph 16.2 of the license agreement because of the Laidlaw transactions and KFC does not have the right to terminate the license agreement as a result. Nor did either Laidlaw transaction give KFC a right of first refusal.

54    I would accordingly allow the appeal on the transfer issue and set aside the declarations in paras. 1, 2, 3 and 4 of the judgment below. Instead, an order will go dismissing the claims for these declarations. Finally, I would set aside para. 13 of the judgment below and would grant the declaration sought therein.

## The Enhancement Issue

55    The other major issue at trial was whether Scott's Food had failed to meet its obligations to enhance its KFC outlets. These obligations are contained in the license agreement and the addendum to it, the Master Development Agreement, signed at the same time. The trial judge's two principal findings on this issue were that Scott's Food had failed to enhance its outlets as required by paragraph 7.2 of the Master Development Agreement and, secondly, because more than five to ten per cent of the outlets had not been enhanced as required, the failure was material and substantive, thereby entitling KFC to terminate the

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

license agreement pursuant to paragraph 17.2(e) unless Scott's Food corrects the failure within three months. The appellants appeal neither of these findings. Indeed, they raise only two grounds of appeal in connection with the enhancement issue.

56    Firstly, they appeal the declaration that KFC is also entitled to terminate the license agreement pursuant to paragraphs 17.2(e) and 17.3 because Scott's Food's enhancement failures were breaches of paragraphs 3.2, 5 and 6 of the license agreement. While the judgment contains this declaration, the reasons for judgment do not reveal the basis upon which the declaration was made.

57    Second, they appeal the finding that to avoid KFC's right to terminate under paragraph 17.2(e), Scott's Food must, within three months, enhance all of its outlets, not just a sufficient number that the failure becomes less than material and substantive.

58    Turning to the first of these two grounds of appeal, it is helpful to set out paragraphs 17.2(e) and 17.3 of the license agreement:

17.2 KFC may, without prejudice to any other rights or remedies contained in this Agreement or at law or in equity, terminate the License upon immediate notice (or in the event advance notice is required by law, upon the giving of such notice) in the event that:

. . . . .

(e) Licensee fails to satisfy, in a material and substantive manner, the requirements for enhancement and development contained in Articles 3.3, 3.4, 7.2 and 7.3 of the Addendum, provided that notice of any such failure is delivered to Licensee and Licensee shall not have corrected such failure within (3) months from the delivery of such notice.

17.3 The License will terminate on the termination date specified in any notice by KFC to Licensee (without any further notice of termination unless required by law), provided that (a) the notice is hand delivered or mailed at least thirty (30) days (or such longer period as may be required by law) in advance of the termination date, (b) the notice reasonably identifies one or more breaches or defaults in Licensee's obligations or performance hereunder, (c) the notice specifies the manner in which the breach(es) or default(s) are not fully remedied before, and as of, the termination date.

59    In my view, paragraph 17.2(e) deals explicitly and exhaustively with the enhancement obligations on the franchisee that, if not met, give KFC the right to terminate the license agreement. None of paragraphs 3.2, 5 or 6 of the license agreement is included in that list.

60    Moreover, as indicated by the trial judge, paragraph 17.3 merely sets out the procedure of formal notice. It does not accord to KFC a substantive right to terminate for any failure by Scott's Food to discharge its enhancement obligations. To so interpret paragraph 17.3 would fly in the face of paragraph 17.2 where the parties have carefully selected the enhancement obligations that, if breached, justify termination. Hence I would reverse the declaration that because the franchisee's enhancement failures breached paragraphs 3.2, 5 and 6 of the license agreement, KFC is entitled to terminate pursuant to paragraphs 17.2(e) and 17.3.

61    As to the second ground of appeal on the enhancement issue, paragraph 17.2(e) of the license agreement provides that failure *in a material and substantive manner* (my emphasis) to meet the franchisee's enhancement obligations as specified therein gives KFC the right to terminate if the failure is not corrected within three months. As I have said, the trial judge found that where more than five to ten per cent of the outlets fall below this required standard, Scott's Food was in substantial breach for the purposes of this paragraph. He went on to say this:

...KFC must give three months' notice from the date of this judgment to Scott's to allow it to remedy the default found in this decision on the enhancement issue. In other words, Scott's must be given three months in which to upgrade all of its remaining outlets to certification standards. If it chooses not to do so, it may close those stores under other termination procedures.

62    There is nothing in the actual judgment appealed from that requires the franchisee to enhance or close all of its remaining outlets to avoid termination. Hence, I propose to make no order on this ground of appeal.

1998 CarswellOnt 4170, [1998] O.J. No. 4368, 114 O.A.C. 357, 41 B.L.R. (2d) 42

63      However, in my opinion, if failure in a material and substantive manner to meet the enhancement requirements occurs when five to ten per cent of the outlets are below standard, correcting that failure means enhancing at least enough outlets so that there is no possibility of this line being crossed. This means that to correct that failure within three months, Scott's Food must ensure that no more than five per cent of its outlets are substandard. I would therefore not think it necessary that to correct the failure, the franchisee must sufficiently upgrade all its remaining outlets. To do so would make the correction incongruent with the failure contrary to what I think is meant by the final phrase of paragraph 17.2(e).

64      The view I have expressed is also consistent with paragraph 6.3 of the Master Development Agreement. It contemplates that the franchisee could operate outlets for a limited period of time even if they had not been enhanced to the required standard. This paragraph is inconsistent with a correction requirement that would compel the franchisee to properly enhance all of its remaining outlets.

65      In summary, I would allow the appeal on the enhancement issue. I would set aside the declaration in para. 9 of the judgment below and order that the claim for this declaration be dismissed.

**Costs**

66      The trial judge ordered that there be no costs of the trial on the basis of paragraph 18.3 of the license agreement which required this result unless one party prevailed entirely, something that did not occur at this trial.

67      Before us, neither party sought to disturb this order and I do not do so. Both parties submitted that costs of the appeal should follow the result. I can see no reason why this should not happen.

68      In conclusion, I would allow the appeals with costs on the transfer issue and the enhancement issue in accordance with these reasons. The trial judgment is otherwise undisturbed.

*Appeal allowed.*

Footnotes

1      *Toronto (City) v. W.H. Hotel Ltd.* (1966), 56 D.L.R. (2d) 539 (S.C.C.) at 548.

2      *Scanlon v. Castlepoint Development Corp.* (1992), 11 O.R. (3d) 744 (Ont. C.A.) at 770.

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# TAB 94

188 L.Ed.2d 146, 82 USLW 4140, 59 Bankr.Ct.Dec. 43, Bankr. L. Rep. P 82,592...

134 S.Ct. 1188
Supreme Court of the United States

Stephen LAW, Petitioner

v.

Alfred H. SIEGEL, Chapter 7 Trustee.

No. 12–5196.    |    Argued Jan. 13,
2014.    |    Decided March 4, 2014.

**Synopsis**

**Background:** Chapter 7 trustee brought adversary
proceeding to avoid lien on debtor's residential property
as fraudulent transfer, and moved to surcharge debtor's
$75,000 homestead exemption based upon debtor's alleged
misconduct in fraudulently representing that lien existed on
property, leaving no equity available for creditors. The United
States Bankruptcy Court for the Central District of California,
Thomas B. Donovan, J., granted surcharge motion. Debtor
appealed. The United States Bankruptcy Appellate Panel
of the Ninth Circuit, 2006 WL 6810960, reversed. Trustee
appealed. The United States Court of Appeals for the
Ninth Circuit, 308 Fed.Appx. 161, affirmed. Trustee filed
renewed motion to surcharge homestead exemption. The
Bankruptcy Court, Donovan, J., 401 B.R. 447, ordered that
exemption be surcharged in its entirety. Debtor appealed. The
Bankruptcy Appellate Panel, 2009 WL 7751415, affirmed.
Debtor appealed. The Court of Appeals, 435 Fed.Appx. 697,
affirmed. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Scalia, held that:

[1] by surcharging debtor's exemption, bankruptcy court
exceeded its statutory and inherent sanction powers, and

[2] federal law provides no authority for bankruptcy courts
to deny an exemption on a ground not specified in the
Bankruptcy Code, abrogating *Latman v. Burdette*, 366 F.3d
774, *In re Yonikus*, 996 F.2d 866, *In re Doan*, 672 F.2d 831,
and *Stewart v. Ganey*, 116 F.2d 1010.

Reversed and remanded.

West Headnotes (16)

**[1]    Bankruptcy**
🔑 Carrying out provisions of Code

**Bankruptcy**
🔑 Frivolity or bad faith;  sanctions

In addition to its statutory authority to
issue order, process, or judgment necessary
or appropriate to carry out provisions of
Bankruptcy Code, bankruptcy court may possess
inherent power to sanction abusive litigation
practices. 11 U.S.C.A. § 105(a).

9 Cases that cite this headnote

**[2]    Bankruptcy**
🔑 Frivolity or bad faith;  sanctions

In exercising its statutory and inherent powers to
sanction abusive litigation practices, bankruptcy
court may not contravene specific statutory
provisions. 11 U.S.C.A. § 105(a).

8 Cases that cite this headnote

**[3]    Bankruptcy**
🔑 Carrying out provisions of Code

Statute authorizing bankruptcy court to "carry
out" provisions of Bankruptcy Code does not
allow court to override explicit mandates of other
sections of Code. 11 U.S.C.A. § 105(a).

7 Cases that cite this headnote

**[4]    Statutes**
🔑 General and specific terms and provisions;
ejusdem generis

**Statutes**
🔑 General and specific statutes

Statute's general permission to take actions of
a certain type must yield to specific prohibition
found elsewhere.

2 Cases that cite this headnote

**[5]    Federal Civil Procedure**

**Inherent authority**

Courts' inherent sanctioning powers are subordinate to valid statutory directives and prohibitions.

2 Cases that cite this headnote

**[6]    Bankruptcy**
   **Equitable powers and principles**

Whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.

10 Cases that cite this headnote

**[7]    Bankruptcy**
   **Carrying out provisions of Code**

**Bankruptcy**
   **Frivolity or bad faith; sanctions**

**Bankruptcy**
   **Operation and effect**

**Bankruptcy**
   **Preference, fraudulent transfer, or concealment**

**Bankruptcy**
   **Professional services; attorney fees**

Reasonable attorney fees that Chapter 7 trustee incurred in defeating fraudulent lien on debtor's residential property was administrative expense, and therefore bankruptcy court violated express terms of statute which entitled debtor, by reference to state law, to exempt $75,000 of equity in his home from his estate and which made that $75,000 not liable for payment of any administrative expense by ordering funds protected by exemption to be made available to pay trustee's fees, exceeding both court's statutory authority to carry out provisions of Bankruptcy Code and its inherent powers to sanction abusive litigation practices. 11 U.S.C.A. §§ 105(a), 327(a), 330(a)(1), 503(b)(2), 522(b)(3)(A), (k); West's Ann.Cal.C.C.P. § 704.730(a)(1).

3 Cases that cite this headnote

**[8]    Statutes**
   **Similarity or difference**

Normal rule of statutory construction is that words repeated in different parts of the same statute generally have the same meaning.

4 Cases that cite this headnote

**[9]    Bankruptcy**
   **Time**

Trustee's failure to make timely objection prevents trustee from challenging exemption claimed by debtor.

1 Cases that cite this headnote

**[10]    Bankruptcy**
   **Property Exempt**

**Bankruptcy**
   **Waiver or Loss of Exemption**

Bankruptcy statute governing exemption of property from estate does not give courts discretion to grant or withhold exemptions based on whatever considerations they deem appropriate; rather, statute exhaustively specifies criteria that will render property exempt. 11 U.S.C.A. § 522(b, d).

4 Cases that cite this headnote

**[11]    Bankruptcy**
   **Who May Claim**

**Bankruptcy**
   **Property Exempt**

**Bankruptcy**
   **Waiver or Loss of Exemption**

Subject of words "may exempt" in bankruptcy statute governing exemptions is the debtor, not the court, and so it is the debtor in whom the statute vests discretion, such that a debtor need not invoke an exemption to which the statute entitles him, but if he does, the court may not refuse to honor the exemption absent a valid statutory basis for doing so. 11 U.S.C.A. § 522(b).

Law v. Siegel, 134 S.Ct. 188 (2014)

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 372 of 378

188 L.Ed.2d 146, 82 USLW 4140, 59 Bankr.Ct.Dec. 43, Bankr. L. Rep. P 82,592...

8 Cases that cite this headnote

**[12]**    **Bankruptcy**
  👈 Property Exempt

  **Bankruptcy**
  👈 Waiver or Loss of Exemption

Courts are not authorized to create additional exceptions beyond carefully calibrated exceptions and limitations set forth in bankruptcy statute governing exemptions. 11 U.S.C.A. § 522.

Cases that cite this headnote

**[13]**    **Bankruptcy**
  👈 Effect of State Law

When a debtor claims a state-created exemption, the exemption's scope is determined by state law, which may provide that certain types of debtor misconduct warrant denial of the exemption.

5 Cases that cite this headnote

**[14]**    **Bankruptcy**
  👈 Property Exempt

  **Bankruptcy**
  👈 Waiver or Loss of Exemption

Federal law provides no authority for bankruptcy courts to deny an exemption on a ground not specified in the Bankruptcy Code; abrogating *Latman v. Burdette,* 366 F.3d 774; *In re Yonikus,* 996 F.2d 866; *In re Doan,* 672 F.2d 831; *Stewart v. Ganey,* 116 F.2d 1010. 11 U.S.C.A. § 522.

1 Cases that cite this headnote

**[15]**    **Bankruptcy**
  👈 Exemptions

It is not for courts to alter the balance struck by statute governing exemptions in bankruptcy. 11 U.S.C.A. § 522.

Cases that cite this headnote

**[16]**    **Bankruptcy**
  👈 Frivolity or bad faith;  sanctions

Because it arises postpetition, a bankruptcy court's monetary sanction imposed upon the debtor survives the bankruptcy case and is thereafter enforceable through the normal procedures for collecting money judgments. 11 U.S.C.A. § 727(b).

3 Cases that cite this headnote

**\*1190** *Syllabus* *

Petitioner Law filed for Chapter 7 bankruptcy. He valued his California home at $363,348, claiming that $75,000 of that value was covered by California's homestead exemption and thus was exempt from the bankruptcy estate. See 11 U.S.C. § 522(b)(3)(A). He also claimed that the sum of two voluntary liens—one of which was in favor of "Lin's Mortgage & Associates"—exceeded the home's nonexempt value, leaving no equity recoverable for his other creditors. Respondent Siegel, the bankruptcy estate trustee, challenged the "Lin" lien in an adversary proceeding, but protracted and expensive litigation ensued when a supposed "Lili Lin" in China claimed to be the beneficiary of Law's deed of trust. Ultimately, the Bankruptcy Court concluded that the loan was a fiction created by Law to preserve his equity in the house. It thus granted **\*1191** Siegel's motion to "surcharge" Law's $75,000 homestead exemption, making those funds available to defray attorney's fees incurred by Siegel in overcoming Law's fraudulent misrepresentations. The Ninth Circuit Bankruptcy Appellate Panel and the Ninth Circuit affirmed.

*Held* : The Bankruptcy Court exceeded the limits of its authority when it ordered that the $75,000 protected by Law's homestead exemption be made available to pay Siegel's attorney's fees. Pp. 1194 – 1198.

(a) A bankruptcy court may not exercise its authority to "carry out" the provisions of the Code, 11 U.S.C. § 105(a), or its "inherent power ... to sanction 'abusive litigation practices,' " *Marrama v. Citizens Bank of Mass.,* 549 U.S. 365, 375– 376, 127 S.Ct. 1105, 166 L.Ed.2d 956, by taking action prohibited elsewhere in the Code. Here, the Bankruptcy Court's "surcharge" contravened § 522, which (by reference to California law) entitled Law to exempt $75,000 of equity in his home from the bankruptcy estate, § 522(b)(3)(A), and which made that $75,000 "not liable for payment of any

Law v. Siegel, 134 S.Ct. 1188 (2014)

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 373 of 378

188 L.Ed.2d 146, 82 USLW 4140, 59 Bankr.Ct.Dec. 43, Bankr. L. Rep. P 82,592...

administrative expense," § 522(k), including attorney's fees, see § 503(b)(2). The surcharge thus exceeded the limits of both the court's authority under § 105(a) and its inherent powers. Pp. 1194 – 1196.

(b) Siegel argues that an equitable power to deny an exemption by "surcharging" exempt property in response to a debtor's misconduct can coexist with § 522. But insofar as that argument equates the surcharge with an outright denial of Law's homestead exemption, it founders on this case's procedural history. The Bankruptcy Appellate Panel recognized that because no one timely objected to the homestead exemption, it became final before the surcharge was imposed. And a trustee who fails to make a timely objection cannot challenge an exemption. *Taylor v. Freeland & Kronz,* 503 U.S. 638, 643–644, 112 S.Ct. 1644, 118 L.Ed.2d 280. Assuming the Bankruptcy Court could have revisited Law's entitlement to the exemption, § 522 specifies the criteria that render property exempt, and a court may not refuse to honor a debtor's invocation of an exemption without a valid statutory basis. Federal courts may apply state law to disallow state-created exemptions, but federal law itself provides no authority for bankruptcy courts to deny an exemption on a ground not specified in the Code. Pp. 1195 – 1197.

(c) Neither the holding of *Marrama v. Citizens Bank* nor its dictum points toward a different result. There, the debtor's bad faith kept him from converting his bankruptcy from a Chapter 7 liquidation to a Chapter 13 reorganization as permitted by § 706(a). But that was because his conduct prevented him from qualifying under Chapter 13, and thus he could not satisfy § 706(d), which expressly conditions conversion on the debtor's ability to qualify under Chapter 13. Pp. 1197 – 1198.

(d) This ruling forces Siegel to shoulder a heavy financial burden due to Law's egregious misconduct and may produce inequitable results for other trustees and creditors, but it is not for courts to alter the balance that Congress struck in crafting § 522. Cf. *Guidry v. Sheet Metal Workers National Pension Fund,* 493 U.S. 365, 376–377, 110 S.Ct. 680, 107 L.Ed.2d 782. Pp. 1197 – 1198.

(e) Ample authority remains to address debtor misconduct, including denial of discharge, see § 727(a)(2)–(6); sanctions for bad-faith litigation conduct under the Bankruptcy Rules, § 105(a), or a bankruptcy court's inherent powers; enforcement of monetary sanctions through the normal procedures for

collecting money **\*1192** judgments, see § 727(b); or possible prosecution under 18 U.S.C. § 152. Pp. 1197 – 1198.

435 Fed.Appx. 697, reversed and remanded.

SCALIA, J., delivered the opinion for a unanimous Court.

## Attorneys and Law Firms

Matthew S. Hellman, Washington, DC, for Petitioner.

Neal K. Katyal, Washington, DC, for Respondent.

Sarah E. Harrington, for the United States as amicus curiae, by special leave of the Court, supporting the Respondent.

Catherine L. Steege, Jenner & Block LLP, Chicago, IL, Carl N. Wedoff, Jenner & Block LLP, New York, NY, Matthew S. Hellman, Counsel of Record, Jessica Ring Amunson, Adam G. Unikowsky, Matthew S. McKenzie, Caroline M. DeCell, Jenner & Block LLP, Washington, DC, for Petitioner.

Neal Kumar Katyal, Counsel of Record, Mary Helen Wimberly, Elizabeth B. Prelogar, Jonathan D. Shaub, Hogan Lovells US LLP, Washington, DC, Steven T. Gubner, Ezra Brutzkus Gubner LLP, Woodland Hills, CA, for Respondent.

## Opinion

Justice SCALIA delivered the opinion of the Court.

The Bankruptcy Code provides that a debtor may exempt certain assets from the bankruptcy estate. It further provides that exempt assets generally are not liable for any expenses associated with administering the estate. In this case, we consider whether a bankruptcy court nonetheless may order that a debtor's exempt assets be used to pay administrative expenses incurred as a result of the debtor's misconduct.

### I. Background

### A

Chapter 7 of the Bankruptcy Code gives an insolvent debtor the opportunity to discharge his debts by liquidating his assets to pay his creditors. 11 U.S.C. §§ 704(a)(1), 726, 727. The filing of a bankruptcy petition under Chapter 7 creates a bankruptcy "estate" generally comprising all of the debtor's property. § 541(a)(1). The estate is placed under the control

Law v. Siegel, 134 S.Ct. 1188 (2014)

Case 09-10138-MFW    Doc 14225-47    Filed 08/15/14    Page 374 of 378

188 L.Ed.2d 146, 82 USLW 4140, 59 Bankr.Ct.Dec. 43, Bankr. L. Rep. P 82,592...

of a trustee, who is responsible for managing liquidation of the estate's assets and distribution of the proceeds. § 704(a) (1). The Code authorizes the debtor to "exempt," however, certain kinds of property from the estate, enabling him to retain those assets post-bankruptcy. § 522(b)(1). Except in particular situations specified in the Code, exempt property "is not liable" for the payment of "any [prepetition] debt" or "any administrative expense." § 522(c), (k).

Section 522(d) of the Code provides a number of exemptions unless they are specifically prohibited by state law. § 522(b)(2), (d). One, commonly known as the "homestead exemption," protects up to $22,975 in equity in the debtor's residence. § 522(d)(1) and note following § 522; see *Owen v. Owen*, 500 U.S. 305, 310, 111 S.Ct. 1833, 114 L.Ed.2d 350 (1991). The debtor may elect, however, to forgo the § 522(d) exemptions and instead claim whatever exemptions are available under applicable state or local law. § 522(b)(3)(A). Some States provide homestead exemptions that are more generous than the federal exemption; some provide less generous versions; but nearly every State provides some type of homestead exemption. See López, **\*1193** State Homestead Exemptions and Bankruptcy Law: Is It Time for Congress To Close the Loophole? 7 Rutgers Bus. L.J. 143, 149–165 (2010) (listing state exemptions).

**B**

Petitioner, Stephen Law, filed for Chapter 7 bankruptcy in 2004, and respondent, Alfred H. Siegel, was appointed to serve as trustee. The estate's only significant asset was Law's house in Hacienda Heights, California. On a schedule filed with the Bankruptcy Court, Law valued the house at $363,348 and claimed that $75,000 of its value was covered by California's homestead exemption. See Cal. Civ. Proc. Code Ann. § 704.730(a)(1) (West Supp. 2014). He also reported that the house was subject to two voluntary liens: a note and deed of trust for $147,156.52 in favor of Washington Mutual Bank, and a second note and deed of trust for $156,929.04 in favor of "Lin's Mortgage & Associates." Law thus represented that there was no equity in the house that could be recovered for his other creditors, because the sum of the two liens exceeded the house's nonexempt value.

If Law's representations had been accurate, he presumably would have been able to retain the house, since Siegel would have had no reason to pursue its sale. Instead, a few months after Law's petition was filed, Siegel initiated an adversary

proceeding alleging that the lien in favor of "Lin's Mortgage & Associates" was fraudulent. The deed of trust supporting that lien had been recorded by Law in 1999 and reflected a debt to someone named "Lili Lin." Not one but two individuals claiming to be Lili Lin ultimately responded to Siegel's complaint. One, Lili Lin of Artesia, California, was a former acquaintance of Law's who denied ever having loaned him money and described his repeated efforts to involve her in various sham transactions relating to the disputed deed of trust. *That* Lili Lin promptly entered into a stipulated judgment disclaiming any interest in the house. But that was not the end of the matter, because the second "Lili Lin" claimed to be the true beneficiary of the disputed deed of trust. Over the next five years, *this* "Lili Lin" managed—despite supposedly living in China and speaking no English—to engage in extensive and costly litigation, including several appeals, contesting the avoidance of the deed of trust and Siegel's subsequent sale of the house.

Finally, in 2009, the Bankruptcy Court entered an order concluding that "no person named Lili Lin ever made a loan to [Law] in exchange for the disputed deed of trust." *In re Law,* 401 B.R. 447, 453 (Bkrtcy.Ct.C.D.Cal.). The court found that "the loan was a fiction, meant to preserve [Law's] equity in his residence beyond what he was entitled to exempt" by perpetrating "a fraud on his creditors and the court." *Ibid.* With regard to the second "Lili Lin," the court declared itself "unpersuaded that Lili Lin of China signed or approved any declaration or pleading purporting to come from her." *Ibid.* Rather, it said, the "most plausible conclusion" was that Law himself had "authored, signed, and filed some or all of these papers." *Ibid.* It also found that Law had submitted false evidence "in an effort to persuade the court that Lili Lin of China—rather than Lili Lin of Artesia—was the true holder of the lien on his residence." *Id.,* at 452. The court determined that Siegel had incurred more than $500,000 in attorney's fees overcoming Law's fraudulent misrepresentations. It therefore granted Siegel's motion to "surcharge" the entirety of Law's $75,000 homestead exemption, making those funds available to defray Siegel's attorney's fees.

The Ninth Circuit Bankruptcy Appellate Panel affirmed. **\*1194** BAP No. CC–09–1077–PaMkH, 2009 WL 7751415 (Oct. 22, 2009) (*per curiam* ). It held that the Bankruptcy Court's factual findings regarding Law's fraud were not clearly erroneous and that the court had not abused its discretion by surcharging Law's exempt assets. It explained that in *Latman v. Burdette,* 366 F.3d 774 (2004), the Ninth Circuit had recognized a bankruptcy court's power

188 L.Ed.2d 146, 82 USLW 4140, 59 Bankr.Ct.Dec. 43, Bankr. L. Rep. P 82,592...

to "equitably surcharge a debtor's statutory exemptions" in exceptional circumstances, such as "when a debtor engages in inequitable or fraudulent conduct." 2009 WL 7751415, at *5, *7. The Bankruptcy Appellate Panel acknowledged that the Tenth Circuit had disagreed with *Latman,* see *In re Scrivner,* 535 F.3d 1258, 1263–1265 (2008), but the panel affirmed that *Latman* was correct. 2009 WL 7751415, at *7, n. 10. Judge Markell filed a concurring opinion agreeing with the panel's application of *Latman* but questioning "whether *Latman* remains good policy." 2009 WL 7751415, at *10.

The Ninth Circuit affirmed. *In re Law,* 435 Fed.Appx. 697 (2011) (*per curiam* ). It held that the surcharge was proper because it was "calculated to compensate the estate for the actual monetary costs imposed by the debtor's misconduct, and was warranted to protect the integrity of the bankruptcy process." *Id.,* at 698. We granted certiorari. 570 U.S. ——, 133 S.Ct. 2824, 186 L.Ed.2d 883 (2013).

## II. Analysis

### A

**[1]** **[2]** A bankruptcy court has statutory authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a). And it may also possess "inherent power ... to sanction 'abusive litigation practices.' " *Marrama v. Citizens Bank of Mass.,* 549 U.S. 365, 375–376, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007). But in exercising those statutory and inherent powers, a bankruptcy court may not contravene specific statutory provisions.

**[3]** **[4]** **[5]** **[6]** It is hornbook law that § 105(a) "does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code." 2 Collier on Bankruptcy ¶ 105.01[2], p. 105–6 (16th ed. 2013). Section 105(a) confers authority to "carry out" the provisions of the Code, but it is quite impossible to do that by taking action that the Code prohibits. That is simply an application of the axiom that a statute's general permission to take actions of a certain type must yield to a specific prohibition found elsewhere. See *Morton v. Mancari,* 417 U.S. 535, 550–551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); *D. Ginsberg & Sons, Inc. v. Popkin,* 285 U.S. 204, 206–208, 52 S.Ct. 322, 76 L.Ed. 704 (1932). [1] Courts' inherent sanctioning powers are likewise subordinate to valid statutory directives and prohibitions.

*Degen v. United States,* 517 U.S. 820, 823, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996); *Chambers v. NASCO, Inc.,* 501 U.S. 32, 47, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). We have long held that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of" the Bankruptcy Code. **\*1195** *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988); see, *e.g., Raleigh v. Illinois Dept. of Revenue,* 530 U.S. 15, 24–25, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000); *United States v. Noland,* 517 U.S. 535, 543, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996); *SEC v. United States Realty & Improvement Co.,* 310 U.S. 434, 455, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940).

**[7]** **[8]** Thus, the Bankruptcy Court's "surcharge" was unauthorized if it contravened a specific provision of the Code. We conclude that it did. Section 522 (by reference to California law) entitled Law to exempt $75,000 of equity in his home from the bankruptcy estate. § 522(b)(3)(A). And it made that $75,000 "not liable for payment of any administrative expense." § 522(k). [2] The reasonable attorney's fees Siegel incurred defeating the "Lili Lin" lien were indubitably an administrative expense, as a short march through a few statutory cross-references makes plain: Section 503(b)(2) provides that administrative expenses include "compensation ... awarded under" § 330(a); § 330(a)(1) authorizes "reasonable compensation for actual, necessary services rendered" by a "professional person employed under" § 327; and § 327(a) authorizes the trustee to "employ one or more attorneys ... to represent or assist the trustee in carrying out the trustee's duties under this title." Siegel argues that even though attorney's fees incurred responding to a debtor's fraud qualify as "administrative expenses" for purposes of determining the trustee's right to reimbursement under § 503(b), they do not so qualify for purposes of § 522(k); but he gives us no reason to depart from the " 'normal rule of statutory construction' " that words repeated in different parts of the same statute generally have the same meaning. See *Department of Revenue of Ore. v. ACF Industries, Inc.,* 510 U.S. 332, 342, 114 S.Ct. 843, 127 L.Ed.2d 165 (1994) (quoting *Sorenson v. Secretary of Treasury,* 475 U.S. 851, 860, 106 S.Ct. 1600, 89 L.Ed.2d 855 (1986)).

The Bankruptcy Court thus violated § 522's express terms when it ordered that the $75,000 protected by Law's homestead exemption be made available to pay Siegel's attorney's fees, an administrative expense. In doing so, the

court exceeded the limits of its authority under § 105(a) and its inherent powers.


**B**

Siegel does not dispute the premise that a bankruptcy court's § 105(a) and inherent powers may not be exercised in contravention of the Code. Instead, his main argument is that the Bankruptcy Court's surcharge did not contravene § 522. That statute, Siegel contends, "establish[es] the procedure by which a debtor may seek to claim exemptions" but "contains no directive requiring [courts] to allow [an exemption] regardless of the circumstances." Brief for Respondent 35. Thus, he says, recognition of an equitable power in the Bankruptcy Court to deny an exemption by "surcharging" the exempt property in response to the debtor's misconduct can coexist comfortably with § 522. The United States, appearing in support of Siegel, agrees, arguing that § 522 "neither gives debtors an absolute right to retain exempt property nor limits a court's authority to impose an equitable surcharge on such property." Brief for United States as *Amicus Curiae* 23.

[9]    Insofar as Siegel and the United States equate the Bankruptcy Court's surcharge **\*1196** with an outright denial of Law's homestead exemption, their arguments founder upon this case's procedural history. The Bankruptcy Appellate Panel stated that because no one "timely oppose[d] [Law]'s homestead exemption claim," the exemption "became final" *before* the Bankruptcy Court imposed the surcharge. 2009 WL 7751415, at *2. We have held that a trustee's failure to make a timely objection prevents him from challenging an exemption. *Taylor v. Freeland & Kronz,* 503 U.S. 638, 643–644, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992).

[10]    [11]    But even assuming the Bankruptcy Court could have revisited Law's entitlement to the exemption, § 522 does not give courts discretion to grant or withhold exemptions based on whatever considerations they deem appropriate. Rather, the statute exhaustively specifies the criteria that will render property exempt. See § 522(b), (d). Siegel insists that because § 522(b) says that the debtor "may exempt" certain property, rather than that he "*shall* be entitled" to do so, the court retains discretion to grant or deny exemptions even when the statutory criteria are met. But the subject of "may exempt" in § 522(b) is the debtor, not the court, so it is the debtor in whom the statute vests discretion. A debtor need not invoke an exemption to which the statute entitles him; but

if he does, the court may not refuse to honor the exemption absent a valid statutory basis for doing so.

[12]    Moreover, § 522 sets forth a number of carefully calibrated exceptions and limitations, some of which relate to the debtor's misconduct. For example, § 522(c) makes exempt property liable for certain kinds of prepetition debts, including debts arising from tax fraud, fraud in connection with student loans, and other specified types of wrongdoing. Section 522(*o* ) prevents a debtor from claiming a homestead exemption to the extent he acquired the homestead with nonexempt property in the previous 10 years "with the intent to hinder, delay, or defraud a creditor." And § 522(q) caps a debtor's homestead exemption at approximately $150,000 (but does not eliminate it entirely) where the debtor has been convicted of a felony that shows "that the filing of the case was an abuse of the provisions of" the Code, or where the debtor owes a debt arising from specified wrongful acts— such as securities fraud, civil violations of the Racketeer Influenced and Corrupt Organizations Act, or "any criminal act, intentional tort, or willful or reckless misconduct that caused serious physical injury or death to another individual in the preceding 5 years." § 522(q) and note following § 522. The Code's meticulous—not to say mind-numbingly detailed—enumeration of exemptions and exceptions to those exemptions confirms that courts are not authorized to create additional exceptions. See *Hillman v. Maretta,* 569 U.S. ——, ——, 133 S.Ct. 1943, 1953, 186 L.Ed.2d 43 (2013); *TRW Inc. v. Andrews,* 534 U.S. 19, 28–29, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001).

[13]    [14]    Siegel points out that a handful of courts have claimed authority to disallow an exemption (or to bar a debtor from amending his schedules to claim an exemption, which is much the same thing) based on the debtor's fraudulent concealment of the asset alleged to be exempt. See, *e.g.,* *In re Yonikus,* 996 F.2d 866, 872–873 (C.A.7 1993); *In re Doan,* 672 F.2d 831, 833 (C.A.11 1982) (*per curiam* ); *Stewart v. Ganey,* 116 F.2d 1010, 1011 (C.A.5 1940)." He suggests that those decisions reflect a general, equitable power in bankruptcy courts to deny exemptions based on a debtor's bad-faith conduct. For the reasons we have given, the Bankruptcy Code admits no such power. It is of course true that when a debtor claims a **\*1197** *state-created* exemption, the exemption's scope is determined by state law, which may provide that certain types of debtor misconduct warrant denial of the exemption. *E.g., In re Sholdan,* 217 F.3d 1006, 1008 (C.A.8 2000); see 4 Collier on Bankruptcy ¶ 522.08[1]–[2], at 522–45 to 522–47. Some of the early decisions on which

188 L.Ed.2d 146, 82 USLW 4140, 59 Bankr.Ct.Dec. 43, Bankr. L. Rep. P 82,592...

Siegel relies, and which the Fifth Circuit cited in *Stewart,* are instances in which federal courts applied state law to disallow state-created exemptions. See *In re Denson,* 195 F. 857, 858 (N.D.Ala.1912); *Cowan v. Burchfield,* 180 F. 614, 619 (N.D.Ala.1910); *In re Ansley Bros.,* 153 F. 983, 984 (E.D.N.C.1907). But *federal law* provides no authority for bankruptcy courts to deny an exemption on a ground not specified in the Code.

## C

Our decision in *Marrama v. Citizens Bank,* on which Siegel and the United States heavily rely, does not point toward a different result. The question there was whether a debtor's bad-faith conduct was a valid basis for a bankruptcy court to refuse to convert the debtor's bankruptcy from a liquidation under Chapter 7 to a reorganization under Chapter 13. Although § 706(a) of the Code gave the debtor a right to convert the case, § 706(d) "expressly conditioned" that right on the debtor's "ability to qualify as a 'debtor' under Chapter 13." 549 U.S., at 372, 127 S.Ct. 1105. And § 1307(c) provided that a proceeding under Chapter 13 could be dismissed or converted to a Chapter 7 proceeding "for cause," which the Court interpreted to authorize dismissal or conversion for bad-faith conduct. In light of § 1307(c), the Court held that the debtor's bad faith could stop him from qualifying as a debtor under Chapter 13, thus preventing him from satisfying § 706(d)'s *express condition* on conversion. *Id.,* at 372–373, 127 S.Ct. 1105. That holding has no relevance here, since no one suggests that Law failed to satisfy any express statutory condition on his claiming of the homestead exemption.

True, the Court in *Marrama* also opined that the Bankruptcy Court's refusal to convert the case was authorized under § 105(a) and might have been authorized under the court's inherent powers. *Id.,* at 375–376, 127 S.Ct. 1105. But even that dictum does not support Siegel's position. In *Marrama,* the Court reasoned that if the case had been converted to Chapter 13, § 1307(c) would have required it to be either dismissed or reconverted to Chapter 7 in light of the debtor's bad faith. Therefore, the Court suggested, even if the Bankruptcy Court's refusal to convert the case had not been expressly authorized by § 706(d), that action could have been justified as a way of providing a "prompt, rather than a delayed, ruling on [the debtor's] unmeritorious attempt to qualify" under § 1307(c). *Id.,* at 376, 127 S.Ct. 1105. At most, *Marrama* 's dictum suggests that in some circumstances a bankruptcy court may be authorized to dispense with futile

procedural niceties in order to reach more expeditiously an end result required by the Code. *Marrama* most certainly did not endorse, even in dictum, the view that equitable considerations permit a bankruptcy court to contravene express provisions of the Code.

## D

[15]    We acknowledge that our ruling forces Siegel to shoulder a heavy financial burden resulting from Law's egregious misconduct, and that it may produce inequitable results for trustees and creditors in other cases. We have recognized, however, that in crafting the provisions of § 522, "Congress balanced the difficult choices that exemption limits impose on debtors with the economic harm that exemptions **\*1198** visit on creditors." *Schwab v. Reilly,* 560 U.S. 770, 791, 130 S.Ct. 2652, 177 L.Ed.2d 234 (2010). The same can be said of the limits imposed on recovery of administrative expenses by trustees. For the reasons we have explained, it is not for courts to alter the balance struck by the statute. Cf. *Guidry v. Sheet Metal Workers Nat. Pension Fund,* 493 U.S. 365, 376–377, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990).

* * *

[16]    Our decision today does not denude bankruptcy courts of the essential "authority to respond to debtor misconduct with meaningful sanctions." Brief for United States as *Amicus Curiae* 17. There is ample authority to deny the dishonest debtor a discharge. See § 727(a)(2)-(6). (That sanction lacks bite here, since by reason of a postpetition settlement between Siegel and Law's major creditor, Law has no debts left to discharge; but that will not often be the case.) In addition, Federal Rule of Bankruptcy Procedure 9011—bankruptcy's analogue to Civil Rule 11—authorizes the court to impose sanctions for bad-faith litigation conduct, which may include "an order directing payment ... of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation." Fed. Rule Bkrtcy. Proc. 9011(c)(2). The court may also possess further sanctioning authority under either § 105(a) or its inherent powers. Cf. *Chambers,* 501 U.S., at 45–49, 111 S.Ct. 2123. And because it arises postpetition, a bankruptcy court's monetary sanction survives the bankruptcy case and is thereafter enforceable through the normal procedures for collecting money judgments. See § 727(b). Fraudulent conduct in a bankruptcy case may also subject a debtor to criminal prosecution under 18 U.S.C.

§ 152, which carries a maximum penalty of five years' imprisonment.

But whatever other sanctions a bankruptcy court may impose on a dishonest debtor, it may not contravene express provisions of the Bankruptcy Code by ordering that the debtor's exempt property be used to pay debts and expenses for which that property is not liable under the Code.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

**Parallel Citations**

188 L.Ed.2d 146, 82 USLW 4140, 59 Bankr.Ct.Dec. 43, Bankr. L. Rep. P 82,592, 14 Cal. Daily Op. Serv. 2285, 2014 Daily Journal D.A.R. 2640, 24 Fla. L. Weekly Fed. S 577

Footnotes

* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1 The second sentence of § 105(a) adds little to the analysis. It states: "No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." Even if the "abuse of process" language were deemed to confer additional authority beyond that conferred by the first sentence (which is doubtful), that general authority would also be limited by more specific provisions of the Code.

2 The statute's general rule that exempt assets are not liable for administrative expenses is subject to two narrow exceptions, both pertaining to the use of exempt assets to pay expenses associated with the avoidance of certain voidable transfers of exempt property. § 522(k)(1)-(2). Neither of those exceptions is relevant here.

---

**End of Document**                                  © 2014 Thomson Reuters. No claim to original U.S. Government Works.