# TAB 95

 

Federal Court                    Cour fédérale

2012 FC 748 (CanLII)

**Date: 20120614**

**Docket: T-299-05**

**Citation: 2012 FC 748**

Ottawa, Ontario, June 14, 2012

**PRESENT:    The Honourable  Mr. Justice Scott**

**BETWEEN:**

### CATHERINE LEUTHOLD

**Plaintiff**

**and**

### CANADIAN BROADCASTING CORPORATION
### and
### JERRY MCINTOSH

**Defendants**

### REASONS FOR JUDGMENT AND JUDGMENT

## I.    INTRODUCTION

[1]    Catherine Leuthold (Miss Leuthold), a professional photo journalist, is claiming an amount of $21,554,954.25 against the defendants the Canadian Broadcasting Corporation [CBC] and Jerry Mc Intosh (the Defendants), for copyright infringement.

2012 FC 748 (CanLII)

## II.    FACTS

### A.    The Parties

[2]    The Plaintiff, Miss Catherine Leuthold is a professional photo-journalist. On September 11, 2001 she was residing in New York City.

[3]    The Defendant, the CBC, is a corporation continued under the *Broadcasting Act*, SC 1991, c 11, [*Broadcasting Act*], carrying on business as a Canadian broadcaster with a principal place of business at 250 Front Street West, Toronto, Ontario, M5W 1E6.

[4]    The Defendant, Mr. Jerry Mc Intosh, was the Director of Independent Documentaries for News, Current Affairs and Newsworld referred to as CBC news and an employee of the CBC at the time of the alleged infringements.

### B.    The Production and the Copyrighted Works

[5]    In the months that followed the terrorist attacks on the World Trade Center [WTC], a documentary film entitled "As the Towers Fell" (the Production), was commissioned by the CBC from Newsco Productions Inc. The Production was directed by Desmond Smith.

[6]      The Production was meant to portray how the attacks on the WTC unfolded through the eyes and reaction of journalists, cameramen and photographers who were on the scene on September 11, 2001.

[7]      The original plan called for a 30 minute Production. As shooting progressed the Production's duration evolved from 30 to 60 minutes and then to 90 minutes. It also became obvious that Newsco was incapable of handling the work and the CBC had to assign staff to, amongst others, clear the rights and assist in the editing of the Production (see transcript, testimony of Jerry Mc Intosh, February 9, 2012, page 7, lines 10 to 25 and page 8, lines 1 to 3; transcript, testimony of Rose Torriero, February 8, 2012, page 139, lines 12 to 17; transcript, testimony of Kathy Markou, February 8, 2012, page 201, lines 17 to 25 and page 202, lines 1 to 5; and Joint Book of Documents, Newsco contracts, tabs 18 to 20 inclusively).

[8]      Four versions of the Production were actually made and presented at various times on both the CBC main network and the Newsworld channel (Newsworld) (Joint Book of Documents, volume II, exhibit D-9):

2012 FC 748 (CanLII)

2012 FC 748 (CanLII)

| Date and time of presentation | Time of diffusion | Duration of documentary | Starting airing time of photographs | Number of seconds photographs are presented | Network |
|---|---|---|---|---|---|
| March 17, 2002 | 10:00 a.m. | 60 min | N/A | 18 | Main network |
| March 17, 2002 (Tape C) | 7:00 p.m. | 60 min | 19:14:45 19:14:53 19:16:16 19:22:03 19:22:11 | 18 | Newsworld |
| September 10, 2002 (Tape C, 1 of 2) | 8:00 p.m. | 90 min | 20:21:08 20:21:15 20:24:10 20:25:28 | 18 | Main network and Newsworld |
| September 11, 2002 (Tape A) | 1:00 a.m. | 90 min | 01:21:07 01:21:13 01:24:09 01:25:26 | 18 | Newsworld |
| September 7, 2003 (Tape C) | 10:00 p.m. | 120 min | 22:28:12 22:28:19 22:31:14 22:32:31 | 18 | Newsworld |
| September 8, 2003 (Tape A) | 1:00 a.m. | 120 min | 01:29:06 01:29:12 01:32:07 01:33:25 | 18 | Newsworld |
| September 14, 2003 (Tape B) | 12:00 p.m. | 60 | N/A | 0 | Newsworld |
| September 14, 2003 (Tape C) | 7:00 p.m. | 60 min | N/A | 0 | Newsworld |
| September 11, 2004 (Tape C) | 10:00 p.m. | 120 min | 22:28:45 22:28:52 22:31:47 22:33:05 | 18 | Newsworld |
| September 12, 2004 (Tape A) | 1:00 a.m. | 120 min | 01:27:59 01:28:05 01:31:00 01:32:18 | 18 | Newsworld |
| September 12, 2004 | 4:00 a.m. | 120 min | N/A | 18 | Newsworld |

[9]    Included in tapes A and C of the Production were a number of Stills Photographs (the

Photographs) of the terrorist attacks on the WTC on September 11, 2001, taken by Miss Leuthold.

Miss Leuthold also appears in the Production.

[10]    Miss Leuthold is the owner of the copyright in the Photographs.

[11]    At all material times, the Defendants were aware that copyright subsisted in the

Photographs.

[12]    At all material times, the Defendants had no reason to believe that Miss Leuthold did not

own the copyright in the Photographs.

## C.    The Broadcasts of the Production and the Copyrighted Works

[13]    On March 19, 2002, Miss Leuthold sent a fax (the first license) permitting the CBC to

incorporate her Photographs of the 9/11 events in the Production and to broadcast the said

Photographs on Canadian television on the condition that they be used for the 9/11 Documentary

only (see Joint Book of Documents, volume I, tab 8, page 357). It reads:

> To: Douglas Arrowsmith
> From: Catherine Leuthold
>
> Douglas
>
> Got your email
>
> CBC may use my photographs of the WTC Disaster. Said
> Photographs used for 9.11 Documentary only. If the photographs are

2012 FC 748 (CanLII)

used for advertising said Documentary, I, the photographer must be
financially compensated per prior mutual agreement.

Sincerely

"Catherine Leuthold"
Signed

[14]    The parties disagree on the scope and conditions of this first License.

[15]    The Production was first broadcast on March 17, 2002, on the CBC Main Channel at 10:00

a.m. and the same day, on CBC's specialty service Newsworld at 7:00 p.m.

[16]    CBC's Newsworld is part of a programming undertaking which is wholly owned by the

CBC. Its operations result in the communication of works, newscasts and documentaries or other

subject matter to the Canadian public 24 hours continually.

[17]    In the ensuing days, employees of the CBC communicated with Miss Leuthold to obtain her

signature on a waiver.

[18]    The waiver was not signed and on June 20, 2002, Rose Torriero, a CBC employee, sent an

email to Miss Leuthold enquiring about the waiver (see Joint Book of Documents, volume I, tab 4,

page 23).

[19]    Over the following months Miss Leuthold negotiated with different persons working at the

CBC and Newsco (see Email chain, Joint Book of documents, volume I, tab 4, pages 10 to 91;

transcript, testimony of Catherine Leuthold, February 6, 2012, pages 78 and 79; transcript,

2012 FC 748 (CanLII)

testimony of Rose Torriero, February 8, 2012, pages 117 and 118; and transcript, testimony of Kathy Markou, February 8, 2012, page 201, lines 23 to 25, and page 202, lines 1 to 5).

[20]     On September 5, 2002, Miss Leuthold, after a series of exchanges with Jerry McIntosh, Desmond Smith and Rose Torriero, reached an understanding whereby the CBC agreed to pay her the sum of $2,500.00 US for the usage of five photographs in a forthcoming broadcast.

[21]     On October 7, 2002, Miss Leuthold and the CBC signed the second License (the Stills License), which reflected the agreement reached on September 5, 2002, permitting the CBC to incorporate five photographs in the Production and to broadcast these on Canadian television for one broadcast on CBC's Network & Regional TV stations, in return for compensation of $ 2,500.00 in US currency (see Joint Book of Documents, volume I, tab 2).

[22]     The Production was broadcast on September 10, 2002, on CBC's Main Channel and on the same date on Newsworld at 8:00 p.m. (see Joint Book of Documents, volume II, exhibit D-9).

[23]     The Defendant, the CBC, transmitted the Production over its Newsworld cable channel on the dates and times and for the duration, that appear in the above referenced table (see Joint Book of Documents, volume II, exhibit D-9).

[24]     For each of the transmissions referred to in exhibit D-9, Newsworld transmitted the Production by telecommunication to all Canadian distribution undertakings that carried the Newsworld service on these respective dates.

2012 FC 748 (CanLII)

[25]    The Defendants admit they had no authorization from Miss Leuthold for the six broadcasts on Newsworld referred to in exhibit D-9 but claim they were authorized to broadcast on Newsworld on March 17 and September 10, 2002.

[26]    The Defendants transmitted to all the Canadian distribution undertakings that have the right to carry the Newsworld service, the Production, which contained the Photographs belonging to Miss Leuthold; they, in turn, transmitted the Production to their respective subscribers.

[27]    Each transmission of the Production by the Defendant, the CBC, over its main channel was broadcasted in all Canadian time zones (5 in total), at their respective local time, directly or through the CBC's affiliated stations.

## III.    ISSUES

[28]    The parties have listed 6 issues to be determined by the Court:

   *1.      Did the Defendants infringe the Plaintiff's (Miss Leuthold's) copyright on March 17, 2002, September 10 and 11, 2002, September 7 and 8, 2003 and September 11, and 12, 2004?*

   *2.      In respect of each CBC broadcast and Newsworld transmission, did each participating affiliated station and Broadcasting Distribution Undertaking [BDU],*

2012 FC 748 (CanLII)

*as the case may be, infringe the Plaintiff's (Miss Leuthold's) copyright each time the Production was communicated to the public?*

3.      *If so, is the Defendant, the CBC, liable for such infringement by the affiliated stations and the BDUs?*

4.      *If there was copyright infringement by the Defendants, the affiliated stations or the BDUs, what remedies should be awarded to the Plaintiff (Miss Leuthold) in terms of damages, profits, injunctive relief, and delivery up?*

5.      *Is the Defendant Jerry McIntosh independently liable for any infringement of the Plaintiff's (Miss Leuthold's) copyright and, if so, what remedies should be awarded?*

6.      *Regardless of the Court's finding on liability, what measures of costs should be awarded given the conduct of the parties and outstanding offers to settle?*

## IV.    LEGISLATION

[29]    The applicable sections of the *Broadcasting Act* and the *Copyright Act*, RCS, 1985, c C-42, [*the Copyright Act*], are appended to this decision.

2012 FC 748 (CanLII)

2012 FC 748 (CanLII)

# V.    ANALYSIS

### 1.    Did the Defendants infringe the Plaintiff's (Miss Leuthold's) copyright on March 17, 2002, September 10 and 11, 2002, September 7 and 8, 2003 and September 11, and 12, 2004?

## A.    Miss Leuthold's Position

[30]    Miss Leuthold claims that artistic work is defined in the *Copyright Act*, and it includes photographs. The Defendants have admitted that she holds the copyright on the Photographs. Pursuant to subsection 3(1) of the *Copyright Act*, Miss Leuthold asserts that she is the sole owner of the rights to reproduce the Photographs and publicly present them as part of any cinematographic work, to communicate them to the public by telecommunication, and to authorize any of the foregoing.

[31]    Miss Leuthold also relies on the definition of "telecommunication" that is found in the *Copyright Act,* which specifies that "any transmission of signs, signals, writing, images or sounds or intelligence of any nature by wire, radio, visual, optical or other electromagnetic system" is a telecommunication".

[32]    Of particular importance, according to Miss Leuthold, is paragraph 2.4(1) *(c)* of the *Copyright Act*. That paragraph clearly states that "for the purposes of communication to the public by telecommunication, […] (c) where a person as part of (i) a network, within the meaning of the

*Broadcasting Act*, whose operations result in the communication of works or other subject-matter to

the public, or (ii) any programming undertaking whose operations result in the communication of

works or other subject-matter to the public, transmits by telecommunication a work or other subject-

matter that is communicated to the public by another person who is not a retransmitter of a signal

within the meaning of subsection 31(1), the transmission and communication of that work or other

subject-matter by those persons constitute a single communication to the public for which those

persons are jointly and severally liable."

[33]    Miss Leuthold claims that the Defendants reproduced the Photographs without her consent

and in a manner that is not permitted by the *Copyright Act*. The Defendants publicly presented the

Photographs, as part of a cinematographic work, communicated them to the public by

telecommunication and authorized the foregoing without her consent.

[34]    Miss Leuthold underlines the fact that the CBC had completed several broadcasts of the

Production prior to signing the Licenses, although both Licenses authorized only a single broadcast.

[35]    Pursuant to subsection 27(2) of the *Copyright Act*, it is an act of infringement

for any person to:

> (*a*) sell or rent out, (*b*) distribute to such an extent as to affect
> prejudicially the owner of the copyright, (*c*) by way of trade
> distribute, expose or offer for sale or rental, or exhibit in public,
> (*d*) possess for the purpose of doing anything referred to in
> paragraphs (*a*) to (*c*), or (*e*) import into Canada for the purpose of
> doing anything referred to in paragraphs (*a*) to (*c*), a copy of a
> work, sound recording or fixation of a performer's performance or
> of a communication signal that the person knows or should have
> known infringes copyright or would infringe copyright if it had
> been made in Canada by the person who made it.

2012 FC 748 (CanLII)

2012 FC 748 (CanLII)

[36]     By reason of the aforesaid acts of the Defendants, Miss Leuthold claims to have suffered

substantial damages, and would have continued to suffer damages if the Defendants had not ceased

their infringing activities.

## B.     Position of the Defendants

[37]     The Defendants admit that the CBC did infringe Miss Leuthold's copyright in the

Photographs but dispute the number of infringing communications to the public and the amount of

damages claimed.

[38]     The Defendants contend that Miss Leuthold gave her permission to the CBC to use the

Photographs for the initial broadcast of the Production on March 17, 2002. Said permission

according to the Defendants, included Newsworld and all broadcasts in all time zones.

[39]     In September 2002, to commemorate the one-year anniversary of 9/11, the CBC did

broadcast the Production.

[40]     On October 7, 2002, the Stills License which permitted the CBC's use of the Photographs in

the September 2002 broadcast on CBC's Network and Regional TV stations was signed. It provided

for the payment of $2,500.00 US to Miss Leuthold.

[41]    Another implicit term of this License, according to the Defendants, included the right to broadcast the Production in different time zones, being the time zones in which the various CBC Regional TV stations were located and on Newsworld.

[42]    Defendants further claim that the CBC's conduct, throughout its relationship and dealings with Miss Leuthold, has been in accordance with accepted business practices and was by no means highhanded, reprehensible or oppressive.

[43]    Finally, the CBC alleges to have acted in good faith with respect to the exercise of its rights.

## C.    Analysis

[44]    The parties hold different interpretations of the scope of the Licenses that govern their relationship. The Court must therefore determine the exact scope of the Licenses in order to properly assess the extent of the infringements, the damages and the compensation to which Miss Leuthold is entitled.

[45]    The Defendants submit that the March 17 and September 10, 2002 communications to the public, by means of broadcasts, were authorized under the two licenses that were executed and that Miss Leuthold was fairly compensated for these.

2012 FC 748 (CanLII)

*The March 17, 2002 Broadcast*

[46]    Miss Leuthold is claiming damages for the March 17, 2002 broadcasts based on her interpretation of the first license. She claims that the license was restricted to one broadcast in one time zone, on the CBC's main channel, which excluded regional stations, affiliates and Newsworld.

[47]    During her testimony she referred the Court to the email she forwarded to Desmond Smith after having received a draft waiver from Rose Torriero, a CBC employee entrusted to clear the rights she held in the Photographs. In that email she reminds Desmond Smith that this is not what she agreed to. That email is dated Monday March 25, 2002 (see transcript, testimony of Catherine Leuthold, February 6, 2012, page 79, line 11 to 25 and page 80, lines 1 to 25). She also referred the Court to Miss Torriero's response dated March 25, 2002 and the subsequent exchanges of emails in which she specified one broadcast (see Email chain, Joint Book of documents, volume I, tab 4).

[48]    Miss Leuthold testified never to have been aware of the existence of the CBC's distribution network (see transcript, testimony of Catherine Leuthold, page 90, lines 12 to 16). She cannot state for certain if she knew that the documentary had already aired when she was approached by the CBC in March of 2002 (see transcript, testimony of Catherine Leuthold, page 89, lines 2 to 25 and page 90, lines 1 to 10).

[49]    The Defendants affirm that Miss Leuthold gave her permission to use the Photographs for the initial broadcast of March 17, 2002. This, they claim, is apparent from the fax sent to Douglas Arrowsmith on March 19, 2002. They also claim that Miss Leuthold admitted that no compensation

2012 FC 748 (CanLII)

was due for the March 17, 2002 broadcast since she wrote in an email to Jerry Mc Intosh on September 4, 2002: "so you did get them for free the first go round, so its in your court" [emphasis added].

[50]    It is clear from the March 19 fax sent by Catherine Leuthold that the CBC's broadcast of March 17 was authorized by Catherine Leuthold, even though her permission was granted after the fact. As the Court reviews the term of that authorization there are no limits of any kind imposed upon the CBC except that "if the photographs are to be used for advertising said Documentary, I, the photographer must be financially compensated per prior mutual agreement." The Court cannot accept terms that are not written, there is no financial compensation to be paid unless the photographs are used to advertise the Documentary. Since they were not used to advertise the Production, there is no payment owed to Miss Leuthold for the March 17, 2002 broadcast by the CBC.

[51]    Furthemore, the concept of a one-time use or one broadcast first appears in the March 25, 2002 email from Catherine Leuthold to Rose Torriero (see Joint Book of Documents, tab 4, page 16). It is impossible for the Court to accept that this condition applied to the March 17th broadcast since there is no evidence on the record to establish that this restriction limiting the rights of the Defendant, the CBC, to one broadcast was discussed or even mentioned prior to that date or to the March 19, 2012 authorization.

2012 FC 748 (CanLII)

*Is the March 17 Newsworld broadcast covered by the March 19, 2002 authorization?*

[52]     Miss Leuthold testified that to her the CBC "was a regular network like NBC, CBS, you know just regular T.V."; that Newsworld meant nothing to her at that time and that it was only much later that she understood what Newsworld meant (see transcript, testimony of Catherine Leuthold, February 6, 2012, page 92, lines 2 to 20). On the other hand, witnesses for the CBC testified that when clearing rights, the waivers or licenses always benefited Newsworld (see transcript, testimony of Rose Torriero, February 8, 2012, page 144, lines 1 to 18); and transcript, testimony of Kathy Markou, February 8, 2012, page 203, lines 6 to 25 and page 208, lines 6 to 21).

[53]     The Court weighs the evidence adduced as follows: Newsworld is included in the first license because Miss Leuthold did not impose any restrictions when she retroactively granted permission on March 19, 2002.

[54]     The same reasoning applies with respect to time zones and CBC affiliates and regional stations in regards to the scope of the first license.

*The September 10 broadcasts and the Stills License*

[55]     The Defendants submit that the reproduction of the Photographs that appear in the September 10, 2002 broadcasts were covered by the Stills License.

2012 FC 748 (CanLII)

[56]    The Court must determine the scope of the reproduction rights that were granted by Miss Leuthold when she executed the Stills License in October 2002. That determination calls for a simultaneous examination of certain provisions of the *Copyright Act* and the terms of the License between the parties.

[57]    For the interpretation of that License, the Court must turn to subsection 13(4) of the *Copyright Act,* which provides that:

> 13 (4) The owner of the copyright in any work may assign the right, either wholly or partially, and either generally or subject to limitations relating to territory, medium or sector of the market or other limitations relating to the scope of the assignment, and either for the whole term of the copyright or for any other part thereof, and may grant any interest in the right by licence, but no assignment or grant is valid unless it is in writing signed by the owner of the right in respect of which the assignment or grant is made, or by the owner's duly authorized agent.

[58]    Miss Leuthold granted the Defendants the right to reproduce the Photographs in the Production. By executing the License, which was transmitted and drafted in part by the CBC, Miss Leuthold did not grant any interest to the Defendants in her copyright. She gave the Defendants the right to make one broadcast of the Production, which included her Photographs. The meaning of the term "one broadcast", in the Stills License, is ambiguous, and the parties differ on its significance.

[59]    The Court believes that it is important to reproduce the relevant paragraphs of the License.

<div align="center">Stills License</div>

> The Canadian Broadcasting Corporation (hereinafter referred to as the "CBC" wishes to include the 5 photographs of 911 created by Catherine J. Leuthold (hereinafter referred to as the "Stills" in the CBC Documentary "As the Towers Fell" (hereinafter referred to as the "Production").

Catherine J. Leuthold, 300 East 70th Street, New York, N.Y. 10021, (hereinafter referred to as "Licensor") hereby grants to CBC the non-exclusive and limited right to incorporate the Stills in the Production. CBC shall have the right (but not the obligation) to broadcast the Stills on Canadian television for one broadcast on CBC's Network & Regional TV stations **which it did on the anniversary of 9.11.02** [the remarks in bold were added by Miss Leuthold in her handwriting]

In consideration of the rights conferred herein, CBC agrees to pay Licensor a total fee of $2500.00US (two thousand and five hundred dollars in American currency), such fee payable upon full execution of both copies of this license.

Licensor is not a registered Canadian company for the Goods & Services Tax; therefore GST will not be paid in addition to the amount specified herein.

Licensor is the sole party entitled of the copyright and ownership of the Stills licensed herein and incorporated into the Production.

CBC shall be the sole copyright holder in the Production and in this capacity shall have the right to edit the Production as is required to accommodate broadcast.

Licensor warrants that it is fully empowered to grant the rights herein granted, and that there is no contract with any other person firm, or corporation which could in any way interfere with CBC's rights under this Licence. Licensor further warrants and represents that it has obtained and/or retained all consents and rights, including copyright, necessary to license the rights specified herein to CBC, without any limitations or restrictions **under the one-time usage fee** [the remarks in bold were added by Miss Leuthold in her handwriting]

Licensor shall indemnify CBC and hold it harmless from and against any and all loss, damages or expenses, including legal fees and disbursements which CBC may suffer or incur as a result of any claim, action or proceeding arising from a breach of any of the warranties or representations made by the Licensor in this Licence.

This Licence embodies the entire agreement between the parties with regard to the matters dealt with herein and no understandings or agreements, oral or written, exist between the parties except as herein

2012 FC 748 (CanLII)

expressly set out. No modifications of this Licence shall be valid without the written consent of the parties hereto.

This Licence shall be governed by the laws of the Province of Ontario and of Canada and the parties hereto attorn to the exclusive jurisdiction of the courts of said province and country.

Acceptance of the terms and conditions of this Licence shall be attested to by the signatures of the parties of this Licence, and shall constitute a binding agreement between them.

Canadian Broadcasting Corporation:


"Kathy Markou"_____
Kathy Markou, Manager of Program Rights
Business Affairs

Date: Oct 7/02

Licensor:


"Catherine Leuthold"
Catherine Leuthold


## **Preliminary motion**


[60]     The Court must first deal with the motion presented by the Defendants to deny recognition of Mr. Jay Thompson to testify as an expert on behalf of Miss Leuthold. The Defendants, after a thorough cross-examination of Mr. Thompson, claim that he has no expertise in the clearing of rights existing pursuant to the *Copyright Act* but has expertise on the regulatory environment. According to the Defendants, the issue being the interpretation of a License granted under the *Copyright Act*, the expertise of Mr. Thompson cannot assist the Court in the interpretation of the Stills License because it is not relevant. Miss Leuthold, on the other hand, claims that Mr.

2012 FC 748 (CanLII)

Thompson's knowledge of the regulatory environment can assist the Court in determining what the terms used in the License generally mean in the industry.

[61]     The Court allowed Mr. Thompson to testify subject to ruling on the Defendant's motion in this judgment. Having weighed the arguments of both parties the Court recognizes Mr. Thompson as an expert qualified to assist the Court in the interpretation of the meaning "to broadcast the Stills on Canadian television for one broadcast on the CBC's Network and Regional TV stations" because his knowledge of the licensing of broadcasters can possibly have some relevance in the final interpretation of the disputed phrase in the Stills License.

### *What is the meaning of one broadcast?*

[62]     Miss Leuthold claims that one broadcast essentially means one transmission in one time zone which started in Atlantic Canada (see transcript, final arguments, February 13, 2012, page 21, lines 18 to 25 and page 22). Therefore only the six regional stations located in Atlantic Canada were entitled to broadcast the Production, one time under the authorized "one time usage" as defined by Miss Leuthold.

[63]     Her interpretation is fundamentally based on her claim that she always insisted on one time usage in all the contracts she signed related to all her photographic work.

2012 FC 748 (CanLII)

[64]     According to the Defendants, the phrase "to broadcast the Stills on Canadian television for one broadcast on the CBC's Network and Regional stations" is more encompassing and it includes all the CBC affiliates in all time zones and Newsworld.

[65]     Defendants argue that it was impossible for Miss Leuthold to exclude Newsworld since she admitted not having known of its existence when she negotiated the Stills License (see transcript, testimony of Catherine Leuthold, February 6, 2012, page 168, lines 2 to 10).

[66]     They also contend that it was irrelevant to Miss Leuthold whether the Production was broadcasted over the air or by cable because she testified not having such preoccupation at the time she negotiated the Stills License, but only in 2003 when she negotiated terms for a broadcast on channel 5 in New York (see transcript, testimony of Catherine Leuthold, February 6, 2012, page 163, lines 12 to 23).

[67]     Miss Leuthold alleges that the Stills License covered one broadcast, for one time only, on the CBC network, which does not include the CBC Newsworld and the CBC's affiliated stations.

[68]     It is recognized that "other than in specific situations, which are subject to imperative provisions found in other statutes . . . there is a complete freedom [for the parties] to conclude any form of agreement, subject only to the general principles of the Act, as well as respect of fundamental rights and freedoms and public order" (see Normand Tamaro, *The 2012 Annotated Copyright Act*, Toronto, Carswell, 2012, at page 412 [Tamaro Annotated *Copyright Act*]). To put it in context, parties had complete freedom to negotiate the terms of the Stills License.

2012 FC 748 (CanLII)

[69]    The Ontario Court of Appeal held in *SimEx Inc v IMAX Corp*, [2005] OJ No 5389, at para 23, that:

> [23] To summarize, while the court strives to interpret a contract in a manner consistent with the intent of the parties, the parties are presumed to have intended the legal consequences of their words. The court will consider the context or factual matrix in which the contract was drafted, including commercial reasonableness, to understand what the parties intended. The court will not adopt an interpretation that is "clearly" commercially absurd. The court must also construe the contract as a whole. The various provisions "should be read, not as standing alone, but in light of the agreement as a whole and other provisions thereof": *Scanlon v Castlepoint Development Corp* (1992), 99 D.L.R. (4th) 153 (Ont CA) at 179. Where the contract is unambiguous, extrinsic evidence is inadmissible…

*Analysis time zones*

[70]    The Court rejects Miss Leuthold's interpretation that one broadcast in only one time zone is allowed by the Stills License because there is no specific term to that effect in the Stills License and more importantly, Miss Leuthold's own expert stated that each regional station broadcasts in its respective time zone (see transcript, testimony of Jay Thompson, February 7, 2012, page 160, lines 24 and 25 page 161, lines 1 to 18).

[71]    Miss Leuthold has failed to adduce any evidence to support her interpretation that only one time zone is covered by the Stills License. Two other witnesses also stated that it was common understanding in the industry that a Canadian broadcast, when it relates to a Canadian network, includes all time zones (see transcript, testimony of Rose Torriero, February 8, 2012, page 136, lines 1 to 4; transcript, testimony of Kathy Markou, February 8, 2012, page 188, lines 8 to 23).

*Is Newsworld covered by the Stills License?*

[72]     Mr. Jay Thompson prepared an expert report for Miss Leuthold to provide his opinion with respect to the interpretation of the sentence "to broadcast the Stills on Canadian television for one broadcast on CBC's Network and Regional TV stations" in the Stills License. Mr. Thompson also opined on whether the reference to the CBC's Network could reasonably be interpreted to include the CBC specialty television programming service Newsworld.

[73]     Mr. Thompson found that different categories of broadcasting services are regulated in different ways and are subject to different regulatory privileges and that the CBC must use the appropriate terminology according to the widely-accepted and understood regulatory meaning.

[74]     In Mr. Thompson's view, "the CBC is licensed by the CRTC to operate, amongst other broadcasting services, both English and French language television networks as well as various specialty programming undertakings such as CBC Newsworld. Specialty programming undertakings are not "networks" and, unless the term "Network" is used in their branded name, it would be wrong, inaccurate and confusing from a legal standpoint to refer to them as such" (see Mr. Jay Thompson's Expert Report, Tab 5 of the Trial record at page 121, paragraph 7).

[75]     Newsworld is included in the definition of Specialty Programming Undertakings (SPU) which is defined as "an undertaking for the transmission of programs, either directly by radio waves or other means of telecommunications or indirectly through a distribution undertaking, for reception

2012 FC 748 (CanLII)

by the public by means of broadcasting receiving apparatus" (see Mr. Jay Thompson's Expert

Report, Tab 5 of the Trial record at page 121). In other words, the SPU are more like program

originators and they are issued programming undertaking licenses. Consequently, he finds that

Newsworld is not a network or part of the CBC's network.

[76]    It is clear, from Mr. Thompson's perspective, that "the CBC Television Network – which

the Stills Licence refers to as "CBC's Network" – is a separate and distinct entity from CBC

Newsworld, and that the latter is not included as part of the former" (see Mr. Jay Thompson's

Expert Report, tab 5 of the trial record, page 122 at paragraph 12).

[77]    The sentence, in the Stills License, "to broadcast the Stills on Canadian television for one

broadcast on CBC's Network and Regional TV stations" would mean that Newsworld as a

Specialty Programming Undertaking [SPU] is not included in the License and therefore, would have

infringed the Plaintiff's copyright in the Stills for the 2002, 2003 and 2004 broadcasts.

[78]    In a decision dated January 6, 2000, the CRTC wrote, in paragraph 3, that:

> . . .
> Though their operations are based on commercial revenues and
> subscriber fees rather than primarily on public funding, and though
> Newsworld and RDI report to the Commission as distinct and
> separately licensed entities, there exists a healthy symbiosis between
> core and specialty services on both the French and English sides of
> the CBC. They cooperate and share personnel and equipment in an
> effort to maximize every production dollar available for the benefit
> of their viewers (see CRTC 2000-3 decision, expert Jay Thompson's
> Book of Authorities, volume I, tab 10).

2012 FC 748 (CanLII)

[79]    RDI and Newsworld also keep separate accounting "to ensure that specialty services funded largely through subscriber fees, are not underwritten by the CBC's parliamentary grants; tax dollars intended to fund the over-the-air radio and television services. This rationale is still valid and the Commission has re-imposed these conditions" (see CRTC 2000-3 decision, expert Jay Thompson's Book of Authorities, volume I, tab 10, paragraph 25).

[80]    Even though the License does not prohibit Newsworld from sharing its content with the main services, the CRTC clearly distinguishes Newsworld and the CBC from each other as they are subject to different regulations. The sharing of resources does not mean that the CRTC considers the CBC and Newsworld as one entity. The CRTC, in its decision, underlined that "in the conditions of licence imposed herein, the Commission clarifies that while RDI and Newsworld may simulcast each other's programming, they may not simultaneously broadcast regular programming with other CBC services regardless of whether or not the programming is originated by them or by another CBC service" (CRTC 2000-3 decision, expert Jay Thompson's Book of Authorities, volume I, tab 10 at paragraph 35). This, according to Mr. Thompson, shows that Newsworld, as a SPU, is completely different from the CBC main-channel, and its content must be differentiated.

[81]    The Court notes that the prohibition applies only to a simultaneous broadcasting of regular programming with other CBC services. Even if the September 10 broadcasts aired at 8:00 pm the Court notes that they were not regular programming as evidenced in D-9.

[82]    The Defendants, on their part, rely on the testimony of Rose Torriero, Kathy Markou and Jane Ward to substantiate their claim that Newsworld is covered by the Stills License (see transcript,

testimony of Rose Torriero, February 8, 2012, page 135, lines 1 to 18; transcript, testimony of

Kathy Markou, February 8, 2012, page 187, lines 9 to 21; and transcript, Janice Ward, February 7,

2012, page 65, lines 19 to 25 and page 66, line 1).

[83]    The parties have produced three (3) copies of contracts between the CBC and Newsco for

the production of the documentary film on the 9/11 events (see Joint Book of Documents, volume

II, tabs 18-20). The document produced under tab 19 indicates that Newsworld was part of the

agreement and that Desmond Smith, the producer and Newsco's representative, knew that

Newsworld would necessarily be entitled to broadcast the Production. In the course of his

negotiations with Miss Leuthold and subsequent interventions on her behalf, was Miss Leuthold

apprised of the fact that Newsworld would broadcast the production? There is no evidence to that

effect save one email.

[84]    Desmond Smith sent an email to Miss Leuthold on the 2nd day of September 2002, prior to

the agreement reached by Miss Leuthold with the CBC on September 5th, and wrote the following:

"the 85 minute, commercial free program entitled "As the Towers Fell: Minute by Minute with the

Journalists" will be broadcast in Canada on September 8th on the CBC Network at 8 p.m. and will

be seen in the USA wherever Newsworld International is carried" [emphasis added] (see Joint Book

of documents, volume I, tab 4, page 33). It appears, from that email, that Miss Leuthold would have

been informed at least minimally of some form of Newsworld involvement and did not take any

steps to exclude Newsworld.

2012 FC 748 (CanLII)

[85]    The program aired on September 10 based on an email sent by Miss Leuthold to Rose

Torriero on September 5, 2002. It reads:

> Subject: re New York Photos.
> Ok Rose that's fine just make sure its one time usage and my credit
> is under each picture and its not for World Wide right. Thanks for
> your kind words and I appreciate it please send me info who to Bill
> and where to fax it to.
> Catherine Leuthold

[86]    The exact terms of the Still License were not finalized until October 2, 2002 and then signed

by Kathy Markou on October 7, 2002.

[87]    Counsel for Miss Leuthold argues that, in this case, the Stills License should be interpreted

in her favor based on the *contra proferentem* doctrine because the contract was drafted by the CBC.

He alleges that the onus was on the corporation to clearly indicate the scope of the License since

Miss Leuthold is the weaker party. According to Miss Leuthold, that license clearly meant one

usage, one transmission that was all. It was CBC's choice to make better use or not of that one

transmission. It chose to use it on the main channel in Atlantic Canada according to Miss Leuthold.

Therefore all other transmissions were excluded from the License and infringed on her rights.

[88]    Counsel for the Defendants respond that the evidence adduced clearly shows that the intent

of the parties prior to the broadcast was quite broad and that, in essence, it can be summed up as:

"One time usage for Canadian broadcast". More importantly, three witnesses testified that

Newsworld was always included when rights were cleared by the CBC (see transcript, testimony of

Rose Torriero, February 8, 2012, page 134, lines 22 to 25 and page 135, lines 1 to 18; transcript,

2012 FC 748 (CanLII)

testimony of Kathy Markou, February 8, 2012, page 187, lines 9 to 21; and transcript, testimony of Janice Ward, February 7, 2012, page 65, lines 19 to 25 and page 66, line 1).

[89]    The Court concludes that Newsworld is included in the expression for "One broadcast on CBC's Network & Regional TV stations" for the following reasons:

- Firstly, the evidence adduced by the Defendants clearly establishes that when clearing rights, the CBC always included Newsworld.

- Secondly, the only evidence to the contrary came from Mr. Thompson who based his opinion on the distinction the CRTC makes between the CBC and Newsworld. To this Court, that distinction may be correct, from a strict regulatory perspective, but it cannot apply to the clearing of rights. In fact, Mr. Thompson admitted in his testimony that in the industry, Newsworld is sometimes referred to as a Network, though inappropriately from a regulatory perspective. This admission contradicts in part his conclusion (see transcript, testimony of Jay Thompson, February 7, 2012, page 186, lines 14 to 25 and page 187, lines 1 to 23).

- It is trite law that when interpreting an ambiguous provision in a contract the Court may turn to industry usage. In this case, the evidence as to industry usage clearly favors the Defendants. Furthermore, in considering what is commercially sensible, the Court cannot accept Miss Leuthold's interpretation whereby the CBC would have agreed to terms that ran against their normal usage, that is to exclude Newsworld and affiliated stations.

- Thirdly, Ms. Leuthold is asking this Court to apply the *contra proferentem* doctrine and construe the language employed in the stills License against its underwriter, the CBC. However, "resort is to be had to this rule only when all other rules of construction fail to enable the Court of construction to ascertain the meaning of a document" (see *Reliance Petroleum Limited v Canadian General Insurance Company*, [1956] SCR 936 at page 953; Consolidated Bathurst Export v Mutual Boiler and Machinery Insurance Co, [1980] 1 SCR 888; *Progressive Homes Ltd v Lombard General Insurance Co. of Canada*, 2010 SCC 33 [*Progressive*]). In *Progressive*, the Supreme Court of Canada made the following remarks:

> [23] Where the language of the insurance policy is ambiguous, the courts rely on general rules of contract construction (Consolidated-Bathurst, at pp. 900-902). For example, courts should prefer interpretations that are consistent with the reasonable expectations of the parties (Gibbens, at para. 26; Scalera, at para. 71; Consolidated-Bathurst, at p. 901), so long as such an interpretation can be supported by the text of the policy. Courts should avoid interpretations that would give rise to an unrealistic result or that would not have been in the contemplation of the parties at the time the policy was concluded (Scalera, at para. 71; Consolidated-Bathurst, at p. 901). Courts should also strive to ensure that similar insurance policies are construed consistently (Gibbens, at para. 27). These rules of construction are applied to resolve ambiguity. They do not operate to create ambiguity where there is none in the first place.
>
> [24] When these rules of construction fail to resolve the ambiguity, courts will construe the policy contra proferentem - against the insurer (Gibbens, at para. 25; Scalera, at para. 70; Consolidated-Bathurst, at pp. 899-901). One corollary of the contra proferentem rule is that coverage provisions are interpreted broadly, and exclusion clauses narrowly (Jesuit Fathers, at para. 28).

[90]    The rules of construction in this case can reasonably be supported to give the License its proper interpretation based on the industry usage.

2012 FC 748 (CanLII)

[91]    The Court therefore concludes that the Stills License included Newsworld and the right to broadcast in all time zones to affiliates and regional television stations. Consequently, the September 10, 2002, broadcasts did not infringe on Miss Leuthold's copyright.

   **2.     *In respect of each CBC broadcast and Newsworld transmission, did each participating affiliated station and BDUs, as the case may be, infringe Plaintiff's (Miss Leuthold's) copyright each time the Production was communicated to the public?***

[92]    The Defendants admit that the CBC did broadcast the Production on Newsworld without authorization, on September 11, 2002, at 1:00 a.m., September 7, 2003, at 10:00 p.m., September 8th 2003, at 1:00 a.m., September 11, 2004, at 10:00p.m., September 12, 2004, at 1:00 a.m. and September 12, 2004, at 4:00 a.m. and that it is jointly and severally liable with the BDUs for these infringements. At trial, Counsel for the CBC made the following statements:

> Me LEBLANC: --- je veux que la position soit claire que la solidarité -- les BDU  -- ce que je vous dis là c'est que nous sommes solidaires avec les BDU; d'accord? Alors, pour cette communication  unique.

> LA COUR: Pour ces communications  uniques?

> Me LEBLANC: Les six ou huit.

> LA COUR: Oui, oui.

> Me LEBLANC: Tout à fait.

> LA COUR: C'est ce que j'avais compris ---

> Me LEBLANC: Absolument.

2012 FC 748 (CanLII)

LA COUR: --- dans votre position.

Me LEBLANC: Absolument. Donc, on est solidaires de quoi? Bien, on est solidaires des dommages causés à Madame Leuthold. Quels sont ces dommages-là? La valeur de la licence. Je reviens à la jurisprudence.

Comment ensuite on va se répartir entre les BDU et Radio-Canada? Ça, ça nous regarde. Vous avez un contrat -- un contrat type qui est déposé, ça dit que c'est Radio-Canada, dans le contrat, qui va prendre en charge …

Mais là, je ne parle pas de la Loi, je parle du contrat.

Mais, nous, on est solidaires avec les BDU pour ces six communications et ce qu'on doit se poser comme question c'est, donc, d'accord on est solidaires des dommages de Madame Leuthold, pas de 700/800/300 communications techniques pour arriver au téléviseur du Canadien (see transcript, representations by Me Leblanc, February 14, 2012, pages 76 et 77).

[93]    Miss Leuthold, on the other hand, claims that each transmission by the BDUs constitutes a separate communication to the public that must be compensated.

[94]    The Court will deal with this issue in its answer to the fourth question.

### 3.    Is the Defendant, the CBC, liable for such infringement by the affiliated stations and the BDUs?

[95]    The Defendants acknowledged their joint and several liabilities with the BDUs (see transcript, representations by Me Leblanc, February 14, 2012, pages 76 and 77).

[96]    Newsworld's signal retransmitted by the BDUs infringed Plaintiff's copyright in the photographs.

[97]    At trial, Counsel for the CBC argued that:

> Le BDU est le radiodiffuseur, est solidairement responsable de la communication au public. C'est pour cela que le producteur indépendant -- ou, dans ce cas ici, Radio-Canada -- libère les droits et libère les droits pour la communication au public jusqu'aux téléspectateurs.
>
> Sinon, regardez la situation: Pour 2,500$, Radio-Canada peut diffuser sur 'main channel' qui -- et vous avez la pièce aussi dans le 'Joint Book' -- a beaucoup plus de cotes d'écoute au Canada que Newsworld. Mais si Radio-Canada veut diffuser sur Newsworld le même documentaire, il faudrait que la Cour conclut que la licence librement négociée aurait été plus de 2.8$ millions parce que c'est ce qu'on vous dit: Pour différer une diffusion câblée au Canada, dans le cas de Radio-Canada, on vous dit qu'il y a -- je prends '732' mais le chiffre peut varier […]
>
> […]
> il faut donc -- Maître O'Connor vous amène à dire: Il faut donc négocier une licence avec chacun de ce[s] BDU là, ce qui fait que pour diffuser sur le câble -- et je vous soumets qu'en ce moment, toutes les stations qui diffusent sur le câble -- c'est la même technologie; c'est les mêmes BDU; ça peut varier dans le nombre -- devraient donc payer des sommes avoisinant, je présume, les 2.8 millions pour une diffusion à travers le Canada.
>
> C'est un résultat incongru et c'est un résultat incongru parce qu'il part d'une fausse prémisse. C'est-à-dire on va déterminer -- on va compenser en vertu des actes de contrefaçon sans se préoccuper de ce que vaut vraiment l'œuvre […]
>
> […]
>
> Ce n'est pas abstrait. On n'ajoute pas des dommages à chaque fois qu'on peut prouver qu'il y a eu, dans ce cas-ci, une communication additionnelle. Une communication publique, d'accord; c'est pour ça qu'on dit six ou huit, mais dans le chemin pour s'y rendre, là les BDU n'influencent pas parce que sinon, ça viendrait justement -- ça mènerait justement, je le dis avec beaucoup d'égard, à une situation

2012 FC 748 (CanLII)

qui serait inéquitable, qui ferait en sorte que, justement, les chiffres
qui ont été avancés devant vous seraient des chiffres possibles pour
une compensation (see transcript, representations by Me Leblanc,
February 14, 2012, pages 16, 17 and 25).

[98]    Defendants argue that they have infringed Miss Leuthold's copyright on no more than 6

separate occasions. They refer to the definition of "broadcasting" and "meaning of other means of

telecommunications" and allege that a broadcast is a transmission from the broadcaster to the

Canadian public. For a production to be transmitted to the public, a number of BDUs will retransmit

the broadcaster's signal to a certain number of Canadian subscribers. The Defendants submit that

the process of retransmission to the public is technology neutral under the definition of "meaning of

other means of telecommunication". According to them, this definition exists in the *Broadcasting*

*Act* for the purpose of avoiding an infringement that would emanate from the technical

retransmission of a distribution undertaking.

[99]    On the other hand, Miss Leuthold wants to be compensated for each transmission on the

basis of the value of her five photographs. However, the Defendants contend that her claim runs

counter to the general principle of the *Copyright Act*.

[100]   The Court's answer to the third question is the following: the Defendant, the CBC, is liable

jointly and severally with the BDUs but only for the six communications to the public that infringed

on Miss Lethold's copyright.

[101]   In order for the Court to assess the issue of damages, it must first determine on what basis to

award the damages claimed by Miss Leuthold.

***4.      If there was copyright infringement by the Defendants, the affiliated stations or the BDUs, what remedies should be awarded to the Plaintiff (Miss Leuthold) in terms of damages, profits, injunctive relief, and delivery up?***

**A.      Miss Leuthold's position**

[102]   Miss Leuthold's position is summed up in the following document that was tabled by her counsel.

2012 FC 748 (CanLII)

**Alleged Infringement Damages Claim Summary**

| Date/Time | Alleged Infringer | Nature of Alleged infringement | Reference (Copyright Act) | Damages SUS | Damages SC | CBC/Newsworld Remarks Liability |
|---|---|---|---|---|---|---|
| March 17, 2002/10:00 a.m. | CBC Network | 15 UTs | 3()(6) 2.4()(e)(6) | Joint & Several | | 6 stns in Atlantic Canada within authorised one-time usage |
| | **Regional Stations** | | | | | |
| | Montreal (QB) CBMT 6 | CTP | 3()(6) | $2,500.00 | $3,969.50 | $3,969.50 |
| | London (ON) CBLN | CTP | 3()(6) | $2,500.00 | $3,969.50 | $3,969.50 |
| | Ottawa (ON) CBOT 4 | CTP | 3()(6) | $2,500.00 | $3,969.50 | $3,969.50 |
| | Toronto (ON) CBLT 5 | CTP | 3()(6) | $2,500.00 | $3,969.50 | $3,969.50 |
| | Windsor (ON) CBET 9 | CTP | 3()(6) | $2,500.00 | $3,969.50 | $3,969.50 |
| | Winnipeg (MN) CBWT 6 | CTP | 3()(6) | $2,500.00 | $3,969.50 | $3,969.50 |
| | Regina (SK) CKBT 9 | CTP | 3()(6) | $2,500.00 | $3,969.50 | $3,969.50 |
| | Saskatoon (SK) CBKST 11 | CTP | 3()(6) | $2,500.00 | $3,969.50 | $3,969.50 |
| | Edmonton (AL) CBXT 5 | CTP | 3()(6) | $2,500.00 | $3,969.50 | $3,969.50 |
| | Calgary (AL) CBRT 9 | CTP | 3()(6) | $2,500.00 | $3,969.50 | $3,969.50 |
| | Vancouver (BC) CBUT 2 | CTP | 3()(6) | $2,500.00 | $3,969.50 | $3,969.50 |
| | Whitehorse (YK) CFWH | CTP | 3()(6) | $2,500.00 | $3,969.50 | $3,969.50 |
| | Yellowknife (NWT) CFYK TV8 | CTP | 3()(6) | $2,500.00 | $3,969.50 | $3,969.50 |
| | **Affiliated Stations** | | | | | |
| | Thunder Bay (ON) CKPR-TV | CTP | 3()(6) | $2,500.00 | $3,969.50 | $3,969.50 |
| | Lloydminster (AL) CKSA-TV 2 | CTP | 3()(6) | $2,500.00 | $3,969.50 | $3,969.50 |
| | | | SUB-TOTAL CBC Network | | $59,542.50 | |

| | Newsword | 72 UTs | 3(1)(6)<br>2.4(1)(e)(ii) | Joint &<br>Several | | | |
|---|---|---|---|---|---|---|---|
| March 17, 2002/7 :00 p.m. | Each distribution undertaking | CTP | 3(1)(6)<br>2.4(1)(e)(ii) | Joint &<br>Several $2,500.00 | $3,969.50 | $2,905,674.00 | 732 BDUs. See pp. 518-532 |
| September 10, 2002 / 8:00 p.m. | CBC Network | 15 UTs | 3(1)(6)<br>2.4(1)(e)(i) | Joint &<br>Several | | | 6 stns in Atlantic Canada within authorised one-time usage |
| | **Regional Stations** | | | | | | |
| | Montreal (QB) CBMT 6 | CTP | 3(1)(6) | $2,500.00 | $3,930.00 | $3,930.00 | |
| | London (ON) CBLN | CTP | 3(1)(6) | $2,500.00 | $3,930.00 | $3,930.00 | |
| | Ottawa (ON) CBOT 4 | CTP | 3(1)(6) | $2,500.00 | $3,930.00 | $3,930.00 | |
| | Toronto (ON) CBLT 5 | CTP | 3(1)(6) | $2,500.00 | $3,930.00 | $3,930.00 | |
| | Windsor (ON) CBET 9 | CTP | 3(1)(6) | $2,500.00 | $3,930.00 | $3,930.00 | |
| | Winnipeg (MN) CBWT 6 | CTP | 3(1)(6) | $2,500.00 | $3,930.00 | $3,930.00 | |
| | Regina (SK) CKBT 9 | CTP | 3(1)(6) | $2,500.00 | $3,930.00 | $3,930.00 | |
| | Saskatoon (SK) CBKST 11 | CTP | 3(1)(6) | $2,500.00 | $3,930.00 | $3,930.00 | |
| | Edmonton (AL) CBXT 5 | CTP | 3(1)(6) | $2,500.00 | $3,930.00 | $3,930.00 | |
| | Calgary (AL) CBRT 9 | CTP | 3(1)(6) | $2,500.00 | $3,930.00 | $3,930.00 | |
| | Vancouver (BC) CBUT 2 | CTP | 3(1)(6) | $2,500.00 | $3,930.00 | $3,930.00 | |
| | Whitehorse (YK) CFWH | CTP | 3(1)(6) | $2,500.00 | $3,930.00 | $3,930.00 | |
| | Yellowknife (NWT) CFYK TV8 | CTP | 3(1)(6) | $2,500.00 | $3,930.00 | $3,930.00 | |
| | **Affiliated Stations** | | | | | | |
| | Kingston (ON) CKWS-TV | CTP | 3(1)(6) | $2,500.00 | $3,930.00 | $3,930.00 | No Stations Covered by Licence for One Broadcast |
| | Peterborough Bay (ON) CHEX-TV | CTP | 3(1)(6) | $2,500.00 | $3,930.00 | $3,930.00 | |
| | Thunder Bay (ON) CKPR-TV | CTP | 3(1)(6) | $2,500.00 | $3,930.00 | $3,930.00 | |
| | Brandon (MB) CKX | CTP | 3(1)(6) | $2,500.00 | $3,930.00 | $3,930.00 | |
| | Lloydminster (AL) CKSA-TV 2 | CTP | 3(1)(6) | $2,500.00 | $3,930.00 | $3,930.00 | |
| | Medicine Hat (AL) CHAT-TV 6 | CTP | 3(1)(6) | $2,500.00 | $3,930.00 | $3,930.00 | |
| | Dawson Creek (BC) CJDC-TV 5 | CTP | 3(1)(6) | $2,500.00 | $3,930.00 | $3,930.00 | |
| | Prince George (BC) CKPG-TV 2 | CTP | 3(1)(6) | $2,500.00 | $3,930.00 | $3,930.00 | |
| | Terrace (BC) CFTK-TV 3 | CTP | 3(1)(6) | $2,500.00 | $3,930.00 | $3,930.00 | |

**SUB-TOTAL CBC Network** $86,460.00

2012 FC 748 (CanLII)

| | | | | Joint & Several | | | |
|---|---|---|---|---|---|---|---|
| September 10, 2002 / 8:00 p.m. **Newsworld** | Newsworld | 732 UTs | 3()(f) 2.4()(e)(ii) | | | | 732 BDUs. See pp. 518-532 |
| | **Each distribution undertaking** | CTP | 3()(f) | $2,500.00 | $3,930.00 | $2,876,760.00 | |
| September 11, 2002 / 1:00 a.m. | Newsworld | 732 UTs | 3()(f) 2.4()(e)(ii) | | | | 732 BDUs. See pp. 518-532 |
| | **Each distribution undertaking** | CTP | 3()(f) | $2,500.00 | $3,930.00 | $2,876,760.00 | |
| September 7, 2003 / 10:00 p.m. | Newsworld | 712 UTs | 3()(f) 2.4()(e)(ii) | | | | 712 BDUs. See pp. 533-547 |
| | **Each distribution undertaking** | CTP | 3()(f) | $2,500.00 | $3,426.75 | $2,439,846.00 | |
| September 8, 2003 / 1:00 a.m. | Newsworld | 712 UTs | 3()(f) 2.4()(e)(ii) | | | | 712 BDUs. See pp. 518-532 |
| | **Each distribution undertaking** | CTP | 3()(f) | $2,500.00 | $3,426.75 | $2,439,846.00 | |
| September 11, 2004 / 10:00 p.m. | Newsworld | 807 UTs | 3()(f) 2.4()(e)(ii) | | | | 807 BDUs. See pp. 548-564 |
| | **Each distribution undertaking** | CTP | 3()(f) | $2,500.00 | $3,250.75 | $2,623,355.25 | |
| September 12, 2004 / 1:00 a.m. | Newsworld | 807 UTs | 3()(f) 2.4()(e)(ii) | | | | 807 BDUs. See pp. 548-564 |
| | **Each distribution undertaking** | CTP | 3()(f) | $2,500.00 | $3,250.75 | $2,623,355.25 | |
| September 12, 2004 / 4:00 a.m. | Newsworld | 807 UTs | 3()(f) 2.4()(e)(iii) | | | | 807 BDUs. See pp. 548-564 |
| | **Each distribution undertaking** | CTP | 3()(f) | $2,500.00 | $3,250.75 | $2,623,355.25 | |

**TOTAL Each distribution undertaking** Assumes it communicated all Newsworld transmi **$28,435.25**

2012 FC 748 (CanLII)

2012 FC 748 (CanLII)

| TOTAL | | | | | |
|---|---|---|---|---|---|
| **Regional Stations** | | | | | |
| Montreal (QB) CBMT 6 | CTP | 3(0)(0) | $2,500.00 | $7,899.50 | 6 stns in Atlantic Canada within authorised one-time usage |
| London (ON) CBLN | CTP | 3(0)(0) | $2,500.00 | $7,899.50 | |
| Ottawa (ON) CBOT 4 | CTP | 3(0)(0) | $2,500.00 | $7,899.50 | |
| Toronto (ON) CBLT 5 | CTP | 3(0)(0) | $2,500.00 | $7,899.50 | |
| Windsor (ON) CBET 9 | CTP | 3(0)(0) | $2,500.00 | $7,899.50 | |
| Winnipeg (MN) CBWT 6 | CTP | 3(0)(0) | $2,500.00 | $7,899.50 | |
| Regina (SK) CKBT 9 | CTP | 3(0)(0) | $2,500.00 | $7,899.50 | |
| Saskatoon (SK) CBKST 11 | CTP | 3(0)(0) | $2,500.00 | $7,899.50 | |
| Edmonton (AL) CBXT 5 | CTP | 3(0)(0) | $2,500.00 | $7,899.50 | |
| Calgary (AL) CBRT 9 | CTP | 3(0)(0) | $2,500.00 | $7,899.50 | |
| Vancouver (BC) CBUT 2 | CTP | 3(0)(0) | $2,500.00 | $7,899.50 | |
| Whitehorse (YK) CFWH | CTP | 3(0)(0) | $2,500.00 | $7,899.50 | |
| Yellowknife (NWT) CFYK TV8 | CTP | 3(0)(0) | $2,500.00 | $7,899.50 | |
| **Affiliated Stations** | | | | | |
| Kingston (ON) CKWS-TV | CTP | 3(0)(0) | $2,500.00 | $3,930.00 | No Stations Covered by Licence for One Broadcast |
| Peterborough Bay (ON) CHEX-TV | CTP | 3(0)(0) | $2,500.00 | $3,930.00 | |
| **Thunder Bay (ON) CKPR-TV** | CTP | 3(0)(0) | **$5,000.00** | **$7,899.50** | |
| Brandon (MB) CKX | CTP | 3(0)(0) | $2,500.00 | $3,930.00 | |
| **Lloydminster (AL) CKSA-TV 2** | CTP | 3(0)(0) | **$5,000.00** | **$7,899.50** | |
| Medicine Hat (AL) CHAT-TV 6 | CTP | 3(0)(0) | $2,500.00 | $3,930.00 | |
| Dawson Creek (BC) CJDC-TV 5 | CTP | 3(0)(0) | $2,500.00 | $3,930.00 | |
| Prince George (BC) CKPG-TV 2 | CTP | 3(0)(0) | $2,500.00 | $3,930.00 | |
| Terrace (BC) CFTK-TV 3 | CTP | 3(0)(0) | $2,500.00 | $3,930.00 | |

TOTAL Newsworld Liability    $21,408,951.75

TOTAL CBC Network Liability    $146,002.50

Notes

UT means Unauthorised Transmission
CTP means Communication to the Public

2012 FC 748 (CanLII)

Calculation of Newsworld Revenues for Alleged Infringement

| Month | Revenues | Reference | Duration of Alleged Infringement | | Hours/Mins in month | % of Hours | Pro-rata Revenues |
|---|---|---|---|---|---|---|---|
| March, 2002 | $4,687,664 | Page 505 | | 00:60:00 | 744 / 44,640 | 0.00134409 | $6,301 |
| September, 2002 | $4,660,384 | Page 510 | 1:30:00  x 2 = | 3:00:00 | 720 / 43,200 | 0.00416667 | $19,418 |
| September, 2003 | $4,752,952 | Page 517 | 2:00:00  x 2 = | 4:00:00 | 720 / 43,200 | 0.05555556 | $26,405 |
| September, 2004 | $4,904,891 | TBC | 2:00:00  x 3 = | 6:00:00 | 720 / 43,200 | 0.00833333 | $40,874 |
| | | | | | | TOTAL: | $92,998 |

[103]   Miss Leuthold relies on the definitions found in paragraphs 2.4(1) (*c*) and 3(1) (*f*) of the *Copyright Act*.

[104]   She also applies the definitions of broadcasting, broadcasting undertaking, distribution undertaking and network found in the *Broadcasting Act*.

[105]   In essence, her position is that each transmission should be compensated, whether it was aired by the CBC on the main channel or by a regional station or an affiliate or by a BDU relaying a signal received from Newsworld. Since each transmission by a BDU constitutes an infringement, she is therefore claiming $2,500.00 US or the equivalent in Canadian dollars at the exchange rate applicable at the time. In September 2003, the number of distribution undertakings stood at approximately 712, and in 2004 they were about 807 distribution undertakings (see Joint Book of Documents, volume II, pages 518 to 564). Therefore, each unauthorized transmission on Newsworld is assessed at $2,439,846.00 in 2003 and $2,623,355.25 in 2004. The damages for the broadcast on the main channel inclusive of regional stations and affiliates and taking into consideration the time zones are evaluated at $146,002.50 for the network, as defined by Miss Leuthold.

[106]   Miss Leuthold is also claiming $92,998.00 as her prorated share of Newsworld revenues generated during the period of the unauthorized broadcasts. In delimiting that amount the total length of each Production aired was taken into consideration. The September 2003 broadcast lasted 2 hours. Therefore, the amount claimed is based on the revenues for the total month derived from cable subscribers, divided by the total hours of broadcasting and the number of days in the month.

2012 FC 748 (CanLII)

2012 FC 748 (CanLII)

[107]   Miss Leuthold also asserts that her contribution was more significant than any other participant on the Production since she was paid $2,500.00 US for one play whereas the BBC only received $20,000.00 for a worldwide license for five years. She argues that the total Production constitutes an infringement and not just the 18 seconds where the Photographs appear because she comments the Photographs during the Production and her appearance is significant.

[108]   Miss Leuthold is also asking the Court for bifurcation or an accounting of profits.

[109]   At trial her counsel amended Miss Leuthold's position with respect to punitive and exemplary damages. Miss Leuthold desisted from her claim of $15,000.00 for punitive damages but maintained her claim of $25,000.00 strictly for exemplary damages from defendant, the CBC, and $10,000.00 from Mr. Jerry Mc Intosh, based on their alleged callous behavior and the fact that it aired the Production on several occasions despite the limited rights granted under the Stills License.

## B.      Defendants' position

[110]   The Defendants rely on the expert testimony of Elizabeth Klink. Mrs. Klink was recognized by the Court as an expert on the valuation of Stills. In order to assign a value to the Photographs she contacted the top three international photographic archive collections, Corbis Images, Getty Images and Associated Press. She negotiated Worldwide Rights directly with all three for photographs. She also dealt directly with the Canadian representative of Corbis. Her conclusion was that each

Photograph had an average value of $300.00 US in 2002 for use worldwide all media in perpetuity (see Trial Records, tab 4, page 113).

[111]   Citing *Hutton v Canadian Broadcating Corp. (CBC)* (1989), 29 CPR (3d) 398 at pages 450-451 confirmed by (1992) 41 CPR (3d) 45 (CA Alta) [*Hutton c Canadian Broadcasting Corp*], the Defendants claim that damages should be assessed on the basis of the amount that the defendant, the CBC, would have paid for the broadcasting rights. They further argue that, since it was customary for the plaintiff to grant licenses, then, the best measure of damages is the value of a license that would have been freely negotiated by the parties. Miss Leuthold at the time was selling the Photographs for $500.00 US each. They then refer to the Corbis site claiming that three of Miss Leuthold's Photographs can be obtained with unlimited worldwide rights for $350.00 Canadian per image (see Trial Records, Elizabeth Klink expert report, tab 4, page 108).

[112]   The Defendants also underline the importance of determining the value of compensation that should be awarded for the infringements not on the number of technical infringements that occurred but, on the six times Canadians were provided access to the Photographs because the two licenses negotiated, specifically entailed that all Canadians could view the Photographs.

[113]   It is also the Defendants' position that to compensate Miss Leuthold on the basis of the number of technical infringements is contrary to the definitions found in the *Broadcasting Act* where a broadcast is a transmission to the public independently of the apparatus used.

2012 FC 748 (CanLII)

[114]   Finally the Defendants claim that the proper amount to which Miss Leuthold is entitled is $875.00 US for Canadian broadcast rights based on Mrs. Klink's testimony.

## Objections

[115]   In the course of Mrs. Klink's testimony, the Court took under advisement two objections from counsel representing the plaintiff, Miss Leuthold. The objections pertained to the admissibility of testimony by Mrs. Klink that contradicted statements made by Miss Leuthold with respect to the number of photographers that actually took pictures on 9/11 and the value of photographs in a more limited market such as Canada, for a shorter time frame than the assessment included in her report.

[116]   The Court rejects both objections raised by plaintiff, Miss Leuthold, because an expert witness can testify to varying parameters that influence the value of goods she was asked to appraise and can also rebut evidence introduced by another witness inasmuch as her testimony is based on personal knowledge, which was the case in this instance.

## C.    Analysis

### *Damages*

[117]   Under subsection 34(1) of the *Copyright Act*, "where copyright has been infringed, the owner of the copyright is, subject to this Act, entitled to all remedies by way of injunction, damages,

2012 FC 748 (CanLII)

2012 FC 748 (CanLII)

accounts, delivery up and otherwise that are or may be conferred by law for the infringement of a right".

[118]   The Court has identified two questions that must be answered in order to properly compensate Miss Leuthold for the infringements of her copyright.

### *Compensation for each infringement or each communication to the public and basis for compensation.*

[119]   The parties disagree on the number of infringements that need to be compensated. This Court has determined that the licenses covered the transmissions of March 17, 2002 and September 10, 2002, on both the CBC network inclusive of affiliates and regional stations in all time zones and Newsworld.

### 1.   *At issue is the entitlement to compensation for each individual communication by a BDU or should the compensation be based on each overall communication to the public?*

[120]   Miss Leuthold takes the position that the *Copyright Act* provides for compensation for each separate act of infringement. Her counsel, citing from *Tamaro Annotated Copyright Act*, page 726, acknowledged that a basis for compensation as held in various cases and more particularly the case of *Webb & Knapp v Edmonton (City)* (1970), 44 Fox, where "the Court referred to an English decision, *Meikle v Maufe*, [1941] 3 All ER 144, where it was held that for breach of copyright,

specifically of architectural works, the starting point in assessing damages was the sum which might have been charged for a licence to use the copyright. From there, the surrounding circumstances should be taken into account as with the infringement of any proprietary right".

[121]   Counsels for the Defendants have also acknowledged that the amount paid for a license is a valid starting point. They cited *Hutton c Canadian Broadcasting Corp* and *Video Box Enterprises Inc v Peng*, 2004 FC 482, but they insist that, in the present case at issue are only six communications to the public and not the number of communications from each BDU.

[122]   In support of their position they claim that if the Court was to consider the technical means used this would be counter to the *Copyright Act* because compensation would vary not on the number of occasions the public saw the Production but on the means used to communicate the Production.

[123]   Defendants also allege that the theory developed by Miss Leuthold to the effect that each transmission by a BDU constitutes an infringement is contrary to the definitions in the *Broadcasting Act*.

[124]   Miss Leuthold, on the other hand, claims that each BDU should have negotiated a license with her. The amount of that license constitutes in her view a starting point. The Court should also consider a deterrent to discourage others from contravening her rights.

2012 FC 748 (CanLII)

[125]   According to Miss Leuthold's counsel, if a distribution undertaking had approached Catherine Leuthold in isolation to obtain a license to communicate her Photographs to the public, the cost would have been $500.00 US per photograph. The value of a license is $2,500.00 US independently of the number of subscribers held by that BDU whether it would be 1000 or 1,2 million.

[126]   Miss Leuthold recognizes that the numbers derived from such a formula are impressive but according to her, the issue is solely that each infringement must be compensated. If Miss Leuthold had been paid a license fee for every infringement then, that total amount constitutes the appropriate compensation. Since the compensation is based on a license fee after the fact, the Court should not consider volume discounts or the fact that ultimately the CBC will be responsible for the total amount.

[127]   The Court rejects Miss Leuthold's position that damages should be awarded on the basis that each broadcasting undertaking should have negotiated a license which had a value of at least $2,500.00 US.

[128]   The *Copyright Act* is meant to properly compensate the owner of a copyright if his rights are infringed. In the present case the rights of Miss Leuthold were infringed. On six separate occasions her Photographs were viewed by Canadians for a duration of 18 seconds without her authorization. The Court will compensate Miss Leuthold for every one of the six communications to the Canadian public, but it cannot accept the principle that compensation must be awarded on the basis of each technical act of infringement because applying such a method runs counter to our reading of the

2012 FC 748 (CanLII)

*Broadcasting Act* with the *Copyright Act*. To this Court subparagraph 2.4(1) (*c*) (ii) of the *Copyright Act* must be read in conjunction with the definition of broadcast in the *Broadcasting Act*. The important factor to consider is the number of occasions the infringing broadcasts could be seen by the public. In this instance there were six separate occasions lasting 18 seconds each where the Canadian public who subscribe to cable could see the Photographs on Newsworld. The technical means used to relay the infringing work has no bearing on the amount of compensation owed to Miss Leuthold save for the revenues derived from the infringing broadcast. What is important in this Court's opinion is to adequately compensate a copyright owner for the damage suffered. The number of potential viewers bears some significance in terms of the value to be assigned to a license.

[129]   Miss Leuthold's position also runs counter to the initial intent of the parties when they freely negotiated the licenses. It is clear that when Miss Leuthold negotiated the licenses, the technical means used by the Defendants to communicate her Photographs were never a consideration (see transcript, testimony of Catherine Leuthold, February 6, 2012, page 90, lines 10 to 16; page 91, lines 12 to 25; and page 92, lines 1 to 20).

[130]   By analogy, should Miss Leuthold have opted for statutory compensation pursuant to subsection 38.1(3) of the *Copyright Act*, her compensation would have been limited. The relevant provision states that:

> 38.1(3) where
>
> (a) there is more than one work or other subject-matter in a single medium and

b) the awarding of even the minimum amount referred to in subsection (1) or (2) would result in a total award that, in the court's opinion , is grossly out of proportion to the infringement,

The court may award, with respect to each work or other subject matter, such lower amount than $500 or 200$, as the case may be, as the court considers just.

[131]   More importantly the jurisprudence holds that "even if the evidence to support a calculation on the above-mentioned basis is not available, damages will nevertheless be awarded based on the evidence available and drawing reasonable inferences, using common-sense. Copyright is said to be a property that is a wasting asset. When copyright infringement is established and actual loss or specific damages cannot be proven but, nevertheless, it is shown that damages resulted directly from the infringement, damages will be granted at large and "may be dealt with broadly and as a matter of common sense, without professing to be minutely accurate"" (*Intellectual Property Disputes: Resolutions & remedies*, Vol 2, Ronald E. Dimock, « Monetary Relief – Damages by Me François Grenier, Carswell, 2003, Toronto, at page 17-16; *Prism Hospital Software v Hospital Medical Records Institute*,[1994] BCJ No 1906 at para 665).

### *What constitutes an appropriate compensation taking into consideration the facts and evidence adduced in this instance?*

[132]   The Court must first underline the fact that in Canada, copyright "is a creature of statute and the rights and remedies it provides are exhaustive" (see *Théberge v Galerie d'Art du Petit Champlain inc*, [2002] 2 SCR 336, 2002 SCC 34, at para 5; *Bishop v Stevens*, [1990] 2 SCR 467, at page 477; *Compo Co v Blue Crest Music Inc*, [1980] 1 SCR 357, at page 373).

[133]   It may, in certain instances, be more difficult to assess damages resulting from copyright infringement.  In his 2012 annotated *Copyright Act*, at page 727, Normand Tamaro makes a jurisprudential review of the general principal regarding quantum and quotes from a judgment rendered by the Superior Court of Québec:

> [36] Dans *Webb & Knapp v City of Edmonton* [(1970), 44 Fox Pat C 141 (SCC)] la Cour Suprême a reconnu que le droit d'auteur présente parfois un problème d'évaluation quant à la détermination du préjudice pécuniaire subi par le titulaire des droits, et se réfère à un arrêt anglais [*Meihle c Maufe*, [1941] 3 All E R 144] où le tribunal a statué que dans des cas de contrefaçon de plans d'une œuvre architecturale, il faut se demander ce qu'il en aurait coûté pour obtenir une licence pour utiliser les droits d'auteur de la manière dont ils ont été utilisés . . .
>
> [37] Il est souvent dit qu'en matière de droit d'auteur, les tribunaux n'ont pas besoin de déterminer les pertes et dommages avec précision ; c'est plutôt une matière relevant du sens commun.  En l'espèce, le Tribunal exercera son pouvoir discrétionnaire pour fixer les dommages payables . . . (see *Corp. de développement immobilier Intersite c Immobilière Versant III inc*, 2007 QCCS 4428 at paras 36-37).

[134]   Another general principle that applies can be stated as follows "the Copyright Act does not permit the person who has infringed the copyright of the owner to escape a condemnation for damages merely because they are impossible or difficult to prove. Damages can be granted for breach of the *Copyright Act* without the necessity to prove them and if damages are difficult to assess or cannot be evaluated "… the tribunal must do the best it can, although it may be that the amount awarded will really be a matter of guesswork'"" (see *U & R Tax Services Ltd v H & R Block Canada Inc* (1995), 62 CPR (3d) 257 (Fed TD) at para 46).

[135]   Furthermore, it has been recognized that material damages such as profits derived from the publication of infringing work, are generally difficult to assess. Nevertheless, in copyright matters

2012 FC 748 (CanLII)

they need not be proven. The copyright owner is justified in assuring the protection of the property protected by the copyright. "The determination of damages [can be], to a large extent, […] a rough and ready one" (see *Slumber-Magic Adjustable Bed Co v Sleep-King Adjustable Bed Co.* (1984), 3 CPR (3d) 81 (BCSC) at para 30).

[136]   An important factor that warrants consideration in the present case is the basis on which the Court can assess the material damages. The discussions between the parties on the cost of a license can be used as an element to consider in deriving the amount to which Miss Leuthold is entitled. This "constitute[s] a basis for determining the compensatory damages" (see Normand Tamaro, *The 2012 Annotated Copyright Act*, at page 732; see also *Construction Denis Desjardins inc v Jeanson*, 2010 QCCA 1287; *Eros - Équipe de recherche opérationnelle en santé inc v Conseillers en gestion et infromatique C.G.I. inc*, 2004 FC 178 (FC) [*Eros*]).

[137]   The damages may also be assessed on the basis of the loss of profits in the various commercial markets in which the work could have been shown (see *École de conduite Tecnic Aubé inc v 1509 8858 Quebec Inc* (1986), 12 CIPR 284 (Que SC); see also the particular case of an infringement in respect of the publication of eight photographs in *Parker v Key Porter Books Ltd* (2005), 40 CPR (4th) 80 (SCJ)).

[138]   Fundamentally, the Court's discretion is broad but its assessment of damages must be based on common sense. "Any reasonable method can be used to calculate the damages that the plaintiff has suffered" (Ysolde Gendreau et David Vaver, "Canada", in *International Copyright Law and Practice*, vol 1, LexisNexis, 1988, at CAN-113).

2012 FC 748 (CanLII)

[139]   Both parties have submitted that the discussions surrounding the licenses are a valid starting point to assess the amount of compensation owed to Miss Leuthold. The Court agrees. Evidence was adduced by Miss Leuthold that rights to use her photographs commanded a price ranging from $185.00 to as much as $10, 000.00 (see Joint Book of Document, volume II, tab 22, exhibit P-22). In each instance Miss Leuthold insisted on proper credits and limited usage (see transcript, testimony of Catherine Leuthold, February 6, 2012, page 101, lines 8 to 25 and page 102, lines 1 to 17).

[140]   The Defendants dispute the limited usage Miss Leuthold claims to have negotiated in all instances, based on the expert report produced by Mrs. Elizabeth Klink that concluded that worldwide rights for all media in perpetuity were valued at $500.00 US per Photograph. The report also asserted that Corbis, who has represented Miss Leuthold since 2003, could grant worldwide rights all media in perpetuity. This was denied by Miss Leuthold who testified that in her case, the rights granted were always limited commercial use notwithstanding the language appearing on the Corbis website or the standard Corbis agency agreement (see transcript, testimony of Catherine Leuthold, February 6, 2012, page 185, lines 13 to 25; page 186, lines 1 to 7 and page 187, lines 2 to 7).

[141]   It is clear to the Court that Miss Leuthold's Photographs are valuable in that they generate a certain amount of income annually. Miss Leuthold did not present any evidence as to what percentage of her annual income is derived from the sale of rights to reproduce the Photographs; she

had no obligation to that effect under the *Copyright Act*. The $2,500.00 US paid by the Defendant, the CBC, is a valid basis from which to start. That fee was based on a limited usage.

[142]   The Court accepts Miss Leuthold's position that she always negotiated limits to the rights granted. It is obvious that by limiting the rights granted, Miss Leuthold maintains a limited access to her work hence protecting its commercial value.

[143]   Mrs. Klink states that she would not pay more than $500.00 US per photo unlimited worldwide right all media (Joint Trial Record, tab 4, page 113). While the Court takes into consideration that opinion, it must also determine what is an adequate compensation based on all the evidence adduced. When cross-examined by counsel for Miss Leuthold, Mrs. Klink acknowledged that she was not aware that Miss Leuthold had sold some Photographs to People Magazine, Le Monde, Newsweek for amounts ranging from $2,300.00 to $10,000.00 in 2001 but did confirm that the Photographs decreased in value further you are from the event (see transcript, testimony of Mrs. Klink, February 8, 2012, pages 80 and 81).

[144]   The Court assesses the damages at $3,200.00 US for each of the six unauthorized communication to the public on the basis that Miss Leuthold could have negotiated a higher license fee than the initial $2,500.00 in view of the repeated usage. The Court is also taking into consideration the amount received by Miss Leuthold for publication of her photographs in Der Spiegel and Le Monde. Though these are publications with a more limited distribution, the images can be viewed by more people for a longer length of time.

2012 FC 748 (CanLII)

*Proof of profits*

[145]   Subsection 35(2) of the *Copyright Act* provides that:

> In proving profits,
>
> *(a)*      the plaintiff shall be required to prove only receipts or revenues derived from the infringement; and
>
> *(b)*      the defendant shall be required to prove every element of cost that the defendant claims.

[146]   "The Copyright Act provides for a specific system of accounting at s 35(2), setting out the parameters within which the profits referred to in s 35(1) are calculated" (see Normand Tamaro, *The 2012 Annotated Copyright Act*, at page 756).

[147]   In this case the Court will not grant an accounting of profits for the following reason: there exists no causal link between the fee paid by Newsworld subscribers and the six unauthorized communications to the public that infringed on Miss Leuthold's rights.

[148]   The Court will only grant an accounting of profits where it finds a direct link between the infringements and the profits of the infringer.  In the present case, there is no evidence on the record linking the revenues of Newsworld to the six unauthorized communications to the public. Newsworld revenues did not increase as a result of the six communications to the public (see transcript, testimony of Janice Ward, February 7, 2012, page 56, lines 1 to 25 and page 57, lines 1 to 15) (Joint Book of documents, volume II, tab 10, page 517 A).

[149]   The evidence adduced on the revenues of Newsworld is the basis for the Defendants claim of $ 92,998.00 for the eight infringements alleged based on a prorated share of these revenues. The Court has concluded that only six unauthorized communications to the public infringed Miss Leuthold's rights. If we apply the formula used by Miss Leuthold but limit it to the actual length of time, the Photographs appeared on Newsworld during the months of September 2003 and 2004, which is18 seconds rather than the full length of the Production, the amount payable for a pro-rata share of revenues is $66.00 for 2003 and $102.73 for 2004.

[150]   The Court grants these amounts because the revenues of Newsworld, though not linked to the infringement, are nonetheless generated from continuous programming airing on a 24 hour basis. The Photographs appearing in the Production occupied air time for 18 seconds. Miss Leuthold should be compensated as such.

[151]   At page 356, Volume I of the Joint Book of Documents, the Defendants have produced a summary of the publicity revenues generated from all the communications to the public. These publicity revenues totalize $6,960.00. The Defendants claim that these include revenues from two communications that did not include Miss Leuthold's Photographs. Consequently, an amount of $2,604.00 must be deducted, leaving a balance$4,356.00. If we consider that the Production cost at least $70,000.00 to produce, there are no profits to be apportioned in this instance and hence, no valid reason to order an accounting of profits (see Joint Book of documents, volume II, tabs 18 and 19).

2012 FC 748 (CanLII)

*Punitive and exemplary damages*

[152]   Miss Leuthold has modified her claim with respect to punitive and exemplary damages. She desisted from her claim of $15,000.00 for punitive damages but maintained her claim of $25,000.00 strictly for exemplary damages from Defendant, the CBC, and $10,000.00 from Jerry Mc Intosh, based on their alleged callous behavior and the fact that they aired the Production on several occasions despite the limited rights granted by the Stills License.

[153]   The Court underlines that, while they are often confused, there is a distinction between punitive and exemplary damages (see *Jelin Investments Ltd v Signtech Inc* (1990), 34 CPR (3d) 171 (Fed TD)). Exemplary damages go beyond full compensation of the Plaintiff and include a sum to penalize the Defendant. Punitive damages can be defined, on the other hand, as the granting of a more generous amount for an award of actual damages rather than a more moderate amount because of the reprehensible conduct of the Defendant.

> Punitive damages are awarded against a defendant in exceptional cases for "malicious, oppressive and high-handed" misconduct that "offends the court's sense of decency": Hill v. Church of Scientology of Toronto, [1995] 2 SCR 1130, at para 196. The test thus limits the award to misconduct that represents a marked departure from ordinary standards of decent behaviour. Because their objective is to punish the defendant rather than compensate a plaintiff (whose just compensation will already have been assessed) [...] (see *Whiten v Pilot Insurance Co*, 2002 SCC 18 at para 36 [*Whiten*]).

[154]   The Supreme Court also wrote that "In *Vorvis*, . . . this Court held that punitive damages are recoverable in such cases provided the defendant's conduct said to give rise to the claim is itself "an actionable wrong" (p. 1106). The scope to be given this expression is the threshold question in this

2012 FC 748 (CanLII)

case, i.e., is a breach of an insurer's duty to act in good faith an actionable wrong independent of the

loss claim under the fire insurance policy?" (see *Whiten* at para 78)

[155]   The Supreme Court adds:

> The more reprehensible the conduct, the higher the rational limits to
> the potential award. The need for denunciation is aggravated where,
> as in this case, the conduct is persisted in over a lengthy period of
> time (two years to trial) without any rational justification, and despite
> the defendant's awareness of the hardship it knew it was inflicting
> (indeed, the respondent anticipated that the greater the hardship to
> the appellant, the lower the settlement she would ultimately be forced
> to accept) (see *Whiten* at para 112).

[156]   Exemplary damages are only awarded with the objective "of punishment and deterrence"

(see *Quebec (Public Curator) v Syndicat national des employés de l'hôpital St-Ferdinand*, [1996]

SCJ No 90).

[157]   Miss Leuthold's counsel referred the Court to extracts from Normand Tamaro's *Annotated*

*Copyright Act*, at page 739, where the Author makes the point that "where the defendant's actions

constituted a callous disregard for the rights of the plaintiff". He argued that in this instance, the

conduct of Jerry McIntosh and the CBC does constitute such callous disregard for the rights of Miss

Leuthold.

[158]   The Defendants respond that exemplary damages are only awarded where the copyright was

infringed intentionally. They rely on *Eros*, cited above, where the Court stated that a plaintiff is only

allowed exemplary damages where fraud or a malicious intent are proven. Again citing *Hutton c*

*Canadian Broadcasting Corp.*, the Defendants claim that it stands for the principle that exemplary

2012 FC 748 (CanLII)

damages are only granted in the presence of an outright counterfeiting coupled with the breach of an interim injunction such as in *Pro Arts Inc v Campus Crafts Holdings Ltd* (1980), 110 DLR (3d) 366. In sum, Defendants allege that such circumstances do not exist in the present case.

[159]   The evidence on the record does not lead to the granting of exemplary damages against the CBC or Jerry Mc Intosh. It is clear that the six unauthorized communications to the public resulted from an honest mistake which Mr. McIntosh admitted quite candidly in his testimony (see transcript, testimony of Jerry Mc Intosh, February 9, 2012, page 17, lines 24 and 25; page 18, lines 1 to 16; page 23, lines 6 to 25 and page 24, lines 1 to 7).

[160]   There is no evidence on the record that can lead the Court to award exemplary damages.

### Injunction relief

[161]   There is no necessity to grant Miss Leuthold the injunction relief sought. CBC ceased to broadcast the Production in 2005. The injunction would have no effect whatsoever (see *De Montigny c Cousineau*, [1950] SCR 297 at page 304; *Durand and Cie v Patrie Publishing Co*, [1960] SCR 649 at page 658) There is no probability of a repetition of the particular act complained of (see *Canadian Performing Right Society Ltd v Canadian National Exhibition Association*, [1934] OR 610 (HC)).

2012 FC 748 (CanLII)

*Delivery-up*

[162]   The Plaintiff is entitled to delivery-up according to subsection 34(1) of the *Copyright Act*. It is useful to repeat the following passage from *Canada v James Lorimer & Co*, [1984] 1 FC 1065, at page 1073, on the issue of delivery-up:

> It likewise follows that, where the infringing work is found to include any substantial part of a work in which copyright subsists, the copyright owner is to be deemed owner of all copies of the infringing work and all production plates and is prima facie entitled to the assistance of the Court in gaining possession of them. The onus is on the infringer to establish grounds upon which the Court may properly exercise its discretion against granting such relief.... Those grounds must lie in the conduct of the copyright owner, not in the conduct or motives of the infringer.

[163]   Subsection 38(1) of the *Copyright Act* governs the right for the Plaintiff to recover all infringing material in possession of the Defendants. It is the infringer's burden to establish a reason why this Court should refuse this measure. This reason cannot be based on the infringer's behavior or motives (CBC's practice concerning its logger tapes and archives). In the present case delivery-up is ordered.

5.      *Is the Defendant, Jerry McIntosh, independently liable for any infringement of the Plaintiff's (Miss Leuthold's) copyright and, if so, what remedies should be awarded?*

2012 FC 748 (CanLII)

## A.    Miss Leuthold's position

[164]   The Defendant, Jerry Mc Intosh, is the Director of Documentaries for CBC News. According to Miss Leuthold, Mr. Mc Intosh infringed her copyright in the Photographs by permitting eight unauthorized viewing of the Production by the Canadian public.

## B.    Position of the Defendants

[165]   The Defendants submit that there is no evidence of any infringement or authorization of infringement by Mr. Mc Intosh, either in his personal capacity or in his professional capacity. The allegations against him are frivolous, scandalous and vexatious.

## C.    Analysis

[166]   In the joint book of documents, the Defendants reproduced Mr. McIntosh's job description. That description entails to "[direct] and oversee all news and current affairs documentary programming and program development activities in order to attain the objectives of the English Television Network and CBC Newsworld and fulfill public expectations and corporate obligations" (see Joint Book of Documents, volume I, tab 8, page 339).

[167]   A director of CBC Documentary Unit also "directs and oversees the production of documentary programming…" (see Joint Book of Documents, volume I, tab 8, page 340) or News, current Affairs and Newsworld.

[168]   The Court underlines the following passages from Mr. McIntosh's testimony:

> A.      I'm embarrassed by the mistake. I take responsibility for it.
> But I believe it was an honest mistake.
>
> We knew that Ms. Leuthold did not want her images in the
> documentary and I instructed a version be created without them and I
> felt comfortable and confident that that version was going to air on
> subsequent transmissions and I was shocked in 2004 to discover that
> we have aired the wrong tape. Physically somebody had gone to the
> library of hundreds of videotapes, pulled the wrong one. That's what
> happened.
>
> It's embarrassing. I'm not proud of it. But I admitted that to Ms.
> Leuthold in an email I sent to her and said let's straighten it out and
> we'll compensate you.
>
> Q.      The first time you learned of that mistake, you just said 2004,
> can you be more specific? When did you learn, the first time that - - -
>
> A.      It's a long time ago, so I don't remember precisely. It could
> have been an email from Catherine saying "What's up?", you know,
> "What's going on? How come my images are on CBC?" That's
> possible. It could have been possible that she called somebody else
> and they called me or - - -
>
> Q.      Okay.
>
> You've been director or director of documentary for how long - - or
> at that time you would have been for how long, in 2004?
>
> A.      I'd gone through a number of different kind of subtle changes
> in the job description, taking on additional responsibility, but for
> approximately 10 years.
>
> Q.      And up until you left the CBC in 2006, did that situation ever
> happen to you?
>
> A.      No. This is the first time I've ever encountered it.
>
> Q.      How many documentaries would you have been responsible
> for over the course of your duties?
>
> A.      Hundreds - - hundreds of documentaries.

2012 FC 748 (CanLII)

Q.      Have you ever been sued yourself or, to your knowledge, the CBC, for infringement of copyright in stills or video footage?

A.      No. No.

. . .

THE WITNESS: From my point of view, this – - this e-mail was me reaching the conclusion that we were not going to be able to get the unlimited rights to broadcast Ms. Leuthold's images.

She was intent on holding as to one - - one play only and that I was satisfied with that for the one plan in September of 2002 and that, in subsequent transmissions, we were going to air a documentary that contained none of her images.

And I regretted that, at the time because I would have preferred to have the images but that wasn't to be so we said: Okay, let's move on. We'll remove the images and that'll be it.

Q.      And you've testified to the 60-minute version that was prepared without her stills. You also testified that there was a 90-minute version that included the stills.

Why were her stills not taken out of that 90-minute version?

A.      I don't have the answer to that. I don't know that.

I issued instructions to remove her - - her images from the documentary. It appears that in one case, the 60-minute case, they were removed. The 90-minute tape, obviously, was not corrected and, inadvertently, was transmitted.
(see transcript, testimony of Mr. Mc Intosh, February 9, 2012, page 18, lines 1 to 25, page 19, lines 1 to 23, page 23, lines 5 to 25 and page 24, lines 1 to 7)

[169]   In authorizing the broadcast, Mr. McIntosh infringed Plaintiff's copyright in the

Photographs.

2012 FC 748 (CanLII)

[170]   However, he is not liable for this infringement because the CBC is held responsible for the misconduct of its employees. Vicarious liability is "a theory that holds one person responsible for the misconduct of another because of the relationship between them. Although the categories of relationships in law that attract vicarious liability are neither exhaustively defined nor closed, the most common one to give rise to vicarious liability is the relationship between master and servant, now more commonly called employer and employee" (see *671122 Ontario Ltd v Sagaz Industries Canada Inc*, 2001 SCC 59 at para 25 [*Sagaz*]). More specifically, the master's tort theory "posits that the employer is vicariously liable for the acts of his employee because the acts are regarded as being authorized by him so that in law the acts of the employee are the acts of the employer" (see *Sagaz* at para 28).

[171]   Mr. McIntosh is not personally liable because it is clear from the evidence on the record that the unauthorized communications to the Canadian public were not the resultant of a deliberate act or the result of gross negligence.

6.      *Regardless of the Court's finding on liability, what measures of costs should be awarded given the conduct of the parties and outstanding offers to settle?*

[172]   Rules 419 to 421 of the *Federal Courts Rules*, SOR-98-106 [the *Rules*], deal with offers to settle. They complement Rules 400(3) and 409 which allow the Court and the assessment officers to take into account of written offers to settle in assessing cost.

[173]   Rule 420 of the *Federal Court Rules* prescribes costs consequences where a party obtains a judgment less favorable than a written offer to settle made by opposing party.

[174]   The Court will permit the parties to present their respective position with respect to cost at a special hearing to be set after the parties have received this judgment.

### Motion to amend

[175]   Counsel for Miss Leuthold presented a motion to amend his pleadings so that any amount awarded to Miss Leuthold in respect of an unauthorized communication to the public be based on the US dollar exchange rate applicable on the date of that communication to the public.

[176]   Counsel for the Defendants opposed that amendment on grounds that the pleadings were closed and that Miss Leuthold has failed to properly introduce evidence to the applicable exchange rate on the dates of the unauthorized communications to the public.

[177]   The Court rejects the amendment because it is contrary to Rule 75(2) of the *Federal Court Rules*. That Rule clearly states that amendments are not allowed during a hearing unless the purpose is to make the document accord with the issues at the hearing which is not the case in this instance, as the applicable exchange rate on the dates of the unauthorized communications to the public was never properly introduced in evidence.

2012 FC 748 (CanLII)

2012 FC 748 (CanLII)

## JUDGMENT

**THIS COURT**

1.  **ALLOWS** the Plaintiff's action;

2.  **DECLARES** that:

    i)    copyright subsist in the Photographs as defined in this judgment

    ii)   the plaintiff is the rightful owner of the copyright in the Photographs; and

    iii)  the copyright has been infringed by the Defendant, the Canadian Broadcasting Corporation, on six occasions that is on September 11, 2002, September 7, 2003, September 8, 2003, September 11, 2004, September 12, 2004 at 1:00 am and September 12, 2004, at 4:00 am, for which the Defendant, the Canadian Broadcasting Corporation, is jointly and severally liable with each broadcasting distribution undertaking that retransmitted the Photographs;

3.  **CONDEMNS** the Defendant, the Canadian Broadcasting Corporation, jointly and severally with each BDU, to pay total damages of $3,200.00 US dollars for each of the six unauthorized communications of the Photographs to the public, for a total of $19,200.00 US dollars;

4.      **CONDEMNS** the Canadian Broadcasting Corporation to pay an amount of $168.74 Canadian, plus interest, as such part of the revenue received by Newsworld from the unauthorized communication of the Photographs to the public on the dates above mentioned;

5.      **ORDERS** the defendant, the Canadian Broadcasting Corporation, to deliver up to the Plaintiff all copies of films, videos, disks or other tangible media containing the Photographs save for one copy of the final version of the Production to be retained by Defendant, the CBC, for archival purposes only;

6.      **ORDERS** the Defendant, the Canadian Broadcasting Corporation to erase all copies of the Photographs from all purely electronic media, and to provide to the Plaintiff, within fourteen days of judgment herein, an affidavit from an officer of the Defendant, the Canadian Broadcasting Corporation, that this order has been fully executed; and

7.      **RESERVES** its decision as to costs until the Court has heard the representation of the parties at a special hearing to be set in the weeks following receipt of this judgment.


<div style="text-align:right">

"André F.J. Scott"
_____
Judge

</div>

2012 FC 748 (CanLII)

2012 FC 748 (CanLII)

**ANNEX**

**Sections 2 and 3(2) of the *Broadcasting Act*, SC 1991, c 11 read as follows:**

**Definitions**

**2.** (1) In this Act,

*"broadcasting"*
« radiodiffusion »

*"broadcasting"* means any transmission of programs, whether or not encrypted, by radio waves or other means of telecommunication for reception by the public by means of broadcasting receiving apparatus, but does not include any such transmission of programs that is made solely for performance or display in a public place;

*"broadcasting receiving apparatus"*
« récepteur »

*"broadcasting receiving apparatus"* means a device, or combination of devices, intended for or capable of being used for the reception of broadcasting;

*"broadcasting undertaking"*
« entreprise de radiodiffusion »

*"broadcasting undertaking"* includes a distribution undertaking, a programming undertaking and a network;

*"Commission"*
« Conseil »

*"Commission"* means the Canadian Radio-television and Telecommunications Commission established by the *Canadian Radio-television and Telecommunications Commission Act*;

**L'article et le paragraphe 3(2) de la *Loi sur la radiodiffusion*, SC 1991, c 11 se lit comme suit:**

**Définitions**

**2.** (1) Les définitions qui suivent s'appliquent à la présente loi.

« *Conseil* »
"Commission"

« *Conseil* » Le Conseil institué par la *Loi sur le Conseil de la radiodiffusion et des télécommunications canadiennes*.

« *émission* »
"program"

« *émission* » Les sons ou les images — ou leur combinaison — destinés à informer ou divertir, à l'exception des images, muettes ou non, consistant essentiellement en des lettres ou des chiffres.

« *encodage* »
"encrypted"

« *encodage* » Traitement électronique ou autre visant à empêcher la réception en clair.

« *entreprise de distribution* »
"distribution undertaking"
« *entreprise de distribution* »

Entreprise de réception de radiodiffusion pour retransmission, à l'aide d'ondes radioélectriques ou d'un autre moyen de télécommunication, en vue de sa

*"Corporation"*
« Société »

*"Corporation"* means the Canadian Broadcasting Corporation continued by section 36;

*"distribution undertaking"*
« entreprise de distribution »

*"distribution undertaking"* means an undertaking for the reception of broadcasting and the retransmission thereof by radio waves or other means of telecommunication to more than one permanent or temporary residence or dwelling unit or to another such undertaking;

*"encrypted"*
« encodage »

*"encrypted"* means treated electronically or otherwise for the purpose of preventing intelligible reception;

*"licence"*
« licence »

*"licence"* means a licence to carry on a broadcasting undertaking issued by the Commission under this Act;

*"Minister"*
« ministre »

*"Minister"* means such member of the Queen's Privy Council for Canada as is designated by the Governor in Council as the Minister for the purposes of this Act;

*"network"*
« réseau »

*"network"* includes any operation where control over all or any part of the programs or program schedules of one or more

réception dans plusieurs résidences permanentes ou temporaires ou locaux d'habitation, ou en vue de sa réception par une autre entreprise semblable.

« *entreprise de programmation* »
"programming undertaking"

« *entreprise de programmation* »
Entreprise de transmission d'émissions soit directement à l'aide d'ondes radioélectriques ou d'un autre moyen de télécommunication, soit par l'intermédiaire d'une entreprise de distribution, en vue de leur réception par le public à l'aide d'un récepteur.

« *entreprise de radiodiffusion* »
"broadcasting undertaking"

« *entreprise de radiodiffusion* »
S'entend notamment d'une entreprise de distribution ou de programmation, ou d'un réseau.

«*exploitation temporaire d'un réseau*»
"temporary network operation"

« *exploitation temporaire d'un réseau* » Exploitation d'un réseau en vue d'une certaine émission ou série d'émissions couvrant une période maximale de soixante jours.

« *licence* »
"licence"

« *licence* » Licence d'exploitation d'une entreprise de radiodiffusion, délivrée par le Conseil aux termes de la présente loi.

« *ministre* »
"Minister"

« *ministre* » Le membre du Conseil

2012 FC 748 (CanLII)

3

broadcasting undertakings is delegated to another undertaking or person;

*"program"*
« émission »

*"program"* means sounds or visual images, or a combination of sounds and visual images, that are intended to inform, enlighten or entertain, but does not include visual images, whether or not combined with sounds, that consist predominantly of alphanumeric text;

*"programming undertaking"*
« entreprise de programmation »

*"programming undertaking"* means an undertaking for the transmission of programs, either directly by radio waves or other means of telecommunication or indirectly through a distribution undertaking, for reception by the public by means of broadcasting receiving apparatus;

*"radio waves"*
« ondes radioélectriques »

*"radio waves"* means electromagnetic waves of frequencies lower than 3 000 GHz that are propagated in space without artificial guide;

*"temporary network operation"*
« exploitation temporaire d'un réseau »

*"temporary network operation"* means a network operation with respect to a particular program or a series of programs that extends over a period not exceeding sixty days.

privé de la Reine pour le Canada chargé par le gouverneur en conseil de l'application de la présente loi.

« *ondes radioélectriques* »
'radio waves'

« *ondes radioélectriques* » Ondes électromagnétiques de fréquences inférieures à 3 000 GHz transmises dans l'espace sans guide artificiel.

« *radiodiffusion* »
'broadcasting'

« *radiodiffusion* » Transmission, à l'aide d'ondes radioélectriques ou de tout autre moyen de télécommunication, d'émissions encodées ou non et destinées à être reçues par le public à l'aide d'un récepteur, à l'exception de celle qui est destinée à la présentation dans un lieu public seulement.

« *récepteur* »
'broadcasting receiving apparatus'

« *récepteur* » Appareil ou ensemble d'appareils conçu pour la réception de radiodiffusion ou pouvant servir à cette fin.

« *réseau* »
'network'

« *réseau* » Est assimilée à un réseau toute exploitation où le contrôle de tout ou partie des émissions ou de la programmation d'une ou plusieurs entreprises de radiodiffusion est délégué à une autre entreprise ou personne.

« *Société* »
'Corporation'

2012 FC 748 (CanLII)

2012 FC 748 (CanLII)

« *Société* » La Société Radio-Canada, visée à l'article 36.

**Meaning of "other means of telecommunication"**

**Moyen de telecommunication**

(2) For the purposes of this Act, *"other means of telecommunication"* means any wire, cable, radio, optical or other electromagnetic system, or any similar technical system.

(2) Pour l'application de la présente loi, sont inclus dans les moyens de télécommunication les systèmes électromagnétiques — notamment les fils, les câbles et les systèmes radio ou optiques — , ainsi que les autres procédés techniques semblables.

**Interpretation**

**Interprétation**

(3) This Act shall be construed and applied in a manner that is consistent with the freedom of expression and journalistic, creative and programming independence enjoyed by broadcasting undertakings.

(3) L'interprétation et l'application de la présente loi doivent se faire de manière compatible avec la liberté d'expression et l'indépendance, en matière de journalisme, de création et de programmation, dont jouissent les entreprises de radiodiffusion.

**_Broadcasting Policy for Canada_**

**_Politique canadienne de radiodiffusion_**

**Declaration**

**Déclaration**

**3.** (1) It is hereby declared as the broadcasting policy for Canada that

**3.** (1) Il est déclaré que, dans le cadre de la politique canadienne de radiodiffusion :

(*a*) the Canadian broadcasting system shall be effectively owned and controlled by Canadians;

*a*) le système canadien de radiodiffusion doit être, effectivement, la propriété des Canadiens et sous leur contrôle;

(*b*) the Canadian broadcasting system, operating primarily in the English and French languages and comprising public, private and community elements, makes use of radio frequencies that are public property and provides, through its

*b*) le système canadien de radiodiffusion, composé d'éléments publics, privés et communautaires, utilise des fréquences qui sont du domaine public et offre, par sa

5

programming, a public service essential to the maintenance and enhancement of national identity and cultural sovereignty;

(c) English and French language broadcasting, while sharing common aspects, operate under different conditions and may have different requirements;

(d) the Canadian broadcasting system should

(i) serve to safeguard, enrich and strengthen the cultural, political, social and economic fabric of Canada,

(ii) encourage the development of Canadian expression by providing a wide range of programming that reflects Canadian attitudes, opinions, ideas, values and artistic creativity, by displaying Canadian talent in entertainment programming and by offering information and analysis concerning Canada and other countries from a Canadian point of view,

(iii) through its programming and the employment opportunities arising out of its operations, serve the needs and interests, and reflect the circumstances and aspirations, of Canadian men, women and children, including equal

programmation essentiellement en français et en anglais, un service public essentiel pour le maintien et la valorisation de l'identité nationale et de la souveraineté culturelle;

c) les radiodiffusions de langues française et anglaise, malgré certains points communs, diffèrent quant à leurs conditions d'exploitation et, éventuellement, quant à leurs besoins;

d) le système canadien de radiodiffusion devrait :

(i) servir à sauvegarder, enrichir et renforcer la structure culturelle, politique, sociale et économique du Canada,

(ii) favoriser l'épanouissement de l'expression canadienne en proposant une très large programmation qui traduise des attitudes, des opinions, des idées, des valeurs et une créativité artistique canadiennes, qui mette en valeur des divertissements faisant appel à des artistes canadiens et qui fournisse de l'information et de l'analyse concernant le Canada et l'étranger considérés d'un point de vue canadien,

(iii) par sa programmation et par les chances que son fonctionnement offre en matière d'emploi, répondre aux besoins et aux intérêts, et refléter la condition et les

2012 FC 748 (CanLII)

2012 FC 748 (CanLII)

rights, the linguistic duality and multicultural and multiracial nature of Canadian society and the special place of aboriginal peoples within that society, and

(iv) be readily adaptable to scientific and technological change;

(*e*) each element of the Canadian broadcasting system shall contribute in an appropriate manner to the creation and presentation of Canadian programming;

(*f*) each broadcasting undertaking shall make maximum use, and in no case less than predominant use, of Canadian creative and other resources in the creation and presentation of programming, unless the nature of the service provided by the undertaking, such as specialized content or format or the use of languages other than French and English, renders that use impracticable, in which case the undertaking shall make the greatest practicable use of those resources;

(*g*) the programming originated by broadcasting undertakings should be of high standard;

aspirations, des hommes, des femmes et des enfants canadiens, notamment l'égalité sur le plan des droits, la dualité linguistique et le caractère multiculturel et multiracial de la société canadienne ainsi que la place particulière qu'y occupent les peuples autochtones,

(iv) demeurer aisément adaptable aux progrès scientifiques et techniques;

*e*) tous les éléments du système doivent contribuer, de la manière qui convient, à la création et la présentation d'une programmation canadienne;

*f*) toutes les entreprises de radiodiffusion sont tenues de faire appel au maximum, et dans tous les cas au moins de manière prédominante, aux ressources — créatrices et autres — canadiennes pour la création et la présentation de leur programmation à moins qu'une telle pratique ne s'avère difficilement réalisable en raison de la nature du service — notamment, son contenu ou format spécialisé ou l'utilisation qui y est faite de langues autres que le français ou l'anglais — qu'elles fournissent, auquel cas elles devront faire appel aux ressources en question dans toute la mesure du possible;

*g*) la programmation offerte par les entreprises de radiodiffusion devrait être de haute qualité;

2012 FC 748 (CanLII)

(*h*) all persons who are licensed to carry on broadcasting undertakings have a responsibility for the programs they broadcast;

(*i*) the programming provided by the Canadian broadcasting system should

  (i) be varied and comprehensive, providing a balance of information, enlightenment and entertainment for men, women and children of all ages, interests and tastes,

  (ii) be drawn from local, regional, national and international sources,

  (iii) include educational and community programs,

  (iv) provide a reasonable opportunity for the public to be exposed to the expression of differing views on matters of public concern, and

  (v) include a significant contribution from the Canadian independent production sector;

(*j*) educational programming, particularly where provided through the facilities of an independent educational authority, is an integral part of the Canadian broadcasting system;

(*k*) a range of broadcasting services in English and in French shall be extended to all Canadians as resources become available;

*h*) les titulaires de licences d'exploitation d'entreprises de radiodiffusion assument la responsabilité de leurs émissions;

*i*) la programmation offerte par le système canadien de radiodiffusion devrait à la fois :

  (i) être variée et aussi large que possible en offrant à l'intention des hommes, femmes et enfants de tous âges, intérêts et goûts une programmation équilibrée qui renseigne, éclaire et divertit,

  (ii) puiser aux sources locales, régionales, nationales et internationales,

  (iii) renfermer des émissions éducatives et ommunautaires,

  (iv) dans la mesure du possible, offrir au public l'occasion de prendre connaissance d'opinions divergentes sur des sujets qui l'intéressent,

  (v) faire appel de façon notable aux producteurs canadiens indépendants;

*j*) la programmation éducative, notamment celle qui est fournie au moyen d'installations d'un organisme éducatif indépendant, fait partie intégrante du système canadien de radiodiffusion;

*k*) une gamme de services de radiodiffusion en français et en anglais doit être progressivement offerte à tous les Canadiens, au

2012 FC 748 (CanLII)

(*l*) the Canadian Broadcasting Corporation, as the national public broadcaster, should provide radio and television services incorporating a wide range of programming that informs, enlightens and entertains;

(*m*) the programming provided by the Corporation should

    (i) be predominantly and distinctively Canadian,

    (ii) reflect Canada and its regions to national and regional audiences, while serving the special needs of those regions,

    (iii) actively contribute to the flow and exchange of cultural expression,

    (iv) be in English and in French, reflecting the different needs and circumstances of each official language community, including the particular needs and circumstances of English and French linguistic minorities,

    (v) strive to be of equivalent quality in English and in French,

    (vi) contribute to shared national consciousness and identity,

fur et à mesure de la disponibilité des moyens;

*l*) la Société Radio-Canada, à titre de radiodiffuseur public national, devrait offrir des services de radio et de télévision qui comportent une très large programmation qui renseigne, éclaire et divertit;

*m*) la programmation de la Société devrait à la fois :

    (i) être principalement et typiquement canadienne,

    (ii) refléter la globalité canadienne et rendre compte de la diversité régionale du pays, tant au plan national qu'au niveau régional, tout en répondant aux besoins particuliers des régions,

    (iii) contribuer activement à l'expression culturelle et à l'échange des diverses formes qu'elle peut prendre,

    (iv) être offerte en français et en anglais, de manière à refléter la situation et les besoins particuliers des deux collectivités de langue officielle, y compris ceux des minorités de l'une ou l'autre langue,

    (v) chercher à être de qualité équivalente en français et en anglais,

    (vi) contribuer au partage d'une conscience et d'une identité nationales,

2012 FC 748 (CanLII)

(vii) be made available throughout Canada by the most appropriate and efficient means and as resources become available for the purpose, and

(viii) reflect the multicultural and multiracial nature of Canada;

(*n*) where any conflict arises between the objectives of the Corporation set out in paragraphs (*l*) and (*m*) and the interests of any other broadcasting undertaking of the Canadian broadcasting system, it shall be resolved in the public interest, and where the public interest would be equally served by resolving the conflict in favour of either, it shall be resolved in favour of the objectives set out in paragraphs (*l*) and (*m*);

(*o*) programming that reflects the aboriginal cultures of Canada should be provided within the Canadian broadcasting system as resources become available for the purpose;

(*p*) programming accessible by disabled persons should be provided within the Canadian broadcasting system as resources become available for the purpose;

(*q*) without limiting any obligation of a broadcasting undertaking to provide the programming contemplated by paragraph (*i*), alternative television programming services in English and in French should be provided where necessary to ensure that the full range of programming contemplated by that paragraph is made available through the Canadian broadcasting system;

(vii) être offerte partout au Canada de la manière la plus adéquate et efficace, au fur et à mesure de la disponibilité des moyens,

(viii) refléter le caractère multiculturel et multiracial du Canada;

*n*) les conflits entre les objectifs de la Société énumérés aux alinéas *l*) et *m*) et les intérêts de toute autre entreprise de radiodiffusion du système canadien de radiodiffusion doivent être résolus dans le sens de l'intérêt public ou, si l'intérêt public est également assuré, en faveur des objectifs énumérés aux alinéas *l*) et *m*);

*o*) le système canadien de radiodiffusion devrait offrir une programmation qui reflète les cultures autochtones du Canada, au fur et à mesure de la disponibilité des moyens;

*p*) le système devrait offrir une programmation adaptée aux besoins des personnes atteintes d'une déficience, au fur et à mesure de la disponibilité des moyens;

*q*) sans qu'il soit porté atteinte à l'obligation qu'ont les entreprises de radiodiffusion de fournir la programmation visée à l'alinéa *i*), des services de programmation télévisée complémentaires, en anglais et en français, devraient au besoin être offerts afin que le système canadien de radiodiffusion puisse se

2012 FC 748 (CanLII)

(*r*) the programming provided by alternative television programming services should

    (i) be innovative and be complementary to the programming provided for mass audiences,

    (ii) cater to tastes and interests not adequately provided for by the programming provided for mass audiences, and include programming devoted to culture and the arts,

    (iii) reflect Canada's regions and multicultural nature,

    (iv) as far as possible, be acquired rather than produced by those services, and

    (v) be made available throughout Canada by the most cost-efficient means;

(*s*) private networks and programming undertakings should, to an extent consistent with the financial and other resources available to them,

    (i) contribute significantly to the creation and presentation of Canadian programming, and

    (ii) be responsive to the evolving demands of the public; and

conformer à cet alinéa;

*r*) la programmation offerte par ces services devrait à la fois :

    (i) être innovatrice et compléter celle qui est offerte au grand public,

    (ii) répondre aux intérêts et goûts de ceux que la programmation offerte au grand public laisse insatisfaits et comprendre des émissions consacrées aux arts et à la culture,

    (iii) refléter le caractère multiculturel du Canada et rendre compte de sa diversité régionale,

    (iv) comporter, autant que possible, des acquisitions plutôt que des productions propres,

    (v) être offerte partout au Canada de la manière la plus rentable, compte tenu de la qualité;

*s*) les réseaux et les entreprises de programmation privés devraient, dans la mesure où leurs ressources financières et autres le leur permettent, contribuer de façon notable à la création et à la présentation d'une programmation canadienne tout en demeurant réceptifs à l'évolution de la demande du public;

2012 FC 748 (CanLII)

(*t*) distribution undertakings

    (i) should give priority to the carriage of Canadian programming services and, in particular, to the carriage of local Canadian stations,

    (ii) should provide efficient delivery of programming at affordable rates, using the most effective technologies available at reasonable cost,

    (iii) should, where programming services are supplied to them by broadcasting undertakings pursuant to contractual arrangements, provide reasonable terms for the carriage, packaging and retailing of those programming services, and

    (iv) may, where the Commission considers it appropriate, originate programming, including local programming, on such terms as are conducive to the achievement of the objectives of the broadcasting policy set out in this subsection, and in particular provide access for underserved linguistic and cultural minority communities.

**Further declaration**

(2) It is further declared that the Canadian broadcasting system constitutes a single system and that the objectives of the broadcasting policy set out in subsection (1)

*t*) les entreprises de distribution :

    (i) devraient donner priorité à la fourniture des services de programmation canadienne, et ce en particulier par les stations locales canadiennes,

    (ii) devraient assurer efficacement, à l'aide des techniques les plus efficientes, la fourniture de la programmation à des tarifs abordables,

    (iii) devraient offrir des conditions acceptables relativement à la fourniture, la combinaison et la vente des services de programmation qui leur sont fournis, aux termes d'un contrat, par les entreprises de radiodiffusion,

    (iv) peuvent, si le Conseil le juge opportun, créer une programmation — locale ou autre — de nature à favoriser la réalisation des objectifs de la politique canadienne de radiodiffusion, et en particulier à permettre aux minorités linguistiques et culturelles mal desservies d'avoir accès aux services de radiodiffusion.

**Déclaration**

(2) Il est déclaré en outre que le système canadien de radiodiffusion constitue un système unique et que la meilleure façon d'atteindre les

2012 FC 748 (CanLII)

can best be achieved by providing for the regulation and supervision of the Canadian broadcasting system by a single independent public authority.

objectifs de la politique canadienne de radiodiffusion consiste à confier la réglementation et la surveillance du système canadien de radiodiffusion à un seul organisme public autonome.

**Sections 2, 3, subsection 13(4), section 27 and subsections 34(1) and 35(2) of the *Copyright Act*, RSC, 1985, c C-42, read as follows:**

**Les articles 2, 3, le paragraphe 13(4), l'article 27 et les paragraphes 34(1) et 35(2) de la *Loi sur le droit d'auteur* RSC, 1985, c C-42 se lisent comme suit:**

### Definitions

2. In this Act,

*"architectural work"*
« oeuvre architecturale »

*"architectural work"* means any building or structure or any model of a building or structure;

*"architectural work of art"*
*"architectural work of art"* [Repealed, 1993, c. 44, s. 53]

*"artistic work"*
« oeuvre artistique »

*"artistic work"* includes paintings, drawings, maps, charts, plans, photographs, engravings, sculptures, works of artistic craftsmanship, architectural works, and compilations of artistic works;

*"Berne Convention country"*
« pays partie à la Convention de Berne »

*"Berne Convention country"* means a country that is a party to the Convention for the Protection of Literary and Artistic Works concluded at Berne on September 9, 1886, or

### Définitions

2. Les définitions qui suivent s'appliquent à la présente loi.

« *accessible sur le marché* »
"commercially available"

« *accessible sur le marché* »
S'entend, en ce qui concerne une oeuvre ou de tout autre objet du droit d'auteur

> *a)* qu'il est possible de se procurer, au Canada, à un prix et dans un délai raisonnables, et de trouver moyennant des efforts raisonnables;

> *b)* pour lequel il est possible d'obtenir, à un prix et dans un délai raisonnables et moyennant des efforts raisonnables, une licence octroyée par une société de gestion pour la reproduction, l'exécution en public ou la communication au public par télécommunication, selon le cas.

« *appareil récepteur* »

2012 FC 748 (CanLII)

any one of its revisions, including the Paris Act of 1971;

*"Board"*
« Commission »

*"Board"* means the Copyright Board established by subsection 66(1);

*"book"*
« livre »

*"book"* means a volume or a part or division of a volume, in printed form, but does not include

    (*a*) a pamphlet,

    (*b*) a newspaper, review, magazine or other periodical,

    (*c*) a map, chart, plan or sheet music where the map, chart, plan or sheet music is separately published, and

    (*d*) an instruction or repair manual that accompanies a product or that is supplied as an accessory to a service;

*"broadcaster"*
« radiodiffuseur »

*"broadcaster"* means a body that, in the course of operating a broadcasting undertaking, broadcasts a communication signal in accordance with the law of the country in which the broadcasting undertaking is carried on, but excludes a body whose primary activity in relation to communication signals is their retransmission;

*"choreographic work"*
« oeuvre chorégraphique »

*"choreographic work"* includes any work of

*« appareil récepteur »*[Abrogée, 1993, ch. 44, art. 79]

*« artiste interprète »*

*« artiste interprète »*[Abrogée, 1997, ch. 24, art. 1]

*« artiste-interprète »*
French version only

*« artiste-interprète »* Tout artiste-interprète ou exécutant.

*« bibliothèque, musée ou service d'archives »*
"library, archive or museum"

*« bibliothèque, musée ou service d'archives »* S'entend :

    *a*) d'un établissement doté ou non de la personnalité morale qui :

        (i) d'une part, n'est pas constitué ou administré pour réaliser des profits, ni ne fait partie d'un organisme constitué ou administré pour réaliser des profits, ni n'est administré ou contrôlé directement ou indirectement par un tel organisme,

        (ii) d'autre part, rassemble et gère des collections de documents ou d'objets qui sont accessibles au public ou aux chercheurs;

    *b*) de tout autre établissement à but non lucratif visé par règlement.

2012 FC 748 (CanLII)

choreography, whether or not it has any story line;

*"cinematograph"*

*"cinematograph"*[Repealed, 1997, c. 24, s. 1]

*"cinematographic work"*
« oeuvre cinématographique »

*"cinematographic work"* includes any work expressed by any process analogous to cinematography, whether or not accompanied by a soundtrack;

*"collective society"*
« société de gestion »

*"collective society"* means a society, association or corporation that carries on the business of collective administration of copyright or of the remuneration right conferred by section 19 or 81 for the benefit of those who, by assignment, grant of licence, appointment of it as their agent or otherwise, authorize it to act on their behalf in relation to that collective administration, and

> (*a*) operates a licensing scheme, applicable in relation to a repertoire of works, performer's performances, sound recordings or communication signals of more than one author, performer, sound recording maker or broadcaster, pursuant to which the society, association or corporation sets out classes of uses that it agrees to authorize under this Act, and the royalties and terms and conditions on which it agrees to authorize those classes of uses, or

> (*b*) carries on the business of collecting and distributing royalties or levies payable pursuant to this Act;

« Commission »
"Board"

« Commission » La Commission du droit d'auteur constituée au titre du paragraphe 66(1).

« compilation »
"compilation"

« compilation » Les oeuvres résultant du choix ou de l'arrangement de tout ou partie d'oeuvres littéraires, dramatiques, musicales ou artistiques ou de données.

« conférence »
"lecture"

« conférence » Sont assimilés à une conférence les allocutions, discours et sermons.

« contrefaçon »
"infringing"

« contrefaçon »

> *a*) À l'égard d'une oeuvre sur laquelle existe un droit d'auteur, toute reproduction, y compris l'imitation déguisée, qui a été faite contrairement à la présente loi ou qui a fait l'objet d'un acte contraire à la présente loi;

> *b*) à l'égard d'une prestation sur laquelle existe un droit d'auteur, toute fixation ou reproduction de celle-ci qui a été faite contrairement à la présente loi ou qui a fait l'objet d'un acte contraire à la présente loi;

> *c*) à l'égard d'un enregistrement

15

*"collective work"*
« recueil »

*"collective work"* means
>   (*a*) an encyclopaedia, dictionary, year book or similar work,

>   (*b*) a newspaper, review, magazine or similar periodical, and

>   (*c*) any work written in distinct parts by different authors, or in which works or parts of works of different authors are incorporated;

*"commercially available"*
« accessible sur le marché »

*"commercially available"* means, in relation to a work or other subject-matter,

>   (*a*) available on the Canadian market within a reasonable time and for a reasonable price and may be located with reasonable effort, or

>   (*b*) for which a licence to reproduce, perform in public or communicate to the public by telecommunication is available from a collective society within a reasonable time and for a reasonable price and may be located with reasonable effort;

*"communication signal"*
« signal de communication »

*"communication signal"* means radio waves transmitted through space without any artificial guide, for reception by the public;

*"compilation"*
« compilation »

*"compilation"* means

sonore sur lequel existe un droit d'auteur, toute reproduction de celle-ci qui a été faite contrairement à la présente loi ou qui a fait l'objet d'un acte contraire à la présente loi;

*d*) à l'égard d'un signal de communication sur lequel existe un droit d'auteur, toute fixation ou reproduction de la fixation qui a été faite contrairement à la présente loi ou qui a fait l'objet d'un acte contraire à la présente loi.

La présente définition exclut la reproduction — autre que celle visée par l'alinéa 27(2)*e*) et l'article 27.1 — faite avec le consentement du titulaire du droit d'auteur dans le pays de production.

« débit »

« débit »[Abrogée, 1997, ch. 24, art. 1]

« *déficience perceptuelle* »
"perceptual disability"

« *déficience perceptuelle* »
Déficience qui empêche la lecture ou l'écoute d'une oeuvre littéraire, dramatique, musicale ou artistique sur le support original ou la rend difficile, en raison notamment :

>   *a*) de la privation en tout ou en grande partie du sens de l'ouïe ou de la vue ou de l'incapacité d'orienter le regard;

>   *b*) de l'incapacité de tenir ou de manipuler un livre;

(*a*) a work resulting from the selection or arrangement of literary, dramatic, musical or artistic works or of parts thereof, or

(*b*) a work resulting from the selection or arrangement of data;

*"computer program"*
« programme d'ordinateur »

*"computer program"* means a set of instructions or statements, expressed, fixed, embodied or stored in any manner, that is to be used directly or indirectly in a computer in order to bring about a specific result;

*"copyright"*
« droit d'auteur »

*"copyright"* means the rights described in

(*a*) section 3, in the case of a work,

(*b*) sections 15 and 26, in the case of a performer's performance,

(*c*) section 18, in the case of a sound recording, or

(*d*) section 21, in the case of a communication signal;

*"country"*
« pays »

*"country"* includes any territory;

*"defendant"*
Version anglaise seulement

*"defendant"* includes a respondent to an application;

*"delivery"*

*c*) d'une insuffisance relative à la compréhension.

*« distributeur exclusif »*
"exclusive distributor"

*« distributeur exclusif »* S'entend, en ce qui concerne un livre, de toute personne qui remplit les conditions suivantes :

*a*) le titulaire du droit d'auteur sur le livre au Canada ou le titulaire d'une licence exclusive au Canada s'y rapportant lui a accordé, avant ou après l'entrée en vigueur de la présente définition, par écrit, la qualité d'unique distributeur pour tout ou partie du Canada ou d'unique distributeur pour un secteur du marché pour tout ou partie du Canada;

*b*) elle répond aux critères fixés par règlement pris en vertu de l'article 2.6.

Il est entendu qu'une personne ne peut être distributeur exclusif au sens de la présente définition si aucun règlement n'est pris en vertu de l'article 2.6.

*« droit d'auteur »*
"copyright"

*« droit d'auteur »* S'entend du droit visé :

*a*) dans le cas d'une oeuvre, à l'article 3;

*b*) dans le cas d'une prestation, aux articles 15 et 26;

*"delivery"*[Repealed, 1997, c. 24, s. 1]

*"dramatic work"*
« oeuvre dramatique »

*"dramatic work"* includes

> (*a*) any piece for recitation, choreographic work or mime, the scenic arrangement or acting form of which is fixed in writing or otherwise,

> (*b*) any cinematographic work, and

> (*c*) any compilation of dramatic works;

*"educational institution"*
« établissement d'enseignement »

*"educational institution"* means

> (*a*) a non-profit institution licensed or recognized by or under an Act of Parliament or the legislature of a province to provide pre-school, elementary, secondary or post-secondary education,

> (*b*) a non-profit institution that is directed or controlled by a board of education regulated by or under an Act of the legislature of a province and that provides continuing, professional or vocational education or training,

> (*c*) a department or agency of any order of government, or any non-profit body, that controls or supervises education or training referred to in paragraph (*a*) or (*b*), or

> (*d*) any other non-profit institution prescribed by regulation;

*"engravings"*
« gravure »

*c*) dans le cas d'un enregistrement sonore, à l'article 18;

*d*) dans le cas d'un signal de communication, à l'article 21.

« *droits moraux* »
"moral rights"

« *droits moraux* » Les droits visés au paragraphe 14.1(1).

« *enregistrement sonore* »
"sound recording"

« *enregistrement sonore* »
Enregistrement constitué de sons provenant ou non de l'exécution d'une oeuvre et fixés sur un support matériel quelconque; est exclue de la présente définition la bande sonore d'une oeuvre cinématographique lorsqu'elle accompagne celle-ci.

« *établissement d'enseignement* »
"educational institution"

« *établissement d'enseignement* » :

> *a*) Établissement sans but lucratif agréé aux termes des lois fédérales ou provinciales pour dispenser de l'enseignement aux niveaux préscolaire, élémentaire, secondaire ou postsecondaire, ou reconnu comme tel;

> *b*) établissement sans but lucratif placé sous l'autorité d'un conseil scolaire régi par une loi provinciale et qui dispense des cours d'éducation ou de formation permanente,

2012 FC 748 (CanLII)

2012 FC 748 (CanLII)

*"engravings"* includes etchings, lithographs, woodcuts, prints and other similar works, not being photographs;

*"every original literary, dramatic, musical and artistic work"*
« toute oeuvre littéraire, dramatique, musicale ou artistique originale »

*"every original literary, dramatic, musical and artistic work"* includes every original production in the literary, scientific or artistic domain, whatever may be the mode or form of its expression, such as compilations, books, pamphlets and other writings, lectures, dramatic or dramatico-musical works, musical works, translations, illustrations, sketches and plastic works relative to geography, topography, architecture or science;

*"exclusive distributor"*
« distributeur exclusif »

*"exclusive distributor"* means, in relation to a book, a person who

> (*a*) has, before or after the coming into force of this definition, been appointed in writing, by the owner or exclusive licensee of the copyright in the book in Canada, as
>
>> (i) the only distributor of the book in Canada or any part of Canada, or
>>
>> (ii) the only distributor of the book in Canada or any part of Canada in respect of a particular sector of the market, and
>
> (*b*) meets the criteria established by regulations made under section 2.6,

and, for greater certainty, if there are no

technique ou professionnelle;

*c*) ministère ou organisme, quel que soit l'ordre de gouvernement, ou entité sans but lucratif qui exerce une autorité sur l'enseignement et la formation visés aux alinéas *a*) et *b*);

*d*) tout autre établissement sans but lucratif visé par règlement.

« gravure »
"engravings"

« gravure » Sont assimilées à une gravure les gravures à l'eau-forte, les lithographies, les gravures sur bois, les estampes et autres oeuvres similaires, à l'exclusion des photographies.

« livre »
"book"

« livre » Tout volume ou toute partie ou division d'un volume présentés sous forme imprimée, à l'exclusion :

*a*) des brochures;

*b*) des journaux, revues, magazines et autres périodiques;

*c*) des feuilles de musique, cartes, graphiques ou plans, s'ils sont publiés séparément;

*d*) des manuels d'instruction ou d'entretien qui accompagnent un produit ou sont fournis avec des services.

« locaux »

2012 FC 748 (CanLII)

regulations made under section 2.6, then no person qualifies under this definition as an "exclusive distributor";

*"Her Majesty's Realms and Territories"*
*"Her Majesty's Realms and Territories"*[Repealed, 1997, c. 24, s. 1]

*"infringing"*
« contrefaçon »

*"infringing"* means

> (*a*) in relation to a work in which copyright subsists, any copy, including any colourable imitation, made or dealt with in contravention of this Act,

> (*b*) in relation to a performer's performance in respect of which copyright subsists, any fixation or copy of a fixation of it made or dealt with in contravention of this Act,

> (*c*) in relation to a sound recording in respect of which copyright subsists, any copy of it made or dealt with in contravention of this Act, or

> (*d*) in relation to a communication signal in respect of which copyright subsists, any fixation or copy of a fixation of it made or dealt with in contravention of this Act.

The definition includes a copy that is imported in the circumstances set out in paragraph 27(2)(*e*) and section 27.1 but does not otherwise include a copy made with the consent of the owner of the copyright in the country where the copy was made;

*"lecture"*
« conférence »

*"lecture"* includes address, speech and

"premises"

« *locaux* » S'il s'agit d'un établissement d'enseignement, lieux où celui-ci dispense l'enseignement ou la formation visés à la définition de ce terme ou exerce son autorité sur eux.

« *membre de l'OMC* »
"WTO Member"

« *membre de l'OMC* » Membre de l'Organisation mondiale du commerce au sens du paragraphe 2(1) de la *Loi de mise en oeuvre de l'Accord sur l'Organisation mondiale du commerce*.

« *ministre* »
"Minister"

« *ministre* » Sauf à l'article 44.1, le ministre de l'Industrie.

« *oeuvre* »
"work"

« *oeuvre* » Est assimilé à une oeuvre le titre de l'oeuvre lorsque celui-ci est original et distinctif.

« *oeuvre architecturale* »
"architectural work"

« *oeuvre architecturale* » Tout bâtiment ou édifice ou tout modèle ou maquette de bâtiment ou d'édifice.

« *oeuvre artistique* »
"artistic work"

« *oeuvre artistique* » Sont compris parmi les oeuvres artistiques les peintures, dessins, sculptures,

sermon;

*"legal representatives"*
« représentants légaux »

*"legal representatives"* includes heirs, executors, administrators, successors and assigns, or agents or attorneys who are thereunto duly authorized in writing;

*"library, archive or museum"*
«bibliothèque, musée ou service d'archives»

*"library, archive or museum"* means

(*a*) an institution, whether or not incorporated, that is not established or conducted for profit or that does not form a part of, or is not administered or directly or indirectly controlled by, a body that is established or conducted for profit, in which is held and maintained a collection of documents and other materials that is open to the public or to researchers, or

(*b*) any other non-profit institution prescribed by regulation;

*"literary work"*
« oeuvre littéraire »

*"literary work"* includes tables, computer programs, and compilations of literary works;

*"maker"*
« producteur »

*"maker"* means

(*a*) in relation to a cinematographic work, the person by whom the arrangements necessary for the making of the work are undertaken, or

oeuvres architecturales, gravures ou photographies, les oeuvres artistiques dues à des artisans ainsi que les graphiques, cartes, plans et compilations d'oeuvres artistiques.

« *oeuvre chorégraphique* »
"choreographic work"

« *oeuvre chorégraphique* » S'entend de toute chorégraphie, que l'oeuvre ait ou non un sujet.

« *oeuvre cinématographique* »
"cinematographic work"

« *oeuvre cinématographique* » Y est assimilée toute oeuvre exprimée par un procédé analogue à la cinématographie, qu'elle soit accompagnée ou non d'une bande sonore.

« *oeuvre créée en collaboration* »
"work of joint authorship"

« *oeuvre créée en collaboration* » Oeuvre exécutée par la collaboration de deux ou plusieurs auteurs, et dans laquelle la part créée par l'un n'est pas distincte de celle créée par l'autre ou les autres.

« *oeuvre d'art architecturale* »

« *oeuvre d'art architecturale* »[Abrogée, 1993, ch. 44, art. 53]

« *oeuvre de sculpture* »
« *oeuvre de sculpture* »[Abrogée, 1997, ch. 24, art. 1]

« *oeuvre dramatique* »
"dramatic work"

« *oeuvre dramatique* » Y sont

2012 FC 748 (CanLII)

(*b*) in relation to a sound recording, the person by whom the arrangements necessary for the first fixation of the sounds are undertaken;

*"Minister"*
« ministre »

*"Minister"*, except in section 44.1, means the Minister of Industry;

*"moral rights"*
« droits moraux »

*"moral rights"* means the rights described in subsection 14.1(1);

*"musical work"*
« oeuvre musicale »

*"musical work"* means any work of music or musical composition, with or without words, and includes any compilation thereof;

*"perceptual disability"*
« déficience perceptuelle »

*"perceptual disability"* means a disability that prevents or inhibits a person from reading or hearing a literary, musical, dramatic or artistic work in its original format, and includes such a disability resulting from

(*a*) severe or total impairment of sight or hearing or the inability to focus or move one's eyes,

(*b*) the inability to hold or manipulate a book, or

(*c*) an impairment relating to comprehension;

*"performance"*
« représentation » ou « exécution »

assimilées les pièces pouvant être récitées, les oeuvres chorégraphiques ou les pantomimes dont l'arrangement scénique ou la mise en scène est fixé par écrit ou autrement, les oeuvres cinématographiques et les compilations d'oeuvres dramatiques.

« oeuvre littéraire »
"literary work"

« oeuvre littéraire » Y sont assimilés les tableaux, les programmes d'ordinateur et les compilations d'oeuvres littéraires.

« oeuvre musicale »
"musical work"

« oeuvre musicale » Toute oeuvre ou toute composition musicale — avec ou sans paroles — et toute compilation de celles-ci.

« pays »
"country"

« pays » S'entend notamment d'un territoire.

« pays partie à la Convention de Berne »
"Berne Convention country"

« pays partie à la Convention de Berne » Pays partie à la Convention pour la protection des oeuvres littéraires et artistiques, conclue à Berne le 9 septembre 1886, ou à l'une de ses versions révisées, notamment celle de l'Acte de Paris de 1971.

« pays partie à la Convention de Rome »

2012 FC 748 (CanLII)

2012 FC 748 (CanLII)

*"performance"* means any acoustic or visual representation of a work, performer's performance, sound recording or communication signal, including a representation made by means of any mechanical instrument, radio receiving set or television receiving set;

*"performer's performance"*
« prestation »

*"performer's performance"* means any of the following when done by a performer:

    (*a*) a performance of an artistic work, dramatic work or musical work, whether or not the work was previously fixed in any material form, and whether or not the work's term of copyright protection under this Act has expired,

    (*b*) a recitation or reading of a literary work, whether or not the work's term of copyright protection under this Act has expired, or

    (*c*) an improvisation of a dramatic work, musical work or literary work, whether or not the improvised work is based on a pre-existing work;

*"photograph"*
« photographie »

*"photograph"* includes photo-lithograph and any work expressed by any process analogous to photography;

*"plaintiff"*
Version anglaise seulement

*"plaintiff"* includes an applicant;

*"plate"*
« planche »

"Rome Convention country"

« *pays partie à la Convention de Rome* » Pays partie à la Convention internationale sur la protection des artistes interprètes ou exécutants, des producteurs d'enregistrements sonores et des organismes de radiodiffusion, conclue à Rome le 26 octobre 1961.

« *pays partie à la Convention universelle* »
"UCC country"

« *pays partie à la Convention universelle* » Pays partie à la Convention universelle sur le droit d'auteur, adoptée à Genève (Suisse) le 6 septembre 1952, ou dans sa version révisée à Paris (France) le 24 juillet 1971.

« *pays signataire* »
"treaty country"

« *pays signataire* » Pays partie à la Convention de Berne ou à la Convention universelle ou membre de l'OMC.

« *photographie* »
"photograph"

« *photographie* » Y sont assimilées les photolithographies et toute oeuvre exprimée par un procédé analogue à la photographie.

« *planche* »
"plate"

« *planche* » Sont assimilés à une planche toute planche stéréotypée ou autre, pierre, matrice, transposition et épreuve négative, et tout moule

2012 FC 748 (CanLII)

*"plate"* includes

> (*a*) any stereotype or other plate, stone, block, mould, matrix, transfer or negative used or intended to be used for printing or reproducing copies of any work, and

> (*b*) any matrix or other appliance used or intended to be used for making or reproducing sound recordings, performer's performances or communication signals;

*"premises"*
« locaux »

*"premises"* means, in relation to an educational institution, a place where education or training referred to in the definition "educational institution" is provided, controlled or supervised by the educational institution;

*"receiving device"*
*"receiving device"*[Repealed, 1993, c. 44, s. 79]

*"Rome Convention country"*
« pays partie à la Convention de Rome »

*"Rome Convention country"* means a country that is a party to the International Convention for the Protection of Performers, Producers of Phonograms and Broadcasting Organisations, done at Rome on October 26, 1961;

*"sculpture"*
« sculpture »

*"sculpture"* includes a cast or model;

*"sound recording"*
« enregistrement sonore »

ou cliché, destinés à l'impression ou à la reproduction d'exemplaires d'une oeuvre, ainsi que toute matrice ou autre pièce destinées à la fabrication ou à la reproduction d'enregistrements sonores, de prestations ou de signaux de communication, selon le cas.

« *prestation* »
"performer's performance"

« *prestation* » Selon le cas, que l'oeuvre soit encore protégée ou non et qu'elle soit déjà fixée sous une forme matérielle quelconque ou non :

> *a*) l'exécution ou la représentation d'une oeuvre artistique, dramatique ou musicale par un artiste-interprète;

> *b*) la récitation ou la lecture d'une oeuvre littéraire par celui-ci;

> *c*) une improvisation dramatique, musicale ou littéraire par celui-ci, inspirée ou non d'une oeuvre préexistante.

« *producteur* »
"maker"

« *producteur* » La personne qui effectue les opérations nécessaires à la confection d'une oeuvre cinématographique, ou à la première fixation de sons dans le cas d'un enregistrement sonore.

« *programme d'ordinateur* »
"computer program"

*"sound recording"* means a recording, fixed in any material form, consisting of sounds, whether or not of a performance of a work, but excludes any soundtrack of a cinematographic work where it accompanies the cinematographic work;

*"telecommunication"*
« télécommunication »

*"telecommunication"* means any transmission of signs, signals, writing, images or sounds or intelligence of any nature by wire, radio, visual, optical or other electromagnetic system;

*"treaty country"*
« pays signataire »

*"treaty country"* means a Berne Convention country, UCC country or WTO Member;
*"UCC country"*

« pays partie à la Convention universelle »

*"UCC country"* means a country that is a party to the Universal Copyright Convention, adopted on September 6, 1952 in Geneva, Switzerland, or to that Convention as revised in Paris, France on July 24, 1971;

*"work"*
« oeuvre »

*"work"* includes the title thereof when such title is original and distinctive;

*"work of joint authorship"*
« oeuvre créée en collaboration »

*"work of joint authorship"* means a work produced by the collaboration of two or more authors in which the contribution of one author is not distinct from the contribution of the other author or authors;

« *programme d'ordinateur* »
Ensemble d'instructions ou d'énoncés destiné, quelle que soit la façon dont ils sont exprimés, fixés, incorporés ou emmagasinés, à être utilisé directement ou indirectement dans un ordinateur en vue d'un résultat particulier.

« *radiodiffuseur* »
"broadcaster"

« *radiodiffuseur* » Organisme qui, dans le cadre de l'exploitation d'une entreprise de radiodiffusion, émet un signal de communication en conformité avec les lois du pays où il exploite cette entreprise; est exclu de la présente définition l'organisme dont l'activité principale, liée au signal de communication, est la retransmission de celui-ci.

« *recueil* »
"collective work"
« *recueil* »

> *a*) Les encyclopédies, dictionnaires, annuaires ou oeuvres analogues;

> *b*) les journaux, revues, magazines ou autres publications périodiques;

> *c*) toute oeuvre composée, en parties distinctes, par différents auteurs ou dans laquelle sont incorporées des oeuvres ou parties d'oeuvres d'auteurs différents.

« *représentants légaux* »
"legal representatives"

« *représentants légaux* » Sont

2012 FC 748 (CanLII)

*"work of sculpture"*

*"work of sculpture"* [Repealed, 1997, c. 24, s. 1]

*"WTO Member"*
« membre de l'OMC »

*"WTO Member"* means a Member of the World Trade Organization as defined in subsection 2(1) of the *World Trade Organization Agreement Implementation Act*.

**Compilations**

2.1 (1) A compilation containing two or more of the categories of literary, dramatic, musical or artistic works shall be deemed to be a compilation of the category making up the most substantial part of the compilation.

**Idem**

(2) The mere fact that a work is included in a compilation does not increase, decrease or otherwise affect the protection conferred by this Act in respect of the copyright in the work or the moral rights in respect of the work.

Definition of *"maker"*

2.11 For greater certainty, the arrangements referred to in paragraph (*b*) of the definition *"maker"* in section 2, as that term is used in section 19 and in the definition *"eligible maker"* in section 79, include arrangements for entering into contracts with performers, financial arrangements and technical arrangements required for the first fixation of the sounds for a sound recording.

Definition of *"publication"*

2.2 (1) For the purposes of this Act,

compris parmi les représentants légaux les héritiers, exécuteurs testamentaires, administrateurs, successeurs et ayants droit, ou les agents ou fondés de pouvoir régulièrement constitués par mandat écrit.

« *représentation* »
« *représentation* », « *exécution* » ou « *audition* » [Abrogée, 1997, ch. 24, art. 1]

« *représentation* » ou « *exécution* »
"performance"

« *représentation* » ou « *exécution* » Toute exécution sonore ou toute représentation visuelle d'une oeuvre, d'une prestation, d'un enregistrement sonore ou d'un signal de communication, selon le cas, y compris l'exécution ou la représentation à l'aide d'un instrument mécanique, d'un appareil récepteur de radio ou d'un appareil récepteur de télévision.

« *royaumes et territoires de Sa Majesté* »

« *royaumes et territoires de Sa Majesté* » [Abrogée, 1997, ch. 24, art. 1]

« *sculpture* »
"sculpture"

« *sculpture* » Y sont assimilés les moules et les modèles.

« *signal de communication* »
"communication signal"

« *signal de communication* » Ondes radioélectriques diffusées dans

*"publication"* means

    (*a*) in relation to works,

        (i) making copies of a work available to the public,

        (ii) the construction of an architectural work, and

        (iii) the incorporation of an artistic work into an architectural work, and

    (*b*) in relation to sound recordings, making copies of a sound recording available to the public,

but does not include

    (*c*) the performance in public, or the communication to the public by telecommunication, of a literary, dramatic, musical or artistic work or a sound recording, or

    (*d*) the exhibition in public of an artistic work.

### Issue of photographs and engravings

(2) For the purpose of subsection (1), the issue of photographs and engravings of sculptures and architectural works is not deemed to be publication of those works.

### Where no consent of copyright owner

(3) For the purposes of this Act, other than in respect of infringement of copyright, a work or other subject-matter is not deemed to be published or performed in public or communicated to the public by telecommunication if that act is done without the consent of the owner of the copyright.

### Unpublished works

l'espace sans guide artificiel, aux fins de réception par le public.

« *société de gestion* »
"collective society"

« *société de gestion* » Association, société ou personne morale autorisée — notamment par voie de cession, licence ou mandat — à se livrer à la gestion collective du droit d'auteur ou du droit à rémunération conféré par les articles 19 ou 81 pour l'exercice des activités suivantes :

    *a*) l'administration d'un système d'octroi de licences portant sur un répertoire d'oeuvres, de prestations, d'enregistrements sonores ou de signaux de communication de plusieurs auteurs, artistes-interprètes, producteurs d'enregistrements sonores ou radiodiffuseurs et en vertu duquel elle établit les catégories d'utilisation qu'elle autorise au titre de la présente loi ainsi que les redevances et modalités afférentes;

    *b*) la perception et la répartition des redevances payables aux termes de la présente loi.

« *télécommunication* »
"telecommunication"

« *télécommunication* » Vise toute transmission de signes, signaux, écrits, images, sons ou renseignements de toute nature par fil, radio, procédé visuel ou optique, ou autre système électromagnétique.

« *toute oeuvre littéraire, dramatique, musicale ou artistique*

2012 FC 748 (CanLII)

(4) Where, in the case of an unpublished work, the making of the work is extended over a considerable period, the conditions of this Act conferring copyright are deemed to have been complied with if the author was, during any substantial part of that period, a subject or citizen of, or a person ordinarily resident in, a country to which this Act extends.

**Telecommunication**

2.3 A person who communicates a work or other subject-matter to the public by telecommunication does not by that act alone perform it in public, nor by that act alone is deemed to authorize its performance in public.

**Communication to the public by telecommunication**

2.4 (1) For the purposes of communication to the public by telecommunication,

(*a*) persons who occupy apartments, hotel rooms or dwelling units situated in the same building are part of the public, and a communication intended to be received exclusively by such persons is a communication to the public;

(*b*) a person whose only act in respect of the communication of a work or other subject-matter to the public consists of providing the means of telecommunication necessary for another person to so communicate the work or other subject-matter does not communicate that work or other subject-matter to the public; and

(*c*) where a person, as part of

(i) a network, within the meaning of

*originale »*
"every original literary, dramatic, musical and artistic work"

*« toute oeuvre littéraire, dramatique, musicale ou artistique originale »* S'entend de toute production originale du domaine littéraire, scientifique ou artistique quels qu'en soient le mode ou la forme d'expression, tels les compilations, livres, brochures et autres écrits, les conférences, les oeuvres dramatiques ou dramatico-musicales, les oeuvres musicales, les traductions, les illustrations, les croquis et les ouvrages plastiques relatifs à la géographie, à la topographie, à l'architecture ou aux sciences.

**Compilations**

**2.1** (1) La compilation d'oeuvres de catégories diverses est réputée constituer une compilation de la catégorie représentant la partie la plus importante.
**Idem**

(2) L'incorporation d'une oeuvre dans une compilation ne modifie pas la protection conférée par la présente loi à l'oeuvre au titre du droit d'auteur ou des droits moraux.

Définition de *« producteur »*

**2.11** Il est entendu que pour l'application de l'article 19 et de la définition de *« producteur admissible »* à l'article 79, les opérations nécessaires visées à la définition de *« producteur »* à l'article 2 s'entendent des opérations liées à la conclusion des contrats

2012 FC 748 (CanLII)

the *Broadcasting Act*, whose operations result in the communication of works or other subject-matter to the public, or

(ii) any programming undertaking whose operations result in the communication of works or other subject-matter to the public,

transmits by telecommunication a work or other subject-matter that is communicated to the public by another person who is not a retransmitter of a signal within the meaning of subsection 31(1), the transmission and communication of that work or other subject-matter by those persons constitute a single communication to the public for which those persons are jointly and severally liable.

## Regulations

(2) The Governor in Council may make regulations defining "programming undertaking" for the purpose of paragraph (1)(*c*).

## Exception

(3) A work is not communicated in the manner described in paragraph (1)(*c*) or 3(1)(*f*) where a signal carrying the work is retransmitted to a person who is a retransmitter within the meaning of subsection 31(1).

## What constitutes rental

2.5 (1) For the purposes of paragraphs 3(1)(*h*) and (*i*), 15(1)(*c*) and 18(1)(*c*), an arrangement, whatever its form, constitutes a rental of a computer program or sound recording if, and only if,

avec les artistes-interprètes, au financement et aux services techniques nécessaires à la première fixation de sons dans le cas d'un enregistrement sonore.

Définition de « *publication* »

**2.2** (1) Pour l'application de la présente loi, « *publication* » s'entend :

*a*) à l'égard d'une oeuvre, de la mise à la disposition du public d'exemplaires de l'oeuvre, de l'édification d'une oeuvre architecturale ou de l'incorporation d'une oeuvre artistique à celle-ci;

*b*) à l'égard d'un enregistrement sonore, de la mise à la disposition du public d'exemplaires de celui-ci.

Sont exclues de la publication la représentation ou l'exécution en public d'une oeuvre littéraire, dramatique, musicale ou artistique ou d'un enregistrement sonore, leur communication au public par télécommunication ou l'exposition en public d'une oeuvre artistique.

**Édition de photographies et de gravures**

(2) Pour l'application du paragraphe (1), l'édition de photographies et de gravures de sculptures et d'oeuvres architecturales n'est pas réputée être une publication de ces oeuvres.

**Absence de consentement du titulaire du droit d'auteur**

2012 FC 748 (CanLII)

(*a*) it is in substance a rental, having regard to all the circumstances; and

(*b*) it is entered into with motive of gain in relation to the overall operations of the person who rents out the computer program or sound recording, as the case may be.

**Motive of gain**

(2) For the purpose of paragraph (1)(*b*), a person who rents out a computer program or sound recording with the intention of recovering no more than the costs, including overhead, associated with the rental operations does not by that act alone have a motive of gain in relation to the rental operations.

**Exclusive distributor**

2.6 The Governor in Council may make regulations establishing distribution criteria for the purpose of paragraph (*b*) of the definition "exclusive distributor" in section 2.

**Exclusive licence**

2.7 For the purposes of this Act, an exclusive licence is an authorization to do any act that is subject to copyright to the exclusion of all others including the copyright owner, whether the authorization is granted by the owner or an exclusive licensee claiming under the owner.

(3) Pour l'application de la présente loi — sauf relativement à la violation du droit d'auteur —, une oeuvre ou un autre objet du droit d'auteur n'est pas réputé publié, représenté en public ou communiqué au public par télécommunication si le consentement du titulaire du droit d'auteur n'a pas été obtenu.

**Oeuvre non publiée**

(4) Quand, dans le cas d'une oeuvre non publiée, la création de l'oeuvre s'étend sur une période considérable, les conditions de la présente loi conférant le droit d'auteur sont réputées observées si l'auteur, pendant une partie importante de cette période, était sujet, citoyen ou résident habituel d'un pays visé par la présente loi.

**Télécommunication**

**2.3** Quiconque communique au public par télécommunication une oeuvre ou un autre objet du droit d'auteur ne les exécute ni ne les représente en public de ce fait, ni n'est réputé, du seul fait de cette communication, autoriser une telle exécution ou représentation en public.

**Communication au public par telecommunication**

**2.4** (1) Les règles qui suivent s'appliquent dans les cas de communication au public par télécommunication :

*a*) font partie du public les personnes qui occupent les locaux d'un même immeuble

2012 FC 748 (CanLII)

d'habitation, tel un appartement ou une chambre d'hôtel, et la communication qui leur est exclusivement destinée est une communication au public;

*b*) n'effectue pas une communication au public la personne qui ne fait que fournir à un tiers les moyens de télécommunication nécessaires pour que celui-ci l'effectue;

*c*) toute transmission par une personne par télécommunication, communiquée au public par une autre — sauf le retransmetteur d'un signal, au sens du paragraphe 31(1) — constitue une communication unique au public, ces personnes étant en l'occurrence solidaires, dès lors qu'elle s'effectue par suite de l'exploitation même d'un réseau au sens de la *Loi sur la radiodiffusion* ou d'une entreprise de programmation.

**Règlement**

(2) Le gouverneur en conseil peut, par règlement, définir « entreprise de programmation » pour l'application de l'alinéa (1) *c*).

**Restriction**

(3) La retransmission d'un signal à un retransmetteur au sens du paragraphe 31(1) n'est pas visée par les alinéas (1) *c*) et 3(1) *f*).

**Location**

**2.5** (1) Pour l'application des alinéas

2012 FC 748 (CanLII)

3(1)*h*) et *i*), 15(1)*c*) et 18(1)*c*), équivaut à une location l'accord — quelle qu'en soit la forme et compte tenu des circonstances — qui en a la nature et qui est conclu avec l'intention de faire un gain dans le cadre des activités générales du loueur de programme d'ordinateur ou d'enregistrement sonore, selon le cas.

**Intention du loueur**

(2) Il n'y a toutefois pas intention de faire un gain lorsque le loueur n'a que l'intention de recouvrer les coûts — frais généraux compris — afférents à la location.

**Distributeur exclusive**

**2.6** Le gouverneur en conseil peut, par règlement, fixer les critères de distribution pour l'application de la définition de « distributeur exclusif » figurant à l'article 2.

**Licence exclusive**

**2.7** Pour l'application de la présente loi, une licence exclusive est l'autorisation accordée au licencié d'accomplir un acte visé par un droit d'auteur de façon exclusive, qu'elle soit accordée par le titulaire du droit d'auteur ou par une personne déjà titulaire d'une licence exclusive; l'exclusion vise tous les titulaires.

**Copyright in works**

3. (1) For the purposes of this Act, "copyright", in relation to a work, means the sole right to produce or reproduce the work or any substantial part thereof in any material form whatever, to perform the work

**Droit d'auteur sur l'oeuvre**

**3.** (1) Le droit d'auteur sur l'oeuvre comporte le droit exclusif de produire ou reproduire la totalité ou une partie importante de l'oeuvre, sous une forme matérielle

or any substantial part thereof in public or, if the work is unpublished, to publish the work or any substantial part thereof, and includes the sole right

quelconque, d'en exécuter ou d'en représenter la totalité ou une partie importante en public et, si l'oeuvre n'est pas publiée, d'en publier la totalité ou une partie importante; ce droit comporte, en outre, le droit exclusif :

(*a*) to produce, reproduce, perform or publish any translation of the work,

*a*) de produire, reproduire, représenter ou publier une traduction de l'oeuvre;

(*b*) in the case of a dramatic work, to convert it into a novel or other non-dramatic work,

*b*) s'il s'agit d'une oeuvre dramatique, de la transformer en un roman ou en une autre oeuvre non dramatique;

(*c*) in the case of a novel or other non-dramatic work, or of an artistic work, to convert it into a dramatic work, by way of performance in public or otherwise,

*c*) s'il s'agit d'un roman ou d'une autre oeuvre non dramatique, ou d'une oeuvre artistique, de transformer cette oeuvre en une oeuvre dramatique, par voie de représentation publique ou autrement;

(*d*) in the case of a literary, dramatic or musical work, to make any sound recording, cinematograph film or other contrivance by means of which the work may be mechanically reproduced or performed,

*d*) s'il s'agit d'une oeuvre littéraire, dramatique ou musicale, d'en faire un enregistrement sonore, film cinématographique ou autre support, à l'aide desquels l'oeuvre peut être reproduite, représentée ou exécutée mécaniquement;

(*e*) in the case of any literary, dramatic, musical or artistic work, to reproduce, adapt and publicly present the work as a cinematographic work,

*e*) s'il s'agit d'une oeuvre littéraire, dramatique, musicale ou artistique, de reproduire, d'adapter et de présenter publiquement l'oeuvre en tant qu'oeuvre cinématographique;

(*f*) in the case of any literary, dramatic, musical or artistic work, to communicate the work to the public by

*f*) de communiquer au public, par télécommunication, une oeuvre littéraire, dramatique,

2012 FC 748 (CanLII)

telecommunication,

(*g*) to present at a public exhibition, for a purpose other than sale or hire, an artistic work created after June 7, 1988, other than a map, chart or plan,

(*h*) in the case of a computer program that can be reproduced in the ordinary course of its use, other than by a reproduction during its execution in conjunction with a machine, device or computer, to rent out the computer program, and

(*i*) in the case of a musical work, to rent out a sound recording in which the work is embodied,

and to authorize any such acts.

### Simultaneous fixing

(1.1) A work that is communicated in the manner described in paragraph (1)(*f*) is fixed even if it is fixed simultaneously with its communication.

### *Ownership of Copyright*

**13.** (4) The owner of the copyright in any work may assign the right, either wholly or partially, and either generally or subject to limitations relating to territory, medium or sector of the market or other limitations relating to the scope of the assignment, and either for the whole term of the copyright or for any other part thereof, and may grant any

musicale ou artistique;

*g*) de présenter au public lors d'une exposition, à des fins autres que la vente ou la location, une oeuvre artistique — autre qu'une carte géographique ou marine, un plan ou un graphique — créée après le 7 juin 1988;

*h*) de louer un programme d'ordinateur qui peut être reproduit dans le cadre normal de son utilisation, sauf la reproduction effectuée pendant son exécution avec un ordinateur ou autre machine ou appareil;

*i*) s'il s'agit d'une oeuvre musicale, d'en louer tout enregistrement sonore.

Est inclus dans la présente définition le droit exclusif d'autoriser ces actes.

### Fixation

(1.1) Dans le cadre d'une communication effectuée au titre de l'alinéa (1)*f*), une oeuvre est fixée même si sa fixation se fait au moment de sa communication.

### Possession du droit d'auteur

**13.** (4) Le titulaire du droit d'auteur sur une oeuvre peut céder ce droit, en totalité ou en partie, d'une façon générale ou avec des restrictions relatives au territoire, au support matériel, au secteur du marché ou à la portée de la cession, pour la durée complète ou partielle de la

2012 FC 748 (CanLII)

interest in the right by licence, but no assignment or grant is valid unless it is in writing signed by the owner of the right in respect of which the assignment or grant is made, or by the owner's duly authorized agent.

protection; il peut également concéder, par une licence, un intérêt quelconque dans ce droit; mais la cession ou la concession n'est valable que si elle est rédigée par écrit et signée par le titulaire du droit qui en fait l'objet, ou par son agent dûment autorisé.

### Infringement generally

**27.** (1) It is an infringement of copyright for any person to do, without the consent of the owner of the copyright, anything that by this Act only the owner of the copyright has the right to do.

### Règle générale

**27.** (1) Constitue une violation du droit d'auteur l'accomplissement, sans le consentement du titulaire de ce droit, d'un acte qu'en vertu de la présente loi seul ce titulaire a la faculté d'accomplir.

### Secondary infringement

(2) It is an infringement of copyright for any person to

### Violation à une étape ultérieure

(2) Constitue une violation du droit d'auteur l'accomplissement de tout acte ci-après en ce qui a trait à l'exemplaire d'une oeuvre, d'une fixation d'une prestation, d'un enregistrement sonore ou d'une fixation d'un signal de communication alors que la personne qui accomplit l'acte sait ou devrait savoir que la production de l'exemplaire constitue une violation de ce droit, ou en constituerait une si l'exemplaire avait été produit au Canada par la personne qui l'a produit :

(*a*) sell or rent out,

*a*) la vente ou la location;

(*b*) distribute to such an extent as to affect prejudicially the owner of the copyright,

*b*) la mise en circulation de façon à porter préjudice au titulaire du droit d'auteur;

(*c*) by way of trade distribute, expose or offer for sale or rental, or exhibit in public,

*c*) la mise en circulation, la mise ou l'offre en vente ou en location, ou l'exposition en public, dans un but commercial;

2012 FC 748 (CanLII)

(*d*) possess for the purpose of doing anything referred to in paragraphs (*a*) to (*c*), or

(*e*) import into Canada for the purpose of doing anything referred to in paragraphs (*a*) to (*c*),

a copy of a work, sound recording or fixation of a performer's performance or of a communication signal that the person knows or should have known infringes copyright or would infringe copyright if it had been made in Canada by the person who made it.

**Knowledge of importer**

(3) In determining whether there is an infringement under subsection (2) in the case of an activity referred to in any of paragraphs (2)(*a*) to (*d*) in relation to a copy that was imported in the circumstances referred to in paragraph (2)(*e*), it is irrelevant whether the importer knew or should have known that the importation of the copy infringed copyright.

**Plates**

(4) It is an infringement of copyright for any person to make or possess a plate that has been specifically designed or adapted for the purpose of making infringing copies of a work or other subject-matter.

**Public performance for profit**

(5) It is an infringement of copyright for any person, for profit, to permit a theatre or other place of entertainment to be used for the performance in public of a work or other

*d*) la possession en vue de l'un ou l'autre des actes visés aux alinéas *a*) à *c*);

*e*) l'importation au Canada en vue de l'un ou l'autre des actes visés aux alinéas *a*) à *c*).

**Précision**

(3) Lorsqu'il s'agit de décider si les actes visés aux alinéas (2)*a*) à *d*), dans les cas où ils se rapportent à un exemplaire importé dans les conditions visées à l'alinéa (2)*e*), constituent des violations du droit d'auteur, le fait que l'importateur savait ou aurait dû savoir que l'importation de l'exemplaire constituait une violation n'est pas pertinent.

**Planches**

(4) Constitue une violation du droit d'auteur la confection d'une planche conçue ou adaptée précisément pour la contrefaçon d'une oeuvre ou de tout autre objet du droit d'auteur, ou le fait de l'avoir en sa possession.

**Représentation dans un but de profit**

(5) Constitue une violation du droit d'auteur le fait, dans un but de profit, de permettre l'utilisation d'un théâtre ou d'un autre lieu de

2012 FC 748 (CanLII)

subject-matter without the consent of the owner of the copyright unless that person was not aware, and had no reasonable ground for suspecting, that the performance would be an infringement of copyright.

divertissement pour l'exécution en public d'une oeuvre ou de tout autre objet du droit d'auteur sans le consentement du titulaire du droit d'auteur, à moins que la personne qui permet cette utilisation n'ait ignoré et n'ait eu aucun motif raisonnable de soupçonner que l'exécution constituerait une violation du droit d'auteur.

**Presumptions respecting copyright and ownership**

**Droit d'auteur**

**34.1** (1) In any proceedings for infringement of copyright in which the defendant puts in issue either the existence of the copyright or the title of the plaintiff thereto,

**34.** (1) En cas de violation d'un droit d'auteur, le titulaire du droit est admis, sous réserve des autres dispositions de la présente loi, à exercer tous les recours — en vue notamment d'une injonction, de dommages-intérêts, d'une reddition de compte ou d'une remise — que la loi accorde ou peut accorder pour la violation d'un droit.

(*a*) copyright shall be presumed, unless the contrary is proved, to subsist in the work, performer's performance, sound recording or communication signal, as the case may be; and

(*b*) the author, performer, maker or broadcaster, as the case may be, shall, unless the contrary is proved, be presumed to be the owner of the copyright.

**Liability for infringement**

**Violation du droit d'auteur : responsabilité**

**35.** (2) In proving profits,

**35.** (2) Dans la détermination des profits, le demandeur n'est tenu d'établir que ceux provenant de la violation et le défendeur doit prouver chaque élément du coût qu'il allègue.

(*a*) the plaintiff shall be required to prove only receipts or revenues derived from the infringement; and

(*b*) the defendant shall be required to prove every element of cost that the defendant claims.

## FEDERAL COURT

## SOLICITORS OF RECORD

| | |
|---|---|
| **DOCKET:** | T-299-05 |
| **STYLE OF CAUSE:** | CATHERINE LEUTHOLD<br>v<br>CANADIAN BROADCASTING<br>CORPORATION<br>and<br>JERRY MCINTOSH |
| **PLACE OF HEARING:** | Montreal, Quebec |
| **DATE OF HEARING:** | February 6, 7 8, 9, 13 and 14, 2012 |
| **REASONS FOR JUDGMENT<br>AND JUDGMENT:** | SCOTT J. |
| **DATED:** | June 14, 2012 |

**APPEARANCES:**

Daniel O'Connor                                        FOR THE PLAINTIFF

Christian Leblanc                                      FOR THE RESPONDENTS

**SOLICITORS OF RECORD:**

Daniel O'Connor, Avocats                               FOR THE PLAINTIFF
Pointe-Claire, Québec

Myles J. Kirvan                                        FOR THE RESPONDENTS
Deputy Attorney General of Canada
Montréal, Québec

2012 FC 748 (CanLII)

# TAB 96

281 B.R. 535
United States Bankruptcy Court,
D. Delaware.

In re LIDS CORPORATION, Debtor.
Lids Corporation, Plaintiff,
v.
Marathon Investment Partners, L.P., Defendant.

Bankruptcy No. 01–21 (MFW).    |    Adversary
No. 01–4758(MFW).    |    Aug. 6, 2002.

Chapter 11 debtor brought adversary proceeding to avoid, as preference, the security interest granted to creditor less than 90 days prepetition, and creditor defended solely on theory that debtor was solvent at time of transfer. The Bankruptcy Court, Mary F. Walrath, J., held that: (1) valuation evidence that was based for most part on book value of debtor's assets as reported according to generally accepted accounting principles (GAAP) was insufficient to rebut the statutory presumption of insolvency during 90-day preference period; (2) analyses conducted by transferee's expert using market multiple methodology and comparable transaction methodology were likewise insufficient to rebut debtor's presumptive insolvency; and (3) supposed non-financial indicators of debtor's solvency were not probative and were insufficient to rebut presumption.

Judgment for debtor.

West Headnotes (16)

**[1]**    **Bankruptcy**
    Insolvency

**Bankruptcy**
    Preferences

In preference avoidance proceeding, transferee must present sufficient evidence that debtor was solvent on transfer date to rebut statutory presumption of insolvency, and where transferee fails to do so, debtor is entitled to rely on presumption to establish that it was insolvent. Bankr.Code, 11 U.S.C.A. § 547(f).

Cases that cite this headnote

**[2]**    **Bankruptcy**
    Preferences

In preference avoidance proceeding, if transferee presents sufficient evidence to rebut statutory presumption of insolvency, burden of persuasion shifts to debtor to convince court that it was insolvent on relevant date. Bankr.Code, 11 U.S.C.A. § 547(f).

Cases that cite this headnote

**[3]**    **Bankruptcy**
    Insolvency

As long as liquidation in bankruptcy is not clearly imminent on date of alleged preferential transfer, debtor must be valued as going concern for purpose of assessing its solvency. Bankr.Code, 11 U.S.C.A. § 547(b)(3).

1 Cases that cite this headnote

**[4]**    **Bankruptcy**
    Insolvency

"Fair valuation" of debtor's assets, such as court must undertake in assessing whether debtor was insolvent at the time of alleged preferential transfer, is a market rather than distress value, in case where debtor is to be valued as going concern; however, valuation must be analyzed in realistic framework, considering amounts which can be realized in a reasonable time assuming a willing seller and willing buyer. Bankr.Code, 11 U.S.C.A. §§ 101(32)(A), 547(b)(3).

4 Cases that cite this headnote

**[5]**    **Bankruptcy**
    Insolvency

"Fair valuation" of debtor's assets, such as court must undertake in assessing whether debtor was insolvent at the time of alleged preferential transfer, means that assets should be valued at sales price that a willing and prudent seller would accept from willing and prudent buyer if assets were offered in fair market and for reasonable period of time. Bankr.Code, 11 U.S.C.A. §§ 101(32)(A), 547(b)(3).

3 Cases that cite this headnote

**[6]**    **Bankruptcy**

🔑 Preferences

Valuation evidence that was based for most part on book value of Chapter 11 debtor's assets as reported according to generally accepted accounting principles (GAAP) was insufficient to rebut the statutory presumption of insolvency during 90-day preference period. Bankr.Code, 11 U.S.C.A. § 547(f).

3 Cases that cite this headnote

**[7]**    **Bankruptcy**

🔑 Insolvency

Although generally accepted accounting principles (GAAP) are relevant in assessing debtor's solvency/insolvency, for preference avoidance purpose, they are not determinative. Bankr.Code, 11 U.S.C.A. § 547(b)(3).

1 Cases that cite this headnote

**[8]**    **Bankruptcy**

🔑 Insolvency

Market multiple methodology, pursuant to which net revenues and earnings are multiplied by an appropriate range of risk-adjusted multiples to determine company's total enterprise value is an acceptable technique for determining debtor's solvency for preference avoidance purposes. Bankr.Code, 11 U.S.C.A. § 547(b)(3).

1 Cases that cite this headnote

**[9]**    **Bankruptcy**

🔑 Preferences

Analysis conducted by transferee's expert using the market multiple methodology was insufficient to rebut Chapter 11 debtor's presumptive insolvency during 90-day preference period, where expert's comparables were not truly comparable, involving companies that, unlike debtor, were profitable, and where net revenue multiples used by expert did not

account for profitability and skewed values upward. Bankr.Code, 11 U.S.C.A. § 547(b)(3).

3 Cases that cite this headnote

**[10]**    **Bankruptcy**

🔑 Insolvency

Comparable transaction methodology, which examines recent transactions where companies have been bought and sold on market, is an acceptable technique for determining debtor's solvency for preference avoidance purposes. Bankr.Code, 11 U.S.C.A. § 547(b)(3).

1 Cases that cite this headnote

**[11]**    **Bankruptcy**

🔑 Preferences

Analysis that transferee's expert conducted using a comparable transaction methodology did not suffice to rebut Chapter 11 debtor's presumptive insolvency during 90-day preference period, where comparable sales considered by expert were too old to be probative of debtor's value upon transfer date. Bankr.Code, 11 U.S.C.A. § 547(b)(3).

1 Cases that cite this headnote

**[12]**    **Bankruptcy**

🔑 Insolvency

Unlike debtor's assets, its debts must be measured at their face, and not at their market, value when evaluating debtor's solvency for preference avoidance purposes. Bankr.Code, 11 U.S.C.A. § 547(b)(3).

3 Cases that cite this headnote

**[13]**    **Bankruptcy**

🔑 Insolvency

Bankruptcy court must consider debtor's contingent liabilities along with its total debt, when assessing debtor's solvency for preference avoidance purposes; however, contingent liabilities must be limited to costs arising from foreseeable events that might occur while the debtor remains a going concern and do not

include costs associated with liquidation or dissolution of debtor, as such costs inherently contradict going concern classification of debtor. Bankr.Code, 11 U.S.C.A. § 547(b)(3).

1 Cases that cite this headnote

[14]  **Bankruptcy**
       👈 Preferences

Supposed non-financial indicators of Chapter 11 debtor's solvency at time of alleged preferential transfer, including investors' contribution of $14.9 million in new money to debtor's business, debtor's opening of 14 new kiosks for its business, and financial statements prepared for debtor's board of directors, were not probative of value of debtor's assets or liabilities, and were insufficient to rebut statutory presumption of debtor's insolvency during 90-day preference period. Bankr.Code, 11 U.S.C.A. § 547(f).

2 Cases that cite this headnote

[15]  **Bankruptcy**
       👈 Preferences

Schedules of assets and liabilities filed by debtor in connection with its Chapter 11 petition, that indicated debtor's assets exceeded its liabilities by roughly $10 million, were insufficient to rebut statutory presumption of debtor's insolvency during 90-day preference period, given that debtor's statements in schedules were based on book, rather than upon market, value of its assets. Bankr.Code, 11 U.S.C.A. § 547(f).

3 Cases that cite this headnote

[16]  **Bankruptcy**
       👈 Preferences

Motions filed by debtor on first day of its Chapter 11 case, which sought authorization to pay certain vendors for goods in transit, approval of employee retention plan and adequate protection payments to secured creditor, were not probative of value of debtor's assets or liabilities, and were insufficient to rebut statutory presumption of debtor's insolvency during 90-day preference period. Bankr.Code, 11 U.S.C.A. § 547(f).

1 Cases that cite this headnote

**Attorneys and Law Firms**

*538  Michael R. Lastowski, Ralph N. Sianni, Duane Morris, LLP, Wilmington, DE, Paul D. Moore, Duane Morris, LLP, Boston, MA, for Debtor.

Robert Dehney, Jason Staib, Morris, Nichols, Arsht & Tunnell, LLP, Wilmington, DE, Jay R. Indyke, Kronish, Lieb, Weiner & Hellman, New York City, for Official Committee of Unsecured Creditors.

Henry A. Heiman, Heiman, Aber, Goldlust & Baker, Wilmington, DE, Anthony M. Feeherry, Goodwin Proctor, LLP, Boston, MA, for Marathon Investment Partners, LLP.

**Opinion**

*OPINION*[1]

MARY F. WALRATH, Bankruptcy Judge.

This matter is before the Court on the Complaint of Lids Corporation ("Lids") to avoid a security interest granted to Marathon Investment Partners, L.P. ("Marathon") pursuant to sections 547 and 550 of the Bankruptcy Code. At trial, Marathon asserted that the security interest is not avoidable as a preference because Lids was not insolvent at the time. For the reasons set forth below, we find that Lids was insolvent at all relevant times, and, therefore, we conclude that the security interest is avoidable.

**I.  FACTUAL BACKGROUND**

Lids, founded in 1992, was a retail company that specialized in selling licensed logo sports caps and other brand name hats. From 1992 to 2000, Lids grew from a single kiosk to 388 stores in 47 states, and launched a website in October 2000 (Lids.com) which offered hats via the Internet. On September 26, 2000, Lids and Footstar, Inc.[2] announced a strategic alliance to offer Lids' products at Footstar locations. Under that agreement, Lids operated freestanding shops within Just For Feet superstores, and the companies shared Lids' sales revenues from these locations.

From 1998 through 2000, Lids spent roughly $53 million to fund losses of $22 million and to provide $31 million for expansion. Lids' business model was rapid expansion in pursuit of revenue growth. However, this rapid expansion was very costly and Lids was unable to produce positive cash flows. For fiscal year end ("FYE") 1998, Lids' earnings before interest, taxes, depreciation, and amortization ("EBITDA") was negative $1 million; for FYE 1999, EBITDA was negative $2.8 million; for the twelve months ending January 4, 2001, EBITDA was negative $6.7 million.

On September 13, 1996, Lids executed a credit agreement ("the Credit Agreement") with Fleet Retail Finance, Inc. **\*539** ("Fleet"). On April 22, 1999, in need of additional financing, Lids and Marathon executed a Warrant Purchase Agreement and a 12% Note due in 2004 for $2.5 million ("the Note"). By 2000, Lids was in violation of numerous covenants in its agreements with Fleet and Marathon. In May 2000, Lids requested a waiver of the covenant defaults from Marathon. On September 15, 2000, the First Amendment to the Note and Warrant Purchase Agreement and a Security Agreement were executed by Lids and Marathon. Under those agreements, the interest rate on the Note was increased to 14%, and Lids granted Marathon a security interest in all of its personal property. In exchange, Marathon waived Lids' covenant defaults. Marathon perfected its security interest in Lids' property on October 20, 2000.

During 2000, Lids needed an additional $30 million to continue operations and finance losses. However, Lids was only able to raise only $14.9 million. That same year, Lids began looking for potential buyers but was unsuccessful.

In October 2000, Lids hired James Marcum ("Marcum") as Chief Operating Officer to effectuate an organizational restructuring and bring Lids out of its financial downward spiral. After some extensive internal investigation, Marcum became seriously concerned about the financial condition of the company. In November 2000, Marcum prepared a presentation for Lids' Board of Directors. Based on the figures in the presentation, Marcum believed that there would be no availability under the Credit Agreement with Fleet by January 2001 and that, consequently, Lids would require a new credit facility.

On December 6, 2000, Fleet informed Lids that it would begin restricting the amount of credit available to Lids because of Lids' covenant defaults. Fleet began to decrease the amount of credit available to Lids on December 14, 2000.

Lids was unable to secure an alternate lender or locate a buyer and on January 4, 2001, Lids filed a voluntary petition under Chapter 11 of the Bankruptcy Code. After the filing, Lids maintained business as usual while it continued to search for a buyer. Only two buyers made offers for Lids: Hat World, Inc. ("Hat World") and Lids Acquisition, Inc. Ultimately, Hat World made the higher offer (approximately $16 million) and an order authorizing the sale of substantially all of Lids' assets to Hat World pursuant to section 363 of the Bankruptcy Code was entered on April 12, 2001. The sale closed on April 13, 2001.

On July 5, 2001, Lids filed a Complaint to avoid the security interest granted to Marathon. Marathon filed an Answer on August 9, 2001. On December 7, 2001, Lids and Marathon filed a Joint Pretrial Statement, and trial was held on December 10 and 11, 2001. Lids and Marathon filed Post–Trial Memoranda on January 22, 2002, and Reply Memoranda on January 31, 2002.

## II. *JURISDICTION*

This Court has jurisdiction over this matter as a core proceeding pursuant to 28 U.S.C. §§ 1334 and 157(b)(1), (b)(2)(A), (F), (K), and (O).

## III. *DISCUSSION*

This case is before the Court on Lids' Complaint to avoid the security interest granted to Marathon, pursuant to section 547(b) of the Bankruptcy Code, which provides that:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

**\*540** (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition;

. . . . .

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

11 U.S.C. § 547(b).

The parties have stipulated to all of the elements necessary to avoid the transfer of the security interest under section 547(b), except section 547(b)(3). Thus, the only issue is whether Lids was "insolvent" on October 20, 2000 ("the Valuation Date"), the date when Marathon perfected its security interest by filing financing statements with the appropriate government offices.

### A. *"Insolvent" under the Bankruptcy Code*

Section 101(32)(A) of the Bankruptcy Code defines "insolvent" as the "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation." 11 U.S.C. § 101(32)(A). This standard for solvency is typically called the "Balance Sheet Test." *In re Trans World Airlines, Inc.,* 180 B.R. 389, 405 n. 22 (Bankr.D.Del.1994). However, this may be a misnomer because the Balance Sheet Test is based on a fair valuation and not based on Generally Accepted Accounting Principles ("GAAP"), which are used to prepare a typical balance sheet. *Id.*

Several different valuation methodologies are recognized as effective ways of determining the solvency of a company for purposes of section 547. *See id.* at 411 n. 28. However, we will only address the methodologies applied by the parties in this case. Both parties retained experts to value Lids as of the Valuation Date. Marathon retained Houlihan Lokey Howard & Zukin ("Houlihan"), and Lids retained Ernst & Young Corporate Finance, LLC ("EYCF"). Houlihan and EYCF used several different methodologies to value Lids.

### B. *Presumption of Insolvency and Burden of Proof*

[1]  [2]  Section 547(f) provides that "for the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." 11 U.S.C. § 547(f). "A presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption." Fed.R.Evid. 301.[3] Therefore, Marathon must present sufficient evidence that Lids was solvent on the

Valuation Date to rebut the presumption created by section 547(f). If Marathon fails to present evidence to rebut the presumption, Lids is entitled to rely on the presumption to establish that it was insolvent. *See* 11 U.S.C. § 547(g). *See also In re Old World Cone Company,* 119 B.R. 473, 477 (Bankr.E.D.Pa.1990). However, if Marathon presents evidence that rebuts the presumption, then the burden of persuasion shifts to Lids to convince the Court that it was insolvent on the relevant date. *See* 11 U.S.C. § 547(g). *See also* **\*541** *Trans World Airlines,* 180 B.R. at 404; *Old World Cone Company,* 119 B.R. at 477.

### C. *Marathon's Solvency Analysis*
Marathon relies largely on Houlihan's financial analyses and conclusions and on other non-financial evidence to rebut the presumption that Lids was insolvent on the Valuation Date.

### 1. *Balance Sheet Test*
[3]  Lids and Marathon agree that the Balance Sheet Test is used to determine solvency for the purposes of section 547. *See Trans World Airlines,* 180 B.R. at 405 (solvency determined based on Balance Sheet Test). The parties also agree that Lids should be considered as a "going concern." A "going concern" is a commercial enterprise actively engaging in business with the expectation of indefinite continuance. BLACK'S LAW DICTIONARY 592 (7th ed.1999). As long as liquidation in bankruptcy is not clearly imminent on the Valuation Date, the company must be valued as a going concern. *See e.g., In re Trans World Airlines, Inc.,* 134 F.3d 188, 193 (3d Cir.1998). As of the Valuation Date, Lids planned to continue operations as usual. Therefore, it must be valued as a going concern on that date.

### a. *Asset Valuation*
[4]  [5]  As stated in section 101(32)(A), assets should be measured at a "fair valuation." 11 U.S.C. § 101(32)(A). In the context of a going concern, fair valuation of assets is:

> "market value" rather than "distress value," but ... the valuation must be analyzed "in a realistic framework" considering amounts that can be realized "in a reasonable time" assuming a "willing seller" and a "willing buyer."

*Id.* at 193–94. More specifically, "a fair valuation of assets contemplates a conversion of assets into cash during a

reasonable period of time." *Id.* at 194. The Third Circuit Court defined a "reasonable time" as:

> an estimate of the time that a typical creditor would find optimal: not so short a period that the value of the goods is substantially impaired via a forced sale, but not so long a time that a typical creditor would receive less satisfaction of its claim, as a result of the time value of money and typical business needs, by waiting for the possibility of a higher price.

*Id.* at 195. Therefore, assets should be valued at the sale price a willing and prudent seller would accept from a willing and prudent buyer if the assets were offered in a fair market for a reasonable period of time.

Houlihan prepared a report ("the Houlihan Report") of its analyses and conclusions regarding the value of Lids' assets as of the Valuation Date. In its report, Houlihan primarily relied on three valuation methodologies—adjusted balance sheet, market multiple, and comparable transaction—to establish the value of Lids' assets.

For the purposes of its solvency analysis, the Houlihan Report defines "fair value" as:

> the amount that may be realized if the Company's aggregate assets are sold as an entirety with reasonable promptness in an arm's length transaction under present conditions for the sale of comparable business enterprises, as such conditions can be reasonably evaluated by Houlihan Lokey.

(Exh. 66 at p. 1.)

Lids claims that the Houlihan Report fails to apply the correct definition of fair value, seemingly because Houlihan's definition did not include "fair market price." However, we find no indication that Houlihan **\*542** has applied the wrong standard of value. Fair market price is implicit in Houlihan's definition. Houlihan is not required to state explicitly that its definition of value is synonymous with fair market price if it is implicit in the definition.

#### i. *Adjusted Balance Sheet*

 **[6]**   Houlihan and EYCF have each presented adjusted balance sheet values for Lids' assets. However, the parties offer remarkably different values. While Houlihan asserts that Lids' total assets range from $48,950,000 to $55,950,000, EYCF claims that Lids' assets were worth $17,524,000.

Houlihan's balance sheet is arranged in three categories labeled "GAAP as of October 2000," "Low Fair Value ('LFV')," and "High Fair Value ('HFV')." (Exh. 66 at p. 12.) The GAAP category reflects Lids' value calculated under GAAP. The LFV and HFV represent the range Houlihan has assigned to Lids' adjusted value. With only one exception, the LFV and HFV figures are identical to the figures in the GAAP category. The only adjustments made to the LFV and HFV figures on the balance sheet were to Lids' "Goodwill." The LFV estimate of Lids' goodwill is negative $65,000, while the HFV estimate is positive $6,935,000. However, the Houlihan Report does not contain any explanation of the adjustments made on the balance sheet.

Lids asserts that the balance sheet presented in the Houlihan Report fails to ascribe fair market value to Lids' assets. Lids claims that Houlihan simply adopted the GAAP figures as of October, 2000, without adjusting to reflect the fair market value of the assets, which was much less. Lids also asserts that attributing any value to Lids' goodwill is groundless because of Lids' history of accelerating losses.

EYCF prepared its own valuation, which differs substantially from the Houlihan Report. EYCF presented an adjusted balance sheet under "Scenario One: Sale of Assets Over a Reasonable Period of Time." Unlike the Houlihan Report, EYCF's balance sheet includes numerous adjustments to the book values assigned to assets and liabilities. This analysis starts with the book values and the estimated recoverable percent of each asset's value to determine the total fair market value of Lids' assets. For example, EYCF estimated that on sale of its inventory, Lids could recover 105% of its cost. The book value of Lids' inventory was $15,633,000 based on a valuation performed by Great American Appraisals & Valuation Services, LLC. Thus, EYCF estimated the fair market value of Lids' inventory to be $16,415,000. Applying the same methodology to the other assets, EYCF estimated the total value of Lids' assets to be $17,524,000.

[7]    Based on the evidence presented by both parties, we find Houlihan's balance sheet analysis unconvincing as to Lids' solvency. Houlihan's balance sheet simply reflects the book value of Lids' assets reported under GAAP. The only adjustment was a minor adjustment to the goodwill account. It is well established that although GAAP is relevant in section 547 solvency analysis, it is not determinative. *See e.g., Arrow Electronics, Inc. v. Justus (In re Kaypro),* 230 B.R. 400, 413 (9th Cir. BAP 1999) ("[T]here is no generally accepted accounting principle method for analyzing the insolvency of a company.... Although such principles are relevant, they are not controlling in insolvency determinations"); *In re Sierra Steel, Inc.,* 96 B.R. 275, 278 (9th Cir. BAP 1989) ("although GAAP are relevant, they are not controlling in insolvency determinations"); *In re Lease–A–Fleet, Inc.,* 155 B.R. 666, 679 (Bankr.E.D.Pa.1993) ("Courts are not required to rely upon GAAP standards when determining the issue of insolvency"); *In* **\*543** *re Joshua Slocum, Ltd.,* 103 B.R. 610, 623–24 (Bankr.E.D.Pa.1989) ("While GAAP principles do not control this court's determination of insolvency, we are inclined to accord weight to a company's treatment of its assets and liabilities according to GAAP"). Therefore, Houlihan's adoption of GAAP value for Lids' assets (without any adjustment to reflect market value) is not determinative of Lids' solvency.

We need not conclude that EYCF's valuation is correct. At a minimum though, the adjusted balance sheet presented by EYCF raises significant doubt about the validity of Houlihan's valuation. Therefore, we conclude that Houlihan's evidence

of valuation based largely on the book value of Lids' assets does not rebut the presumption that Lids was insolvent.

### ii. *Market Multiple Methodology*

Houlihan also applied a Market Multiple Methodology to value Lids' assets. Under this methodology, net revenues and earnings are multiplied by an appropriate range of risk-adjusted multiples to determine the company's total enterprise value. In its analysis, Houlihan selected multiples by bench marking certain publicly traded companies, using quantitative and qualitative factors.

[8]    The Market Multiple Methodology is an acceptable technique for determining solvency. *See, e.g., Covey v. Commercial Nat. Bank of Peoria,* 960 F.2d 657, 660 (7th Cir.1992); *Trans World Airlines,* 180 B.R. at 411 n. 28.

[9]    Houlihan selected the following comparable companies in its market multiples analysis: Finish Line, Inc., Wet Seat, Inc., Gadzooks, Inc., Reeds Jewelers, Inc., and several others. Houlihan chose these companies as comparables because they are specialty retailers, as is Lids. Houlihan calculated multiple ranges for net revenue and EBITDA for each of the comparable companies selected. Based on the multiples for the comparable companies, Houlihan selected a range of multiples to be applied to Lids for revenue and EBITDA as follows:

| LTM[4] Ended 10/31/00 | Representative Level (000's) | Multiple Range | Value (000's) | lines |
|---|---|---|---|---|
| TEV[5]/Revenue | $125,586 | 0.20x – 0.25x | $25,117 – 31,397 | |
| **Projected FYE 1/27/01** | | | | |
| TEV/Revenue | $130,206 | 0.15x – 0.20x | $19,531 – 26,041 | |
| **Projected FYE 1/26/02** | | | | |
| TEV/Revenue | $146,342 | 0.10x – 0.15x | $14,634 – 21,951 | |
| EBITDA | $ 5,513 | 4.0x – 5.0x | $22,052 – 27,566 | |
| **Concluded TEV** | | | **$20,000 – 27,000** | |

(Exh. 66 at p. 14.) Houlihan multiplied Lids' projected revenues and EBITDA by the appropriate ranges of multiples

to determine Lids' total enterprise value range. (However, Houlihan did not use EBITDA to estimate Lids' total enterprise value for LTM ended October 31, 2000, or Projected FYE January 27, 2001, because Lids' EBITDA was negative for those periods **\*544** and would not yield a positive total enterprise value.)

Lids asserts that Houlihan's application of the Market Multiple Methodology is flawed. Specifically, Lids contends that the companies selected by Houlihan as comparable are not similar to Lids because (i) the companies selected were profitable, while Lids was never profitable, (ii) the companies have proven business plans, while Lids' strategy has never yielded financial success, and (iii) the companies are established and performance is predictable, while Lids has consistently missed projections. Lids asserts Houlihan failed to consider how a buyer would discount the enterprise value of Lids based on these adverse factors.

Further, Lids asserts that the EBITDA multiples used in the Houlihan Report were inaccurate because the multiples used for Lids were greater than the mean and median multiples used for the other, more profitable and stable, companies. While the mean and median EBITDA multiples for the comparable companies were 3.8 and 3.6 respectively, Houlihan applied a range of 4.0 to 5.0 to Lids' projected EBITDA for FYE January 26, 2002.

Lids claims that Houlihan's use of net revenue multiples is also inappropriate because these multiples fail to account for profitability and improperly skew values upward. For example, a store may generate sales revenue, but operate at a substantial loss; the net revenue multiple counts the store's revenues, but fails to account for its losses. Lids asserts that a more pragmatic approach would include both revenues and profits.

Lids' expert, EYCF, also applied a Market Multiples Methodology to value Lids as of October 2000 (Exh. 69.) However, unlike Houlihan, EYCF did not use total EBITDA or net revenue in its analysis.

Instead, EYCF presented scenarios based on what buyers would do. In "Scenario 3: Hypothetical Sale of Profitable Stores," EYCF assumed a buyer would only purchase Lids' profitable stores. Based on this assumption, EYCF adjusted Lids' financial results to reflect only those stores. According to those adjusted figures, Lids' EBITDA for LTM October 2000 was $2.5 million. Applying a range of multiples (3.75

to 4.75) to Lids' adjusted EBITDA, and adding to that figure the expected return after the remaining stores are liquidated, EYCF estimated Lids' total asset value ranged from $10.4 million to $12.8 million.

Based on Lids' assertions and EYCF's market multiple analysis, we find Houlihan's market multiple asset valuation unconvincing. We are not persuaded that Houlihan's choice of multiples accurately reflects the comparable companies' values for the reasons asserted by Lids. We also find that Houlihan has improperly relied on Lids' projections to calculate value. Over the last few years, Lids has consistently failed to meet its projections; in 2000 alone, Lids' budget was revised three times to account for poor performance. Despite these revisions, Lids still missed its projections for 2000.

Furthermore, the Houlihan Report assumed that after October 31, 2000, when Lids' EBITDA was negative $6,299,000, the company would nonetheless turn around. Houlihan relied on Lids' projections that at FYE January 27, 2001, its EBITDA would increase to negative $3,456,000, and that at FYE January 26, 2002, its EBITDA would be positive $5,513,000. There is no evidence to support the assumption that such a dramatic change would occur. Therefore, any conclusions based on these projections are unconvincing. As a result, we conclude that Houlihan's Market Multiple Methodology **\*545** has failed to establish that Lids was solvent on the Valuation Date.

### iii. *Comparable Transaction Methodology*

Houlihan also used the Comparable Transaction Methodology to value Lids' assets, which examines recent transactions where companies have been bought and sold on the market.

**[10]**   The Comparable Transaction Methodology is sufficient because this methodology is designed to yield the price the company would carry in the marketplace based on similar transactions. As one court has stated:

> To decide whether a firm is insolvent ... a court should ask: *What would a buyer be willing to pay for the debtor's entire package of assets and liabilities?* If the price is positive, the firm is solvent; if negative, insolvent.

*Id.* at 660 (emphasis added).

**[11]**   Houlihan valued Lids under the Comparable Transaction Methodology for LTM October 2000 using only a net revenue range of multiples developed from information on nineteen companies involved in transactions between 1995 and 2001. Houlihan multiplied Lids' net revenue for LTM October 2000 by the range of multiples (0.25x – 0.30x) to yield an estimated total enterprise value from $31 to $38 million.

Lids asserts that using net revenue multiples does not accurately reflect value because it fails to account for losses or profitability and skews values upward. Lids also claims that Houlihan's application of the Comparable Transaction Methodology is incorrect because Houlihan failed to account for the current economic environment and market conditions. The sales transactions considered by Houlihan occurred long ago, before market conditions changed.

EYCF also acknowledged the Comparable Transaction Methodology in its report. However, EYCF stated that it found no companies comparable to Lids based on the size, nature of the business, and profitability for the purposes of a comparable transaction analysis. Therefore, EYCF stated it could not conduct this type of analysis.

We conclude that Houlihan's Comparable Transaction analysis of Lids is unconvincing. The net revenue multiple used by Houlihan does not accurately reflect Lids' value, because it ignores the fact that Lids has never been profitable while comparing it to profitable companies. We also find that the sales considered by Houlihan are outdated. Most of the transactions considered in the Houlihan Report occurred several years ago, long before market conditions changed, for the worse. Thus, the comparable sales considered by

Houlihan are too old to be probative of Lids' value as of October, 2000.

**b. *Debt Valuation***

**[12]**   After determining the value of Lids, it is necessary to reduce that value by the liabilities which existed on the Valuation Date to determine if Lids was solvent. Section 101(12) defines "debt" as "liability on a claim." 11 U.S.C. § 101(12). Section 101(5)(A) defines "claim" as "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 11 U.S.C. § 101(5)(A). Unlike assets, debts are measured at their face value and not at market value. *See Trans World Airlines,* 134 F.3d at 196 (publicly traded debt is measured by face value, not market value). Debts are measured at face value because the language "at a fair valuation" in section 101(32)(A) applies only to the valuation **\*546** of assets; it does not apply to valuation of debts. *Id.* at 196.

**[13]**   Contingent liabilities must also be included in the total debt. However, "contingent liabilities must be limited to costs arising from foreseeable events that might occur while the debtor remains a going concern." *Id.* at 198. Contingent liabilities do not include costs associated with liquidation or dissolution of the debtor because such costs inherently contradict the going concern classification of the debtor. *Id.* Therefore, when conducting a balance sheet analysis, the fair market value of the assets is compared to the face value of the liabilities, including contingent liabilities.

Houlihan listed Lids' liabilities at $13,464,000 as of the Valuation Date. The figure is broken down in Houlihan's balance sheet as follows:

| Liability Account | Value | |
|---|---|---|
| Current Portion of Long–Term Debt | $ 1,484,000 | lines |
| Short Term Borrowings | $ 9,662,000 | |
| Long Term Debt | $ 632,000 | |
| Subordinated Debt | $ 1,686,000 | |
| **Total** | **$13,464,000** | |

(Exh. 66 at p. 12.) Houlihan, however, excluded from its calculation "Other Non–Current Liabilities" of $1,477,000. [6] Additionally, Houlihan failed to account for additional contingent liabilities which EYCF added to Lids' balance sheet ($10,285,000 to $89,317,000) consisting of lease rejection and severance obligations. The latter were based on EYCF's assumption that a buyer would take only profitable stores thereby requiring Lids to liquidate the remaining stores.

Although we do not conclude that the contingent liabilities presented by EYCF are accurate, we conclude that Houlihan improperly valued Lids' debt by excluding the $1,477,000 in liabilities and failing to account for any contingent liabilities. Consequently, we conclude that the $13,464,000 in debt presented by Houlihan is not an accurate figure.

### c. *Houlihan's Conclusions*

Based on the values Houlihan assigned to Lids' assets and debts, Houlihan concluded that Lids' assets exceeded debts by $12,738,000 to $19,738,000 on the Valuation Date. Marathon therefore asserts that Lids was solvent as of the Valuation Date. EYCF reached a much different conclusion regarding the value of Lids' assets and debts. Based on its analyses, EYCF estimated that Lids' debts exceeded assets by a range of $8.5 million to $107.5 million, making Lids deeply insolvent.

We conclude that the Houlihan Report does not rebut the presumption of insolvency imposed under section 547(f) because Houlihan's valuations are flawed and because EYCF's report raises serious doubts about the validity of Houlihan's assumptions. We are not convinced that the figures Houlihan has assigned to Lids' assets and debts accurately reflect Lids' value, and, therefore, we find that the Houlihan Report is not sufficient to rebut the presumption that Lids was insolvent on the Valuation Date.

### 2. *Non–financial Indicators*

 **[14]**    In addition to the Houlihan Report, Marathon relies on several other factors which it asserts rebuts the presumption that Lids was insolvent on the Valuation Date. However, unlike the Houlihan Report, Marathon's other arguments are not based on the Balance Sheet Test. Instead, Marathon's arguments are **\*547** based primarily on inferences drawn from Lids' and others' conduct.

First, Marathon asserts that Lids was solvent in October 2000 because every party with a financial interest in Lids treated Lids as a solvent company. For example, Marathon asserts

that the contribution by Lids' investors' of $14.9 million in new money in 2000 is an indication that Lids was solvent. Further, Marathon claims that Lids was solvent because it was current with its vendors and continued business as usual with its vendors after the Valuation Date. Marathon also claims that Fleet's continued funding of overadvances on the credit line to Lids prior to and after October 2000, evidences that Lids was solvent on the Valuation Date.

Second, Marathon asserts that Lids was solvent on the Valuation Date because Lids conducted itself as a solvent company. For example, Marathon relies on financial statements prepared by Lids for its Board of Directors, which stated that assets exceeded liabilities in August, September, and October 2000. To further support its argument, Marathon notes that Lids opened 14 new kiosks in August 2000, started a website and added to its line of products, all of which it asserts evidences that Lids was solvent.

Lids disputes Marathon's arguments for several reasons. For example, Lids claims that Marathon's arguments based on Lids' financial statements which were prepared in accordance with GAAP are not determinative of value because GAAP is not controlling for the purposes of determining solvency under section 547(b)(3). Lids also asserts that Marathon has ignored evidence and misrepresented the facts and conduct of Lids and others.

We conclude that Marathon's arguments are based on a subjective evaluation of Lids' solvency rather than the objective test required by section 547(b). Lids' conduct and the conduct of third parties are not probative of the value of Lids' assets or liabilities. Marathon has cited no case to support the proposition that a company is solvent simply because other parties believe that it is solvent. Recent failures of companies which were touted by financial analysts as solvent point to the fallacy in Marathon's argument. Furthermore, Marathon has not cited any case to support its argument that Lids was solvent simply because it acted like it was or told others that it was. Marathon's arguments do not rebut the presumption that Lids was insolvent as of the Valuation Date.

Marathon also asserts that Lids was solvent as of the Valuation Date because it did not consider filing for bankruptcy until Fleet restricted its credit line in December 2000. Marathon relies on testimony that Lids filed for bankruptcy because it was unable to secure financing from its lenders and was unable to raise any capital. Based on this

testimony, Marathon concludes that because Lids filed for bankruptcy due to that cash crisis, Lids was not insolvent prior thereto on the Valuation Date. However, Lids contends that its crisis with Fleet existed long before the Valuation Date; Lids had been in default on the Fleet line since at least August 2000.

We find Marathon's argument here unconvincing. While Fleet's action restricting the credit available to Lids was the precipitating factor in Lids' filing for bankruptcy, it was not the only factor. Years of poor performance, inability to raise capital, lack of credit, and defaults on agreements with several lenders contributed to Lids' decision to file bankruptcy. Even if Lids' cash crisis did cause its bankruptcy, that does not prove that Lids was solvent until that moment. Many companies are insolvent long before bankruptcy is filed. In fact, section 547 assumes a debtor is **548** insolvent for at least 90 days before the bankruptcy petition is actually filed.

### 3. *Lids' Pleadings*

 **[15]**    Marathon asserts that all of the initial pleadings filed in Lids' Chapter 11 case provide evidence that Lids was solvent when the petition was filed. Marathon cites Mr. Doyle's affidavit [7] which stated that Lids' assets exceeded liabilities by $10 million as of December 31, 2000. Marathon also notes that the Schedules of Assets and Liabilities filed with the Court evidence Lids' solvency. Lids responds that Mr. Doyle's affidavit and the Schedules were based on book

values, not market values. Lids argues that since GAAP-based financials do not determine solvency, Mr. Doyle's affidavit and the Schedules do not prove that Lids was solvent as of the Valuation Date.

As discussed previously, while it is well-established that GAAP may be relevant in section 547 solvency analysis, GAAP is not determinative. Therefore, the pleadings cited by Marathon do not prove that Lids was solvent as of the Valuation Date, and Marathon has failed to rebut the section 547(f) presumption of insolvency.

 **[16]**    Marathon also asserts that various motions filed by Lids on the first day of this case (which sought authorization to pay certain vendors for goods already in transit, approval of an employee retention plan and adequate protection payments to a secured creditor) all evidence its solvency. These motions do not prove solvency; they simply evidence Lids' desire to keep its business operating until a buyer could be found. The motions provide no evidence of the fair value of Lids' assets and liabilities and, therefore, do not rebut the presumption of insolvency.

### IV. *CONCLUSION*

For the foregoing reasons, we find that Lids was insolvent at all relevant times, and, therefore, we conclude that the security interest granted to Marathon within 90 days of the Petition Date is avoidable pursuant to section 547 of the Bankruptcy Code.

Footnotes

1    This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

2    Footstar, Inc., had filed bankruptcy on November 4, 1999.

3    Federal Rule of Bankruptcy Procedure 9017 makes the Federal Rules of Evidence applicable in bankruptcy cases.

4    Last twelve months ("LTM").

5    Total Enterprise Value ("TEV")

6    The Accounts Payable amount of $18,757,000 and Current Liabilities amount of $2,514,000 were properly excluded because both the Market Multiple and Comparable Transactions Methods incorporate in their valuation the assumption of such debt.

7    John M. Doyle was Lids' Chief Financial Officer at the time the petition was filed.

**End of Document**                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 97

[ORDE, J.]

## RE MAHAFFEY.

*Will—Devise of Farm to Son for Life—Direction to Pay Debts, " Includ-*
*ing Doctors' Bills, Nursing and Care "—Claims of Daughters for*
*Board and Lodging and Nursing of Testator—Meaning of " Includ-*
*ing "—Relationship of Parties—Absence of Evidence from which*
*Contract to Pay might be Inferred.*

The testator, who died in April, 1921, aged 86 years, left a will dated in
June, 1918, by which he gave his farm to his son J. for life, upon the
understanding that the son was to pay one of his (J.'s) sons $1,000 at
majority, with remainder at J.'s death to J.'s other sons; he also
directed J. " to pay all my just debts including doctors' bills, nursing
and care in case of my illness, funeral expenses and also to put up a
suitable monument over my grave;" he directed his executors to pay
his daughter S. $700 and his daughter M. $500; and the residue of
his estate he gave equally to these two daughters.  He had lived with
his daughter M. from May, 1915, to July, 1917, and again from April,
1920, until his death in April, 1921, and with his daughter S. from
July, 1917, to April, 1920.  In February, 1921, the testator was, by
order of the Court, declared incapable of managing his affairs.  Each
of the daughters made a claim upon the estate for maintenance,
board, lodging, and nursing, during the periods mentioned, and these
claims were allowed by the Judge of a Surrogate Court:—
*Held*, on appeal, that the words of the will, " nursing and care in case
of my illness," could not be extended so as to include the payment of
any claim not in the nature of a debt of the testator; and, in any
event, the direction had reference to nursing and care only during
illness, and in a will made in June, 1918, could not have been intended
to cover maintenance, board and lodging, for a period of 3 years
before that date.
Meaning of " including " considered.
*Held*, also, that the relationship of the claimants to the testator brought
their claims within the rule that, without some evidence that the
services rendered were intended to be paid for, no contract or obli-
gation to pay could be inferred; and, as in this case it was admitted
that there was no arrangement or understanding with the claimants
when their father went to live with them as to any payment for
maintenance or services of any kind, their claims should not have
been allowed.
*Mercantile Trust Co. of Canada Limited v. Campbell* (1918), 43 O.L.R.
57, distinguished.

An appeal by James Henry Mahaffey from an order of a Sur-
rogate Court Judge.

March 3.  The appeal was heard by ORDE, J., in the Weekly
Court, Toronto.

*H. S. White*, K.C., for the appellant.

*L. V. O'Connor*, for Sarah Elizabeth Stephenson.

*J. E. Anderson*, for Margaret Sloan.

May 17.  ORDE, J.:—This is a motion by way of appeal, under
the provisions of subsec. 6 of sec. 69 of the Surrogate Courts Act,

Orde, J.
1922.
——
Re
Mahaffey.

R.S.O. 1914, ch. 62, from the order of His Honour Judge McMillan, one of the Judges of the Surrogate Court of the County of Victoria, upon the contestation, on behalf of the estate of John Mahaffey, deceased, by James Henry Mahaffey, one of the executors, of the respective claims of his two co-executors, Sarah Elizabeth Stephenson and Margaret Sloan. The learned Surrogate Court Judge allowed the claims, and James Henry Mahaffey now appeals.

John Mahaffey, a farmer in the county of Victoria, died on the 8th April, 1921, aged 86 years, leaving a will dated the 18th June, 1918, probate of which was duly granted to the three executors above named. By his will he directs his son James Henry Mahaffey " to pay all my just debts including doctors' bills nursing and care in case of my illness funeral expenses and also to put up a suitable monument over my grave;" he gives his farm to James Henry Mahaffey for life upon the understanding that he is to pay to Thomas Mahaffey (a son of James Henry) $1,000 when he attains 21, with remainder at James Henry's death to the other sons of James Henry; he directs his executors to pay to his daughter Sarah Elizabeth Stephenson $700 and to his daughter Margaret Sloan $500; and the residue of his estate is given equally to Mrs. Stephenson and Mrs. Sloan.

The testator lived with his daughter Mrs. Sloan for two periods prior to his death, namely, from May, 1915, to July, 1917, and again from April, 1920, until his death in April, 1921, and with his daughter Mrs. Stephenson during the intervening period between July, 1917, and April, 1920.

Mrs. Sloan's claim was for maintenance, board, lodging, attendance, and nursing for a total period of a little more than 3 years, for which she claimed $721, and an additional $39.40 for expenses connected with the funeral, less a sum of $58 received from the testator in his lifetime, leaving $702.40, the whole of which was allowed by the Surrogate Court Judge.

Mrs. Stephenson made a similar claim for maintenance, etc., for a period of 2 years and nearly 10 months, the sum claimed being $841.60, less a credit of $400, leaving $441.60 as her net claim. The Surrogate Court Judge thought the claim excessive and deducted $200, leaving $241.66, which he allowed.

In February, 1921, an order was made by Rose, J., declaring John Mahaffey incapable of managing his affairs, under sec. 37 of the Lunacy Act, but Mahaffey died before a committee was appointed by the Local Master under the order.

Counsel for the claimants referred to the words " nursing and care in case of my illness," in the direction to James Henry Mahaffey to pay the testator's debts, as in some way strengthen-

ing their claims. The word "including," while often meaning "namely," is ordinarily construed as a word of extension, indicating an enlargement of or an addition to those things which would ordinarily be included within the definition of the word which it follows: *Regina* v. *Kershaw* (1856), 6 E. & B. 999, 1007; *Regina* v. *Hermann* (1879), 4 Q.B.D. 284; *Re Duncombe* (1902), 3 O.L.R. 510. But it is doubtful if the context here would really extend the words "nursing and care in case of my illness" so as to include the payment of any claim not in the nature of a debt of the testator. The inclusion of the doctor's bills, which would clearly be debts, indicates that the testator had in mind those expenses connected with his last illness which, not being claimed until after death, are not by many people regarded as quite in the same category as debts, but are frequently treated as if they were funeral or testamentary expenses. In any event the direction has reference only to nursing and care during illness, and in a will made in June, 1918, could hardly have been intended to cover maintenance, board and lodging, for a period of 3 years prior to that date.

The relationship of the parties here brings the claims clearly within the rule that, without some evidence of an agreement that the services rendered were intended to be paid for, no contract or obligation to pay can be inferred: *Redmond* v. *Redmond* (1868), 27 U.C.R. 220; *Iler* v. *Iler* (1885), 9 O.R. 551; *Peckham* v. *Depotty* (1890), 17 A.R. 273, at p. 278; *Mercantile Trust Co. of Canada Limited* v. *Campbell* (1918), 43 O.L.R. 57, at p. 71. In some cases stress has been laid upon the question whether or not the person against whose estate the claim was made was *in loco parentis* to the claimant: see *McGugan* v. *Smith* (1892), 21 Can. S.C.R. 263; *Murdoch* v. *West* (1895), 24 Can. S.C.R. 305. Those were cases where the claimant, in each case a young person, had lived with and been supported by the deceased and the claims were made for services rendered to the deceased. There is necessarily a wide distinction in point of fact between such cases and one like the present, where the claim is for maintenance and services rendered for the parent who comes to reside with his child. But the distinction is only one of fact, and in no way affects the rule as I have stated it. As put in Macdonell on Master and Servant, 2nd ed., p. 111, "the difficulty is one not of law, but of fact," and at p. 112 it is said: "Probably no clearer principle can be stated than that which is laid down in *Davies* v. *Davies* (1839), 9 C. & P. 87. There Williams, J., in charging the jury said: 'Neither the services on the one hand, nor the board and lodging on the

Orde, J.

1922.

RE
MAHAFFEY.

other, can be charged for, unless the jury are satisfied that there was a contract.' "

Now it is admitted by both claimants that there was no arrangement or understanding whatever when their father went to live with them as to any payment by him for maintenance or services of any kind. The testator's wife, who was Mrs. Sloan's stepmother, died in May, 1915, and almost immediately afterwards Mrs. Sloan took her father to live with her, because, as she said, there was no other place for him to go. Her sister, Mrs. Stephenson, was ill at the time. He stayed with her for 2 years and 2 months, during which period she had to look after him carefully, as owing to his age he required constant attention. She says he offered her money on several occasions, which she refused to take. On one occasion she kept $58, which he " gave " her, as she says. She adds that he said, " Maggie, I owe you this." She also says that he had often said that if he had money he would pay her. But I think it is clear that any such offers and the gift of the $58 were not made on any other footing than from a sense of moral obligation, and a desire to help, such as an old man might naturally feel towards his daughter. Her husband, John Sloan, swears to a conversation he overheard in which the testator had said to Mrs. Sloan that he would pay her some day, but no time was mentioned nor what it was for which she was to be paid.

In July, 1917, Mahaffey apparently paid a visit to his other daughter, Mrs. Stephenson. No arrangement was made as to maintenance or board, but, as Mrs. Stephenson and her daughter Mrs. Fry say, " he just came on a visit and stayed and stayed and stayed." While with Mrs. Stephenson he gave her $400. She says that when he did this she told him she would apply it on his board and that he said, " Don't bother, that is a present for you." This is corroborated by her daughter. In April, 1920, he returned to Mrs. Sloan and remained with her till his death in the following April. There was no evidence of anything during that period from which an implied contract to pay could be inferred.

On the 16th February, 1921, Mrs. Sloan wrote her half-brother a letter which contains some important admissions. She complains bitterly to her brother about the fact that her sister Mrs. Stephenson had got $400 from her father, and says that she, Mrs. Sloan, was going " to lift his board so you will be all notified I am not going to keep him for nothing when he could give so much of his money to Sarah." And later in the letter she says, " I suppose you will be vexed, but I have to look out for myself. I should of (sic) made him pay from the first." It is impossible, in my judgment, to read this letter and at the same time find as a fact

that Mrs. Sloan had ever had any idea that her father was staying with her on a paying basis. The letter was written a week after the lunacy order was made, and after that Mahaffey could not have bound himself by any bargain.

Mrs. Stephenson's claim rests on a more slender footing than that of Mrs. Sloan. The only evidence from which it is suggested a contract may be inferred is what I have mentioned above. Her counsel relies on *Mercantile Trust Co. of Canada Limited* v. *Campbell,* 43 O.L.R. 57, as an authority in support of the contention that the payment of the $400 to Mrs. Stephenson was an acknowledgment of liability. But it was expressly stated to be a gift, and the deceased said nothing which could be construed as an admission of liability or as a promise to pay for his board. The *Mercantile Trust Co.* case is somewhat unusual and is really not a direct authority upon the question involved here. There the estate sought to recover, as belonging to the deceased, certain moneys which she had handed to her niece, and it was held that, as on the evidence the moneys had been placed in the hands of the niece to be expended for her aunt's care and benefit, she was entitled to retain out of such moneys the sums so expended. It is true the defendant was given the right to increase her claim on the reference, if so advised, to a sum in excess of the amount first claimed, but that was because, on the facts, the Court held that the aunt went to the defendant with the understanding that she would pay for her support. Here there is no such evidence, nor is there anything upon which to find that the $400 was other than a gift to Mrs. Stephenson.

The disposition of the estate under the will has very little bearing on the question, except as disclosing the testator's attitude towards the three children. All that James Henry himself gets is a life-estate in the farm, which latter is said to be worth $4,000, and his life-estate is subject to the obligation to pay the debts, etc., and $1,000 to his son Thomas. The two legacies to the daughters and the gift to them of all the residue gives them, I understand, a fairly substantial share in the estate. It is true that James Henry's other sons get the farm at his death, but the testator may have had his reasons for making them special objects of his bounty. The daughters were married and had their own homes, and on the face of it there seems nothing unfair about the distribution.

The appeal from the order of the learned Surrogate Court Judge must therefore be allowed, and the claims of Mrs. Sloan and Mrs. Stephenson against the estate are disallowed, except that Mrs. Sloan is entitled to be paid the $39.40 expended by her as part

Orde, J.

1922.

Re
Mahaffey.

of the funeral expenses, and is also entitled to be paid as a debt of the estate for the maintenance of her father for the period between the 8th February, 1921, when the lunacy order was made, and the day of his death, the 8th April, 1921, at $300 per annum, which for the two months would entitle her to $50. Her right to be compensated after that order rested upon an entirely different footing from her claim for compensation before it was made. The order will therefore provide for the payment to her by James Henry Mahaffey of those two sums of $39.40 and $50 respectively.

Under all the circumstances, I think there should be no order as to costs, either here or below.

---

1922.

May 17.

[ORDE, J.]

### BRENNER'S TRUSTEE v. BRENNER.

*Bankruptcy—Action Brought by Trustee in Official Name—Interim Injunction Order — Usual Undertaking as to Damages — Personal Undertaking of Trustee Required if Estate Insufficient—Trustee's Right to Indemnity from Creditors—Judicial Discretion—Terms—Bankruptcy Act, secs. 15, 16, 35.*

The usual undertaking as to damages given on behalf of a plaintiff who obtains an interim injunction should, in the case of a trustee in bankruptcy suing in his official capacity, be made binding upon him personally, unless the Court is satisfied that the estate in his hands will be sufficient to answer damages. A trustee is under no obligation to take such a proceeding without proper indemnity from the creditors: sec. 35 of the Bankruptcy Act.

*Westminster Association Limited* v. *Upward* (1880), 24 Sol. J. 690, and *Rosling & Flynn Limited* v. *Law Guarantee and Trust Co.* (1903), 47 Sol. J. 255, applied.

The form of the undertaking and the person who is to undertake are questions for the Court to determine as a condition to the granting of the interlocutory injunction. The Court is never bound to grant an interlocutory injunction, and there is no practice which hampers the judicial discretion as to the terms which the Court may impose.

*East Molesey Local Board* v. *Lambeth Waterworks Co.*, [1892] 3 Ch. 289, 299, 300, followed.

Sections 15 and 16 of the Bankruptcy Act considered.

This action was brought by the trustee of the property of N. Brenner & Company Limited, authorised assignor, against Nathan Brenner, Meyer Brenner, and two chartered banks, to recover moneys alleged to be the property of the assignor-company.

The defendants Nathan Brenner and Meyer Brenner moved, in the action, for an order declaring the trustee, who sued in his official capacity, personally responsible for any damages which might be found to have been sustained by the applicants by reason of certain injunction orders.

# TAB 98

Case 09-10138-MFW    Doc 14225-48    Filed 08/15/14    Page 124 of 474

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

2000 CarswellOnt 4362
Ontario Court of Appeal

Marchand (Litigation Guardian of) v. Public General Hospital Society of Chatham

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65, 51 O.R. (3d) 97

## Joel Marchand, a minor by his litigation guardian Richard Allen Marchand, the said Richard Allen Marchand and Barbra Marchand (Appellants) and The Public General Hospital Society of Chatham (also known as The Public General Hospital), A. Olson, P. Colebrook, M. Want and G. Asher (Respondents)

Laskin, Goudge, Sharpe JJ.A.

Heard: November 22-25, 1999

Judgment: November 27, 2000 [*]
Docket: CA C25915

Proceedings: varying *Marchand (Litigation Guardian of) v. Public General Hospital of Chatham* (1997), 33 O.R. (3d) 570, 1997 CarswellOnt 1778, 12 C.P.C. (4th) 373 (Ont. Gen. Div.); additional reasons to *Marchand (Litigation Guardian of) v. Public General Hospital Society of Chatham* (1996), 1996 CarswellOnt 5562 (Ont. Gen. Div.); and affirming *Marchand (Litigation Guardian of) v. Public General Hospital Society of Chatham* (1996), 1996 CarswellOnt 5562 (Ont. Gen. Div.)

Counsel: Barry A. Percival, Q.C., Martin Wunder, Q.C., Ronald D. Davis for Appellants
Joshua Liswood, Kathryn M. Frelick for Respondents, The Public General Hospital Society of Chatham, A. Olson, P. Colebrook, M. Want
W. Niels F. Ortved, J. Thomas Curry for Respondent, G. Asher

Subject: Public; Evidence; Civil Practice and Procedure; Torts; Family

### Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

### Headnote

#### Health law --- Health care professionals — Nurses — Negligence

Child suffered neurological injuries shortly after birth which resulted in child being totally dependent on others for care for rest of his life — Parents and child brought action for negligence against nurses — Action was dismissed on grounds that parents and child failed to prove negligence on balance of probabilities — Nurses' conduct met acceptable standard of care — Nurses proved on balance of probabilities that child's injuries arose from unforeseen placental abruption — Nurses did not cause or contribute to child's neurological injuries — Parents and child appealed — Appeal dismissed — There was ample evidence before trial judge to support his finding that acts of alleged negligence had not been established, and his determination of cause of tragedy.

#### Health law --- Physicians and surgeons — Malpractice — Causation

Child suffered neurological injuries shortly after birth which resulted in child being totally dependent on others for care for rest of his life — Parents and child brought action for negligence against obstetrician and nurses — Action was dismissed on grounds that parents and child failed to prove negligence on balance of probabilities — Obstetrician and nurses adduced positive evidence that their conduct met acceptable level of care and that child's injuries arose from unforeseen placental

Case 09-10138-MFW    Doc 14225-48    Filed 08/15/14    Page 125 of 474

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

abruption — Parents and child appealed — Appeal dismissed — There was ample evidence before trial judge to support his finding that acts of alleged negligence had not been established, and his determination of cause of tragedy.

### Health law --- Physicians and surgeons — Malpractice — Standard of care — Specialists

Child suffered neurological injuries shortly after birth which resulted in child being totally dependent on others for care for rest of his life — Parents and child brought action for negligence against obstetrician — Action was dismissed on grounds that parents and child failed to prove negligence on balance of probabilities — Obstetrician adduced positive evidence that conduct met acceptable level of care of obstetricians practising obstetrics at that time in Ontario and that child's injuries arose from unforeseen placental abruption — Parents and child appealed — Appeal dismissed — There was ample evidence before trial judge to support his finding that acts of alleged negligence had not been established and his determination of cause of tragedy.

### Evidence --- Opinion — Experts — Expert reports

Child suffered neurological injuries shortly after birth which resulted in child being totally dependent on others for care for rest of his life — Parents and child unsuccessfully brought action for negligence against obstetrician and nurses — Trial judge decided pursuant to R. 53.08 of Rules of Civil Procedure that parents and child failed to comply with R. 31.07 and R. 53.03 but that their expert witness could testify — Trial judge ruled that expert could not testify on issue of bradycardia which was not mentioned in report — Parents and child contended that issue was related to issue in report and that trial judge too narrowly interpreted R. 53.03 regarding "substance" of expert's proposed testimony — Parents and child also challenged refusal to allow another expert witness to testify on her second report — Parents and child submitted that cumulatively, evidentiary rulings and their uneven application denied opportunity to fairly present their case — Parents and child appealed — Appeal dismissed — Expert's report merely stated his conclusion about standard of care but did not mention bradycardia, nor point at which fetal distress was determined, nor addressed reserve capacity that fetus might have had — Expertise was only on standard of care in Michigan — No prejudice arose from interpretation of R. 53.03 because expert was not qualified to give expert evidence on causation — Expert's testimony may explain and amplify his/ her report but only on matters latent in or touched on by report — Allowing second expert to testify on her second report would open new field not covered in first report.

### Practice --- Trials — Time of trial — Adjournment — Discretion of trial judge

Child suffered neurological injuries shortly after birth which resulted in child being totally dependent on others for care for rest of his life — Parents and child unsuccessfully brought action for negligence against obstetrician and nurses — Expert's report stated his conclusion that appropriate standard of care was to attach fetal heart monitor on admission to hospital to indicate fetal distress at earliest possible point — Report did not refer to bradycardia, nor state point at which fetal distress was determined, nor address reserve capacity that fetus might have had — Report dealt with topic of fetal distress in connection with his opinion on standard of care but his expertise was only on standard of care in Michigan — Trial judge ruled that expert could not testify on issue of bradycardia because it was directed to issue not addressed in expert's report — Parents and child unsuccessfully requested adjournment to obtain supplementary reports from other proposed expert witnesses — Parents and child contended that taken cumulatively, evidentiary rulings and their uneven application denied opportunity to fairly present their case — Appeal dismissed — No injustice resulted — Trial judge clearly stated that ruling applied only to particular expert and that adequacy of other expert reports would be dealt with as need arose — Trial judge emphasized need to continue trial given that parties were several weeks into trial and there had already been substantial examinations for discovery — Permitting filing of more reports would require more discoveries and prolong trial.

### Evidence --- Opinion — Experts — Weight of evidence — Based on hearsay

Child suffered neurological injuries shortly after birth which resulted in child's being totally dependent on others for care for rest of his life — Parents and child unsuccessfully brought action for negligence against obstetrician and nurses — Trial judge ruled that parents and child had to produce source documents listed in home care expert's report upon which expert based her opinion, failing which her opinion would lack probative value — Trial judge ruled that if report was based on reports of doctors, opinion of doctors must be proven — Refusal to prove those medical reports breached implied

Case 09-10138-MFW    Doc 14225-48    Filed 08/15/14    Page 126 of 474

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362
2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

undertaking to prove opinions of medical doctors referred to in report — Counsel sought to rely upon videotapes as foundation for expert's opinion rather than upon medical reports that served as basis for opinion — Trial judge ruled that this was attempt to rely on different set of facts from facts that served as basis for experts' reports — Trial judge ruled that counsel must file list of expert witnesses they intended to call or whose reports would be filed and that before expert could testify there must be voir dire to determine facts or opinions that expert relied on in forming opinion — Parents and child contended that taken cumulatively, evidentiary rulings and their uneven application denied opportunity to fairly present their case — Parents and child appealed — Appeal dismissed — Party must prove foundational facts relied upon by expert in forming his/her opinion failing which expert opinion will be given little or no weight — Observations and conclusions could not be established in any other way than by adducing medical reports containing those observations and conclusions — Videotapes could only provide evidence of child's present capability but not about his future development.

**Practice --- Discovery — Examination for discovery — Range of examination — Information subsequently obtained or recalled**

Child suffered neurological injuries shortly after birth which resulted in child being totally dependent on others for care for rest of his life — Parents and child unsuccessfully brought action for negligence against obstetrician and nurses — After commencement of trial, obstetrician provided letter correcting answers given on examination for discovery — Parents and child contended that trial judge erred in permitting physician to correct his discovery evidence — Parents and child contended that taken cumulatively, evidentiary rulings and their uneven application denied opportunity to fairly present their case — Parents and child appealed — Appeal dismissed — No prejudice resulted — Obstetrician could explain his discovery answer in his testimony because original discovery answer was not formal admission — Rule 31.09 of Rules of Civil Procedure imposes continuing obligation to correct and complete answers given on discovery — Combined effect of R. 31.09 and R. 53.08 permitted evidence to be admissible — Original discovery answer and corrected answers and explanations were all before trial judge — Trial judge was entitled to weigh answers and explanation and decide which version to accept.

**Evidence --- Opinion — Opinion evidence in particular matters — General**

Child suffered neurological injuries shortly after birth which resulted in child being totally dependent on others for care for rest of his life — Parents and child unsuccessfully brought action for negligence against obstetrician and nurses — Action was discontinued against pathologist and two nurses on condition that they be available at trial for cross-examination — Trial judge ruled that compliance with R. 53.03 of Rules of Civil Procedure was required to elicit opinion evidence from physician — Since no R. 53.03 reports had been filed, leave was required — Trial judge ruled that unless notice was given or leave was granted, pathologist would not be permitted to give independent opinion evidence about conduct of others or to express opinion about cause of child's condition — Trial judge ruled that pathologist could give opinion evidence about his own reports if such evidence was limited to his own involvement in matter — Cross-examination was limited to pathologist's opinion of nature of placental abruption, if any, that occurred — Trial judge also ruled that nurse could not be asked about her opinion concerning conduct of other defendants — Parents and child contended that taken cumulatively, evidentiary rulings and their uneven application denied opportunity to fairly present their case — Parents and child appealed — Appeal dismissed — Ruling concerning pathologist was in error but did not result in prejudice — Nurse was to be regarded as lay witness because she was not qualified as expert at trial — Nurse was asked her opinion on conduct of other defendants but was not being asked to state opinion in order to more accurately express facts she perceived — Nurse's proposed testimony was not admissible and was properly disallowed.

**Evidence --- Examination of witnesses — Cross-examination — Impeachment — Inconsistent statement**

Child suffered neurological injuries shortly after birth which resulted in child being totally dependent on others for care for rest of his life — Parents and child unsuccessfully brought action for negligence against obstetrician and nurses — Counsel for parents and child attempted to cross-examine nurse on answers that he had read in from her discovery — Trial judge acknowledged that although R. 31.11(4) of Rules of Civil Procedure entitled counsel to rebut discovery evidence read into record, contradiction must be through another witness or by other admissible evidence apart from evidence of defendant who was examined for discovery — Parents and child contended that taken cumulatively, evidentiary rulings

Case 09-10138-MFW Doc 14225-48 Filed 08/15/14 Page 127 of 474

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

and their uneven application denied opportunity to fairly present their case — Parents and child appealed — Appeal dismissed — Rule does not limit party's right to rebut discovery answers — There is no reason in principle to prevent party from attempting to contradict adverse party's discovery answers by cross-examining adverse party — Trial judge erred in ruling that counsel could not attempt to contradict nurse's discovery answers by cross-examining her on those answers — However, ruling did not result in prejudice — Counsel objected only after question was asked and nurse reiterated her discovery answers — It was highly unlikely that further cross-examination would have elicited evidence helpful to parents and child.

## Evidence --- Examination of witnesses — Cross-examination — Right to cross-examine

Child suffered neurological injuries shortly after birth which resulted in child being totally dependent on others for care for rest of his life — Parents and child unsuccessfully brought action for negligence against obstetrician and nurses — Obstetrician was permitted to cross-examine nurse called as expert witness by nurses and hospital — Trial judge ruled that cross-examination was permissible because statement of claim had pleaded that medical respondents were responsible for conduct of nurses — Statement of defence of nurses denied that physicians were responsible for their conduct and denied that they were negligent — Nurses stated that they had no knowledge of negligence alleged to have been committed by physicians — Hospital and nurses cross-claimed against medical defendants and relied upon allegations in statement of claim — Medical defendants in their statement of defence denied all allegations in statement of claim and cross-claimed against hospital and nurses — Parents and child objected to cross-examination on ground that there was similarity of interest — Parents and child contended that taken cumulatively, evidentiary rulings and their uneven application denied opportunity to fairly present their case — Parents and child appealed — Appeal dismissed — Trial judge properly concluded on basis of pleadings that there was adversity of interest and properly allowed obstetrician to cross-examine nurse.

## Practice --- Trials — Conduct of trial — Powers and duties of trial judge — General

Child suffered neurological injuries shortly after birth which resulted in child being totally dependent on others for care for rest of his life — Parents and child unsuccessfully brought action for negligence against obstetrician and nurses — Parents and child contended that trial judge's conduct of trial raised reasonable apprehension of bias towards them — Parents and child submitted that defence counsel were insulting, hostile, discourteous and rude to their counsel and to their client but that trial judge condoned this behaviour and failed to restrain or control it — Parents and child submitted that by itself, trial judge's refusal to restrain defence counsel raised reasonable apprehension of bias — Parents and child also submitted that trial judge showed hostility to their counsel, that he interfered in presentation of case and that in his reasons he unfairly judged credibility of female parent — Parents and child appealed — Appeal dismissed — Reasonably informed person, observing trial judge's conduct during entire trial and reading his reasons for judgment would have no difficulty in concluding that he remained impartial and that he demonstrated no actual or apprehended bias and that parents and child were not deprived of fair trial — Failure to do more to restrain or control defendants' counsel does not automatically indicate judicial bias — Neither individually nor collectively did trial judge's interventions support claim of judicial bias — Trial judge intervened when needed in order to try to control difficult trial and understanding evidence — Trial judge's rebukes of counsel were evenly distributed throughout trial and among all trial counsel — Overall, evidence reasonably supported trial judge's findings that evidence of female parent did not withstand scrutiny — Relentless acrimony between counsel did not prevent trial judge from conducting and judging case fairly and thoroughly.

## Practice --- Disposition without trial — Discontinuance of action — With leave — Terms or conditions

Child suffered neurological injuries shortly after birth which resulted in child being totally dependent on others for care for rest of his life — Parents and child brought action for negligence against obstetrician and nurses — Parents and child included claim on behalf of provincial insurance plan to recover costs of insured services — Plan granted leave to discontinue its claim against defendants on condition that defendants could recover costs against plan — Plan's claim was never assessed and action was dismissed — Plan was sophisticated insurer and understood risks of litigation — Trial was devoted to issues of interest to plan until discontinuance — Defendants were awarded their party-and-party costs of trial and provincial insurer was ordered to pay small portion of those costs and remainder was responsibility of parents and child — Defendants' unsuccessfully brought motion to have counsel for parents and child pay 70 per cent of costs

Case 09-10138-MFW    Doc 14225-48    Filed 08/15/14    Page 128 of 474

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

award — Parents and child appealed costs order — Order varied — Dismissal of action and dismissal of appeal were both without costs — In oral argument on appeal, counsel for all defendants undertook not to pursue parents and child for costs of trial and stated that they were not seeking costs of appeal — Concession and tragedy leading to case both rendered it appropriate to vary costs order at trial to relieve parents and child of obligation to pay for defendants' costs.

### Practice --- Costs — Costs of particular proceedings — Miscellaneous proceedings

Child suffered neurological injuries shortly after birth which resulted in child being totally dependent on others for care for rest of his life — Parents and child brought action for negligence against obstetrician and nurses — Parents and child included claim on behalf of provincial insurance plan to recover costs of insured services — Plan granted leave to discontinue its claim against defendants on condition that defendants could recover costs against plan — Plan's claim was never assessed and action was dismissed — Plan was sophisticated insurer and understood risks of litigation — Trial was devoted to issues of interest to plan until discontinuance — Defendants were awarded their party-and-party costs of trial and provincial insurer was ordered to pay small portion of those costs and remainder was responsibility of parents and child — Defendants' unsuccessfully brought motion to have counsel for parents and child pay 70 per cent of costs award — Parents and child appealed costs order — Dismissal of action and dismissal of appeal were both without costs — In oral argument on appeal, counsel for all defendants undertook not to pursue parents and child for costs of trial and stated that they were not seeking costs of appeal — Concession and tragedy leading to case both rendered it appropriate to vary costs order at trial to relieve parents and child of obligation to pay for defendants' costs.

## Table of Authorities

### Cases considered by *Laskin J.A.*:

*Auto Workers' Village (St. Catherines) Ltd. v. Blaney, McMurtry, Stapells, Friedman* (1997), 14 C.P.C. (4th) 152 (Ont. Gen. Div.) — referred to

*Bachalo v. Robson* (1995), 35 C.P.C. (3d) 230, 101 Man. R. (2d) 316 (Man. Q.B.) — distinguished

*Burke v. Gauthier* (1987), 24 C.P.C. (2d) 281 (Ont. H.C.) — distinguished

*Capital Distributing Co. v. Blakey* (1997), 147 D.L.R. (4th) 372, 33 O.R. (3d) 58, 10 C.P.C. (4th) 109, 37 O.T.C. 371 (Ont. Gen. Div.) — referred to

*Christoyiannis (Litigation Guardian of) v. Benoit* (December 10, 1998), Doc. Ottawa 59062/91 (Ont. Gen. Div.) — referred to

*Collins v. Belgian Dry Cleaners, Dyers & Furriers Ltd.* (1951), 4 W.W.R. (N.S.) 241, [1952] 1 D.L.R. 712 (Sask. C.A.) — considered

*Draper v. Jacklin* (1969), [1970] S.C.R. 92, 9 D.L.R. (3d) 264 (S.C.C.) — applied

*Iler v. Beaudet*, [1971] 3 O.R. 644 (Ont. Co. Ct.) — referred to

*Machado v. Pratt & Whitney Canada Inc.* (1993), 17 C.P.C. (3d) 340 (Ont. Master) — referred to

*Majcenic v. Natale* (1967), [1968] 1 O.R. 189, 66 D.L.R. (2d) 50 (Ont. C.A.) — considered

*McEachrane v. Children's Aid Society of Essex (County)* (1986), 10 C.P.C. (2d) 265 (Ont. H.C.) — referred to

Case 09-10138-MFW    Doc 14225-48    Filed 08/15/14    Page 129 of 474

**Marchand (Litigation Guardian of) v. Public General Hospital...**, 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

*Ollett v. Bristol Aerojet Ltd.*, [1979] 1 W.L.R. 1197, [1979] 3 All E.R. 544 (Eng. Q.B.) — distinguished

*Quantrill v. Alcan-Colony Contracting Co.* (1978), 18 O.R. (2d) 333 (Ont. C.A.) — applied

*R. v. Abbey*, [1982] 2 S.C.R. 24, 138 D.L.R. (3d) 202, 43 N.R. 30, 39 B.C.L.R. 201, 29 C.R. (3d) 193, 68 C.C.C. (2d) 394, [1983] 1 W.W.R. 251 (S.C.C.) — distinguished

*R. v. Graat*, [1982] 2 S.C.R. 819, 18 M.V.R. 287, 31 C.R. (3d) 289, 2 C.C.C. (3d) 365, 144 D.L.R. (3d) 267, 45 N.R. 451 (S.C.C.) — applied

*R. v. Grosse* (1996), 19 M.V.R. (3d) 197, 107 C.C.C. (3d) 97, 91 O.A.C. 40, 29 O.R. (3d) 785 (Ont. C.A.) — distinguished

*R. v. Lavallee*, [1990] 4 W.W.R. 1, 67 Man. R. (2d) 1, [1990] 1 S.C.R. 852, 108 N.R. 321, 76 C.R. (3d) 329, 55 C.C.C. (3d) 97 (S.C.C.) — applied

*R. v. S. (R.D.)*, 151 D.L.R. (4th) 193, 118 C.C.C. (3d) 353, 10 C.R. (5th) 1, 218 N.R. 1, 161 N.S.R. (2d) 241, 477 A.P.R. 241, [1997] 3 S.C.R. 484, 1 Admin. L.R. (3d) 74 (S.C.C.) — applied

*R. v. Scardino* (1991), 6 C.R. (4th) 146, 46 O.A.C. 209 (Ont. C.A.) — applied

*Shipman v. Antoniadis* (1975), 8 O.R. (2d) 449, 58 D.L.R. (3d) 321 (Ont. C.A.) — applied

*Thorogood v. Bowden* (1978), 21 O.R. (2d) 385, 89 D.L.R. (3d) 604 (Ont. C.A.) — applied

*Wade v. Sisters of St. Joseph* (1976), 2 C.P.C. 37 (Ont. H.C.) — referred to

**Statutes considered:**

*Evidence Act*, R.S.O. 1990, c. E.23
    s. 52 — referred to

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194
    Generally — referred to

    R. 31.07(1) — referred to

    R. 31.09 — considered

    R. 31.09(1) — referred to

    R. 31.09(2)(a) — referred to

    R. 31.09(3) — referred to

    R. 31.09(3)(a) — referred to

    R. 31.11 — considered

Case 09-10138-MFW    Doc 14225-48    Filed 08/15/14    Page 130 of 474

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

R. 31.11(1)(a) — considered

R. 31.11(1)(b) — considered

R. 31.11(4) — considered

R. 51.05 — considered

R. 53.03 — considered

R. 53.03(1) — considered

R. 53.03(2) — considered

R. 53.08 — considered

R. 53.08(1)(d) — referred to

**Words and phrases considered**

**formal admission**

[Per Laskin, Goude and Sharpe JJ.A.:] First, [defendant's] original discovery answer was not a formal admission. As such, it was always open to him to explain his discovery answer in his testimony. In Sopinka, Lederman and Bryant, *The Law of Evidence in Canada*, 3 rd ed. (Toronto: Butterworths, 1999) at 1051-53, the authors distinguish between formal and informal admissions. A formal admission is conclusive as to the matter admitted, and cannot be withdrawn except by leave of the court or the consent of the party in whose favour it was made. *The Law of Evidence* states at 1051-52 that a formal admission may be made in the following ways:

1) by a statement in the pleadings or by failure to deliver pleadings;

2) by an agreed statement of facts filed at the trial;

3) by an oral statement made by counsel at trial, or even counsel's silence in the face of statements made to the trial judge by opposing counsel with the intention that the statements be relied on by the judge;

4) by a letter written by a party's solicitor prior to trial; or

5) by a reply or failure to reply to a request to admit facts.

In contrast, an informal admission does not bind the party making it, if it is overcome by other evidence. That is, a party making an informal admission may later lead evidence to reveal the circumstances under which the admission was made in order to reduce its prejudicial effect.

**May rebut that evidence by introducing any other admissible evidence**

[Per Laskin, Goude and Sharpe JJ.A.:] The wording of Rule 31.11(4) [of the Rules of Civil Procedure, R.R.O. 1990, Reg. 194], does not limit a party's right to rebut discovery answers. Rule 31.11(4) states that a party "may rebut *that* evidence by introducing *any other* admissible evidence." The words "that evidence" refer to the discovery answers read into evidence. In our view, the words "any other admissible evidence" must refer to any evidence other than the discovery answers read into evidence. We can see no reason in principle to prevent a party from attempting to contradict an adverse party's discovery answers by cross-examining the adverse party.

Case 09-10138-MFW    Doc 14225-48    Filed 08/15/14    Page 131 of 474

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

**substance**

[Per Laskin, Goude and Sharpe JJ.A.:] In our view, these cases indicate that the "substance" requirement of R. 53.03(1) [of the Rules of Civil Procedure, R.R.O. 1990, Reg. 194] must be determined in light of the purpose of the rule, which is to facilitate orderly trial preparation by providing opposing parties with adequate notice of opinion evidence to be adduced at trial. Accordingly, an expert report cannot merely state a conclusion. The report must set out the expert's opinion, and the basis for that opinion. Further, while testifying, an expert may explain and amplify what is in his or her report but only on matters that are "latent in" or "touched on" by the report. An expert may not testify about matters that open up a new field not mentioned in the report. The trial judge must be afforded a certain amount of discretion in applying R. 53.03 with a view to ensuring that a party is not unfairly taken by surprise by expert evidence on a point that would not have been anticipated from a reading of an expert's report.

APPEAL from judgment reported at *Marchand (Litigation Guardian of) v. Public General Hospital of Chatham* (1997), 33 O.R. (3d) 570, 1997 CarswellOnt 1778, 12 C.P.C. (4th) 373 (Ont. Gen. Div.), dismissing medical negligence action.

*Laskin J.A.***:**

1    In July 1990, Barbra and Allen Marchand were expecting their first child. Barbra's pregnancy had been relatively uneventful. However, by July 10 she was 16 days beyond her due date and her obstetrician, Dr. G. Asher, arranged for her to be induced the next day at the Public General Hospital in Chatham.

2    Mrs. Marchand was admitted to the Hospital at 1:05 a.m. on July 11. At 8:32 that morning her son Joel was delivered by emergency caesarean section performed by Dr. Asher.

3    Tragically, Joel was born profoundly disabled. He suffered asphyxia as a fetus with the result that the cells in the cortex of his brain were destroyed. He cannot walk or talk and will be entirely dependent on others for his care throughout his life.

4    In this action Joel and his parents sued Dr. Asher, the Hospital and three of the Hospital nurses claiming that their negligence caused Joel's condition.

5    The trial began on October 18, 1993. It was anticipated to run for six to eight weeks. In the end it took 165 court days to complete. The trial was characterized by an extraordinary level of rancour and hostility on the part of counsel all of whom were, regrettably, senior members of the bar of Ontario. It was not a trial of which the administration of justice can be proud.

6    On October 7, 1996 Granger J. released his reasons for judgment dismissing the action. This is the appeal by Joel and his parents from that decision.

7    The appellants make three broad attacks on the trial judgment.

8    First, the appellants argue that the trial judge erred in declining to find that the respondents were negligent in not properly monitoring Mrs. Marchand's pregnancy and in not delivering Joel earlier.

9    Second, the appellants argue that they did not receive a fair trial because of the erroneous and one-sided evidentiary rulings made by the trial judge.

10    Third, the appellants argue that the trial judge's conduct of the trial raised a reasonable apprehension of bias towards them. They submit that the trial judge failed to restrain or control the unprofessional conduct of defence counsel throughout the entire trial.

11    We will deal with each of these issues in turn.

**I. Were the respondents negligent?**

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-48    Filed 08/15/14    Page 132 of 474

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

12    In this Court the appellants relied on a series of acts and omissions by Dr. Asher and the Hospital nurses, which they argued, were negligent and which they claimed led to Joel's tragedy. These acts and omissions all relate to the final stages of Mrs. Marchand's pregnancy as it stretched beyond her due date into its forty-first and forty-second weeks.

13    The appellants described the four components of this "cumulative negligence" as follows:

>    (a) failing to instruct Mrs. Marchand about the importance of fetal kick count as an indicator of fetal health;

>    (b) improperly administering and interpreting the non-stress test given to Mrs. Marchand on July 5;

>    (c) thereafter failing to retest, monitor, or induce Mrs. Marchand; and

>    (d) failing to attach a fetal heart monitor once Mrs. Marchand was admitted to the hospital on July 11.

14    At trial, Granger J. considered and rejected each of these arguments.

15    The appellants also challenge the finding made by the trial judge that the tragedy which befell Joel was caused not by any act or omission of the respondents, but by a sudden abruption or rupture of the placenta pulling away from the uterine wall. The trial judge found that this began without warning at about 7:40 a.m. on July 11 resulting in cataclysmic oxygen deprivation to Joel's brain before his birth some 50 minutes later. On appeal the appellants raised no allegations of negligence relating to the treatment of Joel from 7:40 a.m. onwards.

16    We did not find it necessary to call on the respondents to respond to any of these arguments. There was ample evidence before the trial judge to support both his finding that none of the acts of negligence had been established and his determination of the cause of the tragedy that befell Joel. Nonetheless, we will briefly review each of the arguments.

*1. Allegations of "Cumulative Negligence"*

17    First, the appellants allege that Dr. Asher was negligent in failing to advise Mrs. Marchand of the significance of reduced fetal movement as her pregnancy went beyond term. However, the trial judge found as a fact that Dr. Asher did indeed have a complete discussion with her concerning fetal movement. Equally important, the trial judge found that Mrs. Marchand reported no significant reduction in fetal movement to Dr. Asher and that any reduction she experienced was a natural consequence of the fetus entering the birth canal and therefore of no moment. These findings are amply supported in the evidence and ought not to be disturbed.

18    Second, the appellants allege negligence in connection with the non-stress test ("NST") administered to Mrs. Marchand on July 5 to determine the health of her fetus. They say that Nurse Oslon was negligent in administering the NST and in interpreting the results to show a healthy fetus and that Dr. Asher was negligent in failing to review the results himself or failing to have them reviewed by another professional.

19    Again, however, the findings of the trial judge are to the contrary and are well founded in the evidence. He found that Nurse Oslon administered the test properly. Indeed there was no evidence to the contrary. The trial judge also found that she was correct in interpreting the results of the test to indicate a healthy fetus, a conclusion which accorded with the predominant view of the expert witnesses called at trial. While several of the appellants' experts found the test results raised a suspicion, the trial judge correctly concluded that even this could render Nurse Olson's conclusion no more than an error in judgment falling short of negligence. Finally, although the trial judge found that Dr. Asher should have reviewed the NST results himself, he also found that the doctor would have reached the same conclusion as Nurse Olson (which he found to be the correct conclusion) that the test result was normal. Therefore the course of Mrs. Marchand's pregnancy would not have changed had Dr. Asher reviewed the NST results himself.

20    The appellant's third allegation of negligence is that Dr. Asher fell below the required standard of care in failing to intervene in Mrs. Marchand's pregnancy until July 10 when he scheduled an induction for the next day.

Case 09-10138-MFW Doc 14225-48 Filed 08/15/14 Page 133 of 474

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

21    In addressing this argument the trial judge conducted a careful review of the expert evidence on standard of care called by both sides. He was careful to address himself to the standard required of obstetricians practising in Ontario in July and August 1990. He concluded on the basis of ample evidence that where, as here, the pregnancy was normal and there was no indication of fetal distress, it was entirely acceptable practice to do without serial anti-natal monitoring and to schedule the induction when Dr. Asher did. There is no basis to interfere with that conclusion.

22    Finally, the appellants allege negligence in the failure of nursing staff to attach a fetal heart monitor to Mrs. Marchand following her admission to the Hospital at 1:05 a.m. on July 11. Nurse Colebrook did not do this but monitored the fetal heart rate intermittently with the use of a stethoscope. That monitoring detected no abnormality before 7:40 a.m.

23    Once again the trial judge carefully reviewed and considered the expert evidence. He concluded that in the circumstances the nursing decision to monitor the fetal heart rate by stethoscope rather than by attaching a fetal heart monitor met an acceptable standard of care. This was particularly so given that the monitoring results indicated that the fetus was not in distress before 7:40 a.m. The record amply supports this finding and we would not interfere with it.

24    In summary, the trial judge concluded that none of the components of the cumulative negligence advanced by the appellants were made out on the evidence. In our view, this conclusion is unassailable.

*2. Causation*

25    The appellants also attack the finding of causation made by the trial judge. He rejected their assertion at trial that Joel's asphyxia was due to a long slow deterioration of the placenta, which could have been detected by proper care. Rather, he found that the fetus was assaulted by a sudden placental abruption, which commenced without warning about 7:40 a.m. and which resulted in critical oxygen deprivation to the fetus until Joel was delivered at 8:32 a.m.

26    Here, as well, the finding of the trial judge is well supported in the evidence. It cannot be said in any way to be unreasonable. The trial judge carefully reviewed the evidence. He recognized that much of the evidence describing an abruption came from Dr. Asher himself. There was also, however, significant corroborating evidence, particularly the testing of the relevant blood gases. That clinical evidence supported the conclusion that an acute event, which had its onset at about 7:40 a.m. and evolved rapidly thereafter, caused Joel's profound injuries.

27    The conclusion about what happened to Joel was carefully drawn after a review of all the evidence. It is a reasonable conclusion, which we must accept. A severe spontaneous placental abruption, not anything done by the respondents, caused this tragedy.

**II. Did the appellants receive a fair trial?**

28    The appellants submit that, taken cumulatively, a number of evidentiary rulings by the trial judge as well as the trial judge's uneven application of his evidentiary rulings (a) denied the appellants the opportunity fairly to present their case or, (b) created a reasonable apprehension of bias on the part of the trial judge. In their factum, the appellants submit that the impugned rulings "distorted the trial process"; "impaired any reasonable attempt to achieve justice"; and "negated the Marchands' right to present their case fully." The appellant made similar oral submissions.

29    We do not understand the appellants to say that any one of the evidentiary rulings, standing on its own, would be sufficient to warrant interference by this court. Rather, it is their position that we must consider whether the overall, cumulative effect of these rulings denied the appellants a fair trial. We will review each impugned ruling individually to assess whether the cumulative complaint the appellants advance has any substance.

*A. Evidentiary Rulings*

*1. Ruling limiting expert evidence to the "substance" of the report*

Case 09-10138-MFW Doc 14225-48 Filed 08/15/14 Page 134 of 474

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

30     During the examination-in-chief of Dr. Fields, an expert witness called by the appellants, their counsel asked about indications of late decelerations on the NST strip. Counsel for the respondents objected on two grounds: first, rule 31.07(1), which prevents a party from introducing information at trial where he or she has refused to furnish the information on discovery; and second, rule 53.03(1), which requires a party to serve an expert's report setting out the substance of the expert's proposed testimony. On examination for discovery, counsel for the respondents had asked that the location of late decelerations be identified on the NST strip. Appellants' counsel refused to provide that information. Although the appellants filed a report from Dr. Fields, the report merely described the NST strip as abnormal and suspicious.

31     The trial judge ruled that the appellants had failed to comply with both rules 31.07 and 53.03. However, applying rule 53.08, the trial judge allowed Dr. Fields to testify about indications of late decelerations on the NST strip on the ground that counsel for the respondents would have sufficient time to prepare their cross-examination of Dr. Fields. In making this ruling, he cautioned counsel for the appellants (and to a lesser extent counsel for the respondents) that, at some point, attempts to examine experts on matters outside their reports would cause prejudice to the other side requiring the exclusion of testimony.

32     The appellants' counsel proceeded to examine Dr. Fields extensively on the NST strip. He then began to examine Dr. Fields on the relationship between oxygen deprivation and fetal reserve, and specifically about bradycardia (abnormally slow heart rate). Counsel for the respondents objected on the ground that the concept of bradycardia appeared nowhere in Dr. Fields' report. The appellants' counsel argued that the report dealt with the standard of care in treating an overdue mother, and that the questions went to signs of fetal distress some hours before the delivery. The trial judge ruled that the appellants' counsel could not pursue the "bradycardia" line of questioning because Dr. Fields' report made no mention of when fetal distress was determined.

33     The appellants submit that Dr. Fields should have been permitted to explain what bradycardia means because bradycardia is a sign of fetal distress, and fetal distress appeared in the report. They contend that the trial judge erred in adopting an unduly narrow construction of rule 53.03, specifically with respect to the phrase "the substance of his or her proposed testimony." In particular, the appellants submit that the trial judge erred in equating "substance" with "summary". Indeed, in their factum, the appellants submit that "the Marchands' expert witnesses were constrained to testifying *verbatim* from the contents of their reports." It is the appellants' submission that this ruling set an erroneously high standard for what is required in an expert report and impeded the presentation of their case.

34     Rule 53.03 governs expert opinion evidence. At the time of trial, rule 53.03 provided:

53.03 (1) A party who intends to call an expert witness at trial shall, not less than ten days before the commencement of the trial, serve on every other party to the action a report, signed by the expert, setting out his or her name, address and qualifications and the substance of his or her proposed testimony.

(2) No expert witness may testify, except with leave of the trial judge, unless subrule (1) has been complied with. [1]

Unless a party has fully complied with the requirements set out in rule 53.03(1), an expert witness called by that party may not testify except with leave.

35     This court considered the meaning of the "substance" of the proposed testimony of an expert in *Thorogood v. Bowden* (1978), 21 O.R. (2d) 385 (Ont. C.A.). A medical expert retained by the plaintiff in a personal injury action submitted a report indicating that the injuries would manifest in more intensive symptoms later in life. At trial, the plaintiff's medical expert gave evidence about the possibility of arthritis and the future need for an artificial hip. On appeal, the defendant argued that the trial judge ought to have declared a mistrial, as the matters raised by the expert had not been included in his medical reports. The court dismissed the appeal. Lacourcière J.A., writing for the majority, reasoned as follows at 386:

We interpret the law with respect to medical reports to be that a medical expert is not to be narrowly confined to the precise contents of his report, but he has a right to explain and amplify. What was done here, in our view, . . . was to expand on

Case 09-10138-MFW    Doc 14225-48    Filed 08/15/14    Page 135 of 474

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

what was latent in the medical report, and it did not open a new field. In our view, the trial Judge properly concluded that there was no prejudicial surprise here and, therefore, exercised his discretion and properly refused to declare a mistrial.

36    *Thorogood* was applied in *Auto Workers' Village (St. Catherines) Ltd. v. Blaney, McMurtry, Stapells, Friedman* (1997), 14 C.P.C. (4th) 152 (Ont. Gen. Div.). The plaintiff alleged, among other things, that the solicitors were negligent and caused the plaintiff damages in connection with a condominium project. The plaintiff called a lawyer to give expert opinion evidence in the area of condominium development. During examination-in-chief, the witness opined that a clause in an agreement might be void. The defendants objected to this line of questioning on the ground that it went beyond the expert's report. Quinn J. ruled that the expert could not testify about the validity of the clause, as that opinion was not stated in his report. Quinn J. relied on *Thorogood* and found, at 157 that the impugned questioning entered a new field:

The opinion, [by the expert], as to the voidness of the price-escalation clause, creates a discrete instance of solicitors' negligence: one which had never before been raised by the plaintiff. In other words, it opens up a new field. It is neither touched upon nor latent in the report of [the expert]. Therefore, the report does not contain "the substance" of the "proposed testimony" on the issue of voidness, as required by subrule 53.03(1).

See also *Iler v. Beaudet*, [1971] 3 O.R. 644 (Ont. Co. Ct.); *McEachrane v. Children's Aid Society of Essex (County)* (1986), 10 C.P.C. (2d) 265 (Ont. H.C.)

37    *Ollett v. Bristol Aerojet Ltd.*, [1979] 3 All E.R. 544 (Eng. Q.B.), dealt with an action for personal injuries suffered in connection with some machinery. An expert witness filed a report merely setting out a factual description of the machine and the alleged circumstances in which the accident happened. Ackner J. considered the English equivalent of rule 53.03 and found that the report failed to comply with the requirement that the parties exchange the substance of the expert's proposed testimony. He interpreted the term "substance" in light of the function of expert evidence, stating at 544:

. . . An expert, unlike other witnesses, is allowed, because of his special qualifications and/or experience, to give *opinion* evidence. It is for his opinion evidence that he is called, not for a factual description of the machine or the circumstances of the accident, although that is often necessary in order to explain and/or justify his conclusions. When the substance of the expert's report is to be provided, that means precisely what it says, both the substance of the factual description of the machine and/or the circumstances of the accident and his expert opinion in relation to that accident, which is the very justification for calling him.

38    In our view, these cases indicate that the "substance" requirement of rule 53.03(1) must be determined in light of the purpose of the rule, which is to facilitate orderly trial preparation by providing opposing parties with adequate notice of opinion evidence to be adduced at trial. Accordingly, an expert report cannot merely state a conclusion. The report must set out the expert's opinion, and the basis for that opinion. Further, while testifying, an expert may explain and amplify what is in his or her report but only on matters that are "latent in" or "touched on" by the report. An expert may not testify about matters that open up a new field not mentioned in the report. The trial judge must be afforded a certain amount of discretion in applying rule 53.03 with a view to ensuring that a party is not unfairly taken by surprise by expert evidence on a point that would not have been anticipated from a reading of an expert's report.

39    We are unable to conclude that the trial judge erred in his ruling. Although we do not have a copy of his report, it appears from the transcripts that Dr. Fields' report merely stated his conclusion that the appropriate standard of care was to attach a fetal heart monitor on admission to indicate fetal distress at the earliest possible point. Dr. Fields' report did not refer to bradycardia, did not state the point at which fetal distress was determined, and did not deal with the "reserve capacity" that the fetus might have had.

40    Moreover, the trial judge had ruled that Dr. Fields had expertise only with regard to the standard of care in Michigan. Dr. Fields' report dealt with the topic of fetal distress in connection with his opinion on the standard of care. The appellants' counsel, however, sought to elicit from Dr. Fields, through the bradycardia questions, evidence going to causation. Thus, the bradycardia

Case 09-10138-MFW    Doc 14225-48    Filed 08/15/14    Page 136 of 474

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

evidence was directed to an issue not addressed in the report. Accordingly, even if the trial judge erred in his interpretation of rule 53.03, no prejudice arises from that error as Dr. Fields had not been qualified to give expert evidence about causation.

*2. Denial of request for adjournment*

41      In the light of the trial judge's ruling restricting Dr. Fields to the "substance" of his report, the appellants requested an adjournment for a "couple of weeks" to obtain supplementary reports from other witnesses they intended to call to give expert evidence. In particular, the appellants sought to obtain a supplementary report from Dr. Silver, whose original report was less than one page and dealt only with the issue of abruption. Counsel for the respondents opposed the request, arguing that the appellants were seeking an opportunity to "re-do the liability case", and that if the request was allowed, the respondents were entitled to a further examination for discovery.

42      The trial judge refused the appellants' request for an adjournment. He clarified the effect of his ruling concerns Dr. Fields' report, stating that it "is not a general ruling throughout the trial. It does not apply to all the reports. It only replies to the evidence that I heard from Dr. Fields yesterday and the way the evidence was developed." The trial judge emphasized the need to proceed with the trial, noting that counsel for the respondents would be entitled to a further examination for discovery if the experts were allowed to file further reports, thus unduly delaying the completion of the case.

43      Although the appellants did not specifically address the reasons why the denial of their request for an adjournment was in error, they submit that the Fields ruling required them to revisit every report submitted by their liability experts. The denial of an adjournment, they say, prevented them from fully and fairly presenting their case.

44      In our view, the trial judge did not act improperly in refusing to grant the request for an adjournment. The trial judge made it clear that the Fields ruling applied only to Dr. Fields, and that he would deal with issues concerning the adequacy of other expert reports as they arose. The trial judge emphasized the need to continue with the trial. This need was properly emphasized, given that: the parties were then several weeks into the trial; there had been substantial discovery prior to the trial; and the filing of additional reports would necessitate further examinations for discovery, thus prolonging the trial. The denial of an adjournment did not cause any injustice in this case.

*3. Ruling preventing Dr. Silver from testifying on her second report*

45      The appellants called Dr. Silver, a pathologist at the Toronto Hospital for Sick Children, as an expert witness. Dr. Silver had prepared a report dated April 22, 1993. Following the Fields ruling, the appellants obtained a further report from Dr. Silver. Dr. Silver's second report was served on November 24, 1993. The respondents were not advised of the substance of Dr. Silver's additional evidence before being served with this report. The respondents objected to Dr. Silver testifying on matters raised in the second report on the grounds that: (a) the second report set out a new theory of causation; and (b) allowing Dr. Silver to testify in accordance with the second report would cause prejudice to the respondents as Dr. Manning, an expert in fetal medicine called by the appellants, had already testified and the respondents would be denied to opportunity to cross-examine him on the new theory.

46      The trial judge ruled that he would not grant leave for Dr. Silver to give evidence about matters set out in the second report. The trial judge described the first report of Dr. Silver, which stated that the presence of meconium within the fetal membrane provided evidence of fetal distress, as extremely short. In contrast, the second report was over three pages long, and largely devoted to explaining the reasons for Dr. Silver's opinion about why a placental abruption could not have resulted in severe birth asphyxiation.

47      The trial judge commented on the two reports as follows:

. . . . I simply do not accept the argument that the report of April 22nd, 1993 would allow Dr. Silver to give the evidence as set out in her report dated November 23, 1993. Mr. Wunder is attempting to do with Dr. Silver exactly what I had ruled he could not do with Dr. Fields, which is, to just state a conclusion in a report and attempt to explain in the evidence the

reason for the conclusion. The reason should be in the report so opposing counsel will know such reasoning and can test it by cross-examining other expert witnesses.

48    The trial judge then considered whether rule 53.08 obliged him to grant leave for Dr. Silver to give evidence as proposed. The trial judge agreed that the respondents would suffer prejudice if Dr. Silver was allowed to give the proposed testimony. Dr. Manning had completed his testimony, and the respondents would be unable to cross-examine Dr. Manning on Dr. Silver's second report. Accordingly, the respondents' right to a full and fair defence would be impaired. The trial judge found that requiring Dr. Manning to return for further cross-examination would result in undue delay. Given these considerations, the trial judge refused to grant leave.

49    We do not agree that the trial judge erred in denying leave to permit Dr. Silver to testify about matters in her second report for three reasons.

50    First, the appellants sought to elicit Dr. Silver's opinion that severe birth asphyxiation could not have resulted from an abruption. The first report did not deal with abruption; this report concerned the presence of meconium as an indication of fetal distress. Accordingly, testimony on abruption would certainly "open up a new field" not covered in the first report.

51    Second, the trial judge found that the respondents would be prejudiced as they had been unable to cross-examine Dr. Manning about Dr. Silver's second report and that requiring Dr. Manning to re-attend would cause undue delay. This was a matter within the discretion of the trial judge and we see no basis to interfere.

52    Third, Dr. Silver, ultimately, did testify about her opinion that an abruption was not the cause of Joel Marchand's injuries.

53    We add that the appellants could have avoided the very problem they encountered with respect to the evidence of Dr. Silver. They had gone to trial on a one-page report from a witness they considered important and should not have been surprised when it proved inadequate. When it did, they took no steps to advise the respondents to expect the amplified report they had asked Dr. Silver to prepare.

*4. "Foundational facts" rulings*

54    On November 4, 1993, the appellants entered as Exhibit 47 ("Ex. 47") a report written by two home care experts, Ms. Kelly and Ms. Snell, dated August 19, 1993. Ex. 47 listed various source documents, including numerous reports from medical practitioners involved in the care of Joel Marchand. Counsel for Dr. Asher stated that he understood the appellants to be undertaking to call the authors of Ex. 47 and also to prove the source documents. The trial judge responded that the appellants would have to produce their source documents. The appellants' counsel gave no indication that he would not prove the source documents.

55    On November 24, 1993, the appellants served a letter advising that Ms. Kelly and Ms. Snell would no longer be relying on the medical reports referred to in Ex. 47; instead, the two witnesses would be relying on videos filed at trial. The respondents objected to Ms. Kelly giving opinion evidence on a basis other than these medical reports. The respondents' counsel argued that the appellants had undertaken to prove the medical opinions contained in these reports. The respondents' counsel further argued that Ms. Kelly's evidence was of no probative value as there was no admissible evidence proving the factual foundation of her opinion.

56    The trial judge accepted the respondents' submissions and ruled that Ms. Kelly's opinion lacked probative value unless the appellants proved the facts on which she based her opinion (the "foundational facts ruling"). The trial judge acknowledged that the appellants might prove Joel's disability in a number of ways, but noted that "if [Ms. Kelly's] opinion is based on the opinions of doctors then the plaintiff must attempt to prove the opinions of such doctors . . . ". The trial judge also found that the appellants' counsel's refusal to prove the medical reports referred to in Ex. 47 breached an implied undertaking to prove the opinions of the medical doctors referred to in Ex. 47.

Case 09-10138-MFW    Doc 14225-48    Filed 08/15/14    Page 138 of 474

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

57      Given the breach of this implied undertaking, the trial judge stated that he did "not intend to give Ex. 47 any weight whatsoever." As the respondents did have notice of the substance of Ms. Kelly's evidence, the trial judge was prepared to allow Ms. Kelly to testify. However, he stated that he would insist that all of the facts on which Ms. Kelly relied be proved by some admissible evidence before he would permit Ms. Kelly to state her opinion.

58      A similar issue arose later on May 19, 1994. The appellants proposed to call Ms. Staub to give opinion evidence regarding the future care costs for Joel Marchand. Ms. Staub had written a report dated September 13, 1993, which had been filed as an exhibit on an implied undertaking that the appellants would prove the facts on which the report was based. The respondents objected to Ms. Staub being allowed to give evidence on the ground that the appellants had failed to prove the foundational facts. The appellants' counsel suggested that the earlier foundational facts ruling was unclear, and submitted that the foundational facts ruling allowed him to prove the foundational facts upon which Mr. Staub's opinion was based in a manner different than that set out in her written report. The trial judge reiterated that the effect of the foundational facts ruling was that if a report was based on the reports of doctors, the opinion of the doctors must be proven.

59      The trial judge also referred to an earlier ruling requiring counsel to file a list of the expert witnesses they intended to call or whose reports would be filed under s. 52 of the *Ontario Evidence Act*. He also ruled that before an expert could testify a voir dire be held in order to determine the facts or opinions that the expert relied on in forming his or her opinion.

60      In *R. v. Lavallee* (1990), 55 C.C.C. (3d) 97 (S.C.C.), the Supreme Court of Canada reviewed the circumstances in which expert opinion evidence may be admitted, notwithstanding that the opinion is based upon hearsay evidence. Wilson J. reviewed the Supreme Court's prior decision in *R. v. Abbey* (1982), 68 C.C.C. (2d) 394 (S.C.C.), and at 127-128 interpreted *Abbey* as standing for the following propositions:

1. An expert opinion is admissible if relevant, even if it is based on second-hand evidence.

2. This second-hand evidence (hearsay) is admissible to show the information on which the expert opinion is based, not as evidence going to the existence of the facts on which the opinion is based.

3. Where the psychiatric evidence is comprised of hearsay evidence, the problem is the weight to be attributed to the opinion.

4. Before any weight can be given to an expert's opinion, the facts on which the opinion is based must be found to exist.

Thus, *Lavallee* establishes that an expert opinion based upon hearsay will be admissible; however, the weight to be attached to that opinion is an issue.

61      Wilson J. clarified the fourth proposition, and rejected the proposition that every fact relied upon by the expert must be independently proven before any weight could be attached to an expert opinion. She stated at 130-131:

. . . *Abbey* does not, in my view, provide any authority for that proposition. The court's conclusion in that case was that the trial judge erred in treating as proven the facts upon which the psychiatrist relied in formulating his opinion. The solution was an appropriate charge to the jury, not an effective withdrawal of the evidence. In my view, as long as there is some admissible evidence to establish the foundation of the expert's opinion, the trial judge cannot subsequently instruct the jury to completely ignore the testimony. The judge must, of course, warn the jury that the more the expert relies on facts not proven in evidence the less weight the jury may attribute to the opinion.

. . .

Where the factual basis of an expert's opinion is a mélange of admissible and inadmissible evidence the duty of the trial judge is to caution the jury that the weight attributable to the expert testimony is directly related to the amount and quality of admissible evidence on which it relies.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-48    Filed 08/15/14    Page 139 of 474

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

62    Sopinka J., in a concurring judgment, noted that the principles underlying *Abbey* give rise to a contradiction: an expert opinion based entirely on hearsay will be admissible, but will be entitled to no weight. He provided the following resolution at 132-133:

> The resolution of the contradiction inherent in *Abbey*, and the answer to the criticism *Abbey* has drawn, is to be found in the practical distinction between evidence that an expert obtains and acts upon within the scope of his or her expertise (as in *City of St. John*,) and evidence that an expert obtains from a party to litigation touching a matter directly in issue (as in *Abbey*.)

> In the former instance, an expert arrives at an opinion on the basis of forms of enquiry and practice that are accepted means of decision within that expertise. A physician, for example, daily determines questions of immense importance on the basis of the observations of colleagues, often in the form of second or third-hand hearsay. For a court to accord no weight to, or to exclude, this sort of professional judgment, arrived at in accordance with sound medical practices, would be to ignore the strong circumstantial guarantees of trustworthiness that surround it, and would be, in my view, contrary to the approach this court has taken to the analysis of hearsay evidence in general, exemplified in *Ares v. Venner* (1970), 14 D.L.R. (3d) 4. In *R. v. Jordan* (1984), 11 C.C.C. (3d) 565 (B.C.C.A.), a case concerning an expert's evaluation of the chemical composition of an alleged heroin specimen, Anderson J.A. held, and I respectfully agree, that *Abbey* does not apply in such circumstances: see also *R. v. Zundel* (1987), 31 C.C.C. (3d) 97 at p. 146 (Ont. C.A.), where the court recognized an expert opinion based upon evidence "... of a general nature which is widely used and acknowledged as reliable by experts in that field".

> Where, however, the information upon which an expert forms his or her opinion comes from the mouth of a party to the litigation, or from any other source that is inherently suspect, a court ought to require independent proof of that information. The lack of such proof will, consistent with *Abbey* , have a direct effect on the weight to be given to the opinion, perhaps to the vanishing point. But it must be recognized that it will only be very rarely that an expert's opinion is entirely based upon such information, with no independent proof of any of it. Where an expert's opinion is based in part upon suspect information and in part upon either admitted facts or facts sought to be proved, the matter is purely one of weight. . . . [parallel citations omitted].

63    This Court considered the weight to be given to an expert opinion based solely upon hearsay evidence in *R. v. Scardino* (1991), 6 C.R. (4th) 146 (Ont. C.A.). The accused appealed from his conviction for second degree murder. At trial, the accused led expert evidence from a psychiatrist, who testified that the accused suffered from a psychiatric disorder that would have prevented him from appreciating the nature and quality of his acts. Among the evidence relied upon by the expert in forming his opinion was a factual account of the events recounted by the accused. The trial judge instructed the jury that these matters had not been established in evidence, and thus the "degree to which [the expert's] opinion is dependent upon those statements attributed to the accused is of no weight . . . ". Finlayson J.A. found that the trial judge had not erred in her charge to the jury, stating at 153 that "[a]n expert's opinion is admissible in evidence, notwithstanding the absence of proof in some areas relied upon by the expert. However, the weight to be given to the opinion in such cases is diminished, sometimes to the point where the opinion can be given no weight at all." This general proposition was reaffirmed by this Court in *R. v. Grosse* (1996), 29 O.R. (3d) 785 (Ont. C.A.), where this Court indicated that an expert opinion based entirely upon inadmissible evidence would be entitled to no weight and therefore could not be accepted by the trial judge.

64    It is clear from the Supreme Court's decision in *Lavallee* that proof of foundational facts goes to the weight to be accorded to the opinion rather than its admissibility. It follows that, taken in isolation, the appellants' unwillingness to prove in evidence the medical reports upon which they had relied was not a sufficient reason to preclude Ms. Kelly and Ms. Staub from testifying.

65    The trial judge based his refusal to admit the evidence on his finding that the evidence would have no weight. Ordinarily, this is not the appropriate approach. The question of weight can only be assessed at the close of a party's case; it cannot be assessed prior to an expert witness giving testimony. Further, it is not the law that a party must prove the identical factual foundation relied upon by an expert in formulating an opinion. Indeed, the Supreme Court clearly rejected that proposition in *Lavallee*.

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

66    However, it appears to us that the issues in the case at bar were more complex. The appellants sought to rely upon videotapes as the foundation for the opinions of Ms. Kelly and Ms. Staub rather than the medical reports that served as the basis for the Kelly and Staub reports. The trial judge characterized the matter as an attempt by the appellants to rely upon a different set of facts from the facts that served as a basis for the experts' reports.

67    While a party might prove the *same* set of facts from alternative sources, it must also be the case that a party cannot rely upon a *different* set of facts. This proposition is merely a variation of the basic rule articulated in *Lavallee*: in so far as a party fails to prove those facts relied upon by an expert in forming his or her opinion, the expert opinion will be entitled to little or no weight.

68    We are not persuaded that, in light of all the factors before the trial judge, he erred in his approach to the problem he faced. The foundational facts ruling has to be considered in the context of a long and difficult trial and in relation to the trial judge's efforts to manage that trial in an efficient manner. The appellants were in breach of an undertaking and were refusing to prove in evidence the factual foundation of the opinion. It was open to the trial judge to conclude that the observations and conclusions could not be established in any way other than by adducing the medical reports containing those observations and conclusions. The videotapes could only provide evidence of Joel Marchand's *present* capabilities; they could say nothing about Joel Marchand's future development. The appellants' refusal to prove the medical reports provided a sufficient basis for the trial judge to conclude that the experts' opinions would be entitled to no weight. Given the protracted nature of the trial and the explicit position taken by the appellants as to what they would and would not prove, we would not interfere with the trial judge's decision not to hear evidence that would be given no weight.

69    Even if the trial judge did err, the error resulted in no substantial wrong or miscarriage of justice. The opinions of Ms. Kelly and Ms. Staub were entitled to little or no weight, given that the factual foundations of their reports had not been proved in evidence. Even if the trial judge had heard the proposed testimony, he could not have accepted it. Finally, this evidence pertained only to damages and would have had no impact on the trial judge's liability findings.

*5. Ruling allowing the respondents to correct Dr. Asher's discovery admission*

70    On examination for discovery, the appellants' counsel asked Dr. Asher a number of questions relating to his observations of amniotic fluid during Mrs. Marchand's caesarean section. The relevant questions and answers are reproduced below. The most important is Q. 596 and Dr. Asher's "admission" of oligohydramnios.

594 Q. Am I correct that at birth this child was observed to suffer the symptoms of oligohydramnios?

A. At birth there was very little amniotic fluid.

595 Q. So am I correct, that's a diagnosis of oligohydramnios?

A. That is the diagnosis, but you said symptoms, didn't you?

596 Q. Sorry. Am I correct this child showed oligohydramnios at birth?

A. Yes.

. . .

792 Q. . . . May I take it there was some amniotic fluid?

A. Yes.

793 Q. You have told me very little?

A. I said scant I believe.

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

. . .

801 Q. Would you describe the amount of amniotic fluid? Your report says "very little". You told me today, "scant". Are you able to give me some graphic description of how much? Just a couple of drops ...

A. No, it would be approximately 300 *c.c.* 's.

802 Q. And what would the normal amount be?

A. It would be as much as 800 cc.

. . .

810 Q. Am I correct, your record - your Operative Record does not disclose that there was 300 *c.c.* 's of amniotic fluid?

A. No, that's a recollection.

811 Q. Okay, so I suggest to you that it could have been 150.

A. You can suggest what you want. My recollection is approximately 300 *c.c.* 's.

812 Q. No, you're the one who is testifying and yes, I can suggest what I want as long as it's not irresponsible ...

A. Yes.

813 Q. ... and I just want ...

A. Well, I think it's a little - 150 is a big difference at that level.

814 Q. I understand. Could it have been 200, sir?

A. It wasn't measured so I can't tell you absolutely.

815 Q. So we can't be absolute about the 300.

A. No.

816 Q. And so I suggest to you it could have been 200.

A. No.

817 Q. You think it was more than that.

A. Yes.

71      After the trial had commenced, counsel for the respondents sent the appellants' counsel a letter correcting a number of the answers given by Dr. Asher on discovery, and withdrawing the "admission" of oligohydramnios. The corrections relevant for present purposes are as follows:

596 Q. Sorry. Am I correct this child showed oligohydramnios at birth?

A. There was no oligohydramnios at birth. For a 42 week gestation the amniotic fluid would normally be approximately 250 to 300 cc.

. . .

Case 09-10138-MFW    Doc 14225-48    Filed 08/15/14    Page 142 of 474

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

801 Q. You reported very little, you told me today scant. Are you able to give me some graphic description of how much, just a couple of drops?

A. No, it would be approximately 300 cc.

802 Q. And what would the normal amount be?

A. An amniotic fluid volume of 800 cc's would be normal for approximately 40 weeks gestation.

72    The appellants' counsel objected to the trial judge granting leave for Dr. Asher to correct the answers that he gave on discovery. The appellants argued that they relied on Dr. Asher's "admission" of oligohydramnios and would be prejudiced in the presentation of their case if Dr. Asher changed his admission. The appellants' counsel submitted that Rule 31.09(1) requires a party to correct any incorrect or incomplete answers "forthwith", and that the respondents had failed to comply with this requirement. The appellants' counsel also argued that Dr. Asher's corrections would have affected the examination in-chief of Dr. Manning (who had finished testifying) and would affect the examination in-chief of Dr. Johnson (who had been sent a number of Dr. Asher's discovery answers for consideration).

73    The trial judge reserved his ruling, but did observe that Dr. Asher's discovery answers would in any event have been subject to clarification by him on either examination-in-chief or on cross-examination. He also noted that, even if the corrections were allowed, the appellants' counsel would be able to cross-examine Dr. Asher extensively on any putative mistake. The trial judge did not make an explicit ruling allowing Dr. Asher to correct his answer on discovery, but he did allow the trial to proceed on the basis that Dr. Asher was free to testify that there was no oligohydramnios.

74    On cross-examination, Dr. Asher gave the following explanation of his discovery answers and of his corrections:

A. I was under the mistaken idea that 800 cc of amniotic fluid was, was normal for 42 weeks, and I was actually thinking of a term pregnancy which was 40 weeks, or a pregnancy at the due date which was 40 weeks as - and actually that's - the average volume at 40 weeks would be 800 cc, the average volume at 42 weeks would be somewhere between 250 and 300 cc.

75    The appellants submit that the trial judge erred in allowing the respondents to correct the admission made by Dr. Asher during his examination for discovery and that prejudice inevitably flowed as the appellants' case was premised on an admission of oligohydramnios. The appellants also submit that they suffered prejudice in being required to cross-examine Dr. Asher on his admission and then the subsequent correction.

76    In our view, the trial judge committed no error in permitting Dr. Asher to correct his discovery evidence for three reasons.

77    First, Dr. Asher's original discovery answer was not a formal admission. As such, it was always open to him to explain his discovery answer in his testimony. In Sopinka, Lederman and Bryant, *The Law of Evidence in Canada*, 3rd ed. (Toronto: Butterworths, 1999) at 1051-53, the authors distinguish between formal and informal admissions. A formal admission is conclusive as to the matter admitted, and cannot be withdrawn except by leave of the court or the consent of the party in whose favour it was made. *The Law of Evidence* states at 1051-52 that a formal admission may be made in the following ways:

1) by a statement in the pleadings or by failure to deliver pleadings;

2) by an agreed statement of facts filed at the trial;

3) by an oral statement made by counsel at trial, or even counsel's silence in the face of statements made to the trial judge by opposing counsel with the intention that the statements be relied on by the judge;

4) by a letter written by a party's solicitor prior to trial; or

Case 09-10138-MFW Doc 14225-48 Filed 08/15/14 Page 143 of 474

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

5) by a reply or failure to reply to a request to admit facts.

In contrast, an informal admission does not bind the party making it, if it is overcome by other evidence. That is, a party making an informal admission may later lead evidence to reveal the circumstances under which the admission was made in order to reduce its prejudicial effect.

78    Dr. Asher's original discovery answer does not constitute a formal admission in the sense described in *The Law of Evidence*. We note as well that Rule 51.05, governing the withdrawal of admissions requiring leave of the court, does not apply to an admission made on examination for discovery.

51.05 An admission made in response to a request to admit, a deemed admission under rule 51.03 [failure to respond to a request to admit] or an admission in a pleading may be withdrawn on consent or with leave of the court.

See Holmested and Watson, *Ontario Civil Procedure* (Toronto: Carswell, 1984) at 31 § 26.

79    Second, Rule 31.09 outlines a party's obligations with respect to information obtained subsequent to an examination for discovery. At the time of trial, rule 31.09 provided:

31.09 (1) Where a party has been examined for discovery or a person has been examined for discovery on behalf or in place of, or in addition to the party, and the party subsequently discovers that the answer to a question on the examination,

(a) was incorrect or incomplete when made; or

(b) is no longer correct and complete,

the party shall forthwith provide the information in writing to every other party.

(2) Where a party provides information in writing under subrule (1),

(a) the writing may be treated at a hearing as if it formed part of the original examination of the person examined; and

(b) any adverse party may require that the information be verified by affidavit of the party or be the subject of further examination for discovery.

(3) Where a party has failed to comply with subrule (1) or a requirement under clause (2)(b), and the information subsequently discovered is,

(a) favourable to the party's case, the party may not introduce the information at the trial, except with leave of the trial judge; or

(b) not favourable to the party's case, the court may make such order as is just.

80    Holmested and Watson, *supra*, describe at 31 § 25 the obligation under rule 31.09 as an ongoing duty to correct and complete the answers given. In general, parties are entitled to correct their discovery answers. The impact of corrections is a matter to be decided by the trial judge, who is entitled to examine both the original and the amended answers: See *Machado v. Pratt & Whitney Canada Inc.* (1993), 17 C.P.C. (3d) 340 (Ont. Master); *Capital Distributing Co. v. Blakey* (1997), 33 O.R. (3d) 58 (Ont. Gen. Div.).

81    Third is the combined effect of rules 31.09 and 53.08. Subrule 31.09(3)(a) provides that, where a party has failed to correct a discovery answer "forthwith", the party may not introduce the evidence except with leave. As noted above in the discussion of the ruling with respect to Dr. Silver, subrule 53.08(d) provides that, where evidence is admissible only with leave under subrule 31.09(3), the trial judge *shall* grant leave unless to do so will cause prejudice or undue delay. Accordingly, notwithstanding

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

non-compliance with subrule 31.09(3), a trial judge must grant leave unless to do so would cause prejudice that could not be overcome by an adjournment or costs.

82    With respect to the correction, subrule 31.09(2)(a) provides that a correction "may" be treated as forming part of the original examination. As there was no ruling on the correction, it is unclear whether the correction was, in fact, treated in that manner.

83    There are circumstances in which a party will not be permitted to correct their discovery answers. In *Burke v. Gauthier* (1987), 24 C.P.C. (2d) 281 (Ont. H.C.), a personal injury action, the plaintiff sought to adduce evidence that his physical condition had substantially changed since his examination for discovery. The plaintiff had given no notice of the new evidence, and the respondents objected to its admission. Campbell J. began by describing the purpose of rule 31.09 at 285:

> The purpose of the provision is obvious. The parties prepare for trial on the basis of the evidence given at the discoveries. They assume that the answers given on discovery continue to be correct and complete, unless they are given information to the contrary. They figure out what they have to meet, decide how to prepare their own case, what investigations if any to undertake, what witnesses to call, what instructions to seek, and what kind of settlement might be reasonable, on the basis of evidence given at the discoveries. If that evidence changes then there is a different case to meet. If the changes are not brought to the attention of the adverse party before trial he has no time or opportunity to investigate and prepare and consider the need for fresh medical examination and must meet a case different from the one that his opponent has led him to expect.

Campbell J. found that the new evidence changed the nature of the case the respondents had to meet. In considering whether to grant leave, he found that the plaintiff was well aware of the change, and that he had made no attempt to bring the new evidence to the defendant's attention. Accordingly, Campbell J. declined to grant leave. See also *Bachalo v. Robson* (1995), 35 C.P.C. (3d) 230 (Man. Q.B.).

84    The present case is distinguishable. The respondents did not put forward a different case at trial. Dr. Asher's testified, both on discovery and on cross-examination, that there were approximately 300 *c.c.* of amniotic fluid. The respondents led evidence at trial that indicated 300 *c.c.* of amniotic fluid did not constitute oligohydramnios for a pregnancy of 42 weeks. Dr. Asher's original discovery answer, that he thought the "child showed oligohydramnios at birth" even if not corrected or explained, did not require the trial judge to find that there was oligohydramnios. There was ample evidence before the trial judge for him to find, as he did, that there was no oligohydramnios at birth.

85    Accordingly, we do not accept the argument that the appellants were prejudiced by this ruling. The discovery answer did not amount to a formal admission. Even if the trial judge had not allowed Dr. Asher to correct his discovery answers, Dr. Asher was still entitled to give a different answer at trial and explain the reason for the change in his evidence. The trial judge was entitled to decide which version he accepted. The original discovery answers, the corrected answers, and Dr. Asher's explanations were all before the trial judge. The trial judge was entitled to weigh the differing answers and the explanation in deciding the matter. It is clear from his reasons that he accepted Dr. Asher's explanation and the corrected discovery answer. In our view, it was open to the trial judge to reach this conclusion, and there appears to be no basis to interfere with his ruling on this matter.

86    We see no error in the manner in which this issue was dealt with by the trial judge.

*6. Ruling restricting the cross-examinations of defendants to elicit opinion evidence.*

87    The appellants discontinued their action against three respondents - Nurse Brown-Davidson, Nurse Kroeker and Dr. Awad - on the condition that they be available at trial for cross-examination. The appellants attempted to lead opinion evidence from these witnesses. On appeal the appellants complained about their inability to lead opinion evidence from Dr Awad.

88    The trial judge ruled that the appellants were required to comply with rule 53.03 if they intended to elicit opinion evidence from Dr. Awad. As no rule 53.03 reports had been filed, the appellants were required to seek leave of the court. The trial judge further noted that he was required to give leave unless prejudice would result.

Case 09-10138-MFW    Doc 14225-48    Filed 08/15/14    Page 145 of 474

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

89    Dr. Awad was the pathologist involved in the treatment of Joel Marchand. The respondents objected to counsel for the appellants leading any opinion evidence from Dr. Awad that was not covered by the reports he had prepared as a treating physician. The trial judge ruled that, unless notice was given or leave was granted, Dr. Awad would not be permitted to give independent opinion evidence concerning the conduct of others, or to express his opinion on the cause of Joel's condition. However, the trial judge stated that there could be no objection to Dr. Awad giving opinion evidence concerning his own reports, provided such evidence was limited to his involvement in the matter.

90    As the cross-examination proceeded, this ruling was applied to limit the right of the appellants to cross-examine Dr. Awad on his opinion of the nature of the abruption, if any, that had occurred. Before this court, the respondents do not attempt to support this ruling. The respondents conceded before us that as Dr. Awad was a treating physician, this was a permissible line of questioning, and that the trial judge erred in his ruling on the point. In our view, this error did not result in any significant prejudice to the appellants. The appellants presented their own evidence on the nature of the abruption. The trial judge fully considered the appellants' theory and we are not satisfied that Dr. Awad's evidence would have made any difference.

91    Appellants' counsel sought to cross-examine Nurse Olson with respect to her opinion about the conduct of other respondents - Nurse Colebrook and Nurse Want - regarding the use of a fetal heart monitor on July 11, 1991. The respondents objected, arguing that the questions called for inadmissible opinion evidence, and that the respondent could not be qualified as an expert for the purpose of giving opinion evidence.

92    The trial judge ruled that appellants' counsel was "not entitled to ask Nurse Olson, a party defendant, her opinion concerning the conduct of other defendants." Accordingly, he restricted appellants' counsel to cross-examining Nurse Olson regarding events on July 5, 1991, when she administered the NST to Mrs. Marchand. The trial judge relied on the proposition that a plaintiff cannot on discovery ask one defendant about the conduct of another defendant, and concluded that "if such questions cannot be asked on an examination for discovery I fail to see how such questions can be asked at trial." He then provided the following rationale for his ruling:

> A defendant takes the witness box to defend his or her actions as set out in the pleadings, not to give opinion evidence on issues between the plaintiff and other respondents. The opinion of Nurse Olson on issues between herself and the plaintiffs is relevant to the pleaded issues. Here Mr. Wunder proposes to ask Nurse Olson her opinion on issues which are not pleaded between herself and the plaintiffs.

93    There is support for the proposition that on an examination for discovery a party cannot obtain an expert opinion from the opposite party about the conduct of another party to the action: See *Wade v. Sisters of St. Joseph* (1976), 2 C.P.C. 37 (Ont. H.C.); *Christoyiannis (Litigation Guardian of) v. Benoit* (December 10, 1998), Doc. Ottawa 59062/91 (Ont. Gen. Div.). As the scope of examination for discovery is wider than cross-examination, as a matter of logic, the proposition ought to apply equally to cross-examination.

94    Nurse Olson was not qualified as an expert at trial. Like Dr. Awad, Nurse Olson was called to testify about her own involvement in the case. It is necessary, then, to regard Nurse Olson as a lay witness for the purpose of assessing the trial judge's ruling.

95    As a general proposition, lay witnesses may not testify as to their opinion. However, in *R. v. Graat* (1982), 2 C.C.C. (3d) 365 (S.C.C.), at 378, Dickson J. noted that the "line between 'fact' and 'opinion' is not clear." As such, he found "no reason in principle or common sense why a lay witness should not be permitted to testify in the form of an opinion if, in doing so, he is able more accurately to express the facts he perceived." He stated at 379 that a lay witness would be permitted to give opinion evidence in the following circumstances:

> I accept the following passage from *Cross on Evidence* as a good statement of the law as to the cases in which non-expert opinion is admissible (at p. 448):

Case 09-10138-MFW    Doc 14225-48    Filed 08/15/14    Page 146 of 474

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362
2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

When, in the words of an American judge, "the facts from which a witness received an impression were too evanescent in their nature to be recollected, or too complicated to be separately and distinctly narrated", a witness may state his opinion or impression. . . .

96     The rationale for admitting opinion evidence in such circumstances is that "it may be difficult for the witness to narrate his factual observations individually." Thus, witnesses are allowed to state their opinions because they "had an opportunity for personal observation," and "were in a position to give the court real help."

97     The impugned line of questioning went beyond Nurse Olson's personal involvement in the case. She was asked for her opinion on the conduct of other respondents. Nurse Olson was not being asked to state an opinion in order to "more accurately to express the facts [she] perceived." The proposed testimony fell outside of the basis for admissibility set out in *Graat*, *supra*, and, in our view, was properly disallowed.

*7. Rulings preventing impeachment of witnesses on read-ins*

98     Nurse Colebrook was asked a number of questions on examination for discovery about her ability to reach Mrs. Marchand's cervix during her vaginal examination on admission to hospital. Nurse Colebrook stated that she was unable to reach Mrs. Marchand's cervix because it was posterior. She also stated that Mrs. Marchand was tense. These questions and answers were read in as part of the appellants' case.

99     On cross-examination, counsel for the appellants suggested that Nurse Colebrook was unable to reach Mrs. Marchand's cervix because Mrs. Marchand was tense and not because her cervix was posterior. Nurse Colebrook testified that while Mrs. Marchand was in fact tense, she could not reach her cervix because it was posterior. Counsel for the respondents objected to this line of questioning on the ground that appellants' counsel was attempting to contradict the answers he had read in from Nurse Colebrook's discovery.

100     The trial judge acknowledged that rule 31.11(4) entitled appellants' counsel to rebut discovery evidence read into the record, but interpreted the rule to mean "that such contradiction must be through another witness or by other admissible evidence apart from the evidence of the defendant who was examined for discovery." He ruled as follows:

In my view the evidence read into the record cannot be contradicted by cross-examining the author of the statement that was read into the record in an attempt to discredit the very evidence which [counsel] made part of the plaintiff's case.

101     Rule 31.11 governs the use of examination for discovery at trial. The relevant portions of rule 31.11 provide as follows:

31.11 (1) At the trial of an action, a party may read into evidence as part of the party's own case against an adverse party any part of the evidence given on the examination for discovery of,

(a) the adverse party; or

(b) a person examined for discovery on behalf or in place of, or in addition to the adverse party, unless the trial judge orders otherwise,

if the evidence is otherwise admissible, whether the party or person has already given evidence or not.

(4) A party who reads into evidence as part of the party's own case evidence given on an examination for discovery of an adverse party, or a person examined for discovery on behalf or in place of or in addition to an adverse party, may rebut that evidence by introducing any other admissible evidence.

102     It is clear from the wording of rule 31.11 that a party may read any part of an adverse party's examination for discovery into evidence as part of his or her own case. Moreover, it is also clear that that party is entitled to rebut that evidence by

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW   Doc 14225-48   Filed 08/15/14   Page 147 of 474

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362
2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

introducing any other admissible evidence. In their discussion of the predecessor to rule 31.11, Holmested & Gale, *Ontario Judicature Act and Rules of Practice*, (Scarborough: Carswell, 1983) at 1767, affirm this last proposition:

> If a party, as part of his own case, puts in evidence unfavourable to him from the discovery of the opposite party and does not contradict it, he may be bound by it, but he may contradict that which is unfavourable by other evidence and in the circumstances of the particular case may accept or reject such portions as he shall see fit, including the evidence given on discovery. . . . There is no general rule that a party putting in discovery is bound by the answers. If a party, as part of his own case, puts in unfavourable evidence from the discovery of an opposite party, he may contradict it by other evidence . . . .

103    There appears to be no case directly deciding whether a party is entitled to contradict discovery answers read into evidence during cross-examination of the declarant. This is hardly surprising as, for obvious tactical reasons, it will be rare for a party to read in an answer and then seek to impeach the declarant on that very answer.

104    The wording of rule 31.11(4) does not limit a party's right to rebut discovery answers. Rule 31.11(4) states that a party "may rebut *that* evidence by introducing *any other* admissible evidence." The words "that evidence" refer to the discovery answers read into evidence. In our view, the words "any other admissible evidence" must refer to any evidence other than the discovery answers read into evidence. We can see no reason in principle to prevent a party from attempting to contradict an adverse party's discovery answers by cross-examining the adverse party.

105    In our view, the trial judge erred in ruling that appellants' counsel could not attempt to contradict Nurse Colebrook's discovery answers by cross-examining her on those answers. However, it is also our view that no prejudice flowed from the trial judge's erroneous ruling. Counsel objected only after the question was asked and Nurse Colebrook reiterated what she had said on discovery. It is highly unlikely that further cross-examination would have elicited evidence helpful to the appellants.

106    The real source of prejudice, if any, to the appellants was the tactical decision to read in the answers that Nurse Colebrook gave on discovery. Having read those answers in, the appellants risked that a finding would be made unless they could contradict those answers by other evidence. It was unlikely, as a practical matter, that those answers could have been effectively contradicted by cross-examining the declarant. Justice Gordon's comment in *Collins v. Belgian Dry Cleaners, Dyers & Furriers Ltd.* (1951), 4 W.W.R. (N.S.) 241 (Sask. C.A.) at 244 is apposite:

> It is perfectly true that . . . a party has been permitted to adduce evidence contradicting parts of the examination for discovery of his opponent put in at the trial. I still cannot understand why counsel still persist in tendering in evidence questions and answers from their opponent's examination for discovery which are diametrically opposed to their client's contention.

### 8. Ruling prohibiting demonstrative evidence

107    In the course of his examination in-chief of Dr. Fields, appellants' counsel sought to refer the witness to an enlargement of the test strip produced by the NST administered on July 5, 1990. Counsel for Dr. Asher objected to its use on the grounds that (a) the enlargement was of poor quality and omitted essential details, and (b) the observations that Dr. Fields might make about the enlargement would likely differ from the observations the defendant nurses could make about the originals. Counsel for the nurses and the hospital endorsed those objections, and made the further objection that (c) Dr. Fields was precluded from testifying about the NST strip by the trial judge's ruling limiting Dr. Fields' testimony.

108    The trial judge ruled that Dr. Fields could comment on the original NST strip, or a copy the same size as the original, but that he could not comment on the enlargement. The rationale for the ruling was that the respondent nurses did not have the enlargement, and that it would not assist the court if Dr. Fields were able to observe something on the enlargement not observable from the original.

109    It is well established that a decision whether to admit demonstrative evidence is within the discretion of the trial judge: see *Draper v. Jacklyn* (1969), [1970] S.C.R. 92 (S.C.C.), and *Shipman v. Antoniadis* (1975), 8 O.R. (2d) 449 (Ont. C.A.). We see no basis for interfering with the trial judge's ruling.

Case 09-10138-MFW    Doc 14225-48    Filed 08/15/14    Page 148 of 474

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

110     In any event, the ruling could not have affected the outcome of the trial. The original NST strip was already before the court. Dr. Fields was permitted to comment on the original NST strip and the appellants were not prevented from adducing evidence on the matter. This was not a case where a party sought to enter demonstrative evidence to assist a jury in their fact-finding function. The trial was being heard by judge alone, and the trial judge had a copy of the NST strip before him.

*9. Ruling permitting cross-examination of Mrs. Kwolek*

111     Mrs. Kwolek, a registered nurse, was called by counsel for the respondent nurses and the hospital as an expert witness. The appellants objected to counsel for Dr. Asher cross-examining witnesses called by counsel for the other respondents on the ground that there was a similarity of interest between the respondent nurses, the hospital, and Dr. Asher.

112     The trial judge ruled that counsel for Dr. Asher had the right to cross-examine Mrs. Kwolek. He stated that paragraphs 14 and 27 of the statement of claim were a complete answer to the objection, as the statement of claim pleaded that the medical respondents - i.e., Dr. Asher - were responsible for the conduct of the nurses.

113     The right to confront and interrogate an adverse witness is regarded as a fundamental right of parties to a trial. However, in certain circumstances a party will not be permitted to put leading questions in cross-examination to a witness called by an adverse party. *The Law of Evidence* sets out these circumstances at 940:

> In cases where there are co-defendants with similar interests who have pleaded separately and are represented by different counsel, a trial judge has discretion to refuse to allow counsel for one defendant to cross-examine a co-defendant's witnesses. If, however, the interests of the parties are not similar, separate counsel are usually allowed to cross-examine a co-defendant or that co-defendant's witness.

114     It is necessary, then, to determine whether the respondent nurses were adverse in interest to Dr. Asher.

115     The statement of claim pleads that the respondent doctors were responsible for the conduct of the nurses. The doctors would undoubtedly seek to establish that they were not negligent; rather, any negligence was the sole responsibility of the nurses. The nurses would undoubtedly seek to establish that they were not negligent and that any negligence was the sole responsibility of the doctors. Accordingly, based upon the appellants' statement of claim, the respondent nurses and Dr. Asher were adverse in interest.

116     In their statement of defence, the nurses denied that the doctors were responsible for their conduct, and denied that they were negligent. The nurses stated that they had no knowledge of the negligence alleged to have been committed by the doctors. The hospital and nurses crossclaimed against the medical respondents, and relied upon the allegations contained in the appellants' statement of claim. Similarly, the medical respondents, in their statement of defence, denied all allegations contained in the statement of claim, and crossclaimed against the hospital and nurses.

117     In view of the pleadings, the trial judge properly concluded that there was an adversity of interest and he properly allowed counsel for Dr. Asher to cross-examine Nurse Kwolek.

**B. Uneven application of evidentiary rulings**

118     The appellants submit that the uneven application of certain evidentiary rulings provides further indication of bias on the part of the trial judge.

*1. Ruling relating to Dr. Tithecott*

119     The respondents called Dr. Tithecott, a treating physician, as a witness. Dr. Tithecott was asked questions regarding the cord gases, and the inferences he drew from them for the purpose of resuscitating Joel Marchand. He was also asked about the significance of the "marked metabolic acidosis" that Joel Marchand's cord gases displayed. Dr. Tithecott testified that the acidosis "indicated to me that the child had suffered a severe event a short time before delivery." Counsel for the appellants

Case 09-10138-MFW    Doc 14225-48    Filed 08/15/14    Page 149 of 474

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

objected on the grounds that (a) Dr. Tithecott was being asked to give opinion evidence, (b) no notice of that opinion had been given to the appellants, (c) counsel for the respondents was obliged to comply with rule 53.03, and (d) Dr. Tithecott ought to be confined to the "four corners of his report". Appellants' counsel was particularly concerned about Dr. Tithecott giving evidence about the timing of the severe event.

120    The trial judge allowed the examination to proceed. The appellants contends that this ruling is inconsistent with the Awad ruling. Like Dr. Awad, Dr. Tithecott was not a "rule 53.03 witness". Dr. Tithecott was called as a witness of fact, not as an expert witness. Thus, in so far as Dr. Tithecott was testifying about the facts of his own involvement, or the opinions that went to the exercise of his judgment, rule 53.03 was not engaged. We have found that the trial judge erred in applying rule 53.03 to limit the cross-examination of Dr. Awad. However, it is our view that a number of factors distinguish the situation with respect to Dr. Tithecott sufficiently to explain any difference in the manner the trial judge dealt with his evidence. The appellants had substantial notice of this area of questioning by way of: Dr. Tithecott's examinations for discovery, his responses to requests to admit, and the report that he made contemporaneously with his examination of Joel Marchand. Another distinguishing point is that the trial judge took into account the appellants' right of reply in assessing whether there was any prejudice. In our view, there is no merit to the submission that the trial judge's ruling on this issue indicates bias or an unwillingness to apply the same standard to the respondents as he had applied to the appellants.

*2. Rulings relating to Dr. Smith*

121    The appellants complain of two rulings with respect to Dr. Smith. Dr. Smith prepared three reports. The first ruling concerned his third report, filed by the respondents 10 months before Dr. Smith testified, and some 4 months after Dr. Manning had testified. The report dealt with different blood gas orders. The trial judge ruled that Dr. Smith could testify about his third report. The second ruling permitted counsel for Dr. Asher to ask Dr. Smith to comment on testimony given by Dr. Whyte in cross-examination. The first ruling is said to be inconsistent with the Silver ruling and the second with the Fields ruling.

122    In our view, there is no merit to these submissions. The trial judge distinguished the Silver ruling on several grounds. It became apparent that appellants' counsel was aware that there were two different blood gas orders and could have raised the matter with Dr. Manning. Accordingly, the trial judge ruled that he was not taken by surprise and that Dr. Smith could give evidence about the contents of the third report. The trial judge also differentiated the Silver ruling from the present situation noting that Dr. Smith's third report was delivered 10 months before the defence started. Moreover, even if something new was raised by the defence it could be addressed through the appellants' right of reply.

123    The second ruling concerning Dr. Smith was also correct. It is well-established that an expert witness can be asked to comment on the opinion of another expert: see *Quantrill v. Alcan-Colony Contracting Co.* (1978), 18 O.R. (2d) 333 (Ont. C.A.).

*3. Ruling relating to Dr. Eyman*

124    Dr. Eyman was called by the respondent, Dr. Asher, to give expert evidence on the issue of Joel Marchand's life expectancy. Dr. Eyman had prepared two reports on the issue of damages. The first report was dated November 12, 1993 and was prepared on the basis of materials sent to Dr. Eyman by the respondents. The second report was dated May 5, 1994 and was prepared after Dr. Eyman attended a physical examination of Joel Marchand conducted by two other physicians, and viewed four hours of videotapes of Joel Marchand. The second report was based upon Dr. Eyman's own observations and the observations of the two other physicians.

125    During the *voir dire* on the foundational facts issue, Dr. Eyman was asked what materials he was sent and what materials he relied upon. He could not recall precisely what materials he relied upon. The appellants submitted that, in accordance with the foundational facts ruling, the respondents were required to prove all the documents Dr. Eyman had been given. The trial judge rejected this argument.

126    The trial judge differentiated his ruling with respect to Dr. Eyman from his rulings with respect to Ms. Kelly and Ms. Staub. He characterized his rulings with respect to Ms. Kelly and Ms. Staub as a response to the appellants' attempts to rely

Case 09-10138-MFW    Doc 14225-48    Filed 08/15/14    Page 150 of 474

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

upon a *different* set of facts from those relied upon by Ms. Kelly and Ms. Staub. In contrast, his ruling with respect to Dr. Eyman was based on the respondents having proven the *same* set of facts relied upon by Dr. Eyman, albeit through different means.

127      Dr. Eyman's reports appeared to be based on factual observations; for example, whether Joel Marchand could crawl. Observations of this nature would be capable of proof through various sources. It appears to us that in the Eyman ruling, the trial judge characterized the appellants' position concerning Ms. Kelly's and Ms. Staub's reports as an attempt to rely upon "X, Y, Z" rather than "A, B, C" where the experts had relied upon "A, B, C" in preparing their reports. We have already found that to the extent the trial judge limited the right of the appellants to establish the same foundational facts relied on by Ms. Kelly and Ms. Staub through different means, he erred. However, as the Eyman ruling indicates, the trial judge was endeavouring to be consistent. If he erred in the application of the Kelly and Staub rulings, any error he committed falls well short of an indication of bias or a predisposition to favour the respondents.

### C. Conclusion on the evidentiary rulings

128      We conclude that the evidentiary rulings of the trial judge and the manner in which they were applied do not support the contention that the appellants were denied the opportunity to fairly present their case, nor did these rulings create a reasonable apprehension of bias on the part of the trial judge. The trial judge's rulings were carefully considered and reflect, in our view, a sincere and diligent effort to conduct a fair trial. We have concluded that virtually all of the impugned rulings were correctly decided. The very few errors we have identified were inconsequential and even viewed cumulatively did not result in any significant prejudice to the appellants. Accordingly, this ground of appeal is dismissed.

### III. Did the trial judge's conduct of the trial raise a reasonable apprehension of bias?

129      The appellants' main contention on the appeal is that the trial judge's conduct of the trial raised a reasonable apprehension of bias towards them. They submit that throughout the trial defence counsel were insulting, hostile, discourteous and rude to their counsel, Mr. Wunder, and indeed to Mrs. Marchand, and yet the trial judge condoned this behaviour, never restraining or controlling it. The appellants submit that, by itself, the trial judge's refusal to restrain defence counsel raises a reasonable apprehension of bias. The appellants also submit that the trial judge showed hostility to Mr. Wunder, that he interfered in Mr. and Mrs. Marchand's presentation of the case, and that, in his reasons, he unfairly judged the credibility of Mrs. Marchand. All of this conduct, the appellants contend, further supports their claim of judicial bias.

130      The trial judge's conduct, which the appellants submit cumulatively amounts to judicial bias, can conveniently be discussed under the following six categories, of which the first is by far the most serious:

> (1) the trial judge refused to restrain defence counsel's repeated attacks on Mr. Wunder's integrity and competence;

> (2) the trial judge refused to control defence counsel's inappropriate treatment of Mrs. Marchand;

> (3) the trial judge prevented the appellants from fairly presenting their case by his one-sided interventions;

> (4) the trial judge on one occasion talked with defence counsel in the absence of appellants' counsel;

> (5) the trial judge unfairly criticized Mr. Wunder; and

> (6) the trial judge showed antipathy to Mrs. Marchand in his reasons for judgment.

131      Before considering this ground of appeal, we will briefly review the principles that apply to a claim of judicial bias. These principles, now well established, have recently been summarized by the Supreme Court of Canada in *R. v. S. (R.D.)*, [1997] 3 S.C.R. 484 (S.C.C.). They are as follows:

> 1. All adjudicative tribunals owe a duty of fairness to the parties who appear before them. The scope of the duty and the rigour with which the duty is applied vary with the nature of the tribunal. Courts, however, should be held to the highest standards of impartiality.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-48    Filed 08/15/14    Page 151 of 474

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

2. Impartiality reflects a state of mind in which the judge is disinterested in the outcome and is open to persuasion by the evidence and submissions. In contrast, bias reflects a state of mind that is closed or predisposed to a particular result on material issues.

3. "Fairness and impartiality must be both subjectively present and objectively demonstrated to the informed and reasonable observer. If the words or actions of the presiding judge give rise to a reasonable apprehension of bias to the informed and reasonable observer, this will render the trial unfair." (at p. 524)

4. The test for bias contains a twofold objective standard: the person considering the alleged bias must be reasonable and informed; and the apprehension of bias must itself be reasonable. In the words of de Grandpré J. in *Committee for Justice and Liberty v. National Energy Board*, [1978] 1 S.C.R. 369 at 394, approved by the Supreme Court of Canada in *R.D.S.*, *supra*:

> [T]he apprehension of bias must be a reasonable one, held by reasonable and right-minded persons, applying themselves to the question and obtaining thereon the required information. [The] test is "what would an informed person, viewing the matter realistically and practically - and having thought the matter through - conclude. . . . "

5. The party alleging bias has the onus of proving it on the balance of probabilities.

6. Prejudgment of the merits, prejudgment of credibility, excessive and one-sided interventions with counsel or in the examination of witnesses and the reasons themselves may show bias. The court must decide whether the relevant considerations taken together give rise to a reasonable apprehension of bias.

7. The threshold for a finding of actual or apprehended bias is high. Courts presume that judges will carry out their oath of office. Thus, to make out an allegation of judicial bias, requires cogent evidence. Suspicion is not enough. The threshold is high because a finding of bias calls into question not just the personal integrity of the judge but the integrity of the entire administration of justice.

8. Nonetheless, if the judge's words or conduct give rise to a reasonable apprehension of bias, it colours the entire trial and cannot be cured by the correctness of the subsequent decision. Therefore, on appeal, a finding of actual or apprehended bias will ordinarily result in a new trial.

132    The respondents deny that either the words or the conduct of the trial judge gave rise to a reasonable apprehension of bias. They submit, in the alternative, that the appellants waived their right to claim judicial bias and should be precluded from doing so on appeal. In support of their submission on waiver, they say that an allegation of bias should be raised at the first available opportunity, and that instead the appellants waited until 19 months after the completion of the evidence and 3 months after the release of the reasons for judgment. They also point out that the appellants opposed four mistrial motions brought by the defence during the trial and that the appellants insisted the trial judge hear their own motion for a mistrial (because of the alleged perjury of a witness) even while their motion to recuse the trial judge for bias was pending. [2] It is unnecessary for us to consider this alternative submission of waiver in the light of our conclusion that the appellants' claim of judicial bias fails on its merits.

133    We therefore turn to the appellants' allegation of judicial bias, applying the legal principles we summarized to the six categories of bias raised by the appellants.

### 1. The trial judge refused to restrain defence counsel's repeated attacks on Mr. Wunder's integrity and competence

134    This is the appellants' main submission in support of their allegation of judicial bias. They submit that throughout the 165 days of trial, defence counsel repeatedly accused their counsel, Mr. Wunder, of manipulating evidence; of deliberately misinforming witnesses and feeding them answers through objections during cross-examination; of deliberately flouting, subverting and ignoring the rules of practice; and of showing contempt for the trial judge and his rulings. They contend that the trial judge failed to restrain defence counsels' repeated attacks on Mr. Wunder's integrity and competence, and by not restraining

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

it, the trial judge condoned it and lent the weight of his office to the defence position. Thus, the appellants argue that the trial judge's failure to restrain defence counsels' attacks on Mr. Wunder gave rise to apprehended bias.

135    The record shows that from early on in the trial, any degree of trust between Mr. Wunder, on the one hand, and Mr. Tait, counsel for Dr. Asher, and Mr. Liswood, counsel for the hospital and nurses, on the other, had completely vanished, to be replaced by a level of rancour and hostility rarely, if ever, seen in an Ontario courtroom. The record also amply supports the appellants' contention that Mr. Tait repeatedly attacked Mr. Wunder's integrity and competence. Comments about counsel that have no place in any courtroom infected this trial from start to finish. The following examples should adequately give the flavour of what took place.

136    Mr. Tait accused Mr. Wunder of "a complete lack of integrity"; of cheating and intentionally defying the rules of practice; of using the right to object to cross-examination "to suggest answers to every witness who has come into this courtroom"; of abuses of the *Rules of Civil Procedure*; of using and abusing solicitor-client privilege as a "mask for deception", to "conceal misconduct", "as a manipulative device", "to conceal the devices by which the evidence of witnesses is manipulated" and as a "shield for deceit"; of "manipulating" the evidence and facts; of deliberately misinforming an expert witness; of "flatly lying" to the court; of deliberately misleading the court, showing contempt for the court, defying and deceiving the court about the evidence of Dr. Whyte; of "trickery" and "sleight of hand"; and of committing an outrage on the court. Mr. Tait told the trial judge that he (Mr. Tait) wrong to assume Mr. Wunder was competent and would comply with the *Rules of Civil Procedure*, and he even suggested that Mrs. Marchand made a mistake in choosing Mr. Wunder as her counsel.

137    The following two passages typify the tenor of Mr. Tait's verbal attacks on Mr. Wunder:

I don't want to leave today [ . . . without at least indicating to Your Honour, the sense of total outrage, that a deceitful, legal mind could possibly invent so preposterous a distortion of the judicial process; a complete violation of every principle of *Ashmore*  that he has so freely adopted.

[ . . . ]

This is a profound disgrace. I invite Your Honour to reread *Ashmore* tonight and I invite you to tell Mr. Wunder to take this argument to the Court of Appeal if he wishes, but it will not be heard in this court.

[ . . . ]

It wasn't for me to say that I disagreed with the ruling. We accept it and we went on. But to come forward with this kind of scurrilous manipulation, of which - of what, for Mr. Wunder was essentially a break, a break that he so genuinely didn't expect that he invited you to rule last week.

[ . . . ] This is scurrilous and this is disgraceful and I ask Your Honour not to countenance it.

. . .

Mr. Wunder has abused the rules of practice and his obligations as counsel in respect of this particular witness at every turn. And the rules of practice and the relief they provide for honest counsel are not there as an excuse to permit unchecked grossly improper manipulation of the whole litigation process.

138    Mr. Tait was not alone in his criticisms of Mr. Wunder. Mr. Liswood, too, maligned the appellants' counsel. He accused Mr. Wunder of manipulating, abusing and making a mockery of the judicial system; of using the *Rules of Civil Procedure* as an "excuse to permit unchecked grossly improper manipulation of the whole litigation process"; of "flagrantly subverting" the *Rules of Civil Procedure*; of "suppressing" facts and information from the defence; of "contrivance and manipulation" in the delivery of expert reports; of continually withdrawing from his commitments; and of violating Rule 10 of the *Rules of Professional Conduct* by knowingly attempting to deceive the court and by knowingly misstating the contents of documents.

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

139    We do not intend to suggest that this conduct was all one-sided. On occasion, Mr. Wunder acted in a similar way. But Mr. Tait and Mr. Liswood must accept most of the responsibility for conduct that by any reasonable standards of civility was unacceptable for any counsel, let alone senior counsel who should know better.

140     In this Court, Mr. Ortved and Mr. Curry, who acted for Dr. Asher, made no attempt to defend Mr. Tait's conduct or to substantiate any of Mr. Tait's many allegations against Mr. Wunder. Instead, they candidly acknowledged that Mr. Tait's conduct toward Mr. Wunder had fallen below an acceptable standard. Mr. Liswood also acknowledged that his own conduct at trial had been unacceptable. We have little doubt that the appellants must have found the repeated maligning of their counsel unsettling, to say the least.

141    The unprofessional conduct of counsel is a matter for the Law Society of Upper Canada. The issue before us, however, centres not on the conduct of counsel but its impact on the fairness of the trial. Our focus centres on the conduct of the trial judge. The question we must answer is whether an informed person viewing the matter realistically would conclude that the way the trial judge dealt with defence counsels' attacks on Mr. Wunder created a reasonable apprehension of bias and thus deprived the appellants of a fair trial. We are not persuaded that the trial judge's conduct supports a finding of bias.

142     There are three answers to the appellants' submission that a reasonable apprehension of bias arises from the trial judge's refusal to restrain or control defence counsel. First, the trial judge did not remain silent about counsels' conduct. He intervened in the trial. On the fifteenth day of the trial, November 16, 1993, Mr. Tait accused Mr. Wunder of manipulating the schedule of witnesses to give one of the appellants' experts, Dr. Fields, time to repair his evidence. Mr. Wunder objected to this characterization of his conduct. The trial judge responded:

> Look, he says a lot of things and you say a lot of things. I do not pay a whole lot of attention to what you are saying on those matters. Now, let us just proceed with this.

143    The following day, Mr. Tait protested that in his 27 years of practice he had "never been so badly treated by any other counsel". He added that he had "never met the equal of Mr. Wunder for ignoring his obligations". This time, the trial judge replied at length, in an attempt to change the atmosphere of the trial. He urged counsel to stop their "interminable fighting" and he emphasized the need for civility in the courtroom:

> Let me say this that it struck me last night as I reflected upon what I considered to be a rather lengthy day. We had some rather strenuous debates about certain matters that we should never lose sight of why we are here. It strikes me that what we are here to do is to try this issue fairly, make sure we try it fairly to all parties, and to achieve that there has to be full and complete disclosure. Having practiced in those days when you did not make disclosure unless you had to, I know what it is like. But those are not what we are doing today. These cases are far too complex for that.
>
> I am also struck, as I read in the latest issue of the *Canadian Lawyer*, somebody was interviewing the former Attorney General, Ian Scott, and he said that the only thing that makes litigation is good manners. Somehow there's a lack of manners in this trial and I do not suggest to point a finger at anyone. I think it is important, we are going to be here for another few weeks. We are into our fifth week and there is no reason why we cannot all act like gentlemen in the courtroom. We can stop sniping at each other. If anybody thinks that there has been prejudice as a result of a lack of disclosure, they can politely argue strenuously, but politely argue rule 53.08 and 31.07, all deal with the matter. If anybody thinks that as a result of the lack of disclosure that they have been prejudiced and they want an adjournment, I am going to grant it. I make it abundantly clear right now that I am going to do my utmost to make sure that this matter is fairly dealt with. We have a plaintiff here who is entitled to have her action heard before this court. She wants to have it heard whether she is right or wrong. We will not know until the case, but she will have heard, and so will Dr. Asher and so will the nurses. They are entitled to that. So I just urge you all, let us get along. Let us try and move along with this case. It is going to be long enough without this interminable fighting.

. . .

Case 09-10138-MFW   Doc 14225-48   Filed 08/15/14   Page 154 of 474

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

Let us move on but let us not conduct ourselves in a manner in which it really does not place the legal profession in a good light. We have a tough enough issue as it is to try now. Let us move forward.

144      Unfortunately, the trial judge's exemplary words seemed to have had little effect. Soon after, Mr. Tait again disparaged Mr. Wunder's ability:

. . . Mr. Wunder is a counsel who lectures the profession and writes books about trial preparation. He's a senior counsel. He's entitled to style himself a Queen's Counsel and while I have a dim view as to his appreciation of the contents of the *Rules of Practice*, that is no excuse for adjourning a trial.

145      The appellants complain that though the trial judge's intervention on November 17, 1993 was salutary, after that day and indeed for the rest of the trial, the trial judge never tried to restrain defence counsel. This complaint is not entirely correct because on February 9, 1994 during an interchange with Mr. Percival (acting for Mr. Wunder on a motion), the trial judge again commented on counsels' conduct:

Mr. Percival: I am sorry, I wish I could be more helpful to you on that issue, but as I said, I felt that that was the address because I saw, I thought to a certain extent there was some very, I thought, intemperate and rather strong language utilized by Mr. Liswood, condemning the conduct of Mr. . . . .

The Court: There has been a lot of strong language in this trial . . .

Mr. Percival: Well, I'm not going to try to get into it.

The Court: . . . Mr. Percival on both sides, and I keep reminding counsel of what the former Attorney General said, that only good manners makes litigation bearable.

Mr. Percival: I understand.

The Court: And that falls on deaf ears from time to time in this trial.

Mr. Percival: And I know that this has been a very difficult trial. I've seen some of the transcripts. I certainly have not had the opportunity to do it all, and as I said to you before, this has been a very difficult case I think for everybody, quite apart from your Honour.

146      Although the appellants say that the trial judge should have done more, his observations both in November 1993 and in February 1994 at least show that he was not oblivious to what was taking place and that he tried to control counsels' conduct.

147      Second, the failure of the trial judge to do more to restrain or control defence counsel does not automatically indicate judicial bias. We recognize that other trial judges might well have dealt with the acrimony in the courtroom differently, and, perhaps more effectively. This trial judge chose to be relatively passive, indeed, probably too passive. He was well aware of the acrimony and chose largely to ignore.

148      Just as civility in the courtroom is very much the responsibility of counsel, it is also very much the responsibility of the trial judge. It is shared responsibility of profound importance to the administration of justice and its standing in the eyes of the public it serves. Unfortunately, we have no doubt that the failure to satisfactorily discharge this responsibility in this case tarnished the reputation of the administration of justice. This case underlines the importance being given by leaders of the bench and bar to improving civility in the courtroom.

149      However for this court, the question must be whether in light of what went on in the courtroom there was a reasonable apprehension of bias on the part of the trial judge, thus depriving the appellants of a fair trial. Nothing in the trial record or in the trial judge's reasons suggests that he condoned defence counsels' conduct or lent the weight of his office to the defence position. A review of the transcripts establishes that counsels' conduct had no effect on the trial judge's efforts to fairly judge

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

the case before him. The trial judge's reasons are thorough and present a fair and balanced consideration of all the contentious issues in the trial. In short, we do not think that an informed and reasonable observer looking realistically at the trial unfolding would apprehend from the trial judge's conduct that he was biased, or unfair in adjudicating this case.

150    Third, and admittedly a less important answer to the appellants' submission is that most of the acrimonious language and most of the attacks on Mr. Wunder, occurred during submissions on motions, not during the presentation of evidence. This, in our view, is one reason why defence counsels' conduct had no impact on the appellants' fair presentation of their case.

151    To conclude this ground of appeal, although we deplore the conduct of defence counsel, the appellants have not shown that the way the trial judge dealt with defence counsels' attacks on Mr. Wunder gave rise to a reasonable apprehension of bias.

### *2. The trial judge refused to control defence counsels' inappropriate treatment of Mrs. Marchand*

152    The appellants submit that defence counsels' conduct towards Mrs. Marchand was inappropriate and went unchecked by the trial judge. The appellants rely on five examples of inappropriate conduct. The first two examples show defence counsel in an unflattering light. However, none of the examples suggest judicial bias. We will deal briefly with each of them:

(a) During Mrs. Marchand's first day of testimony, Mr. Tait commented to Mr. Liswood "she's a liar". This unfortunate comment was said loud enough for Mrs. Marchand to hear it and loud enough for the court reporter to record it. However, the trial judge did not hear the comment and, once apprised of it, he neither condoned nor accepted it.

(b) The appellants submit that Mr. Tait and Mr. Liswood taunted Mrs. Marchand with deprecating facial expressions from the counsel table. The record suggests that defence counsel rolled their eyes, smiled and laughed out loud during parts of Mrs. Marchand's cross-examination. Defence counsels' conduct again was unprofessional but, in our view, did not affect the fairness of the trial.

(c) The appellants contend that Mr. Tait taunted Mr. and Mrs. Marchand by gratuitously reminding them again and again that their son Joel had almost no brain tissue. We find no merit in this contention. Throughout the trial, Mr. Tait accepted that Joel Marchand had suffered a tragic injury. In our view, neither the phrasing nor the tone nor the content of his cross-examination of Mr. and Mrs. Marchand was objectionable. The issues in the case required the defence to explore Joel's brain function, his ability to see and whether he could play with a computer. As the trial judge pointed out to Mrs. Marchand, questioning on these issues was relevant to Joel's life expectancy and to the appellants' damages claim. The absence of any objection to this questioning from the appellants' counsel is perhaps the best evidence that the cross-examination was not unfair.

(d) The appellants also submit that on cross-examination defence counsel harassed Mrs. Marchand for being unable to remember her last menstrual period in September 1989. The defence undoubtedly conducted a tough, aggressive cross-examination but, in our view, not a harassing cross-examination. Joel's expected due date and its relationship to Mrs. Marchand's menstrual period was an important issue at trial, and Mrs. Marchand had previously given five different answers about when her last menstrual period occurred. Again, Mr. Wunder did not object either to the tone or to the length of the cross-examination on this issue. In a trial where both sides made frequent objections and interjections, the lack of an objection on this issue is a good indicator that this complaint now made has little substance.

(e) Finally, the appellants submit that defence counsel insulted and belittled Mrs. Marchand during their cross-examination of her. As we have said, the cross-examination was at times aggressive, apparently even loud. But we do not consider it to have been unfair. Mr. Wunder did at one point ask the trial judge to ask Mr. Tait to "keep his tone down and not be rude to the witness". The trial judge refused, commenting that he did not think Mr. Tait had been rude but that if Mrs. Marchand was being intimidated he would intervene. In the light of this observation and our review of the entire cross-examination of Mrs. Marchand, we cannot find anything in the words or the conduct of the trial judge that would reasonably suggest that he was biased.

### *3. The trial judge prevented the appellants from fairly presenting their case by his one-sided interventions*

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

153    The appellants submit that the trial judge intervened excessively during Mr. Wunder's cross-examination of witnesses and by doing so, prevented the appellants from fairly presenting their case. Before discussing the interventions the appellant rely on, we will briefly review the legal principles that apply to this submission.

154    A trial judge is not required to sit mute and listen to evidence without commenting or interjecting. A trial judge has the right, indeed the duty, to intervene to clarify and understand the evidence or to control the trial, provided that in intervening, the trial judge does not interfere with the fair presentation of the evidence and does not prejudge the issues in dispute or the credibility of the witnesses. The limits on the trial judge's right to intervene were concisely set out by Evans J.A. in *Majcenic v. Natale* (1967), [1968] 1 O.R. 189 (Ont. C.A.), at 203:

> . . . I can appreciate that on occasion it is not only desirable but necessary that the trial Judge question the witnesses for the purpose of clarification of the evidence and I do not consider that he is solely an umpire or arbitrator in the proceedings. There is a limit however to the intervention and when the intervention is of such a nature that it impels one to conclude that the trial Judge is directing examination or cross-examination in such a manner as to constitute possible injustice to either party, then such intervention become interference and is improper.

155    The appellants submit that the trial judge in this case crossed the permissible limits of intervention. We disagree. The appellants gave several examples of what they claimed were one-sided interventions by the trial judge during Mr. Wunder's cross-examination. These examples were put forward to show that the trial judge unfairly intervened to articulate a defence position or that he disrupted the appellants' presentation to a degree that raised a reasonable apprehension of bias. We will review the most salient examples, most of which were not objected to at the time and none of which, in our view, supports the appellants' submissions.

156    The appellants point to an intervention by the trial judge during the cross-examination of Dr. Asher. Mr. Wunder was trying to impeach Dr. Asher on his discovery evidence, and defence counsel objected that Mr. Wunder had not done so properly. The trial judge intervened, appropriately, to point out that Mr. Wunder had not covered the topic on Dr. Asher's discovery:

> The Court: But you did not ask.
>
> Mr. Wunder: I'm sorry, sir?
>
> The Court: You did not ask him, how much did you take out after.
>
> Mr. Wunder: Well. . . .
>
> The Court: I think the important point is, Mr. Wunder, you said, "You didn't tell me this on discovery."
>
> Mr. Wunder: Yes, sir.
>
> The Court: And he did tell you about taking them about after and I do not appreciate you suggesting to a witness that "you don't tell me something on discovery" when he does in fact tell you something on discovery.
>
> Mr. Wunder: Your Honour, well - you are the final arbiter of that, as to whether or not it's . . . .
>
> The Court: No, but you were - you were suggesting to this witness that this evidence about him taking the clots out of the uterus was brand new evidence which you had never heard of before.

157    Mr. Wunder eventually accepted that he had not adequately dealt with the topic on discovery when he said: "And I guess I can be faulted for not asking you in greater detail the quantity or how it was removed."

158    The appellants also point to an incident that arose during an argument over the late disclosure of Dr. Kirsch's medical records. Defence counsel suggested an adverse inference might be drawn on a particular point. Mr. Wunder questioned what the adverse inference might be. Instead of allowing defence counsel to answer, the trial judge responded:

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

The Court: Well, suppose that the adverse inference he proposes to advance is that I find as a fact that Barbra suffered severe pain.

Mr. Wunder: If that is my friend's position, if you articulate it adequately I would like to hear it from him.

Mr. Liswood: Joe, may I . . .

Mr. Wunder: Excuse me, wait, could I have Mr. Colangelo - I'd like to know from Mr. Colangelo . . .

The Court: Well, he would extend that I would think. On his argument he would extend it that that would alter the opinions of Dr. Fields, Manning, Johnson. He would say the same thing with regard to the use of the hands and scooting.

Mr. Wunder: I would just like my friend to articulate what adverse inference that he is talking about so that I can meet the argument, sir, and appreciate his argument.

The Court: Well, I am not absolutely sure that he has to because what he is saying is that that is a possibility and he says that I cannot deal with that until we get to the end of the trial.

Mr. Wunder: I understand, sir. He did not complete the sentence. He is going to argue an adverse inference. I would like to know what adverse inference, that's all, from him.

The Court: Well, he is going to argue it at some later date.

159     In our view, the trial judge did not act improperly in intervening to set out the defence position. This was probably done with a view to moving the trial along. Moreover, counsel for all the parties fully argued whether an adverse inference should have been drawn without any inappropriate intervention by the trial judge.

160     The appellants also point to an intervention by the trial judge during Mr. Tait's cross-examination of the appellants' expert, Dr. Fields, on his qualifications to give opinion evidence. Mr. Wunder objected to the questioning and the trial judge responded:

Mr. Wunder: Your Honour, aren't all these questions really designed to go to a matter of weight? The doctor is really qualified to give opinion evidence.

The Court: I suspect that I may hear some argument as to the ability of this witness, or whether or not I should allow this witness to give expert evidence as to the standard of care which might be expected in Ontario if he is not familiar with it. He makes a bald statement. He makes a bald statement as I understand it. I am only anticipating what I think Mr. Tait might say, that he makes a bald statement that the standard of practice is the same.

Mr. Wunder: Well, the . . .

The Court: That is quite a different question than saying that he does not have expertise.

Mr. Wunder: Expertise evidence Is expert evidence received by courts without regard to geographical barriers, and often . . .

The Court: Well, let us let Mr. Tait press on and we will come back to you, Mr. Wunder, when we argue this whole issue.

Mr. Wunder: Thank you, sir.

The trial judge's comments are innocuous and no possible apprehension of bias can arise from them, particularly because the trial judge permitted Dr. Fields to give expert evidence.

161     Finally, the appellants submit that the trial judge especially interfered with their presentation of the case during the cross-examination of Dr. Asher on his withdrawal of the admission of oligohydramnios. A lengthy argument took place during this cross-examination, much of it over an excerpt from a textbook on obstetrics. During the argument, covering 44 pages of

Case 09-10138-MFW    Doc 14225-48    Filed 08/15/14    Page 158 of 474

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362
2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

transcript, the trial judge intervened many times and put a few questions to the witness. However, as we read these pages, the trial judge was simply trying to control, as he was entitled to do, a heated exchange between counsel. As well the few questions the trial judge asked were not obviously helpful to the defence.

162      The appellants cite other examples from Mr. Wunder's cross-examination, which they say also demonstrates that the trial judge's interventions were one-sided. We do not think that individually or collectively these other examples support the appellants' claim of judicial bias. The trial judge intervened when needed in order to try to control this difficult trial and to understand the evidence, including intervening during defence counsels' cross-examination.

### 4. The trial judge spoke with defence counsel in the absence of Mr. Wunder

163      On one occasion in April 1995, respondents' counsel telephoned the trial judge to find out whether he would sit 2 days previously scheduled as non-sitting days to accommodate an out-of-town witness. Mr. Wunder was not party to the call, apparently because he was ill and was home recovering. The appellants now contend that the trial judge exhibited bias by speaking to respondents' counsel alone.

164      We see no merit in this contention. The telephone call was limited to scheduling. Moreover, it was disclosed immediately to Mr. Wunder in writing and the next day in open court. Mr. Wunder accepted the trial judge's explanation for the telephone call.

### 5. The trial judge unfairly criticized Mr. Wunder

165      The appellants submit that not only did defence counsel unfairly criticize their counsel, so too did the trial judge. The contend that the trial judge showed "a deeply critical attitude, perhaps outright hostility" toward Mr. Wunder. In our view, the trial record does not substantiate this contention. We will refer briefly to the two examples relied on by the appellants during oral argument to show that their contention has no merit.

166      The appellants pointed to an exchange between the trial judge and Mr. Wunder over the contents of expert reports, which took place during the examination-in-chief of the appellants' expert, Dr. Geisler. The exchange was as follows:

Mr. Wunder: Your Honour, I cannot believe that my friends' cross-examination is limited to and dependent upon what is in the plaintiff's reports. I just can't believe it. Surely they bring much more to this trial than that and surely they can't complain that they chose not to cross-examine people on issues that relate clearly to life expectancy.

The Court: Now wait a second. Let me get something straight, Mr. Wunder. If I am defending a case and I have your medical reports which identifies the areas that your experts are going to talk on or give evidence on or render opinions on, why would I venture into areas that could be just a mine field, to discuss with the doctor when I know that your other experts are allowed to give evidence about those matters?

Mr. Wunder: Because under our jurisprudence every expert is allowed to expand on his report.

The Court: Well because you see - where you and I are parting company is that you want to play by the rule - sort of the ambush rules as your experts get in the box . . .

Mr. Wunder: I resent that remark, Your Honour.

The Court: Well, you know, that is what it is coming down to.

Mr. Wunder: That's what my friends have persuaded you it's coming down to, sir.

The Court: No, they have not persuaded me of anything, Mr. Wunder. I will make up my own mind.

We see nothing unfairly critical in the trial judge's comments, which indeed reflect our views on the issue being debated.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-48    Filed 08/15/14    Page 159 of 474

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

167    The appellants also rely on an exchange between the trial judge and Mr. Wunder over the "Colebrook ruling", which took place during the cross-examination of Dr. Asher. The relevant part of what was a rather innocuous exchange is as follows:

The Court: You keep saying burdened with the ruling in Colebrook. I am satisfied that the ruling, the Colebrook Number Two Ruling is correct. You say burdened with it. I would have thought you would have known that. Maybe you did not know that principle.

Mr. Wunder: I certainly didn't, Your Honour.

The Court: Well, there you go.

Mr. Wunder: If I may continue my representations to Your Honour. Here is a statement by you and by me. One, that I didn't want to be taken to vouch for the truthfulness of what Dr. Asher says and I wanted to be able to challenge his credibility. So that was clearly stated on the record. And secondly, you assuring me that I would be able to cross-examine him on that correction, as you said, almost forever. Now . . .

The Court: And you have got that right.

Mr. Wunder: I'm sorry, Your Honour. When someone has a right to cross-examine, Your Honour, you recall from Sopinka, where they lead the simplest fact, one can cross-examine on all issues and I want - I want to exercise that right. We've been on that before. Do you need the reference from Sopinka, sir?

The Court: No. I know what Sopinka says.

Mr. Wunder: I'm sure you do, sir.

The Court: But you are talking about having read something into the record, making it part of the plaintiff's case, and then are you entitled to cross-examine the author of that statement that you read into the record to prove that it is not true? You and I seem to part company on that. You seem to think that you can. I have said that you cannot.

Again, we find nothing unfair in the trial judge's observations, and certainly none of his observations reflect any animosity or hostility toward Mr. Wunder.

168    As we have said before, the trial judge presided over a long and difficult trial, marked by open hostility and lack of trust among counsel, and by frequent interruptions by all counsel to the flow of evidence. The trial judge cannot be criticized, let alone be found guilty of judicial bias, for his occasional mild rebuke to counsel. We add that those occasional rebukes were quite evenly distributed throughout the trial and among all trial counsel. The appellants' claim that the trial judge showed "outright hostility" to Mr. Wunder is not substantiated on this record. In sharp contrast to this claim, the trial judge praised Mr. Wunder's dedication to his clients' case, in a ruling on June 3, 1994 dismissing a defence motion to refer Mr. Wunder's conduct to the Official Guardian for review:

I assume that Mr. Liswood and Mr. Colangelo are suggesting that Mr. Wunder who acts on behalf of the Litigation Guardian, is not protecting the best interests of Joel Marchand and accordingly his conduct of this action on behalf of Joel Marchand required review by the Official Guardian.

This trial commenced on October 18th, 1993 and I am told that as of this day, the court has been convened approximately 90 days and the Plaintiffs' case is not complete. I am doubtful that the Plaintiffs' case will be completed by the end of June 1994. Mr. Wunder has appeared at trial on all of the days that court has been convened and although I have not agreed with all of his submissions or the manner in which parts of the Plaintiffs' case has been presented, it would be unfair of me prior to hearing all of the evidence to second guess Mr. Wunder on the presentation of the Plaintiffs' case. Mr. Wunder has been a dedicated counsel who has attempted to present his clients' case in a manner which he feels is most favourable to his client. It would be wrong for me at this time in this trial to say that Mr. Wunder has not acted in the best interests of his clients.

Case 09-10138-MFW    Doc 14225-48    Filed 08/15/14    Page 160 of 474

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

In my opinion, the actions of Mr. Wunder in this trial indicate that he perceives that his strategy in presenting his clients' case is in the best interests of his clients and at the end of the trial when I have heard all of the evidence, he may be right.

Mr. Wunder enjoys an exceedingly high reputation in the person injury field in Ontario and I must take his reputation of excellence into account when I consider the Motion of the Respondents to have this matter referred to the Official Guardian for review. There is absolutely no doubt in my mind that Mr. Wunder has dedicated himself to the presentation of this action and the suggestion that his conduct of this action should be reviewed by the Office of the Official Guardian is totally unfounded and is not warranted in this action. I want the record to indicate that although I have not agreed with many of the submissions of Mr. Wunder, and have ruled against him on some occasions in this trial, I see no reason to alter my views that Mr. Wunder is attempting to act in the best interests of his clients and perceives that his actions are in the best interests of his clients.

### 6. The trial judge showed antipathy to Mrs. Marchand in his reasons for judgment

169     The appellants submit that the trial judge's reasons reflect his antipathy towards Mrs. Marchand. They argue that the trial judge rejected her evidence except where it bolstered the respondents' defence abruption theory and that he suggested in his reasons Mrs. Marchand "sought success in this case in priority to Joel's well-being". The appellants gave three examples of the trial judge's alleged antipathy. We will briefly review each example. None of them supports the appellants' submission.

170     First, the appellants point to the trial judge's discussion of Joel's life expectancy. In that discussion, the trial judge expressed reservations about Mrs. Marchand's beliefs concerning her son's abilities and her reaction to professional advice for Joel's care.

171     The trial judge thoroughly considered the question of Joel's life expectancy, devoting nearly 200 pages of his reasons to it. He praised Mrs. Marchand as a devoted, loving and caring mother who was trying to do the best for her son. The trial judge, however, was concerned about the divergence between Mrs. Marchand's evidence and the expert evidence, especially on the key issue of Joel's mobility. On that issue, everyone accepted the importance of the evidence of Dr. Richard Eyman, a defence expert in epidemiology and biostatistics, who had developed a scale to predict life expectancy based on physical skills. In assessing Joel's mobility, the trial judge took into account the optimistic beliefs expressed by Mrs. Marchand and two of her friends, and compared them with the $4\frac{1}{2}$ hours of videotapes of Joel, the evidence of Joel's physiotherapist and the evidence of a doctor who participated in the defence medical (examination of Joel).

172     The trial judge concluded that he could find no acceptable evidence that Joel could crawl, scoot or roll, which are key Eyman criteria. The trial judge was concerned that the appellants' efforts to suggest otherwise had their genesis in the Eyman criteria, a concern that was heightened by the apparently overstated information Mr. and Mrs. Marchand gave to Dr. MacGregor, who assessed Joel's mobility just before trial. The beliefs that Mrs. Marchand maintained about Joel's ability are entirely understandable but the trial judge was entitled to discount those beliefs when they clashed with the expert evidence. In our view, the trial judge's unwillingness to accept Mrs. Marchand's evidence on Joel's mobility does not reflect antipathy toward her but a fair weighing of all the evidence presented to him.

173     The second example that the appellants rely on is the trial judge's finding on reduced fetal movements. The appellants argued at trial that Dr. Asher was negligent because he failed to tell Mrs. Marchand to count her baby's movements. This argument could succeed only if the evidence showed a significant reduction in fetal movements. There was no such evidence. The trial judge accepted Mrs. Marchand's testimony that some reduction in fetal movements had occurred but he did not elevate her testimony to support a finding of significant reduction. This does not substantiate a claim of bias.

174     Finally, the appellants complain that the trial judge accepted Dr. Kirsch's evidence about a discussion he had with Mrs. Marchand after Joel was born. Dr. Kirsch said that during an office assessment Mrs. Marchand told him that at the time of abruption she had suffered pain concurrently with a fall in the fetal heart rate. This evidence was adverse to Mrs. Marchand's interests and she was not asked about it in examination-in-chief or in re-examination. Nonetheless, the trial judge accepted Dr. Kirsch's evidence. Doing so cannot be equated with antipathy towards Mrs. Marchand.

Case 09-10138-MFW    Doc 14225-48    Filed 08/15/14    Page 161 of 474

Marchand (Litigation Guardian of) v. Public General Hospital..., 2000 CarswellOnt 4362

2000 CarswellOnt 4362, [2000] O.J. No. 4428, 138 O.A.C. 201, 43 C.P.C. (5th) 65...

175     Overall, we are satisfied that the evidence reasonably supports the trial judge's findings of credibility. Mrs. Marchand overstated her evidence, albeit understandably, and the trial judge was justified in concluding that her evidence did not withstand scrutiny.

### 7. The Cumulative effect

176     The appellants submit that the trial judge's conduct, as described in the six categories above, cumulatively amounts to judicial bias. We reject this submission.

177     We have dealt with the appellants' submissions relating to individual complaints in each of the six categories and found that none of the conduct complained about established judicial bias. However, the principles in *S. (R.D.)* call for a consideration of the cumulative effect of the allegations of bias. For this reason, we must consider whether the totality of the appellants' complaints give rise to a reasonable apprehension of bias. We do not think that they do.

178     In our opinion the relentless acrimony between counsel in this complex and lengthy case did not prevent the trial judge from conducting and judging the case fairly and thoroughly. We are satisfied that a reasonably informed person, observing the trial judge's conduct during the entire trial and reading his reasons for judgment, would have no difficulty in concluding that he remained impartial and that he demonstrated no actual or apprehended bias.

179     We therefore also dismiss this ground of appeal.

### IV. Costs

180     The trial judge awarded the respondents their party-and-party costs of the trial, which he fixed in the total amount of $2,154,447.85 ($1,233,791.25 payable to Dr. Asher and $920,656.60 payable to the other respondents). The trial judge ordered that O.H.I.P. pay a small portion of those costs and the appellants the remainder. He also dismissed a defence motion to have Mr. Wunder pay 70% of the cost award.

181     The appellants appeal the costs order. They submit that we should deny the respondents their costs of the trial even if we dismiss the appellants' appeal. In their factums filed on appeal, the respondents sought to maintain the trial judge's costs award. In oral argument, however, counsel for all respondents undertook not to pursue the appellants for the costs of the trial and stated that the respondents were not seeking costs of this appeal. In light of this concession and the tragic event that led to this case we think it appropriate to vary the costs order at trial to provide that the appellants have no obligation for the respondents' costs.

### V. Conclusion

182     For the foregoing reasons, paragraphs 2 and 3 of the judgment at trial are set aside, to be replaced by an order that the dismissal of the action is without costs. This appeal is dismissed without costs.

*Appeal dismissed without costs; action dismissed without costs.*

### Footnotes

*       Leave to appeal refused 2001 CarswellOnt 3412, 2001 CarswellOnt 3413, (sub nom. *Marchand v. Public General Hospital Society of Chatham)* 282 N.R. 397 (note), (sub nom. *Marchand v. Public General Hospital Society of Chatham)* 156 O.A.C. 358 (note) (S.C.C.).

1       Rule 53.03 has since been amended to require earlier service of the report, and to allow supplementary reports.

2       The trial judge dismissed both of the appellants' motions.

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# TAB 99

36 U.S.P.Q.2d 1289, 27 UCC Rep.Serv.2d 1134

67 F.3d 917
United States Court of Appeals,
Federal Circuit.

Duncan McCOY, Alex Dorsett, and Alex–
Duncan Shrimp Chef, Inc., Plaintiffs–Appellees,
v.

MITSUBOSHI CUTLERY, INC., and Admiral Craft
Equipment Corporation, Defendants–Appellants.

No. 95–1087.    |    Oct. 4, 1995.
|    Rehearing Denied Oct. 30, 1995.

Patentee brought action against manufacturer, alleging that manufacturer committed patent and trademark infringement, tortious interference with prospective business relations and unfair competition when manufacturer resold patented knives it had produced under agreement with patentee when patentee refused to pay for them. The United States District Court for the Southern District of Texas, Frances H. Stacy, United States Magistrate Judge, entered judgment in favor of patentee, and manufacturer appealed. The Court of Appeals, Rader, Circuit Judge, held that: (1) manufacturer that produced patented knives under agreement with patentee had implied license, and could resell knives under Texas law as self-help remedy when patentee refused to pay; (2) manufacturer did not commit trademark infringement or unfair competition by reselling knives; and (3) manufacturer did not tortiously interfere with patentee's prospective business relations.

Reversed.

West Headnotes (20)

[1]     **Patents**
   🔑  Nature of patent rights

Patent confers on its holder right to exclude others from making, using, or selling what is described in its claims. 35 U.S.C.A. § 154(a)(1).

1 Cases that cite this headnote

[2]     **Copyrights and Intellectual Property**
   🔑  Scope of Exclusive Rights;  Limitations

**Patents**
   🔑  Nature of patent rights

**Trademarks**
   🔑  Mark as property;  property rights in general

**Trademarks**
   🔑  Contracts in General

Intellectual property rights, like any other property rights, are subject to contractual obligations of their owner and applicable law.

2 Cases that cite this headnote

[3]     **Patents**
   🔑  Persons who may grant license

**Trademarks**
   🔑  Licenses

Patent or trademark owner may contract to confer license on another party.

4 Cases that cite this headnote

[4]     **Courts**
   🔑  Particular questions or subject matter

Federal Circuit applies regional circuit law to trademark and unfair competition issues that are not unique to Federal Circuit's exclusive jurisdiction.

3 Cases that cite this headnote

[5]     **Patents**
   🔑  Implied licenses

**Trademarks**
   🔑  Implied licenses

In some circumstances, entire course of conduct between patent or trademark owner and accused infringer may create implied license.

11 Cases that cite this headnote

[6]     **Patents**
   🔑  Express Licenses

**Patents**
   🔑  Implied licenses

Whether express or implied, patent license is contract governed by ordinary principles of state contract law.

11 Cases that cite this headnote

**[7]**    **Patents**
    Implied licenses

Law may imply licenses to make effective contracts of patentee; implied license, however, must not exceed limits necessary to make contract effective.

Cases that cite this headnote

**[8]**    **Patents**
    Implied licenses

To enforce contracts of patentee, law may imply license where patent holder sells or authorizes sale of patented product—a voluntary sale; thus, authorized sale of patented product places that product beyond reach of patent.

7 Cases that cite this headnote

**[9]**    **Patents**
    Implied licenses

Under implied license created when patent holder sells or authorizes sale of patented product, patent holder receives reward for inventive work in first sale of patented product.

5 Cases that cite this headnote

**[10]**    **Patents**
    Implied licenses

In some cases, law implies license where patent holder does not authorize sale of patented product—an involuntary sale.

3 Cases that cite this headnote

**[11]**    **Patents**
    Implied licenses

Law may create implied license to enforce contract obligations of patent holder and recognize legal rights of aggrieved parties.

3 Cases that cite this headnote

**[12]**    **Patents**
    Implied licenses

Manufacturer that produced patented knives under agreement with patentee had implied license to enforce patentee's promise to pay, and could resell knives under state commercial law as self-help remedy when patentee refused to pay. V.T.C.A., Bus. & C. §§ 2.703(4), 2.706(a).

2 Cases that cite this headnote

**[13]**    **Patents**
    Implied licenses

Owner of intellectual property rights may not evade application of ordinary contract remedy of resale for unjustified refusal to pay.

2 Cases that cite this headnote

**[14]**    **Trademarks**
    Unfair competition

Liability for unfair competition under Lanham Act, like liability for trademark infringement, depends on likelihood of confusion. Lanham Trade-Mark Act, § 43(a)(1)(A), as amended, 15 U.S.C.A. § 1125(a)(1)(A).

10 Cases that cite this headnote

**[15]**    **Trademarks**
    Use on Genuine Goods; Resale Under Original Marks or Name

Manufacturer that produced trademarked knives under agreement with trademark holder did not commit trademark infringement or unfair competition by reselling knives when trademark holder refused to pay for them; because knives were genuine, manufacturer did not cause consumer confusion by reselling them. Lanham Trade-Mark Act, § 43(a)(1)(A), as amended, 15 U.S.C.A. § 1125(a)(1)(A).

12 Cases that cite this headnote

McCoy v. Mitsuboshi Cutlery, Inc., 67 F.3d 917 (1995)

36 U.S.P.Q.2d 1289, 27 UCC Rep.Serv.2d 1134

**[16]    Torts**

☞ Defense, justification or privilege in general

Under defense of legal justification, party exercising its legal rights in good faith cannot tortiously interfere with another's prospective business relations.

Cases that cite this headnote

**[17]    Federal Courts**

☞ Trade, Business, and Finance

**Torts**

☞ Business relations or economic advantage, in general

Whether party acted in good faith, for purposes of defense of legal justification to claim of tortious interference with another's prospective business relations, is question of fact for jury, which Court of Appeals reviews for substantial evidence.

Cases that cite this headnote

**[18]    Torts**

☞ Business relations or economic advantage, in general

Manufacturer that agreed to produce patented knives for patentee did not tortiously interfere with patentee's prospective business relations by reselling knives when patentee refused to pay for them, absent evidence that manufacturer acted in bad faith.

Cases that cite this headnote

**[19]    Antitrust and Trade Regulation**

☞ Miscellaneous particular practices

Manufacturer that agreed to produce patented knives for patentee did not commit unfair competition under Texas law by reselling knives upon patentee's refusal to pay, absent finding of independent tort or other illegality committed by manufacturer.

3 Cases that cite this headnote

**[20]    Patents**

☞ Original utility

4,759,126. Cited.

Cases that cite this headnote

## Attorneys and Law Firms

**\*918** George M. Bishop, George M. Bishop and Associates, Houston, Texas, argued for plaintiffs-appellees. Of counsel were **\*919** Guy C. Matthews and J. Albert Riddle, Matthews and Associates, Houston, Texas.

William W. Goodrich, Jr., Arent, Fox, Kintner, Plotkin and Kahn, Washington, DC, argued for defendants-appellants. With him on the brief were Jennifer A. Albert and Marilyn T. Dare.

Before MAYER, MICHEL, and RADER, Circuit Judges.

## Opinion

RADER, Circuit Judge.

Duncan McCoy, Alex Dorsett, and Alex–Duncan Shrimp Chef, Inc. (McCoy) sued Mitsuboshi Cutlery, Inc. (Mitsuboshi) and Admiral Craft Equipment Corp. (Admiral Craft) for infringing McCoy's intellectual property rights and committing business torts. McCoy's sales organization had hired Mitsuboshi to make and supply shrimp knives covered by McCoy's patent and trademarks. When Mitsuboshi produced the knives, McCoy refused to pay for them. Mitsuboshi resold the knives to Admiral Craft. McCoy sought damages from Mitsuboshi and Admiral Craft for selling the knives to third parties. Admiral Craft settled with McCoy before trial.

A jury found that Mitsuboshi committed patent and trademark infringement in violation of federal law, tortious interference with McCoy's prospective business relations in violation of Texas law, and unfair competition in violation of federal and Texas law. The jury also found, however, that McCoy breached its contract with Mitsuboshi by refusing to pay for the knives. The trial court then entered judgment awarding McCoy $2.6 million in actual and punitive damages, attorney fees, and costs, plus prejudgment interest. *McCoy v. Mitsuboshi Cutlery, Inc.,* No. H–93–1774 (S.D.Tex. Sept. 19, 1994) (final judgment). The trial court also awarded Mitsuboshi $89,337 on its breach of contract counterclaim. *Id.* Because Mitsuboshi was entitled to resell the knives

in response to McCoy's wrongful refusal to pay, this court reverses.

## BACKGROUND

McCoy owns U.S. Patent No. 4,759,126 on a shrimp knife that peels, deveins, and butterflies in one motion. McCoy arranged for Mitsuboshi, a Japanese knife manufacturer, to produce shrimp knives embodying the patented invention. At McCoy's request, Mitsuboshi stamped the knives with McCoy's registered U.S. Trademarks Nos. 1,687,589 and 1,702,878. From 1988 to 1990, Mitsuboshi manufactured and sold large quantities of these knives to McCoy.

In 1991, McCoy's separate marketing organization, A.T.D. Marketing, Inc. (ATD), ordered 150,000 of the knives from Mitsuboshi. Mitsuboshi produced the knives. When Mitsuboshi timely offered the knives, ATD refused to accept or pay for them. ATD's refusal left Mitsuboshi holding the 150,000 knives in its warehouse in Japan. The record contains no suggestion that the knives were defective.

McCoy acknowledged its responsibility for ATD's refusal to pay. McCoy, however, accepted and paid for only about 20,000 of the 150,000 knives ordered. McCoy refused to pay for the other 130,000 knives. On the basis of these facts, the jury found that McCoy breached its contract with Mitsuboshi. McCoy did not appeal this jury verdict.

Following McCoy's partial payment, Mitsuboshi continued to negotiate for payment and delivery of the remaining 130,000 knives. McCoy, however, remained silent, unable to pay for them. In the face of this silence, Mitsuboshi repeatedly notified McCoy of its intent to resell the knives to mitigate damages. At length, Mitsuboshi sold 6,456 of the knives to Admiral Craft, a mail-order wholesaler of restaurant supplies. Admiral Craft sold 958 of the knives in the United States to restaurants and supply houses in 1993 through its mail catalog.

McCoy sued Mitsuboshi and Admiral Craft for patent and trademark infringement, unfair competition in violation of both federal and Texas law, and several Texas state law torts. Admiral Craft settled, but Mitsuboshi persevered, counterclaiming for breach of contract. At the close of evidence, Mitsuboshi moved for judgment as a matter of law that it was entitled to resell the knives. The trial court denied Mitsuboshi's motion. The jury found against Mitsuboshi on

the infringement, *920 unfair competition, and tortious interference counts, and for Mitsuboshi on the breach of contract count. Mitsuboshi then renewed its motion for judgment as a matter of law. The trial court again denied the motion. Mitsuboshi appeals.

## DISCUSSION

### I.

The jury found, and McCoy does not contest, that McCoy breached its contract with Mitsuboshi. This appeal thus raises the purely legal question of the effect of McCoy's breach on his intellectual property rights in the knives. This court confronts this question for the first time.

[1] [2] [3] [4] A patent confers on its holder the right to exclude others from making, using, or selling what is described in its claims. 35 U.S.C.A. § 154(a)(1) (West Supp.1995); *see generally Rite–Hite Corp. v. Kelley Co.,* 56 F.3d 1538, 1547, 35 USPQ2d 1065, 1070 (Fed.Cir.1995) (en banc). This court has recognized that these intellectual property rights, like any other property rights, are subject to the contractual obligations of their owner and the applicable law:

> Th[e] right to exclude may be waived in whole or in part. The conditions of such waiver are subject to patent, contract, antitrust, and any other applicable law, as well as equitable considerations such as are reflected in the law of patent misuse. *As in other areas of commerce, private parties may contract as they choose, provided that no law is violated thereby....*

*Mallinckrodt, Inc. v. Medipart, Inc.,* 976 F.2d 700, 703, 24 USPQ2d 1173, 1176 (Fed.Cir.1992) (emphasis added). Thus, a patent or trademark owner may contract to confer a license on another party. *See id.* (patent); *Moore Bus. Forms, Inc. v. Ryu,* 960 F.2d 486, 489, 22 USPQ2d 1773, 1774–75 (5th Cir.1992) (trademark). [1] In most instances under contract law, a patent or trademark owner intentionally creates an express license. A licensee, of course, has an affirmative defense to a claim of patent infringement.

[5]  In some circumstances, however, the entire course of conduct between a patent or trademark owner and an accused infringer may create an implied license. *See Stickle v. Heublein, Inc.,* 716 F.2d 1550, 1559, 219 USPQ 377, 383 (Fed.Cir.1983). The Supreme Court stated:

> Any language used by the owner of the patent or any conduct on his part exhibited to another from which that other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license and a defense to an action....

*De Forest Radio Tel. Co. v. United States,* 273 U.S. 236, 241, 47 S.Ct. 366, 367, 71 L.Ed. 625 (1927). When warranted by such a course of conduct, the law implies a license. *Devices for Medicine, Inc. v. Boehl,* 822 F.2d 1062, 1068, 3 USPQ2d 1288, 1293–94 (Fed.Cir.1987).

[6]  [7]  Whether express or implied, a license is a contract "governed by ordinary principles of state contract law." *Power Lift, Inc. v. Weatherford Nipple–Up Sys., Inc.,* 871 F.2d 1082, 1085, 10 USPQ2d 1464, 1466 (Fed.Cir.1989). Moreover the law may imply licenses "to make effective the contracts of the patentee." 6 Ernest B. Lipscomb, III, *Libscomb's Walker on Patents* § 20:14, at 33 (3d ed. 1987). An implied license, however, must not exceed the limits necessary to make the contract effective. *See Waterman v. Mackenzie,* 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923 (1891).

[8]  [9]  To enforce the contracts of the patentee, the law may imply a license where a patent holder sells or authorizes the sale of a patented product—a voluntary sale. *See, e.g., United States v. Univis Lens Co.,* 316 U.S. 241, 250–51, 62 S.Ct. 1088, 1093, 86 L.Ed. 1408, 53 USPQ 404, 408 (1942); *Ansul Co. v. Uniroyal, Inc.,* 448 F.2d 872, 880, 169 USPQ 759, 763–64 (2d Cir.1971), *cert. denied,* **\*921** 404 U.S. 1018, 92 S.Ct. 680, 30 L.Ed.2d 666, 172 USPQ 257 (1972). Thus, "an authorized sale of a patented product places that product beyond the reach of the patent." *Intel Corp. v. ULSI Sys. Technology, Inc.,* 995 F.2d 1566, 1568, 27 USPQ2d 1136, 1138 (Fed.Cir.1993), *cert. denied,* 510 U.S. 1092, 114 S.Ct. 923, 127 L.Ed.2d 216 (1994). Under this implied license, a patent holder receives a reward for inventive work in the first sale of the patented product. *Univis,* 316 U.S. at 251, 62 S.Ct. at 1093. As the Supreme Court stated:

> Patentees ... are entitled to but one royalty for the patented machine, and consequently when a patentee has himself constructed the machine and sold it, or authorized another to construct and sell it, or to construct and use and operate it, and the consideration has been paid to him for the right, he has then to that extent parted with his monopoly, and ceased to have any interest whatever in the machine so sold or so authorized to be constructed and operated.

*Bloomer v. Millinger,* 68 U.S. (1 Wall.) 340, 350, 17 L.Ed. 581 (1863).

[10]  In some cases, the law implies a license where a patent holder does not authorize the sale of a patented product—an involuntary sale. *See, e.g., Wilder v. Kent,* 15 F. 217, 219 (C.C.W.D.Pa.1883). For example, in *Wilder,* the patent holder sued an individual for infringement who purchased a machine at a sheriff's sale. The court dismissed the complaint finding the purchaser had acquired the right to use the patented machine through the purchase at the sheriff's sale. The court reasoned: "To deny to the sheriff's vendee the right to use such machine would in effect prevent its sale upon an execution at law ... and practically withdraw it from the reach of the owner's execution creditors." *Id.* While appreciating the unique nature of patent rights, the court noted that "a patented machine is susceptible of manual seizure, and the unrestricted sale thereof does not involve the transfer of any interest in the patent." *Id.* at 220.

Justice Story, sitting on the Massachusetts Circuit Court, recognized a similar principle in denying a patent holder the right to sue a sheriff for infringement for his part in the sale of a patented product at a sheriff's sale. *Sawin v. Guild,* 21 F.Cas. 554, 554–55 (C.C.D.Mass.1813) (No. 12,391). He reasoned that statutes must be construed where possible to avoid introducing "public mischiefs, or manifest incongruities." *Id.* Justice Story felt a great public mischief would result if courts construed the patent laws to permit an action against a sheriff for selling a patented product at a sheriff's sale. *Id.*

More recently, in an opinion authored by Judge Friendly, the United States Court of Appeals for the Second Circuit expressly recognized and extended this implied license doctrine to the sale of products by an aggrieved seller to

remedy a buyer's breach. *Platt & Munk Co. v. Republic Graphics, Inc.,* 315 F.2d 847, 137 USPQ 268 (2d Cir.1963). Platt & Munk owned copyrights on educational toys and contracted with Republic to supply them. *Id.* at 849. After Republic began delivery, Platt & Munk alleged various defects and refused to pay for the balance of the toys. *Id.* at 849–50. Republic then informed Platt & Munk of its intent to resell the toys to recover its production costs. Platt & Munk responded by seeking an injunction prohibiting Republic from reselling the toys without Platt & Munk's consent. *Id.* at 850. The trial court granted a preliminary injunction without addressing whether the toys were actually defective or whether Platt & Munk had the right to refuse payment. Republic filed an interlocutory appeal. *Id.*

The Second Circuit remanded to the trial court to determine whether Platt & Munk justifiably refused to pay for the toys. *Id.* at 855. If not, it instructed the trial court to lift the injunction. In other words, if Platt & Munk breached the contract, Republic had a right to resell the toys notwithstanding any copyright protection. *Id.* The Second Circuit based its holding on New York contract law, which provided a seller of goods the right to mitigate damages for contract breaches. *Id.* at 854. Where Platt & Munk breached, the Second Circuit found that Platt & Munk's copyrights had no effect on Republic's state law right to resell:

> We see no reason why the copyrighted character of the goods should preclude [resale] **\*922** when—and the qualification is vital—the person for whom the goods were being made unjustifiably refuses to pay the price.

*Platt,* 315 F.2d at 855.

[11]    This ruling extended the implied license doctrine beyond sales under judicial decree to sales under self-help provisions in commercial law. Together, *Wilder, Sawin,* and *Platt* demonstrate that the law may create an implied license to enforce the contract obligations of the patent holder and recognize legal rights of aggrieved parties. In the case of the sheriff's sale, the patent holder defaulted on an obligation collateralized by patented merchandise. The creditor can have the property seized by the sheriff and sold. In the case of the self-help sale, the patent holder has defaulted on a contractual obligation based on patented merchandise. Under commercial law, the aggrieved seller can sell the merchandise and recover any losses from the breaching buyer. Absent an implied

license in either case, patent holders could frustrate otherwise available commercial remedies.

[12]    Here, McCoy and Mitsuboshi had a long-standing business relationship whereby Mitsuboshi manufactured McCoy's patented knives. In 1991, McCoy placed a purchase order for 150,000 knives with Mitsuboshi. Mitsuboshi, in turn, accepted the order and performed its obligations under that agreement. When it tendered the knives to McCoy, McCoy breached the contract by failing to pay. At that point, rather than immediately act, Mitsuboshi continued to negotiate with McCoy in an effort to secure payment and deliver the knives. After repeated failed attempts, Mitsuboshi sold some of the knives to an American company.

The applicable state contract law in this case is Texas's version of the Uniform Commercial Code. Tex.Bus. & Com.Code §§ 1.101–11.108 (1995) (Texas UCC). Because this case involves the sale of goods, the Texas UCC entitles the seller to resell the goods upon the buyer's wrongful refusal to pay. Texas UCC §§ 2.703(4), 2.706(a). Consequently, under Texas contract law, when McCoy breached the contract, Mitsuboshi had a right to resell the knives to recoup its losses without McCoy's consent.

[13]    As in *Platt,* an implied license properly enforces McCoy's contractual promise to pay for the knives, reflects Mitsuboshi's commercial efforts to resolve the matter, and recognizes Mitsuboshi's rights to mitigate under the Texas UCC. This court, like our sister circuit in *Platt,* sees no reason why the owner of intellectual property rights deserves to evade application of the ordinary contract remedy of resale for an unjustified refusal to pay.

This implied license does not offend the protection afforded patent and trademark rights by federal law. Instead, licenses, like other federal property and contract rights, conform to the applicable state laws. *See Power Lift,* 871 F.2d at 1085; *see also Mallinckrodt,* 976 F.2d at 703. As this court observed in *Power Lift,* the Supreme Court has held that federal patent law does not preempt enforcement of contracts under state law. *Id.* (discussing *Aronson v. Quick Point Pencil Co.,* 440 U.S. 257, 261–64, 99 S.Ct. 1096, 1098–1100, 59 L.Ed.2d 296, 201 USPQ 1, 4–6 (1979)). By the same reasoning, federal trademark law does not preempt contract enforcement either. Intellectual property owners "may contract as they choose," *Mallinckrodt,* 976 F.2d at 703, but their intellectual property rights do not entitle them to escape the consequences of dishonoring state contractual obligations.

Mitsuboshi's right to resell under Texas law, furthermore, did not require a prior adjudication that McCoy acted wrongfully in refusing to pay for the knives. Section 2.706(a) of the Texas UCC authorizes a seller to resell without adjudication:

> Under the conditions stated in Section 2.703 on seller's remedies [that is, "[w]here the buyer wrongfully ... fails to make a payment due on or before delivery"], the seller may resell the goods concerned.... Where the resale is made in good faith and in a commercially reasonable manner the seller may recover the difference between the resale price and the contract price together with any incidental damages ... but less expenses saved in consequence of the buyer's breach.

**\*923** Section 2.706(a) explicitly authorizes a seller in Mitsuboshi's position to first resell the goods and then, if it chooses, sue to recover the difference between the resale price and the original contract price. Under the Texas UCC, therefore, Mitsuboshi had the right to resell as a self-help remedy without first obtaining judicial confirmation of McCoy's breach.

*Platt* also does not require an adjudication before resale in this case. *Platt* involved a preliminary injunction prohibiting resale. In upholding the preliminary injunction pending determination of whether Platt & Munk was obligated to pay for the goods, the Second Circuit merely recognized that the trial court had not abused its discretion in granting an injunction in light of Platt & Munk's "good faith claim that its failure to pay for the goods was justified." *Platt,* 315 F.2d at 855.

In this case, McCoy did not seek nor obtain a preliminary injunction prohibiting Mitsuboshi from reselling the knives, despite McCoy's knowledge that Mitsuboshi intended to resell. Under Texas law, nothing prevented Mitsuboshi from exercising its right to resell in response to McCoy's breach. In sum, Mitsuboshi did not infringe McCoy's patent or trademarks by exercising its Texas law right to resell the knives to mitigate the breach.

## II.

**[14]** Title 15 of the U.S.Code prohibits unfair competition:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> is *likely to cause confusion, or to cause mistake, or to deceive* as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> ....
>
> shall be liable in a civil action....

15 U.S.C. § 1125(a)(1)(A) (1994) (emphasis added). This statute covers a wide range of unfair business practices—each, however, possessing a common thread: "[T]he touchstone of a section 1125(a) unfair competition claim is whether the defendant's actions are 'likely to cause confusion.' " *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.,* 988 F.2d 587, 592, 26 USPQ2d 1532, 1536 (5th Cir.1993) (quoting section 1125(a)). Thus liability for unfair competition, like liability for trademark infringement, depends on likelihood of confusion. *Id.* at 590, 592; *see also* 15 U.S.C. § 1114(1)(a) (1994).

The United States Court of Appeals for the Fifth Circuit considers likelihood of confusion a question of fact. *Moore,* 960 F.2d at 489. In *Matrix Essentials,* however, the Fifth Circuit held as a matter of law that no likelihood of confusion can arise from the sale of genuine goods, even if the sale is unauthorized. 988 F.2d at 590–93. In *Matrix Essentials,* Emporium sold without authorization Matrix's hair-care products. Emporium, a high-volume discount drug store, acquired a supply of genuine Matrix products bearing Matrix trademarks and offered them for sale. *Id.* at 589. The products had the same origin, and thus the same quality, as other Matrix products. *Id.* at 590. Matrix, however, intended its products to be sold only in hair-cutting salons. *Id.* at 589. To protect its retail policy, Matrix bought out Emporium's entire stock. *Id.* Emporium then acquired a second supply of Matrix products. *Id.* Matrix responded by suing for trademark infringement and unfair competition. *Id.*

The Fifth Circuit rejected Matrix's claims: "Emporium's sale of Matrix products cannot cause confusion as to manufacture or sponsorship because the goods were manufactured and labeled by Matrix." *Id.* at 592. Our sister circuit observed: "the general rule is that 'trademark law does not apply to the

sale of genuine goods bearing a true mark, even if the sale is without the mark owner's consent.' " *Id.* at 590 (quoting *Shell Oil Co. v. Commercial Petroleum, Inc.,* 928 F.2d 104, 107, 18 USPQ2d 1156, 1157 (4th Cir.1991)). It is a tautology that a consumer purchasing **\*924** genuine goods receives exactly what the consumer expects to receive: genuine goods. The consumer is not confused or deceived about the source or quality of the product. *See Matrix Essentials,* 988 F.2d at 591.

 [15]    In this case, the knives resold by Mitsuboshi were genuine. They were the same knives that Mitsuboshi would have delivered to McCoy if McCoy had not wrongfully refused to pay for them. Because the knives were genuine, *Matrix Essentials* dictates that Mitsuboshi did not cause consumer confusion by reselling them. That McCoy did not authorize resale is immaterial. Therefore, this court holds as a matter of law that Mitsuboshi did not commit trademark infringement or unfair competition by reselling the knives.

McCoy argues that Mitsuboshi confused consumers by selling McCoy goods without McCoy's approval. This argument mirrors Matrix's argument, which the Fifth Circuit rejected. In support of its unfair competition claim, Matrix argued that Emporium "[misled] consumers into believing that it is an authorized retailer of Matrix products and that Matrix condones the sale of its products through ordinary retail drugstores." *Id.* at 592. The Fifth Circuit rejected this form of confusion, if confusion at all, as actionable unfair competition:

> Matrix is not able to point to any authority holding that the unauthorized stocking of a trademark owner's products, without more, rises to the level of a "misleading representation of fact."
>
> ....
>
> We are not persuaded by Matrix's arguments to expand the reach of section 1125(a) to provide a cause of action merely for the unauthorized stocking and sale of a manufacturer's products. Absent more culpable conduct on the part of the seller, we are unwilling to find misrepresentation in the mere act of putting a manufacturer's product on one's shelf and offering it for sale. We therefore affirm the district court's grant of summary judgment in favor of Emporium on the trademark and unfair competition claims.

*Id.* at 593. *Matrix Essentials* thus squarely holds that the sale of genuine goods, even if unauthorized, cannot cause confusion and consequently cannot constitute trademark

infringement or unfair competition. This court, as a matter of law, holds that Mitsuboshi committed no violation of the unfair competition statute.

### III.

 [16]    [17]    The jury also found that Mitsuboshi committed tortious interference and unfair competition in violation of Texas law. Under the defense of legal justification, a party exercising its legal rights in good faith cannot tortiously interfere with another's prospective business relations. *Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931, 939–40 (Tex.1991); *see also International Shortstop, Inc. v. Rally's, Inc.,* 939 F.2d 1257, 1270–71 (5th Cir.1991) (following *Victoria Bank & Trust* ), *cert. denied,* 502 U.S. 1059, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992). Whether the party acted in good faith is a question of fact for the jury, *see Victoria Bank & Trust,* 811 S.W.2d at 940, which this court reviews for substantial evidence. *Genentech, Inc. v. Wellcome Found. Ltd.,* 29 F.3d 1555, 1565, 31 USPQ2d 1161, 1168–69 (Fed.Cir.1994).

In this case, however, the jury did not reach the question of good faith. In finding that Mitsuboshi committed patent and trademark infringement and unfair competition, the jury necessarily found that Mitsuboshi did not have a legal right to resell the knives. As explained, this finding is wrong as a matter of law. The law entitled Mitsuboshi to resell the knives.

 [18]    This court need not, however, remand for a jury to determine whether Mitsuboshi acted in good faith when it resold the knives, because "nothing of record warrants a further exercise of the fact-finding function." *Panduit Corp. v. Dennison Mfg. Co.,* 810 F.2d 1561, 1565–66, 1 USPQ2d 1593, 1595 (Fed.Cir.), *cert. denied,* 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). The record contains no evidence that Mitsuboshi acted in bad faith. Instead, the record conclusively shows Mitsuboshi's good faith. Consequently, as a matter of law, Mitsuboshi did **\*925** not tortiously interfere with McCoy's prospective business relations.

To find unfair competition under federal law, the trial court instructed the jury that McCoy could prevail on its unfair competition claim only if it proved Mitsuboshi's resale of the knives created a likelihood of confusion. As explained, this record involves no likelihood of confusion because the knives resold by Mitsuboshi were genuine. McCoy contends

on appeal, however, that the jury's unfair competition verdict rests on Texas state law, which recognizes a broader range of unfair practices without proof of a likelihood of confusion. McCoy's maneuvering is to no avail.

[19]    In support of its state law argument, McCoy cites *Schoellkopf v. Pledger,* 778 S.W.2d 897 (Tex.Ct.App.1989), *error denied,* (June 13, 1990). *Schoellkopf* recognizes "unlawful business injury" as a type of unfair competition. *Id.* at 904. [2] *Schoellkopf* does not delineate the precise bounds of this broadly defined tort. It does, however, recognize that this type of unfair competition requires commission of another tort or other illegal conduct:

> Without some finding of an independent substantive tort or other illegal conduct, we hold that liability cannot be premised on the tort of "unfair competition."

*Id.* at 904–05. *Schoellkopf* applied this standard in a way directly relevant to the present case. A jury had awarded Pledger actual and punitive damages, finding that Schoellkopf had tortiously interfered with Pledger's contract rights and committed unfair competition. *Id.* at 899. The Texas Court of Appeals reversed the tortious interference verdict. *Id.* at 900–04. The court then reversed the unfair competition verdict, holding that Schoellkopf could not be liable for unfair competition absent tortious interference because Schoellkopf had not committed "an independent substantive tort or other illegal conduct." *Id.* at 904–05.

Likewise, Mitsuboshi has not committed an independent tort or illegal conduct justifying a finding of unfair competition under McCoy's theory on appeal. Because Mitsuboshi did not commit patent or trademark infringement, federal unfair competition, or tortious interference, no independent tort or illegality supports the verdict of unfair competition. This court also reverses that verdict.

## CONCLUSION

Texas law entitled Mitsuboshi to resell the knives upon McCoy's wrongful refusal to pay for them. The trial court erred in denying Mitsuboshi judgment as a matter of law on each of the counts in McCoy's complaint—infringement of McCoy's patent or trademarks, tortious interference with McCoy's prospective business relations, and unfair competition with McCoy by reselling the knives.

## COSTS

Each party shall bear its own costs.

*REVERSED.*

## Parallel Citations

36 U.S.P.Q.2d 1289, 27 UCC Rep.Serv.2d 1134

---

Footnotes

1    This court applies regional circuit law—here, the law of the Fifth Circuit—to trademark and unfair competition issues that are not unique to this court's exclusive jurisdiction. *See, e.g., Imagineering, Inc. v. Van Klassens, Inc.,* 53 F.3d 1260, 1263, 34 USPQ2d 1526, 1528 (Fed.Cir.), *cert. den.,* 516 U.S. 909, 116 S.Ct. 277, 133 L.Ed.2d 197 (1995) (No. 95–127).

2    Other types of unfair competition recognized under Texas law include trade secret misappropriation, passing off, and misappropriation of business opportunity. *United States Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.,* 865 S.W.2d 214, 217 (Tex.Ct.App.1993), *error denied,* (March 30, 1994). None of these liability theories are applicable, however. McCoy has never claimed that Mitsuboshi misappropriated its trade secrets. Before trial, furthermore, McCoy voluntarily dismissed its passing off claim, and the trial court dismissed McCoy's misappropriation of business opportunity claim.

---

End of Document                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 100

58 U.S.P.Q.2d 1596

247 F.3d 44
United States Court of Appeals,
Third Circuit.

MEDTRONIC AVE, INC.

v.

ADVANCED CARDIOVASCULAR
SYSTEMS, INC., Appellant.

No. 00–5230.    |    Argued Feb.
12, 2001.    |    Filed: April 17, 2001.

Manufacturer of coronary stent devices brought three separate patent infringement actions against competitor. After two of cases were transferred to court in which third case was pending, competitor moved to stay action, pending arbitration of whether provisions of settlement agreements between competitor and third medical device company, whose coronary catheter business line had been acquired by manufacturer while suits were pending, barred claims. The United States District Court for the District of Delaware, Sue L. Robinson, Chief Judge, denied motion. Competitor appealed. The Court of Appeals, Greenberg, Circuit Judge, held that: (1) Court of Appeals had jurisdiction over appeal pursuant to Federal Arbitration Act (FAA), and residual jurisdictional statute, and (2) manufacturer's claims, which had never been owned by third device company before its business line was acquired, did not come within scope of mutual release and covenant not to sue contained in third company's settlement agreements with competitor, rights under which had been assigned to manufacturer.

Affirmed.

West Headnotes (26)

**[1]    Federal Courts**

 Intellectual property

Court of Appeals for circuit in which district court was located had jurisdiction, pursuant to Federal Arbitration Act (FAA), and residual jurisdictional statute, over appeal from district court order denying motion to stay patent infringement suits in order to allow defendant to enforce arbitration clauses in agreements it had entered with company whose product line had subsequently been acquired by plaintiff, which contained a release and covenant not to sue, even though Federal Circuit would have jurisdiction over any final decision in case; no final decision existed, appeal was not from an interlocutory order, and order was not appealable as one denying an interlocutory injunction. 9 U.S.C.A. § 16(a)(1)(A); 28 U.S.C.A. §§ 1292, 1294, 1295(a), 1338.

6 Cases that cite this headnote

**[2]    Federal Courts**

 Compromise and Settlement

Court of Appeals exercise plenary review over legal questions concerning the applicability and scope of an arbitration agreement.

9 Cases that cite this headnote

**[3]    Federal Courts**

 "Clearly erroneous" standard of review in general

To extent that district court predicated its decision regarding applicability and scope of an arbitration agreement, on findings of fact, standard of review applied by Court of Appeals is whether those findings were clearly erroneous.

10 Cases that cite this headnote

**[4]    Federal Courts**

 Contracts

When a district court interprets language contained in contracts, Court of Appeals reviews its determination under the clearly erroneous standard, but if district court engages in contract construction, Court of Appeals exercises plenary review.

11 Cases that cite this headnote

**[5]    Alternative Dispute Resolution**

 Constitutional and statutory provisions and rules of court

**Federal Courts**

 Alternative dispute resolution

By enacting Federal Arbitration Act (FAA), Congress provided a framework for the development of a body of uniform federal law governing contracts within its scope; therefore, if FAA is applicable, federal law applies in questions regarding the construction and enforcement of an arbitration clause, even in those cases in which the district court's jurisdiction is based on diversity of citizenship. 9 U.S.C.A. § 1 et seq.

3 Cases that cite this headnote

**[6]** **Federal Courts**

👉 Alternative dispute resolution in general

Although Federal Arbitration Act (FAA) creates federal substantive law regarding agreements to arbitrate, it does not create any independent federal-question jurisdiction. 9 U.S.C.A. § 4; 28 U.S.C.A. § 1331.

1 Cases that cite this headnote

**[7]** **Federal Courts**

👉 Alternative dispute resolution

If Federal Arbitration Act (FAA), applies, federal law, including general principles of contract law, determines whether there is a valid arbitration clause. 9 U.S.C.A. § 1 et seq.

2 Cases that cite this headnote

**[8]** **Alternative Dispute Resolution**

👉 Remedies and Proceedings for Enforcement in General

Federal Arbitration Act (FAA) allows litigants to obtain an order requiring a reluctant party to arbitrate a dispute in appropriate circumstances, as it directs the district court to order a party to arbitrate if it is satisfied that the making of the agreement for arbitration or the failure to comply therewith is not an issue. 9 U.S.C.A. § 4.

Cases that cite this headnote

**[9]** **Alternative Dispute Resolution**

👉 Arbitrability of dispute

Under Federal Arbitration Act (FAA), when one party refuses to arbitrate, the issue of whether the dispute is within the scope of the agreement requires district court resolution. 9 U.S.C.A. § 4.

4 Cases that cite this headnote

**[10]** **Alternative Dispute Resolution**

👉 Contractual or consensual basis

Arbitration is fundamentally a creature of contract, and thus, arbitrators have the authority to resolve disputes only if the parties have agreed to submit to arbitration.

3 Cases that cite this headnote

**[11]** **Alternative Dispute Resolution**

👉 Evidence

For a court to enter an order compelling arbitration, there must be sufficient evidence that the parties consented to arbitration in an express agreement.

1 Cases that cite this headnote

**[12]** **Alternative Dispute Resolution**

👉 Elements

While a court asked to stay proceedings pending arbitration must determine whether there is a valid agreement to arbitrate and, if so, whether the specific dispute falls within the substantive scope of that agreement, its function nevertheless is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator; in that instance, court's function is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract.

25 Cases that cite this headnote

**[13]** **Alternative Dispute Resolution**

👉 Disputes and Matters Arbitrable Under Agreement

In determining whether a claim falls within the scope of an arbitration agreement, court's focus is on the factual underpinnings of the claim, rather than the legal theory alleged in the complaint.

24 Cases that cite this headnote

**[14]**  **Alternative Dispute Resolution**
👈  Merits of controversy

If a court determines that there is an agreement to arbitrate, and that the issue in dispute falls within the scope of the agreement, it must submit the matter to arbitration without ruling on the merits of the case.

21 Cases that cite this headnote

**[15]**  **Alternative Dispute Resolution**
👈  Arbitration favored;  public policy

**Alternative Dispute Resolution**
👈  Construction in favor of arbitration

Federal policy favors arbitration, and thus, a court resolves doubts about the scope of an arbitration agreement in favor of arbitration.

9 Cases that cite this headnote

**[16]**  **Alternative Dispute Resolution**
👈  Construction in favor of arbitration

**Alternative Dispute Resolution**
👈  Evidence

There is a presumption of arbitrability, and an order to arbitrate should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.

21 Cases that cite this headnote

**[17]**  **Alternative Dispute Resolution**
👈  Construction in favor of arbitration

While there is a presumption in favor of arbitrability, there is a limit as to how far a court should go in resolving a dispute in favor of arbitration, and while interpretive disputes should be resolved in favor of arbitrability, a compelling case for nonarbitrability should not be trumped by a flicker of interpretive doubt.

5 Cases that cite this headnote

**[18]**  **Release**
👈  Nature and requisites in general

**Release**
👈  Covenant not to sue as release

A "release" is a provision that intends a present abandonment of a known right or claim, while a "covenant not to sue," by contrast, also applies to future claims and constitutes an agreement to exercise forbearance from asserting any claim which either exists or which may accrue.

8 Cases that cite this headnote

**[19]**  **Alternative Dispute Resolution**
👈  Persons affected or bound

**Alternative Dispute Resolution**
👈  Disputes and Matters Arbitrable Under Agreement

Patent infringement claims asserted by manufacturer of coronary stent devices against competitor, which were pending at time manufacturer acquired coronary catheter business line of third medical device company, were never possessed by third company, so that claims were not within scope of settlement agreement entered in connection with prior patent infringement litigation between third company and competitor, which contained mutual releases between competitor and third company, and arbitration clause, and manufacturer was not bound by settlement agreement, rights under which had been assigned to manufacturer in connection with its acquisition of third company, to arbitrate dispute as to whether release barred its claims.

4 Cases that cite this headnote

**[20]**  **Release**
👈  Scope and extent in general

A release usually will not be construed to bar a claim which had not accrued at the date of its execution, or a claim which was not known to the party giving the release.

8 Cases that cite this headnote

**[21]**  **Release**

👉 Covenant not to sue or execute

Patent infringement claims asserted by manufacturer of coronary stent devices against competitor, which were pending at time manufacturer acquired coronary catheter business line of third medical device company, and thus were never possessed by third company, did not come within scope of covenant not to sue entered by third company in connection with its settlement of prior patent infringement against competitor, rights under which had been assigned to manufacturer in connection with its acquisition of third company.

2 Cases that cite this headnote

**[22]**  **Assignments**

👉 Nature and extent of rights of assignee in general

Absent a provision stating otherwise, assignment of a contract will result in the assignee stepping into the shoes of the assignor with regard to the rights that the assignor held, and not in an expansion of those rights to include those held by the assignee.

8 Cases that cite this headnote

**[23]**  **Assignments**

👉 Rights of assignee as against debtor

An assignment does not modify the terms of the underlying contract; rather, it is a separate agreement between the assignor and the assignee which merely transfers the assignor's contract rights, leaving them in full force and effect as to the party charged.

10 Cases that cite this headnote

**[24]**  **Assignments**

👉 Nature and extent of rights of assignee in general

Insofar as an assignment touches on the obligations of the other party to the underlying contract, the assignee simply moves into the shoes of the assignor.

9 Cases that cite this headnote

**[25]**  **Assignments**

👉 Nature and extent of rights of assignee in general

An assignment is intended to change only who performs an obligation, not the obligation to be performed.

2 Cases that cite this headnote

**[26]**  **Assignments**

👉 Nature and extent of rights of assignee in general

An assignee obtains only the right, title and interest of his assignor at the time of his assignment, and no more.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*47** Peter Buscemi, (argued), Richard S. Meyer, D. Michael Underhill, John H. Williamson, Mark A. Goodin, Morgan, Lewis & Bockius, Washington, DC, Attorneys for Appellee.

Frederick L. Cottrell, III, Jeffrey L. Moyer, Jennifer C. Bebko, **\*48** Richards, Layton & Finger, Wilmington, DE, Aldo A. Badini, (argued), Henry J. Ricardo, Carol A. Polizzi, Dewey Ballantine LLP, New York, NY, Richard A. Bardin, Craig B. Bailey, Fulwider Patton Lee & Utecht, LLP, Los Angeles, CA, Attorneys for Appellant.

Before SCIRICA, FUENTES, and GREENBERG, Circuit Judges.

**Opinion**

**OPINION OF THE COURT**

GREENBERG, Circuit Judge.

This matter is before the court on an appeal from an order of the district court dated September 30, 1999, denying American Cardiovascular Systems' ("ACS") motion for a stay of patent infringement litigation pending arbitration pursuant to 9 U.S.C. § 3. ACS sought a stay in this litigation brought by

Medtronic/Arterial Vascular Engineering, [1] Inc. ("AVE") so that it could enforce the arbitration clauses in two agreements containing a release and a covenant not to sue, respectively, into which ACS had entered with C.R. Bard, Inc. ("Bard"). After ACS and Bard executed these agreements, AVE, in 1998, purchased Bard's coronary catheter business. At that time Bard assigned the two agreements to AVE. AVE and ACS agree that the arbitration clauses are valid and that their provisions bind them, but AVE asserts that the claims it advances in this patent infringement litigation are outside the scope of the two agreements. The district court agreed with AVE and ACS appeals. We will affirm the district court's order denying the motion to stay the litigation pending arbitration because Bard never owned the claims involved in this litigation and, as a result, disputes regarding them are not subject to the arbitration provisions of either agreement. Thus, although AVE has stepped into Bard's shoes, inasmuch as it owes to ACS only obligations it derived from Bard, the arbitration clauses in the two agreements do not apply to AVE's separate claims involved here.

## I. BACKGROUND

ACS's coronary stent delivery systems consist of small pieces of stainless steel that are laser cut from a tube and affixed to a stent delivery catheter. The FDA-approved coronary stent is pre-mounted on a catheter that positions the stent in the appropriate region of the blood vessel. The balloon end of the catheter is inflated to expand the stent and place it against the vessel wall. The catheter then is withdrawn.

### (a) The 1992 Agreement

Bard, a company involved in the development, manufacture and sale of medical devices, sued ACS in 1988, alleging infringement of certain of its patents for catheter technology. *See C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.*, No. SA CV 88–646 JSL, 1989 U.S. Dist. LEXIS 18439 (C.D.Cal. July 28, 1989); app. at 352–56. ACS then sued Bard in 1990, alleging infringement of several of ACS's patents for catheter technology, but Bard asserted counterclaims for infringement of Bard's catheter technology patents in that litigation. *See Advanced Cardiovascular Sys., Inc. v. C.R. Bard, Inc.*, No. C90–0503 FMS, 1992 WL 478215 (N.D.Cal. Dec. 22, 1992); app. at 293–351. In January 1992, ACS and Bard settled the actions through an agreement (the "1992 Agreement") in which they cross-licensed various catheter patents to each other and agreed to pay royalties.

**\*49**  The 1992 Agreement contained mutual releases which provided that each party:

> on behalf of [itself and its] respective predecessors, successors, parents, subsidiaries, assigns, stockholders, officers, directors, attorneys, agents, employees and representatives hereby releases and discharges the other party, and its respective predecessors and successors, parents, subsidiaries and their respective assigns, stockholders, officers ... from any and all debts, claims, demands, damages, liabilities, obligations, causes of action, agreements, suits, sums of money, and rights, whether known or unknown, suspected or unsuspected, which are based on any actions or inaction occurring prior to the date of this Agreement and which the party now owns or holds, or at any time heretofore owned or held, by reason of any act, matter, cause or thing whatsoever [subject to certain exceptions not relevant here].

1992 Agreement ¶ 8; app. at 87–88.

The agreement also provided for arbitration to settle certain disputes:

> Any dispute between the parties concerning the construction, interpretation, and effect of this Agreement or any clause herein contained, or the rights and liabilities of the parties hereunder, or the coverage of any patent claims licensed herein, shall be resolved, if necessary, by binding arbitration in accordance with the commercial arbitration rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

1992 Agreement ¶ 15.a; app. at 92.

Medtronic AVE, Inc. v. Advanced Cardiovascular Systems, Inc., 247 F.3d 44 (2001)

58 U.S.P.Q.2d 1596

**(b) The 1998 Agreement**

In 1997 Bard sued ACS for infringement of certain of its patents for catheters based on actions not covered by the 1992 Agreement. *See C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc., 997 F.Supp. 556 (D.Del.1998);* app. at 357–62. Then in 1998 Bard sued ACS again for infringement of its catheter patents. *See C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.,* No. 98–120(RRM) (D.Del.); app. at 363–67. To resolve these actions, Bard and ACS entered into a settlement agreement on or about April 4, 1998, in which ACS agreed to pay Bard $100,000,000, and the parties cross-licensed certain catheter patents to each other. This agreement did not contain any releases but did include mutual covenants not to sue which, with respect to Bard, provided as follows:

> Bard and its Affiliates covenant not to sue ACS and its Affiliates for any and all debts, claims, demands, and liabilities, whether known or unknown, suspected or unsuspected, which are based in any way on any and all of ACS's and its Affiliates past and current domestic and foreign angioplasty catheters including stent delivery catheters. For purposes of this section, "ACS's and its Affiliates past and current domestic and foreign angioplasty catheters including stent delivery catheters" shall mean ACS's and its Affiliates past and current domestic and foreign angioplasty catheters including stent delivery catheters and shall specifically exclude any future modifications to such products.

1998 Agreement ¶ 4.b; app. at 110.

The 1998 Agreement required ACS to deliver to Bard certain catalogues and materials which showed "current domestic and foreign angioplasty catheters including stent delivery catheters" to identify products exempted from suit by the Agreement. *See* app. at 110 (1998 Agreement ¶ 4.b). The ACS Coronary Stent Delivery **\*50** Systems, including the ACS RX Multi–Link and the ACS RX Multi–Link HP, were listed and pictured in the materials that ACS provided to Bard, and these products were the subject of the infringement action. *See* app. at 56–57. The U.S. and International Product Brochures ACS delivered listed the integrated stent delivery systems which consist of a stent mounted on a stent delivery catheter. *See* app. at 20–38.

In this 1998 Agreement, Bard and ACS also agreed to settle certain disputes by arbitration as provided in the following clause:

> Any dispute between the parties concerning the construction, interpretation, and effect of this Agreement or any clause herein contained, or the rights and liabilities of the parties hereunder, or the coverage of any patent claims licensed herein, shall be resolved, if necessary, by binding arbitration in accordance with the commercial arbitration rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

1998 Agreement ¶ 13; app. at 116.

**(c) Actions Between ACS and AVE and AVE's Purchase of Bard's Business**

During the period of its disputes with Bard, ACS also was involved in litigation with AVE. ACS first sued AVE in December 1997 in the Northern District of California, and AVE sued ACS on February 18, 1998, in the District of Delaware. AVE's complaint for patent infringement of its stent technology patents against ACS involves two ACS coronary stent delivery systems: the ACS RX Multi-link Stent Delivery System and the ACS RX Multi-link HP Stent Delivery System. AVE also has advanced various state law claims against ACS (including breach of contract, misappropriation of trade secrets, unfair competition, and wrongful acquisition of property and conversion) regarding the development of the stent delivery systems and events that occurred between 1989 and 1991. Then, in April 1998, ACS brought a second patent infringement action in the Northern District of California against AVE.

While these three actions were pending, on October 1, 1998, AVE purchased the assets of Bard's coronary catheter business which included its various catheter technology patents. *See* app. at 176. The 1992 Agreement allowed its assignment as long as the patents that were the subject of the Agreement were transferred, *see* app. at 95–96 (1992 Agreement ¶ 22), and the 1998 Agreement allowed its assignment in connection with a merger, consolidation or sale

of its stock or sale of the assets of its business. *See* app. at 119–20 (1998 Agreement ¶ 20). Accordingly, Bard assigned all of its rights and obligations under the two agreements to AVE.

On February 8, 1999, in response to AVE's action against it and after the California court transferred the two cases pending before it to Delaware, ACS moved to stay AVE's district court action, *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, No. 98–80–SLR (D.Del.), pending arbitration of whether either the release in the 1992 Agreement or the covenant not to sue in the 1998 Agreement bars the action. In addition, ACS filed a demand for arbitration. Obviously, the demand for arbitration was somewhat unusual as ACS predicated it on provisions in agreements to which AVE was not a party when it brought the action. AVE opposed ACS's motion, arguing that Bard never owned AVE's claims against ACS for infringement of AVE's stent patents or the state law claims involved in the litigation **\*51** between AVE and ACS. AVE also argued that the Bard–ACS agreements did not cover these claims and that they were not subject to arbitration.

In March 1999, the district court held a hearing on ACS's motion and then, on September 30, 1999, denied the motion. *See* app. at 5 (Mem. Order at 1). The district court held that it could not interpret the release of all claims held by Bard in the 1992 Agreement or its undertakings in the 1998 Agreement as applying to separate claims held by Bard's assignee, AVE. *See* app. at 16 (Mem. Order at 12). The court stated that "[a]lthough catheters and stents may be bundled for marketing purposes, there can be no question but that catheters and stents involve different technology and patents and that AVE developed its stent technology independent of Bard [the assignor to AVE]." App. at 17 (Mem. Order at 13).

Subsequently, ACS made a motion to reargue its motion to stay the action pending arbitration or, in the alternative, for a stay pending appeal. On March 24, 2000, ACS withdrew its motion to reargue and filed an appeal from the district court's September 30, 1999 order. On March 31, 2000, ACS moved in this court to stay proceedings in the district court pending appeal, and, after AVE filed its opposition to ACS's motion, a motions panel of this court referred ACS's motion to the merits panel by an order dated May 5, 2000. ACS, however, has withdrawn the motion as the district court has stayed the proceedings before it.

**(d) Related Cases and Proceedings**

This case, *Medtronic AVE, Inc. v. Advanced Cardiovascular Systems, Inc.*, 98–80–SLR, has been consolidated with the two proceedings ACS brought against AVE in the Northern District of California and which the California court transferred to the District of Delaware, *Advanced Cardiovascular Systems, Inc. v. Arterial Vascular Engineering, Inc.*, No. 98–314, and *Advanced Cardiovascular Systems, Inc. v. Arterial Vascular Engineering, Inc.*, No. 98–316. Medtronic, Inc., AVE's parent company, also has sued ACS twice regarding infringement of Medtronic's stent patents. *See Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, No. 97–2459 JMR/FLN (D.Minn.); *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc. and Guidant Corp.*, No. 99–761 JMR/FLN (D.Minn.). ACS moved to stay the proceedings based on the arbitration clause in the 1998 Agreement between Bard and ACS. The district court denied ACS's motion, and the Court of Appeals for the Eighth Circuit affirmed. *See Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 221 F.3d 1343 (table), 2000 WL 637045 (8th Cir.2000). The court ruled that as the parent corporation of AVE, Medtronic, Inc. was not bound to the 1998 Agreement.

## II. DISCUSSION

**(a) Jurisdiction**

The district court had jurisdiction over this patent infringement case pursuant to 28 U.S.C. § 1331 and 1338(a). We conclude for the reasons we set forth that we have jurisdiction over the appeal of the denial of the motion to stay pending arbitration pursuant to 9 U.S.C. § 16(a)(1)(A) and 28 U.S.C. § 1294(1).

The parties in their primary briefs indicated, without substantial discussion, that this court has jurisdiction over this appeal under 9 U.S.C. § 16(a)(1)(A). We, however, questioned this point inasmuch as the district court's jurisdiction was based in whole or in part on 28 U.S.C. § 1338 so that under 28 U.S.C. § 1295(a) the United States Court of Appeals for the Federal **\*52** Circuit would have exclusive jurisdiction over an appeal from a "final decision" in this case. Accordingly, we directed the parties to file supplemental briefs on the jurisdictional point. In their supplemental briefs they have adhered to their position that we have jurisdiction.

 **[1]**   After considering these briefs we have determined that we have jurisdiction and thus we adjudicate this appeal on the merits. Our starting point is 9 U.S.C. § 16(a)(1)(A) which

makes the order in this case appealable. Section 16(a)(1)(A), however, does not indicate the court to which such an appeal may be taken. Thus, we examine the general statutes providing for the courts of appeals' jurisdiction. We conclude that section 1295(a) does not vest jurisdiction in the Court of Appeals for the Federal Circuit because this appeal is not from a "final decision." After all, rather than ending the litigation on the merits, *see John Hancock Mutual Life Ins. Co. v. Olick*, 151 F.3d 132, 135–36 (3d Cir.1998), "the order ensure[d] that [the] litigation will continue in the District Court." *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 275, 108 S.Ct. 1133, 1136, 99 L.Ed.2d 296 (1988); *see Aluminum Co. of Am. v. Beazer East, Inc.*, 124 F.3d 551, 557 (3d Cir.1997). Furthermore, we see no reason to regard the order as final under the collateral order doctrine as we are satisfied that even if it were not appealable under section 16(a)(1)(A), it effectively could be reviewed after entry of a final judgment in the district court. *See Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978); *Quiepo v. Prudential Bache Secs., Inc.*, 867 F.2d 721, 722 (1st Cir.1989). Thus, section 1295(a) does not vest jurisdiction in the Court of Appeals for the Federal Circuit over the current appeal in this case.

We also conclude that the Court of Appeals for the Federal Circuit could not have jurisdiction over this appeal under 28 U.S.C. § 1292(c) which vests it with exclusive jurisdiction over an appeal from an interlocutory order as described in 28 U.S.C. § 1292(a)(1) or (b) in cases in which it would have jurisdiction over an appeal from a final decision under section 1295. Plainly section 1292(b) cannot be applicable as the procedures for allowing an interlocutory appeal as set forth in that section have not been followed here.

Thus, we are left to consider only section 1292(a)(1) which deals, *inter alia*, and as possibly applicable here, with orders refusing to grant injunctions. Upon consideration of that subsection we are satisfied, in harmony with *Gulfstream*, 485 U.S. at 287–88, 108 S.Ct. at 1142–43, and in accordance with the weight of authority, that the order denying the stay should not be regarded as appealable as an order denying an interlocutory injunction under section 1292(a)(1). *See McLaughlin Gormley King Co. v. Terminix Int'l Co.*, 105 F.3d 1192, 1193–94 (8th Cir.1997); *Quiepo*, 867 F.2d at 722; *see also Cofab, Inc. v. Philadelphia Joint Bd. etc.*, 141 F.3d 105, 108–09 (3d Cir.1998).

In view of the foregoing analysis we come to the conclusion that the Court of Appeals for the Federal Circuit would not

have had jurisdiction if ACS had prosecuted this appeal to that court. That conclusion, however, in itself does not mean that we do have jurisdiction. After all, what we have held with respect to the Court of Appeals for the Federal Circuit's lack of jurisdiction under section 1295(a) would apply equally to us if we attempted to exercise jurisdiction under our usual source of jurisdiction, 28 U.S.C. § 1291, as that section, like section 1295(a), provides for jurisdiction only over appeals from "final decisions." Moreover, we no more can **\*53** exercise jurisdiction under section 1292(a)(1) by regarding the order denying the stay as an order denying an interlocutory injunction than could the Court of Appeals for the Federal Circuit under section 1292(c)(1) which incorporates that section. Thus, this case is the unusual one that finally turns on the residual jurisdictional statute, 28 U.S.C. § 1294(1), which provides, with exceptions that we hold are inapplicable, that an appeal from a reviewable decision of a district court "shall be taken to the ... court of appeals for the circuit embracing the district." Inasmuch as the appeal has been taken from the United States District Court for the District of Delaware, which is within this circuit, we have jurisdiction.

In reaching our result we have not overlooked the opinion of the Court of Appeals for the Seventh Circuit in *In re BBC International, Ltd.*, 99 F.3d 811 (7th Cir.1996), a case that we brought to the parties' attention when we requested the supplemental briefs. In *BBC*, the regional court of appeals held that it did not have jurisdiction to entertain a petition for a writ of mandamus pursuant to 28 U.S.C. § 1651(a) which authorizes courts of appeals "in aid of their respective jurisdictions" to issue writs. *Id.* at 812–13. In reaching its conclusion, the court indicated that the "[p]ower to issue writs of mandamus depends on [the] power to entertain appeals when the case ends," and it thus held that it did not have jurisdiction to issue the writ because any appeal from a final decision in the case would have to be taken to the Court of Appeals for the Federal Circuit. *Id.* at 813. Thus, for the court to determine whether it had jurisdiction to entertain a writ of mandamus it had to work backwards from its conclusion on the question of whether it would have jurisdiction at the time of a final decision.

Here, however, our methodology is different as we are deciding the case on the basis of what court has jurisdiction now. Thus, our analysis in no way is confined by a provision such as that in section 1651(a) that a court may issue writs "in aid" of its jurisdiction. Consequently, the circumstance that the Court of Appeals for the Federal Circuit will have exclusive jurisdiction over any appeal from a final decision

in this case does not require that we conclude differently than we do with respect to our jurisdiction over the appeal in this case at this time.

**(b) Standard of Review**

**[2]  [3]  [4]**  We exercise plenary review over the legal questions concerning the applicability and scope of an arbitration agreement. *See Harris v. Green Tree Fin. Corp.,* 183 F.3d 173, 176 (3d Cir.1999) (considering a district court's denial of a motion to compel arbitration and stay proceedings pending arbitration); *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 7 F.3d 1110, 1113 (3d Cir.1993). Nevertheless, to the extent that the district court predicated its decision on findings of fact, our standard of review is whether those findings were clearly erroneous.[2]  **\*54**  *See Kaplan v. First Options of Chicago, Inc.,* 19 F.3d 1503, 1509 (3d Cir.1994).

**(c) Court Decides Arbitrability of Dispute**

**[5]  [6]  [7]**  When Congress enacted the Federal Arbitration Act, 9 U.S.C. §§ 1–13, it provided a framework for the development of a body of uniform federal law governing contracts within its scope. Therefore, if the Arbitration Act is applicable, federal law applies in questions regarding the construction and enforcement of an arbitration clause, even in those cases in which the district court's jurisdiction is based on diversity of citizenship.[3]  *See Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985); *Goodwin v. Elkins & Co.,* 730 F.2d 99, 108 (3d Cir.1984); *Becker Autoradio U.S.A., Inc. v. Becker Autoradiowerk,* 585 F.2d 39, 43 (3d Cir.1978). Accordingly, if the Arbitration Act applies, federal law, including general principles of contract law, determines whether there is a valid arbitration clause. *See First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995); *Mitsubishi,* 473 U.S. at 626, 105 S.Ct. at 3353; *Harris,* 183 F.3d at 178; *Goodwin,* 730 F.2d at 108.

**[8]  [9]  [10]  [11]**  In appropriate circumstances, 9 U.S.C. § 4 allows litigants to obtain an order requiring a reluctant party to arbitrate a dispute, as it directs the district court to order a party to arbitrate if it is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not an issue." *PaineWebber Inc. v. Hartmann,* 921 F.2d 507, 510 (3d Cir.1990); *see Harris,* 183 F.3d at 178–79. But under section 4 when one party refuses to

arbitrate, the issue of whether the dispute is within the scope of the agreement requires district court resolution. *See AT&T Techs., Inc. v. Communication Workers of Am.,* 475 U.S. 643, 649, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986); *PaineWebber,* 921 F.2d at 510–11. There is an issue in dispute in those circumstances because arbitration is "fundamentally a creature of contract," *Kaplan,* 19 F.3d at 1512, and thus arbitrators have the authority to resolve disputes only if the parties have agreed to submit to arbitration. *See AT&T Techs.,* 475 U.S. at 648, 106 S.Ct. at 1418 (" '[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' "). Accordingly, for a court to enter an order compelling arbitration there must be sufficient evidence that the parties consented to arbitration in an express agreement. *See United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960); *Kaplan,* 19 F.3d at 1512; *PaineWebber,* 921 F.2d at 511; *Par–Knit Mills, Inc. v. Stockbridge Fabrics Co.,* 636 F.2d 51, 54 (3d Cir.1980).

**[12]  [13]  [14]**  While a court asked to stay proceedings pending arbitration must determine  **\*55**  whether there is a valid agreement to arbitrate and, if so, whether the specific dispute falls within the substantive scope of that agreement, "its function [nevertheless] is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract." *United Steelworkers of Am. v. American Mfg. Co.,* 363 U.S. 564, 567–68, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960); *see also United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 36–37, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987). To determine whether a claim falls within the scope of an arbitration agreement, the "focus is on the factual underpinnings of the claim rather than the legal theory alleged in the complaint." *Svedala Indus., Inc.,* Civ. No. 96–4538, 1996 WL 590861, at \*3 (E.D.Pa.1996), citing, *inter alia, Mitsubishi,* 473 U.S. at 622, n. 9, 105 S.Ct. at 3351 n. 9. If the court determines that there is an agreement to arbitrate and that the issue in dispute falls within the scope of the agreement, it must submit the matter to arbitration without ruling on the merits of the case. *See Beck v. Reliance Steel Prods. Co.,* 860 F.2d 576, 579 (3d Cir.1988).

**[15]  [16]  [17]**  However, federal policy favors arbitration and thus a court resolves doubts about the scope of an arbitration agreement in favor of arbitration. *See Moses H. Cone,* 460 U.S. at 24–25, 103 S.Ct. at 941; *First Liberty*

*Inv. Group v. Nicholsberg*, 145 F.3d 647, 653 (3d Cir.1998); *Kaplan,* 19 F.3d at 1512. There is a "presumption of arbitrability." *PaineWebber,* 921 F.2d at 511; *see Pritzker,* 7 F.3d at 1114–15; *Stateside Mach. Co. v. Alperin,* 591 F.2d 234, 240 (3d Cir.1979) ("doubtful issues regarding the applicability of an arbitration clause are to be decided in favor of arbitration."). An order to arbitrate "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *United Steelworkers v. Warrior,* 363 U.S. at 582–83, 80 S.Ct. at 1353; *see also AT&T Techs.,* 475 U.S. at 650, 106 S.Ct. at 1419; *First Liberty Inv. Group,* 145 F.3d at 653; Schulte v. Prudential Ins. Co. of Am. (In re Prudential Ins. Co.), 133 F.3d 225, 231 (3d Cir.1998); *Sharon Steel Corp. v. Jewell Coal and Coke Co.,* 735 F.2d 775, 778 (3d Cir.1984) ("So long as the appellant's claim of arbitrability was plausible, interpretation of the contract should have been passed on to the arbitrator."). Yet there is a limit as to how far a court should go in resolving a dispute in favor of arbitration because, as we stated in *PaineWebber,* while interpretive disputes should be resolved in favor of arbitrability, "a compelling case for nonarbitrability should not be trumped by a flicker of interpretive doubt." *PaineWebber,* 921 F.2d at 513.

**(d) The 1992 Settlement Agreement and Release**

 **[18]**    **[19]**    As we have indicated, AVE does not dispute that it is bound by the agreements between ACS and Bard, including the arbitration clauses. Accordingly, the question for us to determine is whether the district court erred in holding that the dispute is not within the scope of the arbitration clauses. In the release [4] contained in the 1992 Agreement, each **\*56** party released the other party from demands, damages, liabilities, obligations, causes of action, agreements, suits, sums of money and rights, which were based on any actions or inaction occurring prior to the date of the agreement and which the party then owned or held. *See* app. at 87–88 (1992 Agreement ¶ 8). The agreement also provided for arbitration of "any dispute between the parties concerning the construction, interpretation and effect of this Agreement or any clause herein contained, or the rights and liabilities of the parties hereunder." App. at 92 (1992 Agreement ¶ 15.a).

But even if AVE predicates its claims on property interests extant prior to the date of the 1992 Agreement, inasmuch as Bard did not then own or hold the interests of AVE, Bard could not have agreed to release ACS from or arbitrate claims

relating to those interests. Accordingly, while it is true that when AVE accepted the assignment of the 1992 agreement from Bard it "step[ped] into [Bard's] shoes," *see Premier Dental Prod. Co. v. Darby Dental Supply Co.,* 794 F.2d 850, 853 (3d Cir.1986); *Professional Collection Consultants v. Hanada,* 62 Cal.Rptr.2d 182, 184, 53 Cal.App.4th 1016, 1018–19 (Cal.Ct.App.1997), the agreement to arbitrate cannot be applied to AVE's separate interests that Bard never owned. Therefore, although this litigation is extraordinarily complex, our resolution of it requires nothing more than the application of a rather straightforward principle.

ACS argues that *Svedala Industries,* 1996 WL 590861, supports the view that releases given by an assignor can bar independent, pre-existing claims of an assignee where the release explicitly applies to successors and assigns. It argues that, like AVE, the plaintiff in *Svedala* contended that the release could not bar its independent patent claims because the promisor did not hold rights to the patent at issue at the time of the release. In *Svedala,* two companies, Barmac and Tidco International, entered into a license agreement in 1988 regarding the #571 patent and related products that Barmac owned. The patent related to an impact breaking apparatus designed to reduce the size of certain minerals. Tidco and Svedala Industries, Inc. ("Svedala Inc.") were sister companies, as both were subsidiaries of Svedala Industries, AB ("Svedala AB"). *See Svedala,* 1996 WL 590861, at *1. In 1993, Tidco, Svedala Inc., and Svedala AB entered into a settlement agreement and mutual release with Kemper Equipment Inc. over certain disputes regarding the sales and operations of their respective crushing and screening equipment business and ancillary operations. *See id.* at *1.

The release agreement provided that the parties on behalf of themselves and their respective:

> predecessors, successors, heirs, assigns, ... subsidiaries, sister companies, parent companies and all persons, connected with them fully release and discharge the other and their respective predecessors, successors ... subsidiaries, sister companies, parent companies ... from any and all claims, demands, causes of action, obligations, damages and liabilities of any nature whatsoever, whether or not now known, suspected or claimed....

*Id.* at *1. About one year later in 1994 Tidco acquired Barmac. *See id.* at *2. Then in 1996, Tidco assigned the #571 patent Barmac previously owned to Svedala Inc. *See id.* at *2. Svedala Inc. then brought a lawsuit against Kemper and Rock Engineered for infringement of the #571 patent. Kemper and Rock Engineered moved to stay the proceedings and to compel arbitration. *See id.* at *2.

 **\*57**  The court rejected Svedala's argument that Svedala predicated on a contention that at the time of the 1993 release agreement it had no rights in the #571 patent and therefore had no patent infringement claim to release so that the matter did not fall within the arbitration clause. In rejecting the argument, the court reasoned, *inter alia,* that although Svedala Inc. did not have rights in the patent at the time of the release, Barmac did have rights in the patent at that time, and Tidco is the successor of Barmac [5] and is a sister company to the plaintiff Svedala Inc. *See id.* at *4. The release specified that it applied to all successors and sister companies and all persons connected with them, and Svedala Inc., in addition to being a party to the release, was a sister company of Tidco (a party to the release) and also later an assign. *See id.* at *1.

Obviously the situation in *Svedala* is completely distinguishable from that here. First of all, the plaintiff Svedala Inc. itself was a party to the broad 1993 release, whereas AVE was not a party to the 1992 release between Bard and ACS. Second, even if Svedala had not been a party to the release, Tidco was a party to the release and entered into it on behalf of its sister companies, of which Svedala was one. In this case, AVE was not bound to the release agreement between Bard and ACS through a relationship with either of the parties existing at the time of the execution of the release. Because the defendants in *Svedala* put forth evidence that they had made and offered for sale the accused infringing device prior to the time of the release, the fact that Svedala Inc. was a party to the release is relevant, even if the claim was unknown.

In contrast, in this case, although Bard was a party to the release and later assigned the contract to AVE, at the time of the release Bard did not own and, in fact, never owned the patents that are now the subject of the suit between AVE and ACS. This is a crucial difference because here, unlike in *Svedala,* the party seeking to invoke the arbitration clause is trying to apply the clause in an action on a patent that was not acquired from a party to the agreement to arbitrate. Thus, if AVE's action against ACS concerned patents that

Bard acquired after the date of the release and Bard assigned the contract containing that release to AVE, this case would be in a very different posture.

In another case that ACS cites to support its case, *Universal Studios Inc. v. Viacom Inc.,* 705 A.2d 579 (Del.Ch.1997), two parties entered into a joint venture agreement relating to the cable television business that included a non-compete provision requiring that the participants not engage in the same business as the joint venture. *See id.* at 583. Another party, Viacom, then bought the interests of one of the participants in the joint venture. This acquisition posed a problem because Viacom already was in the cable business. After complex negotiations and business developments that we need not describe, litigation ensued. The court held that the non-compete clause was effective with respect to Viacom. *See id.* at 590–91, 600.

*Universal Studios* is different from this case in that the parties there were involved in a joint venture and had signed a non-compete agreement and exclusivity agreement, and the purchaser of the interest of one joint venturer stepped into its shoes thereby becoming as subject to the non-compete provision of the joint venture agreement as to all its other provisions. Accordingly, the joint venture agreement **\*58** and the non-compete and exclusivity agreements gave rise to different fiduciary and contractual obligations and duties than those provided by a release or covenant not to sue which relate to obligations and claims of the parties subject to the agreement rather than claims of a third party. Thus, *Universal Studios* dealt with the obligations of a party to adhere to the terms of a joint venture when it acquired an interest in the venture. Accordingly, the factual pattern in *Universal Studios* is so distinct from that here that the case is not useful in resolving the controversy here.

*Reid v. Contel Cellular of Louisville, Inc.,* 208 F.3d 214 (table), 2000 WL 303005 (6th Cir.2000), is a more pertinent citation than *Svedala* and *Universal Studios*. In *Reid*, Contel acquired a portion of the business of McCaw Cellular, Reid's employer. Contel, however, though it hired other McCaw Cellular employees, did not hire Reid, according to Reid because of her physical handicap. Reid then filed an action under Kentucky law against Contel in state court which was removed to the district court. Reid, however, remained McCaw Cellular's employee.

Subsequently Reid left McCaw Cellular's employment and at that time received a severance package pursuant to which

**Medtronic AVE, Inc. v. Advanced Cardiovascular Systems, Inc., 247 F.3d 44 (2001)**

58 U.S.P.Q.2d 1596

she released McCaw Cellular and its successors and assigns from all possible claims. Contel then successfully moved for summary judgment on the ground that it was a "successor/ assign" of McCaw Cellular. On appeal, the court of appeals reversed, indicating that "Contel's assignee status vis-a-vis McCaw extends only to the subject matter contained within the purchase agreement and that it is illogical to allow Contel to benefit as assignee from every release to which McCaw has been a party since the date of the purchase agreement." *Id.* at *2.

We certainly agree with *Reid* because a contrary holding would have meant that the successor to a release could apply it to bar claims quite beyond anything the parties to the release could have contemplated. After all, a releasor giving a release to a second party hardly would anticipate that, as a result of an assignment, a third party could apply the release to a claim the releasor had against the third party that was quite independent of its claims against the second party. *Reid*, then, supports the result the district court reached in this case.

[20]    Moreover, a release usually will not be construed to bar a claim which had not accrued at the date of its execution or a claim which was not known to the party giving the release. *See Three Rivers Motors Co. v. Ford Motor Co., 522 F.2d 885, 895–96 (3d Cir.1975).* While it is true that cases ACS has cited support the view that a release can bar even unknown claims, these cases would be relevant only if it were Bard's unknown claims that AVE, stepping into Bard's shoes, wished to pursue against ACS. *See id. at 894–96* (holding that although ordinarily words of release will not be construed to bar unknown claim, parties intended to release accrued but unknown antitrust claims); *San Diego Hospice v. San Diego, 37 Cal.Rptr.2d 501, 504–05, 31 Cal.App.4th 1048, 1052–54 (Cal.Ct.App.1995).* Inasmuch as AVE seeks to assert claims that Bard never owned, the cases ACS cites are not relevant. Accordingly, it can be said with "positive assurance" that the claims in this case which AVE asserts against ACS are not within the scope of the release in the 1992 Agreement and that AVE thus is not bound to arbitrate disputes regarding them.

**(e) The 1998 Settlement and Covenant Not to Sue**

[21]    The covenant not to sue in the 1998 Agreement provided:

*59    Bard and its Affiliates covenant not to sue ACS and its Affiliates for any and all debts, claims, demands, and liabilities, whether known or unknown, suspected or unsuspected, which are based in any way on any

and all of ACS's and its Affiliates past and current domestic and foreign angioplasty catheters including stent delivery catheters. For purposes of this section, "ACS's and its Affiliates past and current domestic and foreign angioplasty catheters including stent delivery catheters" shall mean ACS's and its Affiliates past and current domestic and foreign angioplasty catheters including stent delivery catheters and shall specifically exclude any future modifications to such products.

1998 Agreement ¶ 4.b; app. at 110. However, the covenant not to sue does not apply to AVE's separate claims that Bard never owned.

In *Spindelfabrik Suessen–Schurr Stahlecker & Grill v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft, 829 F.2d 1075, 1079 (Fed.Cir.1987),* defendant Schubert had entered into a license agreement with Murata Machinery, Ltd. ("Murata") in 1982. Under this agreement, Murata granted a nonexclusive license to its patents to Schubert. *See id.* In 1983, Suessen sued Schubert for infringement of Suessen's #946 patent, which dominated the Murata patents under which Schubert had a license. *See id.* at 1076. Suessen later bought Murata's technology and business from Murata in 1984. *See id.* at 1079. Schubert, in defense against Suessen's action, argued that it had an implied license under the Suessen #46 patent, as Schubert's actions were merely an exercise of its license under the 1982 agreement. *See id.* Schubert also claimed that when Suessen acquired the Murata patents, it "stepped in the shoes" of Murata and therefore was barred by legal estoppel from suing Schubert for practicing the licensed technology. *See id.*

The court rejected Schubert's argument for an implied license. *Id.* at 1080. Under the agreements at issue, Suessen had not made a promise not to sue under Suessen's separate patents, and treating it as such would be an overly broad interpretation. *See id.* at 1081. "[A] patent license agreement is in essence nothing more than a promise by the licensor not to sue the licensee.... Indeed, the patentee of X and his licensee, when making, using, or selling X, can be subject to suit under other patents." *Id.*

Similarly, in *ZapatA Industries Inc. v. W.R. Grace & Co., 51 U.S.P.Q.2d 1619, 1620, 1999 WL 667419 (S.D.Fla.1999),* ZapatA Industries Inc. ("ZapatA") and Advanced Oxygen Technologies, Inc. ("AOTI") settled disputes between them by entering into a license agreement in 1991 under which AOTI was to receive ownership of the oxygen technology and all rights in related patents issued or applied for by either

party and ZapatA was given licenses of all patents covering the oxygen technology and agreed to pay royalties to AOTI. *See id.* at 1622. In 1992, following a breach of contract dispute, ZapatA and AOTI entered a settlement agreement under which ZapatA agreed to assign all patents and patent applications to AOTI and the license agreement was amended and would remain in effect unless the parties agreed on a new one. The settlement agreement did not expand or amend the provisions of the license agreement in which each party had made the representation that as of August 1, 1991 (the date of the license agreement), the technology licensed to the other party did not infringe any third party patent rights. *See id.* at 1622–23. In 1991 and 1992, after the date of the license agreement between AOTI and ZapatA, W.R. Grace & Co. ("Grace") **\*60** independently obtained two patents (which AOTI never owned). *See id.* at 1623. In 1995, Grace acquired AOTI's oxygen scavenging technology and its patents, under which ZapatA was licensed by AOTI. The purchase agreement did not contain a provision that would release ZapatA or any other third party from liability for infringing the Grace patents. *See id.* at 1623.

ZapatA claimed but Grace denied that ZapatA had an "implied license" under the Grace patents because Grace assumed AOTI's warranty of non-infringement under the AOTI ZapatA settlement agreement. *See id.* at 1625. Consequently, ZapatA instituted an action seeking a declaration that Grace was precluded from enforcing its patents against ZapatA by reason of implied license and estoppel. Grace filed a motion for summary judgment on this issue because AOTI never owned the Grace patents or had any rights under those patents and therefore did not have any right under them to provide to ZapatA through the AOTI–ZapatA agreements. *See id.* The court stated: "ZapatA received nothing more from AOTI than a promise not to be sued by AOTI on AOTI's patents. That promise did not, and ... could not, apply to Grace's patents which AOTI never owned and never had any rights under. To the extent Grace assumed the license, it owed ZapatA nothing more than what AOTI had owed.... Grace's 'commitment' does not include a promise, express or implied, not to sue under Grace's own patents." *Id.* at 1626–27.

[22]  [23]  [24]  [25]  [26]  While obviously *Schubert* and *ZapatA* involve facts distinct from those here, similar principles apply in this case. At the time of the 1998 Agreement, Bard and ACS contracted for a covenant not to sue. When AVE stepped into Bard's shoes, it had to adhere to the covenant not to sue on *Bard's* claims. But absent a

provision stating otherwise, assignment of a contract will result in the assignee stepping into the shoes of the assignor with regard to the rights that the assignor held and not in an expansion of those rights to include those held by the assignee. "An assignment does not modify the terms of the underlying contract. It is a separate agreement between the assignor and the assignee which merely transfers the assignor's contract rights, leaving them in full force and effect as to the party charged.... Insofar as an assignment touches on the obligations of the other party to the underlying contract, the assignee simply moves into the shoes of the assignor." *Citibank, N.A. v. Tele/Resources, Inc.*, 724 F.2d 266, 269 (2d Cir.1983). "[A]n assignment is intended to change only who performs an obligation, not the obligation to be performed." *Capitan Enter., Inc. v. Jackson*, 903 S.W.2d 772, 776 (Tex.App.—El Paso 1994). " 'An assignee obtains only the right, title and interest of his assignor at the time of his assignment, and no more.' " *Id.*, citing *State Fidelity Mortgage Co. v. Varner*, 740 S.W.2d 477, 480 (Tex.App.— Houston [1st Dist.] 1987). Thus, AVE did not by accepting the assignments from Bard limit its rights under the patents involved in this action which it did not obtain from Bard.

ACS argues that if Bard had acquired a new patent the day after the 1998 Agreement was executed, the agreement by its terms would have prevented Bard from asserting that new patent against the ACS products because the covenant not to sue is product based, not patent based. ACS maintains that the district court focused on the technology and the patents rather than the products. [6] *See* Br. of Appellant 23. **\*61** But the "stepping into the shoes" assignment means that even if Bard had obtained a new patent related to catheters the day after the Agreement was executed, AVE could not now sue ACS based on that patent if the covenant not to sue was interpreted to cover a patent that was obtained after the covenant not to sue was signed. [7] However, if AVE had acquired a new patent the day after the parties executed the 1998 Agreement, it still could sue on it because Bard never would have owned that patent and therefore the patent would not have been within the scope of the agreement.

### III. CONCLUSION

For the foregoing reasons, we will affirm the district court's order denying ACS's motion to stay the proceedings in the district court pending arbitration.

**Parallel Citations**

58 U.S.P.Q.2d 1596

Footnotes

1　Medtronic, Inc. acquired AVE in January 1999 and thus AVE has been known as Medtronic AVE, Inc. since that time. The district court, by an order dated October 22, 1999, allowed the caption of the consolidated cases to be amended to reflect the name change.

2　When a district court interprets language contained in contracts we review its determination under the clearly erroneous standard. *See John F. Harkins Co. v. Waldinger Corp.*, 796 F.2d 657, 658 (3d Cir.1986). But if the district court engages in contract construction, we exercise plenary review. *See id.* at 659. "By 'interpretation of language' we determine what ideas that language induces in other persons. By 'construction of the contract,' as that term will be used here, we determine its legal operation—its effect upon the action of courts and administrative officials. If we make this distinction, then the construction of a contract starts with the interpretation of its language but does not end with it; while the process of interpretation stops wholly short of a determination of the legal relations of the parties." *Id.* at 659 (citing 3 Corbin, Corbin on Contracts, § 534 at 9 (1960)).

3　Although the Arbitration Act creates federal substantive law regarding agreements to arbitrate, it does not create any independent federal-question jurisdiction under 28 U.S.C. § 1331. 9 U.S.C. § 4 "provides for an order compelling arbitration only when the federal district court would have jurisdiction over a suit on the underlying dispute; hence, there must be diversity of citizenship or some other independent basis for federal jurisdiction before the order can issue.... Section 3 likewise limits the federal courts to the extent that a federal court cannot stay a suit pending before it unless there is such a suit in existence." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 26 n. 32, 103 S.Ct. 927, 942 n. 26, 74 L.Ed.2d 765 (1983).

4　A release is a provision that intends a present abandonment of a known right or claim. By contrast, "a covenant not to sue also applies to future claims and constitutes an agreement to exercise forbearance from asserting any claim which either exists or which may accrue...." *McMahan & Co. v. Bass*, 673 N.Y.S.2d 19, 21, 250 A.D.2d 460, 461 (1998).

5　We also note that the district court in *Svedala* apparently regarded Barmac as a predecessor of Tidco for purposes of the release. *See Svedala*, 1996 WL 590861, at *4.

6　The district court reasoned that there "can be no question but that catheters and stents involve different technology and patents and that AVE developed its stent technology independent of Bard. The plain and unambiguous language of the 1998 Agreement, therefore, demonstrates that the litigation at issue, involving stent technology, is not an arbitrable grievance under the 1998 Agreement." App. at 17 (Mem. Order at 13).

7　It is uncertain whether the covenant not to sue would be interpreted to cover a patent that was obtained after the covenant not to sue was signed inasmuch as the covenant covers claims that are based on ACS's and its Affiliates *past and current* domestic and foreign angioplasty catheters including stent delivery catheters, specifically excluding any future modifications to such products. Therefore, it is possible that a patent obtained after this agreement still would be based on a "past or current" catheter; however, it is also possible that a patent obtained after the agreement would not be considered based on such a catheter and could, for example, be considered a "future modification."

---

**End of Document**　　　　　　　　© 2014 Thomson Reuters. No claim to original U.S. Government Works.

 © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 101



Federal Court                                    Cour fédérale

2010 FC 1265 (CanLII)

**Date: 20101222**

**Docket: T-1272-97**

**Citation: 2010 FC 1265**

**BETWEEN:**

**MERCK & CO. INC. and
MERCK FROSST CANADA LTD.**

**Plaintiffs/
Defendants by Counterclaim**

**and**

**APOTEX INC. and
APOTEX FERMENTATION INC.**

**Defendants/
Plaintiffs by Counterclaim**

<u>**PUBLIC REASONS FOR JUDGMENT**</u>
**(Confidential Reasons for Judgment issued on December 9, 2010)**

<u>**SNIDER J.**</u>

**I.**     <u>**Introduction**</u>

A.     *Overview*

[1]     The subject of this litigation is the drug lovastatin, sold in Canada under the trade name

MEVACOR since 1988 by Merck Frosst Canada Inc. (or its successor, Merck Frosst Canada

Ltd. (Merck Frosst), one of the Plaintiffs in this action). MEVACOR was the first commercialized "statin" sold in the Canadian market and is used for the treatment of elevated blood cholesterol. Until January 31, 2001, when the patent expired, MEVACOR was the subject of Canadian Patent No. 1,161,380 ('380 Patent) issued January 31, 1984 to Merck & Co., Inc. (Merck & Co.), the other Plaintiff in this action. Stated briefly, the '380 Patent is a product-by-process patent to lovastatin when made with a micro-organism known as *Aspergillus terreus* (also referred to as *A. terreus*). Merck Frosst sells MEVACOR in Canada under licence from Merck & Co. In these reasons, I will refer to Merck Frosst and Merck & Co., collectively, as "Merck" or the "Plaintiffs".

[2]     In March 1997, Apotex Inc., one of the Defendants in this action, began selling its brand of lovastatin tablets in Canada (Apo-lovastatin). The active pharmaceutical ingredient (API) that remains in dispute in this litigation was made either by Apotex Fermentation Inc. (AFI), the other Defendant in this action, in Winnipeg, Manitoba, or by Qingyuan Blue Treasure Pharmaceuticals Co. Ltd. (Blue Treasure), in China. In these reasons, I will refer to Apotex Inc. and AFI, collectively, as "Apotex" or the "Defendants".

[3]     Merck claims that the Defendants infringed the '380 Patent:

- through the use of infringing API that was made in China and shipped from Blue Treasure to AFI;

- through the "salting" of non-infringing lovastatin with infringing lovastatin;

2010 FC 1265 (CanLII)

- through the manufacturing of one batch of infringing API (batch CR0157) in Winnipeg by AFI; and

- with some other small amounts of infringing product made in Winnipeg by AFI.

[4]    The Defendants claim that there has been no infringement of the '380 Patent and that, in any event, the '380 Patent is invalid. Further, they argue that Merck & Co. has no standing to bring this action, having assigned all of its interest in the '380 Patent to an affiliate, Merck and Company, Incorporated (MACI).

[5]    The application leading to the '380 Patent was filed in Canada on June 11, 1980. According to s. 78.1-78.2 of the present *Patent Act*, R.S.C. 1985, c. P-4, as amended, patent applications filed before October 1, 1989, are to be dealt with under the provisions of the *Patent Act* as they read immediately before that date. Accordingly, references in these reasons to the *Patent Act* [referred to as the *Patent Act* or the *Act*], unless specifically noted otherwise, will be to the *Act* as it stood immediately prior to October 1, 1989.

B.    *Summary of issues and conclusions*

[6]    Very briefly, although there are a myriad of subsidiary issues, the key questions to be addressed in this proceeding are as follows:

1.    Does Merck & Co. have standing to bring this action?

2.        Have the Defendants infringed the '380 Patent?

3.        Is the '380 Patent valid?

[7]      As explained in these reasons, I have concluded that:

1.        Merck & Co. has standing to bring this action;

2.        The '380 Patent was infringed; and

3.        The '380 Patent is valid.

[8]      As a result, the claims of the Plaintiffs will be allowed, to the extent described below, and

the counterclaims of the Defendants will be dismissed.

[9]      Finally, by way of introduction, I note that this trial is subject to a bifurcation order dated

November 14, 2003 (Bifurcation Order). Accordingly, the question of damages will be

considered in a subsequent proceeding.

2010 FC 1265 (CanLII)

C.      *Background to this litigation*

[10]    For almost ten years after its introduction into the Canadian market, Merck enjoyed its

patent for MEVACOR without challenge. In 1993, Apotex Inc. tried to enter the market with a

generic version of lovastatin and, to that end, applied to the Minister of Health for a Notice of

Compliance (NOC) pursuant to the relevant provisions of the *Patented Medicines (Notice of*

*Compliance) Regulations*, SOR/93-133, as amended by SOR/98-166 [*PMNOC Regulations* or

the *Regulations*]. Apotex alleged that it would not infringe the '380 Patent, as it would not be

using a process to produce lovastatin that would fall within the scope of the patent.

[11]    As permitted by the *Regulations*, in April 1993, Merck filed an application with this

Court to prohibit the Minister from issuing an NOC to Apotex Inc. A key feature of the *PMNOC*

*Regulations* is the imposition of a statutory stay upon the filing of an application for prohibition

until a determination can be made as to whether the "second person" – in this case, Apotex Inc. –

was justified in its claims that its generic drug would not infringe any existing patents.

Section 6(1) of the *Regulations*, as they were at that time, automatically prohibited the Minister

from issuing an NOC to Apotex Inc. for up to 30 months.

[12]    The statutory stay expired on December 1, 1996, without any hearing before the Court on

the merits of the prohibition application. Merck Frosst Canada Inc. sought an extension of the

stay. In an oral judgment dated March 26, 1997, Justice Rothstein (then a judge with the Federal

Court, Trial Division) refused to extend the time period or to issue a prohibition order. An NOC

was issued to Apotex Inc. on March 27, 1997.

2010 FC 1265 (CanLII)

[13]    Following the issuance of the NOC and a series of Court challenges, two actions were

commenced:

1.    Merck commenced this action against Apotex Inc. and Apotex Fermentation Inc.

(AFI) for patent infringement (Court File T-1272-97). The statement of claim was

filed on June 12, 1997.

2.    By statement of claim filed June 29, 2001, Apotex Inc. seeks compensation from

Merck under s. 8 of the *PMNOC Regulations* (Court File No. T-1169-01).

[14]    In 2001, Apotex Inc. commenced a third party claim against Biogal Pharmaceutical

Works Ltd. (Biogal) in Court File No.T-1272-97. The subject matter of the third party claim was

300 kg of bulk lovastatin acquired by Apotex Inc. from Biogal pursuant to a Supply Agreement.

In its third party claim, Apotex Inc. claimed that, in the event that the '380 Patent is held to be

valid and infringed, Biogal was liable for any relief that may have been awarded against Apotex

Inc. Biogal participated in the T-1272-97 litigation until a settlement was reached among the

parties to this litigation. By Court Order dated May 28, 2010, the Plaintiffs' claims against

Apotex Inc. and AFI in the Amended Fresh as Amended Statement of Claim and referenced in

paragraphs 36 and 67-73 therein relating to lovastatin supplied by Biogal to Apotex Inc. were

dismissed.

[15]    Both actions were heard together in a trial that commenced on February 1, 2010. These

Reasons deal only with the issues in Court File No. T-1272-97 – Merck's claim of infringement

2010 FC 1265 (CanLII)

and Apotex's counterclaim of patent invalidity. Separate Reasons for Judgment and Judgment have been issued contemporaneously with these Reasons in Court File No. T-1169-01.

[16]    During the 35-day evidentiary phase of this trial, many witnesses appeared, both as expert and fact witnesses. In Appendix A, I have set out a brief overview of the expert and fact witnesses who appeared during the trial and the areas to which they testified. For the expert witnesses, I have set out a very short description of their education and experience in the areas for which this Court found each of them to be qualified. More detailed references to the witnesses' evidence and testimony are contained in the appropriate sections of these reasons.

## II.    Table of Contents

[17]    To assist the reader, the following sets out a Table of Contents for these Reasons with paragraph numbers for each heading

I.     **Introduction** .......................................................................**1 – 16**
       A.     *Overview* ............................................................... 1 - 5
       B.     *Summary of issues and conclusions* ........................ 6 - 9
       C.     *Background to this litigation* ............................... 10 - 16
II.    **Table of Contents** ............................................................**17**
III.   **Background** ......................................................................**18 - 39**
       A.     *The '380 Patent and Statins* .................................. 18 - 24
       B.     *History of AFI/Blue Treasure Production* ............... 25 - 39
IV.    **Standing** ..........................................................................**40 - 56**
V.     **Claims Construction** ........................................................**57 - 130**
       A.     *Principles of Claims Construction* ........................ 57 - 62
       B.     *The hypothetical skilled person* ............................ 63 - 67
       C.     *The Patent Specification* ...................................... 68 - 81
       D.     *The claims in issue* .............................................. 82 - 87
       E.     *The meaning of "a microfungus of genus
              Aspergillus in Claim 1* ........................................ 88 - 99
       F.     *The meaning of "isolating the products"* ............ 100 - 109

2010 FC 1265 (CanLII)

|  | G. | *Inclusion of non-producing strains* | 110 - 121 |
|  | H. | *The promised use of the '380 Patent* | 122 - 126 |
|  | I. | *Summary on Claims Construction* | 127 - 130 |
| **VI.** | **Infringement – Background** | | **131 - 188** |
|  | A. | *Introduction* | 131 - 133 |
|  | B. | *Burden* | 134 - 186 |
|  | C. | *Summary of Merck's case on infringement* | 187 - 188 |
| **VII.** | **Infringement – the Circumstantial Case** | | **189 - 360** |
|  | A. | *Blue Treasure "Salting"* | 189 - 208 |
|  | B. | *Infringement by Blue Treasure from March 1998* | 209 - 335 |
|  |  | (1)    Batch Records | 211 - 249 |
|  |  | (2)    P2000 | 250 - 259 |
|  |  | (3)    Fermentation Duration | 260 - 270 |
|  |  | (4)    Increased Titres | 271 - 294 |
|  |  | (5)    Motivation, Means and Opportunity | 295 - 320 |
|  |  | (a)    *Motivation* | 296 - 310 |
|  |  | (b)    *Means* | 311 - 316 |
|  |  | (c)    *Opportunity* | 317 - 320 |
|  |  | (6)    Blue Treasure Conduct | 321 - 335 |
|  | C. | *Conclusion on Blue Treasure Circumstantial Evidence* | 336 - 342 |
|  | D. | *AFI Batch CRO 157* | 343 - 360 |
| **VIII.** | **Infringement – the DNA Evidence** | | **361 - 463** |
|  | A. | *Introduction* | 361 - 369 |
|  | B. | *Nexus between the samples tested and the allegedly infringing lovastatin* | 370 - 377 |
|  | C. | *Reproducibility of the testing in the Davies lab* | 378 - 390 |
|  | D. | *Failure of Dr. Davies to find C. fuckelii DNA in the tablets from Batch CR0157* | 391 - 395 |
|  | E. | *DNA evidence and the Apotex Experts* | 396 - 422 |
|  |  | (1)    What is Ancient DNA? | 402 - 404 |
|  |  | (2)    Is DNA derived from a pharmaceutical product degraded or fragmented? | 405 - 410 |
|  |  | (3)    Can one compare how DNA derived from a pharmaceutical product is fragmented to how DNA from "ancient DNA" is degraded? | 411 - 414 |
|  |  | (4)    Are the opinions of the Defendants' experts relevant to fragmented DNA | 415 - 422 |
|  | F. | *Contamination* | 423 - 444 |
|  |  | (1)    Dr. Davies | 425 – 430 |
|  |  | (2)    Dr. Taylor | 431 - 439 |
|  |  | (3)    Dr. Gilbert | 440 - 444 |

G.     *Other criticisms of Dr. Davies's opinion* .........................445 - 463

    (1)    Lack of knowledge................................................449 - 451

    (2)    Incomplete Report & Lack of
          Disclosure ............................................................452 - 457

    (3)    Unexpected results ..............................................458 - 463

**IX.    Infringement – Conclusion................................464 - 466**

**X.    Validity .................................................................467 - 609**

A.    *Introduction*......................................................467 - 468

B.    *Overbreadth* ......................................................469 - 475

C.    *Utility* ...............................................................476 - 532

    (1)    General Principles ...............................................476 - 485

    (2)    The '380 Patent....................................................486 - 488

    (3)    Lack of Utility......................................................489 - 495

    (4)    Sound Prediction ..................................................496 - 532

        (a)    *The Factual Basis* ....................................498 - 511

        (b)    *Line of Reasoning* ....................................512 - 519

        (c)    *Disclosure* ................................................520 - 532

D.    *First Inventorship/Missed Conflict* ....................533 - 609

    (1)    Introduction .........................................................533 - 534

    (2)    Legal Principles ...................................................535 - 540

    (3)    Was there a missed conflict .................................541 - 558

    (4)    Did the Endo application disclose the invention
          of the '380 Patent? ..............................................559 - 562

    (5)    Red Yeast Rice/Anticipation................................563 - 609

        (a)    *Principles of Anticipation* .........................563 - 569

        (b)    *Background on Red Yeast Rice* .................570 - 571

        (c)    *Legal Consequences of lovastatin in*
            *Red Yeast Rice* .........................................572 - 583

        (d)    *Evidence of lovastatin in Red Yeast*
            *Rice prior to the priority date* ..................584 - 598

        (e)    *Disclosure of lovastatin in Red Yeast*
            *Rice* ..........................................................599 - 609

**XI.    Conclusion ...........................................................610 - 642**

A.    *Damages or Profits*...........................................610 - 624

B.    *Exemptions from Liability*.................................625 - 637

C.    *Conclusion* ........................................................638 - 642

**Appendix A – List of Witnesses ............................................. A1 – A11**

**Appendix B – Claims 1 to 8 and 13 to 15 of the
    '380 Patent  .......................................................B1 – B4**

2010 FC 1265 (CanLII)

III.    **Background**

A.    *The '380 Patent and Statins*

[18]    Lovastatin, as made by the process of the '380 Patent, is an example of a medicinally-valuable drug that is produced by a process of fermentation. In very simple terms, the laboratory begins with a micro-organism - in this case, *Aspergillus terreus* – and, through increasingly larger fermentations carried out in very controlled settings, manufactures the API of interest.

[19]    The '380 Patent relates to "hypocholesteremic products from the cultivation of a microfungus of the species <u>Aspergillus</u>." Dr. Antonio Gotto provided very helpful background information on the role of "hypocholesteremic" medications, such as lovastatin, in the treatment of cardiovascular disease. In addition to being qualified because of his stature as a professor of medicine, Dr. Gotto's experience as a treating physician during the 1970s and 1980s was directly relevant to the matters before me.

[20]    Atherosclerosis is a type of cardiovascular disease that occurs when cholesterol and other substances build up in the walls of arterial blood vessels to form plaque. Over time, the build-up of plaque thickens and hardens the arterial walls restricting the flow of blood from the heart. Heart attacks and strokes may follow.

[21]    The build-up of plaque is promoted by low density lipoproteins (referred to as LDL or "bad" cholesterol). According to Dr. Gotto, the relationship between reducing "bad" cholesterol and reducing the risk of cardiovascular disease has been known for over 20 years. Thus, a primary goal of medicine is to lower LDL cholesterol. The class of drugs known as "statins" are of great assistance in achieving this goal.

[22]    In Dr. Gotto's words (Gotto Expert Report, Exhibit 2, paras. 24, 38):

> It was only with the discovery of statins – starting with lovastatin (MEVACOR®) in the late 1970s – that treatment of elevated cholesterol became much more effective.
>
> . . .
>
> The single most significant discovery to date for the treatment of cholesterol was the discovery of lovastatin in the late 1970s.

[23]    Dr. Gotto described how statins work to lower cholesterol. Statins reduce the production of cholesterol by the liver. Specifically, statins block the liver enzyme known as HMG-CoA reductase (hydroxyl-methylglutaryl-coenzyme A reductase); hence, statins are known as HMG-CoA reductase inhibitors. Dr. Gotto made the general comment that "statins changed medical practice" (Gotto Expert Report, Exhibit 2, para. 50). No one disagreed with this opinion.

[24]    Lovastatin, as manufactured and sold by Merck (or its predecessors in interest) under the trade name MEVACOR, was the first commercially-available statin.

2010 FC 1265 (CanLII)

B.      *History of AFI/Blue Treasure Production*

[25]    An important part of the story for this litigation is how Apotex Inc. became interested in

lovastatin and how Apotex Inc., AFI and the Blue Treasure Joint Venture became involved.

[26]    Dr. Bernard Sherman is currently the Chairman and Chief Executive Officer of Apotex

Inc., a company that he founded in 1973. During his oral testimony, Dr. Sherman described

Apotex Inc. in the following terms:

> It's a pharmaceutical manufacturer, the largest in Canada today.
> We produce primarily generic pharmaceutical products, but also
> some innovative products.  We have huge dosage form
> manufacturing facilities.  We are vertically integrated. We have
> chemical plants.  We spend enormously on research and
> development, the largest in Canada, and we have divisions in many
> countries around the world and factories in many countries,
> including chemical plants.

[27]    Apotex Inc. recognized the significance of the lovastatin market. Dr. Sherman described

lovastatin, in 1993, as "one of the biggest selling drugs in the country at the time, close to $100

million a year".

[28]    Of particular relevance to this litigation, Dr. Sherman told the Court how his company's

version of lovastatin became entangled with a suddenly-changed regulatory regime in 1993.

Until 1993, it was possible for a generic company to obtain a compulsory licence to allow it to

produce a generic equivalent of a patented medicine. The original intent of Apotex Inc. was to

obtain a compulsory licence to use *Aspergillus terreus* to make lovastatin. According to

2010 FC 1265 (CanLII)

Dr. Sherman, in 1993, the licence regime and licences issued under it were cancelled. They were

replaced with the *PMNOC Regulations* outlined by Dr. Sherman as follows:

> In 1993, not only were the licences – the licence regime
> eliminated, including retroactive cancellation of some licences –
> one applicable to this case – but, in addition to that, a new regime
> was instituted, called the Patented Medicines (Notice of
> Compliance) Regulations, pursuant to which patentees or first
> persons, persons who had approval for the original brand, could list
> patents which they purported were relevant to a product; and, if
> they listed the patent, then a generic applicant, a second person,
> cannot get federal approval until the requirements of those
> regulations are satisfied, which means that the second person has
> to serve a notice of allegation in which it is alleged that the patent
> will not be infringed or is invalid. Then, within 45 days, if the
> patentee or first person institutes a prohibition application, which
> almost always happens, there is a delay in federal approval until
> that matter is resolved, which can take a very long time.

[29]     A relationship of interest to this case is that of Apotex Inc. and AFI. In the mid-1980s,

Apotex Inc. contracted with ABI Biotechnology Inc. (ABI) in Winnipeg to develop and

manufacture certain fermented products. Ultimately, the assets of ABI were bought by Apotex

Inc. and the company was renamed as AFI. Through AFI, Apotex Inc. gained the capacity to

manufacture products using fermentation processes. AFI added to the vertical integration of the

Apotex family of business entities.

[30]     AFI was to be the source of the API lovastatin. As described in detail by Dr. Lasure, in

her Expert Report (Exhibit 48), and by Dr. David Cox, during his testimony, the following steps

were taken by AFI:

- AFI acquired Merck's deposited strains of *Aspergillus terreus* from the American
  Tissue Culture Collection (ATCC), including a strain designated ATCC 20542.

2010 FC 1265 (CanLII)

- ATCC 20542 was then mutated by UV mutagenesis twice to create a mutant strain of ATCC 20542.

- AFI designated the strain as BN-2-70 and the process for manufacturing lovastatin using this strain as AFI-1.

- Between 1991 and 1995, AFI developed a commercial scale fermentation process for making lovastatin using AFI-1 – that is, using *Aspergillus terreus*.

[31]    In 1992, Dr. Sherman testified that, anticipating the intent of the government, Apotex began to look for a non-infringing process. Apotex "had to find a microbe that would produce lovastatin that was not *Aspergillus terreus*". In her Expert Report, Dr. Lasure summarized the context and the results of this search:

- On June 25, 1988, the Journal of Antibiotics published an article entitled "The Synthesis of  Compactin (ML-236B) and Monacolin K in fungi" written by Dr. Akira Endo et al. Dr. Endo reported on fungal strains capable of producing Monacolin K (known now to be lovastatin), including *Phoma* species M4452.

- In June 1992, a sample of *Phoma* Sp. M4452 was sent to AFI by Dr. Endo.

2010 FC 1265 (CanLII)

- For the next six months or so, AFI took steps in its laboratories to confirm and develop the production of lovastatin from the Endo sample. The process was initially referred to as *Phoma* #4; later designated as "AFI-4".

- By May 1993, a sample of the AFI-4 product was confirmed to be *Coniothyrium fuckelii* (also referred to as *C. fuckelli*).

- Apotex Inc. filed a patent for the AFI-4 process – a process for making lovastatin using *Coniothyrium fuckelii* – that subsequently issued as United States Patent No. 5,409,820 on April 25, 1995.

[32]    As described by a number of witnesses, including Dr. Cox and Ms. Lori Christofalos, AFI's production of AFI-4 lovastatin and shipments to Apotex Inc. can be divided into three phases:

1.    Phase 1 occurred between June 1996 and August 1997, during which all production was done solely at AFI facilities in Winnipeg. The finished API was shipped to Apotex Inc., beginning with the shipment of batch CR0157 on December 2, 1996.

2.    In Phase 2, Blue Treasure (discussed below) manufactured approximately 70 batches of technical-grade lovastatin. The product was then shipped to AFI for

2010 FC 1265 (CanLII)

processing into API and shipment to Apotex Inc. Phase 2 lasted from about

mid-1997 to January 1998.

3.      Phase 3 consisted of approximately 294 batches of API-grade lovastatin

manufactured entirely at Blue Treasure after March 1998.The product was sent to

AFI, where "some testing" was carried out, and then shipped to Apotex Inc. This

phase continued until October 1999, with the last shipment received at AFI on

March 2, 2000.

[33]    The joint venture company known as Qingyuan Blue Treasure Pharmaceuticals Co. Ltd.

(Blue Treasure or Blue Treasure Joint Venture) is a critical component of this litigation.

Dr. David Cox, President and Chief Executive Officer of AFI from September 1994 to

September 1997, provided a clear and helpful background about this joint venture. Dr. Cox was

on the Board of Directors of Blue Treasure during the same period.

[34]    Blue Treasure was formed pursuant to a Joint Venture Contract dated January 25, 1994

among Qingyuan New North River Pharmaceutical Co. Ltd. (New North River), Zuhai Special

Economic Zone Lizhu Pharmaceutical Group Co. Ltd., Sichuan Industrial Institute of

Antibiotics, AFI and BIOTECS. AFI held a 42.5% share of the Blue Treasure Joint Venture. As

set out in clause 4.01 of the Joint Venture Contract, the purpose of the Blue Treasure Joint

Venture was as follows:

The purpose of the Joint Venture is to renovate and operate the
Factory, to purchase or otherwise obtain all necessary raw
materials and equipment required for the production of the

Products, and to produce, market, distribute and sell Products at a
profit to customers both in China and abroad.

[35]    In 1994, New North River was already an operational pharmaceutical facility with

capacity for carrying out fermentation processes. Under the Joint Venture Contract, New North

River contributed a portion of its facilities located on its property to the Blue Treasure Joint

Venture.

[36]    As defined in the Joint Venture Contract, "Products" meant "the drug Lovastatin as Bulk

Products and Finished Products". Dr. Cox stated that the Blue Treasure Joint Venture "was set

up to produce and distribute and sell Lovastatin in the Chinese domestic market". AFI's main

contribution to the Blue Treasure Joint Venture was the organism that produced lovastatin.

Dr. Sherman told the Court that the decision to move the production of lovastatin to Blue

Treasure was made for the following reasons:

> [Blue Treasure] had capacity there, and we wanted to move the
> production for Canada out of Winnipeg, both to bring costs down
> and to free up Winnipeg to go on for other things that would be
> needed later.

[37]    In the spring of 1995, AFI transferred to Blue Treasure the information and knowledge it

had developed to manufacture lovastatin made from *Aspergillus terreus*. Among the things

transferred to Blue Treasure were: a document setting out the process for producing lovastatin

from *Aspergillus terreus*, entitled "Scale-up Process to 15000L Fermenter"; and, 25 vials of

strain BN-2-70 from seed bank A18-378, and 5 rice cultures from batch #CF0057 (shipped to

Blue Treasure on May 15, 1995). Blue Treasure began producing lovastatin, using the AFI-1

process, in 1996.

2010 FC 1265 (CanLII)

[38]    In about April 1997, AFI determined that it would transfer the AFI-4 technology to Blue Treasure together with a guarantee that AFI would purchase the lovastatin from Blue Treasure, provided that the lovastatin was all made by the AFI-4 process and that "the Blue Treasure facility be exclusively dedicated to AFI-4". The terms of this arrangement were set out in a letter agreement dated April 16, 1997 between AFI and Blue Treasure. Dr. Cox described the impact of the AFI-4 transfer as "transformative in a positive way". The transfer of AFI-4 to Blue Treasure was made with very explicit instructions that the lovastatin purchased by Apotex was to be produced exclusively with the AFI-4 *Coniothyrium fuckelii* strain, with no possibility of contamination from *Aspergillus terreus* (see, for example, letter dated September 12, 1997 from Mr. Fowler to Mr. Zhou). Problems quickly arose. These problems are discussed later in Section VII of these reasons.

[39]    From 1997 to 1999, AFI imported lovastatin from Blue Treasure in accordance with the terms of the Blue Treasure Joint Venture. The lovastatin API was then sold to Apotex Inc.

**IV.    <u>Standing</u>**

[40]    The first issued raised by Apotex is the standing of Merck & Co. to bring this action.

2010 FC 1265 (CanLII)

[41]    The authority of a party to claim damages for patent infringement is found in s. 55(1) of

the *Patent Act*.

> 55.(1) Any person who infringes a patent is liable to the patentee and to all persons claiming under him for all damages sustained by the patentee or by any person, by reason of the infringement.

> 55.(1) Quiconque viole un brevet responsable, envers le breveté et envers toute personne se réclamant du breveté, des tous dommages-intérêts que cette violation a fait subir au breveté ou à cette autre personne.

[42]    The term "patentee" is defined in s. 2 of the *Patent Act* to mean "the person for the time

being entitled to the benefit of a patent".

[43]    The '380 Patent was granted to Merck & Co. In 1985, Merck & Co. entered into a

License Agreement with Merck Frosst (the 1985 License Agreement), granting an non-exclusive

licence to Merck Frosst. That Agreement was amended, effective January 1, 1989, to add the

'380 Patent. Subsequently, as of January 1, 1992, Merck & Co. entered into an agreement (the

MACI Agreement) with Merck and Company, Incorporated (MACI) pursuant to which Merck &

Co., as Licensor, granted to MACI, as Licensee:

> A permanent and exclusive royalty-free license for the Intellectual Property which Licensor owns or hereinafter acquires, but for any outstanding licenses for the Intellectual Property which already granted pursuant to the License Agreement, dated January 1, 1985, and amendments thereto between Merck & Co., Inc. and Merck Frosst Canada Inc.

[44]    Apotex does not dispute Merck Frosst Canada Ltd.'s standing in this action, as the

successor in interest to Merck Frosst Canada Inc. However, Apotex submits that Merck & Co.

has no standing to bring this action, having assigned all of its interest in the '380 Patent to MACI

2010 FC 1265 (CanLII)

pursuant to the MACI Agreement. Apotex asserts that, as of November 1992, MACI had the

"full and unrestricted benefit of the '380 Patent". Merck & Co. lost all benefit of the patent and,

as a result, the right to damages under s. 55 (1) of the *Patent Act*. Apotex argues that, although

the agreement is entitled "License Agreement", a review of the words of the agreement

demonstrates that the intent of the parties to the MACI Agreement was to convey the entire right,

title and interest in the '380 Patent to MACI.

[45]     Apotex submits that agreements which take the form of a licence, but nevertheless

convey all of the substantive rights in a patent, have consistently been held to constitute an

effective assignment or transfer of that patent. In support of this argument, Apotex relies on a

line of jurisprudence of courts in the United States and the United Kingdom (*Merck & Co., Inc.

v. Francis R. Smith*, 261 F.2d 162 at 164 (3rd Cir. 1958); *Vaupel Textilmaschinen KG v.

Meccanica Euro Italia SPA*, 944 F.2d 870, 874 (Fed. Cir. 1991); *Prima Tek II, L.L.C. v. A-Roo

Co.*, 222 F.3d 1372, 1377-78 (Fed. Cir. 2000); *Guyot v. Thompson* [1894] R.P.C. 541 at 554

(C.A.)[*Guyot*]).

[46]     I do not find the authorities relied on by Apotex to be of any assistance. Except in the

case of *Guyot*, above, a decision of the High Court of Justice – Chancery Division, the Courts in

those cases were considering the effect of agreements in the context of U.S. patent law. I do not

see how they could guide this Court in determining the meaning of the terms of and, if necessary,

the intent of the parties to the MACI Agreement. I did not have the benefit of an expert in U.S.

law opining as to whether the MACI Agreement would constitute a transfer of all of the rights of

the patent to MACI under applicable U.S. law. Moreover, the facts in *Guyot*, where an exclusive

assignee was attempting to enforce the terms of an Indenture, are simply too remote from the question before me.

[47]     Rather, I would look at this issue in the context of the Canadian law of contracts. As I understand the state of the Canadian law of contracts, the express language of the parties to a contract is the core of their contractual obligations. Where the words of a contract are clear and unambiguous, a court need not look beyond those clear words to determine its intent and effect.

[48]     Apotex was unable to point me to a single Canadian case that supports its position. Nevertheless, I would agree that the title of the License Agreement would not be determinative if there is clear and persuasive evidence that Merck & Co. intended to convey all of its rights in the '380 Patent to MACI, retaining nothing to itself. Whether this is so or not will depend on an examination of the words of the MACI Agreement and the facts and circumstances surrounding the MACI Agreement.

[49]     In this case, the express language of clause 2 of the MACI Agreement uses the word "license". On its face, the MACI Agreement only grants a "license". The Supreme Court of Canada in *Domco Industries Ltd., v. Armstrong Cork Canada Ltd.*, [1982] 1 S.C.R. 907 at p.912, 66 C.P.R. (2d) 46, adopted the comments of Fry L.J. at p. 470, in *Heap v. Hartley* (1889), 42 Ch. D. 461:

> An exclusive license is only a license in one sense; that is to say, the true nature of an exclusive license is this. It is leave to do a thing, and a contract not to give leave to anybody else to do the same thing. But <u>it confers like any other license, no interest or property in the thing</u>. [Emphasis added.]

[50]     I also note the language of certain clauses in the MACI Agreement that refer to rights

retained by Merck & Co. For example, clause 3 provides the Licensor with the rights to inspect

the Licensee's facilities. Under clause 5.2, the Licensee is to supply the Licensor with a detailed

description of any disclosure of "licensed know-how" to any governmental authority. In my

view, retention of rights such as these is inconsistent with an intention to transfer all rights under

the patent.

[51]     In support of its position, Apotex points to a recital to the MACI Agreement:

> WHEREAS, the Licensor desires to grant the Licensee a
> permanent and exclusive license with respect to its <u>remaining</u> right,
> title and interest in and to the rights which it has acquired with
> respect to such intellectual property as a contribution to the capital
> of the Licensee. [Emphasis added.]

Apotex relies on the Supreme Court of Canada decision in *Dukart v. Surrey (District)*, [1978] 2

S.C.R 1039 at p.1052-53, 86 D.L.R. (3d) 609 [*Dukart* cited to S.C.R] as support for its

submission that, where the words of a recital manifest a clear intention, the Courts have inferred

that the parties intended that these words be given effect.

[52]     The case of *Dukart* does not assist Apotex. *Dukart* involved the grant of an "easement"

and the question of the true intentions of the parties. In that case, the body of the agreement

contained no language with respect to the extent of the rights granted under the agreement. The

recital clause was used by the Supreme Court to provide the necessary meaning to the agreement.

[53]     The case before me is different in that provisions in the body of the MACI Agreement

speak to the intent of the agreement and the scope of the "transfer" from Merck & Co. to MACI.

2010 FC 1265 (CanLII)

The use of a recital or preamble as an interpretative aid must always be approached with caution.

As pointed out by Justice Abella (as she then was) in *Lay v. Lay* (2000), 47 O.R. (3d) 779, 184

D.L.R. (4th) 652 (Ont. C.A.) at paragraph 12, leave to appeal to SCC refused, [2000] S.C.C.A.

No. 369 (QL), 264 N.R. 398 (note):

> There is no doubt that an introduction or a preamble can provide
> interpretative assistance, but I see no basis for accepting the novel
> proposition that its terms can triumph over those in the body of the
> contract.

[54]    In my view, the words of the MACI Agreement establish the creation of a licence and not

a conveyance of all rights in the '380 Patent. The use of the word "remaining" in the recital does

not "triumph over" the words of the agreement. This is sufficient to defeat the argument of

Apotex.

[55]    However, even if I accept that there may be ambiguity in the MACI Agreement, I am

satisfied that the parties to the MACI Agreement did not intend to convey the entire right, title

and interest in the '380 Patent. One indication of the intent of the parties to an agreement is the

behaviour of the parties. If the MACI Agreement is not clear on its face, it is of assistance to

examine the behaviour of the parties after the execution of the agreement. Was the behaviour of

Merck & Co., from November 1992, consistent with a company who had given up its entire

right, title, estate and interest in the '380 Patent? Clearly, the answer is "no". If there had been

such intent, why would Merck & Co. commence and pursue this litigation for 13 years in its own

name? Further, why would Merck & Co. remain as the named patentee on the '380 Patent?

[56]    I am satisfied that the MACI Agreement did not operate as a conveyance of the entire

right, title and interest of Merck & Co. to MACI. Merck & Co. has standing to bring this action.


**V.**    **Claims Construction**


A.    *Principles of Claims Construction*


[57]    The first step in a patent suit is to construe the claims, in accordance with principles that

are well-established in the jurisprudence (see, for example, *Whirlpool Corp. v. Camco Inc*., 2000

SCC 67, [2000] 2 S.C.R. 1067 [*Whirlpool*]). This jurisprudence teaches that claims are to be

interpreted in a purposive way in order "to achieve fairness and predictability and to define the

limits of the monopoly" (*Dimplex North America Ltd. v. CFM Corp.*, 2006 FC 586, 292 F.T.R.

38 at para. 49 [*Dimplex*], aff'd 2007 FCA 278, 60 C.P.R. (4th) 277).


[58]    Construction of the claims is a matter for the Court to determine. The Court is called on

to determine, on an objective basis, what a hypothetical skilled person would have understood

the invention to mean (*Whirlpool,* above, at paras. 45, 53). Where a patent is of a highly

technical nature, the person skilled in the art will be someone possessing a high degree of expert

scientific knowledge in the particular field of art to which the patent relates (*Aventis Pharma Inc.

v. Apotex Inc.*, 2005 FC 1283, 278 F.T.R. 1 [*Ramipril I (FC)*]; *Apotex Inc. v. Syntex

Pharmaceuticals International Ltd et al* (1999), 166 F.T.R. 161 at para. 38, [1999] F.C.J. No.

548 (QL)(F.C.T.D.).

2010 FC 1265 (CanLII)

[59]    Where necessary, the whole of the patent, and not only the claims, should be interpreted (*Eli Lilly Canada Inc. v. Apotex Inc.*, 2008 FC 142, 63 C.P.R. (4th) 406 at para. 25; *Eli Lilly Canada Inc. v. Novopharm Ltd.*, 2007 FC 596, 58 C.P.R. (4th) 214 at para. 103). The Court should construe the claims in light of the description in the specification, assisted by experts as to the meaning of technical terms if such terms cannot be understood by the Court from reading the specification (*Shire Biochem Inc. v. Canada (Minister of Health)*, 2008 FC 538, 328 F.T.R. 123 at para. 22 [*Shire*]; *Whirlpool,* above, at para. 45).

[60]    It is also important to recognize that purposive construction should be directed at the points in dispute between the parties (*Shire*, above, at para. 22).

[61]    Lastly, as the '380 Patent was issued under the old *Patent Act*, all claims at issue are to be construed as of the date the patent was granted and issued (*Pfizer Canada Inc. v. Canada (Minister of Health)*, 2005 FC 1725, 285 F.T.R. 1 at para. 36). For the '380 Patent, that date is January 31, 1984.

[62]    With these overarching principles in mind, I turn to the patent in question.

B.    *The hypothetical skilled person*

[63]    As noted, claims must be construed from the view of a hypothetical skilled person. Thus, as a preliminary matter, I must define what attributes would be held by our hypothetical skilled person.

2010 FC 1265 (CanLII)

[64]    In its final written argument, Apotex described the person to whom the '380 Patent is

addressed as follows:

> The skilled addressee of the '380 Patent is a notional person
> having a thorough knowledge of cultivating fungal
> micro-organisms. Such a person may have an advanced degree,
> such as a Ph.D., in biochemistry, mycology or industrial
> biochemical processes and several years of related practical
> experience in an industrial setting.  The skilled addressee would
> also include pharmaceutical formulators, and medical and organic
> chemists interested in using the compounds of the alleged
> invention to treat hyperlipemia and hypercholesteremia.

[65]    Given the nature of this product-by-process patent, I believe that experience and

knowledge related to fungal micro-organisms is fundamental. This expertise would, in my view,

include both academic qualifications and technical experience. Identification of micro-

organisms, developing, recognizing and identifying productive strains and growing cultures in

appropriate media for commercialization are all aspects of the '380 Patent with which the skilled

addressee must be familiar. I agree with Dr. Clardy when he states (Clardy Expert Report,

Exhibit 17, para. 25):

> … [F]ermenting fungi to obtain secondary metabolites requires
> experience beyond ordinary academic training and because
> isolating natural products from fermentations requires the interplay
> of chemistry, biosynthesis and biological assays beyond formal
> academic training.

[66]    Since the invention consists of processes for preparing compounds that are targeted to

lower serum cholesterol, the skilled person would have sufficient knowledge of medical and

organic chemistry to be able to understand cholesterol biosynthesis. This expertise could be

acquired through academic training or clinical practice.

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

[67]    With these remarks on some of the skills necessary, I accept Apotex's description of the person to whom the '380 Patent is addressed.

C.    *The Patent Specification*

[68]    I begin with a brief overview of the patent specification.

[69]    The '380 Patent is what is commonly described as a product-by-process patent. That is, the inventors do not make a specific (or *per se*) claim to the compound lovastatin; rather, they claim the product lovastatin and three other compounds when the compounds are made by the processes described in the patent. The '380 Patent is entitled "HYPOCHOLESTEREMIC FERMENTATION PRODUCTS AND PROCESS OF PREPARATION". As set out in the summary:

> This invention relates to hypocholesteremic products from the cultivation of a microfungus of the species <u>Aspergillus</u>.  More specifically, it relates to compounds of the formulae:

> as well as pharmaceutically acceptable salts and lower alkyl and
> substituted alkyl esters of the carboxylic acids in which the
> possible substituent is phenyl, dimethylamino or acetylamino.  The
> invention also relates to a process of cultivating the microfungus
> and isolating from the medium a hypocholesteremic compound of
> the above structures. These new compounds have excellent
> properties of inhibiting cholesterol biosynthesis and are useful
> against hypercholesteremia and hyperlipemia.

[70]    I was assisted in understanding the chemical structures of, and relationship amongst, the

four compounds identified in this summary (and set out in claim 1) by Drs. Lasure, Clardy and

Samson.

[71]    Compound I is the marketed product named lovastatin. Compound II is dihydro-

lovastatin. It differs from lovastatin (Compound I) only in relation to the bonds in the double ring

structure. Compounds I and II are both lactones, meaning that the ring at the top right of the

structure is closed. Compound III is the open acid or hydroxy acid form of Compound I and

Compound IV is the open acid or hydroxy acid form of Compound II. Each of Compounds III

and IV has an open ring at the top with a COOH (carboxyl) group.

[72]    At p. 2 of the patent description, the inventors disclose, as prior art, the work and patents

of Endo and others related to the compound compactin:

> Recently, Endo et al., described (U.S. 4,049,495 and 3,983,140) a
> fermentation product obtained by cultivation of a micro-organism
> of the genus Penicillium and isolation from the medium. They
> called it ML 236 B and determined its structure together with two
> related compounds 236 A and 236 C. Its structure, under the name
> compactin, was also determined by A.G. Brown, T.C. Smale, T.J.
> King, J. Chem. Soc.   (Perkin I)  1165  (1975). This compound has
> been found to be an inhibitor, in vivo, of the biosynthesis of
> cholesterol.

[73]    The inventors then distinguish their invention from that of the prior art.

> We have found that unexpectedly, the cultivation of a micro-
> organism very different from that employed by Endo, a
> microfungus of the genus Aspergillus, produces new substances
> that are also very potent inhibitors of the biosynthesis of
> cholesterol in mammals. We have further found that these
> substances comprise principally the new compounds I, II, III and
> IV, of the above structures, accompanied by only traces of other
> compounds. These new compounds are much more potent
> inhibitors of cholesterol synthesis in vivo than is the compound,
> ML236B described by Endo.

[74]    In short, the patent specification discloses that the inventors of this patent built on the

existing work of Endo and others in relation to the anti-cholesterol properties of compactin. They

discovered that the Compounds I, II, III and IV, cultivated from "a microfungus of the genus

*Aspergillus*", rather than from the genus *Penicillium*, were more potent inhibitors of cholesterol

synthesis *in vivo* than compactin.

[75]    At p. 3 of the patent specification, the inventors state that, "The compounds of this

invention are highly useful as antihypercholesteremic agents for the treatment of atherosclerosis,

hyperlipemia and like diseases in humans."

[76]    Beginning on p. 4, the inventors begin their more detailed description of how this

invention relates to a process for producing the identified compounds. From the experts, I have

learned that the method of production of the '380 Patent is described as a "fermentation".

Dr. Lasure described this as follows (Lasure Expert Report, Exhibit 48, para. 20):

> Unlike more traditional processes by which chemists may
> synthesize chemical compounds in a laboratory or a factory using
> controlled chemical reactions in vitro, the process disclosed in the
> '380 Patent is a biological process involving the use of a specific

> fungus that synthesizes lovastatin in vivo when that fungus is
> grown in or under certain conditions which the '380 Patent calls a
> "fermentation".

[77]    The inventors describe their use of two sample micro-organisms from the culture

collection of Merck and Co., referred to as MF-4833 and MF-4845. These two micro-organisms

were placed on deposit with the American Type Culture Collection (ATCC) and assigned

accession numbers ATCC 20541 and ATCC 20542 respectively.  It is clear that the inventors are

not limiting their invention to the use of these two micro-organisms.

> Although the use of these is described in connection with the
> process of this invention, other organisms of the genus Aspergillus
> including mutants of the above ones are also capable of producing
> these novel compounds and their use is contemplated in carrying
> out the process of this invention.

[78]    In the paragraph that follows, the inventors disclose that:

> The morphological characteristics of the micro-organisms
> MF-4833 and MF-4845 have been found to be those of the genus
> Aspergillus. Using the criteria specified in the standard authority
>  . . . and by comparison with known species, it has been
> determined that both strains are Aspergillus terreus.

[79]    Beginning at the bottom of p. 5, the process of fermentation is described, with reference

to such matters as illustrative media, optimal temperature ranges and the pH of nutrient media

suitable for growing the culture. More detail is provided regarding fermentation scaling, from the

initial culture in small flasks to the large-scale fermentation tanks. Once the fermentation broth is

made, the reader is instructed that the compounds are conveniently isolated from the

fermentation broth as lactones I and II or, alternatively, as salts of Compounds III and IV. Other

methods of yielding the compounds of the invention are disclosed.

2010 FC 1265 (CanLII)

[80]     The physico-chemical properties of the compounds are set out starting at p.8. At p. 9-10, the inventors set out their belief, "with a considerable degree of certainty", the stereo chemical structures of Compounds I and III. Similar data and stereo chemical structures of Compounds II and IV are described at p. 11-12.

[81]     The specification, from p. 13 to 43, illustrates the "invention" with 27 examples.

D.     *The claims in issue*

[82]     Merck, as it outlined in a response to a demand for particulars dated July 8, 1998, alleged that claims 1 to 8, 10, 11, 13 to 16, 18 and 19 of the '380 Patent were infringed by the Defendants. Merck specifically stated that it was not relying upon every claim in the '380 Patent.

[83]     In their Statements of Defence and Counterclaim, Apotex asserts that all of the claims of the '380 Patent are invalid. Subsequent submissions of the parties lead me to the conclusion that, at this stage, the only claims still in issue – and that require construction – are claims 1 to 8 and

2010 FC 1265 (CanLII)

13 to 15. I have set out claim 1 in full below. The remaining claims are included in Appendix B

to these reasons.

> 1.      A process of producing the compounds of structural
> formulae:



I                              II

III                            IV

> which compromises fermenting a nutrient medium with a
> microorganism of the genus *Aspergillus terreus* and isolating the
> products and when desired converting said products to their
> corresponding pharmaceutically acceptable salt or lower alkyl ester
> or a substituted lower alkyl ester wherein the substituent is phenyl,
> dimethylamine or acetylamine or the cation of the salt is derived
> from ammonia, ethylenediamine, N-methyl-glucamine, lysine,
> arginine or ornithine.

[84]    The disagreement between the parties focuses on aspects of claim 1. The proper

construction of the other claims at issue flow from a resolution of the construction of claim 1.

That is, a proper construction of claim 1 will be determinative of the main points in dispute for

the remainder of the claims in issue, claims 2 to 8 and 13 to 15.

2010 FC 1265 (CanLII)

[85]    The areas of disagreement between Apotex and Merck are the following:

1.    What is the meaning of the phrase "a micro-organism of genus *Aspergillus terreus*" in claim 1?

2.    What is the meaning of the word "isolating" in claim 1?

3.    Does the '380 Patent promise that all strains of *Aspergillus terreus* will be capable of producing the four compounds of the invention?

4.    What is the promised use of the claimed invention?

[86]    The final two construction issues relate to the "promise" of the '380 Patent.  The question of what is promised – or not – by the '380 Patent is primarily relevant to the question of the utility of the patent. However, it is an analysis that logically forms part of the '380 Patent claims construction.

[87]    Generally, ascertaining the promise of a patent is an exercise that requires the assistance of expert evidence (*Bristol-Myers Squibb Co. v. Apotex Inc.*, 2007 FCA 379, F.C.J. No. 1579 (QL) at para. 27). This is because the promise should be properly defined, within the context of the patent as a whole, through the eyes of a person of skill in the art.

2010 FC 1265 (CanLII)

E.      *The meaning of "a microfungus of genus Aspergillus terreus" in claim 1*

[88]    The first construction issue raised by Apotex relates to the proper interpretation of the words "a micro-organism of the genus *Aspergillus terreus*" in claim 1.

[89]    Claim 1 speaks to a process for producing four compounds "which comprises fermenting a nutrient medium <u>with a micro-organism of the genus *Aspergillus terreus*</u> . . .." Apotex argues that, on a proper interpretation of claim 1, a skilled person would read the words "genus *Aspergillus terreus*" as referring to all micro-organisms in the genus *Aspergillus*. Merck asserts that claim 1 is limited to micro-organisms of the species *Aspergillus terreus*.

[90]    The nomenclatures used in the '380 Patent would be understood by any high school biology student (and even this judge) as part of the binomial system of naming living organisms. All living organisms are named according to a hierarchy of classifications. The hierarchy is as follows:

(i)      Kingdom
(ii)     Phylum
(iii)    Class
(iv)     Order
(v)      Family
(vi)     Genus
(vii)    Species

In accordance with the accepted binomial convention, living organisms are identified by using the name of the genus (capitalized) together with the name of the species within the genus (lower case).

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

[91]    There is no such genus as *Aspergillus terreus*. As I have learned from the experts in this case, Drs. Clardy, Lasure and Samson, the well-established rules of taxonomy dictate that *Aspergillus* is a genus and that *Aspergillus terreus* is a species within the genus *Aspergillus*. As submitted by the parties, the use of the term "genus *Aspergillus terreus*" in claim 1 can mean one of two things:

> (a)    the inventors were claiming only those compounds made with micro-organisms of the <u>species</u> *Aspergillus terreus,* and inadvertently used the term "genus" in place of "species" (Merck's position); or,

> (b)    the inventors were claiming compounds produced from any micro-organism falling within the <u>genus</u> *Aspergillus* (Apotex's position).

[92]    Even without expert assistance, it appears to me that the first option provides the preferable interpretation. There is no question that the skilled reader would recognize *Aspergillus terreus* as a species – that is, a subset of the genus *Aspergillus*. The skilled reader would assume that the inventors intended that claim1 include only the micro-organisms of the genus *Aspergillus* that belong to the species *terreus*. To read the phrase as including all species within the genus *Aspergillus* would ignore the plain meaning of the term *terreus*, as used in the claim.

[93]    Not only does my construction of the words accord with common sense, it is consistent with the opinions of Drs. Lasure and Clardy. In the view of Dr. Clardy (Clardy Expert Report, Exhibit 17, para. 33):

> … [T]he words *Aspergillus terreus* were in January 1984 and
> remain today words which, by definition, mean and would be read
> by the skilled person to describe a subset or sub-category of
> *Aspergillus* that is not and cannot include the entire *Aspergillus*
> genus.

[94]     Initially, Dr. Samson expressed a different interpretation of this phrase and concludes that

(Samson Expert Report, Exhibit 109, para. 37):

> … [B]ased on the repeated references in the patent to the use of a
> micro-organism of the "genus *Aspergillus*" and from the balance of
> my review of the '380 Patent described above, it is my opinion that
> a person skilled in the are would have concluded that the inventors
> did not intend to place any limits on the micro-organisms that can
> be used in the process other than that they be from the genus
> *Aspergillus*.

[95]     I acknowledge that the disclosure or specification of the '380 Patent makes a number of

references to the "genus *Aspergillus*". Nevertheless, the key problem with Dr. Samson's

interpretation of the phrase "genus *Aspergillus terreus*" in claim 1 is that it ignores completely

the word "*terreus*". If I were to accept Dr. Samson's opinion, I would be expanding the claim

from "*Aspergillus terreus*" to the much broader designation of "*Aspergillus*". As Dr. Samson

stated, there are over 250 species that fall within the genus *Aspergillus* (Samson Expert Report,

Exhibit 109, para. 17).

[96]     Dr. Samson's approach to claims construction is contrary to the teachings of the Supreme

Court in *Whirlpool*, above, at paragraph 52, where Justice Binnie refers to the statement of

Taschereau J. in *Metalliflex Ltd. v. Rodi & Wienenberger AG* (1960), [1961] S.C.R. 117

(S.C.C.), at p. 122:

> The claims, of course, must be construed with reference to the
> entire specifications, and the latter may therefore be considered in

2010 FC 1265 (CanLII)

order to assist in apprehending and construing a claim, but <u>the patentee may not be allowed to expand his monopoly specifically expressed in the claims "by borrowing this or that gloss from other parts of the specifications"</u>. [Emphasis added.]

[97]     During cross-examination, Dr. Samson appeared to have qualified or changed his opinion. Specifically, he agreed that "the inclusion of the word '*terreus*' in claim 1 excludes all other species of *Aspergillus* including *niger* and *nidulus* and *oryzae* and the other 246 [species]."

[98]     Moreover, when read in its entirety, the specification is consistent with the limitation of the invention to micro-organisms of the species *Aspergillus terreus*. For example, the inventors disclose the use of micro-organisms MF-4833 and MF-4845; these are examples of *Aspergillus terreus* and not of some other species within the genus *Aspergillus*.

[99]     In summary on this point, the words of claim 1 make it very clear that the patentee is not claiming compounds made with any of the 250 species of *Aspergillus*; rather, the boundary of the invention, as claimed, includes the four identified compounds when made with a single species – *Aspergillus terreus*. The use of the word "genus" before "*Aspergillus terreus*" may have been a simple inconsequential error by the drafters or the patentee may have intended the word "genus" to modify only the word "*Aspergillus*" and not the entire phrase "*Aspergillus terreus*". Regardless, given the specificity of the term "*Aspergillus terreus*", the use of the word "genus" would not change the meaning ascribed to the phrase by the skilled addressee.

2010 FC 1265 (CanLII)

F.    *The meaning of "isolating the products"*

[100]   The second construction issue concerns that part of claim 1 which states that the process

of producing the compounds "comprises fermenting a nutrient medium with a micro-organism of

the genus *Aspergillus terreus* and isolating the products . . .".

[101]   The parties disagree on the meaning of the phrase "isolating the products". Apotex

submits that claim 1 requires the production of all four of the compounds, that claim 2 requires

the production of both Compound I and II (the lactones) and that claim 5 requires the production

of both Compound III and IV (the hydroxy acids). In other words, Apotex argues that, for

purposes of the claims, the compounds must be separated from each other, purified and

crystallized before they are "isolated". Merck submits that "isolating" simply means separating

the compounds from the fermentation broth and does not require the compounds to be purified or

crystallized.

[102]   The term "isolating" is not defined in the patent. Therefore, it is necessary to review the

specification to determine what meaning was reasonably intended by the inventors.

[103]   Example 1 of the '380 Patent is entitled "Preparation of Compounds I and III". The

inventors first set out a procedure for fermenting a particular culture of *Aspergillus terreus*. At

the end of this step, the skilled person would have a fermentation broth that is "set aside for

isolation of the product". After the fermentation is completed, the next step is the "Isolation of

Compound I".  This involves separating the broth solids from the broth liquids, extracting the

liquids using a mixture of solvents and extracting the solids. The resulting extracts are combined

and concentrated to 15 ml of crude extract. There is no purification or crystallization described as

part of the "Isolation of Compound I". Further, the next step – "Testing of Compound I" – is

carried out on the crude extract. There is no further purification or crystallization carried out

before the testing.

[104]   In reviewing the examples of the patent, I note that Examples 3, 4 and 5 all refer to

isolation without any purification or crystallization.

[105]   From the specification, I conclude that the inventors meant the term "isolating" to simply

refer to separating the compounds from the broth. This was the interpretation given to the term

"isolating" by Dr. Clardy who opined that (Clardy Expert Report, Exhibit 17, para. 102):

> In the '380 Patent "isolating" does not necessarily require complete
> separation or purification of the active compounds. The concept of
> "isolating the products" of a fermentation as those words are used
> in the patent requires getting the products out of the fermentation
> broth. The products do not necessarily have to be isolated from one
> another nor be crystalline, nor be completely purified. All of this
> would be understood by the skilled person reading the patent in
> January 1984. I note that the "Isolation of Compound I" in
> Example 6 is more complex and includes the further purification
> and crystallization of a specific fraction containing Compound I,
> but example 1 makes clear that such steps are optional and not
> necessarily required for "isolating" as that word is used in the
> patent.

[106]   Dr. Samson provided a contrary view. In his Reply Expert Report, Dr. Samson opines as

follows (Samson Reply Expert Report, Exhibit 11, para. 41):

> The '380 Patent says that the compounds are extracted or isolated
> from the fermentation broth as "hypocholesteremic compounds"
> (see page 2, lines 4 to 7). This would have been understood by a

2010 FC 1265 (CanLII)

person skilled in the art to mean that the invention requires that the
compounds be removed from the fermentation broth and isolated
from any other compound in the broth, and then purified and
crystallized so that they can be useful as "hypocholesteremic
compounds".

[107]   I have difficulty with Dr. Samson's understanding of the term "isolating". Foremost, this

interpretation ignores much of the content of the specification that describes the testing of the

crude extract. During cross-examination, Dr. Samson acknowledged that, in some of the

examples, there was no purification, separation or crystallization prior to testing. Nevertheless,

he clung – unreasonable, in my view – to the opinion that the skilled person would presume that

"isolation" or "isolating" includes the steps of extraction, crystallization and separation.

[108]   Beyond the disclosure of the '380 Patent, the interpretation proposed by Merck is also

supported by the reading of claim 1 in the context of the other claims – in particular claim 13.

The general process is set out in claim 1. Claim 13 is a claim to a compound selected from

Compounds I, II, III and IV. Had the inventors intended claim 1 to require a separation of each

compound from the others, they could have used similar language of selection. The use of the

phrase "isolating the products" rather that "isolating each product" is a strong indication, for the

skilled reader, that the inventors did not intend that each of the compounds be separated from

each other, purified and crystallized.

[109]   In sum, I am satisfied that, on a proper claims construction, the words "isolating the

products" in claim 1 do not require that the relevant compounds be separated from each other,

purified or crystallized prior to testing.

G.    *Inclusion of non-producing strains*

[110]   For the third construction question, Apotex submits that, whether the Court construes the phrase "genus *Aspergillus terreus*" in claim 1 to include all micro-organisms or fungi within the genus *Aspergillus* or just those within the species *Aspergillus terreus*, the '380 Patent promises that all such micro-organisms can be used to produce the compounds in the Patent. Merck, on the other hand, asserts that the person skilled in the art would know – and eliminate from coverage of the '380 Patent  – any strain or fungus that cannot produce the claimed compounds.

[111]   Neither claim 1 nor the specification explicitly states that the '380 Patent excludes non-producing strains of *Aspergillus terreus*. The question to be determined is whether the skilled addressee, in 1984, would know that the claims of the '380 Patent are limited to the producing strains of *Aspergillus terreus*.

[112]   An essential element of the invention embodied in the '380 Patent is the production of particular compounds through the process of fermentation or cultivation of fungi. As described by Dr. Lasure, who has extensive experience working with such micro-organisms, "a culture of *Aspergillus terreus* is a living sample of a fungus from that species" (Lasure Expert Report, Exhibit 48, para. 60). Thus, within species, there are variations.

[113]   Dr. Sorensen described the organic compounds that are produced by fungi as "secondary metabolites". "Secondary metabolites" are compounds produced as a result of the metabolic function of the initial fungal micro-organism during the fermentation process (Sorensen Expert

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

Report, Exhibit 132, para. 6). While Dr. Clardy opined that "in the general case it was expected that a particular isolate from a producing species would be expected to produce a given metabolite," he cautioned that there is always a possibility of non-production, for a number of reasons, all of which would have been known in 1984 (Clardy Expert Report, Exhibit 17, paras. 39-41):

- fungi can be intentionally mutated to disrupt the genes responsible for making a metabolite;

- fungi can lose a producing ability over time because of subculturing, or mishandling, or reasons that are never understood;

- some fungi in a producing species simply do not have production capability, although Dr. Clardy thought that this would be unusual except where the isolates have been maintained by serial subculturing;

- fungi tend to change randomly, especially when stored and maintained artificially by scientists;

- if during subculturing, a sample of a variant is taken for further growth, and especially if there is repeated subculturing, the fungus can become one in which a characteristic of the parent culture is lost; and

- • physical deterioration of the fungus will lead to loss of specific metabolic functions.

[114]   Dr. Clardy summed up the situation as follows (Clardy Expert Report, Exhibit 17, para. 42):

> It was part of the common knowledge of the skilled person in 1984 and such a person would have known, with virtual certainty, that among the many isolates (or strains) of a given species there would inevitably be found isolates that have lost the capacity to produce a particular metabolite under particular conditions, or in some rare cases, that never had an ability to produce the metabolite at all.

[115]   Dr. Samson did not share this opinion. In his view, the skilled person would interpret the claims as including the production by *Aspergillus* of all four identified compounds (Samson Expert Report, Exhibit 110, para. 52). He disagreed that the exclusion of non-producing strains was implicit. However, during cross-examination, he acknowledged that the opinions of Drs. Lasure and Clardy were "both scientific opinions that a reasonable person of ordinary skill in the art could have reached in January 1984".

[116]   Dr. Samson, during cross-examination, also agreed that the person of ordinary skill in 1984 would have been fully aware that not every strain in a species will make a given metabolite. Even more specifically, Dr. Samson acknowledged that, in 1984, a skilled person reading the claims of the '380 Patent would know that there are strains of *Aspergillus terreus* that would not produce lovastatin.

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

[117]   In sum, I prefer the opinions of both Drs. Lasure and Clardy to the effect that a skilled person would know, from his or her general knowledge, that:

> (a)     there are many variations in the micro-organisms within the species *Aspergillus terreus*, such that not every micro-organism within the species will necessarily provide the desired results and that some testing and routine experimentation will be required; and

> (b)     the term "nutrient medium", as used within the patent description, would include the media used in the examples and other media that, upon routine testing, would result in the desired compounds.

[118]   In light of this general knowledge, Drs. Clardy and Lasure were both of the opinion that the skilled person would recognize – even without an explicit limitation in the claims – that the claims of the '380 Patent exclude non-producing strains of *Aspergillus terreus*. The use of the word "producing" in claim 1 tells the skilled person that non-producing strains are excluded, even though the explicit words are not used.

[119]   Further support for the conclusion reached by Drs. Clardy and Lasure is contained within the disclosure. In addition to the disclosure of the structure of the compounds and the therapeutic activity of the compounds, the skilled person is provided with examples of the media and conditions that could be used.

2010 FC 1265 (CanLII)

[120]   Moreover, the skilled person would also bring to his or her laboratory "bench", a set of skills used routinely. In light of the nature of fungi and their use in the pharmaceutical industry, it appears logical to me that the skilled person would have extensive experience with the types of experimentation and testing that are used to identify and optimize producing micro-organisms. During cross-examination, Dr. Samson confirmed that a number of experiments, known in 1984, could have been performed simultaneously, in a short period of time, to identify the producing micro-organisms. He agreed that about 300 shake flask experiments could be run at one time. The skilled person could rapidly screen a large numbers of isolates of *Aspergillus terreus* to determine which strains are producing. Moreover, since, on my construction, the claims are limited to strains of the species *Aspergillus terreus*, there are manageable boundaries on the testing that would be required.

[121]   Having considered the evidence of the three experts, I am persuaded that the opinions of Drs. Lasure and Clardy on this point are to be preferred to that of Dr. Samson. An implicit requirement that non-producing strains are excluded from the coverage of claim 1 is "being neither benevolent nor harsh but rather seeking a construction which is reasonable and fair to both patentee and public" (*Consolboard Inc. v. MacMillan Bloedel (Saskatchewan) Ltd.*, [1981] 1 S.C.R. 504 at p.520, 56 C.P.R. (2d) 145 [*Consolboard* cited to S.C.R.]). I do not accept Apotex's assertion that the '380 Patent states, implies or promises that all strains of *Aspergillus terreus* will be capable of producing the four compounds of the claimed invention.

H.    *The promised use of the '380 Patent*

[122]    As a final construction issue, Apotex submits that the '380 Patent makes the explicit promise that the four compounds identified in claim 1 are "highly useful as anti-hypercholesteremic agents for the treatment of atherosclerosis, hyperlipemia and like diseases in humans".

[123]    The "promise" of the '380 Patent appears to be clearly set out in at least two places in the specification. In the "Summary of the Invention", at p. 2 of the patent, the patentees state that:

> These new compounds have excellent properties of inhibiting
> cholesterol biosynthesis and are useful against hypercholesteremia
> and hyperlipemia.

[124]    A slightly more detailed promise is found at p. 3, where the patentees explain that:

> The compounds of this invention are highly useful as
> antihypercholesteremic agents for the treatment of atherosclerosis,
> hyperlipemia and like diseases in humans.

[125]    Dr. Samson's opinion is that the detailed statement in the patent (p.3) expresses the promise of the '380 Patent (Samson Expert Report, Exhibit 110, para. 25). Although Dr. Lasure did not directly respond to the question of what was the promise of the patent, she described the uses of the '380 Patent to include the following (Lasure Expert Report, Exhibit 48, para. 21):

> With respect to uses, the '380 Patent discloses that the four
> compounds (and salts and esters of them) can be used to inhibit
> cholesterol biosynthesis, can be used against hypercholesteremia
> (high levels of cholesterol in the blood) and hyperlipidemia (high
> levels of lipids in the blood) and can be used as antifungal agents
> (to kill or inhibit growth of fungi on plants).

2010 FC 1265 (CanLII)

Anti-fungal properties have not been referred to by Apotex in this matter. The issue for this trial is focused on the medical use.

[126]   Based on the words of the specification and supported by the opinions of Drs. Lasure and Samson, I find that the skilled person would read the '380 Patent as promising that the compounds (or secondary metabolites) produced from strains of *Aspergillus terreus*, by the fermentation process identified in the patent, are "useful as antihypercholesteremic agents for the treatment of atherosclerosis, hyperlipemia and like diseases in humans".

I.      *Summary on Claims Construction*

[127]   Considering the words of the claims of the '380 Patent and the specification and guided by the expert testimony, the relevant claims of the patent should be construed in the following manner:

- Claim 1 is a claim to a process for producing the four identified compounds by a fermentation process using the range of nutrient media and conditions described in the specification (or as would be generally known to the skilled person), following which the compounds are isolated or extracted from the fermentation broth by any of

2010 FC 1265 (CanLII)

the known means identified in the specification (or as would be generally known to the skilled person). Of particular relevance to this litigation:

○   the micro-organism or fungus to be used is a strain of the species *Aspergillus terreus*, excluding those strains that are unable to produce the desired compounds and excluding micro-organisms from other species within the genus *Aspergillus*; and

○   after the fermentation stages of the process, the resulting broth may contain any or all of the four compounds.

[128]   With this construction of claim 1, the construction of claims 2 to 8 follows. Each of these claims is a "subset" of claim 1, whereby the claim is restricted to:

•   the process of producing only Compounds I and II (claim 2) or Compounds III and IV (claim 5);

•   the process of producing the identified compounds using a particular originating micro-organism (claim 3 and 6); and

•   the process of producing the identified compounds using certain operational requirements (claims 4, 7 and 8).

2010 FC 1265 (CanLII)

[129]   Claim 13 claims any one of the four identified compounds (the same compounds as described in claim 1) when made by the process of claim 1 "or by an obvious chemical equivalent". Claim 14 is a similar claim to either Compound I or II when made by the process of claim 2 "or by an obvious chemical equivalent". Claim 15 claims each of Compound III and IV when made by the process of claim 5 "or by an obvious chemical equivalent".

[130]   Finally, I find that the skilled person would read the '380 Patent as promising that the compounds (or secondary metabolites) produced from strains of *Aspergillus terreus*, by the fermentation process identified in the patent, are "useful as antihypercholesteremic agents for the treatment of atherosclerosis, hyperlipemia and like diseases in humans".

## VI.    **Infringement – Background**

A.    *Introduction*

[131]   Having established the proper construction of the relevant claims of the '380 Patent, I now turn to the question of infringement.

[132]   Section 44 of the *Patent Act* confers on a patentee and his legal representatives "the exclusive right, privilege and liberty of making, constructing, using and vending to others to be used the invention" of a patent. Merck claims that the Defendants infringed their rights under the '380

2010 FC 1265 (CanLII)

Patent by the production of lovastatin using the *Aspergillus terreus* micro-organism. Specifically, Merck claims infringement in three different scenarios:

1.      infringement through the manufacture (during Phase 1 of production described above), by AFI in Winnipeg, of quantities of lovastatin included in batch CR0157;

2.      infringement, between April 1997 and March 1998, through the manufacture by Blue Treasure of quantities of infringing lovastatin that were shipped to AFI, when Blue Treasure was allegedly "salting" the lovastatin shipments with infringing *Aspergillus terreus* lovastatin; and

3.      infringement from March 1998, when Blue Treasure was allegedly shipping lovastatin manufactured with *Aspergillus terreus*.

[133]   Subject to the possible exceptions of regulatory or experimental use, the making, constructing, using or vending lovastatin using *Aspergillus terreus* would be an infringement of the '380 Patent. Thus, if Merck can satisfy the Court that certain volumes of lovastatin made from the product received from Blue Treasure were manufactured from or contained, through "salting", *Aspergillus terreus* lovastatin, infringement has been established. Similarly, if Merck can persuade the Court that batch CR0157 contained lovastatin manufactured from *Aspergillus terreus*, infringement has been proved.

2010 FC 1265 (CanLII)

B.    *Burden*

[134]   The first point to be made is that proof of infringement is subject to the civil standard of proof. Merck's burden – whatever it may be – is met if infringement can be shown on a balance of probabilities. Stated in different words, Merck will succeed if it is more likely than not that infringement occurred.

[135]   It is trite law that the party alleging infringement bears the burden of proving infringement (see *Monsanto Canada Inc. v. Schmeiser*, 2004 SCC 34, [2004] 1 S.C.R. 902 at para. 29 [*Monsanto*]). However, consideration must be given to the scheme of the *Patent Act* and, in particular, to s. 39(2). Under the *Patent Act* applicable to this action, s. 39(1) provides that:

| | |
|---|---|
| 39. **Naturally occurring substances intended for food or medicine—**(1) In the case of inventions relating to naturally occurring substances prepared or produced by, or significantly derived from, microbiological processes and intended for food or medicine, the specification shall not include claims for the resulting food or medicine itself, except when prepared or produced by or significantly derived from the methods or processes of manufacture particularly described and claimed. [1987, c. 41, s. 14] | 39. **Procédés Microbiologiques Naturels—**(1) Lorsqu'il s'agit d'inventions couvrant des substances que l'on trouve dans la nature, préparées ou produites, totalement ou pour une part notable, selon des procédés microbiologiques et destinées à l'alimentation ou à la médication, aucune revendication pour l'aliment ou le médicament ne doit être faite dans le mémoire descriptif, sauf pour celui ainsi préparé ou produit selon les modes du procédé de fabrication décrits en détail et revendiqués. [1987, ch. 41, art. 14 ] |

2010 FC 1265 (CanLII)

[136]   This provision is followed by s. 39(2) which states that:

| | |
|---|---|
| (2)    In an action for infringement of a patent where the invention relates to the production of a new substance, any substance of the same chemical composition and constitution shall, in the absence of proof to the contrary, be deemed to have been produced by the patented process. | (2)    Dans une action en contrefaçon de brevet où l'invention porte sur la production d'une substance nouvelle, toute substance formée des mêmes composants et éléments chimiques est, en l'absence de preuve contraire, réputée avoir été produite par la procédé breveté. |

[137]   On its face, s. 39(2) applies to the facts before me. In Merck's opinion, the '380 Patent is to an invention that relates to the production of lovastatin – a "new substance". The lovastatin produced in any of Phases 1, 2 or 3 of the Defendants' manufacturing is a substance with the same chemical composition and constitution as that produced by the process of the '380 Patent. As such, s. 39(2) would apply and, absent proof to the contrary, such lovastatin would be deemed to be produced by the process of the '380 Patent. With respect to lovastatin manufactured as part of Phase 1 (except for batch CR0157), Merck accepts that there is "proof to the contrary". However, Merck asserts that, for lovastatin that is contained in batch CR0157 and all production sourced from Blue Treasure, s. 39(2) applies and the production must be deemed to be made from *Aspergillus terreus*, thereby infringing the '380 Patent.

[138]   The dispute between the parties centres on the meaning of the words "new substance" in s. 39(2).

[139]   Merck argues that the substances (Compounds I-IV) claimed in the '380 Patent are new and novel and s. 39(2) is engaged. While there is no definition of "new", the word appears in s. 2

2010 FC 1265 (CanLII)

under the definition of "invention".  As such, for patent purposes, "new" could mean novelty, or a product that has not been anticipated.

[140]   Apotex submits that the definition of newness has to be determined in light of patent legislation as a whole. Where a word has a meaning in one section, it ought to be the same in every section within a document, absent legislative intent to show that the word can have various meanings. In line with this argument, Apotex's counsel, in final argument, acknowledged that ss. 2 and 39(2) use the word "new". However, the word does not appear in provisions that deal specifically with novelty (anticipation): ss. 61, 27, 43. Thus, one cannot say that "new" equates with "anticipation".

[141]   According to Apotex, the interpretation of "new" must fit into the context of s. 39(2) and its commonsense purpose. In oral submissions, Apotex argued that the purpose of s. 39(2) (and its presumption of infringement) was:

> […] to deal with the impossibility of a plaintiff, when it comes to a process in a product-by-process claiming form, not being able, absent proof from the defendant of what that process is, to challenge the infringing nature of that process.

[142]   In line with this purpose, once another process is disclosed for the same product, the "newness" of the substance *per se* no longer exists. Apotex also asserted that newness can be lost in a number of other ways: prior commercialization, disclosure and use of the substance.

[143]   On the facts of this case, Apotex notes that the application that resulted in Canadian Patent No. 1,129,794  (the '794 Patent or the Endo Patent) related to the claims for lovastatin and

2010 FC 1265 (CanLII)

was filed in Canada before the '380 Patent. The '794 Patent also had an earlier priority and issue

date. It publicly describes an alternate process to create lovastatin. In Apotex's view, the same

can be said for lovastatin created from Red Yeast Rice.

[144]   As argued by the parties, there is no direct case law on the interpretation of "new" in

s. 39(2). It is helpful to return to first principles of statutory interpretation.

[145]   The starting point of my analysis is the general principle clearly stated by the Supreme

Court in *Rizzo & Rizzo Shoes Ltd., Re*, [1998] 1 S.C.R. 27 at paragraph 21, 154 D.L.R. (4th) 193

(See also *Bell ExpressVu Ltd. Partnership v. Rex*, 2002 SCC 42, 2 S.C.R. 559 at para. 26, and

cases cited therein):

> […] Elmer Driedger in Construction of Statutes (2nd ed. 1983)
> best encapsulates the approach upon which I prefer to rely. He
> recognizes that statutory interpretation cannot be founded on the
> wording of the legislation alone. At p. 87 he states:
>> Today there is only one principle or approach,
>> namely, the words of an Act are to be read in their
>> entire context and in their grammatical and ordinary
>> sense harmoniously with the scheme of the Act, the
>> object of the Act, and the intention of Parliament.

[146]   *Sullivan on the Construction of Statutes*, 5th ed. (Markham, Ont.: LexisNexis, 2008)

(*Sullivan*) comments on the modern principles as articulated by Driedger (p. 3):

> The court must adopt an interpretation that is appropriate. An
> appropriate interpretation is one that can be justified in terms of (a)
> its plausibility, that is, its compliance with the legislative text; (b)
> its efficacy, that is, its promotion of legislative intent; and (c) its
> acceptability, that is, the outcome complies with accepted legal
> norms; it is reasonable and just.

2010 FC 1265 (CanLII)

[147]   Furthermore, in relation to the textual analysis of legislation, there are a number of

relevant principles: (a) the presumption of consistent expression (*Sullivan*, above, pp. 214-23),

and (b) the presumption of coherence (*Sullivan*, above, pp. 223-25).


[148]   Under the principle of consistent expression, it is presumed that the legislature uses

language carefully and consistently within the same statute. As such, same words presumptively

have the same meanings. On the flip side, one can infer, from the use of different words or a

different form of expression, that a different meaning was intended by drafters. This principle

was highlighted by the Federal Court of Appeal in *Peach Hill Management Ltd. v. Her Majesty*

*the Queen* (2000), 257 N.R. 193 at paragraph 12, G.S.T.C. 45: "When an Act uses different

words in relation to the same subject such a choice by Parliament must be considered intentional

and indicative of a change in meaning or a different meaning."


[149]   According to *Sullivan* (pp. 221-22), the strength of this presumption varies. Highly

technical statutes and terms that play a key role in the legislative scheme are strongly presumed

to have the same meaning throughout. For example the definition of "income" in taxation

legislation was considered to be a key term in *Mattabi Mines Ltd. v. Ontario (Minister of*

*Revenue)*, [1988] 2 S.C.R. 175, 53 D.L.R. (4th) 656. The presumption of consistent expression is

also strong when the repeated words contribute to a noticeable pattern.


[150]   This presumption, however, can be weakened when one examines the context

surrounding the words: "Identical words may not have identical meanings once they are placed

in different contexts and used for different purposes. This is particularly true of general or

2010 FC 1265 (CanLII)

abstract words" (see *Sullivan*, p. 222; *Jevco Insurance Co. v. Pilot Insurance Co.* (2000), 49 O.R. (3d) 760, O.J. No. 2259 (QL) (Ont. Sup. Ct.)).

[151]   The other relevant principle is the presumption of coherence. Here, one presumes that provisions of the same legislation are meant to work together logically as parts of a functioning whole.

> The parts are presumed to fit together logically to form a rational, internally consistent framework; and because the framework has a purpose, the parts are also presumed to work together dynamically, each contributing something toward accomplishing the intended goal. […] It is presumed that the body of legislation enacted by a legislature does not contain contradictions or inconsistencies, that each provision is capable of operating without coming into conflict with any other (*Sullivan*, above, p. 223).

[152]   In applying these principles, the question is: does "new" in s. 39(2) mean "new" in the ordinary sense, or in the sense of novelty? In other words, to displace the application of s. 39(2), does Merck have to prove that the substance of the product-by-process claim in the '380 Patent was novel, or simply that it was not known before?

[153]   For the reasons that follow, I interpret the word "new" to simply mean a substance that was not previously known or used, rather than novelty.

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

[154]   First, within the context of ss. 2 and 39(2), "new" has been used as an adjective.

According to the *Gage Canadian Dictionary* (W.S. Avis et al. (ed) (1983), Gage Educational

Publishing Co., Toronto), at p. 766, "new" is defined as "not existing before". *Black's Law*

*Dictionary* (6th ed.) (St. Paul, Minn.: West Publishing Co, 1990), at p. 1042 describes "new" as

follows:

> [...] this word may denote novelty, or the condition of being
> previously unknown or of recent or fresh origin, but ordinarily it is
> a purely relative term and is employed in contrasting the date,
> origin, or character of one thing with the corresponding attributes
> of another thing of the same kind or class.
>
> In order to be "new", as the word is used in the patent laws, the
> achievement must be either one that produces an unusual or
> improved or advanced result, which was unknown to the same
> prior art at the time of the claimed invention; or the achievement
> must be one that produced an old result in an unusual and
> substantially more efficient, or economical way. [Emphasis added.]

[155]   As seen above, the ordinary meaning of "new" can equate to novelty or simply a

condition of being previously unknown. It is a word that is "purely relative" in nature.

[156]   Second, I turn to the contextual meaning of the word "new" within the *Patent Act*. While

there is no dispute that patent legislation is highly technical, does the word "new" carry a

specific and technical meaning? Is it used in a way that creates a noticeable pattern? Is there a

presumption of consistency? My answer to these questions is "no".

[157]   "New" in ss. 2 and 39(2) is relative as well; in both instances, the word is used as an

adjective to describe different things. Under s. 2, "new" describes how an "art" or

"improvement" can rise to the level of an invention. The notion of novelty is part and parcel of this interpretation.

[158]   On the other hand, in s. 39(2), legislators are not describing what constitutes an invention. This provision relates solely to infringement and novelty is not directly at issue. Further, the word "new" is not employed to determine if an "art" or "improvement" constitutes an invention. It merely describes a "substance" or a "product" in a product-by-process claim. There is no requirement that the "substance" be inventive. Section 39(2) deals with the claims in a product-by-process patent. In such claims, the substance cannot be divorced from its process (see s. 39(1) of the *Patent Act*). Accordingly, in a product-by-process claim, whether the substance is novel is not determinative. It is the process of producing the substance that must be novel, new, and inventive. In the context of a product-by-process claim, "new" does not necessitate a novel (not-anticipated) substance.

[159]   Third, this interpretation is consistent with the rest of the legislative scheme and avoids internal inconsistencies. If "new" described a novel substance or medicine as the invention *per se*, it would contradict s. 39(1) of the *Act*.

[160]   Applying this to the case at hand, the claimed invention is not lovastatin, but lovastatin created through the process of fermenting the organism *Aspergillus terreus*. It is clear from s. 39(1) of the *Act* that the patentee cannot merely claim lovastatin, a medicinal substance, as the invention. Lovastatin is merely the product of the product-by-process claim in the '380 Patent.

2010 FC 1265 (CanLII)

[161]   Fourth, ss. 27, 43, and 61, which relate to questions of novelty, have no mention of the word new.

[162]   Fifth, the jurisprudence supports the interpretation of "new" which means not previously known. According to Justice Nadon, in *Eli Lilly and Co. v. Nu-Pharm Inc.*(1994), 54 C.P.R. (3d) 145 at para. 32, [1994] F.C.J. No. 225 (QL) (F.C.T.D.)[*Eli Lilly and Co. v. Nu-Pharm Inc*. cited to C.P.R.], the presumption of infringement does not arise until the plaintiff has satisfied a minimum evidentiary burden that the substances in question are "new substances". This means that the initial burden is on Merck to show that the substances created from the process in the '380 Patent are "new substances". The burden is not on Apotex to show that the substances are not new or are anticipated. Since the burden is on Merck to show that the substances created from the process in the '380 Patent are "new substances", to equate "new" with the test of "novelty" would lead to an illogical result. Under the scheme of Canadian patent law, defendants to an infringement action have the burden to prove anticipation (a subset of invalidity). Thus, to have the patentee prove novelty under s. 39(2) would contradict fundamental principles of patent law.

[163]   In sum, "new" is a highly relative term and its definition is dependent on its context. Within the context of s. 39(2) of the *Act*, "new substance" means a substance that was not previously known.

[164]   With respect to the '380 Patent, the question is whether Compounds I-IV were previously known, or are they simply "old" products?  In other words, even if anticipation is not established

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

by the lovastatin produced by Red Yeast Rice or by the Endo Patent, can lovastatin be said to have been sufficiently "known", and thus, successfully undermine the "newness" of the substance in the '380 Patent? The answer to these questions is found in the claims construction.

[165]   Claim 1 of the '380 Patent clearly states that it is "a process of producing the compounds of the structural formulae [Compounds I-IV]". While the parties acknowledge that Compound I, lovastatin, is identical to the structure in Dr. Endo's '794 Patent, claim 1 does not solely fence out Compound I, but also II, III, and IV. The Defendants presented no evidence that Dr. Endo knew of, or used, Compounds II, III, and IV. Further, there is no evidence that lovastatin produced by Red Yeast Rice contains Compounds II, III and IV.

[166]   Accordingly, I agree with Merck's argument that the combination of substances produced (Compounds I-IV) is new. There is no evidence that either the Endo Patent or the fermentation of traditional Red Yeast Rice would produce such a combination.

[167]   In light of the above, I conclude that s. 39(2) is engaged.

[168]   The question that follows is this: If s. 39(2) applies, what is the interpretation of "in the absence of proof to the contrary"? Does it mean that Apotex has an evidentiary burden and that, once this burden is met, the persuasive burden returns to the Plaintiffs to establish infringement? Or does it mean that the persuasive burden is established and therefore Apotex must disprove infringement?

[169]   Merck argues that s. 39(2) mandates that the persuasive burden of proof remains with Apotex to show non-infringement. This is supported by the language in the provision – infringement is deemed "in the absence of proof to the contrary". According to Merck, this is different from the presumption of validity, which is weakly worded as merely "in the absence of evidence to the contrary". Merck relies on *Apotex Inc. v. Tanabe* (1994), 59 C.P.R. (3d) 38 at paragraph 92, [1994] O.J. No. 2613 (QL) (Ont. Gen. Div.) [*Apotex v. Tanabe* cited to C.P.R.] to interpret the language in s. 39(2) as creating an onus that it "is not simply an obligation to adduce some evidence to the contrary". Rather, "proof to the contrary" is a "much higher onus than the onus simply to adduce some evidence to the contrary" (*Apotex v. Tanabe*, above, at para. 92). Thus, Merck concludes that s. 39(2) is a provision that deems, rather than presumes, infringement. Consequently, in Merck's view, the persuasive burden is on Apotex to prove non-infringement. I disagree.

[170]   Section 39(2) of the *Act* creates a presumption of infringement that confers on Apotex an evidentiary burden to rebut infringement. There is no support for Merck's argument that s. 39(2) deems infringement and puts the persuasive burden on Apotex.

[171]   *Hughes & Woodley on Patents*, 2nd ed., looseleaf (Markham, ON: LexisNexis Canada, 2005) at paragraph 45 states that s. 39(2) creates a presumption of infringement:

> This provision creates a presumption of infringement, but, only
> once an applicant has satisfied a minimum evidentiary burden,
> establishing that the substances in question are "new" and
> identical. These provisions, however, may permit the Court to give
> a broader interpretation of the claims than a mere purposive
> construction. This is to be contrasted with section 45 of the Patent
> Act which provides for a presumption of validity in the absence of
> "evidence" to the contrary. Speculation, as to alternative processes

2010 FC 1265 (CanLII)

that may have been used to produce the product, falls short of the
required evidence to the contrary. [Emphasis added; see also *Eli
Lilly and Co. v. Nu-Pharm Inc.*, above.]

[172]   The text notes that, compared to the validity presumption (rebuttable on an evidentiary

basis), the presumption of infringement is stronger. This can be supported by Justice Campbell's

decision in *Apotex v. Tanabe* (above, at para. 92). While Justice Campbell held that "proof to the

contrary" necessitates a higher standard than "evidence to the contrary", he does not go so far as

to say that "proof to the contrary" equates to a persuasive burden to prove a fact on a balance of

probabilities. As such, comparing the presumptions of validity and infringement, there is only a

difference in degree rather than nature of the burden.

[173]   Justice Gibson, in *Abbott Laboratories v. Canada (Minister of Health)*, 2004 FC 1349,

260 F.T.R. 276 at para. 101 [*Abbott Laboratories*], examined the words "in the absence of proof

to the contrary" in s. 6(6) of the *Regulations*:

> (6) For the purposes of an application referred to in subsection (1),
> if a second person has made an allegation under subparagraph
> 5(1)(*b*)(iv) or (2)(*b*)(iv) in respect of a patent and the patent was
> granted for the medicinal ingredient when prepared or produced by
> the methods or processes of manufacture particularly described and
> claimed in the patent, or by their obvious chemical equivalents, it
> shall be considered that the drug proposed to be produced by the
> second person is, in the absence of proof to the contrary, prepared
> or produced by those methods or processes. [Emphasis added.]

[174]   According to Justice Gibson, this provision deals with product-by-process claims, and

also creates a presumption that the patent will be infringed. Despite the strong words of "in the

absence of proof to the contrary", Justice Gibson was clear that there is no shift in the persuasive

burden (*Abbott Laboratories*, above, above, at para. 101).

2010 FC 1265 (CanLII)

[175]   The Supreme Court, in *Circle Film Enterprises Inc.  v. Canadian Broadcasting Corp.,*

[1959] S.C.R. 602 at p.604, 31 C.P.R. 57 [*Circle Film* cited to S.C.R], considered similar words

in s. 20(3)(b) of the *Copyright Act*, R.S.C. 1927, c. 532: "The author of the work shall, <u>unless the</u>

<u>contrary is proved</u>, be presumed to be the owner of the copyright." In seeking to characterize the

words in s. 20(3)(b), Justice Judson stated (*Circle Film*, above, at p. 606):

> I take the operation of a presumption of this kind to be as stated by
> Wigmore on Evidence, 3rd ed., s. 2491(2):
>
>> It must be kept in mind that the peculiar effect of a
>> presumption "of law" (that is, the real presumption)
>> is merely to invoke a rule of law compelling the
>> jury to reach the conclusion in the absence of
>> evidence to the contrary from the opponent. <u>If the</u>
>> <u>opponent does offer evidence to the contrary</u>
>> <u>(sufficient to satisfy the judge's requirement of</u>
>> <u>some evidence), the presumption disappears as a</u>
>> <u>rule of law, and the case is in the jury's hands free</u>
>> <u>from any rule</u>. [Emphasis added.]

[176]   In sum, I conclude that the phrase "in the absence of proof to the contrary", in s. 39(2),

amounts to an evidentiary burden to rebut the presumption of infringement.

[177]   Following this, a number of questions are raised: what is an evidentiary burden? Also,

what do the Defendants in this case have to prove in order to meet their evidentiary burden and

rebut the presumption of infringement?

2010 FC 1265 (CanLII)

[178]   On the definition of evidentiary burden, the Federal Court of Appeal in *Hoffmann-La Roche Ltd. v. Canada (Minister of Health and Welfare)* (1996), 70 C.P.R. (3d) 206 at para. 8, 205 N.R. 331 [*Hoffmann-La Roche* cited to C.P.R.] stated:

> […] the "persuasive burden" or the "legal burden", is the burden of establishing a case to the civil standard of proof. By contrast, the <u>"evidential burden" consists of the burden of putting an issue in play and means that a party has the responsibility to ensure that there is sufficient evidence of the existence or non-existence of a fact or an issue on the record to pass the threshold for that particular fact or issue.</u> Nu-Pharm, supra, per Stone J.A., at page 33. [Emphasis added.]

[179]   According to the Supreme Court of Canada in *R. v. Fontaine*, 2004 SCC 27, [2004] 1 S.C.R. 702 at paragraph 11 [*Fontaine*], the "evidentiary burden" is not a burden of proof. It is a legal question left for the judge to determine whether "there is some evidence upon which a properly instructed jury could reasonably decide the issue" (*Fontaine*, above, at para. 13). In making such a determination, "the judge does not evaluate the quality, weight or reliability of the evidence" (*Fontaine*, above, at para. 12).

[180]   Justice Wetston in *Pharmacia Inc. v. Canada (Minister of National Health and Welfare)*(1995), 60 C.P.R. (3d) 328 at paragraph 28, 92 F.T.R. 253 (F.C.T.D.) [*Pharmacia* cited to C.P.R.], held that the presumption of infringement is bolstered by the common law presumption. According to *Pharmacia*, the common law presumption is (above, at para. 20):

> […] where the subject-matter of an allegation lies particularly within the knowledge of one of the parties, that party must prove it. In this instance, the applicants submit that only the respondent knows the precise composition and process to be used in making their product.

[181]   The Court of Appeal in *Hoffmann-La Roche* set out the test for establishing the common law presumption: (a) the defendant asserted no facts to support allegations of non-infringement; (b) the evidence of non-infringement lay peculiarly within the knowledge of the defendant; and (c) the plaintiff had no other available means to access such evidence (above, at para. 8).

[182]   Combining principles of the evidentiary burden, the common law presumption and s. 39(2), I conclude that Apotex's burden is to show that it used a non-infringing process to create lovastatin, and that this process was disclosed to Merck. At this time, the Court should not assess the quality, weight or reliability of the evidence, but merely ask if there is sufficient evidence to put the issue in play.

[183]   I find that Apotex, by its disclosure of the AFI-4 process (fermenting *Coniothyrium fuckelii* to produce lovastatin), has met its evidentiary burden to rebut the presumption of s. 39(2). Merck has accepted that the non-infringing AFI-4 process was used at the AFI plant in Winnipeg to produce lovastatin (except for CR0157). Because Apotex has met its evidentiary burden, the presumption of infringement has been rebutted. In the words of Wigmore, "… the presumption disappears as a rule of law and the case is in the jury's hands free from any rule" (*Circle Film*, above, at p. 606). The persuasive burden of proof is back with Merck.

[184]   By way of summary, the burden within s. 39(2) of the *Act* is as follows:

a)      Merck has the evidentiary burden to prove its substance is "new" in order to engage s. 39(2);

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

b)      Apotex then has the evidentiary burden to prove a viable alternative process existed to create lovastatin that does not infringe the '380 Patent – if this is done, the presumption of law is lifted; and finally,

c)      Merck has the persuasive burden to prove infringement.

[185]   On the facts of this case, I am persuaded that the '380 Patent involves a "new substance" thereby engaging s. 39(2). Apotex has established that a viable alternative exists that does not infringe the '380 Patent. Accordingly, Merck has the persuasive burden to satisfy me, on a balance of probabilities, that Apotex's sale of lovastatin, manufactured by Blue Treasure lovastatin or out of batch CR0157, was made by a process that infringed the '380 Patent.

[186]   I turn now to consider whether Merck has met its burden. In my view they have, with respect to some of the lovastatin manufactured by Blue Treasure and lovastatin that originated from AFI batch CR0157.

C.      *Summary of Merck's case on infringement*

[187]   As noted above, Merck claims infringement of the '380 Patent in three different scenarios:

1.      infringement, between April 1997 and March 1998, through the manufacture by Blue Treasure of quantities of infringing lovastatin that were shipped to AFI,

2010 FC 1265 (CanLII)

when Blue Treasure was allegedly "salting" the lovastatin shipments with

infringing *Aspergillus terreus* lovastatin;


2.      infringement from March 1998, when Blue Treasure was allegedly shipping

lovastatin manufactured with *Aspergillus terreus*; and


3.      infringement through the manufacture (during Phase 1 of production described

above), by AFI in Winnipeg, of quantities of lovastatin included in batch CR0157.


[188]   I will deal with each of these scenarios separately.


**VII.**   **Infringement – the Circumstantial Case**


A.      *Blue Treasure "Salting"*


[189]   Merck asserts that Blue Treasure was "salting" its earlier shipments of lovastatin with

infringing AFI-1 lovastatin. In simple terms, Merck submits that Blue Treasure was "diluting" its

AFI-4 lovastatin with AFI-1 lovastatin, thereby infringing the '380 Patent with each and every

shipment of lovastatin to AFI.


[190]   On March 18, 2010, Merck received a copy of an e-mail, dated September 8, 1997

purportedly from Dr. Su to his "managers" at AFI. In the e-mail, Dr. Su wrote that "before the

switchover, [Blue Treasure] . . . produced 296.6 kg #1 product". This 296.6 kg product is the

2010 FC 1265 (CanLII)

basis of Merck's salting argument. The Defendants have not provided evidence as to how this quantity of AFI-1 lovastatin was sold or disposed of.

[191]   Does the failure of Blue Treasure to account for this quantity of AFI-1 lovastatin lead to a finding, on a balance of probabilities, that this lovastatin ended up being shipped to Canada as a "salted" mixture with non-infringing AFI-4?

[192]   Merck argues that, absent evidence of the whereabouts of the entire 296.6 kg, the reasonable inference is that all or part of that quantity of AFI-1 lovastatin was used to "salt" the AFI-4 lovastatin. By salting the Winnipeg shipments with infringing lovastatin, Merck asserts that Blue Treasure was able to sell the more cheaply-made lovastatin where payment was priced, on a kilogram basis, on the more costly AFI-4 lovastatin. Blue Treasure was also thereby able to dispose of its aging inventory of infringing lovastatin that could not be moved on the domestic Chinese market. According to Merck, if there were an innocent explanation for Blue Treasure's disposition of the infringing lovastatin, AFI would have provided it; none has come.

[193]   In addition to the Defendants' failure to provide sufficient information on the disposal of 296.6 kg of AFI-1 lovastatin, Merck points to two other key factors which, in their view, support the allegation of "salting". The first point is the evidence that demonstrates the difficulty that Blue Treasure was having selling lovastatin into the Chinese or other foreign markets at a reasonable profit. (This evidence is discussed at some length in the section of these reasons dealing with "motivation".)

[194]   Moreover, Merck refers to AFI's concern that unusually low levels of RC-14 were found

in the first two shipments of lovastatin from Blue Treasure. Merck argues that AFI had been

worried enough about the possibility of "adulteration" that Dr. Su was sent to Blue Treasure to

investigate and supervise the Blue Treasure lovastatin productions. No determination was ever

made by Dr. Su about the reason for the unusually low levels of RC-14 in the shipments of AFI-

4 lovastatin. Merck appears to argue that the RC-14 level could be explained if the shipment to

AFI had been, in fact, a mixture of AFI-1 and AFI-4 lovastatin.


[195]   In a letter dated August 11, 1997, Dr. Cox advised Mr. Zhou that:

> I was very disappointed to learn that 2 out of 3 batches of
> lovastatin made by the new AFI process had failed our quality
> control, partly because your people had unilaterally made changes
> to our process.


[196]   The most worrying problem with the lovastatin batches was the low levels of a compound

known as RC-14. In a letter from Mr. Alexander (Sandy) Fowler (Finance Manager at AFI) to

Mr. Zhou dated September 12, 1997, Mr. Fowler described the "puzzle" as follows:

> Our scientists are very concerned in regard to the low levels of
> RC14 in certain of the batches produced at Blue Treasure. At
> [AFI], we have never produced AFI-4 lovastatin with such low
> RC14. In fact, in our experience, the "signature" of AFI-4 is a
> higher level of RC14.


[197]   Low levels of RC-14 were characteristic of AFI-1. Thus, it is clear that the real concern

was whether the AFI-4 lovastatin was being produced using AFI-1 or was being contaminated in

some way by the *Aspergillus terreus* strain. During his oral testimony, Dr. Cox was very direct in

his testimony about the lack of trust between AFI and Blue Treasure. The decision was made by

2010 FC 1265 (CanLII)

AFI to send Dr. Jerry Su to Blue Treasure to work with the management team (see letter dated August 18, 1997 from Dr. Cox to Mr. Zhou).

[198]   Dr. Jerry Su was the Group Leader of Research & Development at AFI from September 1996 to December 1998. Dr. Su arrived in China on August 28, 1997 and remained there until the end of October 1997. As set out in his "Report on the work at Blue Treasure", dated November 13, 1997, his primary task was to ensure that Blue Treasure maintained all fermentation free of contamination from the *Aspergillus terreus* strain. He investigated the low levels of RC-14 but, even after his time in China and his examination of a number of possible reasons, the cause of low RC-14 levels in two batches was still a "puzzle". Nevertheless, Dr. Su appeared to be satisfied that the runs conducted while he was at Blue Treasure would meet the quality control standards at AFI.

[199]   Together, Merck submits, all of this evidence is consistent with a finding that, on a balance of probabilities, Blue Treasure was mixing infringing AFI-1 lovastatin with the AFI-4 lovastatin that was being shipped to AFI from Blue Treasure.

[200]   In terms of the technical feasibility of salting, Merck relies on the statement of Dr. Cox who testified that there is nothing difficult about salting:

> Q.    You understood, at the time, doctor, that Lovastatin made from one process could be made and mixed with Lovastatin made using another process; you understood that was a technical feasibility?
>
> A.    It's very straightforward.  You put them together and mix them.

2010 FC 1265 (CanLII)

[201]   I agree with Merck that the Defendants – in particular AFI – have presented obstacles to uncovering relevant facts related to the amount of AFI-1 lovastatin actually produced and sold by Blue Treasure. Once the e-mail of Dr. Su came to light on March 18, 2010, Merck sought and was granted, on consent, an opportunity for further discovery of Mr. Fowler. Mr. Fowler has been the Finance and Administration Manager at AFI since 1996. Questions related to this lovastatin were put to Mr. Fowler and taken under advisement by counsel for AFI. AFI refused to provide confirmation of the 296.6 kg quantity (Undertaking #2319). In Undertaking #2320, AFI was also asked, in respect of the 296.6 kg product:

> To advise full particulars, when it was made, what happened to it, who it was sold to, for how much and financial benefits to AFI and Apotex.

[202]   All of this information was refused. Although Apotex refers to some evidence on the record that directionally supports legitimate sales of AFI-1 lovastatin, the information is far from complete or clear.

[203]   In spite of my serious concerns about the unwillingness or inability of the Defendants to provide evidence concerning the alleged 296.6 kg product, I have problems with Merck's argument on this point.

[204]   My first concern is that I have little evidence that Blue Treasure produced 296.6 kg of AFI-1 lovastatin. In Dr. Su's e-mail, there is the reference that, "before the switchover, [Blue Treasure] . . . produced 296.6 kg #1 product". There is no indication in the e-mail of where this number came from. Contrary to the assertion by Merck, the e-mail does not "prove" the existence of 296.6 kg of infringing lovastatin.

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

[205]   The second problem is that I have no evidence, beyond the cryptic statement of Dr. Cox, as to how salting could be carried out. No expert spoke to the practice. As noted by counsel for Apotex in final argument:

> . . . there was no evidence led as to how you put together AFI-1 material with AFI-4 material, whether the appearance and composition of technical grade lovastatin, colour wise, physical characteristics, crystallinity, whether that is comparable.

[206]   In addition, I have no confirmation from anyone that low levels of RC-14 could be explained by salting. That question could have been posed to any number of witnesses by Merck and was not. The closest discussion on the record occurred during the cross-examination of Mr. Fowler. Mr. Fowler was questioned at length about why Dr. Su was sent to China. Specifically, the concern that Blue Treasure had switched the organisms was put to Mr. Fowler. His response included a vague reference to the possibility of "contamination or mixing of product":

> The concern from my perspective was that there not be any mix-up or errors resulting in a contamination or mixing of product, that sort of thing.  Certainly, in everybody's mind there was a possibility of some mix-up, and that's what we wanted to get to the bottom of.

This statement is certainly not sufficient for me to conclude that AFI believed that "salting" was going on at Blue Treasure.

[207]   I conclude that it is possible that Blue Treasure used some of the alleged 296.6 kg of AFI-1 lovastatin to "salt" the AFI-4 lovastatin being shipped to AFI. However, on the evidence before me, I have insufficient evidence about how that could have been done from a technical

perspective. Nor do I have any evidence that AFI believed that "salting" might have been the reason for the low levels of RC-14.

[208]   In short, Merck has failed to persuade me, on a balance of probabilities, that any quantities of lovastatin were salted with infringing lovastatin.

B.      *Infringement by Blue Treasure from March 1998*

[209]   As I understand Merck's argument on infringement after March 1998, the key reasons why I should find that the lovastatin manufactured by Blue Treasure and sold to AFI for sale in Canada, was produced using a process that infringed the '380 Patent are as follows:

- The Batch Records (referred to below) produced by Blue Treasure to demonstrate the use of the non-infringing AFI-4 process for producing lovastatin are not genuine.

- The Defendants failed to provide evidence that Blue Treasure acquired sufficient quantities of a compound known as P2000 with which to carry out fermentations with the *Coniothyrium fuckelii* micro-organism.

- The reduction in the duration of fermentation, beginning in March 1998, is unexplained except by the use of the infringing process.

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

- The increase in the quantities of titres, beginning in March 1998, is unexplained except by the use of the infringing process.

- Blue Treasure had the motivation, the means and the opportunity to produce lovastatin with the less expensive, more efficient AFI-1 infringing process.

- The conduct of Blue Treasure before and during this trial is consistent with infringement.

[210]   In addition to the above – much of which consists of circumstantial evidence – Merck asserts that it has direct evidence of infringement through the DNA evidence put forward by Dr. Julian Davies.

(1)    <u>Batch Records</u>

[211]   Standard pharmaceutical industry practice requires that detailed and exact records be kept of all steps in the production of pharmaceutical products. In this trial, the Defendants put forward 364 documents as true photocopies of the batch records for 364 fermentation batches of lovastatin made at Blue Treasure (the Batch Records). There is no doubt that, if the Batch Records (all of which are contained in Exhibit 149) can be believed, they are direct evidence that Blue Treasure was using the non-infringing AFI-4 process and not a process using *Aspergillus terreus*. However, the issue is whether I can believe that the Batch Records are reliable, or even truthful, in some important aspects. Quite simply, I cannot.

[212]   The first problem with the Batch Records is that they are not the original working records from the batches. The original Batch Records, together with every single related document and working paper, were destroyed in 2003. All that is before this Court are photocopies of what is alleged to be the original batch records.

[213]   The Batch Records were introduced into evidence by Mrs. Quifen Hu. Mrs. Hu has been the Manager of the Bacterial Culture Department at Blue Treasure since 1995. From 1991 to 1994, she was the Manager of the Intermediates Department at New North River in China. Since 1995, Mrs. Hu's responsibilities have mainly related to maintaining the seed bank at Blue Treasure and initializing the fermentation process for the production of lovastatin.

[214]   Each of the 364 Batch Records is substantially the same in format; each appears to be a pre-printed form with data and other entries written by hand. They reflect fermentations that began on May 27, 1997, with batch no. CF-403-97001, and ran until the fermentation of batch no. CF-410-99166, which began on September 29, 1999.

[215]   Parts 1.1 and 1.2 are entitled "Production Record of Lovastatin Fermentation". The list of ingredients of the medium is printed on the form and the quantities used are hand written in the appropriate space. Information on the pH adjustment and the steps for inoculation of the seed flasks are documented. The final step described is the culture of a second seed flask.

[216]   Parts 2 to 14 of each batch record set out the scale-up of fermentation from the final step of Part 1.2 to Part 13, which is entitled the "Production Fermenter", where the final product is

2010 FC 1265 (CanLII)

fermented. Along the way, increasingly larger fermenters are prepared and then inoculated with the seed media from the previous stage.

[217]   The only place that the initiating or seed micro-organism is described is in Parts 1.1 and 1.2. The batch no. is recorded on the cover sheet of each batch record and on most pages, and always begins with the letters "CF". Presumably, this means that the particular run is being carried out with *Coniothyrium fuckelii*. In addition, each of the 364 Batch Records is pre-printed with an entry that identifies the production strain as "*Coniothyrium fuckelii* AFI-4 85-42". For Parts 2 to 14, no strain is identified.

[218]   Mrs. Hu was responsible for overseeing the process to the end of Part 1.2. After that, the production steps were within the responsibility of the Fermentation Production Department, where Mr. Dingjun Luo (whose testimony is referred to later in these Reasons) worked.

[219]   The first point to make about the Batch Records is that they do not qualify as business records that can be accepted for the truth of their contents as an exception to the hearsay rule of evidence.

[220]   Since *Ares v. Venner*, [1970] S.C.R. 608 at p. 363, 12 C.R.N.S. 349, the common law in Canada has recognized that certain records:

> . . . made contemporaneously by someone having personal knowledge of the matters then being recorded and under a duty to make the entry or record should be received in evidence as *prima facie* proof of the facts stated therein.

2010 FC 1265 (CanLII)

[221]   The common law has been codified in s. 30(1) of the *Canada Evidence Act*, R.S.C. 1985, c. C-5:

> Where oral evidence in respect of a matter would be admissible in a legal proceeding, a record made in the usual and ordinary course of business that contains information in respect of that matter is admissible in evidence under this section in the legal proceeding on production of the record.

> Lorsqu'une preuve orale concernant une chose serait admissible dans une procédure judiciaire, une pièce établie dans le cours ordinaire des affaires et qui contient des renseignements sur cette chose est, en vertu du présent article, admissible en preuve dans la procédure judiciaire sur production de la pièce

[222]   The evidentiary record on the Batch Records is, to put it bluntly, a mess. One thing that I can say with certainty is that the Batch Records reflected in Exhibit 149 were not made contemporaneously with the fermentations to which they ostensibly relate. I need only compare these Batch Records to those produced as part of the production runs at AFI. The AFI records contain numerous corrections and deletions. From the writing styles, it is clear that a number of persons completed the documents at various stages of each fermentation. In contrast, the Batch Records do not contain a single strike-out or correction; they, as described by counsel for Merck, are "pristine". This would be unheard of in any production facility.

[223]   As I understand it, AFI acknowledged, late in the trial, that the staff at Blue Treasure completed unilingual Chinese work sheets on the plant floor and that, subsequently, the data collected was transposed into bilingual batch records. Other evidence, provided through an Undertaking, is that Mr. Luo confirmed that unilingual sheets "did exist and that information from those sheets . . . were transferred into the bilingual batch record".

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

[224]   If these are not business records, the question becomes: how much, if any, weight should be given to the Batch Records?

[225]   Three witnesses provided testimony on the Batch Records – Mr. Dingjun Luo, Mrs. Hu and Dr. Jerry Su.

[226]   The best evidence of how the Batch Records were created, and by whom, was provided by Dr. Jerry Su. As noted earlier, from September 1996 to December 1998, Dr. Su was the Group Leader of Research & Development at AFI. He has not worked for AFI since that time. Dr. Su was quite firm in his recollection, having spent long hours at the Blue Treasure plant observing and taking notes as to the daily operations.  The following flows from Dr. Su's testimony:

- Blue Treasure maintained two sets of batch records.  There were no "unilingual worksheets" for part of the process, only the original Chinese language batch records, which Dr. Su called the "first set" of batch records.  These were used on the plant floor and entries were made therein by operators.

- The first set of batch records was collected and the data therein were copied out, by hand, into a "second set" of bilingual batch records.

- Dr. Su sat next to, and witnessed, the person copying the batch records, but did not see whether the information was accurately being copied.

2010 FC 1265 (CanLII)

- The person who copied the data into the second set of batch records (apparently the originals of the ones before the Court) was Mr. Luo, Manager of the Production and Technology Department.

- Dr. Su did not recall ever seeing Mrs. Hu signing any of the Batch Records.

[227]   I have no reason to disbelieve Dr. Su and, where there is conflicting testimony from Mrs. Hu or Mr. Luo, I prefer the testimony of Dr. Su. At present, Dr. Su has no connection with AFI or Blue Treasure and no motive to fabricate his evidence. His explanation of the transfer of data from the original working documents is logical and consistent with the form of the Batch Records that make up Exhibit 149.

[228]   Mr. Luo's testimony was presented by AFI in an attempt to validate the Batch Records as reliable documents. Mr. Luo is currently Deputy General Manager with Blue Treasure. He first joined Blue Treasure, as a technician, in 1995. In 1996, he described his position at Blue Treasure as Head of Production and Technology.

[229]   Mr. Luo was a very difficult witness. AFI's counsel admitted, in oral final argument, that there were problems with Mr. Luo's testimony. As the evidentiary record with respect to the Chinese Journal Articles demonstrates (see para. 322 of these reasons), Mr. Luo was prepared to fabricate evidence when it served his purpose. His testimony was replete with poor memory of matters that ought to have been known to him. In spite of his senior position at Blue Treasure, he

claimed to be unaware of any matter that did not fall directly under his supervision. His evidence on the subject of the Batch Records was particularly problematic.

[230]   When cross-examined on the question of the second set of Batch Records, Mr. Luo was unequivocal:

> Q.      Thank you, sir.  Did you tell the lawyers that there was a unilingual Chinese worksheet from which data were copied into a second set of batch records?
>
> A.      There is no such first set and second set of records.
>
> Q.      Did you tell the lawyers that a unilingual worksheet, containing the parameters mentioned in a letter from February, were prepared and that those data were copied into the second set of batch records which have been produced in the litigation?  Did you tell the lawyers that?
>
> A.      No.

[231]   The problem is that Mr. Luo provided a different and conflicting explanation about the Batch Records, recorded as a response to Undertaking # 6585:

> Mr. Luo advised that it was the operators that transferred information from the unilingual worksheets into the bilingual English/Chinese batch record. He would then check the bilingual batch record to ensure that it was accurate and that no information was missing.

[232]   As demonstrated by these examples and other portions of the record, the evidence of Mr. Luo with respect to the Batch Records lacks credibility.

[233]   Another witness who spoke about the Batch Records was Mrs. Hu. Apotex submits that I should accept Mrs. Hu as a reliable witness. I find that difficult to do.

2010 FC 1265 (CanLII)

[234]   Mrs. Hu was an evasive and difficult witness. Her testimony on the Batch Records was no less confusing than that of Mr. Luo. Repeatedly, she refused to acknowledge matters that should have been within her knowledge. She was lead extensively through her direct testimony. In general, her testimony in chief was a reading of the Batch Records. Mrs. Hu's recollection of making lovastatin with *Coniothyrium fuckelii* from May 1997 to October 1999 and her testimony with respect to the Batch Records were not consistent and did not stand up on cross-examination.

[235]   When taken to the cover page of the batch record for the first run of AFI-4, Mrs. Hu testified that she signed the original of this batch record on May 26, 1997, the date reflected on the record. Similarly, she testified that she signed each and every one of the 364 Batch Records on the date that the various operations were performed. She vehemently and – in my view – illogically clung to her testimony that she herself signed the record on each and every day. Mrs. Hu also testified that there were no unilingual Chinese records and that she had never seen anyone writing numbers on a separate work sheet for copying into the batch records later. This, of course, is not what the Court was told by Dr. Su. Moreover, her testimony that there were no unilingual or working records is inconsistent with the "pristine" appearance of the Batch Records in Exhibit 149.

[236]   Mrs. Hu may well have signed at the appropriate spots in Parts 1.1 and 1.2 of the reconstructed Batch Records. She may well have believed that Parts 1.1 and 1.2 of the Batch Records accurately reflected what she had done at that stage of the fermentation runs. However, I find, as a matter of fact, that she did not do so contemporaneously with the fermentation runs. Rather, she signed the pages after Mr. Luo had completed the forms. It is difficult to say whether

2010 FC 1265 (CanLII)

Mrs. Hu, whose testimony demonstrated no understanding of the English language, was even able to read what was printed and written on the forms or took the time to compare the information on the original operational records to the headings and data that appeared in Parts 1.1 and 1.2 of the Batch Records. The original records could have helped corroborate her testimony; sadly, they were destroyed. Most significantly, Mrs. Hu's testimony does not reliably establish which runs, if any, were made using AFI-4, in spite of the use of the identifier "*Coniothyrium fuckelii* AFI-4 85-42" on each of the Batch Records.

[237]   In sum, I am not persuaded that the Batch Records contain the original data from the 364 fermentations allegedly carried out by Blue Treasure; rather, they were transcribed from the originals, most likely by Mr. Luo.

[238]   Another area of concern regarding the Batch Records was the destruction of the original documents in January 2003. The fact that the original batch records were destroyed six years into this litigation by Blue Treasure, a joint venture in which the Defendants are partners, raises a serious concern. Were they destroyed, as asserted by Merck, to hide evidence of the actual production methods?

[239]   Mrs. Hu's testimony on why the original batch records were destroyed was inconsistent and illogical. According to Mrs. Hu, she was the person who authorized the destruction of the originals. She testified that she did so pursuant to a Chinese GMP policy (apparently entitled "Guidance for Industry – Q7A Good Manufacturing Practice Guidance for Active Pharmaceutical Ingredients"). However, when questioned about the policy, it was clear that she

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

did not have even the most basic understanding of the policy. Mrs. Hu was unable to recall

clearly any of the details related to the destruction. She could not remember clearly the last time

she signed a request for destruction. Finally, the copy of the GMP Policy presented to the Court

was apparently brought into effect in April 2003 – three months _after_ the alleged destruction. I

am left without any reasonable explanation as to why the original records were destroyed.

[240]   I find that the original batch records were destroyed for reasons that cannot be

determined, thereby leaving me unable to confirm any of the information contained in the Batch

Records.

[241]   Moreover, any further confirmation of how and when the Batch Records were actually

prepared is impossible. Mr. Brian Lindblom, recognized by the Court as an expert in forensic

document examination, provided helpful opinions regarding this issue. Mr. Lindblom examined

the Batch Records and, in his Expert Report, provided the following list of relevant tests that he

would have performed on the original documents had they been available to him (Lindblom

Expert Report, Exhibit 66, para. 19):

> (a)    whether the paper used in the original batch record was in
> fact available at the time the documents were allegedly
> made;
>
> (b)    whether all of the inks used in the original batch record
> were in fact available at the time the documents were
> allegedly made;
>
> (c)    whether the ink has been on the document for the amount
> of time indicated by the date of the batch record;
>
> (d)    whether a single ink had been used for a batch record
> supposedly completed by numerous people over many days
> (in which one would expect to find more that one ink type);

2010 FC 1265 (CanLII)

(e)     whether and perhaps when alterations had been made to documents which might suggest some type of fabrication;

(f)     whether the documents were in fact completed in the chronological fashion suggested by the time line set out in the batch records (this can be determined through examination of indentations); and

(g)     whether more than one person completed the handwriting on the batch record (as one would expect for a process which occurred over many days).

[242]   I conclude that the Batch Records are not reliable or trustworthy evidence that the fermentation runs that took place at Blue Treasure after March1998 were using the AFI-4 process to produce lovastatin. The pre-printed forms could have easily referred to *Coniothyrium fuckelii* as the production strain, even if a strain of *Aspergillus terreus* was used. The data could readily have been changed to cover up the use of the AFI-1 infringing process. Indeed, the lack of credibility of the two Blue Treasure witnesses leads me to conclude that it is more likely than not that the Batch Records were fabricated, at least with respect to any information that could identify the strain of micro-organism used.

[243]   The Batch Records and the testimony of Mr. Luo and Mrs. Hu are critical underpinnings of the Defendants' defence to the allegation of infringement. In my view, the Batch Records contain data about the fermentations that are not consistent with that defence.

[244]   Apotex asserts that Merck's argument that the Batch Records should not be relied on is inconsistent with Merck's use of the data to highlight the problems with the titres, the use of P2000 and the reduction in fermentation duration. I do not find the position of Merck, when

explained in oral argument, to be inconsistent. I believe that what Merck is saying is that the

Batch Records should be completely rejected. In the absence of reliable records on the

fermentations, Merck asserts that the Defendants have no defence to the allegation of

infringement. However and alternatively, Merck argues, if the Batch Records are to be believed,

the data demonstrates that Blue Treasure must have been using the infringing AFI-1 process after

March 1998.

[245]   On a final note, the Defendants submit that I should exercise caution in assessing the

credibility of Mrs. Hu and Mr. Luo. In particular, they point to the existence of cultural

differences that could account for the behaviour or demeanour of these witnesses.

[246]   This concern about applying "western" standards to an assessment of credibility was

considered, in a criminal context, by the Ontario Court of Appeal in the case of *R. v. E.(T.)*, 2007

ONCA 891, [2007] O.J. No. 4952 (QL) [*R. v. E.(T.)*]. In that case, the trial judge stated that he

did not believe the accused, relying heavily on the demeanour of the accused during his

testimony. The Court of Appeal at paragraph 5, in finding that the judge erred, stated as follows:

> The appellant contends that the trial judge's references to the
> appellant's apparent passivity and to his failure to make eye contact
> with the other witnesses at the trial constitute erroneous use of
> demeanour evidence. We agree. As the trial judge himself
> observed, accused persons can react differently in a stressful
> criminal trial. Without explaining why, and without
> acknowledging the effect of cultural background on demeanour
> (the appellant was born and raised in Sudan), the trial judge
> equated passivity and an absence of eye contact with witnesses
> with rejection of the appellant's credibility and, ultimately, his
> testimonial denial of committing the offence. This equation is, in
> our view, a misconceived and improper linkage.

2010 FC 1265 (CanLII)

[247]   In the criminal context, there is a significant difference in burden and standard of proof.

The Crown, in *R. v. E.(T.)*, bore the burden of proving all of the elements of the alleged offence

beyond a reasonable doubt. It was open to the Crown to put forward expert evidence on cultural

background; had it done so, the outcome in the Court of Appeal's decision might have differed.

Further, it appears, from reading the judgment of the Court of Appeal, that the trial judge placed

much of his reliance on the demeanour of the accused; as noted by the Court of Appeal, the trial

judge "equated" demeanour with rejection of the accused's credibility.

[248]   In the case before me, Mrs. Hu and Mr. Luo are the Defendants' witnesses. They were

put forward expressly to respond to the claim by Merck that Blue Treasure was, at least in part,

using the infringing AFI-1 process. During their appearances, I was never alerted to the fact that

any cultural background issues would alter how they presented themselves. Nor did the

Defendants put forward any expert testimony on what these alleged "cultural differences" could

be. In fact, beyond a general caution, the Defendants make no attempt to describe what particular

attributes would affect the testimony or to describe what specific aspects of their demeanour

reflect a cultural difference. In the circumstances, I can see no reason why I should not rely on

demeanour (within reason and not solely) in assessing their credibility.

[249]   Having said this, however, I am aware that both Mrs. Hu and Mr. Luo testified through

an interpreter. Even with competent translation (which we had in this trial), I can appreciate that

there may be times where the witnesses could have become frustrated with the inability to testify

directly. This frustration was readily apparent with Mrs. Hu – less so with Mr. Luo. In those

2010 FC 1265 (CanLII)

situations, the answers may not have been as clear as they could have been. I have taken that into account.

(2)    <u>P2000</u>

[250]   The evidence before me is that the compound known as Polyglycol P2000 (P2000) was an essential ingredient in the AFI-4 process. As I understand it, foaming created by the fermentation process negatively affects the production levels. When P2000 was added to the fermenters it acted as an anti-foaming agent and increased the titres dramatically. Without P2000, it is fair to say that the production of lovastatin using *Coniothyrium fuckelii* would not be commercially viable.

[251]   Dr. Connors, an expert witness who provided the Court with his understanding of the history of the AFI-4 process at AFI, spoke in superlatives about the decision to add P2000 to the process. According to Dr. Connors, the addition of P2000 to the fermentation medium in March 1995 was a key breakthrough in the development of the AFI-4 process at AFI:

> This is March of 1995.  This is really the big break in the project.  I will take you to, under tab 63, AFI production 4-39, the very first one.  This is when you are glad to be a scientist.  This is when you are glad that you chose science.  This, again, is culture 115 57, and this is the first data that suggests that <u>adding P2000 in larger amounts than what you would normally add it gives you a dramatic increase in the production of Lovastatin with this culture.</u>
>
> You can see through the top row of data that day six, day seven, day eight titers, 300 mgs per litre.  If you increase the P2000 up to two percent or 20 mls per litre, by day eight you have almost 1.6 grams per litre. <u>Spectacular.  I mean, this is incredible.</u>

2010 FC 1265 (CanLII)

You can see, also, more importantly too, or just as important, that this is a dose dependant manner.  As you increase the concentration of P2000 incrementally, you see a concomitant increase in the titer of Lovastatin as well.  So this was a very good result.  This was something that really broke the project open for them.

[Emphasis added.]

[252]   The increased amount of P2000 needed for the AFI-4 process as compared to the AFI-1 process is dramatic – in the order of 10 to 20 times more is required for the AFI-4 process. Mr. Scott Primrose is a senior research scientist at AFI. In 1993, he was working in the microbiology laboratory of AFI, where much of his work focussed on the development of non-infringing lovastatin – that is, the AFI-4 process. He confirmed that the AFI-1 process required about $1/20^{th}$ of the amount of P2000. Dr. Sailer described the amount of P2000 used for the AFI-4 process as "very unusual":

Typically amount of anti-foam used for fermentation it's like point two percent and in this case was two percent, 10 times more. [Emphasis added.]

[253]   Merck submits that Blue Treasure did not have sufficient quantities of P2000 to complete 364 runs of the AFI-4 process. Merck calculated that Blue Treasure would have needed 73,338 kg of P2000 to run 364 fermentation batches. This calculation was not disputed by the Defendants. Blue Treasure also needed P2000 for other projects, including for the production of compactin and AFI-1 lovastatin.

[254]   How much P2000 did Blue Treasure have? According to the evidence, between May 1, 1997 and June 9, 1998, AFI made 10 shipments of P2000 to Blue Treasure for a total of 27,784.80 kg. This would have been far short of the 73,338 kg needed to run the AFI-4 process,

but certainly sufficient to supply the AFI-1 process. Approximately 5 to 10% of the amount of

P2000 is needed for the AFI-1 process. How did Blue Treasure obtain the remaining P2000 that

it needed? There really was no answer to that question.

[255]   Dr. Connors speculated as follows:

> The balance of the P2000 could have come from someplace else.
> Might have been the amount they started with. Perhaps this was the
> amount of raw material that Winnipeg provided, and P2000 was
> sourced through some local vendor.  P2000 is not an unusual
> chemical.  It's a commodity, and could very well be available in
> China.  I don't know for sure.

[256]   The Defendants assert that, after July 1998, Blue Treasure began to source its own raw

materials, including P2000. Mr. Fowler, speaking to this issue during his testimony, stated that

"after the fifth order [for P2000] Blue Treasure was able to purchase its own raw materials".

However, Mr. Fowler provided nothing beyond speculation that Blue Treasure was accessing

P2000 from other markets; he had no personal knowledge of how that might have happened or if,

indeed, it did.

[257]   Beyond the speculation of Dr. Connors and Mr. Fowler, I have nothing that speaks to

Blue Treasure's acquisition of the required quantities of P2000. I have seen no invoices or

shipment statements to back up the Defendants' assertions in this regard.

[258]   The missing P2000 is extremely important. Without sufficient quantities of P2000, Blue

Treasure could not have produced AFI-4 lovastatin throughout the entire 364 runs. There are

obviously people associated with Blue Treasure who could have provided evidence of additional

2010 FC 1265 (CanLII)

purchases of P2000, if such purchases had taken place. For example, Mr. Zhou was the Plant

Manager at the relevant time. Of those who might have been able to assist the Court, only Mr.

Luo was called as a witness and he was not asked about P2000. In the circumstances, I will

presume that the evidence that could have been provided by the witnesses from Blue Treasure,

who were not called to testify, would have adversely affect the Defendants' case (see *Levesque v.*

*Comeau*, [1970] S.C.R. 1010, 16 D.L.R. (3d) 425). In other words, I will assume that Blue

Treasure has no further evidence that it ever purchased enough P2000 to carry out the 364

fermentations using the AFI-4 process.

[259]   In the absence of evidence to the contrary, it is not unreasonable to believe that Blue

Treasure was not using the AFI-4 process as the Defendants claim. On the other hand, I have

evidence that the Blue Treasure had sufficient P2000 - 27,784.80 kg – to carry out the

fermentations using the AFI-1 infringing process. I have persuasive evidence – albeit

circumstantial – that supports a conclusion that Blue Treasure was using the infringing AFI-1

process to produce lovastatin.

(3)    Fermentation Duration

[260]   One of Merck's arguments focuses on the notion of "fermentation duration". As

discussed in the background section of these reasons, the production of lovastatin requires

fermentation over a period of time. It is self-evident to say that a manufacturer will try to

produce the largest volume of final product over the least amount of time. For example, in

2010 FC 1265 (CanLII)

general, producing 100 units of material over 10 days is economically more efficient than producing the same 100 units over 12 days.

[261]   Production of lovastatin is reported in "titres" (also "titers") – that is, the concentration of a solution as determined by titration, usually measured in units of mg/L or g/L.

[262]   Dr. Mila Sailer explained "fermentation duration" as the interaction of a number of factors. Dr. Sailer was a fact witness presented to the Court by AFI. Dr. Sailer worked as a natural product chemist with AFI, and was involved in the production of lovastatin in October 1996 when AFI started its first commercial production of lovastatin from *Coniothyrium fuckelii*. Dr. Sailer explained that production of a product such as lovastatin requires consideration of a number of factors:

> There is a number of factor which is to be considered when you, when you want to optimize the production of the facility, fermentation facility.  So, for instance, you have to look on the production curve doing the fermentation run, you have to look on a capacity of the seed train which is used for inoculation of production vessels.  You have to look on the capacity of the downstream equipment.  You have to look on, for instance, on impurity profile during the fermentation run, which can change. You have to look on cost of the media.

[263]   Under the notion of the "production curve", Dr. Sailer spoke about fermentation durations and confirmed that often there is a trade-off between titres and fermentation times. Sometimes, he said "it's not the best to . . . go for maximum titres"; rather, "sometimes it's much better to shorten the time and do a higher number of fermentation[s]". While Dr. Sailer was not presented as an expert, his testimony codifies common sense when it comes to a general view of the factors affecting production.

2010 FC 1265 (CanLII)

[264]   The experience of AFI, in its Winnipeg facilities, during the period between August 1996 and August 1997, was that 76 batches of AFI-4 were run with an average fermentation duration of 11 days. In other words, the optimization spoken of by Dr. Sailer for AFI-4 was reached by an 11-day fermentation.

[265]   As we know, Blue Treasure began its runs of AFI-4 in June 1997. About 70 runs were made at Blue Treasure between June 1997 and October 1997. If the Batch Records are to be believed, although there is significant fluctuation, the average fermentation duration during that period was about 11 days. This was an expected result, given the experience of AFI with the AFI-4 process in Winnipeg.

[266]   Blue Treasure shut down its production of lovastatin from October 1997 to March 1998. Other than 17 runs that took place between December 1997 and January 1998, there was no production of lovastatin in this period. Upon resumption of production in March 1998, the fermentation duration was immediately lower and eventually stabilized at nine days.

[267]   These data were depicted by a graph, in Exhibit 83, prepared by Merck and presented to, and discussed by, a number of witnesses. What could account for the change in the fermentation duration?

[268]   Merck's explanation for the reduction in the fermentation duration after the plant shutdown is that Blue Treasure began to use the infringing AFI-1 process, instead of the AFI-4 process, to produce lovastatin.

[269]   The graph was first presented to Dr. Cox during cross-examination. Dr. Cox, whose testimony was very credible and trustworthy, agreed with counsel for Merck that Exhibit 83 showed that the AFI's 11-day fermentation duration for AFI-4 was roughly consistent with the fermentation duration experienced by Blue Treasure up until the plant shutdown. He also agreed that the graph in Exhibit 83 depicted an average nine-day fermentation duration after the resumption of production at Blue Treasure in March 1998. Finally, and most importantly, Dr. Cox confirmed that the AFI-1 process transferred to Blue Treasure could be run in nine days.

[270]   In my view, the decrease in fermentation duration after the Blue Treasure plant shutdown is more likely to have occurred with the production of AFI-1 lovastatin than with the production of AFI-4 lovastatin. Thus, even if the Batch Records are accepted as reliable evidence of the production runs, the data with respect to fermentation duration are consistent with the use of the AFI-1 process and not the non-infringing AFI-4 process.

(4)   Increased Titres

[271]   Fermentation duration is not the only variable to be considered in the economics of producing lovastatin. The amount of production or titres from each fermentation batch is of equal significance. Related to this issue is the role of Amicase in the fermentation medium. The AFI-4 process transferred to Blue Treasure required the use of a compound in the medium called Amicase. As I understand it, Amicase is an enzyme that is used as a catalyst in a chemical reaction. Dr. Connors testified that, "If you take out Amicase, then you get less lovastatin."

2010 FC 1265 (CanLII)

[272]   Amicase was an expensive ingredient and the evidence suggests that Blue Treasure was taking steps to try to avoid its use. In a memorandum dated October 23, 1997 to Dr. Xinfa Xiao and Dr. David He, both employees of AFI, Mr. Huigen Xu, of Blue Treasure, explained that, when Blue Treasure tested fermentation without Amicase, they "did not find any effect on the product quality". However, the same memorandum reports a reduction in titres of 9.75% at the 12,800 L fermentation stage. Mr. Fowler confirmed that, although a loss of productivity of 9.75% was the result of removing Amicase from the medium, Blue Treasure could achieve a cost savings of about $224.00 US per kilogram by its elimination.

[273]   From about January 1998, Blue Treasure produced lovastatin without using Amicase. One would logically expect that thereafter there would be a reduction in titres as reflected in the memorandum of October 23, 1997. That does not appear to have been the case.

[274]   In Exhibit 103, Merck's counsel attempted to pull together all of the information on titres. This exhibit was prepared from Exhibit 149 (a complete set of the Blue Treasure Batch Records), and presented in graphical format in Exhibit 83. During three periods, the average titres recorded by Blue Treasure showed the following:

| Period | Average titres (g/ml) |
|---|---|
| June 7, 1997 to October 27, 1997 | 2.3 (n = 53 runs) |
| December 8, 1997 to January 11, 1998 | 2.0 (n = 17 runs) |
| March 7, 1998 to October 7, 1999 | 2.2 (n = 292 runs) |

[275]   The chart demonstrates that there was a drop in titres of about 13% for the period December 8, 1997 to January 11, 1998. However, the titres increased, after the Blue Treasure plant shutdown, to a level approximately equal to the runs made with Amicase. The obvious

2010 FC 1265 (CanLII)

question is this: in the post-March 1998 period, how could Blue Treasure have obtained

production levels without Amicase consistent with those with Amicase?

[276]    Merck submits that the only reasonable explanation is that after March 7, 1998, Blue

Treasure was using the AFI-1 process and not the AFI-4 process.

[277]    In final oral argument, Apotex refers to a sub-set of the Batch Records to argue that there

is no evidence that the omission of Amicase resulted in a reduction in titres. For support of this

statement, they refer to Table A of Exhibit 156, listing "All L4-39-581 Fermentations Pre-March

1998." Apotex points out that the average titres of the three runs with Amicase are actually lower

than in the 12 runs listed in Table A that were run without Amicase:

> The point is, using the same time point from the data, when you
> remove Amicase at nine days, you have a significantly better titre
> performance. So the argument, the argument that you would expect
> titres to go down, because they did remove Amicase in the later
> runs in March and following, is not borne out by this document
> which my friend put forward as Exhibit 156.  It shows exactly the
> opposite.

[278]    The problem with Apotex's submissions on this point is that the average of titres with

Amicase highlighted by Apotex was based on an average of only three runs (September 24,

1997, September 26, 1997 and October 17, 1997). Apotex then compares this extremely small

sample size against another small sample of 12 runs. In my view, the averages used by Apotex

are based on a sub-set of the Batch Records from which relative conclusions as to titres for the

entire Batch Records cannot be made.

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

[279]   I prefer the information set out in Exhibit 103, which demonstrates an increase in titres of 13%. I accept that this is inconsistent with the omission of Amicase.

[280]   Even discounting the effect of the omission of Amicase, there are inexplicable changes in production levels after the plant shutdown. This change in titres can be viewed in the context of L4-39-581, one particular strain of *Coniothyrium fuckelii* allegedly used both before and after the plant shutdown. From the Blue Treasure Batch Records, we can track the runs that Blue Treasure claims it used for this particular strain. Merck counsel prepared Exhibit 156 from the Batch Records. Table A of Exhibit 156 is a summary of the Batch Records for all runs using the L4-39-581 strain prior to the plant shutdown. Between September 24, 1997 and January 11, 1998, 15 fermentations were carried out. Although these batches ran for a duration of 11 days, we can calculate the hypothetical titres at nine days from the records. If these batches had been run for nine days, the average (arithmetic mean) titre would have been 1719 mg/L. Table B of Exhibit 156 consists of information from the Blue Treasure Batch Records for the alleged runs using the L4-39-581 strain after the plant shutdown. From March 7, 1998 to April 23, 1998, 19 runs were performed with an average fermentation duration of 8.3 days and an average titre of 2109 mg/L. This shows an increase of over 20% in titres.

[281]   This increase is dramatic. Allegedly using the same strain of *Coniothyrium fuckelii*, L4-39-581, Blue Treasure managed to increase the productivity of the fermentation by over 20%. What explanation is there for the increase? Merck submits that the only reasonable explanation is that, for the runs after the plant shut down, Blue Treasure was <u>not</u> using a strain of *Coniothyrium fuckelii*, but was using a strain of *Aspergillus terreus*.

[282]   In support of its belief, Merck referred to the testimony of Dr. Connors who was presented with scatter graphs representing the variations in titres among the Blue Treasure runs. Dr. Connors agreed that "one possible explanation" for a variation in titres before and after the plan shut down, could be the micro-organism or fungus used, when the medium and the process are kept constant. Dr. Connors did not specify what other explanations there could have been other than to say that something had to be different:

> What did you do in the middle that you didn't do on either side? I wouldn't necessarily say the culture has to be different, but something is different, obviously.

Dr. Connors provided no further assistance to the Court on what could explain the differences.

[283]   The data replicated in some of the exhibits produced by Merck's counsel from the Batch Records show that the variability in titres between runs diminished over time. I can accept, as a matter of common sense, the comments of Dr. Cox who explained that, "with the passage of time and the practice and the reproducibility and the adherence to the [Standard Operating Practices] and the ironing out of the problems", there would be more consistency in titres. However, this does not account for the dramatic and immediate change in titres in evidence before me.

[284]   The only witness presented by the Defendants who could speak to the dramatic change in titres was Mr. Luo. He was on the plant floor during the relevant times. According to the Defendants, Mr. Luo indicated that other changes to the fermentation conditions could result in a change of titres. Mr. Luo spoke about possible changes to aeration, pressure, the media and agitation, and about increased familiarity with the process. However, when Mr. Luo's testimony is examined, only one explanation – increased agitation – is really offered. And, I have difficulty with that explanation.

2010 FC 1265 (CanLII)

[285]   Exhibit 156 was presented to Mr. Luo during cross-examination. He was asked what could have explained the increased titres after the plant shutdown. Mr. Luo testified that a 23% jump could be justified as follows:

> A 23 percent jump, it's not necessarily like by changing the [strains]. It can also be changed by optimizing the fermentation conditions of the medium.
>
> . . . There is lots of factors. It is not only the strain.
>
> As the staff, the production staff, get more familiarized with the production procedure and techniques, and then they get improvement on that, it will also change.
>
> So even for the same strain and the different batches, even for the same strain, the different batches may also have a different – like, a different result in titre.

[286]   When questioned, Mr. Luo suggested that a change in aeration could improve production. However, he was unable to point to any change in aeration from the pre-shutdown runs to the post-shutdown runs.

[287]   Mr. Luo explicitly agreed that there was no change in pressure.

[288]   With respect to a change in medium, Mr. Luo was questioned about the removal of Amicase. His explanation was bewildering. While he acknowledged that removing Amicase would probably reduce the titres, he stated that the removal of Amicase would not necessarily reduce titres. This runs counter to other testimony on the issue and to common sense.

2010 FC 1265 (CanLII)

[289]   At the end of the line of cross-examination on the issue of increased titres, the only

possibly concrete suggestion from Mr. Luo was that increased agitation during the fermentation

could account for the 23% rise in titres.

[290]   Apotex argues that a change in agitation could indeed explain the change in titres. Apotex

first refers to production parameters set out in Exhibit 49 where a cultivation condition of

"agitation between 100 and 130 (depending on DO)" is set out for AFI-1. In contrast, Apotex

notes that the agitation described in the Batch Records for AFI-4 is closer to 170. Moreover,

Apotex points to Exhibit 94, an AFI comparative report where it is reported in section 5.5 that,

"for most of fermentation time, less vigorous agitation is needed for AFI-1 compared to AFI-4."

[291]   I give no weight to the information contained in Exhibit 49 referred to by Apotex. First,

the document appears to have been produced no later than spring of 1995 as part of the transfer

of technology related to AFI-1 lovastatin from AFI to Blue Treasure. I have no idea of what the

ultimate instructions followed were and no explanation of why an agitation of 100 to 130 should

be used. I also observe that the document is made subject to the note that:

> This is a preliminary document and many process parameters
> including agitation, aeration, media volumes, cultivation durations,
> feeding amounts and frequencies etc. are subject to additional
> adjustments during the validation runs.
>
> [Emphasis added.]

Beyond the Batch Records, I have no information on what the actual agitation levels for AFI-1 in

production were or should have been. This document does not assist me.

2010 FC 1265 (CanLII)

[292]   I also give no weight to the statement contained in section 5.5 of Exhibit 94. Exhibit 94 is

an untitled document that was produced by AFI during the pre-trial litigation. The document

appears to relate to differences between the AFI-1 and AFI-4 processes. It was referred to by

counsel for Merck during cross-examination of Dr. Sailer. Dr. Sailer described the document as

"some kind of R & D report possibly" and admitted that he had never seen the document.

Although Dr. Sailer was questioned on some of the contents of this document, I have no idea

who is the author of this document or whether section 5.5 is accurate.

[293]   That leaves Apotex's analysis of the Batch Records as the only support for the increased

agitation argument. I acknowledge that there appears, in general, to be an increase in agitation

after the plant shutdown. However, I have no reliable evidence that would support Mr. Luo's

statement that an increase in agitation explains the dramatic increase in titres.

[294]   This leaves me with no credible explanation for the post-shutdown increase in titres other

than a change in organism. Thus, even if the Batch Records are accepted as reliable evidence of

the production runs, the data with respect to titres are consistent with the use of the AFI-1

process and not the non-infringing AFI-4 process. In spite of the removal of Amicase and a

decrease in fermentation duration, Blue Treasure managed to obtain increased titres. The only

explanation consistent with the evidence before me is that Blue Treasure was using a different

micro-organism – *Aspergillus terreus*.

2010 FC 1265 (CanLII)

(5)    Motivation, Means and Opportunity

[295]   Supporting the arguments above, Merck also submits that Blue Treasure had the motive, means and opportunity to make and ship infringing lovastatin to AFI.

(a)    *Motivation*

[296]   First, Merck asserts that Blue Treasure had a significant financial motivation to make infringing lovastatin that it would then sell to AFI. A number of facts certainly appear to support this argument:

- the financial difficulties prior to the introduction of AFI-4;

- the problems with the production of lovastatin using AFI-4; and

- the inability of Blue Treasure to make a profit at the Blue Treasure Joint Venture contract price.

[297]   Financial problems at Blue Treasure appear to have existed even before the production of AFI-4 lovastatin. As we know, Blue Treasure was expected to sell AFI-1 lovastatin in China or other foreign markets. The Minutes of the 6th Meeting of the Board of Blue Treasure held August 26-27, 1996 described the difficult market conditions in China and indicated serious financial problems at Blue Treasure. At that time, unpaid loans and utilities bills would leave

Blue Treasure with no funds to produce the planned lovastatin. Dr. Cox, during cross-

examination, acknowledged that, at that time, the outlook was <u>not</u> "very promising".

[298]   A concern for Blue Treasure from early 1997 was the challenge of selling into the

Chinese market. In a memorandum, dated March 7, 1997, Mr. Zhou referred to the "less than

satisfactory" sales of lovastatin in China and commented as follows:

> In domestic market, there is a fierce rivalry market of Bulk
> Lovastatin course price to decline. As far as we know, ZeJing
> province Hai Mei Pharm. Offered the price of Bulk Lovastatin is
> RMB thirty-two thousand [approximately $3,900 US as confirmed
> by Mr. Fowler (T4565)] for one kg. <u>If we do that, we will difficult
> to subsist.</u> [Emphasis added.]

[299]   Mr. Fowler, who was responsible for financial matters at AFI during the relevant times,

confirmed that RMB 32,000 would convert to approximately US $3900. In the absence of any

other evidence on the pricing economics, I accept that Blue Treasure's "break even" price for the

sale of lovastatin was about US $3900.

[300]   The financial difficulties of Blue Treasure apparently were worsened by the refusal of

AFI to provide higher-yielding strains of *Aspergillus terreus*. In the same memorandum referred

to above, Mr. Zhou "urgently" requested that AFI provide it with an improved strain or "super

fungus". Since Mr. Zhou did not testify at the trial, I can only assume that he believed that a

better strain of *Aspergillus terreus* would have helped Blue Treasure's dire financial situation.

AFI did not respond to this request from Blue Treasure. Dr. Cox acknowledged the refusal:

> Q.      You had a contract, after having given them that strain,
> which obliged you to give them all of the improvements, correct?
>
> A.      Correct.

2010 FC 1265 (CanLII)

> Q.      You were withholding that, despite your certain knowledge
> of their financial situation?
>
> A.      Yes
>
> Q.      And despite the contractual obligations?
>
> A.      If they were able to sell material with the old strain we
> might have considered doing that.  There's no point in transferring
> a high performing strain when they can't sell the bulk material.

[301]   The decision to send the AFI-4 micro-organism to Blue Treasure was made, at least in part, to allow Blue Treasure to make non-infringing lovastatin that it could sell on the Canadian market. In spite of this, the evidence before me shows that Blue Treasure had some difficulties with producing lovastatin with the strain of AFI-4 sent by AFI. The result was that the financial picture for Blue Treasure did not improve.

[302]   Blue Treasure's experience with AFI-4 was troubled. Wide fluctuations in batch-to-batch titres were observed at Blue Treasure prior to March 1998. As acknowledged by Dr. Cox, running a plant economically and efficiently requires a range of variability within acceptable limits; variability outside the acceptable range would make it harder to earn a profit. A memorandum, dated August-13, 1997, from Mr. Zhou to Dr. Cox highlighted the difficulty:

> Because the fermentation viscosity of new AFI process have a
> great fluctuation, some equipment in downstream didn't suit for
> the new technology and brought many difficult for downstream.
>
> [Emphasis added.]

[303]   Blue Treasure also experienced difficulties with some of the AFI-4 strains provided by

AFI. In a memorandum dated October 20, 1997, Mr. Zhou noted that a replacement strain for

L4-42-581 showed only 50% of the productivity and:

> Therefore, it can't be used for production. Also the strain L4-39-581 was not satisfactory for production: titers of shake flask test and fermentation showed more than 20% productivity reduction will occur if Strain L4-39-581 is used compared to that of Strain L4-42-581. This will certainly affect margin of cost and price.

[304]   Mr. Zhou requested that AFI send "100 frozen vials of L4-42-581 or vials with similar

productivity or higher". The request for more vials of L4-42-581 was repeated by Dr. Su in an e-

mail dated October 19, 1997. As confirmed by Mr. Primrose, a shipment of seed vials that

included 10 vials of L4-42-581 was sent by AFI to Blue Treasure on August 4, 1998. I have no

other evidence of any response to the request of Blue Treasure for a better AFI-4 strain.

[305]   Apotex asserts that the fact that Blue Treasure was requesting additional information and

a better AFI-4 strain is inconsistent with Merck's hypothesis that Blue Treasure was, in fact,

using the infringing process after March 1998. Given that Mr. Zhou, the author of most of the

memoranda relied on by Apotex, did not testify in this trial, I have no way of determining

whether Apotex's theory is believable.

[306]   As noted above, Blue Treasure was concerned about being able to subsist with pricing of

about US $3900 per kg for *Aspergillus terreus* lovastatin. Considerable evidence was produced

at trial to demonstrate that the costs of producing AFI-4 would be higher and that the profit

margins even smaller.

2010 FC 1265 (CanLII)

[307]    As stated in a lengthy AFI Monthly Scientific Report, dated July 3, 1997, in which the

AFI-1 and AFI-4 processes were compared, "The calculated cost of production of AFI-1 was

significantly less than the production costs for AFI-4." The same document stated that the media

ingredients were the single most significant cost factor.

[308]    The offer to transfer the AFI-4 process to Blue Treasure and to purchase AFI-4 lovastatin

was outlined in a letter dated April 10, 1997 from Dr. Cox to Mr. Zhou. As confirmed by Dr.

Cox, Blue Treasure initially asked for US $6000 per kg. AFI agreed to pay only US $4500 to US

$5000, depending on the average titres. A price of US $4500 would be about $600 to $700 over

Blue Treasure's "break even" price of US $3900 per kg. However, the margin would have been

significantly eroded by the added costs of the AFI-4 media ingredients and by having to meet

AFI's 0.2% RC-14 specification. Moreover, over the course of the batches sold to AFI, the

purchase price dropped to US $3300 per kg.

[309]    The result is that, if Blue Treasure had been using the AFI-4 process, it would have been

losing significant amounts of money for each kilogram of product shipped to AFI. Blue Treasure

could not have made a profit by selling AFI-4 lovastatin to AFI at the price AFI paid. However,

the evidence of Mr. Fowler was that, once Blue Treasure began to use the AFI-4 process, they

"worked their way out of the financial difficulties and became profitable". Quite simply, there is

no evidence on the record that explains how Blue Treasure could have turned a profit using the

AFI-4 process.

2010 FC 1265 (CanLII)

[310]   I conclude that Blue Treasure had financial motivation to use the AFI-1 process instead of the non-infringing – but more costly – AFI-4 process.

(b)      *Means*

[311]   The ability or means of Blue Treasure to produce the quantities of AFI-1 lovastatin depends, at least to some extent, on the availability of the appropriate strains of AFI-1.

[312]   Apotex argues that it was not shown that Blue Treasure had such a strain. Apotex refers to the production master batch records provided to Blue Treasure as part of the *Aspergillus terreus* technology transfer. In production, the strain showed titres generally below the 1.5 g/L level. Not only was the titre level well below 2.0 g/L reflected in the Batch Records, but the stated fermentation time was 12 to 15 days – a longer period than reported in any of the post-March 1998 runs. Merck does not agree.

[313]   Merck submits that Blue Treasure was in possession of a high-producing strain of AFI-1 giving it the means to make additional AFI-1 lovastatin with the very titres reflected in the Batch Records after March 1998 when the average titres were about 2.2 g/L. The reference to this strain is contained in the Management Report for the 6th Meeting of the Board of Directors of the Blue Treasure Joint Venture held on August 26-28, 1996. In that document, at paragraph 1.3, the titres are stated to be 2300 to 2500 mg/L. Moreover, a document entitled "Historical review of Lovastatin production improvement *Aspergillus* sp. and *Conioth[y]rium fuckelii* strains in R&D Biology" states that AFI achieved up to 5100 mg/L. When Mrs. Hu was asked whether Blue

2010 FC 1265 (CanLII)

Treasure had an AFI-1 strain that produced titres in the range of 2300 to 2500 mg/L, she claimed to be unable to know what the question was about. This response is surprising given Mrs. Hu's responsibilities for the security of various strains of both AFI-1 and AFI-4 and for inoculating the initial fermentations for each batch.

[314]   With respect to fermentation duration, the evidence of Dr. Cox was that the AFI-1 strain transferred could be run in nine days.

[315]   Although there appears to be some contradictory evidence, I conclude that it is more likely than not that Blue Treasure had a strain of AFI-1 that could have met the titres and fermentation durations reflected in the Batch Records after March 1998.

[316]   I am persuaded that Blue Treasure had the means to produce lovastatin with the infringing AFI-1 process.

(c)     *Opportunity*

[317]   The final element examined by Merck is opportunity.

[318]   As described earlier in these reasons, Dr. Jerry Su was sent to Blue Treasure to investigate certain problems with the initial AFI-4 runs. Dr. Su arrived in China on August 25, 1997 and returned to Winnipeg on October 31, 1997. Dr. Su expressed his opinion that the runs he observed were carried out in accordance with the Standard Operating Procedure for AFI-4.

2010 FC 1265 (CanLII)

However, as confirmed by Mr. Fowler, after Dr. Su's departure in October 1997, no one was ever sent from AFI to assess the production. AFI apparently assumed that Blue Treasure would follow the instructions that had been provided in spite of earlier problems.

[319]   AFI also missed another chance to identify the micro-organism used by Blue Treasure. As confirmed by Ms. Christofalos, with each shipment of product to AFI, Blue Treasure sent a sample consisting of a mycelial or fungal cake. Dr. Connors opined that such product could have been subjected to DNA testing for the presence of the non-infringing *Coniothyrium fuckelii*. However, the fungal cake was never tested and was, unfortunately, destroyed during the course of this litigation.

[320]   Blue Treasure had the opportunity to revert to manufacturing AFI-1 as soon as Dr. Su left at the end of October 1997.

(6)    Blue Treasure Conduct

[321]   Merck submits that the behaviour of Blue Treasure raises serious doubts about the Defendants' allegations that there has been no infringement. One of the most serious and disturbing stories involves two articles published in the Chinese Journal of Antibiotics. Merck argues that these two articles are direct evidence that Blue Treasure used *Aspergillus terreus* to manufacture lovastatin, most likely in late 1997. Furthermore, the behaviour of Blue Treasure's employee, Mr. Luo, in association with the articles, provides evidence that Blue Treasure is prepared to go to great lengths to cover up its infringing activities.

[322]   In early 1999, an article entitled "Optimization of Formula for Lovastatin Fermentation Medium through Uniform Design" was published in the Chinese Journal of Antibiotics, February 1999, Vol. 24, No. 1 (referred to as Article #1). One of the authors of this article was listed as "LUO Dingjun". Mr. Luo who appeared as a witness in this trial is the same Mr. Luo who wrote this article. As set out in the abstract of Article #1, the authors were presenting a method of optimizing a fermentation medium for producing lovastatin. In summary terms, the authors conducted experiments to ascertain the effectiveness of replacing two "extremely expensive" raw materials – Peptone and Amicase – in the fermentation medium with domestically produced raw materials. One of the replacement products was a fish powder, giving rise to a reference, during this trial, to the experiments as the "fish powder experiments".

[323]   Article #1, in its abstract, contains the following sentence:

> The company [Blue Treasure] has imported patented lovastatin production technology from Canada, with the fermentation medium formula being a United States patented (patent number 5409820) formula.

[324]   The reference to "patent number 5409820" is most likely a reference to United States Patent No. 5, 409, 820 issued to Apotex Inc. on April 25, 1995. This patent claims a process for making lovastatin using *Coniothyrium fuckelii*. In spite of this reference at the beginning of Article #1, there is no further reference to *Coniothyrium fuckelii*. Indeed, the article explicitly states that the fish powder experiments were conducted on the "Lovastatin-producing strain *Aspergillus terreus* BN 270-001." There is no reference in Article #1 to the use of a *Coniothyrium fuckelii* strain of lovastatin. The article also describes Guangdong Blue Treasure Pharmaceutical Co. Ltd. as the company who was producing lovastatin in China and the

company that was interested in the lowering of the costs of the fermentation medium for lovastatin.

[325]   A second article, entitled "A Study Regarding Lovastatin-Producing Strain Protoplast Mutation and Fermentation Formula Optimization," was published in the Chinese Journal of Antibiotics, October 2000, Vol. 25, No. 5 (referred to as Article #2). Mr. Luo was also one of the authors of this article. The purpose of Article #2, as reflected in the abstract, was to produce a high-yield strain of lovastatin "by mutating lovastatin-producing strain protoplasts" and optimizing the fermentation culture medium formula. Once again, the authors listed, as the strain used for their experiments, "lovastatin-producing strain *Aspergillus terreus* (BN 270-053)". In Article #2, there is no mention of the US Patent.

[326]   Dr. Luo testified that the shake flask experiments (referred to in Article #1 and #2) were performed at Blue Treasure's microbiology lab.

[327]   These articles raise a strong inference that, at the time of the experiments, Blue Treasure was producing lovastatin from *Aspergillus terreus* at its facility.

[328]   Mr. Luo was asked about the two journal articles during his examination-in-chief. In response to a question on the purpose of publication, Mr. Luo responded that:

> Getting this paper published is mainly for the technicians being
> able to get certified.  Basically it's a kind of when you come to a
> profession new to get certified, certification.

2010 FC 1265 (CanLII)

[329]   Mr. Luo was unable to remember clearly when the experiments were run, but he thought that they were carried out in 1997 "between summer and fall of that year". Mr Luo further testified as follows:

> Q.      Where was these experiments conducted?
>
> A.      These experiments are done at Blue Treasure's micro-biology laboratory.
>
> A.      Specifically what strain was used I can't remember so clearly, but looking through this article probably I used number 4 strain.
>
> Q.      Why does it say Aspergillus terreus was used?
>
> A.      Because at that time due to the confidentiality reasons I don't want to leak the secrets about AFI-4 strain.

[330]   I find Mr. Luo's testimony related to these two articles to be astounding. First, it is simply incomprehensible that a group of scientists would fabricate a journal article to hide the identity of the *Coniothyrium fuckelii* fungus. Beyond a bald assertion, Mr. Luo presented no cogent reasons as to why the use of *Coniothyrium fuckelii* would have been confidential.

[331]   I also question Mr. Luo's testimony with respect to when the experiments were conducted. His lack of memory is surprising. Mr. Luo has known about the significance of these articles for some time and yet was unable to recall the dates of the experiments. He could have refreshed his memory in a number of ways before testifying. Instead, he expressed the view that the experiments were done in the period of time before the use of the AFI-4 process. His faulty memory, in my view, is consistent with fabrication, by Mr. Luo, of what organism was being used at Blue Treasure in the time leading up to the publication of the articles.

[332]   The two articles contain other references that discredit Mr. Luo's claims. First, the strain used for the articles was described as BN 270-053. In the opinion of Dr. Lasure, this was a reference to the 53rd isolate of *Aspergillus terreus* BN-2-70. This is the same strain obtained from AFI as AFI-1 (Lasure Expert Report, Exhibit 48, para. 242).

[333]   The second area of disconnection relates to the ability of the strains of *Coniothyrium fuckelii* used in AFI-4 to sporulate. The evidence of Dr. Cox was to the effect that, in his experience working at AFI, the strain of *Coniothyrium fuckelii* transferred to Blue Treasure had lost the ability to produce spores during fermentation:

> Q.      All right.  You know that at some point Coniothyrium fuckelii ceased sporulating at AFI?
>
> A.      Yes, I believe so.
>
> Q.      That makes it harder to prepare and maintain consistent seed banks from generation to generation?
>
> A.      A little bit, yeah.
>
> Q.      That cessation of sporulation is a property of the organism?
>
> A.      Not of the organism, no, it was an effect of the mutagenic strain improvement program that AFI performed.
>
> Q.      The non sporulating character became intrinsic to Coniothyrium fuckelii as a result of that program, is that fair?
>
> A.      That strain of Coniothyrium fuckelii, yes.
>
> Q.      Right.
>
> A.      It's not an inherent characteristic of the species.

Q.      Got it.  <u>Never a problem that was encountered with Aspergillus terreus?</u>

A.      <u>No.</u>

[Emphasis added.]

[334]   In spite of the information that the AFI-4 strain sent to Blue Treasure could not sporulate, in Article #2, at section 1.2.3, the authors explicitly report as follows:

> Investigation of strain-producing capacity: The spores on the mature PDA slants are washed, inoculated onto a rice culture medium, and cultured for 7 days, yielding mature rice spores.

[335]   In sum, Mr. Luo's explanation about why he lied in the two articles is not believable. Mr. Luo fabricated his testimony before this Court to cover up the use of *Aspergillus terreus* at a time when Blue Treasure was supposed to have been exclusively using the AFI-4 process. The better explanation for these two articles and Mr. Luo's testimony is that the fish powder experiments were carried out on lovastatin using AFI-1.  I find that, on a balance of probabilities, the experiments were carried out with the AFI-1 process (that is, with *Aspergillus terreus*). It follows that the two articles support Merck's claims that Blue Treasure was using *Aspergillus terreus* to make lovastatin and thus infringing the '380 Patent.

C.      *Conclusion on Blue Treasure Circumstantial Evidence*

[336]   Most of the foregoing evidence could be characterized as circumstantial evidence and requires that I draw inferences to reach the conclusion that, on a balance of probabilities, there was infringement.

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

[337]   With respect to the drawing of inferences, Apotex argues that I must avoid relying on alleged inferences that are no more than speculation. I agree.

[338]   Obviously, there is a difference between reasonable inference and pure conjecture. The Federal Court of Appeal provided the following comments in an appeal of an immigration judicial review, in *Minister of Employment and Immigration v. Satiacum* (1989), 99 N.R. 171 at p. 179, [1989] F.C.J. No. 505 (QL)(F.C.A.):

> The common law has long recognized the difference between reasonable inference and pure conjecture. Lord Macmillan put the distinction this way in **Jones v. Great Western Railway Co.** (1930), 47 T.L.R. 39 at 45, 144 L.T. 194 at 202 (H.L.):
>> The dividing line between conjecture and inference is often a very difficult one to draw. A conjecture may be plausible but it is of no legal value, for its essence is that it is a mere guess. An inference in the legal sense, on the other hand, is a deduction from the evidence, and if it is a reasonable deduction it may have the validity of legal proof. The attribution of an occurrence to a cause is, I take it, always a matter of inference.
>
> In **R. v. Fuller** (1971), 1 N.R. 112 at 114, Hall J.A. held for the Manitoba Court of Appeal that "[t]he tribunal of fact cannot resort to speculative and conjectural conclusions." Subsequently a unanimous Supreme Court of Canada expressed itself as in complete agreement with his reasons: [1975] 2 S.C.R. 121 at 123, 1 N.R. 110 at 112.

[339]   In the case before me, I am satisfied that I am not relying on conjecture or mere guess; rather, the deduction from the totality of the evidence that Blue Treasure was manufacturing lovastatin using the infringing AFI-1 process is reasonable and logical.

[340]   Given the extent of the evidence before me and the lack of alternative, reasonable explanations for much of that evidence, I find that Merck has satisfied its burden to show that it is more likely than not that, from March 1998, Blue Treasure was manufacturing lovastatin using the infringing AFI-1 process. The lovastatin was then delivered to AFI for ultimate sale into the Canadian market. This constituted infringement of the '380 Patent.

[341]   This conclusion stands without any reference to the DNA evidence. That is, regardless of whether the DNA evidence presented by Merck constitutes reliable evidence of direct infringement, I find that any amount of lovastatin manufactured and sold in Canada that used lovastatin produced by Blue Treasure after March 1998 infringed the '380 Patent.

[342]   The DNA evidence is dealt with in section VIII of the Reasons.

D.      *AFI Batch CR0157*

[343]   Merck no longer claims that all of the lovastatin produced in Winnipeg by AFI infringed the '380 Patent. However, Merck continues to assert that one batch of lovastatin – referred to as CR0157 – contained lovastatin that was made using the process protected by the '380 Patent.

[344]   Batch CR0157 consisted of 12.57 kg of USP-grade lovastatin. It was manufactured at AFI in Winnipeg and sent directly to the attention of Dr. Barry Sherman at Apotex Inc. on December 2, 1996. It was the first batch of AFI-4 lovastatin shipped to Apotex Inc.

2010 FC 1265 (CanLII)

[345]   The batch history reflects that CR0157 was the final crystallization of CR0151 which, in turn, was a recrystallization of CR0149. CR0149 was the crystallization of three extraction batches: CR0117, CR0145 and CR0144. The "genealogy" of batch CR0157 was confirmed by Dr. Sailer, during his examination-in-chief, and is depicted in Figure 1 below.

## Figure 1



2010 FC 1265 (CanLII)

[346]   The essence of Merck's argument is that CR0157 was a combined batch of non-infringing and infringing lovastatin. The key evidence relied on by Merck is:

(1)     AQA 94 Batch Records (referred to as AQA 94) show that CR0157 was "AFI#1,4 FLAGGED contains top secret material" which would indicate it was a mixture of *Aspergillus terreus* and *Coniothyrium fuckelii* lovastatin;

(2)     Some of the batches that ultimately resulted in batch CR0157 (specifically CR0151, CR0117, CR0144 and CR0149) show significant alterations that increased the weights of lovastatin from those initially recorded.

(3)     The DNA testing carried out by Dr. Davies demonstrated that tablets of Apo-lovastatin tested positive for *Aspergillus terreus* and negative for *Coniothyrium fuckelii*.

[347]   In my view, for the reasons that follow, neither of the first two arguments is persuasive on its own. However, the direct evidence of *Aspergillus terreus* in tablets made from the CR0157 batch was uncontradicted and provides direct evidence of infringement.

[348]   As part of the trial record, the Defendants produced AFI's batch records. These records were obviously produced contemporaneously with the fermentations to which they refer and were kept in AFI's normal course of business. In contrast to the Batch Records for Blue

2010 FC 1265 (CanLII)

Treasure, the AFI batch records are acceptable as business records. In other words, the AFI batch records are *prima facie* proof of the facts stated therein.

[349]   However, it does not follow that every document, produced by AFI, that looks like a business record meets the strict criteria to be admitted into evidence as a business records. This is particularly true with the document referred to as AQA 94 and relied on by Merck.

[350]   AQA 94 is a one-page document consisting of a list of 56 batch numbers with brief notations. The entry of interest is at line 11:

> CR0157 AFI#1,4 FLAGGED contains top secret material.

[351]   The document was introduced to Dr. Cox who was unable to identify it or to provide any testimony that could have assisted the Court. Ms. Christofalos was asked about the document during her examination-in-chief.

> Q.      Are you able to identify this document?
>
> A.      This looks like one of our internal, well, it is one of our internal record-keeping documents where we just have made an index of a bunch of documents that is going into a box.
>
> Q.      Do you know what purpose was made for it?
>
> A.      Just for filing purposes.
>
> Q.      Do you know when it was made?
>
> A.      We started this exercise late 99.  I would, that's my recollection, late 99.
>
> Q.      Can you tell the Court who made it?
>
> A.      Could have been any number of people, most likely our records clerks.

[352]   Although Ms. Christofalos admitted that she did not prepare the document, she expressed

her view that the list was merely an identification of boxes of documents. Further, Ms

Christofalos provided what, in my view, was a reasonable explanation of why there was the

reference to "AFI#1,4" in the document:

- The person making this list would have looked at the first page of the actual

   Interim Production Batch Record and would only have seen "Product Name:

   lovastatin USP" and "Product Part Number:  6000".

- Part number 6000 applied to lovastatin made with either AFI-1 (*At*) or AFI-4 (*Cf*),

   thus leading to the entry listing both.

- The reason why the error was never corrected was because these lists were not

   control documents.

[353]   With all respect to Merck, I fail to see how this document of dubious origin can be strong

circumstantial evidence of an infringing product in a batch of lovastatin. Dr. Cox was clearly

unaware of AQA 94. Ms. Christofalos's explanation was simply that this was an index of

documents. She did not prepare the list and was unsure of who could have prepared it. The list of

documents was only made in 1999 – more than two years after batch CR0157 was manufactured.

Unlike the AFI batch records, AQA 94 does not qualify as a business record. I do not accept it

for the truth of its contents – in particular, that CR0157 was a mixture of infringing and non-

2010 FC 1265 (CanLII)

infringing lovastatin. In light of the lack of connection between AQA 94 and the "genealogy" of CR0157, I give no weight to this document.

[354]   The only remaining argument of Merck (other than the DNA evidence) relates to some apparent anomalies surrounding the weight of the three preliminary batches that ultimately became part of CR0157. In making this argument, Merck refers to the batch records for three antecedent downstream batches: CR0151, CR0117 and CR0144. In each case, a document that forms part of the batch records shows a manual change to the originally-recorded weight of the material obtained. In each case the weight was increased. In Merck's submission, the augmentation is consistent with the addition of infringing lovastatin to the batch.

[355]   In response, the Defendants attempted to provide an explanation for these discrepancies through the evidence of Dr. Sailer and Ms. Christofalos.

[356]   Dr. Sailer clarified that the antecedent weights going into CR0157 cannot simply be added up, as it is a weight loss process.

> Q.      Right.  Well again, I don't have any errors to complain about there either.  The only point I guess I'm conceding, and I want to make sure I understand that I have it right, is that we can't simply add together these three numbers?
>
> A.      We can because the batch 151 was generated from batch CR0149 and those two errors which we see in the material coming to batch CR0149, which you said it's plus 11.2 plus 1.2 kilograms, generated certain quantity.
>
> Q.      Right.
>
> A.      As a starting material for the next batch 151.  During the next batch when they tried to discharge it they have to correct it

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

because they discharge extra 3.8 kilograms, which actually doesn't matter at all because if they didn't discharge it, we will dissolve it anyway and mix it with the 11.11 kilograms to generate 14.8 kilograms of product, which was starting material for the batch 157 of the final product.

Q.      All right.

[357]   Further, at a later date, extra lovastatin was found that had been captured in the filter, which was not initially observed by the operators. It was subsequently recorded. Dr. Sailer points out that the crossed out weights were the result of mistakes by inexperienced technicians.

Q.      All right.  So let's go to tab three, page 82.  Have you got that page?

A.      Yes.

Q.      And I'm seeing a table one crude Lovastatin obtained, do you see that?

A.      Yes, I do.

Q.      And I see the first listing is CR0117?

A.      I can see it.

Q.      But I see the net weight is 3.8 kilograms.

A.      Yes.

Q.      What explanation, if any, do you have for the Court for that?

A.      I have similar explanation.  This is first batch which was filtered on this equipment, NF 1, and this is what they found when actually they dismantled the screen, they dropped the bottom and they found there was still product there.  I know it should be recorded here but as I said it was first batch.  And yeah, we didn't have really experience.  We were quite new crew there, so yeah, it's missing, missing note that additional 1.2 kilogram was found on the screen.

[358]   Finally, I observe that the corrections to the records were made some eight days after the original entry. When asked about the delay, Dr. Sailer was unable to provide a response.

[359]   While the explanations given by Dr. Sailer and Ms. Christofalos <u>could</u> provide a sufficient answer for the discrepancy, they are only that - an explanation or hypothesis. Their answers do not explain why there was an eight-day delay in changing the document or provide a fulsome explanation of how the process of making lovastatin would "lose weight".

[360]   In sum, I am left with unanswered questions on the make-up of batch CR0157. Since the batch was never tested by Apotex, I have no direct evidence that the batch was not *Aspergillus terreus* lovastatin. However, in the submission of Merck, I do have direct evidence that tablets from the CR0157 batch were made from infringing lovastatin. Merck makes this argument based on the DNA testing results of Dr. Davies. That evidence is considered in section VIII of these Reasons.

## VIII.   <u>Infringement – the DNA Evidence</u>

A.      *Introduction*

[361]   Merck's case on the direct evidence of infringement rests on the DNA testing carried out on behalf of Dr. Julian Davies in his laboratory at the University of British Columbia (referred to as the Davies Lab). Merck relies on the Expert Report and testimony of Dr. Davies to assert that

there is direct evidence that lovastatin manufactured by Blue Treasure and lovastatin contained

in AFI batch CR0157 contained *Aspergillus terreus*, thereby infringing the '380 Patent.

[362]   Dr. Davies received and tested three samples of lovastatin, consisting of: (a) three vials of

white powder and one vial of brown powder, purporting to be samples from Blue Treasure

provided through the services of Mr. Ted Kavowras; and (b) Apo-lovastatin tablets made from

AFI batch CR0157.

[363]   Two sets of experiments were carried out at the Davies Lab on the same samples – the

first in 2003 and another in 2007. In 2003, the experiments were performed by Karen Lu, a

senior technician for the Davies Lab. In 2007, Grace Yim, a Ph.D candidate in the Davies Lab,

assisted Karen Lu in performing the experiments.

[364]   In 2003, the experimental procedure involved a number of steps: DNA was extracted

from the samples; specific primers diagnostic of the fungi region in DNA were chosen from the

published literature; the primers were used to amplify the DNA in a nested polymerase chain

reaction (nested PCR); the amplified DNA was subjected to gel electrophoresis; and then the gel

was stained and analyzed under ultra-violet (UV) light for the presence of DNA. The UV light

analysis highlighted the presence of bands which correlated to 130 base pairs (bp). These bands

were determined to be a positive "hit" for *Aspergillus terreus* DNA. The bands were extracted

from the gel and sent to a lab which specializes in DNA sequencing. The Davies Lab compared

the results of the DNA sequencing to the sequence for *Aspergillus terreus* DNA that is located in

2010 FC 1265 (CanLII)

the database at the National Institute for Biotechnology Information. This comparison confirmed that the DNA "hit" in the lovastatin samples was, in fact, *Aspergillus terreus* DNA.

[365]   In 2007, the Davies Lab repeated the experiments with a modified procedure and tested for the presence of both *Aspergillus terreus* and *Coniothyrium fuckelii* DNA. Again, a positive result was only found for *Aspergillus terreus*.

[366]   The combination of the experiments performed in 2003 and 2007 resulted in 13 positive findings of *Aspergillus terreus* DNA, and no positive findings of *Coniothyrium fuckelii* DNA. Based on these results, Dr. Davies opined that the fungus responsible for producing the lovastatin in the samples tested by the Davies Lab was *Aspergillus terreus*.

[367]   The first general and critical consideration is that the burden that falls on Merck is one of a balance of probabilities. That is, Merck succeeds if I am satisfied that it is more likely than not that the samples tested contained *Aspergillus terreus* DNA.

[368]   A number of issues arise with respect to the DNA evidence presented through Dr. Davies:

1.      Is there a nexus between the Blue Treasure samples tested and the Blue Treasure lovastatin that is alleged to infringe the '380 Patent?

2010 FC 1265 (CanLII)

2.      Should the results of the testing in the Davies Lab be rejected because they were

        not reproducible by Dr. Poinar?


3.      Does the failure of Dr. Davies to find *C. fuckelii* DNA in the tablets from batch

        CR0157 support Apotex's position that his DNA evidence is unreliable?

4.      Is "ancient DNA" the same as, or analogous to, the DNA that would be found in

        the samples tested by Dr. Davies?


5.      Should the results of the testing in the Davies Lab be rejected because the

        *Aspergillus terreus* DNA found in the Davies Lab was the result of contamination

        by exogenous DNA?


6.      Should the weight to be given to Dr. Davies's Expert Report and his opinions be

        reduced due to:


        a)      the inability to describe elements of the experiments reported in his

                Expert Report;


        b)      the incomplete reporting of the experiments conducted in the

                Davies Lab;


        c)      the failure to disclose the majority of tests relied on; or

2010 FC 1265 (CanLII)

d)      the failure to use negative extraction controls?

[369]   To this list, I would add the issue of the weight to be given to the opinions of the experts put forward by Apotex – Drs. Gilbert, Poinar and Taylor. Should the narrow expertise of these witnesses reflect on the weight to be given to, or the relevance of, their opinions?

B.      *Nexus between the samples tested and the allegedly infringing lovastatin*

[370]   An assessment of the DNA evidence in this case necessarily begins with the source of the samples that were tested in the Davies Lab. The presence of *Aspergillus terreus* in the samples only establishes infringement if the samples were obtained: (a) from lovastatin that was manufactured by Blue Treasure during the relevant time period; or, (b) from Apo-lovastatin tablets whose source was AFI batch CR0157.

[371]   I begin with the three vials of white powder and one vial of brown powder allegedly obtained from Blue Treasure. In 2000, a law firm representing Merck hired Mr. Ted Kavowras to obtain samples of Blue Treasure lovastatin. Mr. Kavowras has an investigative consulting firm based in China called Panoramic Consulting. Most of his investigations are done undercover. Mr. Kavowras has considerable experience obtaining evidence used in civil litigation.

[372]   Mr. Kavowras testified that, using the alias of "Mr. Garcia", he approached Blue Treasure to obtain lovastatin samples. In October 2000 and January 2001, he obtained samples from an employee of Blue Treasure. Samples, from two batches, were delivered in a sealed

2010 FC 1265 (CanLII)

package with a corresponding certificate of analysis for each of the two samples - recorded as batch numbers 200012016 and 200012015. During his testimony at trial, Mr. Kavowras confidently identified the exhibits produced as the samples that he obtained from Blue Treasure. The samples were transported in carry-on luggage that accompanied Mr. Kavowras and were stored in his office in a secure location.

[373]   Merck presented Ms. Giuliani to speak to the delivery chain from the hands of Mr. Kavowras to Dr. Davies. The samples were delivered to Ms. Giuliani who stored them in the company vault, and arranged for their delivery to Dr. Davies. Dr. Davies testified that the samples he received were in "perfect" condition.

[374]   The evidence presented by Merck shows that the chain of evidence was intact and that the samples delivered to Dr. Davies were in an unaltered form.

[375]   Apotex does not take issue with the transmittal of the samples to Dr. Davies. However, the problem is that these samples were taken from Blue Treasure between 2000 and 2001. There is no clear evidence that these samples were samples of the Blue Treasure lovastatin manufactured during the relevant time period from 1997 to 1999. Merck has failed to persuade me that the samples are representative of the lovastatin made, sold and distributed by Apotex Inc. Without the link of the samples taken by Mr. Kavowras to the lovastatin produced by Blue Treasure during the 1997 to 1999 period, I am unable to conclude that any DNA evidence from Dr. Davies can establish infringement.

2010 FC 1265 (CanLII)

[376] The situation with respect to the Apo-lovastatin tablets is different. There is no dispute that the source of the tablets tested was AFI batch CR0157. Thus, if I conclude, on a balance of probabilities, that the CR0157 tablets tested in the Davies Lab contained the DNA of *Aspergillus terreus* that was not the result of contamination of the samples, infringement has been demonstrated.

[377] Moreover, if I am wrong in my conclusion with respect to the lack of nexus in the Blue Treasure samples, the question before me would be whether the evidence establishes that those Blue Treasure samples contained the DNA of *Aspergillus terreus* that was not, on a balance of probabilities, the result of contamination. If it does, infringement has been demonstrated.

C. *Reproducibility of the testing in the Davies Lab*

[378] Apotex argues that I should reject the testing done in the Davies Lab because Dr. Poinar was unable to reproduce his results.

[379] In addition to being asked to provide his opinion on Dr. Davies's work, Dr. Poinar was retained by counsel for Apotex to design and carry out experiments with the same materials that were tested in the Davies Lab. Dr. Poinar tested 12 lovastatin samples made by AFI or Blue Treasure. For control purposes, Dr. Poinar's experiments included lovastatin samples that were known to have been produced with *Aspergillus terreus.* According to Apotex, Dr. Poinar used an extraction method that was essentially the same as Dr. Davies's protocol. Dr. Poinar concluded that: "both *A. terreus* and *C. fuckelii* DNA were absent in all samples tested". By way of

apparent explanation, Dr. Poinar observed that (Poinar Expert Report, Exhibit 135, p.15 "conclusion"):

> The sample processing and/or extraction steps are too lossful to permit detection of trace amounts of DNA from the source fungus (neither *A. terreus* or *C.fuckelii* was detected in samples of known origin).

[380]   In other words, Dr. Poinar concluded that it is impossible to obtain detectable amounts of DNA from pharmaceutical fungal products using the experimental methods employed by Dr. Davies.

[381]   Apotex relies on the evidence of Dr. Poinar to draw the conclusion that any positive results observed by Dr. Davies were as a result of contamination, not endogenous DNA.

[382]   It appears that Dr. Poinar approached his experiments with the opinion that it is unlikely that DNA would survive (Poinar Expert Report, Exhibit 135, para. 62):

> … a careful examination of the entire procedure for the fermentation, extraction, recrystalization and purification of lovastatin makes it unlikely that DNA would survive this procedure.

During his oral testimony, he restated this view:

> So it is surprising, although certainly not impossible, that DNA would actually then survive that.

[383]   Given Dr. Poinar's initial starting bias, is there any doubt that his experiments would fail to find DNA? It appears to me that there is a real risk that Dr. Poinar brought a confirmational bias to his laboratory work. In other words, I question whether Dr. Poinar carried out the

2010 FC 1265 (CanLII)

experiments to confirm his thesis that DNA would not be present, rather than with an open, independent mind.

[384]   Even putting aside my concern about Dr. Poinar's approach to the experiments, I have serious problems with his experimental methods and results.

[385]   The first concern relates to Dr. Poinar's experiences with the *Aspergillus terreus* assay. On this issue, Dr. Gilbert, accepted as an expert in the area of microbial genetics and microbiology, was of great assistance to the Court. During cross-examination, Dr. Gilbert was shown certain of the data from Dr. Poinar's experiments. In particular, he was shown two sets of qPCR data. Without knowing (as we do now) whether the information came from the *Coniothyrium fuckelii* assay or the *Aspergillus terreus* assay, he was asked to comment on various aspects of those data. The first series of slides consisted of data from the *Coniothyrium fuckelii* assay. Dr. Gilbert described the various melting curves as "very good-looking" and "pretty nice". With respect to the *Coniothyrium fuckelii* series of slides, he agreed that the data reflected an "experiment in which the PCR reactions [are] well behaved and as expected" and that the reaction was "running well". Dr. Gilbert acknowledged that the standard curve for the *Coniothyrium fuckelii* assay was typical of "a PCR reaction that is running well and predicatively as expected". The gel samples shown to Dr. Gilbert were described as "pretty much a textbook example".

[386]   The situation changed dramatically when Dr. Gilbert was shown the *Aspergillus terreus* data. For example, whereas the efficiency for one of the *Coniothyrium fuckelii* slides was

2010 FC 1265 (CanLII)

described as 93.5%, the efficiency of a standard curve for an *Aspergillus terreus* assay was only 70%. Dr. Gilbert opined that the experimenter was "having problems with his quantification" and that "possibly", he was having problems with the primers, reactants or inhibition, problems that were not apparent in the *Coniothyrium fuckelii* assay.

[387]   Overall, Dr. Gilbert agreed that, even apart from quantification, the stochasticity, randomness and unexpected results were an indication that the *A. terreus* experiment did not run as well or as smoothly as the *Coniothyrium fuckelii* assay. He also acknowledged that the data supported this conclusion.

[388]   The necessary corollary of Dr. Gilbert's opinion is that Dr. Poinar's results are reliable regarding the absence of *C. fuckelii* but that they cannot be used as a basis to rule out the presence of *A. terreus*.

[389]   The next problem with Dr. Poinar's work is that he did not employ the same methods that were carried out in the Davies Lab. Using a single round of PCR, Dr. Poinar was unable to get any hits with the *A. terreus* primers at the 0.1 copy level. However, he was able to get a hit using Dr. Davies's nested PCR reaction.  Despite the possibility that it would confirm Dr. Davies's results and despite success at the 0.1 copy level with Dr. Davies's protocol, Dr. Poinar did not attempt to reproduce or run a single sample through Dr. Davies's entire nested PCR protocol. Finally, Dr. Poinar agreed with the following premise put to him in cross-examination:

> Q.      You can't, based on your experiments, rule out the possibility that if you had done his experiment, reproduced his experiment, you might have found terreus?

2010 FC 1265 (CanLII)

A.    No.

[390]   Based on the evidence before me, I cannot conclude that Dr. Davies's work is not

reproducible.

D.    *Failure of Dr. Davies to find C. fuckelii DNA in the tablets from batch CR0157*

[391]   As noted above, Dr. Davies found *A. terreus* DNA in the tablets from AFI batch CR0157

but did not find any *C. fuckelii* DNA in the tablets. On its face, this appears to be inconsistent

with Merck's theory that batch CR0157 was likely a mix of *Coniothyrium fuckelii* lovastatin and

*Aspergillus terreus* lovastatin. In final argument, Apotex stated that this alleged inconsistency "is

fundamentally fatal to any reliance upon the Davies [Lab] testing", and described its position as

follows:

> [Dr. Davies] did not find CF when he should have, but he found
> AT when he should not have.  The AT could only, in that scenario,
> have been exogenous AT.
> ....
>
> The other alternative on CR0157 is that it is a mixture.  Some AT
> lovastatin was thrown into the mix, but much of it, most of it, I
> believe, even on that scenario, was CF lovastatin.
>
> So on that scenario, it contains both CF and AT lovastatin.  Dr.
> Davies should have detected AT and he should have detected CF.
> He still didn't detect CF under that scenario, which calls into
> question his testing and calls into question whether the DNA
> survives, and indicates that the AT that he did find, again, must be
> exogenous DNA, because he didn't find the CF.

[392]   The position of Apotex is based on what I believe is an incorrect assumption. A failure to find a particular micro-organism through DNA testing is not determinative that the micro-organism is not present. On the other hand, assuming appropriate laboratory procedures and no contamination, a finding of a specific micro-organism is strong evidence that the micro-organism is present in the sample. This was acknowledged by Dr. Poinar during his cross-examination:

> Q. . . . If you want to say to someone, Look, in my opinion, DNA is absent from this sample, the actual -- the scientifically correct proposition is, always, DNA is absent from this sample to a state of detection limit; correct?
>
> A.      That's correct.
>
> Q.      But the flip side of the coin for the positive finding, it is not the same in science.  In science you can say, I found terreus in this sample.  I don't know how much was there, but I amplified it?
>
> A.      Hmm hmm.
>
> Q.      So to that extent, the positive finding is different from what you need to prove the negative?
>
> A.      As long as all the proper precautions are put into place.  So had all of the extraction controls and PCR controls been there, then the possibility would exist; that's correct.

[393]   For example, we know that Dr. Poinar did not find any *A. terreus* DNA in any of the samples that he tested. Yet, we also know that there were lovastatin samples provided to Dr. Poinar – in addition to the samples in issue – that clearly contained *Aspergillus terreus* DNA. Nevertheless, Dr. Poinar was unable to confirm the presence of this micro-organism. As discussed above, I have rejected Dr. Poinar's presumption that DNA cannot be found in such samples. It follows that his conclusion that *Aspergillus terreus* DNA was not present in the

2010 FC 1265 (CanLII)

samples is incorrect; *Aspergillus terreus* DNA was present and Dr. Poinar simply did not use adequate experimental methods to find the DNA.

[394]   Applying this analysis to Dr. Davies, I conclude that the failure of Dr. Davies to find *Coniothyrium fuckelii*, even if it existed in batch CR0157, does not mean his finding with respect to *Aspergillus terreus* cannot be relied on. It certainly does <u>not</u> follow, as asserted by Apotex, that the DNA found by Dr. Davies in AFI batch CR0157 must be exogenous.

[395]   A large caveat must be introduced at this point. I have rejected Apotex's reliance on either Dr. Poinar's inability to find *Coniothyrium fuckelii* or *Aspergillus terreus* or Dr. Davies's failure to find *Coniothyrium fuckelii* DNA in the CR0157 tablets. However, that does not necessarily mean that I will accept Dr. Davies's conclusions. As stated by Dr. Poinar, "all the proper precautions" must be in place before one can rely on the results of the DNA testing. That brings me to the key issue with respect to the DNA evidence relied on by Merck: Is the DNA evidence reliable? Stated differently, were "proper precautions" used in the Davies Lab? Any discussion of this question must begin with the opinions of the experts put forward by the Defendants in response to Dr. Davies's DNA evidence.

E.    *DNA evidence and the Apotex Experts*

[396]   Apotex's response to the DNA evidence rests on the criticisms of Dr. Davies's work provided by three experts – Drs. Gilbert, Poinar and Taylor.

2010 FC 1265 (CanLII)

[397]   Dr. Taylor was qualified to provide opinions to the Court as an expert mycologist, and microbiologist with particular expertise in fungal DNA evolution and fungal DNA PCR amplifications. Dr. Taylor opined on Dr. Davies's Expert Report and DNA testing results, particularly with respect to the possibility of contamination in the Davies Lab.

[398]   Dr. Gilbert was qualified as an expert in the analysis of low copy and degraded DNA. His expert testimony and report deal with the issue of infringement. He explains the problems with the use of ancient or degraded DNA (referred to as ancient DNA). Dr. Gilbert was asked to examine Dr. Davies's laboratory notebooks, and comment on whether the conclusions generated were justified by the methods used.

[399]   Dr. Poinar was qualified as an expert in the extraction and characterization of low copy and degraded DNA. Dr. Poinar reviewed the experiments performed by the Davies Lab, and (discussed above) attempted to replicate the results through testing of his own. Dr. Poinar was asked to answer two general questions: first, whether or not the experimental design of Dr. Davies matched the rigour necessary for an ancient DNA or low template sample project; second, whether Dr. Davies's data support his hypothesis that *Aspergillus terreus* DNA was found in samples of lovastatin from the Defendants.

[400]   As a general rule of evidence, witnesses may not give opinion evidence, but may only testify as to the matters within their knowledge, observation and experience. An exception to this rule applies to expert witnesses. Experts are necessary to assist the Court in scientific matters that would not normally be within the knowledge of the judge. However, before accepting the

2010 FC 1265 (CanLII)

opinion evidence, the trier of fact must determine the admissibility of the evidence in accordance with four criteria: relevance, necessity in assisting the trier of fact, the absence of an exclusionary rule and a properly qualified expert (*R v. Mohan,* [1994] 2 S.C.R. 9, 114 D.L.R. (4th) 419).

[401]   In this case, Drs. Taylor, Gilbert and Poinar appear to satisfy three of the four criteria. However, given the narrowness of their experience and the focus of their opinions on ancient DNA, I seriously question the relevance of their opinions. This is true for all three experts, although more so with respect to Dr. Poinar and Dr. Gilbert. While the level of my concern does not lead me to conclude that all of their opinion evidence is inadmissible, it does reflect on the weight that should be given to their opinions. The key problem exists with the characterization of the DNA tested by Dr. Davies as ancient DNA.

(1)    <u>What is Ancient DNA?</u>

[402]   The first question is: what is ancient DNA? On the record before me, there is no clear definition of this term. However, each of the Defendants' experts provided insights on how to understand what ancient DNA is:

- Dr. Poinar stated that (Poinar Expert Report, Exhibit 135, para. 2):

  The study of ancient DNA is the retrieval and meticulous characterization of DNA sequences from samples which are assumed to be heavily degraded, in low copy numbers and typically stemming from forensic, fossil, sub-fossil, archeological, and palenontological remains.

2010 FC 1265 (CanLII)

- Dr. Gilbert stated that (Gilbert Expert Report, Exhibit 130, para. 8):

  I have been involved in the analysis of a range of materials that contain degraded DNA, and/or low copy number modern DNA. These include ancient bone and tooth material, often dating back tens of thousands of years in age, hair shaft and root, nail, horn, skin (both tanned into leather and dried), mummified soft tissues, feather, eggshell, ancient plant seeds and leaves, formalin and Bouin's solution fixed soft tissues, historic blood samples, feces, urine, soil, ice and honey.

- Dr. Taylor stated that (Taylor Expert Report, Exhibit 124, para. 25) :

  This scarcity of DNA in the lovastatin samples makes analysis of DNA from these samples akin to analysis of DNA from archeological samples, the field of research referred to above as "ancient DNA". A key complication of ancient DNA research is the high likelihood of contamination of the sample with DNA from modern sources of by DNA that has been amplified by PCR from modern DNA, unless the necessary precautions are taken.

[403]   There is a clear gap in these opinions – they fail to provide a comprehensive analysis of how DNA was degraded in the process of making a pharmaceutical product, or even how to compare the DNA in ancient DNA to DNA derived from a pharmaceutical product. Without this evidence, I am unable to compare the evidence presented on ancient DNA to evidence presented by Dr. Davies.

[404]   Dr. Taylor made a sweeping statement in his report that "the scarcity of DNA … is akin to archaeological samples". In the absence of a comprehensive analysis, this is neither a convincing statement nor a scientific one. What is the basis for his knowledge that the DNA in lovastatin is scarce? Where is the evidence that shows us that these two types of DNA can be

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

considered analogous? Without something further, I do not see how it can be logical to compare the level of DNA available from ancient bone and tooth material to DNA derived from a pharmaceutical product.


    (2)    <u>Is DNA derived from a pharmaceutical product degraded or fragmented?</u>


[405]   The next step is to consider the condition or state of DNA derived from a pharmaceutical product. During the trial, there was some controversy over the semantics of whether the DNA derived from the lovastatin samples, and tested by Dr. Davies, was "fragmented" or "degraded". Apotex argues that Dr. Davies specifically described the DNA that was the subject of his experiments as "degraded DNA". Although this is correct, Dr. Davies provided a sufficient explanation of what was meant by the use of this term in his Expert Report.


[406]   During his oral testimony, Dr. Davies described the process whereby the fungal DNA in lovastatin is fragmented during industrial processing. He explained that DNA is released by the cells which expose the DNA to shearing forces in the fermentation machine. This was not contested. The issue was whether these shearing forces would cause "fragmentation" or "degradation". Dr. Davies was asked about this during cross-examination:

> Q.      You just told me a few moments ago that there would be fragments or, the word that you didn't like to use, degradation; would I be right that you would agree with this, that although some of the DNA survives in the pharmaceutical process involved here, there, unquestionably, would be some DNA that would be degraded during the process?

> A.      In the case of a fermentation process, I think I mentioned this before, during fermentation and particularly at the end, cells begin to LYSE, they break and they release DNA.  That DNA is

going to be sheared; it's going to be exposed to shearing forces of the big stirrers that are used in the fermentation. And shearing will break DNA.

For one thing, Aspergillus DNA often has a lot of protein bound to it which might stabilize it, but we planned our experiments with the expectation that the DNA was going to be sheared. It would never shear down to almost nothing.

[407]   In his report, Dr. Davies uses the word "degraded" when referring to the DNA which was the subject of his experiments. However, during oral testimony, Dr. Davies clarified that he equates the word "degraded" to "fragmented" – which is the word he should have used in his Expert Report. Dr. Davies explained that fragmentation is a normal process that occurs to all DNA which is outside a cell. He did not intentionally refer to "degradation" as synonymous with the process that results in ancient DNA.

Q.      You talk about the difficulties your lab experienced, you say:"I underscored the difficulty in obtaining DNA from pharmaceutical samples."And then you should read it, but go to the sentence that begins, "although some DNA survives the process."

A.      Yes.

Q.      It says:

"There is unquestionably some DNA that is degraded during the process."Do you accept that as correct, that's your view?

A.      I do.

THE COURT:  Is that because you equate the word degraded with fragmented?

THE WITNESS:  Yes.  This is different.

THE COURT:  Let me get here to paragraph 63.  When you use the word "degraded" in paragraph 63, do you mean fragmented?

THE WITNESS:  I mean a very general process.

2010 FC 1265 (CanLII)

THE COURT:  Is there something beside fragmentation that you mean by the word degraded in that paragraph?

THE WITNESS:  Yes, Your Honour.  There are enzymes, chemicals, in the reaction in the fermenter that could chemically modify the DNA.

[408]   Dr. Davies goes on to opine that there is no clear evidence that the *A. terreus* DNA is "degraded" (in terms of the ancient DNA reference) during the fermentation process.

> Q.      Going back to my question, do you not agree with this, that a though some DNA survives the fermentation, purification process, that there, unquestionably, would be some DNA that is degraded during the process?
>
> A.      If we buy degradation, we're talking about chemical reactions, and I would say yes, it's possible.
>
> Q.      Not unquestionable?
>
> A.      I don't know, you see. Nobody's ever looked.  You've got a fermenter with things DNA has never seen and you're stirring it up.I don't know anybody is going to look to see what the DNA would be like and how it was broken.  We didn't look at the fermenter. We only looked at the powder.

[409]   In my view, Dr. Davies's explanation is clear as to why DNA derived from a pharmaceutical process could be considered to be "fragmented" but not "degraded".

[410]   So, what does this mean to me? Apotex's experts assume that the DNA tested by the Davies Lab was "degraded" in the same manner that ancient DNA is degraded. I do not agree. The only relevant evidence presented before me on this issue was that of Dr. Davies. I conclude that the DNA tested by Dr. Daves is considered to be "fragmented" but not "degraded".

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

(3)     Can one compare how DNA derived from a pharmaceutical product is
        fragmented to how DNA from "ancient DNA" is
        degraded?

[411]   After considering the evidence on what is ancient DNA, I will now consider whether

DNA derived from a pharmaceutical product that is "fragmented" can accurately be referred to

as ancient DNA. I conclude that it cannot.

[412]   In my view, it does not logically flow to compare DNA from "ancient bone and tooth

material, often dating back tens of thousands of years" to DNA from *Aspergillus terreus* which

has been processed into a pharmaceutical product. This is true especially in light of

understanding that the subject DNA is not "degraded" in the same manner.

[413]   Without specific expert evidence on this, it is not logical to compare the two. The

Defendants' experts provide no relevant evidence on this point. However, Dr. Davies explicitly

states that one cannot compare ancient DNA to DNA derived by a pharmaceutical process.

> Q.     Tell me what you understand the words "ancient DNA" to
> mean to at least those that use the expression?"
>
> A.     As I understand it, it is DNA being isolated from remnants
> of earlier civilization, animals, from earlier stages, things of that
> type, and looking for DNA from those samples and trying to
> identify them.  So the sequencing of some old human genomes
> recently.  I don't know if that's called ancient DNA or not.
>
> Q.     In your description of it, would I be correct that the DNA
> one has in the context that you've given me for in ancient DNA, is
> DNA that is either low copy number DNA or degraded DNA?
>
> A.     Depends how you define degraded.
>
> Q.     How would you define degraded?

A.      I think there are two kinds of degradation.

Q.      What are they?

A.      One is that the DNA can be broken to give very low molecular weight fragments which makes it more difficult to do a PCR.

. . .

Q.      On the last sentence, the process of cleaving that you talked about in that sentence, that causes, according to your sentence, further degradation, not a new but further suggestion that the earlier process that you described, the purification steps earlier, causes degradation, and that leads to further degradation through the cleavage from the enzymes, correct?

A.      That is correct.  What I should have said is that <u>the DNA is really modified and broken up in a horrible way, and there would be very little intact chromosomal DNA but there would be fragments, and some of those would not work in PCR because they'd be modified further.  That's the difference between this and ancient DNA</u>, and things like that.

Q.      I don't know what you mean by that.  What do you mean by ancient DNA?

A.      It's DNA from million year old remains and things of this type.

Q.      You're suggesting that that DNA is not fragmented and not degraded and not broken up?

A.      It's everything.  It's even worse.  <u>So the techniques used for ancient DNA are really very specific, and it's not the same as this</u>.

Q.      Because it's even more extreme and ancient DNA versus what you encountered here?

A.Yes, cosmic rays have been acting on it for a long time.  But as I think I mentioned right at the beginning, <u>one of the biggest problems with what they call ancient DNA is the question of desiccation, and desiccation causes quite severe damage to DNA.</u>

[Emphasis added.]

2010 FC 1265 (CanLII)

[414]   Dr. Davies provides his expert opinion that DNA that has been hit with cosmic rays for thousands of years – DNA that scientists did not think even existed until a few short years ago – cannot be compared with DNA that has been processed into a pharmaceutical product. I agree with him.

> (4)    Are the opinions of the Defendants' experts relevant to fragmented DNA from pharmaceutical products?

[415]   Having concluded that ancient DNA is not comparable to DNA derived from a pharmaceutical product, I turn to a consideration of whether the opinions presented by the Defendants' experts extend beyond the field of ancient DNA. In other words, can the opinions of any of the experts assist the Court in gaining a different understanding of the DNA testing from fungal pharmaceutical compounds than what was provided by Dr. Davies?

[416]   In my view, none of the experts has provided me with the necessary link between ancient DNA and the DNA in issue. Apotex has failed to satisfy me that the evidence of these experts is relevant to the issues before me.

[417]   Dr. Waldo Taylor was the only expert (other than Dr. Davies) whose expertise extended beyond the field of ancient DNA. During his examination-in-chief, he stated the following:

> Q.       I just want to ask you about the expression "ancient DNA".
> Can you describe what you understand that to mean?
>
> A.       Sure.  As I mentioned, when the PCR reaction became
> available it was possible to examine DNA and biological
> specimens, or really any specimen, where DNA was wanting,
> where it was scarce. So that field has grown and it encompasses
> people who study ancient DNA, who study DNA that survives in

2010 FC 1265 (CanLII)

the fossil specimens, things like Neanderthal bones or organisms in amber.  It includes forensic studies where there's a little amount of DNA associated with some social interaction that you'd like to study.  It includes <u>the study that we're concerned with today, trying to identify the organism that produced a pharmaceutical compound</u>.

[Emphasis added.]

[418]   However, during his cross-examination Dr. Taylor acknowledged that he was not fully aware of "the whole story" of how the lovastatin samples tested in the Davies Lab were treated or prepared.

[419]   Dr. Taylor's opinions are seriously undermined by his admission that he lacks understanding of how the relevant pharmaceutical compounds have been prepared or treated.  It is inadequate for an expert to explicitly state that the subject DNA is comparable to ancient DNA when he does not know the scientific basis for this comparison.

[420]   Neither Dr. Gilbert nor Dr. Poinar offered their opinions on how, if at all, fragmented DNA from a pharmaceutical compound could be treated as ancient DNA.

[421]   According to Dr. Gilbert, there are millions of scientists in the world who have access to, use or rely upon PCR data; yet, there were only a "handful of people on the earth" who are qualified to undertake the kind of ancient DNA analysis Apotex promotes. It would have been more helpful to the Court (and relevant to the issues of this case) if Apotex had presented DNA experts who operated outside this "handful of people on the earth".

[422]   In sum, I have difficulty with the opinions of the Apotex experts. Their opinions are based on an assumption that Dr. Davies's work and opinion could be evaluated against the same standards, protocols and norms as would be used by the "handful of people on the earth" with an expertise in ancient DNA. I am not satisfied that this assumption is correct. This problem informs my evaluation of the criticisms levelled at Dr. Davies's work. The Apotex experts are providing their opinions through a very narrow prism that is only marginally relevant – at best – to the issues before me.

F.      *Contamination*

[423]   As we know, Dr. Davies had 13 hits for *Aspergillus terreus* DNA from three different samples. In their arguments, the Defendants raise many, many problems with Dr. Davies's opinion, his testimony at the trial and the procedures and results from the Davies Lab. I have considered all of their concerns. The most serious allegation is the risk that the *Aspergillus terreus* DNA found in the samples tested was the result of contamination by exogenous *Aspergillus terreus*. In other words, the Defendants submit that the risk of contamination in the Davies Lab was so high that I cannot accept the DNA testing evidence of Dr. Davies as reliable.

[424]   As all of the experts would agree, contamination is always a serious risk in DNA testing. I acknowledge the risk. The question for this Court is whether the risk of contamination makes it more likely than not that Dr. Davies's *Aspergillus terreus* DNA findings are false.

2010 FC 1265 (CanLII)

(1)     Dr. Davies

[425]   Dr. Davies was clearly aware of the risk of contamination. Dr. Davies addressed the issue

of laboratory contamination on several occasions during his testimony and in his Expert Report.

Dr. Davies stated (Davies Expert Report, Exhibit 55, para. 77):

> I do not consider contamination to be a likely explanation to
> account for the presence of *Aspergillus terreus*. For example, if our
> laboratory was contaminated, I would have expected to see
> *Aspergillus terreus* amplicons in the negative controls. However,
> this was not the case.

[426]   Dr. Davies cautioned that there is always a possibility of a contamination while carrying

out a PCR reaction with DNA. However, during his oral testimony, he insisted that, "[the Davies

Lab] took every possibility to avoid contamination. We're not forensic scientists, but we can

work clean."

[427]   Dr. Davies likened the scenario of contamination in the subject experiments to "the

chance that lightening would hit you." He explained that his two investigators, Grace Yim and

Karen Lu, were extremely careful workers and precautions were taken to prevent contamination,

including:

- working in a sterilized area to kill bacteria and fungi that could be a source of
  contamination;

- autoclaving the micro-pipets and tips to sterilize and prevent cross-experiment
  contamination;

- operating in a UV-radiated, stainless steel biosafety hood to purify the incoming
  air and allow for easy cleaning of the hood; and

- utilizing experiments with zero DNA controls, and following the protocol that the
  experiment would be repeated if contamination was found in the zero DNA
  control.

[428]   Dr. Davies was convinced that contamination was not responsible for the results of these

experiments. He opined that the fact that the Davies Lab never found *Coniothyrium fuckelii* or

any other fugus of the genus *Aspergillus* (other than *terreus*) as a contaminant, was evidence to

support his assertion that contamination was not responsible. Dr. Davies observed that it was

hard to believe that, if contamination had been present in the experiments, it would only be found

in the form of *Aspergillus terreus*.

[429]   Lastly, as Dr. Davies most poignantly stated, "DNA doesn't fly" or "float around in the

air".

[430]   Against the backdrop of Dr. Davies's expert testimony, I turn to the evidence of the

experts produced by Apotex. In general, as discussed above, the Apotex experts brought a very

narrow perspective to the question of contamination. All three imposed incredibly high standards

on the work of DNA laboratories and began with the assumption that Dr. Davies was dealing

with DNA that was akin to ancient DNA that might be found in the 1000-year old remains of

extinct animals. Quite simply, these experts imposed an overall standard on the DNA testing

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

performed by the Davies Lab that is not reasonable in the circumstances. Two experts – Dr.

Taylor and Dr. Gilbert – were particularly stubborn in their opinions on contamination in the

Davies Lab.

(2)    Dr. Taylor

[431]   Dr. Taylor equated the analysis of the tested lovastatin to an "analysis of DNA from

archaeological samples" (Taylor Expert Report, Exhibit 124, para. 25). For the reasons expressed

earlier, I am of the view that this assumption is flawed, or unsupported by the record.

[432]   Directly following from this assumption, Dr. Taylor expressed the view that a

"substantial risk of contamination" could come from two sources: (a) cultures of *Aspergillus*

*terreus* which were used by Merck to produce lovastatin; or, (b) *Aspergillus terreus* DNA that

was PCR amplified in the Davies Lab.

[433]   Dr. Taylor concluded that (Taylor Expert Report, Exhibit 124, para. 28):

> If Dr. Davies did in fact detect *Aspergillus terreus* DNA, then his
> own laboratory practices very likely caused his samples to become
> contaminated with such DNA from *Aspergillus terreus* cultures or
> from DNA that been PCR amplified from *Aspergillus terreus*
> DNA.

[434]   During cross-examination, Dr. Taylor stated that the most likely source of contamination

was *Aspergillus terreus* DNA from PCR amplifications in the Davies Lab. This theory was

discussed with Dr. Gilbert during cross-examination. Dr. Gilbert explained why the amplified

material posed more of a risk; it is because the "PCR part" would "be more concentrated" with

DNA. However, as the evidence shows, the strains of both *Aspergillus terreus* and *Coniothyrium fuckelii* were present in the Davies Lab at the relevant time. Dr. Gilbert also confirmed that the risk of contamination from the control DNA from *Aspergillus terreus* or *Coniothyrium fuckelii* was equivalent, even though the DNA concentration would differ. Yet, Dr. Davies found *Aspergillus terreus* DNA in 13 experiments but never documented a single instance of *Coniothyrium fuckelii*. How could it be that amplified *Aspergillus terreus* DNA would cause contamination but not the *Coniothyrium fuckelii* DNA? Dr. Gilbert repeatedly refused to accept the possibility that zero findings of *Coniothyrium fuckelii* DNA should reassure the experimenter that contamination by *Aspergillus terreus* was not probable. I find his denials to be unhelpful and, frankly, illogical. Thus, Merck submits, Dr. Taylor's theory does not withstand examination. I agree. Zero findings of *Coniothyrium fuckelii* demonstrates the weakness in the theory that contamination would, more likely than not, occur from *Aspergillus terreus* DNA that was amplified by PCR in the Davies Lab.

[435]   Another theory of contamination presented by Dr. Taylor was the possibility of airborne spores. I do not accept this as likely in the Davies Lab. The use of a biosafety hood with purified air would dramatically reduce the possibility of such contamination. Further, Dr. Taylor acknowledged that he had never studied the ability to amplify from a single spore of *Aspergillus terreus* and admitted that it was speculative to conclude that a single spore would amplify by PCR.

[436]   A final concern of Dr. Taylor relates to his reading of the various "gels" that recorded the experimental results. Dr. Taylor noted a "milestone" on the gels. Dr. Taylor observed the following (Taylor Expert Report, Exhibit 124, para. 33):

> . . . Dr. Davies' laboratory records from 2007 confirm that DNA was amplified from the lovastatin samples using coniothyrium fuckelii specific primers, thus indicating the presence of coniothyrium fuckelii DNA in the sample. However, Dr. Davies did not mention this in his affidavit. Accordingly, Dr. Davies' failure to acknowledge coniothyrium fuckelii as the potential source organism, based on his erroneous assertion that no coniothyrium fuckelii DNA was found, was not warranted.

[437]   In other words, Dr. Taylor was of the opinion that Dr. Davies had positive findings of *Coniothyrium fuckelii* that were overlooked or never reported. I agree that an unreported instance of *Coniothyrium fuckelii* would be a critical contention with respect to the possibility of contamination and also with respect to Dr. Davies's conclusion that there was no *Coniothyrium fuckelii* DNA found in any of the samples tested. However, examination of Dr. Taylor's statement and observations by Dr. Gilbert and Dr. Poinar diminish the significance of this observation.

[438]   During his cross-examination, Dr. Taylor acknowledged that his conclusion that this was *Coniothyrium fuckelii* was speculative; he agreed that the first amplification of DNA using a *C. fuckelii* primer may have been *Coniothyrium fuckelii* DNA or "may be OJ Simpson's DNA". Dr. Poinar agreed that, based on the data, one could not conclude that the band observed by Dr. Taylor was a band of *Coniothyrium fuckelii* DNA. When Dr. Gilbert was asked about the existence of any bands that were the correct size for *Coniothyrium fuckelii* using the *Coniothyrium fuckelii* specific primers, Dr. Gilbert responded that there were "zero" such bands.

2010 FC 1265 (CanLII)

[439]   Viewed as a whole, I do not find that Dr. Taylor's opinions regarding contamination are supported by the record.

(3)    Dr. Gilbert

[440]   Dr. Gilbert provided his expert opinion that "contamination presents a serious challenge to the data generated by Dr. Davies's team". I do not believe that anyone would disagree with this statement. However, Dr. Gilbert continues to express his view that, "as a result, his results cannot be viewed as reliable."

[441]   The first problem that I have with Dr. Gilbert's opinion is that it is directed to his field of specialization – the fields of ancient DNA and forensic genetics. In his Expert Report, Dr. Gilbert refers to samples that "were millions of years old". His entire opinion is premised on the assumption – unexplained, in my view – that Dr. Davies was working with degraded DNA that was comparable to ancient DNA. As discussed above, I am not persuaded that this is a meaningful comparison.

[442]   Moreover, the contamination theory posited by Dr. Gilbert (and Drs. Taylor and Poinar) is that exogenous *Aspergillus terreus* resulted in the positive findings by the Davies Lab. Thus, unless the experts can identify a credible source of the exogenous *Aspergillus terreus* DNA, the theory does not stand up to scrutiny. Upon cross-examination, Dr. Gilbert acknowledged that there was no evidence that contaminants, if they existed in the Davies Lab, were *Aspergillus terreus*.

2010 FC 1265 (CanLII)

[443]   Further, how has Dr. Gilbert measured or defined the term "reliable"? Can the possibility

of contamination explain away every one of the 13 "hits"? Does the risk of contamination make

it more likely than not that *Aspergillus terreus* does not exist in the samples? Or, is

contamination merely a possibly?


[444]   In sum, I am not persuaded that the risk of contamination in the Davies Lab rises to the

level where, on a balance of probabilities, I cannot rely on the results obtained and opined on by

Dr. Davies.


G.      *Other criticisms of Dr. Davies's opinion*


[445]   The Defendants levelled a number of other criticisms at the work of Dr. Davies.

Specifically, the Defendants submit that the following principles must be followed to determine

whether the Court should ignore the expert evidence of Dr. Davies:


- Where an expert's conclusion is not appropriately explained and supported, it may

  properly be given no weight by the trier of fact (*Backman v. Canada* (1999), 178

  D.L.R. (4th) 126 at para. 34, 246 N.R. 309 (F.C.A.)).


- Likewise, for a Court to accept an expert's opinion, the trier of fact must know the

  facts and/or assumptions upon which the expert has based his or her opinion

  (*Johnson & Johnson v. William H. Rorer, (Canada) Ltd.* (1980), 48 C.P.R. (2d)

  58 at para. 7, [1980] F.C.J. No. 200 (QL) (F.C.T.D.)).

- Where those facts turn out to be inaccurate or incomplete, the weight given to an expert's opinion may be significantly reduced (*Misik (E.) v. M.N.R.*, [1993] 1 C.T.C. 2360 at p. 2373, [1993] T.C.J. No. 13 (QL) (T.C.C.)).

[446]   In support of their position that the opinion of Dr. Davies should be rejected, the Defendants point to "spurious bands" seen on some of the "gels". These bands, in the view of the Defendants, demonstrate that Dr. Davies's opinion was inaccurate.

[447]   In principle, I agree with the Defendant's argument that an expert should: (1) appropriately explain their conclusions; (2) inform the Court of the underlying facts and/or assumptions; and (3) provide accurate and complete information. If unable to do so, it should be expected that the weight of their opinion will be significantly reduced.

[448]   However, I believe that the Defendants are misapplying these principles to the opinions given by Dr. Davies.

(1)    Lack of knowledge

[449]   I agree with the Defendants that there were aspects of the experiments performed in the Davies Lab that Dr. Davies was unable to describe to the Court. However, the critical question is whether his knowledge of the technical aspects of the experiments was fundamental to his expert opinion. I do not think it was.

[450]   If one accepts that someone is an expert in their field (as the Defendants did in the case of

Dr. Davies), the parties must provide the Court with a clear understanding of what their expertise

is. A problem arose in this case because of a misunderstanding between what constitutes being

an expert in the science of microbiology and an expert in performing the technical experiments

of microbiology. There obviously was confusion of what was expected of Dr. Davies. Dr. Davies

obtained his Ph.D in 1956, and reached professor emeritus status in 1997. He is unquestionably

an expert in his field. One does not rise to that level at a Canadian university without having

outstanding accomplishments in an area of expertise. However, it is not surprising that someone

like Dr. Davies, who is in charge of a laboratory with many students and technicians, is not

personally performing the experiments and may not be knowledgeable on all of the technical

aspects of the experimental procedure. Obviously (and somewhat critically of Dr. Davies), I am

of the view that Dr. Davies should have prepared better for his testimony. However, unless the

lack of knowledge goes the heart and substance of Dr. Davies's opinion, I would not be

persuaded to reject that opinion.


[451]   The Defendants agreed, after reviewing his Expert Report, and before his oral testimony,

that Dr. Davies was an expert in microbiology and microbial genetics. That expertise includes

the use of DNA techniques for studying microbes. That expertise – and not the minutia of

laboratory procedures – was the focus of his opinion. I do not agree with the Defendants that Dr.

Davies's lack of knowledge of some the technical aspects of the experiments should necessarily

lead this Court to the conclusion that the evidence is unreliable.

2010 FC 1265 (CanLII)

(2)    Incomplete Report & Lack of Disclosure

[452]   The Defendants argue that Dr. Davies was incorrect and incomplete in his report of, and conclusions as to, the majority of the experiments disclosed. I agree that Dr. Davies's notebooks and conclusions were incomplete. However, the determinative question is whether the missing information is fundamental to his expert opinion. I do not believe it was.

[453]   The Defendants refer to the following incidents of incompleteness:

- In 2003, experiments 13, 19 and 20 are disclosed. The inference is that at least 17 other experiments were not disclosed. Thus, 17 of 20 or 85% of all experiments were not disclosed.

- In Karen Lu's 2007 work, experiments 7, 8, 18, 20, 22, 23 and 24 are disclosed. The inference is that at least 17 other experiments were not disclosed. Thus, 17 of 24 or approximately 71% of all experiments were not disclosed.

- In Grace Yim's 2007 work, experiments 32, 33, 35 and 36 are disclosed. The inference is that at least 8 other experiments are not disclosed. Thus, 8 of 12 or approximately 67% of all experiments were not disclosed.

- In total, 42 or 54 experiments, or 78% of all experiments were not disclosed.

[454]   The Defendants submit that Dr. Davies provided an incomplete picture of the experiments performed by only providing selected pages for litigation. The Defendants allege that Dr. Davies erred by providing only the pages that "would bear on the conclusion", and not all of the pages that were relevant. The Defendants further argue that Dr. Davies provided an erroneous explanation for withholding the notebook pages because "the non-disclosed experiments did not bear on the conclusion 'in any significant way'". I do not agree with the Defendants that this was an erroneous explanation.

[455]   During cross-examination, Dr. Davies testified that the reason he did not disclose all of the pages relating to all of the experiments performed in his lab was that this was not "routine" procedure for a scientist. When preparing evidence to support a publication, it is "routine" for a scientist to provide only the pages that support the conclusion that the scientist has opined. There was no malice or bad faith in Dr. Davies's lack of disclosure.

> Q.      You deprived a reader of coming to a different conclusion about the sufficiency or the relevance of the experiments included and not included, correct?
>
> A.      No, I don't think so. May I make the point that when one publishes a scientific paper, you have to publish a logical sequence of events, and you publish the results, and you then interpret the results based on the experiments? This was not a scientific paper. Things were much simpler here than that. I believe we gave you a continuum.  We selected some experiments.  Some of them were experiments that didn't work that well, but you got an idea as to what was going on.  I don't see anything wrong with that.

[456]   During cross-examination, Dr. Davies was presented with a chart, prepared by counsel, representing the missing information. Throughout the cross-examination, I was unable to observe any missing notes or details that would have had a material impact on the overall opinion of Dr.

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

Davies. When asked about the chart during cross-examination, Dr. Poinar stated that all documents need to be put forward. However, he also acknowledged that, in this case, the data depicted in the chart meant little, if anything, to the conclusions being drawn by Dr. Davies.

[457]   I do not agree with the Defendants that the decision of Dr. Davies to exclude certain pages <u>must</u> result in a conclusion that his evidence is unreliable. What is important is that the opinions of the expert not be contradicted or otherwise weakened by any missing information. By not putting forward all of the notebook pages, Dr. Davies ran the risk of not being able to substantiate his opinions. However, in this case, as admitted by Dr. Poinar, the missing information is not relevant to the overall conclusion. Accordingly, while I would have preferred that Dr. Davies had provided a more complete picture of the experiments performed, I do not consider that his opinion to be fatally flawed by his failure to do so.

> (3)   Unexpected results

[458]   The Defendant's argue that Dr. Davies obtained unexpected results and therefore his work cannot be relied upon. At the heart of their argument is the presence of "spurious bands" that only became visible upon dramatic enlargement of a photograph of the gel that was stained and analyzed under UV light for the presence of the PCR amplified DNA

[459]   The Defendants argue that the experiments of Dr. Davies were flawed because, upon investigation of the laboratory notebooks, extra bands could be seen on the gel pictures. The

Plaintiffs, on the other hand, argue that any evidence involving "photoshopped" gels should not be considered or given any weight by this Court. I agree with the Plaintiffs on this point.

[460]   When presented with the greatly enlarged photographs, Dr. Davies commented that the gel photographs were manipulated by the Defendants. Dr. Davies stated:

> Your photo shopping is up to some amazing magnification … people do this to public papers sometimes and I think it's unrealistic. It's not what you see on the actual gel. This is not the actual gel. This is a doctored gel in my opinion … You can find many bands on PCR gels that you would not see by eye. You would not see by other detections if you photo shopped them up in some way. I am just very concerned about this, and I find it difficult to draw what I would consider to be sound conclusions

[461]   I agree with Dr. Davies. The original photographs of the gels are highly technical and – frankly – confusing to this judge. How can I be certain that taking those already confusing depictions and enlarging them to this extraordinary scale does not bear a risk of introducing photographic ghosts, shadows or other images that did not originally exist? I have no evidence that such distortion of the original evidence would not introduce errors or unreliable results.

[462]   Even if I were to accept that there are faint bands that were not seen in the original gels or referred to by Dr. Davies, none of this evidence accounts for Dr. Davies's findings of *Aspergillus terreus* in the lovastatin samples.

[463]   Overall, the presence of the spurious bands, or the impact of the photoshopped pictures, does not lead me to the conclusion that the results of the experiment were flawed.

2010 FC 1265 (CanLII)

## IX.    <u>Infringement – Conclusion</u>

[464]    My overall conclusion is that Dr. Davies's testing results are reliable and credible evidence that the lovastatin samples tested in his laboratory contained *Aspergillus terreus* DNA. I have rejected the contamination theory of Apotex.

[465]    I am satisfied that the lovastatin tablets tested originated from AFI batch CR0157. The DNA evidence satisfies me that, on a balance of probabilities, the Defendants infringed the '380 Patent with the manufacture and sale of any product from AFI batch CR0157.

[466]    The situation with respect to the Blue Treasure samples is different. As noted earlier in these reasons, I am not persuaded that Merck has demonstrated a nexus between the samples tested in the Davies Lab and the allegedly infringing product. Thus, I do not accept the DNA evidence as direct evidence of infringement by the lovastatin produced by Blue Treasure. Nevertheless, the remaining evidence presented by Merck with respect to the Blue Treasure lovastatin strongly supports the conclusion that there was infringement. This is discussed earlier in these reasons. If I am wrong with respect to the lack of nexus, then I would conclude that the DNA evidence is evidence of direct infringement, a conclusion that would strengthen – but not change – my earlier finding of infringement.

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

**X.**    **Validity**

A.    *Introduction*

[467]   Having determined the issues of claims construction and infringement, I now turn to the issue of validity. In their counterclaims, each of the Defendants assert that the '380 Patent is invalid. If they are correct, there will be no question of infringement; the Defendants cannot infringe an invalid patent.

[468]   In an infringement action, the patentee benefits from the presumption of validity (s. 45 of the *Patent Act* and s. 43(2) of the *Patent Act* currently in force). Thus, Apotex bears the burden of proving, on a balance of probabilities, that the '380 Patent is invalid. As of the close of argument in this trial, the following remained as Apotex's grounds of invalidity:

- All of the disputed claims, except for claims 3 and 6, are invalid because they are overly broad.

- Certain of the claims are invalid because they could not demonstrate utility. In particular:

  ○ claims 1, 2, 5 and 13 to 15 demonstrate a lack of utility, in that not all of the compounds included in the claims are useful in fulfilling the promise of the '380 Patent; and

2010 FC 1265 (CanLII)

    ○    the utility of the claimed subject matter, including pharmaceutical utility, demonstrates a lack of sound prediction, in that the inventor could not predict, as of the Canadian filing date, that the compounds claimed would fulfil the utility promised by the '380Patent.

- Claims 13 to 15 are invalid because of prior use or anticipation by the existence of lovastatin in a traditional Asian product known as "Red Yeast Rice".

- The claims are invalid because Merck was not the first to invent lovastatin.

B.    *Overbreadth*

[469]   Apotex argues that the claims of the '380 Patent, other than claims 3 and 6, are "overbroad" because they claim processes that were not invented by the named inventors. In their submission, the invention, as claimed, comprises numerous strains or species which were not tested or evaluated by the inventors to determine, as of the priority date, whether they were capable of producing the compounds.

[470]   A patent which claims more than what has been invented can be found to be invalid as being overly broad. The concept of "overbreadth" has been referred to in a number of cases before our Court. In support of its position, Apotex relies on the case of *Biovail Pharmaceuticals Inc. v. Canada (Minister of National Health and Welfare)*, 2005 FC 9, [2005] F.C.J. No. 7 (QL)

[*Biovail*]. In *Bioval*, above, at paragraph 61, Justice Harrington described the notion of "covetous claiming" as follows:

> If the inventor claims more than he should, he loses everything.
>
>> His fences must be clearly placed in order to give the necessary warning and he must not fence in any property that is not his own. [Thorsen P. in *Minerals Separation North American Corp. v. Noranda Mines Ltd.*, [1947] Ex. C.R. 306 at page 52, as quoted in *Free World Trust*, supra, at para. 14]

[471]   In *Biovail*, above, the patent in issue (a patent for a controlled-release pharmaceutical tablet) disclosed only one sustained-release mechanism, referred to as an osmotic process, using a compound known as HPMC as the carrier. The generic company was using a different mechanism and compound – a hydrogel process using a compound known as HPC as the carrier. Justice Harrington's key finding was that the patent was not infringed because the inventors only contemplated the osmotic process, and not the hydrogel process, which was a substantially different process. However, in the alternative, Justice Harrington considered that, if the claims were to be construed to include the hydrogel process, "the patent was invalid for covetous claiming" (*Biovail*, above, at para. 60).

[472]   *Biovail*, in my view, does not support Apotex's submission on overbreadth. Unlike the patent in *Biovail*, the '380 Patent's claims and disclosure make reference to all producing species of *Aspergillus terreus*. The question of whether the inventors could extrapolate their laboratory results from the specific samples tested is a question of sound prediction and not of overbreadth.

2010 FC 1265 (CanLII)

[473]   Apotex also relies on *Eli Lilly Canada Inc. v. Apotex Inc.*, 2008 FC 142, 63 C.P.R. (4th) 406 [*Eli Lilly Raloxifene (FC)*], aff'd 2009 FCA 97, 78 C.P.R. (4th) 388, a decision in respect of a patent that claimed the use of raloxifene in the treatment of osteoporosis and bone loss. At paragraphs 179-182, Justice Hughes discussed the assertion that the claims were overly broad. Key to his conclusion that the claims were overly broad was the "disconnect" between the disclosure and the claims in the patent. The disclosure limited the osteoporosis and bone loss to that without the adverse effects of estrogen therapy. In all but one of the claims in issue, there was no limitation to the use of the drug for bone loss due to estrogen-related causes. Thus, Justice Hughes concluded that all but one of the claims in issue were overly broad. The issue of overly broad claims was not overturned by the Court of Appeal.

[474]   In my view, *Eli Lilly Raloxifene (FC)*, above, does not support an argument that the claims of the '380 Patent are overly broad. In the patent before me, the disclosure is consistent with the claims in issue. Contrary to the submissions of Apotex, the disclosure of the '380 Patent is not limited to the two strains of *Aspergillus terreus* that were used in the experimentation by Merck that lead to the invention.

[475]   In brief, on Apotex's claim of overbreadth, I conclude that this argument, on the facts of this case, is more properly a question of sound prediction - in particular, both the factual basis for the prediction and the sufficiency of the disclosure.

C.    *Utility*

(1)    <u>General Principles</u>

[476]    Apotex submits that the '380 Patent is invalid on the grounds that:

1.    the impugned claims lack actual utility, in that certain strains of *Aspergillus terreus* have been shown to be unable to produce any of the claimed compounds; and

2.    as of the relevant date, the inventors could not soundly predict that the claimed compounds would have the utility promised by the '380 Patent.

[477]    Section 2 of the *Patent Act* defines an invention as something that is "new and useful". From this comes the concept of "utility".

[478]    A number of principles associated with the law of utility are well established in the jurisprudence. To begin, the overarching concept is that, as of the relevant date, there must have been a demonstration of utility of the invention or, lacking that, a sound prediction of utility based on the information and science available at the time of the prediction (see, for example, *Merck & Co. v. Apotex Inc.*, 2005 FC 755, 41 C.P.R. (4th) 35 at para. 121; *Pfizer Canada Inc. v. Apotex Inc.*, 2007 FC 26, 306 F.T.R. 254 at paras. 36-40, aff'd 2007 FCA 195, 60 C.P.R. (4th) 177, leave to appeal to SCC refused, [2007] S.C.C.A. No. 371 (QL), 381 N.R. 399 (note)).

[479]   Apotex bears the burden on this issue of validity. To demonstrate lack of utility, Apotex

must show "that the invention will not work, either in the sense that it will not operate at all or,

more broadly, that it will not do what the specification promises that it will do" (*Consolboard*,

above, at p. 525).

[480]   For many patents in the pharmaceutical field, the inventors will not yet have

demonstrated that the invention "works", as of the relevant date. In such cases, the inventors rely

on the concept of "sound prediction". The doctrine of sound prediction can be relied upon by an

inventor to justify patent claims whose utility has not actually been demonstrated, but can be

soundly predicted based upon the information and expertise available (*Apotex Inc. v. Wellcome

Foundation Ltd*., 2002 SCC 77, [2002] 4 S.C.R. 153 at para. 56 [*Wellcome AZT*]). A party

challenging the utility of a patent based on sound prediction must demonstrate that the prediction

was not sound or that there is evidence of a lack of utility. As stated in *Wellcome AZT*, above, at

paragraph 56:

> If a patent sought to be supported on the basis of sound prediction
> is subsequently challenged, the challenge will succeed if, *per*
> Pigeon J. in *Monsanto Co. v. Commissioner of Patents*, [1979] 2
> S.C.R. 1108, at p. 1117, the prediction at the date of application
> was not sound, or, irrespective of the soundness of the prediction,
> "[t]here is evidence of lack of utility in respect of some of the area
> covered".

[481]   The relevant date is the date of the filing of the Canadian patent application (*Ramipril I

(FC)*, above, at paras. 88-96).  For the '380 Patent, that date is June 11, 1980.

2010 FC 1265 (CanLII)

[482]   Where the specification does not promise a specific result, no particular level of utility is required - a "mere scintilla" of utility will suffice (H.G. Fox, *The Canadian Law and Practice Relating to Letters Patent for Inventions* (4th ed., 1969), at p.153). However, as stated in *Consolboard*, above, where the specification sets out an explicit "promise", utility must be measured against that promise (see, for example, *Pfizer Canada Inc. v. Canada (Minister of Health)*, 2008 FCA 108, 67 C.P.R. (4th) 23 at para. 53 [*Pfizer Atorvastatin (FCA)*]). In other words, does the invention do what the patent promises it will do? The question to consider is whether, at the date of filing, the patentee had sufficient information upon which to base the promise. If not, the patentee must have had sufficient information upon which to make a sound prediction of the promise.

[483]   At paragraph 70 of *Wellcome AZT*, above, the Supreme Court of Canada articulated a three-part test that must be satisfied in order to establish that a sound prediction has been made by the an inventor. The three elements of the test are:

1.    there must be a factual basis for the prediction;

2.    the inventor must have an articulable and "sound" line of reasoning from which the desired result can be inferred from the factual basis; and

3.    there must be proper disclosure.

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

[484]   To be sound, a prediction does not need to amount to certainty, as it does not exclude the risk that some compounds within the area claimed may, at some later time, prove to be devoid of utility.

[485]   With these principles in mind, I turn to the '380 Patent and the evidence before me.

(2)    The '380 Patent

[486]   As of the relevant date of June 11, 1980 (the Canadian filing date), Merck had made, but not tested, the compounds for which the process is claimed. In other words, it was not relying on actual utility but on its prediction that the four compounds would have utility.

[487]   As noted, sound prediction must be measured against the promise of the patent, where one is explicitly expressed or may be implied. The promise of the '380 Patent is discussed in Section V of these Reasons. To review, I have concluded the following:

1.    The '380 Patent does not promise that all micro-organisms within the species *Aspergillus terreus* will produce the four compounds of claim 1 or the compounds identified in the other disputed claims.

2.    The patent does promise that the compounds produced by the fermentation process identified in the patent are "useful as antihypercholesteremic agents for the treatment of atherosclerosis, hyperlipemia and like diseases in humans".

[488]    I will measure the utility of the '380 Patent against these two promises.


    (3)    <u>Lack of Utility</u>


[489]    Apotex claims that it has presented empirical evidence of inutility of claims 1, 2 and 5. This assertion of inutility is founded on testing, by Drs. Sorenson and Samson, that demonstrated that not all strains of micro-organisms within the genus *Aspergillus* or – more narrowly – within the species *Aspergillus terreus* are capable of producing the claimed compounds.


[490]    Dr. Sorensen was asked, by counsel for AFI, to investigate the ability of different strains of *Aspergillus terreus* to produce lovastatin. He was instructed to use fermentation conditions and media contemplated or specifically taught in the '380 Patent. He designed experiments involving four different strains of *Aspergillus terreus*. Two of those strains (referred to as A18 and R99) were strains which had previously been shown to produce Compound I. The other two strains (referred to as UAMH 7844 and UAMH 9313) were obtained by Dr. Sorensen from the University of Alberta Microfungus Collection and Herbarium (UAMH). In simple terms, Dr. Sorensen's results were as follows:


    •    lovastatin (Compound1) was detected in the A18, R99 and UAMH 9313 extracts;


    •    lovastatin was not detected in the UAMH 7844 extract; and

2010 FC 1265 (CanLII)

- no quantifiable quantities of dihydrolovastatin (Compound II) were detected in any of the four extracts.

[491]   Similar results were obtained by Dr. Samson, who also carried out testing of certain micro-organisms at the request of counsel for AFI. Dr. Samson found that:

- A18, R99 and a strain identified as Merck ATCC 20542 produced lovastatin;

- a strain identified as *Aspergillus terreus* IBT 20944 produced no detectable quantities of lovastatin; and

- a strain identified as *Aspergillus alabamensis* (which, according to Dr. Samson, would have been classified as *Aspergillus terreus* in 1984) produced no detectable quantities of lovastatin.

[492]   Witnesses presented by Merck did not dispute the core of these findings. Dr. Alberts, one of the named inventors, acknowledged that not all *Aspergillus terreus* strains tested by Merck produced lovastatin. Dr. Lasure agreed that some strains of *Aspergillus terreus* would not produce lovastatin. In Apotex's view, the result must be that claims 1, 2 and 5, and each of the dependent product claims 13 to 15, are invalid since they include embodiments that will not achieve the promised result.

[493]   The problem with this argument is that Apotex relies on a construction and promise of the '380 Patent with which I do not agree. During final argument, Apotex conceded that their assertion is established assuming that "my friend's construction is not adopted".

[494]   For the reasons expressed in my analysis of proper claims construction, I have concluded that: (a) the claims only include micro-organisms that fall within the species *Aspergillus terreus*; (b) the '380 Patent does not promise that all micro-organisms within the species *Aspergillus terreus* will produce lovastatin; and, (c) none of claims 1, 2 and 5 requires that all four (or two, where applicable) compounds be produced from each fermentation. Thus, it is irrelevant that that Drs. Sorenson and Samson found strains of *Aspergillus terreus* which were incapable of producing lovastatin and that other strains could only produce lovastatin (Compound I).

[495]   Apotex has failed to meet its burden to demonstrate that "[t]here is evidence of lack of utility in respect of some of the area covered" (*Wellcome AZT*, above, at para. 56).

(4)    Sound Prediction

[496]   As noted above, Apotex may satisfy its burden of showing a lack of utility even where it cannot demonstrate inutility. Its burden can be met by demonstrating, on a balance of probabilities, that the prediction of the inventors was not sound. I turn now to a consideration of whether the three elements of the test for sound prediction, as set out in *Wellcome AZT*, above, have been met.

2010 FC 1265 (CanLII)

[497]    In determining that the requirements for sound prediction had been met, the Court in *Wellcome AZT* found that the factual basis for the sound prediction of a new use compound rested upon the *in vitro* test results of AZT against the HIV in a human cell line along with Glaxo's data on AZT, including animal tests (above, para. 72). The line of reasoning was found to be Glaxo's knowledge of the mechanism for the reproduction of a retrovirus.

(a)    *The Factual Basis*

[498]    The question of sound prediction is one of fact (*Wellcome AZT*, above, at para. 71). The inventors must be able to show that, at the relevant time, they were in possession of a factual basis upon which they could articulate the desired result. The perspective being examined at this stage is a subjective one. The knowledge, activities and endeavours of the inventors themselves must be considered.

[499]    In this case, Merck's key witness was Mr. Alfred W. Alberts, one of the named inventors of the '380 Patent. In credible testimony, Mr. Alberts told the "story" of the invention that became the '380 Patent.

[500]    The '380 Patent story began in 1975, when Mr. Alberts arrived at Merck and began working in the area that was called "basic research". He established a new department within that domain, a department that was called "biochemical regulation". The mandate of the department was to take a rational approach to the development of new drugs. Mr. Alberts described the approach as follows:

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

> The approach that I was brought in to do was to go and do a – go back to the beginning, find the -- to break down the system, find the key targets for the disease, and then start from there with discovering -- hopefully discovering compounds that affect the disease process by working at the very simple, basic level, and then moving up from there to animal studies.

[501]   One area of research for the department was cholesterol biosynthesis. According to

Mr. Alberts, it was well known, by 1975, that cholesterol was intimately involved with the

atherosclerotic process. The pathway of cholesterol biosynthesis was understood in 1975 and

was described by Mr. Alberts as follows:

> The pathway of cholesterol biosynthesis is very complex.  This is just a brief summary highlighting the salient features of the process.
> It starts with a simple two carbon compound known as acetate and which is basically the salt of vinegar.
>
> It's activated to a compound known as acetyl coenzyme A/acetyl CoA.
>
> Then in a series of steps, three acetyl CoA units are joined together to form the compound known as hydroxymethylglutaryl coenzyme A/HMG-CoA, which is converted by an enzyme known as HMG CoA reductase to mevalonic acid. And I will refer -- sometimes refer to it as mevalonic acid or the salt form, which is mevalonate. And this six carbon compound in a series of condensations ends up as the 30 carbon compound, squalene, which is then modified into the 27 carbon sterol lipid cholesterol.

[502]   The Merck scientists were the first to isolate mevalonic acid – described by Mr. Alberts

as "the potential missing link in the cholesterol pathway".

[503]   Based on their knowledge of this pathway, the Merck scientists were looking for

compounds that could break this chain. One part of the biosynthesis that was of interest was the

hydroxy-methylglutaryl-coenzyme A reductase (known as HMG-CoA reductase) stage. The

2010 FC 1265 (CanLII)

scientists understood that, if a compound could inhibit or blocked the synthesis of cholesterol at

the HMG-CoA reductase stage, there would be no conversion of: (a) HMG CoA reductase to

mevalonic acid; (b) mevalonic acid to squalene; and, (c) squalene to cholesterol.

[504]   The Merck scientists first became aware of compounds that inhibited HMG-CoA

reductase in early 1976, when:

> We received at Merck a correspondence from a representative in
> Japan who came across a newly issued, newly published patent in
> Japan describing an inhibitor of HMG-CoA reductase known as
> ML-236B and also became known as Compactin.

[505]   A sample of compactin was received from Sankyo Company in Japan. In addition, Dr.

Akira Endo of the Sankyo Company visited Merck on August 26, 1977. According to notes of

the meeting, Dr. Endo presented data with respect to ML-236B (compactin). It was stated that

the compound "inhibits de novo cholesterol biosynthesis and reduces serum cholesterol when

administered orally [in rats]." This compound operated as an HMG-CoA reductase inhibitor.

[506]   The goal was clearly to develop a compound that would be as good as or better than

compactin. Beginning in January 1978, the Merck scientists introduced a new *in vitro* assay, the

HMG-CoA reductase assay. This allowed the measurement of the inhibition of HMG-CoA

reductase by any tested micro-organism. ML-236B (compactin) was the benchmark against

which the activity of organisms from the Merck chemical library were measured. Between

January 1978 and November 1978, none of a large number of tested micro-organisms met the

goal.

2010 FC 1265 (CanLII)

[507]   As reflected in the laboratory notebooks and in Mr. Alberts's testimony, November 7, 1978 was a turning point. In the first week of November 1978, Mr. Alberts's group received samples 18 and 19 (F 4683 and F 4684), both of which demonstrated inhibitory activity in the HMG-CoA reductase assay.

[508]   From that point, the most important steps can be summarized as follows.

- On November 27, 1978, Mr. Alberts strongly recommended that Merck further pursue "the isolation and characterization of the inhibitory component in F 4683 for use as a potential hypocholesterolemic agent".

- In December 1978, another sample – F 4797 – was found to have inhibitory activity that was tenfold higher than the first culture, F 4683.

- On February 12, 1979, the structure of lovastatin, the lactone (L-154,803), was recorded by Dr. Albers-Schonberg; the structure was similar to compactin.

- On February 12, 1979, Dr. Otto Hensens identified and recorded the structure of the open dihydroxy acid form of lovastatin.

- On February 13, 1979, Ms. Chen assayed the two samples used to identify the structures above and confirmed that they were inhibitory.

2010 FC 1265 (CanLII)

- On February 16, 1979, Mr. Alberts signed the Merck Confidential Memorandum of Invention (referred to below).

- On August 1, 1979, the structure of the natural dihydro (Compound II of the '380 Patent) was identified and recorded by Dr. Otto Hensens, having been found active in the HMG-CoA reductase assay on July 31, 1979.

- On August 2, 1979, a hydrolyzed version of the natural dihydro, being the open hydroxyl acid (Compound IV of the '380 Patent), was assayed and also found to be active in the HMG-CoA reductase assay.

[509]   On February 16, 1979, Dr. Alberts completed a "Confidential Memorandum of Invention", on behalf of the inventors. This Memorandum summarizes the work of the inventors. The structure of Compound I, a "homolog" of ML-236B (compactin), "produced by an *Aspergillus*" is described. The inventors explicitly note the utility or proposed use of the invention as "hypocholesteremic, antifungal". As of the date of the Memorandum, the inventors had found that the compound had "*in vitro* potency similar to ML-236B as inhibiting HMG-CoA reductase."

[510]   Apotex's main criticism of Merck's work relates to what was not done by the Merck scientists. Apotex submits that, because there was no testing of the compounds on humans before the Canadian filing date, Merck was missing a critical piece of factual information. In Apotex's view, without this information, the inventors did not have an adequate factual basis for the prediction that the compounds would be "useful as antihypercholesteremic agents for the

2010 FC 1265 (CanLII)

treatment of atherosclerosis, hyperlipemia and like diseases in humans."  However, when cross-

examined on this issue, Mr. Alberts was clear as to how Merck reached its prediction, even

though human trials had not taken place by the Canadian filing date.

> Q.    Based on the test results that you had obtained, the in vivo
> animal test results you'd obtained, would you not agree that you
> could not reliably predict that Lovastatin was going to be an
> effective treatment for hypercholesteremia in humans?
>
> A.    The only way I could answer that is with any drug before
> it's been tested in humans, whether it's Lovastatin, whether it's an
> antibiotic, no matter what it is, you can not reliably predict it's
> going to work in humans until you put it into the humans, and that
> is irrespective of the drug.
>
> Q.    In terms of these particular models, these animal results, is
> it not fair to say that these animal models, as a predictor of activity
> in humans, could not be relied upon to make a sound an
> assessment of its potential effectiveness?
>
> A.    There was enough -- let me go to one animal model that
> was a good predictor there, and that's the dog, because the dog
> responds very nicely to the other cholesterol lowering drug,
> cholestyramine; in fact, it's one of the few models that responds to
> cholestyramine. Humans respond to cholestyramine.  Rats do not
> respond to cholestyramine.  Dogs do.  Humans do. So there was a
> reasonable assumption that a drug that did not lower cholesterol in
> the rats would conceivably work in humans and based on the
> biology, based on the biochemistry of the system, it was a
> reasonable prediction that it would work and based on our
> knowledge of Compactin.  So we had a whole body of evidence
> that suggested it would work.

[511]   I agree with Mr. Alberts; the inventors had a whole body of evidence that suggested that

the compounds would work in humans. The inventors had an adequate factual basis for their

predictions.

2010 FC 1265 (CanLII)

(b)    *Line of Reasoning*

[512]   I next consider whether Apotex has shown that there was no articulable line of reasoning from which the desired results could be inferred from the factual basis. The question is: given the experimentation and laboratory results that formed the factual basis together with information drawn from the prior art, could Merck reasonably infer that the compounds would meet the promise of being "useful as antihypercholesteremic agents for the treatment of atherosclerosis, hyperlipemia and like diseases in humans"?

[513]   There was little expert evidence produced by either side that speaks directly to the question of sound prediction or the line of reasoning. Some assistance was provided by Dr. Gotto, who described his own observations and the findings of scientists in the mid to late 1970s which demonstrated the link between high cholesterol and atherosclerosis.

[514]   It was also known at the relevant time that HMG-CoA was the enzyme in the liver responsible for making cholesterol.

[515]   Obviously, an essential element in the chain is an understanding of cholesterol biosynthesis. No expert presented an alternative to Mr. Alberts's description of the biosynthesis pathway. It follows, from an understanding of cholesterol biosynthesis, that a compound that can prevent the completion of this pathway – at any stage – will have a good chance of preventing the formation of cholesterol. Thus, it would have been part of the line of reasoning for the

development of all statins, such as lovastatin, that a compound that could inhibit HMG-CoA *in vivo* could be predicted to lower cholesterol in humans.

[516]   The next step in the chain of reasoning is the key element – that is, compactin. The Merck inventors knew about the behaviour of compactin. Compactin works on the cholesterol biosynthesis at the HMG CoA reductase stage; it inhibits or prevents the enzyme from producing mevalonic acid. From the disclosure contained in the Endo Patent, the Merck scientists had knowledge of the *in vivo* activity of compactin.

[517]   The inventors also knew that the structure of the compounds that they had developed from fermentation of *Aspergillus terreus* was similar to the structure of compactin. It was not unreasonable for the inventors to predict that a compound with a similar structure to compactin would have similar inhibitory properties. Strengthening this prediction, the Merck scientists also had their own *in vitro* testing data that demonstrated activity. All of this information was available to the inventors of the '380 Patent as of February 12, 1979. This reasoning was confirmed by Dr. Gotto during cross-examination:

> Q.      Let me ask you this.  If in 1979 a compound had been found that could inhibit HMG-CoA reductase in a cell culture in vitro, would one be able to know whether or not that compound would be effective in treating atherosclerosis, hyperlipidemia or those kinds of diseases in humans?
>
> A.      Based on the knowledge that one had about Compactin, yes.

[518]   In my view, an articulable line of reasoning has been demonstrated. In other words, by February 12, 1979, the inventors of the '380 Patent could soundly predict that the compounds of

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

the invention would provide treatment for hypercholesteremia in humans based on the known *in vivo* activity of the closely-related compound, compactin, and Merck's own *in vitro* data. In other words, there was an articulable line of reasoning from which the desired result – lowering of cholesterol in humans – could be inferred from the factual basis. This was over a year in advance of the Canadian filing date of June 11, 1980.

[519]   Moving forward from February 1979, the Merck scientists were able to add even more information to support the articulable line of reasoning. By July 1979, Merck had supplementary *in vivo* data that confirmed cholesterol synthesis inhibition in rats. Well in advance of the Canadian filing date, Merck had obtained positive results in dogs. This information, while not essential to the sound prediction as of the Canadian filing date, certainly provides additional support for the prediction.

(c)     *Disclosure*

[520]   The final element of sound prediction is "disclosure". The question is: in the '380 Patent, has Merck provided disclosure of the factual basis and the line of reasoning? I believe that it has.

[521]   In *Eli Lilly Canada Inc. v. Apotex Inc.*, 2009 FCA 97, 78 C.P.R. (4th) 388 at para. 18, leave to appeal to SCC refused, [2009] S.C.C.A. No. 219 (QL), 401 N.R. 400 (note)) [*Eli Lilly Raloxifene (FCA)*], the Court of Appeal (referring to *Wellcome AZT*, above) stated that, "where the claimed invention had not yet actually been reduced to practice, the patent must provide a

disclosure such that a person skilled in the art, given that disclosure, could have as the inventors did, soundly predicted that the invention would work once reduced to practice."

[522]   Apotex's argument of inadequate disclosure involves two discrete areas: the first is the adequacy of disclosure of factual underpinnings of the invention, and the second is the adequacy of disclosure of methods for producing the claimed compounds from strains of *Aspergillus*.

[523]   With respect to the first argument, Apotex asserts that many of the facts that were stated by Dr. Alberts to form the basis of the inventors' prediction of utility were not disclosed in the patent. Specifically, Apotex submits as follows:

> However, the only data disclosed in the '380 Patent that could form a "factual basis" for the predicted utility of the compounds as anti-hypercholesteremic agents are the tests reported in the examples. None of these tests evaluated the capacity of a test compound to lower serum cholesterol levels in mammals or humans. None of the compounds is shown to have been tested in an animal model to determine whether it lowered serum cholesterol. There is no reference or explanation of the rate-limiting role of the HMG-CoA reductase enzyme. There is no disclosure of the knowledge that Merck acquired from its work with compactin, and no disclosure of any relationship between the compounds of the invention and cholestyramine, or why (and how) the properties of cholestyramine would inform a prediction of utility. There is also no data about the toxicology, pharmacokinetics or bioavailability of the compounds that would enable the skilled addressee to predict that the compounds could be effectively administered and tolerated by humans over the identified range of dosage strengths. Accordingly, virtually all of the "facts" Dr. Alberts stated formed the basis of the inventors' prediction of utility are not disclosed.

[524]   The first problem with Apotex's argument is that it is based on a requirement that the patent disclose data to support the promise. The question of whether or not a patentee has

2010 FC 1265 (CanLII)

obtained enough data to substantiate its invention is an irrelevant consideration with respect to

the application of subsection 27(3) of the *Act*. The Court is concerned with the sufficiency of the

disclosure, not the sufficiency of the data underlying the invention (*Pfizer Atorvastatin* (*FCA*),

above, at para. 56).

[525]    Apotex also refers to the animal testing carried out by Merck in 1979. Reference is made

to the testimony of Mr. Alberts where he agreed that the testing of dogs led Merck to believe that

lovastatin would result in cholesterol reduction in humans. The '380 Patent does not disclose this

testing. Thus, Apotex submits that the failure to disclose the existence and results of such tests

establishes that there is insufficient information disclosed in the '380 Patent to justify the

prediction. I do not agree with either Apotex's characterization of Mr. Alberts's testimony or the

inference that they draw.

[526]    Apotex relies on *Eli Lilly Raloxifene (FC)*, above. In that case, Justice Roger Hughes, the

trial judge, found, as a matter of fact, that Merck had placed reliance on a paper published before

the Canadian filing date (the Hong Kong study). Justice Hughes concluded that the requirement

for disclosure had not been met; the Court of Appeal agreed in *Eli Lilly Raloxifene FCA,* above,

at paragraph 17. As noted by the Court of Appeal in *Eli Lilly Raloxifene FCA*, at paragraph 15,

"As the prediction was made sound by the Hong Kong study, this study had to be disclosed." In

my view, the situation before me is distinguishable.

[527]    I agree that the cross-examination of Mr. Alberts resulted in a list of facts and

information that the inventors of the '380 Patent knew as of the Canadian filing date. One of the

2010 FC 1265 (CanLII)

areas of interest relates to the dog studies carried out in 1979. Apotex pounces on this information as something that ought to have been disclosed in the '380 Patent in order to justify the sound prediction. However, I do not understand the jurisprudence to teach that the patent specification must disclose absolutely everything that that the inventor knew up to the relevant date. In *Eli Lilly Raloxifene (FC)*, above, without disclosure of the Hong Kong study, a skilled person would not have had sufficient information to understand the justification for the prediction. We must examine the specification to determine whether, with the information disclosed (even if there was more information available and undisclosed), a skilled person could have soundly predicted that the invention would work once reduced to practice.

[528]   In the case of the '380 Patent, the question is whether sufficient information was disclosed to allow the skilled person to soundly predict that the compounds of the invention would be "useful as antihypercholesteremic agents for the treatment of atherosclerosis, hyperlipemia and like diseases in humans".

[529]   What was disclosed in the '380 Patent? The '380 Patent contains the following disclosures:

- the association between atherosclerosis and high cholesterol (p. 2, lines 11-15);

- the utility of inhibiting cholesterol biosynthesis (p. 2, lines 14-16);

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

- prior art consisting of US patents for compactin, a fermentation product obtained from the genus *Penicillium*, which compound was found to be an inhibitor, *in vivo*, of the biosynthesis of cholesterol (p. 2, lines 17-26);

- the discovery by the inventors of the '380 Patent that compounds produced from *Aspergillus* are more potent inhibitors of cholesterol synthesis *in vivo* than compactin (p. 2, lines 28-33; p. 3, lines 1-5);

- the fact that HMG-CoA reductase inhibition is the relevant means of inhibiting cholesterol biosynthesis (p. 14, lines 30-35);

- the structure of lovastatin and the other compounds (p. 9, 10, 11 and 12);

- *in vitro* HMG-CoA reductase inhibition by lovastatin, (p. 14, line 30; p. 15, line 6; p. 24, lines 7-8; p. 25, lines 10-12; p. 42, lines 1-13); and

- *in vivo* inhibition of cholesterol synthesis by Compound II (p. 42, lines 15-25).

[530]   Taken as a whole, I am not persuaded that there was inadequate disclosure. A skilled person would conclude that the '380 Patent sufficiently discloses the factual basis and the line of reasoning to soundly predict that the claimed compounds would be useful in the treatment of high cholesterol. In other words, as required by the jurisprudence, the '380 Patent discloses the factual basis and line of reasoning for its promise. The prediction was made sound by the

information disclosed; the disclosure of other information within the knowledge of the inventors was not essential to the prediction.

[531]   The second of Apotex's submissions is that the '380 Patent fails to disclose the methods for determining which strains of the genus *Aspergillus* will produce the desired compounds. As discussed in the section of these reasons on claims construction, I have concluded that the patent only claims compounds produced from *Aspergillus terreus* and, further, that it does not promise that lovastatin can be produced from all strains of *Aspergillus terreus*. Apotex argues that, even on this narrower construction and promise, Merck was required to disclose the methods for identifying producing strains. Apotex argues that the specification does not disclose this information and that to find the producing strains would require excessive and inventive experimentation by the skilled person.

[532]   The courts have recognized that "routine trials and experiments not amounting to new inventions might be required to put [an invention] into practice" (*Proctor & Gamble Co. v. Bristol-Myers Ltd.*(1978), 39 C.P.R. (2d) 145 at para. 51, [1978] F.C.J. No. 812 (QL) (F.C.T.D.); see also, *Mobil Oil Corp. v. Hercules Canada Inc.* (1995), 63 C.P.R. (3d) 473, [1995] F.C.J. No. 1243 (QL) (F.C.A.)); *Aventis Pharma Inc. v. Apotex Inc*. 2005 FC 1283, 43 C.P.R. (4th) 161 at para. 207). The evidence before me does not support Apotex's assertion that inventive experimentation would be required to find producing strains of *Aspergillus terreus*. I have already discussed this issue (see paragraphs 57 to 130) under claims construction. To repeat, I am satisfied that the skilled person could use well-known techniques to rapidly screen a large number of isolates of strains of *Aspergillus terreus* to determine which strains are producing.

2010 FC 1265 (CanLII)

Moreover, since, on my construction, the claims are limited to strains of the species *Aspergillus terreus*, there are manageable boundaries on the testing that would be required.

D.    *First Inventorship/Missed Conflict*

(1)    Introduction

[533]   Apotex submits that the Merck inventors were not the first inventors of the compound lovastatin as claimed in the '380 Patent and that, therefore, the '380 Patent should be invalidated on the basis that the "invention" of the '380 Patent was known or used as of the date of filing the patent application. In so arguing, Apotex recognizes that it must overcome the requirements of the *Patent Act*.

[534]   The patent application that resulted in the issuance of the '380 Patent was patent application No. 353, 777 filed with the Patent Office on June 11, 1980 (the Monaghan Application). Apotex submits that the Monaghan Application disclosed the invention of lovastatin and ought to have been placed into conflict with patent application No. 345, 983 (the Endo Application), which was filed with the Patent Office on February 19, 1980. The Endo Application ultimately resulted in the issuance of the '794 Patent.

(2)    <u>Legal Principles</u>

[535]   Prior to 1989, the overall scheme under the *Patent Act* was one of first to invent. By contrast, the scheme under the *Patent Act* currently in force can be described as first to file. The notion of first inventorship is embodied in s. 27(1) of the *Act*:

27. (1) Subject to this section, any inventor or legal representative of an inventor of an invention that was

(a)    not known or used by any other person before he invented it,

(b)    not described in any patent or in any publication printed in Canada or in any other country more than two years before presentation of the petition hereunder mentioned, and

(c)    not in public use or on sale in Canada for more than two years prior to his application in Canada,

may, on presentation to the Commissioner of a petition setting out the facts, in this Act termed the filing of the application, and on compliance with all other requirements of this Act, obtain a patent granting to him an exclusive property in the invention.

Sous réserve des autres dispositions du présent article, l'auteur de toute invention ou le représentant légal de l'auteur d'une invention peut, sur présentation au commissaire d'une pétition exposant les faits, appelée dans la présente loi "le dépôt de la demande", et en se conformant à toutes les autres prescriptions de la présente loi, obtenir un brevet qui lui accorde l'exclusive propriété d'une invention qui n'était pas :

a)    connue ou utilisée par une autre personne avant que lui-même l'ait faite;

b)    décrite dans un brevet ou dans une publication imprimée au Canada ou dans tout autre pays plus de deux ans avant la présentation de la pétition ci-après mentionnée;

c)    en usage public ou en vente au Canada plus de deux ans avant le dépôt de sa demande au Canada.

[536]   Recognizing that more than one person might claim inventorship to similar or

overlapping subject matters, Parliament provided means for identifying and resolving such a

conflict. To begin, s. 43(1) of the *Act* defines when a conflict exists:

| Conflict between two or more pending applications exists | Se produit un conflit entre deux ou plusieurs demandes pendantes dans les cas suivants: |
|---|---|
| (a)   when each of them contains one or more claims defining substantially the same invention; or | a)   chacune d'elles contient une ou plusieurs revendications qui définissent substantiellement la même invention; |
| (b)   when one or more claims of one application describe the invention disclosed in one of the other applications | b)   une ou plusieurs revendications d'une même demande décrivent l'invention divulguée dans l'autre ou les autres demandes |

The balance of s. 43 sets out the procedures for declaring and dealing with a conflict.

[537]   While s. 27(1) gives the right to a patent to the first inventor, the *Act* also contemplates

that legal proceedings may be brought with respect to the validity of patents (see the *Patent Act*,

starting at s. 53). In particular, s. 59 of the *Act* permits a defendant (such as Apotex) in a patent

infringement action to plead "any fact or default which by this *Act* or by law renders the patent

void." Under s. 60(1) of the *Act*, a patent or any claim in a patent may be "declared invalid or

void by the Federal Court ... at the instance of any interested person."

2010 FC 1265 (CanLII)

[538]   However, when the validity of a patent is being challenged on the question of

inventorship, s. 61(1) is a limiting or qualifying provision. In the case before me, s. 61(1)(b) is

relevant:

<div style="margin-left:2em">

No patent or claim in a patent shall be declared invalid or void on the ground that, before the invention therein defined was made by the inventor by whom the patent was applied for, it had already been known or used by some other person, unless it is established that

(b)     that other person had, before the issue of the patent, made an application for patent in Canada on which conflict proceedings should have been directed;

Aucun brevet ou aucune revendication dans un brevet ne peut être déclaré invalide ou nul pour la raison que l'invention qui y est décrite était déjà connue ou exploitée par une autre personne avant d'être faite par l'inventeur qui en a demandé le brevet, à moins qu'il ne soit établi que, selon le cas :

b)      cette autre personne avait, avant la délivrance du brevet, fait une demande pour obtenir au Canada un brevet qui aurait dû donner lieu à des procédures en cas de conflit;

</div>

[539]   As stated in s. 61(1)(b), no patent will be declared invalid on the grounds of prior

inventorship by some other person <u>unless</u> the challenging party can establish that the other

person had, before the issue of the patentee's patent, made an application for a patent in Canada

<u>on which conflict proceedings should have been directed.</u> Stated in other words, a party may

only successfully raise inventorship as an issue if: (a) the invention in the patent or claim had

already "been known or used by some other person"; (b) the other person made a patent

application for this prior invention in Canada; or (c) "conflict proceedings should have been

directed". The interpretation of s. 61(1)(b) was the subject of discussion in the case of

*Laboratoires Servier v. Apotex Inc.*, 2008 FC 825, 67 C.P.R. (4th) 241 [*Servier FC*] .

2010 FC 1265 (CanLII)

[540]   Thus, the threshold question to be answered is whether, on the facts before me, there was a "missed conflict". In other words, should conflict proceedings have been directed between the Endo Application and the Monaghan Application? If there was no missed conflict, Apotex is precluded, by s. 61(1)(b),  from challenging the validity of the '380 Patent on the grounds of prior inventorship.

        (3)      Was there a missed conflict

[541]   The Endo Application was filed on February 19, 1980; the Endo Patent was issued on August 17, 1982. The Monaghan Application was filed on June 11, 1980; the '380 Patent was issued on January 31, 1984. Conflict could have been declared only during the co-pendency of the two applications; that is, between June 11, 1980 and August 17, 1982.

[542]   A review of the case or file history for the '380 Patent provides us with the sequence of events leading to the issuance of the patent.

[543]   As filed, claims 1 to 7 of the Monaghan Application were claims to processes for producing certain compounds. However, claim 8 was for Compounds I and II alone and claim 9 was for Compounds III and IV alone. Claims 10 to 19 were claims to salts, esters and compounds all of which were dependent on claims 8 or 9. While claims 1 to 7, as filed, were product-by-process claims, claims 8 to 19 did not contain process restrictions; they were what is referred to as *per se* claims. The problem with *per se* claims is that they were not permissible under the *Patent Act*, as it

2010 FC 1265 (CanLII)

existed at the relevant time. Specifically, s. 41(1) (later, s. 39(1)) of the *Patent Act*, as it stood in

1982) stated that:

| | |
|---|---|
| In the case of inventions relating to naturally occurring substances prepared or produced by, or significantly derived from, microbiological processes and intended for food or medicine, the specification <u>shall not include claims for the resulting food or medicine itself, except when prepared or produced by or significantly derived form the methods or processes of manufacture particularly described and claimed.</u> [Emphasis added.] | Lorsqu'il s'agit d'inventions couvrant des substances que l'on trouve dans la nature, préparées ou produites, totalement ou pour une part notable, selon des procédés microbiologiques et destinées à l'alimentation ou à la médication, <u>aucune revendication pour l'aliment ou le médicament ne doit être faite dans le mémoire descriptif, sauf pour celui ainsi préparé ou produit selon les modes du procédé de fabrication décrits en détail et revendiqués.</u> [Non souligné dans l'original.] |

In simple terms, the inventors of the Monaghan Application could never have received a patent

that included claims 8 to 19, as originally filed.

[544]   In a letter from the Patent Office dated November 10, 1982 (Office Action), counsel for

the Monaghan Application was advised of the problem:

> The claims of this application are governed by Section 41(1) of the Patent Act. In the case of a substance intended for food or medicine and prepared by a chemical process, an application must have a patentable process claim, and any product claim must be in process-dependent form and of the same scope as the process claim. Amendment or cancellation of claims 8-19 is required.

[545]   The response to the Office Action was received by the Patent Office on February 9, 1983.

Amended claims 1 through 20 were substituted for the non-allowable claims 8 to 19. Evidently,

2010 FC 1265 (CanLII)

the Commissioner of Patents agreed with the submission that the Monaghan Application now contained "claims conforming with the requirements of section 41(1)"; the '380 Patent was issued on January 31, 1984.

[546]   Each of Apotex and Merck put forward an expert to speak to the practices of the Patent Office at the relevant times. Both Mr. Robert Barrigar (put forward by Merck) and Mr. Robert Hirons (put forward by Apotex) have been registered patent agents in Canada for a long time. Both have extensive knowledge of Canadian patent prosecution and practice between 1980 and 1982, and are knowledgeable about practices of the Commissioner of Patents at that time. I accepted the qualifications of each to speak to these matters.

[547]   Both experts agreed that a declaration of conflict would not have been made between two pending applications when each application contained process-dependent claims for the same compound made using different processes. Accordingly, the question of missed conflict could only have arisen between claims 8 to 19, as originally filed, of the Monaghan Application and some or all of the claims of the Endo Application.

[548]   Mr. Hirons opined that the requirements of s. 43(1)(b) of the *Patent Act* were satisfied and a conflict, as defined in that provision, existed between the two applications (Hirons Expert Report, Exhibit 117, para. 13). Mr. Hirons pointed out that, during the period of co-pendency, the compound claims in the Monaghan Application were not restricted by process. Thus, in his view, a conflict between the two applications necessarily existed. In other words, one or more of

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

claims 8 to 19 of the Monaghan Application described the invention disclosed in the Endo

Application and, as a result, the Commissioner should have commenced conflict proceedings.

[549]   Frankly, this is, to a large degree, a legal opinion and not one for which I need the

assistance of an expert. That being said, I do not disagree with Mr. Hirons's conclusion that a

conflict, as defined in s. 43(1)(b), existed as between the two applications. Moreover, Mr.

Hirons's description of how conflict proceedings were conducted, once directed, is not

inaccurate.

[550]   However, Mr. Hirons fails to answer the question of whether "conflict proceedings

should have been directed". He assumes that the existence of a conflict automatically requires

the Commissioner to direct conflict proceedings. The mere existence of a conflict at the

application stage does not, in my view, automatically mean that conflict proceedings should have

been directed.

[551]   In responding to this question, I refer first to the procedures described in s. 43, in respect

of the legal requirements of the *Patent Act*. Sections 43(2) to 43(4) deal with procedures to be

followed before a conflict is declared. I accept that, when a s. 43(1) conflict exists, s. 43(2) sets

out a mandatory procedure to be followed.

| Procedure to be followed before conflict is declared | Procédure à suivre avant déclaration de conflit |
|---|---|
| (2)    When the Commissioner has before him two or more applications referred to in subsection (1), he shall | (2)    Lorsque le commissaire a devant lui deux ou plusieurs de ces demandes, il doit : |

2010 FC 1265 (CanLII)

| | |
|---|---|
| (a)    notify each of the application of the apparent conflict and transmit to each of them a copy of the conflicting claims, together with a copy of this section; and | a)    notifier à chacun des demandeurs le conflit apparent, et transmettre à chacun d'' eux une copie des revendications concurrentes, ainsi qu'une copie du présent article; |
| (b)    give to each applicant the opportunity of inserting the same or similar claims in his application within a specified time. | b)    procurer à chaque demandeur l'occasion d'insérer dans sa demande les mêmes revendications ou des revendications similaires, dans un délai spécifié. |

[552]   In this case, assuming that claims 9 to 19 of the Monaghan Application, as originally filed, were in conflict with some or all of the claims in the Endo Application, the Commissioner was required to follow the procedure set out in s. 43(2) of the *Act*. He did not do so in this case. However, these are steps to be taken before the declaration of conflict to determine if there should be a <u>formal</u> declaration. Thus, even if the Commissioner erred by not complying with the mandatory provision, any such error would be of no moment if, at the end of the day, there was no need to make a formal declaration of conflict. The next step – the formal declaration – is set out in s. 43(5):

| Formal declaration of conflict | Déclaration formelle de conflit |
|---|---|
| (5)    Where the subject matter of the claims described in subsection (3) is found to be patentable and the conflicting claims are retained in the applications, the Commissioner shall require each applicant to file in the Patent Office, in a sealed envelope duly endorsed, | (5)    Si l'objet des revendications visées au paragraphe (3) est reconnu brevetable et que les revendications concurrentes sont maintenues dans les demandes, le commissaire exige de chaque demandeur le dépôt, au Bureau des brevets, dans une |

within a time specified by him, an affidavit of the record of invention, which affidavit shall declare

(a) the date at which the idea of the invention described in the conflicting claims was conceived;

(b) the date on which the first drawing of the invention was made;

(c) the date when and the mode in which the first written or oral disclosure of the invention was made; and

(d) the dates and nature of the successive steps subsequently taken by the inventor to develop and perfect the invitation from time to time up to the date of the filing of the application for patent.

enveloppe scellée portant une suscription régulière, dans un délai qu'il spécifie, d'un affidavit du relevé de l'invention. L'affidavit déclare :

a) la date d laquelle a été conçue l'idée de l'invention décrite dans les revendications concurrentes;

b) la date laquelle a été fait le premier dessin de l'invention;

c) la date i laquelle a été faite 1a première divulgation écrite ou orale de !'invention et la manière dont elle a été faite;

d) les dates et la nature des expériences successives que l'inventeur a pratiquées par la suite afro de développer et mettre graduellement au point cette invention jusqu'à la date du dépôt de la demande de brevet,

[553] Of critical importance, this provision establishes that the conflict proceedings described in s. 43(5) and the balance of s. 43 only apply "where the subject-matter of the claims described in subsection (3) is found to be patentable and the conflicting claims are retained in the applications."

[554] Relating the file history to the co-pendency period between the Endo Application and the Monaghan Application, at no time between June 11, 1980 and August 17, 1982 was the Monaghan Application in a patentable form. Quite simply the potentially-conflicting *per se*

2010 FC 1265 (CanLII)

claims of the Monaghan Application were not patentable; claims 8 to 19 did not contain claims that met the requirements of the *Patent Act*. The subject matter of claims 8 to 19 was <u>not</u> patentable. In short, during the co-pendency period, there was no obligation on the Commissioner to declare a conflict.

[555]   My understanding of s. 43 of the *Patent Act* is consistent with the practices of the Patent Office. Mr. Barrigar, using his experience and knowledge of processes in the Patent Office, provided his opinion on how, in practical terms, the Patent Office would have dealt with the two patent applications. This portion of his Expert Report and his oral testimony were very helpful. In brief, the Patent Office would not, faced with unpatentable claims, have initiated conflict proceedings. Rather, the practice of the Patent Office was as described by Mr. Barrigar (Barrigar Expert Report, Exhibit 44, para. 18):

> Based on my experience, and consistent with the provisions of the "Old Act", it was the uniform practice of the Patent Office in the period 1980 to and including 1984 to implement conflict practice in the context of the Patent Act as a whole. As discussed more fully below, this meant that only claims satisfying the other requirements of the Act and applicable Patent Rules were placed in conflict. It was the practice of the Patent Office to endeavour to dispose of all other claiming issues before declaring any conflict, so that if possible it would not be necessary to conduct conflict proceedings. Conflict proceedings constituted a drain on Patent Office resources and delayed issue of patents.

[556]   Thus, while the Commissioner may "technically" have been required to comply with ss. 43(2) to 43(4) of the *Act*, his failure to do so is without consequence where, as in this case, the requirements to pursue the conflict in formal proceedings, as set out in s. 43(5), were not met. Even Mr. Hirons finally agreed, on cross-examination that:

2010 FC 1265 (CanLII)

> There are very good policy reasons why the Commissioner of
> Patent would not want to launch or commence conflict proceedings
> in respect of claims that everybody knows cannot be issued in the
> form they are written.

[557]   Apotex asserts that the practice of resolving apparent conflicts, by requiring the applicant

to amend all or part of the specification to remove objectionable claims, should have no bearing

on the right to invoke s. 61 of the *Patent Act*. I disagree. Where a patent application contains

claims that can never result in a patent, there is no conflict to declare.

[558]   In summary on this issue, I am satisfied that, on the facts of this case, there was no

requirement to direct conflict proceedings between the Endo Application and the Monaghan

Application. There was no missed conflict and Apotex is precluded, by s. 61(1)(b) of the *Act*,

from challenging the validity of the '380 Patent on the grounds of prior inventorship.

(4)    Did the Endo application disclose the invention of the '380 Patent?

[559]   If I am incorrect in my conclusion that Apotex is precluded from challenging the validity

on the grounds of prior inventorship, I turn to the question of whether the Endo Application and

Patent disclose the same invention as that of the '380 Patent.

[560]   The Endo Application and Patent clearly refer to a substance called "Monacolin K". As

set out in claim 1, the Endo Patent claims:

> A process for preparing Monacolin K, which process comprises
> cultivating a Monacolin K-producing micro-organism of the genus
> *Monascus* in a culture medium therefore.

2010 FC 1265 (CanLII)

[561]   It is accepted that Monacolin K is lovastatin. However, as discussed earlier in these Reasons, an essential feature of the claims of the '380 Patent is that the lovastatin be made using a strain of the species *Aspergillus terreus*. The invention is lovastatin when made by fermentation of *Aspergillus terreus* and does not include lovastatin made with other micro-organisms. *Monascus* is a different genus from *Aspergillus*. Accordingly, the two applications that included allowable claims did not contain one or more claims defining substantially the same invention. Moreover, neither application described the invention disclosed in the other application.

[562]   Thus, even if I accept that there was a missed conflict, the invention of the '380 Patent is not the same as that of the Endo Application or Patent. Apotex has not persuaded me that the invention of the '380 Patent was known or used by Dr. Endo prior to the filing date of the Monaghan Application.

(5)   Red Yeast Rice/Anticipation

[563]   Apotex submits that claims 13 to 15 of the '380 Patent are invalid pursuant to the principles of "anticipation by prior use". Briefly stated, Apotex's argument is that the compound lovastatin (also known as Monacolin K) was known and used in the form of traditional Red Yeast Rice long before the priority date of the '380 Patent or any earlier date of invention. Thus, Apotex alleges that the presence of lovastatin in any Red Yeast Rice product before the priority date of the '380 Patent was anticipatory of claims 13 to 15. In this section, I will use the term

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

"Red Yeast Rice" to refer to the products, including rice, that are made with the substance known as red yeast.

(a)    *Principles of Anticipation*

[564]   The concept of anticipation arises from s. 27(1) of the *Patent Act*. Subsection 27(1) permits any inventor to file an application for an invention that was "not known or used by any other person before he invented it". This requirement is echoed in s. 61(1)(a), which allows the Court to invalidate any patent or claim(s) if another person had "disclosed or used the invention in such a manner that it had become available to the public". In short, the *Patent Act* requires that the subject matter of a claim must not have been disclosed to the public before the claim date.

[565]   The guiding jurisprudence on the legal test of anticipation is found in the Supreme Court of Canada decision in *Apotex v. Sanofi-Synthelabo*, 2008 SCC 61, [2008] 3 S.C.R. 265 [*Sanofi-Synthelabo*]. At paragraphs 23-27, the Supreme Court teaches that the issue of whether an invention is anticipated by the prior art requires that the Court have regard to two questions:

1.    Was the subject matter of the invention disclosed to the public by a single disclosure?

2.    If there has been such a clear disclosure, is the working of the invention enabled by that disclosure?

[566]   At the first step of the analysis, the Supreme Court provided the following guidance

(*Sanofi-Synthelabo*, above, at para. 25):

> When considering the role of the person skilled in the art in respect
> of disclosure, the skilled person is "taken to be trying to understand
> what the author of the description [in the prior patent] meant"
> (para.32). At this stage, there is no room for trial and error or
> experimentation by the skilled person. He is simply reading the
> prior patent for the purposes of understanding it.

[567]   Once disclosure has been made, the question of enablement was described by the

Supreme Court (*Sanofi-Synthelabo*, above, at para 27):

> Once the subject matter of the invention is disclosed by the prior
> patent, the person skilled in the art is assumed to be willing to
> make trial and error experiments to get it to work. While trial and
> error experimentation is permitted at the enablement stage, it is not
> at the disclosure stage. For purposes of enablement, the question is
> no longer what the skilled person would think the disclosure of the
> prior patent meant, but whether he or she would be able to work
> the invention.

[568]   In *Abbott Laboratories v. Canada (Minister of Health)*, 2008 FC 1359, 337 F.T.R. 17

[*Abbott Clarithromycin (FC)*], aff'd 2009 FCA 94, 387 N.R. 347, Justice Hughes undertook a

helpful survey of the law of anticipation as it exists after *Sanofi-Synthelabo*, above. He

summarized the legal requirements for anticipation as follows (*Abbott Clarithromycin (FC)*,

above, at para. 75):

> For there to be anticipation there must be both disclosure and
> enablement of the claimed invention.
>
> 1.    The disclosure does not have to be an "exact
>       description" of the claimed invention. The
>       disclosure must be sufficient so that when read by a
>       person skilled in the art willing to understand what
>       is being said, it can be understood without trial and
>       error.

2010 FC 1265 (CanLII)

2.      If there is sufficient disclosure, what is disclosed
        must enable a person skilled in the art to carry out
        what is disclosed. A certain amount of trial and
        error experimentation of a kind normally expected
        may be carried out.

3.      The disclosure when carried out may be done
        without a person necessarily recognizing what is
        present or what is happening.

4.      If the claimed invention is directed to a use different
        from that previously disclosed and enabled then
        such claimed use is not anticipated. However if the
        claimed use is the same as the previously disclosed
        and enabled use, then there is anticipation.

5.      The Court is required to make its determinations as
        to disclosure and enablement on the usual civil
        burden of balance and probabilities, and not to any
        more exacting standard such as quasi-criminal.

6.      If a person carrying out the prior disclosure would
        infringe the claim then the claim is anticipated.

[569]   The date for assessment of anticipation is June 15, 1979, the priority date of the '380

Patent.

(b)      *Background on Red Yeast Rice*

[570]   It is undisputed that Red Yeast Rice (or similar products containing red yeast, such as red

yeast bean curd) has been used produced and consumed in Asian countries for hundreds of years.

Dr. Scott Harding, an expert witness presented by Apotex, described the uses of Red Yeast Rice

in (mainly) Chinese culture as follows (Harding Expert Report, Exhibit 115, para. 15):

        [Red Yeast Rice] has traditionally been used as a specialty food,
        as a dye or food pigment and as a natural remedy for
        gastrointestinal infections and diseases of the blood.

*2010 FC 1265 (CanLII)*

[571]   According to Dr. Harding, more recently, Red Yeast Rice has been marketed as a product that can lower lipid levels and reduce cardiovascular risk.

(c)      *Legal Consequences of lovastatin in Red Yeast Rice*

[572]   The expert testimony of Dr. Harding is to the effect that Red Yeast Rice is not and was not produced from *Aspergillus terreus*. Dr. Harding opined that traditional Red Yeast Rice was produced through fermentation of certain strains of species from the genus *Monascus*.

[573]   Since Red Yeast Rice does not involve the use of *Aspergillus terreus* in any way, it cannot have been an anticipatory disclosure of the process claims of the '380 Patent. As discussed in the section of these reasons on claims construction, claims 1 to 12 are process claims in which producing strains of *Aspergillus terreus* are fermented to produce certain compounds (including lovastatin as Compound I). Apotex does not assert the argument of anticipation against claims 1 to 12; rather it limits it argument to the product-by-process claims 13 to 15.

[574]   Claim 13 is a claim to any one of Compounds I to IV, when prepared by the process defined in claim 1 or by an obvious chemical equivalent. Claim 14 is a claim to one of Compound I or II, when prepared by the process defined in claim 2 or by an obvious chemical equivalent and claim 15 is a claim to one of Compound III or IV, when prepared by the process defined in claim 5, or by an obvious chemical equivalent. Earlier in these reasons, I construed claims 13 to 15 to require that, as an essential element, the product (be it Compound I, II, III or

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

IV) is produced by the process defined in the earlier claims. Specifically, the compounds of claims 13 to 15 <u>must</u> be made from the fermentation of a species of *Aspergillus terreus*.

[575]   For the moment, I will assume that lovastatin could be found in Red Yeast Rice as of the priority date. I accept the opinion of Dr. Harding that Red Yeast Rice is a result of the fermentation of species within the genus *Monascus*. If the allegedly anticipatory product – lovastatin found in Red Yeast Rice – is produced from something other than *Aspergillus terreus*, it cannot, in my view, meet the legal test for anticipation. Stated in terms of the test, Red Yeast Rice does not meet the first requirement that the prior invention must disclose the subject matter of claims 13 to 15.

[576]   Apotex responds to this analysis by asserting that a product-by-process claim is a claim to the product. In the words of Apotex:

> Where the product was previously known and a new process for making it has been discovered, the only invention that can be claimed is the process because the product is not "new".  Thus, a product-by-process claim can be anticipated by prior disclosure of the product but not of the process.

Apotex relies on the Supreme Court decision in *Hoffmann-LaRoche Ltd. v. Canada (Commissioner of Patents)*, [1955] S.C.R. 414, 23 C.P.R. 1 [*Hoffmann-LaRoche 1955* cited to S.C.R.] for this submission.

[577]   I acknowledge that the *Hoffmann-LaRoche 1955* decision does appear to support Apotex's position. *Hoffmann-LaRoche 1955* involved an application for a patent that claimed a new process for making a known substance called aldehyde, as well as aldehyde when made by

that process. The Commissioner of Patents granted the claim for the new process for making

aldehyde, but not the claim for aldehyde made by that process. The inventor appealed to the

Exchequer Court, without success (*Hoffmann-La Roche Ltd. v. Canada (Commissioner of*

*Patents)*(1953), [1954] Ex. C.R. 52, 19 C.P.R. 80), and then to the Supreme Court of Canada,

again without success. In his brief reasons for dismissing the appeal, Chief Justice Cartwright,

speaking on behalf of four of five of the justices, stated: "There being nothing new about the

product, the appellant is not entitled to obtain a patent therefore even on the basis of a process

dependent product claim" (*Hoffmann-LaRoche 1955*, above, at p.415). Little analysis is offered

in the single page of Chief Justice Cartwright's reasons.

[578]   I admit to having considerable difficulty in understanding how the conclusion in

*Hoffmann-LaRoche 1955* can fit with the protection offered by the *Patent Act*. It seems illogical

to me that a process for making a substance can be novel and thus patentable but that a claim for

the product when made by that process is automatically not patentable. I understand that

situations could exist that would invalidate the product-by-process claim. For example (without

limitation):

- a product-by-process claim could be challenged on the basis that the substance,

  <u>when made by the described process</u>, was anticipated or obvious; or

- an earlier patent or disclosure is to the product made by any means (although, of

  course, this could not have happened with the '380 Patent since, at that time, *per*

  *se* claims were not permitted).

2010 FC 1265 (CanLII)

However, where the substance is only claimed when made by a particular process and where the making of the product by that particular process is novel, the boundaries of the claim are well delineated. I cannot see why the claim would automatically be invalidated simply because someone else has claimed the same product made by a different process.

[579]   Finally, I observe that the Supreme Court in *Hoffmann-LaRoche 1955* implicitly accepted the validity of the claims to "a new and useful process for manufacture of an aldehyde". There is, in my view, no principled reason why, if the product-by-process claim is invalidated, the new process for making the known substance is not also invalid.

[580]   There has been little jurisprudence in which the principle in *Hoffmann-LaRoche 1955*. However, what little there has been over the last 65 years does not, it seems, directly contradict the Supreme Court decision. *Hoffmann-LaRoche 1955* was recently considered by the Federal Court of Appeal in *Abbott Laboratories v. Canada (Minister of Health)*, 2007 FCA 153, 59 C.P.R. (4th) 30 (*Abbott Clarithromycin (FCA)*), where Justice Sharlow observed at paragraph 15 that, "There is no jurisprudence that casts any doubt on the correctness of the principle stated in *Hoffmann.*"

[581]   The Court of Appeal also had occasion to examine the applicability of *Hoffmann-LaRoche 1955* in *Bayer AG v. Apotex Inc.*, 2001 FCA 263, 14 C.P.R. (4th) 263 [*Bayer Ciprofloxin*]. In that case, Apotex Inc. appealed from an order prohibiting the Minister of National Health and Welfare from issuing to it an NOC under the *Regulations*. Apotex alleged that Bayer's Canadian patents for ciprofloxacin were invalid because Bayer had already applied

in another country for a patent on the same drug. The inventions were substantially the same but used a different synthesis process. Apotex Inc. relied on *Hoffmann-LaRoche 1955* for the proposition that the differences in the process for the making of the drug were not "legally relevant" (*Bayer Ciproflaxin*, above, at para. 15). In rejecting this argument, Justice Evans, speaking for the Court, commented as follows (*Bayer Ciproflaxin*, above, at para. 16):

> In our view, however, that case is readily distinguishable from the case at bar. In particular, the issue in Hoffmann-La Roche, supra, was whether the patent application satisfied the requirement in paragraph 28(1)(b) of the Patent Act that a patent may only be obtained for an invention to the extent that it contains an element of novelty. This is not the question before us. What we must decide is whether the inventions that are the subject of the Chilean and Canadian patents are the same invention. And, as counsel for Bayer points out in his memorandum, <u>Apotex did not allege in any of its notices of allegations that the product by process patent obtained in Canada for ciprofloxacin was invalid because ciprofloxacin had already been invented, and that the use of the malonic ester synthesis process to produce an intermediate could not therefore render the invention novel.</u>  [Emphasis added.]

[582]   In summary, it appears that I must accept the holding of *Hoffmann-LaRoche 1955*. In contrast to the situation before Justice Evans in *Bayer Ciproflaxin*, Apotex has clearly argued that the product-by-process claims are invalid because the substance – lovastatin or Monacolin K – had already been invented. Paraphrasing the words of Justice Sharlow in *Abbott Clarithromycin (FCA)*,  above, for the purposes of applying the *Hoffmann-LaRoche 1955* principle, lovastatin is "known" as of June 15, 1979, if a hypothetical claim for its invention would fail on the ground of anticipation or lack of novelty.

2010 FC 1265 (CanLII)

[583]   Apotex submits that the existence of Red Yeast Rice – a substance known for centuries –

would satisfy this test. The issue is whether the product lovastatin, as described in the '380

Patent, however made, was anticipated by Red Yeast Rice.

2010 FC 1265 (CanLII)

(d)     *Evidence of lovastatin in Red Yeast Rice prior to the priority date*

[584]   The first question is whether the evidence before me establishes that Red Yeast Rice was

a source of lovastatin before the priority date. If it does not, then the claim of anticipation must

fail. However, if I am persuaded that, on a balance of probabilities, Red Yeast Rice, prepared by

traditional methods, contained lovastatin, I will continue on to consider whether there was both

disclosure and enablement.

[585]   In Dr. Harding's opinion, there is ample scientific literature that indicates that Red Yeast

Rice and similar products "produced in solid phase fermentation and using strains of *Monascus*

that were traditionally employed, have appreciable levels of Monacolin K [lovastatin] and are

effective in lowering blood cholesterol *in vivo*" (Harding Expert Report, Exhibit 115, para. 52).

Dr. Harding concludes that, "people have consumed Monacolin K for centuries."

[586]   Dr. Harding stated that the amount of Monacolin K in Red Yeast Rice will vary

depending on the fermentation conditions used. It follows (and Dr. Harding did not disagree) that

not all Red Yeast Rice contains Monacolin K.

[587]   In addition to his literature search, Dr. Harding tested two different samples of Red Yeast Rice products that he bought from Asian specialty markets in Winnipeg and Toronto. His conclusion was that both samples contained low, but detectable, levels of Monacolin K.

[588]   I will begin with the results from Dr. Harding's tests on two commercial samples of Red Yeast Rice. Even if those samples did contain measurable quantities of lovastatin (Monacolin K) (which I am prepared to accept), these samples were produced well after the priority date of the invention of the '380 Patent. They tell us nothing about the existence of lovastatin in Red Yeast Rice at any time prior to 1979. Moreover, beyond representations on the packaging, we have no evidence as to how these commercial products were produced and whether the lovastatin found in the samples resulted from traditional methods of fermentation.

[589]   As described by Dr. Harding, the modern techniques of producing Red Yeast Rice would differ from traditional methods:

> The modern techniques would employ things like flasks and control environments.  Traditionally these things were fermented in boxes or bamboo plates, containers, in open areas, and the temperature was controlled either by fanning or ensuring no direct sunlight, these sorts of things, but also by mixing the rice to uniformly distribute the yeast to get the full colour and the final product through every kernel of rice, but it's also to reduce the temperature.

[590]   In his Expert Report, Dr. Harding also notes that, while traditional and modern production practices are quite similar, "modifications [have] been introduced into modern production to enhance the production of the desired metabolites" (Harding Expert Report, Exhibit 115, para. 28).

2010 FC 1265 (CanLII)

[591]   Dr. Havel, an expert presented to the Court by Merck, also commented that:

> Samples collected in January to April 1998, 12 years after the
> Negishi paper, may have been produced under conditions which
> were not, I believe, we can consider truly traditional red yeast rice
> on or before 1980.

[592]   In my view, Dr. Harding's opinion that the two samples he tested were prepared in

accordance with traditional methods is speculative. The results of Dr. Harding's tests on two Red

Yeast Rice samples cannot be used to reliably demonstrate that, before the priority date, Red

Yeast Rice contained lovastatin.

[593]   I have similar difficulties with the literature referenced by Dr. Harding in his Expert

Report. One article was cited as Negishi et al, "Productivity of Monacolin K in the genus

Monascus species" (referred to as Negishi). Negishi reports having tested 124 *Monascus* strains

in total. Almost all of the species were isolated from several different red yeast food products.

Negishi used modern techniques to carry out the experiments, and found that 17 strains of five

species were capable of producing Monacolin K. The initial problem that I have with this paper

is that it post-dates, by many years, the priority date of the '380 Patent. I have no information on

how the Red Yeast Rice samples were collected and whether these same products would have

been available in the years before 1979.

[594]   Another reference by Dr. Harding was a 2001 journal article by Heber et al, entitled "An

Analysis of Nine Proprietary Chinese Red Yeast Rice Dietary Supplements: Implications of

Variability in Chemical Profile and Contents" (referred to as Heber). Heber purchased nine

different commercially available dietary Red Yeast Rice supplements and found total Monacolin

2010 FC 1265 (CanLII)

K content from 0% to 0.58%.  While the paper may demonstrate that a few samples of Red Yeast Rice products collected and tested for purposes of the paper contained measurable amounts of Monacolin K, they do not establish that lovastatin existed in Red Yeast Rice prior to 1979.

[595]   The only possible link between testing that occurred after 1979 and the potential for the production of lovastatin from Red Yeast Rice prior to that date would be the production methods. Dr. Harding appears to base his overall opinion that traditional Red Yeast Rice has contained Monacolin K throughout the centuries on the observed similarities between traditional and modern production methods.  If it can be established that the production methods used in both periods were the same, it may be possible to extrapolate post-1979 results to pre-1979 samples of Red Yeast Rice.

[596]   Dr. Harding testified in cross-examination that, of the seven pieces of prior art cited in his report, only two dealt with the fermentation of Red Yeast Rice prior to 1979.

[597]   However, upon closer examination, there were significant differences in the traditional methods of producing Red Yeast Rice and those that would produce lovastatin, including:

- traditional Red Yeast Rice was most likely be fermented at temperatures in excess of 30ºC where lovastatin cannot be produced;

- there is an inverse relationship between the amount of pigment-producing ability and the amount of lovastatin-producing ability in Red Yeast Rice; and

2010 FC 1265 (CanLII)

- the modern strains of Red Yeast Rice provide no information about whether the traditional Red Yeast Rice produced lovastatin.

The evidence is strong that the production of lovastatin is very dependent on the temperature of fermentation. Although Negishi reported that 17 of 50 samples of the *Monascus* species produced Monacolin K, they also reported that Monacolin K was produced only when the fungi were grown at 25ºC. As observed by Negishi, "under conditions of incubation at 30 to 37ºC, those Monacolin K-producing strains lost their capability of producing Monacolin K . . .".  The '380 Patent teaches the reader to incubate the *A. terreus* fungus at 28ºC, a temperature at which *Monascus* would likely be incapable of producing lovastatin.

[598]   In sum, I am not persuaded that the evidence demonstrates that lovastatin was contained in Red Yeast Rice prior to the priority date. It follows that Apotex has not satisfied its burden of demonstrating that Red Yeast Rice anticipates lovastatin.

(e)    *Disclosure of lovastatin in Red Yeast Rice*

[599]   In the event that I am wrong in this conclusion, I will assume that lovastatin was contained in at least some samples of Red Yeast Rice prior to the relevant date. The question is whether this satisfies the requirement of disclosure. In my view, as discussed in the following, Apotex has not persuaded me that the subject matter of the invention - lovastatin – was disclosed to the public by Red Yeast Rice.

[600]   The evidence demonstrates that, if Red Yeast Rice contained lovastatin, it did not do so under all conditions of fermentation. That is, prior to June 15, 1979, not every Red Yeast Rice product contained lovastatin. Further, it is also evident that persons who produced or used Red Yeast Rice were unaware that it contained lovastatin.

[601]   Apotex argues that *Calgon Carbon Corp. v. North Bay (City)*, 2008 FCA 81, 64 C.P.R. (4th) 337 at paragraph 8 and *Baker Petrolite Corp. v. Canwell Enviro-Industries Ltd.*, 2002 FCA 158, 17 C.P.R. (4th) 478 at paragraphs 35, 42 [*Baker Petolite*] stand for the proposition that the extent or duration of the prior use or sale is not important; that disclosure to "even one member of the public" destroys the novelty of a chemical product. Thus, Apotex submits, the existence of lovastatin, in even one sample of Red Yeast Rice, as of the priority date would be anticipatory of the compound claimed in the '380 Patent.

[602]   I disagree with Apotex's assertion that the existence of lovastatin in even one sample of Red Yeast Rice is sufficient to demonstrate disclosure. I think that Apotex confuses "disclosure to one member of the public" as stated in *Baker Petrolite*, above, at paragraph 42, with "one disclosure". If the prior art invariably or predictably discloses the compound, there may well be anticipation. However, where the existence of the compound alleged to be anticipatory cannot be reasonably or consistently predicted from a large universe of possibilities, I cannot see how this could possibly meet the test for disclosure. Anticipation must be more than an accidental presence of a compound.

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

[603]   Not only does Apotex's argument appear illogical to me, it is not supported by the jurisprudence. In *Abbott Clarithromycin* (*FCA*), above, at paragraph 22, the Court of Appeal considered the argument of Abbott that a skilled person must have certain knowledge regarding the prior art.

> Abbott argues that a person skilled in the art who heated clarithromycin Form I by the known technique would not and could not know that clarithromycin Form II had been created, unless they also knew that the heating process had to be stopped before the substance reached its melting point at 225ºC. In my view, the absence of that knowledge is legally irrelevant. The undisputed evidence is that <u>clarithromycin Form II would have been present</u> if the heating technique had been followed. There were well established analytical techniques that would have disclosed its presence if anyone had cared to look at the appropriate moment. [Emphasis added.]

[604]   In the case before me, I have no such evidence that lovastatin <u>would have been present</u> in Red Yeast Rice. Indeed the evidence, as disclosed in the literature cited (for example, Negishi and Heber), is that lovastatin was present only in a very few samples.

[605]   Apotex also argues that the fact that no one, including the skilled person, ever recognized that Red Yeast Rice contained lovastatin is not relevant. Apotex submits that the Federal Court of Appeal, in *Abbott Laboratories v. Canada (Minister of Health)*, 2006 FCA 187, 56 C.P.R. (4th) 387 at paragraphs 15-23, refers to the principle, outlined by Lord Hoffmann in *BV v. Smithkline Beecham plc*, [2005] UKHL 59, [2006] 1 All ER 685 [*Synthon BV*], that a patent is disclosed even though the author or maker of the prior art was not aware that he was doing so. Apotex refers to *Synthon BV*, above, at paragraphs 22-23 for support on this point.

[606]   I agree with Apotex that the cited passage of the House of Lords decision in *Synthon BV*,

above, does contain a reference to the fact that an awareness of infringement is not a

requirement. However, an examination of the entire passage clarifies the context in which those

remarks were made. As stated by Lord Hoffmann in *Synthon BV*, above, at paragraphs 22-23:

> . . . the matter relied upon as prior art must disclose subject matter
> which, if performed, would necessarily result in an infringement of
> the patent. . . . But patent infringement does not require that one
> should be aware that one is infringing: "whether or not a person is
> working [an] ... invention is an objective fact independent of what
> he knows or thinks about what he is doing": *Merrell Dow*
> *Pharmaceuticals Inc v H N Norton & Co Ltd* [1996] RPC 76, 90. It
> follows that, whether or not it would be apparent to anyone at the
> time, whenever subject-matter described in the prior disclosure is
> capable of being performed and is such that, if performed, it must
> result in the patent being infringed, the disclosure condition is
> satisfied. The flag has been planted, even though the author or
> maker of the prior art was not aware that he was doing so.
>
> Thus, in *Merrell Dow,* the ingestion of terfenadine by hay-fever
> sufferers, which was the subject of prior disclosure, necessarily
> entailed the making of the patented acid metabolite in their livers.
> It was therefore an anticipation of the acid metabolite, even though
> no one was aware that it was being made or even that it existed.
> But the infringement must be not merely a possible or even likely
> consequence of performing the invention disclosed by the prior
> disclosure. It must be necessarily entailed. If there is more than one
> possible consequence, one cannot say that performing the
> disclosed invention will infringe. The flag has not been planted on
> the patented invention, although a person performing the invention
> disclosed by the prior art may carry it there by accident or (if he is
> aware of the patented invention) by design. Indeed, it may be
> obvious to do so. But the prior disclosure must be construed as it
> would have been understood by the skilled person at the date of the
> disclosure and not in the light of the subsequent patent. As the
> Technical Board of Appeal said in *T/396/89 UNION*
> *CARBIDE/high tear strength polymers* [1992] EPOR 312 at para
> 4.4:
>
> > "It may be easy, given a knowledge of a later
> > invention, to select from the general teachings of a
> > prior art document certain conditions, and apply
> > them to an example in that document, so as to

2010 FC 1265 (CanLII)

> produce an end result having all the features of the
> later claim. However, success in so doing does not
> prove that the result was *inevitable*. All that it
> demonstrates is that, given knowledge of the later
> invention, the earlier teaching is capable of being
> adapted to give the same result. Such an adaptation
> cannot be used to attack the novelty of a later
> patent."

[607]   An understanding of this passage demonstrates that Apotex has selectively read the comments of Lord Hoffmann, omitting a key consideration. I agree with Apotex that an awareness that the prior art discloses the anticipatory invention is not a requirement of disclosure. Justice Hughes made that point in *Abbott Clarithromycin (FC)*, above, at paragraph 75. However, while supporting the argument of Apotex, the passage from *Synthon BV*, above, makes it very clear that the disclosure requirement is only met where infringement <u>must</u> occur when the prior art is practised. Paraphrasing the words of Lord Hoffmann, the flag of anticipatory disclosure is not planted on the patent in question unless the prior disclosure would necessarily result in an infringement of the patent.

[608]   Applied to the situation before me, Red Yeast Rice only satisfies the disclosure requirement of the test for anticipation if it can be said to necessarily produce lovastatin. As we know from the evidence, that is definitely not the case. Indeed, the evidence before me is that the existence of lovastatin in Red Yeast Rice would be a very rare event.

[609]   In conclusion on this issue, I do not accept Apotex's submission that lovastatin was anticipated by Red Yeast Rice.

2010 FC 1265 (CanLII)

## XI.    **Conclusion**

[610]   As noted at the beginning of these reasons, this litigation was subject to the Bifurcation

Order. Thus, the matter proceeded to trial without requiring the parties to adduce evidence at trial

on any issue of fact pertaining to the following:

1.      the extent of infringement, if any, by the Defendants of the '380 Patent;

2.      the amount of damages suffered, if any, by the Plaintiffs as a result of any such

infringement; or

3.      the amount of profits earned by the Defendants from any such infringement.

[611]   According to the terms of the Bifurcation Order, the determination of whether the

Plaintiffs are entitled to elect to recover profits was to be determined by the trial judge. In final

arguments, Merck submitted that it wished to elect to recover profits. Apotex objected.

A.    *Damages or Profits*

[612]   Once a patentee has successfully demonstrated infringement, the Court has the discretion

to grant the patentee's choice of remedies – either damages (pursuant to s. 55 of the *Patent Act*)

or an accounting of profits (pursuant to s. 57 of the *Patent Act*). Merck wishes to elect an

accounting of profits and asks this Court to so direct. Apotex argues that I should not exercise my discretion in this case.

[613]   While both damages and accounting of profits are intended to provide compensation to a wronged plaintiff, the fundamental principles underlying the two remedies and the practical considerations are substantially different.

[614]   The object of an award of damages is to make good any loss suffered by the plaintiff as a result of the defendant's infringement of the patent. Quantification of the award is based on the losses suffered by the plaintiff; any gains realized by the defendant because of its wrongdoing are not relevant. On the other hand, an accounting of profits is based on the premise that the defendant, by reason of its wrongful conduct, has improperly received profits which belong to the plaintiff. The objective of the award is to restore those actual profits to their rightful owner, the plaintiff, thereby eliminating whatever unjust enrichment has been procured by the defendant. Calculation is based on the profits wrongfully gained by the defendant; any other losses suffered by the plaintiff are irrelevant.

[615]   An accounting of profits is not an easy calculation. As was stated by the late Justice Paul Rouleau, of this Court, when speaking about such an accounting in *Beloit Canada Ltd. v. Valmet-Oy.* (1993), 55 C.P.R. (3d) 433 at para. 3, [1994] F.C.J. No. 682 (F.C.T.D.)(QL), rev'd in part 61 C.P.R. (3d) 271, [1995] F.C.J. No. 733 (QL)(F.C.A.), leave to appeal to S.C.C. refused, [1995] S.C.C.A. No. 388 (QL), 64 C.P.R. (3d) vi:

> This was undoubtedly a most expensive, lengthy and difficult
> reference and one which clearly underlines the pitfalls of granting

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

the remedy of an accounting of profits other than in exceptional
and appropriate circumstances and after due deliberation by the
court.

[616]   In spite of practical difficulties, the Federal Court of Appeal in *Beloit Canada Ltd. v.*

*Valmet Oy* (1992), 45 C.P.R. (3d) 116 at para. 10, [1992] F.C.J. No. 825 (QL), stated that it

could:

> ...see no reason in principle why a patentee, whose property has
> been wrongly appropriated through infringement, should not
> recover all the profits, direct and indirect, derived by the infringer
> from his wrongful infringement.

[617]   It is necessary for a party seeking an equitable remedy, such as profits, to show some

basis for the exercise of equity (*Janssen-Ortho Inc. v. Novopharm Ltd.*, 2006 FC 1234, 57 C.P.R.

(4th) 58 at para. 132, aff'd 2007 FCA 217, 59 C.P.R. (4th) 116 leave to appeal to S.C.C. refused,

[2007] S.C.C.A. No. 442 (QL), 383 N.R. 397 (note); *Servier FC*, above, at para. 507).

[618]   Merck submits that it can demonstrate a basis for an election of profits. Specifically, it

puts forward the following factors:

- The Plaintiffs have not committed any inequitable conduct which would disentitle

  them to equitable relief.

- The Plaintiffs did not delay in commencing the litigation. The infringement action

  was commenced on June 12, 1997, within 3 months of Apotex Inc. receiving an

  NOC for Apo-lovastatin.

- The Defendants could not have doubted that the Plaintiffs would pursue an infringement action given the lengthy history of prior lovastatin litigation.

- The reasons why the litigation took years to prosecute are not, Merck submits, reasons to disentitle the Plaintiffs to equitable relief:

  ○ the long and complicated facts of the cases: we are dealing with a process patent, where the acts of infringement are conducted in secret, requiring the Plaintiffs to attempt to prove infringement through a long discovery process and repeated motions for productions;

  ○ AFI's history of use of *Aspergillus terreus* to make lovastatin going back to 1991 to 1999;

  ○ the transfer of *Aspergillus terreus* and AFI-1 technology to Blue Treasure in 1995 and its use;

  ○ the filing of a statement of claim in T-1169-01;

  ○ Apotex Inc.'s refusal to agree to consolidate the two proceedings for discovery meaning that the Plaintiffs had to repeat to a large extent the discovery from the infringement action;

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

    ○    the patent expiry on January 31, 2001, thereby capping the period of infringement as of that date; and

    ○    two years of the delay due to the length of the trial requested.

- Delay in the action is a factor that is more related to the complicated facts of the proceeding rather than the diligence of the Plaintiffs.

[619]   While I agree with Merck that it has not committed any inequitable conduct that would disentitle them from the equitable remedy of profits, other factors weigh against such a remedy in this case.

[620]   A factor that causes me serious concern is the time that this matter took to come to trial. Merck attempts to distance itself from any decisions that resulted in the delay of this trial for almost thirteen years. I cannot accept that the Defendants and the Federal Court bear all of the responsibility for the delay. The consequence of this delay is, inevitably, that reaching back to the period between 1997 and 2001 to assess Apotex profits would be exceedingly difficult.

[621]   The difficulty in assessing profits is further exacerbated by the complexities of the commercial arrangements that involved not only AFI and Apotex Inc., but also Blue Treasure and Biogal. Merck consented to the settlement involving Biogal's interests on May 28, 2010.

[622]   An additional layer of complexity comes from the fact that Merck does not assert that all of the lovastatin that was produced during the 1997 to 2001 period infringed the '380 Patent.  On the Canadian-produced material by AFI, except for the batch referred to as CR0157, there is no assertion of infringement. I have also concluded that Merck has not made out its case for infringement with respect to all of the Blue Treasure productions.

[623]   Dissecting Apotex's profits to account for the Biogal settlement and the non-infringing production would be a complex undertaking.

[624]   Balancing the factors in this case, I am not persuaded that I ought to exercise my discretion and permit the Plaintiffs to elect an accounting of profits. The Plaintiffs will be entitled to their damages. Specifically, a hearing under ss. 107 and/or 153 of the *Federal Courts Rules*, SOR/98-106 [*Federal Courts Rules*] shall be conducted to determine: the extent of infringement by the Defendants of the '380 Patent; and, the amount of damages suffered by the Plaintiffs as a result of such infringement.

B.      *Exemptions from Liability*

[625]   Related to the issue of damages is the question of whether any volumes of lovastatin produced by Apotex should be exempt from a finding of infringement. Apotex relies on s. 55.2(1) of the *Patent Act* (post October 1, 1989) to submit that it should not be held liable for any infringement relating to its experimental and regulatory uses of lovastatin.

2010 FC 1265 (CanLII)

[626]   Exemptions from liability are founded in s. 55.2(1) of the *Patent Act* (post October 1,

1989). That provision states that:

| | |
|---|---|
| 55.2(1) It is not an infringement of a patent for any person to make, construct, use or sell the patented invention solely for uses reasonably related to the development and submission of information required under any law of Canada, a province or a country other than Canada that regulates the manufacture, construction, use or sale of any product | 55.2(1) Il n'y a pas contrefaçon de brevet lorsque l'utilisation, la fabrication, la construction ou la vente d'une invention brevetée se justifie dans la seule mesure nécessaire à la préparation et à la production du dossier d'information qu'oblige à fournir une loi fédérale, provinciale ou étrangère réglementant la fabrication, la construction, l'utilisation ou la vente d'un produit. |

[627]   Apotex may claim an exemption from liability for certain amounts of the infringing

product, provided that it can satisfy its burden to demonstrate that the product was used for

permitted purposes (such as obtaining regulatory approval or to comply with regulations) (*Merck

& Co. v. Apotex Inc.*, 2006 FC 524, 53 C.P.R. (4th) 1, rev'd on other grounds 2006 FCA 323, 55

C.P.R. (4th) 1 leave to appeal to S.C.C. refused, [2006] S.C.C.A. No. 507 (QL), 370 N.R. 400

(note)).

[628]   The Canadian *Food and Drug Regulations*, C.R.C. 1978, c. 869 [*Food and Drug

Regulations*], and the United States *Food Drug and Cosmetic Act*, 21 U.S.C., as amended [*Food

Drug and Cosmetic Act*], required Apotex Inc. to retain and test samples of lovastatin on a

routine basis. Apotex submits that its testing and retention of lovastatin falls within the scope of

subsection 55.2(1) of the *Patent Act* and the common law exception and is therefore exempt from

infringement.

[629]   Apotex submits that the evidence clearly shows that, as required by the Canadian *Food and Drug Regulations*, above, and the regulations under the U.S. *Food Drug and Cosmetic Act*, above, Apotex: (i) acquired and used bulk lovastatin, and formulations incorporating bulk lovastatin, for the purpose of obtaining permission to sell lovastatin containing pharmaceutical products in Canada and the United States; (ii) carried out in process quality control sampling of lovastatin formulations; and (iii) retained samples of bulk and finished dosage forms of lovastatin.

[630]   Mr. Barber, the Manager of the Formulations Department at Apotex Inc., and Ms. Copsey, Manager of Packaging and Director of Commercial Lab Operations at Apotex Inc., explained in detail how Apotex Inc. used lovastatin for these purposes. The business records of Apotex Inc. adduced at trial reflect those uses. Apotex submits that its use of lovastatin for these experimental and regulatory purposes is exempt from infringement under s. 55.2(1) and (6) of the *Patent Act* (post October-1989) and the common law.

[631]   Mr. Fahner was the Vice-President of Finance at Apotex Inc. during the relevant times. He compiled charts identifying the quantities of lovastatin from each lot of bulk lovastatin and finished dosage batch that were used by Apotex Inc. for each of the purposes described by Mr. Barber and by Ms Copsey, namely, the research and development work in preparation of the submission batches, the retention of API samples and the process sampling and finished goods retention.  Apotex Inc. submits that the evidence establishes that the following quantities of

2010 FC 1265 (CanLII)

lovastatin were used by Apotex Inc. for regulatory and experimental purposes and should be exempt from any finding of infringement:

| Use of lovastatin by Apotex Inc. | Total Quantity (in kg) |
|---|---|
| Research and Development | 59.1111 |
| Reserve Samples (API) | 22.0986 |
| In Process Samples | 6.58078 |
| Finished Goods Retained Samples | 4.2654 |

[632]   I do not understand Merck to be objecting to the exemption of these Apotex Inc. volumes from a finding of infringement. I am satisfied that the volumes set out in the above table are exempt from any finding of infringement.

[633]   AFI also conducted research and development work involving the use of the micro-organism *Aspergillus terreus* after the assets of ABI were acquired in July 1991. Initially, the work was a continuation of the work commenced by ABI in 1988 and was specifically related to obtaining a compulsory licence. Subsequently, the work involved the research and development of *Aspergillus terreus* for regulatory submissions and for eventual commercialization of *Aspergillus terreus* lovastatin. In the course of these activities, ABI, and subsequently AFI, manufactured 6.9 kg of *Aspergillus terreus* lovastatin. This was supplied to Apotex Inc. and used for research and development purposes and for regulatory submissions. AFI submits that this work is exempt from infringement. I agree.

[634]   In 1998 and 1999, AFI ran a few fermentations using *Aspergillus terreus* at the 14,000 litre scale for research and development purposes directed to market readiness upon expiry of the '380 Patent. A total of 13.45 kg was manufactured from these runs. The Defendants assert that this work is exempt from infringement.  In June 2002, this material was supplied to Brantford

2010 FC 1265 (CanLII)

Chemical Inc., a sister company to Apotex Inc., for development purposes in an effort to make simvastatin, another statin that is not the subject of this litigation. Apotex Inc. submits that there was no evidence at trial that the 13.45 kg was ever used to manufacture tablets for sale in Canada, or elsewhere. This work is exempt from infringement. I agree.

[635]   Merck objects to an exemption from liability for any amounts of AFI-1 lovastatin made in Winnipeg during the period 1993 to 1999. In their view, these volumes clearly infringed the '380 Patent. Moreover, through the transfer of the AFI-1 technology to Blue Treasure for commercial purposes, the infringement resulted in a loss of Merck's right to the "full enjoyment of the monopoly" (*Monsanto*, above, at para. 34). Accordingly, Merck argues, these volumes should not be the subject of any "fair dealing" exemption. In addition, Merck submits that the liability should extend to all 296.6 kg of AFI-1 lovastatin that were allegedly made by Blue Treasure.

[636]   I am not prepared to make this link. In light of the Supreme Court of Canada's decision in *Micro Chemicals Limited v. Smith Kline & French Inter-American Corp.*, [1972] S.C.R. 506, 2 C.P.R. (2d) 193 [*Micro Chemicals*], Merck's allegation is without foundation.  In the case at bar, AFI was doing exactly what the defendant did in *Micro Chemicals*. AFI was carrying out research for the purposes of improving its *Aspergillus terreus* process to ensure that the process could be used on a commercial scale. This is the type of activity that the Supreme Court held was exempt from infringement. The supply of the developed technology to Blue Treasure, who was permitted to utilize the AFI-1 process to make lovastatin for sale outside Canada, was not, in the circumstances, an act of infringement.

[637]   In sum, I am satisfied that neither the 6.9 kg nor the 13.45 kg of *Aspergillus terreus*

lovastatin referred to above should attract liability. Moreover, I am not prepared to conclude that

the alleged 296.6 kg of AFI-1 lovastatin that was made using the transferred AFI-1 technology

infringed the '380 Patent.


C.      *Conclusion*


[638]   In conclusion, the action of the Plaintiffs will succeed, in part, and they will be entitled to

an order for the recovery of damages sustained as a consequence of the Defendants' infringement

of the '380 Patent by the following:


1.      all Apo-lovastatin product that was produced by AFI from AFI batch CR0157;

        and


2.      the 294 batches of lovastatin produced by Blue Treasure in China after March

        1998 and imported into Canada.


[639]   Damages and the extent of infringement will be determined by way of a reference

pursuant to Rule 153 of the *Federal Courts Rules* and in accordance with the Bifurcation Order

dated November 14, 2003. The parties will be permitted to address the specific terms of a

reference as to damages, by way of written submissions to be served and filed within 60 days of

the date of the Judgment. The parties will have a further 15 days to serve and file reply

submissions.

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

[640]   Merck will also be entitled to an order for prejudgment interest pursuant to ss. 36 and 37 of the *Federal Courts Act*, S.C. 2002, c. 8.

[641]   The counterclaims of the Defendants will be dismissed. Specifically, I conclude that the '380 Patent was valid and that Merck & Co. has standing to bring this action.

[642]   The question of costs was not addressed by the parties in their final submissions. Obviously, Merck, as the successful party will be entitled to costs, although the amount of those costs should reflect the specific circumstances of this trial. The parties will be given a period of time to attempt to resolve the issue of costs among themselves. I sincerely hope that the direction of this Court is not required. However, in the event that the parties cannot agree on costs, they may serve and file submissions, not to exceed ten pages in length, within 60 days of the date of the Judgment. The parties will have a further 15 days to serve a reply, any such reply not to exceed five pages.

## POSTSCRIPT

[1]      These Reasons for Judgment are un-redacted from confidential Reasons for Judgment which were issued on December 9, 2010 pursuant to the Direction dated December 9, 2010.

[2]     The Court canvassed counsel for the parties whether they had concerns if the reasons were

issued to the public without redactions. On December 15, 2010 and December 17, 2010, in separate

letters, the parties advised that there are no portions of the confidential Reasons for Judgment that

should be redacted.

<div style="text-align: right">

"Judith A. Snider"

Judge

</div>

Ottawa, Ontario
Public Reasons – December 22, 2010
Confidential Reasons - December 9, 2010

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

## Appendix A – List of Witnesses

I.      List of Witnesses

A.      *Plaintiffs' Expert Witnesses*


    (1)     Dr. Jerry Lee **Atwood**

        Dr. Atwood is a professor and Chairman of the Department of Chemistry at the
University of Missouri-Columbia. He obtained a Ph.D from the University of Illinois.
Dr. Atwood has been the editor of several scientific publications and has published more than
640 articles in refereed journals. Dr. Atwood was qualified as an expert in organic chemistry.

        On behalf of Merck, Dr. Atwood opined on issues of validity. He also compared the
chemical characteristics of Compound I in the '380 Patent to the chemical characteristics of
Monacolin K in the '794 Patent. Dr. Atwood responded to certain opinions expressed Dr. Robert
McClelland in his Expert Report.

    (2)     Mr. Robert Hubbell **Barrigar**

        Mr. Barrigar is a barrister and solicitor and a registered Canadian patent agent. He
obtained an LL.M Degree from Harvard Law School. He has practised in intellectual property
law for 30 years. His practice involved litigation pursuant to s. 45(8) of the "old" Patent Act,
including patent applications that were the subject of conflict proceedings. Mr. Barrigar was
qualified in matters of patent agency and procedures in the Canadian Patent Office, including
practices of the Commissioner of Patents at the relevant time.

        On behalf of Merck, Mr. Barrigar provided his opinion on whether the '380 and '794
Patents would have been placed in conflict proceedings by the Canadian Patent Office.

    (2)     Dr. Jon **Clardy**

        Dr. Jon Clardy is a professor at the Harvard Medical School, in the Department of
Biological Chemistry and Molecular Pharmacology. He has a Ph.D in Organic Chemistry.
Currently, Dr. Clardy holds positions as the Co-Director, Harvard University Program in
Chemical Biology; Senior Associate Member, Broad Institute of Harvard and MIT; and the
Infectious Disease Initiative, Broad Institute of Harvard and MIT. Dr. Clardy was recognized as
an expert in organic chemistry, medicinal chemistry, natural products chemistry, and the
biosynthesis of microbial metabolites.

        On behalf of Merck, Dr. Clardy opined on the construction and validity of the '380
Patent.

(3)    Dr. Julian **Davies**

Dr. Davies is a professor emeritus of Microbiology and Immunology at the University of British Columbia, where he has worked since 1992. Dr. Davies obtained his Ph.D in Organic Chemistry from the University of Nottingham. He was qualified as an expert in the area of microbial genetics and microbiology.

On behalf of Merck, Dr. Davies gave opinion evidence on issues relating to infringement of the '380 Patent. In 2003 and in 2007, samples of raw and processed lovastatin were tested under his supervision for the DNA of *Aspergillus terreus* and *Coniothyrium fuckelii*.

(4)    Dr. Antonio Marion **Gotto**

Dr. Gotto is a professor of Medicine at Cornell University. In addition to a Ph.D in Biochemistry from Oxford University, he earned an M.D. from Vanderbilt University. Dr. Gotto was qualified as an expert in the area of atherosclerosis, lipid metabolism and cardiovascular risk protection.

On behalf of Merck, Dr. Gotto gave opinion evidence on cholesterol, cardiovascular disease and the discovery and use of lovostatin.

(5)    Dr. Richard **Havel**

Dr. Richard Havel is a physician specializing in medicine, endocrinology and metabolism. Dr. Havel is a professor emeritus at the University of California, and he has served as an editor of the American Journal of Clinical Nutrition. Dr. Havel was qualified as an expert in internal medicine, clinical nutrition, endocrinology and metabolism, specifically the treatment of patients with hyperlipidemia, hypercholesterolemia and cardiovascular disease.

On behalf of Merck, Dr. Havel gave opinion evidence on the issues surrounding red yeast rice and the '380 Patent.

(6)    Dr. Linda Lee **Lasure**

Dr. Lasure obtained a Ph.D in Genetics from the University of Syracuse. Dr. Lasure has worked for various pharmaceutical corporations, including as staff scientist at Pacific Northwest National Lab, where she established a new program to apply fungal biotechnology to the problem of efficient conversion of lignocellulosic biomass to commercial products. She has authored numerous papers, chapters and books relating to industrial microbiology and currently holds three patents related to fungal biotechnology. Dr. Lasure was qualified as an expert in industrial microbiology.

On behalf of Merck, Dr. Lasure opined on construction and infringement of the '380 Patent.

2010 FC 1265 (CanLII)

(7)    Mr. Brian **Lindblom**

Mr. Lindblom is a forensic document examiner and the founding principal of Document Examination Consultants Inc. Mr. Lindblom was qualified as an expert in forensic document examination.

On behalf of Merck, Mr. Lindblom opined on the authenticity of the documents produced by AFI that were alleged to be Blue Treasure's Batch Records.

(8)    Dr. Bernard A. **Olsen**

Dr. Olsen obtained a Ph.D in Analytical Chemistry from the University of Wisconsin, and then worked for 29 years as a senior research fellow at Eli Lilly and Company. Currently, Dr. Olsen is an independent pharmaceutical consultant. He was qualified as an expert in the area of analytical chemistry.

On behalf of Merck, Dr. Olsen analyzed 11 test samples of Red Yeast Rice using High-Performance Liquid Chromatography (HPLC). The results were compared to the HPLC results of Compounds I, II, III, and IV of the '380 Patent.

B.    *Plaintiffs' Fact Witnesses*

(1)    Dr. Alfred **Alberts**

Dr. Alberts is one of the named inventors on the '380 Patent. He testified regarding the invention of lovastatin.

(2)    Ms. Rebecca **Gentile** (Gilbert)

Ms. Gentile (formerly Gilbert) is the Senior Stability Coordinator for Merck & Co. Her responsibilities include generating and compiling data for use in regulatory filings. She testified regarding the Red Yeast Rice project at Merck & Co.

(3)    Mr. Ronald **Harvey**

Mr. Harvey was the Director of Marketing for Merck Frosst in 1997 (now retired). He testified regarding the marketing procedures used at Merck and the sales figures for lovastatin in 1997.

(4)      Mr. Ted **Kavowras**

Mr. Kavowras is the Managing Director of Panoramic Consulting, an investigative business based in Hong Kong. Mr. Kavowras testified that he obtained lovastatin from Blue Treasure between 2000 and 2001.

(5)      Ms. Donna **Kugit**

Ms. Kugit, an employee of Merck, testified regarding the samples that were packaged and shipped to Bill Richardson.

(6)      Dr. Natalie **Lazarowych**

Dr. Lazarowych is the Chief Scientific Officer and Director of Research at Dalton. In 2003, Dalton did work for law firm McCarthy Tetrault LLP with respect to lovastatin. She testified regarding the preparation of lovastatin samples that were sent to the law firm at that time.

(7)      Ms. Carol **Mercer**

Ms. Mercer is an administrative assistant with the IP litigation department at Merck. She testified about Merck's protocol for logging and labeling samples that are put into their database.

(8)      Mr. Robert **Quesnel**

Mr. Quesnel is the Vice-President of Legal Affairs & General Counsel for Sanofi Aventis Canada, and was the Director of Legal Affairs at Merck Frosst Canada from 1995 to 2007. He spoke to the legal issues surrounding Apo-lovastatin.

(9)      Mr. James P. **Richardson**

Mr. Richardson is the Director of Tax Planning for Merck Sharp and Dohme Corp., and has worked as in some capacity as an accountant for them for over 25 years. He testified regarding the license agreement, dated January 1, 1985, between Merck and Co. Inc. and Merck Frosst Canada.

(10)     Ms. Elizabeth Giuliani **Scott**

Ms. Scott was employed as in-house counsel for Merck and Co between 1998 to 2007. She testified that she communicated with, and received samples from, Mr. Kavowras.

2010 FC 1265 (CanLII)

C.     *Defendants' Expert Witnesses*

(1)     Dr. Neal **Connors**

Dr. Connors holds a Ph.D in microbiology from Ohio State University. For 17 years, Dr. Connors was an employee with Merck Research Laboratories, where he worked as a senior research biochemist and a senior investigator focusing on strain development for both fungi and bacteria. Since 2009, Dr. Connors has been the President of Phoenix BioConsulting, LLC, and provides scientific consulting services to the fermentation, industrial microbiology and biotechnology sectors. Dr. Connors was qualified as an expert in industrial microbiology.

On behalf of Apotex, Dr. Connors gave opinion evidence on the AFI-4 *Coniothyrium fuckelii* process for producing lovastatin. He responded to Dr. Lasure's opinion on the AFI-4 process for making lovastatin in commercial quantities during the period commencing April 1996.

(2)     Dr. Marcus Thomas Pius **Gilbert**

Dr. Gilbert is an associate professor at the Natural History Museum of Denmark's Centre of GeoGenetics at the University of Copenhagen. He completed a D.Phil in the Department of Zoology at the University of Oxford, where his research focused on ancient DNA analysis. He has written numerous articles on analysis of ancient DNA and also teaches on the subject. Dr. Gilbert was qualified as an expert in the analysis of low copy and degraded DNA.

On behalf of Apotex, Dr. Gilbert opined on infringement, specifically on the issue of ancient DNA. Dr. Gilbert replied to the Expert Report of Dr. Davies and commented on Dr. Davies's experimental results.

(3)     Dr. Scott **Harding**

Dr. Harding is an adjunct professor in the Department of Human Nutritional Science and a research associate at the Richardson Centre for Functional Foods and Nutraceuticals at the University of Manitoba. Dr Harding received a Ph.D from McGill University. He was qualified as an expert in human nutrition and metabolism.

On behalf of Apotex, Dr. Harding gave opinion evidence on the Monacolin K producing capabilities of traditional Chinese Red Yeast Rice. In addition, he replied to the Expert Reports of Drs. Havel, Clardy and Oslen.

(4)     Mr. Robert **Hirons**

Mr. Hirons is a registered patent agent in Canada with over 40 years of experience. He has been involved in the prosecution of numerous applications before the Commissioner of Patents, several of which involved conflict proceedings. Mr. Hirons was qualified as an expert in Canadian patent prosecution and practice between 1980 and 1982 and knowledgeable about the practices of the Commissioner of Patents at that time.

2010 FC 1265 (CanLII)

On behalf of Apotex, Mr. Hirons gave opinion evidence on whether the '380 Patent and the '794 patent should have been placed in conflict proceedings by the Commissioner of Patents. Mr. Hirons also replied to the Expert Report of Mr. Barrigar.

(5)    Dr. Robert Allan **McClelland**

Dr. McClelland is professor emeritus in the Department of Chemistry at the University of Toronto.  His research focus is biological and medicinal chemistry, and he has received numerous research awards in Canada. Dr. McClelland was qualified as an expert in organic and medicinal chemistry.

On behalf of Apotex, Dr. McClelland opined on the construction and validity of the '380 Patent. Specifically, he compared the chemical characteristics of Monacolin K ('794 Patent) and Compound I ('380 Patent). In addition, Dr. McClelland's report replied to the Expert Report of Dr. Atwood.

(6)    Dr. Hendrik Nicholas **Poinar**

Dr. Poinar is an associate professor in the Department of Anthropology at McMaster University. He obtained a Ph.D in molecular evolutionary genetics and biomolecular anthropology from Lüdwici Maximillians Universität München. Dr. Poinar has worked in the field of ancient DNA for more than 15 years and has published 44 peer-reviewed articles on the subject. He is considered one of the founding members of the field of ancient DNA.  Dr. Poinar was qualified as an expert in the extraction and characterization of low copy number and degraded DNA.

On behalf of Apotex, Dr. Poinar opined on infringement issues, specifically the experimental results of Dr. Davies. In addition, he was asked to replicate Dr. Davies's finding using similar methods.

(7)    Dr. Robert A. **Samson**

Dr. Samson received an M.Sc and Ph.D from the University of Utrecht in the Netherlands. Dr. Samson is the head of the Department of Applied and Industrial Mycology at the CBS Fungal Biodiversity Centre in the Netherlands. His research is focused on polyphasic taxonomy of the fungal genera *Penicillium* and *Aspergillus*. He was qualified as an expert in applied and industrial mycology with specific expertise in the polyphasic taxonomy of the genus *Aspergillus*.

On behalf of Apotex, Dr. Samson opined on the construction of the '380 Patent including the classification of fungal taxonomy. He also responded to the Expert Reports of Dr. Clardy and Dr. Lasure.

2010 FC 1265 (CanLII)

(8)    Dr. John Lyle **Sorensen**

Dr. Sorensen is an assistant professor in the Department of Chemistry at the University of Manitoba. He obtained a Ph.D in Chemistry from the University of Alberta, where his research focused on the biosynthesis of lovastatin and the pathway used by *Aspergillus terreus*. Dr. Sorensen was qualified as an expert in natural products chemistry.

On behalf of Apotex, Dr. Sorensen opined on construction and validity of the '380 Patent, specifically the fermentation and media conditions contemplated by the '380 Patent. He also replied to the Expert Report of Dr. Clardy.

(9)    Dr. John Waldo **Taylor**

Dr. Taylor is a professor in the Department of Plant and Microbial Biology at the University of California at Berkeley. He has studied fungi for 37 years and fungal DNA for 30 years and published more than 160 articles relating to PCR amplification and fungal DNA. Dr. Taylor was qualified as an expert mycologist and microbiologist, with particular expertise in the area of fungal DNA evolution and fungal DNA PCR amplifications.

On behalf of Apotex, Dr. Taylor opined on infringement, specifically in response to the DNA evidence of Dr. Davies.

D.    *Defendants' Fact Witnesses*

(1)    Mr. Donald **Barber**

Mr. Barber is the Manager of the Formulations Department at Apotex Inc.. He testified regarding the general steps taken in product development at Apotex Inc. and commented on the development of Apo-lovastatin.

(2)    Ms. Lori **Christofalos**

Ms. Christofalos is the Manager of Quality Assurance Regulatory Affairs at AFI. She testified about AFI's standard operating procedures for the fermentation of cultures of *Coniothyrium fuckelii*.

(3)    Ms. Elaine **Copsey**

Ms. Copsey has worked for Apotex Inc. since 1999 as Manager of Packaging and Director of Commercial Lab Operations. She testified regarding the procedures for quality control testing at Apotex Inc., specifically the procedures for testing bulk and raw product.

(4)    Dr. David **Cox**

Dr. Cox was the President of AFI between 1994 and 1997. On behalf of AFI, he testified about the corporate background of AFI, the *Aspergillus terreus* and *Coniothyrium fuckelii* projects and the technology transfer to Blue Treasure.

(5)    Mr. Gordon **Fahner**

Mr. Fahner is the Vice President of Supply Chain and has worked at Apotex Inc. since 1989. He testified regarding the standard operating procedures for Apotex Inc. between 1997 and 2001. Specifically, he spoke about the receipt, storage and use of raw materials.

(6)    Mr. Alexander **Fowler**

Mr. Fowler has been the Finance and Administration Manger at AFI since 1996. Mr. Fowler testified regarding the financial matters relating to the technological transfer between AFI and Blue Treasure.

(7)    Mr. John **Hems**

Mr. Hems is the Director of Regulatory Affairs at Apotex Inc., where he has worked for 30 years. In his current capacity, Mr. Hems oversees the drug approval submissions to regulatory agencies. He testified that his department was responsible for the regulatory submissions made for Apo-lovastatin in the early 1990s.

(8)    Mrs. Qifen **Hu**

Mrs. Hu has been the Manager of the Bacterial Culture Department at Blue Treasure since 1995. She is responsible for receiving and testing cultures received from AFI. Mrs. Hu testified regarding the AFI-4 *Coniothyrium fuckelii* strain and the Blue Treasure batch records.

(9)    Mr. Dingjun **Luo**

Mr. Luo has been the Deputy General Manager at Blue Treasure since 1995. He testified regarding the creation, completion and approval of batch records at Blue Treasure. Mr. Luo authored two articles in the Chinese Journal of Antibiotics which describe the production of lovastatin at Blue Treasure. The articles specifically referred to *Aspergillus terreus* as the fungi source.

2010 FC 1265 (CanLII)

(10)    Mr. Scott **Primrose**

Mr. Primrose has been a senior research scientist with AFI since 1991. He testified regarding the AFI-4 process, specifically the preparation of *Coniothyrium fuckelii* seed banks and the protocols for shipping vials to Blue Treasure.

(11)    Dr. Mila **Sailer**

Dr. Sailer has been employed at AFI since 1994 as a natural product chemist and then Director of Technology. Dr. Sailer obtained a Ph.D in experimental mycology at the Institute of Microbiology at the former Czechoslovakia Academy of Science. He was involved in developing the process to create lovastatin from *Coniothyrium fuckelii*. His testimony related to the development of the AFI-4 process, the technology transfer from AFI to Blue Treasure and the differences in optimal fermentation for *Aspergillus terreus* and *Coniothyrium fuckelii*.

(12)    Dr. Bernard Charles **Sherman**

Dr. Sherman is the Founder, Executive Chairman, and Chief Executive Officer for Apotex Inc.. He has overall responsibility of the company, but focuses primarily on product development, business development and legal issues. Dr. Sherman testified regarding the formation of AFI, the development of lovastatin and the process of finding a non-infringement method to produce Apo-lovastatin. He also spoke about the joint venture with Blue Treasure.

(13)    Dr. Jerry **Su**

Dr. Su worked for AFI from 1996 to 1998 as a fermentation specialist. He was the Group Leader responsible for research and development and the fermentation of AFI-4. Dr. Su spoke about his personal experience visiting Blue Treasure in China and compared their procedures to the procedures at AFI.

E.    *Affidavit (March 1, 2010 & April 1, 2010*

(1)    Bruce **Davis**

Mr. Davis is currently employed by AFI as QC Production Support Manager and swore in his affidavit that he was asked by Lori Christofalos to send samples to a warehouse in Montreal called Warnex Inc.

(2)    Lucinda **Gordon**

Ms. Lucinda Gordon was employed by AFI from August 17, 1992 to September 24, 1998 as a microbiology technician. She swore in her affidavit that on November 3, 1997 she was asked to create an additional *Coniothyrium fuckelii* seed bank at AFI.

2010 FC 1265 (CanLII)

(3)      Leeyuan **Huang**

Mr. Huang was employed by Merck & Co. Inc as Senior Research Scientist in 1997. He swore in his affidavit that he collected various samples and provided them to Dr. Richard Monaghan of Merck & Co. Inc.

(4)      Emily **Malcolm**

Ms. Malcolm is currently a legal assistant at Goodmans LLP and swore in her affidavit that on June 9, 2009 she was given a bag labelled "Red Yeast Rice" and sent it to Taylor McCaffrey LLP in Winnipeg.

(5)      Alexander **Patrick**

Mr. Patrick was employed in the summer of 2009 by Goodmans LLP and swore in his affidavit that on June 2, 2009 he purchased a bag of produced labelled "Red Yeast Rice" at Hua Sheng Supermarket located at 293 Spadina Avenue in Toronto.

(6)      Angela **Razo**

Ms. Razo is employed as a law clerk by Apotex Inc. and swore in her affidavit that in October 2009 she was asked to collect and send a number of pharmaceutical samples to Dr. Hendrik Poinar at McMaster University in Hamilton.

(7)      Heather **Sheps**

Ms. Sheps is currently a legal assistant employed by Taylor McCaffrey LLP and swore in her affidavit regarding the circumstances of the transfer of the Red Yeast Rice product.

(8)      Sylvia **Su**

Ms. Su swore in her affidavit that she provided Ms. Lily Su a sample of a packet labelled "yeast" that she obtained from the Triangle Oriental Market located at 748 D East Chatham Street in Cary, North Carolina.

(9)      Lee Wen **Su**

Mr. Su was employed as an associate in the law firm of Olsson, Frank and Weeda in 1997. He swore that he delivered samples to Mr. Adams on May 6, 1997.

(10)  <u>Yoshikazu **Tani**  (Expert Statement)</u>

Mr. Tani is a patent attorney and licensed patent agent with the firm of Tani & Abe, located in Tokyo and swore in his affidavit that he was asked by Apotex Inc. to review two documents issued by the Japanese Patent Office related to an invention entitled "Novel Physiologically Active Monacolin K and the Production of Same".

(11)  <u>Xin **Wang**</u>

Ms. Wang is a research technician at the Richardson Centre for Functional Foods and Neutraceuticals and swore in her affidavit that on April 26, 2009 she purchased product labelled "Read Year Rice" at Sun Wah Herb Garden in Winnipeg.

2010 FC 1265 (CanLII)

**Appendix B – Claims 1 to 8 and 13 to 15 of the '380 Patent**

1.      A process of producing the compounds of structural formulae:



which compromises fermenting a nutrient medium with a microorganism of the genus *Aspergillus terreus* and isolating the products and when desired converting said products to their corresponding pharmaceutically acceptable salt or lower alkyl ester or a substituted lower alkyl ester wherein the substituent is phenyl, dimethylamine or acetylamine or the cation of the salt is derived from ammonia, ethylenediamine, N-methyl-glucamine, lysine, arginine or ornithine.

2010 FC 1265 (CanLII)

2010 FC 1265 (CanLII)

2.      The process of producing the compounds of structural formulae:



I

II

which comprises fermenting a nutrient medium with a microorganism of the genus *Aspergillus terreus* and isolating the products.

3.      The process of Claim 2 in which the microorganism is one deposited in the American Type Culture Collection with Accession number 20541 or 20542.

4.      The process of Claim 2 in which the isolation comprises extraction of the fermentation mixture with a solvent followed by chromatography.

5.      The process of producing the compounds of structural formulae:



III

IV

which comprises fermenting a nutrient medium with a microorganism of the genus *Aspergillus terreus* and isolating the products.

2010 FC 1265 (CanLII)

6.      The process of Claim 5 in which the microorganism is one deposited in the American Type Culture Collection with Accession number 20541 or 20542.

7.      The process of Claim 5 in which the isolation comprises extraction of the fermentation mixture with a solvent followed by chromatography.

8.      The process of Claim 5, wherein compound III is reacted with ammonia to form the ammonium salt of compound III.

13.     A compound selected from:



I



II



III



IV

or a pharmaceutically acceptable salt or lower alkyl ester or a substituted lower alkyl ester wherein the substituent is phenyl, dimethylamine or acetylamine or the cation of the salt is derived from ammonia, ethylenediamine, N-methylglucamine, lysine, arginine or ornithine, when prepared by the process defined in Claim 1 or by an obvious chemical equivalent.

2010 FC 1265 (CanLII)

14.    A compound selected from:



I



II

when prepared by the process defined in Claim 2 or by an obvious chemical equivalent.

15.    A compound selected from:



III



IV

when prepared by the process defined in Claim 5 or by an obvious chemical equivalent.

## FEDERAL COURT
## SOLICITORS OF RECORD

DOCKET:                    T-1272-97

STYLE OF CAUSE:            Merck & Co Inc. and Merck Frosst Canada Ltd.  v.
                           Apotex Inc**.** and Apotex Fermentation Inc.
                           Biogal Pharmaceutical Works Ltd. (Third Party)

PLACE OF HEARING:          Toronto, Ontario

DATE OF HEARING:           February 1, 2, 3, 4, 2010; February 8, 9, 10, 11, 2010
                           February 16, 17, 18, 19, 2010; February 22, 24, 2010
                           March 1, 2, 3, 4, 5, 2010; March 8, 10, 11, 2010
                           March 16, 17, 18, 19, 2010; March 22, 23, 24, 25, 2010
                           March 29, 30, 31, 2010; April 1, 15, 2010
                           May 17, 18, 19, 20 and 21, 2010

PUBLIC
REASONS FOR JUDGMENT:      SNIDER J.

DATED:                     December 22, 2010

APPEARANCES:

Andrew J. Reddon                        FOR THE PLAINTIFFS
Glynnis P. Burt
David Tait
William H. Richardson
Ariel Neuer

Harry Radomski                   FOR THE DEFENDANT APOTEX INC.
Jerry Topolski
Ben Hackett
David Scrimger

John A. Myers                    FOR THE DEFENDANT APOTEX
G. Patrick S. Riley                      FERMENTATION INC.
Nicole D.S. Merrick
Rodrique C. Roy

J. Alan Aucoin                   FOR THE FORMER THIRD PARTY
Anthony M. Prenol                BIOGAL PHARMACEUTICAL
Antonio Turco                              WORKS LTD.
Athar K. Malik

2010 FC 1265 (CanLII)

**<u>SOLICITORS OF RECORD</u>:**

MCCARTHY TÉTRAULT LLP                    FOR THE PLAINTIFFS
Barristers and Solicitors
Toronto, Ontario

GOODMANS LLP                    FOR THE DEFENDANT APOTEX INC.
Barristers and Solicitors
Toronto, Ontario

TAYLOR MCCAFFREY LLP                    FOR THE DEFENDANT APTOEX
Barristers and Solicitors                    FERMENTATION INC.
Winnipeg, Manitoba

BLAKE, CASSELS & GRAYDON                    FOR THE FORMER THIRD PARTY
LLP                    BIOGAL PHARMACEUTICAL
Barristers and Solicitors                    WORKS LTD.
Toronto, Ontario

2010 FC 1265 (CanLII)

TAB 102

499 F.3d 1332
United States Court of Appeals,
Federal Circuit.

Frank MORROW (on behalf of and as Trustee
for the General Unsecured Creditors' Liquidating
Trust of At Home Corporation, and on behalf
of and in the name of the At Home Liquidating
Trust of At Home Corporation), Plaintiff,
and
Hank M. Spacone (on behalf of and as
Trustee for the General Unsecured Creditors'
Liquidating Trust of At Home Corporation, and
on behalf of and in the name of the At Home
Liquidating Trust of At Home Corporation),
Plaintiff/Counterclaim Defendant–Appellant,
and
Jacquelyn Crawford (as Trustee for the
At Home Liquidating Trust of At Home
Corporation), Counterclaim Defendant–Appellant,
v.
MICROSOFT CORPORATION, Defendant/
Counterclaimant–Cross Appellant.

Nos. 2006–1512, 2006–1518, 2006–
1537.    |    Sept. 19, 2007.    |    Rehearing and
Rehearing En Banc Denied Nov. 16, 2007. [*]

**Synopsis**

**Background:** Trustee of liquidating trust established in bankruptcy proceeding for benefit of patentee's general unsecured creditors brought action against software company alleging infringement of patent relating to dynamic generation of hyperlinks in a source document to other topicly relevant documents. The United States District Court for the Northern District of California, 2006 WL 1600675 and 2006 WL 648740, Claudia Wilken, J., ruled that trust had standing had to sue under bankruptcy law, and granted software company's motion for summary judgment of noninfringement, and parties cross-appealed.

**[Holding:]** The Court of Appeals, Moore, Circuit Judge, held that liquidating trust lacked constitutional standing to sue for patent infringement.

Reversed and vacated.

Prost, Circuit Judge, filed dissenting opinion.

West Headnotes (12)

**[1]**    **Federal Courts**
      Standing

Standing is a legal question and jurisdictional issue that court reviews without deference. U.S.C.A. Const. Art. 3, § 2, cl. 1.

Cases that cite this headnote

**[2]**    **Patents**
      Nature of patent rights

**Patents**
      Requisites and Validity of Assignments and Grants

**Patents**
      Persons entitled to sue

Patent statutes govern the creation and protection of patent rights, how rights can be transferred, and the parties entitled to assert those rights. 35 U.S.C.A. §§ 100(d), 261, 281.

2 Cases that cite this headnote

**[3]**    **Bankruptcy**
      In general;  standing

**Bankruptcy**
      Sale or Assignment of Property

**Patents**
      Transfer on insolvency

**Patents**
      Persons entitled to sue

Bankruptcy courts and courts of equity have the power to order assignment of legal title from the original patent owner to the receiver or trustee according to the requirements of the patent statutes, thus vesting the receiver or trustee with the right to bring suit for infringement. 35 U.S.C.A. §§ 100(d), 261, 281.

Cases that cite this headnote

**[4] Patents**

👉 Persons entitled to sue

Determination of standing to file patent infringement suit would be made under patent law principles in case in which bankruptcy proceedings led to a liquidation plan agreement, negotiated at arms-length between classes of interested parties, dividing the debtor's patent rights.

1 Cases that cite this headnote

**[5] Patents**

👉 Persons entitled to sue

For purposes of establishing standing to sue for patent infringement, constitutional injury in fact occurs when a party performs at least one prohibited action with respect to the patented invention that violates the legal right to exclude others from making, using, selling, or offering to sell the patented invention in the United States, or importing the invention. U.S.C.A. Const. Art. 3, § 2, cl. 1; 35 U.S.C.A. §§ 154, 271.

16 Cases that cite this headnote

**[6] Patents**

👉 Persons entitled to sue

A patentee who holds all the exclusionary rights and suffers constitutional injury in fact from infringement is one entitled to sue for patent infringement in its own name. U.S.C.A. Const. Art. 3, § 2, cl. 1; 35 U.S.C.A. §§ 154, 271.

12 Cases that cite this headnote

**[7] Patents**

👉 Construction and Operation of Assignments and Grants

**Patents**

👉 Persons entitled to sue

If a patentee transfers "all substantial rights" to the patent, that amounts to an assignment or a transfer of title, which confers constitutional standing on the assignee to sue for patent infringement in its own name alone; when a party holds all rights or all substantial rights, it alone has standing to sue for infringement. U.S.C.A. Const. Art. 3, § 2, cl. 1; 35 U.S.C.A. §§ 154, 271.

42 Cases that cite this headnote

**[8] Patents**

👉 Complainants

Parties that hold the exclusionary rights under the patent statutes can only enforce those rights through or in the name of the owner of the patent, and the patentee who transferred those exclusionary interests is usually joined to satisfy prudential standing concerns; however, when the patentee is the infringer, or the prudential concerns are not at play in a particular case, joinder of the patentee is not necessary. U.S.C.A. Const. Art. 3, § 2, cl. 1; 35 U.S.C.A. §§ 154, 271; Fed.Rules Civ.Proc.Rule 19, 28 U.S.C.A.

29 Cases that cite this headnote

**[9] Patents**

👉 Nature of ownership of patents

**Patents**

👉 Assignability of patents

A patent is a bundle of rights which may be retained in whole or in part, divided, and assigned. 35 U.S.C.A. § 261.

1 Cases that cite this headnote

**[10] Patents**

👉 Persons entitled to sue

Those that hold less than all substantial rights to the patent and lack exclusionary rights under the patent statutes lack constitutional standing to sue for patent infringement; such plaintiffs are not injured by a party that makes, uses, or sells the patented invention because they do not hold the necessary exclusionary rights, and the standing deficiency cannot be cured by adding the patent title owner to the suit. U.S.C.A. Const. Art. 3, § 2, cl. 1; 35 U.S.C.A. §§ 154, 271.

52 Cases that cite this headnote

**[11]    Patents**

☞    **Persons entitled to sue**

Liquidating trust established in bankruptcy proceeding for benefit of patentee's general unsecured creditors lacked constitutional standing to sue for patent infringement since trust's interests in the patent did not include sufficient exclusionary rights such that it suffered an injury in fact from infringing activities; while trust held the right to sue parties for patent infringement except for the controlling shareholders, patent title holder held the right to sell the patent, grant exclusive and nonexclusive licenses, grant the right to sublicense, or transfer any of the rights that it held to another party.

U.S.C.A. Const. Art. 3, § 2, cl. 1; 35 U.S.C.A. §§ 154, 271.

24 Cases that cite this headnote

**[12]    Patents**

☞    **Original utility**

6,122,647. Cited.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*1334** Jason C. Kravitz, Nixon Peabody LLP, of Boston, MA, argued for plaintiff/counterclaim defendant-appellant. With him on the brief was Richard D. Rochford, Jr.

Brett J. Williamson, O'Melveny & Myers LLP, of Newport Beach, CA, for counterclaim defendant-appellant. Of counsel were Nathaniel L. Dilger and Mark S. Davies, of Washington, DC.

Frank E. Scherkenbach, Fish & Richardson P.C., of Boston, MA, argued for defendant/counterclaimant-cross appellant. With him on the brief were Kurt L. Glitzenstein, Craig R. Smith, and Charles H. Sanders. Of counsel on the brief was Isabella E. Fu, Microsoft Corporation, of Redmond, WA. Of counsel was Jennifer K. Bush, Fish & Richardson, PC, of San Diego, CA.

Before PROST, Circuit Judge, PLAGER, Senior Circuit Judge, and MOORE, Circuit Judge.

**Opinion**

Opinion for the court filed by Circuit Judge MOORE. Dissenting opinion filed by Circuit Judge PROST.

MOORE, Circuit Judge.

Spacone appeals the United States District Court for the Northern District of California's grant of Microsoft Corporation's (Microsoft) motion for summary judgment of noninfringement of claims 2, 8, 12, and 13 of U.S. Patent No. 6,122,647 (the #647 patent). Microsoft cross-appeals, asserting Spacone lacked standing to bring suit. We reverse the district court's determination that Spacone had standing to sue Microsoft for infringement of the #647 patent and vacate the judgment of noninfringement.

**BACKGROUND**

**I.**

At Home Corp. (AHC) was a provider of internet services over the cable television infrastructure but filed a petition for bankruptcy under Chapter 11 on September 28, 2001. After AHC filed for bankruptcy protection, two committees of creditors were appointed to represent each class of creditors' interests in the bankruptcy proceeding. In April 2002, after several days of mediation, the committees entered into **\*1335** a settlement of their claims against AHC. The committee settlement agreement was incorporated into a joint bankruptcy liquidation plan (liquidation plan). This liquidation plan was prepared for the purpose of liquidating AHC's assets in a manner amenable to the various creditors, and was confirmed by the United States Bankruptcy Court for the Northern District of California. It became effective on September 30, 2002.

Under the liquidation plan, three trusts were created—the General Unsecured Creditors' Liquidating Trust (GUCLT), the At Home Liquidating Trust (AHLT), and the Bondholders Liquidating Trust (BHLT). Morrow and Spacone were appointed as former and current trustees (respectively) for GUCLT. [1] The liquidation plan distributed certain assets and rights among the trusts. BHLT was given rights to

causes of actions against AHC's controlling shareholders, including AT & T Corporation, Comcast Corporation, and Cox Communications. GUCLT received the rights to all other causes of action (called "Estate Litigation"), including claims for misappropriation or infringement of AHC's intellectual property rights. AHLT (the "Plan Agent" in charge of conducting the administrative wind-down of the company's business) was given ownership rights in AHC's intellectual property, since all of the assets not distributed to BHLT or GUCLT were assigned to AHLT. Thus, AHLT received legal title to the #647 patent under the liquidation plan though it did not have the right to sue third parties for infringement of the patent. The liquidation plan and the associated agreements provided that AHLT's assets were to be managed for the benefit of the bondholders and the general creditors of BHLT and GUCLT.

## II.

Spacone, as the trustee of GUCLT, filed suit against Microsoft on October 22, 2003 alleging infringement of the #647 patent. The #647 patent, entitled "Dynamic Generation of Contextual Links in Hypertext Documents," relates to dynamic generation of hyperlinks in a source document to other documents that are topically relevant to the content of the source document or user-selected portion of that document. Spacone accused Microsoft's software applications that contain "Smart Tag Functionality," including those found in Microsoft Office XP® and Microsoft Office 2003®, of infringing several claims of the #647 patent. On November 12, 2003, Microsoft answered and asserted counterclaims against Spacone and Crawford (trustee for AHLT), seeking a declaration of noninfringement, invalidity, and unenforceability of the #647 patent.

Microsoft filed a motion for summary judgment contending that GUCLT lacked standing. In response, Spacone filed a cross-motion for summary judgment that standing existed, asserting he had standing to pursue this action as trustee of GUCLT or alternatively on behalf of and in the name of AHLT. The district court denied Microsoft's standing motion and granted Spacone's cross-motion, concluding that GUCLT had standing to sue under bankruptcy law principles and based on its trust beneficiary status. *Spacone v. Microsoft Corp.,* No. C 03–04739 CW, slip. op. (N.D.Cal. Aug. 10, 2004). Microsoft moved the district court to certify the standing order for interlocutory appeal, but the district court denied this motion.

*1336 On April 2, 2004, GUCLT filed a motion in the bankruptcy court requesting clarification of its rights under the liquidation plan approved by that court. GUCLT argued that it had the right to prosecute and settle patent infringement claims, the right to grant nonexclusive licenses to settle these claims, and the right to receive revenues generated from these settlement licenses. The bankruptcy court ruled in GUCLT's favor and BHLT appealed this ruling to the district court. The district court reversed the bankruptcy court, holding GUCLT did not have the right to grant licenses to settle Estate Litigation or receive licensing revenues.[2] The district court determined that GUCLT was not given ownership or licensing rights in the #647 patent under the liquidation plan, rather, AHLT was assigned the patent and had the exclusive right to license the patent and collect royalties from it.

The parties completed discovery, then cross-moved for summary judgment on the invalidity and infringement issues. On March 10, 2006, the district court denied Spacone's motion and granted Microsoft's motion for summary judgment of non-infringement and invalidity. *Spacone v. Microsoft Corp.,* 2006 WL 648740, No. C 03–04739 CW (N.D.Cal. Mar. 10, 2006). Spacone and Crawford then timely appealed to this court. Microsoft timely appealed the district court's determination of standing. We have jurisdiction over this appeal pursuant to 28 U.S.C. §§ 1295(a)(1), 2107(a), and Fed. R.App. 4(a).

## ANALYSIS

### I.

[1]  As a threshold matter, we must consider the district court's determination that bankruptcy principles govern the standing inquiry in this case. Standing is a legal question and jurisdictional issue that this court reviews without deference. *See Evident Corp. v. Church & Dwight Co.,* 399 F.3d 1310, 1313 (Fed.Cir.2005). The district court ruled that Spacone had standing to bring this infringement suit based on the special circumstances surrounding the trust relationship between GUCLT and AHC created through the bankruptcy proceedings. *SJ Opinion I,* slip op. at 9–11. Specifically, it noted that GUCLT's rights "arise out of bankruptcy law and trust relationships, rather than a traditional patent licensing relationship." *Id.* at 10. The court determined that GUCLT had a "proprietary interest" in the patent (1) as AHC's

successor for all purposes related to the Estate Litigation and had the power to pursue this litigation in AHC's name as if it had never gone bankrupt; and (2) as a trust beneficiary of the patent that AHLT holds in trust for GUCLT and BHLT and an equitable title holder for purposes of the Estate Litigation. *Id.* It did not analyze GUCLT's standing to bring this suit under patent law standing principles.

**[2]** The question as to how bankruptcy or trust law relationships affect the standing analysis in a patent infringement case is a question of first impression in this court. GUCLT and AHLT certainly gained rights to the #647 patent through the bankruptcy proceeding, but this suit against Microsoft was filed pursuant to and is governed by the patent laws. The patent statutes govern the creation and protection of patent rights, how rights can be transferred, and the parties entitled to assert those rights. *See* **\*1337** 35 U.S.C. §§ 100(d), 261, 281; *Crown Die & Tool Co. v. Nye Tool & Mach. Works,* 261 U.S. 24, 40, 43 S.Ct. 254, 67 L.Ed. 516 (1923). In *Crown Die,* the plaintiff asserted that it held sufficient interest in the patent for standing purposes as the beneficial owner of claims for past infringement in equity, though it did not hold legal title to the patent. 261 U.S. at 44, 43 S.Ct. 254. Quoting *Gayler v. Wilder,* 51 U.S. 477, 10 How. 477, 13 L.Ed. 504 (1850), the Court noted that a patent monopoly does not exist at common law but rather under congressional acts, and patent rights are not acquired unless authorized by and acquired in the manner prescribed by statute. *Crown Die,* 261 U.S. at 44, 43 S.Ct. 254. The Court stated that equitable rules "[were] not intended to set aside a policy and rule having its source in the patent statutes and cannot affect this case." *Id. Crown Die,* however, involved an assignment of patent rights rather than the disposition of patent rights through bankruptcy proceedings.

**[3]** **[4]** The court in *Ball v. Coker,* 168 F. 304 (C.C.D.S.C.1909) considered the process by which receivers and trustees legitimately gain rights to patents in determining whether the receiver appointed in that case held sufficient rights to the patent to sue for infringement. The court noted that mere appointment of a receiver to manage and control a patent does not vest legal title enabling him to sue for infringement in his own name. *Id.* at 307 (citing 2 *Robinson on Patents* § 766). Rather, bankruptcy courts and courts of equity have the power to order assignment of legal title from the original owner to the receiver or trustee according to the requirements of the patent statutes, thus vesting the receiver or trustee with the right to bring suit for infringement. *Id.*

(citing *Stephens v. Cady,* 14 How. 528, 531, 14 L.Ed. 528 (1852) (copyright infringement case)). The court stated that

> [u]nder [the patent statutes] no person may bring suit for profits or damages for infringement who is not the patentee, or such assignee or grantee as the statute points out. The claim to recover profits or damages for this infringement cannot be severed from the title by an assignment or grant so as to give the right of action for such claim in disregard of the statute. Profits or damages for infringement cannot be sued for except on the basis of title as patentee, or as such assignee or grantee to the whole or part of the patent, and not on the basis merely of the assignment of a right to a claim for damages severed from such title.

*Id.* at 308. Thus, the patent statutes have long been recognized as the law that governs who has the right to bring suit for patent infringement, even when patent rights have been transferred as a result of bankruptcy or proceedings in equity.[3] In this case, bankruptcy proceedings led to a liquidation plan agreement negotiated at arms-length between classes of interested parties. Where parties have contractually divided patent rights, we have analyzed standing to file the infringement suit under patent law principles. *E.g., Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.,* 248 F.3d 1333 (Fed.Cir.2001); *Prima Tek II, LLC v. A–Roo Co.,* 222 F.3d 1372 (Fed.Cir.2000); *Abbott Labs. v.* **\*1338** *Diamedix Corp.,* 47 F.3d 1128 (Fed.Cir.1995). Accordingly, we must determine whether GUCLT has shown that it has standing to sue Microsoft for infringement under the patent statutes. *Sicom Sys., Ltd. v. Agilent Techs., Inc.,* 427 F.3d 971, 976 (Fed.Cir.2005) (stating the party bringing suit bears the burden of establishing that it has standing).

## II.

### A. Rights Transferred from AHC to GUCLT and AHLT

To determine whether GUCLT has standing, we must first understand its rights to the patent at the time this suit was initiated. AHC owned the patent before the effective date of the liquidation plan in September 2002.[4] After

the effective date, AHC ceased to exist and AHC's assets, rights, obligations, and causes of action were divided among GUCLT, BHLT, and AHLT. GUCLT was given the right to bring suit on the intellectual property assets against any party other than AHC's controlling shareholders. Since it has the right to sue, GUCLT has the exclusive right or duty to (1) decide, at its discretion, whether to investigate, pursue, or dismiss patent infringement actions (without consultation with AHLT and BHLT); (2) collect damages from infringement litigations; (3) incur any liability arising from claims or defenses of any infringement defendant; (4) incur all costs and expenses associated with such litigations; and (5) assume any litigation sanctions. In order to settle patent infringement litigation, AHLT's consent is required. Otherwise, AHLT has no oversight powers with respect to the suits of GUCLT, cannot unreasonably withhold its consent to settle, and is required to "fully and promptly cooperate, assist, and join in all such actions and execute any necessary papers for such actions." There is no indication, however, that GUCLT holds the right to make, use, or sell the invention of the #647 patent, much less the exclusive right to do any of these things with the patented technology. Additionally, GUCLT was not given the right to grant licenses or sublicenses under the patent or collect any licensing royalties.

All rights and assets not specifically transferred from AHC to GUCLT or BHLT under the liquidation plan were transferred to AHLT. It is undisputed that AHLT holds legal title to the #647 patent and all the "sticks" in the "bundle of rights" associated with the patent that were not specifically transferred to GUCLT. AHLT holds all rights to license the #647 patent to third parties and collect royalties from those licenses, royalties not shared with GUCLT and BHLT. AHLT also holds the exclusive right to make, use, and sell the patented technology—though it is contractually prohibited from exercising that right itself under the liquidation plan. AHLT may transfer any of its rights to the #647 patent to third parties with the consent of GUCLT and BHLT.

## B. Article III Standing Requirements

Given this disposition of patent rights between AHLT and GUCLT, to have standing GUCLT must meet both constitutional and prudential standing requirements. Article III of the constitution limits the judicial role in our system of government to the resolution of "cases" and "controversies." The standing inquiry enforces this constitutional restriction on the power of the courts. To demonstrate the minimal constitutional standing requirements have been satisfied, "[a] **\*1339** plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Hein v. Freedom Religion Found., Inc.,* 551 U.S. 587, 127 S.Ct. 2553, 2555–56, 168 L.Ed.2d 424 (2007) (citing *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). These requirements have been described as the injury in fact, traceability, and redressability inquiries. But standing "often turns on the nature and source of the claim asserted.... Essentially, the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *see also Int'l Primate Prot. League v. Admins. of Tulane Educ. Fund,* 500 U.S. 72, 76, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991) ( "[S]tanding is gauged by the specific common-law, statutory or constitutional claims that a party presents."); *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State,* 454 U.S. 464, 484, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) ("The requirement of standing 'focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated.' "). Since the patent statutes give rise to the right to sue others for patent infringement, they also define the nature and source of the infringement claim and determine the party that is entitled to judicial relief.

[5]   A "patentee" is entitled to bring a "civil action for infringement of his patent." 35 U.S.C. § 281, and the "patentee" includes the patentee to whom the patent was issued and the "successors in title to the patentee," 35 U.S.C. § 100(d). The "successor[ ] in title" is the party holding *legal title* to the patent. *See Enzo Apa & Son, Inc. v. Geapag A.G.,* 134 F.3d 1090, 1093 (Fed.Cir.1998); *Prima Tek II LLC v. A–Roo Co.,* 222 F.3d 1372, 1377 (Fed.Cir.2000) (noting the assignee of all substantial rights under the patent becomes the effective patentee and can sue in its own name for infringement). A patent grant bestows the legal right to exclude others from making, using, selling, or offering to sell the patented invention in the United States, or importing the invention. *See* 35 U.S.C. § 154; 35 U.S.C. § 271 (describing permitted and prohibited actions with respect to the exclusionary rights). This right to exclude is the legal interest created by statute. *Arachnid,* 939 F.2d at 1578. Constitutional injury in fact occurs when a party performs at least one prohibited action with respect to the patented

invention that violates these exclusionary rights. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (stating that constitutional injury arises from invasion of a legally protected interest which is concrete and particularized and actual or imminent rather than conjectural or hypothetical). The party holding the exclusionary rights to the patent suffers legal injury in fact under the statute. [5]

[6]  [7]  There are three general categories of plaintiffs encountered when analyzing the constitutional standing issue in patent infringement suits: those that can sue in their own name alone; those that can sue as long as the patent owner is joined in the suit; and those that cannot even participate as a party to an infringement suit. The first category includes plaintiffs that hold all legal rights to the patent as the patentee or assignee of all patent rights —the entire bundle of sticks. Unquestionably, **\*1340** a patentee who holds all the exclusionary rights and suffers constitutional injury in fact from infringement is one entitled to sue for infringement in its own name. Additionally, if a patentee transfers "all substantial rights" to the patent, [6] this amounts to an assignment or a transfer of title, which confers constitutional standing on the assignee to sue for infringement in its own name alone. *Intellectual Prop. Dev.,* 248 F.3d at 1345. When a party holds all rights or all substantial rights, it alone has standing to sue for infringement.

[8]  The second category of plaintiffs hold exclusionary rights and interests created by the patent statutes, but not all substantial rights to the patent. As the grantee of exclusionary rights, this plaintiff is injured by any party that makes, uses, sells, offers to sell, or imports the patented invention. *Evident,* 399 F.3d at 1313; *Intellectual Prop. Dev.,* 248 F.3d at 1346 ("A party such as IPD that has the right to exclude others from making, using, and selling an invention described in the claims of a patent is constitutionally injured by another entity that makes, uses, or sells the invention."). Parties that hold the exclusionary rights are often identified as exclusive licensees, because the grant of an exclusive license to make, use, or sell the patented invention carries with it the right to prevent others from practicing the invention. [7]

However, these exclusionary rights "must be enforced through or in the name of the owner of the patent," and the patentee who transferred these exclusionary interests is usually joined to satisfy prudential standing concerns. *Indep. Wireless Tel. Co. v. Radio Corp. of Am.,* 269 U.S. 459, 467, 469, 46 S.Ct. 166, 70 L.Ed. 357 (1926). The patentee is

joined for the purpose of avoiding the potential for multiple litigations and multiple liabilities and recoveries against the same alleged infringer. *Intellectual Prop. Dev.,* 248 F.3d at 1347 (indicating that joining the patentee satisfies a prudential not constitutional standing requirement); *Propat,* 473 F.3d at 1193; *Indep. Wireless,* 269 U.S. at 469, 46 S.Ct. 166 (stating that where there is no express covenant by the patent owner to sue infringers it is an implied obligation to allow use of the licensor's name, which is indispensable to the enjoyment of the patent monopoly). When the patentee is the infringer, or the prudential concerns are not at play in a particular case, joinder of the patentee is not necessary. This joinder analysis has been incorporated in Federal Rule of Civil Procedure 19. *See* Fed.R.Civ.P. 19, Advisory Committee Note to Subdivision (a) (1937); *Prima Tek II,* 222 F.3d at 1377.

[9]  [10]  The third category of plaintiffs includes those that hold less than all substantial rights to the patent and lack exclusionary rights under the patent statutes to meet the injury in fact requirement. **\*1341** They are not injured by a party that makes, uses, or sells the patented invention because they do not hold the necessary exclusionary rights. Plaintiffs in this category lack constitutional standing. [8] *See Sicom,* 427 F.3d at 976 ("A nonexclusive license confers no constitutional standing on the licensee to bring suit or even to join a suit with the patentee because a nonexclusive licensee suffers no legal injury from infringement." (internal citations omitted)). This standing deficiency cannot be cured by adding the patent title owner to the suit. *Propat,* 473 F.3d at 1189; *Intellectual Prop. Dev.,* 248 F.3d at 1348–49.

## C. Injury in Fact

[11]  Here, we are faced with the question of whether GUCLT holds the exclusionary rights and suffers constitutional injury in fact. Microsoft asserts that GUCLT lacks sufficient rights to be a party to this case. Spacone argues that AHLT merely holds "bare" legal title to the #647 patent in trust for the benefit of GUCLT and that GUCLT has standing to sue because it possesses partial equitable title to the #647 patent. The question is whether GUCLT's interests in the patent include sufficient exclusionary rights such that GUCLT suffers an injury in fact from infringing activities. If GUCLT holds all substantial rights, it can sue in its name alone. If GUCLT holds less than all substantial rights but sufficient exclusionary rights that it suffers injury in fact, it can sue as a co-party with the legal title holder AHLT. If it

lacks injury in fact, GUCLT lacks standing to be a party to this case.

GUCLT holds the right to sue parties (except for the controlling shareholders) for patent infringement. Its inability to sue controlling shareholders is a limitation on this right, as is the requirement that AHLT approve the settlement of any suits brought by GUCLT. Thus, GUCLT's right to sue comes with restrictions. In *Vaupel,* this court indicated that the right to sue is an important right, and like GUCLT Vaupel held the exclusive right to sue for infringement, subject only to the obligation to inform Markowsky of the suit. But unlike GUCLT, Vaupel also held the exclusionary rights— an exclusive license (right to make, use, or sell the patented invention) along with the exclusive right license and the right to sublicense (subject to prior consent by Markowsky). The grant of this exclusive license and the right to sublicense constituted a transfer of the exclusionary rights to the patent to Vaupel. Within this context, Vaupel held all substantial rights as the "effective patentee" because it held the exclusionary rights and additional important patent rights including the right to bring a patent suit. *Vaupel,* 944 F.2d at 875. Vaupel could sue without joinder of Markowsky. In contrast, GUCLT lacks an exclusive license, the exclusive right to license, and the right to sublicense. These are important aspects of the exclusionary rights held by Vaupel.

Moreover, GUCLT's control with respect to infringement litigation does not lead to the conclusion that GUCLT suffers injury in fact from infringement. In *Sicom,* we held that Sicom lacked all substantial rights (it was not a category one plaintiff) because it did not have the right to settle litigation it initiated without prior written consent of the licensor, even though it had the right to sue *and* an  **\*1342**  exclusive license to the patent. 427 F.3d at 979.

While GUCLT has been granted the right to sue infringers that are not controlling shareholders, AHLT is the patent title holder, holds the right to sell the patent, grant exclusive and nonexclusive licenses, grant the right to sublicense, or transfer any of the rights that AHLT holds to another party. The only limitations on AHLT's ability to control and transfer its patent rights is GUCLT's and BHLT's consent. In *Speedplay,* we noted that this type of consent requirement was not significantly restrictive of Speedplay's exclusionary patent rights, which included an exclusive license and the right to sublicense a potential infringer. 211 F.3d at 1252. In this case the requirement that GUCLT and BHLT consent to transfer of rights to the #647 patent is not significantly

restrictive of AHLT's exclusionary rights. Nor does this consent requirement transfer to GUCLT any exclusionary rights to the patent. Moreover, there is no indication that AHLT is restricted as to the parties to whom it could transfer any of the exclusionary rights that it holds under the #647 patent. Thus, AHLT could grant an exclusive license to any party, which would transfer the right to exclude others from practicing the patented invention.

The problem for GUCLT and AHLT is that the exclusionary rights have been separated from the right to sue for infringement. The liquidation plan contractually separated the right to sue from the underlying legally protected interests created by the patent statutes—the right to exclude. For any suit that GUCLT brings, its grievance is that the exclusionary interests held by AHLT are being violated. GUCLT is not the party to which the statutes grant judicial relief. *See Warth,* 422 U.S. at 500, 95 S.Ct. 2197. GUCLT suffers no legal injury in fact to the patent's exclusionary rights. As the Supreme Court stated in *Independent Wireless,* the right to bring an infringement suit is "to obtain damages for the injury to his exclusive right by an infringer." 269 U.S. at 469, 46 S.Ct. 166; *see also Sicom,* 222 F.3d at 1381 ("Standing to sue for infringement depends entirely on the putative plaintiff's proprietary interest in the patent, not on any contractual arrangements among the parties regarding who may sue ..."); *Ortho,* 52 F.3d at 1034 ("[A] right to sue clause cannot negate the requirement that, for co-plaintiff standing, a licensee must have beneficial ownership of some of the patentee's proprietary rights.").

The importance of AHLT's right to license third parties to our constitutional standing analysis is underscored by *Textile Productions.* This court determined that the transfer of the right to sue in that case did not provide standing to even participate in the suit because the agreement did not clearly manifest that the owner would refrain from granting a license to anyone else in the particular area of exclusivity. *Textile Productions,* 134 F.3d at 1485. We stated that the right to license third parties is an important patent right because implicit in the right to exclude is the right to waive that right; that is, to license activities that would otherwise be excluded. *See Id.*; *Prima Tek II,* 222 F.3d at 1379. GUCLT does not have the right to license or sublicense or otherwise forgive activities that would normally be prohibited under the patent statutes. We "pay particular attention to whether the agreement conveys in full the right to exclude" in order to find standing. *Id.* at 1379–80.

Even in *Propat,* this court found that Propat had no standing to participate in an infringement suit though it enjoyed the exclusive right to sue third parties for patent infringement, the right to grant licenses to third parties, and the right to enforce license agreements. **\*1343** 473 F.3d at 1191. Propat's right to license and sue third parties was subject to prior approval by the legal title holder Authentix—approval that could not be unreasonably withheld. Propat was also required to receive the consent of Authentix before it assigned rights or obligations under the agreement to another party. This court held that Authentix didnot assign all substantial rights to Propat and Propat could not even sue as a co-plaintiff with Authentix. *Propat,* 473 F.3d at 1189 (noting that even if Authentix was a party this would not ameliorate Propat's standing problem). Propat lacked sufficient exclusionary rights and therefore did not suffer statutory legal injury.

While GUCLT enjoys greater control over infringement litigation than did Propat, it lacks the important rights to grant and enforce licenses that Propat held. GUCLT lacks the right to waive the patent's exclusionary rights by waiving those rights in license or sublicense agreements.

Spacone asserts that this court's decision in *Evident* supports GUCLT's standing to bring suit now that AHLT is a party. We do not agree that GUCLT suffers the legal injury that entitles it to be a party to this infringement suit. In keeping with the decisions from this court, *Evident* stands for the proposition that a party with the rights of an exclusive licensee holds exclusionary rights and has standing to sue for infringement if the patentee joins the suit to satisfy any prudential concerns present in that case. *Evident,* 399 F.3d at 1314; *see also Propat,* 473 F.3d at 1193; *Intellectual Prop. Dev.,* 248 F.3d at 1345–46; *Textile Prods.,* 134 F.3d at 1484; *Abbott Labs.,* 47 F.3d at 1131. Unlike Evident, AHLT's participation as a third party defendant does not affect GUCLT's standing to bring this suit. To demonstrate entitlement to join as a *co-plaintiff* GUCLT must have the right to exclude others from making, using, or selling the invention in the United States. *See Ortho Pharm. Corp. v. Genetics Institute, Inc.,* 52 F.3d 1026, 1030–32 (Fed.Cir.1995).

Contrary to the dissent's suggestion, GUCLT's beneficial ownership interest as the future beneficiary of 45% of whatever assets are still held by AHLT when it completes its wind-down of AHC's business does not affect the outcome of our standing analysis. Indeed, there is no indication as to what, if any, assets will flow to GUCLT after AHLT completes its work. Regardless, whatever interests in the #647 patent may flow to GUCLT in the future are insufficient to convert its equitable future interests in the patent into full legal exclusionary interests as of the time this suit was initiated. In *Arachnid, Inc. v. Merit Indus., Inc.,* 939 F.2d 1574, 1577, 1578 n. 3 (Fed.Cir.1991), the plaintiff also asserted that it had standing to sue for damages as the equitable title holder to the patent because in equity it was the real owner of the patent rights. It asserted that this equitable interest met the standing requirements because another party held legal title to the patent. This court rejected this equitable interest-based standing argument. We stated that equitable title to the patent is insufficient to confer standing to sue for legal relief from infringement. *Id.* at 1579–80 (noting that the owner of equitable title may seek redress in a court of equity such as rescission of title transfer but cannot bring an action at law for infringement damages). Similarly, GUCLT lacks the exclusionary rights under the #647 patent and relies on its equitable interests in AHLT's assets. But GUCLT lacks legal injury in fact, and its beneficial interest in assets held by AHLT or the fact that AHLT has been brought into this case as a third party defendant does not cure GUCLT's constitutional standing deficiencies.

 **\*1344**  Only when a party holds the exclusionary rights to the patent but lacks all substantial rights may the party join the legal title owner in a suit to enforce patent rights. Joining the legal title holder only satisfies prudential standing requirements. It cannot cure constitutional standing deficiencies. Since GUCLT fails to meet constitutional standing requirements, it cannot be a party to this suit for patent infringement.

## CONCLUSION

Since GUCLT lacked standing to sue Microsoft for infringement of the #647 patent, the district court lacked jurisdiction. Thus, we will not consider the appealed infringement issues on the merits. We reverse as to standing and vacate the infringement rulings.

*REVERSED AND VACATED*

## COSTS

Each party shall bear its own costs for this appeal and cross-appeal.

PROST, Circuit Judge, dissenting.

The majority holds that, in a bankruptcy proceeding, separating the title to a patent from the right to sue for infringement extinguishes all standing to enforce the patent. Because I believe the General Unsecured Creditors' Liquidating Trust of At Home Corporation ("GUCLT") holds a sufficient bundle of rights to support co-plaintiff standing with the holder of legal title, I respectfully dissent.

Pursuant to the liquidation plan, three entities divided the interests and assets of the At Home Corporation ("AHC"). The At Home Liquidating Trust of At Home Corporation ("AHLT") received all assets of AHC, including the patent at issue in this case. Two additional trusts represent the unsecured creditors to AHC: the Bond Holders' Liquidating Trust of At Home Corporation ("BHLT") and the GUCLT. BHLT received the rights to causes of action against AHC's controlling shareholders; GUCLT received the rights to pursue all other causes of action—including infringement of intellectual property, including U.S. Patent No. 6,122,647 ("the patent"). As the liquidation plan stated, AHLT exists to manage the assets for the benefit of GUCLT and BHLT. Indeed, AHLT requires their consent to sell or otherwise dispose of the patent.

I agree with the majority insofar as it holds that GUCLT does not have standing to enforce the patent in its own name; it is not, as the majority describes, in the "first category" of plaintiffs—patentees and holders of all substantial rights. But the analysis does not end there. As it is apparent that AHLT, having assigned the right to sue, cannot enforce the patent alone, the only way to enforce the patent requires AHLT and GUCLT to act as co-plaintiffs. The majority opinion forecloses that option.

Plaintiffs in the majority's "second category" hold fewer than all substantial rights in the patent, and therefore may not sue in their name alone. They may still enforce the patent, but must do so in the patentee's name and may compel the patentee to join as a necessary party. Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc., 248 F.3d 1333, 1347–48 (Fed.Cir.2001). Further, as this court recognized in Evident Corp. v. Church & Dwight Co., a defendant's counterclaims may bring the patentee into a case and provide the original "second category" plaintiff with the support required for standing. 399 F.3d 1310, 1314 (Fed.Cir.2005). While I agree that Evident may only apply to the "second category" of plaintiffs, I believe the majority errs by excluding GUCLT from that category.

If, as I would hold, GUCLT is properly considered a "category two" plaintiff, then **\*1345** it could have added AHLT to the suit either voluntarily or involuntarily to satisfy our prudential standing requirements. See Intellectual Prop. Dev., 248 F.3d at 1347–48. GUCLT had no need to add AHLT, however, because Microsoft's counterclaims here brought AHLT into the case, thus satisfying our prudential requirements. Evident, 399 F.3d at 1314. While I accept the usefulness of the majority's attempt to clearly delineate our jurisprudence on standing, that attempt misses the mark by failing to correctly define the second category of plaintiffs.

The majority narrowly defines the second category without any reasoned basis. It describes "exclusionary rights and interests" as "created by the patent statutes," but does not elucidate why only patentees and exclusive licensees should enjoy such rights. Maj. op. at 1340. Indeed, the precedent cited seems to contradict the majority's strict categorizations. In Intellectual Property Development, this court extensively discussed the underpinnings of our standing requirements. In that case, we stated, "Article III standing to sue in [patent cases] derives solely from the Patent Act.... This statutory language, however, fails to limit Article III standing to patentees and assignees." Intellectual Prop. Dev., 248 F.3d at 1346. Thus, our precedent clearly shows that while protectable legal interests may derive from the patent statutes, those statutes do not limit standing to patentees—thus allowing standing for the majority's "second category" of plaintiffs.

While the majority effectively treats the second category as occupied solely by exclusive licensees, that category may properly include other types of plaintiffs. In Intellectual Property Development, 248 F.3d at 1346, we clarified that determining standing of non-patentee parties requires analysis under the standard set forth in Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Specifically, a putative plaintiff must demonstrate (1) an injury in fact (invasion of a legal interest that is concrete and particularized, and actual or imminent injury); (2) a causal connection between the defendant's action and the injury; and (3) that it is likely a favorable decision would redress the injury. Lujan, 504 U.S. at 560–61, 112 S.Ct. 2130. No serious argument could contend that GUCLT does not satisfy the second two factors; thus—as the majority ostensibly recognizes—the key question regarding constitutional standing is whether or not GUCLT suffers an injury in fact from Microsoft's infringement. Rather than

meaningfully evaluating the injury to the plaintiff here, the majority simply falls back on the established boundary including exclusive licensees.

Looking at injury in fact as arising from a breach of exclusionary rights under the patent, the majority equates exclusionary rights with the right to practice and right to license. Maj. op. at 1341–42. Exclusive licensees have the right to enforce a patent because that is the only way to give meaning to their exclusivity. *Indep. Wireless Tel. Co. v. Radio Corp. of Am.,* 269 U.S. 459, 469, 46 S.Ct. 166, 70 L.Ed. 357 (1926). Although exclusionary rights are important to an exclusive license, it does not follow that *only* exclusive licensees (and patentees) may hold those rights. While *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.* recognized that an exclusive license includes exclusionary rights, it concerned the difference between an exclusive license and an assignment. 944 F.2d 870, 874 (Fed.Cir.1991). *Vaupel* does not stand for the proposition that a party requires an exclusive license to gain exclusionary rights.

The majority further looks to *Sicom Systems, Ltd. v. Agilent Technologies, Inc.* **\*1346** for the proposition that control over litigation is insufficient to confer standing for a non-patentee. 427 F.3d 971 (Fed.Cir.2005). Several problems cloud the comparison. First, the only issue in *Sicom* was whether or not the putative plaintiff could sue in its name alone, without adding the holder of legal title. *Id.* at 975. That is not the question here. Further, Sicom had the right to sue only for *commercial* infringement, leaving open a broad range of potential non-commercial infringers. *Id.* at 979. Under such an arrangement, "a single infringer could be vulnerable to multiple suits for any noncommercial infringement." *Id.* That is not the case here.

Focusing much attention on the right to grant licenses under the patent here, the majority concludes that without such a right, GUCLT is missing a key component of the so-called exclusionary rights necessary for standing.[1] If, as the majority states, AHLT could freely and exclusively license the target of GUCLT's litigation, it would eviscerate GUCLT's right to sue. None of the documents defining the outcome of bankruptcy, however, explicitly address the right to license the patent. A nonexclusive license is a covenant not to sue, *Ortho Pharm. Corp. v. Genetics Inst., Inc.,* 52 F.3d 1026, 1032 (Fed.Cir.1995), so separating the right to sue from the right to license without any basis in the parties' arrangement makes a distinction without a solid

basis. Because the two concepts are so intertwined, I would recognize that the right to sue—explicitly assigned to GUCLT—includes the right to offer nonexclusive licenses to targets of litigation.

Moreover, any right that AHLT has regarding transfer of rights under the patent is subject to consent by GUCLT. Nothing in the Trust Agreement indicates that GUCLT cannot unreasonably withhold such consent, an omission that sharply contrasts with the requirement that AHLT consent to settlement of suit by GUCLT and not unreasonably withhold such consent. The arrangement clearly places less restriction on GUCLT and demonstrates that GUCLT is the party controlling litigation, including settlement of the litigation through licensing.

The majority looks to *Speedplay, Inc. v. Bebop, Inc.* as indicating that a requirement for consent by the grantor of rights does not restrict the rights granted. 211 F.3d 1245 (Fed.Cir.2000). But that case concerned a grantor reserving the right of consent—not to be unreasonably withheld—to ensure the economic value of the consideration it received. *Id.* at 1251–52. Here, without the requirement for reasonableness, GUCLT's consent more substantially restricts AHLT. The consent provision should ensure that AHLT cannot—as the majority would have it—negate GUCLT's right to sue by granting licenses.

*Speedplay* also stated that the only reasonable basis to withhold consent is when giving consent would harm the economic value of the patent. *Id.* Even if—contrary to the plain language here—GUCLT were required not to unreasonably withhold consent, if AHLT were to offer a license to a target of GUCLT's litigation against GUCLT's wishes, it would be reasonable under *Speedplay* for GUCLT to withhold consent. I believe, therefore, that whatever right to license the patent AHLT may **\*1347** hold, it does not interfere with GUCLT's right to enforce the patent.

The bankruptcy agreements also provide that GUCLT requires AHLT's consent prior to settling any litigation, not to be unreasonably withheld. Under *Speedplay,* the requirement that AHLT not unreasonably withhold such consent indicates a more limited impact on GUCLT's right to control litigation and enforce the patent. Moreover, while the majority recognizes that AHLT must "fully and promptly cooperate" with GUCLT's litigation efforts, it fails to give any meaningful weight to that requirement. Indeed, if AHLT must fully cooperate with GUCLT, then AHLT must exercise

its rights in the patent consistent with GUCLT's litigation
goals. That includes refraining from licensing the targets
of litigation unless GUCLT desired a license as part of a
settlement deal. At such time, AHLT must cooperate by
consenting to the settlement and offering a license as GUCLT
directs.

The majority also places great emphasis on *Propat
International Corp. v. RPost, Inc.,* believing it to control this
case. 473 F.3d 1187 (Fed.Cir.2007). I disagree. In *Propat,* the
plaintiff required the patent owner's permission in order to
select litigation targets, *Id.* at 1194; here, GUCLT does not
require AHLT's permission. I believe the selection of targets
forms a major portion of the right to enforce a patent, and
provides an important basis for distinguishing this case from
*Propat.*

Further, the holder of title in *Propat* retained an economic
interest in the patent; here, AHLT does not retain an economic
interest where it holds title to the patent in trust for GUCLT
and BHLT. Finally, in *Propat* this court viewed the right
to transfer one's interest as an important indicium of a true
ownership interest. *Id.* Here, we have no indication that
GUCLT cannot freely assign its rights under the bankruptcy
agreement. In almost every way, its rights exceed those of
the bare licensee in *Propat.* In light of GUCLT's substantially
greater interest here, I cannot agree that it does not hold a
proprietary interest in the patent. Assigned the right to enforce
the patent, GUCLT suffers an injury when a party infringes
the patent and thus satisfies the *Lujan* standards for standing.

I would hold that GUCLT does suffer an injury in fact. First,
GUCLT holds an equitable interest in the title to the patent
as beneficiary to the AHLT. I agree with the majority that
ownership of equitable title to a patent does not by itself
provide sufficient interest to sustain standing to sue alone
for damages. *See Arachnid, Inc. v. Merit Indus., Inc.,* 939
F.2d 1574, 1579 (Fed.Cir.1991). In *Arachnid,* however, the
plaintiff wanted the court to impose a trust extending prior to
the date on which a district court awarded ownership to the
plaintiff. *Id.*

GUCLT's equitable ownership in the patent should play
a relevant role in the analysis. Exclusive licensees have
standing to sue in the patent owner's name in part because the
patent owner holds title to the patent in trust for the exclusive
licensee, as the majority admits. *Indep. Wireless Tel. Co. v.
Radio Corp. of Am.,* 269 U.S. 459, 469, 46 S.Ct. 166, 70 L.Ed.
357 (1926). Here, AHLT *explicitly* holds the title in trust for

GUCLT and BHLT, providing stronger reason to consider
injury to the interests of the beneficiaries. Infringement of the
patent diminishes its value and directly reduces the benefit
enjoyed by GUCLT. While the majority states that we cannot
know what assets will flow to GUCLT from AHLT, that
does not change the fact that GUCLT and BHLT are the sole
beneficiaries of AHLT. Any harm to the value of AHLT's
assets directly affects GUCLT, causing an injury in fact.

**\*1348** Moreover, GUCLT's interest does not stop with its
equitable interest in title to the patent; it also received the
explicit right to sue as part of the bankruptcy agreement.
While the majority points to precedent disallowing standing
based on right to sue clauses in license agreements, those
cases do not dictate the result here. For example, in *Prima Tek
II, L.L.C. v. A–Roo Co.* this court held that a right to sue clause
in a license agreement cannot allow standing *by the licensee
alone.* 222 F.3d 1372, 1381 (Fed.Cir.2000). I find *Prima Tek
II* inapposite where GUCLT—as a "category two" plaintiff—
has no need to support standing in its own name.

In *Ortho,* this court also concluded that a right to sue clause
cannot provide a non-exclusive licensee with standing. 52
F.3d at 1034. The court, however, based its holding in part
on the details of the case—Ortho wanted standing to pursue
a second case against an infringer that had already lost a
suit by the patentee. *Id.* at 1035. Here, the agreement plainly
assigns the entire right to sue Microsoft to GUCLT, who in
the present case would litigate next to the holder of legal title
to the patent, AHLT. Such a situation presents none of the
difficulties that arose in *Ortho.*

Supported by no precedent clearly on point, the majority
chooses to close the door on GUCLT enforcing the
patent with AHLT as a co-plaintiff. I would follow the
opposite course, particularly in light of the various policy
considerations that guide the courts on standing. Indeed,
this case does not implicate the perils associated with a
relaxed standing requirement—that multiple plaintiffs may
subject a defendant to suit for the same conduct, or that
the patentee may miss an opportunity to defend against
invalidation. *Evident,* 399 F.3d at 1314; *see also Ortho,* 52
F.3d at 1031 (quoting *A.L. Smith Iron Co. v. Dickson,* 141
F.2d 3, 6 (2d Cir.1944)). On the contrary, the bankruptcy
agreement here clearly specifies the actions that GUCLT
may pursue, separating a small number of defendants subject
to suit only by BHLT. Allowing co-plaintiff standing for
GUCLT and AHLT would create no risk of multiple suits and
would permit AHLT to ensure a full defense of the patent's

validity. Devoid of policy considerations, the majority opinion merely concludes that GUCLT lacks exclusionary rights. As explained, because the indicia of standing point the other way, I believe GUCLT does hold such an interest. Where GUCLT has received the right to enforce the patent and the patentee presently holds title in trust for GUCLT, infringement of the patent constitutes injury in fact.

While I do not read any precedent as directly governing the peculiar circumstances of this case, I also do not read any as precluding co-plaintiff standing for GUCLT. I believe

that, in denying all possibility for enforcing the patent, the majority opinion extends limitations on co-plaintiff standing without a reasoned basis. Accordingly, while neither GUCLT nor AHLT individually may pursue infringement litigation, I would not deprive the patent of all value. Because I would allow GUCLT and AHLT, as co-plaintiffs, standing to sue Microsoft, I respectfully dissent.

### Parallel Citations

48 Bankr.Ct.Dec. 243, 84 U.S.P.Q.2d 1377

---

Footnotes

\*    Circuit Judge Gajarsa did not participate in the vote.

1    Frank A. Morrow was the trustee of GUCLT until April 14, 2005, when he was succeeded by Hank M. Spacone. Spacone was substituted into this action as the named plaintiff after assuming his position as trustee. For purposes of this opinion, references to Spacone are references to his predecessor or GUCLT, when applicable.

2    On August 19, 2005, GUCLT appealed this order to the Ninth Circuit. That appeal involves the issue of whether GUCLT has an independent right to license the intellectual property assets formerly held by AHC. *Spacone v. Williamson,* No. 05–16717 (9th Cir. filed Aug. 19, 2005).

3    35 U.S.C. § 261 provides that "applications for patent, patents, or any interest therein" are assignable "by an instrument in writing." The patent statutes allow the instrument that assigns "any interest" to take the form of a patent license or any other written instrument that transfers patent rights. The type of written instrument (e.g., license or assignment agreement, dissolution agreement, or merger agreement) and the factual context in which the instrument is created is irrelevant—this does not provide a basis for divorcing the standing analysis from the patent statutes.

4    The suit against Microsoft was filed in October 2003, after the effective date of the liquidation plan.

5    Though there are three constitutional standing inquiries—injury in fact, traceability, and redressability, we only discuss injury in fact, which is dispositive of this case.

6    The all substantial rights inquiry is a proxy for the statutory requirement that a party bringing an infringement suit have the interests of a patentee, including the exclusionary rights granted by the patent statutes and other important incidental rights, such as the right to assign those rights or vindicate them through enforcement proceedings. *See Sicom,* 427 F.3d at 976; *Prima Tek II,* 222 F.3d at 1378–79; *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.,* 944 F.2d 870, 875 (Fed.Cir.1991). The assignee becomes the "effective patentee."

7    But in determining whether a party holds the exclusionary rights, we determine the substance of the rights conferred on that party, not to the characterization of those rights as exclusive licenses or otherwise. *See Vaupel,* 944 F.2d at 874–75. For instance, an exclusive licensee who actually holds all substantial rights may sue in its own name alone for patent infringement.

8    As this court has stated previously, a patent is a bundle of rights which may be retained in whole or in part, divided and assigned. *Intellectual Prop. Dev.,* 248 F.3d at 1342 (citing *Vaupel,* 944 F.2d at 875; 35 U.S.C. § 261. While parties are free to assign some or all patent rights as they see fit based on their interests and objectives, this does not mean that the chosen method of division will satisfy standing requirements.

1    The majority's extensive reliance on GUCLT's inability to license the patent rests entirely on the district court's interpretation of the parties' agreements. As the majority notes, that issue is the subject of an appeal currently pending before the Ninth Circuit. An unsettled issue playing such a central role in the present case demands independent analysis, which the majority opinion lacks.

---

**End of Document**      © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 103

723 F.3d 413
United States Court of Appeals,
Third Circuit.

MYLAN INC.; Mylan
Pharmaceuticals Inc., Appellants

v.

SMITHKLINE BEECHAM CORPORATION, n/
k/a Glaxosmithkline LLC, d/b/a Glaxosmithkline;
Smithkline Beecham P.L.C., n/k/a Smithkline
Beecham, Limited; Smithkline Beecham (Cork)
Limited, successor to SB Pharmco Puerto Rico,
Inc.; Apotex Inc; and Apotex Corporation.

No. 12–1539.   |   Argued: Jan. 8,
2013.   |   Opinion Filed: July 22, 2013.

**Synopsis**
**Background:** Licensee filed breach of contract suit against
patent owner and competitor, claiming patent owner violated
licensing agreement by providing generic paroxetine to
another generic drug company to be marketed and sold in
direct competition with licensee. The United States District
Court for the District of New Jersey, Joel A. Pisano, J., 2012
WL 603804, granted summary judgment in favor of patent
owner and competitor. Licensee appealed.

**Holdings:** The Court of Appeals, Ambro, Circuit Judge, held
that:

[1] fact issues precluded summary judgment on breach of
contract claim;

[2] there was no evidence that patent owner acted with bad
motive or intent when entering into supply and distribution
agreement with competitor; and

[3] there was no evidence to support licensee's claim against
competitor for tortious interference with contract under New
Jersey law.

Affirmed in part, reversed in part, and remanded.

West Headnotes (12)

**[1]**   **Health**
         **New drugs**
A New Drug Application (NDA) must provide,
inter alia, a statement of the drug's components,
scientific data showing that the drug is safe and
effective, and proposed labeling describing the
uses for which the drug may be marketed.

Cases that cite this headnote

**[2]**   **Federal Civil Procedure**
         Contract cases in general
In a contract interpretation action, summary
judgment is appropriate only where the
contractual language is unambiguous—i.e.,
subject to only one reasonable interpretation.

3 Cases that cite this headnote

**[3]**   **Federal Civil Procedure**
         Contract cases in general
On motion for summary judgment in a breach of
contract action, if the nonmoving party presents
a reasonable alternative reading of the contract,
then a question of fact as to the meaning of the
contract exists which can only be resolved at
trial.

1 Cases that cite this headnote

**[4]**   **Federal Courts**
         Contracts
Whether a contract is ambiguous is an issue of
law subject to plenary review.

3 Cases that cite this headnote

**[5]**   **Contracts**
         Admissibility
Under New Jersey law, courts must always
consider all of the relevant evidence that
will assist in determining the intent and

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

meaning of the contract when making ambiguity determinations.

Cases that cite this headnote

**[6]    Contracts**
         Extrinsic circumstances

Evidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement; this is so even when the contract on its face is free from ambiguity.

2 Cases that cite this headnote

**[7]    Federal Civil Procedure**
         Contract cases in general

When interpreting a contract, courts must consider all relevant evidence to determine if any ambiguity exists and, if the contested provisions fall in that gray area, summary judgment is improper.

1 Cases that cite this headnote

**[8]    Federal Civil Procedure**
         Patent cases

Genuine issue of material fact existed regarding whether license agreement limited to whom patent owner could market and sell drug after licensee's two-year period of generic exclusivity, precluding summary judgment on licensee's breach of contract claim against patent owner under New Jersey law.

1 Cases that cite this headnote

**[9]    Patents**
         As to licensors

There was no evidence that patent owner acted with bad motive or intent when entering into supply and distribution agreement with competitor for pharmaceutical paroxetine hydrochloride controlled release tablets, as required for licensee's claim of breach of the implied covenant of good faith and fair dealing under New Jersey law.

Cases that cite this headnote

**[10]   Torts**
         Knowledge and intent;  malice

**Torts**
         Improper means;  wrongful, tortious or illegal conduct

Under New Jersey law, a plaintiff must demonstrate interference with a contractual relationship that is knowing, intentional, and wrongful.

Cases that cite this headnote

**[11]   Torts**
         Contracts in general

There was no evidence that competitor had knowledge of licensee's asserted contractual right to preclude other generic pharmaceutical companies from marketing and selling pharmaceutical paroxetine hydrochloride controlled release tablets, or that competitor secured supply and distribution agreement with patent owner through fraud, dishonesty, or illegal conduct of any kind, as required for licensee's claim against competitor for tortious interference with contract under New Jersey law.

Cases that cite this headnote

**[12]   Patents**
         Original utility

7,229,640. Cited.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*415** Gary D. Adamson, Esquire, Michael E. Johnson, Esquire, (Argued), Alston & Bird, New York, NY, for Appellants.

William H. Burgess, Esquire, F. Christopher Mizzo, Esquire, (Argued), Michael A. Pearson, Esquire, Kirkland & Ellis, Washington, DC, Thomas A. Cunniff, Esquire, Fox

Rothschild, Lawrenceville, NJ, Eric I. Abraham, Esquire, (Argued), Christina L. Saveriano, Esquire, Hill Wallack, Princeton, NJ, for Appellees.

Before: SCIRICA, AMBRO, and FUENTES, Circuit Judges.

**Opinion**

### OPINION OF THE COURT

AMBRO, Circuit Judge.

[1] This case involves competing rights over the pharmaceutical paroxetine hydrochloride controlled release tablets ("paroxetine") in generic form. Defendant/Appellee GSK [1] holds patent and FDA rights to market and sell paroxetine for the treatment of depression under the brand name Paxil CR. [2] As part of a 2007 settlement agreement, GSK granted Plaintiff/Appellant "Mylan" (jointly and severally referring to Mylan Inc. and Mylan Pharmaceuticals Inc.) certain rights to produce, market, and sell generic paroxetine. Then, in 2010, GSK agreed—as part of an unrelated settlement—to begin supplying Defendant/Appellee "Apotex" (jointly and severally referring to Apotex Inc. and Apotex Corp.) with GSK-produced generic paroxetine for marketing and sale to downstream customers. Mylan filed suit against GSK and Apotex, claiming the 2010 agreement violated its licensing agreement with GSK, which did not permit GSK to provide its own form of generic paroxetine to another generic drug company—such as Apotex—to be marketed and sold in direct competition with Mylan.

The District Court found that the terms of the GSK–Mylan agreement were unambiguous, and they did not limit to whom GSK was permitted to market and sell its own version of generic paroxetine. It thus held GSK did not breach its agreement by agreeing to provide Apotex with GSK-produced generic drugs, and granted summary judgment against Mylan on all claims. For the reasons that follow, we reverse the Court's grant of summary judgment on the breach-of-contract cause of action against GSK, and remand for the parties to proceed to trial on that claim. We affirm its grant of summary judgment on all other claims. Because the District Court denied GSK's motion to strike Mylan's expert damages report as moot on the basis of its summary judgment rulings, we will vacate that denial for reconsideration on remand. [3]

**\*416 I. BACKGROUND**

**A. GSK–Mylan Patent Settlement & License Agreement**

In June 2007, GSK sued Mylan for patent infringement after Mylan sought FDA approval to introduce a generic version of paroxetine into the market before GSK's patent had expired. [4] The parties settled the case shortly thereafter, signing a Patent License and Settlement Agreement in August 2007 ("License Agreement"). Section II(c) of the License Agreement granted Mylan exclusive rights to market and sell generic paroxetine for the remaining life of GSK's patent (*i.e.*, nearly nine years of complete generic exclusivity). This included manufacturing, marketing, and selling Mylan's own generic paroxetine drug products, as well as sales rights for AG paroxetine manufactured by GSK. Mylan's generic rights were exclusive "even [as] to GSK." *See* J.A. at 51 (quoting License Agreement, Section II(c)).

The parties submitted to the Federal Trade Commission ("FTC") the License Agreement, in accord with its terms and as required by federal law. *See* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub.L. No. 108–173, Title XI §§ 1112–13, 117 Stat.2066, 2461–63 (codified at 21 U.S.C. § 355). In response to concerns raised by the FTC about the length and absoluteness of Mylan's exclusive generic rights, the parties amended the License Agreement in September 2007 (the "Second Amendment"; the First Amendment to the License Agreement is irrelevant to this opinion). It provided two specific exceptions to the complete generic exclusivity provided under the License Agreement. First, in the settlement of subsequent patent litigation with other third-party companies that had filed ANDAs for generic paroxetine, GSK was permitted to grant nonexclusive licenses as part of a settlement agreement with those third parties:

> If GSK receives a Third Party Notification and GSK initiates an action for patent infringement, GSK can enter into a settlement agreement with respect to such action at any time and Mylan **\*417** agrees to waive its exclusivity under Section II(c) in order to permit GSK under such settlement agreement to grant such Third Party a non-exclusive license under the GSK Patents to sell Generic Paroxetine Product(s) in the dosage form(s) specified in the Third Party's ANDA....

J.A. at 51 (quoting Second Amendment, Section II(e) para. a) (the so-called "ANDA Clause").

Second, and more relevant here, GSK (or a GSK affiliate) was entitled to market and sell AG paroxetine beginning two years after Mylan launched its generic products:

> Also, GSK or its Affiliate may commence marketing and selling generic paroxetine hydrochloride controlled or modified release products pursuant to its Paxil® CR NDA ("Authorized Generic Products") at the end of the second year after Mylan launches its Generic Paroxetine Products.

Id. (quoting Second Amendment, Section II(e) para. b) (the "Authorized Generic Clause").

The Second Amendment alleviated the FTC's exclusivity-related concerns. Thereafter, Mylan launched its generic paroxetine drug products in May 2008.

## B. GSK–Apotex Antitrust Litigation & Supply Agreement

In May 2010, GSK settled an unrelated antitrust lawsuit brought against it by Apotex. The terms of the settlement agreement provided for a $300 million cash payment to Apotex; in addition, Apotex was entitled to a guaranteed minimum of $180 million to be earned through the sale of GSK products (i.e., "in-kind transfers"). During negotiations regarding the potential products GSK would provide for the in-kind transfers, Apotex became aware that Mylan (i) had certain licensing rights with respect to paroxetine, for which Mylan paid GSK royalties, and (ii) was the only generic paroxetine market participant. While it refused Apotex's request for a copy of the License Agreement due to confidentiality concerns, GSK did advise Apotex that its supply obligation to Mylan ended by June 2010. See J.A. at 8.

The parties agreed that one of the GSK-supplied products from which Apotex would produce sales revenues would be AG paroxetine. Thus, to implement the in-kind transfer arrangement, GSK and Apotex subsequently entered into an Exclusive Supply & Distribution Agreement for AG paroxetine ("S & D Agreement"). Id. Apotex subsequently

began sales activities for AG paroxetine, which led to the filing by Mylan of this lawsuit in September 2010.

## C. District Court Proceedings

Mylan brought claims against GSK for breach of contract and the implied covenant of good faith and fair dealing, and against Apotex for tortious interference with and inducement to breach a contract. The crux of Mylan's claims was that the terms of the amended License Agreement only allowed third-party generic companies that had filed their own ANDAs to sell generic paroxetine, and that, even after Mylan's two-year exclusivity period, only GSK was permitted to engage in marketing and sales activities for AG paroxetine that were directed to downstream customers —e.g., "wholesalers, retailers, pharmacy chains, mail order pharmacies, pharmacists, hospitals, clinics, and managed market companies." See Mylan Br. at 43. Mylan asserted this was consistent with its position during negotiations— that to allow otherwise would force it to compete against other generic companies that were not required to expend the time and resources to secure FDA approval by filing **\*418** an ANDA. Mylan thus argued that GSK violated the License Agreement by entering into the S & D Agreement and supplying Apotex—an intermediary drug company— with GSK-produced AG paroxetine for marketing and sale in competition with Mylan.[5]

The District Court granted summary judgment in favor of GSK and Apotex. In doing so, it ruled that the Authorized Generic Clause of the Second Amendment was clear and unambiguous, thus permitting GSK to market and sell AG paroxetine to whomever it wished, including Apotex, after Mylan's two-year period of generic exclusivity. Hence the Court declined to consider any of the intent evidence submitted by the parties, as well as the industry and custom evidence offered by Mylan, on the ground that such evidence "cannot be used 'to create an ambiguity where none exists' in order to preclude summary judgment." Id. at 13 (quoting Int'l Union, UAW v. Skinner Engine Co., 188 F.3d 130, 145 (3d Cir.1999)).

The Court thus held GSK did not violate the License Agreement or, in the absence of proof of bad motive, the implied covenant of good faith and fair dealing. Because it found no protectable contract right, the Court also held Mylan's claims against Apotex necessarily failed; this meant that GSK and Apotex were entitled to judgment as a matter of law on all claims brought by Mylan.

On appeal, Mylan challenges the District Court's interpretation of the Authorized Generic Clause and its consequent grant of summary judgment in favor of (i) GSK on Mylan's contractual claims, and (ii) Apotex with respect to Mylan's tortious interference claim. [6]

## II. DISCUSSION [7]

### A. Standard of Review

Our review of the grant or denial of summary judgment is plenary, and we "apply[ ] the same standard as the district court." *Tri–M Grp., LLC v. Sharp,* 638 F.3d 406, 415 (3d Cir.2011) (citing *Ruehl v. Viacom, Inc.,* 500 F.3d 375, 380 n. 6 (3d Cir.2007)). "Summary judgment is appropriate only where, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." *Ruehl,* 500 F.3d at 380 n. 6 (quoting *Lexington Ins. Co. v. W. Pa. Hosp.,* 423 F.3d 318, 322 n. 2 (3d Cir.2005)) (internal quotation marks omitted).

[2]  [3]  [4]  In a contract interpretation action, summary judgment is appropriate only where the contractual language is unambiguous—*i.e.,* "subject to only one reasonable interpretation." *See Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co.,* 180 F.3d 518, 521 (3d Cir.1999) (citations omitted). "If the nonmoving party presents a reasonable alternative reading of the contract, then a question of fact as to the meaning of the contract exists which can only be resolved at trial." **\*419** *Newport Assocs. Dev. Co. v. Travelers Indem. Co.,* 162 F.3d 789, 792 (3d Cir.1998) (citing *Tigg Corp. v. Dow Corning Corp.,* 822 F.2d 358, 361 (3d Cir.1987); *Landtect Corp. v. State Mut. Life Assurance Co.,* 605 F.2d 75, 80 (3d Cir.1979)). Whether a contract is ambiguous is an issue of law subject to plenary review. *Sumitomo Mach. Corp. v. AlliedSignal, Inc.,* 81 F.3d 328, 332 (3d Cir.1996) (citing *Teamsters Indus. Emps. Welfare Fund v. Rolls–Royce Motor Cars, Inc.,* 989 F.2d 132, 135 (3d Cir.1993)).

[5]  [6]  [7]  Under New Jersey law (which the parties do not dispute governs here), courts must always "consider all of the relevant evidence that will assist in determining the intent and meaning of the contract" when making ambiguity determinations. *Conway v. 287 Corp. Ctr. Assocs.,* 187 N.J. 259, 901 A.2d 341, 346 (2006). "Evidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. This is so even when the

contract on its face is free from ambiguity." *Sumitomo Mach. Corp.,* 81 F.3d at 332 (quoting *Atl. N. Airlines, Inc. v. Schwimmer,* 12 N.J. 293, 96 A.2d 652, 656 (1953)). In aid of interpretation, courts should consider, for example, "the particular contractual provision, an overview of all the terms, the circumstances leading up to the formation of the contract, custom, usage, and the interpretation placed on the disputed provision by the parties' conduct." *Kearny PBA Local No. 21 v. Town of Kearny,* 81 N.J. 208, 405 A.2d 393, 400 (1979). Thus, courts must consider all relevant evidence to determine if any ambiguity exists and, if the contested provisions fall in that gray area, summary judgment is improper. [8]

### B. Breach of Contract

[8]  The District Court concluded that, as amended, the License Agreement did not limit to whom GSK could market and sell AG paroxetine after Mylan's two-year period of generic exclusivity. Mylan argues there is a reasonable alternative interpretation—*i.e.,* that the Authorized Generic Clause only allowed GSK to market and sell AG, whereas supplying a third-party generic competitor with GSK-produced AG paroxetine for marketing and sale to downstream customers was impermissible—and thus the District Court erred in refusing to consider the evidence offered in support of this reading. For the reasons explained below, we agree.

In support of its alternative meaning, Mylan presented various forms of intent evidence. [9] First, it submitted extrinsic evidence of the License Agreement's negotiations, including the parties' respective objectives and their actions taken to mollify the FTC's concerns about Mylan's nine-year exclusivity pre-Second Amendment. **\*420** Mylan also offered custom and usage evidence, including expert testimony regarding industry understanding of the phrase "marketing and selling." [10] Mylan pointed as well to rules of contract construction—*e.g.,* affording meaning to the use of different words (in particular, "affiliate" and "third party") and reading provisions in light of other relevant sections of the License Agreement (specifically the section regarding the consequences of a "Negative Response" from the FTC)—to support its interpretation of the Authorized Generic Clause.

The District Court needed to take into account the alternative meaning suggested by Mylan, and the nature of the objective evidence offered in support of its suggested meaning, to determine whether that extrinsic evidence "demonstrate[d] the existence of a latent ambiguity." *Duquesne Light Co. v.*

*Westinghouse Elec. Corp.,* 66 F.3d 604, 614 (3d Cir.1995) (quoting *Samuel Rappaport Family P'ship v. Meridian Bank,* 441 Pa.Super. 194, 657 A.2d 17, 22 (1995)) (internal quotation marks omitted). Yet it refused to consider the extrinsic evidence submitted by Mylan. New Jersey law, which is expansive as to extrinsic evidence in aid of contract interpretation, requires otherwise. *See Conway,* 901 A.2d at 347 ("permit[ting] a broad use of extrinsic evidence to achieve the ultimate goal of discovering the intent of the parties ... [and] to uncover the true meaning of contractual terms"). The District Court was not free to reject such evidence on the ground that it found the agreement on its face free from ambiguity. *See Atl. N. Airlines,* 96 A.2d at 656. [11]

This is especially so when the alternative reading of the contested language suggested by Mylan was both reasonable and supported by objective evidence of the parties' intentions. This demonstrates latent ambiguity in the contractual language. Hence summary judgment was not appropriate on Mylan's breach-of-contract cause of action. "The construction of a written contract is usually a legal question for the court, but where there is uncertainty, ambiguity or the need for parol evidence in aid of interpretation, then the doubtful provision should be left to the jury." *Schor v. FMS Fin. Corp.,* 357 N.J.Super. 185, 814 A.2d 1108, 1113–14 (N.J.Super.Ct.App.Div.2002). The District Court's grant of summary judgment in favor of GSK on Mylan's breach-of-contract cause of action is therefore reversed and remanded for that claim to proceed to **\*421** trial. [12]

## C. Breach of the Implied Covenant of Good Faith and Fair Dealing

The District Court identified two grounds on which Mylan's breach of the implied covenant of good faith and fair dealing claim failed. First, to the extent Mylan's cause of action was based on on its right to preclude third-party generic companies from selling AG paroxetine, the Court rejected the claim because it had already determined the contract language unambiguously did not give Mylan that right. Given our holding with respect to the contract claim, this reasoning is without continuing force.

[9]    The Court also found, however, that Mylan had failed to prove that GSK acted with the requisite bad motive or intent when entering into the S & D Agreement with Apotex. *See Wilson v. Amerada Hess Corp.,* 168 N.J. 236, 773 A.2d 1121, 1130 (2001) (requiring that a party have acted "with the objective of preventing the other party from receiving its

reasonably expected fruits under the contract" to establish a breach of the implied covenant). Mylan retorts that bad motive turns on the parties' intentions, and thus is a question for the jury, citing *Seidenberg v. Summit Bank,* 348 N.J.Super. 243, 791 A.2d 1068 (N.J.Super.App.Ct.Div.2002). However, *Seidenberg* 's reference to the "trier of fact" was meant to illustrate that defining bad faith is "unrealistic," not to relieve a party of its obligation to set out sufficient evidence of bad intention—*i.e.,* to demonstrate an issue of material fact—in order to survive a motion for summary judgment. *Id.* (concluding it "best to entrust the drawing of [the bad faith] line to trial judges and juries" but admonishing against "an unduly expansive version of bad faith").

While the S & D Agreement arguably frustrated expected profits of Mylan from sales of its generic products by introducing a direct third-party competitor, it has not produced any evidence that GSK entered into that subsequent agreement with bad faith or improper motive. *See id.* Accordingly, we affirm the District Court's grant of summary judgment on Mylan's good faith and fair dealing claim.

## D. Tortious Interference with a Contract

As to the alleged tortious interference of contract by Apotex, the District Court again rested its dismissal of this claim on its conclusion that Mylan had no protectable right to prevent third parties from selling AG paroxetine after its two-year period of exclusivity. With that absence, Mylan failed to make the threshold showing of an existing or prospective contractual relationship required for a tortious interference **\*422** claim. *See, e.g., Velop, Inc. v. Kaplan,* 301 N.J.Super. 32, 693 A.2d 917, 926 (N.J.Super.Ct.App.Div.1997) (citing *Printing Mart–Morristown v. Sharp Elecs. Corp.,* 116 N.J. 739, 563 A.2d 31, 37 (1989) (*per curiam* )). Given our determination that Mylan arguably had a protectable contract right, we cannot conclude that was a proper ground to conclude Apotex was entitled to judgment as a matter of law on this claim.

[10]    Summary judgment was nonetheless appropriate here. Under New Jersey law, a plaintiff must demonstrate interference with a contractual relationship that is knowing, intentional, and wrongful. *See Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1167 (3d Cir.1993) (citing *Fineman v. Armstrong World Indus.,* 980 F.2d 171, 186 (3d Cir.1992); *Printing Mart–Morristown,* 563 A.2d at 37). Mylan falls short of establishing that interference here.

**[11]** As an initial matter, the record does not suggest that Apotex had knowledge of Mylan's asserted contractual right to preclude other generic pharmaceutical companies from marketing and selling AG paroxetine. Actual knowledge of the contract with which a defendant supposedly interfered is a prerequisite to making out a claim for tortious interference. *Id.; see also* Restatement (Second) of Torts § 766 cmt. i (1979) (requiring that an actor "have knowledge of the contract with which he is interfering and of the fact that he is interfering with the performance of the contract" to incur liability). [13] It is undisputed that Apotex never saw the License Agreement, and there is no evidence in the record that it knew any specifics with regard to the Agreement's terms during the S & D negotiations with GSK. And without knowledge of the specific contractual right, Apotex cannot be deemed to have intentionally interfered with that right.

Mylan nonetheless asserts that the knowledge requirement was satisfied here based on evidence establishing, in effect, willful blindness on the part of Apotex. Assuming, for the sake of argument, that showing a deliberate indifference to the terms of a contract would be sufficient to satisfy the first tortious interference element, the record merely demonstrates that Apotex understood Mylan had licensing rights to sell a generic form of paroxetine. Mylan has not pointed to any evidence indicating Apotex believed that Mylan's licensing rights were exclusive as to other third-party sellers or that Apotex's resale of AG paroxetine would otherwise infringe the Licensing Agreement. *See, e.g.,* DiGiorgio Corp. v. Mendez & Co., 230 F.Supp.2d 552, 564

(D.N.J.2002) ("General knowledge of a business relationship is not sufficient; the defendant must have specific knowledge of the contract right upon which his actions infringe." (citing Matrix Essentials, Inc., 870 F.Supp. at 1247)).

And even if we were to impute knowledge to Apotex, Mylan has failed to establish the requisite "malice" to sustain this cause of action. Where the parties to a tortious interference claim are business competitors—such as Mylan and Apotex—establishing intentional and malicious interference requires evidence that "one competitor interfere[d] with another's economic advantage through conduct which [wa]s fraudulent, dishonest, or illegal." Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc., 282 N.J.Super. 140, 659 A.2d 904, 936 (N.J.Super.Ct.App.Div.1995) (citations omitted). **\*423** There is no record indication that Apotex secured its S & D Agreement with GSK through fraud, dishonesty, or illegal conduct of any kind. [14] Even construed in the most favorable light, the evidence was lacking to substantiate Mylan's tortious interference cause of action, and summary judgment was therefore properly granted to Apotex.

We hold that summary judgment was inappropriate as to the breach-of-contract claim against GSK; thus we reverse and remand for the parties to proceed to trial on that claim. We also vacate the denial of GSK's motion to strike as moot and remand to permit the District Court to consider that motion on the merits. On all other grounds, we affirm the Court's judgment.

Footnotes

1    "GSK" refers collectively to SmithKline Beecham Corp., n/k/a Glaxo SmithKline LLC, d/b/a GlaxoSmithKline; SmithKline Beecham P.L.C., n/k/a SmithKline Beecham, Ltd.; and SmithKline Beecham (Cork) Ltd., successor to SB Pharmco Puerto Rico, Inc.

2    GSK maintains patent rights under U.S. Patent No. 7,229,640 (expires July 2016), and is authorized to market and sell paroxetine pursuant to FDA-approved New Drug Application ("NDA") No. 02–0936. An NDA must provide, *inter alia,* "a statement of the drug's components, scientific data showing that the drug is safe and effective, and proposed labeling describing the uses for which the drug may be marketed." Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S, ––– U.S. ––––, 132 S.Ct. 1670, 1676, 182 L.Ed.2d 678 (2012).

3    The parties have moved to file under seal Volumes III through VII of the Joint Appendix and unredacted versions of their briefs, as well as to continue impoundment of the portions of the certified record filed under seal in the District Court. We are satisfied there is good cause to seal these records—*i.e.,* to protect the parties' confidential proprietary business and competitive interests. *See* Littlejohn v. BIC Corp., 851 F.2d 673, 678 (3d Cir.1988) (citing Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 598, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978)); Publicker Indus., Inc. v. Cohen, 733 F.2d 1059, 1070–71 (3d Cir.1984). Thus, we grant the motions to seal and limit our discussion to those underlying facts and evidence already disclosed during the litigation and not under seal.

4    Once a new pharmaceutical has been approved for sale, there are two means by which a generic form of the drug may be introduced into the market. First, a generic company can file an Abbreviated New Drug Application ("ANDA"), which seeks FDA authorization to produce and sell a generic version of an already approved drug product. *See* 21 U.S.C. § 355(j); 21 C.F.R. § 314.92–99. Second,

the brand company may produce an "authorized generic" ("AG") under its approved NDA, which is labeled as generic and sold at a lower price than its branded equivalent, to compete with other generic products on the market. *See* 21 U.S.C. § 355(t)(3).

> An ANDA filer must certify that the generic drug will not infringe on any patent covering the pioneer drug. One way it may do this—as was done by Mylan here—is by challenging the validity of the relevant patent via a "Paragraph IV" certification. *See id.* § 355(j)(2)(A)(vii)(IV). For a more thorough discussion of the patent obligations with respect to generic applicants, see Abbreviated New Drug Application Regulations; Patent Exclusivity Provisions, 59 Fed.Reg. 50,338 (Oct. 3, 1994) (codified at 21 C.F.R. pt. 314). *See also Mylan Pharm., Inc. v. Shalala,* 81 F.Supp.2d 30, 32–34 (D.D.C.2000) (discussing the development of generic drug-approval guidelines and ramifications of a Paragraph IV certification.)

5    Apotex undisputedly did not come within the scope of the ANDA Clause, as it never prepared an ANDA for generic paroxetine, nor was it sued by GSK for infringing patents purportedly covering paroxetine. And with respect to the Authorized Generic Clause, Apotex is a "Third Party" and not a GSK affiliate as defined by the License Agreement.

6    Mylan does not raise on appeal its inducement to breach claim against Apotex; thus, the issue is waived. *See, e.g., In re Surrick,* 338 F.3d 224, 237 (3d Cir.2003).

7    The District Court had subject matter jurisdiction under 28 U.S.C. § 1332. We exercise appellate jurisdiction pursuant to 28 U.S.C. § 1291.

8    Federal law is consistent with this approach. *See, e.g., Int'l Union, UAW v. Mack Trucks, Inc.,* 917 F.2d 107, 111 (3d Cir.1990) ( " 'In making the ambiguity determination, a court must consider the words of the agreement, alternative meanings suggested by counsel, and extrinsic evidence offered in support of those meanings.' " (quoting *Kroblin Refrigerated Xpress, Inc. v. Pitterich,* 805 F.2d 96, 101 (3d Cir.1986))); *Teamsters Indus. Emps.,* 989 F.2d at 135 (instructing that a court construing contract language is not permitted "simply [to] determine whether, from [its] point of view, the language is clear[, but instead must] 'hear the proffer of the parties and determine if there [are] objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings' " (last alteration in original) (quoting *Sheet Metal Workers, Local 19 v. 2300 Grp., Inc.,* 949 F.2d 1274, 1284 (3d Cir.1991))).

9    In light of our decision that determining the meaning of the Authorized Generic Clause is an issue properly left to the jury, it is not necessary to engage in a protracted review and analysis of this evidence. Accordingly, we provide only an abridged discussion here.

10   In a specialized and highly technical field, such as the pharmaceutical industry, trade usage evidence is particularly instructive when interpreting the meaning of disputed contractual language. *See, e.g., USX Corp. v. Liberty Mutual Ins. Co.,* 444 F.3d 192, 198 n. 11 (3d Cir.2006) (applying Pennsylvania law).

> Mylan asserts that its industry custom, practice, and usage evidence was uncontested. However, while GSK did not offer competing expert evidence on this subject, it did produce its own evidence of industry practice with respect to placing AG drugs on the market. To the extent GSK's evidence is deemed reliable and relevant to the interpretation of the License Agreement, it too should be considered by the jury.

11   We note that the language quoted by the District Court from *International Union, UAW v. Skinner Engine Co.* about "creat[ing] an ambiguity where none exists," 188 F.3d at 145, does not apply here. As an initial matter, that case involved the interpretation of a collective bargaining agreement under Pennsylvania law. Further, the statement was made in the context of rejecting self-serving testimony that contradicted, rather than interpreted, facially unambiguous contractual language. *Id.* In contrast, Mylan offered various forms of objective evidence in support of its reading, and we believe this evidence is interpretive rather than contradictory as to the License Agreement's terms.

12   GSK also asserts Mylan failed to prove damages caused by its alleged breach of the License Agreement. GSK's damages argument does not establish that it was entitled to judgment as a matter of law on the contract claim. First, Mylan submitted an expert report on damages it claims to have suffered from Apotex's sales of AG paroxetine in the District Court, which GSK moved to strike on the ground that the report relied on documents and opinions that Mylan withheld during discovery. The Court denied the motion as moot after finding GSK was entitled to judgment as a matter of law on Mylan's contractual claims. Because that motion has not yet been addressed by the District Court, we will not speculate on its merits but rather will allow the Court to consider it on remand. Second, GSK suggests several alternative factual scenarios that it claims would also have generated generic paroxetine market competition and, accordingly, the same "harm" to Mylan. Whether and to what degree GSK's hypothetical scenarios would have affected Mylan's profits under the License Agreement—and thus its damages from a breach thereof—is a disputed issue of material fact to be resolved at trial.

13   New Jersey has adopted the Restatement's definition of tortious interference with a contract. *See Matrix Essentials, Inc. v. Cosmetic Gallery, Inc.,* 870 F.Supp. 1237, 1247 (D.N.J.1994) (citations omitted).

14   A breach alone is insufficient to establish that a third party is liable for tortious interference. *See* Restatement (Second) of Torts § 766B cmt. e (explaining that interference resulting from a breach of contract does not amount to tortious behavior unless it was wrongful, which turns on the actor's intent to interfere).

* * * * * *

End of Document                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 104

PRINTED AND
PUBLISHED IN
GREAT BRITAIN

41

No. 2.]    REPORTS OF PATENT, DESIGN, AND TRADE MARK CASES    [Vol. LIV.

Vol. LIV]    24TH FEBRUARY, 1937    [No. 2

IN THE HIGH COURT OF JUSTICE—CHANCERY DIVISION.

*Before* MR. JUSTICE CLAUSON.

January 22nd, 23rd and 24th, and February 11th, 1936.

IN THE COURT OF APPEAL.

*Before* LORDS JUSTICES SLESSER AND ROMER, AND MR. JUSTICE EVE.

June 18th and 19th, and July 7th, 1936.

NATIONAL CARBONISING CO., LD. *v.* BRITISH COAL DISTILLATION, LD.

*Licence under Patents—Covenant to communicate improvements—Patents assigned—Action for declaration that assignees entitled to benefit of covenant—Assignability—Construction of licence—Conduct of parties—Covenant held not assignable, and no case of novation established—Action dismissed—Appeal to Court of Appeal—Construction—Covenant held assignable—Appeal allowed.*

*L & N., Ld. granted a licence under certain Patents to* Leicestershire L. & N. C. D., Ld., *whose name was subsequently changed to* B. C. D. Ld. *The licence contained a covenant by the licensees to communicate improvements to the licensors and permit them to use and work the same.* L. & N. C. D., Ld. *having gone into voluntary liquidation, the liquidator purported to assign the Patents and the benefit of the licence to the Plaintiffs. The Plaintiffs brought an action against* B. C. D., Ld. *for a declaration that the Plaintiffs were entitled to the benefit of the covenant, and they alleged that the Defendants were possessed of an invention falling within the scope of the covenant and claimed that the Defendants were bound to communicate the invention to them and permit them to use and work the same. The Plaintiffs contended that, as a matter of construction of the licence, the benefit of the covenant had passed to them, and also that by reason of the subsequent course of dealing between the*

D

42

*National Carbonising Co., Ld. v. British Coal Distillation Ld.*

*parties the Defendants were to be taken as having accepted the Plaintiffs as standing in the place of* L. & N. C. D., Ld. *The Defendants, whilst admitting that they were possessed of an invention falling within the scope of the covenant, denied both these contentions.*

Held by CLAUSON J., *that the covenant was not assignable, and that the rights of the Plaintiffs and Defendants had not been affected by any course of dealing or conduct occurring after the assignment of the Patents to the Plaintiffs. The action was dismissed with costs.*  5

*The Plaintiffs appealed to the Court of Appeal.*

Held, *that throughout the licence, including the covenant to communicate improvements, the word " patentee " must have been intended to mean the patentee and its assigns, and that the Plaintiffs were entitled to the benefit of the covenant. The appeal was allowed with costs.*  10

*Per* ROMER L.J.—*A licence under a patent is a grant of a right and does not merely confer upon the licensee an interest in equity.*  15

On the 28th of July, 1931, *L. & N. Coal Distillation, Ld.* granted a sole and exclusive licence within a certian area under certain Letters Patent, of which it was the proprietor, to *Leicestershire (L. & N.) Coal Distillation, Ld.*, whose name was subsequently changed to *British Coal Distillation, Ltd.*  Clause 3 of the licence was as follows:—  20

" The licensee shall forthwith communicate to the patentee full particulars
" of any improvements in the said inventions or of any further invention which
" it may make discover or become entitled to in respect of the said process
" (whether such improvement or invention be patented or not) and (without
" expense to the patentee) shall give to the patentee or its proper officers full  25
" information and details thereof with all necessary plans drawings and designs
" for demonstrating the exact mode of using or working the same and will
" permit the patentee to use and work the same during the continuance of
" this licence without payment of any further consideration than is provided for
" by clause 11 hereof."  30

The other clauses of the licence, so far as they are material, are set out in the Judgments.

On the 24th of March, 1933, *L. & N. Coal Distillation, Ld.* having gone into voluntary liquidation, the liquidator purported to assign the Letters Patent and (*inter alia*) the benefit of the licence to *National Carbonising Co., Ld.*  35

On the 27th of February, 1935, *National Carbonising Co., Ld.* issued an Originating Summons under R.S.C. Order 54A for the determination of the question whether by virtue of the assignment of the 24th of March, 1933, they were entitled to call for the performance by *British Coal Distillation, Ld.* of the provisions of Clause 3 of the above-mentioned licence, and for a declaration  40
of their right to have communicated to them by *British Coal Distillation, Ld.*

*National Carbonising Co., Ld.* v. *British Coal Distillation Ld.*

full particulars of all improvements or further inventions in respect of the process referred to in the said licence and the right to use and work the same as therein provided. The Summons came on for hearing on the 21st of May, 1935, before Mr. Justice LUXMOORE. At the hearing *National Carbonising Co.,*
5 *Ld.* sought to rely, in addition to the question of construction, upon the conduct of the parties subsequent to the assignment to them, and the learned Judge expressed the view that the matter could not conveniently be dealt with upon Summons, and made no order thereon save that the costs should be reserved, with liberty to apply.

10    On the 25th of June, 1935, *National Carbonising Co., Ld.* commenced an action against *British Coal Distillation, Ld.*, claiming:—(1) A Declaration that the Plaintiffs were and had at all material times been entitled to receive and the Defendants bound to supply full particulars of any and all improvements or further inventions in respect of the L. & N. process as and when the
15 Defendants became entitled to the same and that the Plaintiffs were entitled to us and work the same as provided in Clause 3 of the Licence dated the 28th day of July, 1931. (2) A Declaration that the invention the subject of Letters Patent No. 401,767 fell within the licence aforesaid and that the Plaintiffs were entitled to call for the performance of Clause 3 aforesaid in connection
20 therewith. (3) An injunction to restrain the Defendants from dealing with Letters Patent No. 401,767 otherwise than in accordance with Clause 3 aforesaid. (4) Further or other relief. (5) Payment by the Defendants of the Plaintiffs' costs of this Action together with the costs of the former proceeding (1935 N. No. 392).

25    The Plaintiffs, by their Statement of Claim, alleged as follows:—(1) In or about the month of July, 1931, *L. & N. Coal Distillation, Ld.* were possessed of a process for the distillation of solid carbonaceous material and were the registered legal owners of certain Letters Patent relating thereto. By a Licence dated the 28th day of July, 1931, the said *L. & N. Coal Distillation, Ld.* granted
30 to the Defendants by their then name of *Leicestershire (L. & N.) Coal Distillation, Ld.* a sole and exclusive licence in connection with the working of the said process and apparatus therefor within the Counties of Leicester, Derby, Nottingham, Warwick and Stafford. The Plaintiffs would refer for the full contents thereof to the said licence, which formed Exhibit " A " to the Affidavit of *Arthur*
35 *Vaughan Cowell* sworn in the proceeding referred to in Paragraph 8 thereof on the 7th day of March, 1935, to which proceeding this Action was intended to be supplemental. (2) Pursuant to the Special Resolution passed on the 16th day of June, 1932, and with the consent of the Board of Trade the name of the Defendants was changed from *Leicestershire (L. & N.) Coal Distillation, Ld.*
40 to their present name. (3) Prior to the 30th day of May, 1932, the Defendants were possessed of an invention relating to a process and apparatus for the distillation of solid carbonaceous material being an improvement upon the process referred to in Paragraph 1 thereof, and on the 30th day of May, 1932, the Defendants together with one *Clifford Machen* an employee of the Defendants
45 applied for Letters Patent in connection therewith, which said Letters Patent were duly granted under No. 401,767. (4) By Clause 3 of the Licence aforesaid the Defendants were bound to communicate forthwith to and permit the use by the said *L. & N. Coal Distillation, Ld.* of all improvements or further inventions to which the Defendants became entitled but the Defendants failed to communicate
50 the invention referred to in Paragraph 3 thereof to the said Company. (5) In

D 2

44

*National Carbonising Co., Ld.* v. *British Coal Distillation Ld.*

or about the month of December, 1932, the said *L. & N. Coal Distillation, Ld.* went into voluntary liquidation and one *John Harold Senior* was appointed the Liquidator thereof.  (6) By a Deed of Assignment dated the 24th day of March, 1933, to which the Plaintiffs would refer for the full contents thereof the Plaintiffs acquired *inter alia* the rights of the said *L. & N. Coal Distillation, Ld.* in the 5 said Patents together with the benefit and burden of the Company's interest in the Licence referred to in Paragraph 1 thereof.  Notice of the said Assignment was given by the Plaintiffs to the Defendants by Letter dated the 15th day of May, 1933.  The said Assignment and Notice formed Exhibits " C " and " D " respectively to the aforesaid Affidavit of *Arthur Vaughan Cowell*.   (7) There- 10 after the Defendants accepted the benefit of the said Licence and had obtained particulars of improvements and details of and information concerning the same from the Plaintiffs, but by letters dated the 27th day of February, 1934, and the 29th day of January, 1935, the Defendants refused to give to the Plaintiffs information and details of the improvement made by the Defendants as set out 15 in Paragraph 3 thereof and wrongfully claimed that the Plaintiffs had no interest therein.  Thereunder the Plaintiffs would rely upon the matters set forth in the Affidavits of *Arthur Vaughan Cowell* sworn in the said proceeding on the 7th day of March and the 13th day of April, 1935, respectively and in the Exhibits thereto.  (8) By a proceeding commenced by Originating Summons (1935 N. 20 No. 392) by the Plaintiffs against the Defendants the Plaintiffs sought the deter- mination of the question whether the Plaintiffs were entitled to call for the per- formance of the obligation referred to in Paragraph 4 thereof and prayed a Declaration of its right to receive full particulars of all improvements or further inventions possessed by the Defendants and of its right to use and work the 25 same.   (9) On the 21st day of May, 1935, the said Originating Summons came on for hearing before the Honourable Mr. Justice *Luxmoore* who made no Order thereon except that the costs thereof were reserved with liberty to apply in regard thereto either in the said proceeding or in any action that might be brought by the Plaintiffs in relation to the Licence referred to in Paragraph 1 30 thereof.

The Defendants, by their Defence, alleged as follows:—(1) They admitted that in or about the month of July, 1931, *L. & N. Coal Distillation, Ld.* were possessed of a process for the distillation of solid carbonaceous material and were the registered legal owners of certain Letters Patent relating thereto.  They 35 admitted the Licence dated the 28th July, 1931, referred to in paragraph 1 of the Statement of Claim, and would refer to the said Licence for the full terms and effect thereof.  They made no admission as to the Plaintiffs' intention that this action should be supplemental to the proceeding referred to in paragraph 8 of the Statement of Claim.  They denied that this action was or could be supple- 40 mental to the said proceeding.   (2) They admitted paragraph 2 of the Statement of Claim.   (3) They admitted that prior to the 30th May, 1932, they were possessed of an invention relating to a process and apparatus for the distillation of solid carbonaceous material.  They did not admit the allegation that the said invention was an improvement upon the process referred to in paragraph 1 of 45 the Statement of Claim, but were prepared to admit that the said invention was a further invention in respect of the said process within the meaning of Clause 3 of the said Licence.  They admitted that on the 30th May, 1932, they together with one *Clifford Machen*, one of their employees, applied for Letters Patent for their said invention, which said Letters Patent were duly granted under 50

*National Carbonising Co., Ld.* v. *British Coal Distillation Ld.*

No. 401,767. (4) The Defendants would refer to Clause 3 of the said Licence for the full terms and effect thereof. The invention referred to in paragraph 3 of the Statement of Claim was communicated to *L. & N. Coal Distillation, Ld.* on or about the 11th January, 1933. (5) They admitted that on or about the 4th November, 1932, the said *L. & N. Coal Distillation, Ld.* went into voluntary liquidation and one *John Harold Senior* was appointed the liquidator thereof. (6) They admitted that the Plaintiffs were party to a Deed of Assignment dated the 24th March, 1933, such Assignment being the Exhibit " C " to the affidavit of *Arthur Vaughan Cowell* referred to in paragraph 6 of the Statement of Claim. They did not admit that the terms or effect of the said Assignment were correctly or sufficiently set out in the said paragraph, and would refer to the said Assignment for the full terms and effect thereof. They admitted the Notice referred to in paragraph 6 of the Statement of Claim. (7) They did not admit any of the allegations contained in paragraph 7 of the Statement of Claim with the exception that they admitted writing letters to the Plaintiffs dated the 27th February, 1934, and 29th January, 1935. They would refer if necessary to the said letters for the full terms and effect thereof. (8) They admitted that an Originating Summons, 1935 N. No. 392) was issued by the Plaintiffs and would refer if necessary to the said Summons for the full terms and effect thereof. (9) They admitted that the said Originating Summons came on for hearing before the Honourable Mr. Justice *Luxmoore* on the 21st May, 1935, but did not admit that the directions given by Mr. Justice *Luxmoore* were correctly stated in paragraph 9 of the Statement of Claim. (10) Save as thereinbefore expressly admitted or otherwise dealt with they denied each and every allegation contained in the Statement of Claim as though the same were specifically set out and traversed. (11) The Plaintiffs were not entitled to the relief claimed or any relief.

The action came on for trial on the 22nd of January, 1936, before Mr. Justice CLAUSON.

*H. B. Vaisey,* K.C. and *G. H. Lloyd-Jacob* (instructed by *Slaughter & May*) appeared for the Plaintiffs; *R. F. Roxburgh,* K.C. and *G. W. Tookey* (instructed by *Nicholson Graham & Jones*) appeared for the Defendants.

Judgment was reserved and was delivered on the 11th of February, 1936.

**Clauson J.**—On the 28th of July, 1931, *L. & N. Coal Distillation, Ld.,* as owners of certain Patents, granted to the Defendants by their then name of *Leicestershire (L. & N.) Coal Distillation, Ld.* a licence to use the patented inventions within a certain limited area. The Defendants bound themselves by clause 3 of the licence to communicate to the Patentee *L. & N. Coal Distillation, Ld.* certain further inventions in respect of the process to which the Patents related and to permit the Patentee to work such further inventions during the term of the licence.

The Defendants have made a further invention which admittedly falls within the category of further inventions already mentioned, and obtained on the 30th of May, 1932, Letters Patent for that further invention, and *L. & N. Coal Distillation, Ld.* became entitled thereupon to require the Defendants to permit them to use that invention during the period of the licence.

In this state of facts *L. & N. Coal Distillation, Ld.* went into liquidation and by deed of the 24th of March, 1933, conveyed to the Plaintiffs the Patents which were the subject-matter of the licence of the 28th of July, 1931, and the benefit

46

*National Carbonising Co., Ld.* v. *British Coal Distillation Ld.*

and burden of that licence. That the effect of that assignment was to vest the original Patents in the Plaintiffs is beyond question. I have not to consider in this action what the position would be if the Defendants used the invention comprised in the original Patents and on being sued by the Plaintiffs for infringement set up the licence of 1931 as an answer. The question in this action is a different one. It is whether the Plaintiffs are entitled to require the Defendants to communicate to them the new inventions within the category stated in clause 3 of the licence and to permit the Plaintiffs to use and work such new inventions. 5

The question that I have to decide turns on the true meaning and construction of the licence of the 28th of July, 1931, and in approaching that question I have to remember certain points which are developed in the Judgments of Mr. Justice *Mathew*, the Appeal Court, and the House of Lords in the case of *Tolhurst* v. *Associated Portland Cement Manufacturers (1900) Ld.*, L.R. (1901) 2 K.B., page 811; (1902) 2 K.B., page 660, and (1903) A.C., page 414. Those points may be conveniently stated as follows : In considering how far the assignees of one party to a contract are entitled to enforce a contract against the other party it is to be borne in mind (*a*) that the absence of any express reference in the contract to " assigns " is immaterial if on the true construction of the contract it is intended that the benefit of the contract is to be assignable (see *per* Lord *Halsbury*, [1903] A.C., at page 416; (*b*) that the existence in the contemplation of the parties, exhibited in the contract as properly construed, of an element of skill or of personal confidence indicates that the party from whom skill is expected or in whom confidence is placed, is not to be free to call upon the other party to the contract to accept performance of the contract by a third party, or to be free to put such third party in his place vicariously to perform his obligations under and to take the benefit of the contract (see *per* Lord *Macnaghten*, [1903] A.C., at page 417); (*c*) that in the absence of some clear provision to the contrary in the contract it is not to be supposed that the parties intend that either should be free by alienation of the benefit of the contract to increase the burden placed upon the other party (see *per* Lord *Lindley*, (1903) A.C., at page 423); or, in other language, the benefit of a contract cannot be assigned by one party if the result of the assignment would be to impose upon the other party a greater liability than he ever intended to assume (see *per* Mr. Justice *Mathew*, (1901) 2 K.B., at page 816); (*d*) that where the consideration moving from one party has been executed and nothing more remains but to enforce the obligation of the contract against the party who has received the consideration, and it makes no difference to the party on whom the obligation lies whether he discharges it to the original obligee or to some person to whom the original obligee has assigned the benefit of the obligation, the assignee can enforce the obligation; but that this last statement is to be confined strictly to the case where the consideration moving from the party, whose assignee seeks to enforce the contract, has been executed, and that, where there are mutual obligations still to be enforced and it is impossible to say that the whole consideration has been executed, the party against whom the contract is sought to be enforced may refuse to accept performance by the assignee of the other party, as performance by the original party, and as fulfilling the original party's remaining obligations. This seems to appear from the statement of the law by Sir *Richard Henn Collins*, Master of the Rolls, in L.R. (1902) 2 K.B., at pages 668, 669. 10 15 20 25 30 35 40 45

Turning now to the document which I have to construe, I find the following points to be worthy of special notice : (A) There is no express mention of 50

invisible

Case 09-10138-MFW    Doc 14225-48    Filed 08/15/14    Page 463 of 474

47

No. 2.]    REPORTS OF PATENT, DESIGN, AND TRADE MARK CASES    [Vol. LIV.

*National Carbonising Co., Ld.* v. *British Coal Distillation Ld.*

assigns in the document, but clause 16 seems to indicate that, if the licensee goes into liquidation with a view to reconstruction, the Patentee is to be bound to accept the reconstructed company (that is, the licensee's assignee) as standing in the place of the licensee for the purposes of the document.  (B) The licence
5 is a grant of rights in respect of certain Letters Patent and the Patentee is by law, without any possible question, free to assign the Letters Patent, subject always to the rights granted to the licensee by the licence.  There would, however, be nothing illegal in the Patentee agreeing with the licensee to retain the Patents in his own hands either for a period or, indeed, for the whole life of
10 the Patents, and such an agreement would be perfectly valid between the parties whether contained in express words or implied.  (C) The licence is, for the period and within the area to which it relates, exclusive, and while no express power to assign is given, a power to sub-license is given.  (D) The consideration (omitting for the moment certain mutual covenants to which I shall have
15 to refer later) is of an unusual character.  It consists partly of fully paid shares in the capital of the licensee, that is, of a share in the profits and assets of the licensee, and for the rest of an arrangement under which the Patentee gets one-fourth of the royalties received on sub-licences by the licensee, while *per contra* the licensee gets one-fourth of the royalties received on sub-licences by
20 the Patentee in respect of the area outside the licence.  In truth this part of the consideration is really constituted by the entry of Patentee and licensee into a sort of partnership in assets and profits, the relative shares in profits varying infinitely according to the varying proportions of the two groups of royalties. The royalties the subject-matter of this rather remarkable arrangement include,
25 as I read the document, though it is by no means lucid on this point, royalties received in respect of improvements upon or new inventions in respect of the process to which the original Letters Patent relate.  (E) Clauses 2 and 3 of the licence work out a scheme under which each party to the licence is to communicate to the other all improvements in and further inventions relating to
30 the process to which the Patents, subject-matter of the licence, relate, whether such improvements or further inventions be patented or not, and is to give the other party and its officers full information and details thereof with all necessary plans, etc., for demonstrating the mode of working, and is to permit the other party to use and work such improvements and inventions during the period of
35 the licence without further payment.  There is a proviso that the Patentees are not to be liable to act as consulting engineers for the design or erection of plants or to supply working drawings or plans of any auxiliary plant not covered by the Patents the subject of the licence, or by any further inventions which the Patentees may make, discover, or become entitled to, in respect of the said
40 process or plant.  (F) Clause 9 contains a provision restricting each party in regard to constructing or erecting plant for sub-licensees.

A detailed consideration of these features of the document leads me to the following conclusions.  First, that it is intended that, if the licensee goes into liquidation for reconstruction, the Patentee is to accept the reconstructed Com-
45 pany as the *alter ego* of the licensee, and the reconstructed Company is to step into the shoes of the licensee in every respect.  Secondly, that save to this extent there is nothing to indicate that either party can require the other to accept the performance of the contract by any assignee as a substitution for the performance by the party itself.  Thirdly, that the parties' tacit con-
50 templation, not, I admit, stated explicitly, is that during the life of the Patents

48

No. 2.]      REPORTS OF PATENT, DESIGN, AND TRADE MARK CASES   [Vol. LIV.

*National Carbonising Co., Ld.* v. *British Coal Distillation Ld.*

their respective relations to the subject-matter of the agreement shall remain unchanged, subject only to the event of a reconstruction of the licensee; in other words, it is implied that the Patentee shall retain and work the Patents. The intricate way in which the interests of the parties are commingled in regard to royalties seems to me to point strongly in this direction. Fourthly, the 5 provisions as to communication and use of improvements and new inventions seem to me to point strongly in the same direction, and all the more so because these provisions extend to unpatented improvements and inventions, a circumstance which seems to imply that the personality of the party to whom the communication is to be made is of real practical importance.                    10

I need not refer again to the principles which I have stated as being recognised in *Tolhurst's* case. On the true construction of the document it appears to me that (subject still to the proviso as to the case of the reconstruction of the licensee) I must read '' Patentee '' and '' Licensee '' throughout as meaning in the strictest sense *L. & N. Coal Distillation, Ld.* and the Defendants.          15

As I have already stated, *L. & N. Coal Distillation, Ld.* have in fact assigned the Patents and the benefit of the licence to the Plaintiffs. This may give rise to various questions of difficulty, but the only question which I have to solve is whether as matters stand the Plaintiffs are entitled to require the Defendants to communicate with them and permit them to use certain new 20 inventions relating to the process which the Defendants have admittedly made. If the licence is to be construed as I have indicated above, the question must obviously be answered in the negative, and this action must fail, subject only to one further point.

It is suggested by the Plaintiffs that since the assignment by *L. & N. Coal* 25 *Distillation, Ld.* to the Plaintiffs the Defendants and the Plaintiffs have so acted that the Court ought to treat them as mutually bound to a contract in the terms of the licence with the substitution of the Plaintiffs for the Patentee therein named for all the purposes of the licence. It is, of course, possible that the parties may have so acted as to lead to this result, and I need not 30 consider narrowly whether the result is to be reached by applying some principle of estoppel or on some principle of substitution or novation. I am, however, clear on the correspondence and the facts that I cannot accede to this suggestion. [The learned Judge then referred to certain correspondence and meetings between the parties.] I am satisfied on the evidence and the 35 correspondence that nothing occurred at either of those meetings which either party intended, or understood, to operate so as to alter the legal position of the parties, whatever that might be.

Soon after this the relations between the Companies became acutely strained, though suggestions of negotiations for some entirely new arrangement were still 40 in the air.

It follows that I can see no ground upon which I can decide that the mutual rights of the Plaintiffs and the Defendants have been affected by any course of dealing or conduct which occurred after the Plaintiffs had taken the transfer which they took from the original Patentee.                                      45

*National Carbonising Co., Ld.* v. *British Coal Distillation Ld.*

The action will accordingly be dismissed, but I intimated when I reserved judgment that I would hear the parties as to the exact Order to be made as to costs. There is some question of the costs of an Originating Summons.

After a discussion, the action was dismissed with costs, including the 5 Defendants' costs of the Originating Summons.

The Plaintiffs appealed. The Appeal came on for hearing on the 18th of June, 1936, before Lords Justices SLESSER and ROMER and Mr. Justice EVE.

The same Counsel, instructed as before, appeared for the Appellants and Respondents.

10    *Vaisey* K.C. for the Appellants.—The main question arising on this appeal is whether the Plaintiffs have succeeded to the rights of *L. & N. Coal Distillation, Ld.* under the licence granted to the Defendants under their former name. There is no doubt that the licence was assigned to the Plaintiffs, in so far as it was capable of assignment. The case is closely analogous to *Tolhurst's* case 15 (*ubi supra*). I shall submit that the licence was intended to operate between the Patentee as licensor and the Defendant company as licensee. The second question arising is whether the course of dealing between the parties, to be gathered from the correspondence and the oral evidence, amounted to a novation or acceptance of the Plaintiffs as standing in the shoes of *L. & N. Coal Distilla-* 20 *tion, Ld.* The learned Judge has taken far too narrow a view of the licence, which I submit is a commercial document capable of assignment to a new patentee, and has held one part assignable and left the other part hanging in the air. The Defendants were granted a Patent for a further invention in May, 1932, and on the 4th of November, 1932, *L. & N. Coal Distillation, Ld.* went into 25 voluntary liquidation. The liquidator then assigned the Patents and the benefit of the licence to the Plaintiffs, and on the 15th of May, 1933, formal notice of the assignment was given by the Plaintiffs to the Defendants. Thereafter the Plaintiffs and the Defendants co-operated with one another. On the 27th of February, 1934, the Defendants notified the Plaintiffs of their contention that 30 the Plaintiffs were not entitled to be treated as assignees as regards clause 3 of the licence. A patent is assignable by express provision of section 71 of the Patents and Designs Acts, 1907 to 1932. [The licence of the 28th of July, 1931, was read.] Several of the clauses, including clause 3, are intended to apply to the Patentee for the time being, and I submit that the licence, at any rate 35 on the side of the Patentee, could be assigned as a whole. [The Pleadings were read, and *Tolhurst's* case (*ubi supra*) was referred to.] It is impossible to say that the Plaintiffs are bound to allow the Defendants facilities under the licence, while not receiving the corresponding benefit. In my submission the case is within *Tolhurst's* case and the Plaintiffs are entitled to the relief claimed.

40    **Slesser L.J.**—We should like to hear Mr. *Roxburgh* on the first point.
    *Roxburgh* K.C. for the Respondents.—Clause 2 of the licence could not be enforced as against assigns of the Patentee. If Mr. *Vaisey* were right, the element of reciprocity would be gone at the outset. Positive covenants do not run with property, though negative covenants may do so. If it is wrong to 45 write in the word "assigns" in clause 2, then *prima facie* it is wrong to put it in clause 3. Although the Patents may be assignable, it does not follow that the whole licence is assignable. On the authorities, the burden of such an

50

*National Carbonising Co., Ld.* v. *British Coal Distillation Ld.*

agreement does not pass. Clause 11 is certainly not binding on the Plaintiffs. There are scarcely any cases in which the word '' assigns '' will be read into an executory contract, because the result might be to increase the burden on the other party. *Tolhurst's* was a very exceptional case. In the present case the licence agreement was between a parent company and a subsidiary. What would 5 be the position if *L. & N. Coal Distillation, Ld.* had assigned the agreement to the Defendants' greatest trade rivals? The disclosure contemplated by clause 3 includes unpatented inventions, the communicaton of which is a very confidential matter. The assignees of the Patents are in the position of licensees under the covenant to communicate improvements. [**Slesser L.J.**—It looks as if 10 the last limb of clause 16 contemplates that the licensee's assignee may step in. Why should not the assignee of the Patentee do so?] The fact that in certain circumstances the licence could be assigned does not preclude the possibility that the obligation put upon the licensee by another clause cannot be assigned. The question is not whether the licence in whole or in part can be assigned, but 15 whether clause 3, being an obligation to disclose and to grant a licence, can be assigned. [**Romer L.J.**—If the licensee can assign, the personal element is gone.] That is only a permitted assignment. If the Patents were assigned while the original Patentee was still in existence, he could still carry out his obligations to the Defendants though not under some of the clauses, for instance 4, 5 20 or 6. There are two tests as to whether the words of assignability may be put into clause 3, namely, would putting the words in possibly increase the burden on the other party? If not, they ought to be put in unless there is a personal element present. [*Tolhurst's* case, L.R. (1903) A.C., at p. 423, *per* Lord *Lindley*, was referred to.] The competence of the party, to whom the disclosure 25 is made, to make use of it is a matter that has to be taken into account. Under Section 14 of the Patents and Designs Acts, 1907 to 1932, the Patents could be assigned for different localities. The Defendants would then have to disclose to several different parties, or as regards one Patent to one party and as regards a second Patent to another party. Importance attaches to the reciprocal nature 30 of the covenants in clauses 2 and 3. The agreement is a joint adventure. Clause 2 cannot be binding upon the Plaintiffs. [*Kemp* v. *Baerselman*, L.R. (1906) 2 K.B. 604, and *Dr. Jaeger's, etc., Co., Ld.* v. *Walker & Sons*, (1897) 77 L.T. 180, were referred to.] [**Romer, L.J.**—Even if there is a personal element, the parties can make the contract assignable. The cases all come to this, what is the 35 true construction of the document?] [**Slesser L.J.**—In this case the Patent itself is assignable. That is a distinction from the reported cases.] Even if the licence agreement is not assignable, the Defendants have an equitable right to a licence since the Plaintiffs have notice of the licence. It is questionable whether the licence amounts to an absolute or an equitable right. Such a complicated 40 royalty arrangement as the present cannot have contemplated numerous assignments to different parties. Under the Judicature Act the benefit of monetary payments can be assigned. If clause 3 were a covenant in the agreement having no relation to the Patents, the fact that it occurred in the licence would be no ground for saying that it was assignable with the Patents. [*British Waggon* 45 *Co.* v. *Lea & Co.*, (1880) L.R. 5 Q.B.D. 149, was referred to.] That is the only other case in which an executory contract was held to be assignable, and that was more a case of vicarious performance than of assignment. The principles of law applicable to the present case are to be found in *Tolhurst's* case (*ubi supra*), and I submit that they show that this clause is not assignable. 50

Case 09-10138-MFW    Doc 14225-48    Filed 08/15/14    Page 467 of 474

51

No. 2.]    REPORTS OF PATENT, DESIGN, AND TRADE MARK CASES    [Vol. LIV.

*National Carbonising Co., Ld.* v. *British Coal Distillation Ld.*

*Tookey* followed.—The learned Judge found that the parties contemplated that during the life of the Patents their respective relations to the subject-matter of the agreement should remain unchanged. If that is correct, the Defendants must succeed. Since the Patents are assignable, the parties may 5 have intended (1) that the licence should remain unassignable though the Patents were assigned, or (2) that the licence should be wholly assignable, or (3) that part of the licence should be assignable. Except in the second case, the Defendants must succeed. If any part of the licence is unassignable, that part must be clauses 2 and 3, by reason of their vitally personal character. A patent 10 licence, in my submission, is an absolute right. There were licences at common law before the Judicature Acts. [*Hindmarch's* Law of Patents (1846) was referred to.] [**Slesser L.J.**—I cannot see how it can be said that an action based on a licence would not lie at common law.] It has sometimes been suggested that a licence is a mere equitable right. [*New Ixion Tyre & Cycle Co., Ld.* v. 15 *Spilsbury* (1898) 15 R.P.C. 380, 567, was referred to.] The fact that an assignee · of a patent takes subject to a licence does not mean that he takes subject to all the conditions on which the licence was granted. If the licence were contained in two agreements and only the grant registered, a assignee would take subject only to the grant. He ought not to get the benefit of merely collateral 20 conditions. [*Hassall* v. *Wright* (1870) L.R. 10 Eq. 509, was referred to.] It would be quite wrong to hold the Defendants bound under clause 3 to communicate an invention and grant a licence to a third party. The Defendants cannot, in the absence of novation, enforce clause 2, and ought not to be bound under clause 3.

25 *Vaisey* K.C. replied.—Quite different considerations might have arisen if the licence had been contained in two documents. The question is one, not of law, but of intention. Clause 6 would be nonsense unless it applied to the Patentee for the time being. Clause 16 also indicates that the parties had assignees in mind. According to the Patents Act the Patentee could assign the Patents, 30 subject in the present case to the rights of the Defendants. If there is an equitable obligation to pay royalties, why should there not be an equitable obligation to disclose a new invention? The reasonable construction of the agreement is that the Plaintiffs are bound by it and have succeeded to all rights under it. Any other construction would produce capricious results and would 35 be unsatisfactory from a business point of view. [**Romer L.J.**—All that mattered to the licensee was that the licensor should have the Patents.] There was nothing in the agreement to prevent the licensors from closing their laboratories. I submit that the appeal should be allowed. As to relief, the first declaration claimed would be sufficient.

40 Judgment was reserved and was delivered on the 7th of July, 1936.

**Slesser L.J.**—In July, 1931, a company called *L. & N. Coal Distillation, Ld.*, were the registered legal owners of Letters Patent relating to the distillation of coal. On July 28th, 1931, they granted a sole and exclusive licence to the *Leicestershire (L. & N.) Coal Distillation, Ld.*, now, by change of name, the 45 Defendants, the *British Coal Distillation, Ld.*, to work the processes and apparatus within the counties of Leicester, Derby, Nottingham, Warwick and Stafford. This licence was of a peculiar kind containing reciprocal obligations and rights between the Patentee and the licensee. The consideration was stated to be the allotment and issue to the Patentee or its nominees of certain

52

*National Carbonising Co., Ld.* v. *British Coal Distillation Ld.*

deferred shares credited as fully paid up in the capital of the licensee. In addition to granting the right to use and work the inventions with full power to grant sub-licences within the named counties, by clause 2 the Patentee was bound to communicate to the licensee any improvements in the inventions or further inventions which it might discover or become entitled to, and to 5 give to the licensee full information and details for demonstrating the exact mode of using or working the same, without the payment of any further consideration except one-fourth of all royalties or cash payments which might be received by the licensee in respect of the use of the inventions or any of them (this would include improvements and further inventions) in any district 10 within the area controlled by the licensee other than the county of Leicester.

There followed in clause 3 a complementary obligation upon the licensee to communicate to the Patentee its improvements or further inventions and an obligation to permit the Patentee to use and work the same during the continuance of the licence without payment of any further consideration other 15 than one-fourth of royalties and cash payments payable to, or received by, the Patentee in any district in Great Britain and Northern Ireland other than the named counties of the licensee. This covenant, by clause 11, would include all royalties or cash payments payable to and received by the Patentee, whether under the original Patents or improvements or further inventions. 20

Clause 5, which deals with any action or proceeding for the revocation of the Letters Patent, puts an obligation upon each party to give the other notice in writing thereof, followed by an obligation to confer to consider the necessity or expediency of defending any action and arrangements as to the costs and expenses and indemnities, together with an express provision that the licensee 25 may, where necessary, use the name of the Patentee. A similar provision in clause 6 deals with infringement, or threatened infringement, of the Letters Patent, and again it is provided that in any contemplated action the licensee may, where necessary, use the name of the Patentee. These provisions are here set out because in this case it is argued, there being no reference to assigns in 30 the licence, that the licence was not assignable.

On the 24th of March, 1933, *L. & N. Coal Distillation, Ld.*, the Patentees, being in liquidation, the liquidator purported to assign the patent rights to the Plaintiffs, the *National Carbonising Co., Ld.*, including the inventions and Letters Patent and all rights thereunder and the benefits of the licences granted, 35 one of which was the licence of the 28th of July, 1931, from *L. & N.* to the *Leicestershire L. & N. Coal Distillation, Ld.*, now the Defendants.

The Statement of Claim asks for a declaration that the Plaintiffs are, and have at all material times been, entitled to receive, and the Defendants bound to supply, full particulars of improvements or further inventions under clause 3 40 of the licence of the 28th of July, 1931. The Defendants admit that they are possessed of an invention which was a further invention within the meaning of clause 3 of the licence and that they had applied for Letters Patent for it which had been granted; but, as I have said, they deny the assignability of the licence which, in fact, is the sole issue in this case. 45

It is clear, in the first place, that the absence of any express reference in the contract to assigns is not conclusive if the true view is that it was intended that the benefit of the contract should be assignable. In the words of Lord *Halsbury*,

*National Carbonising Co., Ld.* v. *British Coal Distillation Ld.*

Lord Chancellor, in *Tolhurst's* case, (1903) Appeal Cases, page 414, at page 416:
" The word ' assigns ' not being in the contract is immaterial if it is ascertained
" that the intention of the contract is that it should be assigned ".   In my
opinion such an intention is clearly expressed in the agreement for licence of
5 July 28th, 1931.   The assignment of the 24th of March, 1933, is primarily an
assignment of the inventions and Letters Patent and all rights therein, and the
assignment to the purchaser is said to be absolutely subject to and with the
benefit of the several licences which include the licence of the 28th of July, 1931.

So far as concerns the invention and the Patents, there can be no doubt that
10 patent right, being a recognised species of property, can be transferred from
the original patentee to any other person, and, so far as the licence is onerous
upon the patentee, the patentee, having divested himself of his rights to the
extent of depriving himself from enforcing them under the patent against the
licensee in respect of acts which fall within the terms of the licence, can only
15 assign the benefits of the patent under the limitation; but here, under the licence
agreement, the Patentee receives benefits; for example, the right to have com-
municated to him improvements or further inventions made by the licensee under
clause 3, and the right to use and work the same on the Patentee paying to the
licensee the sums stated in clause 11.   These benefits inure to the Patentee's
20 rights and in my view can properly be assigned along with the Patent itself.   It
is further significant that it is expressly provided under clauses 5 and 6, where
proceedings are necessary for the protection of the Letters Patent or any of
them, that the licensee may use the name of the Patentee.   If the argument of
the Respondents be right and the licence is not assignable with the original
25 Patents, there would be no provision thereafter whereby the licensee could use
the name of the assignee and, although a threat to the Patents might injure the
licensee, the licensee in such a case would be without a remedy and some of the
purposes of clauses 5 and 6 would be defeated, because thereby the licensee is
given an interest in the maintenance of the patent rights, under which by licence
30 he works, which may need protection.

It is argued for the licensee that there is here such dependence upon the
mutual personal confidence or personal skill to be exercised by the respective
parties to the licence as to prevent the inference arising that the parties intended
to make their right under the licence assignable.   I am unable to find any such
35 dependence.   There is no obligation upon the licensee to make any improve-
ments or further inventions, nor upon the Patentee, but only a mutual obliga-
tion to communicate them if they are made, with respective permission to use
and work and pay.   In this respect this case seems to me very distinguishable
from such authorities as *Dr. Jaeger's* case, (1897) 77 Law Times, page 180,
40 where it was held that the agreement required a certain degree of skill, knowledge
and supervision in its performance, and was therefore not assignable, or the
case of *Kemp* v. *Baerselman*, L.R. (1906) 2 King's Bench, page 604, where the
contract was with a specific manufacturer and was held to be personal in nature
and unassignable.

45 The learned Judge agrees that the effect of the assignment was to vest the
original Patents in the Plaintiffs, who were free by law to assign the Letters
Patent subject to the rights of the licensee, but he comes to the view that there
is constituted by the licence a sort of partnership in assets and profits.   He bases
his conclusion upon the view, among other matters, that it is implied that the

54

*National Carbonising Co., Ld.* v. *British Coal Distillation Ld.*

Patentee shall retain and work the Patents. I can find no justification for this conclusion. Certainly ther are no such words to be found to restrict the right of the Patentee to assign; and to assume such power would, in my opinion, do violence to the general right of a patentee to dispose of his patent as he wills.

Finally, the learned Judge relies upon a clause to which I have not referred, 5 clause 16, to the effect that " In the event of any order being made or any " resolution being passed for the winding-up of the licensee, except a resolution " for winding-up with a view to reconstruction, then and in any such event " the Patentee may forthwith by notice to the licensee determine this licence ". He says that by this it is intended that, if the licensee went into liquidation 10 for reconstruction, the Patentee was to accept the reconstructed company as the *alter ego* of the licensee, and that the reconstructed company was then to step into the shoes of the licensee in every respect. In my view, the exception to the power of the Patentee, by notice, to determine the licence in the event of the winding-up of the licensee merely means that, if the winding-up be for 15 the purposes of reconstruction, the Patentee cannot, under clause 16, determine the licence. But I do not agree that these words destroy the right of the Patentee to assign and, as for resolutions for winding-up other than with a view to reconstruction, clause 16 merely gives a power to the Patentee to determine the licence, which, if he elects, he need not use. So that, even in that event, he is free to 20 assign the Patents and his rights under the licence, if he thinks fit; certainly there is nothing in clause 16 to prevent him.

I agree also with the additional reasons stated by Lord Justice *Romer* in his Judgment.

I think, therefore, that the learned Judge was wrong in coming to a con- 25 clusion in favour of the Respondents and that the Appellants are entitled to their first declaration (a), which is the only declaration they now claim. The appeal, therefore, will be allowed with costs here and below.

**Romer L.J.**—The question to be determined on this appeal is whether in clause 3 of the licence of the 28th of July, 1931, the word " Patentee " is to be 30 read as meaning the Patentee and its assigns. In answering this question the authorities to which our attention has been drawn do not, I think, afford any assistance; for they lay down no general principle applicable to the case, except perhaps this, that a contract which involves the exercise of personal skill on one side or the other, or which is based upon the confidence that one party 35 has in the other, is *prima facie* unassignable. In all cases the question whether the particular contract is assignable or not is merely one of construction. " I cannot think ", said Lord *Macnaghten* in the leading authority upon the subject, " that any legal principle is involved in this case. The case may " be of great importance to the parties. From a legal point of view it is, I 40 " think, of no importance at all. The question, as it seems to me, depends " simply and solely on the true meaning and effect of the contract ". That was said of the case of *Tolhurst* v. *Associated Portland Cement Manufacturers*, L.R. (1903) Appeal Cases, page 416, and can be said equally truly of the present one. 45

I therefore turn to the contract in the present case which is the licence of the 28th of July, 1931. It is made between *L. & N. Coal Distillation, Ld.*, therein

55

No. 2.]    REPORTS OF PATENT, DESIGN, AND TRADE MARK CASES    [Vol. LIV.

*National Carbonising Co., Ld.* v. *British Coal Distillation Ld.*

called " the Patentee " of the one part and the Defendants by their then name
of the *Leicestershire (L. & N.) Coal Distillation, Ld.,* therein called " the
" licensee " of the other part.    The Patentee was at that time engaged in a
process for the distillation of solid carbonaceous material and was the registered
5 owner of various Letters Patent, and had made applications for other Letters
Patent relating to the said process.    The licensee appears to have been desirous
of exploiting the subject-matter of the inventions and applications within the
counties of Leicester, Derby, Nottingham, Warwick and Stafford, and by
clause 1 the Patentee accordingly granted to the licensee an exclusive licence
10 to use and work all the said inventions within the said counties during the
unexpired residue of the respective terms of the Letters Patent and any extension
and renewals thereof.    The clause expressly authorised the licensee to grant
sub-licences in consideration of the payment of royalties or for other considera-
tion as thereinafter mentioned.    Part of the consideration for the licence was
15 the allotment and issue to the Patentee or its nominees of fully paid shares in
the licensee.

So far as royalties were concerned it was provided (clause 7) that no royalty
or other sum should be payable by the licensee to the Patentee in respect of
the use of the invention in the County of Leicester but (clause 10) that the
20 licensee should pay the Patentee one-fourth of all royalties and cash payments
in lieu of royalties payable to and received by it in respect of the use of the
said inventions in any of the other of the said counties, it being agreed
(clause 8) that the royalty to be paid by any sub-licensees should be at the rate
of 6d. per ton of raw material treated under the inventions though such royalty
25 might from time to time be varied in such manner as the Patentee and licensee
should mutually determine.    A corresponding obligation was imposed by
clause 11 on the Patentee to pay to the licensee one-fourth of all royalties and
cash payments in lieu of royalties payable to and received by it in respect of
the use of the inventions in any district within the area controlled by the
30 Patentee other than the five counties already mentioned.    It would seem from
the contract that neither the Patentee nor the licensee intended themselves to
work the inventions, but to exploit them within their respective territories by
means of licences and sub-licences as the case might be.

Clause 5 provided that, if at any time during the continuance of the licence
35 any action or proceeding for the revocation of any of the said Letters Patent
should come to the knowledge of either of the parties thereto, such party should
forthwith give notice thereof to the other.    In a certain event the licensee was
to be at liberty to defend any such proceedings and for that purpose the licensee
might, where necessary, use the name of the Patentee.

40    Clause 6 dealt with infringements or threatened infringements of any of the
Letters Patent and provided that, in the event therein mentioned, the licensee
might take action to prevent such infringements, and for that purpose the
licensee might, where necessary, use the name of the Patentee.

Clause 3, which is the important one for the present purpose, is in these
45 words: " The licensee shall forthwith communicate to the patentee full par-
" ticulars of any improvements in the said inventions or of any further inven-
" tion which it may make discover or become entitled to in respect of the said

56

No. 2.]        REPORTS OF PATENT, DESIGN, AND TRADE MARK CASES        [Vol. LIV.

*National Carbonising Co., Ld.* v. *British Coal Distillation Ld.*

" process (whether such improvement or invention be patented or not) and
" (without expense to the patentee) shall give to the patentee or its proper
" officers full information and details thereof with all necessary plans drawings
" and designs for demonstrating the exact mode of using or working the same
" and will permit the patentee to use and work the same during the continuance 5
" of this licence without payment of any further consideration than is pro-
" vided for by clause 11 hereof ". By clause 2 a corresponding obligation had
been imposed upon the Patentee in favour of the licensee.

Finally, clause 16 is in these terms : " In the event of any of the royalties or
" other sums payable under the provisions of this deed being in arrear and 10
" remaining unpaid for a period of twenty-one days after the same shall
" become payable as hereinbefore provided whether or not demand therefor
" shall have been made by the patentee or if the licensee shall have committed
" or knowingly permitted a breach of any other of the covenants hereinbefore
" contained and on its part to be performed and observed and shall in the case 15
" of any such breach capable of being made good have failed to make good the
" same within twenty-one days after the licensee shall have been served with
" notice by the patentee requiring the licensee to make good such breach or in
" the event of any order being made or any resolution passed for the winding
" up of the licensee except a resolution for winding up with a view to recon- 20
" struction then and in any such event the patentee may forthwith by notice to
" the licensee determine this licence ".

Now, it is to be observed that the parties clearly contemplated that the
licensee company might go into voluntary liquidation with a view to recon-
struction and that in such event the benefit of the licence would be assigned 25
to the reconstructed company.    It is also clear that they contemplated the
possibility of the licensee company going into liquidation otherwise than with
a view to a reconstruction and that in such event the benefit of the licence
would be assigned unless the Patentee determined the licence; for, if this were
not so. the provisions of clause 16 relating to the winding up of the licensee 30
would be almost meaningless.    Every winding up involves the sale of the
company's assets, and the power to determine the licence in the event of a
winding up other than for the purposes of reconstruction must have been in-
serted in order to enable the Patentee, if he so desired, to prevent the licence
being sold.    In these circumstances it cannot be said that an assignment of the 35
licence was not contemplated by the parties.    The word " licensee " where
used in the licence must, therefore, be read as meaning the licensee and those
who might be its assigns in the event of a liquidation.

The next thing to be observed is that a patentee is fully entitled to assign
his rights under the Letters Patent to another and that this must be deemed to 40
have been known to the parties.    Such an assignment could not, of course,
defeat the rights of the licensee under the licence.    It was indeed suggested in
the argument for the Respondents that the licence only conferred some interest
in equity and that it would not prevail against the title of a purchaser of the
legal interest in the Letters Patent without notice of the licence.    No authority 45
was cited that in any way supports this extraordinary proposition and, in my
opinion, it is without any foundation.    It is said in *Hindmarch* on Patents that
a licence to use an invention comprised in a patent is in fact a grant of a right

57

No. 2.]     REPORTS OF PATENT, DESIGN, AND TRADE MARK CASES     [Vol. LIV.

*National Carbonising Co., Ld.* v. *British Coal Distillation Ld.*

by the patentee to the licensee and, until the present case, I have never heard any suggestion to the contrary. But though the licence would remain in full force after an assignment of the Patent the licensee would only continue to exercise it upon the terms as to payment of royalties and otherwise that are con-
5 tained in it. This being so, it would seem plain that, if the patentee is to be regarded as having the power of assigning the Patents and can only assign them subject to the rights of the licensee, he must also be regarded as having the power at the same time to assign the benefits accruing to him under the licence.

If then the parties had in their minds the possibility of an assignment of the
10 Patents by the Patentee, and we must I think assume this to have been the case, it is incredible that they did not intend the Patentee to have power to assign his right to be paid royalties under clause 10 and his power of agreeing the royalties to be charged under clause 8. In other words, I think that we are constrained to read the words " the Patentee " in clauses 8 and 10 as meaning
15 the Patentee and its assigns. If this be right, the word must have the same meaning in clause 16. The parties could not have intended that the power to determine the licence for non-payment of the royalties should be severed from the right to receive the royalties, or that a company that had ceased to have any interest in the Patents should be able to determine the licence. It seems plain,
20 moreover, that in clauses 5 and 6 of the licence the word " Patentee " must also be read as Patentee or its assigns; for after an assignment of the Patents the use of the Patentee's name would in no way help the licensee to resist revocation of the Patents or maintain an action for infringement. It would be the name of the assignee that the licensee would require to use for those purposes.

35 These considerations seem to lead inevitably to the conclusion that the word " Patentee " throughout the licence, and, therefore, in clause 3, must have been intended to mean the Patentee and its assigns. It was contended an behalf of the Respondents that this could not have been so in the case of clauses such as 2, 4 and 11, which impose obligations of a positive character upon the
25 Patentee, inasmuch as the obligations would not be enforceable against an assignee; but the fact that such obligations would not be directly enforceable against the assignee affords no reason for thinking that all the rights of the Patentee under the Patents are not assignable, for the Patentee's assignee could not enforce those rights except upon the terms of fulfilling the obligations
30 imposed upon the Patentee. The word " Patentee ", moreover, in a licence is commonly made in express terms to include the patentee, his executors, adminis-trators and assigns: (see *Key & Elphinstone's* Precedents in Conveyancing, 13th edition, volume 2, page 442) notwithstanding the fact that the licence imposes positive obligations upon the Patentee. It was further objected on behalf of
40 the Respondents that clauses 2 and 3 were based upon the confidence that each party reposed in the other and that the licensee could not, therefore, be asked to perform clause 3 in favour of any person or company other than the Patentees themselves. The licence, it was said, created a *quasi* partnership between the parties and the Respondents could not be compelled to have another *quasi*
45 partner thrust upon them; but I can find nothing in the licence that remotely resembles a partnership agreement. There was to be no co-operation between the parties in working the process or in exploiting the invention. The process was apparently to be worked not by the Patentee or licensee, but by their respective licensees and under-licensees. In granting these each party would

E

*National Carbonising Co., Ld. v. British Coal Distillation Ld.*

act independently of the other, the only matter in which they were to act in concert being any variation of the agreed royalty of sixpence per ton. I can see no reason whatever for thinking that the terms of the licence, so fas as they had to be performed by the Patentee, could not be just as satisfactorily 5 performed by an assignee of the Letters Patent. So long as the licensee company is paid its one-fourth share of the royalties received under the other licences granted by the Patentee, it is, I should have thought, a matter of complete indifference to that company who it is that grants the licences and by whom it is that the royalties are paid. 10

I therefore come to the conclusion that the word " Patentee " in clause 3 of the licence means the Patentee and its assigns. The benefits reserved to the Patentee by that clause are just as much part of the consideration accruing to the Patentee for the granting of the licence as is the share of the royalties payable under clause 10; and the Plaintiffs, as the assignees of the Patentee, are 15 in my judgment entitled to the benefit of both those considerations.

For these reasons I think that this appeal should be allowed with costs here and below and a declaration made as asked by paragraph (a) of the claiming part of the Statement of Claim.

**Eve J.**—The question involved in this appeal is purely one of construction 20 and, with all respects to the learned Judge, I prefer to his construction the construction arrived at by the Judgments which have just been read. The appeal, in my opinion, must be allowed.

**Slesser L.J.**—The appeal will be allowed, with costs here and below. I understand there is a question with regard to the costs of the Originating Summons. 25

After a discussion, the Order of *Clauson* J. as to the costs of the Originating Summons was allowed to stand.

Leave to appeal to the House of Lords was refused.

----

IN THE HIGH COURT OF JUSTICE—CHANCERY DIVISION.

*Before* MR. JUSTICE CLAUSON. 30

June 30th, July 1st, 2nd, 3rd, 6th, 7th, 8th, 9th and 30th, 1936.

NORTON AND GREGORY LD. AND OTHERS *v.* JACOBS.

*Patent—Action for Infringement—Novelty—Subject-matter—Prior User— Insufficiency—Inutility—False Suggestion—Non-disclosure of best method— Counterclaim for threats—Patents held invalid and not infringed—Costs of new* 35 *issue raised in consequence of evidence given at trial—Patents ordered to be revoked.*