TAB 105

410                    NATIONAL TRUST CO. *v.* MEAD                    [1990] 2 S.C.R.

**National Trust Company** *Appellant*

*v.*

**David Mead, Remai Financial Corp. and
Remai Construction (1981) Inc.** *Respondents*

INDEXED AS: NATIONAL TRUST CO. *v.* MEAD

File No.: 21157.

1990: February 23; 1990: August 16.

Present: Lamer C.J.* and Wilson, La Forest,
L'Heureux-Dubé, Gonthier, Cory and McLachlin JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR
SASKATCHEWAN

*Mortgages — Action on covenant to pay — Individual assuming mortgage from corporation which had waived provincial statutory protection against being sued on covenant to pay — Provincial statute permitting only corporate mortgagors to waive protection — Whether individual assuming mortgage bound by waiver as a successor or assign of original corporate mortgagor — Whether assumption agreement effects a novation — The Limitation of Civil Rights Act, R.S.S. 1978, c. L-16, ss. 2, 40.*

The respondent Remai Construction (1981) Inc. ("Remai") granted a mortgage to the appellant National Trust as security for a loan to be applied in the construction of a condominium unit. Remai waived the protection of the Saskatchewan *Limitation of Civil Rights Act*, s. 2(1) of which provides that no action lies on the covenant to pay in a mortgage. Section 2(2)(d) extends this protection to subsequent purchasers who assume such a mortgage. Under s. 40(1) of the same Act agreements purporting to waive the protection of the Act are null and void, but s. 40(2) creates an exception to ss. 2 and 40(1) by permitting corporate mortgagors to waive the protection and provides that such a waiver is binding on the corporation's successors and assigns.

The respondent Mead purchased the condominium unit from Remai and executed an assumption of liability agreement in favour of National Trust which contained a covenant making Mead personally liable on the mort-

**National Trust Company** *Appelante*

*c.*

**David Mead, Remai Financial Corp. et
Remai Construction (1981) Inc.** *Intimés*

RÉPERTORIÉ: NATIONAL TRUST CO. *c.* MEAD

Nº du greffe: 21157.

1990: 23 février; 1990: 16 août.

Présents: Le juge en chef Lamer* et les juges Wilson,
La Forest, L'Heureux-Dubé, Gonthier, Cory et
McLachlin.

EN APPEL DE LA COUR D'APPEL DE LA
SASKATCHEWAN

*Hypothèques — Action fondée sur l'engagement personnel de payer — Particulier prenant en charge une hypothèque consentie par une société qui avait renoncé à la protection accordée par une loi provinciale contre toute action fondée sur l'engagement personnel de payer — Loi provinciale ne permettant qu'aux sociétés débitrices hypothécaires de renoncer à cette protection — Le particulier qui prend en charge une hypothèque est-il lié par une renonciation en sa qualité de successeur ou de cessionnaire de la société qui était la débitrice hypothécaire originaire? — La convention de prise en charge opère-t-elle une novation? — The Limitation of Civil Rights Act, R.S.S. 1978, ch. L-16, art. 2, 40.*

L'intimée Remai Construction (1981) Inc. («Remai») a consenti à l'appelante National Trust une hypothèque en garantie d'un prêt devant être affecté à la construction d'une unité en copropriété. Remai a renoncé à la protection de *The Limitation of Civil Rights Act* de la Saskatchewan, dont le par. 2(1) dispose que l'engagement personnel de payer contenu dans un acte constitutif d'hypothèque ne donne lieu à aucun droit d'action. L'alinéa 2(2)d) étend cette protection aux acheteurs subséquents qui prennent en charge une telle hypothèque. Aux termes du par. 40(1), est nul et non avenu tout accord par lequel on prétend renoncer à la protection de la Loi, mais le par. 40(2) crée une exception à l'art. 2 et au par. 40(1) en permettant aux sociétés débitrices hypothécaires de renoncer à cette protection et prévoit qu'une telle renonciation lie leurs successeurs et cessionnaires.

L'intimé Mead a acheté l'unité en copropriété à Remai et a signé au profit de National Trust une convention d'acceptation de responsabilité contenant une clause rendant Mead personnellement responsable du

───────

* Chief Justice at the time of judgment.

* Juge en chef à la date du jugement.

1990 CanLII 73 (SCC)

gage. The mortgage fell into arrears and National Trust brought an action against Remai and Mead for the full amount of the principal and interest owing. The action against Remai was later discontinued. The chambers judge granted an order *nisi* for sale of the property but refused to order personal judgment for the deficiency against Mead. The Court of Appeal dismissed National Trust's appeal.

The issues in this appeal are (1) whether the general protection extended to individuals under s. 2(1) prevails over the exception contained in s. 40(2) for corporations and their successors or assigns; (2) whether the particular wording of the assumption agreement releases Mead from liability on the personal covenant; and (3) whether the assumption agreement effects a novation.

*Held*: The appeal should be dismissed.

*Per* Lamer C.J. and Wilson, La Forest, L'Heureux-Dubé, Gonthier and Cory JJ.: Remai's exercise of its waiver under s. 40(2) of *The Limitation of Civil Rights Act* is not binding on Mead. Any exception to the principle in s. 2 that individual mortgagors be insulated from personal liability should be construed as narrowly as possible. The meaning of "successor" in s. 40(2) should be restricted to other corporations since the application of the s. 40(2) exception to "successors" was only intended to ensure liability on the personal covenant of a corporation which steps into the shoes of the original corporate mortgagor. While "assigns" would prima facie include individual assigns of corporate mortgagors, the purpose of this exception is to protect mortgagees who extend mortgages to corporations on condition that the latter provide a personal covenant and who then find that the corporation has unilaterally (and without the mortgagee's consent) assigned the mortgage to an individual on whom the personal covenant would not otherwise be binding under the Act. It is these "assigns" who must be bound by the personal covenant of the original corporate mortgagor if the mortgagee is to have the protection contemplated by s. 40(2). In this case the concern about the mortgagee's rights being unfairly defeated does not arise since National Trust freely entered into an assumption agreement with Mead. The fact that Mead assumed the mortgage by way of assumption agreement with National Trust means that

paiement de l'hypothèque. L'hypothèque est tombée en retard de paiement et National Trust a intenté contre Remai et Mead une action en paiement du montant intégral du capital et de l'intérêt dus. National Trust s'est par la suite désistée de l'action contre Remai. Le juge en chambre a rendu une ordonnance conditionnelle de vente du bien-fonds, mais a refusé d'accorder contre Mead un jugement personnel pour couvrir l'insuffisance. La Cour d'appel a rejeté l'appel interjeté par National Trust.

Le pourvoi soulève les questions de savoir (1) si la protection générale accordée aux particuliers aux termes du par. 2(1) l'emporte sur l'exception énoncée au par. 40(2) à l'égard des sociétés, de leurs successeurs et de leurs cessionnaires; (2) si le libellé particulier de la convention de prise en charge dégage Mead de toute responsabilité fondée sur l'engagement personnel; et (3) si la convention de prise en charge opère une novation.

*Arrêt*: Le pourvoi est rejeté.

*Le* juge en chef Lamer et les juges Wilson, La Forest, L'Heureux-Dubé, Gonthier et Cory: La renonciation faite par Remai en vertu du par. 40(2) de *The Limitation of Civil Rights Act* ne lie pas Mead. Toute exception au principe, posé par l'art. 2, que les particuliers débiteurs hypothécaires soient mis à l'abri de la responsabilité personnelle doit recevoir l'interprétation la plus restrictive possible. Le sens du terme «successeur» au par. 40(2) doit se limiter à d'autres sociétés, puisque l'application de l'exception prévue au par. 40(2) aux «successeurs» a pour seul objet d'assurer la responsabilité fondée sur l'engagement personnel d'une société qui prend la place de la société qui était la débitrice hypothécaire originaire. Bien que le mot «cessionnaires» comprenne à première vue les particuliers cessionnaires de sociétés débitrices hypothécaires, cette exception a pour objet la protection de créanciers hypothécaires qui consentent des hypothèques à des sociétés à condition que celles-ci s'engagent personnellement à payer, et qui découvrent par la suite que la société a unilatéralement (et sans le consentement du créancier hypothécaire) cédé l'hypothèque à un particulier qui, autrement, ne serait pas lié par l'engagement personnel aux termes de la Loi. Ce sont ces «cessionnaires» qui doivent être liés par l'engagement personnel de la société qui était la débitrice hypothécaire originaire si le créancier hypothécaire doit bénéficier de la protection envisagée par le par. 40(2). En l'espèce, le problème de l'anéantissement injuste des droits du créancier hypothécaire ne se pose pas étant donné que National Trust a librement conclu avec Mead une convention de prise en charge. Le fait que Mead a pris l'hypothèque en charge au moyen d'une convention de prise en charge intervenue avec National

1990 CanLII 73 (SCC)

he is entitled to the protection of s. 2(2)(d) of the Act, which is not subject to the waiver exception under s. 40(2).

The personal covenant set out in the assumption agreement is unenforceable against Mead. The wording of the agreement, in conjunction with the Act, is clearly capable of being construed as releasing Mead from any obligation to pay under the covenant. The agreement provides that Mead will be bound by all the terms of the mortgage "as though it had been originally made, executed and delivered to him as Mortgagor", in which case s. 2 would have applied, no exception under s. 40(2) would have been available, and the personal covenant would have been unenforceable pursuant to s. 40(1).

The assumption agreement did not effect a novation. The clause in the agreement stating that National Trust may at any time release the original mortgagor cannot be construed as a present release of Remai such as would be necessary to replace Remai with Mead as principal debtor. This conclusion is strengthened when the terms of the original mortgage are taken into consideration: the "no prejudice" clause confirms that there was no intention on the part of National Trust to release Remai. Taken together, these provisions are a strong indication that Mead's assumption of the debt was not accepted by National Trust in full consideration and substitution of Remai's obligation. The conduct of the parties does not negate that indication. National Trust's action in discontinuing its suit against Remai is equivocal, and cannot be construed as supporting an inference that the trust company was no longer looking to Remai for satisfaction of the debt. Discontinuance does not preclude a litigant from bringing the action at a later date, and thus does not constitute the kind of compelling circumstance necessary to found a novation.

*Per* McLachlin J.: Wilson J.'s conclusions and reasons were agreed with, subject to the comment that ss. 2(2)(d) and 40(2) of the Act involve a facial conflict which should be resolved by recourse to legislative intention.

## Cases Cited

By Wilson J.

**Considered:** *Canada Permanent Trust Co. v. Neumann* (1986), 8 B.C.L.R. (2d) 318; *Re Bank of Nova Scotia and Vancouver Island Renovating Inc.* (1986), 31 D.L.R. (4th) 560; *Prospect Mortgage Investment*

Trust lui donne droit à la protection de l'al. 2(2)(d) de la Loi, lequel n'est pas assujetti à l'exception que constitue la renonciation prévue au par. 40(2).

On ne peut se prévaloir contre Mead de l'engagement personnel contenu dans la convention de prise en charge. Le libellé de la convention, combiné avec la Loi, admet manifestement une interprétation qui dégage Mead de toute obligation de payer fondée sur l'engagement personnel. La convention prévoit que Mead est lié par la totalité des conditions de l'hypothèque, «comme s'il était lui qui l'avait consentie et qui avait signé l'acte constitutif», auquel cas l'art. 2 se serait appliqué, aucune exception fondée sur le par. 40(2) n'aurait pu être invoquée et, suivant le par. 40(1), l'engagement personnel aurait été de nul effet.

La convention de prise en charge n'opère pas de novation. La clause de la convention stipulant que National Trust pouvait à n'importe quel moment dégager le débiteur hypothécaire originaire de ses engagements ne saurait s'interpréter comme le genre de décharge actuelle de Remai qui serait nécessaire pour que Mead soit substitué à Remai en tant que débiteur principal. Cette conclusion est renforcée quand on prend en considération les conditions de l'hypothèque primitive: la clause «de réserve de droits» confirme l'absence d'intention de la part de National Trust de dégager Remai de sa responsabilité. Prises ensemble, ces dispositions constituent une forte indication que National Trust n'a pas accepté la prise en charge de la dette par Mead en plein acquittement et en pleine substitution de l'obligation de Remai. La conduite des parties ne neutralise pas cette indication. Le fait que National Trust se soit désistée de son action contre Remai est équivoque et ne peut s'interpréter comme soutenant l'inférence selon laquelle la société de fiducie ne comptait plus sur Remai pour le paiement de la dette. Le désistement n'empêche pas une partie d'intenter l'action à une date ultérieure et, par conséquent, ne constitue pas le genre de circonstance déterminante qui est nécessaire pour fonder une novation.

*Le juge* McLachlin: Le juge McLachlin souscrit aux conclusions et aux motifs du juge Wilson, sous réserve de l'observation que l'al. 2(2)(d) et le par. 40(2) de la Loi sont en conflit apparent et qu'on doit résoudre ce conflit en ayant recours à l'intention du législateur.

## Jurisprudence

Citée par le juge Wilson

**Arrêts examinés:** *Canada Permanent Trust Co. v. Neumann* (1986), 8 B.C.L.R. (2d) 318; *Re Bank of Nova Scotia and Vancouver Island Renovating Inc.* (1986), 31 D.L.R. (4th) 560; *Prospect Mortgage Invest-*

*Corp. v. Van-5 Developments Ltd.* (1985), 68 B.C.L.R. 12; **disapproved:** *Eaton Bay Trust Co. v. Ling* (1987), 45 D.L.R. (4th) 1; **referred to:** *Herold v. British American Oil Co.* (1954), 12 W.W.R. (N.S.) 333; *First City Trust Co. v. Friesen* (1985), 38 Sask. R. 220; *Canada Trustco Mortgage Co. v. Grover*, [1987] 2 W.W.R. 766; *Potash v. Royal Trust Co.*, [1986] 2 S.C.R. 351; *Disney Farms Ltd. v. Canadian Imperial Bank of Commerce*, [1984] 5 W.W.R. 285; *Polson v. Wulffsohn* (1890), 2 B.C.R. 39; *Central & Eastern Trust Co. v. Rosebowl Holdings Ltd.* (1981), 34 N.B.R. (2d) 308; *Central Trust Co. v. Bartlett* (1983), 30 R.P.R. 267; *Saskatchewan Trust v. Ross* (1985), 41 Sask. R. 121.

**Statutes and Regulations Cited**

*Limitation of Civil Rights Act*, R.S.S. 1978, c. L-16, ss. 2 [am. 1983-84, c. 44, s. 2], 40.
*Queen's Bench Rules of Saskatchewan*, rule 198(4).

APPEAL from a judgment of the Saskatchewan Court of Appeal (1988), 70 Sask. R. 11, [1988] 5 W.W.R. 365, 52 D.L.R. (4th) 159, affirming the refusal of Wright J. to order a personal judgment against the respondent in a mortgage action. Appeal dismissed.

*W. G. Turnbull*, for the appellant.

*Dale A. Canham*, for the respondents.

The judgment of Lamer C.J. and Wilson, La Forest, L'Heureux-Dubé, Gonthier and Cory JJ. was delivered by

WILSON J.—The issue in this case is the right of a mortgagee in the province of Saskatchewan to sue on the personal covenant. The parties contend that resolution of this issue depends upon the interpretation of the relevant statute, the construction of an assumption agreement, and the application of the principle of novation.

1. The Facts

The respondent Remai Construction (1981) Inc. ("Remai") granted a mortgage in the amount of $40,725 to the appellant National Trust Company ("National Trust") on June 28, 1984 as security for a loan to be applied in the construction of a condominium unit in Saskatoon. *The Limitation of Civil Rights Act*, R.S.S. 1978, c. L-16 ("the Act"), provides that a mortgagee's right to recover

---

*ment Corp. v. Van-5 Developments Ltd.* (1985), 68 B.C.L.R. 12; **arrêt critiqué:** *Eaton Bay Trust Co. v. Ling* (1987), 45 D.L.R. (4th) 1; **arrêts mentionnés:** *Herold v. British American Oil Co.* (1954), 12 W.W.R. (N.S.) 333; *First City Trust Co. v. Friesen* (1985), 38 Sask. R. 220; *Canada Trustco Mortgage Co. v. Grover*, [1987] 2 W.W.R. 766; *Potash c. Royal Trust Co.*, [1986] 2 R.C.S. 351; *Disney Farms Ltd. v. Canadian Imperial Bank of Commerce*, [1984] 5 W.W.R. 285; *Polson v. Wulffsohn* (1890), 2 B.C.R. 39; *Central & Eastern Trust Co. v. Rosebowl Holdings Ltd.* (1981), 34 N.B.R. (2d) 308; *Central Trust Co. v. Bartlett* (1983), 30 R.P.R. 267; *Saskatchewan Trust v. Ross* (1985), 41 Sask. R. 121.

**Lois et règlements cités**

*Limitation of Civil Rights Act*, R.S.S. 1978, ch. L-16, art. 2 [mod. 1983-84, ch. 44, art. 2], 40.
*Queen's Bench Rules of Saskatchewan*, règle 198(4).

POURVOI contre un arrêt de la Cour d'appel de la Saskatchewan (1988), 70 Sask. R. 11, [1988] 5 W.W.R. 365, 52 D.L.R. (4th) 159, confirmant le refus du juge Wright de rendre un jugement personnel contre l'intimé dans une action hypothécaire. Pourvoi rejeté.

*W. G. Turnbull*, pour l'appelante.

*Dale A. Canham*, pour les intimés.

Version française du jugement du juge en chef Lamer et des juges Wilson, La Forest, L'Heureux-Dubé, Gonthier et Cory rendu par

LE JUGE WILSON—Le litige vise le droit d'un créancier hypothécaire dans la province de la Saskatchewan d'intenter une action fondée sur l'engagement personnel de payer. Les parties soutiennent que c'est là une question dont la résolution dépend de l'interprétation de la loi applicable, de l'interprétation d'une convention de prise en charge et de l'application du principe de la novation.

1. Les faits

L'intimée Remai Construction (1981) Inc. («Remai») a consenti à l'appelante National Trust Company («National Trust») le 28 juin 1984 une hypothèque de 40 725 $ en garantie d'un prêt devant être affecté à la construction d'une unité en copropriété à Saskatoon. Aux termes de *The Limitation of Civil Rights Act*, R.S.S. 1978, ch. L-16 («la Loi»), le droit d'un créancier hypothé-

1990 CanLII 73 (SCC)

Case 09-10138-MFW   Doc 14225-49   Filed 08/15/14   Page 6 of 374

414     NATIONAL TRUST CO. *v.* MEAD   *Wilson J.*     [1990] 2 S.C.R.

the unpaid balance due on a mortgage is restricted to the land itself. Any personal covenant is void and unenforceable. The Act, however, permits corporate mortgagors to waive the protection provided by the Act and Remai did so in the present case.

On August 28, 1984, the respondent David Mead ("Mead") purchased the condominium unit from Remai and executed an Assumption of Liability Agreement ("Assumption Agreement") in favour of National Trust. The Assumption Agreement contained a covenant making Mead personally liable on the mortgage.

On October 1, 1986, the mortgage fell into arrears and two months later National Trust commenced an action against Remai and Mead jointly and severally for *inter alia* the full amount of the principal and interest owing. In its statement of defence, Remai alleged that the Assumption Agreement released it from its covenant to pay or alternatively constituted a novation which had the effect of discharging it from any further liability on the covenant. The action against Remai was discontinued.

Mead entered no statement of defence. National Trust then applied for an order *nisi* for sale and for personal judgment against Mead. Wright J. in chambers refused to order personal judgment for the deficiency but granted an order *nisi* for sale without recorded reasons. The Saskatchewan Court of Appeal dismissed National Trust's appeal. National Trust now appeals to this Court.

## 2. The Legislation

*The Limitation of Civil Rights Act* provides:

**2**(1) Where land is hereafter sold under an agreement for sale in writing, or mortgaged whether by legal or equitable mortgage for the purpose of securing the purchase price or part of the purchase price of the land affected, or where a mortgage is hereafter given as collateral security for the purchase price or part of the purchase price of land, the vendor's or mortgagee's right

caire de recouvrer le solde impayé d'un prêt hypothécaire se limite au bien-fonds lui-même. Tout engagement personnel de payer est nul et sans effet. La Loi permet toutefois aux sociétés débitrices hypothécaires de renoncer à la protection qu'elle accorde, ce qu'a fait Remai en l'espèce.

Le 28 août 1984, l'intimé David Mead («Mead») a acheté l'unité en copropriété à Remai et a signé au profit de National Trust une convention d'acceptation de responsabilité («convention de prise en charge»). Cette convention contenait une clause rendant Mead personnellement responsable du paiement de l'hypothèque.

Le 1er octobre 1986, l'hypothèque est tombée en retard de paiement et, deux mois plus tard, National Trust a intenté contre Remai et Mead conjointement et solidairement une action visant notamment à l'obtention du paiement du montant intégral du capital et de l'intérêt dus. Dans sa défense, Remai alléguait que la convention de prise en charge la déliait de son engagement de payer ou, subsidiairement, qu'elle constituait une novation ayant pour effet de la libérer de toute autre obligation fondée sur son engagement personnel. National Trust s'est désistée de l'action contre Remai.

Mead n'a pas produit de défense. National Trust de son côté a présenté une demande visant à obtenir une ordonnance conditionnelle de vente et un jugement personnel contre Mead. Le juge Wright, siégeant en chambre, a refusé d'accorder un jugement personnel pour couvrir l'insuffisance, mais il a rendu une ordonnance conditionnelle de vente sans motifs consignés. La Cour d'appel de la Saskatchewan a rejeté l'appel interjeté par National Trust et celle-ci se pourvoit maintenant devant notre Cour.

## 2. Les textes législatifs

*The Limitation of Civil Rights Act* dispose:

[TRADUCTION] **2**(1) Lorsqu'un bien-fonds se vend en exécution d'un contrat de vente écrit ou qu'il est grevé d'une hypothèque, en common law ou en *equity*, aux fins de garantir la totalité ou une partie du prix d'achat dudit bien-fonds, ou lorsqu'une hypothèque est consentie à titre de garantie accessoire de la totalité ou d'une partie du prix d'achat d'un bien-fonds, le droit du

1990 CanLII 73 (SCC)

to recover the unpaid balance due shall be restricted to the land sold or mortgaged and to cancellation of the agreement for sale or foreclosure of the mortgage or sale of the property, and no action shall lie on the covenant for payment contained in the agreement for sale or mortgage.

(1.1) The benefit of subsection (1) extends to and includes a mortgage that secures, or is given as collateral security for, the purchase price or part of the purchase price of the land, whether or not the mortgagee was the vendor of that land.

(2) The benefit of subsections (1) and (1.1) extends to and includes:

(a) the personal covenant of the purchaser contained in any assignment by the vendor of such an agreement for sale;

(b) the personal covenant of the assignee contained in any assignment by the purchaser of such an agreement for sale;

(c) the personal covenant of the mortgagor contained in an agreement extending any such mortgage;

(d) the personal covenant of a purchaser of lands subject to any such mortgage, to assume and pay the mortgage;

and no action lies on any such personal covenant.

**40**(1) Subject to subsection (2), every agreement or bargain, verbal or written, express or implied, that this Act or any provision thereof shall not apply or that any benefit or remedy provided by it shall not be available, or which in any way limits, modifies or abrogates or in effect limits, modifies or abrogates any such benefit or remedy, is null, void and of no effect, and moneys paid under or by reason of any such agreement or bargain are recoverable in any court of competent jurisdiction.

(2) A corporate body may in writing agree that this Act or any provision thereof shall have no application to:

(a) any mortgage, charge or other security for the payment of money made, given or created by it after March 25, 1959;

(b) any agreement or instrument entered into by it after March 25, 1959, involving the payment by it of money, or its liability to pay money;

vendeur ou du créancier hypothécaire de recouvrer le solde impayé devenu exigible ne porte que sur le bien-fonds vendu ou hypothéqué et ne permet que l'annulation du contrat d'achat, ou la forclusion ou la vente du bien-fonds. L'engagement de payer contenu dans le contrat de vente ou dans l'acte constitutif d'hypothèque ne donne lieu à aucun droit d'action.

(1.1) Le paragraphe (1) s'applique également à une hypothèque qui garantit, ou qui garantit accessoirement, la totalité ou une partie du prix d'achat du bien-fonds, que le créancier hypothécaire ait été ou non le vendeur de ce bien-fonds.

(2) Les paragraphes (1) et (1.1) s'appliquent également:

a) à l'engagement personnel pris par l'acheteur lors de la cession, faite par le vendeur, d'un tel contrat de vente;

b) à l'engagement personnel pris par le cessionnaire lors d'une cession, faite par l'acheteur, d'un tel contrat de vente;

c) à l'engagement personnel du débiteur hypothécaire contenu dans un accord reportant l'échéance d'une telle hypothèque;

d) à l'engagement personnel de l'acquéreur de biens-fonds grevés d'une telle hypothèque de prendre en charge et de payer cette hypothèque.

Ces engagements personnels ne donnent lieu à aucun droit d'action.

**40**(1) Sous réserve du paragraphe (2), est nul, non avenu et inopérant tout accord ou entente, écrit ou oral, exprès ou implicite, qui stipule l'inapplicabilité de la présente loi ou de quelqu'une de ses dispositions ou l'exclusion de tout avantage ou redressement y prévu, ou qui de quelque manière limite, modifie ou supprime un tel avantage ou redressement, ou qui a un tel effet. Toute somme versée en vertu ou en raison d'un tel accord ou entente est recouvrable devant un tribunal compétent.

(2) Une personne morale peut convenir par écrit de l'inapplicabilité de la présente loi ou de quelqu'une de ses dispositions:

a) à une hypothèque, charge ou autre garantie qui est destinée à assurer le paiement d'une somme d'argent et qu'elle a consentie, accordée ou créée postérieurement au 25 mars 1959;

b) à une entente ou à un acte, signé par elle postérieurement au 25 mars 1959, qui prévoit le paiement d'une somme d'argent par elle ou qui la rend responsable du paiement d'une telle somme;

1990 CanLII 73 (SCC)

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 8 of 374

416        NATIONAL TRUST CO. *v.* MEAD    *Wilson J.*        [1990] 2 S.C.R.

(c) any agreement or instrument renewing or extending or collateral to any such mortgage, charge, other security, agreement or instrument; or

(d) the rights, powers or remedities [*sic*] of any other person under any such mortgage, charge, other security, agreement or instrument;

and, notwithstanding anything in this Act, an agreement made by a corporate body under this subsection shall be binding upon the corporate body, its successors and assigns.

### 3.  The Assumption Agreement

The relevant parts of the Assumption Agreement between National Trust (the Mortgagee) and Mead (the Purchaser) read as follows:

**WHEREAS** by a mortgage dated the 28th day of June, 1984 . . .

**AND WHEREAS** the Purchaser represents to the Mortgagee that he has purchased the said lands and premises and is now the owner thereof subject to the said mortgage.

**AND WHEREAS** the Purchaser has agreed to assume and covenant with the Mortgagee to pay to the Mortgagee the mortgage indebtedness now owing under the said mortgage.

**NOW THIS INDENTURE WITNESSETH** that in consideration of the premises and the sum of One Dollar ($1.00) now paid by the Mortgagee to the Purchaser, it is hereby agreed as follows:

1. The Purchaser covenants and agrees with the Mortgagee, that he will pay to it the said principal money now owing, and all monies that may be advanced hereafter with respect to the said mortgage, together with interest thereon, and that he will perform each and all of the covenants, conditions, and obligations in the said mortgage contained to be performed by the Mortgagor therein at the times and in the manner and in all respects as therein provided, and that he will be bound by each and all of the terms and covenants, conditions and obligations of the said mortgage as though it had been originally made, executed and delivered by him as Mortgagor.

. . .

**AND THE PURCHASER HEREBY AUTHORIZES AND INSTRUCTS THE MORTGAGEE TO PAY TO THE MORTGAGOR NAMED IN THE SAID MORTGAGE OR TO HIS NOMINEE, THE**

c) à une entente ou à un acte qui renouvelle ou proroge une telle hypothèque, une telle charge, une telle autre garantie, un tel accord ou un tel acte, ou qui leur est accessoire; ou

d) aux droits, pouvoirs ou recours pouvant être exercés par une autre personne en vertu d'une telle hypothèque, d'une telle charge, d'une telle autre garantie, d'une telle entente ou d'un tel acte.

De plus, indépendamment des termes de la présente loi, une entente conclue par une personne morale en vertu du présent paragraphe lie cette personne morale, ses successeurs et ses cessionnaires.

### 3.  La convention de prise en charge

Les parties pertinentes de la convention de prise en charge intervenue entre National Trust (la créancière hypothécaire) et Mead (l'acheteur) portent:

[TRADUCTION] **CONSIDÉRANT** que par hypothèque en date du 28 juin 1984 [. . .]

**ET CONSIDÉRANT** que l'acheteur déclare à la créancière hypothécaire s'être porté acquéreur des terres et des locaux en question et être actuellement propriétaire de ceux-ci, sous réserve de ladite hypothèque.

**ET CONSIDÉRANT** que l'acheteur s'engage envers la créancière hypothécaire à prendre en charge la dette hypothécaire existant en vertu de ladite hypothèque et à lui rembourser le montant de cette dette.

**LE PRÉSENT ACTE CONSTATE** qu'en contrepartie du bien-fonds et de la somme d'un dollar (1 $) versée maintenant par la créancière hypothécaire à l'acheteur, les parties conviennent de ce qui suit:

1. L'acheteur s'engage envers la créancière hypothécaire à lui payer ledit montant du capital encore impayé et toutes sommes avancées en vertu de ladite hypothèque, ainsi que les intérêts courus. Il convient de remplir intégralement, aux époques et de la manière prescrites dans l'acte constitutif d'hypothèque et en parfaite conformité avec celui-ci, les engagements, les conditions et les obligations qui, aux termes dudit acte, incombent au débiteur hypothécaire. En outre, il se reconnaît lié par la totalité des modalités, engagements, conditions et obligations que comporte ladite hypothèque comme si c'était lui qui l'avait consentie et qui avait signé l'acte constitutif.

. . .

**ET L'ACHETEUR AUTORISE PAR LES PRÉSENTES LA CRÉANCIÈRE HYPOTHÉCAIRE À PAYER AU DÉBITEUR HYPOTHÉCAIRE NOMMÉ DANS L'ACTE CONSTITUTIF D'HYPO-**

1990 CanLII 73 (SCC)

**FULL PROCEEDS OF THE LOAN THEREBY SECURED.**

This Agreement shall extend to and bind and may be taken advantage of by the respective heirs, executors, administrators, successors and assigns as the case may be of each and every party hereto . . . all covenants shall be joint and several; time shall be of the essence hereof; and all provisions hereof shall have effect notwithstanding any statute to the contrary.

### 4. The Courts Below

As mentioned, Wright J. hearing the case in chambers gave no recorded reasons for his order *nisi*.

Writing for the Saskatchewan Court of Appeal (1988), 70 Sask. R. 11, Cameron J.A. encapsulates the statutory scheme as follows at p. 12:

Ordinarily, a person who borrows money from another for the purpose of buying land and gives that other a mortgage upon the land to secure repayment of the loan, can have the land taken from him on foreclosure, if he defaults, but cannot be sued on his covenant to pay: **The Limitation of Civil Rights Act**, S.S. 1979, c. L-6, s. 2. That is subject, however, to an exception. A corporate borrower is empowered to agree when granting a mortgage that the statute will not apply to that mortgage: s. 40(2). And, according to the **Act**, an agreement or waiver of that sort binds both the corporation and its "successors and assigns".

After a review of the facts Cameron J.A. sought guidance from previous authority on the question whether a mortgagee is limited to its remedy against the land when an individual assumes a mortgage from a corporation which has waived the statutory protection of s. 2. He found the jurisprudence inconsistent on this point, noting that a great deal seemed to depend on the terms of the particular assumption agreement and whether it could be said to give rise to a novation.

**THÈQUE OU À LA PERSONNE PAR LUI DÉSIGNÉE LA TOTALITÉ DU PRODUIT DU PRÊT GARANTI PAR L'HYPOTHÈQUE ET LUI DEMANDE DE LE FAIRE.**

La présente convention vise et lie les héritiers, les exécuteurs, les administrateurs, les successeurs et les cessionnaires respectifs, selon le cas, de chacune des parties aux présentes, et leur profite, [. . .]; tout engagement est pris conjointement et solidairement; les délais fixés par les présentes sont de rigueur; et toutes les stipulations des présentes s'appliquent indépendamment de toute disposition législative contraire.

### 4. Les juridictions inférieures

Comme je l'ai déjà mentionné, les motifs de l'ordonnance conditionnelle du juge Wright, qui a entendu la cause en cabinet, n'ont pas été consignés.

Écrivant au nom de la Cour d'appel de la Saskatchewan (1988), 70 Sask. R. 11, le juge Cameron résume ainsi le régime établi par la Loi, à la p. 12:

[TRADUCTION] D'ordinaire, une personne qui emprunte de l'argent à une autre afin de se porter acquéreur d'un bien-fonds et qui consent au prêteur en garantie du remboursement du prêt une hypothèque grevant ledit bien-fonds peut se voir enlever celui-ci pour cause de forclusion si elle se trouve en défaut, mais elle ne peut faire l'objet de poursuites fondées sur son engagement de payer: **The Limitation of Civil Rights Act**, S.S. 1979, ch. L-6, art. 2. Cette règle souffre toutefois une exception. En effet, il est loisible à une société emprunteuse qui consent une hypothèque de convenir que la Loi ne s'y applique pas: par. 40(2). Et, aux termes de la Loi, un accord ou une renonciation de ce genre lie à la fois la société et ses «successeurs et [ . . . ] cessionnaires».

Ayant passé en revue les faits, le juge Cameron a cherché dans la jurisprudence la réponse à la question de savoir si un créancier hypothécaire est limité à l'exercice de son recours contre le bien-fonds dans un cas où une personne prend en charge une hypothèque consentie par une société qui a renoncé à la protection accordée par l'art. 2 de la Loi. Le juge Cameron a constaté que la jurisprudence se contredisait sur ce point et a fait remarquer que les termes de la convention de prise en charge en litige ainsi que la réponse donnée à la question de savoir si cette convention pouvait être considérée comme opérant une novation semblaient y jouer un rôle important.

He then considered the particular wording of the Assumption Agreement before him, especially the undertaking of Mead to perform all the covenants in the mortgage "as though it had been originally made, executed and delivered by him as Mortgagor". At pages 16-17, he found these words virtually dispositive of the matter before him:

The meaning of these words is clear. And if taken literally, so too is their effect. Had Mr. Mead been the original mortgagor he would have been entitled to the benefit of s. 2 of the **Act**, and would have been disabled by s. 40 from agreeing otherwise. Thus the effect of the words is to extend to him the benefit of the statute and, in turn, to limit National Trust's remedy against the land. Even if this were uncertain, the result would not change, because the agreement falls to be construed contra proferentem—against the one who drew it and in favour of the one who made it. Hence the words have to be given the meaning most favourable to Mr. Mead.

The Saskatchewan Court of Appeal also based its decision on a finding that novation had occurred in the form of a substitution of Mead for Remai as mortgagor. Cameron J.A. drew the four elements necessary to establish a novation from *Herold v. British American Oil Co.* (1954), 12 W.W.R. (N.S.) 333 (Alta. S.C.) and *Canada Permanent Trust Co. v. Neumann* (1986), 8 B.C.L.R. (2d) 318 (C.A.) as follows:

(i) The new debtor must assume the complete liability.

(ii) The creditor must accept the new debtor as a principal debtor and not as an agent or guarantor.

(iii) The creditor must accept the new contract in full satisfaction and substitution for the old contract.

(iv) The new contract must be made with the consent of the old debtor.

In this case Mead expressly assumed in clause 1 of the Assumption Agreement the complete liability under the mortgage. National Trust accepted him as principal debtor and gave valuable consideration. Mead undertook to repay the loan and agreed in clause 2 of the Agreement that if Na-

Il a examiné ensuite le libellé particulier de la convention de prise en charge dont il était question, et spécialement la promesse de Mead de s'acquitter de tous les engagements que comportait l'hypothèque «comme si c'était lui qui l'avait consentie et qui avait signé l'acte constitutif». Aux pages 16 et 17, il conclut qu'il n'en fallait guère davantage pour régler la question dont il se trouvait saisi:

[TRADUCTION] Le sens de ces mots est clair. Et si on les prend littéralement, tel est également leur effet. Si M. Mead avait été le débiteur hypothécaire originaire, il aurait eu droit au bénéfice de l'art. 2 de la **Loi**, et l'art. 40 serait venu l'empêcher d'en convenir autrement. Aussi les mots en question ont-ils pour effet de le faire bénéficier de la loi et, par le fait même, de limiter National Trust à l'exercice de son recours contre le bien-fonds. Même s'il planait quelque doute à ce sujet, le résultat serait identique puisque la convention est à interpréter *contra proferentem*, c'est-à-dire au détriment de la partie qui l'a rédigée et au profit de l'autre partie. D'où il s'ensuit qu'il faut donner aux mots en cause le sens le plus favorable à M. Mead.

La Cour d'appel de la Saskatchewan a fondé son arrêt en outre sur la conclusion qu'il y avait eu novation sous la forme de la substitution de Mead à Remai en tant que débiteur hypothécaire. Le juge Cameron a tiré des décisions *Herold v. British American Oil Co.* (1954), 12 W.W.R. (N.S.) 333 (C.S. Alb.) et *Canada Permanent Trust Co. v. Neumann* (1986), 8 B.C.L.R. (2d) 318 (C.A.), les quatre éléments nécessaires pour qu'il y ait novation:

(i) Le nouveau débiteur doit assumer totalement la responsabilité.

(ii) Le créancier doit accepter le nouveau débiteur comme débiteur principal et non pas en qualité de mandataire ou de garant.

(iii) Le créancier doit accepter le nouveau contrat en pleine satisfaction et substitution de l'ancien contrat.

(iv) Le nouveau contrat doit être conclu avec le consentement de l'ancien débiteur.

En l'espèce, Mead a assumé expressément dans la clause première de la convention de prise en charge la pleine responsabilité de l'hypothèque. National Trust l'a accepté à titre de débiteur principal et a donné une contrepartie de valeur. Mead s'est engagé à rembourser le prêt et a con-

1990 CanLII 73 (SCC)

tional Trust released Remai "from any or all of the covenants" contained in the mortgage, this would not affect his (Mead's) liability or National Trust's charge on the land. As between National Trust and Remai the Court of Appeal concluded that National Trust had discharged Remai. It premised this finding on National Trust's discontinuance of its action against Remai. The Court of Appeal also found that National Trust accepted the new arrangement in satisfaction of and in substitution for the old one based on the combination of the Assumption Agreement and National Trust's conduct in relation to Remai. Finally, Remai consented to the substitution of Mead as the new debtor. The court was therefore satisfied that the Assumption Agreement effected a novation and that the chambers judge was right in confining National Trust to its remedy against the land under s. 2(1) of the Act.

venu à la clause 2 de la convention que si National Trust déliait Remai [TRADUCTION] «de l'un ou de l'ensemble des engagements» énoncés dans l'acte constitutif d'hypothèque, cela ne changerait rien à sa responsabilité (celle de Mead) ni à la charge de National Trust grevant le bien-fonds. En ce qui concerne les rapports entre National Trust et Remai, la Cour d'appel a conclu que cette dernière avait été dégagée de sa responsabilité par National Trust. Cette conclusion reposait sur le fait que National Trust s'était désistée de son action contre Remai. Se fondant sur la convention de prise en charge ainsi que sur la conduite de National Trust envers Remai, la Cour d'appel a conclu en outre que National Trust avait accepté le nouvel accord en satisfaction et en substitution de l'ancien. Finalement, Remai a donné son consentement à la substitution de Mead en tant que nouveau débiteur. La cour a été en conséquence convaincue que la convention de prise en charge opérait une novation et que c'est avec raison que le juge siégeant en cabinet avait limité National Trust à l'exercice de son recours contre le bien-fonds conformément au par. 2(1) de la Loi.

## 5. The Issues

The issues raised by this appeal are as follows:

A. Does the general protection extended to individuals under s. 2(1) of the Act prevail over the exception contained in s. 40(2) for corporations and their successors or assigns?

B. Does the particular wording of the Assumption Agreement release Mead from liability on the personal covenant?

C. Does the assumption agreement effect a novation?

## 6. Analysis

### A. *Statutory Interpretation*

Section 2 of the Act provides that when land is mortgaged for purposes of securing the purchase price of land, the mortgagee's recovery rights are restricted to foreclosure and sale of the mortgaged land. No action on the personal covenant lies against the mortgagor for any deficiency. Section 2(2)(d) extends that protection to subsequent purchasers by sweeping within its ambit "the personal

## 5. Les questions en litige

Le présent pourvoi soulève les questions suivantes:

A. La protection générale accordée aux particuliers aux termes du par. 2(1) de la Loi l'emporte-t-elle sur l'exception énoncée au par. 40(2) à l'égard des sociétés, de leurs successeurs et de leurs cessionnaires?

B. Le libellé particulier de la convention de prise en charge dégage-t-il Mead de toute responsabilité fondée sur l'engagement personnel?

C. La convention de prise en charge opère-t-elle une novation?

## 6. Analyse

### A. *L'interprétation des dispositions législatives*

L'article 2 de la Loi porte que quand une hypothèque est consentie sur un bien-fonds afin de garantir le prix d'achat de celui-ci, les droits de recouvrement du créancier hypothécaire se limitent à la forclusion et à la vente du bien-fonds grevé. Aucune action fondée sur l'engagement personnel ne peut être intentée contre le débiteur hypothécaire en cas d'insuffisance. C'est là une

1990 CanLII 73 (SCC)

covenant of a purchaser of lands subject to any such mortgage, to assume and pay the mortgage".

On a plain reading of s. 2(2)(d) National Trust cannot recover from Mead on his personal covenant. This statutory intent is reinforced by s. 40(1) of the Act, which provides that agreements purporting to waive the protection of the Act are "null, void and of no effect".

Section 40(2), however, creates an exception to s. 2 and 40(1) of the Act by permitting corporate mortgagors to waive the protection. In its mortgage agreement with National Trust, Remai expressly waived the protection under s. 2 of the Act and gave a personal covenant on the mortgage. Under the terms of s. 40(2) such a waiver is binding upon "the corporate body, its successors and assigns". The question to be decided therefore is whether Mead is bound by the waiver as a successor or assign of Remai. The answer turns on the interaction between ss. 2 and 40(1) of the Act, which preclude enforcement of the personal covenant against an individual mortgagor, and s. 40(2) of the Act, which binds successors and assigns to a waiver of s. 2 by a corporate mortgagor.

As the Saskatchewan Court of Appeal points out, existing case law on the point is not very helpful. In *First City Trust Co. v. Friesen* (1985), 38 Sask. R. 220 (Q.B.), an individual assumed a mortgage from a corporate builder. MacLeod J. rejected an argument that s. 40(2) bound only corporate successors and assigns. At page 223 he states:

Whether the mortgagee can or cannot obtain personal judgment against the defendant Friesen depends on the terms of the assumption agreement. Without that agree-

protection que l'al. 2(2)d) accorde également aux acheteurs subséquents du fait qu'il englobe dans sa portée «l'engagement personnel de l'acquéreur de biens-fonds grevés d'une telle hypothèque de prendre en charge et de payer cette hypothèque».

Selon une interprétation littérale de l'al. 2(2)d), National Trust ne peut obtenir de Mead un recouvrement fondé sur l'engagement personnel de celui-ci. Cette intention du législateur se trouve renforcée par le par. 40(1) de la Loi, qui dispose que tout accord par lequel on prétend renoncer à la protection de la Loi est «nul, non avenu et inopérant».

Le paragraphe 40(2) crée toutefois une exception à l'art. 2 et au par. 40(1) de la Loi en permettant aux sociétés débitrices hypothécaires de renoncer à la protection. Dans la convention hypothécaire qu'elle a conclue avec National Trust, Remai a expressément renoncé à la protection de l'art. 2 de la Loi et s'est engagée personnellement à garantir l'hypothèque. Suivant les termes du par. 40(2), pareille renonciation lie la «personne morale, ses successeurs et ses cessionnaires». La question à trancher est donc de savoir si Mead est lié par la renonciation en tant que successeur ou cessionnaire de Remai. La réponse tient à l'interrelation de l'art. 2 et du par. 40(1) de la Loi, qui viennent empêcher qu'un particulier débiteur hypothécaire ne soit contraint de s'acquitter de son engagement personnel de payer, et du par. 40(2) de la Loi qui prévoit qu'une renonciation à l'application de l'art. 2 faite par une société débitrice hypothécaire lie ses successeurs et ses cessionnaires.

Ainsi que le fait remarquer la Cour d'appel de la Saskatchewan, la jurisprudence se révèle fort peu utile sur ce point. Dans l'affaire *First City Trust Co. v. Friesen* (1985), 38 Sask. R. 220 (B.R.), un particulier a pris en charge une hypothèque consentie par une société constructrice. Le juge MacLeod a rejeté l'argument selon lequel le par. 40(2) ne s'applique qu'aux successeurs et aux cessionnaires qui sont des personnes morales. Il dit, à la p. 223:

[TRADUCTION] Quant à savoir si la créancière hypothécaire peut ou non obtenir un jugement personnel contre le défendeur Friesen, cela dépend des conditions

ment, there would be no privity of contract between the mortgagee and Friesen, and personal judgment could only go against the defendant corporate body . . . .

I am satisfied that the position of persons such as Friesen, (that is, successors and assigns) was contemplated by the legislature, whose words must be accepted for what they say, without imposing an artificial construction on those words to benefit a person who, if different circumstances had prevailed, could have been able to invoke the protection of the statute as against the mortgagee.

In *Canada Trustco Mortgage Co. v. Grover*, [1987] 2 W.W.R. 766 (Sask. Q.B.), Wright J. (the chambers judge in the case at bar) rejected *First City* on the strength of this Court's judgment in *Potash v. Royal Trust Co.*, [1986] 2 S.C.R. 351. In *Potash* this Court was asked to interpret s. 10 of the federal *Interest Act*, R.S.C. 1970, c. I-18, which provided that individuals must be given the right to pay off a mortgage after five years. The respondent in that case entered into a renewal agreement after five years without paying off the mortgage and then proceeded to pay it off subsequent to entering into the renewal agreement. Although the Act did not specifically provide that a person could not waive its provisions, I stated for the Court at p. 373 that "I agree with counsel for Potash that s. 10(1) was enacted in the public interest and that the long standing rule against contracting out or waiver should apply to it." Wright J. does not expand his application of *Potash* to the facts of *Grover* but I assume that he took from it that, if parties cannot waive protective provisions in circumstances where the statute is silent, then where the statute expressly invalidates a waiver (e.g., s. 40(1) of the Act), any exception to that protection should be construed as narrowly as possible. The facts in *Grover* were for all intents and purposes the same as in the case at bar. Wright J. found that the applicant mortgagee was not entitled to judgment against the individual mortgagor to whom the mortgage had been assigned by the original corporate mortgagor.

de la convention de prise en charge. En l'absence de cette convention, il n'y aurait pas de lien de droit contractuel entre la créancière hypothécaire et Friesen, et un jugement personnel ne pourrait être rendu alors que contre la personne morale défenderesse [. . .]

Je suis convaincu que la situation de personnes comme Friesen (c'est-à-dire les successeurs et les cessionnaires) a été envisagée par le législateur, dont les paroles sont à prendre littéralement, sans leur imposer une interprétation artificielle afin de profiter à une personne qui, si les circonstances avaient été différentes, aurait pu invoquer la protection de la loi contre son créancier hypothécaire.

Dans l'affaire *Canada Trustco Mortgage Co. v. Grover*, [1987] 2 W.W.R. 766 (B.R. Sask.), le juge Wright (le juge en chambre, en l'espèce) s'est fondé sur notre arrêt *Potash c. Royal Trust Co.*, [1986] 2 R.C.S. 351, pour rejeter la décision *First City*. Notre Cour était appelée dans l'affaire *Potash* à interpréter l'art. 10 de la *Loi sur l'intérêt*, S.R.C. 1970, ch. I-18, qui reconnaissait aux particuliers le droit de purger une hypothèque à l'expiration d'une période de cinq ans. L'intimé dans cette affaire-là, ayant conclu une convention de renouvellement au bout de cinq ans sans purger l'hypothèque, l'a purgée après la conclusion de la convention. Quoique la Loi n'exclue pas expressément la renonciation à l'application de ses dispositions, j'ai dit au nom de la Cour, à la p. 373: «Je suis d'accord avec l'avocat de Potash pour dire que le par. 10(1) a été adopté dans l'intérêt public et que la règle établie depuis longtemps qui interdit la renonciation doit s'y appliquer.» Le juge Wright n'applique pas l'arrêt *Potash* aux faits de l'affaire *Grover*, mais je présume qu'il en a déduit que, si des parties ne peuvent renoncer à des dispositions protectrices dans des circonstances où la Loi se tait à ce sujet, alors dans un cas où la Loi invalide expressément une renonciation (p. ex. le par. 40(1) de la Loi), toute exception à cette protection doit recevoir l'interprétation la plus restrictive possible. Les faits dans l'affaire *Grover* sont pratiquement identiques à ceux de la présente instance. Le juge Wright a décidé que la créancière hypothécaire requérante n'avait pas droit à ce qu'un jugement soit rendu contre le particulier débiteur hypothécaire auquel l'hypothèque avait été cédée par la société qui était la débitrice hypothécaire originaire.

1990 CanLII 73 (SCC)

I agree with Cameron J.A. that these cases are not of much assistance. I turn therefore to a consideration of the purpose of s. 2 of the Act. Section 2 protects individual mortgagors from being personally liable on a mortgage and restricts the mortgagee's remedy to the property. Individuals usually take out mortgages to secure residential houses or farms. Their home is typically the largest single asset they have. One can well imagine that once that is lost the individual in many instances has little else to seize and imposing the additional burden of personal liability would be onerous and perhaps futile. I note in passing that s. 2 was originally enacted by the Saskatchewan legislature in 1934 (S.S. 1934-35, c. 89, s. 4) at a time when many prairie farmers were "losing the farm" thanks to the notorious and disastrous effects of the "dustbowls" and the Depression.

Section 40 of the Act was enacted through a series of amendments to the statute between 1953 and 1961. The purpose in permitting corporate borrowers to waive the protection provided under the Act was, in my view, aptly described by Malone J. in *Disney Farms Ltd. v. Canadian Imperial Bank of Commerce*, [1984] 5 W.W.R. 285 (Sask. Q.B.) at pp. 287-88:

Since 1965 the Limitation of Civil Rights Act [R.S.S. 1965, c. 103, s. 27] has permitted bodies corporate to waive the entire provisions thereof. A similar waiver provision is also found in the Saskatchewan Land Contracts (Actions) Act, R.S.S. 1978, c. L-3 [s. 5]. In my opinion, the purpose of these provisions is to facilitate corporate financing that otherwise may not be available if lenders could not realize upon their security on default by a corporate borrower. I am also of the opinion that the provisions of the Limitation of Civil Rights Act were primarily intended to benefit and protect individuals, as distinct from limited companies, who usually are more sophisticated in the management of their affairs and require larger amounts of capital to maintain their operations.

Je partage l'avis du juge Cameron de la Cour d'appel que ces décisions ne sont pas d'un très grand secours. Je passe en conséquence à l'examen de l'objet de l'art. 2 de la Loi. L'article 2 met les particuliers débiteurs hypothécaires à l'abri de la responsabilité personnelle relativement à une hypothèque et ne permet au créancier hypothécaire que l'exercice d'un recours contre le bien-fonds. Or, les particuliers consentent habituellement des hypothèques à titre de garanties afférentes à des maisons d'habitation ou à des fermes. Normalement, la maison représente leur bien le plus important. On peut donc bien s'imaginer que dans beaucoup de cas il ne restera à un particulier qui a perdu ce bien pas grand-chose d'autre susceptible de saisie et que lui imposer en outre la responsabilité personnelle serait pour lui une lourde charge et ne servirait peut-être à rien. Je fais remarquer en passant que l'art. 2 a été initialement adopté par le législateur de la Saskatchewan en 1934 (S.S. 1934-35, ch. 89, art. 4), époque où bien des agriculteurs des Prairies [TRADUCTION] «perdaient leur ferme» par les effets notoires et désastreux de la sécheresse et de la Dépression.

L'article 40 a été adopté au moyen d'une série de modifications apportées à la Loi entre 1953 et 1961. L'objet de l'autorisation donnée aux sociétés emprunteuses de renoncer à la protection offerte par la Loi est expliqué avec justesse, selon moi, par le juge Malone dans la décision *Disney Farms Ltd. v. Canadian Imperial Bank of Commerce*, [1984] 5 W.W.R. 285 (B.R. Sask.), aux pp. 287 et 288:

[TRADUCTION] Depuis 1965, *The Limitation of Civil Rights Act* [R.S.S. 1965, ch. 103, art. 27] permet aux personnes morales de renoncer à l'application de toutes ses dispositions. On retrouve une disposition de renonciation analogue dans la *Saskatchewan Land Contracts (Actions) Act*, R.S.S. 1978, ch. L-3 [art. 5]. À mon avis, ces dispositions sont destinées à faciliter aux sociétés l'obtention d'un financement qui, autrement, leur serait peut-être refusé si les prêteurs ne pouvaient pas réaliser leur garantie en cas de défaut par une société emprunteuse. Je suis en outre d'avis que les dispositions de *The Limitation of Civil Rights Act* visent principalement à avantager et à protéger les particuliers, par opposition aux sociétés à responsabilité limitée qui, en règle générale, apportent à la gestion de leurs affaires un plus grand savoir-faire et qui ont besoin de capitaux plus importants pour continuer leurs opérations.

1990 CanLII 73 (SCC)

I think it is clear that the policy concerns animating the protection of individuals from personal liability for mortgage deficiencies are not particularly compelling when applied to corporations. The meaning to be attributed to the provisions of the Act should reflect these policy concerns. Thus, any exception to the principle in s. 2 that individual mortgagors be insulated from personal liability should be construed as narrowly as possible.

Turning to s. 40(2) of the Act, the provision states that if a corporation waives its protection, that waiver binds all successors and assigns "notwithstanding anything in this Act". When used in reference to corporations, a "successor" generally denotes another corporation which, through merger, amalgamation or some other type of legal succession, assumes the burdens and becomes vested with the rights of the first corporation. In terms of s. 40(2) of the Act it is understandable that a new corporation should be bound by the waiver of the old one since the new one is essentially supplanting the old one in all respects. Indeed, restricting the meaning of "successor" in s. 40(2) to other corporations makes sense in light of the policy driving the Act. In my view, the application of the s. 40(2) exception to "successors" was only intended to ensure liability on the personal covenant of a corporation which steps into the shoes of the original corporate mortgagor. It is apparent that Mead is not a "successor" to Remai here.

The word "assign" has, of course, a broader meaning. An "assign" is anyone to whom an assignment is made and presumably, but for the specific reference to "successors", would include both individuals and corporations. As between mortgagors, an assignment would be an agreement between the original mortgagor and his purchaser by which the latter would assume the mortgage debt in exchange for valuable consideration. Section 2(2)(b) of the Act specifically extends the protection of s. 2 to assignees of purchasers whereas s. 40(2) binds assigns of corporations who have

Je crois qu'il est évident que les préoccupations d'ordre public motivant la protection des particuliers contre la responsabilité personnelle pour l'insuffisance de garanties hypothécaires ne sont pas particulièrement impérieuses dans le cas de sociétés. Le sens prêté aux dispositions de la Loi devrait refléter ces préoccupations d'ordre public. Ainsi, toute exception au principe, posé par l'art. 2, que les particuliers débiteurs hypothécaires soient mis à l'abri de la responsabilité personnelle doit recevoir l'interprétation la plus restrictive possible.

Voilà qui nous amène au par. 40(2) de la Loi, qui porte que, si une société renonce à la protection à laquelle elle a droit, cette renonciation lie tous ses successeurs et cessionnaires «indépendamment des termes de la présente loi». Employé à l'égard de sociétés, le terme «successeur» désigne généralement une autre société qui, par fusion ou une autre forme de succession juridique, assume les obligations et acquiert les droits de la première société. Dans le contexte du par. 40(2) de la Loi, il est compréhensible qu'une nouvelle société soit liée par la renonciation faite par l'ancienne société puisque, essentiellement, la nouvelle se substitue à tous les égards à l'ancienne. De fait, quand on tient compte de l'intérêt public qui anime la Loi, il est logique de donner au terme «successeur» employé au par. 40(2) un sens qui se limite à d'autres sociétés. À mon avis, l'application de l'exception prévue au par. 40(2) aux «successeurs» avait pour seul objet d'assurer la responsabilité fondée sur l'engagement personnel d'une société qui prend la place de la société qui était la débitrice hypothécaire originaire. Il est évident que Mead n'est pas un «successeur» de Remai en l'espèce.

Le sens du mot «cessionnaire» est bien entendu plus large. «Cessionnaire» désigne en effet toute personne en faveur de laquelle une cession est faite et, n'eût été la mention expresse de «successeurs», comprendrait en principe à la fois les personnes physiques et les personnes morales. Dans le cas de débiteurs hypothécaires, une cession serait un accord entre le débiteur hypothécaire originaire et l'acheteur en vertu duquel ce dernier prendrait en charge la dette hypothécaire moyennant une contrepartie de valeur. L'alinéa 2(2)b) de la Loi accorde expressément la protection de l'art. 2 aux

1990 CanLII 73 (SCC)

waived s. 2 "notwithstanding anything in this Act". This would presumably include individual assigns of corporate mortgagors. It is my view, however, that the purpose of this exception is to protect mortgagees who extend mortgages to corporations on condition that the latter provide a personal covenant and who then find that the corporation has unilaterally (and without the mortgagee's consent) assigned the mortgage to an individual on whom the personal covenant would not otherwise be binding under the Act. It is those "assigns" who must be bound by the personal covenant of the original corporate mortgagor if the mortgagee is to have the protection contemplated by the section. This situation would arise where there is an assignment of the mortgage from a corporate mortgagor to an individual without an assumption agreement between the individual mortgagor and the mortgagee.

Where the mortgagee (in this case National Trust) has entered into an assumption agreement with the new mortgagor, however, the concern about the mortgagee's rights being unfairly defeated simply does not arise. National Trust was completely free in the present case to decide whether or not to let Mead assume the mortgage from Remai. If it saw itself as exposed to an undue risk if it could not sue on the personal covenant to recover a deficiency on the mortgage debt, it was at liberty to refuse to enter into the Assumption Agreement with Mead. It is noteworthy that while ss. 2(2)(a)-(d) extend the protection of the Act to circumstances of assignment, extension or assumption of a mortgage, s. 40(2) only binds successors and assigns to a waiver by a corporate body. There is no evidence on the record indicating whether Remai assigned its mortgage to Mead. Even if it had, however, the fact that Mead also assumed the mortgage by way of Assumption Agreement with National Trust entitles him to the benefit of s. 2(2)(d), which in turn is not subject to the waiver exception under s. 40(2). Remai's exercise of its

cessionnaires d'acheteurs tandis que le par. 40(2) lie les cessionnaires de sociétés ayant renoncé à l'application de l'art. 2 «indépendamment des termes de la présente loi». Cela comprendrait en principe les particuliers cessionnaires de sociétés débitrices hypothécaires. Je suis toutefois d'avis que cette exception a pour objet la protection de créanciers hypothécaires qui consentent des hypothèques à des sociétés à condition que celles-ci s'engagent personnellement à payer, et qui découvrent par la suite que la société a unilatéralement (et sans le consentement du créancier hypothécaire) cédé l'hypothèque à un particulier qui, autrement, ne serait pas lié par l'engagement personnel aux termes de la Loi. Ce sont ces «cessionnaires» qui doivent être liés par l'engagement personnel de la société qui était la débitrice hypothécaire originaire si le créancier hypothécaire doit bénéficier de la protection envisagée par l'article en question. Cette situation se présenterait dans le cas où une société débitrice hypothécaire cède l'hypothèque à un particulier sans qu'il n'y ait de convention de prise en charge entre le particulier débiteur hypothécaire et le créancier hypothécaire.

Toutefois, lorsque le créancier hypothécaire (en l'occurrence National Trust) a conclu une convention de prise en charge avec le nouveau débiteur hypothécaire, le problème de l'anéantissement injuste des droits du créancier hypothécaire ne se pose simplement pas. En l'espèce, National Trust avait toute liberté de décider si elle allait ou non permettre à Mead de prendre en charge l'hypothèque consentie par Remai. Si elle croyait courir un risque indu dans l'hypothèse où elle n'aurait pas la possibilité de prendre action, fondée sur l'engagement personnel, en recouvrement de toute insuffisance à l'égard de la dette hypothécaire, elle était libre de refuser de conclure la convention de prise en charge avec Mead. Il est à noter que, si les al. 2(2)a) à d) permettent de bénéficier de la protection de la Loi dans les cas de la cession, de la prorogation ou de la prise en charge d'une hypothèque, le par. 40(2) porte que seuls sont liés par une renonciation faite par une personne morale les successeurs et les cessionnaires. Aucun élément de preuve au dossier n'indique si Remai a cédé son hypothèque à Mead. Même dans ce cas cependant,

1990 CanLII 73 (SCC)

waiver under s. 40 of the Act does not therefore bind Mead.

B. *Assumption Agreement*

I am in general agreement with the reasoning of the Court of Appeal regarding the interpretation and effect of the Assumption Agreement. The wording of the Agreement, in conjunction with the Act, is clearly capable of being construed as releasing Mead from any obligation to pay under the personal covenant set out in the Agreement. It provides *inter alia* that Mead will be bound by all of the terms, covenants, conditions and obligations of the mortgage "as though it had been originally made, executed and delivered by him as Mortgagor." The Court of Appeal pointed out that had the Agreement been originally made, executed and delivered by Mead as mortgagor, s. 2 would have applied, no exception under s. 40(2) would have been available, and the personal covenant would have been unenforceable pursuant to s. 40(1). National Trust would have been restricted to its remedy against the land. The doctrine of *contra proferentem* would resolve any lingering ambiguity in Mead's favour.

National Trust submits that the doctrine of *contra proferentem* is inapplicable here because the construction put on the Agreement by the Court of Appeal would make the inclusion of the personal covenant pointless. It could have no effect. Since the Court should strive to give meaning to the parties' agreement, it should reject an interpretation that would render one of its terms ineffective.

In my view, the presence of s. 40(1) in the Act belies the claim made by National Trust that the ideal construction of the Agreement is one that gives effect to each and every one of its terms. Section 40(1) explicitly contemplates the inclusion of a personal covenant in a mortgage but states

le fait que Mead a en outre pris l'hypothèque en charge au moyen de la convention de prise en charge intervenue avec National Trust lui donne droit au bénéfice de l'al. 2(2)d), lequel n'est pas assujetti à l'exception que constitue la renonciation prévue au par. 40(2). La renonciation faite par Remai en vertu de l'art. 40 de la Loi ne lie donc pas Mead.

B. *La convention de prise en charge*

Je souscris d'une manière générale au raisonnement de la Cour d'appel en ce qui concerne l'interprétation et l'effet de la convention de prise en charge. Le libellé de la convention, combiné avec la Loi, admet manifestement une interprétation qui dégage Mead de toute obligation de payer fondée sur l'engagement personnel contenu dans la convention. Celle-ci prévoit notamment que Mead est lié par la totalité des modalités, des engagements, des conditions et des obligations énoncés dans l'hypothèque, «comme si c'était lui qui l'avait consentie et qui avait signé l'acte constitutif». La Cour d'appel a fait remarquer que si la convention avait été originairement conclue et signée par Mead en tant que débiteur hypothécaire, le par. 2 se serait appliqué, on n'aurait pu invoquer aucune exception fondée sur le par. 40(2) et, suivant le par. 40(1), l'engagement personnel aurait été de nul effet. L'unique recours de National Trust aurait été celui contre le bien-fonds. Le principe de *contra proferentem* aurait fait bénéficier Mead de toute ambiguïté qui pouvait subsister.

National Trust prétend que le principe de *contra proferentem* ne s'applique pas en l'espèce parce que l'interprétation donnée à la convention par la Cour d'appel rendrait inutile l'inclusion de l'engagement personnel. Il serait sans effet. Comme notre Cour doit s'efforcer de donner un sens à la convention intervenue entre les parties, il y a lieu de rejeter une interprétation par suite de laquelle l'une de ses conditions serait inopérante.

Selon moi, l'existence du par. 40(1) de la Loi réfute l'argument de National Trust voulant que l'interprétation idéale de la convention soit celle qui permette à chacune de ses conditions d'avoir un effet. Le paragraphe 40(1) envisage explicitement l'inclusion d'un engagement personnel dans

1990 CanLII 73 (SCC)

that such covenants are null, void and of no effect subject to the exception contained in s. 40(2) for corporate mortgagors. Although the closing paragraph of the Assumption Agreement states that "all provisions hereof shall have effect notwithstanding any statute to the contrary", this cannot be enforced by National Trust in face of the explicit prohibition in the statute against contracting out of its protection.

In the result, I think the Court of Appeal construed the Assumption Agreement correctly when it declared that the personal covenant was unenforceable against Mead. I do not find it necessary to invoke the doctrine of *contra proferentem* to buttress this conclusion.

## C. *Novation*

The respondent Mead has pleaded in the alternative that the Assumption Agreement effected a novation so that the old agreement with Remai was gone and the new agreement with Mead as mortgagor was substituted for it. If this were so Mead would unquestioningly be entitled to the protection of s. 2 of the Act. While it is not strictly necessary to decide this issue since I have already concluded that, as a matter of interpretation of the Assumption Agreement, Mead is not liable on the covenant, it may nevertheless be helpful if the Court were to try to resolve some of the confusion concerning the application of the doctrine of novation in a mortgage context.

The common law has long recognized that while one may be free to assign contractual benefits to a third party, the same cannot be said of contractual obligations. This principle results from the fusion of two fundamental principles of contract law: 1) that parties are able to make bargains with the parties of their own choice (freedom of contract); and 2) that parties do not have to discharge contractual obligations that they had no part in creating (privity of contract). Our law does, however, recognize that contractual obligations which a

un acte constitutif d'hypothèque, mais dit que ces engagements sont nuls, non avenus et inopérants, sous réserve de l'exception prévue au par. 40(2) pour les sociétés débitrices hypothécaires. Bien que la clause finale de la convention de prise en charge porte que «toutes les stipulations des présentes s'appliquent indépendamment de toute disposition législative contraire», National Trust ne saurait s'en prévaloir étant donné que la Loi interdit expressément toute renonciation contractuelle à sa protection.

En définitive, j'estime que la Cour d'appel a interprété correctement la convention de prise en charge en affirmant qu'on ne pouvait se prévaloir de l'engagement personnel contre Mead. Je ne crois pas qu'il soit nécessaire de recourir au principe de *contra proferentem* pour étayer cette conclusion.

## C. *La novation*

L'intimé Mead a fait valoir subsidiairement que la convention de prise en charge opérait une novation de sorte que l'ancienne convention avec Remai disparaissait pour être remplacée par la nouvelle convention conclue avec Mead en tant que débiteur hypothécaire. S'il en était ainsi, Mead aurait indubitablement droit à la protection de l'art. 2 de la Loi. Quoiqu'il ne soit pas strictement nécessaire de trancher ce point puisque j'ai déjà conclu que, en ce qui concerne l'interprétation de la convention de prise en charge, Mead n'a aucune responsabilité fondée sur l'engagement personnel, il serait peut-être utile néanmoins que la Cour fasse une tentative de dissiper dans une certaine mesure la confusion relative à l'application du principe de la novation dans un contexte hypothécaire.

Voilà longtemps que la common law reconnaît que si l'on peut être libre de céder à un tiers les avantages découlant d'un contrat, il n'en va pas de même des obligations contractuelles. C'est là un principe qui procède de la fusion de deux principes fondamentaux du droit des contrats: 1) celui selon lequel les parties peuvent contracter avec qui elles veulent (la liberté contractuelle); et 2) celui selon lequel les parties ne sont pas tenues de s'acquitter d'obligations contractuelles à la création desquelles elles n'ont pas participé (effets relatifs du contrat).

1990 CanLII 73 (SCC)

party has freely assumed may be extinguished in certain circumstances and the doctrine of novation provides one way of achieving this.

A novation is a trilateral agreement by which an existing contract is extinguished and a new contract brought into being in its place. Indeed, for an agreement to effect a valid novation the appropriate consideration is the discharge of the original debt in return for a promise to perform some obligation. The assent of the beneficiary (the creditor or mortgagee) of those obligations to the discharge and substitution is crucial. This is because the effect of novation is that the creditor may no longer look to the original party if the obligations under the substituted contract are not subsequently met as promised.

Because assent is the crux of novation it is obvious that novation may not be forced upon an unwilling creditor and, in the absence of express agreement, the court should be loath to find novation unless the circumstances are really compelling. Thus, while the court may look at the surrounding circumstances, including the conduct of the parties, in order to determine whether a novation has occurred, the burden of establishing novation is not easily met. The courts have established a three-part test for determining if novation has occurred. It is set out in *Polson v. Wulffsohn* (1890), 2 B.C.R. 39 as follows:

1. The new debtor must assume the complete liability;

2. The creditor must accept the new debtor as principal debtor and not merely as an agent or guarantor; and

3. The creditor must accept the new contract in full satisfaction and substitution for the old contract.

There has been some disagreement among courts across the country as to the weight to be attributed to these elements and it might be helpful to review some of the authorities. Indeed, such a review makes it clear that these three factors are

Notre droit reconnaît toutefois que les obligations contractuelles qu'une partie a librement assumées peuvent dans certaines circonstances être éteintes et le principe de la novation constitue un moyen d'y parvenir.

Une novation est une convention trilatérale qui opère l'extinction d'un contrat existant et y substitue un contrat nouveau. De fait, pour qu'une convention effectue une novation valide, la contrepartie convenable consiste en l'extinction de la dette primitive en échange d'une promesse de s'acquitter d'une obligation quelconque. Il est crucial que le bénéficiaire (le créancier, hypothécaire ou autre) de ces obligations donne son consentement à l'extinction et à la substitution. La raison en est que la novation a pour conséquence que le créancier ne peut plus s'adresser au débiteur originaire si par la suite on ne s'acquitte pas des obligations conformément au contrat substitué.

Puisque le consentement constitue l'élément essentiel de la novation, il est évident qu'on ne saurait imposer la novation à un créancier qui n'en veut pas et, en l'absence d'une entente expresse, un tribunal doit se montrer hésitant à conclure à la novation, à moins que les circonstances ne le commandent vraiment. Donc, bien que le tribunal puisse tenir compte des circonstances, y compris la conduite des parties, afin de déterminer s'il y a eu novation, il n'est pas facile de s'acquitter du fardeau de prouver la novation. Les tribunaux ont établi un critère comportant trois volets pour déterminer s'il y a eu novation. Ce critère, qui se trouve énoncé dans la décision *Polson v. Wulffsohn* (1890), 2 B.C.R. 39, est le suivant:

[TRADUCTION]

1. Le nouveau débiteur doit assumer totalement la responsabilité;

2. Le créancier doit accepter le nouveau débiteur comme débiteur principal et non pas simplement en qualité de mandataire ou de garant; et

3. Le créancier doit accepter le nouveau contrat en pleine satisfaction et substitution de l'ancien contrat.

Il existe un certain désaccord au sein des tribunaux du pays relativement au poids à attribuer à ces éléments, de sorte qu'il pourrait être utile d'examiner quelques décisions. En fait, il devient évident au terme d'un tel examen que ces trois

1990 CanLII 73 (SCC)

not the only ones to be considered. The courts are usually confronted with an amalgam from which they must distil their finding of fact as to whether novation has occurred or not.

I start with the conduct of the parties. In *Central & Eastern Trust Co. v. Rosebowl Holdings Ltd.* (1981), 34 N.B.R. (2d) 308 (C.A.), Rosebowl had granted a mortgage to Central with one Huestis acting as guarantor of the loan. Rosebowl subsequently sold the property to another party who assumed the mortgage. When Central subsequently informed Rosebowl as to the balance then due on the mortgage, Rosebowl advised Central that the mortgage had been assumed by its purchaser and that a new mortgage was being recorded. Thereafter, Central closed out Rosebowl's account. Approximately two years later the purchaser started to fall into arrears. Rosebowl was not informed of these defaults until Central decided to sell the property under the power of sale contained in the mortgage. Proceedings were brought against Rosebowl and Huestis when the sale resulted in a deficiency.

Rosebowl and Huestis submitted that Central took all the necessary steps to give effect to the sale and assumption of mortgage by the purchaser when it closed out Rosebowl's account as opposed to crediting it with the monthly instalments made by the purchaser. It was also stressed that Rosebowl's solicitor acted for the trust company when the equity of redemption was transferred. Ryan J.A., writing for the court, held that these circumstances were insufficient to establish a novation. He held that there was no express agreement to the effect that Central would accept the purchaser as principal debtor and give up its right of action against Rosebowl and Huestis nor did the evidence support an inference to that effect.

What if changes have been made to the terms of the original mortgage? In *Canada Permanent Trust Co. v. Neumann, supra*, the Neumanns joined together with another couple, the Mas, and granted a mortgage to Canada Permanent. Later

facteurs ne sont pas les seuls qui soient pris en considération. Les tribunaux font habituellement face à une situation complexe d'où ils doivent tirer leur conclusion de fait quant à l'existence ou l'inexistence d'une novation.

Je prends comme point de départ la conduite des parties. Dans l'affaire *Central & Eastern Trust Co. v. Rosebowl Holdings Ltd.* (1981), 34 N.B.R. (2d) 308 (C.A.), Rosebowl avait consenti une hypothèque à Central, le prêt étant garanti par un nommé Huestis. Rosebowl a par la suite vendu le bien-fonds à une autre partie, qui a pris l'hypothèque en charge. Quand Central a informé Rosebowl du solde impayé de l'hypothèque, Rosebowl lui a fait savoir que l'hypothèque avait été prise en charge par l'acheteur et qu'on était en voie de faire enregistrer une nouvelle hypothèque. Ensuite, Central a clos le compte de Rosebowl. Environ deux ans plus tard, l'acheteur commençait à prendre du retard dans ses versements. Rosebowl n'en a été mise au courant qu'au moment où Central a décidé de vendre le bien-fonds en vertu du pouvoir de vente prévu dans l'acte constitutif d'hypothèque. Quand le produit de la vente s'est avéré insuffisant, une instance a été engagée contre Rosebowl et Huestis.

Rosebowl et Huestis ont fait valoir que Central avait pris toutes les mesures pour donner effet à la vente et prise en charge de l'hypothèque par l'acheteur quand elle a clos le compte de Rosebowl plutôt que de le créditer des mensualités versées par l'acheteur. On a souligné en outre que l'avocat de Rosebowl avait agi pour le compte de la société de fiducie lors du transfert du droit de rachat. Le juge Ryan, au nom de la Cour d'appel, a statué que ces circonstances ne suffisaient pas pour établir une novation. Il a conclu qu'il n'y avait pas de convention expresse portant que Central accepterait l'acheteur comme débiteur principal et renoncerait à son droit de poursuivre Rosebowl et Huestis; il a conclu en outre que la preuve ne justifiait pas une inférence dans ce sens.

Or, qu'arrive-t-il si des modifications ont été apportées aux conditions de l'hypothèque primitive? Dans l'affaire *Canada Permanent Trust Co. v. Neumann*, précitée, les Neumann se sont joints à un autre couple, les Ma, pour consentir une hypo-

1990 CanLII 73 (SCC)

wishing to absolve themselves of this liability, the Neumanns conveyed all their interest and title to the Mas in return for the latter's promise to assume sole liability for the mortgage debt. Canada Permanent was not a party to this transfer and did not specifically release the Neumanns from their debt. The Mas later entered into a modification agreement reducing the interest rate as well as the amount of the monthly instalments. The Neumanns were not aware of this agreement until the Mas defaulted and the trust company demanded payment. Canada Permanent brought suit against the Neumanns on their personal covenant. The trial judge allowed the action and granted judgment in an amount calculated in accordance with the modification agreement.

Carrothers J.A. allowed the Neumanns' appeal, finding that there had been a novation. He based his judgment on the fact that the modification agreement had altered the mortgage in several respects, holding at p. 321:

There cannot be two contracts of mortgage and two methods of calculating the mortgage debt existing in respect of the same mortgage at the same time. This is legally repugnant and can only be construed as a novation and an acceptance on the part of the trust company of the Mas exclusively as principal debtors, thus releasing the Neumanns of their obligation. These circumstances are, in my view, consistent with novation.

A different result on similar facts was reached in the case of *Central Trust Co. v. Bartlett* (1983), 30 R.P.R. 267 (N.S.C.A.). There, the equity of redemption in certain lands had been transferred several times. After each transfer the transferee entered into an assumption agreement with Central Trust providing that all remedies were reserved by the mortgagee. The final transferee renewed the mortgage at a much higher rate of interest than the rate in the original mortgage and subsequently fell into arrears. The property was sold and Central Trust sued Bartlett on his personal covenant for the deficiency. Bartlett argued, *inter alia*, that the mortgagee could be taken as impliedly releasing him from his obligations under

thèque à Canada Permanent. Par la suite, les Neumann, désireux de se libérer de cette charge, ont cédé en totalité leur droit et leur titre aux Ma en échange de la promesse de ces derniers de devenir seuls responsables de la dette hypothécaire. Canada Permanent n'était pas partie à cette cession et n'a pas expressément dégagé les Neumann de leur dette. Les Ma ont conclu ensuite une convention modificative portant réduction du taux d'intérêt et du montant des mensualités. Les Neumann ignoraient l'existence de cette convention jusqu'au moment où les Ma se sont trouvés en défaut et que la société de fiducie a revendiqué le paiement. Canada Permanent a intenté contre les Neumann une action fondée sur leur engagement personnel de payer. Le juge de première instance a accueilli l'action et a accordé une somme calculée en conformité avec la convention modificative.

Concluant à la novation, le juge Carrothers de la Cour d'appel a accueilli l'appel formé par les Neumann. Il a fondé son jugement sur le fait que la convention modificative était venue changer l'hypothèque à plusieurs égards. Il dit, à la p. 321:

[TRADUCTION] Il ne peut subsister parallèlement à l'égard de la même hypothèque deux contrats hypothécaires et deux méthodes de calculer la dette hypothécaire. Cela est juridiquement inadmissible et ne peut s'interpréter autrement que comme une novation et comme une acceptation des Ma par la société de fiducie en tant que seuls débiteurs principaux, les Neumann étant par le fait même dégagés de leur obligation. Ces circonstances, selon moi, sont compatibles avec l'existence d'une novation.

Des faits analogues ont conduit à une conclusion différente dans l'affaire *Central Trust Co. v. Bartlett* (1983), 30 R.P.R. 267 (C.A.N.-É.). Là, le droit de rachat afférent à certains biens-fonds avait fait l'objet de plusieurs cessions. À la suite de chaque cession, le cessionnaire a conclu avec Central Trust une convention de prise en charge dans laquelle la créancière hypothécaire se réservait tous ses recours. L'ultime cessionnaire a renouvelé l'hypothèque à un taux d'intérêt bien plus élevé que celui fixé pour l'hypothèque primitive et a fini par tomber en défaut. La propriété a été vendue et Central Trust a intenté contre Bartlett une action en paiement du solde fondée sur son engagement personnel. Bartlett a soutenu notamment que la

1990 CanLII 73 (SCC)

the mortgage by entering into a renewal agreement with another party on very different terms and without his consent. Hart J.A. rejected this argument at p. 272 and held that Bartlett continued to be liable for the original amount in the mortgage:

In no event could Mr. Bartlett become liable for any amount in excess of the amount he undertook to pay in accordance with the rate of interest set forth in his agreement. A tender of this amount would, I believe, end any further obligation he may have to the mortgagee under the assumption agreement. The mere extension of time to pay would not, in my view, be evidence of an intention to release the other persons liable to pay the mortgage debt.

In my view, significant changes in the terms of a mortgage effected without the consent of the original mortgagor constitute very strong evidence of novation. It is not necessary, of course, for a different contract to be brought into existence for a novation to take place. The essence of novation is the substitution of debtors. However, where significant changes in terms occur and the creditor has not applied to the original mortgagor for its consent, I believe this is a strong indication that the creditor is no longer looking to the mortgagor for payment.

This view has been expressed by the British Columbia Court of Appeal on a number of occasions: see especially *Re Bank of Nova Scotia and Vancouver Island Renovating Inc.* (1986), 31 D.L.R. (4th) 560 and *Eaton Bay Trust Co. v. Ling* (1987), 45 D.L.R. (4th) 1. In the *Vancouver Island* case the purchaser had entered into an agreement with the bank on substantially changed terms. When the purchaser fell into arrears the bank looked to Vancouver Island for the deficiency. The British Columbia Court of Appeal held that usually such changes in terms would support Vancouver Island's argument that there had been a novation. However, not so in this case because the guarantor of Vancouver Island's liability on the covenant acted as solicitor for the purchaser

créancière hypothécaire pouvait être considérée comme l'ayant implicitement dégagé de ses obligations découlant de l'hypothèque du fait d'avoir conclu avec une autre partie, sans le consentement de Bartlett, une convention de renouvellement dont les conditions étaient nettement différentes. Le juge Hart de la Cour d'appel rejette cet argument à la p. 272 et dit que Bartlett demeurait responsable du montant primitif de l'hypothèque:

[TRADUCTION] Dans aucun cas M. Bartlett ne pourrait devenir responsable d'une somme supérieure à celle qu'il s'est engagé à payer au taux d'intérêt prévu dans son contrat. S'il offrait cette somme, cela éteindrait, je crois, toute obligation qu'il pourrait avoir envers la créancière hypothécaire aux termes de la convention de prise en charge. La simple prorogation de l'échéance ne constitue pas, selon moi, une preuve de l'intention de décharger les autres personnes tenues de la dette hypothécaire.

À mon avis, des modifications importantes apportées aux conditions d'une hypothèque sans le consentement du débiteur hypothécaire originaire constituent une preuve très convaincante qu'il y a eu novation. La passation d'un contrat différent n'est pas, bien entendu, une condition sine qua non de la novation. La novation se caractérise essentiellement par la substitution de débiteurs. Toutefois, lorsque les conditions subissent des changements importants et que le créancier n'a pas demandé le consentement du débiteur hypothécaire originaire, je crois que c'est là une forte indication que le créancier ne cherche plus à se faire désintéresser par ce débiteur hypothécaire.

Cette même opinion a été exprimée à plusieurs reprises par la Cour d'appel de la Colombie-Britannique: voir spécialement *Re Bank of Nova Scotia and Vancouver Island Renovating Inc.* (1986), 31 D.L.R. (4th) 560, et *Eaton Bay Trust Co. v. Ling* (1987), 45 D.L.R. (4th) 1. Dans l'affaire *Vancouver Island*, l'acheteur avait conclu avec la banque une convention qui modifiait sensiblement les conditions de l'hypothèque. Quand l'acheteur s'est trouvé en défaut, la banque a tenté de recouvrer auprès de Vancouver Island le montant de l'insuffisance. La Cour d'appel de la Colombie-Britannique a dit que de telles modifications des conditions appuieraient normalement l'argument de Vancouver Island voulant qu'il y ait eu novation. Il n'en était cependant rien dans cette

1990 CanLII 73 (SCC)

and was therefore well aware of the amendments to the mortgage and must be taken to have expressly or impliedly consented to them.

I noted earlier that there are three requirements for an effective novation. The significance attached by some courts to changes in the mortgage terms has given rise to the suggestion that a fourth requirement should be added, namely the consent of the original debtor. Consent as an added element arose from the decision of Egbert J. in *Herold v. British American Oil Co.*, *supra*, a case dealing with a typical commercial contract. The *Herold* case has been followed in British Columbia: see *Eaton Bay Trust Co.*, *supra*; *Neumann*, *supra*; and *Prospect Mortgage Investment Corp. v. Van-5 Developments Ltd.* (1985), 68 B.C.L.R. 12 (C.A.). In *Neumann*, Lambert J.A. attempted to bring some clarity to the issue by drawing a distinction between those instances where what takes place is akin to the straightforward assignment of a simple debt and those instances where the burdens or benefits to one of the parties to the original contract have been altered. At pages 322-23 he said:

In my opinion, in a case where the old debtors are co-covenantors on a straightforward mortgage of land so that they are simply debtors, the situation is comparable to the situation of the assignability of another simple debt, that is, the consent of the old debtor is not required. So in straightforward mortgage cases the fourth principle of novation referred to ... does not apply. In such a case the consent of the party being released is not a requisite of the complete novation. The situation may well be otherwise where both the burden and the benefits are being altered for one of the parties to the original contract.

In my view, if Lambert J.A. meant to suggest in this passage that the consent of the original debtor is required for a novation in cases where there

affaire-là parce que le garant de la responsabilité de Vancouver Island résultant de son engagement personnel de payer avait été l'avocat de l'acheteur et était en conséquence parfaitement au courant des modifications apportées à l'hypothèque et devait être considéré comme y ayant expressément ou implicitement consenti.

Je fais remarquer plus haut que trois exigences doivent être remplies pour qu'il y ait une novation valide. L'importance attachée par certains tribunaux aux modifications apportées aux conditions de l'hypothèque a fait qu'on a proposé d'ajouter une quatrième exigence, savoir le consentement du débiteur originaire. Le consentement en tant que nouvel élément tire son origine de la décision du juge Egbert dans l'affaire *Herold v. British American Oil Co.*, précitée, mettant en cause un contrat commercial typique. La décision *Herold* a été suivie en Colombie-Britannique: voir l'arrêt *Eaton Bay Trust Co.*, précité; l'arrêt *Neumann*, précité; et l'arrêt *Prospect Mortgage Investment Corp. v. Van-5 Developments Ltd.* (1985), 68 B.C.L.R. 12 (C.A.). Dans l'arrêt *Neumann*, le juge Lambert de la Cour d'appel tente d'élucider la question en faisant une distinction entre les cas dans lesquels il s'agit de quelque chose qui s'apparente à la simple cession d'une simple dette et les situations où les charges incombant à l'une des parties au contrat primitif ou les avantages lui revenant ont subi une modification. Aux pages 322 et 323, le juge Lambert dit:

[TRADUCTION] À mon avis, lorsque les anciens débiteurs sont liés dans le cadre d'une simple hypothèque portant sur un bien-fonds de façon à ce qu'ils ne soient que des débiteurs ordinaires, cette situation est comparable à celle de la cessibilité d'une autre dette ordinaire, c'est-à-dire que le consentement de l'ancien débiteur n'est pas requis. Par conséquent, dans le cas d'une simple hypothèque le quatrième principe en matière de novation qui a été mentionné [. . .] ne joue pas. Dans un pareil cas, le consentement de la partie déchargée n'est pas nécessaire pour que la novation soit parfaite. Il se peut bien qu'il en soit autrement lorsqu'on modifie pour l'une des parties au contrat primitif à la fois la charge et les avantages conférés.

D'après moi, si le juge Lambert a voulu dire dans ce passage que le consentement du débiteur originaire est requis pour qu'il y ait novation dans

1990 CanLII 73 (SCC)

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 24 of 374

432        NATIONAL TRUST CO. *v.* MEAD    *Wilson J.*        [1990] 2 S.C.R.

have been significant changes in the original mortgage terms, I think he must be in error. It seems to me that if the original mortgagor consents to the mortgage being assumed by his assignee on different terms, this would indicate rather that he considers himself to continue to be bound despite the assignment. Consent to changed terms, in other words, does not indicate novation but rather continuing liability. On the other hand, when changes in the terms have been effected without the knowledge or consent of the original mortgagor, that will be a strong indication in favour of novation.

With respect to the effect of assumption and renewal agreements, it would appear that some courts have come perilously close to holding that the execution of such agreements *per se* effects a novation. Thus, for example, in *Saskatchewan Trust v. Ross* (1985), 41 Sask. R. 121, Osborn J. of the Saskatchewan Queen's Bench held that a novation had been effected when the purchaser of the equity of redemption submitted all the documents regarding assumption of the mortgage in accordance with the request of the mortgagee. This, together with the mortgagee's failure to communicate in any way with the original mortgagor until the purchaser had been in default for several months, was sufficient in the court's view to establish a novation.

Other courts have come out strongly that the execution of an assumption agreement in and of itself is not sufficient to establish a novation. For example, in *Prospect Mortgage, supra,* Esson J.A. commented at p. 26:

> Because novation is essentially an issue of fact, it would be wrong in principle to say, as a generalization, that assumption agreements or extension agreements, or other particular classes of documents, do or do not create a novation. The question must be decided in each case having regard to all of the circumstances of which the language of the new contract is only one.

In my view, the execution of an assumption agreement does not *per se* effect a novation. As

des cas où des modifications importantes ont été apportées aux conditions de l'hypothèque primitive, il s'est trompé. Il me semble que si le débiteur hypothécaire originaire consent à ce que l'hypothèque soit prise en charge par son cessionnaire selon des modalités différentes, cela indique plutôt qu'il se considère encore lié en dépit de la cession. En d'autres termes, le consentement à la modification des conditions est indicatif non pas de novation mais bien de la responsabilité qui subsiste. Par ailleurs, quand des modifications des conditions interviennent à l'insu du débiteur hypothécaire originaire ou sans son consentement, c'est là une forte indication qu'il y a eu novation.

Pour ce qui est de l'effet de conventions de prise en charge et de renouvellement, il semble que certains tribunaux soient passés périlleusement près de statuer que la passation de telles conventions opère par le fait même une novation. Ainsi, par exemple, dans l'affaire *Saskatchewan Trust v. Ross* (1985), 41 Sask. R. 121, le juge Osborn de la Cour du Banc de la Reine de la Saskatchewan a décidé qu'il y avait eu novation lorsque l'acheteur du droit de rachat a remis, à la demande de la créancière hypothécaire, tous les documents concernant la prise en charge de l'hypothèque. Ce fait, combiné avec l'omission de la créancière hypothécaire de communiquer de quelque manière avec le débiteur hypothécaire originaire avant que l'acheteur ne soit en défaut depuis plusieurs mois, suffisait selon la cour pour établir la novation.

D'autres tribunaux ont dit catégoriquement que la conclusion d'une convention de prise en charge ne suffit pas par elle-même pour établir une novation. Par exemple, dans l'arrêt *Prospect Mortgage,* précité, le juge Esson affirme, à la p. 26:

> [TRADUCTION] Comme la novation constitue essentiellement une question de fait, on aurait tort en principe de prétendre, à titre de généralisation, que les conventions de prise en charge, les conventions de prorogation ou d'autres catégories particulières de documents opèrent ou n'opèrent pas la novation. Cette question est à trancher dans chaque cas en fonction de toutes les circonstances, les termes du nouveau contrat n'en étant qu'une.

À mon avis, la conclusion d'une convention de prise en charge n'opère pas en soi la novation.

Esson J.A. quite rightly noted, because novation is a question of fact, it would be wrong to hold that the execution of a document by itself would satisfy the doctrine. This is not to say, however, that such an agreement may not carry significant weight in determining whether a novation has taken place. Indeed, if the parties have directed their minds to setting out the terms of the debt relationship in writing, it seems to me that the terms of that agreement should conclude what the parties intended their relationship to be. In other words, in the absence of a written agreement or clear contractual language, the conduct of the parties may take on greater significance in elucidating the intent of the parties than when such an agreement has in fact been executed and is clear. Thus, the language of assumption agreements is deserving of careful scrutiny even although the subsequent conduct of the parties may also be factored into the Court's determination.

"No prejudice" clauses of various kinds have been considered by the courts with conflicting results. In *Central Trust Co. v. Bartlett, supra,* the equity of redemption in certain lands had been transferred several times. Each transferee executed an assumption agreement which contained a clause reserving all security taken by the mortgagee in respect of the mortgage. The court in that case held that since the assumption agreement specifically provided that Bartlett was not to be released, this negatived any finding of novation.

The British Columbia Court of Appeal first considered the effect of such clauses in *Prospect Mortgage, supra.* In that case the mortgage company attempted to hold Van-5 to its covenant after a sale of the mortgaged lands had resulted in a deficiency. When Van-5 purchased the property, it signed an agreement containing the following clause:

Ainsi que le fait remarquer le juge Esson, et en cela il a parfaitement raison, puisque la novation est une question de fait, on aurait tort de conclure que la seule signature d'un document satisferait à ce principe. Cela ne veut toutefois pas dire qu'une telle convention ne peut peser très lourd quand il s'agit de déterminer s'il y a eu novation. De fait, si les parties se sont donné la peine d'énoncer par écrit les conditions régissant les rapports engendrés par la dette, il me semble que les modalités de cet accord doivent être déterminantes quant à ce que les parties ont voulu que soit la nature de leurs relations. En d'autres termes, en l'absence de convention écrite ou de dispositions contractuelles explicites, la conduite des parties peut prendre, dans l'élucidation de leur intention, une importance plus grande qu'elle n'en a dans le cas où une telle convention a été conclue et où ses termes sont clairs. Aussi les termes de conventions de prise en charge méritent-ils un examen attentif, même si la conduite subséquente des parties peut également entrer en ligne de compte dans la détermination faite par le tribunal.

Différents types de clauses «de réserve de droits» ont été examinées par les tribunaux, qui sont arrivés à des résultats contradictoires. Dans l'affaire *Central Trust Co. v. Bartlett,* précitée, le droit de rachat afférent à certains biens-fonds avait fait l'objet de plusieurs cessions. Chaque cessionnaire avait signé une convention de prise en charge contenant une clause qui réservait toutes les garanties prises par la créancière hypothécaire à l'égard de l'hypothèque. La cour a dit dans cette affaire-là que, comme la convention de prise en charge stipulait expressément que Bartlett ne devait pas être dégagé de sa responsabilité, cela militait contre toute conclusion à la novation.

La Cour d'appel de la Colombie-Britannique a étudié l'effet de telles clauses pour la première fois dans l'arrêt *Prospect Mortgage,* précité. Dans cette affaire, la société créancière hypothécaire avait tenté de forcer Van-5 à respecter son engagement de payer quand le produit de la vente des biens-fonds hypothéqués s'était révélé insuffisant. Lors de l'achat du bien-fonds en question, Van-5 avait signé une convention renfermant la clause suivante:

1990 CanLII 73 (SCC)

. . . the Covenantors further covenant and agree with the Mortgagee that the liability of the covenantors under this Mortgage shall not be released or affected in any manner whatsoever by any acts, omission or thing whatsoever done by or consented to by the Mortgagee or the Mortgagor except for the payment in full of the principal monies, interest and all other monies secured by this Mortgage.

Van-5 sold its interest to the purchasers who also signed an agreement with Prospect. By the terms of the agreement, the interest rate on the mortgage was to remain the same although the amount of the monthly payments was increased. The agreement also contained a "no prejudice" clause. Van-5 contended that it was no longer liable on the covenant since there had been a novation of the mortgage when it sold its interest to a subsequent purchaser who entered into an agreement on different terms. Esson J.A. held that the language of the modification agreement by itself did not effect a novation. Indeed, he noted that the language in fact expressed a contrary intention on the part of Prospect. Esson J.A. continued at p. 27:

On this issue, however, the language of the new agreement is not conclusive against the covenantors who, of course, are not parties to it. There are matters raised in the affidavits submitted by the covenantors which may be capable of establishing an intention by the creditor, notwithstanding the language of the agreement, to accept a new contract in full satisfaction of and in substitution for the old.

On this basis the court refused the petitioner's application for personal judgment and directed a trial of the novation issue.

The following year in *Re Bank of Nova Scotia and Vancouver Island Renovating Inc., supra,* Macfarlane J.A. of the same court took a very similar approach to Esson J.A. In that case both the original mortgage and the renewal agreement contained similar clauses to those in *Prospect Mortgage.* Macfarlane J.A. refused to treat these

[TRADUCTION] [. . .] les auteurs de l'engagement conviennent en outre avec la créancière hypothécaire que, mis à part le paiement intégral du capital, de l'intérêt et de toute autre somme garantie par la présente hypothèque, aucun acte ni aucune omission commis par la créancière ou le débiteur hypothécaires ou auxquels ils ont consenti ne dégage lesdits auteurs de l'engagement de leur responsabilité en vertu de la présente hypothèque ni n'a aucun autre effet sur cette responsabilité.

Van-5 a vendu son droit aux acheteurs, qui ont eux aussi signé une convention avec Prospect. Aux termes de la convention, le taux d'intérêt hypothécaire demeurait identique, mais les mensualités étaient augmentées. La convention comportait en outre une clause «de réserve de droits». Van-5 a fait valoir qu'elle n'avait plus aucune responsabilité fondée sur l'engagement de payer parce que l'hypothèque avait fait l'objet d'une novation quand elle avait vendu son droit à un acquéreur subséquent, qui a conclu une convention dont les modalités étaient différentes. Le juge Esson a statué que les termes de la convention modificative n'opéraient pas par eux-mêmes une novation. Il a fait remarquer en fait qu'ils exprimaient même l'intention contraire de la part de Prospect. Le juge Esson poursuit, à la p. 27:

[TRADUCTION] Sur cette question, toutefois, les termes de la nouvelle convention ne sont pas déterminants à l'endroit des auteurs de l'engagement, qui, bien entendu, n'y sont pas parties. Il est des points soulevés dans les affidavits produits par les auteurs de l'engagement dont on peut dégager, indépendamment du libellé de la convention, une intention chez la créancière hypothécaire d'accepter un nouveau contrat en pleine exécution et substitution de l'ancien contrat.

Sur ce fondement, la cour a rejeté la demande de la requérante en jugement personnel et a ordonné que la question de la novation fasse l'objet d'une instruction.

L'année suivante, dans l'affaire *Re Bank of Nova Scotia and Vancouver Island Renovating Inc.,* précitée, le juge Macfarlane de la même cour a adopté un point de vue fort semblable à celui du juge Esson. Il s'agit là d'une affaire où l'acte constitutif d'hypothèque primitif et la convention de renouvellement contenaient tous les deux des clauses semblables à celles en cause dans l'affaire *Prospect Mortgage.* Le juge Macfarlane a refusé

1990 CanLII 73 (SCC)

provisions as determinative and articulated the following rationale for his refusal at p. 565:

So far as the without prejudice clause in the renewal agreement is concerned, it is not binding on the mortgagors because the mortgagors were not parties to that agreement. The clause is, however, circumstantial evidence which may be looked at in considering whether it was the intention of the bank to accept Van Isle in the place of the Pearsons as mortgagors and to substitute the new agreement with Van Isle for the old agreement with the Pearsons. Similarly, the clause in the original mortgage entitled "Extension of Time" is a clause that can be looked at as circumstantial evidence in determining whether the original mortgagors are bound or not.

In the result the court looked to the conduct of the parties to determine the novation issue. It found that the intention of the bank was to deal with Van Isle alone and therefore the bank had to be taken as accepting the new contract in substitution for the old one.

The judgment of the same court in *Eaton Bay Trust Co. v. Ling, supra,* seems to be very much at odds with both of the previous decisions. In that case Lynch sold his property to Ling, who in turn assumed the mortgage at a higher interest rate with the mortgagee. Ling did not execute a formal assumption agreement and did not give Eaton Bay a personal covenant. Lynch's mortgage contained a "no prejudice" clause. When the mortgage fell into arrears, Eaton Bay sued Lynch on his personal covenant. Lynch argued that there had been a novation as the terms of the mortgage had been amended without his notice or consent.

Carrothers J.A. rejected Lynch's argument on the following grounds. He held that, in the usual course of events, material changes in terms would be a strong indication that there had been a novation of the mortgage. This, he held, was a consequence of the dual aspect of a mortgage, i.e. the pledge of land and the personal covenant. Carroth-

de considérer ces clauses comme déterminantes, motivant ainsi son refus, à la p. 565:

[TRADUCTION] En ce qui concerne la clause «sous toutes réserves» figurant dans la convention de renouvellement, elle ne lie pas les débiteurs hypothécaires parce que ces derniers n'ont pas été parties à cette convention. La clause constitue néanmoins une preuve circonstancielle dont on peut tenir compte en examinant si la banque a eu l'intention d'accepter Van Isle à la place des Pearson à titre de débiteur hypothécaire et de substituer à l'ancienne convention avec les Pearson la nouvelle intervenue avec Van Isle. De même, la clause portant la rubrique «Prorogation d'échéance» que contenait l'acte constitutif d'hypothèque primitif peut être considérée comme une preuve circonstancielle aux fins de déterminer si, oui ou non, les débiteurs hypothécaires originaires sont liés.

En définitive, la cour a tenu compte de la conduite des parties pour trancher la question de la novation. Elle a conclu que l'intention de la banque avait été de ne traiter qu'avec Van Isle et qu'elle devait en conséquence être considérée comme ayant accepté le nouveau contrat en substitution de l'ancien.

L'arrêt rendu par la même cour dans l'affaire *Eaton Bay Trust Co. v. Ling*, précitée, semble diamétralement opposé aux deux arrêts antérieurs. Dans cette affaire, Lynch avait vendu son bien-fonds à Ling qui, lui, a pris en charge l'hypothèque consentie à la créancière hypothécaire, mais à un taux d'intérêt plus élevé. Ling n'a pas signé de convention de prise en charge en bonne et due forme ni ne s'est engagé personnellement envers Eaton Bay. L'hypothèque de Lynch contenait une clause «sous toutes réserves». Quand il prit du retard dans le paiement de l'hypothèque, Eaton Bay a engagé contre Lynch une action fondée sur son engagement personnel. Lynch a allégué la novation du fait que les conditions de l'hypothèque avaient été modifiées à son insu et sans son consentement.

Le juge Carrothers de la Cour d'appel a rejeté l'argument de Lynch pour les motifs suivants: Il a dit qu'en temps normal des changements substantiels dans les conditions constitueraient une forte indication qu'il y avait eu novation de l'hypothèque. Cela, a-t-il statué, résultait de la dualité de l'hypothèque, qui est une garantie portant sur un

1990 CanLII 73 (SCC)

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 28 of 374

436        NATIONAL TRUST CO. *v.* MEAD    *Wilson J.*        [1990] 2 S.C.R.

ers J.A. referred to his own judgment in *Canada Permanent Trust Co. v. Neumann, supra*, for the proposition that it was legally repugnant to have two different mortgage debts. Notwithstanding the fact that material changes had been made to the original mortgage, the court went on to hold that there had been no novation in the circumstances. It viewed the "no prejudice" clause in the original mortgage as evidencing *in futuro* consent on the part of Lynch to the kind of alterations embraced by the renewal agreement between Eaton Bay and Ling.

I am in general agreement with the decisions in *Prospect Mortgage* and *Vancouver Island* but I am uneasy with the *Ling* decision. It seems to me that the notion of *in futuro* consent may work considerable inequities in some circumstances. Given the conduct of the mortgagee in that case, I would have been inclined to hold that a novation had been effected.

The Saskatchewan Court of Appeal applied four tests of novation in the present case and found that each of them had been met. The court noted that it was permitted to take all the circumstances into account. In doing so the court not only considered the language of the Assumption Agreement but as well took into account the fact that National Trust had discontinued its action against Remai. Cameron J.A. held that this action supported an inference that National Trust both accepted Mead as principal debtor and accepted the new contract in full satisfaction of and substitution for the old contract (the second and third tests).

The Assumption Agreement executed by Mead contained the following provision regarding release of Remai:

2. It is agreed that the Mortgagee may at any time and in such manner as it thinks fit release the Mortgagor named in the said mortgage from any or all of the covenants therein contained and that neither such release nor anything herein contained nor anything done

bien-fonds et qui comporte en même temps une garantie personnelle. Le juge Carrothers a invoqué son propre arrêt dans l'affaire *Canada Permanent Trust Co. v. Neumann*, précitée, à l'appui de la proposition selon laquelle la coexistence de deux dettes hypothécaires différentes était juridiquement inadmissible. Malgré le fait que des modifications substantielles avaient été apportées à l'hypothèque primitive, la cour a conclu qu'il n'y avait pas eu de novation dans les circonstances. Elle a vu la clause «de réserve de droits» comprise dans l'acte constitutif d'hypothèque primitif comme une preuve du consentement *in futuro* de Lynch au genre de modifications contenues dans la convention de renouvellement intervenue entre Eaton Bay et Ling.

J'approuve généralement les arrêts *Prospect Mortgage* et *Vancouver Island*, mais l'arrêt *Ling* me trouble. Il me semble en effet que la notion d'un consentement *in futuro* peut dans certaines circonstances être génératrice de grandes injustices. Compte tenu de la conduite de la créancière hypothécaire dans cette affaire-là, j'aurais incliné à conclure à la novation.

La Cour d'appel de la Saskatchewan a appliqué quatre critères afin de déterminer s'il y avait eu novation en l'espèce et a décidé que chacun de ces critères avait été rempli. La cour a fait remarquer qu'il était permis de tenir compte de toutes les circonstances. En ce faisant, la cour a pris en considération non seulement les termes de la convention de prise en charge, mais aussi le fait que National Trust s'était désistée de son action contre Remai. Le juge Cameron a dit qu'on pouvait en inférer que National Trust acceptait Mead comme débiteur principal et qu'elle acceptait le nouveau contrat en pleine satisfaction et substitution de l'ancien contrat (les deuxième et troisième critères).

La convention de prise en charge conclue par Mead contenait la clause suivante concernant la libération de Remai de sa responsabilité:

[TRADUCTION] 2. Il est convenu que la créancière hypothécaire peut à n'importe quel moment et de la manière qu'elle juge convenable dégager le débiteur hypothécaire nommé dans ledit acte constitutif d'hypothèque de l'un ou de l'ensemble des engagements y

1990 CanLII 73 (SCC)

pursuant hereto shall affect or be construed to affect the lien, charge or encumbrance of or conveyance effected by the said mortgage, or the priority thereof over other liens, charges, encumbrances, or conveyances, or, except as expressly provided by any such release of the Mortgagor, to release or affect the liability of the Purchaser or of any party or parties whomsoever who may now be or hereafter become liable to the Mortgagee under or on account of the said mortgage; nor shall anything herein contained or done in pursuance hereof affect or be construed to affect any other security or instrument, if any, held by the Mortgagee as security for the aforesaid mortgage indebtedness. [Emphasis added.]

The Court of Appeal construed this clause as effecting the release of Remai. With great respect, I think it was in error in so doing. In this provision Mead agrees with National Trust that National Trust is free in the future to release the original mortgagor and that, should it do so, Mead's liability would in no way be affected. Such a provision, in my opinion, does not effect a novation. Its effect, as I see it, is to preserve National Trust's remedies against both Remai and Mead until such time as National Trust releases Remai. It cannot itself be construed as a present release of Remai such as would be necessary in order to replace Remai with Mead as principal debtor.

This conclusion is, in my opinion, strengthened when the terms of the original mortgage are taken into consideration. That mortgage contained a "no prejudice" clause which read:

20. NO extension of time given by the Mortgagee to the Mortgagor or any one claiming under the Mortgagor, nor any other dealing by the Mortgagee with the owner of the equity of redemption in the Mortgaged Premises shall in any way affect or prejudice the rights of the Mortgagee against the Mortgagor or any other person liable for the payment of the moneys secured by this Mortgage. No forebearance by the Mortgagee to seek any remedy for breach of any covenant, agreement, provision or proviso contained in this Mortgage shall operate as a waiver of any rights or remedies of the

énoncés et que ni cette décharge, ni aucune disposition des présentes, ni aucun acte accompli en exécution des présentes ne touche ni ne doit s'interpréter comme touchant le privilège ou la charge résultant de ladite hypothèque, ou la cession effectuée par celle-ci ou la priorité qu'a cette hypothèque sur tout autre privilège, charge ou cession, ni, sauf disposition expresse d'une telle décharge du débiteur hypothécaire, n'écarte pas ni ne modifie, ni ne doit s'interpréter comme écartant ou modifiant, la responsabilité de l'acheteur ou de toute partie qui est maintenant ou qui pourra devenir responsable envers la créancière hypothécaire en vertu ou en raison de ladite hypothèque. De plus, aucune disposition des présentes ni aucun acte accompli en exécution des présentes ne touche ni ne doit s'interpréter comme touchant toute autre garantie ou tout autre acte, s'il en est, détenu par la créancière hypothécaire en garantie de la dette hypothécaire susdite. [Je souligne.]

La Cour d'appel a interprété cette clause comme dégageant Remai de sa responsabilité. Avec égards, je crois que c'est là une erreur de sa part. Dans cette clause Mead convient avec National Trust que celle-ci sera désormais libre de décharger le débiteur hypothécaire originaire et que, si elle le fait, cela ne changera en rien la responsabilité de Mead. Une telle disposition, selon moi, n'opère pas de novation. Son effet, à mon sens, est de maintenir les recours pouvant être exercés par National Trust à la fois contre Remai et contre Mead jusqu'à ce que National Trust dégage Remai de sa responsabilité. Elle ne saurait par elle-même s'interpréter comme le genre de décharge actuelle de Remai qui serait nécessaire pour que Mead soit substitué à Remai en tant que débiteur principal.

Cette conclusion est renforcée, à mon avis, quand on prend en considération les conditions de l'hypothèque primitive. Celle-ci contenait une clause «de réserve de droits» ainsi libellée:

[TRADUCTION] 20. AUCUNE prorogation d'échéance accordée par la créancière hypothécaire au débiteur hypothécaire ou à tout ayant cause de celui-ci, ni aucun autre arrangement intervenu entre la créancière hypothécaire et le titulaire du droit de rachat afférent au bien-fonds grevé de l'hypothèque ne préjudicie d'aucune manière aux droits de la créancière hypothécaire à l'égard du débiteur hypothécaire ou de toute autre personne tenue du paiement des fonds garantis par l'hypothèque. Aucune abstention de la créancière hypothécaire de demander un redressement pour le manquement à un

1990 CanLII 73 (SCC)

Mortgagee with respect to such or any subsequent or other breach. [Emphasis added.]

This clause confirms that there was no intention on the part of National Trust to release Remai. Taken together, these provisions are a strong indication that the assumption of the debt by Mead was not accepted by National Trust in full consideration and substitution of Remai's obligation. The question therefore becomes whether the conduct of the parties can negative that indication.

The action of National Trust in discontinuing its suit against Remai could be construed as supporting an inference that the trust company was no longer looking to Remai for satisfaction of the debt. Indeed, the Court of Appeal viewed it in that light. With respect, I think that the Court of Appeal erred in so doing. I think it attributed too much significance to the discontinuance of National Trust's action against Remai. While I appreciate that the Assumption Agreement contemplated that National Trust could release Remai "at any time and in such manner as it thinks fit", I believe that its conduct in discontinuing its action against Remai is equivocal, particularly in light of Rule 198(4) of the *Saskatchewan Queen's Bench Rules* which states that discontinuance of an action shall not be a defence to any subsequent action against the party. Since discontinuance does not preclude a litigant from bringing the action at a later date, it is not, in my view, an adequate basis on which to find an intention to release the original mortgagor. It does not constitute the kind of compelling circumstance necessary to found a novation.

No other circumstances were presented as indicating that novation occurred. Since I have found that there was no intention on the part of

engagement, à un accord, à une condition ou à une stipulation contenus dans le présent acte constitutif d'hypothèque n'a l'effet d'une renonciation à des droits ou à des recours pouvant être exercés par la créancière hypothécaire à l'égard de ce manquement ou de tout autre manquement. [Je souligne.]

Cette clause confirme l'absence d'intention de la part de National Trust de dégager Remai de sa responsabilité. Prises ensemble, ces dispositions constituent une forte indication que National Trust n'a pas accepté la prise en charge de la dette par Mead en plein acquittement et en pleine substitution de l'obligation de Remai. La question qui se pose est donc de savoir si la conduite des parties vient neutraliser cette indication.

Le fait que National Trust se soit désistée de son action contre Remai peut s'interpréter comme appuyant l'inférence selon laquelle la société de fiducie ne comptait plus sur Remai pour le paiement de la dette. C'est là d'ailleurs le point de vue qu'a adopté la Cour d'appel. Avec égards, je crois qu'en cela elle a eu tort. J'estime en effet qu'elle a attaché trop d'importance au désistement par National Trust de son action contre Remai. Bien que je me rende compte de ce que la convention de prise en charge envisageait que National Trust puisse dégager Remai de sa responsabilité «à n'importe quel moment et de la manière qu'elle juge[ait] convenable», je crois que son désistement de son action contre Remai est une conduite équivoque, surtout compte tenu du par. 198(4) des *Saskatchewan Queen's Bench Rules*, qui porte que le désistement d'une action ne peut être invoqué comme moyen de défense dans le cadre d'une action subséquente contre la même partie. Comme le désistement n'empêche pas une partie d'intenter l'action à une date ultérieure, il ne représente pas, selon moi, un fondement suffisant pour une conclusion à l'existence d'une intention de dégager le débiteur hypothécaire originaire de sa responsabilité. Il ne constitue pas le genre de circonstance déterminante qui est nécessaire pour fonder une novation.

Aucune autre circonstance n'a été alléguée comme indiquant qu'il y a eu novation. Puisque je conclus que National Trust n'a pas eu l'intention

1990 CanLII 73 (SCC)

National Trust to release Remai, it follows that the test for novation has not been met.

## 7. Disposition

I would dismiss the appeal on the combined interpretation of the Act and the Assumption Agreement. The respondent, David Mead, is entitled to his costs.

The following are the reasons delivered by

McLACHLIN J.—I agree with Wilson J.'s conclusions and reasons, subject to the following comment. I view ss. 2(2)(d) and 40(2) of the Act as involving a facial conflict, which I would resolve by recourse to legislative intention, and in particular the intention of the legislature to benefit the non-corporate borrower.

*Appeal dismissed with costs.*

*Solicitors for the appellant: Pederson, Rourke, Pinch, Saskatoon.*

*Solicitors for the respondents: Rendek, McCrank, Halvorsen, Canham, Regina.*

de dégager Remai de sa responsabilité, il s'ensuit qu'on n'a pas satisfait au critère à appliquer pour qu'il y ait novation.

## 7. Dispositif

Je suis d'avis de rejeter le pourvoi en me fondant sur l'interprétation de la Loi et de la convention de prise en charge. L'intimé David Mead a droit à ses dépens.

Version française des motifs rendus par

LE JUGE McLACHLIN—Je souscris aux conclusions et aux motifs du juge Wilson, sous réserve de l'observation suivante. Je considère que l'al. 2(2)d) et le par. 40(2) de la Loi sont en conflit apparent et je le résoudrais en ayant recours à l'intention du législateur et en particulier l'intention de la part de la législature d'avantager l'emprunteur individuel.

*Pourvoi rejeté avec dépens.*

*Procureurs de l'appelante: Pederson, Rourke, Pinch, Saskatoon.*

*Procureurs des intimés: Rendek, McCrank, Halvorsen, Canham, Regina.*

1990 CanLII 73 (SCC)

# TAB 106

# In the Court of Appeal of Alberta

**Citation: Nexxtep Resources Ltd v Talisman Energy Inc, 2013 ABCA 40**

**Date:** 20130201
**Docket:** 1201-0058-AC
**Registry:** Calgary

2013 ABCA 40 (CanLII)

**Between:**

### Nexxtep Resources Ltd.

Appellant
(Defendant /Defendant by Counterclaim)

- and -

### Talisman Energy Inc., as Managing Partner for Talisman Energy Canada, a Partnership, and Talisman Energy Canada, and Omers Energy Inc.

Respondents
(Defendants/Plaintiffs by Counterclaim)

_____

**The Court:**

### The Honourable Madam Justice Marina Paperny
### The Honourable Mr. Justice Clifton O'Brien
### The Honourable Mr. Justice Frans Slatter

_____

### Memorandum of Judgment

Appeal from the Judgment by
The Honourable Mr. Justice G. H. Poelman
Dated the 24th day of January, 2012
Filed on the 22nd day of February, 2012
(2012 ABQB 62, Docket: 0601 03847)

2013 ABCA 40 (CanLII)

---

**Memorandum of Judgment**

---

**The Court:**

## I. Introduction

[1]     The origin of this lawsuit is a mistake with respect to the formation from which natural gas is being produced from a gas well.

[2]     The respondent, Talisman Energy Inc (Talisman), held petroleum and natural gas leasehold interests in section 16 of the Leedale area of Alberta. These interests included a vertical well producing sweet gas and a horizontal well producing sour gas.

[3]     In 2004, Talisman agreed to sell certain interests in section 16 to the appellant, Nexxtep Resources Ltd (Nexxtep). According to the Energy and Resources Conservation Board (ERCB) at that time, the vertical well was producing from the zone above the Mannville formation, while the sour gas was being produced from the zone below. Later investigation proved this to be in error. The vertical well was producing its sweet gas, at least in part, from the zone below the Mannville.

[4]     The description of the interest in section 16 sold to Nexxtep included the words "PNG base of Mannville to base of Pekisko". Following discovery of the error, Nexxtep sued Talisman in trespass and conversion, arguing it was entitled to compensation for the sweet gas being removed from the lower zone beneath the Mannville.

[5]     The trial judge dismissed Nexxtep's claim, finding that the sale agreement did not convey the gas being produced by the vertical well. In making this finding, he ascertained what the parties intended to convey from the terms of their agreement taken as a whole and within the relevant background context known to the parties at the time they made their agreement. Nexxtep appeals.

## II. Background

[6]     In 2002, Talisman put out a marketing package indicating it was interested in disposing of its interests in the Leedale area of Alberta.

[7]     Nexxtep responded and, on May 1, 2003 the parties entered into a letter agreement in which Talisman agreed to sell to Nexxtep all of its interests in the Leedale area. This included Talisman's interests in Section 16, recorded by Talisman's internal identification system as three "mineral rights equities," or MREs. MRE 1 was a 72.4763% working interest in the zone – base Cardium to base of Mannville – which included a vertical well that was producing sweet gas. MRE 4 was directly below, in a zone described by the regulator as base of Mannville to base of Pekisko. Here Talisman had a 34.4262% working interest after payout, with production coming from a horizontal well producing sour gas (the Calpine well).

2013 ABCA 40 (CanLII)

[8]     Difficulties arose when the parties attempted to follow through with the letter agreement. As a result, the parties entered into a second letter agreement, dated December 15, 2003, which contemplated a transaction in two stages, the first stage to be completed on January 31, 2004, and the second stage to be completed on March 31, 2004.

[9]     The first stage closing set for January 31, 2004 did not occur. In response, Nexxtep issued various demand letters and the filed a statement of claim in which it claimed all of the interests set out in the land schedule attached to the December 15, 2003 letter agreement.

[10]     More negotiations followed and on March 31, 2004 the parties entered into the purchase and sale agreement (the Agreement). Talisman agreed to sell Nexxtep certain "Assets" in the Leedale area for $3.95 million dollars. The assets included certain petroleum and natural gas rights in section 16 of the Leedale area and described, in part, as being lease rights from the "base of Mannville to the base of Pekisko". It is common ground that the vertical well bore and related production equipment were not included in the assets purchased by Nexxtep. The sale was conditional upon the execution of release and quit claim relating to the two letter agreements and the lawsuit filed in the Court of Queen's Bench.

[11]     Two years passed before Nexxtep's internal investigations disclosed that the vertical well was producing sweet gas from a pool within the "base of Mannville to the base of Pekisko" zone. Nexxtep applied to the ERCB for a re-designation of the pool from which the sweet gas was being drawn. After a contested hearing, the Board agreed with Nexxtep and re-designated the pool as being from below the base of the Mannville zone. Nexxtep then sued Talisman in trespass and conversion.

### III.  The Trial Judgment; 2012 ABQB 62

[12]     At trial, Nexxtep submitted it had purchased the oil and gas rights in the zone described as "base of Mannville to base of Pekisko," and that the gas being produced by the vertical well was drawing sweet gas from that zone. This meant that a case of trespass and conversion had been made out. Talisman disagreed. According to Talisman, the court was entitled to consider the parties' dealings with respect to the Leedale properties as part of the "factual matrix." When that was considered, along with the words of the Agreement and its Appendices, it was clear that the parties had never intended to convey any interest in the vertical well, or the pool from which it was drawing sweet gas, and that the words of the Agreement should be so construed.

[13]     The trial judge agreed with Talisman. He found that he was entitled to consider evidence of the factual matrix "to the extent it is instructive as to the genesis of the transaction; its background and context; the subject matter meant to be described by the words; and the aim, commercial purpose and practical objectives sought to be achieved" (para 22). He then reviewed the history of negotiations preceding the Agreement, including the discussions leading to the two letter agreements

2013 ABCA 40 (CanLII)

and the values attached to the various properties as negotiations took place. After considering the regulatory context, and the logical conclusion of Nexxtep's argument, he concluded, at para 59:

> That result [as proposed by Nexxtep] is contrary to the intention of the parties as manifested by the PSA read as a whole within its proper factual matrix. Nexxtep hangs everything on six words ("PNG base Mannville to base Pekisko") in one box of the land schedule; it ignores the other parts of the PSA that show an intention to convey tangibles and miscellaneous interests along with petroleum and natural gas rights, and the evidence that leads through two letter agreements and a statement of claim expressly referred to in the PSA. A reasonable person looking at the entire PSA and the factual matrix would conclude that the intended subject of conveyance with respect to Section 16 rights was Talisman's entire 34.4262% working interest in the petroleum and natural gas rights below the base of the Mannville zone, but excluding the pool from which the vertical well produced. The words they used meant exactly that on March 31, 2004.

## IV.  Grounds of Appeal

[14]    The appellant submits the trial judge erred by:

> (a)  failing to properly apply the law regarding contractual interpretation by:
>
>> (i) failing to give the words of a contract their plain and ordinary meaning;
>>
>> (ii) adding words to a contract which contradicted the express language contained therein;
>>
>> (iii) considering parol evidence to interpret a contract that was clear and unambiguous; and
>>
>> (iv) failing to consider and apply the "entire agreement" clause in the contract;
>
> (b) failing to consider relevant evidence at trial;

2013 ABCA 40 (CanLII)

(c) properly stating the law with regard to the admissibility of factual matrix evidence, but mis-characterizing parol evidence as factual matrix evidence; and

(d) in provisionally granting rectification.

## V.  Standard of Review

[15]    In *Spartacus Holdings Ltd v Building 400 Ltd*, 2011 ABCA 18, 100 RPR (4th) 1, this Court set out a useful summary of the standard of review relating to issues arising from contractual interpretation. The Court stated, at paras 5-7:

> The interpretation of a contract may invoke different standards of review. Some findings of fact may be required. Generally, facial interpretation of contractual terms will be an extricable issue of law for which correctness applies. In some cases the trial judge may have to determine which documents, promises, and consideration constitute the contract or whether relevant business practices or specialized language should apply to its interpretation. There is a limited ability to introduce evidence regarding the circumstances surrounding the formation of the contract.

> Findings of fact on such issues will only be disturbed on appeal if they disclose palpable and overriding error: *Dow Chemical Canada v. Shell Chemicals Canada* (2010), 477 A.R. 112, [2010] A.J. No. 432 (QL), 2010 ABCA 126 at para. 11, leave denied [1010] S.C.C.A. No. 234 (QL); *Double N Earthmovers v. Edmonton* (2005), 263 A.R. 201, 2005 ABCA 104 at para. 16, aff'd, [2007] 1 S.C.R. 116, 2007 SCC 3. A trial judge's determination of the factual matrix surrounding the contract in light of the evidence as a whole (including if appropriate extrinsic evidence) is a matter of fact, although the determination may be influenced by legal concepts: *Dow Chemical* at para. 11; *Diegel v. Diegel* (2008), 100 Alta. L.R. (4th) 1, 2008 ABCA 389 at para. 20; *Double N Earthmovers* at para. 16.

> Once the exact terms and nature of the contract, and the surrounding facts, have been established, the interpretation of the words of the contract is a matter of law. The interpretation and application of contract principles to a settled set of facts is a question of law reviewed for correctness: *Dow Chemical* at para. 12; *Diegel* para. 20; *Alberta Importers and Distributors (1993) Inc, v. Phoenix Marble*

*Ltd.* (2008), 432 A.R. 173, 2008 ABCA 177 at para. 9; *Fenrich v. Wawanese Mutual Insurance Co.* (2005), 371 A.R. 53, 2005 ABCA 199 at para. 6; *McDonald Crawford v. Morrow* (2004), 348 A.R. 118, 2004 ABCA 150 at paras. 5 and 43.

[16]    The determination of whether a contract is ambiguous involves interpreting the words of the Agreement, which interpretation is a matter of law so that the correctness standard applies. If the court finds a contract is ambiguous, however, and it is necessary to examine extrinsic evidence to determine the true meaning of the Agreement, the findings in that regard will be subject to deference.

## VI. Analysis

[17]    Although Nexxtep objects to the admission of certain evidence for the purpose of interpreting the Agreement, both parties agree that the evidence establishes that prior to the execution of the Agreement, they each believed that the vertical well was producing sweet gas from above the base of the Mannville formation. This was a mistake, as it has subsequently been ascertained that the vertical well is draining hydrocarbons from below the base of the Mannville formation.

[18]    The evidence, thus, establishes a mutual mistake on the part of the parties at the time their agreement was made. However, neither party seeks to invoke the doctrine of mistake and to rescind the Agreement, or otherwise obtain a remedy for mistake. Rather, Nexxtep submits that the Agreement clearly conveys to it the petroleum and natural gas rights from the base of the Mannville to the base of the Pekisko, and that all contrary evidence is extrinsic and not admissible. Nexxtep argues, therefore, that the trial judge erred in failing to enforce its strict contractual rights.

[19]    Talisman responds to this argument, by saying that the trial judge correctly perceived that the Agreement, when interpreted as a whole, and with regard to the surrounding commercial circumstances, never conveyed the pool or zone from which the vertical well is producing to Nexxtep. Talisman further submits that if the Agreement is ambiguous, in regard to the interest that was conveyed thereby, then the trial judge was correct in finding that he could resort to the extrinsic evidence.

[20]    It is trite law that contracts should be enforced in accordance with the intention of the parties, which is to be gleaned from the words used in their agreements. Extrinsic evidence is not admissible when the document is clear and unambiguous. However, this does not mean that a court interpreting a contract is confined only to examining the words used, and to give them a dictionary meaning. Contracts are not to be interpreted in a vacuum. Contextual evidence of surrounding circumstances, disclosing facts known to the parties at the time the contract was made, is part of the interpretative process.

2013 ABCA 40 (CanLII)

[21]    Indeed, this Court has held that the interpretation of the words used in a contract must have regard "to the relevant background context known to the parties": *ATCO Electric Ltd v Alberta (Energy and Utilities Board)*, 2004 ABCA 215, [2004] 11 WWR 220, at para 76. The court adopted Lord Bingham of Cornhill's statement of the law in *Bank of Credit & Commerce International v Ali*, [2001] 1 All ER 961 (HL) at 965:

> To ascertain the intention of the parties the court reads the terms of the contract as a whole, giving the words used their natural and ordinary meaning in the context of the agreement, the parties' relationship and all the relevant facts surrounding the transaction so far as known to the parties. To ascertain the parties' intentions the court does not of course inquire into the parties' subjective states of mind but makes and objective judgment based on the materials already identified.

[22]    In determining the objective intention of the parties, we start by examining the words used in the Agreement. The Agreement identifies Talisman's interest in certain "assets" which are the subject matter of the sale, "subject to and in accordance with the terms of this Agreement". The "assets" are defined to mean "the Petroleum and Natural Gas Rights, the Tangibles and the Miscellaneous Interests". The Petroleum and Natural Gas Rights are, in turn, defined to mean the land and leases described in Schedule "A". The Tangibles are defined to mean tangible depreciable property used for the production of petroleum substances from the subject lands. The subject wells are described in Schedule "C".

[23]    It is thus necessary to look to Schedule "A" to ascertain what petroleum and natural gas rights were sold to Nexxtep. Item no 41 identifies the sale to include Petroleum and Natural Gas rights in Alberta Crown Lease 0480010153 with respect to section 16, township 43, range 4, west of the 5th Meridian. In describing the interest to be acquired by Nexxtep, the Schedule under a column entitled "legal description" sets out the location of section 16 within Alberta, followed by the words, "PNG base Mannville to base Pekisko".

[24]    Nexxtep focuses on these words and submits that their meaning is clear – it acquired all the petroleum and natural gas rights in section 16 from base Mannville to base Pekisko. Nothing further need be considered; all other evidence is extrinsic and inadmissible. We say, "not so fast". The whole of the contract need be examined, within its factual matrix, to determine the interest that was sold.

[25]    Schedule "A" further describes the interest sold as "MRE 4". Evidence with respect to the meaning of this description is admissible to provide an understanding of the meaning of the Schedule. As set out by the trial judge, MRE means "mineral rights equities", a term used by Talisman to designate ownership at different vertical "splits" or zones within a particular Crown

2013 ABCA 40 (CanLII)

lease for a surface location. Talisman had 3 vertical splits, or MREs, with respect to section 16. Schedule "A" identifies only MRE 4 as being conveyed to Nexxtep, leaving MREs 1 and 3 in the possession of Talisman (para 11).

[26]    Schedule "A" shows the net interest held by Talisman in MRE 4, i.e., the working interest sold to Nexxtep, as being 34.4262 % after payout. Thus, Talisman retained its interest in MRE 1, being a 72.4763 % working interest in the vertical split from base Cardium to base Mannville, from which it was then believed that the vertical well was producing sweet gas. In addition, Schedule "A" shows that the MRE 4 interest, acquired by Nexxtep, was not operated by Talisman, whereas Talisman did operate MRE 1. Schedule "A" also describes the "unique well identifier" relating to the interests being conveyed to Nexxtep. MRE 4 lists only a horizontal well operated by Calpine. Finally, the Schedule makes reference, under the heading "contracts", to a farmout agreement relating to the horizontal well. Schedule "C" specifically identifies the well as the Calpine H2 Wilson Creek 2-16-43-4 well, and confirms Talisman's working interest as being 34.4262 %.

[27]    In short, the remaining parts of Schedule "A", excluding the description "PNG base Mannville to base Pekisko", describe the interest in section 16, acquired by Nexxtep, as being a 34.4262 % working interest in the petroleum and natural gas rights, not then being operated by Talisman, and relating to a well operated by Calpine and producing from the Wilson Creek formation. It needs to be asked, therefore, how these parts of Schedule "A" affect the "legal description" from "PNG base Mannville to base Pekisko." Did the parties intend, objectively, by using the words of Schedule "A", to convey the whole of Talisman's interest in the zone below Mannville, including its operated interests from which the sweet gas was being produced, or does the legal description merely refer to the location of the horizontal well which Talisman did not operate? Put another way, does Schedule "A", when read together with Schedule "C" and the other parts of the contract, show that Nexxtep was only purchasing Talisman's interests in the production from the Wilson Creek formation operated by Calpine and within the base Mannville to base Pekisko? It is necessary to examine the other parts of the Agreement to ascertain the intention of the parties.

[28]    The Agreement sets out Talisman's "closing conditions" to the sale in clause 7. Subparagraph (3) thereof prescribes the following condition:

> (e)    Purchaser having executed a release and quit claim, in form and content satisfactory to Vendor, relating to the Offers to Purchase made to Vendor dated May 1, 2003 and December 15, 2003 and the action commenced by Purchaser in the Alberta Court of Queen's Bench as Action Number Q.B. 040103849.

2013 ABCA 40 (CanLII)

[29]    In our view, it was appropriate for the trial judge to have regard to the release and prior claim advanced by Nexxtep, as he did, when considering the commercial purpose of the Agreement. The existence of an "entire agreement" clause in the Agreement did not preclude the court from considering documents expressly referred to in the Agreement for the purpose of interpreting and understanding the intention of the parties to that Agreement, as distinct from adding terms thereto, which is precluded by such a clause.

[30]    Here the trial judge examined the prior proposed transactions between the parties, and claims arising therefrom, as part of the factual matrix known to the parties at the time the Agreement was made. As Doherty JA observed in his commentary on the principles governing contractual interpretation, found in *Dumbrell v Regional Group of Companies, Inc*, 2007 ONCA 59, 279 DLR (4th) 201:

> Insofar as written agreements are concerned, the context, or as it is sometimes called the "factual matrix", clearly extends to the genesis of the agreement, its purpose, and the commercial context in which the agreement was made: *Kentucky Fried Chicken Canada v Scott's Food Services Inc* (1998), 114 OAC 357 at 363 (CA).  [para 55]

[31]    Doherty JA also pointed out in *Dumbrell* that a consideration of the factual matrix does not depend upon finding some ambiguity in the contract, at para 54:

> A consideration of the context in which the written agreement was made is an integral part of the interpretative process and is not something that is resorted to only where the words viewed in isolation suggest some ambiguity. To find ambiguity, one must come to certain conclusions as to the meaning of the words used. A conclusion as to the meaning of words used in a written contract can only be properly reached if the contract is considered in the context in which it was made: see McCamus, *The Law of Contracts* (Toronto:  Irwin Law, 2005) at 710-11.

[32]    The trial judge recognized that evidence of prior negotiations was not part of the factual matrix (para 21). Rather, the prior alleged agreements were examined in the context of the closing requirement stipulating delivery of a release and quit claim by Nexxtep of its claims arising out of the prior alleged agreements. This evidence assisted the court in determining the object of the Agreement on an objective basis.

[33]    Likewise, we think it appropriate that the trial judge admitted expert and regulatory evidence as part of the commercial context in which the Agreement was made. Nexxtep acknowledged that it had not purchased the vertical well and production facilities. The trial judge accepted the evidence

of Gerry J DeSorcy, former chairman of the Alberta Natural Resources Conservation Board, that it would be difficult and unpredictable as to whether any purchaser of the pool of sweet gas could obtain a license to produce it without having also purchased the well and production facilities.

[34]    The Supreme Court of Canada commented in *Consolidated Bathurst Export Ltd v Mutual Boiler and Machinery Insurance Co*, [1980] 1 SCR 888 at 901, 112 DLR (3d) 49:

> Even apart from the doctrine of *contra proferentem* as it may be applied in the construction of contracts, the normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. Consequently, literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted. Where words may bear two constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation of the policy which promotes a sensible commercial result.

[35]    The trial judge made note of the expert evidence that it was customary industry practice to purchase the well bore when purchasing producing property, and that Nexxtep's interpretation would result in it intending to acquire only a portion of Talisman's interest in the sweet gas pools (34.4262% of 72.4763%), leaving Nexxtep with no present means to produce the portion of sweet gas it purchased, and leaving Talisman and other co-owners of the remaining interest in the sweet gas no longer able to use the vertical well for its production (para 59). The fact that this is commercially unreasonable, and unlikely, is telling against Nexxtep's interpretation.

[36]    We agree with the trial judge, therefore, that an objective interpretation of the Agreement, when it is examined as a whole and within its factual matrix, demonstrates that the asset sold with respect to section 16 was Talisman's known and entire 34.4262 % non-operated working interest in the petroleum and natural gas rights below the base of the Mannville zone.The reference to base Mannville to base Pekisko, included in the "legal description" of the asset being conveyed, is a reference to the space or vertical split within which Talisman's 34.4262% working interest in the production from Calpine H2 Wilson Creek 2-16-43-4 was known to be located.

[37]    The facts known to the parties at the time of making the contract did not include that the sweet gas was being produced from a pool or zone below the base of the Mannville. However, when

2013 ABCA 40 (CanLII)

2013 ABCA 40 (CanLII)

the Agreement is examined as a whole, it is clear that MRE 4 refers only to Talisman's non-operated interest in the natural gas being produced by the Calpine well. The interpretation advanced by Nexxtep fails to give effect to the whole of the Agreement, results in a strange commercial transaction, and bestows a potential benefit upon it for which it never bargained nor paid.

[38]    In our view, the trial judge correctly applied the principles governing contractual interpretation and arrived at the proper result. He relied upon the evidence admitted before him only to construct the background factual matrix, which shows the facts known to the parties at the time the Agreement was made, as well as their commercial object from an objective standpoint.

[39]    Finally, we are in agreement that the evidence admitted, as well as the analysis undertaken by the trial judge, does not depend upon finding an ambiguity. However, like him, we add that if the words under the column "legal description" in Schedule "C" result in conflicting descriptions of the subject matter of the sale, so as to create doubt as between potential interpretations, then the evidence was properly admitted to resolve the ambiguity and leads to the same result.

## VII.  Conclusion

[40]    The appeal is dismissed.


Appeal heard on December 5, 2012

Memorandum filed at Calgary, Alberta
this 1st day of February, 2013


_____

                                                                    Paperny J.A.

_____

                                                                    O'Brien J.A.

_____

                                                                    Slatter J.A.

2013 ABCA 40 (CanLII)

**Appearances:**

G.S. Watson
S.L. Kelley
          for the Appellant

R.W. Block, Q.C.
M.A. Marion
          for the Respondents

TAB 107

862 F.Supp.2d 406
United States District Court,
E.D. Pennsylvania.

NORDETEK ENVIRONMENTAL, INC., et al.

v.

RDP TECHNOLOGIES, INC.

Civil Action No. 09–4714.    |    May 16, 2012.

**Synopsis**

**Background:** Former shareholder and his company, which had allegedly obtained license in water treatment technology, brought action against family-owned corporation alleging claims for patent infringement, false designation of origin, false advertising, and trade infringement. Corporation counterclaimed for breach of fiduciary duty and breach of contract. Cross-motions for summary judgment were filed, plaintiffs moved to exclude expert, and corporation moved to hold former shareholder's wife in contempt and to stay arbitration.

**Holdings:** The District Court, Dalzell, J., held that:

[1] shareholder would not be collaterally estopped from challenging valuation on corporation's claim for compensatory damages;

[2] shareholder was not collaterally estopped from claiming that he did not violate his fiduciary duty to corporation;

[3] testimony estimating corporation's financial losses was inadmissible; and

[4] fact issues precluded summary judgment on corporation's claims for damages against former shareholder.

Plaintiffs' motion granted in part and denied in part; Defendants' motion granted in part and denied in part.

West Headnotes (22)

[1]    **Judgment**

**Nature and requisites of former adjudication as ground of estoppel in general**

Under Pennsylvania law, a plea of collateral estoppel is valid if 1) the issue decided in the prior adjudication was identical with the one presented in the later action, 2) there was a final judgment on the merits, 3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication, and 4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action.

Cases that cite this headnote

[2]    **Alternative Dispute Resolution**

**Conclusiveness of Adjudication**

Even if arbitrator credited expert's $1,325,000 valuation of corporation following former shareholder's alleged bad acts, under Pennsylvania law, former shareholder and his company would not be collaterally estopped from challenging valuation on corporation's claim for compensatory damages resulting from shareholder's alleged breach of fiduciary duties and breach of contract, where arbitrator explicitly noted that any determination respecting valuation was not necessary to final judgment.

Cases that cite this headnote

[3]    **Alternative Dispute Resolution**

**Conclusiveness of Adjudication**

Under Pennsylvania law, arbitrator's finding that former shareholder devised plan that was intended to harm corporation did not collaterally estop shareholder from claiming that he did not violate his fiduciary duty to corporation, where finding was not necessary to arbitrator's conclusions.

Cases that cite this headnote

[4]    **Alternative Dispute Resolution**

**Matters concluded**

Under Pennsylvania law, arbitrator's observation that corporation continued to be profitable

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 47 of 374

**Nordetek Environmental, Inc. v. RDP Technologies, Inc., 862 F.Supp.2d 406 (2012)**
88 Fed. R. Evid. Serv. 545

enterprise after former shareholder's actions did not collaterally estop corporation from claiming that it suffered damages from shareholder's alleged breach of fiduciary duties, where issue was not decided during arbitration.

Cases that cite this headnote

**[5]    Federal Civil Procedure**
🔑 Admissibility

Expert's testimony estimating corporation's financial losses resulting from former shareholder's alleged wrongful conduct using diminution of value approach was inadmissible on motion for summary judgment on corporation's breach of fiduciary duty and damages claims against shareholder; use of diminution in business value methodology to estimate losses by valuating corporation's post-injury worth at time of its maximum infirmity was not relevant to facts of case, and methodology was applied incorrectly. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[6]    Damages**
🔑 Nature and theory of compensation

**Damages**
🔑 Nature and Theory of Damages Additional to Compensation

Compensatory damages have as their purpose the desire to make the plaintiff whole, and punitive damages are a windfall to the recipients over and above compensatory damages to which they are entitled.

Cases that cite this headnote

**[7]    Evidence**
🔑 Matters directly in issue

Whether mitigation efforts can generally reduce damages awards is a question of law upon which experts are not qualified to opine. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

**[8]    Damages**
🔑 Duty of Person Injured to Prevent or Reduce Damage

Mitigation efforts do not reduce damages because any damages calculus assumes that reasonable efforts to mitigate have been made; thus, final damages are net of mitigation.

Cases that cite this headnote

**[9]    Damages**
🔑 Duty of Person Injured to Prevent or Reduce Damage

Where plaintiffs fail to make mitigation efforts, they cannot recover the quantum of damages that they might otherwise have averted; thus, under Pennsylvania law one injured by the tort of another is not entitled to recover damages for any harm that he could have avoided by the use of reasonable effort or expenditure after the commission of the tort. Restatement (Second) of Torts § 918(1).

Cases that cite this headnote

**[10]    Damages**
🔑 Duty of Person Injured to Prevent or Reduce Damage

Where a plaintiff has made reasonable efforts to mitigate damages, he may recover "mitigation damages" for any costs incurred in the course of these efforts plus the amount of any remaining loss; but awarding such a mitigating plaintiff damages for injury that was avoided or repaired through his efforts would do more than make him whole or return him to a position as nearly as possible equivalent to his position prior to the tort, it would, in short, award him a windfall.

Cases that cite this headnote

**[11]    Federal Civil Procedure**
🔑 Admissibility

When the ruling on admissibility turns on factual issues, at least in the summary judgment context, failure to hold an in limine hearing may be an

abuse of discretion. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

Cases that cite this headnote

[12]    **Federal Civil Procedure**
       🔑 Corporations and business organizations

Genuine issue of material fact existed regarding whether former shareholder's actions caused damages to corporation, precluding summary judgment on corporation's claims for damages against former shareholder.

Cases that cite this headnote

[13]    **Fraud**
       🔑 Fiduciary or confidential relations

To allege a breach of fiduciary duty under Pennsylvania law, a plaintiff must establish that a fiduciary or confidential relationship existed between her and the defendants, and must also allege three elements: (1) that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed, (2) that the plaintiff suffered injury, and (3) the defendant's failure to act solely for the plaintiff's benefit was a real factor bringing about plaintiff's injuries.

1 Cases that cite this headnote

[14]    **Contracts**
       🔑 Grounds of action

To state a breach of contract claim under Pennsylvania law, a plaintiff must allege (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages.

2 Cases that cite this headnote

[15]    **Corporations and Business Organizations**
       🔑 Fiduciary nature of relation

Former shareholder's position as secretary and treasurer of corporation placed him in fiduciary relationship with corporation under Pennsylvania law.

Cases that cite this headnote

[16]    **Corporations and Business Organizations**
       🔑 Good faith

Former shareholder breached fiduciary duty to corporation by intentionally failing to act in good faith and solely for benefit of corporation in all matters for which he was employed.

1 Cases that cite this headnote

[17]    **Contracts**
       🔑 Restriction of competition

Shareholder agreement, which mandated that for period of two years after date on which a shareholder's employment terminated, shareholder could not engage either directly or indirectly in any manner or capacity whatsoever in any business competitive with business of corporation, prohibited shareholder from competing against corporation.

Cases that cite this headnote

[18]    **Federal Civil Procedure**
       🔑 Corporations and business organizations

Genuine issue of material fact existed regarding whether corporation suffered damages from former shareholder's breach of contract, precluded summary judgment on corporation's breach of contract claim against shareholder under Pennsylvania law.

Cases that cite this headnote

[19]    **Alternative Dispute Resolution**
       🔑 Stay of Arbitration

       **Federal Courts**
       🔑 Writs in general

District court would not enjoin under All Writs Act arbitration between corporation and former shareholder regarding former shareholder's entitlement to payout under shareholder agreement; although court ruled that former shareholder and his company had waived any right to arbitrate claims pending

before court, no party asserted claim before court regarding shareholder's entitlement to payout. 28 U.S.C.A. § 1651(a).

Cases that cite this headnote

[20]     **Federal Courts**
👉 Pendency and Scope of Prior Proceedings; First-Filed Rule

**Federal Courts**
👉 Injunction Against Proceedings

The first-filed rule encourages sound judicial administration and promotes comity among federal courts of equal rank; it gives a court the power to enjoin the subsequent prosecution of proceedings involving the same parties and the same issues already before another district court.

Cases that cite this headnote

[21]     **Contempt**
👉 Nature and Elements of Contempt

**Contempt**
👉 Nature and grounds of power

Process of contempt is a severe remedy, and should not be resorted to where there is fair ground of doubt as to the wrongfulness of the defendant's conduct.

Cases that cite this headnote

[22]     **Federal Civil Procedure**
👉 Contempt

There was no evidence that former shareholder's wife countermanded court's instruction to appear for additional day of deposition in proceedings with corporation, and thus finding of contempt for violation of order was not warranted.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*409** Paul R. Fitzmaurice, Haddonfield, NJ, Joseph E. Chovanes, Malvern, PA, for Nordetek Environmental, Inc., et al.

**Opinion**

*MEMORANDUM*

DALZELL, District Judge.

As we noted in an earlier memorandum, *see Nordetek Envtl., Inc. v. RDP Tech., Inc.,* 677 F.Supp.2d 825 (E.D.Pa.2010), this case arises from the venom between two brothers, Paul G. ("Paul") and Richard ("Dick") Christy. Together for decades they ran a successful company, RDP Technologies, Inc. ("RDP"), before enmity between them led Paul to leave the company, start his own firm, Nordetek Environmental, Inc. ("Nordetek"), and attempt to compete against RDP— all in alleged violation of his fiduciary duties to his family's company and a non-competition provision in a shareholder agreement.

Thus it was that plaintiffs and counterclaim defendants Nordetek and Paul on October 14, 2009 filed suit against defendant and counterclaim plaintiff RDP, asserting claims for patent infringement, false designation of origin, false advertising, and trade infringement. They shortly thereafter filed a motion for preliminary injunction, to which RDP responded with its own preliminary injunction motion. After a hearing, we denied Nordetek and Paul's motion for preliminary injunction and granted RDP's motion for one. *Id.* After further briefing, we granted RDP's motion for summary judgment with respect to all of Nordetek and Paul's claims against it. Aug. 9, 2010 Order (docket entry # 110). But by this time RDP had filed counterclaims against Nordetek and Paul —including claims for breach of fiduciary duty and breach of contract—which the counterclaim defendants unsuccessfully moved to dismiss. Moreover, several months after the entry of our preliminary injunction against Paul, RDP moved to hold Paul in contempt for violating the injunction—a motion that we granted. June 11, 2010 Order (docket entry # 100).

After those battles this case settled into relative quiet for a time, as the parties first attempted (unsuccessfully) to mediate their claims before Judge Jacob P. Hart, and then participated in arbitration proceedings before our former colleague, the Hon. Edward N. Cahn, aimed at fixing a value of RDP to determine how much Paul's shares in RDP were worth at the time he resigned. Judge Cahn issued a decision in that arbitration about a year **\*410** ago and offered to help the parties mediate the rest of their claims. While the parties accepted this gracious offer, Judge Cahn's efforts at mediation were unavailing, leading us to set a schedule for discovery

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 50 of 374

Nordetek Environmental, Inc. v. RDP Technologies, Inc., 862 F.Supp.2d 406 (2012)
88 Fed. R. Evid. Serv. 545

and motion practice regarding the remaining counterclaims in this case.

RDP has now filed a motion for summary judgment with respect to its counterclaims for breach of fiduciary duty and breach of contract, a motion to hold Lisa Christy ("Lisa"), Paul's wife, in contempt and a motion to enjoin a second arbitration that Paul has initiated. Paul and Nordetek have filed a motion for summary judgment regarding seven of RDP's ten counterclaims, as well as a motion to preclude the expert testimony of J. Mark Penny that RDP has proffered.

RDP restricts its motion for summary judgment to a subset of its counterclaims explaining that it "is willing to liquidate the entirety of its damages to $5,165,000, i.e., those resulting from Paul Christy's breaches of his fiduciary duty and contractual obligations."[1] RDP's Mot. Summ. J. ("RDP's MSJ") at 3 n. 2. With respect to liability for Paul's alleged breach of fiduciary duty, RDP argues that "collateral estoppel applies to findings made in arbitration proceedings, as well as in litigation," id. at 5, and suggests that since Judge Cahn found that Paul " 'devised a plan that was intended to harm RDP,' " id. at 8 (quoting Ex. 604 to RDP's MSJ ("Cahn Opinion") at 4), RDP is entitled to summary judgment on that claim. Id. at 10. RDP also points to evidence presented in the arbitration proceedings that it says demonstrates Paul's alleged breach. Id. at 9–10. With respect to liability for Paul's alleged breach of his noncompetition obligation, RDP notes that this Court has found that Paul competed with RDP, so that it is entitled to summary judgment on this claim as well. Id. at 11, Finally, with respect to damages, RDP argues that because (1) "Judge Cahn found that the value of RDP prior to a deduction for Paul Christy's bad acts was $6,490,000," id. at 14, (2) RDP's expert Edward Wilusz set "the value of RDP following Paul Christy's bad acts" at $1,325,000, id. at 15, and (3) "[a]fter hearing all of the evidence, Judge Cahn credited Wilusz's report, and rejected Paul Christy's challenges to it," id., RDP is therefore "entitled to $5,165,000—the difference in RDP's value." Id.

As for Paul and Nordetek, they contend in their motion for summary judgment that "Judge Cahn found, and RDP is collaterally estopped from challenging, [that] RDP has not—and cannot—show any damages were caused to it by Paul Christy's conduct." Nordetek's Mot. Summ. J. ("Nordetek's MSJ") at 1. Since causation and damages "are both elements of [RDP's] Counts I–IV and VI–VIII," Paul and Nordetek argue that "RDP cannot establish the existence of the elements of its claims and summary judgment is

appropriate." Id. Paul and Nordetek further assert that "the only evidence of economic damages RDP has provided for any of its counterclaims rests entirely on Penny's unreliable and irrelevant expert opinion." Id. at 9. Since as counterclaim defendants they move for the preclusion of this testimony pursuant to **411 *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), Paul and Nordetek suggest that they are entitled to summary judgment.

As this canvass of these motions makes clear, the two pending motions for summary judgment and motion to preclude expert testimony involve related issues. We will thus examine these motions together, considering each pertinent issue in turn, before pivoting to resolve RDP's motions to hold Lisa in contempt and enjoin Paul's second arbitration.

### I. *The Parties' Arguments Respecting Collateral Estoppel*

We first consider the parties' respective efforts to use Judge Cahn's Opinion and Award to collaterally estop their opponents and secure summary judgment. We begin by reviewing the outlines of collateral estoppel doctrine in Pennsylvania.

[1]    As the Supreme Court of Pennsylvania explained in *Safeguard Mut. Ins. Co. v. Williams,* 463 Pa. 567, 345 A.2d 664, 668 (1975),

> [A] plea of collateral estoppel is valid if, 1) the issue decided in the prior adjudication was identical with the one presented in the later action, 2) there was a final judgment on the merits, 3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication, and 4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action.

While this language suggests that only four requirements need be met in order for the doctrine to apply, an array of case law makes clear that in addition "[t]he identical issue must have been necessary to final judgment on the merits." *Balent v. City of Wilkes–Barre,* 542 Pa. 555, 669 A.2d 309, 313 (1995). *See also, e.g., City of Pittsburgh v. Zoning Board of Adjustment of Pittsburgh,* 522 Pa. 44, 559 A.2d 896, 901 (1989) ("Collateral estoppel applies if ... the determination

in the prior proceeding was essential to the judgment.");
*Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 327 n. 5, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) ("Under the doctrine of collateral estoppel ... the second action is upon a different cause of action and the judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action."); *Witkowski v. Welch,* 173 F.3d 192, 203 n. 15 (3d Cir.1999) ("Some Pennsylvania courts state that there are actually five—instead of four—elements to the issue preclusion doctrine. The fifth element requires that the determination of an issue in the prior case must have been 'essential' to the previous judgment.... In any event, the doctrine is essentially the same under either analysis."); *Irizarry v. Office of General Counsel,* 934 A.2d 143, 151 (Pa.Commw.Ct.2007) ("If the parties to an action have had an opportunity to appear and be heard in a prior proceeding involving the same subject matter, all issues of fact which were actually adjudicated in the former action and essential to the judgment therein are concluded as between the parties.") (quoted in RDP's MSJ Reply at 2).

RDP attempts to apply the doctrine of collateral estoppel to bar Paul and Nordetek from challenging (1) Wilusz's $1,325,000 valuation of RDP and (2) the contention that Paul violated his fiduciary duty to RDP. Given the requirements of the doctrine, there are at least two problems with RDP's first application of the collateral estoppel doctrine.

To begin, though RDP claims that "Judge Cahn rejected all challenges to Wilusz's $1,325,000 valuation," RDP's MSJ at 13 n. 13 (citing Cahn Opinion at 7), and that "Judge Cahn credited Wilusz's report" **\*412** as to "RDP's worth after Paul Christy began competing—and after he convinced Stephansen to purport to cancel RDP's license," *id.* at 15 (citing Cahn Opinion generally without pin citation), this simply is not true. RDP points to *no* language from Judge Cahn's Opinion and Award suggesting that he accepted Wilusz's $1,325,000 valuation of RDP, and our own parsing of the Opinion—including the passages RDP cites—reveals no language even hinting at such acceptance. Indeed, as we note below, Judge Cahn rejected the suggestion that he determine RDP's value following Paul's alleged wrongful conduct, and instead explained that he would "evaluate RDP without any deduction for Paul's conduct and leave for determination in Judge Dalzell's Court an assessment of the damages allegedly caused by Paul both before and after his resignation." Cahn Opinion at 7.

We are, in truth, puzzled by how RDP's counsel can so confidently assert a proposition that finds no support in the record and appears to be false. More seriously, this flat-footed stance brings into play Fed.R.Civ.P. 11(b), which states that "[b]y presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: ... (3) the factual contentions have evidentiary support ...." [2]

[2]    In any case, even if Judge Cahn *had* credited Wilusz's $1,325,000 valuation, Paul and Nordetek would still not be estopped from challenging this valuation—for any determination respecting this valuation was not "necessary to [Judge Cahn's] final judgment." *Balent,* 669 A.2d at 313. In fact, Judge Cahn explicitly noted that he would *not* evaluate the effect of Paul's acts on RDP's valuation and the passage warrants quoting at length:

> My assignment is complicated by the fact that RDP has damage claims against Paul currently pending before Judge Dalzell.... I had originally intended, as confirmed by my remarks at Oral Argument, to include in my decision as to the value of RDP some consideration of Paul's acts to harm the company. I was going to weave into my decision Paul's acts up to September 18, 2009, the date of his resignation. That approach would leave for Judge Dalzell's determination an assessment of any damages caused by Paul after September 18, 2009. When I attempted to make decisions using that approach, I realized that it would be very difficult to segregate the impact of Paul's conduct before and after September 18, 2009. I also realized that Judge Dalzell, in his Order of August 9, 2010, ruled that Paul has waived any right to arbitrate RDP's claims. That is a compelling reason for me to abstain from an assessment of any of RDP's alleged damages. Consequently, I have changed my

approach and will evaluate RDP without any deduction for Paul's conduct and leave for determination in Judge Dalzell's Court an assessment of the damages allegedly caused by Paul both before and after his resignation.

Cahn Opinion at 6–7. Judge Cahn then reiterated that

> **\*413** Judge Dalzell and/or a jury will have the responsibility to assess any monetary damages in regard to RDP's claims against Paul. Paul is entitled to receive 43% of $6,490,000 in installments calculated in accordance with the Agreement. Judge Dalzell's Court will calculate the amount of damages Paul may owe to RDP for any harm he caused to RDP.

*Id.* at 8–9. Judge Cahn thus reached the following conclusions:

1. The Arbitrator has jurisdiction over this dispute pursuant to paragraph 15j of the Amended and Restated Shareholder Agreement.

2. The Arbitrator has in personam jurisdiction over the parties who have appeared personally and through counsel.

3. The valuation of RDP Technologies, Inc. as of September 17, 2009 is $6,490,000.

*Id.* at 9.

In sum, Judge Cahn's only conclusion on the merits arising out of the arbitration was that RDP was worth $6,490,000 prior to Paul's alleged wrongful conduct. We are at a loss to understand how the value of RDP *after* Paul's alleged wrongful conduct could possibly have been "necessary" to this conclusion. To the extent RDP claims that Judge Cahn could not accept Wilusz's *ex ante* valuation of RDP without relying upon Wilusz's opinion as a whole—including as to RDP's value after Paul's alleged conduct—such a contention neither finds support in Judge Cahn's Opinion nor makes sense as a matter of logic, given that Wilusz employed different methodologies and assumptions in arriving at the two valuations. *See* Cahn Opinion at 4 ("VMI produced a report that valued RDP at $5,900,000 prior to Paul's resignation and at $1,325,000 thereafter. VMI's assumption

in support of the lower evaluation is that any prospective purchaser would assume that Paul would compete with RDP and that RDP would lose the Tekkem license. Considering those assumptions, VMI's lower evaluation was based on a liquidation approach. VMI's higher evaluation was based on an income approach."). Thus, even if Judge Cahn accepted Wilusz's $1,325,000 valuation—and his Opinion betrays no hint that he did—such acceptance was not necessary to Judge Cahn's final judgment and thus cannot warrant applying the doctrine of collateral estoppel.

 **[3]**  RDP's second attempt to apply the collateral estoppel doctrine—to foreclose Paul from claiming that he did not violate his fiduciary duty to RDP—also fails, though for only one of the two reasons described above. Judge Cahn did find that

> Evidence consisting of emails, memoranda to and from attorneys and other documents establishes that Paul, after his return to Pennsylvania, devised a plan that was intended to harm RDP. The components of Paul's plan included fomenting a dispute between Tekkem and RDP by advising Tekkem that royalty payments were underreported and taking other actions calculated to disrupt the business of RDP. As of August 13, 2009, Paul's lawyers confirm his "plan to start your own company, salvage your relationships with licensors so that they will do business with your new entity, and compete against RDP."

*Id.* at 2–3. But if this matter had actually been decided in the prior arbitration, it was no more necessary to Judge Cahn's conclusions than the value of RDP following Paul's alleged wrongful conduct. RDP has not bothered to explain how Judge Cahn's finding that Paul devised a plan to harm RDP was a prerequisite to his conclusion that RDP was worth $6,490,000 as of September 17, 2009, "without any deduction  **\*414** for Paul's conduct." *Id.* at 7. Such a finding is thus nothing more than dicta that does not bind Paul pursuant to the doctrine of collateral estoppel.

 **[4]**  As for Paul and Nordetek, they suggest that "Judge Cahn noted, and RDP though [*sic* ] its counsel confirmed, [that] RDP wasn't damaged and has recovered from Paul's actions," and that "Judge Cahn's findings are binding on RDP through collateral estoppel." Nordetek's MSJ at 5. In support of *this* claim, counterclaim defendants cite passages of the transcript of the arbitration proceedings before Judge Cahn wherein he explained that

Case 09-10138-MFW   Doc 14225-49   Filed 08/15/14   Page 53 of 374

Nordetek Environmental, Inc. v. RDP Technologies, Inc., 862 F.Supp.2d 406 (2012)
88 Fed. R. Evid. Serv. 545

I also think what's going to be urged on Judge Dalzell is that the company was—when Paul Christy did his acts following September 18th, he darn near ruined the company, and it was only through Richard Christy's Herculean efforts that the company was saved. Of course, in basic damage law you can only recover for what you lost. So even though Mr. Christy, Mr. Richard Christy, was lucky to salvage the company, it doesn't mean that Paul Christy gets short-changed. I need you to address that.

...

What you're suggesting is that I put a liquidation value on the company because on November 12th it was at death's door, but fortunately for Richard Christy, you got Judge Dalzell to correct those things and somehow you got Stephansen back on track. Now the company's pretty good.

Nordetek's MSJ at 4–5 (quoting Arbitration Tr., Vol. V, 2055–57). We can readily reject this supposed application of estoppel doctrine. Judge Cahn's musings on this point during a colloquy with counsel in the course of the proceedings cannot mean that this was an "issue *decided* in the prior adjudication." *Safeguard Mut. Ins. Co.,* 345 A.2d at 668 (emphasis added).

But Paul and Nordetek also note that in Judge Cahn's Opinion and Award he observed that

> [A]lthough it was necessary for Dick to obtain an injunction and contempt Order from Judge Dalzell in regard to Paul's competition and while it was necessary for Dick to engage in arbitration proceedings to confirm the Tekkem license, those events enabled RDP to survive and, according to the June 30, 2010 Financial Statements, continue as a profitable enterprise.

Nordetek's MSJ at 5 (quoting Cahn Opinion at 8). This observation comes closer to an actual determination respecting the health of RDP's ongoing operations. Moreover, it appears that Judge Cahn made this finding to demonstrate the validity of his conclusion respecting RDP's September 17, 2009 value, noting that "subsequent events are germane" to "evaluat[ing] an earlier appraisal," and that "the higher VMI liquidation was based on the assumptions that Paul would not compete and the Tekkem license would be retained." Cahn Opinion at 8. Even if this issue was actually decided

and necessary to Judge Cahn's judgment, however, it is far from a *finding* that RDP sustained no damages as a consequence of Paul's alleged wrongful conduct. Nordetek and Paul thus cannot employ Judge Cahn's observation that RDP "continue[d] as a profitable enterprise," *id.,* to collaterally estop RDP from claiming that it has suffered damages.

We will accordingly reject RDP's and Paul and Nordetek's attempts to apply the doctrine of collateral estoppel to Judge Cahn's decision in order to secure summary judgment.

## II. *Paul and Nordetek's Motion to Preclude Testimony*

 **[5]**   Paul and Nordetek move "to preclude any and all evidence, whether testimonial **\*415** or otherwise, proffered by Defendant RDP Technologies, Inc.'s expert, J. Mark Penny". They contend that Penny estimates RDP's financial losses resulting from Paul's alleged wrongful conduct by "completely disregard[ing] RDP's actual business operations before and after September 18, 2009, which contradict his assumptions and conclusions." Nordetek's Mot. Preclude at 1. RDP responds that (1) Paul cannot challenge these assumptions, inasmuch as he must "adher[e] to the allegations he made in his complaint (as judicial estoppel requires him to do)," RDP's Resp. to Nordetek's Mot. Preclude at 5; and (2) "*Paul Christy's* own expert admitted that Penny's methodology was correct, that Penny's assumptions, facts and calculations were correct, that Paul Christy damaged RDP, and that Richard Christy's efforts to repair the damage Paul Christy did cannot be used to reduce RDP's damages." *Id.* at 6–7 (emphasis in original). RDP thus concludes that "this case presents the classic 'battle of the experts' in which each expert argues that the (permissible) methodology he selected is superior," *id.* at 16, and that under these circumstances preclusion of expert testimony is inappropriate. *Id.* at 17.

Fed.R.Evid. 702 provides that

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Interpreting this Rule, the Supreme Court has explained that a "trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786. *See also Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ("We conclude that *Daubert's* general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."). The Supreme Court elaborated in *Daubert* that the condition enshrined in Rule 702(a) "goes primarily to relevance," quoting Chief Judge Becker for the proposition that " '[a]n additional consideration under Rule 702—and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.' " *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786 (quoting *United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir.1985)). Importantly, the Supreme Court has emphasized that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

In Penny's expert report, he explains that

We have been asked to quantify the damages to RDP as a result of alleged wrongful acts of Paul Christy. In measuring damages, we considered three approaches: **\*416** 1) cost to cure, 2) measurement of lost profits and 3) diminution in value. The choice of approach is pragmatic, based on availability of data. In some instances, facts and circumstances favor one model over other approaches.

In this instance, for example, a cost to cure approach would entail gathering data about attorney's fees, time records of RDP personnel spent on this matter, ascribing an appropriate billing rate for RDP personnel time, and measuring the opportunity cost of time spent away from RDP's normal business. This type of calculation becomes difficult, in terms of reasonable certainty, however, when coming up with measures of RDP time spent (detailed time

records were not kept), billing rates and opportunity costs. Therefore, we did not utilize this approach.

With regard to a lost profits analysis, we note that RDP did not prepare projected income or cash flow statements. Consequently, it is difficult to map out differential scenarios reflecting anticipated income compared to scenarios reflecting interruption of RDP's established relationships and the loss of prospective new customers. For this reason, measurement of lost profits is problematic. Having ruled out two of three approaches, it is evident that the facts and circumstances of this matter lend themselves more readily to a diminution of value approach to damages measurement.

Under a diminution of value approach, damages are measured based upon comparison of the value of RDP without any deduction for harm arising from alleged wrongful acts to the value of RDP after accounting for the impact of the alleged damaging activity.

Ex. 25 to Nordetek's Mot. Preclude ("Penny Report") at 11. As Penny elaborates, a diminution of value approach requires the measurement of fair market value, which

involves consideration of three broad approaches to value, namely the market approach, the income approach and the asset-based approach.

Due to a lack of useful publicly-traded comparative companies and transaction data, Judge Cahn did not place reliance on expert valuations based on the market approach. In the instant case, the market approach is rendered even less viable due to the need to identify pricing data from a reasonably comparative company that was also similarly harmed. For this reason, we have not utilized a market-based approach in measuring the damaged value of RDP.

As previously noted, RDP's lack of projections makes lost profits analysis problematic. The lack of projections also makes projections of damaged cash flow scenarios difficult if not impossible to ascertain.... We do not have a historical record of RDP earnings which reflects cash flow generation ability absent the Tekkem license and with direct competition from Nordetek and Paul. Since the Slakers using Tekkem's intellectual property accounts for such a large portion of RDP sales, the profit making capability of RDP in a damaged scenario is not readily ascertainable.

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 55 of 374

Nordetek Environmental, Inc. v. RDP Technologies, Inc., 862 F.Supp.2d 406 (2012)
88 Fed. R. Evid. Serv. 545

Because both the market and income approaches do not provide a satisfactory means of estimating RDP's fair market value in a damaged scenario, we turn to the asset-based approach.

*Id.* at 12–13.

Based on Judge Cahn's Opinion, Penny "adopt[s] $6.49 million as a reasonable measure of the unharmed fair market value of the stockholders' equity of RDP." *Id.* at 12. Penny then notes that "RDP's book value of June 30, 2009 was approximately $2.1 million," *id.* at 13, and that its "net **\*417** tangible book value (excluding the book value of patents) [was] $1.32 million." *Id.* at 14. According to Penny, the differential between Judge Cahn's figure and this latter valuation represents "the unharmed value of intangible assets," namely "license agreements, customer relationships, backlog, experienced workforce, proprietary information and know-how, goodwill and the like." *Id.*

Next comes the critical step in Penny's analysis:

Without the Tekkem license, it follows that indicated aggregate intangible asset value of $5.17 million for RDP would be significantly, if not totally, impaired. Total impairment would result if RDP, stripped of its enabling asset, could not generate sufficient earnings from its remaining base of tangible and intangible assets to provide a fair return on its overhead or to operate at a scale necessary to employ the technical staff needed to participate in its business.

Without the Tekkem license and with competition from Paul, RDP faced the loss of its current and prospective bookings and the prospect of laying off its employees. In this case, the value of RDP's remaining asset base was stripped of its earnings capability. Without prospective earning capability, a prospective buyer would view the value of RDP's remaining intangible assets to be highly speculative. Consequently, a buyer would be unlikely to ascribe significant value to RDP's remaining intangible assets. Therefore, the fair market value of RDP equity interests would gravitate towards net tangible asset value, or lower, in a liquidation scenario.

*Id.* at 15. Penny concludes that "for purposes of calculating damages, the fair market value of RDP's aggregate equity interests, in a damaged state, without the Tekkem license, with competition from Paul and other harms caused by Paul's alleged wrongful acts, is reasonably measured at an amount

not greater than net tangible asset value of $1.32 million." *Id.* at 16–17.

Nordetek and Paul argue that Penny's expert report must be precluded for two reasons. First, they contend that "[a] diminution of value approach is deemed appropriate in two senarios: (1) the immediate destruction of a business; and (2) the 'slow death' of a business. As RDP's ongoing business operations demonstrate, neither scenario applies here." Nordetek's Mot. Preclude at 4. Second, they assert that

RDP's expert's analysis is based on two flawed factual assumptions. The first assumption is that RDP permanently lost its ability to sell and install Tekkem technology under an exclusive licensing agreement as of September 18, 2009. The second assumption was that Paul Christy would secure exclusive rights to the Tekkem technology and engage in direct competition, stripping away as much as 75% of RDP's business. Neither assumption came to fruition.

*Id.* at 2.

Taking up Nordetek and Paul's first set of arguments, we note that we, too, are dubious about the appropriateness of a diminution of value approach under the present circumstances —at least as RDP seeks to employ it. As Kenneth M. Kolaski and Mark Kuga explain, such an approach is appropriate "if a business is destroyed completely, for example by fire or because a defendant's actions were so harmful that a plaintiff is forced out of business," or where "the alleged bad acts of a defendant cause a business to lose profits over a period of time but then ultimately destroy the business concern"—a so-called "slow death" scenario. *Measuring* **\*418** *Commercial Damages Via Lost Profits or Loss of Business Value: Are These Measures Redundant or Distinguishable?,* 18 J.L. & Comm. 1, 5, 16 (1998). *See also* James R. Hitchner, *Financial Valuation: Applications and Models* 1033–34 (2d ed.2006) (noting that "[w]here an immediate destruction of the business occurs, diminution of value generally would be indicated as the most appropriate measure of damages," but that "[t]he measure of damages for a temporary impairment is considered lost profits," and "[t]he slow death of a business ... might use a combination of the two measures"). The obvious distinguishing feature of these two scenarios is that the value

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 56 of 374

Nordetek Environmental, Inc. v. RDP Technologies, Inc., 862 F.Supp.2d 406 (2012)
88 Fed. R. Evid. Serv. 545

of the damages incurred by the business-owner remains the same from the time of the business's death until the time damages are assessed by a court, since the business (presumably) remains dead throughout this period. There is thus no risk that a plaintiff will recover a windfall by receiving damages that *exceed* his actual loss. Where a business has not been destroyed completely or undergone a slow death, but instead sustained an injury from which it ultimately recovered in part, we could nonetheless imagine that the diminution in value approach *might* be applicable [3] —but only if the post-injury value of the business is determined at the time damages are assessed so that the diminution in value reflects the actual loss suffered.

[6]    Notably, RDP seeks to apply the diminution in business value approach to estimate its post-injury value—not at the time damages are assessed, but in the immediate aftermath of Paul's allegedly wrongful conduct—that is, at RDP's absolute nadir as a company, even though RDP concedes that Dick's "efforts to save RDP" were "ultimately successful." RDP's Resp. to Nordetek's Mot. Preclude at 17; *see also* RDP's MSJ at 18 ("There is no dispute that, as a result of the efforts of Richard Christy, and the injunction entered by this Court, RDP was able to retain most of the large contracts it was seeking."). Such an approach ignores, however, that compensatory damages "have as their purpose the desire to make the plaintiff whole," *Feingold v. Se. Pa. Transp. Auth.,* 512 Pa. 567, 517 A.2d 1270, 1276 (1986), and that punitive damages "are a windfall to the recipients over and above compensatory damages to which they are entitled." *In re Collins,* 233 F.3d 809, 812 (3d Cir.2000). Insofar as RDP attempts to employ a diminution in business value methodology to estimate its losses by valuing its post-injury worth at the time of its maximum infirmity—though it has since recovered some (if not all) of its financial health [4] —we do not believe that such a methodology is "relevant" to the facts of this case.

[7]    RDP's main argument in defense of this methodology is that attacks upon it "ignore[ ] *Paul Christy's* own expert's admission that Richard Christy's acts to repair Paul Christy's damage cannot reduce RDP's damages claim." RDP's Resp. to Nordetek's Mot. Preclude at 17 (emphasis in original). Of course, whether mitigation efforts can generally reduce damages awards is a question of law upon which **\*419** experts are not qualified to opine. More troubling, the principle that RDP enunciates—that a defendant is responsible for any damages avoided or repaired through a plaintiff's mitigation efforts—is simply wrong.

[8]    [9]    [10]    It is true that efforts to mitigate injury cannot reduce damages, but not for the reason that RDP contends. Mitigation efforts do not reduce damages because any damages calculus *assumes* that reasonable efforts to mitigate have been made. Thus, final damages are *net* of mitigation. Where plaintiffs fail to make such efforts, they cannot recover the quantum of damages that they might otherwise have averted. Thus, under Pennsylvania law " 'one injured by the tort of another is not entitled to recover damages for any harm that he could have avoided by the use of reasonable effort or expenditure after the commission of the tort.' " *Yost v. Union R. Co.,* 380 Pa.Super. 236, 551 A.2d 317, 322 (1988) (quoting Restatement (Second) of Torts § 918(1) (1979)). To be sure, where a plaintiff *has* made reasonable efforts to mitigate damages, he may recover "mitigation damages" for any costs incurred in the course of these efforts [5] plus the amount of any remaining loss. *See, e.g.,* All Seasons Services, Inc. v. Newnam, 2006 WL 2052407, at \*9 (Pa.Com.Pl.2006); *Comdyne I, Inc. v. Corbin,* 908 F.2d 1142, 1149–50 (3d Cir.1990) (discussing analogous proposition in context of New Jersey law). But awarding such a mitigating plaintiff damages for injury that was avoided or repaired through his efforts would do more than make him whole or return him to " 'a position as nearly as possible equivalent to his position prior to the tort,' " *Trosky v. Civil Serv. Comm'n,* 539 Pa. 356, 652 A.2d 813, 817 (1995)— it would, in short, award him a windfall. Compensatory damages are not designed to function as such a lottery. [6]

Aside from inappropriate methodology, Penny's report is also infirm because it applies this methodology incorrectly. *Even if* we accept that RDP's post-injury value should be determined at the time of its maximum depression—at best a dubious proposition—Penny does not appear to have actually calculated this value. Instead, Penny opines that "the fair market value of RDP's aggregate equity interests, in a damaged state, *without the Tekkem license,* with competition from Paul and other harms caused by Paul's alleged wrongful acts, is reasonably measured at an amount not greater than net tangible asset value of $1.32 million," Penny Report at 16–17 (emphasis added). His valuation is thus based on the assumption that RDP lost the Tekkem license.

**\*420**  But RDP has presented no evidence that it ever *lost* this license, and its representations to this Court suggest that Paul's actions, at worst, placed a cloud upon the validity of this license that ultimately lifted. As we explained in our January 8, 2010 Opinion in this matter,

Notwithstanding his receipt of RDP's wired funds, Stephansen [the owner of the Tekkem technology] wrote to Dick on October 2, 2009 and reiterated that the agreement had been terminated. He demanded that RDP stop using the Tekkem trademark and cease advertising Tekkem slakers. RDP's attorney responded on October 5 and explained RDP's view that Stephansen had not terminated the license.... It is also undisputed that [on October 13, 2009] Nordetek signed a putatively exclusive License Agreement with Stephansen.

*Nordetek Envtl.,* 677 F.Supp.2d at 835 (citations omitted). We noted at that time that "RDP is proceeding as though it still has a Tekkem license because it believes that Stephansen never properly terminated the 2001 License Agreement," *id.* at 836, and observed that "RDP is currently marketing Tekkem slakers and may well be doing so lawfully." *Id.* at 842 (emphasis omitted). *See also* Prelim. Inj. Hrg. Tr. at 93, Dec. 18, 2009 (Dick: "We have the TEKKEM License.... And our attorney says the determination was not valid and if we—have a worst case scenario, it is that the license goes nonexclusive."). In any event, the parties agree that on "February 11, 2010 ... RDP executed a new license agreement with Tekkem." Penny Report at 17; *see also* Nordetek's Mot. Preclude at 3 ("A February 11, 2010 agreement ... retroactively reinstated RDP's exclusive licensing agreement for the Tekkem technology.").

The core problem with Penny's analysis is that it equates RDP's *disputed* license to the Tekkem technology with having *no* license at all, thus failing to recognize that disputed title is *not* valueless. To the contrary, disputed title can be quite valuable. In patent litigation, for example, holders of disputed interests in intellectual property commonly sell those interests for prodigious sums to other parties who then litigate their entitlement to the patents in question. In fact, elementary statistical principles suggest that the expected value (E (V)) of a disputed license is not zero, but $E(V) = P_1 V_1 + P_2 V_2$, where $V_1$ equals the value of the license, $V_2$ equals the value of not having the license (presumably, zero), $P_1$ equals the probability that the claimant will retain the license, and $P_2$ equals the probability that the claimant will lose the license (presumably, $1-P_1$). [7] Penny's analysis assumes that

following Paul's wrongful conduct $P_1$ equaled zero from RDP's perspective, but he presents no explanation as to why this would be true. [8] Notably, RDP represented to us at *421 the time of the preliminary injunction hearing that this probability was *not* zero, and RDP's resolution of a licensing agreement with Stephansen a few months later demonstrates that this probability was in business reality non-zero. Even if we assume that RDP's compensatory damages can properly be calculated by taking its pre-injury value and subtracting the amount it was worth at its post-injury bottom—an approach that, as we have explained, appears here unjustified—Penny did not look to the right facts in calculating the latter value.

RDP's main retort in defense of Penny's application of his methodology is that "Penny can base his opinion on Paul Christy's allegations that RDP did not have the Tekkem license, that Nordetek did, and that Paul Christy was permitted to compete," RDP's Resp. to Nordetek's Mot. Preclude at 6, arguing that "[a]lthough Paul Christy may wish to disavow his prior allegations, he is estopped from doing so." *Id.* at 6 n. 8. There are at least two problems with this argument. To begin, our Court of Appeals has made it clear that "in our Circuit judicial estoppel is generally not appropriate where the defending party did not convince the District Court to accept its earlier position." *G–I Holdings, Inc. v. Reliance Ins. Co.,* 586 F.3d 247, 262 (3d Cir.2009). RDP appears to concede as much, noting that " 'a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.' " RDP's Resp. to Nordetek's Mot. Preclude at 6 n. 8 (quoting *Krystal Cadillac–Oldsmobile GMC Truck, Inc. v. General Motors Corp.,* 337 F.3d 314, 319 (3d Cir.2003)). But RDP nowhere explains how Paul and Nordetek "gain[ed] an advantage" in this litigation by making the allegations that RDP now claims they are estopped from denying.

Second, if the doctrine of judicial estoppel were to apply to bar Paul and Nordetek from denying allegations made in their complaint, it would appear equally well to estop RDP from denying averments made in its own pleadings. In RDP's amended answer to Nordetek and Paul's complaint, it "denie[s] that the termination of the Stephansen license agreement has occurred." RDP's Am. Ans. to Nordetek's Am. Compl. ¶ 37 (docket entry # 109). If we were to accept RDP's distorted view of judicial estoppel, we would thus be left in the nonsensical position of obliging RDP to claim that it *had* the Tekkem license at the same time we required Nordetek

and Paul to claim that RDP did *not* have this license. Damages determinations do not take us through such a looking-glass.

In the final analysis, RDP suggests that even if we do not credit Penny's expert report, we should nonetheless not resort to the "drastic remedy" of precluding his opinion. RDP's Resp. to Nordetek's Mot. Preclude at 15. RDP contends that (1) it "does not have to prove the amount of damages it suffered with mathematical certainty," RDP's Resp. to Nordetek's MSJ at 4; (2) "[a]s the plaintiff on its counterclaims, RDP is entitled to select **\*422** the method used to quantify its damages," RDP's MSJ at 13; and (3) a motion to preclude expert testimony "cannot be granted absent a hearing during which the expert can be questioned regarding the bases of his opinions." RDP's Resp. to Nordetek's Mot. Preclude at 15.

However true RDP's first two contentions may be, this Court cannot abdicate its gatekeeping function under the Federal Rules of Evidence. *See Kumho Tire Co., Ltd.,* 526 U.S. at 158–59, 119 S.Ct. 1167 ("I join the opinion of the Court, which makes clear that the discretion it endorses—trial-court discretion in choosing the manner of testing expert reliability—is not discretion to abandon the gatekeeping function.") (Scalia, J., concurring). As our reasoning above demonstrates, Penny's report is not simply more uncertain than we would like. We also do not simply suggest that another methodology would be preferable to the one he used. Rather, our close reading of Penny's report reveals that his methodology is not appropriate to the particulars of this case. Perhaps more importantly, Penny's application of this methodology rested on unfounded and incorrect, but highly consequential, assumptions. We thus cannot conclude that expert testimony as defective as Penny's could "help the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702(a).

**[11]** As for RDP's third point, it is true that "when the ruling on admissibility turns on factual issues ... at least in the summary judgment context, failure to hold such a hearing may be an abuse of discretion." *Padillas v. Stork–Gamco, Inc.,* 186 F.3d 412, 418 (3d Cir.1999). But our Court of Appeals has also stressed that "[a]n in limine hearing will obviously not be required whenever a *Daubert* objection is raised to a proffer of expert evidence. Whether to hold one rests in the sound discretion of the district court." *Id.* Here, we do not need further development of the factual record to determine that Penny's expert report is inadmissible. RDP concedes that Penny's report would result in its windfall

recovery of compensatory damages for injury that RDP averted or repaired, and Penny unambiguously states that his analysis is predicated on an assumption—*i.e.,* that RDP no longer had the Tekkem license—that simply was not true. Under these circumstances, Penny's report does not "fit" the facts of this case. We will thus grant Paul and Nordetek's motion to preclude Penny's expert testimony.

### III. *The Parties' Remaining Arguments for Summary Judgment*

As we have noted, the parties assert grounds in support of their motions for summary judgment that do not rest exclusively on the doctrine of collateral estoppel. Nordetek and Paul suggest that the preclusion of Penny's expert report means that RDP has not pointed to evidence supporting damages so that Nordetek and Paul are entitled to summary judgment on seven of RDP's counterclaims. RDP points to evidence in the record to claim that there is no genuine issue of fact in dispute regarding Paul's liability for breach of fiduciary duty and contract breach.

Under Fed.R.Civ.P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," where "[a] party asserting that there is a genuine dispute as to a material fact must support that assertion with specific citations to the record." *Bello v. Romeo,* 424 Fed.Appx. 130, 133 (3d Cir.2011). On a motion for summary judgment, "[t]he moving party first must show that no genuine **\*423** issue of material fact exists," *Adderly v. Ferrier,* 419 Fed.Appx. 135, 136 (3d Cir.2011) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), whereupon "[t]he burden then shifts to the non-moving party to set forth specific facts demonstrating a genuine issue for trial." *Id.* " 'A disputed fact is "material" if it would affect the outcome of the suit as determined by the substantive law,' " *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.,* 650 F.3d 915, 925 (3d Cir.2011) (quoting *Gray v. York Newspapers, Inc.,* 957 F.2d 1070, 1078 (3d Cir.1992)), while a factual dispute is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Bialko v. Quaker Oats Co.,* 434 Fed.Appx. 139, 141 n. 4 (3d Cir.2011) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (brackets omitted). We "draw all reasonable inferences in favor of the nonmoving party, and [we] may not make credibility determinations or weigh the

evidence." *Eisenberry v. Shaw Bros.,* 421 Fed.Appx. 239, 241 (3d Cir.2011) (quotation marks omitted).

 **[12]**    Nordetek and Paul argue that "the only evidence of economic damages RDP has provided for any of its counterclaims rests entirely on Penny's unreliable and irrelevant expert opinion," and that "because RDP has failed to provide any evidence of actual financial damages, Paul Christy's motion for summary judgment as to RDP's claims for Counts I–IV and VI–VIII should be granted." Nordetek's MSJ at 9. While we will grant Nordetek and Paul's motion to preclude Penny's report, we cannot agree, drawing all reasonable inferences in RDP's favor, that RDP has failed to provide evidence that counterclaim defendants' alleged wrongful conduct caused it to sustain damages.

As we noted above, RDP may seek as damages costs that it incurred in mitigating injury Paul and Nordetek caused— which may include litigation costs, the costs of negotiating a new license with Stephansen, and the costs of recovering customers lost due to Paul's alleged malfeasance. Even if RDP lost no profits as a result of counterclaim defendants' alleged conduct, RDP may *still* prove damages by demonstrating that it incurred the above costs because of this alleged conduct. RDP expended obvious efforts in litigation and licensing as a consequence of Paul's allegedly wrongful conduct, and we thus draw the inference that these efforts were not cost-free. RDP has pointed to evidence in the record suggesting that its employees went to great lengths to keep customers nearly lost due to Paul's activities, *see* RDP's MSJ at 18, and we will similarly infer that these efforts carried a cost.

We therefore cannot conclude, as a matter of law, that there is no genuine dispute of material fact as to whether counterclaim defendants' alleged conduct caused damages to RDP. We will accordingly deny Paul and Nordetek's motion for summary judgment.

 **[13]   [14]**    Turning to RDP's motion for summary judgment, it argues that evidence in the record demonstrates that Paul breached his fiduciary duty to RDP as well as a non-competition obligation. As Judge DuBois has explained, "[t]o allege a breach of fiduciary duty [under Pennsylvania law], a plaintiff must establish that a fiduciary or confidential relationship existed between her and the defendants," and must also allege three elements:

(1) That the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed;

 **\*424**  (2) That the plaintiff suffered injury; and

(3) The defendant's failure to act solely for the plaintiff's benefit was a real factor bringing about plaintiff's injuries.

*Baker v. Family Credit Counseling Corp.,* 440 F.Supp.2d 392, 414 (E.D.Pa.2006) (quoting Pa. S.S.J.I. § 4.16). To state a breach of contract claim under Pennsylvania law, a plaintiff must allege "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *Omicron Systems, Inc. v. Weiner,* 860 A.2d 554, 564 (Pa.Super.2004) (brackets and quotation marks omitted).

 **[15]**    RDP points to evidence in the record demonstrating that during Paul's employment with RDP he (1) created and delivered a spreadsheet to Stephansen indicating that RDP had not paid Stephansen what was owed under its licensing agreement; (2) plotted to bring about the termination of RDP's exclusive license to the Tekkem technology, including by forcing RDP into bankruptcy; (3) agreed to indemnify Stephansen and pay any attorney's fees arising from Stephansen's licensing dispute with RDP; and (4) planned to start his own company, secure the Tekkem license, and compete against RDP. *See* RDP's MSJ at 8–10 (citing exhibits). Nordetek and Paul make no effort to point to contradictory evidence in the record, instead focusing upon RDP's asserted failure to show damages. *See* Nordetek's Resp. to RDP's MSJ at 25 ("Both of RDP's counterclaims for breach of fiduciary duty and breach of contract require that RDP prove damages."). Paul's position as an officer at RDP, *see* RDP's MSJ at 7 (citing Ex. 16 to RDP's MSJ (describing Paul's position as Secretary–Treasurer and Director of RDP and offering his resignation))—which counterclaim defendants do not dispute—unquestionably placed him in a fiduciary relationship with RDP.

 **[16]**    The evidence RDP cites demonstrates that Paul intentionally failed to act in good faith and solely for the benefit of RDP in all matters for which he was employed. RDP has thus established that Paul (1) had a fiduciary duty to RDP and (2) breached this duty.

In ruling on Nordetek and Paul's motion for summary judgment, we drew the inference in RDP's favor that it suffered an injury as a result of Paul's conduct. In ruling on RDP's motion, however, we must draw all reasonable inferences in counterclaim defendants' favor, and we are

constrained to note that RDP has not yet pointed to any evidence that it suffered actual injury due to Paul's conduct or incurred costs in the course of its efforts to mitigate such injury. We will thus grant summary judgment in RDP's favor only with respect to the "duty" and "breach" elements of its fiduciary duty claim against Paul, leaving for trial the questions of injury and causation.

[17]    [18]    As for RDP's breach of contract claim against Paul, it points to the existence of a contract to which Paul was a party, RDP's MSJ at 10–11 (citing Ex. 1 to RDP's MSJ) ("Shareholder Agreement"), and notes that "Paul Christy breached that contract by competing against RDP." *Id.* at 11. In our January 8, 2010 Opinion, we explained that "[o]n the record before us, RDP is likely to succeed in showing that RDP and Nordetek (through Paul) are 'striving for [the same] custom'—because that is, in fact, what they are doing." *Nordetek Envtl., 677 F.Supp.2d at 842.* As counterclaim defendants have presented no evidence that would undermine this conclusion, we now decide that, for the reasons given in our earlier Memorandum, Paul competed against RDP in violation of **\*425** the Shareholder Agreement, which mandated that

> For a period of two years after the date on which a Shareholder's employment terminates for any reason, that Shareholder shall not engage either directly or indirectly in any manner or capacity whatsoever (including principal, agent, partner, officer, director, shareholder, employee, consultant or otherwise) in any business competitive with the business of the Corporation in the United States, Canada or anywhere in the world that the Corporation is currently doing business, does business in the future or where the corporation is pursuing business possibilities.

Shareholder Agreement ¶ 9(b). As we noted in 2010, Paul violated this Agreement not only by seeking customers in competition with RDP, but "by getting the Tekkem license for Nordetek in the first place." *Nordetek Envtl., 677 F.Supp.2d at 842.* But, for the reasons described above, we cannot conclude at this time that RDP has established that it suffered damages as a result of Paul's breach. We will thus grant summary judgment in RDP's favor on this claim only as to the elements

of "contract" and "breach," leaving the question of damages for trial.

## IV. *RDP's Motion to Enjoin Arbitration Proceedings*

[19]    Turning to RDP's motion to enjoin arbitration, RDP notes that "[f]ive months after Judge Cahn rejected Paul Christy's request to require RDP to increase its payments, Paul Christy filed a second arbitration against RDP." RDP's Mot. Enjoin at 3. RDP argues that this "second arbitration is an attempt to evade both this Court's order that he waived his right to arbitrate the amount of damage he did to RDP, and Judge Cahn's refusal to increase the payments RDP is currently making," *id.* (citations omitted), and that "[t]his Court should therefore enter an injunction protecting its judgment that 'plaintiffs waived any right to arbitrate' their claims, *see* Dkt. 110 at ¶ (mm), as well as its jurisdiction over those claims." *Id.* at 5.

RDP predicates its motion on the All Writs Act, which provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). RDP notes that the Supreme Court has " 'recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained.' " RDP's Mot. Enjoin at 4 (quoting *United States v. N.Y. Tel. Co.,* 434 U.S. 159, 172, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977)).

The Order we issued that RDP suggests must now be protected provides, *inter alia,* that "the plaintiffs waived any right to arbitrate." Aug. 9, 2010 Order at ¶¶ mm (docket entry # 110). The arbitration that RDP seeks to enjoin concerns "RDP Technologies' ('RDP') failure to pay Paul Christy, a minority shareholder in RDP who resigned as an employee from RDP on September 18, 2009, the amounts due to him in accordance with the Amended and Restated Shareholder Agreement and the Order entered on July 25, 2011 by the Philadelphia County Court of Common Pleas decreeing the value of RDP to be $6,490,000 as of September 17, 2009." Ex. 643 to RDP's Mot. Enjoin at 2. RDP suggests that "[i]f the Court does not enter an injunction, and instead permits Paul Christy to prosecute his second arbitration, there is a possibility that the arbitrators will do exactly what this Court (and **\*426** Judge Cahn) have said the arbitrators cannot do, namely adjudicate the amount of damage Paul Christy did to RDP, and therefore the net amount RDP must pay Paul

Christy or that Paul Christy must pay RDP." RDP's Mot. Enjoin at 6–7.

[20]    Reading our August 9, 2010 Order in context, it is plain that we ruled only that Paul and Nordetek had waived any right to arbitrate the claims pending before this Court. No party has asserted before this Court any claim respecting Paul's entitlement to a payout under the Shareholder Agreement. We thus discern no conflict between Paul's second arbitration and our August 9, 2010 Order, especially because the scope of this arbitration appears to exclude any consideration of damages that Paul may owe RDP as a result of RDP's claims before this Court. As a result, we will deny RDP's motion to enjoin Paul's second arbitration pursuant to the All Writs Act.[9]

**V. *RDP's Motion to Sanction Lisa Christy***

[21]    Finally, RDP urges that Lisa Christy, Paul's wife, should "be held in contempt because she failed to truthfully answer the questions put to her during her deposition, and because the answers to questions she actually gave under oath were almost uniformly evasive." RDP's Mot. Sanctions at 2. As the Supreme Court noted in *California Artificial Stone Paving Co. v. Molitor,* 113 U.S. 609, 618, 5 S.Ct. 618, 28 L.Ed. 1106 (1885), "[p]rocess of contempt is a severe remedy, and should not be resorted to where there is fair ground of doubt as to the wrongfulness of the defendant's conduct."

[22]    While we did issue an Order in this matter instructing Lisa to "APPEAR for an additional day of deposition, lasting no longer than seven additional hours, and ... answer truthfully and completely all questions posed within the analysis outlined in this Order," Nov. 28, 2011 Order at ¶ 3 (docket entry # 148), our review of the deposition transcript does not suggest that Lisa countermanded this instruction. We will thus deny RDP's motion for contempt.

### ORDER

AND NOW, this 16th day of May, 2012, upon consideration of counterclaim plaintiff RDP Technologies, Inc.'s ("RDP's") amended counterclaims (docket entry # 112), RDP's motion for summary judgment (docket entry # 142), RDP's motion to enjoin Paul G. Christy from pursuing arbitration (docket entry # 143), counterclaim defendants Paul G. Christy ("Paul") and Nordetek Environmental, Inc.'s ("Nordetek's") motion to preclude expert opinion testimony by J. Mark Penny

(docket entry **\*427** # 144), Paul and Nordetek's motion for summary judgment (docket entry # 145), RDP's motion for contempt against Lisa Christy (docket entry # 156), and any memoranda, responses, replies, and exhibits filed regarding these submissions, and upon the analysis set forth in the accompanying Memorandum, it is hereby ORDERED that:

1. Paul and Nordetek's motion to preclude expert testimony (docket entry # 144) is GRANTED;

2. The expert report of J. Mark Penny (exhibit 25 to docket entry # 144) is PRECLUDED pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999);

3. Paul and Nordetek's motion for summary judgment (docket entry # 145) is DENIED;

4. RDP's motion for summary judgment (docket entry # 142) is GRANTED IN PART to the extent set forth in the next paragraph;

5. RDP is GRANTED summary judgment on (1) the "contract" and "breach" elements of Count I of its amended counterclaims and (2) the "duty" and "breach" elements of Count IV of its amended counterclaims (docket entry # 112);

6. RDP's motion to enjoin Paul G. Christy from pursuing arbitration (docket entry # 143) is DENIED;

7. RDP's motion for contempt against Lisa Christy (docket entry # 156) is DENIED;

8. By May 29, 2012, RDP's counsel shall SHOW CAUSE why they should not be sanctioned pursuant to Fed.R.Civ.P. 11(c) for misrepresenting the contents of the Honorable Edward N. Cahn's March 29, 2011 Opinion and Award; and

9. By May 29, 2012, RDP shall ADVISE the Court as to the recommended disposition of its remaining counterclaims against Paul and Nordetek—including whether any of these claims are subject to disposition by jury—with leave granted to Paul and Nordetek to respond to this submission by June 11, 2012.

### ORDER

AND NOW, this 16th day of May, 2012, upon consideration of this Court's Memorandum of today and the accompanying Order, in which we direct the parties to brief us on the recommended disposition of counterclaim plaintiff RDP Technologies, Inc.'s remaining counterclaims, it is here by

ORDERED that pending the Court's consideration of the submissions contemplated in paragraph 9 of our other Order of this date, the Clerk of Court shall TRANSFER this matter from our Active docket to the Civil Suspense docket.

**Parallel Citations**

88 Fed. R. Evid. Serv. 545

## Footnotes

1 As this quotation makes clear, RDP now seeks only compensatory damages resulting from Paul's alleged wrongdoing, though it notes that it has also asserted claims against Paul that would entitle it to recoup "punitive damages resulting from the willful, malicious and outrageous nature of Paul Christy's conduct." RDP's MSJ at 3 n.2. But RDP is not shy about the fist in this glove: "In the event that RDP's motion for summary judgment [is] not granted in its entirety, RDP reserves the right to, and intends to, seek the maximum available damages on all of its claims at trial." *Id.*

2 We will accordingly order RDP's counsel to show cause why they should not be sanctioned pursuant to Rule 11(c). To avoid sanction, RDP's counsel must point to specific language from Judge Cahn's March 29, 2011 Opinion and Award in which he "reject[s] all challenges to Wilusz's $1,325,000 valuation" and "credit[s] Wilusz's report" with respect to this valuation. RDP's MSJ at 13 nn. 13, 15.

3 We make this observation not to suggest that such an approach would be appropriate, but only to emphasize that we do not *foreclose* such an application of this methodology.

4 We note that a logical consequence of RDP's approach is that if Paul's actions had robbed RDP of its value only for a split second, after which its value rebounded of its own accord to previous levels, RDP would nonetheless be entitled to its entire value in damages —though it would have incurred no real world loss.

5 In this case, such damages might include the costs of (1) pursuing litigation designed to negate Paul's allegedly wrongful conduct, (2) negotiating a new license with Stephansen after his purported revocation of RDP's prior license as a result of Paul's alleged fiduciary breach, and (3) recovering customers lost as a result of Paul's alleged efforts to harm RDP.

6 RDP argues that "Paul Christy's position is that, if he had literally shot his brother in the back of the head, and through good luck, the efforts of a fine surgeon, and a lot of hard work in rehab his brother survived and even thrived, his brother would not be entitled to recover damages unless he could prove he lost income during the period of his recovery." RDP's MSJ at 16 n. 15. Of course, under these hypothetical circumstances, Dick might well be entitled to recover damages for the costs of mitigation—*e.g.,* medical and rehabilitation bills-as well as damages for emotional distress and pain and suffering. The important point is that Dick would *not* be entitled to recover the value of his future earning stream in the form of compensatory damages under the counterfactual assumption that he had *not* recovered from his injury, when in fact he had.

7 To be sure, this formulation of the expected value oversimplifies matters to some extent since in reality we can envision more than two outcomes to a dispute over a license. Another plausible outcome, for example, might involve two claimants sharing a non-exclusive license. In the interests of clarity, we confine our analysis to the two-outcome case.

8 RDP notes that its other expert, Wilusz, "was very firm in testifying that, in light of Stephansen's purported termination of the Tekkem license, and given that Paul Christy was the main point of contact with Stephansen, after Paul Christy's resignation any potential buyer would assume that the Tekkem license had been cancelled no matter what RDP or Richard Christy might say." RDP's MSJ at 12 n. 10 (citations omitted). This insistence that a would-be buyer would ignore the strength of RDP's legal claim to the license and instead consider only who "was the main point of contact with Stephansen," flies in the face of economic logic. Moreover, given that this assertion is unsupported by any evidence that Wilusz or Penny ever consulted any actual potential buyer for RDP, it comes close to the *"ipse dixit"* that Joiner, 522 U.S. at 146, 118 S.Ct. 512, warns courts against crediting. Wilusz and Penny's opinions as to the valuelessness of RDP's disputed license is further belied by the evidence—that Paul and Nordetek introduced and that RDP does not challenge—demonstrating that during the time this license was disputed (between September 18, 2009 and February 12, 2010) RDP booked no less than six projects with a total value exceeding $3.5 million—four of which involved use of Tekkem lime slakers. *See* Nordetek's Mot. Preclude at 28 (citing Exs. 9G, 9I, 9J, 9K, 9L, and 9P to Nordetek's Mot. Preclude).

9 In a passing comment, RDP suggests that Paul's second arbitration "violat[es] the 'first filed rule.' " RDP's Mot. Enjoin at 3. As our Court of Appeals explained in EEOC v. Univ. of Pennsylvania, 850 F.2d 969, 971 (3d Cir.1988) (internal brackets, ellipsis, and quotation marks omitted), *aff'd,* 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990), "[t]he first-filed rule encourages sound judicial administration and promotes comity among federal courts of equal rank. It gives a court 'the power' to enjoin the subsequent

prosecution of proceedings involving the same parties and the same issues already before another district court." Given that (1) the issue of Paul's entitlement to a payout under the Shareholder Agreement has never been before this Court, and, in any event, (2) no other federal court has pending before it proceedings involving the same parties and the same issues as in this case, the first-filed rule does not apply here.

More importantly, our holding at this time does not foreclose RDP's right to invoke our equitable powers to prevent any windfall to Paul should the second arbitration produce a valuation before a damages verdict before us becomes final.

---

**End of Document**
© 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 108

Nortel Networks Corp., Re, 2013 ONCA 427, 2013 CarswellOnt 8251

2013 ONCA 427, 2013 CarswellOnt 8231, 230 A.C.W.S. (3d) 125, 5 C.B.R. (6th) 254

2013 ONCA 427
Ontario Court of Appeal

Nortel Networks Corp., Re

2013 CarswellOnt 8231, 2013 ONCA 427, 230 A.C.W.S. (3d) 125, 5 C.B.R. (6th) 254

## In the Matter of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended

In the Matter of a Plan of Compromise or Arrangement of Nortel Networks Corporation, Nortel Networks Limited, Nortel Networks Global Corporation, Nortel Networks International Corporation and Nortel Networks Technology Corporation

S.T. Goudge, J.C. MacPherson, R.G. Juriansz JJ.A.

Judgment: June 20, 2013
Docket: M42415

Proceedings: refusing leave to appeal *Nortel Networks Corp., Re* (2013), 2013 CarswellOnt 3993, 2 C.B.R. (6th) 1, 2013 ONSC 1757 (Ont. S.C.J. [Commercial List]); full reasons to *Nortel Networks Corp., Re* (2013), 2013 ONSC 1470, 2013 CarswellOnt 2508 (Ont. S.C.J. [Commercial List])

Counsel: Matthew P. Gottlieb, Robin B. Schwill, Sean Campbell, James Renihan for Moving Party, EMEA Debtors
Jay A. Carfagnini, Fred Myers, Joseph Pasquariello, Peter Kolla, Derrick Tay, Jennifer Stam for Monitor and Canadian Debtors
Sheila Block, Scott A. Bomhof, Andrew Gray, Adam Slavens, Shayne Kukulowicz, Michael Wunder, Ryan Jacobs, Barbara Grossman for Nortel Networks Inc., other U.S. Debtors, Official Committee of Unsecured Creditors
Mark Zigler, Sean O'Donnell for Canadian Creditors' Committee
Richard B. Swan, Gavin H. Finlayson for Informal Nortel Noteholder Group
Michael E. Barrack, D.J. Miller for U.K. Pension Claimants

Subject: Insolvency; International; Civil Practice and Procedure

### Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

### Headnote

#### Bankruptcy and insolvency --- Companies' Creditors Arrangement Act — Appeals

Motion judge approved allocation protocol which provided for joint trial by Superior Court of Justice in Ontario and United States Bankruptcy Court for District of Delaware — Joint trial would determine issue of how to allocate more than US $7 billion in proceeds currently held in escrow — Allocation issue had to be resolved before creditors could receive any meaningful distribution from debtors' estates — Motion was brought for leave to appeal order made in proceedings under Companies' Creditors Arrangement Act — Motion dismissed — Order requiring joint trial did not infringe Ontario court's independence and sovereignty — Relevant agreement between parties did not contain agreement to submit allocation issue to binding arbitration — Agreement was broad enough to establish that allocation issue could be resolved by joint trial before Ontario and Delaware courts — Majority of stakeholders were prepared to proceed with joint trial — Granting leave to appeal would impose additional costs and would further delay proceedings.

#### Conflict of laws --- Bankruptcy — General principles

Motion judge approved allocation protocol which provided for joint trial by Superior Court of Justice in Ontario and United States Bankruptcy Court for District of Delaware — Joint trial would determine issue of how to allocate more than US $7 billion in proceeds currently held in escrow — Allocation issue had to be resolved before creditors could receive any meaningful distribution from debtors' estates — Motion was brought for leave to appeal order made in proceedings under Companies' Creditors Arrangement Act — Motion dismissed — Order requiring joint trial did not infringe Ontario court's independence and sovereignty — Relevant agreement between parties did not contain agreement to submit allocation issue to binding arbitration — Agreement was broad enough to establish that allocation issue could be resolved by joint trial before Ontario and Delaware courts — Majority of stakeholders were prepared to proceed with joint trial — Granting leave to appeal would impose additional costs and would further delay proceedings.

**Civil practice and procedure --- Practice on appeal — Leave to appeal — Miscellaneous**

**Table of Authorities**

**Cases considered:**

*R. v. Beauregard* (1986), 70 N.R. 1, *(sub nom. Beauregard v. Canada)* [1986] 2 S.C.R. 56, 30 D.L.R. (4th) 481, 26 C.R.R. 59, 1986 CarswellNat 1004, 1986 CarswellNat 737 (S.C.C.) — considered

*Timminco Ltd., Re* (2012), 2012 CarswellOnt 9633, 2012 ONCA 552 (Ont. C.A.) — distinguished

**Statutes considered:**

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36
        Generally — referred to

MOTION for leave to appeal from judgment reported at *Nortel Networks Corp., Re* (2013), 2013 CarswellOnt 3993, 2 C.B.R. (6th) 1, 2013 ONSC 1757 (Ont. S.C.J. [Commercial List]), issuing order in proceedings under *Companies' Creditors Arrangement Act*.

*Per curiam*:

1    This expedited motion is for leave to appeal from the motion judge's order in *CCAA* proceedings involving Nortel Networks Corporation and other Canadian Nortel affiliates. The motion judge approved an Allocation Protocol, which provides for a joint trial by the Superior Court of Justice in Ontario and the United States Bankruptcy Court for the District of Delaware. The joint trial will determine (among other matters) the issue of how to allocate more than US$7 billion in proceeds currently held in escrow, which were generated by the sale of Nortel assets by Nortel entities in Canada (the "Canadian Debtors"), Nortel entities in the U.S. (the "US Debtors"), and Nortel entities in the U.K., Europe, the Middle East, and Africa (the "EMEA Debtors"). The allocation issue must be resolved before Nortel creditors can receive any meaningful distribution from the Nortel debtors' respective estates.

2    The moving parties are the Joint Administrators of Nortel Networks UK Limited, on behalf of 24 EMEA Debtors. They contend that a joint trial by the Ontario and Delaware court is "a violation of the Ontario court's independence and sovereignty and will be fraught with irresolvable procedural and substantive problems." They also contend that the Nortel parties agreed that the allocation issue must be decided by way of a private, transnational arbitration proceeding and the Ontario court ought to have required the parties to submit to arbitration.

3    In *Timminco Ltd., Re*, 2012 ONCA 552 (Ont. C.A.), the Court said, at para. 2:

Nortel Networks Corp., Re, 2013 ONCA 427, 2013 CarswellOnt 8251

2013 ONCA 427, 2013 CarswellOnt 8231, 230 A.C.W.S. (3d) 125, 5 C.B.R. (6th) 254

In the *CCAA* context, leave to appeal is to be granted sparingly and only where there are serious and arguable grounds that are of real and significant interest to the parties. In determining whether leave ought to be granted, this Court is required to consider the following four-part inquiry:

  • whether the point on the proposed appeal is of significance to the practice;

  • whether the point is of significance to the action;

  • whether the proposed appeal is *prima facie* meritorious or frivolous; and

  • whether the appeal will unduly hinder the progress of the action.

4    In *Timminco*, the proposed appeal foundered on the third point. The same is true of the proposed appeal in this case.

5    The order requiring a joint Ontario-Delaware trial under the court-approved Allocation Protocol does not infringe the Ontario court's independence and sovereignty. The order does not offend the classic definition of judicial independence in *R. v. Beauregard*, [1986] 2 S.C.R. 56 (S.C.C.), at para. 21. Cooperation and communication between the two courts in accordance with the relevant protocols is not inconsistent with judicial independence, but rather is a sensible and effective response to a significant interjurisdictional commercial case.

6    Similarly groundless is the argument that in 2009, the Nortel parties entered a binding agreement to arbitrate the allocation issue. The relevant agreement between the parties, the Interim Funding and Settlement Agreement ("IFSA"), does not contain an agreement to submit the allocation issue to binding arbitration. Indeed the IFSA does not use the terms "arbitrators" or "arbitration", nor does it specify the governing rules for arbitral proceedings.

7    The language of s. 12(b) of the IFSA requires the "dispute resolver(s)" to determine the allocation issues under the terms of a protocol referred to as the Interim Sales Protocol. Section 12(c) does not create a binding obligation to conclude such a protocol, but only a duty to attempt to reach agreement on it. The parties were unable to agree on the protocol despite their good faith efforts to do so. There is no suggestion in the IFSA that the parties must submit the allocation issue to arbitration if they fail to agree on the Interim Sales Protocol. The general forum selection clause in s. 16(b) of the IFSA is clearly and unambiguously broad enough to establish that the allocation issue can instead be resolved by a joint trial before the Ontario and Delaware courts.

8    Given that there is no ambiguity in this wording of the IFSA, the motion judge properly disregarded the extrinsic evidence relied on by the EMEA Debtors. He also did not err in failing to refer to the laws of the State of New York, which govern the IFSA pursuant to the forum selection clause in s. 16(a). Applying the relevant principles of New York law leads to the same conclusion that the parties to the IFSA did not enter an agreement to arbitrate the allocation issue.

9    Finally, we note in connection with the fourth component of the test set out above that the majority of the key stakeholders in the *CCAA* proceedings are prepared to proceed with the joint trial. Granting leave to appeal would impose additional costs and threaten further delay in proceedings that have already experienced too much of both.

10    The motion is dismissed with costs to the respondents fixed at $2000 inclusive of disbursements and HST.

*Motion dismissed.*

---

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.  3

TAB 109

1988 CarswellBC 531
British Columbia Supreme Court

Northland Properties Ltd., Re

1988 CarswellBC 531, [1988] B.C.W.L.D. 2663, [1988] C.L.D. 1460, [1988] B.C.J. No.
1210, 11 A.C.W.S. (3d) 76, 29 B.C.L.R. (2d) 257, 69 C.B.R. (N.S.) 266, 73 C.B.R. (N.S.) 146

# Re NORTHLAND PROPERTIES LIMITED et al.

Trainor J.

Heard: June 27-30, 1988
Judgment: July 5, 1988
Docket: Vancouver No. A 880966

Counsel: *R. Clark, R.D. McCrae, R. Ellis* , and *G. Gardner* , for petitioners.
*E.C. Chiasson, Q.C., G. Thompson* , and *C.S. Bird* , for Bank of Montreal.
*N. Kambas* , for Excelsior Life Insurance and National Life Insurance.
*S. Strukoff* , for Metropolitan Trust.
*A. Edson* , for Touche Ross.
*A.C. Zepil* , for Guardian Trust.

Subject: Corporate and Commercial; Insolvency

## Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

## Headnote

### Bankruptcy --- Interim receiver — Appointment

Court discussing factors for consideration on application for consolidation order.

Additional monitoring of companies' affairs not required at present time.

The petitioning companies collectively owned and operated a chain of hotels, office buildings and development real estate. Although separate legal entities, the companies were managed and operated as a single entity without regard to which company owned which asset. Expenses and revenues were only allocated to each company for the purpose of filing separate tax returns. Owing $117 million in secured debt to the bank, the companies petitioned under the Companies' Creditors Arrangement Act and were granted permission to propose plans of compromise or arrangement to their creditors. The court further ordered that the companies remain in possession of their assets and carry on business and that any bankruptcy or winding-up proceedings by creditors be stayed. The companies brought in chartered accountants to prepare audited financial statements, and consented to a "stand still" order and to a requirement that they report to the court and to the creditors until the plans could be presented at the creditors' meeting. In this present application, the bank sought, inter alia, an order appointing an interim receiver. The companies sought, inter alia, an order merging and consolidating their reorganizations.

**Held:**

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 70 of 374

Northland Properties Ltd., Re, 1988 CarswellBC 531
1988 CarswellBC 531, [1988] B.C.W.L.D. 2663, [1988] C.L.D. 1460...

Applications dismissed.

The role of the interim receiver would be that of a monitor or watchdog over the companies' activities until the creditors' meeting. It would take the receiver at least one month to familiarize itself with the corporate structure and finances before it could begin to assess and report on the companies' financial activities. In light of this, and as chartered accountants were already involved, reporting requirements existed, and stay of proceedings and "stand still" orders were in place, the appointment of an interim receiver was not warranted at this time.

In determining the appropriateness of a consolidation order, the court must balance the economic prejudice to the creditors resulting from continued corporate separateness against the economic prejudice caused by consolidation. It is not sufficient, on an application for consolidation, to show a unity of interest or an intermingling of funds; it must also be shown that consolidation would prevent a harm or prejudice or would effect a benefit generally. Although the companies had been run substantially as a single entity, their assets and liabilities had been capable of segregation for tax purposes. Further, at this time, a consolidation order would interfere or appear to interfere with the rights of the creditors by giving the appearance of approval of an amalgamation without reference to the creditors. The creditors could consider approving a consolidation plan when they had had the opportunity to review the individual reorganization plans submitted to them.

**Table of Authorities**

**Cases considered:**

Avery Const. Co., Re, 24 C.B.R. 17, [1942] 4 D.L.R. 558 (Ont.) — *referred to*

Baker and Getty Fin. Services Inc., Re, 78 B.R. 139 (Ohio Bankruptcy Court, 1987) — *considered*

Snider Bros., Re, 18 B.R. 230 (Mass. Bankruptcy Court, 1982) — *applied*

Vecco Const. Indust. Inc., Re, 3 B.R. at 410 — *referred to*

**Statutes considered:**

Companies' Creditors Arrangement Act, R.S.C. 1970, c. C-25

ss. 3-7

s. 11

United States Bankruptcy Code, c. 11

Application for orders appointing interim receiver and consolidation of companies' reorganizations.

*Trainor J.* :

1    There are several motions before me in which both the petitioner companies and the Bank of Montreal ask for orders and directions pursuant to the provisions of the Companies' Creditors Arrangement Act. Not only the rights of the companies and the bank, but those of all creditors will be affected by my rulings and I have also heard submissions of counsel and representatives of other creditors. The submissions of counsel have been lengthy and supported by their review of affidavits and exhibits thereto. The motions of course must be considered in the light of that evidence. It is therefore appropriate to set out something of the background or history of the relationship of the parties involved in these proceedings.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 71 of 374

Northland Properties Ltd., Re, 1988 CarswellBC 531

1988 CarswellBC 531, [1988] B.C.W.L.D. 2663, [1988] C.L.D. 1460...

2      The companies are engaged in the business of real estate invest ment and development in western Canada and in the western United States. They collectively own and operate:

3      (a) A chain of 20 hotels and motels in Western Canada known as the "Sandman Inns";

4      (b) Five office buildings in Calgary and Vancouver;

5      (c) An office building in Portland, Oregon;

6      (d) Development land in California;

7      (e) A number of other smaller office buildings and parcels of land.

8    The Sandman Inns chain of hotels was founded in 1967. All hotels, inns and office buildings, with a couple of exceptions, were constructed by the companies as new facilities. Until 1977, separate companies were incorporated to acquire property in selected communities for the purpose of establishing a hotel, the purpose of separate corporate ownership being to permit the management of each hotel to participate. This policy was changed at that time and the interest of each participating owner was bought out. In his affidavit sworn 27th May 1988, Robert John Gaglardi, who is the president and a director of each of the companies, avers:

> 24. In summary, although legal title to the companies' real estate and other assets is disbursed among the companies, beneficial ownership ultimately resides for the most part in myself and Ralph Beck [the father-in-law of Robert John Gaglardi], albeit in differing proportions. The companies' separate legal existence has been maintained only for the purpose of reflecting the different degrees of beneficial ownership of the companies' assets and as required to satisfy certain lenders including Bank of Montreal (the "bank"). Otherwise, and for all other intents and purposes, and in particular for the purpose of day-to-day management and operations, the companies are treated internally and by others as a single business entity.

9    Mr. Gaglardi further says that the companies' business operations are divided into the hotel division and the office division with no distinction being made on the basis of legal ownership of the property and assets comprising each division. He states:

> 26. By virtue of operating as two divisions without regard to corporate niceties and actual legal ownership, the finances of the companies are inextricably intertwined. As a rule, trade creditors of the hotel division bill their accounts to "Sandman Inns", notwithstanding that a particular hotel may be owned by any one of Sandman Inns, Northland or Sandman Four.

> 28. Cheques and other instruments generated from hotel operations are also made payable to Sandman Inns without regard to the corporate entity actually owning the particular hotel to which the income is attributable.

> 29. Similarly, the office division operates generally under the name of "Northland Properties" notwithstanding actual legal ownership of each office building. Cheques received from tenants of office properties are as a rule all made out in favour of Northland.

> 30. Until recently, the companies collectively maintained a single operating account with the bank in Vancouver, British Columbia. Into this account were deposited all cheques and cash from the hotel and office divisions regardless of their source and without heed to the company which owned the property in respect of which the income was generated. This account was maintained in the name of "Sandman Inns" and no attempt was ever made by the bank or by the companies to allocate revenues, deposits or withdrawals to each company. As to payroll, all cheques are issued by Sandman Inns in relation to both the hotel division and the office division.

10    He further says that the audited financial statements of the companies, with the exception of Northland, are prepared on a consolidated basis only, although he does acknowledge that separate tax returns have been filed each year and that it has been necessary to allocate expenses and revenues for that purpose.

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 72 of 374

Northland Properties Ltd., Re, 1988 CarswellBC 531

1988 CarswellBC 531, [1988] B.C.W.L.D. 2663, [1988] C.L.D. 1460...

11    On the other hand, I have an affidavit of Mr. Bygott, a manager with the special accounts management unit of the Bank of Montreal, sworn 23rd June 1988, in which he challenges a further statement by Mr. Gaglardi that "the system is incapable of producing separate financial summaries for each company". Mr. Bygott exhibits to his affidavit materials produced on behalf of the companies from which he concludes that it is "quite possible and relatively simple for the companies to determine and set out comprehensive particulars of the debts owed by each of them and the security therefor on an unconsolidated basis".

12    The companies began to experience financial problems starting in 1981 and 1982 when their revenues declined and interest rates rose sharply. The suspension of payment of interest to the bank led to a number of attempts to restructure the companies' indebtedness. The bank worked closely with the companies in those processes. One of the issues to be resolved between the companies and the bank is the claim by the companies that the bank is liable to them for damages for what has been described in argument as "lender liability". This claim is based on dealings between the companies and the bank and allegations of damage arising from the exercise of control by the bank over the business operations of the companies. That issue may be relevant to a determination of the voting rights of the bank with respect to the plan proposed by the companies under the Companies' Creditors Arrangement Act. Otherwise, that issue is not before me at this time.

13    By the spring of 1988, the financial status of the companies, in general terms, was that they owed slightly less than $200 million and had assets valued at approximately $100 million. The amount owing to the bank, which was included in that general indebtedness, was in the sum of approximately $117 million.

14    Other indebtedness of the companies was roughly as follows:

  1. Priority mortgagees ...... $77,000,000

  2. General unsecured creditors ...... 2,000,000

  3. Property and business taxes ...... 3,700,000

  4. Corporation capital tax ...... 300,000

15    The indebtedness to the bank, in its submission, is made up as follows:

  1. Series A bonds ...... $45,000,000

  2. Series C bonds ...... 2,000,000

  3. The Put debt secured by the A bonds, the U.S. trust deeds and the other security ...... 70,000,000

16    In December 1987 the bank authorized the commencement of a receivership action against the companies. Royal Trust Corporation of Canada, acting on behalf of the bank under a trust deed to which the companies were parties, moved in the receivership action for summary judgment against the companies under the trust deed and the appointment of a receiver-manager of the companies. The motions for summary judgment and the request for the appointment of a receiver-manager of the companies were heard by Boyle L.J.S.C. on 1st and 2nd February 1988. The companies sought and obtained an adjournment of the applications until 8th April 1988 to allow them time to obtain evidence confirming the availability of alternate financing. At the time of granting those adjournments, Boyle L.J.S.C. said:

  Although the long history of negotiations and agreements are relevant here, there is no need to detail them. There is some bitterness on the companies' part as a result of what they see as interference by the bank in their operations at consequent cost to the companies but, even if their operation had been ideal day-to-day, their financial distress now would remain acute.

  It is enough to say that the bank gave the companies many opportunities to refinance and in no sense sandbagged them unexpectedly with the present proceedings.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1988 CarswellBC 531, [1988] B.C.W.L.D. 2663, [1988] C.L.D. 1460...

17    The hoped-for alternate financing did not materialize. Consequently, on 6th April 1988 the companies filed petitions in the bankruptcy court for the district of Oregon pursuant to c. 11 of the United States Bankruptcy Code acknowledging indebtedness in the amount of $200 million with assets having a value of approximately half that amount.

18    On 7th April 1988 the companies petitioned this court under the Companies' Creditors Arrangement Act. That Act provides:

3. This Act does not apply in respect of a debtor company unless

(*a* ) the debtor company has outstanding an issue of secured or unsecured bonds, debentures, debenture stock or other evidences of indebtedness of the debtor company or of a predecessor in title of the debtor company issued under a trust deed or other instrument running in favour of a trustee, and

(*b* ) the compromise or arrangement that is proposed under section 4 or section 5 in respect of the debtor company includes a compromise or arrangement between the debtor company and the holders of an issue referred to in paragraph (a).

19    I found that the companies in these proceedings were debtor companies which, on the material filed in support of the petition, qualified them to invoke the Companies' Creditors Arrangement Act.

20    The Companies' Creditors Arrangement Act further provides:

4. Where a compromise or arrangement is proposed between a debtor company and its unsecured creditors or any class of them, the court may, on the application in a summary way of the company or of any such creditor or of the trustee in bankruptcy or liquidator of the company, order a meeting of such creditors or class of creditors, and, if the court so determines, of the shareholders of such company, to be summoned in such manner as the court directs.

5. Where a compromise or arrangement is proposed between a debtor company and its secured creditors or any class of them, the court may, on the application in a summary way of the company or of any such creditor or of the trustee in bankruptcy or liquidator of the company, order a meeting of such creditors or class of creditors, and, if the court so determines, of the shareholders of such company, to be summoned in such manner as the court directs.

6. Where a majority in number representing three-fourths in value of the creditors, or class of creditors, as the case may be, present and voting either in person or by proxy at the meeting or meetings thereof respectively held pursuant to sections 4 and 5, or either of such sections, agree to any compromise or arrangement either as proposed or as altered or modified at such meeting or meetings, the compromise or arrangement may be sanctioned by the court, and if so sanctioned is binding on all the creditors, or the class of creditors, as the case may be, and on any trustee for any such class of creditors, whether secured or unsecured, as the case may be, and is also binding on the company, and in the case of a company that has made an authorized assignment or against which a receiving order has been made under the Bankruptcy Act or is in course of being wound up under the Winding-up Act, is also binding on the trustee in bankruptcy or liquidator and contributories of the company.

7. Where an alteration or modification of any compromise or arrangement is proposed at any time after the court has directed a meeting or meetings to be summoned, such meeting or meetings may be adjourned on such term as to notice and otherwise as the court may direct, and such directions may be given as well after as before adjournment of any meeting or meetings, and the court may in its discretion direct that it shall not be necessary to adjourn any meeting or to convene any further meeting of any class of creditors or shareholders that in the opinion of the court is not adversely affected by the alteration or modification proposed, and a compromise or arrangement so altered or modified may be sanctioned by the court and have effect under section 6.

21    As the initial step with respect to the compromise or arrangement to which reference is made in those sections, I ordered as follows:

WestlawNext® CANADA    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 74 of 374

Northland Properties Ltd., Re, 1988 CarswellBC 531

1988 CarswellBC 531, [1988] B.C.W.L.D. 2663, [1988] C.L.D. 1460...

AND THIS COURT FURTHER ORDERS that the Petitioners be and are hereby authorized and permitted to file with this Honourable Court, on or before August 25, 1988, or such other date as may be ordered by this Court, a formal plan of compromise or arrangement (the "Reorganization Plan") between the Petitioners and its secured and unsecured creditors ...

AND THIS COURT FURTHER ORDEERS that the Petitioners shall remain in possession of their undertaking, property and assets and shall continue to carry on their business and upon approval of the Reorganization Plan as provided for in the Petition, to implement same according to its terms.

22    The Companies' Creditors Arrangement Act also provides:

11. Notwithstanding anything in the *Bankruptcy Act* or in the *Winding-up Act* , whenever an application has been made under this Act in respect of any company, the court, on the application of any person interested in the matter, may, on such notice to any other person, or without notice as it may see fit, make an order staying until such time as the court may prescribe or until further order all proceedings taken or that might be taken in respect of such company under the *Bankruptcy Act* and the *Winding-up Act* or either of them, and the court may restrain further proceedings in any action, suit or proceeding against the company upon such terms as the court sees fit, and the court may also make an order that no suit, action or other proceeding shall be proceeded with or commenced against the company except with the leave of the court and subject to such terms as the court imposes.

23    Pursuant to the authority of that section, I ordered as follows:

AND THIS COURT FURTHER ORDERS that all proceedings taken or that might be taken by any of the Petitioners' creditors under the Bankruptcy Act, R.S.C. 1970, c. B-3 and the Winding-up Act, R.S.C. 1970, c. W-10, or either of them, shall be stayed until further order of this Court upon notice to the Petitioners and that further proceedings in any action, suit or proceeding commenced by any person against any of the Petitioners be stayed until further order of this Court upon notice to the Petitioners, that no action, suit or other proceeding may be proceeded with or commenced against any of the Petitioners by any person except with leave of this Court, upon notice to the Petitioners, and subject to such terms as this Court may impose, and that the right of any person to realize upon or otherwise deal with any security held by that person on the undertaking, property and assets of any of the Petitioners be and the same is postponed on such terms and conditions as this Court may deem proper.

24    On 20th June 1988 I heard a motion by counsel on behalf of Guardian Trust Company, one of the priority mortgagees in these proceedings. Because it is fundamental to the motions before me now, I want to repeat a portion of what I said in dealing with the Guardian Trust motion:

With respect to this particular legislation, I would like to refer to what is said by the court in *Meridian Dev. Inc. v. T.D. Bank,* 52 C.B.R. (N.S.) 109, [1984] 5 W.W.R. 215, 32 Alta. L.R. (2d) 150, 11 D.L.R. (4th) 576, 53 A.R. 39 (Q.B.) . At p. 113, Mr. Justice Wachowich said:

This Act, though little used, is one of a number of federal statutes dealing with insolvency. In common with the various other statutes, it envisages the protection of creditors and the orderly administration of the debtor's affairs or assets.

Then he cites authority for that proposition and continues:

In the words of Duff C.J.C. who spoke for the court in *A.G. Can. v. A.G. Que.*, [1934] S.C.R. 659, 16 C.B.R. 1 at 2, [1934] 4 D.L.R. 75 :

'... the aim of the Act is to deal with the existing condition of insolvency in itself to enable arrangements to be made in view of the insolvent condition of the company under judicial authority which, otherwise, might not be valid prior to the initiation of proceedings in bankruptcy. *Ex facie* it would appear that such a scheme in principle does not radically depart from the normal character of bankruptcy legislation.'

1988 CarswellBC 531, [1988] B.C.W.L.D. 2663, [1988] C.L.D. 1460...

> The legislation is intended to have wide scope and allows a judge to make orders which will effectively maintain the status quo for a period while the insolvent company attempts to gain the approval of its creditors for a proposed arrangement which will enable the company to remain in operation for what is, hopefully, the future benefit of both the company and its creditors.

I adopt that as a statement of the purpose of this legislation and the underlying purpose behind the order which was made on 7th April last.

25    At the time I made that order I was satisfied on the basis of the material filed in support of the petition that the companies should have an opportunity to lay before their creditors a proposal as to how their liabilities could be met and the companies continue in operation. The purpose of this legislation is to keep companies in business if possible. That is the sense in which this legislation is to be distinguished from winding-up or bankruptcy proceedings: *Re Avery Const. Co.*, 24 C.B.R. 17, [1942] 4 D.L.R. 558 (Ont.) .

26    There are separate motions before me for consideration and decision at this time. I will consider each in detail but, in summary, they are as follows:

**1. Motion by the companies for an order that:**

27    (a) Their reorganizations be merged and consolidated for all purposes;

28    (b) The form of proof of claim and its instructions annexed to the motion be approved;

29    (c) They be granted liberty to file a single consolidated reorganization plan;

30    (d) The process for accepting and determining the claims of creditors be as set forth in the instructions to proof of claim;

31    (e) They be granted liberty to constitute preliminary classes of creditors.

**2. Motion by the bank:**

32    (a) For a "stand still" order;

33    (b) For the appointment of Touche Ross Limited as interim receiver of the companies.

**3. Motion by the bank for an order:**

34    For directions with respect to the bank's entitlement to vote at any meeting of creditors called in these proceedings.

35    At the time of drafting these reasons for judgment, counsel have not completed their submissions with respect to all of the issues raised in the notices of motion. However, I propose to deal with those matters in respect of which they have confirmed to me that their submissions have been completed.

**Motion No. 2 — For a "stand still" order and the appointment of an interim receiver**

36    I will not set out all of the detail with respect to the powers and duties sought for Touche Ross Limited as interim receiver of the companies authorizing it to monitor the operations and affairs of the companies. Suffice to say that nothing turns at this time, and in the particular circumstances of this case, on the extent and nature of those powers and duties.

37    The stand still order sought is as follows:

THIS COURT ORDERS THAT, until further Order of this Honourable Court, the Petitioners, and each of them, be and are hereby enjoined and restrained from:

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1988 CarswellBC 531, [1988] B.C.W.L.D. 2663, [1988] C.L.D. 1460...

(a) issuing any further shares, bonds, debentures or other securities, or permitting the transfer of any such instruments or otherwise changing in any way their corporate or share structure;

(b) selling, transferring, or otherwise disposing of or charging, encumbering or otherwise mortgaging any of their assets, save and except leases of office space entered into in the ordinary and usual course of management of office properties;

(c) incurring any debts or obligations whatsoever, except in the ordinary and usual course of business and as necessary to continue business operations in the manner conducted prior to 7th April 1988;

(d) applying any of their cash flow in any manner or for any purpose other than in the ordinary and usual course of business and for the purpose of continuing present business operations; and

(e) entering into or effecting any arrangements or compromises with, or making any payments other than in the ordinary and usual course of business and for the purpose of continuing present business operations to any creditors, including secured creditors, without obtaining an Order of this Honourable Court following proper notice to the parties of record.

38      Consideration of the matters raised in this motion involves a recognition of the fact that there has been in place an order staying any and all proceedings which might be taken by any creditor of the companies since 7th April 1988. Reorganization plans need not be filed until 25th August 1988 and the meetings of creditors are scheduled for 16th September 1988. During the whole of that period there is no order directing the companies to report to their creditors. The operations of the companies continue to be controlled and directed by their boards of directors and there is no mechanism in place to ensure that the rights of the creditors are being properly protected.

39      In the course of submissions, counsel for the companies informed me that he would consent to the stand still order as set out above subject only to some possible minor adjustment of the wording thereof. On that basis, that order will be made. If counsel have a problem with the wording, they may arrange to speak to me.

40      I also understood in the course of submissions that counsel for the companies consented to an order being made obliging the companies to report to the creditors and the court as follows:

```
                        Reporting Requirements
        Section in:
        -----------

        Credit          Trust
        Agreement       Deed            Item
        ---------       ----            -------------------------------
        7.2             6.4             Evidence of maintenance of cor-
                                        porate existence

        7.3             -               Evidence of maintenance of
                                        federal, provincial and municipal
                                        licences, consents and permits

        7.4             6.9             Evidence of payment of taxes when
                                        due (including 1988 tax rolls).

        7.5             6.7             Access to all properties and right
                                        to physically inspect.

        7.8-7.11        6.18            Evidence of maintenance of
                                        adequate insurance coverage, pay-
                                        ment of premiums when due and re-
                                        newal when due (August 1, 1988).

        9.1                             1987 annual audited financial
                                        statements (draft, if necessary).
```

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 77 of 374

Northland Properties Ltd., Re, 1988 CarswellBC 531
1988 CarswellBC 531, [1988] B.C.W.L.D. 2663, [1988] C.L.D. 1460...

| | | |
|---|---|---|
| 9.2 | – | Quarterly (within 30 days) un-audited financial statements (commencing quarter ended March 31, 1988). |
| 9.3 | – | Monthly (within 30 days) unaudited profit/loss, cash flow and variance reports (in the form as traditionally provided, by individual property and combined on a divisional basis). |
| 9.4 | – | Bi-weekly (within 5 days) daily revenue summaries for all hotels (in the form of the "Flash Reports" as traditionally provided). |
| 9.5 | – | Annual budgets and business plans (combined, divisional and by corporate entity). |
| 8.12 | 6.6 | Evidence of capital expenditures since August 1987 (actual vs. plan vs. budget). |
| 8.12 | – | Details of major individual expenditures, greater than $20,000 per corporate entity or $200,000 for all entities combined in the fiscal year. |
| 7.5 | 6.5 | Monthly detailed listing of:<br>-aged payables<br>-aged receivables<br>-reconciliations of bank accounts (including outstanding cheques) |
| 7.16 and 7.13 | 6.6 and 6.14 | Details of any municipal health, fire or work orders over any of the properties, and evidence of compliance. |
| 8.3 and 8.4 | 6.13 | Details of prior mortgages:<br>-current balance outstanding<br>-current status (arrears, if any)<br>-status of renewals as they occur including details of terms. |
| 7.5 | 6.5 | Detailed occupancy/tenancy information for properties:<br>(a) Hotels<br>-occupancy levels by property<br>-room rates by property<br>-commencing March 1988<br>(b) Commercial<br>-current rent rolls<br>-tenant inducements (cash/free |

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 78 of 374

Northland Properties Ltd., Re, 1988 CarswellBC 531

1988 CarswellBC 531, [1988] B.C.W.L.D. 2663, [1988] C.L.D. 1460...

```
                              rent/lease     takeovers/others)
                              -commitments for tenant improve-
                              ments
                              -leases under negotiations
```

41    A further significant fact to be considered on this motion is that the companies have engaged a firm of chartered accountants to prepare material for the creditors' meetings. In his affidavit sworn 27th June 1988 John Bowles, a partner of Coopers & Lybrand chartered accountants, avers that they:

> ... are currently in the process of preparing for the audit of the 1987 financial statements of the Northland/Sandman Group, which, together with the stub period financial statements for the period January 1, 1988 to July 31, 1988 with a review engagement report will be included with the Petitioners' information circular to be delivered to their creditors in conjunction with their final proposed plan.

42    He further avers that the books and records of the companies have been reviewed for the period 7th April to 31st May 1988 and that Coopers & Lybrand:

> ... have not become aware of anything that would lead us to believe that the Petitioners have not continued to conduct themselves in the normal course of their business and in furtherance of the finalization of their reorganization plan.

43    On the basis of all of that material, it appears that the companies will be reporting and that a firm of chartered accountants are in the process of doing an audit and preparing a full financial statement for the purposes of full consideration of the plan proposed at the creditors' meeting.

44    I am satisfied that I have jurisdiction to appoint an interim receiver and spell out the responsibilities of that office such that his true role would be that of a monitor or watchdog during this interim period. The cost would be significant, but is not a factor of great weight considering the total indebtedness of the companies. The most significant factor militating against the appointment of a monitor at this time is the evidence that it probably would require at least one month for him to familiarize himself with the corporate structures and finances before he could even begin to assess the financial activities of the companies and report on them. When the material is provided in response to the reporting requirements and the reports from Coopers & Lybrand, the creditors may wish to apply for an order for further or other directions to the companies. In the meantime, however, the motion for the appointment of an interim receiver is refused.

**Motion No. 1(a) and (c)**

45    The order sought under this motion is under the general heading of consolidation. The particular request is for an order that:

> a) The within reorganizations with respect to Northland Properties Limited, Sandman Inns Ltd., Sandman Four Ltd., Unity Investment Company, Limited, B & W Development Co. (1986) Ltd., and T N Developments Ltd. under the Company Act and the Companies' Creditors Arrangements Act be merged and consolidated for all purposes.

46    In putting forward this motion, the companies assert that they are not seeking to vary their obligations to the creditors at this time. However, the proposal is that the court approve the preparation of a single reorganization plan for presentation to the creditors of all of the companies. The companies say this is realistic and practical because all of the businesses of the companies were carried on as a single entity which resulted in the financial affairs of the companies being so interwoven that they have become inseparable. They point as well to the common ownership and management of the companies and to the greater cost involved in the preparation of a separate reorganization plan for each corporation.

47    Counsel for the bank in opposing this motion questions the jurisdiction of the court to make such an order. Consolidation is not specifically authorized under the Companies' Creditors Arrangement Act. The end result of the process which the companies ask that they be given leave to set in motion at this time would be amalgamation of the companies. The companies would appear

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1988 CarswellBC 531, [1988] B.C.W.L.D. 2663, [1988] C.L.D. 1460...

to be insolvent and that fact is a bar to amalgamation in many jurisdictions in Canada. A company seeking amalgamation as a general rule is required to satisfy the court that its creditors approve of the amalgamation. Of course, that request can be made by the companies. However, I do not think that it would be appropriate for the companies to obtain from the court what might appear to be approval of amalgamation without any reference to the creditors.

48      I appreciate that there is evidence that the companies have, in large part, been run as a single entity. However, as I have pointed out, their assets, income and liabilities have been segregated for the purposes of income tax returns and there is some evidence that separate schedules of assets and liabilities have been filed in the United States bankruptcy proceedings.

49      There is a scarcity of Canadian cases dealing with this subject and none of the ones referred to me has been of assistance. Both counsel have referred to American cases dealing with the somewhat analogous c. 11 bankruptcy proceedings. In *Re Baker and Getty Fin. Services Inc.*, 78 B.R. 139 (Ohio Bankruptcy Court, 1987), the court said:

> The propriety of ordering substantive consolidation is determined by a balancing of interests. The relevant enquiry asks whether "the creditors will suffer greater prejudice in the absence of consolidation than the debtors (and any objecting creditors) will suffer from its imposition".

The court then went on to list seven factors which had been developed to assist in the balancing of interests. Those factors are:

50      1. Difficulty in segregating assets;

51      2. Presence of consolidated financial statements;

52      3. Profitability of consolidation at a single location;

53      4. Commingling of assets and business functions;

54      5. Unity of interests in ownership;

55      6. Existence of intercorporate loan guarantees; and

56      7. Transfer of assets without observance of corporate formalities.

57      (*Re Vecco Const. Indust. Inc.*, 4 B.R. at 410)

58      I have considered the submissions of counsel with respect to each of those factors. I also refer to *Re Snider Bros.*, 18 B.R. 230 (Mass. Bankruptcy Court, 1982), where the court said at p. 234:

> It must be recognized and affirmatively stated that substantive consolidation, in almost all instances, threatens to prejudice the rights of creditors ... This is so because separate debtors will almost always have different ratios of assets to liabilities. Thus, the creditors of a debtor whose asset-to-liability ratio is higher than that of its affiliated debtor must lose to the extent that the asset-to-liability ratio of the merged estates will be lower. Why then would substantive consolidation ever be permitted?

> A review of the case law reveals that equity has provided the remedy of consolidation in those instances where it has been shown that the possibility of economic prejudice which would result from continued corporate separateness outweighed the minimal prejudice that consolidation would cause. While several courts have recently attempted to delineate what might be called "the elements of consolidation", *In re Food Fair, Inc.*, 10 B.R. 13 , 124 (Bkrtcy. S.D.N.Y. 1981); *In re Veccon Construction Industries, Inc.*, 4 B.R. 407 , 6 B.C.D. 461, 1 C.B.C. 2d 216 (Bkrtcy. E.D. Va. 1980), I find that the only real criterion is that which I have referred to, namely the economic prejudice of continued debtor separateness versus the economic prejudice of consolidation.

And at p. 238:

1988 CarswellBC 531, [1988] B.C.W.L.D. 2663, [1988] C.L.D. 1460...

Moreover, the evidence in support of an application to consolidate must do more than show a unity of interest or an intermingling of funds. It must show a harm which has resulted therefrom, *Soviero v. Franklin National Bank of Long Island*, supra, or that prejudice will result from a lack of consolidation, *Chemical Bank New York Trust Co. v. Kheel*, supra. Indeed, consolidation has been denied even though the debtors had always conducted their business on a consolidated basis, with a joint bank account, inter-corporate loans, and joint payroll, because the court was not satisfied that the prior practice of operating as a single unit was necessary or desirable. *In re Coventry Energy Corporation*, 5 B.C.D. 98 (S.D. Ohio 1979). In addition, consolidation was denied in that case despite the absence of objections by any party. Hence, it must be clearly shown that not only are the "elements of consolidation" present in a given bankruptcy setting, but that the court's action is necessary to prevent harm or prejudice, or to effect a benefit generally.

59    I accept the analysis contained in the *Snider* case. It would be improper for the court to interfere with or appear to interfere with the rights of the creditors. In my view, that appearance would be created by making an order that the reorganizations be merged and consolidated for all purposes. The order sought in this part of the motion is refused. Of course that does not mean that the companies are barred from seeking from the creditors their approval of a consolidated plan. I say that consolidation is not appropriate at this time. The creditors may decide to accept a consolidated plan when they have had a full opportunity to consider the reorganization plans submitted to them.

**Motion No. 1(b) and (d)**

60    The companies move for an order that:

b) The form of Proof of Claim and its instructions attached hereto as Schedule "A" be approved by this Honourable Court for mailing by the Petitioners to their creditors;

d) The process for accepting and determining the claims of creditors of the Petitioners be as set forth in the Instructions to the Proof of Claim attached hereto.

61    I have reviewed the proof of claim form and the instructions accompanying it. As well, I have considered the submissions of counsel for the companies and the bank. I confirm the ruling which I made on 29th June 1988 that because of the unusual financial arrangements between the companies and the bank, it would be inappropriate to require the bank to attempt to set out its claims on that form. I ruled that the bank should have leave to file a separate individual statement of its claims. That statement must be filed by 6th July 1988. If the companies take objection to the statement, they are entitled to reply by 13th July 1988, following which a date may be obtained from the registrar to appear before me in respect of those differences.

62    I confirm that there are two matters contained in the motions still to be resolved. Counsel have agreed to exchange written submissions following which a date for a further hearing will be arranged if necessary. Those two matters are the companies' motion that they be granted liberty to constitute preliminary classes of creditors and a motion by the bank for an order for directions with respect to the bank's entitlement to vote at any meeting of creditors called in these proceedings.

*Order accordingly.*

---

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 110

31 Bankr.Ct.Dec. 333, Bankr. L. Rep. P 77,486, 11 Tex.Bankr.Ct.Rep. 327

119 F.3d 349
United States Court of Appeals,
Fifth Circuit.

In the Matter of CAJUN ELECTRIC
POWER COOPERATIVE, INC., Debtor.
The OFFICIAL COMMITTEE OF
UNSECURED CREDITORS, Appellant,
v.

CAJUN ELECTRIC POWER COOPERATIVE,
INC., By and Through Its Chapter 11
Trustee, Ralph R. MABEY; Entergy Gulf
States, Inc.; Entergy Corporation; United
States Department of Agriculture, on
Behalf of Rural Utilities Service, Appellees.

No. 96–30985.    |    Aug. 5, 1997.

Unsecured trade creditors committee objected to proposed
settlement of claims between Chapter 11 debtor-electrical
power cooperative and debtor's two largest creditors. The
United States District Court for the Middle District of
Louisiana, Frank J. Polozola, J., approved settlement.
Committee appealed. The Court of Appeals, Benavides,
Circuit Judge, held that: (1) district court's approval of
settlement was final order for purposes of appeal; (2)
settlement did not effect prohibited sub rosa plan of
reorganization; and (3) approval of settlement agreement was
not abuse of discretion.

Affirmed.

West Headnotes (17)

[1]    **Bankruptcy**
        🔑 Representation of debtor, estate, or creditors

        Trustee in bankruptcy has standing to bring
        equitable subordination claim on behalf of
        estate's creditors.

        6 Cases that cite this headnote

[2]    **Bankruptcy**
        🔑 Jurisdiction

Court of Appeals' jurisdiction was governed by
statute concerning appeals from final decision
of district court where district court heard case
itself as court of bankruptcy, rather than sitting
as bankruptcy appeals court. 28 U.S.C.A. §§
158(d), 1291.

1 Cases that cite this headnote

[3]    **Bankruptcy**
        🔑 Finality; interlocutory orders

        District court's approval of settlement ending
        protracted litigation between Chapter 11 debtor-
        electrical power cooperative and its two largest
        creditors was "final" order within context of
        bankruptcy appeals, and therefore Court of
        Appeals had jurisdiction over appeal from
        approval order under statute governing appeals
        from final decisions of district court. 28 U.S.C.A.
        § 1291.

        10 Cases that cite this headnote

[4]    **Federal Courts**
        🔑 In general; necessity

        Appellate jurisdiction under statute governing
        appeals from final decisions of district courts
        ordinarily depends on existence of decision by
        district court that ends litigation on the merits
        and leaves nothing for court to do but execute
        judgment. 28 U.S.C.A. § 1291.

        Cases that cite this headnote

[5]    **Bankruptcy**
        🔑 Finality; interlocutory orders

        In Fifth Circuit, in bankruptcy context,
        liberalized final judgment rule of statute
        governing appeals from bankruptcy courts
        applies even when appellate jurisdiction is based
        on statute governing appeals from final decisions
        of district courts. 28 U.S.C.A. §§ 158(d), 1291.

        2 Cases that cite this headnote

[6]    **Bankruptcy**
        🔑 Finality

        **Bankruptcy**

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 83 of 374

Matter of Cajun Elec. Power Co-op., Inc., 119 F.3d 349 (1997)

31 Bankr.Ct.Dec. 333, Bankr. L. Rep. P 77,486, 11 Tex.Bankr.Ct.Rep. 327

🔑 Finality;  interlocutory orders

Under liberalized final judgment rule applicable to bankruptcy appeals, jurisdiction exists if there is order finally disposing of some, but not necessarily all, of claims. 28 U.S.C.A. §§ 158(d), 1291.

2 Cases that cite this headnote

[7]    **Bankruptcy**
    🔑 Review

Court of Appeals would review de novo district court's legal conclusion that settlement between Chapter 11 debtor-electrical power cooperative and its two largest creditors did not effect sub rosa plan of reorganization; related factual findings would be reviewed for clear error.

6 Cases that cite this headnote

[8]    **Bankruptcy**
    🔑 Compromises, Releases, and Stipulations

Settlement between Chapter 11 debtor-electrical power cooperative and its two largest creditors did not effect prohibited sub rosa plan of reorganization; settlement did not dispose all claims against debtor, restrict creditors' rights to vote as they deemed fit on proposed plan, or dispose of virtually all of debtor's assets, but rather disposed of debtor's interest in nuclear plant, which would facilitate reorganization without denigrating objecting unsecured trade creditors' rights, and debtor retained as much as $1.1 billion in other assets. Bankr.Code, 11 U.S.C.A. § 363(b); Fed.Rules Bankr.Proc.Rule 9019(a), 11 U.S.C.A.

15 Cases that cite this headnote

[9]    **Bankruptcy**
    🔑 Review

Court of Appeals would review district court's decision to approve settlement between Chapter 11 debtor-electrical power cooperative and its two largest creditors for abuse of discretion and subsidiary factual findings for clear error.

Cases that cite this headnote

[10]    **Bankruptcy**
    🔑 Judicial authority or approval

Approval of compromise settlement of debtor's claim should only be given if settlement is fair and equitable and in best interest of the estate. Fed.Rules Bankr.Proc.Rule 9019(a), 11 U.S.C.A.

4 Cases that cite this headnote

[11]    **Bankruptcy**
    🔑 Judicial authority or approval

Words "fair and equitable," as used in context of approval of compromise settlement of debtor's claim, are terms of art, and mean that senior interests are entitled to full priority over junior ones. Fed.Rules Bankr.Proc.Rule 9019(a), 11 U.S.C.A.

8 Cases that cite this headnote

[12]    **Bankruptcy**
    🔑 Judicial authority or approval

In deciding whether settlement of litigation is fair and equitable, judge in bankruptcy must make well-informed decision, comparing terms of compromise with likely rewards of litigation; in particular, judge must evaluate and set forth in comprehensible fashion probability of success in litigation, with due consideration for uncertainty in fact and law, complexity and likely duration of litigation and any attendant expense, inconvenience and delay, and all other factors bearing on wisdom of compromise. Fed.Rules Bankr.Proc.Rule 9019(a), 11 U.S.C.A.

22 Cases that cite this headnote

[13]    **Bankruptcy**
    🔑 Judicial authority or approval

With respect to requirement that bankruptcy court consider probability of success in litigation as factor in determining whether settlement is fair and equitable, it is unnecessary for court

Matter of Cajun Elec. Power Co-op., Inc., 119 F.3d 349 (1997)

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 84 of 374

31 Bankr.Ct.Dec. 333, Bankr. L. Rep. P 77,486, 11 Tex.Bankr.Ct.Rep. 327

to conduct mini-trial to determine probable outcome of any claims waived in settlement; court need only apprise itself of relevant facts and law so that it can make informed and intelligent decision. Fed.Rules Bankr.Proc.Rule 9019(a), 11 U.S.C.A.

22 Cases that cite this headnote

[14]    **Bankruptcy**
    👉 Judicial authority or approval

In considering "all other factors bearing on wisdom of settlement," as part of determining whether compromise settlement of debtor's claim is fair and equitable, court should consider best interests of creditors, with proper deference to their reasonable views, and extent to which settlement is truly the product of arms-length bargaining, and not of fraud or collusion. Fed.Rules Bankr.Proc.Rule 9019(a), 11 U.S.C.A.

24 Cases that cite this headnote

[15]    **Bankruptcy**
    👉 Judicial authority or approval

Approval of settlement under Chapter 11 debtor-electrical power cooperative and its two largest creditors was not abuse of discretion; likelihood that debtor would succeed on waived claims, including equitable subordination claims against settling creditors, was minimal, cost and complexity of settled litigation was staggering, settlement was result of arms-length bargaining, and, although numerical majority of creditors opposed settlement, overall interests of creditors were well served by settlement. Bankr.Code, 11 U.S.C.A. § 510(c); Fed.Rules Bankr.Proc.Rule 9019(a), 11 U.S.C.A.

7 Cases that cite this headnote

[16]    **Bankruptcy**
    👉 Inequitable conduct

Equitable subordination is remedial in nature and is only rarely granted. Bankr.Code, 11 U.S.C.A. § 510(c).

6 Cases that cite this headnote

[17]    **Bankruptcy**
    👉 Inequitable conduct

Equitable subordination is permitted when claimant engaged in inequitable conduct, conduct resulted in harm to creditors or conferred unfair advantage upon claimant, and equitable subordination is not inconsistent with Bankruptcy Code. Bankr.Code, 11 U.S.C.A. § 510(c).

7 Cases that cite this headnote

**Attorneys and Law Firms**

*351 Joseph E. Friend, Breazeale, Sachse & Wilson, New Orleans, LA, Gerald M. Amero, Catherine Ruth Connors, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, ME, for Appellant.

David S. Rubin, Kantrow, Spaht, Weaver & Blitzer, Baton Rouge, LA, Lon A. Jenkins, Kenneth L. Cannon, LeBoeuf, Lamb, Greene & MacRae, Salt Lake City, UT, for Cajun Electric Power Cooperative, Inc.

Tom F. Phillips, Courtney S. DeBlieux, Taylor, Porter, Brooks & Phillips, Baton Rouge, LA, David J. Messina, Taylor, Porter, Brooks & Phillips, New Orleans, LA, for Entergy Gulf States, Inc. and Entergy Corp.

Thomas Mark Bondy, William Kanter, U.S. Department of Justice, Civil Division, Washington, DC, for U.S. Department of Agriculture.

Appeal from the United States District Court for the Middle District of Louisiana.

Before SMITH, BARKSDALE and BENAVIDES, Circuit Judges.

**Opinion**

*352 BENAVIDES, Circuit Judge:

Cajun Electric Power Cooperative, Inc. ("Cajun") is a non-profit rural electrical power cooperative that made an imprudent investment in a nuclear power plant and

Matter of Cajun Elec. Power Co-op., Inc., 119 F.3d 349 (1997)
31 Bankr.Ct.Dec. 333, Bankr. L. Rep. P 77,486, 11 Tex.Bankr.Ct.Rep. 327

is now a Chapter 11 debtor. In this bankruptcy appeal, a committee representing more than 500 unsecured trade creditors asserting claims of approximately $7 million objects to the settlement of litigation between Cajun and its two largest creditors. The district court, having withdrawn the reference to the bankruptcy court in order to superintend the case directly, approved the settlement.

Cajun's largest creditor is the federal government's Rural Utilities Service ("RUS") (formerly the Rural Electrification Administration), which provided Cajun with loans and loan guarantees for its investment in the River Bend nuclear plant. RUS asserts that it has secured claims against Cajun of $4.2 billion. Cajun's second-largest creditor is the nuclear plant's builder and principal owner, Gulf States Utilities Co. ("Gulf States"), which through its corporate successor, Entergy Gulf States, Inc., asserts unsecured claims of $400 million. The settlement was agreed to by Cajun's Chapter 11 trustee, Ralph R. Mabey.

The settlement approved by the district court would end the litigation between Cajun, RUS, and Gulf States relating to the River Bend plant. It also would resolve several other claims. In the view of the district court, the settlement would clear the way for approval of a plan of reorganization for the debtor, Cajun.

In the instant appeal, the trade creditors disavow any intention of preventing a settlement of the underlying litigation. They claim, however, that the settlement is flawed and should be "modified." They ask this court to order that the settlement be made contingent upon approval of a reorganization plan, or, alternatively, to equitably subordinate the claims of Gulf States and RUS.

In support of these requests, appellants advance two distinct legal theories. First, they contend that the settlement approved by the district court is an impermissible *sub rosa* reorganization plan. Alternatively, they contend that the settlement is not fair and equitable.

We affirm the district court order approving the settlement. Consequently, we need not address whether the unusual relief sought by the Committee is appropriately addressed to this court. [1]

**FACTUAL AND PROCEDURAL BACKGROUND**

Cajun and Gulf States were bitter rivals who in 1980 united in a common endeavor: construction of the River Bend nuclear reactor. Cajun invested $588 million in River Bend in exchange for a 30 percent ownership stake. RUS lent Cajun a substantial amount of capital for its investment in River Bend and guaranteed the remainder of Cajun's River Bend loans.

When River Bend turned out to be a financial drain, Cajun attempted to remain solvent by raising its rates. This course was disallowed by the Louisiana Public Service Commission on the ground that River Bend was an imprudent investment. On December 21, 1994, Cajun filed for protection from its creditors under Chapter 11.

It is unnecessary to recount the entire history of Cajun's Chapter 11 proceedings. We need only provide a brief summary of the settlement agreement approved by the district court.

If the settlement is affirmed, Cajun first and foremost would be freed of any future involvement in River Bend. Cajun would be **\*353** obligated, however, to pay $107 million toward its share of the reactor's decommissioning trust fund. Cajun would be absolved of any further liability for the plant's decommissioning, but would be barred from recovering any excess if the decommissioning fund proves to be overfunded.

Cajun, unshackled from its River Bend investment, would drop its suit against Gulf States seeking (1) rescission of the River Bend agreement on grounds of fraud and error; or, in the alternative, (2) damages for breach of contract, breach of fiduciary duty, and mismanagement. A four-month trial was held in district court on the fraud suit; it ended with the district court ruling in Gulf States' favor, although a final written opinion has not yet been issued. The breach of contract suit has not yet gone to trial; the trustee has estimated that Cajun might recover $200 million in damages.

[1] The parties would relinquish several additional claims against one another, including:

• Claims and counter-claims relating to Gulf States' transmission of Cajun power (the "Transmission Services" suit). Based on a ruling favoring Gulf States by the Federal Energy Regulatory Commission ("FERC"), the settling parties estimate that Cajun could be required to pay $55 million in counter-claim damages if this suit runs its course.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

*Matter of Cajun Elec. Power Co-op., Inc., 119 F.3d 349 (1997)*

31 Bankr.Ct.Dec. 333, Bankr. L. Rep. P 77,486, 11 Tex.Bankr.Ct.Rep. 327

• A dispute over Cajun's unilateral decision to cease payments to Gulf States on certain River Bend expenses (the "Service Water" suit). Gulf States has obtained a preliminary injunction allowing it to deduct the money withheld by Cajun, $58 million, from Gulf States' payments to Cajun for electricity generated by Cajun's coal-burning plant. The $58 million has been deposited in district court; under the settlement, Gulf States would keep it.

• Cajun's claim against Gulf States and RUS for equitable subordination. [2]

• Claims between Cajun and RUS arising from River Bend, including Cajun's claims for lender liability and waiver of deficiency judgment. Cajun retains the right to claim that RUS did not perfect its security interest.

• Cajun transfers two transmission lines worth $20 million to Gulf States, which agrees to transmit Cajun power through its lines.

Also under the settlement, RUS succeeds to Cajun's interest in River Bend. RUS can keep this "asset," sell it, or force Gulf States to take it. In the unlikely event that the plant is sold to a third party, Cajun will deduct the sale price from its debt to RUS. The eventual owner of Cajun's interest in River Bend would receive any proceeds from litigation over design defects, estimated by the trustee to be about $10 million.

The Committee representing the trade creditors did not ask the district court to reject the Agreement. Instead, the Committee requested that the court defer approval until confirmation of a bankruptcy plan, or, in the alternative, approve the settlement conditionally, pending confirmation of a plan. The district court denied these requests and approved the settlement on August 27, 1996. The Committee appeals.

## DISCUSSION

## I. JURISDICTION

[2] [3] Because the district court did not sit as a bankruptcy appeals court but heard the case itself as a court of bankruptcy, 28 U.S.C. 158(d) does not confer appellate jurisdiction on this court. Instead, our jurisdiction is governed by 28 U.S.C. § 1291. *Cajun Elec. Power Coop., Inc. v. Central Louisiana Elec. Co. (In re Cajun Elec. Power Coop., Inc.),* 69 F.3d 746 (5th Cir.1995), *modified on other grounds on reh'g,* 74 F.3d 599 (5th Cir.) (per curiam)(authorizing appointment of trustee

in the instant case), *cert. denied,* 519 U.S. 808, 117 S.Ct. 51, 136 L.Ed.2d 15 (1996).

***354** [4] [5] [6] Section 1291 vests the federal courts of appeals with "jurisdiction of appeals from all final decisions of the district courts...." Appellate jurisdiction under this statute ordinarily "depends on the existence of a decision by the District Court that 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.' " *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 467, 98 S.Ct. 2454, 2457, 57 L.Ed.2d 351 (1978) (quoting *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945)). However, it is settled in this circuit that in the bankruptcy context, the liberalized final judgment rule of 28 U.S.C. § 158(d) applies, even when appellate jurisdiction is based on section 1291. *Cajun,* 69 F.3d at 748. Under this rule, jurisdiction exists if there is an order finally disposing of some, but not necessarily all, of the claims.

The district court's approval of the settlement order brings to an end the protracted litigation over the River Bend nuclear project and various other claims among Cajun, Gulf States, and RUS. It is "final" as the term is understood in bankruptcy. Accordingly, we have jurisdiction under 28 U.S.C. § 1291.

## II. *SUB ROSA* REORGANIZATION

[7] We review *de novo* the district court's legal conclusion that the settlement does not effect a *sub rosa* plan of reorganization. *See Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1307 (5th Cir.1985). Related factual findings are reviewed for clear error. *See id.* at 1308.

[8] A bankruptcy trustee is authorized by statute to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Under the Bankruptcy Rules, a trustee is permitted to settle lawsuits pursuant to section 363(b). FED. BANKR.R. 9019(a). However, section 363(b) does not authorize the trustee to enter a settlement if the result amounts to a *sub rosa* plan of reorganization. As we have stated:

> The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of a plan sub rosa in connection with a sale of assets.

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 87 of 374

Matter of Cajun Elec. Power Co-op., Inc., 119 F.3d 349 (1997)
31 Bankr.Ct.Dec. 333, Bankr. L. Rep. P 77,486, 11 Tex.Bankr.Ct.Rep. 327

*Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.),* 700 F.2d 935, 940 (5th Cir.1983). On the other hand, "compromises are a normal part of the process of reorganization, oftentimes desirable and wise methods of bringing to a close proceedings otherwise lengthy, complicated and costly." *Rivercity v. Herpel (In re Jackson Brewing Co.),* 624 F.2d 599, 602 (5th Cir.1980) (internal quotation marks and citations omitted).

The Committee asserts that the instant settlement effectively gutted the assets of the estate without affording the unsecured trade creditors the procedural protections of the reorganization process. Specifically, the Committee contends that the settlement, by removing more than $100 million from the estate and by eliminating the estate's equitable subordination claims against RUS and Gulf States, effectively dictates the terms of any future reorganization plan—an outcome proscribed by our cases. Appellees counter that far from being a *sub rosa* reorganization plan, the settlement removes a major obstacle to reorganization by ridding Cajun of its involvement in River Bend. They point out that the nuclear plant and related litigation had clouded title to Cajun's other assets, precluding any sale of those assets prior to a settlement.

Appellees make a strong argument that the Committee failed to preserve this issue for appeal by stating precisely the Chapter 11 protections that they would lose under the settlement. However, even assuming that the Committee preserved the issue, we reject its claim on the merits. [3]

The legal standard for deciding whether a transaction under section 363(b) amounts to a *sub rosa* reorganization emerges from our case law. In the *Braniff* case, this court **\*355** reversed the district court's approval of a transaction that would have transferred the bankrupt airline's cash, aircraft and equipment, and terminal leases to another airline (the purchaser) in exchange for scrip for travel on the purchaser.

We found the transaction deficient on three grounds. First, the agreement "had the practical effect of dictating some of the terms of any future reorganization plan." *Braniff,* 700 F.2d at 940. That is because, had a reorganization plan failed to restrict the use of the travel scrip as specified in the agreement, the scrip would have been forfeited. *Id.* Second, the agreement required Braniff's secured creditors to vote "in favor of any future reorganization plan approved by a majority of the unsecured creditors committee." *Id.* The secured creditors'

voting rights were thus infringed. Finally, the transaction "provided for the release of claims by *all parties* against Braniff, its secured creditors, and its officers and directors." *Id.* (emphasis added). Had the sale of Braniff's assets been approved, we concluded, "little would remain" in the estate and there would be "little prospect or occasion for further reorganization." *Id.*

The instant settlement is not a *sub rosa* reorganization of the type disapproved in *Braniff.* It does not dispose of all claims against Cajun, nor does it restrict creditors' right to vote as they deem fit on a proposed reorganization plan. Finally, the settlement does not dispose of virtually all of Cajun's assets, leaving "little prospect or occasion for further reorganization." *Cf. Braniff,* 700 F.2d at 940. Instead it disposes of one particular "asset," River Bend, which is not so much the crown jewel of Cajun's estate but its white elephant. *Cf. Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303 (5th Cir.1985) (recognizing that the disposal of a crown jewel asset might, in some circumstances, amount to a *sub rosa* plan). The removal of River Bend from the estate will facilitate Cajun's reorganization, and will do so without denigrating the rights of the unsecured trade creditors.

Undeniably, the settlement removes $107 million in cash and transmission lines worth $20 million from the debtor's estate; it also precludes Cajun from pursuing litigation—an uncertain prospect at best—against Gulf States and RUS. [4] However, Cajun retains as much as $1.1 billion in non-River Bend assets. In sum, the settlement does not "alter creditors' rights, dispose of assets, and release claims to the extent proposed in the wide-ranging transaction disapproved in" *Braniff. Richmond Leasing,* 762 F.2d at 1303. The cases are entirely distinguishable, and the settlement at issue does not effect a *sub rosa* plan.

### III. FAIR AND EQUITABLE SETTLEMENT

The Committee argues in the alternative that the settlement violates the "fair and equitable" standard and that the district court erred by approving it without conditioning the settlement on approval of a reorganization plan.

[9]    We review the district court's decision to approve the settlement for an abuse of discretion. *Connecticut Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.),* 68 F.3d 914, 917 (5th Cir.1995) (internal citations omitted). Subsidiary factual findings are reviewed for clear error. *Id.*

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 88 of 374

Matter of Cajun Elec. Power Co-op., Inc., 119 F.3d 349 (1997)

31 Bankr.Ct.Dec. 333, Bankr. L. Rep. P 77,486, 11 Tex.Bankr.Ct.Rep. 327

[10]    [11]    As noted above, the courts are empowered to approve a compromise settlement of a debtor's claim under Bankruptcy Rule 9019(a). *See id.* Approval should only be given if the settlement is "fair and equitable and in the best interest of the estate." *Id.* (citing *In re Jackson Brewing Co.,* 624 F.2d at 602 (additional citations omitted)). The "fair and equitable standard" is not as vague as it might appear to be. "The words 'fair and equitable' are terms of art—they mean that senior interests are entitled to full priority over junior ones." *United States v. AWECO, Inc. (In re AWECO, Inc.),* 725 F.2d 293, 298 (5th Cir.) (internal quotation marks **\*356** and citations omitted), *cert. denied,* 469 U.S. 880, 105 S.Ct. 244, 83 L.Ed.2d 182 (1984).

[12]    In deciding whether a settlement of litigation is fair and equitable, a judge in bankruptcy must make a well-informed decision, "compar [ing] the terms of the compromise with the likely rewards of litigation." *Jackson Brewing Co.,* 624 F.2d at 602 (internal quotation marks and citation omitted). In particular:

[The judge] must evaluate and set forth in a comprehensible fashion:

(1) The probability of success in the litigation, with due consideration for the uncertainty in fact and law,

(2) The complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and

(3) All other factors bearing on the wisdom of the compromise.

*Id.* (internal citation omitted).

[13]    With respect to the first factor, it is unnecessary to conduct a mini-trial to determine the probable outcome of any claims waived in the settlement. "The judge need only apprise himself of the relevant facts and law so that he can make an informed and intelligent decision...." *La Salle Nat'l Bank v. Holland (In re American Reserve Corp.),* 841 F.2d 159, 163 (7th Cir.1987).[5]

[14]    Under the rubric of the third, catch-all provision, we have specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider the best interests of the creditors, "with proper deference to their reasonable views." *Foster Mortgage Corp.,* 68 F.3d at 917. Second, the court should consider "the extent

to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Id.* at 918 (internal citations omitted).

[15]    Applying this standard to the facts of the instant case, we conclude that the district court did not abuse its discretion by approving the settlement. We consider each factor in turn.

*Probability of Success in Litigation.* The settlement requires Cajun to abandon several claims against Gulf States and RUS. None of these actions look particularly promising from our vantage point, and more important, none impressed the district court.

Under the agreement, Cajun would drop its suit against Gulf States for rescission of the River Bend joint ownership agreement. The probability of Cajun's succeeding in this action is close to nil, inasmuch as Cajun has already lost after a four-month trial in district court. Moreover, the district court, which is excruciatingly familiar with the details of this case, found that Cajun had little chance of succeeding in the companion action seeking damages for breach of contract and breach of fiduciary duty.

The settlement also would require Cajun to drop the Transmission Services suit. This action has boomeranged against Cajun, resulting in a judgment of $55 million against it on Gulf States' counter-claim.

Cajun would be forced to drop the Service Water suit as well. In that action, Gulf States has obtained an injunction effectively denying Cajun the right to withhold payment for various River Bend expenses. Cajun does not seem to be giving up anything of value by waiving its right to pursue these actions.

Perhaps most important to the Committee, Cajun would be required to surrender any claim of equitable subordination against Gulf States and RUS. These claims too are unlikely to succeed, for the reasons that follow.

[16]    The Bankruptcy Code provides that "after notice and a hearing, the court may—(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim...." 11 U.S.C. § 510(c). Equitable subordination is remedial in nature and is only rarely granted. *United States Abatement Corp. v. Mobil Exploration & Producing U.S., Inc.*

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 89 of 374

Matter of Cajun Elec. Power Co-op., Inc., 119 F.3d 349 (1997)

31 Bankr.Ct.Dec. 333, Bankr. L. Rep. P 77,486, 11 Tex.Bankr.Ct.Rep. 327

*(In re United States Abatement Corp.),* 39 F.3d 556, 561 (5th Cir.1994).

**\*357** **[17]** The Bankruptcy Code does not specify the circumstances in which equitable subordination is appropriate. Instead, drawing on common law principles, this circuit has crafted a widely followed standard authorizing equitable subordination if three preconditions are satisfied. Under this test, equitable subordination is permitted when (1) the claimant engaged in inequitable conduct; (2) the conduct resulted in harm to the creditors or conferred an unfair advantage upon the claimant; and (3) equitable subordination is not inconsistent with the Bankruptcy Code. *United States Abatement* Corp., 39 F.3d at 561 (citing *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.),* 926 F.2d 1458, 1464 (5th Cir.1991)); *see also Benjamin v. Diamond (In re Mobile Steel Co.),* 563 F.2d 692, 699–700 (5th Cir.1977) (additional citations omitted). As a practical matter, we generally have found equitable subordination in only three typical cases: "(1) when a fiduciary of the debtor misuses his position to the disadvantage of other creditors; (2) when a third party controls the debtor to the disadvantage of other creditors; and (3) when a third party actually defrauds other creditors." *United States Abatement* Corp., 39 F.3d at 561 (internal citations omitted).

The settlement would force Cajun to relinquish claims of equitable subordination against Gulf States and RUS. The only conceivable bases for these claims are (1) that Gulf States breached a fiduciary duty to Cajun, and (2) that RUS controlled Cajun to the trade creditors' disadvantage. However, Cajun has failed to present a persuasive argument as to why Gulf States owed it a fiduciary duty, let alone as to how Gulf States breached that duty. Moreover, the theory that Cajun was controlled by RUS is far-fetched.

The typical case of equitable subordination based on creditor control of the debtor involves a corporate insider. *See, e.g., Fabricators,* 926 F.2d at 1465–66. On occasion, bankruptcy courts have found that a creditor exerted such dominance over the debtor as to warrant subordination of the creditor's claims. However, the degree of control in such cases far exceeds the influence of RUS over Cajun, and is typically related to some egregious misconduct by the creditor. *See, e.g., In re American Lumber Co.,* 5 B.R. 470, 478–79 (D.Minn.1980) (creditor deprived borrower of its sole source of cash, forced it to adopt austerity measures, decided which creditors would be paid, and required debtor to provide secured interest in all remaining assets); *Slefco v. First Nat'l Bank of Stuttgart*

*(In re Slefco),* 107 B.R. 628 (Bankr.E.D.Ark.1989) (bank made false representations to debtor about amount of loan and ability to borrow in the future, leading debtor to pledge all its assets to the bank); *Bank of New Richmond v. Production Credit Ass'n of River Falls (In re Osborne),* 42 B.R. 988 (W.D.Wis.1984) (affirming subordination based on affirmative misrepresentation to another creditor). In this case, by contrast, Cajun does not even bother to allege that RUS engaged in inequitable conduct. Nor does Cajun explain how RUS, an arm of the government with no authority to actually take over and run the company, can rationally be viewed as its alter ego.

In sum, Cajun's prospects in the courtroom, on the equitable subordination claims as in its other lawsuits, are iffy at best. More likely, they are dismal. Our review of Cajun's likelihood of success in litigation does not support the Committee's assertion that the settlement should be modified.

*Complexity and Expense of Litigation.* We need not belabor this factor. According to the trustee, the litigation has cost Cajun $37 million to date, and continuing the litigation would cost "millions of dollars and years of delay." The district court has repeatedly commented upon the complexity of the legal issues raised. The fraud trial in district court took four months; the breach of contract trial would consume an estimated seven to fourteen months. Moreover, the district court found that continuing the litigation would waste the estate's resources and chill efforts to acquire Cajun's non-nuclear assets. These findings were not clearly erroneous.

Given the complexity and cost of the litigation, settlement is advisable.

*The Best Interests and Wishes of the Creditors.* The trustee testified, and the district court found, that Cajun's ownership interest **\*358** in River Bend was a major impediment to reorganization. The district court also determined that the settlement would remove this obstacle without altering the creditors' rights under the Code. The court thus concluded that the settlement was in the creditors' interests. None of these findings were clear error.

The issue is complicated somewhat by the requirement that the court, in considering whether a settlement is fair and equitable, consider the reasonable views of a majority of the creditors. *In re Foster Mortgage Corp.,* 68 F.3d at 917. In this case, the vast numerical majority of creditors is represented by the Committee, which opposes the settlement as approved

Matter of Cajun Elec. Power Co-op., Inc., 119 F.3d 349 (1997)
31 Bankr.Ct.Dec. 333, Bankr. L. Rep. P 77,486, 11 Tex.Bankr.Ct.Rep. 327

by the district court.[6] The appellees point out, however, that the trade creditors' aggregate claim against Cajun is only a drop in the bucket—by some estimates less than one percent of Cajun's total debt.

Even if we were to count heads and declare that a majority opposes the settlement, it is established that the "desires of the creditors are not binding." *In re Foster,* 68 F.3d at 917. The test is not the desires of the majority as such, but the best interests of the creditors, taking into account their reasonable views. In this case there is room to argue about who speaks for the "majority." But given the salutary effects of a settlement on the prospects for reorganization, and given also the relatively small amount of the trade creditors' claims, the district court did not clearly err by finding the settlement in the creditors' interests. In any event, given that all of the other factors in the equation overwhelmingly favor the settlement, the wishes of the trade creditors do not compel us to reject the settlement.

*Arms-Length Negotiations.* The Committee does not contest the district court's determination that the settlement was the result of arms-length bargaining, and not the result of fraud or collusion.

Based on the foregoing factors, we hold that the district court did not abuse its discretion by finding that the settlement was fair and equitable.[7] Cajun's prospects in the litigation are dubious; the cost and complexity of the litigation are staggering. The settlement was the result of arms-length bargaining. And although a numerical majority of creditors opposes the settlement, the overall interests of the creditors, giving due regard to the views of the two largest creditors as well the many smaller ones, will be well served by the settlement.

## CONCLUSION

The order of the district court approving the settlement is AFFIRMED.

### Parallel Citations

31 Bankr.Ct.Dec. 333, Bankr. L. Rep. P 77,486, 11 Tex.Bankr.Ct.Rep. 327

Footnotes

1    As discussed below, this court has the authority to set aside the order approving the settlement if we find that it was an abuse of the district court's discretion. That is not the relief sought by the Committee, however. The Committee asks this court to order that up to $7 million in unsecured trade creditors' claims be paid in full as part of any reorganization plan incorporating the settlement.
        Appellees contend that this relief is unauthorized by the Bankruptcy Code, and if granted, would amount to a *sub rosa* reorganization plan. They further contend that such a ruling would amount to an order equitably subordinating the claims of Gulf States and RUS, without the benefit of a trial in district court.

2    A trustee in bankruptcy has standing to bring an equitable subordination claim on behalf of the bankrupt estate's creditors. *See Fruehauf Corp. v. T.E. Mercer Trucking Co. (In re T.E. Mercer Trucking Co.),* 16 B.R. 176, 187 (Bankr.N.D.Tex.1981); *First Bank Billings v. Feterl Mfg. Co. (In re Parker Montana Co.)* 47 B.R. 419, 421 (D.Mont.1985).

3    In its reply brief, the Committee cites portions of the district court record in which it listed various procedural protections afforded by Chapter 11, such as the right to a disclosure statement providing adequate information about any proposed plan. Missing from this recitation is any indication of how the Committee might lose these protections if the settlement is approved.

4    As noted above, Cajun retains the right to pursue certain claims against RUS, including the claim that its security interest was not perfected.

5    In this case, the district court had already tried a four-month trial on the rescission claim and was more than familiar with the applicable facts and law.

6    The Committee contends that it would not oppose the settlement, if only it were conditioned on approval of a plan that protected their interests.

7    The district court cited public safety as one more factor favoring the settlement. We do not doubt that the public interest will be served by a settlement that resolves a dispute over River Bend's decommissioning trust fund, thus assuring the availability of funds for the safe decommissioning of the nuclear plant. However, we do not rely on this factor and need not decide whether public safety is an appropriate consideration in determining whether a settlement is fair and equitable.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**Matter of Cajun Elec. Power Co-op., Inc., 119 F.3d 349 (1997)**
31 Bankr.Ct.Dec. 333, Bankr. L. Rep. P 77,486, 11 Tex.Bankr.Ct.Rep. 327

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 111

408 F.2d 937
United States Court of Appeals Third Circuit.

PAN AMERICAN REALTY TRUST
v.
TWENTY ONE KINGS, INC., Appellant.
DE LEO ASSOCIATES COMPANY
v.
TWENTY ONE KINGS, INC., Appellant.

Nos. 17386, 17387.    |    Argued Jan.
30, 1969.    |    Decided March 24, 1969.

Consolidated actions to recover for services rendered under separate building and architectural contracts. The United States District Court for the Virgin Islands, District of St. Croix, Christiansted Jurisdiction, Albert Branson Maris, J., 297 F.Supp. 143, rendered judgments for plaintiffs, and defendant appealed. The Court of Appeals held that owner, having been unable to secure a first mortgage contemplated by rider to building contract whereby contractor was to supply all additional funds which were not raised by first mortgage, did not perform its part of contract and, thereby, discharged contractor from duty of further performance, so that contractor, on notification of owner to do nothing further, was entitled to treat contract as absolutely and finally broken and was entitled to recover money it had expended and for services it had performed.

Affirmed.

West Headnotes (4)

[1]    **Contracts**
       👉 Construction as a whole

       In construing contracts, entire contract must be considered and, as between possible interpretations of ambiguous provisions, that which best accords with sense of remainder of contract must be chosen.

       1 Cases that cite this headnote

[2]    **Contracts**
       👉 Application to Contracts in General

A written contract is to be construed so as to give effect to all of its parts, and any construction which would render the agreement meaningless should be avoided.

3 Cases that cite this headnote

[3]    **Contracts**
       👉 Breach by failure of performance
       **Contracts**
       👉 Discharge of contract by breach
       **Implied and Constructive Contracts**
       👉 Part performance where contract is rescinded or abandoned and full performance is prevented

       Owner, having been unable to secure a first mortgage contemplated by rider to building contract whereby contractor was to supply all additional funds which were not raised by first mortgage, did not perform its part of contract and, thereby, discharged contractor from duty of further performance, so that contractor, on notification of owner to do nothing further, was entitled to treat contract as absolutely and finally broken and was entitled to recover money it had expended and for services it had performed.

       2 Cases that cite this headnote

[4]    **Implied and Constructive Contracts**
       👉 Defenses

       Failure of owner to raise first mortgage money, which it had agreed to use to pay architect, did not relieve it from liability for expenses incurred and fees earned by architect before unilateral cancellation of building contract by owner.

       Cases that cite this headnote

**Attorneys and Law Firms**

**\*937** John D. Marsh, Christiansted, V.I., for appellant.

Ronald H. Tonkin, James, Hodge & Tonkin, Christiansted, V.I., for appellees.

Before FREEDMAN, VAN DUSEN and ALDISERT, Circuit Judges.

**Opinion**

**\*938**  OPINION OF THE COURT

PER CURIAM:

Defendant (appellant) challenges judgments entered February 5, 1968, in two civil actions, which were consolidated for trial to the court, contending that the trial judge incorrectly interpreted separate building and architectural contracts under which plaintiffs had rendered the services for which they recovered on a quantum meruit basis. Pan American Realty Trust recovered a judgment of $27,823.14 for engineering services and expenses, with interest from April 12, 1966, an attorney's fee of $2,500., and costs. The judgment for De Leo Associates Company was for architectural services and expenses in the amount of $30,196.75, with interest from April 12, 1966, an attorney's fee of $2,500., and costs.

I. No. 17,386

[1]  [2]  [3]  The building contract was dated December 3, 1965, and provided for payment 'in current funds' of costs of construction of an Apartment-Office and Underground Parking Building, plus a fee of $35,000., by the defendant-owner. Articles 13 and 14 provided:

'The Contractor shall, between the first and seventh of each month, deliver to the Architect a statement, sworn to if required, showing in detail and as completely as possible all moneys paid out by him on account of the cost of the work during the previous month for which he is to be reimbursed \* \* \*. 'The Architect shall check the Contractor's statements of moneys due, \* \* \* and shall promptly issue certificates to the Owner for all such as he approves, which certificates shall be payable on issuance.'

A rider to this contract, executed the same day, specified that 'The contractor agrees to supply all additional funds needed to complete the job that is not raised by a first mortgage, \* \* \* (which funds were to) be advanced at the beginning of the job.' [1]  A second rider dated December 8, 1965 specified that 'The contractor shall commence with the work under the main contract without undue delay.' [2]  The defendant-owner never secured the first mortgage contemplated by the contract and unilaterally cancelled the contract on April 12, 1966. [3] Meanwhile, the contractor had rendered the services and

incurred the expenses comprising the $27,823.14 described above. Construing the above  **\*939**  documents together in Pan American Realty Trust v. Twenty One Kings, Inc., V.I., F.Supp. (1968), the trial judge:

'\* \* \* concluded that until the owner had secured a commitment for a first mortgage loan the contractor was not obligated to advance the additional funds beyond that loan which would be needed to complete the building contract. For, until that event occurred, it would not be possible to know what amount of additional funds would be needed. But if, and when, a first mortgage commitment was secured the plaintiff contractor could know exactly how much additional money had to be put up and then could proceed to do so. '\* \* \* A cardinal principle governing the construction of contracts is that the entire contract must be considered and, as between possible interpretations of ambiguous provisions, that will be chosen which best accords with the sense of the remainder of the contract. A written contract is to be construed so as to give effect to all of its parts, and any construction which would render the agreement meaningless should be avoided. [4] \* \* \* These obligations of the contractor were conditioned upon the prior procurement by the defendant of a commitment for a first mortgage loan. To accept the defendant's view would be to render the contract unworkable and meaningless. The defendant, having been unable to secure the contemplated first mortgage commitment, did not perform its part of the contract, and thereby discharged the plaintiff from the duty of further performance by the impossibility of rendering it. \* \* \* The plaintiff contractor, upon notification from the defendant under date of April 12, 1966 to 'do nothing further under the provisions of this contract' was entitled to treat the contract as absolutely and finally broken by the defendant. \* \* \* Accordingly upon the defendant's recission of the construction contract the plaintiff was entitled to recover the money it had actually expended and for the services it had actually performed.' [5]

After careful consideration of the record and the contentions of defendant, we have decided that the judgment should be affirmed for all the reasons stated by the trial judge. [6]

**\*940**  II. No. 17,387

The architectural contract, dated February 26, 1965, provided for a fee not to exceed $15,000. plus expenses of personnel, including consultants for surveys, soil tests, auditing, etc., as well as reimbursable transportation and living expenses. [7] Most of the work done under this contract, as amended, was

completed prior to the execution of the building contract in December 1965. In the above-mentioned rider dated December 8, 1965, defendant agreed that '$14,500 more or less' of the architect's fee was unpaid and that expenses were due the architect, which sums then due were to be paid by defendant 'during construction.' This rider also provided 'First monies paid by financial institution financing construction shall be allocated to architects fees.'

 [4]    For the reasons stated under I above and those in the findings, conclusions and April 29, 1968, opinion of the trial judge, the record justifies the trial judge's conclusion that the

failure of the defendant to raise the first mortgage money, which it had agreed to use to pay the architect, did not relieve it from liability for the expenses incurred, and fees earned, by the architect before the unilateral cancellation of the contract by defendant on April 12, 1966.

The judgments entered February 5, 1968, will be affirmed.

**Parallel Citations**

7 V.I. 39

## Footnotes

1    This rider read as follows:

'In consideration of the mutual promises flowing between the parties hereto and the consideration in the main contract it is mutually agreed as follows:

'1. The contractor agrees to supply all additional funds needed to complete the job that is not raised by a first mortgage.

'2. As security for said funds so advanced the contractor agrees to accept and the owner agrees to execute a second mortgage for the amount so advanced. Said second mortgage shall bear interest at same percent charged by bank and be payable at $300.00 per month, inclusive of interest, for a period of five (5) years. Said mortgage may be prepaid at any pay period in multiples of $300.00, without penalty.

'3. Said mortgage shall be executed and delivered at the completion of the job when it has been determined what the amount of the mortgage is to be. Also, said mortgage will be executed and delivered after the bank has executed and filed its mortgage.

'4. The contractor agrees to retain William C. Raines during the duration of this job for coordinating and doing legal work. The salary for said William C. Raines shall be $200.00 per month, and is to commence upon notice by William C. Raines to the Contractor.

'5. Since bank funds will not be released until the job has progressed to a certain stage, it is agreed by the contractor that the funds to be advanced as herein outlined shall be advanced at the beginning of the job.

'6. The contractor agrees to proceed with this job immediately.'

2    Other terms of this rider contemplating payment by the first mortgagee of amounts due the architect on December 8, 1965, are referred to under II, below.

3    The trial judge found that the defendant made false representations to a financial institution in order to persuade it to commit itself to a first mortgage. The testimony discloses that these representations included a false statement that $200,000. had been released to Pan American for materials to be stockpiled and that an officer of the plaintiff advised this institution that the above representations were false (Exhibits P-10— P-14). Shortly thereafter (within a month), the contract was cancelled by defendant. Since the President and sole stockholder of defendant, who testified that 'I am Twenty One Kings', admitted at least once during the trial that he had testified inaccurately, the trial judge would have been justified in rejecting his testimony.

4    This reasoning is in accord with the following language of § 235(c) of the Restatement of Contracts, relied on inter alia by defendant:

'A writing is interpreted as a whole and all writings forming part of the same transaction are interpreted together.'

See New Wrinkle, Inc. v. John L. Armitage & Co., 238 F.2d 753, 757 (3rd Cir. 1956); cf. The Kronprinzessin Cecilie, 244 U.S. 12, 24, 37 S.Ct. 490, 492, 61 L.Ed. 960 (1917), where the court said:

'Business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs.'

5    See, also, findings and conclusions of January 25, 1968.

6    Since defendant's action in failing to get the first mortgage (particularly in its misrepresentations making it difficult to obtain such mortgage— see footnote 3) and its unilateral cancellation of the building contract were a total breach of both contracts, § 347 of the Restatement of Contracts specifies the applicable measure of damages as follows:

'(1) * * * the injured party can get judgment for the reasonable value of a performance rendered by him, measured as of the time it was rendered, * * * if the performance so rendered was

(a) a part or all of a performance for which the defendant bargained; * * *

'(2) Interest at the legal rate, on the value of the performance as to which restitution in money is adjudged, may be given from the date of receipt of the performance.'

Comments b and c of § 347 include this language:

'b. * * * In granting restitution as a remedy for breach, however, the purpose to be attained is the restoration of the injured party to as good a position as that occupied by him before the contract was made. * * * In the great majority of cases this remedy merely requires a payment in money by the defendant of the value of the consideration received by him from the plaintiff as a part or full performance of the contract. The consideration so received may be of any kind, commonly consisting of services rendered, * * *.

'c. If the plaintiff's performance is part of the very performance for which the defendant bargained as part of an agreed exchange, it is to be valued, not by the extent to which the defendant's total wealth has been increased thereby, but by the amount for which such services and materials as constituted the part performance could have been purchased from one in the plaintiff's position at the time they were rendered.'

Section 468(1) of the Restatement of Contracts, cited by the learned trial judge, is an application of the basic principle stated in the above-quoted § 347(1). Section 468(3) and the comment thereon (d), relied on by defendant, applies where there has been 'no fault on either side,' which is not the situation presented in this record. The language in most of the sections of Chapter 14 of the Restatement of Contracts governing IMPOSSIBILITY makes clear that the rules there stated apply 'in the absence of * * * contributing fault on the part of the person subject to the duty' (or 'of the promissor'). See §§ 458-461.

7    Additional work was required of the architect by changes in the owner's plans made in August 1965.

---

**End of Document**                                      © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 112

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 98 of 374

Pass Creek Enterprises Ltd. v. Kootenay Custom Log Sort Ltd., 2003 BCCA 580, 2003...

2003 BCCA 580, 2003 CarswellBC 2696, [2003] B.C.J. No. 2508, [2004] B.C.W.L.D. 34...

2003 BCCA 580
British Columbia Court of Appeal

Pass Creek Enterprises Ltd. v. Kootenay Custom Log Sort Ltd.

2003 CarswellBC 2696, 2003 BCCA 580, [2003] B.C.J. No.
2508, [2004] B.C.W.L.D. 34, 188 B.C.A.C. 110, 308 W.A.C. 110

# Pass Creek Enterprises Ltd. (Respondent / Plaintiff) and Kootenay Custom Log Sort Ltd. (Appellant / Defendant)

Hollinrake J.A., Saunders J.A., and Thackray J.A.

Heard: September 24, 2003
Judgment: November 3, 2003
Docket: Vancouver CA030165

Proceedings: reversing in part *Pass Creek Enterprises Ltd. v. Kootenay Custom Log Sort Ltd.* (2002), 2002 BCSC 1301, 2002 CarswellBC 2082 (B.C. S.C.)

Counsel: M.A. Koochin for Appellant
J.M. Hogg, Q.C. for Respondent

Subject: Natural Resources; Contracts; Property; Civil Practice and Procedure

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

### Timber --- Sale of timber — Interpretation of contract — Measurement

Parties entered into contract to purchase quantity of logs — Contract stated that estimated volume of logs was 4,000 cubic metres, although vendor delivered 4,700 cubic metres of logs — Purchaser did not accept delivery of certain logs on grounds that it was not required to accept log shipment of more than 4,000 cubic metres, and that certain logs did not meet measurement specifications — Vendor's action for damages for breach of contract was allowed — Trial judge found that agreement stating that contract involved 4,000 cubic metres of logs was merely estimate, and that agreement contemplated purchase of greater amount — Trial judge found that 4,700 cubic metres was reasonably within commitment entered into by purchaser — Trial judge found that measurement specification documents were inconsistent with agreement and were invalid — Purchaser appealed — Appeal allowed in part — Trial judge's findings regarding volume of logs ordered were reasonable and should not be interfered with — Trial judge erred by not incorporating into main agreement provisions of specification documents which were not inconsistent with main agreement — Re-hearing regarding damages ordered regarding validity of rejections of logs for not meeting specifications.

### Contracts --- Construction and interpretation — Resolving ambiguities — Contra proferentem

Parties entered into contract to purchase quantity of logs — Contract stated that estimated volume of logs was 4,000 cubic metres, although vendor delivered 4,700 cubic metres of logs — Purchaser did not accept delivery of certain logs on grounds that it was not required to accept log shipment of more than 4,000 cubic metres, and that certain logs did not meet specifications — Vendor's action for damages for breach of contract was allowed — Trial judge found that agreement stating that contract involved 4,000 cubic metres of logs was merely estimate, and that agreement contemplated purchase of greater amount — Trial judge found that provisions regarding amount of lumber were ambiguous and should be interpreted against purchaser — Trial judge found that 4,700 cubic metres was reasonably within commitment entered

Pass Creek Enterprises Ltd. v. Kootenay Custom Log Sort Ltd., 2003 BCCA 580, 2003...

2003 BCCA 580, 2003 CarswellBC 2696, [2003] B.C.J. No. 2508, [2004] B.C.W.L.D. 34...

into by purchaser — Trial judge found that specification documents were inconsistent with agreement and were invalid — Purchaser appealed — Appeal allowed in part — Trial judge's findings regarding volume of logs ordered were reasonable and should not be interfered with — Trial judge erred by not incorporating into main agreement provisions of specification documents which were not inconsistent with main agreement — Re-hearing regarding damages ordered regarding validity of logs rejected for not meeting specifications.

**Table of Authorities**

**Cases considered by _Saunders J.A._:**

_Adamastos Shipping Co. v. Anglo-Saxon Petroleum Co._ (1958), [1959] A.C. 133, [1958] 1 All E.R. 725, [1958] 1 Lloyd's Rep. 73 (U.K. H.L.) — followed

APPEAL by purchaser from judgment reported at _Pass Creek Enterprises Ltd. v. Kootenay Custom Log Sort Ltd._ (2002), 2002 BCSC 1301, 2002 CarswellBC 2082 (B.C. S.C.), allowing vendor's action for damages for breach of contract regarding sale of logs.

_Saunders J.A._:

1    Kootenay Custom Log Sort Ltd., the appellant, has been ordered to pay damages totalling $41,244, court ordered interest and costs to Pass Creek Enterprises Ltd. for breach of a log purchase agreement. Pass Creek was the vendor of logs and Kootenay was the purchaser. The damages were assessed for two wrongs found by the learned trial judge, that Kootenay wrongly declined to accept delivery of certain logs on the basis that the contract did not require it to accept logs beyond the volume of 4,000 cubic metres, and that Kootenay wrongly denied payment for logs that it said did not meet its specifications.

2    Kootenay contends on appeal that the trial judge erred in concluding that the agreement obliged it to accept logs beyond the volume of 4,000 cubic metres, in concluding that its specifications were not incorporated into the agreement and in affording the weight given by the trial judge to the report of an expert witness, Mr. Marshall. As to the latter issue, it was argued at trial that the trial judge should conclude that Mr. Marshall lacked credibility. The trial judge, having heard the evidence and submissions, rejected that submission and gave weight to that report. In doing so he was well within the role of a trial judge; his assessment of that evidence is not a matter with which we can or should interfere in my view. I would not accede to that ground of appeal.

3    I turn then to the issues of interpretation of the contract. There are two issues, the first dealing with the volume which was contracted to be sold, and the second dealing with the quality of the logs which were required to be accepted by Kootenay.

**The Volume Issue**

4    The Log Purchase Agreement is a single page dated August 6, 2000. It identifies Pass Creek as the vendor and Kootenay as the purchaser, and provides:

The Vendor warrants and represents to the purchaser that it has good right and title to the logs and agrees to sell to the purchaser, the logs described as follows:

PROPERTY DESCRIPTION: TIMBER SALE A45672

TIMBER MARK: 45672 ESTIMATED VOLUME: 4000m

5    The question is whether this provision required Kootenay to purchase more than 4,000 cubic metres. Kootenay says it did not, that the contract was to purchase only 4,000 cubic metres, and that it was entitled to reject, as it did, a volume over that amount. On this issue the trial judge said:

**WestlawNext** CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 100 of 374

Pass Creek Enterprises Ltd. v. Kootenay Custom Log Sort Ltd., 2003 BCCA 580, 2003...

2003 BCCA 580, 2003 CarswellBC 2696, [2003] B.C.J. No. 2508, [2004] B.C.W.L.D. 34...

[6] Kootenay submits the Agreement required it to accept just 4,000 cubic metres of logs, although it actually accepted approximately 4,100 cubic metres before log deliveries ended. Pass contends the Agreement required Kootenay to accept all the logs meeting specifications delivered from timber sale A45672, relying on the wording of the Agreement and the practice in the industry which was reflected in an earlier log purchase contract between the parties.

[7] The Agreement refers to an estimated volume of 4,000 cubic metres of logs, indicating that Kootenay was aware that the volume of logs coming from timber sale A45672 could only be estimated. Before agreeing to purchase the estimated volume Kootenay's employees inspected the site of the timber sale and Kootenay's manager, Rick Biller, obtained from Pass a copy of the 1998 timber cruise prepared by the B.C. Forest Service which calculated the gross merchantable volume of logs in timber sale A45672 to be 4,066 cubic metres. Mr. Biller reviewed the cruise in order to evaluate his volume numbers.

[8] I accept the evidence that a B.C. Forest Service cruise is merely an estimate of the volume of wood and that such a cruise can be as much as 20 percent lower than the actual merchantable volume of logs recovered during logging operations. The parties were aware of such variation prior to entering the Agreement as they encountered such in their first contract signed July 18 and 20, 2000, in which Kootenay contracted to purchase from Pass an estimated volume of 300 cubic metres of logs from timber sale A62231. Pursuant to that contract, also prepared on Kootenay's standard form, Pass delivered and Kootenay accepted without dispute some 400 cubic metres of logs, reflecting a 33 percent increase above the estimated 300 cubic metres referred to in the contract.

[9] Kootenay submits that Pass agreed to limit the volume of logs to 4,000 cubic metres during a meeting between the parties on August 26, 2000. The meeting was difficult as Mr. Biller expressed concern about the quality of the wood delivered by Pass and Darryl Hunt, the manager of Pass, disagreed with the manner in which Kootenay was valuing the logs delivered. At one point Mr. Biller suggested that the Agreement end when 4,000 cubic metres were delivered and he testified that Mr. Hunt was upset, but seemed to accept the proposal, an interpretation with which Mr. Hunt disagrees. Given the hostility of the meeting, the vagueness of what was actually said and the absence of any written confirmation of a change to the Agreement, I am not prepared to find that Pass agreed to limit the volume of logs to 4,000 cubic metres.

. . . . .

[12] As a result of Kootenay's actions, Pass, after October 13, 2000 found other purchasers for the remaining logs from timber sale A45672 and claims from Kootenay the difference between the Agreement prices and the amount Pass eventually received for the logs.

[13] The words "estimated volume" are found in Kootenay's standard form contract which forms the basis of the Agreement. The expression introduced ambiguity into the parties' arrangement thereby attracting the *contra proferentem* rule which provides that the words of the document should be construed against the party which drew them or, put another way, that the meaning least favourable to the author of the document prevails: *Manulife Bank of Canada v. Conlin* (1996), 139 D.L.R. (4th) 426 at paras 8 and 9 (S.C.C.). In this case, through its employment of the words "estimated volume" I find Kootenay is liable to purchase more than the 4,000 cubic metres of logs.

[14] Both Kootenay and Pass in entering the Agreement were aware the volume could only be estimated and that the actual volume delivered by Pass to Kootenay might well be in excess of 4,000 cubic metres. I find from the wording of the Agreement that Kootenay agreed to purchase from Pass between August 3 and October 31, 2000, all the logs delivered from timber sale A45672 which met the specifications found in the Agreement and that such a conclusion is consistent with the parties' dealings in connection with the Agreement and the earlier contract relating to timber sale A62231.

. . . . .

[18] Prior to signing the Agreement the parties negotiated log prices and specifications, those being basic to the Agreement with Kootenay preparing several draft contracts for Mr. Hunt's consideration before the parties reached a consensus on

Pass Creek Enterprises Ltd. v. Kootenay Custom Log Sort Ltd., 2003 BCCA 580, 2003...

2003 BCCA 580, 2003 CarswellBC 2696, [2003] B.C.J. No. 2508, [2004] B.C.W.L.D. 34...

the terms found in the Agreement. Mr. Hunt acknowledges receiving Kootenay's specification cards, but paid them little attention as he considered the specifications were fully set out in the Agreement.

[19] At no point in the negotiations does it appear that the parties discussed Kootenay's specification cards and when Kootenay forwarded the Agreement acceptable to Pass with reference to log prices and specifications, Kootenay did not include the specification cards, incorporating them only by reference in the Agreement.

6    In my view the learned trial judge was correct in concluding that the term "estimated amount" contemplated a requirement to purchase more than 4,000 cubic metres. The question then is whether the amount not received, which would have taken the delivered volume to about 4,700 cubic metres, was within that commitment. The learned trial judge concluded it was, considering a previous contract between the parties in which the delivered volume was about 33 percent more than the stated amount. That conclusion was supported by the evidence, and is not one with which this Court should interfere, in my view. It follows that I would not accede to this ground of appeal.

**The Specifications Issue**

7    I turn now to the issue of the rejection of logs as failing the specifications of Kootenay. The log purchase agreement provided:

The Purchaser agrees to pay the Vendor the amount of:

| $100 **/m** | **for** BUSH RUN | **Specs:** SAWLOG SPECS 4" TOP |
| $100 **/m** | **for** GREEN WHITE PINE | **Specs:** PEELER SPECS INCLUDES SOME GRADE 3 |
| $ 50 **/m** | **for** DRY WHITE PINE | **Specs:** GRADES 4, 5 AND SOME GRADE 3 |
| $ 50 **/m** | **for** DRY LODGEPOLE PINE | **Specs:** 4, 5 GRADES 4" TOP |

All logs delivered must be sorted according to the vendors current specification and quality standards as set out in the Purchaser's current "Log Specifications" card. Penalties will be applied and deducted for any log not meeting contract specifications and quality standards.

8    Kootenay had sent Pass Creek specification pages for sawlogs, peelers and lodgepole pine, accompanied by a fax cover sheet. The specification pages for sawlogs and peelers were headed "KCLS BUCKING SPECIFICATIONS" and were dated August 3, 2000. The sawlogs sheet provided sawlog log lengths, the minimum diameters of the tops of the logs and these terms:

1) Measure all logs from the shortest point on the butt. Top sizes are measured inside bark

2) Hemlock must be "white/bright"

3) No broken ends, crook or schoolmarms

4) Limbs must be cut flush with the stem

8) Cut all snipes, shortest log is 12'6"

9) No processor marks on logs over 10" top size, house logs are 10 - 18" tops

10) Logs not meeting specs are subject to penalty. Logs with excessive defect are scaled as "X" with no payment.

9    The peeler specification sheet provided peeler log lengths, the top size, and these terms:

1) Measure all logs from the shortest point on the butt

2) Top sizes are measured inside bark

3) No broken ends, crooks or schoolmarms

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 102 of 374

Pass Creek Enterprises Ltd. v. Kootenay Custom Log Sort Ltd., 2003 BCCA 580, 2003...

2003 BCCA 580, 2003 CarswellBC 2696, [2003] B.C.J. No. 2508, [2004] B.C.W.L.D. 34...

4) No center butt rot allowed, no dead white pine allowed

5) Cluster knots and knots over 2.5% not allowed

6) No shake or pitch in peelers

7) Limbs must be cut flush with the stem

8) Cut all snipes

9) Logs not meeting specs are subject to penalty. Logs with excessive defect are scaled as "X" with no payment.

10    The lodgepole pine specification sheet provided:

1. Dead, dry sound lodgepole (20% or less moisture content).

2. Minimum diameter of 9" tip and 12" butt (after butt swell is removed).

3. Maximum taper of 5" in a 40 foot log.

4. Minimum log length of 40 feet. For shorter logs, the minimum tip size needs to be 10".

5. No red rot or unremovable surface rot.

6. Straight - crown not to exceed 3" on a 40 foot log.

7. Check width not to exceed 3/8" wide.

8 Spiral checking not to exceed 1/4 turn in 16 feet or 1" in 10".

9. Catface acceptable as long as it is no more than 1/3 of the log diameter, and does not deform the log.

11    Pass Creek contended at trial that these specification sheets were inconsistent with the specifications particularized in the written contract, in particular the diameters.

12    On this issue the learned trial judge referred to the language of the agreement set out above and said:

[17] The language is somewhat vague in referring to the "vendors current specifications and quality standards", however, I understand the standards referred to are those which Kootenay prepared; they are not standards prepared by Pass.

[18] Prior to signing the Agreement the parties negotiated log prices and specifications, those being basic to the Agreement with Kootenay preparing several draft contracts for Mr. Hunt's consideration before the parties reached a consensus on the terms found in the Agreement. Mr. Hunt acknowledges receiving Kootenay's specification cards, but paid them little attention as he considered the specifications were fully set out in the Agreement.

[19] At no point in the negotiations does it appear that the parties discussed Kootenay's specification cards and when Kootenay forwarded the Agreement acceptable to Pass with reference to log prices and specifications, Kootenay did not include the specification cards, incorporating them only by reference in the Agreement.

[20] An issue arises because the specifications in the Agreement conflict in part with those found in the specification cards. For example, the Agreement allows for sawlogs with four-inch top, but the specification card calls for a minimum of an eight-inch top. There is a similar conflict between the specification cards and the Agreement regarding lodgepole pine, with the former calling for a nine-inch tip and the latter requiring a four-inch top.

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 103 of 374

Pass Creek Enterprises Ltd. v. Kootenay Custom Log Sort Ltd., 2003 BCCA 580, 2003...

2003 BCCA 580, 2003 CarswellBC 2696, [2003] B.C.J. No. 2508, [2004] B.C.W.L.D. 34...

13    After reviewing the evidence tendered on behalf of Pass Creek as to its understanding of the term specifications and explaining the grading references, he held:

> [23] Kootenay submits that the Agreement incorporates the terms found in the specifications cards and both the Agreement and specifications cards constitute the whole contract between the parties. Although I concur with counsel for Kootenay that parties to an agreement can incorporate the provisions in whole or in part of another document, there is a limitation to that incorporation as noted by Mr. Justice Gow in *French v. Victoria Aerie No. 12 Fraternal Order of Eagles*, [1987] B.C.J. No. 510 (B.C.S.C.). He held at p. 4 that the provisions of another agreement could be incorporated with a primary document, insofar as the incorporated provisions were not inconsistent with the primary document. In this case, the provisions Kootenay attempts to incorporate into the Agreement are inconsistent with the negotiated specifications found in the Agreement.

> [24] Further, even if Kootenay were correct in its submission that the specification cards form part of the Agreement, Kootenay would I conclude again run afoul of the *contra proferentem* rule. Kootenay filled in the specifications on what became the Agreement before forwarding it to Pass and I have concluded that the specifications found on the face of the Agreement brought the industry's scaling language into the Agreement. These specifications conflict with the contents of Kootenay's specification cards which are merely alluded to in the Agreement. If the cards were to form part of the Agreement they would introduce an ambiguity into the parties' Agreement.

> [25] I would resolve that ambiguity by applying the *contra proferentem* rule and conclude that the specifications found on the Agreement are applicable, not those on the specification cards, that being the interpretation least favourable to Kootenay.

14    On appeal Kootenay contends that the trial judge erred in failing to incorporate any portion of the specifications in the contract. Pass Creek supports the order, saying that the Kootenay specifications are so inconsistent with the specifications particularized in the contract that they must be considered as not forming a part of the contract. In addition to the diameter issue described by the trial judge, they refer to the reference in the contract to grades established by the Ministry of Forests (grades 3, 4 and 5) which they say covers the issue of log quality and is inconsistent with the particulars on the cards.

15    It is basic that clauses of a written agreement prevail in a contest between terms of a written agreement and an incorporated document: *Adamastos Shipping Co. v. Anglo-Saxon Petroleum Co.*, [1959] A.C. 133, [1958] 1 Lloyd's Rep. 73 (U.K. H.L.). As Lord Keith observed, it is very much the same thing whether one reads in only as much of the incorporated document as is not inconsistent with the subject matter of the incorporated document, or one reads in the entire incorporated document and then treats an inconsistent term as insensible and to be disregarded. At p. 178, in a passage equally apt to this case, he said:

> The parties have incorporated the Act contractually into their contract of charterparty, and to say that the provisions of the Act shall not apply to their charterparty would render the incorporation nugatory and make no sense of what was intended to be a "paramount clause" in their contract. It is, of course, possible to read a clause in a contract as senseless and read it out of the contract altogether, but in commercial contracts that is a course that the court should be slow to adopt. As stated by Lord Wright in *Hillas & Co. Ltd. v. Arcos Ltd.*, [147 L.T. 503 at 514], it is "the duty of the court to construe such documents fairly and broadly, without being too astute or subtle in finding defects; but on the contrary, the court should seek to apply the old maxim of English law, Verba ita sunt intelligenda ut res magis valeat quam pereat.

16    I consider that the issue in this case is simply whether the specifications are included by reference, to any degree, into the contract, and not a case in which *contra proferentem* provides assistance. In the event the specifications are included by reference, then, to the extent that they are not inconsistent with provisions in the Log Purchase Agreement, they could be relied upon by Kootenay in refusing to pay for delivered logs.

17    Words in a contract are presumed to have meaning. The specification cards were sent to Pass Creek prior to execution of the agreement and were referred to in the agreement. In my view the interpretation of the trial judge effectively gives no meaning to the words "as set out in the Purchaser's current "Log Specifications" card". This is not a case in which the specification cards

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 104 of 374

Pass Creek Enterprises Ltd. v. Kootenay Custom Log Sort Ltd., 2003 BCCA 580, 2003...
2003 BCCA 580, 2003 CarswellBC 2696, [2003] B.C.J. No. 2508, [2004] B.C.W.L.D. 34...

were so inconsistent with the words in the contract that the only reasonable interpretation is that they are not applicable. The log quality provisions of the specifications provided by Kootenay cannot be said to be entirely inconsistent with the lumber grading references. In my view they filled the role of particularizing the quality requirements beyond simple grading. For example, as to sawlogs the specifications provided they must not have broken ends, crooks or schoolmarms; for peelers, limbs must be cut flush with the stem, and for lodgepole pine, there could not be red rot or unremovable surface rot. These provisions are not, on the evidence, inconsistent with the references to its log grades. To the extent the diameter provisions are inconsistent with the cards, the tailor-made provision of the log purchase agreement of course prevailed and the specification card is to be disregarded in that respect.

18    It follows that I consider that the order for damages arising from rejection of logs for failing to meet specifications must be set aside. The issue of whether all the logs were properly rejected as failing to meet the specifications was addressed at trial by Pass Creek but not decided by the trial judge. It may be argued that the phrase "[P]enalties will be applied and deducted for any log not meeting contract specifications and quality standards" precludes complete rejection by Kootenay of logs failing the specifications incorporated by reference. It is therefore appropriate, in my view, to remit the issue of damages, as it relates to the specifications issue, to the trial court for determination.

19    The damage award also included a small sum for general damages. No serious issue was taken on this head of damage, apart from the argument that there was no breach of contract at all. As I have concluded that Kootenay did breach the contract by failing to accept all of the logs required to be accepted under the contract, I would not interfere with that award.

**Conclusion**

20    The order appealed set out the orders for payment individually. I therefore would allow the appeal only to the extent of setting aside paragraph 1 of the order appealed relating to failure to meet specifications, paragraph 4 of the order to the extent it includes goods and services tax on the amount referred to in paragraph 1, paragraph 7 of the order as it relates to interest on the amounts of paragraph 1, and paragraph 9 to the extent required to correspond with these reasons, the matter of damages for failure to meet specifications and ancillary orders being remitted to the

21    trial court for determination. The parties may make submissions in writing on the issue of costs.

***Thackray J.A.:***

22    I agree.

***Hollinrake J.A.:***

23    I agree.

*Appeal allowed in part.*

End of Document                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 113

8 Collier Bankr.Cas.2d 522, 10 Bankr.Ct.Dec. 933

700 F.2d 935
United States Court of Appeals,
Fifth Circuit.

In re BRANIFF AIRWAYS, INC., Debtor.
PENSION BENEFIT GUARANTY CORPORATION,
CONTINENTAL AIR LINES, INC., et al.,
Plaintiffs-Appellants Cross-Appellees,
v.
BRANIFF AIRWAYS, INC.,
et al., Defendants-Appellees,
and
Braniff Ticketholders Committee,
Defendant-Appellee Cross-Appellant.

No. 83-1101.    |    March 2, 1983.    |    Rehearing
and Rehearing En Banc Denied April 20, 1983.

Bankruptcy court approved an agreement and memorandum
of understanding between debtor airline and its creditors, both
agreements being jointly referred to as "PSA transaction."
The United States District Court for the Northern District of
Texas at Fort Worth, Eldon B. Mahon, J., after de novo review
of the bankruptcy court's findings, approved the transaction.
Expedited appeal was granted. The Court of Appeals, Gee,
Circuit Judge, held that: (1) District Court's approval of
the transaction was not authorized under Bankruptcy Code
provision authorizing trustee, after notice and hearing, to
"use, sell, or lease," other than in ordinary course of business,
property of the estate; (2) District Court did not have power to
order the Federal Aviation Administration to allocate certain
landing "slots" at various airports to debtor airline so that
debtor airline could transfer them in the PSA transaction;
and (3) District Court did not have power to order debtor's
assumption of its defaulted lease on terminal facilities at
Washington National Airport and its subsequent assignment
in the PSA transaction without FAA approval.

Reversed and remanded.

West Headnotes (8)

**[1]**    **Bankruptcy**
👉 Time for Sale;  Emergency and Sale
Outside Course of Business

Where certain portions of proposed transaction
were clearly outside scope of Bankruptcy Code
provision under which trustee, after notice and
hearing, may use, sell or lease, other than in
the ordinary course of business, property of the
estate, inasmuch as debtor and bankruptcy court
under such proposal would be short-circuiting
requirements for confirmation of reorganization
plan by establishing terms of plan sub rosa
in connection with sale of assets, district court
was without power under that code provision
to approve such transaction. Bankr.Code, 11
U.S.C.A. §§ 361, 363, 363(b), 1101 et seq., 1126.

86 Cases that cite this headnote

**[2]**    **Bankruptcy**
👉 Time for Sale;  Emergency and Sale
Outside Course of Business

Where under agreement between debtor and its
creditors the secured creditors would be required
to vote portion of their deficiency claim in favor
of any future reorganization plan approved by
majority of the unsecured creditors' committee,
such action was not comprised by term "use,
sell, or lease" within Bankruptcy Code provision
authorizing trustee, after notice and hearing, to
use, sell or lease, other than in ordinary course
of business, property of the estate. Bankr.Code,
11 U.S.C.A. §§ 361, 363, 363(b, e), 1101 et seq.,
1126.

71 Cases that cite this headnote

**[3]**    **Bankruptcy**
👉 Time for Sale;  Emergency and Sale
Outside Course of Business

Proposed transaction which provided for release
of claims by all parties against chapter 11
debtor, its secured creditors and its officers and
directors was not "use, sale or lease" authorized
by Bankruptcy Code provision under which
trustee, after notice and hearing, may use, sell or
lease, other than in ordinary course of business,
property of the estate. Bankr.Code, 11 U.S.C.A.
§§ 363(b), 1125, 1129(a)(7), (b)(2)(B).

24 Cases that cite this headnote

**[4]** **Aviation**

 Regulation in General

Regulations issued by Federal Aviation Administration to implement policies of statute authorizing FAA to assign use of navigable airspace are subject to only limited review in Courts of Appeals. Federal Aviation Act of 1958, §§ 102(a)(4, 5, 9), 103, 307(a), 1006(a, e), as amended, 49 U.S.C.A. §§ 1302(a)(4, 5, 9), 1303, 1348(a), 1486(a, e); Department of Transportation Act, § 6(c)(1), 49 U.S.C.A. § 1655(c)(1); Bankr.Code, 11 U.S.C.A. § 105; 5 U.S.C.A. § 551(4).

2 Cases that cite this headnote

**[5]** **Bankruptcy**

 Licenses and Permits

Under Federal Aviation Act provision granting to Federal Aviation Administration broad authority to assign use of navigable airspace, landing slots were not "property" of chapter 11 airline as to which bankruptcy court would be authorized to issue whatever orders it thought necessary to protect them, but, rather, special federal aviation regulations establishing slots are "rules" as defined in Administrative Procedure Act and do not lose their character as rules because they modify airlines' claimed rights to slot allocations. Federal Aviation Act of 1958, §§ 102(a)(4, 5, 9), 103, 1006(a, e), as amended, 49 U.S.C.A. §§ 1302(a)(4, 5, 9), 1303, 1486(a, e); Department of Transportation Act, § 6(c)(1), 49 U.S.C.A. § 1655(c)(1); Bankr.Code, 11 U.S.C.A. § 105; 5 U.S.C.A. § 551(4).

32 Cases that cite this headnote

**[6]** **Licenses**

 Transfer of Rights

Any transfer of state or federal regulatory license or certificate is subject to continuing jurisdiction and approval of applicable agency. Federal Aviation Act of 1958, § 307(a), 49 U.S.C.A. § 1348(a); 5 U.S.C.A. § 551(4).

3 Cases that cite this headnote

**[7]** **Bankruptcy**

 Contracts Assumable; Assignability

Bankruptcy Code provision that trustee in bankruptcy may not assume or assign unexpired lease if applicable law excuses lessor from accepting performance from an assignee and if lessor does not consent to assignment is not intended to apply only to personal service contracts. Bankr.Code, 11 U.S.C.A. §§ 365, 365(c).

28 Cases that cite this headnote

**[8]** **Aviation**

 Lease of Facilities

**Bankruptcy**

 Leases

Under applicable law, Federal Aviation Administration was to control leasing of space at national airport, and no person could operate at national airport without its approval, and where proposed transferee airline had not been approved to operate at national airport, Bankruptcy Code provision that trustee in bankruptcy may not assume or assign unexpired lease if applicable law excuses lessor from accepting performance from assignee and if lessor does not consent to assignment excused FAA from accepting performance from proposed transferee airline, and district court erred in authorizing chapter 11 airline to assign its rights under lease. Bankr.Code, 11 U.S.C.A. §§ 365, 365(c); D.C.Code 1981 §§ 7-1101 to 7-1107.

31 Cases that cite this headnote

**Attorneys and Law Firms**

**\*937** Gerald Goldman, Hughes, Hubbard & Reed, Washington, D.C., Arthur L. Moller, Sheinfeld, Maley & Kay, Houston, Tex., for Continental Air Lines.

Marc Johnston, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for Federal Aviation.

Bruce H. Simon, New York City, for Air Line Pilots Ass'n Intern., et al.

Rufus S. Garrett, Jr., Fort Worth, Tex., for Delta Airlines.

James F. Parker, San Antonio, Tex., for Southwest Airlines.

James R. O'Donnell, Houston, Tex., Robert E. Cohn, Washington, D.C., for Peoples Exp. Airlines, Inc.

Alvin D. Shapiro, Kansas City, Mo., for U.S. Air, Inc.

Harold C. Abramson, Dallas, Tex., for United Airlines, Inc.

Ernest W. DuBester, Washington, D.C., for Intern. Ass'n of Machinists.

Kent G. Cprek, Washington, D.C., for Pension Benefit Guaranty Corp.

Ronald S. Orr, Los Angeles, Cal., for American Airlines.

Kent Kibbie, Fort Worth, Tex., for the Bank of New York.

John P. Campbell, New York City, W.B. West, III, Dallas, Tex., for U.S. Trust Co. of New York.

Sander L. Esserman, Dallas, Tex., for Secured Bond Owners Creditors Committee.

Edward L. Rothberg, Atty., Tax Div., Dept. of Justice, Dallas, Tex., for the U.S.

George G. Olsen, Washington, D.C., for Regional Airline Ass'n.

David Bonderman, Washington, D.C., Michael J. Crames, Andrew A. Kress, New York City, for Braniff.

Robert J. White, Los Angeles, Cal., R. Bruce Keiner, Jr., Washington, D.C., for Pacific Southwest Airlines, Inc.

L.N.D. Wells, Jr., Dallas, Tex., for Intern. Broth. of Teamsters.

St. Clair Newbern, III, Fort Worth, Tex., for Braniff Ticketholders Committee.

A.L. Vickers, Dallas, Tex., Philip Pierce, New York City, for Unsecured Creditors' Committee.

Hugh M. Ray, Houston, Tex., David T. Sykes, Philadelphia, Pa., for Ins. Co. Secured Creditors of Braniff.

John R. Blinn, Stephen A. Goodwin, Fort Worth, Tex., Alan B. Miller, New York City, for Secured Bank Lenders.

*938  Robert L. Hoffman, Dallas, Tex., for Dallas-Fort Worth Regional airport bd.

Daniel C. Stewart, Dallas, Tex., for Interfirst Bank Dallas.

Appeals from the United States District Court for the Northern District of Texas.

Before GEE, GARZA and POLITZ, Circuit Judges.

**Opinion**

GEE, Circuit Judge:

The facts and procedural history of this case are exceedingly complex. However, the succinct summary by the district court below is sufficient to afford an understanding of our decision today:

On May 13, 1982, Braniff and Braniff International Corporation ("International") filed petitions for reorganization under Chapter 11 of the Bankruptcy Code (the "Code") and were continued in the management and operation of their businesses and properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Code. No trustee or examiner was appointed. Shortly thereafter, to minimize the effect of Braniff's termination of service, the Department of Transportation and Federal Aviation Administration (DOT/FAA) distributed to other carriers, on an emergency basis, approximately 100 of the over 400 [landing] slots allocated to Braniff. [For safety reasons, the FAA allocates hourly landing slots at airports among the various airlines. *See* Part II, *infra.*] On May 24, 1982, DOT/FAA issued Special Federal Aviation Regulation ("SFAR") 44-4, 47 Fed.Reg. 22,492 (1982) providing for allocation of the remaining slots formerly used by Braniff through participation by air carriers in a random draw.

Thereafter, on May 27, 1982, the Unsecured Creditors' Committee filed an Application seeking a declaration of whether the FAA allocation of former Braniff slots constituted a violation of the automatic stay under 11 U.S.C. § 362 or of a temporary restraining order entered earlier by the Bankruptcy Court proscribing interference with Braniff's property. On June 24, 1982, the Bankruptcy Court approved a stipulation among the United States, Braniff, and the Unsecured Creditors' Committee, stating that the slots would be recalled and made available "[s]hould Braniff or an air carrier succeeding to the rights, duties and obligations of Braniff begin operations."

On December 23, 1982, Braniff filed an application for approval of a proposed agreement between Braniff and PSA. On December 30, 1982, Braniff filed with the Bankruptcy Court a "Memorandum of Understanding" as a basis for a proposed settlement and compromise of all claims, counterclaims, and potential litigations by and among Braniff, certain unsecured creditors, and certain secured creditors.

Between December 30, 1982, and January 3, 1983, various notices of hearings on the proposed agreements were mailed or published. These documents gave notice of a hearing to be held on January 14, 1983, to consider the matters set forth in the PSA Agreement and the Memorandum of Understanding. As stated in these notices, a hearing commenced before United States Bankruptcy Judge John Flowers on January 14, 1983, in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Bankruptcy Division.

From January 14, 1983, through January 26, 1983, all interested parties were afforded an opportunity to present evidence on their behalf. The Bankruptcy Court heard oral arguments on January 28, 1983, and announced its opinion in this matter on Monday, January 31, 1983. The Bankruptcy Court entered its "Order Regarding the PSA Agreement and Agreement and Stipulation" and its "Findings of Fact and Conclusions of Law Approving the PSA Agreement and Agreement and Stipulation" on February 1, 1983. On that same date, the Bankruptcy Court entered an order pursuant to Sections (e)(2)(A)(i) and (e)(3) of the Local Rule, certifying its order and findings for immediate review to the United **\*939** States District Court for the Northern District of Texas.

*In re Braniff Airways, Inc.,* No. CA4-83-57-E (N.D.Tex. Feb. 18, 1983) (unpublished memorandum opinion).

The Bankruptcy Court approved both the PSA Agreement and the Memorandum of Understanding between Braniff and its creditors (both agreements hereinafter jointly referred to as the "PSA transaction"). Pursuant to a Local Rule, [1] the district court conducted a *de novo* review of the Bankruptcy Court's findings. In three days of hearings, the district court heard testimony, received evidence and heard oral argument. Thereafter, the district court, as had the Bankruptcy Court, approved the PSA transaction. Because business exigencies required that the PSA transaction be consummated soon if it was to happen at all, we granted this expedited appeal.

Three principal issues are presented. First, was the district court's approval of the PSA transaction authorized under Section 363(b) of the Bankruptcy Code, 11 U.S.C. § 363(b)? Second, did the district court have the power to order the FAA to allocate certain landing "slots" at various airports to Braniff so that Braniff could transfer them in the PSA transaction? Third, did the district court have the power to order Braniff's assumption of its defaulted lease on terminal facilities at Washington National Airport and its subsequent assignment in the PSA transaction without FAA approval?

## I.

[1]    The courts below approved the PSA transaction pursuant to Section 363(b) of the Bankruptcy Code, which provides:

> The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

11 U.S.C. § 363(b).

The appellants contend that § 363(b) is not applicable to sales or other dispositions of all the assets of a debtor, and that such a transaction must be effected pursuant to the voting, disclosure and confirmation requirements of the Code. *See In re White Motor Credit Corp.,* 14 B.R. 584 (Bkrtcy.N.D.Ohio 1981).* Braniff responds that cases decided before and after promulgation of the Code authorize a § 363(b) sale of all of a debtor's assets. *See In re Dania Corp.,* 400 F.2d 833 (5th Cir.1968); *In re WHET, Inc.,* 12 B.R. 743, 750-51 (Bkrtcy.D.Mass.1981).*

We need not express an opinion on this controversy because we are convinced that the PSA transaction is much more than the "use, sale or lease" of Braniff's property authorized by § 363(b). Reduced to its barest bones, the PSA transaction would provide for Braniff's transfer of cash, airplanes and equipment, terminal leases and landing slots to PSA in return for travel scrip, unsecured notes, and a profit participation in PSA's proposed operation. The PSA transaction would also require significant restructuring of the rights of Braniff creditors. Appellants raise a blizzard of objections to each of these elements of the deal. It is not necessary, however, to decide whether each individual component of the PSA transaction is or is not authorized by § 363 because the entire transaction was treated by both courts below as an integrated

whole. Since certain portions of the transaction are clearly outside the scope of § 363, the district court was without power under that section to approve it. Its order must be reversed.

Three examples will illustrate our rationale. The PSA Agreement provided that Braniff would pay $2.5 million to PSA in exchange for $7.5 million of scrip entitling the holder to travel on PSA. It further required that the scrip be used only in a future Braniff reorganization and that it be issued only to former Braniff employees or shareholders or, in a limited amount, to unsecured creditors. This provision not only changed the composition of Braniff's assets, the contemplated result under **940 § 363(b), it also had the practical effect of dictating some of the terms of any future reorganization plan. The reorganization plan would have to allocate the scrip according to the terms of the PSA agreement or forfeit a valuable asset. The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets.

[2]    Second, under the agreement between Braniff and its creditors, the secured creditors were required to vote a portion of their deficiency claim in favor of any future reorganization plan approved by a majority of the unsecured creditors' committee. Again, such an action is not comprised by the term "use, sell, or lease," and it thwarts the Code's carefully crafted scheme for creditor enfranchisement where plans of reorganization are concerned. *See* 11 U.S.C. § 1126. [2]

[3]    Third, the PSA transaction also provided for the release of claims by all parties against Braniff, its secured creditors and its officers and directors. On its face, this requirement is not a "use, sale or lease" and is not authorized by § 363(b).

For these reasons, we hold that the district court was not authorized by § 363(b) to approve the PSA transaction and that its order is reversed. In any future attempts to specify the terms whereby a reorganization plan is to be adopted, the parties and the district court must scale the hurdles erected in Chapter 11. *See e.g.* 11 U.S.C. § 1125 (disclosure requirements); *id.* § 1126 (voting); *id.* § 1129(a)(7) (best interest of creditors test); *id.* § 1129(b)(2)(B) (absolute priority rule). Were this transaction approved, and considering the properties proposed to be transferred, little would remain save fixed based equipment and little prospect

or occasion for further reorganization. These considerations reinforce our view that this is in fact a reorganization.

## II.

Because of sharply reduced air traffic control capacity caused by the strike of the Professional Air Traffic Controllers Organization in the summer of 1981, the FAA instituted a program for curtailing air carrier operations. *See* Special Federal Aviation Regulation ("SFAR") No. 44, 46 Fed.Reg. 39606 (1981). The FAA determined the maximum safe number of hourly arrivals at designated airports and allocated hourly "landing slots" among the carriers using the airports.

On May 12, 1982, Braniff abruptly ceased all operations and on the following day filed a petition in the bankruptcy court below. Immediately thereafter, the FAA distributed to other carriers more than 100 of some 450 slots previously allocated to Braniff in order to minimize the effect of Braniff's abandonment of service on the travelling public. *See* 47 Fed.Reg. 22492 (1982). Approximately a week later, the FAA issued SFAR No. 44-4 to provide for the allocation of the remaining abandoned slots (except for about 50 slots that the FAA retired to reduce air traffic congestion in the Dallas area) through a random draw under which similarly situated competing carriers would be treated equally. 47 Fed.Reg. at 22492. The more than 100 slots originally distributed on an emergency basis subsequently also **941 were assigned under a random draw procedure. *See* 47 Fed.Reg. 30908 (1982).

At about the time that Braniff filed its petition for reorganization, Braniff's chairman orally asked the Administrator of the FAA to hold the slots that Braniff had been using to permit it to reorganize. Effectively granting this request, the FAA published SFAR No. 44-4 as an emergency rule. Although all landing slots always have been subject to immediate defeasance in appropriate circumstances, the SFAR provided that the allocation of former Braniff slots to other carriers:

> will be for a period of up to 60 days from May 20, 1982, and may be cancelled by the FAA at the end of that 60-day period or during that period upon 24-hour notice. The temporary approval for these slots may

be extended at the discretion of the Administrator.

47 Fed.Reg. at 22494.

The preamble to the regulation stated that "[i]f Braniff does again operate, then the slots necessary for continued Braniff operations will be returned to Braniff." *Id.* at 22492. A subsequent stipulation was entered into among Braniff, the FAA, and certain creditors providing that, subject to FAA regulations, the slots would be returned to Braniff or a successor upon reorganization. In its order below, the District Court issued an injunction requiring the FAA to transfer slots to PSA to effectuate the PSA transaction. Since the district court ordered the FAA to allocate slots to PSA, and since nothing in our opinion would preclude reconsideration of the PSA transaction as a plan of reorganization, in the interest of judicial economy we will proceed to address the lower court's authority to order this action by the FAA.

In promulgating the landing slot program, the FAA relied upon its authority under the Federal Aviation Act to "assign ... the use of the navigable airspace under such terms, conditions, and limitations as [it] may deem necessary in order to insure the safety of aircraft and the efficient utilization of such airspace. [It] may modify or revoke such assignment when required in the public interest." 49 U.S.C. § 1348(a). According to the legislative history, that Act vested "unquestionable authority for all aspects of airspace management in the [FAA] Administrator." S.Rep. No. 1811, 85th Cong., 2d sess. 14 (1958). *See also id.* at 15 (Administrator given "plenary authority in the matter of air traffic rules"); H.R.Rep. No. 2360, 85th Cong., 2d sess. 6-7 (1958), U.S.Code Cong. & Admin.News 1958, p. 3741. As stated in *Air Line Pilots Association, International v. Quesada,* 276 F.2d 892, 894 (2d Cir.1960):

> The Federal Aviation Act was passed by Congress for the purpose of centralizing in a single authority-indeed, in one administrator-the power to frame rules for the safe and efficient use of the nation's airspace.

*See also City of Houston v. FAA,* 679 F.2d 1184, 1195 (5th Cir.1982); *Northwest Airlines, Inc. v. Goldschmidt,* 645 F.2d 1309, 1315 (8th Cir.1981).

The Federal Aviation Act contains explicit standards governing the exercise of the FAA's broad authority to

assign use of the navigable airspace under 49 U.S.C. § 1348(a). In addition to "insur[ing] the safety of aircraft and the efficient utilization of such airspace," *id.,* regulations in this area must take cognizance of such policies as the requirements of the national defense, id. § 1303, as well as the encouragement of a competitive air transportation system and "[t]he development and maintenance of a sound regulatory environment ... responsive to the needs of the public." Id. §§ 1302(a)(4), (5), and (9), made applicable to the FAA by 49 U.S.C. § 1655(c)(1) and 49 C.F.R. § 1.47(a).

**[4]**  Regulations issued by the FAA to implement the policies of the statute are subject to only limited review in the courts of appeals. 49 U.S.C. § 1486(a); *see, e.g., Northwest Airlines, Inc. v. Goldschmidt,* 645 F.2d 1309 (8th Cir.1981). Congress expressly provided that the FAA's findings of fact are "conclusive" if supported by "substantial evidence." *Id.* § 1486(e).

**\*942**  **[5]**  Notwithstanding Congress' manifest intent that the FAA exercise exclusive jurisdiction over navigable airspace subject to review in the courts of appeals, Braniff argues that the landing slots are "property" of its estate and that under § 105 of the Code, 11 U.S.C. § 105, the Bankruptcy Court may issue whatever orders it thinks necessary to protect them. We disagree.

We cannot accept Braniff's characterization of the slots as its property. We agree with the view expressed by the Eighth Circuit that SFAR's establishing slots are "rules" as defined in the Administrative Procedure Act,[3] and do not lose their character as rules because they modify airlines' claimed rights to slot allocations. *Northwest Airlines, Inc. v. Goldschmidt,* 645 F.2d 1309, 1321 (8th Cir.1981). *See also Air Lines Pilots Association, Int'l v. Quesada,* 276 F.2d 892, 896 (2d Cir.1960) (FAA action limiting pilots' licenses to age 60 does not lose rulemaking character because it changes pilots' claimed property rights). The slots are actually restrictions on the use of property-airplanes; not property in themselves. As such, they are not within the jurisdiction of the Bankruptcy Court under § 105 of the Code.[4]

**[6]**  Moreover, even if we were to assume that the slots give rise to some limited proprietary interest so as to confer jurisdiction over them on the Bankruptcy Court, the most substantial and persuasive line of authority establishes that any transfer of a state or federal regulatory license or certificate is subject to the continuing jurisdiction and approval of the applicable agency. *See e.g. LaRose v. FCC,*

494 F.2d 1145, 1149 (D.C.Cir.1974) (radio license); *Barutha v. Prentice,* 189 F.2d 29, 31 (7th Cir.), *cert. denied,* 342 U.S. 841, 72 S.Ct. 69, 96 L.Ed. 635 (1951) (state motor carrier license); *In re Rainbo Express, Inc.,* 179 F.2d 1, 5 (7th Cir.), *cert. denied sub nom. Richardson v. National Acceptance Co.,* 339 U.S. 981, 70 S.Ct. 1029, 94 L.Ed. 1085 (1950) (ICC license); *In re Airlines Transport Carriers, Inc.,* 129 F.Supp. 679, 683-4 (S.D.Cal.1955) (CAB letter of registration). *See generally Hyde v. Woods,* 94 U.S. 523, 525, 24 L.Ed. 264 (1877) (debtor's seat on stock exchange "is incumbered with conditions" that "entered into and became an incident of the property when it was created."). [5] At most, a determination that the slots were "property" might allow the debtor to transfer them to another carrier for purposes of the bankruptcy laws, but approval of that transfer under the Federal Aviation Act would rest solely with the FAA.

### III.

Because, like the slot issue, the question of the lower courts' authority over Braniff's Washington National Airport lease is likely to recur if the PSA transaction is reconsidered as a plan of reorganization, we will consider it now.

The district court order authorized Braniff to assume its lease and agreements with the United States for the use of facilities and lease of space at Washington National Airport and assign them to PSA. People Express Airlines, Inc. challenges this portion of the district court's order. We find that the district court erred in authorizing the assignment of the lease to PSA.

**\*943** When Braniff filed for reorganization, Braniff was lessee and user of certain airport terminal space at Washington National Airport under agreements with the United States, the owner and operator of the airport. Subsequently, Braniff and the United States reached, and the Bankruptcy Court approved, an agreement and stipulation to modify the Braniff-FAA Use and Lease Agreement. Under the modification, the United States received the right to use, occupy and lease the space at National previously leased to Braniff, while Braniff was released from its obligation to pay future rents and all post petition rent claims against Braniff were forgiven. Further, Braniff was given the right to recapture the premises upon thirty days notice in the event Braniff reinstituted operations as an air carrier at National. People Express was thereafter granted a lease on the space subject to Braniff's right to recapture.

**[7]** Section 365(c) of the Bankruptcy Code, 11 U.S.C. § 365(c), provides that the trustee in Bankruptcy may not assume or assign an unexpired lease if applicable law excuses the lessor from accepting performance from an assignee and if the lessor does not consent to assignment. The district court found § 365(c) inapplicable, stating, as have some Bankruptcy Courts, *e.g. In re Taylor Mfg., Inc.,* 6 B.R. 370 (Bkrtcy.N.D.Ga.1980), that § 365(c) was intended to apply only to personal service contracts. Nothing in the statute authorized the district court to depart from the express language of § 365(c), which provides for its application to unexpired leases and belies any limitation to personal service contracts. It may well be that the *impetus* for Congress' enactment of § 365(c) was to preserve the pre-Code rule that "applicable law" precluding assignment of personal service contracts is operative in bankruptcy. *See 1 Norton, Bankruptcy Law & Practice* § 23.14 (1981) ("typical" contract falling within § 365 is for personal performance). However, the drafters actually codified a much broader principle. Surely if Congress had intended to limit § 365(c) specifically to personal service contracts, its members could have conceived of a more precise term than "applicable law" to convey that meaning.

**[8]** Even assuming that it were appropriate to resort to legislative history when the face of the statute is so plain, a doubtful assumption in this case, we have been referred to no history that requires the radical construction of the district court, and we found none ourselves. The district court consequently erred in finding that § 365(c) was not applicable to the Braniff-United States lease.

Here, applicable law excuses the lessor, the United States, from accepting performance from the assignee, PSA. The Washington Airport Act, 7 D.C.Code §§ 1101-1107, provides in part:

> Sec. 1102. The administrator shall have control over, and responsibility for, the care, operation, maintenance, and protection of the airport, together with the power to make and amend such rules and regulations as he may deem necessary to the proper exercise thereof.

> Sec. 1103. The administrator is empowered *to lease upon such terms as he may deem proper,* space or property within or upon the airport for purposes essential or appropriate to the operation of the airport. (Emphasis added.)

Pursuant to these provisions the FAA has promulgated 14 C.F.R. § 159.91(a) which provides:

> (a) No person may engage in any commercial activity on the Airport without the approval of, and under terms and conditions prescribed by, the Airport Manager.

Applicable law, therefore, provides that the FAA is to control the leasing of space at National Airport and that no person may operate at National Airport without its approval. Since

PSA has not been approved to operate at National Airport, § 365(c) excuses the FAA from accepting performance from PSA. The district court therefore erred in authorizing Braniff to assign its rights under the lease.

For the reasons we have stated, the order of the district court is REVERSED, and the **\*944** case is REMANDED for further proceedings consistent with this opinion.

**Parallel Citations**

8 Collier Bankr.Cas.2d 522, 10 Bankr.Ct.Dec. 933

Footnotes

1    See *In re Braniff Airways, Incorporated, et al.,* 700 F.2d 214 (5th Cir.1983) (district court and bankruptcy court constitutionally exercised jurisdiction pursuant to Local Rule).

2    We are aware that the Code provides for certain adjustments in the rights of creditors pursuant to a valid § 363 transaction in order to provide "adequate protection" to secured creditors. 11 U.S.C. § 363(e) (condition use, sale or lease so as to assure "adequate protection" of secured creditors' interest); 11 U.S.C. § 361 (periodic payments, additional liens, or other relief may be used to provide adequate protection). However, nothing has been brought to our attention that would indicate that this particular provision of the PSA transaction was adopted to assure adequate protection and we do not see how it could have been. More important, the other provisions discussed in the text affect only unsecured creditors and are wholly unrelated to any issue of adequate protection. Accordingly, although some actions that technically are not "uses, sales or leases" may be authorized by § 363 and § 361 to assure "adequate protection," the offending portions of the PSA transaction are not within that rubric.

3    5 U.S.C. § 551(4): "[A]n agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy...."

4    Since the Bankruptcy Court was without subject-matter jurisdiction the stipulation allegedly allocating slots to PSA as Braniff's successor was of no effect.

5    Braniff relied principally on a dictum of this court to the effect that a bankruptcy court may stay regulatory proceedings under § 105 to the extent that they threaten the assets of the estate. *SEC v. First Financial Group,* 645 F.2d 429, 440 (5th Cir.1981). No such threat was present in that case and it is therefore not binding on us for that proposition. In other principal cases relied upon by Braniff, *e.g. In Re Shipper's Interstate Service, Inc.,* 618 F.2d 9, 13 (7th Cir.1980); *In re Bel Air Chateau Hospital, Inc.,* 611 F.2d 1248, 1251 (9th Cir.1979), the proposition was also dictum. Moreover, *First Financial* concerned appointment by the SEC of a receiver for the debtor's existing assets. We think that whatever vitality the "threat to assets" theory may have, it is inapplicable where, as here, the very existence of the "asset" depends on the regulatory activity in question.

**End of Document**    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 114

63 A.F.T.R.2d 89-344, 88-2 USTC P 9601

863 F.2d 263
United States Court of Appeals,
Third Circuit.

PLEASANT SUMMIT LAND

CORPORATION, Appellant in 88-1373,

v.

COMMISSIONER OF INTERNAL REVENUE.

George PRUSSIN and Sharon

Prussin, Appellants in 88-1377,

v.

COMMISSIONER OF INTERNAL REVENUE.

Nos. 88-1373, 88-1377.    |    Argued Oct. 7,
1988.    |    Decided Nov. 25, 1988.    |    Opinion
on Denial of Rehearing in No. 88-1377 Jan. 30, 1989.

Land corporation and investors in limited partnership that
indirectly purchased property from land corporation appealed
from adverse decision entered by the United States Tax
Court, Mary Ann Cohen, J., following consolidated trial
on their petitions to redetermine deficiencies determined by
Commissioner of Internal Revenue. The Court of Appeals,
Greenberg, Circuit Judge, held that: (1) tax court's factual
finding that property was not held primarily for sale to
customers in ordinary course of trade or business-meaning
that income from its sale would not be included in
determining whether land corporation was "personal holding
company"-was not clearly erroneous, and fact that property
was subject to preexisting contract of sale at time it was
purchased did not mandate contrary legal conclusion; (2) tax
court's finding that nonrecourse debt exceeded fair market
value was not clearly erroneous; and (3) noncourse debt did
not support interest and depreciation deductions to extent it
exceeded sum of cash investment by partnership in property
and fair market value of property at time of its purchase.

Affirmed in part, reversed in part, and remanded.

West Headnotes (8)

[1]    **Internal Revenue**
🔑 Judicial Authority and Duty

Court of Appeals has plenary review of Tax
Court's construction of Internal Revenue Code.

6 Cases that cite this headnote

[2]    **Internal Revenue**
🔑 Trade or Business of Taxpayer

**Internal Revenue**
🔑 Nature and Source of Income

Tax Court's factual finding that land corporation
did not hold property primarily for sale to
customers in the ordinary course of its trade or
business was not clearly erroneous; thus, income
from sale of property would not be included in
determining whether corporation was "personal
holding company" under Internal Revenue Code.
26 U.S.C.A. § 1221(1).

6 Cases that cite this headnote

[3]    **Internal Revenue**
🔑 Trade or Business of Taxpayer

Court must consider and weigh several factors
in determining whether purchase of asset for
sale subject to preexisting contract of sale results
in acquisition of property to be held primarily
for sale to customers in ordinary course of
trade or business, including purpose for which
taxpayer acquired and held property, extent of
improvements made to facilitate sale, activity
of taxpayer in promoting sales, frequency and
continuity of sales, extent and substantiality of
sales, length of time between purchase and sales,
and relative income to taxpayer from sale of
property, compared with his other income.

2 Cases that cite this headnote

[4]    **Internal Revenue**
🔑 Income and Losses of Partnership or
Venture

Partnership's purchase of property, not
individual limited partners' investment in
partnership, was appropriate focal point of
analysis of tax consequences of investment.

3 Cases that cite this headnote

[5]    **Internal Revenue**

 Weight and Sufficiency

Tax court judge's finding that nonrecourse indebtedness exceeded fair market value of property was not clearly erroneous.

6 Cases that cite this headnote

[6]  **Internal Revenue**
 Particular Transactions

**Internal Revenue**
 Cost or Value of Property

Nonrecourse debt did not support depreciation and interest deductions, to extent it exceeded sum of cash investment by partnership in property and fair market value of property at time of its purchase.

12 Cases that cite this headnote

[7]  **Internal Revenue**
 Particular Transactions

**Internal Revenue**
 Cost or Value of Property

Taxpayer who has acquired property subject to nonrecourse indebtedness that is far larger than property's fair market value at time of acquisition is entitled to deductions for interest and depreciation attributable to nonrecourse indebtedness, to extent of collateral's fair market value.

7 Cases that cite this headnote

[8]  **Internal Revenue**
 Deductions

Commissioner of Internal Revenue was not required to periodically recalculate the sum of nonrecourse debt constituting genuine indebtedness in determining taxpayer's deductions.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*264**  Paul Windels, Jr. (argued), John Y. Taggart, Clayton A. Prugh, Windels, Marx, Davies & Ives, New York City, for appellants.

William S. Rose, Jr., Asst. Atty. Gen., Gary R. Allen, Jonathan S. Cohen (argued), Michael J. Roach, U.S. Dept. of Justice, Tax Div., Washington, D.C., for appellee.

Before    HIGGINBOTHAM,    MANSMANN    and GREENBERG, Circuit Judges.

**Opinion**

**OPINION OF THE COURT**

GREENBERG, Circuit Judge.

Appellants, Pleasant Summit Land Corporation (PSLC) and George and Sharon  **\*265**  Prussin, appeal from adverse decisions entered by the Tax Court following a consolidated trial on their petitions to redetermine deficiencies determined by the Commissioner of Internal Revenue. PSLC challenges the Tax Court's conclusion that it was a "personal holding company" subject to the tax on personal holding companies in its tax year in issue. Resolution of its appeal depends on whether its sale of the Summit House apartments in West Orange, New Jersey, was of a capital asset and thus resulted in a capital gain or whether the Summit House was a property it held primarily for sale to customers in the ordinary course of its trade or business so that its sale resulted in ordinary gross income.

George Prussin is an investor in a limited partnership, Pleasant & Summit Associates (PSA), which indirectly purchased Summit House from PSLC. The Prussins challenge the Tax Court's conclusions that: (1) nonrecourse financing of the Summit House purchase exceeded its fair market value; (2) the nonrecourse financing would not support depreciation and interest deductions which they claimed by reason of George Prussin's limited partnership interest in PSA; and (3) these deductions would be disallowed in full rather than only to the extent that they were the product of financing in excess of the fair market value of Summit House. Furthermore, they argue that the complete disallowance of the deductions unconstitutionally violated their right to due process of law.

This court has jurisdiction under section 7482(a) of the Internal Revenue Code of 1954. [1] The Tax Court had jurisdiction under I.R.C. §§ 6213(a), 6214(a), and 7442. Inasmuch as PSLC was a New Jersey corporation with its principal place of business in New Jersey when it filed its petition and filed its appeal to this court and the Prussins were a married couple residing in New Jersey at all times relevant to their petition and appeal, the venue for these appeals properly lies in this court. [2]

We will affirm the Tax Court's decision with respect to PSLC. We will reverse the Tax Court's decision to the extent it completely disallowed the Prussins' deductions and will remand for a determination of the fair market value of Summit House and for calculation of the appropriate deductions allowable to the Prussins. Since we hold that the Prussins' deductions may be disallowed only in part, their constitutional claim is moot and we do not address it.

## I. BACKGROUND

### A. *The Underlying Business Transaction*

On May 3, 1978, in an arm's length transaction, PSLC entered into an agreement to purchase the Summit House, a property on Summit Street, West Orange, New Jersey, containing two apartment buildings and a small separate resident manager's apartment for $4,200,000. The purchase was closed on or about June 1, 1978 and the consideration was paid by $250,000 in cash, by delivery of a $1,350,000 note secured by a purchase money mortgage, and by PSLC **\*266** taking title subject to a previously existing $2,600,000 nonrecourse mortgage.

Contemporaneously with the purchase, PSLC created a wholly owned subsidiary, Mount Orange Realty Corp. (MORC), to which it then sold the Summit House buildings while retaining the land beneath them. The sale price to MORC was $5,200,000, consisting of $500,000 in cash which MORC borrowed or owed and a $4,700,000 nonrecourse mortgage which wrapped around and was subject to the prior two mortgages. [3] The note which this mortgage secured permitted accumulation of interest and principal through December 31, 1988, except that annual interest payments were required up to the available cash flow. This conveyance of the property placed the depreciable buildings in one entity while leaving the nondepreciable land in another.

PSLC then sold its MORC stock to the newly created PSA, which was organized to acquire the Summit House, for $2,559,200, paid in the form of a nonrecourse note secured by the MORC shares, for which a mortgage of Summit House to PSLC was immediately substituted. This note had provisions for accumulation of interest and principal through December 31, 1988, similar to those in the $4,700,000 note. PSA then dissolved MORC, took direct ownership of the Summit House buildings and took over MORC's obligations including the $500,000 due on the purchase of the Summit House and the $4,700,000 nonrecourse wraparound mortgage. Thus, the cost to PSA for acquisition of Summit House was the $2,559,200 indebtedness for the purchase of the MORC shares, assumption of MORC's $500,000 obligation, and assumption of MORC's $4,700,000 nonrecourse wraparound mortgage for a total of $7,759,200. The record, however, does not clearly establish that PSA paid the $500,000. Of course, this assumption of obligations did not transform the nonrecourse debts to recourse obligations. The consequence of these transactions was to leave PSA with large debts with interest charges and a substantial depreciable asset, a situation setting up the possibility for it to claim large tax deductions. Additionally, PSLC leased the land under the buildings to PSA for $10,000 a year under an agreement allowing rent to be accumulated and deferred at a fixed rate of interest. This provision caused PSA to generate additional tax deductions for the interest which accrued on the unpaid rent.

PSA sold thirty limited partnership units to a group of investors including George Prussin for a total of $1,980,000 paid with down payments and subsequent installments. The offering memorandum to the investors indicated that the $500,000 due on the sale from PSLC would be paid from the investors' down payments, leading the Commissioner in his brief to indicate that it appears that MORC's $500,000 obligation for its down payment was satisfied from the investors' funds. Inexplicably, the agreement for sale of the MORC shares between PSLC and PSA included a warranty by PSLC that MORC had no liabilities. Some months after PSA acquired Summit House, a new nonrecourse mortgage was substituted for the prior $2,600,000 mortgage but this did not enhance PSA's risk in the transaction. Most of the foregoing transactions were nearly contemporaneous and thus they formed part of one large structured undertaking.

PSA reported losses on its income tax returns for 1978 and 1979, and later years, largely attributable to interest deductions and depreciation. These losses were passed through to the limited partners who used them to off-set

income on their individual income tax returns. On December 19, 1985 an unrelated third party purchased the Summit House land from PSLC and the buildings and lease from PSA for a total of $7,000,000.

**B. *The Assessment of Deficiencies Against PSLC***

On its corporate income tax return for its taxable year ending May 31, 1979, PSLC **\*267** indicated that: (1) it had realized a gain of $3,742,704 on the sale of certain improvements to land in West Orange, New Jersey (Summit House); (2) it elected to use the cost recovery method for reporting this profit; and (3) under this method none of the gain was includable in its gross income for the taxable year covered by the return.

On October 7, 1982, the Commissioner issued a deficiency notice to PSLC. This notice stated that: (1) PSLC was required to recognize gain on the sale of its real property in the year of the sale;[4] (2) PSLC was not entitled to use the cost recovery method of accounting; (3) under the installment method of accounting, which PSLC had elected as an alternative to the cost recovery method, PSLC was required to report a gain in the amount of $464,069 for the taxable year ending May 31, 1979; (4) the $464,069 sum was a capital gain to PSLC in the taxable year ending May 31, 1979; (5) PSLC was a "personal holding company" because more than sixty percent of its adjusted ordinary gross income was from interest because the $464,069 was a capital gain and not ordinary income, and (6) inasmuch as PSLC was a personal holding company it owed an additional $106,832 under the personal holding company tax imposed by I.R.C. § 541.

**C. *The Assessment of Deficiencies Against the Prussins***

The Prussins reported a loss of $417,012 from George Prussin's distributive share of the 1978 losses of PSA on their joint federal income tax return for 1978, and a loss of $345,170 from George Prussin's distributive share of PSA's 1979 losses on their 1979 income tax return. On April 22, 1985, the Commissioner issued a deficiency notice to the Prussins entirely disallowing his share of the partnership losses on the ground that the Prussins had not established the amount and character of any of the partnership items on which their individual loss claims were based.

**D. *This Litigation***

PSLC and the Prussins brought these actions challenging the Commissioner's deficiency notices. Prior to the consolidated trial, PSLC conceded all issues other than its status as a personal holding company. A trial then ensued before Judge Cohen of the United States Tax Court whose opinion is reported as *Pleasant Summit Land Corporation v. Commissioner,* T.C.M. (CCH) 1987-469 at 566-76 (Sept. 17, 1987) [hereinafter *PSLC* ]. Judge Cohen held that PSLC qualified as a personal holding company subject to the personal holding company tax and, accordingly, she upheld the Commissioner's assessment of a $236,840 deficiency for PSLC's taxable year ending May 31, 1979. On this appeal PSLC challenges the Tax Court's finding that PSLC was a personal holding company, though it does not contend that, if it was a personal holding company, the assessment was erroneously calculated.

Judge Cohen determined that the Prussins had deficiencies for their taxable years ending December 31, 1978, and December 31, 1979, respectively, of $264,571.00 and $141,496, attributable to her sustaining the disallowance of deductions that PSA passed through to its limited partners including **\*268** the Prussins.[5] The disallowance of PSA's deductions was based on Judge Cohen's factual finding that the nonrecourse debt underlying its purchase of Summit House was greater than its fair market value, which did not exceed $4,200,000. The judge held that as a matter of law nonrecourse indebtedness in excess of fair market value would not support deductions for either depreciation or interest payments as there was no investment in the property and no genuine indebtedness for its purchase. She explained that no depreciable basis in Summit House had been established and consequently no portion of the nonrecourse indebtedness would support tax deductions. On appeal the Prussins challenge Judge Cohen's findings of fact, her application of legal standards, and the constitutionality of the legal standards applied.

## II. THE STANDARDS OF REVIEW

[1]    This court has plenary review of the Tax Court's construction of the Internal Revenue Code. *See Minizza v. Stone Container Corp.,* 842 F.2d 1456, 1459 (3d Cir.1988); *Creque v. Luis,* 803 F.2d 92, 93 (3d Cir.1986). This standard of review applies with regard to three issues on appeal. First, it is a question of law whether a single factor test or a multiple factor analysis is employed to determine if a property is held primarily for sale to customers in the

63 A.F.T.R.2d 89-344, 88-2 USTC P 9601

ordinary course of a taxpayer's trade or business. Second, it is a question of law whether nonrecourse indebtedness in excess of fair market value may support depreciation and interest deductions. Third, it is a question of law whether deductions based on such indebtedness should be completely disallowed when a taxpayer fails to meet his burden of proof of the fair market value of the property.

The Tax Court's conclusion that the nonrecourse indebtedness on the underlying transaction exceeded the fair market value of Summit House was a finding of fact subject to review for clear error only. *See Anderson v. Bessemer City,* 470 U.S. 564, 573-76, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985); *Commissioner v. Duberstein,* 363 U.S. 278, 289, 80 S.Ct. 1190, 1198-99, 4 L.Ed.2d 1218 (1960); *B.B. Rider Corp. v. Commissioner,* 725 F.2d 945, 948 (3d Cir.1984).

PSLC argues that while factual findings are generally subject to review under the clearly erroneous standard, the Tax Court finding that the underlying transaction was not of property held primarily for sale to customers within the ordinary course of its trade or business, constituted an "ultimate fact" subject to plenary review. The Commissioner, however, urges that we accept this finding unless it was clearly erroneous. We have indicated that we no longer recognize the ultimate fact exception to the standard that factual findings are reviewed only for clear error. *American Home Products Corp. v. Barr Laboratories, Inc.,* 834 F.2d 368, 370 n. 2 (3d Cir.1987). Further, the Supreme Court has rejected the ultimate fact exception and has stated that the clearly erroneous standard applies to findings of ultimate fact. *See Pullman-Standard v. Swint,* 456 U.S. 273, 285-90, 102 S.Ct. 1781, 1788-91, 72 L.Ed.2d 66 (1982). Thus, our earlier decisions permitting plenary review of ultimate fact determinations, *see, e.g., Jersey Land & Development Corp. v. United States,* 539 F.2d 311, 315 (3d Cir.1976); *Pennroad Corp. v. Commissioner,* 261 F.2d 325, 328 (3d Cir.1958), *cert. denied,* 359 U.S. 958, 79 S.Ct. 797, 3 L.Ed.2d 766 (1959), cannot be taken to represent the present position of this court. Therefore, to the extent that the Tax Court's conclusion regarding the character of the underlying transaction was predicated on a factual finding, it must be accepted unless clearly erroneous. We add, however, that even under a plenary standard of review we would reach the same conclusion as the Tax Court on this issue. Finally, we point out that PSLC contends that, as a matter of law, the undisputed facts require a reversal of the finding in the Tax Court that the sale of Summit House was not of a property held primarily for sale to customers in the ordinary course of PSLC's trade or business. Thus, as we

make a plenary determination of legal issues, the dispute over the standard of review is of limited significance in this case.

## III. PSLC'S APPEAL

Determination of whether PSLC was properly held to be a personal holding company **\*269** turns solely on whether Summit House was "property held by [PSLC] primarily for sale to customers in the ordinary course of [its] trade or business" within I.R.C. § 1221(1). The Tax Court's opinion provided a clear explanation of the purpose of the personal holding company tax which we need not repeat. We do note that the personal holding company tax is imposed on all corporations satisfying a mechanical test of objective factors which the Tax Court explained in detail.

### A. *The Mechanical Test of the Personal Holding Company Tax*

Section 541 of the Internal Revenue Code imposes an additional tax on undistributed personal holding company income, as defined in section 545, for "every personal holding company (as defined in section 542)." Section 542(a) provides that any corporation is a personal holding company if it meets mechanical tests relating to the number of stockholders and to the character of income earned during the tax year. Inasmuch as all PSLC stock was owned by one person, PSLC agrees that the stockholder test was met and thus we do not describe that test in detail.

The character of income requirement is contained in section 542(a)(1), which provides that "[a]t least 60 percent of [the corporation's] adjusted ordinary gross income (as defined in section 543(b)(2)) for the taxable year [must be] personal holding company income (as defined in section 543(a))." This may be expressed as follows: a corporation is a personal holding company if the fraction consisting of personal holding company income as the numerator and adjusted ordinary gross income as the denominator is greater than or equal to sixty percent (60%). Our task in establishing this fraction is simplified by the circumstance that during its applicable tax year PSLC had only two kinds of income, income from interest payments on debts arising from the Summit House transactions and income from the sale of the Summit House property.

Inasmuch as the parties agree that only the interest payments constituted personal holding company income, the numerator

of the fraction is not in dispute. They disagree, however, over calculation of the denominator of the fraction. If the gain from the sale of Summit House is included in the denominator then PSLC is not a personal holding company. But if the gain is excluded then only the interest income is included in both the numerator and the denominator, giving the fraction a value of one or 100% and, since 100% is greater than 60%, PSLC is a personal holding company.

**B. Calculation of the Denominator**

The denominator of the fraction consists of "adjusted ordinary gross income (as defined in section 543(b)(2))." I.R.C. § 542(a)(1). Section 543(b)(2) defines adjusted ordinary gross income as "ordinary gross income" subject to certain reductions not applicable to this case.

"Ordinary gross income" is defined by section 543(b)(1)(A) as gross income less "all gains from the sale or other disposition of capital assets." [6] A "capital asset" is defined by section 1221 to include all property of a taxpayer subject to certain specific exceptions. PSLC argues that the exception for "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" applies to the Summit House. I.R.C. § 1221(1).

**C. Whether the Sale was Within the Ordinary Course of Trade or Business.**

While the Commissioner recognizes that a pre-trial stipulation provided that PSLC held Summit House exclusively for sale, he contends that the sale was not of an asset primarily held for sale within the ordinary course of PSLC's trade or business. A determination that PSLC's sale of Summit House was not within the ordinary course of its trade or business would result in the exception of section 1221(1) not applying and, inasmuch as PSLC has not argued that any other exception applies, the general rule of section 1221 would govern. Thus, Summit House would be deemed to be a capital asset and the gain on its sale would be excluded from both PSLC's ordinary gross income and adjusted ordinary gross income. Consequently, PSLC's interest income would constitute the only element of both the numerator and denominator giving the fraction a value of one or 100% and PSLC would qualify as a personal holding company.

Thus, it is perfectly obvious that the determination of whether PSLC is a personal holding company turns solely on whether

its sale of Summit House was of **\*270** property held primarily for sale within the ordinary course of its trade or business. PSLC argues that the trial judge's conclusion that its sale of Summit House was not within the ordinary course of its trade or business was clearly erroneous and that, in any event, the Tax Court was required to reach the opposite conclusion as a matter of law.

**1. PSLC's Factual Challenge**

 [2]   We have held that determination of whether property is held for sale within the ordinary course of a taxpayer's trade or business is a question of fact. See Jersey Land & Development Corp., 539 F.2d at 315; Juleo, Inc. v. Commissioner, 483 F.2d 47, 50 (3d Cir.) (Gibbons, J., dissenting), cert. denied, 414 U.S. 1103, 94 S.Ct. 737, 38 L.Ed.2d 559 (1973); Heebner v. Commissioner, 280 F.2d 228, 231-32 (3d Cir.), cert. denied, 364 U.S. 921, 81 S.Ct. 285, 5 L.Ed.2d 260 (1960). [7]   PSLC argues that the Tax Court's finding was clearly erroneous because it was inconsistent with the pretrial stipulation that PSLC held Summit House exclusively for sale.

This stipulation reads as follows:

> On or about June 1, 1978, PSLC purchased a certain piece of real estate located in West Orange, New Jersey, and certain fixtures, equipment, and other personal property located on or used in connection therewith.... *Said purchase was made by PSLC with a view towards immediately reselling the buildings and personalty* to its wholly-owned subsidiary, Mount Orange Realty Corp [MORC]. (Emphasis added.)

PSLC relies on the emphasized portion. This language, however, is not inconsistent with the Tax Court's conclusion that PSLC did not establish that the Summit House transaction occurred within the ordinary course of PSLC's trade or business for it does not even mention the point.

Furthermore, PSLC did not present any evidence as to whether it held Summit House primarily for sale to customers within the ordinary course of its trade or business. Since PSLC bore the burden of proof on this issue, see Tax Ct.R.P. 142(a); Helvering v. Taylor, 293 U.S. 507, 513-15, 55 S.Ct. 287, 290-91, 79 L.Ed. 623 (1935); Anastasato v.

*Commissioner,* 794 F.2d 884, 886-87 (3d Cir.1986), the Tax Court upheld the Commissioner's determination. Judge Cohen pointed out that "[h]ad petitioner chosen to address the issue at trial, it might have submitted evidence demonstrating that the property was held or sold in the ordinary course of PSLC's trade or business. See section 1221(1). Absent such evidence, we cannot find that the property was not a capital asset. Rules 142(a) and 149(b). Respondent's [Commissioner's] determination is sustained." *PSLC* at 573 (citations omitted).

In summary, the stipulation does not state that the Summit House transaction was within PSLC's ordinary course of trade or business and PSLC offered no evidence that it was. Thus, we hold that the Tax Court's factual finding that the sale was not within the ordinary course of PSLC's trade or business was not clearly erroneous.

## 2. PSLC's Legal Challenge

[3]   PSLC nevertheless advances the slightly different argument that, as a matter of law, the stipulated facts required that the Tax Court conclude that sale of Summit House occurred within the ordinary course of its business. In substance, its argument is that as a matter of law it must be concluded that the purchase of an asset for sale subject to a pre-existing contract of sale *always* results in the acquisition of a property to be held primarily for sale to customers in the ordinary course of trade or business. PSLC argues that the Tax Court erred in failing to follow this single factor approach. If, however, as the Commissioner argues, a court must consider and weigh several factors to make this determination, then PSLC cannot prevail on this theory.

This court addressed the problems involved in determining when a sale occurs during a taxpayer's ordinary course of business in *Jersey Land & Development Corp.,* where we stated:

> Whether or not a taxpayer has held real property for sale to customers in the ordinary course of its business is an issue that has often been litigated in the federal courts. Despite this volume of **\*271** litigation, however, *there is no fixed formula or rule of thumb to which a court may readily resort for guidance in resolving this issue.* Rather, each case must, by necessity, turn upon its own facts since *this*

*question is, in the final analysis, one of fact to be determined from the totality of the circumstances surrounding each particular case.* [539 F.2d at 315 (emphasis added.) ]

This fact-specific approach in *Jersey Land & Development* was consistent with our precedents. *See Heebner v. Commissioner,* 280 F.2d at 232; *Kaltreider v. Commissioner,* 255 F.2d 833, 838 (3d Cir.1958). The Tax Court has followed this approach and it is now stated that the determination "[w]hether income from the sale of property is excluded from capital gains treatment is a question of fact, the burden of which is on [the taxpayer]." *S & H, Inc. v. Commissioner,* 78 T.C. 234, 242 (1982) *see Baumgart v. Commissioner,* 47 T.C.M. (CCH) 592, 598, 52 T.C.M. (P-H) 3095, 3101 (1983) [available on WESTLAW, 1983 WL 14727].

The characterization of the income from the sale of Summit House is a question of fact depending partially on PSLC's intent with respect to its business activities. *See Baumgart,* 47 T.C.M. (CCH) at 596, 52 T.C.M. (P-H) at 3099. Several cases have identified a number of factors to be considered in this analysis. [8] The factors most frequently identified are: (1) the purpose for which the taxpayer acquired and held the property; (2) the extent of improvements made to facilitate its sale; (3) the activity of the taxpayer in promoting the sales; (4) the frequency and continuity of sales; (5) the extent and substantiality of sales; (6) the length of time between purchase and sale; and (7) the relative income to the taxpayer from the sale of the property, compared with his other income. *See Baumgart,* 47 T.C.M. (CCH) at 598, 52 T.C.M. (P-H) at 3101; *S & H,* 78 T.C. at 243 n. 12. This court has enumerated and relied on these factors. *See Kaltreider,* 255 F.2d at 838.

PSLC has not cited any controlling authority to suggest that we have departed from this multi-factor analysis. PSLC does, however, cite *S & H. Morley v. Commissioner,* 87 T.C. 1206 (1986), *Baumgart,* and *DeMars v. United States,* 71-1 U.S. Tax Cas. (CCH) ¶ 9288, at 86,114, 27 A.F.T.R.2d (P-H) ¶ 71-490, at 71-925 (S.D.Ind.1968) [available on WESTLAW, 1968 WL 170], for the proposition that when a taxpayer purchases real estate for sale to a specific party under a pre-existing contract, it holds the property primarily for sale to customers in the ordinary course of business regardless of other factors or facts.

*S & H* and *Morley* do not stand for the stated proposition. Like our case, those cases involved a taxpayer's single venture and determination of whether the property involved was held primarily for sale to customers within the ordinary course of the taxpayer's trade or business. *S & H* and *Morley* merely rejected adoption of an absolute prohibition precluding the court from determining that a unique undertaking was within the scope of the taxpayer's trade or business with respect to that single transaction. As *Morley* explained, *S & H* "rejected the so-called 'one-bite' rule to the extent that such rule established that 'a taxpayer who engaged only in one venture or one sale *cannot under any circumstances* be held to be in a trade or business as to that venture or sale.' " *Morley,* 87 T.C. at 1211 (*citing S & H,* 78 T.C. at 244 (emphasis added)). By rejecting a *per se* rule, the Tax Court in *Morley* and *S & H* reaffirmed that this is an issue of fact in which no one fact or factor is dispositive. *See Morley,* 87 T.C. at 1213.

*DeMars* and *Baumgart,* however, do go further and state a *per se* rule, "that property acquired for the purpose of sale to a specific party pursuant to a pre-existing arrangement constitutes property held for sale in the ordinary course of a trade or business." *DeMars,* 71-1 U.S.Tax Cas. (CCH) ¶ 9288 at 86,117, 27 A.F.T.R.2d (P-H) ¶ 71-490, at 71-929. We, however, decline to follow these cases as we have previously stated that "[n]o single factor or test is dispositive." *Kaltreider,* 255 F.2d at 838. Thus, we reaffirm our conclusion that whether a property is held primarily for sale to customers within the ordinary course of a taxpayer's trade or business is a fact specific question for which no single factor is dispositive. Here the finding of fact by the Tax Court on the issue was not clearly erroneous and thus must be upheld. In any event, on an independent review of the record we would reach the same result **\*272** because of the lack of evidence that the transaction involved a property held primarily for sale to customers in the ordinary course of PSLC's trade or business. Thus, we will affirm the judgment of the Tax Court on PSLC's appeal.

## IV. THE PRUSSINS' APPEAL

The Prussins, as limited partners in PSA, claimed a deduction for their distributive share of PSA's depreciation and interest deductions which the Commissioner, upheld by the Tax Court, completely disallowed. Three issues are raised with respect to the Tax Court's decision on this point. First, we consider whether PSA's purchase of Summit House, and not the individual limited partners' investment in PSA, is the

appropriate transaction for examination. Second, we must decide whether the Tax Court's finding of fact that PSA's nonrecourse indebtedness substantially exceeded the fair market value of Summit House was clearly erroneous. Third, we must consider which of the following approaches should be followed: (1) the excess nonrecourse indebtedness may support the claimed deductions; (2) the presence of excess nonrecourse indebtedness requires a complete disallowance of the claimed deductions; or (3) only deductions attributable to the nonrecourse indebtedness to the extent that it was excessive should be disallowed.

### A. *The Relevant Inquiry Takes Place at the Partnership Level*

 [4]   The Prussins urge that we consider the transaction from the perspective of the individual limited partners who did make substantial cash contributions for their investments. But a partnership is required to file its own federal income tax return. Accordingly, for the purpose of computing income and deductions, "the partnership is regarded as an independently recognizable entity apart from the aggregate of its partners." *United States v. Basye,* 410 U.S. 441, 448, 93 S.Ct. 1080, 1085, 35 L.Ed.2d 412 (1973); *accord Brannen v. Commissioner,* 722 F.2d 695, 703 (11th Cir.1984). After the partnership's income and deductions are calculated and reported it is a conduit through which income and deductions are distributed to individual partners. *See Brannen,* 722 F.2d at 703; *Goodwin v. Commissioner,* 75 T.C. 424 (1980), *aff'd without published opinion,* 691 F.2d 490 (3d Cir.1982). Thus, inasmuch as the Prussins claim losses from the Summit House transaction because of George Prussin's limited partnership interest in PSA, we must make our analysis of the investment from the point of view of the partnership. *See Simon v. Commissioner,* 830 F.2d 499, 506-07 (3d Cir.1987). This conclusion renders immaterial the Prussins' argument which, predicated on the investment of the limited partners, is that this transaction should be regarded as an at risk rather than a nonrecourse transaction.

### B. *Whether PSA's Nonrecourse Indebtedness Exceeded the Fair Market Value of Summit House*

 [5]   If we assume, even though the record is unclear on this point, that PSA paid the $500,000 which MORC was to have paid to PSLC, PSA's purchase price for Summit House was $7,759,200, of which no more than $500,000 was paid other than by creation of nonrecourse indebtedness. Otherwise it was $7,259,200. It is this investment which must be compared to the fair market value of Summit House.

63 A.F.T.R.2d 89-344, 88-2 USTC P 9601

The Prussins challenge Judge Cohen's finding of the maximum fair market value. At trial they had the burden of proof on the issue. Tax Ct.R.P. 142(a); *see Helvering v. Taylor,* 293 U.S. at 513-15, 55 S.Ct. at 290-91; *Anastasato v. Commissioner,* 794 F.2d at 886-87. But they introduced no significant evidence of valuation and they produced no expert testimony on this point. [9]

While normally the parties to a real estate transaction have adverse economic interests and thus can be expected to establish fair market value themselves, Judge Cohen explained that here "[s]ales subsequent to PSLC's acquisition of the property ... were not at arm's length, and provide no evidence of the property's fair market value." *PSLC* at 575. This determination rested on her perception of the motivation for the conveyances: "in a transaction entered into primarily to generate tax benefits, the interests of the buying and selling parties are not necessarily adverse." *PSLC* at 575.

**\*273** The Prussins challenge this line of reasoning by asserting that not paying money out is almost *always* better than getting a deduction. Thus, PSA would not pay an excessive amount for the property. While their reasoning is generally true, the Tax Court cited PSA's own projected tax benefits to demonstrate that this transaction did indeed provide deductions sufficient to compensate for the additional money paid out. *See PSLC* at 570. In addition, there was no evidence that PSA had attempted to negotiate the sales price. We conclude that Judge Cohen was justified in considering indications other than what PSA paid to determine the fair market value of Summit House.

The Tax Court did consider the following indicia of fair market value: (1) PSLC had paid $4,200,000 for the improvements *and the land* in an arms length transaction immediately before selling the improvements to PSA for over $7,700,000, *see PSLC* at 573-76; (2) the assessed value of the improvements for property tax purposes suggested a fair market value of $1,522,500; [10] (3) the improvements were insured for $2,745,000; [11] and, (4) the improvements and land were sold in 1985 for $7,000,000.

The Prussins argue that the Tax Court erroneously ignored oral testimony regarding the anticipated increase in value of Summit House provided it could be marketed as originally envisioned as cooperatives or condominiums, a purpose frustrated by a change of local law. We, however, see no reason to accept this assertion in view of Judge Cohen's

analysis of the evidence in the record. Further, the facts of this case demonstrate the peril in relying on anticipated changes in a property to support an enhanced value. In short, Judge Cohen did not have to reject solid evidence showing a maximum fair market value because of a speculative projected new use.

The Prussins erroneously assert that Judge Cohen held that PSLC's purchase price was conclusive of fair market value in PSA's subsequent purchase. She, however, did not hold that Summit House could be worth no more to PSA than PSLC had paid for the property. What she did hold was that the Prussins had failed to meet their burden of proof on value and that only the sale to PSLC on the record provided evidence of the value of Summit House. Furthermore, she did not find that fair market value was $4,200,000; she concluded that fair market value could not have been more than that sum. *See PSLC* at 575.

Given her consideration of many different bases for finding fair market value and the Prussins' failure to present expert testimony on value, we conclude that Judge Cohen's findings as to the maximum fair market value were not clearly erroneous. Accordingly, we will not disturb her finding that the nonrecourse financing exceeded the fair market value of Summit House.

## C. *The Appropriate Legal Standard*

The Internal Revenue Code does not expressly provide in any section germane to this case for any adjustment of deductions when nonrecourse debt exceeds fair market value. [12] Thus, it is necessary to analyze the overall statutory framework and legal precedents to understand the significance of the Tax Court's finding that PSA's nonrecourse debt exceeded the fair market value of Summit House.

## 1. The Statutory Framework

The Internal Revenue Code allows a deduction for "a reasonable allowance for the exhaustion, wear and tear" of property used in the taxpayer's trade or business and of property held for the production of income. I.R.C. § 167(a). This depreciation deduction is calculated using the adjusted basis of the property used to calculate gain under section 1011. *See* I.R.C. § 167(g). The basis of the property for purposes of calculating gain under section 1011 is ultimately defined in section 1012. Section 1012 provides that generally the "basis of property shall be the cost of such property."

63 A.F.T.R.2d 89-344, 88-2 USTC P 9601

**\*274** The cost of property includes the amount of indebtedness incurred or assumed by the purchaser as part of the purchase transaction. *See Crane v. Commissioner, 331 U.S. 1, 9-10, 67 S.Ct. 1047, 1052-53, 91 L.Ed. 1301 (1947).* However, several courts of appeals have held that nonrecourse debt in excess of fair market value is not included in the cost of property for purposes of calculating the depreciation deduction. *See, e.g., Odend'hal v. Commissioner, 748 F.2d 908, 912-14 (4th Cir.1984), cert. denied, 471 U.S. 1143, 105 S.Ct. 3552, 86 L.Ed.2d 706 (1985); Estate of Franklin v. Commissioner, 544 F.2d 1045, 1049 (9th Cir.1976).*

Section 163(a) of the Internal Revenue Code allows a deduction for all interest paid or accrued within the taxable year on indebtedness. This provision allows a deduction for interest paid on nonrecourse debt. It has been held, however, that when "both the purchase price and the lesser principal amount of the nonrecourse note which makes up a portion of such purchase price unreasonably exceed the value of the property acquired, then no 'genuine indebtedness' exists and no 'investment in the property' occurs." *Flowers v. Commissioner, 80 T.C. 914, 942 (1983); see also Odend'hal, 748 F.2d at 912-14; Estate of Franklin, 544 F.2d at 1049.*

Although separate statutory provisions govern interest and depreciation deductions, the case law typically merges issues relating to their allowance. Thus, when nonrecourse debt is excluded from the basis for purposes of calculation of depreciation, it is not treated as genuine indebtedness for determination of interest deductions.

## 2. Whether the Nonrecourse Indebtedness is Included In PSA's Basis and Whether it is "Genuine Indebtedness"

[6]    Although this court has not previously addressed this issue, [13] decisions of other courts of appeals have disallowed deductions for interest and depreciation in circumstances similar to those here. Some of these cases specifically involve investments in real estate and improvements. [14]

Of the cases decided by other courts of appeals, that most similar to this case is *Odend'hal v. Commissioner, 748 F.2d 908. Odend'hal* stands for the proposition that if the fair market value of property is less than its nonrecourse financing, the principal of the nonrecourse financing in excess of fair market value is not included in the basis for the purpose of claiming depreciation. Moreover, *Odend'hal* holds

this excess nonrecourse debt does not sustain a deduction for interest payments.

The facts of *Odend'hal* were as follows. Ten taxpayers purchased a warehouse and food processing facility. As in this case, the taxpayers acquired only the improvements and a long term lease on the land. [15] The purchase took place in December of 1972 for a total consideration of $4,000,000 of which $80,000 was paid in cash and $3,920,000 was financed by nonrecourse debt. Interest on the nonrecourse debt was to be serviced currently but the principal was due in a balloon payment at the end of a fifteen year period.

The promoter of this investment represented that based on a depreciable lifespan of fourteen-and-a-half years, the income earned from leasing the property would not equal the total of the cost of leasing the **\*275** land, mortgage interest, and depreciation. However, he explained that the interest and depreciation deductions would generate additional tax benefits so that an investor in the 50% tax bracket would convert the investment income loss into an after-tax gain.

Although the taxpayers purchased the property for $4,000,000, the Tax Court concluded that its fair market value was only $2,000,000. Because of the wide discrepancy between the face value of the nonrecourse debt and the fair market value, the Tax Court held that the nonrecourse note did not represent genuine indebtedness. Thus, it did not allow the taxpayers to include the nonrecourse debt in their basis for purposes of depreciation. In addition, the taxpayers were allowed to deduct interest and other expenses only to the extent of their income from the property.

The taxpayers appealed to the United States Court of Appeals for the Fourth Circuit, arguing that the Tax Court's determination of fair market value was clearly erroneous and that, as a matter of law, the Tax Court was bound to recognize the entire nonrecourse indebtedness when computing depreciation and interest deductions. The Court of Appeals rejected both contentions.

In finding that the Tax Court's valuation of the property was not clearly erroneous, the Court of Appeals relied, in part, on the fact that the same property had been conveyed for $2,670,000 in an arm's length sale five years before it was sold to the group of ten taxpayers. *See id.* at 911-12. Once the fair market value was established the court turned to the issue of the excessive nonrecourse debt. It stated:

If, as a matter of fact, the fair market value of the property is less than that financed by a nonrecourse loan, the authorities hold that the principal of the nonrecourse loan which exceeds fair market value does not represent a real investment in the property by a taxpayer and he may not include that nonrecourse amount in his basis for depreciation. In addition, the interest paid on the loan is not allowable as an interest deduction. Basis for depreciation usually includes the amount of any indebtedness incurred or assumed by the purchaser in connection with the purchase of the property, because the taxpayer has an obligation to pay the debt. When the debt is a nonrecourse loan, the principal amount of the loan is included in the taxpayer's basis so long as the fair market value of the property is at least equal to the amount of the nonrecourse debt at the time it was incurred, because the taxpayer, even though he has no personal liability at stake, has an economic incentive to pay off the debt rather than to lose the collateral. But if the stated price financed by nonrecourse debt exceeds the fair market value of the property, to the extent of the excess, the taxpayer has no equity in the property to protect and no economic incentive to pay off the debt. [*Id.* at 912.] (Citations omitted.)

Under this analysis taxpayers are able to claim depreciation and interest deductions to the extent that nonrecourse debt does not exceed fair market value.

*Odend'hal* ultimately relied on *Estate of Franklin,* 544 F.2d 1045, which imposed similar limits on deductions supported by nonrecourse debt. In *Estate of Franklin* the owner of a motel agreed to sell it for $1,224,000 with the entire purchase price to be paid by a note secured by a nonrecourse mortgage with monthly principal and interest installments of $9,045.36. A balloon payment of $975,000 was due ten years from

the sale. The property was leased back to the seller for a monthly rental equal to the $9,045.36 monthly debt service. The seller was responsible for operating the motel and paying all expenses. The buyers' only cash payment was $75,000 of prepaid interest.

The buyers claimed that they could take interest and depreciation deductions for the ten years and then either make the balloon payment and complete the purchase or back out of the purchase. The Tax Court characterized this transaction as a ten year option to purchase and accordingly disallowed the deductions for interest and depreciation.

The Court of Appeals for the Ninth Circuit considered the case from a different perspective. It held that if the transaction met two criteria it would not be considered a sale for tax purposes and thus no interest or depreciation deductions would be allowed. The first test was whether the value on which the transaction was based exceeded the fair market value of the property. The second factor was whether the transaction was financed with nonrecourse debt which exceeded the fair market value of the underlying property. The Court of Appeals concluded that the transaction in   **\*276** *Estate of Franklin* met these two criteria and thus it affirmed the Tax Court.

The Prussins attempt to distinguish *Odend'hal* and *Estate of Franklin* on two rationales. First, they argue cash represented only three percent of the purchase price in *Odend'hal* and just over six percent of the purchase price in *Estate of Franklin,* as opposed to their own more substantial investment in PSA. Second, they contend the large balloon payments in *Odend'hal* and *Estate of Franklin* demonstrate that the transactions were mere options to purchase and that here there are no such balloon payments.

Each of these attempts to distinguish *Odend'hal* and *Estate of Franklin* must fail. With regard to the first objection, the appropriate comparison with *Odend'hal* and *Estate of Franklin* is the proportion of cash to nonrecourse debt paid by PSA rather than the amount of the individual limited partners' cash investments. Based on a purchase price of $7,759,200 and a $500,000 cash payment, assuming it was made, this calculation would indicate that 6.44% of the purchase price was paid in cash. This analysis reveals the similarity of this case to the precedents rather than providing a basis to distinguish them. Of course, the Prussins' argument is even weaker if the $500,000 was not paid.

The Prussins' second rationale partially misstates the terms of PSA's obligations. As we have indicated, principal payments on the mortgages were substantially postponed. [16] But even if they were not, it is the existence of deferred nonrecourse indebtedness in excess of the value of the property that creates the economic disincentive to pay the debt. While there may be less incentive to make a balloon payment at the end of a term as compared with earlier structured payments, the proper analysis must be predicated on a comparison of the nonrecourse debt to the fair market value of the property at its acquisition.

The Prussins attempt to distinguish other cases applying *Estate of Franklin* to real estate investments. Both *Beck v. Commissioner,* 678 F.2d 818 (9th Cir.1982), and *Narver v. Commissioner,* 75 T.C. 53 (1980), *aff'd per curiam,* 670 F.2d 855 (9th Cir.1982), are supposedly inapplicable in light of the small percentage of the purchase price paid in a form other than nonrecourse debt and the great overvaluing of the property. But the Prussins' attempt to distinguish these cases must fail for the same reason that *Odend'hal* and *Estate of Franklin* cannot be distinguished: that is, the Prussins are not comparing the same parts of the different transactions as they are looking to the limited partners' investment rather than that of PSA. The Summit House purchase price was substantially paid by PSA with nonrecourse obligations. [17]

While we regard *Odend'hal* and *Estate of Franklin* as the appropriate precedents, we do not consider them as authority to eliminate all deductions for interest and depreciation. While we realize that a taxpayer holding property subject to a nonrecourse debt in excess of the market value of the property may have no incentive to pay off any portion of the debt, including the amount not exceeding the fair market value of the property, it is equally logical to recognize that the creditor holding the debt has no incentive to take back the property if the taxpayer offers to pay the debt up to the value of the property. For example, if a creditor held a nonrecourse debt for $1,500,000 on a property with a fair market value of $1,000,000, he would have a disincentive to foreclose if his defaulting debtor offered to settle the debt for not less than $1,000,000. Thus, it is appropriate to disregard only the portion of nonrecourse debt in excess of the fair market value of the property when it was acquired for purposes of calculations of the depreciation and interest deductions and to regard the nonrecourse debt as genuine indebtedness to the extent it is not disregarded. **\*277** Moreover, there is precedent for disallowing deductions based on nonrecourse

debt only insofar as attributable to the excess of debt over the fair market value. *See Odend'hal,* 748 F.2d at 912-14.

Unquestionably, the record compels the conclusion that Summit House, though not exceeding $4,200,000 in fair market value, had a substantial value. Thus, under our analysis the Tax Court's determination that the deductions should be disallowed in full cannot be sustained. Accordingly, we will remand the case to the Tax Court for a determination of fair market value of Summit House at the time of PSA's acquisition. [18]

We also conclude that the actual cash investment of PSA in the purchase of Summit House, if there was any, should be disregarded in the calculation of the fair market value as it obviously was at risk. While Judge Cohen inferred that the $500,000 was not paid by PSA, we are not satisfied that this was necessarily correct, particularly in view of the Commissioner's brief in which it is recited that it appears that the $500,000 was paid from the investor's funds. According to the Prussins, the absence of evidence establishing that the $500,000 was paid is attributable to the fact that there was no issue at trial raised regarding this point. On the remand it may be definitively ascertained whether the payment was made. The significance of the cash investment is that there is an economic reason to pay off a nonrecourse debt when there is some equity in the property, even though the total debt when added to the equity exceeds the value of the property, as the alternative to paying the debt is the loss of the equity. Thus, if there is a $500,000 equity in a property worth $4,000,000, the owner of the property should logically be willing to pay off up to $4,000,000 in nonrecourse debt to save the property because his loss in that case will not exceed $500,000 but his loss in giving up the property will be $500,000.

The Prussins' constitutional challenge is based on a contention that they were denied due process of law by the total disallowance of the deductions. Thus, they do not assert that the result we reach would deny them due process of law. Accordingly, their constitutional argument is moot and will not be considered.

## V. CONCLUSION

In summary, we hold that PSLC failed to establish that it held Summit House primarily for sale to customers in the ordinary course of its trade or business. Hence, the decision of the Tax Court with respect to PSLC will be affirmed. We hold that

63 A.F.T.R.2d 89-344, 88-2 USTC P 9601

the Tax Court's finding that PSA's nonrecourse debt exceeded the fair market value of Summit House was not clearly erroneous and will not be disturbed. We also hold that PSA's nonrecourse debt did not support interest and depreciation deductions to the extent it exceeded the sum of the cash investment of PSA in Summit House and the fair market value of Summit House at the time of its purchase. We will partially reverse the decision as to the Prussins and will remand the matter to the Tax Court for a determination of the fair market value of Summit House, the actual cash investment, if any, made by PSA for the purchase of Summit House, and forfurther proceedings consistent with this opinion which will partially allow the interest and depreciation deductions claimed by them.

## OPINION

GREENBERG, Circuit Judge

The Commissioner filed a petition urging this panel of the court to reconsider our opinion filed on November 25, 1988. Although we will deny the petition we will address several of the Commissioner's arguments.

 [7]    As framed by the Commissioner the issue meriting rehearing is:

> Whether a taxpayer who has acquired property subject to nonrecourse indebtedness that is far larger than the fair **\*278** market value of the property at the time of acquisition is entitled to deductions for interest and depreciation attributable to the nonrecouse indebtedness to the extent of the fair market value of the collateral.

Our opinion answered this question in the affirmative.

The Commissioner petitions for reconsideration on two bases. First, he objects to our reading of several precedents upon which we rely as persuasive authority. Second, the Commissioner argues that our opinion will create valuation problems which will produce intolerable administrative burdens.

The Commissioner's first argument refers to our reliance on *Odend'hal v. Commissioner*, 748 F.2d 908 (4th Cir. 1984), cert. denied, 471 U.S. 1143, 105 S.Ct. 3552, 86 L.Ed.2d 706(1985) and *Estate of Franklin v. Commissioner*., 544 F.2d 1045 (9th Cir. 1976). He argues that the courts in these cases disallowed any depreciation or interest deductions rather than disallowing only deductions attributable to the excess nonrecouse debt. Accordingly, he contends that we should disregard the language in each of the opinions suggesting the contrary result.

We observe, however, that in both *Odend'hal* and *Estate of Franklin*, as the Commissioner seems to acknowledge, the issue of whether the taxpayers were entitled to a partial deduction was apparently not raised either before the Tax Court, *see Odend'hal v. Commissioner*, 80 T.C. 588, 590, 602-05, 617-18(1983); *Estate of Franklin v. Commissioner*, 64 T.C. 752, 760-62, 770-71 (1975), or on appeal, *see Odend'hal*, 748 F.2d at 909, 912, 913; *Estate of Franklin*, 544 F.2d at 1046, 1048-49. In this case the issue was squarely presented to the court, and thus we were required to rule on it. We found the opinions and reasoning in *Odend'hal* and *Estate of Franklin* persuasive while we found their holdings, which did not directly address this issue, not in opposition. Indeed, the Commissioner acknowledges in his petition for rehearing that "[t]o be sure, there is language in the opinions in both *Odend'hal* and *Estate of Franklin*, which, taken out of context, could be read as consistent with the panel opinion here."

 [8]    The Commissioner's second argument is based on a misreading of our opinion. The Commissioner correctly notes that we call "for the taxpayers to use the fair market value of the property on the date of purchase in determining how much of the nonrecourse debt to allow in calculating their basis in the property." However, the Commissioner suggests that we would allow annual recalculations of the portion constituting genuine indebtedness " because [the taxpayers] have an incentive to repay a greater amount of the nonrecouse debt each year." Accordingly, the Commissioner observes that these recalculations would impose administrative burdens and produce "computational anarchy". We cannot perceive how the Commissioner arrived at this understanding as we said that "it is appropriate to disregard only the portion of nonrecouse debt in excess of the fair market value of the property when it was acquired for purposes of the depreciation and interest deductions and to regard the nonrecouse debt as genuine indebtedness to the extent it is not disregarded." Panel opinion, *supra*, at 277-78 (emphasis added.) We never suggested that there would be annual

63 A.F.T.R.2d 89-344, 88-2 USTC P 9601

reevaluations. Thus, the administrative burdens which the Commissioner contemplates do not exist. However, to clear up any possible misunderstanding, we now expressly state that our opinion of November 25, 1988, is not to be read to require periodic recalculations of the sum of nonrecourse debt constituting genuine indebtedness.

The Commissioner argues in support of his second basis for rehearing that "a borrower whose note exceeds a reasonable estimate of the fair market value of the property has no immediate incentive to pay off any part of the note, because his payments will not give him any equity in the property unless and until the value of his interest exceeds the face amount of the note." In this regard the Commissioner points out that "the investor's entitlement to the claimed tax benefits" is fixed at the time the property is acquired. But if the lender is rational the borrower does have an incentive to pay off a portion of the debt for the lender has a disincentive to foreclose if the purchaser offers to pay the debt up to the value of the property. While the Commissioner dismissed the compromise possibility as "entirely speculative" and "wholly unpredictable at the time the borrower acquires the property subject to the non-recourse note" his argument proves too much because the concept of disallowance of the deductions in excess non-recourse financing  **\*279** situations is based on the theoretical economic disincentive to the borrower to pay the debt rather than upon what ultimately happens. It is no more speculative to assume that the lender will act rationally in compromising than it is to assume that the borrower will not foolishly pay the entire nonrecourse debt. We said as much in our original opinion and we see no reason to change our conclusion in this regard.

The Commissioner's Petition for Rehearing will be denied.

## Parallel Citations

63 A.F.T.R.2d 89-344, 88-2 USTC P 9601

## Footnotes

1    The years with respect to which tax liability is contested predate the enactment of the Tax Reform Act of 1986, Pub.L. No. 99-514, 100 Stat. 2085. Thus, while that Act redesignated the Internal Revenue Code of 1954 as the Internal Revenue Code of 1986, *see id.* § 2, we refer throughout this opinion to the 1954 Code which governs the substantive issues.

2    A related case, *Estate of Isaacson v. Commissioner,* 2d Cir., Docket No. 88-4062, arising from the same transaction but involving different taxpayers, was appealed to the United States Court of Appeals for the Second Circuit. In this related case, the estate of Melvin W. Isaacson and Miriam A. Isaacson appealed from a decision disallowing deductions for depreciation and interest based on Melvin Isaacson's ownership of two limited partnership units in PSA. Venue for the Isaacson appeal lay to the Court of Appeals for the Second Circuit rather than to this court because the Isaacsons resided in Connecticut at the time their tax court petitions were filed. I.R.C. § 7482(b). PSLC and the Prussins in their brief recite that the Commissioner "would not consent to a consolidation of these appeals." On October 24, 1988 the court affirmed the Isaacson appeal in a per curiam opinion for the following reason: "We agree with the reasoning and conclusions of the Tax Court, and, for the reasons set forth in Judge Cohen's thorough opinion, the judgment of the Tax Court is affirmed." 860 F.2d 55. Notwithstanding the opinion of the Court of Appeals for the Second Circuit, we have independently arrived at our result which is partially different. We note that in its brief recitation of the facts, the Court of Appeals for the Second Circuit indicated that $500,000 was paid in cash by PSLC for the original purchase. We are confident that the correct figure was $250,000, as set forth by Judge Cohen.

3    The $500,000 was not paid by MORC. A pretrial stipulation indicated that it was to be paid but does not indicate that this happened. In their brief, appellants suggest it was borrowed and was thus owed. It should be noted that the consideration in the PSLC and MORC purchases was divided between personal property and real estate but the allocation is not significant for our purposes.

4    In the Tax Court opinion the judge refers to the gain on the sale of Summit House by PSLC as being on a sale *to* MORC but the parties refer to it as being on the sale to PSA and therefore, in effect, being *of* MORC. Thus, PSLC in its brief, in an assertion that the Commissioner does not challenge, indicates that "the Commissioner determined that PSLC realized a capital gain of $3,742,704 from its sale of Summit House to PSA of which $464,069 was recognizable in PSLC's taxable year ending May 31, 1979, because of the application of the installment method. Although PSLC's sale was of the stock of MORC, the Commissioner computed the gain as if PSLC had sold Summit House to PSA" for $7,759,200. Elsewhere, however, PSLC refers to the $464,069 as "income realized on the sale of real property to its subsidiary by PSLC...." We will not linger on this point as all of the transactions we have described were clearly part of a related program. Furthermore, the parties do not treat the question of which transfer was taxed as significant. We do note that the size of the gain suggests that the transfer to PSA was taxed. We also point out that it was not simply the Commissioner who determined that there was a gain of $3,742,704, as suggested in the quotation, for PSLC reported that gain on its tax return.

63 A.F.T.R.2d 89-344, 88-2 USTC P 9601

5    In its brief, the Commissioner indicates that the deficiencies were $229,842.80 and $138,112.50. These figures come from the decision of the Tax Court rather than the opinion. On the record before us, we cannot account for this discrepancy but are not required to do so as the deficiencies will in any event be recalculated.

6    There are other exclusions as well but they are not applicable.

7    The determination of the taxpayer's primary purpose in holding the property is made as of the time of sale. *Jersey Land & Development,* 539 F.2d at 315. Here, the circumstances were such that PSLC's purpose in holding the Summit House could not have changed in the time between when it acquired the property and sold the shares of MORC.

8    This court has observed, however, that while these factors may be helpful in analyzing residential real estate transactions, they are of limited utility when commercial real estate is involved. *See Jersey Land & Development,* 539 F.2d at 316.

9    Judge Cohen observed that Tax Court Rule of Procedure 143(f) and a pretrial standing order required the taxpayers to present an expert report but that the taxpayers decided to forego expert testimony on the value of Summit House. *See PSLC* at 574 & n. 6.

10   The Tax Court relied on the assessed value and the municipality's stated relationship between the assessed value and fair market value. The assessed value had been presented by PSA to its investors in its initial offering memorandum. *See PSLC* at 575. Judge Cohen considered and rejected the Prussins' contention that PSLC's purchase price was for less than the fair market value. This finding was not clearly erroneous.

11   The replacement value of the buildings, not the land, was insured for this value under a policy containing a 90 percent coinsurance clause. *See PSLC* at 574.

12   The at risk provisions of the Internal Revenue Code of 1954 do not govern this case. *See* I.R.C. § 465 as amended by the Revenue Act of 1978, Pub.L. No. 95-600, § 201, 92 Stat. 2763, 2814-15 (1978).

13   In *CRC Corp. v. Commissioner,* 693 F.2d 281 (3d Cir.1982), *cert. denied,* 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983), we held that we would not require the Commissioner to permit contingent or speculative obligations to be included in the basis while the uncertainty surrounding them was unresolved. *CRC,* like *Brountas v. Commissioner,* 692 F.2d 152 (1st Cir.1982), *cert. denied,* 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983), and *Gibson Products Co. v. United States,* 637 F.2d 1041 (5th Cir.1981), on which it relied, should thus be regarded as timing cases and, while wholly consistent with our result, are not sufficient authority on which to base our decision.

14   The Prussins argue that cases involving wasting assets are inapplicable to real estate investments. The Prussins rely on *Siegel v. Commissioner,* 78 T.C. 659, 690 (1982), to demonstrate that the Tax Court recognizes the distinction between wasting assets and realty when determining whether excess debt should be added to basis. *Siegel* involved a limited partnership investment in a motion picture and thus to the extent it addresses the treatment of real estate, the portion of *Siegel* relied on by the Prussins is dictum. The actual holding of *Siegel* is not inconsistent with our result but even if it was we would not be bound by it.

15   The lease at the lessees' option was for 99 years. Here it was for 90 years.

16   We have so concluded on the basis of our study of notes and mortgages in the record. We point out, however, that the Commissioner makes no mention of this point in his brief.

17   The Prussins challenge the entire *Estate of Franklin* line of cases by pointing out that inasmuch as this is a limited partnership case, the Commissioner's reliance on the nonrecourse aspect of the transaction is "completely misplaced" as the limited partners were not liable anyway. We do not agree, because the legal insulation of the limited partners in no way would impact on the incentive of the general partner to pay a recourse obligation. Thus, their argument on this point incorrectly looks at the transaction from the wrong perspective. As we have indicated, the relevant inquiry takes place at the partnership level. Their argument may actually cut the other way as in a limited partnership recourse note situation it could be contended that the *Estate of Franklin* rationale should be followed if the debt is excessive as compared to the value of the property and the general partner is not financially responsible.

18   While Judge Cohen indicated that "the fair market value of the property could not have been more than $4,200,000," *PSLC* at 575, she may have concluded that it was $4,200,000, though her opinion does not include a definitive finding on the point. We, however, doubt that she did intend to determine the fair market value as distinguished from the maximum fair market value, as the $4,200,000 figure came from the price to PSLC which included the land and improvements and PSA by purchasing MORC acquired only the improvements. If, however, we misunderstand her findings on this point, the fair market value need not be reconsidered. We also point out that while we are remanding the case for calculation of the fair market value, the Prussins will be limited to a maximum value of $4,200,000, as we are upholding the finding that the fair market value did not exceed that figure.

---

**End of Document**                        © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 115

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 131 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

1998 ABQB 279
Alberta Court of Queen's Bench

Pocklington Foods Inc. v. Alberta (Provincial Treasurer)

1998 CarswellAlta 335, 1998 ABQB 279, [1998] 10 W.W.R. 244, [1998]
A.J. No. 364, 159 D.L.R. (4th) 81, 218 A.R. 59, 61 Alta. L.R. (3d) 125

# Pocklington Foods Inc., Plaintiff v. Her Majesty the Queen in Right of the Province of Alberta as Represented by the Provincial Treasurer of Alberta, Defendant

Ritter J.

Judgment: May 1, 1998
Docket: Edmonton 9003-14825

Counsel: *W. E. Code*, *Q.C.* and *C. J. Popowich*, *Esq.*, for the Plaintiff.
*N. J. Pollock, Q.C.*, *M. E. Lesniak, Esq.* and *A. R. Gray, Esq.*, for the Defendant.

Subject: Contracts; Corporate and Commercial

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

### Contracts --- Performance or breach — Breach — General

Plaintiff corporation entered into loan agreement with Alberta government — Government provided both loans and loan guarantees to subsidiary corporation of plaintiff on condition that if subsidiary defaulted, government would be entitled to take shares of subsidiary and apply amount equivalent to their value to total indebtedness — Agreement provided that value of shares was to be determined by government "in the exercise of its reasonable discretion" — Subsidiary defaulted and government seized its shares — Plaintiff sued for breach of contract when government informed it that subsidiary's shares were valued at nil — Action allowed — Evidence established that government breached contract by not exercising its discretion reasonably — Government decided for political reasons to simply not conduct valuation of shares and arbitrarily decided that shares were worth nothing — Court established value of shares of subsidiary at $95,000,000, which was to be set-off against debt owed to government totalling $114,000,000.

### Corporations --- Shares — Share capital — Value

Plaintiff corporation entered into loan agreement with Alberta government — Government provided both loans and loan guarantees to subsidiary corporation of plaintiff on condition that if subsidiary defaulted, government would be entitled to take shares of subsidiary and apply amount equivalent to their value to total indebtedness — Agreement provided that "value" of shares was to be determined by government "in the exercise of its reasonable discretion" — Subsidiary defaulted and government seized its shares — Plaintiff sued for breach of contract when government informed it that subsidiary's shares were to be valued at nil — Action allowed — Evidence established that government breached contract by not exercising its discretion reasonably — Court proceeded to value shares of subsidiary — "Value" of shares interpreted to have required that shares be valued pursuant to fair market value standard — Facts of case required that actual value of shares be determined pursuant to combination of market price, valuation of net assets, and capitalization of maintainable earnings approaches — Plaintiff not entitled to special compensation because of special value placed on

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 132 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...
1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

shares by government — Value of shares of subsidiary determined to be $95,000,000, which was to be set-off against debt owed to government totalling $114,000,000.

**Table of Authorities**

**Cases considered by *Ritter J.*:**

*Associated Provincial Picture Houses Ltd. v. Wednesbury Corp.*, [1948] 1 K.B. 223, [1947] 2 All E.R. 680 (Eng. C.A.) — considered

*Bexley v. Dunning*, [1976] 4 W.W.R. 446 (B.C. S.C.) — considered

*Brant Investments Ltd. v. KeepRite Inc.* (1987), 37 B.L.R. 65, 60 O.R. (2d) 737, 42 D.L.R. (4th) 15 (Ont. H.C.) — referred to

*Canada (National Capital Commission) v. Hobbs*, [1970] S.C.R. 337, 10 D.L.R. (3d) 11 (S.C.C.) — considered

*Canadian Gas & Energy Fund Ltd. v. Sceptre Resources Ltd.*, 29 B.L.R. 178, [1985] 5 W.W.R. 43, 38 Alta. L.R. (2d) 223, 61 A.R. 67 (Alta. Q.B.) — considered

*Dau v. Murphy Oil Co.*, [1970] S.C.R. 861, 73 W.W.R. 269, 12 D.L.R. (3d) 19 (S.C.C.) — referred to

*Diggon-Hibben Ltd. v. R.*, [1949] S.C.R. 712, 64 C.R.T.C. 295, [1949] 4 D.L.R. 785 (S.C.C.) — considered

*Domglas Inc. v. Jarislowsky, Fraser & Co.*, 13 B.L.R. 135, [1980] C.S. 925 (Que. S.C.) — considered

*Domglas Inc. v. Jarislowsky, Fraser & Co.*, [1982] C.A. 377, 22 B.L.R. 121, 138 D.L.R. (3d) 521 (Que. C.A.) — referred to

*Ellis v. Abell* (1884), 10 O.A.R. 226 (Ont. C.A.) — considered

*Fraser Inc. v. Aitken* (1988), 41 B.L.R. 87 (Ont. H.C.) — referred to

*Gold Coast Selection Trust Ltd. v. Humphrey (Inspector of Taxes)*, 30 T.C. 209, [1948] A.C. 459, [1948] 2 All E.R. 379 (U.K. H.L.) — considered

*Grant v. Grant* (1870), L.R. 5 C.P. 727 (Eng. Exch.) — considered

*Hemani v. British Pacific Properties Ltd.* (1992), 24 R.P.R. (2d) 248, 70 B.C.L.R. (2d) 91 (B.C. S.C.) — considered

*Indian Molybdenum Ltd. v. R.*, [1951] 3 D.L.R. 497 (S.C.C.) — considered

*Kelvin Energy Ltd. v. Bahan* (1987), 52 Alta. L.R. (2d) 71, 79 A.R. 259 (Alta. Q.B.) — considered

*King v. Major Oil Investments Ltd.*, [1943] 2 W.W.R. 541 (Alta. S.C.) — considered

*King v. Major Oil Investments Ltd.*, [1944] 3 W.W.R. 233 (Alta. C.A.) — referred to

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

*Lake Erie & Northern Railway v. Brantford Golf & Country Club* (1916), 32 D.L.R. 219 (S.C.C.) — considered

*Lord Advocate v. Earl Home* (1891), 28 S.L.R. 293, 18 R. 397 (Scotland Ct. Sess.) — considered

*Montreal (City) v. Sun Life Assurance Co.*, [1950] S.C.R. 220, [1950] 2 D.L.R. 785 (S.C.C.) — considered

*Montreal Island Power Co. v. Laval-des-Rapides (Ville)*, [1935] S.C.R. 304, [1936] 1 D.L.R. 621 (S.C.C.) — considered

*New Quebec Raglan Mines Ltd. v. Blok-Andersen* (1993), 9 B.L.R. (2d) 93 (Ont. Gen. Div. [Commercial List]) — referred to

*Northwestern Mechanical Installations Ltd. v. Yukon Construction Co.*, 20 Alta. L.R. (2d) 156, 37 A.R. 132, [1982] 5 W.W.R. 40, 136 D.L.R. (3d) 685 (Alta. C.A.) — considered

*R. v. Bourque* (1962), 34 D.L.R. (2d) 120 (N.B. C.A.) — referred to

*R. v. Harwood* (1900), 6 Ex. C.R. 420 (Can. Ex. Ct.) — referred to

*R. v. Jones*, 23 M.P.R. 426, *(sub nom. Saint John Sulphite Ltd., Ex parte)* [1949] 4 D.L.R. 259 (N.B. C.A.) — referred to

*R. v. Roach*, [1919] 3 W.W.R. 56 (Alta. S.C.) — considered

*R. v. Rothesay Assessors* (1964), 50 M.P.R. 317, 46 D.L.R. (2d) 156 (N.B. C.A.) — referred to

*R. v. Trudel* (1914), 49 S.C.R. 501, 19 D.L.R. 270 (S.C.C.) — considered

*Secretary of State for Education & Science v. Tameside Metropolitan Borough Council*, [1977] A.C. 1014, [1976] 3 All E.R. 665 (U.K. H.L.) — considered

*Shapiro v. Winnipeg City Assessor* (1987), 49 Man. R. (2d) 305, *(sub nom. Shapiro v. City Assessor for City of Winnipeg)* 43 D.L.R. (4th) 506 (Man. C.A.) — referred to

*Steen v. R.*, 86 D.T.C. 6498, [1986] 2 C.T.C. 394, 6 F.T.R. 179, [1987] 1 F.C. 139 (Fed. T.D.) — considered

*T. Eaton Co. v. Alberta (Assessment Appeal Board)* (1995), 33 Alta. L.R. (3d) 349, [1996] 1 W.W.R. 399, 174 A.R. 99, 102 W.A.C. 99, 128 D.L.R. (4th) 469 (Alta. C.A.) — considered

*Westfair Foods Ltd. v. Watt*, 73 Alta. L.R. (2d) 326, 48 B.L.R. 43, [1990] 4 W.W.R. 685, 106 A.R. 40 (Alta. Q.B.) — referred to

*Winnipeg (City) v. T. Eaton Realty Co.*, [1944] 2 W.W.R. 541, 52 Man. R. 106, [1944] 2 D.L.R. 638 (Man. K.B.) — referred to

*Withycombe Estate, Re*, [1945] S.C.R. 267 (S.C.C.) — considered

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

*Zwicker v. Stanbury*, [1953] 2 S.C.R. 438, [1954] 1 D.L.R. 257 (S.C.C.) — referred to

**Statutes considered:**

*Business Corporations Act*, S.A. 1981, c. B-15
    Generally — referred to

*Business Corporations Act*, R.S.O. 1990, c. B.16
    Generally — referred to

*Canada Business Corporations Act*, R.S.C. 1985, c. C-44
    Generally — referred to

*Income Tax Act*, S.C. 1970-71-72, c. 63
    s. 7(1)(a) — referred to

**Words and phrases considered**

**fair market value**

The experts agreed that the most common value standard is fair market value, which is a notional concept involving a willing buyer and a willing seller. The concept assumes equally informed, arms-length parties and involves an objective standard. Matters like compulsion on one of the parties to act are assumed away, such that the intended result is something that allows for fairness to each of the parties involved in the evaluation. The notion of fair market value assumes that the market is open and unrestricted and that there are no potential purchasers who are excluded from participation in the market. In assuming that the parties are acting at arms-length, the negotiation is contemplated to be between parties with opposing interests, each having an economic stake in the outcome.

**value-to-owner**

Another standard of value is the value-to-owner, or value-in-use, which is defined as the price the owner would pay rather than be denied the uninterrupted ownership and use of the property. It is also defined as the adverse value of the entire loss, direct and indirect, that the owner might expect to suffer if he is deprived of the property. It is never less than fair market value and can be used to describe either owner-perceived economic advantage, non-economic advantage, or a combination of both. In an economic context, value-to-owner may be equal to or greater than fair market value.

**value-in-use**

Another standard of value is the value-to-owner, or value-in-use, which is defined as the price the owner would pay rather than be denied the uninterrupted ownership and use of the property. It is also defined as the adverse value of the entire loss, direct and indirect, that the owner might expect to suffer if he is deprived of the property. It is never less than fair market value and can be used to describe either owner-perceived economic advantage, non-economic advantage, or a combination of both. In an economic context, value-to-owner may be equal to or greater than fair market value.

**asset base**

The asset base, or cost base approach is a way of measuring the future benefits of ownership by quantifying the amount of money that would be required to replace the future service capability of the subject property. This approach contemplates that the cost to purchase or develop new property is commensurate with the economic value of the service that the property can provide during its life. It assumes that economic benefits exist and are of sufficient amount and duration to justify the expenditures. Under this approach, current costs of obtaining an unused replica of the subject property, including intangible

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 135 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...
1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

property, or cost of obtaining a property of equivalent utility, is determined. Depreciation is deducted from the cost to reflect elements of physical, economic, and functional obsolescence.

**cost base**

The asset base, or cost base approach is a way of measuring the future benefits of ownership by quantifying the amount of money that would be required to replace the future service capability of the subject property. This approach contemplates that the cost to purchase or develop new property is commensurate with the economic value of the service that the property can provide during its life. It assumes that economic benefits exist and are of sufficient amount and duration to justify the expenditures. Under this approach, current costs of obtaining an unused replica of the subject property, including intangible property, or cost of obtaining a property of equivalent utility, is determined. Depreciation is deducted from the cost to reflect elements of physical, economic, and functional obsolescence.

**income approach**

The income approach involves an estimation of the cash flow of the business and its profitability. The profitability is then converted to value by the application of a capitalization or discount rate. In determining the appropriate rate, factors such as interest rates, rate of return expected by investors on relevant investments, and the risk characteristics of the anticipated benefits are taken into consideration. In some industries and in some circumstances the value of a business is determined simply by multiplying or capitalizing the gross revenue.

**market approach**

The market approach involves comparable properties. What the evaluator does is look at the sale prices for similar assets which have sold on the open market. The evaluator then makes adjustments for the differences between the asset being evaluated and those similar assets which have been sold. The market approach is frequently used with respect to real estate appraisals, particularly where there are a great many similar properties which have sold, or which are on the market.

**value**

The question of value has arisen in contractual situations. In *Bexley et al. v. Dunning*, [1976] 4 W.W.R. 446 (B.C.S.C.), the Court ... determined that in the absence of surrounding circumstances indicating a different sense, what value meant was "what can be obtained in money on the open market".

In a contractual sense, the classic statement of value is found in *Lord Advocate v. Earl of Home* (1891), 28 Sc. L.R. 293 18 R (Ct. of Sess.) 397 at 403 where Lord MacLaren said "... value ... means exchangeable value - the price which the subject will bring when it is exposed to the test of competition."

ACTION by plaintiff corporation against government for breach of contract.

*Ritter J.*:

**Introduction**

1    This matter arises out of a series of transactions involving the Government of the Province of Alberta and a meat processing company, Gainers Inc., which was 100 percent owned by the Plaintiff Pocklington Foods Inc. In turn, Pocklington Foods Inc. was wholly owned by Mr. Pocklington.

2    To some extent, this matter involves the overlay of politics on what would normally be purely commercial arrangements. That is because one of the parties is the Government of Alberta, in a direct sense, as the Defendant is a Department of that Government and not some arms-length entity owned by government.

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

3     Where there is such an overlay a Court should always proceed with caution as it is not normally the function of the Courts to comment on or question political decisions of government. At the same time, if what might be regarded as purely political invades what should be purely commercial, and if that invasion has some real effect on the commercial arrangements or consequences flowing from those commercial arrangements, then the Court must consider whether the introduction of political consideration was appropriate.

4     In this trial, several former Ministers of the Government of Alberta testified. In some instances their credibility was placed in issue. The duty of the Court is to test that credibility as it would with any witness before the Court. It is also the duty of the Court to state its findings with respect to credibility, provided that determination has some material purpose in deciding the issues before the Court. The Court should not cast aspersions on the credibility of a witness where credibility plays no part in a determination of the issues before it. This applies to all witnesses whether or not they hold or held high public office.

5     At the same time, the Court cannot shy away from determinations of credibility because of concern that someone who is in the public domain and holds or held a high public profile has further to fall than does someone who is not so stationed.

6     The next item that I wish to comment on in relation to the nature of the Government as a party to this action is that I heard a great deal about "taxpayers" from several defence witnesses. I take it that the overuse of this word occurred because it is expected that the Court will consciously or subconsciously extend a benefit to a party if the Court is convinced that that party is really composed of all of the citizens of a province. That is not the case. The Government comes before this Court like any other party. Courts are required to uphold the law and sometimes that requires the Court to do what is unpopular or what will affect the will or the purse of citizenry.

7     In addition, to extend a benefit to "taxpayers" on a case-by-case basis would be counterproductive to citizens and the Government. If the fact that one party is Government and composed of citizens resulted in special considerations for that party, no one would ever do business with the Government, or if they did, would require a premium to do so.

8     The final general consideration that I wanted to comment upon arising from the Government of Alberta being a party is in relation to comments that one often hears and sees to the effect that omissions of past governments should not be visited on present citizenry. In my view, such comments are illogical. If citizens do not feel responsible for omissions of past governments, then logically they should refuse to accept any continuing benefits which are attributable to such governments. I doubt that anyone would refuse to use highways, hospitals or schools built by the government of the day when these events arose in order to be consistent with their position that what is past is past. I raise this consideration only to point out that it played no role in this decision.

9     Some of the issues to be determined by this Court are outlined in the Court Order of the Case Management Judge, Costigan, J., granted on Thursday, the 1st day of May, 1997. Some of those issues have become moot due to agreements among the parties, or concessions made by one or another of them. I will respond specifically to the issues that remain in dispute near the end of these Reasons.

10     While the issues stated in the Order and otherwise raised in the pleadings give rise to a degree of complexity, they may be broken down into the following questions:

    1. Having regard to the assets, liabilities and purpose of Gainers Inc., excluding the benefits and detriments arising from a series of related Court actions, is there any surplus value to shares?

    2. Is the Defendant required to account to the Plaintiff for any surplus value in the shares of Gainers Inc. and Gainers Properties Inc. taken by the Defendant on the 6th of October, 1989?

    3. Has the Crown reasonably valued the shares of Gainers Inc. and Gainers Properties Inc.?

    4. If the shares have a nil or positive value, how does that affect the related actions?

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

5. If the value of the shares is a negative figure (excluding consideration of the related actions), what steps should the Defendant take in pursuit of its claims under the series of related actions?

11     During the course of these Reasons it is my intention to follow a somewhat linear process, but where I feel there is a valid reason I will make reference to matters which might more appropriately relate to subjects other than the subject I am dealing with at the time. This is because the resolution of the questions before me involves an interplay of factors.

12     In addition, while I intend to lay out the general facts as I have found them, specific facts will be alluded to throughout my Reasons. I do this to "bring home" the facts that I find particularly compelling in relation to a particular area of my analysis.

13     It is my intention to follow the following general headings in terms of my analysis and conclusion:

1. General factual narrative.

2. The valuation of Gainers by the Defendant.

3. Valuation theory.

4. Intangible assets.

5. Land appraisal.

6. Valuation of improvements.

7. Tax loss carry forward.

8. Expert business evaluation.

9. Legal analysis.

10. Conclusions.

14     I intend to further break down each of these general headings so that the reader will have a better understanding of the point being addressed or the source or purpose of the point being addressed.

**Factual Matters**

*Agreed Statements of Facts*

15     The parties are in agreement on many facts. They have filed a series of Agreed Statements of Facts and have included, as attachments to those agreements, documents relevant to this matter. From the Agreed Statements of Facts, the following factual analysis arises.

16     Gainers Inc., or a predecessor of Gainers Inc. has been in the meat packing business in Edmonton, Alberta since before 1900. In or about 1977, an agreement was made by Mr. Peter Pocklington to acquire Gainers Inc. This acquisition was completed in 1978, through a series of companies owned by Mr. Pocklington.

17     Expansion of Gainers ensued and pursuant to an agreement entered into in 1980 and completed in January 1981, Gainers Inc. acquired the Canadian Food Business assets of Swift Canadian Co., including the slaughtering and meat plant at 66th Street and Yellowhead Trail in Edmonton, Alberta. The main slaughtering and meat packing operations of Gainers Inc. were moved to this plant, and between 1981 and 1982 a 50,000 square foot distribution centre was constructed on this main plant site. The old Gainers Inc. Edmonton Plant was then closed.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 138 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

18      In connection with the acquisition from Swifts, Gainers Inc. and other companies entered into a Permitted User Agreement with Swift Canadian Company Limited, dated January 13, 1981. That Permitted User Agreement and Amendments and Modifications made after it provided Gainers with the right to use Swift trademarks for the specified period of time contained in the Agreement.

19      Gainers Inc. has continued to operate from the former Swift Plant in Edmonton, Alberta. In 1983 Gainers Inc. disposed of its Eastern Canadian operations, and certain other assets which had been acquired from Swift.

20      In 1985, as part of a re-organization, Gainers Inc. became a wholly owned subsidiary of 332658 Alberta Ltd., which was later re-named Pocklington Foods Inc. The terms of Pocklington Foods Inc.'s acquisition of Gainers Inc. are set out in an agreement which was dated September 23, 1985. Pursuant to that agreement it was agreed that the fair market value of Gainers Inc.'s common shares was $50,000,000.00 with certain provisions for adjustments set out in that agreement.

21      The book value of Gainers Inc.'s fixed assets was "stepped up" for the Audited September 28th, 1985 Gainers Inc,'s financial statements as part of the 1985 reorganization. The book value was written up to appraised value, based on appraisals done in 1984. (The fiscal year end of Gainers Inc. is the last Saturday of each September and accordingly the dates of the Audited Financial statements vary from year-to-year.)

22      In 1985 Gainers Inc. purchased the assets of Magic Pantry Foods. Magic Pantry produced retort pouch microwavable trays containing complete meals for retail market, for military rations and for private label products for diet centres.

23      In 1986 the business assets of Sodor Foods Inc., a regional meat processor in Quebec City, were acquired and this operation was conducted by Sodor Foods Inc. as a Gainers Inc. subsidiary. This Plant was closed by Gainers Inc. during March, 1989, with the consent of the Defendant. All of the equipment at the Sodor Plant was then moved to other Gainers Inc. Plants.

24      In 1986 Gainers Inc. endured a long strike by its unionized employees, and an associated boycott of its products which spread across Canada. The effect of the strike and the boycott extended into the 1987 fiscal year results and beyond.

25      During 1986 and 1987 Gainers Inc. constructed a 45,000 square foot bacon processing facility in North Battleford, Saskatchewan.

26      In September of 1987, in connection with closing the Master Agreement (which will be described in some detail later in these Reasons), most of Gainers Inc.'s fixed assets were conveyed to Gainers Properties Inc. Gainers Inc. and Gainers Property Inc. agreed that Gainers Inc.'s fixed assets were to be conveyed to Gainers Property Inc. at fair market value, based on appraisals which were prepared in 1987.

27      In September of 1987, Gainers Inc. acquired Z & W Foods Limited in Toronto from Loblaws. The Purchase Agreement relating to this transaction was assumed by Kretchmar Inc., a wholly owned subsidiary of Gainers Inc., and the operation was thereafter operated as Kretchmar Inc. This company specialized in high-quality processed meat and had such customers as McDonalds. As part of the acquisition, Kretchmar Inc. entered into a five year supply agreement with Loblaws in Eastern Canada, and Gainers Inc. entered into a five year supply agreement with Kelly Douglas in Western Canada to supply certain of their food and processed meat requirements.

28      By 1989 Gainers Inc. had nine distribution and sales offices or facilities across Canada and two sales facilities in the United States. Its branded products were sold under the Gainers Inc. and Swift names and names owned by Gainers Inc., as well as under private brand labels. In 1989, Gainers Inc. was one of the largest meat processors in Canada, and the only national meat processor located in Alberta. It was the largest hog slaughterer in Western Canada. It employed over 1,500 people nationally, with 1,200 of its employees working in Alberta. The company's operations had a significant impact on the manufacturing and agricultural sectors of the Alberta economy.

29      As of October 6th and 10th, 1989 Gainers Inc., Kretchmar Inc. and Sodor Foods Inc. were the owners or registered owners of various trademarks and trademark applications. In particular, Gainers Inc. had the following Swift brands listed in

Case 09-10138-MFW   Doc 14225-49   Filed 08/15/14   Page 139 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

stores across Canada, namely: Swift Premium, Lazy Maple, Sugar Plum and Ever Sweet. It also had the following Gainers Inc. brands listed in retail stores, namely: Superior and Captain's Cabin. Kretchmar Inc. or Gainers Inc. had the following Kretchmar brands listed, namely: Kretchmar Deli Line and Karl Kraemar. Gainers Inc. distributed Magic Pantry brands through the Magic Pantry Division. Gainers Inc. also bought and sold poultry products, fish and some dairy products, but not under a specific brand that Gainers Inc. represented.

30    Pocklington Foods Inc. continued to be the sole shareholders of Gainers Inc. until October 6th, 1989 when Gainers Inc.'s shares were taken out of escrow by the Defendant and its nominee pursuant to an agreement which will be described below.

31    Because of legislation which was in effect in the Province of Alberta during the relevant time, Gainers Inc. was required by law to buy its Alberta hogs from a Hog Board. That Board was known by various names, but in this judgment will be referred to as the A.P.P.D.C., being the Alberta Pork Producers Development Corporation.

32    On or about May 29th, 1986, Gainers Inc. and the A.P.P.D.C. entered into a contract for the pricing and supply of hogs. A similar contract was made by the A.P.P.D.C. and Fletchers, who were Gainers Inc.'s primary competitor for the purchase of hogs in Alberta. These contracts expired during July of 1989. No new contract replaced them in 1989 or 1990, but, for a time, hogs appear to have been supplied to Gainers Inc. in a manner consistent with the expired contract.

33    On or about the 25th of September, 1987 the Plaintiff and the Province of Alberta Treasury Branches ("A.T.B."), together with several other parties, entered into an agreement in writing, entitled "Master Agreement". Pursuant to the Master Agreement:

(a) The A.T.B. agreed to issue a guarantee in favour of a Chartered Bank to secure the repayment by Gainers Properties Inc. to that Chartered Bank of the sum of $55,000,000.00, together with accrued interest thereon, which sum had been agreed by the Chartered Bank to be lent to Gainers Property Inc.;

(b) It was provided that in the event that A.T.B. assigned its interest in the Master Agreement to the Defendant, Her Majesty In Right of the Province of Alberta as represented by the Provincial Treasurer of Alberta, it was anticipated that the Defendant, subject to the terms and conditions set out in the Master Agreement, would lend to Gainers Property Inc. up to $12,000,000.00 to be advanced in six semi-annual instalments commencing April 1st, 1987 of $2,000,000.00 each. In these Reasons that loan will from time-to-time be referred to as the "Term Loan";

(c) It was agreed that the proceeds of each instalment of the Term Loan would be loaned by Gainers Property Inc. to Gainers Inc. As security or collateral security as defined in the Master Agreement, Gainers Inc., Gainers Property Inc. and Pocklington Foods Inc. and others delivered to A.T.B. debentures, mortgages and other items of security, including, *inter alia*:

(i) An agreement in writing executed by Pocklington Foods Inc., A.T.B., Gainers Inc. and others and entitled "Negative Pledge";

(ii) An agreement in writing executed by Pocklington Foods Inc., Treasury Branch and an Escrow Agent and entitled "Escrow Agreement"; and

(d) The Master Agreement also contained a number of positive covenants which the Pocklington Group agreed to observe.

34    Pursuant to the Escrow Agreement and the Negative Pledge, Pocklington Foods Inc. delivered to the Escrow Agent certain documents, including a share certificate representing 101 class "A" common voting shares of Gainers Inc., issued in the name of Pocklington Foods Inc., which shares represented 100 percent of the issued shares of Gainers Inc. and with the share transfer form thereon duly endorsed in blank and the executed undated resignation of each Director and Officer of Gainers Inc. It was also agreed that if the Escrow Agent received a letter from the A.T.B. directing the Escrow Agent to deliver the escrow documents to the A.T.B., that Escrow Agent would without inquiry and unconditionally, release the escrow documents to the A.T.B.

35    Pursuant to the Negative Pledge, Pocklington Foods Inc. agreed to and did ensure delivery to the Escrow Agent of executed undated resignations of all Gainers Inc.'s Directors and Officers. It also agreed with the A.T.B. that the A.T.B., upon the

occurrence of any event of default as defined under the Master Agreement, would have the right to deliver to the Escrow Agent a letter of direction requiring delivery to the A.T.B. of the escrow documents. Article 6.04 of the Negative Pledge Agreement provided that upon receipt of the Gainers Inc. shares by the A.T.B. from the Escrow Agent, the A.T.B. was entitled to:

> (a) Sell the Gainers Inc.'s shares by public or private sale, acting in good faith, to a *bona fide* third party purchaser, in such manner, and on such terms as may seem to it advisable, without notice or advertisement, and for the purposes thereof each and every requirement relating thereto and prescribed by law or otherwise is hereby waived, the Treasury Branches may make delivery to the purchaser of good and sufficient deeds, assurances and conveyances of the Gainers Inc. shares and give receipts for the purchase price and any such shares shall be a perpetual bar, both at law and in equity, against Pocklington Foods Inc. and all those claiming by, from, or under it. The proceeds realized from the sale of all or any part of the Gainers Inc. shares shall be applied by the Treasury Branches to the total actual indebtedness, or in the manner contemplated in Article 10.01(b) of the Master Agreement, or in reduction of the total aggregate indebtedness or to any combination of the foregoing; it being understood and agreed that no such payment shall release any of the G.I. Group, or Pocklington, or any one or more of them from their respective covenants and agreements pursuant to the Master Agreement and all other Agreements contemplated unless and until zero total outstanding obligations due and owing pursuant to the Master Agreement have been duly and fully paid, performed and satisfied, as the case may be; or

> (b) Accept the G.I. shares as payment of a portion of the total actual indebtedness in which event the Treasury Branches shall apply on account of the total actual indebtedness that amount equivalent to the value of the Gainers Inc. shares at the time as determined by the Treasury Branches in the exercise of its reasonable discretion; it being understood and agreed that no such application of the value of the G.I. shares to the total indebtedness, or in the manner contemplated by Article 10.01(b) of the Master Agreement, or in reduction of the total aggregate indebtedness, or any combination of the foregoing shall release any members of the G.I. Group, or Pocklington, or any one or more of them from their respective covenants and agreements pursuant to the Master Agreement and all other agreements contemplated thereby unless and until all total outstanding obligations due and owing pursuant to the Master Agreement have been duly and fully paid, performed and satisfied as the case may be.

36     Under Article 1.01 of the Master Agreement "Total Actual Indebtedness" means the total Term Loan outstanding at the relevant time, together with the repayable "Loan Guarantee Amount", which is defined as any monies required to have been paid to Lloyds Bank by the A.T.B. pursuant to the Loan Guarantee to a maximum of $55,000,000.00 plus interest, which would then be outstanding together with interest.

37     The agreements between the A.T.B. and the Plaintiff and other companies associated with the Plaintiff also contained several other important provisions. In particular, there were positive covenants to the effect that the red meat business would be continuously carried on by Gainers Inc. at the Gainers Inc. Plants and that Gainers Inc. would maintain certain productive capacities in each of the Gainers Plants, unless the Crown otherwise consented. Further, Gainers Inc. was to, upon securing Government grants equivalent to 25 percent of the construction costs, cause a hog plant to be constructed in Southern Alberta, which plant was to be operating by June, 1989.

38     The corporations associated with the Plaintiff also agreed that they would not change the general nature of the businesses of any of various companies involved in the meat production business and would not sell or otherwise dispose of their assets, except in the ordinary course of the business.

39     The Master Agreement also contained a provision which was under a heading referred to as "Condition Precedent To Loan Guarantee and Term Loan". That condition was to the effect that all steps required to effect a corporate restructuring of any of the members of the Gainers Group, or all members thereof, as the case may be, as disclosed in the Gainers Inc. Pro Forma Balance Sheet, would be completed. That Pro Forma Balance Sheet directed the write-off of various intercorporate transactions involving Gainers Inc. and related corporations.

40     The various documents also contain clauses to the effect that the documents themselves constitute the entire agreement between the parties and supersede any previous representations or agreements.

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 141 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

41     It was acknowledged by the Defendant that A.T.B. was acting under the direction of the Defendant in this transaction. It was always anticipated that A.T.B. would be used as an interim party and that A.T.B. would be replaced under the Master Agreement by the Defendant at a later date.

42     The Deputy Provincial Treasurer also acknowledged that A.T.B. had not conducted its usual credit review, or followed its normal credit approval procedures, and that normal due diligence in the transaction had been performed by the Defendant to the extent the Defendant thought necessary.

43     The Defendant acknowledged that it approved the Master Agreement for, among others, "economic development" reasons. One of the reasons it approved this financing package was to retain the benefits to the provincial economy that could be expected from the continuation of Gainers Inc.'s operations, which included jobs and marketing of Alberta meat products.

44     In addition to the financing obtained from the A.T.B., Gainers Inc. also continued the use of an operating line of credit with Lloyds Bank in the approximate sum of $25,000,000.00. Lloyds took primary security from Gainers Inc. against its inventory and receivables while A.T.B. took primary security from Gainers Properties Inc. against the fixed assets.

45     Prior to the execution of the Master Agreement, the Plaintiff provided to the Defendant a number of appraisals of Gainers Inc.'s fixed assets to be conveyed to Gainers Property Inc. in conjunction with the Master Agreement. These stated the value of Gainers Property Inc.'s assets to be as follows:

| | | |
|---|---|---|
| 1. | Edmonton Plants, machinery and equipment | $15,610,000.00 |
| 2. | North Battleford Plant, land, building and equipment | $7,400,000.00 |
| 3. | Magic Pantry Division - Hamilton machinery and equipment | $3,070,000.00 |
| 4. | Magic Pantry Division - Hamilton land and buildings | $2,430,000.00 |

46     On September 29th, 1987 prior to the implementation of the Master Agreement, the Plaintiff also provided to the Defendant a letter of appraisal for the Edmonton Main Plant, land and buildings, advising of a value of $30,790,000.00. On October 5th, 1987 the Defendant acknowledged that the appraisals were satisfactory for the Defendant's purposes.

47     Prior to the completion of the Master Agreement, the fixed assets of the Edmonton Plant, the North Battleford Bacon Plant, Magic Pantry, the Sales Unit and Sodor were sold to Gainers Property Inc. for $57,924,000.00. The transaction was recorded in Gainers Property Inc.'s books at this price, and the book value of those assets as set out in Gainers Property Inc.'s Audited September 1988 financial statements was based on this acquisition price. The difference between the 1987 sale price of the fixed assets to Gainers Property Inc. and the previous book value in Gainers Inc.'s financial statements was recorded as a deferred gain on sale on Gainers Inc.'s audited September 1988 financial statements and in the 1987 Gainers Inc. Pro Forma Balance Sheet.

48     Pursuant to an agreement entitled "Assignment", dated March 30th, 1988 the Master Agreement and related documents and securities were assigned by the A.T.B. to the Defendant. All parties acknowledged and agreed that the obligation of the A.T.B. was at an end and that the Defendant, in all aspects, replaced the A.T.B.

49     Subsequently, the Defendant advanced three instalments of $2,000,000.00 each of the Term Loan to Gainers Property Inc. on or about June 7th, 1988, October 3rd, 1988 and April 10th, 1989. Gainers Property Inc., acquired with the proceeds 6,000,000 Class "C" preferred shares of Gainers Inc., which were issued to Gainers Property Inc. by Gainers Inc. These were endorsed in blank by Gainers Property Inc. and delivered to the Escrow Agent pursuant to Amending Agreements, Escrow Agreements and Negative Pledges dated April 3rd, 1988, June 7th, 1988, October 3rd, 1988 and April 3rd, 1989, which agreements were substantially similar to the Escrow and Negative Pledge Agreements.

50     By letter dated April 3rd, 1989, Gainers Inc. requested an extension of the Southern Alberta Hog Plant completion date to June 30th, 1990.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

51    By some time in May of 1989, Gainers Inc. and Gainers Property Inc. were in default with the Crown and with their banker under their borrowing agreements, and in July and August, 1989, steps were taken to increase the banker's security. On June 1st, 1989 Lloyds Bank presented Gainers Inc. with a demand for payment of the loans held by it. Pursuant to an agreement set out in a letter dated August 8th, 1989 from Alberta to, *inter alia*, Gainers Property Inc., Gainers Inc. and Pocklington Finance Inc. and the Plaintiff, and confirmed and acknowledged and agreed to by those parties (this agreement is sometimes herein referred to as the "Letter Agreement"):

(a) One hundred percent of the common and preferred shares of Gainers Property Inc. were agreed to be transferred by Peter Pocklington to Gainers Inc. It was agreed that Gainers Inc. would enter into agreement with respect to the Gainers Property Inc. shares in favour of the Defendant, substantially similar to that of the Negative Pledge and Escrow Agreement;

(b) Peter Pocklington transferred the Gainers Property Inc. shares to Gainers Inc. and Gainers Inc. delivered the Gainers Property Inc. shares to the Escrow Agent, and further, entered into the Gainers Property Inc. shares Escrow Agreements and Gainers Property Inc. shares Negative Pledges with Gainers Property Inc. and the Crown, upon terms and conditions substantially the same as those set out in the original Escrow Agreement and the original Negative Pledge and further delivered to the Escrow Agent duly executed, undated resignations of all Gainers Property Inc. Directors and Officers; and

(c) It was agreed that upon receipt by the Defendant of the Gainers Property Inc. shares from the Escrow Agent, consequent upon delivery to the Escrow Agent of a letter of direction, the Crown was entitled to proceed pursuant to Article 6.04 of the Gainers Property Inc. shares Negative Pledge as previously quoted in these Reasons.

52    In September, 1989 Gainers Inc.'s position under its financial agreement with Lloyds Bank deteriorated further and the bank gave notice of an intention to enforce its security. On October 5th, 1989 the Crown gave notice to Gainers Property Inc., Gainers Inc., the Group's subsidiaries and Mr. Pocklington, in accordance with the provisions of the Master Agreement and the Letter Agreement, of the happening of the following events of default:

(a) A default by Gainers Property Inc. in the payment of interest due on October 1st, 1989 on the Term Loan;

(b) Failure to pay rent to Gainers Property Inc. by Gainers Inc. and Sodor for the months of September and October, 1989;

(c) Failure to commence construction of a hog plant in Southern Alberta by September 30th, 1989;

(d) Defaults on or after August 8th, 1989 between Gainers Inc., Gainers Property Inc. and Pocklington, or any one or more of them and the Bank.

53    At the same time the Defendant also gave notice:

(a) That it terminated the Letter Agreement;

(b) That it was exercising its rights under Article 15.04 of the Master Agreement; and

(c) That it would take such steps as it deemed fit to immediately enforce the terms of the security, the Master Agreement, the Letter Agreement and all other agreements contemplated under the Master Agreement. The Defendant also declined to make the October 1st, 1989 advance on the Term Loan.

54    On October 5th, 1989, the Defendant also caused to be delivered to the Escrow Agent letters of direction requiring the Escrow Agent to deliver to the Defendant the escrow documents, including the Gainers Inc. shares, the Gainers Inc. preferred shares and the Gainers Property Inc. shares. These documents, including the shares, were delivered to the Defendant by the Escrow Agent in the early morning of October 6th, 1989.

WestlawNext® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

55    On October 10th, 1989 the Defendant gave notice in writing to the Plaintiff, under Article 6.04 of the Negative Pledge, that the Defendant would apply on account of the total actual indebtedness an amount representing the value of the shares taken as determined by the Defendant in its exercise of its reasonable discretion.

56    On October 6th, 1989 the Defendant caused the Gainers Inc. shares and the Gainers Inc. preferred shares to be registered in the name of the Defendant's nominee. The Defendant's nominee was the registered owner of those shares in trust for the Defendant and for the management and employees of Gainers Inc.

57    The Defendant acknowledges that it caused the Gainers Inc. shares to be delivered out of escrow and to the Defendant's nominee for the following reasons, among others:

(a) In order to obtain or preserve economic development for economic benefits, including the preservation of jobs at Gainers Inc.'s Edmonton Plants and the preservation of Gainers Inc.'s meat business, including slaughter and processing business, primarily the hog/pork operations;

(b) In order to gain control of those assets that would enable continuation of the contribution to the economy of Alberta that Gainers Inc. had achieved;

(c) To continue the operation of the company's business and provide a market for Alberta meat products, primarily pork;

(d) To protect agricultural producers and suppliers in Alberta;

(e) To give the company an opportunity to re-establish itself;

(f) To support an industry important to Alberta's diversification strategy;

(g) To ultimately privatize the company, with a view to continuing operations in Alberta, maximizing realization of Gainers Inc.'s assets, and minimizing Crown financial support;

(h) To minimize the impact on livestock markets and producers;

(i) To protect the interests of small creditors.

58    After the Defendant acquired the assets of Gainers Inc. and Gainers Property Inc., Mr. Pocklington by a letter dated October 17th, 1989 required "The Crown in exercising its reasonable discretion take into account the underlying value of assets in Gainers Inc., including tax losses and intangibles as valued by the Hathaway Corporation in its report of September 22, 1989", which had been delivered to the Crown. The Defendant did not advise the Plaintiff that it had determined a value for the Gainers Property Inc. shares by August 3rd, 1990, at which date the Plaintiff commenced this action.

59    Several other actions, primarily between the Crown and Mr. Pocklington and one or more of his companies and also involving others, were commenced by the Crown, its nominee, Gainers Inc., or Gainers Property Inc. on October 6th, 1989 and thereafter. One has been the subject of a previous trial, which trial was heard by Clarke, J. of this Court, judgment being pronounced on December 6th, 1995. That judgment allowed a claim advanced by Gainers Inc. in the sum of $712,200.00, plus interest. All other claims were dismissed. Costs were awarded to the Defendants in that action and set off against the judgment in favour of Gainers Inc. and the interest thereon. This judgment has been appealed to the Alberta Court of Appeal, but as of the date of this decision, has not yet been heard by the Alberta Court of Appeal. The remaining actions are in various states of readiness and the first of them is scheduled to be heard in the fall of 1998.

*Factual Findings Based on the Evidence*

60    In addition to matters arising from the Agreed Statements of Facts, I am able to determine a number of other facts which are based on the evidence that I heard during the course of this trial. Some of those facts are really not controverted, as both Plaintiff and Defence witnesses testified to them. Many facts are supported by the numerous documents that were filed

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

as exhibits in these proceedings and I will, from time to time, refer to some of those exhibits. Finally, other facts were hotly contested by the parties and where there are factual matters which were contested, I will make my findings and give the reasons as to why I came to the conclusion that I did.

61     On December 5th, 1985 Dick Johnston, the Minister of Economic Development, wrote to Mr. Pocklington at the Plaintiff corporation. In his letter he indicated that:

> During one of our conversations on the question of hog marketing in Alberta you mentioned the possibility of your company locating a plant in Southern Saskatchewan. I indicated that I owned some farmland adjoining the town of Indian Head, Saskatchewan, which would be ideal for such a facility.

He then went on to suggest that Indian Head would be an appropriate location for the proposed Southern Saskatchewan Hog Facility.

62     Mr. Johnston, indicated that he sent this letter after he and Mr. Pocklington had briefly discussed this matter at a social occasion. He says that it was a follow-up to their conversation and the first sentence quoted seems to support that version.

63     Mr. Pocklington indicated that the letter "came out of the blue" and he was surprised by it. He further indicated that at the time he received the letter he felt it was totally inappropriate coming from a Minister of the Crown, as the Edmonton Oilers, another entity owned by Mr. Pocklington, owed a large debt to the A.T.B. At that time the A.T.B. was very much a hands on operated near bank owned by the Province of Alberta. Mr. Pocklington testified that he did not know what to do, and as a result did nothing.

64     Mr. Pocklington further testified that it was his "feeling" that his failure to respond to Mr. Johnston's inquiry soured whatever relationship existed between them and was one of the precipitators that led to the downfall of Gainers Inc. It was suggested by the Plaintiff that if this were the case, it would logically follow that the downfall of Gainers Inc. was precipitated by a personal vendetta, as opposed to purely commercial reasons. It was further submitted that if I came to this conclusion, then the conclusion would support a claim for general damages, as well as punitive and exemplary damages.

65     Mr. Johnston indicated that the letter was merely a form of passing reference with no significant importance attached to it. He further indicated that he was not really aware that Mr. Pocklington was indebted through the Edmonton Oilers to the A.T.B., and I gather that it is Mr. Johnston's position that he was not taking advantage of the fact that he was a Minister of the Crown.

66     I do not believe Mr. Johnston when he suggests that he was not aware that the Edmonton Oilers were indebted to the A.T.B. As Provincial Treasurer he was directly responsible for those Branches. The notoriety of Mr. Pocklington's dealings within the Province of Alberta was such that practically every grade school student in Alberta could have told you to whom the Edmonton Oilers owed money, and yet Mr. Johnston would have this Court believe that he, as the person in charge of that entity, was not aware that money was owed to the A.T.B.

67     I am, however, satisfied that this letter sent almost four years prior to the steps taken by the Defendant to acquire the shares of the Gainers Group of Companies played no role in that acquisition. The letter is significant only in that it raises questions of morality involving Mr. Johnston; further it heightens perceptions respecting his credibility. I will comment on that credibility later in these Reasons.

68     During the course of the trial, questions were asked and answers given with respect to the negotiations that led to the Master Agreement and the documents contemplated by the Master Agreement. At the time those questions were asked, objections were raised on the basis that those questions were a breach of the parole evidence rule. The position taken was that as the language in the contract was clear and unambiguous, it alone could be looked at in order to ascertain the intention of the parties. (*Indian Molybdenum Ltd. v. R.*, [1951] 3 D.L.R. 497 (S.C.C.), *King v. Major Oil Investments Ltd.*, [1943] 2 W.W.R. 541 (Alta. S.C.); aff'd. [1944] 3 W.W.R. 233 (Alta. C.A.), *Northwestern Mechanical Installations Ltd. v. Yukon Construction Co.* (1982), 20 Alta. L.R. (2d) 156 (Alta. C.A.), *Ellis v. Abell* (1884), 10 O.A.R. 226 (Ont. C.A.), *Grant v. Grant* (1870), L.R. 5 C.P. 727 (Eng. Exch.))

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 145 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

69    At the time these questions were posed and answered, I indicated that I would consider their admissibility and relevance at the end of the trial. Many of them related to a meeting between Mr. Pocklington and the then Premier of the Province of Alberta, Donald Getty. At that meeting, the question of financial assistance from the Province of Alberta to Gainers Inc. was first raised. That financial assistance was ultimately provided. The documentation reflecting that financial assistance consists of the Master Agreement, and the documents contemplated by the Master Agreement.

70    The Master Agreement itself and the documents contemplated by the Master Agreement were drafted by Counsel for the Defendant and were reviewed by counsel for the Plaintiff. In his testimony, Mr. Pocklington acknowledged that he signed the documents only after receiving advice from his counsel, his accountants, and others who had reviewed the documents on his behalf, and after he had satisfied himself that the documents reflected the transaction as he understood it.

71    In those circumstances, one would not normally give consideration to any extrinsic evidence, and in particular the evidence offered by Mr. Pocklington, about discussions involving or leading to the Master Agreement.

72    Similarly, one would expect the same to be the case with respect to subsequent discussions that Mr. Pocklington had relative to further agreements between himself, the Plaintiff, the Gainers corporations and the Defendant where those discussions were ultimately reduced to a written contract.

73    It is, however, my determination that the Master Agreement itself contemplates that if these discussions occurred, then they are relevant to at least one of the questions that I must determine. I come to this conclusion because of the wording of 6.04(b) of the Negative Pledge Agreements. That provision required the Defendant to utilize its reasonable discretion in determining the value of the Gainers Inc. shares. I am satisfied that in the circumstances of this case, the Defendant's conduct is relevant to the determination of whether or not that discretion was exercised in a reasonable manner. I am satisfied that that conduct included conduct by the representatives of the Defendant leading to the creation of the agreements, the conduct of the representatives of the Defendant leading to the acquisition of the Gainers Group shares, and finally the conduct of the various representatives of the Defendant after the acquisition of the Gainers Group shares by the Defendants.

74    I turn to the discussions. It was the evidence of Mr. Pocklington that during the month of December, 1986 Gainers Inc. was involved in a strike lock out and had been involved in that strike lock out for several months. He indicated that he was contacted by the then Premier of the Province of Alberta, Donald Getty, and asked to attend at a meeting with Mr. Getty. Mr. Getty, in his evidence, confirmed that this occurred.

75    Mr. Pocklington says that at that meeting a "gentleman's agreement" was arrived at, and that that gentleman's agreement included two key components:

    1. A package of financing, which ultimately constituted the Master Agreement; and

    2. An agreement that something would be done about the monopoly of the A.P.P.D.C.

76    It is clear from Mr. Pocklington's evidence that he did not consider these "agreements" to be legally binding on the Defendant, but that he considered the Defendant to have a moral obligation to fulfil them.

77    In his testimony Mr. Getty indicated that no agreements were reached, but that he did indicate that there might be financing available to assist Gainers Inc. pursuant to various Government programmes and that Mr. Pocklington should approach the appropriate Ministers who administered those programmes if he desired that financing. Mr. Getty could not remember any substantial discussion about the A.P.P.D.C. monopoly, and says that he definitely did not make any commitment in that regard. From Mr. Getty's perspective, it was possible that matters were raised about the A.P.P.D.C. by Mr. Pocklington as Mr. Pocklington raised many problems relating to Gainers, including things like pricing for pork products and pricing relating to the raw material for pork products, namely hogs.

78    No minutes were kept of this meeting, nor was any other documentation created shortly after its occurrence which would reflect the contents of the discussion at this meeting. There is, however, some subsequent documentation which gives some

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

light to the nature of the discussions between Mr. Pocklington and Mr. Getty. One of the exhibits tendered was a memo, initially sent by Dick Johnston to Donald Getty, and then returned with a notation placed thereon by Mr. Getty. The memo from Mr. Johnston to Mr. Getty was delivered to Mr. Getty during the course of a Cabinet Meeting and raises the question of assistance to Gainers. It is clear from the tenor of that memo that Mr. Getty had reported to other Cabinet Ministers subsequent to his meeting with Mr. Pocklington. The memo from Mr. Johnston states:

> You suggested the potential for us considering 'something' for Gainers during your Gainers' strike discussion. My question:
>
> Did you make any comments which could guide my discussions this afternoon?

Mr. Getty then responded with the following words:

> Dick, some type of thing like for pulp mill at Whitecourt or like Sask. or like the magnesium deal. - Some funding through guarantees or creative debentures or preferred.

79      Mr. Johnston and Mr. Getty indicated that the reference to the pulp mill at Whitecourt related to the Miller Western Pulp Mill at Whitecourt. The reference to Sask. related to the Husky Oil Upgrader at Lloydminster, Saskatchewan, and the magnesium deal related to a proposed magnesium plant in High River, Alberta. Each of these projects had received some government funding including at least a portion in the form of an interest free loan.

80      The next document that flows from these discussions was not created until after Gainers Inc.'s financial picture had taken a turn for the worse. Mr. Getty testified that during the spring and summer of 1989 he kept hearing rumours to the effect that Mr. Pocklington was saying that he had reneged on some form of undertaking relating to hog pricing. Consequently, he sent Mr. Pocklington a letter on July 12th, which states in part:

> At no time could I, nor would I, make any specific commitments that involved our Government. I was aware that your Company wanted certain changes in its hog purchasing arrangements and financing, etc., but my position was that this was not appropriate for me to discuss and would have to be the result of future discussions with the Ministers responsible, such as Economic Development and Trade, Treasury, or Agriculture. I also stressed to you I would not be involved in those details but that any further assistance must be at going commercial terms or under existing Government programmes to help strengthen and diversify our province during a difficult economic downturn.

81      Mr. Getty testified that subsequent to the delivery of this correspondence he never heard back from Mr. Pocklington and that at subsequent meetings at which both he and Mr. Pocklington attended, Mr. Pocklington did not raise the Province's alleged reneging of its commitment to "the free market purchase and sale of hogs".

82      Mr. Pocklington also testified that he had discussions about the A.P.P.D.C. with other Government Ministers, and that while those Government Ministers acknowledged that the A.P.P.D.C. monopoly was a problem for slaughterhouses in Alberta, they were unprepared to do anything about that monopoly. He indicated that their position was invariably to the effect that the hog producers were supporters of the party in power and that, generally speaking, the employees in the Gainers Plant supported an opposition party. Consequently, they were unwilling to honour any commitment that the Government had made to allow for the free marketing of hogs.

83      Two of these Ministers testified at this trial. They were Dick Johnston, the Minister of Economic Development, and Ernie Isley, who at one time was the Minister of Agriculture. Mr. Johnston and Mr. Isley acknowledged having discussions with Mr. Pocklington relative to hog marketing. They, however, denied making any commitment and stated that the hog processing plant owners and management were constantly contacting them relative to what they perceived to be a pricing problem. They, however, felt that this problem had been resolved by the contract entered into between the A.P.P.D.C. and the two major producers referred to earlier in these Reasons. Consequently, they were not prepared to do anything about it.

84      I conclude that both the questions of the loan and hog pricing came up during the course of the meeting between Mr. Pocklington and Mr. Getty. I am satisfied that there was no commitment to the point of being contractual. Words like

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

"gentleman's agreement" have no real meaning in law. They are, however, generally well-known concepts from a moral perspective. In this respect, I am also satisfied that what Mr. Pocklington perceived to be a gentleman's commitment was probably something less than that. There was discussion, the matter was on the table and there was an undertaking by Mr. Getty to see what he could do about the problems that Gainers was facing, but nothing more.

85      I am satisfied that Mr. Getty perceived, and with the passage of time, enhanced that perception, the matter to be a very loose discussion only. Mr. Pocklington perceived the results of the meeting to be considerably more precise than what Mr. Getty perceived them to be. I am satisfied that this is a genuine difference of opinion and that the reality is probably somewhere between what Mr. Pocklington felt occurred and what Mr. Getty felt occurred.

86      I am also satisfied that Mr. Pocklington raised the question of hog marketing with several Government Ministers and was told things like "our support must remain with the farmers, as they are supporters of the Government". That, in my view, did not create a moral circumstance of the type that was required to be taken into consideration in the Government's reasonable exercise of its discretion in the valuation of the Gainers Group shares.

87      I turn to other questions which relate to matters involving the Defendant's conduct, and, which in my view, are at least potentially relevant to the question of whether or not the Defendant acted reasonably in the exercise of its discretion in valuing the shares of the Gainers Group of companies.

88      In September of 1987, which is the time frame within which the Master Agreement and related documents were completed, the Defendant conducted its due diligence to the extent that it felt was necessary. That due diligence included the receipt of appraisals, which appraisals were provided by the Gainers Group. At that time the Defendant communicated with the Gainers Group and the Plaintiff to the effect that the appraisals it had received were satisfactory for the Defendant's purposes.

89      The representative of the Defendant who was in charge of administering the loans to the Gainers Group was George Kinsman. It was Mr. Kinsman's view and his advice to the Defendant that the Gainers Group was essentially bankrupt in the fall of 1987. It was Mr. Kinsman's view, and again this was communicated to the Defendant, that within six months of the granting of the loan the Defendant would be taking over all of the assets of Gainers, due to defaults that he anticipated would occur. Mr. Kinsman's evidence was to the effect that it turned out that he was wrong, but that there was a reason for that. In 1988 the Gainers Group showed a profit. It was generally acknowledged by a number of witnesses that that profit resulted from a lock out affecting Gainers' major competitor, Fletchers in Red Deer. The result of that lock out was that Gainers was left to supply virtually all of the Alberta market for pork and other meat products. In consequence, Gainers had an operating profit of approximately $8,000,000.00 in its year ending in September 1988.

90      The events which occurred after the Fletchers labour dispute was resolved support Mr. Kinsman's prognosis. Gainers commenced losing, and continued to lose, approximately $1,000,000.00 each month. By May 1989, Gainers was in default with its primary lender, Lloyds Bank and with the Defendant respecting the loans and guarantees provided by the Defendant.

91      I conclude that Mr. Kinsman was correct in his assessment and that due diligence conducted in a businesslike manner would have revealed to the Defendant that the events which ultimately transpired were likely to transpire. I also conclude that the loan to Gainers Inc. was precipitated by a desire to deal with two political matters, namely:

    1. The Gainers' strike, which was causing considerable social and economic upheaval in Edmonton and elsewhere in the Province of Alberta; and

    2. The desire of the then current Government to see to the continued diversification of the economy of the Province of Alberta, including, as Government Ministers testified, enhancing the value added nature of various agricultural products produced in the Province.

92      I also conclude that the commitment of the Government to provide a loan to Gainers Inc. was significantly stronger than the Government Ministers were willing to admit, as the political will overrode the advice they received from their employee charged with administering the loan.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 148 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

93      I raise these matters now, as they reflect upon the testimony that I frequently heard from Government Ministers and representatives to the effect that they hoped and expected Gainers, the Plaintiff and others who were committed to meet their obligations under the Master Agreement and related documents. The substance behind those expectations seems a little hollow in the face of the advice that those same Ministers and representatives of the Defendant had received from the experienced economist and banker who was charged with administering the loan. Mr. Kinsman's expectation was that what actually occurred would occur, and he passed that expectation on to the Ministers of the Government.

94      From the spring of 1989 until the shares were taken by the Defendant, Ministers of the Defendant, Deputy Ministers of the Defendant and employees of the Defendant engaged in numerous meetings, discussions and other activities in an attempt to deal with and determine the best way to resolve Gainers' financial issues. Several committees were struck, including a Cabinet Steering Committee, whose specific duties were to deal with the financial deterioration at Gainers. The subject of Gainers' financial position was discussed at the Priorities and Planning Committee of Cabinet, was discussed among the various Deputy Ministers, was discussed by the staff of the departments involved in the administration of the Master Agreement or affected by Gainers' operations, and was the subject of numerous memos, minutes and documents flowing among various departments, employees and officers of the Defendant.

95      Several of the writings emanating from the Defendant have left the Plaintiff with the view that the Defendant was acting in a manner that was outside the commercial nature of the contractual relationships between the parties, and introduced political and other considerations into those relationships. On May 30th, 1989 the Priorities and Planning Committee of Cabinet met. Those in attendance included Premier Donald Getty, Dick Johnston and Ernie Isley. Subsequently, a memorandum relating to that meeting was prepared by the Deputy Secretary to Cabinet. The memorandum states that the Finance and Coordination Cabinet Committee agreed to:

(a) Send notice of default to Gainers; and

(b) Appoint an Inspector to determine the present status of the company and to assist in the formulation of alternative strategies.

The memorandum then states that the Provincial Treasurer should act as spokesperson on the issue, and that efforts should be made to investigate alternatives such as an employee buy-out to allow the company to continue to operate. The memorandum finally states:

Any take out action recommended must ensure that no benefits fall to existing shareholders should this recommendation be pursued.

96      The only existing shareholder was the Plaintiff. It is the Plaintiff's position that this reference is indicative of a vendetta and the political considerations taken by the Defendant in its dealings with the Plaintiff. The Plaintiff is of the view that the Defendant was aware that in some circles the owner of the Plaintiff was not a popular person, having been involved in the Gainers strike lock out and having sold Edmonton Oilers' hockey star, Wayne Gretsky, to the Los Angeles Kings. It was, accordingly, politically astute of the Defendant Government to ensure that they dealt with the Plaintiff in a fashion that was different than had the owner of Gainers been someone other than the Plaintiff.

97      Mr. Pocklington points out that subsequent to this memorandum, he entered into negotiations with the Defendant and Lloyds Bank with a view to finding a solution to Gainers' financial problems. He understood these to be give-and-take type of negotiations, but the memorandum makes it clear that no "give" was contemplated by the Defendant.

98      Mr. Getty and Mr. Johnston both suggest that the meaning of the last sentence in the memo has been misconstrued by the Plaintiff. They say that what was discussed at the meeting, and what the last sentence intends to convey, is that the direction determined was not to prevent the Plaintiff from receiving a surplus should one exist, but to ensure that the Plaintiff was forced to comply with the Master Agreement.

99    At the trial, during argument and throughout this litigation, it has been the Defendant's position that it is not responsible to pay any surplus, should one exist, to the Plaintiff. I find the position taken by the Ministers in their evidence and the position taken by the Defendant in its submissions difficult to reconcile. I doubt that they remember what the intention of the Committee of Cabinet was when it met on the 30th of May, 1989 and prefer to take the plain meaning of the memorandum as representing that intention. That plain meaning is that the Defendant was going to ensure that no benefits fell to the existing shareholder should take out action be pursued.

100    I consider that plain meaning to be a factor to be considered in the determination of whether or not the Defendant has exercised its reasonable discretion in the valuation of the shares.

101    The second writing emanating from the Defendant which leaves the Plaintiff with the view that the Defendant was acting outside the commercial nature of the contractual relationships between the parties is found in a memorandum dated the 4th of July 1989 and prepared by Barry Mehr, who was the Associate Deputy Minister of Agriculture in charge of marketing. This memorandum was sent to Ernie Isley, who was then the Minister of Agriculture.

102    The memorandum makes reference to the fact that the alternatives put forward by Mr. Pocklington indicate that he is still in a negotiation mood. It then suggests that the Government of Alberta can improve its position by, for example, inclusion of Mr. Pocklington's share position in one of his holdings, Canbra Foods Inc. It then further states that:

> Any dealings with Pocklington will be seen as letting Pocklington off the hook and will raise much political and public concern.

103    It is suggested by the Plaintiff that these statements raise two flags. The first is that at the time all parties were in negotiations and there was an expectation that those negotiations would be conducted in good faith. The tenor of the first portion of the memo, however, suggests that the Defendant should at least consider improving its position by inclusion of Mr. Pocklington's position re Canbra shares.

104    In his testimony, Mr. Mehr indicated that he might have thought that Canbra shares were already part of the security provided to the Defendant. I am satisfied that that was not the case. Mr. Mehr was one of the recipients of previous correspondences indicating that the Defendant had no claim to Mr. Pocklington's shares in Canbra Foods. Further, the tenor of the memo indicates that inclusion of Canbra shares will improve the Defendant's position. It is impossible to ascertain how one can improve that position by taking security on shares that are already part of the security. Mr. Mehr had to be suggesting that the Defendant attempt to negotiate Mr. Pocklington into adding his shares in Canbra as security to the Defendant.

105    The second portion of this memo raises a concern that the negotiations were not being conducted on a commercial basis, but rather with political objectives in mind. No one has testified on behalf of the Defendant that Mr. Pocklington, or the Plaintiff, were made aware that in addition to the usual commercial objectives, these negotiations also included political features.

106    The next document to which the Plaintiff makes reference in relation to this aspect of its claim is a memorandum dated the 7th of August, 1989. This memorandum was made by Mr. Pocklington and comprises notes made during the course of a telephone conversation with Dick Johnston. The notes state:

> If I didn't back up the Government to stop Lloyds from foreclosure, Johnston threatened retaliation on Palm and any and all assets of Peter P.

The memo further states:

> Also claims that Cabinet wants blood.

This memo is dated one day before Mr. Pocklington signed the Letter Agreement. Mr. Pocklington suggests that the threats made by Mr. Johnston precipitated his signing the agreement the next day. At the time of this memorandum, Mr. Pocklington was the owner of Palm Dairies. This is what is meant by "Palm" in the memorandum.

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

107    Mr. Johnston testified that many conversations occurred between himself and Mr. Pocklington at about the time of the August 8th Letter Agreement. He indicated that he recalls telling Mr. Pocklington that Cabinet was insisting that the Government enforce its security. He further recalls telling Mr. Pocklington in no uncertain terms that if necessary the Defendant would be realizing on its assets and would realize to the fullest extent possible as allowed by the Master Agreement and the documents contemplated by it.

108    Mr. Johnston denies saying that Cabinet wanted blood and said that if he did say something like that, it would have only been to convey the urgency of the situation to Mr. Pocklington.

109    There is, to some extent, a conflict between the testimony of Mr. Pocklington and that of Mr. Johnston. They were the only parties to this conversation, and consequently we have a clear contest of credibility. It is my finding that the events as related by Mr. Pocklington are to be preferred, as he made a memorandum of the conversation and Mr. Johnston has no distinct recollection of it. Secondly, having regard to the findings which I will relate later as to Mr. Johnson's credibility, I prefer the evidence of Mr. Pocklington to that of Mr. Johnston.

110    The final writing which the Plaintiff has referenced in relation to what it considers to be inappropriate considerations by the Defendant in its administration of the loan and guarantees, is found in a memorandum from Brian Williams, the Executive Director of Business Finance Development for the Department of Economic Development and Trade, to George de Rappard, Chief Deputy Minister of the same Department, dated September 27th, 1989. Near the conclusion of this two page memorandum is found the following sentence:

> I believe the public must be convinced Alberta has taken every action possible to strip Peter Pocklington of as many of his assets as possible.

111    The Plaintiff suggests that this quotation indicates the type of thinking that was prevalent within the minds of those charged with the administration of the Gainers loans and guarantees. That is, that there was a concern for political gains to be made at the expense of the Plaintiff and ultimately Mr. Pocklington. Mr. Williams stated that what was meant was that the public must be convinced that every action possible was taken to realize on the security provided for under the Master Agreement. That, of course, is not what the document states and I am satisfied that what was meant by the statement contained in this memorandum is its plain English meaning.

112    Another concern that the Plaintiff raised regarding the Defendant's administration of the Gainers loan and guarantees results from an approach made by three senior management members of Gainers Inc. to the Defendant in the spring of 1989. This approach was done through an Edmonton lawyer, hired by these three senior managers. The purpose of the approach was to advance concerns to the Defendant about the use of Gainers Inc. by the Plaintiff and its *alter ego*, Mr. Pocklington. Subsequent to this approach, meetings between personnel from the Defendant, the Defendant's solicitors and these three senior managers ensued. However, I am, satisfied that by the time these meetings occurred Mr. Pocklington was aware that senior management was dealing with the Defendant and had consented to those dealings in the hopes that an agreement between the Defendant and senior management and employees of Gainers Inc. would result in some form of buy-out of his interest in Gainers.

113    It is clear that at the time of the initial approach, Mr. Pocklington as Chairman and Principal of Gainers was not aware of the approach. One of the two senior managers who testified indicated that the approach was made on behalf of "stakeholders" whom he defined as being the management and employees of Gainers, the suppliers of Gainers, the Northern Alberta hog farmers who provided the raw materials for Gainers, the customers of Gainers and the Defendant. Gainers' sole shareholder was apparently not regarded as a "stakeholder".

114    There is no evidence to indicate that the Defendant invited this approach by senior management, or obtained confidential information that was utilized by the Defendant in its dealings with the Plaintiff. It is true that shortly after the approach the Defendant provided the Plaintiff with the first notice indicating default under the terms of the Master Agreement and related documents, but that default was precipitated by acts of default which were clearly independent of any approach by Gainers'

management. In consequence, I do not see how the approach by Gainers' senior management to the Defendant assists the Plaintiff in any material respect.

115    The Plaintiff also complains that the Defendant refused to cooperate when the Plaintiff attempted to effect the sale of its Magic Pantry Division. Again, I do not feel there is any merit in this position. The assets of Magic Pantry were part of the security enjoyed by the Defendant. The Master Agreement provides a specific formula for the use of proceeds emanating from a sale of Magic Pantry. What the Plaintiff was proposing was a sale of Magic Pantry assets, with all the proceeds being injected into Gainers to allow it to continue to operate and hopefully weather the storm created by a downturn in the meat industry. The Defendant took the position that if part of the security was sold the proceeds realized from that security should be applied on account of Gainers' indebtedness to the Defendant to the extent provided for in the Master Agreement. I am satisfied that the Defendant was entitled to take this position and that its doing so was totally within the commercial context in which the parties were operating.

116    The Plaintiff suggests that the fact that the Defendant immediately upon the acquisition of the Gainers shares, commenced various actions against Mr. Pocklington, the Plaintiff and corporations associated with Mr. Pocklington or the Plaintiff is indicative of the Defendant following up on its threat "to strip Peter Pocklington of all of his assets". I do not intend to comment to any great extent upon the ability of the Defendant to succeed with respect to these actions, but note that the subject matter of one of the actions has already attracted comment by one of the Case Management Judges in this litigation. That is in relation to the action brought by the Defendant to recover dividends paid by Gainers to the Plaintiff. McDonald, J. of this Court, in commenting on an application of the Defendants in that action (Mr. Pocklington et al.) to have the action struck stated:

> In my view, Mr. Kowalchuk's [counsel for Mr. Pocklington et al.] arguments are likely to be very persuasive at trial, that G.I. cannot complain of acts asserted to be by the Pocklington Group, and that the Pocklington Group made full disclosure to Counsel for Alberta and the A.T.B. of their intention to declare the dividends which were, in fact, declared not long after the 1987 transactions, and likewise to redeem shares, and that the Counsel referred to accepted those declared intentions without complaint.

117    One of the related actions has already proceeded to trial and the Defendant has only recovered the amount offered to it. That action is the subject of an appeal, but that appeal has been lodged for approximately one and a half years without any significant advancement through the process.

118    Another action was lodged on the 6th of October, 1989. The Statement of Claim was presented to me during the course of the trial and I have had an opportunity to review it. There does not appear to be anything in the Statement of Claim which would indicate any urgency like a limitation date, calling for the action to be commenced immediately upon the Defendants obtaining the shares of Gainers. In his testimony, Mr. Johnston acceded to a suggestion that the real purpose for commencing this action was to permit the Government of the day to respond to embarrassing questions in the Legislature by pleading that it could not respond to the questions as the matter was before the Court.

119    Having reviewed the Statement of Claim and having heard the testimony before me, I can categorically state that at least some of the claims contained in that Statement of Claim have little chance of success, unless witnesses who testified in this trial contradict themselves at that trial. For example, the Statement of Claim makes reference to Sodor, which was a Division of Gainers operating in Quebec, not continuously carrying on business. However, various defence witnesses indicated that the Plaintiff contacted the Defendant in the spring of 1989 with a request to the effect that Sodor be allowed to discontinue its operations. The Defendant agreed to this request and made much of this agreement in support of its position that it had no vendetta against the Plaintiff or Mr. Pocklington.

120    How the exact opposite allegation can be maintained in a Statement of Claim is difficult to ascertain. I conclude that the real purpose to the filing of the Statement of Claim on the 6th of October, 1989 was the "collateral benefit" referred to in evidence by Mr. Johnston, consisting of the ability of the Government to respond to embarrassing questions in the Legislature to the effect that the Government could not provide any real response as the matter was before the Court.

WestlawNext® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 152 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

121     The filing of a Statement of Claim for such a purpose is either an abuse of process, or comes close to being that. It is inappropriate for the Government or any other party to use the Courts for purposes other than the legitimate pursuit of Court remedies. I am satisfied that, as Mr. Johnston testified, this collateral benefit was very much in the mind of the Defendant when instructions to file the Statement of Claim on October 6th, 1989 were given.

122     Finally, the Plaintiff suggests that the manner in which the A.T.B. became a party to the Master Agreement is indicative of the political considerations which were taken by the Defendant in its dealings with the Plaintiff. It was acknowledged by several Defendant witnesses that the reason the A.T.B. was indicated to be a party (and then quickly assigned away as a party) to the Master Agreement, instead of a Department of Government was that procedures were in place whereby the accounts of the Departments of Government were reviewable in the Legislature, while the private dealings of the A.T.B. were not. Mr. Johnston, in his evidence, testified that this was the case, but it was his recollection that Mr. Pocklington insisted upon this. Mr. Pocklington testified that it was the Defendant who insisted on the A.T.B. being the party to the agreement.

123     Later in his testimony, Mr. Johnston indicated that the reason the Government preferred to proceed through the A.T.B. was to avoid questions in the Legislature, which would result in full public knowledge of the terms and conditions of the Gainers loan. Mr. Johnston explained that the Gainers loan was made close to the time when the Principal Group of Companies, centred in Edmonton, was placed into receivership. Many members of the public had lost money as a result of the downfall of the Principal Group, and the Provincial Government, as the regulator of that Group, was the recipient of many complaints relating to that regulation. A political decision was made to the effect that lending money to a corporation such as Gainers, in the face of extensive losses by small investors in the Principal Group would have political repercussions. Consequently, the Government decided to proceed through the A.T.B., as the accounts of the A.T.B. were not subject to review in the Legislature.

124     There is a contradiction in the testimony of Mr. Johnston, as he initially indicates that Mr. Pocklington insisted upon the A.T.B. being utilized. If that remains his position, I prefer the testimony of Mr. Pocklington. I note that in one of his correspondences to Donald Getty, Mr. Pocklington complained that the Defendant's insistence on the utilization of the A.T.B. greatly delayed the process of advancement of loan proceeds, thereby affecting Gainers' financial status. That letter was sent well before any actions were commenced and some time before the realization on the shares of Gainers by the Defendant was imminent.

125     The Defendant has produced no response to that correspondence indicating it to be erroneous, and I take that lack of response to be approbation of the position taken by Mr. Pocklington.

126     After Gainers Inc.'s initial default in May of 1989, the Defendant commissioned an accounting firm, Woods Gordon, to review the financial position of Gainers Inc. so as to assist the Defendant in the determination of steps it should take relative to the default by Gainers Inc. The Woods Gordon Report was completed and was presented to several Ministers of the Government, several Deputy Ministers and other persons associated with the Gainers Inc. account during the first and second weeks of June 1989. The conclusions emanating from this Report were that Gainers would likely lose money for the balance of 1989, that it could not survive without more funds and that it could not carry its then debt load.

127     Further, pork markets and hog prices were such that the then losses were likely to continue well into 1990. In addition, the plant and equipment needed to be replaced if Gainers was to continue within the industry in the future, would cost $40,000,000.00-$50,000,000.00 or more.

128     The Report also concluded that Kretchmar and Magic Pantry were viable operations which could be sold as going concerns for a maximum return to the holders. Finally, the Report concluded that the management at Gainers, Kretchmar and Magic Pantry were good, experienced and conscientious.

129     The Report then outlined various options and indicated the estimated result should the Defendant pursue any of those options. The first option suggested that the Defendant realize on the assets immediately. It was estimated that in the event the Defendant pursued this option, there would be a shortfall of approximately $40,000,000.00.

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 153 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

130    The second option was to do nothing and let Lloyds Bank take steps to liquidate the Gainers corporations. It was estimated that permitting this option to occur would result in an estimated shortfall to the Defendant of a sum between $45,000,000.00-$50,000,000.00.

131    The third option presented to the Defendant was to operate Gainers until replacement production facilities were in place. The Report estimated a shortfall and investment requirement in the pursuit of this option of between $106,000,000.00-$166,000,000.00.

132    The fourth option was for the Defendant to operate Gainers until third parties could take over the "kill and cut" portions of Gainers' activities. The shortfall and investment estimated to be required from the Defendant in pursuit of this option was placed at between $78,000,000.00-$100,000,000.00.

133    The third and fourth options included investment, and presumably that investment would have enhanced the value of the assets of Gainers. It is, however, the case that each of these options also included a shortfall while the Gainers' operations were conducted by the Defendant. In each case the shortfall exceeded the estimated shortfall for the first two options.

134    The Plaintiff and Mr. Pocklington were aware that Woods Gordon was conducting an investigation of Gainers' affairs, and Mr. Pocklington and other officers of the Plaintiff, together with management of Gainers Inc. cooperated with Woods Gordon personnel in their investigation.

135    At about the same time that the Defendant engaged Woods Gordon to conduct an investigation of the financial affairs of Gainers, Lloyds Bank engaged Ernst and Young to conduct a similar investigation. A Report was ultimately produced and that Report was made available to both the Plaintiff and the Defendant. The conclusions in that Report were similar to those contained in the Woods Gordon Report.

136    One of the events of default which occurred at the end of May, 1989 was the fact that Gainers Inc. was also in default with respect to its obligations to Lloyds Bank. In consequence, on June 1, 1989, Lloyds Bank demanded repayment of various credit facilities provided by Lloyds Bank to Gainers Inc. At about the same time, the Defendant provided the Plaintiff and Gainers Inc. with notice of Gainers Inc.'s default under the Master Agreement.

137    The demands and notices of default provided to Gainers Inc. precipitated a flurry of negotiations between the Plaintiff's employees and officers, Lloyds Bank and the Defendant. Various accommodations resulted in the Lloyds Bank's demands being deferred or withdrawn for a period of time. For example, on July 12, 1989 a Letter Agreement was entered into between Lloyds Bank and Gainers Inc. whereby Lloyds obtained additional security by way of security from Kretchmar, charging the accounts receivable in Kretchmar in favour of Lloyds Bank in support of a $3,000,000.00 guarantee provided by Kretchmar of the Gainers' indebtedness to Lloyds Bank. Gainers Inc. also provided Lloyds Bank with an unconditional irrevocable $2,000,000.00 letter of credit, which was considered as a topping up of Gainers' inventory and accounts receivable for the purposes of calculating the margin position of Gainers in determination of the amount of the operating line of credit established for Gainers by Lloyds Bank, which was available to be drawn by Gainers at any given time.

138    However, throughout the summer of 1989 the financial position of Gainers Inc. did not improve but continued to deteriorate. Gainers Inc. was still losing approximately $1,000,000.00 each month. This resulted in continued pressure by both the Defendant and Lloyds Bank for an injection of capital by the shareholder in Gainers Inc. and for additional security to secure the positions of Lloyds Bank and the Defendant. This pressure and continued negotiations resulted in the Letter Agreement referred to in the Agreed Statements of Facts portion of these Reasons. That Letter Agreement accomplished a release by the Defendant of security valued at $5,000,000.00 in favour of Lloyds Bank and the Plaintiff pledged $5,000,000.00 in other assets to the Defendant. The Letter Agreement provided for a 90 day cooling off period and it was hoped by all parties that during that period some sort of accommodation or solution might be found.

139    Such a solution was not to be the case. Gainers continued to lose money and the operating line of credit with Lloyds Bank was frequently out of margin. Lloyds Bank considered the Letter Agreement to be breached and provided the Plaintiff

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 154 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

with further demands near the end of September, 1989. At that time, the intention of Lloyds Bank to place the Gainers into receivership was obvious and the fact of receivership was imminent.

140    In late September and early October, 1989 the Defendant agreed to provide further guarantees of $3,000,000.00, then a total of $5,000,000.00, respecting Lloyds Bank's operating line of credit, on the condition that Lloyds Bank did not take steps to place Gainers into receivership. In addition, the Defendant obtained the right to acquire all of Lloyds Bank's loan accounts with Gainers. Lloyds Bank agreed to a five percent reduction in the total indebtedness should the Defendant exercise such option, as Lloyds Bank anticipated costs in realization which would be avoided by a pay out from the Defendant.

141    I now turn to events which occurred after the Defendant decided to acquire the shares of Gainers Inc. and Gainers Property Inc. pursuant to the provisions of 6.04(b) of the various Negative Pledge Agreements.

142    Immediately upon acquiring the shares on October 6, 1989 the Premier of the Province, Donald Getty, and the Provincial Treasurer, Dick Johnston, held a news briefing. At that briefing a press release was provided to those in attendance. It advised of the move by the Defendant to acquire the shares in Gainers. The release speaks of meat packing being a major component of the Defendant's efforts in upgrading agricultural products. It further speaks of Gainers as being the only Alberta based company with a processed meat brand name and a national marketing distribution system. It makes reference to protecting 1,200 jobs in the City of Edmonton and indicates that the action was taken to ensure that agricultural producers and suppliers in Alberta would be protected. It further states that Gainers was considered to be an integral part of the Defendant's strategy to rebuild the economic strength of the Province of Alberta.

143    Mr. Johnston is quoted as stating:

We have a responsibility to pursue Mr. Pocklington's outstanding financial obligations to the Government and the Company through every legal means available. We will file an action in the court today in response to his defaults in those obligations. Any money realized by those in other possible legal actions will offset financial commitments made by the Government.

144    A Board of Directors was immediately appointed, with a senior accountant from a national accounting firm being appointed to the Presidency of Gainers.

145    On October 10th, 1989 the Defendant provided the Plaintiff with a notice to the effect that it was proceeding under 6.04(b) of the Negative Pledge Agreements, and not under 6.04(a) or any of the other potential remedies available to the Defendant. On October 17th, 1989 Mr. Pocklington wrote to A.J. McPherson, Deputy Provincial Treasurer, and asked him that in the exercise of its "reasonable discretion" Alberta take into account the underlying value of the assets of Gainers Inc., including assets valued by the Hathaway Corporation in their report of September 22, 1989. The Hathaway Report was a report relating to the value of intangibles.

146    The letter also requested that the Government consider the excess value of vehicle leases, residual value in pension funds, the value of Magic Pantry Division, the value of Gainers' tax losses, and the excess value of Kretchmar Inc. over and above the book value of shares, plus inter-company accounts.

147    At about the same time as the acquisition of the shares in Gainers Inc. and Gainers Property Inc. the Defendant entered into trust agreements with the management and employees of Gainers Inc. These trust agreements provided that 10 percent of the shares of Gainers was to be held in trust for the management and employees. The effect of this was another "collateral benefit", which enabled the Defendant to keep its financial dealings with Gainers out of the purview of Legislative review by Members of the Legislature. Pursuant to the regulations in force, corporations not wholly owned by the Government were considered to be outside of the purview of Legislative review.

148    On October 10th, 1989 there appeared two media reports which summarized interviews with Dick Johnston respecting the Government's acquiring of the Gainers shares and during which Mr. Johnston made statements respecting the value of those shares. In one of those reports, Mr. Johnston is quoted as stating:

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 155 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

There are more assets in the Company than our total exposure.

This report also indicated that Mr. Johnston stated that Gainers had assets of about $120,000,000.00 and Government liabilities of slightly more than $100,000,000.00, including a $65,000,000.00 loan guarantee. In the second report, Mr. Johnston is quoted as indicating that Gainers owed about $100,000,000.00 and stated that the $55,000,000.00 value reported by media on the day of takeover included only the hard physical assets. He is further quoted as stating that the Gainers' accounts receivable, current inventory, and off balance sheets assets were worth approximately another $65,000,000.00. Mr. Johnston testified that these quotations were made at a media scrum which occurred as he was moving between various locations in the Alberta Legislature. He acknowledged that what he said was consistent with the plain meaning of those statements and stated that he "mis-spoke" when he estimated a positive value to Gainers' assets over and above the debt of approximately $20,000,000.00.

149    It is noteworthy that only a very few days before these statements were made to the media, Mr. Johnston had been provided with a report from his Deputy Minister indicating that the lowest possible negative value to Gainers was $42,000,000.00. Accordingly, his "mis-speaking" was to the extent of a difference of at least $62,000,000.00.

150    I am satisfied that Mr. Johnston did not mis-speak. I am satisfied that he knew full well that the Defendant valued Gainers' shares at substantially less than the total exposure to which those shares were subject. When he spoke to the media, he was under no legal compulsion to tell the truth. However, when he testified in Court, he was under such legal compulsion. It would have been a simple matter for him to say that he misled the media and the public when he indicated that the assets of Gainers were more than sufficient to cover Gainers' liabilities, as that was not his belief at the time. It is suggested that Mr. Johnston took an opportunity to correct his "mis-speaking" approximately six months later, when he is quoted in another media report as having indicated that "there was a negative value and that the Government would be pursuing Mr. Pocklington for that negative value". However, that statement was not in the same context, and was by then self-serving, as the Defendant was pursuing Mr. Pocklington.

151    The best that can be said for Mr. Johnston is that when he testified that he mis-spoke to the media, he had convinced himself that he "mis-spoke" as opposed to his deliberately attempting to mislead this Court. Regardless, his credibility suffers, as either he is capable of adjusting his views to suit his purposes, or he has chosen to deliberately lie in Court.

152    Several times previously I indicated that I would, at a subsequent point, make reference to Mr. Johnston's credibility. This is that subsequent point. I conclude that Mr. Johnston's credibility is lacking, and that where his evidence is contradicted by the evidence of Mr. Pocklington, I prefer the evidence of Mr. Pocklington.

153    I also come to this conclusion because of the nature of Mr. Johnston's testimony. I found Mr. Johnston to be incapable of directly responding to questions. It frequently appeared that Mr. Johnston was restating the question to suit his purposes and then responding to the restated question, or responding to a question that was not asked at all. Questions which were perfectly straightforward, and which could have been answered directly, were answered obliquely, or not at all.

**The Valuation of Gainers by the Defendant**

154    Subsequent to the acquisition of Gainers Inc., the Defendant continued the operation of Gainers Inc., using existing management, and under the direction of a Board of Directors appointed by the Defendant. In early August of 1990, the Plaintiff filed its Statement of Claim in this action. On the 14th of August, 1990 Allister McPherson, the Deputy Provincial Treasurer, sent to the Plaintiff and Peter H. Pocklington a letter stating:

In the exercise of Alberta's reasonable discretion, the G.I. shares and the G.P.I. shares have no value which will be applied on account of the total actual indebtedness.

155    Mr. McPherson stated that he understood that the Crown was to determine whether there was a value to the shares at the time they were taken. He stated that the approach he took was to determine what the shares were worth in a fair market sense — what they would have been worth to a third party at the time.

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

156    He also said that he looked at the liabilities and the assets of Gainers to determine whether there was any value that belonged to the previous owner. He considered that the determination of the value of the shares was similar to the determination of the value of mortgaged property on a foreclosure of the mortgage.

157    Mr. McPherson admitted that he did not provide any real value to the intangibles, aside from the values that were found in the financial statements for Gainers. He also did not consider or value the tax loss carry forward. Finally, when he made his determination that the shares had no value which could be applied on account of the total actual indebtedness, he did not create any memorandum listing assets and liabilities, or outlining any of the matters that he took into consideration in that determination.

158    He had reviewed financial statements and reports emanating from Gainers both prior to the Government acquiring the shares and after the Government did acquire the shares. He was aware of the Woods Gordon Report and the Coopers & Lybrand Report. He was aware of the activities of Gainers both before and after the Defendant's acquisition of it.

159    He never determined a specific value of assets. He used the financial statement as the template. In determining the value of the shares, he did not take into account the value to the Government, including economic benefits, because the shares were part of the security package and in that context it did not seem reasonable to him that the shares would have a different value to the Government than they would to some other party.

160    Mr. McPherson indicated that he discussed the specifics of his determination of the value of the shares with Mr. Kinsman. Mr. Kinsman testified that he met with Mr. McPherson on a number of occasions and outlined to Mr. McPherson various factors which he believed Mr. McPherson took into consideration. Mr. Kinsman advised Mr. McPherson that Gainers, in his opinion, had no value as a going concern and was essentially insolvent.

161    Mr. McPherson testified that he was not aware of any discussions or memorandum within the Defendant which gave rise to what I have described as political considerations. For example, while he had communication with Mr. Mehr and Mr. Williams, he says that it was never indicated to him by those people that Mr. Pocklington, or the Plaintiff, should be treated any differently than would have been the case had the Plaintiff been a party other than one controlled by Mr. Pocklington.

162    I am satisfied that it would have been impossible for Mr. McPherson to be unaware of, and totally immune to, political influences. His own Minister, Dick Johnston, testified that both he and the entire Cabinet were extremely upset with the state of Gainers' loans and guarantee. Mr. Johnston acknowledged that in discussions with Mr. Pocklington expletives were frequently utilized. Memos emanated from people who are allegedly civil servants without political affiliation, and yet those memos made it clear that those people were concerned about the political wellbeing of the Government. Those same people had daily contact with Mr. McPherson and that daily contact was often directed towards the status of Gainers' accounts. It is impossible to believe that people would only have discussions relating to the nature of the ownership of Gainers in the absence of Mr. McPherson.

163    The Plaintiff's reading of the letter of August 14th, 1990 suggests that the Defendant simply determined it would not apply any amount on account of the indebtedness, but did not determine what the value of the shares was. The Plaintiff further takes the position that no value was ever determined. It comes to this conclusion on the following basis:

(a) No documents exist relating to any valuation of shares;

(b) The value of the shares was never a topic considered by the Defendant's Committees in respect of Gainers. Mr. McPherson was initially not able to state when the valuation was done and said so at his Discoveries. At trial, he indicated that the valuation was arrived at by the end of June, 1990, but for some reason, which he cannot explain, he did not send the letter relating to valuation until August 14th, some 11 days after the Plaintiff had filed its suit in this matter;

(c) Mr. McPherson never set out a calculation that would show a value. The information said to have been relied on was done in his mind, without any writing;

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 157 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

(d) Mr. McPherson stated that he considered the valuation would be assets minus liabilities, but did not take into consideration intangibles that do not appear on the financial statements, nor tax losses carried forward.

164    Finally the Plaintiff raises the questions of introduction of political considerations, personal vendetta and the like into the valuation process. This is really a bad faith argument and suggests that by the time it came to the valuation of the Plaintiff's shares, the process had to be contaminated by irrelevant, largely political considerations.

165    In my analysis of the question of whether or not the Defendant conducted a reasonable valuation, it is first necessary to review the agreement under which the Defendant was operating. It is common ground that the Defendant elected to proceed under Article 6.04(b) of the various Negative Pledge Agreements. The operative portions of that section state:

Accept the G.I. shares as payment of a portion of the total actual indebtedness, in which event the Treasury Branches shall apply on account of the total actual indebtedness that amount equivalent to the value of the G.I. shares at that time as determined by Treasury Branches in the exercise of its reasonable discretion.

166    It is further common ground that in interpreting that provision, the Defendant is to be substituted for the A.T.B. Further, by the time of the valuation, the reference to G.I. shares included both Gainers Inc. shares, and the Gainers Property Inc. shares.

167    The total actual indebtedness was defined as meaning, at the relevant time, the total Term Loan outstanding ($6,000,000.00 plus interest) at that time, together with the repayable loan guarantee amount then outstanding, together with all interest accrued thereon as of the date of calculation of the same and due and owing in each case by Gainers Property Inc. It is acknowledged by the Defendant that by October 10th, 1990 the Defendant had secured the position of Lloyds Bank and had, in fact, paid out the guaranteed loan. This meant that the additional sum of $55,000,000.00, plus interest, had been paid to Lloyds Bank and constituted part of the total actual indebtedness. As the value of the shares is to be applied against the total actual indebtedness, the total actual indebtedness must be withdrawn from the equation when a share valuation is conducted. Otherwise, the total actual indebtedness enters the equation twice. Accordingly, to consider the amount of the total actual indebtedness as being a liability for the purpose of calculating the value of the shares and then to apply the shares' value to the total actual indebtedness, is an unreasonable exercise of discretion. That is the case no matter what standard of review of an exercise of reasonable discretion might be used.

168    It is further clear from the evidence of Mr. McPherson that this is exactly what he did. It was suggested by Defence Counsel in argument that the valuation can be adjudged as being reasonable on a corrected basis, namely for the Court to look at what Mr. McPherson did as being reasonable in terms of arriving at a nil value having regard to all the assets and liabilities. But for the Court to do this would be for the Court to approve a procedure that is not contemplated by the agreement. The drafting of the agreement was in the hands of the Defendant, the Defendant is a sophisticated party, has a battery of lawyers available to it within its own entity, and has the ability to hire (and has hired) outside Counsel. For the Court at this point in the process to correct or redo what the Defendant did in its exercise of discretion in these circumstances is not appropriate.

169    In the event I am incorrect in any part of this analysis, I wish to state my analysis and findings with respect to whether the exercise of discretion would have been reasonable had Defendant gone through the process contemplated by the agreement, but continued to utilize the factors that it alleges to have utilized. It is clear that the Defendant had a discretion, but I am satisfied that that discretion is not a totally unfettered discretion. As stated by Lord Green M.R. in *Associated Provincial Picture Houses Ltd. v. Wednesbury Corp.* (1947), [1948] 1 K.B. 223 (Eng. C.A.), at 229:

A person entrusted with a discretion must, so to speak, direct himself properly in law. He must call his own attention to the matters which he is bound to consider. He must exclude from his consideration matters which are irrelevant to what he has to consider.

170    I am satisfied, and the case law supports this position, that there are many possible results emanating from an exercise of reasonable discretion in the valuation of Gainers Inc.'s and Gainers Property Inc.'s shares. A Court should not interfere where the

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 158 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

Court has a different opinion from that of the person exercising the discretion. As stated by Lord Denning in *Secretary of State for Education & Science v. Tameside Metropolitan Borough Council* (1976), [1977] A.C. 1014 (U.K. H.L.), at pp. 1025 to 1026:

> No one can properly be labelled as being unreasonable unless he is not only wrong, but unreasonably wrong, so wrong that no reasonable person could sensibly take that view.

171    Some cases speak of manifest unreasonableness, which I take to mean as being obvious unreasonableness (see *Hemani v. British Pacific Properties Ltd.* (1992), 24 R.P.R. (2d) 248 (B.C. S.C.)). But, in my view, the word "manifest" is almost a redundancy as most unreasonableness will be obvious.

172    I am satisfied that a reasonable exercise of discretion in valuing shares encompasses a process component. To show what I mean by requiring a reasonable process component, I give the following example. If Mr. McPherson had placed a series of numbers on a dart board and thrown a dart at that board, striking one of those numbers, and if he had determined the value to be that particular number, then even if the value determined was within the realm of reason, I would not consider that method to be a reasonable exercise of the Defendant's discretion in valuing the Gainers shares.

173    I have already detailed the matters which were available to Mr. McPherson to consider. Mr. McPherson, in his evidence, testified that he considered some of those matters and Mr. Kinsman, in his evidence, indicated that he and Mr. McPherson discussed and reviewed the balance of the items. Unfortunately, there is no written document outlining the factors taken into consideration by Mr. McPherson in his exercise of the Defendant's discretion. Mr. McPherson says that he did the valuation "in his mind" and used the financial statement for Gainers as a template in determining the value of the Gainers Inc. and Gainers Property Inc. shares.

174    By any standard, the Gainers assets were extensive. They comprised the general assets that I referred to earlier in this decision and each of those general assets included many other components. When I look at the process of evaluation and consider the fact that the standard for appeal of finding of facts in civil litigation is not dissimilar from the standard in the exercise of a discretion, such as the one to be exercised by the Defendant, I wonder what the Defendant would consider would be an appropriate argument at appeal if in the course of this decision I simply stated that I had considered all relevant factors, and without any breakdown of those factors, gave a value to the shares.

175    I suspect that the Defendant, if it were unhappy with that value, would argue that the process I utilized was flawed and unreasonable. An argument by the Plaintiff that I had a great deal of material before me may not meet with success.

176    That is not to say that in every exercise of reasonable discretion in the valuation of shares there needs to be a written calculation of that value, but surely when the value of the assets behind the shares is in the Defendant's own estimation in excess of $70,000,000.00 and those assets are practically enumerable, then some form of calculation or written process is necessary.

177    I turn to consideration of another matter which leads me to the conclusion that the Defendant has not properly exercised its discretion. It is the Defendant's position before this Court that the shares have a negative value of $42,000,000.00. The letter of August 14, 1990 does not say that. It simply states that no amount will be applied to the shares. It is obvious that Mr. McPherson did not determine the value to be a negative $42,000,000.00 or any other particular amount. In my view, the Plaintiff was entitled to know what the Defendant's true evaluation was, and entitled to have the Defendant utilize a process that would arrive at an appropriate value.

178    I find it noteworthy that during the month of July, 1990 the Defendant cancelled appraisals, which it had previously commissioned, respecting Gainers assets. No explanation was given for that cancellation.

179    The Defendant has taken the next step in this matter and has asked this Court to calculate the value in the event that this Court determines a reasonable valuation process or result was not achieved by the Defendant. In doing so, the Defendant has presented to this Court a series of appraisals. In fact, these appraisals constitute the largest part of the Defendant's case relative to valuation. The Defendant has also proffered an expert in share values who has tied the values as established by the appraisals together, so as to enable this Court to come to a proper determination of share value.

WestlawNext CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

180    I take it that the Defendant feels that it is necessary for this Court to have these appraisals in order to arrive at a reasonable valuation. The Defendant has also supplied this Court with practically every piece of information that was available to Mr. McPherson and yet the Defendant still felt the appraisals to be necessary for this Court's determination. If the Defendant was of the view that the matters before Mr. McPherson were sufficient to establish a reasonable valuation, then why has it taken the next step in its presentation of its case to this Court. I conclude that the reason is not based on an abundance of caution, but based on the Defendant's assessment that the appraisals and the evidence from the expert valuator are necessary.

181    Further, the Defendant has asked this Court to establish the negative value and acknowledges that Mr. McPherson did not do so. If the steps taken by Mr. McPherson were a reasonable exercise of the Defendant's discretion, then that should end the matter. What the Defendant is asking this Court to conclude is that Mr. McPherson partially exercised the Defendant's reasonable discretion and that the Court should accept that, but should complete the balance of that exercise. In my view, in order to be reasonable, an exercise of discretion such as contemplated by paragraph 6.04(b) of the Negative Pledge Agreements must be sufficiently complete to enable both parties to know exactly where they stand. By the Defendant's own acknowledgement, this exercise of discretion by Mr. McPherson does not meet that standard.

182    I turn to the matters allegedly considered by Mr. McPherson and those matters which he did not consider. Much of the Defendant's case was an attempt to outline to the Court the materials and information that were available to Mr. McPherson when he exercised the discretion as to the value of the shares on behalf of the Defendant. In his evidence, Mr. McPherson outlined that he had considered some of those materials and that he consulted with Mr. Kinsman. Mr. Kinsman, in his evidence, indicated that the consultation was extensive and that all of the evidence proffered by the Crown, excepting the evidence from appraisers, was discussed between himself and Mr. McPherson.

183    Mr. McPherson has indicated he allegedly considered all of the evidence which was proffered in Court relating to Gainers' financial affairs. I assume that he at least gave some consideration to those matters, as several of them were ongoing; for example, things like monthly reports emanating from Gainers, several of which involved presentations where Mr. McPherson was in attendance. Mr. McPherson did not, however, give any consideration to the possible value relating to the tax loss carry forward. The Plaintiff's expert has valued that tax loss carry forward at approximately $4,000,000.00. The Defendant's expert has approached the tax loss carry forward on a different basis, but has also valued it at several million dollars.

184    With respect to the intangibles not found on the balance sheet, again Mr. McPherson acknowledged that he did not give consideration to those matters. The Plaintiff's expert valued those intangibles at $25.6 million. The Defendant's expert valued those intangibles at a substantially lesser amount, but one of the Defendant's experts acknowledged a cost of $7.5 million being the re-creation cost of management in place, and further acknowledged that there was some value to the Swift brand name.

185    Several of the appraisers who testified indicated that there is always going to be a difference of opinion in the value of property, and that a range of approximately 10 percent in that difference is common. From that I conclude that if the assets not considered by Mr. McPherson constituted a value totalling less than 10 percent of the total value that he arrived at, then that would be within the field of practice and would be reasonable. There are two difficulties here:

  1. Mr. McPherson did not arrive at any value. He simply stated that there was nothing to apply, and I am satisfied from his evidence that he himself never considered whether or not there was a negative value, or what that negative value might have been;

  2. If one looks at the value which the Defendant submits is the appropriate value, the assets missed by Mr. McPherson could easily constitute more than 10 percent of that total value. To exclude assets that constitute more than 10 percent must place whatever figure his mind was able to discern outside of that reasonable scope for difference.

186    Mr. McPherson denied drawing his attention to political considerations, or considerations relating to who the owner of the Plaintiff was. In fact, he stated that he was not aware that such discussions were going on around him, or that any of the documents that I have referred to in evidence existed. I have already said that I find this impossible to believe and will

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 160 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

not repeat that discussion here, other than to say I am satisfied that political considerations had to and did filter down to Mr. McPherson and influence his process of evaluation.

187    In conclusion, I determine that the Defendant did not exercise its reasonable discretion in valuing the shares and applying that value against the total actual indebtedness. Further, I am satisfied that once this matter was before the Court, the utilization of a Statement of Defence that denies any value without any more substance, or reference to a process of valuation, does not elevate what was unreasonable to reasonable. The Defendant having failed to exercise its reasonable discretion, or having exercised it unreasonably, it now falls to the Court to make a determination of value.

## Valuation Theory

188    Between the summer of 1990 and the date of trial, the Defendant sold many of the assets of Gainers, including essentially all of its equipment to various purchasers. The Defendant's operations in North Battleford, Saskatchewan, Kretchmar and Magic Pantry have all been sold. The sole remaining asset of any significance is the plant located on Yellowhead Trail in the City of Edmonton. That plant was ultimately leased to Maple Leaf Foods and operated by Maple Leaf Foods until December of 1997 when Maple Leaf Foods shut down its Edmonton operations as a result of a strike. I am satisfied that it was the strike and other economic factors that caused the shutdown of the Maple Leaf Plant in Edmonton, and not the condition of the plant.

189    As part of the process for preparation for trial in this matter, each of the parties commissioned various appraisals. Meetings of various experts, representing each of the parties ensued, and the value of at least some of the assets and the liabilities of Gainers have now been agreed upon. The agreed values are as follows:

| | |
|---|---|
| Value of Magic Pantry Foods | $ 10,980,000.00 |
| Value of Kretchmar | $ 9,500,000.00 |
| Gainers' Fixed Assets North Battleford (All) | $ 7,200,000.00 |
| Edmonton Equipment | $ 13,500,000.00 |
| Sodor | $ 1,000,000.00 |
| Pension Assets | $ 410,000.00 |
| Bonds | $ 30,000.00 |

In addition, the parties have agreed to the "book value" of several assets belonging to Gainers. These are as follows:

### *AGREED BOOK VALUES*

| | |
|---|---|
| Accounts receivable | $ 13,300,000.00 |
| Inventory | $ 16,200,000.00 |
| Prepaid items | $ 190,000.00 |
| Bank indebtedness | $114,000,000.00 |

190    It was further agreed that for the purpose of this litigation the opening balance of the tax loss carry forward available to Gainers Inc. as at the valuation date was $20,000,000.00.

191     In consequence, some of the assets that go into the share values are agreed upon in terms of their value. The Bank indebtedness is agreed upon and the opening balance of the tax loss carried forward is also agreed upon. What the value of that tax loss carry forward is, is not agreed upon. Not all the agreements as to value of assets transcribe into agreement as to value of shares.

192    Each of the parties presented evidence and a theory as to how the shares should be valued. The evidence consisted of appraisals and evidence relating to the quality of the Gainers Plant and operations. Experts in the valuation of shares presented evidence on behalf of the Plaintiff and the Defendant. Those experts attempted to take the appraisal results, apply the theory of valuation that they felt was appropriate, and provide the Court with an opinion of the value of the shares of Gainers Inc. and Gainers Property Inc.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

193    Having regard to the agreed values, the following outlines what remains in dispute:

    1. The appropriate standards and approaches to be applied in valuing Gainers' assets;

    2. The actual value of the opening balance of the tax loss carry forward is;

    3. The value of Gainers' lands and plant located on Yellowhead Trail in Edmonton;

    4. The value of intangibles, and in particular, intangible assets that do not appear on Gainers' balance sheets;

    5. The translation from asset value to share value.

194    In my review and consideration of these questions, I will first outline the theory of each of the Plaintiff and the Defendant as to the appropriate standard and approach and the evidence given by their experts in that regard. I will then make reference to the individual appraisals conducted by various asset appraisers, and then provide further detail relating to the evidence of the expert share evaluators. Next, I will review the law as it relates to valuations and appraisals, and interpretation of contracts. Finally, I will relate that analysis to the appraisal and valuation evidence previously reviewed.

195    I have already indicated that each of the Plaintiff and the Defendant presented experts who testified as to the appropriate method to value the shares of Gainers Inc. and Gainers Property Inc. The experts generally agreed on the description of various theories of value, but were unable to agree on what were the proper standards of value and approach as to valuation.

196    It is common ground that the first step is the determination of an appropriate value standard. The determination of value standard asks the question value to whom?

197    The experts agreed that the most common value standard is fair market value, which is a notional concept involving a willing buyer and a willing seller. The concept assumes equally informed, arms-length parties and involves an objective standard. Matters like compulsion on one of the parties to act are assumed away, such that the intended result is something that allows for fairness to each of the parties involved in the evaluation. The notion of fair market value assumes that the market is open and unrestricted and that there are no potential purchasers who are excluded from participation in the market. In assuming that the parties are acting at arms-length, the negotiation is contemplated to be between parties with opposing interests, each having an economic stake in the outcome.

198    It was the opinion of the Defendant's expert that the fair market value standard was the appropriate standard to be applied and the Defendant's expert used it in his evaluation of the shares.

199    Another standard of value is the value-to-owner, or value-in-use, which is defined as the price the owner would pay rather than be denied the uninterrupted ownership and use of the property. It is also defined as the adverse value of the entire loss, direct and indirect, that the owner might expect to suffer if he is deprived of the property. It is never less than fair market value and can be used to describe either owner-perceived economic advantage, non-economic advantage, or a combination of both. In an economic context, value-to-owner may be equal to or greater than fair market value.

200    The Plaintiff's expert took the view that value-to-owner, or value-in-use was the appropriate standard, and referred to that value as the value to the Defendant. It was his opinion that this was the appropriate standard of value, in view of the fact that the Defendant had a choice to proceed under 6.04(a) (sell the shares) or 6.04(b) (assume the assets of Gainers). The fact that the Defendant chose to proceed under 6.04(b) indicated that the Defendant had a particular attachment to, or use for the Gainers' assets. The Plaintiff's expert was of the opinion that the Defendant was proceeding in order to obtain and preserve economic development benefits and political benefits. The Plaintiff's expert was not able to quantify what those benefits were, but was of the opinion that the benefits had to exceed the fair market value of the assets, otherwise the Defendant would have proceeded to liquidation, or disposal of the assets in the marketplace.

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 162 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

201      After the determination of a standard of value, the evaluator must proceed to determine the appropriate approach. The approach is also referred to as the appropriate valuation method or technique. Each of the experts agreed that there are three basic approaches for valuing a business, business ownership interest, or security:

(a) The asset base (cost) approach;

(b) The income approach; and

(c) The market approach.

202      The asset base, or cost base approach is a way of measuring the future benefits of ownership by quantifying the amount of money that would be required to replace the future service capability of the subject property. This approach contemplates that the cost to purchase or develop new property is commensurate with the economic value of the service that the property can provide during its life. It assumes that economic benefits exist and are of sufficient amount and duration to justify the expenditures. Under this approach, current costs of obtaining an unused replica of the subject property, including intangible property, or cost of obtaining a property of equivalent utility, is determined. Depreciation is deducted from the cost to reflect elements of physical, economic, and functional obsolescence.

203      The income approach involves an estimation of the cash flow of the business and its profitability. The profitability is then converted to value by the application of a capitalization or discount rate. In determining the appropriate rate, factors such as interest rates, rate of return expected by investors on relevant investments, and the risk characteristics of the anticipated benefits are taken into consideration. In some industries and in some circumstances the value of a business is determined simply by multiplying or capitalizing the gross revenue.

204      The market approach involves comparable properties. What the evaluator does is look at the sale prices for similar assets which have sold on the open market. The evaluator then makes adjustments for the differences between the asset being evaluated and those similar assets which have been sold. The market approach is frequently used with respect to real estate appraisals, particularly where there are a great many similar properties which have sold, or which are on the market.

205      It was the Plaintiff's expert's opinion that an asset based, or cost approach was the appropriate approach to be utilized. The Defendant's expert utilized an income approach, and also looked at the market approach and an asset based approach as a check on his value as determined under the income approach.

206      Having stated in a general sense the concepts involved in evaluation which were presented to this Court, I will now look at the evidence contained in the appraisals.

## Intangible Assets

207      The Plaintiff called two experts with respect to the appraisal of intangibles. The first expert on behalf of the Plaintiff was Russell Parr. He presented evidence relating to theories of evaluation of intangibles. Mr. Parr, however, had no intimate knowledge of the meat business and, accordingly, the Plaintiff also retained Allan H. Beswick to review and establish the value of intangibles. Mr. Beswick had a 40 year career in the meat industry at the management and consultant level, and generally his qualifications to provide his opinion were accepted by the Defendant.

208      The valuing of intangibles deals with assets that often do not show on a company's balance sheet, but are nevertheless valuable. These assets come about as a result of years of trial and error to find procedures and methods that are most effective for a particular business entity. They are crucial to the ongoing success of any business enterprise.

209      In his appraisal, Mr. Beswick considered the following:

1. The in place management of Gainers;

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 163 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

2. Gainers' trade marks;

3. Shelf space allocation obtained by Gainers in various retail outlets;

4. Suppliers' lists;

5. Packaging;

6. The development of standards;

7. The development of processes and procedures;

8. Accounting procedures;

9. The establishment of creditworthiness;

10. Codes for inter-company use;

11. Customer lists and records; and

12. Management information system development (computer and data systems).

210    The Defendant's expert, Mr. Steel, agreed that these type of assets can have value, dependent on the particular circumstances of the business enterprise being valued. It was, however, his opinion that the value of these assets in Gainers' circumstances was very little and certainly substantially less than the value attributed to these assets by Mr. Beswick.

211    Mr. Parr testified that as the Defendant wanted Gainers' assets to continue its political and economic agenda, the question to be asked was what those assets would have cost the Defendant to create if Gainers did not already exist. Mr. Beswick, in preparing his Report and giving his evidence, assumed that the new corporation being created would be formed for the purpose of earning profits. The Defendant suggests that as Mr. Parr ruled out the income approach on the basis that this business was not being required or set up for the purpose of profit, but rather for the extension of economic and political benefit, the basis for Mr. Beswick's opinion is not solidly established. In my view, this is not the case. The cost of setting up a company like Gainers would be the same, or very similar, whether the purpose was profit, or to maximize economic and political benefits within a community. A business that hopes to sell $400,000,000.00 worth of product annually requires systems in place and the other intangibles referred to in the Beswick Report.

212    Mr. Beswick also assumed that the new company would attempt to enter the market with all existing companies in the market continuing their operations, including Gainers. The Defence suggests that this assumption is inconsistent with the valuation theories of Mr. Parr and Mr. Wise, the Plaintiff's share evaluator, because if Gainers continued to operate, the Crown would have no need or desire to create another competitor. What the Defence misses with respect to this assumption is that when one is doing an appraisal, one frequently is operating in a notional world and at the end, that appraisal is brought back into the real world. It may well be, however, that this assumption would lead to a skewing of costs, as the necessity of meeting another competitor may well entail greater cost in terms of things like advertising expense. To that extent, the Defence's point is well made.

213    In order to determine the value of the intangibles, Mr. Beswick attempted to determine what it would cost to set up the systems that constitute those intangibles. His conclusions were as follows:

| | | |
|---|---|---|
| 1. | A two year marketing expenditure | $11.4 million |
| 2. | Sales Expenditures (for staff) | $ 6.7 million |
| 3. | Marketing | $ 600,000.00 |
| 4. | Research development | $ 400,000.00 |
| 5. | Quality assurance | $ 400,000.00 |

WestlawNext® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

| 6. | Fresh meats | $ 800,000.00 |
| 7. | Human resources | $ 300,000.00 |
| 8. | Operations | $2,300,000.00 |
| 9. | Administration | $1,400,000.00 |
| 10. | Contingency | $1,200,000.00 |
| | *TOTAL* | *$25.5 million* |

214      In his Report, Mr. Beswick stated that he did not reduce the $25.5 million by any amount to account for the fact that most of it would be deductible and would result in income tax savings. It was his view that in the first two years of operation, a new corporation would not turn a profit and hence there would be nothing to deduct against. This ignores the fact that tax losses can be carried forward. However, the failure to consider any deduction for tax loss carry forward is not inconsistent with the general theory of the Plaintiff. That theory is that this operation was not being created for the purpose of profit, but for the purpose of fulfilment of economic and political objectives. In such circumstances, there likely would never be income against which the tax loss could be set off.

215      The Defence experts with respect to valuation of intangibles were David Haigh and Andrew Caldwell, who carry on business together as expert evaluators of intangibles. Mr. Haigh's and Mr. Caldwell's joint evidence was presented by way of a report. It was met by a rebuttal report from Mr. Parr and Mr. Haigh and Mr. Caldwell presented a surrerebuttal report.

216      It was the opinion of Mr. Haigh and Mr. Caldwell that the cost approach was not relevant to the valuation of Gainers' intangible asset portfolio as at the 6th of October, 1989. It was their view that what the intangibles might have cost to create is virtually impossible to accurately calculate, and irrelevant to the contemporary value. It was their conclusion that the income approach was the appropriate approach to use when assessing the value of Gainers' intangible assets. In their view, commercial investors are generally willing to pay for assets which produce a return. This depends on post-tax earnings.

217      They acknowledged that the Gainers portfolio of intangible assets ensured greater trade distribution, volume of sales and prices than might have been the case without them. They helped ensure that Gainers' losses were no greater than they were, and that a return was made on the tangible assets. However, over and above this, the value was not necessarily high.

218      As the valuation of a business on an income basis is prospective, one should base it upon what one expects the business to earn. Accordingly, Mr. Haigh and Mr. Caldwell utilized the income projections from a financing plan, which had been submitted by Gainers' management to the Defendant and which included what Mr. Haigh and Mr. Caldwell considered to be optimistic projections relating to future Gainers' earnings. On the basis of those projections, they calculated a not more than value of $3.78 million for the intangible assets of Gainers. When asked to assume the following factors, namely:

> 1. Swifts' and Gainers' brands were relatively weak and the business of Gainers was predominantly in the area of bulk commodity meats;

> 2. Gainers' intangibles would not be of primary importance to a potential purchaser in October, 1989; and

> 3. Gainers never paid for shelf space prior to October of 1989;

they concluded that their original intangible asset valuation at $3.78 million may have been overstated. On the basis of these factors, the intangible value of assets may have had some value to Gainers' business as a going concern, which might have been in the order of $2,000,000.00 to $3,000,000.00.

219      The assumptions made by Mr. Haigh and Mr. Caldwell were supported by the evidence of several witnesses who testified about the methods used in the meat industry for the establishment of market share and the effects these methods had on the value of Gainers' intangible assets. Mr. William Baker testified that he was employed by Intercontinental Packers in Saskatoon, Saskatchewan for some 32 years. After the takeover of Gainers by the Defendant, Intercontinental Packers offered to purchase Gainers, but did not attach any significant value to the trademarks or goodwill of Gainers in making that offer. The

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 165 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...
1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

trademarks were not considered valuable because of the labour strike which had occurred prior to the Government takeover and the subsequent boycott of Gainers' products in the marketplace. In his view, Gainers brands were looked at in the marketplace as a commodity-type brand of product, which was significantly price sensitive.

220    Mr. Thomas Hodgins testified that he was the Meat Merchandising Manager for Canada Safeway from 1978 through 1992, and that from 1990 through 1992 he was in charge of all of Safeway's Alberta stores, constituting approximately 80 retail locations. In his view, price was the most important factor in creating product demand when it came to branded meat products. Gainers and Swifts brands did very well in Safeway Stores before the strike and before a change in the Presidency of Gainers. After the change in Presidency, the formula seemed to have changed, resulting in more moisture in bacon and hams and a lack of quality in the luncheon meats. This and the strike caused sales to drop.

221    Brian Parteno was a Vice President of Gainers, both prior to and after the takeover of Gainers by the Defendant. He testified that Gainers did not pay for shelf space in 1989, and that the Gainers brand names were in the process of being replaced by Swift brand names because of the boycott following the strike. Gainers got its product onto the shelves by promoting through retailers (co-op advertising), and pricing advertised products in such a way that they would move quickly through the supermarket.

222    The Defendant also called Roy Steel as an expert in the area of Accounting and Management Consulting, particularly in respect to the management, sales, marketing and market entry strategies, operation, costs and prices, and corporate restructuring in the Canadian food processing industry. Mr. Steel testified that, in his opinion, trademarks were not necessary to a meat packing operation similar to Gainers, even if the owner wished to make a profit. That is because an operation similar to Gainers can be profitable without selling any processed or branded product. He further testified that, in his opinion, if the owner of a meat packing operation similar to Gainers does not care about making a profit, but is concerned about economic development value, there would even be less motivation to spend money to create brands. He testified that he would never advise the Defendant, or anyone else, to pay $25 million for the intangible assets of Gainers. He did, however, acknowledge that $7.5 million, being the cost of putting management into place, was a realistic cost. He also acknowledged that there was some value to the Swift brand name, but concluded that it would be no more than what Gainers had paid for it.

223    He also stated that individual assets can have an apparent value, but if the company does not generate any profits, they are then valueless. When a company is liquidated, very little can be recovered from its intangible assets.

**Land Appraisal**

224    Each of the Plaintiff and the Defendant presented evidence through an expert land appraiser. The Plaintiff's expert land appraiser was Edward Shaske, while the Defendant utilized Larry Dybvig. The lands in relation to which value is disputed are those lands where Gainers' main plant is located, immediately North of Yellowhead Trail and east of 66th Street in the City of Edmonton. More specifically, the municipal address is 12425 - 66th Street, Edmonton, Alberta. The Yellowhead Trail, which is on the south boundary of the subject property, is a major east/west arterial road, linking Highway number 16 East with Highway number 16X West. 66th Street is a major roadway running from the south, between 118th Avenue to the Fort Trail, a short distance to the north.

225    Development within the area surrounding Gainers' property includes residential areas south of 122nd Avenue, and north of the Fort Trail. The Fort Trail, which runs diagonally from southwest to northeast has commercial and industrial development along its frontage. The subject property is located within a small pocket of industrial utilized land that has the Yellowhead Trail as the southern boundary and railway tracks as the northern boundary. This industrial development runs along the Yellowhead Trail and extends from the railway tracks to the east, to approximately 50th Street.

226    Access to the subject lands is easily obtained from Yellowhead Trail, as well as 66th Street, which branches off from the Fort Trail. 66th Street leads to the South to 118th Avenue, which is a major roadway that leads into residential areas. Easy access to the Capilano Freeway is also obtainable. This freeway runs south and ultimately connects with the Whitemud Freeway,

WestlawNext. CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

which bisects the city from east to west. It may be concluded that the subject lands have good access to major roadways, as well as access to major residential areas which supply the labour forces required.

227      The lands themselves are made up of four individual lots. Lot 1, which is located with a frontage on 62nd Street to the east, is almost rectangular in shape, with the exception of a small cut on the northeast corner. It contains a total of 15.37 acres. Lot 2 is located on the northwest corner of 62nd Street and Yellowhead Trail. This is a rectangular lot with an area of 4.3 acres. Lot 3 is irregular in shape and is located with extensive frontage along Yellowhead Trail and 66th Street. It also has rear frontage on 62nd Street. It comprises 27.13 acres. Lot 4, which contains 0.43 acres is a very long and narrow strip situated to the extreme Northeast of Lot 1, with frontage along 126th Avenue. Its apparent purpose is historical, as at one time livestock was delivered by way of train, and Lot 4 provided a corridor to herd the livestock from the point of unloading of the train to the Gainers property. Generally, there is good access to all of the lands, with the access to Lot 2 being exceptional.

228      At the time of the acquisition of Gainers' shares, Lot 2 was utilized for the purposes of parking. All of the improvements relating to the Gainers plant were located on Lot 3. Lot 1 was essentially vacant, as was Lot 4. In their proposed operating plan, Gainers' management had submitted a plan whereby a new plant would be located on Lot 1. This would, presumably, allow the old plant to continue operating in its present location on Lot 3 until the new plant was ready. The old plant would then be substantially demolished.

229      It was common ground between the two appraisers and the share evaluators, that Lot 4 was considered to be excess to the needs of Gainers. Mr. Shaske also considered Lot 2 to be excess, although it was utilized for Gainers' parking. The Defendants took the view that Lot 2 was required for parking, as Gainers' employees had to park somewhere. I am satisfied that Lot 2 may have been excess within a reasonable period of time, as the reconstruction of a new Gainers plant on Lot 1 would have freed up the entirety of Lot 3, which would have allowed for parking for Gainers' personnel.

230      It was the Plaintiff's expert's opinion that the highest and best use of the lands would be the continuation of the existing utilization as a meat packing plant, as an interim use, until economic conditions ripened to warrant redevelopment of the site to a use that would conform with the surrounding land uses, which were in transition from heavier industrial to light industrial and commercial utilization. The Plaintiff's expert described this property as a special use property, that is that the lands and the plant were devoted to a particular single use, and the plant in particular was not adaptable to uses other than that.

231      The Plaintiff's expert used a direct comparison method in valuing the land. That is, he examined sales that he considered to be comparables, made adjustments to the sale price per acre relating to those sales to reflect differences between the comparables and the lands being appraised, and then applied the price per acre to the appraised lands. He appraised the lands as if they were vacant, and not on the basis that they were being used for the special use meat packing plant. With respect to Lots 1 and 4, he felt that those properties could be appraised together, as they were back properties, and Lot 4 is joined to Lot 1. He found six indicators, and went through the exercise of adjusting those indicators for factors such as location, size, time of sale and corner location. He concluded a value of $63,000.00 per acre. This placed the value of Lot 1, after costs to prepay improvements had been deducted, at $949,000.00. Lot 4 was valued at $14,000.00.

232      With respect to Lot 2, he also found six indicators. He considered Lot 2 to be the most valuable property, and after going through the same adjustments mentioned that relate to Lots 1 and 4, he concluded a value of $164,630.00 per acre. This parcel was valued, after costs to prepay were deducted, as $655,000.00.

233      Finally, with respect to Lot 3, the same sales utilized in arriving at a value for Lot 2 were considered. The size adjustment, and a corner influence adjustment were made relating to those two lots.

234      In order to determine a size adjustment factor, he located two separate sets of sales involving larger lots (between 4.04 and 7.24 acres) and smaller lots (between 1.08 acres and 2.11 acres) and determined that a price differential relating to size of 38 percent was appropriate. He also used a second subset to test size differential, involving only one large lot of 7.91 acres, and a group of six lots varying between 1.02 and 1.87 acres. He determined that a decrease in price per acre for the large lot involving that amount of land in the range of 28.39 percent resulted. He acknowledged that as the sampling was small, it would

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 167 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

be difficult to determine the accuracies of percentages, but they did indicate a fairly large differential for small parcels versus large parcels. It was his opinion that considering that Lot 3 could be subdivided, if it was not being utilized for a packing plant, a maximum adjustment of 25 percent for size differential was appropriate. The resulting adjusted value per acre for Lot 3 was $115,500.00. When prepayment costs were deducted, his appraisal resulted in the sum of $3,100,000.00 as the value for Lot 3.

235     The Defendant's expert was Larry Dybvig, who is an employee of American Appraisals Canada Inc. and resides in Vancouver, British Columbia. Mr. Dybvig utilized a concept of value being the market value - continued use. He defined it as the estimated monetary amount at which the subject property might be expected to exchange between a willing buyer and a willing seller, neither being under duress, each having reasonable knowledge of all relevant facts and with equity to both. He assumed the retention of the facilities at their present location for the continuation of their current use as part of the going concern, being the meat packing plant. An estimate of market value arrived at on the premise of continued use does not represent the amount that might be realized from piecemeal disposition of the assets in the marketplace, or from alternative use of the assets. It was his opinion that the premise of continued use is generally appropriate when:

1. The assets are fulfilling an economic demand for the service they provide;

2. The assets have a significant remaining useful life expectancy;

3. There are responsible ownership and competent management;

4. Diversion of the assets to an alternate use would not be economically feasible or legally permitted;

5. Continuation of the existing use by present or similar users is practical; and

6. Due consideration is given to the assets' functional utility.

236     Mr. Dybvig based part of his analysis on what appears to be a subdivision method. That method involves looking at a subdivision and the cost per acre in that subdivision and relating it to a similar subdivision emanating from the subject property. He concluded that one subdivision within the general area was similar. One actual sale in the general area consisting of approximately 5 1/2 acres was also similar. He then looked at the cost per acre of several other properties, some of which were located in different areas of the City and concluded that those properties were superior. The properties that he felt were similar had a price range of approximately $75,000.00 per acre. Mr. Dybvig applied $75,000.00 per acre to the large block of property, consisting of Lots 1 through 3, and came to a value of $3,487,500.00. He substantially reduced the cost per acre for Lot 4, because of its 35 foot depth and extreme width. He concluded that there was little demand for this type of land in the area, and therefore applied a $25,000.00 per acre factor, for a total value of $10,500.00. He rounded the total of $3,498,000.00 to $3,500,000.00.

237     It is noteworthy that most of the sales that Mr. Dybvig considered to be superior occurred after the date of appraisal and involved lands in locations other than within the vicinity of the subject lands.

238     His comparable number 5 was in the vicinity of the subject lands. The sale price per acre was $110,077.00. It was reduced to the $75,000.00 range as it consisted of 2.58 acres, and of course, the subject lands are substantially larger than that. This is a reduction in excess of 30 percent for size differential.

239     I find it noteworthy that the Defendant was critical of the size differential analysis conducted by the Plaintiff's appraiser. However, the Defendant's appraiser made similar size differential deductions without any analysis at all. That is, he relied only on his experience, without attempting to show the Court how that experience might operate in conducting a size differential reduction.

240     I recognize that the experience and the knowledge of the appraiser is a factor to be considered, and that appraisers have to utilize their experience and knowledge. However, a Court will always find it of assistance if there is some attempt to show how that experience and knowledge was applied, even if there exists some imperfections within that attempt.

WestlawNext. CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 168 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

241     I also had some difficulty with the Defence expert's adjustment for superior property. The values attained from those considered to be superior were reduced based on statements like "recognizing the premium associated with smaller industrial sites and industrial properties having substantial exposure to vehicular traffic, the value per acre indicated by this transaction was concluded to be superior to that of the subject property". As an example, one of those properties was found between Fort Road and 54th Street, west of 136th Avenue. The exposure on these streets would not be any greater than the exposure found on the subject property, which borders the Yellowhead Trail, one of the major routes through the City of Edmonton. The second property, being comparable number 3, has proximity to the same Yellowhead Trail (but not actually on it) and that was considered to be something that would result in a premium. I cannot see how proximity to a street would provide a premium over and above actually being on that street. If it is considered that some of the subject lands are not actually on Yellowhead Trail, surely they enjoy the same sort of proximity as does comparable number 3.

242     The Defendant's experts also made reference to a number of sales that occurred after 1989 and were not in the initial Defendant's report. The Defendant considered the sale of the Canada Packers' property to be particularly instructive. This property, which is located on Fort Road, totalled 26.42 acres and sold at a price of $39,364.00 per acre. However, on cross-examination, the Defendant's expert acknowledged that the sale price included a requirement of demolishing the Old Canada Packers' facility. That, apparently, cost something in the vicinity of $1,000,000.00 and would have had the effect of doubling the price per acre. I conclude that further analysis of each of the Plaintiff's and Defendant's experts' analysis is required and I will state my views respecting their evidence later in this decision.

**Valuation of Improvements**

243     The Plaintiff's expert with respect to the valuation of the improvements, on the subject lands was again Edward Shaske. The Defendant called as its expert Joseph Martins, who was also with American Appraisals Canada Inc. in Vancouver. The Defendant also called several witnesses who testified as to the condition of the improvements. Generally, it is acknowledged that many of the improvements were old and that the plant itself was inefficient. It is, however, also acknowledged that the improvements do have some value, and some of the improvements are relatively modern, up-to-date and fully functional. For example, a distribution centre was built in the early 1980s, and even the Defendant's appraisers acknowledged that it fulfilled the function it was built for and was in good operating condition. Other buildings were constructed in the 1960s, and still other buildings were constructed more than 80 years prior to early October of 1989.

244     The inefficiency of a multi-storey plant was described by several witnesses during the course of their testimony. Essentially, the way the Gainers' kill plant operated was to have livestock herded up a ramp to the top floor of a six-storey structure. The actual killing was done on this floor, and then the carcasses were dropped down to lower floors, where cutting, wrapping and processing were accomplished. Sometimes the process would require the raw materials to move up a floor or two, and this would be accomplished through the use of elevators. The inefficiency existed because the elevators acted as a bottleneck to the process. A further inefficiency existed in that livestock was stressed by the six-storey climb required to get to the top floor of the kill building. Stressed livestock does not produce the quality of carcass that unstressed livestock produces. Consequently, there was not only an inefficiency in terms of operations, but an inefficiency that led to a reduction in quality.

245     I am satisfied that on the evidence much of the Gainers plant was old and relatively inefficient. It, however, was still functional and still capable of doing the job it was designed for. I am also satisfied that the maintenance of the Gainers plant kept it reasonably functional. There was significant evidence as to the amounts spent on maintenance, and I am satisfied that a reasonable amount was spent on maintenance by the Plaintiff prior to the take over of Gainers by the Defendant. No doubt more could have been spent, but that probably is the case with practically any plant of this nature. The plant always met the standards required of it by the Federal Meat Inspectors, the only exception being for a brief period of time with respect to one area after the Defendant acquired the plant.

246     The Plaintiff's expert testified that he had discussions with management personnel for Gainers prior to preparing his report. That discussion led him to understand that management was projecting a new kill plant within five to ten years. In fact,

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 169 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...
1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

the plant has not been rebuilt. This means it was utilized as a meat packing plant, in substantially the same form as existed in 1989, for more than 8 years after the acquisition of the shares by the Government.

247    When asked as to why the expert chose five years, as opposed to any other time frame, it was his indication that an appraisal is done prospectively, not with hindsight. He, for whatever reason, chose to do it on the prospective basis of five years, even though management had indicated that the plant would be replaced within five to ten years.

248    With respect to the improvements themselves, there are approximately 35 to 45 buildings on the property, and because some of them are joined with others, there are approximately 20 to 25 distinct structures. The type of building varies from wood frame, to brick, to concrete structures. The buildings range in terms of their purpose, their functionality, their age and the method of construction.

249    In appraising the improvements, the Plaintiff's expert, Mr. Shaske, felt it was appropriate to use a depreciated cost approach. This was because the improvements are a unique special purpose property and are not often bought and sold in the marketplace. He crafted his appraisal on the basis of replacement cost, which is the cost of construction of a building having a utility equivalent to the building being appraised, but built with modern materials, designs and layout. He looked at each building individually and considered each building in terms of its condition. He then developed a replacement cost model, based on a cost service manual. He indicated that replacement cost of improvements is generally calculated through the use of either a cost service manual, or local contractor estimates. The cost service manual provides unit cost information for benchmark structures at a given date, and supply indices to account for variations from the benchmark structures in terms of construction details, geographic location and the passage of time.

250    Local contractor experience is generally preferred where similar buildings have been recently completed or are under construction. Here some of the buildings were from another era, and were constructed at various times, with renovations, additions and modifications. They did not lend themselves to contractor comparisons, and accordingly a cost service manual was used.

251    He chose a manual entitled the *Marshall Swift Evaluation Manual*, which was developed in the United States and contains adjustments to account for localized conditions, including in Edmonton. He indicated that the *Bouekh Manual*, which was a manual used by the Defendant's expert was not appropriate to the appraisal of this property, because that Manual applies an across-the-board value for a hog slaughtering operation. Here, because of the many different types of buildings, with different ages and types of construction, it was impossible to take an across-the-board figure and apply it uniformly.

252    It was Mr. Shaske's opinion that none of the buildings had a remaining economic life of less than 15 years from the date of appraisal. With respect to some of the newer buildings, he used the actual age and applied depreciation to that. With other buildings, he looked at the projected life of the building, and then considered what was left in it and applied the number of years left to the number of years the building is expected to last, to determine a depreciation factor.

253    In calculating depreciation, he used the depreciation tables found in the *Marshall Swift Manual*. These tables are not a straight line depreciation, where the building depreciates down to zero over a certain period, with the same amount being deducted each year, nor are they a declining balance form of depreciation, where a percentage is taken off the initial value, and then the same percentage is taken off of each year from the balance remaining.

254    What the tables do represent is a tracking of literally tens of thousands of sales of different types of property across North American. From that tracking, the people who prepared the *Marshall Swift Manual*, calculated what actually happens when a building is bought and sold in terms of the deduction in value for the fact that the useful life of the building was diminishing. The result is that as buildings get older they decline, but not on any exact curve, or on a straight line. One might describe the form of depreciation utilized by the *Marshall Swift Manual* as a "real world" depreciation. That is, depreciation which represents what actually happens in the marketplace.

255    Mr. Shaske then used his experience in categorizing various buildings in terms of their form of construction and quality, and applied the useful life as contained in the *Marshall Swift Manual*. It was his conclusion that in 1989 the depreciated

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 170 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

cost of the structures was $21,342,110.00. Subsequent agreement between Counsel resulted in a decrease of this depreciated replacement cost to $20,227,000.00. Mr. Shaske then added this amount to the $4,718,000.00 that he had appraised as being the value of the land, and the result was $26,060,110.00. He rounded that figure to $26,000,000.00. I assume that with the reduction agreed by Counsel, Mr. Shaske would have rounded the total amount for the land and the buildings to $25,000,000.00.

256    In arriving at his conclusions, Mr. Shaske, entered into a notional reconstruction of the exact same building, and applied depreciation to it, which he indicated would result in removal of functional and economic obsolescence. It is difficult to appreciate how this would occur, because that exercise results in the exact same enterprise as already exists with all of its functional and economic obsolescence. Mr. Shaske acknowledged that he estimated replacement of an exactly same size building, and was not aware of whether or not that exact size would be required. He further acknowledged that management would have a better understanding of that than he would.

257    With respect to replacement with a similar six-storey building, it was Mr. Shaske's evidence that if a modern single-storey building was built, that that building would cost more per square foot, as ground floor space is more expensive than second, third, fourth, fifth and sixth floor space.

258    Mr. Shaske further acknowledged that life expectancy of the building was based on his experience. He did not obtain a measure of life expectancy from any of the management, staff or any other consultants in the meat industry. He agreed that the rendering plant and feed mill were included in his appraisal, even though they appeared to be inactive. With respect to the entire property, Mr. Shaske indicated that his total depreciation rate came to 39 percent.

259    The Defence expert was Mr. Joseph Martins. He testified that:

    1. A return on investment from the assets was assumed, and if the earnings were inadequate a reduction in value would be required;

    2. He had inspected the premises on three occasions in 1987, 1990 and 1996;

    3. In addition to his own observations, he also collected data and information from drawings, reports, plant staff and consultants;

    4. He described the conditions of the building as poor to fair, requiring repair, showing its age, with portions not in use;

    5. Based on reports from Mr. Horton, an Engineer retained by plant management, discussions with plant management and review of the drawings for an intended replacement plant, it was his opinion that as of October, 1989, the plant had a five year remaining economic life;

    6. He was of the view that the replacement cost new of the improvements was $41,200,000.00;

    7. He based his estimates on the models contained in the *Boueckh Manual*, which he considered to be superior to the *Marshall Swift Manual* because it included more types of building construction and special use buildings;

    8. He then made deductions for all forms of depreciation;

    9. Physical and functional incurable depreciation was then determined;

    10. He measured depreciation against existing improvements, not intended replacement improvements; and

    11. He used a straight line method of depreciation.

260    His concluded value of all the improvements was $10,685,000.00.

261    If one adjusts his figures to account for the fact that Mr. Martins chose the lowest possible number of years given to him by management as being the useful life of the oldest of the improvements, and substitutes an eight year useful life for

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

the oldest of the improvements, leaving the balance of the improvements at the amounts concluded by Mr. Martins, the result would have shown a value of $12,230,050.00 for the improvements. At 10 years, the result would be $13,387,000.00. At 15 years, the result would be $16,090,000.00.

262    I will provide my comments as to the correct view for the value of the improvements near the conclusion of this judgment.

**Tax Loss Carry Forward**

263    As I noted in the Agreed Statements of Facts portion of this judgment, the parties agreed that, for the purpose of this decision, the total tax loss carry forward was $20,000,000.00. They did not agree as to what purpose it may be put.

264    The evidence disclosed that the disposal of Magic Pantry Foods, as contemplated in the Agreed Statements of Facts, would have depleted the opening balance by $4,902,000.00. However, at the same time, Gainers was losing money at approximately $1,000,000.00 per month, and consequently I am satisfied that a sale of Magic Pantry would have been easily offset by the continued losses of Gainers.

265    The Defendant also makes much of the fact that the Defendant was a Crown corporation and would not be taxable. The Defendant takes the position that Mr. Wise's selection of the standard "value-to-Defendant-in-use" results in an inconsistency as he has valued the tax loss.

266    I look at the matter differently than the Defendant. If Mr. Wise's standard of value is the correct one, then the tax loss carry forward could be regarded as a surplus asset. That is, if it is anticipated that the Defendant is taking over Gainers for the purposes of the economic and political advantages referred to in Mr. Wise's evidence, and expects to continue losing money, the tax loss carry forward has no value to the Defendant, whether the Defendant is a Crown corporation or not. It would, however, have value to a profitable competitor.

267    The Defendant suggests that Mr. Wise's proposal that the assets of Gainers be moved out of the corporation into a new corporation, leaving only the tax loss carry forward within Gainers itself, with a subsequent sale of Gainers to a profitable meat processing company for the purpose of amalgamation, is not possible under current tax legislation. The Defendant filed with its argument a number of provisions from the *Income Tax Act* and put forward submissions indicating that the Gainers to be sold to the profitable meat marketing company would not be an active business carrying on meat marketing, and therefore could not be amalgamated with a profitable corporation, resulting in tax write-offs to that corporation.

268    The Defendant did not offer any expert evidence with respect to the tax loss carry forward issue. The only expert evidence offered by the Plaintiff was the evidence of Mr. Wise, who in addition to being an expert business evaluator, is a Chartered Accountant. The Defendant was unable to address questions such as whether there would be an advantage to the Crown in purchasing a very small meat processing plant, placing that in Gainers, and then selling that off, together with the tax loss carry forward, to a profitable meat processing company.

269    I am satisfied that a literal reading of the tax legislation presented by the Defendant would have enabled the Defendant to pursue such an avenue. The Defendant chose not to do so, but that is not the Plaintiff's problem.

270    In consequence, I am satisfied that if Mr. Wise's theory or approach to valuation is appropriate, then the tax loss carry forward is a surplus asset, and his valuation of it at $4.1 million is a reasonable valuation. For reasons which will become apparent, the same analysis does not hold true with respect to the theory of the Defendant's expert in share values.

**Expert Business Evaluation**

271    The Plaintiff presented as its expert in valuing a business Richard Wise. Mr. Wise's qualifications were accepted by the Defendant. In fact, he has testified many times in Canada and elsewhere as to the valuation of businesses. This includes the valuation of shares representing business assets.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved. 41

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 172 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

272    The results of his testimony, as with any expert who has testified on a number of occasions in Court, varies. That is, he has not always been successful in convincing the Court that the position he presented to the Court was the correct one. Each of the Plaintiff and the Defendant presented copies of cases where Mr. Wise's testimony has been commented on. In reviewing those cases, I feel that I can draw little from them. The fact is that, like many experts who testify in Court on a number of occasions, Mr. Wise's evidence has been accepted from time-to-time, and the evidence of the expert giving a contrary position has been accepted from time-to-time. This does not mean, *per se*, that Mr. Wise might be termed "a hired gun", who is willing to compromise his opinions to fit the scenario desired by the particular litigant on whose behalf he is called. Legitimate differences of opinion can and do arise between experts, and sometimes a Court will be convinced to accept one expert's opinion, and sometimes the other's. This does not mean that the acceptance or rejection by another Court should be overly persuasive to subsequent Courts unless there is a pattern of contradictions, or a consistent lack of Court acceptance of a particular expert's testimony.

273    The Defence expert with respect to valuation of shares was Michael Dobner. Mr. Dobner has provided reports and evidence before Expropriation Boards and the like in the past. This, however, was the first time he testified in Court. Consequently there is no "track record" emanating from a series of testimonies in Court which would have allowed the Plaintiff to attack Mr. Dobner's evidence in a similar fashion. The Plaintiff, however, pointed out that Mr. Dobner was considerably less experienced than Mr. Wise in terms of presentation of evidence and experience in the field.

274    I am satisfied that the Plaintiff is correct as Mr. Dobner is obviously less experienced than Mr. Wise, as very few people in Canada or North America have Mr. Wise's experience. At the same time, Mr. Dobner's evidence impressed me as being straightforward, based on facts that might be drawn from the evidence as a whole, and generally logical.

275    The Defence and Plaintiff's expert differ in the selection of the appropriate value term, and in relation to the approach to valuation. These differences are fundamental to their opinions and I am satisfied that they are legitimate differences of opinion, as opposed to being based on inexperience, or arising from the type of witness who might be termed "a hired gun".

276    The Plaintiff's expert, Mr. Wise, testified that the first step in valuation of shares involves the selection of the appropriate value term. In his view, this selection is dictated by the fact that Article 6.04 of the Negative Pledge Agreements employs the term "value" with respect to Gainers' shares. The term is not defined in the Negative Pledge Agreements, the Master Agreement, or any related agreements.

277    It was Mr. Wise's evidence that there are many standards of value employed in different situations. These include terms like fair value, book value, adjusted book value, real value, fair cash value, going concern value, replacement value, liquidation value, value-in-use, value-to-owner, investment value, sentimental value, prestige value and many others. In fact, Mr. Wise testified that there are in excess of 100 standards of value.

278    It was his testimony that the standard of value addresses the question of value to whom. He was also of the view that the term "value" depended on the identity of the person making the assessment (in this case the Defendant), and on its interpretation of the benefits and risks related to the property being valued.

279    He observed the process utilized by the Defendant in October of 1989 and determined that the Defendant had three alternatives. First, it could have liquidated the assets of Gainers. Secondly, it could have sold the Gainers shares. Thirdly, it could have operated Gainers as a going concern, with a view to ultimately privatizing the operation. In his view, under the first alternative liquidation value would be the appropriate valuation standard. Under the second alternative, fair market value, or market value would be the appropriate standard. Finally, under the third alternative, which was the choice made by the Defendant, his view was value-to-owner, or value-in-use would be the relevant value standard.

280    He defined value-to-owner as the price the owner would pay, rather than be denied the uninterrupted ownership and use of the property. He stated that it was also defined as the adverse value of the entire loss, direct and indirect, that the owner might expect to suffer if he were deprived of the property. It was his view that having regard to the reasons listed at paragraph #57 of this decision, the Defendant intended to continue the operations of Gainers in order to preserve economic development

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 173 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

advantages generated by the business, so the value standard should be selected in light of the value of the Gainers shares to the Defendant.

281    It was his opinion that to maintain, or retain, the economic benefits in Alberta, the Defendant had two alternatives:

> (a) To reconstruct and recreate the operations in Alberta of similar function and utility to Gainers; or

> (b) Take possession of Gainers, thereby ensuring continuing operations.

It was his opinion that if the Defendant had proceeded under alternative (a), a certain cost would have resulted. Therefore, the value of Gainers' shares to the Defendant represented at least the cost it would have otherwise had to incur to recreate Gainers as it existed at the valuation date.

282    Mr. Wise was also of the view that all of the parties were sophisticated, represented by legal counsel and must have been aware of the concept of fair market value. The fact that they chose not to utilize the words "fair market value" in paragraph 6.04 of the Negative Pledge Agreements was instructive to Mr. Wise. In his view, this was an indication that the parties intended that a term other than fair market value be used by the Defendant in the exercise of its reasonable discretion in valuing the Gainers shares.

283    When Mr. Wise presented this evidence, the Defendant raised the objection that this testimony usurped the function of the Court. However, it was and remains my view, that in order to appreciate the evidence of an expert witness, one must appreciate the basis for that evidence.

284    The next step in Mr. Wise's evaluation of the Gainers shares was to consider the appropriate approach. As I discussed earlier, there are three basic approaches for valuing a business and they are the asset based (cost) approach, the income approach and the market approach. I have already discussed these approaches and I will not say more about them, other than that it was Mr. Wise's opinion that an asset based approach was the appropriate one. Again, he considered the fact that what the Defendant was receiving was a business which allowed the Defendant to pursue its economic and political objectives. If the Defendant had not received Gainers in this form, and as the Defendant wished to retain these economic benefits, the Defendant's only alternative would have been to reconstruct the operation of Gainers. To do so would have required the Defendant to essentially recreate Gainers in its entirety, and the cost of recreation in Mr. Wise's view is the value of Gainers to the Defendant.

285    The Defendant argued that there was no expert evidence proffered by the Plaintiff to show what the economic value of Gainers was to the Defendant relating to those items referred to at paragraph #57 of this decision. It was Mr. Wise's view that such evidence was unnecessary because if the cost of recreating Gainers was greater than the perceived economic benefits, the Defendant would have proceeded under 6.04(a) of the Negative Pledge Agreements.

286    In arriving at his adjusted shareholders' equity, Mr. Wise looked at the balance sheet of Gainers as it existed at the end of September, 1989 and made adjustments to that balance sheet, based on the agreed values referred to earlier in this decision, and the replacement cost value as established by the Plaintiff's expert. From those figures, he restated the balance sheet as follows:

| | |
|---|---:|
| Current assets | $ 35,190,000.00 |
| Due from affiliates | $ 804,000.00 |
| Fixed assets | $ 48,254.00 |
| Other assets | $ 26,040,000.00 |
| Business of Magic Pantry Foods | $ 10,700,000.00 |
| Investment in Kretchmar | $ 9,500,000.00 |
| Value of tax loss | $ 4,100,000.00 |
| Total assets | $ 134,588,000.00 |
| Liabilities | ($114,000,000.00) |
| *ADJUSTED SHAREHOLDERS' EQUITY* | *$ 20,588,000.00* |

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 174 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

287    He then suggested a range of plus or minus five percent to account for the inaccuracy inherent in the process of appraising assets and came to an adjusted shareholders' equity range of between $21,600,000.00 and $19,600,000.00. Having regard to the Agreement by Counsel relating to Mr. Shaske's evidence, reducing his appraisal figures by $1,000,000.00, I assume that that range also reduces by $1,000,000.00, so that the range would now be between $20,600,000.00 and $18,600,000.00.

288    Mr. Wise did not feel it was appropriate to make any adjustment to the values of the shares based on tax shielding, which is essentially a comparison of capital cost allowances when assets are sold versus when shares are sold. This was because Gainers, as it existed, was already losing money and, from a tax perspective, having greater losses would not be of any benefit to Gainers. Further, the basic assumption made by Mr. Wise was that the economic and political benefits which fell to the Defendant were at least equivalent to the cost of recreation. The cost of recreation would involve the total figures he arrived at and, again, the availability of larger capital cost allowances in that cost of recreation would not be a benefit to the Defendant.

289    The Defence expert, Michael Dobner, was of the opinion that fair market value was the appropriate value standard. He defined fair market value as being the highest price available in an open and unrestricted market between informed and prudent parties acting at arms-length and under no compulsion to act, expressed in terms of cash.

290    Mr. Dobner used "constant dollars" throughout his report and evidence. He defined "constant dollars" as money based on October, 1989 value, such that the effects of inflation were taken into account.

291    It was also Mr. Dobner's evidence that he approached the valuation of Gainers' shares on a "not more than value" approach. He did this by giving the Plaintiff the most favourable treatment whenever there were variables to be considered. That is, where a range of values might have been appropriate, he chose the value that was the most beneficial to the Plaintiff. Having proceeded on this basis, it was his opinion that the normal five to ten percent range of difference one would expect in valuing shares would not exist with respect to the value conclusions he arrived at.

292    Mr. Dobner did not consider intercorporate debts involving Gainers and other companies owned or under the control of Mr. Pocklington. Nor did he take into consideration the related actions, because the Consent Order granted by Costigan, J., referred to earlier in these Reasons specifically directed the exclusion of the related actions when valuing the shares for the purposes of this trial.

293    It was Mr. Dobner's conclusion that fair market value always includes consideration of a liquidation value. That is, because if the liquidation value is greater than the fair market value of the business as a going concern, then the liquidation value is the fair market value. It was his conclusion that with respect to Gainers, the liquidation value was less than the fair market value of Gainers as a going concern. This is because of the cost of liquidation and the fact that, on liquidation, many assets of Gainers would experience a diminished value.

294    It was Mr. Dobner's opinion that the income approach to valuation was the appropriate one. That is because investors in a business are interested in the cash productivity of the business. It was Mr. Dobner's view that it is a function of the benefits of the business which brings value to the owner.

295    The approach he utilized was to take projections relating to income, put forward to the Defendant in 1989 as part of the management's proposal relating to a take over of Gainers by management and employees, and applying an appropriate discount factor to those projections to give a present value to them. I am satisfied that this approach with respect to projected income was reasonable. It should be remembered that management had initially approached the Defendant "behind the Plaintiff's back" in the Spring of 1989. While it might be argued that during that time management was acting contrary to its duty to the owner, it cannot be demonstrated that its projections would have continued that contrary activity. This is because when management made its projections, it was acting with a view to acquiring Gainers and in order to do so, it had to show that Gainers would, within a reasonable time, become profitable. The greater the profitability it was able to show, the more likely it would be able to convince the Defendant to enter into some sort of arrangement with management and the employees.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 175 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...
1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

296    Further, when I review the projections, I note that they contain some fairly glowing assumptions regarding a Gainers' turnaround. The expert evidence offered by the Defendant relating to the meat industry indicated that such a glowing turnaround was not anticipated and did not occur.

297    In his analysis, Mr. Dobner considered that many meat packing companies operate with borrowed money. He considered the industry standard to be one where the corporate ratio consisted of 65 percent equity and 35 percent debt. Based on that standard, he concluded that if one were to acquire Gainers, using 35 percent borrowed money, and if one could anticipate the returns contemplated by management in its projections, the price to be paid for Gainers, reflective of fair market value, was $73,348,000.00.

298    Included in that amount were what he described as being excess assets. These are assets that Gainers really did not require in order to continue its operations. They included an advance by Gainers to a company called High Grade Feeders Inc. At the time of the valuation, this company was considered to be insolvent. Mr. Dobner, in keeping with his best to the Plaintiff value approach, gave that account a 50 percent value to reflect its uncertainty. He took a similar approach respecting a further $80,000.00 advanced to other companies under the control of Mr. Pocklington. It was his opinion that a best to the Plaintiff fair market valuation of those assets was $40,000.00.

299    In accordance with the Agreed Statements of Facts, he concluded the value of the bonds to be $30,000.00 and the value of Sodor Foods to be $1,000,000.00. He also concluded the value of pension assets to be $410,000.00 and considered that there was excess land at the Edmonton Plant, which he valued at $1.5 million. Based on these figures, he estimated the fair market value of the excess assets to be not more than $3,000,000.00.

300    Mr. Dobner then considered what he described as contingent assets, which consisted of two lawsuits brought by Gainers. One was against Rolston Purina and one was against Canadian Pacific Railway. Again, on a best to Plaintiff value basis, he concluded that these lawsuits were to be valued at $600,000.00.

301    Finally, he conducted a similar analysis respecting lawsuits against Gainers and concluded that the best position from the Plaintiff's point of view would be to value those as a liability of $1,300,000.00. The result of his analysis is as follows:

| | |
|---|---|
| Operating business enterprise | $71,000,000.00 |
| Excess assets | $3,000,000.00 |
| Contingent assets | $600,000.00 |
| Contingent liabilities | $1,300,000.00 |
| *TOTAL* | *$73.3 million* |

302    As I noted earlier, Mr. Dobner considered both the valuation of assets in use and the market value approach as checks for the reasonableness of the value that he found using the income approach. I will deal with his views regarding the market approach first.

303    Mr. Dobner looked at several comparable corporations that were traded publicly and concluded that those comparable corporations gave some indication as to the value of Gainers' shares. He added a premium to the share price that these shares were being traded at of 20 percent to reflect the fact that the price on a stock exchange reflects a minority position. A majority position is always considered to be more valuable than a minority position, and the Gainers shares represented a majority position. After conducting his analysis of the similar corporations, his conclusion was a value indication of $87.5 million for Gainers. He testified that this supported a valuation based on an income approach of approximately $71,000,000.00 for Gainers as the comparable companies were, on the date of the valuation, in a substantially better market and technological position than Gainers was. It was his view that the Gainers Plant was far from modern, and that the brand names of Gainers were not well-known. In addition, Gainers was operating in a very competitive market and was facing new competitors which would likely have an adverse future effect on Gainers' earnings.

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

304    Mr. Dobner then considered the appraised value of the assets in use. He arrived at a total figure relating to these assets by taking amounts contained in various appraisal reports and stating that he was giving the best possible figure relating to those appraisal reports to the Plaintiff. The total was approximately 40 percent greater than the amount that he had determined on the basis of the income approach. Mr. Dobner testified that in his experience, this was not unusual and in fact supported his conclusion of a market value or fair market value of $71,000,000.00 for Gainers because the assets appraisals do not take into account economic obsolescence. The Gainers Plant was old, and had many built-in inefficiencies in plant design and methods of operation.

305    At the conclusion of the trial of this matter, I asked Mr. Dobner to prepare a calculation which took into consideration reduction in interest rates relating to monies borrowed for the purposes of the acquisition of Gainers. I asked him to do the calculations for a reduction of interest rates by 1/3 after five years, and by 1/2 after five years. The results were that the values for Gainers' shares, on an income basis, would be increased to $87,848,000.00 for a 1/3 reduction in interest after five years, and $97,848,000.00 for a 1/2 reduction in interest rate after five years.

306    I am satisfied that it is the Defendant's position that reductions in interest rates which followed 1989 should not be taken into consideration, since a purchaser would not have been contemplating such reductions. However, I am also satisfied that the sophisticated purchaser that would be required in order to purchase assets worth many millions of dollars would have available to it appropriate economic advice which would have at least indicated that future interest rate reductions were a likelihood. Mr. Dobner's report supports this position. On page 17 of his report, Mr. Dobner makes reference to a likelihood of interest rate reduction predicted by economists. He, however, limits that prediction to two years following the acquisition of the shares. I am satisfied that economists could have predicted some continuing interest rate reduction having regard to factors that were in place, or about to be brought into place in the marketplace.

307    I now turn to difficulties that I perceive which emanate from Mr. Dobner's testimony and report. The first arises from the agreed values. These are contained in the Agreed Statements of Facts, and in particular those Facts dated the 30th of September, 1997 and in Exhibit 41, which outlines some agreed values for the purposes of Article 6.04(b) of the Negative Pledge Agreements. These Agreed Facts include certain values that are to be applied directly to 6.04(b) and which relate to assets that Mr. Dobner included in Gainers. For example, the assets in the North Battleford Saskatchewan Plant have an agreed value of $7,200,000.00. Secondly, the equipment in the Edmonton Plant is agreed to be valued at $13,500,000.00 for the purposes of 6.04(b) of the Negative Pledge Agreements.

308    Mr. Dobner's analysis ignores these agreements. He pulled these assets out of the agreement, and included them in his analysis of Gainers' value as a going concern.

309    I am satisfied that in his asset based check of the income based approach Mr. Dobner pulled these values out of the agreement and considered them on the basis of the 40 percent reduction that he spoke about. This is incorrect as the values contained in the agreement were to be applied directly to the value requirement of Article 6.04(b) of the Negative Pledge Agreements.

310    I recognize that this poses a difficulty when one prefers to do an evaluation of an entire enterprise on a cash flow, or income basis. But the parties have agreed to these values, and as they are values for the purpose of 6.04(b) of the Negative Pledge Agreements, it is not for Mr. Dobner, or me, to alter that agreement.

311    The second difficulty I have with respect to Mr. Dobner's approach is that it is difficult to appreciate how or why a 40 percent reduction should be applied to accounts receivable, inventory, prepaid expenses and the like. When Mr. Dobner approached these items on a liquidation basis, he reduced them to account for things like spoilage, dissatisfied customers, and cost of disposal with respect to the inventory and presumably similar considerations, plus bad debt considerations with respect to the accounts receivable. However, his reductions on a liquidation basis do not come anywhere close to 40 percent, and a discount of 40 percent for these items on an asset comparison basis seems excessive.

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 177 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

312    Accounts receivable should not suffer the concerns relating to economic obsolescence that Mr. Dobner referred to in his evidence. Perhaps some of the inventory would, as it would be in the process of production, but other inventory would have been completely processed and would already have been subject to the economic obsolescence concerns raised by Mr. Dobner.

313    I am also concerned that the reduction on a market basis from $87,000,000.00 to $71,000,000.00 was arrived at because those were the amounts that Mr. Dobner had concluded. In other words, there is no real basis for that reduction. In fact, in expressing the reduction, Mr. Dobner has ignored the excess assets which would still have existed on the fair market basis analysis. In other words, the reduction is really from approximately $90,000,000.00 down to $71,000,000.00.

314    Another concern that I have regarding Mr. Dobner's analysis arises from the appraisals that he has chosen to use. Mr. Dobner states that he is proceeding on a best to the Plaintiff basis. However, it is clear that some appraisals that he has relied upon in doing his check on an asset in use basis against the income analysis are far from best to the Plaintiff evaluations. For example, the Plaintiff's appraiser who appraised the improvements was told by management that the improvements were expected to continue in use for five to ten years. That appraiser chose a five year term when evaluating the oldest of the improvements. In actuality, the improvements continued to be used until December of 1997 when the plant was closed, not because the improvements were incapable of being further utilized, but because of a strike.

315    It was the Plaintiff's expert's opinion that even the oldest of the improvements had a continued useful life of approximately 15 years. This appraiser is probably the most experienced appraiser in the Province of Alberta, and while one should not generally consider hindsight in conducting appraisals, hindsight can assist in determining which of the views of appraisers is correct when those views are disparate. I am satisfied that Mr. Shaske's view with respect to the durability of the improvements is to be preferred over that of the Plaintiff's expert.

316    I am also satisfied that Mr. Shaske's values with respect to lands are to be preferred to those of the Plaintiff's expert. As I have stated, Mr. Shaske is probably the most experienced appraiser in Alberta. In fact, the Defendant itself has utilized Mr. Shaske's services many times. While his approach to valuation may not fit within the Defendant's general theory of value, I am satisfied that the figures obtained are nevertheless reasonable.

317    The reasons I prefer Mr. Shaske's valuation of land includes the following:

   1. An appreciation of the true effects of the system of tax assessment in effect in the City of Edmonton at the relevant time;

   2. A recognition that the location of Gainers' Yellowhead Trail Plant is what might be considered to be a prime industrial location, having access to transportation for finished products and raw materials (in terms of roadways and railways) and in terms of a labour force (being close to significant residential areas), as opposed to lands on the outskirts of Edmonton which are not as accessible to Yellowhead Trail, or other major flow-ways;

   3. A recognition that no premium attaches to land that is adjacent to Yellowhead Trail in comparison with land that abuts the Yellowhead Trail;

   4. The utilization of comparables which were closer in time to the relevant date; and

   5. The explanation, although far from perfect, of the manner in which adjustment for size differential was made. The Defendant's expert simply made such an adjustment without any explanation.

318    I turn to one further matter which I should consider in analysis of Mr. Dobner's evidence that being his treatment of the tax loss carry forward. Mr. Dobner has utilized much of the tax loss carry forward to offset income tax which would emanate from the profits projected by Gainers' management. Therefore, if his approach is correct, the tax loss carry forward is not an excess asset.

319    I now turn to consideration of the law relating to the valuation of shares.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

## Legal Analysis

320    There are several issues that I should deal with prior to considering the main issues relating to valuation. These issues were raised by the Defendant and if the Defendant is successful with respect to any of them, the question of valuation is rendered academic and the Defendant succeeds. It is, however, my determination that the Defendant is not to be successful with respect to these preliminary issues, for the reasons which follow.

321    The first issue is the question of whether or not a surplus is payable to the Plaintiff at all. It is the Defendant's position that there is nothing compelling the Defendant to pay a surplus to the Plaintiff, even if one exists. If that is the case, the Plaintiff's claim must be dismissed.

322    The answer to this question is found in paragraph 6.04(b) of the Negative Pledge Agreements. That paragraph indicates that the A.T.B. is to use its reasonable discretion in determining the value of the shares and to apply that on "account of the total actual indebtedness".

323    It was the Defendant's choice to structure this transaction through the A.T.B.. I am satisfied that an account at the A.T.B. operates in essentially the same manner as an account at a bank. That is, unless there is something in the account agreement to the contrary, the account can have a positive or a negative balance. If it has a positive balance, then money is owed to the account holder by the bank, or in this case the A.T.B.. If it has a negative balance, then the account holder owes money to the bank, or in this case the A.T.B.

324    Therefore, if the value of the shares creates a surplus, that surplus must be paid over to the Plaintiff.

325    The second question raised came about by virtue of the fact that in the fall of 1990, in a related action, Mr. Pocklington filed an Affidavit wherein he indicated that Gainers owed more money than its asset value. I am satisfied that Mr. Pocklington was talking about a fair market value scenario and not about the value of Gainers calculated in the manner that his experts considered to be the correct standard and approach. Further, I am satisfied that Mr. Pocklington's statement is of little more value than Mr. Johnston's statement, which earlier valued the Gainers shares at something in excess of $20,000,000.00.

326    The third matter arose during the course of argument. The Defendant took the position that the values established by Defence evidence were reasonable and constituted part of the Defendant's reasonable valuation. I have already determined that the valuation conducted in the summer of 1990 was not reasonable and I will not repeat my reasons for that. I take it that the Defendant is of the view that it is to be given a second chance at utilizing its reasonable discretion in the valuing of the Gainers shares. I further take it that the evidence composed of the appraisals and the share valuation done by Mr. Dobner constitutes the Defendant's view of what the results of that second chance are.

327    I am satisfied that when the Defendant did not exercise its reasonable discretion in 1990, that failure constituted a breach of contract. The Defendant is not now in a position to correct, or make amends for that breach on its own. The reason I come to that conclusion is because the exercise of a reasonable discretion includes a reasonable time element. To exemplify this; if a party in the position of the Defendant conducted its evaluation tens of years after the acquisition of shares, then that evaluation is, *prima facie*, unreasonable. Here the Defendant would have required some time to conduct its investigations and exercise its reasonable discretion. But that time has long since passed.

328    When a breach of contract occurs and Courts are accessed, the Court makes a determination which results in placing the parties in positions they should have been absent the breach. The parties themselves do not make that determination.

329    It is the Plaintiff's position that the Court should interpret the valuing requirement in Article 6.04(b) of the Negative Pledge Agreements as meaning value-in-use to the owner, being the Defendant. It is the Defendant's position that fair market value, calculated on the present valuing of a stream of income is the appropriate standard. As I have noted, it would appear that at least some of the agreed upon values for the purposes of paragraph 6.04(b), and which total $42,667,000.00 were arrived at on an asset-by-asset basis. It is not clear as to whether or not fair market value was the value standard, or some other value

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 179 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

standard was used. This is because the Agreed Statements of Facts, dated September 30th, 1997, suggests that where agreement has been arrived at, the market value continued use, the fair market value in use, the depreciated replacement cost, and the value for the purposes of valuing the shares pursuant to Article 6.04(b) are all equivalent to the agreed amount. I assume that the reason is to satisfy each side that their position remains in tact.

330    Several appraisers acknowledged that in appraising assets, a range of 10 percent is expected, and if appraisers come up with different figures within that range, each figure is reasonable. Mr. Dobner was not as generous as he stated that he was giving a best to the Plaintiff value throughout, and consequently no adjustment was appropriate. However, he was not as generous as he stated he was being, as I have already determined that when he considered his best to Plaintiff scenario, he did not look at the underpinnings of any of the appraisals that he took into consideration. Mr. Wise says that he looked at each of the Plaintiff's appraisals and considered them to have been appropriately performed. He was not able to detect things like an overlap between the appraisals of the improvements and the appraisals of the equipment, but did give a value range within 10 percent.

331    When confronted with the questions of what are the correct value standard and approach, Counsel were unable to refer me to cases where a share acquisition as has occurred here has been before the Courts. The mixture of political, social and economic considerations that are found in the matter before me, and which are attached to a commercial contract, appear to be unique. I will, therefore, consider other occasions where the question of value has been considered by Canadian Courts.

332    The question of value has arisen in contractual situations. In *Bexley v. Dunning*, [1976] 4 W.W.R. 446 (B.C. S.C.), the Court considered a written option to purchase shares "at such price as the [company's] auditors shall determine to be the value of the shares". The Court considered that it was necessary to determine the meaning to be given to the word "value". It determined that in the absence of surrounding circumstances indicating a different sense, what value meant was "what can be obtained in money on the open market".

333    In a contractual sense, the classic statement of value is found in *Lord Advocate v. Earl Home* (1891), 28 S.L.R. 293, 18 R. 397 (Scotland Ct. Sess.), at 403 where Lord MacLaren said "... value ... means exchangeable value - the price which the subject will bring when it is exposed to the test of competition."

334    In property tax assessment cases, Courts are often called on to interpret words like real value, actual value and similar expressions. In *Montreal Island Power Co. v. Laval-des-Rapides (Ville)*, [1935] S.C.R. 304 (S.C.C.), Duff, C.J.C. dissented with respect to the principles applied by the majority, but not with respect to the result of their judgment. At p. 305, he quoted with approval the passage from the judgment of Lord MacLaren in *Lord Advocate v. Earl Home*, *supra*, and stated:

> For the purpose of defining the valuation of property for taxation purposes, the Courts have, in this country, and generally speaking, on this continent, accepted this view of the term "value".

335    This decision has been quoted with approval in judgments in the following cases: *Winnipeg (City) v. T. Eaton Realty Co.*, [1944] 2 D.L.R. 638 (Man. K.B.); *R. v. Jones*, (sub nom. *Saint John Sulphite Ltd., Exporté*) [1949] 4 D.L.R. 259 (N.B. C.A.); *R. v. Rothesay Assessors* (1964), 46 D.L.R. (2d) 156 (N.B. C.A.); *R. v. Bourque* (1962), 34 D.L.R. (2d) 120 (N.B. C.A.); *Shapiro v. Winnipeg City Assessor* (1987), 43 D.L.R. (4th) 506 (Man. C.A.).

336    In succession duty situations (*R. v. Roach*, [1919] 3 W.W.R. 56 (Alta. S.C.)), the Court determined that value was equivalent to the current price at which the property could be sold.

337    With respect to income tax legislation, in *Steen v. R.* (1986), 86 D.T.C. 6498 (Fed. T.D.) the Court held that the value of shares for the purposes of s. 7(1)(a) of the *Income Tax Act* is fair market value.

338    The dissenting shareholders' provisions in the Canada, Alberta and Ontario Business Corporations Acts, all provide that dissenting shareholders are entitled to be paid by the corporation the fair value of their shares. Courts which have applied the dissenting shareholders' provision have consistently held that fair value should be fixed by first determining fair market value and then making any adjustments required by the circumstances of the case. In *Canadian Gas & Energy Fund Ltd. v. Sceptre Resources Ltd.* (1985), 29 B.L.R. 178 (Alta. Q.B.) Forsythe, J. stated at pp. 192-193 that:

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 180 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

... I am satisfied that the fair market value of the shares forms the main criteria **[sic]** to be utilized in establishing the fair value of the shares on the critical date.

339    In *Kelvin Energy Ltd. v. Bahan* (1987), 52 Alta. L.R. (2d) 71 (Alta. Q.B.), Forsythe, J. again considered the term "fair value" as used in the dissenting shareholders' provisions of the *Alberta Business Corporations Act*, and stated at p. 76:

The term "fair value" has been subject to judicial interpretation and comment concerning the method of arriving at what is the fair value of a particular share. It is clear from the authorities that there are four generally accepted methods of valuation which can be used in arriving at the fair market value of Kelvin shares from which the fair value of the dissenting shares may be determined for the purposes of s. 184 of A.B.C.A. These are as follows:

1. Market price;

2. Net assets approach;

3. Earnings or investment value approach;

4. A combination of the foregoing.

340    Similar conclusions were arrived at by Courts in a myriad of decisions involving the question of fair value under various *Business Corporations Acts*, including *Brant Investments Ltd. v. KeepRite Inc.* (1987), 60 O.R. (2d) 737 (Ont. H.C.); in *New Quebec Raglan Mines Ltd. v. Blok-Andersen* (1993), 9 B.L.R. (2d) 93 (Ont. Gen. Div. [Commercial List]); *Fraser Inc. v. Aitken* (1988), 41 B.L.R. 87 (Ont. H.C.).

341    With respect to expropriations, it is clear that a party from whom land was taken under the compulsory powers of expropriation is entitled to the compensation for the value of the land to him. This principle is based on rationale set out by Rand, J. in *Diggon-Hibben Ltd. v. R.*, [1949] S.C.R. 712 (S.C.C.), at 715, where he stated:

A compensation statute should not be approached with the attitude that Parliament intended an individual to be victimized and lost because of the accident that his land rather than his neighbour's should be required for public purposes; ...

342    In *Lake Erie & Northern Railway v. Brantford Golf & Country Club* (1916), 32 D.L.R. 219 (S.C.C.), an expropriation involving lands for a public golf course, Duff, J. spoke of the value in land to the parties losing the land, and then said at p. 229:

It is needless to emphasize perhaps that the phrase does not imply that compensation is to be given for "value" resting on motives and considerations that cannot be measured by any economic standard.

343    In *Canada (National Capital Commission) v. Hobbs*, [1970] S.C.R. 337 (S.C.C.), Abbott, J. referred to the manner in which value is to be determined, and at pp. 339-340 stated:

Generally speaking, an owner is entitled to the value of the property to him, calculated on the basis of its highest and best use. This value may be the market value, but it may be more in those cases where, for some reason, the land has a special value to the owner beyond what it would have in similar use by somebody else.

Where it is claimed that a property has a special value to the owner over and above its market value, the owner must adduce the facts necessary to prove this value, which must be such that it can be measured in terms of money. It is not sufficient for a claimant to say that he would pay a certain amount of money rather than be deprived of his property. There must be proof that the land has special advantages that gave it a special economic value for the expropriated party ...

344    Expropriation legislation has been considered by the Alberta Court of Appeal. In *T. Eaton Co. v. Alberta (Assessment Appeal Board)* (1995), 128 D.L.R. (4th) 469 (Alta. C.A.), the Alberta Assessment Appeal Board confirmed a municipal tax assessment of land. The Court of Appeal held that the municipality and Board erred in law by having regard to the special value

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 181 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

of the land to the owner rather than its value on the market, finding that generally special value of land to a particular person is irrelevant in the determination of the market value.

345      It is a general principle that in expropriation and similar circumstances, the value to the taker of the property is not a legitimate measure of compensation to the party from whom the property has been taken. This proposition was succinctly stated by Duff, J. in *R. v. Trudel* (1914), 49 S.C.R. 501 (S.C.C.), at pp. 510-511, where he states:

> The principle of compensation is, of course, well settled. It is stated very clearly in the following passage from the judgment of Moulton, L.J. in **Re Lucas and Chesterfield Gas and Water Board** at p. 29:

>> The principles on which compensation is assessed when land is taken under compulsory powers are well-settled. The owner receives for the land he gives up their equivalent, i.e. that which they were worth to him in money. His property, therefore, not diminished in amount, but to that extent it is compulsorily changed in form. But the equivalent is estimated on the **value to him**, and not on the value to the purchaser.' (Emphasis added)

346      Similar statements of law may be found in *R. v. Harwood* (1900), 6 Ex. C.R. 420 (Can. Ex. Ct.); *Dau v. Murphy Oil Co.*, [1970] S.C.R. 861 (S.C.C.) and in *Westfair Foods Ltd. v. Watt* (1990), 106 A.R. 40 (Alta. Q.B.). In the latter case, which dealt with determination of fair value under the *Business Corporations Act*, the Court determined that value to taker was not a legitimate measure of compensation.

347      In circumstances where there is a limited, or no market, the Courts have looked at the return one might expect to realize on money invested in the undertaking. In *Montreal (City) v. Sun Life Assurance Co.*, [1950] S.C.R. 220 (S.C.C.), the Supreme Court stated that the rule for determining compensation in expropriation cases was not to be followed in municipal assessment cases where the land and buildings are to be assessed at their value. The Court stated that the test to be used was an objective one, and that Courts should seek the exchange value, or the value in a competitive market. If such a competitive market does not exist, then the expropriating authority or Court should ask what a prudent investor would pay for the subject property, keeping in mind the return that might be expected upon the money invested. In *Withycombe Estate, Re*, [1945] S.C.R. 267 (S.C.C.), the Supreme Court of Canada allowed an appeal from the Court of Appeal of Alberta that had overturned a decision of a Commissioner appointed to determine the value of a theatre property for the purpose of succession duty. There was no evidence of the value of the property in the open market. The Commissioner had determined the value on the basis of capitalization of revenue. In his judgment, Estey, J. stated at p. 287:

> The authorities are clear that under such statutory provision as we are here concerned with, value means market value as that term is properly understood. The value with which we are concerned here is the value of Untermeyer's death, that is to say, the then value of every advantage which his property possessed for these advantages, as they stood, would naturally have an effect on the market price. The sum of all these advantages controls the market price, which, if it be not spasmodic or ephemeral, is the best test of fair market value of property of this description.

348      Assistance for Courts in evaluating shares can be had by consideration of the nature of shares. They are fractions of potential interest in the assets in the active life of the company, whatever it may be, into which the capital is divided (*Zwicker v. Stanbury*, [1953] 2 S.C.R. 438 (S.C.C.)).

349      Courts have provided general comment with respect to the methods of valuation of shares and those comments are instructive. In *Brant Investments Ltd. v. KeepRite Inc.*, *supra*, [at para 340] the Court held that four methods of valuation appear to have been generally accepted by experts and judges alike. These are:

> (a) The quoted market price on the stock exchange: the market value approach;

> (b) The valuation of the net assets of the company at fair market value: the assets approach;

> (c) The capitalization of maintainable earnings: the earnings or investment value approach; and

> (d) Some combination of the preceding three approaches.

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 182 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

It further held that the value of shares determined by the "market value approach" must be distinguished from the "market value". The former is determined by quoted prices on the stock market; the latter is "an opinion arrived at by evidence, assumptions, calculations and judgment, in the absence of an actual transaction".

350    In *Domglas Inc. v. Jarislowsky, Fraser & Co.* (1980), 13 B.L.R. 135 (Que. S.C.); aff'd (1982), 138 D.L.R. (3d) 521 (Que. C.A.), Greenberg, J. concluded that:

The Canadian jurisprudence ... although it places primary emphasis on the earnings method, reserves as well a role for net asset values. The basic concept currently accepted by valuation theories is that a business is worth only what it can earn, except where it is worth less on an earnings basis than the amount that would be realized if it were liquidated.

351    He further concluded that the earnings approach involved a two-stage process, namely; first, to arrive at the most probable and reasonable prospective net earnings; and second, to capitalize those projected earnings at an appropriate rate.

352    Courts have also concluded that valuation is not a science, and cannot be done with mathematical precision (*Gold Coast Selection Trust Ltd. v. Humphrey (Inspector of Taxes)*, [1948] 2 All E.R. 379 (U.K. H.L.)).

353    In *Brant Investments Ltd. v. KeepRite Inc.*, *supra*, Anderson, J. stated at p. 775:

While due application of the methodical approach is adopted by experts is useful, it is dependent upon factors which are entirely a matter of judgment and the end result is an opinion, not a precise solution arrived at by precise methods utilizing only known and constant factors.

354    I conclude that from the foregoing precedents the following general principles may be drawn:

1. Canadian Courts have generally considered the word "value" when it is contained in legislation, regulations, contracts and other legal documents to be synonymous with market value or fair market value;

2. Generally speaking the capitalization of maintainable earnings, the earnings or investment value approach is the method of valuation preferred by Canadian Courts. At the same time, the market price, as determined by stock exchange analysis and the valuation of net assets of a company at fair market value, being the assets approach, also plays some role. In some cases, a combination of these three approaches may be desirable;

3. Generally speaking value, where assets are being removed by one party from another party, is approached from what the value was to the party losing the assets. In particular, where governmental authorities remove assets and those assets provide a special value to that authority, that special value does not constitute part of the value to be paid to the party losing the asset as compensation for his loss;

4. The "circumstances of the case" may direct the Court to utilize a particular value standard, or particular value approach;

5. Determination of "value" is an art and not a science. Value cannot be determined with mathematical precision. It is not simply a matter of plugging particular numbers into a particular formula. Appraisers use their subjective knowledge in determining value of assets. Similarly share evaluators apply their subjective knowledge to the treatment of value;

6. Finally, Courts in determining value must consider the application of subjective knowledge and test that against logical analysis in order to determine the "value" in the particular matter before the Court.

## Conclusions

355    I turn to consideration of the matter before me. Here, pursuant to a commercial contract, the Defendant loaned to Gainers monies and pursuant to a guarantee, guaranteed other monies being loaned to Gainers by a bank. In return, Gainers

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

provided the Defendant with certain security documentation, including the Master Agreement, the Escrow Agreement and the Negative Pledge Agreements. By virtue of the various Escrow Agreements, the Plaintiff placed in escrow its shares in Gainers Inc. and Gainers Property Inc. The Defendant had the right to acquire those shares from the Escrow Agent upon events of default occurring.

356    Events of default did occur and the Defendant provided the Escrow Agent with appropriate direction pursuant to the Escrow Agreement and the Negative Pledge Agreements.

357    By virtue of the Negative Pledge Agreements the Defendant had two choices:

> 1. It could sell the shares and apply the amount obtained by virtue of the sale to the debt owing, which was defined as the direct debt and any debt paid to the bank pursuant to the guarantee;

> 2. It could keep the shares and apply on account of the same debt an amount equivalent to the value of the shares as determined by the Defendant in the exercise of its reasonable discretion.

Pursuant to the Notice dated October 10th, 1989, the Defendant elected to proceed under the second option available to it.

358    It is acknowledged by the Defendant that the reasons it elected to proceed under the second option was that it hoped to preserve certain economic and political advantages that Gainers provided to the Defendant. It was feared that Gainers would be placed in receivership by the bank and that receivership would result in liquidation of Gainers. Upon liquidation of Gainers, there was no guarantee that the economic and political benefits relating to Gainers would continue for the Defendant.

359    The Defendant also took into consideration the fact that by electing to proceed under the second option, it would, on the basis of advice it had received from professionals, lose less money than it would have had had it proceeded under any other reasonable alternative.

360    The Plaintiff has not been able to refer me to any case where a Court has decided value on the basis of its preferred standard. I must determine whether within these general circumstances, there is anything which directs me to apply the value standard and value approach urged by the Defendant. I come to the conclusion that there is not.

361    I am satisfied that the first option available to the Defendant would have achieved the same political and economic benefits. Gainers could have been sold by the Defendant at some price to investors. Such a sale could have included a condition of continued operation. A sale under 6.04(a), by the Plaintiff's own admission, would reflect fair market value, or market value, and that value would have been the amount to be applied against the debt as defined in the Master Agreement. I can see nothing that changes what the Defendant received under 6.04(b) from what it would have received had it proceeded under 6.04(a).

362    I am also satisfied there are public policy grounds which direct Courts away from the form of valuation urged by the Plaintiff. The Plaintiff's position is little different than that of a land owner whose land is required for a major highway, airport, or similar enterprise and who takes the position that he is entitled to receive an amount equivalent to the political, social and economic benefits enjoyed by the governing body in question. Such an approach has been rejected by Canadian Courts in expropriation and other forced acquisitions.

363    A requirement that when Government is a lender it must pay the borrower upon the borrower's default a premium, would hamstring Government and narrow the political choices available to Government. For example, certain political parties and forms of Government are of the position that Government's involvement in the economy should be extremely proactive. That is their political choice. If such a Government is elected, then the ability of such a Government to pursue its mandate would be hampered by the fact that it has to pay a premium in pursuit of that mandate. Political choices should not be affected by Courts imposing special rules when Government is a party to a commercial agreement.

364    I am satisfied that the appropriate value standard which arises out of the circumstances of this case is that which is normally applicable to commercial contracts. I can see no reason why I should apply a standard different to this lender than I

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 184 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

would had the lender been a bank. I am satisfied that the correct value standard is fair market value, or market value, relative to the shares taken.

365    I turn to the question of approach to value. Here I have greater difficulty in determining the appropriate approach. There are several reasons for this difficulty, they include:

> 1. The agreed Statement of Facts and agreement relating to value for the purposes of 6.04(b) respecting certain specific assets. Unfortunately, the Plaintiff's evaluator pulled the value of these assets out of the agreed values in the agreement, and put them back into his calculation of fair market value on the basis of an income approach;

> 2. The Defendant had the ability to affect the share value as it was in charge of regulating a method of setting the price for the raw materials used by Gainers, namely hogs. The hog contract between Gainers and the A.P.P.D.C. had expired by the time valuation was required. The Defendant had the ability to affect the price or value at which Gainers' shares could be sold by simply creating a new formula, which either increased or decreased the price of hogs. It could also deregulate the pricing of hogs and has come close to doing that under the current regime. Any of these activities gave the Defendant an ability to affect the price or value of the Gainers shares which would not normally be available to another commercial lender;

> 3. The fact that I found much of the appraisal evidence and the direct marketing analysis of the Defendant's share valuator to be wanting.

366    I, accordingly, conclude that a combination of the market price, the valuation of net assets of the company and capitalization of maintainable earnings is the appropriate approach to the valuation of Gainers' shares. In fact, I conclude that all three of these approaches point towards a particular value range.

367    I will first deal with consideration of a capitalization of maintainable earnings approach. As I have stated, I am satisfied that the projections provided by management and utilized by the Defendant's expert were reasonable projections. No evidence was presented as to what actually occurred as the evidence indicated that some Gainers assets were eventually sold, or leased to third parties other than management and the employees of Gainers.

368    In dealing with this approach, I will keep in mind the ability of the Defendant to affect Gainers profitability through Hog Marketing and the fact that some assets have already been valued for the purposes of Article 6.04(b) of the Negative Pledge Agreements.

369    I also noted previously that in my view a downturn in interest rates was something that should have been predictable and this is supported by the Defendant's own expert. I am satisfied that that prediction would have been in the range of a drop of 1/3 from the interest rates that existed in October of 1989. That by itself provides a value to Gainers of approximately $87,000,000.00. When I add an amount which reflects a reasonable factor relating to the pull out of the Gainers assets and the ability of the Defendant to affect the value of Gainers' shares through its hog marketing policies, I conclude that a value based on an income approach or capitalization of maintainable earnings approach can reasonably be put in the range of $90,000,000.00 to $95,000,000.00. Finally, if I consider that in a very quick turnaround a purchaser of Gainers could expect some additional value for the inventory and accounts receivable, I am pushed towards the $95,000,000.00 figure.

370    With respect to the market price on stock exchange approach, similar problems exist. The share value of Gainers was still capable of being affected by the Defendant's hog marketing pricing policies. Certain assets were already valued and those values totalled in excess of $42,000,000.00. What was left included the accounts receivable, inventories, and prepaid expenses. It also included Gainers' physical plant and lands and the intangible assets. I am again satisfied that the market approach, utilized by the Defendant's expert, did not take these factors into consideration in determining the market value at approximately $87,000,000.00 reflected his determined value of just over $73,000,000.00.

371    Again, I am satisfied that the range of value, had the appropriate considerations been taken, would have been in the $90,000,000.00 to $95,000,000.00 range.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 185 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 1998 ABQB 279, 1998...

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

372    With respect to the asset approach, I have earlier made comment regarding the differentiation between a write off of inventories and prepaid expenses of 40 percent, and a substantially lesser amount when liquidation was considered. The sale of these inventories would be exactly the same on an ongoing basis as it would have been on a liquidation basis. In addition, I have determined that certain other appraisals utilized by the Defendant's expert, Mr. Dobner, were not the appraisals of choice, and the result would have been an increased asset base. Even if the appraised assets, with their built in inefficiencies were to be reduced by a reasonable percentage to reflect obsolescence, the result is in the range of $90,000,000.00 to $95,000,000.00.

373    I am, according to each of these approaches, pushed towards the $95,000,000.00 figure and, in fact, determine it to be the correct value of Gainers, excluding the related actions.

374    I turn to the question of the debt. Exhibit 41 indicates the debt relating to Gainers (excluding Kretchmar and Magic Pantry) is $114,000,000.00. The Defendant and its expert is prepared to accept that amount of debt at face value.

375    The Defendant's expert, however, added an additional $2,000,000.00, which he says emanates from Kretchmar and Magic Pantry. However, the agreed statement of facts indicate that the *net value* of Magic Pantry and Kretchmar are the amounts contained in the Agreed Statements of Facts. The Defendant's share evaluation expert was the only witness to make reference to a differential in debt as it related to Magic Pantry and Kretchmar, and again, I do not believe that the Defendant's expert can override agreements made between the parties and which are filed as Agreed Statements of Facts. Consequently, I set the debt at $114,000,000.00. This means that there is a shortfall in the value of Gainers' shares in the sum of $19,000,000.00. In other words, there is $19,000,000.00 more owing by Gainers than there are assets to support that debt.

376    There are, however, additional assets in Gainers. These consist of the related actions. Part of the value of any corporation includes contingent assets and here some of the contingent assets have been taken into consideration but not others. The contingent assets that have not been taken into consideration are those referred to in the Consent Order of Costigan, J. earlier referred to. They consist of various lawsuits commenced by Gainers and the Defendant which would have the effect, if successful, of obtaining money from the Plaintiff, Mr. Pocklington, or other corporations owned by Mr. Pocklington. Any such monies would have the effect of reducing the negative equity in Gainers. Once the negative equity became a positive amount, the Plaintiff would be entitled to judgment reflecting that positive amount. Consequently it does not make sense for the Defendant and Gainers Inc. to pursue the Plaintiff, Mr. Pocklington, or other corporations owned by Mr. Pocklington, for an amount which would exceed $19,000,000.00 on a net basis.

377    During the course of argument, the Defendant conceded this and acknowledged that this answered several of the questions contained in the Consent Order of Costigan, J.

378    One of the related actions has already proceeded to trial and judgment has been rendered in favour of the Defendant in a sum just in excess of $700,000.00. However, the Defendant, while successful in terms of a judgment amount in its favour, was not successful in terms of costs. Costs were awarded to the Plaintiff, or some other corporation controlled by Mr. Pocklington, as the amount of the judgment had been made available to the Defendant in advance of the trial.

379    During the course of argument respecting the related actions, it was the Defendant's position that the balancing of the accounts would include all of the Defendant's costs on a solicitor/client basis. I gather the Defendant was taking the position that those costs were payable whether or not the Defendant was successful in the pursuit of each related action.

380    In my view, that would be inappropriate, and could well lead to abuse of process. To give the Defendant immunity with respect to its costs and to do so on a solicitor/client basis would invite the Defendant to pursue all the suits it has commenced, regardless of any of their chances of success.

381    I have previously stated that I am satisfied that the initial suit brought by the Defendant immediately upon the Defendant obtaining the shares of Gainers was done for purposes other than the prosecution of legitimate claims. It is, therefore, in my view, not beyond belief that the Defendant would engage in a less than creditable course of conduct.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1998 ABQB 279, 1998 CarswellAlta 335, [1998] 10 W.W.R. 244, [1998] A.J. No. 364...

382      I have also previously referred to a passage from McDonald, J., who at one time was in charge of case management of this and the related actions, which addresses the Defendant's chance of success with respect to at least one of those actions. Also there is some apparent difficulty with respect to the validity of claims for monies which were written out of Gainers' Balance Sheet as a part of the Master Agreement.

383      I, therefore, conclude that the question of whether the Defendant is entitled to solicitor and client costs with respect to actions in relation to which it might succeed shall be left to the trial judge respecting those actions. I feel compelled to comment, however, that as regards the question of the Defendant receiving any costs in relation to actions where it loses, this must be answered by the word "no". Further, in any situation where a trial judge determines that the real purpose of the Defendant in pursuit of an action was an abuse of process, or the pursuit of a doomed and hopeless cause, that trial judge is asked to consider whether or not the Plaintiff, Mr. Pocklington, or a company owned by him, should receive solicitor and client costs. There is one further matter to be dealt with. That is the question of the Plaintiff's claims for general, punitive and exemplary damages arising out of some of the Defendant's actions. I have determined that some Defendant actions were less than credit worthy, but in my view they do not invite general, punitive or exemplary damages. They may affect costs.

384      At the conclusion of argument, the parties indicated that with respect to this matter they would prefer to await the outcome and then deal with costs. If Counsel are not able to arrive at any determination with respect to costs, they may of course seek audience with me and the question will be argued before myself in open Court. I also ask Counsel, if they feel that I have missed any issue or matter, that they address that issue or matter at the same time. However, I indicate that this is not an invitation to re-litigate or re-argue matters that I have dealt with.

*Action allowed.*

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

 Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 116

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 188 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 2000 ABCA 8, 2000...

2000 ABCA 8, 2000 CarswellAlta 7, [2000] 3 W.W.R. 267, [2000] A.W.L.D. 184...

2000 ABCA 8
Alberta Court of Appeal

Pocklington Foods Inc. v. Alberta (Provincial Treasurer)

2000 CarswellAlta 7, 2000 ABCA 8, [2000] 3 W.W.R. 267, [2000] A.W.L.D. 184, 184
D.L.R. (4th) 152, 213 W.A.C. 188, 250 A.R. 188, 2 B.L.R. (3d) 103, 75 Alta. L.R. (3d) 263

# Pocklington Foods Inc., Appellant (Plaintiff) and Her Majesty the Queen in the Right of the Province of Alberta as Represented by the Provincial Treasurer of Alberta, Respondent (Defendant)

McClung, Picard, Hunt JJ.A.

Heard: November 29, 1999
Judgment: January 11, 2000
Docket: Edmonton Appeal 9803-0366-AC

Proceedings: affirming (1998), 61 Alta.L.R. (3d) 125 (Alta. Q.B.)

Counsel: *John M. Hope, Q.C.*, for Appellant.
*N.J. Pollock, Q.C.* and *A.R. Gray*, for Respondent.

Subject: Contracts; Corporate and Commercial

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

Corporations --- Shares — Share capital — Value

Plaintiff corporation entered into loan agreement with Alberta government — Government provided both loans and loan guarantees to subsidiary corporation of plaintiff on condition that if subsidiary defaulted, government would be entitled to take shares of subsidiary and apply amount equivalent to their value to total indebtedness — Agreement provided that value of shares was to be determined by government "in the exercise of its reasonable discretion" — Subsidiary defaulted and government seized its shares — Plaintiff sued for breach of contract when government informed it that subsidiary's shares were to be valued at nil — Action was allowed and value of shares was determined by court pursuant to fair market value standard — Actual value of shares was determined pursuant to combination of market price, valuation of net assets, and capitalization of maintainable earnings approaches — Plaintiff appealed from court's valuation of shares — Appeal dismissed — It was not for court to interfere with findings of trial judge who chose to reject expert evidence before him, especially where that evidence was in competition with other expert opinions — Judge did not err in assessing value of shares.

**Table of Authorities**

Cases considered:

*Cyprus Anvil Mining Corp. v. Dickson* (1986), 8 B.C.L.R. (2d) 145, 33 D.L.R. (4th) 641 (B.C. C.A.) — applied

*Domglas Inc. v. Jarislowsky, Fraser & Co.*, [1982] C.A. 377, 22 B.L.R. 121, 138 D.L.R. (3d) 521 (Que. C.A.) — considered

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW   Doc 14225-49   Filed 08/15/14   Page 189 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 2000 ABCA 8, 2000...

2000 ABCA 8, 2000 CarswellAlta 7, [2000] 3 W.W.R. 267, [2000] A.W.L.D. 184...

*Tat v. Ellis* (1999), 228 A.R. 263, 188 W.A.C. 263 (Alta. C.A.) — referred to

*Toneguzzo-Norvell (Guardian ad litem of) v. Burnaby Hospital*, [1994] 2 W.W.R. 609, 87 B.C.L.R. (2d) 1, 18 C.C.L.T. (2d) 209, [1994] 1 S.C.R. 114, 110 D.L.R. (4th) 289, *(sub nom. Toneguzzo-Norvell v. Savein)* 162 N.R. 161, *(sub nom. Toneguzzo-Norvell v. Savein)* 38 B.C.A.C. 193, *(sub nom. Toneguzzo-Norvell v. Savein)* 62 W.A.C. 193, *(sub nom. Toneguzzo-Norvell v. Savein)* [1994] R.R.A. 1 (S.C.C.) — considered

*Towne Cinema Theatres Ltd. v. R.*, [1985] 1 S.C.R. 494, [1985] 4 W.W.R. 1, 18 D.L.R. (4th) 1, *(sub nom. R. v. Towne Cinema Theatres Ltd.)* 59 N.R. 101, 37 Alta. L.R. (2d) 289, 61 A.R. 35, 18 C.C.C. (3d) 193, 45 C.R. (3d) 1 (S.C.C.) — considered

APPEAL by plaintiff from judgment reported at 61 Alta. L.R. (3d) 125, 159 D.L.R. (4th) 81, 218 A.R. 59, [1998] 10 W.W.R. 244 (Alta. Q.B.) with respect to court's valuation of shares relating to breach of contract action.

*Per curiam*:

1     The panel is unanimous that the appeal by Pocklington Foods Inc. ("Pocklington") must be dismissed. The parties were informed of that decision on November 29, 1999, the date the appeal was heard. This memorandum of judgment provides our reasons.

2     Pocklington appealed the trial judge's valuation of the shares of Gainers Properties Inc. ("Gainers"). The Crown in the Right of the Province of Alberta, the Respondent, had entered into an agreement with Pocklington in September of 1987 to grant a loan to Gainers and to guarantee the repayment of a loan given to Gainers by a chartered bank. In return, Pocklington provided the Crown with security in the form of shares in Gainers Inc. Pocklington subsequently defaulted in its payments under the loan agreement and the Crown acquired the shares of the company. The Crown exercised its option under the agreement to continue the operation of the company and apply the value of shares against the outstanding debt. The Crown took the position that the shares had no value to be applied to the total actual indebtedness owed by Pocklington to the Crown.

3     The trial judge found that the Crown did not reasonably exercise its discretion in valuing the shares. Thus, he undertook the task of valuation himself and, based on the evidence of the experts before him, he chose a combination method of valuation. It involved an assessment of the shares on each of an income based approach, an asset based or cost approach, and a market based approach. The trial judge ultimately valued the shares of Gainers at $95,000,000.

4     On appeal, Pocklington took issue with the trial judge's method of valuation. First, it argued that the trial judge erred in failing to determine that the only approach appropriate to valuation on the unique facts of this case was the asset based or cost approach. Second, it submitted that the trial judge erred in failing to consider that the shares had worth to the Crown beyond their intrinsic value — that is, the political and economic benefits the Crown received from the continued operation of Gainers. No issue was taken with the trial judge's decision that the value standard to be used was fair market value.

5     D. H. Peterson in *Shareholder Remedies in Canada*, looseleaf (Toronto and Vancouver: Butterworths, 1989) at 4.1 writes that, while there are a variety of valuation techniques that may be employed by a court in valuing shares, "in any particular case, the factual circumstances are paramount" and they alone will determine which approach is to be adopted. Lambert J.A. in *Cyprus Anvil Mining Corp. v. Dickson* (1986), 8 B.C.L.R. (2d) 145 (B.C. C.A.) at 158-9 made the following comments:

    ... the problem of finding fair value of stock is a special problem in every particular instance. It defies being reduced to a set of rules for selecting a method of valuation, or to a formula or equation which will produce an answer with the illusion of mathematical certainty. Each case must be examined on its own facts, and each presents its own difficulties. Factors which may be critically important in one case may be meaningless in another. Calculations which may be accurate guides for one stock may be entirely flawed when applied to another stock.

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 190 of 374

Pocklington Foods Inc. v. Alberta (Provincial Treasurer), 2000 ABCA 8, 2000...
2000 ABCA 8, 2000 CarswellAlta 7, [2000] 3 W.W.R. 267, [2000] A.W.L.D. 184...

The one true rule is to consider all the evidence that might be helpful, and to consider the particular factors in the particular case, and to exercise the best judgment that can be brought to bear on all the evidence and all the factors. I emphasize: it is a question of judgment.

6    Because share valuation involves primarily the judgment and discretion of a trial judge based on the facts of the case, a lower court's valuation approach should not be interfered with on appeal unless that technique displays a "manifest error": see *Domglas Inc. v. Jarislowsky, Fraser & Co.* (1982), 138 D.L.R. (3d) 521 (Que. C.A.) at 523; see also *Toneguzzo-Norvell (Guardian ad litem of) v. Burnaby Hospital*, [1994] 1 S.C.R. 114 (S.C.C.) at 121.

7    At trial, the learned trial judge heard expert evidence from both parties on the compelling approaches available in the valuation of the shares. Each party advocated that a particular method be employed by the trial judge. However, after considering the evidence and determining that there were difficulties in the approaches advanced by each party, the trial judge selected a combination approach as the most appropriate method of valuation in the circumstances.

8    It is not for this Court to interfere with the findings of a trial judge who choses to reject expert evidence before him, especially where that evidence is in competition with other expert opinions. As was stated by the Supreme Court of Canada in *Towne Cinema Theatres Ltd. v. R.*, [1985] 1 S.C.R. 494 (S.C.C.) at 517:

the law is clear that a trier of fact does not have to accept testimony, whether expert or otherwise. He can reject it, in whole or in part. He cannot, however reject it without good reason.

See also *Toneguzzo-Norvell (Guardian ad litem of) v. Burnaby Hospital*, *supra*; *Tat v. Ellis* (1999), 228 A.R. 263 (Alta. C.A.) at 267, (1999), 188 W.A.C. 263 (Alta. C.A.).

9    The trial judge declined the conclusions of the expert witnesses before him for valid and stated reasons. There is no legal authority for the principle put forth by Pocklington that, because the Crown enjoyed economic (or at least political) benefits from the continued operation of Gainers, the only appropriate method of share valuation was the asset base or cost approach. Nor is there legal authority for the principle that, in determining the share value, the trial judge had to value any political and economic benefits acquired by the Crown. Few businesses are acquired without collateral hopes for their good fortune.

10    We are not persuaded that the learned trial judge's scrutiny of the competing avenues to assess the value of Gainers' shares was an error at all, let alone an error that was palpable and overriding. Therefore, we dismiss the appeal.

*Appeal dismissed.*

End of Document    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 117

Price Waterhouse Ltd. v. A.E. LePage Real Estate Services Ltd., 1984 CarswellNS 21

1984 CarswellNS 21, 10 D.L.R. (4th) 424, 141 A.P.R. 153, 51 C.B.R. (N.S.) 21...

1984 CarswellNS 21
Nova Scotia Supreme Court, Trial Division

Price Waterhouse Ltd. v. A.E. LePage Real Estate Services Ltd.

1984 CarswellNS 21, 10 D.L.R. (4th) 424, 141 A.P.R. 153, 51 C.B.R. (N.S.) 21, 63 N.S.R. (2d) 153

# Re HARDY; PRICE WATERHOUSE LIMITED v.
# A.E. LePAGE REAL ESTATE SERVICES LIMITED

Rogers J. [in Chambers]

Heard: March 28, 1984
Judgment: May 18, 1984
Docket: Halifax No. B-SP-989

Counsel: *P.D. Darling*, for applicant.
*R.W. Carmichael*, for respondent.

Subject: Corporate and Commercial; Insolvency; Estates and Trusts

## Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

## Headnote

**Bankruptcy --- Administration of estate — Trustees — Duty to act fairly**

Trustees — Duties and powers — Rule in Ex parte James: duty to act fairly — Real estate agent negotiating sale of bankrupt's farm prior to bankruptcy but agreement for sale not signed until after bankruptcy — Trustee negotiating directly with purchaser, not consulting agent, and not paying commission — Estate unjustly enriched as result of agent's efforts — Conduct of trustee manifestly unfair — Agent entitled to full commission.

Early in November 1982 the respondent real estate agent negotiated a sale of a farm property to H. However, no binding agreement for the sale of the property was entered and, due to the purchaser's difficulty in securing financing, the agreement was extended on a number of occasions. On 22nd March 1983 the solicitor for the purchaser wrote to the solicitor for the vendor requesting another extension until 16th May 1983. This offer was neither accepted nor rejected by the vendor by 11th April 1983, on which date she filed an assignment in bankruptcy. The trustee in bankruptcy began negotiating directly with H. concerning the sale of the property. The agent was no longer consulted and did not participate in these negotiations. Eventually an agreement was struck between the trustee and H. and the property was conveyed to him on 24th May 1983. The agent was not notified of the sale and was not paid a commission, nor did the trustee advise the agent that the listing agreement with the vendor had been terminated or disclaimed. The agent sought entitlement to his full commission of 8 per cent of the sale price out of the proceeds of the bankrupt's estate and contended that its claim was not provable in bankruptcy but that it was entitled to the full amount and not to just a dividend. The agent argued inter alia that the estate had been unjustly enriched at its expense and that the trustee had acted unfairly and unjustly towards it during the administration of the bankrupt's estate, contrary to the "rule in *Ex Parte James*".

## Held:

Judgment for agent for amount claimed.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Price Waterhouse Ltd. v. A.E. LePage Real Estate Services Ltd., 1984 CarswellNS 21

1984 CarswellNS 21, 10 D.L.R. (4th) 424, 141 A.P.R. 153, 51 C.B.R. (N.S.) 21...

The bankrupt's estate had been enriched as a result of the agent's efforts by receipt of a definite benefit. The trustee was able to dispose of a major asset very shortly after bankruptcy to a purchaser, H., whose interest in purchasing the property had been maintained, nurtured and solidified over the many months of negotiations by the agent. By selling the property to H. the trustee avoided the expense of advertising the property for sale and retaining the services of a real estate agent to find another buyer. This enrichment occurred at the expense of the agent who spent much time and some money on the bankrupt's behalf in the negotiations with H. for which the trustee was denying him recompense. The benefit to the estate of having a ready and willing buyer for the property accrued to the estate at the expense of the agent, and it would be unjust to permit the estate to retain the benefit of the services performed by the agent under the listing agreement without paying just compensation. The fact that the trustee did not request the services rendered did not preclude recovery. The trustee knew of the efforts of the agent in consummating a sale of the property to H. or, if it did not, it certainly should have known from the correspondence to which it had access. The trustee, in acting without regard to the efforts and services provided by the agent, offended against the rule in *Ex parte James* which imposes a duty on the trustee to act fairly in the administration of a bankrupt's estate. The rule is of general application and not just referable to situations where a mistake has occurred. The conduct of the trustee in taking advantage of the services performed by the agent under the listing agreement and then refusing to pay for those services was manifestly unfair and constituted an infraction of the rule; therefore the agent should be paid for its services of which the trustee had had the benefit. The measure of compensation payable by the trustee should be as set forth in the listing agreement, i.e. 8 per cent.

**Table of Authorities**

**Cases considered:**

*Condon, Re; Ex parte James*, 9 Ch. App. 609, [1874-80] All E.R. 388 (C.A.) — *applied*

*Park Lane Ranch Ltd. v. Fleetwood Village Hldg. (Phase II) Ltd.* (1980), 17 R.P.R. 35 (B.C.S.C.) — *applied*

*Tyler, Re; Ex parte Official Receiver*, [1907] 1 K.B. 865 (C.A.) — *applied*

**Statutes considered:**

Bankruptcy Act, R.S.C. 1970, c. B-3, s. 16(1).

**Authorities considered:**

Duncan and Honsberger, Bankruptcy in Canada, 3rd ed. (1961), pp. 102-103.

Application for directions under s. 16(1) of Bankruptcy Act.

*Rogers J.*:

1        This is an application under s. 16(1) of the Bankruptcy Act, R.S.C. 1970, c. B-3, brought by the trustee for directions respecting the claim of A.E. LePage Real Estate Services Limited for a commission on the sale of the property of the bankrupt, Lisbet Hardy, at Maitland, Hants County, Nova Scotia.

2        Section 16(1) reads as follows:

16.(1) A trustee may apply to the court for directions in relation to any matter affecting the administration of the estate of a bankrupt and the court shall give in writing such directions, if any, as to it appear proper in the circumstances.

Price Waterhouse Ltd. v. A.E. LePage Real Estate Services Ltd., 1984 CarswellNS 21

1984 CarswellNS 21, 10 D.L.R. (4th) 424, 141 A.P.R. 153, 51 C.B.R. (N.S.) 21...

3    During the last week of October 1982 Mr. H. Douglas Roberts, an agent with the real estate firm of A.E. LePage Real Estate Services Limited, was retained by the bankrupt's solicitor, Mr. David Curtis, to assist her [the bankrupt] in selling her farm property at Maitland. On 4th November 1982 Mrs. Hardy entered into a listing agreement with A.E. LePage which was effective until 31st December 1983. The property was listed for $95,000 and the agreement provided for an 8 per cent sales commission.

4    Early in November 1982 Mr. Roberts was successful in negotiating a sale of Mrs. Hardy's farm to a Mr. Marion Hardin. Although there had been some discussions between Mr. Hardin and Mrs. Hardy before the entrance of Mr. Roberts on the scene, no agreement for the sale of the property had been entered into and there were no offers outstanding from Mr. Hardin.

5    I refer to the affidavit of Mr. Roberts as to the context in which the agreement was signed.

> 4. THAT at our meeting on November 4, 1982, I found the Bankrupt to be in a distressed emotional state due, I believe, in part, to the recent death of her husband and, in part, to financial difficulties she was then experiencing. Mrs. Hardy indicated that she was anxious to sell the farm as she was unable to manage it by herself and she was in need of money to retire some outstanding debt obligations. Mrs. Hardy informed me that Marion Hardin had expressed some interest in purchasing the property. Mrs. Hardy indicated that because of her condition and the stress she was under at the time, she found it difficult to deal with Mr. Hardin. She expressed some concern that Mr. Hardin may have been attempting to take advantage of her situation. Because of this and some unsettling previous encounters with Mr. Hardin, Mrs. Hardy advised me that she would prefer not to deal with him any further. She indicated that Mr. Hardin was then staying in Vermont. To the best of my information, knowledge and belief, based upon my discussions with Mrs. Hardy and her solicitor, Mr. Curtis, there was at that time no offer to purchase outstanding from Mr. Hardy, no agreement, written or otherwise, to sell the property to Mr. Hardin, nor had the parties at that time agreed upon a purchase price.

6    I am satisfied after reading Mr. Roberts' affidavit with its exhibits and the affidavit of Mr. Robert Cordy of Price Waterhouse with its attached exhibits, that had it not been for the efforts of Mr. Roberts, the relationship of buyer and seller between Mr. Hardin and Mrs. Hardy would likely never have come into being.

7    On 17th November 1982, after numerous discussions with Mrs. Hardy and Mr. Hardin, an agreement for the purchase and sale of the Hardy farm was entered into between Mrs. Hardy and Mr. Hardin for the purchase price of $80,000. The agreement was conditional upon Mr. Hardin obtaining financing through the Nova Scotia Farm Loan Board. Mr. Hardin had difficulty securing the financing, at least partly because he was a native of Vermont and not a Canadian citizen. As a result, the financing clause of the agreement was extended on a number of occasions.

8    In the months following the signing of the agreement of purchase and sale, Mr. Roberts kept in regular touch with Mr. David Curtis, Mrs. Hardy and Mr. Hardin. During this time, Mr. Roberts also attempted to locate another purchaser for the property. Signs advertising the property for sale were posted and maintained on the premises. Newspaper advertisements were run on at least two occasions at the expense of A.E. LePage. Mr. Roberts travelled to Maitland on at least four separate occasions to show the property to potential purchasers. Mr. Roberts also had discussions with Mrs. Hardy's creditors to advise them of the progress in attempting to sell the property and to request their forebearance with respect to taking action against Mrs. Hardy.

9    By March 1983 Mr. Hardin had still not been able to obtain financing. Finally on 22nd March 1983, Mr. Hardin's solicitor, Mr. F.V.W. Pennick, wrote Mr. Curtis, Mrs. Hardy's solicitor, requesting another extension, this time until 16th May 1983. This offer had neither been accepted nor rejected by Mrs. Hardy by 11th April 1983, the date on which she made an assignment into bankruptcy. The offer to extend the time was not accepted by the trustee and was withdrawn by Mr. Hardin's solicitor by letter of 19th April 1983.

10    As to how Mr. Hardin's lawyer, Mr. Pennick, regarded this dénouement, I quote from his letter of 19th April 1983 to Mr. Roberts:

> It is certainly a shame that after all the work which has been done, the deal could not be completed. Mr. Hardin is presently negotiating with Price Waterhouse, but I understand that will be regarded as a completely independent transaction.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Price Waterhouse Ltd. v. A.E. LePage Real Estate Services Ltd., 1984 CarswellNS 21

1984 CarswellNS 21, 10 D.L.R. (4th) 424, 141 A.P.R. 153, 51 C.B.R. (N.S.) 21...

Thank you for you help throughout.

11    On 12th April 1983 Price Waterhouse Limited was appointed trustee of the estate of Mrs. Hardy. At about that time, as can be gleaned from Mr. Pennick's letter of 19th April, the trustee began negotiating directly with Mr. Hardin concerning the sale of Mrs. Hardy's farm. A.E. LePage was no longer consulted and did not participate in the further negotiations. An agreement to sell for $68,000 was finally struck between the trustee and Mr. Hardin and the property was conveyed on 24th May 1983. A.E. LePage was not notified of the sale and has not been paid a commission. At the same time, the trustee never advised A.E. LePage that the listing agreement with Mrs. Hardy had been terminated or disclaimed.

12    A.E. LePage seeks entitlement to its full commission of 8 per cent of the eventual sale price of the farm of $68,000 out of the proceeds of the bankrupt's estate. It contends that it is not just another claimant who must prove its claim in bankruptcy.

13    A.E. LePage argues first that the listing agreement survived the bankruptcy and in the circumstances of this case was impliedly adopted by the trustee and thus the trustee is obliged to pay to it its sales commission.

14    The real estate company argues secondly that the estate and the creditors of the bankrupt have been unjustly enriched at its expense.

15    And thirdly, A.E. LePage says the trustee has acted unfairly and unjustly toward it during the administration of the bankrupt's estate contrary to the "rule in *Ex Parte James*" [*Re Condon; Ex parte James*, 9 Ch. App. 609, [1874-80] All E.R. 388 (C.A.)].

16    As I first read the affidavits, correspondence, other exhibits and memoranda of counsel, I was soon struck with the impression that Mr. Roberts and his company were being hard done by at the hands of the trustee. This impression remained as I listened to the arguments of counsel and studied again the material on file.

17    As I view the evidence in this matter, it is unnecessary for me to address the question of whether the listing agreement survived the bankruptcy or whether the trustee accepted it.

18    It is the equitable arguments that appeal to me more strongly.

19    With respect to the claim for unjust enrichment, I was referred to the case of *Park Lane Ranch Ltd. v. Fleetwood Village Hldg. (Phase II) Ltd.* (1980), 17 R.P.R. 35 (B.C.S.C.). In that case land was sold under court order after default under a mortgage while in the hands of a receiver-manager. An offer to purchase was obtained but was increased by about $200,000 through the efforts of two real estate salesmen. It was held by Callaghan J. of the British Columbia Supreme Court that the agents were entitled to a commission at the usual rate even though the property had never been listed. The mortgagee obtained a substantial benefit from the efforts of the agents and would be unjustly enriched if it did not have to pay for the benefit.

20    In discussing the principles underlying a claim for unjust enrichment, Callaghan J. said at pp. 43-44:

Is there, then, in the circumstances of this case an unjust enrichment? Unjust enrichment presupposes three things:

1. That the defendant has been enriched by receipt of a benefit;

2. That he has been enriched at the plaintiff's expense; and

3. That it would be unjust to allow the defendant to retain the benefit.

The principle is discussed in *Fibrosa Spolka Akcyjna v. Fairbairn Lawson Combe Barbour Ltd.*, [1943] A.C. 32, [1942] 2 All E.R. 122 (H.L.), by Lord Wright at p. 61 [A.C.]. He said:

It is clear that any civilized system of law is bound to provide remedies for cases of what has been called unjust enrichment or unjust benefit, that is to prevent a man from retaining the money of or some benefit derived from

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Price Waterhouse Ltd. v. A.E. LePage Real Estate Services Ltd., 1984 CarswellNS 21

1984 CarswellNS 21, 10 D.L.R. (4th) 424, 141 A.P.R. 153, 51 C.B.R. (N.S.) 21...

another which it is against conscience that he should keep. Such remedies in English law are generically different from remedies in contract or in tort, and are now recognized to fall within a third category of the common law which has been called quasi-contract or restitution.

Further at p. 62:

Lord Mansfield does not say that the law implies a promise. The law implies a debt or obligation which is a different thing. In fact, he denies that there is a contract; the obligation is as efficacious as if it were upon a contract. The obligation is a creation of the law just as much as an obligation in tort. The obligation belongs to a third class distinct from either contract or tort, though it resembles contract rather than tort.

The above questions were adopted and applied by the majority of the Supreme Court of Canada in *Deglman v. Guar. Trust Co.*, [1954] S.C.R. 725, [1954] 3 D.L.R. 785 at 794.

To render an individual liable to pay for services it is usually required either that he should have requested them, which is not the case here, or, having had an opportunity to reject, accepted them, with actual or presumed knowledge that they would be paid for: see The Law of Restitution (1966), by Goff and Jones, p. 15. At the hearing in Chambers, at the very latest, the receiver-manager was aware of the part played by the real estate agents and further was aware they were looking for a commission from the sale proceeds. Furthermore, it is indisputable that an incontrovertible benefit of $200,000 was bestowed upon Winnipeg at the time the Court approved the sale, a benefit obtained by the efforts of the realtors. There was no objection to the sale by the receiver-manager, for obvious reasons. Bearing that in mind, it is my view that the respondent, Winnipeg, was unjustly enriched at the expense of the realtors. What, then, is the measure of the realtors' recovery? Surely it must be based on the reasonable value of their services.

21    Mrs. Hardy's bankrupt estate has been enriched as a result of Mr. Roberts's efforts by receipt of a definite benefit. The trustee was able to dispose of a major asset, Mrs. Hardy's farm, very shortly after Mrs. Hardy went into bankruptcy, to a purchaser, Mr. Hardin, whose interest in purchasing the property had been maintained, nurtured and solidified over many months of negotiations by Mr. Roberts. By selling the property to Hardin, the trustee was able to avoid having to incur the expense of advertising the property for sale and retaining the services of a real estate agent to find another buyer.

22    And clearly this enrichment occurred at the expense of A.E. LePage whose agent Mr. Roberts spent much time and some money on Mrs. Hardy's behalf in the negotiations with Mr. Hardin for which the trustee is denying him recompense. The benefit to the estate of having a ready and willing buyer for Mrs. Hardy's farm accrued to the estate at the expense of A.E. LePage and in my view it would be unjust to permit the estate to retain the benefit of the services performed by A.E. LePage under the listing agreement, without paying just compensation.

23    It is true that, as in the *Park Lane Ranch* case, the trustee-receiver did not request the services rendered. However, that fact did not preclude recovery in that case nor in my view should it preclude recovery in this case.

24    There is no question but that the trustee knew of the efforts of Mr. Roberts in consummating a sale of Mrs. Hardy's farm to Mr. Hardin or, if it did not, it certainly should have known from the correspondence to which it had access. Equity demands, in my view, that the trustee not be allowed to benefit from the efforts of Mr. Roberts without paying just compensation.

25    Similarly it is my opinion that the trustee in acting as I have described, without regard to the efforts and services provided by A.E. LePage, has offended against the rule in *Ex parte James* which imposes a duty on a trustee to act fairly in the administration of a bankrupt's estate.

26    This rule is described in Duncan and Honsberger, Bankruptcy in Canada, 3rd ed. (1961), at pp. 102-103:

In the administration of a bankrupt's estate, the Trustee will be ordered to do what the Court considers to be morally right and honest, even in a case in which no claim can be sustained against him in law or in equity. The Trustee is an officer of the Court and as such must act justly and fairly and the Court will not permit him to take advantage of a mistake.

Price Waterhouse Ltd. v. A.E. LePage Real Estate Services Ltd., 1984 CarswellNS 21

1984 CarswellNS 21, 10 D.L.R. (4th) 424, 141 A.P.R. 153, 51 C.B.R. (N.S.) 21...

27    The rule is of general application and not just referable to situations where a mistake has occurred: see *Re Tyler; Ex parte Official Receiver*, [1907] 1 K.B. 865 (C.A.).

28    And a further definition of the rule is set out by Buckley L.J. in *Re Tyler*, supra, p. 873:

> In *Ex Parte Simmonds* (3) Lord Esher, referring to *Ex Parte James* (2), says that the Court will direct its officer to act as any high-minded man would act, namely, not to take advantage of a mistake of law. That is to say, assuming that he has a right enforceable in a Court of justice, the Court of Bankruptcy or the Court for the administration of estates in Chancery will not take advantage of that right if to do so would be inconsistent with natural justice and that which an honest man would do.

29    In my view, the conduct of the trustee in taking advantage of the services performed by A.E. LePage under the listing agreement and then refusing to pay for those services, constitutes an infraction of this rule. Such conduct is manifestly unfair. A.E. LePage should be paid for its services of which the trustee has had the benefit.

30    In my opinion, a measure of compensation payable by the trustee to A.E. LePage can and should be found in the sale commission rate set out in the listing agreement, that is, 8 per cent.

31    I direct, therefore, in response to the application of the trustee under s. 16(1) of the Bankruptcy Act, that the trustee pay to A.E. LePage Real Estate Services Limited the sum of $5,440 as appropriate compensation for its services in the sale of the Hardy farm, to be provided out of the estate of the bankrupt.

32    A.E. LePage shall have its costs, to be taxed against the estate.

33    Pre-judgment interest shall be at the rate of 11 per cent.

*Directions given.*

---

**End of Document**    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 118

2002 CarswellOnt 1261, 33 C.B.R. (4th) 284, 113 A.C.W.S. (3d) 760

**C**

2002 CarswellOnt 1261, 33 C.B.R. (4th) 284, 113 A.C.W.S. (3d) 760

PSINet Ltd., Re

In the Matter of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as Amended

In the Matter of a Plan of Compromise or Arrangement of PSINet Limited, PSINet Realty Canada Limited, PSINetworks Canada Limited and Toronto Hosting Centre Limited, Applicants

Ontario Superior Court of Justice [Commercial List]

Farley J.

Heard: March 14, 2002
Judgment: March 14, 2002
Docket: 01-CL-4155

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: *Lyndon A.J. Barnes*, *Monica Creery*, for Applicants

*Geoffrey B. Morawetz*, for the Monitor, PricewaterhouseCoopers Inc.

*Peter H. Griffin*, for PSINet Inc.

*Edmond F.B. Lamek*, for 360Networks Services Ltd.

Subject: Corporate and Commercial; Insolvency

Corporations --- Arrangements and compromises — Under Companies' Creditors Arrangement Act — Arrangements — Approval by court — "Fair and reasonable"

Corporations proposed consolidated plan of arrangement or compromise — Consolidated plan was approved by creditors at meeting — Unsecured creditors strongly supported consolidated plan — Since meeting of creditors negotiations with respect to some aspects of plan had been ongoing — Corporations brought motion to sanction consolidated plan of arrangement or compromise — As result of negotiations, sanction was unopposed — Motion granted — Consolidated plan avoided complex and potentially litigious issues arising from allocation of proceeds from sale of corporations' assets — Consolidated plan was in strict compliance with statutory requirements and adhered to previous orders of court — Determination was made that all done or purported to be done was authorized by Companies' Creditors Arrangement Act — Creditors had sufficient time to make reasoned decision — As to fairness and reasonableness of plan, perfection was not required — In circumstances, given in-

2002 CarswellOnt 1261, 33 C.B.R. (4th) 284, 113 A.C.W.S. (3d) 760

tertwined nature of business, consolidated plan was appropriate — Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36.

### Cases considered by *Farley J.*:

*Associated Freezers of Canada Inc., Re*, 36 C.B.R. (3d) 227, 1995 CarswellOnt 944 (Ont. Bktcy.) — considered

*Canadian Airlines Corp., Re*, 2000 ABCA 238, 2000 CarswellAlta 919, [2000] 10 W.W.R. 314, 20 C.B.R. (4th) 46, 84 Alta. L.R. (3d) 52, 9 B.L.R. (3d) 86, 266 A.R. 131, 228 W.A.C. 131 (Alta. C.A. [In Chambers]) — referred to

*Canadian Airlines Corp., Re*, 2000 ABQB 442, 2000 CarswellAlta 662, [2000] 10 W.W.R. 269, 20 C.B.R. (4th) 1, 84 Alta. L.R. (3d) 9, 9 B.L.R. (3d) 41, 265 A.R. 201 (Alta. Q.B.) — considered

*Central Guaranty Trustco Ltd., Re*, 21 C.B.R. (3d) 139, 1993 CarswellOnt 228 (Ont. Gen. Div. [Commercial List]) — referred to

*J.P. Capital Corp., Re*, 31 C.B.R. (3d) 102, 1995 CarswellOnt 53 (Ont. Bktcy.) — referred to

*Lehndorff General Partner Ltd., Re*, 17 C.B.R. (3d) 24, 9 B.L.R. (2d) 275, 1993 CarswellOnt 183 (Ont. Gen. Div. [Commercial List]) — referred to

*Northland Properties Ltd., Re*, 73 C.B.R. (N.S.) 175, 1988 CarswellBC 558 (B.C. S.C.) — considered

*Northland Properties Ltd., Re*, *(sub nom. Northland Properties Ltd. v. Excelsior Life Insurance Co. of Canada)* 34 B.C.L.R. (2d) 122, *(sub nom. Northland Properties Ltd. v. Excelsior Life Insurance Co. of Canada)* 73 C.B.R. (N.S.) 195, *(sub nom. Northland Properties Ltd. v. Excelsior Life Insurance Co. of Canada)* [1989] 3 W.W.R. 363, 1989 CarswellBC 334 (B.C. C.A.) — referred to

*Northland Properties Ltd., Re*, 69 C.B.R. (N.S.) 266, 29 B.C.L.R. (2d) 257, 73 C.B.R. (N.S.) 146, 1988 CarswellBC 531 (B.C. S.C.) — referred to

*Sammi Atlas Inc., Re*, 1998 CarswellOnt 1145, 3 C.B.R. (4th) 171 (Ont. Gen. Div. [Commercial List]) — considered

### Statutes considered:

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3

Generally — referred to

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36

Generally — referred to

MOTION by corporations to sanction consolidated plan of arrangement or compromise.

### *Farley J.*:

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2002 CarswellOnt 1261, 33 C.B.R. (4th) 284, 113 A.C.W.S. (3d) 760

1    This motion was for the sanctioning of the consolidated plan of arrangement or compromise of the four Canadian applicants under the *Companies' Creditors Arrangement Act* ("CCAA"). The consolidated plan was approved by the creditors of the applicants at meetings held February 28, 2002. Since that time and as permitted by the consolidated plan there have been ongoing negotiations concerning various aspects of the plan. It is a tribute to the expertise and experience of the parties involved and their counsel that they have been able to negotiate resolutions of the various points in issue with the result that this sanction motion is unopposed. I also think it commendable that the Monitor so amply demonstrated the objectivity and neutrality which is the hallmark of a court-appointed officer.

2    I am advised that while the applicants initially considered an unconsolidated plan which had the support of PSINet Inc. ("Inc."), their parent and major creditor, it was considered that the consolidated route was the way to go. The consolidated plan avoids the complex and likely litigious issues surrounding the allocation of the proceeds from the sale of substantially all of the assets of the applicants to Telus Corporation. The consolidated plan also reflected the intertwined nature of the applicants and their business operations, which businesses in essence operated as a single business and with only one of the applicants having employees. I have previously alluded to the incomplete and deficient record keeping of the applicants. While shooting oneself in the foot should not be endorsed, this is another factor favouring consolidation and the elimination of expensive allocation (amongst the four Canadian applicants) litigation.

3    I note that the consolidated plan also provides that Inc. valued its charge against the assets of PSINet Limited ("Ltd.") one of the applicants to $55 million. The Monitor, PricewaterhouseCoopers Inc. found this to be a reasonable amount and within the range of values which might reasonably be anticipated. Again however I would repeat my observation about incomplete and deficient record keeping.

4    At the February 28th meeting of creditors, a single class of creditors, namely the unsecured creditors, voted on the consolidated plan as it then existed. Secured creditors were not affected by the plan, but were of course characterized as unsecured creditors to the extent that their claim exceeded the expected deficiency in the deemed realization of their security. 92.7% of the creditors voting, representing 98.8% in value of the claims, voted in favour of the plan. Had the votes of Inc. and other creditors affiliated with the applicants been ignored, then 92.5% of the class, representing 87.2% in value voted in favour of the plan.

5    Since the vote, 360Network Services Ltd. (and other affiliates) ("360Networks") have reached agreement with the applicants and Inc. to resolve a motion brought by 360Networks in respect of its concerns regarding the consolidation of the estates of the applicants in the plan of arrangement.

6    Similarly Inc. has made certain concessions as to the plan with an eye to making good on the condition imposed on it to make a material (albeit modest) adjustment so as to compensate the other creditors for the "frustration cost" associated with Inc.'s late blooming discovery of its security vis-à-vis Ltd. and its motion to reperfect this security.

7    The three part test for sanctioning a plan is laid out in *Northland Properties Ltd., Re* (1988), 73 C.B.R. (N.S.) 175 (B.C. S.C.), affirmed (1989), 73 C.B.R. (N.S.) 195 (B.C. C.A.); *Sammi Atlas Inc., Re,* 3 C.B.R. (4th) 171 (Ont. Gen. Div. [Commercial List]):

> (a) There must be strict compliance with all statutory requirements and adherence to the previous orders of the court;

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2002 CarswellOnt 1261, 33 C.B.R. (4th) 284, 113 A.C.W.S. (3d) 760

(b) All material filed and procedures carried out are to be examined to determine if anything has been done or purported to be done which is not authorized by the CCAA or other orders of the court; and

(c) The plan must be fair and reasonable.

8    It appears to me that parts (a) and (b) have been accomplished, now that Inc. has made the further concessions. The creditors have had sufficient time and information to make a reasoned decision. They have voted in favour of the consolidated plan by a significant margin over the statutory requirement, even where one eliminates the related vote of Inc. and its affiliates. In reviewing the fairness and reasonableness of a plan, the court does not require perfection. As discussed in *Sammi* at p. 173:

> A Plan under the CCAA is a compromise; it cannot be expected to be perfect. It should be approved if it is fair, reasonable and equitable. Equitable treatment is not necessarily equal treatment... One must look to the creditors as a whole (i.e. generally) and to the objecting creditors (specifically), and see if rights are compromised in an attempt to balance interests (and have the pain of the compromise equitably shared) as opposed to a confiscation of rights...

9    There is a heavy onus on parties seeking to upset a plan that the required majority have supported: See *Sammi* at p. 174 citing *Central Guaranty Trustco Ltd., Re*, 21 C.B.R. (3d) 139 (Ont. Gen. Div. [Commercial List])

10    The fairness and reasonableness of a plan are shaped by the unique circumstances of each case, within the context of the CCAA. In *Canadian Airlines Corp., Re*, [2000] 10 W.W.R. 269 (Alta. Q.B.), leave to appeal refused [2000] 10 W.W.R. 314 (Alta. C.A. [In Chambers]) Paperny J. at p. 294 considered factors such as the composition of the unsecured vote, what creditors would receive on liquidation or bankruptcy as opposed to the plan, alternatives available (to the plan and bankruptcy) and the public interest. I have already discussed the first element; the third and fourth do not appear germane here. As to the second, it is clear that the creditors generally are receiving more than in a bankruptcy and to the extent that Inc. is impacted, it has consented to such impact.

11    In the circumstances of this case, the filing of a consolidated plan is appropriate given the intertwining elements discussed above. See *Northland Properties Ltd., Re*, 69 C.B.R. (N.S.) 266 (B.C. S.C.), affirmed (B.C.C.A.), *supra*, at p. 202; *Lehndorff General Partner Ltd., Re*, 17 C.B.R. (3d) 24 (Ont. Gen. Div. [Commercial List]) at p. 31. While consolidation by its very nature will benefit some creditors and prejudice others, it is appropriate to look at the overall general effect. Here as well the concessions of Inc. have ameliorated that prejudice. Further I am of the view if consolidation is appropriate (and not proceeded with by any applicant for tactical reasons of minimizing valid objections), then it could be inappropriate to segregate the creditors into classes by corporation which would not naturally flow with the result that one or more is given a veto, absent very unusual circumstances (and not present here). I would also note that *Associated Freezers of Canada Inc., Re*, 36 C.B.R. (3d) 227 (Ont. Bktcy.) and *J.P. Capital Corp., Re*, 31 C.B.R. (3d) 102 (Ont. Bktcy.) which referred to prejudice to one creditor were not CCAA cases, but rather *Bankruptcy and Insolvency Act* cases; secondly *Associated Freezers* merely kept the door open for the objecting party to reconsider its position given the short notice and provided that if on reflection it wished to come back to make its submissions, it was entitled to do so for a period of time.

12    In the end result (and with no creditors objecting), I approve and sanction the consolidated plan as amended. Order to issue accordingly as per my fiat.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2002 CarswellOnt 1261, 33 C.B.R. (4th) 284, 113 A.C.W.S. (3d) 760

*Motion granted.*

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

TAB 119

2002 CarswellOnt 1261, 33 C.B.R. (4th) 284, 113 A.C.W.S. (3d) 760

**c**

2002 CarswellOnt 1261, 33 C.B.R. (4th) 284, 113 A.C.W.S. (3d) 760

PSINet Ltd., Re

In the Matter of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as Amended

In the Matter of a Plan of Compromise or Arrangement of PSINet Limited, PSINet Realty Canada Limited, PSINetworks Canada Limited and Toronto Hosting Centre Limited, Applicants

Ontario Superior Court of Justice [Commercial List]

Farley J.

Heard: March 14, 2002
Judgment: March 14, 2002
Docket: 01-CL-4155

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Counsel: *Lyndon A.J. Barnes*, *Monica Creery*, for Applicants

*Geoffrey B. Morawetz*, for the Monitor, PricewaterhouseCoopers Inc.

*Peter H. Griffin*, for PSINet Inc.

*Edmond F.B. Lamek*, for 360Networks Services Ltd.

Subject: Corporate and Commercial; Insolvency

Corporations --- Arrangements and compromises — Under Companies' Creditors Arrangement Act — Arrangements — Approval by court — "Fair and reasonable"

Corporations proposed consolidated plan of arrangement or compromise — Consolidated plan was approved by creditors at meeting — Unsecured creditors strongly supported consolidated plan — Since meeting of creditors negotiations with respect to some aspects of plan had been ongoing — Corporations brought motion to sanction consolidated plan of arrangement or compromise — As result of negotiations, sanction was unopposed — Motion granted — Consolidated plan avoided complex and potentially litigious issues arising from allocation of proceeds from sale of corporations' assets — Consolidated plan was in strict compliance with statutory requirements and adhered to previous orders of court — Determination was made that all done or purported to be done was authorized by Companies' Creditors Arrangement Act — Creditors had sufficient time to make reasoned decision — As to fairness and reasonableness of plan, perfection was not required — In circumstances, given in-

2002 CarswellOnt 1261, 33 C.B.R. (4th) 284, 113 A.C.W.S. (3d) 760

tertwined nature of business, consolidated plan was appropriate — Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36.

### Cases considered by *Farley J.*:

*Associated Freezers of Canada Inc., Re*, 36 C.B.R. (3d) 227, 1995 CarswellOnt 944 (Ont. Bktcy.) — considered

*Canadian Airlines Corp., Re*, 2000 ABCA 238, 2000 CarswellAlta 919, [2000] 10 W.W.R. 314, 20 C.B.R. (4th) 46, 84 Alta. L.R. (3d) 52, 9 B.L.R. (3d) 86, 266 A.R. 131, 228 W.A.C. 131 (Alta. C.A. [In Chambers]) — referred to

*Canadian Airlines Corp., Re*, 2000 ABQB 442, 2000 CarswellAlta 662, [2000] 10 W.W.R. 269, 20 C.B.R. (4th) 1, 84 Alta. L.R. (3d) 9, 9 B.L.R. (3d) 41, 265 A.R. 201 (Alta. Q.B.) — considered

*Central Guaranty Trustco Ltd., Re*, 21 C.B.R. (3d) 139, 1993 CarswellOnt 228 (Ont. Gen. Div. [Commercial List]) — referred to

*J.P. Capital Corp., Re*, 31 C.B.R. (3d) 102, 1995 CarswellOnt 53 (Ont. Bktcy.) — referred to

*Lehndorff General Partner Ltd., Re*, 17 C.B.R. (3d) 24, 9 B.L.R. (2d) 275, 1993 CarswellOnt 183 (Ont. Gen. Div. [Commercial List]) — referred to

*Northland Properties Ltd., Re*, 73 C.B.R. (N.S.) 175, 1988 CarswellBC 558 (B.C. S.C.) — considered

*Northland Properties Ltd., Re*, *(sub nom. Northland Properties Ltd. v. Excelsior Life Insurance Co. of Canada)* 34 B.C.L.R. (2d) 122, *(sub nom. Northland Properties Ltd. v. Excelsior Life Insurance Co. of Canada)* 73 C.B.R. (N.S.) 195, *(sub nom. Northland Properties Ltd. v. Excelsior Life Insurance Co. of Canada)* [1989] 3 W.W.R. 363, 1989 CarswellBC 334 (B.C. C.A.) — referred to

*Northland Properties Ltd., Re*, 69 C.B.R. (N.S.) 266, 29 B.C.L.R. (2d) 257, 73 C.B.R. (N.S.) 146, 1988 CarswellBC 531 (B.C. S.C.) — referred to

*Sammi Atlas Inc., Re*, 1998 CarswellOnt 1145, 3 C.B.R. (4th) 171 (Ont. Gen. Div. [Commercial List]) — considered

## Statutes considered:

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3

Generally — referred to

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36

Generally — referred to

MOTION by corporations to sanction consolidated plan of arrangement or compromise.

***Farley J.*:**

2002 CarswellOnt 1261, 33 C.B.R. (4th) 284, 113 A.C.W.S. (3d) 760

1      This motion was for the sanctioning of the consolidated plan of arrangement or compromise of the four Canadian applicants under the *Companies' Creditors Arrangement Act* ("CCAA"). The consolidated plan was approved by the creditors of the applicants at meetings held February 28, 2002. Since that time and as permitted by the consolidated plan there have been ongoing negotiations concerning various aspects of the plan. It is a tribute to the expertise and experience of the parties involved and their counsel that they have been able to negotiate resolutions of the various points in issue with the result that this sanction motion is unopposed. I also think it commendable that the Monitor so amply demonstrated the objectivity and neutrality which is the hallmark of a court-appointed officer.

2      I am advised that while the applicants initially considered an unconsolidated plan which had the support of PSINet Inc. ("Inc."), their parent and major creditor, it was considered that the consolidated route was the way to go. The consolidated plan avoids the complex and likely litigious issues surrounding the allocation of the proceeds from the sale of substantially all of the assets of the applicants to Telus Corporation. The consolidated plan also reflected the intertwined nature of the applicants and their business operations, which businesses in essence operated as a single business and with only one of the applicants having employees. I have previously alluded to the incomplete and deficient record keeping of the applicants. While shooting oneself in the foot should not be endorsed, this is another factor favouring consolidation and the elimination of expensive allocation (amongst the four Canadian applicants) litigation.

3      I note that the consolidated plan also provides that Inc. valued its charge against the assets of PSINet Limited ("Ltd.") one of the applicants to $55 million. The Monitor, PricewaterhouseCoopers Inc. found this to be a reasonable amount and within the range of values which might reasonably be anticipated. Again however I would repeat my observation about incomplete and deficient record keeping.

4      At the February 28th meeting of creditors, a single class of creditors, namely the unsecured creditors, voted on the consolidated plan as it then existed. Secured creditors were not affected by the plan, but were of course characterized as unsecured creditors to the extent that their claim exceeded the expected deficiency in the deemed realization of their security. 92.7% of the creditors voting, representing 98.8% in value of the claims, voted in favour of the plan. Had the votes of Inc. and other creditors affiliated with the applicants been ignored, then 92.5% of the class, representing 87.2% in value voted in favour of the plan.

5      Since the vote, 360Network Services Ltd. (and other affiliates) ("360Networks") have reached agreement with the applicants and Inc. to resolve a motion brought by 360Networks in respect of its concerns regarding the consolidation of the estates of the applicants in the plan of arrangement.

6      Similarly Inc. has made certain concessions as to the plan with an eye to making good on the condition imposed on it to make a material (albeit modest) adjustment so as to compensate the other creditors for the "frustration cost" associated with Inc.'s late blooming discovery of its security vis-à-vis Ltd. and its motion to reperfect this security.

7      The three part test for sanctioning a plan is laid out in *Northland Properties Ltd., Re* (1988), 73 C.B.R. (N.S.) 175 (B.C. S.C.), affirmed (1989), 73 C.B.R. (N.S.) 195 (B.C. C.A.); *Sammi Atlas Inc., Re*, 3 C.B.R. (4th) 171 (Ont. Gen. Div. [Commercial List]):

      (a) There must be strict compliance with all statutory requirements and adherence to the previous orders of the court;

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2002 CarswellOnt 1261, 33 C.B.R. (4th) 284, 113 A.C.W.S. (3d) 760

(b) All material filed and procedures carried out are to be examined to determine if anything has been done or purported to be done which is not authorized by the CCAA or other orders of the court; and

(c) The plan must be fair and reasonable.

8    It appears to me that parts (a) and (b) have been accomplished, now that Inc. has made the further concessions. The creditors have had sufficient time and information to make a reasoned decision. They have voted in favour of the consolidated plan by a significant margin over the statutory requirement, even where one eliminates the related vote of Inc. and its affiliates. In reviewing the fairness and reasonableness of a plan, the court does not require perfection. As discussed in *Sammi* at p. 173:

A Plan under the CCAA is a compromise; it cannot be expected to be perfect. It should be approved if it is fair, reasonable and equitable. Equitable treatment is not necessarily equal treatment... One must look to the creditors as a whole (i.e. generally) and to the objecting creditors (specifically), and see if rights are compromised in an attempt to balance interests (and have the pain of the compromise equitably shared) as opposed to a confiscation of rights...

9    There is a heavy onus on parties seeking to upset a plan that the required majority have supported: See *Sammi* at p. 174 citing *Central Guaranty Trustco Ltd., Re*, 21 C.B.R. (3d) 139 (Ont. Gen. Div. [Commercial List])

10    The fairness and reasonableness of a plan are shaped by the unique circumstances of each case, within the context of the CCAA. In *Canadian Airlines Corp., Re*, [2000] 10 W.W.R. 269 (Alta. Q.B.), leave to appeal refused [2000] 10 W.W.R. 314 (Alta. C.A. [In Chambers]) Paperny J. at p. 294 considered factors such as the composition of the unsecured vote, what creditors would receive on liquidation or bankruptcy as opposed to the plan, alternatives available (to the plan and bankruptcy) and the public interest. I have already discussed the first element; the third and fourth do not appear germane here. As to the second, it is clear that the creditors generally are receiving more than in a bankruptcy and to the extent that Inc. is impacted, it has consented to such impact.

11    In the circumstances of this case, the filing of a consolidated plan is appropriate given the intertwining elements discussed above. See *Northland Properties Ltd., Re*, 69 C.B.R. (N.S.) 266 (B.C. S.C.), affirmed (B.C.C.A.), *supra*, at p. 202; *Lehndorff General Partner Ltd., Re*, 17 C.B.R. (3d) 24 (Ont. Gen. Div. [Commercial List]) at p. 31. While consolidation by its very nature will benefit some creditors and prejudice others, it is appropriate to look at the overall general effect. Here as well the concessions of Inc. have ameliorated that prejudice. Further I am of the view if consolidation is appropriate (and not proceeded with by any applicant for tactical reasons of minimizing valid objections), then it could be inappropriate to segregate the creditors into classes by corporation which would not naturally flow with the result that one or more is given a veto, absent very unusual circumstances (and not present here). I would also note that *Associated Freezers of Canada Inc., Re*, 36 C.B.R. (3d) 227 (Ont. Bktcy.) and *J.P. Capital Corp., Re*, 31 C.B.R. (3d) 102 (Ont. Bktcy.) which referred to prejudice to one creditor were not CCAA cases, but rather *Bankruptcy and Insolvency Act* cases; secondly *Associated Freezers* merely kept the door open for the objecting party to reconsider its position given the short notice and provided that if on reflection it wished to come back to make its submissions, it was entitled to do so for a period of time.

12    In the end result (and with no creditors objecting), I approve and sanction the consolidated plan as amended. Order to issue accordingly as per my fiat.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

2002 CarswellOnt 1261, 33 C.B.R. (4th) 284, 113 A.C.W.S. (3d) 760

*Motion granted.*

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

# TAB 120

R. v. Century 21 Ramos Realty Inc., 1987 CarswellOnt 925

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 211 of 374

1987 CarswellOnt 925, [1987] 1 C.T.C. 340, [1987] O.J. No. 178, 19 O.A.C. 25...

1987 CarswellOnt 925
Ontario Court of Appeal

R. v. Century 21 Ramos Realty Inc.

1987 CarswellOnt 925, [1987] 1 C.T.C. 340, [1987] O.J. No. 178, 19 O.A.C. 25,
29 C.R.R. 320, 32 C.C.C. (3d) 353, 37 D.L.R. (4th) 649, 56 C.R. (3d) 150, 58 O.R. (2d) 737, 87 D.T.C. 5158

# Century 21 Ramos Realty Inc. (formerly known as L. Ramos Realty Limited) and Urbano L. Ramos, Appellants, and Her Majesty The Queen, Respondent, and between Urbano L. Ramos, Appellant, and Her Majesty The Queen, Respondent

Martin, Houlden and Tarnopolsky, JJ.A.

Judgment: February 27, 1987

Proceedings: on appeal from summary conviction for tax evasion

Counsel: *J.A. Giffen*, Q.C. for the appellants.
*Robert W. Hubbard*, for the respondent.

Subject: Criminal; Constitutional; Income Tax (Federal)

**Related Abridgment Classifications**
For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**
   **Income tax --- General principles — Constitutional issues — General**

   **Income tax --- Business and property income — Shareholder benefits — Appropriation of property**

   **Income tax --- Tax avoidance — Indirect payments**

   **Income tax --- Administration and enforcement — Offences — Tax evasion**

   **Criminal law --- Constitutional issues in criminal law — Charter of Rights and Freedoms — Rights and freedoms — Charter protection against double jeopardy and double punishment**

   **Criminal law --- Appeals — Appeal of summary conviction offence — Appeal of conviction or acquittal — Right of appeal**

   **Income tax --- Administration and enforcement of Act — Offences — Tax evasion**

Income tax — Federal — Income Tax Act, R.S.C. 1952, c. 148 (am. S.C. 1970-71-72, c. 63) — 12(1)(b), 15(1)(b), 56(2), 239(1)(d) — Constitution Act, 1982 — 7, 11(h), 15 — Summary convictions for tax evasion — Appropriation of corporate property — Attribution of benefit to shareholder — Constitutionality of charge provision.

The taxpayer, R, was president and sole shareholder of the taxpayer corporation, R Realty, a real estate brokerage business. In 1978 R Realty earned a commission of $125,000 for procuring the sale of an apartment property. Having insufficient

Case 09-10138-MFW Doc 14225-49 Filed 08/15/14 Page 212 of 374

R. v. Century 21 Ramos Realty Inc., 1987 CarswellOnt 925

1987 CarswellOnt 925, [1987] 1 C.T.C. 340, [1987] O.J. No. 178, 19 O.A.C. 25...

funds to close the transaction, the purchaser assumed liability for payment of the commission due R Realty. The purchaser issued 25 of its shares to R personally; the shares were thought by all parties to have a value of $25,000. In December 1978, the purchaser paid $25,000 to R Realty, which R Realty reported as income. The purchaser subsequently gave R Realty a $75,000 mortgage on the property, which R Realty did not report as income. It was later realized that the shares issued to R had a value of only $25. The purchaser therefore executed a promissory note in R's favour in the amount of $24,975, payable July 31, 1981 or on the sale of the property. It was unclear whether the note was issued to R in 1978 or 1979. The mortgage was discharged December 12, 1979 and on the same day a new mortgage was placed on the property from the purchaser to a numbered corporation of which R was the sole shareholder and director. There was considerable evidence that the documents were not executed until February 1980, however the appeals were argued on the basis that the transactions took place in December 1979.

Both R and R Realty were charged with tax evasion under paragraph 239(1)(d) of the Act. The first information alleged that R failed to report income of $25,000 in 1978 and $75,000 in 1980. The second information alleged that R Realty and R failed to report income of $100,000 in 1978. The provincial judge granted motions of acquittal on both informations. He held that on a charge under paragraph 239(1)(d) it is essential for the Crown to prove that a section 152 assessment has been made prior to the laying of the charge and that the Crown had failed to do so. Additionally, in respect of the second information, he held that the Crown had failed to prove that the tax payable had not been paid. On appeal these rulings were held to be in error. The trial continued and at its conclusion the provincial judge acquitted R and R Realty. That judgment was appealed and reversed, and the appellants brought the present appeal. The appellants made additional arguments in respect of the constitutionality of section 239. They contended that the right of the Attorney General to proceed either by way of summary conviction or indictment contravened the equality right contained in section 15 of the Charter; and further that the Crown's right of appeal to the summary conviction appeal court on questions of fact in summary conviction cases contravened sections 7 and 11(h) of the Charter. Finally, the appellants contended that based on the *Kienapple* principle a conviction on the first information precluded a conviction on the second since the same money was involved in both charges.

**HELD:**

In respect of the second information, there was no doubt that R Realty earned the $125,000 commission in 1978, and pursuant to paragraph 12(1)(b) should have reported it in that year; there was no legal impediment or condition precedent to the payment of the commission by the purchaser to R Realty. In respect of the first information and the charge against R of evading tax on $25,000 in 1978, there was evidence to support the provincial judge's finding that the shares had a value of only $25 in 1978. By paragraph 15(1)(b) only the "amount or value" of property appropriated for the benefit of a shareholder must be included in income. Therefore, regardless of the parties' belief as to the value of the shares it was not incumbent on R to report $25,000 of income for the 1978 taxation year. In respect of the charge of evading tax on income of $75,000 in the 1980 taxation year, the Court was obliged to assume that the mortgage transactions occurred in December 1979. However, R appropriated the mortgage in 1980, when the transaction was finalized. Though the mortgage was given to R's numbered corporation, the benefit was attributable to R, pursuant to subsection 56(2). R was guilty of failing to report income of $75,000 in the 1980 taxation year. The appellants' constitutional arguments failed. Further, the *Kienapple* principle was not applicable. The offences charged in the two informations constituted different delicts; moreover, the two offences were indistinguishable from each other. Appeal allowed in part.

**Table of Authorities**

**Cases referred to:**

*Phillips and Phillips v. The Queen* (1983), 8 C.C.C. (3d) 118;

*M.N.R. v. John Colford Contracting Co. Ltd.*, [1960] C.T.C. 178, 60 D.T.C. 1131;

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 213 of 374

R. v. Century 21 Ramos Realty Inc., 1987 CarswellOnt 925
1987 CarswellOnt 925, [1987] 1 C.T.C. 340, [1987] O.J. No. 178, 19 O.A.C. 25...

*A.G. Rodgers Real Estate Ltd. v. M.N.R.*, [1984] C.T.C. 2051, 84 D.T.C. 1034;

*R. v. Hoffman-La Roche Ltd. (Nos. 1 & 2)* (1981), 62 C.C.C. (2d) 118;

*R. v. Giguère et al.*, [1983] S.C.R. 448;

*Re McDonald and The Queen* (1985), 21 C.C.C. (3d) 330;

*R. v. R.L.* (1986), 26 C.C.C. (3d) 417;

*Reference re an Act to Amend the Education Act* (1986), 53 O.R. (2d) 513;

*Re Blainey and Ontario Hockey Association* (1986), 54 O.R. (2d) 513;

*R. v. Smythe*, [1971] S.C.R. 680, 3 C.C.C. (2d) 366;

*State v. Clark*, 630 P. 2d 810 (1981);

*Andrews v. Law Society of British Columbia*, [1986] 4 W.W.R. 242;

*R. v. LeGallant* (1987), 54 C.R. (3d) 46;

*City of Klamath Falls v. Winters*, 619 P. 2d 217 (1980);

*State v. Jones*, 569 P. 2d 19 (1977);

*Florence Mining Co. v. Cobalt Lake Mining Co.* (1909), 18 O.L.R. 275 at 280, 13 O.W.R. 837, 1909 CarswellOnt 211, C.R. [1911] 2 A.C. 412 at 424 (Ont. C.A.) , affd. 43 O.L.R. 474;

*Cripen v. Attorney General for Ontario* (1925), 56 O.L.R. 327, affd. 56 O.L.R. 530;

*R. v. Court of Sessions of the Peace et al., ex parte Lafleur*, [1967] 3 C.C.C. 244;

*Morgentaler v. The Queen*, [1975] S.C.R. 616, 20 C.C.C. (2d) 449;

*Re Saikaly and The Queen* (1979), 48 C.C.C. (2d) 192;

*Stolar v. The Queen* (1983), 4 C.R.R. 252;

*R. v. Taylor* (1983), 8 C.R.R. 29;

*Operation Dismantle v. The Queen*, [1985] 1 S.C.R. 441;

*Re Regina and Arviv* (1985), 19 C.C.C. (3d) 395;

*R. v. Kworak* (1986), 20 C.R.R. 325;

Case 09-10138-MFW   Doc 14225-49   Filed 08/15/14   Page 214 of 374

R. v. Century 21 Ramos Realty Inc., 1987 CarswellOnt 925

1987 CarswellOnt 925, [1987] 1 C.T.C. 340, [1987] O.J. No. 178, 19 O.A.C. 25...

*R. v. Morgentaler et al.*, 52 O.R. (2d) 353, 22 C.C.C. (3d) 353;

*R. v. Dennis* (1960), 125 C.C.C. 321;

*R. v. Antonelli* (1977), 38 C.C.C. (2d) 206;

*R. v. Purves and Purves* (1979), 50 C.C.C. (2d) 211;

*R. v. Colbeck* (1978), 42 C.C.C. (2d) 117;

*R. v. Gillis* (1981), 60 C.C.C. (2d) 169;

*R. v. Medicine Hat Greenhouses Ltd. and German* (1981), 59 C.C.C. (2d) 257;

*R. v. Jordan* (1971), 1 C.C.C. (2d) 385;

*Kienapple v. The Queen*, [1975] 1 S.C.R. 729, 15 C.C.C. (2d) 524;

*R. v. Prince* (1987), 54 C.R. (3d) 97;

*R. v. Arnott and St. James*, [1970] 5 C.C.C. 190;

*R. v. Paish* (1979), 5 C.R. (3d) 281.

**By The Court**:

1    These are summary conviction appeals. The appeals to this court are, therefore, restricted to questions of law. As will be seen, they raise a number of questions of law, the principal one being the validity of the procedure for appeals from the trial court to the summary conviction appeal court provided by Part XXIV of the *Criminal Code*, R.S.C. 1970, c. C-34.

2    There were two separate informations. The first information related to the appellant Urbano L. Ramos (Ramos) only. It charged that:

URBANO L. RAMOS ... unlawfully did in the Township of Ekfrid, in the County of Middlesex or elsewhere in the Province of Ontario, between the 31 day of December, 1977 and the 22nd day of August, 1981, wilfully evade the payment of $29,515.70 in taxes imposed on him by the *Income Tax Act*, R.S.C. 1952, Chapter 148, as amended, by failing to report income in the sum of $25,000.00 for the taxation year 1978 and $75,000.00 for the taxation year 1980, and he has thereby committed an offence contrary to Section 239(1)(d) of the said *Act*.

The second information related to both the appellant Ramos and the appellant Century 21 Ramos Realty Inc. (Ramos Realty). It charged that:

CENTURY 21 RAMOS REALTY INC. (formerly known as L. Ramos Realty Limited) ... and: URBANO L. RAMOS ... being an officer, director or agent of the said Century 21 Ramos Realty Inc., (formerly known as L. Ramos Realty Limited) unlawfully did in the City of London, in the County of Middlesex or elsewhere in the Province of Ontario, between the 31st day of December, 1977 and the 4th day of July, 1979 wilfully evade the payment of $15,000.00 in taxes imposed by the *Income Tax Act*, R.S.C. 1952, Chapter 148, as amended, upon the said L. Ramos Realty Limited, by failing to report

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

R. v. Century 21 Ramos Realty Inc., 1987 CarswellOnt 925

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 215 of 374

1987 CarswellOnt 925, [1987] 1 C.T.C. 340, [1987] O.J. No. 178, 19 O.A.C. 25...

income in the sum of $100,000.00 for the taxation year 1978, and they have thereby committed an offence contrary to Section 239(1)(d) of the said *Act*.

Section 239 of the *Income Tax Act*, R.S.C. 1952, c. 148, as amended, creates a hybrid offence. The Crown elected to proceed summarily.

3    The trial on the first information commenced on July 27, 1983. Following the completion of the evidence on the first information, the appellant was arraigned on the second information, and counsel agreed that the evidence called on the first information would apply to the second information. It was not suggested that the procedure followed infringed the principle laid down in *Phillips and Phillips v. The Queen* (1983), 8 C.C.C. (3d) 118.

4    At the close of the Crown's case on the second information, defence counsel moved for an acquittal on both informations. The provincial judge granted the motions. With respect to both informations, he held that on a charge under paragraph 239(1)(d) of the *Income Tax Act*, it is essential for the Crown to prove that an assessment has been made pursuant to section 152 of the Act before the charge has been laid, and the Crown had failed to do so. With respect to the second information, he held that it was essential for the Crown to prove that the tax payable ($15,000) had not been paid, and the Crown had failed to do this, notwithstanding the filing by it of the income tax return of the company for the taxation year 1978 which showed income of $6,747 and tax due of $1,012.

5    An appeal was taken by way of stated case from the decision of the provincial judge to Ewaschuk, J. who allowed the appeal. In a short endorsement, he ruled that the provincial judge had erred on both grounds.

6    The defendants then appealed to this Court. The appeal was dismissed. On the ground common to both informations, the Court held that on a charge under paragraph 239(1)(d) of the *Income Tax Act*, it is not essential for the Crown to prove that prior to the charge being laid an assessment has been made pursuant to section 152 of the Act. On the ground which related to the second information only, it held that there was evidence that the tax had not been paid in that the tax return for the company for the taxation year 1978, filed as an exhibit by the Crown, did not disclose the $100,000 income which the Crown alleged had been wilfully omitted from the company's tax return with a view to avoiding tax.

7    The trial then continued before the provincial judge. At the conclusion of the case, the provincial judge in a short, oral judgment acquitted the appellants. The Crown appealed to the District Court. After hearing argument, the summary conviction appeal court judge reserved judgment. In a long, carefully reasoned judgment, he set aside the acquittals and found the appellants guilty as charged. The appellants have appealed to this court pursuant to section 771 of the *Criminal Code*.

8    The appellants served notice on the respondent and on the Attorney General of Ontario of their intention to argue a constitutional question, namely, the validity of sections 613(4), 748, 755 and 771 of the *Criminal Code*. The Attorney General of Ontario saw fit to intervene, filed an intervenant's factum, and was represented on the arguments of the appeal.

## 1. Facts

9    Prior to trial, the parties agreed in a letter upon certain facts. Unfortunately, the letter of agreed facts is not as clear as it might be, and what is worse, as will be seen, some of the statements contained in it are contradictory.

10    Ramos was the president and sole shareholder of Ramos Realty, a company engaged in the real estate brokerage business. In 1978, Ramos Realty acted for the vendor, Baycrest Consolidated Holdings Limited (Baycrest) in the sale of certain properties on the south side of Huron Street in the City of London, known as the Dorvan Apartments. The sale price was $5,350,000, and the vendor agreed to pay Ramos Realty a commission of $125,000 for its services in procuring the offer.

11    The purchaser of the property, a company known as 388144 Ontario Limited (388144), did not have sufficient funds to close the transaction. It, therefore, arranged with Baycrest and Ramos Realty that as part of the purchase price, it would assume the liability for payment of the $125,000 real estate commission due to Ramos Realty. It is the events surrounding the payment of the $125,000 by 388144 which give rise to the charges against the appellants.

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 216 of 374

R. v. Century 21 Ramos Realty Inc., 1987 CarswellOnt 925

1987 CarswellOnt 925, [1987] 1 C.T.C. 340, [1987] O.J. No. 178, 19 O.A.C. 25...

12    388144 was incorporated under the *Business Corporations Act*, R.S.O. 1970, c. 53 on June 16, 1978. It was incorporated for the purpose of buying the Dorvan Apartments. The authorized capital of the corporation was $40,000 divided into 40,000 shares of no par value. The money to purchase the apartments was provided by a number of investors. A person who invested in the company received shares and a promissory note. The financial statement of the company for the period ending June 30, 1979, showed 815 common shares issued for a cash consideration of $815 and notes payable to shareholders of $814,185.

13    On July 13, 1978, 388144 issued 25 common shares to Ramos in his personal capacity. By letter dated September 18, 1978, Paul Downs, the solicitor for 388144 in the purchase of the Dorvan Apartments, forwarded the shares to Ramos. In his letter, he said:

I enclose herewith Share Certificates representing the shares you purchased in the above Company [388144], at a cost of $1,000.00 per share.

The letter of agreed facts states that "Paul Downs never received instructions from Ramos that the shares were not to be issued to him personally".

14    On November 20, 1978, Ramos Realty wrote to Baycrest to confirm that the amount of outstanding commission on the sale of the Dorvan Apartments was $100,000. On November 23, 1978, Paul Downs executed an undertaking in writing addressed to Baycrest and their solicitors to obtain a full and final release from Ramos Realty with respect to the balance of the real estate commission of $100,000 on the sale of the Dorvan Apartments.

15    The letter of agreed facts states that these two documents indicate that by November 1978, the real estate commission owed to Ramos Realty "had been reduced by $25,000 which was the 25 shares and the promissory note paid to Ramos by 388144". As the summary conviction appeal court judge pointed out, this cannot be so, since, as will be seen, the promissory note was not in existence at this time.

16    On December 6, 1978, 388144 paid $25,000 to Ramos Realty. The fiscal year end of Ramos Realty was December 31, and this amount was included by Ramos Realty in income in its tax return for the year 1978. Since this payment was reported by Ramos Realty as income, it forms no part of the charges against the appellants.

17    In December 1978, 388144 executed a mortgage for $75,000 on the Dorvan Apartments to Ramos Realty as mortgagee. The mortgage is dated December 11, 1978. It was payable in full on November 23, 1979, and repayment was personally guaranteed by two of the officers of 388144. The mortgage was not shown in the financial statement of Ramos Realty filed with its tax return for the year ending December 31, 1978, nor was it ever reported as income by Ramos Realty.

18    Although the date is unclear — presumably it was some time in 1979 — the principals of 388144 realized that an error had been made in issuing the 25 shares for $25,000 and that they should only have been issued for $25. It was agreed, therefore, with Ramos that his 25 shares had a value of $25, and the company executed a promissory note dated October 15, 1979, to Ramos for $24,975. The note was payable July 31, 1981, or on the sale of the property (the note does not identify the property but it was clearly the Dorvan Apartments), whichever first occurred. Again, the letter of agreed facts states that "Paul Downs never received instructions from Ramos that the note was not to be issued to Ramos personally".

19    A list of the shareholders of 388144 from the working papers of its accountants showed Ramos as the holder of 25 of the 815 issued common shares shown on the company's balance sheet for the period ending June 30, 1979.

20    The letter of agreed facts is confusing and to some extent contradictory on the date on which the promissory note was issued to Ramos. In para. 7, the letter states that 388144 paid the $125,000 commission as follows:

— $25,000 in shares ... of 388144 Ontario Limited and a promissory note ... from 388144 to Urbano Ramos personally in *1978*; [our italics].

However, para. 8 states:

R. v. Century 21 Ramos Realty Inc., 1987 CarswellOnt 925

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 217 of 374

1987 CarswellOnt 925, [1987] 1 C.T.C. 340, [1987] O.J. No. 178, 19 O.A.C. 25...

Exhibit 2F, a promissory note dated October 15, *1979* was subsequently issued by 388144 Ontario Limited to Urbano Ramos personally and replaced $24,975.00 worth of consideration of the $25,000 worth of shares referred to above. This substitution was necessitated when the company realized it had exceeded its share capital authorization allowed by its Charter. [our italics].

Then, in para. 10, it contains the sentence which we have quoted earlier that the letter of November 20, 1978, and the undertaking of November 23, 1978, indicate that by November *1978*, the real estate commission owed to Ramos Realty by 388144 of $125,000 had been reduced by $25,000 which was the 25 shares and the promissory note.

21     At the trial, the Crown called Mario Ferreira, the president of 388144, as a witness for the prosecution. His evidence is equally confusing as to the date when the note was issued. Crown counsel at the trial seems to have been unaware of the problem.

22     The letter of agreed facts states that the mortgage of December 11, 1978, was discharged December 12, 1979, and on the same day a new mortgage was placed on the Dorvan Apartments from 388144 to 409668 Ontario Limited (409668). If the discharge and mortgage are examined, they indicate that they were executed and registered not in 1979 but in 1980. The discharge was clearly executed and registered on March 4, 1980. The only thing that links the new mortgage to 1979 is the date on the first page of December 12, 1979. The affidavit of execution by the guarantor is sworn February 14, 1980, and the affidavit as to age and spousal status, which contains a declaration for the purpose of the *Planning Act* and the *Income Tax Act* is also sworn on February 14, 1980. The mortgage was registered March 4, 1980, the same day as the discharge. Again, Crown counsel at the trial does not appear to have directed her attention to the matter, and it is not mentioned in the judgments below. Accordingly, we must decide these appeals on the basis of the statements contained in the letter of agreed facts, i.e., that the mortgage of December 11, 1978, was discharged and replaced by a new mortgage to 409668 on December 12, 1979.

23     409668 was a corporation of which Ramos was the sole shareholder and director. The new mortgage was payable in full on November 23, 1980. Interest ran from November 23, 1979. Payment was personally guaranteed by one of the officers of 388144. By an assignment of mortgage dated March 3, 1980 and registered March 6, 1980, 409668 assigned the new mortgage to the Bank of Montreal as collateral security for a loan of $35,000 to 409668.

## 2. Evasion of Tax as Charged in the Second Information

24     We believe it is more convenient to deal first with the alleged evasion of tax as charged in the second information. There is no doubt that Ramos Realty had earned the $125,000 commission in 1978, and should, therefore, have reported it as income in that year. This is clear from paragraph 12(1)(b) of the *Income Tax Act* which provides:

12.(1) There shall be included in computing the income of a taxpayer for a taxation year as income from a business or property such of the following amounts as are applicable:

. . . . .

(b) any amount receivable by the taxpayer in respect of property sold or services rendered in the course of a business in the year, notwithstanding that the amount or any part thereof is not due until a subsequent year, unless the method adopted by the taxpayer for computing income from the business and accepted for the purpose of this Part does not require him to include any amount receivable in computing his income for a taxation year unless it has been received in the year, and for the purposes of this paragraph, an amount shall be deemed to have become receivable in respect of services rendered in the course of a business on the day that is the earlier of

(i) the day upon which the account in respect of the services was rendered, and

(ii) the day upon which the account in respect of those services would have been rendered had there been no undue delay in rendering the account in respect of the services;

25     In acquitting the appellants on the second information, the provincial judge said that the mortgage and the promissory note were given for the $100,000 which it was alleged that Ramos Realty had failed to report and that the mortgage and the

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 218 of 374

R. v. Century 21 Ramos Realty Inc., 1987 CarswellOnt 925

1987 CarswellOnt 925, [1987] 1 C.T.C. 340, [1987] O.J. No. 178, 19 O.A.C. 25...

note was not due until 1979 and 1981 respectively. While what the provincial judge stated was undoubtedly true, with respect, it in no way affects the liability of Ramos Realty for tax on the commission. The provincial judge concluded his reasons for acquitting the appellants by stating that "I find that there is no evidence of any appropriation during the 1978 and 1980 years". With respect, this also was wrong. While "appropriation" is a relevant consideration for the first information, it has no relevance for the second: the issue on the second information was whether the commission was an "amount receivable" falling within paragraph 12(1)(b) of the *Income Tax Act*.

26    The provincial judge thus erred in law in his reasons for acquitting the appellants on the second information, and counsel for the appellants did not attempt to support them. Rather, he submitted that there was a legal impediment or condition precedent to the payment of the commission to Ramos Realty, and hence it did not have to be reported as income for the taxation year 1978: see  *Minister of National Revenue v. John Colford Contracting Co. Ltd.*, [1960] C.T.C. 178, 60 D.T.C. 1131 (Ex.Ct.), and *A.G. Rodgers Real Estate Ltd. v. Minister of National Revenue*, [1984] C.T.C. 2051, 84 D.T.C. 1034 (T.C.C.).

27    The legal impediment or condition precedent to payment flowed, counsel contended, from a letter written by William Ash of the legal firm of Ash and Cale, the solicitors for Baycrest, to Paul Downs, the solicitor for 388144, on November 21, 1978. In the letter, Mr. Ash detailed the amounts required to discharge the third and fourth mortgages received by Baycrest from 388144 on closing and set out certain amounts that could be properly deducted from the amounts owing on the mortgages. One of the deductions was $75,000, being the real estate commission owing to Ramos Realty. Mr. Ash in his letter put the matter this way:

> I also confirm that it is in order for you to deduct from the balance of $75,000.00 being the balance of real estate commission payable subject to your providing me with a release from the real estate agent before the discharges of the two mortgages will be released.

In the letter of agreed facts, it is acknowledged that Mr. Ash was in error as to the amount of commission owing to Ramos Realty and that the correct amount was $100,000 not $75,000. The release requested by Mr. Ash was executed by Ramos Realty on February 27, 1979, and was sent to Ash and Cale by Mr. Downs on February 28, 1979. The release did not refer to any specific sum; it merely acknowledged that Ramos Realty had received "its commission in full re the sale of the Dorvan Apartments".

28    On this point, the learned summary appeal court judge said:

> I cannot accept that argument. Firstly, the issue between Baycrest and 388144 was payment in full of the purchase price. Obviously, Baycrest was not willing to provide discharges of the mortgages from 388144 until it was satisfied that the purchase price had been paid in full and this entailed performance by 388144 of its agreement to pay the real estate commission to Ramos Realty. As soon as the sale had been completed, the commission was earned by Ramos Realty. The only issue then was how the commission was to be paid. Because of the circumstances outlined above, 388144 agreed to pay the commission. As between the person responsible to pay the commission (388144) and the person entitled to receive the commission (Ramos Realty), there was no condition precedent or legal impediment to the payment of the commission. The commission had been fully earned at that time. The only issue was, failing 388144's ability to make immediate payment, what arrangements would be made to secure future payment of the commission? The cases relied upon by Mr. Giffen are distinguishable on their facts and do not assist him. I conclude that the transaction in question falls squarely within s. 12(1)(b) of the Income Tax Act and that the commission of $100,000.00 should have been included in computing the income of Ramos Realty in the 1978 taxation year.

We agree with this reasoning. The request by Mr. Ash was, in our opinion, only a request for a receipt and was not a legal impediment or condition precedent to the payment of the commission by 388144. The $100,000 should, therefore, have been included as income by Ramos Realty for the year 1978. We shall deal subsequently with the personal liability of Ramos on the second information.

**3. Evasion of Tax by Ramos on Income of $25,000 for the Taxation Year 1978 as Charged in the First Information**

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 219 of 374

R. v. Century 21 Ramos Realty Inc., 1987 CarswellOnt 925

1987 CarswellOnt 925, [1987] 1 C.T.C. 340, [1987] O.J. No. 178, 19 O.A.C. 25...

29    On the failure to report income in the sum of $25,000 for the taxation year 1978, the provincial judge accepted the evidence of the Crown witness Mario Ferreira, the president of 388144, that the share certificates had only a value of $25, not $25,000, in the taxation year 1978. Accordingly, he acquitted Ramos of this charge.

30    The evidence on the value of the shares in the taxation year 1978 is confusing, and the letter of agreed facts, as we have pointed out, does not assist in clarifying the issue. In our opinion, there was evidence to support the finding of the provincial judge that the shares had a value of only $25 in 1978. This being so, the summary conviction appeal court judge should not have interfered with that finding.

31    In his reasons, the summary conviction appeal court judge directed his mind to the issue of what the result would have been if he was wrong, and the shares had a value of only $25 in 1978. He was of the opinion that Ramos should still have reported $25,000 in his 1978 tax return since all of the parties concerned, including Ramos, were of the belief that the shares had a value of $25,000. With respect, we do not agree. The belief of Ramos, in our judgment, was immaterial.

32    Paragraph 15(1)(b) of the *Income Tax Act* provides:

15.(1) Where in a taxation year

. . . . .

(b) funds or property of a corporation have been appropriated in any manner whatever to, or for the benefit of, a shareholder, ...

the amount or value thereof shall ... be included in computing the income of the shareholder for the year.

It is thus only the "amount or value" of the property appropriated to or for the benefit of the shareholder that must be included in computing the income of the shareholder for the taxation year. Since there was, as we have noted, evidence to support the finding of the provincial judge that the value of the shares in 1978 was only $25, the summary conviction appeal court judge erred in law in finding that it was incumbent upon Ramos to report $25,000 of income for the 1978 taxation year. We shall deal later with the effect of this error.

**4. Evasion of Tax by Ramos on Income of $75,000 for the Taxation Year 1980 as Charged in the First Information**

33    This portion of the appeal was argued on the basis that the discharge of the mortgage of December 11, 1978, and the giving of the new mortgage both occurred on December 12, 1979. There is, as has been pointed out, considerable evidence that the documents were not, in fact, executed until February and March of 1980. However, assuming, as we must, that the documents were given in 1979, was the information in error when it charged tax evasion for the year 1980?

34    The answer to this question turns on subsection 15(1) of the *Income Tax Act* which we have quoted above. The Crown called an expert witness, Gilbert J. Claerhout, an employee of Revenue Canada. On the assumption that the mortgage of December 11, 1978, was discharged and the new mortgage to 409668 was registered on December 12, 1979, he was of the opinion that Ramos had appropriated the mortgage in 1979. However, because 409668 had a fiscal year end of February 29, 1980, and because 409668 could up to that date have taken remedial steps to correct the situation, he was of the view that there was also an appropriation in 1980. Up until February 29, 1980, according to Mr. Claerhout, because of the year end of 409668 which straddled 1979 and 1980, Ramos had the option of reporting the $75,000 in either 1979 or 1980.

35    On the basis of Mr. Claerhout's evidence, the provincial judge held that the appropriation had occurred in 1979, not in 1980, and hence Ramos should be acquitted.

36    The summary conviction appeal court judge came to the opposite conclusion. He accepted Mr. Claerhout's evidence that Ramos had an option to report the $75,000 as income in 1979 or 1980. He concluded, therefore, that the Crown had proved beyond a reasonable doubt that having failed to declare the income in 1979, Ramos was obligated to report it in 1980 and having failed to do so, he was guilty of failing to report income of $75,000 for the taxation year 1980 as charged in the first information.

R. v. Century 21 Ramos Realty Inc., 1987 CarswellOnt 925

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 220 of 374

1987 CarswellOnt 925, [1987] 1 C.T.C. 340, [1987] O.J. No. 178, 19 O.A.C. 25...

37     With respect, we do not believe that the witness Claerhout should have been permitted to give an opinion as to when the appropriation occurred. It was a question of law for the judge as to what constitutes an appropriation. It was for the judge to determine, in compliance with the legal definition, if and when an appropriation took place. This was not something on which an expert witness could give evidence.

38     The *Income Tax Act* does not define the word "appropriate". It is, however, a common English word. *The Shorter Oxford English Dictionary* gives the following definitions: "1. to make over to any one as his own; ... 2. To take for one's own, or to oneself ...". In our opinion, the mortgage was taken by Ramos as his own in 1980, and the provincial judge erred in law in finding that the appropriation occurred in 1979.

39     The Crown called as a witness a chartered accountant, Gregory Francis Mosey, the accountant for Ramos, Ramos Realty and 409668 during the years 1979 and 1980. He testified that he received instructions from Ramos for the preparation of the financial statement of 409668 for the fiscal period ending February 29, 1980. On the financial statement of 409668 for that period, there is shown a mortgage receivable from 388144 of $75,000. Mr. Mosey gave evidence that on April 17, 1980, he discussed this mortgage with Ramos. He was informed by Ramos that Ramos had been holding the mortgage personally; he was never told that the mortgage was the property of Ramos Realty. In his adjusting entries for the year end, Mr. Mosey debited accounts receivable $75,000 and credited the amount due to shareholder (Ramos) $75,000. The amount due to shareholder of $75,000 appeared on the balance sheet of the company under the heading "Current Liabilities" and was included in the item "Due to shareholder" of $121,453. The financial statement was not finalized by Mr. Mosey until the end of April 1980. The witness testified that, as a result of the way in which the mortgage had been handled, Ramos could have drawn the amount due to him out of the company tax free.

40     In light of the evidence of the witness Mosey, we are of the opinion that Ramos did not appropriate the mortgage until 1980. It was only in April 1980, when Ramos informed Mr. Mosey that the mortgage was owned by him personally and the financial statement of 409668 was finalized, that Ramos had irrevocably made the mortgage his own. The appropriation of the mortgage occurred, therefore, in 1980.

41     The fact that the mortgage was given to 409668 and not directly to Ramos is covered by subsection 56(2) of the *Income Tax Act* which provides:

> 56.(2) A payment or transfer of property made pursuant to the direction of, or with the concurrence of, a taxpayer to some other person for the benefit of the taxpayer or as a benefit that the taxpayer desired to have conferred on the other person shall be included in computing the taxpayer's income to the extent that it would be if the payment or transfer had been made to him.

42     Although we do not agree with his reasons, the summary conviction appeal court judge was right in finding Ramos guilty of failing to report income in the sum of $75,000 for the taxation year 1980. It was agreed by the parties that if we came to this conclusion, the amount of the tax avoided was $22,338.74, not $29,515.70 as charged in the first information.

## 5. Failure of the Crown to Prove that Ramos Evaded the Payment of Tax for Both 1978 and 1980 as Charged in the first Information

43     Counsel for the appellants submitted that if we concluded that the Crown had proved that Ramos failed to report income for the taxation year 1980 but not for the taxation year 1978, then, since the charges are conjunctive, Ramos should be acquitted on the first information. The summary conviction appeal court judge rejected this submission on the basis of the decision of this court in *R. v. Hoffman-La Roche Ltd.* (*Nos. 1 & 2*) (1981), 62 C.C.C. (2d) 118.

44     In *Hoffman-La Roche* the accused had been charged with selling the drugs librium and valium at unreasonably low prices contrary to paragraph 34(1)(c) of the *Combines Investigation Act*, R.S.C. 1970, c.C-23, as amended. The trial judge convicted the appellant of selling valium only, and he amended the indictment by deleting the words referring to librium. On appeal, it was argued that the trial judge had erred in amending the indictment. Martin, J.A., at 136, disposed of this argument as follows:

R. v. Century 21 Ramos Realty Inc., 1987 CarswellOnt 925

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 221 of 374

1987 CarswellOnt 925, [1987] 1 C.T.C. 340, [1987] O.J. No. 178, 19 O.A.C. 25...

Mr. Sexton for the Crown contended before us and before the trial Judge that the indictment alleged a single illegal policy with respect to both Librium and Valium. His position was that no amendment was necessary to enable a conviction to be made for engaging in that illegal policy with respect to Valium only, but that if an amendment were required, it could be made pursuant to s. 529(2)(a) and (4) without injustice to the appellant.

I am of the view that it would have been open to the trial Judge, without amending the indictment, to convict the appellant of the offence charged under s. 34(1)(c) with respect to Valium only. Where an indictment charges an accused with stealing a number of articles, it is unnecessary to prove that the accused stole all the articles specified; the accused may be convicted of stealing only those articles which he is proved to have stolen. Similarly, where an accused is charged with stealing or obtaining by false pretenses a sum of money, the accused may be convicted of stealing or obtaining by false pretenses a lesser sum established by the evidence without amending the indictment: see *Machent v. Quinn*, [1970] 2 All E.R. 255; *Lake v. The Queen*, [1969] S.C.R. 49, [1969] 2 C.C.C. 224, 1 D.L.R. (3d) 322.

In my opinion, the same principle is applicable here, and a conviction could have been made on the original indictment of the offence charged under s. 34(1)(c), restricted to Valium only. Although, as I have indicated, it was not necessary to amend the indictment to enable the Court to convict the appellant on that part of the indictment which related to Valium, I am satisfied that the amendment did not amount to a substantial wrong to the appellant or result in a miscarriage of justice. I would not therefore give effect to this ground of appeal.

This statement of the law was approved by Dickson, J. (as he then was) in R. v. Giguère et al., [1983] 2 S.C.R. 448 at 465-66.

45     We agree with the summary conviction appeal court judge that failure to prove the entire offence as charged in the first information is of no consequence. The information charged Ramos with wilfully evading the payment of $29,515.70 in taxes. Although the Crown has not proved that this full amount of tax was evaded, it has proved that Ramos evaded payment of $22,338.74 of tax. On the basis of *Hoffman-La Roche*, Ramos is properly convicted of wilfully evading payment of the lesser amount of tax. We would therefore amend the conviction of Ramos on the first information for evading payment of tax by failing to report income in the sum of $25,000 for the taxation year 1978 and substitute the figure $22,338.74 as the amount of tax avoided.

## 6. Whether Subsection 239(1) of the Income Tax Act Conferring on the Attorney General of Canada the Right to Elect to Proceed by Indictment or by Summary Conviction Contravenes Section 15 of the Charter

46     The appellant challenges the constitutional validity of sections 613(4), 748, 755 and 771 of the *Criminal Code* on the ground that these provisions violate sections 7, 11(h), 11(h) and 15 of the *Canadian Charter of Rights and Freedoms*. In fact, his challenge must be taken to be to section 239 of the *Income Tax Act*, under which he was charged and convicted, because it is a hybrid offence provision.

47     His submissions that section 15 of the Charter is violated by the *Criminal Code* sections mentioned are not based, *per se*, on the procedures therein set out, but rather on those procedures as compared to procedures that would have applied if the election provided for in section 239 for prosecuting upon indictment had been taken. Subsection (1) of section 239 provides:

(1) Every person who has

. . . . .

(d) wilfully, in any manner, evaded or attempted to evade, compliance with this Act or payment of taxes imposed by this Act, ...

is guilty of an offence and, in addition to any penalty otherwise provided, is liable on summary conviction to

(f) a fine of not less than 25% and not more than double the amount of the tax that was sought to be evaded, or

(g) both the fine described in paragraph (f) and imprisonment for a term not exceeding 2 years.

Case 09-10138-MFW   Doc 14225-49   Filed 08/15/14   Page 222 of 374

R. v. Century 21 Ramos Realty Inc., 1987 CarswellOnt 925

1987 CarswellOnt 925, [1987] 1 C.T.C. 340, [1987] O.J. No. 178, 19 O.A.C. 25...

However, subsection (2) permits the Attorney General of Canada to choose an alternate proceeding:

> (2) Every person who is charged with an offence described by subsection (1) may, at the election of the Attorney General of Canada, be prosecuted upon indictment and, if convicted, is, in addition to any penalty otherwise provided, liable to imprisonment for a term not exceeding 5 years and not less than 2 months.

48    In the present case the Attorney General did *not* elect to prosecute upon indictment, thereby proceeding under subsection (1) and the relevant pro visions in Part XXIV of the *Criminal Code*. Thus the appeal provisions in sections 613(4), 748, 755 and 771 of the *Criminal Code* came into operation and it is these provisions to which the appellant objects as compared to the procedures that would have been applicable if the prosecution had proceeded upon indictment. The question to be addressed, therefore, is whether the distinctions between the rights of appeal in summary conviction offences, which applied to the appellant, and those in indictable offences, which did not, violate sections 7, 11(h) and 15 of the Charter.

49    Section 15 of the Charter provides:

> Every individual is equal before and under the law and has the right to the equal protection and equal benefit of the law without discrimination, and in particular without discrimination based on race, national or ethnic origin, colour, religion, sex, age or mental or physical disability.

50    Perhaps the best way to discuss the possible meaning of the equality rights in section 15 of the Charter is to start with the first opinion expressed on the issue by this Court in *Re McDonald and The Queen* (1985), 21 C.C.C. (3d) 330. At 349 Morden, J.A. put forth the basic proposition that:

> ... [T]he purpose of s. 15 is to require "that those who are similarly situated be treated similarly": Tussman and tenBroek, "The Equal Protection of the Laws", 37 *Cal. L. Rev.* 341 (1948), at p. 344.

51    In the subsequent case of *R. v. R.L.* (1986), 26 C.C.C. (3d) 417, Morden, J.A. added a second observation as to the "essentially relational nature of equality". His two propositions were stated thus at 424-25:

> ... The essentially relational nature of equality has been described as follows. "The concept of equality is, by definition, relational or comparative. A person can only be found to be equal *in relation to* or *in comparison with* some other person who serves as a standard or criterion." Monroe H. Freedman, "Equality in the Administration of Criminal Justice", Nomos IX (1967) 250 at pp. 253-4. The concern for equality is that those who are similarly situated with respect to the purpose of the law be treated similarly: see Tussman and tenBroek ... and *Re McDonald and The Queen* ... referring to the Tussman and tenBroek article.

52    The views of Morden, J.A. in *Re McDonald* were subsequently referred to with approval by Howland, C.J.O. and Robins, J.A. in their dissenting opinion in *Reference re an Act to Amend the Education Act* (1986), 53 O.R. (2d) 513 at 554-55, and by Dubin, J.A. in *Re Blainey and Ontario Hockey Association* (1986), 54 O.R. (2d) 513 at 524-25. It was applied by this court in *Bregman and Bregman v. Attorney General for Canada* (unreported, released 29, November 1986) to hold that someone who was a member of an allied force at a time when he had no connection with Canada, even though he subsequently became a citizen, is not "similarly situated" to someone who was domiciled in Canada when he joined an allied force for the purpose of the war.

53    Applying this approach, the determination of whether two or more particular classes of persons are in fact similarly situated becomes the analytical point of departure in any section 15 analysis. It would seem that if persons are held not to be similarly situated, then no further analysis is required. However, it is not always clear whether persons *are* or *are not* similarly situated, and whether, even if they are not, this is relevant to a section 15 inquiry.

54    It is necessary to be cautious in this classification. It is usually possible to find differences between classes of persons and, on the basis of these differences, conclude that the persons are not similarly situated. However, what are perceived to be significant "differences" between persons or classes of persons could be the result of stereotypes based on existing inequalities

1987 CarswellOnt 925, [1987] 1 C.T.C. 340, [1987] O.J. No. 178, 19 O.A.C. 25...

which the equality provisions of the Charter are designed to eliminate, not perpetuate. The effects of past discrimination between classes of persons can result in these classes in fact not being similarly situated. Certain differences, such as the biological ones between the sexes, result in there being no actual comparable class, as with respect to reproductive issues. While some of these situations may well require differential treatment in the interests of equality, it is important that some differences between the classes of persons not operate to prevent a valid section 15 equality analysis by concluding that classes are not similarly situated. Rather, the determination of whether persons are similarly situated must also consider the relevance of the differences and, thus, the question ought to be whether the differences among those being treated differently by the legislation in question are relevant for the purposes of that legislation.

55    In the present case, the two relevant classes of persons are those persons whose acquittals for indictable offences are being appealed and those persons whose acquittals for summary conviction offences are being appealed. It is not clear, however, that these are the types of classifications contemplated by section 15 of the Charter. In considering whether the Crown's discretion to proceed either by way of summary conviction or by way of indictment violated the equality provision of the *Canadian Bill of Rights*, Fauteux, C.J.C. in *R. v. Smythe*, [1971] S.C.R. 680; 3 C.C.C. (2d) 366, stated at 685 (C.C.C. 370):

> In my opinion, appellant's views fail to recognize that the provisions of s. 132(2) [present s. 239] do not, by themselves place any particular person or class of persons in a condition of being distinguished from any other member of the community and that, applicable without distinction to everyone, as indeed they are, these provisions simply confer upon the Attorney-General of Canada the power of deciding, according to his own judgment and in all cases, the mode of prosecution for offences described in s. 132(1).

56    A similar issue was addressed by the Oregon Supreme Court in *State v. Clark*, 630 P. 2d 810 (1981), in considering whether the distinction between those persons accorded a preliminary hearing because charged by information, and those persons denied such a hearing because indicted, violated the equal protection guarantees of the Fourteenth Amendment. With regard to the term "class", the court held, at p. 816:

> The terms "class" and "classification" are invoked sometimes to mean whatever distinction is created by the challenged law itself and sometimes to refer to a law's disparate treatment of persons or groups by virtue of characteristics which they have apart from the law in question. Familiar examples of the latter kind of "class" are personal characteristics such as sex, ethnic background, legitimacy, past or present residency or military service. On the other hand, every law itself can be said to "classify" what it covers from what it excludes. For instance, the rule of this court that limits the time for filing a petition for review ... "classifies" persons by offering the "privilege" of review to those who file within 30 days and denying it to those who file later. Similarly, a law that licenses opticians and optometrists to perform different functions. See *Williamson v. Lee Optical*, 348 U.S. 483 ... (1955), does not grant or deny privileges to classes of persons whose characteristics are those of "opticians" and "optometrists"; rather, the law creates these classes by the licensing scheme itself. Attacks on such laws as "class legislation" therefore tend to be circular and, as the above quotations from early decisions show, have generally been rejected whenever the law leaves it open to anyone to bring himself or herself within the favoured class on equal terms ...

57    With respect to the classification suggested by the defendant, that is, those persons who are indicted, and those persons who are charged by information, the court held, at 817-18:

> ... [W]e think this is an example of the "circular" use of the concept of "class" mentioned above. The distinction to be tested is the use or nonuse of preliminary hearings. The "classes" said to fail the test of equal protection are the "class" of those defendants who receive preliminary hearings (because charged by information) and the "class" of those who do not (because indicted). But these defendants do not exist as categories or as classes with distinguishing characteristics before and apart from a prosecutor's decision who to charge — one, or some, or all defendants. Aside from the manner in which the decision is made, see *City of Klamath Falls*, ... 619 P. 2d 217 ..., defendants charged under either procedure are "classes" only as an effect of the dual procedural scheme itself ...

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW Doc 14225-49 Filed 08/15/14 Page 224 of 374

R. v. Century 21 Ramos Realty Inc., 1987 CarswellOnt 925

1987 CarswellOnt 925, [1987] 1 C.T.C. 340, [1987] O.J. No. 178, 19 O.A.C. 25...

58    Similarly, the intervenant submits, it is not so much the provisions of the *Criminal Code* that distinguish any particular person or class of persons from any other member of the community, as that all members of the community are equally subject to the dual procedure. He argues that there are no personal characteristics or attributes of an individual person or class of persons upon which the distinction is drawn. Rather, the distinction is based on the Attorney General's judgment with regard to the act allegedly committed by the accused. As in *Clark*, the categories of accused persons do not exist as categories or classes with distinguishing characteristics before and apart from the Attorney General's decision of how to charge them.

59    We would not be prepared to accept the proposition that it is necessary, if the persons alleging a section 15 infringement are to succeed, that these persons constitute categories or classes with distinguishing characteristics before and apart from the prosecutor's decision. It is true that there are no personal characteristics or attributes of an individual person or class of persons upon which the distinction in this case is drawn. However, in a section 15 case the question is not whether those alleging a violation of their equality rights have differences which exist independently of the law, but rather, whether the law treats those persons differently. Nonetheless we would be wise to heed the caution of the Court in *Clark* about avoiding the circular use of the term "class" in an analysis of equality.

60    However, assuming that persons charged with indictable offences and persons charged with summary conviction offences can be considered classes for the purpose of a section 15 analysis, it must then be determined whether these classes are similarly situated.

61    In the context of offences which are classified exclusively as indictable offences, such as murder, on the one hand, and those classified exclusively as summary conviction offences, such as fraudulently obtaining food or lodging, on the other hand, it is not difficult to conclude that persons charged with these indictable offences are not in the same class as persons charged with these summary conviction offences. The differences between these classes of persons, namely, the seriousness of the offence committed, can be seen to be relevant to the general purpose of the criminal procedure provisions of the *Criminal Code*, that is, providing the accused with a fair trial and appeal. Since the indictable offences carry with them harsher penalties, that is, greater threats to the liberty of the accused, the legislation demands that greater safeguards be provided.

62    However, this distinction becomes somewhat less clear in the context of hybrid offences. The choice of procedure in hybrid offences could also be seen to be based on the degree of seriousness of the offence. This choice is not made on an an a *priori* basis, but rather, is left to the discretion of the Attorney General to determine according to the particular circumstances of the case. However, where a hybrid offence is involved two virtually identical cases may nevertheless be treated differently if the Attorney General elects to proceed by indictment in one, and by summary conviction in the other. While the differential treatment thereby accorded these persons may well be justifiable in some cases, it may be difficult to conclude that two persons who have committed the same offence are not in fact similarly situated for the purpose of a section 15 analysis.

63    It would appear that the appellant is attempting to compare either the general class of the persons charged with indictable offences with the general class of persons charged with summary conviction offences, or the somewhat narrower class of persons involved in an appeal concerning summary conviction offences with persons involved in an appeal concerning indictable offences. Nevertheless, it is necessary to proceed to the next step of a section 15 analysis, namely, whether differential treatment within the context of hybrid offences constitutes "discrimination" within the meaning of section 15.

64    There are at least two approaches to the meaning of the term "without discrimination" in section 15, whether it prohibits *any* distinction or only such distinctions as are invidious, unreasonable or unjustifiable. These two approaches were set out by Morden, J.A. in the *McDonald* case, *supra*, at 348-49:

> ... On the one hand, the section can be read as providing that there is no infringement unless there is unequal treatment *resulting from discrimination*, that is, discrimination in the sense of invidiousness — unjustifiability, unreasonableness or irrelevance. On this approach, putting it in its simplest terms, there would be no infringement unless the person alleging infringement could show an inequality that was unreasonably imposed: see Gold, "A Principled Approach to Equality Rights", 4 Supreme Court L.R. 131 (1982), at pp. 151-3, where this approach discussed on the basis that "the equality

rights ... in the *Charter* contain within them a non-absolutist conception" without reference in this part of the article to the words "without discrimination". On the other hand, it has been argued that discrimination should be read in a neutral sense, as meaning merely distinction or classification, with the result that "s. 15 should be interpreted as providing for the universal application of every law. Where a law draws a distinction between individuals, on any ground, that distinction is sufficient to constitute a breach of s. 15, and to move the constitutional issue to s. 1 [to consider whether the law is justified]": Hogg, *Constitutional Law of Canada*, 2nd ed. (1985), pp. 799-801.

65    Chief Justice Howland and Robins, J.A., in their dissenting opinion in the *Education Act Reference, supra*, at 554-55, although also not needing to choose between the two approaches, clearly recognized that more than just the making of distinctions is necessary before finding that section 15 is infringed;

> ... There is no infringement of the section unless the unequal treatment is discriminatory. Most laws provide for distinctions and prescribe different results based on those distinctions. Indeed, a State could not function without classifying its citizens for various purposes and treating some differently from others. As Mr. Justice Stewart pointed out in his discussion of the equal protection clause of the U.S. Fourteenth Amendment in *San Antonio School District v. Rodriguez* (1973), 411 U.S. 1 at p. 60: "There is hardly a law on the books that does not affect some people differently from others." Similarly, although spoken in a different context, Chief Justice Dickson said at p. 347 S.C.R., p. 362 D.L.R. of *Big M Drug Mart Ltd., supra*, "... the interests of true equality may well require differentiation in treatment" ...

66    We agree. The reasons for rejecting the neutral approach, which would hold *any* distinction to be in violation of section 15, were persuasively summarized by McLachlin, J.A. for the British Columbia Court of Appeal in *Andrews v. Law Society of British Columbia*, [1986] 4 W.W.R. 242 at 249-50:

> It cannot have been the intention of Parliament to guarantee a general right against unequal treatment. Almost all statutes draw distinctions between individuals. It cannot be supposed that in all such cases the individual's constitutional rights are infringed. To call every legislative distinction between people an infringement of s. 15 is to trivialize the fundamental rights guaranteed by the *Charter*.

> Second, such an approach deprives the phrase "without discrimination" of content: provided the treatment is unequal, one passes immediately to s. 1 of the *Charter*. That would run counter to accepted canons of statutory interpretation. Hogg, p. 800 acknowledges this problem, but says, because "discrimination" is ambiguous and can be read in a "neutral sense", it should be taken to remit the entire question of justification to s. 1. I cannot accept that view. "Discrimination" must be taken to have meaning within s. 15 itself.

> Third, it cannot have been the intention of Parliament that the government be put to the requirement of establishing under s. 1 that all laws which draw distinction between people are "demonstrably justified in a free and democratic society". If weighing of the justifiability of unequal treatment is neither required nor permitted under s. 15, the result will be that such universally accepted and manifestly desirable legal distinctions as those prohibiting children or drunk persons from driving motor vehicles will be viewed as violations of fundamental rights and be required to run the gauntlet of s. 1.

Although we find her fourth reason for rejecting a neutral interpretation of section 15 less persuasive than the three quoted above, it adds a caution worth contemplating (at 250-1):

> Finally, it may further be contended that to define "discrimination" under s. 15 as synonymous with unequal treatment on the basis of personal classification will be to elevate s. 15 to the position of subsuming the other rights and freedoms defined by the *Charter* ... That, however, may be what will become of s. 15 if it is interpreted as being violated by any distinction or unequal treatment. Section 15, like the 14th Amendment in the United States Constitution will dwarf the other provisions of the *Charter* and be the central issue in virtually all *Charter* litigation. Laws which do not violate any other fundamental right or freedom will almost always (if the United States experience is any guide) be *alleged* to violate s. 15 because the legislature classified or failed to classify. Even though legislation does not violate any other sections, it will always be required to run the gauntlet of ss. 15 and 1. In my view, this cannot have been the intention of the enactors

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 226 of 374

R. v. Century 21 Ramos Realty Inc., 1987 CarswellOnt 925

1987 CarswellOnt 925, [1987] 1 C.T.C. 340, [1987] O.J. No. 178, 19 O.A.C. 25...

of the *Charter*. To interpret s. 15 as other than a section guaranteeing equal protection and benefit without discrimination in the sense of unequal treatment that is unfair or unjustified is to quote Dickson J. [now C.J.C.] "to overshoot [its] actual purpose": Big *M Drug Mart, supra*, at p. 344.

67    Without a detailed and definitive analysis of what would be a proper test for the pejorative view of the words "without discrimination" in section 15, we are content for the purposes of this case to adopt that of Madam Justice McLachlin in the *Andrews* case, *supra*, at 253:

... The ultimate question is whether a fair-minded person, weighing the purposes of legislation against its effects on the individuals adversely affected and giving due weight to the right of the legislature to pass laws for the good of all, would conclude that the legislative means adopted are unreasonable or unfair.

In the more recent case of *R. v. LeGallant* (1987), 54 C.R. (3d) 46 at 55, Hinkson, J.A., also for the British Columbia Court of Appeal, expressed it in these terms:

... [D]iscrimination involves the drawing of an unreasonable or unjustifiable distinction. The question to be answered in determining whether or not law is discriminatory is whether the law is reasonable or fair, having regard to its purpose and effect. Involved in this approach is the consideration that a law may be discriminatory if it treats some persons unduly prejudicially.

68    On this point it is interesting to note that although the French version of the equality rights provision in the European Convention on Human Rights (art. 14) uses the words "sans distinction aucune", the European Court of Human Rights, in the *Belgian Linguistic* case (1968), 1 E.H.R.R. 252 at 284, decided that the pejorative implication of the English words "without discrimination" was more appropriate:

... [T]he principle of equality of treatment is violated if the distinction has no objective and reasonable justification. The existence of such a justification must be assessed in relation to the aim and effects of the measure under consideration, regard being had to the principles which normally prevail in democratic societies. A difference of treatment in the exercise of a right laid down in the convention must not only pursue a legitimate aim: Article 14 is likewise violated when it is clearly established that there is no reasonable relationship of proportionality between the means employed and the aim sought to be realised.

69    To apply the pejorative or adverse test to this case, we have to ask whether the different rights of appeal in a summary conviction offence, as against those in an indictable offence, do pose an inherent disadvantage. The appellant submits that he is disadvantaged because in summary conviction procedures the Crown has a right of appeal from an acquittal on questions of fact, which it does not have on appeals in proceedings by indictment.

70    In determining this issue it is useful to consider the decision of the Supreme Court of Oregon in *City of Klamath Falls v. Winters*, 619 P. 2d 217 (1980). The court, at 225, considered whether the differences in appeal rights available to defendants prosecuted in district court as compared with those available to defendants prosecuted in municipal court or the discretion to prosecute defendants in municipal court rather than district court, violated the constitutional guarantees to the equal protection of the law:

To convicted defendants seeking appeal, there are advantages inherent in each of these systems. Persons convicted in municipal court have the advantage of a complete new trial, including the right to a new jury. Thus, they have the opportunity to seek review not only of legal questions, but they may also seek new factual determinations as well. They also have an advantage resulting from possible use of the trial in municipal court for the purpose of "discovery" and prior to trial *de novo* in the circuit court. Further appeal to the Court of Appeals, however, is limited to questions of the constitutionality of Charter provisions or ordinances.

Persons convicted in district court have the advantage of appellate review before a multi-judge court. That review, however, is limited to errors of law appearing on the record ..., and such persons do not have the advantages resulting from a review

R. v. Century 21 Ramos Realty Inc., 1987 CarswellOnt 925

1987 CarswellOnt 925, [1987] 1 C.T.C. 340, [1987] O.J. No. 178, 19 O.A.C. 25...

by trial *de novo* in the circuit court. It would be difficult to state categorically which system offers greater advantages to defendants. Whether one or the other system is to the advantage of a particular defendant depends on whether his defence rests only on factual contentions or also on legal contentions.

71    As in *Klamath Falls*, in the present case there are advantages inherent in each of the two procedures, and whether one or the other is to the advantage of a particular individual may depend at least partly on whether his or her defence rests on factual contentions or legal ones.

72    In the present case, the appellant simply asserts that the distinctions between indictable and summary conviction procedures should end once a trial is concluded, and that there is no justification for the distinction in the rights of appeal. He submits, further, that there is no justification to permit an appellate court on an appeal by the Crown in summary conviction cases to review findings of fact. Since the burden of proof is on the appellant to demonstrate that the distinction is unreasonable and thus contrary to section 15 we consider that the appellant has failed to meet this burden.

73    The intervenant, the Attorney General of Ontario, directly addresses the question of the reasonableness of the distinction in the rights of appeal. He submits in his factum that:

> ... [T]he provisions of the *Code* relating to summary conviction procedure are aimed at providing what is generally a simpler, more expeditious mode of criminal procedure for those matters which do not call for the significant punishments available upon conviction by way of indictment. The provision of an intermediary appeal, in such cases, to a local court broad in scope, is a rational method of ensuring that the summary nature of the procedure set out in part XXIV does not give rise to miscarriages of justice, whether they arise out of questions of law or fact.

74    In addressing this question, useful reference can be made to another decision of the Supreme Court of Oregon — *State v. Jones*, 569 P. 2d 19 (1977). The defendant challenged, *inter alia*, the constitutionality of the procedure requiring a preliminary hearing or a grand jury indictment when a felony charge was laid, but not when it was a misdemeanour, on the ground that it denied him equal protection of the law. However, the court held, at 24, that there is a rational basis for the difference in treatment because of the distinction between felonies and misdemeanours:

> The greater penalties and more onerous consequences of a felony conviction form a rational basis for requiring a probable cause determination via preliminary hearing or grand jury indictment in order to try an accused for a felony. It is not a denial of equal protection to not accord a misdemeanant the same treatment. A misdemeanant charged in circuit court by information is subjected to the same statutory penalty provisions and is accorded the same procedural safeguards associated with arraignment and trial as any other misdemeanant charged in a court of limited jurisdiction. See *State v. Belt*, 16 O.R. App. 213, 517 P. 2d. 1219, Sup. Ct. review denied (1974). In other words a misdemeanant charged in circuit court is treated no differently than any other misdemeanant with the exception that the forum is different.

The court thus concluded that there was no violation of the equality guarantees of the Fourteenth Amendment.

75    One of the main purposes of the summary conviction procedure is to provide, as submitted by the intervenant, for a simpler, more expeditious mode of criminal procedure for those less serious offences which carry less significant punishments than for indictable offences. Indictable offences, on the other hand, in carrying greater penalties and more onerous consequences for the liberty of the accused, are thus provided with more complex procedural requirements to safeguard the liberty of the accused. The different purposes provide a rational basis for the difference in the right of appeal. As noted by the intervenant, the provision of an intermediate appeal in summary conviction offences by the Crown on questions of fact, as set out in the case law, provides what appears to be a rational method of ensuring that the summary nature of the procedure does not give rise to miscarriages of justice. The limitation of the Crown's right to appeal in indictable offences to grounds of law alone, on the other hand, appears to be a rational method of protecting the liberty of the accused.

76    The very purpose of a hybrid offence provision is to allow for a variation in the differing circumstances that are to be found from one case to another. An offence like tax evasion is such that in one case it will be appropriate, due to the greater seriousness of the act committed, to proceed by indictment, whereas in another less serious case, it will be appropriate to proceed by way of

R. v. Century 21 Ramos Realty Inc., 1987 CarswellOnt 925

1987 CarswellOnt 925, [1987] 1 C.T.C. 340, [1987] O.J. No. 178, 19 O.A.C. 25...

summary conviction. The hybrid offence provision in the *Income Tax Act* is thus a means by which the criminal law provides the Attorney General with sufficient flexibility to take the specific circumstances of each case into account and ensure that, in each case, the interests of justice are served. In fact, lack of such choice could lead to a contravention of section 15 in that persons who are *not* similarly situated would get the same treatment and, thereby be treated unfairly.

77     It should be emphasized that we do not come to our conclusion because of any doubts that may have arisen, concerning judicial review of the Attorney General's discretion, in such older cases as *Florence Mining Co. v. Cobalt Lake Mining Co.* (1909), 18 O.L.R. 275 (Ont. C.A.), affd. 43 O.L.R. 474 and *Cripen v. Attorney General for Ontario* (1925), 56 O.L.R. 327, affd. 56 O.L.R. 530, or such *Canadian Bill of Rights* cases as *R. v. Court of Sessions of the Peace et al., ex parte Lafleur*, [1967] 3 C.C.C. 244, (Que.C.A.), *R. v. Smythe, supra*, (S.C.C.), *Morgentaler v. The Queen*, [1975] S.C.R. 616, 20 C.C.C. (2d) 449 and *Re Saikaly and The Queen* (1979), 48 C.C.C. (2d) 192 (O.C.A.). These are all pre-Charter cases and any doubts as to judicial review of ministerial discretion in such early Charter cases as *Stolar v. The Queen* (1983), 4 C.R.R. 252 (B.C.C.A.), and *R. v. Taylor* (1983), 8 C.R.R. 29 (B.C.S.C.) were laid to rest in the Supreme Court of Canada decision in *Operation Dismantle v. The Queen*, [1985] 1 S.C.R. 441. It is now clear that a decision of the Attorney General, like a decision of Cabinet, is reviewable, not on the ground of whether it was sound, but rather on the ground of whether or not it violates the accused's rights under the Charter. See *Re Regina and Arviv* (1985), 19 C.C.C. (3d) 395, a decision of this court which preceded *Operation Dismantle*, and *R. v. Kworak, Balian and Ghara Khanian* (1986), 20 C.R.R. 325, a decision of Smith, J. of the Ontario High Court which followed the Supreme Court decision. If the Attorney General's election were otherwise discriminatory, it could be found violative of section 15, but not merely on the ground of exercise of ministerial discretion.

78     Thus, we conclude that section 239 of the *Income Tax Act* and the choice made in this case of proceeding by way of summary conviction do not contravene section 15 of the Charter. Because of that conclusion, we do not need to consider the application of section 1 of the Charter.

79     It follows from these reasons that the Attorney General's right of election, pursuant to section 239 of the *Income Tax Act*, does not contravene paragraph 11(f) of the Charter providing for a right to a jury in the circumstances specified in that subsection.

## 7. Whether the Crown's Right of Appeal to the Summary Conviction Appeal Court on Questions of Fact in Summary Conviction Cases Contravenes Sections 7 and 11(h) of the Charter

80     The appellant contended that the Crown's right of appeal to the summary conviction appeal court on questions of fact in summary conviction cases infringed section 7 and paragraph 11(h) of the Charter.

81     Section 7 of the Charter reads:

Everyone has the right to life, liberty and security of the person and the right not to be deprived thereof except in accordance with the principles of fundamental justice.

82     Paragraph 11(h) reads:

Any person charged with an offence has the right

. . . . .

(h) *if finally acquitted* of the offence, not to be tried for it again and, *if finally found guilty* and punished for the offence, not to be tried or punished for it again; and [Emphasis added.]

83     This court held in *R. v. Morgentaler, Smoling and Scott* (1985), 52 O.R. (2d) 353 at 405-10; 22 C.C.C. (3d) 353 at 404-10 that the Crown's right of appeal from an acquittal in proceedings by indictment on a question of law alone had been an established part of the criminal process in Canada for almost a century prior to the advent of the Charter, and did not offend against the double jeopardy principle guaranteed therein by paragraph 11(h), which was the relevant section in determining whether the right of appeal conferred by the *Criminal Code* on the Crown contravened the Charter. The court in that case

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 229 of 374

R. v. Century 21 Ramos Realty Inc., 1987 CarswellOnt 925

1987 CarswellOnt 925, [1987] 1 C.T.C. 340, [1987] O.J. No. 178, 19 O.A.C. 25...

accepted the view expressed by distinguished commentators on the Charter that the word "finally" was inserted in paragraph 11(h) to ensure that the provision did not prevent the Court of Appeal from ordering a new trial. The court found it unnecessary to decide whether the aspects of double jeopardy recognized by the defence of *res judicata* and issue estoppel might be protected by section 7 of the Charter if not encompassed by paragraph 11(h).

84     The prosecutor's right of appeal in summary conviction matters on questions of fact, as well as on questions of law, has also been an established part of the criminal process in Canada for almost a hundred years.

85     Under the 1892 *Criminal Code* (55-56 Vict., c. 29, s. 879, which was derived from *An Act to Amend The Summary Convictions Act* (1888), 51 Vict., c. 45, s. 7), a right of appeal from the dismissal of a charge tried on summary conviction was conferred on the prosecutor. The defendant, of course, had a similar right of appeal from conviction. The appeal was by way of a trial *de novo*. When the appeal was properly lodged and called for hearing, although a fresh plea was not taken, the prosecutor was required to prove his case whether the appeal was by the prosecutor from a dismissal or was an appeal by the defendant from conviction. He might do this by calling the same evidence or by calling additional evidence: see *R. v. Dennis* (1960), 125 C.C.C. 321 (S.C.C.). The defendant, likewise, was entitled to adduce additional evidence. The appeal in summary conviction matters by way of a trial *de novo* was continued under the new *Code* which came into force on April 1, 1955. However, under the new *Code*, the appellant, for the first time, was required to set forth the grounds of appeal in the notice of appeal (subparagraph 722(1)(a)(ii). See now section 750 and the Rules thereunder.). Manifestly, from the very nature of the appeal by way of trial *de novo*, the parties had a right of appeal on questions of fact.

86     In addition to the right of appeal by way of a trial *de novo*, the prosecutor and the accused, of course, had, and still have, the more limited right of appeal by way of stated case from the dismissal of a charge on questions of law or questions involving jurisdiction. A further appeal from the decision of the summary conviction appeal court on the decision of the appeal court in appeals by way of stated case lies to the Court of Appeal with leave of that court on a question of law.

87     As a result of the changes effected by the *Criminal Law Amendment Act*, S.C. 1974-75-76, c. 93, s. 94, an appeal on the record, as opposed to an appeal by way of trial *de novo*, is now the normal method of appeal in summary conviction matters. An appeal by way of trial *de novo* is exceptional and requires an order of the Summary Conviction Appeal Court which may be made only in the circumstances specified in subsection (4) of section 755.

88     Section 755 of the *Code* (as amended by S.C. 1983-84, c. 40, s. 20(3)), so far as it is material, reads:

755. (1) Where an appeal is taken under section 748 in respect of any conviction, acquittal, sentence or order, the provisions of sections 610 to 616, with the exception of subsections 610(3) and 613(5), apply *mutatis mutandis*.

(2) Where an appeal court orders a new trial, it shall be held before a summary conviction court other than the court that tried the defendant in the first instance, unless the appeal court directs that the new trial be held before the summary conviction court that tried the accused in the first instance.

(3) Where an appeal court orders a new trial, it may make such order for the release or detention of the appellant pending such trial as may be made by a justice pursuant to section 457 and the order may be enforced in the same manner as if it had been made by a justice under that section and the provisions of Part XIV apply *mutatis mutandis* to the order.

(4) Notwithstanding subsections (1) to (3), where an appeal is taken under section 748 and where, because of the condition of the record of the trial in the summary conviction court or for any other reason, the appeal court, upon application of the defendant, the informant, the Attorney General or his agent, is of the opinion that the interests of justice would be better served by hearing and determining the appeal by holding a trial *de novo*, the appeal court may order that the appeal shall be heard by way of trial *de novo* in accordance with such rules as may be made under section 438 and for this purpose the provisions of sections 729 to 744 apply with such modifications as the circumstances require.

R. v. Century 21 Ramos Realty Inc., 1987 CarswellOnt 925

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 230 of 374

1987 CarswellOnt 925, [1987] 1 C.T.C. 340, [1987] O.J. No. 178, 19 O.A.C. 25...

(5) The appeal court may, for the purpose of hearing and determining an appeal under subsection (4), permit the evidence of any witness taken before the summary conviction court to be read if that evidence has been authenticated in accordance with section 468 and if

(a) the appellant and respondent consent,

(b) the appeal court is satisfied that the attendance of the witness cannot reasonably be obtained, or

(c) by reason of the formal nature of the evidence or otherwise the court is satisfied that the opposite party will not be prejudiced,

and any evidence that is read under the authority of this subsection has the same force and effect as if the witness had given the evidence before the appeal court.

. . . . .

89    We take the following propositions to be established by the authorities:

90    1. The Crown is entitled under section 755 to appeal on questions of fact: *R. v. Antonelli* (1977), 38 C.C.C. (2d) 206 (B.C.C.A.); *R. v. Purves and Purves* (1979), 50 C.C.C. (2d) 211 (Man. C.A.); *R. v. Colbeck* (1978), 42 C.C.C. (2d) 117 (Ont. C.A.); *R. v. Gillis* (1981), 60 C.C.C. (2d) 169 (N.S.C.A.).

91    2. The summary conviction appeal court is not empowered to retry the case and on a review of the record to substitute its findings on credibility for those of the trial judge; the summary conviction appeal court is entitled to set aside an acquittal on questions of fact only where the verdict is unreasonable or cannot be supported by the evidence: *R. v. Colbeck* (1978), 42 C.C.C. (2d) 117 (Ont. C.A.); *R. v. Medicine Hat Greenhouses Ltd. and German* (1981), 59 C.C.C. (2d) 257; *R. v. Gillis* (1981), 60 C.C.C. (2d) 169 (N.S.C.A.).

92    It is thus apparent that historically in Canada, the prosecutor, including the Crown, has always from early times had a right of appeal from an acquittal on questions of fact in summary conviction matters, unlike the Crown's right of appeal in respect of an acquittal for an offence tried on indictment, which has always been restricted to grounds of law alone.

93    In *R. v. Jordan* (1971), 1 C.C.C. (2d) 385, the Nova Scotia Court of Appeal held that an appeal by the Crown by way of trial *de novo* from the accused's acquittal did not constitute double jeopardy. This court in *R. v. Morgentaler, Smoling and Scott, supra,* found it unnecessary to decide for the purpose of that appeal whether an appeal by the Crown by way of a trial *de novo* might in some circumstances, at any rate, contravene the principle that no person shall be placed twice in jeopardy for the same offence (p. 408), and we, of course, are not called on to decide that issue in this case.

94    We are, however, satisfied that the Crown's more limited right of appeal under section 755 on questions of fact *on the record*, as that right has been delineated in the case law, does not contravene either section 7 or paragraph 11(h) of the Charter.

## 8. Whether the Summary Conviction Appeal Court Judge was Empowered to Enter a Conviction

95    Counsel for the appellant also contended that the summary conviction appeal court was not empowered to enter a conviction, but was limited to ordering a new trial.

96    It is convenient, for ease of reference, to again reproduce subsection 755(1) of the *Code* which reads:

755. (1) Where an appeal is taken under section 748 in respect of any conviction, acquittal, sentence or order, the provisions of sections 610 to 616, with the exception of subsections 610(3) and 613(5), apply *mutatis mutandis*.

97    Subsection 613(4) of the *Code* (as amended by S.C. 1985, c. 19, s. 143(3)) reads:

(4) Where an appeal is from an acquittal the court of appeal may

1987 CarswellOnt 925, [1987] 1 C.T.C. 340, [1987] O.J. No. 178, 19 O.A.C. 25...

(a) dismiss the appeal; or

(b) allow the appeal, set aside the verdict and

(i) order a new trial, or

(ii) except where the verdict is that of a court composed of a judge and jury, enter a verdict of guilty with respect to the offence of which, in its opinion, the accused should have been found guilty *but for the error in law*, and pass a sentence that is warranted in law, or remit the matter to the trial court and direct the trial court to impose a sentence that is warranted in law. [Emphasis added.]

98    In *R. v. Antonelli, supra*, the British Columbia Court of Appeal pointed out that the incorporation of subsection 613(4) by subsection 755(1) is qualified by the words *mutatis mutandis*, i.e. "with the necessary changes in points of detail". Farris, C.J.B.C., delivering the judgment of the court, said at 211-12:

It seems to me that a necessary change which must be made in s-s.(4) when it is applied to summary conviction appeals is the striking out of the words "but for the error in law". Those words are a necessary part of the section as it applies to appeals in proceedings by way of indictment because of the application of s. 605(1)(a) restricting the Crown to appeals on questions of law alone. However, as has already been pointed out, s. 605(1)(a) does not apply to appeals in summary conviction matters and the words "but for the error in law" are thus irrelevant in that context.

99    In *R. v. Medicine Hat Greenhouses Ltd. and German, supra*, at 269, Harradence, J.A. appears to have accepted the reasoning of Farris, C.J.B.C. that the words *mutatis mutandis* in subsection 755(1) make necessary a change in subparagraph 613(4)(b)(ii) by striking out the words "but for the error in law". However, Stevenson, J.A. (with whom Lieberman, J.A. concurred) left open the question whether the Summary Conviction Appeal Court's power to enter a conviction, as distinct from ordering a new trial, was confined to cases where there was an error of law. He said at 272:

I assume, that under the provisions of s. 748 of the *Code* the Crown is not restricted to an appeal on law alone. I prefer, however, to do as did the majority in *R. v. Purves and Purves* (1979), 50 C.C.C. (2d) 211, [1980] 1 W.W.R. 148, 12 C.R. (3d) 362, and not express an opinion on the power of the Court of Queen's Bench acting under s. 613 on an appeal from acquittal. In *R. v. Antonelli* (1977), 38 C.C.C. (2d) 206, 5 B.C.L.R. 154, cited by Harradence J.A., the British Columbia Court of Appeal found it a "necessary change in detail" to delete the words "but for the error in law", in s. 613(4) [am. 1974-75-76, c. 93, s. 75]. Harradence J.A. accepts that deletion. I prefer to leave a decision on that question for a case in which we have had the benefit of full argument. It seems to me at least arguable that on an appeal which does not involve an "error in law" the Court of Queen's Bench may be restricted to ordering a new trial.

Section 748 gives the Crown a right of appeal on an acquittal. Section 755 [rep. & sub. 1974-75-76, c. 93 s. 94] applies s. 613. Section 613(4) prescribes the powers the appellate Court has. The imposition of a guilty verdict after acquittal at first instance is a power not lightly granted and it appears to me that Parliament might well have chosen to allow the substitution of a finding of guilt only where there was an error in law. I do not want to be taken, by this judgment, as foreclosing that argument.

100    Although we are inclined to agree with the reasoning of the British Columbia Court of Appeal in *R. v. Antonelli, supra*, it is unnecessary to express a final opinion on that point in this case. There were, as we have previously mentioned, errors of law made by the trial judge. Credibility was not in issue in this case, and, in our view, the summary conviction appeal court was entitled to enter convictions for the offences.

### 9. The Kienapple Principle

101    The appellant contended that the conviction on the first information precluded a conviction on the second information on the basis of the *Kienapple* principle (*Kienapple v. The Queen*, [1975] 1 S.C.R. 729, 15 C.C.C. (2d) 524), since the same money was involved in both charges. In our view, the *Kienapple* principle is inapplicable in this case. The offences charged

R. v. Century 21 Ramos Realty Inc., 1987 CarswellOnt 925

Case 09-10138-MFW    Doc 14225-49    Filed 08/15/14    Page 232 of 374

1987 CarswellOnt 925, [1987] 1 C.T.C. 340, [1987] O.J. No. 178, 19 O.A.C. 25...

in the two informations constitute different delicts. The offences not only are not founded on the same acts, but the offence charged in the second information has additional and distinguishing elements from the offence charged in the first: see *R. v. Prince* [(1987), 54 C.R. (3d) 97](#).

102    Accordingly, this ground of appeal must be rejected.

## 10. The Arraignment

103    Counsel for the appellants contended that the trial on the second information was a nullity since the appellants were not arraigned on the offence charged in the information. The appellants were arraigned as follows:

CLERK OF THE COURT: URBANO L. RAMOS and CENTURY 21 RAMOS REALTY INC. (formerly known as L. Ramos Realty Limited) are charged unlawfully did in the City of London, in the County of Middlesex or elsewhere in the Province of Ontario, between the 31st day of December, 1977 and the 4th day of July, 1979 wilfully evade the payment of $15,000.00 in taxes imposed by the *Income Tax Act*, R.S.C. 1952, Chapter 148, as amended, upon the said L. Ramos Realty Limited, by failing to report income in the sum of $100,000.00 for the taxation year 1978, and they have thereby committed an offence contrary to Section 239(1)(d) of the said *Act*.

Q. To that charge, how do you plead — guilty or not guilty URBANO RAMOS?

A. Not Guilty.

Q. And on behalf of the company?

A. Not Guilty.

104    It will be seen that the Clerk of the Court in reading to the appellants the charge contained in the second information omitted those words describing the appellant Urbano L. Ramos, namely, "R.R. #3 Glencoe, Ontario being an officer, director or agent of the said Century 21 Ramos Realty Inc., (formerly known as L. Ramos Realty Limited)".

105    Counsel for the appellants relied upon the judgment of this court in *R. v. Arnott and St. James*, [[1970] 5 C.C.C. 190](#). In that case the appellant was charged with theft, and there were substantial and numerous differences between the information and the arraignment. The information alleged theft *under $50* and the Canadian National Railway was stated to be the owner of the goods alleged to have been stolen. The arraignment alleged theft over *$50* and made no reference at all to ownership in the goods alleged to have been stolen. In addition, the arraignment mentioned a different alleged place of commission of the offence than that specified in the information. Although counsel in that case conceded that neither he nor his clients were deceived or misled in any way, the court held that there had been such a grave departure from proper procedure that the appellants' convictions must be set aside and a new trial directed. That case is readily distinguishable from the one at bar. It was unnecessary to describe the appellant Urbano L. Ramos in the information as "an officer, director or agent" of Century 21 Ramos Realty Inc.: see *R. v. Paish* [(1979), 5 C.R. (3d) 281](#) (B.C.C.A.). The omission on arraignment of the description of the appellant contained in the information was innocuous. Furthermore, section 736 of the *Code* applicable to summary conviction matters provides, in part: "Where the defendant appears, the *substance* of the information shall be stated to him ... and he shall be asked whether he pleads guilty or not guilty ...". [Emphasis added.] There is no merit in this ground of appeal.

106    Section 242 of the *Income Tax Act* reads as follows:

Where a corporation is guilty of an offence under this Act, an officer, director or agent of the corporation who directed, authorized assented to, acquiesced in, or participated in, the commission of the offence is a party to and guilty of the offence and is liable on conviction to the punishment provided for the offence whether or not the corporation has been prosecuted or convicted.

107    Ramos was the sole shareholder, director and officer of Ramos Realty. We have found that Ramos Realty was guilty of the offence charged in the second information. By virtue of section 242, Ramos is also guilty of the offence.

1987 CarswellOnt 925, [1987] 1 C.T.C. 340, [1987] O.J. No. 178, 19 O.A.C. 25...

## 11. Conclusion

108    For the reasons previously set out, leave to appeal is granted and the conviction on the first information is amended by substituting the figure of $22,338.74 as the amount of the tax avoided for the figure of $29,515.70 alleged in the information. The sentence imposed on this conviction is set aside and the matter is remitted to the summary conviction appeal court judge to impose a fit sentence on the amended conviction. We should add that counsel for the Attorney General of Canada agreed that if the court amended the conviction as aforesaid, this was the appropriate course to follow with respect to sentence. The appeal is otherwise dismissed.

*Order accordingly.*

**End of Document**    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 121

CITATION: R. v. Dunn, 2013 ONSC 137
COURT FILE NO.: 10-00145
DATE: 20130114

## ONTARIO

### SUPERIOR COURT OF JUSTICE

| | | |
|---|---|---|
| BETWEEN: | ) | |
| | ) | |
| HER MAJESTY THE QUEEN | ) | *Robert Hubbard, Amanda Rubaszek & David Friesen*, for the Crown |
| – and – | ) ) | |
| | ) | |
| FRANK  A.  DUNN,  DOUGLAS  C. BEATTY  AND MICHAEL J. GOLLOGLY | ) ) ) | *David M. Porter, John Dent, Sarit Batner, Harry Underwood & Andrew Matheson,* for the Defendant,  Frank A. Dunn, |
| Defendants | ) ) | |
| | ) | *Gregory Lafontaine &, Lori Anne Thomas,* for the Defendant,  Douglas C. Beatty |
| | ) ) | |
| | ) | *Sharon Lavine & Robin McKechney*, for the Defendant,  Michael J. Gollogly |
| | ) ) | |
| | ) | **HEARD:** January 12, 16, 17, 18, 19, 20, 30, 31, February 1, 2, 3, 6, 7, 8, 9, 13, 14, 15, 16, 17, 21, 22, 27, 28, 29, March 5, 6, 26, 27, 28, April 2, 3, 4, 5, 10, 11, 17, 18, 30, May 1, 2, 3, 10, 14, 22, 23, 24, 28, 29, June 4, 5, 12, 13, 14, 19, 20, 21, 22, 25 & 26, September 27, 28, October 2, 3, 2012 |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**Contents**

Nortel's Circumstances during the time-frame of this indictment ................................................. 6

The law of fraud as it applies to the allegations against the accused in this case ........................... 9

Materiality ...................................................................................................................................... 11

      SAB 99 and Mr. Dunn, Mr. Beatty and Mr. Gollogly ........................................................... 13

The presumption of innocence, reasonable doubt, R. v. W.(D.), [1991] 1 S.C.R. 742 ............... 13

Business Records .......................................................................................................................... 14

Should the evidence of some of the Nortel and Deloitte's employees be viewed with caution? . 14

A few basic accounting principles ................................................................................. 18

    More generally ........................................................................................................... 20

    Considerations concerning the set-up and use of accrued expenses/liabilities ................ 21

Nortel specific circumstances ...................................................................................... 21

    Deloitte's historical relationship with Nortel ............................................................. 21

    Target setting and Nortel's culture ........................................................................... 22

    The employment of Mr. Dunn, Mr. Beatty and Mr. Gollogly at Nortel ............................. 23

    Mr. Frank Dunn ..................................................................................................... 23

    Mr. Douglas Beatty ................................................................................................ 24

    Mr. Michael Gollogly .............................................................................................. 24

    Mr. Dunn, Mr. Beatty and Mr. Gollogly .................................................................... 25

    Nortel was a complex corporate organization ............................................................. 25

The Financial Results of Nortel Networks Corporation ..................................................... 26

    Nortel's Consolidation Close Process ........................................................................ 27

    Excess accrued liabilities & Nortel's policy of Conservatism ......................................... 29

    The accused knew there were excess liabilities on the balance sheet ............................... 32

    Unsupported and excessive accrued liabilities on the balance sheet ................................ 33

    Nortel's Pro Forma earnings calculations .................................................................. 33

    Pro Forma earnings and Bonus Thresholds ............................................................... 34

Nortel's Re-statement of previously-published financial statements ..................................... 35

    The First restatement ............................................................................................. 36

    A short chronology ................................................................................................. 36

    Who was Responsible .............................................................................................. 37

    Nortel Restatements are complex .............................................................................. 37

    How the Restatements came about ............................................................................ 37

The Comprehensive Balance Sheet Review ........................................................ 39

Was the Comprehensive Balance Sheet Review Comprehensive? ...................................... 41

The results of the second restatement ................................................................. 43

Inferences concerning Nortel's restated financial results for Q1 03 and Q2 03 .................. 47

Q4 02-the 4th quarter of 2002 ............................................................................... 48

The participation of Mr. Dunn and Mr. Beatty ...................................................... 51

The specific late entry accrued expenses/liabilities solicited by Mr. Harrison ................... 52

The solicitation of late entries from Karen Sledge ................................................... 52

Late entry Fringe and Vacation accrued liability balances .......................................... 52

Fringe Benefit Accrued Liability Balances ........................................................... 52

Vacation Expenses ...................................................................................... 53

Soliciting accrued expenses in Asia ................................................................... 54

The solicitation of additional accruals from Ken Crosson ........................................... 56

Excess and obsolete inventory ......................................................................... 56

Use of Mr. Crosson's $30 million as an offset ....................................................... 58

The JDS Uniphase Corporation transactions ......................................................... 58

Perot Systems ............................................................................................ 61

The solicitation of additional accruals from Jim Kinney for the period Q4 02 .................. 62

Mr. Gollogly's knowledge generally .................................................................. 64

360 Networks ............................................................................................ 65

The manipulation of Nortel's pro forma earnings before taxes to get a bonus ................... 66

Did the late entry accrual expenses/liabilities misrepresent Nortel's US GAAP financial results for Q4 02? ....................................................................................... 66

Susan Shaw's 2002 Summary of Accrued Liabilities .................................................. 67

Corporate ...................................................................................................... 70

Non-Op. ....................................................................................................... 71

Q4 2002 Conclusion ........................................................................................................ 72

Q1 03 & Q2 03 ................................................................................................................... 74

The release of $361 million in Q1 03 and $372 million in Q2 03 ........................................ 74

The Crown's Chart – "operations" Ex. 42E ....................................................................... 75

The PWC release – $19 million-originally released Q1 03 ................................................. 76

The Genuity release – $23 million originally released Q1 03 ............................................. 77

The Optical Warranty release – $8 million released in Q2 03 ............................................ 78

Conclusion ........................................................................................................................ 79

The release of $80 million in Non-op accrued liability balances and the entitlement to a
bonus ................................................................................................................................ 79

The effect of the $80 million on earnings ......................................................................... 85

Conclusion concerning the Bonus Payments & earnings .................................................. 85

The materiality of the release of $80 million of Non-op accrued liability balances ............. 86

Conclusion ........................................................................................................................ 89

Susan Shaw's list of $189 million Non-op accrued liabilities ............................................ 89

Should the $189 million have been dealt with in Q4 02? .................................................. 93

The knowledge of Mr. Dunn, Mr. Beatty and Mr. Gollogly ............................................. 94

The accrued liability balance for the Degree of Difficulty bonus – $25 million .................. 95

The accrued liability balance for the General Provision $10 million .................................. 96

The $142 million in accrued liabilities which Nortel wished to release in Q2 03 ............... 98

Conclusion ........................................................................................................................ 99

The use of Outlooks and Roadmaps in 2003 ................................................................... 100

The Arris Proposal ........................................................................................................... 105

Deloitte's interest in forecasting ...................................................................................... 105

The 2003 Outlooks and Roadmaps tracked proposed releases ........................................ 107

The February 19, 2003 teleconference .............................................................................. 107

The June 6, 2003 Outlook and the surrounding events ........................................... 111

The release of the $4 million Siemens accrued liability balance .......................... 113

The Restricted Stock Unit Bonus Plan.................................................................... 115

Conclusion .............................................................................................................. 116

The draft letters Mr. Gollogly prepared for the Board of Directors and the Audit Committee
in July 2003 ............................................................................................................. 117

Mr. Gollogly's draft letter to the Chairman of the Board of Directors, the Chairman of the
Audit Committee and the Chairman of the Joint Leadership Resources Committee ......... 120

Conclusion .............................................................................................................. 121

Mr. Gollogly's draft letter to Mr. Beatty ............................................................... 121

The "now infamous intercompany out of balance provision" ............................... 122

Mr. Gollogly's reference to the unsupported accrued liability balances ............... 123

Mr. Gollogly's reference to the forecasted Q3 03 loss ......................................... 125

Mr. Gollogly's concern about Nortel's internal controls ...................................... 125

Conclusion .............................................................................................................. 125

The language in the 2003 press releases and the notes to the first restatement ................. 126

The Crown's criticism of the Q3 03 financial results ................................................. 129

Preservation of the integrity of the Q3 03 General Ledger ................................... 131

Conclusion .............................................................................................................. 132

Conclusion .................................................................................................................... 132

The excess and unsupported accrued liabilities ................................................... 132

Q4 2002(Q4 02) ..................................................................................................... 133

The $80 million in Non-op Accrued liability balances released to the Q1 03 profit and loss
statement ................................................................................................................. 134

The Return to Profitability Bonus ......................................................................... 134

The Restricted Stock Unit Bonus .......................................................................... 134

The $80 million generally ................................................................................... 135

The attempt to release the $142 Million ............................................................ 136

Nortel's published financial results for Q3 03 ................................................... 136

The Comprehensive Balance Sheet Review ....................................................... 136

The Q1 & Q2 03 accrued liability balance releases ........................................... 138

Verdict ............................................................................................................... 139

**MARROCCO J.:**

[1]     The defendants are charged with two counts of fraud.

[2]     The first count alleges that, between January 1, 2000 and April 28, 2004, the three accused did, by deceit falsehood or other fraudulent means, defraud the public by deliberately misrepresenting the financial results of Nortel Networks Corporation.

[3]     The second alleges that, between January 1, 2000 and April 28, 2004, the three accused did, by deceit falsehood or other fraudulent means, defraud Nortel Networks Corporation by deliberately misrepresenting the financial results of Nortel Networks Corporation.

[4]     In both counts, it is alleged that the extent of the fraud exceeded $5,000.

[5]     For the sake of completeness, I make two observations: first, the events captured by this indictment concern matters which occurred between 2000 and 2004. Nortel did not commence *Companies Creditors Arrangement Act* proceedings until January 14, 2009. The evidence in this proceeding did not describe events linked to the commencement of those proceedings. Second, Nortel Networks Corporation's shares traded publicly on the New York and Toronto Stock Exchanges. It ceased trading publicly on January 14, 2009.

**NORTEL'S CIRCUMSTANCES DURING THE TIME-FRAME OF THIS INDICTMENT**

[6]     All allegations of criminal conduct are made within a factual fabric or context. A true appreciation of the nature of the alleged criminal conduct is impossible without a description of that fabric or context.

[7]     Part of the factual context for this matter is set out in Exhibit 251D. Exhibit 251D was received in evidence as a business record of Deloitte & Touche.

[8]     Nortel Networks Corporation ("Nortel") was in the business of providing data, wireless and optical networking products and services to telecommunications carriers and enterprise customers around the world. Between 1998 and 2001, Nortel Networks Corporation and its

predecessor, Nortel Networks Limited, undertook a total of twenty-two acquisitions for an aggregate purchase price of $29 billion. These acquisitions were undertaken during a period of both strong economic growth in 1999 and 2000 and rapid infrastructure build-out by the telecommunications industry.

[9]    By 2001, the telecommunications industry began to experience a slowdown attributed to excess capacity created as a result of the build-out, the consolidation of service providers within the industry and lower capital spending by industry participants. As a result, there was a dramatic and significant reduction in the demand for Nortel's products and services.

[10]   In response to the industry and economic downturn in 2001, Nortel attempted to streamline its operations. Nortel reduced its overall workforce from approximately 94,002 to approximately 52,000 and incurred severance and termination charges in excess of $3.3 billion. Nortel discontinued aspects of its operations and divested itself of investments. Nortel recorded a write down of $12.4 billion for goodwill and other intangible assets in the quarter ending June 30, 2001.

[11]   In 2002, Nortel reduced its workforce to 37,000 as at December 31, 2002. Nortel experienced a write down of its goodwill in its Optical business of approximately $595 million and, on December 13, 2002, Nortel pledged substantially all of its assets in favor of certain lenders.

[12]   Nortel experienced net income losses of $197 million in 1999, $2.9 billion in 2000, $27.4 billion in 2001 and $3.6 billion in 2002.

[13]   The equity of Nortel's shareholders shrank from $28.7 billion in 2000 to $1.9 billion in 2002.

[14]   The circumstances had become so dire at Nortel that, when a quarterly result was announced, the auditors had to take a view of the next twelve months from the date of the quarterly report and opine on the likelihood of Nortel continuing as a going concern.

[15]   Nortel Networks was publicly-traded on the New York Stock Exchange. The New York Stock Exchange ran on Nortel equipment. Nortel's decline was so severe that the closing share price for the company's common shares in September 2002 fell below the minimum for continual listing on the New York Stock Exchange. The Chairman of Nortel's Board was advised that Nortel might be de-listed although, in fact, this did not occur.

[16]   The compelling but rather sterile economic reality described above was put into more human terms by Mr. Bruce Richmond, who testified as a Crown witness. During the time-frame of the indictment, Mr. Richmond was the Vice-Chair and Deputy Chief Executive of Deloitte & Touche LLP (Canada). He is a chartered accountant; he is a Fellow of the Institute of Chartered Accountants since 1997, a designation conferred on approximately 2% of the Institute's members.

[17]   During the time-frame set out in the indictment, Mr. Richmond was responsible for overall management of Deloitte's clients across the entire Deloitte organization, which comprised sixty-seven offices with $1.4 billion in revenues.

2013 ONSC 137 (CanLII)

[18]    Mr. Richmond was professionally associated with Nortel through Deloitte & Touche from the late 1970's.

[19]    Through the time-frame described in the indictment, Mr. Richmond served as the Deloitte & Touche Senior Advisory Partner to Nortel. Specifically, Mr. Richmond had been the Senior Advisory Partner at Nortel since 1992. In addition to Nortel, Mr. Richmond also served as the Advisory Partner to approximately a dozen of Canada's major corporations.

[20]    I accept Mr. Richmond's entire evidence in this matter without qualification.

[21]    As Advisory Partner, Mr. Richmond had two primary responsibilities; first, to interface with the directors, particularly members of the Audit Committee, as well as the CEO and the CFO; second, to be a sounding board for the Deloitte partners conducting Nortel audits and reviews.

[22]    Mr. Richmond attended virtually all Audit Committee meetings.

[23]    Mr. Richmond described Nortel as a major client in the same category as Canadian banks and other major Canadian corporations. Mr. Richmond indicated that approximately twenty companies in Canada would be described as major clients.

[24]    Mr. Richmond described Nortel's situation during the time period set out in the indictment as follows: "Nortel was descending down a very slippery path at a very fast rate… The notion of where the bottom was going to be was not understood at that point in time by anybody… One day a client existed the next day it was out of business… The team was clearly on red alert in terms of what they were facing… ….endeavoring to the best of our collective ability, and I'm talking Nortel folk and I'm talking Deloitte folk, to put your arms around a situation that frankly, having had 20 years in the profession and having been the lead client guy and the senior client service guy for the largest firms in the country, this was a situation that we had never seen before".

[25]    Later on in his evidence, Mr. Richmond said: "in the years 2001, 2002, the company was fighting for its very survival…"

[26]    Mr. Richmond indicated that the free-fall that Nortel was experiencing resulted in a situation where Nortel could be comfortable with the value of an asset on one day and next day be convinced that the asset was severely diminished in value.

[27]    As a result of that situation, Nortel's Audit Committee and Board of Directors were in Mr. Richmond's words: "focused like a laser beam in terms of ensuring from their perspective in the discharge of their responsibilities that the Corporation was doing whatever was required to ensure that they had identified and appropriately quantified provisioning in connection with any exposure of the Corporation".

[28]    Nortel's Audit Committee and Board of Directors had succeeded in communicating this concern about providing for every risk to senior management and the field.

2013 ONSC 137 (CanLII)

[29]    Nortel's first re-statement re-stated more than $900 million in excess accrued liabilities into previously-published Nortel financial statements. I am satisfied that one of the underlying reasons for the presence of these   excess accrued liability balances was the determination of Nortel's Audit Committee, auditors, senior management and field staff to provide for every risk and, thereby, avoid unpleasant surprises.

## THE LAW OF FRAUD AS IT APPLIES TO THE ALLEGATIONS AGAINST THE ACCUSED IN THIS CASE

[30]    It is the Crown's position that the accused told lies and that the lies put investors at risk of economic deprivation. It is also the Crown's position that the accused told lies which put Nortel itself at risk of economic deprivation. The lies, according to the indictment, are found in the deliberate misrepresentation of Nortel Networks Corporation`s financial results.

[31]    The offence of fraud is set out in the *Criminal Code*, RSC 1985, C. C-46 s. 380 in the following terms:

> 380. (1)  Every one who, by deceit, falsehood or other fraudulent means, whether or not it is a false pretense within the meaning of this Act, defrauds the public or any person, whether ascertained or not, of any property, money or valuable security or any service,
>
>> (a) is guilty of an indictable offence and liable to a term of imprisonment not exceeding 10 years, where the subject matter of the offence is a testamentary instrument or the value of the subject matter of the offence exceeds $5000.

[32]    At the outset of the trial, the Crown provided the court with a factum setting out the general principles of the law of fraud, as well as helpful references to s. 397(1)(a) of the *Criminal Code*. That factum was quite helpful and I have attempted to apply those principles in this case.

[33]    In *R. v. Zlatic* (1993), 79 C.C.C. (3d) 466 (S.C.C.) at para. 26, the court stated that the *actus reus* of fraud will be established by proof of: (i) the prohibited act, be it an act of deceit, a falsehood or some other fraudulent means; and (ii) deprivation caused by the prohibited act, which may consist in actual loss or the placing of the victim's pecuniary interests at risk.

[34]    The court, in *R. v. Zlatic*, at para. 26, held that the *mens rea* for fraud was established by proof of: (i) subjective knowledge of the prohibited act; and, (ii) subjective knowledge that the prohibited act could have as a consequence the deprivation of another (which deprivation may consist in knowledge that the victim's pecuniary interests are put at risk).

[35]    Finally, the court stated that, where proof of these two elements was established, the accused was guilty if he or she actually intended the prohibited consequence or was reckless concerning the consequences (see: *R. v. Zlatic (supra)*, at para. 27).

[36]    In *R. v. Eizenga* 2011 ONCA 113 [2011] O.J. No. 524, at para. 81, the Court of Appeal emphasized that a subjective intent to mislead was not an essential element of fraud.

[37]    In *R. v. Theroux* (1993), 79 C.C.C. (3d) 449, at paras. 16-17 (S.C.C.), McLachlin J. [as she then was] defined the *actus reus* for the offence of fraud as requiring two elements: a dishonest act and deprivation.

[38]    McLachlin J. indicated that deprivation was established if it was proven that the dishonest act caused detriment, prejudice or risk of prejudice to the economic interests of the victim.

[39]    In *R. v. Theroux*, McLachlin J. [as she then was] defined the *mens rea* requirement for the offence of fraud.

[40]    McLachlin J. stated that the *mens rea* of fraud was established by proof of subjective awareness that one was undertaking the prohibited act, *i.e.* the deceit, falsehood or other dishonest act, and that the prohibited act could cause deprivation in the sense of depriving the proposed victim of property or putting the proposed victim's property at risk.

[41]    McLachlin J. also stated that the fact that an accused person may have hoped that the deprivation would not take place or may have felt that there was nothing wrong with what he or she was doing was not a defence (see: *R v Theroux*, at para. 22).

[42]    Later on, McLachlin J. stated, at para. 29: "the accused must have subjective awareness at the very least that his or her conduct will put the property or economic expectations of others at risk".

[43]    This case deals with false financial results. Where the omission or misstatement complained of is not material to those financial results, it stands to reason that it will be difficult to prove that there was any risk of prejudice to the economic interests of the public.

[44]    The public are not defined in the indictment in count one. Obviously, the public can be divided into different groups or segments. I am satisfied that a fair interpretation of the public in this case is the investing public.

[45]    In count two, the victim is defined; namely, Nortel Networks Corporation.

[46]    As indicated earlier, the Crown advances the proposition that, in this fraud case, the accused told lies. McLachlin J. specifically commented in *R. v. Theroux*, at para.29: "But in cases like the present one, where the accused tells a lie knowing that others will act on it and thereby puts their property at risk, the inference of subjective knowledge that the property of another would be at risk is clear".

[47]    In *R. v. Drabinsky*, 2011 ONCA 582 [2011] O.J. No. 4022, one of the charges in the indictment was that the accused in that case had provided false financial information to persons who invested in an IPO. In that case, at para. 80, the Ontario Court of Appeal stated: "the Crown had to prove the appellants knew that the financial statements contained misrepresentations and that they were material to the decision to invest in the IPO".

2013 ONSC 137 (CanLII)

[48]    The matter before me is different; there is no IPO. In this case, the defendants are, in count one, facing a charge of defrauding the public by deliberately misrepresenting the financial results of Nortel Networks Corporation. Accordingly, if one applies the same conclusion that the Court of Appeal expressed in *R. v. Drabinsky, supra*, the conclusion in this case must be that the Crown has to prove that the accused knew that Nortel's financial statements contained misrepresentations that were material to the decision of a member of the investing public to buy, hold or sell Nortel publicly-traded securities.

[49]    With respect to count two, the essence of the matter seems to be that the misrepresentation of Nortel's financial results created the economic risk that Nortel Networks Corporation would pay money to the defendants that ought not to be paid to them.

## MATERIALITY

[50]    In *R. v. Drabinsky*, at para. 83, the Court of Appeal commented on the notion of materiality. The court said that materiality in the context of that case was a fair inference from the nature of the misrepresentations, the documents in which they appeared and the context in which those documents were used.

[51]    At paras. 81 & 82, the Court of Appeal, in *R. v. Drabinsky*, upheld the trial judge's decision that the misrepresentations in the financial statement relied on in support of the IPO were material to the decision to purchase shares through the IPO.

[52]    The materiality of a misstatement or omission is, therefore, important. In its opening, as part of a Glossary of Terms, the Crown provided a definition of materiality. In the context of financial statements, an omission or misstatement is material according to this glossary if "the judgment of a reasonable person relying on the statements would have been changed or influenced by the inclusion or correction of the item".

[53]    The Crown offered expert evidence on various aspects of the accounting issues of concern in this proceeding. This evidence was received on consent in the form of a written report from Asset Risk Advisory Inc. The Asset Risk Advisory Inc. Report was prepared by Mr. Robert Chambers, who is a lawyer, a chartered accountant, a certified fraud Examiner and a Fellow of the Institute of Chartered Accountants of Ontario.

[54]    At paragraph 31 of his report, which was appended to his affidavit, Mr. Chambers made the following observation about materiality: "According to FASB, materiality is the quality of being important. The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item."

[55]    Mr. Chambers referred the reader of his report to SEC Staff Accounting Bulletin 99 ("SAB 99") for guidance in determining materiality. SAB 99 was published in 1999 – the same year that Nortel's world began to unravel.

[56]    In SAB 99, SEC made it clear that exclusive reliance on dollar thresholds cannot be used as a substitute for a full analysis of all relevant considerations when determining materiality.

2013 ONSC 137 (CanLII)

[57]    SAB 99 states that, among the considerations that may render material a quantitatively small misstatement of a financial statement item, are:

- Whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate;

- Whether the misstatement masks a change in earnings or other trends;

- Whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise;

- Whether the misstatement changes a loss into income or vice versa;

- Whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability;

- Whether the misstatement affects the registrant's compliance with regulatory requirements;

- Whether the misstatement affects the registrant's compliance with loan covenants or other contractual requirements;

- Whether the misstatement has the effect of increasing management's compensation – for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation; and,

- Whether the misstatement involves concealment of an unlawful transaction.

[58]    Apart from Mr. Chambers' general statements, no expert evidence concerning materiality was offered in this case. Representatives of Deloitte performed a materiality analysis, which was admitted as a business record and to which reference will be made.

[59]    Count number one alleges a fraud upon the public. Nortel was publicly-traded. I am satisfied that the public in this case includes the investing public. Persons who own publicly-traded Nortel securities are included in the term "public". Persons who are thinking of purchasing publicly-traded Nortel securities are included in the term "public". I accept and intend to apply the notion of materiality that is described in Mr. Chambers' report. A misrepresented financial result is material if, in light of the surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable member of the investing public would have been changed or influenced by the correction of the item. The omission of a financial result is material if, in light of the surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable member of the investing public would have been changed or influenced by the disclosure of the item.

2013 ONSC 137 (CanLII)

*SAB 99 and Mr. Dunn, Mr. Beatty and Mr. Gollogly*

[60]    Mr. Gollogly was aware of SAB 99. Mr. Gollogly sent a memo to selected Nortel employees dealing with SAB 99 on March 3, 2003. His memo attached SAB 99 itself. Mr. Gollogly made a presentation to Nortel's Audit Committee on April 23, 2003, in which he explained the concept of materiality. Mr. Beatty and Mr. Dunn were normally in attendance at Audit Committee meetings.

[61]    I am satisfied that Mr. Dunn and Mr. Beatty were present when Mr. Gollogly made this presentation to the Audit Committee.

[62]    Mr. Beatty was aware of SAB 99. On April 19, 2003, Mr. Beatty sent an e-mail to Mr. Gollogly which stated: "would you please email me the charts (if possible) for SAB 99 that speak to the need to disclose, particularly if management comp'n is achieved etc. – probably useful to have the SAB 99 text as well for Monday a.m."

[63]    Mr. Dunn was Nortel's CEO during the time with which we are concerned. Prior to that, he was Nortel's CFO and, prior to that, he was Nortel's Corporate Controller.

[64]    Mr. Dunn, Mr. Beatty and Mr. Gollogly were senior officers of a corporation publicly-traded on the New York Stock Exchange with annual revenues of approximately $10 billion per year during the time frame of the indictment.

[65]    I am satisfied that Mr. Dunn, Mr. Beatty and Mr. Gollogly were aware of the specifics of SAB 99, the importance of determining whether items of financial information were materially important and, finally, the importance of making the appropriate disclosure to the public.

**THE PRESUMPTION OF INNOCENCE, REASONABLE DOUBT, R. V. W.(D.), [1991] 1 S.C.R. 742**

[66]    I have instructed myself on the presumption of innocence, the burden of proof and reasonable doubt. In a criminal case, the accused is presumed to be innocent unless and until the Crown has proved his/her guilt beyond a reasonable doubt. It is not the responsibility of any accused under our law to establish or to demonstrate or to prove his innocence. If the Crown should fail to prove guilt in respect of a particular crime beyond a reasonable doubt, then the accused is not guilty of that crime. To put the matter somewhat differently, in order to find an accused guilty of a particular offence, the Crown must prove each and every one of the essential elements of that offence beyond a reasonable doubt. If I should entertain a reasonable doubt about the proof of one or more of those essential elements, then I must find the accused not guilty of that offence.

[67]    A reasonable doubt is not a far-fetched or frivolous doubt. It is not some fanciful doubt. It is not a doubt based upon sympathy or prejudice. Rather, it is an honest and fair doubt based on reason and common sense. It is doubt that logically arises from the evidence or lack of evidence. It is not enough that I believe that Mr. Dunn, Mr. Beatty or Mr. Gollogly is probably or likely guilty of count one or count two of this indictment. In those circumstances, I must find any or all of them not guilty because Crown counsel has failed to satisfy me of guilt beyond a reasonable doubt. Proof of probable guilt or likely guilt is not proof of guilt beyond a reasonable

doubt. I should also remember, however, that it is virtually impossible to prove anything with absolute certainty. Crown counsel is not required to do so. Absolute certainty is a standard of proof that is impossibly high.

[68]    If, based on all the evidence, I am sure that Mr. Dunn, Mr. Beatty or Mr. Gollogly committed the offence described in either count one or count two in the indictment, I should find Mr. Dunn, Mr. Beatty or Mr. Gollogly guilty of such offence since I would have been satisfied of guilt beyond a reasonable doubt. If, at the end of the case based on all the evidence, I am not sure that Mr. Dunn, Mr. Beatty or Mr. Gollogly committed either count one or count two in this indictment, I should find Mr. Dunn, Mr. Beatty or Mr. Gollogly not guilty of such offence. If, after a full consideration of all the evidence admissible against any one of defendants, there remains in my mind a reasonable doubt concerning the guilt of such defendant, then the Crown has failed to meet the standard of proof which the law requires, the presumption of innocence prevails and it is my duty to acquit. On the other hand, if, after a full and careful consideration of all the evidence, I am left with no reasonable doubt concerning the guilt of Mr. Dunn or Mr. Beatty or Mr. Gollogly on either or both counts in the indictment, the presumption of innocence has been displaced and it is my duty to convict.

[69]    Reasonable doubt applies to issues of credibility. I am not required to firmly believe or disbelieve any witness or set of witnesses. I must ask myself whether, on the basis of the evidence which I do accept, I am convinced beyond a reasonable doubt by that evidence of the guilt of one or more of the accused )see: R. v. W.(D.), [1991] 1 S.C.R. 742, at para. 28).

**BUSINESS RECORDS**

[70]    During the course of this trial, the Crown and the defence tendered hundreds of documents. These documents were received as business records. As such, they are capable of proving the facts contained within them. However, I am not bound to accept the business records as proof of facts contained within them.

**SHOULD THE EVIDENCE OF SOME OF THE NORTEL AND DELOITTE'S EMPLOYEES BE VIEWED WITH CAUTION?**

[71]    The Crown indicated that several of the witnesses listed in the Appendix to its submissions were accomplices. The Crown indicated that these witnesses sought to minimize their involvement or distance themselves from wrongdoing and that this took the form of acquiescing quickly with defence suggestions on cross-examination.

[72]    Leading questions were asked on cross-examination and it is correct that, on many occasions, witnesses accepted the suggestions contained in those questions.

[73]    At the same time, the Crown submits that there was strong confirmatory evidence of aspects of the testimony of these witnesses in the documents which were tendered.    The witnesses in respect of whom the Crown urges caution played a role, according to the Crown, in the planning, analysis and use of accrued liability balances to meet earnings targets. Without the co-operation of these witnesses, the Crown submits the three accused would not have been able

2013 ONSC 137 (CanLII)

2013 ONSC 137 (CanLII)

to shift Nortel from a profit to a loss in Q4 02 (the fourth quarter of 2002) and engineer profits in Q1 03, Q2 03 and Q3 03 (the first quarter of 2003 etc.).

[74]    This is perhaps an appropriate place to observe that there is nothing about the background of any of these witnesses which makes them inherently "unsavory". The evidence has disclosed that regulatory proceedings against the defendants are in abeyance pending the outcome of this matter. The evidence has not disclosed that any of the witnesses listed in the Crown's Appendix are facing criminal charges themselves. There is no suggestion in the evidence that any of these witnesses are the subject of outstanding regulatory proceedings.

[75]    The Crown submits that there was a long-standing culture of Conservatism at Nortel and many of the witnesses who are chartered accountants or certified management accountants had to know that accrued liability balances therefore existed and were being used to meet earnings targets. The Crown submits that compliant employees assisted the accused in misrepresenting the financial results of Nortel Networks Corporation.

[76]    I am satisfied that, during the time-frame of the indictment, there was at Nortel a culture of Conservatism, in the accounting sense of that term. I am satisfied that this culture existed for in excess of twenty years. It has to be remembered, however, that, until 1999, the SEC and the Ontario Securities Commission had not prohibited the practice of releasing accrued liability balances to bridge the gap between a company's actual performance and a previously announced financial target. Coincidentally, it was in the same year, 1999, that Nortel began experiencing significant losses.

[77]    Finally, one has to remember that Nortel's culture concerning the recording of accrued liability balances was slow to change because for fiscal 2000, 2001 2002 Nortel reported losses in the billions and, as a result, the Board of Directors, Nortel's auditors and its senior management were preoccupied with survival.

[78]    The accused called no defence. All of the witnesses who testified were called by the Crown.

[79]    The ten witnesses listed in the Crown's Appendix gave evidence which was capable of both inculpating and exculpating the accused. As well, this is not a case in which it is relatively straightforward to delineate evidence which implicates any one or all of the accused in either of the offences set out in the indictment.

[80]    With respect to those portions of the evidence which, in my view, are exculpatory, the question is whether such evidence alone or in combination with other evidence leaves me with a reasonable doubt (see: *R. v. Rowe*, 2011 ONCA 753, 2011 OJ No. 5382 (Ont. CA), at para. 42).

[81]    With respect to those portions of the evidence which implicate the accused, I have to decide whether the credit of these witnesses is such that I should caution myself about accepting, in the absence of confirmatory evidence, testimony from them which implicates any one or more of the three accused.

[82]   As indicated earlier, the Crown suggested that these witnesses were accomplices and that their evidence implicating the accused should be viewed with caution in the absence of confirmatory evidence.

[83]   I propose now to consider a few highlights of the testimony of the witnesses named by the Crown.

[84]   Mr. Brian Harrison was, during the time-frame of the indictment, the Vice-President of Performance Management and, later, when the position of Vice-President Performance Management was eliminated, Nortel's Director of Financial Planning and Analysis. Mr. Harrison was directly involved in the process of soliciting accruals during Q4 02. It is the Crown's view that he actively assisted in changing a Q4 02 pro forma gain before taxes into a loss before taxes. Mr. Harrison was a CMA or certified management accountant during the time-frame of the indictment. He no longer has that designation for reasons which were not disclosed. He was interviewed many times by different police forces and regulatory authorities. At one point, he was told that he was a target of the investigation into the matters described in this indictment. Prior to actually testifying, he was told by the police and the Crown that he was no longer considered a target of the investigation into these matters.

[85]   In my view, I should exercise some caution before accepting unconfirmed evidence from Mr. Harrison which I think implicates any of the accused in this matter

[86]   Linda Mezon, Nortel's Assistant Corporate Controller for a portion of the time-frame described in this indictment, indicated she was not aware of the fact that there was a point in time in Q4 02 when Mr. Harrison's Outlook (forecast) suggested positive pro forma earnings before taxes of $73 million. Ms. Mezon also played a central role in the JDS offset in the fourth quarter of 2002 (Q4 02). While I will discuss this in more detail later, it is sufficient to say that the JDS offset resulted in expenses being reduced to reflect a reduction in revenue at a late point in Nortel's close of the books for Q4 02.

[87]   Even if I were to disbelieve Ms. Mezon concerning what she knew about Nortel's preliminary pro forma earnings before taxes during the early part of the Q4 02 close, this would not make her a witness, whose testimony implicating any or all of the accused, should be viewed with caution in the absence of confirmatory evidence. It simply means that she knew something which she claimed not to know. While this could affect her credibility, it does not make her a *Vetrovec* witness (see: *R. v. Winmill* (1999), 131 C.C.C. (3d) 380 (Ont. C.A.), at para. 113). Similarly, her participation in the JDS offset does not make her a witness whose evidence implicating the accused ought to be viewed with caution unless confirmed by other evidence. It simply means that, with the knowledge and consent of her superiors and Nortel's auditors, she accepted an entry to offset the loss of revenue caused by the accounting for the JDS transaction. This conduct does not make her a witness whose evidence implicating the accused I should be cautious about accepting in the absence of confirmatory evidence.

[88]   Helen Verity was the Director of Consolidations for Nortel from 2001 – 2003. She received Outlooks or forecasts during the Q4 02 close process. Her handwriting is on some of them. Ms. Verity testified that she was not aware of the skepticism which greeted Mr. Harrison's assertion that Nortel's pro forma earnings before taxes were positive in Q4 02. While this may be

2013 ONSC 137 (CanLII)

a credibility issue as far as Ms. Verity's concerned, it does not make her a *Vetrovec* witness (see: *R. v. Winmill, supra*, at para. 113).

[89]    Mr. Crosson was a long-standing Nortel employee who, during the material time, was the Vice-President of Global Operations. Mr. Ken Crosson, despite the fact that he was satisfied with the original financial results he submitted to Nortel headquarters in Brampton during the Q4 02 close, came up with additional accrued liability balances upon request. These additional balances resulted in increases in expenses and a corresponding decrease in earnings. This clearly assisted Mr. Harrison, who was canvassing for accrued liability expenses/liabilities which, by definition, would decrease earnings.

[90]    Mr. Crosson, in my view, was responding to requests from his superiors, but I am not satisfied that he responded in an inappropriate way. He indicated in his estimation there was some flexibility concerning excess and obsolete accrued liability balances relating to inventory. While his responses arguably were not entirely consistent with United States Generally Accepted Accounting Principles ("US GAAP") and while that may be a concern for securities regulators, the accrual balances which he agreed to increase could be changed without distorting Nortel's underlying financial reality.

[91]    I am not satisfied that Mr. Crosson's conduct changes his character as a witness such that I ought to be cautious, in the absence of confirmatory evidence, about accepting inculpatory evidence from him.

[92]    Mr. Glenn Morita was the Director of Finance for the Europe Middle East Asia Region during the time-frame of the indictment.  Mr. Morita was also satisfied with his original financial results submitted to Nortel headquarters in Brampton during the Q4 02 close but, nevertheless, located additional accrued liability balances upon request from Mr. Harrison. The fact that Mr. Morita provided additional accrued liability balances which he thought were genuine does not change Mr. Morita's character as a witness such that, in the absence of confirmatory evidence, caution should be exercised before accepting evidence from him implicating any or all of the accused.

[93]    Mr. Jim Kinney was, during the time-frame in the indictment, Vice-President Finance of Wireless, which was a business unit within Nortel. Mr. Kinney and his group worked very hard to meet their Q4 02 target. Despite this, Mr. Kinney submitted additional accrued liability balances that moved him off target in Q4 02. He testified that he was not concerned because he had been requested by his superiors to find additional accruals and that is what he did.

[94]    I do not find that Mr. Kinney's behavior in this regard changes his character as a witness and that I should, therefore, be cautious in the absence of confirmatory evidence about accepting evidence from him implicating any or all of the accused.

[95]    Ms. Karen Sledge was the U.S. Controller during the Q4 02 close. She became Assistant Corporate Controller in 2003 where she remained until 2005. When she was Assistant Corporate Controller Ms. Sledge reported to Mr. Gollogly until he was suspended in March 2004. Ms. Sledge changed the Fringe accrued liability balance as a result of repeated calls from Mr. Gollogly and others. Ms. Sledge was not comfortable with making this change and mentioned it

to the representatives of the Wilmer Cutler Pickering law firm. Wilmer Cutler Pickering, about one year later, were conducting, at the request of Nortel's Audit Committee, an independent review of the circumstances leading to Nortel's re-statement of previously-published financial results. Her conduct does not change her character as a witness such that I should, in the absence of confirmatory evidence, exercise caution before accepting inculpatory evidence from her.

## A FEW BASIC ACCOUNTING PRINCIPLES

[96]    Mr. Robert Chambers, the Crown's expert, provided some basic accounting principles in his report.

[97]    A general principle underlying US GAAP is that expenses are to be matched with revenues as long as it is reasonable to do so. When work or a product makes its contribution to revenue, expenses associated with that work or product are recognized even if those expenses cannot be known with precision. This matching principle is applied through accrual accounting. In such a situation, the accrued expenses are estimated.

[98]    An accrued expense is an expense that has been incurred but not yet paid. An accrued liability is an obligation disclosed on the balance sheet that is not yet payable.

[99]    Recording an accrued expense reduces income on the profit and loss statement and, simultaneously, results in the recording of an accrued liability on the balance sheet.

[100]    Once the accrued liability is recorded on the balance sheet of a publicly-traded corporation like Nortel, the corporation is required to assess that accrued liability balance at the end of each financial quarter to determine whether something has occurred within that quarter which requires a change (i.e., an increase or decrease) in the estimate of the liability.

[101]    If an event has occurred within that quarter which requires a change in the estimate of the accrued liability balance, then the accrued liability balance should be either increased or decreased in that quarter. This is sometimes referred to as a "change in estimate".

[102]    If an accrued liability balance is increased as a result of the change in estimate, earnings are negatively affected.

[103]    If an accrued liability balance is decreased as a result of a change in estimate, earnings are positively affected.

[104]    In Nortel speak, the event which required a change in the estimate of the accrued liability balance was called a triggering event or a trigger. Put simply, trigger was a word used to denote an event or some other situation that drove a change in an accrued liability balance.

[105]    When the accrued expense becomes certain and is paid, the earnings of the corporation can be favorably affected. The following example, borrowed and slightly-amended from the Crown's expert evidence, illustrates this.

[106]    Assume that, as a result of a contract into which it has entered, a publicly-traded corporation is involved in litigation at the close of its fiscal year ending December 31, 2002 and

assume that an unfavorable outcome is probable. Management does not know the exact amount it will have to pay, but its reasonable estimate is that the judgment against it will be for not less than $3 million and not more than $9 million. If no amount within that range appears to be a better estimate than any other, Financial Accounting Standards No. 5 ("FAS 5") requires that an expense of $3 million be recorded at December 31, 2002, *i.e.*, the expense estimate at the lowest end of the estimated range of appropriate exposures.

[107]   Recording this expense on the profit and loss statement will have a $3 million negative impact on earnings for the period ending December 31, 2002. Recording this accrued expense also results in an accrued liability of $3 million being recorded on the balance sheet.

[108]   In the example above, if the company thought that $4 million was the best estimate of its liability, then it would record $4 million as an expense/liability despite the fact that it was not at the lowest end of the range of appropriate liabilities. It is only when no amount within the acceptable range is a better estimate than any other that the lowest amount in the range must be chosen.

[109]   Assume, for simplicity's sake, that the company settles the litigation for $2 million in the third quarter of 2003 and pays the plaintiff in that quarter. At the end of the third quarter of 2003, the company should eliminate the accrued liability of $3 million. $2 million of the liability was used to pay the plaintiff so the remaining balance is $1 million. This remaining $1 million excess is removed from the balance sheet and $1 million is recorded on the profit and loss statement as a positive impact on earnings. This is sometimes referred to as a "releasing" the accrued liability balance to the profit and loss statement or "releasing the accrual" or a "releasing the $1 million". Sometimes it is referred to as "reversing the accrual".

[110]   In some of the documentation received in evidence, accrued liabilities were referred to as "provisions". Setting up accrued expense/liability was sometimes referred to as "provisioning".

[111]   There is a timing issue in the example. US GAAP, specifically SEC Bulletin 14, requires the elimination of the accrued liability and the recording of the $1 million positive impact on earnings in the quarter when the event precipitating the conversion of the liability occurred. In this example, it is the third quarter of 2003 because the precipitating event is the settlement of the litigation.

[112]   In the example, if the accrued liability balance was not adjusted in the third quarter of 2003, then an "error" has occurred. In the third quarter 2003, accrued liability balances would be $3 million greater than they should be and earnings would be $1 million lower than they should be.

[113]   An accrued liability can be falsely stated on the balance sheet if any one of three things happens:

- first, if, contrary to US GAAP, the liability is fictitious;

- second, if, contrary to US GAAP, an artificially-high number is used to estimate the liability when it is first set up;

- third, if an event occurs within a quarter which calls for a change (*i.e.*, an increase or decrease) in the estimate of the accrued liability and, contrary to US GAAP, a change in estimate does not occur. From that point on, accrued liabilities will be either overstated or understated on the balance sheet.

[114]  When there are excess accrued liability balances on the balance sheet, an opportunity is created to tailor earnings by arbitrarily "releasing the accrual" to positively impact earnings in the quarter where you want to increase earnings. The motive for tailoring earnings is often to meet a previously-publicized financial target. Such behavior is contrary to US GAAP. The financial results in the tailored quarter are misrepresented. Whether the misrepresentation is material is a separate consideration.

[115]  Returning to the example, if the corporation did not release the $1 million in Q3 02 but, instead, left it on the balance sheet for a rainy day, the corporation would be said to have a "cookie jar" of $1 million on its balance sheet.

[116]  A corporation can also tailor earnings by lowering them if, contrary to US GAAP, it creates an accrued expense/liability which is completely false or artificially high. The false or artificially-high expense negatively affects earnings and results in earnings being misrepresented on the corporation's profit and loss statement. Recording the false or artificially-high expense automatically results in the recording of a false or artificially-high accrued liability. When this happens, the corporation's financial results are misrepresented. Whether the misrepresentation is material is a separate consideration.

[117]  Finally, a corporation has to account for impairment of its assets even if there is uncertainty concerning the recognition of revenue or the incurring of an expense and uncertainty concerning how much money is involved.

[118]  The Financial Accounting Standards Board issued the Statement of Financial Accounting Standards No. 5 ("FAS 5") in March 1975 to assist in accounting for uncertainties related to the occurrence of future events, commonly known as accounting for contingencies.

[119]  Nortel was required to record an expense related to a material contingency if information available prior to the issuance of its financial statements indicated that it was probable that an asset had been impaired or a liability had been incurred at the date of the financial statements and the amount of the impairment or loss could be reasonably estimated. The evidence established that, during Nortel's decline, assets thought secure became impaired overnight. The evidence established that great uncertainty existed in 2001 and 2002 concerning the extent to which Nortel's assets had become impaired.

### More generally

[120]  First, when estimating and recording accrued expenses/liabilities, considerable discretion is accorded to management and, correspondingly, considerable judgment is required.

[121]  Second, Mr. Richmond testified that, while the basic concepts of accrual accounting were straightforward, their application could be quite complex. He testified that, between 2000 and

2013 ONSC 137 (CanLII)

2013 ONSC 137 (CanLII)

2005, the operating mechanics of accrual accounting did not change, the regulatory environment changed. To this, I would add sometimes reasonable differ; sometimes interpretations and applications of basic principles change.

### *Considerations concerning the set-up and use of accrued expenses/liabilities*

[122]  Mr. Richmond explained that there are two considerations. The first is ensuring that your provisioning for expenses is appropriate at any point in time; that is, that you had identified every risk for which you should provide. The second consideration requires, if necessary, reducing accrued liability balances should they turn out, at any point in time, to be overstated.

[123]  It was Mr. Richmond's view that there had been a practice in corporate Canada and corporate America in the late 1990s to prepare financial statements in a professional, thorough and comprehensive way, but also in a way that made sure there was flexibility in the accrued liability levels of the corporation so that, at the end of a quarter if a CEO found himself slightly short of the market's expectations of profitability, he or she might release accrued liabilities from the balance sheet and, thereby, positively impact earnings in order to meet the corporation's publicly-stated targets.

[124]  Mr. Richmond commented that this practice was ended by the SEC and the Ontario Securities Commission in 1999. The result of the change, according to Mr. Richmond, was that it was still permitted to provision in a prudent way, but not appropriate after the results of the corporation had been determined to go in and use "magic" to change numbers arbitrarily to comply with previously-publicized targets.

[125]  Mr. Richmond described this change in 1999 as "a huge deal". Mr. Richmond gave examples of corporations such as Microsoft, which had experienced difficulty with regulators because they failed to appreciate this change in the environment.

## NORTEL SPECIFIC CIRCUMSTANCES

### *Deloitte's historical relationship with Nortel*

[126]  The scope of Deloitte's involvement with Nortel is an important part of the context of this matter. It is difficult to get a full appreciation of the total number of Deloitte & Touche partners and associates who worked on the Nortel file. Mr. Richmond indicated that younger partners, managers and senior accountants worked on the Nortel file full-time. In terms of billings, Nortel was a major client of Deloitte.

[127]  Evidence in this proceeding indicated that external auditing fees for 2003 were approved by the Nortel Audit Committee in the amount of $19 million.

[128]  Some Deloitte's auditors including the lead audit partner had their offices in Brampton at Nortel headquarters.

[129]  Deloitte had been Nortel's auditors for approximately one hundred years.

[130]  I am satisfied that Nortel was a significant Deloitte & Touche client. I am satisfied that Deloitte & Touche were embedded in one form or another in all aspects of Nortel's operations. The evidence is replete with communications between Nortel staff and Deloitte staff. Many of the witnesses testified that, when Deloitte asked for information, it was provided. This assertion is amply borne out by the documentary record.

### Target setting and Nortel's culture

[131]  Mr. Peter Dans testified in this matter. Mr. Dans worked at Nortel from 1990 to 2007. Mr. Dans served in a strategic planning role from 2001 to 2003. Specifically, Mr. Dans was assigned to the Global Planning and Reporting Group.

[132]  Mr. Dans has a degree in engineering. He has an MBA; he is also a CMA – that is, a certified management accountant.

[133]  Mr. Dans described the setting of targets. He testified that Nortel, whose fiscal year was the calendar year, started working on its budget in August. In August 2003, Mr. Dans prepared budgets and potential targets for each of the business units for fiscal 2004. The initial targets came from the Global Planning and Reporting Group. They produced a target for revenue and profitability which was essentially in the form of a profit and loss statement. Mr. Dans then reviewed these initial targets with the accused Douglas Beatty and it was Mr. Dans' understanding that Mr. Beatty reviewed the target with the accused Frank Dunn.

[134]  The targets were sent to the Presidents and financial Vice-Presidents of the various business units so that they could provide their view on achieving their proposed target.

[135]  Mr. Dunn and the Presidents of the business units would hold a final meeting and set the budget targets for the year.

[136]  Mr. Dans further testified that there were times during the year when targets were updated. Mr. Dans indicated that Mr. Dunn and Mr. Beatty set what were called "stretch targets". This was a target that would be harder to achieve. It might be as much as 5% better than the budget. While Mr. Dans only had direct knowledge of this process for the fiscal year 2003, it was his impression that the target setting process employed in 2003 had not changed from earlier years.

[137]  Hitting the target was an important part of Nortel's culture. Mr. Kinney offered the observation that one negotiated targets which allowed one to succeed rather than fail.

[138]  Mr. Gollogly described the attitude at Nortel in an e-mail, dated July 31, 2003: "... General approach is to sandbag good news and close hard to the forecast".

[139]  E-mails were received as business records in this trial.

[140]  Mr. Glenn Morita is a chartered accountant. He was the Director of Finance for the Europe Middle East Asia Region. Mr. Morita similarly expressed himself in an e-mail to a colleague, dated January 8, 2004. Mr. Morita testified and confirmed the implication in his e-mail.

2013 ONSC 137 (CanLII)

2013 ONSC 137 (CanLII)

[141]   The inference I draw is that the Nortel business units made a very determined effort to meet their targets.

### The employment of Mr. Dunn, Mr. Beatty and Mr. Gollogly at Nortel

[142]   Mr. Richmond and other witnesses were able to provide some history and context to the employment at Nortel of all three accused. This evidence could not be elicited from the accused because they did not testify.

### Mr. Frank Dunn

[143]   Specifically, Mr. Richmond testified that Mr. Dunn, a certified management accountant by training, joined Nortel out of university. Mr. Richmond, although aware of Mr. Dunn, only began to deal with him when Mr. Dunn became Corporate Controller (1992-1993). When Mr. Dunn was Nortel's Controller, Mr. Richmond met with him both individually and at Audit Committee meetings.

[144]   Mr. Richmond indicated that, after Mr. Dunn became Nortel's CFO, their dealings became more frequent. Mr. Richmond was present at Audit Committee meetings when Mr. Dunn, as CFO, made presentations and commented on issues.

[145]   Mr. Richmond pointed out that, when Mr. Dunn was the CFO of Nortel, he was the CFO of a corporation with the largest capitalization value of any corporation in Canada.

[146]   Mr. Dunn became the CEO of Nortel in the fall of 2001. Mr. Richmond continued to deal with Mr. Dunn after that time.

[147]   Mr. Richmond testified that Mr. Dunn was technically competent as far as accounting skills were concerned. Mr. Brian Harrison indicated that Mr. Dunn was knowledgeable concerning accounting principles. Mr. Harrison also testified that Mr. Dunn was very interested in details; he described him as detail-oriented. In a similar vein, Ms. Helen Verity, a chartered accountant herself, testified that she worked with Mr. Dunn and Mr. Beatty at different times during her career at Nortel. Ms. Verity described Mr. Dunn as "a very smart man" with a good grasp of accounting principles. Mr. Ken Crosson testified that he had known Mr. Dunn for twenty-five years at Nortel and offered the opinion that Mr. Dunn was "very familiar with numbers, very efficient with numbers. Understood – – he – – he understood numbers". Mr. Crosson also indicated that, on the occasions when he and Mr. Dunn discussed accounting issues, Mr. Dunn was able to "understand it completely".

[148]   I accept the assessments of Mr. Dunn offered by Mr. Richmond, Mr. Harrison, Ms. Verity and Mr. Crosson. They had years to observe Mr. Dunn and their evidence in this regard did not appear to be contentious.

[149]   Mr. Lynton R. Wilson also testified.  Mr. Wilson was the Chairman, President and CEO of BCE Inc. and, as a result, joined the Board of Nortel in 1991. Mr. Wilson was a member of the Board of Directors throughout the period described in the indictment. He was the Chair of the Board of Directors of Nortel for most of the period set out in the indictment. Mr. Wilson was, therefore, personally familiar with the period described in the indictment.

[150]   Mr. Wilson is an Officer of the Order of Canada and a Companion of the Order of the Business Hall Of Fame. During his career, Mr. Wilson served as CEO and as a director of a number of major Canadian corporations.

[151]   I accept Mr. Wilson's evidence without qualification.

[152]   Mr. Wilson became the Chair of Nortel's Board in 2001. He testified that Mr. Dunn was asked to take on the role of CEO at Nortel in the fall of 2001 at a difficult time. At that time with reference to Nortel, Mr. Wilson stated, "the ship was listing pretty badly…"

[153]   It was Mr. Wilson's opinion that it was a credit to Mr. Dunn's leadership that he was able "to keep the ship afloat" after he became CEO in 2001.

### Mr. Douglas Beatty

[154]   The evidence established that Mr. Beatty was a C.A., who became the CFO of Nortel on July 17, 2002. Thus, Mr. Beatty's first quarter as CFO was Q3 2002. Prior to being CFO, Mr. Beatty was the Corporate Controller. Mr. Beatty succeeded Mr. Dunn as Corporate Controller.

[155]   Mr. Richmond testified that he felt it was part of his responsibility to assess Mr. Beatty's ability to be CFO. Mr. Richmond indicated that it never occurred to him to suggest to the Chair of the Board or the Chair of the Audit Committee that Mr. Beatty did not possess the technical and other expertise to carry out his responsibilities. To the contrary, Mr. Richmond testified that he recommended Mr. Beatty to the Board for the position of CFO.

[156]   Mr. Brian Harrison testified and I accept his evidence that Mr. Beatty was knowledgeable concerning accounting principles. Ms. Helen Verity also confirmed that Mr. Beatty was "a good accountant". Mr. Ken Crosson testified that he was in contact with Mr. Beatty on at least a weekly basis. He testified that Mr. Beatty was a very knowledgeable and efficient accountant.

[157]   I accept the evidence of Mr. Richmond, Mr. Harrison, Ms. Verity and Mr. Crosson concerning Mr. Beatty's background and accounting acumen.

### Mr. Michael Gollogly

[158]   The evidence established that Mr. Gollogly is a C.A., who became Nortel's Corporate Controller on July 25, 2002, eight days after Mr. Beatty became CFO. July 25 was in the third quarter of 2002. The fourth quarter of 2002 (October 1-December 31) figured quite prominently in the evidence in this case.

[159]   At an earlier point in his career, Mr. Gollogly had been Nortel's Assistant Controller (the late 1990s). He moved from Assistant Controller to senior executive positions with Nortel in France, Asia and England and then returned to the Brampton head office in July 2002 as Controller.

[160]   Quite significantly, immediately upon assuming his position, Mr. Gollogly made a better understanding of Nortel's Balance Sheet a priority for him and his staff.

2013 ONSC 137 (CanLII)

[161]  Exhibit 42 TT demonstrates that, in January 2003, Mr. Gollogly began Balance Sheet Reviews for all units and statutory entities within Nortel.

[162]  Mr. Richmond was of the view that Mr. Gollogly was technically competent as far as his accounting skills were concerned. Mr. Harrison and Ms. Verity both indicated that Mr. Gollogly was knowledgeable concerning accounting principles.

[163]  In addition, Mr. Gollogly prepared draft letters and made presentations to the Audit Committee of Nortel staff which demonstrated that he was quite knowledgeable concerning accounting principles of interest in this proceeding.

[164]  I accept Mr. Richmond's, and Ms. Verity's assessment of Mr. Gollogly's accounting ability.

### Mr. Dunn, Mr. Beatty and Mr. Gollogly

[165]  The three defendants were, from Q3 02 (the 3rd quarter of 2002), the three senior managers of the Corporation.

[166]  I am satisfied that all three of the defendants were knowledgeable and experienced accountants who had the principal responsibility for Nortel's financial statements and records.

[167]  I am satisfied that they were, by reason of their training, their access to forecasts and their long association with Nortel, interested in and well-acquainted with all aspects of Nortel's financial affairs.

[168]  I am satisfied that all three accused were aware of financial information which materially affected Nortel's financial results.

### Nortel was a complex corporate organization

[169]  Nortel, itself, is part of the fabric in context of this case. Because we are dealing with the consolidated financial statements, there is a tendency to think of Nortel as a single entity. This is not precise.

[170]  Mr. Richmond testified that Nortel operated in at least sixty countries in the world. He stated that the organizational chart included dozens of separate entities operating in geographies all over the world. He pointed out that, every time you had a subsidiary Nortel Corporation, generally speaking, you had to conduct an audit.

[171]  Mr. Richmond described Nortel as a large, complex organization with a large and complex audit-processing team. He estimated that there were hundreds of people involved in Nortel auditing.

[172]  This fact is important because it means that the financial information which the Regions were forwarding to corporate headquarters each quarter was financial information which had been produced by entities which, themselves, had been audited.

[173]   Mr. Donald Hathway was Deloitte's Lead Audit Partner on the Nortel audit commencing in the spring of 2003. He was the DeLoitte person in charge of the conduct of the actual audit. Mr. Hathway stated that Nortel had a matrix organization. He said that responsibility for particular General Ledger accounts was divided between geographic entities and line of business entities. He said that responsibility for particular accounts was not always clear because of the complicated nature of the organization. Mr. Hathway testified that there were financial decisions made at the business level which were not controlled by Regional Controllers and for which Regional Controllers would have no responsibility.

[174]   Mr. James Kinney testified. Mr. Kinney is a Certified Management Accountant. He started at Nortel in 1980 and continued there until 2004. From August 2002, he was the Vice-President Finance for the Wireless Business Group. Mr. Kinney indicated that, from a business perspective, Nortel was divided by both Business Lines and Regions. Mr. Kinney also indicated that the Business Lines, in turn, were divided by technologies and products. The products were also divided by Regions. Each Line of Business had a President; each Region had a President. Each Line of Business had Vice-President Finance and each Region had Vice-President Finance.

[175]   Mr. Kinney testified that the Regions were also responsible for the contractual liabilities that went with the customer. Contractual liabilities were 40% of Nortel's total liabilities. Contracts would be understood by the responsible person in the Regional organization and would have been set-up through the Regional organization. Knowledge about the documentation of the contract and knowledge concerning the customer resided with individuals within the Regional organization.

[176]   Finally, it was Mr. Kinney's view that ownership of the balance sheet resided in many sections of Nortel but, primarily, in the Regions. This aspect of Mr. Kinney's evidence was not contentious and I accept it.

[177]   I am satisfied that Nortel's business organization worldwide was composed of dozens of separate corporations operating in geographies everywhere and that it was internally a complex entity.

**THE FINANCIAL RESULTS OF NORTEL NETWORKS CORPORATION**

[178]   Because the essence of these charges is that the defendants deliberately misrepresented the financial results of Nortel Networks Corporation, it is necessary to make some comments about Nortel's financial results and Nortel's decisions to re-state some of those results.

[179]   Nortel's fiscal year ended on December 31. Nortel reported its financial results in accordance with US GAAP and Canadian Generally Accepted Accounting Principles ("Canadian GAAP"). The primary financial statements were prepared in accordance with US GAAP.

[180]   Mr. Robert Chambers, the Crown's expert on accounting matters, stated that US GAAP is the common set of United States accounting principles, standards and procedures that companies use to compile their financial statements. It is a combination of standards set by the Financial Accounting Standards Board Statements of Financial Accounting Standards, the Accounting Principles Board Opinions and Accounting Research Bulletins, the American Institute of

2013 ONSC 137 (CanLII)

Certified Public Accountants Statement of Position, the Financial Accounting Standards Board Emerging Issue Task Force, SEC Staff Accounting Bulletins, as well as other rules of the SEC.

[181]  Mr. Chambers indicated that there were thousands of standards set by these various standards-setting agencies.

[182]  The evidence in the trial concerned compliance with US GAAP; compliance with Canadian GAAP was not an issue.

### *Nortel's Consolidation Close Process*

[183]  Nortel had an accelerated closing process, which meant that financial results had to be reported publicly within less than four weeks. It is the General Ledger which is being closed. Nortel reported quarterly so the closing process occurred quarterly. Nortel reported annual results so the General Ledger was closed annually.

[184]  Ms. Helen Verity, the Director of Consolidations, indicated that the Consolidation Close meant that Nortel consolidated its results.

[185]  Ms. Verity indicated that there were stages of consolidation. Each business unit closed its General Ledger. Ms. Verity referred to the Regional General Ledger as a sub-ledger. Sometimes, the sub-ledger was referred to as Advance 2. Each business unit may have had more than one entity for which it was responsible so each business unit had to consolidate those entries before it could close its sub-ledger. Mr. Morita testified that the sub-ledgers (Advance 2) had to close within three to five days of the end of the fiscal quarter.

[186]  Backup for sub-ledger entries remained in the Regions. The Regions had their own management sign-off and they had their own auditors. The same was true for entries coming from Corporate Services.

[187]  After Day 4, late entries that were not material would not be considered. Despite this rule, if one of Ms. Verity's counterparts from the Regions called and wanted to book a late entry, there would be a discussion about the entry. If the entry was a re-classification between the business units, she would refuse to book the entry. If an entry was significant, Ms. Verity would tell Ms. Mezon, who approved late entries, to expect it.

[188]  Mr. Dans testified that an Outlook was prepared every time a consolidation took place and Mr. Dans pointed out that consolidations took place every day and sometimes more than once a day during the first days of a close as results came into corporate headquarters in Brampton Ontario. The Outlook prepared by Mr. Dans during the closing of the books was a snapshot of Nortel's financial results at that moment. The word "Outlook" denoted more than one document. One type of Outlook was a forecast. Forecasts were prepared throughout the quarter.

[189]  After the sub-ledgers were closed, draft financial statements were produced according to the number of adjustments and entries which occurred. Mr. Dans indicated that the draft financial statements were available to the Controller and the CFO upon request.

[190]   The corporate headquarters General Ledger was referred to as Advance 1. When the last entry was made into that General Ledger, numbers were final.

[191]   Ms. Verity testified that management wanted to have a line of sight to the results earlier than waiting for the consolidated results and so, on Day 4 of the close, a draft of the results would be run. It is important to remember that the close process contemplates repeated drafts being produced after the sub-ledgers had been closed. Draft results can change due to entries from corporate headquarters. Mr. McMillan, Nortel's Director of Consolidations, indicated that, by Day Four or Day Five of the close process, corporate in Brampton would get their first complete view of the regional financial information. At this point, according to Mr. McMillan, they did not have a complete view from a corporate perspective.

[192]   The evidence established that there were up to twenty draft financial statements produced over the close. Each draft statement was numbered.

[193]   Results can change due to entries to the General Ledger from corporate headquarters or late entries from the Regions. Corporate headquarters was not subject to the same deadlines as the Regions.

[194]   There were two headquarters units which submitted entries to the General Ledger. These units were called Corporate and Non-op. Corporate was a consolidation of the various corporate functions such as real estate, human resources etc.; Non-op was a catchall – a collection of everything that was left over.

[195]   Releases of accrued liability balances to the profit and loss statement from Corporate and Non-op could be entered in the General Ledger after the Regions had closed their sub-ledgers.

[196]   The Assistant Corporate Controller, Linda Mezon, advised whether an entry from the Regions was appropriate for the General Ledger. Ms. Mezon would advise Helen Verity that an entry was appropriate and Ms. Verity would sign the entry so that it could be recorded in the General Ledger.

[197]   Ms. Verity testified that she was responsible for managing the time-lines associated with the close process. Ms. Verity testified that there was a well-established close schedule. It was distributed by e-mail prior to the close and one of her responsibilities was to hold people accountable to that schedule. It was her responsibility to work with Nortel people to resolve timing issues.

[198]   Ms. Verity was responsible for resolving posting issues that arose during the close process; she reviewed profit and loss statements and balance sheets; she prepared binders and provided information to the Investor Relations Group within Nortel.

[199]   Ms. Verity indicated that an entry was significant if it was significant to the profit and loss statement or the balance sheet. An entry was significant if it was not a "net to zero" or a re-classification entry. This distinction was made because dealing with such items would slow down the close process.  At the same time, management cared about trying to get things right and so the compromise was that after Day 4 of the close, entries that changed the consolidated results

2013 ONSC 137 (CanLII)

for external reporting purposes or changed the profit and loss statement would be processed. Ms. Mezon said even small items which met those criteria could be processed.

[200]   Ms. Verity indicated that Fringe was the last entry of the close because, if you made another entry to the General Ledger, it might affect the Fringe. Typically, when all entries had been finalized, the business units released any Fringe accrued liabilities to the profit and loss statement.

[201]   The binders for which Ms. Verity was responsible contained a consolidation package which was an XL-based profit and loss statement and balance sheet.

[202]   The consolidation package was available to everyone at head office in her group; it was available to the auditors and it was available to Linda Mezon, the Assistant Corporate Controller.

[203]   There was a Frank Dunn binder which was prepared for the purpose of giving Mr. Dunn a summary of the close. Douglas Beatty and Michael Gollogly and the Assistant Controller and several others received copies of this binder.

[204]   Mr. McMillan indicated that the executive package binder included financial statements prepared by Corporate Consolidations and detailed schedules.

[205]   The external auditors, according to Ms. Verity, had access to all of the close process material, including the Frank Dunn binder. Mr. Dans indicated that Deloitte & Touche had special access to and a special binder for late entries. The Late Journal Entry Binder contained a copy of the late entries and a copy of the backup for those entries. Deloitte and Touche received regular profit and loss statement updates during the close process.

[206]   Ms. Verity indicated that there were regularly-scheduled update meetings during the close; there was also a Controller's meeting and a CFO meeting. At the Controller's meeting, there would be a discussion of entries outside the close process which remained outstanding. At the CFO meeting, the results were discussed with the CFO.

### Excess accrued liabilities & Nortel's policy of Conservatism

[207]   Nortel had a long-standing corporate policy concerning estimates of liabilities. Nortel Corporate Policy 300.33 provided that any anticipated decline in the value of Nortel assets and any anticipated liabilities must be provided for in accordance with the accounting concept of Conservatism.

[208]   On February 27, 2003, following a review of Nortel's accounting policies including Corporate Policy 300.33, Deloitte & Touche reported to the Audit Committee that they considered Policy 300.33 to be an appropriate accounting policy.

[209]   Mr. Chambers discussed Conservatism.

[210]   The accounting concept of Conservatism is a characteristic of financial accounting. It is referenced in paragraph 17 of Accounting Principles Board Statement No. 4, as follows: "Conservatism. Frequently assets and liabilities are measured in the context of significant

uncertainties historically; managers, investors, and accountants have generally preferred that possible errors in measurement be in the direction of understatement rather than overstatement of net income and net assets. This has led to the convention of Conservatism…"

[211]  It is also referenced in paragraph 35 of Accounting Principles Board Statement No. 4, as follows: "Conservatism. The uncertainties that surround the preparation of financial statements are reflected in a general tendency toward early recognition of unfavorable events and minimization of the amount of net assets and net income".

[212]  As indicated earlier, the Financial Accounting Standards Board issued Financial Accounting Standard 5 ( FAS 5), which provides that where there is a range of accrued liabilities and no estimate within the range is better than any other, the lowest estimate in the range must be used. Significantly, paragraph 84 of provides that FAS 5 is not inconsistent with the accounting concept of Conservatism.

[213]  Mr. Richmond testified that Nortel had, for twenty years prior to the events described in the indictment, a Conservative accounting culture within the context of the rules.

[214]  Mr. Richmond stated that because of the precipitous descent that Nortel went through, those in the field took it upon themselves to identify as many risks as they could and to put an estimate of those risks at the conservative end of the range.

[215]  Mr. Richmond elaborated that, when an organization is experiencing the "free fall" that Nortel was experiencing, a customer that one day might appear sound may very well be in financial peril the next day. As a result, Mr. Richmond stated that it was his experience at Nortel that, in preparing Nortel's financial statements, there was an overarching desire by the directors and the executive management team to ensure that they did the best job possible to prepare the financial statements to adequately account for risks.

[216]  Mr. Richmond testified that Nortel was operating in an atmosphere of doubt about the value of its assets and the operative principle was "if in doubt provide for it".

[217]  It struck Mr. Richmond as reasonable and unsurprising that Nortel employees and Deloitte professional staff defaulted to a position that was at the conservative end of the range when recording an accrued expense and liability estimating a particular risk.  Mr. Richmond testified that this was something he personally embraced and that it was appropriate in Nortel's set of circumstances "to provide at the reasonably hard end of that conservative range". He also testified that the identification of the range involved considerable judgment.

[218]  More generally, Mr. Richmond said that the essential concern was whether Nortel would stabilize before it hit the ground.

[219]  Mr. Richmond indicated that the critical issue, during the time period described in the indictment, was "making sure that you have the cash to operate the enterprise". Mr. Richmond indicated that cash was a critical issue in terms of everything Nortel did. I infer from this that Nortel's cash position was material to its financial results.

[220]   There was no suggestion in the evidence that Nortel's financial results misrepresented its cash reserves, its cash flow generally or its cash flow in its various business units.

[221]   Mr. Richmond stated that the data, upon which risk management decisions were made, changed very rapidly and, therefore, management's estimates quantifying risk went up and down.

[222]   Mr. Richmond indicated that the Audit Committee's preference was for Nortel to be at the conservative end of the acceptable range of risk. He described making sure that adequate provisions had been taken against the risk that assets had lost their value as an overarching paramount focus of Deloitte and Nortel in 2001 and 2002. According to Mr. Richmond, management and Deloitte's were both told by the Audit Committee concerning the corporation's exposure to risks to "make sure there are no surprises".

[223]   Mr. Wilson, the Chair of the Board of Nortel, gave similar evidence. He referred specifically to a briefing the Board received in January 2003 concerning an accrued expense/liability of $50 million taken in respect of a claim by a company known as 360 Networks. Mr. Wilson did not recall the details of the briefing concerning the taking of the provision, but he recalled that Mr. Cleghorn, the Chair of the Audit Committee during the time period of the indictment, asked at the Board meeting if $50 million was sufficient because the claim against Nortel was for $100 million.

[224]   Similar evidence was provided by Mr. Cleghorn. Prior to serving as Chair of the Nortel Audit Committee, Mr. Cleghorn was the Chairman and CEO and a Director of the Royal Bank of Canada. He was also Chairman of the Board of the Canadian Pacific Railway until 2012. He, like Mr. Richmond, is a Fellow of the Institute of Chartered Accountants of Ontario.

[225]   I accept Mr. Cleghorn's evidence without qualification.

[226]   Mr. Cleghorn described participating at the Audit Committee meeting in 2001 where Nortel management advised that it was necessary to write off $19 billion. Mr. Cleghorn testified that his first thought when he heard this was "did they get it all?" Mr. Cleghorn testified that, during the period described in the indictment, the auditors were regularly asked if they were satisfied with management's estimates of liabilities.

[227]   Mr. Gollogly expressed a somewhat similar view in an e-mail, dated October 13, 2003. In this e-mail, Mr. Gollogly proposed a draft for the Note to the Financial Statements explaining why it was necessary for Nortel to re-state earlier financial statements.   While Mr. Gollogly's proposed draft was not used, I note that he attributed the overstatement of accruals and the failure to draw down accruals in the correct fiscal period to "the high level of Conservatism used to identify Nortel Networks financial exposure during our period of realignment and our significant workforce reductions…"

[228]   A more extreme view was articulated by Mr. Michael McMillan in his evidence. Mr. McMillan joined Nortel in 1997. Mr. McMillan had an M.B.A. from the University of Manitoba. During the timeframe of the indictment Mr. McMillan was Nortel's Director of Consolidations. It was Mr. McMillan's evidence that accrued liabilities were booked on a worst-case scenario

basis rather than a best estimate basis. Mr. Peter Dans, to whom reference will be made later, testified that he was aware of accruals being booked on a conservative basis "which may have been the worst-case scenario sometimes".

[229]   During the time period described in the indictment, Nortel lost billions. I do not find it unusual that sensible people confronted with that reality would think that the worst-case scenario was the best estimate of the risks to Nortel's assets. I also do not find it unusual that sensible people confronted with Nortel's reality would be slow to decrease accrued liabilities already on the balance sheet.

[230]   I am satisfied that throughout the time period described in the indictment accrued liabilities at Nortel were estimated at the high-end of the range of estimates and sometimes on a worst-case scenario basis. According to the evidence a risk can be provided for on a worst-case scenario basis provided that it is the judgment of the person estimating the risk that the worst-case scenario is the best estimate of that risk.

[231]   One of the risks created by Nortel's situation was that excess accrued liability balances would find their way onto Nortel's balance sheet. This reality created a possibility of using accrued liability balances to meet financial targets. Exhibit 5, tab 242 provides an example of how ingrained this problem was by 2004. This document is an e-mail string. Mr. Glenn Morita, one of the authors of some of the e-mails in the string, in an e-mail, dated January 8, 2004, wrote: "sounds like you Aussies are like squirrels (not sure if you have them Down Under) secretly storing your nuts for a rainy day". Mr. Morita testified that he was frustrated when he sent the e-mail because his Australian counterpart was covering an expense with the release of an accrued liability balance. Mr. Morita said he was frustrated because Nortel had just gone through a Comprehensive Balance Sheet Review and his Region, which included Australia, thought that it had cleaned up the problem, but it turned out that they had not.   There are other references in emails to digging up "opportunities" and having "flexibility".

[232]   Nortel's Conservatism concerning the recording of accrued liabilities and expenses was likely in effect for twenty years. It was ingrained in Nortel's culture.

[233]   This policy of Conservatism was memorialized in Nortel Corporate Policy number 300.33. This policy had been reviewed by Deloitte in 2003 and found to be an appropriate corporate accounting policy. This policy, which had become a Nortel cultural norm, resulted in the excess accrued liability balances found on Nortel's consolidated balance sheet during the Comprehensive Balance Sheet Review in 2003.

### *The accused knew there were excess liabilities on the balance sheet*

[234]   I am satisfied beyond a reasonable doubt that all three accused, by virtue of their long experience with Nortel and their positions of responsibility, well-understood how the men and women in the field were implementing Nortel's policy of Conservatism.

[235]   I am satisfied, based on the evidence adduced at this trial, that none of the accused initiated this policy.

[236]  I am satisfied beyond a reasonable doubt that they knew that the policy of Conservatism had created excess accrued liabilities and, therefore, they knew that these excess liabilities could be released to assist in meeting financial targets.

[237]  I also find that the enormous losses suffered by Nortel in these years created a situation in which senior management, Nortel's Board of directors and Nortel's auditors were quite reasonably concentrating on doing all things necessary to make sure that Nortel had sufficient cash reserves to survive and continue in business. I am satisfied that non cash impacting excess accrued liabilities on the balance sheet were not a priority.

[238]  I am satisfied, on the evidence, that Mr. Gollogly, virtually from the time he took over as Corporate Controller, turned his attention to Nortel's balance sheet. I am also satisfied, on the evidence, that neither Mr. Dunn nor Mr. Beatty, his immediate superiors, did anything to impede his efforts.

### Unsupported and excessive accrued liabilities on the balance sheet

[239]  The evidence persuades me that accruals were present on Nortel's consolidated balance sheet which could not be supported by documentation. However, I decline to draw the inference that these accruals never existed. It seems more logical to me that the downsizing of Nortel, which involved the closing of offices, the selling of real estate and, undoubtedly, the storage of documents, created a situation in which supporting documentation for some of Nortel's accrued liability balances could not be located. Further, the loss of employees (two out of every three worldwide) created a situation in which the institutional memory concerning the unsupported accruals no longer existed within the company. I am satisfied that these were the reasons why unsupported accrued liabilities were present on Nortel's consolidated balance sheet.

[240]  Also, the evidence does establish and, I so find, that excessive accrued liabilities existed because accrued liabilities were not released when they should have been and because accrued liabilities were not adjusted when they should have been.

[241]  Mr.  Dunn and Mr. Beatty took part in the analyst calls which generated a 2002 Accrued Liability Report by Ms. Susan Shaw. Ms. Shaw, a chartered accountant in Nortel's Corporate Consolidations Group, reported to Mr. Gollogly.  Ms. Shaw advised both Mr. Gollogly and Mr. Harrison that there were unsupported liabilities on Nortel's balance sheet.

[242]  I am satisfied that all three accused knew that there were unsupported and excessive accrued liabilities on Nortel's balance sheet.

### Nortel's Pro Forma earnings calculations

[243]  The evidence disclosed that securities regulators encouraged Nortel and other publicly-listed companies to refrain from reporting non-GAAP measures commencing Q1 2003 (Q1 03). Prior to Q1 2003, Nortel had reported "pro forma" financial results.

[244]  As a result of this regulatory change in attitude, as of fiscal 2003, pro forma earnings calculations at Nortel became an internal measure only. This meant that, commencing in Q1 03, Nortel no longer published pro forma financial results.

2013 ONSC 137 (CanLII)

[245]  Pro forma financial results were calculated using a formula generated internally at Nortel. This formula changed from year-to-year. The 2002 pro forma formula was not the same as the formula used in 2003.

[246]  Despite this change, certain Nortel bonus plans, which are important for our purposes, continued to be triggered by Nortel's 2002 formula for calculating pro forma earnings.

[247]  The pro forma calculation of earnings differed from the calculation of earnings according to US GAAP. The pro forma formula for calculating earnings excluded items, including significant cost items, which were included in US GAAP earnings calculations. The items excluded were non-operational in nature. For example, pro forma earnings calculations excluded gains from buying back bonds. According to Mr. Harrison, the items included in pro forma earnings calculations were, themselves, calculated in accordance with US GAAP. Mr. Harrison's evidence in this regard was not questioned and I accept this aspect of his evidence.

[248]  For the sake of completeness, the method of calculating pro forma earnings that was used in 2002 excluded charges which were included in the 2003 method of calculating pro forma earnings. In other words, the 2002 formula resulted in higher pro forma earnings.

[249]  The difference between pro forma earnings calculations and US GAAP earnings calculations was also referenced in a glossary of terms filed in this proceeding which contained a definition of "pro forma". The definition provided, in part, that pro forma financial statements consisted of information which Nortel management believed was meaningful to investors.

[250]  Nortel published Q4 02 pro forma financial results in its January 24, 2003 press release announcing financial results for Q4 02. Nortel did not publish pro forma financial statements for Q4 02.

[251]  In 2003, Nortel did not publish pro forma earnings calculations at all.

### *Pro Forma earnings and Bonus Thresholds*

[252]  Mr. Cleghorn testified that, in the summer of 2002, Nortel employees were being approached by the competition. By this time, many employees at Nortel had been laid off or fired, sales were declining and the auditors considered Nortel to be a high-risk audit. Employees with stock options found that the options were worthless. In an effort to prevent valuable employees from leaving the company, Mr. Cleghorn testified that the Board adopted a Return to Profitability Bonus Plan.

[253]  The Return to Profitability Bonus Plan was announced in November 2002. It provided eligible employees with a special bonus if Nortel achieved profitability for any quarter in the period from Q4 2002 through to and including Q4 2003.

[254]  Profitability for the purpose of this bonus plan was based on pro forma earnings from continuing operations; it also included an accrual for the cost of the bonus in such period. In other words, there had to be sufficient pro forma earnings before taxes from operations to pay for the bonus. Senior executives would be paid in three tranches.

2013 ONSC 137 (CanLII)

[255]  Pro forma earnings (loss) before taxes was an internal Nortel calculation and metric. This meant that Nortel could change the calculation and this happened in 2003. The Board of Directors, however, in a minute from the 2:50 p.m. Board meeting of April 24, 2003, decided that, for greater certainty concerning the bonus calculations, Nortel's 2002 formula for calculating pro forma earnings before taxes would continue to be used for the purpose of calculating whether the Return to Profitability Bonus and the Restricted Stock Unit Bonus were earned. This is significant because it meant that, although Nortel changed the way in which it calculated pro forma earnings in 2003, this change did not affect the pro forma calculation of earnings for the purpose of determining whether Restricted Stock Unit and Return to Profitability Bonus targets had been met.

[256]  Entitlement to bonuses is an issue in this trial. The bonus payment issue was not made simpler by the fact that Mr. Dans, who did the bonus calculations, erroneously used Nortel's 2003 pro forma income formula in some of his calculations. Mr. Dans agreed that profitability was more easily achieved under the 2002 formula than the 2003 formula.

## NORTEL'S RE-STATEMENT OF PREVIOUSLY-PUBLISHED FINANCIAL STATEMENTS

[257]  The evidence established that Nortel, on two occasions, restated financial statements which it had previously published.

[258]  Neither restatement affected Nortel's cash position. Nortel's cash position was critical to its survival.

[259]  Mr. Chambers, the Crown's expert, explained in his report when a restatement of previously-published financial information is necessary. Mr. Chambers indicated that, if a misstatement has occurred in a publicly-traded corporation's published financial results, a restatement of the prior year's financial statements is required if the misstatement is material in the prior year or if a correction in the current year, *i.e.*, when the misstatement is discovered, materially overstates or understates earnings in the current year.

[260]  Mr. Chambers also offered expert evidence on the reasons why financial statements are restated. Mr. Chambers stated in his report that Restatements occur because the earlier financial statements contain errors:

- due to the misapplication of US GAAP;

- mathematical mistakes;

- incorrect facts;

- fraud due to the manipulation of accounting records, misrepresentation, or the intentional misapplication of US GAAP;

- changes in accounting principles; and,

2013 ONSC 137 (CanLII)

2013 ONSC 137 (CanLII)

- stock splits.

[261]  Mr. Chambers stated that the majority of Restatements are attributable to internal company errors.

[262]  Mr. Hathway, the lead auditor for Deloitte on the Nortel file in 2003, explained when it is necessary to restate prior published financial results so that accrued liability balances can be re-profiled to the appropriate financial periods when they should have been released to the profit and loss statement.

[263]  Mr. Hathway testified that, where there is an error in the financial statements due to an overstatement of accrued liabilities, there are two choices:

- if the overstatement of an accrued liability balance is not material to either the balance sheet or the profit and loss statement in the current quarter or the quarter in which it should have been released, then it can be, with the appropriate disclosure, released to the profit and loss statement in the quarter in which the error is discovered; and,

- if the overstatement is material to the results in the quarter in which the error is discovered or to the results in the quarter in which it should have been released to the profit and loss statement, then there must be a Restatement of the earlier financial statements to push the excess accrued liability balance back to the period when it should have been released.

[264]  Mr. Richmond testified that Restatements in both Canada and the United States are infrequent. He said that for an organization to restate a previously-published financial result is not something that is well-embraced by the organization. Mr. Richmond's evidence is consistent with evidence heard in the trial to the effect that Mr. Beatty told Mr. Cleghorn that a restatement was never a good idea.

### *The First restatement*

#### *A short chronology*

[265]  Nortel's first decision to restate financial statements for 2000, 2001, 2002, Q1 2003 and Q2 2003 was announced on October 23, 2003.

[266]  This restatement essentially restated excessive accrued balances on Nortel's balance sheet back to the quarters when they should have been released to the profit and loss statement.

[267]  The restated financial statements resulting from the first Restatement were released to the public on December 23, 2003 approximately two months after the announcement of the first Restatement.

2013 ONSC 137 (CanLII)

### Who was Responsible

[268]  Ms. Sledge, indicated that she personally dealt with both Douglas Beatty and Michael Gollogly in connection with the first Restatement and that, from her perspective, both Douglas Beatty and Michael Gollogly were in charge of the first Restatement. Ms. Sledge's evidence in this regard is consistent with the positions held by Douglas Beatty and Michael Gollogly during the first Restatement; namely CFO and Controller. I accept this portion of Ms. Sledge's evidence; although I am satisfied Ms. Sledge, a certified public accountant and Nortel's Assistant Corporate Controller from 2003-2005, also had a major role in the first restatement.

### Nortel Restatements are complex

[269]  Mr. Michael McMillan testified that, due to the significant number of corporate entities involved worldwide, the restatement process was complex. I accept Mr. McMillan's evidence that the restatement process for Nortel was a complex one.

### How the Restatements came about

[270]  Mr. Richmond described the situation at Nortel when consideration was being given for the first time to restating financial statements from earlier periods. The immediate cause of this discussion was the release to the profit and loss statement in Q2 03 (the second quarter of 2003) of approximately $142 million in accrued liabilities which could no longer be supported. The release of this $142 million would have had a positive effect on earnings. These balances had been released during preparation of one of the preliminary drafts of Nortel's Q2 03 financial statements during the Q2 03 close process described earlier.

[271]  Mr. Gollogly made Mr. Hathaway, Deloitte's lead Nortel audit partner, specifically aware of the $142 million and asked Mr. Hathway for Deloitte's view. Mr. Hathway objected to the release of these balances, with the result that the release of these balances was reversed in the next preliminary draft of the financial statements and the $142 million in accrued liability balances was returned to Nortel's balance sheet where they always been.

[272]  No profit and loss statement containing the $142 million was ever published.

[273]  It was Mr. Richmond's evidence that Mr. Dunn maintained that the $142 million was the total number of unsupported liabilities on Nortel's consolidated balance sheet. It was Mr. Dunn's view that the $142 million should remain released to the profit and loss statement of Q2 03 and that there should be appropriate disclosure of this fact in the press release publishing Nortel's Q2 03 financial results. Mr. Dunn maintained that his view should be respected because not only was he the CEO, but he had been, prior to that, Nortel's CFO and Corporate Controller.

[274]  This is perhaps an appropriate time to observe the obvious. Mr. Dunn was spectacularly wrong; the first restatement identified in excess of $900 million of accrued liabilities that could no longer remain on Nortel's consolidated balance sheet.

[275]  Mr. Richmond indicated that Mr. Dunn also resisted the idea of a comprehensive balance sheet review due to the workload demands it would place on a group of busy people. This

observation attributed to Mr. Dunn seems reasonable to me because, by this time in 2003, Nortel's employees had been reduced by two-thirds.

[276]  Mr. Richmond indicated that, if Mr. Dunn had been correct, the restatement might have been a simple as booking the $142 million back into 2002 because, in 2002, Nortel suffered total losses of $3.7 billion. Thus, the effect of restating the $142 million into 2002 would only have been to reduce that loss to $3.5 billion approximately, which would have been an immaterial change to Nortel's financial statements for 2002.

[277]  Mr. Richmond indicated that it was Deloitte's position that Nortel had to comprehensively review its balance sheet so that the true extent of the accrued liability problem would be known and that, only when that had occurred, could consideration be given to the correct accounting treatment of the $142 million in unsupported accrued liability balances that everyone already knew was on Nortel's consolidated balance sheet.

[278]  Mr. Richmond indicated that it was Deloitte's view that it was appropriate to "park" the $142 million on the balance sheet until the comprehensive review of the balance sheet was completed. It was Mr. Richmond's view and Deloitte's view that leaving the $142 million on Nortel's balance sheet did not misrepresent Nortel's financial results. Mr. Richmond explained that Nortel had more than $5 billion in liabilities on its balance sheet in Q2 03 and that, in Deloitte's view, the $142 million was not material to that total. Mr. Chambers, the Crown's expert, offered no opinion to the contrary.

[279]  I accept Mr. Richmond's evidence in this regard and I agree with his conclusion.

[280]  Mr. Richmond further explained that Nortel's profit and loss statement for Q2 03 revealed that it was, at long last, at break-even and that, therefore, the release of the $142 million to the profit and loss statement in Q2 03 would have been material to that statement and, therefore, could not be permitted.

[281]  I agree with this conclusion as well.

[282]  Finally, Mr. Richmond pointed out that Deloitte's was not satisfied that the $142 million represented the entire extent of the problem.

[283]  Mr. Richmond indicated that this discussion between Deloitte and Mr. Dunn went on for a period of time.

[284]  Nortel's second-quarter concluded on June 30, 2003. Mr. Richmond indicated that, sometime in the first two weeks of July 2003, he had a meeting with Mr. Dunn which resolved the matter as follows:

- The $142 million in accrued liabilities, released to the profit and loss statement in Q2 03 and returned to Nortel's balance sheet after Deloitte's objected, would remain on Nortel's balance sheet;

- Nortel would comprehensively review its balance sheet;

- The fact that a comprehensive balance sheet review was taking place would be disclosed in Nortel's public financial filings for Q2 03. Mr. Richmond did not suggest that this aspect of the discussion was contentious.

### The Comprehensive Balance Sheet Review

[285]  Ms. Karen Sledge testified that she participated in the Comprehensive Balance Sheet Review which began at the end of July 2003. During this process, she was part of the team reviewing all of the different accounts from the different regions and business units. She said, as the balance sheet review proceeded, it became clear that that there was more and more on the balance sheet that needed to be corrected. She said that the numbers were increasing every time they looked at the accounts.

[286]  It was Ms. Sledge's evidence that, at some point during the Balance Sheet Review process, those involved realized that there would need to be a restatement of prior years' financial results. Her evidence in this regard is also consistent with Mr. Richmond's evidence that, as the Comprehensive Balance Sheet Review progressed, the quantum of excess accrued liabilities increased. Mr. Richmond indicated that, as a practical matter, the error with respect to accrued liabilities was so large that a Restatement was inevitable.

[287]  I accept this aspect of Ms. Sledge's evidence.

[288]  Mr. McMillan testified that there was a timing sensitivity associated with the first Restatement. Specifically, he said that all of the people involved in the restatement wanted to make sure that it was completed within the normal reporting lines so that the appropriate filings with the SEC and the Ontario Securities Commission would not be delayed. Mr. McMillan said that the need to report in a timely manner made the first Restatement a demanding exercise.

[289]  It was Mr. McMillan's view that "at the end of it I felt that we had done a good job of it and we had managed it within the timeframe". Mr. McMillan also indicated that he was quite surprised that it was necessary to restate Nortel's earlier financial results a second time. I accept Mr. McMillan's evidence concerning timeliness.

[290]  Mr. Richmond also testified that there was pressure to complete the Comprehensive Balance Sheet Review in a timely manner. Mr. Richmond indicated that there was an agreement among the Board, senior management and Deloitte to complete the review "as rapidly as was humanly possible".

[291]  It was Mr. McMillan's view that the Comprehensive Balance Sheet Review and first Restatement was driven by Karen Sledge and Michael Gollogly. He said that these were the two people to whom he regularly reported. McMillan's evidence is not contentious and I accept it. Ms. Sledge work was obviously satisfactory; she remained in Nortel's employ until 2010.

[292]  Mr. Peter Dans testified that there was a "focus on getting the Restatement correct and there was, you know, high level of review that was going to be associated with that to try and ensure that the Restatement was done correctly".

[293]   Mr. Richmond said that it was his observation, as the balance sheet review progressed, that "there were some really tired folk, both at Nortel and our firm in terms of trying to make that happen".

[294]   Mr. Richmond indicated that the Comprehensive Balance Sheet Review exercise was so intense that, at one point, he spoke to the Chairman of the Audit Committee and suggested that Nortel should provide an opportunity for those Nortel and Deloitte employees and partners involved in the Comprehensive Balance Sheet Review to enjoy a long weekend.

[295]   The time pressure was so intense that Mr. Gollogly wrote in his diary "get it done versus get it right" which was a play on the theme for the restatement which was "do it once and do it right".

[296]   Mr. Hathway recounted being present when Mr. Gollogly suggested to Mr. Dunn that the restatement might not be finished in time for Nortel's next public filing; Mr. Hathway indicated that Mr. Dunn was adamant that a delay was unacceptable.

[297]   Mr. Richmond indicated that, in his view, the Deloitte Nortel engagement team, led by Don Hathway and John Cawthorne, was as close to workaholics as he had ever seen; he said their behaviour was matched by the individuals working for Mr. Gollogly.

[298]   Ms. Karen Sledge testified that she remembered one evening where she, Mr. Hathway and Mr. Gollogly were up the entire night resolving balance sheet review issues affecting Nortel's operations in Asia.

[299]   Mr. Hathway was interviewed by the R.C.M.P. in connection with this matter on November 14, 2005. By this time, he was well-aware of the results of the Wilmer Cutler Pickering independent inquiry on behalf of the Audit Committee concerning the causes of the need to restate Nortel's previously-published financial statements. By this time, Mr. Dunn, Mr. Beatty and Mr. Gollogly had been accused of wrongdoing in that report and, as a result, fired for cause.

[300]   During the course of that interview, Mr. Hathway was asked by Sgt. Bone if he felt a conscientious effort had been made during the first balance sheet review. Mr. Hathway said he thought the Nortel side had done a conscientious job. When asked why he thought that, he said "the extent of the work they did, the amount of documentation they tried to go back and find, they did, seemed to me they made a real effort to get behind these items and find out what the real story was, when we asked questions about it, if we were not satisfied with what they gave us initially we would tell them to follow up and it seemed to me they were making a real concerted effort to get you know to respond to our questions and to get the answers…"

[301]   Mr. Hathway confirmed that his answers in the R.C.M.P. interview reflected his thinking, not only at the time of the Comprehensive Balance Sheet Review, but also at the time of his RCMP interview in November 2005.

[302]   During the course of the R.C.M.P. interview, Mr. Hathway recounted a conversation with Mr. Gollogly at the time when it became clear that there would be a restatement. Apparently, Mr. Gollogly asked Mr. Hathway if he, that is Mr. Gollogly, should resign. Mr. Gollogly thought he

2013 ONSC 137 (CanLII)

should resign because he was the Corporate Controller and should accept responsibility for the fact that the Audit Committee found it necessary to restate previously-published financial results. Mr. Hathway told Mr. Gollogly that he did not think he should resign. When asked during the R.C.M.P. interview why he gave Mr. Gollogly that advice, Mr. Hathway said, "my view was Mike was trying to get the numbers right…" Mr. Hathway was asked during his interview if his opinion had changed and he said, "I am not sure my opinion's changed".

### *Was the Comprehensive Balance Sheet Review Comprehensive?*

[303]   The Crown suggested all three accused misinformed the public by saying that the first restatement represented a comprehensive review engaged in for the purpose of correcting past accounting errors.

[304]   The Crown maintains that the first restatement was not comprehensive.   The Crown suggested that the scope of the first restatement was too narrow.

[305]   The Crown suggested that, because Nortel and Deloitte staff worked so hard, the first restatement was under-resourced.

[306]   The Crown submits that the first restatement understated the extent of the errors on the balance sheet and argues this is demonstrated by the fact that there was a second restatement.

[307]   Mr. Wilson, whose evidence I accept, testified that the impact of the restatement of $900 million in accrued liability balances identified during the Comprehensive Balance Sheet Review was favorable to shareholders. The $900 million represented expenses on the balance sheet that did not have to be recognized. Shareholders' equity was increased by $900 million.

[308]   Mr. Wilson described the first restatement as a restatement of over-providing; amounts were brought back which added to the shareholders investment in the company.

[309]   The Crown has never suggested that the $900 million in accrued liability balances ought not to have been restated.

[310]   I accept the evidence of Mr. Richmond, Ms. Sledge, Mr. McMillan and others attesting to the effort that went into the first restatement. No witness testified or suggested that Mr. Beatty or Mr. Gollogly interfered with the first restatement. Mr. Hathway remained convinced, after the release of the Wilmer Cutler Pickering Review and after the investigation into this matter had begun, that "Mike was trying to get the numbers right".

[311]   I propose to separately consider why there was a second restatement and the inferences to be drawn from that restatement.

[312]   I am satisfied the Comprehensive Balance Sheet Review was, in a word, comprehensive.

[313]   I am not satisfied that the scope of the first Comprehensive Balance Sheet Review (a review of all accrued liability balances in excess of $100,000 and a review of all accrued liability balances released to the profit and loss statement equal to or in excess of $2 million) was too narrow in scope.

[314]   It became apparent in the late summer that a restatement would likely be necessary. The scope of the Comprehensive Balance Sheet Review was approved by Nortel's auditors and Nortel's Audit Committee. Nortel's Audit Committee and auditors knew that the decision to restate earlier published financial statements would attract regulatory interest. It was to satisfy regulators that Nortel's Audit Committee hired Wilmer Cutler Pickering to conduct an independent review of the circumstances leading to the decision to restate. I am satisfied that, without the benefit of hindsight, Nortel's auditors and Nortel's Audit Committee thought that these parameters were reasonable.

[315]   I am not satisfied that the first restatement was under-resourced. Deloitte was free to add staff as they saw fit. Mr. Richmond did not hesitate to recommend that Nortel staff and Deloitte staff be compelled to take a long weekend. I have no doubt he would have recommended that Nortel find additional staff for the Comprehensive Balance Sheet Review if it had come to his attention that the project, which he had insisted upon, was being compromised because it was under-resourced on the Nortel side. The Comprehensive Balance Sheet Review did, in fact, reveal that approximately $900 million in accrued liability balances needed to be restated.

[316]   I am not satisfied that the original balance sheet review was too narrow in scope

[317]   I am satisfied that there was intense pressure to complete the Comprehensive Balance Sheet Review as quickly as possible. I do not attribute this imperative to the accused alone. I accept the evidence of Mr. Richmond that there was an agreement among the Board, senior management and Deloitte that the Comprehensive Balance Sheet Review should be completed "as rapidly as was humanly possible". I am satisfied that this imperative existed because Nortel wanted to put the balance sheet review and a restatement, if there was indeed going to be one, behind them as quickly as possible and because the accused and Nortel's Audit Committee wanted to make their appropriate filings with the SEC and the Ontario Securities Commission within normal reporting lines.

[318]   I am not satisfied, on the evidence, including the evidence specifically referred to, that the first restatement was not comprehensive because timelines were short.

[319]   I am not persuaded that any or all of the three accused insisted upon an unreasonably short timeline in an effort to make certain that the first restatement failed to uncover the true extent of the accrued liability problem on Nortel's balance sheet.

[320]   I attach no importance to the fact that Mr. Beatty told Mr. Cleghorn, the chair of the Audit Committee, that he, that is Mr. Beatty, viewed a restatement as a last resort or that a restatement was a last resort. Mr. Beatty's statement proves that his attitude toward a restatement was consistent with what Mr. Richmond described as the attitude of corporations generally.

[321]   The restatement of these accrued liability balances had no cash impact on Nortel's cash reserves. Maintaining sufficient cash reserves to keep Nortel functioning was the most pressing responsibility of Nortel senior management, Audit Committee and Board of Directors. In fact, neither the first restatement nor the second restatement had an effect on Nortel's critically important cash reserves.

[322]   Mr. Richmond testified that Nortel lost $3.5 billion in 2000, $27 billion in 2001 and $3.7 billion in 2002. It was his view that the $900 million in excess accrued liability balances was not material to Nortel's financial statements in those years. Mr. Chambers did not offer a contrary opinion.

[323]   Mr. Chambers did not offer any opinion concerning the comprehensive balance sheet review or the first restatement.

[324]   I am not satisfied beyond a reasonable doubt that Nortel's original financial statements for 2000, 2001, 2002, Q1 03 and Q2 03 were materially misstated. I am not satisfied that Nortel's original financial statements for those fiscal years materially misrepresented Nortel's financial results. I am not satisfied beyond a reasonable doubt that Nortel's financial statements published after the first restatement materially misrepresented Nortel's financial results.

[325]   I am satisfied that Nortel's original financial statements for the years 2000, 2001, 2002, Q1 03 and Q2 03 properly reflected Nortel's financial reality.

### *The results of the second restatement*

[326]   The Crown relied upon the fact of and results from the second restatement as proof that the first restatement was not comprehensive.

[327]   Mr. Richmond indicated that, when it became clear in October 1993 that there were $900 million in excess accrued liability balances to be restated, he suggested that the directors retain independent attorneys to review the circumstances which led to both the recording of excess accrued liability balances on Nortel's consolidated balance sheet and the decision to restate previously-published financial statements for fiscal 2000, 2001, 2002, Q1 2003 and Q2 2003.

[328]   The independent attorneys chosen were from the U.S. firm of Wilmer Cutler Pickering.

[329]   The Summary of Findings and Recommended Measures resulting from the WCP Review ("WCP Summary") was received in evidence for contextual purposes and not as proof of the facts or conclusions contained within it.

[330]   The WCP Summary is contextual in the sense that it affected conduct which was the subject of evidence in these proceedings. For example, it precipitated the decision by the Board of Directors to restate for a second time. It also precipitated the decision by the Board of Directors to terminate all three defendants for cause. Finally, Mr. Hathway repeatedly asserted during his testimony that Deloitte's attitude toward Nortel would have been different had Deloitte known about the matters disclosed in the WCP Summary.

[331]   The WCP Summary recorded the conclusion that the defendants and other persons employed in the former finance management of Nortel carried out accounting practices relating to the recording and release of provisions that were not in compliance with US GAAP in at least Q3 2002 and Q4 2002 and Q1 2003 and Q2 2003.

[332]   The WCP Summary concluded that the dollar value of the individual provisions recorded and released was relatively small and that the aggregate value of the provisions made the

difference between a profit and a reported loss on a pro forma basis in Q4 2002 and the difference between a loss and a reported profit on a pro forma basis in Q1 2003 and Q2 2003.

[333]  Nortel did not publish pro forma results in Q1 03 or Q2 03.

[334]  The WCP Summary concluded that these practices were undertaken to meet internally imposed pro forma earnings targets.

[335]  The WCP Summary concluded that the conduct in question caused Nortel to pay bonuses to all employees and senior management under bonus plans tied to pro forma profitability.

[336]  The WCP Summary recorded that the work of Nortel's external auditor, Deloitte & Touche LLP, was not examined, although several current and former audit partners were interviewed.

[337]  With respect to the Q3 2003 and Q4 2003, the WCP Summary concluded that no evidence emerged to suggest an attempt to release provisions strategically in those quarters. However, given the significant volume of accrued liability balance releases in those quarters, it recommended a review of releases down to a low threshold.

[338]  In addition, the WCP Summary recorded a series of recommendations intended to prevent a recurrence of the conduct uncovered by the WCP Review.

[339]  I do not wish to imply that I disagree with the Wilmer Cutler Pickering conclusions. I have no opinion about their conclusions. Forming an opinion about their conclusions would confuse my task with theirs, fail to take into account differences in the evidence we considered and fail to take into account my standard of proof and whatever standard they used. Wilmer Cutler Pickering was answering a question: what were the facts and circumstances leading to the need to restate Nortel's previously-published financial statements for the relevant periods (*i.e.*, 2000, 2001, 2002, Q1 03 & Q2 03)? I am trying to determine beyond a reasonable doubt whether Nortel's financial results were deliberately misrepresented during the time-frame of the indictment.

[340]  Mr. Richmond stated that, on or about March 5, 2004, he found out that Wilmer Cutler Pickering intended to recommend that Nortel restate its prior financial results yet again. Mr. Richmond briefed the Chairman of the Board and the Chairman of the Audit Committee. Mr. Richmond's briefing led to a March 10, 2004 Board meeting attended by representatives of the Wilmer Cutler Pickering firm and, following the Board meeting, a press release, dated March 10, 2004.

[341]  The March 10, 2004 press release announced that Nortel Networks would delay filing its 2003 annual reports. The press release indicated that Nortel was re-examining the establishment, timing of, support for and release to income of certain accrued liabilities in prior periods. The press release indicated that Nortel suspected that it would have to revise both its previously announced consolidated results for the fiscal year ending December 31, 2003 and its consolidated results for one or more earlier quarterly periods.

[342]  Mr. Richmond testified that, when Nortel publicly-stated that it was going from the first Restatement to a Second Restatement, the level of interest in its affairs was intense. He stated that everyone from the Ontario Securities Commission to the SEC was looking over the collective shoulder of Nortel and Deloitte. He said that there was a mandate to get the Second Restatement right in an environment where there was significant litigation going on in the marketplace. He described it as a "high-stakes game".

[343]  Mr. Hathway indicated that the parameters for the second restatement were chosen as a result of the findings of the Wilmer Cutler Pickering independent review. He testified that the Wilmer Cutler Pickering Review revealed information which suggested that aspects of the prior accounting were not correct and raised the potential of earnings management. It was Mr. Hathway's view that these findings eroded confidence in senior management and resulted in a second restatement.

[344]  Mr. Hathway accepted the Wilmer Cutler Pickering conclusions and, based on those conclusions, testified that the first restatement was not comprehensive. As indicated earlier, I do not accept Mr. Hathway's conclusion.

[345]  I am satisfied that, once the Audit Committee received the Wilmer Cutler Pickering Review, it was necessary in response to that information to restate for a second time.

[346]  The evidence established that this second review of Nortel's previously-published financial results considered issues related to revenue recognition, as well as the release of accrued liability balances. Thus, it not only dealt directly with Nortel's consolidated balance sheets, but also directly with the revenue side of its consolidated profit and loss statements.

[347]  The thresholds for the first and second restatement were not the same. The first restatement reviewed all accrued liability balances in excess of $100,000; the second restatement reviewed all accrued liability balances in excess of $10,000. The first restatement reviewed all releases of accrued liability balances to income in excess of $2 million; the second restatement reviewed all releases of accrued liability balances to income in excess of $100,000.

[348]  The Second Restatement of Nortel's previously-published financial results was released January 11, 2005.

[349]  A press release, dated January 11, 2005, announced the restatement of Nortel's consolidated financial results for the fiscal years ended December 31, 2001 and 2002. It also released a revision of Nortel's previously-announced results for the 2003 fiscal year.

[350]  The various press releases were admitted into evidence as business records. The press releases were also attached to Nortel's filings with the SEC. SEC filings were received as business records.

[351]  The January 11, 2005 press release announced that the restated financial results reflected substantial revenue adjustments. The adjustments in revenue, according to the press release, had to be made because there had been accounting errors in Nortel's previously-released consolidated financial results related to revenue recognition. The press release announced that

Wilmer Cutler Pickering would be conducting a further independent review of the circumstances that led to the erroneous recognition of revenue.

[352]  The causes of the substantial revenue recognition adjustments reflected in the Second Restatement were not developed in the evidence offered in this case.

[353]  This aspect of the January 11, 2005 press release is consistent with the evidence of Ms. Karen Sledge, whose evidence in this regard I accept, that the first Restatement focused primarily on the accrued liabilities on the balance sheet, while the Second Restatement had a much broader scope.

[354]  The Crown's expert, Mr. Chambers, indicated that, as a general rule, expenses are to be matched with revenues as long as it is reasonable to do so. Accordingly, the logical inference is that, if revenues are re-profiled or restated from one financial quarter to another, the expenses associated with earning those revenues will be similarly re-profiled or restated.

[355]  The first restatement was published December 23, 2003; the second restatement was announced March 10, 2004. The reason for the proximity of these two announcements was disclosed in the evidence.

[356]  Mr. Richmond recommended to the Board that it not file the restated financial statements until Wilmer Cutler Pickering had completed their independent review. Mr. Richmond testified that there was no legal or regulatory requirement to file the restated financial statements on or about December 23, 2003. It was Mr. Richmond's view that, now that the first restatement was completed, the restated financial statements could be put to one side until Wilmer Cutler Pickering provided their advice, which was expected by mid-February 2004.

[357]  The Board, for its own reasons, decided to publish the restated financial statements without waiting. Mr. Richmond conferred with the Wilmer Cutler Pickering firm, who advised that, at that point in December 2003, they knew of no reason why the restated financial statements could not be published. Accordingly, the statements were published.

[358]  A short time later, Wilmer Cutler Pickering advised, among other things, that the accused had engaged in earnings management and that there should be a review of Nortel's previously-published financial results.

[359]  Neither the first or second restatement affected Nortel's critically-important cash reserves. The Wilmer Cutler Pickering review did not suggest that Nortel's cash reserves had been misrepresented in Nortel's original financial statements or in the first restatement of those financial statements.

[360]  The first restatement of previously published financial results differed from the 2nd restatement because the thresholds for the 2nd restatement were lower and because the 2nd restatement considered errors in revenue recognition as well as accrued liabilities.

### *Inferences concerning Nortel's restated financial results for Q1 03 and Q2 03*

[361]   During Q1 03, Nortel's financial results were affected by the release of $361 million in accrued liability balances to income. These releases affected Nortel's balance sheet and profit and loss statement for Q1 03. The first restatement restated $111 million of these balances. The second restatement restated a further $106 million of these balances.

[362]   During Q2 03, Nortel's financial results were affected by the release of $372 million in accrued liability balances to income. These releases affected Nortel's balance sheet and profit and loss statement for Q2 03. The first restatement restated $105 million of these balances. The second restatement restated a further $105 million of these balances.

[363]   The Crown submits that this indicates that the original Q1 03 and Q2 03 releases were not in the "normal course" and that, therefore, Nortel's financial results were misrepresented in the original financial statements and the first restatement of those financial statements. The Crown argued that the effect of the two restatements was to demonstrate that approximately 2/3 of the accrued liability balances released during Q1 03 and Q2 03 were wrongly released in those periods. The Crown submits that this supports its argument that the Comprehensive Balance Sheet Review was misrepresented as comprehensive and that the resulting financial statements misrepresented Nortel's financial results.

[364]   In my view, this is an incomplete interpretation of the restatement process. The restatement process had the effect of restating releases of accrued liability balances in two directions:

- releases of accrued liability balances to income came out of the profit and loss statements for Q1 03 and Q2 03 into which they had erroneously been released. These releases were restated to the profit and loss statements for the quarters into which they should have been released;

- releases of accrued liability balances came into the profit and loss statements for Q1 03 and Q2 03, if those quarters were the quarters into which those balances should have been released.

[365]   The Crown's interpretation only takes into account the accrued liability balances removed from income and, as a result, is incomplete.

[366]   One of the late entry accruals provided by Mr. Morita, the PRC securitization release, was restated from Q4 02 to Q1 03. Although a small amount, $1.8 million, it is an example of a release that was restated into Q1 03. The fact that this release into Q1 03 was randomly reflected in the evidence illustrates that it is reasonable to conclude that other releases were restated into Q1 03. The evidence does not permit an analysis of the net effect on a quarter-by-quarter basis of the restating of accrued liability balances.

[367]   Mr. Chambers did not offer the opinion that this "one way analysis" was valid.

[368]   The reason for releasing specific balances undermines the suggestion that the 3 accused are responsible for the Q1 03 and Q2 03 balances that were restated.

[369]  The evidence demonstrated that at least one release was restated out of Q1 03 because Deloitte disagreed with itself. An example of this seemingly odd conclusion is the Genuity release ($23 million) which is discussed elsewhere in these reasons.

[370]  The PWC accrued liability release ($19 million), also discussed elsewhere, was restated out of Q1 03 on the basis of the legal opinion which was produced in April 2004 after the accused had been dismissed from their positions.

[371]  The fact that the results of the first restatement were tested undermines that portion of the argument which suggests that the first restatement misrepresented Nortel's financial results.

[372]  Mr. Dans testified that he was involved with Deloitte when they performed a trending analysis to validate the results of the first restatement. He stated that each of the leadership categories presented to Deloitte & Touche the results of the restatement and explained the trends that resulted from the restatement to validate those trends from a business perspective. He described it as a "validation exercise."

[373]  No evidence suggested that this trending analysis indicated that the results of the first restatement could not be validated from a business perspective. No evidence suggested Mr Dans was mistaken about the validation exercise. The trending analysis was not produced. I accept this aspect of Mr. Dans' evidence.

[374]  The restatement of individual accrued liability balances occurred for a variety of reasons. It is not safe to generalize. The specifics of each restated balance have to be looked at in order to see what inferences they support. The first restatement was validated. No expert offered an opinion concerning the Comprehensive Balance Sheet Review and the first restatement.

[375]  As indicated earlier, I am satisfied that the first restatement of previously published financial results differed from the 2nd restatement because the thresholds for the 2nd restatement were lower and because the 2nd restatement considered errors in revenue recognition as well as accrued liabilities.

[376]  I am not satisfied, by the evidence, that the first restatement of accrued liability balances released in Q1 03 and Q2 03 demonstrates that the 3 accused misrepresented Nortel's original financial results. I am not satisfied, by the evidence, that the 2nd restatement of accrued liability balances demonstrates that the 3 accused misrepresented Nortel's financial results as first restated.

## Q4 02-THE 4TH QUARTER OF 2002

[377]  Q4 02 was the subject of considerable evidence. The Crown argued that the accused attempted to manage earnings in Q4 02 and, in so doing, deliberately turned a pro forma profit into a pro forma loss.

[378]  The Crown submitted that the solicitation of late accrued expenses/liabilities wrongly converted a pro forma gain before taxes into a pro forma loss before taxes in Q4 02.

[379]  Mr. Harrison described how his solicitation of late entry accrued expenses and liabilities for fiscal Q4 02 came about.

[380]  As indicated earlier, after the business unit sub-ledgers had been closed and the business unit financial results submitted to corporate headquarters, Mr. Harrison frequently prepared an Outlook document to give management a hint of the consolidated financial results. This Outlook document was a snapshot of the results from the general ledger.

[381]  At a daily status update meeting, Mr. Harrison shared his latest Outlook snapshot. Mr. Harrison also commented on what entries were still to be made.

[382]  Typically, the Assistant Corporate Controller, Linda Mezon, the Controller, Michael Gollogly, Mr. Harrison and someone from his staff would be in attendance.

[383]  Mr. Harrison identified one of these snapshots, dated January 6, 2003, which indicated that Nortel's pro forma gain before taxes was $73 million. Mr. Harrison testified that, when he announced this result at the January 6 status meeting, there was surprise. He testified that showing a profit in Q4 02 seemed out of context. He described the feeling at the meeting was that the result did not make sense.

[384]  Skepticism concerning Mr. Harrison's calculation of a pro forma gain before taxes of $73 million was justified. Nortel's pro forma income calculations excluded gains on the buyback of bonds. Mr. Harrison erroneously included $59 million in gains from one such bond transaction in his January 6 Outlook calculations. Mr. Harrison had overstated Nortel's pro forma net gain before taxes by this amount.

[385]  Mr. Harrison corrected his error two days later. By this time, Mr. Harrison had solicited the late entry accrued expenses/liabilities of which the Crown now complains.

[386]  Mr. Harrison testified that, as a result of the skepticism concerning his calculation, he agreed to make calls to senior finance individuals in each of the business units and the Regions to see if they had accrued expenses/liabilities which they had failed to record.

[387]  Mr. Harrison had no clear recollection of any particular person asking him to make these calls; he said the idea that he would do that came from the meeting. Mr. Harrison testified he had never before made a call of this nature.

[388]  Mr. Harrison testified that he made these phone calls and told each of the individuals to whom he spoke that Nortel's results were very favorable and asked each of the individuals if they had any accrued expenses they needed to cover.

[389]  Mr. Harrison's calls resulted in the various business units booking approximately $176 million worth of accrued expenses/liabilities.

[390]  Mr. Harrison created a list of the individual accrued expenses which he had solicited and testified that $137 million of this total came from Non-op which Mr. Harrison stated was under the "purview of the Controller". Mr. Harrison, elsewhere on the same list, indicated that $126

million in additional accrued expenses came from Non-op. The reason for this discrepancy is not clear.

[391]  Two days later, January 8, 2003, Mr. Harrison's Outlook, or snapshot at the daily status meeting, suggested that Nortel was going to have a pro forma loss before taxes of $73 million, rather than a pro forma gain of $73 million.

[392]  Mr. Harrison indicated that, if he had not made the calls, the $176 million in accrued expenses would not have been booked and that Nortel's pro forma and US GAAP results would have not reflected the $176 million in negative impacts represented by the late entry accrued expenses/liabilities.

[393]  Mr. Harrison confirmed that if, the Q4 2002 results had reflected a pro forma gain before taxes, most of Nortel's employees would have been entitled to all or part of a Return to Profitability Bonus.

[394]  The payment of this bonus in Q4 2002 was awkward from Nortel's point of view because, in Q4 2002, Nortel experienced a loss calculated according to US GAAP of $248 million. This result had to be publicly reported. Bonus payments were payable if net pro forma income was positive after allowing for the cost of the bonus. The bonus was payable regardless of the fact that that there was a US GAAP loss.

[395]  The awkwardness, to which I refer results from the fact that Nortel would have publicly reported a US GAAP loss and, at the same time, publicly reported that it was paying its employees a bonus. The evidence disclosed that it was well-known that other publicly-traded corporations had been criticized for precisely this behavior.

[396]  The three accused representing Nortel senior management were motivated to avoid such a situation.

[397]  Additional accrued expenses/liabilities which were all that Mr. Harrison was soliciting would have a negative impact on pro forma earnings. Sufficient additional accrued expenses /liabilities could, therefore, turn a pro forma gain before taxes into a pro forma loss before taxes. If Nortel reported a pro forma loss before taxes in its press release announcing Q4 02 financial results, then no bonus would be payable.

[398]  Reporting a pro forma loss before taxes in Q4 02 was expected.  Mr. Dunn had publicly predicted pro forma gains before taxes in Q2 03 or the second quarter of 2003.

[399]  Mr. Beatty had expressed himself to Mr. Harrison on a related issue. In a conversation in Q3 02 or the third quarter of 2002, according to Mr. Harrison, Mr. Beatty stated that "The Street" would not reward Nortel for only one quarter of positive earnings. Mr. Harrison said that he understood the objective was constant positive results.

[400]  It is not contrary to the criminal law to attempt to manage the affairs of a corporation to achieve a financial target. The question is whether, in attempting to achieve the targeted result, those responsible for preparation of the corporation's financial results cause the financial statements to misrepresent the corporation's financial results.

2013 ONSC 137 (CanLII)

[401]   Accordingly, the question becomes did the late entry accrued expenses/liabilities cause a misrepresentation of Nortel's financial results?

[402]   Before considering the additional accrued liability balances which resulted from Mr. Harrison's solicitation, I propose to discuss the participation of Mr. Dunn, Mr. Beatty and Mr. Gollogly in the solicitation of additional accrued expenses.

### The participation of Mr. Dunn and Mr. Beatty

[403]   Nortel was a multibillion-dollar year business, international in scope and publicly-traded. It was also financially at risk. When Nortel announced a quarterly result, the auditors had to take a view of the next twelve months from the date of the quarterly report and opine on whether Nortel would be able to continue in business as a going concern.

[404]   It is not logical and I decline to draw the inference that matters affecting Nortel's pro forma and US GAAP earnings escaped the attention of Nortel's CFO and CEO. Both Mr. Dunn and Mr. Beatty were accomplished accountants. Mr. Dunn, in particular, was described as very intelligent with a mind for detail. The evidence disclosed that on a trip to China, as one would expect, he made arrangements to be kept informed of the final 2002 financial results. Mr Dunn told Mr. Wilson that Nortel was profitable on operations in Q4 02 but the quarter was going to be negative due to accruals including 360 Networks.

[405]   Exhibit 1, tab 30 was received as a business record. It is, therefore, capable of proving the facts contained in it. One of the facts contained in the business record is that Mr. Beatty discussed with Mr. Dunn the $30 million increase in Optical's excess and obsolete inventory accrued liability balance. The increase in this balance came about as a result of Mr. Harrison's solicitation of additional accrued expenses. Thus, the evidence is that Mr. Dunn was informed by Mr. Beatty of Optical's response to Mr. Harrison's communication.

[406]   Nortel's Board of Directors decided to pay a Return to Profitability Bonus based on Nortel's 2002 formula for calculating pro forma gains (losses) before taxes. The bonus was created, in part, at Mr. Dunn suggestion because Nortel's competitors were attempting to hire away Nortel employees. It stands to reason that conclusions concerning whether the bonus was payable or not would be brought to Mr. Dunn's attention.

[407]   Mr. Beatty, as Nortel's CFO, would obviously be preoccupied with Nortel's financial results.

[408]   Mr. Gollogly was Nortel's Controller. Mr. Gollogly was at the meeting on January 6, 2003 when Mr. Harrison announced that his calculations indicated that Nortel was pro forma positive by $73 million at that point in time. It was at the same meeting that it was decided that Mr. Harrison would call around and solicit late entries.

[409]   I am satisfied that all three accused knew that Mr. Harrison was soliciting additional late entry accrued expenses/liabilities for fiscal Q4 02.

*The specific late entry accrued expenses/liabilities solicited by Mr. Harrison*

*The solicitation of late entries from Karen Sledge*

*Late entry Fringe and Vacation accrued liability balances*

[410]   Karen Sledge offered some testimony concerning the solicitation of additional accrued expenses in connection with Fringe and Vacation benefits during the close of the books for Q4 02.

[411]   Ms. Sledge is a CPA, which is the American designation which corresponds to our C.A. In Q4 2002, Ms. Sledge was responsible for accrued liability balances for vacations, holidays and termination benefits. Ms. Sledge indicated that she took on this responsibility in 2002, which was also the first year that she had U.S. Controller responsibilities.

### *Fringe Benefit Accrued Liability Balances*

[412]   In September or October 2002, Ms. Sledge and her team made a forecast that they did not have enough expenses accrued to cover medical costs in the U.S. throughout the fourth quarter of 2002.

[413]   Ms. Sledge indicated that an additional $13 million should be added to the Fringe accrued liability balance. This was done in October 2002. This increase in the accrued liability balance negatively affected Nortel's Q4 02 results by $13 million.

[414]   This conclusion was based on a review of medical costs associated with recently-terminated employees which demonstrated that recently-terminated employees took greater advantage of medical benefits than active employees. Apparently, terminated employees in 2002 spent approximately 141% of active employees' expenditures. Terminations in 2002 were 6% higher than originally estimated. Medical costs rose between 18 and 20% in 2002, resulting in significantly higher prescription drug costs.

[415]   On December 20, 2002, only two months after the original forecast, Ms. Sledge's staff indicated that they had overestimated this accrued liability balance by $7.3 million. This meant that, on December 20, 2002, Ms. Sledge and her team thought that a release to the profit and loss statement in the amount of $7.3 million would reduce the Fringe accrued liability balance to the appropriate level.  This meant that the $7.3 million would positively affect Nortel's Q4 02 results by $7.3 million.

[416]   On January 3, 2003, two weeks later, Ms. Sledge advanced a new position, namely that the Fringe accrued liability balance should be reduced by $37 million. This meant that the Fringe accrued liability balance had been overestimated by $37 million. This meant that Q4 02 results would be positively affected by $37 million. A journal entry recording this $37 million reduction was made on January 4, 2003.

[417]   Ms. Sledge received two or three telephone calls from Mr. Gollogly on January 5 or 6, 2003, as well as a call from Mary Cross, her immediate supervisor, expressing concern about the $37 million release.

[418]   According to Ms. Sledge, Mr. Gollogly asked her to take a look at her decision to release this $37 million and Ms. Sledge initially responded that she thought the decision to release the accrued liability was correct. Ms. Sledge indicated that Mr. Gollogly became more emphatic about the need for her to reconsider the release with each call.

[419]   Ms. Sledge said that she then increased the Fringe accrued liability balance by $11 million. A journal entry recording this $11 million increase was made on January 13, 2003. This, in effect, reduced the $37 million positive impact on earnings by $11 million. Ms. Sledge testified that, without these calls, she would not have increased the Fringe accrued liability balance.

[420]   Ms. Sledge based her decision to increase the Fringe accrued liability balance by $11 million on invoices that had been incurred but not yet received from medical institutions. A trending analysis was done on these invoices and this analysis indicated the invoices would ultimately come in higher than expected.

[421]   Ms. Sledge said that she asked her own team to consider whether the $11 million increase was justified. Their verification of the increase was communicated to Ms. Sledge on January 13, 2003. Accordingly, the Fringe accrued liability balance was adjusted upwards by $11 million at that time.

[422]   Ms. Sledge indicated that she then asked her staff to determine why their initial forecast had suggested a $13 million increase in the Fringe accrued liability balance was necessary and then their subsequent forecast recommended a $37 million reduction in the accrued liability balance. Ms. Sledge's staff discovered a $19 million double counting error was, in part, responsible. In addition, Ms. Sledge's staff discovered that four months of employee severance notifications and their corresponding medical expenses had been overlooked in their original calculations.

[423]   It is clear from Exhibit 58A, tab 8 that Deloitte & Touche audited Ms. Sledge's decision to increase the Fringe accrual by $11 million. It appears that Deloitte did this on January 17, 2003. Deloitte concluded that the Fringe accrued liability balance should be increased, but only by $8.7 million and a downward adjustment of $2.3 million, representing the difference between $11 million and $8.7 million, was made in Q1 03.

[424]   Nortel published its Q4 02 results on January 23, 2003.

[425]   Ms. Sledge testified that the accrual increase was restated during the Second Restatement. Deloitte restated the $11 million increase because the increase was "not based on sufficient and/or appropriate evidence to support the accrual".

### Vacation Expenses

[426]   Ms. Sledge testified that she was also responsible for accrued liability balances for vacation expenses. She said that, after she had submitted her figures, she was asked by her supervisor, Mary Cross, and by Mr. Gollogly if she had any other accrued expenses/liabilities to record in Q4 02.

[427]   Ms. Sledge knew that there had been a $9 million release of vacation accrued liability balances to the profit and loss statement. Ms. Sledge reversed the release of this $9 million to the profit and loss statement. She did so by increasing the percentage factor that Nortel used in establishing vacation liability. Specifically, she increased the percentage factor from 75% to 85%.

[428]   Ms. Sledge's increase in the percentage factor used in establishing vacation liability and the supporting documentation were specifically brought to the attention of Deloitte & Touche.

[429]   In an e-mail to Deloitte explaining the decision, Ms. Sledge that prior to 1998, the U.S. had used 100% as a vacation factor and Canada 75%. In September 1998, after a survey of North American employers to determine the average vacation days on hand, a decision was made to use 75% as a factor across North America. Due to unusual circumstances at Nortel in 2002, which Ms. Sledge partially identified as layoffs, management churn and employees not taking time off out of fear that they would be laid off, the consensus was reached that Nortel North American employees had not taken vacation and, therefore, a factor of 85% factor was more appropriate than 75%.

[430]   Ms. Sledge indicated in her e-mail that a North American survey and analysis was scheduled for June-July 2003 and that further adjustments could be made upon receipt of the survey results and analysis.

[431]   The North American survey was conducted in May 2003, which suggested a range of percentages varying from 77% to 89%.

[432]   The $9 million increase in the vacation accrued liability balance was restated in the second restatement. The reason given for restating this $9 million increase was that the results of the survey were not available at the end of Q4 02.

[433]   The restatement set the appropriate percentage at 85% for Q2 03 and Q3 03, which was the period when the study was available. The restatement set the appropriate percentage factor at 77% for Q4 03.

### Soliciting accrued expenses in Asia

[434]   Glenn Morita joined Nortel in 1997 and became a chartered accountant in 1998. Commencing in 2000, he was stationed in what Nortel termed the Asia Region. His title was Director of Finance.

[435]   Asia Region was very large; it included China, India, Pakistan, Australia, New Zealand, Taiwan and Japan.

[436]   When Mr. Morita first arrived in Asia Region, he reported to Mr. Gollogly. Mr. Morita knew Mr. Gollogly prior to being stationed in Asia because both of them were stationed in Brampton for a time.

[437]   While in Asia Region, Mr. Morita was responsible for end of year, budgeting, forecasting and financial reporting. Mr. Morita said that he was also responsible for passing information along to the Corporate Consolidation Group in Brampton headed by Mr. Harrison.

[438]   Mr. Morita indicated that, during the quarterly close of the general ledger, it was his responsibility to make sure that partial almost complete deals were properly documented so that Asia Region could book the revenues and the appropriate expenses associated with those revenues. Mr. Morita also indicated that, sometimes, it was possible to proceed more quickly with part of a project and, thereby, trigger a release of an accrued liability balance to income.

[439]   During the course of his cross-examination, Mr. Morita indicated that accrued expenses booked in Asia were not readily visible in North America, with the result that Corporate in Brampton depended upon Asia Region to tell them about potential accrued liability releases to the profit and loss statement.

[440]   Mr. Morita indicated that he had received a request to look for potential accrued expenses/liabilities that had been missed at the original close of the Asia Region sub-ledger. Mr. Morita said the request came from Mr. Gollogly and his team. He recalled the request specifically as being one to survey the Region and all the Regional Financial Primes for risk areas that they might want to cover off.

[441]   Mr. Morita said that he spent the day making calls around the Region asking if there were accrued expenses/liabilities which people wanted to book to the general ledger.

[442]   Mr. Morita pointed out that, at the time he was making these calls in January, the books in Asia Region had already been closed and Asia Region had already submitted its final Q4 02 figures to corporate headquarters in Brampton.

[443]   Mr. Morita booked three additional items totaling $4.8 million. He said that these were not large items; they were not material at the corporate consolidations level. Mr. Morita indicated that because he was sending these three items so late in the process, he thought the entries would be refused because they were not material to the results. Mr. Morita testified that he sent the information along to demonstrate that he had cooperated with the request from Mr. Gollogly and his team. He indicated that he had no backup for these accruals when he sent them along. Back up was obtained later.

[444]   The $4.8 million in accrued expenses was, in fact, booked to the General Ledger on January 8, 2003. Mr. Morita agreed on cross-examination with the suggestion that he viewed this process as an opportunity to make things more accurate; to go back and to double-check for opportunities to cover off risk.

[445]   It appears that one of these items (the PRC securitization release) was restated from the Q4 02 profit and loss statement to the Q1 2003 profit and loss statement. The reason for this restatement appears to be that it was part of a Securitization Review.

[446]   Mr. Morita indicated that the $4.8 million in additional accrued expenses, which he submitted, were given to him by his contacts in the various countries. He indicated that the three accrued expenses which he submitted were genuine and verifiable. Mr. Morita indicated that he

went through each expense with the individual submitting the expense. It was his view that, if he had not booked these accrued expenses in Q4 02, they would have been booked in a subsequent quarter. Mr. Morita was firm that he would not have engaged in this process if he thought he was doing something wrong or incorrect.

[447]  Mr. Morita indicated that, from his perspective, whether it was proper to set-up an accrued expense or release an accrued liability balance to the profit and loss statement depended upon whether the set-up or release could be justified.

[448]  Mr. Morita indicated that, from his perspective, while it was not proper to release accrued expenses to the profit and loss statement to meet targets, the appropriate release of accrued liabilities to the profit and loss statement could, in fact, assist in meeting targets.

### *The solicitation of additional accruals from Ken Crosson*

### *Excess and obsolete inventory*

[449]  Mr. Crosson joined Nortel in 1975 after obtaining an MBA from York University. From 2000 to 2003, he was the Vice-President of Global Operation; he was located in Raleigh, North Carolina. Mr. Crosson had between twelve and seventeen people reporting to him. Mr. Crosson reported to the accused Douglas Beatty. He was terminated by Nortel in 2003 for matters apparently unrelated to this case.

[450]  Global Operations was a single supply chain that supplied product to various lines of business. Mr. Crosson was responsible for the financial management of the supply chain in the manufacturing of Nortel's products. Mr. Crosson was responsible for efficiently managing inventory; this was one of his two prime responsibilities.

[451]  Mr. Crosson indicated that gross inventory was valued at $2 billion and that there was an accrued liability balance for inventory for $1 billion approximately. In Mr. Crosson's words, <u>half</u> the inventory "was provided for". The risk with respect inventory was that it was excess or obsolete; *i.e.*, not sold within the appropriate period of time or unusable.

[452]  Mr. Crosson pointed out that excess inventory on the books of Nortel's contract manufacturers was, in many cases, Nortel's responsibility and had to be provided for. According to Mr. Crosson, determining who was responsible for what was a contentious matter among Nortel and its contract manufacturers. Finally, Mr. Crosson indicated that the Optical business unit had an inventory problem. Specifically, Optical's exposure on account of excess and obsolete inventory was more than $500 million or approximately ½ of the total accrued liability balance on account of excess and obsolete inventory.

[453]  The precise amount of the inventory accrued liability balance was determined by an algorithm or formula. Obsolete inventory was not usable and so the accrued liability for it was 100% of its value on Nortel's books. Excess inventory was inventory calculated on a percentage basis based on whether the inventory was six-months-old, nine-months-old or one-year-old. The algorithm made these calculations.

2013 ONSC 137 (CanLII)

[454]  Mr. Crosson testified that determining the level of excess inventory involved judgment and forecasting. Forecasting is important because, if orders do not come in and revenues are not as anticipated, then there will be a calculation suggesting that excess inventory is greater than originally anticipated and the accrued liability balance for excess inventory will have to be increased. Optical was particularly vulnerable in this regard.

[455]  The accrued liability balance for excess and obsolete inventory was also affected by various attempts to dispose of the inventory. For example, Nortel approached manufacturers of similar items and offered its excess or obsolete inventory to them at a significant discount. Mr. Crosson testified that Deloitte & Touche took an active interest in auditing these excess or obsolete inventory mitigation programs.

[456]  Mr. Crosson indicated that the Optical business unit had not reached "the bottom" and so there was always the risk that the accrued liability balance on account of Optical's inventory was not sufficient. Specifically, the possibility was that, when the algorithm was applied to Optical's inventory, it would indicate that the accrued liability balance for Optical's inventory must increase.

[457]  Mr. Crosson indicated that running the algorithm for all of Nortel's inventory required time; specifically, it required you to input the age of the inventory and then run the algorithm. It was not something that could be done instantaneously. Accordingly, a decision was reached in late 2002 to postpone re-evaluating the inventory and focus on disposing of it.

[458]  Mr. Crosson indicated that he submitted his financial information for Q4 02 on time that is by January 5, 2003. Mr. Crosson indicated that he was satisfied that his financial information was accurate. Mr. Crosson indicated that, prior to submitting his financial information, he gave consideration to increasing the accrued liability balance on account of excess and obsolete inventory by $50 million. His evidence in this regard is confirmed by an Outlook outlining a potential $50 million increase in the accrued liability balance for excess and obsolete inventory, dated December 19, 2002.

[459]  Mr. Crosson ultimately decided not to make this adjustment to the excess and obsolete inventory balance in Q4 02.

[460]  Mr. Crosson testified that he received a telephone call from Brian Harrison on January 6 or 7, 2003 asking him if he could justify increasing his inventory accrued liability balance. Specifically, the request was, if required, could Mr. Crosson justify increasing his inventory accrued liability balance for Optical by $30-$35 million. Mr. Crosson indicated that he had never before received such a communication. Mr. Crosson indicated to Mr. Harrison that, based on Optical's history and the fact that he did not see a bottom for Optical, such an increase could be justified.

[461]  Mr. Crosson would not have increased the accrued liability balance for Optical's inventory had he not received Mr. Harrison's call.

[462]  Increasing Optical's accrued liability balance had the effect of reducing its income because it meant increasing Optical's expenses on its profit and loss statement, thereby

negatively affecting Optical's net income. A similar effect would be felt on Nortel's consolidated profit and loss statement.

[463]  Subsequent to agreeing to this increase, Mr. Crosson testified that he was then asked to agree to a reduction of this increase from $35 million to $30 million. Mr. Crosson indicated that he was unconcerned about the reduction.

[464]  Mr. Crosson indicated that, after the reduction, the backup documentation was changed to support a $30 million increase in the excess and obsolete inventory accrued liability balance rather than a $35 million increase.

[465]  Interestingly, one of the business records introduced was an e-mail from Mr. Beatty to Mr. Gollogly and others indicating that Mr. Dunn did not agree with the $30 million increase in the accrued liability balance for Optical's inventory.

### Use of Mr. Crosson's $30 million as an offset

[466]  The tale of Mr. Crosson's $30 million increase in the excess and obsolete inventory accrued liability balance contained an unexpected twist.

### The JDS Uniphase Corporation transactions

[467]  Nortel purchased a plant from JDS Uniphase which was located in Switzerland and, as well, purchased related assets in New York State.

[468]  The purchase price ($2.8 billion) had two components – cash and Nortel shares. A portion of the Nortel shares (500,000 shares) amounted to future consideration for the purchase of these assets. Specifically, if Nortel purchased 16.9% of its component needs from JDS in the years 2001, 2002 and 2003, then Nortel would not have to issue 500,000 shares of its stock to JDS. In other words, this portion of the purchase price was deferred and could potentially amount to a purchase price discount.

[469]  At the time of the transaction in 2001, advice was received from Deloitte & Touche concerning how this deferral of the purchase price should be treated in the years 2001, 2002 and 2003. Specifically, Deloitte's advice was that Nortel positively impact net income by approximately $40 million per quarter. Nortel followed this advice. Each quarter, commencing immediately after the purchase, $40 million in positive impacts to income was automatically posted to the General Ledger. Consistent with this decision $40 million in positive impacts had been posted in Q4 02.

[470]  On November 8, 2002, Nortel sold these assets to an arm's length company.

[471]  Deloitte gave Nortel the opinion that the $40 million in positive impacts to Q4 02 net income had to be reduced by $25 million. Nortel accepted Deloitte's opinion.

[472]  Due to the fact that the resolution of this matter was not straightforward, the decision to reduce the $40 million positive impact for Q4 02 by $25 million was not made until January 21, 2003. This was two days before Nortel intended to publish its Q4 02 results.

[473]   Rather than revise Nortel's financial statements for Q4 02, a decision was made to find a fully offsetting entry. Specifically, the accrued liability balance for Optical's excess and obsolete inventory was reduced by $25 million.

[474]   From the Crown's perspective, the changes in the accrued liability balance for Optical's excess and obsolete inventory are suspicious in the extreme. First, Mr. Crosson increases the accrued liability balance for excess and obsolete inventory by $35 million in response to Mr. Harrison's request. The $35 million increase is reduced to $30 million. Then it is reduced to $5 million so that Nortel's financial statements will not have to be changed two days before they were to be published.

[475]   Ms. Linda Mezon testified in these proceedings. Ms. Mezon joined Nortel in Brampton in May 2001 as Assistant Corporate Controller. At this point in time, Mr. Beatty was the Controller. She left Nortel in 2003.

[476]   Ms. Mezon is both a CPA (the American equivalent of the Canadian CA) and a C.A. Ms. Mezon is also an MBA. She was a member for eight years of the Accounting Standards Board, which is responsible for setting accounting standards in Canada for public companies, private entities, not-for-profit organizations and government entities.

[477]   Ms. Mezon testified that she had a good solid working knowledge of both Canadian and United States GAAP.

[478]   Ms. Mezon indicated that, after the decision was made to reduce Nortel's revenue by $25 million on January 21, she, Mr. Gollogly and Helen Verity had a conversation about finding an offset. The reason they were looking for an offset was because it was January 21, 2003 and the press release describing Nortel's financial results was due to be released on January 23, 2003. Finding an offset would mean that the financial statements which already been prepared would not have to be changed.

[479]   Ms. Mezon indicated that it was not her job to find the actual offset and so she went home. The next morning she found out that the offset was a $25 million reduction of Mr. Crosson's $30 million increase in the excess and obsolete inventory accrued liability balance. Ms. Mezon testified that, as soon as she found out about this, she contacted Mr. Crosson and confirmed that he was content with the reduction.

[480]   Ms. Mezon explained her own thinking which was quite helpful. She thought that the total accrued liability balance for excessive and obsolete inventory exceeded $1 billion and so she asked herself whether the $25 million reduction would materially misstate the balance sheet and she concluded that it would not. Ms. Mezon indicated that she knew that excessive and obsolete inventory had been discussed many times with Deloitte & Touche. She described excessive and obsolete inventory as "a very difficult area because in this business, you know the demand had ramped up very quickly, and the demand had fallen off very quickly, particularly, for instance, in Optical, which was—it was very difficult the forecast".

2013 ONSC 137 (CanLII)

[481]   She said that she concluded that the $25 million reduction was not material. She said that, although she talked to Mr. Gollogly about the offset, she felt the decision was really her responsibility because she was the "GAAP expert".

[482]   Ms. Mezon testified that she made Deloitte & Touche specifically aware of the offset.

[483]   Deloitte specifically reviewed the offset and concluded that the $25 million release was a release associated with inventory classed as a deferred asset which had already been provided for. Accordingly, there was no impact on the inventory line in Nortel's consolidated balance sheet from the $25 million reduction. This conclusion is recorded in Exhibit 156; a Deloitte's working paper, at Tickmark I. Deloitte's working papers were admitted into evidence as business records. The author of this particular working paper was not called as a witness. No witness, including the Crown's expert Mr. Robert Chambers, suggested this conclusion was wrong.

[484]   As far as the offsetting entry is concerned, Ms. Mezon understood the transaction concerning which she was testifying and took responsibility for her decisions.  The decision to reduce the excess and obsolete inventory balance to offset the unexpected revenue decline was reasonably taken. Mr. Crosson was consulted; it is true, only after the decision was taken. However, Mr. Crosson was consulted before Nortel's financial statements for Q4 02 were finalized. The auditors were made aware of the downward adjustment and signed off on the financial statements for an "accounting reason" that was not challenged.

[485]   There is one other aspect of this matter and that is the difficulty with drawing general conclusions about an item which has been restated.

[486]   The Q4 02 accounting for this transaction was reviewed when Nortel sold these assets to an arm's length purchaser. At a meeting of Nortel's Audit Committee on January 9, 2003, Deloitte & Touche confirmed that they were of the opinion that the accounting advice which they gave in 2001 remained appropriate.

[487]   During the second restatement, Deloitte changed its opinion concerning the treatment of the entire transaction.

[488]   Deloitte's new approach calculated that the deferral of the purchase price was worth approximately $500 million. Accordingly, Deloitte decided that the appropriate accounting treatment was to reduce the purchase price by $500 million. This reduction in the purchase price meant that $319 million in positive revenue impacts, which had resulted from the $40 million revenue entry in each quarter after the sale, had to be eliminated. As a result, revenue in 2001 and 2002 was collectively reduced by $319 million as a result of Deloitte changing its mind. I infer from Mr. Chambers report that any expenses associated with earning this $319 million would also have to be restated.

[489]   Deloitte gave two opinions endorsing the accounting treatment of this transaction. The first opinion was given in 2001 and the second confirming opinion was given to the Audit Committee in 2003. In October 2004, during the second restatement, Deloitte changed its opinion, resulting in a reduction in Nortel revenues.

[490]  The Crown argues that the accused, in restating previously-published financial statements, have admitted that accrued expenses/liabilities should not have been recorded in the quarters in which they were recorded, that they were not properly released in the quarters when they should have been released and that, therefore, Nortel's financial statements are not US GAAP compliant. The Crown argues that the fact that there was a restatement proves that Nortel's financial results were misrepresented from 2000 to May 2003 and the only question is whether the accused knew this when those results were published.

[491]  It would be wrong to conclude in a criminal case such as this that the $319 million reduction in revenue means that Nortel's original financial statements misstated its revenue in 2001 in 2002 by $319 million. Describing the original JDS entries as false or wrong inaccurately characterizes what occurred and could easily lead to the false conclusion that something inappropriate happened when the original accounting was done. A consideration of the details of this transaction illustrates why it is impossible to draw the inference which the Crown urges from the fact that accounting entries are restated. The accounting for this transaction was changed because Deloitte changed its mind. A consideration of the specifics of this restatement of the JDS Uniphase transaction makes it clear that it is dangerous to generalize about items that are restated.

[492]  When the facts of this specific restatement are known, it is clear that the accused could not have known that the original treatment of the $500 million purchase price discount was an error or wrong or false. Such words are not appropriate when describing the fact that Deloitte changed its mind.

### Perot Systems

[493]  Mr. Crosson found a second accrued expense/liability – Perot Systems.

[494]  In March 1996, Perot Systems and Nortel Networks Corporation combined to jointly pursue certain identified business opportunities. In 1997, there were significant performance defaults by Nortel. Nortel Networks Corporation and Perot Systems settled their dispute over these defaults in August 1998 upon the following terms:

- Nortel paid $2 million to Perot Systems;

- Nortel agreed to provide Perot Systems with $5 million in product credits;

- Nortel agreed to award Perot Systems a total of $75 million in business over five years ending August 1, 2003.

[495]  From 1998 to the end of December 2002, Nortel had provided Perot Systems with approximately $48 million worth of business. By the close of Q4 2002, Nortel had identified the fact that it still had to provide $27 million worth of work by August 2003 to meet its settlement obligations. Nortel received legal advice in November 2002 to the effect that Perot Systems had a legal right to invoice them for the $27 million difference.

[496]   Nortel was looking for an opportunity to establish a more permanent relationship with Perot Systems. Nortel wanted to continue to do business with Perot Systems and Perot Systems wanted to continue to do business with Nortel. Nortel did not want to receive an invoice for $27 million. Both sides wanted to avoid litigation.

[497]   When Mr. Crosson submitted his Q4 2002 results, he did not provide for or set up an accrued expense/liability to reflect the risk of unsuccessful litigation with Perot systems. Mr. Crosson did not believe there was sufficient risk. Mr. Crosson knew that Nortel was struggling and was not going to create an expense if he did not believe the $27 million risk warranted it. Mr. Crosson agreed that he knew, on January 2, 2003, about a potential exposure under the Perot Systems Settlement Agreement.

[498]   After Mr. Harrison's telephone call, there was an accrued liability balance entry made in the general ledger for Q4 2002 increasing accrued expenses and accrued liabilities by $27 million on account of Perot Systems.

[499]   Mr. Crosson indicated that he would not have suggested the $27 million increase unless he thought it could be justified. Mr. Crosson indicated that any late entry increase in accrued liability balances would have to be supported to the satisfaction of Deloitte & Touche.

[500]   Mr. Crosson said initially when he submitted his financial information, he did not submit the Excess and Obsolete Inventory accrued liability balance increase and the Perot Systems Perot systems accrued liability balance increase because the accrued expenses/liabilities which he submitted were within a range with which he could live. He felt he could also support a higher number and, therefore, felt that increases of these two accrued liability balances were supportable. Mr. Crosson also testified that the material that he submitted in support of these increases was genuine.

### The solicitation of additional accruals from Jim Kinney for the period Q4 02

[501]   Mr. Kinney was trained as a certified management accountant. He started at Nortel in 1980 and worked there continuously until 2004. Commencing in August 2002, he was the Vice-President Finance for Wireless, one of Nortel's business units. He succeeded Michael Gollogly in that position. As the VP Finance for Wireless, Mr. Kinney reported to the accused, Douglas Beatty. There were various Financial Primes within Wireless and those persons reported to Mr. Kinney.

[502]   As Vice-President Finance for Wireless, Mr. Kinney was responsible for the consolidation of its global financial performance, financial planning and analysis, liaison with the other line organizations, sales proposals and budgeting.

[503]   Mr. Kinney indicated that, in October 2002, he had a phone conversation with the defendant, Michael Gollogly. Mr. Gollogly advised Mr. Kinney that there were issues with the Wireless balance sheet and acknowledged some responsibility for their existence. Mr. Gollogly instructed Mr. Kinney to clean up the balance sheet. Mr. Gollogly was not specific about the items which were problematic. Mr. Kinney said that Mr. Gollogly, as Controller, was instructing

2013 ONSC 137 (CanLII)

2013 ONSC 137 (CanLII)

him to get a thorough understanding of what was on the balance sheet, why it was there and, most importantly, whether it should stay on the balance sheet.

[504]  Mr. Kinney said that the balance sheet cleanup at Nortel began in earnest in December 2002 with a conference call among himself, people on his staff, Karen Sledge, in her role as U.S. controller, and Mary Cross, in her role as Controller for North America. It was agreed that Wireless would review its balance sheet quarter by quarter, region by region and entity by entity. The purpose of the review, according to Mr. Kenny, was to determine whether accrued liability balances should remain on the balance sheet.

[505]  Mr. Kinney said he had no contact with Douglas Beatty or Frank Dunn about the balance sheet cleanup that he was undertaking.

[506]  Mr. Kinney explained the difficulty he faced trying to clean up the Wireless balance sheet. Whether liabilities remained on the balance sheet came down to a judgment call based on the representation of the individual who was responsible for the specific accrued liability balances on the Wireless balance sheet. The tricky part, according to Mr. Kinney, arose because many of the liabilities had to do with liquidated damages or potential customer claims. These items were, therefore, self-determined. Within the sales organization, the decision was dependent upon internal representation that there was a liability and that the liability needed to remain on the balance sheet.

[507]  Mr. Kinney said that he viewed the passage of time as the failsafe mechanism. The longer something was on the balance sheet without a claim the more confident he became that it could be taken off the balance sheet. Mr. Kinney said that, in his judgment, an accrued liability balance could be released to the profit and loss statement if there was a high degree of certainty, if not virtual certainty, that the liability no longer existed. Mr. Kinney said he followed the practice of allowing a cooling-off period when he thought an accrued liability balance could be released to the profit and loss statement. Specifically, he waited one extra quarter to make sure that an unexpected exposure did not present itself.

[508]  Mr. Kinney also followed the practice of seeking customer representation that the liability was gone and used receipt of that representation as the event which triggered removal of the liability balance.

[509]  Mr. Kinney testified that, until July 31, 2003, he thought that balance sheet reconciliation was sufficient justification to remove an accrued liability from the balance sheet. According to Mr. Kinney, when he heard a presentation by Mr. Gollogly which indicated that this was not a sufficient justification, it was "a game changer". The evidence disclosed that Mr. Kinney was not alone in this misconception.

[510]  This is perhaps an appropriate place to remark on the fact that Mr. Beatty is a chartered accountant like Mr. Gollogly. I am satisfied that he understood when accrued liabilities could be released to the profit and loss statement. Mr. Kinney recounted that Mr. Beatty explained to him that a change in estimate was a proper way of releasing an accrued liability to the profit and loss statement. Mr. Kinney testified that Mr. Beatty provided him with a reference to the section of

the accountants' handbook dealing with the proprietary of accrued liability balance sheet releases.

[511]  Mr. Kinney testified that, for Q4 2002, the Wireless "stretch target" contribution to pro forma earnings before taxes was $70 million. He agreed that, on January 7, 2003, his submitted numbers had reached that target. Mr. Kinney testified that he received a telephone call from either Brian Harrison or Michael Gollogly. Mr. Kinney was not the only one on this telephone call. He believed there were other Vice Presidents of Finance on the call. They were told that Nortel had a favorable variance to its anticipated earnings and that, as a result, they were being asked to go back and make certain that adequate provision had been made.

[512]  Mr. Kinney indicated that he would not have attempted to find and book increases to Nortel's accrued liability balances without the phone call from Mr. Harrison or Mr. Gollogly.

[513]  Mr. Kinney solicited Wireless for possible increases in the accrued liability balances and received two responses upon which he acted. The first related to an inventory issue involving a customer in China and the second dealt with an increased risk as a result of Nortel's relationship with France Telecom.

[514]  The result of Mr. Kinney's efforts was that he submitted accrued liability balance increases of $12 million. This $12 million increase in the accrued liability balances for Wireless was not restated.

[515]  Coincidentally, Wireless revenue was reduced by a further $8 million because, during the closing of the General Ledger, $8.9 million was removed from Mr. Kinney's revenue calculations by Nortel corporate headquarters.

[516]  As a result of searching for and booking the $12 million in accrued liability balance increases and the $8.9 million revenue reversal, Wireless missed its stretch target by $19 million.

[517]  Mr. Kinney indicated that he was concerned about the reaction of the President of Wireless because Wireless had missed its target. He also indicated that he was not concerned about the reaction of senior management because senior management set the target and, therefore, could dispense with the target.

### Mr. Gollogly's knowledge generally

[518]  Because Mr. Kinney took over from Mr. Gollogly and because Mr. Gollogly instructed Mr. Kinney to clean up the Wireless balance sheet, this is an appropriate place to comment on Mr. Gollogly's knowledge concerning Nortel's financial results.

[519]  Mr. Kinney said that, when he took over as VP Finance for Wireless, he recognized that the balance sheet for Wireless was not well understood within Wireless. After he took over as VP Finance for Wireless, Mr. Kinney recognized that there were significant excess accrued liability balances on the Wireless balance sheet. He also thought that there were accrued expenses/ liabilities which were not well understood. Mr. Kinney testified that he thought that there were $180 million in excess accrued expenses/liabilities on the Wireless financial statements at the end of Q2 02.

[520]  Mr. Kinney also observed that Wireless used the balance sheet as a means by which to meet its earnings targets. This practice was not peculiar to Wireless. Mr. Gollogly said as much in an e-mail (Exhibit 3, tab 140), dated July 31, 2003. Specifically, he said in the e-mail: "I think we need to reinforce the importance of forecasting. It seems like a throwaway comment, but if we 'cleanup' the balance sheet, the LC's ability to deliver earnings based partly on discretionary elements pretty much goes away. So they will need an incremental level of precision in their forecasting. I do not think the company is ready for this since the general approach is to sandbag good news and close 'hard' to the forecast. But if we cannot move the numbers one way or the other, we may get much more surprised than currently".

[521]  I am satisfied beyond a reasonable doubt that Mr. Gollogly knew that there were excess accrued liabilities on Nortel's balance sheet.

[522]  I am also satisfied that Mr. Gollogly was determined to do something about this after he became Corporate Controller. I say this because one of his first acts was to begin balance sheet reviews. His instruction to Mr. Kinney is telling, not only in terms of his knowledge, but also his intent to remove these excess accrued liabilities. I am not persuaded that he understood the extent of the problem.

[523]  Although slightly out of context, it is perhaps appropriate to point out here that Mr. Richmond testified that the $900 million in excess accrued liabilities identified in the Comprehensive Balance Sheet Review were not material, in his opinion, to Nortel's financial results in fiscal 2001 and 2002 due primarily to the $33 billion in losses that Nortel experienced in those years. Mr. Chambers did not offer a contrary opinion.

### *360 Networks*

[524]  The largest late entry accrued expense/liability in Q4 02 was $50 million. This accrual was in relation to 360 Networks litigation. This entry was reviewed during the second restatement. Deloitte's conclusion was "accrual was appropriate based primarily on in-house legal representation". Accordingly, this entry was never restated.

[525]  Reference has been made elsewhere to Nortel's preoccupation with providing for every possible risk. With respect to this accrued expense/liability, Mr. Cleghorn, the Chair of the Audit Committee, recalled this matter. Specifically, he recalled that, at a January 2003 Audit Committee meeting, he sought specific assurances $50 million was a sufficient accrued liability balance for this risk because the 360 Networks claim was for $100 million.

[526]  Mr. Cleghorn's evidence was entirely consistent with other evidence to the effect that it was part of Nortel's culture to provide for every possible risk in order to ensure that there were no surprises.

[527]  There is no issue about the appropriateness of this late accrued expense/liability entry which comprised $50 million of the $176 million in late entries.

[528]  I accept the evidence of Ms. Sledge, Mr. Morita, Mr. Crosson, Ms. Mezon and Mr. Kinney concerning the solicitation of late entry accrued expenses/liabilities.

[529]   Nortel's press release of January 23, 2003 also announced a pro forma net loss for Q4 02 of $62 million. This was the only report of a pro forma financial result. Q4 02 was the last time Nortel ever announced pro forma results. Pro forma financial results for Q4 02 were never restated. Deloitte published no opinion concerning pro forma results because it was not retained to do so.

[530]   I am satisfied that the negative impacts of the $59 million revenue error which Mr. Harrison made in his January 6 calculation and $50 million late entry accrued liability for 360 Networks, the appropriateness of which has never been challenged, were more than sufficient to create a pro forma loss in Q4 02. I am satisfied that it was Mr. Harrison's snapshot on January 6, 2003 of a pro forma gain before taxes of $73 million which misrepresented Nortel's pro forma Q4 02 financial result.

[531]   I am not satisfied that the reported pro forma loss of $62 million misrepresented Nortel's Q4 02 financial results.

### The manipulation of Nortel's pro forma earnings before taxes to get a bonus

[532]   The Crown alleges that the accused manipulated Nortel's pro forma earnings before taxes calculation in order to get a bonus. I reject this submission elsewhere in these reasons.

### Did the late entry accrual expenses/liabilities misrepresent Nortel's US GAAP financial results for Q4 02?

[533]   Nortel's press release, on January 23, 2003, announced its financial results for Q4 02. Nortel reported a net loss calculated according to US GAAP of $248 million.

[534]   Nortel's Q4 02 financial statements were restated twice.

[535]   Exhibit 85B also records that, after the second restatement, Nortel reported a net loss calculated according to US GAAP of $294 million for Q4 02.

[536]   I am not satisfied the difference is a misrepresentation. No witness offered such an opinion.

[537]   In addition, in Q4 02, Nortel originally reported total revenue of approximately $2.5 billion. After the second restatement, Nortel reported total revenue of approximately $2.6 billion.

[538]   In Q4 02, Nortel originally reported a gross margin of 39%. The second restatement reported a gross margin of 42%. Mr. Harrison indicated that it was his experience with Nortel that it typically reported gross margins in the range of 40%. No witness suggested that the difference in reported gross margins was important.

[539]   Nortel's press release of January 23, 2003 announced that it was "net cash positive" in Q4 02. The evidence did not suggest that this assertion was a misrepresentation. This was a critically- important piece of information for investors because the evidence indicates that maintaining sufficient cash reserves was a fundamental concern for Nortel's Board of Directors, Audit Committee, senior management and Auditors and fundamental for Nortel's survival.

[540]  Nortel's original financial statements for Q4 02 indicated that Nortel had outstanding approximately 4.3 billion shares. The evidence did not suggest that this assertion was a misrepresentation.

[541]  I am satisfied that the late entry accrued expenses/liabilities did not result in a misrepresentation of Nortel's US GAAP financial results for Q4 02.

[542]  I am not satisfied that Nortel's original published US GAAP financial results misrepresented Nortel's actual financial results.

### Susan Shaw's 2002 Summary of Accrued Liabilities

[543]  Susan Shaw prepared a compilation dealing with accrued liabilities and presented it to Mr. Gollogly in Q4 02. Her compilation indicated that $303 million in accrued liabilities were no longer required and available for release.

[544]  It is the Crown's position that, despite knowing that there were millions of dollars in excess accruals on the balance sheet, none of the accused advised Nortel's Audit Committee or Deloitte about this situation.

[545]  It is also the Crown's position that the accused did not initiate a comprehensive review of Nortel's balance sheet or initiate a restatement of its previously-published financial information.

[546]  Ms. Shaw brought her findings to the attention of her superiors, Helen Verity and Linda Mezon. Susan Shaw reported her findings to Mr. Gollogly. Ms. Mezon testified that she brought Ms. Shaw's report to the attention of Mr. Beatty.

[547]  Ms. Shaw's compilation informed Mr. Gollogly and Mr. Beatty that $303 million in accrued liability balances were no longer required and available for release. It also told Mr. Gollogly, who as Corporate Controller was responsible for Non-op, that $66 million of the no longer required accrued liability balances were Non-op accrued liability balances.

[548]  On November 6, 2002, Ms. Shaw sent an e-mail to Mr. Gollogly's assistant attaching an XL spreadsheet entitled "Acc Liab Q3 for FD". I am satisfied that FD refers to the accused Frank Dunn.

[549]  Mr. Dunn was financially trained and described as an intelligent detail-oriented person. Given Nortel's precarious position, I am satisfied that financial information of any importance was brought to his attention. I am satisfied that Ms. Shaw's compilation would have been considered important because it had been generated in response to questions from outside financial analysts.

[550]  I am satisfied, therefore, that Mr. Gollogly, Mr. Beatty and Mr. Dunn were aware that Ms. Shaw believed that there were $303 million in accrued liability balances which were no longer required and were available for release.

[551]  Some context is helpful in assessing the Crown's position.

[552]   Susan Shaw is a chartered accountant. She joined Nortel in 1988 and, in 2002; she was transferred to the Corporate Consolidations Group where she reported to Helen Verity, who was the Director of that group.

[553]   During a call with securities analysts in July 2002, one of the analysts asked Douglas Beatty about Nortel's accrued current liabilities. The analyst pointed out that Nortel's accrued current liabilities exceeded $5 billion and had been increasing over the last few quarters.

[554]   The first problem raised by the question was that if the $5 billion was all cash impacting, then Nortel would not have enough cash to pay all those liabilities. As indicated many times these reasons cash was a critical issue in terms of anything and everything Nortel did.

[555]   The second problem with the question was that Nortel's business had been declining in the previous quarters and yet the liabilities did not seem to be trending downward.

[556]   As a result of this question, the Assistant Corporate Controller, Linda Mezon, asked Helen Verity to look into the matter. Specifically, Linda Mezon wanted to know which provisions would require payment and, therefore, have an impact on cash. In addition, Ms. Mezon wanted to know when the accrued liability balances would be cleared to the profit and loss statement.

[557]   Helen Verity asked the various finance vice presidents throughout Nortel, in an e-mail dated August 2, 2002, to follow up on the question. Ms. Verity assigned the task of compiling the information provided to Ms. Shaw.

[558]   Ms. Shaw described the process she followed in preparing her compilation as iterative. The various business units were provided with their liability balances at Q2 2002 (June 30, 2002) and asked whether those liabilities were going to be cash impacting. In addition, they were asked whether all of the accrued liability balances were correct or whether some were greater than necessary. The business units were also asked whether those that were required were going to be utilized within 2002.

[559]   There was a template which was provided to the units and Ms. Shaw was in communication with the various business units about the information provided when they returned the completed template; she was also in communication with Helen Verity and Linda Mezon to make sure that she was collecting the information that they wanted.

[560]   Ms. Shaw emphasized that, while the business units were being asked for information, they were not being asked to justify their numbers.

[561]   Ms. Shaw also indicated that the information which the units were providing was not designed to provide the basis for a determination of what accrued liabilities should be released to income.

[562]   Finally, Ms. Shaw indicated that 50% of her work concerned contractual liabilities because they composed 40% of the total liabilities on Nortel's consolidated balance sheet. Given that Nortel's total liabilities exceeded $5 billion, contractual liabilities exceeded $2 billion.

[563]  I am satisfied that the primary purpose, from Ms. Shaw's point of view, was to determine the cash impact of Nortel's accrued liabilities as at Q2 2002.

[564]  One of the pieces of information which Ms. Shaw uncovered was that, in the opinion of the various business units, there was a total of $303 million in accrued liabilities which were no longer required and available for release.

[565]  Ms. Shaw's Summary of Accrued Liabilities was not kept a secret. E-mail evidence was introduced which indicated that senior accountants of Deloitte & Touche were aware of her work.

[566]  The $303 million in excess accrued liabilities was broken down into categories.

[567]  Two thirds of this total is contractual liabilities. A contractual liability was an accrued liability that arose out of a promise to perform that Nortel had made in agreeing to supply a product or service. Put simply, when the total revenue which Nortel was to receive from the contract to supply a product or perform a service was recognized, the cost of providing that product or service for the life of the contract also had to be estimated and recognized.

[568]  Of the remaining one-third of these accrued liabilities, which were no longer required and available for release (approximately $100 million), $66 million was attributed to Non-op, which was a non-operating unit under the control of Nortel's Corporate Controller, Michael Gollogly. Mr. Gollogly had only recently (July 25, 2002) assumed this position when Ms. Shaw presented him with her final compilation in October 2002.

[569]  To put the $66 million in excess accrued liabilities in context, it should be remembered that Ms. Shaw's report also identified the fact that Non-op had, at the end of Q2 2002, total accrued liabilities of $315 million. In other words, at the end of Q2 2002, $249 million in accrued liabilities were, according to Ms. Shaw, required by Non-op and $66 million were not required.

[570]  In addition, it should be remembered that Ms. Shaw was consolidating results being provided to her. She was not determining which specific accrued liability balances were required and which specific accrued liability balances were no longer required.

[571]  On September 16, 2002, Ms. Shaw met with Linda Mezon to explain the results of her consolidation so that Linda Mezon could meet with Michael Gollogly and provide him with a progress report.

[572]  On October 2, 2002, Mr. Gollogly was formally briefed by Ms. Shaw and others on the final results of her consolidation. Ms. Shaw indicated that, during the meeting, Mr. Gollogly was concerned to know the persons who had provided the information contained in her compilation. It was her impression that Mr. Gollogly was attempting to acquire a level of confidence about the financial information in her report.

[573]  It is important to remember that the numbers in Ms. Shaw's report were those available for the period ending Q2 2002, *i.e.*, June 30, 2002. The numbers in this report were never updated.

[574]  Mr. Richmond provided some assistance on the implication of Ms. Shaw's report. Mr. Richmond was not shown the report and, given his position and responsibilities as Senior Advisory Partner in the Nortel/ Deloitte's relationship, there is no reason why he should have been shown the report. Suffice to say, Deloitte was aware of Ms. Shaw's report and documentary evidence suggested that a person within Deloitte was to liaise with Ms. Shaw while she was preparing her compilation. This person was never identified in the evidence.

[575]  Mr. Richmond said his reading of Ms. Shaw's report suggested to him that she had performed "some sort of analysis and concluded that there were $303 million of provisions that were so-called no longer required". Mr. Richmond stated that there would be a need to review whether that was an accurate statement. He said it would have to be reviewed carefully with many different people to find out whether $303 million was the correct number. After that had been done, consideration would be given to the appropriate way of returning the $303 million to Nortel's profit and loss account.

[576]  I am satisfied that, while Ms. Shaw's report would require follow-up, it would not support, as the Crown suggested, a restatement of Nortel's previously-published financial statements. Mr. Richmond testified that restatements are a serious matter. Obviously, an unverified internal compilation could not provide the basis for the restatement of previously-published financial results.

[577]  Mr. Michael McMillan was asked, in 2004, to follow-up on Ms. Shaw's report. The purpose of this project was, in part, to find out what happened to the reserves that had been identified by Ms. Shaw's October 2002 report as no longer required and available for release

[578]  Prior to preparing his report, Mr. McMillan met with Ms. Shaw, reviewed her original mandate and located the templates upon which she relied. Mr. McMillan requested the business units to locate all documentation which they had used to satisfy Linda Mezon's original e-mail requesting information.

[579]  Mr. McMillan developed a template for the business units to use in determining what happened to the forecasted balances. Mr. McMillan consolidated the submissions from the various business units and reviewed his report with Deloitte & Touche.

[580]  Mr. McMillan reported on March 26, 2004. Mr. McMillan provided a copy of his report and an explanation to the law firm of Wilmer Cutler Pickering which, along with Huron Consulting LLP, was reviewing on behalf of the Audit Committee the reasons why Nortel had to restate some of its prior published financial statements.

[581]  By March 26, 2004, the accused had been virtually suspended. There was no suggestion that they played any role in the preparation of Mr. McMillan's report.

[582]  As far as Corporate and Non-op were concerned, Mr. McMillan came to the following conclusions:

Corporate

2013 ONSC 137 (CanLII)

- the forecasted releases were mainly specific and traceable; only $1 million was unidentified;

- $7 million in forecasted real estate releases were, subsequent to Ms. Shaw's Compilation, found to be supportable accrued liability balances and not released; $1 million of this balance was used.

- $1 million release dealing with a supplier bankruptcy was determined to be valid and released in Q4 2002;

- $4 million out of $15 million accrued on account of asset shrinkage was released in Q4 02 and the remainder was reclassified;

- $5 million which had been accrued on account of late terminations was released in Q1 2003;

- $5 million accrued as a specific Controller's provision was not released in 2002 or 2003; this accrual was re-profiled during the Second Restatement;

- $1 million accrued on account of annual report printing was released in Q3 2002 and this was found to be a valid release;

- $28 million accrued on account of dispute resolution was released in Q3 02 and this was determined to be a valid release;

Non-Op

- $20 million on account of Intercompany Out Of Balance was released in Q3 2002 and reversed to Q4 2001 in the First Restatement;

- $20 million could not be linked to a specific balance and was, therefore, categorized as unidentified.

[583] Mr. McMillan indicated that a portion of the forecasted releases in the original study were not linked to specific provisions and, for that reason, it was necessary to go back to the business units to determine whether the forecast was in relation to a specific provision or a basket of provisions.

[584] Mr. McMillan determined that $222 million of the $303 million was released in Q3 2002 and Q4 2002. Specifically, he determined that $146 million in releases occurred in Q3 2002; $76 million in releases occurred in Q4 2002. No witness testified that the release of this $222 million was material to Nortel's 2002 financial results.

[585] As originally calculated Nortel lost $1.8 billion in Q3 02 and $250 million in Q4 02. Nortel lost approximately $3.6 billion in fiscal 2002. These releases to income were not material to Q3 02, Q4 02 or fiscal 2002 financial results.

[586]   In addition to carrying out the specific task of preparing this accrued liability analysis, Ms. Shaw had ongoing responsibilities for reporting on the status of accrued liabilities in Corporate and Non-op. As a result, she was able to confirm that $20 million of the $66 million was released in Q3 2002 to Nortel's profit and loss statement. This $20 million would have favorably impacted earnings. I attach no significance in terms of the accuracy of Nortel's financial statements to the release of these excess provisions in Q3 2002 because Nortel lost $1.8 billion in Q3 2002.

[587]   Mr. McMillan determined that $10 million in releases occurred in Q1 2003 and $14 million in releases occurred in Q2 2003. No further evidence was led concerning these releases and I am unable to determine whether they were released in the normal course of business or otherwise.

[588]   Mr. McMillan concluded that $57 million in releases were either not released or so vaguely described in Ms. Shaw's report that they could not be identified.

[589]   Ms. Shaw testified that she thought Mr. McMillan's conclusions concerning her report were accurate.

[590]   The release of this $303 million in accrued liabilities would not be cash impacting but would favorably impact earnings by $303 million. The entire $303 million would not be material to Nortel's 2002 balance sheet or profit and loss statement. In 2002, Nortel had approximately $5.2 billion in liabilities on its consolidated balance sheet. Nortel's consolidated profit and loss statement for 2002 reported losses of $3.6 billion.

### Q4 2002 Conclusion

[591]   I am satisfied that Mr. Gollogly did not accept Mr. Harrison's assertion on January 6, 2003 that Nortel's pro forma gain before taxes on that date was $73 million.

[592]   I am satisfied that Mr. Gollogly was quite right to be skeptical about this result because Mr. Harrison had made a $59 million error on the revenue side in his January 6 calculation.

[593]   I am satisfied that Mr. Harrison and Mr. Gollogly, with the knowledge and consent of Mr. Dunn and Mr. Beatty, were attempting to manage Nortel's financial results in this quarter for the following reasons:

- First, the Wireless business unit, for which Mr. Kinney was the Vice-President Finance, had achieved its stretch target of $70 million. It is not logical that Mr. Kinney would be asked to go over his results to see if he had made any errors or if there were risks for which he wanted to provide unless the intention was to negatively manage the pro forma gain which Mr. Harrison had reported;

- Second, all of the persons solicited by Mr. Harrison or Mr. Gollogly were only asked to provide additional accrued expenses/liabilities. They were not asked if there were any positive impacts to income which they had erroneously failed to report.

2013 ONSC 137 (CanLII)

[594]  However, it is clear that Mr. Harrison erroneously included $59 million in his revenue calculation.  It is also clear that the 360 Networks' late entry accrued liability expense/liability of $50 million is unchallenged.    These two required adjustments (totaling $109 million) turn Mr. Harrison's forecasted earnings before taxes into a loss.

[595]  In the same vein, if I consider Mr. Harrison's erroneously calculated pro forma gain of $73 million as a starting point and then account for the negative impacts of the $59 million revenue error and the $176 million in late entries of accrued expenses/liabilities, the pro forma loss before taxes should have been greater than the $62 million which Nortel reported in its January 23, 2003 press release. Accordingly, there must have been positive impacts to Nortel's pro forma gain (loss) which are not clear from the evidence. In short, there must have been other changes to Nortel's pro forma calculations which are not apparent from the evidence.

[596]  I am not satisfied Nortel's pro forma financial results for Q4 02 were correctly reflected in Mr. Harrison's January 6 Outlook calculation.

[597]  I am not satisfied that Nortel had pro forma earnings before taxes in Q4 02.

[598]  The evidence does not establish that Nortel's published Q4 02 pro forma $62 million loss misrepresented Nortel's Q4 02 financial results.

[599]  When I consider all the evidence, including the evidence to which I have made specific reference, I am not satisfied beyond a reasonable doubt that the accruals solicited by Mr. Harrison and recorded in Q4 02 resulted in a misrepresentation of Nortel's US GAAP financial results for Q4 02 or fiscal 2002.

[600]  I am not satisfied that Nortel's financial results for Q4 02 were misrepresented due to the solicitation of late entry accrued liability expenses/balances.

[601]  I am satisfied that $222 million of the $303 million identified by Ms. Shaw in 2002 as provisions no longer required and available for release were, in fact, released in Q3 02 and Q4 02. I am also satisfied that a portion of the $57 million identified as unreleased was so noted because it could not be identified and, therefore it cannot be determined whether those unsupported provisions were released or not in 2002 or 2003.

[602]  I am not persuaded that the release of these accrued liability balances in Q3 02 and Q4 02 materially misrepresented Nortel's financial results in those periods or for the fiscal year 2002.

[603]  The circumstances surrounding the $10 million released in Q1 2003 and the $14 million, released in Q2 2003 were not disclosed in the evidence. I am not satisfied that those releases misrepresented Nortel's financial results in Q1 03 or Q2 03.

[604]  I am not satisfied beyond a reasonable doubt that the manner in which Nortel dealt with the $303 million in accrued liability balances identified by Susan Shaw as no longer required and available for release in her October 2002 compilation misrepresented Nortel's financial results in Q4 02, fiscal 2002, Q1 03 or Q2 03.

2013 ONSC 137 (CanLII)

**Q1 03 & Q2 03**

*The release of $361 million in Q1 03 and $372 million in Q2 03*

[605]   Quantitatively, Nortel released $361 million in accrued liability balances to its profit and loss statement in Q1 03. The Crown contends that, in its original filings, the accused, on behalf of Nortel, falsely represented that these accruals were in the normal course.

[606]   Included in the $361 million and accrued liability balance releases were $80 million in accrued liability balance releases relating to Non-op. The Crown contends this $80 million was improperly released and, further, that the motive for the improper $80 million release was the desire on the part of the accused to qualify for a bonus and to meet previously-published financial targets.

[607]   Mr. Cleghorn, the Chair of the Audit Committee, testified that he thought that, apart from the $80 million, the balance of the $361 million in releases was in the normal course.

[608]   The first restatement reviewed the release of these accrued liability balances and determined that $111 million of these balances should be restated. The Crown contends that this underestimated the extent of the problem because, during the second restatement, an additional $106 million was identified and re-profiled or restated.

[609]   The Crown contends that the combined effect was that $218 million was restated and that this demonstrates, along with other evidence, that the $361 million was not in the normal course and that the first restatement was not comprehensive.

[610]   Quantitatively, Nortel released $372 million in accrued liability balances to its profit and loss statement in Q2 03. The Crown contends that, in its original filings, the accused, on behalf of Nortel, falsely represented that these accruals were in the normal course.

[611]   The first restatement reviewed the release of these accrued liability balances and determined that $105 million of these balances should be restated. The Crown contends that this underestimated the extent of the problem because, during the second restatement, an additional $105 million was identified and restated.

[612]   The Crown contends that the combined effect was that $210 million was restated and that this demonstrates, along with other evidence, that the $372 million was not in the normal course and that the second restatement was not comprehensive.

[613]   The Crown's expert did not express an opinion consistent with the Crown's contention.

[614]   The Crown attempted to demonstrate the financial effect of the $361 million in Q1 03 and the $372 million in Q2 03 by means of a chart which it constructed and which was received as Exhibit 42E. Mr. Harrison confirmed the entries in the Exhibit reproduced the entries in his Outlooks. Mr. Chambers expressed no opinion concerning this chart.

### The Crown's Chart – "operations" Ex. 42E

[615]  It is necessary to make an observation about Exhibit 42E in order to avoid its misapplication in this trial.

[616]  The Crown introduced this chart which it had prepared; the chart was based on Mr. Harrison's Outlooks and Roadmaps (forecasts). Mr. Harrison confirmed that the entries in the Exhibit reproduced entries in his Outlooks.

[617]  There is a column in the chart marked "Operations". I attach no weight to this column. To the extent that the Operations column was intended to describe positive or negative net income from the actual operations of the business units, I find it to be unreliable.

[618]  Mr. Harrison indicated Operations for him was something that he tracked. It was a metric he created; it was a metric to show the earnings, excluding the positive impact of the release of accrued liabilities to the profit and loss statement.

[619]  The evidence established that, in order to calculate net income from a business unit's operations or its normalized results for a particular quarter, one had to eliminate both the positive impacts of releasing accrued liability balances to the profit and loss statement in that quarter and the negative impacts of setting up accrued expenses/ liabilities in that quarter.

[620]  An example of this calculation for the Wireless business unit is found in Exhibit 42G. The analysis starts with the actual results for the period Q4 02; that is $46 million. According to Exhibit 42G, Wireless set up $196 million worth of accrued expenses/liabilities in Q4 02 which had a negative impact on its net income of $196 million. According to the Exhibit, Wireless released $181 million in accrued liabilities in Q4 02 to its profit and loss statement which had a positive effect on its net income of $181 million. To determine Wireless' "normalized results", both of these impacts must be eliminated. The net effect of this calculation is that net income is increased by $15 million.

[621]  Accordingly, as described in Exhibit 42G, the normalized result for Wireless in Q4 02 is $60 million approximately.

[622]  A comparison with Mr. Harrison's calculation reveals why this aspect of the Crown's chart is unreliable. Mr. Harrison's calculation only involved eliminating the positive impact of the release of $181 million. Mr. Harrison confusingly called this metric which he had created "Operations". Applying Mr. Harrison's methodology leads to a net loss in his "Operations" metric of $135 million.

[623]  Confusing Mr. Harrison's metric with the normalized results for the Wireless business unit leads to the erroneous conclusion that Wireless lost $135 million on account of its Operations when, in fact, Wireless enjoyed a $60 million gain on operations.

[624]  To the extent that the Operations column in the Crown's chart was intended to describe positive or negative net income from actual operations, it is unreliable. I attach no weight to Mr. Harrison's Operations metric. Mr. Harrison's Operations metric does not accurately establish operational losses at any time during the time-frame of the indictment.

[625] The evidence established that, in Q1 03, Nortel's set-up $1.1 billion in accrued liability balances and released $361 million in accrued liability balances to the Q1 03 profit and loss statement.

[626] The evidence established that, in Q2 03, Nortel set up $1.2 billion in accrued liability balances and released $372 million in accrued liability balances to the Q2 03 profit and loss statement.

[627] This activity with respect to accrued liability balances was fully-disclosed to Nortel's Audit Committee by Mr. Gollogly.

[628] I propose now to comment on certain specific releases which were disclosed in the evidence.

### The PWC release – $19 million-originally released Q1 03

[629] This release was specifically referred to in the Wilmer Cutler Pickering Review. It was part of a list of fourteen items listed in the review that the authors said required further study. Each of these items was, according to Mr. Kerr, analyzed from cradle-to-grave. According to Mr. Kerr, this meant an analysis of the accrued liability balance from the moment it was established. Any activity in the accrued liability balance was specifically considered.

[630] This accrued liability balance was released to the profit and loss statement in Q1 03. Accordingly, it is part of the $361 million in accrued liability balances in Q1 03 which the Crown maintained were not in the normal course. The PWC release was not restated in the first restatement. It was specifically identified in the Wilmer Cutler Pickering review. It was then analyzed from cradle-to-grave during the second restatement.

[631] Some context is helpful in considering this accrued liability balance.

[632] In April 2000, Nortel outsourced certain services to PWC. In 2002, Nortel decided to bring these services in-house. An accrued liability balance in the amount of $19 million was set up to account for certain disputed invoices between Nortel and PWC.

[633] The repatriation of the services was substantially completed in December 2002. The Final Close of the Disengagement Agreement between Nortel and PWC occurred on January 17, 2003.

[634] Nortel originally released the $19 million PWC accrued liability balance to its profit and loss statement in Q1 03, the quarter in which the Disengagement Agreement closed.

[635] On April 13, 2004, Nortel received legal advice from its senior counsel. This advice was to the effect that closings of the disengagement agreement for all locations, other than those in France, were completed before December 31, 2002. It was counsel's opinion that no claims against Nortel could originate from the French locations, despite the fact that the closing of the disengagement agreement with respect to locations in France did not take place until January 17, 2003.

[636]   Upon receiving this legal opinion in April 2004, Deloitte decided that the $19 million accrued liability balance should be restated from Q1 03 to Q4 02. Deloitte was also of the view that the legal opinion of April 13, 2004 did not represent new information and, as a result, the failure to originally release the $19 million accrued liability in Q4 02 was classified as an error.

[637]   The $19 million was restated to Nortel's Q4 02 profit and loss statement.

[638]   As can be seen from the details of this release, the original set-up of the release properly recorded an accrued liability.

[639]   I am not satisfied that the release in Q1 03, as opposed to Q4 02, can fairly be classified as false. I am not persuaded that the failure to restate this accrued liability balance release in the first restatement demonstrates that the first restatement was not comprehensive or a continuation of the fraud alleged in this indictment. I am satisfied that the release in Q1 03 is exactly what Deloitte said it was: namely, an error. Furthermore, it was an error that is understandable once the facts are known.

[640]   Finally, it has not been demonstrated that the accused were, in any sense, responsible for this error or the failure to consider the error in the first restatement.

### *The Genuity release – $23 million originally released Q1 03*

[641]   This is another accrued liability that was originally released in Q1 03. It was part of the $361 million in total releases for that quarter. It was not restated during the first restatement.

[642]   It was also identified by Wilmer Cutler Pickering as a release which should be reviewed and, as such, was subject to "cradle-to-grave" reconsideration.

[643]   Some context is helpful in considering this accrued liability balance.

[644]   Nortel had several claims against Genuity, totaling approximately $156 million. Genuity alleged that Nortel was liable for substantial claims arising out of their business relationship. Specifically, Genuity alleged that Nortel had supplied defective equipment, had resiled from a guarantee and, finally, that Nortel was liable to Genuity for contributions to a joint development and marketing fund.

[645]   Genuity filed a petition for re-organization under the US Bankruptcy Code in November 2002. At the same time, Genuity proposed to sell all of its assets free and clear of pre-existing claims to an arm's length third-party purchaser.

[646]   The arm's length purchaser received permission to purchase Genuity's assets in Q1 03 and the $19 million accrued liability balance was released to Nortel's profit and loss statement.

[647]   Nortel's counsel advised that part of Genuity's claim was well-founded in its opinion. Nortel and Genuity reached a settlement at the end of Q2 03. Nortel's counsel was of the view that the settlement would not be approved by the Bankruptcy Court because they believed it would be opposed by others interested in Genuity's bankruptcy. However, there was no opposition to the settlement and the Bankruptcy Court approved the settlement in Q3 03.

[648]   During the second restatement, the release was reviewed. The opinion of the Deloitte reviewers was that the Q1 03 release was appropriate. However, the U.S. National Office of Deloitte & Touche overruled the Deloitte reviewers and required that this conclusion be changed. Deloitte's U.S. national office required that the $23 million release in Q1 03 be classified as an error on the basis that the release should have occurred in Q2 03 instead of Q1 03.

[649]   This release also undermines the position taken by the Crown with respect to the Q1 03 and Q2 03 releases. The Genuity release reveals that the $23 million released in Q1 03 was restated into Q2 03. The Crown's submission is undermined because it only takes into account releases that were restated out of Q2 03; it ignores the releases that were restated into Q2 03. This same observation applies to Q1 03. The Crown's submission does not take into account those releases restated into Q1 03.

[650]   Finally, the specifics of this accrued liability balance indicate that it was restated because Deloitte, in essence, disagreed with itself.

[651]   There is no evidence that would permit me to conclude that any or all of the accused were responsible for this error or for the failure to restate it in the first restatement.

### The Optical Warranty release – $8 million released in Q2 03

[652]   In Q1 2001, the Optical Warranty accrued liability balance became underfunded by $21 million. Adjustments were made to the balance in 2001 and 2002. These adjustments reflected changes in the standard costs for the Optical Network Repair Group. The problem was that customers were using the warranty at a higher rate than had been used to calculate the accrued liability balance. In other words, the accrued liability balance on account of the Optical Warranty was not adequate.

[653]   However, during the first half of 2002, it was discovered that the Optical Network Repair Group's standard costs, which were used to record warranty usage, were overstated by about 64% in 2001. This problem was corrected in Q2 02. This meant that the accrued liability balance for Optical Warranty was overfunded; however, the accrued liability balance remained overfunded because of the Optical Networks management team did not have confidence in its data.

[654]   By Q2 03, there was twelve months' usage data available. Accordingly, the accrued liability balance for the Optical Warranty was reduced by $8 million in Q2 03.

[655]   The $8 million reduction in the Optical Warranty accrued liability balance was reviewed and confirmed during the first restatement. It was the opinion of Deloitte during the first restatement that the $8 million change was due to a change in estimate.

[656]   The $8 million with which we are concerned was considered again during the second restatement because it was specifically mentioned in the Wilmer Cutler Pickering review.

[657]   In April 2004 during the second restatement, the decision that the $8 million was released to income as a result of a change in estimate and, therefore, in accordance with US GAAP. The release was confirmed again.

[658]   However, for reasons that are not clear, the matter was reviewed yet again in October 2004. This time it was decided that the Optical Warranty model that was used in arriving at the decision to release $8 million to the profit and loss statement was, itself, inherently flawed. The model was inherently flawed because it had not been revised to reflect the significant changes that had taken place in the Optical business unit's environment in 2001 and 2002. Accordingly, a New Warranty Model was developed. This new model was applied retroactively to 1999.

[659]   Accordingly, the $8 million Q2 03 release was determined to be an error. In addition, the new Warranty Model was applied to all changes in the Optical Warranty accrued liability balance from 1999 to 2003. The changes which had taken place in the Optical Warranty accrued liability balance from 1999 to 2003, based on the old model, were determined to be errors as well.

[660]   A consideration of the specific details surrounding the restatement of this accrued liability balance leads to the conclusion that the decision to restate was taken based on a New Warranty Model which did not exist in Q2 03. The new model did not exist when the accused were employed at Nortel.

[661]   The evidence does not demonstrate that the accused had any role in the decision to release this accrued liability balance in Q2 03 or any knowledge that the old warranty model was flawed.

### Conclusion

[662]   The specific releases to which I have referred demonstrate that the decision to restate on account of an error can be the same thing as saying that there was a decision to restate on account of a difference of opinion.. Clearly new information can affect the decision to restate. Arguably hindsight can be a factor in the decision to restate.

[663]   I agree with the Crown that the fact that accrued liability balances were restated is capable of supporting an inference that financial results were misrepresented, but I am not persuaded by the evidence which I have heard that I should draw such an inference in this case.

[664]   As a result, I cannot give effect to the Crown's submissions concerning the inferences I should draw from the fact that original Q1 03 and Q2 03 accrued liability balance releases were restated.

[665]   I am not satisfied beyond a reasonable doubt that the three accused misrepresented Nortel's Q1 03 and Q2 03 financial results by releasing to income $361 million and $372 million respectively in accrued liability balances. Further I am not satisfied that the original release to income of $361 million and $372 million misrepresented Nortel's financial results.

### The release of $80 million in Non-op accrued liability balances and the entitlement to a bonus

[666]   There was no triggering event in Q1 03 that would have justified the release of this $80 million in accrued liability balances to Nortel's profit and loss statements for Q1 03. This fact was well-known to everyone.

2013 ONSC 137 (CanLII)

[667]   The Crown alleges that the release of this $80 million in Non-Op accrued liabilities to the profit and loss statement in Q1 03 had the effect of changing pro forma losses in Q1 into a profit which resulted in substantial Return to Profitability and Restricted Stock Unit bonuses being paid to all three defendants in May 2003.

[668]   Put differently, it is the Crown's position that, without the release of this $80 million, the profit targets required for the payment of these bonuses would not have been met and none of the accused would have been entitled to a bonus.

[669]   It is the Crown's position that Mr. Hathway was misled when he was informed by either Mr. Gollogly or Mr. Beatty that the Return to Profitability Bonus would have been paid even without the release of the $80 million.

[670]   The Crown also alleges that the three accused failed to disclose the fact that there was a direct connection between the $80 million release of accrued liabilities and the payment of these bonuses. Specifically, the release of the $80 million offset the liability ($73 million) associated with paying the Return to Profitability Bonus.

[671]   The Crown takes the position that the disclosure in the April 24, 2003 release made it appear as though these two events were unrelated. Specifically, the press release in the Crown's view failed to draw a direct connection between the $80 million release and the payment of the bonuses (*i.e.*, it did not say that the $73 million RTP Bonus was payable because of the release of the $80 million) nor did the press release mention that the $80 million was related to other excess accrued liabilities; namely $109 million in unsupported accrued liabilities which remained on Nortel's consolidated balance sheet.

[672]   It is also the Crown's position that Nortel's SEC filings for Q1 03 obfuscated the nature of the $80 million release.

[673]   The Crown also alleges that the release of this $80 million improperly reduced US GAAP losses.

[674]   It is the Crown's position that the improper release of this $80 million resulted in the publication of financial statements which misrepresented Nortel's financial results.

[675]   It is the Crown's position that even if, based on the Second Restatement financial statements, the bonus milestones would have been met at some point in 2003, the timing of those payments would have been different in the sense that the payments would have been made in different quarters of 2003. The Crown maintains Nortel was at risk when the bonuses were paid based on false results and it does not matter that the bonuses would have been payable later in 2003 based on the restated results for that year.

[676]   I have no difficulty in accepting the fact that all three accused knew what targets had to be hit before they were entitled to the Return to Profitability Bonus and the Restricted Stock Unit Bonus. I attach no significance to that fact; it is simply rational economic behavior. The inference is easily drawn from the access that all three accused had access to Outlooks (forecasts), as well as their positions in the company. The evidence was, for example, that Mr. Dunn played a role in deciding the milestones for the Return to Profitability Bonus.

2013 ONSC 137 (CanLII)

[677]  Releasing the $80 million in accrued liabilities to the profit and loss statement was specifically considered by Deloitte & Touche in an internal memo, which appears to have been produced to the Crown on December 23, 2011.

[678]  Counsel for Deloitte indicated in the letter producing the memo that it had been previously produced to "other regulators". Counsel for Deloitte indicated in the letter producing the memo that it was a "desk file", which apparently means it was never finalized and incorporated into Deloitte's audit working papers. I infer this information was provided to explain the late production.

[679]  Apparently, after the draft memo was turned over to the unidentified regulators, Deloitte was asked a series of questions by one or more of these regulators which they answered. The questions and answers were also turned over to the Crown on December 23, 2011 and produced in this trial as business records of Deloitte & Touche.

[680]  The trial in this matter commenced in January 2012. The authors of the memo, Diana De Acetis, Peter Chant and Chris Allen, were not called as witnesses.

[681]  It is trite that business records are capable of proving the facts contained within them. I am not required to find that these business records or any other business records prove the facts contained in them. However, I found this business record to be particularly helpful, despite the fact that it was a "desk file."

[682]   The draft memo to the Nortel Networks Corporation file of Deloitte & Touche LLP was primarily written by Diana De Acetis. However, during the course of the drafting of the memo, Ms. De Acetis received significant content and input from two other Deloitte accountants, namely, Peter Chant and Chris Allen. Tony Ciciretto assisted by providing information to Ms. De Acetis, but was not otherwise directly involved in the memo's preparation. In addition, according to the memo's introduction, Don Hathway, John Cawthorne and others reviewed the memo. It appears from Exhibit 11 tab 42 that Mr. Hathway also provided information to Ms. De Acetis, Mr. Chant and Mr. Allen prior to the preparation of the memo.

[683]  When Ms. De Acetis prepared this memo, she was a senior manager in Deloitte's Complex Accounting and Transaction Expertise Group. As a member of that group, Ms. De Acetis had provided technical assistance and advice to members of the Nortel engagement team in respect of a number of issues which had arisen during the course of the quarterly reviews in Q1 and Q2 2003.

[684]  Ms. De Acetis reported to Peter Chant. Mr. Chant was a partner and practice group leader of the Complex Accounting and Transaction Expertise Group. Mr. Chant was not a member of the engagement team that performed Deloitte's audits or quarterly reviews at Nortel in Q1 and Q2 2003. However, like Ms. De Acetis, he provided technical assistance and advice to members of that engagement team from time to time in respect of a number of issues that arose in connection with the Q1 and Q2 2003 quarterly reviews.

[685]   Chris Allen was a partner at Deloitte, who worked on the Nortel engagement during the Q1 and Q2 2003 reviews. Mr. Allen was a senior member of the Deloitte engagement team for Nortel.

[686]   Tony Ciciretto was, during the Q1 and Q2 2003 reviews, responsible for supervising Deloitte's review work in respect of Nortel's Corporate Analysis and Consolidations Group in Brampton. Mr. Ciciretto's name appears on very many e-mails which were received in evidence as business records. I infer from the documentation that Mr. Ciciretto was a senior member of the Nortel engagement team. Mr. Ciciretto was not called as a witness.

[687]   According to the information provided to the Crown by Deloitte, the memo was created because, in April 2003 during the course of performing its review work, Deloitte's engagement team noted that Nortel had released $80 million in accrued liabilities. Deloitte's engagement team identified a number of documentation and support issues with respect to these accrued liabilities. In late June or early July 2003, Deloitte's engagement team became aware that Nortel intended to release in its financial results for Q2 03 a number of additional accrued liability balances which were no longer required on Nortel's balance sheet. Once again, the engagement team identified documentation and support issues. Based on Deloitte's advice, Nortel did not release these accrued liabilities to the profit and loss statement.

[688]   As a result of these documentation and support issues, Diana De Acetis was asked to conduct a review of Nortel's release of the $80 million in accrued liability balances to the profit and loss statement in Q1 2003 to determine whether these releases were appropriate under US GAAP. I should add here that, in terms of topic and timing, this is an extremely pertinent inquiry.

[689]   According to the information provided to the Crown, Ms. De Acetis obtained background information from Mr. Ciciretto and other members of the Deloitte engagement team for Nortel. Ms. De Acetis prepared an initial draft of the memo in July 2003 and then received comments from Chris Allen and others. Further drafts were generated during July and August. In September, Ms. De Acetis received further comments from Peter Chant. By late September or early October 2003, work on the preparation of the draft memo itself was halted.

[690]   The draft memo bears the date of July 15, 2003. At this point according to the evidence, it was clear to Deloitte that Nortel had unsupported accrued liabilities on its balance sheet and that a Comprehensive Balance Sheet Review was required.

[691]   The draft memo identified six corporate level provisions totaling $80 million, which Nortel determined in Q1 2003 were no longer required or which could not otherwise be justified on its balance sheet at their current balances. In addition to itemizing these accrued liability balances, the memo set out when the accrued liabilities were recorded, the reason for initially recording them and the reasons and support for their reversal in Q1 2003.

[692]   The memo concluded that $6 million worth of releases resulted from a change in estimate triggered in Q1 2003. Therefore, the release of this $6 million was entirely in accordance with US GAAP.

[693]   The memo concluded that the remaining five accrued liability balances totaling $74 million could not be supported. Of this amount, two of the balances, EDSN ($9 million) and Capital Tax ($10 million), had been recognized as errors in the year in which they were created, that is 2002, and so their release in Q1 2003 was considered to be the correction of an error.

[694]   The memo concluded that the remaining three accrued liability balances released to the profit and loss statement in Q1 2003; namely, Intercompany Out Of Balance ($35 million), QST ($5 million) and Short Close ($15 million) were errors, although the memo specifies that a portion of the Short Close release in Q1 2003 was in accordance with US GAAP.

[695]   The memo then spends three pages analyzing whether the releases were material to the Q1 2003 financial statements. The analysis references Staff Accounting Bulletin 99 of the SEC, which has been referred to repeatedly during this trial, as the foundation for a materiality analysis. No materiality expert testified during the trial. The Crown's expert did not comment on the materiality analysis in this memo.

[696]   The memo concluded that "the reversal of the provisions was not considered on a qualitative and quantitative basis to be material to Nortel's financial statements for Q1 2003…"

[697]   One of the tests for materiality which is set out in Staff Accounting Bulletin 99 is whether the misstatement "changes a loss into income or vice versa". Accordingly, the memo re-calculates Nortel's net income for Q1 2003, excluding the effects of the release of the $80 million in accrued liability balances to the profit and loss statement. The memo concludes, after making the appropriate accounting adjustments that Nortel would have had net income of $2.2 million without the benefit of the release of the $80 million to income. The memo concludes that this net income of $2.2 million would have been earned after allowing for payment of the Return to Profitability Bonus and the Success Plan Bonus. The Success Plan Bonus was the performance-based bonus for a large portion of employees. Accordingly, the release of the $80 million did not turn a loss into a profit.

[698]   More specifically, the memo concludes, in an Appendix, that the Return to Profitability Bonus target is achieved whether the $80 million in accrued liability balances is released to the profit and loss statement or not.

[699]   The memo also concludes that the Success Plan Bonus earnings, revenue and cash flow targets are met whether the $80 million in accrued liability balances is released to the profit and loss statement or not.

[700]   Thus, the memo concludes that the thresholds for these two bonuses would have been met whether or not the $80 million in accrued liability balances is released to the profit and loss statement.

[701]   The memo, which was received as Exhibit 251D, is quite thorough. It analyzes six specific accrued liabilities totaling $80 million and it calculates the financial state of affairs relevant for our purposes that would have existed had the $80 million remained on the balance sheet of Nortel instead of being incorporated into its profit and loss statement.

2013 ONSC 137 (CanLII)

[702]   Mr. Harrison testified that he did not calculate the Return to Profitability Bonus plan target in the same fashion as Deloitte & Touche. His evidence in this regard was not particularly helpful.

[703]   A review of the minutes of the Human Resources Committee of the Board of Directors of Nortel Networks Corporation, known in Nortel speak as the Joint Leadership Resources Committee ("JLRC"), demonstrates that the bonus target for the Return to Profitability Bonus is to be calculated using Nortel's method in 2002 of calculating pro forma gains before taxes.

[704]   The only issue is whether Deloitte's calculation is consistent with that definition. The lack of similarity between Mr. Harrison's method of calculating the target for the Return to Profitability Bonus and Deloitte's method is of no assistance.

[705]   Deloitte's calculation is contained in one of the Appendices to the memo. The only way to describe this Appendix is by the document number, DT 601338. The Appendix has two purposes: its first stated purpose is to evaluate the effects of the release to income of $80 million of accrued liability balances in Q1 03 on Nortel's ability to achieve the Return to Profitability Bonus and Success Plan Bonus thresholds. In this memo, the release of accrued liability balances to the profit and loss statement is described as the "reversal of provisions". The second stated purpose is to evaluate the effects of the reversal of these provisions reported on net income for Q1 03.

[706]   As a result, this Appendix addresses two important issues in this trial.

[707]   The first calculation concludes that the Return to Profitability Bonus target is met with and without the release of the $80 million. The calculation is plainly set out. It starts with Nortel's loss from continuing operations as reported and then adjusts for the pro forma items that are called for by the 2002 definition of pro forma income; namely, the amortization of acquired technology, stock compensation expense, special charges, and gains on the buyback of bonds. It then adjusts for the cost of the bonuses and arrives at positive pro forma gains before taxes of $161 million. It then adjusts or subtracts the $80 million with which we are concerned and it concludes that the Return to Profitability Bonus target is met.

[708]   Mr. Dans testified about this calculation, although I found his evidence to be vague. He agreed with the adjustment for the amortization of acquired technology, stock compensation, special charges and gains on the buyback of bonds. To the extent that he said that Deloitte, in this Appendix, did not adjust for the cost of the Return to Profitability Bonus, he was in error. If I misunderstood Mr. Dans' evidence, it does not matter because the Deloitte calculation did adjust for the cost of the bonus.

[709]   Deloitte included in its calculation two positive adjustments totaling $28 million. Mr. Dans did not agree with these adjustments. It does not matter. Assuming Mr. Dans is correct, pro forma gains before taxes are $133 million. If I had to decide this matter, I would prefer the Deloitte analysis in the Appendix to Mr. Dans' conclusory statement.

[710] The Appendix then considers the Success Bonus Plan which had three targets: an earnings target, a revenue target and a cash flow targets. Deloitte, in this memo, concluded that all three targets were met with or without regard to the $80 million with which we are concerned.

[711] I observe here that the Restricted Stock Unit Bonus Plan, with which we were also concerned in this trial, is not referred to in this memo. It was never suggested that a threshold for this bonus plan was achieved in Q1 03.

### The effect of the $80 million on earnings

[712] The appendix then considers the effect of the $80 million with which we are concerned on reported earnings. It concludes that Nortel achieved positive earnings with or without the $80 million. This calculation appears on document DT 601339. Mr. Dans did not comment on this calculation.

[713] Apart from the calculation's conclusion, the analysis contains a note dealing with foreign tax credits. The note reveals that the authors of this memo participated in a conference call with a person identified as John Van Oglrop. The purpose of the call was to obtain clarification about certain foreign tax credits. It appears that a foreign tax credit, which had been recorded as a recoverable asset, had been written off in Q1 2003 and it should have been written off in 2002. This meant that the accrued liability balance for foreign tax credits was overstated by $20 million in Q1 2003 and understated in 2002. The note is interesting because it demonstrates the thoroughness with which the authors of this desk memo approached their task.

### Conclusion concerning the Bonus Payments & earnings

[714] I am satisfied that the Return to Profitability Bonus was payable in Q1 2003 with or without the release of $80 million in Non-op accrued liability balances.  I am satisfied that the Success Plan Bonus was payable with or without the release of $80 million in Non-Op accrued liability balances. The Restricted Stock Unit Bonus Plan was not an issue in Q1 03.

[715] I am satisfied that Nortel achieved net US GAAP income in Q1 03 with or without the $80 million.

[716] I am satisfied that Mr. Hathway was not misled when he was told by either Mr. Beatty or Mr. Gollogly that the Return to Profitability Bonus would have been paid with or without the release of the $80 million in Non-op accrued liability balances.

[717] I am not satisfied that the accused used Non-op "cookie jar" accrued liability balances to manage earnings and permit the payment of a bonus in Q1 03.

[718] I am not satisfied that the inclusion of the $80 million with which we are concerned in Nortel's profit and loss statement for Q1 03 misrepresented Nortel's financial results.

2013 ONSC 137 (CanLII)

### *The materiality of the release of $80 million of Non-op accrued liability balances*

[719]  Ms. De Acetis, Mr. Chant and Mr. Allen considered whether the $80 million in Non-op accrued liability balances, which were released to Nortel's profit and loss statement in Q1 03, were material to the Q1 03 financial statements.

[720]  Notwithstanding the fact that this is entitled a draft memo, the materiality analysis is instructive.

[721]  The memo concluded that, from a quantitative perspective, the $80 million was material because the materiality threshold used for Deloitte's Q1 03 audit review was $14 million. These authors noted that the $14 million threshold was calculated in accordance with the stated policy of the Deloitte & Touche firm.

[722]  The authors then considered whether the $80 million was material from a qualitative perspective.

[723]  Staff Accounting Bulletin 99 of the SEC mandates both a quantitative and qualitative analysis prior to a materiality determination.

[724]  No materiality expert was called during the trial.

[725]  The draft memo then applies all of the considerations which are set out in Staff Accounting Bulletin 99.

[726]  The draft memo concludes that all six accrued liability balance releases all relate to estimates which are inherently imprecise. The memo concludes that the degree of imprecision is high due to the changes at Nortel and in the industry. According to the authors, there is an inability to accurately predict liabilities of the type that make up the $80 million.

[727]  The memo concluded that the $80 million in changes do not mask a change in earnings or other trends. Six ($6) million in releases were in accordance with US GAAP. Of the remaining $74 million $44, million was reported in "other income". Of the remaining $30 million, $25 million was due to the reversal of a tax provision. The short close liability release ($5 million) was reported as a part of selling, general and administrative expenses during a time when sales, general and administrative expenses were going through dramatic reductions. The remaining $5 million was composed of a portion of the Out Of Balance account which related to Research and Development. Apparently, the classification of items within selling, general and administrative expenses and research and development expenses did not affect trends for those financial statement line items.

[728]  The memo then concluded that the $80 million did not hide a failure to meet analysts' expectations. In order to make this determination, the authors reviewed a variety of analysts' reports and concluded that they focused primarily on revenues, gross margins, operating expenses and operating income and earnings before interest taxes depreciation and amortization (commonly known as "EBITDA").

2013 ONSC 137 (CanLII)

[729]  The memo then examined whether the $80 million changed a loss into income. It was the opinion of the authors that, without the $80 million, Nortel would have made a net income of $2.2 million after payment of the Return to Profitability Bonus and the Success Bonus.

[730]  Pursuant to the provisions of Staff Accounting Bulletin 99, the authors then addressed the question of whether the $80 million concerned a segment or other portion of Nortel's business that had been identified as playing a significant role in Nortel's profitability. The authors answered this question in the negative because Nortel reported contribution from four segments. Research and Development ("R & D") and "Other Income" were excluded from this calculation. Selling, General and Administrative expense was included when calculating contribution to profit, but the contribution of this item was small.

[731]  The authors concluded that the release of the $80 million did not affect Nortel's compliance with regulatory requirements.

[732]  The authors also concluded that the $80 million did not affect Nortel's compliance with loan covenants and other contractual requirements. These requirements required Nortel to have a tangible net worth of $1.8 billion or more. In Q1 03, Nortel reported a tangible net worth of $2.33 billion.

[733]  Finally, the authors concluded that the release of the $80 million did not conceal an unlawful transaction.

[734]  As part of their analysis, the authors commented on the fact that Nortel specifically disclosed the release of the $80 million of favorable impacts in the 10-Q Report for Q1 03.

[735]  The authors pointed out that the effect on Nortel's earnings of the release of the $80 million was brought to the attention of Nortel's Audit Committee on April 23, 2003 prior to Nortel's publication of its financial results.

[736]  After making all these observations, the authors set out their conclusion. They noted that, quantitatively, the $80 million appeared to be material. The authors concluded that the $80 million did not have any of the qualitative characteristics that would indicate a particular concern to users of the financial statement. These items were, at the most, 5% of any particular line item in which they were included and fully disclosed in the notes to the financial statements.

[737]  When the authors considered all of these factors, their collective conclusion was that, if the $80 million had been removed from the financial statements, it would not have altered the total mix of information available to an investor.

[738]  It was the authors' opinion that the $80 million was not material in the broadest sense of the term.

[739]  Mr. Hathway, from late February 2003 Deloitte's lead audit partner on the Nortel 2003 audit, attempted to distance himself from these conclusions by saying that it was based on the knowledge that Deloitte had at the time the memo was prepared.

2013 ONSC 137 (CanLII)

[740]   On cross-examination, he seemed to say that it was still possible that US GAAP was not complied with, but the non-compliance was immaterial.

[741]   Later on in his cross-examination, Mr. Hathway indicated that he did not agree with the conclusion that the Return to Profitability Bonus target would have been met with and without the $80 million. He suggested that the authors, although he seemed to be referring to Ms. De Acetis, may not have understood the metric for calculating the bonus, although he conceded that Ms. De Acetis would have done her best to understand it before doing her calculation. It would have been a simple matter for Mr. Hathway to explain the error in Ms. De Acetis's calculation. He never did this on cross-examination or on re-examination.

[742]   I do not know how Mr. Hathaway could presume to disagree with Ms. De Acetis' calculations when he admitted in his direct examination that he did not have a detailed understanding of the Nortel pro forma calculations. He stated that he recommended that Nortel discontinue disclosing pro forma earnings in its Q1 03 financial statements, which Nortel did do.

[743]   Mr. Hathway admitted that he reviewed the memo. Mr. Hathway said he had a vague recollection of providing his comments to the author of the memo, but he could not remember what his comments were.

[744]   Mr. Hathway said that he would have made changes or edits to the memo, but did not do so because it was determined that there would be a restatement of earlier published financial statements and that the payment of the bonus would be looked at as part of the restatement.

[745]   Finally, Mr. Hathway said that the author of the memo, by which he seemed to mean Diana De Acetis, was not part of the engagement team and was not familiar with everything that was going on at Nortel. This particular assertion is misleading.

[746]   Ms. De Acetis was consulted on other matters and obviously was familiar with the Nortel file [see: Exhibit 228, tab 215].

[747]   In addition, the memo, which Mr. Hathway seemed to view as only the work of Ms. De Acetis, was co-authored by her superior, Mr. Chant, as well as Mr. Allen.

[748]   Mr. Allen joined the Nortel engagement in 2001. In Q1 03 and Q2 03, he was a senior member of the Deloitte engagement team for Nortel. Finally, Mr. Allen attended the meeting on April 15, 2003, where each one of the accrued liability balance releases which made up the $80 million, which is the subject of the memo, was specifically discussed prior to Deloitte agreeing to their Q1 03 release.

[749]   Mr. Chant was a partner in the firm and was the practice group leader of the Complex Accounting and Transaction Expertise Practice Group to which Ms. De Acetis was assigned.

[750]   Mr. Ciciretto, who provided information to Diana De Acetis, was a senior member of Deloitte's Nortel engagement team.

[751]   I simply do not accept this portion of Mr. Hathway's evidence. He admits he was asked for his comments about this memo. I am satisfied he would have provided those comments in a

timely way. I do not understand why he would not have insisted on his comments being incorporated into the memo.

[752]   The notion that Mr. Hathway had some comments concerning and disagreements with the memo, which he may have communicated to the author, but which were ignored and never recorded in writing, seems unlikely. I do not believe Deloitte would conduct itself in this fashion. It seems far more logical to me that the memo would have been changed to reflect Mr. Hathway's comments or that his comments and edits would have been described in the memo in some form that made clear the portions with which he disagreed.

[753]   I do not accept this portion of Mr. Hathway's evidence based on the thoroughness of the memo.

[754]   The Crown's expert, Mr. Chambers, did not comment on this memo.

### Conclusion

[755]   I accept the analysis and conclusions in the draft memo prepared by Ms. De Acetis, Mr. Chant and Mr. Allen. I reject Mr. Hathway's evidence to the effect that the calculations in this draft memo are somehow not correct. This memo represents a coherent materiality analysis and I find it persuasive.

[756]   I am satisfied that the release of the $80 million from Nortel's balance sheet to its profit and loss statement was not material to Nortel's Q1 03 financial results.

[757]   I am not satisfied that including the $80 million with which we have been concerned in Nortel's Q1 03 profit and loss statement or removing the $80 million from Nortel's Q1 03 consolidated balance sheet misrepresented Nortel's financial results for Q1 03 to the public or to Nortel's Audit Committee and its Board of Directors.

[758]   I am satisfied that the thresholds for the Return to Profitability Bonus and the Success Bonus Plan were met with or without the release of the $80 million.

### Susan Shaw's list of $189 million Non-op accrued liabilities

[759]   Reference was made earlier to Ms. Shaw's 2002 report. This is a second occurrence involving Ms. Shaw. It involves Non-op accrued liability balances with which she was concerned in Q1 03. This occurrence not only involves the $80 million to which I have referred, but an additional $109 million in accrued liability balances.

[760]   One of Susan Shaw's responsibilities was to analyze and be responsible for Non-op accrued liability balances. Throughout Q4 2002, Ms. Shaw had been expressing to her superior, Helen Verity, uneasiness about some of Non-op accrued liability balances for which she lacked support.

[761]   In February 2003, Ms. Shaw started reporting to Brian Harrison because Helen Verity left Nortel. In an effort to educate Mr. Harrison about Non-op and to bring to his attention the

problem with some of the accrued liability balances, Ms. Shaw classified the Non-op accrued liabilities on a chart which was entered into evidence as Exhibit 11, tab 11.

[762]  On this chart, she referred to the accrued liability balances which concerned her as "releasable provisions". Specifically, Ms. Shaw's concerns were that the "releasable provisions" on the chart were not current, didn't seem to be changing and lacked sufficient backup. Ms. Shaw believed that the problem with backup flowed both from the fact that there had been substantial staff reductions (two out of every three employees had been dismissed) and because facilities had been closed resulting in documents being packed up and put into storage making it virtually impossible to search for supporting documentation. Ms. Shaw pointed out that she was not suggesting that backup for these accrued liabilities did not exist; she was simply saying that she did not have that backup.

[763]  Ms. Shaw also cautioned that prematurely releasing an accrued liability which was truly required would create an exposure at a point in the future when the accrued liability crystallized. The evidence established that failing to provide for a risk was very countercultural at Nortel.

[764]  Ms. Shaw thought she met with Mr. Harrison in the latter part of February 2003 and, at that meeting, presented her list of Non-op accrued liabilities and explained the Non-op balance sheet. During the course of her explanation, she identified $189 million worth of "releasable provisions" or accrued liability balances which, in her view, had to be removed from the balance sheet.

[765]  Ms. Shaw's list of releasable provisions presented a problem: there was no justification for retaining these accrued liability balances on the balance sheet; there was no justification for releasing them in Q1 03; Mr. Dunn, Mr. Beatty and Mr. Gollogly had to provide certifications with their financial filings to the effect that, based on their knowledge, Nortel's financial statements fairly presented Nortel's financial condition; the auditors had to provide an opinion that the financial statements "present fairly, in all material respects, the financial position of Nortel Networks…".

[766]  Mr. Harrison was unable to assist Ms. Shaw with the problem. Mr. Harrison was not a chartered accountant. He was a Registered Industrial Accountant; later called a Certified Management Accountant. Quite illogically, he suggested that they release half of it in Q1 03 and half of it in Q2 203. Mr. Harrison described his solution as "an elegant way of, you know, getting out of the problem". Mr. Harrison's solution was hardly elegant. Ms. Shaw was a chartered accountant; she was not comfortable with his suggestion. Mr. Harrison agreed to raise the issue with Mr. Gollogly.

[767]  When Susan Shaw returned from a winter holiday, she was advised that Mr. Harrison was proposing to release $75 million of the Non-Op accrued liabilities on her list of releasable provisions. Mr. Harrison indicated, in his e-mail of March 24, 2003, that he was waiting confirmation from Mr. Beatty and Mr. Gollogly. Later, Ms. Shaw was advised that an additional $9 million from her list of releasable provisions was added to the liabilities that were to be released (total $84 million). Ms. Shaw was unable to say who made this decision.

[768]  Ms. Shaw testified that she was then asked to prepare an explanation of these releases, both for Nortel's purposes and so that Nortel could explain the accrued liability balance releases to Deloitte & Touche.

[769]  Ms. Shaw's written explanation was entered into as an exhibit. Specifically, it appears at tab 20 of Exhibit 11. By the time Ms. Shaw began to prepare her explanation, the list of accrued liability balances to be released had been reduced to $80 million from $84 million. Ms. Shaw did not know how the reduction came about. This $80 million in accrued liability balances is the same $80 million to which I have previously referred.

[770]  Ms. Shaw's prepared explanatory notes described the $80 million in accrued liability balances. Ms. Shaw testified that she prepared an additional chart which showed the $109 million remaining accrued liability balances. This chart was introduced as Exhibit 67G.

[771]  The Crown submitted that the decision to only release $80 million in accrued liabilities in Q1 03 is illogical. The Crown submits there is no difference between the $80 million which was released in Q1 03 and the remaining $109 million which was not released.

[772]  The Crown submitted that Ms. Shaw was aware of these liabilities in Q4 02. The Crown submitted many of them appeared on her $303 million liability list which she compiled in August 2002. The Crown pointed out that the $189 million in accrued liability balances were restated as part of the Comprehensive Balance Sheet Review and the first restatement process. Therefore, the Crown submits that the inclusion of these accrued liability balances in Q4 02, Q1 03 and Q2 03 represented the inclusion of false financial information on Nortel's consolidated balance sheet and as a result Nortel's financial results were misrepresented.

[773]  Ms. Shaw e-mailed her typewritten explanatory notes and other information to Joyce Lam and Guillermo Olguin, both of whom are chartered accountants with Deloitte & Touche, on April 14, 2003. Mr. Olguin forwarded her e-mail and attachments to John Cawthorne, Tony Ciciretto, Chris Allen and others on April 14, 2003.

[774]  Ms. Shaw indicated that she sent her material to Deloitte & Touche in advance of a joint meeting between Nortel and Deloitte to highlight for them the fact that $80 million in accrued liabilities for which there was little backup had been released to the profit and loss statement in one of the preliminary closings of General Ledger for Q1 03.

[775]  Mr. Shaw testified that, by the time this document was discussed with Deloitte & Touche on April 15, 2003, the $80 million had been released to the profit and loss statement. April 15, 2003 was approximately halfway through the close cycle for the preparation of the Q1 2003 financial statements.

[776]  At the April 15 meeting, on the Nortel side, Ms. Shaw, Brian Harrison, Linda Mezon, Michael McMillan and Michael Gollogly attended; on the Deloitte & Touche side, John Cawthorne, Don Hathway, Tony Ciceretto, Joyce Lam and Chris Allen attended. Mr. Hathway and Mr. Cawthorne were the two most senior Deloitte & Touche auditors on the Nortel file, with the exception of Mr. Richmond. Mr. Allen was one of the co-authors of the desk file memo to which I referred earlier.

[777]  Ms. Shaw said that her role at the meeting was to walk the Deloitte & Touche partners through her explanation of each of the provisions that had been released, as well as the provisions that remained. She said that her own purpose was to make it very clear that her report was the sum total of her knowledge of the accrued liability balances in her chart.

[778]  Ms. Shaw testified that she went through each item mentioned. She recalled a lengthy discussion about the Intercompany Out of Balance accrued liability balance because it was an ongoing issue between Nortel and Deloitte. Other evidence established that Mr. Dunn wanted to maintain the provision and Deloitte's wanted the Non-op Intercompany Out Of Balance account reconciled and then eliminated. Ms. Shaw indicated that the Intercompany Out Of Balance portion of the discussion was quite heated.

[779]  Ms. Shaw testified that, after the Intercompany Out Of Balance item had been discussed, the meeting proceeded to discuss the other items in her report. She said that Deloitte wanted to know what event had triggered the releases and that she informed them that there really were no triggering events. Ms. Shaw also recalled, at one point, someone on the Deloitte side wanted to know whether Nortel staff understood that there had to be a triggering event before an accrued liability balance could be changed or released to the profit and loss statement. She informed Deloitte that the accrued liability balances had been on Nortel's books for a number of quarters if not years. Ms. Shaw said it was quite evident at the meeting that these balances did not have adequate backup and that their release to the profit and loss statement had not been triggered. She said that Deloitte wanted to know why they were releasing these accrued liabilities in Q1 2003.

[780]  Ms. Shaw indicated that after the $80 million was discussed the remaining accrued liabilities, which totaled $109 million, were discussed.

[781]  The existence of provisions for which there was little support would not come us a surprise to either Mr. Cawthorne or Mr. Hathway despite their lack of experience with the Nortel engagement. In February 2003 Mr. Cawthorne asked for and received a list of "soft provisions" prepared in connection with the 2002 audit. The accrued liability balances on this list totaled $413 million. Mr. Hathway saw this list because his handwriting is on it. Soft provisions were accrued liability balances with questionable support.

[782]  Ms. Shaw elaborated that the other Deloitte partners were experienced with the Nortel account and the liability balances to which she was referring. Ms. Shaw testified that these balances had been on the books for many quarters and, for those experienced with the Nortel account, were not new. She said, for example, everyone from Deloitte, with the exception of John Cawthorne and Don Hathway, who were both new to the file, knew what the Matra Restructuring accrued liability balance was.

[783]  Evidence was introduced which established that balance sheet reviews were conducted in 2002 in relation to the balance sheet for Non-op. Ms. Shaw testified that these balance sheet reviews could go on for hours and that partners from Deloitte & Touche attended. Ten e-mails were introduced, which indicated that, in 2002, accountants with Deloitte & Touche were reviewing and asking questions about changes in accrued liabilities in Non-op in Q3 2002. I accept this aspect of Ms. Shaw's evidence.

2013 ONSC 137 (CanLII)

[784]   John Cawthorne, Tony Ciciretto, Joyce Lam and Chris Allen did not testify. Only Don Hathway testified and gave evidence about the April 15, 2003 meeting. Mr. Hathway was not part of the Nortel engagement prior to early 2003.

[785]   Ms. Shaw testified that, in her mind, there was no difference between the $189 million, which she initially identified, and the $80 million which was actually released in Q1 2003. Ms. Shaw said that, after she made her presentation and after the partners at Deloitte & Touche had finished asking her questions, she and others left the meeting. Ms. Shaw estimated that the portion of the meeting which she attended lasted for about forty-five minutes. She said four people remained behind in the meeting room: John Cawthorne, Don Hathway, Linda Mezon and Michael Gollogly.

[786]   I accept Ms. Shaw's evidence concerning the $109 million Non-Op accrued liability balances which remained on Nortel's balance sheet. Her conduct as she described it is entirely consistent. Ms. Shaw had responsibility for Non-op's liabilities; she had concerns about some of them. She brought her concerns to the attention of her superiors. As a chartered accountant, she understood the importance of making sure that Nortel's auditors understood that there was no support for the $80 million in accrued liability balances that were being released to the profit and loss statement and no support for the $109 million in accrued liability balances which remained on Nortel's balance sheet. She was quite candid in describing her own discomfort with these liability balances.

[787]   The $80 million remained released to income in Nortel's published financial results for Q1 2003. The $109 million remained on Nortel's published balance sheet where it always been included in Nortel's $5 billion in liabilities...

[788]   Ms. Shaw made further inquiries about the $109 million in Q2 03. She testified that she consulted with a broader group concerning the remaining $109 million of Non-op accrued liability balances. She described it as "taking more time and really going deeper into the provisions…" Ms. Shaw indicated that no new information concerning the remaining provisions was discovered. It was her evidence that "quite a bit of time was spent trying to find out about some of these items". Ms. Shaw testified that, because so many people had left the company, it was impossible to track down the information. I accept this aspect of Ms. Shaw's evidence.

### Should the $189 million have been dealt with in Q4 02?

[789]   The Crown suggested that the accrued liability balances, which appeared in Ms. Shaw's $189 million list, also appeared in her Accrued Liability Analysis report which she presented to Mr. Gollogly in October 2002. The Crown suggested, in argument, that this meant that Mr. Gollogly should have decided in October 2002 that these accrued liability balances were not supportable and dealt with them at that time. I reject this argument.

[790]   Ms. Shaw's Accrued Liability Analysis Report in October 2002 (Exhibit 1, tab 5) listed all of the Non-op accrued liabilities. This list totaled $315 million. Ms. Shaw identified each accrued liability balance and the total. Ms. Shaw did not state in her Report that all of these accrued liability balances could not be supported and should be released. Ms. Shaw indicated in

her Report that $66 million of Non-op accrued liability balances could not be supported and should be released. Ms. Shaw did not identify these individual balances.

[791]  In February 2003, Ms. Shaw, in her capacity as a person responsible for the Non-op accrued liability balances, met with Mr. Harrison to whom she was directly reporting. She met with him about the state of accrued liability balances in Non-op. In that meeting, Ms. Shaw advised Mr. Harrison that there were $189 million in Non-op accrued liability balances which, in her view, at that time were not supportable. In her notes which she prepared for that meeting, she referred to these accrued liability balances as "Releasable Provisions." In her notes, Ms. Shaw specifically identified each one of these provisions.  Mr. Gollogly was not present at that meeting.

[792]  There is no basis for suggesting that Ms. Shaw had disclosed to Mr. Gollogly in the fall of 2002 the specific Non-op accrued liability balances which were incorporated into the memo which she were prepared for the April 15, 2003 meeting with Deloitte.

[793]  The Crown also suggested that Mr. Gollogly did not deal with the $189 million in accrued liability balances in Q4 02 because he wished to maintain them as a "cookie jar" to assist in managing earnings.  I reject this argument for the same reason.

### The knowledge of Mr. Dunn, Mr. Beatty and Mr. Gollogly

[794]  I have already indicated elsewhere that I am satisfied that Mr. Dunn, Mr. Beatty and Mr. Gollogly were very aware of financial developments within Nortel.

[795]  I am also satisfied that accrued liability balances owned by the two non-operational units of Nortel; namely, Corporate and Non-op, were under the control of the Controller. The Crown relied on this fact to suggest that all three accused were more familiar with accrued liability balances in Corporate and Non-op.

[796]  The decisions to be taken with respect to this $189 million were important. Nortel's financial situation was still precarious although improving. It is clear that Mr. Gollogly was at the meeting with representatives of Deloitte in April 2003 when the decision to release the $80 million in accrued liability balances was confirmed.

[797]  The evidence discloses, and Mr. Gollogly well-understood, his obligations as Nortel's controller. I am satisfied that he brought to Mr. Beatty's attention this $189 million balance sheet problem. Mr. Dunn was described in the evidence as a strong, intelligent detail-oriented leader.

[798]  I am satisfied beyond a reasonable doubt that Mr. Gollogly, Mr. Beatty and Mr. Dunn were aware of Ms. Shaw's and Nortel's $189 million in releasable provisions.

[799]  The Crown relied on the presence of two accrued liability balances in Non-op as a further indication of the familiarity of all three accused with Corporate and Non-op accrued liability balances. The two accrued liability balances to which the Crown referred were known as the Degree of Difficulty ("DOD") bonus and the General Provision.

[800]  I am satisfied that all 3 accused were familiar with Non-op accrued liability balances. However, reference was made to these 2 accrued liability balances and it is helpful to look at them in detail and see what they demonstrate.

### The accrued liability balance for the Degree of Difficulty bonus – $25 million

[801]  The Degree of Difficulty accrued liability balance was created when Mr. John Roth was Nortel CEO. It was created to provide for the risk created by the fact that Mr. Roth had the authority, at his discretion, to pay a bonus to a senior executive. As a result, the Degree of Difficulty bonus was payable at the discretion of the CEO. Ms. Mezon indicated that details surrounding the payment of a Degree of Difficulty Bonus were considered confidential to the CEO. The other Bonus Plans disclosed in the evidence were payable upon the recommendation of the JLRC committee of the Board of Directors.

[802]  Mr. Roth left Nortel in 2000. Accordingly, this accrued liability balance was set up prior to that time. The original accrued liability balance was $19 million and later increased to $25 million.

[803]  Due to the fact that Nortel was in extremely difficult financial circumstances from 2000 forward, it is not surprising that Mr. Dunn never attempted to use this balance to pay a bonus.

[804]  The Crown suggested that the accused attempted to release this provision as a substitution for the Intercompany Out Of Balance provision. It is the Crown's position that Deloitte & Touche would not agree to the release of any portion of the Intercompany Out Of Balance accrued liability balance in Q2 03 because the entire Intercompany Out Of Balance account was under review. It is the Crown's position that the accused then attempted to release both the Degree of Difficulty accrued liability balance and the General Provision as a substitute.

[805]  It is also the Crown's position that this provision had been identified in February 2003 by Susan Shaw's as a provision that should not be on the balance sheet and that it ought not to have been, therefore, retained on the balance sheet in Q1 03.

[806]  The inclusion of the Degree of Difficulty bonus in Ms. Shaw's notes simply demonstrates that she knew nothing about the details surrounding this accrued liability balance. Ms. Shaw had no documentation herself because details surrounding the payment of a degree of difficulty bonus were considered confidential. She knew that it had been on the books for a long time and that it had not changed. As a result, Ms. Shaw included reference to this bonus in the notes she prepared for her discussion with Deloitte in April 2003. In her April 14, 2003 Report, Ms. Shaw recorded a brief description of the bonus plan and then the words "left in place per Frank Dunn".

[807]  This is perhaps an appropriate place to note that documentation existed supporting this bonus plan. It was approved by Nortel's Board of directors when it was created. The person, who had the authority to pay the bonus, Mr. Dunn, was still employed at Nortel. Ms. Shaw's note "left in place per Frank Dunn" obviously means that Ms. Shaw had received information from someone that Mr. Dunn wished to retain the discretion to pay a bonus to a senior executive.

[808]   Nortel did not attempt to release this accrued liability balance in Q1 03. In Q2 03, the attempt to release this accrued liability balance was unsuccessful because Mr. Hathway would not approve it and the other balances which totaled $142 million. Even if the release of this accrued liability balance would have been material to Nortel's profit and loss statement in Q2 03, it never happened. All that happened was that this $25 million accrued liability balance remained on Nortel's balance sheet where it always been.

[809]   Mr. Hathway testified that, at the April 15, 2003 meeting, he questioned reference to this accrued liability balance because Ms. Shaw, in her memo, did not indicate whether a bonus was going to be paid.

[810]   Even if the Crown's submission is correct and it is true that Mr. Gollogly, Mr. Beatty and Mr. Dunn attempted to release this accrued liability balance to substitute, in part, for the fact that they could not release the Intercompany Out Of Balance accrued liability balance that is not the end of the matter. The release never took place. It is not a crime for a corporation to try to achieve a financial target. A line is crossed when, in pursuit of that goal, financial statements are released to the public which misrepresent the corporation's financial results. No such misrepresentation was brought about by an unsuccessful attempt, if that is what happened, to release the accrued liability balance associated with the Degree of Difficulty bonus.

[811]   Mr. Richmond testified that it was Deloitte's opinion that leaving the $142 million on the Nortel balance sheet pending The Comprehensive Balance Sheet Review did not misrepresent Nortel's financial results. Mr. Chambers, the Crown's expert, did not offer a contrary opinion.

[812]   I attach no significance to the existence of the Degree of Difficulty accrued liability balance. I attach no significance to the fact that Mr. Dunn wanted it left in place in Q1 03 and subsequently changed his mind in Q2 03. I attach no significance to the fact that the 3 accused unsuccessfully attempted to release this balance in Q2 03.

### The accrued liability balance for the General Provision $10 million

[813]   In an undated note, Ms. Shaw records that the General Provision was set up to cover various items confidential to the Controller.

[814]   The evidence indicated that the timing of the set-up of this General Provision was unclear. Documentary evidence indicated that this accrued liability balance was set-up either in Q3 00 or Q4 01. Mr. Beatty was the Controller of Nortel at the time. Helen Verity testified that this provision was, in fact, held by the Controller. Ms. Mezon said she had very little knowledge about this accrued liability balance except that it was confidential.

[815]   This provision was not released in Q1 03. Ms. Shaw referred to it in her notes for the April 15, 2003 meeting with Deloitte & Touche. In her report, the only note Ms. Shaw recorded concerning this accrued liability balance was "left in place per Doug Beatty". Ms. Shaw had no information about this accrued liability balance except that it was confidential and held by the Controller. Ms. Shaw indicated that this limited information had come from Brian Harrison or Linda Mezon.

[816]   Ms. Shaw indicated that the name of the accrued liability balance in the General Ledger cannot be relied upon to define it. Ms. Shaw indicated that the only way to know the risk for which an accrued liability balance was providing was to read the specific backup for it.

[817]   Ms. Shaw pointed out in her evidence that this accrued liability balance was well-known to Deloitte & Touche. It had been on the Nortel books for many quarters.

[818]   Mr. Hathway indicated that he questioned the provision at that April 2003 meeting when he saw it on Susan Shaw's list. He testified that US GAAP did not permit a general provision and that, unless there was more to this provision than Susan Shaw had provided, it was not permitted. Mr. Hathway agreed that, even though he was new to the Nortel file, he was aware that some of the provisions on Susan Shaw's list, including this one, had been on Nortel's balance sheet for a long period of time. As indicated earlier Mr. Hathway had seen a soft provisions list totaling $413 million which had been provided to Mr. Cawthorne in February 2003.

[819]   Mr. Richmond testified that an accrued liability balance intended to provide for liability generally, that is, a provision that was not tied to a specific liability, existed inside corporate Canada and in the United States prior to 1999. In 1999, he testified there was a clear attempt to eliminate this type of accrued liability balance. Accordingly the purpose of the provision needed to be understood.

[820]   Obviously Mr. Beatty could have been asked about the provision at any time. If the provision was for a specific purpose then the only question would be whether Mr. Beatty thought it was possible that he might use it. If the provision was general in nature it had to be eliminated because it was contrary to US GAAP.

[821]   An attempt was made to release this accrued liability balance to the profit and loss statement in Q2 03. Ms. Shaw could not remember how it was that she learned that this balance was to be released. Specifically, it was part of the $59 million in Non-op accrued liability balances which were included in the $142 million of accrued liability balances which were, for a short time during a preliminary close of Nortel's Q2 03 general ledger, released to Nortel's profit and loss statement.

[822]   In a note explaining why, in Q2 03, this accrued liability balance should be released to the profit and loss statement, Ms. Shaw explained that specific drawdowns and the timing of those drawdowns were unknown and, therefore, the accrued liability balance should be eliminated.

[823]   This accrued liability balance was not released to Nortel's Q2 03 published profit and loss statement. Karen Sledge testified that, during the first restatement, this accrued liability balance was completely eliminated.

[824]   The Crown suggested that the accused attempted to release this provision as a substitution for the Intercompany Out Of Balance provision. It is the Crown's position that Deloitte & Touche would not agree to release any portion of the Intercompany Out Of Balance accrued liability balance to Nortel's profit and loss statement because the entire Intercompany

2013 ONSC 137 (CanLII)

Out Of Balance account was under review. It is the Crown's position that the accused then attempted to release both this balance Degree of Difficulty balance as a substitute. This never happened.

[825]   Even if the Crown's submission is correct and it is true that Mr. Gollogly, Mr. Beatty and Mr. Dunn attempted to release this accrued liability balance to substitute, in part, for the fact that they could not release the Intercompany Out Of Balance accrued liability balance that is not the end of the matter. The release never took place. It is not a crime for a corporation to try to achieve a financial target. A line is crossed when, in pursuit of that goal, financial statements are released to the public which misrepresent the corporation's financial results. No such misrepresentation was brought about by an unsuccessful attempt, if that is what happened, to release the accrued liability balance associated with the General Provision.

[826]   It is also the Crown's position that this provision had been identified in February 2003 by Susan Shaw's as a provision that should not be on the balance sheet and that it ought not to have been, therefore, retained on the balance sheet in Q1 03. Ms. Shaw identified this provision as one that Mr. Beatty wanted left in place. The only question is whether this accrued liability balance existed to provide for a specific risk.

[827]   As indicated this accrued liability balance was never released. It was included in the $142 million. It never affected Nortel's profit and loss results. It remained on the balance sheet where it had always been. Mr. Richmond testified that it was Deloitte's opinion that leaving the $142 million on the Nortel balance sheet pending The Comprehensive Balance Sheet Review did not misrepresent Nortel's financial results. Mr. Chambers, the Crown's expert, did not offer a contrary opinion.

[828]   I attach no significance to the existence of the General Provision accrued liability balance. I attach no significance to the fact that Mr. Beatty wanted it left in place in Q1 03 and subsequently changed his mind in Q2 03. I attach no significance to the fact that the 3 accused unsuccessfully attempted to release this provision in Q2 03.

### The $142 million in accrued liabilities which Nortel wished to release in Q2 03

[829]   Mr. Hathway testified that Mr. Gollogly advised him that, in the initial close or one of the initial closes of the General Ledger for Q2 03, Nortel had identified $142 million of reserves that did not have support and had released those reserves to the profit and loss statement, thereby positively impacting earnings by $142 million. Mr. Gollogly asked Mr. Hathway if this would be acceptable to Deloitte & Touche. Mr. Hathway objected.

[830]   Mr. Hathway indicated that his objection was that, because these amounts must have had no support at the end of Q1 03, when these amounts were combined with the $80 million released to income in Q1 03, they would have amounted to a material error in Nortel's profit and loss statement.

[831]  As a result of Mr. Hathway's objection, Mr. Gollogly returned the $142 million to Nortel's balance sheet where it had always been. This happened at the next preliminary close of the General Ledger. Mr. Hathway had no recollection of discussing the $142 million release with Mr. Beatty or Mr. Dunn.

[832]  As a result of this occurrence, Deloitte insisted that Nortel undertake a comprehensive review of its balance sheet. Mr. Gollogly had already instituted a balance sheet review. However, this comprehensive balance sheet review was agreed on between Mr. Dunn and Mr. Richmond, endorsed by Nortel's Audit Committee and disclosed in Nortel's public filings.

[833]  The results of the comprehensive balance sheet review led to a decision to restate for the first time Nortel's previously-published financial results.

[834]  Included in these $142 million balances were $59 million in Non-op accrued liability balances from the $109 million in Non-op balances which Ms. Shaw discussed with Deloitte on April 15, 2003.

[835]  The return of the $142 million in releases resulted in the return to Nortel's balance sheet of $55 million out of the $59 million in Non-op accrued liability balances. The one release which did not return to the balance sheet was a $4 million release that had to do with Siemens, which is discussed elsewhere in these reasons.

[836]  No published Nortel financial results reflected this $142 million as a component of Nortel's earnings.

[837]  There is no doubt that Mr. Dunn and Mr. Beatty were aware of the momentary release of the $142 million. Mr. Dunn told both Mr. Richmond and the Audit Committee that the $142 million represented all of the remaining unsupported accrued liability balances on Nortel's balance sheet. It was Mr. Dunn's view that those liability balances should remain released to Nortel's Q2 03 profit and loss statement with the appropriate disclosure in Nortel's financial statements and press release. Mr. Beatty attended the Audit Committee meeting where these releases were discussed.

### Conclusion

[838]  I am also satisfied that the attempt to release $142 million in accrued liability balances in Q2 03 did not misrepresent Nortel's financial results because Mr. Hathway objected to the release and Mr. Gollogly returned the $142 million to Nortel's balance sheet where those balances had always been.

[839]  Mr. Richmond testified that it was Deloitte's opinion that leaving the $142 million on the Nortel balance sheet pending The Comprehensive Balance Sheet Review did not misrepresent Nortel's financial results. Mr. Chambers, the Crown's expert, did not offer a contrary opinion. I adopt this conclusion is my own.

[840]  The $109 million in balances which remained on Nortel's balance sheet as Non-op accrued liability balances were defined by Ms. Shaw as releasable provisions. Their presence on the balance sheet raises an issue concerning the appropriateness of the certification signed by the

accused as part of the Nortel financial filings and the appropriateness of the Deloitte audit opinions while those releasable provisions were on the balance sheet.

[841]  Mr. Richmond testified that the $142 million, which contained $59 million from Ms. Shaw's list, was appropriately parked on the balance sheet pending the Comprehensive Balance Sheet Review.

[842]  The Crown's expert, Mr. Chambers, in his report offered no opinion concerning the appropriateness of the certifications of Mr. Dunn, Mr Beatty or Mr. Gollogly. He also offered no comments concerning the Deloitte opinion which accompanied the Q1 03 published financial statements.

[843]  I am not satisfied that it is safe for me to draw a conclusion about this particular aspect of the matter in the absence of such evidence.

[844]  I am not satisfied beyond a reasonable doubt that the retention on Nortel's balance sheet of $109 million of accrued liability balances which Ms. Shaw identified as releasable misrepresented Nortel's financial results.

[845]  I am satisfied, based on my acceptance of Ms. Shaw's evidence, that Ms. Shaw at the April 15, 2003 meeting fully-disclosed to Deloitte the circumstances surrounding the release of $80 million in accrued liability balances, as well as the circumstances surrounding the decision to keep the remaining $109 million in accrued liabilities on the balance sheet.

[846]  The $80 million which was released in Q1 03 had been conclusively determined to be unsupportable. Deloitte, the Audit Committee, Ms. Shaw and all the accused knew that there were no triggering events in Q1 03 which required the release of this $80 million. It was obviously the view of everyone involved that the disclosed release of this $80 million would not materially affect Nortel's balance sheet profit and loss statement and thereby misrepresent Nortel's financial results. As indicated elsewhere in these reasons, I agree with this conclusion. I mention it here to note that the way in which the release of the $80 million was handled was unobjectionable.

[847]  Disclosure of the fact that Nortel's financial results for Q1 03 were positively affected by the release of this $80 million was included in Nortel's published financial statements and the press release announcing the Q1 03 financial results.

[848]  When I consider all of the evidence, including the evidence to which I have specifically referred, I am not satisfied that the release of this $80 million misrepresented Nortel's financial results.

### The use of Outlooks and Roadmaps in 2003

[849]  Nortel management used documents known as Outlooks and Roadmaps in connection with forecasting. Several Outlooks, approximately five, were prepared for every quarter.

[850]  Mr. Brian Harrison prepared many of the Outlooks and Roadmaps which were entered into evidence. Mr. Harrison was assigned to the Global Planning and Reporting Group.

2013 ONSC 137 (CanLII)

[851]   Mr. Harrison said the Outlook's purpose was to provide insight into the estimates that the various business units provided to management. Mr. Harrison indicated that, in the volatile environment in which Nortel found itself, with cash challenges, downsizing and a soft market, forecasting was important.

[852]   Mr. Harrison indicated that the Outlook process called for him to collect forecasts and other information from each of the business units through their financial representatives and consolidate those forecasts into an overall view. The Outlooks which he produced included information about accrued liability balances that the business units had released in the quarter; the Outlooks included information about possible releases of accrued liability balances to income. Mr. Harrison's evidence in this regard is confirmed by notations identifying possible releases which appear on some of the Outlooks.

[853]   Mr. Harrison received the financial information used in his Outlooks from contacts within the Finance Groups of the various units within Nortel.

[854]   Mr. Harrison prepared Outlooks whenever he received news of any importance from the various business units.

[855]   The business units engaged in active operations were known as: Enterprise, Wireline, Wireless, and Optical. There were two other units, Corporate and Non-Op, referred to on these Outlooks and Roadmaps. As indicated earlier, Corporate was a consolidation of the various corporate functions such as real estate, human resources etc.; Non-op was a catchall – a collection of everything that was left over.

[856]   Mr. Harrison did not perform calculations to arrive at the numbers employed in the Outlooks which he created; he did perform the mathematical calculations within the Outlook itself.

[857]   Mr. Harrison included a Gross Margin in his Outlooks calculation because Gross Margin, in his experience, was a useful metric for profitability. In Mr. Harrison's experience, Nortel's gross margin during the time-frame of this indictment was in the 40% range.

[858]   Mr. Harrison testified that he prepared a document known as a Roadmap. His evidence was that Roadmaps were started in February 2003; they were prepared in Q1 03 and Q2 03 and not after that time. Mr. Harrison described them as a modeling exercise.

[859]   According to Mr. Harrison, a Roadmap was more ambitious than an Outlook; it described where Nortel wanted to go rather than where it was heading. Mr. Harrison said that the difference between an Outlook and a Roadmap was that a Roadmap reflected what the business units would like to achieve or had been asked to achieve. Roadmaps included items positively affecting earnings such as higher sales, reduction of expenses and accelerated deal closings to record revenue sooner and releases or possible releases of accrued liability balances to income.

[860]   Mr. Harrison indicated that he received information on a variety of fronts from the business units concerning what had actually occurred in relation to their attempts to achieve their targets.

[861]   Mr. Harrison testified that it was his responsibility to work with the business units to determine how the business units were going to achieve the target.

[862]   Mr. Harrison described the Roadmap as a hypothetical scenario. He indicated that it was not clear to him when he was creating these hypotheses that they were doable; rather, they were based on the best information he had from the various business units.

[863]   Mr. Harrison indicated that the targets in the Roadmaps came from Mr. Beatty, although in one instance, a target for a Roadmap came from Mr. Dunn. Mr. Harrison stated that the targeted figure was pro forma income earnings before taxes. Mr. Harrison indicated that he passively accepted the target and prepared his Outlooks with the target as a given.

[864]   Mr. Harrison indicated that the practice of setting targets was a long-standing one at Nortel; this practice did not originate with Mr. Beatty or the other defendants. Mr. Harrison also testified that the practice of preparing Outlooks pre-dated Mr. Beatty's appointment as CFO.

[865]   Mr. Harrison testified that, despite the fact that he reported to the Controller, the main customer for his Outlooks and Roadmaps was the CFO, Douglas Beatty, although e-mail evidence demonstrated that, on occasion, the Outlooks and Roadmaps were shown to Mr. Dunn and the business unit presidents, who were collectively referred to as the "FAD Cabinet".

[866]   I am satisfied that the targets set by Mr. Beatty and contained in the Roadmaps were approved by Mr. Dunn. Given the precarious financial position of Nortel, it is inconceivable that financial targets would be set for the various business units without the approval of the CEO. Mr. Gollogly was also aware of these targets because he was on the Outlook distribution list.

[867]   Mr. Harrison left Nortel in June 2003 and, thereafter, the Outlook process, including Roadmap preparation, was taken over by Mr. Peter Dans.   Mr. Dans had assisted with the preparation of Outlooks prior to taking over from Mr. Harrison.

[868]   According to Mr. Dans, the Outlook was part of a standard process whereby the Global Planning and Reporting Group collected forecasts from the various leadership categories and consolidated them into a forecast for the subsequent quarters.

[869]   Mr. Dans described the Outlook process as a short-term forecast that tended to focus on two or three quarters out from the time the Outlook was prepared.

[870]   Mr. Dans said that he first became aware of Roadmaps in February or March 2003. Mr. Dans indicated that, from that point onward, the Outlook package also included a Roadmap and was, therefore, received by all persons who were on the Outlook distribution list.

[871]   It was Mr. Dans' evidence that a Roadmap was an analysis or scenario that was put together by the Global Planning and Reporting Group. It was quite often based on an Outlook. According to Mr. Dans, the Global Planning and Reporting Group came up with targets for revenue and profitability. Mr. Dans then reviewed his analysis with his superior, Peter Browne, and then with Douglas Beatty. Mr. Dans understood that Mr. Beatty reviewed these targets with Mr. Dunn.

[872]  Mr. Dans' evidence in this regard is slightly different than Mr. Harrison's. In my view, Mr. Harrison sought to distance himself from the target-setting process which I found odd, given that he was the Director of Global Planning and Reporting. I prefer the evidence of Mr. Dans in this regard concerning the origination of targets.

[873]  Mr. Dans testified that the Corporate Planning and Reporting Group where he was also assigned would ask the various business units to indicate the extent to which balance sheet releases were included in their forecasts and then record these releases separately within the Outlook package. Mr. Dans indicated that the Global Planning and Reporting Group did not segregate provision releases according to whether they had been triggered in the current quarter; they just looked at provision releases in general. It is clear that balance sheet releases to income were recorded on the Outlooks and Roadmaps and I accept Mr. Dans' evidence in this regard.

[874]  Some of the Outlooks referred to accrual liability releases as "balance sheet"; this was later changed to "other" at the suggestion of Mr. Beatty. Mr. Beatty apparently offered no reason for the terminology change.

[875]  Mr. Harrison testified that the Outlook distribution list was limited. Mr. Dans testified that Mr. Beatty would further distribute the Outlook package if he thought it advisable. The Outlook package was forwarded to Mr. Peter Browne when Mr. Harrison reported to him and to Michael Gollogly when Mr. Harrison reported to him.

[876]  I attach no significance to the fact that the distribution of Outlooks and Roadmaps was relatively narrow because there are disclosures issues which arise when confidential financial information is widely disseminated within the corporation but not otherwise publicly made known.

[877]  The Crown pointed out that the presentations made to the Board of Directors consistently understated what senior management believed Nortel's actual results would be. Mr. Harrison, who prepared the Outlooks, offered his own observation which was that commitments to the Board of Directors were more conservative generally. Mr. Harrison explained that his Outlooks had a short shelf life. They were frequently replaced by other Outlooks. Board communications were more rigid and less frequent and, in his experience, more conservative. Mr. Harrison said the Outlooks were a short-term management tool to generate discussion. The Board update was more like placing a marker to explain how Nortel was doing versus its budget.

[878]  The Crown suggested that the Board was not given accurate information about Nortel's performance. The Crown suggested that Mr. Beatty deliberately understated Nortel's financial results and withheld Mr. Harrison's Outlooks.

[879]  The Crown's suggestion applies to all three accused because the evidence was that Mr. Dunn, Mr. Beatty and Mr. Gollogly attended Audit Committee and Board of directors meetings when Board updates were presented.

[880]  I am satisfied that any financial presentation to the Audit Committee or the Board of Directors was, in effect, a representation to the Board by all three accused.

[881]  I previously referred to Exhibit 42E and the portion of it I found unreliable.  I now propose to refer to other information contained in that exhibit.  Exhibit 42E was used by the Crown to put some specificity to the argument that the Audit Committee received understated estimates concerning Nortel's financial performance.

[882]  On January 23, 2003, Mr. Beatty provided the Board with a financial forecast update for Q1 03 which predicted a pro forma loss of $112 million. Mr. Beatty also advised the Board that Nortel could expect a US GAAP loss of $240 million.

[883]  On February 27, 2003, Mr. Beatty provided the Board with a financial forecast update for Q1 03 which predicted a pro forma loss of $50 million. Mr. Beatty also advised the Board that they could expect a US GAAP loss of $128 million.

[884]  By March 28, 2003 Mr. Beatty provided the Board with a financial forecast update for Q1 03 which predicted a pro forma loss of $20 million. Mr. Beatty also advised the Board that they could expect the US GAAP loss of $48 million.

[885]  On April 24, 2003, Mr. Beatty advised the Board that Nortel achieved a pro forma profit of $40 million. Mr. Beatty also advised the Board that Nortel achieved US GAAP profit of $54 million.

[886]  It would be obvious to the Board that Nortel's results for Q1 03 were improving throughout the quarter. Secondly, among other things, the Board would know that these results were based on revenues of $2.4 billion which helps to put the fluctuations into perspective.

[887]  In Q2 03 (which began April 1, 2003), Mr. Beatty advised the Board on April 22, 2003 in a financial update that Nortel would report pro forma earnings before taxes for Q2 03 of $25 million. Mr. Beatty also advised the board to expect a US GAAP loss of $54 million.

[888]  On May 2, 2003, Mr. Beatty advised the Board to expect a pro forma profit of $25 million. Mr. Beatty also advised the Board to expect the US GAAP loss of $54 million.

[889]  On May 29, 2003, Mr. Beatty advised the Board in a financial update that Nortel was anticipating a pro forma profit for Q2 03 of $25 million. Mr. Beatty also advised the Board to expect the US GAAP loss of $54 million.

[890]  On July 28, 2003, the Board was advised that Nortel's pro forma profit for Q2 03 was $34 million. Mr. Beatty also advised the Board that Nortel experienced a US GAAP loss of $14 million.

[891]  Nortel's revenues for Q2 03 were $2.3 billion.

[892]  In Q3 03 (which began July 1, 2003), the Board was advised in a financial update, dated July 28, 2003, to expect a pro forma loss before taxes of between $30 million and $60 million. Mr. Beatty also advised the Board to expect the US GAAP loss of between $40 million in $70 million.

2013 ONSC 137 (CanLII)

[893]   On September 25, 2003 in two financial updates, the Board was advised that Nortel's pro forma gain before taxes for Q3 03 was predicted to be $65 million or, alternatively, between $50 and $75 million. Mr. Beatty also advised the Board that the US GAAP income was predicted to be $51 million or, alternatively, between $45 million and $65 million.

[894]   On October 23, 2003, the Board of Directors was advised that Nortel was expecting a pro forma profit before taxes of $172 million. Mr. Beatty also advised the Board to expect a US GAAP profit of $179 million.

[895]   On November 21, 2003, the Board was advised that for Q3 03 the pro forma gain before taxes was $179 million. Mr. Beatty also advised the Board that Nortel US GAAP profit was $185 million.

[896]   Nortel's revenues for Q3 03 were $2.2 billion.

[897]   The evidence indicated that forecasting can be difficult. Nortel's difficulty with forecasting in Q1 03 is demonstrated by the circumstances surrounding the Arris proposal.

### The Arris Proposal

[898]   On the day after Mr. Beatty provided his January 23, 2003 Board update (which predicted a US GAAP loss of $240 million), he received an e-mail telling him about a proposal from the Board of Arris. Nortel owned 27% of Arris and the majority owners of Arris wanted to buy Nortel out. The buyout, if it took place, would increase Nortel's US GAAP income by approximately $137 million.

[899]   In Q1 03 Nortel, eventually accepted a proposal from Arris, although the transaction did not close until March 2003, shortly before the end of Q1 03.

[900]   Obviously, Mr. Beatty could not go to the Audit Committee the day after he made his financial update presentation and advise them that there was a possibility of a dramatic improvement in US GAAP net income in Q1 03. It was not clear until March that there would actually be a deal. There was evidence that the chair of the Audit Committee was in regular contact with Mr. Dunn and was very often given a "heads up" about what was happening.

[901]   The Arris Proposal illustrates not only the vagaries of forecasting, but also the sense of urgency on the part of Mr. Beatty and others within Nortel to close the transaction in Q1 03 and significantly improve US GAAP earnings in that quarter.

### Deloitte's interest in forecasting

[902]   Mr. Harrison testified, and his evidence was confirmed by e-mail correspondence and Deloitte and Touche business records, that the forecasting process which he used was reviewed by Nortel's auditors in Q4 2002.

[903]   Mr. Harrison also indicated that Deloitte & Touche were interested in forecasting to assist in planning. At this time, Deloitte was required to express an opinion on the likelihood of Nortel

2013 ONSC 137 (CanLII)

remaining in business in the twelve months following their audit or quarterly review This confirms Mr. Harrison's evidence in this regard.

[904] Accordingly, I accept Mr. Harrison's evidence concerning Deloitte's interest in forecasting.

[905] Mr. Dans indicated that Deloitte and Touche were provided with a copy of the final Outlook for Q1 2003 and Q2 2003. It was also his recollection that Deloitte & Touche were provided with both a preliminary and final Outlook for Q2 03. Mr. Dans confirmed that the process worked out with Deloitte & Touche was that they were given the last Outlook of the quarter so that they could compare the actual results with the final Outlook. In addition, there was a telephone conference with each of the heads of the business units, Mr. Dans and representatives of Deloitte & Touche during which the actual results were presented and variances, if any, between those results and the final Outlook explained. Exhibit 53 confirms that the Outlook, dated September 17, 2002, was provided to Deloitte & Touche as part of their audit of the forecasting process. In addition, some further confirmation of Mr. Dans' evidence is provided in Exhibit 65 – an internal Deloitte & Touche e-mail – forwarding "the most recent outlook/forecast". There was some evidence that the Outlooks provided to Deloitte & Touche were in a different format than the internal Nortel Outlook package; the content, however, was similar.

[906] Exhibit 2, tab 94 is an e-mail. This e-mail records that "D & T will be looking for the Outlook and the list of accrued liability balances to be released to the profit and loss statement". This e-mail establishes that at least some of the Outlooks produced by Mr. Harrison and Mr. Dans were provided to Deloitte & Touche and that these Outlooks included the accrued liability balances that were to be released to the profit and loss statement.

[907] I accept Mr. Dans' evidence that Outlook packages were provided to Deloitte & Touche during Q1 and Q2 2003 and that Deloitte & Touche was aware of the Outlook forecasting process which he employed. Mr. Dans could not recall Deloitte & Touche receiving Roadmaps and I find that none were provided to them.

[908] During the close period when the consolidated financial results were being prepared, Mr. Harrison also prepared for Mr. Gollogly and the Assistant Controller, Linda Mezon, a similar looking document, also called an Outlook, based on actual numbers to provide management with a perspective on the evolving financial results for the quarter. This update was prepared daily and each time there was an update of the General Ledger. By this method, management could compare the actual results recorded in the General Ledger with the targeted results that Mr. Harrison had been preparing in the form of Outlooks and Roadmaps throughout the quarter.

[909] I accept the evidence of Mr. Harrison and Mr. Dans concerning the preparation and distribution of Outlook packages including Roadmaps. Their evidence in this regard was entirely consistent with the documentary evidence.

[910] I am satisfied that the Board was given accurate, albeit understated, updates about Nortel's progress through each of the three quarters to which I referred. I am satisfied that the Board was given predictions about Nortel's performance which were deliberately understated in

the sense that Mr. Dunn, Mr. Beatty and Mr. Gollogly were confident that the targets which they had predicted could be achieved. The Audit Committee and the Board of Directors were composed of experienced sophisticated directors whom I would expect to be able to assess management's targets.

[911]  I do not find it unreasonable that the three accused would avoid promising the Audit Committee more than it might be able to deliver. Hitting the target was an important part of Nortel's culture. Mr. Kinney offered the observation that one negotiated targets to succeed not to fail and I accept his evidence in this regard as an accurate description of the Nortel approach to target setting.

[912]  I am satisfied that the financial updates provided to the Board of Directors accurately presented Nortel's financial results. Even if I had not come to this conclusion, I would not have been persuaded by the evidence that it was proven beyond a reasonable doubt that the financial updates misrepresented Nortel's financial results.

### The 2003 Outlooks and Roadmaps tracked proposed releases

### The February 19, 2003 teleconference

[913]  I have already commented on the fact that the Outlooks and Roadmaps tracked releases of accrued liability balances to income. The Crown also introduced other evidence which, in its submission, supported the idea that the accused were managing earnings by arbitrarily releasing accrued liability balances to income contrary to US GAAP and thereby misrepresenting Nortel's financial results to the investing public and Nortel's Audit Committee and Board of Directors

[914]  Mr. Harrison testified that he participated in a conference call on February 19, 2003 with Mr. Beatty, Mr. Gollogly and the four Vice-Presidents of Finance for the four business units: Wireline, Wireless, Enterprise and Optical. Mr. Dunn did not participate in the call.

[915]  At this time, Mr. Harrison had prepared a Roadmap which was part of a series of documents entitled, "2003 Financial Commitment". This document was prepared for Mr. Beatty, who intended to present it at Mr. Dunn's cabinet meeting. Mr. Dunn's cabinet, or the FAD Cabinet, consisted of all the persons reporting directly to Mr. Dunn; that is, the Presidents of the business units.

[916]  Mr. Harrison's Roadmap contained a target of a $20 million pro forma loss before taxes. This represented an improved target from a previous Q1 03 Roadmap. Similarly, there was a new improved Q2 03 target.

[917]  In Q1 03, the Roadmap required Corporate to achieve a $2 million improvement over budget; the Roadmap required Non-op to achieve a $13 million improvement over budget.

[918]  Mr. Harrison said Corporate and Non-op were not revenue-producing business units. It was Mr. Harrison's view that Corporate could achieve the increase required ($2 million) by spending less. It was Mr. Harrison's view that there were a variety of income and expense lines, including releasing accrued liability balances to the profit and loss statement in Non-op that could be used to achieve the $13 million improvement required of it by the Roadmap.

[919]  The Roadmap indicates that there is still a $12 million shortfall which is represented by a $12 million "plug" to hit the target. This plug is recorded under Non-op. Mr. Harrison indicated that he recorded the shortfall under Non-op because it was the least contentious way to record it. Apparently, if Mr. Harrison had tried to record the $12 million shortfall under any of the active business units, the heads of those units would have objected.

[920]  Mr. Harrison testified that he made notes of the conversation on the Roadmap which was entered as a Nortel business record (Exhibit 1, tab 45). He identified his handwriting on portions of the Roadmap.

[921]  Part of the documentation shows whether meeting the Roadmap target will result in the payment of Return to Profitability Bonus, the RSU bonus and the Success Bonus.

[922]  Mr. Harrison made notes of the call as the call was progressing. According to Mr. Harrison's notes, the Vice-President of Finance for Wireless said he could meet his $70 million Roadmap and that he would be releasing $50 million of accrued liabilities to his profit and loss statement in order to do that. The Vice-President for Enterprise said that he could achieve his target and that Enterprise would be releasing $8 million of accrued liability balances to the profit and loss statement. The Vice-President Finance for Wireline indicated that it would be able to achieve its Roadmap target and would be releasing $20 million. The Finance Vice-President for Optical indicated that it could achieve its target and it would be releasing $21 million in accrued liability balances. There appears to have been no discussion concerning the shortfall.

[923]  According to Mr. Harrison's notes, the various Finance Vice-Presidents indicated that they could achieve the Roadmap target and that they would be releasing, in total, $99 million of accrued liability balances to the profit and loss statement.

[924]  This presentation also contains a Roadmap for Q2 03. This Roadmap sets a target of positive $54 million in earnings before taxes. This Roadmap contains a "plug" or shortfall of $22 million.

[925]  According to Mr. Harrison's notes, the Vice-President Finance for Wireless indicated that it could reach this target and that it would be releasing zero accrued liability balances. The Vice-President Finance for Enterprise indicated that it could achieve its Roadmap target for Q2 03 and that it would be releasing $7 million in accrued liabilities from its balance sheet to its profit and loss statement. The Vice-President Finance for Wireline indicated that it could achieve its Q2 Roadmap target and that it would be releasing $15 million. Mr. Harrison noted that the Vice-President of Finance for Optical indicated that it could achieve the Roadmap target and that it would be releasing $20 million in accrued liability balances. There appears to have been no discussion concerning the shortfall.

[926]  Mr. Harrison said that these Vice-Presidents were indicating what they realistically thought they could achieve.

[927]  Mr. Harrison's evidence in-chief was to the effect that the information concerning the release of accrued liability balances was in addition to the acceptance of the target by the various Finance Vice-Presidents. The gist of his evidence was, for example, that the Vice-President

Finance for Enterprise indicated in the conference call that Enterprise could not meet the $85 million target suggested for it in the Roadmap in Q1 03, but could meet a target of $80 million and that included in its revenues would be $8 million in accrued liability balances that had been released to the profit and loss statement.

[928] Mr. Crosson, who attended the teleconference, had no specific recollection of the teleconference.

[929] Mr. Kinney described the Roadmap as a "what if scenario". Mr. Kinney's version of this teleconference prior to the trial apparently had been that he had been given the target for Wireless on February 3, 2003 and asked to use the release of accrued liability balances from Wireless' balance sheet to meet the target.

[930] At the trial, however, Mr. Kinney's evidence was different. Mr. Kinney confirmed that his original recollection of this matter was that he could not remember a telephone call on February 19, 2003. However, over the years, he had been shown documents to help refresh his memory and that, as a result of looking at those documents; he had come to believe what I set out in the previous paragraph.

[931] Mr. Kinney agreed that counsel for Mr. Dunn had shown him documents at an interview immediately prior to his testimony. Mr. Kinney agreed that, based on those documents, he was now satisfied that the $75 million target for Wireless came from Wireless itself as far back as December 13, 2002. Documentary evidence tendered on cross-examination made it clear that the President of Wireless suggested the $70 million target to Mr. Dunn on January 15, 2003. Apparently, there had been some negotiation between the President of Wireless and Mr. Dunn in January 2003, which resulted in the target for Wireless being pushed back to $70 million from $75 million.

[932] It was very clear on cross-examination that Mr. Kinney's recollection of this matter has been confused over the years. Mr. Kinney concluded by saying, "I am the first to admit that I have probably mixed them all up…"

[933] Mr. Kinney testified that he and his staff paid attention to potential releases of accrued liability balances to the profit and loss statement. Mr. Kinney stated that he and his staff would try to resolve outstanding issues and obtain releases from his customers so that accrued liability balances could be released to the profit and loss statement in a particular quarter. He mentioned Qualcomm as an example of an issue that he thought he would be able to resolve in Q1 03. He also indicated that there were some matters not resolved in Q4 02 which he thought could be resolved in Q1 03.

[934] Finally, Mr. Kinney was referred to an Outlook, dated February 6, 2003, in which Wireless projected $48 million in releases of accrued liability balances. Mr. Kinney agreed that it appeared that he already knew at the time of the February 3 phone call that Wireless was projecting $48 million in releases of accrued liabilities.

[935] Projections about balance sheet releases were not always positive. Specifically, Mr. Kinney pointed out that when he was asked about possible releases of accrued liability balances

2013 ONSC 137 (CanLII)

for Q2 03, he indicated there would be zero releases from Wireless in that quarter. In December 2002, Mr. Crosson told Mr. Harrison that he was considering increasing the accrued liability balance for excess and obsolete inventory by $50 million. Mr. Harrison recorded this on his December 19, 2002 Outlook. Mr. Crosson changed his mind.

[936]  I am satisfied that Mr. Kinney's recollection of the telephone calls of February 3 and February 19, 2003 is unreliable.

[937]  I am also satisfied that the documentation confirms Mr. Harrison's evidence of these two teleconferences. The Q1 Roadmap at Exhibit 1, tab 45 was a target which represented an improvement upon Nortel's Q1 03 budget target. This target, I am satisfied, was communicated to Mr. Harrison by Mr. Beatty and then discussed with the Vice-Presidents of Finance of the various business units.

[938]  I am satisfied that these discussions, as recorded in Mr. Harrison's notations on Exhibit 1, tab 45, represented two pieces of information: whether the business unit could meet the revised target and to what extent the unit would be relying upon releases of accrued liability balances.

[939]  Nortel was in an extremely difficult financial situation; forecasting was both difficult and important.

[940]  I am satisfied that Mr. Harrison was interested in this information because he thought it was part of his job to understand whether or not Nortel's various business units were generating positive net income on their operations.

[941]  The reference to balance sheet releases in the Roadmaps is disconcerting. On the one hand, tracking releases suggests earnings management; on the other hand, it is undeniable that Mr. Kinney indicated that Wireless would have zero balance releases in Q2 03. Mr. Harrison noted his comments on Exhibit 1, tab 45, document number 505-5637. Mr. Kinney's comment of zero balances, as noted by Mr. Harrison at the time, is consistent with the Vice-Presidents of Finance for the business units keeping Mr. Harrison aware of the contribution anticipated from balance sheet releases in each quarter.

There was also a part of Nortel's culture which understood that the balance sheet could be used to achieve the target. In a July 31, 2003 e-mail, Mr. Gollogly makes the following observation: "it seems like a throwaway comment, but if we clean up the balance sheet, the LC's ability to deliver earnings based partly on discretionary elements pretty much goes away". There are other references in emails to digging up "opportunities" and having "flexibility".

[942]  The claim by Mr. Harrison and Mr. Dans that they tracked proposed accrued liability balance sheet releases throughout the quarter in their Outlooks and Roadmaps for forecasting purposes and so that they could encourage events triggering these releases within the quarter is supported by notes that appear in the Outlook packages. For example, see the Q2 2003 Roadmap at Exhibit 2, tab 78. The Roadmaps also include notes concerning the setup of accrued liabilities and expenses (see: for example, Exhibit 1, tab 35). The Outlooks also include written notes concerning potential impacts which have yet to be included in the forecast (see also: Exhibit 1, tab 35).

[943]   I am not satisfied that that these two telephone calls represent an example of Mr. Gollogly, Mr. Beatty and the Vice-Presidents of Finance of Nortel's business units discussing how they would each resort to their balance sheet without regard to US GAAP to meet the February Roadmap financial earnings before taxes target of $20 million referred to in Exhibit 1, tab 45.

[944]   I am satisfied that Mr. Harrison, for his own forecasting purposes, wanted to know the extent to which releases of accrued liability balances were assisting the business units in meeting their financial target.

[945]   I am not satisfied that these two telephone calls represent Mr. Gollogly, Mr. Beatty and the Vice-Presidents of Finance of Nortel's business deciding to use approximately $100 million in excess accrued liabilities to meet financial targets.

### The June 6, 2003 Outlook and the surrounding events

[946]   The Crown also suggested that the true nature of the Outlook and Roadmap process was demonstrated by events which occurred around the June 6, 2003 Outlook.

[947]   Mr. Beatty made notes of his attendance at the June 18 Frank Dunn Cabinet meeting. Mr. Dunn's cabinet consisted of the Presidents of Nortel's business units. Mr. Beatty's notes read in part "FAD Staff Meeting… Q2 results-embarrassed/ashamed-no RTP-grow the top line/cut costs".

[948]   The Crown asked me to infer that Mr. Beatty recorded Mr. Dunn's comments. The e-mail traffic prior to the meeting makes it clear that Mr. Beatty was presenting his June 6, 2003 Outlook. As part of the backup for his presentation, Mr. Beatty had what was termed a "Q2 2003 Bottom-up Roll up". The Bottom-up Rollup reflected the actual experience of the business units in Q2 03 as of June 6, 2003. Q2 03 ended on June 30, 2003.

[949]   The Bottom-up Rollup stated that, if the books were closed on June 6, 2003, Nortel would experience a pro forma loss before taxes of $45 million and a loss calculated according to US GAAP of $95 million.

[950]   The Crown suggested that, on June 20, 2003, two days after the Frank Dunn cabinet meeting, Nortel's Bottom-Up Rollup suggested that, if the books were closed that day, Nortel would experience a pro forma gain before taxes of $50 million and US GAAP net income of zero.

[951]   This improvement, according to the Crown, resulted from a $129 million increase in liability balances released to the profit and loss statement. Specifically, on June 6, accrued liability balance releases totaled $179 million and, on June 18, totaled $308 million.

[952]   Finally, the Crown points out that the June 20 Outlook also tracked whether the required RSU Bonus Plan milestone would be met.

[953]   If one accepts the Crown's argument, then one has to assume that the Presidents of the business units left Mr. Dunn's cabinet meeting on June 6 and returned to their business units and

began releasing accrued liability balances to the profit and loss statements to improve their financial performance so that Mr. Dunn would no longer feel "embarrassed and ashamed" and so that they would avoid any consequences attendant upon Mr. Dunn feeling like that. While this sounds plausible enough, it actually is not when you consider what was actually going on within Nortel at this time.

[954]  Mr. Dans testified, and his evidence in this regard was not challenged, that Nortel had been going through a process of balance sheet reviews initiated by Mr. Gollogly in June 2003. These reviews are to be distinguished from the Comprehensive Balance Sheet Review which was formally launched on July 31, 2003. These reviews were being used to identify excess accrued liability balances, as well as any accrued liability balances that were to be released in Q2 03 in the normal course. All of these balances were fed centrally into corporate headquarters in Brampton so that headquarters could understand them. Initially, the accrued liability balances were released into the profit and loss statement and then reviewed by a corporate control team working with Deloitte & Touche. Obviously, some releases would be normal course releases and others would represent a cleaning-up of the balance sheet.

[955]  Not surprisingly, it was in Q2 03 that Mr. Gollogly informed Mr. Hathway that $142 million in releases for which there was no support had been released to Nortel's profit and loss statement in an early preliminary closing of the general ledger.

[956]  I do not find it logical that the Presidents of the business units would indiscriminately release accrued liability balances to attempt to satisfy Mr. Dunn in the face of this type of scrutiny. To the extent that these excess accrued liability balances represented a "cookie jar", they were, in effect, at least partially emptying the "cookie jar" in a pointless exercise. Decisions to release liability balances which were not US GAAP compliant would likely be discovered when the release was reviewed by headquarters and the auditors.

[957]  Assuming that the Presidents were upset by Mr. Dunn's comments and move to do something about it, it is unlikely that this could have taken place between June 18 and June 20. Mr. Dans testified that his Outlooks were based on information which the business units had received and consolidated from the regions in which they were operating. When Mr. Harrison was soliciting the set-up of late entry accrued expenses/liabilities in Q4 02, his contacts within the Regions first had to call their own contacts to identify specific accrued expenses/liabilities. It seems reasonable that, in seeking to locate specific accrued liabilities for release, a similar process would be followed. It is difficult to see this being done within two days. Further, there was no necessity to complete the process within two days because Q2 03 did not end until June 30, 2003 and the business units were not required to close in their sub-ledgers for a few days after that.

[958]  I cannot accept the Crown submission. The events surrounding the June 6 and June 20 Outlooks seem to me to be disconnected from the submission of accrued liability balances to Nortel head office.

2013 ONSC 137 (CanLII)

### *The release of the $4 million Siemens accrued liability balance*

[959]  The Crown suggested that the way in which the Siemens accrued liability balance was manipulated illustrated the management of earnings to achieve a bonus target. The Siemens $4 million dollar release occurred originally in Q2 03. This is an appropriate place to examine that release in detail.

[960]  In connection with the January 28, 2000 acquisition of a company called Qtera, that company and two of its employees were named as defendants in a lawsuit filed by Siemens ICN in Palm Beach County Florida. The lawsuit (Siemens v. Qtera, Diner & Cao) alleged, among other things, misappropriation of trade secrets.

[961]  An accrued liability balance was set up to allow for the fact that Nortel might be unsuccessful in defending the lawsuit. The original accrued liability balance was in the amount of $36 million; it was part of a larger entry involving various Qtera balances.

[962]  The original accrued liability balance was set up in Q3 01. In Q4 01, a portion of this balance, namely $32 million, was internally re-classified from Corporate to the United States where the litigation was taking place. This left the $4 million balance in Corporate on account of the Siemens litigation.

[963]  Mr. Beatty was Nortel's Controller at this time and responsible for Corporate accrued liability balances.

[964]  Nortel entered into a settlement agreement with Siemens on September 17, 2001. Nortel's first payment to Siemens on account of the settlement in the amount of $20 million occurred on October 25, 2001. A final payment of $12 million due in October 2002 remained.

[965]  Mr. Beatty was required, as the CFO, to authorize the final $12 million payment. Upon being requested to authorize this payment, Mr. Beatty asked Mr. Gollogly, the Controller in October 2002, to look into the matter and advise him about it. Mr. Beatty was later told that the proposed final payment amount was correct and the final payment was made in October 2002. Accordingly, as of October 2002, approximately $32 million of the original $36 million accrued liability balance had been used. The accrued liability balance in the amount of $4 million remained with Corporate.

[966]  When Ms. Shaw met with Mr. Harrison in February 2003 to discuss Non-op accrued liability balances, she did not identify the Siemens $4 million accrued liability balance as one that should be released.

[967]  In the notes she prepared for her meeting on April 15, 2003 with representatives of Deloitte, the Siemens $4 million was not part of the $80 million that had been released in Q1 03. However, the $4 million Siemens accrued liability balance was referred to in Ms. Shaw's notes as a Non-op liability balance. Specifically, Ms. Shaw recorded: "this provision was established in Q3 01 for potential exposures relating to a legal suit with Siemens. This settlement was made in Q4 02 after extremely rancorous dealings with Siemens. It was determined by management that this provision would be left in place for a couple of quarters after the settlement to ensure no further claims were made or adjustments to the settlement".

[968]  The Siemens $4 million accrued liability balance was released to the profit and loss statement in Q2 2003; ultimately, the $4 million excess accrual balance was restated during the First Restatement to Q4 2001 when the litigation was settled.

[969]  Deloitte's view in the first restatement was that this matter should not have remained an accrued liability balance after the settlement was entered into in Q4 01.

[970]  The Crown suggested that accrued liability balances were restated because they were false. This entry, along with others, illustrates the difficulty with the Crown's assertion. Simply put, the Crown's submission ignores the possibility that there can be a difference of opinion.

[971]  Indeed, there would have been a difference of opinion in connection with this entry. Mr. Hathway stated that proper accounting mandated that there be no remaining accrued liability balance for this matter subsequent to the final payment, rather than the entering into of the settlement agreement. Mr. Hathway's opinion, as expressed in his evidence and Deloitte's opinion during the First Restatement are obviously different.

[972]  The truth of the matter probably is that there is more than one financial quarter to which this $4 million accrued liability balance could properly be restated. Put differently, one chartered accountant might conclude that the triggering event for the release of the accrued liability balance was the entering into of the written settlement of the litigation in Q4 01; another chartered accountant acting in good faith might conclude that the triggering event for the release of the accrued liability balance was Nortel's final settlement payment.

[973]  Interestingly, the Crown asserted, in its closing submissions that the correct course of action was to clear the $4 million from Nortel's balance sheet after the final settlement payment.

[974]  Management's decision to release the accrued liability balance one or two quarters after the final settlement payment was excessively cautious, but entirely consistent with Nortel's culture.

[975]  I decline to draw any inculpatory inference from the retention of the accrued liability balance, given Nortel's history of ensuring that every liability was properly provided for.

[976]  The Siemens accrual liability balance had been on the Nortel balance sheet since 2001 and, thus, had been reviewed in one form or another for every quarter since then. No secret was made of the fact that the litigation had settled and that Nortel had made a $20 million payment on account of that settlement in October 2001.

[977]  As discussed elsewhere, in Q2 03, Mr. Gollogly advised Mr. Hathway about the release during a preliminary close of the books of $142 million in accrued liability balances. Mr. Hathway did not approve of this release, with the result that the $142 million was returned to Nortel's balance sheet in subsequent draft Q2 03 financial statements. However, the $4 million Siemens balance remained released. Given the controversial nature of the $142 million accrued liability balance release in Q2 03, I am satisfied that Deloitte adverted to the Siemens release at that time.

[978]   The Crown's position is that the Siemens accrual was not released when it should have been and remained for the accused to utilize in Q2 03 in order to achieve a Restricted Stock Unit Bonus Plan milestone.

[979]   This assertion requires some consideration of the Restricted Stock Unit Bonus Plan.

### The Restricted Stock Unit Bonus Plan

[980]   As the name implies, this bonus was payable in shares unless the executive receiving the bonus elected to receive payment in cash. No such election was made in Q2 2003.

[981]   Payment of this bonus was not made on an "all or nothing" basis. In other words, a percentage of the total allocation for a particular quarter could be paid. For example, the JLRC Committee of the Board of Directors (the Board's HR Committee) could determine and recommend to the Board of Directors that 90% of the bonus was earned, in which case that percentage of the bonus would be paid out.

[982]   The performance period for payment of this bonus was January 1, 2003 to December 31, 2005. The proposed performance milestones were four distinct "Return on Sales before Tax" percentage targets. The percentage was calculated on Sales, as the description of the milestones suggests. In other words, the milestone considered what percentage Nortel's return on sales before tax was of total sales. In addition, the milestones were calculated "on a **rolling four** quarter basis". [Emphasis added]

[983]   The first milestone required a Return on Sales before Tax percentage of sales of equal to or better than <u>negative</u> 6.5% calculated "on a rolling four quarter basis."

[984]   The "rolling four quarter basis" for the calculation means that, if you want to make the Restricted Stock Unit Bonus Plan milestone calculation in Q2 03, you have to look back four quarters starting with Q2 03; namely, Q2 03, Q1 03, Q4 02 and Q3 02.

[985]   The final payment on account of the Siemens settlement was made in Q4 02. If the $4 million had been released to the profit and loss statement in Q4 02, as Mr. Hathway thought it should, it would have been included in the RSU Bonus Plan milestone calculation in the same way as it was when it was originally released in Q2 03 because the calculation of the percentage is "on a rolling **four** quarter basis" and Q4 02 and Q2 03 are in the same four quarter set.

[986]   Accordingly, the release of the $4 million to the profit and loss statement in Q4 02 or Q2 03 would have the same effect on the ability of the accused to benefit from the Restricted Stock Unit Bonus Plan.

[987]   The Crown's position seems to be that, because the Siemens accrual was not released when it should have been, it remained in a "cookie jar" to be utilized in Q2 03 in order to achieve the RSU milestone.

[988]   In the first restatement, the $4 million was restated to Q4 01 when Nortel and Siemens entered into their settlement agreement. It is true that, at that point in time, Mr. Dunn was the CEO and Mr. Beatty was the Controller. I am not satisfied that the evidence demonstrates that

Mr. Dunn or Mr. Beatty played any role in the decision to retain the $4 million Siemens accrual balance in Corporate in Q4 2001.

[989]  It is also true that, in Q4 01, Nortel reported <u>negative</u> net income of $1.8 billion. I am not persuaded that, in that quarter facing that level of negative net income, Mr. Beatty and Mr. Dunn decided to manipulate liabilities and set them aside in a "cookie jar" for a rainy day. It seems more reasonable to me that their thoughts at the time would be that the rainy day was upon them.

[990]  Ms. Shaw's note, based on her inquiries, was prepared in Q1 03 and it provides that management decided to leave the $4 million excess accrued liability balance in place for a "couple of quarters" to ensure no further claims were made and that there were no further adjustments to the settlement. Her note suggests that management made a decision in Q4 02 to retain the $4 million as an accrued liability for a "couple of quarters" which would be to Q2 03, which was the quarter when the $4 million was released to the profit and loss statement. This decision meant there were no surprises in connection with the Siemens settlement without making it harder to achieve the Restricted Stock Unit Bonus Plan milestone of -6.5% calculated on a rolling 4 quarter basis.

[991]  Leaving the accrued liability on the balance sheet for a time after it was releasable is consistent with Mr. Kinney's approach to releasing accrued liabilities. Mr. Kinney said he followed the practice of allowing a cooling-off period, when he reached a point in time when he thought he could reduce an accrued liability balance. Specifically, he would wait one extra quarter to make sure that some unexpected exposure did not present itself. This is similar in approach to what happened with the Siemen's $4 million. I do not condone Mr. Kinney's practice because it was contrary to US GAAP; I simply mention it.

### Conclusion

[992]  I am not satisfied beyond a reasonable doubt that the three accused used the $4 million Siemens accrued liability balance to falsely represent to Nortel's Audit Committee, JLRC committee and board of directors that Nortel had achieved the financial results of meeting the Restricted Stock Unit Bonus Plan milestone of -6.5%.

[993]  I am not satisfied that the restatement of this accrued liability balance to Q4 01 proves anything. Mr. Hathway thought that the accrued liability balance should have been released in Q4 02 when the final settlement payment was made. This seems to be a reasonable conclusion. It apparently was not correct according to Deloitte's opinion in the first restatement. The difference of opinion demonstrates that one should be careful before drawing an inculpatory inference based, in part, on the fact that an accrued liability balance was restated. The circumstances surrounding the restatement of an item are significant.

[994]  Finally, I am not satisfied beyond a reasonable doubt that any or all of the three accused knew that the $4 million Siemens' accrued liability balance should have been released in Q4 01.

### The draft letters Mr. Gollogly prepared for the Board of Directors and the Audit Committee in July 2003

[995]   Some of the evidence concerned two unsent letters authored by Mr. Gollogly, in which he questioned whether Nortel had truly returned to profitability. The Crown pointed out that the three accused never expressed similar sentiments in Nortel's financial statements or press releases. The relevant time period is July 2003.

[996]   Mr. Hathway testified that, shortly before Monday, July 7, 2003, Mr. Gollogly advised him that, in the initial close or one of the initial closes of the books for Q2 03, Nortel had identified $142 million of accrued liabilities that did not have support and had released those accrued liabilities to the profit and loss statement.

[997]   After Mr. Hathway objected, Mr. Gollogly reversed the $142 million out of the profit and loss statement and put it back on the balance sheet.  This reversal happened on Thursday, July 10, 2003.

[998]   Mr. McMillan testified that the draft financial results, produced after the $142 million was returned to the balance sheet, recorded that Nortel had a US GAAP loss of $14 million for Q1 03.

[999]   Mr. McMillan testified that, on Friday, July 11, 2003, he was advised by his superior, Mr. Peter Browne, to make three journal entries. Mr. McMillan said that Mr. Browne provided him with support for the entries and they were made on Friday, July 11, 2003.

[1000] These entries transferred $20 million in accrued liability balances to the profit and loss statement. They, therefore, had a positive impact of $20 million on the profit and loss statement. As indicated earlier, prior to this entry, Nortel had a US GAAP loss of $14 million; thus, this $20 million positive impact on net income had the effect of changing the $14 million tiny US GAAP loss into to a tiny gain.

[1001] Nortel's pro forma income for Q2 03 was positive despite the return of $142 million to the balance sheet.

[1002] Thus, the effect of these three journal entries was that Nortel had both positive pro forma income and positive US GAAP income.

[1003] Mr. McMillan testified that Mr. Gollogly was away when this happened.

[1004] The evidence established that Mr. Dunn had expressed publicly to Mr. Harrison that he did not believe it was in Nortel's interest to have a pro forma gain before taxes and a US GAAP loss at the same time. This was always a possibility because pro forma net income was calculated differently than US GAAP net income.

[1005] Mr. Hathway testified that, on Sunday, July 13, 2003, Mr. Gollogly called him at his home in the United States. Mr. Gollogly told Mr. Hathway that while he, Mr. Gollogly, was out of the office on July 11, 2003; Mr. Beatty had instructed Mr. Gollogly's staff to post three journal entries which transformed the Q2 2003 results from a tiny loss to a tiny profit. Mr.

Hathway indicated that he and Mr. Gollogly agreed to discuss the matter further on Monday, July 14, 2003 when he, that is Mr. Hathway, would be back in Canada.

[1006] Mr. Hathway indicated that Mr. Gollogly's concern centered on the fact that turning a loss into a profit was one of the qualitative factors to be considered in deciding whether an entry to the General Ledger was material.

[1007] Mr. Hathway testified that he saw Mr. Gollogly on Monday, July 14, 2003 at Mr. Gollogly's office in Brampton. He said Mr. Gollogly was very upset about the entries. Mr. Gollogly told Mr. Hathway that he was going to see Mr. Beatty and demand that the three entries be removed from the profit and loss statement and put back on the balance sheet. Mr. Gollogly advised Mr. Hathway that he intended to resign if Mr. Beatty refused. Mr. Hathway described this as a "gutsy move by Mr. Gollogly".

[1008] The three entries were reversed.

[1009] Mr. Hathway indicated that, later, he had a conversation with Mr. Beatty about what had happened. Mr. Hathway indicated that Mr. Beatty's view was that he, that is Mr. Beatty, was Nortel's CFO and, therefore, entitled to make General Ledger entries.

[1010] This is perhaps an appropriate place to make the obvious point that these three entries never had any effect on the profit and loss statement published by Nortel for the period Q2 03. The three entries were put back on the balance sheet before the financial results were published. These entries did not cause the Audit Committee or the Board of Directors to do anything.

[1011] Similarly, the $142 million in balances released to the profit and loss statement and then returned to Nortel's balance sheet never had an effect on the profit and loss statement published by Nortel for the period Q2 03. The $142 million was brought to the attention of Nortel's Audit Committee because it prompted the Comprehensive Balance Sheet Review.

[1012] With respect to the three entries totaling $20 million, the Crown submits that this is another example of senior management at Nortel, in this case Mr. Beatty, doing whatever it takes to meet a target. It is also the Crown's position that I should draw the inference that Mr. Dunn was aware of these matters and approved of Mr. Beatty's actions.

[1013] I have already indicated that I have no difficulty in drawing the inference that Mr. Dunn was aware of important matters affecting Nortel's profit and loss statement. This is especially true with respect to these three matters because they had the effect of turning a tiny US GAAP loss into a tiny profit and Mr. Dunn had publicly-stated that Nortel would be profitable for Q2 03.

[1014] In addition, Nortel, despite the fact that the $142 million was not released to the profit and loss statement, still had a pro forma profit and, therefore, was in a position that Mr. Dunn did not think advisable; namely, a pro forma profit and a US GAAP loss. Specifically, Mr. Dunn did not want Nortel to be reporting a US GAAP loss while, at the same time, reporting internally positive pro forma income because reporting positive pro forma income would require the payment of bonuses. Mr. Dunn was concerned that Nortel would be criticized for paying its employees bonuses when it was publicly reporting a loss.

[1015] In Q1 03, Nortel reported US GAAP results only. Accordingly, Nortel was publicly reporting a loss and publicly reporting that it was paying bonuses to its employees.

[1016] Mr. Gollogly reported to the Board on July 24, 2003, which was after the $142 million had been removed from the profit loss statement and returned to the balance sheet, that there was positive pro forma income for the quarter of $40 million and a positive pro forma income for the year to date of $48 million. It is not clear from Mr. Gollogly's presentation whether this was a pro forma income calculation according to the 2002 formula or the 2003 formula. The Board of Directors had decided that it was the 2002 formula which was to be used for bonus purposes. However, the evidence suggested that the 2002 formula yielded a higher net income figure than the 2003 formula.

[1017] Mr. Beatty's instruction to release the $20 million in accrued liabilities to the profit and loss statement had the effect of solving this problem because it converted the tiny US GAAP loss into a profit and thereby created a situation in which Nortel would have been publicly reporting US GAAP net income and publicly reporting that it was paying a bonus.

[1018] I accept the Crown's submission that Mr. Beatty's conduct demonstrates he was, with Mr. Dunn's knowledge and consent, willing to go to considerable lengths to achieve a targeted result.

[1019] I am satisfied that this episode proves that Mr. Beatty, with Mr. Dunn's consent, was prepared to go to considerable lengths to avoid a situation which Mr. Dunn considered awkward.

[1020] I am satisfied that the only reason Mr. Beatty intervened as he did was to manage Nortel's US GAAP income for the purpose of turning a tiny loss into a tiny profit. The effort was unsuccessful.

[1021] To help Mr. Beatty understand how unhappy he was with the three Journal entries, authorized in his absence, Mr. Gollogly prepared two draft letters which were never sent.

[1022] The Crown submits that this entire incident demonstrates that entries made to the General Ledger were intentional. The Crown also submits that these letters demonstrate that Mr. Gollogly was well aware of the significance of turning a tiny loss into a tiny profit or *vice versa*.

[1023] I am satisfied that Mr. Gollogly well-understood the significance from a materiality perspective of turning a tiny profit into a tiny loss or *vice versa*. I am satisfied that the draft letters demonstrate that Mr. Beatty was capable of directing entries to the General Ledger that were quite intentional and quite significant.

[1024] I want to consider the Crown's submission that Mr. Gollogly's concern about Nortel's quality of earnings and return to profitability were not disclosed by Mr. Gollogly or Mr. Beatty. I have no difficulty in assuming that Mr. Gollogly brought the draft letters to Mr. Beatty's attention and used those letters to help persuade Mr. Beatty to reverse the entries to which Mr. Gollogly objected.

[1025] I propose to consider each draft letter separately.

### Mr. Gollogly's draft letter to the Chairman of the Board of Directors, the Chairman of the Audit Committee and the Chairman of the Joint Leadership Resources Committee

[1026] This undated draft letter was never sent. However, Mr. Gollogly's draft letter to Mr. Beatty, which was also introduced in evidence, is dated July 14, 2003. I am satisfied that this draft letter was drafted at the same time as the draft letter to Mr. Beatty. The content of the two letters is similar. In addition, the evidence establishes that Mr. Gollogly was in the mood to resign if the three entries were not reversed and the effect of this draft letter, had it been sent, would almost certainly have been his termination.

[1027] In this draft letter, Mr. Gollogly indicates that, due to the fact that the SEC was making inquiries of Nortel in April and May 2003, it was necessary to be particularly vigilant in the application of accounting issues within the company.

[1028] Mr. Gollogly then called attention to unsupported accrued liability balances on Nortel's consolidated balance sheet which he placed in the area of $192 million. I should note at this point that Mr. Gollogly's $192 million is the same as the $142 million referred to in these reasons. The $142 million was specifically discussed by the Audit Committee. The $50 million was actually the Intercompany Out Of Balance account which was under review by the auditors and not a secret. Nortel's auditors publicly-reported a problem with Nortel's internal controls which referred to the $142 million that, for a short time, had been released to income. Mr. Richmond indicated that, when these matters were discussed, some people spoke of $142 million and others spoke of $192 million.  Mr. Richmond testified that everyone was speaking about the same set of numbers.

[1029] Mr. Gollogly then disclosed that management had a forecast suggesting a $75 million pro forma loss in Q3 03. He indicates that this forecast begs the question whether further restructuring is required. He suggests that a change in the company-stated policy that a small loss position is unconcerning may be in order.

[1030] Finally, Mr. Gollogly says that the Q3 03 forecast calls into question the quality of the Q2 03 results.

[1031] The forecast to which Mr. Gollogly refers was, in a word, incorrect. Nortel reported positive net income of $185 million in Q3 2003.  Nortel's published results for Q3 2003 were not restated in the first restatement. Financial results for Q3 03 were restated in the second restatement. Net earnings remained positive in the amount of $131 million despite the revenue recognition issues that were prevalent during that restatement.

[1032] In addition, the Crown, in its opening, suggested that the Q3 03 results had been affected by improper earnings management techniques employed by the accused. Evidence was received concerning the extent to which Nortel and Deloitte's staff preserved the integrity of the general ledger for Q3 03. As indicated in my discussion of the financial results for Q3 03, I accept that evidence. I am satisfied that the integrity of the Q3 03 general ledger was maintained.

[1033] Mr. Gollogly then makes reference to a positive impact of $51 million to the Q2 2003 profit and loss statement. He also makes the point that Nortel's gross margins contain approximately $50 million worth of positive adjustments due to changes in estimates.

[1034] Mr. Gollogly made a presentation to the Board on April 24, 2003, in which he specifically noted and highlighted at page 38 of his presentation, the $51 million to which he referred in his draft letter. Thus, the Board of Directors was made aware of this concern.

[1035] The $50 million in gross margin adjustments was not discussed by Mr. Gollogly. No opinion evidence was offered concerning gross margin calculations. Mr. Harrison indicated that typically Nortel's gross margins were approximately 40%. His evidence in that regard was on contentious.

[1036] In his draft letter, Mr. Gollogly makes reference to the July 11, 2003 journal entries. These entries were reversed on July 14, 2003.

[1037] Mr. Gollogly indicates that he questions the wisdom of making bonus payments because the Q2 03 results are affected by the two items referred to above which total $101 million. Mr. Gollogly notes, in his letter, that there are many other factors to consider when determining whether to pay bonuses. This latter observation is correct. The evidence disclosed that Nortel's competitors were approaching key Nortel employees and urging them to leave the company. This was a primary reason for the creation of the Return to Profitability Bonus.

[1038] Mr. Gollogly indicates in the draft letter that he feels so strongly about the payment of the bonuses that he will not accept his return to profitability bonus. Mr. Gollogly obviously thought better of the matter and, in fact, accepted his bonus.

### Conclusion

[1039] When I consider the content of this draft letter and the other evidence, I am not prepared to accept the Crown submission in regard to the disclosure of the contents of this letter.

[1040] I am satisfied that Mr. Gollogly's concern about the prospects for Q3 03 was misplaced. I am satisfied that the other matters concerning earnings were disclosed to the Audit Committee and, through the Audit Committee, to the Board of Directors with the exception of the gross margin adjustments. There was public disclosure of the Comprehensive Balance Sheet Review and the fact that the auditors had identified a reportable condition as a result of the attempt to release the $142 million. Finally, Mr. Gollogly's concern over the appropriateness of paying a bonus was a matter beyond his authority. The decision to pay a bonus was a decision for the JLRC committee of the board and the Board of Directors as a whole.

### Mr. Gollogly's draft letter to Mr. Beatty

[1041] This is the second draft letter to which the Crown referred.

[1042] Mr. Gollogly begins his letter by referring to certain elements of the Q2 results with which he is uncomfortable.

2013 ONSC 137 (CanLII)

[1043] He first refers to what he called the three final July 11, 2003 journal entries. These are the three entries totaling $20 million. He speaks to the need for supporting documentation and indicates to Mr. Beatty that he, that is Mr. Beatty, will have to sign each of the three journal entries. He also indicates that a memo or note is required explaining why the three final entries are not material.

[1044] The three final Journal entries to which Mr. Gollogly objects were reversed on July 14, 2003 prior to the publication of Nortel's financial statements.

[1045] Mr. Gollogly then indicates that he is insisting upon a full and fair discussion of two key elements of the Q2 2003 results with the Audit Committee.

[1046] The first is the inclusion of the $101 million composed of the $51 million of customer financing services and $50 million relating primarily to contract changes in estimates and contract finalization in Nortel's Q2 03 profit and loss statement.

[1047] Nortel's press release, dated July 24, 2003, discloses the fact that selling, general and administrative expenses included the US$51 million benefit to which Mr. Gollogly referred. In addition, Mr. Gollogly made a presentation to the Audit Committee concerning this $51 million.

[1048] The second is that the balance sheet as at June 30 contains $142 million of accrued liabilities that Nortel is investigating and approximately $50 million of accrued liabilities relating to what he refers to as the "now infamous intercompany out of balance provision…" Mr. Gollogly wants the Board informed that these provisions will likely need to be reversed into the profit and loss statement when Nortel's analysis is complete.

[1049] The second point suggests Mr. Gollogly thinks that the Board needs to know that $192M will be "reversed into the P&L at some point in the future". If this is what he means, he was simply mistaken concerning what would become of the $142 million. The Audit Committee and the Board of Directors were well aware of the $142 million.

[1050] Mr. Richmond indicated that, when these matters were discussed, some people spoke of $142 million and others spoke of a $192 million. Mr. Richmond testified that everyone was speaking about the same set of numbers.

[1051] Mr. Richmond also testified that the $50 million Out Of Balance accrued liability balance, which Mr. Gollogly in his draft letter referred to as the "now infamous intercompany out of balance provision…", had been the subject of discussion between Mr. Dunn and the audit partners for months.

[1052] Due to the fact that Mr. Gollogly referred to the Intercompany Out Of Balance account as "infamous", I think it is appropriate to consider that account in some detail.

### The "now infamous intercompany out of balance provision"

[1053] Mr. Richmond indicated that Nortel had maintained an Intercompany Out Of Balance account for many years. Mr. Richmond explained that, when you have a company as large as Nortel, there are transactions that flow from one company to another within Nortel's corporate

world. Therefore, you will have balances due to and due from the various entities in Nortel's corporate world. When you come to do a consolidation, these balances should net out to zero but frequently do not. As a result, an accrued liability balance is maintained to account for the discrepancy. In Nortel's case, this had been true for some years.

[1054] Mr. Richmond indicated that Nortel's Intercompany Out Of Balance accrued liability balance fluctuated. In the years 2001 and 2002, the quantum of the account was driven up with the result that the balances due to and due from the various entities in Nortel's corporate world were out of balance by as much as $100 million.

[1055] Mr. Richmond explained that Deloitte wanted to work through a reconciliation process and reconcile the balances due to and due from the various Nortel entities to attempt to bring the Intercompany Out Of Balance accrued liability balance to zero.

[1056] Mr. Richmond indicated the Intercompany Out Of Balance account had been the subject of discussion between Mr. Dunn and the audit partners for months.

[1057] The Intercompany Out Of Balance account was well-known to Deloitte. It was the subject of two detailed Deloitte memos, dated April 10, 2003 and April 16, 2003 (Exhibit 227, tab 79). The memos were received as business records of Deloitte & Touche. Neither of the Deloitte's accountants who authored these memos was called as a witness.

[1058] These memos explain, in part, that the Intercompany Out Of Balance account is reviewed monthly and that, at that time, discrepancies are identified. Importantly the memos disclose that discrepancies identified as "material" are cleared.

[1059] The Intercompany Out Of Balance account balance fluctuated as a result of judgment exercised at the senior management level of Nortel concerning what was sufficient. Therefore, the opportunity to achieve an earnings target by varying the Intercompany Out Of Balance account balance presented itself. However, the account was well- known and scrutinized by Deloitte & Touche and material discrepancies were cleared monthly.

[1060] Specifically, the April 16, 2003 memo demonstrates that the reduction in the Intercompany Out Of Balance accrued liability balance by $35 million, which formed part of the contentious $80 million Q1 03 release to income, was reviewed prior to the finalization of the Q1 03 financial statements. The reduction was found to be unobjectionable.

[1061] There was nothing infamous about the Intercompany Out Of Balance account. Mr. Gollogly's reference may have been facetious; in which case, it is understandable. If the reference was serious, it was erroneous.

### *Mr. Gollogly's reference to the unsupported accrued liability balances*

[1062] Mr. Richmond indicated that he met with Mr. Dunn between July 11 and July 15, 2003. They agreed that the $142 million would be "warehoused" on Nortel's balance sheet pending the outcome of the Comprehensive Balance Sheet Review. While Mr. Richmond and Mr. Dunn resolved the matter between July 11 and July 15, in fact, Mr. Gollogly had already reversed the

2013 ONSC 137 (CanLII)

entry on July 10, 2003. I interpreted Mr. Richmond's evidence to be that Mr. Dunn agreed to leave the $142 million on Nortel's balance sheet.

[1063] Mr. Richmond indicated that there was a longer discussion concerning Deloitte's insistence that there be a comprehensive balance sheet review. Mr. Dunn said that he had been the Controller, the CFO and the CEO and that he was intimately aware of Nortel's financial affairs and that it was his view that the $142 million was the end of the matter. Accordingly, it was Mr. Dunn's view that the $142 million should be released to the profit and loss statement and disclosed in Nortel's Q2 03 press release. Mr. Richmond testified that he expressed Deloitte's view that a comprehensive balance sheet review was required to corroborate Mr. Dunn's position. Mr. Richmond also expressed the view that simply releasing $142 million of accrued liability balances into a profit and loss statement that otherwise showed a loss of $14 million would not satisfy regulators.

[1064] Mr. Richmond indicated that, during the meeting, Mr. Dunn agreed that a comprehensive balance sheet review was necessary.

[1065] The minutes of the Audit Committee meeting in July 18, 2003 indicate that Mr. Gollogly made a presentation concerning Nortel's Q2 03 results. His presentation was described as preliminary and subject to change. Part of his presentation outlined "Key Issues." The first item under this heading was entitled "Reserves". Mr. Gollogly's notes indicate that he made reference to the fact that: significant reserves and provisions were recorded on the balance sheet; significant additions, usages and releases of those reserves and provisions had occurred in Q2 03; management had a project underway to gather support and determine the proper resolution of certain reserve balances.

[1066] Mr. Cleghorn confirmed that, at the July 23 Audit Committee meeting, Mr. Dunn indicated that, while he was not pleased at the prospect of a comprehensive balance sheet review, it would result in stronger financial statements.

[1067] Minutes of the Audit Committee for July 24, 2003 indicate that Mr. John Cawthorne made a presentation dealing specifically with an analysis of Nortel's balance sheet. In his presentation, he pointed out that certain balance sheet accruals and provisions were established by management in prior periods dating back to 1999 and earlier. He indicated that these accruals and provisions were recorded by the company during periods when the balance sheet and income statement were much larger. Mr. Cawthorne indicated that these accruals and provisions were receiving greater scrutiny due to the shrinking size of Nortel's overall balance sheet and their materiality to the income statement. His presentation points out that there is a lack of documentation about certain accruals and that, as a result of that and the passage of time and the turnover of personnel, it is unclear what adjustments should have been made be made to these provisions in prior years. As a result, management has a project underway to gather support and determine the proper resolution of these questionable balances.

[1068] Prior to making this presentation Mr. Cawthorne and Mr. Hathway had received a soft provisions list in February 2003 which listed $413 million in soft provisions or accrued liability balances was questionable support.

2013 ONSC 137 (CanLII)

[1069] Finally, Nortel's press release of July 24, 2003 announced a Comprehensive Balance Sheet Review.

[1070] I am satisfied that what Mr. Gollogly mistakenly thought was a problem involving only $142 million of accrued liability balances and $50 million of Intercompany Out Of Balance accrued liability balances was brought to the attention of the Audit Committee as Mr. Gollogly suggested in his draft letter.

[1071] I am satisfied that, as of July 24, 2003, some ten days after the date on Mr. Gollogly's draft letter, the Audit Committee was well-aware of the fact that there were potential problems with accrued liabilities.

### Mr. Gollogly's reference to the forecasted Q3 03 loss

[1072] Mr. Gollogly also records in this draft letter that he wants a discussion at the Audit Committee of the fact that the current Q3 03 forecast projects a loss in circumstances where the projected revenue for Q3 03 is the same as the actual revenue in Q2 03.

[1073] As indicated in my discussion of Q3 03, this forecast was simply wrong. Nortel reported net income of $185 million calculated according to the US GAAP despite the fact that revenue for Q3 03 was flat to Q2 03.

[1074] Nortel's published results for Q3 03 were restated in the second restatement; net income was positive in the amount of $131 million after restatement.

[1075] Nortel also reported positive net income in Q4 03 of $528 million (Exhibit 85B).

[1076] Mr. Gollogly's concern in this regard seems to have been misplaced.

### Mr. Gollogly's concern about Nortel's internal controls

[1077] Finally, due to the fact that there were late adjustments and an ongoing review of unsubstantiated or poorly-supported accrued liabilities, Mr. Gollogly wanted a full debate with Mr. Nick DeRoma, Nortel's General Counsel, on the adequacy of Nortel's internal controls.

[1078] I am not certain whether a debate involving Mr. DeRoma, Mr. Gollogly and others within Nortel took place.

[1079] Mr. Cawthorne, in his presentation to the Audit Committee of July 24, 2003, brought to the committee's attention that Deloitte had identified a reportable condition which, in my view, was sufficient to bring to the Audit Committee's attention the fact that Nortel was experiencing an internal control problem.

### Conclusion

[1080] Generally, I am satisfied that the matters of concern to Mr. Gollogly, which he expressed in his draft letter to Mr. Beatty, were disclosed to the Audit Committee.  Mr. Gollogly's concern

about earnings in Q3 03 was misplaced. The other issues were disclosed to Nortel's Audit Committee and Board of Directors.

### The language in the 2003 press releases and the notes to the first restatement

[1081] The Crown objected to a statement in the press release, dated April 24, 2003, which stated that Nortel's reported results included approximately $80 million of favorable impacts associated with reductions in accrued liability balances. The press release went on to say that these favorable impacts were more than offset by costs related to the Return to Profitability Bonus Plan and stock-based compensation.

[1082] There is no basis for this objection. The return to profitability bonus was estimated to cost $73 million. This amount is very close to the $80 million in favorable impacts. The two entries basically offset each other.

[1083] What is not true is that the $80 million in favorable impacts permitted Nortel to pay the return to profitability bonus that it would otherwise not have been able to pay. As explained elsewhere, I am not satisfied that such a conclusion is proven by the evidence.

[1084] In my view, the press release simply says that Nortel's earnings were not inflated by this $80 million because Nortel's expenses included an employee bonus of virtually the same amount of money. The statement in the press release is not false and no objection can properly be maintained to it.

[1085] The Crown also objected to the same press release because it failed to properly describe the $80 million as excess accruals.

[1086] The Crown also objected to the press release because it said that the press release alluded to the $80 million in a manner that was almost unintelligible.

[1087] The press release stated "in the first quarter of 2003, our SG&A and R&D and other income-net included approximately $80 million of favorable impacts associated with reductions in accruals which principally related to the accumulation of charges associated with the integration activities of previously acquired companies and operations originally structured as joint ventures as well as miscellaneous tax matters…"

[1088] The procedure for drafting press releases was not explicitly spelled out in the evidence. The evidence did disclose, however, that there was an Investor Relations Committee and a Press Release Working Group that was a subcommittee of that committee that decided on the wording of press releases. Various persons were canvassed for their views. In addition, the committee had the assistance of internal and external securities lawyers. In addition, Mr. Cleghorn indicated that the Audit Committee would not approve press releases without a sign-off from Nortel's auditors. Mr. Richmond confirmed that he assisted in drafting the April 24, 2003 press release.

[1089] On the evidence before me, I am not prepared to conclude that any or all of the accused are entirely responsible for the wording of Nortel's press releases announcing financial results and other material matters. I am satisfied that the press release was the product of many people

2013 ONSC 137 (CanLII)

including outside counsel. I also do not accept the Crown's characterization of the wording of the press release as far as the $80 million was concerned.

[1090] The Crown also asserted that Conservatism was contrary to US GAAP and disclosure of the existence of this practice within Nortel was required in the press release.

[1091] As indicated elsewhere, I am not satisfied that the evidence established that Conservatism was contrary to US GAAP.

[1092] The Crown also suggested that the introductory note to the restated financial statements was false and relied upon a draft note prepared by Mr. Gollogly. Mr. Gollogly's draft was his suggestion concerning the wording of the note that would accompany the restated financial statements and the Item 4 disclosure required by the September 30 10-Q report.

[1093] In his draft of the note, Mr. Gollogly, in part, states the following:

- Nortel initiated a comprehensive review in the 2nd quarter of fiscal 2003;

- the objective of the review was to assess whether previously-recorded accrued liability balances could potentially have a material impact on future financial results;

- preliminary observations indicated a lack of support and documentary evidence for certain accrued liabilities established in fiscal 2002 and 2001;

- the review is now completed and preliminary results indicate that certain accrued liabilities recorded in 2002 and 2001 were either overstated or not drawn down in the correct fiscal period;

- the systemic causes of these errors are the high level of conservatism used to identify Nortel's financial exposure during the period of business realignment, significant workforce reductions resulting in departures from stated finance policies and lost business knowledge around specific internal control processes; and,

- Nortel has determined the need to voluntarily restate its financial statements for the errors contained in previously reported financial statements because the aggregate impact would be material to future financial results.

[1094] Mr. Gollogly indicates an email to Mr. Beatty attaching the draft that this was the first note that he had drafted.

[1095] The first restatement of the financial statements for Q2 03 included a note which disclosed that:

- Nortel had initiated a comprehensive review of its assets and liabilities;

- in excess of $900 million in accrued liability balances needed to be restated;

2013 ONSC 137 (CanLII)

- these balances were either initially recorded incorrectly in prior periods or not properly released to the profit and loss statement in the appropriate period;

- in certain cases these accrued liability balances had not been adjusted for changes in estimates in the appropriate periods;

- certain other errors which were not material were also corrected;

- Nortel made certain revenue adjustments, corrected errors related to its deferred income tax assets and foreign-currency accounts and reclassified adjustments to its consolidated balance sheet;

- certain accruals and provisions should not have been recorded because the appropriate conditions in documentation supporting the establishment of these accruals and provisions did not exist at the time of recognition. These accrued liability balances were re-profiled to the periods in which they were created and then eliminated;

- Nortel identified situations where accrued liability balances had been released to the profit and loss statement in inappropriate periods. These accrued liability balances have been recognized in the appropriate periods;

- the restatement includes the release of accrued liability balances established to bring the intercompany payables and receivables into balance. (I note that this is a reference to the Intercompany Out Of Balance account which occupied a certain amount of attention during the course of this trial); and,

- excessive accrued liability balances for discretionary bonuses have been adjusted.

[1096] The Crown relies on the fact that Mr. Gollogly states in his draft that the systemic causes for overstating accrued liability balances or failing to draw them down in the correct fiscal period was a high level of Conservatism used to identify financial exposure during the period of Nortel's realignment from 2000-2002.

[1097] The note in the financial statements does not use the word Conservatism, but it discloses that accrued liability balances were recorded incorrectly in prior periods, not properly released, not adjusted for changes in estimates in the appropriate period.

[1098] The Crown indicated, in its opening, that Conservatism was contrary to US GAAP. The evidence did not support such a conclusion.

[1099] The Crown complained that the press release announcing the first restatement did not say that the restatement was required due to a systemic tendency to overstate accrued liabilities.

[1100] It is true that the note to the restated financial statements does not say that there was a systemic or cultural tendency in Nortel to set-up accrued liability balances on a worst-case

2013 ONSC 137 (CanLII)

scenario basis. The restatement, however, discloses that over $900 million in accrued liability balances were excessive because they were not recorded properly, not properly released or not adjusted in a timely manner. The restatement discloses that this happened in 2000, 2001, 2002 and the first two quarters of 2003. A reasonable reader would conclude that the problems identified in the restatement note were systemic at least in the years that were stated.

[1101] I attach no significance to the absence of a reference, in the note accompanying the restated financial statements, to Nortel's financial errors resulting from systemic causes.

[1102] The Crown suggested that the assertion in Mr. Gollogly's draft that certain known errors which were not material were not corrected until the restatement was false. The Crown submitted the errors were material. Mr. Gollogly's draft does not define those errors. It is impossible to know to what he was referring.

[1103] The note that accompanied the restated financial statements makes a similar statement. That note also fails to define the errors to which it refers.

[1104] It is impossible to conclude that either of these references to the correction of unspecified immaterial errors were references to material errors.

[1105] Finally, Mr. Gollogly clearly prepared a draft of the note that was to accompany the restated financial statements. He submitted it first to Blair Morrison, Gordon Davies, Karen Sledge and Gary Beck. The next day Mr. Gollogly forwarded the same note to Mr. Beatty for his consideration. In his e-mail to Mr. Beatty, Mr. Gollogly makes reference to a new draft note which potentially will have been reviewed by someone named Nick. Nortel's General Counsel was Nick DeRoma. While it makes sense that Nortel's General Counsel would review the wording of the note accompanying the restated financial statements, I cannot say for certain to whom Mr. Gollogly was referring.

[1106] I am not satisfied that there is any real difference between Mr. Gollogly's draft and the note that actually accompanied the restated financial statements.

[1107] Even if the note accompanying the restated financial statements was incomplete and I am not satisfied that it was, I am not satisfied that Mr. Gollogly, Mr. Beatty or Mr. Dunn could in their sole discretion determine the final wording of Nortel press releases.

## THE CROWN'S CRITICISM OF THE Q3 03 FINANCIAL RESULTS

[1108] The Crown maintained that Mr. Gollogly's concerns about Q3 03 were never properly disclosed either to the Audit Committee or to the public. Mr. Gollogly's concern about Q3 03 earnings was misplaced as indicated earlier. The forecast to which Mr. Gollogly referred was likely a September 19, 2003 Outlook.

[1109] The Crown attacked Nortel's original publication of Q3 03 results. The Crown maintained that Nortel's financial statements, as originally published for Q3 03, misrepresented Nortel's financial results for that fiscal period. Specifically, the Crown maintained that the Q3 03 results were "polluted" because $391 million in accrued liability balances were released to the profit and loss statement in Q3 03.

2013 ONSC 137 (CanLII)

[1110] The September 19, 2003 Outlook referred to by Mr. Gollogly in his draft letters indicates that this sum is made up of $264 million, the release of which was triggered in Q3, and $127 million the release of which was triggered in earlier quarters of 2003.

[1111] The Crown also highlighted a reference in Mr. Gollogly's diary which the Crown suggested demonstrated his opinion that the accounting oversight in Q3 03 was a "joke". Specifically, Mr. Gollogly indicated, in a diary entry, dated October 7, 2003, "intense scrutiny on Q3-it is a joke". This reference occurs on a page which is entitled "LC\Region Finance Call". The diary entry seems to be recording comments that were made during this telephone call. It is not clear from the entry that the comment represents Mr. Gollogly's view or one of the callers that it is a joke to suggest that there is intense scrutiny on Q3.

[1112] The Crown also relied on a note made by Mr. Beatty. This note states "Q3 was 'Amnesty' time from now on people will be fired for not following proper accounting practices". The Crown asked me to interpret this reference as a statement by Mr. Beatty that Q3 was everyone's last opportunity to manage earnings by releasing accrued liability balances to the profit and loss statement.

[1113] Mr. Beatty's note is dated September 30, 2003 and the document purports, on its face, to be notes of the Finance Conference Call. The note appears under a bullet point entitled "what is needed going forward". The first item that is needed, according to the note, is an understanding of how much the world has changed from a regulatory point of view. The second thing that is needed, according to the note, is that Q3 was amnesty time and that from now on people will be fired for not following proper accounting practices. The third item that is required, according to the note, is that if you are in doubt about what to do, you are to ask Karen's team who have the final say. The note is dated September 30, 2003, which is the last day of Q3.

[1114] With respect to Mr. Beatty's note, it seems to me to be more reasonable to construe the statement, assuming for a moment it was made by Mr. Beatty, as a promise not to fire employees who disclose, in Q3 03, items which should be removed from the balance sheet. This would certainly be consistent with the worldwide effort to comprehensively review the balance sheet.

[1115] The Crown also relied upon the fact that the September 19, 2003 Outlook prepared by Mr. Dans forecasted net income of $178 million and the press release of October 23, 2003 announced net income of $179 million. The Crown suggested that it was extraordinary that Mr. Dans' forecast could be so accurate.

[1116] In this regard, it is also a fact that Mr. Dans produced an Outlook, dated September 2, 2003, (seventeen days earlier) in which he projected net income for Q3 03 at $19 million.

[1117] It is more reasonable to me to conclude that Mr. Dans produced Outlooks which forecasted varying levels of net income; one of which, in Q3 03, happened to be quite accurate.

[1118] Wilmer Cutler Pickering, on behalf of Nortel's Audit Committee, in effect, investigated the behavior of the three accused and their report resulted in all three accused being fired. Wilmer Cutler Pickering concluded with respect to Q3 03 and Q4 03: "In light of concerns raised by the inappropriate accounting judgments outlined above, the Audit Committee expanded its

investigation to determine whether excess provisions were released to meet internal EBT targets in each of these two quarters. No evidence emerged to suggest an intent to release provisions strategically in those quarters to meet EBT targets". Wilmer Cutler Pickering indicated that a further review down to a low threshold would be conducted and that any changes would be reflected in the second restatement.

### *Preservation of the integrity of the Q3 03 General Ledger*

[1119] Returning to the Crown's suggestion that the Q3 03 general ledger was polluted, some care needs to be taken with references to non-trigger items finding their way into the Q3 03 general ledger due to the way in which Nortel and Deloitte used the Q3 03 General Ledger during the Comprehensive Balance Sheet Review.

[1120] The Comprehensive Balance Sheet Review took place during Q3 03. Ms. Sledge described the steps taken to preserve the integrity of the Q3 03 general ledger:

- Balance sheet items identified as not belonging on the balance sheet any longer were given a specific code in the General Ledger;

- The code identified them as items that potentially would need to be restated. These separately coded balance sheet items were separately tracked in a parallel system because they were recorded in a database as items marked for potential restatement;

- Ms. Sledge testified that these entries were tracked very carefully. These balance sheet items, by definition, were items that needed to come off the balance sheet, but did not belong in the Q3 profit and loss statement;

- These separately coded items were then audited by Deloitte & Touche; and,

- When it was decided that prior published financial statements were, in fact, going to be restated, the coded items removed from the General Ledger and restated to the appropriate prior financial period.

[1121] Ms. Sledge testified that she felt rushed into the October 23, 2003 press release but, nevertheless, she felt that Nortel's balance sheet and profit and loss statement and financial records were accurate. In this regard, it should be remembered that the October 23, 2003 press release specified that the financial results were <u>preliminary</u> results.

[1122] During the Crown's opening submissions, reference was made to the fact that Ms. Sledge prepared a project update for Mr. Gollogly, dated October 10, 2003, and that the presentation stated that the preliminary Q3 03 results were "polluted". In this presentation, the word polluted is placed in quotation marks. Ms. Sledge testified that the slide was prepared by one of her staff and meant to convey that all of the unsupported balances were initially released to the Q3 03 profit and loss statement because they could not remain on the balance sheet. The items were separately coded and then restated when it was determined that a restatement was necessary.

[1123] I attach no significance to the fact that one of the pages of Ms. Sledge's report to Mr. Gollogly contains the word polluted in quotes. The unsupported balances were separately coded so that they could be identified and, in that sense, the Q3 03 results were, for a time, "polluted."

[1124] I am satisfied that the process employed by Ms. Sledge and her team and audited by Deloitte preserved the integrity of the Q3 03 results.

[1125] Mr. Chambers did not offer the opinion in his report that the Q3 03 financial results were polluted or otherwise contaminated.

### Conclusion

[1126] When I consider this evidence, I am not satisfied that the Q3 03 results were false due to the improper release of accrued liability balances to the profit and loss statement.

[1127] In Q3 03, the total accrued liability balances released to the profit and loss statement, in fact, totaled $391 million. This is a significant volume of releases. Some of these releases were in the normal course and some were not. Steps were taken to identify which was which. The integrity of Nortel's General Ledger was maintained. There was no misrepresentation of Nortel's Q3 03 financial results.

[1128] I am not satisfied beyond a reasonable doubt that Nortel's original Q3 03 financial statements misrepresented Nortel's financial results.

## CONCLUSION

### The excess and unsupported accrued liabilities

[1129] I am satisfied beyond a reasonable doubt that all three accused, by virtue of their long experience with Nortel and their positions of responsibility, well-understood how the men and women in the field were implementing Nortel's policy of Conservatism.

[1130] I am satisfied beyond a reasonable doubt that they knew that the policy of Conservatism and its implementation had created excess accrued liabilities which could be released to assist in meeting financial targets. Liabilities were very often estimated by men and women in the field on a worst-case scenario basis. As well, in order to avoid exposing Nortel to risks that were not provided for, there was a reluctance to reduce accrued liability balances in the appropriate quarter in response to a triggering event. The result was the presence of excess accrued liabilities on Nortel's balance sheet.

[1131] The evidence does establish, and I so find, that excessive accrued liabilities existed because genuine accrued liabilities were not released when they should have been and because genuine accrued liabilities were not adjusted when they should have been. I am not satisfied that any or all of the accused understood the extent of the excess accrued liabilities on Nortel's balance sheet.

[1132] I am satisfied that, in addition to excess accrued liabilities, there were accrued liabilities on Nortel's balance sheet which could not be supported.

[1133] The evidence persuades me that accruals were present on Nortel's consolidated balance sheet which could not be supported by documentation. I am satisfied that the downsizing of Nortel, which involved the closing of offices, the selling of real estate and, undoubtedly, the storage of documents, created a situation in which supporting documentation for some of existing accrued liability balances could not be located. Further, the loss of employees (two out of every three worldwide) created a situation in which the institutional memory concerning the unsupported accruals no longer existed within the company.

[1134] I am satisfied beyond a reasonable doubt that all 3 accused knew that there were unsupported accrued liabilities on Nortel's balance sheet. I am not satisfied that any or all of the accused understood the extent of the unsupported accrued liabilities on Nortel's balance sheet.

[1135] I am satisfied that neither the unsupported nor the excess accrued liabilities were fictitious. This finding does not mean that the release of accrued liabilities could not be used to manage earnings or achieve a pre-published financial target. It simply means that both the unsupported and the excessive liability balances originated from real risks.

[1136] I am satisfied, on the evidence, that Mr. Gollogly, virtually from the time he took over as Corporate Controller, turned his attention to Nortel's balance sheet.

[1137] I am satisfied that the enormous losses suffered by Nortel in fiscal 2000 and 2001 created a situation in which senior management, Nortel's Board of Directors and Nortel's auditors were concentrating their efforts and energy on doing what was necessary to make sure that Nortel had sufficient cash reserves to survive.

### Q4 2002(Q4 02)

[1138] Mr. Harrison initially reported in his January 6 snapshot pro forma earnings before taxes of $73 million. It is clear that he erroneously included $59 million in his revenue calculation and that the 360 networks accrued liability balance of $50 million is unchallenged. These two uncontested adjustments are capable of turning Mr. Harrison's forecasted earnings before taxes into a loss.

[1139] I am not satisfied that Nortel's Q4 2002 financial results were pro forma net profitable.

[1140] When I consider all of the evidence, including the evidence to which I have made specific reference, I am not satisfied beyond a reasonable doubt that the late entry accrued expenses/liabilities solicited by Mr. Harrison and recorded in Q4 02 misrepresented Nortel's financial results.

[1141] When I consider all of the evidence, including the evidence to which I have specifically referred, I am not satisfied beyond a reasonable doubt that Nortel's January 23 press release reporting a pro forma net loss of $62 million misrepresented Nortel's pro forma financial results.

[1142] When I consider all the evidence, including the evidence to which I have made specific reference, I am not satisfied beyond a reasonable doubt that the accruals solicited by Mr. Harrison and recorded in Q4 02 resulted in a misrepresentation of Nortel's US GAAP financial results.

2013 ONSC 137 (CanLII)

[1143] I am not satisfied beyond a reasonable doubt that the late entry accruals solicited by Mr. Harrison caused a misrepresentation of Nortel's financial results to Nortel's Audit Committee, Nortel's JL RC Committee or Nortel's Board of Directors.

[1144] I am satisfied that $222 million of the $303 million identified by Ms. Susan Shaw as provisions no longer required and available for release were, in fact, released in Q3 02 and Q4 02. I am also satisfied that $57 million worth of accrued liability balances, described by Mr. McMillan as unreleased, included releases which could not be identified.

[1145] I am satisfied that the release of this $222 million in Q3 02 and Q4 02 did not result in a misrepresentation of Nortel's financial results for those quarters or for fiscal 2002. These releases positively impacted earnings in those quarters but Nortel still lost in excess of $2 billion in those two quarters.

[1146] I am not satisfied beyond a reasonable doubt that the manner in which the three accused dealt with the $303 million in accrued liability balances identified by Susan Shaw in her October 2002 compilation resulted in a misrepresentation of Nortel's financial results to the investing public or Nortel's Board of Directors.

### *The $80 million in Non-op Accrued liability balances released to the Q1 03 profit and loss statement*

### *The Return to Profitability Bonus*

[1147] I am satisfied that the Return to Profitability Bonus was payable in Q1 2003 with or without the release of $80 million in Non-op accrued liability balances.

[1148] I am satisfied that Mr. Hathway was not misled when he was told by either Mr. Beatty or Mr. Gollogly that the Return to Profitability Bonus was payable with or without the release of the $80 million with which we have been concerned.

### *The Restricted Stock Unit Bonus*

[1149] I am not satisfied that the $4 million Siemens accrued liability balance released in Q2 03 misrepresented Nortel's financial results by causing them to indicate that a Restricted Stock Unit Bonus Plan milestone had been reached.

[1150] I am not satisfied that releasing the $4 million Siemens balance in Q2 03 created a risk to the pecuniary interests of Nortel Networks Corporation contrary to count 2 in the indictment by falsely indicating that the first milestone of the Restricted Stock Unit Bonus Plan had been met.

[1151] I am satisfied that the release of the $4 million Siemens accrued liability balance in Q4 02 or Q2 03 would have had exactly the same effect as far as the first milestone of the Restricted Stock Unit Bonus Plan was concerned.

[1152] I am not satisfied that any or all of the accused knew that the $4 million Siemens accrued liability balance should have been released in Q4 01.

### The $80 million generally

[1153] I am satisfied that Nortel achieved net income in Q1 03 with or without the $80 million.

[1154] I am satisfied that including the $80 million with which we have been concerned in Nortel's Q1 03 profit and loss statement or removing the $80 million from Nortel's Q1 03 consolidated balance sheet did not misrepresent Nortel's financial results for Q1 03.

[1155] I am satisfied, based on my acceptance of Ms. Shaw's evidence, that Ms. Shaw, Mr. Gollogly and the other Nortel employees at the April 15, 2003 meeting fully disclosed to their auditors the circumstances surrounding the release of $80 million in accrued liability balances, as well as the circumstances surrounding the remaining $109 million in accrued liabilities on the balance sheet.

[1156] The $80 million which was released in Q1 03 had been conclusively determined to be unsupportable. Deloitte, the Audit Committee, Ms. Shaw and all the accused knew that there were no triggering events in Q1 03 which required the release of this $80 million. It was obviously the view of everyone involved that the release of this $80 million would not materially affect Nortel's balance sheet or profit and loss statement. As indicated elsewhere in these reasons, I agree with this conclusion.

[1157] Disclosure of the fact that Nortel's financial results for Q1 03 were positively affected by the release of this $80 million was, in fact, included in Nortel's published financial statements and the press release announcing the Q1 03 financial results.

[1158] I accept the conclusions in the draft memo prepared by Ms. De Acetis, Mr. Chant and Mr. Allen. I find the memo persuasive. I reject Mr. Hathway's evidence to the effect that the calculations or conclusions in this draft memo are not correct.

[1159] I accept the coherent materiality analysis in the draft memo prepared by Ms. De Acetis, Mr. Chant and Mr. Allen.

[1160] I am satisfied that the release of $80 million in Non-op accrued liability balances to Nortel's profit and loss statement was not material to Nortel's Q1 03 profit and loss statement.

[1161] I am satisfied that the release of the $80 million from Nortel's balance sheet to its profit and loss statement was not material to Nortel's Q1 03 balance sheet.

[1162] I am satisfied that the release of this $80 million did not create a risk to the pecuniary interests of Nortel Networks Corporation.

[1163] I am not satisfied that the way in which the three accused dealt with the $80 million in unsupported accrued liability balances in Q1 03 misrepresented Nortel's financial results to the investing public or Nortel's Audit Committee or Nortel's board of directors.

2013 ONSC 137 (CanLII)

### The attempt to release the $142 Million

[1164] I am also satisfied that the attempt to release $142 million in unsupported or excess accrued liability balances in Q2 03 did not misrepresent Nortel's financial results. Mr. Hathway objected to the release and Mr. Gollogly returned the $142 million to Nortel's balance sheet where those balances had always been.

[1165] I am satisfied that the presence of this $142 million in accrued liability balances on Nortel's balance sheet in Q2 03 did not misrepresent Nortel's liabilities or otherwise misrepresent Nortel's financial results in Q2 03. Mr. Richmond was clearly of this opinion; the Crown expert Mr. Chambers did not offer a contrary opinion.

[1166] Because the presence on Nortel's balance sheet of $142 million in unsupported/excess accrued liability balances was disclosed to Nortel's Audit Committee in a way which resulted in a Comprehensive Balance Sheet Review, I am satisfied that the presence of this $142 million in unsupported balances on Nortel's balance sheet did not create a risk to the pecuniary interests of Nortel Networks Corporation.

### Nortel's published financial results for Q3 03

[1167] When I consider this evidence, I am not satisfied that the original published Q3 03 financial statements misrepresented Nortel's financial results for Q3 03 due to the improper release of accrued liability balances to the profit and loss statement or for any other reason.

[1168] In Q3 03, the total accrued liability balances released to the profit and loss statement, in fact, totaled $391 million. This is a significant volume of releases. Some of these releases were in the normal course and some were not. Steps were taken to identify which was which to ensure that the published financial statements were not affected inappropriately. Neither Mr. Chambers nor any other witness offered the opinion that the steps were inadequate.

[1169] I am satisfied that the steps taken to preserve the integrity of the Q3 03 financial statements were successful with the result that Nortel's financial results for that quarter were not misrepresented.

### The Comprehensive Balance Sheet Review

[1170] The first restatement produced $900 million in favorable impacts to shareholders. The $900 million in excess accrued liabilities represented expenses/liabilities on the balance sheet that did not have to be recognized. It was never suggested that these accrued liability balances ought not to have been restated. As a result of restating these balances, shareholder equity was increased.

[1171] I am satisfied that the Comprehensive Balance Sheet Review was comprehensive. It identified more than $900 million in excessive accrued liabilities.

[1172] I am satisfied that there was intense pressure to complete the Comprehensive Balance Sheet Review as quickly as possible. I do not attribute this imperative to the accused alone. I accept the evidence of Mr. Richmond that there was an agreement among the Board, senior

management and Deloitte that the comprehensive balance sheet review should be completed "as rapidly as was humanly possible". I am satisfied that this imperative existed because the accused and Nortel's Audit Committee wanted to make their appropriate filings with the SEC and the Ontario Securities Commission within normal reporting lines. I am not satisfied, on the evidence, including the evidence specifically referred to, that the Comprehensive Balance Sheet Review was not comprehensive because timelines were short.

[1173] The evidence falls far short of proving that the accused, either individually or collectively, attempted to frustrate the Comprehensive Balance Sheet Review or the first restatement of Nortel's previously-published financial results. Deloittes, specifically Mr. Richmond, insisted on the Comprehensive Balance Sheet Review and I am satisfied that Deloitte would not have accepted such obstruction and would have brought the matter to the attention of the Audit Committee.

[1174] I am not satisfied that the first restatement was under-resourced. Deloitte was free to add staff as they saw fit. Mr. Richmond did not hesitate to recommend that Nortel staff and Deloitte staff be compelled to take a long weekend. I have no doubt he would have recommended that Nortel find additional staff for the Comprehensive Balance Sheet Review if it had come to his attention that the project, which Deloitte had insisted upon, was being compromised because it was under-resourced on the Nortel side.

[1175] I am satisfied that the scope of the Comprehensive Balance Sheet Review was reasonable. The scope of the Comprehensive Balance Sheet Review was accepted by Nortel's auditors and its Audit Committee. Throughout the Comprehensive Balance Sheet Review, there was no suggestion that the scope of the review was too narrow.

[1176] I accept the evidence of Mr. Richmond, Ms. Sledge, Mr. McMillan and others attesting to the effort that went into the Comprehensive Balance Sheet Review.

[1177] I accept the evidence of Mr. Dans that there was a trending analysis done at the conclusion of the first restatement which validated the results of that restatement.

[1178] An accrued liability balance when Deloitte decided there had been an error. In order to understand what to make of the error, one has to understand the specifics of the release. An example is the JDS Uniphase transaction. Deloitte gave Nortel an opinion in 2001 concerning the accounting for this transaction which Nortel accepted. Deloitte confirmed its original advice on January 9, 2003. During the second restatement, Deloitte changed its opinion entirely. Nortel accepted Deloitte's new opinion and, as a result, restated $319 million worth of revenue. Deloitte behaved in a similar manner when considering the Optical Warranty accrued liability balance.

[1179] It would be imprecise and dangerous to conclude, without knowing the specifics of the transactions, that Nortel's prior published financial results were false because transactions such as these were restated. The more accurate statement is that Deloitte changed its mind about the accounting treatment for these transactions and, as a result, previously-published financial statements had to be changed. Once the specifics of the transaction are known, it is clear that the three accused could not have known about these so-called errors.

[1180] It would be wrong to infer that the three accused knew that an accrued liability balance that was restated was false in the absence of evidence concerning the specifics of the balance.

[1181] When I consider all of the evidence, it is my conclusion that the second restatement produced different results than the first restatement because the thresholds of the second restatement were different, because the second restatement concentrated on revenue recognition, as well as excessive accrued liability balances, and because Deloitte changed its mind about the accounting for specific transactions. Sometimes, as the specifics of the Genuity accrued liability balance demonstrate, Deloitte disagreed with itself. With respect to that release, the U.S. National Office of Deloitte & Touche disagreed with the Deloitte reviewers at Nortel and overruled them.

[1182] I am not satisfied by the evidence in this case, including the fact that the second restatement resulted in financial statements which were different than Nortel's previously-published and restated financial statements, proves that the previously-published and restated financial statements misrepresented Nortel's financial results. For example, in the period Q4 02, which occupied a considerable amount of the court's time, Nortel's original published financial statements reported a US GAAP loss of $248 million and revenue of $2.5 billion. After two restatements, Nortel reported a US GAAP loss of $294 million and revenue of $2.6 billion.

### The Q1 & Q2 03 accrued liability balance releases

[1183] I am not satisfied beyond a reasonable doubt that the three accused deliberately misrepresented Nortel's original Q1 03 and Q2 03 published financial results by releasing $361 million and $372 million, respectively, to Nortel's Q1 03 and Q2 03 profit and loss statements.

[1184] The restated releases referred to in the evidence lead me to the conclusion that the decision to restate on account of an error can be the same thing as saying that there was a decision to restate on account of a difference of opinion. The difference of opinion can occur with the benefit of hindsight. The difference of opinion can be influenced by new information. As indicated earlier, when deciding to restate an accrued liability balance, sometimes Deloitte disagreed with itself. The specifics of each restated item are a story, the details of which cannot be inferred from the ending.

[1185] In the abstract, it is true that the fact that accrued liability balances in Nortel's balance sheet were restated is capable of supporting an inference that, in their original form, the financial statements misrepresented Nortel's financial results. Based on the evidence that I have heard, it is my conclusion that I should not draw such an inference in this case.

[1186] When I consider the evidence generally, including the evidence to which I have referred, I come to the conclusion that I am not satisfied by the evidence that, apart from the $80 million in Non-op releases, the Q1 03 and Q2 03 accrued liability releases were outside the normal course of business.

[1187] As a result, I cannot give effect to the Crown submissions concerning the inferences I ought to draw from the fact that the original Q1 03 and Q2 03 accrued liability balances were restated.

**VERDICT**

[1188] For the reasons that I have set out and having regard to all the evidence, I am not satisfied beyond a reasonable doubt that Frank A. Dunn, Douglas C. Beatty and Michael J. Gollogly deliberately misrepresented the financial results of Nortel Networks Corporation and, therefore, I find each of them not guilty of counts one and two in this indictment.

2013 ONSC 137 (CanLII)

_____
                        MARROCCO J.

**Released: 20130114**

**CITATION:** R. v. Dunn, 2013 ONSC 137
**COURT FILE NO.:** 10-00145
**DATE:** 20130114

2013 ONSC 137 (CanLII)

## ONTARIO

## SUPERIOR COURT OF JUSTICE

**B E T W E E N:**

HER MAJESTY THE QUEEN

– and –

FRANK A. DUNN, DOUGLAS C. BEATTY AND
MICHAEL J. GOLLOGLY

Defendants

---

**JUDGMENT**

---

MARROCCO J.

**Released: 20130114**