TAB 122

**Her Majesty The Queen**  *Appellant*

*v.*

**Chikmaglur Mohan**  *Respondent*

INDEXED AS: R. *v.* MOHAN

File No.: 23063.

1993: November 9; 1994: May 5.

Present: Lamer C.J. and La Forest, L'Heureux-Dubé, Sopinka, Gonthier, Cory, McLachlin, Iacobucci and Major JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR ONTARIO

*Evidence — Admissibility — Expert evidence — Nature of expert evidence — Expert evidence as to disposition — Pediatrician charged with sexual assault of patients — Expert witness called to testify that character traits of accused not fitting psychological profile of putative perpetrator of offences — Whether expert's testimony admissible.*

*Criminal law — Expert evidence — Nature of expert evidence — Expert evidence as to disposition — Pediatrician charged with sexual assault of patients — Expert witness called to testify that character traits of accused not fitting psychological profile of putative perpetrator of offences — Whether expert's testimony admissible.*

Respondent, a practising pediatrician, was charged with four counts of sexual assault on four female patients, aged 13 to 16 at the relevant time, during medical examinations conducted in his office. His counsel indicated that he intended to call a psychiatrist who would testify that the perpetrator of the alleged offences would be part of a limited and unusual group of individuals and that respondent did not fall within that narrow class because he did not possess the characteristics belonging to that group. The psychiatrist testified in a *voir dire* that the psychological profile of the perpetrator of the first three complaints was likely that of a pedophile, while the profile of the perpetrator of the fourth complaint that of a sexual psychopath. The psychiatrist intended to testify that the respondent did not fit the profiles but the evidence was ruled inadmissible at the conclusion of the *voir dire*.

Respondent was found guilty by the jury and appealed. The Court of Appeal allowed respondent's

**Sa Majesté la Reine**  *Appelante*

*c.*

**Chikmaglur Mohan**  *Intimé*

RÉPERTORIÉ: R. *c.* MOHAN

Nᵒ du greffe: 23063.

1993: 9 novembre; 1994: 5 mai.

Présents: Le juge en chef Lamer et les juges La Forest, L'Heureux-Dubé, Sopinka, Gonthier, Cory, McLachlin, Iacobucci et Major.

EN APPEL DE LA COUR D'APPEL DE L'ONTARIO

*Preuve — Admissibilité — Preuve d'expert — Nature de la preuve d'expert — Preuve d'expert quant à la prédisposition — Pédiatre accusé d'agression sexuelle sur des patientes — Expert appelé à témoigner que les traits de caractère de l'accusé ne répondent pas au profil psychologique de l'auteur putatif des infractions — Le témoignage d'expert est-il admissible?*

*Droit criminel — Preuve d'expert — Nature de la preuve d'expert — Preuve d'expert quant à la prédisposition — Pédiatre accusé d'agression sexuelle sur des patientes — Expert appelé à témoigner que les traits de caractère de l'accusé ne correspondent pas au profil psychologique de l'auteur putatif des infractions — Le témoignage d'expert est-il admissible?*

L'intimé, un pédiatre, fait face à quatre chefs d'accusation d'agression sexuelle commise sur quatre patientes, âgées à l'époque de 13 à 16 ans, pendant leur examen médical dans le bureau de l'intimé. Son avocat a exprimé l'intention d'appeler un psychiatre qui témoignerait que l'auteur des infractions alléguées appartenait à un groupe limité et inhabituel d'individus et que l'intimé ne faisait pas partie de cette catégorie restreinte parce qu'il n'en possédait pas les caractéristiques propres. Le psychiatre a témoigné au voir-dire que le profil psychologique de l'auteur des trois premières agressions alléguées était probablement celui d'un pédophile alors que celui de la quatrième était celui d'un psychopathe sexuel. Le psychiatre avait l'intention de témoigner que l'intimé ne correspondait pas à ces profils, mais son témoignage a été jugé inadmissible à l'issue du voir-dire.

Déclaré coupable par le jury, l'intimé a interjeté appel. La Cour d'appel a accueilli l'appel de l'intimé,

1994 CanLII 80 (SCC)

appeal, quashed the convictions and ordered a new trial. The Court of Appeal therefore found it unnecessary to deal with the Crown's sentence appeal. At issue here was the determination of the circumstances in which expert evidence is admissible to show that character traits of an accused person do not fit the psychological profile of the putative perpetrator of the offences charged. Resolution of this issue involved an examination of the rules relating to (i) expert evidence, and (ii) character evidence.

*Held*: The appeal should be allowed.

The evidence should be excluded.

Expert Evidence

Admission of expert evidence depends on the application of the following criteria: (a) relevance; (b) necessity in assisting the trier of fact; (c) the absence of any exclusionary rule; and (d) a properly qualified expert. Relevance is a threshold requirement to be decided by the judge as a question of law. Logically relevant evidence may be excluded if its probative value is overborne by its prejudicial effect, if the time required is not commensurate with its value or if it can influence the trier of fact out of proportion to its reliability. The reliability versus effect factor has special significance in assessing the admissibility of expert evidence. Expert evidence should not be admitted where there is a danger that it will be misused or will distort the fact-finding process, or will confuse the jury.

Expert evidence, to be necessary, must likely be outside the experience and knowledge of a judge or jury and must be assessed in light of its potential to distort the fact-finding process. Necessity should not be judged by too strict a standard. The possibility that evidence will overwhelm the jury and distract them from their task can often be offset by proper instructions. Experts, however, must not be permitted to usurp the functions of the trier of fact causing a trial to degenerate to a contest of experts.

Expert evidence can be excluded if it falls afoul of an exclusionary rule of evidence separate and apart from the opinion rule itself. The evidence must be given by a witness who is shown to have acquired special or peculiar knowledge through study or experience in respect of the matters on which he or she undertakes to testify.

annulé les déclarations de culpabilité et ordonné un nouveau procès. La Cour a ainsi conclu qu'il n'était pas nécessaire d'entendre l'appel du ministère public contre la sentence. Il faut déterminer en l'espèce les circonstances dans lesquelles la preuve d'expert est admissible pour démontrer que des traits de caractère d'un accusé ne répondent pas au profil psychologique de l'auteur putatif des infractions reprochées. La résolution de la question passe par l'examen des règles en matière (i) de preuve d'expert, et (ii) de preuve de moralité.

*Arrêt*: Le pourvoi est accueilli.

La preuve est exclue.

Preuve d'expert

L'admission de la preuve d'expert repose sur l'application des critères suivants: a) la pertinence; b) la nécessité d'aider le juge des faits; c) l'absence de toute règle d'exclusion; et d) la qualification suffisante de l'expert. La pertinence est une exigence liminaire déterminée par le juge comme question de droit. La preuve logiquement pertinente peut être exclue si sa valeur probante est surpassée par son effet préjudiciable, si elle exige un temps excessivement long qui est sans commune mesure avec sa valeur ou si son effet sur le juge des faits est disproportionné par rapport à sa fiabilité. Le facteur fiabilité-effet revêt une importance particulière dans l'appréciation de l'admissibilité de la preuve d'expert. La preuve d'expert ne devrait pas être admise si elle risque d'être utilisée à mauvais escient et de fausser le processus de recherche des faits, ou de dérouter le jury.

Pour être nécessaire, la preuve d'expert doit, selon toute vraisemblance, dépasser l'expérience et la connaissance d'un juge ou d'un jury et être évaluée à la lumière de la possibilité qu'elle fausse le processus de recherche des faits. La nécessité ne devrait pas être jugée selon une norme trop stricte. La possibilité que la preuve ait un impact excessif sur le jury et le détourne de ses tâches peut souvent être contrecarrée par des directives appropriées. Les experts ne doivent toutefois pas pouvoir usurper les fonctions du juge des faits, ce qui pourrait réduire le procès à un simple concours d'experts.

La preuve d'expert peut être exclue si elle contrevient à une règle d'exclusion de la preuve, distincte de la règle applicable à l'opinion. La preuve doit être présentée par un témoin dont on démontre qu'il ou elle a acquis des connaissances spéciales ou particulières grâce à des études ou à une expérience relatives aux questions visées dans son témoignage.

In summary, expert evidence which advances a novel scientific theory or technique is subjected to special scrutiny to determine whether it meets a basic threshold of reliability and whether it is essential in the sense that the trier of fact will be unable to come to a satisfactory conclusion without the assistance of the expert. The closer the evidence approaches an opinion on an ultimate issue, the stricter the application of this principle.

En résumé, la preuve d'expert qui avance une nouvelle théorie ou technique scientifique est soigneusement examinée pour déterminer si elle satisfait à la norme de fiabilité et si elle est essentielle en ce sens que le juge des faits sera incapable de tirer une conclusion satisfaisante sans l'aide de l'expert. Plus la preuve se rapproche de l'opinion sur une question fondamentale, plus l'application de ce principe est stricte.

## Expert Evidence as to Disposition

## Preuve d'expert quant à la prédisposition

The Crown cannot lead expert evidence as to disposition in the first instance unless it is relevant to an issue and is not being used merely as evidence of disposition. The accused, however, can adduce evidence as to disposition, but this evidence is generally limited to evidence of the accused's reputation in the community with respect to the relevant trait or traits. The accused in his or her own testimony may also rely on specific acts of good conduct. Evidence of an expert witness that the accused, by reason of his or her mental make-up or condition of the mind, would be incapable of committing or disposed to commit the crime does not fit either of these categories. A further exception, however, has developed that is limited in scope. Although the exception has been applied to abnormal behaviour usually connoting sexual deviance, its underlying rationale is based on distinctiveness.

Le ministère public ne peut produire une preuve d'expert quant à la prédisposition que si elle est pertinente et n'est pas utilisée comme simple preuve de la prédisposition. L'accusé peut en revanche produire une preuve quant à la prédisposition, mais cette preuve se limite, en règle générale, à la preuve de la réputation de l'accusé au sein de la collectivité relativement aux traits de caractère concernés. L'accusé peut aussi invoquer dans son propre témoignage des actes particuliers de bonne conduite. Le témoignage d'un expert indiquant qu'en raison de sa constitution mentale ou de son état mental, l'accusé serait incapable de commettre le crime ou ne pourrait être prédisposé à le commettre, ne correspond à aucune de ces catégories. Cependant, une autre exception de portée limitée a été créée. Bien que cette exception ait été appliquée à des comportements anormaux liés usuellement à une déviance sexuelle, sa raison d'être est le caractère distinctif.

Before an expert's opinion as to disposition is admitted as evidence, the trial judge must be satisfied, as a matter of law, that either the perpetrator of the crime or the accused has distinctive behavioural characteristics such that a comparison of one with the other will be of material assistance in determining innocence or guilt. Although this decision is made on the basis of common sense and experience, it is not made in a vacuum. The trial judge should consider the opinion of the expert and whether the expert is merely expressing a personal opinion or whether the behavioural profile which the expert is putting forward is in common use as a reliable indicator of membership in a distinctive group. A finding that the scientific community has developed a standard profile for the offender who commits this type of crime will satisfy the criteria of relevance and necessity. The evidence will qualify as an exception to the exclusionary rule relating to character evidence provided the trial judge is satisfied that the proposed opinion is within the field of expertise of the expert witness.

Avant d'admettre en preuve l'opinion d'un expert sur la prédisposition, le juge du procès doit être convaincu, en droit, que l'auteur du crime ou l'accusé possède des caractéristiques de comportement distinctives de sorte que la comparaison de l'un avec l'autre aidera considérablement à déterminer l'innocence ou la culpabilité. Bien que cette décision repose sur le bon sens et l'expérience, elle n'est pas prise dans le vide. Le juge du procès devrait considérer, d'une part, l'opinion de l'expert et, d'autre part, si ce dernier exprime simplement une opinion personnelle ou si le profil de comportement qu'il décrit est couramment utilisé comme indice fiable de l'appartenance à un groupe distinctif. La conclusion que la profession scientifique a élaboré un profil type du délinquant qui commet ce genre de crime satisfera aux critères de pertinence et de fiabilité. La preuve sera considérée comme une exception à la règle d'exclusion relative à la preuve de moralité à condition que le juge soit convaincu que l'opinion proposée se situe dans le domaine d'expertise du témoin expert.

1994 CanLII 80 (SCC)

R. *v.* MOHAN                                    [1994] 2 S.C.R.

## Application to This Case

Nothing in the record supported a finding that the profile of a paedophile or psychopath has been standardized to the extent that it could be said that it matched the supposed profile of the offender depicted in the charges. The expert's group profiles were not seen as sufficiently reliable to be considered helpful. In the absence of these indicia of reliability, it could not be said that the evidence would be necessary in the sense of usefully clarifying a matter otherwise unaccessible, or that any value it may have had would not be outweighed by its potential for misleading or diverting the jury.

The similarities detailed by the judge dealt with the perpetrator's *modus operandi* of the acts subject to the individual counts. These were not matters to which the expert evidence related. Moreover, whether a crime is committed in a manner that identifies the perpetrator by reason of striking similarities in the method employed in the commission of other acts is something that a jury can, generally, assess without the aid of expert evidence.

## Cases Cited

**Considered:** *R. v. Lupien*, [1970] S.C.R. 263; *R. v. Chard* (1971), 56 Cr. App. R. 268; *Lowery v. The Queen*, [1974] A.C. 85; *R. v. Turner*, [1975] Q.B. 834; **referred to:** *R. v. Robertson* (1975), 21 C.C.C. (2d) 385; *R. v. McMillan* (1975), 23 C.C.C. (2d) 160, aff'd [1977] 2 S.C.R. 824; *R. v. Lavallee*, [1990] 1 S.C.R. 852; *R. v. French* (1977), 37 C.C.C. (2d) 201; *R. v. Taylor* (1986), 31 C.C.C. (3d) 1; *R. v. C. (M.H.)*, [1991] 1 S.C.R. 763; *R. v. Lyons*, [1987] 2 S.C.R. 309; *R. v. Abbey*, [1982] 2 S.C.R. 24; *R. v. B.(G.)*, [1990] 2 S.C.R. 30; *Morris v. The Queen*, [1983] 2 S.C.R. 190; *R. v. Béland*, [1987] 2 S.C.R. 398; *R. v. Melaragni* (1992), 73 C.C.C. (3d) 348; *R. v. Bourguignon*, [1991] O.J. No. 2670 (Q.L.); *R. v. Lafferty*, [1993] N.W.T.J. No. 17 (Q.L.); *Kelliher (Village of) v. Smith*, [1931] S.C.R. 672; *Director of Public Prosecutions v. Jordan*, [1977] A.C. 699; *R. v. Marquard*, [1993] 4 S.C.R. 223; *R. v. Morin*, [1988] 2 S.C.R. 345; *R. v. McNamara (No. 1)* (1981), 56 C.C.C. (2d) 193, leave to appeal refused [1981] 1 S.C.R. xi; *Thompson v. The King*, [1918] A.C. 221; *R. v. Garfinkle* (1992), 15 C.R. (4th) 254.

## Statutes and Regulations Cited

*Criminal Code*, R.S.C., 1985, c. C-46, s. 693.

## Application à l'espèce

Rien dans le dossier ne permettait de conclure que le profil du pédophile ou du psychopathe a été normalisé au point où on pourrait soutenir qu'il correspond au profil présumé du délinquant décrit dans les accusations. Les profils de groupes décrits par l'expert n'ont pas été considérés suffisamment fiables pour être utiles. En l'absence de ces indices de fiabilité, on ne pouvait pas dire que la preuve serait nécessaire au sens où elle clarifierait utilement une question qui serait autrement inaccessible, ou que la valeur qu'elle pourrait avoir ne serait pas surpassée par la possibilité qu'elle induise le jury en erreur ou le détourne de ses tâches.

Les similitudes, expliquées par le juge, portaient sur le *modus operandi* de l'auteur des actes qui étaient l'objet de chefs spécifiques. La preuve d'expert ne visait pas ces questions. De plus, la question de savoir si la crime est commis d'une manière qui identifie l'auteur, en raison de similitudes frappantes dans la méthode utilisée pour perpétrer d'autres actes, peut être appréciée en général par un jury sans l'aide de la preuve d'expert.

## Jurisprudence

**Arrêts examinés:** *R. c. Lupien*, [1970] R.C.S. 263; *R. c. Chard* (1971), 56 Cr. App. R. 268; *Lowery c. The Queen*, [1974] A.C. 85; *R. c. Turner*, [1975] Q.B. 834; **arrêts mentionnés:** *R. c. Robertson* (1975), 21 C.C.C. (2d) 385; *R. c. McMillan* (1975), 23 C.C.C. (2d) 160, conf. par [1977] 2 R.C.S. 824; *R. c. Lavallee*, [1990] 1 R.C.S. 852; *R. c. French* (1977), 37 C.C.C. (2d) 201; *R. c. Taylor* (1986), 31 C.C.C. (3d) 1; *R. c. C. (M.H.)*, [1991] 1 R.C.S. 763; *R. c. Lyons*, [1987] 2 R.C.S. 309; *R. c. Abbey*, [1982] 2 R.C.S. 24; *R. c. B.(G.)*, [1990] 2 R.C.S. 30; *Morris c. La Reine*, [1983] 2 R.C.S. 190; *R. c. Béland*, [1987] 2 R.C.S. 398; *R. c. Melaragni* (1992), 73 C.C.C. (3d) 348; *R. c. Bourguignon*, [1991] O.J. No. 2670 (Q.L.); *R. c. Lafferty*, [1993] N.W.T.J. No. 17 (Q.L.); *Kelliher (Village of) c. Smith*, [1931] R.C.S. 672; *Director of Public Prosecutions c. Jordan*, [1977] A.C. 699; *R. c. Marquard*, [1993] 4 R.C.S. 223; *R. c. Morin*, [1988] 2 R.C.S. 345; *R. c. McNamara (No. 1)* (1981), 56 C.C.C. (2d) 193, autorisation de pourvoi refusée [1981] 1 R.C.S. xi; *Thompson c. The King*, [1918] A.C. 221; *R. c. Garfinkle* (1992), 15 C.R. (4th) 254.

## Lois et règlements cités

*Code criminel*, L.R.C. (1985), ch. C-46, art. 693.

Authors Cited

Beven, Thomas. *Negligence in Law*, 4th ed. By William James Byrne and Andrew Dewar Gibb. London: Sweet & Maxwell, 1928.

Cross, Rupert, Sir. *Cross on Evidence*, 7th ed. By Sir Rupert Cross and Colin Tapper. London: Butterworths, 1990.

McCormick, Charles Tilford. *McCormick on Evidence*, 3rd ed., Lawyer's ed. By Edward W. Cleary, general editor. St. Paul, Minn.: West Publishing Co., 1984.

Mewett, Alan W. "Character as a Fact in Issue in Criminal Cases" (1984-85), 27 *Crim. L.Q.* 29.

Pattenden, Rosemary. "Conflicting Approaches to Psychiatric Evidence in Criminal Trials: England, Canada and Australia", [1986] *Crim. L.R.* 92.

Rimm, David C. and John W. Sommervill. *Abnormal Psychology*. New York: Academic Press, 1977.

APPEAL from a judgment of the Ontario Court of Appeal (1992), 8 O.R. (3d) 173, 55 O.A.C. 309, 71 C.C.C. (3d) 321, 13 C.R. (4th) 292, allowing an appeal from convictions by Berstein J. sitting with jury and ordering a new trial. Appeal allowed.

*Jamie C. Klukach*, for the appellant.

*Brian H. Greenspan* and *Sharon E. Lavine*, for the respondent.

The judgment of the Court was delivered by

SOPINKA J. — In this appeal we are required to determine under what circumstances expert evidence is admissible to show that character traits of an accused person do not fit the psychological profile of the putative perpetrator of the offences charged. Resolution of this issue involves an examination of the rules relating to expert and character evidence.

I. Facts

A. *The Events*

The respondent, a practising pediatrician in North Bay, was charged with four counts of sexual assault on four of his female patients, aged 13 to

Doctrine citée

Beven, Thomas. *Negligence in Law*, 4th ed. By William James Byrne and Andrew Dewar Gibb. London: Sweet & Maxwell, 1928.

Cross, Rupert, Sir. *Cross on Evidence*, 7th ed. By Sir Rupert Cross and Colin Tapper. London: Butterworths, 1990.

McCormick, Charles Tilford. *McCormick on Evidence*, 3rd ed., Lawyer's ed. By Edward W. Cleary, general editor. St. Paul, Minn.: West Publishing Co., 1984.

Mewett, Alan W. «Character as a Fact in Issue in Criminal Cases» (1984-85), 27 *Crim. L.Q.* 29.

Pattenden, Rosemary. «Conflicting Approaches to Psychiatric Evidence in Criminal Trials: England, Canada and Australia», [1986] *Crim. L.R.* 92.

Rimm, David C. and John W. Sommervill. *Abnormal Psychology*. New York: Academic Press, 1977.

POURVOI contre un arrêt de la Cour d'appel de l'Ontario (1992), 8 O.R. (3d) 173, 55 O.A.C. 309, 71 C.C.C. (3d) 321, 13 C.R. (4th) 292, qui a accueilli un appel des déclarations de culpabilité prononcées par le juge Berstein, siégeant avec jury, et ordonné un nouveau procès. Pourvoi accueilli.

*Jamie C. Klukach*, pour l'appelante.

*Brian H. Greenspan* et *Sharon E. Lavine*, pour l'intimé.

Version française du jugement de la Cour rendu par

LE JUGE SOPINKA — Nous sommes appelés à déterminer en l'espèce les circonstances dans lesquelles la preuve d'expert est admissible pour démontrer que des traits de caractère d'un accusé ne répondent pas au profil psychologique de l'auteur putatif des infractions reprochées. La résolution de la question passe par l'examen des règles en matière de preuve d'expert et de moralité.

I. Les faits

A. *Les événements*

L'intimé, un pédiatre exerçant à North Bay, fait face à quatre chefs d'accusation d'agression sexuelle sur quatre de ses patientes, âgées à

16 at the relevant time. The alleged sexual assaults were perpetrated during the course of medical examinations of the patients conducted in the respondent's office. The complainants had been referred to the respondent for conditions which were, in part, psychosomatic in nature.

Evidence relating to each complaint was admitted as similar fact evidence with respect to the others. The complainants did not know one another. Three of them came forth independently. Following a mistrial, which was publicized, the fourth victim came forward, having heard about the other charges. Three of the four complainants had been victims of prior sexual abuse. With respect to two of them, the respondent knew about their sexual abuse at the hands of others. The alleged assaults consisted of fondling of the girls' breasts and digital penetration and stimulation of their vaginal areas, accompanied by intrusive questioning of them as to their sexual activities. All of the complainants testified that the respondent did not wear gloves while examining them internally. The respondent, who testified in his own defence, denied the complainants' evidence.

At the conclusion of the respondent's examination in chief, counsel for the respondent indicated that he intended to call a psychiatrist who would testify that the perpetrator of the offences alleged to have been committed would be part of a limited and unusual group of individuals and that the respondent did not fall within that narrow class because he did not possess the characteristics belonging to that group. The Crown sought a ruling on the admissibility of that evidence. The trial judge held a *voir dire* and ruled that the evidence tendered on the *voir dire* would not be admitted.

The jury found the respondent guilty as charged on November 16, 1990. He was sentenced to nine months' imprisonment on each of the four counts, to be served concurrently, and to two years' probation. The respondent appealed his convictions and the Crown appealed the sentence. The Court of Appeal allowed the respondent's appeal, quashed the convictions and ordered a new trial. Accordingly, the Court of Appeal found it was not neces-

*a*

*b*

*c*

*d*

*e*

*f*

*g*

*h*

*i*

*j*

l'époque de 13 à 16 ans. Les agressions sexuelles auraient été commises pendant l'examen médical des patientes dans le bureau de l'intimé. Les plaignantes lui avaient été référées pour des problèmes qui, en partie, étaient de nature psychosomatique.

La preuve relative à chaque plainte a été admise comme preuve de faits similaires à l'égard des autres. Les plaignantes ne se connaissaient pas. Trois d'entre elles ont porté plainte de façon indépendante. Après l'annulation d'un procès rendu public, la quatrième victime, ayant pris connaissance des accusations, s'est fait connaître. Des quatre plaignantes, trois avaient auparavant été victimes d'abus sexuels. En outre, l'intimé savait que deux d'entre elles l'avaient été par d'autres. Les agressions alléguées consistaient à avoir caressé les seins des filles et avoir pénétré et stimulé la région vaginale avec les doigts, et à leur avoir posé des questions indiscrètes sur leurs activités sexuelles. Toutes les plaignantes ont témoigné que l'intimé ne portait pas de gants pendant l'examen interne. L'intimé, qui a témoigné pour sa propre défense, a nié les témoignages des plaignantes.

À l'issue de l'interrogatoire principal de l'intimé, l'avocat de ce dernier a exprimé l'intention d'appeler un psychiatre qui témoignerait que l'auteur des infractions alléguées appartenait à un groupe limité et inhabituel d'individus et que l'intimé ne faisait pas partie de cette catégorie restreinte parce qu'il n'en possédait pas les caractéristiques propres. Le ministère public a demandé au juge du procès de se prononcer sur l'admissibilité de cette preuve. Ce dernier a tenu un voir-dire, à la suite duquel il a conclu à l'inadmissibilité de la preuve présentée au voir-dire.

Le 16 novembre 1990, le jury a déclaré l'intimé coupable des infractions reprochées. Il a été condamné à neuf mois d'emprisonnement relativement à chacun des quatre chefs, à purger concurremment, et à deux années de probation. L'intimé a interjeté appel des déclarations de culpabilité et le ministère public a interjeté appel de la sentence. La Cour d'appel a accueilli l'appel de l'intimé, annulé les déclarations de culpabilité et ordonné un

sary to deal with the Crown's sentence appeal and refused the Crown leave to appeal.

The appellant sought leave to appeal to this Court against the decision of the Ontario Court of Appeal pursuant to s. 693 of the *Criminal Code*, R.S.C., 1985, c. C-46. On December 10, 1992 leave to appeal was granted by this Court, [1992] 3 S.C.R. viii.

B. *The Excluded Evidence*

In the *voir dire*, Dr. Hill, the expert, began his testimony by explaining that there are three general personality groups that have unusual personality traits in terms of their psychosexual profile perspective. The first group encompasses the psychosexual who suffers from major mental illnesses (*e.g.*, schizophrenia) and engages in inappropriate sexual behaviour occasionally. The second and largest group contains the sexual deviation types. This group of individuals shows distinct abnormalities in terms of the choice of individuals with whom they report sexual excitement and with whom they would like to engage in some type of sexual activity. The third group is that of the sexual psychopaths. These individuals have a callous disregard for people around them, including a disregard for the consequences of their sexual behaviour towards other individuals. Another group would include pedophiles who gain sexual excitement from young adolescents, probably pubertal or post-pubertal.

Dr. Hill identified pedophiles and sexual psychopaths as examples of members of unusual and limited classes of persons. In response to questions hypothetically encompassing the allegations of the four complainants, the expert stated that the psychological profile of the perpetrator of the first three complaints would likely be that of a pedophile, while the profile of the perpetrator of the fourth complaint would likely be that of a sexual psychopath. Dr. Hill also testified that, if but one perpetrator was involved in all four complaints described in the hypothetical questions, he would

nouveau procès. Elle a ainsi conclu qu'il n'était pas nécessaire d'entendre l'appel de la sentence ·interjeté par le ministère public, et a refusé à ce dernier l'autorisation d'appeler.

L'appelante a demandé à notre Cour l'autorisation de se pourvoir contre la décision de la Cour d'appel de l'Ontario conformément à l'art. 693 du *Code criminel*, L.R.C. (1985), ch. C-46. Le 10 décembre 1992, notre Cour a accordé l'autorisation, [1992] 3 R.C.S. viii.

B. *Les éléments de preuve écartés*

Lors du voir-dire, le Dr Hill, l'expert, a d'abord expliqué qu'il existait trois groupes généraux de personnalité possédant des traits de personnalité inhabituels du point de vue de leur profil psychosexuel. Le premier groupe comprend le psychosexuel qui souffre de maladie mentale grave (par exemple, la schizophrénie) et qui adopte à l'occasion un comportement sexuel inapproprié. Le deuxième groupe, le plus large, inclut les personnes ayant des déviations sexuelles. Les individus appartenant à ce groupe présentent des anomalies marquées quant au choix des personnes auxquelles ils relient l'excitation sexuelle et avec lesquelles ils aimeraient avoir une certaine forme d'activité sexuelle. Le troisième groupe comprend les psychopathes sexuels. Ils sont totalement insensibles à l'égard des gens qui les entourent, et indifférents aux conséquences de leur comportement sexuel envers autrui. Les pédophiles formeraient un quatrième groupe. Ils sont sexuellement excités par de jeunes adolescents qui sont vraisemblablement à l'âge pubertaire ou postpubertaire.

Le Dr Hill a qualifié les pédophiles et les psychopathes sexuels d'exemples d'individus membres d'une catégorie inhabituelle et restreinte de personnes. En réponse à des questions hypothétiques réunissant les allégations des quatre plaignantes, l'expert a déclaré que le profil psychologique de l'auteur des trois premières infractions serait probablement celui d'un pédophile, alors que le profil de l'auteur de la quatrième infraction serait probablement celui d'un psychopathe sexuel. Le Dr Hill a également témoigné que, si un seul auteur était impliqué relativement aux quatre

1994 CanLII 80 (SCC)

uniquely categorize that perpetrator as a sexual psychopath. He added that such a person would belong to a very small, behaviourally distinct category of persons. Dr. Hill was asked whether a physician who acted in the manner described in the hypothetical questions would be a member of a distinct group of aberrant persons. His answer was that such behaviours could only flow from a significant abnormality of character and would be part of an unusual and limited class. In cross-examination, Dr. Hill said: "You bring an extra abnormal, extra component for the abnormality when you talk about a physician in his or her office." According to Dr. Hill, physicians who were also sexual offenders would be a small group because not only would they be breaking the usual norms of society, but they would also be breaking out against the norms of the medical profession which are very strict given the intimate contact necessary to treat patients. It was contemplated that Dr. Hill would go on to testify "to the effect that Doctor Mohan does not have the characteristics attributable to any of the three groups in which most sex offenders fall."

## II. Judgments Below

### A. *High Court of Justice* (Ruling on *Voir Dire*) (Bernstein J.)

In ruling on the admissibility of Dr. Hill's evidence, the trial judge stated the issues as follows:

One: Did the offences alleged to have been committed by the accused have unusual features which would indicate that anyone who committed them was a member of a limited and distinguishable group?

Two: Did the psychiatrist have the necessary qualifications and expertise to venture an opinion on the first issue so as to be helpful to the jury?

The trial judge noted that Dr. Hill had personally interviewed and treated three doctors who engaged in criminal sexual misconduct with their patients. He also noted that Dr. Hill admitted that

plaintes décrites dans les questions hypothétiques, il le qualifierait de psychopathe sexuel uniquement. Il a ajouté qu'une telle personne appartiendrait à un groupe très restreint de personnes distinctes du point de vue de leur comportement. On a demandé au Dr Hill si un médecin agissant de la manière décrite dans les questions hypothétiques ferait partie d'un groupe distinct de personnes anormales. Il a répondu que de tels comportements ne pouvaient que découler d'une grave anomalie du caractère et feraient partie d'une catégorie inhabituelle et restreinte. En contre-interrogatoire, le Dr Hill a dit: [TRADUCTION] «Vous apportez une anomalie supplémentaire, un élément supplémentaire d'anomalie lorsque vous parlez d'un médecin dans son bureau.» Selon le Dr Hill, les médecins qui sont également des délinquants sexuels seraient peu nombreux parce que non seulement ils violent les normes ordinaires de la société, mais aussi les normes de la profession médicale, qui sont très strictes étant donné le contact intime inhérent au traitement des patients. On prévoyait que le Dr Hill témoignerait ensuite [TRADUCTION] «que le Dr Mohan ne possède pas les caractéristiques attribuables à l'un des trois groupes auxquels appartiennent la plupart des délinquants sexuels.»

## II. Les juridictions inférieures

### A. *La Haute Cour de Justice* (décision relativement au voir-dire) (le juge Bernstein)

En se prononçant sur l'admissibilité du témoignage du Dr Hill, le juge du procès a formulé ainsi les questions en litige:

[TRADUCTION]

(1) Les infractions imputées à l'accusé avaient-elles des caractéristiques inhabituelles indiquant que quiconque les a commises appartient à un groupe restreint et distinctif?

(2) Le psychiatre possédait-il les compétences et l'expérience nécessaires pour exprimer sur la première question une opinion qui soit utile au jury?

Le juge du procès a signalé que le Dr Hill avait lui-même interrogé et traité trois médecins ayant eu un comportement sexuel criminel avec leurs patients. Il a également signalé que le Dr Hill avait

he was not aware of any scientific study or literature related to the psychiatric make-up of doctors who sexually abuse their patients and that his experience with three admitted offenders who were doctors was not a sufficient basis to allow him to make any generalizations on the subject. Dr. Hill acknowledged that he, as a psychiatrist, is unable to diagnose individuals as having the distinct characteristics of a pedophile or of a homosexual until the patient has performed an overt act which suggests the existence of the characteristic.

The trial judge reviewed the case law in which the use of such psychiatric evidence had been discussed (*i.e.*, *R. v. Lupien*, [1970] S.C.R. 263; *R. v. Robertson* (1975), 21 C.C.C. (2d) 385 (Ont. C.A.); *R. v. McMillan* (1975), 23 C.C.C. (2d) 160 (Ont. C.A.); *R. v. Lavallee*, [1990] 1 S.C.R. 852; *R. v. French* (1977), 37 C.C.C. (2d) 201 (Ont. C.A.); *R. v. Taylor* (1986), 31 C.C.C. (3d) 1 (Ont. C.A.)). From these cases, the trial judge concluded that the use of psychiatric evidence has been greatly expanded since *R. v. Lupien*. He cited the following words of Martin J.A. in *R. v. Robertson* (at p. 423):

Evidence that the offence has distinctive features which identified the perpetrator as a person possessing unusual personality traits constituting him a member of an unusual and limited class of persons would render admissible evidence that the accused did not possess the personality characteristics of the class of persons to which the perpetrator of the crime belonged.

The trial judge also relied on the following passage of *R. v. McMillan* (at p. 175):

I leave open, until the question is required to be decided, whether when the crime is one assumed to be committed by normal persons, *e.g.*, rape, psychiatric evidence is admissible to show that the accused is a member of an abnormal group, possessing characteristics which make it improbable that he committed the offence, *e.g.*, that he is a homosexual with an aversion to heterosexual relations. I am disposed, however, to think that such evidence is admissible.

admis qu'il ne connaissait aucune étude ou documentation scientifique relative au portrait psychiatrique des médecins qui abusent sexuellement de leurs patients, et que son expérience acquise auprès des trois délinquants reconnus, qui étaient des médecins, ne lui permettait pas de faire des généralisations sur le sujet. Le Dr Hill a reconnu qu'à titre de psychiatre, il n'était pas en mesure de diagnostiquer chez des individus les caractéristiques distinctes d'un pédophile ou d'un homosexuel, tant que le patient n'avait pas commis d'acte manifeste pouvant indiquer l'existence de la caractéristique.

Le juge du procès a passé en revue la jurisprudence dans laquelle l'utilisation de la preuve psychiatrique a été analysée (p. ex., *R. c. Lupien*, [1970] R.C.S. 263; *R. c. Robertson* (1975), 21 C.C.C. (2d) 385 (C.A. Ont.); *R. c. McMillan* (1975), 23 C.C.C. (2d) 160 (C.A. Ont.); *R. c. Lavallee*, [1990] 1 R.C.S. 852; *R. c. French* (1977), 37 C.C.C. (2d) 201 (C.A. Ont.); *R. c. Taylor* (1986), 31 C.C.C. (3d) 1 (C.A. Ont.)). Fort de ces arrêts, le juge du procès a conclu que l'utilisation de la preuve psychiatrique a considérablement été élargie depuis l'arrêt *R. c. Lupien*. Il a repris les propos suivants du juge Martin de la Cour d'appel dans l'arrêt *R. c. Robertson* (à la p. 423):

[TRADUCTION] La preuve que l'infraction présente des caractéristiques distinctives qui identifient l'auteur du crime comme une personne possédant des traits de personnalité inhabituels, qui le rattachent ainsi à une catégorie inhabituelle et restreinte de personnes, rendrait admissible la preuve que l'accusé ne possédait pas les traits de personnalité propres à la catégorie à laquelle l'auteur du crime appartient.

Le juge du procès a également invoqué le passage suivant de l'arrêt *R. c. McMillan* (à la p. 175):

[TRADUCTION] Je laisse ouverte, jusqu'à ce qu'elle doive être tranchée, la question de savoir, lorsqu'un crime, comme le viol, est présumé être commis par des personnes normales, si la preuve psychiatrique est admissible pour établir que l'accusé fait partie d'un groupe anormal possédant des caractéristiques en raison desquelles il est peu probable qu'il ait commis l'infraction, comme le fait qu'il soit un homosexuel ayant une aversion pour les relations hétérosexuelles. Je suis toutefois disposé à penser qu'une telle preuve est admissible.

1994 CanLII 80 (SCC)

After relying on *R. v. McMillan*, the trial judge held:

Doctor Hill is of the opinion that sexual assault is a crime committed by a distinguishable group. As I read the cases, I came to the conclusion that it is the size and the degree of distinctiveness of the "unusual and limited class of persons" which determines whether expert opinion will be helpful in defining the class and categorizing accused persons within or without the group. These days it is trite to say that a large number of men from all walks of life commit sexual offences on young women. While all may have some type of character disorder, I doubt that expert evidence regarding the normality of any given accused would be of assistance to a trier of fact absent some more distinguishing within the wide spectrum of sexual assault.

The evidence of Doctor Hill is not sufficient, I believe, to establish that doctors who commit sexual assaults on patients are in a significantly more limited group in psychiatric terms than are other members of society. There is no scientific data available to warrant that conclusion. A sample of three offenders is not a sufficient basis for such a conclusion. Even the allegations of the fourth complainant . . . are not so unusual, as sex offenders go, to warrant a conclusion that the perpetrator must have belonged to a sufficiently narrow class.

I conclude that if the evidence was received as proposed, it would merely be character evidence of a type that is inadmissible as going beyond evidence of general reputation, and does not fall within the proper sphere of expert evidence.

B. *Ontario Court of Appeal* (1992), 8 O.R. (3d) 173

It was apparent for Finlayson J.A., who wrote the court's judgment, that the trial judge's conclusions were based on a misapprehension of the evidence of Dr. Hill. Finlayson J.A. stated that Dr. Hill did not base his opinion on case studies of the three physicians he had as patients who were accused of sexual crimes. Rather, Finlayson J.A. was of the view at p. 177 that, in concluding that the perpetrators in the hypothetical examples would fall into an unusual and limited class of persons, and that, if the perpetrator were a physician, the class into which he would fall would be even

Après avoir invoqué l'arrêt *R. c. McMillan*, le juge du procès a déclaré:

[TRADUCTION] Selon le Docteur Hill, l'agression sexuelle est un crime commis par un groupe distinctif. Compte tenu de la jurisprudence, je conclus que c'est l'importance et le degré de distinction de la «catégorie inhabituelle et restreinte de personnes» qui détermine si l'opinion d'un expert contribuera à définir la catégorie et à inclure les accusés dans ce groupe ou à les en exclure. Il va sans dire qu'un grand nombre d'hommes de tous les milieux commettent des infractions sexuelles sur de jeunes femmes. S'il se peut que tous souffrent d'une forme de désordre mental, je doute que la preuve d'expert portant sur la normalité d'un accusé soit utile au juge des faits en l'absence d'un élément plus distinctif se situant à l'intérieur du large spectre de l'agression sexuelle.

À mon avis, le témoignage du Docteur Hill ne suffit pas à établir que les médecins qui agressent sexuellement leurs patients forment un groupe beaucoup plus restreint sur le plan psychiatrique que les autres membres de la société. Aucune donnée scientifique ne justifie cette conclusion. Un échantillon de trois délinquants ne suffit pas comme fondement à une telle conclusion. Même les allégations de la quatrième plaignante [. . .] ne sont pas inhabituelles, en ce qui concerne les délinquants sexuels, au point de justifier la conclusion que l'auteur du crime devait appartenir à une catégorie suffisamment restreinte.

Je conclus que, si la preuve proposée était admise, elle ne serait qu'une preuve de moralité sous une forme inadmissible puisqu'elle excède la preuve de la réputation générale, et qu'elle n'entre pas dans la sphère de la preuve d'expert.

B. *La Cour d'appel de l'Ontario* (1992), 8 O.R. (3d) 173

Il était évident pour le juge Finlayson, qui s'est prononcé au nom de la cour, que le juge du procès avait tiré des conclusions fondées sur une mauvaise compréhension du témoignage du Dr Hill. Le juge Finlayson a déclaré que l'opinion du Dr Hill ne reposait pas sur le cas des trois médecins qu'il avait traités et qui avaient été accusés de crimes sexuels. Au contraire, le juge Finlayson s'est dit d'avis, à la p. 177, que pour conclure que les auteurs, dans les exemples hypothétiques, tomberaient dans une catégorie inhabituelle et restreinte de personnes et que, si l'auteur du crime était un

narrower, Dr. Hill based his opinion on all of his experience:

With respect, I think the learned trial judge was in error, in that he ruled on the sufficiency of the evidence of Dr. Hill, not its admissibility. It was up to the jury to consider what weight should be given to the expert opinion. Crown counsel suggested on appeal that the trial judge was ruling on the qualifications of the expert witness to give the opinion that he did. I do not think that is a correct interpretation of the trial judge's reasons. Dr. Hill's qualifications are outstanding and no attempt was made at trial to challenge them. I think the trial judge was saying that Dr. Hill's personal experience in dealing with sex-offending physicians and the lack of scientific literature specific to such physicians did not justify Dr. Hill giving the opinion that he did. In my opinion, in restricting his interpretation of Dr. Hill's testimony to "doctors who commit sexual assaults on patients", the trial judge misapprehended the opinion of Dr. Hill and the broad psychiatric experience upon which it was based.

Finlayson J.A. went on to say that the evidence of Dr. Hill was admissible on two bases. On the first basis, given that similar fact evidence was admitted showing that the acts compared are so unusual and strikingly similar that their similarities cannot be attributed to coincidence, Dr. Hill's testimony was admissible to show that the offences alleged were unlikely to have been committed by the same person (*R. v. C. (M.H.)*, [1991] 1 S.C.R. 763).

On the second basis, it was admissible to show that the respondent was not a member of either of the unusual groups of aberrant personalities which could have committed the offenses alleged. Referring to *R. v. Lupien*, *supra*, at pp. 275-78, *R. v. Robertson*, *supra*, at p. 425, and *R. v. McMillan*, *supra*, Finlayson J.A. held that it is settled law that opinion evidence showing that the accused did or did not possess the distinguishing characteristics of an abnormal group is admissible in a criminal case, where it would appear that the perpetrator of the crime alleged is a person with an abnormal propensity or disposition which stamps him or her as being a member of that special and extraordi-

médecin, la catégorie à laquelle il appartiendrait serait encore plus restreinte, le Dr Hill a fondé son opinion sur son expérience générale:

[TRADUCTION] Avec égards, j'estime que le juge du procès a commis une erreur puisqu'il s'est prononcé sur la suffisance du témoignage du Dr Hill et non sur son admissibilité. Il appartenait au jury d'apprécier la valeur de l'opinion d'expert. Le ministère public a donné à entendre en appel que le juge du procès se prononçait sur les compétences du témoin expert pour exprimer l'opinion en cause. Je ne crois pas qu'il s'agisse là d'une interprétation juste des motifs du juge du procès. Les compétences du Dr Hill sont remarquables et personne n'a tenté de les contester au procès. À mon avis, le juge du procès affirmait que l'expérience personnelle du Dr Hill acquise auprès des médecins auteurs d'infractions sexuelles, d'une part, et l'absence de documentation scientifique sur de tels médecins, d'autre part, ne permettaient pas au Dr Hill d'exprimer l'opinion en cause. À mon avis, en restreignant aux «médecins qui agressent sexuellement leurs patients» son interprétation de l'opinion du Dr Hill, le juge du procès a mal interprété celle-ci et la grande expérience psychiatrique sur laquelle elle est fondée.

Le juge Finlayson a ensuite ajouté que le témoignage du Dr Hill était admissible pour deux motifs. D'une part, étant donné que la preuve de faits similaires admise démontre que les actes comparés sont si inhabituels et d'une similitude si frappante qu'on ne peut attribuer celle-ci à la coïncidence, le témoignage du Dr Hill était admissible pour démontrer qu'il était peu probable que les infractions alléguées aient été commises par la même personne (*R. c. C. (M.H.)*, [1991] 1 R.C.S. 763).

Par ailleurs, il était admissible pour démontrer que l'intimé n'était pas membre des groupes inhabituels de personnalités anormales qui auraient pu commettre les infractions alléguées. Invoquant les arrêts *R. c. Lupien*, précité, aux pp. 275 à 278; *R. c. Robertson*, précité, à la p. 425 et *R. c. McMillan*, précité, le juge Finlayson a conclu qu'il est établi en droit que le témoignage d'opinion qui démontre que l'accusé possédait ou ne possédait pas les caractéristiques distinctives d'un groupe anormal est admissible dans une affaire criminelle lorsqu'il appert que l'auteur du crime reproché a une propension ou une prédisposition anormale qui indique qu'il est membre de cette catégorie (ou

nary class (or group). In this case, the psychiatrist showed that pedophiles and sexual psychopaths are members of special and extraordinary classes. Considering also the issues put to the jury in the case at bar (complex psychological issues, testimonial trustworthiness), Finlayson J.A. held that evidence of persons with professional psychiatric experience in dealing with sexual offences would be of assistance (based on: *R. v. Lyons*, [1987] 2 S.C.R. 309; *R. v. Abbey*, [1982] 2 S.C.R. 24; *R. v. Lavallee*, *supra*; *R. v. B.(G.)*, [1990] 2 S.C.R. 30).

The court allowed the respondent's appeal, quashed the convictions and ordered a new trial. Accordingly, the Court of Appeal refused leave to the Crown's sentence appeal.

III.  Analysis

The admissibility of the rejected evidence was analyzed in argument under two exclusionary rules of evidence: (1) expert opinion evidence, and (2) character evidence. I have concluded that, on the basis of the principles relating to exceptions to the character evidence rule and under the principles governing the admissibility of expert evidence, the limitations on the use of this type of evidence require that the evidence in this case be excluded.

(1)  *Expert Opinion Evidence*

Admission of expert evidence depends on the application of the following criteria:

(a) relevance;

(b) necessity in assisting the trier of fact;

(c) the absence of any exclusionary rule;

(d) a properly qualified expert.

(a)  Relevance

Relevance is a threshold requirement for the admission of expert evidence as with all other evidence. Relevance is a matter to be decided by a judge as question of law. Although *prima facie* admissible if so related to a fact in issue that it

groupe) spéciale et extraordinaire. En l'espèce, le psychiatre a démontré que les pédophiles et les psychopathes sexuels appartiennent à des catégories spéciales et extraordinaires. Tenant compte également des questions soumises au jury en l'espèce (questions psychologiques complexes, fiabilité du témoignage), le juge Finlayson a conclu que le témoignage de personnes dotées d'une expérience psychiatrique professionnelle dans le domaine des infractions sexuelles serait utile (fondé sur: *R. c. Lyons*, [1987] 2 R.C.S. 309; *R. c. Abbey*, [1982] 2 R.C.S. 24; *R. c. Lavallee*, précité; *R. c. B.(G.)*, [1990] 2 R.C.S. 30).

La cour a accueilli l'appel de l'intimé, annulé les déclarations de culpabilité et ordonné un nouveau procès. Elle n'a donc pas autorisé le ministère public à en appeler de la sentence.

III.  Analyse

L'admissibilité de la preuve écartée a été analysée en plaidoirie au regard de deux règles d'exclusion de la preuve: (1) le témoignage d'opinion d'un expert et (2) la preuve de moralité. Compte tenu des principes qui gouvernent les exceptions à la règle en matière de preuve de moralité et de ceux qui gouvernent l'admissibilité de la preuve d'expert, j'ai conclu que les restrictions imposées à l'utilisation de ce type de preuve exigent d'écarter le témoignage en l'espèce.

(1)  *Témoignage d'opinion d'un expert*

L'admission de la preuve d'expert repose sur l'application des critères suivants:

a) la pertinence;

b) la nécessité d'aider le juge des faits;

c) l'absence de toute règle d'exclusion;

d) la qualification suffisante de l'expert.

a)  La pertinence

Comme pour toute autre preuve, la pertinence est une exigence liminaire pour l'admission d'une preuve d'expert. La pertinence est déterminée par le juge comme question de droit. Bien que la preuve soit admissible à première vue si elle est à

1994 CanLII 80 (SCC)

tends to establish it, that does not end the inquiry. This merely determines the logical relevance of the evidence. Other considerations enter into the decision as to admissibility. This further inquiry may be described as a cost benefit analysis, that is "whether its value is worth what it costs." See *McCormick on Evidence* (3rd ed. 1984), at p. 544. Cost in this context is not used in its traditional economic sense but rather in terms of its impact on the trial process. Evidence that is otherwise logically relevant may be excluded on this basis, if its probative value is overborne by its prejudicial effect, if it involves an inordinate amount of time which is not commensurate with its value or if it is misleading in the sense that its effect on the trier of fact, particularly a jury, is out of proportion to its reliability. While frequently considered as an aspect of legal relevance, the exclusion of logically relevant evidence on these grounds is more properly regarded as a general exclusionary rule (see *Morris v. The Queen*, [1983] 2 S.C.R. 190). Whether it is treated as an aspect of relevance or an exclusionary rule, the effect is the same. The reliability versus effect factor has special significance in assessing the admissibility of expert evidence.

There is a danger that expert evidence will be misused and will distort the fact-finding process. Dressed up in scientific language which the jury does not easily understand and submitted through a witness of impressive antecedents, this evidence is apt to be accepted by the jury as being virtually infallible and as having more weight than it deserves. As La Forest J. stated in *R. v. Béland*, [1987] 2 S.C.R. 398, at p. 434, with respect to the evidence of the results of a polygraph tendered by the accused, such evidence should not be admitted by reason of "human fallibility in assessing the proper weight to be given to evidence cloaked under the mystique of science". The application of this principle can be seen in cases such as *R. v. Melaragni* (1992), 73 C.C.C. (3d) 348, in which Moldaver J. applied a threshold test of reliability to what he described, at p. 353, as "a new scientific

ce point liée au fait concerné qu'elle tend à l'établir, l'analyse ne se termine pas là. Cela établit seulement la pertinence logique de la preuve. D'autres considérations influent également sur la décision relative à l'admissibilité. Cet examen supplémentaire peut être décrit comme une analyse du coût et des bénéfices, à savoir «si la valeur en vaut le coût.» Voir *McCormick on Evidence* (3e éd. 1984), à la p. 544. Le coût dans ce contexte n'est pas utilisé dans le sens économique traditionnel du terme, mais plutôt par rapport à son impact sur le procès. La preuve qui est par ailleurs logiquement pertinente peut être exclue sur ce fondement si sa valeur probante est surpassée par son effet préjudiciable, si elle exige un temps excessivement long qui est sans commune mesure avec sa valeur ou si elle peut induire en erreur en ce sens que son effet sur le juge des faits, en particulier le jury, est disproportionné par rapport à sa fiabilité. Bien qu'elle ait été fréquemment considérée comme un aspect de la pertinence juridique, l'exclusion d'une preuve logiquement pertinente, pour ces raisons, devrait être considérée comme une règle générale d'exclusion (voir *Morris c. La Reine*, [1983] 2 R.C.S. 190). Qu'elle soit traitée comme un aspect de la pertinence ou une règle d'exclusion, son effet est le même. Ce facteur fiabilité-effet revêt une importance particulière dans l'appréciation de l'admissibilité de la preuve d'expert.

La preuve d'expert risque d'être utilisée à mauvais escient et de fausser le processus de recherche des faits. Exprimée en des termes scientifiques que le jury ne comprend pas bien et présentée par un témoin aux qualifications impressionnantes, cette preuve est susceptible d'être considérée par le jury comme étant pratiquement infaillible et comme ayant plus de poids qu'elle ne le mérite. Comme le juge La Forest l'a dit dans l'arrêt *R. c. Béland*, [1987] 2 R.C.S. 398, à la p. 434, relativement au témoignage sur les résultats d'un détecteur de mensonges produits par l'accusé, une telle preuve ne devrait pas être admise en raison de «la faillibilité humaine dans l'évaluation du poids à donner à la preuve empreinte de la mystique de la science». On a appliqué ce principe dans des décisions comme *R. c. Melaragni* (1992), 73 C.C.C. (3d) 348, dans laquelle le juge Moldaver a appliqué un

technique or body of scientific knowledge". Moldaver J. also mentioned two other factors, *inter alia*, which should be considered in such circumstances (at p. 353):

(1) Is the evidence likely to assist the jury in its fact-finding mission, or is it likely to confuse and confound the jury?

(2) Is the jury likely to be overwhelmed by the "mystic infallibility" of the evidence, or will the jury be able to keep an open mind and objectively assess the worth of the evidence?

A similar approach was adopted in *R. v. Bourguignon*, [1991] O.J. No. 2670 (Q.L.), where, in ruling upon a *voir dire* concerning the admissibility of D.N.A. evidence, Flanigan J. admitted most of the evidence but excluded statistical evidence about the probability of a match between the DNA contained in samples taken from the accused and those taken from the scene of a crime. The learned judge explained:

This Court does not think that the criminal jurisdiction of Canada is yet ready to put such an additional pressure on a jury, by making them overcome such fantastic odds and asking them to weigh it as just one piece of evidence to be considered in the overall picture of all the evidence presented. There is a real danger that the jury will use the evidence as a measure of the probability of the accused's guilt or innocence and thereby undermine the presumption of innocence and erode the value served by the reasonable doubt standard. As said in the Schwartz case: "dehumanize our justice system".

I would therefore, rule admissible the D.N.A. testing evidence but not the statistic probabilities. This restriction can be easily overcome by evidence that "such matches are rare" or "extremely rare" or words to the same effect, which will put the jury in a better position to assess such evidence and protect the right of the accused to a fair trial.

It should be noted that, subsequently, other courts have rejected the distinction drawn by Flanigan J. and have admitted both DNA evidence and the evi-

critère préliminaire de fiabilité à ce qu'il a qualifié de [TRADUCTION] «nouvelle technique ou discipline scientifique» (p. 353). Le juge Moldaver a également mentionné deux facteurs, entre autres, qui devraient être considérés dans de telles circonstances (à la p. 353):

[TRADUCTION]

(1) La preuve est-elle susceptible de faciliter la tâche de recherche des faits du jury, ou susceptible de l'embrouiller et de le dérouter?

(2) Le jury est-il susceptible d'être écrasé par l'«infaillibilité mystique» de la preuve, ou sera-t-il capable de garder l'esprit ouvert et d'en apprécier objectivement la valeur?

Un point de vue semblable a été adopté dans la décision *R. c. Bourguignon*, [1991] O.J. No. 2670 (Q.L.) où, se prononçant sur un voir-dire concernant l'admissibilité de la preuve d'ADN, le juge Flanigan a admis la plus grande partie de la preuve en excluant toutefois les statistiques sur la probabilité que l'ADN prélevé sur des échantillons recueillis sur l'accusé concorde avec celui prélevé sur la scène du crime. Le juge s'est exprimé ainsi:

[TRADUCTION] Notre Cour ne croit pas que la juridiction criminelle au Canada soit prête à imposer une pression supplémentaire aux membres du jury en exigeant d'eux qu'ils surmontent des obstacles aussi énormes et qu'ils la pondèrent comme un simple élément de preuve à examiner dans le cadre de l'ensemble de la preuve produite. Il y a un danger réel que le jury utilise la preuve comme une mesure de la probabilité de la culpabilité ou de l'innocence de l'accusé et que cela mine la présomption d'innocence et la valeur que présente la norme du doute raisonnable. Comme on l'a dit dans l'affaire Schwartz, «déshumaniser notre système de justice».

Je déclarerais par conséquent admissible la preuve de l'analyse d'A.D.N., mais pas les probabilités statistiques. Cette restriction peut facilement être surmontée par la preuve qu'«une telle concordance est rare» ou «extrêmement rare» ou par une formulation de ce genre, ce qui permettra au jury de mieux apprécier la preuve en question et protégera le droit de l'accusé à un procès équitable.

Il y a lieu de signaler que, par la suite, d'autres tribunaux ont rejeté la distinction établie par le juge Flanigan et ont admis tant la preuve d'ADN que la

dence regarding statistical probabilities of a match. (See, *e.g.*, *R. v. Lafferty*, [1993] N.W.T.J. No. 17 (Q.L.)). I rely on *R. v. Bourguignon*, *supra*, simply to illustrate the mode of approach adopted there and leave the specific issue decided by Flanigan J. to be considered when it arises.

#### (b) Necessity in Assisting the Trier of Fact

In *R. v. Abbey*, *supra*, Dickson J., as he then was, stated, at p. 42:

> With respect to matters calling for special knowledge, an expert in the field may draw inferences and state his opinion. An expert's function is precisely this: to provide the judge and jury with a ready-made inference which the judge and jury, due to the technical nature of the facts, are unable to formulate. "An expert's opinion is admissible to furnish the Court with scientific information which is likely to be outside the experience and knowledge of a judge or jury. If on the proven facts a judge or jury can form their own conclusions without help, then the opinion of the expert is unnecessary" (*Turner* (1974), 60 Crim. App. R. 80, at p. 83, *per* Lawton L.J.)

This pre-condition is often expressed in terms as to whether the evidence would be helpful to the trier of fact. The word "helpful" is not quite appropriate and sets too low a standard. However, I would not judge necessity by too strict a standard. What is required is that the opinion be necessary in the sense that it provide information "which is likely to be outside the experience and knowledge of a judge or jury": as quoted by Dickson J. in *R. v. Abbey*, *supra*. As stated by Dickson J., the evidence must be necessary to enable the trier of fact to appreciate the matters in issue due to their technical nature. In *Kelliher (Village of) v. Smith*, [1931] S.C.R. 672, at p. 684, this Court, quoting from *Beven on Negligence* (4th ed. 1928), at p. 141, stated that in order for expert evidence to be admissible, "[t]he subject-matter of the inquiry must be such that ordinary people are unlikely to form a correct judgment about it, if unassisted by persons with special knowledge". More recently, in *R. v. Lavallee*, *supra*, the above passages from *Kelliher* and *Abbey* were applied to admit expert

preuve relative aux probabilités statistiques d'une concordance. (Voir, p. ex., *R. c. Lafferty*, [1993] N.W.T.J. No. 17 (Q.L.)). Je m'appuie sur l'arrêt *R. c. Bourguignon*, précité, seulement pour illustrer la méthode adoptée dans cette affaire et je laisse la question précise tranchée par le juge Flanigan à considérer quand elle sera soulevée.

#### b) La nécessité d'aider le juge des faits

Dans l'arrêt *R. c. Abbey*, précité, le juge Dickson, plus tard Juge en chef, a dit à la p. 42:

> Quant aux questions qui exigent des connaissances particulières, un expert dans le domaine peut tirer des conclusions et exprimer son avis. Le rôle d'un expert est précisément de fournir au juge et au jury une conclusion toute faite que ces derniers, en raison de la technicité des faits, sont incapables de formuler. [TRADUCTION] «L'opinion d'un expert est recevable pour donner à la cour des renseignements scientifiques qui, selon toute vraisemblance, dépassent l'expérience et la connaissance d'un juge ou d'un jury. Si, à partir des faits établis par la preuve, un juge ou un jury peut à lui seul tirer ses propres conclusions, alors l'opinion de l'expert n'est pas nécessaire» (*Turner* (1974), 60 Crim. App. R. 80, à la p. 83, le lord juge Lawton).

Cette condition préalable est fréquemment reprise dans la question de savoir si la preuve serait utile au juge des faits. Le mot «utile» n'est pas tout à fait juste car il établit un seuil trop bas. Toutefois, je ne jugerais pas la nécessité selon une norme trop stricte. L'exigence est que l'opinion soit nécessaire au sens qu'elle fournit des renseignements «qui, selon toute vraisemblance, dépassent l'expérience et la connaissance d'un juge ou d'un jury»: cité par le juge Dickson, dans *Abbey*, précité. Comme le juge Dickson l'a dit, la preuve doit être nécessaire pour permettre au juge des faits d'apprécier les questions en litige étant donné leur nature technique. Dans l'arrêt *Kelliher (Village of) c. Smith*, [1931] R.C.S. 672, à la p. 684, notre Cour, citant *Beven on Negligence* (4e éd. 1928) à la p. 141, a déclaré que la preuve d'expert était admissible si [TRADUCTION] «l'objet de l'analyse est tel qu'il est peu probable que des personnes ordinaires puissent former un jugement juste à cet égard sans l'assistance de personnes possédant des connaissances spéciales». Plus récemment, dans

evidence as to the state of mind of a "battered" woman. The judgment stressed that this was an area that is not understood by the average person.

As in the case of relevance, discussed above, the need for the evidence is assessed in light of its potential to distort the fact-finding process. As stated by Lawton L.J. in *R. v. Turner*, [1975] Q.B. 834, at p. 841, and approved by Lord Wilberforce in *Director of Public Prosecutions v. Jordan*, [1977] A.C. 699, at p. 718:

"An expert's opinion is admissible to furnish the court with scientific information which is likely to be outside the experience and knowledge of a judge or jury. If on the proven facts a judge or jury can form their own conclusions without help, then the opinion of an expert is unnecessary. In such a case if it is given dressed up in scientific jargon it may make judgment more difficult. The fact that an expert witness has impressive scientific qualifications does not by that fact alone make his opinion on matters of human nature and behaviour within the limits of normality any more helpful than that of the jurors themselves; but there is a danger that they may think it does."

The possibility that evidence will overwhelm the jury and distract them from their task can often be offset by proper instructions.

There is also a concern inherent in the application of this criterion that experts not be permitted to usurp the functions of the trier of fact. Too liberal an approach could result in a trial's becoming nothing more than a contest of experts with the trier of fact acting as referee in deciding which expert to accept.

These concerns were the basis of the rule which excluded expert evidence in respect of the ultimate issue. Although the rule is no longer of general application, the concerns underlying it remain. In light of these concerns, the criteria of relevance and necessity are applied strictly, on occasion, to exclude expert evidence as to an ultimate issue.

l'arrêt *R. c. Lavallee*, précité, les passages précités des arrêts *Kelliher* et *Abbey* ont été appliqués pour admettre une preuve d'expert sur l'état d'esprit d'une femme «battue». On a souligné qu'il s'agissait là d'un domaine que la personne ordinaire ne comprend pas.

Comme la pertinence, analysée précédemment, la nécessité de la preuve est évaluée à la lumière de la possibilité qu'elle fausse le processus de recherche des faits. Comme le lord juge Lawton l'a remarqué dans l'arrêt *R. c. Turner*, [1975] Q.B. 834, à la p. 841, qui a été approuvé par lord Wilberforce dans l'arrêt *Director of Public Prosecutions c. Jordan*, [1977] A.C. 699, à la p. 718:

[TRADUCTION] «L'opinion d'un expert est recevable pour donner à la cour des renseignements scientifiques qui, selon toute vraisemblance, dépassent l'expérience et la connaissance d'un juge ou d'un jury. Si, à partir des faits établis par la preuve, un juge ou un jury peut à lui seul tirer ses propres conclusions, alors l'opinion de l'expert n'est pas nécessaire. Dans un tel cas, si elle est exprimée dans un jargon scientifique, elle rend la tâche de juger plus difficile. Le seul fait qu'un témoin expert possède des qualifications scientifiques impressionnantes ne signifie pas que son opinion sur les questions de la nature et du comportement humains dans le cadre de la normalité est plus utile que celle des jurés eux-mêmes; ces derniers risquent toutefois de croire qu'elle l'est.»

La possibilité que la preuve ait un impact excessif sur le jury et le détourne de ses tâches peut souvent être contrecarrée par des directives appropriées.

Il y a également la crainte inhérente à l'application de ce critère que les experts ne puissent usurper les fonctions du juge des faits. Une conception trop libérale pourrait réduire le procès à un simple concours d'experts, dont le juge des faits se ferait l'arbitre en décidant quel expert accepter.

Ces préoccupations sont le fondement de la règle d'exclusion de la preuve d'expert relativement à une question fondamentale. Bien que la règle ne soit plus d'application générale, les préoccupations qui la sous-tendent demeurent. En raison de ces préoccupations, les critères de pertinence et de nécessité sont à l'occasion appliqués strictement

1994 CanLII 80 (SCC)

Expert evidence as to credibility or oath-helping has been excluded on this basis. See *R. v. Marquard*, [1993] 4 S.C.R. 223, *per* McLachlin J.

#### (c) The Absence of any Exclusionary Rule

Compliance with criteria (a), (b) and (d) will not ensure the admissibility of expert evidence if it falls afoul of an exclusionary rule of evidence separate and apart from the opinion rule itself. For example, in *R. v. Morin*, [1988] 2 S.C.R. 345, evidence elicited by the Crown in cross-examination of the psychiatrist called by the accused was inadmissible because it was not shown to be relevant other than as to the disposition to commit the crime charged. Notwithstanding, therefore, that the evidence otherwise complied with the criteria for the admission of expert evidence it was excluded by reason of the rule that prevents the Crown from adducing evidence of the accused's disposition unless the latter has placed his or her character in issue. The extent of the restriction when such evidence is tendered by the accused lies at the heart of this case and will be discussed hereunder.

#### (d) A Properly Qualified Expert

Finally the evidence must be given by a witness who is shown to have acquired special or peculiar knowledge through study or experience in respect of the matters on which he or she undertakes to testify.

In summary, therefore, it appears from the foregoing that expert evidence which advances a novel scientific theory or technique is subjected to special scrutiny to determine whether it meets a basic threshold of reliability and whether it is essential in the sense that the trier of fact will be unable to come to a satisfactory conclusion without the assistance of the expert. The closer the evidence approaches an opinion on an ultimate issue, the stricter the application of this principle.

pour exclure la preuve d'expert sur une question fondamentale. La preuve d'expert sur la crédibilité ou la justification a été exclue pour ce motif. Voir l'arrêt *R. c. Marquard*, [1993] 4 R.C.S. 223, les motifs du juge McLachlin.

#### c) L'absence de toute règle d'exclusion

Le respect des critères a), b) et d) n'assurera pas l'admissibilité de la preuve d'expert si celle-ci contrevient à une règle d'exclusion de la preuve, distincte de la règle applicable à l'opinion. Ainsi, dans l'arrêt *R. c. Morin*, [1988] 2 R.C.S. 345, la preuve obtenue par le ministère public en contre-interrogatoire du psychiatre cité par l'accusé a été jugée inadmissible parce qu'il n'avait pas été établi qu'elle était pertinente autrement que relativement à la propension à commettre le crime reproché. En dépit du fait que la preuve respectait par ailleurs les critères d'admissibilité de la preuve d'expert, elle a donc été exclue sur le fondement de la règle qui interdit au ministère public de produire une preuve de la propension de l'accusé à moins que ce dernier n'ait mis sa moralité en jeu. La portée de la restriction, lorsqu'une telle preuve est produite par l'accusé, est au cœur même de la présente affaire, et sera analysée ci-après.

#### d) La qualification suffisante de l'expert

Enfin, la preuve doit être présentée par un témoin dont on démontre qu'il ou elle a acquis des connaissances spéciales ou particulières grâce à des études ou à une expérience relatives aux questions visées dans son témoignage.

En résumé, il ressort donc de ce qui précède que la preuve d'expert qui avance une nouvelle théorie ou technique scientifique est soigneusement examinée pour déterminer si elle satisfait à la norme de fiabilité et si elle est essentielle en ce sens que le juge des faits sera incapable de tirer une conclusion satisfaisante sans l'aide de l'expert. Plus la preuve se rapproche de l'opinion sur une question fondamentale, plus l'application de ce principe est stricte.

1994 CanLII 80 (SCC)

(2) *Expert Evidence as to Disposition*

In order to decide what principles should govern the admissibility of this kind of evidence, it is necessary to consider the limitations imposed by the rules relating to character evidence, having regard to the restrictions imposed by the criteria in respect of expert evidence.

I have already referred to *R. v. Morin*, wherein an unanimous court decided that the Crown cannot lead such evidence in the first instance unless it is relevant to an issue and is not being used merely as evidence of disposition. As I stated, at p. 371:

In my opinion, in order to be relevant on the issue of identity the evidence must tend to show that the accused shared a distinctive unusual behavioural trait with the perpetrator of the crime. The trait must be sufficiently distinctive that it operates virtually as a badge or mark identifying the perpetrator. The judgment of Lord Hailsham in *Boardman*, quoted above, provides one illustration of the kind of evidence that would be relevant.

. . .

Conversely, the fact that the accused is a member of an abnormal group some of the members of which have the unusual behavioural characteristics shown to have been possessed by the perpetrator is not sufficient. In some cases it may, however, be shown that all members of the group have the distinctive unusual characteristics. If a reasonable inference can be drawn that the accused has those traits then the evidence is relevant subject to the trial judge's obligation to exclude it if its prejudicial effect outweighs its probative value. The greater the number of persons in society having these tendencies, the less relevant the evidence on the issue of identity and the more likely that its prejudicial effect predominates over its probative value.

When, however, the evidence is tendered by the accused, other considerations apply. The accused is permitted to adduce evidence as to disposition both in his or her own evidence or by calling witnesses. The general rule is that evidence as to character is limited to evidence of the accused's reputation in the community with respect to the relevant trait or traits. The accused in his or her own testi-

(2) *Preuve d'expert quant à la prédisposition*

Pour déterminer les principes qui devraient gouverner l'admissibilité de ce genre de preuve, il faut considérer les restrictions imposées par les règles relatives à la preuve de moralité, eu égard aux restrictions imposées par les critères relatifs à la preuve d'expert.

J'ai cité plus haut l'arrêt *R. c. Morin* dans lequel notre Cour unanime a décidé que le ministère public ne peut produire une telle preuve en premier lieu que si elle est pertinente et n'est pas utilisée comme simple preuve de la prédisposition. Comme je l'ai mentionné, à la p. 371:

À mon avis, pour être pertinente relativement à la question de l'identité, la preuve doit tendre à démontrer que l'accusé partageait avec l'auteur du crime un trait de comportement distinctif inhabile. Le trait doit être distinctif au point d'agir presque comme une étiquette ou une marque qui identifie l'auteur du crime. L'extrait précité des motifs de lord Hailsham dans l'arrêt *Boardman* donne un exemple du genre de preuve qui serait pertinente.

. . .

Inversement, l'appartenance de l'accusé à un groupe anormal dont certains membres présentent des caractéristiques de comportement inhabituelles que possédait l'auteur du crime, n'est pas suffisante. Dans certains cas, cependant, il peut être démontré que tous les membres du groupe ont les caractéristiques distinctives inhabituelles. Si on peut raisonnablement en déduire que l'accusé possède ces traits, la preuve est alors pertinente sous réserve de l'obligation du juge du procès de l'exclure si son effet préjudiciable l'emporte sur sa valeur probante. Plus le nombre de personnes dans la société présente ces tendances, moins la preuve est pertinente relativement à la question de l'identité et plus il est vraisemblable que son effet préjudiciable soit supérieur à sa valeur probante.

Néanmoins, lorsque la preuve est celle de l'accusé, d'autres facteurs entrent en jeu. L'accusé peut produire une preuve sur la prédisposition tant par son propre témoignage que par celui d'autres témoins. Suivant la règle générale, la preuve de moralité se limite à la preuve de la réputation de l'accusé au sein de la collectivité relativement au trait de caractère concerné. L'accusé peut toutefois

mony, however, may rely on specific acts of good conduct. See *R. v. McNamara (No. 1)* (1981), 56 C.C.C. (2d) 193, at p. 348; leave to appeal refused, [1981] 1 S.C.R. xi. Evidence of an expert witness that the accused, by reason of his or her mental make-up or condition of the mind, would be incapable of committing or disposed to commit the crime does not fit either of these categories. A further exception, however, has developed that is limited in scope. I propose to examine the extent of this exception.

In England, with the exception of non-insane automatism, expert psychiatric and psychological evidence is not admissible to show the accused's state of mind unless it is contended that the accused is abnormal in the sense of suffering from insanity or diminished responsibility. In *R. v. Chard* (1971), 56 Cr. App. R. 268, the trial judge refused to allow medical evidence that the accused who was not alleged to be suffering from a disease of the mind lacked the necessary *mens rea*. In the Court of Appeal, Roskill L.J. stated at p. 271 that it was "not permissible to call a witness, whatever his personal experience, merely to tell the jury how he thinks an accused man's mind — assum[ing] a normal mind — operated at the time of the alleged crime . . . ."

In *Lowery v. The Queen*, [1974] A.C. 85 (P.C.), such evidence was admitted when tendered by one co-accused against another. It was a case involving the sadistic murder of a young girl. Lowery and King were both charged, and it was obvious that one, the other, or both of them were guilty. In this context, King sought to prove that he feared Lowery and that Lowery dominated him. The Privy Council held that the trial judge acted properly in allowing King to call a psychiatrist to swear that he was less likely to have committed the crime than Lowery. That is, character evidence tendered by a psychiatrist was held to be admissible. Lord

invoquer dans son propre témoignage des actes particuliers de bonne conduite. Voir *R. c. McNamara (No. 1)* (1981), 56 C.C.C. (2d) 193, à la p. 348; autorisation de pourvoi refusée, [1981] 1 R.C.S. xi. Le témoignage d'un expert indiquant qu'en raison de sa constitution mentale ou de son état mental, l'accusé serait incapable de commettre le crime ou ne pourrait être prédisposé à le commettre, ne correspond à aucune des catégories concernées. Une autre exception de portée limitée a toutefois été créée. Je propose d'en examiner l'étendue.

En Angleterre, à l'exception de l'automatisme non fondé sur l'aliénation mentale, la preuve d'expert psychiatrique et psychologique n'est pas admissible pour démontrer l'état d'esprit de l'accusé, sauf si on fait valoir qu'il est anormal parce qu'il souffre d'aliénation mentale ou de responsabilité amoindrie. Dans l'arrêt *R. c. Chard* (1971), 56 Cr. App. R. 268, le juge du procès a refusé d'accueillir la preuve médicale portant que l'accusé, dont on n'alléguait pas qu'il souffrait d'une maladie mentale, n'avait pas la *mens rea* requise. En Cour d'appel, le lord juge Roskill a déclaré, à la p. 271, qu'il était [TRADUCTION] «interdit de citer un témoin, quelle que soit son expérience personnelle, simplement pour dire au jury comment il pense que l'esprit de l'accusé — en suppos[ant] qu'il ait un esprit normal — fonctionnait à l'époque du crime reproché . . .»

Dans l'arrêt *Lowery c. The Queen*, [1974] A.C. 85 (C.P.), un témoignage semblable, rendu par un coaccusé contre l'autre, a été admis. L'affaire portait sur le meurtre sadique d'une jeune fille. Lowery et King étaient tous deux accusés, et il était évident que l'un ou l'autre, ou les deux, étaient coupables. C'est dans ce contexte que King a cherché à établir qu'il craignait Lowery et que ce dernier exerçait sur lui sa domination. Le Conseil privé a conclu que le juge du procès avait agi correctement en permettant à King d'appeler un psychiatre pour témoigner sous serment qu'il était moins susceptible d'avoir commis le crime que Lowery. La preuve de moralité produite par un psychiatre a ainsi été jugée admissible. Lord

1994 CanLII 80 (SCC)

Morris of Borth-y-Gest of the Privy Council stated, at p. 103:

Lowery and King were each asserting that the other was the completely dominating person at the time Rosalyn Nolte was killed: each claimed to have been in fear of the other. In these circumstances it was most relevant for King to be able to show, if he could, that Lowery had a personality marked by aggressiveness whereas he, King, had a personality which suggested that he would be led and dominated by someone who was dominant and aggressive . . . . Not only however was the evidence which King called relevant to this case: its admissibility was placed beyond doubt by the whole substance of Lowery's case.

Moreover, in *R. v. Turner, supra*, the accused unsuccessfully pleaded provocation in answer to a charge of murder of his girlfriend whom he alleged that he had killed in a fit of rage caused by her sudden confession of infidelity. He appealed on the grounds that the trial judge had wrongly refused to admit the evidence of a psychiatrist. That psychiatrist was to testify to the effect that the accused was not mentally ill, that he had a great affection toward the victim and that he deeply regretted his act of murder. The evidence was rejected on the basis that it was not the proper subject of expert evidence. As for *Lowery v. The Queen*, it was confined to its own facts.

C. Tapper in *Cross on Evidence* (7th ed. 1990), at p. 492, reconciled *Lowery v. The Queen* and *R. v. Turner* using a principled approach:

Juries do not need to be told that normal men are liable to lose control of themselves when their women admit to infidelity, but they require all the expert assistance they can get to help them determine which of two accused has the more aggressive personality.

Tapper then proceeded to reconcile the two cases using a more technical approach:

Another way of reconciling the cases would be to treat the fact that Lowery had put his character in issue as crucial to the decision of the Privy Council, the psychiatric evidence then being admissible to impugn the credibility of his testimony. Unfortunately we are left with-

out any guidance on the subject from the Court of Appeal who contented themselves with saying that *Lowery*'s case was decided on its special facts.

With respect to the development of the exception in Canada, *R. v. Lupien, supra*, is a good starting point. It involved a respondent who was convicted of attempting to commit an act of gross indecency, and whose defence was that he lacked the requisite intent to commit the act because he thought his companion was a woman. He sought to prove his "lack of intent" by tendering psychiatric evidence which showed that he reacted violently against any type of homosexual activity and, therefore, could not have knowingly engaged in an act of gross indecency. Ritchie J. concluded, at pp. 277-78, that the evidence was admissible for the following reasons:

I am far from saying that as a general rule psychiatric evidence of a man's disinclination to commit the kind of crime with which he is charged should be admitted, but the present case is concerned with gross indecency between two men and I think that crimes involving homosexuality stand in a class by themselves in the sense that the participants frequently have characteristics which make them more readily identifiable as a class than ordinary criminals. See *Reg. v. Thompson* [(1917), 13 Cr. App. R. 61 at 81]. In any event, it appears to me that the question of whether or not a man is homosexually inclined or otherwise sexually perverted is one upon which an experienced psychiatrist is qualified to express an opinion and that if such opinion is relevant it should be admitted at a trial such as this even if it involves the psychiatrist in expressing his conclusion that the accused does not have the capacity to commit the crime with which he is charged.

It is this passage that created the abnormal group exception which is often sought to be applied to various contexts other than the homosexual context.

The Ontario Court of Appeal, and specifically Martin J.A., further looked into this exception of proving the disposition of the accused through psychiatric evidence in the following two cases: *R. v. McMillan, supra*, aff'd [1977] 2 S.C.R. 824, and *R. v. Robertson, supra*.

reusement, nous sommes laissés sans autre assistance à cet égard que la simple déclaration de la Cour d'appel portant que l'affaire *Lowery* a été décidée en fonction de ses faits propres.

L'arrêt *R. c. Lupien*, précité, est un bon point de départ de l'évolution de l'exception au Canada. Déclaré coupable d'avoir tenté de commettre un acte de grossière indécence, l'intimé plaidait qu'il n'avait pas l'intention requise pour commettre l'acte, parce qu'il croyait que son compagnon était une femme. Il a tenté d'établir son «absence d'intention» en produisant une preuve psychiatrique démontrant qu'il réagissait violemment à tout genre d'activité homosexuelle et que, par conséquent, il ne pouvait avoir sciemment commis un acte de grossière indécence. Le juge Ritchie a conclu à l'admissibilité de la preuve pour les motifs suivants (aux pp. 277 et 278):

Je suis loin de poser comme règle générale que la preuve psychiatrique des prédispositions d'une personne à ne pas commettre le genre de crime dont il est accusé doit être admise, mais dans cette affaire-ci il s'agit de grossière indécence entre deux hommes et je pense que les crimes relatifs à l'homosexualité sont dans une catégorie à part, en ce sens que leurs auteurs possèdent souvent des caractéristiques qui les rendent collectivement plus facilement identifiables que les criminels ordinaires. Voir *Regina v. Thompson* [(1917), 13 Cr. App. R. 61 à 81]. De toute façon, il me paraît qu'un psychiatre est qualifié pour exprimer un avis sur la question de savoir si un homme est prédisposé à l'homosexualité, ou autrement sexuellement perverti. Si un tel avis est pertinent, il doit être recevable dans un procès comme celui-ci, même s'il amène le psychiatre à exprimer l'avis que l'inculpé ne possède pas la capacité de commettre le crime dont il est accusé.

C'est ce passage qui a créé l'exception relative au groupe anormal que l'on tente fréquemment d'appliquer dans des contextes autres que celui de l'homosexualité.

La Cour d'appel de l'Ontario, et en particulier le juge Martin, a examiné plus amplement l'exception qui consiste à démontrer la prédisposition de l'accusé à l'aide de la preuve psychiatrique, dans les deux affaires suivantes: *R. c. McMillan*, précité, conf. par [1977] 2 R.C.S. 824, et *R. c. Robertson*, précité.

1994 CanLII 80 (SCC)

*R. v. McMillan* involved an accused who was charged with the murder of his infant child and whose defence was that it was in fact his wife and not he who killed the child. The trial judge allowed the accused to call a psychiatrist who testified that the accused's wife had a psychopathic personality disturbance with brain damage. This psychiatric evidence showed that a third party, the accused's wife, was more likely to have committed the crime because of her abnormal personality/disposition. Martin J.A., speaking for the Court, found that disposition to commit a crime is generally relevant since it goes to the probability/propensity of the person doing or not doing the act charged. He then referred to *R. v. Lupien*, at p. 169, as creating the following exception:

One of the exceptions to the general rule that the character of the accused, in the sense of disposition, when admissible, can only be evidenced by general reputation, relates to the admissibility of psychiatric evidence where the particular disposition or tendency in issue is characteristic of an abnormal group, the characteristics of which fall within the expertise of the psychiatrist.

After having noted the applicability of *R. v. Lupien*, Martin J.A. engaged in a lengthy discussion of the exception and in fact extended *R. v. Lupien*. This extension, at pp. 173-75 of *R. v. McMillan*, was affirmed by the Supreme Court of Canada:

I do not consider that, because the crime under consideration was not one that could only be committed by a person with a special or abnormal propensity, psychiatric evidence with respect to Mrs. McMillan's disposition, was, therefore, inadmissible, in the circumstances of this case.

All evidence to be admissible must, of course, be relevant to some issue in the case. Psychiatric evidence with respect to the personality traits or disposition of a person, whether of the accused or another, may be admissible for different purposes. While those purposes are not mutually exclusive, evidence which is relevant for one purpose may not be for another.

Dans l'affaire *R. c. McMillan*, l'accusé était inculpé du meurtre de son jeune enfant. Il plaidait que c'était en fait sa femme, et non lui, qui avait tué l'enfant. Le juge du procès a permis à l'accusé d'appeler un psychiatre qui a témoigné que l'épouse de l'accusé souffrait d'un trouble psychopathique de la personnalité et de lésions cérébrales. Cette preuve psychiatrique a démontré qu'un tiers, l'épouse de l'accusé, était plus susceptible d'avoir commis le crime en raison de sa personnalité et de sa prédisposition toutes deux anormales. Exprimant l'opinion de la Cour, le juge Martin a conclu que la prédisposition à commettre un crime est généralement pertinente puisqu'en ce qui concerne la perpétration de l'acte reproché, elle vise la propension et la probabilité. Il a ensuite indiqué que l'arrêt *R. c. Lupien*, à la p. 169, créait l'exception suivante:

[TRADUCTION] L'une des exceptions à la règle générale suivant laquelle, lorsqu'elle est admissible, la moralité de l'accusé (dans le sens de la prédisposition) ne peut être démontrée que par la preuve de la réputation générale, porte sur l'admissibilité de la preuve psychiatrique lorsque la prédisposition ou la propension en question est propre à un groupe anormal, dont les caractéristiques relèvent de l'expertise du psychiatre.

Après avoir noté l'applicabilité de cet arrêt, le juge Martin a longuement analysé l'exception et il a en fait élargi la portée de l'arrêt *R. c. Lupien*. Cette expansion, aux pp. 173 à 175 de l'arrêt *R. c. McMillan*, a été confirmée par la Cour suprême du Canada:

[TRADUCTION] Je ne considère pas que, du fait qu'il ne s'agit pas d'un crime qui n'aurait pu être commis que par une personne dotée d'une propension particulière ou anormale, la preuve psychiatrique relative à la prédisposition de Mme McMillan était par conséquent inadmissible dans les circonstances de l'espèce.

Pour être admissible, toute preuve doit évidemment être pertinente relativement à certaines questions soulevées dans l'affaire. La preuve psychiatrique relative aux traits de caractère ou à la prédisposition d'une personne, qu'il s'agisse ou non de l'accusé, peut être admissible à différentes fins. Si ces fins ne sont pas mutuellement exclusives, la preuve pertinente quant à une fin peut ne pas l'être quant à une autre.

Psychiatric evidence with respect to the personality traits or disposition of an accused, or another, is admissible provided:

(a) the evidence is relevant to some issue in the case;

(b) the evidence is not excluded by a policy rule;

(c) the evidence falls within the proper sphere of expert evidence.

One of the purposes for which psychiatric evidence may be admitted is to prove identity when that is an issue in the case, since psychical as well as physical characteristics may be relevant to identify the perpetrator of the crime.

Where the offence is of a kind that is committed only by members of an abnormal group, for example, offences involving homosexuality, psychiatric evidence that the accused did or did not possess the distinguishing characteristics of that abnormal group is relevant either to bring him within, or to exclude him from, the special class of which the perpetrator of the crime is a member. In order for psychiatric evidence to be relevant for that purpose, the offence must be one which indicates that it was committed by a person with an abnormal propensity or disposition which stamps him as a member of a special and extraordinary class.

Psychiatric evidence with respect to the personality traits or disposition of the accused, or another, if it meets the three conditions of admissibility above set out, is also admissible, however, as bearing on the *probability* of the accused, or another, having committed the offence.

It would appear that it was upon this latter ground that the psychologist's evidence was held to be admissible in *Lowery v. The Queen, supra*, although the features of the offence in that case were sufficiently indicative of the possession of an abnormal propensity by the perpetrator, that the expert evidence might have been relevant to the issue of identity as well. Since in that case the evidence was offered by the accused King, it was not excluded from the policy rule which prevents the prosecution from introducing evidence to prove that the accused by reason of his criminal propensities is likely to have committed the crime charged. Both accused in *Lowery v. The Queen* had psychopathic personalities (although the features of King's psychopathic personality were

La preuve psychiatrique relative aux traits de caractère ou à la prédisposition d'une personne, qu'il s'agisse ou non de l'accusé, est admissible à trois conditions:

a) la preuve est pertinente quant à une question soulevée dans l'affaire;

b) la preuve n'est exclue par aucune règle de principe;

c) la preuve entre dans le domaine de la preuve d'expert.

La preuve psychiatrique peut être admise entre autres pour établir l'identité lorsque cet élément est soulevé dans l'affaire, puisque des caractéristiques tant psychiques que physiques peuvent être pertinentes relativement à l'identification de l'auteur du crime.

Lorsque l'infraction est de celles qui sont commises uniquement par les membres d'un groupe anormal, par exemple les infractions relatives à l'homosexualité, la preuve psychiatrique que l'accusé possédait ou non les caractéristiques distinctives de ce groupe anormal est pertinente relativement à son inclusion dans la catégorie particulière dont l'auteur du crime fait partie, ou à son exclusion. Pour que la preuve psychiatrique soit pertinente quant à cette fin, l'infraction doit indiquer qu'elle a été commise par un individu doté d'une propension ou d'une prédisposition anormale qui le désigne comme faisant partie d'une catégorie spéciale et extraordinaire.

Si elle satisfait aux trois conditions d'admissibilité énoncées ci-dessus, la preuve psychiatrique relative aux traits de caractère ou à la prédisposition d'une personne, qu'il s'agisse ou non de l'accusé, est toutefois également admissible comme portant sur la *probabilité* que l'accusé ou une autre personne ait commis l'infraction en cause.

Il semble que ce soit pour ce dernier motif que le témoignage du psychologue a été jugé admissible dans l'arrêt *Lowery c. The Queen*, précité, bien que les caractéristiques de l'infraction dans cette affaire aient suffisamment indiqué une propension anormale de l'auteur du crime pour que la preuve d'expert ait pu être pertinente relativement à la question de l'identité également. Puisque dans cette affaire la preuve a été produite par l'accusé King, elle n'a pas été exclue par la règle de principe qui interdit à la poursuite d'introduire une preuve pour établir qu'en raison de sa propension criminelle, l'accusé est susceptible d'avoir commis le crime reproché. Les deux accusés dans l'affaire *Lowery c. The Queen* ayant des personnalités de psychopathes (bien que les caractéristiques de la personnalité psychopathique de King soient moins marquées que celles de

1994 CanLII 80 (SCC)

less severe than Lowery's) and hence their personality traits fell within the proper sphere of expert evidence.

.  .  .

Where the crime under consideration does not have features which indicate that the perpetrator was a member of an abnormal group, psychiatric evidence that the accused has a normal mental make-up but does not have a disposition for violence or dishonesty or other relevant character traits frequently found in ordinary people is inadmissible. The psychiatric evidence in the circumstances postulated is not relevant on the issue of identity to exclude the accused as the perpetrator any more than the possession of violent or dishonest tendencies by the accused or a third person would be admissible to identify the accused or the third person as the perpetrator of the crime.

"So common a characteristic is not a recognisable mark of the individual." (*Per* Lord Sumner in *Thompson v. Director of Public Prosecutions* (1918), 26 Cox C.C. 189 at p. 199.)

While such evidence is relevant as bearing on the probability of the accused having committed the crime, the psychiatric evidence proffered in such circumstances really amounts to an attempt to introduce evidence of the accused's good character, as a normal person, through a psychiatrist. Such evidence does not fall within the proper sphere of expert evidence and is subject to the ordinary rule applicable to character evidence which, in general, requires the character of the accused to be evidenced by proof of general reputation.

I leave open, until the question is required to be decided, whether when the crime is one assumed to be committed by normal persons, *e.g.*, rape, psychiatric evidence is admissible to show that the accused is a member of an abnormal group, possessing characteristics which make it improbable that he committed the offence, *e.g.*, that he is a homosexual with an aversion to heterosexual relations. I am disposed, however, to think that such evidence is admissible. [Emphasis in original.]

The evidence of the psychiatrist was held to be admissible.

Martin J.A. elaborated on the reasoning set out above in *R. v. Robertson, supra*. That case involved a 16-year-old accused charged with bru-

Lowery), leurs traits de caractère entraient dans le domaine de la preuve d'expert.

.  .  .

Lorsque le crime en cause ne présente aucune caractéristique indiquant que l'auteur faisait partie d'un groupe anormal, la preuve psychiatrique que l'accusé a une constitution mentale normale, mais qu'il n'a pas de prédisposition à la violence ou à la malhonnêteté ou d'autres traits de caractère pertinents que possèdent fréquemment les personnes ordinaires, est inadmissible. Dans les circonstances énoncées, la preuve psychiatrique n'est pas plus pertinente relativement à la question de l'identité en vue de déterminer que l'accusé n'est pas l'auteur du crime que ne serait admissible la preuve que l'accusé ou un tiers a une tendance violente ou malhonnête en vue de déterminer que l'accusé ou le tiers est l'auteur du crime.

«Une caractéristique si courante ne constitue pas une marque reconnaissable de l'individu.» (Les motifs de lord Sumner dans l'arrêt *Thompson c. Director of Public Prosecutions* (1918), 26 Cox C.C. 189, à la p. 199.)

Si une telle preuve est pertinente parce qu'elle porte sur la probabilité que l'accusé ait commis le crime, la preuve psychiatrique produite dans de telles circonstances équivaut réellement à une tentative d'introduire une preuve de la bonne moralité de l'accusé, comme une personne normale, par l'entremise d'un psychiatre. Une telle preuve n'entre pas dans le domaine de la preuve d'expert. Elle est assujettie à la règle ordinaire en matière de preuve de moralité qui, en général, requiert que la moralité de l'accusé soit démontrée au moyen de la preuve de sa réputation générale.

Je laisse ouverte, jusqu'à ce qu'elle doive être tranchée, la question de savoir, lorsqu'un crime, comme le viol, est présumé être commis par des personnes normales, si la preuve psychiatrique est admissible pour établir que l'accusé fait partie d'un groupe anormal possédant des caractéristiques en raison desquelles il est peu probable qu'il ait commis l'infraction, comme le fait qu'il soit un homosexuel ayant une aversion pour les relations hétérosexuelles. Je suis toutefois disposé à penser qu'une telle preuve est admissible. [En italique dans l'original.]

Le témoignage du psychiatre a été jugé admissible.

Le juge Martin a commenté le raisonnement énoncé ci-dessus dans l'arrêt *R. c. Robertson*, précité, où l'accusé de 16 ans était inculpé d'avoir tué

tally murdering a nine-year-old girl by kicking her. The defence sought to introduce expert psychiatric evidence to show that a propensity for violence or aggression was not a part of the accused's psychological make-up. This tended to rebut evidence led by the Crown as to the accused's violent character. Martin J.A. summed up, at p. 426:

While the judgment of Ritchie, J., deals only with the admissibility of psychiatric evidence with respect to disposition in offences involving homosexuality, there would appear to be no logical reason why such evidence should not be admitted on the same principle in other cases where there is evidence tending to show that, by reason of the nature of the offence, or its distinctive features, its perpetrator was a person who, in the language of Lord Sumner, was a member of "a specialized and extraordinary class", and whose psychological characteristics fall within the expertise of the psychiatrist, for the purpose of showing that the accused did not possess the psychological characteristics of persons of that class. Obviously, where such evidence is adduced by the accused, the prosecution is entitled to call psychiatric evidence in order to rebut the evidence introduced by the defence.

In my view, however, the judgment of Ritchie, J., in *R. v. Lupien, supra*, provides no support for a conclusion that, in the case of ordinary crimes of violence, psychiatric evidence is admissible to prove that the accused's psychological make-up does not include a tendency or disposition for violence.

Martin J.A. further stated, at pp. 429-30:

In my view, psychiatric evidence with respect to disposition or its absence is admissible on behalf of the defence, if relevant to an issue in the case, where the disposition in question constitutes a characteristic feature of an abnormal group falling within the range of study of the psychiatrist, and from whom the jury can, therefore, receive appreciable assistance with respect to a matter outside the knowledge of persons who have not made a special study of the subject. A *mere* disposition for violence, however, is not so uncommon as to constitute a feature characteristic of an abnormal group falling within the special field of study of the psychiatrist and permitting psychiatric evidence to be given of the absence of such disposition in the accused. [Emphasis in original.]

brutalement à coups de pied une fille de neuf ans. La défense avait tenté d'introduire une preuve psychiatrique d'expert pour démontrer que la constitution psychologique de l'accusé n'indiquait aucune propension à la violence ou à l'agression. Cette preuve visait à réfuter la preuve introduite par le ministère public au sujet de la nature violente de l'accusé. Le juge Martin a résumé à la p. 426:

[TRADUCTION] Si les motifs du juge Ritchie ne portent que sur l'admissibilité de la preuve psychiatrique relative à la prédisposition à commettre des infractions relatives à l'homosexualité, il ne paraît exister aucune raison logique de ne pas admettre une telle preuve en se fondant sur le même principe dans d'autres affaires où la preuve tend à démontrer qu'en raison de la nature de l'infraction ou de ses caractéristiques distinctives, son auteur faisait partie, dans les termes de lord Sumner, d'une «catégorie spéciale et extraordinaire», dont les caractéristiques psychologiques relèvent du domaine d'expertise du psychiatre, dans le but de démontrer que l'accusé ne possédait pas les caractéristiques psychologiques propres aux personnes de cette catégorie. De toute évidence, lorsqu'une telle preuve est produite par l'accusé, la poursuite peut produire une preuve psychiatrique pour la réfuter.

À mon avis, toutefois, l'opinion du juge Ritchie dans *R. c. Lupien*, précité, n'offre aucun appui à la conclusion que, dans le cas de crimes ordinaires de violence, la preuve psychiatrique est admissible pour démontrer que la constitution psychologique de l'accusé n'inclut aucune tendance ou prédisposition à la violence.

Le juge Martin a ajouté aux pp. 429 et 430:

[TRADUCTION] À mon avis, la preuve psychiatrique relative à la prédisposition ou à son absence est admissible pour le compte de la défense si elle est pertinente relativement à une question soulevée dans l'affaire, lorsque la prédisposition en question constitue un élément caractéristique d'un groupe anormal qui entre dans le domaine d'étude du psychiatre, et duquel le jury peut donc recevoir une aide appréciable à l'égard d'une question qui se situe à l'extérieur de la connaissance des personnes qui n'ont pas étudié le sujet. Une *simple* prédisposition à la violence n'est toutefois pas inhabituelle au point de constituer un élément caractéristique d'un groupe anormal qui entre dans le domaine particulier d'étude du psychiatre et qui permet que la preuve psychiatrique de l'absence d'une telle prédisposition chez l'accusé soit produite. [En italique dans l'original.]

1994 CanLII 80 (SCC)

Given this reasoning, Martin J.A. concluded that the crime was not specially marked and so the conditions for the admissibility of psychiatric evidence were not met.

A useful summary of the principles that emerge from the cases is made by Alan W. Mewett, "Character as a Fact in Issue in Criminal Cases" (1984-85), 27 *Crim. L.Q.* 29, at pp. 35-36, of his article where he points out the various contexts in which an accused can tender character evidence by way of an expert:

There are thus three basic requirements that must be met before such psychiatric evidence can even be considered as potentially admissible. First, it must be relevant to an issue. Second, it must be of appreciable assistance to the trier of fact and third, it must be evidence that would otherwise be unavailable to the ordinary layman without specialized training, but these requirements only set forth the general requirements for the admissibility of expert testimony.

Once these hurdles have been passed, a number of different scenarios may be postulated. The crime may be an "ordinary" one (which I take to mean a crime for which no special mental characteristics on the part of the perpetrator would be required) and the accused is an "ordinary" person; the crime may be an "ordinary" one, but the accused an "extraordinary" person (*i.e.*, having some peculiar mental make-up that would tend to show that he would not commit that "ordinary" crime); the crime may be "extraordinary", but the accused "ordinary"; or the crime may be "extraordinary" and the accused "extraordinary", in a different direction.

In the first scenario, the evidence is irrelevant because it is simply not probative of anything. In the second it is probative and admissible but only if the extraordinary characteristic of the accused tends to show that he would not commit an ordinary crime of that nature (such as a homosexual being charged with a heterosexual offence). In the third, if it is shown that the crime is such that it could only, or in all probability would only, be committed by a person having identifiable peculiarities that the accused does not possess, it would be admissible. In the last scenario, the situation is the same provided that the difference in the abnormalities tends to exclude the accused from the probable group of perpetrators.

Suivant ce raisonnement, le juge Martin a conclu que le crime n'était pas spécialement marqué, et que les conditions d'admissibilité de la preuve psychiatrique n'étaient donc pas remplies.

Alan W. Mewett, dans un article intitulé «Character as a Fact in Issue in Criminal Cases» (1984-85), 27 *Crim. L.Q.* 29, aux pp. 35 et 36, résume utilement les principes qui ressortent de la jurisprudence. Il souligne les différents contextes dans lesquels un accusé peut produire une preuve de moralité par l'entremise d'un expert:

[TRADUCTION] Il faut donc satisfaire à trois exigences fondamentales pour que la preuve psychiatrique puisse même être considérée comme peut-être admissible. Premièrement, elle doit être pertinente relativement à une question en litige. Deuxièmement, elle doit apporter une aide appréciable au juge des faits et troisièmement, elle ne pourrait être obtenue autrement par le profane ordinaire qui ne possède aucune formation spécialisée. Ces conditions ne font toutefois qu'énoncer les exigences générales d'admissibilité du témoignage d'expert.

Une fois surmontés ces obstacles, différents scénarios peuvent être posés. Le crime peut être «ordinaire» (ce qui à mon avis signifie un crime pour lequel aucune caractéristique mentale particulière ne serait requise chez l'auteur du crime) et l'accusé, une personne «ordinaire»; le crime peut être «ordinaire», et l'accusé, une personne «extraordinaire» (c'est-à-dire que sa constitution mentale particulière tendrait à démontrer qu'il ne commettrait pas ce crime «ordinaire»); le crime peut être extraordinaire, mais l'accusé «ordinaire»; ou le crime et l'accusé peuvent tous deux être «extraordinaires», dans un sens différent.

Dans le premier scénario, la preuve n'est pas pertinente parce qu'elle ne prouve simplement rien. Dans le second, elle n'est probante et admissible que si la caractéristique extraordinaire de l'accusé tend à établir qu'il ne commettrait pas un crime ordinaire de cette nature (comme l'homosexuel accusé relativement à une infraction de nature hétérosexuelle). Dans le troisième, s'il est démontré que le crime est tel qu'il ne pourrait être ou, selon toutes les probabilités, ne serait commis que par une personne ayant des caractéristiques identifiables que l'accusé ne possède pas, elle serait admissible. Dans le dernier scénario, la situation est identique, pour autant que la différence entre les éléments anormaux tende à exclure l'accusé du groupe probable d'auteurs.

I question whether use of the terms "abnormal" and "normal" is the best way to describe the concept that underlies their use. The term "abnormal" is derived from the English cases in which it usually connotes the mental state of insanity or diminished responsibility. See *R. v. Chard, supra,* at p. 270. The basic rationale of these cases is that "normal" human behaviour is a matter which a judge or jury can assess without the assistance of expert evidence. Canadian cases have extended the exception to include what has been described as sexually deviant behaviour. See Rosemary Pattenden, "Conflicting Approaches to Psychiatric Evidence in Criminal Trials: England, Canada and Australia", [1986] *Crim. L.R.* 92, at p. 100. The rationale underlying this extension is the relevance of the evidence based on the distinctiveness of the behavioural traits of either the putative perpetrator of the crime or the accused. This distinctiveness tends to exclude the accused from the category of persons that could or would likely commit the crime.

There are other reasons why the use of the term "abnormal" is no longer satisfactory. Even in medical circles there are differing views as to what constitutes abnormality. See Pattenden, *supra,* at p. 100, and David C. Rimm and John W. Sommervill, *Abnormal Psychology* (1977), at pp. 31 and 32. Moreover, it imports a value judgment on the lifestyle of some groups in society. This is aptly illustrated by considering the statement of Lord Sumner in *Thompson v. The King,* [1918] A.C. 221, at p. 235:

The evidence tends to attach to the accused a peculiarity which, though not purely physical, I think may be recognized as properly bearing that name. Experience tends to show that these offences against nature connote an inversion of normal characteristics which, while demanding punishment as offending against social morality, also partake of the nature of an abnormal physical property. A thief, a cheat, a coiner, or a housebreaker is only a particular specimen of the genus rogue, and, though no doubt each tends to keep to his own line of business, they all alike possess the by no means extraordinary mental characteristic that they propose somehow to get their livings dishonestly. So common a

Je me demande si les termes «anormal» et «normal» sont la meilleure façon de décrire le concept qui sous-tend leur utilisation. Le terme «anormal» découle des affaires survenues en Angleterre, et dans lesquelles il dénote ordinairement l'état mental d'aliénation mentale ou de responsabilité amoindrie. Voir l'arrêt *R. c. Chard,* précité, à la p. 270. Selon le raisonnement qui sous-tend ces affaires, le comportement humain «normal» est une question que le juge ou le jury peut apprécier sans l'aide de la preuve d'expert. Au Canada, on a étendu l'exception pour y inclure ce qui a été qualifié de comportement sexuel déviant. Voir Rosemary Pattenden, «Conflicting Approaches to Psychiatric Evidence in Criminal Trials: England, Canada and Australia», [1986] *Crim. L.R.* 92, à la p. 100. Cet élargissement est motivé par la pertinence de la preuve fondée sur le caractère distinctif des traits de comportement soit de l'auteur putatif du crime, soit de l'accusé. Ce caractère distinctif tend à exclure l'accusé de la catégorie de personnes qui pourraient commettre le crime ou qui seraient susceptibles de le commettre.

Il existe d'autres raisons pour lesquelles l'utilisation du terme «anormal» n'est plus satisfaisante. Même dans les milieux médicaux, il existe des opinions contradictoires quant à ce qui constitue l'anormalité. Voir Pattenden, *op. cit.,* à la p. 100, et David C. Rimm et John W. Sommervill, *Abnormal Psychology* (1977), aux pp. 31 et 32. En outre, le terme en question implique un jugement de valeur sur le style de vie de certains groupes de la société. Cela est bien illustré dans la déclaration de lord Sumner dans l'arrêt *Thompson c. The King,* [1918] A.C. 221, à la p. 235:

[TRADUCTION] La preuve tend à attacher à l'accusé une caractéristique qui, bien que n'étant pas purement physique, peut, à mon avis, être reconnue comme portant à juste titre ce nom. L'expérience tend à démontrer que ces infractions contraires à la nature dénotent une inversion de caractéristiques normales qui, bien qu'elles commandent une punition parce qu'elles offensent la moralité sociale, tiennent également d'une propriété physique anormale. Le voleur, le tricheur, le faux monnayeur ou le cambrioleur n'est qu'un modèle particulier du genre escroc, et bien qu'il ne fasse pas de doute que chacun tend à s'en tenir à son propre domaine, ils possèdent tous la caractéristique mentale aucunement extraor-

1994 CanLII 80 (SCC)

characteristic is not a recognizable mark of the individual. Persons, however, who commit the offences now under consideration seek the habitual gratification of a particular perverted lust, which not only takes them out of the class of ordinary men gone wrong, but stamps them with the hall-mark of a specialized and extraordinary class as much as if they carried on their bodies some physical peculiarity.

The difficulty in defining what is abnormal was recently referred to by McCarthy J.A. in *R. v. Garfinkle* (1992), 15 C.R. (4th) 254. At pages 256-57, speaking for the court, he stated:

What dispositions are to be classified as abnormal, as outside ordinary human experience, for the purpose of admitting psychiatric evidence may be a difficult question. A disposition for sadism is clearly abnormal. Dispositions for violence (short of sadism or something akin thereto), or for dishonesty, are clearly too common to be classified as abnormal. In sexual offences, classification is less easy. However, it seems to me that, whether it be called pedophilia or something else, a disposition in an adult to use boys of 10 and 11 for sexual gratification must be classified as abnormal. Accordingly, in the present case, psychiatric evidence is admissible to show that Garfinkle does not have such a disposition.

In my opinion, the term "distinctive" more aptly defines the behavioural characteristics which are a pre-condition to the admission of this kind of evidence.

How should the criteria for the admission of this type of evidence be applied? I find the following statement of Professor Mewett, *supra*, at p. 36, to be an apt characterization of the nature of the decision which the trial judge must make:

The categorization of crimes into the "ordinary" and the "extraordinary" is therefore a legal question to be determined by the judge, as is the "normality" or "abnormality" of the accused — to the despair, no doubt, of psychiatrists. But admissibility of evidence is a legal question and depends primarily upon relevance, that is, upon its

dinaire qu'ils se proposent d'une façon ou d'une autre de gagner leur vie malhonnêtement. Une caractéristique si courante ne constitue pas une marque reconnaissable de l'individu. Toutefois, les auteurs des infractions qui sont en cause en l'espèce recherchent la gratification habituelle d'une certaine luxure pervertie, qui non seulement les exclut de la catégorie des hommes ordinaires qui se sont écartés du droit chemin, mais indique également qu'ils appartiennent à une catégorie spéciale et extraordinaire, tout autant que si leur corps était marqué par un trait physique particulier.

La difficulté à déterminer ce qui est anormal a récemment été mentionnée par le juge McCarthy de la Cour d'appel dans l'arrêt *R. c. Garfinkle* (1992), 15 C.R. (4th) 254. Aux pages 256 et 257, s'exprimant au nom de la cour, il a déclaré:

[TRADUCTION] La question de savoir quelles prédispositions doivent être qualifiées d'anormales, d'étrangères à la nature humaine ordinaire, dans le but d'admettre la preuve psychiatrique, peut être difficile à trancher. Une prédisposition au sadisme est manifestement anormale. Les prédispositions à la violence (sauf le sadisme ou quelque chose de semblable) ou à la malhonnêteté sont manifestement trop communes pour être qualifiées d'anormales. Les infractions sexuelles sont plus difficiles à classer. Toutefois, qu'on l'appelle pédophilie ou autre, il me semble que la prédisposition chez un adulte à utiliser des garçons de 10 et 11 ans pour obtenir une gratification sexuelle doit être qualifiée d'anormale. En conséquence, en l'espèce, la preuve psychiatrique est admissible pour démontrer que Garfinkle n'a pas une telle prédisposition.

À mon avis, le terme «distinctif» définit mieux les caractéristiques de comportement qui sont une condition préalable à l'admission de cette forme de preuve.

Comment les critères d'admission de cette preuve devraient-ils être appliqués? À mon avis, les propos suivants du professeur Mewett, précité, à la p. 36, qualifient bien la nature de la décision que le juge du procès doit prendre:

[TRADUCTION] La classification des crimes comme «ordinaires», ou «extraordinaires», est donc une question de droit, comme l'est la «normalité» ou l'«anormalité» de l'accusé — au désespoir, sans doute, des psychiatres. Mais, l'admissibilité de la preuve est une question de droit et dépend principalement de sa perti-

assistance to the trier of fact in his inference-drawing process, and this is governed, not by expertise, but by common sense and experience; words like "ordinary", "extraordinary" or "abnormal" are not meant to be scientific expressions but assessments of relevance and are thus clearly within the domain of the judge.

Before an expert's opinion is admitted as evidence, the trial judge must be satisfied, as a matter of law, that either the perpetrator of the crime or the accused has distinctive behavioural characteristics such that a comparison of one with the other will be of material assistance in determining innocence or guilt. Although this decision is made on the basis of common sense and experience, as Professor Mewett suggests, it is not made in a vacuum. The trial judge should consider the opinion of the expert and whether the expert is merely expressing a personal opinion or whether the behavioural profile which the expert is putting forward is in common use as a reliable indicator of membership in a distinctive group. Put another way: Has the scientific community developed a standard profile for the offender who commits this type of crime? An affirmative finding on this basis will satisfy the criteria of relevance and necessity. Not only will the expert evidence tend to prove a fact in issue but it will also provide the trier of fact with assistance that is needed. Such evidence will have passed the threshold test of reliability which will generally ensure that the trier of fact does not give it more weight than it deserves. The evidence will qualify as an exception to the exclusionary rule relating to character evidence provided, of course, that the trial judge is satisfied that the proposed opinion is within the field of expertise of the expert witness.

### (3) *Application to This Case*

I take the findings of the trial judge to be that a person who committed sexual assaults on young women could not be said to belong to a group possessing behavioural characteristics that are sufficiently distinctive to be of assistance in identifying the perpetrator of the offences charged. Moreover,

nence, c'est-à-dire de l'aide qu'elle apporte au juge des faits en lui permettant de tirer des conclusions. Cette question repose non pas sur l'expertise, mais sur le bon sens et l'expérience; des mots tels «ordinaire», «extraordinaire» ou «anormal» ne sont pas destinés à être des expressions scientifiques, mais plutôt des appréciations de la pertinence. Par conséquent ils relèvent clairement du domaine du juge.

Avant d'admettre en preuve l'opinion d'un expert, le juge du procès doit être convaincu, en droit, que l'auteur du crime ou l'accusé possède des caractéristiques de comportement distinctives de sorte que la comparaison de l'un avec l'autre aidera considérablement à déterminer l'innocence ou la culpabilité. Bien que cette décision repose sur le bon sens et l'expérience, comme le professeur Mewett l'indique, elle n'est pas prise dans le vide. Le juge du procès devrait considérer, d'une part, l'opinion de l'expert et, d'autre part, si ce dernier exprime simplement une opinion personnelle ou si le profil de comportement qu'il décrit est couramment utilisé comme indice fiable de l'appartenance à un groupe distinctif. En d'autres termes, la profession scientifique a-t-elle élaboré un profil type du délinquant qui commet ce genre de crime? Une conclusion affirmative sur ce fondement satisfera aux critères de pertinence et de fiabilité. Non seulement la preuve d'expert tendra à prouver un fait en litige, mais elle offrira aussi au juge des faits l'aide dont il a besoin. Une telle preuve aura satisfait au critère préliminaire de la fiabilité qui fera généralement en sorte que le juge des faits ne lui accorde pas plus de poids qu'elle ne le mérite. La preuve sera considérée comme une exception à la règle d'exclusion relative à la preuve de moralité à condition bien sûr que le juge du procès soit convaincu que l'opinion exprimée se situe dans le domaine d'expertise du témoin expert.

### (3) *Application à l'espèce*

À mon sens, le juge du procès a conclu qu'on ne peut dire de la personne qui a commis des agressions sexuelles sur de jeunes femmes qu'elle appartient à un groupe possédant des caractéristiques de comportement suffisamment distinctives pour faciliter l'identification de l'auteur des infrac-

1994 CanLII 80 (SCC)

the fact that the alleged perpetrator was a physician did not advance the matter because there is no acceptable body of evidence that doctors who commit sexual assaults fall into a distinctive class with identifiable characteristics. Notwithstanding the opinion of Dr. Hill, the trial judge was also not satisfied that the characteristics associated with the fourth complaint identified the perpetrator as a member of a distinctive group. He was not prepared to accept that the characteristics of that complaint were such that only a psychopath could have committed the act. There was nothing to indicate any general acceptance of this theory. Moreover, there was no material in the record to support a finding that the profile of a pedophile or psychopath has been standardized to the extent that it could be said that it matched the supposed profile of the offender depicted in the charges. The expert's group profiles were not seen as sufficiently reliable to be considered helpful. In the absence of these *indicia* of reliability, it cannot be said that the evidence would be necessary in the sense of usefully clarifying a matter otherwise unaccessible, or that any value it may have had would not be outweighed by its potential for misleading or diverting the jury. Given these findings and applying the principles referred to above, I must conclude that the trial judge was right in deciding as a matter of law that the evidence was inadmissible.

The Court of Appeal also supported the admissibility of the evidence on the basis that Dr. Hill's evidence tended to rebut alleged similarities between the evidence on the respective counts. On this point, Finlayson J.A. stated at p. 178:

Where, as here, the Crown alleges that the probative value of the similar fact evidence arises from the circumstance that the acts compared are so unusual and strikingly similar that their similarities cannot be attributed to coincidence, the defence is equally entitled to lead evidence as to features of the alleged acts which demonstrate dissimilarities . . . .

tions reprochées. En outre, le fait que l'auteur allégué du crime est un médecin n'a pas facilité la question parce qu'il n'existe aucune preuve acceptable indiquant que les médecins qui commettent des agressions sexuelles tombent dans une catégorie distinctive à laquelle se rattachent des caractéristiques identifiables. En dépit de l'opinion du Dr Hill, le juge du procès n'était pas non plus convaincu que les caractéristiques reliées à la quatrième plainte identifiaient l'auteur comme membre d'un groupe distinctif. Il n'était pas disposé à accepter que les caractéristiques de cette plainte étaient telles que seul un psychopathe pouvait avoir commis l'acte. Rien ne démontre que cette théorie soit généralement acceptée. Par ailleurs, aucun document dans le dossier ne permettait de conclure que le profil du pédophile ou du psychopathe a été normalisé au point où on pourrait soutenir qu'il correspond au profil présumé du délinquant décrit dans les accusations. Les profils de groupes décrits par l'expert n'ont pas été considérés suffisamment fiables pour être utiles. En l'absence d'indices de fiabilité, on ne pouvait pas dire que la preuve serait nécessaire au sens où elle clarifierait utilement une question qui serait autrement inaccessible, ou que la valeur qu'elle pourrait avoir ne serait pas surpassée par la possibilité qu'elle induise le jury en erreur ou le détourne de ses tâches. Compte tenu de ces conclusions, et appliquant les principes mentionnés ci-dessus, je dois conclure que le juge du procès a conclu à juste titre que, du point de vue juridique, la preuve était inadmissible.

La Cour d'appel avait aussi conclu à l'admissibilité de la preuve pour le motif que le témoignage du Dr Hill tendait à réfuter les similitudes alléguées entre la preuve relative aux divers chefs. À cet égard, le juge Finlayson a dit à la p. 178:

[TRADUCTION] Lorsque, comme en l'espèce, le ministère public allègue que la valeur probante de la preuve de faits similaires naît du fait que les actes comparés sont si inhabituels et d'une similitude si frappante que cette similitude ne peut être attribuée à la coïncidence, la défense a elle aussi le droit de produire une preuve relative aux caractéristiques des actes allégués qui démontrent des différences . . .

R. c. MOHAN    *Le juge Sopinka*

The judgment of the Court of Appeal was not supported on this ground either in the respondent's factum or in the oral argument.

The use to which the jury could put the evidence was explained by the trial judge in his charge to the jury. The key passage in the charge in this respect was the following:

If you conclude when considering any of the specific counts that evidence relating to any or all of the other counts is so similar that common sense dictates the relevancy of such evidence to one or more of the issues I mentioned earlier, then you may not must, draw the inferences to which I have referred. [Emphasis added.]

The similarities, which were detailed by the judge, were with respect to the *modus operandi* of the perpetrator of the acts which were the subject of the individual counts. No objection was taken to this aspect of the charge. This use of the similar fact evidence relates to a different issue from the subject matter of the proposed evidence of Dr. Hill. As discussed above, the dissimilarities addressed in Dr. Hill's proposed evidence are not as to *modus operandi* but rather with respect to the comparative psychological make-up of the respondent on the one hand and the alleged perpetrator of the acts charged, on the other. Furthermore, whether a crime is committed in a manner that identifies the perpetrator by reason of striking similarities in the method employed in the commission of other acts is something that a jury can, generally, assess without the aid of expert evidence. As stated by the trial judge, it is a matter of common sense.

I would allow the appeal, set aside the judgment of the Court of Appeal, restore the convictions and remit the matter to the Court of Appeal for disposition of the sentence appeal.

*Appeal allowed.*

*Solicitor for the appellant: The Ministry of the Attorney General, Toronto.*

Le jugement de la Cour d'appel n'a pas été appuyé à cet égard ni dans le mémoire de l'intimé, ni dans les débats.

Dans son exposé au jury, le juge du procès a expliqué l'utilisation que le jury pouvait faire de la preuve. Le passage clé de l'exposé à cet égard est le suivant:

[TRADUCTION] Si vous déterminez, après avoir considéré un des chefs d'accusation, que la preuve relative à un ou à l'ensemble des autres chefs est semblable au point que le bon sens commande la pertinence d'une telle preuve quant à l'une ou plusieurs questions que j'ai mentionnées précédemment, vous pouvez alors tirer les conclusions que j'ai mentionnées. [Je souligne.]

Les similitudes, expliquées par le juge, portaient sur le *modus operandi* de l'auteur des actes qui étaient l'objet de chefs spécifiques. Aucune objection n'a été soulevée sur cet aspect de l'exposé. Cette utilisation de la preuve de faits similaires porte sur une question différente de l'objet du témoignage proposé du Dr Hill. Comme cela est indiqué plus haut, les différences dont traitait la preuve proposée par le Dr Hill ne concernaient pas le *modus operandi* mais plutôt la constitution psychologique du requérant comparée à celle de l'auteur des actes allégués. En outre, la question de savoir si le crime est commis d'une manière qui identifie l'auteur, en raison de similitudes frappantes dans la méthode utilisée pour perpétrer d'autres actes, peut être appréciée en général par un jury sans l'aide de la preuve d'expert. Comme le juge du procès l'a dit, c'est une question de bon sens.

Je suis d'avis d'accueillir le pourvoi, d'infirmer le jugement de la Cour d'appel, de rétablir les déclarations de culpabilité et de renvoyer l'affaire à la Cour d'appel pour qu'elle tranche l'appel de la sentence.

*Pourvoi accueilli.*

*Procureur de l'appelante: Le ministère du Procureur général, Toronto.*

1994 CanLII 80 (SCC)

*Solicitors for the respondent: Greenspan, Humphrey, Toronto.*

*Procureurs de l'intimé: Greenspan, Humphrey, Toronto.*

1994 CanLII 80 (SCC)

TAB 123

591 F.2d 248
United States Court of Appeals,
Third Circuit.

R. M. SMITH, INC., Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE.

No. 78-1442.    |    Argued Nov. 14,
1978.    |    Decided Jan. 26, 1979.

Commissioner of Internal Revenue found that taxpayer's amortization deductions were excessive and issued notice of deficiency, and taxpayer sought review. The Tax Court, William M. Drennan, 69 T.C. 317, found that claimed depreciation and amortization deductions were excessive, and taxpayer appealed. The Court of Appeals, Rosenn, Circuit Judge, held that: (1) Tax Court's valuation of depreciable intangible assets was not clearly erroneous; (2) residual value method was appropriate for determining value of goodwill; (3) Tax Court did not err in including difference between face value of note and its asserted market value in goodwill, and (4) while Tax Court erroneously included in total price which taxpayer paid for stock federal income tax liability of acquired corporation for period between acquisition of stock and liquidation of corporation, Tax Court's judgment would not be disturbed since amount of interim earnings erroneously deducted from total price paid exceeded interim income tax liability and more than offset error in including interim tax liability in total price paid.

Affirmed.

West Headnotes (10)

[1]    **Internal Revenue**
        Value

       Where taxpayer established that Commissioner's valuation of patent was in error, taxpayer was not required to prove correct figure, but, rather, Commissioner had burden of establishing proper valuation and actual tax owed after proper depreciation deductions were taken.

       2 Cases that cite this headnote

[2]    **Internal Revenue**
        Scope and Extent of Review

       Even though taxpayer established that Commissioner's calculation of value of patents was in error and even though Tax Court refused to accept Commissioner's evidence in this regard, where sufficient evidence was introduced to allow Tax Court to reach reasonable conclusion, Tax Court was not limited to simply choosing one of the two values proffered, but it was appropriate for it to evaluate all of the evidence and to make independent determination that did not necessarily accept valuation of either party.

       1 Cases that cite this headnote

[3]    **Internal Revenue**
        Value

       Tax Court's finding of fact with respect to valuation of patents for purposes of Internal Revenue Code provisions relating to basis of assets received by corporation in a distribution in complete liquidation of another corporation was to be reviewed under clearly erroneous standard. 26 U.S.C.A. (I.R.C.1954) § 334(b)(2).

       2 Cases that cite this headnote

[4]    **Internal Revenue**
       Evidence

       Tax Court's finding of fact with respect to valuation of patents, for purposes of Internal Revenue Code provisions relating to basis of assets received by taxpayer corporation in a distribution in complete liquidation of another corporation, was not clearly erroneous. 26 U.S.C.A. (I.R.C.1954) § 334(b)(2).

       1 Cases that cite this headnote

[5]    **Internal Revenue**
       Allocation of Basis

       Under Internal Revenue Code provisions relating to basis of assets received by corporation in a distribution in complete liquidation of another corporation, before allocation of taxable basis

to assets received is made, determination of fair market value of all of the assets must be made. 26 U.S.C.A. (I.R.C.1954) § 334(b)(2).

Cases that cite this headnote

[6]    **Internal Revenue**
       🔑 Allocation of Basis

"Residual value method," which assumes that sum of fair market values of all corporate assets acquired equals price paid for acquisition of these assets, was appropriate for determining value of goodwill for purposes of allocating taxable basis to assets received by taxpayer in a distribution in complete liquidation of another corporation, where there was no proof of substantial variations in asset values during two-month period between acquisition of stock and liquidation of corporation and where taxpayer failed to present evidence showing that price paid was not equal to fair market value. 26 U.S.C.A. (I.R.C.1954) § 334(b)(2).

13 Cases that cite this headnote

[7]    **Internal Revenue**
       🔑 Basis of Property Received by Corporate Transferee

Under Internal Revenue Code provisions relating to basis of assets received by corporation in a distribution in complete liquidation of another corporation, residual value method, which assumes that sum of fair market values of all corporate assets acquired equals price paid for acquisition of these assets, is an appropriate means for deriving value of intangible assets as long as total price paid and values of all other assets are known; however, resulting figure is not to be deemed conclusive proof of unknown value, and evidence suggesting that fair deal was not reached should be permitted. 26 U.S.C.A. (I.R.C.1954) § 334(b)(2).

13 Cases that cite this headnote

[8]    **Internal Revenue**
       🔑 Allocation of Basis

For purposes of Internal Revenue Code provisions relating to basis of assets received by a corporation in a distribution in complete liquidation of another corporation, Tax Court did not err in including in goodwill difference of over $700,000 between face value of 4% promissory note and its asserted market value, which difference resulted from decision by taxpayer and seller corporation to incorporate unstated interest into principal part of installment note, and Tax Court did not err in failing to allocate $700,000 to basis spread among all of the assets received in liquidation. 26 U.S.C.A. (I.R.C.1954) § 334(b)(2).

Cases that cite this headnote

[9]    **Internal Revenue**
       🔑 Valuation of Property

When parties themselves have deliberately fixed values to be placed on elements of a transaction, they are bound to accept Commissioner's construction of these values unless they can prove mistake, undue influence, fraud, or duress.

1 Cases that cite this headnote

[10]   **Internal Revenue**
       🔑 Determination and Disposition of Cause

Although Tax Court erroneously included in total price paid for stock federal income tax liability of acquired corporation for period between acquisition of stock and liquidation of corporation, where Tax Court also erroneously deducted from total price paid interim earnings of acquired corporation, where amount of interim earnings exceeded interim income tax liability and more than offset error in including in total price federal income tax liability, and where Internal Revenue Service did not appeal error in favor of taxpayer, Tax Court's judgment would not be disturbed. 26 U.S.C.A. (I.R.C.1954) § 334(b)(2).

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*249**  Kenneth P. Simon, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for appellant.

M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Jonathan S. Cohen, Richard D. Buik, Attys., Tax Div., Dept. of Justice, Washington, D. C., for appellee.

Before ROSENN, GARTH and HIGGINBOTHAM, Circuit Judges.

**Opinion**

### OPINION OF THE COURT

ROSENN, Circuit Judge.

The issues raised on this appeal reflect some of the subtle tax hazards lurking in corporate liquidations. The issues turn on the application of section 334(b)(2) of the Internal Revenue Code of 1954, 26 U.S.C. s 334(b)(2) (1976), dealing with the basis of property received in liquidation of a subsidiary. Section 334(b)(2) provides that "(i)f property is received by a corporation in a distribution in complete liquidation of another corporation," and if certain requirements are met, "then the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made." Basis in the assets is to be allocated in proportion to the fair market values of the assets. 26 C.F.R. 1.334-1(c)(4) (viii) (1978). In this case, both parties agree that the prerequisites **\*250** to the applicability of section 334(b)(2) have been met. The dispute hinges on the proper allocation of basis to the property transferred.

### I. THE PREDICATE FOR ASSET BASIS

In early 1970, R. A. Gilmour and Robert M. Smith entered into an agreement for the sale of all assets of the Gilmour Company, a manufacturer of lawn and garden equipment, to R. M. Smith, Inc. ("Smith"). At the request of Gilmour, the transaction was changed to a sale of all Gilmour Company stock for a total price of $3,780,550. The agreement did not include identification of the individual values of the assets being transferred. Payment for the stock was as follows: cash in the amount of $780,550; a promissory note for $300,000 at 71/2 percent; and an installment note for $2,700,000 at 4 percent. Smith also assumed existing liabilities of Gilmour Company which, by the time of liquidation, totalled $272,180.93. Although the transfer was effective as of

February 1, 1970, the transaction was not consummated until March 24, 1970. Within a week, Gilmour Co. was liquidated with Smith retaining the assets. After the liquidation, Smith continued to use the trade names, trademarks, and customer lists of Gilmour Company.

Pursuant to section 334(b)(2) and the underlying Treasury regulations, Smith allocated the refined adjusted basis [1] in the stock to the assets received upon liquidation. Included in this allocation was $1,833,392.53 assigned to depreciable intangible assets, namely six patents and an unpatented invention. No allocation was made to nondepreciable intangible assets (E. g., goodwill) which Smith regarded as having no fair market value. In subsequent tax returns, Smith claimed deductions for the amortization of the patents and invention based on the amount assigned.

In reviewing Smith's tax return the Internal Revenue Service ("IRS") concluded that only one patent had any basis and that amounted to $10,000. Thus, the Commissioner viewed the amortization deductions as excessive and issued a notice of deficiency. Smith petitioned the tax court for review of this determination.

The primary issue at trial was the fair market value of the patents and the invention. [2] Each side presented an expert witness who employed the identical method of computing the values but used different variables resulting in substantially differing figures of values. [3] The tax court determined that although the identical method employed by the experts was appropriate, each had either overestimated or underestimated certain variables. The tax court fixed the correct valuation at $860,000, a sum between the figures proposed by the witnesses.

The tax court proceeded to find that Smith had failed to assign basis to nondepreciable intangible assets goodwill, trademark, trade name, and customer lists. The court determined that the value of these intangible assets must be equal to the total purchase price of the stock less the sum of the known values of all other assets. This is based on the assumption that the best evidence of the fair market value of all of the assets is the total price paid for the stock. The court thus determined that the goodwill was worth $1,225,697.41. No attempt was made to fix specific values to the individual components of this total as all are nondepreciable.

The net effect of the court's holdings is that approximately $1.23 million in basis previously assigned to depreciable intangible assets are now assigned to nondepreciable assets,

43 A.F.T.R.2d 79-526, 79-1 USTC P 9179

resulting in a reduction in allowable **\*251** depreciation and amortization deductions.

On appeal, Smith challenges the tax court determinations of the values of the patents and of the nondepreciable intangibles. We affirm.

## II. PATENTS AND INVENTION

In support of its assessment of the fair market value of the patents and invention, Smith presented two witnesses qualified to address this issue. Smith's president adopted a method of calculating this figure which the court found "wholly unacceptable" and refused to give weight to the testimony. However, the other witness, a financial appraiser, utilized an approach which the court found appropriate. His analysis yielded an aggregate fair market value for the six patents of $1,867,000.

The Commissioner presented one expert witness, a patent lawyer. The witness employed the same method as Smith's expert, but his gross value for the patents was only $424,647. [4]

The court found that correct valuation of the patents lay in between the two figures presented by the experts. Specifically, it found the royalty rates and projections of future sales used by Smith's expert to be overly optimistic and those variables applied by the IRS expert to be unduly pessimistic. The judge concluded:

> After giving careful consideration to testimony received, the valuation reports submitted, and the parties' arguments on brief, we have done the best we could to make a reasonable determination of the fair market value of the patents . . . , and, using the same approach used by (both experts), have computed an aggregate amount of $745,000 . . . .

The court also found the unpatented invention to have a value of $115,000. Smith's expert set the figure at $130,000, as opposed to $10,000 by the IRS expert. (The value of this asset is not an issue on appeal.) Thus, the total value of the depreciable intangible assets was determined by the tax court to be $860,000.

[1]   Smith's contention on appeal attacks the appropriateness of the tax court assigning this value to the patents. Smith states that it had the burden of proving that the Commissioner's

determination of the gross values, which initially amounted to $10,000, was arbitrary. Having established that the calculation was in error, Smith was not required to prove the correct figure. The Commissioner had the burden of establishing the proper valuation and thus the actual tax owed. This much is an accurate statement of the law. Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 106, 79 L.Ed. 623 (1935); Federal National Bank v. Commissioner of Internal Revenue, 180 F.2d 494, 497 (10th Cir. 1950).

[2]   [3]   [4]   Where Smith's argument fails is in suggesting that the refusal of the tax court to accept the Commissioner's evidence requires this court to reverse the trial judge with instructions to expunge the deficiencies. The teaching of Helvering v. Taylor, supra, and Federal National Bank v. Commissioner of Internal Revenue, supra, is that the appropriate remedy in the absence of evidence of proper valuation is a remand to allow for additional evidence to be presented. In this case, however, sufficient evidence was introduced to allow the tax court to reach a reasonable conclusion. The court is not limited to simply choosing one of the two values proffered. It is appropriate for it to evaluate all of the evidence and to make an independent determination that does not necessarily accept the valuation of either party. This is not the first time the tax court has used this approach. See Philadelphia Steel & Iron Corp. v. Commissioner, 23 T.C.M. 558, 564-65 (1964), Aff'd per curiam, 344 F.2d 964 (3d Cir. 1965). The court's finding of fact with respect to valuation is to be reviewed under the clearly erroneous standard, **\*252** Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), and in this case must be sustained.

## III. NONDEPRECIABLE INTANGIBLE ASSETS

### A. Is the Residual Value Method Appropriate for Determining the Value ofGoodwill in this Case?

[5]   According to Treasury Regulation 1.334-1(c)(4)(viii) (1978), the allocation of taxable basis to the assets received in a section 334(b)(2) transaction shall be made in proportion to the fair market value of the assets. Thus, before basis is allocated, a determination of fair market value of All of the assets must be made. Having found that Smith received assets not listed on its balance sheet (goodwill, trademark, trade name, and customer lists), the tax court proceeded to assess their worth.

[6]    Rather than attempting an independent appraisal of these intangible assets, the court held that their value could be ascertained by the residual valuation method. Simply put, this method assumes that the sum of the fair market values of all assets acquired equals the price paid for the acquisition of these assets. The formula is the price paid minus known

values of assets equals unknown values of the remaining assets. Because the only assets without known values are the nondepreciable intangible assets, this formula can be applied readily to this case and yield the following results:

| | |
|---|---:|
| total consideration paid | |
| (price plus liabilities assumed) | $4,052,730.93 |
| less known fair market values of assets | |
| (as of date of liquidation) | -2,827,033.52 |
| fair market value of intangible assets | $1,225,697.41 |

The tax court also found that the evidence justifies allocating this sum to nondepreciable intangibles. Upon liquidation, Smith received an ongoing business that had been profitable for a number of years. It inherited a sound marketing program established in North and South America. It continued to use Gilmour Co.'s trade names which the tax court found were "well and favorably known to the users of lawn and garden equipment and promoted sales of these products."

Smith challenges the appropriateness of the utilization of the residual value method to the facts of this case. Smith presents basically two arguments in support of its contention.

First, Smith points out that two months elapsed between acquisition of the stock and liquidation of the corporation. During this time the value of the assets had to change as a result, for example, of normal appreciation and depreciation. If the value of the tangible assets decreased, then, by applying the residual value method (using total price paid on February 1 and the fair market value of assets on March 31), the assigned value to goodwill would be greater (and vice versa), even though the value of goodwill should remain constant. Although the argument is logically sound, the determination of fair market value, as a practical matter, is not an act of precision but only a matter of approximation. Minor fluctuations in asset values during the two months would be insignificant. Although proof of substantial variations would require adjustments in the resulting goodwill figure, this is not a sufficient reason for altogether abandoning the residual value method. In any event, no such proof was presented in this case.

Appellant's second argument is that the tax court permitted "the Commissioner to introduce as new matter residuary value goodwill after the record was closed" and, as a result, Smith was denied an opportunity to present testimony concerning goodwill. If true, this claim is significant.

As pointed out earlier, the theoretical underpinning of the residual value method is that the total price paid for the stock equals the sum of the fair market values of all of the underlying assets. Although this is a sound principle in economic theory, in reality it has its shortcomings. Specifically, it fails to take into account the common situation when one party to the transaction achieves a bargain. If the purchaser of the stock obtains a "good deal," then the residual value method would undervalue the *253 goodwill. If, on the other hand, the price paid is too high, then the computation will result in a correspondingly inflated goodwill figure. This problem does not require rejection of the residual value method price paid Is strongly probative, albeit not conclusive, of fair market value. However, it does suggest that the court consider evidence which would require alterations in the figure or abandonment of the formula altogether.

The cases applying the residual value method recognize this limitation. In Jack Daniel Distillery v. United States, 379 F.2d 569, 180 Ct.Cl. 308 (1967), the parties to the sale of stock had agreed to a value for goodwill after actively bargaining in good faith and settling on the value of the other assets. The court rejected an alternative computation for goodwill advocated by the IRS and used the residual method to confirm the figure agreed to by the parties. "The residuary method, though lacking in precision for use in all cases, may in

a proper case be accepted as the reasonable way to value goodwill." Id. at 579.

In Moss American, Inc. v. Commissioner, 33 T.C.M. 1121 (1974), the question was whether the price of the stock was equal to the fair market value of the underlying assets. The IRS argued that the aggregated fair market values exceeded the price by $12.5 million. However, the court concluded that the Commissioner's evidence was insufficient to treat the purchase of stock as a bargain purchase. "If such a purchase had, in fact, occurred, we would, of course, be faced with a different question and respondent's position would have merit." Id. at 1127-28.

In Plantation Patterns, Inc. v. Commissioner, 29 T.C.M. 817 (1970), Aff'd 462 F.2d 712 (5th Cir. 1972), and Philadelphia Steel & Iron Corp. v. Commissioner, supra, as in the cases above, the court allowed evidence demonstrating the inappropriateness of the residual method to be presented. Only after deciding that the evidence was unpersuasive did the court determine the value of goodwill by this formula. See also 10 Mertens, Law of Federal Income Taxation s 59.37 (residual method of valuing goodwill "should be followed with caution and in most cases the value of the goodwill should be supported by other collateral evidence").

 [7]   The rule to be drawn from these cases is that the residual value method is an appropriate means for deriving the value of intangible assets as long as the total price paid and the values of all other assets are known. The resultant figure, however, is not to be deemed conclusive proof of the unknown value. Evidence suggesting that a fair deal was not reached should be permitted. When appropriate, adjustments should be made in the value assigned to the intangible assets, or a different basis for deriving the figure should be substituted. Collateral evidence supporting a goodwill valuation by the residual method also should be received.

It is evident that in this case the tax court found support for its conclusion that the residual method was appropriate. It considered carefully the evidence which proved that intangible assets of substantial value had been received by Smith upon liquidation. If, however, the court precluded Smith from presenting contrary evidence to show that the price paid was not equal to fair market value, then it committed error. Despite its protestations, our review of the record leads us to the conclusion that Smith did have the opportunity to present such evidence. At trial, Smith argued that any intangible assets received upon liquidation were of nominal value only. The tax court stated in its opinion:

And, although, petitioner steadfastly maintains that we should sustain its asserted valuation of the patents and invention, petitioner Belatedly argued that if we should decide that the fair market values of the patents and invention were of lesser amounts than petitioner has claimed, nevertheless, the value of the trademark and goodwill should not be determined under the residual method. Rather, petitioner urges, as best we can understand it, that a specific determination of the fair market value of the trademark and goodwill must be made . . . . (Emphasis supplied.)

 *254  Thus, it appears that Smith anticipated the possibility that the court might find value for goodwill and it should have presented evidence on this point at

### trial. B. Did the Tax Court Calculate the Residual Value Goodwill Correctly?

Smith argues that the tax court erred in the starting point for the residual method the price paid for the stock. The form of payment for the stock was as follows:
1. $780,550 cash;

2. $300,000 promissory note at 71/2 percent for 3 years;

3. $2,700,000 installment note at 4 percent with no principal payments during first three years;

4. $272,180.92 liabilities assumed.

Smith contends that in determining the price paid, the $2,700,000 note should not have been assigned face value, but that it should have been discounted at its market value, $1,990,943. If this argument is accepted, then the resultant value of the intangible assets would be lower. This would mean that there would be a greater allocation of basis to the depreciable assets, and, thus, greater depreciation deductions. Smith, however, fails to discern the adjustment that then must be made to the $2,700,000 note when calculating the basis in the stock. If the adjustment is made in both places, then the net effect would be nil.

It appears that the difference of over $700,000 between the face value of the note and its asserted market value results from a decision by Smith and Gilmour to incorporate this economic or unstated interest into the principal part of the installment note. If the face value of the note did reflect its market value and the note carried a market rate of interest, then the $700,000 would have been included in interest payments on the note and would have been deductible by Smith. Of course, an equal amount would have to be treated as ordinary income by R. A. Gilmour. By including the sum in the principal portion of the note, the $700,000 becomes a capital gain to Gilmour. The question involving Smith's tax return is whether this amount should be allocated to basis spread among all of the assets received in liquidation allowing Smith to depreciate much of it, or whether it should be assigned to goodwill, a nondepreciable asset. We believe including it in goodwill is the appropriate result in this case.

[8]  [9]  Our independent research has failed to uncover a case which addresses the issue: under the residual method, in calculating the total purchase price for capital stock partially paid by a promissory note, should adjustments be made to the face value of the note when it is apparent from the low interest rate on the obligation that the face value does not equal the market value? The argument in favor of adjustment has intuitive appeal in that greater precision is being used to derive the fair market value of the unknown. However, the effect desired by the taxpayer (increase in bases of depreciable assets) only comes about because less precision is demanded in calculating the basis in the stock. The Internal Revenue Code, 26 U.S.C. s 483 (1976), and the underlying regulations, 26 C.F.R. ss 483.1-483.2 (1978), require that the treatment of notes for tax purposes be adjusted for unstated interest when the rate assigned is less than four percent. Because the interest rate of the note in question is four percent, no adjustment is required; nor do we believe one is necessary. We hold that both calculations should be made at face value. See Commissioner of Internal Revenue v. Danielson, 378 F.2d 771 (3d Cir. 1967). [5] Thus, the tax court did not err.

*255  [10]  The final contention made by Smith is that the tax court erroneously included in the total price paid for the stock the federal income tax liability ($59,766) of the acquired Gilmour Co. for the period between acquisition of the stock and liquidation of the corporation. By application of the residual value method, the increase in the price paid results in an increase in the value assigned to goodwill (see formula, Supra at 252). As noted earlier, an increase in the amount treated as goodwill results in a lower allocation of basis to depreciable assets. Because the tax court was attempting to derive the value of goodwill as of the date of acquisition, the inclusion of the subsequent tax liability in total price paid is inappropriate. The interim income tax liability in no way would increase the value of goodwill at the time of acquisition.

Reversal is unnecessary, however, because the tax court also erred in deducting from the total price paid the interim earnings of the Gilmour Co. ($109,700). The interim earnings flowed into the company after acquisition and became part of the value of the assets known (the subtrahend in the residual value formula). Increasing the subtrahend resulted in a reduction of the value assigned to goodwill. The events transpiring during the interim period could not have altered the value of goodwill as of the date of acquisition and again should not have been included in applying the residual value formula. The amount of interim earnings exceeded the interim income tax liability and more than offset the error claimed by the taxpayer. The IRS has not appealed this error in favor of the taxpayer, and thus, the tax court's judgment need not be disturbed.

## IV. CONCLUSION

We perceive no reversible error by the tax court and its decision will be affirmed. Costs to be taxed against the appellant.

**Parallel Citations**

43 A.F.T.R.2d 79-526, 79-1 USTC P 9179

Footnotes

1    "Refined adjusted basis" is a term adopted by the tax court referring to basis that has gone through two adjustments.

2    Prior to trial the parties agreed to the fair market value of all the tangible assets received by Smith upon liquidation.

3    The president of Smith, Robert M. Smith, also testified on this issue; however, his testimony was discredited by the trial judge.

4    The Commissioner abandoned his original position that the total value of these assets was $10,000.

5    It seems incongruous for the court to approve as large a sum as $1,225,697.41 for the goodwill of a manufacturing concern whose gross revenue only approximates $2,000,000 per annum. This allocation, however, was the direct result of the amount fixed in the installment note by the parties to the sale and purchase. Smith's president was a practicing accountant fully familiar with the affairs of the Gilmour Company, having been its accountant. He should have recognized the possibility that this result might flow from the agreement. When the parties themselves have deliberately fixed the values to be placed on the elements of a transaction, they are bound to accept the Commissioner's construction of these values, unless they can prove mistake, undue influence, fraud, or duress. Commissioner of Internal Revenue v. Danielson, 378 F.2d 771, 775 (3d Cir. 1967).

---

**End of Document**                                       © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 124

## *Ex parte* JAMES. *In re* CONDON.

L. JJ.

1874

July 10.

*Bankruptcy—Execution Creditor—Notice to Sheriff of Petition for Liquidation —Neglect of Creditors to pass Resolution—Subsequent Petition and Adjudication of Bankruptcy—Bankruptcy Act, 1869, ss. 87, 125, sub-s. 12—Bankruptcy Rules, 1870, r. 267—Mistake of Law, Relief against.*

A creditor levied execution on his debtor's goods for a debt exceeding £50, and the sheriff seized and sold them. The debtor filed a petition for liquidation, and served notice of it on the sheriff before the sale. Before the expiration of fourteen days after the sale the first meeting of the creditors was held, but no resolution was passed. The sheriff then, after the expiration of the fourteen days, paid the proceeds of the sale to the execution creditor. Afterwards a bankruptcy petition was filed by another creditor, which stated the filing of the petition for liquidation and the failure of the proceedings, and the debtor was adjudicated bankrupt under this petition. The trustee demanded the proceeds of the sale from the execution creditor, who paid them to him, believing that he was legally entitled to them :—

*Held,* that the liquidation proceedings entirely came to an end on the failure of the meeting to pass a resolution, and that the debtor was not adjudged a bankrupt on the liquidation petition within the meaning of the 87th section of the *Bankruptcy Act,* 1869 ; and the sheriff was therefore justified in paying the proceeds of the sale to the execution creditor :

*Held,* also, that the Court had jurisdiction to relieve against the mistake of law, and to order the money to be repaid by the trustee to the execution creditor.

Proceedings under Rule 267 of the *Bankruptcy Rules,* 1870, for adjudication of bankruptcy based upon the neglect of the first meeting of creditors to pass a resolution for liquidation or composition, must be commenced by petition.

THIS was an appeal from a decision of Mr. Registrar *Roche,* sitting as Chief Judge in Bankruptcy.

In the month of October, 1873, *H. Bradshaw* commenced an action in the Court of Queen's Bench against *John Condon,* in which he obtained judgment for his debt and costs, amounting to £274 3s. 5d.

On the 15th of November, 1873, *Bradshaw* sued out a writ of *fieri facias* against *Condon,* and on the 17th of November the Sheriff of *Middlesex* took possession under it of certain goods of the Defendant's at *Millwall.*

On the 18th of November, *Condon* filed a petition for liquidation by arrangement, notice of which was served on the sheriff on the 22nd of November.

CHANCERY APPEALS. [L. R.

L. JJ.
1874

*Ex parte*
JAMES.
*In re*
CONDON.

On the same day the sheriff sold the goods, which produced a net sum of £142 15s. 6d.

On the 5th of December the first general meeting of creditors was held, but no resolution was passed except that the meeting should be adjourned till the 16th of December.

On the 16th of December neither the debtor nor his solicitor was present at the adjourned meeting, and no resolution was passed by the creditors. No further proceedings were taken in the liquidation.

On the 17th of December the sheriff paid *Bradshaw* the sum of £142 15s. 6d., which he had retained to await the result of the petition for liquidation.

On the 19th of December a petition for adjudication in bankruptcy was filed by another of *Condon's* creditors. This petition was filed under Rule 267 of the *Bankruptcy Rules,* 1870, and stated the filing of the petition for liquidation by arrangement, and that no resolution had been passed at the meeting of creditors, and that no other proceedings had taken place under the petition for liquidation.

On the 10th of January, 1874, *Condon* was adjudicated bankrupt, and Mr. *J. E. James* was appointed trustee of his estate.

Soon after the appointment of the said trustee the solicitors for the trustee threatened *Bradshaw* with proceedings if the money received by him from the sheriff was not paid over to the trustee, and on the 23rd of February, 1874, *Bradshaw*, being advised that, according to the law as then laid down, he would have no defence against such proceedings, paid the sum of £142 15s. 6d. to the trustee.

After the decision of the case of *Ex parte Villars* by the full Court of Appeal (1), *Bradshaw* applied to the trustee to refund the money, and the matter having been brought before the Registrar, on the 26th of June he made an order to that effect. From this decision the trustee appealed.

Mr. *Thesiger*, Q.C., and Mr. *Cooper Willis*, for the Appellant:—

The question in this case really turns upon the construction of

(1) *Ante,* p. 432.

the clause in the 87th section of the *Bankruptcy Act*, 1869 (1), which provides that in cases where notice of a bankruptcy petition has been served on the sheriff, if " the trader against whom the petition has been presented is not adjudged a bankrupt on such petition, or on any other petition of which the sheriff, high bailiff, or other officer, has notice, he may deal with the proceeds of such sale in the same manner as he would have done had no notice of the presentation of a bankruptcy petition been served on him." Under the 125th section a petition for liquidation is for this purpose equivalent to a bankruptcy petition; and we contend that, according to the true construction of this section, the debtor has in this case been adjudged a bankrupt on the petition which was served on the sheriff, and that the proceeds ought, therefore, not to have been paid over to the execution creditor. The proceedings in the liquidation were still pending: *Ex parte Jeffery* (2); and it was the duty of the sheriff to keep the proceeds beyond the fourteen days until he was able to see, not only that the liquidation would not proceed, but that no bankruptcy would arise out of it. In the present case bankruptcy has resulted from the liquidation, for the Court made the order for adjudication under Rule 267 of the *Bankruptcy Rules*, 1870 (3), based upon the neglect of the creditors to pass any resolution; and

L. JJ.

1874

*Ex parte*
JAMES.

*In re*
CONDON.

(1) 32 & 33 Vict. c. 71, s. 87: "Where the *goods of any trader* have been taken in execution in respect of a judgment for a sum exceeding fifty pounds, and sold, the sheriff, or in case of a sale under the direction of the County Court, the high bailiff, or other officer of the County Court, shall retain the proceeds of such sale in his hands for a period of fourteen days, and upon notice being served on him within that period of a bankruptcy petition having been presented against such trader, shall hold the proceeds of such sale, after deducting expenses, on trust to pay the same to the trustee ; but if no notice of such petition having been presented be served on him within such period of fourteen days, or if such notice having been served the trader against whom

the petition has been presented is not adjudged a bankrupt on such petition, or on any other petition of which the sheriff, high bailiff, or other officer has notice, he may deal with the proceeds of such sale in the same manner as he would have done had no notice of the presentation of a bankruptcy petition been served on him."

(2) Law Rep. 17 Eq. 61.

(3) *Bankruptcy Rules*, 1870, r. 267 : " In the event of any neglect on the part of the creditors to pass such resolution, the Court may on the application of any of the creditors, and after notice to the debtor, make an order of adjudication against the debtor, or direct the bankruptcy to be proceeded with, as the case may be."

L. JJ.

1874

*Ex parte*
JAMES.
*In re*
CONDON.

it had also power to make the order under the *Bankruptcy Act,*
1869, s. 125, sub-s. 12 (1).    For this purpose, no petition in bank-
ruptcy was necessary ; it would have been sufficient to give the
Court notice of the failure of the liquidation proceedings : *Ex
parte Page* (2) ; *Ex parte Mylne* (3).

We also contend, even if the Court should be against us on
the construction of the Act, that the money having been paid to
the trustee voluntarily, under a mistake of law, cannot now be
recovered from him.    The trustee is not an officer of the Court,
but the representative of the general body of the creditors, and he
did not receive the money from the execution creditor *virtute
officii*, but simply as such representative : *Brisbane* v. *Dacres* (4) ;
*Steele* v. *Williams* (5).

Mr. *De Gex*, Q.C., and Mr. *Finlay Knight*, for the execution
creditor :—

The debtor cannot be said, in any sense, to have been adjudged
a bankrupt on the liquidation petition.    The proceedings in liqui-
dation were entirely at an end.    The meeting had come to a con-
clusion without passing any resolution, and there could be no
fresh first meeting, *Ex parte Cobb* (6), and it was impossible that
anything further could be done under it.    The petition in bank-
ruptcy was a totally new proceeding ; it is true that the petition
recited the petition for liquidation, but that was because the filing
of the petition was the act of bankruptcy on which the bank-
ruptcy petition was founded : *In re Jones* (before C. J. *Bacon,*
Feb. 25, 1870); *Ex parte Duignan* (7).    It could never have
been intended by the Legislature that after the sheriff knew that
the liquidation proceedings had failed he should keep the money
for six months to see whether a bankruptcy petition would be

---

(1) 32 & 33 Vict. c. 71, s. 125, sub-s.
12 : "If it appear to the Court on satis-
factory evidence that the liquidation
by arrangement cannot, in consequence
of legal difficulties, or of there being no
trustee for the time being, or for any
sufficient cause, proceed without injus-
tice or undue delay to the creditors or
to the debtor, the Court may adjudge

the debtor a bankrupt, and proceedings
may be had accordingly."
(2) 25 L. T. (N.S.) 716.
(3) Roche and Hazlitt's Law and
Practice of Bankruptcy, 2nd Ed. p. 493.
(4) 5 Taunt. 143, 151.
(5) 8 Ex. 625.
(6) Law Rep. 8 Ch. 727.
(7) 40 L. J. (Bkcy.) 68.

founded upon the act of bankruptcy committed by filing the petition for liquidation.  The *Bankruptcy Act*, 1869, s. 125, sub-s. 12, has no application to a case where no resolution at all has been come to, and where therefore the liquidation proceedings are at an end.  The sheriff was therefore justified in paying the money to the execution creditor: *Ex parte Villars* (1).

Then with respect to the second point, we contend that the trustee is an officer of the Court, and is bound to administer the money in his hands according to the principles of the law of bankruptcy.  By the 20th section of the *Bankruptcy Act*, 1869, he is placed in the same position as a receiver of the Court of Chancery.  But independently of the nature of the office of the trustee, the rule that relief cannot be given for a mistake of law has never been considered by the Court of Chancery an inflexible rule, and has been departed from in cases where manifest injustice would result from it: *Re Saxon Life Assurance Society* (2); *Stone v. Godfrey* (3).

Mr. *Thesiger*, in reply.

SIR W. M. JAMES, L.J.:—

I am of opinion that the order of the Registrar must be affirmed.  I adhere to the opinion which I expressed in *Ex parte Villars*, that the rights of an execution creditor ought to be respected except so far as the Act of Parliament has expressly interfered with them.  In levying his execution, he has only done what he had a right to do, and he is entitled to enjoy the proceeds of it unless he is restrained from so doing by the Act.  The onus of proof is thrown on those who desire to shew that he ought not to reap the fruits of his execution.

In this case it is impossible to say that the adjudication of bankruptcy was made on any petition of which the sheriff had notice before he paid the money to the execution creditor.  If before the proceedings in liquidation had failed another petition had been presented before the money had been paid over by the sheriff, it would have been a different case.  But the result of what took

L. JJ.
1874
*Ex parte*
JAMES.
*In re*
CONDON.

(1) *Ante*, p. 432.          (2) 2 J. & H. 408.
(3) 5 D. M. & G. 76.

CHANCERY APPEALS.                    [L. R.

L. JJ.

1874

Ex parte
JAMES.
In re
CONDON.

place at the meeting of the 16th of December was, that the pro-
ceedings under the petition for liquidation came hopelessly to an
end.   There was nothing in the nature of a resolution, nothing
that could result in the appointment of a trustee.   Any creditor
might, if he had chosen to do so, have presented a petition for
adjudication within the fourteen days, and thus have intercepted
the right of the execution creditor; but this was not done, and I
think therefore that the sheriff was justified in paying over the
money, and that the execution creditor was entitled to keep the
proceeds of the sale.

With regard to the other point, that the money was voluntarily
paid to the trustee under a mistake of law, and not of fact, I
think that the principle that money paid under a mistake of law
cannot be recovered must not be pressed too far, and there are
several cases in which the Court of Chancery has held itself not
bound strictly by it.   I am of opinion that a trustee in bankruptcy
is an officer of the Court.   He has inquisitorial powers given him
by the Court, and the Court regards him as its officer, and he is to
hold money in his hands upon trust for its equitable distribution
among the creditors.   The Court, then, finding that he has in his
hands money which in equity belongs to some one else, ought to
set an example to the world by paying it to the person really
entitled to it.   In my opinion the Court of Bankruptcy ought to
be as honest as other people.   The appeal must be dismissed, but
without costs.


SIR G. MELLISH, L.J. :—

I am of the same opinion.   This case cannot, in principle, be
distinguished from *Ex parte Villars* (1) as to the construction of the
87th section.   Although a petition for adjudication is alone men-
tioned in it, it must be understood, under sect. 125, to apply
equally to a petition for liquidation by arrangement, and therefore
it must be read as if a petition for liquidation had been men-
tioned in it.   When, therefore, the sheriff has received notice of a
liquidation petition having been filed, he is bound to keep the
proceeds of the sale beyond the fourteen days, until he knows

(1) *Ante*, p. 432.

whether the proceedings under the petition have come to an end
or not.   The question is, therefore, what in the case of proceedings
in liquidation corresponds to an adjudication in bankruptcy?   The
87th section says in effect that the sheriff is to keep the proceeds
of the sale until he has ascertained whether the debtor against
whom the bankruptcy petition has been presented is or is not
adjudicated bankrupt on that petition or any other petition of
which the sheriff has notice; and, by the 125th section, the ap-
pointment of a trustee under a liquidation petition is made equiva-
lent to an adjudication in bankruptcy.   I am of opinion that when,
on the 16th of December, the creditors dispersed without coming
to any resolution, all proceedings under the liquidation came to an
end, and it became impossible, under that petition, that a trustee
should be appointed.   But it is contended that, although it was
impossible that a trustee should be appointed, it was possible for
the debtor to be adjudicated bankrupt on the declaration of in-
solvency contained in the petition for liquidation, and that the
sheriff ought to have kept the proceeds of the sale until he had
seen whether this would be done or not.   In my opinion it would
be a very inconvenient construction to put upon the 87th section.
The effect would be, that the sheriff would have to keep the
money for six months, because, at any time within that period, a
bankruptcy petition founded on the liquidation petition might be
presented against the debtor.   It was argued that the 267th rule
only requires that notice shall be given to the Court, and not that
a petition shall be filed in the event of neglect on the part of the
creditors to pass a resolution for liquidation.   But I think that it
is not competent to the Court to apply the General Rules in such
a way as to take away from an execution creditor the rights given
him by the Act of Parliament, and that, according to the true
construction of the 125th section, it was not contemplated that a
debtor who has filed a liquidation petition should be adjudicated
bankrupt on the petition for liquidation without a petition in bank-
ruptcy, unless the case came within the 12th sub-section of that
section.   Whether, under that sub-section, the debtor could be
adjudicated bankrupt without a petition in bankruptcy, it is not
necessary now to decide, because it appears to me that that sub-

L. JJ.

1874

*Ex parte*
JAMES.

*In re*
CONDON.

CHANCERY APPEALS.                    [L. R.

L. JJ.

1874

*Ex parte*
JAMES.
*In re*
CONDON.

section only applies to cases in which the creditors have passed a resolution and made some progress in the liquidation.   The Chief Judge has very properly decided that an application under the 167th rule must be made by petition.   At any rate, in my opinion, an execution creditor cannot have his rights taken away by the Rules.

I am therefore of opinion, consistently with *Ex parte Villars* (1), that as soon as the prosecution of the proceedings in liquidation became impossible, the sheriff, having no notice of any other petition, was justified in paying over the money to the execution creditor, and that it cannot be recovered from him.

With respect to the second point, namely, the payment of the money to the trustee under a mistake of law, I entirely agree with the observations of the Lord Justice.

I also agree that the appeal should be dismissed without costs.

Mr. *Thesiger* asked that the costs of the trustee might be paid out of the estate.

SIR W. M. JAMES, L.J. :—

You must make that application to the Registrar.   It appears to me a suitable case for the trustee to have his costs out of the estate, but it is not our practice to make such an order.

Solicitors for the Appellant: Messrs. *Chorley & Crawford.*
Solicitors for the Respondent: Messrs. *Ravenscroft & Hills.*

(1) *Ante*, p. 432.

# TAB 125

1995 CarswellOnt 1169, [1995] O.J. No. 3993, 37 C.B.R. (3d) 237

1995 CarswellOnt 1169
Ontario Court of Justice (General Division), In Bankruptcy

Confederation Treasury Services Ltd., Re

1995 CarswellOnt 1169, [1995] O.J. No. 3993, 37 C.B.R. (3d) 237

# Re bankruptcy of CONFEDERATION TREASURY SERVICES LIMITED

Farley J.

Heard: December 8, 1995
Judgment: December 12, 1995
Docket: Doc. 31-205220

Counsel: *Lyndon A.J. Barnes*, *Gordon Marantz* and *Tristram Mallett*, for UBS Limited and Arm's Length Creditors Committee of Confederation Treasury Services Limited.
*Harry Fogul*, for Province of Ontario.
*Ronald N. Robertson, Q.C.*, and *Edmond Lamek* for UBS Limited.
*William G. Horton* and *Daniel V. Macdonald*, for U.S. rehabilitator of Confederation Life Insurance Company.
*Benjamin Zarnett* and *Gale Rubenstein*, for Peat Marwick Thorne Inc., agent to Superintendent of Financial Institutions, provisional liquidator of Confederation Life Insurance Company.
*Bruce Leonard* and *John R. Sandrelli* for National Organization of Life and Health Insurance Guaranty Associations.
*Charles F. Scott* and *Ulli Streit* for Compcorp.
*L.A. Wittlin*, for Deloitte & Touche Inc., monitor of Confederation Life Ins. Co. pursuant to *Companies' Creditors Arrangement Act*.

Subject: Corporate and Commercial; Insolvency

## Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

## Headnote

Trustees — Appointment — Motion for replacement nominee for trustee — Petitioning creditor bringing motion to have proposed nominee replaced — Other parties opposing nominee as being party that had done extensive forensic investigation on behalf of group of creditors — Motion granted — No evidence to suggest on-going relationship between creditors' group and nominee — No evidence to show that nominee could not fulfil duties in impartial manner — Nominee already familiar with complex case.

In complex proceedings under the *Companies' Creditors Arrangement Act* ("CCAA"), the stay was lifted for the purpose of hearing a motion for a replacement nominee for the trustee. The proposed replacement nominee had done extensive forensic investigation on behalf of a group of creditors in the CCAA proceedings. Other parties opposed the substitution, fearing that the proposed replacement nominee would not be impartial in the bankruptcy proceedings, given its involvement on behalf of the creditors' group in the CCAA proceedings.

## Held:

The motion was granted.

Confederation Treasury Services Ltd., Re, 1995 CarswellOnt 1169

1995 CarswellOnt 1169, [1995] O.J. No. 3993, 37 C.B.R. (3d) 237

There was no evidence of an on-going relationship between the proposed nominee and the creditors' group that would influence the nominee from its neutral, impartial role as trustee acting in the best interests of the estate. The nominee was familiar with and knowledgeable about the complex and complicated case and there was no reason to disqualify it. To appoint another trustee would cause a significant delay as that trustee became acquainted with the case and a significant duplication of expense.

**Table of Authorities**

**Cases considered:**

*Batteries Included, Inc., Re* (1987), 67 C.B.R. (N.S.) 123 (Ont. S.C.) — *considered*

*Bryant, Isard & Co., Re* (1923), 4 C.B.R. 41, 24 O.W.N. 597 (S.C.) — *considered*

*Cadillac Fairview Inc., Re* (February 9, 1995), Doc. B348/94, Farley J. (Ont. Gen. Div. [Commercial List]) — *referred to*

*Drash, Re* (1930), 11 C.B.R. 402, 38 O.W.N. 295 (C.A.) — *referred to*

*Environdyne Industries, Re*, 150 B.R. 1008 (Bankr. N.D. Ill. 1993) — *referred to*

*Ethier, Re* (1991), 7 C.B.R. (3d) 268 (Ont. Bktcy.) — *referred to*

*Federal Trust Co. v. Frisina* (1976), 28 C.B.R. (N.S.) 201, 20 O.R. (2d) 32, 86 D.L.R. (3d) 591 (S.C.) — *considered*

*Gauthier Lumber Ltd., Re* (1960), 1 C.B.R. (N.S.) 127 (Que. S.C.) — *referred to*

*I. Caron Ltd. v. Robin Hood Mills Ltd.* (1935), 17 C.B.R. 101 (Que. S.C.) — *referred to*

*Lamb, Re; Ex parte Board of Trade*, 1 Mans. 373, 9 R. 636, [1894] 2 Q.B. 805  (C.A.)*considered*

*Martin, Re* (1888), 5 Morr. 129, 21 Q.B.D. 29 — *referred to*

*Micro-Time Management Systems, Re*, 102 B.R. 602 (Bankr. E.D. Mich. 1989) — *referred to*

*Orzy, Re* (1923), 3 C.B.R. 737, 53 O.L.R. 323 at 327, [1924] 1 D.L.R. 250 (C.A.) — *referred to*

*Prince Edward Island v. Bank of Nova Scotia* (1988), 70 C.B.R. (N.S.) 209, 72 Nfld. & P.E.I.R. 191, 223 A.P.R. 191, 2 T.C.T. 4090 (P.E.I. T.D.), reversed (1989), 77 C.B.R. (N.S.) 113, 81 Nfld. & P.E.I.R. 295, 255 A.P.R. 295, 2 T.C.T. 4304 (P.E.I. C.A.) — *considered*

*Quinte Nurseries Ltd., Re* (1982), 41 C.B.R. (N.S.) 156 (Ont. S.C.) — *referred to*

*REA Holding Corp., Re*, 4 Bankr. Ct. Dec. 1249 (Bankr. S.D.N.Y. 1979), reversed 2 B.R. 733 (1980) — *considered*

*R.J. Nicol Construction Ltd. (Trustee of) v. Nicol* (1995), 30 C.B.R. (3d) 90, 77 O.A.C. 395 (C.A.) — *referred to*

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1995 CarswellOnt 1169, [1995] O.J. No. 3993, 37 C.B.R. (3d) 237

*Reed, Re* (1980), 34 C.B.R. (N.S.) 83, 28 O.R. (2d) 790, 111 D.L.R. (3d) 506 (C.A.) — *referred to*

*Rizzo Shoes (1989) Ltd., Re* (1995), 29 C.B.R. (3d) 270 (Ont. Gen. Div. [Commercial List]) — *referred to*

*Sharby v. N.R.S. Elgin Realty Ltd. (Trustee of)* (1991), 55 C.C.E.L. 305, 41 E.T.R. 193, 3 O.R. (3d) 129 (Gen. Div.) — *referred to*

*Shaw Co., Re*, 3 C.B.R. 198, 16 Sask. L.R. 275, [1922] 3 W.W.R. 119, 68 D.L.R. 616 (K.B.) — *considered*

*Tannis Trading Inc. v. Camco Food Services Ltd. (Trustee of)* (1988), 67 C.B.R. (N.S.) 1, 63 O.R. (2d) 775, 49 D.L.R. (4th) 128 (S.C.) — *considered*

*W.T. Grant, Re*, 4 B.R. 53 (Bankr. S.D.N.Y. 1980) — *considered*

*W.T. Grant Co. 1, Re*, 699 F.2d 599 (2d. Cir. N.Y. 1983) [cert. denied *Cosoff v. Rodman*, 464 U.S. 822, 70 L. Ed. 2d 97, 104 S. Ct. 89, 52 U.S.L.W. 3262 (1983)] — *referred to*

*Western Canada Beverage Corp., Re* (1993), 22 C.B.R. (3d) 10 (B.C. S.C.) — *referred to*

**Statutes considered:**

Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3 —

s. 13.3

s. 13.3(2)

s. 14

s. 14.04

s. 43(9)

s. 102(5)

s. 163

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36.

Motion for order replacing nominee for trustee.

*Farley J.*:

UBS Limited — "UBS"

Arm's Length Creditors Committee — "ALC Committee"

Confederation Treasury Services Limited — "Treasury"

Province of Ontario — "Ontario"

1995 CarswellOnt 1169, [1995] O.J. No. 3993, 37 C.B.R. (3d) 237

U.S. Rehabilitator of Confederation Life Insurance Company — "Rehabilitator"

National Organization of Life and Health Insurance Guaranty Associations — "NOLA"

Confederation Life Insurance Company — "CLIC"

Peat Marwick Thorne Inc. Agent to the Superintendent of Financial Institutions, Provisional Liquidator of CLIC — "Liquidator"

Deloitte & Touche Inc. — "Deloitte"

Richter & Partners Inc. — "Richter"

BDO Dunwoody Ltd. — "Dunwoody"

Doane Raymond Ltd. — "Doane"

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 as amended — "BIA"

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 — "CCAA"

1    Houlden J.A. is supervising the Treasury CCAA proceedings; he lifted the stay for the purpose of my hearing this motion regarding a replacement nominee for the trustee. It is expected that he will lift the stay generally on Dec. 15, 1995 or shortly thereafter once all pressing matters regarding the CCAA proceedings have been dealt with by him. It would then appear that everyone's expectation and desire is that Treasury immediately thereafter be placed in bankruptcy.

2    UBS (the replacement petitioning creditor in the bankruptcy proceedings) moved to amend the petition to nominate Richter as trustee in bankruptcy in place of Deloitte. It also sought a receiving order against Treasury (appointing Richter as trustee) effective immediately following the termination of the CCAA proceedings. As regards the latter motion, it would seem to me that this should be more appropriately dealt with once the CCAA proceedings have terminated. Mr. Barnes argued on behalf of UBS and the ALC Committee; he was supported by Mr. Robertson also acting for UBS and by Mr. Fogul on behalf of Ontario. Deloitte took no part of the argument; it had previously indicated that it was not willing to stand for appointment as trustee (either as sole trustee or in some joint or shared responsibility capacity) unless it had the endorsement of all three major stakeholders — the ALC Committee, Rehabilitator and Liquidator. The ALC Committee was opposed to Deloitte having a role as trustee. Instead it wished to have Richter, a firm which had done extensive forensic investigation on its behalf in the CCAA proceedings, the investigation being essentially of document review but no interviews or examinations. The substitution of Richter as the trustee nominee was opposed by the remaining participants — Mr. Horton for the Rehabilitator, Mr. Zarnett for the Liquidator, Mr. Leonard for NOLA and Mr. Scott for Compcorp; they preferred that Dunwoody or Doane be the substitute since they submitted that Richter was not impartial in the bankruptcy proceedings given its involvement for the ALC Committee in the CCAA proceedings.

3    The Rehabilitator has tabled a motion which obstensively was to be heard at the same time as this motion for an order:

1. Declaring that the bankruptcy of [Treasury] shall proceed in accordance with the provisions of the Protocol which is attached as Appendix A [to that motion record].

2. In the alternative, declaring that section 69.3(1) of [BIA] does not operate with respect to the [Rehabilitator's] claims against [Treasury] as set forth in the draft Statement of Claim attached as Appendix "B" [to that motion record] (the "Ontario Proceedings").

3. In the further alternative granting the [Rehabilitator] leave to issue and proceed in the Ontario Proceedings; and

4. such further and other relief as to this Honourable Court seems just.

1995 CarswellOnt 1169, [1995] O.J. No. 3993, 37 C.B.R. (3d) 237

This motion was certainly premature since the stay had not been lifted for that purpose and it presupposed that the trustee in bankruptcy (once Treasury were declared bankrupt) would be preempted from this motion. I found this quite puzzling, especially since this matter had been previously informally canvassed and the same concerns expressed. This motion was adjourned to a more appropriate time once all interested parties had been canvassed. This overall battle amongst the stakeholders has been fought since the beginning of the CCAA proceedings some sixteen months ago. Despite this intimate, intensive and extensive involvement it was candidly volunteered by the Rehabilitator that the matter was complicated beyond any comprehension and that it could not be even described after all this time. Thus in the Michigan material there were claims advanced by the Rehabilitator on the basis of eleven separate (and distinct) grounds. It would not seem that the Rehabilitator is estopped from pleading in the alternative: see (*Sharby v. N.R.S. Elgin Realty Ltd. (Trustee of)* (1991), 3 O.R. (3d) 129 (Gen. Div.) at pp. 140-1), at least at this stage of the proceedings.

4     I would also note that the estate is of the magnitude of some $630 million dollars, all of which except approximately $30 million dollars (plus or minus a very wide allowance) is in the form of "cash". Thus while the major percentage of the estate has been liquidated, it is clear that there is a sizeable absolute amount of the number of various types of assets to be gathered in, subject to of course assorted disputes. If this latter role were hived off, it would comprise a major bankruptcy estate by itself.

5     It would appear that Richter, Dunwoody and Doane are willing to be considered as nominees. Deloitte has removed itself from the running, based upon its unfulfilled condition. Other firms are conflicted out.

6     Perhaps it is the fact that

(a) the major stakeholders have been warring in a very negative sense for over a year.

(b) the potential losses for each are quite sizeable, in the hundreds of millions, when each with moral legitimacy looks upon their own "ultimate" situation as an innocent who has been mugged,

(c) there is a great deal of money ($630 million dollars odd) which may be recovered out of the estate.

(d) under certain scenarios it is conceivable that a stakeholder could obtain a benefit before the others and under other scenarios the stakeholder might be shut out from that estate.

(e) tactics may appear at first glance to give more relief (or inflict a negative relief upon the others) than strategies,

(f) stakeholders may be unsure of their comparative positions and interests despite ample opportunity to reflect upon same,

(g) some undisclosed factor(s) or

(h) a combination of some or all of the foregoing,

which has resulted in all concerned attempting to introduce a lot of colour and atmosphere plus premature arguments into these proceedings. I would not think that helpful in the long run, neither for these proceedings in general nor for the interest of the stakeholders so advancing this tinged view of things and trying to set the stage for future battles. However on reflection I trust that counsel and their clients will appreciate that this is unproductive.

7     The ALC Committee and specifically UBS appear to represent creditors of Treasury who loaned funds to Treasury in a commercial situation, taking the benefits of that loan together with its commercial risk. The other side may to some degree or other have claims against the $630 million dollars which may be in the nature of property or trust claim (or something similar) which I will hereafter describe as a proprietary claim which would take some or all of the $630 million dollars out of the estate (and thus away from the potential dividend to be shared amongst the creditors). There also seems to be the possibility of a claim which although a "creditor claim" within the estate is advanced on the basis that it should enjoy a priority and be paid out before the "ordinary" creditor claims, this priority not being of a temporal nature but rather of a preference nature. I think it fair to observe that the rights and entitlements advanced are not so clear cut that, at least at this stage, it would be inappropriate for any

WestlawNext® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1995 CarswellOnt 1169, [1995] O.J. No. 3993, 37 C.B.R. (3d) 237

trustee to acquiesce and hand over the funds. Unless there is some compromise achieved, it is painfully obvious that there will be litigation. This litigation may be as to a dispute between the trustee and someone claiming that it has a proprietary right which takes assets out of the estate (see the comments of Goodman J.A. in *R.J. Nicol Construction Ltd. (Trustee of) v. Nicol* (1995), 30 C.B.R. (3d) 90 (Ont. C.A.) at p. 94 or it may be a dispute amongst creditors within the estate (see the views of Ferguson J.A. in *Re Orzy* (1923), 3 C.B.R. 737 (Ont. C.A.) at p. 741 and Hodgins J.A. at p. 738) or a combination thereof. While the trustee would have an active role in the proprietary claim dispute, it would seem to me on a casual observation of the trustee's role in a dispute between creditors in the estate would primarily be that of a true stakeholder (i.e. in its "original" sense of someone who merely holds the stakes being wagered or fought over as opposed to the "modern" additional sense used by the participants here of someone who claims to have a stake in the outcome of these proceedings) and, as may possibly be required, ensure that the participants observe the rules of the game, even if only on a report basis to the court or by asking for advice and directions.

8     In this regard and regard and generally the trustee is an officer of the court. As stated in *Houlden and Morawetz, Bankruptcy Law in Canada* (3rd ed. 1995) at pp. 1-61/2:

> The trustee is an officer of the court and should impartially represent the interests of creditors: *Re Roy* (1963), 4 C.B.R. (N.S.) 275 (Que. S.C.). He should act equitably and, as far as possible, hold an even hand between competing interests of various classes of creditors: *Re Reed* (1980), 34 C.B.R. (N.S.) 83, reversing 32 C.B.R. (N.S.) 203 (Ont. C.A.). In bringing proceedings, such as an application to set aside a fraudulent preference, he should not adopt an adversarial or hostile role: *Touche Ross Ltd. v. Weldwood of Canada Sales Ltd.* (1983), 48 C.B.R. (N.S.) 83, additional reasons at 49 C.B.R. (N.S.) 284 (Ont. S.C.). Rather, he should present the relevant facts to the court in a dispassionate, non-adversarial manner, and leave the matter to the court for decision.

> . . . . .

> The trustee's obligation is to act for the benefit of the general body of creditors, not just the benefit of unsecured creditors. He must not, therefore, act in a manner which is prejudicial and unfair to the interests of secured creditors: *Re Bell's Ltd.: Bank of Montreal v. Touche Ross Ltd.*, 60 C.B.R. (N.S.) 224, [1986] 4 W.W.R. 211, 48 Sask. R. 241 (Sask. Q.B.).

> A trustee in bankruptcy does not function as an agent of the creditors in the ordinary sense, but as an administrative official required by law to gather in and realize on the assets of the bankrupt, and then to divide the proceeds among those entitled thereto in accordance with the scheme set out in the Bankruptcy Act: *Clarkson Co. v. Muir* (1982), 43 C.B.R. (N.S.) 259, 53 N.S.R. (2d) 609, 109 A.P.R. 609 (C.A.).

9     Mr. Barnes submitted that there were two issues before me — firstly that there was no legal impediment against Richter acting as trustee since there was nothing to prevent a person from becoming such merely because of an association of a nature such as here, where Richter has been acting as a forensic investigator for the ALC Committee (which includes representation of UBS) and secondly that Richter is an appropriate person to nominate (and appoint) in the circumstances.

10     I would observe that Richter does not appear on the material before me to have a problem of possible disqualification pursuant to s. 13.3. of BIA. If there were any potential conflict of interest as set forth in that section, it should disclosed at the time of appointment and at the first meeting of creditors if it falls within s. 13.3(2).

11     S. 43(9) BIA provides that:

> On a receiving order being made, the court shall appoint a licensed trustee as trustee of the property of the bankrupt, having regard, as far as the court deems just, to the wishes of the creditors.

S. 102(5) BIA states:

> The purpose of the first meeting of creditors shall be to consider the affairs of the bankrupt, to affirm the appointment of the trustee or substitute another in place thereof, to appoint inspectors and to give such directions to the trustee as the creditors may see fit with reference to the administration of the estate.

1995 CarswellOnt 1169, [1995] O.J. No. 3993, 37 C.B.R. (3d) 237

See also s. 14 and s. 14.04 of BIA. I did not find it helpful for Mr. Fogul to point out that Ontario could lead a move to appoint Richter as trustee at the first meeting of creditors if it were not so appointed as trustee upon the receiving order being made since such action would be, to my mind, quite inappropriate if I were to determine in this motion that Richter were for some reason "disqualified" in the circumstances.

12    In *Re Quinte Nurseries Ltd.* (1982), 41 C.B.R. (N.S.) 156 (Ont. S.C.) at p. 160 Saunders J. observed:

> The choice of trustee is for the creditors and, in my opinion, the nominee of the petitioning creditor should be appointed pending the first meeting of creditors when the final determination will be made.

I would be of the view that Registrar Ferron's opening words in *Re Batteries Included, Inc.* (1987), 67 C.B.R. (N.S.) 123 (Ont. S.C.) at p. 123:

> The court is not bound to appoint a trustee named in the petition by the petitioning creditor, nor is the official receiver required to appoint a trustee named by the debtor as the assignee in an assignment.

must be taken in context. In that case he went on to examine the various reasons why he appointed another trustee than the one nominated by the petitioning creditor (recognizing this was an interim appointment until the first meeting of creditors). He observed at p. 124:

> I chose to appoint Yale, Kline, Geary Limited as the trustee in place of Collins Barrow Limited, named in the petition for several reasons, none of which have anything to do with competency and integrity.

> In my opinion, in this instance Yale, with whom the debtor filed its assignment, is in a better position to administer the estate. That firm has already been involved in a watching brief for a secured creditor, and has a fairly extensive knowledge of the debtor company.

> In addition Yale has identified the company's assets and liabilities, and has in fact prepared a preliminary statement of affairs which accompanied the assignment. That work will not now have to be duplicated.

> Further, four creditors of the debtor have expressed a preference for Yale, I suppose because of the above factors, and their wishes should at least be given some standing in the matter.

> Finally, there is a suggestion that the debt owing to petitioning creditor is disputed. It seems to me that it would not be appropriate in these circumstances to appoint Collins Barrow Limited as trustee because of the potential for conflict.

This fits within the philosophy of *Re Drash* (1930) 38 O.W.N. 295 (C.A.) at p. 296. See also *I. Caron Ltd. v. Robin Hood Mills Ltd.* (1935), 17 C.B.R. 101 (Que. S.C.) at p. 102.

13    Houlden J.A. for the court in *Re Reed* (1980), 34 C.B.R. (N.S.) 83 (Ont. C.A.) said at p. 86:

> ... Unless this inquiry is carried out, the credit union may be dealt with unfairly. A trustee in bankruptcy should act equitably and so far as possible hold an even hand between the competing interests of various classes of creditors. As James L.J. said in *Re Condon; Ex parte James* (1874), 9 Ch. App. 609 at 614 (L.JJ.):

>> I am of opinion that a trustee in bankruptcy is an officer of the Court. He has inquisitorial powers given him by the Court, and the Court regards him as its officer, and he is to hold money in his hands upon trust for its equitable distribution among the creditors.

See also my view in *Re Rizzo Shoes (1989) Ltd.* (1995), 29 C.B.R. (3d) 270 (Ont. Gen. Div. [Commercial List]) at pp. 277-8 including my observation:

Case 09-10138-MFW   Doc 14225-50   Filed 08/15/14   Page 60 of 279

Confederation Treasury Services Ltd., Re, 1995 CarswellOnt 1169
1995 CarswellOnt 1169, [1995] O.J. No. 3993, 37 C.B.R. (3d) 237

I think it also fair to observe that in deciding whether or not the trustee has acted properly the court must be careful to judge the trustee's conduct in light of the circumstances as they existed at the time the trustee performed the act or made the decision: see *Cocks v. Chapman*, [1896] 2 Ch. 763 at 777 (C.A.).

14    A trustee may be removed for cause: see *Houlden and Morawetz, supra*, at p. 1-52 where the authors observe:

"Cause" means misconduct, fraud, dishonesty, becoming bankrupt or otherwise incapable of acting as a trustee: *Re Herman* (1930), 11 C.B.R. 239 at 246. Cause is not, however, restricted to dishonest conduct; misconduct short of dishonesty is sufficient: *Re Bryant Isard* (1923), 4 C.B.R. 41, 24 O.W.N. 597 (S.C.).

Cause exists: (a) if there is conduct showing that it is no longer fit that a person should continue as trustee; (b) if there is a danger to the estate property; (c) if there is a want of reasonable fidelity; (d) if circumstances prevent the creditors from working in harmony with the trustee; (e) if the trustee cannot act impartially; (f) if there has been an excess of power by the trustee; (g) if there has been a lack of *bona fides* by the trustee; or (h) if there has been unreasonable conduct by the trustee in relation to the bankrupt estate. The main principle upon which the jurisdiction of the court is exercised in ordering the removal of the trustee, is the welfare of the creditors and of the bankrupt estate. The trustee must not undertake a duty and put himself in a position that is in conflict with his duty as trustee, or act in a manner that is inconsistent with that duty. If the trustee has placed himself in a position of conflict, he cannot continue as trustee; he must resign or be removed by the court; *Re Commonwealth Investors Syndicate Ltd.* (1986), 61 C.B.R. (N.S.) 147, 69 B.C.L.R. 346 (S.C.), additional reasons at (1986), 62 C.B.R. (N.S.) 308 (B.C.S.C.). In the *Commonwealth* case, the trustee was removed because he had improperly delayed the winding up of the bankrupt estate for several years.

. . . . .

Even if a trustee is not dishonest, the court, if it is of the opinion that he has not acted in the best interests of creditors and that he cannot act in concord with the inspectors, may remove him and appoint a new trustee: *Re Gauthier Lumber Ltd.; Vanasse Tire Ltd. v. Tardif* (1960), 1 C.B.R. (N.S.) 127 (Que. S.C.).

Where a trustee wishes to be relieved of its duties as trustee in bankruptcy, the court can appoint a substitute under s. 14.04. "Cause", in s. 14.04, embraces a trustee who is incapable of acting for any reason: *Re Philip's Manufacturing Ltd.* (1992), 16 C.B.R. (3d) 127 (B.C.S.C.). Where it would be difficult for a trustee to act impartially and impossible for it to sue itself, a substitute trustee will be appointed: *Re Philip's Manufacturing Ltd.*, supra.

In *Re Bryant, Isard & Co., supra*, Fisher J. was quite caustic with his comments about the actions of the trustee, he said at p. 52 [C.B.R.]:

I find the trustee guilty of misconduct and abuse of his office in making these payments and retaining the cheques.

. . . . .

The trustee who is an officer of the Court, has no right to make free with creditors' moneys committed to his charge.

However he did not remove the trustee, although he sanctioned the trustee with making the estate good on the inappropriate payment and indicated that his order was without prejudice to the creditors removing the trustee. Fisher J. in doing so observed at p. 53:

The Court, on an application to remove a trustee for cause, exercises a judicial discretion. The sole question for me to determine in this case is whether there is in the evidence submitted, sufficient cause shewn that the trustee, J.L. Thorne, is unfit to be continued as trustee in the administration of this estate. The estate is a large one, with many important and complicated business problems to solve before the estate can be finally wound up, and while it is the duty of the Court to vindicate the law but in doing so to abstain if possible from injury to those who are vitally, and beneficially interested, to inflict a needless injury on them and vindicate some legal principle should be avoided. Here to transfer the administration

1995 CarswellOnt 1169, [1995] O.J. No. 3993, 37 C.B.R. (3d) 237

of the estate would involve the necessity of a large additional expense, and delay. Therefore, notwithstanding my findings, I will not adopt the extreme course of removing the trustee from office for the following reasons:

> (1) It would add to the great expense already incurred in this estate.

> (2) The trustee is conversant with the estate, and is in a much better position than a new trustee would be in assisting the Crown authorities in the pending criminal proceedings against N.P. Bryant, and also in the civil actions awaiting trial; and

> (3) The creditors at the meeting of December 4, 1922, and the inspectors at the meeting in May, 1923, were not in favour of removing the trustee, and counsel representing Ottawa, Toronto and Montreal creditors urged before me that it the wish of their clients that the trustee should not be removed, but if what has come to light on this application should lead the creditors to change their opinions they have power to do so under the Act. An authorized trustee, as I have pointed out, is an officer of the Court and must administer the estate in his charge in accordance with *The Bankruptcy Act*.

So to in appointing a trustee the Court is exercising a judicial discretion. No one should take too lightly the burdens and responsibility of securing such an appointment. The appointment is not a franchise to make money (although a trustee should be rewarded for its efforts on behalf of the estate) nor to favour one party or one side. The trustee is an impartial officer of the Court; woe be to it if it does not act impartially towards the creditors of the estate. Miquelon J. in *Re Gauthier Lumber Ltd.* (1960), 1 C.B.R. (N.S.) 127 (Que. S.C.) said at pp. 135-6:

> On ne peut certes pas affirmer que l'intimé a été malhonnête. Par ailleurs, la Cour ne peut non plus dire qu'il a été un gérant impartial, chargé qu'il était par la loi, de protéger les intérêts de tous les créanciers. Les créanciers garantis sont généralement en état de se protéger et leurs intérêts sont assez souvent contraires à ceux des créanciers ordinaires. Ce sont ceux-ci que le syndic représente d'abord et ils ont droit à ce que la conduite d'un syndic solt au-dessus de tout soupçon.

15     McQuaid J. in *Prince Edward Island v. Bank of Nova Scotia* (1988), 70 C.B.R. (N.S.) 209 (P.E.I. T.D.) reversed on other grounds (1989), 77 C.B.R. (N.S.) 113 (P.E.I. C.A.) had concerns about the propriety of appointing a former privately appointed receiver-manager as trustee. His concerns would appear to be expressed as part of his decision in an obiter fashion when he said at p. 220:

> It is clear that, immediately upon his appointment, the trustee in bankruptcy is in full, complete and exclusive control of the bankrupt business and all of the assets thereof, to the total exclusion of the owner, operator or manager of the business. I think it may be said that those erstwhile functionaries, whatever their capacity might have been, become functus upon that appointment. This would clearly include any receiver-manager who might have been in place at the time of the bankruptcy.

> It is the duty of the trustee, who is an officer of the court, to represent impartially the interests of all creditors; he is obligated to hold an even hand as between competing classes of creditors; he must act for the benefit of the general body of creditors; he is not an agent of the creditors, but an administrative official required by law to gather in and realize on the assets of the bankrupt and to divide the proceeds in accordance with the scheme of the *Bankruptcy Act* among those entitled. And perhaps most importantly, he must conduct himself in such a manner as to avoid any conflict, real or perceived, between his interest and his duty.

> *While it may not be incompatible with the scheme of the Bankruptcy Act, or, indeed, with the role of the trustee in bankruptcy, the propriety of appointing the former receiver-manager as trustee is a matter of serious import. The two functions are certainly incompatible, if not in actual conflict.*

> As in this instance, the receiver-manager is, in fact, the nominee of the major creditor, put into place as the watchdog on behalf of that creditor, essentially to preserve and hopefully to realize upon the assets of the business for the benefit of that creditor albeit as the agent of the company. That is normal, prudent business practice, not to be criticized, and something which happens regularly in the world of commerce.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1995 CarswellOnt 1169, [1995] O.J. No. 3993, 37 C.B.R. (3d) 237

> On the other hand, the trustee, who is in actuality an officer of the court, rather than a single creditor's nominee, must represent all creditors, and ensure that conflicting interests are resolved equitably. He must not only act without interest or bias, but must be clearly perceived to be acting without interest or bias.

> That perception may be difficult to maintain when he who yesterday was the man of a single creditor must today act, and be seen to act, as the man of all creditors. (Emphasis added).

As seen by the emphasized words he recognizes that such an appointment may not be incompatible with the BIA or the role of a trustee. It would appear on a reading of the case that McQuaid J. was concerned about there were aspects in which as a receiver-manager representing the interests of a secured creditor the firm in question was not recognizing various aspects which it should have as trustee. For instance he states at pp. 221-2:

> ... It is inconceivable to me that Doane Raymond would not know that Doane Raymond was sitting on a cash deposit representing the assets of the firm whose bankruptcy it was administering.

> I find it equally difficult to believe that "the funds realized from the sale by the Receiver [i.e., the corporate entity of Doane Raymond] of the assets of Island Jewellers were paid to the Bank without the participation or consent of the Trustee in Bankruptcy [i.e., the corporate entity of Doane Raymond]". Is the local office that large that the right hand does not know what the left hand is doing?

16    In *Federal Trust Co. v. Frisina* (1976), 20 O.R. (2d) 32 (S.C.) Galligan J. raised the question of perception or appearances as to a court appointed receiver-manager (i.e. one which was appointed by the court and not privately) when he observed at p. 35:

> Whatever may be required of a person whom a Court will appoint as receiver-manager of a property I think that such a person must be reasonably competent to perform the duties entrusted to him and must be disinterested and impartial so as to be able to deal with the rights of all persons with an interest in the property in a fair and even-handed manner. It ought to be remembered that a receiver-manager appointed by the Court under s. 19 of the *Judicature Act*, becomes an officer of the Court and is therefore very different from a person appointed manager by a mortgagee in possession. That person is simply the agent of the mortgagee.

> I think it follows that not only must the receiver-manager appointed by the Court be impartial, disinterested and able to deal with the rights of all interested parties in a fair and even-handed manner, but he ought to appear to have those qualities.

> A good part of the argument on the motion was taken up with a discussion of the relative competence of Geisel and Lousbury. If all else were equal, it would seem to me to be sensible to appoint that person whom the Court thought to be the more competent. In this case, it seems that both have sufficient competency to perform the duties of a receiver-manager, but because of the view I take of the case it is unnecessary for me to weigh the relative competence of them.

> The evidence discloses two facts that in my opinion seriously mar the appearance of impartiality and disinterestedness which I think Geisel ought to have if he is to be appointed the receiver-manager. I do not intend to cast aspersions upon him by suggesting that, in fact, he would not act impartially and be disinterested, but I do not think he ought to be appointed if circumstances exist which would raise in the mind of a reasonable and intelligent man a real apprehension that he lacked impartiality and disinterestedness.

However it is important to appreciate that the test here is of a reasonable and intelligent man, i.e. one who is objective and who has been informed of all material facts. However in that case it was determined that the receiver-manager in question, as an officer of the court would not pass muster on such an objective test since he had a close and direct business relationship with the second mortgagee applicant as he owed that trust company five million dollars and further that he owned a building which would be in direct competition for tenants with the building which was the subject of the receivership.

WestlawNext® CANADA    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

17      Thus there would appear to be healthy objective reasons for scepticism about the impartiality appearances in both *Federal Trust* and *Prince Edward Island, supra,* based on actual financial competition and *Federal Trust* and the incapability of simultaneously being involved in several roles in *Prince Edward Island.*

18      I think it instructive to read *Tannis Trading Inc. v. Camco Food Services Ltd. (Trustee of)* (1988), 67 C.B.R. (N.S.) 1 (Ont. S.C.) in conjunction with Dr. Morawetz's annotation found at pp. 2-3 of that report. In that case CCL was an audit client of the trustee's organization, which was found to be "an important and valued relationship" (p. 6). At that same page it was determined that "the claims [of the estate] against CCL ... are crucial to the administration of the estate". Saunders J. went on to say at pp. 6-7:

> It appears that the trustee and the inspectors feel that the trustee has acted impartially and will continue to do so. It is likely that such will be the case. That, however, is not the test. In a situation such as this, the court must consider from an objective point of view whether it would be difficult for the trustee to act with impartiality: see *Re Shaw Co.*, 16 Sask. L.R. 275, 3 C.B.R. 198, [1922] 3 W.W.R. 119, 68 D.L.R. 616 (K.B.). In my opinion, the answer in this particular case is clearly in the affirmative. The trustee is, in effect, suing its own client. On the particular facts, I am of the opinion that there is a potential for a conflict of interest and, perhaps more importantly, there is an appearance of conflict. An unsecured creditor seeks the removal of the trustee. There is no suggestion that the request is not bona fide. In my opinion, in the special circumstances of this case, the trustee ought to stand aside or be replaced.

Dr. Morawetz observed at pp. 2-3:

> In ordering that the trustee should be removed, the court relied on the judgment of the Saskatchewan Court of King's Bench in the case of *Re Shaw Co.*, 16 Sask. L.R. 275, 3 C.B.R. 198, [1922] 3 W.W.R. 119, 68 D.L.R. 616, which in turn, relied on the English case of *Re Lamb*, [1894] 2 Q.B. 805, 64 L.J.Q.B. 71 at 74 (C.A.), and held that the court must consider from an objective point of view whether it would be difficult for the trustee to act with impartiality. The court was of the opinion, that there was a potential for a conflict of interest and, perhaps more importantly, there was an appearance of conflict.

> The judgment in the *Shaw Co.* case is very short, and no reference was made to one of the leading Ontario cases, *Re Bryant, Isard & Co.; Ex parte Higginson* (1923), 24 O.W.N. 597, 4 C.B.R. 41 (S.C.). In that case the court considered the removal of a trustee from office to be an extreme course and refused to remove the trustee because: it would add to the great expense already incurred in the estate; a new trustee would not be as conversant with the estate as the present trustee; and neither the inspectors nor the creditors were in favour of removing the trustee. Although in the *Bryant, Isard* case the court did not remove the trustee, the order was made without prejudice to the rights of the creditors to remove the trustee and appoint another in its place if so advised.

See also *Re Ethier* (1991), 7 C.B.R. (3d) 268 (Ont. Bktcy.) at p. 273.

19      In *Shaw, supra*, it should be noted at p. 199 that the trustee had as some (material) shareholders (and a director) persons who were making large claims in the estate of the bankrupt company. As for *Lamb, supra*, the trustee was a creditor of two estates which were in competition with each other as to ownership of the only asset of value as A.L. Smith L.J. said at pp. 820-1:

> Now, what is the salient point in this case? If a man has a pecuniary interest in the success of one estate which is the creditor of another estate, and he has no pecuniary interest in the success of the other estate, and he is called upon to act for both, it seems to me that a prima facie case is made out that he is placed in a difficulty as regards acting with impartiality between the two. It is obvious — everybody knows it who has any knowledge of life — that when a man has a pecuniary interest, his mind is naturally warped in favour of his own interest. It is human nature, and no one can doubt it. Beyond all question Mr. Gregson has a pecuniary interest as a creditor to the amount of 3,000*l.* in the success of Emerson's estate. As regards Lamb's estate he as a creditor has a pecuniary interest of only 400*l.*, and it is said that Emerson's estate is a creditor of Lamb's estate. Standing in this position between the two estates, can it be said with truth that Mr. Gregson's connection with Emerson's estate is not such as to make it difficult for him to act with impartiality towards Lamb's creditors? This is the real question, and that question my brother Vaughan Williams did not put to himself. If he had done so, I think he would have answered it in the same way as I am now doing. We are not suggesting that Mr. Gregson is not a gentleman

1995 CarswellOnt 1169, [1995] O.J. No. 3993, 37 C.B.R. (3d) 237

of probity — not a word has been said about that — but the question is, whether upon the facts of the case the objection of the Board of Trade to his appointment as trustee of Lamb's estate was a valid objection. In my judgment it was.

20     I think it instructive to recall what Cave J. said in *Re Martin* (1888), 21 Q.B.D. 29 at p. 33:

The objection which is taken here is the third of those objections, namely, that the connection of this trustee with, or his relation to, the bankrupt or his estate makes it difficult for him to act with impartiality in the interests of the creditors generally. It is not easy to lay down any general rule, and indeed it is a question of fact with regard to which it is, to my mind, impossible to lay down any accurate general rule. Every case must depend more or less upon its circumstances, and, having regard to the expressions in the Act, one must see whether the facts are such as to lead to the conclusion that the trustee's connection with or relation to the bankrupt or his estate makes it difficult for him to act with impartiality.

21     Is there such a problem for Richter in these circumstances? I think not if one looks at the situation well informed and objectively. As Tysoe J. in *Re Western Canada Beverage Corp.* (1993), 22 C.B.R. (3d) 10 (B.C. S.C.) stated at p. 18:

... It has become fashionable to allege conflicts of interest but the Court will not act out of fashion.

It should almost go without saying (and would not be said but for the unfortunate wrangling history of this case) that once Richter were appointed trustee it bears allegiance to the creditors of the estate as an officer of the Court. It is not beholden to any of the creditors on an individual (or segregated) basis and certainly not to UBS, Ontario or the ALC Committee. Its loyalty is to the creditors as they are found — be it UBS, Ontario, other creditors represented by the ALC Committee, the Rehabilitator or Liquidator — as a collective group. So long as it does so then it will not have a problem with impartiality or conflict of interest.

22     NOLA submitted in its factum that it recommends the appointment of an independent, impartial trustee, citing at p. 6 thereof:

See 11 U.S.C. s 101(14) (E). *In re Micro-Time Management Systems Inc.*, 102 B.R. 602 (Bankr. E.D.Mich. 1989) (Bankruptcy trustee held disqualified because of professional relationship with and consultant work for a major creditor of estate); *In re Envirodyne Industries Inc.*, 150 B.R. 1008, 1019 (Bankr. N.D. Ill. 1993) ("The key issue is whether the [allegedly disinterested] firm's interest in maintaining the client relationship with Salomon, the substantial party-in-interest, could impair the firm's ability to act with impartiality, even unconscious impartiality.")

This was responded to by American counsel (Chaim Fortgang) for the ALC Committee who faxed a submission as follows:

In ¶17 of the factum of [NOLA], counsel cites two U.S. Cases for the proposition that under U.S. Law, representation of a creditors' Committee would be a basis to disqualify a professional from acting as trustee or as a professional for a trustee. The cases cited do not so hold at all. They stand for the proposition that prior representation of a *target* in a potential litigation against the target would disqualify a professional from acting on behalf of the estate, because he could not be expected to vigorously pursue a former client. The law in the U.S. clearly permits counsel for a creditors' committee to become counsel to a Trustee after the creditors' committee has been disbanded.

In a case remarkably similar to the instant situation a contested secured claimant objected to counsel for the creditors' committee functioning as counsel for the trustee. It was alleged inter alia, by the contested secured creditor, that counsel for the creditors' committee advised against a settlement of litigation involving subordinating the claim of the secured creditor proposed by the secured creditor and thus was not disinterested.

The court noted that disqualification motions are often used for purely tactical reasons and the impending conflict between the secured creditor and counsel was not a basis for disqualifying counsel for the trustee.

The objecting party argued that the bankruptcy Code intended to disqualify any person who in the slightest degree had some interest or relationship that would color the independent and impartial attitude required by the Code. Thus counsel should be disqualified. The court disagreed and said "It is *clear* that a law firm's prior representation of a Creditors' committee

1995 CarswellOnt 1169, [1995] O.J. No. 3993, 37 C.B.R. (3d) 237

does not disqualify it from representing a trustee in bankruptcy." In a REA Holding Corporation 4 BCD 1249 (Bkptcy S.D.N.Y. 1979). In re W.T. Grant 4 B.R. (53 Bkptcy S.D.N.Y. 1980).

The Court further observed "Indeed, their previous familiarity with this case through their preparations on behalf of the creditors' committee will station this firm in a position where further delay and expense should be eliminated which might otherwise have been incurred if another law firm were brought into this case by the trustee to investigate the underlying events and transactions."

Counsel to NOLA apparently does not appreciate the distinction between having represented an individual creditor with an adverse interest which may be a basis for disqualification and having represented a creditors' committee (which *is* the estate) which *can not* be a basis for disqualification.

23    I have a number of varying observations concerning these submissions. While I appreciate that there are foreign elements in this matter, including American elements, what we have here is the nomination and appointment of a trustee for a bankrupt estate in Canada pursuant to BIA. That process if governed by Canadian law and a Canadian statute. That is not to say that judges of our court are chauvinistic or xenophobic. To the contrary, we will consider foreign jurisprudence in context and specifically where there appears to be a gap in our jurisprudence. As I said however in another case: *Re Cadillac Fairview*, unreported, released Feb. 9, 1995 at p. 7 for somewhat different purposes:

Recognizing that this is a *CCAA* proceeding which will be governed by Canadian law, perhaps it would be highly desirable for Canadian counsel for all stakeholders to ensure that their clients (and their non-Canadian counsel) appreciate some of the differences between our reorganization law and procedures and that with which they may be more familiar.

When I speak of taking foreign cases in context, one of the most obvious aspects is to consider whether foreign statute law is substantially different in essential elements. However it may be appropriate, keeping in mind that the U.S. legislation has a detailed overwhelming impact on these American cases to review how that jurisdiction views potential conflict situations.

24    Further I would observe that it is unfortunate that it was left up to this court to determine that *REA, supra*, had been ruled upon by the U.S. District Court (S.D.N.Y.) on January 14, 1980 (2 B.R. 733) and the case remanded back to the Bankruptcy Court for reconsideration (as to which see Bankr. L.Rep. (CCH) P67 483, 22 Collier Bankr. Cas. (MB) 1051 (Bankr. S.D.N.Y. 1980)). However it appears to me that this appellate decision was based upon a question of failure to disclose potential conflict of interest and not upon the fact of co-counsel's prior involvement with the creditors' committee in superseded chapter XI proceedings which had been found by the Bankruptcy Court not to conflict with its present role in the bankruptcy proceedings. The prior involvement with that creditors' committee did not appear to trouble the appellate court. As Galgay J. (the bankruptcy judge) said at p. 1253:

The law firm served as counsel to the Official Creditors' Committee during the REA Chapter XI proceeding but at no point in the REA proceeding did Whitman & Ransom represent any particular railroad or airline. The role of counsel to an official creditors' committee is not adverse to or in conflict with the role of counsel to a bankruptcy trustee if liquidation should subsequently ensue.

25    In *Grant, supra*, decided a month after the release of the appellate decision in *REA*, Galgay J. said at pp. 82-3:

... It is also asserted that WGM's role as co-counsel to the Chapter XI Creditors' Committee constitutes a disqualification factor.

[34] This Court recently had the opportunity to review the factors to be considered in entertaining a motion to disqualify attorneys for a trustee in re REA Holding Corp., 4 Bankr.Ct.Dec. 1249 (S.D.N.Y. 1979). The disqualification of both a trustee and his co-counsel was sought upon alleged conflicts of interest which prevented them from adequately representing the interests of the bankrupt estate. Among the alleged conflicts cited was the fact that the counsel for the trustee had represented the Creditors' Committee during the Chapter XI case that preceded an adjudication in bankruptcy and the retention of such counsel by the trustee. In considering that motion I was guided by the teachings of Emle Industries, Inc.

V. Patentex, Inc., 478 F.2d 562 (2d Cir. 1973). Emle admonishes courts to recognize their "responsibility to preserve a balance, delicate though it may be, between an individual's right to his own freely chosen counsel and the need to maintain the highest ethical standards of professional responsibility." 4 Bankr.Ct.Dec. at 1253 (citation omitted). Additionally, I noted the difficulties involved in evaluating the claims asserted in the perspective of the guidelines provided by United States v. Standard Oil Company, 136 F.Supp. 345, 367 (S.D.N.Y. 1955), which states:

When dealing with ethical principles, it is apparent that we cannot paint with broad strokes. The lines are fine and must be so marked. Guideposts can be established when virgin ground is being explored, and the conclusion in a particular case can be reached only after painstaking analysis of the facts of precise application of precedent.

I concluded and reaffirm that "(t)he role of counsel to an official creditors' committee is not adverse to or in conflict with the role of counsel to a bankruptcy trustee if liquidation should subsequently ensue." 4 Bankr.Ct.Dec. at 1253.

In the appeal decision of Re W.T. Grant Co. 1, 699 F.2d 599 (2d. Cir. N.Y. 1983) Friendly J. in dismissing the appeal said at p. 613:

We see no reason to disagree with Judge Galgay's reaffirmation, 4 B.R. at 83, of his conclusion in In re REA Holding Corp., 4 Bankr.Ct.Dec. 1249, 1253 (Bankr.S.D.N.Y. 1979), vacated and remanded on other grounds, 2 B.R. 733 (S.D.N.Y. 1980), that "[t]he role of counsel to an official creditors' committee is not adverse to or in conflict with the role of counsel to a bankruptcy trustee if liqui dation should subsequently ensue." WGM's previous representation of one or more of the banks or their subsidiaries in unrelated matters is scarcely a ground for disqualification. There is no contention that WGM regularly served any of the banks in bankruptcy cases, and their having done so in one or more unrelated cases would not prevent a vigorous assertion of the claims of the subordinated debentureholders against the banks. On an issue of this sort particular weight should be given to the conclusion of the Bankruptcy Judge, who had abundant opportunities to observe the activities of WGM over many months and concluded "that the Trustee's attorneys have served him and the creditors of the bankrupt estate with vigor, objectivity and independence."

26    I think it appropriate to take a look at the fact situations in *Micro-Time* and *Envirodyne, supra*. In both there would appear to be a problem with ongoing relationships of significance with creditors who may be adverse in interest to the bankrupt estate. In *Envirodyne* at pp. 1018-9 Schwartz C.J. said:

... Judge Schmetterer based the American Printers decision, in part, on the reasoning in re Amdura Corp., 121 B.R. 862 (Bankr.D.Colo. 1990). In Amdura, a firm seeking to be employed as debtor's counsel represented the debtor's primary secured lender on an ongoing basis in matters unrelated to the bankruptcy case. The debtor commenced the bankruptcy case as result of its inability to reach an accommodation with the lender. A partner of the firm testified that other counsel would have to be employed to investigate and prosecute a potential suit against the lender because the firm would not "bite the hand that feeds it." In re Amdura, 121 B.R. at 867. During the February 10 hearing, Mr. Millstein argued that the facts in this case do not justify disqualifying Cleary, Gottlieb because, unlike the creditor in Amdura, Salomon is not the primary secured creditor in this case. Mr. Millstein apparently believes that the relative size of the creditor's claim vis-a-vis the estate's total debt is necessarily relevant to whether Debtors' counsel may continue to maintain a relationship with that creditor without violating the tests of Sec. 327(a).

Counsel's argument is not persuasive. The key issue is whether the firm's interest in maintaining the client relationship with Salomon, a substantial party-in-interest, could impair the firm's ability to act with impartiality, even unconscious impartiality. The Amdura opinion correctly focuses on the law firm's ability to act impartially as the debtor's representative in all matters. The court in Amdura does not consider the relative size of the creditor's claim in a vacuum, but in conjunction with the creditor's status as a major client of the firm. Amdura, 121. B.R. at 869.

The court must remain cognizant of the fact that Salomon is an insider, a 64% owner, and a substantial creditor of the Debtor Envirodyne. The negotiation of a plan of reorganization likely will necessitate negotiation with Salomon, a "substantial

1995 CarswellOnt 1169, [1995] O.J. No. 3993, 37 C.B.R. (3d) 237

client" of Cleary, Gottlieb. Given these facts in this case, the Debtors' interests and the interests of the creditor body as a whole are not best represented at a negotiation table by a lawyer who faces a substantial client on the other side. (FN14)

27    In *Micro-Time* Rhodes J. stated at pp. 607-8:

[4] The facts in this case are essentially the same as those in re Gray, 64 B.R. 505 (Bankr.E.D.Mich.1986). Although the trustee and the accountants for the trustee are not prepetition creditors of the estate, Bohl's work for Comerica does present a potential, if not an actual, conflict of interest. Comerica was a major creditor of Micro-Time. The amount of its debt was very strongly disputed and there had been an adverse relationship between the principal of the debtor (Kirkland) and Comerica. When the trustee was appointed, it was clear that a successful resolution of Micro-Time's dispute with Comerica would be a necessary prerequisite to any successful chapter 11 reorganization of Micro-Time. Any hint of any prior or ongoing relationship between Comerica and Bohl would create at least the appearance of impropriety. This is sufficient under the case law and section 101(13) to disqualify John C. Bohl, Jr. as trustee and Parker, Bohl & Associates as accountants for the trustee.

Like the accounting firm in Gray, Bohl did not disclose his potentially disqualifying relationship with Comerica in either the trustee's declaration of disinterest or in the affidavit he submitted when he applied for approval to appoint Parker, Bohl & Associates as accountants for the trustee. Instead, Bohl swore in his affidavit that "To the best of my knowledge neither our firm nor any member thereof ... holds any interest adverse to the matters upon which we are to be engaged. Neither I nor any member of my firm has any relationship or interest in the above named debtor or any other parties of interest therein." These statements were false; Bohl had an ongoing relationship with Comerica.

*Micro-Time* and *Envirodyne* illustrate quite different concerns than the situation prevailing here. There is no suggestion of an ongoing relationship with the ALC Committee side which would possibly influence Richter from its neutral, impartial role as trustee, acting in the best interests of the estate.

28    Thus given that Richter is the preference of the petitioning creditor (and of the ALC Committee which appears to represent apparently unchallenged major creditors); it has the advantage of being quite familiar with and knowledgeable of the situation from its prior involvement as forensic investigator; the proprietary claims have been acknowledged as complex and difficult to describe; those advancing proprietary claims have had the advantage of advice from their own forensic investigators; it does not appear on the material before me that Richter has any ongoing relationship with any creditor and particularly not with any creditor or claimant which may have an adverse position to the estate, it would not seem to me appropriate to disqualify Richter as the nominee for trustee in place of Deloitte in the petition by UBS, but rather it would seem that Richter was adequately qualified to act as trustee. This result would avoid the estate taking a significant period of time to catch up with potential slippage expense if the litigation heats up quickly and a duplication of expense for another firm to come to the same position as Richter now is on the learning curve. On a practical basis, given what is at stake in relation to the funds already expended as to Richter's investigation, I do not see this duplication as a major factor but certainly it is a reasonable factor to consider. To their credit the Rehabilitator and the Liquidator have acknowledged that they in essence expect a fair fight in the proprietary claim situation against a trustee which is adequately and well prepared; they were not opposing Richter on the basis of knocking out a worthy opponent. The Liquidator had no concern about Richter being hired as a consultant by any trustee; I understand the Rehabilitator's attitude to have been the same. They were concerned, I take it, that Richter was beholden to the ALC Committee and the creditors it represented. As discussed, that relationship is at an end and Richter must be indifferent to all creditors, whomsoever they may be. Certainly this aspect of neutrality must be demonstrated throughout the trusteeship, including any s. 163 examinations.

29    In the result I see no impediment to Richter replacing Deloitte as the nominee for trustee in the UBS petition order accordingly.

30    As a postscript I would observe that my secretary and the manager of the Commercial List/Bankruptcy Office were bombarded with calls yesterday and today as to when my decision was going to be released and why it had not been then released. Counsel have advised that they had not done so. It may be that these enquiries were made by persons who were trading

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Confederation Treasury Services Ltd., Re, 1995 CarswellOnt 1169**
1995 CarswellOnt 1169, [1995] O.J. No. 3993, 37 C.B.R. (3d) 237

in or arbitraging claims. Such behaviour is not only inappropriate, but also counterproductive (looking at their self interest of having the decision as early as possible).

*Motion granted.*

---

**End of Document**

Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

 Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 126

1999 CarswellOnt 4112
Ontario Superior Court of Justice [Commercial List]

T. Eaton Co., Re

1999 CarswellOnt 4112, 14 C.B.R. (4th) 298

# In the Matter of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as Amended

In the Matter of a Plan of Compromise or Arrangement of the T. Eaton Company Limited, Applicant

Farley J.

Judgment: November 17, 1999
Docket: 99-CL-3516

Subject: Insolvency; Corporate and Commercial

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

### Bankruptcy --- Bankruptcy petitions for receiving orders — Grounds for petition — General

Creditor brought cross-motion that if debtor's CCAA plan were defeated, then there should be automatic bankruptcy or, failing that result, CCCA stay should be lifted to allow creditor to file petition in bankruptcy — Cross-motion granted — Creditor's motion was pre-empted by revelation that debtor company's Board of Directors authorized filing of assignment in bankruptcy by monitor if CCAA plan were defeated — CCCA stay was lifted temporarily for sole purpose of allowing creditor to file petition in bankruptcy naming trustee but without prejudice to advancing of proposition by creditor that trustee be replaced — Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36.

### Corporations --- Arrangements and compromises — Under Companies' Creditors Arrangement Act — Miscellaneous issues

Debtor brought motion to approve side deal pursuant to s. 9 of CCAA on contingency that CCAA plan would not receive requisite approval of creditors — Motion dismissed — Section 9 deal was not incorporated into separate plan so that creditors could vote on it; rather, what court was being asked to do was approve prospectively sale of certain assets in advance of voting on plan — Ordinarily, sale would be one that would be considered in event of bankruptcy and under supervision of trustee in bankruptcy — In circumstances, it would be inappropriate to deal with s. 9 deal at time — Bankruptcy regime with roles and responsibilities laid out therein should not be ignored or pre-empted by decision at time — Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36.

**Table of Authorities**

**Cases considered by *Farley J.*:**

*British America Nickel Corp. v. M.J. O'Brien Ltd.*, [1927] 1 W.W.R. 869, [1927] A.C. 369, [1927] 1 D.L.R. 1121 (Ontario P.C.) — considered

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

*Canadian Red Cross Society / Société Canadienne de la Croix-Rouge, Re* (1998), 5 C.B.R. (4th) 299 (Ont. Gen. Div. [Commercial List]) — considered

*Confederation Treasury Services Ltd., Re* (1995), 37 C.B.R. (3d) 237 (Ont. Bktcy.) — considered

*Dylex Ltd., Re* (1995), 31 C.B.R. (3d) 106 (Ont. Gen. Div. [Commercial List]) — considered

*Lehndorff General Partner Ltd., Re* (1993), 17 C.B.R. (3d) 24, 9 B.L.R. (2d) 275 (Ont. Gen. Div. [Commercial List]) — considered

**Statutes considered:**

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3
    s. 75 — considered

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36
    Generally — considered

    s. 9 — considered


MOTION by debtor company for approval of side deal pursuant to s. 9 of *Companies' Creditors Arrangement Act* on contingency that plan would not receive requisite approval of creditors; CROSS-MOTION by creditor that if plan were defeated, then there should be automatic bankruptcy or, failing that result, stay should be lifted to allow creditor to file petition in bankruptcy.

**Endorsement.** *Farley J.*:

1    This endorsement deals with (i) the Eaton's motion to have the Court approve the s.9 Side Deal on the contingency that the Plan will not receive the requisite approval of the creditors on Friday, November 19, 1999 and (ii) the Cadillac Fairview motion that if the Plan is defeated then there should be an automatic bankruptcy, or failing that result, that the stay be lifted to allow CF to file a petition in bankruptcy. This endorsement is being written after extensive argument this morning and given out this afternoon with a view that those voting on the Plan have the maximum possible time in the circumstances to reflect on this decision and to make an informed (at least as to these legal points) decision at the time of voting.

2    The CF motion has been somewhat pre-empted by the revelation that the Eaton's Board on November 15 th authorized the filing of an assignment in bankruptcy and that filing material has been given to the Monitor (Richter) to hold in escrow on the condition that if the Plan is defeated on Friday Richter was to file the assignment with the Official Receiver. There then flowed a discussion as to the various merits and disadvantages of the various permutations and combinations involved. It would not be a productive use of limited time to explore these various alternatives. Suffice it to say that with the undertaking given that Eaton's would consent to a Receiving Order if the Plan were not approved by the creditors or sanctioned by the Court, then the simplest and most direct way of dealing with this subject matter is that the CCAA stay is lifted temporarily for the sole purpose of CF filing a petition in bankruptcy naming Richter as trustee, but without prejudice to CF advancing the proposition that Richter be replaced (I would assume by PWC since that was CF's initial choice). However, CF is reminded that such a change would have to be advanced for good and valid reasons in the interests of the bankruptcy estate. I take it that Richter needs no reminding of the necessity to be neutral and objective: see my discussion of this principle in *Re Confederation Treasury Services Ltd.* (1995), 37 C.B.R. (3d) 237 (Ont. Bktcy.).

3    As to the Eaton's motion to have the alternative Side Deal as set out in s.9 approved, it appears to me that this subject has to be examined as to a number of facets: legal, practical and the integrity of the bankruptcy and insolvency system.

**WestlawNext** CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

4     I have no doubt that Blair, J.'s conclusion in *Re Canadian Red Cross Society / Société Canadienne de la Croix-Rouge* (1998), 5 C.B.R. (4th) 299 (Ont. Gen. Div. [Commercial List]) that in a CCAA proceeding, a judge has the authority to approve the sale of assets in essence outside the direct involvement of a plan context. See pp.314-6, where he cited with approval and adoption *Re Lehndorff General Partner Ltd.* (1993), 17 C.B.R. (3d) 24 (Ont. Gen. Div. [Commercial List]) at p.31. It should be noted that I said in *Lehndorff General Partner Ltd.* as cited by Blair J.:

> The CCAA is intended to facilitate compromises and arrangements between companies and their creditors <u>as an alternative to bankruptcy</u> and as such is remedial legislation entitled to a liberal interpretation [emphasis added by me now]

See also p.315 where Blair J. cites *Re Dylex Ltd.* (1995), 31 C.B.R. (3d) 106 (Ont. Gen. Div. [Commercial List]):

> ... and it may be grounded upon the inherent jurisdiction of the Court, not to make orders which contradict a statute, but to "fill in the gaps in legislation so as to give effect to the objects of the CCAA, including the survival program of a debtor until it can present a plan.

5     I understand and sympathize with the observation of Eaton's counsel, Mr. Marantz, that Eaton's and those executives left there are suffering from "plan fatigue" and that they sincerely wish to obtain the best possible result for those affected — both as to the Plan — but if the Plan is defeated, then in the condition of bankruptcy. I also appreciate that reasonable people on opposite sides of a table will not always come to the same conclusion. It is in that respect that one must be particularly concerned that there is a legitimate process which will be followed so that no matter what the result that is obtained from that process, the parties affected will, disappointed though they may be with the decision (and uncertain though they may be with the practical result that will obtain from that decision), say that at least the process was fair, reasonable and objective in the circumstances. One must also take into consideration that persons usually act rationally and in their own legitimate best interests (this also holds true for the aspect of voting (keeping in mind the requirements of *British America Nickel Corp. v. M.J. O'Brien Ltd.*, [1927] A.C. 369 (Ontario P.C.)). One would assume that a person would not agree to do something one day and then without intervening reason, not continue to agree to do the same thing. Of course it would not be human nature if one did not take advantage of a condition not being met to see whether one could obtain an advantage. Alternatives, if realistic, may provide some floor. I would also assume that in considering one's best interests, this *would* include a consideration of the impact of one's good "corporate" citizenship and reputation and how that might be impacted by an unfortunate result in the end for those who society may view as vulnerable.

6     Returning, however, to the subject situation, it is the position of Eaton's that it has beaten the bushes high, wide and low and there is no better deal available than the Sears s.9 one in the event that there is a bankruptcy. In that respect, I must take into consideration that there was no formal process established to consider the best offer(s) on the contingency that the Plan was defeated. The s.9 Sears deal was not incorporated into a separate plan so that the creditors could vote on it. Rather what the court is being asked to do is approve prospectively a sale of certain assets (essentially the assets of the Plan minus the tax loss) in advance of the Plan being voted on — when ordinarily this sale would be one which would be considered in the event of a bankruptcy and under the supervision of a trustee in bankruptcy. It is perhaps unusual that what the creditors would be presented with on this Friday's vote, if the s.9 Sears deal were approved, would be a Hobson's choice — vote down the Plan, then the result would automatically be a vote for the s.9 Sears deal.

7     It was suggested that s.75 BIA concepts should apply by analogy. However, it seems to me that this section is truly aimed at those transactions which are not entered into as part of the insolvency/bankruptcy regime. In may be that to apply this concept to the present situation would be a stretch and in effect backdoor the "trustee in waiting" (if there is to be one). In other words, it should not be applied when it is contemplated that there is a substantial likelihood of there being a trustee in bankruptcy in the immediate future.

8     I must be mindful of the fact that what we are talking about here is a deal worth perhaps $40 million, perhaps $10 million, plus the effect on certain of the employees. If there were certainty or a high probability that if the Plan were defeated, the only alternative to the s.9 Sears deal would be zero, then that would raise the anxiety level.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

T. Eaton Co., Re, 1999 CarswellOnt 4112

1999 CarswellOnt 4112, 14 C.B.R. (4th) 298

9    Richter did not give any opinion in its Monitor's report dated November 11, 1999 as to the value of the s.9 Sears deal nor did it conclude that it would be the only possible transaction which would be open to a trustee in bankruptcy. It stated:

> Eaton's and Sears have also agreed, subject to Court approval, that in the event that the Plan is not successfully implemented, Sears would purchase the underlying assets in the Sears Agreement (i.e. excluding the benefits of the taxes losses) for up to $40 million Canadian, subject to certain conditions. <u>It is the Monitor's view that creditors should not regard a sale to Sears as a certainty in the event that the Plan fails</u>. [emphasis on original]

10    This is in step with Ms. Jackson's statement as Sears' counsel that there is no assurance that Sears will do this (or any of the deal) if the Plan is not approved and Court approval is not now obtained for the s.9 Sears deal. Richter, through Mr. MacNaughton, responded to Mr. Zarnett's observation on behalf of CF that the Monitor's report did not endorse the s.9 Sears deal by observing that it was implicitly supportive.

11    On the other side of the matter one would also observe that the Court should not be engaged itself in the rough and tumble of negotiations as aptly put by Mr. Arcand. I trust that there has been engagement in that process to date and that before the vote is taken that there will be more - sufficient one would trust for the best possible plan in the circumstances to be put forward and voted upon with the sober second and reflective thought of the likely alternatives.

12    I would wish to confirm that I make absolutely no observation as to the merits or value of the present Plan (and the underpinning Sears deal) nor with respect to the s.9 Sears deal. It would be premature to even touch upon that or any variation.

13    In the end result, I am of the view that, in these circumstances, it would be inappropriate to deal with the s.9 Sears deal at this time. I think it extremely desirable to appreciate that the bankruptcy regime with the roles and responsibilities laid out therein should not be ignored or pre-empted by a decision at this time. It is on this basis that I decline to give the requested order.

14    I, however, am certain that notwithstanding the heat of the moment - from moment to moment - that all interested parties will co-operatively work with one another with a view to obtaining the best possible result in the circumstances.

*Motion dismissed; cross-motion granted.*

---

**End of Document**          Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# TAB 127

1976 CarswellNat 603, 27 C.P.R. (2d) 257

1976 CarswellNat 603
Registrar of Trade Marks

Rite Manufacturing Ltd. v. Ever-Tite Coupling Co.

1976 CarswellNat 603, 27 C.P.R. (2d) 257

# RITE MANUFACTURING LTD. v. EVER-TITE COUPLING CO. INC.

N. M. Thurm

Judgment: January 12, 1976
Docket: None given

Counsel: None given

Subject: Intellectual Property; Property

**Table of Authorities**

**Cases considered by *Thurm*:**

*Cheerio Toys & Games Ltd. v. Dubiner* (1964), [1965] 1 Ex. C.R. 524, 28 Fox Pat. C. 1, 44 C.P.R. 134, 1964 CarswellNat 43 (Can. Ex. Ct.) — referred to

*Cheerio Toys & Games Ltd. v. Dubiner* (1965), [1966] S.C.R. 206, 48 C.P.R. 226, 32 Fox Pat. C. 37, 55 D.L.R. (2d) 313, 1965 CarswellNat 51 (S.C.C.) — referred to

*National Carbonising Co. v. British Coal Distillation Ltd.* (1936), 54 R.P.C. 41, [1936] 2 All E.R. 1012 (Eng. C.A.) — referred to

**Statutes considered:**

*Trade Marks Act*, R.S.C. 1970, c. T-10
Generally — referred to

s. 2 — referred to

s. 49(10) — considered

s. 49(10)(a) — considered

s. 49(10)(b) — considered

s. 49(10)(c) — considered

s. 49(11) — referred to

***Thurm*:**

**WestlawNext® CANADA** Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1976 CarswellNat 603, 27 C.P.R. (2d) 257

1    Rite Manufacturing Ltd. is the registered owner of the trade mark EVER-TITE registered under No. 154,784 on December 22, 1967. On May 9, 1968, Ever-Tite Coupling Co., Inc. was registered as a registered user of such trade mark in respect of the wares in association with which the trade mark was registered. Rite Manufacturing Ltd. has applied for cancellation of Ever-Tite Coupling Co., Inc. as a registered user of its trade mark on the grounds that:

There is no existing or subsisting relationship between the registered owner and the registered user of record and the registered owner is not bound by any agreement between other parties.

2    A registered user agreement was entered into in April, 1968, by R.N.G. Oil Equipment Co. Ltd., the owner of the registered trade mark EVER-TITE, registration 154,784, and Ever-Tite Coupling Co., Inc., the proposed registered user of the mark EVER-TITE, in respect of the wares covered by the registration.

3    The trade mark EVER-TITE was originally registered in the Canadian Trade Marks Office under registration 154,784 by R.N.G. Oil Equipment Co. Ltd. (The letters patent show the correct corporate name to be R.N.G. Oil Equipment Company Limited.) By supplementary letters patent issued on January 5, 1968, the name of R.N.G. Oil Equipment Company Limited was changed to R.N.G. Equipment Ltd.-Equipements R.N.G. Ltée.

4    By an assignment dated November 21, 1972 and registered in the Trade Marks Office November 30, 1972, R.N.G. Equipment Ltd.-Equipements R.N.G. Ltée assigned all its right, title and interest in and to the trade mark EVER-TITE, registered under No. 154,784, to Rite Manufacturing Limited.

5    The position of Rite Manufacturing Limited, the current registered owner of the mark EVER-TITE, is that there is no existing or subsisting relationship between Rite Manufacturing Limited and Ever-Tite Coupling Co. Inc. and that the present registered owner Rite Manufacturing Limited is not bound by the agreement between R.N.G. Oil Equipment Company Limited, its predecessor in title, and Ever-Tite Coupling Co. Inc. the registered user of record.

6    Before a decision is made on the grounds raised for cancellation of the registered user, it must be determined if the Registrar has authority to consider the ground on which the trade mark owner is moving to cancel the registered user agreement, a matter about which there has been doubt for some time.

7    Section 49(10) of the *Trade Marks Act*, R.S.C. 1970, c. T-10, reads as follows:

49(10) The registration of a person as a registered user of a trade mark may be cancelled,

(a) by the Registrar on the application in writing of the registered owner or the registered user of the trade mark;

(b) by the Registrar on his own motion in respect of any wares or services for which the trade mark is no longer registered; or

(c) by the Federal Court of Canada upon the application of any person, of which notice is served upon the registered owner and all registered users, on any of the following grounds:

(i) that the registered user has used the trade mark otherwise than by way of the permitted use, or in such a way as to cause, or to be likely to cause, deception or confusion,

(ii) that the owner or the registered user misrepresented or failed to disclose some fact that if accurately represented or disclosed would have justified the Registrar in refusing the application for registration of the registered user,

(iii) that the circumstances have changed since the date of the registration in such a way that at the date of such application for cancellation they would have justified the Registrar in refusing the application for registration of the registered user, or

WestlawNext® CANADA    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1976 CarswellNat 603, 27 C.P.R. (2d) 257

(iv) that the registration ought not to have been effected having regard to rights vested in the applicant by virtue of a contract in the performance of which he is interested.

8    Under s. 49(10)(*c*), the Federal Court of Canada may consider an application by "any person" to cancel the registration of a person as a registered user of a trade mark. The person applying to cancel the registration of a person as a registered user must serve notice upon the registered owner and all registered users of the grounds upon which that person relies for cancellation.

9    Under s. 49(10)(*a*), the only persons who may apply to the Registrar of Trade Marks for cancellation of a person as a registered user of a trade mark are the registered owner and the registered user.

10    Under s. 49(10)(*b*), the Registrar may on his own motion cancel the registration of a person as a registered user of a trade mark in respect of any wares or services for which the trade mark is no longer registered.

11    The grounds upon which the Registrar may consider the cancellation of the registration of a person as a registered user under s. 49(10)(*a*) were commented on as follows by Noel, J., in the case of *Cheerio Toys & Games Ltd. v. Dubiner* (1964), 44 C.P.R. 134 (Can. Ex. Ct.) at p. 151, (1964), [1965] 1 Ex. C.R. 524, 28 Fox Pat. C. 1 (Can. Ex. Ct.) [affirmed(1965), 48 C.P.R. 226, 55 D.L.R. (2d) 313, [1966] S.C.R. 206 (S.C.C.) ]:

This subsection, however, is not too clear as the grounds mentioned under s. 49(10(c) would seem to apply to the proceedings before the Exchequer Court only. However, as the Registrar's right of cancellation is discretionary and as s. 49(12) does not permit the Registrar to "exercise any discretionary power under this section adversely to a person without giving each person that will be affected by the exercise of the power an opportunity of being heard personally or by his agent" it would seem that the same grounds as those contained under para. (c) above could be raised at any such hearing.

12    While the grounds upon which the Registrar may consider cancellation upon an application under s. 49(10)(*a*) by the registered owner or registered user include, as stated by Noel, J., the grounds set out in s. 49(10)(*c*) of the *Trade Marks Act*, those are not the only grounds on which the Registrar may cancel under s. 49(10)(*a*). Indeed, s. 49(10)(*a*) places no limitation on the grounds on which the Registrar may cancel an application. Presumably, on a proper application being made to him, the Registrar could cancel a registered user because the owner and user so wished, because one party had died or gone into bankruptcy or for any other reason of substance. Section 49(10)(*c*) appears to have been intended, in part at least, for those cases where the application for cancellation of a registered user is commenced by a person other than either the registered owner or registered user. For example, the application could be made by a person who had been deceived by the registered user's use of the trade mark, perhaps because of receiving goods inferior to those sold by the registered owner under the same mark.

13    The present registered owner of the trade mark, Rite Manufacturing Ltd., filed two affidavits in support of its application for cancellation of the entry of Ever-Tite Coupling Co. Inc. as a registered user. The first affidavit filed was that of Denis Barclay, the general manager and vice-president of Rite Manufacturing Ltd. Attached to the Barclay affidavit was a certified copy of the letters patent issued on April 17, 1961, incorporating Rite Manufacturing Ltd. The company was incorporated in the Province of Quebec. The Barclay affidavit also includes the statement "THAT, Rite Manufacturing Ltd. is not a related company within the meaning, of section 2 of the *Trade Marks Act* ...". Presumably, this is intended to mean that Rite Manufacturing Ltd. is not related within the meaning of s. 2 of the *Trade Marks Act* to any other company. The second affidavit filed was that of the vice-president of R.N.G. Equipment Ltd.-Equipements R.N.G. Ltée, the predecessor in title to Rite Manufacturing Ltd. This affidavit contains the same statement with respect to the Rite Manufacturing Ltd. not being a related company the meaning of s. 2 of the *Trade Marks Act* with any other company. No doubt, these two affidavits are intended to show, in part at least, that the assignment from R.N.G. to Rite was an arm's length transaction.

14    The lists of principal officers of Rite and R.N.G. as given in the two affidavits refer to Gerald R. McIver, of the Town of Mount-Royal, in the Province of Quebec, as the secretary-treasurer of each of the companies. Although I am not prepared to find from the mere fact that Gerald R. McIver is a secretary-treasurer of the current registered owner as well as being secretary-treasurer of the predecessor in title that Rite Manufacturing Ltd. received the assignment of the mark EVER-TITE with full knowledge of the existence on the register of a registered user agreement between Ever-Tite Coupling Co.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1976 CarswellNat 603, 27 C.P.R. (2d) 257

Inc. and R.N.G. Equipment Ltd.-Equipements R.N.G. Ltée, there are other circumstances that lead to the conclusion that Rite Manufacturing Ltd. knew of the existing registered user agreement at and before the date of assignment of registration 154,784 to Rite Manufacturing Ltd.

15    McIver is secretary-treasurer of both companies. The knowledge of the secretary-treasurer of a company may fairly be taken to be the knowledge of the company. The affidavit of Benjamin E. Alter filed in these proceedings by Ever-Tite shows clearly that McIver is and has been for many years — knowledgeable about the trade mark matters of R.N.G. and, in particular, that he was aware that Ever-Tite was a registered user of the registered trade mark EVER-TITE. In this respect, attached as an exhibit to Alter's affidavit is a copy of a previous affidavit sworn by Alter in connection with an earlier application by R.N.G. to cancel the registration of Ever-Tite as a registered user of the trade mark EVER-TITE. It appears from Alter's previous affidavit that, when R.N.G. first applied to register the trade mark EVER-TITE in Canada, Ever-Tite contemplated opposing the application on the ground that Ever-Tite, not R.N.G., was the person entitled to registration. The following paragraphs from that affidavit speak for themselves:

> Thereafter, the President of our COMPANY, Mr. John T. Krapp, informed me that he had been prevailed upon by his friend, Mr. Gerry McIver of R.N.G., not to oppose the registration but to accept a licence from R.N.G. as a registered user. Mr. Krapp and I spoke to Mr. McIver on the telephone and had a tri-party conversation. Mr. McIver assured us that the registration was not intended to interfere in any manner with the use by our COMPANY of our trade mark EVER-TITE in Canada or elsewhere; that there was an active movement in Canada to "buy Canadian"; that the registration of the trade mark in the name of R.N.G. would be the boost that his business required; that it would so improve his business that he would increase his orders to our COMPANY for items profitable to our COMPANY; that it would improve his ability to pay bills on time; that he realized he was asking for a great deal from us, but that the long friendship between the principals of the two companies was the compelling force; and again, that we could, of course, use our trade mark anywhere without any restriction whatsoever. Copies of the registered user application were sent to us for signature. We observed that the words "wherever practicable" appeared in paragraph 2(C) of the draft registered user agreement in accordance with Mr. McIver's assurance to us that there would be no restriction with respect to the use of our EVER-TITE trade mark in Canada. Obviously, Mr. McIver had informed his attorney that no impediments were to be placed in the way of our COMPANY. Mr. Krapp, still believing that his friendship for Mr. McIver and his desire to co-operate with a COMPANY distributor justified his action, signed and returned the application. Attached hereto and marked Exhibit "C" to this my affidavit is a copy of a letter dated April 11, 1968 which Mr. Krapp of the COMPANY sent to Mr. McIver.

Exhibit "C" just referred to reads as follows:

> I am most pleased to enclose signed copies of EVER-TITE Registered User Application which you forwarded to me. I presume where you state that the proposed permitted use is without definite period, you mean forever.

> To you my very best regards and cooperation.

16    It is also pertinent to mention that the entry of Ever-Tite as a registered user of the registered trade mark EVER-TITE is a matter of public record in the Trade Marks Office.

17    Contrary to normal practice, the registered user agreement in this case contains no provision for its termination by either the trade mark owner or the registered user. As well, the agreement provides that the registered user "will not at any time contest the owner's exclusive right and property to and in the trade mark in Canada and will not take any action to invalidate the trade mark registration". It appears, if the above clause is valid, that if Ever-Tite's right to use the trade mark EVER-TITE in Canada as a licensee is successfully terminated, Ever-Tite will still be precluded by its contractual obligation from reasserting its claim to ownership of the trade mark EVER-TITE in Canada.

18    The *Trade Marks Act* is silent on the status of a registered user entry when the trade mark is assigned to a new owner. Section 49(11) of the Act provides that a registered user of a trade mark does not have any transferable right to the use of

1976 CarswellNat 603, 27 C.P.R. (2d) 257

the trade mark. There is, however, no provision that provides that the registered user entry or the registered user's right to use terminates when the trade mark itself is assigned to a new owner.

19    It seems to follow, therefore, that the intention of the Act is that, after assignment of a trade mark to a new owner, the registered user entry and the registered user's right to use continue in full force and effect and that the registered user agreement continues to bind the registered user and is binding on the new owner until it is terminated in accordance with its terms or by mutual agreement or the registered user entry is cancelled under s. 49(10).

20    There is jurisprudence which supports this view. In the case of patents, it has been held that the purchaser of a legal interest in a patent takes subject to any pre-existing licence whether or not he had notice of the existence of that licence. In *National Carbonising Co. v. British Coal Distillation Ltd.* (1936), 54 R.P.C. 41 (Eng. C.A.), Romer, L.J., states as follows at pp. 56-7:

> The next thing to be observed is that a patentee is fully entitled to assign his rights under the Letters Patent to another and that this must be deemed to have been known to the parties. Such an assignment could not, of course, defeat the rights of the licensee under the licence. It was indeed suggested in the argument for the Respondents that the licence only conferred some interest in equity and that it would not prevail against the title of a purchaser of the legal interest in the Letters Patent without notice of the licence. No authority was cited that in any way supports this extraordinary proposition and, in my opinion, it is without any foundation. It is said in Hindmarch on Patents that a licence to use an invention comprised in a patent is in fact a grant of a right by the patentee to the licensee and, until the present case, I have never heard any suggestion to the contrary. But though the licence would remain in full force after an assignment of the Patent the licensee would only continue to exercise it upon the terms as to payment of royalties and otherwise that are contained in it. This being so, it would seem plain that, if the patentee is to be regarded as having the power of assigning the Patents and can only assign them subject to the rights of the licensee, he must also be regarded as having the power at the same time to assign the benefits accruing to him under the licence.

21    For some 20 years, the practice of the Registrar has been to treat the registered user entry as continuing even after assignment of the trade mark registration to a new owner. No doubt, trade mark owners and licensees have likewise treated the registered user entry as continuing and protecting the validity of the registered trade mark.

22    For the reasons outlined above, it is my conclusion that the mere fact of an assignment of a registered trade mark to a new owner having notice of an existing registered user agreement does not terminate the registered user entry or the registered user's right to continue to use and that any licence or registered user agreement between the previous registered owner and the registered user is binding on the new owner.

23    In this case, the new owner seeks cancellation of the registered user entry under s. 49(10)(*a*) on the ground that there is no subsisting or existing relationship between the registered owner and the registered user of record and the registered owner is not bound by any agreement between other parties.

24    The present registered owner of the registered trade mark EVER-TITE and the registered user, Ever-Tite Coupling Co. Inc., have not negotiated or entered into a formal agreement with one another concerning the registered trade mark EVER-TITE. Ever-Tite Coupling Co. Inc. remains a registered user of the trade mark by effect of law, the present registered owner as assignee having taken the rights in registration 154,784 "Ever-Tite" subject to the existing rights of the registered user.

25    For the reasons expressed above, I have reached the conclusion that a licence or registered user agreement between an owner of a registered trade mark and a registered user is binding on an assignee of the mark, at least where the assignee takes the mark with notice of the registered user. The application for cancellation of Ever-Tite Coupling Co. Inc. as a registered user of registration 154,784 for the mark EVER-TITE is refused.

**End of Document**

Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

# TAB 128

2005 NSCA 12, 2005 CarswellNS 27, [2005] N.S.J. No. 24, 136 A.C.W.S. (3d) 744...

2005 NSCA 12

Nova Scotia Court of Appeal

Ryan v. Sun Life Assurance Co. of Canada

2005 CarswellNS 27, 2005 NSCA 12, [2005] N.S.J. No. 24, 136 A.C.W.S. (3d) 744,
18 C.C.L.I. (4th) 204, 230 N.S.R. (2d) 132, 249 D.L.R. (4th) 628, 729 A.P.R. 132

## Leslie Susan Ryan (Appellant / Respondent by Cross-Appeal) v. Sun Life Assurance Company of Canada (Respondent / Appellant by Cross-Appeal)

Cromwell, Freeman, Oland JJ.A.

Heard: November 17, 2004
Judgment: January 27, 2005
Docket: C.A. 220129

Proceedings: affirming *Ryan v. Sun Life Assurance Co. of Canada* (2003), 2003 NSSC 247, 2003 CarswellNS 455, 7 C.C.L.I. (4th) 111, 219 N.S.R. (2d) 329, 692 A.P.R. 329 (N.S. S.C.)

Counsel: W. Augustus Richardson for Appellant
Douglas Lutz for Respondent

Subject: Insurance; Contracts

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

**Insurance --- Contract of indemnity — Subrogation — Right of insurer**

Insured was enrolled in employer's compulsory group disability insurance plan — Insured was involved in motor vehicle accident and suffered significant injuries resulting in chronic pain syndrome — Insured brought civil action for damages against other motorist which resulted in all-inclusive settlement of $350,000 — It was understood that part of this settlement reflected claim for wage loss but there was no allocation of settlement figure into various heads of damage — Group disability insurer, relying on subrogation clause in policy, sought to offset money received by applicant from lawsuit against disability benefits payable to insured — Insured brought application for order determining applicability, meaning and scope of subrogation clause — Subrogation clause was in effect and was binding on insured — Subrogation clause was not ambiguous and did not limit insurer's recovery to only that part of settlement attributed to past loss of income — If insured was unable to establish what part of settlement related to income compensation or if insurer, acting in good faith, did not accept that figure, insurer was entitled under terms of subrogation clause to recover reasonable amount for loss of earnings from general damage award — Insured appealed, submitting that chambers judge erred in finding that subrogation clause applied to her claim — Insurer cross-appealed, submitting that clause permitted subrogation against 75 per cent of total settlement proceeds less costs and with respect to benefits actually paid or payable under policy — Appeal dismissed — Cross-appeal dismissed — Standard of review is correctness — Insured submitted that subrogation clause did not apply to her claim because it was negotiated and agreed to after date of her accident — Policy provides that it may be modified by mutual agreement of policy holder, who is Her Majesty the Queen in Right of Canada represented by President of Treasury Board, and insurer — Chambers judge was correct to limit insurer's right to reimbursement to part of settlement proceeds which insured could show was fairly attributable to damages for income loss, past or future — Insurer cannot seek reimbursement for benefits accruing to insured after she received her settlement proceeds — Insurer's

Case 09-10138-MFW    Doc 14225-50    Filed 08/15/14    Page 82 of 279

Ryan v. Sun Life Assurance Co. of Canada, 2005 NSCA 12, 2005 CarswellNS 27

2005 NSCA 12, 2005 CarswellNS 27, [2005] N.S.J. No. 24, 136 A.C.W.S. (3d) 744...

right to reimbursement or set-off did not extend to benefits that accrue in future, but only to benefits paid or found to have been payable.

**Table of Authorities**

**Cases considered by *Cromwell J.A.*:**

*Andrews v. Grand & Toy Alberta Ltd.* (1978), [1978] 2 S.C.R. 229, 3 C.C.L.T. 225, 83 D.L.R. (3d) 452, 19 N.R. 50, [1978] 1 W.W.R. 577, 8 A.R. 182, 1978 CarswellAlta 214, 1978 CarswellAlta 295 (S.C.C.) — followed

*British Transport Commission v. Gourley* (1955), [1956] A.C. 185 (U.K. H.L.) — followed

*Chilton v. Co-operators General Insurance Co.* (1997), 41 C.C.L.I. (2d) 35, 32 O.R. (3d) 161, 97 O.A.C. 369, 143 D.L.R. (4th) 647, [1997] I.L.R. I-3423, 1997 CarswellOnt 360 (Ont. C.A.) — followed

*Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), *(sub nom. Exportations Consolidated-Bathurst Ltée c. Mutual Boiler & Machinery Insurance Co.)* [1980] 1 S.C.R. 888, 112 D.L.R. (3d) 49, 32 N.R. 488, [1980] I.L.R. 1-1176, 1979 CarswellQue 157, 1979 CarswellQue 157F (S.C.C.) — followed

*Eli Lilly & Co. v. Novopharm Ltd.* (1998), 227 N.R. 201, 1998 CarswellNat 1061, 1998 CarswellNat 1062, 161 D.L.R. (4th) 1, [1998] 2 S.C.R. 129, 152 F.T.R. 160 (note), 80 C.P.R. (3d) 321 (S.C.C.) — followed

*Housen v. Nikolaisen* (2002), 2002 SCC 33, 2002 CarswellSask 178, 2002 CarswellSask 179, 286 N.R. 1, 10 C.C.L.T. (3d) 157, 211 D.L.R. (4th) 577, [2002] 7 W.W.R. 1, 219 Sask. R. 1, 272 W.A.C. 1, 30 M.P.L.R. (3d) 1, [2002] 2 S.C.R. 235 (S.C.C.) — followed

*MacIsaac v. Deveaux* (2004), 11 C.C.L.I. (4th) 1, 224 N.S.R. (2d) 315, 2004 NSCA 87, 2004 CarswellNS 257 (N.S. C.A.) — followed

*Maritime Life Assurance Co. v. Mullenix* (1986), 76 N.S.R. (2d) 118, 189 A.P.R. 118, 23 C.C.L.I. 248, [1987] I.L.R. 1-2190, 1986 CarswellNS 102 (N.S. T.D.) — distinguished

*Melanson v. Co-operators General Insurance Co.* (1996), [1997] I.L.R. I-3383, 183 N.B.R. (2d) 1, 465 A.P.R. 1, 1996 CarswellNB 364 (N.B. Q.B.) — distinguished

*Melanson v. Co-operators General Insurance Co.* (1997), 1997 CarswellNB 357, *(sub nom. Co-operators General Insurance Co. v. Melanson)* [1998] I.L.R. I-3505, 46 C.C.L.I. (2d) 211, 192 N.B.R. (2d) 273, 489 A.P.R. 273 (N.B. C.A.) — referred to

*Melanson v. Co-operators General Insurance Co.* (1998), 196 N.B.R. (2d) 80 (note), 501 A.P.R. 80 (note), 227 N.R. 195 (note) (S.C.C.) — referred to

*Nova Scotia Public Service Long Term Disability Plan (Trustees of) v. MacDonald* (1996), 38 C.C.L.I. (2d) 178, 153 N.S.R. (2d) 321, 450 A.P.R. 321, 1996 CarswellNS 358 (N.S. S.C.) — distinguished

*Reid Crowther & Partners Ltd. v. Simcoe & Erie General Insurance Co.* (1993), [1993] 2 W.W.R. 433, *(sub nom. Simcoe & Erie General Insurance Co. v. Reid Crowther & Partners Ltd.)* [1993] I.L.R. 1-2914, 13 C.C.L.I. (2d) 161,

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-50    Filed 08/15/14    Page 83 of 279

Ryan v. Sun Life Assurance Co. of Canada, 2005 NSCA 12, 2005 CarswellNS 27...

2005 NSCA 12, 2005 CarswellNS 27, [2005] N.S.J. No. 24, 136 A.C.W.S. (3d) 744...

83 Man. R. (2d) 81, 36 W.A.C. 81, 6 C.L.R. (2d) 161, [1993] 1 S.C.R. 252, 147 N.R. 44, 99 D.L.R. (4th) 741, 1993 CarswellMan 96, 1993 CarswellMan 343 (S.C.C.) — followed

*Sansalone v. Wawanesa Mutual Insurance Co.* (2000), 2000 CarswellBC 885, 2000 CarswellBC 886, *(sub nom. Non-Marine Underwriters, Lloyd's of London v. Scalera)* 2000 SCC 24, 75 B.C.L.R. (3d) 1, 18 C.C.L.I. (3d) 1, *(sub nom. Non-Marine Underwriters, Lloyd's of London v. Scalera)* 185 D.L.R. (4th) 1, 50 C.C.L.T. (2d) 1, [2000] 5 W.W.R. 465, *(sub nom. Non-Marine Underwriters, Lloyd's of London v. Scalera)* [2000] I.L.R. I-3810, *(sub nom. Scalera v. Lloyd's of London)* 253 N.R. 1, *(sub nom. Scalera v. Lloyd's of London)* 135 B.C.A.C. 161, *(sub nom. Scalera v. Lloyd's of London)* 221 W.A.C. 161, *(sub nom. Non-Marine Underwriters, Lloyd's of London v. Scalera)* [2000] 1 S.C.R. 551 (S.C.C.) — considered

APPEAL by insured and CROSS-APPEAL by insurer of judgment reported at *Ryan v. Sun Life Assurance Co. of Canada* (2003), 2003 NSSC 247, 2003 CarswellNS 455, 7 C.C.L.I. (4th) 111, 219 N.S.R. (2d) 329, 692 A.P.R. 329 (N.S. S.C.), with respect to interpretation of subrogation provisions in group disability insurance policy.

*Cromwell J.A.:*

**I. Introduction:**

1    This appeal requires us to interpret the subrogation provisions in a group disability insurance policy.

2    The appellant, Ms. Ryan, was disabled as a result of a motor vehicle accident. She received income replacement benefits based on her loss of earnings under a group disability insurance policy and, as well, a lump sum settlement of her damages claim against the other driver.

3    A dispute arose between Ms. Ryan and the respondent, Sun Life, the disability insurer. It concerned the insurer's right under a subrogation clause to be reimbursed out of Ms. Ryan's settlement proceeds for income replacement benefits that it had paid or might pay in the future. There are three main points in contention: whether the subrogation provisions apply to Ms. Ryan at all; if they do, what part of the settlement is available to the insurer for reimbursement; and does the right to reimbursement extend to benefits to be paid by the insurer in the future?

4    The dispute was taken before a Chambers judge in the Supreme Court. He decided that the insurer could seek reimbursement only from settlement proceeds fairly attributable to damages for income loss, whether past or future. He did not decide whether the insurer could seek reimbursement of benefits which might be payable to Ms. Ryan in the future.

5    Ms. Ryan appeals and the insurer cross-appeals.

6    In my view, both appeals should be dismissed. The judge was correct to limit the insurer's right to reimbursement to the part of the settlement proceeds which Ms. Ryan could show was fairly attributable to damages for income loss, past or future. I also conclude that the insurer cannot seek reimbursement for benefits accruing to Ms. Ryan after she received her settlement proceeds.

**II. Overview of Facts and Judicial History:**

7    Ms. Ryan joined the federal public service in September of 1980. She was enrolled in the compulsory group insurance plan which provided income replacement benefits of 70% of her salary in the event she became disabled. The group policy was amended from time to time and the amendments included the addition of a subrogation clause.

8    In March of 1994, Ms. Ryan was injured in a motor vehicle accident and could not work. Effective in October, 1995, she received income replacement benefits under the group policy based on 70% of her salary. She also sued the other driver, claiming general and special damages. In late 2001, she settled that litigation for an all-inclusive amount of $350,000 which was not apportioned among her various heads of damage.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-50    Filed 08/15/14    Page 84 of 279

Ryan v. Sun Life Assurance Co. of Canada, 2005 NSCA 12, 2005 CarswellNS 27

2005 NSCA 12, 2005 CarswellNS 27, [2005] N.S.J. No. 24, 136 A.C.W.S. (3d) 744...

9    The group disability insurance contract was amended in May of 1994 (after Ms. Ryan's accident) to add a type of subrogation clause. It gave the insurer certain rights to be reimbursed out of the amount employees recovered from third parties and, as well, to set off against benefits, otherwise payable, amounts which the employee had received as a result of litigation or settlement with third parties. The contract provided that this amendment was to be effective from March 1, 1993.

10    Ms. Ryan and the insurer could not agree about the impact of this new clause on the insurer's rights to reimbursement out of the settlement proceeds. Ms. Ryan's position was (and is) that the clause does not apply to her at all because it was not agreed upon until after the accident which gave rise to the settlement: remember that while the clause was back-dated, it was agreed upon in May of 1994 while the accident had occurred in March. If the clause does apply, Ms. Ryan says there are two limits on the right to reimbursement: it applies only to the part of her settlement that is reasonably attributable to past income loss and only with respect to benefits actually paid up to the time of the settlement. The insurer's position was (and is) that the subrogation clause applies and that it permits the insurer to recover against 75% of the entire settlement proceeds (less legal fees) for past benefits paid and with respect to benefits which might become payable in the future.

11    Ms. Ryan brought an application before Davison, J. in Supreme Court Chambers for an interpretation of the subrogation clause. The clause provides:

> Where benefits under this policy have been paid or may be payable to an Employee and the Employee has a right of action against a Third Party for recovery of loss of income which otherwise would have been earned by the Employee during the whole or any part of the period that benefits are paid, or may be payable, to the Employee under this policy,
>
> > 1. any amount recovered by the Employee from the Third Party (including general damages, damages for loss of income, interest and legal costs, whether recovered through settlement or trial), less the Employee's legal costs expended for such recovery, shall be deemed to be the Employee's Net Recovery from the Third Party;
> >
> > 2. the Employee shall pay to Sun Life an amount equal to 75% of his/her Net Recovery from the Third Party (to a maximum of the amounts paid to the Employee under this policy), such percentage of his/her Net Recovery to be held in trust by the Employee for Sun Life until payment is made to Sun Life;
> >
> > 3. in the event that any benefits not paid to the Employee under this policy are subsequently determined to have been payable, Sun Life shall be entitled to set off against its liability for such benefits the amount the Employee would have been obliged to pay pursuant to subparagraph 2. hereof if such benefits had been paid to the Employee before the Employee obtained his/her recovery from the Third Party; ...

12    The Chambers judge held that (decision reported at (2003), 219 N.S.R. (2d) 329 (N.S. S.C.)):

> 1. The subrogation clause was not ambiguous (Reasons, paras. [36] and [52]);
>
> 2. It applies to that part of a settlement or judgment which can reasonably be attributed to a past or future income loss caused by the accident (Reasons, paras. [52] and [58]);
>
> 3. The burden of establishing which part of a settlement or judgment can reasonably be attributed to a past or future loss of income lies on the insured. (Reasons, para. [53]);
>
> 4. If the insured cannot discharge that burden, the insurer is entitled to set off the amount of its benefits against "a reasonable amount for loss of earnings" (Reasons, para. [58]) or "against the whole or part of the amount of settlement or judgment." (Order, para. (3)).

13    Ms. Ryan appeals, submitting that the judge erred in finding that the clause applies to her claim. Alternatively, she says that he erred in finding that the insurer could claim against the portion of her settlement relating to future income loss. The insurer cross-appeals, submitting that the clause permits subrogation against 75% of the total settlement proceeds (less costs) and with respect to benefits actually paid or payable under the policy.

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Ryan v. Sun Life Assurance Co. of Canada, 2005 NSCA 12, 2005 CarswellNS 27

2005 NSCA 12, 2005 CarswellNS 27, [2005] N.S.J. No. 24, 136 A.C.W.S. (3d) 744...

### III. Issues:

14    The issues to be decided are these:

1. What is the applicable standard of review?

2. Does the right of subrogation apply to Ms. Ryan's claim?

3. If so, how should the subrogation clause be interpreted:

(a) Does the right of subrogation apply to the whole of the settlement proceeds?

(b) Does the right of subrogation relate to benefits paid to the date of settlement or also to future benefits to which Ms. Ryan becomes entitled?

### IV. Analysis:

*1. Standard of Review:*

15    The appeal relates to the judge's interpretation of a contract of insurance which is a question of law. The standard of review on that question is correctness: *Housen v. Nikolaisen,* [2002] 2 S.C.R. 235 (S.C.C.) at paras. 8 - 9.

*2. Does the subrogation clause apply to Ms. Ryan?*

16    Ms. Ryan submits that the subrogation clause does not apply to her claim because it was negotiated and agreed to after the date of her accident. The insurer responds that the parties to the contract can, by agreement, stipulate its effective date and they did so, making the clause effective from March 1, 1993. The Chambers judge accepted the insurer's argument on this point and Ms. Ryan says he erred in doing so.

17    In my respectful view, the Chambers judge was right. The policy provides that it may be modified by the mutual agreement of the policy holder (who is Her Majesty the Queen in Right of Canada represented by the President of the Treasury Board) and the insurer. The changes and their effective date were so mutually agreed. Moreover, as the chambers judge stated, relying on J.A. Appleman and J. Appleman, *Insurance Law and Practice* (revised vol I, 1981) at section 44, page 119, the terms of the policy govern the effective date of coverage. Ms. Ryan has not advanced any authority to the contrary.

*3. How should the subrogation clause be interpreted?*

18    It is common ground that, if the subrogation clause applies, it at least permits reimbursement to the insurer of benefits it has paid to Ms. Ryan out of the portion of the settlement relating to past income loss. Ms. Ryan says that is the extent of the right, if it exists. The insurer claims that the right is much broader: it is entitled to reimbursement of all benefits paid or payable out of 75% of the net settlement.

19    The Chambers judge's interpretation resulted in a middle ground. As noted, he held that the insurer could claim against the settlement proceeds that relate to either past or future income loss. Although he adverted to the issue of whether the insurer's right was with respect to benefits actually paid or extended to benefits that would become payable, he did not resolve it.

20    Before turning to an analysis of the language of the policy, it will be helpful to set out the principles of interpretation relating to contracts of insurance. As McLachlin, J. (as she then was) said on behalf of the Court in *Reid Crowther & Partners Ltd. v. Simcoe & Erie General Insurance Co.,* [1993] 1 S.C.R. 252 (S.C.C.), at pp. 268-269, these principles include, but are not limited to: (1) the *contra proferentum* rule; (2) the principle that coverage provisions should be construed broadly and exclusion clauses narrowly; and (3) the desirability, at least where the policy is ambiguous, of giving effect to the reasonable expectations of the parties.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2005 NSCA 12, 2005 CarswellNS 27, [2005] N.S.J. No. 24, 136 A.C.W.S. (3d) 744...

21    The first of these principles, the *contra proferentum* rule, was described by Iacobucci, J. in *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 (S.C.C.) at para. 53 as operating "to protect one party to a contract from deviously ambiguous or confusing drafting on the part of the other party, by interpreting any ambiguity against the drafting party." Its operation depends, therefore, on a finding of ambiguity in the language to be interpreted. Ambiguity in this context means that a term in the contract is reasonably capable of more than one meaning: see for example *Chilton v. Co-operators General Insurance Co.* (1997), 143 D.L.R. (4th) 647 (Ont. C.A.), at 654. The third principle, that the interpretation should give effect to the parties' reasonable expectations, is also engaged when the contract language is ambiguous: *Sansalone v. Wawanesa Mutual Insurance Co.*, [2000] 1 S.C.R. 551 (S.C.C.) at para. 71. (Like McLachlin, J. in *Reid Crowther* at p. 27 and Laskin, J.A. in *Chilton* at 657, I do not think it necessary to decide whether the principle may also apply where the language is not ambiguous.)

22    These principles, however, assume that the first step in any task of interpretation is to give effect to the parties' contractual intent determined by reference to the words they used in drafting the document, possibly read in light of the surrounding circumstances which were prevalent at the time: *Eli Lilly*, *supra* at para 54. It is in this context that the often quoted words of Estey, J. in *Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888 (S.C.C.), at 901 should be understood:

> Even apart from the doctrine of *contra proferentem* as it may be applied in the construction of contracts, the normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. Consequently, literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted. Where words may bear two constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation ... which promotes a sensible commercial result.

23    As Iacobucci, J. pointed out at para. 56 of *Eli Lilly*, where there is no ambiguity in the wording of the document, the *Consolidated-Bathurst* principle favouring the interpretation which produces a "fair result" or a "sensible commercial result" is not determinative. While it would be absurd to adopt an interpretation which is inconsistent with the commercial interests of the parties, it should be presumed that the parties intended the legal consequences of their words. Evidence of their subjective intent should be resorted to only in cases of ambiguity: paras. 54 - 55.

24    I mention this because the parties and the Chambers judge referred to evidence concerning the exchange of drafts and correspondence between the parties relating to this new subrogation clause. While there can be little doubt from a review of this material that the insurer's objective in advancing the language which was subsequently adopted was to give it the right to share in all types of damages, the issue is not what the insurer intended. Rather, as Iacobucci, J. emphasized in *Eli Lilly*, the question is what was the contractual intent of the parties. This is to be determined from the words they used in light of the surrounding circumstances. Evidence of the subjective intent of one of the parties has no independent place in this endeavour; it is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous: *Eli Lilly* at paras. 54 - 55.

25    While I have reviewed all of the evidence in relation to the various drafts and exchanges leading up to the adoption of the subrogation clause, I have not found it necessary to rely on it. In my view, the words agreed upon, read in context, are not ambiguous and evidence of the subjective intention of the insurer is not necessary for, or helpful to, the task of interpretation.

26    It is also fundamental to the task of interpretation that the words must be understood in the context in which they are used. Saunders, J.A. in *MacIsaac v. Deveaux* (2004), 224 N.S.R. (2d) 315, [2004] N.S.J. No. 250 (N.S. C.A.), at paras. 60 - 62 stated that "... particular words and phrases should not be lifted from the context and considered in isolation ..." but must be considered in the "...context, scheme and objectives ..." of the entire contract. He referred to *Liability Insurance Law in Canada*, 3rd ed. (Toronto: Butterworths, 2001) where the author Gordon Hilliker states at pages 27-28:

2005 NSCA 12, 2005 CarswellNS 27, [2005] N.S.J. No. 24, 136 A.C.W.S. (3d) 744...

The requirement that words are to be construed in accordance with their plain, ordinary and popular sense does not mean that one ignores the context in which the words are found. Rather, it is a cardinal rule that a contract of insurance should be considered in its entirety and be constructed liberally so as to give effect to the purpose in which it was written.

27    This is an especially important principle to bear in mind in this case. The clause uses two terms, "loss of income" and "general damages" which give rise to much of the interpretative difficulty. Both have a strict legal meaning, but are also used more loosely to describe different things in their "ordinary and popular sense." Their intended meaning may only be understood in light of the legal context from which the terms are adopted and the particular context in which they are used. Before turning to a detailed review of the text of the clause, it will be helpful to set out briefly the legal context of these two critical and, in this case, problematic terms.

28    We are concerned here with reimbursement out of a judgment or settlement of the employee's personal injury action. The disabled employee will often have a claim for both pecuniary and non-pecuniary losses. The pecuniary losses include those actually experienced to the date of trial or settlement, such as lost earnings, expenses for care and out of pocket expenses. The pecuniary losses also include losses which will likely be suffered after the date of settlement or trial into the future, such as earnings that will not be obtained because of the disability and the cost of care required in the future. The non-pecuniary losses relate primarily to pain and suffering and the loss of amenities and expectation of life, both up to the date of trial or settlement and into the future.

29    In strict legal language in the context of personal injury cases, pecuniary losses suffered to the date of trial or settlement are referred to as "special damages": see S. M. Waddams, *The Law of Damages*, looseleaf (Toronto, Canada Law Book Ltd., 1991) at para. 3.340. Losses likely to be suffered after that date are referred to as "general damages."

30    Technically, therefore, the term "general damages" refers to compensation for two types of losses: future pecuniary loss — such as the cost of future care and the loss of earning capacity — as well as all non-pecuniary loss: see K. Cooper-Stevenson and Iwan Saunders, *Personal Injury Damages in Canada* ( (Toronto: Carswell, 1996) at 93. That this is the correct legal meaning of the term general damages in the personal injury context is confirmed by leading cases both here and in England: *Andrews v. Grand & Toy Alberta Ltd.*, [1978] 2 S.C.R. 229 (S.C.C.) *per* Dickson, J. (as he then was) at 235-236; *British Transport Commission v. Gourley* (1955), [1956] A.C. 185 (U.K. H.L.) *per* Lord Goddard at 206.

31    However, lawyers and others knowledgeable about personal injury claims do not always use the term general damages in its strict, legal meaning. The sense of the term depends on the context in which it is used. For example, in everyday conversation among lawyers about personal injury cases, the term "general damages" (or "generals") is often used to refer only to damages for non-pecuniary loss, that is for pain and suffering and the loss of amenities and expectation of life. However, that is not a precise use of the term or the only use of it in common parlance among lawyers. The other common use of the term occurs where it is necessary to differentiate claims for loss of earnings up to the date of trial and claims for earnings to be lost in the future.

32    In personal injury damage assessment, income loss to the point of trial or settlement is conceptually distinct from the anticipated loss of income to occur in the future. The former, as noted, is an item of special damages while the latter is an item of general damages. But the anticipated loss of income in the future is viewed as the loss of a capital asset — the present loss of the capacity to earn income in the future: see e.g., *Andrews* at page 251; Waddams at para. 3.710. However, in common parlance among lawyers, the term loss of income may be used somewhat loosely to refer to both past and future losses. In a discussion of a loss of income claim, it would be quite usual for lawyers to differentiate between the special damages — that is the past loss of income to the date of judgment or settlement and the general damages — that is the loss of earning capacity into the future.

33    So, while the term general damages has a strict legal meaning which includes damages for future pecuniary losses as well as all non-pecuniary losses, lawyers often use the term somewhat loosely to refer only to one or the other of these types of damages depending on the context. Similarly, the term loss of earnings strictly means the special damages claimed for income lost up to the date of trial or settlement. But in common parlance among lawyers, the term may be used, depending on the

Ryan v. Sun Life Assurance Co. of Canada, 2005 NSCA 12, 2005 CarswellNS 27

2005 NSCA 12, 2005 CarswellNS 27, [2005] N.S.J. No. 24, 136 A.C.W.S. (3d) 744...

context, to refer to both past and future claims. Therefore, in interpreting the terms "general damages" and "loss of income", one must pay close attention to the context in which the terms are used.

34    I turn then to the text of the clause. There are two main issues of interpretation in this case: what goes into the "reimbursement pot" and what may be included in the reimbursement claim. The first concerns how much of the settlement is potentially available to the insurer for reimbursement. The second concerns what benefits may be the subject of the insurer's claim for reimbursement out of the settlement proceeds. I will address each in turn.

*(a) Does the right of subrogation apply to the whole of the settlement proceeds?*

35    I would first note that the subrogation clause here is limited to reimbursement. Unlike many other subrogation clauses, this one does not give the insurer a right to bring an action in the name of the insured. It is, as counsel for the insurer submitted in Chambers, in the nature of a reimbursement clause rather than a traditional subrogation clause.

36    The clause opens with a statement of two conditions. In order for the insurer to seek reimbursement, these two conditions must be present. They are:

> 1. Benefits under the policy "have been paid or may be payable to an Employee". There is no doubt this condition is satisfied.

> 2. The employee "has a right of action against a Third Party <u>for recovery of loss of income which otherwise would have been earned by the Employee during the whole or any part of the period that benefits are paid, or may be payable,</u> to the Employee under this policy."

(Emphasis added)

37    Critical aspects of context are found in the second condition, one relating to the nature of the employee's right of action and the second helping to explain the meaning of the term "loss of income".

38    The condition does not refer to an employee's right to claim damages in general. Instead, it refers specifically to the employee's right of action "for recovery of loss of income ." This is important because, in subsequent paragraphs, the clause defines the fund available to the insurer for reimbursement of benefits in terms of the employee's "recovery" in relation to his or her right of action. But the right of action described in this condition is expressly stated to be a right of action for recovery of loss of income. This suggests that the fund available to the insured for reimbursement does not include all the damages recovered by the employee from the third party, but rather only the damages received on account of loss of income. That is the "right of action" which gives rise to the "recovery" and the fund is later defined in terms of that recovery.

39    A second important contextual consideration helps explain the meaning of the term "loss of income" as it is used in this condition. As noted earlier, this term technically refers to income lost to the point of trial or settlement, but is also sometimes used more loosely to refer to all kinds of loss of income, past and future. The context here makes it clear that this looser meaning is the one intended in this condition. The full phrase in which the term appears is: "recovery of loss of income <u>which otherwise would have been earned by the Employee during the whole or any part of the period that benefits are paid. ...</u>" (Emphasis added) Benefits will be paid into the future so long as the disability lasts. It follows that the "income which otherwise would have been earned" during that period obviously includes income that would have been earned in the future but for the continuing disability. This, in my view, makes it clear that the words "loss of income" in the second condition refer not only to wages actually lost up to the time of settlement, but also to recovery on account of any loss of income during any period for which benefits are paid, a period which could well extend into the future. In other words, read in the context of the entire phrase, the term "loss of income" must be understood here as referring to recovery on account of both past and future income loss.

40    After setting out these two conditions, the clause goes on to do three more things: to set out a definition of the employee's "net recovery", to establish the insurer's rights of reimbursement from that net recovery; and, to address the situation in which

Ryan v. Sun Life Assurance Co. of Canada, 2005 NSCA 12, 2005 CarswellNS 27

2005 NSCA 12, 2005 CarswellNS 27, [2005] N.S.J. No. 24, 136 A.C.W.S. (3d) 744...

benefits that were not paid initially are subsequently found to have been payable. The first two of these elements are most relevant to the task at hand.

41    The language defining net recovery is this:

> any amount recovered by the employee from the Third Party (including general damages, damages for loss for income, interest and legal costs, whether recovered through settlement or trial), less the Employee's legal costs expended for such recovery, shall be deemed to be the Employee's Net Recovery from the Third Party;

42    The question is this: what damages recovered from the third party are included in the definition of the employee's net recovery. The insurer's position is that it includes all damages recovered, including damages for pain and suffering and loss of enjoyment of life and potentially even special damages unrelated to income loss. The insurer points to the expansive language of the definition. The words used are "any amount recovered." This is followed by a non-exhaustive list of inclusions — general damages, damages for loss of income, interest and legal costs — which tends to reinforce the breadth of the intention. The use of the term "general damages" is relied on as evidencing a clear intention not to limit the fund to damages on account of income loss.

43    Ms. Ryan says that the definition includes only the recovery in relation to past income loss to the time of settlement or judgment. She says that the clause is ambiguous and that the interpretation advanced by the insurer leads to absurd results: it permits the insurer to be reimbursed out of settlement proceeds that have nothing to do with the payments made by the insurer. As Mr. Richardson put it on behalf of Ms. Ryan, she has to pay the insurer out of her own pocket. This, he submits, cannot have been the parties' intention and that we should apply the principle that where there are two possible constructions, the one which promotes their true intention should be adopted.

44    The Chamber's judge did not accept the interpretation advanced by either party. As noted, he found that the recovery included only the amounts which could be reasonably attributed to loss of past and future income.

45    It is true that broad words — "any amount recovered by the Employee from the Third Party" — are used to define the fund from which the insurer may seek reimbursement. However, these words must be read in the context of the clause as a whole and particularly the earlier stated conditions which give rise to the right to reimbursement. As discussed earlier, those conditions refer to the employee having a right of action against a Third Party "... for recovery of loss of income ...". Thus, the words "any amount recovered" following on from that statement of entitlement to reimbursement must be understood as relating back to a recovery with respect to that "right of action ... for recovery of loss of income... ." In other words, the recovery on the employee's right of action relates to the right of action which gives rise to that recovery. The right of action, and therefore the recovery, are defined as relating to "loss of income."

46    The reference to general damages in the list of inclusions in the net recovery could be taken, as the insurer suggests, as a reference to damages for pain and suffering and loss of enjoyment of life. However, read in the context of the clause as a whole, I do not find that interpretation to be the most plausible.

47    The term general damages is used in this clause which is triggered where an employee has "... a right of action ... for recovery for loss of income ...". As noted, the clause then defines the fund — the "amount recovered" — out of which the insurer may seek reimbursement. This definition of the "amount recovered" refers back to the first condition for reimbursement — that the employee have a right of action for recovery of loss of income. The amount recovered must be understood in the context of the right of action — that is, a right of action for loss of income — which gives rise to the recovery. That context strongly suggests that the term general damages, which is used to clarify the amount of the recovery, should be understood as referring to the right of action for loss of income which gives rise to the recovery. This, in turn, strongly suggests that the term "general damages" is used to refer to general damages relating to loss of income, that is to future pecuniary loss. That is one of the types of compensation included in the strict meaning of the broad term "general damages" and an appropriate term to use in order to differentiate between damages for past income loss and loss of future earning capacity.

2005 NSCA 12, 2005 CarswellNS 27, [2005] N.S.J. No. 24, 136 A.C.W.S. (3d) 744...

48      The rest of the clause confirms this interpretation. The next item after "general damages" in the list of inclusions within the term "amount recovered" is "damages for loss of income." This appears to be a reference to compensation for past loss of income, as compensation for the loss of future income would better be described as relating to loss of earning capacity. The other inclusions are interest and costs. Thus, consistent with the condition that the employee have a right of action for recovery of loss of income, the inclusions make it clear that both past income loss ("damages for loss of income") and loss of future earning capacity ("general damages") are included.

49      The term "loss of income" in this clause is not modified or explained as it is in the condition discussed earlier. It is sensible that in this clause defining the employee's net recovery, the term loss of income would be used more strictly to refer to past loss of income and in order to contrast those losses with the general damages for loss of earning capacity.

50      In summary, the clause, while not a model of precision, makes it clear that the net recovery consists of damages fairly attributable to income loss. However, and contrary to Ms. Ryan's position, the clause also makes it clear that damages for both past lost earnings and loss of earning capacity into the future are included. This interpretation in my view makes sense of all of the words used by the parties in the context in which they are used. It makes the definition of net recovery consistent with the condition triggering the right to reimbursement — the right of action for recovery of loss of income. It also avoids the harsh result of permitting the insurer to be reimbursed for payment of income replacement benefits out of damages which the employee recovered from a third party to compensate him or her for pain and suffering or to provide for the cost of future care.

51      Consistent with the conclusions of the Chambers judge, I would hold that the employee's net recovery under this clause consists of the portion of the settlement or award which the employee can show is fairly attributable to past income loss and loss of future earning capacity, interest and costs.

*(b) Does the right of subrogation relate to benefits paid to the date of settlement or also to future benefits to which Ms. Ryan becomes entitled?*

52      This issue is concerned primarily with paragraphs 2 and 3 in the clause. They read:

> 2. the Employee shall pay to Sun Life an amount equal to 75% of his/her Net Recovery from the Third Party (to a maximum of the amounts paid to the Employee under this policy), such percentage of his/her Net Recovery to be held in trust by the Employee for Sun Life until payment is made to Sun Life;

> 3. in the event that any benefits not paid to the Employee under this policy are subsequently determined to have been payable, Sun Life shall be entitled to set off against its liability for such benefits the amount the Employee would have been obliged to pay pursuant to subparagraph 2 hereof if such benefits had been paid to the Employee before the Employee obtained his/her recovery from the Third Party; ...

53      Paragraph 2 imposes an obligation on the employee to pay an amount from his or her recovery to the insurer. Paragraph 3 concerns the insurer's right to reduce its liability to pay benefits on account of the recovery received by the employee. The questions are what amounts does paragraph 2 require the employee to pay and what amounts does paragraph 3 entitle the insurer to set off against benefit payments?

54      The insurer contends that these paragraphs create an ongoing obligation on the employee to pay benefits received after the recovery and an ongoing right on the part of the insurer to set off proceeds of the recovery against future benefit payments. As expressed in its factum, the insurer says that paragraphs 2 and 3 entitle the insurer to be reimbursed (or to set off against benefits payable) with respect to benefits to which the employee will become entitled under the terms of the policy after the settlement of her claim against the third party tort feasor.

55      In my view, this is not an interpretation which the clause can reasonably bear.

56      Paragraph 2 does not support the insurer's position. It contemplates one payment by the employee to the insurer out of the recovery of the amount paid to the employee under the policy. The use of the past tense — paid — to describe the amount

2005 NSCA 12, 2005 CarswellNS 27, [2005] N.S.J. No. 24, 136 A.C.W.S. (3d) 744...

of benefits to be repaid suggests that there is no obligation to reimburse the insurer for payments to be made in the future, that is, after the date of reimbursement.

57      Nor does the right of set off in paragraph 3 support the insurer's position. The insurer's right of set off arises on the condition set out at the beginning of the paragraph: that "... any benefits not paid ... are subsequently determined to have been payable." The relevant time to judge whether the benefit was or was not paid is the time the employee receives the recovery. The paragraph requires that the amount of the set off is to be determined as if the benefits that were not paid, but are subsequently determined to have been payable, "... had been paid ... before the Employee obtained his/her recovery ... ." Therefore, paragraph 3 deals with the situation in which two things have occurred: first, benefits to which the employee was entitled had not been paid by the time of recovery; and second, after the employee has obtained his or her recovery, those benefits which ought to have been, but were not paid before the employee received the recovery are determined after the recovery to have been payable.

58      Thus, the paragraph cannot reasonably be interpreted as addressing benefits which relate to a time after the recovery or reimbursement. The use of the language of benefits "not paid ... but subsequently determined to have been payable" is inconsistent with any such intention. That language can only refer to benefits which accrued in the past but were not paid and which were subsequently determined to have been payable before the settlement or reimbursement.

59      This interpretation is consistent with the paragraph's definition of the amount to which the right of set off applies. The paragraph provides that the amount which the insurer is entitled to set off is "... the amount the employee would have been obliged to pay [under paragraph 2] if such benefits [i.e., the benefits which had not been paid at the time of the employee's recovery but are thereafter determined to have been payable] had been paid to the employee before the employee obtained his/her recovery ... ." Thus, the focus of the clause is what benefits had been or ought to have been paid as of the date the employee received his or her recovery from the third party. The former amount — benefits actually paid to the date of recovery — is the subject of paragraph 2. The latter amount — benefits not paid by that date, but subsequently determined to have been payable as of that date — is the subject of paragraph 3. Neither paragraph deals with benefits accruing in the future.

60      The insurer relies on three cases, but none assists in my view. *Maritime Life Assurance Co. v. Mullenix* (1986), 76 N.S.R. (2d) 118 (N.S. T.D.); N.S.J. No. 479 concerned the equitable right of subrogation, not the interpretation of contractual language. As the insurer in the present case has emphasized, the insurer's rights here are entirely contractual and must be determined from the language used in the relevant provisions of the policy. *Mullenix* does not assist in that task. *Nova Scotia Public Service Long Term Disability Plan (Trustees of) v. MacDonald* (1996), 153 N.S.R. (2d) 321 (N.S. S.C.); N.S.J. 418 turned on the particular contractual language in that plan which has virtually nothing in common with the language in the insurer's group disability policy in issue here. Similarly, *Melanson v. Co-operators General Insurance Co.*, [1996] N.B.J. No. 381 (N.B. Q.B.); aff'd (N.B. C.A.); application for leave dismissed (1998) (S.C.C.) turned on the language of an endorsement which is not at all like the contractual language in issue here.

61      I would hold that the right to reimbursement or set off does not extend to benefits that accrue in the future, but only to benefits paid or found to have been payable as of the relevant time.

## V. Disposition:

62      I would dismiss the appeal and the cross-appeal. As success is divided, I would make no order as to costs.

*Appeal dismissed; cross-appeal dismissed.*

---

**End of Document**      Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 129

565 F.Supp. 931
United States District Court,
D. New Jersey.

SANOFI, S.A. and American Home
Products Corporation, Plaintiffs,

v.

MED–TECH VETERINARIAN PRODUCTS,
INC., J.A. Webster, Inc., as Agent for Med-Tech
Veterinarian Products, A.J. Buck & Son, Inc.,
as Agent for Med-Tech Veterinarian Products,
Inc., J.A. Webster, Inc., and A.J. Buck & Son, Inc.

Civ. No. 82–1302.    |    June 15, 1983.

Patentee and licensee sought preliminary injunction against sale of product in the United States by distributor who had acquired product through transfers originating in sale by patentee abroad. The District Court, Sarokin, J., held that: (1) licensee's license to sell patented product in the United States was exclusive; (2) foreign patentee which held United States patent on product and which sold product outside the United States in country in which no patent on product was held was not entitled to injunction against eventual transferee in United States to prohibit resale of goods in the United States, given that, even if patentee had right in first instance to enjoin resale, it waived that right by not placing any written restrictions upon purchaser at time of sale; (3) no implied license to sell patented product in the United States arose by virtue of foreign patentee's sale of product outside the United States without restrictions as to its disposition, where exclusive right to sell product was already held by licensee; and (4) patentee could not transfer a greater right than it possessed, and, since even patentee had no right to sell product in the United States, given existence of exclusive license, exclusive licensee was entitled to injunction against distribution in the United States of product by corporation which had acquired it through foreign broker.

Licensee's application granted; patentee's application denied.

West Headnotes (21)

**[1]    Injunction**
👉 Presumptions and burden of proof

It is movant for preliminary injunction who has burden of satisfying the court of the reasonable probability of success on the merits and of likelihood of irreparable harm, and, upon failure to carry that burden, preliminary injunction application must necessarily be denied.

Cases that cite this headnote

**[2]    Patents**
👉 Rights and powers of patentees as to making, use, or sale of invention

Pharmaceutical distributor, which placed order with broker for importation of pharmaceutical product, acted in good faith, without notice of patentee's restrictions on sale of product in the United States, and without knowledge of foreign broker's misrepresentations made to patentee in order to acquire product, and, hence, those misrepresentations alone would not bar distributor from selling product upon its importation into the United States.

Cases that cite this headnote

**[3]    Patents**
👉 Rights and powers of patentees as to making, use, or sale of invention

Under United States patent laws, patent holder has exclusive right to make, use, and sell his invention throughout the United States.

Cases that cite this headnote

**[4]    Patents**
👉 Assignability of patents

Patent holder's exclusive right to make, use, and sell his invention throughout the United States may be assigned to another.

Cases that cite this headnote

**[5]    Patents**
👉 Requisites and Validity of Assignments and Grants
**Patents**
👉 Nature of license

If patentee conveys to another in writing the whole patent, comprising exclusive right to make, use, and sell invention throughout the United States, or conveys an undivided part or share of that exclusive right, or transfers exclusive right under the patent within and throughout a specified part of the United States, then the transfer will be properly characterized as an "assignment"; any transfer of fewer rights than these is a "license" and not an assignment.

Cases that cite this headnote

**[6]    Patents**
   🔑  Nature of license

Transfer by patentee of right to sell pharmaceutical product in the United States was transfer of less than patentee's entire right in the patent and, hence, transfer must be characterized as a license and not an assignment.

1 Cases that cite this headnote

**[7]    Patents**
   🔑  As to licensors

Nonexclusive license confers upon licensee mere privilge that protects him from claim of infringement by owner of the patent.

1 Cases that cite this headnote

**[8]    Patents**
   🔑  Construction and Operation of Licenses

Nonexclusive licensee has no property interest in patent monopoly, nor any contract with patent owner that others shall not practice the invention.

1 Cases that cite this headnote

**[9]    Patents**
   🔑  Construction and Operation of Licenses

Patent owner who grants nonexclusive license to another is not precluded from further licensing the product and may freely tolerate infringement without violating rights of patent licensees.

1 Cases that cite this headnote

**[10]    Patents**
   🔑  As to licensors

Exclusive licensee has promise of patent owner that owners shall be excluded from practicing patent within field of use for which license has been given.

2 Cases that cite this headnote

**[11]    Patents**
   🔑  Persons entitled to sue

**Patents**
   🔑  New parties and change of parties

Exclusive licensees have right to enjoin acts of infringement, and, because presence of patentee is usually necessary to pursue such relief, may compel patentee to become party to lawsuit.

3 Cases that cite this headnote

**[12]    Patents**
   🔑  As to licensors

Patentee has no more right to practice his patent in field of use where exclusive license has been given than does a stranger; therefore, if exclusive license has been violated by patentee, patentee may be sued for infringement.

6 Cases that cite this headnote

**[13]    Patents**
   🔑  Construction and Operation of Licenses

Patent licensee's license to sell pharmaceutical product throughout the United States was exclusive, in light of language in transfer contract.

Cases that cite this headnote

**[14]    Patents**
   🔑  Grounds for Denial in General

Foreign patentee which held United States patent on pharmaceutical product and which sold product outside the United States in country in which no patent on product was held was not entitled to preliminary injunction against

eventual transferee in United States to prohibit resale of the goods in the United States, given that, even if patentee had right in first instance to enjoin such resale, it waived that right by not placing any restrictions as to further disposition upon purchaser at time of sale.

2 Cases that cite this headnote

[15] **Patents**

🔑 Rights and powers of patentees as to making, use, or sale of invention

Unrestricted sale of patented article by owner of patent conveys to purchaser right of unrestricted ownership as against seller; however, purchaser does not acquire any rights greater than those possessed by owner of patent.

Cases that cite this headnote

[16] **Patents**

🔑 Recording

Although assignments are required to be recorded in order for assignee to prevail against one who has acquired rights in patent without notice, there is no obligation to record license. 35 U.S.C.A. § 261.

2 Cases that cite this headnote

[17] **Patents**

🔑 Rights and liabilities of assignees and grantees

Purchaser of a patent takes subject to outstanding licenses.

3 Cases that cite this headnote

[18] **Patents**

🔑 Rights and liabilities of assignees and grantees

Purchaser of patent is under obligation to inquire of seller as to existence of any outstanding licenses and cannot claim that his expectations have been frustrated if he fails to make necessary inquiry and later discovers that outstanding license interferes with his right of enjoyment.

1 Cases that cite this headnote

[19] **Patents**

🔑 Requisites and Validity of Licenses

No formal granting of license is necessary in order to give it effect; consequently, where owner of patent exhibits conduct from which one dealing with him may properly infer that owner consents to his use of the patent, implied license will arise.

Cases that cite this headnote

[20] **Patents**

🔑 Implied licenses

No implied license to sell patented product in the United States arose by virtue of foreign patentee's sale of product outside the United States without restriction as to its disposition, where exclusive right to sell product within the United States was already held by licensee; patentee could not transfer any greater right than it possessed, and even patentee had no right, in view of exclusive license, to sell product in the United States.

4 Cases that cite this headnote

[21] **Patents**

🔑 Implied licenses

Even if implied license to sell patent product in the United States arose by virtue of foreign patentee's sale of product outside the United States without restriction as to its disposition, such implied license would be subject to outstanding licenses, including prior exclusive license granted by patentee to sell product in the United States, regardless whether taker of implied license had notice of existence of exclusive license.

1 Cases that cite this headnote

Sanofi, S.A. v. Med-Tech Veterinarian Products, Inc., 565 F.Supp. 931 (1983)
220 U.S.P.Q. 416

**Attorneys and Law Firms**

**\*934** Gerard J. Weiser, Weiser, Stapler & Spivak, P.C., Philadelphia, Pa., Benjamin A. Levin, Cherry Hill, N.J., for plaintiff Sanofi, S.A.

William J. Fiore, Meyner & Landis, Newark, N.J., Morris Relson, Darby & Darby, P.C., New York City, for plaintiff American Home Products Corp.

Richard Catenacci, Connell, Foley & Geiser, Newark, N.J., James H. Laughlin, Jr., Benoit, Smith & Laughlin, Arlington, Va., for defendants.

**Opinion**

**AMENDED OPINION**

SAROKIN, District Judge.

This matter, which is before the Court on application of plaintiffs for a preliminary injunction, presents a novel and difficult question arising under the patent laws of the United States. Plaintiff, Sanofi, S.A., is located and incorporated in France. The company manufactures pharmaceutical products and holds patents in the United States and in Canada for the generic drug, acepromazine maleate, a tranquilizer and anti-emetic used in the United States for the treatment of animals. In September, 1959, Sanofi entered into an agreement with plaintiff American Home Products, [1] which conferred upon the company

> the right to manufacture, sell or use in Canada [acepromazine maleate] and pharmaceutical products containing [acepromazine maleate] either alone or associated with other active products in injection or oral form for veterinary use.

The contract further provided:

> > This right to manufacture, use or sell [acepromazine maleate] and pharmaceutical products containing [acepromazine maleate] in Canada will be an exclusive right and limited to products for veterinary use.

Under the contract, which incorporated provisions of an earlier agreement between the companies, American Home Products was obligated to inform Sanofi of any infringements of the patent. Sanofi, in turn, agreed that in exchange for the assistance of American Home in protecting the patent, American Home would not be required to bear any expense in providing the required assistance. The parties further agreed that American Home would compensate Sanofi for rights conferred by the contract by payment of a royalty based on sales of the patented product.

In January, 1963, a letter agreement was entered into by the parties which extended to American Home "the right *to sell* [acepromazine maleate] in the veterinary field in the United States under the same contractual conditions as exist for the Canadian sales." (emphasis supplied).

In July, 1981, and in September, 1981, Medico Industries, Inc., a Delaware corporation with its principal place of business in Kansas, placed two separate orders with a chemical broker, Flavine International, Inc., of Northvale, New Jersey, for the purchase of acepromazine maleate in bulk form. Because it was alleged by plaintiffs that fraud occurred in connection with these transactions, a hearing was held by this court. From the evidence adduced at that hearing, the following findings of fact are made.

Flavine, International, Inc., did a considerable amount of business with Medico, which processed the acepromazine maleate sold by the defendants, distributors of the product. After Medico placed the first order for the acepromazine maleate, Flavine sought out sources for the material. Flavine ultimately contacted Flavine GmbH, a company located in Germany engaged in the identical business of Flavine International, for its assistance in procuring the product. Although Flavine International sometimes referred to Flavine GmbH as a "sister company", there was no evidence of **\*935** any formal relationship between the companies except that they had a history of doing business together. Flavine GmbH ascertained that the acepromazine maleate could be obtained from Sempa-Chimie of Paris, France. Sempa-Chimie was a wholly-owned subsidiary of Clin Midy S.A., which in turn was a wholly-owned subsidiary of plaintiff Sanofi.

The court specifically finds that neither Medico nor Flavine International knew of any patent or any license pertaining to acepromazine maleate and were unaware of any restrictions upon the manufacture, sale or use of the chemical in the United States. Furthermore, there was no attempt made by Medico to conceal its role in the acquisition of the chemical, nor did the company authorize or have knowledge of any

misrepresentations which may have been made in connection with the acquisition of the chemical from Sempa-Chimie.

On the other hand, the court finds that representatives of Sempa-Chimie did advise the Germany-based Flavine company of the existence of the United States patent and sought assurance that the chemical was not to be purchased on behalf of a customer in the United States. Flavine GmbH, in response to the inquiry of Sempa-Chimie, represented by Telex dated July 24, 1981, that the chemical would be destined for South America. In reliance upon that representation, Sempa-Chimie processed the order of Flavine GmbH. A subsequent sale was made in reliance upon the same representation with the expectation that the goods would not be sold or utilized in the United States. Therefore, the court specifically finds that there was a fraudulent misrepresentation which induced Sempa-Chimie to part with its product. The court further finds that, notwithstanding the misrepresentation, Medico Industries was a bona fide purchaser for value without any knowledge of the misrepresentation, and without any knowledge of any restriction on the sale or use of the chemical in the United States.

Even if there were some relationship between Flavine GmbH and Flavine International, their actions as brokers are not binding upon Medico, and any fraud on the part of the brokers will not be imputed to Medico. Nothing in the documents authored by Sempa-Chimie would have placed Medico on notice of any restrictions on sale or use in the United States, even assuming that the documents initiated by Sempa-Chimie would have been passed on to the customer by either of the Flavine companies. The goods, rather than being delivered to South America, were delivered to Medico in the United States and were paid for by Medico.

The Court further finds that Sempa-Chimie advertised in a publication generally circulated in the United States, that through the SST corporation, acepromazine maleate was available for purchase. Although there is no testimony that Medico in any way relied upon the advertisement, the ad is further evidence of Sempa-Chimie's failure to publicize the restrictions, if any, which it claims pertained to the sale of the chemical. Therefore, the court rejects the contention of plaintiff that the position asserted by defendants is barred by the fraud of the defendants or their representatives. Neither defendants nor any of their representatives participated in the fraud, knew of it, nor authorized it, and although the court finds that the fraud occurred, it was not committed by Medico

or anyone acting on its behalf. In no event can the fraud and misrepresentation be imputed to those defendants who remain before the court today. Therefore, the question that this court must determine is whether the patentee or licensee of a patent on a product has a right to enjoin the sale of that product by one who has purchased it from the patentee abroad without any restrictions and seeks to sell it in this country.

## DISCUSSION OF THE LAW

[1]   In deciding whether to grant the application of plaintiffs for a preliminary injunction, the court must consider four factors: (1) whether the moving party has a reasonable probability of eventual success in the litigation; (2) whether the movant will suffer irreparable harm if relief is not granted; (3) the possibility of harm to other **\*936** interested persons from the grant or denial of the injunction; and (4) the public interest. *In re Arthur Treacher's Franchisee Litigation,* 689 F.2d 1137 (3rd Cir.1982). It is the movant who has the burden of satisfying the court of the reasonable probability of success on the merits and of the likelihood of irreparable harm. *Id.* at 1143. The failure to carry that burden must necessarily result in the denial of the preliminary injunction application. *Id.*

[2]   Plaintiffs advance three arguments with respect to the merits of their case. First, they contend that as a matter of law the sale abroad by the United States patent holder of the patented product is not a waiver of the right of the patent holder to exclude the purchaser from bringing the product into this country. As an alternative position, plaintiffs argue that even if an unrestricted sale abroad by the patentee does constitute a waiver of the patentee's right to exclude the product from entering this country, the waiver of that right has no effect upon the outstanding rights of an exclusive licensee. Plaintiffs contend that American Home was given an exclusive license to sell acepromazine maleate here, that American Home did not consent to Medico's importation of the chemical, and that therefore Medico's actions constituted infringement. Plaintiffs' final position is that Medico practiced a deception in obtaining the chemical from Sanofi and that defendants should not be permitted to benefit from that deception.

As the Court has already found, plaintiffs' last position is not meritorious because Medico, in ordering the product for importation, acted in good faith, without notice of restrictions, and without knowledge of Flavine GmbH's misrepresentation. Nevertheless, the Court must still consider the soundness of plaintiffs' first two arguments.

[3]    [4]    [5]    Plaintiffs' first argument, that a sale abroad by a United States patent holder does not give the purchaser the right to bring the product into this country, cannot be accepted under the circumstances of this case. The reason for this conclusion requires analysis of the interest in the patent held by Sanofi and the interest conveyed to American Home. Under the patent laws of this country, the patent holder has the exclusive right to make, use and sell his invention throughout the United States. *Waterman v. Mackenzie,* 138 U.S. 252, 255, 14 S.Ct. 334, 335, 31 L.Ed. 923 (1891). This exclusive right may be assigned to another. *Id.* Therefore, if the patentee conveys to another in writing the whole patent, comprising the exclusive right to make, use and sell the invention throughout the United States, or conveys an undivided part or share of that exclusive right, or transfers the exclusive right under the patent within and throughout a specified part of the United States, then the transfer will be properly characterized as an assignment. *Id.* Any transfer of fewer rights than these is a license and not an assignment. *Id.*

[6]    Plaintiff Sanofi transferred to American Home certain rights that the patentee possessed. Specifically, the contract provides American Home with the right *to sell* acepromazine maleate in the United States under the same contractual conditions as exist for Canadian sales. Under the Canadian agreement, American Home has the right to sell the product in Canada, a right that is exclusive and limited to products for veterinary use. Because Sanofi transferred less than its entire right in the patent to American Home, the transfer must be characterized as a license and not an assignment.

[7]    [8]    [9]    There are two types of licenses, however, exclusive and non-exclusive. A non-exclusive license confers upon the licensee a mere privilege that protects him from a claim of infringement by the owner of the patent. *Western Electric Co. v. Pacent Reproducer Corporation,* 42 F.2d 116 (2d Cir.1930). The non-exclusive licensee has no property interest in the patent monopoly, nor any contract with the patent owner that others shall not practice the invention. *Id.* at 118. The patent owner who grants a non-exclusive license to another is not precluded from further licensing the product, **\*937** and may freely tolerate infringement without violating the rights of the patent licensees. *Id.*

[10]    [11]    [12]    An exclusive licensee, on the other hand, has the promise of the patent owner that others shall be excluded from practicing the patent within the field of use for which the license has been given. *Id.* Exclusive licensees have the right to enjoin acts of infringement and, because

the presence of the patentee is usually necessary to pursue such relief, may compel the patentee to become a party to the lawsuit. *Independent Wireless Telegraph Company v. Radio Corporation,* 269 U.S. 459, 471, 46 S.Ct. 166, 170, 70 L.Ed. 357 (1926). The patentee has no more right to practice his patent in a field of use where an exclusive license has been given, than does a stranger. *Littlefield v. Perry,* 88 U.S. 205, 223 (21 Wall.), 22 L.Ed. 577 (1874). Therefore, if the exclusive license has been violated by the patentee, the patentee may be sued for infringement. *Id.; Research Frontiers, Incorporated v. Marks Polarized Corporation,* 290 F.Supp. 725, 727 (E.D.N.Y.1968).

[13]    Analysis of the agreement entered into between Sanofi and American Home compels the conclusion that American Home holds an exclusive license to sell acepromazine maleate in this country for veterinary purposes, the only purposes for which the drug has received the approval of the Food and Drug Administration. The contract with American Home provides that the company has the right *to sell* in the veterinary field in the United States under the "same contractual conditions as exist for the Canadian sales." The contract governing Canadian sales specifically provides that the right of American Home to sell in Canada is "exclusive". Therefore, when the two agreements are examined together, it is apparent that American Home has the exclusive right to sell Sanofi's patented product, acepromazine maleate, in this country for veterinary purposes.

[14]    Having determined that Sanofi transferred to American Home the exclusive right to sell the patented product in this country, the court must consider Sanofi's argument that it is entitled to enjoin defendants from selling the product in the United States because Sanofi's sale abroad did not confer upon the purchaser the right to bring the product into this country. In support of its argument, Sanofi cites *Boesch v. Graff,* 133 U.S. 697, 10 S.Ct. 378, 33 L.Ed. 787 (1890), and *Griffin v. Keystone Mushroom Farm, Inc.,* 453 F.Supp. 1283 (E.D.Pa.1978).

In *Boesch,* the plaintiff held a United States patent for certain burners. Under a German prior user statute, an individual named Hecht, had the right to sell the burners in Germany. Hecht sold the burners to defendants, who imported them into the United States and began selling them here. Plaintiff brought suit to enjoin the further sale of the burners in this country. In opposing the injunction, defendants argued that they had purchased the burners from one who had a right to sell them in Germany and that the sale thus freed the products

from the patent monopoly of plaintiff. The Supreme Court, rejecting defendants' argument, held:

> The right which Hecht had to make and sell the burners in Germany was allowed him under the laws of that country, and purchasers from him could not be thereby authorized to sell the articles in the United States in defiance of the rights of patentees under a United States patent. A prior foreign patent operates under our law to limit the duration of the subsequent patent here, but that is all. *The sale of articles in the United States under a United States patent cannot be controlled by foreign laws.*

[133 U.S. at 703, 10 S.Ct. at 380.](#) (emphasis supplied).

*Boesch* is distinguishable from this case. In *Boesch,* it was not the patentee who made the sale abroad. In fact, it was not even a licensee of the patentee who made the sale. Rather, the seller was one who had a right to sell by operation of the patent laws of Germany, which provided that patents do not affect persons who, at the time of the patent application, were **\*938** already making use of the invention. Under the circumstances of *Boesch,* the patentee neither received compensation for the use of his invention, nor consented to its importation into this country. Here, however, it was the patentee that made and profited from the initial sale abroad, and, despite having had the opportunity to do so, it placed no restrictions in the sales contract upon further disposition of the product by the purchaser.

For similar reasons, *Griffin,* also cited by Sanofi, is inapposite. In *Griffin,* plaintiff held patents in the United States and in Italy for composting machines. Plaintiff had granted to Celeste Carminati the exclusive license to make, sell and use the invention in Italy. Carminati sold to defendant three of the machines. One of them was used by defendant in its business in this country and the other two were sold by defendant. In opposing plaintiff's suit for infringement, defendant made two arguments. First, it contended that sale of the product by the Italian licensee released the product from the patent monopoly. This argument was rejected by the court, relying upon *Boesch* for support. Defendant next argued that plaintiff was not entitled to relief because it had already received a royalty from the Italian licensee for the sale of the product to defendant, and to allow a remedy for

bringing the product into this country would result in a double recovery. The court rejected this argument as well, noting that plaintiff had two rights at stake, one under Italian patent law and the other under United States patent law, and that the sale or use of the patented product potentially infringed both sets of rights and therefore potentially constituted two separate torts upon which recovery could be based.

*Griffin* too is distinguishable from this situation because here the sale abroad was made by the patent holder itself without restriction. This distinction is of crucial significance. In this case, were the purchaser to search the patent records in the United States, it would find that the holder of the patent is the very party which made the sale without restriction. Though the goods were sold in France, no patent was held on the goods in that country. Therefore, assuming that Sanofi had a right to enjoin the reselling of the goods in this country, it waived that right by not placing any written restrictions upon the purchaser at the time of sale. Strong analogy for this result is found in *[Holiday v. Mattheson,](#)* [24 F. 185 (C.C.N.Y.1885).](#)

In *Holiday,* the United States patent holder sold the patented article to a party in England without restrictions or conditions. The English purchaser then sold the product to another who sought to resell the product in this country. In refusing to enjoin the sale of the product in the United States, the court held:

> When the owner sells an article without any reservation respecting its use, or the title which is to pass, the purchaser acquires the whole right of the vendor in the thing sold: the right to use it, to repair it, and to sell it to others; and second purchasers acquire the rights of the seller, and may do with the article whatever the first purchaser could have lawfully done if he had not parted with it.

*Id.* at 185.

In so holding, the court reasoned that there is a presumption upon sale of a good that the seller intends to part with all of his rights in the thing sold. It would be inconsistent with this presumption, the court found, to allow the seller to subsequently restrict the buyer's use of the product where no restriction was imposed at the time of the sale. *Id.*

Similarly, here, if Sanofi were permitted to impose restrictions upon the resale of its patented product, the expectations of the purchaser would be defeated. The court will therefore not grant to Sanofi an injunction against distribution in this country of the product that it sold in France without restriction. This does not end the matter, however. The Court must still consider whether American Home, the exclusive licensee in the United States, has a right to an injunction. Resolution of this issue requires **\*939** examination of plaintiffs' second argument, that Sanofi could not waive American Home's right to exclude acepromazine maleate from being brought into this country and sold.

[15]    As already noted, it is a principle of patent law that the unrestricted sale of a patented article by the owner of the patent conveys to the purchaser the right of unrestricted ownership as against the seller. *Holiday v. Mattheson,* 24 F. 185 (C.C.N.Y.1885). It is also a principle of patent law, however, that the purchaser does not acquire any rights greater than those possessed by the owner of the patent. *Featherstone v. Ormonde Cycle Company,* 53 F. 110, 111 (C.C.N.Y.1892). In *Featherstone,* the inventor procured patents for his cycle tires in Great Britain and in the United States. The American rights were assigned to plaintiff. The owner of the British patent licensed the defendants to use the tires on their cycles made in Great Britain. Subsequently, defendants sought to sell the tires in the United States. The court, granting an injunction against defendants, stated:

> It is well settled that the unrestricted sale of a patented article by the owner of the patent conveys to the purchaser the right of unrestricted ownership as against the vendor. *But the purchaser does not acquire any right greater than those possessed by the owner of the patent.*

*Id.* (emphasis supplied) (citation omitted). The Court then went on to note that *Boesch v. Graff,* 133 U.S. 697, 10 S.Ct. 378, 33 L.Ed. 787 (1890) was controlling and that the sale of articles in the United States under an American patent could not be affected by foreign laws, except to limit the duration of the patent.

The situation before this court is analogous to that in *Featherstone.* American Home holds an exclusive license to sell the drug acepromazine maleate in this country for veterinary use. Therefore, even the patent holder, Sanofi, would not have the right to sell the drug in this country. True,

Sanofi might have been able to sell the drug for some limited non-veterinary purpose, such as for research, but sales made in the quantity at issue in this case could only have been made in violation of the exclusive right to sell the drug possessed by American Home.

Defendants argue that American Home is not entitled to an injunction because the company did not record its rights in the patented product. Under 35 U.S.C. § 261, recordation is required under certain circumstances:

> An assignment, grant or conveyance shall be void as against any subsequent purchaser or mortgagee for a valuable consideration, without notice, unless it is recorded in the Patent and Trademark Office within three months from its date or prior to the date of such subsequent purchase or mortgage.

[16]    [17]    Defendants misconceive these recordation requirements. First, neither defendant is a "subsequent purchaser or mortgagee" within the meaning of the statute. Second, although assignments are required to be recorded in order for an assignee to prevail against one who has acquired rights in the patent without notice, *CMS Industries, Inc. v. L.P.S. International, Ltd.,* 643 F.2d 289, 294 (5th Cir.1981), there is no obligation to record a license. *Chambers v. Smith,* 2,582, 5 F.Cas. 426, 427 (C.C.Pa.1844); *Jones v. Berger,* 58 F. 1006 (C.C.Md.1893); 4 Deller's Walker on Patents § 401 (2d ed.). Therefore, as noted by the court in *Chambers,* the purchaser of a patent takes subject to outstanding licenses:

> It is the duty of the purchaser to inform himself of the nature of the licensee's ownership and the extent of his right. If he fails to do this, he can not complain that the patentee has misled him, or set up his own remissness to secure to himself a larger interest than was granted to his predecessor in the ownership.

*Chambers v. Smith,* 2,582, 5 F.Cas. 426, 427 (C.C.Pa.1844). See also *Keystone Type Foundry v. Fastpress Company,* 272 F. 242 (2d Cir.1921).

**\*940**  Similarly, a recognized patent treatise notes:

There are no statutory provisions for the recording of licenses or for giving a recorded license any preference or priority over an unrecorded license. However, it is the practice of the Patent Office to record licenses for whatever they may be worth.

*No license is required to be recorded, and no record of a license affects the rights of any person; for a license is good against the world, whether it is recorded or not. A purchaser of a patent takes it subject to all outstanding licenses.*

4 Walker on Patents § 401 (2d ed.) (citations omitted) (emphasis supplied).

 **[18]**   Because the purchaser is under an obligation to inquire of the seller as to the existence of any outstanding licenses, the purchaser cannot claim that his expectations have been frustrated if he fails to make the necessary inquiry and later discovers that an outstanding license interferes with his right of enjoyment. The purchaser therefore stands in a different position with respect to an unknown licensee of the product than he does to a patentee, where the patentee is the seller.

 **[19]**   Because defendants took possession of the patented product subject to the outstanding license of American Home, their further argument, that an implied license arose from the sale of the goods by Sanofi, is without foundation. Under the patent law, no formal granting of a license is necessary in order to give it effect. *De Forest Radio Telephone Company v. United States,* 273 U.S. 236, 241, 47 S.Ct. 366, 367, 71 L.Ed. 625 (1926). Consequently, where the owner of a patent exhibits conduct from which one dealing with him may properly infer that the owner consents to his use of the patent, an implied license will arise. *Id.*

 **[20]**   Defendants argue that an implied license has arisen here because Sanofi made its sale of the patented product without restrictions. Where no restrictions are imposed, defendants contend, the rule of *Adams v. Burke,* 84 U.S. 453 (17 Wall.), 21 L.Ed. 700 (1873) applies. In *Adams,* the patentees transferred the exclusive right to make, sell and use their product, coffin lids, to a company in Cambridge, Massachusetts. The exclusive rights were confined to a specific geographic area within Boston. The patentees' remaining rights in the product were transferred to another party. The Boston licensee sold some of the patented coffin lids to an undertaker who made the purchase in Boston but used the lids outside of the area in which the exclusive license

applied. Plaintiff, who had the patent rights outside of Boston, claimed that the undertaker was infringing the patent and sought an injunction. Denying the injunction, the Court held:

> But, in the essential nature of things, when the patentee, or the person having his rights, sells a machine or instrument whose sole value is in its use, he receives the consideration for its uses and he parts with the right to restrict that use. The article, in the language of the court, passes without the limit of the monopoly. That is to say, the patentee or his assignee having in the act of sale received all of the royalty or consideration which he claims for the use of the purchaser without further restriction on account of the monopoly of the patentees.

Although defendants are correct in stating that sale of an article exhausts the patentees' monopoly in that article, see *United States v. Univis Lens Company,* 316 U.S. 241, 250, 62 S.Ct. 1088, 1093, 86 L.Ed. 1408 (1942), they are incorrect in applying the rule to the facts of this case. The rule has only been applied where the sale is one which the seller had the authority to make in this country. *Compare, Curtiss Aeroplane & Motor Corporation v. United Aircraft Engineering Corporation,* 266 F. 71 (2d Cir.1920) (exhaustion doctrine applied where seller abroad had contractual authority to sell in the United States), *with, Boesch v. Graff,* 133 U.S. 697, 10 S.Ct. 378, 33 L.Ed. 787 (1890) (no exhaustion where seller abroad had no authority to sell in the United States). Sanofi had no authority to sell acepromazine maleate for veterinary purposes in the United States. Although **\*941** the sale was consummated abroad, this country's patent laws were not implicated until the product was brought into this country. *Id.* Once the product entered and was sold in the United States for veterinary purposes, it was American Home's interest that was directly affected. Only American Home had the right to sell here for veterinary purposes, not Sanofi.[2] If the court were to hold that Sanofi's sale of the product exhausted the patent, it would be crediting Sanofi with greater rights than the patentee actually had. Sanofi had no right to allow its product to enter this country without the permission of its exclusive licensee. Sanofi could have protected itself by imposing written restrictions upon the sale but chose not to do so. Therefore, Sanofi might be liable to American Home or to

220 U.S.P.Q. 416

defendants for its omissions. In no event, however, would Sanofi's inaction deprive American Home of its rights under the patent. To credit defendants' argument would require this court to conclude that Sanofi could make an unrestricted sale abroad of goods destined for this country without violating the patent laws, yet could not lawfully initiate that same sale within United States borders. Such an anomalous result would discourage the assignment and licensing of patent rights by making those rights less valuable and more susceptible to circumvention through transactions initiated in foreign countries by United States patentees who have previously transferred rights under their patents.

[21]    Even if the Court were to accept defendants' theory that the sale by Sanofi created an implied license to resell in this country, that license would still be subject to outstanding licenses. Where two licenses conflict, the first prevails, "even though the taker of the second had no notice of the existence of the first." 4 Deller's Walker on Patents § 401 (2d ed.); *New York Phonograph Co. v. Edison,* 136 F. 600 (S.D.N.Y.1905), *aff'd,* 144 F. 404 (2d Cir.1906). Therefore, even if defendants had an implied license from Sanofi, that license would still be subject to that of American Home.

Finally, defendants argue that *Curtiss Aeroplane & Motor Corporation,* 266 F. 71 (2d Cir.1920), controls the outcome of this case. In *Curtiss,* plaintiff owned the United States patent rights for certain airplanes. Plaintiff owned 83% of its subsidiary, which entered into a contract to sell the patented planes to the government of Great Britain. The British government subsequently sold some of the planes to a United States citizen who sought to bring the vehicles into this country. Plaintiff brought suit to enjoin the importation. Refusing to issue an injunction, the court stated:

> If the vendor's patent monopoly consists of foreign and domestic patents, the sale frees the article from the monopoly of both his foreign and his domestic patents, and where there is no restriction in the contract of sale the purchaser acquired the complete title and full right to use and sell the article in any and every country.

*Id.* at 78.

Critical to the Court's ruling was a finding that in plaintiff's contract with the British Government, it was specifically

contemplated that the government could dispose of the planes in any way that it deemed appropriate:

> The plaintiff and the British government alike understood and intended that the aeroplanes to be manufactured by that government as well as those to be supplied to it by the plaintiff *were to become the absolute property of the government, and were to be disposed of as the latter should see fit.* The express language of the contract is that the aeroplanes and other articles should '*become and be the absolute property of the British government.*'

*Id.* at 75. (emphasis supplied).

Therefore, unlike here, the seller of the patented merchandise had authority to sell  **\*942**  in this country. It was only because of that circumstance that the court found the sale to be lawful.

This case, rather than being controlled by *Curtiss,* is analogous to *Daimler Manufacturing Co. v. Conklin,* 170 F. 70 (2d Cir.1909), another Second Circuit opinion. In *Daimler,* defendant purchased an automobile abroad that contained devices covered by United States patents. The seller had the right to make the sale abroad but had no rights under the United States patents. The court, enjoining the use of the product in this country, found that "the purchaser abroad cannot get any greater right than the patentee from whom he buys." *Id.* at 72. Therefore, because the foreign patentee had no authority to use the product here, the court found that the purchaser also had no such authority.

In light of the foregoing, the court concludes that plaintiff American Home will likely succeed on the merits of its case. In addition, there is indication in the record that the company's business is being damaged by defendants' activities. Not only have the company's sales of acepromazine maleate declined but there is also evidence that other related product lines of the company have also been affected. Furthermore, the court notes that it is likely that third parties will neither be harmed nor the public interest disserved by granting American Home's application for a preliminary injunction. Therefore, its application will be granted. Sanofi's application, however, will be denied because the company has not satisfied the court that it is likely to succeed on the merits of its case. Counsel for plaintiff American Home should submit an order consistent with this opinion.

**Parallel Citations**

220 U.S.P.Q. 416

Footnotes

1    For convenience, the Court has referred to Sanofi as the party to the agreement with American Home. The agreement was actually entered into by Clin-Byla S.A., which was Sanofi's name prior to a series of mergers beginning in 1971. The substitution of Sanofi for Clin-Byla has no effect on the analysis of the issues in this case because Sanofi is the record holder of the patent.

2    Although Sanofi advertised in chemical journals in this country that it had acepromazine maleate available for sale, and American Home acquiesced in this apparent violation of its exclusive license, that acquiescence does not constitute a waiver by American Home of its right to pursue other alleged infringers.

**End of Document**                                                        © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 130



## SUPREME COURT OF CANADA

**CITATION:** Sattva Capital Corp. *v.* Creston Moly Corp., 2014 SCC 53

**DATE:** 20140801
**DOCKET:** 35026

**BETWEEN:**

**Sattva Capital Corporation (formerly Sattva Capital Inc.)**
Appellant
and
**Creston Moly Corporation (formerly Georgia Ventures Inc.)**
Respondent
- and -
**Attorney General of British Columbia and BCICAC Foundation**
Interveners

**CORAM:** McLachlin C.J. and LeBel, Abella, Rothstein, Moldaver, Karakatsanis and Wagner JJ.

**REASONS FOR JUDGMENT:**
(paras. 1 to 125)

Rothstein J. (McLachlin C.J. and LeBel, Abella, Moldaver, Karakatsanis and Wagner JJ. concurring)

**NOTE:** This document is subject to editorial revision before its reproduction in final form in the *Canada Supreme Court Reports*.

———————————————

2014 SCC 53 (CanLII)

SATTVA CAPITAL CORP. *v.* CRESTON MOLY CORP.

**Sattva Capital Corporation (formerly Sattva Capital Inc.)**     *Appellant*

*v.*

**Creston Moly Corporation (formerly Georgia Ventures Inc.)**     *Respondent*

and

**Attorney General of British Columbia  and
BCICAC Foundation**     *Interveners*

**Indexed as:  Sattva Capital  Corp.  *v.* Creston Moly Corp.**

**2014 SCC 53**

File  No.:  35026.

2013:  December  12; 2014:  August  1.

Present:    McLachlin C.J.  and  LeBel,  Abella,  Rothstein,  Moldaver,  Karakatsanis  and
Wagner  JJ.

ON APPEAL FROM THE COURT  OF APPEAL FOR BRITISH COLUMBIA

2014 SCC 53 (CanLII)

*Arbitration — Appeals — Commercial arbitration awards — Parties entering into agreement providing for payment of finder's fee in shares — Parties disagreeing as to date on which to price shares for payment of finder's fee and entering into arbitration — Leave to appeal arbitral award sought pursuant to s. 31(2) of the Arbitration Act — Leave to appeal denied but granted on appeal to Court of Appeal — Appeal of award dismissed but dismissal reversed by Court of Appeal — Whether Court of Appeal erred in granting leave to appeal — What is appropriate standard of review to be applied to commercial arbitral decisions made under Arbitration Act — Arbitration Act, R.S.B.C. 1996, c. 55, s. 31(2).*

*Contracts — Interpretation — Parties entering into agreement providing for payment of finder's fee in shares — Parties disagreeing as to date on which to price the shares for payment of finder's fee and entering into arbitration — Whether arbitrator reasonably construed contract as a whole — Whether contractual interpretation is question of law or of mixed fact and law.*

S and C entered into an agreement that required C to pay S a finder's fee in relation to the acquisition of a molybdenum mining property by C.  The parties agreed that under this agreement, S was entitled to a finder's fee of US$1.5 million and was entitled to be paid this fee in shares of C.  However, they disagreed on which date should be used to price the shares and therefore the number of shares to which S was entitled.  S argued that the share price was dictated by the date set out in the Market Price definition in the agreement and therefore that it should receive

2014 SCC 53 (CanLII)

2014 SCC 53 (CanLII)

approximately 11,460,000 shares priced at $0.15.   C claimed that the agreement's "maximum amount" proviso prevented S from receiving shares valued at more than US$1.5 million on the date the fee was payable, and therefore that S should receive approximately 2,454,000 shares priced at $0.70.   The parties entered into arbitration pursuant to the B.C. *Arbitration Act* and the arbitrator found in favour of S.   C sought leave to appeal the arbitrator's decision pursuant to s. 31(2) of the *Arbitration Act*, but leave was denied on the basis that the question on appeal was not a question of law. The Court of Appeal reversed the decision and granted C's application for leave to appeal, finding that the arbitrator's failure to address the meaning of the agreement's "maximum amount" proviso raised a question of law.   The superior court judge on appeal dismissed C's appeal, holding that the arbitrator's interpretation of the agreement was correct.   The Court of Appeal allowed C's appeal, finding that the arbitrator reached an absurd result.   S appeals the decisions of the Court of Appeal that granted leave and that allowed the appeal.

*Held*: The appeal should be allowed and the arbitrator's award reinstated.

Appeals     from     commercial     arbitration     decisions     are     narrowly circumscribed under the *Arbitration Act*.   Under s. 31(1), they are limited to questions of law, and leave to appeal is required if the parties do not consent to the appeal. Section 31(2)(*a*) sets out the requirements for leave at issue in the present case:  the court may grant leave if it determines that the result is important to the parties and the determination of the point of law may prevent a miscarriage of justice.

In the case at bar, the Court of Appeal erred in finding that the construction of the finder's fee agreement constituted a question of law. Such an exercise raises a question of mixed fact and law, and therefore, the Court of Appeal erred in granting leave to appeal.

The historical approach according to which determining the legal rights and obligations of the parties under a written contract was considered a question of law should be abandoned. Contractual interpretation involves issues of mixed fact and law as it is an exercise in which the principles of contractual interpretation are applied to the words of the written contract, considered in light of the factual matrix of the contract.

It may be possible to identify an extricable question of law from within what was initially characterized as a question of mixed fact and law, however, the close relationship between the selection and application of principles of contractual interpretation and the construction ultimately given to the instrument means that the circumstances in which a question of law can be extricated from the interpretation process will be rare. The goal of contractual interpretation, to ascertain the objective intentions of the parties, is inherently fact specific. Accordingly, courts should be cautious in identifying extricable questions of law in disputes over contractual interpretation. Legal errors made in the course of contractual interpretation include the application of an incorrect principle, the failure to consider a required element of a legal test, or the failure to consider a relevant factor. Concluding that C's

application for leave to appeal raised no question of law is sufficient to dispose of this appeal, however the Court found it salutary to continue with its analysis.

In order to rise to the level of a miscarriage of justice for the purposes of s. 31(2)(*a*), an alleged legal error must pertain to a material issue in the dispute which, if decided differently, would affect the result of the case. According to this standard, a determination of a point of law "may prevent a miscarriage of justice" only where the appeal itself has some possibility of succeeding. An appeal with no chance of success will not meet the threshold of "may prevent a miscarriage of justice" because there would be no chance that the outcome of the appeal would cause a change in the final result of the case.

At the leave stage, it is not appropriate to consider the full merits of a case and make a final determination regarding whether an error of law was made. However, some preliminary consideration of the question of law by the leave court is necessary to determine whether the appeal has the potential to succeed and thus to change the result in the case. The appropriate threshold for assessing the legal question at issue under s. 31(2) is whether it has arguable merit, meaning that the issue raised by the applicant cannot be dismissed through a preliminary examination of the question of law.

Assessing whether the issue raised by an application for leave to appeal has arguable merit must be done in light of the standard of review on which the merits of the appeal will be judged. This requires a preliminary assessment of the standard

2014 SCC 53 (CanLII)

of review. The leave court's assessment of the standard of review is only preliminary and does not bind the court which considers the merits of the appeal.

The words "may grant leave" in s. 31(2) of the *Arbitration Act* confer on the court residual discretion to deny leave even where the requirements of s. 31(2) are met. Discretionary factors to consider in a leave application under s. 31(2)(*a*) include: conduct of the parties, existence of alternative remedies, undue delay and the urgent need for a final answer. These considerations could be a sound basis for declining leave to appeal an arbitral award even where the statutory criteria have been met. However, courts should exercise such discretion with caution.

Appellate review of commercial arbitration awards is different from judicial review of a decision of a statutory tribunal, thus the standard of review framework developed for judicial review in *Dunsmuir v. New Brunswick*, 2008 SCC 9, [2008] 1 S.C.R. 190, and the cases that followed it is not entirely applicable to the commercial arbitration context. Nevertheless, judicial review of administrative tribunal decisions and appeals of arbitration awards are analogous in some respects. As a result, aspects of the *Dunsmuir* framework are helpful in determining the appropriate standard of review to apply in the case of commercial arbitration awards.

In the context of commercial arbitration, where appeals are restricted to questions of law, the standard of review will be reasonableness unless the question is one that would attract the correctness standard, such as constitutional questions or questions of law of central importance to the legal system as a whole and outside the

2014 SCC 53 (CanLII)

adjudicator's expertise.    The question at issue here does not fall into one of those categories and thus the standard of review in this case is reasonableness.

In the present case, the arbitrator reasonably construed the contract as a whole in determining that S is entitled to be paid its finder's fee in shares priced at $0.15.    The arbitrator's decision that the shares should be priced according to the Market Price definition gives effect to both that definition and the "maximum amount" proviso and reconciles them in a manner that cannot be said to be unreasonable.    The arbitrator's reasoning meets the reasonableness threshold of justifiability, transparency and intelligibility.

A court considering whether leave should be granted is not adjudicating the merits of the case.    It decides only whether the matter warrants granting leave, not whether the appeal will be successful, even where the determination of whether to grant leave involves a preliminary consideration of the question of law at issue.    For this reason, comments by a leave court regarding the merits cannot bind or limit the powers of the court hearing the actual appeal.

**Cases Cited**

Referred to:  *British Columbia Institute of Technology (Student Assn.) v. British Columbia Institute of Technology*, 2000 BCCA 496, 192 D.L.R. (4th) 122; *King v. Operating Engineers Training Institute of Manitoba Inc.*, 2011 MBCA 80, 270 Man. R. (2d) 63; *Thorner v. Major*, [2009] UKHL 18, [2009] 3 All E.R. 945;

*Prenn v. Simmonds*, [1971] 3 All E.R. 237; *Reardon Smith Line Ltd. v. Hansen-Tangen*, [1976] 3 All E.R. 570; *Jiro Enterprises Ltd. v. Spencer*, 2008 ABCA 87 (CanLII); *QK Investments Inc. v. Crocus Investment Fund*, 2008 MBCA 21, 290 D.L.R. (4th) 84; *Dow Chemical Canada Inc. v. Shell Chemicals Canada Ltd.*, 2010 ABCA 126, 25 Alta. L.R. (5th) 221; *Minister of National Revenue v. Costco Wholesale Canada Ltd.*, 2012 FCA 160, 431 N.R. 78; *WCI Waste Conversion Inc. v. ADI International Inc.*, 2011 PECA 14, 309 Nfld. & P.E.I.R. 1; *269893 Alberta Ltd. v. Otter Bay Developments Ltd.*, 2009 BCCA 37, 266 B.C.A.C. 98; *Hayes Forest Services Ltd. v. Weyerhaeuser Co.*, 2008 BCCA 31, 289 D.L.R. (4th) 230; *Bell Canada v. The Plan Group*, 2009 ONCA 548, 96 O.R. (3d) 81; *Canada (Director of Investigation and Research) v. Southam Inc.*, [1997] 1 S.C.R. 748; *Housen v. Nikolaisen*, 2002 SCC 33, [2002] 2 S.C.R. 235; *Jesuit Fathers of Upper Canada v. Guardian Insurance Co. of Canada*, 2006 SCC 21, [2006] 1 S.C.R. 744; *Tercon Contractors Ltd. v. British Columbia (Transportation and Highways)*, 2010 SCC 4, [2010] 1 S.C.R. 69; *Moore Realty Inc. v. Manitoba Motor League*, 2003 MBCA 71, 173 Man. R. (2d) 300; *Investors Compensation Scheme Ltd. v. West Bromwich Building Society*, [1998] 1 All E.R. 98; *Glaswegian Enterprises Inc. v. B.C. Tel Mobility Cellular Inc.* (1997), 101 B.C.A.C. 62; *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129; *United Brotherhood of Carpenters and Joiners of America, Local 579 v. Bradco Construction Ltd.*, [1993] 2 S.C.R. 316; *Gutierrez v. Tropic International Ltd.* (2002), 63 O.R. (3d) 63; *Domtar Inc. v. Belkin Inc.* (1989), 39 B.C.L.R. (2d) 257; *Quan v. Cusson*, 2009 SCC 62, [2009] 3 S.C.R. 712; *Quick Auto Lease Inc. v. Nordin*, 2014 MBCA 32, 303 Man. R. (2d) 262; *R. v. Fedossenko*, 2013

ABCA 164 (CanLII); *Enns v. Hansey*, 2013 MBCA 23 (CanLII); *R. v. Hubley*, 2009 PECA 21, 289 Nfld. & P.E.I.R. 174; *R. v. Will*, 2013 SKCA 4, 405 Sask. R. 270; *Newfoundland and Labrador Nurses' Union v. Newfoundland and Labrador (Treasury Board)*, 2011 SCC 62, [2011] 3 S.C.R. 708; *Immeubles Port Louis Ltée v. Lafontaine (Village)*, [1991] 1 S.C.R. 326; *MiningWatch Canada v. Canada (Fisheries and Oceans)*, 2010 SCC 2, [2010] 1 S.C.R. 6; *R. v. Bellusci*, 2012 SCC 44, [2012] 2 S.C.R. 509; *R. v. Bjelland*, 2009 SCC 38, [2009] 2 S.C.R. 651; *R. v. Regan*, 2002 SCC 12, [2002] 1 S.C.R. 297; *Homex Realty and Development Co. v. Corporation of the Village of Wyoming*, [1980] 2 S.C.R. 1011; *Dunsmuir v. New Brunswick*, 2008 SCC 9, [2008] 1 S.C.R. 190; *Alberta (Information and Privacy Commissioner) v. Alberta Teachers' Association*, 2011 SCC 61, [2011] 3 S.C.R. 654; *Canadian Western Bank v. Alberta*, 2007 SCC 22, [2007] 2 S.C.R. 3; *Pacifica Mortgage Investment Corp. v. Laus Holdings Ltd.*, 2013 BCCA 95, 333 B.C.A.C. 310, leave to appeal refused, [2013] 3 S.C.R. viii; *Tamil Co-operative Homes Inc. v. Arulappah* (2000), 49 O.R. (3d) 566.

**Statutes and Regulations Cited**

*Administrative Tribunals Act*, S.B.C. 2004, c. 45, ss. 58, 59.
*Arbitration Act*, R.S.B.C. 1996, c. 55 [formerly *Commercial Arbitration Act*], s. 31.
*Civil Code of Québec*.

**Authors Cited**

Brown, Donald J. M., and John M. Evans, with the assistance of Christine E. Deacon. *Judicial Review of Administrative Action in Canada*. Toronto: Canvasback, 1998 (loose-leaf updated May 2014).

Dyzenhaus, David. "The Politics of Deference: Judicial Review and Democracy", in Michael Taggart, ed., *The Province of Administrative Law*. Oxford: Hart, 1997, 279.

Hall, Geoff R. *Canadian Contractual Interpretation Law*, 2nd ed. Markham, Ont.: LexisNexis, 2012.

Lewison, Kim. *The Interpretation of Contracts*, 5th ed. London: Sweet & Maxwell, 2011 & Supp. 2013.

McCamus, John D. *The Law of Contracts*, 2nd ed. Toronto: Irwin Law, 2012.

APPEAL from a judgment of the British Columbia Court of Appeal (Newbury, Low and Levine JJ.A.), 2010 BCCA 239, 7 B.C.L.R. (5th) 227, 319 D.L.R. (4th) 219, [2010] B.C.J. No. 891 (QL), 2010 CarswellBC 1210, setting aside a decision of Greyell J., 2009 BCSC 1079, [2009] B.C.J. No. 1597 (QL), 2009 CarswellBC 2096, and from a subsequent judgment of the British Columbia Court of Appeal (Kirkpatrick, Neilson and Bennett JJ.A.), 2012 BCCA 329, 36 B.C.L.R. (5th) 71, 326 B.C.A.C. 114, 554 W.A.C. 114, 2 B.L.R. (5th) 1, [2012] B.C.J. No. 1631 (QL), 2012 CarswellBC 2327, setting aside a decision of Armstrong J., 2011 BCSC 597, 84 B.L.R. (4th) 102, [2011] B.C.J. No. 861 (QL), 2011 CarswellBC 1124. Appeal allowed.

*Michael A. Feder* and *Tammy Shoranick*, for the appellant.

*Darrell W. Roberts*, *Q.C.*, and *David Mitchell*, for the respondent.

2014 SCC 53 (CanLII)

*Jonathan Eades* and *Micah Weintraub*, for the intervener the Attorney General of British Columbia.

*David Wotherspoon* and *Gavin R. Cameron*, for the intervener the BCICAC Foundation.

The judgment of the Court was delivered by

ROTHSTEIN J. —

## TABLE OF CONTENTS

I.    Facts

II.   Arbitral Award

III.  Judicial History

A.    *British Columbia Supreme Court — Leave to Appeal Decision, 2009 BCSC 1079*

B.    *British Columbia Court of Appeal — Leave to Appeal Decision, 2010 BCCA 239*

C.    *British Columbia Supreme Court — Appeal Decision, 2011 BCSC 597*

D.    *British Columbia Court of Appeal — Appeal Decision, 2012 BCCA 329*

IV.   Issues

V.    Analysis

A.    *The Leave Issue Is Properly Before This Court*

B.    *The CA Leave Court Erred in Granting Leave Under Section 31(2) of the AA*

(1)   Considerations Relevant to Granting or Denying Leave to Appeal Under the *AA*

(2)   The Result Is Important to the Parties

(3)   The Question Under Appeal Is Not a Question of Law

    (a)   *When Is Contractual Interpretation a Question of Law?*

    (b)   *The Role and Nature of the "Surrounding Circumstances"*

    (c)   *Considering the Surrounding Circumstances Does Not Offend the Parol Evidence Rule*

    (d)   *Application to the Present Case*

(4)   May Prevent a Miscarriage of Justice

    (a)   *Miscarriage of Justice for the Purposes of Section 31(2)(a) of the AA*

    (b)   *Application to the Present Case*

(5)   Residual Discretion to Deny Leave

    (a)   *Considerations in Exercising Residual Discretion in a Section 31(2)(a) Leave Application*

    (b)   *Application to the Present Case*

C.   *Standard of Review Under the AA*

D.   *The Arbitrator Reasonably Construed the Agreement as a Whole*

E.   *Appeal Courts Are Not Bound by Comments on the Merits of the Appeal Made by Leave Courts*

VI.   Conclusion

**APPENDIX I**

Relevant Provisions of the Sattva-Creston Finder's Fee Agreement

**APPENDIX II**

Section 3.3 of TSX Venture Exchange Policy 5.1: Loans, Bonuses, Finder's Fees and Commissions

**APPENDIX III**

*Commercial Arbitration Act*, R.S.B.C. 1996, c. 55 (as it read on January 12, 2007) (now the *Arbitration Act*)

[1]        When is contractual interpretation to be treated as a question of mixed fact and law and when should it be treated as a question of law?  How is the balance between reviewability and finality of commercial arbitration awards under the

*Commercial Arbitration Act*, R.S.B.C. 1996, c. 55 (now the *Arbitration Act*, hereinafter the "*AA*"), to be determined? Can findings made by a court granting leave to appeal with respect to the merits of an appeal bind the court that ultimately decides the appeal? These are three of the issues that arise in this appeal.

I.    Facts

[2]      The issues in this case arise out of the obligation of Creston Moly Corporation (formerly Georgia Ventures Inc.) to pay a finder's fee to Sattva Capital Corporation (formerly Sattva Capital Inc.). The parties agree that Sattva is entitled to a finder's fee of US$1.5 million and is entitled to be paid this fee in shares of Creston, cash or a combination thereof. They disagree on which date should be used to price the Creston shares and therefore the number of shares to which Sattva is entitled.

[3]      Mr. Hai Van Le, a principal of Sattva, introduced Creston to the opportunity to acquire a molybdenum mining property in Mexico. On January 12, 2007, the parties entered into an agreement (the "Agreement") that required Creston to pay Sattva a finder's fee in relation to the acquisition of this property. The relevant provisions of the Agreement are set out in Appendix I.

[4]      On January 30, 2007, Creston entered into an agreement to purchase the property for US$30 million. On January 31, 2007, at the request of Creston, trading of Creston's shares on the TSX Venture Exchange ("TSXV") was halted to prevent speculation while Creston completed due diligence in relation to the purchase. On

2014 SCC 53 (CanLII)

March 26, 2007, Creston announced it intended to complete the purchase and trading resumed the following day.

[5]      The Agreement provides that Sattva was to be paid a finder's fee equal to the maximum amount that could be paid pursuant to s. 3.3 of Policy 5.1 in the TSXV Policy Manual. Section 3.3 of Policy 5.1 is incorporated by reference into the Agreement at s. 3.1 and is set out in Appendix II of these reasons. The maximum amount pursuant to s. 3.3 of Policy 5.1 in this case is US$1.5 million.

[6]      According to the Agreement, by default, the fee would be paid in Creston shares. The fee would only be paid in cash or a combination of shares and cash if Sattva made such an election. Sattva made no such election and was therefore entitled to be paid the fee in shares. The finder's fee was to be paid no later than five working days after the closing of the transaction purchasing the molybdenum mining property.

[7]      The dispute between the parties concerns which date should be used to determine the price of Creston shares and thus the number of shares to which Sattva is entitled. Sattva argues that the share price is dictated by the Market Price definition at s. 2 of the Agreement, i.e. the price of the shares "as calculated on close of business day before the issuance of the press release announcing the Acquisition". The press release announcing the acquisition was released on March 26, 2007. Prior to the halt in trading on January 31, 2007, the last closing price of Creston shares was $0.15. On this interpretation, Sattva would receive approximately 11,460,000 shares (based on the finder's fee of US$1.5 million).

[8]        Creston claims that the Agreement's "maximum amount" proviso means that Sattva cannot receive cash or shares valued at more than US$1.5 million on the date the fee is payable. The shares were payable no later than five days after May 17, 2007, the closing date of the transaction. At that time, the shares were priced at $0.70 per share. This valuation is based on the price an investment banking firm valued Creston at as part of underwriting a private placement of shares on April 17, 2007. On this interpretation, Sattva would receive approximately 2,454,000 shares, some 9 million fewer shares than if the shares were priced at $0.15 per share.

[9]        The parties entered into arbitration pursuant to the *AA*. The arbitrator found in favour of Sattva. Creston sought leave to appeal the arbitrator's decision pursuant to s. 31(2) of the *AA*. Leave was denied by the British Columbia Supreme Court (2009 BCSC 1079 (CanLII) ("SC Leave Court")). Creston successfully appealed this decision and was granted leave to appeal the arbitrator's decision by the British Columbia Court of Appeal (2010 BCCA 239, 7 B.C.L.R. (5th) 227 ("CA Leave Court")).

[10]       The British Columbia Supreme Court judge who heard the merits of the appeal (2011 BCSC 597, 84 B.L.R. (4th) 102 ("SC Appeal Court")) upheld the arbitrator's award. Creston appealed that decision to the British Columbia Court of Appeal (2012 BCCA 329, 36 B.C.L.R. (5th) 71 ("CA Appeal Court")). That court overturned the SC Appeal Court and found in favour of Creston.  Sattva appeals the decisions of the CA Leave Court and CA Appeal Court to this Court.

2014 SCC 53 (CanLII)

## II.   Arbitral Award

[11]      The arbitrator, Leon Getz, Q.C., found in favour of Sattva, holding that it was entitled to receive its US$1.5 million finder's fee in shares priced at $0.15 per share.

[12]      The arbitrator based his decision on the Market Price definition in the Agreement:

> What, then, was the "Market Price" within the meaning of the Agreement? The relevant press release is that issued on March 26 . . . . Although there was no closing price on March 25 (the shares being on that date halted), the "last closing price" within the meaning of the definition was the $0.15 at which the [Creston] shares closed on January 30, the day before trading was halted "pending news" . . . . This conclusion requires no stretching of the words of the contractual definition; on the contrary, it falls literally within those words. [para. 22]

[13]      Both the Agreement and the finder's fee had to be approved by the TSXV. Creston was responsible for securing this approval. The arbitrator found that it was either an implied or an express term of the Agreement that Creston would use its best efforts to secure the TSXV's approval and that Creston did not apply its best efforts to this end.

[14]      As previously noted, by default, the finder's fee would be paid in shares unless Sattva made an election otherwise. The arbitrator found that Sattva never made such an election. Despite this, Creston represented to the TSXV that the finder's fee

2014 SCC 53 (CanLII)

was to be paid in cash. The TSXV conditionally approved a finder's fee of US$1.5 million to be paid in cash. Sattva first learned that the fee had been approved as a cash payment in early June 2007. When Sattva raised this matter with Creston, Creston responded by saying that Sattva had the choice of taking the finder's fee in cash or in shares priced at $0.70.

[15]    Sattva maintained that it was entitled to have the finder's fee paid in shares priced at $0.15. Creston asked its lawyer to contact the TSXV to clarify the minimum share price it would approve for payment of the finder's fee. The TSXV confirmed on June 7, 2007 over the phone and August 9, 2007 via email that the minimum share price that could be used to pay the finder's fee was $0.70 per share. The arbitrator found that Creston "consistently misrepresented or at the very least failed to disclose fully the nature of the obligation it had undertaken to Sattva" (para. 56(k)) and "that in the absence of an election otherwise, Sattva is entitled under that Agreement to have that fee paid in shares at $0.15" (para. 56(g)). The arbitrator found that the first time Sattva's position was squarely put before the TSXV was in a letter from Sattva's solicitor on October 9, 2007.

[16]    The arbitrator found that had Creston used its best efforts, the TSXV could have approved the payment of the finder's fee in shares priced at $0.15 and such a decision would have been consistent with its policies. He determined that there was "a substantial probability that [TSXV] approval would have been given" (para. 81). He assessed that probability at 85 percent.

[17]     The arbitrator found that Sattva could have sold its Creston shares after a four-month holding period at between $0.40 and $0.44 per share, netting proceeds of between $4,583,914 and $5,156,934. The arbitrator took the average of those two amounts, which came to $4,870,424, and then assessed damages at 85 percent of that number, which came to $4,139,860, and rounded it to $4,140,000 plus costs.

[18]     After this award was made, Creston made a cash payment of US$1.5 million (or the equivalent in Canadian dollars) to Sattva. The balance of the damages awarded by the arbitrator was placed in the trust account of Sattva's solicitors.

III.  Judicial History

A.  *British Columbia Supreme Court — Leave to Appeal Decision, 2009 BCSC 1079*

[19]     The SC Leave Court denied leave to appeal because it found the question on appeal was not a question of law as required under s. 31 of the *AA*. In the judge's view, the issue was one of mixed fact and law because the arbitrator relied on the "factual matrix" in coming to his conclusion. Specifically, determining how the finder's fee was to be paid involved examining "the TSX's policies concerning the maximum amount of the finder's fee payable, as well as the discretionary powers granted to the Exchange in determining that amount" (para. 35).

[20]     The judge found that even had he found a question of law was at issue he would have exercised his discretion against granting leave because of Creston's

conduct in misrepresenting the status of the finder's fee to the TSXV and Sattva, and "on the principle that one of the objectives of the [*AA*] is to foster and preserve the integrity of the arbitration system" (para. 41).

B.    *British Columbia Court of Appeal — Leave to Appeal Decision, 2010 BCCA 239*

[21]      The CA Leave Court reversed the SC Leave Court and granted Creston's application for leave to appeal the arbitral award. It found the SC Leave Court "err[ed] in failing to find that the arbitrator's failure to address the meaning of s. 3.1 of the Agreement (and in particular the 'maximum amount' provision) raised a question of law" (para. 23). The CA Leave Court decided that the construction of s. 3.1 of the Agreement, and in particular the "maximum amount" proviso, was a question of law because it did not involve reference to the facts of what the TSXV was told or what it decided.

[22]      The CA Leave Court acknowledged that Creston was "less than forthcoming in its dealings with Mr. Le and the [TSXV]" but said that "these facts are not directly relevant to the question of law it advances on the appeal" (para. 27). With respect to the SC leave judge's reference to the preservation of the integrity of the arbitration system, the CA Leave Court said that the parties would have known when they chose to enter arbitration under the *AA* that an appeal on a question of law was possible. Additionally, while the finality of arbitration is an important factor in exercising discretion, when "a question of law arises on a matter of importance and a miscarriage of justice might be perpetrated if an appeal were not available, the

integrity of the process requires, at least in the circumstances of this case, that the right of appeal granted by the legislation also be respected" (para. 29).

C.  *British Columbia Supreme Court — Appeal Decision, 2011 BCSC 597*

[23]      Armstrong J. reviewed the arbitrator's decision on a correctness standard. He dismissed the appeal, holding the arbitrator's interpretation of the Agreement was correct.

[24]      Armstrong J. found that the plain and ordinary meaning of the Agreement required that the US$1.5 million fee be paid in shares priced at $0.15. He did not find the meaning to be absurd simply because the price of the shares at the date the fee became payable had increased in relation to the price determined according to the Market Price definition. He was of the view that changes in the price of shares over time are inevitable, and that the parties, as sophisticated business persons, would have reasonably understood a fluctuation in share price to be a reality when providing for a fee payable in shares. According to Armstrong J., it is indeed because of market fluctuations that it is necessary to choose a specific date to price the shares in advance of payment. He found that this was done by defining "Market Price" in the Agreement, and that the fee remained US$1.5 million in $0.15 shares as determined by the Market Price definition regardless of the price of the shares at the date that the fee was payable.

[25]     According to Armstrong J., that the price of the shares may be more than the Market Price definition price when they became payable was foreseeable as a "natural consequence of the fee agreement" (para. 62). He was of the view that the risk was borne by Sattva, since the price of the shares could increase, but it could also decrease such that Sattva would have received shares valued at less than the agreed upon fee of US$1.5 million.

[26]     Armstrong J. held that the arbitrator's interpretation which gave effect to both the Market Price definition and the "maximum amount" proviso should be preferred to Creston's interpretation of the agreement which ignored the Market Price definition.

[27]     In response to Creston's argument that the arbitrator did not consider s. 3.1 of the Agreement which contains the "maximum amount" proviso, Armstrong J. noted that the arbitrator explicitly addressed the "maximum amount" proviso at para. 23 of his decision.

D.  *British Columbia Court of Appeal — Appeal Decision, 2012 BCCA 329*

[28]     The CA Appeal Court allowed Creston's appeal, ordering that the payment of US$1.5 million that had been made by Creston to Sattva on account of the arbitrator's award constituted payment in full of the finder's fee. The court reviewed the arbitrator's decision on a standard of correctness.

2014 SCC 53 (CanLII)

[29]      The CA Appeal Court found that both it and the SC Appeal Court were bound by the findings made by the CA Leave Court. There were two findings that were binding: (1) it would be anomalous if the Agreement allowed Sattva to receive US$1.5 million if it received its fee in cash, but shares valued at approximately $8 million if Sattva took its fee in shares; and (2) the arbitrator ignored this anomaly and did not address s. 3.1 of the Agreement.

[30]      The Court of Appeal found that it was an absurd result to find that Sattva is entitled to an $8 million finder's fee in light of the fact that the "maximum amount" proviso in the Agreement limits the finder's fee to US$1.5 million. The court was of the view that the proviso limiting the fee to US$1.5 million "when paid" should be given paramount effect (para. 47). In its opinion, giving effect to the Market Price definition could not have been the intention of the parties, nor could it have been in accordance with good business sense.

IV.  Issues

[31]      The following issues arise in this appeal:

(a) Is the issue of whether the CA Leave Court erred in granting leave under s. 31(2) of the *AA* properly before this Court?

(b) Did the CA Leave Court err in granting leave under s. 31(2) of the *AA*?

2014 SCC 53 (CanLII)

(c) If leave was properly granted, what is the appropriate standard of review to be applied to commercial arbitral decisions made under the *AA*?

(d) Did the arbitrator reasonably construe the Agreement as a whole?

(e) Did the CA Appeal Court err in holding that it was bound by comments regarding the merits of the appeal made by the CA Leave Court?

V.   Analysis

A.   *The Leave Issue Is Properly Before This Court*

[32]        Sattva argues, in part, that the CA Leave Court erred in granting leave to appeal from the arbitrator's decision. In Sattva's view, the CA Leave Court did not identify a question of law, a requirement to obtain leave pursuant to s. 31(2) of the *AA*. Creston argues that this issue is not properly before this Court. Creston makes two arguments in support of this point.

[33]        First, Creston argues that this issue was not advanced in Sattva's application for leave to appeal to this Court. This argument must fail. Unless this

2014 SCC 53 (CanLII)

2014 SCC 53 (CanLII)

Court places restrictions in the order granting leave, the order granting leave is "at large". Accordingly, appellants may raise issues on appeal that were not set out in the leave application. However, the Court may exercise its discretion to refuse to deal with issues that were not addressed in the courts below, if there is prejudice to the respondent, or if for any other reason the Court considers it appropriate not to deal with a question.

[34]    Here, this Court's order granting leave to appeal from both the CA Leave Court decision and the CA Appeal Court decision contained no restrictions (2013 CanLII 11315). The issue — whether the proposed appeal was on a question of law — was expressly argued before, and was dealt with in the judgments of, the SC Leave Court and the CA Leave Court.  There is no reason Sattva should be precluded from raising this issue on appeal despite the fact it was not mentioned in its application for leave to appeal to this Court.

[35]    Second, Creston argues that the issue of whether the CA Leave Court identified a question of law is not properly before this Court because Sattva did not contest this decision before all of the lower courts. Specifically, Creston states that Sattva did not argue that the question on appeal was one of mixed fact and law before the SC Appeal Court and that it conceded the issue on appeal was a question of law before the CA Appeal Court. This argument must also fail. At the SC Appeal Court, it was not open to Sattva to reargue the question of whether leave should have been granted. The SC Appeal Court was bound by the CA Leave Court's finding that leave

2014 SCC 53 (CanLII)

should have been granted, including the determination that a question of law had been identified. Accordingly, Sattva could hardly be expected to reargue before the SC Appeal Court a question that had been determined by the CA Leave Court. There is nothing in the *AA* to indicate that Sattva could have appealed the leave decision made by a panel of the Court of Appeal to another panel of the same court. The fact that Sattva did not reargue the issue before the SC Appeal Court or CA Appeal Court does not prevent it from raising the issue before this Court, particularly since Sattva was also granted leave to appeal the CA Leave Court decision by this Court.

[36]    While this Court may decline to grant leave where an issue sought to be argued before it was not argued in the courts appealed from, that is not this case. Here, whether leave from the arbitrator's decision had been sought by Creston on a question of law or a question of mixed fact and law had been argued in the lower leave courts.

[37]    Accordingly, the issue of whether the CA Leave Court erred in finding a question of law for the purposes of granting leave to appeal is properly before this Court.

B.    *The CA Leave Court Erred in Granting Leave Under Section 31(2) of the AA*

   (1)    Considerations Relevant to Granting or Denying Leave to Appeal Under the *AA*

2014 SCC 53 (CanLII)

[38]     Appeals from commercial arbitration decisions are narrowly circumscribed under the *AA*. Under s. 31(1), appeals are limited to either questions of law where the parties consent to the appeal or to questions of law where the parties do not consent but where leave to appeal is granted. Section 31(2) of the *AA*, reproduced in its entirety in Appendix III, sets out the requirements for leave:

> (2) In an application for leave under subsection (1) (b), the court may grant leave if it determines that
>
> (a) the importance of the result of the arbitration to the parties justifies the intervention of the court and the determination of the point of law may prevent a miscarriage of justice,
>
> (b) the point of law is of importance to some class or body of persons of which the applicant is a member, or
>
> (c) the point of law is of general or public importance.

[39]     The B.C. courts have found that the words "may grant leave" in s. 31(2) of the *AA* give the courts judicial discretion to deny leave even where the statutory requirements have been met (*British Columbia Institute of Technology (Student Assn.) v. British Columbia Institute of Technology*, 2000 BCCA 496, 192 D.L.R. (4th) 122 ("*BCIT*"), at paras. 25-26). Appellate review of an arbitrator's award will only occur where the requirements of s. 31(2) are met and where the leave court does not exercise its residual discretion to nonetheless deny leave.

[40]     Although Creston's application to the SC Leave Court sought leave pursuant to s. 31(2)(a), (b) and (c), it appears the arguments before that court and throughout focused on s. 31(2)(a). The SC Leave Court's decision quotes a lengthy

passage from *BCIT* that focuses on the requirements of s. 31(2)(a). The SC Leave Court judge noted that both parties conceded the first requirement of s. 31(2)(a): that the issue be of importance to the parties. The CA Leave Court decision expressed concern that denying leave might give rise to a miscarriage of justice — a criterion only found in s. 31(2)(a). Finally, neither the lower courts' leave decisions nor the arguments before this Court reflected arguments about the question of law being important to some class or body of persons of which the applicant is a member (s. 31(2)(b)) or being a point of law of general or public importance (s. 31(2)(c)). Accordingly, the following analysis will focus on s. 31(2)(a).

### (2)   The Result Is Important to the Parties

[41]      In order for leave to be granted from a commercial arbitral award, a threshold requirement must be met: leave must be sought on a question of law. However, before dealing with that issue, it will be convenient to quickly address another requirement of s. 31(2)(a) on which the parties agree: whether the importance of the result of the arbitration to the parties justifies the intervention of the court. Justice Saunders explained this criterion in *BCIT* as requiring that the result of the arbitration be "sufficiently important", in terms of principle or money, to the parties to justify the expense and time of court proceedings (para. 27). The parties in this case have agreed that the result of the arbitration is of importance to each of them. In view of the relatively large monetary amount in dispute and in light of the fact that the parties have agreed that the result is important to them, I accept that the

importance of the result of the arbitration to the parties justifies the intervention of the court. This requirement of s. 31(2)(a) is satisfied.

### (3)   The Question Under Appeal Is Not a Question of Law

#### (a)   *When Is Contractual Interpretation a Question of Law?*

[42]        Under s. 31 of the *AA*, the issue upon which leave is sought must be a question of law. For the purpose of identifying the appropriate standard of review or, as is the case here, determining whether the requirements for leave to appeal are met, reviewing courts are regularly required to determine whether an issue decided at first instance is a question of law, fact, or mixed fact and law.

[43]        Historically, determining the legal rights and obligations of the parties under a written contract was considered a question of law (*King v. Operating Engineers Training Institute of Manitoba Inc.*, 2011 MBCA 80, 270 Man. R. (2d) 63, at para. 20, *per* Steel J.A.; K. Lewison, *The Interpretation of Contracts* (5th ed. 2011 & Supp. 2013), at pp. 173-76; and G. R. Hall, *Canadian Contractual Interpretation Law* (2nd ed. 2012), at pp. 125-26). This rule originated in England at a time when there were frequent civil jury trials and widespread illiteracy. Under those circumstances, the interpretation of written documents had to be considered questions of law because only the judge could be assured to be literate and therefore capable of reading the contract (Hall, at p. 126; and Lewison, at pp. 173-74).

2014 SCC 53 (CanLII)

[44]      This historical rationale no longer applies. Nevertheless, courts in the United Kingdom continue to treat the interpretation of a written contract as always being a question of law (*Thorner v. Major*, [2009] UKHL 18, [2009] 3 All E.R. 945, at paras. 58 and 82-83; and Lewison, at pp. 173-77). They do this despite the fact that U.K. courts consider the surrounding circumstances, a concept addressed further below, when interpreting a written contract (*Prenn v. Simmonds*, [1971] 3 All E.R. 237 (H.L.); and *Reardon Smith Line Ltd. v. Hansen-Tangen*, [1976] 3 All E.R. 570 (H.L.)).

[45]      In Canada, there remains some support for the historical approach. See for example *Jiro Enterprises Ltd. v. Spencer*, 2008 ABCA 87 (CanLII), at para. 10; *QK Investments Inc. v. Crocus Investment Fund*, 2008 MBCA 21, 290 D.L.R. (4th) 84, at para. 26; *Dow Chemical Canada Inc. v. Shell Chemicals Canada Ltd.*, 2010 ABCA 126, 25 Alta. L.R. (5th) 221, at paras. 11-12; and *Minister of National Revenue v. Costco Wholesale Canada Ltd.*, 2012 FCA 160, 431 N.R. 78, at para. 34. However, some Canadian courts have abandoned the historical approach and now treat the interpretation of written contracts as an exercise involving either a question of law or a question of mixed fact and law. See for example *WCI Waste Conversion Inc. v. ADI International Inc.*, 2011 PECA 14, 309 Nfld. & P.E.I.R. 1, at para. 11; *269893 Alberta Ltd. v. Otter Bay Developments Ltd.*, 2009 BCCA 37, 266 B.C.A.C. 98, at para. 13; *Hayes Forest Services Ltd. v. Weyerhaeuser Co.*, 2008 BCCA 31, 289 D.L.R. (4th) 230, at para. 44; *Bell Canada v. The Plan Group*, 2009 ONCA 548, 96

O.R. (3d) 81, at paras. 22-23 (majority reasons, *per* Blair J.A.) and paras. 133-35 (*per*

Gillese J.A. in dissent, but not on this point); and *King*, at paras. 20-23.

[46]     The shift away from the historical approach in Canada appears to be

based on two developments. The first is the adoption of an approach to contractual

interpretation which directs courts to have regard for the surrounding circumstances

of the contract — often referred to as the factual matrix — when interpreting a

written contract (Hall, at pp. 13, 21-25 and 127; and J. D. McCamus, *The Law of*

*Contracts* (2nd ed. 2012), at pp. 749-51). The second is the explanation of the

difference between questions of law and questions of mixed fact and law provided in

*Canada (Director of Investigation and Research) v. Southam Inc.*, [1997] 1 S.C.R.

748, at para. 35, and *Housen v. Nikolaisen*, 2002 SCC 33, [2002] 2 S.C.R. 235, at

paras. 26 and 31-36.

[47]     Regarding the first development, the interpretation of contracts has

evolved towards a practical, common-sense approach not dominated by technical

rules of construction. The overriding concern is to determine "the intent of the parties

and the scope of their understanding" (*Jesuit Fathers of Upper Canada v. Guardian*

*Insurance Co. of Canada*, 2006 SCC 21, [2006] 1 S.C.R. 744, at para. 27 *per* LeBel

J.; see also *Tercon Contractors Ltd. v. British Columbia (Transportation and*

*Highways)*, 2010 SCC 4, [2010] 1 S.C.R. 69, at paras. 64-65 *per* Cromwell J.). To do

so, a decision-maker must read the contract as a whole, giving the words used their

ordinary and grammatical meaning, consistent with the surrounding circumstances

known to the parties at the time of formation of the contract. Consideration of the surrounding circumstances recognizes that ascertaining contractual intention can be difficult when looking at words on their own, because words alone do not have an immutable or absolute meaning:

> No contracts are made in a vacuum: there is always a setting in which they have to be placed. . . . In a commercial contract it is certainly right that the court should know the commercial purpose of the contract and this in turn presupposes knowledge of the genesis of the transaction, the background, the context, the market in which the parties are operating.
>
> (*Reardon Smith Line*, at p. 574, *per* Lord Wilberforce)

[48]     The meaning of words is often derived from a number of contextual factors, including the purpose of the agreement and the nature of the relationship created by the agreement (see *Moore Realty Inc. v. Manitoba Motor League*, 2003 MBCA 71, 173 Man. R. (2d) 300, at para. 15, *per* Hamilton J.A.; see also Hall, at p. 22; and McCamus, at pp. 749-50). As stated by Lord Hoffmann in *Investors Compensation Scheme Ltd. v. West Bromwich Building Society*, [1998] 1 All E.R. 98 (H.L.):

> The meaning which a document (or any other utterance) would convey to a reasonable man is not the same thing as the meaning of its words. The meaning of words is a matter of dictionaries and grammars; the meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean. [p. 115]

[49]      As to the second development, the historical approach to contractual interpretation does not fit well with the definition of a pure question of law identified in *Housen* and *Southam*. Questions of law "are questions about what the correct legal test is" (*Southam*, at para. 35). Yet in contractual interpretation, the goal of the exercise is to ascertain the objective intent of the parties — a fact-specific goal — through the application of legal principles of interpretation. This appears closer to a question of mixed fact and law, defined in *Housen* as "applying a legal standard to a set of facts" (para. 26; see also *Southam*, at para. 35). However, some courts have questioned whether this definition, which was developed in the context of a negligence action, can be readily applied to questions of contractual interpretation, and suggest that contractual interpretation is primarily a legal affair (see for example *Bell Canada*, at para. 25).

[50]      With respect for the contrary view, I am of the opinion that the historical approach should be abandoned. Contractual interpretation involves issues of mixed fact and law as it is an exercise in which the principles of contractual interpretation are applied to the words of the written contract, considered in light of the factual matrix.

[51]      The purpose of the distinction between questions of law and those of mixed fact and law further supports this conclusion. One central purpose of drawing a distinction between questions of law and those of mixed fact and law is to limit the intervention of appellate courts to cases where the results can be expected to have an

impact beyond the parties to the particular dispute. It reflects the role of courts of appeal in ensuring the consistency of the law, rather than in providing a new forum for parties to continue their private litigation. For this reason, *Southam* identified the degree of generality (or "precedential value") as the key difference between a question of law and a question of mixed fact and law. The more narrow the rule, the less useful will be the intervention of the court of appeal:

> If a court were to decide that driving at a certain speed on a certain road under certain conditions was negligent, its decision would not have any great value as a precedent. In short, as the level of generality of the challenged proposition approaches utter particularity, the matter approaches pure application, and hence draws nigh to being an unqualified question of mixed law and fact. See R. P. Kerans, *Standards of Review Employed by Appellate Courts* (1994), at pp. 103-108. Of course, it is not easy to say precisely where the line should be drawn; though in most cases it should be sufficiently clear whether the dispute is over a general proposition that might qualify as a principle of law or over a very particular set of circumstances that is not apt to be of much interest to judges and lawyers in the future. [para. 37]

[52]      Similarly, this Court in *Housen* found that deference to fact-finders promoted the goals of limiting the number, length, and cost of appeals, and of promoting the autonomy and integrity of trial proceedings (paras. 16-17). These principles also weigh in favour of deference to first instance decision-makers on points of contractual interpretation. The legal obligations arising from a contract are, in most cases, limited to the interest of the particular parties. Given that our legal system leaves broad scope to tribunals of first instance to resolve issues of limited application, this supports treating contractual interpretation as a question of mixed fact and law.

2014 SCC 53 (CanLII)

[53]      Nonetheless, it may be possible to identify an extricable question of law from within what was initially characterized as a question of mixed fact and law (*Housen*, at paras. 31 and 34-35). Legal errors made in the course of contractual interpretation include "the application of an incorrect principle, the failure to consider a required element of a legal test, or the failure to consider a relevant factor" (*King*, at para. 21). Moreover, there is no question that many other issues in contract law do engage substantive rules of law: the requirements for the formation of the contract, the capacity of the parties, the requirement that certain contracts be evidenced in writing, and so on.

[54]      However, courts should be cautious in identifying extricable questions of law in disputes over contractual interpretation. Given the statutory requirement to identify a question of law in a leave application pursuant to s. 31(2) of the *AA*, the applicant for leave and its counsel will seek to frame any alleged errors as questions of law. The legislature has sought to restrict such appeals, however, and courts must be careful to ensure that the proposed ground of appeal has been properly characterized. The warning expressed in *Housen* to exercise caution in attempting to extricate a question of law is relevant here:

> Appellate courts must be cautious, however, in finding that a trial judge erred in law in his or her determination of negligence, as it is often difficult to extricate the legal questions from the factual. It is for this reason that these matters are referred to as questions of "mixed law and fact". Where the legal principle is not readily extricable, then the matter is one of "mixed law and fact" . . . . [para. 36]

[55]      Although that caution was expressed in the context of a negligence case, it applies, in my opinion, to contractual interpretation as well. As mentioned above, the goal of contractual interpretation, to ascertain the objective intentions of the parties, is inherently fact specific. The close relationship between the selection and application of principles of contractual interpretation and the construction ultimately given to the instrument means that the circumstances in which a question of law can be extricated from the interpretation process will be rare. In the absence of a legal error of the type described above, no appeal lies under the *AA* from an arbitrator's interpretation of a contract.

(b)  *The Role and Nature of the "Surrounding Circumstances"*

[56]      I now turn to the role of the surrounding circumstances in contractual interpretation and the nature of the evidence that can be considered. The discussion here is limited to the common law approach to contractual interpretation; it does not seek to apply to or alter the law of contractual interpretation governed by the *Civil Code of Québec*.

[57]      While the surrounding circumstances will be considered in interpreting the terms of a contract, they must never be allowed to overwhelm the words of that agreement (*Hayes Forest Services*, at para. 14; and Hall, at p. 30). The goal of examining such evidence is to deepen a decision-maker's understanding of the mutual and objective intentions of the parties as expressed in the words of the contract. The interpretation of a written contractual provision must always be grounded in the text

2014 SCC 53 (CanLII)

and read in light of the entire contract (Hall, at pp. 15 and 30-32). While the surrounding circumstances are relied upon in the interpretive process, courts cannot use them to deviate from the text such that the court effectively creates a new agreement (*Glaswegian Enterprises Inc. v. B.C. Tel Mobility Cellular Inc.* (1997), 101 B.C.A.C. 62).

[58]    The nature of the evidence that can be relied upon under the rubric of "surrounding circumstances" will necessarily vary from case to case.    It does, however, have its limits. It should consist only of objective evidence of the background facts at the time of the execution of the contract (*King*, at paras. 66 and 70), that is, knowledge that was or reasonably ought to have been within the knowledge of both parties at or before the date of contracting. Subject to these requirements and the parol evidence rule discussed below, this includes, in the words of Lord Hoffmann, "absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man" (*Investors Compensation Scheme*, at p. 114). Whether something was or reasonably ought to have been within the common knowledge of the parties at the time of execution of the contract is a question of fact.

(c)  *Considering the Surrounding Circumstances Does Not Offend the Parol Evidence Rule*

[59]    It is necessary to say a word about consideration of the surrounding circumstances and the parol evidence rule.    The parol evidence rule precludes

admission of evidence outside the words of the written contract that would add to, subtract from, vary, or contradict a contract that has been wholly reduced to writing (*King*, at para. 35; and Hall, at p. 53). To this end, the rule precludes, among other things, evidence of the subjective intentions of the parties (Hall, at pp. 64-65; and *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129, at paras. 54-59, *per* Iacobucci J.). The purpose of the parol evidence rule is primarily to achieve finality and certainty in contractual obligations, and secondarily to hamper a party's ability to use fabricated or unreliable evidence to attack a written contract (*United Brotherhood of Carpenters and Joiners of America, Local 579 v. Bradco Construction Ltd.*, [1993] 2 S.C.R. 316, at pp. 341-42, *per* Sopinka J.).

[60]     The parol evidence rule does not apply to preclude evidence of the surrounding circumstances. Such evidence is consistent with the objectives of finality and certainty because it is used as an interpretive aid for determining the meaning of the written words chosen by the parties, not to change or overrule the meaning of those words. The surrounding circumstances are facts known or facts that reasonably ought to have been known to both parties at or before the date of contracting; therefore, the concern of unreliability does not arise.

[61]     Some authorities and commentators suggest that the parol evidence rule is an anachronism, or, at the very least, of limited application in view of the myriad of exceptions to it (see for example *Gutierrez v. Tropic International Ltd.* (2002), 63 O.R. (3d) 63 (C.A.), at paras. 19-20; and Hall, at pp. 53-64).  For the purposes of this

appeal, it is sufficient to say that the parol evidence rule does not apply to preclude evidence of surrounding circumstances when interpreting the words of a written contract.

    (d)  *Application to the Present Case*

[62]       In this case, the CA Leave Court granted leave on the following issue: "Whether the Arbitrator erred in law in failing to construe the whole of the Finder's Fee Agreement . . ." (A.R., vol. 1, at p. 62).

[63]       As will be explained below, while the requirement to construe a contract as a whole is a question of law that could — if extricable — satisfy the threshold requirement under s. 31 of the *AA*, I do not think this question was properly extricated in this case.

[64]       I accept that a fundamental principle of contractual interpretation is that a contract must be construed as a whole (McCamus, at pp. 761-62; and Hall, at p. 15). If the arbitrator did not take the "maximum amount" proviso into account, as alleged by Creston, then he did not construe the Agreement as a whole because he ignored a specific and relevant provision of the Agreement. This is a question of law that would be extricable from a finding of mixed fact and law.

[65]       However, it appears that the arbitrator did consider the "maximum amount" proviso. Indeed, the CA Leave Court acknowledges that the arbitrator had

considered that proviso, since it notes that he turned his mind to the US$1.5 million maximum amount, an amount that can only be calculated by referring to the TSXV policy referenced in the "maximum amount" proviso in s. 3.1 of the Agreement. As I read its reasons, rather than being concerned with whether the arbitrator ignored the maximum amount proviso, which is what Creston alleges in this Court, the CA Leave Court decision focused on how the arbitrator construed s. 3.1 of the Agreement, which included the maximum amount proviso (paras. 25-26). For example, the CA Leave Court expressed concern that the arbitrator did not address the "incongruity" in the fact that the value of the fee would vary "hugely" depending on whether it was taken in cash or shares (para. 25).

[66]      With respect, the CA Leave Court erred in finding that the construction of s. 3.1 of the Agreement constituted a question of law. As explained by Justice Armstrong in the SC Appeal Court decision, construing s. 3.1 and taking account of the proviso required relying on the relevant surrounding circumstances, including the sophistication of the parties, the fluctuation in share prices, and the nature of the risk a party assumes when deciding to accept a fee in shares as opposed to cash. Such an exercise raises a question of mixed fact and law. There being no question of law extricable from the mixed fact and law question of how s. 3.1 and the proviso should be interpreted, the CA Leave Court erred in granting leave to appeal.

[67]      The conclusion that Creston's application for leave to appeal raised no question of law would be sufficient to dispose of this appeal. However, as this Court

rarely has the opportunity to address appeals of arbitral awards, it is, in my view, useful to explain that, even had the CA Leave Court been correct in finding that construction of s. 3.1 of the Agreement constituted a question of law, it should have nonetheless denied leave to appeal as the application also failed the miscarriage of justice and residual discretion stages of the leave analysis set out in s. 31(2)(a) of the *AA*.

### (4)  May Prevent a Miscarriage of Justice

#### (a)  *Miscarriage of Justice for the Purposes of Section 31(2)(a) of the AA*

[68]    Once a question of law has been identified, the court must be satisfied that the determination of that point of law on appeal "may prevent a miscarriage of justice" in order for it to grant leave to appeal pursuant to s. 31(2)(a) of the *AA*. The first step in this analysis is defining miscarriage of justice for the purposes of s. 31(2)(a).

[69]    In *BCIT*, Justice Saunders discussed the miscarriage of justice requirement under s. 31(2)(a). She affirmed the definition set out in *Domtar Inc. v. Belkin Inc.* (1989), 39 B.C.L.R. (2d) 257 (C.A.), which required the error of law in question to be a material issue that, if decided differently, would lead to a different result: ". . . if the point of law were decided differently, the arbitrator would have been led to a different result. In other words, was the alleged error of law material to the decision; does it go to its heart?" (*BCIT*, at para. 28). See also *Quan v. Cusson*,

2014 SCC 53 (CanLII)

2009 SCC 62, [2009] 3 S.C.R. 712, which discusses the test of whether "some substantial wrong or miscarriage of justice has occurred" in the context of a civil jury trial (para. 43).

[70]      Having regard to *BCIT* and *Quan*, I am of the opinion that in order to rise to the level of a miscarriage of justice for the purposes of s. 31(2)(a) of the *AA*, an alleged legal error must pertain to a material issue in the dispute which, if decided differently, would affect the result of the case.

[71]      According to this standard, a determination of a point of law "may prevent a miscarriage of justice" only where the appeal itself has some possibility of succeeding. An appeal with no chance of success will not meet the threshold of "may prevent a miscarriage of justice" because there would be no chance that the outcome of the appeal would cause a change in the final result of the case.

[72]      At the leave stage, it is not appropriate to consider the full merits of a case and make a final determination regarding whether an error of law was made. However, some preliminary consideration of the question of law is necessary to determine whether the appeal has the potential to succeed and thus to change the result in the case.

[73]      *BCIT* sets the threshold for this preliminary assessment of the appeal as "more than an arguable point" (para. 30).   With respect, once an arguable point has been made out, it is not apparent what more is required to meet the "more than an

arguable point" standard. Presumably, the leave judge would have to delve more deeply into the arguments around the question of law on appeal than would be appropriate at the leave stage to find *more* than an arguable point. Requiring this closer examination of the point of law, in my respectful view, blurs the line between the function of the court considering the leave application and the court hearing the appeal.

[74]      In my opinion, the appropriate threshold for assessing the legal question at issue under s. 31(2) is whether it has arguable merit. The arguable merit standard is often used to assess, on a preliminary basis, the merits of an appeal at the leave stage (see for example *Quick Auto Lease Inc. v. Nordin*, 2014 MBCA 32, 303 Man. R. (2d) 262, at para. 5; and *R. v. Fedossenko*, 2013 ABCA 164 (CanLII), at para. 7). "Arguable merit" is a well-known phrase whose meaning has been expressed in a variety of ways: "a reasonable prospect of success" (*Quick Auto Lease*, at para. 5; and *Enns v. Hansey*, 2013 MBCA 23 (CanLII), at para. 2); "some hope of success" and "sufficient merit" (*R. v. Hubley*, 2009 PECA 21, 289 Nfld. & P.E.I.R. 174, at para. 11); and "credible argument" (*R. v. Will*, 2013 SKCA 4, 405 Sask. R. 270, at para. 8). In my view, the common thread among the various expressions used to describe arguable merit is that the issue raised by the applicant cannot be dismissed through a preliminary examination of the question of law. In order to decide whether the award should be set aside, a more thorough examination is necessary and that examination is appropriately conducted by the court hearing the appeal once leave is granted.

[75]        Assessing whether the issue raised by an application for leave to appeal has arguable merit must be done in light of the standard of review on which the merits of the appeal will be judged. This requires a preliminary assessment of the applicable standard of review. As I will later explain, reasonableness will almost always apply to commercial arbitrations conducted pursuant to the *AA*, except in the rare circumstances where the question is one that would attract a correctness standard, such as a constitutional question or a question of law of central importance to the legal system as a whole and outside the adjudicator's expertise. Therefore, the leave inquiry will ordinarily ask whether there is any arguable merit to the position that the arbitrator's decision on the question at issue is unreasonable, keeping in mind that the decision-maker is not required to refer to all the arguments, provisions or jurisprudence or to make specific findings on each constituent element, for the decision to be reasonable (*Newfoundland and Labrador Nurses' Union v. Newfoundland and Labrador (Treasury Board)*, 2011 SCC 62, [2011] 3 S.C.R. 708, at para. 16). Of course, the leave court's assessment of the standard of review is only preliminary and does not bind the court which considers the merits of the appeal. As such, this should not be taken as an invitation to engage in extensive arguments or analysis about the standard of review at the leave stage.

[76]        In *BCIT*, Saunders J.A. considered the stage of s. 31(2)(a) of the *AA* at which an examination of the merits of the appeal should occur. At the behest of one of the parties, she considered examining the merits under the miscarriage of justice criterion. However, she decided that a consideration of the merits was best done at the

2014 SCC 53 (CanLII)

residual discretion stage. Her reasons indicate that this decision was motivated by the desire to take a consistent approach across s. 31(2)(a), (b) and (c):

> Where, then, if anywhere, does consideration of the merits of the appeal belong? Mr. Roberts for the Student Association contends that any consideration of the merits of the appeal belongs in the determination of whether a miscarriage of justice may occur; that is, under the second criterion. I do not agree. In my view, the apparent merit or lack of merit of an appeal is part of the exercise of the residual discretion, and applies equally to all three subsections, (*a*) through (*c*). Just as an appeal woefully lacking in merit should not attract leave under (*b*) (of importance to a class of people including the applicant) or (*c*) (of general or public importance), so too it should not attract leave under (*a*). Consideration of the merits, for consistency in the section as a whole, should be made as part of the exercise of residual discretion. [para. 29]

[77]      I acknowledge the consistency rationale. However, in my respectful opinion, the desire for a consistent approach to s. 31(2)(a), (b) and (c) cannot override the text of the legislation. Unlike s. 31(2)(b) and (c), s. 31(2)(a) requires an assessment to determine whether allowing leave to appeal "may prevent a miscarriage of justice". It is my opinion that a preliminary assessment of the question of law is an implicit component in a determination of whether allowing leave "may prevent a miscarriage of justice".

[78]      However, in an application for leave to appeal pursuant to s. 31(2)(b) or (c), neither of which contain a miscarriage of justice requirement, I agree with Justice Saunders in *BCIT* that a preliminary examination of the merits of the question of law should be assessed at the residual discretion stage of the analysis as considering the

2014 SCC 53 (CanLII)

merits of the proposed appeal will always be relevant when deciding whether to grant leave to appeal under s. 31.

[79]     In sum, in order to establish that "the intervention of the court and the determination of the point of law may prevent a miscarriage of justice" for the purposes of s. 31(2)(a) of the *AA*, an applicant must demonstrate that the point of law on appeal is material to the final result and has arguable merit.

(b)   *Application to the Present Case*

[80]     The CA Leave Court found that the arbitrator may have erred in law by not interpreting the Agreement as a whole, specifically in ignoring the "maximum amount" proviso. Accepting that this is a question of law for these purposes only, a determination of the question would be material because it could change the ultimate result arrived at by the arbitrator. The arbitrator awarded $4.14 million in damages on the basis that there was an 85 percent chance the TSXV would approve a finder's fee paid in $0.15 shares. If Creston's argument is correct and the $0.15 share price is foreclosed by the "maximum amount" proviso, damages would be reduced to US$1.5 million, a significant reduction from the arbitrator's award of damages.

[81]     As s. 31(2)(a) of the *AA* is the relevant provision in this case, a preliminary assessment of the question of law will be conducted in order to determine if a miscarriage of justice could have occurred had Creston been denied leave to appeal. Creston argues that the fact that the arbitrator's conclusion results in Sattva

2014 SCC 53 (CanLII)

receiving shares valued at considerably more than the US$1.5 million maximum dictated by the "maximum amount" proviso is evidence of the arbitrator's failure to consider that proviso.

[82]    However, the arbitrator did refer to s. 3.1, the "maximum amount" proviso, at two points in his decision: paras. 18 and 23(a). For example, at para. 23 he stated:

> In summary, then, as of March 27, 2007 it was clear and beyond argument that under the Agreement:
>
> (a) Sattva was entitled to a fee equal to the maximum amount payable pursuant to the rules and policies of the TSX Venture Exchange – section 3.1. It is common ground that the quantum of this fee is US$1,500,000.
>
> (b) The fee was payable in shares based on the Market Price, as defined in the Agreement, unless Sattva elected to take it in cash or a combination of cash and shares.
>
> (c) The Market Price, as defined in the Agreement, was $0.15. [Emphasis added.]

[83]    Although the arbitrator provided no express indication that he considered how the "maximum amount" proviso interacted with the Market Price definition, such consideration is implicit in his decision. The only place in the contract that specifies that the amount of the fee is calculated as US$1.5 million is the "maximum amount" proviso's reference to s. 3.3 of the TSXV Policy 5.1. The arbitrator acknowledged that the quantum of the fee is US$1.5 million and awarded Sattva US$1.5 million in shares priced at $0.15. Contrary to Creston's argument that the arbitrator failed to

2014 SCC 53 (CanLII)

consider the proviso in construing the Agreement, it is apparent on a preliminary examination of the question that the arbitrator did in fact consider the "maximum amount" proviso.

[84]      Accordingly, even had the CA Leave Court properly identified a question of law, leave to appeal should have been denied. The requirement that there be arguable merit that the arbitrator's decision was unreasonable is not met and the miscarriage of justice threshold was not satisfied.

(5)  Residual Discretion to Deny Leave

(a)  *Considerations in Exercising Residual Discretion in a Section 31(2)(a) Leave Application*

[85]      The B.C. courts have found that the words "may grant leave" in s. 31(2) of the *AA* confer on the court residual discretion to deny leave even where the requirements of s. 31(2) are met (*BCIT*, at paras. 9 and 26). In *BCIT*, Saunders J.A. sets out a non-exhaustive list of considerations that would be applicable to the exercise of discretion (para. 31):

1.  "the apparent merits of the appeal";

2.  "the degree of significance of the issue to the parties, to third parties and to the community at large";

2014 SCC 53 (CanLII)

3.  "the circumstances surrounding the dispute and adjudication including the urgency of a final answer";

4.  "other temporal considerations including the opportunity for either party to address the result through other avenues";

5.  "the conduct of the parties";

6.  "the stage of the process at which the appealed decision was made";

7.  "respect for the forum of arbitration, chosen by the parties as their means of resolving disputes"; and

8.  "recognition that arbitration is often intended to provide a speedy and final dispute mechanism, tailor-made for the issues which may face the parties to the arbitration agreement".

[86]    I agree with Justice Saunders that it is not appropriate to create what she refers to as an "immutable checklist" of factors to consider in exercising discretion under s. 31(2) (*BCIT*, at para. 32). However, I am unable to agree that all the listed considerations are applicable at this stage of the analysis.

[87]     In exercising its statutorily conferred discretion to deny leave to appeal pursuant to s. 31(2)(a), a court should have regard to the traditional bases for refusing discretionary relief: the parties' conduct, the existence of alternative remedies, and any undue delay (*Immeubles Port Louis Ltée v. Lafontaine (Village)*, [1991] 1 S.C.R. 326, at pp. 364-67). Balance of convenience considerations are also involved in determining whether to deny discretionary relief (*MiningWatch Canada v. Canada (Fisheries and Oceans)*, 2010 SCC 2, [2010] 1 S.C.R. 6, at para. 52). This would include the urgent need for a final answer.

[88]     With respect to the other listed considerations and addressed in turn below, it is my opinion that they have already been considered elsewhere in the s. 31(2)(a) analysis or are more appropriately considered elsewhere under s. 31(2). Once considered, these matters should not be assessed again under the court's residual discretion.

[89]     As discussed above, in s. 31(2)(a), a preliminary assessment of the merits of the question of law at issue in the leave application is to be considered in determining the miscarriage of justice question. The degree of significance of the issue to the parties is covered by the "importance of the result of the arbitration to the parties" criterion in s. 31(2)(a). The degree of significance of the issue to third parties and to the community at large should not be considered under s. 31(2)(a) as the *AA* sets these out as separate grounds for granting leave to appeal under s. 31(2)(b) and (c). Furthermore, respect for the forum of arbitration chosen by the parties is a

2014 SCC 53 (CanLII)

consideration that animates the legislation itself and can be seen in the high threshold to obtain leave under s. 31(2)(a). Recognition that arbitration is often chosen as a means to obtain a fast and final resolution tailor-made for the issues is already reflected in the urgent need for a final answer.

[90]     As for the stage of the process at which the decision sought to be appealed was made, it is not a consideration relevant to the exercise of the court's residual discretion to deny leave under s. 31(2)(a). This factor seeks to address the concern that granting leave to appeal an interlocutory decision may be premature and result in unnecessary fragmentation and delay of the legal process (D. J. M. Brown and J. M. Evans, with the assistance of C. E. Deacon, *Judicial Review of Administrative Action in Canada* (loose-leaf), at pp. 3-67 to 3-76). However, any such concern will have been previously addressed by the leave court in its analysis of whether a miscarriage of justice may arise; more specifically, whether the interlocutory issue has the potential to affect the final result. As such, the above-mentioned concerns should not be considered anew.

[91]     In sum, a non-exhaustive list of discretionary factors to consider in a leave application under s. 31(2)(a) of the *AA* would include:

- conduct of the parties;

- existence of alternative remedies;

- undue delay; and

2014 SCC 53 (CanLII)

- the urgent need for a final answer.

[92]     These considerations could, where applicable, be a sound basis for declining leave to appeal an arbitral award even where the statutory criteria of s. 31(2)(a) have been met. However, courts should exercise such discretion with caution. Having found an error of law and, at least with respect to s. 31(2)(a), a potential miscarriage of justice, these discretionary factors must be weighed carefully before an otherwise eligible appeal is rejected on discretionary grounds.

    (b)  *Application to the Present Case*

[93]     The SC Leave Court judge denied leave on the basis that there was no question of law. Even had he found a question of law, the SC Leave Court judge stated that he would have exercised his residual discretion to deny leave for two reasons: first, because of Creston's conduct in misrepresenting the status of the finder's fee issue to the TSXV and Sattva; and second, "on the principle that one of the objectives of the [*AA*] is to foster and preserve the integrity of the arbitration system" (para. 41). The CA Leave Court overruled the SC Leave Court on both of these discretionary grounds.

[94]     For the reasons discussed above, fostering and preserving the integrity of the arbitral system should not be a discrete discretionary consideration under s. 31(2)(a). While the scheme of s. 31(2) recognizes this objective, the exercise of

discretion must pertain to the facts and circumstances of a particular case. This general objective is not a discretionary matter for the purposes of denying leave.

[95]      However, conduct of the parties is a valid consideration in the exercise of the court's residual discretion under s. 31(2)(a). A discretionary decision to deny leave is to be reviewed with deference by an appellate court. A discretionary decision should not be interfered with merely because an appellate court would have exercised the discretion differently (*R. v. Bellusci*, 2012 SCC 44, [2012] 2 S.C.R. 509, at paras. 18 and 30). An appellate court is only justified in interfering with a lower court judge's exercise of discretion if that judge misdirected himself or if his decision is so clearly wrong as to amount to an injustice (*R. v. Bjelland*, 2009 SCC 38, [2009] 2 S.C.R. 651, at para. 15; and *R. v. Regan*, 2002 SCC 12, [2002] 1 S.C.R. 297, at para. 117).

[96]      Here, the SC Leave Court relied upon a well-accepted consideration in deciding to deny discretionary relief: the misconduct of Creston. The CA Leave Court overturned this decision on the grounds that Creston's conduct was "not directly relevant to the question of law" advanced on appeal (at para. 27).

[97]      The CA Leave Court did not explain why misconduct need be directly relevant to a question of law for the purpose of denying leave. I see nothing in s. 31(2) of the *AA* that would limit a leave judge's exercise of discretion in the manner suggested by the CA Leave Court. My reading of the jurisprudence does not support

the view that misconduct must be directly relevant to the question to be decided by the court.

[98]      In *Homex Realty and Development Co. v. Corporation of the Village of Wyoming*, [1980] 2 S.C.R. 1011, at pp. 1037-38, misconduct by a party not directly relevant to the question at issue before the court resulted in denial of a remedy. The litigation in *Homex* arose out of a disagreement regarding whether the purchaser of lots in a subdivision, Homex, had assumed the obligations of the vendor under a subdivision agreement to provide "all the requirements, financial and otherwise" for the installation of municipal services on a parcel of land that had been subdivided (pp. 1015-16). This Court determined that Homex had not been accorded procedural fairness when the municipality passed a by-law related to the dispute (p. 1032). Nevertheless, discretionary relief to quash the by-law was denied because, among other things, Homex had sought "throughout all these proceedings to avoid the burden associated with the subdivision of the lands" that it owned (p. 1037), even though the Court held that Homex knew this obligation was its responsibility (pp. 1017-19). This conduct was related to the dispute that gave rise to the litigation, but not to the question of whether the by-law was enacted in a procedurally fair manner. Accordingly, I read *Homex* as authority for the proposition that misconduct related to the dispute that gave rise to the proceedings may justify the exercise of discretion to refuse the relief sought, in this case refusing to grant leave to appeal.

[99]      Here, the arbitrator found as a fact that Creston misled the TSXV and Sattva regarding "the nature of the obligation it had undertaken to Sattva by representing that the finder's fee was payable in cash" (para. 56(k)). While this conduct is not tied to the question of law found by the CA Leave Court, it is tied to the arbitration proceeding convened to determine which share price should be used to pay Sattva's finder's fee. The SC Leave Court was entitled to rely upon such conduct as a basis for denying leave pursuant to its residual discretion.

[100]      In the result, in my respectful opinion, even if the CA Leave Court had identified a question of law and the miscarriage of justice test had been met, it should have upheld the SC Leave Court's denial of leave to appeal in deference to that court's exercise of judicial discretion.

[101]      Although the CA Leave Court erred in granting leave, these protracted proceedings have nonetheless now reached this Court. In light of the fact that the true concern between the parties is the merits of the appeal — that is how much the Agreement requires Creston to pay Sattva — and that the courts below differed significantly in their interpretation of the Agreement, it would be unsatisfactory not to address the very dispute that has given rise to these proceedings. I will therefore proceed to consider the three remaining questions on appeal as if leave to appeal had been properly granted.

C.   *Standard of Review Under the AA*

[102]     I now turn to consideration of the decisions of the appeal courts. It is first necessary to determine the standard of review of the arbitrator's decision in respect of the question on which the CA Leave Court granted leave: whether the arbitrator construed the finder's fee provision in light of the Agreement as a whole, particularly, whether the finder's fee provision was interpreted having regard for the "maximum amount" proviso.

[103]     At the outset, it is important to note that the *Administrative Tribunals Act*, S.B.C. 2004, c. 45, which sets out standards of review of the decisions of many statutory tribunals in British Columbia (see ss. 58 and 59), does not apply in the case of arbitrations under the *AA*.

[104]     Appellate review of commercial arbitration awards takes place under a tightly defined regime specifically tailored to the objectives of commercial arbitrations and is different from judicial review of a decision of a statutory tribunal. For example, for the most part, parties engage in arbitration by mutual choice, not by way of a statutory process. Additionally, unlike statutory tribunals, the parties to the arbitration select the number and identity of the arbitrators. These differences mean that the judicial review framework developed in *Dunsmuir v. New Brunswick*, 2008 SCC 9, [2008] 1 S.C.R. 190, and the cases that followed it is not entirely applicable to the commercial arbitration context. For example, the *AA* forbids review of an arbitrator's factual findings. In the context of commercial arbitration, such a provision is absolute. Under the *Dunsmuir* judicial review framework, a privative clause does

2014 SCC 53 (CanLII)

not prevent a court from reviewing a decision, it simply signals deference (*Dunsmuir*, at para. 31).

[105]    Nevertheless, judicial review of administrative tribunal decisions and appeals of arbitration awards are analogous in some respects. Both involve a court reviewing the decision of a non-judicial decision-maker. Additionally, as expertise is a factor in judicial review, it is a factor in commercial arbitrations: where parties choose their own decision-maker, it may be presumed that such decision-makers are chosen either based on their expertise in the area which is the subject of dispute or are otherwise qualified in a manner that is acceptable to the parties. For these reasons, aspects of the *Dunsmuir* framework are helpful in determining the appropriate standard of review to apply in the case of commercial arbitration awards.

[106]    *Dunsmuir* and the post-*Dunsmuir* jurisprudence confirm that it will often be possible to determine the standard of review by focusing on the nature of the question at issue (see for example *Alberta (Information and Privacy Commissioner) v. Alberta Teachers' Association*, 2011 SCC 61, [2011] 3 S.C.R. 654, at para. 44). In the context of commercial arbitration, where appeals are restricted to questions of law, the standard of review will be reasonableness unless the question is one that would attract the correctness standard, such as constitutional questions or questions of law of central importance to the legal system as a whole and outside the adjudicator's expertise (*Alberta Teachers' Association*, at para. 30). The question at issue here, whether the arbitrator interpreted the Agreement as a whole, does not fall into one of

2014 SCC 53 (CanLII)

2014 SCC 53 (CanLII)

those categories. The relevant portions of the *Dunsmuir* analysis point to a standard of review of reasonableness in this case.

D.    *The Arbitrator Reasonably Construed the Agreement as a Whole*

[107]    For largely the reasons outlined by Justice Armstrong in paras. 57-75 of the SC Appeal Court decision, in my respectful opinion, in determining that Sattva is entitled to be paid its finder's fee in shares priced at $0.15 per share, the arbitrator reasonably construed the Agreement as a whole. Although Justice Armstrong conducted a correctness review of the arbitrator's decision, his reasons amply demonstrate the reasonableness of that decision. The following analysis is largely based upon his reasoning.

[108]    The question that the arbitrator had to decide was which date should be used to determine the price of the shares used to pay the finder's fee: the date specified in the Market Price definition in the Agreement or the date the finder's fee was to be paid?

[109]    The arbitrator concluded that the price determined by the Market Price definition prevailed, i.e. $0.15 per share. In his view, this conclusion followed from the words of the Agreement and was "clear and beyond argument" (para. 23). Apparently, because he considered this issue clear, he did not offer extensive reasons in support of his conclusion.

[110]      In *Newfoundland and Labrador Nurses' Union*, Abella J. cites Professor David Dyzenhaus to explain that, when conducting a reasonableness review, it is permissible for reviewing courts to supplement the reasons of the original decision-maker as part of the reasonableness analysis:

> "Reasonable" means here that the reasons do in fact or in principle support the conclusion reached. That is, even if the reasons in fact given do not seem wholly adequate to support the decision, the court must first seek to supplement them before it seeks to subvert them. For if it is right that among the reasons for deference are the appointment of the tribunal and not the court as the front line adjudicator, the tribunal's proximity to the dispute, its expertise, etc, then it is also the case that its decision should be presumed to be correct even if its reasons are in some respects defective. [Emphasis added by Abella J.; para. 12.]
>
> (Quotation from D. Dyzenhaus, "The Politics of Deference: Judicial Review and Democracy", in M. Taggart, ed., *The Province of Administrative Law* (1997), 279, at p. 304.)

Accordingly, Justice Armstrong's explanation of the interaction between the Market Price definition and the "maximum amount" proviso can be considered a supplement to the arbitrator's reasons.

[111]      The two provisions at issue here are the Market Price definition and the "maximum amount" proviso:

## 2. DEFINITIONS

"**Market Price**" for companies listed on the TSX Venture Exchange shall have the meaning as set out in the Corporate Finance Manual of the TSX Venture Exchange as calculated on close of business day before the issuance of the press release announcing the Acquisition. For companies listed on the TSX, Market Price means the average closing price of the

2014 SCC 53 (CanLII)

2014 SCC 53 (CanLII)

Company's stock on a recognized exchange five trading days immediately preceding the issuance of the press release announcing the Acquisition.

And:

**3. FINDER'S FEE**

3.1        . . . the Company agrees that on the closing of an Acquisition introduced to Company by the Finder, the Company will pay the Finder a finder's fee (the "Finder's Fee") based on Consideration paid to the vendor equal to the maximum amount payable pursuant to the rules and policies of the TSX Venture Exchange. Such finder's fee is to be paid in shares of the Company based on Market Price or, at the option of the Finder, any combination of shares and cash, provided the amount does not exceed the maximum amount as set out in the Exchange Policy 5.1, Section 3.3 Finder's Fee Limitations. [Emphasis added.]

[112]     Section 3.1 entitles Sattva to be paid a finder's fee in shares based on the "Market Price". Section 2 of the Agreement states that Market Price for companies listed on the TSXV should be "calculated on close of business day before the issuance of the press release announcing the Acquisition". In this case, shares priced on the basis of the Market Price definition would be $0.15 per share. The words "provided the amount does not exceed the maximum amount as set out in the Exchange Policy 5.1, Section 3.3 Finder's Fee Limitations" in s. 3.1 of the Agreement constitute the "maximum amount" proviso. This proviso limits the amount of the finder's fee. The maximum finder's fee in this case is US$1.5 million (see s. 3.3 of the TSXV Policy 5.1 in Appendix II).

2014 SCC 53 (CanLII)

[113]      While the "maximum amount" proviso limits the amount of the finder's

fee, it does not affect the Market Price definition. As Justice Armstrong explained, the

Market Price definition acts to fix the date at which one medium of payment (US$) is

transferred into another (shares):

> The medium for payment of the finder's fee is clearly established by
> the fee agreement. The market value of those shares at the time that the
> parties entered into the fee agreement was unknown. The respondent
> analogizes between payment of the $1.5 million US finder's fee in shares
> and a hypothetical agreement permitting payment of $1.5 million US in
> Canadian dollars. Both agreements would contemplate a fee paid in
> different currencies. The exchange rate of the US and Canadian dollar
> would be fixed to a particulate date, as is the value of the shares by way
> of the Market Price in the fee agreement. That exchange rate would
> determine the number of Canadian dollars paid in order to satisfy the $1.5
> million US fee, as the Market Price does for the number of shares paid in
> relation to the fee. The Canadian dollar is the form of the fee payment, as
> are the shares. Whether the Canadian dollar increased or decreased in
> value after the date on which the exchange rate is based is irrelevant. The
> amount of the fee paid remains $1.5 million US, payable in the number of
> Canadian dollars (or shares) equal to the amount of the fee based on the
> value of that currency on the date that the value is determined.

> (SC Appeal Court decision, at para. 71)

[114]      Justice Armstrong explained that Creston's position requires the Market

Price definition to be ignored and for the shares to be priced based on the valuation

done in anticipation of a private placement.

[115]      However, nothing in the Agreement expresses or implies that compliance

with the "maximum amount" proviso should be reassessed at a date closer to the

payment of the finder's fee. Nor is the basis for the new valuation, in this case a

private placement, mentioned or implied in the Agreement. To accept Creston's

interpretation would be to ignore the words of the Agreement which provide that the "finder's fee is to be paid in shares of the Company based on Market Price".

[116]     The arbitrator's decision that the shares should be priced according to the Market Price definition gives effect to both the Market Price definition and the "maximum amount" proviso. The arbitrator's interpretation of the Agreement, as explained by Justice Armstrong, achieves this goal by reconciling the Market Price definition and the "maximum amount" proviso in a manner that cannot be said to be unreasonable.

[117]     As Justice Armstrong explained, setting the share price in advance creates a risk that makes selecting payment in shares qualitatively different from choosing payment in cash. There is an inherent risk in accepting a fee paid in shares that is not present when accepting a fee paid in cash. A fee paid in cash has a specific predetermined value. By contrast, when a fee is paid in shares, the price of the shares (or mechanism to determine the price of the shares) is set in advance. However, the price of those shares on the market will change over time. The recipient of a fee paid in shares hopes the share price will rise resulting in shares with a market value greater than the value of the shares at the predetermined price. However, if the share price falls, the recipient will receive shares worth less than the value of the shares at the predetermined price. This risk is well known to those operating in the business sphere and both Creston and Sattva would have been aware of this as sophisticated business parties.

[118]     By accepting payment in shares, Sattva was accepting that it was subject to the volatility of the market. If Creston's share price had fallen, Sattva would still have been bound by the share price determined according to the Market Price definition resulting in it receiving a fee paid in shares with a market value of less than the maximum amount of US$1.5 million. It would make little sense to accept the risk of the share price decreasing without the possibility of benefitting from the share price increasing.  As Justice Armstrong stated:

> It would be inconsistent with sound commercial principles to insulate the appellant from a rise in share prices that benefitted the respondent at the date that the fee became payable, when such a rise was foreseeable and ought to have been addressed by the appellant, just as it would be inconsistent with sound commercial principles, and the terms of the fee agreement, to increase the number of shares allocated to the respondent had their value decreased relative to the Market Price by the date that the fee became payable. Both parties accepted the possibility of a change in the value of the shares after the Market Price was determined when entering into the fee agreement.
>
> (SC Appeal Court decision, at para. 70)

[119]     For these reasons, the arbitrator did not ignore the "maximum amount" proviso. The arbitrator's reasoning, as explained by Justice Armstrong, meets the reasonableness threshold of justifiability, transparency and intelligibility (*Dunsmuir*, at para. 47).

E.   *Appeal Courts Are Not Bound by Comments on the Merits of the Appeal Made by Leave Courts*

[120]     The CA Appeal Court held that it and the SC Appeal Court were bound by the findings made by the CA Leave Court regarding not simply the decision to grant leave to appeal, but also the merits of the appeal. In other words, it found that the SC Appeal Court erred in law by ignoring the findings of the CA Leave Court regarding the merits of the appeal.

[121]     The CA Appeal Court noted two specific findings regarding the merits of the appeal that it held were binding on it and the SC Appeal Court: (1) it would be anomalous if the Agreement allowed Sattva to receive US$1.5 million if it received its fee in cash, but allowed it to receive shares valued at approximately $8 million if Sattva received its fee in shares; and (2) that the arbitrator ignored this anomaly and did not address s. 3.1 of the Agreement:

> The [SC Appeal Court] judge found the arbitrator had expressly addressed the maximum amount payable under paragraph 3.1 of the Agreement and that he was correct.
>
> This finding is contrary to the remarks of Madam Justice Newbury in the earlier appeal that, if Sattva took its fee in shares valued at $0.15, it would receive a fee having a value at the time the fee became payable of over $8 million. If the fee were taken in cash, the amount payable would be $1.5 million US. Newbury J.A. specifically held that the arbitrator did not note this anomaly and did not address the meaning of paragraph 3.1 of the Agreement.
>
> The [SC Appeal Court] judge was bound to accept those findings. Similarly, absent a five-judge division in this appeal, we must also accept those findings. [paras. 42-44]

[122]     With respect, the CA Appeal Court erred in holding that the CA Leave Court's comments on the merits of the appeal were binding on it and on the SC Appeal Court. A court considering whether leave should be granted is not adjudicating the merits of the case (*Canadian Western Bank v. Alberta*, 2007 SCC 22, [2007] 2 S.C.R. 3, at para. 88). A leave court decides only whether the matter warrants granting leave, not whether the appeal will be successful (*Pacifica Mortgage Investment Corp. v. Laus Holdings Ltd.*, 2013 BCCA 95, 333 B.C.A.C. 310, at para. 27, leave to appeal refused, [2013] 3 S.C.R. viii). This is true even where the determination of whether to grant leave involves, as in this case, a preliminary consideration of the question of law at issue. A grant of leave cannot bind or limit the powers of the court hearing the actual appeal (*Tamil Co-operative Homes Inc. v. Arulappah* (2000), 49 O.R. (3d) 566 (C.A.), at para. 32).

[123]     Creston concedes this point but argues that the CA Appeal Court's finding that it was bound by the CA Leave Court was inconsequential because the CA Appeal Court came to the same conclusion on the merits as the CA Leave Court based on separate and independent reasoning.

[124]     The fact that the CA Appeal Court provided its own reasoning as to why it came to the same conclusion as the CA Leave Court does not vitiate the error. Once the CA Appeal Court treated the CA Leave Court's reasons on the merits as binding, it could hardly have come to any other decision. As counsel for Sattva pointed out, treating the leave decision as binding would render an appeal futile.

VI.  Conclusion

[125]     The CA Leave Court erred in granting leave to appeal in this case. In any event, the arbitrator's decision was reasonable. The appeal from the judgments of the Court of Appeal for British Columbia dated May 14, 2010 and August 7, 2012 is allowed with costs throughout and the arbitrator's award is reinstated.

**APPENDIX I**

Relevant Provisions of the Sattva-Creston Finder's Fee Agreement

(a) "Market Price" definition:

### 2. DEFINITIONS

> **"Market Price"** for companies listed on the TSX Venture Exchange shall have the meaning as set out in the Corporate Finance Manual of the TSX Venture Exchange as calculated on close of business day before the issuance of the press release announcing the Acquisition. For companies listed on the TSX, Market Price means the average closing price of the Company's stock on a recognized exchange five trading days immediately preceding the issuance of the press release announcing the Acquisition.

(b) Finder's fee provision (which contains the "maximum amount" proviso):

### 3. FINDER'S FEE

> 3.1     . . . the Company agrees that on the closing of an Acquisition introduced to Company by the Finder, the Company will pay the Finder a finder's fee (the "Finder's Fee") based on Consideration paid to the vendor equal to the maximum amount payable pursuant to the rules and policies of the TSX Venture Exchange. Such finder's fee is to be paid in shares of the Company based on Market Price or, at the option of the Finder, any combination of shares and cash, provided the amount does

2014 SCC 53 (CanLII)

not exceed the maximum amount as set out in the Exchange Policy 5.1, Section 3.3 Finder's Fee Limitations.

**APPENDIX II**

Section 3.3 of TSX Venture Exchange Policy 5.1: Loans, Bonuses, Finder's Fees and Commissions

### 3.3  Finder's Fee Limitations

The finder's fee limitations apply if the benefit to the Issuer is an asset purchase or sale, joint venture agreement, or if the benefit to the Issuer is not a specific financing. The consideration should be stated both in dollars and as a percentage of the value of the benefit received. Unless there are unusual circumstances, the finder's fee should not exceed the following percentages:

| Benefit | Finder's Fee |
|---|---|
| On the first $300,000 | Up to 10% |
| From $300,000 to $1,000,000 | Up to 7.5% |
| From $1,000,000 and over | Up to 5% |

As the dollar value of the benefit increases, the fee or commission, as a percentage of that dollar value should generally decrease.

2014 SCC 53 (CanLII)

2014 SCC 53 (CanLII)

# APPENDIX III

*Commercial Arbitration Act*, R.S.B.C. 1996, c. 55 (as it read on January 12, 2007) (now the *Arbitration Act*)

### Appeal to the court

**31** (1) A party to an arbitration may appeal to the court on any question of law arising out of the award if

(a) all of the parties to the arbitration consent, or

(b) the court grants leave to appeal.

(2) In an application for leave under subsection (1) (b), the court may grant leave if it determines that

(a) the importance of the result of the arbitration to the parties justifies the intervention of the court and the determination of the point of law may prevent a miscarriage of justice,

(b) the point of law is of importance to some class or body of persons of which the applicant is a member, or

(c) the point of law is of general or public importance.

(3) If the court grants leave to appeal under this section, it may attach conditions to the order granting leave that it considers just.

(4) On an appeal to the court, the court may

(a) confirm, amend or set aside the award, or

(b) remit the award to the arbitrator together with the court's opinion on the question of law that was the subject of the appeal.

*Appeal allowed with costs throughout.*

*Solicitors for the appellant:  McCarthy Tétrault, Vancouver.*

*Solicitors for the respondent:  Miller Thomson, Vancouver.*

*Solicitor   for   the   intervener   the   Attorney   General   of   British Columbia:  Attorney General of British Columbia, Victoria.*

*Solicitors for the intervener the BCICAC Foundation:  Fasken Martineau DuMoulin, Vancouver.*

TAB 131

Case 09-10138-MFW    Doc 14225-50    Filed 08/15/14    Page 176 of 279

Scanlon v. Castlepoint Development Corp., 1992 CarswellOnt 633

1992 CarswellOnt 633, [1992] O.J. No. 2692, 11 O.R. (3d) 744, 29 R.P.R. (2d) 60...

1992 CarswellOnt 633
Ontario Court of Appeal

Scanlon v. Castlepoint Development Corp.

1992 CarswellOnt 633, [1992] O.J. No. 2692, 11 O.R. (3d) 744, 29
R.P.R. (2d) 60, 37 A.C.W.S. (3d) 563, 59 O.A.C. 191, 99 D.L.R. (4th) 153

# JOE F. SCANLON v. CASTLEPOINT DEVELOPMENT CORPORATION and BRAMALEA LIMITED

Morden A.C.J.O., Goodman and Robins JJ.A.

Heard: April 2-3, 1992
Judgment: December 17, 1992
Docket: Doc. CA C9007

Counsel: *Dennis R. O'Connor* , for appellant Bramalea Limited.
*Angela M. Costigan* , for respondent.
*Derek A.J. D'Oliveira* and *Dennis M. O'Leary* , for intervenor Stanley Kopman.
*Joseph C. Goldenberg* , for Stella and Vito DiMauro, Rocco Mattucci, Anna Budahazy and Gordon Glavan, Carmen Alfano, Rose Weinberg, Mary Louise Neill, Max Pivetta and Jeff Bridge.

Subject: Property; Contracts

## Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

## Headnote

Sale of Land --- Agreement of purchase and sale — Interpretation of contract

Sale of Land --- Condominiums — Agreement of purchase and sale — Time of performance

Agreement being valid and subsisting.

Agreement being valid and subsisting.

Respondent purchaser failing to objectively satisfy materiality tests respecting alleged deficiencies in disclosure statement.

The respondent purchaser entered into an agreement to purchase a condominium unit in a proposed 47-storey luxury condominium project. The project was subsequently sold to the appellant developer. The closing date specified in the agreement of purchase and sale was November 4, 1991, or as extended. Another clause provided that if the unit were substantially completed to permit occupancy on the closing date but the condominium description and declaration were not yet registered, the purchaser was obliged to occupy the unit on an interim occupancy basis. The closing date would then be extended to 20 days after written notice was given of condominium registration. The vendor was also permitted to extend the closing date where completion of the unit or the common elements was delayed.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.                    1

1992 CarswellOnt 633, [1992] O.J. No. 2692, 11 O.R. (3d) 744, 29 R.P.R. (2d) 60...

The developer commenced construction in 1989 but due to various construction delays, individual unit closings could not take place as anticipated. The developer then unilaterally changed the purchaser's closing date from November 4, 1991, to September 14, 1992.

The purchaser successfully applied for a declaration that his agreement of purchase and sale was void on the basis that the developer's unilateral extension of the closing date constituted an anticipatory breach of the agreement of purchase and sale, and for a repayment of his deposits. The purchaser also argued that the developer failed to comply with s. 52(1) of the *Condominium Act* (Ont.) in not delivering to him an adequate disclosure statement and all material amendments. The developer appealed.

**Held:**

The appeal was allowed.

**Per Robins J.A. (Morden A.C.J.O. concurring)**

The agreement specifically provided for a lapse between the occupancy of the unit and the final closing date which served to accommodate the delay created by the statutory condominium registration process. The parties could not have reasonably expected that the developer was unconditionally guaranteeing that either full or substantial completion would occur in any eventuality on November 4, 1991. The agreement specifically provided that the closing date could be extended when completion of a purchaser's unit was delayed for various reasons, and took into account the practical reality of construction strikes and delays. The extension provision could not reasonably be interpreted to apply only to post-occupancy delays. To construe the provision in such a manner would be to render the clause substantially, if not totally, ineffective. The developer had not in any way acted in bad faith, nor could it be blamed for the delay in completion of the building.

**Per Goodman J.A. (dissenting in part)**

Where it is the intention of a vendor that it have the right to extend the date of substantial completion for a condominium unit, the vendor must set forth such a right clearly in the agreement of purchase and sale. Where a contract is ambiguous, the normal rules of interpretation may be supplemented by the application of the contra proferentem rule. In the context of the agreement as a whole, there existed an ambiguity with respect to the conditions under which the agreement could be extended. Accordingly, where contractual language may bear two constructions, that which produces the more reasonable and fair result is to be applied. An interpretation based on the contra proferentem rule would mean that the vendor was obliged to substantially complete the purchaser's unit by November 4, 1991, and that it could not unilaterally extend the closing date.

With respect to the alleged deficiencies in the disclosure statement, the onus was on the purchaser to prove objectively that had the information that was not disclosed or was inaccurately or insufficiently disclosed been properly divulged in the disclosure statement at the time it was initially delivered to him, he would, as a reasonable purchaser, have regarded the information as sufficiently important to his decision to purchase the unit that he would not have proceeded with the transaction but would have rescinded the agreement prior to the expiration of the 10-day cooling-off period. The deficiencies noted by the purchaser were not sufficient to satisfy the onus required to be fulfilled to render the agreement void.

**Table of Authorities**

**Cases considered:**

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-50    Filed 08/15/14    Page 178 of 279

Scanlon v. Castlepoint Development Corp., 1992 CarswellOnt 633

1992 CarswellOnt 633, [1992] O.J. No. 2692, 11 O.R. (3d) 744, 29 R.P.R. (2d) 60...

*By Goodman J.A. (dissenting in part)*

*Abdool v. Somerset Place Developments of Georgetown Ltd.* (1991), 19 R.P.R. (2d) 229, 82 D.L.R. (4th) 50, 4 O.R. (3d) 280 (Gen. Div.) , reversed (1992), 27 R.P.R. (2d) 157, 10 O.R. (3d) 120, 96 D.L.R. (4th) 449, 58 O.A.C. 176 (C.A.) — *considered*

*Abdool v. Somerset Place Developments of Georgetown Ltd.* (1992), 27 R.P.R. (2d) 157, 10 O.R. (3d) 120, 96 D.L.R. (4th) 449, 58 O.A.C. 176 (C.A.) — *referred to*

*Barchak Estate v. Anderson*, [1945] 1 W.W.R. 657, [1945] 2 D.L.R. 698 (Alta. C.A.) — *considered*

*Budinsky v. Breakers East Inc.* (1992), 23 R.P.R. (2d) 54, 6 O.R. (3d) 255, 87 D.L.R. (4th) 572 (Gen. Div.) , reversed in part (sub nom. *Abdool v. Somerset Place Developments of Georgetown Ltd.* ) (1992), 27 R.P.R. (2d) 157, 10 O.R. (3d) 120, 96 D.L.R. (4th) 449, 58 O.A.C. 176 (C.A.) — *considered*

*Budinsky v. Breakers East Inc.* (sub nom. *Abdool v. Somerset Place Developments of Georgetown Ltd.* ) (1992), 27 R.P.R. (2d) 157, 10 O.R. (3d) 120, 96 D.L.R. (4th) 449, 58 O.A.C. 176 (C.A.) — *referred to*

*Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888, 32 N.R. 488, 112 D.L.R. (3d) 49, [1980] I.L.R. 1-1176 — *considered*

*Di Cecco v. 733725 Ontario Inc.* (December 21, 1990), Doc. 15280/90, Fedak J. (Ont. Gen. Div.) , affirmed (May 21, 1991), Doc. CA 20/91 (Ont. C.A.) — *considered*

*Hillis Oil & Sales Ltd. v. Wynn's Canada Ltd.*, [1986] 1 S.C.R. 57, 65 N.R. 23, 71 N.S.R. (2d) 353, 171 A.P.R. 353, 25 D.L.R. (4th) 649 — *considered*

*Morris v. Cam-Nest Developments Ltd.* (1988), 49 R.P.R. 229, 64 O.R. (2d) 475, 50 D.L.R. (4th) 707 (H.C.) — *considered*

*By Robins J.A. (Morden A.C.J.O. concurring)*

*Albrecht v. Opemoco Inc.* (1991), 21 R.P.R. (2d) 68, 5 O.R. (3d) 385, 85 D.L.R. (4th) 289, 51 O.A.C. 261 (C.A.) — *considered*

*Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888, 32 N.R. 488, 112 D.L.R. (3d) 49, [1980] I.L.R. 1-1176 — *considered*

*Hillis Oil & Sales Ltd. v. Wynn's Canada Ltd.*, [1986] 1 S.C.R. 57, 65 N.R. 23, 71 N.S.R. (2d) 353, 171 A.P.R. 353, 25 D.L.R. (4th) 649 — *referred to*

*McClelland & Stewart Ltd. v. Mutual Life Assurance Co. of Canada*, [1981] 2 S.C.R. 6, 125 D.L.R. (3d) 257, [1981] I.L.R. 1-1393, 37 N.R. 190 — *referred to*

*Métropolitaine, Cie d'assurance-vie c. Frenette*, [1992] 1 S.C.R. 647, 4 C.C.L.I. (2d) 1, 134 N.R. 169, [1992] I.L.R. 1-2823, 89 D.L.R. (4th) 653, 46 Q.A.C. 161, [1992] R.R.A. 466 — *referred to*

Scanlon v. Castlepoint Development Corp., 1992 CarswellOnt 633

Case 09-10138-MFW    Doc 14225-50    Filed 08/15/14    Page 179 of 279

1992 CarswellOnt 633, [1992] O.J. No. 2692, 11 O.R. (3d) 744, 29 R.P.R. (2d) 60...

*National Trust Co. v. Mead*, [1990] 2 S.C.R. 410, 12 R.P.R. (2d) 165, [1990] 5 W.W.R. 459, 71 D.L.R. (4th) 488, 112 N.R. 1, 87 Sask. R. 161 — *referred to*

*Reliance Petroleum Ltd. v. Stevenson*, [1956] S.C.R. 936, 5 D.L.R. (2d) 673 — *referred to*

**Statutes considered:**

Condominium Act, R.S.O. 1980, c. 84 [R.S.O. 1990, c. C.26] —

s. 51(6) [R.S.O. 1990, c. C.26, s. 51(6)]

s. 52 [R.S.O. 1990, c. C.26, s. 52]

s. 52(1) [R.S.O. 1990, c. C.26, s. 52(1)]

s. 52(6)(*c* ) [R.S.O. 1990, c. C.26, s. 52(6)(*c* )]

s. 52(6)(*d* ) [R.S.O. 1990, c. C.26, s. 52(6)(*d* )]

Condominium Act, R.S.O. 1990, c. C.26 —

s. 52

Vendors and Purchasers Act, R.S.O. 1990, c. V.2.

**Rules considered:**

Ontario, Rules of Civil Procedure.

Appeal from decision reported at (1991), 22 R.P.R. 211, 85 D.L.R. (4th) 443 (Ont. Gen. Div.) , additional reasons at (1991), 22 R.P.R. (2d) 211 at 215, 86 D.L.R. (4th) 573 (Ont. Gen. Div.) , declaring respondent's condominium agreement of purchase and sale null and void.

*Goodman J.A.* **(dissenting in part):**

1    This is an appeal by Bramalea Limited ("Bramalea") from the decision of Austin J., reported in (1992), 85 D.L.R. (4th) 443 , in which he held that the applicant, Joe F. Scanlon (the respondent herein), was entitled to a declaration that the agreement of purchase and sale of a condominium unit entered into between Castlepoint Development Corporation ("Castlepoint") and Scanlon on September 16, 1988 is null and void. He further held that Scanlon was entitled to a return of his deposit with interest.

**Terms of Agreement of Purchase and Sale of Condominium Unit**

2    By para. 2(a) of the agreement, the purchase price of the unit was stated to be $424,000. A deposit of $10,000 was payable as a deposit and an additional sum of $74,800 was payable in successive instalments of $32,400, $21,200 and $21,000 on dates specified in the agreement, the last of which was payable 365 days after the presentation of the offer by the purchaser and representing in total 20 per cent of the purchase price. All of these payments were duly made by Scanlon. He was to give back to the vendor a first mortgage for $318,000 (75 per cent of the purchase price) and, as provided by para. 2(a)(vi), to pay the balance of the price "on closing (or Occupancy Date, if applicable) which, when taken together with the deposits heretofore paid will be 25 % of the Purchase Price, subject to the adjustments hereinafter set forth."

3    The other relevant paragraphs contained in the agreement of purchase and sale read as follows:

1992 CarswellOnt 633, [1992] O.J. No. 2692, 11 O.R. (3d) 744, 29 R.P.R. (2d) 60...

1. The following definitions shall apply to this Agreement:

(a) "Act" means the Condominium Act, R.S.O. 1980, Chapter 84, and any amendments thereto.

(b) "Closing Date" or "Closing" means the 4th day of November, 1991 or as extended by Paragraph 13(d).

12. The transaction of purchase and sale is to be completed on the Closing Date.

13. If the Unit is substantially completed sufficient to permit occupancy on Closing, but the declaration and description have not been registered, then the Purchaser shall occupy the Unit on that date (the "Occupancy Date") on the following terms and conditions:

(a) the payment to the Vendor, of the balance of the Purchase Price set forth in this Agreement, but without adjustments;

(b) the payment of the Occupancy Fee, monthly, in advance, on the first day of each month, following Occupancy Date, with appropriate adjustments from Occupancy Date to the first of the month following, said monthly fee not to be credited as payment on account of the Purchase Price. The Purchaser agrees to provide to the Vendor on the Occupancy Date a series of 12 post-dated cheques for the monthly occupancy fees for the 12 months immediately following the Occupancy Date. The Purchaser acknowledges that the components of the occupancy fee as set out in s. 52(6) of the Act are subject to recalculation by the Vendor and may be increased at any time prior to Closing to the maximum permitted by s. 51(6) of the Act with any readjustments to be made 30 days after demand by the Vendor, with the final readjustment on Closing;

. . . . .

(d) the Closing Date shall be extended to a date 20 days after notice in writing is given by the Vendor's Solicitors to the Purchaser or his Solicitor that the declaration and description have been registered. If the Purchaser fails to close the transaction as aforesaid, through no fault of the Vendor, the Purchaser shall be in default hereunder, and shall be required to deliver vacant possession of the Unit. The Vendor shall in that event be entitled to retain all monies paid hereunder for damages and expenses and unpaid occupation charges. The Purchaser shall be responsible for the damages and expenses and the cost of redecorating as may be determined by the Vendor at its sole discretion as a result of the possession herein.

. . . . .

The Purchaser acknowledges and it is understood and agreed that the Purchaser shall not be entitled to access to the Unit prior to the Occupancy Date.

22. If the completion of the Unit or the common elements is delayed by reasons of strikes, lock-outs, fire, lightning, tempest, riot, war and unusual delay by common carriers or unavoidable casualties or by any other cause of any kind whatsoever whether or not beyond the control of the Vendor, the Vendor shall be permitted extensions of time from time to time for completion and the Closing Date shall be extended accordingly. If the Vendor is unable to complete the Unit and close this transaction within such extended time or times for closing, all monies paid hereunder by the Purchaser other than any occupancy fees, shall be returned to him and this Agreement shall be null and void. If the unit is substantially completed by the Vendor on or before Closing or any extension thereof as aforesaid, this transaction shall be completed on such date notwithstanding that the Vendor has not fully completed the Unit or the common elements and the Vendor shall complete such outstanding work within a reasonable time after Closing, having regard to weather conditions and the availability of labour and materials. In any event the Purchaser acknowledges that failure to complete the common elements on or before Closing shall not be deemed to be a failure to complete the Unit.

25. This offer when accepted shall constitute a binding contract of purchase and sale and time shall in all respects be of the essence hereof. It is agreed that there is no representation, warranty, collateral agreement or condition affecting this agreement or the real property or supported hereby other than as expressed herein in writing whether contained in any sales brochures or alleged to have been made by any sales representative or agents.

Case 09-10138-MFW    Doc 14225-50    Filed 08/15/14    Page 181 of 279

Scanlon v. Castlepoint Development Corp., 1992 CarswellOnt 633

1992 CarswellOnt 633, [1992] O.J. No. 2692, 11 O.R. (3d) 744, 29 R.P.R. (2d) 60...

4      Scanlon discontinued the original application against Castlepoint on August 29, 1991 as Castlepoint had prior thereto assigned its interest in the agreement as vendor to Bramalea. Accordingly, Castlepoint is not a party to this appeal.

5      In the proceedings before Austin J., Scanlon relied on two grounds for the relief requested:

(1) That Bramalea had unilaterally purported to change the closing date set forth in the agreement of purchase and sale, thereby committing an anticipatory breach of contract which entitled him to terminate it.

(2) Castlepoint did not make the disclosure required by s. 52 of the *Condominium Act* , R.S.O. 1980, c.84, and as a result the agreement was not binding on him.

6      The relevant provisions of the agreement and the facts of the case will be set out in due course. It is sufficient to say at this time that Austin J. concluded in his reasons, in part, as follows [at p. 446]:

The closing was to be on November 4, 1991, and Bramalea's letter of May 31, 1991, changing the date, constituted an anticipatory breach of the agreement. The date of closing was a fundamental term. Scanlon was therefore entitled to treat the agreement as at an end. He is entitled to a declaration that the agreement is null and void.

In these circumstances it is not necessary to deal with the question of the adequacy of the disclosure made by Castlepoint.

7      In reaching this conclusion Austin J. found that para. 22 of the agreement conflicts with or is contradictory to paras. 12 and 1(b) thereof and that para. 13(d) did not apply in the circumstances. He also purported to apply the contra proferentem principle to the interpretation of the agreement.

8      On this appeal Bramalea took the positions:

1.(a) That it was the intention of the parties under the agreement, read as a whole, to allow for reasonable extensions of time to complete units delayed by the practical realities of high-rise condominium development.

(b) That the exclusion of para. 22 under the contra proferentem rule would leave a gap in the agreement of purchase and sale inconsistent with the intentions and expectations of the vendor and purchaser.

2.(a) That a purchaser can avoid an agreement for the sale and purchase of a condominium unit where the inadequacy of a disclosure statement is so fundamental that a reasonable purchaser of the condominium would have exercised the right of rescission had the adequacy not existed, but no such fundamental inadequacy existed in this case.

(b) That if such a fundamental inadequacy existed it had been waived by the purchaser during the period when the contract was still executory.

9      The second position taken by Bramalea is not really a ground of appeal. Austin J. did not deal with it. Scanlon, as respondent, took the position that if Austin J. was in error with respect to the first ground, he was still entitled to the declaration by reason of the alleged inadequacy of the disclosure statement. It should be noted that this appeal was heard together with appeals in *Abdool v. Somerset Place Developments of Georgetown Ltd.* (1991), 4 O.R. (3d) 280 (Gen. Div.) , and *Budinsky v. Breakers East Inc.* (1992), 6 O.R. (3d) 255 (Gen. Div.) , in which extensive submissions were made with respect to the matter of adequacy of disclosure statements under the provisions of the *Condominium Act* . Reasons were released in those appeals on October 13, 1992 [reported at (1992), 10 O.R. (3d) 120 (C.A.) ], and the principles set forth therein are applicable to this appeal. There is no need to repeat here the reasoning for the conclusions reached in those cases.

**Facts Relating to Bramalea Position on Extension of Time**

10      On September 6, 1988, Scanlon presented an offer to purchase the condominium unit in question to Castlepoint Development Corporation. Castlepoint accepted the offer on September 16, 1988. The agreement of purchase and sale created upon the acceptance was on a form prepared by Castlepoint, which company determined the stipulations contained therein.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1992 CarswellOnt 633, [1992] O.J. No. 2692, 11 O.R. (3d) 744, 29 R.P.R. (2d) 60...

The condominium project comprised 504 dwelling units on 74 floors. The unit purchased by Scanlon is on the 37th floor of the building.

11      On December 22, 1988, Bramalea purchased the project from Castlepoint and received an assignment of Scanlon's purchase agreement. It commenced construction of the project in the month of February 1989. The date fixed for closing by the agreement (November 4, 1991), was approximately 37-1/2 months after acceptance of the offer.

12      On October 17, 1989, Scanlon executed two amendments to the purchase agreement with Bramalea. One amendment acknowledged receipt by him of revised floor plans of the unit and his consent to the changes. The other amendment confirmed the terms of the agreement and Bramalea agreed thereby to permit occupancy of the unit by a third party subject to the conditions set forth therein. The amendments were accepted by Bramalea on April 9, 1990.

13      Scanlon duly made all of the payments by way of deposit and on account of the purchase price in accordance with the terms of the agreement.

14      On or about May 31, 1991, Bramalea notified Scanlon in writing on its letterhead that "your revised occupancy date will now be September 14, 1992." The notice did not indicate any reason for the postponement of the occupancy date. The notice reads as follows:

*RE: PALACE PLACE, SUITE 3709*

Dear Palace Place Purchaser:

We are pleased with the construction progress of Palace Place. Over the past two years, construction has continued at a steady pace with the concrete structure now reaching the 34th floor, the exterior wall windows now at the 18th floor, and the drywall complete to the 4th floor. In June, the installation of the ceramics and the kitchen cabinets are scheduled to commence, and by November 1991 we anticipate completion of the roof.

We have rescheduled your closing date to coincide with the new construction program. The first closings will now commence in January of 1992 and as a result, your revised occupancy date will now be September 14, 1992.

Prior to your occupancy date, a letter will be forwarded to you regarding the details of your move-in. (Inspection appointments, booking elevator times, etc.)

Please forward a copy of this letter to your Solicitor to advise him/her of your revised occupancy date. If you have not as yet informed Bramalea Limited of your Solicitor's name, address, and telephone number, please advise us in writing as soon as possible. For your convenience, our fax number is 487-2779.

In the meantime, should you have any further inquiries or if I can be of any assistance to you, please call me at 480-8442 or fax us a letter to 487-2779.

Sincerely,

BRAMALEA LIMITED

          (signed)

          Ellie Moore,

          Customer Relations Manager,

          Residential Group.

WestlawNext CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-50    Filed 08/15/14    Page 183 of 279

Scanlon v. Castlepoint Development Corp., 1992 CarswellOnt 633

1992 CarswellOnt 633, [1992] O.J. No. 2692, 11 O.R. (3d) 744, 29 R.P.R. (2d) 60...

The revised occupancy date was more than four years after the date of presentation of the offer and if Bramalea's submission is valid, Scanlon was subject to further unilateral delays in that regard and also with respect to final closing of the transaction.

15     On August 7, 1991, Scanlon commenced his application under the *Vendors and Purchasers Act* , R.S.O. 1990, c. V.2; the *Condominium Act* , R.S.O. 1990, c. C.26, as amended, and Regulations made pursuant thereto and under the *Rules of Civil Procedure* for a declaration that the agreement is null and void. The grounds for the application were stated to be that Bramalea had terminated the agreement of purchase and sale by its anticipatory breach of the agreement and that the declarant had failed to make proper disclosure as required by s. 52 of the *Condominium Act* . In an affidavit filed in the proceedings the Vice-President of Finance of Bramalea stated that Bramalea realized it could not complete the project by the date stipulated and that the notice was sent as soon as it realized the situation. It is commonground that the unit was not substantially completed sufficient to permit occupancy on November 4, 1991.

16     Paragraph 25 of the agreement stipulates that time shall in all respect be of the essence thereof. Paragraph1(b) defines "closing date" or "closing." It states that those words mean "the 4th day of November, 1991 or as extended by para. 13(d)." The words are clear and unequivocal in their meaning. If either of the parties to the agreement desire to extend the date it must be done in accordance with the provisions of para. 13(d).

17     It is perhaps unnecessary to say that if the unit had been completed and the declaration and description registered on or before November 4, 1991, both parties would have been obligated to complete the transaction on that date (see para. 12). The definition of closing date makes that conclusion quite clear. If a party to the contract takes the position that the "closing date" or "closing" is a date other than November 4, 1991, it is necessary to show that the provisions of para. 13 support such a claim.

18     As is the case with the wording of para. 1(b), the wording of para. 13 is clear and unambiguous. By applying the definition of "closing," the opening words of that para. would read, "If the unit is substantially completed sufficient to permit occupancy on the 4th day of November, 1991, but the declaration and description have not been registered, then the purchaser shall occupy the unit on that date (the 'Occupancy Date') on the following terms and conditions:."

19     On their face, the provisions of para. 13 can become operative only if the unit is substantially completed sufficient to permit occupancy on November 4, 1991. If that condition had been fulfilled, the declaration and the description not having been registered, November 4, 1991 would be converted from "closing date" to "occupancy date." Scanlon would have been obliged to pay the balance of 25 per cent of the purchase price in accordance with the provisions of para. 2(a)(vi) or face the penalties and damages set out in para. 2(b). In such event, the provisions of paras. 1(b) and 13(d) read together would provide for the extension of the closing date of November 4, 1991 to a later date determined in accordance with the provisions of para. 13(d). Paragraph 2(b) is solely for the benefit of the vendor and is of a Draconian nature insofar as the purchaser is concerned. It provides as follows:

> 2.(b) Failure by the Purchaser to pay any of the sums required by Paragraph2 hereof or of any post-dated cheque to be honoured, shall be a default entitling the Vendor in its sole discretion to terminate this Agreement and retain all sums theretofore paid by the Purchaser as a pre-estimate of liquidated damages and not as a penalty, but without prejudice to the Vendor's right to bring such further or other action as may be available to it as a result of such breach.

20     There is nothing in the wording of para. 13 which extends the time for substantial completion of the unit sufficient to permit occupancy beyond November 4, 1991 and it is clear that Scanlon did not consent to any such extension. It is also clear that Bramalea could not substantially complete the unit by that date and in effect advised Scanlon of that fact by its notice. In those circumstances Scanlon would be entitled to a declaration that he was no longer bound by the agreement unless some other provision in the agreement entitled Bramalea to extend the occupancy date and closing date.

21     Bramalea relies on the provisions of para. 22 of the agreement of purchase and sale. It took the position that the contract must be read as a whole and that the provisions of para. 22 represent a modification of the provisions of 1(b) and 13 and do not conflict with them.

1992 CarswellOnt 633, [1992] O.J. No. 2692, 11 O.R. (3d) 744, 29 R.P.R. (2d) 60...

22      Specifically, Bramalea submitted that para. 13 converts "Closing Date" (pursuant to para. 1(b)) into "Occupancy Date" upon the unit being substantially completed and sufficient to permit occupancy on that date. At the date of such substantial completion (now "Occupancy Date"), Closing Date is redefined under para. 13(d) to be a date after registration of the condominium declaration and description. It then submitted that by para. 22 of the agreement the parties agreed that if substantial completion of the unit sufficient for occupancy purposes is delayed by the factors named therein (and occupancy is not possible on the closing date), closing date is extended to the date of actual completion, on which date para. 13 becomes operative and the extended closing date becomes the "Occupancy Date" pursuant to para. 13(d).

23      I am unable to agree with the second part of this submission. The provisions of para. 22 do not in any part thereof mention "substantial completion of the unit sufficient for occupancy purposes" being delayed by the factors named therein. Paragraph 22 speaks first of delay in "completion of the Unit or the common elements" by reasons of the factors named, permitting extension of time for completion and extension of the closing date. The unmodified use of the word "completion" in referring to a condominium unit connotes the performance of all the work necessary to fully construct the unit.

24      The agreement stipulates in para. 13(a) that Scanlon is obligated to occupy the unit and pay the balance due on closing without adjustments only upon substantial completion sufficient to permit occupancy. He cannot be compelled to close the transaction until the unit is fully completed and the declaration and description have been registered. If the purchaser has entered into occupation of the unit under para. 13 the vendor is obligated to complete the unit and register the declaration before the purchaser can be compelled to close the transaction. Scanlon takes the position that the first sentence of para. 22 refers to an extension of time for such final completion and an extended closing date if such completion is delayed by any of the factors mentioned and that it only becomes operative when a purchaser has entered into occupation after substantial completion in accordance with the provisions of para. 13.

25      He submitted that this interpretation is strengthened by the wording of para. 22 which provides that if the vendor is unable to complete the unit and close the transaction within the extended time or times for closing, all money paid by the purchaser *other than any occupancy fee* shall be returned to him. Since an occupancy fee is payable only after the purchaser has occupied the unit, pursuant to the provisions of para. 13(b), it is reasonable to interpret the words "completion of the unit" as referring to work required to bring the unit from a state of substantial completion sufficient to permit occupancy, to one of full completion.

26      I agree with these two submissions made by Scanlon.

27      It is to be noted that para. 22 of the agreement is an exculpatory paragraph insofar as the vendor is concerned. If the correct interpretation of the clause is that it becomes operative only if the unit is substantially completed sufficient to permit occupancy on November 4, 1991 but the closing has not taken place, the vendor cannot be held responsible for any delays in fully completing the unit or common elements if the delays have resulted from the stated causes, or any causes even if they were within the control of the vendor. In the absence of such clause the purchaser would be able to terminate the contract and claim for damages.

28      The last two sentences of para. 22 are also exculpatory. Scanlon submits that those sentences mean that, the agreement being then ongoing, which would require a previous occupation date and an extended closing date twenty days after notice to the vendor of the registration of the declaration and description, the vendor is entitled to compel the purchaser to complete the transaction even though there has been only substantial completion of the unit rather than full completion.

29      In effect, the position taken by Scanlon is that "substantial completion" as used here can only refer to a situation where the purchaser has entered into occupation under para. 13. If the words "substantial completion" were interpreted to mean a state less than substantial completion sufficient to permit occupancy on closing, the provision would be a direct contradiction of para. 13, on which a purchaser is entitled to rely in determining the closing date. He cannot be compelled to close the transaction before the unit is substantially completed sufficient to permit occupancy. The words can only apply to a situation where the unit has reached a state of substantial completion sufficient to permit occupancy, the declaration and description have been registered but the unit is not yet fully completed.

Scanlon v. Castlepoint Development Corp., 1992 CarswellOnt 633

1992 CarswellOnt 633, [1992] O.J. No. 2692, 11 O.R. (3d) 744, 29 R.P.R. (2d) 60...

30    In my opinion, the two sentences of para. 22 last considered relate to a situation where the purchaser has entered into occupation under para. 13, and the declaration and description have been registered enabling a vendor to establish an extended closing date and requiring the purchaser to complete the transaction although the unit is not fully completed. Substantial completion in this case would be a state at least equal to substantial completion sufficient to permit occupancy but less than full completion.

31    I am of the view that there is nothing in the agreement and other material filed to support the submission of Bramalea that the parties agreed that if substantial completion of the unit sufficient for occupancy purposes is delayed by the factors named therein, closing date is extended to the actual date of completion. If the interpretation sought by Bramalea is the correct one, it may be that, as found by Austin J., it would contradict the provisions of paras. 1(b) and 13. At the very least, from the standpoint of Scanlon, there is an ambiguity in para. 22 in this regard and in applying the contra proferentem principle (of which more will be said later). I would adopt the interpretation of the paragraphs more favourable to Scanlon.

32    Bramalea in its factum and oral argument made substantial submissions to the effect that Scanlon understood that the "closing date" in para. 1(b) of the agreement was the proposed date on which he would go into occupancy and that final closing would be after registration of the condominium declaration and description notwithstanding para. 12 of the agreement. It further asserted that lower floors of high-rise condominiums are completed several months prior to completion of upper units for occupancy purposes and that condominium unit purchasers in the Metropolitan Toronto Area generally understand the necessity, particularly in high-rise condominium developments, of a delay between substantial completion of the unit ready for occupancy and the date on which title to the unit can be transferred.

33    Although it is open to serious doubt whether the understanding of condominium purchasers generally can or should be imputed to a particular purchaser, it is not important for the purposes of this appeal. Scanlon acknowledges that under para. 13, in proper circumstances, the original closing date becomes occupancy date and a new closing date is to be determined in accordance with the terms thereof. His position is simply that under the agreement he expected and was entitled to have his unit substantially completed sufficient to permit occupation on or before November 4, 1991.

34    Having regard to the fact that the original date set for closing (and for occupation) was more than three years after presentation of his offer, such expectation cannot be said to be unrealistic nor unreasonable. A purchaser might reasonably conclude that the vendor had made due allowance for delays which might be encountered in the completion of the project sufficient for occupancy. The right of the vendor to extend the closing date for a period in excess of that provided by para. 1(b) and 13, if it exists at all, must be found in the agreement.

35    I have already dealt with Bramalea's first submission with respect to para. 22. It further submitted, based on an affidavit of a solicitor filed, that paragraphs similar to para. 22 are commonly used in high-rise condominium construction to permit the vendor reasonable flexibility to complete the building because of delays which may occur during the construction process. The solicitor's affidavit stated, in part, at para. 9: "Paragraph 22 of Schedule A to the agreement is a commonly used and overriding provision which contemplates delays. ..."

36    Even if this were so, the fact that it is commonly used does not derogate in any way from the rights of Scanlon to have it interpreted in the light of the other provisions of the agreement. Although the solicitor was not cross-examined on his affidavit, I am not prepared to accept that para. 22 in its exact form is commonly used. Bramalea did not state that it had used this paragraph or a similar paragraph in its own agreements dealing with other projects. Such an allegation would not have strengthened its case in any event but it is interesting to note that counsel for Bramalea stated that the words in para. 22 indicate an intention to allow only for reasonable extensions of time. It should be noted that Bramalea was not the author of the agreement but as assignee thereof it takes the detriment along with any benefit that might enure to it as assignee.

37    As just noted, counsel for Bramalea on this appeal submitted that para. 22 of the agreement should be interpreted to provide only for reasonable extensions of the date for closing resulting from causes other than deliberate bad faith. He was, however, in effect, suggesting that in interpreting this paragraph, the court should add to it words not included in it. The fact

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Scanlon v. Castleport Development Corp., 1992 CarswellOnt 633

Case 09-10138-MFW    Doc 14225-50    Filed 08/15/14    Page 186 of 279

1992 CarswellOnt 633, [1992] O.J. No. 2692, 11 O.R. (3d) 744, 29 R.P.R. (2d) 60...

that a vendor (through its assignee) consents to a less strict interpretation of a paragraph in an agreement not warranted by its actual wording and in fact contradicting such wording, does not assist it in obtaining an interpretation more favourable to it in other respects after it has been executed and acted upon.

38      If the position which Bramalea takes prevails to the effect that paras. 22 and 13(d) involve two completely different situations which are complementary and not contradictory, it would mean, to use the words of the intervenor Kopman, that Bramalea could extend the time for closing at any time that it wished, as often as it wished and for any reason that it wished, even though it is unable to complete by reason of causes for which it is solely to blame. It would be difficult to characterize this interpretation as a fair and reasonable one from the purchaser's standpoint.

39      I am satisfied that para. 22 in the broad form used in the agreement under consideration is not in common use. The material filed does not disclose the use of such a broad paragraph in any particular agreement. On the contrary, although some of the agreements, which formed the subject matter of the appeals heard together with this appeal and the subject matter of cases cited to us, contained provisions relating to subject matter similar to that contained in para. 22, none of such paragraphs were unrestricted as to cause of delay and length of extension of closing date in the manner set forth in para. 22.

40      Furthermore, Bramalea takes the position that, in determining the interpretation of para. 22, the court must look at the agreement as a whole and that the courts have applied provisions in agreements of purchase and sale of a condominium unit extending the completion date for reasons such as strikes, fire and other acts of God, and engineering difficulties, as enforceable against purchasers of those units.

41      In support of this submission Bramalea cited *Morris v. Cam-Nest Developments Ltd.* (1988), 64 O.R. (2d) 475 (H.C.) , where the court held that the vendor was entitled to invoke the provisions of para. 15 of the agreement, as was done, to extend the date for closing set out in para. 4. The provisions of those paragraphs are set forth on p. 482, as follows:

    4. This agreement shall be completed on July 26, 1982, or any extended date as herein provided.

                                            . . . . .

    15. If the completion of the Unit or the common elements is delayed by reason of strikes, lock-outs, fire, lightning, tempest, riot, war and unusual delay by common carriers or unavoidable casualties, or by any other cause of any kind whatsoever beyond the control of the Vendor, ... the Vendor shall be permitted a reasonable extension or extensions of time for completion ... and the date of closing shall be extended accordingly.

42      I do not doubt the correctness of that decision and that it supports the proposition for which it was cited. It has, however, only limited application to the case at bar. In that case, as in all the other cases cited to the court, the agreements under consideration do not contain a definition of "closing date" or "closing" as set forth in para. 1(b) of the subject agreement incorporating therein by reference the provisions of para. 13(d). It must also be noted that para. 15 clearly falls within the extension provision of para. 4 and that the grounds for extension are clearly limited to causes beyond the control of the vendor, and only reasonable extension or extensions are permitted. Obviously, provisions for extended closing dates or extended dates for occupation are enforceable provided that the terms of the agreement for purchase and sale clearly indicate the intention of the parties to give to the vendor the right to ask for the extension in the circumstances therein set forth.

43      In the *Abdool* appeal, heard at the same time as this appeal (although the point under discussion was not in issue in that appeal), the agreement for purchase and sale set out in para. 2(a) the specific date for occupation as "the 1st day of September, 1989 or such extended date pursuant to the terms hereof that the unit is substantially completed by the vendor for occupancy by the purchaser."

44      The agreement did not contain a definition paragraph such as para. 1(b) of the subject agreement, and the provision quoted made it clear that the occupation date was subject to being extended.

45      Paragraph 18 of the *Abdool* agreement permitted the vendor to extend the closing date for any reason other than wilful neglect of the vendor for such reasonable periods of time not exceeding 24 months in aggregate.

Scanlon v. Castleport Development Corp., 1992 CarswellOnt 633

1992 CarswellOnt 633, [1992] O.J. No. 2692, 11 O.R. (3d) 744, 29 R.P.R. (2d) 60...

46    Paragraph 21 of the agreement provided, inter alia, that if the completion of the unit or common elements is delayed by any reason whatsoever, then the vendor shall be permitted a reasonable extension or extensions of time for giving occupancy or completing the Unit from time to time in accordance with the terms of para. 18.

47    In the *Budinsky* appeal, also heard at the same time as this appeal (although the point under discussion was also not in issue in that appeal), a specific date for closing was set out in the agreement. It also provided for occupancy by the purchaser if the unit was substantially completed to permit occupancy on the date set for closing or prior thereto. By para. 8(a) it provided:

> 8.(a) If the completion of the Unit should be delayed for any reason whatsoever, other than wilful neglect of the Vendor, so that the Purchaser cannot be given possession thereof on the earlier of Occupancy Date or Closing Date, then the Vendor, at its sole option, shall be entitled to extend the Occupancy Date for one or more periods of time which the Vendor, in its sole discretion considers reasonable, such periods, not to exceed (18) months.

48    Reference was made by the parties to the case of *Di Cecco v. 733725 Ontario Inc.* , an unreported decision of Fedak J. released on December 21, 1990 and affirmed by this court on May 21, 1991. The agreement under consideration in that case did not contain a definition of "closing date." Paragraph 4 thereof set out a specific closing date. Paragraph 17, which has some similarity to para. 22 of the subject agreement, provided for the right of the vendor to have reasonable extensions of time for completion for causes beyond the control of the vendor and to extend the closing date accordingly. It gave the vendor in addition to, or in lieu of the foregoing extensions, if any, the right to extend closing for a period not exceeding 15 months by giving notice as therein stated.

49    The agreements in these four cases, chosen at random by me, are illustrative of the fact, confirmed by an examination of the agreements under consideration in the various condominium cases cited to the court on the appeals, that para. 22 is not one in common use in condominium sale agreements. They indicate that where it was the intention of the vendor that it shall have right to extend the date for substantial completion of the unit sufficient to permit occupancy or the closing date, it was set forth clearly in the agreement. In addition, a definition of closing date as in para. 1(b) of the subject agreement was not contained in any of those agreements nor considered in any reported cases. Accordingly, the interpretation of the agreement must be approached by applying the principles of contract interpretation to the specific wording of the subject agreement.

**Application of Law to the Agreement**

50    In *Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.*, [1980] 1 S.C.R. 888 , Estey J. said, at p. 901, in delivering the majority judgment of the court:

> Even apart from the doctrine of *contra proferentem* as it may be applied in the construction of contracts, the normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. Consequently, literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted. Where words may bear two constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation of the policy which promotes a sensible commercial result.

51    Where a contract is ambiguous, the normal rules of construction may be supplemented by the application of the contra proferentem rule of construction. In *Hillis Oil & Sales Ltd. v. Wynn's Canada Ltd.*, [1986] 1 S.C.R. 57 , Le Dain J. said, at pp. 68-69, in delivering the judgment of the court:

> Given this ambiguity as to whether the distributor's agreements could be terminated pursuant to clause23 with immediate effect or whether such termination could take effect only upon reasonable notice, I also agree with Richard J. that it should be resolved against Wynn's and in favour of Hillis by application of the *contra proferentem* rule of construction. It is true

Scanlon v. Castlepoint Development Corp., 1992 CarswellOnt 633

1992 CarswellOnt 633, [1992] O.J. No. 2692, 11 O.R. (3d) 744, 29 R.P.R. (2d) 60...

that this rule has been most often invoked with reference to the construction of insurance contracts, particularly clauses in such contracts purporting to limit or exclude the insurer's liability. Statements of the rule and its application in such cases may be found in the decisions of this court in *Consolidated-Bathurst, supra* , and *McClelland and Stewart, supra* . The rule is, however, one of general application whenever, as in the case at bar, there is ambiguity in the meaning of a contract which one of the parties as the author of the document offers to the other, with no opportunity to modify its wording. The rule is stated in its general terms in *Anson's Law of Contract* (25th ed. 1979), at p. 151, as follows:

> The words of written documents are construed more forcibly against the party using them. The rule is based on the principle that a man is responsible for ambiguities in his own expression, and has no right to induce another to contract with him on the supposition that his words mean one thing, while he hopes the Court will adopt a construction by which they would mean another thing, more to his advantage.

The rule is also stated in general terms by Estey J. in *McClelland and Stewart, supra* , at p. 15 as follows:

> That principle of interpretation applies to contracts and other documents on the simple theory that any ambiguity in a term of a contract must be resolved against the author if the choice is between him and the other party to the contract who did not participate in its drafting.

52      As stated previously, the closing date by definition was November 4, 1991. This carries with it the obligation of the vendor to complete the unit by that date. By definition, the only provision for extending such date is under para. 13 which is applicable only if the unit had been substantially completed sufficient to permit occupancy. In effect, para. 13 establishes such substantial completion as a prerequisite to an extension of the closing date from November 4, 1991.

53      Scanlon submitted that para. 13 does not address completion (i.e., "total completion" or "substantial completion" as opposed to "substantial completion sufficient to permit occupancy") of the unit; nor does it address the completion of the common elements, including amenities. Paragraph 1(b) makes no reference to para. 22. Paragraph 22 does not refer to occupancy nor to substantial completion of the units sufficient to permit occupancy. It does not by its words purport to supersede para. 13 in any way.

54      Bramalea takes the position that para. 22 becomes operative when the vendor has failed for any reason (other than deliberate bad faith) to substantially complete the unit sufficient to permit occupancy on November 4, 1991. Scanlon takes the position that para. 22 becomes operative only where there has been such completion but full completion or substantial completion (not modified by the words "sufficient to permit occupancy") has been delayed by the factors set forth therein.

55      In considering the contract as a whole, even without the application of the contra proferentem rule, I would be inclined to agree with the submission made by Scanlon. In *Barchak Estate v. Anderson*, [1945] 1 W.W.R. 657 (Alta. C.A.) , Ford J.A. said, at p. 669, in delivering the majority judgment of the court:

> The best construction of all written instruments is to make all parts agree. The instrument must be construed as a whole and the words of each clause must be so interpreted as to bring it into harmony with the other provisions of the document.

56      Although it may not be possible to do so in all cases, I agree that where there are two possible interpretations of a paragraph it should be interpreted to bring it into harmony with the other provisions of the document and all the more so where the application of the contra proferentem rule supports such a result.

57      I am satisfied that taken in the context of the agreement as a whole, there is an ambiguity with respect to the conditions under which the provisions of para. 22 apply. If one applies the general rule of construction stated by Estey J. in *Consolidated-Bathurst* , supra, viz., that where words may bear two constructions, the more reasonable result, that which produces a fair result, must be taken as the one which would promote the intention of the parties, the position of Scanlon must prevail.

58      On his interpretation of the agreement he would be entitled to no more and no less than substantial completion of the unit sufficient to permit occupancy on November 4, 1991. That is a period more than three years after acceptance of the offer,

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Scanlon v. Castlepoint Development Corp., 1992 CarswellOnt 633

Case 09-10138-MFW    Doc 14225-50    Filed 08/15/14    Page 189 of 279

1992 CarswellOnt 633, [1992] O.J. No. 2692, 11 O.R. (3d) 744, 29 R.P.R. (2d) 60...

and would not be an unreasonable expectation on his part. Similarly, it would not be an unreasonable burden to place on the developer (Bramalea), which is in a position to contract for a closing date that would allow a sufficient cushion for delays which may be encountered on a realistic basis.

59      On Bramalea's interpretation of the agreement, Scanlon, who would reasonably expect to occupy the premises on November 4, 1991, would be put in the position of having his right to occupy the unit and close the transaction delayed for an indefinite period of time for any reason whatsoever. It is difficult to imagine a more unfair result. As previously stated, counsel for Bramalea on the appeal appeared to recognize the unfairness of such an interpretation and stated that the causes for delay must not be occasioned by bad faith and that the extension or extensions of the date must be for a reasonable time. The fact remains, however, that the court is being asked to amend ex post facto a term in an agreement drafted by the vendor.

60      The agreement under consideration was prepared by the original vendor. Its terms are drawn in a manner substantially to protect its interest. The purchaser is required to make his payments on account and to take possession and close the transaction on the dates and times specified. He is given no discretion to delay for any reason without suffering a loss of payments on account and incurring liability for damages. The agreement is replete with provisions exculpatory in nature and giving discretion for extensions of time all of which are favourable to the vendor, and with provisions which require strict compliance with time limits by the purchaser and the payment of damages and forfeiture of money by reason of lack of compliance on the part of the purchaser. It is heavily weighted in favour of the vendor. It is a classic case for the application of the contra proferentem principle which I find to be applicable because of the ambiguity.

61      It was pointed out during the hearing of this appeal that as a matter of fact the delay was caused by structural problems with respect to providing a solid foundation, and by the extremely sophisticated technology involved in building the structure requiring equipment "from overseas." Scanlon was not told of the reason for the delay in the notice extending the closing date nor thereafter until an officer of Bramalea was cross-examined in these proceedings on September 4, 1991.

62      In my opinion, the fact that the delay was caused by a factor which may have been beyond Bramalea's control and that the extension was to be for a period of nine months is really not relevant to the rights of the parties. The extended occupancy date would not have given occupation to Scanlon until four years after he had executed the offer and if para. 22 became operative by superseding or modifying paras. 1(b) and 13, he might be faced with additional delays. The rights of the parties under the contract must be determined by the terms of the agreement at the time of its execution. The fact that the delay in issue did not occur as a result of bad faith on the part of Bramalea does not assist in the interpretation of the contract.

63      By the application of the general rule of construction of contracts and the contra proferentem rule, I interpret para. 22 in accordance with Scanlon's submission. By interpreting the agreement in the manner set forth in these reasons, there is no contradiction between para. 22 and para. 1(b), meaning is given to all parts of para. 22 and its provisions are then fair and reasonable for the purchaser. In effect, that means that it does not contradict the provisions of paras. 1(b) and 13 but rather, covers a different situation, and to that extent my reasons differ with those of Austin J. The result, however, is the same. I conclude that Bramalea was obligated to substantially complete the unit purchased by Scanlon sufficient to permit occupancy by November 4, 1991, that time was of the essence, that Bramalea acknowledged by its notice that it could not comply with this term of the agreement and that that constituted an anticipatory breach entitling him to the declaration granted by Austin J.

64      There is no doubt that a vendor of a condominium unit which is to be erected or is in the process of being erected can, by contract, provide that a proposed occupancy date and closing date be postponed or extended for whatever reasons are therein set out, subject to any statutory provisions which may be applicable. As indicated, this agreement failed to make such a provision.

**Adequacy of Disclosure Statement**

65      Scanlon took the position in the proceedings in the original application and on this appeal that even if he was unsuccessful in persuading the court with respect to the interpretation of the agreement of purchase and sale, he was entitled to the declaration sought on the ground that Bramalea (and its predecessor Castlepoint) had failed to comply with the provisions of the *Condominium Act*, R.S.O. 1980, c. 84, by failing to deliver to him a current disclosure statement and all material amendments

Case 09-10138-MFW    Doc 14225-50    Filed 08/15/14    Page 190 of 279

Scanlon v. Castlepoint Development Corp., 1992 CarswellOnt 633

1992 CarswellOnt 633, [1992] O.J. No. 2692, 11 O.R. (3d) 744, 29 R.P.R. (2d) 60...

thereto. Section 52(1) provides that an agreement of purchase and sale is not binding on the purchaser until the declarant has delivered the statement to the purchaser.

66    In view of the conclusion which I have reached with respect to the interpretation of the agreement, it is not necessary that I deal with this matter in order to determine the outcome of this appeal. It seems to me, however, that in view of the substantial submissions which were made by the various participants in the appeal with respect to this matter, I should address that matter.

67    The questions of the nature of the disclosure statement, the extent of the disclosure requirement, the brevity or fullness of the statement, and generally that which is necessary in order that a statement be deemed to have complied with the Act, were dealt with extensively by this court in the *Abdool* and *Budinsky* appeals (released October 13, 1992). We have also dealt in those appeals with the effect of the failure of a purchaser to rescind an agreement within 10 days after receipt by him of the disclosure statement on his right to declare an agreement non-binding on the ground that the statement did not constitute a disclosure statement within the meaning of the Act.

68    There is no point in repeating in this case the reasons which support the principles espoused in those appeals. These principles, however, must be applied to the individual facts of each case in order to determine whether the statement is one that constitutes a disclosure statement having regard to the requirements of the Act.

69    In *Abdool* and *Budinsky* , the court established the principle to be applied where a purchaser, who has not rescinded an agreement during the 10-day cooling-off period provided by the Act, seeks to resile from the agreement later on the basis of deficiencies in the disclosure statement. That principle is that the onus is on the purchaser to prove objectively that had the information that was not disclosed or was inaccuately or insufficiently disclosed, been properly disclosed in the disclosure statement at the time it was delivered to the purchaser, a reasonable purchaser would have regarded the information as sufficiently important to the decision to purchase that he or she would not likely have gone ahead with the transaction but would have rescinded the agreement before the expiration of the 10-day cooling-off period.

70    In *Abdool* and *Budinsky* , this court held that the purchasers failed to discharge the onus on the basis of the deficiencies therein alleged. In the case at bar, two novel deficiencies are alleged with which I will now deal.

71    First, the complaint is made that Castlepoint failed to comply with s. 52(6)(*c* ) of the Act. That subsection reads as follows:

(6) The disclosure statement referred to in subsection (1) shall contain and fully and accurately disclose,

. . . . .

(*c* ) the portion of units or proposed units which the declarant or the proposed declarant intends to market in blocks of units to investors.

The disclosure statement contained a heading and paragraph as follows:

**Marketing of Blocks of Units**

The declarant reserves the right to market all of the units in the condominium in one or more blocks to investors.

72    A purchaser who was genuinely concerned about buying a unit in a condominium in which one or more blocks might be sold to investors would be immediately put on notice of that possibility by this paragraph. If it were a matter of importance to the purchaser, one would reasonably expect that he or she would rescind the agreement within the 10-day period. Although the paragraph may not be in strict compliance with the provisions of s. 52(6)(*c* ), I am satisfied that the deficiency is not one that if brought to his knowledge would have caused him to rescind within the 10-day period. He knew immediately that some or all of the remaining units might be sold in blocks of units to investors.

73    Second, the complaint is made that Bramalea failed to comply with s. 52(6)(*d* ) of the Act. That subsection reads as follows:

(6) The disclosure statement referred to in subsection (1) shall contain and fully and accurately disclose,

1992 CarswellOnt 633, [1992] O.J. No. 2692, 11 O.R. (3d) 744, 29 R.P.R. (2d) 60...

. . . . .

(*d* ) a brief narrative description of the significant features of the existing or proposed declaration, by-laws and rules governing the use of common elements and units, and of any contracts or leases that may be subject to termination or expiration under section 39.

The disclosure statement set out a list of recreational and other amenities provided for the use of owners and occupants of the dwelling units.

74     Under the heading "Rules governing the use of the units and common elements," the disclosure statement contained the following:

The rules governing the use of the common elements and units are made for the purpose of promoting the safety, security and/or welfare of the owners and/or for the purpose of preventing unreasonable interference with the use and enjoyment of the common elements and of other units. The Board of Directors makes the rules and can change them, but the owners by majority vote of those present at an owners' meeting may in turn change the rules made by the Board of Directors.

Scanlon was provided with a copy of the proposed rules governing the use of the common elements. By para. 4.00, under the heading "Recreation Area," they provided:

Rules pertaining specifically to the use and operation of the recreation facilities will be promulgated by the board and communicated to the owners or posted in the recreational areas and anyone entering the recreation facilities must comply with such rules, as if they were included herein.

75    Finally, Scanlon was provided with a copy of the proposed declaration. By Article IV thereof it provided under the heading "Use of common elements" that "subject to the provisions of the Act, the declaration, the by-laws and the rules, each owner has the full use, occupancy and enjoyment of the whole or any part of the common elements, except as therein otherwise provided." It further provided that the Board shall be entitled to determine from time to time on terms and conditions satisfactory to it, the basis upon which the guest suites, meeting rooms, conference rooms, executive business centre, racquetball and squash courts, may be utilized by the owners and/or occupants of the dwelling units including any changes to be made for the use thereof.

76     Although the disclosure statement does not appear to wholly comply with the provisions of s. 52(6)(*d* ) in the sense that it does not give a narrative description of the significant features of the rules governing the use of common elements, it does point out what is, perhaps, the most significant feature of those rules, viz., that the owners by majority present at a meeting can make and change the rules. The existing rules or lack of rules have less significance when it is made clear that the owners will in due course determine what the rules will provide. It would have been better if the disclosure had indicated that no rules had been made or proposed in connection with the recreational facilities but I am of the view that if a reasonable purchaser were given a more detailed narrative of the rules or lack thereof, he would not have rescinded the agreement having regard to the fact that it was disclosed to him that the Board and finally the owners have the final say as to what those rules will be.

77     Taking into consideration these two novel deficiencies and the other deficiencies alleged by Scanlon, I would find that he has not satisfied the onus required to be fulfilled by the principle laid down in the *Abdool* and *Budinsky* appeals.

78     For the reasons I have given respecting Bramalea's delay, I would dismiss the appeal with costs.

**Robins J.A. (*Morden A.C.J.O.* concurring):**

79     I respectfully disagree with Mr. Justice Goodman's interpretation of the agreement of purchase and sale in issue in this appeal. For the reasons which follow, I am of the opinion that the appellant was not guilty of an anticipatory breach of the agreement and that this appeal should accordingly succeed.

**The Facts**

1992 CarswellOnt 633, [1992] O.J. No. 2692, 11 O.R. (3d) 744, 29 R.P.R. (2d) 60...

80      The facts, reduced to their essentials, may be stated briefly. On September 16, 1988, the respondent Scanlon entered into an agreement with a company known as Castlepoint Development Corporation to purchase a luxury condominium unit on the 37th floor of a proposed residential condominium project to be located on Palace Pier Court on the waterfront of Lake Ontario in Metropolitan Toronto. Construction of the project, which is known as "Palace Place," had not yet been commenced. When completed, Palace Place was to be a 47-storey building containing 504 residential units, parking and storage facilities, and recreational and other amenities.

81      On December 22, 1988, Castlepoint sold the project to the appellant Bramalea Limited. Bramalea received an assignment of the respondent's agreement of purchase and sale and all other agreements of purchase and sale entered into by Castlefield. For all purposes relevant to this appeal, Bramalea now stands in the place and stead of Castlefield and may therefore be treated as though it were the vendor originally named in the agreement.

82      Under the terms of the agreement, the "Closing Date" or "Closing" is defined in paragraph 1(b) as meaning "the 4th day of November, 1991 or as extended by Paragraph 13(d)." Paragraph 12 provides that the transaction is to be completed on the "Closing Date." If, however, the unit is "substantially completed sufficient to permit occupancy on Closing but the description and declaration have not been registered" (as is required by the *Condominium Act* , R.S.O. 1990, c. C.26 (the "Act")), para. 13(d) provides that the purchaser is to occupy the unit on the terms and conditions set out in para. 13. "[T]he Closing Date" would then be extended "to a date 20 days after notice in writing is given by the Vendor's Solicitor to the Purchaser or his Solicitor that the declaration and description have been registered." Paragraph 22 permits the vendor to extend the closing date where completion of the unit or the common elements is delayed. The disclosure statement which accompanied the agreement, and which, of course, is mandated by the Act, projected the date for completion of the amenities and recreational areas as "approximately December 31, 1993."

83      Bramalea commenced construction in February 1989. It appears that the work progressed as planned save for a problem encountered in laying the foundations for the building. Unexpected soil conditions evidently required Bramalea to import sophisticated equipment from overseas to erect the structure. As a result, the construction overall was delayed by approximately ten months. By May 1991, the work had progressed to the point where the concrete structure had reached the 34th floor, the building had been enclosed up to the 18th floor, and the drywall had been completed to the 4th floor. By this stage, it was apparent that the building or, more specifically, the respondent's proposed unit, would not be completed by the November 4, 1991 closing date.

84      On May 31, 1991, Bramalea advised the respondent of the stage to which construction had progressed. Bramalea notified him that the first closings would commence in January of 1992 and that the new "closing date" for his 37th floor unit was being rescheduled so that his "revised occupancy date" would be September 14, 1992. The respondent responded to this notice on August 4, 1991, by the commencement of this application seeking: (1) a declaration that the agreement of purchase and sale was void on the ground that Bramalea's unilateral extension of the closing date constituted an anticipatory breach of the agreement entitling the respondent to terminate the agreement; and (2) a declaration that the agreement was not binding on the ground that the disclosure statement failed to satisfy the requirements of s. 52 of the *Condominium Act* , R.S.O. 1980, c. 84. I agree with my learned colleague's disposition of the disclosure statement issue and need make no further reference to it.

85      The application came on for hearing before Austin J., coincidentally, on November 4, 1991 [reported at (1992), 85 D.L.R. (4th) 443 (Ont. Gen. Div.) ]. Accepting the respondent's contentions, the learned judge declared the agreement null and void on the basis that the closing date as defined by clause 1(b) is a fundamental term of the contract, and that Bramalea's unilateral extension of that date accordingly constituted an anticipatory breach of the contract. In his view, para. 22, upon which Bramalea relied, is in conflict with or contradictory to para. 1(b) and para. 12. "If it had been the intention of the parties that clause 22 override the others, then," the judge concluded, "clause 1(b) would have read, 'or as extended by Paragraphs 13(d) and 22'." In essence, he held that the November 4th closing date could be extended only pursuant to clause 13(d) and for no other reason. Bramalea now appeals from that order.

Case 09-10138-MFW    Doc 14225-50    Filed 08/15/14    Page 193 of 279

Scanlon v. Castlepoint Development Corp., 1992 CarswellOnt 633

1992 CarswellOnt 633, [1992] O.J. No. 2692, 11 O.R. (3d) 744, 29 R.P.R. (2d) 60...

86      Leave to intervene in the appeal was granted to seven condominium unit purchasers represented collectively by Mr. Goldenberg, and to Stanley Kopman, a purchaser of 24 condominium units. The intervenors support the positions advanced by the respondent.

## The Agreement of Purchase and Sale

87      I shall, for ease of reference, reproduce the provisions of the agreement most relevant to the anticipatory breach of contract issue. They are as follows:

1. The following definitions shall apply to this Agreement:

. . . . .

(b) "Closing Date" or "Closing" means the 4th of November, 1991 or as extended by Paragraph 13(d).

. . . . .

12. The transaction of purchase and sale is to be completed on the Closing Date.

13. If the Unit is substantially completed sufficient to permit occupancy on Closing, but the declaration and description have not been registered, then the Purchaser shall occupy the Unit on that date (the "Occupancy Date") on the following terms and conditions:

. . . . .

(d) the Closing Date shall be extended to a date 20 days after notice in writing is given by the Vendor's Solicitors to the Purchaser or his Solicitor that the declaration and description have been registered. If the Purchaser fails to close the transaction as aforesaid, through no fault of the Vendor, the Purchaser shall be in default hereunder, and shall be required to deliver vacant possession of the Unit. The Vendor shall in that event be entitled to retain all monies paid hereunder for damages and expenses and unpaid occupation charges. The Purchaser shall be responsible for the damages and expenses and the cost of redecorating as may be determined by the Vendor at its sole discretion as a result of the possession herein.

. . . . .

22. If the completion of the Unit or the common elements is delayed by reasons of strikes, lock-outs, fire, lightning, tempest, riot, war and unusual delay by common carriers or unavoidable casualties or by any other cause of any kind whatsoever whether or not beyond the control of the Vendor, the Vendor shall be permitted extensions of time from time to time for completion and the Closing Date shall be extended accordingly. If the Vendor is unable to complete the Unit and close this transaction within such extended time or times for closing, all monies paid hereunder by the Purchaser other than any occupancy fees, shall be returned to him and this Agreement shall be null and void. If the unit is substantially completed by the Vendor on or before Closing or any extension thereof as aforesaid, this transaction shall be completed on such date notwithstanding that the Vendor has not fully completed the Unit or the common elements and the Vendor shall complete such outstanding work within a reasonable time after Closing, having regard to weather conditions and the availability of labour and materials. In any event the Purchaser acknowledges that failure to complete the common elements on or before Closing shall not be deemed to be a failure to complete the Unit.

25. This offer when accepted shall constitute a binding contract of purchase and sale and time shall in all respects be of the essence hereof.

## The Applicable Rules of Construction

88      Before considering the contractual provisions which are in dispute, I remind myself of certain well established rules of construction applicable to the issue at hand. The agreement with which we are concerned is a negotiated commercial document which should be construed in accordance with sound commercial principles and good business sense. To the extent that it is possible to do so, it should be construed as a whole and effect should be given to all of its provisions. The provisions should be read, not as standing alone, but in light of the agreement as a whole and the other provisions thereof: *Hillis Oil & Sales Ltd.*

WestlawNext® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Scanlon v. Castlepoint Development Corp., 1992 CarswellOnt 633

Case 09-10138-MFW    Doc 14225-50    Filed 08/15/14    Page 194 of 279

1992 CarswellOnt 633, [1992] O.J. No. 2692, 11 O.R. (3d) 744, 29 R.P.R. (2d) 60...

*v. Wynn's Canada Ltd.*, [1986] 1 S.C.R. 57 , at p. 66. The court should strive to give meaning to the agreement and "reject an interpretation that would render one of its terms ineffective": *National Trust Co. v. Mead*, [1990] 2 S.C.R. 410 , at p. 425.

89     The court is "to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract": *Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.*, [1980] 1 S.C.R. 888 , at p. 901; see also *McClelland & Stewart Ltd. v. Mutual Life Assurance Co. of Canada*, [1981] 2 S.C.R. 6 , at p. 19. In searching for the intention of the parties, the court should give particular consideration "to the *terms* used by the parties, the *context* in which they are used and ... the *purpose* sought by the parties in using these terms": *Métropolitaine, Cie d'assurance-vie c. Frenette*, [1992] 1 S.C.R. 647 , at p. 667.

90     In the event that the court is unable to resolve a contradiction or ambiguity in the terms of a contract, the language of the contract will be construed against its author in accordance with the contra proferentem rule: *Consolidated Bathurst Export Limited v. Mutual Boiler and Machinery Insurance Company* , supra, at p. 901. "The rule is ... one of general application whenever ... there is ambiguity in the meaning of a contract which one of the parties as the author of the document offers to the other, with no opportunity to modify its wording": *Hillis Oil & Sales v. Wynn's Canada* , supra, at pp. 68-69. However, resort is to be had to the contra proferentem rule "only when all other rules of construction fail to enable the Court of construction to ascertain the meaning of a document": *Reliance Petroleum Ltd. v. Stevenson*, [1956] S.C.R. 936 , at p. 953; *Consolidated Bathurst* , supra, at p. 901.

91     With those general principles in mind, I turn to the issue which is the basis of this appeal.

**Does the Agreement of Purchase and Sale Permit Bramalea to Extend the Time for Completion or Substantial Completion of the Respondent's Unit to September 14, 1992, and to Extend the Closing Date Accordingly?**

92     In answering this question it is essential to bear in mind that the subject matter of this agreement is the purchase and sale of a proposed residential condominium unit, and that a transaction of this nature is subject to the *Condominium Act* . Before title can be transferred from the vendor to the purchaser and the transaction can be "closed," as that term is normally understood in real estate transactions, the vendor is obliged under the Act to register a declaration and description of the property. The condominium registration process inevitably creates a delay between the time some or all of the units in a given project are ready for occupancy and the time the developer is able to deliver a registrable transfer of title and "close" the transaction. In *Albrecht v. Opemoco Inc.* (1991), 5 O.R. (3d) 385 , at p. 392, I had occasion to describe the manner in which agreements of purchase and sale of proposed condominium units have generally been structured in this province in contemplation of the delays produced by the complexity of the registration process:

> Under the *Condominium Act* , before title to a proposed unit can be transferred to a purchaser, a developer is obliged to register a declaration and description of the property. Registration, however, cannot be effected until the project has been substantially completed and all requisite governmental approvals have been obtained. The complexity of the registration process is such as to create an inevitable delay between the time that some or all of the units in a given project are completed and otherwise ready for occupancy and the time the developer is able to deliver a registrable transfer of title. The length of the delay depends on a variety of factors, and may be substantial. In order to generate income during this period, condominium developers usually seek to have purchasers take occupancy as soon as their units can be occupied. *Agreements of purchase and sale are therefore generally structured, as are the agreements in these appeals, so as to provide for closing in two stages. The purchaser is first required or permitted to take possession on an interim basis when the unit is substantially complete and ready for occupancy (the possession closing), and the transaction is finally closed after registration has taken place and the vendor is able to transfer title (the title or final closing)* . (Emphasis added.)

93     The present agreement makes provision for the potential delay between the time the unit is ready for occupancy and the time the transaction can be completed in accordance with the Act. It is important for the purposes of this appeal to appreciate the way in which the agreement has been structured to achieve this purpose. The agreement unequivocally provides in para. 12 that the transaction is to be completed on the "Closing Date." This, by definition, is November 4, 1991. It is common ground that para. 12 carries with it the obligation of the vendor to complete the unit by that date. If, however, the transaction cannot

be completed in accordance with para. 12, it is to be closed in the manner provided for in para. 13(d) and the "Closing Date" is to be extended as therein provided.

94     Paragraph 13(d) is manifestly designed to accommodate the delay created by the condominium registration process by effectively providing for the two-stage closing described in *Albrecht* . It does this in a somewhat indirect or circuitous manner. If the unit is at least substantially completed sufficient to permit occupancy on the closing date, that is, on November 4, 1991, but the project has not yet been registered, the purchaser is nonetheless to take occupancy on that date. In that event, the November 4th "Closing Date" becomes the "Occupancy Date," and the "Closing Date" is extended to an unspecified date 20 days after the vendor gives notice that registration has taken place. In the interim, the purchaser is to pay an "occupancy fee" calculated in accordance with s. 51(6) of the Act. The Act contemplates that purchasers of proposed residential condominium units may take possession of or occupy a unit before a deed or transfer can be delivered and contains a number of provisions governing the relationship of the parties during the interim occupancy period.

95     Paragraph 13(d) is concerned with the position of the parties if the unit is substantially completed. It is not concerned with the question of construction delays. This clause deals with the situation in which the unit is ready for occupancy but, because of non-registration, the transaction cannot be concluded. Put another way, if there cannot be a final closing on the "Closing Date" referred to in para. 12, an occupancy closing is to take place if the prerequisites to para. 13(d) are satisfied.

96     Given the terms of this agreement and the accompanying disclosure information, the parties could not realistically have expected the proposed condominium unit transaction to be finally closed on the November 4th closing date. The proposed completion date of the recreational and other amenities, as I noted earlier, was to be "approximately December 31, 1993." Since that was a date more than two years later than the date for completion or substantial completion of the unit, they could hardly have expected that the requisite governmental approvals would be obtained and the project registered so long before these amenities were to be completed. Be that as it may, this agreement plainly provides for completion of the transaction on November 4, 1991, or alternatively provides for the purchaser taking occupancy on that date if the premises are then substantially completed sufficient to permit occupancy. In the latter event, the transaction is to be completed on some future date following registration of the declaration and description.

97     The question then is what happens if the unit cannot be completed or substantially completed by November 4, 1991. Is there no room under the terms of this agreement for extending the defined "Closing Date" to accommodate a delay in the construction of the unit? Does the fact that the term "Closing Date" is defined in para. 1(b) as meaning "the 4th of November, 1991 or as extended by Paragraph 13(d)" restrict extensions to the extension specified in para. 13(d) and preclude any extension of the "Closing Date" as stipulated elsewhere in the agreement? In other words, is Bramalea absolutely and unconditionally bound to deliver a unit ready for occupancy on November 4th and guilty of an anticipatory breach of contract if it informs the purchaser in advance of that date that it will be unable to do so?

98     This brings me to para. 22 of the agreement which, Bramalea says, answers these questions in its favour. However, before considering this provision, I should perhaps say that I have no difficulty in accepting the suggestion that clauses of this type, whether framed in these exact terms or not, are commonly found in contracts for the sale of units in condominium projects under construction as, indeed, they are in construction contracts generally. The practical reality is that the construction of large, luxury high-rise buildings which are to be erected over a lengthy period of time, such as the building in this case, can be subject to many delays for innumerable reasons. Consequently, it is hardly surprising that agreements of purchase and sale are routinely structured so as to permit occupancy closing dates to be extended in the event of construction delays. In his reasons, Goodman J.A. refers to the agreements in the cases to which the court was directed and those in the cases heard contemporaneously with this appeal. Those agreements all contain broad provisions, albeit with limitations differing from the instant agreement, which enable the vendor to extend occupancy closings because of delays *for any reason whatsoever* other than the wilful neglect of the vendor or *for any cause of any kind whatsoever* beyond the control of the vendor. While para. 22 must, of course, be construed in the context of the instant agreement, it should be recognized that force majeure clauses of this kind are not uncommon to high-rise condominium construction and their general purport is by no means unique to this agreement.

Scanlon v. Castlepoint Development Corp., 1992 CarswellOnt 633

1992 CarswellOnt 633, [1992] O.J. No. 2692, 11 O.R. (3d) 744, 29 R.P.R. (2d) 60...

99      The first sentence of para. 22 deals expressly with the situation in issue. It is the operative provision in the factual circumstances of this case. The focus must accordingly be on this part of para. 22, which provides:

> *If the completion of the Unit or the common elements is delayed* by reasons of strikes, lock-outs, fire, lightning, tempest, riot, war and unusual delay by common carriers or unavoidable casualties or by any other cause of any kind whatsoever whether or not beyond the control of the Vendor, *the Vendor shall be permitted extensions of time* from time to time *for completion and the Closing Date shall be extended accordingly* . (Emphasis added.)

100      On a plain reading of this provision, the "Closing Date" may be extended when *completion* of the unit is delayed by reason of the circumstances referred to in the provision. The term "Closing Date" is defined by para. 1(b) to mean "the 4th of November, 1991 or as extended by Paragraph 13(d)." In May 1991, when Bramalea invoked para. 22 and rescheduled the respondent's closing date to September 14, 1992, "the Closing Date" was manifestly the November 4, 1991 closing date. The transaction was to be completed on that date pursuant to para. 12. At that stage, there had been no extension of the closing date by para. 13(d), nor could there have been. Accordingly, to implement para. 22 and give effect to the extension mandated by it while, at the same time, allowing for the extension contemplated by para. 13(d), it is obviously necessary to read the definition of "Closing Date" (and "Closing") in para. 1(b) as meaning "the 14th of September, 1992 or as extended by Paragraph 13(d)."

101      The transaction is then to proceed in precisely the same manner as it would have proceeded had there been no construction delay. Under para. 12, Bramalea is obliged to complete the unit and close the transaction on September 14, 1992, the new "Closing Date," just as it was obliged, before para. 22 was invoked, to complete the unit and close the transaction on November 4, 1991. Paragraph 12, as I noted earlier, carries with it the obligation of the vendor to complete the unit by the final closing date, now September 14, 1992. Paragraph 22, consistent with para. 12, extends the "Closing Date" to the date necessary to accommodate the delay in the "completion of the Unit." Since it was known that the project could not be registered by September 14, 1992, it was apparent that the transaction could not be completed by then in accordance with para. 12. It followed, however, that if Bramalea completed or substantially completed the unit for occupancy by September 14, 1992, there would be an occupancy closing in accordance with para. 13(d) and the date for finally concluding the transaction as provided for in para. 12 would be postponed to an unspecified date 20 days after notice in writing was given that the declaration and description had been registered.

102      In my opinion, para. 22 authorized Bramalea to extend the date of closing of this transaction to September 14, 1992, as it did. Bramalea's notice to this effect did not constitute an anticipatory breach of the agreement or provide a basis for declaring the agreement null and void. Paragraph 22, as I have noted, makes the extension necessitated by the construction delay specifically referable to the defined "Closing Date." Although an express reference to para. 22 in the para. 1(b) definition of this term may have been helpful, the omission of this reference does not preclude the court from giving effect to the part of the para. 22 applicable to this case any more than the omission of a reference to para. 13(d) in para. 1(b) would have precluded the court from giving effect to that provision. The balance of para. 22 must, of course, also be seen in the framework of the closing process envisioned by this agreement, and applied to the relevant factual circumstances.

103      The principles of contractual interpretation require that the agreement be construed as a whole and that, so far as possible, meaning and purpose be given to all its provisions. On the interpretation of the learned motions court judge, however, para. 22 is given no meaning or purpose but is instead effectively ruled out of the agreement. As a result, the vendor's obligation to deliver a unit ready for occupancy on November 4, 1991, is treated as being an absolute and unconditional obligation. Thus, Bramalea's inability, for whatever reason, to have the unit ready for occupancy on that date necessarily constitutes a breach of the agreement; and its advance notification to this effect constitutes an anticipatory breach of the agreement.

104      I am unable to accept that as a proper construction of this agreement. Given the extensions of the "Closing Date" expressly con templated and permitted by para. 22, I think it patent that it cannot have been the intention of the vendor, nor the expectation of the purchaser, that Bramalea was unconditionally guaranteeing either full or substantial completion of the unit on the November closing date. Paragraph 22 takes into account a practical reality of the construction industry — the likelihood, if not the inevitability, of construction delays which may render it impossible to deliver occupancy of this unit on the 37th floor

Case 09-10138-MFW    Doc 14225-50    Filed 08/15/14    Page 197 of 279

Scanlon v. Castlepoint Development Corp., 1992 CarswellOnt 633
1992 CarswellOnt 633, [1992] O.J. No. 2692, 11 O.R. (3d) 744, 29 R.P.R. (2d) 60...

of this 47-storey building on that specific date. The presence of this provision in itself makes manifest an intention to provide a means of extending the closing date in the event of unforeseeable delay. If that were not the intention, para. 22 would be unnecessary and would not have been included in the agreement. In short, on the wording of this contract, the parties have in essence agreed that if supervening events delay construction so that the transaction cannot be concluded by the November 4, 1991, Bramalea is to be permitted to extend that date for the additional time needed to complete construction of the unit.

105    With respect to the contention that paras. 22 and 13(d) are inconsistent with one another, para. 13(d) provides for the two-stage closing described earlier, and sets the terms pursuant to which the purchaser is to occupy the unit during the interim between the occupancy and final closing. This clause is not concerned with delays in the completion of the unit; rather, it addresses the question of what is to happen if the vendor is unable to complete the transaction on the date stipulated in para. 12. In contrast to para. 13(d), para. 22 addresses the question of delay in completion of the unit by the date stipulated in para. 12, and entitles the vendor to extend the time for completion, and accordingly the date for closing of the transaction. The purpose and effect of these clauses is plainly different and each may be afforded a reasonable and distinct meaning. In my opinion, they are neither contradictory nor do they create any ambiguity such as to invoke the doctrine of contra proferentum.

106    I respectfully reject the notion that para. 22 is restricted to the situation in which a unit has been substantially completed and the purchaser has entered into occupation pursuant to para. 13. Such an interpretation overlooks the manner in which this transaction is structured and fails to give proper effect to the intention of the parties as manifested by their agreement. It is to be remembered that once the purchaser has taken occupancy, the "Closing Date" is converted by para. 13(d) from a fixed date to an indeterminate date. At that stage, the vendor is not obliged to complete the transaction on any specific date. Until the project is registered and notice to this effect is given, there is simply no date to which the extension mandated by para. 22 can be referable. If para. 22 is to become operative only after an occupancy closing has taken place, it can be applicable only to exten sions needed because of delays related to the final closing date once that date has been determined.

107    To construe para. 22 in so narrow and restrictive fashion, in my opinion, is to render the clause substantially, if not totally, ineffective. To demonstrate this by way of an example, let us suppose that a strike had occurred in, say, the plumbing or electrical industry, which upset Bramalea's timing for the scheduled completion of the respondent's unit on November 4, 1991, by one month, and thus made it impossible to have an occupancy closing on that date. On this interpretation, para. 22 is inapplicable and Bramalea would not be entitled to extend the November 4th closing date for the extra month needed to enable it to close pursuant to either paras. 12 or 13(d); the transaction would be at an end. If, however, to change the facts, an occupancy closing pursuant to para. 13(d) did take place on November 4, 1991, then, on this interpretation, Bramalea would subsequently be entitled to invoke para. 22. Accordingly, "[i]f the completion of the Unit ... is delayed by reason of strikes ... [Bramalea] shall be permitted extensions of time ... for completion and the Closing Date shall be extended accordingly." What is the "Closing Date" which is to be "extended accordingly"? Until the project is registered and the vendor gives the 20-day notice called for in para. 13(d), there is no set closing date. Before a closing date is set, there is no reason for the vendor to invoke para. 22 and, moreover, there is no mechanism for putting the provision into operation. Once the closing date has been set, there is, I suppose, the far-fetched possibility that something may arise during the 20-day period following the vendor's notice to require the vendor to extend the closing date set by it less than 20 days earlier. Beyond that possibility, the clause would serve no practical purpose.

108    In my opinion, para. 22 cannot be meant to produce a result which, to all intents and purposes, is tantamount to striking the clause from the agreement. For the reasons I have already stated, in executing a contract containing this clause, a purchaser could not reasonably have expected that Bramalea was guaranteeing to deliver occupancy on November 4, 1991, without regard to any of the contingencies that might arise to delay construction.

109    It is argued that para. 22 is an exemption clause, and as such, is to be construed contra proferentem strictly against the party benefiting from the exemption. In my view, whether this provision can properly be described as an exemption clause or not is, in so far as this case is concerned, beside the point. Even assuming it is an exemption clause, and applying the special rules of construction relevant to clauses falling into that category (see A.D. Guest, ed., *Chitty on Contracts* , 24th ed. (London: Sweet & Maxwell, 1977), Vol.1, at p. 362), para. 22 does not admit to a construction which limits its application to post-occupancy closing delays. However, while it is unnecessary to decide the matter, it appears to me that para. 22, or more particularly its first sentence which is the focus of this appeal, cannot be characterized as exclusionary in nature. This provision does not limit

1992 CarswellOnt 633, [1992] O.J. No. 2692, 11 O.R. (3d) 744, 29 R.P.R. (2d) 60...

or exclude the vendor's liability in any respect. Rather, it provides the vendor with a substantive right or entitlement, namely, the right to extend the time for completion, and accordingly, the closing date, in the event of a delay in construction. See S.M. Waddams, *The Law of Contracts*, 2d ed. (Aurora, Ont.: Canada Law Book, 1984), at pp. 346-347.

110     Finally, the argument is made that para. 22 is distinguishable from the force majeure clauses referred to earlier because it permits the vendor extensions for delays resulting from any cause whether the cause was beyond the control of the vendor or not, and because it sets no maximum limit on the number or total length of the extensions that may be permitted. Bramalea acknowledges that the causes for delay cannot be the result of bad faith and that any extension or extensions cannot be for other than a reasonable period of time, and agrees that para. 22 must be read accordingly. However, the respondent's application was not put forward on these grounds. It is not suggested that Bramalea was guilty of bad faith or wilful neglect or was otherwise to blame for the delay in question; nor is it suggested that the ten-month extension was unreasonable and that Bramalea therefore ought not to be entitled to rely on para. 22. This application was based entirely on the proposition that Bramalea was guilty of an anticipatory breach of the agreement because, under the terms of the agreement as the respondent would have it construed, Bramalea was not entitled, for any reason whatsoever, to any extension whatsoever of the November 4th closing date. How para. 22 may be treated in a case in which the length of the extension or the cause of the delay is placed in issue is not a question that arises here, nor is it one that can or should be determined in the context of this case.

**Disposition**

111     I would allow the appeal, with costs, set aside paragraphs 1, 2, 3 and 5 in the order of Austin J., and make an order dismissing the application, with costs, in so far as it seeks a declaration that the agreement of purchase and sale is null and void, a declaration that the applicant has an interest in the lands described in Schedule "A," an order granting leave to issue a certificate of pending litigation, and repayment of the deposit money.

*Appeal allowed.*

---

End of Document

Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 132

407 B.R. 576
United States District Court,
D. Delaware.

In re NEW CENTURY TRS HOLDINGS,
INC., a Delaware corporation, et al., Debtors.
Gregory J. Schroeder, et al., Appellants,
v.
New Century Liquidating Trust, et al., Appellees.

Bank. No. 07–10416 (KJC).   |   Civ.
No. 08–546–SLR.   |   June 16, 2009.

**Synopsis**
**Background:** Confirmation hearing was held on joint liquidating Chapter 11 plan proposed by debtors, and objections were filed on theory that plan would effect an improper substantive consolidation of debtors' estates, that plan improperly discriminated between creditors in same class, that plan failed to satisfy "best interests of creditors" test, and that compromises included in plan were not fair and equitable. The Bankruptcy Court, Kevin J. Carey, J., 390 B.R. 140, entered order overruling objections, and objectors appealed.

**Holdings:** The District Court, Sue L. Robinson, J., held that:

[1] appeal from unstayed plan confirmation order was not equitably moot;

[2] proposed Chapter 11 plan that aggregated various debtor entities into different debtor classes, and that required creditors with claims against debtors that had been placed within same class to compete against each other for payment of their claims from consolidated pool of assets, effected an improper "substantive consolidation" of debtors and could not be confirmed; and

[3] plan unfairly discriminated in favor of certain creditors without consent of other creditors in class.

Reversed and remanded.



West Headnotes (26)

[1]    **Bankruptcy**
        Moot Questions

       Under doctrine of equitable mootness, bankruptcy appeal should be dismissed as equitably moot if affording appellant the relief he seeks would be inequitable.

       Cases that cite this headnote

[2]    **Bankruptcy**
        Moot Questions

       In deciding whether equitable mootness doctrine applies, bankruptcy appellate court must determine whether relief sought by appellant would be inequitable in context of the case before it.

       Cases that cite this headnote

[3]    **Bankruptcy**
        Effect of Want of Stay;  Conclusiveness of Sale

       **Bankruptcy**
        Moot Questions

       In deciding whether the relief sought on bankruptcy appeal would be inequitable and, thus, whether equitable mootness doctrine applies, bankruptcy appellate courts consider the following factors: (1) whether a reorganization plan has been substantially consummated; (2) whether a stay has been obtained; (3) whether relief requested would affect rights of parties not before court; (4) whether relief requested would affect success of plan; and (5) public policy of affording finality to bankruptcy judgments.

       1 Cases that cite this headnote

[4]    **Bankruptcy**
        Moot Questions

       Factors that bankruptcy appellate courts consider in deciding whether an appeal is equitably moot

are given varying weight, depending on the circumstances.

Cases that cite this headnote

**[5]    Bankruptcy**

🗝 Moot Questions

Even assuming that equitable mootness doctrine applies on appeal from order confirming liquidating Chapter 11 plan, factors bearing on whether appeal from plan confirmation order is equitably moot cannot be given same weight in reorganizing and liquidating Chapter 11 cases.

2 Cases that cite this headnote

**[6]    Bankruptcy**

🗝 Moot Questions

Two countervailing considerations inform bankruptcy appellate court's exercise of discretion in deciding whether to dismiss appeal from plan confirmation order as equitably moot: the public policy served by encouraging non-adverse third parties to rely on finality of bankruptcy confirmation orders, on the one hand, and need to preserve meaningful right of appeal, on the other.

Cases that cite this headnote

**[7]    Bankruptcy**

🗝 Moot Questions

If "equitable mootness" bar is too low, i.e., if equitable mootness factors swing too easily in favor equitable mootness, right of appeal becomes meaningless and instruction to apply equitable mootness doctrine cautiously and on limited scope is contravened.

Cases that cite this headnote

**[8]    Bankruptcy**

🗝 Effect of Want of Stay; Conclusiveness of Sale

**Bankruptcy**

🗝 Moot Questions

Even assuming that equitable mootness doctrine applied on appeal from order that confirmed liquidating Chapter 11 plan, appeal from bankruptcy court's unstayed plan confirmation order would not be dismissed as "equitably moot," where plan, while substantially consummated, had not proceeded to point where there had been distribution to any creditor class, where plan could be unraveled without much difficulty, and without prejudice to any non-adverse third parties who had detrimentally relied thereon, and where there was nothing in record to suggest that undoing debtors' current liquidation plan would affect debtors' ability to liquidate in future under different plan.

4 Cases that cite this headnote

**[9]    Bankruptcy**

🗝 Effect of Want of Stay; Conclusiveness of Sale

**Bankruptcy**

🗝 Moot Questions

Mere fact that debtors' liquidating Chapter 11 plan had been substantially consummated, and that reversal of unstayed plan confirmation order would necessitate the unraveling of plan, was not factor weighing in favor of dismissal of appeal from plan confirmation order, as equitably moot; it did not appear that reversal of plan would result in great difficulty or inequity.

1 Cases that cite this headnote

**[10]    Bankruptcy**

🗝 Effect of Want of Stay; Conclusiveness of Sale

**Bankruptcy**

🗝 Moot Questions

Ordinarily, existence or absence of stay is critical factor for bankruptcy appellate court in deciding whether to dismiss appeal from plan confirmation order as equitably moot.

Cases that cite this headnote

**[11]    Bankruptcy**

🔑 Effect of Want of Stay;  Conclusiveness of Sale

**Bankruptcy**

🔑 Moot Questions

Mere fact that bankruptcy court order confirming debtors' liquidating Chapter 11 plan had not been stayed was not factor weighing in favor of dismissal of appeal from that order as equitably moot, where plan had not gone freely forward and it did not appear that any distribution to creditors had been made, and where those plan components that had gone forward were not those on which non-adverse third parties had detrimentally relied.

Cases that cite this headnote

**[12]    Bankruptcy**

🔑 Moot Questions

Equitable mootness doctrine protects interests of non-adverse third parties who are not before bankruptcy appellate court, but who have acted in reliance on plan as implemented.

Cases that cite this headnote

**[13]    Bankruptcy**

🔑 Moot Questions

Effect of relief requested on plan's success, as factor bearing on whether appeal from plan confirmation order is equitably moot, is concerned with whether requested relief will affect re-emergence of debtor as revitalized entity or, in liquidating Chapter 11 case, with whether requested relief will affect debtor's ability to liquidate.

Cases that cite this headnote

**[14]    Bankruptcy**

🔑 Moot Questions

Public policy of affording finality to bankruptcy court judgments is factor weighing in favor of equitable mootness when non-adverse third parties have acted in detrimental reliance on finality of bankruptcy plan confirmation orders to such a degree that reversing those orders

would discourage future detrimental reliance by similarly situated parties.

Cases that cite this headnote

**[15]    Bankruptcy**

🔑 Moot Questions

In reorganization context, finality of bankruptcy judgments is significant factor in deciding whether appeal from plan confirmation order is equitably moot, since multiple parties, including non-adverse third parties, have acted in detrimental reliance on debtor's emerging from bankruptcy as contemplated by reorganization plan; however, when parties have not relied to their detriment on finality, which is often the case in liquidation context, this factor does not weigh in favor of equitable mootness.

Cases that cite this headnote

**[16]    Bankruptcy**

🔑 Conclusions of Law;  De Novo Review

**Bankruptcy**

🔑 Clear Error

On appeal, district court applies "clearly erroneous" standard to bankruptcy court's findings of fact and a plenary standard to its legal conclusions. Fed.Rules Bankr.Proc.Rule 8013, 11 U.S.C.A.

Cases that cite this headnote

**[17]    Bankruptcy**

🔑 Clear Error

Factual finding is "clearly erroneous" when reviewing court, on entire evidence, is left with definite and firm conviction that mistake has been committed. Fed.Rules Bankr.Proc.Rule 8013, 11 U.S.C.A.

Cases that cite this headnote

**[18]    Bankruptcy**

🔑 Conclusions of Law;  De Novo Review

**Bankruptcy**

🔑 Clear Error

With respect to mixed questions of law and fact, district court must accept bankruptcy court's findings of historical or narrative fact unless clearly erroneous, but exercises plenary review of bankruptcy court's choice and interpretation of legal precepts and its application of those precepts to historical facts. Fed.Rules Bankr.Proc.Rule 8013, 11 U.S.C.A.

Cases that cite this headnote

[19]    **Bankruptcy**
        Conclusions of Law;  De Novo Review

On appeal from district court's decisions in its bankruptcy appellate capacity, the Court of Appeals effectively reviews on de novo basis bankruptcy court opinions.

Cases that cite this headnote

[20]    **Bankruptcy**
        Transfer and Consolidation of Cases

        **Bankruptcy**
        Equitable Powers and Principles

"Substantive consolidation" is equitable remedy, that is used, essentially, to address harms caused by debtors, and their related entities, disregarding their separateness and/or otherwise entangling their affairs.

Cases that cite this headnote

[21]    **Bankruptcy**
        Transfer and Consolidation of Cases

Substantive consolidation treats separate legal entities as if they were merged into single survivor left with all the cumulative assets and liabilities, save for inter-entity liabilities, which are erased; result is that claims against separate debtors morph into claims against the consolidated survivor.

2 Cases that cite this headnote

[22]    **Bankruptcy**
        Transfer and Consolidation of Cases

Substantive consolidation of bankruptcy estates is extreme and imprecise, works "rough justice," and is to be used sparingly.

1 Cases that cite this headnote

[23]    **Bankruptcy**
        Grounds and Objections;  Factors Considered

Substantive consolidation is appropriate only when parties consent, when entities to be consolidated disregarded their separateness prepetition to such a significant extent that their creditors relied on breakdown of entity borders and treated them as one legal entity, or when their assets and liabilities are so scrambled postpetition that separating them is prohibitive and hurts all creditors.

Cases that cite this headnote

[24]    **Bankruptcy**
        Reorganization Cases

        **Bankruptcy**
        Provisions for Satisfaction of Claims;  Relation to Recovery in Liquidation

Proposed Chapter 11 plan that aggregated various debtor entities into different debtor classes, and that required creditors with claims against debtors that had been placed within same class to compete against each other for payment of their claims from consolidated pool of assets, effected an improper "substantive consolidation" of debtors and could not be confirmed, though plan did not provide for erasure of inter-entity liabilities.

2 Cases that cite this headnote

[25]    **Bankruptcy**
        Equality of Treatment Within Classes

Proposed Chapter 11 plan is not confirmable, if claims within same class are not receiving same treatment, and if holders of those claims being treated less favorably have not consented to the discrimination. 11 U.S.C.A. § 1123(a)(4).

Cases that cite this headnote

**[26]    Bankruptcy**

    👉 Provisions for Satisfaction of Claims; Relation to Recovery in Liquidation

**Bankruptcy**

    👉 Unsecured Creditors and Equity Holders, Protection Of

Multi-debtor protocol which Chapter 11 debtors had negotiated with creditors holding the same claim against more than one debtor, and which was included in joint liquidating plan that debtors had proposed, which required such creditors to waive the claims that they had to distribution in one class in exchange for a 130% distribution on claim that they possessed in other class, unfairly discriminated in favor of these creditors and against other creditors in class from which 130% distribution was made without these other creditors' consent, in violation of plan confirmation requirement; it did not matter that overall effect on creditors receiving this 130% distribution may have been negative, and that creditors receiving this 130% distribution may have consented to this "negative" treatment. 11 U.S.C.A. § 1123(a)(4).

Cases that cite this headnote

**Attorneys and Law Firms**

**\*579** Joseph H. Huston, Jr., Esquire, and Maria Aprile Sawczuk, Esquire, of Stevens & Lee, P.C., Wilmington, DE, and Robert J. Keach, Esquire, and D. Sam Anderson, Esquire, of Bernstein, Shur, Sawyer & Nelson, P.A., of Portland, ME, for Appellants.

Bonnie Glantz Fatell, Esquire, and David W. Carickhoff, Esquire, of Blank Rome LLP, Wilmington, DE, and Mark T. Power, Esquire, Mark S. Indelicato, Esquire, Don D. Grubman, Esquire, and Joseph Orbach, Esquire, of Hahn & Hessen LLP, New York, NY, for Appellees.

Opinion

**MEMORANDUM OPINION**

SUE L. ROBINSON, District Judge.

**I. INTRODUCTION**

In April 2007, New Century TRS Holdings, Inc. ("TRS Holdings") and its affiliates **\*580** (collectively, "debtors" [1]) filed chapter 11 bankruptcy petitions. In March 2008, debtors filed a liquidation plan. In July 2008, over objections raised by the Ad Hoc Committee of Beneficiaries of the New Century Financial Corporation Deferred Compensation Plan and/or Supplemental Executive Retirement/Savings Plan (collectively, along with Gregory J. Schroeder, Michelle Park, Martin Warren, Steve Holland, and Nabil Bawa, "appellants"), the bankruptcy court confirmed the liquidation plan.

Pending before the court are appellants' appeal [2] (D.I.1) of the plan confirmation and the motion to dismiss filed by New Century Liquidating Trust and Alan M. Jacobs as Liquidating Trustee and Plan Administrator for New Century Warehouse Corporation's (collectively, "appellees") (D.I.13). For the reasons that follow, appellees' motion to dismiss is denied and the bankruptcy court issuances that are the subject of the appeal (Bk.D.I.8254, 8255, 8596, 8626) are reversed.

**II. BACKGROUND**

**A. Debtors' Business and the Events Leading to Bankruptcy**

Debtors were in the business of originating, servicing, and purchasing mortgage loans (as well as selling mortgage loans) through whole loan sales and securitizations. (Bk. D.I. 8254 at 3) Founded in 1995, [3] TRS Holdings grew rapidly from its **\*581** inception. (*Id.* at 8) In 1996, its first year of operation, TRS Holdings originated $357 million in mortgage loans. (*Id.*) Ten years later, in 2006, TRS Holdings originated approximately $60 billion in mortgage loans; between April 2005 and December 2006, TRS Holdings funded more than $200 million in loans almost every business day. (*Id.*) Prior to the bankruptcy filings, TRS Holdings had grown to employ over 7,200 people, had a market capitalization of over $1 billion (as of February 2007), had its equity securities traded on the New York Stock Exchange, had credit facilities of $17.4 billion to finance its activities, and was the second

largest originator of subprime residential mortgage loans. (*Id.*)

In February and March 2007, debtors experienced a swift reversal of fortune. On February 7, 2007, TRS Holdings announced that it must restate its loan repurchase losses in its previously-filed financial statements for quarters ended March 31, June 30, and September 30, 2006, and that it expected to post both a fourth quarter loss and a loss for all of 2006; this announcement precipitated multiple securities class action lawsuits against the company. (*Id.* at 6) On March 2, 2007, TRS Holdings announced that it could not file its 2006 Form 10–K without unreasonable effort and expense, which caused the New York Stock Exchange to announce the de-listing of the company's stock on March 13, 2007. (*Id.* at 7) These announcements led warehouse lenders to cut off funding for loans originated by debtors and to replace debtors as the mortgage loan servicer. (*Id.*) Under those circumstances, debtors were able to fund only a portion of their loan originations. (*Id.*) Ultimately, by the end of March 2007, debtors found themselves with obligations in excess of $7 billion and insufficient liquidity to satisfy those obligations. (*Id.* at 7, 9)

**B. Bankruptcy Proceedings and the Plan**
On April 2, 2007, debtors filed voluntary chapter 11 bankruptcy petitions.[4] (*Id.* at 1) On April 9, 2007, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee"), which consisted of seven creditors holding claims of various types against different individual debtors. (*Id.* at 10 n. 12) Debtors, the Creditors' Committee, and other creditor groups began negotiating a chapter 11 plan. (*See id.* at 9–10)

On June 20, 2007, appellants filed an adversary proceeding against debtors, Wells Fargo Bank, N.A. as Trustee ("Wells Fargo"), the Compensation Committee of the Board of Directors of New Century Financial Corporation as Plan Administrator (the "Compensation Committee"), and the Creditors' Committee concerning amounts that appellants had contributed under deferred compensation plans while in debtors' employ. (*Id.* at 27) In January 1999, TRS Holdings had created a trust (the "Deferred Compensation Trust"), with Wells Fargo as Trustee, to be used in conjunction with The New Century Financial Corporation Deferred Compensation Plan and/or The New Century Financial Corporation Supplemental Executive Retirement/Savings Plan (the "Deferred **\*582** Compensation Plans").[5] (*Id.*

at 23, 27) Appellants and other eligible employees had contributed funds under the Deferred Compensation Plans. (*Id.*) In the adversary proceeding, appellants have sought a declaration that the Deferred Compensation Plans are not "top hat" plans as defined by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"),[6] and that the Deferred Compensation Trust, therefore, is not an asset of the bankruptcy estates that can be used to satisfy other creditors' claims.[7] (*Id.* at 27–28)

On February 2, 2008, after extensive negotiations (Bk. D.I. 8254 at 9), debtors and the Creditors' Committee filed a joint chapter 11 liquidation plan and corresponding disclosure statement. (Bk. D.I. 4804 and 4805) On March 18, 2008, debtors filed an amended joint liquidation plan ("the first amended plan"). (*See* Bk. D.I. 5405) That same day, the bankruptcy court approved the disclosure statement, established procedures for voting on the first amended plan, and scheduled a hearing on plan confirmation. (*See* Bk. D.I. 5396) On April 18, 2008, appellants filed an objection to plan confirmation. (Bk.D.I.6338)

On April 23, 2008, debtors filed a second amended joint liquidation plan (the "second amended plan" or "plan"). (*See* Bk. D.I. 6412) The plan separates the sixteen debtors into three groups (each, a "Debtor Group") to facilitate the distributions to the unsecured creditors. (*Id.* at 10) The first Debtor Group, the Holding Company Debtors, consists of real estate investment entities that typically held residual interests in securitization trusts, owned stock in the Operating Company Debtors, and provided overall direction and management to the Operating Company Debtors.[8] (*Id.* at 11) The second Debtor Group, the Operating Company Debtors, were generally entities that conducted debtors' business operations, including originating, purchasing, and selling loans and servicing loans for third parties.[9] (*Id.*) The final Debtor Group consists only of New Century Warehouse Corporation ("Access Lending"), which was acquired by TRS Holdings in **\*583** early 2006 and was a subsidiary that provided warehouse financing to independent mortgage companies. (*Id.*)

The plan classifies claims based upon the three Debtor Groups. (*Id.*) Claims against the Holding Company Debtors are placed in classes HC1 through HC13, with appellants assigned to class HC3b along with holders of other unsecured claims against NCFC. (*Id.* at 11–13) Claims against the Operating Company Debtors are placed in classes OP1

51 Bankr.Ct.Dec. 211

through OP12. (*Id.* at 13–14) Claims against Access Lending are placed in classes AL1 through AL3. (*Id.* at 14)

The plan provides for the distribution of the net cash available from the assets of the Debtor in each Debtor Group to the holders of unsecured claims against debtors in that Debtor Group. (*Id.* at 14–15) Cash available for distribution to unsecured creditors in each Debtor Group is calculated based on the gross proceeds obtained from disposing of that Debtor Group's assets minus amounts for allowed administrative, priority, and secured claims, expenses of administering the Debtors' estates during the chapter 11 proceedings, and expenses of the liquidating trust established by the plan. (*Id.*)

The plan provides for certain protocols that affect the amount of each claimant's distribution, including the Multi–Debtor Claim Protocol, the Intercompany Claim Protocol, and the EPD/Breach Claim Protocol. [10] (*Id.* at 15–19) The Multi–Debtor Claim Protocol adjusts the distribution amount for creditors holding allowed unsecured claims for which more than one debtor is jointly and/or severally liable. (*Id.* at 15) For instance, under the Multi–Debtor Claim Protocol, unsecured creditors with claims for which Holding Company Debtors NCFC and NC Credit are jointly and/or severally liable will receive 130% of the amount of their claims against NCFC and 0% of the amount of their claims against NC Credit. (*Id.* at 15–16) Similarly, unsecured creditors with claims for which NCMC and other Operating Company Debtors are jointly and/or severally liable will receive 130% of the amount of their claim against NCMC and 0% of the amount of their claim against the other Operating Company Debtors. (*Id.* at 16)

The Intercompany Claim Protocol addresses claims held by one debtor against another debtor by adjusting the distribution amount based on the merits of each debtor's intercompany claims. [11] (*Id.*) First, claims against other debtors within the same Debtor Group receive 0% of the claim amount. (*Id.*) Second, in recognition of NC Capital's potential intercompany claims against NCMC, EPD/Breach claimants with claims against NC Capital will receive 50% of the amount of their claims against the Operating Company Debtors. (*Id.* at 17) Finally, NCFC will receive 50% of the amount of its claims against NCMC in recognition that the NCMC's debt owed to NCFC could be recharacterized as equity in NCFC. (*Id.* at 17–18)

The EPD/Breach Claim Protocol is used to calculate the amount of damages for EPD/Breach Claims and is

interrelated with other compromises in the plan. [12]  **\*584** (*Id.* at 18–19) For example, where the EPD/Breach Protocol generates a claim amount that is disputed as too high or too low, the dispute is resolved consistent with the compromise on the allocation of Litigation Proceeds (as defined in the plan) among the EPD/Breach claimants and other classes of creditors. [13] (*Id.* at 19) Pursuant to that compromise, the EPD/Breach claimants with claims against NC Capital receive 45% of the net Litigation Proceeds, the Holding Company Debtors receive 27.5% of the net Litigation Proceeds, and the Operating Company Debtors (excluding those with EPD/Breach Claims against NC Capital) receive 27.5%. (*Id.* at 24–25)

On the date debtors filed their petitions, debtors had approximately $62 million of cash in their operating accounts. (*Id.* at 19) After filing, debtors generated an additional $230.4 million through asset sales; under the plan, those proceeds are assets of the Operating Company Debtors. (*Id.* at 19–20) The plan provides for the transfer of debtors' remaining assets (including capital stock in Access Lending but not Access Landing's assets [14]) into a liquidating trust. (*Id.* at 20) The liquidating trust is for the benefit of holders of unsecured claims against the Holding Company Debtors and holders of unsecured claims against the Operating Company Debtors. (*Id.*)

The plan provides that debtors' assets will be divided between the Holding Company Debtors and the Operating Company Debtors for purposes of distribution. [15] (*Id.*) The Holding Company assets, as asserted on the respective bankruptcy schedules, consist mostly of intercompany receivables, the Carrington Interests, [16] and the Deferred Compensation Trust. [17] (*Id.* at 21–22) The Operating Company assets include proceeds from the sales of debtors' servicing business and mortgage loans not  **\*585**  subject to repurchase. [18] (*Id.* at 24)

On April 23, 2008, the same day the plan was filed, debtors' claims agent filed a declaration reporting the voting results for the first amended plan. (Bk.D.I.6406) Every class of creditors entitled to vote accepted the first amended plan except class HC3b, which includes appellants. (Bk. D.I. 8254 at 25) Of the 203 votes cast against the first amended plan, 200 were cast by appellants. [19] (*Id.*)

On April 24 and 25, 2008, the bankruptcy court conducted a two-day hearing on plan confirmation. (*Id.* at 2) At the hearing and in post-hearing briefs, appellants raised several arguments against plan confirmation, including that: (i) the plan provides for substantive consolidation of the debtors in violation of *In re Owens Corning,* 419 F.3d 195 (3d Cir.2005); and (ii) the plan does not comply with 11 U.S.C § 1123(a)(4) (as required by § 1129(a)(1)) because, by operation of the Multi–Debtor Claim Protocol, it provides for disparate treatment of claims within the same class. (*Id.;* Bk. D.I. 6645)

On July 2, 2008, the bankruptcy court issued an opinion overruling appellants' objections (the "confirmation opinion") and ordered the plan proponents to draft an order to be entered confirming the plan. (Bk.D.I.8254, 8255) On July 15, 2008, the bankruptcy court entered the plan proponents' confirmation order. (Bk.D.I.8596) On July 23, 2008, to correct a typographical error in that order (*see* Bk. D.I. 8624), the bankruptcy court issued an amended confirmation order. (Bk.D.I.8626) On July 14 and July 24, 2008, appellants timely appealed the confirmation opinion and the related confirmation orders. (Bk.D.I.8563, 8628)

On July 29, 2008, appellants filed a motion to stay the confirmation order pending appeal (the "stay motion"). (Bk.D.I.8673) On August 22, 2008, the bankruptcy court denied the stay motion but imposed on the New Century Liquidating Trust (the "liquidating trust") a duty to provide appellants thirty days written notice of its intent to distribute any funds to classes HC1, HC3a, HC3b, HC5, HC7, HC8, HC10a, HC10b, HC11, and HC13. (Bk.D.I.8847)

### C. Implementation of the Plan

The plan had become effective on August 1, 2008 (the "effective date"). [20] (D.I. 14 at attch. 1, ¶ 5) On the effective date, [21] the liquidating trust was created with Alan M. Jacobs as trustee. (*Id.* at attch. 1, ¶ 6) Also on that date, the Creditors' Committee was dissolved; the Plan Advisory Committee (the "PAC") was formed; debtors' officers and directors ceased serving and were replaced by Jacobs; [22] debtors' assets **\*586** were distributed to the liquidating trust; and NCFC's outstanding common and preferred stock, as well as all notes, securities, and indentures, were cancelled. [23] (*Id.* at attch. 1, ¶¶ 6–12) Approximately 127,000 parties received notice concerning the effective date. (*Id.* at attch. 1, ¶ 16)

Since the effective date, the liquidating trust has entered into contracts with a temporary legal staffing agency and an information technology contractor and has extended a short-term lease. (*Id.* at attch. 1, ¶ 15) Funds spent pursuant to these contracts total approximately $1.3 million. (*Id.* at attch. 1, ¶ 17) The liquidating trust further spent funds as follows: $142,720 as a premium on a one-year bond covering the liquidating trust's assets; $10,640 as a premium on a one-year bond covering Access Lending's assets; $311,400 as a three-year premium on an Errors and Omissions insurance policy covering the liquidating trust, Jacobs as plan administrator and trustee, and the PAC and its members; and approximately $5.65 million for professionals, including counsel, financial advisors, and accountants. [24] (*Id.*)

Claims have been settled and distributions made after the plan was confirmed, including the following: (1) on July 31, 2008, Credit Suisse First Boston Mortgage Capital LLC reached a settlement with debtors and the Creditors Committee fixing and allowing certain claims and determining its distribution class while waiving other claims; (2) on August 28, 2008, the liquidating trust paid approximately $1.84 million to SPI Litigation Direct LLC ("SPI") in settlement of claims arising out of SPI's work for the debtors; (3) on October 23, 2008, Natixis Real Estate Capital Inc. reached a settlement with the liquidating trust fixing and allowing certain claims and determining its distribution class while waiving other claims; (4) on October 29, 2008, the liquidating trust paid approximately $46,000 to Fidelity National Information Services in settlement of administrative claims; (5) on November 25, 2008, the liquidating trust paid $66,000 to AT & T, Inc., and its affiliated entities in settlement of administrative claims; (6) on December 12, 2008, the liquidating trust paid $120,000 to Wells Fargo in settlement of administrative claims; (7) on December 19, 2008, the liquidating trust paid $181,000 to GMAC Commercial Finance LLC in settlement of administrative claims; and (8) on December 29, 2008, the liquidating trust paid $2.6 million to a group of employees in settlement of WARN Act claims and other claims arising out of their termination. [25] (*Id.* at attch. 1,¶21)

### III. DISCUSSION

### A. Analysis of Equitable Mootness

**[1]    [2]**    Under the doctrine of equitable mootness, a bankruptcy appeal should be dismissed as equitably moot if affording the appellant the relief he seeks "would be

inequitable." **\*587** *In re PWS Holding Corp.,* 228 F.3d 224, 236 (3d Cir.2000) (citing *In re Continental Airlines,* 91 F.3d 553, 559 (3d Cir.1996)). Whether the relief sought would be inequitable depends on context. Thus, in deciding whether the doctrine applies, a court must determine whether the relief sought would be inequitable in the context of the case before it.

**[3]** **[4]** In determining whether the relief sought would be inequitable and, hence, whether the doctrine should apply, courts in the Third Circuit are to consider the following factors:

> (1) whether the reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the rights of parties not before the court, (4) whether the relief requested would affect the success of the plan, and (5) the public policy of affording finality to bankruptcy judgments.

*Continental,* 91 F.3d at 560. Courts are to give these factors "varying weight, depending on the circumstances." [26] *PWS Holding,* 228 F.3d at 236.

**[5]** Here, the circumstances are that of a chapter 11 liquidation, and the court must apply the above factors with that liquidation context in mind. [27] This means that the court, in determining whether the relief sought in this case would be inequitable, cannot indiscriminately follow *Continental* and its progeny. [28] This is because the guidance in those decisions concerning how to apply the above factors invokes considerations and employs examples that are relevant to reorganizations but not as much to liquidations. For example, unraveling a substantially consummated reorganization plan can be difficult and inequitable—difficult in that it requires reversing multiple, often complex, future-looking transactions (securing financing, issuing equity, contracting with producers and/or suppliers, etc.) and inequitable in that it shifts the tables on non-adverse third parties **\*588** (such as investors, financiers, etc.) who have acted in reliance on the debtor emerging from bankruptcy in accordance with the particulars of the reorganization plan. *See, e.g., Zenith,* 329 F.3d at 344–46. Thus, in a reorganization context, it makes sense to treat the unraveling of the plan as a significant fact weighing in favor of finding the appeal equitably moot.

*See generally id.* However, it makes less sense to treat the unraveling of the plan with such significance in a liquidation context, since (in that context) the plan transactions tend to be discrete and relatively simple transactions aimed at disposing of the debtor's assets in the short term (sale or disposal of assets, services contracts to sustain the debtor through liquidation, etc.) and the non-adverse third parties transacting with the debtor are not doing so with any particular interest in debtor's future condition, let alone relying on debtor's future condition as contemplated by the particulars of any chapter 11 plan. Accordingly, in light of the foregoing and in keeping with the equitable nature of this inquiry, the court exercises its discretion in assigning weight to the facts of this case.

**[6]** **[7]** **[8]** Two countervailing considerations inform the court's exercise of discretion. On the one hand, public policy is served by encouraging non-adverse third parties to rely on the finality of bankruptcy confirmation orders. *Continental,* 91 F.3d at 565. Since applying the doctrine brings finality, this suggests that there should be a low bar for applying the doctrine and that the court should construe facts accordingly. On the other hand, however, even while encouraging reliance on finality, the court must preserve a meaningful right of appeal. If the equitable mootness bar is too low, that is, if equitable mootness factors swing too easily in favor equitable mootness, the right of appeal becomes meaningless and the instruction to apply the doctrine "cautiously" and on a "limited" scope, *PWS Holding,* 228 F.3d at 236, is contravened.

**1. Substantial consummation**

**[9]** To determine whether the substantial consummation factor weighs in favor of equitable mootness, the court first looks to whether the bankruptcy code's definition of "substantial consummation" has been satisfied. *Zenith,* 329 F.3d at 343–44. The bankruptcy code defines "substantial consummation" as the:

> (A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan.

11 U.S.C. § 1101(2). If this definition has been satisfied, the court may then look to whether a successful appeal would unravel the plan, *see id.* at 344–45, although, in the liquidation context, that fact has diminished significance. Indeed, where the plan that has been substantially consummated can be "reversed without great difficulty and inequity," this factor does not weigh in favor of equitable mootness. *See Nordhoff,* 258 F.3d at 186.

In this case, the bankruptcy code's definition of substantial consummation has been satisfied: debtors' assets [29] have been *589 transferred to the liquidating trust for disposition and distributions have commenced. It is also true that the relief appellants seek would unravel the plan, at least in part, since appellants seek on appeal to undo the plan's debtor groups and protocols.

It does not appear from the record, however, that reversing the plan would result in "great difficulty or inequity." Certain events are the natural and inevitable consequences of a liquidation, *e.g.,* the discharge of employees, cancellation of equity and debts, transfer of assets to the liquidating trustee, and asset sales, to name a few. Indeed, the only aspects of plan implementation that arguably need to be reversed are the relatively few distributions that have occurred, [30] but these are not sufficient to establish "great difficulty and inequity." Accordingly, this factor does not weigh in favor of equitable mootness.

### 2. Obtaining a stay

[10]   Ordinarily, "[t]he existence or absence of a stay is a critical factor in determining whether to dismiss an appeal under the doctrine of equitable mootness." *In re Grand Union Co.,* 200 B.R. 101, 105 (citing *Continental,* 91 F.3d at 561–63). This is so because where no stay has been obtained, the plan goes forward, and it can be difficult to undo the acts of non-adverse third parties proceeding under the plan without prejudicing those non-adverse third parties. *See generally Continental,* 91 F.3d at 561–63; *In re Highway Truck Drivers & Helpers Local Union # 107,* 888 F.2d 293, 297 (3d Cir.1989).

[11]   In this case, however, while no stay has been obtained, the plan has not gone forward freely, at least in part because of the bankruptcy court's imposition of a notice requirement; indeed, it appears from the record that no creditor class has received distributions. Moreover, the plan components that

have gone forward are not those on which non-adverse third parties have detrimentally relied. [31]   Under the circumstances here, then, appellants' failure to obtain a stay has not resulted in the advanced implementation with which this factor is typically concerned. Thus, this factor does not weigh in favor of equitable mootness.

### 3. Rights of non-adverse third parties

[12]   Equitable mootness "protects the interests of non-adverse third parties who are not before the reviewing court but who have acted in reliance upon the plan as implemented." *Continental,* 91 F.3d at 562 (quoting *In re Manges,* 29 F.3d 1034, 1039 (5th Cir.1994) (quotation marks omitted)). As has been discussed, the record does not establish that non-adverse parties have relied on the particulars of the current liquidation plan in such a way as to make a reversal of confirmation inequitable. Accordingly, this factor does not weigh in favor of equitable mootness.

### 4. Affect on the plan's success

[13]   As articulated in *Continental* and its progeny, this factor is ultimately concerned with whether an appellant's requested *590 relief "would affect the re-emergence of the debtor as a revitalized entity." *Nordhoff,* 258 F.3d at 189 (quotation marks omitted). The analogous concern in the liquidation context would be whether the appellant's requested relief would affect the debtor's ability to liquidate. Because nothing in the record suggests that undoing the current liquidation plan will affect debtors' ability to liquidate in the future under a different plan, this factor does not weigh in favor of equitable mootness.

### 5. Public policy of affording finality to bankruptcy judgments

[14]   [15]   This factor weighs in favor of equitable mootness where non-adverse third parties have acted in detrimental reliance on the finality of bankruptcy confirmation orders to such a degree that reversing those orders would discourage future detrimental reliance by similarly situated parties. *See Continental,* 91 F.3d at 565. In the reorganization context, the finality of bankruptcy judgments is significant because multiple parties, including non-adverse third parties, have acted in detrimental reliance on the debtor emerging from bankruptcy as contemplated by the reorganization plan. *See Continental,* 91 F.3d at 565. Thus, the public policy favoring finality is allowed to trump the countervailing consideration of preserving a meaningful right of appeal from erroneous

plan confirmations. Where parties have not relied to their detriment on finality, which is often the case in the liquidation context, this factor does not weigh in favor of equitable mootness.

In this case, there is no record that any non-adverse third party changed its position in reliance on finality to the degree that reversing the appeal here would discourage similarly situated parties from transacting business with a liquidating debtor. Accordingly, this factor does not weigh in favor of equitable mootness.

Having found that none of the equitable mootness factors weigh in favor of applying the doctrine in this case, the court denies appellees' motion to dismiss.

**B. Analysis of the Appeal on the Merits**

**1. Standard of review on appeal**

**[16]   [17]   [18]   [19]**   This court has jurisdiction to hear an appeal from the bankruptcy court pursuant to 28 U.S.C. § 158(a). In undertaking a review of the issues on appeal, the court applies a clearly erroneous standard to the bankruptcy court's findings of fact [32] and a plenary standard to that court's legal conclusions. *See Am. Flint Glass Workers Union v. Anchor Resolution Corp.,* 197 F.3d 76, 80 (3d Cir.1999). With mixed questions of law and fact, the court must accept the bankruptcy court's "finding of historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of the [bankruptcy] court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.' " *Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 642 (3d Cir.1991) (citing *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 101–02 (3d Cir.1981)). The district court's appellate responsibilities are further informed by the directive of the United States Court of Appeals for the Third Circuit, which effectively reviews on a de novo **\*591** basis bankruptcy court opinions. *See In re Hechinger,* 298 F.3d 219, 224 (3d Cir.2002); *In re Telegroup,* 281 F.3d 133, 136 (3d Cir.2002).

**2. Questions presented**

Appellants present five questions on appeal, two of which the court addresses here: [33] (1) does the plan provide for substantive consolidation inconsistent with *In re Owens Corning,* 419 F.3d 195 (3d Cir.2005); and (2) does the plan discriminate among members of class HC3b in violation of 11 U.S.C. § 1123(a)(4)? The court addresses these in order.

**3. Substantive consolidation**

**[20]   [21]   [22]   [23]**   Substantive consolidation is an equitable remedy. *In re Owens Corning,* 419 F.3d at 210. It is used, essentially, to address the harms caused by debtors (and their related entities) disregarding their separateness and/or otherwise entangling their affairs. *See id.* In function, substantive consolidation " 'treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased). The result is that claims against separate debtors morph into claims against the consolidated survivor.' " *Id.* at 205 (quoting *Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.),* 402 F.3d 416, 423 (3d Cir.2005)). The pooling of assets in a consolidated survivor, and the resulting increased competition among creditors for a share of those assets, means that certain creditors may recover significantly less in a substantive consolidation scenario. *See id.* Because substantive consolidation is "extreme ... and imprecise," it works " 'rough justice' " and is to be used sparingly. *Id.* at 210. Indeed, in the Third Circuit, substantive consolidation is appropriate only where the parties consent or where the proposed-to-be-consolidated entities "(i) prepetition disregarded separateness so significantly [that] their creditors relied on the breakdown of entity borders and treated them as one legal entity or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." *Id.*

**[24]**   The question raised on appeal is whether the plan, by aggregating multiple debtors into debtor groups to resolve claims, effects a substantive consolidation. As the bankruptcy court points out, the plan here does not call for the typical case of substantive consolidation where multiple separate entities are merged into a single entity and inter-entity liabilities are erased; instead of many-into-one, the plan calls for many-into-three, and the inter-entity liabilities are not erased. Typical or not, however, the many-into-three framework still presents the same potential inequities for creditors as would be presented in the many-into-one framework, namely that creditors face increased competition for a consolidated pool of assets and a re-valued claim that is less precise than if the creditors were dealing with debtors individually. This is the "rough justice" against which *Owens Corning* warns and, because it is effected by aggregating multiple debtors into one or more debtor groups, it falls within the definition of substantive consolidation.

It is true that the aggregation in this case was not accompanied by erasure of inter-entity liabilities and was achieved by compromise settlement. These facts, however, are not meaningful grounds for **\*592** differentiating the instant case from the typical substantive consolidation scenario because they do not eliminate the aggregation's potentially deleterious effects on creditors, which is the main concern expressed in *Owens Corning* with respect to substantive consolidation and the reason why *Owens Corning* limits the use of substantive consolidation to only a few scenarios. Thus, these differences are not sufficient to place the aggregation in this case outside the definition of substantive consolidation. The bankruptcy court erred, then, in concluding that the plan did not effect a substantive consolidation and, as the record does not show that substantive consolidation is warranted in this case consistent with *Owens Corning,* the plan confirmation must be reversed.

**4. Disparate treatment of class members in the same class**

 **[25]**     To be confirmable, a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). Courts are to enforce this provision according to its plain language. *See Hartford Underwriters Ins. Co. v. Union Planters,* 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000). Accordingly, if claims within the same class are not receiving the same treatment, and the holders of those claims being treated less favorably have not consented to the discrimination, the plan is not confirmable.

 **[26]**     The question raised on appeal is whether the plan, by providing 100% of the determined distribution amount on some claims in class HC3b (the "100% claims") and 130% on other claims in class HC3b whose holders have relinquished claims in class HC10b (the "130% claims"), treats all claims in class HC3b the same or, in the alternative, discriminates with the holders' consent. The bankruptcy court concluded that the plan discriminates with consent, reasoning that the holders of the 130% claims, instead of insisting on receiving 100% of the determined distribution for their HC3b claims and 100% of the determined distribution for their HC10b claims (a total distribution of 200%), consented to less favorable treatment in the form of receiving 0% on their HC10b claims and 130% on their HC3b claims (a total distribution of 130%). The problem, however, is that consent

to less favorable treatment in class HC10b only excuses disparate treatment of claims in that class. It is inapposite to the treatment of claims in class HC3b. The treatment of claims in class HC3b is a separate matter, and it is clear that the plan treats the 100% claims in that class less favorably than the 130% claims without the holders'—or at least appellants'—consent. Thus, the bankruptcy court erred in finding that the plan was in compliance with § 1123(a)(4), and the plan confirmation must be reversed. [34]

**IV. CONCLUSION**

For the aforementioned reasons, the court denies debtors' motion to dismiss (D.I.13), reverses the bankruptcy court's issuances that are the subject of this appeal (Bk.D.I.8254, 8255, 8596, 8626), and remands the case. An appropriate order shall issue.

**ORDER**

At Wilmington this 16th day of June, 2009, having reviewed the appeal filed by **\*593** filed by Gregory J. Schroeder, Michelle Park, Martin Warren, Steve Holland, Nabil Bawa, and the Ad Hoc Committee of Beneficiaries of the New Century Financial Corporation Deferred Compensation Plan and/or Supplemental Executive Retirement/Savings Plan and the motion to dismiss the appeal filed by New Century Liquidating Trust and Alan M. Jacobs as Liquidating Trustee and Plan Administrator for New Century Warehouse Corporation (collectively, "appellees") and the papers filed in connection therewith;

IT IS ORDERED that:

1. Appellees' motion to dismiss (D.I.13) is denied.

2. The bankruptcy court issuances that are the subject of the appeal (Bk.D.8254, 8255, 8596, 8626) are reversed.

3. The case is remanded to the bankruptcy court for further proceedings consistent with the memorandum opinion issued this same day.

**Parallel Citations**

51 Bankr.Ct.Dec. 211

51 Bankr.Ct.Dec. 211

## Footnotes

1 "Debtors" are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. Ill Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; and NCoral, L.P., a Delaware limited liability partnership. (Bk. D.I. 8254 at 1 n. 1) "Debtors" also include New Century Warehouse Corporation (a/k/a Access Lending), a California corporation, which filed its voluntary chapter 11 petition on August 3, 2007. (*Id.*) In total, there are sixteen debtors-in-possession. (*Id.* at 10)

2 Appellants at one time had two appeals pending, but the earlier-filed appeal has been consolidated with the instant appeal by order of the court. (D.I.9)

3 Formed as a Delaware corporation in 1995, the entity formerly known as New Century Financial Corporation ("NCFC") was the parent corporation of the other debtor entities. (Bk. D.I. 8254 at 21) In 2004, in anticipation of NCFC being reorganized into a Maryland real estate investment trust ("REIT") for federal income tax purposes, New Century REIT, Inc. (a Maryland corporation with REIT status) and its wholly-owned subsidiary, NC Merger Sub, Inc. (a Delaware corporation), were established. (*Id.*) On October 1, 2004, to effect the reorganization, NC Merger Sub was merged into NCFC, and NCFC's name was changed to New Century TRS Holdings, Inc. ("TRS Holdings"). (*Id.*) TRS Holdings, the surviving corporation, was now a wholly-owned subsidiary of New Century REIT, Inc., with New Century REIT, Inc., taking the name of "New Century Financial Corporation." (*Id.*) After the merger and reorganization, debtors' general ledger system identified the entity now known as New Century Financial Corporation as "REIT," but continued to identify TRS Holdings as NCFC, its former name. (*Id.*) The court herein refers to the entity formerly known as NCFC and now known as TRS Holdings as TRS Holdings.

4 Measured by the value of pre-petition assets, debtors' bankruptcy filing was the largest chapter 11 filing in 2007 and, as of February 29, 2008, the ninth-largest ever. (Bk. D.I. 8254 at 9 n. 11)

5 As of December 31, 2006, the Deferred Compensation Trust contained more than $43 million. (Bk. D.I. 8254 at 27)

6 ERISA defines a "top hat" plan as "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated individuals." 29 U.S.C. § 1051(2)

7 Appellants argue in the adversary proceeding that, if the Deferred Compensation Plans are not top hat plans subject to ERISA, then any employee contributions "never inure[d] to the benefit of any employer and [have been] held for the exclusive purpose of providing benefits to participants in the [compensation] plan and their beneficiaries and defraying reasonable expenses of administering the [compensation] plan." (Bk. D.I. 8254 at 28 n. 23 (quoting 29 U.S.C. § 1103(c)(1))) In the alternative, appellants argue that the terms of the Deferred Compensation Plans and the Deferred Compensation Trust provide that the Deferred Compensation Trust is available only to general creditors of NCFC. (*Id.* at 28)

8 The Holding Company Debtors consist of NCFC, TRS Holdings, New Century Credit Corporation ("NC Credit"), and NC Residual IV Corporation ("NC Residual IV"). (Bk. D.I. 8254 at 11)

9 The Operating Company Debtors consist of New Century Mortgage Corporation ("NCMC"), NC Capital Corporation ("NC Capital"), Home123 Corporation ("Home123"), NC Asset Holding, L.P. ("NC Asset Holding"), NC Deltex, LLC ("NC Deltex"), New Century REO Corporation ("NC REO"), New Century REO II Corporation ("NC REO II"), New Century REO III Corporation ("NC REO III"), NC Residual III Corporation ("NC Residual III"), New Century Mortgage Ventures, LLC ("NCM Ventures"), and NCoral, L.P. ("NCoral"). (Bk. D.I. 8254 at 11)

10 The plan provides that certain provisions may not "be stricken, altered, or invalidated," including provisions related to the Multi–Debtor Claim and Intercompany Protocols and the treatment and classification of claims. (*See* Bk. D.I. 6412 at 105)

11 These claims appear on debtors' books and records, but there are no promissory notes or instruments evidencing the debt. (Bk. D.I. 8254 at 16)

12 The plan defines an "EPD/Breach Claim" as a claim "arising under an agreement between one or more of the Debtors and a loan buyer or securitization party for (i) breach of representation or warrant under such agreement made by one or more of the Debtors

or (ii) a right under such an agreement to resell a loan to one or more of the Debtors based on a payment default by the borrower on such loan." (Bk. D.I. 8254 at 18)

13  Under the plan, "Litigation Proceeds" are the net proceeds generated from any litigation (except those proceeds belonging to Access Lending) and include any net proceeds from avoidance actions and suits arising out of the need to restate 2006 financial statements. (Bk. D.I. 8254 at 24)

14  Access Lending's assets consist primarily of proceeds from the liquidation of its assets in April 2007 and the cash in its operating account as of the petition date. (Bk. D.I. 8254 at 20 n. 18)

15  During plan negotiations, issues arose over which debtors owned which assets. (Bk. D.I. 8254 at 20–21) These issues stemmed primarily, with respect to the Holding Company Debtors especially, from the 2004 reorganization involving NCFC and TRS Holdings discussed *supra* in footnote 3. (*See id.* at 21)

16  The Carrington Interests are two different partnership interests owned by debtors—one is a general partnership interest valued by debtors at approximately $8 million, and the other is a limited partnership interest valued by the debtors at approximately $42.5 million. (Bk. D.I. 8254 at 22) Debtors' accounting records show that the Carrington Interests are owned by TRS Holdings, but other documents after the 2004 reorganization make ownership unclear. (*Id.*) Income from the limited partnership interest is presently being realized by NCFC, but NCMC advanced the money that TRS Holdings used to purchase the interest. (*Id.*) The Creditors' Committee has asserted that NCMC, by virtue of its having funded the purchase, should be entitled to that interest. (*Id.*)

17  The confusion over whether NCFC or TRS Holdings owned the Carrington Interests and the Deferred Compensation Trust led to the decision to aggregate the assets of the Holding Company Debtors for purposes of distribution. (Bk. D.I. 8254 at 22)

18  It was further agreed during plan negotiations that NCMC would receive any potential tax refunds owed to debtors. (Bk. D.I. 8254 at 24)

19  For reasons not made clear in the bankruptcy court's confirmation order or in the parties' briefs on appeal, the bankruptcy court and the parties treat the voting results on the first amended plan as applicable to the second amended plan.

20  On July 28, 2008, in preparation for the plan taking effect, all of Access Lending's stock was transferred to the liquidating trust, which then became the sole shareholder of Access Lending. (D.I. 14 at attach. 1, ¶ 10)

21  As of the effective date, the Holding Company Debtors had no cash with which to pay their share of administrative expenses. (D.I. 14 at attach. 1, ¶ 24) As part of plan compromises, between the effective date and December 31, 2008, the Operating Company Debtors paid $5.6 million to cover the Holding Company Debtors' share. (*Id.*)

22  Debtors also ceased having employees. (D.I. 14 at attach. 1, ¶ 7)

23  Jacobs speculates that these cancellations precipitated significant tax events in 2008 for equity holders and creditors. (D.I. 14 at attach. 1, ¶ 13)

24  Jacobs avers that the liquidating trust has distributed approximately $21.12 million in payment of professional fees and other pre-effective date administrative claims (D.I. 14 at attach. 1, ¶ 20), but he fails to clarify the allocation between professional fees and administrative claims or whether the $5.65 million in post-effective date professional fees is included in the $21.12 million figure.

25  The bankruptcy court approved each of these settlements. (*See* D.I. 14 at attach. 1, ¶ 21) The liquidating trust also entered into settlements not requiring the bankruptcy court's approval, including settlements with Bloomington Associates 2005 LLC, the Ohio Attorney General, and various taxing authorities. (*Id.* at attach. 1, ¶ 22)

26  The *PWS Holding* court goes on to state that "the foremost consideration is whether the reorganization plan has been substantially consummated," *PWS Holding, 228 F.3d at 236*, but, as discussed hereafter, that statement does not necessarily hold true in the liquidation context.

27  It is reasonable to question whether the equitable mootness doctrine, as articulated by the Third Circuit, even applies in the liquidation context. The court in *In re Zenith Electronics Corp.* stated that "[t]he underlying purpose of the doctrine is to 'prevent[ ] a court from unscrambling complex bankruptcy **reorganizations** when the appealing party should have acted before the plan became extremely difficult to retract.' " *329 F.3d 338, 345 (3d Cir.2003)* (quoting *Nordhoff Investments, Inc. v. Zenith Electronics Corp., 258 F.3d 180, 185 (3d Cir.2001)*) (emphasis added). Similarly, the court in *Continental,* in listing factors for determining whether the doctrine should apply, expressly referred to "reorganization." *See Continental, 91 F.3d at 560.* Likewise, the courts in *Nordhoff, PWS Holding,* and *Zenith* discussed the doctrine applying in a reorganization context. *See generally Nordhoff, 258 F.3d at 185–90; PWS Holding, 228 F.3d at 235–37; Zenith, 329 F.3d at 343–47.*

That said, the express focus on reorganization in these cases can reasonably be attributed to the fact that reorganization plans were at issue in each. Moreover, the court is not aware of any reason why it should be concerned with inequitable appellate relief in a reorganization context but not in a liquidation context. Accordingly, the court assumes, as have other courts in the Third Circuit, that the equitable mootness doctrine may apply in a liquidation context. *See In re Nellson Nutraceutical, Inc., 2008 WL 4532514 (D.Del. Oct.9, 2008); In re Reading Broadcasting, Inc., 2008 WL 3540212 (E.D.Pa. Aug.8, 2008).*

**28**    "*Continental* and its progeny" refers to *Continental* and *PWS Holding,* both cited previously, as well as *Nordhoff Investments, Inc. v. Zenith Electronics Corp., 258 F.3d 180 (3d Cir.2001),* and *In re Zenith Electronics Corp., 329 F.3d 338 (3d Cir.2003).*

**29**    Appellants argue that not all or substantially all of debtors' assets have been transferred to the liquidating trust because it has not yet been determined whether debtors had rights to the amounts contributed under the Deferred Compensation Plans, which is a significant asset. Appellees counter, and the court agrees, that appellants' argument on this point misses the mark. Whatever rights debtors had with respect to those amounts (even if they had no rights) were transferred as of the effective date, thus satisfying the requirement that all or substantially all assets be transferred.

**30**    For example, distributions to administrative and WARN Act claimants.

**31**    The cancellation of debt and equity may have had tax implications for non-adverse third parties, as Jacobs speculates. However, the record does not establish that a successful appeal would create such difficulty with respect to tax filings as to render the appeal inequitable. Accordingly, the court gives no weight to this speculation.

**32**    "A factual finding is clearly erroneous when 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *In re CellNet Data Sys., Inc.,* 327 F.3d 242, 244 (3d Cir.2003) (citing *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)).

**33**    The court does not address appellants' three additional questions since resolving the two questions listed here is sufficient to instruct the parties and the bankruptcy court on remand as to the strictures governing subsequent iterations of the plan.

**34**    While the court appreciates the complexity of dealing with the tangle of debtor entities involved at bar, nonetheless, there are limits to what equity alone can accomplish. The Third Circuit has established those limits in *Owens Corning* and, while it is the final arbiter of how those limits apply to any individual fact scenario, this court declines to further expand the scope of equitable powers given a bankruptcy court in these circumstances.

---

**End of Document**                              © 2014 Thomson Reuters. No claim to original U.S. Government Works.

 © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 133

348 B.R. 234
United States Bankruptcy Court,
D. Delaware.

In re WINSTAR COMMUNICATIONS,
INC. et al., Debtors.
Christine C. Shubert, Chapter 7 Trustee, Plaintiff,
v.
Lucent Technologies Inc., Defendant.

Bankruptcy No. 01–1430 (JBR).    |    Adversary
No. 01–1063 (JBR).    |    Dec. 21, 2005.

**Synopsis**
**Background:** Chapter 11 debtor-telecommunications carrier and its debtor-subsidiary brought adversary proceeding against debtor's lender-equipment supplier. Following case conversion, Chapter 7 trustee filed amended complaint asserting claims for, inter alia, breach of subcontract, preference, and equitable subordination. Lender-supplier filed counterclaim alleging, inter alia, fraud and negligent misrepresentation.

**Holdings:** After conducting trial, the Bankruptcy Court, Joel B. Rosenthal, J., held that:

[1] remaining claims and counterclaims fell within bankruptcy court's core jurisdiction;

[2] lender-supplier breached subcontract under New York law by refusing to pay invoice for work performed by subsidiary;

[3] transfer by debtor of loan proceeds to lender-supplier was preferential transfer;

[4] equitable subordination of claim of lender-supplier was warranted;

[5] lender-supplier did not reasonably rely upon debtor's alleged fraudulent misrepresentations; and

[6] lender-supplier failed to establish negligent misrepresentation claim under New York law.

Judgment for trustee.

West Headnotes (51)

[1] **Bankruptcy**
 Orders

Pursuant to bankruptcy court's pretrial order, adversary defendant waived counterclaims that were not raised in joint pretrial memorandum.

Cases that cite this headnote

[2] **Bankruptcy**
 Counterclaims
**Bankruptcy**
 Claims or proceedings against estate or debtor; relief from stay

District court's findings that claims and counterclaims asserted in Chapter 7 trustee's adversary proceeding against debtor's lender-equipment supplier fell within claims allowance process necessitated determination that claims fell within bankruptcy court's core jurisdiction. 28 U.S.C.A. § 157(b)(2)(B).

Cases that cite this headnote

[3] **Bankruptcy**
 Claims or proceedings against estate or debtor; relief from stay

Whether debtor's lender-equipment supplier breached subcontract by refusing to pay on spreadsheet reflecting work performed by debtor's wholly-owned subsidiary had direct bearing upon whether lender-supplier could recover under its proof of claim for equipment and money loaned, and, if so, in what amount, and therefore Chapter 7 trustee's claim for breach of subcontract fell within bankruptcy court's core jurisdiction, even though proof of claim was filed after original complaint in adversary proceeding raising breach of subcontract claim. 28 U.S.C.A. § 157(b)(2)(B).

2 Cases that cite this headnote

[4] **Bankruptcy**

☞ **Particular proceedings or issues**

Equitable subordination, as an action affecting the liquidation of the assets of the bankruptcy estate or the adjustment of the debtor-creditor or the equity security holder relationship, is a "core" proceeding. 28 U.S.C.A. § 157(b)(2).

Cases that cite this headnote

**[5]** **Bankruptcy**
    ☞ Counterclaims
**Bankruptcy**
    ☞ Claims or proceedings against estate or debtor; relief from stay

Counterclaims for fraud and negligence asserted by debtor-telecommunications carrier's lender-equipment supplier in Chapter 7 trustee's adversary proceeding fell within ambit of lender-supplier's proof of claim and thus were both part of claims allowance process and within bankruptcy court's core jurisdiction, given that counterclaims arose from lender-supplier's due diligence performed under its credit agreement with debtor and conduct in which debtor allegedly engaged in connection with that agreement, which in turn was related to network buildout contract between debtor and lender-supplier underlying proof of claim, since it provided means by which debtor was to obtain financing to pay for goods and services under network buildout contract, including those services subcontracted to debtor's subsidiary under its subcontract with lender-supplier. 28 U.S.C.A. § 157(b)(2).

2 Cases that cite this headnote

**[6]** **Bankruptcy**
    ☞ Consent to or Waiver of Objections to Jurisdiction or Venue

Even if breach of subcontract claim and fraud and negligence counterclaims in Chapter 7 trustee's adversary proceeding against debtor-telecommunications carrier's lender-equipment supplier were non-core matters, lender-supplier waived its objection to bankruptcy court's entry of final orders through its conduct, given that lender-supplier both narrowed what counts and

counterclaims it believed fell outside court's core jurisdiction and repeatedly sought judgment in its favor without noting that court could only recommend findings and conclusions to district court, that lender-supplier failed to raise in joint pretrial memorandum core or non-core nature of claims and counterclaims as legal issue to be determined, and that lender-supplier asserted setoff claims against bankruptcy estate, which it acknowledged was a core matter. 28 U.S.C.A. § 157; Fed.Rules Bankr.Proc.Rule 7012(b), 11 U.S.C.A.

3 Cases that cite this headnote

**[7]** **Contracts**
    ☞ Written Contracts

Through their behavior, telecommunications carrier, its wholly-owned subsidiary, and lender-equipment supplier modified subcontract to provide for payment of purchase orders, invoices, and the like by lender-supplier after subsidiary performed work under subcontract, and therefore lender-supplier breached subcontract under New York law by refusing to pay invoice for work performed by subsidiary due to lack of task order required by subcontract; based upon lender-supplier's past practices, neither carrier nor subsidiary was unreasonable in relying upon lender-supplier's practice of funding and paying for services upon presentation of invoice and spreadsheet, or in expecting practice to continue.

Cases that cite this headnote

**[8]** **Contracts**
    ☞ Parol modification

Although "no oral modification" contract clauses are generally enforceable under New York law, there are two exceptions: (1) when an oral modification is supported by full performance, or by partial performance unequivocally referable to the oral modification, and (2) when a party has relied upon an oral modification through conduct which is incompatible with the express terms of the contract; in latter circumstances, equitable estoppel will prevent the other party

from attempting subsequent strict reliance on the written terms.

Cases that cite this headnote

**[9]    Contracts**
 **Parol modification**

Under New York law, oral directions to perform extra work, or the general course of conduct between the parties, may modify or eliminate contract provisions requiring written authorization or notice of claims.

Cases that cite this headnote

**[10]    Contracts**
 **Evidence**

Under New York law, when a contract has not been fully performed, the party seeking relief from the written terms of the contract must introduce evidence of conduct on the part of other parties or reliance on his own part which is unequivocally referable to an alleged oral modification and incompatible with the contract's written terms.

Cases that cite this headnote

**[11]    Frauds, Statute Of**
 **Part Performance in General**

Given that, under New York law, doctrine of part performance is based upon the equitable principle that it would be a fraud to allow one party, insisting on the statute of frauds, to escape performance after permitting the other party, acting in reliance, to substantially perform, the acts of part performance must have been those of the party insisting on the contract, not those of the party insisting on the statute of frauds.

Cases that cite this headnote

**[12]    Bankruptcy**
 **Proceedings**

By agreeing to stipulated fact which indicated that the transfer element of Chapter 7 trustee's claim alleging preferential transfer had been satisfied, creditor waived argument that no

transfer of debtor's interest had occurred, notwithstanding its subsequent assertion that trustee had not sustained burden of proving that transfer element of claim was met. 11 U.S.C.A. § 547(b).

Cases that cite this headnote

**[13]    Bankruptcy**
 **When Transfer Occurs**

Transfer of debtor-telecommunications carrier's interest in property occurred, for purposes of Chapter 7 trustee's preferential transfer claim, when debtor paid over portion of loan proceeds obtained from different lender to its lender-equipment supplier, given that, but for payment of loan proceeds to lender-supplier, debtor would have had use of such funds; that failure to pay lender-supplier upon completion of financing transaction might have given rise to claim by lender-supplier for breach of contract did not nullify fact that transfer of debtor's interest was made. 11 U.S.C.A. § 547(b).

Cases that cite this headnote

**[14]    Bankruptcy**
 **Ownership of interest transferred**

In determining whether a transfer was "an interest of the debtor in property," for purposes of preferential transfer claim, courts apply the "diminution of estate doctrine," under which a transfer of an interest of the debtor occurs when a transfer diminishes directly or indirectly the fund to which creditors of the same class can legally resort for the payment of their debts to such an extent that it is impossible for other creditors of the same class to obtain as great a percentage as the favored one. 11 U.S.C.A. § 547(b)(1).

Cases that cite this headnote

**[15]    Bankruptcy**
 **Ownership of interest transferred**

Earmarking doctrine did not apply to preclude determination that transfer of debtor-telecommunications carrier's interest in property occurred, for preferential transfer purposes,

when debtor paid over portion of loan proceeds obtained from different creditor to its lender-equipment supplier, given that debtor did not assign its interest in loan proceeds to lender-supplier, but rather had simple contractual obligation to pay over proceeds, and given that debtor did not have agreement with creditor to use loan proceeds to pay lender-supplier. 11 U.S.C.A. § 547(b)(1).

Cases that cite this headnote

[16]    **Bankruptcy**
    Pleading

Earmarking was affirmative defense that was waived by creditor when creditor failed to plead it as such in Chapter 7 trustee's preference avoidance action. 11 U.S.C.A. § 547(b).

3 Cases that cite this headnote

[17]    **Bankruptcy**
        Construction and Operation

Bankruptcy Code's test of insolvency, the so-called "balance sheet" insolvency, compares the fair value of all of debtor's assets with the face or stated value of debtor's liabilities on the relevant date, and is different from equity tests that focus on debtor's current ability to pay debts as they become due. 11 U.S.C.A. §§ 101(32), 547(b).

3 Cases that cite this headnote

[18]    **Bankruptcy**
        Insolvency

Although generally accepted accounting principles (GAAP) are relevant in solvency analysis conducted for purposes of preference avoidance claim, it is not determinative. 11 U.S.C.A. § 547(b).

Cases that cite this headnote

[19]    **Bankruptcy**
        Actions and Proceedings in General

Whether a company is insolvent under the Bankruptcy Code is considered a mixed question of law and fact. 11 U.S.C.A. § 101(32).

Cases that cite this headnote

[20]    **Bankruptcy**
        Construction and Operation

A fair valuation of assets, for purposes of determining whether debtor was insolvent under Bankruptcy Code, contemplates a conversion of assets into cash during a reasonable period of time, and while the determination of what is a reasonable period of time depends upon the facts of each case, a reasonable time should be an estimate of the time that a typical creditor would find optimal: not so short a period that the value of the goods is substantially impaired via a forced sale, but not so long a time that a typical creditor would receive less satisfaction of its claim, as a result of the time value of money and typical business needs, by waiting for the possibility of a higher price. 11 U.S.C.A. § 101(32).

Cases that cite this headnote

[21]    **Bankruptcy**
    Insolvency

Whether, in evaluating debtor's solvency in the context of preference avoidance action, determination of "fair value" requires valuing debtor's assets at the time of challenged transfer as a going concern or on some other basis, such as a liquidation sale, depends upon whether a liquidation in bankruptcy was clearly imminent on the date of challenged transfer; moreover, "going concern" value may not be an appropriate test in an unstable market. 11 U.S.C.A. §§ 101(32), 547(b).

Cases that cite this headnote

[22]    **Bankruptcy**
    Insolvency

Transferee's market approach to valuation of debtor-telecommunications carrier, for purposes of determining whether debtor was solvent on date of allegedly preferential transfer, artificially overvalued debtor, given that market investors did not know that transferee, as debtor's lender-equipment supplier, was holding back on

issuing refinancing notice, that transferee, but not average investor, knew that debtor's true financial picture was much bleaker than debtor's publicized financials would indicate, and that market was too unstable to be adequate indicator of value. 11 U.S.C.A. §§ 101(32), 547(b).

Cases that cite this headnote

[23]    **Bankruptcy**
        👉 Insolvency

Under asset approach to valuation of debtor-telecommunications carrier, debtor was insolvent by approximately $1,600,000,000 on date of allegedly preferential transfer to debtor's lender-equipment supplier, notwithstanding lender-supplier's contention that actual sales price obtained for debtor's assets, as going concern, could not be considered in determining debtor's prepetition insolvency. 11 U.S.C.A. §§ 101(32), 547(b).

Cases that cite this headnote

[24]    **Bankruptcy**
        👉 Insolvency

Under rule of retrojection, when debtor was insolvent on the first known date and insolvent on the last relevant date, and trustee demonstrates the absence of any substantial or radical changes in debtor's assets or liabilities between the retrojection dates, debtor is deemed to have been insolvent at all intermediate times for purposes of trustee's preference avoidance claim. 11 U.S.C.A. §§ 101(32), 547(b).

5 Cases that cite this headnote

[25]    **Bankruptcy**
        👉 Insolvency

Use of capitalized debt-free method of estimating company's value under income approach mandated finding that debtor-telecommunications carrier was insolvent on date of alleged preferential transfer to debtor's lender-equipment supplier, given that debtor never had any debt-free cash flow, and that, by year of challenged transfer, debtor's losses had

grown to $870,000,000. 11 U.S.C.A. §§ 101(32), 547(b).

1 Cases that cite this headnote

[26]    **Bankruptcy**
        👉 Insolvency

Discounted cash flow methodology for valuing company under income approach could not be used to determine whether debtor-telecommunications carrier was insolvent on date of allegedly preferential transfer to its lender-equipment supplier, given unreliability of debtor's future projections, which included growth rates significantly in excess of what was projected to be reasonable growth in the telecommunications industry, and given debtor's historical understatement of its expenses.

Cases that cite this headnote

[27]    **Bankruptcy**
        👉 Construction and Operation

Absent unusual circumstances, Bankruptcy Code's insolvency test anticipates that liabilities will be valued at their face value. 11 U.S.C.A. § 101(32).

Cases that cite this headnote

[28]    **Bankruptcy**
        👉 Construction and Operation

Whether a party is or was "in control" of a debtor, and thus an insider as defined by Bankruptcy Code, requires a case-by-case determination. 11 U.S.C.A. § 101(31).

Cases that cite this headnote

[29]    **Bankruptcy**
        👉 Construction and Operation

True test of "insider" status under Bankruptcy Code is whether one's dealings with the debtor cannot accurately be characterized as arm's-length; emphasis is on the nature of the relationship between debtor and the other person, especially on whether their relationship gave the

other person the power or influence to have a debt owed to it repaid. 11 U.S.C.A. § 101(31).

1 Cases that cite this headnote

**[30]** **Bankruptcy**
   👈 Construction and Operation

In determining whether a creditor, and particularly a bank, has the requisite level of control to be debtor's insider under the Bankruptcy Code, courts examine whether the creditor had more ability to assert control than other creditors and whether the creditor made management decisions for debtor, directed work performance, and directed payment of debtor's expenses; there must be day-to-day control, rather than some monitoring or exertion of influence regarding financial transactions in which the creditor has a direct stake. 11 U.S.C.A. § 101(31).

3 Cases that cite this headnote

**[31]** **Bankruptcy**
   👈 Insider transferees; reasonable cause to believe debtor insolvent

**Bankruptcy**
   👈 Trial

Although whether allegedly preferential transfer was done under pressure from creditor is one fact to be considered in determining issue of creditor's control, creditor's use of its insider's status to force the making of the preferential payment is not required. 11 U.S.C.A. §§ 101(31), 547(b).

2 Cases that cite this headnote

**[32]** **Bankruptcy**
   👈 Insider transferees; reasonable cause to believe debtor insolvent

Lender-equipment supplier for debtor-telecommunications carrier was debtor's "insider" at time of challenged transfer, as required for transfer, which occurred outside 90-day prepetition preference period but less than one year prepetition, to qualify as preferential transfer under Bankruptcy Code,

given evidence and adverse inferences drawn from invocation of Fifth Amendment privilege against self-incrimination by lender-supplier's former employees, that lender-supplier forced debtor's purchase of its goods before equipment was needed and even when goods were not needed, and that lender-supplier forced debtor's involvement in lender-supplier's scheme to inflate revenues. U.S.C.A. Const.Amend. 5; 11 U.S.C.A. §§ 101(31), 547(b).

Cases that cite this headnote

**[33]** **Witnesses**
   👈 Effect of refusal to answer

Fifth Amendment privilege against self-incrimination does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them. U.S.C.A. Const.Amend. 5.

Cases that cite this headnote

**[34]** **Witnesses**
   👈 Effect of refusal to answer

Invocation by former employees of debtor's lender-equipment supplier of Fifth Amendment privilege against self-incrimination warranted drawing of adverse inferences with respect to Chapter 7 trustee's preference avoidance claim against lender-supplier, given that both witnesses were employees of lender-supplier when relevant actions occurred, both were parties to action by Securities and Exchange Commission (SEC) arising from related events, and questions that both refused to answer related directly to their actions as lender-supplier's employees during relevant time period, and given that independent evidence showed witnesses' involvement in transactions about which they were questioned. U.S.C.A. Const.Amend. 5; 11 U.S.C.A. § 547(b).

1 Cases that cite this headnote

**[35]** **Witnesses**
   👈 Effect of refusal to answer

That former employees of debtor-telecommunications carrier's lender-equipment supplier were not parties to Chapter 7 trustee's adversary proceeding against lender-supplier, and were no longer employed by lender-supplier at time of action, did not make admission of their testimony, in which former employees invoked Fifth Amendment privilege against self-incrimination, impermissible. U.S.C.A. Const.Amend. 5.

Cases that cite this headnote

**[36]  Witnesses**
  Effect of refusal to answer

Before an adverse inference may be drawn from a party's refusal to testify in a civil case, there must be independent corroborative evidence to support the negative inference beyond the invocation of Fifth Amendment privilege against self-incrimination. U.S.C.A. Const.Amend. 5.

1 Cases that cite this headnote

**[37]  Bankruptcy**
  Elements and Exceptions

Transfer of interest of debtor-telecommunications carrier that occurred when debtor, while insolvent, paid over portion of loan proceeds obtained from different lender to its lender-equipment supplier, which was debtor's insider, was preferential transfer. 11 U.S.C.A. § 547(b).

Cases that cite this headnote

**[38]  Bankruptcy**
  Particular cases

To the extent that lender-equipment supplier provided new value to debtor-telecommunications carrier, after receiving preferential transfer of loan proceeds from debtor, it did so only on secured basis, and therefore lender-supplier could not rely on new value affirmative defense to preference avoidance claim. 11 U.S.C.A. § 547(g).

Cases that cite this headnote

**[39]  Bankruptcy**
  New Value

To support a new value affirmative defense to preference avoidance claim, creditor must establish that, after receiving a preferential payment, creditor advanced "new value" to debtor not secured by an otherwise unavoidable security interest. 11 U.S.C.A. § 547(c)(4)(A).

Cases that cite this headnote

**[40]  Bankruptcy**
  Inequitable conduct

Courts considering equitable subordination follow the *Mobile Steel* test, under which (1) the claimant must have engaged in some type of inequitable conduct, (2) the misconduct must have resulted in injury to the creditors of the debtor or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim must not be inconsistent with the Bankruptcy Code. 11 U.S.C.A. § 510(c).

Cases that cite this headnote

**[41]  Bankruptcy**
  Determination of priority

When creditor is debtor's insider, the proof required to prove equitable subordination is not demanding, in that trustee need only show material evidence of unfair conduct. 11 U.S.C.A. § 510(c).

1 Cases that cite this headnote

**[42]  Bankruptcy**
  Inequitable conduct

For non-insider claimants, egregious conduct must be established to justify equitable subordination of claim under Bankruptcy Code. 11 U.S.C.A. § 510(c).

1 Cases that cite this headnote

**[43]  Bankruptcy**
  Insiders, stockholders, fiduciaries, and dominant persons

In the context of equitable subordination claim under Bankruptcy Code, there are three categories of misconduct which may constitute inequitable conduct for insiders: (1) fraud, illegality, and breach of fiduciary duties, (2) undercapitalization, and (3) claimant's use of debtor as a mere instrumentality or alter ego. 11 U.S.C.A. § 510(c).

Cases that cite this headnote

[44]    **Bankruptcy**
          👉 Inequitable conduct

Lender-equipment supplier for debtor-telecommunications carrier engaged in egregious conduct supporting equitable subordination under Bankruptcy Code, regardless of whether lender-supplier was treated as debtor's insider, given that lender-supplier used debtor as mere instrumentality to inflate its own revenues, repeatedly threatened debtor with nonpayment after debtor's subsidiary performed significant services under subcontract so as to extract more from debtor, as lender-supplier's captive buyer, and deliberately delayed issuing refinancing notice to debtor to ensure that third-party refinancing occurred and new equity was infused into debtor. 11 U.S.C.A. § 510(c).

Cases that cite this headnote

[45]    **Bankruptcy**
          👉 Inequitable conduct

Egregious misconduct in which lender-equipment supplier engaged with respect to debtor-telecommunications carrier resulted in substantial damages to debtor and debtor's creditors, supporting Chapter 7 trustee's claim for equitable subordination under Bankruptcy Code, including lender-supplier's receipt of preferential transfer of loan proceeds resulting from debtor's third-party refinancing, interest paid by debtor to lender-supplier on unnecessary equipment and services bought by debtor to generate revenue for lender-supplier, and harm resulting from lender-supplier's intentional delay in sending debtor refinancing notice until debtor

received proceeds of third-party refinancing. 11 U.S.C.A. § 510(c).

Cases that cite this headnote

[46]    **Bankruptcy**
          👉 Inequitable conduct

Equitable subordination of claim asserted against debtor-telecommunications carrier by its secured lender-supplier was not inconsistent with Bankruptcy Code, given lender-supplier's egregious conduct in using debtor to inflate its own revenues and damages suffered by debtor and its creditors due to such misconduct by lender-supplier, and therefore claim of lender-supplier would be subordinated to claims of all creditors, including all unsecured claims and deficiency claim of third-party lender, the proceeds of whose loan were subject of preferential transfer to lender-supplier, and those entities who infused equity into debtor at the time preferential transfer was made. 11 U.S.C.A. § 510(c).

Cases that cite this headnote

[47]    **Contracts**
          👉 Agreements relating to actions and other proceedings in general

Under Delaware law, express choice of law provisions in contracts are generally given effect.

Cases that cite this headnote

[48]    **Fraud**
          👉 Elements of Actual Fraud

        **Fraud**
          👉 Fraudulent Concealment

        **Fraud**
          👉 Weight and Sufficiency

To prevail on fraud claim under New York law, claimant must establish, by clear and convincing evidence, each of the following elements: (1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, (4) reasonable reliance on the representation, and (5) resulting damages.

**[49]    Fraud**
    👉 Reliance on Representations and Inducement to Act

To the extent that telecommunications carrier was not in compliance with covenant under credit agreement imposing limits on its cash capital expenditures when it made representations of compliance in connection with four borrowings, lender did not reasonably rely upon carrier's representations, as required to establish fraud under New York law, given that lender was well aware of carrier's financial status and that some of lender's employees had attempted to help carrier to lower its cash capital expenditures to comply with covenant.

Cases that cite this headnote

**[50]    Fraud**
    👉 Statements recklessly made; negligent misrepresentation

**Fraud**
    👉 Weight and Sufficiency

To establish a claim of negligent misrepresentation under New York law, claimant must prove by a preponderance of the evidence (1) carelessness in imparting words, (2) upon which others were expected to rely, (3) and upon which others acted or failed to act, (4) to their damage, and (5) that declarant expressed the words directly to one to whom it is bound by some relation or owes a special duty of care; claimant must also demonstrate that its reliance on the alleged misrepresentations was reasonable.

Cases that cite this headnote

**[51]    Fraud**
    👉 Reliance on Representations and Inducement to Act

Lender-equipment supplier that was deeply immersed in telecommunications carrier's financial transactions could not ignore its own knowledge of carrier's precarious financial

condition and feign surprise to learn that carrier breached covenant of credit agreement imposing limits on carrier's cash capital expenditures in connection with four borrowings in which carrier made representations of compliance, and thus failed to establish negligent misrepresentation claim under New York law.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*241** Stephen M. Rathkopf, Herrick, Feinstein, LLP, New York City, David R. King, Herrick, Feinstein, LLP, Princeton, NJ, for Christine C. Shubert.

Paul C. Sanders, Daniel Slifkin, Michael A. Paskin, Cravath, Swaine & Moore, LLP, New York City, Daniel J. DeFranceschi, Rebecca L. Booth, Jason J. Madron, Richards, Layton & Finger, PA, Wilmington, DE, for Lucent Technologies, Inc.

**Opinion**

**MEMORANDUM OF DECISION INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO COUNTS VII, X, AND XI OF THE SECOND AMENDED COMPLAINT AND COUNTS 5 AND 6 OF THE SECOND AMENDED ANSWER AND COUNTERCLAIMS**

JOEL B. ROSENTHAL, Bankruptcy Judge.

**[1]** This matter came before the Court for trial on Counts VII (breach of subcontract),[1] X (preference), and XI (equitable subordination) of the Second Amended **\*242** Complaint[2] and one count of fraud (Count 5) and one count of negligent misrepresentation (Count 6) of the Second Amended Answer and Counterclaims.[3] As set forth in greater detail below, the Court finds that these matters are core proceedings in which the Court may enter final orders, or with respect to Lucent's counterclaims, even if they are related to non-core proceedings, Lucent has consented to the entry of final orders.

In reaching its determinations, the Court considered the entire 21 days of testimony given by 39 witnesses, considered the demeanor and credibility of the 13 witnesses who testified

in person [4] and, to the extent possible the demeanor and credibility of the 16 witnesses whose videotaped testimony was introduced, [5] considered the credibility of the witnesses whose testimony was read into the record, reviewed the over 1400 exhibits (including many duplicates) totaling many thousands of pages admitted in evidence, heard arguments of counsel, and reviewed the various pre– and post-trial pleadings submitted in support of each party's position. The following **\*243** decision constitutes the Court's findings of fact and conclusions of law in accordance with Fed. R. Bankr.P. 7052, and as set forth below, to the extent that the district court concludes that this Court may only enter proposed finding and rulings pursuant to Fed. R. Bank. P. 9033 with respect to some or all of the counts or counterclaims, the following constitutes the Court's proposed findings and rulings with respect to such counts or counterclaims.

**EXPLANATION OF CITATIONS**

The parties have stipulated to certain facts as most recently set forth in the Revised Joint Stipulation of Uncontested Facts (the "Revised Joint Stipulation"), attached as Exhibit A to the Renumbered Joint Stipulation of Uncontested Facts [Docket # 331].

Citations to trial exhibits introduced by the Plaintiff are cited as "PX # "; Defendant's trial exhibits are cited as "DX # ." In many instances the parties introduced the same document or portions of the same document. The Court generally has cited to duplicate documents by only one exhibit number. Citations to specific pages within a multiple-page exhibit are cited by exhibit number and Bates number or by page number if the exhibit does not contain Bates numbers.

Citations to testimony in the trial transcripts (which include only testimony from witnesses who were physically present in court and deposition testimony read into the record) identify the witness, followed by the designation "Depo" in instances where the deposition testimony was read into the record, and "Tr." along with reference to the transcript volume, the page and, where needed, line numbers. The trial transcripts appear on the docket at numbers 322–326, 338, and 351–356.

Citations to transcripts of videotaped deposition testimony (which was played during trial but not transcribed as part of the trial transcript) contain the designation "Video" and identify the witness; if necessary, whether the testimony is designated as "Direct," "Cross" or "Redirect," [6] the page and

line numbers of the transcribed deposition testimony. The transcripts of the videotaped depositions or portions thereof that were introduced at trial were admitted as exhibits and are listed in the Stipulated Joint Trial Exhibits [Docket # 335].

**JURISDICTION**

1. In order to understand the Court's conclusions with respect to its jurisdiction to enter final orders, [7] it is necessary to explore Lucent's objection to this Court's entry of a final order. On April 18, 2001 **\*244** (the "Petition Date") Wireless Communications, Inc. ("Winstar") and Winstar Wireless, Inc. ("Wireless" and collectively with Winstar, the "Debtors") filed voluntary petitions for reorganization pursuant to Chapter 11 of the United States Bankruptcy Code. (Revised Joint Stipulation, ¶ 3). In January 2002 the cases were converted to Chapter 7 and shortly thereafter Christine C. Shubert (the "Trustee") was appointed as the Chapter 7 trustee. (Id., ¶¶ 3 and 4).

2. This adversary proceeding was commenced by the Debtors on the Petition Date. In July 2002 the Trustee stepped in as the Plaintiff and soon thereafter filed her Second Amended Complaint and Jury Demand ("Second Amended Complaint") [Docket # 69], the operative complaint in this case. As the caption of the Second Amended Complaint suggests, the Trustee requested a jury trial on all actions that could be tried to a jury. In the Second Amended Answer and Counterclaim of Defendant Lucent Technologies Inc. ("Lucent") to the Second Amended Complaint ("Second Amended Answer"), dated March 24, 2004 [Docket # 156], Lucent also demanded a jury trial "on all issues properly triable thereby." Subsequently the Trustee withdrew her request for a jury trial. [8] The Trustee alleged that these proceedings are core; Lucent disagreed except with respect to the preference action. (Second Amended Complaint at ¶ 3; Second Amended Answer at ¶ 3).

3. In June 2004 Lucent sought discretionary withdrawal of the reference pursuant to 28 U.S.C. § 157(d) in the district court and a waiver of Local Bankruptcy Court Rule 5011–1 as it did not file a contemporaneous motion asking the Bankruptcy Court to determine whether these matters were core or non-core [Docket # 208]. [9] In July 2004 Lucent filed a memorandum in support of its withdrawal motion [Docket # 237] and urged withdrawal of the reference on the grounds that Lucent was entitled to a jury trial on the Trustee's preference and breach of contract claims and on its own fraud and negligent misrepresentation counterclaims.

The Bankruptcy Court then stayed its proceedings pending the district court's determination of the withdrawal motion.

4. In November 2004 the district court entered its Memorandum Opinion and Order [District Court Docket 11 and 12] denying the withdrawal motion. Specifically the district court concluded that Lucent had waived its right to a jury trial by the filing of its proofs of claim and that Lucent did not meet the standards for a permissive withdrawal of the reference for "cause" under *In re Pruitt,* 910 F.2d 1160, 1168 (3d Cir.1990).

5. From before the filing of the withdrawal motion, through the conclusion of the Trustee's case-in-chief in this Court when Lucent then unsuccessfully sought judgment on partial findings pursuant to Fed. R. Bank. P. 7052, until after submission of all the evidence, and indeed, submission of each party's proposed findings of fact and conclusions of law in this adversary **\*245** proceeding.[10] Lucent did not raise the issue that the Bankruptcy Court lacked jurisdiction to enter final judgment. In fact the record is clear: Lucent sought a final order in its favor on several occasions from this Court.[11]

6. On the evening of June 9, 2005, Lucent filed a letter, dated June 8, 2005 [Docket # 343], "remind[ing] the Court that Lucent has not consented to the Court's jurisdiction to issue final orders or judgments with respect to non-core proceedings in this matter." In the letter Lucent identified the Trustee's breach of the subcontract claim and Lucent's fraud and negligent misrepresentation counterclaims as non-core. Although the June 8, 2005 letter cites to Lucent's Second Amended Answer and Counterclaims to Second Amended Complaint in support of its position that it has not consented to the entry of final orders by this Court, its failure to mention the withdrawal motion or the district court's ruling is striking and perhaps intentionally deceptive.[12]

7. At closing argument Lucent maintained that the district court's decision did not address the core/non-core issue but only whether Lucent was entitled to a jury trial. Although the district court plainly concluded that the matters on which Lucent claimed a jury trial were triable only in equity, the district court concluded that Lucent's filing of its proofs of claim triggered the claims allowance process.[13] The **\*246** "allowance or disallowance of claims against the estate" is one of the specifically enumerated types of actions which fall

within the express definition of a core proceeding. 28 U.S.C. § 157(b)(2)(B).

8. Following the district court's decision, Lucent filed a motion seeking certification of the district court's order pursuant to 28 U.S.C. § 1292. That motion was pending in the district court when this case was being tried before the Court. Subsequently the district court denied the motion.[14] The district court stated that this Court "has not determined whether this matter is a core or non-core proceeding." (Memorandum Order [District Court Docket # 21] at p. 3).

**[2]** 9. The Court, however, interprets the district court's earlier findings that the claims and counterclaims fall within the claims allowance process to necessitate a finding that these actions are core pursuant to 28 U.S.C. § 157(b)(2)(B). While fully cognizant of this Court's role in following the findings and conclusions of the district court with respect to jurisdiction in this case, lest Lucent continue to espouse the position that whether these proceedings fall within the core jurisdiction of the Bankruptcy Court remains an open issue, this Court seeks to be clear: even if the district court did not intend its use of the phrase "claims allowance process" to be read as synonymous with the language of section 157(b)(2)(B), the Court's independent examination of its own jurisdiction would lead to the same conclusion, namely, the counts decided herein are core pursuant to 28 U.S.C. § 157(b)(2)(B). Although the counterclaims for fraud and misrepresentation could be classified as non-core related to actions, Lucent has given its implicit consent to the entry of final orders on those counterclaims. The rationale for these findings is set forth below.

**[3]** 10. As set forth in greater detail below, in 1998 Lucent and Winstar entered into a Credit Agreement (the "First Credit Agreement") (DX 96) whereby Lucent was the primary secured lender to Winstar, and a Supply Agreement (PX 123) whereby Lucent was to provide Winstar with a turnkey buildout of its global communications network. Because Lucent was unable or unwilling to perform the buildout, it subcontracted services to Wireless under the Network Agreement for Buildout Services (the "Subcontract") (DX 177). The expectation was that Lucent would, in time, assume all of its obligations under the Supply Agreement. Accordingly, the Supply Agreement contemplated that Lucent would "develop a transition plan with Winstar's input, review and potential approval" scheduling Lucent's assumption of the various aspects of the

buildout. (PX 123 at Schedule A ¶ 3.3(a); *see also* PX 123 at ¶ 6.1 and ¶ 6.5). Although all obligations under the First Credit Agreement **\*247** were fully paid in 2000, the First Credit Agreement was replaced by a Second Credit Agreement (DX 29). The anticipated Transition Plan never came to fruition [15] and thus the parties continued to operate under the Supply Agreement and Subcontract.

11. In October 2001 Lucent filed a proof of claim (the "Proof of Claim") (PX 340) which, on its face, states Lucent held a secured claim (and to the extent not secured, an unsecured claim) in "[a]n amount not less than $138,957,218.90" for "goods sold," "money loaned," and "other." In the "Summary of Supporting Documentation" attached as Tab A.2 to the Proof of Claim, Lucent described the documents which support its claim as the "Supply Agreement ..., any amendments thereto and *any and all related documents, agreements and statements of work.*" (Emphasis added). The Subcontract is certainly an agreement related to the Supply Agreement; it is the means by which Lucent was to fulfill its obligation to perform the network buildout. In addition, although the parties do not define a "statement of work," its plain meaning suggests it is nothing more than a description or list of work performed. The March 2001 "spreadsheet," [16] against which Lucent refused to pay, is a breakdown of the services performed. (PX 245). Thus this spreadsheet appears to qualify as a statement of work. Whether Lucent may have breached the Subcontract by refusing to pay the March 2001 spreadsheet has a direct bearing upon whether Lucent may recover under its Proof of Claim and if so, in what amount. Therefore the breach of the Subcontract claim falls within the core jurisdiction of the Court. 28 U.S.C. § 157(b)(2)(B). *Southeastern Sprinkler Co., Inc. v. Meyertech Corp. (In re Meyertech Corp.),* 831 F.2d 410, 418 (3d Cir.1987)(creditor's filing a proof of claim on a pre-petition breach of contract action created an action in bankruptcy court that "[b]y its very nature [ ] fits directly under the more specific definition of a core proceeding under § 157(b)(2)(B) ...."). *See also S.G. Phillips Constructors, Inc. v. City of Burlington, Vermont (In re S.G. Phillips Constructors, Inc.),* 45 F.3d 702 (2d Cir.1995)(filing a proof of claim converts a pre-petition state law claim into a core proceeding); *In re NDEP Corp.,* 203 B.R. 905, 910 (D.Del.1996).

12. The Court is cognizant of the fact the Proof of Claim was filed after the original complaint in this matter. That fact is insufficient to render the above case distinguishable and the breach of contract claim non-core. Although older cases often cite what has been described as a "firmly established rule that

subject matter jurisdiction is tested as of the time of the filing of the complaint," *Rosa v. Resolution Trust Corporation,* 938 F.2d 383, 392 n. 12 (3d Cir.), *cert. denied* 502 U.S. 981, 112 S.Ct. 582, 116 L.Ed.2d 608 (1991), the Third Circuit has recognized that the rule is not to be applied blindly.

The principle that jurisdiction is determined at the outset of the action is simply insufficient to support the continuing **\*248** applicability of [12 U.S.C.] § 1441a(*l* )(1) to this case. One basic difficulty with this argument is that the letter and spirit of the rule apply most clearly to diversity cases. The Supreme Court set out the rule in the diversity context. *St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 286, 290–92, 58 S.Ct. 586, 590, 591–92, 82 L.Ed. 845 (1938). In addition, the Court crafted the rule for the removal of actions from state court, which involves a more lenient standard not relevant here. *Id.* Most importantly, the policies behind removal and the risks of manipulative behavior played a significant role in the Court's decision. St. Paul focused primarily on the monetary threshold for federal jurisdiction, observing that the time of filing rule prevented plaintiffs from subsequently amending their complaint to plead a lesser amount and avoid removal. *Id.* at 294, 58 S.Ct. at 592–93. Similar concerns applied to changes of parties that would potentially destroy diversity of citizenship. *Id.* at 294–95, 58 S.Ct. at 592–93. From the outset, the underlying concern of the time of filing rule was the risk that parties would deploy procedural tactics to manipulate federal jurisdiction.

The rule that jurisdiction is assessed at the time of the filing of the complaint has been applied only rarely to federal question cases. Moreover, in these rare cases, the rule has often been applied axiomatically, without extensive discussion or analysis. *See Rosa v. Resolution Trust Corp.,* 938 F.2d 383, 392 n. 12 (3d Cir.), *cert. denied,* 502 U.S. 981, 112 S.Ct. 582, 116 L.Ed.2d 608 (1991); see also *F. Alderete General Contractors, Inc. v. United States,* 715 F.2d 1476, 1480 (Fed.Cir.1983) (observing in government contracts action that "the decision below is at variance with the long-standing rule in the Federal courts that jurisdiction is determined at the time the suit is filed and, after vesting, cannot be ousted by subsequent events, including action by the parties"). Even in the federal question context, however, the focus of the time of filing rule has been on preventing manipulation of jurisdiction when a claim is removed. As we observed in *Westmoreland Hospital Ass'n v. Blue Cross of Western Pa.,* "a subsequent amendment to the complaint after removal designed to eliminate the federal claim will not defeat federal jurisdiction." 605 F.2d

119, 123 (3d Cir.1979) (emphasis added), *cert. denied,* 444 U.S. 1077, 100 S.Ct. 1025, 62 L.Ed.2d 759 (1980). Along with the obvious goal of judicial efficiency, we perceive the risk of strategic behavior as the primary rationale behind the time of filing rule.

Manipulation of jurisdiction is simply not at issue in this case. There is no suggestion of manipulation, nor would the facts support it. The jurisdiction-destroying transfer of assets between the RTC and New Rock was an arms length transaction independent of the jurisdictional issue. Without the possibility of manipulative behavior, the primary policy behind the time of filing rule is not implicated.

Our rejection of an absolute time of filing requirement breaks no new ground. Courts that have considered the rule more fully have not hesitated to abandon it where appropriate. In *Boelens v. Redman Homes, Inc.,* 759 F.2d 504 (5th Cir.1985), the Fifth Circuit discussed the policies behind the time of filing rule and held that in a federal question case, where the plaintiff's amended complaint omitted federal counts included in the original complaint on which jurisdiction could be based, the court would look to the amended complaint and decline jurisdiction. *\*249 Id. at 508.* The Fifth Circuit interpreted this rule as consistent with the general principle that the amended complaint "supersedes the original and renders it of no legal effect, unless the amended complaint specifically refers to or adopts the earlier pleading." *Id. at 508.*

We were equally quick to reject the time of filing rule in *Lovell Mfg. v. Export–Import Bank,* 843 F.2d 725 (3d Cir.1988):

*Lovell* ... cites several older Third Circuit cases for the proposition that our determination of jurisdiction should be based solely on the basis of the pleadings, and not on subsequent events.... We are uncertain that these cases stand for the broad proposition for which *Lovell* cites them. However, regardless of what they once might have stood for, and regardless of the merit of these principles elsewhere, plainly they do not reflect recent Third Circuit jurisprudence. As *Lovell* itself concedes, later cases clearly hold that once all federal claims have been dropped from a case, the case simply does not belong in federal court.

*Id. at 734* (citations omitted). We concluded by observing "that to the extent a black-letter rule ever existed, precluding a court from relying on post-removal events ..., the Supreme Court clearly did not feel bound by it in

*Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)." *Id. at 735.* Although the time of filing rule certainly retains a large measure of persuasive efficacy, we read *Lovell* as a clear rejection of any iron-clad time of filing requirement. Cf. *Carr v. American Red Cross,* 17 F.3d 671, 683–84 (3d Cir.1994) (federal jurisdiction arising from the involvement of the American Red Cross in a case will cease on the dismissal of the Red Cross from the case).

*New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.,* 101 F.3d 1492, 1503–04 (3d Cir.1996).

13. In this case the operative complaint, the Second Amended Complaint, was filed after the filing of Lucent's Proof of Claim. Moreover, this case does not involve the issue of destroying jurisdiction by subsequent events nor is there any suggestion that the Trustee attempted to manipulate jurisdiction.

**[4]** 14. In its Second Amended Answer, Lucent admitted that the preference action is a core matter but disputed that all other counts were core. (Second Amended Answer at ¶ 3). This denial would include the count for equitable subordination. "Equitable subordination is unquestionably a 'core' proceeding pursuant to section 157(b)(2)." *In re M. Paolella & Sons, Inc.,* 161 B.R. 107, 116 (E.D.Pa.1993), *aff'd* 37 F.3d 1487 (3d Cir.1994). It is an action "affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship...." *See also In re Insilco Technologies, Inc.,* 330 B.R. 512, 520 (Bankr.D.Del.2005).

**[5]** 15. Similarly Lucent's fraud and negligence counterclaims arise from Winstar's alleged conduct in connection with the Second Credit Agreement. This is also an agreement related to the Supply Agreement. [17] It provided the means by which Winstar was to obtain financing to pay for *\*250 goods and services under the Supply Agreement, including those services subcontracted to Wireless under the Subcontract, and thus Winstar's conduct in connection with its draws under the Second Credit Agreement is within the ambit of the Proof of Claim. Moreover, the Second Credit Agreement gave Lucent the right to conduct the due diligence about which it now complains. The counterclaims are now part of the claims allowance process and within the core jurisdiction of this Court. 28 U.S.C. § 157(b)(2)(B).

**[6]**   16. Finally, even if these matters were non-core, Lucent has waived its objection to this Court's entry of final orders by its conduct. *Abramowitz v. Palmer,* 999 F.2d 1274, 1280 (8th Cir.1993); *In re G.S.F. Corp.,* 938 F.2d 1467, 1476 (1st Cir.1991); *In re Daniels–Head & Associates,* 819 F.2d 914, 918–19 (9th Cir.1987).[18] Not only has Lucent narrowed what counts and counterclaims it believes fall outside the core jurisdiction of the Bankruptcy Court,[19] Lucent repeatedly sought judgment in its favor without noting that the Court could only recommend findings and conclusions to the district court.[20] *Baldwin–United Corp. v. Thompson (In re Baldwin–United Corp.),* 48 B.R. 49, 54 (Bankr.S.D.Ohio 1985)* (consent may be implied from failure to object or from any act indicating a willingness to have the bankruptcy court determine a claim). Similarly in the Joint Pretrial Memorandum [Docket # 292] Lucent did not raise the core or non-core nature of the claims and counterclaims as one of the legal issues to be determined. Finally Lucent has asserted a setoff claim against the estate which it acknowledges is a core matter. *In re Iridium Operating LLC,* 285 B.R. 822, 832 (S.D.N.Y.2002). The parties agree Lucent's setoff claim be set off against any monetary award on the breach of the Subcontract claim. The Court believes this is further evidence of Lucent's waiver.

17. For all of the foregoing reasons, the Court concludes these are all core **\*251** matters under 28 U.S.C. § 157 and, to the extent not core matters, Lucent has consented to entry of final orders by this Court. Under the Standing Order of Reference, the Court will enter final judgment.

**OVERVIEW OF FACTS AND THE PARTIES' CLAIMS**

18.   At its essence this case is simply a tale of two companies –one large, one small which entered into what each expected to be a mutually beneficial relationship to build a wireless communications network and deliver services to customers via that network. What became apparent as the evidence unfolded was that what began as a "strategic partnership" to benefit both parties quickly degenerated into a relationship in which the much larger company bullied and threatened the smaller into taking actions that were designed to benefit the larger at the expense of the smaller. Along the way some executives of each company demonstrated their incompetence and arrogance, and in some instances, now find themselves targets of criminal investigations. The Court notes that there was poor communications not only between the two companies but among each companies' employees. In fact,

when Lucent replaced some of its upper level management in the fall of 2000 in response to an internal and SEC investigations, the new executives issued directives regarding the Winstar–Lucent relationship without having even read the operative agreements. Officers and executives often saw the relationship unfolding from different perspectives such that, if the Court were so inclined to view each witness' testimony in isolation, it could find support for virtually any fact. Yet taking all the *credible* evidence as a whole, it is clear that Lucent used Winstar to inflate Lucent's own revenues, especially in the third and fourth quarters of 2000 when Lucent was "feeling a lot of pressure on revenue." (Hayes, Depo, Tr. 13–38). Although Winstar benefitted from some of its dealings with Lucent and its own actions were, at times, no less questionable than Lucent's, the facts point to one conclusion: Lucent extracted what it needed to prop up its own revenue from Winstar in the form of purchases by Winstar of unneeded equipment and manipulated the timing of a refinancing notice that would have put the world on notice that Winstar was in dire financial straits until Lucent could take some more. Lucent used its position as Winstar's lender to ensure Winstar's cooperation by repeated threats to stop both the funding of Winstar's draw requests and the payment of Wireless's invoices for services already performed.

**Summary of the Trustee's Claims**

19.   Although the parties tried this case for 21 trial days, surprisingly most of the critical facts surrounding the relationship of the Debtors and the Defendant are not disputed. The parties could have and should have saved their own and this Court's resources by agreeing to many more underlying facts which really are not disputed.

20.   Prior to their bankruptcies, Winstar, a Delaware corporation, was a local and long distance telecommunications carrier and engaged in the buildout of a global broadband telecommunications network to service its customers. (DX 701 at 8). Its stock was publicly traded. (DX 701; PX 460). Wireless, Winstar's wholly-owned subsidiary, was also a Delaware corporation engaged in the design and construction of Winstar's network. (Revised Joint Stipulation ¶¶ 1 and 2).

21.   Starting at the customer's end, Winstar would build facilities within the customer's building, known as a "B site," to connect the customer to Winstar's voice and data network via a radio and antenna located on the roof of the customer's building. **\*252**  Radios and antennae were also located on the roof of a Winstar's traffic collection point known as a "hub."

Signals were sent between the B site and hub via the radios and antennae. (DX 699 at page 9, line 15 through page 10, line 38). [21]

22. The hubs, in turn, collected the signal traffic and distributed it to a high capacity facility known as a "central office." Typically signals were transmitted between hubs and central offices via fiber cables, either owned by Winstar or leased from an incumbent telephone company. (*Id.*).

23. The central offices had data and voice switching equipment which would connect transmissions from the central office either into other local or long-distance telephone companies or into Winstar's own national fiber network which provided long-haul capacity for Winstar's voice and data services. (*Id.*).

24. Winstar's long-haul network typically was made of fiber supplied by non-Lucent vendors and ran along routes that connected one city to another. (Kipke, Tr. 18–190). Optical equipment that amplified and transmitted the signals were generally located at each end of and at certain intervals along the fiber. (Kipke, Tr. 17–72–73).

25. Lucent, is also a Delaware corporation, whose stock is publicly-traded on the New York stock exchange (DX 739 at ¶ 12). It designs and delivers telecommunications systems, services, and products, including software. (Revised Joint Stipulation ¶ 5). It was, at the relevant times, much larger in size and resources than the Debtors. (Ackerman, Video–Direct, p. 17, line 18–p. 18, line 5).

26. In the late nineties, telecommunications companies were "hot" companies, and on the grow. Winstar, like many others, desired to increase the size and reach of its network and joined forces with Lucent to help accomplish the expansion. Prior to that time, Winstar and Lucent had an arms'-length vendor-creditor relationship whereby Lucent sold goods to Winstar. (Ackerman, Video–Direct at p. 4, line 12). That relationship changed in October 1998 when the two entered into what they both describe as a "strategic partnership." (Ackerman, Video–Direct at pp. 3–4). The "strategic partnership" [22] was created through a series of agreements, three of which figure prominently in this litigation.

27. In October 1998, after three weeks of "lockdown" negotiations, Lucent and Winstar entered into two related agreements: the First Credit Agreement and the Supply Agreement. (*Id.*). Under the First Credit Agreement, dated

October 21, 1998, Lucent became the primary secured lender to Winstar and provided a $2 billion line of credit (although only $500 million could be borrowed at any one time) to be used for the purchase of certain products and services in exchange for a lien in virtually all of Winstar's assets. Wireless was not a borrower, guarantor, or otherwise a signatory to the First Credit Agreement. (Revised Joint Stipulation ¶¶ 13 **\*253** and 14). When the parties entered into the First and subsequently Second Credit Agreements, Lucent expected that the loans were be repaid either by borrowing from other lenders or by raising equity. (Hayes, Depo, Tr. 13–36).

28. Under the Supply Agreement Lucent agreed to provide and finance (under the First Credit Agreement which was later supplanted by the Second Credit Agreement) the purchase of products and services. (Revised Joint Stipulation ¶ 6). Lucent was to provide equipment of a quality described as "Best of Breed" and, in instances where it could not provide Best of Breed equipment, it was obligated to finance Winstar's purchase of such equipment from other vendors. [23] (Ackerman, Video–Direct at pp. 81–82; PX 123 at ¶ 11.3 and Schedule H thereto).

29. To assure that the content of the Winstar network was primarily equipment manufactured and/or sold by Lucent, to develop and enhance its reputation for providing these type of buildout services in a "hot" telecommunications world, and ultimately to enhance its revenue production, Lucent wanted to build Winstar's entire global network, including all supporting infrastructures, on a completely turnkey basis. Consequently the Supply Agreement provided that Lucent would build and deliver a turnkey operation to Winstar. As with its obligations to finance Best of Breed equipment even if supplied by third parties, if Lucent itself was unable to perform the services needed to comply with buildout obligations, it was obligated to finance the payment of those services provided by others who would develop the turnkey system. (PX 123, section 11.3(c)).

30. When the parties entered the Supply Agreement, they both recognized that Lucent did not have all the core competencies necessary to perform the buildout. Therefore the Supply Agreement provided that Lucent would prepare a transition agreement that included a schedule of its assumption of various aspects of the buildout as broadly outlined in the Supply Agreement. (PX 123 at Schedule A, § 3.3). No transition agreement was executed and it quickly became apparent that Lucent either could not or would not take

over the building of the turnkey network as promptly as anticipated. (Kantor, Video–Cross at pp. 46–48). [24] In March 1999 Lucent and Wireless entered into the Subcontract, effective January 4, 1999, whereby Wireless agreed to act as Lucent's subcontractor and build the network at least until such time as Lucent was willing and able to assume that role. (Revised Joint Stipulation ¶ 7). Wireless would perform the services, many or most of which were the types of service it had already been performing directly for Winstar, as Lucent's subcontractor and then bill Lucent. [25]  **\*254** Lucent, in turn, would bill Winstar which would pay Lucent by drawing down under the First Credit Agreement or, after May 2000, the Second Credit Agreement. In essence Lucent loaned Winstar the money to pay Lucent for building the network; Lucent then paid the money over to Wireless. The paperwork, especially the purchase orders, were exchanged after the work was completed. It is Lucent's refusal to pay for services for the month of March 2001 that gives rise to the Count Seven, the breach of the Subcontract claim.

31. As Winstar grew and required additional financing to feed its insatiable appetite for cash to grow its business, it sought bank financing and in May 2000 arranged for a consortium of bank lenders, with Bank of New York as the administrative and collateral agent, to provide a $1.15 billion revolving credit and term loan (the "Bank Facility") for part of its working capital needs. WCI Capital Corp ("WCI Capital"), one of Winstar's subsidiaries, was the borrower; Winstar and certain other of its subsidiaries were guarantors.

32. The First Credit Agreement, pursuant to which Winstar had borrowed approximately $1.2 billion, was paid off with a portion of the proceeds of the Bank Facility and other funds raised by Winstar. Lucent released its lien in Winstar's assets. (Revised Stipulation ¶ 8).

33. Winstar also had raised money in the public debt and equity markets over the years. (DX 701 at 26 and 48).

34. As Winstar was growing and building out a global telecommunications network, it was purchasing millions of dollars of equipment from Lucent. Lucent desired to keep its good customer relationship with Winstar and thus in May 2000, simultaneously with the execution of the Bank Facility and repayment of the $1.2 million owed under the First Credit Agreement, the parties entered into the Second Credit Agreement whereby Winstar received from Lucent a $2 billion line of credit with the ability to borrow up to $1 billion at any one time. WVF–I LLC ("WVF–I"), a newly

formed subsidiary of Winstar was the actual borrower; [26] Winstar and WCI Capital, the borrower under the Bank Facility, were the guarantors. (DX 38). Among other things, the Second Credit Agreement permitted WVF–I to purchase both Lucent and non-Lucent equipment and in exchange WVF–I granted Lucent a security interest ahead of the Bank Facility only in the equipment Lucent financed Lucent also took a security interest in WVF–I's "general intangibles" and "proceeds." The Second Credit Agreement also contained certain financial covenants, including a covenant that Winstar not permit its total Cash Capital Expenditures ("CAPEX") to exceed $1.3 billion in "any year prior to and including 2001"; [27] and entitled Lucent to serve a **\*255** "refinance notice" on Winstar if the outstanding loans exceeded $500,000,000. It also provided that any increases in the Bank senior loan arrangement would be used to repay Lucent. It is a partial repayment made to Lucent pursuant to the Second Credit Agreement, using funds from the so-called Siemans Transaction, that gives rise to Count 10, the preference claim.

35. Winstar repeatedly and knowingly helped Lucent by making massive, last minute, allegedly unneeded purchases that were arranged by Lucent as the ends of quarters approached. These end of quarter deals enabled Lucent to report more revenue and appear more profitable in its quarterly public reports than it really was. [28] In fact the dollar amount of Winstar's purchases of Lucent equipment in end of quarter sales was on average eight times as high as the dollar amount of Winstar purchases of Lucent equipment in months in which a quarter did not end. Lucent used these end of quarter deals to close its own revenue gaps.

36. In addition to the end of quarter deals, Winstar helped Lucent record revenue through alleged accounting schemes such as improper bill and hold deals, [29] whereby Winstar would pay for goods that it did not need, often were not identified with any kind of particularity, and frequently never even left the Lucent warehouse. The Trustee alleges that the Software Pool Agreement, dated September 29, 2000 (PX 323), whereby Winstar was to pay Lucent $135 million, in four equal payments of $33.75 million to be made in January, March, June, and August 2001, for software it did not need, did not use, and had a fair market value of substantially less than the contract price was another in a series of sham transactions that were designed to do little more than inflate Lucent's revenue. [30]

**\*256** 37. The actions of Lucent in allegedly forcing Winstar to enter into transactions such as the end of quarter purchases, bill and hold deals and the Software Pool Agreement, as well as Lucent's alleged delay in negotiating a transition agreement during the later part of 2000 in order to gain leverage over Winstar and its alleged delay in issuing the refinancing notice in order to improve its position viz a vie other creditors, give rise to Count 11, the claim of equitable subordination. [31]

### Summary of Lucent's Counterclaims

38. One of the covenants of the Second Credit Agreement required Winstar's CAPEX to not exceed $1.3 billion in any year prior to and including 2001. It is Winstar's alleged CAPEX in excess of the $1.3 billion limitation, its behavior to bring its CAPEX into compliance, its failure to undertake inquiry regarding its CAPEX, and its certification in each borrowing request that all covenants have been or would be met by the time of the borrowing that give rise to both Lucent's counterclaim for fraud, Counterclaim 5, and its counterclaim for negligent misrepresentation, Counterclaim 6.

### COUNT VII: BREACH OF THE SUBCONTRACT

39. The Trustee contends in Count Seven of the Second Amended Complaint that Lucent breached the Subcontract between Wireless and Lucent, thereby causing Wireless $62,050,742.00 in damages. Lucent responds that it was not required to perform under Subcontract because there was no "task order" for the work performed.

### The Subcontract and Task Orders, Purchase Orders, Invoices and Spreadsheets

40. The Subcontract expressly provides:

1.1. *Services.* Contractor agrees to perform for Lucent the tasks, responsibilities and services described on the attached task specific schedule(s) (individually a "Task Order") (the "Services"). The parties may enter into future Task Orders, to which the parties agree, from time to time, with each Task Order to be consecutively numbered and attached hereto. Services shall be provided in accordance with the provisions of this Agreement and the applicable Task Order and shall be on either a firm, fixed price or time and materials basis as specified in the applicable Task Order executed by both parties.

1.2. *Task Order.* Unless otherwise agreed by the parties in writing, each Task Order will include the

following information: (i) a description of the Services to be performed; (ii) the targeted commencement and completion dates of the Services; (iii) a list of deliverables to be provided by Contractor (the "Deliverables") and targeted delivery dates; (iv) methods of compensation to be provided to the Contractor (e.g., time and materials, firm fixed price or otherwise) and **\*257** other appropriate pricing terms such as hourly rates; and (v) other information the parties agree to include.

41. Even though the Subcontract called for Winstar to submit task orders to Lucent prior to Wireless's provision of services, the parties ignored this requirement and between January 1999 and October 2000, Lucent paid Wireless approximately $325 million for services performed under the Subcontract, most, if not all, without a prior written task order. In fact the parties agree that after the first quarter of 1999 they never exchanged a single task order (Revised Joint Stipulation ¶ 20). [32] Nathan Kantor, Winstar's President and Chief Operating Officer when the relevant agreements, including the Subcontract were negotiated and approved, testified that it was his understanding that Lucent and Winstar agreed that the invoices would function as the equivalent of the task orders. (Kantor, Video at 356–57). "The contract was administered by using the invoices and a Lucent purchase order to reflect these task orders and the work that was performed by Winstar to Lucent and agreed to by Lucent and those invoices were paid for several years." (Kantor, Video at 361–62).

42. Yet if the letter dated January 4, 1999 is a task order, the parties quickly dispensed with the task order process, opting instead to exchange less formal documentation, including purchase orders, invoices and spreadsheets summarizing Wireless' charges. Generally Winstar sent a purchase order to Lucent which, in turn, sent a purchase order to Wireless. Wireless performed the services and then sent Lucent an invoice, with or without an accompanying spreadsheet showing the breakdown of services or goods. Lucent then invoiced Winstar in the same amount as Lucent was billed by Wireless. Then, as described above, Winstar would draw down under the applicable Credit Agreement, use the draw to pay Lucent which would then pay its obligation to Wireless. In fact, Richard Uhl, Winstar's former Chief Financial Officer provided credible testimony about how payments were sought and obtained, as well as the underlying reason for dispensing with formal task orders.

Well, Lucent, the original agreement required that Lucent issue purchase orders. Early on it was discovered that

Lucent was unable or not capable of defining what should go into the purchase order. So the practice evolved, in **\*258** fact, was present when I became CFO in the fall of '99 that inasmuch as Lucent could not produce the details of the purchase order, Winstar Wireless would as its subcontractor to Lucent issue an invoice which Lucent would then cover with a purchase order and that was the sequence. That was the sequence present and existing when I assumed responsibility for Chief financial Officer's position in the fall of 1999.

(Uhl, Video-direct at 11). [33]

43. Shortly after entering the Supply Agreement, Lucent began to balk at the arrangement and as early as June 1999, Lucent threatened to pull the plug. Shortly after entering the Subcontract, Lucent determined very quickly that the pass-through payment arrangement "yielded no material benefit for Lucent, and in fact cost [Lucent] considerable resources to process, track and manage." (DX 163; *see also* Wilson, Tr. 16–30). Lucent could not recognize revenue on the pass-through transaction because it did not have sufficient control over the services being performed by Winstar's employees to allow revenue recognition under the accounting rules. (PX 388 at LW 00303141; DX 523; *see also* DX 155 at 2WC 0016320.) Lucent was also concerned that financing any additional services would hamper its ability to sell Winstar's loans because the banks it consulted with concerning such financing were "very negative on the inclusion of these Incremental services." (DX 149 at WC 0118574; *see* Wilson, Tr. 16–28–29; DX 155; *see also* DX 137.). And Lucent was attempting to sell the Winstar loan as it was among the largest loan Lucent had financed. (Hayes, Depo, Tr. 13–33). Consequently in early June 1999, even though Lucent was still unwilling or unable to build the turnkey operation as required under the Subcontract, it informed Winstar that it would not pass through any additional services because it was "concerned about having to severely discount the paper to sell it." (DX 154.)

44. Quickly discussion escalated to the chief executive level and ultimately Lucent agreed to continue the arrangement and it did so up until March 2001 when Lucent refused to pay for the previously rendered services ostensibly because there was no task order.

45. Lucent ultimately agreed to finance Wireless-performed services and facilitate the favorable accounting treatment that Winstar desired by passing through the 2Q1999 services.

(Wilson, Tr. 16–54.) Lucent only did so as an accommodation to Winstar, which claimed that ending the pass-through would have negative financial repercussions and which promised to negotiate a true turnkey approach to services that would allow Lucent to recognize revenue on such services in the future. "[T]here was a large pressure from Winstar to go ahead and [pass through services because Winstar] felt like it would have implications on their earnings report since they were capitalizing these services last quarter, and had it not happened this quarter it would reflect badly on their announcement." (*Id.*) Therefore, Lucent agreed to pass through Wireless-performed services in 2Q1999 "with the agreement from Winstar that [Winstar and Lucent] would pursue a business arrangement structure around a turnkey approach to the projects and network implementation that would then, again, well define the tasks for each company to perform, orders up front from Winstar to Lucent, Lucent then going through those task lists and ordering back from Winstar what we could not perform." (*Id.; see also* DX 164.)

**\*259** 46. On September 8, 2000 Winstar issued a purchase order, WVF 1–00000002958 (*See also* DX 390 and 391 referencing Lucent's position with respect to the September 8th invoice) that in line item number 1, sought payment of $65,509,331.00. But by this time Lucent was not inclined to increase the Winstar loan. In fact, Lucent was seeking to rid itself of some or all of this debt. At about this time Lucent was seeking to sell the Winstar loan. In mid-September 2000 Deborah Hopkins (Lucent's CFO), Rich McGinn (Lucent's President and CEO), Fred Rubin (Lucent's Treasurer and Senior Vice President), Richard Uhl (Winstar's CFO), and William Rouhana (Winstar's CEO) met with senior officers of the Bank of New York at a luncheon meeting at the Water Club. One of the goals of the meeting was to get the Bank of New York to buy the Winstar debt. The deal was not consummated as the financial market collapsed on the same day as the meeting. (Uhl, Video 282–83).

47. On September 21, 2000 Deborah Harris and William Plunkett of Lucent had a conversation with David Ackerman and Richard Uhl of Winstar and informed them that Lucent would not pay the $65,509,331. The next day Deborah Harris followed up the conversation with an email and a letter (PX–15) which reads in part:

At the signing of the supply agreement certain services in support of the Winstar network deployment were described as potentially being performed by Lucent Technologies. The actual assumption of these services was contingent upon the development and successful execution of a

transition plan for services that Lucent and Winstar agreed were Lucent competencies and could be successfully executed by Lucent.

* * * * * *

There is a category of services which, to date, Winstar continues to provide for itself...

We have been pursuing ways to take on these services in a manner agreeable to all parties, but have not been able to reach consensus. Consequently, we believe it is not appropriate for Lucent to accept Purchase Orders for these services. Specifically, we must reluctantly reject line item # 1 of the Purchase Order for $65,509,331.00, WVF 1–00000002958 issued by Winstar on September 8, 2000. Lucent stands ready to negotiate an arrangement under which Lucent becomes responsible for some or all of these services, whether via outsourcing or some other method. We suggest that Lucent and Winstar each designate an empowered team to move ahead with these negotiations with the goal of completing by October 1, 2000. If you agree with this suggestion, we are ready to start immediately beginning with a kickoff meeting next week.

48. At the time of the Harris letter, Lucent, however, had still not developed the core competencies needed for it to assume the buildout by itself. The suggestion that Lucent was ready and willing to perform the buildout and would do so but for the failure of the parties to agree to a transition plan was nothing more than an attempt to create a pretext for denying further draws under the Second Credit Agreement so that Lucent could renegotiate the terms of the "strategic partnership" for its benefit.

49. In fact, Lucent's demands for a financial concession had already begun by the time of the Harris' letter as had its pressure on Winstar to help Lucent make its end of quarter numbers as reflected in a September 18, 2000 email sent on Harris' behalf.

Nina and Bill:

**260** I have tried to do a very brief summary of all the "good, bad and ugly" on this account. Bottom line is that to do an EOQ [end of quarter] deal, we need Nate to provide direction to Ackerman and Uhl that this will take place. They are vehement that they are out of money and do not want to spend money on product that they can not immediately utilize. The deals of the past are haunting

us...there is $87M in their warehouses. But much of this is also due to problems with Williams.

We have a restructured proposals that categorizes what they need now through to long term. Definitely the majority of the money we are asking for is not for immediate use. It also includes pricing for the B's and Hubs which is 2 tiered, and time sensitive. Depending on how fast we can implement and identify cost reductions thru [sic] the breakthru [sic] items, could cause our BGP to hover around 30% or below.

What 1 need are 2 things:

**1. A call to Nate Kantor getting agreement to move forward on an EOQ deal**. Our meeting with Dave Ackerman is first thing Tuesday morning, so this would need to happen today. We believe they already will be spending around $46M with us, so we are asking for another $50–60M. (I am trying to get the total number in the $110–115M range).

2. Agreement that we can discuss at 5:15 today, on the aggressiveness of the proposal.... (PX 86)(emphasis in the original).

50. The same email transmission further supports a finding that Lucent was not only pressuring Winstar to do deals that were designed to benefit Lucent at Winstar's expense but conspiring to ensure that the lucrative to Lucent end of quarter deals got done.

Following are the "headlines" for the Winstar account:

* * * * * *

• Winstar Services: We pass through around $67M/Q of WinstarServices. We have been told to stop this practice. We will be communicating our position to Winstar the week of 9/18, including options of what portions of these services we can do. **We may want to delay this move for a quarter based on this EOQ deal**.

* * * * * *

• Previous EOQ Deals: ...

– Winstar does have major inventory as a consequence of these deals.

– Credits provided in all the previous EOQ deals are now hitting in 4Q2000 results.... (PX 86) (emphasis added).

51. Aversano placed the call to Kantor and, despite Winstar's financial condition, the deal was done. (Aversano, Video Tr. at 8). As Kantor subsequently wrote to Aversano, "Great to talk to you and we will help whenever possible." (PX 157). Kantor then instructed Ackerman to make the Lucent deal, which ultimately turned into a deal for $212 million in end of quarter purchases, happen. (PX 56).

52. Yet as David Ackerman wrote to Kantor in a September 18, 2000 e-mail, in view of Winstar's CAPEX issues, complying with Kantor's instructions to provide substantial revenue to Lucent would not be possible unless Ackerman got "creative:"

> I just spoke with [Lucent employee Bill] Plunkett. He informed me that you and Nina [Aversano] had met (dinner?) and you agreed to help them get to the number they need this quarter ... something around $110M, of which we've already spent about $45M. There is not much I can give them that we really **\*261** need, but there are some creative things I can do that can get us close to their number without being totally stupid.

\* \* \* \* \* \*

> Thus; we are working to cut another $70 [Million] in addition to the $117 [Million] [to meet capex covenants]. This means stopping ANY and ALL incremental spends for ANYTHING capex immediately, and letting capitalized contractors go ...

\* \* \* \* \* \*

> How much capital CAN I REALLY SPEND THIS YEAR, and how much do I do to give Lucent what they need for 3Q?

> If the answer is; both give Lucent the business, AND reduce the cap spend to $1B even I will need to institute some very severe measures immediately.

(PX–127) (Emphasis in original).

53. After receiving a copy of the September 22, 2000 email and letter, Nate Kantor, Winstar's President and COO, sent the following email to Nina Aversano, President of Lucent's North America group (PX–16):

> I am very surprised and disappointed with this–we've only discussed it a million times. This doesn't sit well with me

and will have a major impact on our ability to help you this quarter.

> You've got to get this fixed.

54. On September 25, 2000 James Cocito, Lucent's chief operating officer of its North America Region, sent Frank Manzi an email suggesting that Lucent consider the possibility of " 'a one more time' strategy." (PX 88). As Cochito noted in his email, "[Kantor] has indicated there will be no deal for the QTR unless this gets fixed. Impact about 60M or more. Also, I will know as of this morning whether they are going to play with the AR as well."

55. On September 27, 2000 Nina Aversano, President of Lucent's North America Region sent Richard Uhl, Winstar's CFO, [34] a letter (PX 17) [35] that purported to modify the terms under which the two companies did business and containing the conditions under which Lucent would pay the September 8, 2000 Purchase Order.

> This is to inform you that Lucent will accept your purchase order WVF 1–0000002958[sic] conditioned upon Winstar's agreeing to the following terms and conditions. If you agree, kindly sign in the space provided below and return to me. Immediately. Nate, this is a great opportunity for us to move our relationship forward to what we envisioned–a seamless partnership where the many resources of Lucent can be utilized to help achieve Winstar's business plan. I hope you agree with me that we should seize the moment.

> It would appear that there has been a great deal of confusion between us regarding which services and to what extent services would be provided by Lucent to Winstar under our Supply Agreement dated October 21, 1998. Pursuant TO Schedule A of that contract the parties intended a transition plan for Lucent to take over services that at that time Winstar was providing to itself. This was a broad plan possibly leading to a full outsourcing of all Winstar required services to Lucent Since the signing of that contract there have been a number of attempts to formalize this broad services relationship. The last such attempt was undertaken this past June when the parties entered into two addenda– the Hub and B–Site Addendum **\*262** [PX–18] and the Optical Network Addendum [PX–19]. These addenda did not include the full range of services contemplated in the Supply Contract.

I'm sure you would agree that the fault for the failure to execute on our original concept lies with both Winstar and lucent. Happily it appears we both favor the same result-a broad services relationship. We need to finalize that result as soon as possible so that our contractual relationship matches our mutual intent. We propose that commencing Monday morning October 2nd, or as soon thereafter as is reasonably possible, out two teams meet at your offices to finalize a broad services agreement. This would be a lock-up session to finalize a full service agreement no later than two weeks thereafter. Consistent with the principles already established in our two addenda referenced above, Lucent would have complete control of the work covered by the scope of work the parties mutually define in this new agreement. Lucent may either perform the work itself by acquiring expertise and personnel from Winstar, or subcontract some or all of it to third parties (including Winstar). Consistent with this model, commencing October 1, 2000, Winstar would perform this work only upon prior receipt of a mutually acceptable written purchase order from Lucent (and not at its sole initiative). Should this process not be followed, Lucent would not be able to accept purchase orders or invoices for any Winstar performed services that are outside the scope of work defined in this agreement.

Further, until this new service agreement is in place, Lucent will not be able to accept purchase orders or invoices for services performed by Winstar after September 30, 2000 that are either outside the scope of the two addenda referenced above or that fall within the scope of the new, as yet unexecuted, service agreement. Prior to Winstar performing any work that might rightfully fall within either of the two existing addenda referenced above, Lucent would need to issue mutually acceptable written purchase orders. Should this process not be followed, Lucent would not be able to accept purchase orders or invoices for any Winstar performed services presumably on Lucent's behalf.

I look forward to your prompt reply, and the further growth of our relationship consistent with our shared vision....

56. Uhl signed the letter thereby acknowledging his assent and returned the same to Lucent. Uhl did not understand this letter to terminate the original agreement in the event the parties were unable to enter into a new agreement. (Uhl Video-direct at pp. 16, 18, and 19). Kantor understood that

Lucent's financial people were demanding a letter because they needed to book revenue. (Kantor Video-direct at 180–81).

57. In addition to Uhl's signing the letter, Lucent extracted another and even more substantial financial concession from Winstar when, on September 29, 2000 the parties executed the Software Pool Agreement (PX 323). Under the Software Pool Agreement Winstar purchased $135 million of unneeded software. The transaction was simply a sham, however. It's purpose was to inflate Lucent's end of quarter revenues. To that end, the Software Pool Agreement was successful: it alone accounted for 26% of Lucent's profits that quarter. (DX 739 at ¶ 60).

58. The end of quarter deals for the third quarter of 2000 committed Winstar to make approximately $212 million in purchases and forced Winstar out of compliance **\*263** with the CAPEX covenant and over the $500 million refinancing threshold. (Ackerman Video at 605–08 and 666–69; PX 43; PX 57; PX 78; PX 107; PX 148).[36]

59. Lucent's Initial software proposal was for a much smaller amount—$25 million—but in less than nine days, with Kantor's promise to Lucent that Winstar would help "wherever possible," the pool expanded approximately five-fold to the $135 million figure. (PX–57; PX–323, Zlotnick Video-direct at 157). This increase occurred without the numerous internal studies or any of the other planning documentation that Mr. Pocalyko testified were typical. (DX–702; Pocalyko Tr. 3–41–42). As Lucent's Deborah Harris advised on September 22, 2000, "I know the overall Software request will be a surprise and that is an area where a conversation will be of (PX–52). benefit."

60. As part of this software pool transaction, the parties also agreed that Lucent's list pricing for the software, rather than Winstar's contractually-reduced pricing, would be used to further boost Lucent's revenue. (PX–53; PX–349). As Winstar executive William Zlotnick testified, the software deal was ultimately priced "at whatever Lucent needed for its revenue." (Zlotnick Video direct at 160–61; PX–79; see also PX–57). Of the $135 million of software, less than $20 million was of value to Winstar. (Zlotnick Video-direct at 169–71). In fact, in post-deal documentation Lucent took the position that Winstar was only entitled to select $20 million of software—and would have to pay extra if it wanted more—despite Winstar's obligation to pay $135 million in cash in 2001. (PX–54). Lucent later recanted this position.

61. To enable Winstar to make the required cash payment for the software, the companies agreed to enter into contracts for credits postdated after September 29, 2000 and payable in the fourth quarter of 2000 (*i.e.,* before Winstar was obligated to actually make the software payments to Lucent), (PX–54; PX–57; PX–186 at internal tab 2; PX–324; PX–462 at 37; Rubin 2003 152:15—154:11).

62. On behalf of Winstar, Ackerman signed the post-dated credit agreements, enabling Lucent to book almost the entire amount of the software deal as revenue in Lucent's final fiscal quarter of 2000 (September 30, 2000). (PX–167; DX–739). Thus, Lucent funded Winstar's purchase of the unnecessary software in advance, to obtain Lucent's September 2000 revenue and profit infusion.

63. Shortly thereafter Rouhana, Winstar's Chairman and CEO, informed Schacht, one of Lucent's directors and who, as of October 23, 2000, resumed his previous position as CEO of Lucent, about the financial improprieties between the companies. Lucent retained its outside counsel to investigate its accounting procedures. The investigation resulted in Lucent's reversal of the revenue recognition from the Software Pool Agreement and a shake-up of the company's accounting staff. (Schacht, Tr. 21 at 33–35).

64. The Securities and Exchange Commission ("SEC") also conducted an investigation that ultimately lead to the SEC's filing a civil complaint against Lucent, certain key Lucent employees, including Deborah Harris, who as Vice President of Sales assumed responsibilities for the Winstar account in August 2000, and **\*264** Plunkett, a member of Lucent's management team overseeing the Winstar account, and former Winstar employee, David Ackerman, a "Group Executive" responsible for the build out of Winstar's network. A criminal investigation is still ongoing. When deposed as part of the SEC, both Harris and Plunkett refused to answer citing their right against self-incrimination under the Fifth Amendment to the United States Constitution.

65. Lucent in fact terminated Mr. Plunkett for his involvement in postdating documents related to the software deal. (Schacht Tr. 21–35). It did nothing, however, to terminate or otherwise punish fellow Winstar Sales Team members Deborah Harris, Vanessa Petrini or David Rigotti, all of whom remained active on the Winstar account into 2001, and who were clearly culpable in the scheme to fraudulently post-date the deal documents. (See PX–73; PX–66). Thus, while Mr. Plunkett

became the scapegoat, the transaction remained in place, and the other Lucent participants remained active on the core Winstar sales team. (Schacht, TR. 21–29:3–21, 21–33:13–17, 21–35:7–14).

66. Soon after sending her September 27, 2000 letter Aversano was relieved of her duties at Lucent and formally left Lucent in December 2000. (Aversano Depo, Tr. 8–22–24.). When she left, the parties had not executed a transition agreement nor had they resolved the ongoing problem of payment of the pass-through requests.

67. During this same time period Lucent was experiencing its own revenue crisis and was attempting to reduce its exposure on loans it was financing. (PX184). By at least mid October 2000 it drafted, but did not send, a refinancing notice as Winstar's outstanding borrowing exceeded the $500 million trigger. (Hayes, Depo, Tr. 13–40); PX 185 ("Per the email below, we are planning to issue a Refinancing Notice to Winstar next week."). Lucent was well aware of the impact sending such a notice could have. By email dated November 2, 2000, Paul Hayes, Lucent's Director of Syndication and whose job was created in late 1999 or early 2000 specifically to manage the process of removing loans from Lucent's books, circulated a memorandum from Beth Perricone addressing the implications of sending a refinancing notice to Winstar. (Hayes, Depo, Tr. 13–31; PX 187). That memorandum provides in part:

> Paul and I have studied the implications for Winstar and Lucent of issuing a refinance notice....

\* \* \* \* \* \*

## IV. Implications of Issuing a Refinance Notice:

### Option 1–Issue a written 105 day refinance notice for all or a portion of the Lucent Loan

Pros:

- Puts pressure on Winstar to seek alternative sources of capital (i.e. existing Bank Syndicate, Bondholders, Equity Sponsors, and Vendors);

- Forces parties to the table to deal with funding shortfall issues;

- Provides ability for Lucent to re-negotiate certain provisions, e.g. content requirements, limit non-

Lucent content financing, eliminate Winstar pre-approval for Lucent loan sales, improve collateral position (i.e. pari passu with Bank Syndicate);

• Repayment by Winstar results in fresh $1B of Lucent financing available for Winstar;

• Lucent can always rescind or modify the refinancing notice

Cons:

**\*265** • Winstar is likely to immediately file 8–K to disclose material adverse event, disclosing the amount of the financing;

• Disclosure may result in details of Lucent's financing becoming public;

• Market rumors may further disrupt capital markets and deter new investors;

• Existing Winstar securities could suffer price deterioration, further impacting market appetite and further depressing price of Lucent Loans;

• Potential Rating Agency implication for Lucent and Winstar;

• Potential increased cash flow requirement for Winstar, which would result at end of Refinance Period (90–105 days). If winstar does not refinance, rate on Lucent Loan increases by 2% (i.e. a potential $13.8 M in additional interest cost annually on current & 690 M of Lucent Loans). If Lucent chooses to convert its notes at the end of the Refinance Period, the Conversion Notes (a defined legal term) could carry a cash payment coupon as high as approx. 21% based on Winstar's current bond prices (i.e. a potential $62 M of additional interest cost annually on current $690 M of Lucent Loans)

**Option 2–Meet with Winstar immediately and advise verbally of pending notice**

Pros:

• Provides opportunity to negotiate right to sell up to $300 M of Lucent Loans today if Lucent desires;

• Advise of refinance amount of 100% of Lucent Loans then negotiate a lesser amount if Lucent desires;

• Flush out any strategic options currently under consideration by winstar;

• Extract other amendments (i.e. collateral, voting, assignments, etc.) and any additional economic concessions (i.e. rate, fees, warrants)

• Limit public disclosure and market impacts

Cons:

• Time is of the essence

• 105 days required for refinance

• Rumors still may permeate the marketplace

**V. Conclusions:**

• Lucent's ultimate negotiating position may be driven by our own perception of Winstar as a "going concern";

• If we believe they are a survivor than our primary concern might be limiting a loss of Lucent profits, i.e., discounting Lucent paper;

• To make the most informed Lucent decision we need better clarity from marketplace on capacity for Winstar debt/equity to make a more informed decision; A confidential discussion may begin immediately on this;

• Alternatively, do we perceive Winstar as completely locked out of the capital markets and absent a strategic investor? Should we be concerned about capital preservation and the impact to Lucent's balance sheet and credit rating?

• Ultimately our decision should be driven by where we think this is going. In our judgment, if the capital market disruption is temporary, i.e., 3–6 months longer; than [sic] Winstar is likely to survive.

68. By November 7, 2000 Lucent had apparently decided to delay issuing the refinancing notice when Beth Perricone again wrote in an email:

As you will see below there was a meeting of the minds at Winstar yesterday. Late last nite [sic] Bill Quinn and I spoke briefly to Peter for the outcomes **\*266** of that meeting. Peter described 3 capital events about to occur:

• Bank group to provide for new term loan of $200M to be supported via guaranty of Siemans. The proceeds of this loan are to paydown [sic] Lucent Apparently Winstar will enter into long term supply agreement w/Winstar [sic] in exchange for their guaranty. Not sure how they will pay for Siemans gear if that facility is used to repay us? ?

• Winstar to enter into new $275M capital lease w/Cisco

• Winstar to inject new $25M of equity (term sheet to follow to Lucent)

This would bring our current exposure of $690M down to $490M or below the trigger amount. I am not clear from Peter whether we will issue refinance notice now, sounds like we are waiting.

Peter want complete due diligence done at Winstar so Quinn, Keller and I are coming up w/ a list today.... (PX 188).

69. On November 10, 2000 Perricone sent yet another email in which she again recommended that due diligence of Winstar be undertaken to evaluate the impact of a refinancing notice prior to send such a notice. (PX 189). Lucent was clearly worried that the issuance of the refinancing notice would have dire consequences for Winstar. (Hayes, Depo, Tr 13–45). Nevertheless Hayes assuredly wrote in a November 16, 2000 email to Hunt–Majean, "Sending the refinancing will not send Winstar into a financial 'tailspin,' and I will stake my bonus from this past year on it." [37] (PX 191).

70. In November 2000 Lucent commenced its due diligence of winstar's financial condition. As a result of the due diligence, Perricone recommended that Lucent lower Winstar's "Asset Quality Rating" or "ARQ" from 6 to 7. [38] (Perricone, Depo, Tr. 3–115).

71. Lucent replaced some of its key management in the fall of 2000 but it continued along a tumultuous path with employees in the sales and finance department continuing to have different goals and objectives. Although Lucent's upper management wanted to extricate the company from the business of lending to its customers, or at least from Winstar, the pressure to have Winstar continue purchasing and building out the network continued. Indeed when Winstar did not behave as Lucent wanted, Lucent simply shut down any discussion of a transition agreement. Lucent continued to

control Winstar throughout the course of their relationship, including in December 2000. Although there may have been periods when Lucent's control was less apparent or even relaxed, and indeed there were times when Winstar was able to extract concessions from Lucent, the fact remains that these parties were not dealing at arms length. For example, the bill and hold transactions were done at the request of Lucent (PX 462 at Exhibit N); [39] purchase **\*267** orders are vague-often describing as "miscellaneous" a purchase of several million dollars (*See, e.g.,* PX 462 at Exhibit H and I); the inflation of the Software Pool Agreement from $31 million to $135 million over the course of a 9 day period (PX 462 at Exhibit P). [40] There were also excessive end of quarter deals, unneeded equipment paid for by Winstar but sitting in Lucent's facilities, duplicate charges, and difficulty, to say the least, in getting credits correctly to Winstar's accounts. [41] Winstar was and remained Lucent's captive purchaser of unneeded and sometimes unidentified goods to permit Lucent to inflate its own revenue.

72. By letter dated December 28, 2000 and addressed to Michael Montemarano, Lucent's Vice President of Finance of Worldwide Sales and Marketing, (DX 556), Winstar sent Lucent a request to borrow $62,324,930.00. [42] Accompanying the letter was a one page "analysis" captioned:

**Winstar Telecommunications, Inc.**

**Lucent Billing for Capital Labor**

**Q1 2001 Estimate**

The chart lists the departments which provided the services under three general headings: "Winstar Systems Group," "Winstar For Buildings," and "Winstar Network Services." Each general heading is followed by a specific list of what appear to be the various departments which rendered services, along with the total of "internal," "external," and "Lucent billable" labor costs incurred by each department for the months of October, November, and **\*268** December (for which month the figures are estimates) of 2000.

73. On the evening of December 27, 2000 Montemarano sent an email (included as part of PX 199) to several Lucent employees, including Ben Verwaayen, Lucent's Vice

Chairmen; and Hopkins, Lucent's CFO, which reads in part as follows:

> Based on a call today from winstar [sic] chairmen, president and CFO we took the following position as articulated by Ben. We could "allow" winstar [sic] to use the credit facility to fund their services for this quarter. We would not engage in any billing/po's between the companies, but they could and do intend to draw down the facility for about 65M [sic]. This is money out the door for us.
>
> We agreed that the 35m [sic] credit granted in 4qtr can be used as a reduction to their outstanding credit facility. It would not be dispersed as cash to them, but we [sic] go against the credit facility as "repayment."
>
> They also Indicated they had presented a draw down last week of 32M [sic], Ben asked them to reconsider this given the extremely low lucent [sic] content.
>
> I will work this tomorrow with their CFO and plan to ensure they adequately document cash draws. In addition, Ben asked the CT [customer team] [43] to set up a meeting with winstar to get the relationship to a new level where both companies benefit.

74. The next morning Lucent's CFO sent the following reply via email (also part of PX 199):

> WE HAVE ALREADY SAID no TO
> THE SERVICES FUNDING.

75. A few hours later, Verwaayen emailed (also part of PX 199) the following:

> Well, after a read out from the lawyers and after reviewing the options with everybody on our pre call yesterday, Winstar can draw down upon the credit facility, including services.
>
> We did push back on credits (no cash, but off setting a/r's) and the 30 million request that came in Friday.
>
> We really had not the option of denying their rights here.
>
> In reality, we can make their lives miserable for a couple of days, but they have an open line and that is what we have to change.
>
> So what we did, after all agreed in our pre call is to create a basis for a fundamental resetting of this relationship.

> We will create from both sides a wishlist how to recreate our legal platform working together and renegotiate on those issues.
>
> I think we all understand how much better we are and how to get out of this situation going forward.
>
> We want to make this a profitable account with clear rules of engagement.

76. But as suggested in the December 29, 2000 email Ben Verwaayen sent, Lucent had used its influence over Winstar to set the stage for the new negotiations.

> Now we have positioned ourselves for a major overhaul of our relationship with Winstar, I think we should involve our partners in treasury and Legal in preparing a model for our negotiations on Jan 9 or 10.... (PX 261).

77. On the evening of January 5, 2001, Elizabeth Perricone (who was not copied on the above series of emails) sent an email (PX 119) which reads in part:

*Financing of Services on 12/29/00:*

> Given our agreement to finance services on 12/29/00, legal feels it would be prudent **\*269** to send Winstar a letter confirming this was a borrowing under the Credit Agreement as an accomodation [sic], and we reserve the right not to make loans for any such purpose in the future.

78. On March 27, 2001 Winstar faxed to Lucent a notice of Winstar's request to borrow $62,050,743.00 effective March 30, 2001. (DX 668). The draw request is on Winstar letterhead and is captioned "Notice of Request for Borrowing." The Notice states that the request is given "[p]ursuant to Section 2.03 of the Credit Agreement" and contains a certification "that all conditions for borrowing set forth in Section 4.03 the [sic] Credit Agreement have been satisfied or will be satisfied as of the date hereof and as of the date the borrowing is made." The Notice also indicates that the entire amount requested is to be paid to the "Borrower" for non-Lucent equipment.

79. On April 2, 2001 Winstar sent Lucent a second fax that contained the back-up detail to the Notice of Request for Borrowing (included as part of DX 668). The cover sheet contains the following note: "Please add this to the

draw request as an attachment. Although this is not usually provided, this is the detail behind the services number." The detail attached is a one page chart that is captioned:

**Winstar Telecommunications, Inc.**

**Lucent Billing for Capital Labor**

**Q1 2001 Estimate**

The chart is virtually identical to the one attached to the fourth quarter 2000 request except that this request is for the months of January, February, and March (for which the figures are estimates) of 2001. The total of all of these costs is approximately $62,050,742. [44]

80. Lucent refused to pay citing the lack of a task order. The lack of a task order was simply a ruse, however. Lucent had not required task orders in the past and, although Aversano's September 27, 2000 letter purported to set new parameters for payment, Aversano's letter extorted Winstar's assent to the reset terms by threatening nonpayment. Even Lucent's own executives testified that the documentation submitted by Winstar created a "commercially binding relationship" for the relevant time periods: "[a]t September 30th [2000], we clearly were in a relationship that was commercially binding because there were purchase orders and invoices between the companies where we subcontracted with them." (Montemarano, Video-direct at 10–11; see also Montemarano, Video-direct 68:8—69:24; Simpson, Video-direct at 18–54). [45]

81. Although, beginning as early as the communications surrounding the invoice for the second quarter of 1999, Lucent warned Winstar that it would pay for Wireless' services "one last time" without a task order, there were too many "one last times" for that warning to be effective. (See Aversano's letter of September 27, 2000; December 27, 2000 call between Lucent and Winstar) (Wilson, Tr. 16–110–11). Moreover, privately Lucent employees agreed that Lucent was obligated to pay for these services. As is discussed in greater detail below, Lucent was using the threat of non-payment to get Winstar to **\*270** renegotiate their various agreements to get a better deal. On repeated occasions, Lucent advised Winstar that it was paying for Wireless' services under the Subcontract "one more time" or "one last time" but always paying each invoice until March 2001 when Lucent

was again trying to turn up the heat to get a better deal from Winstar. (Wilson, Tr. 16–110–11).

**[7]** 82. The requirement that there be "task orders" as contemplated by the Subcontract was modified by the course of conduct between the parties.

**[8]** 83. Lucent argues that this course of conduct between the parties is irrelevant because the Subcontract contains a "no oral modification" clause. Although such clauses are generally enforceable under New York law, there are two exceptions: (1) where an oral modification is supported by full performance, or by partial performance unequivocally referable to the oral modification, *Rose v. Spa Realty Associates,* 42 N.Y.2d 338, 343, 397 N.Y.S.2d 922, 926, 366 N.E.2d 1279 (N.Y.1977), and (2) where a party has relied upon an oral modification through conduct which is incompatible with the express terms of the contract, equitable estoppel will prevent the other party from attempting subsequent strict reliance on the written terms. *Id.,* 42 N.Y.2d at 344, 397 N.Y.S.2d at 927.

**[9]    [10]    [11]** 84. "Under New York law, oral directions to perform extra work, or the general course of conduct between the parties, may modify or eliminate contract provisions requiring written authorization or notice of claims." *Barsotti's, Inc. v. Consolidated Edison Co. of New York, Inc.,* 254 A.D.2d 211, 212, 680 N.Y.S.2d 88, 89 (1998) (internal quotations and citations omitted). When the contract has not been fully performed, "the party seeking relief from the written terms of the contract must introduce evidence of conduct on the part of other parties or reliance on his own part which is 'unequivocally referable' to the oral modification and incompatible with the contract's written terms." *Rose,* 42 N.Y.2d at 341, 344, 366 N.E.2d at 1281, 1283, 397 N.Y.S.2d at 924, 927. "Because the doctrine of part performance is based upon the equitable principle that it would be a fraud to allow one party, insisting on the Statute [of Frauds], to escape performance after permitting the other party, acting in reliance, to substantially perform, the acts of part performance must have been those of the party insisting on the contract, not those of the party insisting on the Statute of Frauds." *Messner Vetere Berger McNamee Schmetterer Euro RSCG Inc. v. Aegis Group PLC,* 93 N.Y.2d 229, 237, 711 N.E.2d 953, 958, 689 N.Y.S.2d 674, 679 (1999).

85. In this case the parties' behavior resulted in a modification to the Subcontract. There can be no question that Wireless' performance was undertaken pursuant to the Subcontract.

Based upon Lucent's past practices, neither Wireless nor Winstar was unreasonable in relying upon Lucent's practice of funding and paying for services upon presentation of an invoice and spreadsheet and neither was unreasonable in expecting this practice to continue. Moreover, it is not credible that almost two years after the pattern had been established that Lucent would insist upon compliance with the letter of the Subcontract, particularly when Lucent has used this tactic in the past to try to pressure Winstar and when Lucent itself was dragging its heels on negotiating the long-awaited transition agreement. In fact, after Lucent forced Uhl, under threat of non-payment of the Winstar's September 8, 2000 invoice in the amount of $65,509,331, to sign Aversano's September 27, 2000 letter (PX 88) purportedly resetting the terms and conditions of the Subcontract, **\*271** Lucent ignored the reset terms the very next quarter. Therefore based on the parties' behavior, the Subcontract was modified to provide for payment of purchase orders, invoices, etc. after the Wireless performed the work and thus Lucent's refusal to pay the March 2001 invoice was in breach of the Subcontract.

86. The Trustee is awarded damages in the amount of $62,050,742.00, the amount of the March 2001 invoice which Lucent was obligated to, but did not, pay. Pursuant to the law of this case, no consequential or punitive damages are awarded in connection with the breach. (*See* Docket # 85 and # 103). Moreover the parties have agreed that, if the event that the Trustee should be awarded damages pursuant to this Count, Lucent would be entitled to an offset of $6.3 million. Therefore the damage award is reduced to $55,750,742.00.

**COUNT X: PREFERENCE**

87. Section 547(b) of the Bankruptcy Code, 11 U.S.C. § 547(b), provides in relevant part as follows:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

\* \* \* \* \* \*

(B) between ninety days and one year before the date of filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

88. The burden of proving each of these elements by a preponderance of the evidence is on the chapter 7 Trustee. 11 U.S.C. § 547(g). *Official Committee of Unsecured Creditors v. Conceria Sabrina,* 195 B.R. 602, 612 (Bankr.M.D.Pa.1996).

89. In November 2000, with Lucent and Winstar still in negotiations on a transition agreement, Winstar informed Lucent that Siemans agreed to join the Bank Facility and lend Winstar an additional $200 million.

90. Prior to the closing of the Siemans loan, Winstar sought Lucent's permission to keep all, or failing that, $100 million of the loan and pay the other $100 to Lucent even though the Second Credit Agreement called for 100% of the proceeds of any increase in the Bank Facility to be paid to Lucent. Lucent refused and responded with a letter dated November 7, 2000 "consent letter" that was merely a list of demands. Those demands included the following:

A. First, Lucent demanded that Winstar draw all of the funds down as soon as they were available and pay them to Lucent, rather than allowing Winstar to determine whether and when it would tap the facility.

B. Second, Lucent demanded that Winstar agree to prepare a written paydown schedule for the remainder of the sums it owed Lucent under the Second Credit Agreement—even though Winstar was not obligated even to begin repaying the sums until 2005—and insisted that **\*272** Winstar help Lucent sell off the other outstanding Winstar borrowings.

C. Third, Lucent required that Winstar cooperate in Lucent's performing a due diligence review of Winstar.

91. When Winstar did not immediately agree to Lucent's demands, Lucent put the transition agreement negotiations on hold. Lucent's communications to Winstar were clear and carried the single message: agree to Lucent's demands or there would be no transition agreement.

92. When Winstar still did not acquiesce, Lucent played its ultimate trump card: give Lucent all of the Siemans proceeds or there would be no further draws under the Second Credit Agreement. Lucent, of course, could not withhold funding without breaching the Second Credit Facility. Lucent's threat was one more ploy to control Winstar.

93. Faced with the economic pressure, Winstar agreed to turn over the Siemans proceeds and on December 7, 2000 closed on a $200 million increase to its syndicated loan with Bank of New York.

94. On the same day Winstar paid, by wire transfer, Lucent $188,180,000 to reduce Winstar's outstanding loan with Lucent. This transfer represented the net loan proceeds of $194 million minus $5,820,000 refund of an up-front fee Winstar had paid Lucent at the time of the borrowing under the Second credit Agreement.

95. Lucent disputes that a transfer of Winstar's interest in property was made, that Winstar was insolvent at the time of the Transfer, and that Lucent was an insider of Winstar at the time of the Transfer.

### Transfer of the Debtor's Interest

[12]   96. Lucent waived the argument that there was not a transfer of Winstar's interest when it agreed to the following stipulated fact set forth in paragraph 6 of the Additions to Stipulated Facts, filed in open court on March 21, 2005:

> Section 547(b)(1) of the United States Bankruptcy Code has been satisfied with respect to the Trustee's claim that the transfer to Lucent of a portion of the Siemens loan proceeds constituted a voidable preference.

[13]   [14]   97. Subsequently, after the Trustee had rested, Lucent argued its motion for partial findings under Fed.R.Civ.P. 52(c), incorporated by reference into Fed. R. Bankr.P. 7052, and asserted for the first time that the Trustee had not sustained her burden of proving that section 547(b) (1) had been satisfied. (Tr. 17–7). Having stipulated that this

element has been satisfied, Lucent is not free to take back the stipulation after the Plaintiff concluded her case. But lest Lucent argue that the stipulated fact which, to the Court, is clear on its face is somehow ambiguous or means something other than what it says, the Court finds that even without the stipulation, there is more than ample evidence that a transfer of Winstar's interest in property occurred when it paid over a portion of the Siemens proceeds to Lucent. As Judge Fitzgerald recently stated in *In re AmeriServe Food Distribution, Inc.*

Section 547(b) requires, inter alia, that the property transferred by the debtor be an "interest of the debtor in property." The Supreme Court has interpreted this to be "property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." *Begier v. IRS,* 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990). In determining whether a transfer was "an interest of the debtor in property," courts apply the "diminution of estate doctrine," under **\*273** which a transfer of an interest of the debtor occurs when a transfer "diminish[es] directly or indirectly the fund to which creditors of the same class can legally resort for the payment of their debts, to such an extent that it is impossible for other creditors of the same class to obtain as great a percentage as the favored one." *In re Superior Stamp & Coin Co. Inc.,* 223 F.3d 1004, 1007 (9th Cir.2000), quoting 4 Collier on Bankruptcy, ¶ 547.03, at 547–26 (15th ed.1993).

*AFD Fund v. Transmed Foods, Inc. (In re AmeriServe Food Distribution, Inc.),* 315 B.R. 24, 29 (Bankr.D.Del.2004).

98. But for the payment over to Lucent that Debtor would have had the use of those funds. That failure to pay Lucent upon completion of the refinancing with Siemens might have given rise to a claim by Lucent for breach of contract does not nullify the fact that a transfer of the Debtor's interest was made.

[15]   99. Lucent further attempts to couch this argument as one of "substitution," that is, Siemens was substituted for Lucent on that portion of the loan it made. This argument is factually incorrect. By Lucent's own admission, its collateral pool was different from that given the Siemens. The Siemens transaction was not simply the substitution of one lender for another. Viewed another way what Lucent is really arguing is, as the Trustee correctly notes, the so-called "earmarking doctrine." Under this theory Lucent argues that Winstar had no ability to divert a vast majority of the Siemens

proceeds away from Lucent. Thus, Lucent asserts Winstar had no interest in the proceeds and was somehow simply a conduit through which the money flowed. But the facts here are distinguishable from those cases in which debtors validly assign proceeds before they are acquired. Here there was no assignment, just a simple promise to pay. That contractual obligation, without more, is insufficient to convert this into an assignment. *Compare In re Computer Engr'ng Assocs., Inc.,* 337 F.3d 38 (1st Cir.2003) (valid assignment of contract proceeds meant that debtor had no interest in proceeds as they accrued); *In re RISCmanagement, Inc.,* 304 B.R. 566 (Bankr.D.Mass.2004) (valid assignment of contract proceeds would deprive debtor of any interest in that property, but mere agreement to pay creditor out of contract proceeds would not). Moreover there is nothing in the record evidencing an agreement between Siemans and the Debtors that the proceeds of the Siemans transaction be used to pay Lucent. *See Reigle v. S.S. Mahajan (In re Kumar Bavishi & Associates),* 906 F.2d 942, 944 (3d Cir.1990) (affirming preference where "record does not reflect the existence of an agreement between [new creditor] and the debtor that the funds be used to pay a specified antecedent debt"); *In re Bohlen Enters., Ltd.,* 859 F.2d 561, 566 (8th Cir.1988); *Howdeshell of Fort Myers v. Dunham–Bush, Inc. (In re Howdeshell of Fort Myers),* 55 B.R. 470, 474–75 (Bankr.M.D.Fla.1985) (rejecting earmarking where debtor decided who to pay, and third party did not "condition" loan on payment to defendant).

**[16]** 100. Finally, earmarking is an affirmative defense. Lucent did not raise it in its Answer or in the Joint Pretrial Memorandum. Thus, even if Lucent had not previously waived the issue in the Additional Stipulated Facts, and even if it had proved facts that bring the Siemens proceeds under the doctrine of earmarking, it waived the defense when it failed to plead it as an affirmative defense.

### Insolvency

**[17]** 101. Under the Bankruptcy Code

**\*274** "insolvent" means—(A) with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—

(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

(ii) property that may be exempted from property of the estate under section 522 of this title ....

11 U.S.C. § 101(32).

**[18]** **[19]** 102. This test of insolvency, the so-called "balance sheet" insolvency, compares the "fair value" of all of the debtor's assets with the face or "stated" value of its liabilities on the relevant date. It is different from equity tests that focus on a debtor's current ability to pay debts as they become due. Moreover, although labeled as the "balance sheet" test, as Judge Wairath noted "this may be a misnomer because the Balance sheet Test is based upon a fair valuation and not based on Generally Accepted Accounting Principles ('GAAP'), which are used to prepare a typical balance sheet." *Lids Corp. v. Marathon Investment Partners, L.P. (In re Lids Corp.),* 281 B.R. 535, 540 (Bankr.D.Del.2002). "[A]lthough GAAP is relevant in [a] section 547 solvency analysis, it is not determinative." *Id.* at 542. "Whether a company is insolvent under the Bankruptcy Code is considered a mixed question of law and fact." *In re Trans World Airlines, Inc.,* 134 F.3d 188, 193 (3d Cir.1998).

### Fair Valuation

103. There are three standard approaches to determine the fair value of assets: the market approach, the income approach and the asset approach. (Scherf, Tr. 12–12–13 and 23–24). Although experts generally consider each of these approaches (Scherf, Tr 12–13), not all of the approaches are appropriate or helpful in determining the proper measure of valuation. Indeed valuation, although employing broad principles of economics, is as much an art as it is a science. Each approach may yield a different result and which approach offers the best or better framework is a determination made in light of the facts of a case. Nevertheless there are some basic tenets that guide courts in evaluation valuation evidence.

104. Fair valuation is generally interpreted as fair market value, that is the amount a hypothetical willing buyer would pay to a willing seller, rather than a distressed or liquidation value. *Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.),* 134 F.3d 188, 194 (3d Cir.1998), *cert. denied,* 523 U.S. 1138, 118 S.Ct. 1843, 140 L.Ed.2d 1093 (1998).

**[20]** **[21]** 105. "[A] fair valuation of assets contemplates a conversion of assets into cash during a reasonable period of time." *Id.* Although the determination of what is a reasonable

period of time depends upon the facts of each case, a "reasonable time should be an estimate of the time that a typical creditor would find optimal: not so short a period that the value of the goods is substantially impaired via a forced sale, but not so long a time that a typical creditor would receive less satisfaction of its claim, as a result of the time value of money and typical business needs, by waiting for the possibility of a higher price." *Id. at 195.* Thus the Court must decide whether "fair value" under the facts of this case means that the Debtor's assets at the time of the transfer must be valued as a going concern or on some other basis, such as a liquidation sale. The answer depends on whether a liquidation in bankruptcy was "clearly imminent on the date of the challenged trans **\*275** fer...." *Id. at 193. Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.),* 100 B.R. 127, 131 (Bankr.D.Mass.1989)("The proper standard of valuation to be applied in determining solvency in a bankruptcy proceeding is the value of the business as a going concern, not the liquidation value of its assets less its liabilities.... Liquidation value is appropriate, however, if at the time in question the business is so close to shutting its doors that a going concern value is unrealistic...."). Moreover "going concern" value may not be an appropriate test in an unstable market. *In re Art Shirt, Ltd.,* 93 B.R. 333 (E.D.Pa.1988).

106. As Lucent's insolvency expert noted in his report:

> During the 1999–2000 period telecom stocks exhibited a great deal of volatility. According to Merrill Lynch, during the period from January 1, 1999 to early March 2000 an average stock within the emerging broadband group appreciated 63% year to date, then these stocks declined an average of 87% by the end of 2000.

(DX 701 at 11).

107. The traditional method of determining " 'going concern' value is by capitalizing net profit." *Vadnais Lumber Supply,* 100 B.R. at 131.

108. The Trustee and Lucent each rely upon the testimony of their respective insolvency experts and not unexpectedly those experts reached vastly different conclusions. The Trustee's expert, Scherf, concluded that Winstar was insolvent on December 7, 2000, the date of the transfer;

Collins, Lucent's expert, concluded the Debtor was solvent on that date.

109. Stephen J. Scherf, the Trustee's expert, is a Certified Public Accountant and a Certified Valuation Analyst. He is a principal in Parente Rudulph, LLC and is well qualified to render an expert opinion in the area of insolvency. Lucent does not dispute his qualifications as an expert in this matter. Scherf's report was admitted into evidence as PX 460.

110. Lucent relied upon the expert opinion of Kevin Collins, a managing director of Houlihan Lokey Howard & Zukin and in charge of the valuation practice of the firm's New York City office. He is also well qualified to render an expert opinion in the area of insolvency and the Trustee does not dispute his qualifications as an expert in this matter. His report was admitted into evidence as DX 701. [46]

111. In this case the Trustee's expert considered all three approaches (Scherf, Tr. 12–24–25), while Lucent's expert did not consider the asset approach (Collins, Tr. 18–16).

### The Market Approach

  **[22]**    112. The market approach measures the subject company's assets and those of similarly situate companies.

113. Collins testified that "there was a large and active trading market for Winstar...." (Collins, Tr. 18–16). He opined that the market approach or an income approach would be the appropriate tests for valuation. Because the market approach considered the value only on the basis that the purchaser could only acquire a minority ownership interest via stock purchases, he then adjusted the value upward **\*276** to include the increase in value that could be attributed to buying a controlling, or indeed entire, interest in the Debtors. Based upon his analysis, he opined that Winstar was solvent on the Transfer date.

114. Scherf rejected the stock market valuation of Winstar and he was correct to do so. The stock market value artificially overvalued the Debtor. For one thing market investors did not know that Lucent was holding back on issuing its refinancing notice. Lucent, but not the average investor, knew that Winstar's true financial picture was much bleaker than the Debtors' publicized financials would indicate. Moreover, as even Collins acknowledged, the market was unstable. [cite] It was simply too unstable to be an adequate indicator of valuation.

115. Moreover, as part of his market approach, Collins, blending a market approach with principles upon which the income approach is based, examined sales of companies or controlling interest in companies that were not comparable to Winstar in performing a guideline company approach and comparable transaction methodology.

### The Asset Approach

[23]  116. Scherf and Collins both utilized an asset approach to value Winstar. This approach looks at categories of assets and determines the fair market value of those assets or categories of assets based on what it would cost to replace or reconstruct the assets, that is, their replacement cost. (Scherf, Tr. 12–24 and PX 460 at 6). This approach generally begins with a company's balance sheet but substitutes the fair market value of assets and liabilities in place of the book value.

[24]  117. The date of the transfer, in this case December 7, 2000, is the relevant date for solvency. The Debtors, however, did not have financial statements as of that date, and, even if they had, financial statements prepared according to GAAP, although relevant, are not controlling. The Debtor did, however, have internally prepared financial statements for December 1, 2000 and December 31, 2000. Thus one approach to determining solvency as of December 7, 2000 is to begin with the financial statements of December 31, 2002 and apply a technique commonly referred to as retrojection. "[T]he United States Court of Appeals for the First Circuit has expressly approved the technique of retrojection, whereby a trustee may meet his burden of proof on the issue of insolvency by showing that the debtor was insolvent at a reasonable time subsequent to the alleged transfer, accompanied by proof that the debtor's financial situation did not change materially during the intervening period." *In re Industrial Commercial Elec., Inc. v. Babineau ( In re Industrial Commercial Elec., Inc.),* 2004 WL 1354530, *7 (Bankr.D.Mass.)* (citations omitted). There is no reason to believe that this technique, employed by both parties' experts, would not be expressly approved by the Third Circuit as well. "That rule [retrojection] provides that when a debtor was insolvent on the first known date and insolvent on the last relevant date, and the trustee demonstrates 'the absence of any substantial or radical changes in the assets or liabilities of the bankrupt between the retrojection dates,' *id.,* the debtor is deemed to have been insolvent at all intermediate times. *Foley v. Briden (In re Arrowhead Gardens, Inc.),* 32 B.R. 296, 300 (Bankr.D.Mass.1983)." *Murphy v. Nunes (In re Terrific Seafoods, Inc.),* 197 B.R. 724, 731 (Bankr.D.Mass.1996).

118. There were no contemporaneously prepared audited financials for the year ended December 31, 2000. Winstar's unaudited financials for that time showed Winstar had a positive net worth *on a book value basis.* (PX 460 at 10). Book value  **\*277**  is not the same as fair value. [47] If Winstar's net worth is evaluated on an income basis, it had a negative value.

119. Scherf identified four subsequent events he believed had to be accounted for in order to apply the asset approach: (1) the recognition and recording of a $1.8 billion impairment charge for the three months ended December 31, 2000 by Grant Thorton, LLP, the Debtors' independent auditors; (2) the sale of substantially all of the Debtors' assets and nor of their liabilities to IDT for $42.5 million on December 19, 2001; [48] (3) the valuation prepared for IDT in connection with the allocation of the purchase price; and (4) the administrative insolvency of the Debtors' estates, a factor which he ultimately determined did not provide evidence of solvency or insolvency on the Transfer Date. (Scherf, Tr. 12–25).

120. The impairment charge was based on projections that were prepared for a presentation on December 11, 2000. The impairment charge was clearly knowable on December 7, 2000. (Scherf, Tr. 12–33).

121. In February 2001 Monoco sent an email documenting Winstar's cash flow problems.-Monaco's email in Feb 2001 re: "Depending on the time of checks clearing, we will have difficulty getting to the end of March when we anticipate a brief reprieve by receiving $60mm from Lucent for services, etc." (PX 284). By March 30, 2001 Uhl recognized Winstar's need to file bankruptcy. (Uhl Video-direct at 242–43).

122. Valuations were prepared for IDT in connection with the December 19, 2001 sale by Deloitte & Touche, which valued just the tangible assets at $328 million, and Empire Valuation, after reviewing the work of Deloitte & Touche, determined that the tangible and intangible assets were worth $630 million.

123. Based upon his analysis, Scherf opined that Winstar was insolvent by approximately $1.6 billion on the Transfer Date. The Court agrees.

124. Lucent criticizes any reliance upon the actual sale price ultimately paid for Winstar's assets during its bankruptcy. It argues this number represents a distress sale and a price

significantly less than Winstar's value on December 7, 2000. The sale price, although not the only or even the primary fact upon which Scherf's valuation is based, is relevant. Contrary to Lucent's characterization of the sale of Winstar's assets, the sale was not an auction but rather as a going concern. *See, e.g.,* Order Authorizing Sale [of substantially all assets to IDT], dated December 19, 2001 at M (entry of sale order necessary to provide uninterrupted service to Debtors' customers) [Docket # 1627]; Master/Final Execution Copy of Asset Purchase Agreement [Docket # 1629].

**\*278 *The Income Approach***

[25] 125. The income approach estimates the value of a company based on its earnings capacity. (PX 460 at 7). There are two commonly used methods to conduct income approach valuation. The first, capitalized debt free method also called capitalization of earnings, is based on a company's debt free net cash flow for one year or some other discreet period. Winstar never had any debt free cash flow. In fact Winstar, which began its operations in 1996, lost $83 million in that year. The losses steadily increased and by 2000 the loss had grown to $870 million. Thus application of this method mandates a finding of insolvency.

[26] 126. Under the second method, the discounted cash flow method, future earnings are projected and then discounted to present value, adjusted to reflect the risk that such earnings will not materialize. (PX 460 at 8). Winstar in fact had prepared projections for a ten (10) year period, until 2009. Because of Winstar's historical performance and the instability of the telecommunications industry, Scherf concluded the Winstar was insolvent using this method. His conclusion is correct. Those projections were speculative at best. They included growth rates significantly in excess of what was projected to be reasonable growth in the telecommunications industry. Moreover, while Winstar generally had been able to meet its revenue projections-although the ten year projections through 2009 relied heavily upon equity infusion which may or may not materialize in an unstable market, historically it understated its expenses. Finally the balance sheet for December 31, 2000 in actuality differed significantly for what Winstar had projected.

127. Collins ignored the deficiencies inherent in Winstar's projections; instead he accepted them at face value and thus his reliance on them produced a flawed result. Further he used a discounted rate of 16% to reflect the risk to investors at a time when Winstar's debt yield was in the range of 25–30%.

128. But Lucent argues that Scherf ignored contemporaneous cash flow data and future projections (which would be used to perform a valuation based on the discounted cash flow method) when performing a valuation based on the income approach and instead relied upon the capitalized debt free net cash flow method. Lucent is incorrect. The capitalized debt free net cash flow method is supported by valuation treatises and has been adopted by courts. Moreover, Scherf did not ignore the discounted cash flow method but rather rejected its use in this case given the unreliability of Winstar's future projections. The discounted cash flow methodology is simply an unacceptable method to be used in this case.

***Amount of Liabilities***

[27] 129. Absent some unusual circumstances not applicable here, the insolvency test anticipates that liabilities will be valued at their face value. *In re Trans World Airlines, Inc.,* 134 F.3d 188, 197 (3d Cir.1998).

130. Scherf values those liabilities at $4.8 billion as of December 7, 2000 (Tr. 12–14–15, PX 460); Collins did not value them as of that date. (Tr. 18–118). In fact Collins testified that he was unable to value the liabilities as of December 7, 2000. (Tr. 18–119). He valued the liabilities as of December 31, 2000 at $4.321 billion. (Tr. 18–118).

131. Based upon the valuation of the assets and liabilities, Winstar was insolvent on December 7, 2000, the date of the Transfer.

**\*279 *Insider Status***

132. Because the Transfer occurred during the period greater than 90 days before the Petition date but less than one year prior to the bankruptcies, the Trustee may only recover on her preference claim if she proves that Lucent was an insider at the time of the Transfer.

133. With respect to a corporation, an insider includes a "person in control of the debtor." 11 U.S.C. § 101(31).

134. Some courts have defined control as the creditor dominating the debtor. *In re A. Tarricone, Inc.,* 286 B.R. 256, 265 (Bankr.S.D.N.Y.2002). Others "have used terminology such as having a 'stranglehold' over the debtor, having 'complete domination' of the debtor, rendering the debtor a 'mere instrumentality or alter ego' of the lender or 'powerless to act independently.' " *Badger Freightways, Inc. v. Continental Ill. Nat'l Bank & Trust Co. Of Chicago*

*In re Badger Freightways, Inc.),* 106 B.R. 971, 981–82 (Bankr.N.D.Ill.1989)(internal citations omitted).

**[28]** **[29]** 135. Both Lucent and the Trustee correctly note that whether a party is or was "in control" of a debtor requires a case by case determination. "The legislative history of § 101(31) indicates that the term applies to 'one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor.' " *Official Committee of Unsecured Creditors v. Austin Financial Services, Inc. (In re KDI Holdings, Inc.),* 277 B.R. 493, 511 (Bankr.S.D.N.Y.1999) (quoting S.Rep. No. 989, 95th Cong., 1st Sess. 25 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5810, 6269) (legislative history 11 U.S.C. § 101(31)) (other citations omitted). "The true test of 'insider' status is whether one's dealings with the debtor cannot accurately be characterized as arm's-length. *In re Craig Systems Corporation,* 244 B.R. 529, 539 (Bankr.D.Mass.2000). The emphasis is on the nature of the relationship between debtor and the other person, especially on whether their relationship gave the other person the power or influence to have a debt owed to it repaid." *In re Demko,* 264 B.R. at 408.

**[30]** 136. In determining whether a creditor, and particularly a bank, has the requisite level of control to be an insider, the courts examine whether the creditor had more ability to assert control than the other creditors, whether the creditor made management decisions for the debtor, directed work performance, and directed payment of the debtor's expenses. *ABC Elec. Serv. Inc. v. Rondout Elec., Inc., (In re ABC Elec. Serv. Inc.),* 190 B.R. 672 (Bankr.M.D.Fla.1995). *There must be day-to-day control, rather than some monitoring or exertion of influence regarding financial transactions in which the creditor has a direct stake.* *In re Armstrong,* 231 B.R. 746, 749–50 (Bankr.E.D.Ark.1999).

**[31]** 137. That does not mean, however, as Lucent asserts that Lucent must have used its control to obtain the transfer although whether the transfer in question was done under pressure from Lucent is one fact to be considered in making the determination of control. *Walsh v. Dutil (In re Demko),* 264 B.R. 404, 408 (Bankr.W.D.Pa.2001). Neither the Bankruptcy Code nor the case law, however, require the use of the insider's status as an insider to force the preferential payment to be made. The elements of a preference are set forth in Section 547(b) which requires, among other things, that the transfer have been made "between ninety days and one year

before the date of filing of the petition, if such creditor at the time of such **\*280** transfer was an insider...." 11 U.S.C. § 547(b)(4)(B). There is nothing in the language that requires the causal connection between the control and the preferential transfer that Lucent claims is needed.

**[32]** 138. In this case the facts indicate that Lucent controlled many of Winstar's decisions relating to the buildout of the network. Lucent forced the "purchase" of its goods well before the equipment was needed and in many instances under the Software Pool Agreement, never needed at all. Lucent treated Winstar as a captive buyer for Lucent's goods. These purchases, especially those under the Software Pool Agreement were just a means for Lucent to inflate its own revenue.

139. Lucent argues, however, that Winstar is complicit in its scheme to inflate revenues. For example when Lucent required Winstar employees to sign false bill and hold letters needed for Lucent to book revenue, they did so even though Winstar knew that Lucent used the process to deceive its auditors. That Winstar was a participant in Lucent's scheme does not prove that Winstar was not under Lucent control. In fact, Lucent's ability to involve Winstar's employees in Lucent duplicity is further evidence of Lucent's control.

**[33]** **[34]** **[35]** 140. Two former Lucent employees, Deborah Harris and William Plunkett refused to answer deposition questions beyond providing their names and addresses and instead asserted their right against self incrimination. [49] "The Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). This Court may and chooses to draw negative adverse inferences from their testimony. Both were employees of Lucent when the relevant actions occurred. [50] Although neither is a party to this lawsuit, a fact which Lucent emphasizes to show that neither "cared whether Lucent succeeds in this litigation," their non-party status does not render admitting their testimony impermissible given the facts of this case. Nor does the fact that neither was employed by Lucent when their testimony was taken. *Rad.* Both Harris and Plunkett were parties to the SEC's action (PX 739); both were employed by Lucent during the relevant **\*281** time frame and the questions they refused to answer related directly to their actions as Lucent employees during this period.

**[36]**   141. Before an adverse inference may be drawn from a party's refusal to testify in a civil case, there must be independent corroborative evidence to support the negative inference beyond the invocation of the privilege. *See Baxter, 425 U.S. at 318, 96 S.Ct. at 1558.* ("the Fifth Amendment does not forbid adverse inferences against parties ... when they refuse to testify in response to probative evidence offered against them"); "[L]iability should not be imposed based solely upon the adverse inference." *United States v. Private Sanitation Industry Ass'n,* 899 F.Supp. 974, 982 (E.D.N.Y.1994), aff'd 47 F.3d 1158 (2d Cir.), *cert. denied sub. nom., Ferrante v. United States,* 516 U.S. 806, 116 S.Ct. 50, 133 L.Ed.2d 15 (1995).

142. During his deposition Mr. Plunkett was asked a series of questions relating to end of quarter deals, sham bill and hold transactions, the Software Poll Agreement. He asserted his Fifth Amendment privilege in response to each question but had he responded truthfully, his testimony would have added to the substantial evidence against Lucent and indeed would have been devastating to his former employer. Examples of the questions asked of this witness are set forth below.

Q: Isn't it a fact that in 1999 and 2000 you participated in transactions between Lucent and Winstar at the end of each quarter form December 31st, 1999 through September 30th, wherein Winstar purchased substantial quantities of equipment, software, and/or services from Lucent Technologies?

A: "On advice of counsel I respectfully decline to answer on the ground that my answer may incriminate or tend to incriminate me." (Hereinafter referred to as "Fifth Amendment Response").

Q: Isn't it a fact that in December 1999 Winstar purchased over $96 million worth of goods and services from Lucent?

A: Fifth Amendment Response

Q: Isn't it a fact that this transaction was referred to as an end of quarter deal?

A: Fifth Amendment Response

Q: Isn't it a fact that certain of the equipment purchased by Winstar in the December 1999 end of quarter deal was not delivered to Winstar but was held by Lucent even through the purchase price was paid by Winstar?

A: Fifth Amendment Response

And isn't it a fact that in connection with the end of quarter deal and in order to be certain that Lucent could book the revenue Lucent prepared letters which it gave to winstar which it asked Winstar to sign?

A: Fifth Amendment Response

Q: Isn't it a fact that Winstar did, in fact, sign the letters provided by Lucent with respect tot he December 1999 end of quarter deal?

A: Fifth Amendment Response

Q: And isn't it, in fact, correct that these letters were not true and correct in all respects?

A: Fifth Amendment Response

Q: Isn't it a fact that these letters falsely stated dates by which Lucent would install the purchased equipment?

A: Fifth Amendment Response

Q: And isn't it a fact the Winstar did not need the equipment purchased through these letters immediately but was buying the equipment earlier to provide Lucent with additional revenue?

A: Fifth Amendment Response

**\*282**   Q: And isn't it a fact that the letters also stated falsely that Winstar lacked the warehouse space to store equipment?

A: Fifth Amendment Response

Q: Isn't it a fact that some of the equipment purchased by Winstar in the December 1999 end of quarter deal included Optronics equipment?

A: Fifth Amendment Response

Q: And isn't it a fact that when your employment with Lucent terminated in November of 2000 this equipment remained in Lucent's warehouses?

A: Fifth Amendment Response

(Plunkett, Deposition transcript at p. 11, line 25 to p. 14, line 23).

143. He was then asked virtually identical questions with respect to March 2000, June 2000 purchases, and September

2000 end of quarter purchases and again asserted his Fifth Amendment privilege. (*Id.* at p. 15. Line 9 to p. 20, line 25, p. 22, line 8 to p. 24, line 4). Similarly when questioned about the Software Pool Agreement, Plunkett refused to answer. Had he answered truthfully his testimony would support the finding that the agreement was a sham transaction; it was nothing more than a device to inflate Lucent's revenues. (*Id.* at p. 24, line 5 to p. 26, line 18). [51]

144. Independent evidence shows that Plunkett was involved in the June 2000 end of quarter deal. *See, e.g.,* PX 360 (Ackerman's June 23, 2000 email to Kantor) ("He [Plunkett] wants us to agree to another $53M in purchases for 2Q (that includes $17M of accelerated pay as you grow for 5ESS's)"). Independent evidence also proves he was involved in the September 2000 end of quarter deal and the Software Pool Agreement. *See e.g.,* PX 125 (Plunkett's September 29, 2000 letter to Ackerman): "Winstar Agrees [sic] to purchase from Lucent the following ... $18,852,500 5ESS PAYG" and PX 127 (Ackerman's September 18, 2000 email to Kantor): "I just spoke with Bill [Plunkett]. He informed me that you and Nina had met (dinner?) And you agreed to help them get to the number they need this quarter...something around $110M, of which we have already spent about $45M. There is not much I can give them that we really need, but there are some creative things I can do that can get us close to their number without being totally stupid."

145. Harris was asked virtually the same questions and also invoked her Fifth Amendment privilege. She, like Plunkett, was involved in the transactions about which she was questioned and the Court finds that had she answered truthfully, her testimony would also have been adverse to Lucent. Had Plunkett and Harris answered truthfully about the nature of the relationship between the two companies, they would have acknowledged Lucent's control over Winstar and lack of arms' length relationship between them. *Rad Services v. Aetna Cas. & Surety Co.,* 808 F.2d 271, 280–81 (3d Cir.1986), *quoting Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). *See also Baxter,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810; *LiButti v. U.S.,* 107 F.3d 110 (2d Cir.1997); *Federal Deposit Ins. Corp. v. Fidelity & Deposit Co. of Maryland,* 45 F.3d 969 (5th Cir.1995); *Davis v. The Mut. Life Ins. Co. of New York,* 6 F.3d 367 (6th Cir.1993), *cert. denied,* 510 U.S. 1193, 114 S.Ct. 1298, 127 L.Ed.2d 650 (1994); **\*283** *Brink's Inc. v. The City of New York,* 717 F.2d 700 (2d Cir.1983).

146. Lucent was an insider of Winstar's on December 7, 2000, the date of the Transfer.

[37] 147. Consequently all of the elements of a preference have been satisfied. The payment of the Siemans proceeds was a preference.

[38] 148. Lucent argues, however, that even if the Transfer was preferential the Trustee may not recover because Lucent gave subsequent new value to Winstar when it continued to loan under the Second Credit Agreement. Although the amount that it claims it gave in new value is an ever-changing figure in this case, the inability of Lucent to fix the amount is irrelevant as it is not entitled to the benefit of the new value defense.

149. Lucent bears the burden of establishing new value. 11 U.S.C. § 547(g) (the creditor ... against whom recovery or avoidance is sought has the burden of proving the non-avoidability of a transfer under subsection (c) of this section); *Phoenix Restaurant Group, Inc. v. Ajilon Professional Staffing LLC (In re Phoenix Restaurant Group, Inc.),* 317 B.R. 491, 494 (Bankr.M.D.Tenn.2004).

150. Lucent's new value defense fails for two reasons. First, to the extent Lucent provided any equipment or software to Winstar after December 7, 2000, it did so on a secured basis, as is evidenced by the Security Agreements dated May 9, 2000, and December 22, 2000, (DX–32; DX–33) and as admitted by Lucent in its October 11, 2001, secured proof of claim (PX–340) and the escrow fund stipulations. (PX–506; PX–507; PX–508). Second, even if the additional value were provided on an unsecured basis, Lucent has failed to show that it was provided *after* the receipt by Lucent of the preferential transfer.

[39] 151. It is well settled that to support a new value affirmative defense, section 547(c)(4)(A) requires a creditor to establish that, after receiving a preferential payment, the creditor advanced "new value" to the debtor "not secured by an otherwise unavoidable security interest." *New York City Shoes, Inc. v. Bentley Int'l, Inc. (In re New York City Shoes, Inc.),* 880 F.2d 679, 680 (3d Cir.1989). Lucent provided only secured value: all Lucent equipment and software sold to Winstar was sold subject to two separate security agreements dated May 9, 2000, and December 22, 2000. (DX–32, DX–33); Lucent's proof of claim (PX–340) alleges a secured claim although it provides no evidence of the value of its collateral; the Trustee and Lucent have entered into three stipulations

(PX–506, PX–507, and PX–508) which recognize the validity of Lucent's security interests and provide for distribution to Lucent of the proceeds of the sale of Winstar assets that were subject to Lucent's lien (subject to judgment on the Trustee's equitable subordination claim).

152. For the foregoing reasons the Trustee is awarded judgment in the amount of $188,180,000.

**COUNT XI: EQUITABLE SUBORDINATION**

[40] 153. The Bankruptcy Code invests the Court with authority to subordinate all or part of a claim "under the principles of equitable subordination...." 11 U.S.C. § 510(c). Courts considering equitable subordination follow the *Mobile Steel* test: (1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the debtor or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with **\*284** the Bankruptcy Code. *In re Mobile Steel Co.,* 563 F.2d 692, 700 (5th Cir.1977). *See also Merrimac Paper Co. v. Harrison (In re Merrimac Paper Co.),* 420 F.3d 53, 58 (1st Cir.2005); *Citicorp Venture Capital, Ltd. v. Committee of Creditors Holding Unsecured Claims,* 160 F.3d 982, 986 (3d Cir.1998).

[41] 154. When the creditor is an insider, the proof required to prove equitable subordination is not demanding. In such cases, a bankruptcy trustee need only show "material evidence" of unfair conduct. *In re N & D Properties, Inc.,* 799 F.2d 726, 731 (11th Cir.1986); *see also In re Epic Capital Corp., et. al.,* 290 B.R. 514, 524 (Bankr.D.Del.2003), *aff'd,* 307 B.R. 767 (D.Del.2004).

[42] 155. "For non-insider claimants, egregious conduct must be established to justify equitable subordination...." *In re Mid–American Waste Systems, Inc.,* 284 B.R. 53, 70 (Bankr.D.Del.2002) (internal citations omitted). "[The degree of non-insider misconduct] has been variously described as 'very substantial' misconduct involving 'moral turpitude or some breach of duty or some misrepresentation whereby other creditors were deceived to their damage' or as gross misconduct amounting to fraud, overreaching or spoliation." *In re M. Paolella & Sons, Inc.,* 161 B.R. 107, 119 (E.D.Pa.1993), citing *In re Osborne,* 42 B.R. 988, 996 (W.D.Wis.1984).

156. Nevertheless the test is the same; only the standard of proof required differs. *Mid–American Waste Systems,* 284 B.R. at 70 (internal citations omitted).

*Inequitable Conduct*

[43] [44] 157. There are three generally recognized categories of misconduct which may constitute inequitable conduct for insiders: "(1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere Instrumentality or alter ego." *Id.*

158. The same facts underlying the finding that Lucent was an insider of Winstar warrant a finding that Lucent engaged in inequitable conduct by using Winstar as a mere instrumentality to inflate Lucent's own revenues.

159. Yet whether Lucent is an insider or not does not affect the outcome of the Court's conclusion that the first prong of the *Mobile Steel* test is satisfied: the facts in this case warrant equitably subordinating Lucent's claim because it was egregious. Lucent repeatedly threatened Winstar with nonpayment after Wireless performed significant services under the subcontract, all in an effort to extract more and more from Winstar, Lucent's captive purchaser. Ultimately, when Lucent's new management regime determined that a refinancing notice, the equivalent of a financial death knell for Winstar, had to be sent, Lucent deliberately held up the refinancing notice to ensure that the Siemans refinancing occurred and new equity was infused into the dying Winstar.

*Harm to Winstar's creditors*

[45] 160. Lucent's conduct resulted in substantial damages to Winstar and ultimately Winstar's creditors, including, apart from the preferential payment itself, the interest paid by Winstar to Lucent on unnecessary Lucent equipment and services purchased by Winstar to generate revenue for Lucent, storage costs, and insurance costs. Winstar sustained additional damages in that the approximate $244 million (on a cost adjusted basis) of Lucent equipment in inventory in warehouses on March 31, 2001 was sold in December 2001 for approximately a penny on the dollar compared to its December 7, 2000, balance sheet stated value.

**\*285** 161. In addition Winstar received $270 million in equity financing on December 7, 2000 through the issuance of Series H Preferred Stock. The funding came primarily from Welch Carson Anderson & Stowe and Credit Suisse First Boston Private Equity. (DX 701 at 26 and 48).

162. The Debtors and their creditors were harmed by Lucent's deliberate delay in sending the refinancing notice. Lucent

intentionally waited until it had received the proceeds of the Siemans refinancing before allowing the public to learn what it already knew; Winstar was in significant financial distress and indeed, as set forth above, was insolvent. Lucent reaped a substantial benefit but at the expense of the Debtors' other creditors.

### Consistent with the Bankruptcy Code

[**46**]    163. Subordinating Lucent's claims is not inconsistent with the Bankruptcy Code.

164. Consequently Lucent's claim will be subordinated under section 510(c) of the Bankruptcy Code to the claims of *all* creditors, including all unsecured claims which includes the deficiency claim of Siemans, if any, and to the interests of those entities who infused the $270 million of equity in Winstar on December 7, 2000. The lien of Lucent is preserved for the benefit of the estate and is transferred to the Trustee in her representative capacity.

### LUCENT'S COUNTERCLAIMS

165. Lucent seeks damages from Winstar's estate on the basis of fraud and negligent misrepresentation arising from Winstar's representation implicit in at least four borrowing representations from and after January 18, 2001 that it was in compliance with the CAPEX covenant.

[**47**]    166. "Under Delaware law, express choice of law provisions in contracts are generally given effect." *Harper v. Delaware Valley Broadcasters, Inc.,* 743 F.Supp. 1076 (D.Del.1990).

[**48**]   [**49**]   167. Lucent must establish each of the following elements: (1) a material misrepresentation or omission of fact; (2) made with knowledge of its falsity; (3) with an intent to defraud; (4) reasonable reliance on the representation; and (5) resulting damages. *Schlaifer Nance & Co. v. Estate of Warhol,* 119 F.3d 91, 98 (2d Cir.1997); *see also Dallas Aero., Inc. v. CIS Air Corp.,* 352 F.3d 775, 784–85 (2d Cir.2003). Each must be proved by clear and convincing evidence. *Dallas Aero., Inc. v. CIS Air Corp.,* 352 F.3d 775, 784–85 (2d Cir.2003).

168. Lucent has not proved that Winstar breached the CAPEX covenant and if it did so, it did so knowingly. Winstar's

employees testified that they believed that the company was in compliance with the CAPEX covenant in the first quarter of 2001. To the extent that Winstar was not in compliance with the CAPEX covenant, this "breach" is harmless. Lucent was well aware of Winstar's financial status and some of its employees were even involved in attempting to help Winstar lower its CAPEX in order to comply with the covenant.

169. Lucent has not demonstrated, and given the level of its knowledge and involvement cannot demonstrate, that it reasonably relied upon Winstar's representations. Lucent itself knew of Winstar's deteriorating financial condition in November and December 2000. Lucent was prepared to issue the refinancing notice as soon as it got the Siemans proceeds. For it now to argue it was duped by the Debtor is disingenuous.

[**50**]   [**51**]   170. To establish a claim of negligent misrepresentation, the claimant must prove by a preponderance of the evidence: (1) carelessness in imparting **\*286** words; (2) upon which others were expected to rely; (3) and upon which others acted or failed to act; (4) to their damage; and (5) the declarant must express the words directly to one to whom it is bound by some relation or owes a special duty of care (which must involve a "closer degree of trust" than that of an ordinary buyer and seller). *Dallas Aero., Inc.,* 352 F.3d at 788; *see also Hydro Investors, Inc. v. Trafalgar Power Inc.,* 227 F.3d 8, 20 (2d Cir.2000). It must also demonstrate that its reliance on Winstar's purportedly false statements was "reasonable." *Morrissey v. GMC,* 21 Fed.Appx. 70, 73 (2d Cir.2001).

171. As set above, Lucent has not met its burden. It cannot ignore its own knowledge and feign surprise to learn the CAPEX covenant was breached when it was deeply immersed in the financial transactions of Winstar. Therefore judgment will enter for Winstar with respect to Lucent's counterclaims.

### CONCLUSION

For the foregoing reasons, the Court finds that judgment should enter for the Plaintiff on all counts and counterclaims as set forth above.

A separate order of judgment for the Plaintiff will enter.

Footnotes

1    The parties agree that the alleged breach is a breach of the Agreement for Network Build-out Services (the "Subcontract") and not a breach of any funding obligation under the credit facilities. *See* Joint Pretrial Memorandum [Adversary Proceeding Docket (hereinafter "Docket") # 292] at Exhibit 12.

2    On May 29 and August 7, 2003, the Bankruptcy Court, on Lucent's motion, entered orders dismissing Count IX (breach of covenant of good faith and fair dealing), precluding the Trustee from recovering consequential or punitive damages on any of her claims, and prohibiting the Trustee from obtaining any affirmative monetary recovery on her equitable subordination claim [Docket 85, 103]. The Trustee, with Lucent's assent, voluntarily dismissed Counts I through VI and Count VIII [Docket # 207].

3    Count 2 of the Second Amended Answer and Counterclaims is a count for setoff pursuant to 11 U.S.C. § 553. The parties have stipulated that in the event the Trustee is awarded judgment against the Defendant under the Subcontract, the Defendant is entitled to a total setoff of $6.3 million. (Stipulation By and Between The Trustee and Lucent. Technologies Inc. Concerning Lucent's Counterclaim for Setoff at ¶ 1 [Docket # 337] ). Counterclaim 3 is a claim for fraud and counterclaim 4 is one for negligent misrepresentation. Both are based on Winstar's alleged representations to Lucent during Lucent's "due diligence" investigation in November and December 2000. Neither of these counterclaims were raised by Lucent in the Joint Pretrial Memorandum as required by paragraph 7(H) and (I) of the Court's Pretrial Order of January 26, 2005 [Docket # 275] ("The parties are ordered to file ... a Joint Pretrial Memorandum approved by all counsel and unrepresented parties, which shall set forth the following: ... (H) The issues of fact which remain to be litigated (evidence at trial shall be limited to these issues); (I) The issues of law to be determined....") and thus are deemed waived. Had they not been waived, the credible evidence supports a finding that Lucent did not carry its burden of proof as it had sufficient knowledge of the financial condition of Winstar during the relevant period that it could not have reasonably relied upon any allegedly misleading information. Lucent's surviving counterclaims for fraud and negligent misrepresentation relate to the breach of the so-called CAPEX covenant.

4    The witnesses who testified at trial were Paul Pocalyko, Stephen Scherf, Martina Hunt–Majean, Mark Wilson, Reginald Kipke, Kevin Collins, Christopher Stark, Michael Keefe, Elizabeth Perricone (some of Perricone's testimony also came in via portions of deposition testimony read at trial), Gregory Garrett, Henry Schacht (some of Schacht's testimony also came in via videotaped deposition testimony played at trial), Vernon Terrill, and John Solomon.

5    The witnesses whose testimony was admitted via videotaped depositions were Nathan Kantor, Lisa Hicks, William Zlotnick, Jill Diroma, Frederic Rubin, David Ackerman, Richard McGinn (some of McGinn's testimony also came in via portions of deposition testimony read at trial), William Rouhana, Michael Montemarano, Deborah Hopkins, Gary Simpson, William Fullerton, Richard Uhl, Kevin Monaco (some of Monaco's testimony also came in via portions of deposition testimony read at trial), Gary Goldman, and Kevin Howell. As noted above some of Schacht's testimony was introduced on videotape; the Court also had the opportunity to observe this witness when he testified in person later during the trial.

6    In many instances non-consecutive portions of videotaped testimony were introduced, In designating the corresponding transcripts, the parties, for some but not all of these witnesses, renumbered the pages sequentially and kept the reference to the original volume and page. In some instances while the renumbered pages introduced as a witness' direct testimony begin with page 1, so do the first pages of the witness' cross examination and redirect testimony. The Court will refer to the renumbered page designation as "direct," "cross" or "redirect" when necessary and omit reference to the original volume and page numbers unless such additional citation is necessary to avoid confusion.

7    Whether the Court treats its order as final under Fed. R. Bankr.P. 7052 or proposes findings and rulings to the district court under Fed. R. Bank. P. 9033 will affect the way in which the parties respond to the orders issued contemporaneously herewith. Moreover "a proceeding's core or non-core nature is crucial in bankruptcy cases because it defines both the extent of the Bankruptcy Court's jurisdiction, and the standard by which the District Court reviews its factual findings." *Halper v. Halper,* 164 F.3d 830, 836 (3d Cir.1999). *Compare* Fed. R. Bankr.P. 9033(d) *with* Fed.R.Bankr.P. 8013.

8    The district court concluded that the Trustee had the right to withdraw her jury demand without Lucent's consent. Memorandum Opinion, dated November 16, 2004, at 7 entered in *Shubert v. Lucent Technologies, Inc.,* United States District Court for the District of Delaware Civil Action 04–928 [District Court Docket # 8].

9    Contemporaneously with the filing of the withdrawal motion, Lucent filed a Motion for Summary Judgment [Docket # 210] seeking judgment from the Bankruptcy court on all three remaining counts. The motion is silent with respect to any objection to the entry of final orders.

10    The last day on which evidence was submitted was May 11, 2005. Both parties rested at that time. Lucent electronically filed its proposed findings of fact and conclusions of law on June 6, 2005 at 11:32 p.m. Closing arguments, which of course are not evidence, occurred on June 13, 2005.

11    Lucent sought summary judgment on Trustee's preference and breach of contract claims as well as its own claims for fraud and negligent misrepresentation in June 2004. There is nothing in the pleadings to suggest Lucent was asking the Court to provide proposed findings and conclusions to the district court. In the Pretrial Memorandum, the parties were unable to agree as to the legal

issues to be decided so each party set forth its position. Nowhere in Lucent's detailed 12 page statement of the legal issues, or indeed anywhere else in the Pretrial Memorandum, does Lucent allege the Court lacked jurisdiction to enter final orders. At the conclusion of the Trustee's case in chief, Lucent orally and in writing sought judgment pursuant to Fed. R. Bank. P. 7052 and again did not raise an objection to this Court's entering a final order. Similarly Lucent's proposed findings and conclusions do not suggest that there is an ongoing dispute as to whether these proceedings fall outside the core jurisdiction of the Court.

12    The Court views the statement in the same June 8, 2005 letter that "[t]his court has never decided whether these claims are core or non-core" as another example of counsel's attempt to mislead this Court. The statement, although technically correct, was occasioned by Lucent's own behavior. As the district court noted, one of the grounds for denying the withdrawal motion was Lucent's failure to follow Local Bankruptcy Rule 5011–1 which required that Lucent file a motion seeking a determination by the Bankruptcy Court as to whether these counts and counterclaims were core or not. Moreover, as discussed herein, whether this Court views the claim and counterclaims as core or non-core is largely irrelevant because, contrary to Lucent's argument, the district court has definitively spoken on this issue when it found that the claims and counterclaims were part of the claims allowance process and when it refused to find, as Lucent had urged, that the claims and counterclaims were independent of the proofs of claim.

13    "[T]he Court finds that the Trustee's subsequent preference action is now part of the claims allowance process, and is triable only in equity." Memorandum Opinion at 6–7. "The Court is not persuaded by Lucent's argument that the determination of its proofs of claim does not depend on the outcome of the Trustee's Subcontract Claim. The Court finds that the Trustee's Subcontract Claim may affect the ordering of creditors or the equitable distribution of the res of the estate and, thus, are now part of the claims allowance process, triable only in equity." Id. at 7–8. "The Court finds that Lucent's Fraud and Negligent Misrepresentation counterclaims involve a decision regarding distribution of the bankruptcy estate and, thus, are now part of the claims allowance process, triable only in equity." Id. at 8.

14    Throughout the course of this case and indeed, after closing arguments, the parties sent a flurry of letters to the Court. Many of them were little more than recitations of the squabbling between the parties regarding alleged misstatements of facts. Ultimately the Court issued an order cautioning the parties that it would not tolerate such behavior [Docket # 350]. Given the district court's Memorandum Order, however, the Court would have expected the parties to file some type of notice advising this court of the district court's decision. Neither parties, however, informed the Court of the district court's decision and order. The Court only discovered the Memorandum Order when it checked the district court docket as it was about to issue these findings and rulings.

15    The Supply Agreement defines the Transition Plan as "the plan specified in Schedule A regarding Lucent's time periods to begin providing certain of the Services as specified in the plan." (PX 123 ¶ 1.1(qq)). Schedule A, titled "Statement of Work," describes Lucent's anticipated role in designing, building, and managing the network. Exhibit A–4 is titled "Initial Transition Plan." The Initial Transition Plan is not the "Transition Plan" which the parties agree never came to be.

16    The Court uses the term "spreadsheet" because this is a term used by the parties to describe this document. What the document is or should be deemed to be is the matter of some discussion, infra.

17    Section 11.3(a) of the Supply Agreement expressly provides:

    Lucent shall provide WinStar financing in accordance with the Credit Agreement and otherwise in accordance with the terms of this Agreement.

18    Although Fed. R. Bankr.P. 7012(b) provides that in non-core matters, "final orders and judgments shall not be entered on the bankruptcy judge's order except by express consent of the parties," the substantial weight of authority holds that consent may be implied. 10 Collier on Bankruptcy ¶ 7012.11 at 7012–25 n. 3 (Bender 2003). Moreover courts have found expressions of consent based upon a party's actions such as filing a complaint. Id. In its counterclaims contained in the Second Amended Answer, Lucent pled only that counterclaims one and two were core. The pleading is silent with respect to any mention of whether the remaining counterclaims are core or not. But in pleading, Lucent requested that judgment be entered in its favor on all counterclaims which should properly be viewed as Lucent's express consent to this Court's jurisdiction to enter final orders.

19    In its closing argument Lucent argued that the Court could not enter a final order only with respect to the breach of the Subcontract claim (Tr. 22–50) and thus the Court finds Lucent waived its objection to the entry of final orders with respect to its counterclaims.

20    During closing argument Lucent's attorney conceded, in response to questioning by the Court, that he had not raised the issue of core versus non-core jurisdiction with the Court directly but had informed the Court during the summary judgment arguments that Lucent had sought certification of the district court's order. At the summary judgment argument, counsel's sole discussion of any challenge to this Court's jurisdiction was as follows:

    Mr. Saunders: Your Honor, I should point out, unless Your Honor already knows this, that we have asked Judge Famum to certify, under Section 1292(b), the jury trial issue.

    Transcript of December 14, 2004 Hearing [Docket # 274] at 20–21. Moreover the argument that this statement put the Court on notice that the core/non-core dichotomy was at issue in the district court is wholly inconsistent with Lucent's argument that the district court focused only on the jury trial issue and did not address the core/non-core issue.

21    DX 699 is a transcript of the testimony of David Ackerman, Winstar's former group executive/executive vice president for corporate strategy and business planning, given under oath on October 11, 2001 as part of the investigation by the Securities and Exchange Commission ("SEC") styled *In the Matter of Lucent Technologies, Inc.*, file no. HO–9128 (the "SEC Action"). The transcript of the Ackerman videotaped deposition to which DX 699 is an exhibit was admitted as Joint Trial Exhibit 6.

22    The "strategic partnership" was not actually a partnership, a fact Lucent spent considerable time emphasizing. The parties used the term simply to connote their intent to work closely and collaboratively. *See* October 22, 1998 Joint Press Release (PX 331).

23    The Supply Agreement provides that 65% of the equipment and services purchased during the first year of the contract would be purchased from Lucent. The percentage increased to 70% thereafter. (PX 123 at ¶ 11.3(b)(1)). The Supply Agreement also permits Lucent to surcharge Winstar if Lucent funds the purchase of goods and services from other vendors beyond the applicable percentages. There was no evidence to suggest that Lucent ever surcharged Winstar despite the fact that the parties agree Lucent funded substantially more non-Lucent purchases than percentages set forth in the Supply Agreement.

24    The transcript of Kantor's videotaped deposition testimony is Joint Trial Exhibit 1.

25    Lucent attempted to portray this arrangement as a scheme perpetrated and controlled by Winstar to enhance its own financials through questionable accounting practices. The Court disagrees. While there is evidence to suggest that this arrangement gave Winstar the means to capitalize many of its network buildout expenses, most of these expenses could be capitalized even without flowing them through Lucent. (Harris, Depo, Tr. 11 at 47).

26    The Second Credit Agreement contemplated the future formation of other Winstar subsidiaries to act as borrowers under the Agreement. Subsequently WVF–LU2 LLC ("WVF–LU2") was formed and was also a borrower under the Second Credit Agreement. It also acquired equipment with funds borrowed under the Second Credit Agreement and gave Lucent a security interest in that equipment. WVF–LU2 is the entity that requested the March 30, 2001 borrowing in the amount of $62,050,743.00. (DX 668). The parties, however, refer to the request as Winstar's request and throughout the conduct of this case did not draw distinctions as to which Winstar entity actually made the funding request.

27    The Second Credit Agreement contained other financial covenants including the obligation that Winstar give Lucent Winstar's financial information signed by an officer who was to certify that the financial statements were kept according to generally accepted accounting principles and that Winstar was in compliance with the Credit Agreements. Moreover each draw request under the Credit Agreements was considered an independent certification that Winstar was in compliance with the covenants. At trial Lucent sought to introduce evidence regarding breaches of these covenants but because Lucent did not raise these issues in the Joint Pretrial Memorandum, the Court refused the introduction of such evidence. Lucent did make an offer of proof that it did not consider it its responsibility to verify the certified draw requests. Even if the evidence of these breaches was properly before the Court and even assuming that Winstar, in fact, breached these additional covenants, the outcome would be no different. As discussed *infra*, Lucent cannot divert its own independent knowledge of Winstar's true financial condition, including its complicity in trying to help Winstar meet the CAPEX requirement, by hiding behind Winstar's alleged breaches.

      In addition the Second Credit Agreement also contained express covenants dealing with foreign collateral, EBITDA, and transaction fees. Again because Lucent did not raise these issues in the Pretrial Memorandum, the Court refused to consider evidence of these alleged breaches. But again, given Lucent's knowledge of the state of Winstar's affairs, it cannot feign that it was somehow deceived.

28    As discussed in greater detail below, the distortion of Lucent's financial picture lead to an SEC investigation that resulted in the commencement of a lawsuit for alleged violations of various securities laws against Lucent, several of its former employees, and three former employees of Winstar.

29    Bill and hold sales are transactions in which a party sells goods to another party but, at the purchaser's request, stores the goods in the seller's facility for shipment at a later date.

30    Winstar could not use funding from the Second Credit Agreement to pay for its purchases under the Software Pool Agreement. (PX 323 at ¶ 6 "Winstar agrees that it will maintain sufficient cash on hand to meet the above-described payment obligations at the respective Invoice Dates independent of any financing arrangements in place between Lucent and Winstar.")

31    In Count XI of her Second Amended Complaint, the Trustee alleges that the Siemans loan is the transaction which give rise to her request for equitable subordination and seeks return of the Siemans loan proceeds and subordination of Lucent's claim. At trial the evidence of Lucent's alleged impermissible conduct was much broader and therefore, to the extent necessary, the Second Amended Complaint is deemed amended to conform to the evidence as such amendment in no way prejudiced Lucent's rights. *See* Fed.R.Civ.P. 15(b), made applicable by Fed. R. Bankr.P. 7015(b); *see generally* 6A Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d §§ 1491,1493 (1990 & Supp.2003). In fact the parties themselves agreed at the end of the trial that their pleadings should be deemed amended to conform to the evidence (which would not include any of the offers of proof) as long as neither party added any new claims, counterclaims, or defenses. *See* Tr. 21–135–140.

32    The task order for that first quarter, dated January 4, 1999, was not actually executed until March 1999 when the parties also executed the Subcontract (Wilson, Tr. 16, 105–06) and this document, which the Defendant describes as the only task order executed, is actually a letter, dated January 4, 1999, from Lucent's Vice President of Emerging Services to a Winstar employee that reads as follows:

> Pursuant to our recently executed *Agreement for Network Build-out Services,* please accept this letter as my authorization for the subcontracting of Network Services from Winstar Wireless, Inc.
>
> The following is a list of services, which Lucent will subcontract to Winstar for an amount not to exceed $25 M for the period January 1, 1999 through March 31, 1999[:]
>
> • Switch Site Planning & Construction
>
> • Hub Site Planning & Construction
>
> • Broadband Riser Engineering
>
> • Inside Wire engineering
>
> • Network Integration (CO & Hubs)
>
> • Network Integration (B Sites)
>
> • Site Surveys
>
> • Site Acquisition
>
> Thank you in advance for your support.

> (First page, bearing Bates Stamp WC0019778, of DX 117). Even this "task order" is devoid of the details that Lucent argues must be present to comply with the Section 1.2 of the Subcontract and be considered a "task order."

33    The transcript of Uhl's videotaped deposition testimony is Joint Trial Exhibit 13.

34    The letter is addressed to Uhl but contains the salutation "Dear Nate."

35    The same document is also a Defendant's exhibit (DX 424).

36    Lucent was well aware of the CAPEX problem. Lucent proposed the Software Pool Agreement, which called for all payments to be deferred until 2001, as a way to commit funds to Lucent without further increasing Winstar's capital expenditures. (Zlotnick Video-direct at 156; the transcript of Zlotnick's testimony is Joint Trial Exhibit 3).

37    Hayes testified that the comment about staking his bonus on his opinion that the refinancing notice would not send Winstar into a tailspin was intended as a joke as Lucent did not offer bonuses. (Hayes, Depo, Tr. 13–89).

38    The ARQ rated Lucent's borrowers on a scale of 1 to 10. The higher the rating, the higher the inherent risk of non-payment. (Perricone, Depo., Tr. 13–115).

39    PX 462 is the Report of Paul Pocalyko who was retained as an expert by Winstar to render an opinion as to whether the transactions were arm's-length and if Lucent exerted undue influence and control. Lucent sought to exclude Pocalyko's testimony under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Assuming for the sake of argument that *Daubert* is applicable in a bench trial, the Court denied the motion. (Tr. of March 16, 2005 hearing at 34–41) [Docket 322]. Although the Court continues to believe its initial ruling is correct, it has used Pocalyko's report only as a convenient vehicle to refer to relevant documents. The Court has not relied upon Pocalyko's opinions in reaching its decision.

40    The Software Pool Agreement prices the equipment at "list" price rather than the reduced price that the Supply Agreement provides.

41    Although the parties disputed these allegations, after weighing the credible evidence, including the documents appended to and compiled as part of the Pocalyko Report, the Court finds that the Plaintiff has proved that Lucent essentially dumped excessive amount of unneeded equipment on Winstar in order to inflate Lucent's own revenues. For example, excluding the $135 million paid to Lucent under the Software Pool Agreement (which itself is another indication of the sham transactions Lucent devised to inflate its own revenues), Winstar made an aggregate of approximately $706,000,000 in purchases from Lucent in calendar years 1999 and 2000. During this period the amount of Lucent equipment paid for by Winstar but sitting in Winstar's or Lucent's warehouses continued to increase so that by March 31, 2001 there was, on an adjusted cost basis, approximately $327 million in those warehouses. Of that $327 million in equipment, the overwhelming majority, indeed about $256 million was paid Lucent equipment while $71 million was non-Lucent merchandise. And needless to say, the valuation of the Lucent equipment at $256 million on an adjusted cost basis is less than that actual amount paid to Lucent by Winstar for that equipment.

> Moreover closer examination of the facts relating to the warehoused equipment purchased from Lucent reveals that of the approximately $256,000,000 (on a cost adjusted basis) of Lucent equipment in Winstar inventory in warehouses as of March 31, 2001, approximately $74 million of the $256 million of Lucent equipment could be specifically traced as to the original date that Winstar purchased such equipment from Lucent. Of that $74 million of Lucent equipment, approximately $36 million (on a cost adjusted basis) of that equipment was purchased by Winstar in a December 31, 1999, end of quarter bill and hold sale and remained in a Lucent warehouse undeployed for 15 months as of March 31, 2001. In fact once Winstar paid for Lucent equipment, it was not unusual for some of that merchandise to sit in a warehouse for more than a year.

42    The letter requests that the funds be wired to WCI Capital Corp.

43   Hayes, Depo, Tr. 13–63.

44   This figure was calculated by the Court; the numbers listed on the line called "Grand Total" are unreadable on the exhibit. Some of the numbers throughout the exhibit are difficult to read but the total appears to be within $1 of the amount requested in the Notice of Request for Borrowing.

45   The transcript of Montemarano's deposition testimony is Joint Trial Exhibit 9; the transcript of Simpson's testimony is Joint Trial Exhibit 11.

46   Both experts have substantial experience testifying as experts. Both have had courts accept their opinions as correct; both have had their opinions criticized. Because the Court must determine solvency in light of the unique facts of *this* case, criticism by another court of the methodology chosen by either expert in a different factual context has limited value.

47   In fact one indication of how poorly Winstar's book value reflected that actual market value of its assets is the optronics inventory. Because Winstar had purchased unneeded equipment from Lucent, including optronics equipment, when Winstar's financial condition was deteriorating in the fall of 2000, it made plans to institute some measures to improve its financial condition. *See* PX 68. One of those measures included selling off excess equipment, including the optronics equipment. (Kantor Video-direct at 479). But the only offer Winstar received for its excess optronics equipment came from Lucent, and it was at a reduced price. *See* PX 22 (Uhl's 12/14/00 email to Frank Jules, Fred Rubin and Nate Kantor: "Guys[,] Carole Spurrier and Debbie Harris called at 4:30 to inform as follows:...5. They have found no buyer for the Optronics. Their internal remarketing group offered to buy it at $.30 on the $1.00. (I said no thanks).").

48   The purchase price was paid as follows: $30 million in cash and $12.5 million in IDT Class B stock. (Scherf 12–34; PX 460 at 10).

49   Prior to trial the Trustee sought a ruling that the Court could draw an adverse interest from Harris' and Plunkett's silence while Lucent disputed that their testimony was relevant and otherwise corroborated. It also argued that the questions posed to these two individuals were too specific thus rendering the examinations unfair. The Court granted the Trustee's motion but noted that it would revisit the issue after hearing the evidence upon Lucent's request. *See* Transcript of March 16, 2005 hearing [docket # 322] at 59–62. Having revisited the issue, the Court concludes that its initial ruling was correct for the reasons set forth herein.

50   There is no dispute that Harris and Plunkett were employed by Lucent during the time when the events at issue in the specific questions which the Court finds that they would have answered adversely had they answered the questions honestly. Ms. Harris answered questions during her 2001 deposition and at the time testified she was employed by Lucent as the Vice President of Sales for the Winstar account beginning in August 2000. (Harris, Depo, Tr. 11–34). She also testified that William Plunkett the Vice President of Emerging Markets and was a member of Lucent's management team responsible for the Winstar account. (*Id.*). Mr. Plunkett was placed on administrative leave by Lucent in late November 2000 and was terminated shortly thereafter. (Wilson, Tr. 16–11). His termination was a direct result of his involvement in postdating documents relating to the Software Pool Agreement. (Schacht, Tr. 21 at 35). Both Harris and Plunkett reported to Nina Aversano.

51   Although there is conflicting testimony about the actual value of the goods Winstar was committed to purchases under the Software Pool Agreement, evidence of the value is that it totaled somewhere between $20 and $40 million, significantly less than the $135 million Winstar was to pay.

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 134

2005 CarswellOnt 7297, [2005] O.J. No. 5389, 11 B.L.R. (4th) 214, 206 O.A.C. 3

2005 CarswellOnt 7297

Ontario Court of Appeal

SimEx Inc. v. IMAX Corp.

2005 CarswellOnt 7297, [2005] O.J. No. 5389, 11 B.L.R. (4th) 214, 206 O.A.C. 3

## SIMEX INC. (Applicant / Appellant) and IMAX CORPORATION and ROBOTS OF MARS, INC. (Respondents / Respondents in Appeal)

Weiler, Rosenberg, Gillese JJ.A.

Heard: September 15, 2005
Judgment: December 15, 2005
Docket: CA C43373

Proceedings: reversing in part *SimEx Inc. v. IMAX Corp.* (2005), 2005 CarswellOnt 831, 2 B.L.R. (4th) 142 (Ont. S.C.J.); additional reasons at *SimEx Inc. v. IMAX Corp.* (2005), 2005 CarswellOnt 1518 (Ont. S.C.J.)

Counsel: John B. Laskin, Sandeep J. Joshi for Appellant, SimEx Inc.
Julian Heller, Rebecca Toth for Respondent, IMAX Corporation
Darryl T. Mann for Respondent, Robots of Mars Inc.

Subject: International; Contracts; Civil Practice and Procedure

### Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

### Headnote

#### Conflict of laws --- Contracts — Choice of law — Where contract specifying law

R Corp. was wholly owned subsidiary of I Corp. — R Corp. entered into production agreement with M Corp. under which M Corp. would produce two films — I Corp. entered into transfer agreement with S Inc. — M Corp.'s successor commenced arbitration in California in accordance with production agreement alleging that I Corp. had failed to pay royalties — I Corp. cross-claimed against S Inc. — M Corp.'s successor served amended statement of claim in arbitration proceedings purporting to add S Inc. as party to arbitration — S Inc. applied for declaration that it was not party to and not bound by production agreement and that any legal proceedings commenced arising out of transfer agreement had to be taken in Ontario courts — Application was dismissed — S Inc. appealed — Appeal allowed — Interpreting transfer agreement was matter for Ontario Courts — Contract was unambiguous — Gist of dispute between S Inc. and I Corp. turned on interpretation of transfer agreement — Given connection of S Inc. and I Corp. to Ontario and Canada and since case turned primarily on interpretation of transfer agreement, I Corp. had not shown "strong cause" or "good reason" why it should not be bound by forum selection clause.

#### Contracts --- Assignment — General principles

R Corp. was wholly owned subsidiary of I Corp. — R Corp. entered into production agreement with M Corp. under which M Corp. would produce two films — I Corp. entered into transfer agreement with S Inc. — M Corp.'s successor commenced arbitration in California in accordance with production agreement alleging that I Corp. had failed to pay royalties — I Corp. cross-claimed against S Inc. — M Corp.'s successor served amended statement of claim in arbitration proceedings purporting to add S Inc. as party to arbitration — S Inc. applied for declaration that it was not party to and not bound by production agreement and that any legal proceedings commenced arising out of transfer agreement had to be taken in Ontario courts — Application was dismissed — S Inc. appealed — Appeal allowed — Declaration was made that I Corp./

2005 CarswellOnt 7297, [2005] O.J. No. 5389, 11 B.L.R. (4th) 214, 206 O.A.C. 3

R Corp. did not assign to S Inc., through transfer agreement, compensation and arbitration obligations under production agreement — Combined effect of reading clauses of transfer agreement and Schedule 5.05, with relevant provisions of production agreement, was that R Corp./I Corp. transferred its ownership rights in films to S Inc. — It did not transfer its other obligations or rights under production agreement — R Corp.'s ability to transfer title to third party was unfettered — S Inc. paid for those ownership rights through time-limited royalties — Nothing indicated that it agreed to pay any other amounts to any other party — Principle that assignment conveys both burden and benefits of contract to assignee did not have any application — There was no rule of law that prevented any party to contract from assigning rights or benefits of contract to third party while keeping burdens.

**Contracts --- Construction and interpretation — Resolving ambiguities — Contra proferentem**

R Corp. was wholly owned subsidiary of I Corp. — R Corp. entered into production agreement with M Corp. under which M Corp. would produce two films — I Corp. entered into transfer agreement with S Inc. — M Corp.'s successor commenced arbitration in California in accordance with production agreement alleging that I Corp. had failed to pay royalties — I Corp. cross-claimed against S Inc. — M Corp.'s successor served amended statement of claim in arbitration proceedings purporting to add S Inc. as party to arbitration — S Inc. applied for declaration that it was not party to and not bound by production agreement and that any legal proceedings commenced arising out of transfer agreement had to be taken in Ontario courts — Application was dismissed — S Inc. appealed — Appeal allowed — Since there was no ambiguity in contract, it was not necessary to resort to principles of interpretation such as contra proferentem rule — Nothing justified invoking rule against S Inc. — Both parties were sophisticated and had legal advisors — Transfer agreement appeared to have been joint effort — Absent ambiguity, extrinsic evidence was not admissible — It was not apparent that interpretation of transfer agreement was clearly commercially absurd.

**Civil practice and procedure --- Costs — Costs of appeals — General principles**

I Corp. was a Canadian corporation that developed, manufactured and supplied motion picture technology for specialty theatre venues. It had substantial premises and assets in California. R Corp. was a wholly owned subsidiary of I Corp. that was in the business of manufacturing and selling ride bases and selling or leasing films for use with those bases. M Corp. was a California corporation that made films that could be used in the type of attractions produced by R Corp. M Corp. and R Corp. entered into a production agreement under which M Corp. would produce two films for use and distribution by R Corp. Years later, I Corp. sought to sell R Corp.'s assets to a purchaser who would provide services required under R Corp.'s contracts with its clients. I Corp. entered into a transfer agreement with S Inc., which was an Ontario corporation in the business of creating and developing simulation attractions that showed films incorporating 3-D and other special effects. S Inc. had a substantial presence in California through a subsidiary.

Two years later, M Corp.'s successor commenced arbitration in California in accordance with the production agreement alleging that I Corp. had failed to pay royalties owing under that agreement. I Corp. cross-claimed against S Inc. alleging that S Inc. had assumed all liabilities and obligations under the production agreement because of the transfer agreement. M Corp.'s successor served an amended statement of claim in arbitration proceedings purporting to add S Inc. as a party to the arbitration.

S Inc. applied for declaration that it was not a party to and not bound by the production agreement and that any legal proceedings commenced arising out of the transfer agreement had to be taken in Ontario courts. The application was dismissed. S Inc. appealed.

**Held:** The appeal was allowed.

The contract was unambiguous. The gist of the dispute between S Inc. and I Corp. turned on the interpretation of the transfer agreement. Given the connection of S Inc. and I Corp. to Ontario and Canada and since the case turned primarily

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2005 CarswellOnt 7297, [2005] O.J. No. 5389, 11 B.L.R. (4th) 214, 206 O.A.C. 3

on interpretation of transfer agreement, I Corp. had not shown "strong cause" or "good reason" why it should not be bound by forum selection clause.

Recital D, where R Corp. and I Corp. recited that they "wish to assign certain rights that they have to certain films", does not suggest that they wished to assign the agreements that led to the production of those films. Article Two was intended to govern the relationship between the parties with respect to the acquired, mostly physical, assets and liabilities. It was apparent on the face of the contract that S Inc.'s obligations were not limited to what was set out in Article Two. In Article Three, R Corp. and I Corp. represented that they had good title to the acquired assets. In a separate section, they represented that they had the right to assign their rights to the films. The two films in question were listed in Schedule 3.04(b). Schedule 3.04(b) included the production agreement. This section was important because it demonstrated that certain parts of the production agreement had been incorporated by reference into the transfer agreement by the use of the words "subject to the terms and conditions of the relevant agreements". As a result, Ontario courts interpreting the transfer agreement would, of necessity, have to interpret some aspects of the production agreement. Article Five first set out certain obligations by S Inc. to the R Corp. base owners. Section 5.05 then described the relationship between S Inc. and I Corp. with respect to the film library. The form of the transfer was set out in Schedule 5.05. This assignment was integral to the transfer agreement. The schedule must be read together with and interpreted as part of the contract. Section 5.09 sets out the obligations of S Inc. to pay royalties to R Corp. depending on the use of the films. S Inc. agreed to pay royalties to R Corp. for the Schedule 3.04(a) films, which included the two films in issue. These payments were time limited, with the royalties ceasing on the fourth anniversary of the closing date. Under clause 8 of the production agreement, R Corp. acquired unrestricted title to the films. The payment was set out in clause 4 and was based on a formula that gave M Corp. a percentage of the net profits. R Corp.'s ownership rights were not limited by the compensation promises.

The combined effect of reading the clauses of the transfer agreement and Schedule 5.05, with the relevant provisions of the production agreement, was that R Corp./I Corp. transferred its ownership rights in the films to S Inc. It did not transfer its other obligations or rights under the production agreement. R Corp.'s ability to transfer title to a third party was unfettered. S Inc. paid for those ownership rights through the time-limited royalties. Nothing indicated that it agreed to pay any other amounts to any other party. The obligation under the production agreement to pay M Corp. was a matter between M Corp. and I Corp. The principle that an assignment conveys both the burden and the benefits of a contract to the assignee did not have any application. There was no rule of law that prevented any party to a contract from assigning the rights or benefits of the contract to a third party while keeping the burdens. To the contrary, without the consent of the other party, the ordinary rule was that the party could only assign the benefits and would remain personally liable to the other party.

Since there was no ambiguity in the contract, it was not necessary to resort to principles of interpretation such as the contra proferentem rule. Nothing in the record would justify invoking the rule against S Inc. Both parties were sophisticated and had legal advisors. The transfer agreement appeared to have been a joint effort. Absent ambiguity, extrinsic evidence was not admissible. It was not apparent that the interpretation of the transfer agreement was clearly commercially absurd. Paragraph one of the Application judge's judgment was set aside and a declaration was made that I Corp./R Corp. did not assign to S Inc., through the transfer agreement, the compensation and arbitration obligations under the production agreement.

Costs were fixed at $25,000 inclusive of disbursements and GST, payable by I Corp. and R Corp.

## Table of Authorities

### Cases considered by *Rosenberg J.A.*:

*ABN Amro Bank Canada v. Krupp MaK Maschinenbau GmbH* (1996), 135 D.L.R. (4th) 130, 49 C.P.C. (3d) 212, (sub nom. *ABN Ambro Bank Canada v. Krupp Mak Maschihnenbau GmbH)* 91 O.A.C. 229, 1996 CarswellOnt 1815 (Ont. Div. Ct.) — distinguished

WestlawNext. CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-50    Filed 08/15/14    Page 262 of 279

SimEx Inc. v. IMAX Corp., 2005 CarswellOnt 7297
2005 CarswellOnt 7297, [2005] O.J. No. 5389, 11 B.L.R. (4th) 214, 206 O.A.C. 3

*Arthur Andersen Inc. v. Toronto Dominion Bank* (1994), 13 C.L.R. (2d) 185, *(sub nom. Andersen (Arthur) Inc. v. Toronto Dominion Bank)* 71 O.A.C. 1, 17 O.R. (3d) 363, 14 B.L.R. (2d) 1, 1994 CarswellOnt 233 (Ont. C.A.) — referred to

*Canadian Premier Holdings Ltd. v. Winterthur Canada Financial Corp.* (2000), 2000 CarswellOnt 1648, 132 O.A.C. 172 (Ont. C.A.) — followed

*Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), *(sub nom. Exportations Consolidated-Bathurst Ltée c. Mutual Boiler & Machinery Insurance Co.)* [1980] 1 S.C.R. 888, 112 D.L.R. (3d) 49, 32 N.R. 488, [1980] I.L.R. 1-1176, 1979 CarswellQue 157, 1979 CarswellQue 157F (S.C.C.) — followed

*Eli Lilly & Co. v. Novopharm Ltd.* (1998), 227 N.R. 201, 1998 CarswellNat 1061, 1998 CarswellNat 1062, 161 D.L.R. (4th) 1, [1998] 2 S.C.R. 129, 152 F.T.R. 160 (note), 80 C.P.R. (3d) 321 (S.C.C.) — followed

*Lounsbury Co. v. Duthie* (1957), [1957] S.C.R. 590, 9 D.L.R. (2d) 225, 1957 CarswellNB 30 (S.C.C.) — referred to

*Petro-Canada v. 366084 Ontario Ltd.* (1995), 25 B.L.R. (2d) 19, 1995 CarswellOnt 1643 (Ont. Gen. Div.) — distinguished

*Rodaro v. Royal Bank* (2002), 2002 CarswellOnt 1047, 22 B.L.R. (3d) 274, 157 O.A.C. 203, 49 R.P.R. (3d) 227, 59 O.R. (3d) 74 (Ont. C.A.) — referred to

*Scanlon v. Castlepoint Development Corp.* (1992), 29 R.P.R. (2d) 60, 59 O.A.C. 191, 11 O.R. (3d) 744, 99 D.L.R. (4th) 153, 1992 CarswellOnt 633 (Ont. C.A.) — considered

*Tru-Wall Group Ltd. v. Stadium Corp. of Ontario Ltd.* (1995), 1995 CarswellOnt 3293 (Ont. Gen. Div. [Commercial List]) — referred to

*Z.I. Pompey Industrie v. ECU-Line N.V.* (2003), 2003 SCC 27, 2003 CarswellNat 1031, 2003 CarswellNat 1032, 240 F.T.R. 318 (note), [2003] 1 S.C.R. 450, 30 C.P.C. (5th) 1, 224 D.L.R. (4th) 577, 2003 A.M.C. 1280, *(sub nom. Pompey (Z.I.) Industrie v. Ecu-Line N.V.)* 303 N.R. 201 (S.C.C.) — referred to

APPEAL by S Inc. from judgment reported at *SimEx Inc. v. IMAX Corp.* (2005), 2005 CarswellOnt 831, 2 B.L.R. (4th) 142 (Ont. S.C.J.), dismissing S Inc.'s application for declaration.

*Rosenberg J.A.*:

1    This appeal concerns the interpretation of a contract (the "Transfer Agreement") under which the appellant SimEx Inc. acquired the rights to certain films that were the subject of an agreement (the "Production Agreement") between Ridefilm Corporation, a subsidiary of the respondent, IMAX Corporation, and a third party. In his judgment, the application judge, Pitt J., held that the assignment attached to the Transfer Agreement conveyed both the burden and the benefits of the Production Agreement to SimEx, including the obligation that any dispute concerning royalties be resolved by arbitration. He therefore dismissed SimEx's application for a declaration that any legal proceedings concerning the Transfer Agreement must be brought in the Ontario courts.

2    For the following reasons I would allow the appeal. In my view, interpreting the Transfer Agreement is a matter for the Ontario Courts. Further, the Transfer Agreement did not assign to SimEx the obligation under the Production Agreement to pay royalties and the requirement to submit disputes to arbitration.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2005 CarswellOnt 7297, [2005] O.J. No. 5389, 11 B.L.R. (4th) 214, 206 O.A.C. 3

**The Facts**

*(a) The parties*

3     The appellant SimEx is an Ontario corporation based in Toronto. It is in the business of creating and developing simulation attractions that show films incorporating 3-D and other special effects. It also has a substantial presence in California through a subsidiary.

4     The respondent IMAX is a Canadian corporation. It develops, manufactures and supplies motion picture technology for specialty theatre venues. It too has substantial premises and assets in California. Ridefilm was a wholly owned subsidiary of IMAX and was in the business of manufacturing and selling ride bases and selling or leasing films for use with those bases (the "Ridefilm bases") to create an attraction in amusement parks and other event attraction sites. For the purposes of this appeal, Ridefilm and IMAX are interchangeable.

5      Midland Production Corp. makes films that can be used in the type of attractions produced by Ridefilm. This appeal concerns compensation for two of Midland's films that were sold to Ridefilm. Midland is a California corporation. It is the predecessor to the respondent Robots of Mars, Inc. For the purposes of this appeal, Midland and Robots are interchangeable. SimEx has an ongoing relationship with Robots through its California subsidiary.

*(b) The first agreement: The 1994 Midland (Robots) and Ridefilm (IMAX) Production Agreement*

6     In 1994, Midland (now Robots) and Ridefilm agreed that Midland would produce two films for use and distribution by Ridefilm. This Production Agreement has several provisions that are important to resolving this appeal. The following is a brief summary of these provisions:

    1. **Ownership**: Ridefilm would be the owner of the films produced by Midland and Midland assigned, sold and transferred all its right, title and interest in the films to Ridefilm.

    2. **Compensation**: Midland was entitled to contingent compensation (referred to in some of the court documents as royalties) from the use of the films. The compensation was based on a sliding scale depending on the profits from the exploitation of the films.

    3. **Assignment**: Ridefilm had the right to "assign any and all of this Agreement and the rights, licenses and privileges granted it hereunder". Midland's consent to the assignment was not required.

    4. **Choice of law**: The agreement was to be interpreted in accordance with the law of New York and any legal action was to be instituted in a court in New York.

    5. **Arbitration of disputes**: In the event of any dispute the parties agreed to submit the dispute to "binding arbitration before an arbitration panel of the American Arbitration Association at a site to be selected by the arbitration panel."

*(c) The second agreement: The 2001 IMAX/Ridefilm and SimEx Transfer Agreement*

7     By 1999, IMAX was anxious to get out of the simulation ride business carried on by its subsidiary Ridefilm. To avoid potential liability to Ridefilm's clients, IMAX needed to find an entity that would be willing to fulfill Ridefilm's obligations to its clients. It sought to sell Ridefilm's assets to a purchaser who would provide the services required under Rideflims's contracts with its clients. After a lengthy search, IMAX was able to reach an agreement with SimEx. The negotiations culminated in the March 2001 Transfer Agreement. The resolution of this appeal turns on the interpretation of several provisions of this agreement. The following is a brief summary of the relevant provisions of the Transfer Agreement:

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

1. **Acquired assets (Article 1)**: Ridefilm agreed to sell its interest in various physical assets listed in a schedule to the agreement and certain rights such as the right to use the Ridefilm mark. The films were not listed in this schedule. SimEx paid $200,000 U.S. for the acquired assets.

2. **Liabilities assumed by SimEx (Article 2)**: SimEx agreed to assume certain liabilities, such as payment of taxes on the acquired assets but also stated that it was not responsible for other liabilities not provided for in the section. SimEx relies on the wording of this clause because it appears to limit its obligation to assume other liabilities of IMAX

3. **Representations and Warranties of Ridefilm and IMAX (Article 3)**: Ridefilm/IMAX made certain representations concerning ownership of the films listed in Schedule 3.04 "subject to the terms and conditions of the relevant agreements attached hereto as Schedule 3.04(b)." The two films in question in this appeal that were produced by Midland are listed in Schedule 3.04(a). Schedule 3.04(b) includes the 1994 Production Agreement between Midland and Ridefilm and the agreements between Ridefilm or IMAX and other production companies. Under some of these other agreements IMAX/Ridefilm did not acquire ownership of the films as it did in the 1994 Ridefilm and Midland Production Agreement.

4. **Transfer of rights to films (Section 5.05)**: This section sets out the crucial agreement concerning assignment of rights. "At the Closing Date, Ridefilm and or IMAX agree[d] to transfer title or assign its rights, as the case may be, to the films set out in Schedule 3.04(a)." Ridefilm did not require Midland's consent to the assignment or transfer of title in these two films. The form of assignment set out in Section 5.05 tracks the wording of Section 5.05.

5. **Royalties (Section 5.09)**: SimEx agreed to pay royalties to Ridefilm where the Schedule 3.04(a) films were used. The amount of royalties depended on whether the films were played on Ridefilm or SimEx bases. However, SimEx's obligation to pay royalties terminated on the fourth anniversary of the Closing Date.

6. **Choice of law (Section 8.01)**: The agreement was to be governed by the laws of Ontario and any legal action was to brought in the courts of Ontario.

7. **Assignment (Section 8.05)**: The consent of the other party was required to assign "any right, remedy, obligation or liability" arising under the agreement.

8    Michael Needham, the president of SimEx, was involved in the negotiations that gave rise to the Transfer Agreement. He states in his supplementary affidavit that the phrase "subject to the terms and conditions of the relevant agreements" in section 3.04 and the phrase "subject to the terms and conditions of said Agreement" in the assignment were added when it was discovered that Ridefilm did not have legal title to three of the ten films but was a mere licensee. This problem did not affect the two films involved in this case. IMAX's principals state that they understood that the assignment of the films included assignment of the obligation to pay the compensation to Robots. The Transfer Agreement and the Assignments were not drafted solely by SimEx but were a matter of negotiation with IMAX and Ridefilm.

*(d) The California arbitration*

9    In California in June 2003, Robots (the successor to Midland) commenced arbitration in accordance with the Production Agreement alleging that IMAX had failed to pay royalties owing under the Production Agreement. In September, IMAX cross-claimed against SimEx alleging that SimEx had assumed all the liabilities and obligations under the Production Agreement because of the Transfer Agreement. SimEx took the position that it was not a party to the Production Agreement and that, in any event, any legal proceedings had to be taken in Ontario in accordance with the Transfer Agreement. Nevertheless, Robots served an amended statement of claim in the arbitration proceedings purporting to add SimEx as a party to the arbitration.

*(e) The Application*

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2005 CarswellOnt 7297, [2005] O.J. No. 5389, 11 B.L.R. (4th) 214, 206 O.A.C. 3

10    SimEx commenced its application in October 2004, seeking a declaration that it was not a party to and not bound by the Production Agreement and that any legal proceedings commenced by IMAX or Robots arising out of the Transfer Agreement had to be taken in Ontario courts. It also sought an injunction enjoining IMAX or Robots from filing any document, taking any step to attempt to add SimEx as a party, or requiring SimEx to submit to the jurisdiction of or participate in the California arbitration.

**The Reasons of the Application Judge**

11    The core of the application judge's reasons appears in para. 22:

On the face of the Assignment, which is a freestanding document, it contains nothing that would be seen as rebutting the presumption that it conveyed both the burden and benefits of a contract to the assignee. See *ABN Amro Bank Canada v. Krupp Mak Maschinenbau Gmbh* (1996), 135 D.L.R. (4 th ) 130 (Ont. Div. Ct.); and *Petro-Canada v. 366081 Ltd.* (1995), 25 B.L.R. (2d) 19 (Ont. Ct. (Gen. Div.)).

12    The application judge also took into account that the Transfer Agreement "specifically provides for the assumption of liabilities", referring to section 2.01. He was of the view that, at a minimum, the last paragraph of this clause was unclear. Accordingly, he could invoke the *contra proferentem* rule and the *ejusdem generis* principle. The application judge found that other provisions of the Transfer Agreement showed that the parties were aware that the agreement would impact on the rights of third parties. He stated that it was not clear why the other party to the Production Agreement (now Robots) was not a party to the Transfer Agreement, "if only to give its consent".

13    The application judge held that SimEx could not avoid the effect of the arbitration provision in the Production Agreement by inserting its own choice of forum and law in its Transfer Agreement. SimEx obviously had notice of the arbitration provision.

14    Finally, the application judge noted that all parties had a connection with California, that SimEx had participated on a special appearance basis in the arbitration, and that Ontario and California law "in the context of this dispute are very similar". These additional features "would lead to judicial equanimity about the matter proceeding wholly in California."

15    He therefore dismissed the application.

**Position of the Parties**

16    SimEx submits that the application judge made several errors as follows:

• Finding that the Transfer Agreement was ambiguous.

• Applying the *contra proferentem* and *ejusdem generis* rules to resolve the ambiguity.

• Holding that the Assignment was a free-standing document.

• Applying a presumption that assignment of rights carries the assignment of both the benefits and the burden of the contract.

17    SimEx submits that as a result of these errors the application judge failed to properly interpret the contract, and therefore, erred in failing to make a declaration that SimEx is not a party to, and is not bound by the compensation and arbitration terms of, the Production Agreement.

18    IMAX and Robots support the decision of the application judge.

**Analysis**

*(a) Interpreting a contract*

**Westlaw**Next. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2005 CarswellOnt 7297, [2005] O.J. No. 5389, 11 B.L.R. (4th) 214, 206 O.A.C. 3

19     The Supreme Court of Canada has considered the rules respecting interpretation of contracts on several occasions. The best known articulation of these principles is found in the reasons of Estey J. in *Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888 (S.C.C.), at 901:

> Even apart from the doctrine of *contra proferentem* as it may be applied in the construction of contracts, *the normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract.* Consequently, literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted. Where words may bear two constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation . . . which promotes a sensible commercial result. [Emphasis added.]

20     In *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 (S.C.C.) at para. 56, Iacobucci J. elaborated on the concepts of promoting the intent of the parties and a commercially sensible interpretation. He explained that absent ambiguity, the primary vehicle for divining the intent of the parties is the words of the contract itself:

> When there is no ambiguity in the wording of the document, the notion in *Consolidated-Bathurst* that the interpretation which produces a "fair result" or a "sensible commercial result" should be adopted is not determinative. Admittedly, it would be absurd to adopt an interpretation which is clearly inconsistent with the commercial interests of the parties, if the goal is to ascertain their true contractual intent. *However, to interpret a plainly worded document in accordance with the true contractual intent of the parties is not difficult, if it is presumed that the parties intended the legal consequences of their words.* [Emphasis added.]

21     Iacobucci J. also stated at para. 54 that the contract must be interpreted "in light of the surrounding circumstances." [1] Evidence of the subjective intent of the parties has "no independent place in this determination" (at para. 54). Furthermore, "it is unnecessary to consider any extrinsic evidence at all when the document is clear and unambiguous on its face" (at para. 55).

22     In *Canadian Premier Holdings Ltd. v. Winterthur Canada Financial Corp.* (2000), 132 O.A.C. 172 (Ont. C.A.) at para. 13, Laskin J.A. explained that, "Where the words of a contract are not ambiguous commercial reasonableness may inform the court's reading of the text, but the interpretation that produces a sensible commercial result is not determinative."

23     To summarize, while the court strives to interpret a contract in a manner consistent with the intent of the parties, the parties are presumed to have intended the legal consequences of their words. The court will consider the context or factual matrix in which the contract was drafted, including commercial reasonableness, to understand what the parties intended. The court will not adopt an interpretation that is "clearly" commercially absurd. The court must also consider the contract as a whole. The various provisions "should be read, not as standing alone, but in light of the agreement as a whole and other provisions thereof": *Scanlon v. Castlepoint Development Corp.* (1992), 99 D.L.R. (4th) 153 (Ont. C.A.), at 179. Where the contract is unambiguous, extrinsic evidence is inadmissible. In my view, the contract in this case was unambiguous. Therefore, while evidence as to the background that led to the two agreements, especially concerning the Transfer Agreement, may be helpful in understanding the context, the assertions by the parties as to what they intended is not admissible.

### (b) Nature of the dispute

24     At the heart of this case is choice of forum. IMAX and Robots assert that this case is about interpreting the Production Agreement and the interpretation of that agreement is vested in the arbitrators in California. SimEx asserts that the case is about interpreting the Transfer Agreement, a task that is presumptively vested in Ontario courts.

25     In my view, the gist of the dispute between SimEx and IMAX turns on the interpretation of the Transfer Agreement. It is only by interpreting the Transfer Agreement that it is possible to determine what portions of the Production Agreement may

2005 CarswellOnt 7297, [2005] O.J. No. 5389, 11 B.L.R. (4th) 214, 206 O.A.C. 3

have been incorporated by reference into that agreement and what parts of the Production Agreement were assigned to SimEx. Under the Transfer Agreement, the parties have chosen to be governed by Ontario law and have agreed that any disputes should be brought in the courts of Ontario. As such, the burden is on IMAX to show there is "good reason" that it not be bound by the forum selection clause. See *Z.I. Pompey Industrie v. ECU-Line N.V.*, [2003] 1 S.C.R. 450 (S.C.C.) at para. 20. Given SimEx and IMAX's connection to Ontario and Canada and since the case turns primarily on interpretation of the Transfer Agreement, IMAX has not shown "strong cause" or "good reason" why it should not be bound by the forum selection clause.

*(c) The Transfer Agreement*

26    In interpreting the Transfer Agreement, it is helpful to look at its overall structure. I start with the recitals and in particular recital "D," where Ridefilm and IMAX recite that they "wish to assign certain rights that they have to certain films". That recital does not suggest that Ridefilm and IMAX wish to assign the agreements that led to the production of those films.

27    The Transfer Agreement itself contains eight articles. Article One is entitled "SALE OF CERTAIN ASSETS". These are for the most part physical assets but also included are rights, such as the right to use the Ridefilm mark. There is a discrete price of U.S. $200,000 attached to these "acquired assets". The rights to the films are not included in this part of the agreement.

28    Article Two is entitled "LIABILITIES". SimEx places a great deal of importance on this part because, while it sets out certain liabilities, such as payment of taxes in relation to the "acquired assets", it also states that "SimEx is not responsible for any liabilities (employee, maintenance, warranty) other than those noted in this section 2.01". The full text of the clause is as follows:

2.01 **LIABILITIES ASSUMED BY SIMEX**

SimEx will assume, as of the Closing Date, the following liabilities and obligations of Ridefilm (collectively, the "Assumed Liabilities"):

(a) payment of taxes, if any, in respect of the Acquired Assets; and

(b) all liabilities for provision of film prints to the Ridefilm Base Owners as set out in Schedule 2.01(b) to a maximum of US $251,900.

SimEx is not responsible for any liabilities (employee, maintenance, warranty) other than those noted in this Section 2.01.

29    Schedule 2.01(b) sets out a list of film prints that Ridefilm was obligated to supply to various clients. This obligation, which SimEx assumed, was valued at U.S. $251,900. SimEx submits that Article Two is clear and unambiguous and wholly determines its liabilities.

30    Having regard to the position of clause 2.01(a) in the contract and its reference back to the acquired assets, it seems to me that Article Two is intended to govern the relationship between the parties with respect to the acquired, mostly physical, assets and liabilities. It is apparent on the face of the contract that SimEx's obligations are not limited to what is set out in Article Two. For example, in Article Five, to which I will turn shortly, SimEx agreed to pay royalties to RideFilm.

31    Article Three is entitled "REPRESENTATIONS AND WARRANTIES OF RIDEFILM AND IMAX." In this article, Ridefilm/IMAX represent that they have good title to the acquired assets. In a separate section, Ridefilm/IMAX represent that they have the right to assign their rights to the films. Because of its importance, I set this section of Article Three out in full:

3.04 **ASSIGNMENT OF FILMS**

Ridefilm and/or IMAX have the right to assign their rights to the films set out on Schedule 3.04(a) *subject to the terms and conditions of the relevant agreements* attached hereto as Schedule 3.04(b). The films set out in this Section 3.04 shall hereinafter collectively be referred to as the "Ridefilm Films".

2005 CarswellOnt 7297, [2005] O.J. No. 5389, 11 B.L.R. (4th) 214, 206 O.A.C. 3

[Emphasis added.]

32    The two films in question in this appeal that were produced by Midland are listed in Schedule 3.04(a). Schedule 3.04(b) includes the 1994 Production Agreement between Midland and Ridefilm and the agreements between Ridefilm or IMAX and other production companies. It appears that for certain of these other agreements IMAX/Ridefilm did not acquire ownership of the films as it did in the 1994 Ridefilm and Midland Production Agreement. [2] IMAX considers the emphasized portion, "subject to the terms and conditions of the relevant agreement" supports its submission that the assignment carried with it the obligations in the agreements, such as the obligation to pay royalties and submit disputes to arbitration. I do not agree with this submission. Again, given the context, apart from the clause dealing with representations and warranties, it seems to me that this section merely makes explicit that there may be limits on the ownership of certain films and the right to assign rights to those films. In other words, IMAX may not be able to give clear title to certain films, the rights to which it purports to convey to SimEx. This section, in my view, does not answer the question of what other rights or obligations SimEx may have assumed.

33    Section 3.04 is important, however, because it demonstrates that certain parts of the Production Agreement have been incorporated by reference into the Transfer Agreement by the use of the words "subject to the terms and conditions of the relevant agreements". As a result, Ontario courts interpreting the Transfer Agreement will, of necessity, have to interpret some aspects of the Production Agreement, despite the choice of law and forum in the Production Agreement. I do not consider this exercise as violating the arbitration clause in the Production Agreement since the parties themselves, one of whom (Ridefilm) was party to the Production Agreement, have chosen to incorporate references to the Production Agreement in the Transfer Agreement. Resort to the Production Agreement can also be justified in view of the need to understand the context in which the Transfer Agreement was drafted. It is not only incorporated by reference, but is also part of the factual matrix.

34    Article Four is entitled "REPRESENTATIONS AND WARRANTIES OF SIMEX". It does not seem to me that this article is of any assistance in resolving the issues in this appeal.

*(d) What was assigned*

35    In my view, the important provisions for resolving this appeal are to be found in Article Five, which is entitled "POST CLOSING COVENANTS". The heading alone signals that this provision will deal with the ongoing obligations between IMAX and SimEx. The Article first sets out certain obligations by SimEx to the Ridefilm base owners. Section 5.05 then describes the relationship between SimEx and IMAX with respect to IMAX/Ridefilm film library. Again, because of its importance I set that provision out in full:

**5.05 TRANSFER OF RIGHTS TO EXISTING FILM LIBRARY**

(a) At the Closing Date, Ridefilm and or IMAX agrees to *transfer title or assign its rights, as the case may be*, to the films set out in Schedule 3.04(a). The form of such transfer is attached hereto as Schedule 5.05.

(b) *Where applicable, Ridefilm and IMAX shall use commercially reasonable efforts to procure the consent of Midland Productions to assign the rights to the films to SimEx set out in Schedule 3.04(a)* as soon as is reasonably practicable. Ridefilm and IMAX provide no covenant as to the likelihood of success in obtaining the consent of Midland Productions to the assignment contemplated in this Section 5.05.

[Emphasis added.]

36    There are several important aspects to this section. First, it is apparent that section 5.05 deals with two different classes or bundles of rights. There are some films to which IMAX/Ridefilm have title and there are some films to which they have some lesser interest. Second, there may be some films for which assignment depends on Midland's consent. There are no such limits with respect to the two films at issue in this appeal. Under the Production Agreement relating to these two films, Ridefilm was to be the owner of the films produced by Midland, which "assigned, sold and transferred all its right, title and interest in the films to Ridefilm." As well, Ridefilm had the right to "assign any and all of this Agreement and the rights, licenses and

2005 CarswellOnt 7297, [2005] O.J. No. 5389, 11 B.L.R. (4th) 214, 206 O.A.C. 3

privileges granted it hereunder". Midland's consent to the assignment was not required. It seems to me that given the unlimited nature of Ridefilm/IMAX's title to these two films, the important part of section 5.05 of the Transfer Agreement is that part whereby Ridefilm and IMAX agree to "transfer title ... to the films".

37      The form of the transfer is set out in Schedule 5.05. I disagree with the application judge that this assignment is a "freestanding document". It is integral to the Transfer Agreement. It is the vehicle by which IMAX fulfils one of its key obligations under the Transfer Agreement, the promise to transfer title to the films to SimEx. The schedule refers back to the Transfer Agreement. In my view, it must therefore be read together with and interpreted as part of the contract.

38      Schedule 5.05 is entitled "ASSIGNMENT". It provides that Ridefilm or IMAX

for good and valuable consideration as set forth in the agreement between IMAX Corporation, Ridefilm Corporation and SimEx Inc. dated March 2, 2001 (the [Transfer] "Agreement") the receipt and sufficiency of which are hereby acknowledged:

Sells, assigns, and transfers, as the case may be to SimEx Inc., ... (the "Assignee") subject to the terms and conditions of said Agreement the Assignor's entire right, title, and interest in and to the films listed in Schedule 3.04(a) *subject to the terms of the agreements contained in Schedule 3.04(b)*. [Emphasis added.]

39      IMAX relies upon this clause, especially the emphasized portion, as transferring not only title to the films but the basket of rights and obligations in the Production Agreement, which is one of the agreements listed in Schedule 3.04(b). In my view, that is not a proper interpretation of the clause when one has regard to the Production Agreement. I will turn to the Production Agreement below. However, to finish with Article Five of the Transfer Agreement, the other important part is section 5.09 entitled "FILM ROYALTIES". This section sets out the obligations of SimEx to pay royalties to Ridefilm depending on the use of the films. Thus, SimEx agrees to pay royalties to Ridefilm for the Schedule 3.04(a) films, which includes the two films at issue in this case. These payments were, however, time limited. The royalties cease on the "Termination Date", being the fourth anniversary of the Closing Date.

40      Turning then to the Production Agreement, Ridefilm acquired unrestricted title to the films, under clause 8 of that agreement. Clause 8 is entitled "OWNERSHIP" and includes the following provisions:

[Ridefilm] shall at all times own the Films and all elements and components thereof ... and [Midland] shall not at any time own the same.

. . . . .

[Midland] hereby assigns, sells, transfers and quitclaims to [Ridefilm] all right, title and interest in and to the Films, the negative and the results and proceeds of the services of all persons rendering services in connection with production of the Films.

41      It would be difficult to imagine a more complete divesture of ownership rights than that contained in clause 8. Ridefilm, of course, agreed to pay for the films to which it had acquired these rights. That payment is set out in clause 4, which is entitled "CONTINGENT COMPENSATION". The compensation is based on a formula that gives Midland a percentage of the net profits. Robots, the successor to Midland, claims that it has not been paid the compensation contemplated by this clause, and, therefore, in accordance with the arbitration clause it has launched the California arbitration. However, Ridefilm's ownership rights were not limited by the compensation promises. If Ridefilm failed to make the payments required, Midland would have a remedy for breach of contract but there is nothing to indicate that Ridefilm's ownership rights would be impacted. In addition, Ridefilm agreed in clause 12.2 to indemnify Midland for any breach of the agreements made by Ridefilm. Out of interest, this may be contrasted with the Transfer Agreement. Under Article Seven of the Transfer Agreement entitled "DEFAULT", if the Agreement is terminated prior to the fourth anniversary of the closing date, the rights assigned by IMAX/Ridefilm to SimEx under section 5.05 revert back to IMAX/Ridefilm.

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

*(e) Presumptions concerning interpretation of contracts and assignments*

42    In my view, it is unnecessary to resort to any presumptions of construction and interpretation of contracts to resolve the issue in this case. The combined effect of reading the clauses of the Transfer Agreement and Schedule 5.05, with the relevant provisions of the Production Agreement, is that Ridefilm/IMAX transferred its ownership rights in the films to SimEx. It did not transfer its other obligations or rights under the Production Agreement. Ridefilm's ability to transfer title to a third party (here SimEx) was unfettered. SimEx paid for those ownership rights through the time-limited royalties set out in section 5.09. I see nothing to indicate that it agreed to pay any other amounts to any other party. The obligation under the Production Agreement to pay Midland (now Robots) is a matter between Robots and IMAX.

43    It seems to me that the application judge's error is in his statement at para. 18:

Transferors can only transfer the interest that they have in an asset being transferred and the transferors [*sic*, transferees] can receive no more than the transferor had to transfer. *If the transferor's right, title and interest are limited in scope then the right, title and interest of the transferee receiving it are also limited in scope.* [Emphasis added.]

44    As I have demonstrated, Ridefilm's title to the films at issue in this case was not limited. The contractual obligation to pay royalties did not affect the ownership rights.

45    I do not say that Ridefilm/IMAX could not assign its obligations under the Production Agreement to SimEx. Under clause 13 of the Production Agreement, Ridefilm "shall have the right to assign any and all of this Agreement and the rights, licenses and privileges granted it hereunder". Thus, it would appear that Ridefilm could have assigned the obligations to pay royalties to SimEx and apparently without Midland's consent contrary to the ordinary rule that a contractor cannot shift the burden of a contract without the consent of the other party to the contract. See *Lounsbury Co. v. Duthie*, [1957] S.C.R. 590 (S.C.C.), at 596-97 and *Rodaro v. Royal Bank* (2002), 59 O.R. (3d) 74 (Ont. C.A.) at para. 33. Equally, Ridefilm could assign "any ... of this agreement", meaning that it could assign part, if it so chose. That is what happened here. It assigned or transferred title to the films. It did not transfer or assign the other bundle of rights and obligations in the Production Agreement.

46    The cases relied upon by IMAX that stand for the proposition that vicarious performance of the assignor's burdens or obligations without the consent of the contractor will only be permitted where it "could make no difference" have no application here. [3] By contract, IMAX/Ridefilm was entitled to assign any part of the Production Agreement without Midland's consent. The issue is whether it did so.

47    In this respect, I cannot agree with the application judge that the principle (he called it a presumption) that an assignment conveys both the burden and benefits of a contract to the assignee had any application. The application judge relied upon two cases. The first is *ABN Amro Bank Canada v. Krupp MaK Maschinenbau GmbH* (1996), 135 D.L.R. (4th) 130 (Ont. Div. Ct.). In that case, ABN received a general assignment of accounts including a Technology Licensing Agreement (TLA) from its customer. The TLA included an arbitration clause. ABN, however, claimed that it was not bound by the arbitration clause. In that context, Adams J. speaking for a majority of the court said the following at pp. 135-36:

ABN is, in law, a party to the arbitration agreement. It is a fundamental and, I think, universal commercial legal principle that *an assignor is not entitled to divide that which is assigned amongst assignees so as to convey the benefits and nullify the burdens*: *First City Capital Ltd. v. Petrosar Ltd.* (1987), 42 D.L.R. (4th) 738, 61 O.R. (2d) 193, 7 A.C.W.S. (3d) 112 (H.C.J.). Thus, a party seeking to enforce assigned rights under an agreement can only do so subject to the terms and conditions embodied therein: *Best v. Beatty* (1920), 53 D.L.R. 44, 47 O.L.R. 265, 18 O.W.N. 67 (C.A.); affirmed 58 D.L.R. 552, 61 S.C.R. 576. This principle has been applied, by this and other courts, to include arbitration clauses... [Emphasis added.]

48    The difference between the *ABN* case and this case is that IMAX did not assign the Production Agreement but only ownership of the films that were produced as a result of the Production Agreement. Obviously, if it had assigned the entire Production Agreement, the principle set out in *ABN* would apply and SimEx as the assignee of the Agreement would have

2005 CarswellOnt 7297, [2005] O.J. No. 5389, 11 B.L.R. (4th) 214, 206 O.A.C. 3

been bound to pay the contingent compensation and bound by the arbitration clause. IMAX assigned its rights to the films not to the agreement.

49      The other case relied upon by the application judge, *Petro-Canada v. 366084 Ontario Ltd.* (1995), 25 B.L.R. (2d) 19 (Ont. Gen. Div.) is similar to *ABN*. It deals with assignment of a party's interest in an agreement. In that context, Cumming J. held at para. 55 that the assignee "steps into the shoes of [the assignor] and has the rights and is subject to the obligations of [the assignor] under the agreement".

50      There is no rule of law that prevents a party to a contract (here IMAX/Ridefilm) from assigning the rights or benefits of the contract to a third party (SimEx), while keeping the burdens. To the contrary, without the consent of the other party to the contract (here Midland/Robots), the ordinary rule is that the party (IMAX/Ridefilm) can only assign the benefits and will remain personally liable to the other party (Midland/Robots). See *Rodaro*, *supra* at paras. 33-4 and G.H.L. Fridman, *The Law of Contract in Canada*, 4 [th] ed. (Toronto: Carswell, 1999) at 727. It will be recalled that the application judge queried why Robots was not a party to the Transfer Agreement "if only to give its consent" (at para. 25). Two reasons suggest themselves. Robots' consent was not required under the terms of the Production Agreement, and in any event, IMAX was assigning only the rights not the burdens.

51      Since, in my view, there is no ambiguity in this contract, it is unnecessary to resort to principles of interpretation such as the *contra proferentem* rule. I can see nothing in this record that would justify invoking that rule against SimEx. These were both sophisticated parties with legal advisers. The Transfer Agreement appears to have been a joint effort. Absent ambiguity, extrinsic evidence, such as the assertion by the IMAX principals that SimEx understood that the assignment of the films was "subject to" the obligation to pay the compensation to Robots, is not admissible.

*(f) Sensible commercial result*

52      IMAX submits that the interpretation suggested by SimEx results in a "commercial absurdity." According to IMAX, it would not make sense for IMAX to retain the obligation to pay royalties to Robots, while deprived, after four years, of the income stream from the use of the films, especially given what IMAX refers to as the "modest initial purchase price" of U.S. $200,000. I think that a court would have a difficult time deciding whether or not the U.S. $200,000 was a modest initial purchase price.

53      In any event, U.S. $200,000 was not the only benefit that IMAX acquired from this agreement. SimEx also assumed Ridefilm/IMAX's liability to provide film prints to the Ridefilm Base Owners, an obligation that the parties valued at U.S. $251,900. Finally, SimEx gave Ridefilm base owners access to its film library. The importance of those rights is expressed in section 7.01(b) whereby the parties acknowledge that "access to and conversion of the SimEx Film Library is a significant and unique inducement to IMAX and Ridefilm to enter into this Agreement and of a nature of which a remedy in damages for the breach of SimEx's obligation in connection therewith will not be sufficient".

54      If, on the other hand, IMAX's interpretation is correct, for the four year period following the closing of the Transfer Agreement, SimEx would be obliged to pay compensation and royalties to two different parties for use of the same films. It is not apparent to me that the interpretation of the Transfer Agreement given in these reasons is clearly commercially absurd.

**Disposition**

55      Accordingly, I would allow the appeal, set aside paragraph one of the Judgment that dismisses the application, and make a declaration that IMAX/Ridefilm did not assign to SimEx, through the Transfer Agreement, the compensation and arbitration obligations under the Production Agreement. SimEx did not pursue its appeal from the dismissal of the application for an anti-suit injunction.

56      At the hearing of the appeal, the parties agreed that the successful party was entitled to costs fixed at $25,000 inclusive of disbursements and G.S.T. I would fix the costs accordingly, payable by IMAX and Robots.

SimEx Inc. v. IMAX Corp., 2005 CarswellOnt 7297

2005 CarswellOnt 7297, [2005] O.J. No. 5389, 11 B.L.R. (4th) 214, 206 O.A.C. 3

57    SimEx is also entitled to its costs of the application. Under paragraph 2 of the judgment, the application judge reserved the issue of costs. If the parties are unable to agree on the costs of the application they should make submissions to the application judge in accordance with the judgment.

*Weiler J.A.:*

I agree.

*Gillese J.A.:*

I agree.

*Appeal allowed.*

Footnotes

1    What this court referred to as "the factual matrix" in *Arthur Andersen Inc. v. Toronto Dominion Bank* (1994), 17 O.R. (3d) 363 (Ont. C.A.), at 372.

2    For example, in a 1996 agreement between New Wave International ("NWI") and IMAX, while IMAX had exclusive rights "in perpetuity" to distribute the film produced by NWI, NWI retained ownership of the copyright of the film.

3    Some of these cases are discussed by Farley J. in *Tru-Wall Group Ltd. v. Stadium Corp. of Ontario Ltd.*, [1995] O.J. No. 2610 (Ont. Gen. Div. [Commercial List]).

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 135

Case 09-10138-MFW    Doc 14225-50    Filed 08/15/14    Page 274 of 279

Sistem Mhendislik nsaat Sanayi Ve Ticaret Anonim Sirketi..., 2012 ONSC 4983,...

2012 ONSC 4983, 2012 CarswellOnt 10757

2012 ONSC 4983

Ontario Superior Court of Justice [Commercial List]

Sistem Mhendislik nsaat Sanayi Ve Ticaret Anonim Sirketi v. Krygyz Republic

2012 CarswellOnt 10757, 2012 ONSC 4983

# Sistem Mühendislik Insaat Sanayi Ve Ticaret Anonim Sirketi, Applicant and Kyrgyz Republic and Kyrgyzaltyn JSC, Respondents

Newbould J.

Heard: August 27, 2012
Judgment: September 4, 2012
Docket: CV-11-9419-00CL

Counsel: Steven G. Frankel, for Applicant

J. Brian Casey, Christina Doria, for Respondents

John A.M. Judge, for Centerra Gold Inc.

Subject: Civil Practice and Procedure; Corporate and Commercial; International; Securities

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

**Remedies --- Injunctions — Form and operation of order — Continuance of interim or interlocutory injunctions — Prima facie case — Effect of illegal conduct**

Applicant corporation S obtained award of US$8.5 million from arbitration panel against Kyrgyz Republic over illegal expropriation — S obtained order in nature of Mareva injunction freezing four million shares of C held by Kyrgyz government corporation K — S applied to extend order for 90 days and for additional order requiring C to hold $3,080,00 in trust to credit of proceeding representing dividend to be paid to K — Applications granted — Republic did not appear and K appeared but did not file evidence — Agreement tendered showed clear intention that Republic was shareholder in C — Strong prima facie case made that shares owned by government — Real risk that share certificates had been or would be removed from Canada as well as dividend if paid to K — Given refusal of government to prevent payment of award, appropriate to tie up dividend.

**Remedies --- Injunctions — Procedure on application — Undertaking regarding damages — Discretion of court**

Applicant corporation S obtained award of US$8.5 million from arbitration panel against Kyrgyz Republic over illegal expropriation — S obtained order in nature of Mareva injunction freezing four million shares of C held by Kyrgyz government corporation K — S successfully applied to extend order for 90 days and for additional order requiring C to hold $3,080,00 in trust to credit of proceeding, representing dividend to be paid to K — K sought letter of credit in support of undertaking as to damages — Court exercised its discretion not to order security — Shares would not be dissipated unless K or Kyrgyz government chose to sell them — Dividend would presumably remain in interest-bearing account.

**Business associations --- Specific matters of corporate organization — Shareholders — General principles — Who are shareholders — Miscellaneous**

Applicant corporation S obtained award of US$8.5 million from arbitration panel against Kyrgyz government over illegal expropriation — S obtained order in nature of Mareva injunction freezing four million shares of C held by Kyrgyz

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

government corporation K — S applied to extend order for 90 days — Application granted — Agreement tendered showed clear intention that Republic was shareholder in C — Prime Minister of Kygyzstan made statements indicating that government owned 33 per cent of C — C had made statements indicating that holding by K was holding by government — Expert in Kyrgyz law gave opinion that shares were owned by goverment.

**Table of Authorities**

**Cases considered by *Newbould J.*:**

*Chitel v. Rothbart* (1982), 39 O.R. (2d) 513, 30 C.P.C. 205, 69 C.P.R. (2d) 62, 141 D.L.R. (3d) 268, 1982 CarswellOnt 508 (Ont. C.A.) — referred to

*Sibley & Associates LP v. Ross* (2011), 2011 CarswellOnt 4671, 2011 ONSC 2951, 106 O.R. (3d) 494, 334 D.L.R. (4th) 645 (Ont. S.C.J.) — referred to

*Sistem Mühendislik Insaat Sanayi Ve Ticaret Anonim Sirketi v. Kyrgyz Republic* (2012), 2012 CarswellOnt 10369, 2012 ONSC 4751 (Ont. S.C.J. [Commercial List]) — referred to

**Statutes considered:**

*Securities Act*, R.S.O. 1990, c. S.5
    Generally — referred to

*Securities Transfer Act, 2006*, S.O. 2006, c. 8
    Generally — referred to

MOTION for extension of order in nature of Mareva injunction and order requiring dividend be held in trust.

*Newbould J.*:

1      This is a motion by Sistem Mühendislik Insaat Sanayi Ve Ticaret Anonim Sirketi ("Sistem") to extend the order of Justice Strathy dated August 17, 2012, which granted relief in the nature of a Mareva injunction. In essence, Sistem seeks to freeze 4,000,000 common shares in Centerra Gold Inc. ("Centerra") nominally held by Kyrgyzaltyn JSC ("Kyrgyzaltyn"), and to prevent Kyrgyzaltyn from removing from Ontario share certificates evidencing those shares. Sistem also seeks an order requiring Centerra to hold $3,080,000 in trust to the credit of this proceeding, being an amount equal to a dividend payment that Centerra will otherwise make to Kyrgyzaltyn on August 30, 2012. [1]

2      On September 9, 2009, an arbitration panel constituted pursuant to the International Center for Settlement of Investment Disputes ("ICSID") Additional Facility Rules ordered the Kyrgyz Republic (the "Republic") pay to Sistem US $8.5 million, plus certain costs and interest (the "Award"). The arbitration concerned the illegal expropriation of the Hotel Pinara, a hotel in Bishkek, the capital of Kyrgyzstan, owned by Sistem. The arbitration panel found that the Republic was responsible for the expropriation.

3      Despite retaining counsel and actively participating in the arbitration, the Republic has refused to pay the Award. It has also rejected the validity of judgments recognizing the Award in France and Switzerland.

4      On October 8, 2010, Sistem commenced an application in this Court for an order recognizing and enforcing the Award. Despite being given notice of the application, the Republic did not file material or appear. On January 5, 2011, Echlin J. made an order recognizing the Award as an award of this Court.

5    Centerra is a publicly-traded Canadian mining company that has extensive operations in Asia and, though subsidiaries, operates the Kumtor gold mine in the Republic, one of the largest gold mines in the world. Centerra's head office is in Toronto, it is a reporting issuer under the *Securities Act*, R.S.O. 1990, c. S.5 and its shares are traded over the Toronto Stock Exchange.

6    Kyrgyzaltyn, a state-owned enterprise wholly-owned by the Republic, nominally holds 77,401,766 Centerra shares. Sistem maintains that the true owner of the shares is the Republic. Sistem is seeking to enforce the award against those shares, and has therefore sought declaratory relief from this Court that, if granted, would permit the seizure of enough of those shares to satisfy the award.

7    Having obtained the order from Echlin J., Sistem sought to enforce the Award. On February 11, 2011, the Registrar of this Court issued a Writ of Seizure and Sale directing the Sheriff of the City of Toronto to seize and sell the real and personal property of the Republic sufficient to satisfy the Republic's judgment debt to Sistem. Sistem asked the sheriff to enforce the Writ by seizing the Republic's beneficial interest in the Centerra shares. Ultimately, however, the sheriff was unwilling to do so.

8    Sistem also caused the Registrar to issue a Notice of Garnishment against Centerra in respect of existing or future debts owed by Centerra to the Republic. Centerra has denied that any such debt exists, and has not paid any money to the Sheriff pursuant to the Notice of Garnishment.

9    On May 3, 2011, Sistem brought a motion for a declaration that (i) the Republic beneficially owns the Centerra shares and (ii) the Sheriff may seize those shares pursuant to the Writ. Neither the Republic nor Kyrgyzaltyn responded to the motion. Centerra, however, did oppose the motion, which was adjourned sine die on June 8, 2011.

10    On August 22, 2011, Sistem brought a motion to add Kyrgyzaltyn as a party to the Application. The Republic and Kyrgyzaltyn were provided with notice of the motion, but again did not appear. As before, Centerra opposed the motion.

11    The motion was heard by Cumming J. on September 29, 2011, after the matter was transferred to the Commercial List. On September 30, 2011, Justice Cumming delivered reasons allowing Sistem's motion. Among other things, Justice Cumming found that Centerra had no standing.

12    After the Amended Notice of Application was issued and served, Kyrgyzaltyn filed an appearance and then brought two motions. The first was to set aside the order of Echlin J. on the basis that the Court had no jurisdiction. The second was to stay any determination of the share ownership issue in favour of the Courts of the Republic on the basis of *forum non conveniens*. Centerra supported Kyrgyzaltyn's jurisdiction motion.

13    On July 25, 2012, Mr. Brown J. dismissed Kyrgyzaltyn's motions. He directed the parties to attend at a 9:30 a.m. chambers appointment before him in order to present a timetable and plan for the adjudication of the remainder of the Application, that is, the share ownership issue. Further, he directed the Republic to file an appearance by September 1, 2012 and be present at the chambers appointment, if it wanted to participate in the proceedings at all.

14    On August 14, 2012, Sistem became aware through news reports from the Republic that Kyrgyzaltyn either has received or will shortly receive certificates in respect of 74,551,766 of the 77,401,766 shares. The reports further indicate that the certificates have been or will soon be moved out of Ontario and to the Republic. One report quotes the Prime Minister of the Republic as calling this event "historical". The remaining 2,850,000 shares nominally held by Kyrgyzaltyn are pledged to Centerra.

15    On August 17, 2012, Sistem brought an *ex parte* motion for relief in the nature of a Mareva injunction. Strathy J. granted the motion. See *Sistem Mühendislik Insaat Sanayi Ve Ticaret Anonim Sirketi v. Kyrgyz Republic*, 2012 ONSC 4751 (Ont. S.C.J. [Commercial List]) (CanLII). His order provided that it would expire in 10 days unless Sistem applied to extend it. Sistem now applies to extend his order for a further 90 days.

16    Sistem's evidence is that the shares of Centerra had a market price on August 15, 2012 of $6.67 per share. At this price, the Award could be satisfied by the seizure and sale of less than 2,000,000 shares. There has, however, been considerable volatility

Sistem Mhendislik nsaat Sanayi Ve Ticaret Anonim Sirketi..., 2012 ONSC 4983,...

2012 ONSC 4983, 2012 CarswellOnt 10757

in Centerra's share price, which has had a 52 week high of $23.69. There could be further volatility in the share price. In the circumstances, Sistem asked for an order freezing 4,000,000 shares, which Strathy J. granted.

17      Centerra announced that in August 30, 2012 it will pay a dividend of $0.04 per share to shareholders of record as of August 17, 2012. This will entitle Kyrgyzaltyn to a payment of $3,080,000. Sistem asked for an order that such amount and any further dividends to be paid to Kyrgyzaltyn be held in trust by Centerra to the credit of this proceeding, which Strathy J. ordered.

18      The Republic has not appeared to defend this motion by Sistem to extend the Mareva injunction ordered by Strathy J. Kyrgyzaltyn has appeared and opposes the motion. It has not filed any evidence. Thus the evidence on this motion is the evidence that was before Strathy J.

19      Centerra has appeared only for the limited purpose of seeking consent amendments to the order of Strathy J. to deal with what are said to be ambiguities in the order.

20      The tests for granting a Mareva injunction are well known and need not be repeated here. See *Chitel v. Rothbart* (1982), 39 O.R. (2d) 513 (Ont. C.A.). One requirement is that the moving party must establish a strong *prima facie* case.

21      Kyrgyzaltyn primary contention is that Sistem has not established any case, let alone a strong *prima facie* case, as there is no evidence that Kyrgyzaltyn holds the Centerra shares for the Republic. I do not agree, and essentially agree with the reasons of Strathy J. in granting the Mareva injunction in the first place.

22      Kyrgyzaltyn asserts, and I agree, that the fact that shares are held by a subsidiary does not in itself mean that they are the asset of the parent. Kyrgyzaltyn asserts that there is no evidence that the shares of Centerra held by Kyrgyzaltyn are held on any basis on behalf of the Republic that wholly owns the shares of Kyrgyzaltyn. I do not accept that assertion.

23      Kyrgyzaltyn relies on an agreement amongst the Republic, Kyrgyzaltyn, Cameco, Centerra and Kumtor under which Cameco, which was a large shareholder of Centerra, agreed to exit Centerra and transfer its shares to Kyrgyzaltyn. The agreement provided that approximately 25.3 million shares of Centerra owned by Cameco would be transferred to Kyrgyzaltyn and that an additional approximately 18.2 million shares would issued by Centerra from treasury to Kyrgyzaltyn. The agreement provided expressly in section 2.2 that the treasury shares would be issued to Kyrgyzaltyn so that "Kyrgyzaltyn will beneficially own" such shares and be "entitled to all the benefits arising from such shares". Kyrgyzaltyn asserts that that is the end of the matter and that it is Kyrgyzaltyn and not the Republic that beneficially owns the shares of Centerra.

24      I note that section 2.2 does not deal with the 25.3 million shares of Centerra to be transferred under the agreement by Cameco. It may be that section 2.2 was intended to mean that so far as Centerra was concerned, it was Kyrgyzaltyn that was entitled to act as beneficial owner of those treasury shares issued to Kyrgyzaltyn. But there are other provisions in the agreement that indicate that Kyrgyzaltyn holds the shares of Centerra for the benefit of the Republic.

25      The preamble to the agreement provided-

Whereas Cameco... and Kyrgyzaltyn, which holds shares in Centerra on behalf of the Government (Kyrgyzaltyn, together with the Government, the "Kyrgyz Side") are the largest shareholder of Centerra;

26      This is a clear statement that Kyrgyzaltyn holds its shares of Centerra on behalf of the Republic. Moreover, section 2.5(c) provided that the "Kyrgyz Side [meaning the Republic and Kyrgyzaltyn] shall have no restrictions on the transfer or encumbrance of any common shares it holds..." (Underlining added) and section 2.5 (d) provided that "Any common shares held by the Kyrgyz Side shall be subject to the provision of section 3.8 of the 2004 Shareholders Agreement..." These provisions indicate a clear intention that the Republic is a shareholder in Centerra.

27      There are other indications that the shares of Centerra held by Kyrgyzaltyn are held for the Republic. In a press release of April 22, 2011, the Prime Minister of the Republic was quoted as saying that "we have a 33% stake in Centerra". In a central Asia newswire of May 2, 2011 there is reference to a Bishkek (the capital of Kyrgyzstan) news agency 24.kg reporting that the Deputy Prime Minister made the statement that the Kyrgyz government is looking to expand its stake in Centerra.

Sistem Mhendislik nsaat Sanayi Ve Ticaret Anonim Sirketi..., 2012 ONSC 4983,...

2012 ONSC 4983, 2012 CarswellOnt 10757

28      There are statements from Centerra that indicate that so far as Centerra is concerned, the holding of its shares by Kyrgyzaltyn is a holding by the Republic. While these statements are not directly by Kyrgyzaltyn or the Republic, they are statements of Centerra management about a very important shareholder. In the Management's Discussion and Analysis (MD&A) section of the 2009 annual report of Centerra, it refers to the transfer by Cameco of 25.3 million common shares "to Kyrgyzaltyn", "to the Government" and "to the Kyrgyz Government". In the MD&A in the 2010 annual statement of Centerra, there is reference to "the issuance of common shares to the Government". In an April 24, 2009 press release of Centerra, there is reference to an agreement to issue 18,232,615 common shares of Centerra to the Government and to the agreement of Cameco to transfer 23.5 million shares to the Government.

29      Sistem has filed expert evidence of Ms. Mirgul Smanalieva, an expert in Kyrgyz law, to the effect that under the law of the Republic, the Republic is the owner of the Centerra shares and that Kyrgyzaltyn holds the Centerra shares on behalf of the Republic. She further opines that the shares and any dividends are the property of the Republic and may be seized in satisfaction of the arbitration Award. This report was known to Kyrgyzaltyn at the time of the hearing before Brown J., although not relevant then as the issue was *forum non conveniens*, but to date no opposing expert opinion has been produced.

30      Kyrgyzaltyn points to the affidavit of Mr. Frank Hebert, the general counsel and corporate counsel of Centerra. He states in his affidavit that it is made in support of Centerra's interest in the motion. I fail to see any interest Centerra has in the motion, as it involves a question which should be irrelevant to Centerra. Whatever the court decides will be binding on Centerra, which should have no interest in who between Sistem or Kyrgyzaltyn is right. The fact that Centerra has in prior motions sought to intervene to support the position of Kyrgyzaltyn and the Republic is an indication that Centerra is not being entirely neutral in this matter.

31      Mr. Hebert states in his affidavit that he is "aware that Kyrgyzaltyn was intended to be, and is, the beneficial owner and not merely the nominal owner of the shares of Centerra". He says this is set out in section 2.2 of the agreement I have referred to. He says that Centerra has always observed this provision and has paid dividends directly to Kyrgyzaltyn. I can understand that as between Centerra and Kyrgyzaltyn, Centerra deals with Kyrgyzaltyn as the holder of the shares. But that does not deal directly with the question of who between the Republic and Kyrgyzaltyn is the beneficial owner of the Centerra shares. His statements are contradictory to the position of Centerra in its MD&A statements and press releases. I see the statement of Mr. Hebert as mainly argument.

32      In my view, Sistem has established a strong *prima facie* case that the shares of Centerra held by Kyrgyzaltyn are held for the benefit of the Republic. This of course does not mean that Sistem will necessarily succeed on this point at the trial of the action, if it proceeds that far, but I am satisfied, as was Strathy J., that the case of Sistem is sufficiently strong to say that a strong *prima facie* case has been established.

33      Kyrgyzaltyn also contends that there is no evidence of a risk that there will be a dissipation of assets. In answer to a question from the bench, Mr. Casey said that Kyrgyzaltyn would make no undertaking to retain the dividends it will receive from Centerra, and no undertaking regarding the shares except in the alternative. That is a clear indication that any dividends it obtains will be given to the Republic, which is consistent with the evidence that the Republic intends to cause the dividends to be transferred to the Republic.

34      A judgment creditor need not invariably provide direct evidence that there is a risk of removal or dissipation of assets. Rather, such a risk can, in an appropriate case, be inferred from the circumstances. See *Sibley & Associates LP v. Ross*, 2011 ONSC 2951 (Ont. S.C.J.) at para. 63.

35      Sistem is concerned that if the share certificates for the shares are physically transferred to the Republic they will not be capable of being seized by the sheriff to satisfy the Award and Sistem's efforts to enforce the Award will be frustrated. Sistem believes that this activity is designed to put the Shares beyond the reach of this court and to avoid the enforcement of the judgment in favour of Sistem. Under the *Securities Transfer Act* S.O. 2006, c. 8, an interest in a certificated security may only be seized by seizing the actual certificates (subject to limited exceptions that do not apply). Thus, if the certificates are

2012 ONSC 4983, 2012 CarswellOnt 10757

moved to the Republic, the sheriff will be unable to seize them and the Republic will have made itself judgment-proof with respect to the shares.

36    Mr. Casey stated in argument that the share certificates of Centerra have already been moved to the Republic. This is consistent with press reports emanating from Kyrgyzstan that the certificates have or will shortly be received by Kyrgyzaltyn and that the Prime Minister of Kyrgyzstan had described this event as historical. Mr. Casey asserts that where the certificates are located is not important as the share register of Centerra is in Canada and the court can make whatever order regarding the shares that it deems appropriate. Sistem points out that it is by no means certain that if a Canadian court ordered the share certificates to be returned that Kyrgyzaltyn would obey the order. The Republic has made it clear that it will do everything in its power to avoid paying Sistem the amount of the Award, and there is no reason to think that it would not direct Kyrgyzaltyn to ignore an order of this court.

37    Kyrgyzaltyn also contends that it is overkill to tie up both 4 million common shares of Centerra and the dividends of $3,080,000. It contends that the shares are more than enough. However, taken the attempts by both the Republic and Kyrgyzaltyn to prevent recognition and payment of the Award and to spirit away the share certificates, I think it appropriate that the dividends to be tied up.

38    I agree with Strathy J. in his conclusion that while the evidence is limited concerning efforts to remove the shares from this jurisdiction, it is consistent with the course of conduct of the respondents in taking every possible measure to avoid payment of the Award and the coincidence of this action being taken within a few weeks of the order of Brown J. cannot be overlooked. In my view there is a real risk that the share certificates will, if not already removed from Canada, be removed and a real risk that the dividends if paid to Kyrgyzaltyn will be removed.

39    It was not argued that the balance of convenience favours Kyrgyzaltyn. However, I agree with Strathy J. for the reasons given by him that the balance of convenience favours the granting of the relief sought.

40    Kyrgyzaltyn also contends that there is no evidence that Sistem has any assets in Canada and that a letter of credit should be posted in support of its undertaking as to damages in an amount equivalent to the number of shares frozen at today's price. Whether an undertaking as to damages or security for it is required is a discretionary matter. In this case, I see no purpose in requiring a letter of credit for the value of the shares being tied up. The shares exist somewhere and will not be dissipated unless Kyrgyzaltyn or the Republic takes some steps to sell them. Mr. Casey says there is no intent to do that. The dividends will presumably remain in an interest bearing account.

41    Strathy J. held that he did not propose to order security for the undertaking in light of the substantial judgment Sistem has. I am of the same view.

42    In the circumstances the motion to extend the order of Strathy J. for 90 days is granted. With respect to the proposed changes to the order of Strathy J., Mr. Casey had not had a chance to review the proposed changes. If the parties cannot agree on the changes, the matter can be taken up with me.

*Order accordingly.*

Footnotes

1    It was agreed that no interim order was required tying up the assets pending my decision on this motion, as under the language of the order of Strathy J., Sistem was required to apply for an extension of the order within 10 days, which it did, failing which the order would terminate.

---

**End of Document**                         Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.