TAB 136

2003 BCCA 344, 2003 CarswellBC 1399, [2003] B.C.W.L.D. 467, [2003] B.C.J. No. 1335...

2003 BCCA 344
British Columbia Court of Appeal

Skeena Cellulose Inc., Re

2003 CarswellBC 1399, 2003 BCCA 344, [2003] B.C.W.L.D. 467, [2003] B.C.J. No.
1335, 13 B.C.L.R. (4th) 236, 184 B.C.A.C. 54, 302 W.A.C. 54, 43 C.B.R. (4th) 187

# In the Matter of the Companies' Creditors
# Arrangement Act, R.S.C. 1985, c. C-36, as amended

Skeena Cellulose Inc., Orenda Forest Products Ltd., Orenda Logging Ltd. and 9753
Acquisition Corp. (Respondents / Petitioners) and Clear Creek Contracting Ltd. and Jasak
Logging Ltd. (Appellants / Applicants) and The Truck Loggers' Association (Intervenor)

Newbury, Hall, Levine JJ.A.

Heard: April 28-29, 2003
Judgment: June 9, 2003
Docket: Vancouver CA030149

Proceedings: affirming (2002), 5 B.C.L.R. (4th) 193 (B.C.S.C.)

Counsel: *J.S. Forstrom*, for Appellants
*M.I. Buttery, S.A. Dubo*, for Respondents
*M. Maclean, J.I. McLean*, for Intervenor, Truck Loggers' Association

Subject: Corporate and Commercial; Civil Practice and Procedure; Insolvency; Natural Resources; Property

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

> **Corporations --- Arrangements and compromises — Under Companies' Creditors Arrangement Act —
> Miscellaneous issues**
>
> Respondent logging company held long term timber harvesting contracts with five contractors, including applicants
> — Contracts were required to be renewed indefinitely under Timber Harvesting Contract and Subcontract Regulation
> — Logging company entered into arrangement under Companies' Creditors Arrangement Act — Logging company
> obtained come-back order allowing it to terminate contracts pursuant to report from monitor being filed 21 days before
> implementation — Logging company sent letter terminating applicants' contracts — Contracts were terminated before
> relevant monitor's report was filed — Creditors' meeting took place within 21 days of report being issued — Application
> for declaration that cancellation of contracts was invalid was dismissed — Trial judge found that elimination of contracts
> was consolidation and downsizing, which was permitted under order — Trial judge found that no prejudice occurred by
> not giving proper notice of cancellation of contracts — Trial judge found that applicants were creditors with claim for
> specific performance — Applicants appealed — Appeal dismissed — Trial judge correctly found that granting application
> would allow inappropriate differentiation in treatment between applicants and other creditors — Act gave court authority
> to allow logging company to break contracts, despite renewal requirements in Regulations — Regulations did not create
> statutory requirements to which contracts were subject, but dictated specific terms of contracts — Plan was fair, equitable
> and reasonable considering broad range of interests at stake — Lack of notice did not affect outcome of creditors' meeting
> — Logging company did not act in bad faith.

2003 BCCA 344, 2003 CarswellBC 1399, [2003] B.C.W.L.D. 467, [2003] B.C.J. No. 1335...

**Table of Authorities**

**Cases considered by *Newbury J.A.*:**

*Armbro Enterprises Inc., Re*, 22 C.B.R. (3d) 80, 1993 CarswellOnt 241 (Ont. Bktcy.) — considered

*Baxter Student Housing Ltd. v. College Housing Co-operative Ltd.* (1975), [1976] 2 S.C.R. 475, [1976] 1 W.W.R. 1, 20 C.B.R. (N.S.) 240, 57 D.L.R. (3d) 1, 5 N.R. 515, 1975 CarswellMan 3, 1975 CarswellMan 85 (S.C.C.) — considered

*Blue Range Resource Corp., Re*, 1999 CarswellAlta 597, 245 A.R. 154 (Alta. Q.B.) — considered

*Cam-Net Communications v. Vancouver Telephone Co.*, 182 D.L.R. (4th) 436, 1999 BCCA 751, 1999 CarswellBC 2808, 71 B.C.L.R. (3d) 226, 132 B.C.A.C. 52, 215 W.A.C. 52, 2 B.L.R. (3d) 118, 17 C.B.R. (4th) 26 (B.C. C.A.) — considered

*Canadian Airlines Corp., Re* (2000), 2000 ABQB 442, 2000 CarswellAlta 662, [2000] 10 W.W.R. 269, 20 C.B.R. (4th) 1, 84 Alta. L.R. (3d) 9, 9 B.L.R. (3d) 41, 265 A.R. 201 (Alta. Q.B.) — considered

*Dylex Ltd., Re*, 31 C.B.R. (3d) 106, 1995 CarswellOnt 54 (Ont. Gen. Div. [Commercial List]) — followed

*Hongkong Bank of Canada v. Chef Ready Foods Ltd.* (1990), 51 B.C.L.R. (2d) 84, 4 C.B.R. (3d) 311, *(sub nom. Chef Ready Foods Ltd. v. Hongkong Bank of Canada)* [1991] 2 W.W.R. 136, 1990 CarswellBC 394 (B.C. C.A.) — considered

*Keddy Motor Inns Ltd., Re*, 90 D.L.R. (4th) 175, 13 C.B.R. (3d) 245, 6 B.L.R. (2d) 116, *(sub nom. Keddy Motor Inns Ltd., Re (No. 4))* 110 N.S.R. (2d) 246, *(sub nom. Keddy Motor Inns Ltd., Re (No. 4))* 299 A.P.R. 246, 1992 CarswellNS 46 (N.S. C.A.) — considered

*Mine Jeffrey inc., Re*, 2003 CarswellQue 90, 35 C.C.P.B. 71, 40 C.B.R. (4th) 95 (Que. C.A.) — considered

*Northland Properties Ltd., Re*, *(sub nom. Northland Properties Ltd. v. Excelsior Life Insurance Co. of Canada)* 34 B.C.L.R. (2d) 122, *(sub nom. Northland Properties Ltd. v. Excelsior Life Insurance Co. of Canada)* 73 C.B.R. (N.S.) 195, *(sub nom. Northland Properties Ltd. v. Excelsior Life Insurance Co. of Canada)* [1989] 3 W.W.R. 363, 1989 CarswellBC 334 (B.C. C.A.) — referred to

*Olympia & York Developments Ltd. v. Royal Trust Co.*, 17 C.B.R. (3d) 1, *(sub nom. Olympia & York Developments Ltd., Re)* 12 O.R. (3d) 500, 1993 CarswellOnt 182 (Ont. Gen. Div.) — considered

*Pacific National Lease Holding Corp., Re*, 72 B.C.L.R. (2d) 368, 19 B.C.A.C. 134, 34 W.A.C. 134, 15 C.B.R. (3d) 265, 1992 CarswellBC 524 (B.C. C.A. [In Chambers]) — considered

*Pacific National Lease Holding Corp. v. Sun Life Trust Co.*, 34 C.B.R. (3d) 4, 10 B.C.L.R. (3d) 62, [1995] 10 W.W.R. 714, *(sub nom. Pacific National Lease Holding Corp., Re)* 62 B.C.A.C. 151, *(sub nom. Pacific National Lease Holding Corp., Re)* 103 W.A.C. 151, 1995 CarswellBC 369 (B.C. C.A.) — referred to

**WestlawNext** CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW   Doc 14225-51   Filed 08/15/14   Page 4 of 493

Skeena Cellulose Inc., Re, 2003 BCCA 344, 2003 CarswellBC 1399

2003 BCCA 344, 2003 CarswellBC 1399, [2003] B.C.W.L.D. 467, [2003] B.C.J. No. 1335...

*Reference re Companies' Creditors Arrangement Act (Canada)*, 16 C.B.R. 1, [1934] S.C.R. 659, [1934] 4 D.L.R. 75, 1934 CarswellNat 1 (S.C.C.) — referred to

*Repap British Columbia Inc., Re* (June 11, 1997), Doc. Vancouver A970588 (B.C. S.C.) — referred to

*Robert F. Kowal Investments Ltd. v. Deeder Electric Ltd.*, 9 O.R. (2d) 84, 21 C.B.R. (N.S.) 201, 59 D.L.R. (3d) 492, 1975 CarswellOnt 123 (Ont. C.A.) — considered

*Royal Oak Mines Inc., Re*, 1999 CarswellOnt 792, 7 C.B.R. (4th) 293 (Ont. Gen. Div. [Commercial List]) — referred to

*Sammi Atlas Inc., Re* (1998), 1998 CarswellOnt 1145, 3 C.B.R. (4th) 171 (Ont. Gen. Div. [Commercial List]) — considered

*Smoky River Coal Ltd., Re*, 1999 CarswellAlta 491, 175 D.L.R. (4th) 703, 237 A.R. 326, 197 W.A.C. 326, 71 Alta. L.R. (3d) 1, [1999] 11 W.W.R. 734, 12 C.B.R. (4th) 94, 1999 ABCA 179 (Alta. C.A.) — referred to

*Sulphur Corp. of Canada Ltd., Re*, 2002 ABQB 682, 2002 CarswellAlta 896, 35 C.B.R. (4th) 304, [2002] 10 W.W.R. 491, 5 Alta. L.R. (4th) 251, 319 A.R. 152 (Alta. Q.B.) — considered

*T. Eaton Co., Re*, 1999 CarswellOnt 3542, 14 C.B.R. (4th) 288 (Ont. S.C.J. [Commercial List]) — referred to

*United Used Auto & Truck Parts Ltd., Re*, 2000 BCCA 146, 2000 CarswellBC 414, 73 B.C.L.R. (3d) 236, [2000] 5 W.W.R. 178, 16 C.B.R. (4th) 141, 135 B.C.A.C. 96, 221 W.A.C. 96 (B.C. C.A.) — considered

*United Used Auto & Truck Parts Ltd., Re*, 2000 CarswellBC 2132, 2000 CarswellBC 2133, 261 N.R. 196 (note), 149 B.C.A.C. 160 (note), 244 W.A.C. 160 (note) (S.C.C.) — referred to

*Westar Mining Ltd., Re*, 70 B.C.L.R. (2d) 6, 14 C.B.R. (3d) 88, [1992] 6 W.W.R. 331, 1992 CarswellBC 508 (B.C. S.C.) — referred to

**Statutes considered:**

*Bank Act*, S.C. 1991, c. 46
   s. 178 — referred to

*Builders Lien Act*, S.B.C. 1997, c. 45
   Generally — referred to

*Canada Business Corporations Act*, R.S.C. 1985, c. C-44
   Generally — referred to

*Commercial Arbitration Act*, R.S.B.C. 1996, c. 55
   Generally — referred to

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36
   Generally — considered

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

3

2003 BCCA 344, 2003 CarswellBC 1399, [2003] B.C.W.L.D. 467, [2003] B.C.J. No. 1335...

s. 4 — considered

s. 5 — considered

s. 6 — considered

s. 11 — referred to

s. 11(1) — considered

s. 11(2) — considered

s. 11(3) — considered

s. 11(4) — considered

s. 11(6) — considered

*Forest Act*, R.S.B.C. 1996, c. 157
  Generally — considered

  s. 56.1 [en. 1998, c. 29, s. 10] — referred to

*Forest Amendment Act, 1991*, S.B.C. 1991, c. 11
  Generally — referred to

*Mechanics' Liens Act*, R.S.M. 1970, c. M80
  Generally — referred to

**Regulations considered:**

*Forest Act*, R.S.B.C. 1996, c. 157
  *Timber Harvesting Contract and Subcontract Regulation*, B.C. Reg. 22/96

  Generally

  Pt. 2

  Pt. 5

  Div. 5

  s. 1(1) "AAC reduction criteria"

  s. 13

  ss. 13-15

  s. 24

  s. 28(2)(d)

  s. 32(g)

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

s. 32(h)

APPEAL by logging contractors from judgment reported at 2002 BCSC 1280, 2002 CarswellBC 2032, 5 B.C.L.R. (4th) 193 (B.C. S.C.), dismissing contractors' application for declaration that cancellation of contracts pursuant to *Companies' Creditors Arrangement Act* was invalid.

*Newbury J.A.*:

1      This appeal turns on the interaction of two statutory regimes — the scheme of "replaceable" or "evergreen" logging contracts established by the Province under the *Forest Act*, R.S.B.C. 1996, c. 157, and the scheme of judicial stays and creditors' compromises available under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 as amended (the "CCAA"), to insolvent corporations whose indebtedness exceeds $5,000,000.

2      Both schemes are said to involve considerations of fairness and equity. In the case of the *Forest Act*, a detailed series of "contractual" terms is required to be incorporated in agreements between the holders of harvesting licences granted by the Crown, and the contractors they in turn retain to carry out the logging. Most aspects of the relationship are either provided for in the mandatory terms or must be resolved by arbitration, the principles and procedures of which are also regulated by the Act. Most importantly, a licence holder must agree that when such an agreement expires, it will be renewed (or in the statutory terminology, "replaced") on terms substantially the same as those of the expired contract, assuming the contractor has performed its obligations thereunder. In this way, the legislation seeks to provide contractors with a degree of "security" analogous to the security of tenure implicit in a Crown harvesting licence, and to achieve greater fairness between the licence holder and its contractors.

3      In the case of the CCAA, the fairness analysis required to be carried out by the court generally refers to fairness as between classes of creditors. That analysis is tempered by the starker realities of whether the proposal before the court offers a chance of survival to the debtor corporation and whether it will be acceptable to the requisite majority of creditors. Unlike the detailed provisions of the *Forest Act* and regulations thereto, the CCAA is a brief set of "broad-brush" provisions that leave wide avenues of discretion to be exercised by courts in circumstances that may not permit the fine weighing of individual interests. As observed in *Keddy Motor Inns Ltd., Re* (1992), 13 C.B.R. (3d) 245 (N.S. C.A.), at 258, the legislation contemplates "rough-and-tumble negotiations between debtor companies desperately seeking a chance to survive and creditors willing to keep them afloat but on the best terms they can get."

4      The substantive question raised by this appeal is to what extent considerations of fairness between individual logging contractors who have replaceable contracts with a corporation in CCAA proceedings, should figure in the "rough-and-tumble" considerations applicable to a large corporate insolvency. Looked at another way, does the desirability of staving off a bankruptcy which could have disastrous consequences for many individuals, local governments and communities, supplant considerations of fairness between the holders of replaceable logging contracts to which the debtor corporation is a party?

*FACTUAL BACKGROUND*

5      The insolvent corporation in this case is Skeena Cellulose Inc. ("Skeena"). At all material times, it owned and operated a pulp mill and three sawmills, and held related forest tenures, mainly in north-western British Columbia. It was a large employer in that region and was one of the major manufacturers of bleached softwood kraft pulp in North America.

6      Skeena has experienced financial difficulties for many years. It underwent a financial restructuring under the CCAA in 1997. Although many of the positive results hoped for from that arrangement improved Skeena's long-term prospects, it appears that various other factors prevented full recovery. In August 2001, the Toronto-Dominion Bank demanded payment of more than $350,000,000 from Skeena and its subsidiaries, froze their operating lines and began to refuse to honour their cheques, including payroll cheques. Other creditors followed suit, and on September 5, 2001, Skeena and its subsidiaries petitioned the Supreme Court of British Columbia for a stay of proceedings under the CCAA.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Skeena Cellulose Inc., Re, 2003 BCCA 344, 2003 CarswellBC 1399

2003 BCCA 344, 2003 CarswellBC 1399, [2003] B.C.W.L.D. 467, [2003] B.C.J. No. 1335...

7     The petition alleged, and it is not disputed, that Skeena owed over $409,000,000 (exclusive of interest) mainly to the Toronto-Dominion Bank and to corporations owned by the Province, which also held over 70 percent of its common shares. This debt was represented by bonds issued under a trust deed secured by charges on all of Skeena's assets, present and future. The petition stated that Skeena and its subsidiaries were insolvent and described the impact their bankruptcy could have on the provincial economy:

> 50. If the Petitioners were to totally cease operations or go into liquidation, the direct loss of jobs in British Columbia would be enormous, including the approximately 1,050 existing Skeena employees and, at least 1,000 employees of logging contractors, road building and silviculture contractors. It would also directly and indirectly impact service industries and business which rely on Skeena for a source of revenue. By the Petitioners' estimate, as many as 7,000 additional jobs in British Columbia would be affected.

> 51. A liquidation of the Petitioners would be particularly devastating to the communities of Terrace, South Hazelton, and Prince Rupert. Skeena is the largest employer in those communities, and many hundreds of families depend on Skeena for their livelihoods in those communities.

> 52. The loss of this number of jobs would also, of course, have a generally damaging effect on the British Columbia economy, given the spillover effect of lost wages and lost purchases.

> 53. Skeena is currently in good standing under its collective agreements and other employment relationships. However, if some or all of the employees would be terminated, severance claims, including payments for group termination under the Employment Standards Act, could be significant.

8     Chief Justice Brenner, who I understand heard most if not all the applications in this matter in Supreme Court, granted an initial order *ex parte* on September 5, 2001, staying proceedings against Skeena and its subsidiaries for 30 days and appointing Arthur Andersen Inc. as Monitor. On October 5, he granted a "Come-back Order" which extended the stay and contemplated that the petitioners would file a formal plan of compromise or arrangement (entitled the "Reorganization Plan") with their creditors on or before November 5; that they would file a formal plan of arrangement (entitled the "Plan of Arrangement") with their shareholders under the *Canada Business Corporations Act*, R.S.C. 1985, c. C-44; and that meetings of their creditors would be called to vote on the Reorganization Plan. Under the heading "Post-Filing Operations", the Order stated:

> 11. The Petitioners shall remain in possession of the Assets and shall continue to carry on business in the ordinary course provided that they shall have the right with the approval of the Monitor, or this Court, to proceed with an orderly disposition of such of the Assets as they deem appropriate, either with the consent of any creditor holding security against such Assets or pursuant to an Order of this Court, in order to facilitate the downsizing and consolidation of their business and operations (the "Downsizing").

> 12. To facilitate the Downsizing, the Petitioners may:

>> (a) terminate the employment of such of the Petitioners' employees or temporarily lay off such of the Petitioners' employees as they deem appropriate;

>> (b) terminate such of the Petitioners' supplier or service arrangements or agreements as they deem appropriate;

>> (c) abandon such leases, tenures, contracts, rights, authorizations, franchises, dealerships, permits, approvals, uses or consents as are deemed to be unnecessary for the Petitioners' business; . . .

> all without interference of any kind from third parties, including landlords and notwithstanding the provisions of any lease, other instrument or law affecting or limiting the rights of the Petitioners to remove or divest Assets from leased premises, and that any liabilities of the Petitioners arising as a result thereof shall be claims provable in these proceedings in the same manner as all creditor claims existing as at the Filing Date and provided that:

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 8 of 493

Skeena Cellulose Inc., Re, 2003 BCCA 344, 2003 CarswellBC 1399

2003 BCCA 344, 2003 CarswellBC 1399, [2003] B.C.W.L.D. 467, [2003] B.C.J. No. 1335...

(f) the Monitor shall have submitted to the Court a report of any proposed termination of any Forest Act Replacement Contract under the foregoing sub-paragraph (b) at least 21 days before such plan is implemented;

(g) the implementation of any of the plans and procedures contemplated by the foregoing sub-paragraphs (a)-(d) including any termination or partial termination of any contract, shall be without prejudice to the claims of any counter party to such contract to file a proof of claim in such manner as may be provided for in the Reorganization Plan;

(h) the Petitioners shall provide 3 days' written notice of any termination of any executory agreements under the foregoing sub-paragraphs (b) or (c); and

(i) the counter party or parties to any agreements proposed by the Petitioners to be terminated in accordance with the foregoing, including the counter party or parties to any Forest Act Replacement Contracts, may during the applicable 3 day notice period, in the case of executory contracts, or within 21 days of the filing of the Monitor's report, in the case of the Forest Act Replacement Contracts, apply to the Court in this proceeding to show cause why such agreement or agreements should not be terminated or for such directions as to the termination of such agreements as may be appropriate. [Emphasis added.]

9      The deadline for the filing of the Reorganization Plan was extended by the Court on several occasions while solutions to Skeena's difficulties were sought and potential purchasers were pursued. Finally, on February 28, 2002, a Plan was filed which proposed that an outside buyer, NWBC Timber & Pulp Ltd. ("NWBC"), would acquire the interests of the secured lenders for $8,000,000. Of this, $2,000,000 would be paid to the Monitor for distribution to the unsecured creditors, so that the secured creditors would receive $6,000,000 on debt in excess of $400,000,000. The claims of governmental bodies for property taxes would be compromised, and the holders of existing common shares would surrender them for no consideration. Skeena would then issue new common shares to NWBC. The Plan was of course subject to many conditions, including approval by the specified classes of creditors and shareholders and the passing of applicable appeal periods in respect of the Court's order. After some amendments, the Plan was approved by the Court on April 4, 2002. Once the conditions contained in the Order were met, NWBC completed its purchase of the shares and secured debt of Skeena in early May.

### The Appellants' Logging Contracts

10     The appellants or their predecessors had been performing logging services under contract with Skeena or its predecessors since the 1960s. In 1991, their contracts became "replaceable logging contracts" under new provisions of the *Forest Act*. At the time Skeena's financial difficulties became manifest in 2001, the corporation had five such contracts. All five were due to expire on December 31, 2001, and Skeena was required to offer replacement contracts to the contractors thereunder no later than September 30 of that year.

11     Skeena did not offer replacement contracts to the appellants, but did renew those of its three other logging contractors. Mr. Veniez, the president and chief executive officer of NWBC and Skeena following the Reorganization, explained this decision by reference, at least in part, to the fact that whereas the *Forest Act* scheme requires a licence holder to cut at least 50 percent of its allowable annual cut ("AAC") through replaceable contracts, Skeena had entered into such contracts for approximately 65 percent of its AAC. Moreover, the change in control of Skeena contemplated by the Reorganization would result in a five percent reduction of its AAC, absent a ruling to the contrary by the Ministry of Forests. Mr. Veniez deposed in these proceedings that:

17. As part of its efforts to ensure the economic viability of Skeena, NWBC determined, in consultation with Skeena management at the time, that it would be desirable to reduce the amount of timber required to be harvested under replaceable contracts to the current statutory minimum of 50% of Skeena's AAC.

18. Because NWBC's acquisition of Skeena represents a change of control, I knew that Skeena's Terrace Woodlands' AAC would be reduced by 5% to approximately 878,000 m$^3$. Therefore, in consultation with Skeena management, I determined

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 9 of 493

Skeena Cellulose Inc., Re, 2003 BCCA 344, 2003 CarswellBC 1399

2003 BCCA 344, 2003 CarswellBC 1399, [2003] B.C.W.L.D. 467, [2003] B.C.J. No. 1335...

that it would be appropriate to reduce the volume of timber allocated to evergreen contractors to 439,000 m$^3$, representing a reduction of approximately 160,000 m$^3$.

19. I was advised by Skeena management that, until the terminations of Clear Creek and Jasak, Skeena's five evergreen contractors held the following volumes:

| Contractors | Volume |
|---|---|
| Don Hull & Sons | 166,239 m{3} |
| K'Shian Logging | 166,239 m{3} |
| Main Logging | 99,828 m{3} |
| Clear Creek | 83,331 m{3} |
| Jasak | 83,331 m{3} |

20. In consultation with Skeena management and the Province, NWBC determined that it would be appropriate to terminate the Clear Creek and Jasak contracts, representing a reduction of "evergreen" volume of approximately 166,662 m$^3$.

21. I recognize that by terminating these two contracts, Skeena will be slightly below the 50% allowable minimum under the Contract Regulation, but it is Skeena's intention to re-tender the approximately 6,000 m$^3$ difference in the form of a new evergreen contract. The approximately 160,000 m$^3$ balance will be tendered on the open market (as opposed to have to negotiate rates with its existing evergreen contractors). I expect that this tendering process will result in substantial savings to Skeena and significantly reduce its delivered wood costs for this 160,000 m$^3$. (If the cost differential is $3.90/m$^3$, the savings could be as much as $624,000 per year).

22. Moreover, a tendering process for this volume of wood will help to establish more accurate fair market values for both evergreen and non-evergreen contracts (in this regard, I am advised by Mr. Curtis that historically it has been difficult to establish these values in light of the predominance of evergreen contracts).

23. In deciding to terminate certain of Skeena's evergreen contracts, I reasoned that this would better allow Skeena to reorganise the size (volume) and equipment configurations for its different contracts. (Skeena does have the right to insist that its current evergreen contractors log by whatever methods Skeena stipulates, but historically it has been more cost-efficient for Skeena to introduce new logging methods via an open tendering process than by introducing changes to existing replaceable contracts).

24. Finally, I was advised by Skeena management that Clear Creek and Jasak had, historically, been more expensive than the three other evergreen contractors listed above. That is, through a combination of the rates charged by those two contractors, and their relative efficiency, the cost to Skeena of logs produced by Clear Creek and Jasak was greater than for the other three evergreen contractors above.

25. With the foregoing considerations in mind, I, on behalf of NWBC, advised Skeena's management at the time that NWBC would require, as a condition of going forward with the acquisition of Skeena, that Skeena take steps within the context of the CCAA proceedings to terminate the Clear Creek and Jasak contracts.

26. By asking Skeena to terminate those contracts, NWBC was in no way motivated to frustrate the objectives of the *Forest Act*. On the contrary, for the reasons set out above, NWBC perceives these terminations to be an important aspect of what I hope and fully expect will be a successful reorganization of Skeena. [Emphasis added.]

12    On or about March 1, 2002, each of the appellants received a letter from Skeena purporting to terminate its replaceable contract, effective immediately. Neither the Court nor the appellants had received prior notification from Skeena or the Monitor — even though under the terms of the Come-back Order, the Monitor was required to submit to the Court "a report of any

Skeena Cellulose Inc., Re, 2003 BCCA 344, 2003 CarswellBC 1399

2003 BCCA 344, 2003 CarswellBC 1399, [2003] B.C.W.L.D. 467, [2003] B.C.J. No. 1335...

proposed termination of any Forest Act Replacement Contract . . . at least 21 days before such plan is implemented" and even though within 21 days of the filing of the Monitor's report, the parties to such contracts were to be entitled to apply to the Court to "show cause why such agreement or agreements should not be terminated or for such directions as to the termination of such agreements as may be appropriate." Two weeks later, in its Eleventh Report to the Court, the Monitor referred to the terminations as *faits accomplis*:

> We have been advised that the petitioner has terminated replaceable logging contracts with Jasak Logging Ltd. and Clear Creek Contracting Ltd. in accordance with the Order. Copies of the letters of termination to each of the contractors dated March 4, 2002 and March 1, 2002, respectively are attached.

> These replaceable logging contracts have been terminated in accordance with the terms of the Purchase Agreement between NWBC Timber & Pulp Ltd., 552513 British Columbia Ltd. and Skeena Cellulose Inc. dated February 20, 2002.

13      It is not clear to me what "plan" was being referred to in subpara. 12(f) of the Come-back Order quoted above, nor whether it was necessary to "terminate" contracts that had not been renewed. On appeal, however, Skeena acknowledged that the Monitor's report had been filed two weeks after the termination letters were issued and that the "creditors' meeting to vote on the Plan took place before the 21-day time period referred to in the Come-back Order had expired." Thus counsel did not take issue with the Chief Justice's conclusion that Skeena had not complied strictly with the Come-back Order.

14      Upon receiving the letters of termination, the appellants' solicitors wrote to the Monitor's solicitors objecting that that the Come-back Order had not been complied with. They explained:

> Our clients are in a position where they cannot file proofs of claim on March 25 as their contracts are not terminated yet and they do not know if the contracts will be terminated and, if there is a termination, what class of creditor they will be. Due to the failure to deal with this matter in a timely fashion, it appears that the parties have no choice but to postpone the deadline for filing claims to the middle of April with a vote of creditors to take place in early May.

The appellants asked the Monitor for information as to how the termination would result in lower costs to Skeena and requested a copy of the contract of purchase between Skeena and NWBC. The Monitor declined to provide a copy of this agreement on the basis that it was confidential. The agreement was never adduced into evidence.

15      In further correspondence, Skeena characterized its earlier letters to the appellants as having "served to clarify that the previously expired contract with Jasak and Clear Creek would not be reinstated." (My emphasis.) Again, however, since that characterization of the letters was not pursued by counsel in this court or the court below, I will proceed on the footing that the contracts were terminated, as opposed to not having been renewed. (In law, the distinction in this case may be insignificant.) The appellants were told that if they wished to vote on Skeena's Reorganization Plan, they would have to file proofs of claim by March 22. At the same time, Skeena told the appellants it was prepared to discuss future arrangements with them "for the continuation of their services to Skeena."

16      By March 22, the appellants did file conditional proofs of claim in the CCAA proceeding, claiming indebtedness in the amount of $2,925,315.14 in the case of Jasak Logging Ltd., and $2,896,680 in the case of Clear Creek Contracting Ltd. (Mr. Forstrom advised us that these amounts represented the present value of the income stream which the appellants stood to earn under their contracts over the next 50 years or so. I understand that apart from these 'future' losses, nothing was owing by Skeena to the appellants under their expired contracts.) The Monitor disallowed a portion of each claim and instead allowed a claim of $172,430.47 to Jasak and $166,670 to Clear Creek. The appellants notified the Monitor that they disagreed with its position.

17      On March 28, Jasak and Clear Creek filed a motion in Supreme Court seeking an order restraining Skeena from terminating their contracts and declaring them "in full force and effect and are binding upon the parties thereto". Alternatively, they sought the summary determination of the value of their respective claims as creditors in Skeena's plan of arrangement. However, before the motion could be heard, the meeting of Skeena's creditors took place and the Reorganization Plan was approved by the requisite numbers of each class. The appellants did not attend or vote at the meeting. On April 4, 2002 Skeena applied for and

Skeena Cellulose Inc., Re, 2003 BCCA 344, 2003 CarswellBC 1399

2003 BCCA 344, 2003 CarswellBC 1399, [2003] B.C.W.L.D. 467, [2003] B.C.J. No. 1335...

obtained court approval of the Plan. As earlier mentioned, NWBC closed its purchase of the shares of Skeena in accordance with the Reorganization Plan in early May. We are told that it has not yet resumed its logging operations.

18    The appellants' motion to have the termination of their contracts declared invalid was heard in Chambers on June 17 and was dismissed by the Chief Justice on September 4, 2002. His reasons are now reported at (2002), 5 B.C.L.R. (4th) 193 (B.C. S.C.).

### The Chief Justice's Reasons

19    After reciting the facts before him, the Chief Justice briefly summarized the purpose of the replaceable contract scheme and the nature of replaceable contracts. He noted that in Skeena's CCAA proceeding in 1997, Thackray J. (as he then was) had determined that the Court had the authority under the CCAA to allow Skeena to terminate replaceable logging contracts notwithstanding their unusual 'statutory' aspects. (See *Repap British Columbia Inc., Re* (June 11, 1997), Doc. Vancouver A970588 (B.C. S.C.).) Thackray J. had observed:

> I do not accept that allowing the petitioner to terminate renewable contracts is a striking down of the Provincial legislation. I mentioned several times to Mr. Ross that I could and do go so far as to find that there is legislat[ive] involvement in replaceable contracts under the *Forest Act*. However, I cannot accede to the position taken by Mr. Ross that these contracts attain some classification that makes them almost statutory contracts and thereby subject to some different rule of the law than general commercial contracts. There is no doubt that the parties are governed by the regulation and that the regulations forming part of the contract will govern many events by parties to the contracts. However the issue here is whether or not the contract is subject to the particular order that I gave under the *Companies' Creditors Arrangement Act*. I am of the opinion that it is subject to the order which I gave and that this Court had the jurisdiction to give that order. [para. 7]

20    The Chief Justice then turned to the questions of whether on this occasion, Skeena had complied with the "procedures and conditions" stipulated in the Come-back Order and whether the termination conformed to the "broader principles of economic necessity and fairness" underlying the Court's discretionary authority under the CCAA. In connection with the first question, he noted that the Come-back Order had authorized the termination of arrangements and agreements by Skeena only for the purpose of facilitating the "downsizing and consolidation of their business and operations (the 'Downsizing')". He noted the appellants' submission that although Skeena claimed to be "downsizing" its operations, it had maintained its timber harvesting rights and was planning to continue to harvest timber from them, presumably to the extent it always had in the past. On the other hand, there was the fact that the change in control of Skeena would result in a five percent reduction of Skeena's AAC, which Skeena proposed to reflect in a reduction in volume of timber allocated to "evergreen" contractors by approximately 160,000 cubic metres. The Chief Justice concluded that this reduction qualified as "Downsizing" for purposes of the Come-back Order. This conclusion was not specifically challenged on appeal.

21    In response to the appellants' objection that Skeena had terminated their contracts without first filing a report of the Monitor, the Chief Justice agreed that the letters of termination had been "issued untimely". He concluded, however, that since the appellants had had "clear and unequivocal notice", prior to the creditors' meeting, of Skeena's intention to terminate their contracts and to treat their claims as compromised under the Plan, they had not been prejudiced by the lack of strict compliance. (para. 41.)

22    The remaining question framed by the Chief Justice was whether Skeena's termination of two of its five replaceable logging contracts constituted an "inappropriate differentiation of treatment between the applicants and other [Skeena] creditors." (para. 42.) He noted that one of the unfortunate results of insolvency restructurings is that some persons suffer hardship. In this case, Skeena had had to terminate the employment of many individuals, its unsecured and secured creditors stood to recoup only a small fraction of their claims, and the Court had already dismissed an application brought by the Pulp, Paper and Research Institute of Canada similar to that brought by the appellants. The Court noted the comments of LoVecchio J. in *Blue Range Resource Corp., Re*, [1999] A.J. No. 788 (Alta Q.B.), to the effect that an order authorizing the termination of a contract is appropriate in a restructuring since, like others dealing with the insolvent corporation, the contracting party will have its claim for damages. But that claim should not be elevated above those of other contracting parties; as LoVecchio J. had stated:

A unilateral termination, as in any case of breach, may or may not give rise to a legitimate claim in damages. Although the Order contemplates and to a certain extent permits unilateral termination, nothing in section 16.e or in any other part of the Order would suggest that Blue Range is to be relieved of this consequence; indeed Blue Range's liability for damages seems to have been assumed by Duke and Engage in their set-off argument. The application amounts to a request for an order of specific performance or an injunction which ought not to be available indirectly. In my view, an order authorizing the termination of contracts is appropriate in a restructuring, particularly given that it does not affect the creditors' rights to claim for damages.

The Applicants are needless to say not happy about having to look to a frail and struggling company for a potentially significant damages claim. They will be relegated to the ranks of unsecured judgment creditors and may not, indeed likely will not, have their judgments satisfied in full. While I sympathise with the Applicants' positions, they ought not to, in the name of equity, the guide in CCAA proceedings, be able to elevate their claim for damages above the claims of all the other unsecured creditors through this route. [paras. 37-8]

23    Similarly in this case, the Chief Justice concluded that the applicants before him were "seeking to be put in a position superior to [Skeena's] other creditors." (para. 50.) In the result, since Thackray J. had already ruled that replaceable contracts could be terminated as part of a CCAA reorganization, and the appellants had had "full knowledge prior to the creditors' meetings that they would have claims under the Plan if their contracts were to be terminated", the Chief Justice saw no reason why the appellants should "in effect, be placed in a better position than other creditors." (para. 53.)

## ON APPEAL

24    On appeal, the appellants challenged both the Court's ruling on the question of notice and its substantive ruling that the Come-back Order validly permitted Skeena to terminate the appellants' "evergreen" contracts. Since Mr. Forstrom, counsel for the appellants, focussed on the second argument in his oral submissions in this court — and rightly so in my view — I will deal with it first. It is linked to the argument made by the intervenor, the Truck Loggers' Association, which challenges the court's constitutional and statutory jurisdiction to "permit" Skeena to terminate *any* replaceable logging contracts, contrary to what Mr. Maclean says is the intention of the *Forest Act*. Mr. Maclean submits that this legislation must prevail over what he characterized as the exercise of the court's "inherent jurisdiction" under the CCAA when the court approves an arrangement which includes the termination of a lease or other contract.

25    It may be useful at this point to review in greater depth the unusual scheme of replaceable contracts imposed by the *Forest Act*, and then to review the CCAA and the "inherent" or 'supervisory' jurisdiction exercised by the courts thereunder.

### The Forest Act Scheme

26    The Province first introduced a regime of statutorily-mandated logging contracts in 1991. The initial legislation was revised somewhat in 1996 when the present Regulation 22/96 to the *Forest Act* was enacted. Speaking in the Legislative Assembly in June 1991, the then Minister of Forests stated that the purposes of the legislation were to "address logging-contractor security in British Columbia", to "improve the balance in . . . contractual relationships" between holders of timber rights and logging contractors, and to provide a quick and inexpensive system for resolving disputes between them. The Minister drew an analogy between the desire of long-term licence holders for security of tenure from the Crown, and the needs of logging contractors and subcontractors, who also make large capital investments in logging equipment, for similar security vis-à-vis the licence holders. Accordingly, the *Forest Amendment Act, 1991*, c. 11, permitted the imposition of a series of requirements on the holders of certain classes of timber licences with respect to logging contracts already in existence, and logging contracts entered into thereafter.

27    Most of the provisions relevant to this appeal are contained in Regulation 22/96. Part 2, headed "Written Contracts and Subcontracts Required", states that persons entering into a timber harvesting contract or subcontract must do so in writing. If the terms of a contract do not comply with the Regulation, the parties are required to make reasonable efforts to cause the contract to do so. Every "replaceable contract" (defined in s. 152 of the Act) must provide that the contractor's interest thereunder

2003 BCCA 344, 2003 CarswellBC 1399, [2003] B.C.W.L.D. 467, [2003] B.C.J. No. 1335...

is assignable, subject to the consent of the licence holder, which consent may not be unreasonably withheld. As well, every contract must provide that all disputes between the parties in connection with the contract "will be referred to mediation and, if not resolved by the parties through mediation, will be referred to arbitration." (The Regulation leaves unsaid the apparent intention that neither party will have recourse to courts of law to resolve such disputes.) The *Commercial Arbitration Act*, R.S.B.C. 1996, c. 55, applies to such arbitrations, but there are also detailed rules in Regulation 22/96 for the mediation and arbitration proceedings and for the keeping of a publicly available "Register of Timber Harvesting Contract and Subcontract Arbitration Awards" by the Ministry of Forests.

28    Part 5 of the Regulation is headed "Replaceability of Contracts and Subcontracts". It requires that the holders of Crown licences carry out specified proportions of their timber harvesting operations by means of replaceable contracts. Different requirements apply to different classes of licence and to operations in the Coastal and Interior regions respectively. As I noted earlier, since Skeena operates in the Coastal region, it is required to harvest at least 50 percent of its timber by means of replaceable contracts.

29    Sections 13-15 of the Regulation deal with the commencement and expiration of replaceable contracts in the following terms:

13 (1) A replaceable contract must provide that

(a) if the contractor has satisfactorily performed its obligations under the contract, and conditional on the contractor continuing to satisfactorily perform the existing contract, <u>the licence holder must offer a replacement contract to the contractor</u>, and

(b) the replacement contract must

(i) <u>be offered 3 months or more before the expiry of the contract being replaced</u>,

(ii) provide that it commences on or before the expiry of the contract being replaced,

(iii) provide for payment to the contractor of amounts in respect of timber harvesting services as agreed to by the parties or, failing agreement, as determined under section 25, and

(iv) otherwise be on substantially the same terms and conditions as the contract it replaces.

(2) If a replaceable contract does not provide for an expiry date, the contract expires on the second anniversary of the date on which the contract commenced.

14(1) A replaceable contract must provide that, upon reasonable notice to the contractor, the licence holder may require, for bona fide business and operational reasons, that the contractor

(a) use different timber harvesting methods, technology or silvicultural systems,

(b) move into a new operating area, or

(c) undertake any other operating change necessary to comply with a direction made by a government agency or lawful obligation imposed by any federal, provincial or municipal government.

(2) A replaceable contract must provide that if a requirement made pursuant to subsection (1) results in a substantial change in the timber harvesting services provided by the contractor, <u>the contractor may, within 60 days of receiving notice under subsection (1), elect by notice in writing to the licence holder to terminate the replaceable contract</u> without incurring any liability to the licence holder.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2003 BCCA 344, 2003 CarswellBC 1399, [2003] B.C.W.L.D. 467, [2003] B.C.J. No. 1335...

(3) A replaceable contract must provide that, if a requirement is made pursuant to subsection (1) and the contractor does not elect to terminate the replaceable contract as provided for in subsection (2), either party may, within 90 days of the contractor receiving notice under subsection (1), request a review of the rate then in effect.

(4) If, after any changes in timber harvesting services required by the licence holder under subsection (1), the parties are unable to agree upon the rate to be paid for timber harvesting services, a rate dispute is deemed to exist.

15 A replaceable contract must provide that the contract terminates, to the extent that it relates to the licence, upon the cancellation, expiry or surrender of a licence under which the timber harvesting services provided by the contractor are carried out. [Emphasis added.]

30    The Regulation stipulates that if a dispute arises regarding the amount of work to be specified in a replaceable contract, the matter may be referred to arbitration under s. 24. The same is true of any dispute regarding the rates chargeable by the contractor for its work. The arbitrator must determine a rate that is reasonable and competitive by industry standards and which "would permit a contractor operating in a manner that is reasonably efficient in the circumstances in terms of costs and productivity to earn a reasonable profit."

31    Division 5 of the Regulation deals with reductions in work under a replaceable contract due to a reduction in AAC. If the Crown reduces the AAC under a harvesting licence, the holder "must apportion the effect of the reduction in AAC . . . proportionately among (i) all contractors holding replaceable contracts, and (ii) any company operations in respect of the licence." (s. 28(2)(d).) Alternatively, the holder may make a proposal either to reduce the AAC covered by one or more of its replaceable contracts or to terminate one or more such contracts. If the proposal is objected to by one or more of the affected contractors, a "dispute is deemed to exist" between the licence holder and the contractor(s). If not settled by mediation, this dispute must also be arbitrated in accordance with s. 32, which states in part:

(g) an arbitrator must resolve the dispute in the manner that the arbitrator believes most fairly takes into account each of the AAC reduction criteria; [and]

(h) for greater certainty, in making a decision with respect to the dispute

(i) an arbitrator is not restricted to choosing between any of the various AAC reduction proposals made by the parties to the arbitration, and

(ii) an arbitrator may make an award that includes the termination of one or more of the replaceable contracts, or reduces the amount of work available to any contractor or company operation in a manner that is not proportionate to the reduction in AAC. [Emphasis added.]

The Regulation defines the term "AAC reduction criteria" to mean each of the following factors:

(a) the amount of work specified in each replaceable contract to which the proposal relates;

(b) the relative seniority of each contractor with a replaceable contract;

(c) the economic impact of the proposal on the timber harvesting operations carried out under that licence by each contractor with a replaceable contract;

(d) the impact of the proposal on employment;

(e) the economic impact of the proposal on the licence holder; [and]

(f) the impact of the proposal on community stability; . . .

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2003 BCCA 344, 2003 CarswellBC 1399, [2003] B.C.W.L.D. 467, [2003] B.C.J. No. 1335...

32       As Mr. Forstrom points out, then, the statutorily-mandated terms of replaceable logging contracts "tie" them in a sense to Crown licences themselves. A licence holder must carry out a specified percentage of its logging through contractors under replaceable contracts. If the AAC under the licence is reduced, the work committed to by the licence holder in its replaceable contracts may also be reduced. If the licence is cancelled or surrendered, any replaceable contract referable thereto also terminates. Mr. Forstrom and Mr. Maclean go further, however, and argue that the "tie" confers a "special status" on the contractor and that the status must be recognized in the event of a breach of the obligation to renew or continue the contract, and must be reflected in any CCAA arrangement. I will return below to these arguments.

### The CCAA

33    Unlike the *Forest Act* and Regulation, the CCAA is very brief. It operates substantially through judge-made law interpreting and applying its 22 sections. For purposes of this appeal, the key ones are the following:

4. Where a compromise or an arrangement is proposed between a debtor company and its unsecured creditors or any class of them, the court may, on the application in a summary way of the company, of any such creditor or of the trustee in bankruptcy or liquidator of the company, order a meeting of the creditors or class of creditors, and, if the court so determines, of the shareholders of the company, to be summoned in such manner as the court directs.

5. Where a compromise or an arrangement is proposed between a debtor company and its secured creditors or any class of them, the court may, on the application in a summary way of the company or of any such creditor or of the trustee in bankruptcy or liquidator of the company, order a meeting of the creditors or class of creditors, and, if the court so determines, of the shareholders of the company, to be summoned in such manner as the court directs.

* * *

6. Where a majority in number representing two-thirds in value of the creditors, or class of creditors, as the case may be, present and voting either in person or by proxy at the meeting or meetings thereof respectively held pursuant to sections 4 and 5, or either of those sections, agree to any compromise or arrangement either as proposed or as altered or modified at the meeting or meetings, <u>the compromise or arrangement may be sanctioned by the court, and if so sanctioned is binding</u>

(a) <u>on all the creditors or the class of creditors, as the case may be</u>, and on any trustee for any such class of creditors, whether secured or unsecured, as the case may be, and on the company; and

(b) in the case of a company that has made an authorized assignment or against which a receiving order has been made under the *Bankruptcy and Insolvency Act* or is in the course of being wound up under the *Winding-up and Restructuring Act*, on the trustee in bankruptcy or liquidator and contributories of the company.

* * *

11. (1) Notwithstanding anything in the *Bankruptcy and Insolvency Act* or the *Winding-up Act*, where an application is made under this Act in respect of a company, the court, on the application of any person interested in the matter, may, subject to this Act, on notice to any other person or without notice as it may see fit, make an order under this section.

(2) An application made for the first time under this section in respect of a company, in this section referred to as an "initial application", shall be accompanied by a statement indicating the projected cash flow of the company and copies of all financial statements, audited or unaudited, prepared during the year prior to the application, or where no such statements were prepared in the prior year, a copy of the most recent such statement.

(3) A court may, on an initial application in respect of a company, make an order on such terms as it may impose, effective for such period as the court deems necessary not exceeding thirty days,

WestlawNext® CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Skeena Cellulose Inc., Re, 2003 BCCA 344, 2003 CarswellBC 1399

2003 BCCA 344, 2003 CarswellBC 1399, [2003] B.C.W.L.D. 467, [2003] B.C.J. No. 1335...

(a) staying, until otherwise ordered by the court, all proceedings taken or that might be taken in respect of the company under an Act referred to in subsection (1);

(b) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

(c) prohibiting, until otherwise ordered by the court, the commencement of or proceeding with any other action, suit or proceeding against the company.

(4) A court may, on an application in respect of a company other than an initial application, make an order on such terms as it may impose,

(a) staying, until otherwise ordered by the court, for such period as the court deems necessary, all proceedings taken or that might be taken in respect of the company under an Act referred to in subsection (1);

(b) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

(c) prohibiting, until otherwise ordered by the court, the commencement of or proceeding with any other action, suit or proceeding against the company.

. . . . .

(6) The court shall not make an order under subsection (3) or (4) unless

(a) the applicant satisfies the court that circumstances exist that make such an order appropriate; and

(b) in the case of an order under subsection (4), the applicant also satisfies the court that the applicant has acted, and is acting, in good faith and with due diligence.

34    There is now a large body of judge-made law which "fills the gaps" between these provisions. Most notably, courts appear to have given full effect to the "broad public policy objectives" of the Act, which in the phrase of a venerable article on the topic (Stanley E. Edwards, "Reorganizations under the Companies' Creditors Arrangement Act", (1947) 25 *Can. Bar Rev.* 587) are to "keep the company going despite insolvency" for the benefit of creditors, shareholders and others who depend on the debtor's continued viability for their economic success. As the author commented:

Hon. C.H. Cahan when he introduced the bill to the House of Commons indicated that it was designed to permit a corporation through reorganization to continue its business, and thereby to prevent its organization being disrupted and its goodwill lost. It may be that the main value of the assets of a company is derived from their being fitted together into one system and that individually they are worth little. The trade connections associated with the system and held by the management may also be valuable. In the case of a large company it is probable that no buyer can be found who would be able and willing to buy the enterprise as a whole and pay its going concern value. The alternative to reorganization then is often the sale of the property piecemeal for an amount which would yield little satisfaction to the creditors and none at all to the shareholders.

Reorganization may give to those who have a financial stake in the company an opportunity to salvage its intangible assets. To accomplish this they must ordinarily give up some of their nominal rights, in order to keep the enterprise going until business is better or defects in the management can be remedied. This object may be furthered by providing in the reorganization plan for such matters as a shift in control of the company or reduction of the fixed charges to such a degree as to make it possible to raise new money through new issues of bonds or shares. It may therefore be in the interest of all parties concerned to give up their claims against an insolvent company in exchange for new securities of lower nominal amount and later maturity date.

Skeena Cellulose Inc., Re, 2003 BCCA 344, 2003 CarswellBC 1399

2003 BCCA 344, 2003 CarswellBC 1399, [2003] B.C.W.L.D. 467, [2003] B.C.J. No. 1335...

*Public Interest*

Another reason which is usually operative in favour of reorganization is the interest of the public in the continuation of the enterprise, particularly if the company supplies commodities or services that are necessary or desirable to large numbers of consumers, or if it employs large numbers of workers who would be thrown out of employment by its liquidation. This public interest may be reflected in the decisions of the creditors and shareholders of the company and is undoubtedly a factor which a court would wish to consider in deciding whether to sanction an arrangement under the C.C.A.A. [at 592-3]

(See also Duff, C.J.C. in *Reference re Companies' Creditors Arrangement Act (Canada)* [1934] S.C.R. 659 (S.C.C.).)

35     In accordance with these objectives, Canadian courts have adopted a "standard of liberal construction" that serves the interests of a "broad constituency of investors, creditors and employees" and reflects "diverse societal interests." (See *Smoky River Coal Ltd., Re* (1999), 175 D.L.R. (4th) 703 (Alta. C.A.), at 721-2.) In *Hongkong Bank of Canada v. Chef Ready Foods Ltd.* (1990), 51 B.C.L.R. (2d) 84 (B.C. C.A.), for example, this court held that security granted under s. 178 of the *Bank Act* was not exempt from the CCAA provisions applicable to "security" and secured creditors, since otherwise a single creditor (in that case, a bank) could frustrate the objectives of the statute. Gibbs J.A. observed:

The purpose of the C.C.A.A. is to facilitate the making of a compromise or arrangement between an insolvent debtor company and its creditors to the end that the company is able to continue in business. It is available to any company incorporated in Canada with assets or business activities in Canada that is not a bank, a railway company, a telegraph company, an insurance company, a trust company, or a loan company. When a company has recourse to the C.C.A.A. the court is called upon to play a kind of supervisory role to preserve the status quo and to move the process along to the point where a compromise or arrangement is approved or it is evident that the attempt is doomed to failure. Obviously time is critical. Equally obviously, if the attempt at compromise or arrangement is to have any prospect of success there must be a means of holding the creditors at bay, hence the powers vested in the court under s. 11.

There is nothing in the C.C.A.A. which exempts any creditors of a debtor company from its provisions. The all encompassing scope of the Act qua creditors is even underscored by s. 8 which negates any contracting out provisions in a security instrument. And Chef Ready emphasizes the obvious, that if it had been intended that s. 178 security or the holders of s. 178 security be exempt from the C.C.A.A. it would have been a simple matter to say so. [at 88-9]

36     In connection with other "priority" issues — the power to grant priority to persons advancing debtor-in-possession ("DIP") financing and to the Monitor for the payment of its fees and disbursements before the payment of secured creditors — this court has called in aid Equity's ability to adapt to changing circumstances in order to achieve the objectives of the statute. In *United Used Auto & Truck Parts Ltd., Re* (2000), 16 C.B.R. (4th) 141 (B.C. C.A.), this court declined to follow an earlier case in which the Ontario Court of Appeal had ruled that the receiver of a partnership had no authority to subordinate the interests of secured creditors to liability for the receiver's disbursements, unless one of three exceptions applied. (See *Robert F. Kowal Investments Ltd. v. Deeder Electric Ltd.* (1975), 21 C.B.R. (N.S.) 201 (Ont. C.A.).) Mackenzie J.A. commented:

Houlden J.A. stated that these three exceptions were not exhaustive. Nonetheless the *Kowal* statement of exceptions has been influential in subsequent cases and they were applied by this Court in *Lochson Holdings Ltd. v. Eaton Mechanical Inc.* (1984), 55 B.C.L.R. 54 (C.A.). But as Macdonald J. observed in *Westar Mining*, supra at 93-94, different considerations apply under the *CCAA*. The court is concerned with the survival of the debtor company long enough to present a plan of reorganization. That is a broader interest than that of creditors alone. The jurisdiction must expand from the *Kowal* exceptions to serve that broader interest.

Thus the receivers' jurisdiction and the monitors' jurisdiction are analogous to the extent that they are both rooted in equity but they diverge to the extent that the monitors' jurisdiction serves a broader statutory objective under the *CCAA*. In my opinion the jurisdiction under the *CCAA* cannot be restricted to the *Kowal* exceptions. [paras. 21-22; emphasis added.]

In conclusion, he stated:

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 18 of 493

Skeena Cellulose Inc., Re, 2003 BCCA 344, 2003 CarswellBC 1399

2003 BCCA 344, 2003 CarswellBC 1399, [2003] B.C.W.L.D. 467, [2003] B.C.J. No. 1335...

In my opinion, <u>an equitable jurisdiction is available to support the monitor which is sufficiently flexible to be adapted to the monitor's role under the *CCAA*. It is a time honoured function of equity to adapt to new exigencies.</u> At the same time it should not be overlooked that costs of administration and DIP financing can erode the security of creditors and *CCAA* orders should only be made if there is a reasonable prospect of a successful restructuring. That determination is largely a matter of judgement for the judge at first instance and appellate courts normally will be slow to interfere with an exercise of discretion.

In my opinion, <u>super-priority for DIP financing rests on the same jurisdictional foundation in equity</u>. Priority for the reasonable restructuring fees and disbursements could have been allowed as part of DIP financing. It is immaterial that they have been allowed here as part of the administration charge. [paras. 30-31; emphasis added.]

(I understand that leave to appeal *United Used Auto & Truck Parts Ltd.* was granted by the Supreme Court of Canada [*United Used Auto & Truck Parts Ltd., Re*, 2000 CarswellBC 2132 (S.C.C.)], but that the case settled before the appeal was heard.)

37    In the exercise of their 'broad discretion' under the CCAA, it has now become common for courts to sanction the indefinite, or even permanent, affecting of contractual rights. Most notably, in *Dylex Ltd., Re* (1995), 31 C.B.R. (3d) 106 (Ont. Gen. Div. [Commercial List]), Farley J. followed several other cases in holding that in "filling in the gaps" of the CCAA, a court may sanction a plan of arrangement that includes the termination of leases to which the debtor is a party. (See also the cases cited in *Dylex*, at para. 8; *Re T. Eaton Co.* (1999), 14 C.B.R. (4th) 288 (Ont. S.C.), at 293-4; *Smoky River Coal Ltd.*; *supra*, and *Armbro Enterprises Inc., Re* (1993), 22 C.B.R. (3d) 80 (Ont. Bktcy.), at para. 13.) In the latter case, R.A. Blair J. said he saw nothing in principle that precluded a court from "interfering with the rights of a landlord under a lease, in the CCAA context, any more than from interfering with the rights of a secured creditor under a security document. Both may be sanctioned when the exigencies of the particular re-organization justify such balancing of the prejudices." In its recent judgment in *Mine Jeffrey inc., Re*, [2003] Q.J. No. 264 (Que. C.A.), the Quebec Court of Appeal observed that "A review of the jurisprudence shows that the debtor's right to cancel contracts prejudicial to it can be provided for in an order to stay proceedings under s. 11." (para. 74.)

38    But in approving and implementing compromises and arrangements under the statute, courts are concerned with more than the efficacy of the plans before them and their acceptability to creditors. Courts also strive to ensure fairness as between the unsecured, secured and preferred creditors of the corporation and as between the debtor and its creditors generally. In the article from which I have already quoted, Stanley Edwards also wrote:

In addition to being feasible, <u>a reorganization plan should be fair and equitable as between the parties</u>. In order to make the Act workable it has been necessary to permit a majority of each class, with court approval, to bind the minority to the terms of an arrangement. This provision is justified as a precaution that minorities should not be permitted to block or unduly delay the reorganization for reasons that are not common to other members of the same class of creditors or shareholders, or are contrary to the public interest. If small groups are placed in too strong a position they become capable of acquiring a nuisance value which will make it necessary for the reorganizers to buy them off at a high price in order to effectuate the plan successfully. However, <u>care should be taken that this statutory power of binding minorities should not be utilized to confiscate the legitimate claims of those minorities or of any class of creditors or shareholders.</u> [at 595; emphasis added.]

39    This theme has been repeated and refined in various cases over the years as CCAA courts have struggled with increasingly complex forms of debt and security and with increasingly complicated plans of arrangement. In current terms, the principle of equity is expressed as a concern to see that a plan of arrangement is fair and reasonable and represents an attempt to "balance interests (and have the pain of the compromise equitably shared) as opposed to a confiscation of rights". (*Per* Farley J. in *Sammi Atlas Inc., Re* (1998), 3 C.B.R. (4th) 171 (Ont. Gen. Div. [Commercial List]), at 173.) Elsewhere, it has been said that one measure of what is "fair and reasonable" is the "extent to which the proposed Plan treats creditors equally in their opportunities to recover, consistent with their security rights, and whether it does so in a non-intrusive and as non-prejudicial a manner as possible." (*Per* Blair J. in *Olympia & York Developments Ltd.* (1993), 12 O.R. (3d) 500 (Ont. Gen. Div.), at 513.) At the same time, fairness and reasonableness are not "abstract notions, but must be measured against the available commercial alternative."

Skeena Cellulose Inc., Re, 2003 BCCA 344, 2003 CarswellBC 1399

2003 BCCA 344, 2003 CarswellBC 1399, [2003] B.C.W.L.D. 467, [2003] B.C.J. No. 1335...

Thus in *Canadian Airlines Corp., Re*, [2000] A.J. No. 771, [2000] 10 W.W.R. 269 (Alta. Q.B.), the Court summarized the interaction between the objectives of a CCAA arrangement and the principles of fairness and reasonableness as follows:

In determining whether to sanction a plan of arrangement under the CCAA, the court is guided by two fundamental concepts: "fairness" and "reasonableness". While these concepts are always at the heart of the court's exercise of its discretion, their meanings are necessarily shaped by the unique circumstances of each case, within the context of the Act and accordingly can be difficult to distill and challenging to apply. Blair J. described these concepts in *Olympia and York Dev. Ltd. v. Royal Trust Co.*, *supra*, at page 9:

"Fairness" and "reasonableness" are, in my opinion, the two keynote concepts underscoring the philosophy and workings of the Companies' Creditors Arrangement Act. Fairness is the quintessential expression of the court's equitable jurisdiction - although the jurisdiction is statutory, the broad discretionary powers given to the judiciary by the legislation which make its exercise an exercise in equity - and "reasonableness" is what lends objectivity to the process.

The legislation, while conferring broad discretion on the court, offers little guidance. However, the court is assisted in the exercise of its discretion by the purpose of the CCAA: to facilitate the reorganization of a debtor company for the benefit of the company, its creditors, shareholders, employees and, in many instances, a much broader constituency of affected persons. Parliament has recognized that reorganization, if commercially feasible, is in most cases preferable, economically and socially, to liquidation: *Norcen Energy Resources Ltd. v. Oakwood Petroleums Ltd.*, [1989] 2 W.W.R. 566 at 574 (Alta. Q.B.); *Northland Properties Ltd. v. Excelsior Life Insurance Co. of Canada*, [1989] 3 W.W.R. 363 at 368 (B.C.C.A.).

The sanction of the court of a creditor-approved plan is not to be considered as a rubber stamp process. Although the majority vote that brings the plan to a sanction hearing plays a significant role in the court's assessment, the court will consider other matters as are appropriate in light of its discretion. In the unique circumstances of this case, it is appropriate to consider a number of additional matters:

a. The composition of the unsecured vote;

b. What creditors would receive on liquidation or bankruptcy as compared to the Plan;

c. Alternatives available to the Plan and bankruptcy;

d. Oppression;

e. Unfairness to Shareholders of [the debtor]; and

f. The public interest. [paras. 94-96]

40    Of course, there are also statutory and constitutional limitations on the court's exercise of its authority under the CCAA. The Supreme Court of Canada's decision in *Baxter Student Housing Ltd. v. College Housing Co-operative Ltd.* (1975), [1976] 2 S.C.R. 475 (S.C.C.) confirmed that it is beyond the authority of a CCAA court to provide for a priority that runs contrary to the express terms of a statute (in that case, the *Mechanics Lien Act* of Manitoba.) Thus in *Baxter*, the fact that the provincial legislation created a lien having priority over "all judgments, executions, assignments, attachments, garnishments and receiving orders", precluded an order granting CMHC priority for new advances over and above all prior registered liens. Dickson J. (as he then was) stated for the Court:

. . . the inherent jurisdiction of the Court of Queen's Bench is not such as to empower a judge of that Court to make an order negating the unambiguous expression of the legislative will. The effect of the order made in this case was to alter the statutory priorities which a Court simply cannot do. [at 480; emphasis added.]

41    *Baxter* continues to be applied today: see *Royal Oak Mines Inc., Re* (1999), 7 C.B.R. (4th) 293 (Ont. Gen. Div. [Commercial List]) and *Westar Mining Ltd., Re* (1992), 70 B.C.L.R. (2d) 6 (B.C. S.C.). However, the Court in *United Used Auto & Truck Parts*

2003 BCCA 344, 2003 CarswellBC 1399, [2003] B.C.W.L.D. 467, [2003] B.C.J. No. 1335...

*Ltd.* distinguished *Baxter* on the basis that the former did not involve an express statutory priority that could not be overcome by the Court's equitable jurisdiction. Mackenzie J.A. noted that the receiver's jurisdiction originates in the "equitable jurisdiction of the Court of Chancery and [that] while that jurisdiction cannot be exercised contrary to a statute, nothing precludes its exercise to supplement a statute and effect a statutory object." (para. 18.)

42    It may be unnecessary to add that in cases of direct or express conflict between the CCAA itself and a provincial statute, the doctrine of paramountcy would apply and the federal statute would prevail. The only case brought to our attention which, on its face at least, applied the doctrine of paramountcy in the CCAA context was *Sulphur Corp. of Canada Ltd., Re*, [2002] A.J. No. 918 (Alta. Q.B.). In addressing the question of whether the Court had the authority to permit DIP financing ranking in priority to liens registered under the *Builders' Lien Act* of British Columbia, LoVecchio J. distinguished *Baxter* and *Royal Oak Mines Inc.*, *supra*, on the basis that the discretion to grant priority for DIP financing was grounded in s. 11 of the CCAA rather than purely in the court's inherent jurisdiction. (This, at least, is what I draw from the Court's comments at paras. 35-37.) Seeing the case before him as involving a conflict between a federal statute and a provincial statute, LoVecchio J. ruled that the former prevailed and that in exercising its jurisdiction under the CCAA, the Court could grant priority for DIP financing. (See also *Pacific National Lease Holding Corp. v. Sun Life Trust Co.* (1995), 10 B.C.L.R. (3d) 62 (B.C. C.A.).)

### The Issues in this Case

43    Against this background, I turn at last to the substantive questions raised by the intervenor and the appellants respectively — did the Chambers judge have the jurisdiction to include in the Come-back Order provisions that contemplated the termination of *any* replaceable logging contracts; and if so, did he err by failing to consider whether the appellants would be treated fairly in relation to Skeena's other replaceable contractors or by failing to consider whether the termination of the appellants' contracts was, in their words, "a necessary or justifiable part of [Skeena's] reorganization plan at all"?

### Jurisdiction

44    On behalf of the Truck Loggers' Association, Mr. Maclean contended that the Chambers judge had strayed outside his jurisdiction because nothing in s. 11 of the CCAA (which permits the granting of a stay) extends to the termination of a contract. On this view, any authority to sanction a termination must originate not in the statute, but in the Court's inherent jurisdiction. Based on the authority of *Baxter*, *Royal Oak Mines Inc.* and *Westar Mining Ltd.*, the intervenor submits that the court's inherent jurisdiction cannot be used to override legislation such as the *Forest Act* and Regulation 22/96.

45    It is true that in "filling in the gaps" or "putting flesh on the bones" of the CCAA — for example, by approving arrangements which contemplate the termination of binding contracts or leases — courts have often purported to rely on their "inherent jurisdiction". Farley J. did so in *Dylex*, for example, at para. 8, and in *Royal Oak Mines Inc.*, *supra*, at para. 4, the latter in connection with the granting of a "superpriority"; and Macdonald J. did so in *Westar Mining Ltd.*, *supra*, at 8 and 13. The court's use of the term "inherent jurisdiction" is certainly understandable in connection with a statute that confers broad jurisdiction with few specific limitations. But if one examines the strict meaning of "inherent jurisdiction", it appears that in many of the cases discussed above, the courts have been exercising a discretion given by the CCAA rather than their inherent jurisdiction. In his seminal article, "The Inherent Jurisdiction of the Court", (1970) 23 *Current Legal Problems*, Sir J.H. Jacob, Q.C., writes that the inherent jurisdiction of a superior court of law is "that which enables it to fulfill itself as a court of law." The author explains:

On what basis did the superior courts exercise their powers to punish for contempt and to prevent abuse of process by summary proceedings instead of by the ordinary course of trial and verdict? The answer is, that the jurisdiction to exercise these powers was <u>derived, not from any statute or rule of law, but from the very nature of the court as a superior court of law, and for this reason such jurisdiction has been called "inherent."</u> This description has been criticized as being "metaphysical," but I think nevertheless it is apt to describe the quality of this jurisdiction. For the essential character of a superior court of law necessarily involves that it should be invested with <u>the power to maintain its authority and to prevent its process being obstructed and abused</u>. Such a power is intrinsic in a superior court; it is its very life-blood, its very essence, its immanent attribute. Without such a power, the court would have form but would lack substance. . . . The

2003 BCCA 344, 2003 CarswellBC 1399, [2003] B.C.W.L.D. 467, [2003] B.C.J. No. 1335...

juridical basis of this jurisdiction is therefore <u>the authority of the judiciary to uphold, to protect and to fulfill the judicial function of administering justice according to law in a regular, orderly and effective manner.</u> [at 27-28; emphasis added]

The author also notes that unlike inherent jurisdiction, the source of statutory jurisdiction "is of course the statute itself, which will define the limits within which such jurisdiction is to be exercised, whereas the source of inherent jurisdiction of the court is derived from its nature as a court of law, so that the limits of such jurisdiction are not easy to define, and indeed appear to elude definition." (at 24.)

46    Applying this distinction to the issue at hand, I think the preferable view is that when a court approves a plan of arrangement under the CCAA which contemplates that one or more binding contracts will be terminated by the debtor corporation, the court is not exercising a power that arises from its nature as a superior court of law, but is exercising the discretion given to it <u>by the CCAA.</u> (As to the meaning of "discretion" in this context, see S. Waddams, "Judicial Discretion", (2001) 1 *Cmnwth. L.J.* 59.) This is the discretion, given by s. 11, to stay proceedings against the debtor corporation and the discretion, given by s. 6, to approve a plan which appears to be reasonable and fair, to be in accord with the requirements and objects of the statute, and to make possible the continuation of the corporation as a viable entity. It is these considerations the courts have been concerned with in the cases discussed above, rather than the integrity of their own process.

47    In saying this, I leave to one side the jurisdiction of the court to make special provision for the payment of the fees and expenses of a monitor appointed under the CCAA. The monitor's functions are of course analogous to those of a receiver — traditionally a creature of Equity. I suspect that this particular power may be properly described as both an equitable jurisdiction and a statutory discretion. As this court said in *United Used Auto*, nothing precludes the exercise of the equitable jurisdiction of the Court of Chancery to "supplement a statute and effect a statutory object." (para. 18.) In any event, the distinction between these two sources of authority is one that, in my mind at least, 'eludes definition'.

48    Returning, then, to the intervenor's argument, the first question posed by it must in my view be revised to whether the Chief Justice erred in purporting to exercise the <u>statutory discretion</u> given by the CCAA in a manner that conflicts with the *Forest Act*. But the second branch of the question also incorporates an assumption that is problematic. Can it be said that the Come-back Order conflicts with the *Forest Act* or the scheme created thereby? It is true that the Act and Regulation contemplate a perpetual series of contracts (provided the contractor fulfils its obligations thereunder) and contemplate the termination of a replaceable contract only in the event of a reduction in AAC or the expiration or surrender of the licence. But nothing in the legislation to which we were referred purports to <u>invalidate</u> a termination of a replaceable logging contract by the licence holder or to require that a court make an order for specific performance in the event of such a termination. (In a CCAA context, such an order would be very unlikely, as well as futile.) The licence holder will of course be liable in damages for breach of contract, giving rise to a "claim" against the debtor corporation under the CCAA. The licence holder may also be in breach of one or more of its obligations under the Act; but ultimately, a logging contract is still a "contract" at law, notwithstanding that many of its terms are dictated by the legislation for the protection and security of the contractor.

49    Thus I disagree with the intervenor's assertion that the effect of the Come-back Order was to "eliminate" the licence holder's "statutory obligation under the *Forest Act* to replace the contract and to eliminate the other conditions that are required by the Regulation to be included in the contract." In fact, the renewal of the appellants' contracts was not required by the <u>Act</u> *per se*; what the Act required was that each of their contracts contain a clause requiring renewal. It was those <u>contractual</u> terms which were breached. The licence holder's obligations, mandated by the scheme, were not "eliminated" by the Come-back Order or even by Skeena: having been breached, the obligations are recognized as giving rise to claims against the corporation either for specific performance or for damages.

50    It follows in my view that in approving an arrangement in which the debtor corporation terminates a replaceable logging contract, a CCAA court is not overriding "provincial legislation" as the intervenor contends. Nor is the court "overriding" the terms of the contract: it is merely exercising the discretion given to it by the statute to approve a plan of arrangement. The breach of contract is recognized as a matter of fact by the court, but is not "permitted" in the sense that the licence holder is somehow immunized from the usual consequences of its breach at law or in Equity. Finally, even if the *Forest Act* or Regulation did prohibit the termination of replaceable contracts, the federal government's powers with respect to bankruptcy and insolvency

2003 BCCA 344, 2003 CarswellBC 1399, [2003] B.C.W.L.D. 467, [2003] B.C.J. No. 1335...

would become applicable once the CCAA was invoked and the doctrine of paramountcy would operate to resolve any direct conflict.

### The Exercise of the Court's Discretion

51      The appellants and the intervenor argued that even if the Court did have the authority to grant the Come-back Order on the terms it did, the Chief Justice erred in failing to exercise his discretion so as to achieve "fairness" between the appellants and Skeena's three other logging contractors, whose contracts were, in theory at least, unaffected by the Reorganization Plan. As I mentioned earlier, both the appellants and the intervenor contend that contractors under replaceable contracts have "special status" as persons entitled to share in the benefits of a Crown resource (timber) and that the *Forest Act* scheme is predicated on fairness between them, and between them and the holders of Crown licences. They note that the Chief Justice referred in his "fairness" analysis only to the question of whether the Order differentiated inappropriately "between the applicants and other [Skeena] creditors" and made no reference to fairness as between the appellants and the other three contractors or as between the appellants and Skeena itself. In Mr. Forstrom's submission, it is unfair that his clients should suffer the loss of their very significant income streams under the replaceable contracts when the other three contractors will suffer no such loss, and when the licence holder itself suffers only the loss of five percent of its AAC under the *Forest Act*. (In fact, it is possible the Minister may revoke that reduction upon application by Skeena under s. 56.1 of the Act.) In essence, the argument of the appellants is "Why us?"

52      It is trite law that the scope of review open to an appellate court in respect of the exercise of discretion of a CCAA court (or any other court) is narrow. In *Pacific National Lease Holding Corp., Re* (1992), 72 B.C.L.R. (2d) 368 (B.C. C.A. [In Chambers]), Macfarlane J.A. (in Chambers) observed that this court should exercise its powers "sparingly" when asked to intervene in this context. In his words:

> In supervising a proceeding under the C.C.A.A. orders are made, and orders are varied as changing circumstances require. . . . In that context appellate proceedings may well upset the balance, and delay or frustrate the process under the C.C.A.A. [para. 32]

Macfarlane J.A.'s comments were echoed by the Alberta Court of Appeal in *Smoky River Coal*, *supra*, where Hunt J.A. noted at para. 61 that ". . . Parliament, mindful that CCAA cases often require quick decision-making, intended that most decisions be made by the supervising judge. This supports the view that those decisions should be interfered with only in clear cases."

53      Another principle informing the court's task flows from the fact that a plan of arrangement approved by the court is not the plan of the court. It is a compromise arrived at by the debtor company and the requisite number of its creditors. The court should not readily interfere with their business decision, especially where the plan has been approved by a high percentage of creditors. As observed by Blair J. in *Re Olympia & York*, *supra*, "[I]t is not my function to second guess the business people with respect to the 'business' aspects of the Plan, descending into the negotiating arena and substituting my own view of what is a fair and reasonable compromise or arrangement for that of the business judgment of the participants. The parties themselves know best what is in their interests in those areas." (at 510.) (See also *Sammi Atlas Inc., Re*, *supra*, at para. 5, and *Northland Properties Ltd., Re* (1989), 73 C.B.R. (N.S.) 195 (B.C. C.A.), at 205, *per* McEachern C.J.B.C.)

54      In this case, the chief executive officer of NWBC and Skeena provided the Chambers judge below with an explanation as to why they chose to reduce the volume of timber allocated to Skeena's evergreen contractors, and why they chose to terminate the contracts of the appellants rather than to terminate all five contracts or reduce the work allocated to all five. I have already mentioned Mr. Veniez's affidavit evidence (see para. 11 above) that the cost to Skeena of logs produced by each of the appellants was greater than those produced by the other three contractors and that NWBC made it a "condition of going forward with the acquisition of Skeena, that Skeena take steps within the context of the CCAA proceedings to terminate the Clear Creek and Jasak contracts."

55      In this court, Mr. Forstrom asked us to discount Mr. Veniez's evidence, contending that since the appellants' objections to the Come-Back Order had been known to NWBC when it completed its purchase of the Skeena shares, NWBC must be

2003 BCCA 344, 2003 CarswellBC 1399, [2003] B.C.W.L.D. 467, [2003] B.C.J. No. 1335...

taken to have effectively "waived" this condition. I am not persuaded that such an inference necessarily follows from NWBC's completion of the Plan. At that time, the Come-back Order clearly authorized the termination of replaceable logging contracts, and the validity of a similar order had been upheld by Thackray J. in 1997. It may be that in deciding to proceed, NWBC undertook a risk that the appellants would be successful either before the Chief Justice or on appeal, but we have no evidence as to what concessions NWBC may have obtained to protect against that risk.

56     As for the argument that the appellants' contracts were no less costly to Skeena than those of the other three contractors (since the rates chargeable under all five contracts were subject to arbitration), Mr. Veniez deposed:

13. I acknowledge that the Contract Regulation dictates that any rates determined according to this process must be determined according to what a licence-holder and a contractor acting reasonably in similar circumstances would agree is a rate that is competitive by industry standards. However, this provides little comfort to licence-holders such as Skeena, because ultimately rates under the Contract Regulation are determined on a cost-plus reasonable profit for replaceable contractors basis which, in my view, acts as a significant disincentive for replaceable contractors to be cost effective on an ongoing basis.

14. On the contrary, the Contract Regulation in my view creates a legislated disincentive for evergreen contractors to control their cost structures, because volumes under these contracts are guaranteed. This results in high costs being passed on to Skeena.

15. Prior to NWBC's acquisition of Skeena, and the termination of the replaceable contract that has given rise to this application, I was advised that Skeena, on average, paid approximately 10% more for work done under replaceable contracts than work done pursuant to contracts issued after a competitive bid process. Indeed, I am advised by Derrick Curtis, Skeena's Terrace Woodland's Manager, that in March 2001 Skeena put out to tender a harvesting contract (Setting S83303), consisting of roughly 20,000 m$^3$, and received tenders from both evergreen and non-evergreen contractors. The latter offered significantly lower rates ($23.95/m$^3$ vs. $27.85/m$^3$, a difference of $3.90/m$^3$), resulting in a 14% reduction in costs to Skeena. [Emphasis added.]

57     There was, then, a "business case" for the actions taken by Skeena and NWBC vis-à-vis the appellants. Clear Creek and Jasak did not apply to cross-examine Mr. Veniez on this evidence, and did not bring anything to our attention which would cast doubt on his statements. In these circumstances, the Chambers judge was entitled to take seriously the assertion that the termination of the appellants' contracts would save Skeena a considerable sum per year and that that fact was important to the only purchaser willing to make an offer acceptable to the requisite number of creditors. In the terminology used by Mr. Forstrom, there was a "causal link" between the terminations and the chances of success of the Reorganization Plan. For this reason, I do not agree with his submission that *Dylex* is different in principle from the case at bar: the appellants' contracts in particular were said to be too costly for Skeena to continue operating under them, in the same way the terminated leases were said to be too costly for Dylex to continue leasing under them. And, weighing Dylex's precarious financial position against that of the landlord (which was described as "less than robust"), the Court 'gave the nod' to the insolvent corporation, rejecting the proposition that Dylex should have to prove that without the three proposed closures (of leases), its proposal would not be viable. (*supra*, para. 10.)

58     In this case, the appellants deposed that the evergreen contracts were important to them, particularly for financing purposes. Mr. Rigsby, the controller of Clear Creek, for example, deposed:

26. Clear Creek requires its Replaceable Contract in order to obtain financing for capital costs. Lending institutions require that Clear Creek has a replaceable contract when considering lending money to, or financing equipment for, Clear Creek. Within the logging industry, it is very difficult to obtain financing without the security of a replaceable contract.

. . . . .

Skeena Cellulose Inc., Re, 2003 BCCA 344, 2003 CarswellBC 1399

2003 BCCA 344, 2003 CarswellBC 1399, [2003] B.C.W.L.D. 467, [2003] B.C.J. No. 1335...

30. Clear Creek remains capable of properly capitalising itself, and maintaining its own equipment and other capital investments in good working order, provided that it has a replaceable contract. If Clear Creek's replaceable contract remains in place, Clear Creek will be able to provide competitive, cost-effective, and efficient services and rates to [Skeena] . . . .

59     This evidence brings us squarely to the question of fairness. As already noted, for purposes of the CCAA, the court must be satisfied that the arrangement proposed is "fair, reasonable and equitable." Courts have made it clear that "equity" is not necessarily "equality"; in the words of Farley J. in *Sammi Atlas Inc., Re*:

A Plan under the CCAA is a compromise; it cannot be expected to be perfect. It should be approved if it is fair, reasonable and equitable. Equitable treatment is not necessarily equal treatment. Equal treatment may be contrary to equitable treatment. One must look at the creditors as a whole (i.e. generally) and to the objecting creditors (specifically) and see if rights are compromised in an attempt to balance interests (and have the pain of the compromise equitably shared) as opposed to a confiscation of rights . . . . [para. 4]

60     I have no difficulty in accepting the appellants' argument that fairness as between them and the other three evergreen contractors and as between the appellants and Skeena was a legitimate consideration in the analysis in this case. (Indeed, I believe the Chief Justice considered this aspect of fairness, even though he did not mention it specifically in this part of his Reasons.) The appellants are obviously part of the "broad constituency" served by the CCAA. But the key to the fairness analysis, in my view, lies in the very breadth of that constituency and wide range of interests that may be properly asserted by individuals, corporations, government entities and communities. Here, it seems to me, is where the flaw in the appellants' case lies: essentially, they wish to limit the scope of the inquiry to fairness as between five evergreen contractors or as between themselves and Skeena, whereas the case-law decided under the CCAA, and its general purposes discussed above, require that the views and interests of the "broad constituency" be considered. In the case at bar, the Court was concerned with the deferral and settlement of more than $400,000,000 in debt, failing which hundreds of Skeena's employees and hundreds of employees of logging and other contractors stood to lose their livelihoods. The only plan suggested at the end of the extended negotiation period to save Skeena from bankruptcy was NWBC's acquisition of its common shares for no consideration and the acceptance by its creditors of very little on the dollar for their claims. As the Chief Justice noted, many individuals and corporations, as well as the Province, incurred major losses under the Plan. Each of them might also ask "Why me?" However, as he also noted, that is a frequent and unfortunate fact of life in CCAA cases, where the only "upside" is the possibility that bankruptcy and even greater losses will be averted.

61     As has been seen, the purchaser required as a condition of proceeding with the Reorganization Plan that the appellants' contracts be terminated. In the absence of evidence that Skeena or the purchaser was motivated by anything other than a desire to improve the debtor corporation's financial prospects for survival post-arrangement, it cannot in my view be said that the Chambers judge erred in ruling that the termination of the appellants' replaceable contracts was a valid part of the Reorganization Plan in this case.

### Procedural Question

62     The second ground of appeal advanced by the appellants was that since Skeena had failed to comply strictly with the requirements of the Come-back Order in relation to the termination of their contracts, the terminations were null and void. In response to the Chief Justice's conclusion that the appellants had not been prejudiced by the failure to give timely notice, the appellants submitted that the terminations could not have been effective until 21 days after they received the Monitor's Eleventh Report. In the meantime, the creditors' meeting took place. The appellants contend that since there was uncertainty as to whether their contracts had been validly terminated or would be terminated, it was unclear whether they were entitled to vote at the meeting. Accordingly, they submit that they:

. . . were effectively disenfranchised in the *CCAA* proceeding. The Come-Back Order contemplates that the effectiveness of any proposed termination of a replaceable logging contract will be determined in a timely way, before the Plan of reorganisation is submitted to the creditors for approval. By failing to give proper notice, [Skeena] created uncertainty

about both when and if the Appellants' contracts would be terminated. The Appellants were only entitled to vote in relation to the Plan if they acknowledged that the termination of their contracts was effective when the initial (and clearly invalid) notice was given on March 1, 2002.

This placed the Appellants on the horns of a dilemma. Had the Appellants exercised the right to vote on April 2,2002, based on the premise that their contracts had been terminated, they would be guilty of approbation and reprobation in relation to their position that no valid notice of termination had yet been given and that their contracts remains in force. [Skeena] structured the approval process in such a way that the Appellants would effectively be required to waive their right to proper notice of termination under the Come-Back Order in order to vote on the Plan.

63    In response, Skeena emphasizes that the appellants did file proofs of claim with the Monitor prior to the creditors' meeting. Skeena says the Chief Justice was correct in concluding that the appellants were not prejudiced in fact, since if it is ultimately determined that the replaceable logging contracts were not validly terminated, the appellants will be free to withdraw their proofs of claim; and if the contracts were validly terminated, the appellants will share *pro rata* under the Plan with Skeena's other unsecured creditors once the amounts of all claims have been finally determined.

64    As for the proposition that the appellants could not both reprobate and approbate, Skeena notes that "conditional voting" was permitted by the Monitor in light of the time pressures attendant upon the approval of the Plan. These led the Monitor to allow voting even by those claimants whose claims it had disallowed. The Monitor noted their particular ballots as "objected to" in case the votes cast by them ultimately had an impact on the outcome of the vote for the applicable class. Mr. Zuk, the chair and claims officer for the meeting, deposed that even if all of the disallowed claims were reversed and the appellants' votes were counted, the result would not have been affected. This statement was not challenged by the appellants.

65    In these circumstances, I cannot agree with the appellants that the delay in their receipt of notice of the terminations of their contracts and the delay in the processing of their proofs of claim were prejudicial to them. It is certainly unfortunate that these delays occurred, but there is no evidence (as opposed to speculation) that the delays were the result of bad faith or deliberate omission. On the other hand, the appellants could have had little doubt that they faced major difficulties once the initial CCAA order was granted (September 5, 2001) and once the "replacement" deadline of September 30 passed. Ultimately, the effect of the delay in their receipt of formal notice made no difference to the appellants' position and did not influence the approval of the Reorganization Plan one way or the other, especially given the small amount allowed by the Monitor in respect of the appellants' claims in relation to Skeena's indebtedness. The appellants chose not to attend the meeting and not to vote, even on a conditional basis. In these circumstances, the Chief Justice correctly recognized that, as stated by Rowles J.A. for the Court in *Cam-Net Communications v. Vancouver Telephone Co.* (1999), 71 B.C.L.R. (3d) 226 (B.C. C.A.), a supervising court under the CCAA must be alert to the incentive for creditors to "avoid the reorganization compromise" and must "scrutinize carefully any action by a creditor which would have the effect of giving it an advantage over the general body of creditors." (para. 20.)

66    Moreover, the arguments which the appellants would have made at the show cause hearing have now been made in the Supreme Court and in this court. If my analysis is correct, they would have failed even if the Court's approval of the Reorganization Plan had been delayed in accordance with the apparent intent of the Come-back Order.

67    I cannot say the Chief Justice was wrong in concluding that Skeena's failure to give timely notice was anything other than a procedural error without prejudicial consequences. I would dismiss this ground of appeal, as well as the substantive grounds, for the reasons I have given.

**Hall J.A.:**

   I agree.

**Levine J.A.:**

   I agree.

*Appeal dismissed.*

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

**Skeena Cellulose Inc., Re, 2003 BCCA 344, 2003 CarswellBC 1399**

2003 BCCA 344, 2003 CarswellBC 1399, [2003] B.C.W.L.D. 467, [2003] B.C.J. No. 1335...

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 137

2005 CarswellOnt 5060, [2005] O.J. No. 4887, 47 C.L.R. (3d) 311

2005 CarswellOnt 5060
Ontario Master

Skyway Canada Ltd. v. Clara Industrial Services Ltd.

2005 CarswellOnt 5060, [2005] O.J. No. 4887, 47 C.L.R. (3d) 311

# Skyway Canada Limited v. Clara Industrial Services Ltd. et. al.

Master MacLeod

Judgment: October 19, 2005
Docket: 05-CV-283515PD 1

Counsel: Robert Kennaley for Defendant / Moving Party, Safespan Systems Inc.
Ken Eccleston for Plaintiff
Matthew Alter, Cullen Price for Defendant, Clara Industrial Services Ltd.

Subject: International; Contracts

## Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

## Headnote

### Conflict of laws --- Contracts — Choice of law — Forum conveniens — General principles

C Ltd. was hired as general contractor for bridge commission to clean, paint and metalize bridge between Ontario and New York — S Inc., an American corporation in New York, was distributor and licensee of platform system designed for working on bridges — S Ltd. was Canadian distributor of S Inc. under agreement which contained choice of law and forum clause, stating New York law would govern and that parties would submit to exclusive jurisdiction of courts of New York — S Inc. and S Ltd. were hired by C Ltd. as sub-contractors — Problems arose in project resulting in delays and cost overruns — Three actions were commenced, namely action by C Ltd. in Welland, Ontario, action by S Inc. in New York, and action by S Ltd. in Toronto, Ontario — Actions included various counterclaims and crossclaims — S Inc. brought motion for stay of Toronto proceeding as against it, and for stay of crossclaim by C Ltd. — Motion dismissed — Case law states choice of appropriate forum is designed to ensure action is tried in jurisdiction that has closest connection with action and parties and that all factors pertaining to making determination must be considered — Relevant factors included location where contract was signed, applicable law of contract, location in which majority of witnesses and key witnesses resided, location where bulk of evidence would come from, jurisdiction in which factual matters arose, residence or place of business of parties, and loss of juridical advantage — Most if not all of factors were neutral as between Ontario and New York — Motion would fail on forum non conveniens test, as litigation was first commenced in Ontario, contracts and subcontracts were formed in Ontario, facts were marginally more connected with Ontario than New York and there were other parties involved in Ontario litigation that were necessary parties but were not presently parties to New York litigation.

### Conflict of laws --- Contracts — Choice of law — Where contract specifying law

C Ltd. was hired as general contractor for bridge commission to clean, paint and metalize bridge between Ontario and New York — S Inc., an American corporation in New York, was distributor and licensee of platform system designed for working on bridges — S Ltd. was Canadian distributor of S Inc. under agreement which contained choice of law and forum clause, stating New York law would govern and that parties would submit to exclusive jurisdiction of courts of New York — S Inc. and S Ltd. were hired by C Ltd. as sub-contractors — Problems arose in project resulting in delays and cost overruns — Three actions were commenced, namely action by C Ltd. in Welland, Ontario, action by S Inc. in

2005 CarswellOnt 5060, [2005] O.J. No. 4887, 47 C.L.R. (3d) 311

New York, and action by S Ltd. in Toronto, Ontario — Actions included various counterclaims and crossclaims — S Inc. brought motion for stay of Toronto proceeding as against it, and for stay of crossclaim by C Ltd. — Motion dismissed — Forum selection clause will not induce court to take jurisdiction if action has no real and substantial connection with jurisdiction — On other hand, in face of clause, party resisting it must show "strong cause" why it should not be bound by forum selection clause — Even if forum clause applied to claims between S Inc. and S Ltd., powerful and persuasive reason existed not to divide action by staying only part of it — This would create unnatural division of issues — It would be unfair to require other parties to litigate in New York simply because there was forum clause in agreement between two of subtrades — No suggestion existed that New York law was different from Ontario law in respect of issues in dispute.

**Table of Authorities**

**Cases considered by *Master MacLeod*:**

*Amchem Products Inc. v. British Columbia (Workers' Compensation Board)* (1993), [1993] 3 W.W.R. 441, 14 C.P.C. (3d) 1, [1993] 1 S.C.R. 897, 150 N.R. 321, 23 B.C.A.C. 1, 39 W.A.C. 1, 102 D.L.R. (4th) 96, 77 B.C.L.R. (2d) 62, 1993 CarswellBC 47, 1993 CarswellBC 1257, [1993] I.L.Pr. 689 (S.C.C.) — considered

*Ash v. Corp. of Lloyd's* (1992), 7 C.P.C. (3d) 364, *(sub nom. Ash v. Lloyd's Corp.)* 9 O.R. (3d) 755, 94 D.L.R. (4th) 378, 1992 CarswellOnt 449, 60 O.A.C. 241, [1993] I.L.Pr. 330 (Ont. C.A.) — considered

*Beals v. Saldanha* (2003), 2003 SCC 72, 2003 CarswellOnt 5101, 2003 CarswellOnt 5102, 113 C.R.R. (2d) 189, 70 O.R. (3d) 94 (note), 39 B.L.R. (3d) 1, 39 C.P.C. (5th) 1, 234 D.L.R. (4th) 1, [2003] 3 S.C.R. 416, 314 N.R. 209, 182 O.A.C. 201 (S.C.C.) — considered

*DiPaolo Machine Works Ltd. v. Prestige Equipment Corp.* (1996), 5 C.P.C. (4th) 175, 1996 CarswellOnt 2913 (Ont. Gen. Div.) — referred to

*Eastern Power Ltd. v. Azienda Comunale Energia & Ambiente* (1999), 1999 CarswellOnt 2807, 178 D.L.R. (4th) 409, *(sub nom. Eastern Power Ltd. v. Azienda Comunale Energia & Ambiente)* 125 O.A.C. 54, 50 B.L.R. (2d) 33, 39 C.P.C. (4th) 160 (Ont. C.A.) — followed

*Eastern Power Ltd. v. Azienda Comunale Energia & Ambiente* (2000), 2000 CarswellOnt 2212, 2000 CarswellOnt 2213, 259 N.R. 198 (note), 139 O.A.C. 397 (note) (S.C.C.) — referred to

*Frymer v. Brettschneider* (1994), 19 O.R. (3d) 60, 115 D.L.R. (4th) 744, 28 C.P.C. (3d) 84, 72 O.A.C. 360, 1994 CarswellOnt 538, [1996] I.L.Pr. 138 (Ont. C.A.) — referred to

*Kuhlkamp v. Apera Technologies Inc.* (2004), 188 O.A.C. 361, 2004 CarswellOnt 2929 (Ont. C.A.) — referred to

*Morguard Investments Ltd. v. De Savoye* (1990), 46 C.P.C. (2d) 1, 15 R.P.R. (2d) 1, 76 D.L.R. (4th) 256, 122 N.R. 81, [1991] 2 W.W.R. 217, 52 B.C.L.R. (2d) 160, [1990] 3 S.C.R. 1077, 1990 CarswellBC 283, 1990 CarswellBC 767 (S.C.C.) — followed

*Muscutt v. Courcelles* (2002), 2002 CarswellOnt 1756, 213 D.L.R. (4th) 577, 160 O.A.C. 1, 60 O.R. (3d) 20, 13 C.C.L.T. (3d) 161, 26 C.P.C. (5th) 206 (Ont. C.A.) — followed

*Shekhdar v. K&M Engineering & Consulting Corp.* (2004), 71 O.R. (3d) 475, 2004 CarswellOnt 2423 (Ont. S.C.J.) — referred to

2005 CarswellOnt 5060, [2005] O.J. No. 4887, 47 C.L.R. (3d) 311

*Texserv Inc. v. Incon Container USA Ltd.* (2000), 2000 CarswellOnt 1690, 48 O.R. (3d) 427, 7 B.L.R. (3d) 70, 47 C.P.C. (4th) 256 (Ont. S.C.J.) — referred to

*Z.I. Pompey Industrie v. ECU-Line N.V.* (2003), 2003 SCC 27, 2003 CarswellNat 1031, 2003 CarswellNat 1032, 240 F.T.R. 318 (note), [2003] 1 S.C.R. 450, 30 C.P.C. (5th) 1, 224 D.L.R. (4th) 577, 2003 A.M.C. 1280, *(sub nom. Pompey (Z.I.) Industrie v. Ecu-Line N.V.)* 303 N.R. 201 (S.C.C.) — followed

**Statutes considered:**

*Negligence Act*, R.S.O. 1990, c. N.1
    Generally — referred to

MOTION by American corporation for stay of proceeding as against it, and for stay of crossclaim by co-defendant.

***Master MacLeod*:**

1    The defendant, Safespan Systems Inc., ("Safespan"), an American corporation with its headquarters in Tonawanda, New York, moves to stay this proceeding as against it and also moves to stay the crossclaim by its co-defendant Clara Industrial Services Ltd., ("Clara"). [1] This action, commenced in Toronto, is one of three actions currently pending as a result of the same construction dispute.

**The Construction Project and the Bid**

2    By way of background Clara was a general contractor for the Niagara Falls Bridge Commission ("the Commission") and was hired to clean, paint & metalize the Rainbow Bridge between Niagara Falls, Ontario and Niagara Falls, New York. As is well known to legions of tourists, the bridge spans roughly 1,000 feet of the Niagara Gorge at a height of over 200 feet above the water. One may readily imagine that carrying out bridge restoration work in such a location while complying with the occupational health and safety legislation in two jurisdictions requires fairly specialized equipment. Clara required subtrades to provide such equipment and to carry out the work associated with installation, operation and dismantling of it.

3    Safespan is the distributor & licencee of certain patented technology including a platform system designed for working on bridges. Skyway Canada Limited ("Skyway") is the Canadian distributor under an agreement with Safespan executed on March 2nd, 2001. That agreement provides for payment of royalties when Skyway uses or distributes the system in Canada and also provides that Safespan and Skyway will jointly do work on international bridges. Significantly for this motion the distributorship agreement contains a choice of law and forum clause stating that the agreement "shall be governed and construed in accordance with New York state law and both parties agree to submit to the exclusive jurisdiction of the courts of New York."

4    On December 19, 2001 Skyway sent Clara a "Pre-Bid Quotation" announcing the formation of a joint venture between Skyway and Safespan. This was preparatory to Clara's own bid on the bridge renovation project, which was submitted, to the Commission on December 21, 2001. Clara's bid was accepted by the Commission on January 3rd, 2002 and Clara then advised the joint venture that Clara "intends to utilize your services as primary Sub-Contractor for the Safespan Platform System for the Rainbow Bridge Project". The quote by the joint venture was communicated to Clara from Skyway's office in Weston, Ontario and the letter of intent was handed to representatives of Safespan and Skyway at a meeting in Thunder Bay, Ontario on January 10th, 2002.

5    In the letter of intent, Clara proposed to issue a purchase order to Skyway on behalf of the joint venture. Subsequently there were amendments to the structure of the bid and the purchase order eventually issued by Clara was issued to Safespan and directed to its office in Tonawanda. It appears this was sent by fax from Thunder Bay on March 13, 2002. By return fax sent to Thunder Bay, Safespan accepted the purchase order. As appears from Tabs E — I of the motion record there was a further

2005 CarswellOnt 5060, [2005] O.J. No. 4887, 47 C.L.R. (3d) 311

change to the structure of the sub-contact so that rather than there being a joint venture, Skyway was to perform the Canadian portion of the work and Safespan was to perform the U.S. portion. It appears that Safespan retained the duty of subcontract administration and it is not absolutely clear whether Clara treated Skyway as a sub trade of Safespan or effectively split the original sub contract into two. [2] In any event there is no forum clause in the agreements between Clara and any of the other parties. Only Skyway and Safespan are parties to the agreement containing the forum clause.

**The "Skewback Issue"**

6    Actual work on the Bridge apparently began in April of 2002 and continued until November of 2003. The project ran into early difficulty because the anchors for the Safespan system that were to be used on the Canadian side of the bridge were problematic due to "voids" in the concrete "skewbacks" [3] where the anchors were to be positioned. This — and I gather other factors — resulted in both delays and cost overruns. In turn these factors led to a dispute between Clara and the Bridge Commission and spawned the three court proceedings referred to below.

7    Clara contends there is money owing under the prime contract and it is also due money for extras including its costs on the "skewback issue". The Commission rejects this claim as it is of the view that the skewback issue is Clara's responsibility. According to the Commission, Clara's fixed price bid should not have been based on the assumption the skewbacks could be used to anchor the platform cables. In simplest terms, the Commission asserts that the fact that the skewback caps were not adequate to support anchors should have been apparent from the information in the bid documents. The Commission asserts that delays and cost overruns are all the responsibility of Clara and on that basis, and on the basis of incomplete or deficient work, it not only denies Clara's claims for extra work on the skewback issue but also asserts it will not, and need not, pay the outstanding balance of the original contract price. [4]

8    Clara does not accept this view but if the bid documents do disclose the problem then Clara blames the subtrades who are the experts in deploying the Safespan system for not detecting the problem when they put in their own bids. Thus Clara believes that if the Commission avoids paying Clara, Clara should be relieved of its obligation to pay the subtrades and should be indemnified for its losses arising from the skewback problem. There are other elements of the dispute between Clara and the Commission that do not involve these subtrades but the skewback issue and the resulting delay claims clearly form the heart of the dispute. Certainly it is the skewback issue that is the focus of the Toronto action.

**The litigation**

9    Three separate court actions were commenced as a result of these disputes. They are as follows:

A) Action 792/04 was commenced in Welland by Clara against the Commission on May 18, 2004. ("the Welland action") That is a claim for $ 1.3 million owing under the contract and $3.6 million for extra work including the skewback issue. The action also includes delay and other breach of contract damages of $5 million and a claim for punitive damages.

The Commission defends on the basis that the structural problem with the skewback caps was disclosed and should have been known to Clara. The Commission also takes the view the work done by Clara was incomplete. The defence resulted in a demand for particulars and, after receipt of particulars, a Reply was delivered by Clara on July 30 [th], 2004.

The Commission also third partied the American consulting Engineers who prepared the bid packages. The third party "G.P.I." has defended the main action and the third party claim. The third party claim was issued on January 11, 2005.

B) Action 119806 was commenced in the Supreme Court of New York on June 21, 2004 in Niagara County. ("the New York action") That is an action by Safespan against Clara as well as against Clara's labour and material bonding company — United States Fire Insurance Company ("U.S. Fire"). This claim apparently includes the work done by Skyway.

2005 CarswellOnt 5060, [2005] O.J. No. 4887, 47 C.L.R. (3d) 311

Clara has disputed the New York claim on the basis of *forum non conveniens* and jurisdiction. Clara also pleads an implied "pay when paid" clause & it counterclaims on the basis that Safespan was negligent in not ascertaining that the voids existed in the concrete. In the counterclaim, Clara seeks damages against Safespan including delay damages.

C) This action 05-CV-283515PD 1 ("the Toronto action") was commenced on February 4 [th], 2005. In the statement of claim, Skyway seeks payment from Clara for $175,837.65 owing under the contract for work not related to the Safespan system, from either defendant the sum of $150,050.00 said to be due under the contract in relation to the Safespan work and a further $332, 844.28 in compensation for the work on the Skewback anchoring & design issues.

In this proceeding Clara counterclaims against the plaintiff and the Commission and it crossclaims against Safespan. Clara also counterclaims against Urban Tech — a U.S. consulting firm. From these parties, Clara claims contribution & indemnity and damages of $2.9 million. Clara, while denying that the tender documents should have alerted the parties to the Skewback problem alleges that all of the subcontractors were negligent in not recognizing and detecting the problem.

10    While the Welland action contains other claims against the Commission besides the claim for the Skewback work it is apparent that the action can only be determined by deciding who should bear responsibility for the extra costs and delays occasioned by the forced redesign of the platform system. There are therefore three proceedings involving overlapping but not identical parties all of which proceedings involve this central and highly contested issue. The question is whether or not this last action should be stayed against Safespan? None of the other U.S. parties have contested the jurisdiction or the venue.

### Jurisdiction and the nature of the proceedings

11    All parties concede that this court has jurisdiction *simpliciter*. Both Clara and Skyway are Ontario corporations. The Commission is incorporated in Ontario and in the U.S. and it maintains offices in both jurisdictions. The work in question was done on the Ontario side of the bridge — or at least that is where the problems arose and the re-engineering was implemented. The contract with Clara was formed in Ontario and the subcontract between Safespan and Clara was formed in Thunder Bay, Ontario either when the letter of intent was handed to representatives of the joint venture at a meeting or when Clara received the fax accepting the purchase order. [5] Clearly there is a real & substantial connection between the subject matter of the dispute and the Province of Ontario within the meaning of the decisions in *Morguard* [6] and *Muscutt*. [7]

12    The issue then is not jurisdiction but forum. Should the court decline to exercise jurisdiction in favour of the courts of New York? It is relevant that there is already a proceeding in Welland, Ontario. Although the moving defendant is not a party to that proceeding at this time, it is the evidence of Clara that it would have amended its pleading to join the subtrades as defendants in light of the defence delivered by the Commission and pursuant to the *Negligence Act*. [8] It did not take this step, it is deposed, due to settlement discussions and then the commencement of the other actions and this motion. Those subtrades and the Commission are now parties to the Toronto action by virtue of the counterclaim and crossclaim.

13    At the hearing of the motion, Clara brought its own motion for an order that this action (the Toronto action) be consolidated with the Welland action or tried together with it. This order was not opposed as all parties agree whatever the outcome of the motion for a stay, there should not be two separate proceedings in Ontario. As noted, the parties have previously agreed the Toronto action should be moved to Welland. The consent order for consolidation, trial together or trial one after the other in the discretion of the trial judge at Welland was signed at the hearing.

14    It is also important to consider that nothing I determine has any effect in the American proceeding. The Supreme Court of New York will make its own determination as to whether or not to assume jurisdiction over Clara and to allow the litigation in New York State to continue. While it is conceivable that what I decide here may have some influence on the other court, I cannot assume that will be so. It appears that there may be parallel litigation in both jurisdictions whatever I decide.

2005 CarswellOnt 5060, [2005] O.J. No. 4887, 47 C.L.R. (3d) 311

15    Were these actions to be sequenced, and were it possible to separate them, the logical order would be to determine the issues between Clara and the Commission, then to determine what Clara owes Safespan and/or Skyway, then to determine what Safespan owes Skyway (assuming what it recovers from Clara includes Skyway's claims). Only if Safespan obtains judgment against Clara and Clara is unable to pay, would the action against Clara's bonding company be necessary. Finally, although it is not in evidence and there is no action at present, I take notice of the fact that labour and material bonds are normally secured by personal guarantees so to bring the matter full circle, the bonding company in all probability would claim over against the principal of Clara. This would be confusing enough if the actions were all in one jurisdiction and if the findings of fact could be made independently. It appears to me however that the issue of whether or not the bid documents should have put Clara and its subtrades on notice of the skewback problem, apportionment of fault amongst the principal actors and the various consultants and the related issues of misrepresentation would be most efficiently determined in an action in which all necessary parties are present. As this stands this is the case with the combined Ontario actions. The bonding company is not a party but bond actions normally await determination of liability in the main action and proceed separately.

16    Safespan argues that the dispute between Clara and the Commission is broader than the dispute involving the subtrades and it does not wish to be dragged into the big dispute for what is its much smaller subtrade claim. There is some truth to this but unfortunately this is a common feature of construction litigation in which subtrades become tied up with a broader dispute between the contractor and the owner. There are various solutions to this if the subtrade issues can be hived off and tried separately but most of them would require either consent of all affected parties or vigorous management of the issues by a judge having jurisdiction over all necessary parties and issues. Given Clara's counterclaim or cross claim against the subtrades, there is nothing so discrete about Safespan's claim against Clara that it may be said to be improperly joined to the other issues in the Ontario action.

17    As a consequence of this analysis, this court has jurisdiction over the dispute and the claim against Safespan is not artificially grafted onto it or improperly joined. Unless there is a powerful argument in favour of deferring to the action in New York State, the motion to stay part of this proceeding ought not to be granted.

**The forum test**

18    Various cases were cited to me decided by this court and by various levels of appellate court. It may safely be said that there has been some evolution in thinking on the issue of *forum non conveniens* and the importance of forum selection clauses. In part this has been influenced by the evolution in the case law concerning recognition of foreign judgments. In the Morguard [9] decision, the Supreme Court of Canada adopted the "real and substantial connection" test as the standard for enforcing judgments of other provinces in Canada. In so doing it embraced the principle of "comity" and altered the old common law tests of territoriality, sovereignty, independence and attornment. In *Beals v. Saldanha* [10] the Supreme Court upheld the Ontario Court of Appeal decision extending this test to recognition of foreign judgments arising in jurisdictions outside Canada. That case involved a default judgment obtained in Florida against residents of Ontario for damages in connection with a sale of Floridian land. Subject to certain limited defences, foreign judgments issued by courts of competent jurisdiction in the United States and elsewhere will be recognized and enforced in Canada based on there being a significant connection between the cause of action and the foreign court. This approach to recognition of jurisdiction over the dispute has implications for determining if it is appropriate to stay a domestic action in favour of a foreign proceeding.

19    Ontario courts ought to defer to the courts of another jurisdiction in cases involving a foreign defendant if the other jurisdiction is a more appropriate and convenient forum for the action and for securing the ends of justice. This was the principle reiterated by the Supreme Court of Canada in *Amchem Products Inc. v. British Columbia (Workers' Compensation Board)* [11] The implications of *Amchem Products Inc.* and other recent decisions were fully reviewed by the Ontario Court of Appeal in *Muscutt v. Courcelles.* [12] In applying the principles of comity and real and substantial connection, it will no longer serve a resident of Ontario to ignore a foreign proceeding on the basis there has been no attornment to that jurisdiction. Providing there is a real and substantial connection with the other jurisdiction, the judgment of the foreign court will be recognized on the basis of comity. Conversely an Ontario action will not be stayed simply because there is a foreign proceeding or because the foreign

2005 CarswellOnt 5060, [2005] O.J. No. 4887, 47 C.L.R. (3d) 311

defendant has not attorned. The appropriate procedure is therefore to appear in the jurisdiction and to seek a stay on the basis of *forum non conveniens*. Such motions as a result are occurring with some frequency.

20      The leading case in Ontario setting out the factors to be considered on a *forum non conveniens* application remains *Eastern Power Ltd. v. Azienda Comunale Energia & Ambiente* [13]  In that decision the Court of Appeal approved the general test enunciated by Arbour J.A. in an earlier decision [14] to the effect that the choice of the appropriate forum is designed to ensure that the action is tried in the jurisdiction that has the closest connection with the action and the parties and that all factors pertaining to making this determination must be considered. While the Court of Appeal therefore did not endorse a closed catalogue of relevant factors, the following factors were considered to be relevant:

        a) the location where the contract in dispute was signed,

        b) the applicable law of the contract,

        c) the location in which the majority of the witnesses reside,

        d) the location of key witnesses

        e) the location where the bulk of the evidence will come from

        f) the jurisdiction in which the factual matters arose,

        g) the residence or place of business of the parties, and,

        h) loss of juridical advantage.

21      In the case at bar, as in many of the cases cited, most if not all of these factors are neutral as between Ontario and New York. Since litigation was first commenced in Ontario, since the contracts and sub contracts appear to have been formed in Ontario, since the facts are marginally more connected with Ontario than New York and since there are other parties involved in the Ontario litigation that are necessary parties but are not presently parties to the New York litigation, the motion would fail on a *forum non conveniens* test. Counsel for the defendant was frank in conceding that but for the forum selection clause, the motion would probably not have been launched.

**The forum selection clause and the strong cause test**

22      In *Ash v. Corp. of Lloyd's* [15] the Ontario Court of Appeal affirmed the policy in this jurisdiction of giving great weight to forum selection clauses. The existence of a forum selection clause places a heavy burden on the party seeking to avoid it. The courts will generally give effect to such an agreement unless there are overwhelming reasons not to do so. See *DiPaolo Machine Works Ltd. v. Prestige Equipment Corp.* [16]

23      There was some debate in the cases as to whether or not a forum selection clause is merely a factor to be considered in the *forum non conveniens* test or whether forum selection cases are in a different category. [17] This has recently been resolved by the Supreme Court of Canada in *Z.I. Pompey Industrie v. ECU-Line N.V.* [18] In that decision the Court contrasted cases in which a stay is sought based on a forum selection clause and cases based on the *forum non conveniens* doctrine. "In the latter inquiry", said Bastarache J., "the burden is normally on the defendant to show why a stay should be granted, but the presence of a forum selection clause ... is sufficiently important to warrant a different test, one where the starting point is that the parties should be held to their bargain." This does not mean that such a clause will be determinative. A forum selection clause will not induce a court to take jurisdiction if the action has no real and substantial connection with the jurisdiction. [19] On the other hand in the face of the clause, the party resisting it must show "strong cause" why it should not be bound by the forum selection clause.

Skyway Canada Ltd. v. Clara Industrial Services Ltd., 2005 CarswellOnt 5060

2005 CarswellOnt 5060, [2005] O.J. No. 4887, 47 C.L.R. (3d) 311

24    In the circumstances of this case, there are in my view several persuasive reasons why the forum clause ought not to result in staying of these proceedings:

> 1. There are other parties to this dispute that are not bound by the forum selection clause. Were this a free standing dispute between the parties to the distributorship agreement, there would be a much stronger argument in favour of enforcing the forum clause.

> 2. The primary document to be interpreted in this proceeding is the prime contract and the tender documents between the Commission and Clara that are said to have disclosed the skewback problem. Those documents do not contain a forum clause or a choice of law provision.

> 3. Although the relationships between Skyway and Safespan as first joint ventures and then as co-subcontractors or as sub trade and sub-sub trade may have been effected by amendment & expansion of their distribution agreement containing the forum clause, the dispute that must now be adjudicated has little if anything to do with the interpretation of the agreement or the payment of royalties. It is far from clear that the choice of law or forum clause was intended to encompass claims for negligence.

> 4. The breaches of contract on which the claims are based are primarily breaches of contract between Clara & the Commission or between Clara and the sub trades. The disputes between Skyway and Safespan are primarily subsidiary claims for extra work dealing with who gets paid for the extra work if Clara fails to pay or which if either should indemnify Clara if Clara is found to have suffered a loss over the skewback issue.

> 5. The claims are so intertwined that it seems impossible to efficiently adjudicate the issues between these parties without also dealing with all of the issues as between the other parties.

25    I am therefore of the view that even if the forum clause applies to the claims between Safespan and Skyway, a determination that may have to await trial, there is powerful and persuasive reason not to divide the action by staying only part of it. This would create an unnatural division of issues. Conversely it would be unfair to require the other parties to litigate in New York simply because there is a forum clause in the agreement between two of the subtrades.

26    There was no evidence before me to suggest that the law of New York is in any way different from the law of Ontario in respect of the issues in dispute. If however, there is some difference that affects the outcome as between the parties to the distributorship agreement, the domestic court can be asked to apply New York law. Refusal to enforce the forum selection clause, in other words, need not deprive either party of the benefit of the choice of law provision assuming any such benefit exists.

## Conclusion and order

27    In conclusion, the motion to partially stay this proceeding is dismissed. As noted, I have granted the order for the Toronto action to be tried together with the Welland action in Welland.

28    The defendant shall have 30 days from the release of these reasons, or in the event of an appeal, 30 days from disposition of the appeal, to deliver its defences to the claim and the cross claim.

## Costs

29    Cost of an interlocutory motion will ordinarily follow the event and be fixed and payable forthwith on a partial indemnity scale. Counsel are invited to agree on costs. If counsel are unable to agree and they wish to make submissions regarding the quantum of costs, the scale of costs or whether a different order would be more just, they may agree amongst themselves to a schedule for written submissions or I may be spoken to for directions.

30    Arrangements to deal with costs, if any, are to be made with my office within 30 days.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2005 CarswellOnt 5060, [2005] O.J. No. 4887, 47 C.L.R. (3d) 311

*Motion dismissed.*

Footnotes

1      For the benefit of those not familiar with Ontario civil procedure, this may require a brief word of explanation. Under our rules, a defendant may assert a claim against the plaintiff by means of a counterclaim, against another defendant by means of a crossclaim and against someone who is not already a party by means either of the counterclaim, if there is a counterclaim, or a third party claim. In this proceeding, Clara counterclaimed against the plaintiff and also added the Commission and Clara's consultant, Urban Tech, Inc. as defendants by counterclaim. Clara has "crossclaimed" against its co-defendant Safespan, which is the moving party.

2      The relationship is also unclear to the president of Safespan as appears from paragraph 23 of his affidavit.

3      A "skewback" is a sloping surface on which the ends of an arch abut. The girders of a steel span arch rest on the concrete skewbacks, which are in turn part of the bridge abutments.

4      See defence in action no. 792 / 04 (Welland)

5      See *Eastern Power Ltd. v. Azienda Comunale Energia & Ambiente* (1999), 178 D.L.R. (4th) 409 (Ont. C.A.) at para. 27 in which the court holds that a contract accepted by facsimile transmission is formed where the fax is received and is not subject to the "postal acceptance exception".

6      *Morguard Investments Ltd. v. De Savoye*, [1990] 3 S.C.R. 1077 (S.C.C.)

7      *Muscutt v. Courcelles* (2002), 60 O.R. (3d) 20 (Ont. C.A.)

8      R.S.O. 1990, c. N.1

9      Note 5, supra. In Morguard, the Supreme Court of Canada adopted the "real and substantial connection" test as the standard for enforcing judgments of other provinces in Canada and altered the old common law tests of territoriality, sovereignty, independence and attornment.

10      [2003] 3 S.C.R. 416 (S.C.C.)

11      [1993] 1 S.C.R. 897 (S.C.C.) *Amchem Products Inc.* dealt with an anti-suit injunction which is an extraordinary remedy in which a party is restrained from pursuing the suit in the foreign jurisdiction but it restated the law in connection with *forum non conveniens.*

12      Note 6, supra

13      (1999), 178 D.L.R. (4th) 409 (Ont. C.A.), leave to appeal denied, (S.C.C.) and see *Kuhlkamp v. Apera Technologies Inc.*, [2004] O.J. No. 3064 (Ont. C.A.)

14      *Frymer v. Brettschneider* (1994), 19 O.R. (3d) 60 (Ont. C.A.)

15      (1992), 9 O.R. (3d) 755 (Ont. C.A.)

16      (1996), 5 C.P.C. (4th) 175 (Ont. Gen. Div.)

17      The tendency to assimilate these considerations was discussed by Cullity J. in *Texserv Inc. v. Incon Container USA Ltd.* (2000), 48 O.R. (3d) 427 (Ont. S.C.J.)

18      [2003] 1 S.C.R. 450 (S.C.C.) at para. 21.

19      *Shekhdar v. K&M Engineering & Consulting Corp.* (2004), 71 O.R. (3d) 475 (Ont. S.C.J.)

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 138

830 F.2d 476
United States Court of Appeals,
Third Circuit.

SLATKY, John, Appellant,

v.

AMOCO OIL COMPANY, Appellee, Service
Station Dealers of America, Inc., Amicus Curiae.

No. 86-5102.    |    Argued Aug. 20,
1986.    |    Reargued In Banc May 4,
1987.    |    Decided Sept. 30, 1987.

Petroleum franchisee brought action against distributor challenging alleged failure to make franchise premises available to him at a reasonable price prior to termination of franchise. The United States District Court for the Middle District of Pennsylvania, William W. Caldwell, J., 626 F.Supp. 1223, entered judgment in favor of distributor, and franchisee appealed. The Court of Appeals, Becker, Circuit Judge, held that: (1) distributor's offer to sell the premises must be objectively reasonable in that it approaches fair market value; (2) evidence sustained finding that distributor sincerely believed that its offer was reasonable; but (3) remand was required to determine whether offer was reasonable.

Reversed and remanded.

Mansmann, Circuit Judge, filed a dissenting opinion.

West Headnotes (8)

[1]    **Antitrust and Trade Regulation**
    👉 Duration, Termination, and Renewal

So long as petroleum distributor's nonrenewal of franchise is based on marketing decision, courts are precluded from examining the merits of the decision but courts may scrutinize the merits of a termination or nonrenewal decision which result from a franchisee's misconduct. Petroleum Marketing Practices Act, § 102(b)(3)(D), 15 U.S.C.A. § 2802(b)(3)(D).

6 Cases that cite this headnote

[2]    **Antitrust and Trade Regulation**
    👉 Transfer, Sale, and Assignment

Courts are not required to defer to petroleum distributor's determination of the reasonableness at the price at which it offers the premises to the franchisee prior to terminating the franchise. Petroleum Marketing Practices Act, § 102(b)(3)(D), 15 U.S.C.A. § 2802(b)(3)(D).

3 Cases that cite this headnote

[3]    **Antitrust and Trade Regulation**
    👉 Duration, Termination, and Renewal

    **Antitrust and Trade Regulation**
    👉 Transfer, Sale, and Assignment

What the court decides on a challenge to the decision of a petroleum distributor not to renew the franchise is not whether the distributor determined not to renew according to some elusive notion of good faith but, rather, whether it sincerely made a decision to sell the property or to alter it or to accomplish some other business purpose permitted under the statute. Petroleum Marketing Practices Act, § 102(b)(3)(D), 15 U.S.C.A. § 2802(b)(3)(D).

1 Cases that cite this headnote

[4]    **Antitrust and Trade Regulation**
    👉 Transfer, Sale, and Assignment

Subjective good faith standard is not the proper standard to apply in determining whether petroleum distributor has made bona fide offer to sell the premises to the franchisee prior to termination of franchise. Petroleum Marketing Practices Act, § 102(b)(3)(D), 15 U.S.C.A. § 2802(b)(3)(D).

14 Cases that cite this headnote

[5]    **Antitrust and Trade Regulation**
    👉 Transfer, Sale, and Assignment

Petroleum distributor must make an offer to sell premises to franchisee prior to terminating franchise as if it actually wanted to sell the property and thus must set the offer at a fair market value. Petroleum Marketing Practices

Act, § 102(b)(3)(D), 15 U.S.C.A. § 2802(b)(3)(D).

6 Cases that cite this headnote

**[6]**  **Antitrust and Trade Regulation**
👈  Transfer, Sale, and Assignment

In determining whether petroleum distributor has made bona fide offer to sell premises to franchisee prior to terminating franchise, court must first determine if the distributor believed that its offer price represented fair market value and then must determine whether the estimate was objectively reasonable, i.e., whether the offer approached fair market value. Petroleum Marketing Practices Act, § 102(b)(3)(D), 15 U.S.C.A. § 2802(b)(3)(D).

30 Cases that cite this headnote

**[7]**  **Antitrust and Trade Regulation**
👈  Weight and Sufficiency

Finding that petroleum distributor believed that its offer to sell premises to franchisee prior to termination of franchise was at fair market value was sustained by the evidence. Petroleum Marketing Practices Act, § 102(b)(3)(D), 15 U.S.C.A. § 2802(b)(3)(D).

1 Cases that cite this headnote

**[8]**  **Antitrust and Trade Regulation**
👈  Transfer, Sale, and Assignment

To determine whether petroleum distributor's estimate of fair market value of property, and thus the price at which it offered the property to the franchisee prior to termination of franchise, was reasonable, court must focus on the specific facts used by the appraisers in their valuation and the inferences made from them. Petroleum Marketing Practices Act, § 102(b)(3)(D), 15 U.S.C.A. § 2802(b)(3)(D).

13 Cases that cite this headnote

**Attorneys and Law Firms**

**\*477**  Joel Weisberg (argued), Harrisburg, Pa., for appellant.

Dimitri G. Daskal, Washington, D.C., for amicus curiae.

John A. Guernsey (argued), DeStefano & Guernsey, Philadelphia, Pa., Marguerite E. McDermed, Amoco Corp., Chicago, Ill., for appellee.

**\*478  Argued Aug. 20, 1986.**

Before BECKER, MANSMANN, Circuit Judges, and TEITELBAUM, District Judge. \*

**Reargued In Banc May 4, 1987.**

Before GIBBONS, SEITZ, WEIS, HIGGINBOTHAM, SLOVITER, BECKER, STAPLETON and MANSMANN, Circuit Judges.

**Opinion**

**OPINION OF THE COURT**

BECKER, Circuit Judge.

Under Title I of the Petroleum Marketing Practices Act, ("PMPA"), 15 U.S.C. §§ 2801-06, an oil company that terminates or fails to renew a franchise for a permissible business purpose unrelated to the franchisee's misconduct must make a "bona fide offer" to sell to the franchisee the leased property used by the franchisee in his business. §§ 2802(b)(2)(E)(iii)(I); 2802(b)(3)(D)(iii)(I). This appeal from the judgment of the district court, 626 F.Supp. 1223, following a bench trial, in favor of appellee Amoco Oil Company and against one of its franchisees, appellant John Slatky, requires us to decide what this "bona fide offer" provision requires the oil company (hereinafter "distributor") to do and in what manner courts should scrutinize the distributor's offer in determining its *bona fides*.

The district court found that Amoco sincerely believed its offer price, derived from its internal business practices, was at fair market value and that the offer had a reasonable basis in fact because its procedures were reasonable, notwithstanding that the price was substantially higher than the estimate of independent appraisers retained by Slatky and by Amoco

itself. We conclude that the district court erred in failing
to insist that the offer be objectively reasonable, i.e., that it
approach fair market value. We therefore reverse and remand
for further proceedings.


# I. *The Statutory Scheme*

Title I of the PMPA generally regulates the relationship
between distributors of motor fuel, principally oil refiners,
and their franchisees, principally retail gas station operators,
many of whom lease their stations from the distributors.
Evidence at Congressional hearings indicated that distributors
had been using the threat of termination or nonrenewal to
compel franchisees to comply with the distributor's marketing
policies. *See* S.Rep. No. 731, 95th Cong., 2d Sess. 17-19,
*reprinted in* [1978] *U.S. CodeCong. & Ad.News* 873, 875-77
(hereinafter "Senate Report"). In addition, Congress found
that franchisors had used their superior bargaining power
and the threat of termination to gain an unfair advantage in
contract disputes. *Id.*

In passing the PMPA, Congress determined that franchisees
had a "reasonable expectation[ ]" that "the [franchise]
relationship will be a continuing one." Senate Report at 18,
U.S.Code Cong. & Ad.News 1978, at 876. The PMPA's
goal is to protect a franchisee's "reasonable expectation"
of continuing the franchise relationship while at the same
time insuring that distributors have "adequate flexibility ...
to respond to changing market conditions and consumer
preferences." Senate Report at 19, U.S.Code Cong. &
Ad.News 1978, at 877. To accomplish these purposes, the
PMPA works principally by limiting the grounds on which
distributors may terminate or fail to renew a franchise. 15
U.S.C. § 2802. The PMPA also provides various notification
requirements, some of which guarantee a franchisee an
opportunity to correct any improper conduct with which he
has been charged. *See §§ 2802, 2804.*

Most of the grounds for termination or nonrenewal involve
some form of franchisee misconduct. For example, a
distributor may terminate for a franchisee's failure to pay
sums due under the franchise agreement, *see § 2802(b)(2)
(C)* (incorporating § 2802(c)(8)), or for a franchisee's "fraud
or criminal misconduct ... relevant to the operation" of
the property, § 2802(b)(2)(C) (incorporating § 2802(c)(1)). A
distributor may fail to renew because of **\*479** numerous
"bona fide customer complaints" about the franchisee's
operations of the property, *see § 2802(b)(3)(B)*, or because of

a franchisee's failure to operate a property "in a clean, safe,
and healthful manner," *see § 2802(b)(3)(C)*.

To assure distributors' market flexibility, however, the Act
also permits termination or nonrenewal because of certain
distributor business decisions. So long as a franchisee has
received or been offered at least a three year franchise
agreement, a distributor may terminate or fail to renew a
franchise agreement if it decides "in good faith and in the
normal course of business" to withdraw from the relevant
geographic market area. *See § 2802(b)(2)(E).* [1]

In addition, for three-year franchisees, a distributor may fail
to renew the agreement of a franchisee who leases a property
from the distributor if the distributor determines "in good faith
and in the normal course of business:

> (I) to convert the leased marketing premises to a use other
> than the sale or distribution of motor fuel,

> (II) to materially alter, add to, or replace such premises,

> (III) to sell such premises, or

> (IV) that renewal of the franchise relationship is likely
> to be uneconomical to the franchisor [distributor] despite
> any reasonable changes or reasonable additions to the
> provisions of the franchise which may be acceptable to the
> franchisee."

§ 2802(b)(3)(D)(i).

Whenever a distributor terminates or fails to renew a franchise
relationship for one of these business purposes, however, he
must meet several other requirements. First, the distributor
may not terminate or fail to renew in order to convert the
property to direct management by its own employees or
agents. *See § 2802(b)(2)(E)(ii), 2802(b)(3)(D)(ii).* Second,
the distributor must either make a "bona fide offer" to sell
the property or, if applicable, provide the franchisee a right
of first refusal on an offer made by another. *See §§ 2802(b)
(2)(E)(iii)(I);* 2802(b)(3)(D)(i). [2] The meaning of the "bona
fide offer" requirement under the nonrenewal subsection, §
2802(b)(3)(D)(i), is the principal issue in this case.


# II. *Facts and Procedural History*

For several years, Slatky was an Amoco franchisee, leasing
a gasoline station in York, Pennsylvania. In May, 1985,

following a year in which Slatky's sales volume started to decline, Amoco determined not to renew Slatky's franchise on the ground that renewal would be uneconomical despite any reasonable changes or additions to the franchise relationship to which Slatky might agree. Amoco gave proper notice, and because it based its nonrenewal on § 2802(b)(3)(D)(i)(IV), it proceeded, in a letter dated June 28, 1985, to offer to sell Slatky the station for $306,300.00 without the underground tanks and pumps. The testimony reveals that Amoco arrived at this price through a two-step process.

First, Amoco's employee Melvin O'Dell evaluated the land alone in early May, 1985. O'Dell based his appraisal on three allegedly comparable properties, which had been sold several years before. He testified, however, that he made no effort to verify his information about these "comparables" or to find other reports on other properties. O'Dell further testified that his best comparable was a property that he later found had been understated in land area by 40% and that was not suitable as a basis of comparison because of its location. **480** [3] Based on this analysis, O'Dell appraised the value of the land at $155,000.

Following the land appraisal, another Amoco employee, Charles Bogdanowicz, performed an initial appraisal of the property improvements. Bogdanowicz had no formal appraisal experience but had built stations for Amoco in several parts of Pennsylvania. He estimated the replacement cost of the improvements, including tanks and lines, to be $121,300.

Based on these two estimates, Amoco's real estate manager, Eugene O'Brien, recommended a price of $276,300 to the district manager, Lemuel Warfield. Although he did not disagree with any of the conclusions used to come up with the appraisal, Warfield sent a note back to O'Brien stating, "costs as they are today and the improvements that we have on the property, I would believe the appraisal would be more reasonable at $350,000, less tanks and lines." Warfield asked O'Brien to review the figure, and O'Brien passed this request to O'Dell. [4]

O'Dell then reviewed his appraisal and came up with a land value of $185,000, $30,000 higher than the first estimate. In a letter to Warfield, O'Brien stated that this new figure was "about as far as we think it should go." Warfield then offered to sell the station to Slatky for $306,300 ($185,000 for the land plus $121,300 for the improvements), explicitly stating that this figure did not cover the tanks and pumps.

After Slatky filed his complaint in this case, Warfield sent Slatky a letter explaining that the exclusion of the tanks and pumps was mistaken and offering the property for $256,300 plus $50,000 for the tanks and pumps.

Slatky's suit seeks damages and an injunction ordering Amoco to sell the property to him at fair market value. He did not challenge the grounds for nonrenewal but claimed that Amoco's offer of $306,300 was not a bona fide offer because it was not at fair market value. Two certified appraisers hired by Slatky valued the property respectively at $158,200 (including pumps and tanks) and $145,000 (not including pumps and tanks). An independent appraisal eventually commissioned by Amoco for this litigation appraised the property at $221,000 also not including pumps and tanks.

After a bench trial, the district court held that Amoco had fulfilled its obligation to make a bona fide offer. The court accepted as a general standard the requirement that the offer be "sincere and have a reasonable basis in fact." [5] The court found the sincerity standard met because Amoco had followed its "general" procedure for determining the selling price of property and because it believed its offer price to be at fair market value. The court also found that Amoco's offer had a reasonable basis in fact because, although its appraiser had not followed formal appraisal techniques, "the procedures used by them were reasonable" and hence the "offer was not arbitrarily made." The district court made no finding whether the offer actually approached fair market value, as Slatky claimed the statute required, or whether the offer was a reasonable estimate of fair market value. This appeal followed.

### III. *Amoco's Subjective Good Faith Standard*

#### A.

Amoco's principal contention is that we should interpret the term "bona fide" to require that a distributor make its offer only in subjective good faith. Amoco grounds this argument on an analogy between the distributor's determination of an **481** offer price and its original determination not to renew a franchise because of a business reason permitted under § 2802(b)(3)(D). The statute requires only that the latter decision be made "in good faith and in the normal course of business." *Id.* The Senate Report states:

> These tests provide adequate protection of franchisees from arbitrary or discriminatory termination or non-renewal, yet avoid judicial scrutiny of the business judgment itself. Thus, it is not necessary for the court to determine whether a particular marketing strategy, such as a market withdrawal, or the conversion of leased marketing premises to a use other than the sale of distribution of motor fuel, is a wise business decision.

Senate Report at 37, U.S.Code Cong. & Ad.News 1978, at 896. Contending that the decision about an offer price is essentially the same kind of business judgment as a decision not to renew the franchise, Amoco claims that the same good faith standard designed to prevent second-guessing of a distributor's business judgment should apply.

[1] We reject Amoco's suggestion for several reasons. First and fundamentally, we disagree with Amoco's basic analogy between a nonrenewal decision on the one hand and the determination of a bona fide offer price on the other. We have noted that Congress wished distributors to have the flexibility to respond to changing market conditions: when making a nonrenewal decision under § 2802(b)(3)(D), distributors make such a marketing decision. So long as nonrenewal was truly based on such a marketing decision, Congress precluded courts from examining its merits. Congress did not, however, preclude courts from scrutinizing the merits of termination or nonrenewal decisions that result from a franchisee's misconduct. Whether a franchisee has truly created health or safety violations or violated a term of the franchise agreement is a question the courts may examine freely. Congress thereby distinguished between decisions involving general business matters and decisions turning on a right created by the PMPA.

[2] Like a termination or nonrenewal decision for franchisee misconduct, the determination of an offer price is not a business decision. It is not a decision that the distributor decides on its own to make. Rather, the distributor sets a bona fide price only because the statute requires it to do so. Indeed, when a distributor fails to renew a franchise because of a decision to convert a property to a different use, or to alter the premises, *see* § 2802(b)(3)(D)(i)(I), (II), selling the property will interfere with its business plans. The determination of an offer price therefore represents something we may call a

"compliance judgment," a judgment about how best to protect the company's interests while complying with the statute. Congress did not instruct the courts to defer to such decisions.

The legislative history reveals this distinction. Under H.R. 1300 (94th Cong), the predecessor to Title I of the PMPA, a franchisee could not obtain injunctive relief if the franchisor failed to renew on the basis of "a determination made by the franchisor in good faith and in the normal course of business" even if such nonrenewal was prohibited under the bill. H.R. 1300 § 105(e)(1)(A). But such nonrenewal decisions were remediable with money damages, which would have compensated the franchisee for the loss of its reasonable expectation of renewal. *Id.* § 105(e)(2).

Under H.R. 1300, the distributor could mitigate damages by making a bona fide offer. Responding to the pleas of the major oil companies, *see, e.g., Hearings on H.R. 130, Senate Subcomm. on Energy Conservation and Regulation of the Energy and Natural Resources Committee,* Publ. No. 95-61, 250 (95th Cong., 1st Sess.) (statement of Duval Pickey, Vice President of Marketing for Exxon), the next Congress made a bona fide offer a surrogate for damages, H.R. 130 (95th Cong.), and that provision became law. Under either bill, however, Congress treated the bona fide offer requirement not as a statutory recognition of a business judgment but as a form of compensation to the franchisee for the harm resulting from the **\*482** distributor's valid business judgment. We would misread that legislative history and permit distributors to "eat their cake and have it too" if we were to defer not only to the business merits of the distributor's business judgment but also to the distributor's sense of the fairness of its offer of compensation.

[3] Second, even assuming the correctness of the analogy between nonrenewal decisions and offer price decisions, Amoco confuses procedural restrictions with substantive ones. The substantive restriction on the nonrenewal decision comes from the limitation on the distributor's grounds for renewal. The "good faith and normal course of business" requirement is essentially a procedural direction to the courts about how to judge whether the distributor has abided by the substantive restrictions and failed to renew only because of one of the statutorily permissible reasons. Thus, what the court decides in a challenge to a nonrenewal decision is not whether the distributor determined not to renew according to some elusive notion of good faith but whether it sincerely made a decision to sell the property or to alter it or to accomplish some other business purpose permitted under the

statute. *See* Senate Report at 37, U.S.Code Cong. & Ad.News 1978, at 896 ("good faith test is meant to preclude sham determinations").

Amoco's suggestion that the statute only requires a distributor to determine an *offer* price in "good faith" takes this procedural standard of judicial scrutiny and turns it into a substantive restriction on the distributor's behavior. But a mere requirement to make an offer "in good faith" is essentially without content. Failing to suggest what a distributor must sincerely decide, it suggests only some kind of floating goodwill. Because it is so ephemeral, a franchisee would virtually never be able to show its absence. Even if we were to accept Amoco's analogy between the offer price decision and a decision not to renew a franchise, we would therefore adopt the "good faith" standard only as a standard of judicial scrutiny. In order to decide whether the distributor had made the offer price in good faith, we would still have to decide what kind of offer price the statute requires.

## B.

 [4]    Apart from its analogy between the bona fide offer provision and the decision not to renew a franchise, Amoco claims that a subjective good faith standard is consistent with the general purposes of the statute. According to Amoco, the statute seeks only to prevent "arbitrary and discriminatory" terminations and nonrenewals while otherwise leaving the distributor unfettered discretion to pursue its own economic self-interest. By requiring only that a distributor make an offer in good faith, Amoco claims, courts can prevent discriminatory conduct while otherwise allowing distributors to act in accordance with their self-interest.

This reading of the statute's requirements, however, trivializes Congress's goals. Distributors have no reason to mistreat franchisees out of simple spite, and Congress did not attribute any such motivation to them. The Senate Report makes clear that the "arbitrary and discriminatory" terminations and nonrenewals Congress wished to stop were those aimed at forcing the franchisee to accept marketing practices not set out in the franchise agreement. *Senate Report* at 12-19, 36-37, U.S.Code Cong. & Ad.News 1978, at 873-877, 894-896. Obviously, Congress found that distributors had been using their power over franchisees to further their own self-interest. In remedying this "disparity in bargaining power" by limiting the grounds for termination and nonrenewal, Congress protected the franchisee's interests by curbing those

of the distributor. *Senate Report* at 18, U.S.Code Cong. & Ad.News 1978, at 876.

Other provisions also quite explicitly restrict a distributor's self-interest in favor of franchisees. In particular, Congress proscribed a distributor from terminating or failing to renew a franchise for the purpose of transferring a property to direct management by its own employees. *See* § 2802(b)(2)(E)(ii), § 2802(b)(3)(D)(ii).  **\*483**  These provisions in part address Congress' fear that major distributors were engaging in predatory pricing to drive independents out of business. *See* Cong.Rec. S12761-62 (daily ed. May 5, 1978) (statement of Sen. Durkin). But these provisions also reflect Congress' concern that the major distributors' desire to operate their own stations resulted in their pressing franchisees to sell out or face stiff increases in rent. *See* 123 Cong.Rec. H10,385 (daily ed. April 5, 1977) (statement of Rep. Conte). By protecting in this way the franchisee's interest in continuing to earn a livelihood from the franchise property, Congress limited the ability of the distributor to shift to more profitable direct management.

As these specific provisions illustrate, the very act of passing the PMPA indicated Congress's rejection of the view advanced by the major gasoline retailers that remedial legislation was unnecessary because the interests of distributors and franchisees were in harmony. *See, e.g., Senate Hearings, supra,* at 319-22 (statement of Kenneth E. Curtis, Vice-President of Marketing for Amoco). While a subjective good faith standard would probably enable distributors to pursue their own, unfettered self-interest, the statute does not generally guarantee distributors that right. We therefore reject this goal as a guiding principle for interpreting the bona fide offer provision.

## IV. *The Role of Fair Market Value*

### A.

Having rejected Amoco's proffered definition of a bona fide offer, we must now derive the correct one. The starting point of all statutory analysis is the words of the statute themselves. Our review of the many statutes in which Congress has used the term "bona fide" reveals that while Congress uses the phrase in contexts in which good faith intent helps reveal and may even help determine genuineness, the term is also used to convey an objective notion of actuality. [6] For example, immigration statutes provide special privileges variously for a

"bona fide student," 8 U.S.C. § 1101(a)(15)(F)(i), for a father with a "bona fide parent-child relationship" with a child, 8 U.S.C. § 1101(b)(1)(D), for a "bona fide member of the crew" of a vessel, 8 U.S.C. § 1287, or for employees of a "bona fide United States incorporated nonprofit organization," 8 U.S.C. § 1430(c). While the purposes of those who claim to fit into these categories may be relevant to a determination of their *bona fides*, the status of each would seem to turn at least substantially on objectively verifiable characteristics.

Bona fide occupational qualifications for employment, which serve as exceptions to our employment discrimination laws, *see* 29 U.S.C. § 621, 42 U.S.C. § 2000e-2(e), work similarly. For a qualification to be bona fide, an employer must show not only that it is necessary but the facts must support its "reasonable necessity" and the inability to accomplish the same purpose through a less discriminatory means. *See Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977) (interpreting Title VII); *Western Air Lines v. Criswell*, 472 U.S. 400, 105 S.Ct. 2743, 2751-53, 86 L.Ed.2d 321 (1985) (interpreting Age Discrimination in Employment Act).

A review of the fourteen code sections that use the phrase "bona fide offer" does not provide a definite meaning. Some refer to a "bona fide offer of employment," providing for special relocation benefits to those who have accepted such an offer under certain circumstances, *see* 29 U.S.C. § 1653; 19 U.S.C. § 2298(b), or denying benefits to those who have rejected them, *see* 42 U.S.C. § 607(b). In these contexts, Congress does not appear to use the phrase in connection with any notion of price level.

In many other contexts, however, Congress uses the phrase "bona fide offer" in tandem with some specified notion of market value. *See, e.g.,* 16 U.S.C. § 544f(*o*) (conservation area rules limiting use of property do not apply to unpurchased land for which owner has made "bona fide offer" **\*484** to sell to government; offer "shall not be considered bona fide" if owner refuses consideration equal to the fair market value); 45 U.S.C. § 748(e) (in complicated statutory scheme governing abandonment of rail-line by bankrupt railroad company, company must sell if it receives "bona fide offer" for 75% of appraised value of line); 10 U.S.C. § 9512(e)(2)(D) (Secretary of Defense may reimburse private owner of aircraft modified to be able to serve as cargo plane if needed by government if resale of plane pursuant to "bona fide, arm's length transaction made to the highest bidder" is for a price less than fair market value of non-modified plane).

We acknowledge that the coupling of "bona fide offer" with some particular statement of value could suggest that "bona fide" conveys a solely independent meaning. We believe, however, that we read these statutes more fairly by deducing that Congress generally intends the *bona fides* of an offer to be determined in accordance with some level of fair market value.

Section 3604 of Title 42 U.S.C., which does not explicitly define bona fide in some relation to "fair market value," supports this view. That section makes it illegal "to refuse to sell or rent after the making of a bona fide offer ... a dwelling to any person because of race, color, religion, sex, or national origin." Because a property owner who refused to rent or sell a property because of a below-market price would not engage in discrimination, an offer that did not meet the market price would assumedly not be a bona fide offer.

Notwithstanding the helpful guidance of these sections, they primarily establish that the phrase "bona fide" gains meaning from its statutory context. We must therefore derive the meaning of bona fide offers to sell under the PMPA from that statute's legislative purpose.

As we have discussed, the overriding purpose of Title I of the PMPA is to protect the franchisee's reasonable expectation of continuing the franchise relationship. Because of the distributor's need to adjust to changing market conditions, however, Congress permitted distributors to end the franchise relationship for legitimate business reasons. Yet in doing so, distributors still deprived franchisees of their reasonable expectations. The bona fide offer provision therefore serves as a second, and distinct, layer of protection, assuring the franchisee an opportunity to continue to earn a livelihood from the property while permitting the distributor to end the franchise relationship.

Permitting the distributor to set an offer price as high as it wished would not provide this second layer of protection because the distributor's business plans may lead it to wish to retain the property. Distributors would set offer prices that compensated them fully for the loss of their business plans. Alternatively, distributors would set an even higher price if they thought the franchisee would pay it. The special desire of a franchisee to maintain the property with which he has worked is exactly what produces the distributor's general bargaining advantage. Either price, a price reflecting the distributor's desire to pursue its business plans or a price reflecting the franchisor's special commitment to the

property, might fail to compensate the franchisee for the loss of his reasonable expectation of renewal.

[5]    To protect the interests of franchisees, we believe that the statute effectively requires the distributor to set an offer price ignoring both its own alternative business plans and the special needs of a franchisee to hold on to the property. Rather, the statute requires the distributor to make an offer as if it "actually" wanted to sell the property (not necessarily to the franchisee but to someone). With such a desire, however, the distributor would set an offer price at fair market value. That, by definition, is the highest price a willing buyer would pay, and an offer at fair market value protects the franchisee's reasonable expectation of being able to make a living with the franchise property.

**B.**

Having stated this requirement, we must now decide in what manner courts should scrutinize the distributor's offer to determine  **\*485**  whether it complies with the requirement. In *Robertson v. Mobil Oil Corp.,* 778 F.2d 1005, 1008 (3d Cir.1985), we defined "bona fide" in the context of the PMPA provision permitting nonrenewal of a franchise because of "bona fide customer complaints" to mean "sincere and having a reasonable basis in fact." We similarly here are guided by Congress's decision not actually to use the term "fair market value" but instead the term bona fide, which suggests some degree of deference. That choice indicates, we believe, a recognition that "the word 'value' almost always involves a conjecture, a guess, a prediction, a prophecy." *Amerada Hess Corp. v. Commissioner,* 517 F.2d 75, 83 (3d Cir.1975) (quoting other cases). "[T]here is no universally infallible index of fair market value." *Id.* There may be a range of prices with reasonable claims to being fair market value. Were we to mandate that courts determine whether the distributor's offer actually was at fair market value, distributors could rarely rest comfortably that their offer would eventually be determined by the court to be fair market value.

On the other hand, a standard of scrutiny that simply focused on whether the distributor believed its offer to represent fair market value would leave the franchisee open to injury through sloppiness or mere error. Such a focus might also prove difficult to apply, for intentions are always difficult to discern, especially when we deal not with the intentions of individuals but of organizations.

[6]    We therefore believe that courts should scrutinize the distributor's offer in a manner similar to that we adopted in *Robertson.* Courts should determine first if the distributor believed its offer price represented fair market value. Even if the distributor did have that sincere belief, however, courts should also determine whether the estimate was objectively reasonable. i.e., whether the offer approached fair market value. [7]

**V.** *The Need for Remand*

[7]    In this case, our disagreement with the district court is narrow. The district court found that Amoco sincerely believed its offer to be at fair market value. Slatky has pointed to considerable evidence that might support a contrary finding, in particular to apparently sloppy appraisal methods and to pressures placed on the appraisal department by the district manager, Lemuel Warfield, that resulted in a higher price. However, the district court's finding on the sincerity of Amoco's belief is not clearly erroneous.

[8]    The district court also found that the "procedures" used by the Amoco employees were reasonable, and upon this finding, it apparently risked its judgment that the offer had a reasonable basis in fact. [8]    The mere following of reasonable procedures, however, does not necessarily result in a reasonable estimate. To determine whether the estimate was reasonable, the district court must focus on the specific facts used by the appraisers in their valuation and the inferences made from them.

Slatky presented evidence that the land appraisal was based on out-of-date and inappropriate comparables and that the improvements appraisal did not represent local costs. Slatky also presented the testimony of independent appraisers that disagreed  **\*486**  markedly with the evaluations of Amoco. Indeed, Amoco's own appraiser, apparently hired for trial preparation, valued the property $31,000 less than the amount offered by Amoco. The district court should have evaluated these specific challenges. In the face of an apparent congruence of independent appraisals that Amoco's estimate was considerably too high, the court had an obligation to state clearly why it found the Amoco estimate objectively reasonable. [9]

Because the district court failed to find objective reasonableness (in addition to a belief that the property was

offered to the franchisee at fair market value), the judgment of the district court will be reversed and the case remanded for further proceedings consistent with this opinion. The district court will have to make further fact findings. We leave it to the discretion of the district court whether to reopen the record.

MANSMANN, Circuit Judge, dissenting.

I respectfully dissent. I disagree with the majority's position regarding what evidentiary burden a franchisor must meet to establish that an offer is bona fide, and what evidence a franchisee may introduce in order to raise a triable issue of fact on the bona fides of an offer to sell the franchise premises. The statute puts the good faith of the franchisor at issue, not the market value of the franchise property. Reliance on the opinion of a certified, independent appraiser would be competent evidence of the franchisor's good faith in arriving at its offering price. However, nothing in the statute supports the majority's intimation that, in every case, an independent appraisal is required as part of the franchisor's initial evidentiary burden and that the district court is required to make an independent determination of fair market value.

I believe that once the franchisor has established that it has arrived at its offering price in accordance with its usual appraisal practices, it is entitled to an inference that the offer was made in good faith, i.e., that the franchisor's usual appraisal practices produced a price which the franchisor reasonably believed represented the value of the property. The burden would then shift to the franchisee to raise a triable issue of fact with regard to the franchisor's good faith.

**I.**

Congress enacted Title I of the PMPA to remedy the disparity of bargaining power which enabled a petroleum franchisor to obtain the right to terminate a franchise relationship for minor contract violations or changes in circumstances. Evidence at Congressional hearings demonstrated that franchisors used the prospect of nonrenewal to compel franchisees to comply with the franchisor's marketing policies, and frustrated the reasonable renewal expectations of franchisees through arbitrary and discriminatory cancellations. See generally S.Rep. No. 731, 95th Cong., 2d Sess. 17-19, reprinted in 1978 U.S.Code Cong. & Ad.News 873, 875-77 (the "Senate Report"). In order to strengthen the bargaining position of franchisees, Congress drafted Title I to prohibit a franchisor from terminating or failing to renew a franchise agreement

except on grounds specified in the statute. The statute also requires written notice of the franchisor's intent to terminate or fail to renew. 15 U.S.C. § 2804(a).

The legislative history of the PMPA recognizes an essential legislative purpose to provide statutory grounds for termination and nonrenewal which would not be "so broad as to deny franchisees meaningful protections from arbitrary or discriminatory terminations and nonrenewals or to prevent fulfillment of the reasonable renewal expectations of the franchisees." Senate Report at 18, 1978 U.S.Code Cong. & Ad.News at 877. Yet, a competing legislative concern was expressed for "the legitimate needs of a franchisor to be able to terminate a franchise or not renew a franchise relationship based upon certain actions of the franchisee." Id. at 19, 1978 U.S.Code Cong. & Ad.News at 877. Congress also **487 recognized the particular importance of providing "adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences." Id.

The statutory grounds for termination or nonrenewal reflect Congress' attempt to strike a balance among these competing concerns. Permissible grounds for either termination or nonrenewal include specific courses of conduct of the franchisee, events such as fraud or bankruptcy, and agreement of the parties, or the franchisor's determination to withdraw from the geographic area. See 15 U.S.C. §§ 2802(b)(2)(A)-(E). Customer complaints, failure of the franchisee to operate the franchise in a safe and sanitary manner, and failure by the parties to agree to reasonable changes in the franchise agreement are also grounds for nonrenewal. See 15 U.S.C. §§ 2802(b)(3)(A)-(C). A franchisor may also fail to renew a franchise if he decides "in good faith" and "in the normal course of business" to convert the premises to another use, to materially alter the premises, to sell the premises, or that the franchise is uneconomical. 15 U.S.C. § 2802(b)(3)(D).

To establish a prima facie case under the enforcement provisions of the PMPA, the franchisee need only establish a termination or nonrenewal of a franchise agreement. 15 U.S.C. § 2805(c). The franchisor then has the burden of going forward with evidence to establish as an affirmative defense that the termination or nonrenewal was permitted under the statute. Id. When the decision not to renew is based upon one of the business judgments permitted under § 2802(b)(2)(E) or (b)(3)(D), the franchisor must also establish in defense that the determination was not for the purpose of converting the premises to operation by employees or agents

of the franchisor for the franchisor's own account, 15 U.S.C. § 2802(b)(2)(E)(ii) and (b)(3)(D)(ii), and that it has complied with the notice requirements of the statute, 15 U.S.C. § 2804.

The statutory section in dispute here provides that once a franchisor has made an economic determination not to renew a franchise agreement in accordance with the statute and has notified the franchisee of its decision not to renew, the franchisor must make to the franchisee a "bona fide offer" to sell or otherwise transfer the franchisor's interest in the marketing premises or grant a right of first refusal of an offer made by another. 15 U.S.C. §§ 2802(b)(2)(E)(iii), (b)(3)(D)(iii).

The parties agreed that the PMPA places upon the franchisor the burden of proving its compliance with the statutory requirements including the fact that its offer was "bona fide." The parties stipulated that Amoco's ground for nonrenewal of Slatky's franchise was a business decision permitted by the statute and that the franchisor had complied with the notice requirements of the statute. Section 2802(b)(3)(D)(iii) is the applicable provision requiring a bona fide offer, and the parties parted company over the definition of "bona fide" to be applied here.

After a bench trial, the district court rendered judgment for Amoco.[1] In seeking to ascertain the correct legal standard to apply, the district court relied on our decision in *Robertson v. Mobil Oil Corp.,* 778 F.2d 1005 (3d Cir.1985), in finding that Amoco's offer to Slatky was bona fide. In *Robertson* we defined bona fide in the context of a different section of the PMPA, namely § 2802(b)(3)(B) which allows termination or nonrenewal of a franchise based on "bona fide" customer complaints. We there defined a bona fide complaint as "sincere and having a reasonable basis in fact." *Id.* at 1008.

The district court concluded that Amoco's offer was reached in a reasonable manner, in the normal course of business, by Amoco's employees who appraise any property **\*488** Amoco intends to buy, sell, or lease and who followed procedures normally used for evaluating any of Amoco's property for sale. The court found that "although [Amoco's real estate manager] was requested to reappraise the land which resulted in a higher valuation, there is no evidence that he was directed to increase his appraisal." The court relied upon these findings in concluding that the offer had a reasonable basis in fact. The district court made no finding of fact regarding whether the offer approached the fair market value of the marketing premises as determined by

an independent appraisal, but the court found the offer to be sincere in that the property was offered at what Amoco believed was the fair market value. The court rejected the argument of the plaintiff that in order for the franchisor to meet its statutory obligation of proving a bona fide offer under the PMPA, the franchisor must demonstrate that its offer equals or approaches a fair market value as determined by an independent appraiser.

On appeal, the plaintiff argues that the district court erred first in finding that Amoco's valuation procedures were reasonable, and second, in applying a legal standard which did not require an independent consideration of the fair market value of the marketing premises.

Our review in cases of statutory construction is plenary. *Chrysler Credit Corp. v. First National Bank Trust Company of Washington,* 746 F.2d 200, 202 (3d Cir.1984); *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 101-02 (3d Cir.1981). Findings of fact should stand unless clearly erroneous. *See Leeper v. United States,* 756 F.2d 300, 308 (3d Cir.1985).

## II.

Neither the statute itself nor the legislative history of the PMPA provides us with an explicit definition of "bona fide." In *Robertson* we arrived at a definition of bona fide suited to the particular statutory context of the PMPA-namely, that Congress intended "bona fide" customer complaints to be "sincere and hav[e] a reasonable basis in fact." *Robertson,* 778 F.2d at 1008. Our present task is to determine precisely what our *Robertson* definition requires in the context of offers to sell leased marketing premises pursuant to § 2802(b)(3)(D)(iii) of the PMPA.

The avowed purpose of Title I of the PMPA "is the establishment of minimum Federal standards governing the termination and nonrenewal of franchise relationships for the sale of motor fuel by the franchisor or supplier of such fuel." Senate Report at 15, 1978 U.S.Code Cong. & Ad.News at 873. Congress implemented its objective primarily by delineating clearly the grounds on which the franchisors may terminate or refuse renewal of an existing franchise. *See* 15 U.S.C. § 2802. As discussed above, the remedial scheme of the statute attempts to balance the franchisee's relative lack of bargaining power and reasonable renewal expectations

against the legitimate property rights and economic interests of the franchisor. *See* Senate Report at 18-19.

I agree with the majority that protection of the franchisee requires that the franchisor behave as though it truly wished to sell the franchise premises. Thus, consistent with *Robertson*, for an offer to be bona fide the appraisal upon which it is based must have a reasonable basis in fact. I disagree with the majority's view regarding what role the concept of "market value" should play in the court's determination of whether the franchisor has conformed to the bona fide offer.

The majority implies that a franchisor may not meet its burden of proof to establish the bona fide offer element of its defense without affirmatively establishing, in addition, that its offering price was "objectively reasonable," measured by the degree to which the offer "approach[es] fair market value" as determined by an independent appraiser and by the district court. The majority effectively requires the franchisor to introduce evidence that it relied upon the opinion of an independent appraiser in arriving at its offering price. The majority would then further require that the district court make an independent determination **\*489** of the acceptable range of fair market values for the franchise premises. I disagree. I find no basis in the PMPA for imposing the majority's objective evidentiary standard.

The statutory construction process must look in the first instance to the plain meaning of a statute's terms. *See National Freight v. Larson,* 760 F.2d 499, 503 (3d Cir.), *cert. denied,* 474 U.S. 902, 106 S.Ct. 228, 88 L.Ed.2d 227 (1985). "The common legal definition of bona fide, consistent with the non-legal definition, is '[i]n or with good faith; honestly, openly, and sincerely ... real, actual, genuine, and not feigned.' " *Robertson,* 778 F.2d at 1008, *quoting* Black's Law Dictionary (5th ed. 1979). In a legal context, the term bona fide looks almost exclusively to subjective good faith. For example, a bona fide purchaser, a bona fide holder for value, a bona fide mortgagee or a bona fide possessor of property may be party to illegal transactions yet exempt from liability because the action was taken in subjective good faith irrespective of another's prior or superior claim of right to the property. Additionally, nothing in § 2802(b)(3)(D)(iii) requires a franchisor to offer to sell, transfer, or assign its interest in the leased marketing premises for a price which in fact approximates fair market value. We must presume, accordingly, that Congress, in prescribing a bona fide offer did not necessarily intend to equate the franchisor's good faith

with an enforcing court's independent determination of fair market value.

No express statutory language governs what evidence may inform the bona fides of an offer. I believe the concept of a bona fide offer as utilized in § 2802(b)(3)(D)(iii) contemplates subjective good faith, *i.e.,* is undertaken without a motive or purpose to discriminate against the franchisee, which may be objectively evidenced through the use of the franchisor's normal procedure for appraising property for sale. The position of § 2802(b)(3)(D)(iii) in the statutory remedial scheme suggests that the franchisor's decision as to an offering price should be subject to a standard of intent similar to that which governs economic determinations which may support a decision not to renew a franchise. Under the PMPA, the requirement to offer the property for sale is triggered by the franchisor's reliance upon grounds for nonrenewal set forth in § 2802(b)(3)(D), which involve economic decisions regarding marketing strategy or recommitment of resources. There is nothing in the statute to indicate that compliance with § 2802(b)(3)(D)(iii) demands anything more than what is required for compliance with the sections which trigger its applicability. The standard governing those economic decisions is that they be made "in good faith and in the normal course of business." §§ 2802(b)(3)(D)(I)-(IV).

We may reasonably assume that through its ordinary valuation procedures a franchisor will determine a selling price which it considers to be market value and that the valuation will, as a result, have a reasonable basis in fact.

The fact that ordinary business procedures are not expressly required by the language of the section under consideration does not mean that a decision in the ordinary course of business may not evidence a bona fide offer. The absence of the express requirement of normal procedures merely suggests that other courses of conduct, *e.g.,* the use of outside appraisers even if not the franchisor's usual practice, could evidence good faith as well. I find nothing in the PMPA which requires the franchisor to offer its interest in the marketing premises to a current franchisee at a price which is any less than the franchisor would expect to receive from a third party purchaser. Section 2802(b)(3)(D)(iii)(II) contemplates that the franchisor might actively solicit bids or offer the marketing premises at a given price to the public at large. The section requires only that the franchisor must "offer [ ] the franchisee a right of first refusal ... of an offer, made

by another, to purchase such franchisor's interest in such premises."

The purposes of the statute would be served by defining a bona fide offer to sell as an offer to sell the fully operative marketing premises, which offer is the same as that which the franchisor would make to **\*490** any prospective buyer and based upon a valuation of the marketing premises arrived at through the normal procedures used by the franchisor in informing its decision at what price to offer any of its property for sale. Initially, therefore, the franchisor need carry the evidentiary burden to show that the franchisor arrived at its asking price through the normal appraisal procedures employed in the buying and selling of any of its property. Such a showing would presumptively satisfy our *Robertson* requirement of a sincere offer reasonably based in fact.

If the franchisor met its initial evidentiary burden, the franchisee could then introduce evidence of any arbitrary or discriminatory variation from the franchisor's normal business practices. If as Slatky complains, the franchisor did not really desire to sell the premises and inflated the selling price to prevent a sale, the franchisee could challenge the bona fides of the offer, for example, by introducing evidence to controvert the facts supporting the appraisal, the inferences drawn from them, on any unexplained inflation of the appraisers' figures in arriving at an offering price.

### III.

I part company with the majority's suggestion that the mere fact that independent appraisers arrived at a different opinion of the value of the property raises an issue of fact as to the bona fides of the franchisor's offer.

Market value is merely a matter of opinion until the subject property actually changes hands. *Amerada Hess Corp. v. Commissioner,* 517 F.2d 75, 83 (3d Cir.), *cert. denied,* 423 U.S. 1037, 96 S.Ct. 574, 46 L.Ed.2d 412 (1975). [2] As the majority recognizes, there may be a range of prices with reasonable claims to being fair market value. Consequently, a test of Amoco's bona fides cannot require more than that it relied on a well-founded opinion as to the market value of the franchise property, *i.e.,* whether Amoco reasonably believed its offer to be at fair market value, the standard applied by the district court. This conclusion fully comports with the Congressional aims expressed in the overall scheme and legislative history of the PMPA.

Slatky cites *Tobias v. Shell Oil Co.,* 782 F.2d 1172 (4th Cir.1986), and *Brownstein v. Arco Petroleum Products Co.,* 604 F.Supp. 312 (E.D.Pa.1985), as squarely holding that a "bona fide offer" must approach fair market value. The plaintiff, however, misplaces his reliance on these authorities. In *Brownstein,* the plaintiff attacked the *bona fides* of Arco's offer to sell him the franchise premises at a price sixteen percent above the value Arco's appraiser had assigned to the property. Since Arco could not demonstrate why it inflated its appraiser's figures, the district court held that the offer was not in conformity with the offeror's general practice for selling property, and was therefore not bona fide. *Id.* at 316. This result conforms to our analysis.

We note that the district court stated that:

> Even had Arco demonstrated that the procedures by which it arrived at the offering price were consistent with those utilized in non-PMPA-restricted cases, I am not convinced that it would have satisfied the strictures of the Act.... [A] proper reading of the Act compels the conclusion that for an offer to be bona fide-that is *actual*- it must meet or very nearly approach what the offeror believes to be the fair market value of the property [footnote omitted].

**\*491** *Id.,* emphasis in original. A close reading of *Brownstein* shows it to be consistent with Amoco's, not Slatky's, position. Even the court's dicta tested "what the offeror *believes* to be the fair market value of the property [footnote omitted]." *Id.,* emphasis added. The trial judge here specifically found that Amoco believed its offer to reflect fair market value. Even under the *Brownstein* analysis, therefore, Amoco has satisfied the bona fide offer requirement of the PMPA.

The opinion of the Court of Appeals for the Fourth Circuit in *Tobias* offers little help to us here. In *Tobias* the fair market value of the premises was undisputed and, in fact, the franchisor's sale price approached fair market value. *See Tobias,* 782 F.2d at 1174. The court was not faced with the problem we have here.

In sum, neither the express language nor the legislative history of § 2802(b)(3)(D) requires a franchisor's "bona fide

offer" to approach fair market value as determined by the court or by an independent appraiser. I conclude that the PMPA's requirement of a "bona fide offer" contemplates, at a minimum, that the franchisor should follow its general practice for selling property. The franchisor, of course, may demonstrate its good faith by means of an independent appraisal of fair market value if it so wishes, but nothing in the Act or its history requires such a course.

**IV.**

Applying the legal standard enunciated above to the facts as found by the district court, I would hold that Amoco's offer to sell the premises was "bona fide." The district court properly found the franchisor's offer to be bona fide because the offeror arrived at its opinion of the value of the property in accordance with its normal procedures and offered to sell the property to the plaintiff at a price based upon that appraisal. In my view the trial court had discretion to credit the testimony of Amoco's employees with respect to Amoco's good faith in arriving at what they perceived to be a fair offering price.

Amoco's employees were qualified to form and express an opinion as to the value of the franchise property. A substantial and sufficient basis for the expression of that opinion appears in the record. The record establishes that the employees are acquainted with the property and are informed about the state of the market. The weight and credibility of their evidence was for the factfinder.

Eugene O'Brien, Manager of Projects for the North East United States, testified that out of 40 years of employment with Amoco approximately 38 were spent in real estate related positions involving extensive on-the-job experience as well as seminars and training courses. In 1985 his project team was responsible for $6.5 million in sales of properties. He testified about the company's procedures for determining an offering price and the employment of those procedures in this case. He affirmed that the procedures used in this case were the same as those employed by Amoco throughout the history of his employment with them. He further testified that Amoco's general procedure for determining the offering price of property is to conduct an initial appraisal of the land and real estate improvements by its own employees. That appraisal is then reviewed by a real estate manager and project team director. If the review raises questions, the property is reappraised or the appraisal is otherwise corrected. A selling price is then determined by Amoco's capital asset manager.

Melvin O'Dell, the capital investment representative for that area who prepared the appraisal of the land value, testified that he had been a capital investment representative for 25 of his 33 years with Amoco and had spent the first 8 years with Amoco in other real estate related positions. His duties and responsibilities for the past 25 years have been to buy, sell, lease and appraise Amoco properties in Pennsylvania and the four adjoining states. He testified to extensive on-the-job training, numerous appraisal seminars and a real estate license. He performs roughly 75 appraisals in the course of a year. Factors he relies on include determination of comparable sales in the market area and evaluation of **\*492** them in relation to the site being appraised as to size, geographic location, accessibility, overall appeal, zoning, and traffic volume. He makes on-site inspections of the comparable properties and the subject property.

Charles Bogdanowicz, who appraised the improvements, had been, at the time of his testimony, employed by Amoco for 13 years, the last 5 of which were spent as a project engineer. In this capacity he designs facilities to be constructed on various Amoco properties, a job which requires him to estimate the cost of improvements, secure bids, purchase equipment for service station facilities, supervise construction and, approximately twice a month, appraise service station improvements and equipment.

Lemuel Warfield, the Washington, D.C., district manager, testified that based on the number of gallons sold at the subject property Amoco could not purchase a replacement property, *i.e.,* with the potential to pump as many gallons, for the building and land value assigned by Amoco's appraisers. He testified that Amoco would have to pay close to half a million dollars to replace the property. Nevertheless, and despite his protest which resulted only in a closer appraisal of the land value and an increase of $30,000, his opinion that the station was more profitable for Amoco than reflected in the offer was not taken into consideration in arriving at the offering price. Thus, the only evidence of record regarding the matter of "value to Amoco" was that income from alternative uses was not considered by Amoco in setting its offering price.

I would hold that the franchisor's evidence of a price arrived at through its usual appraisal procedures and by experts who are qualified to testify as to the value of the property raised an inference that the franchisor believed it was offering the premises to the franchisee at a fair price. This inference satisfied the burden of proof as to the franchisor's good faith

defense unless the plaintiff was able to raise an issue of fact as to the franchisor's good faith. I do not believe the franchisee met this burden simply by introducing evidence of lower appraisals. Something more persuasive would be required than evidence that other appraisers were of a different opinion.

Under the majority's analysis, an independent appraisal of market value would be the only way to determine good faith. Reliance upon the opinion of a qualified independent appraiser would be persuasive evidence of a franchisor's good faith but it certainly would not be conclusive. The opinions of independent appraisers and the reasonableness of the franchisor's reliance upon them would be subject to testing and scrutiny by cross-examination and, as with the employee appraisers, the district court would have to decide what weight to give their opinions.

The majority also insists that the district court must focus on the specific facts used by the Amoco appraisers in their evaluation and the inferences made from them. I agree, but only to the extent that the franchisee is able to produce evidence to raise an issue of fact. The only fact placed in issue by the plaintiff here was that O'Dell's original appraisal of land value had been based on a considerable underestimation of the square footage of the principal comparable property, the Turkey Hill Market site. O'Dell, however, corrected the figures in his second appraisal and testified that he had determined that the underestimation would not change his estimate of the value of the subject property because even with the additional square footage the Turkey Hill site was considerably smaller than the franchise premises and was not adapted to as many uses.

The majority holds that where the franchisor introduces evidence of independent appraisals which are considerably lower than the franchisor's offer, the district court must state clearly why it finds the franchisor's offer to be objectively reasonable. Since, as the majority admits, the franchisor's good faith, and not the precise market value of the property, is the ultimate statutory issue, I do not believe the franchisee raises a triable issue of fact simply by introducing evidence of lower **\*493** appraisals. Something more persuasive would be required than evidence that other appraisers arrived at a different figure.

The plaintiff might, for example, place the franchisor's good faith in issue by offering persuasive evidence that the franchisor did not follow its usual procedures or employ its usual criteria or that the franchisor's witnesses were not competent to testify concerning the value of the property, *i.e.*, that the figures developed by the franchisor's appraisers or adjustments to their figures were based on speculation, guess, or conjecture. If employees did not know or consider some of the factors ordinarily used by certified appraisers, they may be asked to relate the details of their training and experience which justified them in disregarding the factors ignored.

The majority seizes upon the argument that O'Dell used out-of-date and inappropriate comparables in making his land value appraisal. However, the plaintiff introduced no evidence that better comparables were available. Plaintiff's expert testified that his best comparable was a site known as the Turkey Hill Mini-Mart which O'Dell also used as his principal comparable. The plaintiff's experts both testified on cross-examination that there were no recent sales of property for use as a service station in the area.

The majority also finds suspect the fact that Mr. O'Brien, after receiving O'Dell's first land estimate of $155,000, requested that O'Dell reevaluate the property. O'Dell then secured current traffic volume figures for the subject property and each comparable, determining the current zoning status of each and studying the residential areas encompassing the marketing areas of all three comparables and the subject property; he thereupon increased his land appraisal to $185,000.

The plaintiff also faulted O'Dell for failing to rely on comparables he had selected personally. However, O'Dell testified that he was familiar with the work of the prior appraiser, found him to be thorough and exacting and was comfortable in relying upon his selection of comparable properties. The plaintiff's arguments go only to the weight and credibility of O'Dell's testimony, a subject properly within the discretion of the trial court.

The majority also suggests that the improvements' appraisal did not represent local costs. Bogdanowicz, however, testified from his experience with new construction in Pennsylvania, Delaware, New Jersey, Maryland, and particularly in Harrisburg, that he would conclude that the construction costs in the Harrisburg area are comparable to the Philadelphia area where he had done most of his construction during the last three years.

The arguments made by the plaintiff and adopted by the majority are in essence challenges to the methods used by the

Amoco appraisers. Whatever suspicions the majority might have as to Amoco's good faith, there is no *evidence* that the appraisal is speculative. The facts supporting Amoco's appraisal were virtually unchallenged, and there is no evidence that the conclusions drawn from that data were incorrect. Nor is there any basis in fact to assume that an independent appraiser could value franchise property more accurately than could its present owner. The fact that the appraisers were employed by the defendant may also affect the weight of their testimony. Nevertheless, questions as to weight and credibility are for the factfinder, and we may not remand simply on the basis of our own speculation.

Even in cases where the facts will admit of more than one opinion, it is the province of the factfinder to choose among them. In this case, however, such a choice is not necessary. The defendant's burden is to prove good faith. If the data will support the franchisor's opinion as to the value of the property, the franchisor may not have proved market value, but it has proved good faith. This is true even if the facts will also reasonably support another opinion as to market value.

The district court specifically found that the procedures outlined by O'Brien are those followed by Amoco in the valuation of any property Amoco intends to buy, sell or lease. In addition, the court found that in this case Amoco did follow its customary **\*494** business procedures in arriving at an offering price to Slatky. The record clearly indicates that Amoco's appraisers were capable of forming an intelligent opinion derived from an adequate knowledge of the nature and kind of property in controversy and of its value. The district court noted that Amoco's appraisers showed precisely how they arrived at their respective appraisals. The district court found that the franchisor sincerely believed its offer to be at fair market value. The majority agrees that this finding is not clearly erroneous. No further findings were necessary to support the conclusion that the offer was bona fide.

The facts found by the district court support the decision that Amoco has fulfilled its statutory obligation to make a bona fide offer to sell the marketing premises to Slatky. Therefore, I would affirm the judgment of the district court.

## Parallel Citations

56 USLW 2215

## Footnotes

\*  Honorable Hubert I. Teitelbaum, United States District Judge for the Western District of Pennsylvania, sitting by designation.

1  The Senate Report explained that the disparity in bargaining power increased "as shorter franchise periods and more frequent renewal intervals are utilized." Senate Report at 18, U.S.Code Cong. & Admin.News 1978, at 877. By permitting terminations or nonrenewals for business reasons only of franchisees who had obtained or were offered three year franchises, Congress provided an incentive to distributors to provide franchises of at least that length.

2  In the case of a termination, a franchisor has a third option: he may sell the property to another franchisor and have that franchisor offer the franchisee a franchise agreement comparable to those the other franchisor has with other franchisees. *See* § 2802(b)(2)(E)(iii)(II).

3  Testimony of Slatky's appraisers indicated that the claimed sales price for the next most comparable property could not be verified.

4  Warfield had earlier told Slatky that he considered the property worth $500,000.

5  The district court took this standard from *Robertson v. Mobil Oil Corp.,* 778 F.2d 1005 (3d Cir.1985), in which we dealt with the provision in the PMPA permitting nonrenewal of a franchise because of "bona fide customer complaints." 15 U.S.C. § 2802(b)(3)(B). We interpreted the term bona fide there to mean "sincere and having a reasonable basis in fact." 778 F.2d at 1008.

6  According to a computer search of the United States Code, 369 sections of the Code contain the phrase "bona fide."

7  While we have held that sincere belief and objective reasonableness (as defined) are essential elements in the determination of the *bona fides* of an offer, we do not thereby exclude the possibility that there may be other relevant factors. For example, an offer approaching fair market value might be hedged with unreasonable conditions of sale.

8  Exactly what the district court meant by the reference to the appraiser's "procedures" in this context is unclear. The full sentence reads: "Although Mr. O'Dell and Mr. Bogdanowicz did not apply formal appraisal techniques, the procedures used by them were reasonable." 626 F.Supp. at 1226. In context, the reference appears to refer to broader techniques of appraisal. It certainly does not refer to the actual choice of comparables, the measurements of them, or the formula for relating one comparable to another.
      The district court's standard of "reasonableness" is also unclear. The court suggested that the procedures were reasonable so long as the offer "was not arbitrarily made." *Id.* We do not believe that an offer is reasonable whenever it is not arbitrary. A reasonable offer must be one that approaches fair market value.

9  We do not suggest that any one valuation method is appropriate.

56 USLW 2215

1  Amoco had counterclaimed for damages caused by the plaintiff's possession of the service station beyond the lease expiration date. Relying on the parties' pretrial stipulation to maintain the status quo pending the outcome of the trial, the district court entered judgment in favor of the plaintiff on the counterclaim.

2  In *Amerada Hess Corp. v. Commissioner,* we cited the classic formulation of fair market value: " 'the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.' " *Id., citing United States v. Cartwright,* 411 U.S. 546, 551, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973), *quoting* Treas. Reg. § 20.2031-1(b). We also noted that " 'the word "value" almost always involves a conjecture, a guess, a prediction, a prophecy.' " *Amerada Hess Corp.,* 517 F.2d at 83, *citing Andrews v. Commissioner,* 135 F.2d 314, 317 (2d Cir.), *cert. denied,* 320 U.S. 748, 64 S.Ct. 51, 88 L.Ed. 444 (1943), *quoting Commissioner v. Marshall,* 125 F.2d 943, 946 (2d Cir.1942). Furthermore, "there is no universally infallible index of fair market value." *Amerada Hess Corp.,* 517 F.2d at 83. The supposedly objective standard of fair market value is, therefore, subject to a host of variables.

**End of Document**    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 139

52 Bankr.Ct.Dec. 276, Bankr. L. Rep. P 81,728

602 F.3d 82
United States Court of Appeals,
Second Circuit.

In re Peter S. KALIKOW and
Kalikow Real Estate Co., Debtors.
Sheldon H. Solow, Steven M. Cherniak, Evergence
Capital Advisors, Inc., and Sheila M. Gowan,
Chapter 11 Trustee of Dreier LLP, et al., Appellants,
v.
Peter S. Kalikow and Kalikow
Real Estate Co., Appellees.

Docket Nos. 08–5268–bk(L), 08–
5274–bk (CON).    |    Argued: Oct.
29, 2009.    |    Decided: April 8, 2010.

**Synopsis**
**Background:** Former Chapter 11 debtor moved to reopen
and to enforce release, discharge, and injunction provisions of
its plan of reorganization after post-confirmation lender and
its chief operating officer allegedly used defunct corporation
to received notices of creditors' claims. The United States
Bankruptcy Court for the Southern District of New York,
Lifland, J., granted the motions and awarded costs and
expenses to former debtor as sanction. On appeal, the United
States District Court for the Southern District of New York,
Deborah A. Batts, J., affirmed, and appeal was taken.

**Holdings:** The Court of Appeals, Miner, Circuit Judge, held
that:

[1] debtor's motions were sufficient to alert lender and officer
that relief was being sought against them, so as to support
exercise of personal jurisdiction;

[2] lender and officer were properly served;

[3] motion to enforce could be resolved as a contested matter
rather than through an adversary proceeding;

[4] lender and officer were not personally bound by injunctive
provisions of debtor's reorganization plan; but

[5] injunction did not bar lender from using defunct
corporation as front to receive notices of unsecured creditors'
claims.

Affirmed in part and reversed in part.

West Headnotes (20)

**[1]** **Bankruptcy**
        Conclusions of law;  de novo review

A district court's order in a bankruptcy case
is subject to plenary review, meaning that the
Court of Appeals undertakes an independent
examination of the factual findings and legal
conclusions of the bankruptcy court.

14 Cases that cite this headnote

**[2]** **Bankruptcy**
        Discretion

A bankruptcy court's award of sanctions will
not be set aside by the Court of Appeals in the
absence of an abuse of discretion.

11 Cases that cite this headnote

**[3]** **Bankruptcy**
        Discretion

The bankruptcy court necessarily abuses its
discretion if it based its ruling on an erroneous
view of the law or on a clearly erroneous
assessment of the evidence.

9 Cases that cite this headnote

**[4]** **Bankruptcy**
        Venue;  Personal Jurisdiction
**Bankruptcy**
        Construction, execution, and performance

Former Chapter 11 debtor's motion to enforce
release, discharge, and injunction provisions
of its plan of reorganization was sufficient to
alert its post-confirmation lender and lender's
chief operating officer that relief was being
sought against them, so as to support exercise of

52 Bankr.Ct.Dec. 276, Bankr. L. Rep. P 81,728

personal jurisdiction over those parties; although the motion was never amended to name the lender and the officer, it sought relief from their attorney and as-yet-unidentified parties, based on debtor's belief that unknown individuals were using defunct corporation as front to receive notices of unsecured creditors' claims. 11 U.S.C.A. § 105; Fed.Rules Civ.Proc.Rule 10, 28 U.S.C.A.

Cases that cite this headnote

**[5]** **Federal Courts**
    Notice

Before a federal court may exercise personal jurisdiction over a party, the procedural requirement of service must be satisfied.

3 Cases that cite this headnote

**[6]** **Constitutional Law**
    Bankruptcy

Due process requirements concerning service of process apply in motion proceedings under bankruptcy rules with the same force as in adversarial proceedings. U.S.C.A. Const.Amend. 14; Bankruptcy Rules 7004, 9014(b), 11 U.S.C.(1988 Ed.).

Cases that cite this headnote

**[7]** **Bankruptcy**
    Nature and form; adversary proceedings

In a contested matter in a bankruptcy case, the notice of hearing is treated as a summons and the motion is treated as a complaint. Bankruptcy Rule 9014(b), 11 U.S.C.(1988 Ed.).

4 Cases that cite this headnote

**[8]** **Bankruptcy**
    Procedure
**Bankruptcy**
    Nature and form; adversary proceedings

The motion in a contested bankruptcy proceeding need not specifically name the parties

to the matter. Bankruptcy Rule 9014(b), 11 U.S.C.(1988 Ed.).

3 Cases that cite this headnote

**[9]** **Constitutional Law**
    Pleading
**Federal Civil Procedure**
    Caption

Although the failure to amend a caption to name the parties may constitute a violation of rule governing form of pleadings, such error does not per se constitute a deprivation of due process. U.S.C.A. Const.Amend. 14; Fed.Rules Civ.Proc.Rule 10, 28 U.S.C.A.

Cases that cite this headnote

**[10]** **Bankruptcy**
    Process; service
**Bankruptcy**
    Construction, execution, and performance

Proper service on attorney of former Chapter 11 debtor's motion to enforce release, discharge, and injunction provisions of its plan of reorganization constituted service on post-confirmation lender and lender's chief operating officer, where lender and officer engaged the attorney to place notices of unsecured creditors' claims, and that attorney continued to act as counsel for them in connection with the enforcement motion. 11 U.S.C. § 105; Fed.Rules Civ.Proc.Rule 4(e), 28 U.S.C.A.

Cases that cite this headnote

**[11]** **Bankruptcy**
    Nature and form; adversary proceedings
**Bankruptcy**
    Construction, execution, and performance

Former Chapter 11 debtor's motion to enforce release, discharge, and injunction provisions of its plan of reorganization, made after defunct corporation was allegedly used as a front to receive notices of unsecured creditors' claims, involved the enforcement of a pre-existing injunction, permitting resolution of

In re Kalikow, 602 F.3d 82 (2010)

Case 09-10138-MFW   Doc 14225-51   Filed 08/15/14   Page 57 of 493

52 Bankr.Ct.Dec. 276, Bankr. L. Rep. P 81,728

the motion a contested matter rather than through an adversary proceeding; relief sought, including publication of corrective notices, was meant to correct the alleged violation of the existing injunction. 11 U.S.C.A. § 524(g)(1)(A); Fed.Rules Bankr.Proc.Rule 7001(7), 11 U.S.C.A.

4 Cases that cite this headnote

[12]   **Bankruptcy**
       🔑 Nature and form;  adversary proceedings

       **Bankruptcy**
       🔑 Construction, execution, and performance

Post-confirmation lender and lender's chief operating officer were not deprived of a fair opportunity to present their case when bankruptcy court proceeded by motion, rather than initiating an adversary proceeding, to enforce the terms of former Chapter 11 debtor's reorganization plan, where relief requested by former debtor that allegedly went beyond terms of original injunction was not granted, and lender and officer appeared at two hearings and made written submissions before the bankruptcy court. 11 U.S.C.A. § 524(g)(1)(A); Fed.Rules Bankr.Proc.Rule 7001(7), 11 U.S.C.A.

1 Cases that cite this headnote

[13]   **Bankruptcy**
       🔑 Conclusiveness

       **Bankruptcy**
       🔑 Construction, execution, and performance

Post-confirmation lender and lender's chief operating officer were not personally bound by injunctive provisions of former Chapter 11 debtor's reorganization plan and confirmation order, and thus could not be sanctioned for violating those provisions; the provisions only pertained to holders of pre-confirmation claims discharged in bankruptcy, and the lender and officer were not holders of such claims. 11 U.S.C.A. §§ 524(a), 1141(d)(1)(A).

Cases that cite this headnote

[14]   **Bankruptcy**

       🔑 Discharge as injunction

       **Bankruptcy**
       🔑 Effect of Discharge

Generally, a discharge in bankruptcy relieves a debtor from all pre-petition debt, and the discharge statute permanently enjoins creditor actions to collect discharged debts. 11 U.S.C.A. § 524(a).

1 Cases that cite this headnote

[15]   **Bankruptcy**
       🔑 Discharge as injunction

Statute stating that discharge operates as an injunction against further efforts to collect discharged debts does not prohibit misled creditors from inquiring about their claims, or otherwise submitting a proof of claim, to a third party who has no relation to the reorganization proceedings and has not sought repayment from the former debtor or initiated proceedings in court on behalf of the creditors. 11 U.S.C.A. § 524(a)(2).

2 Cases that cite this headnote

[16]   **Bankruptcy**
       🔑 Discharge as injunction

Statute stating that discharge operates as an injunction against further efforts to collect discharged debts did not bar former Chapter 11 debtor's post-confirmation lender from using defunct corporation as front to receive notices of unsecured creditors' claims, where former creditors neither contacted former debtor nor initiated judicial proceedings, and their contact with corporation did not pressure former debtor to repay any of its discharged debts. 11 U.S.C.A. § 524(a)(2).

1 Cases that cite this headnote

[17]   **Bankruptcy**
       🔑 Frivolity or bad faith;  sanctions

Bankruptcy court's discretion to award sanctions may be exercised only on the basis of the specific authority invoked by that court. 11 U.S.C.A. § 105(a).

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 58 of 493

In re Kalikow, 602 F.3d 82 (2010)
52 Bankr.Ct.Dec. 276, Bankr. L. Rep. P 81,728

8 Cases that cite this headnote

**[18]    Bankruptcy**
  👉 Contempt

The statutory contempt powers given to a
bankruptcy court complement the inherent
powers of a federal court to enforce its own
orders. 11 U.S.C.A. § 105(a).

6 Cases that cite this headnote

**[19]    Bankruptcy**
  👉 Equitable powers and principles
  **Bankruptcy**
  👉 Contempt

Bankruptcy Code's contempt provision does not
itself create a private right of action, but a court
may invoke the provision if the equitable remedy
utilized is demonstrably necessary to preserve
a right elsewhere provided in the Code; these
powers are in addition to whatever inherent
contempt powers the court may have and must
include the award of monetary and other forms
of relief to the extent such awards are necessary
and appropriate to carry out the provisions of
the Bankruptcy Code and provide full remedial
relief. 11 U.S.C.A. § 105(a).

11 Cases that cite this headnote

**[20]    Bankruptcy**
  👉 Equitable powers and principles
  **Bankruptcy**
  👉 Contempt

Equitable power conferred on a bankruptcy court
by the Bankruptcy Code's contempt provision is
the power to exercise equity in carrying out the
provisions of the Bankruptcy Code, rather than
to further the purposes of the Code generally, or
otherwise to do the right thing. 11 U.S.C.A. §
105.

14 Cases that cite this headnote

**Attorneys and Law Firms**

***85** David M. Gossett, Richard Ben–Veniste, Mayer Brown
LLP, Washington, DC, for Appellants.

Sheldon H. Solow and Steven M. Cherniak, Joan M.
Secofsky, Howard D. Ressler, Diamond McCarthy LLP, New
York, NY, for Appellants Evergence Capital Advisors, Inc.,
and Sheila M. Gowen, Chapter 11 Trustee of Dreier LLP.

Randy M. Mastro, Gibson Dunn & Crutcher LLP, New York,
NY, for Appellees Peter S. Kalikow and Kalikow Real Estate
Co.

Before: MINER, RAGGI, and HALL, Circuit Judges.

**Opinion**

MINER, Circuit Judge:

Appellants, Sheldon Solow ("Solow"), Steven Cherniak
("Cherniak"), Evergence Capital Advisors, Inc.
("Evergence"), the law firm of Dreier LLP,[1] Marc S. Dreier,
and Kosta Kovachev (collectively, the "Appellants"),[2]
appeal from a judgment entered on September 30, 2008, in
the United States District Court for the Southern District of
New York (Batts, *J.*), affirming orders entered on June 21,
2004, and October 14, 2004, in the United States Bankruptcy
Court for the Southern District of New York (Lifland, *B.J.*).
The Bankruptcy Court's order of June 21, 2004, granted
(1) the motion of debtors-appellees, Peter S. Kalikow and
Kalikow Real Estate Co. (together, "Kalikow"), to reopen
Chapter 11 proceedings, pursuant to 11 U.S.C. § 350 (the
"350 Motion"); and (2) the motion of Kalikow seeking an
order, pursuant to 11 U.S.C. §§ 105, 524, 1141, as against
Evergence and against its "controlling persons[ ] and agents,"
including the law firm of Dreier LLP, to enforce the release,
discharge, and injunction provisions of Kalikow's plan of
reorganization (the "Plan") set forth in the Bankruptcy Court's
Confirmation Order of January 27, 1994 (the "Enforcement
Motion"). The Bankruptcy Court's order of October 14, 2004,
granted "costs and expenses, including, without limitation,
attorneys' fees and expenses," incurred up to September 28,
2004, in connection with the Enforcement Motion. The total
amount of the award set forth in the October 14, 2004 order
was $334,583.12.

On appeal, the District Court affirmed the judgment and
orders of the Bankruptcy Court, holding that: (1) the
Bankruptcy Court correctly found that it had the authority to

In re Kalikow, 602 F.3d 82 (2010)

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 59 of 493

52 Bankr.Ct.Dec. 276, Bankr. L. Rep. P 81,728

conduct the postconfirmation proceedings by motion, rather than by an adversary proceeding, because Kalikow sought to enforce the pre-existing injunction and provisions of the Plan and Confirmation Order, pursuant to 11 U.S.C. §§ 524(a)(2), 1141; (2) the Bankruptcy Court properly found that personal jurisdiction existed as to Solow and Cherniak because, although they were not initially named in Kalikow's motions, they had intentionally attempted to conceal their identities during the proceedings in the Bankruptcy Court; and (3) the Bankruptcy Court did not abuse its discretion in imposing **86** sanctions against the Appellants because that court "possessed ample evidence of damages" and "clearly provided the basis for imposing sanctions against Appellants by specifically noting that the notices posted by them ... violated the Confirmation Order ... [and] that the Appellants had acted in bad faith, with no legitimate purpose for their conduct."

For the reasons that follow, we affirm the judgment of the District Court in all respects except its imposition of sanctions upon the Appellants, pursuant to 11 U.S.C. §§ 524(a)(2), 1141, for violating the injunction provisions of the Plan and Confirmation Order. We affirm the judgment of the District Court in all other respects.

## BACKGROUND

**I. *Bankruptcy Court Proceedings***
This appeal arises from Chapter 11 bankruptcy proceedings commenced by Kalikow on August 21, 1991, in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). On December 21, 1993, Kalikow filed a plan of reorganization. The Plan vested Kalikow with the property of the estate, free from creditors' interests, and discharged Kalikow from "any Claim and any 'debt' ... that [arose] before the Effective Date." In particular, "every holder of a discharged Claim" was "precluded from asserting against [Kalikow] ... any further Claim based on any document, instrument or act, omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date."

The Bankruptcy Court confirmed the Plan pursuant to a Confirmation Order dated January 27, 1994. The Confirmation Order:

(1) made "the Plan and its provisions ... binding upon the Debtors ... and any holder of a claim against or interest in the Debtors."

(2) relieved Kalikow of all "liability to any holder of a Claim for any ... activity ... arising out of ... the confirmation."

(3) operated "as a discharge ... as to each holder of a Claim," relieving the debtors "from all debts that arose against them prior to or on the Effective Date."

(4) precluded any creditor holding a "discharged debt ... from asserting against the Debtors, ... any other or further Claim" based upon activity "prior to the Effective Date."

(5) "restrained and enjoined" all "creditors ... whose claims are discharged" from "employing any process or any act to collect, recover, or offset such debts," except as provided in the Plan.

The Confirmation Order also preserved creditors' claims for liability created by the express terms of any agreement or other document executed and delivered by Kalikow in connection with implementation of the Plan.

As part of the Plan, Kalikow was required to submit to the Bankruptcy Court a representation letter (the "Representation Letter") that would provide unsecured creditors assurance that Kalikow had made a full disclosure of their assets. Kalikow submitted such a letter on February 17, 1994. The Representation Letter reserved to the Plan Administrator an enforcement mechanism in the event of a breach by Kalikow. It authorized the Plan's Administrator, on behalf of creditors, to pursue a post-confirmation claim "as a result of a misrepresentation or breach of the representations and warranties set forth [in the Representation Letter]" up to ten years from the Plan's effective date—i.e., until February 17, 2004. This provision of the Representation Letter **87** was incorporated into section 4.6 of the Plan Administrator Agreement, which stated that "[e]xcept as expressly provided ... in this Section 4.6 [of the Plan Administrator Agreement], no person other than the Plan Administrator shall have authority to commence any legal action or otherwise pursue any right or remedy with respect to any misrepresentation or breach of warranty under the Kalikow Representation Letter." Should the Plan Administrator decline to pursue such a claim, section 4.6 of the Plan Administrator Agreement authorized an unsecured creditor to seek the court's permission to pursue

52 Bankr.Ct.Dec. 276, Bankr. L. Rep. P 81,728

a post-confirmation claim as described in the Representation Letter. [3]

In February 1994, a few weeks after the Confirmation Order had issued, Solow provided Kalikow with a $7 million loan and received in exchange an option to buy an interest in Kalikow's reorganized business. Kalikow repaid that loan in June 1994—more than five years earlier than it was due. Kalikow then repurchased the purchase-option from Solow for $2 million in 1995. The rapid repayment of the loan and repurchase of the option caused Solow to speculate that Kalikow had concealed a portion of their assets from creditors. Solow never produced any evidence to support that speculation. In 1997, Solow moved in the Bankruptcy Court for the appointment of an examiner to investigate Kalikow's representations. By this time, the bankruptcy cases were closed. The Plan Administrator had been discharged on December 26, 1995. Kalikow opposed the motion, arguing that Solow lacked standing to bring it as "a post-confirmation lender who has been paid in full." The motion was denied.

Approximately seven years after Solow's motion was denied, as the ten-year period for postconfirmation claims was about to expire, Solow and Cherniak [4] consulted Dreier LLP with respect to the approaching claims deadline of February 17, 2004. At that time, Marc Dreier ("Dreier") of Dreier LLP contacted Evergence, a defunct Florida Corporation, and Kovachev, Evergence's owner, to front as the contact for notices (the "Notices") apprising unsecured creditors "under the 1994 Chapter 11 Plan of Reorganization of Debtors Peter S. Kalikow and Kalikow Real Estate Co" of possible claims. The Notices contained a list of creditors of the estates, some listed with the amounts of their claims, followed by the statement: "You may have additional rights of recovery based on a failure by the debtors to make truthful disclosure. The deadline for your pursuing additional recovery is February 17, 2004. All interested creditors should contact the undersigned." The Notices bore the name of Evergence, and provided phone and fax numbers; however, these numbers were associated with a telephone and fax machine on the premises of Dreier LLP. After the publication of the Notices on February 9 and 12, 2004, in *The New York Times* and the New *York Post,* [5] a **\*88** number of listed creditors attempted to contact Evergence, either individually or by counsel. In response to the Notices, there were eighteen letters (from former creditors or their counsel) faxed to the fax number provided, and there were sixty-five telephone calls (from fifty-nine separate numbers) made to the number provided. The law firm of Bingham McCutchen prepared

for its client, 1001 Fifth Avenue Owners, Inc, and faxed to the number provided, a proof of claim for submission to the Bankruptcy Court. NFS Services, Inc. also submitted a letter of authority to collect on behalf of its client, Lehman Brothers Holdings, Inc. However, no creditor submitted a claim to the Bankruptcy Court or Plan Administrator, or attempted to recover from Kalikow directly.

In response to the Notices, on April 14, 2004, Kalikow filed the 350 Motion seeking an order pursuant to 11 U.S.C. § 350 to reopen Kalikow's "substantively consolidated bankruptcy cases." On April 20, 2004, Kalikow filed the Enforcement Motion, pursuant to 11 U.S.C. §§ 105, 524, 1141, seeking "to enforc[e] the release, discharge, and injunction provisions of the Plan and Confirmation Order." The Enforcement Motion was directed against "Evergence Capital Advisors, Inc., and its directors, officers, controlling persons, and agents, including the law firm of Dreier LLP." [6] The motion identified Evergence as a defunct Florida corporation, dissolved on October 4, 2002. Kosta Kovachev was identified as the president of Evergence. [7] Kalikow alleged in the Enforcement Motion that the Notices had been placed in bad faith, had been designed to appear as if ordered by a court, had created confusion among creditors, and had injured Kalikow's reputation. The Enforcement Motion sought an order (1) enjoining publication of the Notices pursuant to the Plan, the Confirmation Order, and 11 U.S.C. §§ 524, 1141; (2) directing Evergence to cease and desist from "engaging in any further such actions"; (3) requiring Evergence to publish corrective notice of the same size, placement, and frequency in the same publications; and (4) imposing sanctions on Evergence in the amount of Kalikow's costs and attorneys' fees related to investigating and responding to the Notices.

On May 6, 2004, Kalikow deposed Marc S. Dreier at the offices of Dreier LLP to discover any information Dreier might have regarding the Notices. At that time, Dreier declined to name the clients who had contacted Dreier LLP with regard to the post-confirmation claims, citing attorney-client privilege. Sometime thereafter, the Bankruptcy Court held a conference in chambers and compelled disclosure. When the deposition resumed on May 28, 2004, Dreier named Solow and Cherniak as the firm's clients.

On June 7, 2004, Dreier LLP filed an objection to the Enforcement Motion on behalf of Solow and Cherniak, claiming that Kalikow's motions had "sought no relief against [them]." The objection disputed Kalikow's allegations of bad faith, arguing that the Notices had been placed **\*89**

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 61 of 493

In re Kalikow, 602 F.3d 82 (2010)
52 Bankr.Ct.Dec. 276, Bankr. L. Rep. P 81,728

in order to alert creditors, before the deadline expired, to the possibility of post-confirmation claims based on Kalikow's misrepresentations. The objection also argued that the Bankruptcy Court lacked subject matter jurisdiction, that the dispute should be heard by a formal adversary proceeding, and that there was no legal basis for relief. Kalikow filed a reply on June 9, 2004, stating that relief would be sought against Dreier individually, as well as against Solow and Cherniak.

At a hearing on June 10, 2004, in the Bankruptcy Court, the court granted Kalikow's motions. The Bankruptcy Court found that the Notices "implicate[d]" the injunctive provisions of the Plan and Confirmation Order. The court considered, *inter alia,* (1) the timing of the Appellants' actions in placing the advertisements nine years after Kalikow repaid Solow and repurchased the option, and seven years after Solow's motion to appoint an examiner was denied; (2) the choice to publish the Notices in two of New York's most widely-read newspapers as a method of contacting creditors —whose addresses and contact information could have been easily obtained—when mailing the information would have been significantly less expensive; (3) the Notices had "the appearance of legal notices that are published at the direction of this Court"; and (4) "[t]he [N]otices were designed to mislead the public into thinking that they have a right to reassert discharged claims." The court also found that none of the Appellants was a former unsecured creditor of Kalikow. The court concluded that the Notices had not been placed in good faith and rejected the argument that, because no creditor had attempted to collect a discharged claim, the injunction had not been violated. As to the injunctive relief requested by Kalikow, the Bankruptcy Court declined to grant this request, stating that because "no creditors took the [respondents'] bait beyond retention of counsel and inquiry at their expense," the requested injunctive relief would "serve[ ] no basic purpose at this point in time." Instead, the court awarded "the recovery of costs incurred in investigating and bringing on this process," with other forms of relief "more appropriately addressed ... in other non-bankruptcy proceedings."

On June 21, 2004, the Bankruptcy Court issued a written order (the "First Order") restating its oral ruling of June 10, 2004. The First Order imposed sanctions on "Evergence Capital Advisors, Inc. and its directors, officers, controlling persons, and agents, including the law firm of Dreier LLP," and "Solow, ... Cherniak, ... Dreier and ... Kovachev." The court ordered:

that the Former Debtors shall provide to the [sanctioned parties] billing information (the "Invoices and Receipts") evidencing the costs and expenses, including without limitation attorneys' fees and expenses (the "Total Costs and Expenses") incurred by the Former Debtors in connection with the Enforcement Motion and in otherwise investigating and responding to the Notices through the date of the Hearing.

The court further ordered that any objections to Kalikow's statement of expenses be made within five days of Kalikow's submission, at which point the court would "schedule a hearing to determine the proper amount of [sanctions] to be awarded."

On June 30, 2004, Kalikow submitted its statement of expenses in the amount of $266,172.63, to which the Appellants objected, and the Bankruptcy Court scheduled a hearing to determine the proper amount of sanctions. Kalikow submitted a larger request on July 16, 2004, totaling $299,046.98, which reflected costs incurred **\*90** after the June 10 hearing and up to July 16.

On September 14, 2004, the Appellants objected to the expenses and costs submitted by Kalikow, arguing that the total amount was excessive, that individual entries were ambiguous or unreasonable, that costs incurred after June 10 should be excluded, and that costs for speaking with *The New York Times* reporters and drafting professional grievances were not legitimately within those awarded. Because Solow, Cherniak, and Dreier had not been made parties to the case prior to the adjudication of their liability, the Appellants also objected to any award based on the underlying merits, submitting a declaration by Dreier, with several attachments, explaining the good-faith basis of Solow and Cherniak for believing that Kalikow might have misrepresented their assets in the earlier bankruptcy proceeding and explaining their desire to alert creditors to the issue before the deadline expired.

In a hearing held on September 28, 2004, the Bankruptcy Court concluded that it did "not find the amounts that are requested [by Kalikow] to be unusual given all of the circumstances of this case.... The sanction here I find is

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 62 of 493

In re Kalikow, 602 F.3d 82 (2010)
52 Bankr.Ct.Dec. 276, Bankr. L. Rep. P 81,728

appropriate and it is justified by the documentation that has been submitted to the [c]ourt." The Bankruptcy Court also stated that the "proper amount" of costs and expenses would include those incurred through the date of the September 28, 2004 hearing because "the request for fees today[ ] has been caused by the covert behavior of the [Appellants] as well as the tendency to extensively litigate almost all matters that surrounded the various Orders and issues that are here," including the Appellants' submissions "devoted to the underlying merits." The court concluded that the expenses and costs were "fair, reasonable, and appropriate" and included costs "up to today."

On October 14, 2004, the Bankruptcy Court issued a written order (the "Second Order") requiring the Appellants to pay $334,583.12 to Kalikow, but staying payment if the Appellants posted a $300,000 bond with the Bankruptcy Court, pending final judgment on appeal. The Appellants posted the bond of the requisite amount on October 26, 2004, and timely appealed to the United States District Court for the Southern District of New York.

## II. *The District Court's Decision*

The First and Second Orders were appealed to the District Court, and the appeals were consolidated in that court. In the District Court, four of the Appellants, Evergence, Kovachev, Dreier LLP, and Marc S. Dreier, argued that the Bankruptcy Court lacked subject-matter jurisdiction to hear allegations of conduct so far afield from the subject of the injunctions. They also argued that the Notices had not violated any injunction; that the sanctions were legally unwarranted; that the Bankruptcy Court lacked personal jurisdiction over non-parties; that the court had erred in weighing the evidence; and that the sanctions were excessive. Solow and Cherniak joined the foregoing arguments and submitted a brief with respect to personal jurisdiction.

The District Court rejected all of the Appellants' arguments in an unpublished decision dated September 29, 2004, entered as judgment on September 30, 2008, and affirmed the judgment and orders of the Bankruptcy Court. The court held that (1) the Bankruptcy Court had personal jurisdiction over Solow and Cherniak, who had "intentionally sought to keep their identities secret"; (2) the Bankruptcy Court did not err in proceeding by motion instead of an adversary proceeding because **\*91** it had been asked to enforce a previous injunction and not to issue a new injunction; and (3) the Bankruptcy Court neither committed clear error nor abused its discretion in imposing sanctions against the Appellants and

awarding costs and fees to Kalikow.[8] Solow and Cherniak filed a notice of an appeal to this Court on October 27, 2008. Evergence, Dreier LLP, Marc S. Dreier, and Kosta Kovachev filed their notice of an appeal to this Court on October 28, 2008.

On appeal, Solow and Cherniak argue (1) that the Bankruptcy Court did not have personal jurisdiction over Solow and Cherniak; (2) that the Bankruptcy Court erred in proceeding by motion instead of an adversary proceeding; and (3) that the Bankruptcy Court erred in concluding that the Appellants had violated the injunctive provisions of the Plan and therefore abused its discretion in imposing sanctions against them.

## ANALYSIS

### I. *Of the Standard of Review*

[1]   "A district court's order in a bankruptcy case is subject to plenary review, meaning that this Court undertakes an independent examination of the factual findings and legal conclusions of the bankruptcy court." *In re Duplan Corp.,* 212 F.3d 144, 151 (2d Cir.2000). Findings of fact are reviewed for clear error, and conclusions of law are reviewed *de novo. Id.* "The Bankruptcy Court's interpretation of the text of the Plan [and] the Confirmation Order ... are conclusions of law reviewed *de novo.*" *Id.*

[2]   [3]   A bankruptcy court's award of sanctions will not be set aside by this Court in the absence of an abuse of discretion. *In re Highgate Equities, Ltd.,* 279 F.3d 148, 151 (2d Cir.2002); *Sussman v. Bank of Israel,* 56 F.3d 450, 456 (2d Cir.1995). The bankruptcy court "necessarily abuse[s] its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *In re Highgate Equities, Ltd.,* 279 F.3d at 152.

### II. *Of Personal Jurisdiction Over Solow and Cherniak*

[4]   Solow and Cherniak argue that although they had notice of the Enforcement Motion and related proceedings, they were never made proper parties to the proceedings nor properly served with process. Specifically, Solow and Cherniak argue that Kalikow's motions were never amended to name them as respondents and were insufficiently descriptive to alert them that relief was being sought against them. Solow and Cherniak also claim that service of Kalikow's Enforcement Motion on Dreier, the attorney who represented Solow and Cherniak at that time, constituted

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 63 of 493

In re Kalikow, 602 F.3d 82 (2010)
52 Bankr.Ct.Dec. 276, Bankr. L. Rep. P 81,728

inadequate service as to them. Both the Bankruptcy Court and the District Court rejected these arguments, finding that Solow and Cherniak could not have been named in the § 350 motion to reopen and the Enforcement Motion because they purposefully concealed their identities until their attorney, Marc S. Dreier, was ordered by the Bankruptcy Court to reveal their names, and that Solow and Cherniak were sufficiently apprised and given notice of the motions.

**\*92** **[5]** **[6]** "Before a federal court may exercise personal jurisdiction over a [party], the procedural requirement of service ... must be satisfied." *Dynegy Midstream Servs. v. Trammochem,* 451 F.3d 89, 94 (2d Cir.2006) (internal quotation marks omitted); *see also Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.,* 526 U.S. 344, 350, 119 S.Ct. 1322, 143 L.Ed.2d 448 (1999) (stating that service of process is "fundamental to any procedural imposition on a named defendant"). These due process requirements apply in motion proceedings (i.e., contested proceedings) under Bankruptcy Rule 9014(b) with the same force as in adversarial proceedings under Bankruptcy Rule 7004. *In re Zumbrun,* 88 B.R. 250, 252 (B.A.P. 9th Cir.1988).

**[7]** **[8]** **[9]** "[I]n a contested matter, [as here,] the notice of hearing is treated as a summons and the motion is treated as a complaint." *In re Parker,* 392 B.R. 490, 496 (Bankr.D.Utah 2008). Consistent with due process, Bankruptcy Rule 9014 requires that "reasonable notice" be given to the party against whom relief is sought. Contrary to Solow and Cherniak's claim, the motion need not specifically name the parties to the matter. *See In re Zumbrun,* 88 B.R. at 253. Although the failure to amend a caption to name the parties may constitute a violation of Federal Rule of Civil Procedure 10, such error does not *per se* constitute a deprivation of due process. *See Baker v. Latham Sparrowbush Assocs.,* 72 F.3d 246, 254 (2d Cir.1995) (stating that to satisfy due process, notice need only be "reasonably calculated" to apprise the adverse party (internal quotation marks omitted)).

Here, Kalikow's motion sought an order against "Evergence ... and its directors, officers, controlling persons, and agents, including the law firm of Dreier LLP." Moreover the motion specified that its terms would apply to as-yet-unidentified parties, noting that "[t]he use of Evergence to place the Notices makes it likely that the individuals behind the Notices do not want to be identified.... [I]t appears that certain parties are using Evergence as a front here to pursue their improper ends." Thus, we agree with the lower courts that the motion was sufficiently descriptive to alert Solow

and Cherniak that relief was being sought against them. Indeed, after Solow and Cherniak's identities were revealed (following much resistance), Kalikow expressly stated in its Reply to Dreier LLP's objection that relief was sought against Solow and Cherniak.

**[10]** Alternatively, Solow and Cherniak argue that they were not properly served. They, however, do not dispute that their counsel, Dreier LLP, was properly served. Although Solow and Cherniak argue that Dreier LLP did not represent them, the record clearly establishes that (1) Solow and Cherniak engaged Dreier LLP to place the Notices; and (2) Dreier LLP continued to act as counsel for Solow and Cherniak in connection with the Enforcement Motion. For example, Dreier stated during his deposition that "[w]e continue to represent these clients insofar as these clients need representation in connection with this matter." And in the Appellants' submitted objections to Kalikow's motions in the Bankruptcy Court, Dreier acknowledged that "for purposes of full disclosure to the Court, it should be noted that Dreier LLP was retained by Sheldon H. Solow and Stephen Cherniak —each in their individual capacities—in connection with some of the facts and events upon which the Injunction Motion is based." Moreover, Dreier LLP filed their papers on behalf of Solow and Cherniak on July 8, 2004, attempted to submit papers on their behalf on September 14, 2004, and appeared at a hearing on their behalf on September 28, 2004. Indeed, the record establishes that **\*93** Dreier LLP was not only Solow's "trusted lawyer" in this case but also in other litigation as well. *Cf. Luedke v. Delta Air Lines, Inc.,* 159 B.R. 385, 395 (S.D.N.Y.1993) (holding that defendant's active participation through its counsel in one proceeding implicitly authorized counsel to accept service on client's behalf in related proceeding); *In re Reisman,* 139 B.R. 797, 801 (Bankr.S.D.N.Y.1992). Proper service on Dreier LLP, therefore, constituted proper service on Solow and Cherniak. Fed.R.Civ.P. 4(e).

Thus, because Solow and Cherniak were properly served and given reasonable notice of the relief sought against them, we conclude that the Bankruptcy Court properly exercised personal jurisdiction over them.

### III. *Of the Bankruptcy Court's Decision to Proceed by Motion*

**[11]** Solow and Cherniak argue that because Kalikow's Enforcement Motion sought injunctive relief, the Bankruptcy Court was required to conduct the case as an adversary

In re Kalikow, 602 F.3d 82 (2010)

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 64 of 493

52 Bankr.Ct.Dec. 276, Bankr. L. Rep. P 81,728

proceeding, rather than a contested matter. Citing to Federal Rules of Bankruptcy Procedure 7001(7), which requires the commencement of an adversary proceeding "to obtain an injunction or other equitable relief," Solow and Cherniak argue that Kalikow should have been required to have commenced an adversary proceeding in response to the publication of the Notices. Specifically, Solow and Cherniak claim that Kalikow sought injunctive relief in the Enforcement Motion beyond the enforcement of those injunctions provided for in the Plan and Confirmation Order. The Bankruptcy Court rejected this claim, finding that the Enforcement Motion involved the enforcement of a pre-existing injunction, a consideration that permits the resolution of the motion as a contested matter rather than through an adversary proceeding. See In re Texaco Inc., 182 B.R. 937, 945 (Bankr.S.D.N.Y.1995); In re WorldCorp, Inc., 252 B.R. 890, 895 (Bankr.D.Del.2000) ("[A]n adversary proceeding is not necessary where the relief sought is the enforcement of an order previously obtained."); see also 11 U.S.C. § 524(g)(1)(A) (providing that a court may issue an injunction in connection with an order confirming a plan of reorganization "after notice and [a] hearing"); cf. Fed. R. Bankr.P. 7001(7) (setting forth the scope and requirements for an adversary proceeding).

[12]    We hold that the District Court did not err in concluding that the Enforcement Motion did not seek a new injunction but, rather, "[sought] to enforce an injunction already in place—[one] that was created by sections 1141 and 524 of the Bankruptcy Code and the express terms of the [Plan] and Confirmation Order." See In re Texaco, 182 B.R. at 945. That is, we reject the argument of Solow and Cherniak insofar as they claim that Kalikow sought new injunctive relief from the Bankruptcy Court, as the relief sought—including publication of corrective notices—was meant to correct the alleged violation of the existing injunction. We agree with the District Court that the relief sought by Kalikow—including publication of corrective notices—was to correct the perceived violation of the injunction. Moreover, the requested relief of the publication of corrective notices was not granted by the District Court, and none of the Appellants therefore suffered any prejudice. Solow and Cherniak have thus failed to demonstrate that they were prejudiced from the denial of the "formalities and discovery rights accompanying normal civil suits" accorded to adversary proceedings. Solow and Cherniak appeared at two hearings and made written submissions before the Bankruptcy Court. We reject their **94 claim that they were deprived of a fair opportunity to present their case as a result of the Bankruptcy Court

proceeding by motion, as opposed to initiation of an adversary proceeding to enforce the terms of the Plan and Confirmation Order.

IV. *Of the Bankruptcy Court's Award of Sanctions*

[13]    Solow and Cherniak argue that the injunctive provisions cited by the Bankruptcy Court are unrelated to their conduct and that the injunctive provisions of the Plan and the Confirmation Order only pertain to holders of pre-confirmation claims discharged in bankruptcy. As Solow and Cherniak were not holders of pre-confirmation discharged claims, they claim that they were not personally bound by these injunctive provisions.

The Bankruptcy Court imposed sanctions on the Appellants because it found that they had "violat[ed] the release, discharge, and injunction provisions of the Reorganization Plan, the Confirmation Order, and Sections 1141 and 524 of the Bankruptcy Code." The court also found that the "[t]he notices were designed to mislead the public into thinking that they have a right to reassert discharged claims." Although we find no clear error with any of the factual findings of the Bankruptcy Court, including its findings regarding the Appellants' motives behind the publication of the Notices, we conclude that sanctions were not properly imposed in this case pursuant to 11 U.S.C. §§ 524(a)(2), 1141. Our holding, however, should not be read to condone the Appellants' conduct in this case.

[14]    The effect of a discharge in Chapter 11 bankruptcy is set forth in § 524 of the Bankruptcy Code. "Generally, a discharge in bankruptcy relieves a debtor from all pre-petition debt, and § 524(a) permanently enjoins creditor actions to collect discharged debts." Bessette v. Avco Fin. Servs., Inc., 230 F.3d 439, 444 (1st Cir.2000); see also Nat'l Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum Co.), 118 F.3d 1056, 1062 n. 13 (5th Cir.1997); Hardy v. United States (In re Hardy), 97 F.3d 1384, 1388–89 (11th Cir.1996); In re Getzoff, 180 B.R. 572, 573 (9th Cir.BAP 1995). When there is a confirmation order of a reorganization plan in bankruptcy pursuant to Chapter 11, that confirmation order discharges the debtor from all pre-confirmation claims. 11 U.S.C. § 1141(d)(1)(A). A confirmed plan binds both "the debtor ... and any creditor," 11 U.S.C. § 1141(a), which includes entities that have "claim[s] against the debtor that arose at the time of or before the order for relief," 11 U.S.C. § 101(10). Similarly, § 524(a)(2) provides that a discharge "operates as an injunction against ... an act[ ] to collect, recover or offset any such debt as a personal

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 65 of 493

*In re Kalikow*, 602 F.3d 82 (2010)
52 Bankr.Ct.Dec. 276, Bankr. L. Rep. P 81,728

liability of the debtor, whether or not discharge of such debt is waived." 11 U.S.C. § 524(a)(2); *see also* 11 U.S.C. § 727(c)(1) (stating that the "trustee, a creditor, or the United States trustee may object to the granting of a discharge").

We agree with Solow and Cherniak that they are not holders of pre-confirmation claims discharged in bankruptcy who would normally be bound by the provisions of the Plan, as only a preconfirmation creditor or holder of such a claim is bound by the plain language of the injunctive provisions of the Plan. Kalikow's Plan specifically provided that it "bind[s] all holders of Claims," and "discharge[s] the Debtors from any Claim ... that arises before the [Plan's] Effective Date." Likewise, the Confirmation Order eliminated the debtor's liability as "to any holder of a claim"; discharged the debtors, "as to each holder of a Claim," from "debts that arose **\*95** ... prior to or on the Effective Date"; precluded, "as to every discharged debt ..., the creditor that held such debt ... from asserting against the Debtors, ... any other or further Claim" based on pre-confirmation events; and "restrained and enjoined" all "creditors ... or other entities whose claims are discharged ... by the Plan and this order" from acting "to collect ... such debts" in the future.

Accordingly, the Bankruptcy Court's authority, pursuant to §§ 524(a)(2) and 1141, does not extend to sanctioning the Appellants, whose bad-faith conduct did not run afoul of the plain language of the Confirmation Order. *Cf. Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir.1995) (observing that to hold a party in contempt, a court must have "entered a clear and unambiguous order").

Furthermore, Solow and Cherniak cannot be liable for a violation of an injunction in their alleged capacities as accessories to or agents of a bound party (i.e., a holder of a pre-confirmation discharged claim) in this case. Although injunctions can bind third parties who act on a named party's behalf, *see Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14, 65 S.Ct. 478, 89 L.Ed. 661 (1945), here, because the Bankruptcy Court found that none of the bound parties—the holders of pre-confirmation discharged claims—took any prohibited act as a result of the Notices, Solow and Cherniak may not be sanctioned as acting on behalf of creditors. *Cf. Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir.2002) ("Before a party can be found guilty of aiding and abetting civil contempt, the court must find: (1) that the party subject to the court's mandate committed contempt; and (2) that another party assisted the enjoined party.").

**[15]** **[16]** We reject Kalikow's argument that §§ 524, 1141, and the Confirmation Order forbid any "attempt to collect" without regard to the party "from whom" one attempts to collect. *Cf. Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 833 (2d Cir.1930) ("[I]t is not the act described which the decree may forbid, but only that act *when the defendant does it.*" (emphasis added)). Although § 524(a)(2) broadly states that it "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor," 11 U.S.C. § 524(a)(2), it cannot be that § 524(a)(2) prohibits misled creditors from inquiring about their claims (or otherwise submitting a proof of claim) to a third party who (1) has no relation to the reorganization proceedings and (2) has not sought repayment from the former debtor or initiated proceedings in court on behalf of the creditors. *Cf. In re Nassoko*, 405 B.R. 515 (Bankr.S.D.N.Y.2009) (involving case where the creditor *sent the debtor* a letter allegedly intended to induce payment of discharged debt).

In cases where courts have held that § 524(a)(2) bars creditors from any act to collect a discharged debt through various subterfuges, the creditors' schemes at least involved contact with the debtor to extract payment. *See, e.g., In re Walker*, 180 B.R. 834 (Bankr.W.D.La.1995) (continued deduction of loan payments from debtor's paycheck without affirmative manifestation of debtor's assent to such payments violated discharge injunction); In re Cost, 161 B.R. 856 (Bankr.S.D.Fla.1993) (withholding debtor's social security benefits to repay prepetition overpayment violated discharge injunction), *vacated by settlement* 190 B.R. 694 (S.D.Fla.1994). Here, in contrast, no creditor collected from a third party what he was owed by Kalikow, and no third party thereby acquired an interest against, or demanded payment from, Kalikow, either directly or through **\*96** the Bankruptcy Court as a result of the Appellants' actions. The former creditors neither contacted Kalikow nor initiated judicial proceedings. Their contact with Evergence in no way "pressured" Kalikow to repay any of the discharged debts. *In re Nassoko*, 405 B.R. at 525 (internal quotation marks omitted); *cf. id.* (observing that the purpose of section 524(a)(2) "is to give complete effect to the discharge.... Once a debt is discharged, the debtor will not be pressured in any way to repay it." (internal quotation marks and alternation omitted)). [9] Accordingly, the "acts" specified in § 524(a)(2) taken by holders of pre-confirmation claims discharged in bankruptcy—i.e., telephone calls and the mailing of letters and proof-of-claim forms to Evergence—are simply too far

In re Kalikow, 602 F.3d 82 (2010)

52 Bankr.Ct.Dec. 276, Bankr. L. Rep. P 81,728

removed from debtor Kalikow and the Bankruptcy Court to fall within the reach of 11 U.S.C. § 524(a)(2).

## V. *Whether 11 U.S.C. § 105(a) is an Independent Basis for the Award of Sanctions*

[17] [18] Kalikow argues in the alternative that § 105(a) of the Bankruptcy Code serves as an independent basis for affirming the Bankruptcy Court's award of sanctions in this case. We disagree. The Bankruptcy Court's discretion to award sanctions may be exercised only on the basis of the specific authority invoked by that court. Because an award might be based on "any of a number of rules or statutory provisions," each "governed by differing standards," we have found it "imperative that the court explain its sanctions order with care, specificity, and attention to the sources of its power." *Sakon v. Andreo,* 119 F.3d 109, 113 (2d Cir.1997) (internal quotation marks omitted). The statutory contempt powers given to a bankruptcy court under § 105(a) complement the inherent powers of a federal court to enforce its own orders. *See Int'l Union, UMWA v. Bagwell,* 512 U.S. 821, 831, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) ("The traditional justification for the relative breadth of the contempt power has been necessity ...."); *see also Goya Foods, Inc. v. Wallack Mgmt. Co.,* 290 F.3d 63, 78 (1st Cir.2002).

[19] Section 105(a) of the Bankruptcy Code empowers a bankruptcy court with authority to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). We have long recognized that "[s]ection 105(a) limits the bankruptcy court's equitable powers, which 'must and can only be exercised within the confines of the Bankruptcy Code.'" *In re Dairy Mart Convenience Stores, Inc.,* 351 F.3d 86, 92 (2d Cir.2003) (quoting *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988)). Section 105 "does not 'authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity.'" *Id.* (quoting **\*97** *United States v. Sutton,* 786 F.2d 1305, 1308 (5th Cir.1986)); *accord Bessette,* 230 F.3d at 444 ("Section 105(a) empowers the bankruptcy court to exercise its equitable powers—where necessary or appropriate—to facilitate the implementation of other Bankruptcy Code provisions." (internal quotation marks and alteration omitted)). "Thus, § 105 does not itself create a private right of action, but a court may invoke § 105(a) if the equitable remedy *utilized* is demonstrably

necessary to preserve a right elsewhere provided in the Code...." *Bessette,* 230 F.3d at 444–45 (internal quotation marks omitted). These powers are "in addition to whatever inherent contempt powers the court may have" and "must include the award of monetary and other forms of relief to the extent such awards are necessary and appropriate to carry out the provisions of the Bankruptcy Code and provide full remedial relief." *Id.* at 445 (internal quotation marks and citations omitted). We therefore must reject Kalikow's argument that § 105 serves as an independent basis for awarding sanctions without violation of § 524(a)(2) or another provision of the Bankruptcy Code.

[20] We certainly acknowledge the legitimate concern of the Bankruptcy Court and appreciate its attempt to exercise a combination of inherent and statutory authority to remedy the harm caused by the Appellants' reprehensible conduct. We must hold, however, that the equitable power conferred on a bankruptcy court by 11 U.S.C. § 105 "is the power to exercise equity in carrying out the *provisions* of the Bankruptcy Code, rather than to further the purposes of the Code generally, or otherwise to do the right thing." *In re Dairy Mart Convenience Stores, Inc.,* 351 F.3d at 92. This limitation "suggests that an exercise of section 105 power be tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective." *Id.* (quoting 2 *Collier on Bankruptcy* ¶ 105.01[1] (15th ed.2003)). Further, the Supreme Court has cautioned that "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *see also Sakon,* 119 F.3d at 113.

## VI. *Conclusion*

For the foregoing reasons, we affirm the Bankruptcy Court's judgment in all respects except its imposition of sanctions. *See In re Highgate Equities, Ltd.,* 279 F.3d at 152 (The bankruptcy court exceeds its discretion "if it based its ruling on an erroneous view of the law."). Accordingly, we VACATE the judgment of the District Court insofar as it upholds the award of sanctions, and we REMAND the case to the District Court with instructions to remand to the Bankruptcy Court for further proceedings consistent with this opinion.

### Parallel Citations

52 Bankr.Ct.Dec. 276, Bankr. L. Rep. P 81,728

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 67 of 493

In re Kalikow, 602 F.3d 82 (2010)
52 Bankr.Ct.Dec. 276, Bankr. L. Rep. P 81,728

Footnotes

1    Sheila McGowan, as Chapter 11 Trustee for Dreier LLP, has been substituted in place of the original appellant Dreier LLP.

2    Only appellants Solow and Cherniak submitted briefs to this Court. By letter dated August 18, 2009, Sheila McGowan joined in all arguments relevant to Dreier, LLP.

3    The Plan Administrator Agreement provides that upon a determination by the Bankruptcy Court, "following notice to all parties in interest, including [Kalikow], and a hearing, that the Plan Administrator has unreasonably refused or failed to pursue any right or remedy ... after receiving written request to do so from the holder of an [unsecured] [c]laim, then the [Bankruptcy] Court may authorize such holder to pursue such right and remedy on behalf of all of the holders of [unsecured] [c]laims."

4    Cherniak was the Chief Operating Officer of the Solow Development Corporation.

5    The Notices appearing in the *New York Post* were printed as "Legal Notice" and had the following heading: "THIS IS A NOTICE TO ALL UNSECURED CREDITORS UNDER THE 1994 CHAPTER 11 PLAN OF REORGANIZATION OF DEBTORS PETER S. KALIKOW AND KALIKOW REAL ESTATE CO." Solow paid more than $70,000 in advertising costs for the placement of the Notices in *The New York Times* and the *New York Post*.

6    In addition to Evergence and Dreier LLP, notice of the Enforcement Motion was given to the Office of the United States Trustee for the Southern District of New York and counsel to the Plan Administrator.

7    According to the Enforcement Motion, the Securities and Exchange Commission filed a civil complaint against Kovachev and several other individuals in November 2003 for allegedly running a $28 million "Ponzi scheme."

8    The District Court also upheld the Bankruptcy Court's determination that it had "core" subject-matter jurisdiction to decide the motions because the Notices "directly affected the integrity of [Kalikow's] bankruptcy proceedings" and were "designed to mislead third parties into thinking they had viable claims," thus implicating the Plan and the Confirmation Order. This holding, however, is not challenged on appeal.

9    *In re Nassoko,* cited by Kalikow, is inapposite here. In that case a creditor sold a discharged debt to a third party, who in turn demanded payment from the debtor. 405 B.R. at 518–19. The court rejected the creditor's argument that selling the loan did not constitute an action to collect, observing that such reasoning would allow any creditor to "simply collect on a discharged debt indirectly by selling it to a third party, aware that the third party intended to pursue collection of the debt. The third party could then plead ignorance of the discharge, thereby purporting to insulate all parties from liability." *Id.* at 522. In the case before us, although former creditors responded to the Notices by making telephone calls and by faxing letters in search of information, none of these creditors ever filed suit or attempted to make a collection in violation of the injunction.

**End of Document**                                          © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 140

2002 WL 31947572
Only the Westlaw citation is currently available.
United States Court of Federal Claims.

STANDARD FEDERAL BANK, Plaintiff,
v.
THE UNITED STATES, Defendant.

No. 95-CV-478.    |    Dec. 30, 2002.

**Attorneys and Law Firms**

Edward L. Lublin, Washington, D.C., with whom was
Lawrence S. Sher, for plaintiff.

Thomas P. Reilly, Trial Attorney, Commercial Litigation
Branch, Civil Division, Department of Justice, Washington,
D.C., with whom were Stuart E. Schiffer, Assistant Attorney
General, David M. Cohen, Director, Jeanne E. Davidson,
Deputy Director, for defendant.

**Opinion**

### *Opinion and Order*

SYPOLT, J.

*1 Before the court are the parties' cross-motions for
partial summary judgment [1] with respect to whether the
Federal Home Loan Bank Board (FHLBB or Bank Board)
and the Federal Savings and Loan Insurance Corporation
(FSLIC) guaranteed plaintiff the right to use for regulatory
purposes the purchase method of accounting for goodwill
created through its acquisitions of various savings and loan
associations ("regulatory goodwill"), notwithstanding the
subsequent enactment of the Financial Institutions Reform,
Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L.
No. 101-73, 103 Stat. 183 (codified in relevant part at 12
U.S.C. § 1464).

### *Background*

This is one of approximately 120 cases brought in this
court by savings and loan, or "thrift," institutions to obtain
damages allegedly occasioned by the enactment of FIRREA,
for breaches of contracts the government allegedly entered
into in approving mergers with and acquisitions of some of
the hundreds of thrifts threatened with insolvency during the

savings and loan crisis of the late 1970's and early 1980's. A
chief cause of the crisis was the increasing rate of inflation
and rising interest rates, because of which the interest paid to
attract depositors outpaced the returns thrifts were collecting
on the existing long-term fixed-rate mortgage loans the thrifts
were created to disburse. *See* Federal Home Loan Bank Act,
Pub.L. No. 72-304, 47 Stat. 725 (1932) (codified as amended
at 12 U.S.C. §§ 1421-1449 (1988)).

As regulator of these institutions' deposits, the FSLIC
faced the undesirable prospect of initiating receivership and
liquidating the banks. Compensating the unpaid depositors
would be potentially enormously costly to the government.
*See United States v. Winstar Corp.,* 518 U.S. 839, 843-861
(1996) (discussing in depth the circumstances of the savings
and loan crisis) (*Winstar* ). [2] *See also Winstar Corp., v.
United States,* 64 F.3d 1531 (Fed.Cir.1995) (*Winstar II* );
*California Federal Bank, FSB v. United States,* 245 F.3d 1342
(Fed.Cir.2001) (*Cal.Fed.II* ).

To stave off such consequences, the FHLBB and FSLIC
adopted a plan of encouraging healthier (not always 'healthy,'
as some cases have held, *see Winstar II,* at 1535, a relative
concept, in fact) thrifts to acquire or merge with the failing
ones, and often offered various inducements for doing so,
such as: cash contributions (often treated as a capital credit
not reducing assets in regulatory compliance calculations);
loans on more-favorable-than-market terms; various types
of agreements from enforcing regulatory requirements not
met due to the merger; indemnification agreements; and,
the principal inducement discussed in *Winstar,* permission
to treat the negative net worth of the surviving thrift
as amortizable goodwill countable toward meeting the
thrift's minimum regulatory capital requirements (regulatory
goodwill).

Under generally accepted accounting principles (GAAP),
an entity resulting from a merger or acquisition may elect
between the "pooling method" of accounting treatment (in
which the two former entities' assets and liabilities are fully
merged) and the "purchase method" of accounting treatment.
Under the latter method, the excess of the purchase price
(including assumed liabilities) over the fair market value of
the acquired asset is treated as an intangible asset, called
"goodwill," which is amortized against (deducted from)
income over a term of years. In the context of the savings
and loan transactions, this goodwill is generally referred to
as "supervisory goodwill," if it was created during a merger
approved by the federal banking authorities and "regulatory

goodwill" if it also could be counted toward meeting the minimum regulatory capital requirements established by the banking regulations. *See* 12 C.F.R § 563.13 (1983). By the device of goodwill, liabilities in effect became assets for accounting purposes, whether for regulatory purposes (to meet regulatory minimum capital requirements) or for public accounting purposes (to satisfy public financial disclosure requirements).

 **\*2**  In the 1970's, the accounting profession established rules governing the accounting method to be applied to a purchase transaction of a savings and loan acquisition under GAAP. *See* Financial Accounting Standards Board (FASB) Interpretation No. 9, "Applying APB Opinion Nos. 16 and 17 When a Savings and Loan Association or Similar Institution is Acquired in a Business Combination Accounted for by the Purchase Method" (1976). The GAAP rules provided that goodwill could be amortized over a period of not more than 40 years, utilizing either a straight-line method (whereby goodwill is divided into equal amounts spread evenly over the entire amortization period) or an interest-rate approach, which amplifies amounts in the early years. [3]

On September 1, 1981, the FHLBB issued Memorandum # R 31b, which formally approved, and set guidelines for, the purchase method of accounting for goodwill arising from the acquisition of a savings and loan institution. Consistent with the earlier FASB Interpretation No. 9, it permitted amortization of intangible assets when the amount paid for such assets cannot be determined, for a useful life of up to forty years.

Between 1980 and 1983, plaintiff Standard Federal Bank (Standard), located in Troy, Michigan, consummated four transactions in which it acquired a total of seven federally-insured thrifts that were experiencing varying degrees of financial difficulties: 1) First Federal Savings and Loan Association of Niles, Michigan (Niles), in 1980; 2) Landmark Savings and Loan Association (Landmark), in 1981; 3) Peoples Federal Savings and Loan Association (Peoples), in 1982; and 4) four Indiana thrifts (Indiana Thrifts), in 1983.

In 1989, Congress enacted FIRREA, which, among other things, phased out, over a five-year period, a thrift's ability to count supervisory goodwill toward the new regulatory minimum capital ("core capital") requirements. *See* 12 U.S.C. § 1464(t).

Standard alleges that FIRREA and its implementing regulations took effect, at the time it held $120.5 million of unamortized supervisory goodwill generated by the merger transactions at issue here. Although Standard's strong financial position allowed it to meet the new regulatory capital requirements without having to rely on any regulatory goodwill, Standard claims that the enactment of FIRREA limited its "ability to make acquisitions using goodwill" and denied it "valuable benefits and business opportunities."

### *Procedural History*

On July 26, 1995, Standard filed a complaint for monetary relief in connection with the four transactions in this case seeking: 1) restitution for breach of contract; 2) restitution for frustration of contractual purpose; 3) restitution as a result of mutual mistake; 4) damages for breach of contract; 5) compensation for taking of property rights; 6) compensation for taking of contract rights; 7) damages for deprivation of property without due process; and 8) damages for retroactive application of FIRREA in violation of the due process clause.

 **\*3**  Pursuant to the Omnibus Case Management Order, Standard filed four short-form motions for summary judgment on liability for breach of contract. *See supra,* note 1. On March 3, 1997, defendant filed a cross-motion for summary judgment on liability.

Briefing on defendant's motion to dismiss plaintiff's non-contractual claims for restitution, takings of property and contract rights, and due process violations has been stayed. (However, the court notes that the takings and due process claims are unlikely to prevail because this court has no jurisdiction over due process claims and the Federal Circuit has recently held that "the enactment and enforcement of FIRREA did not effect a taking [under the Fifth Amendment]." *Castle v. United States,* 301 F.3d 1328, 1342 (Fed.Cir.2002).

Following the reassignment of the case to this judge in February, 2002, the parties filed memoranda on the effect of the Federal Circuit's decision *Cal. Fed. II.* Defendant then filed a supplemental motion, which plaintiff opposes, seeking dismissal based on the FHLBB Principal Supervisory Agent's (PSA) and Supervisory Agent's (SA) lack of authority to enter into the Landmark and Niles contracts. [4] Because the court grants defendant's motion for summary judgment on other grounds, it need not reach this issue.

### *Standard of Review*

Under Rule 56(c) of the Rules of the United States Court of Federal Claims (RCFC), a motion for summary judgment will be granted if, after drawing all reasonable inferences in favor of the non-movant, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *O'Connor v. United States,* 308 F.3d 1233, at 1240 (Fed.Cir.2002) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Castle v. United States,* 301 F.3d at 1336.

The "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986); *see Bayer AG v. Carlsbad Tech., Inc. (Bayer Corp.)* 298 F.3d 1377, 1379-80 (Fed.Cir.2002).

In deciding cross-motions for summary judgment, grant of the motion in favor of one party nonetheless must satisfy the requirement that all justifiable inferences be drawn in favor of the losing party. *Murphy Exploration & Prod. Co. v. Oryx Energy Co.,* 101 F.3d 670, 673 (Fed.Cir.1996).

In ruling on a motion for summary judgment, the court "must be guided by the substantive evidentiary standards that apply to the case." *Liberty Lobby,* 477 U.S. at 255. Thus, before a party may prevail on a breach of government contract claim, it must demonstrate the existence of the basic elements of a contract, *i.e .:* mutual intent to contract, including offer and acceptance based on a meeting of the minds; consideration; and an individual with actual authority to bind the government. *Cf. Cal. Fed. II,* 245 F.3d at 1346 (citing *Massie v. United States,* 166 F.3d 1184, 1188 (Fed.Cir.1999)).

### *Elements of Winstar Contracts*

**\*4** Plaintiff's central argument is that the transactions in this case are substantively indistinguishable from those in *Winstar* and *Cal. Fed. II.*

Defendant argues that the facts and circumstances of the Niles, Landmark, and Peoples transactions are eminently distinguishable from those in *Winstar* and *Cal. Fed. II* because there is no evidence that Standard bargained with the bank regulators in any of these cases to be permitted, as a condition of merger, to use goodwill in meeting its regulatory net worth requirements.

It bears noting at the outset that, neither in *Winstar* nor in any similar case, has a court held that, as a matter of law, and irrespective of the contractual promises actually exchanged, that every supervisory takeover of a failing thrift during the savings and loan crisis of the 1980's resulted in a contractual obligation by the government, that was breached by the enactment of FIRREA, to allow the surviving bank to count goodwill toward meeting its minimum regulatory capital requirements in the face of subsequent contrary statutory requirements.

To do so would be tantamount to deciding that a contract must be implied as a matter of law in all of these cases once the minimum documentation required for regulatory approval is present, and would contravene the intent, clearly expressed by the Supreme Court in *Winstar* as well as by the Federal Circuit in *Cal.Fed.II,* that these cases be adjudicated based on their individual facts and according to accepted principles of contract law. This approach also would be inconsistent with the strict prohibition against this court's exercise of jurisdiction over contracts implied-in-law. *See Barrett Ref. Corp. v. U.S.,* 242 F.3d 1055, 1059 (Fed.Cir.2001); *Heyer Prods., Co. v. U.S.,* 177 F.Supp. 252, 252 (Ct.Cl.1959).

Consistent with these principles, the Supreme Court in *Winstar,* recognizing that it was not a trier of fact, avoided deciding the facts relevant to whether a contract was formed, relying instead, as behooves an appellate court, on the factual determinations of the courts below. *See Winstar,* 518 U.S. at 860-61. The frequent references to, the factual record by the Supreme Court in *Winstar,* 518 U.S. at 860-868, 909, and by the Federal Circuit in *Cal. Fed. II,* 245 F.3d at 1344-1348, underscore the need for a fact-intensive and transaction-specific analysis in each of these cases. As the Supreme Court expressly directed, a court in *Winstar*-related litigation should apply "ordinary principles of contract construction and breach that would be applicable to any contract action between private parties." *Winstar,* 518 U.S. at 871.

The elements indicating actual contractual agreement to permit the use of regulatory goodwill in each of the three *Winstar* cases-*Glendale, Winstar,* and *Statesman*-included: 1) a merger proposal from the acquiring thrift containing a

specific request for the purchase method of accounting; 2) extensive negotiations; 3) an FHLBB resolution expressly approving the use of the purchase method of accounting for regulatory goodwill and specifying both the goodwill amount and the exact amortization period permitted; 4) a clearly-insolvent acquisition target; and 5) no discernible business reason for entering into the transaction absent an agreement to permit the use of goodwill for regulatory purposes. While agreements providing for financial assistance from the government were involved in all three *Winstar* cases, it is clear that, even with the assistance agreements, the transactions would not have been economically viable from the plaintiffs' perspective without the favorable regulatory goodwill treatment as well.

 **\*5**  Another circumstance that strongly supported the reading of the documents as contractual promises in *Winstar* was the fact that each of the surviving thrifts would have been in violation of regulatory net worth requirements from the moment the transaction was consummated had it been unable to count supervisory goodwill toward meeting the regulatory capital requirements. *Winstar,* 518 U.S. at 862-67.

Also, the transactions in *Cal. Fed. II,* as in *Winstar,* were based on merger proposals expressly requesting permission to amortize goodwill over a specific term of years (over an estimated useful life of 35-years in the Brentwood transaction and 40-years in the Family transaction), and the requests were expressly granted by the FHLBB through forbearance letters stipulating that the resulting associations could amortize goodwill for the amortization period and goodwill amount requested. These transactions also involved extensive negotiations over the specific amounts of goodwill and the terms of the amortization periods.

Such extensive negotiations clarify that purchase accounting for regulatory purposes for the full term of the specified amortization period was "a central consideration" and "an essential term" of the acquisitions. *See Cal. Fed. II,* 245 F.3d at 1348; *see also Winstar,* 518 U.S. at 849 and 855 (stating: "[r]ecognition of [supervisory] goodwill under the purchase method was essential to supervisory merger transactions ..." and stating "[t]he advantageous treatment of amortization schedules ... in supervisory mergers amounted to more clear-cut departures from GAAP and, hence, subjects worthy of agreement....")

The circumstances in several recent *Winstar*-related cases, in which members of this court have identified thrift merger

transactions that did not give rise to contracts by the government to permit goodwill treatment, are distinguishable from those in *Winstar* and *Cal.Fed.II. See Fifth Third Bank of W. Ohio v. United States,* 52 Fed. Cl. 202 (2002); *Anchor Savings Bank, FSB. v. United States,* 52 Fed. Cl. 406 (2002); *First Commerce Corp. v. United States,* 53 Fed. Cl. 38 (2002).

In *Fifth Third Bank,* the court denied plaintiff's summary judgment motion when the plaintiff's only request for accounting forbearances was contained in its merger application materials, which created doubt as to whether the government's ultimate approval of the merger was an expression of its intent to enter into a contract or merely an exercise of its regulatory authority and the surrounding economic circumstances and negotiating history did not clearly support an intent to contract.

In *Anchor,* the court granted defendant's motion for summary judgment on one of two transactions when plaintiff did not request an accounting forbearance (with regard to goodwill or otherwise), defendant did not grant such a forbearance, and there was no assistance agreement. Plaintiff relied solely upon its merger application and the subsequent approval of the merger by the FHLBB.

 **\*6**  Finally, in *First Commerce,* the court granted defendant's motion for summary judgment when plaintiff bank never specifically requested assurances from the government that it would receive purchase money accounting treatment of regulatory goodwill, there was no assistance agreement and integration clause, and the circumstances indicated that plaintiff bank would have acquired the failing thrift absent any regulatory forbearances since plaintiff would have remained in capital compliance after the acquisition without them.

Accordingly, the court must determine whether, on the specific, unique undisputed facts and circumstances of the particular transactions at issue in this case, the FHLBB agreed to allow Standard to use goodwill for regulatory purposes.

### *The Indiana Transactions*

Because defendant no longer contests the entry of summary judgment on liability for breach of contract in connection with the acquisition of the Indiana Thrifts, the court grants plaintiff's motion for summary judgment on liability for breach of contract with respect to the Indiana Thrifts.

### The Niles Transaction

### Facts

In the fall of 1980, Niles, an institution with assets of approximately $133 million, suffered financial losses in excess of $10.5 million, apparently occasioned by unauthorized investment transactions by its president and managing officer. Because the losses would have exceeded its net worth of $4.8 million by approximately $5.7 million, the FHLBB appointed a conservator for Niles on September 2, 1980 and FSLIC publicly solicited proposals for its acquisition by another thrift.

Six institutions were represented at a bidder's conference on September 16, 1980. Standard offered by far the largest amount of "loss sharing," $4 million; the lowest offer was $500,000. By letter to the FHLBB of September 21, 1980, Standard proposed to acquire Niles as a "logical expansion ... consistent with [Standard's] long-range policy of developing a broader geographical base...."

In its merger proposal the same day, Standard requested the use of the purchase method of accounting for regulatory as well as public accounting purposes; a five-year supervisory forbearance for any failure by Standard to meet the reserve and net worth requirements of FHLBB Rule 12 C.F.R. § 563.13(c) arising from the acquisition of Niles; and an agreement that it would not be subject to "adverse consequences, sanctions, or other restrictions for failure arising from the acquisition of Niles to meet the requirements of applicable regulations limiting advances or lending."

An internal memorandum of October 9, 1980, *recommended* approval of the merger, but recommended that the Secretary of the FHLBB be directed (emphasis added) "to interpose no objection to the use of purchase accounting *for certain reports."* The following day, the FHLBB adopted Resolution No. 80-641, which approved the merger, and authorized the FSLIC to make a loan and contribution to the merged entity, but did not mention purchase accounting, goodwill amortization periods, or the use of goodwill for regulatory reporting requirements.

**\*7** On October 14, 1980, FSLIC, Standard, and Niles entered into a five-year "assistance agreement." Under its terms, Standard would absorb up to $4 million of Niles'

liabilities ($3.5 million in existing negative net worth —— the remainder would be paid by FSLIC —— and 10% in additional portfolio losses up to $5 million), while FSLIC would contribute up to $50 million in cash and provide a five-year, $20 million loan, at a more-favorable-than-market rate. [5]

The assistance agreement specified no particular accounting treatment, but only that GAAP accounting rules would apply. It required no accountant's letter, regarding the purchase method of accounting for regulatory purposes, or even regarding GAAP treatment. The only opinion of counsel required was one regarding the corporate *bona fides* of the merger.

The assistance agreement did not mention purchase accounting, amortization of goodwill (or, necessarily, a particular amortization period), or otherwise betray any intention to use goodwill to meet regulatory minimum net worth requirements. The merger agreement, entered into by Standard and Niles on the same date as the assistance agreement, also did not mention purchase accounting or supervisory goodwill.

The assistance agreement's integration clause provided that it "supersede[d] all prior agreements and understandings of the parties ... excepting only the plan of merger and any resolutions or letters issued contemporaneously herewith by the [FHLBB] or the [FSLIC], ... [but,] in the event of any conflict ... the provisions of this [a]greement shall govern...." It also provided that "[n]o modification or termination of this [a]greement shall be binding unless executed in writing by the parties thereto or their successors."

On October 15, 1980, the FHLBB issued a letter confirming that the merger was being instituted for supervisory reasons and the five-year forbearance (which expired before the enactment of FIRREA). The letter also stated that "for purposes of [FHLBB] regulatory and reporting requirements, the accounting for the merger shall be on the basis of a *pooling* of interests [not purchase]" and that, while the FHLBB had "no objection to the use of purchase accounting to reflect the merger," its use was to be restricted to *"public financial statements issued to the public* by Standard subsequent to the merger ..." (emphasis added).

Standard concedes that it recognized the inconsistent reporting requirements at the time (that it would be permitted to use purchase accounting for public, but not regulatory,

purposes), but now alleges that it agreed to proceed with the merger "after receiving assurances from FHLBB and FSLIC officials that the accounting treatment issue would be revisited after the Niles' [sic] merger was closed...." However, the court must disregard this allegation as there is no proffer of evidence as to when, by whom, or under what circumstances such assurances were made. *See* RCFC 56(e), which provides: "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials ... but[,] ... by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."

**\*8** Over a year after the merger, on October 21, 1981, Standard wrote to an FHLBB Principal Supervisory Agent (PSA) *see supra* note 4, and requested permission to change the regulatory accounting treatment for the Niles merger from the pooling to the purchase method, based on FHLBB Memorandum # R 31b, issued September 1, 1981, by which the FHL authorized the use of purchase accounting in savings and loan mergers. Standard requested this treatment for regulatory as well as for public reporting purposes, and sought to amortize $11,387,100 of the supervisory goodwill created by the merger over a 40-year period, on a straight-line basis. On December 29, 1981, an SA (retroactively) approved the purchase method of accounting for the Niles merger.

### Discussion

Numerous factors support the conclusion that the government entered into no agreement permitting Standard to use the purchase method of accounting for the Niles transaction for regulatory purposes: 1) the merger clearly was approved initially on the pooling, not purchase, basis; 2) there is no evidence of negotiations to permit the use of purchase method accounting for regulatory purposes; 3) the assistance agreement does not mention purchase accounting and there is no evidence of a bilateral written modification to the assistance agreement to that effect, as required by the integration clause; 4) the accountant's letter did not specify a goodwill amount or amortization period; 5) Niles was only barely insolvent at the time of the merger and the merger would not have rendered the surviving entity insolvent absent purchase accounting of regulatory goodwill; and 6) plaintiff had valid business reasons for entering into the transaction other than use of purchase method accounting treatment for

supervisory goodwill by the surviving entity for regulatory accounting.

While Standard proposed to acquire Niles on the condition that the merger be accounted for using purchase accounting for regulatory and public accounting purposes, this term was not included in the FHLBB resolution (No. 80-641) approving the Niles merger or in the October 14, 1980 three-way agreement between Niles, Standard and FSLIC, which did provide, however, for various other forms of governmental assistance from the government.

Unlike the resolutions and forbearance letters incorporated into the assistance agreements in *Winstar,* which permitted purchase accounting for regulatory purposes, the forbearance letter issued to Standard expressly prohibited such treatment for regulatory purposes (although permitting it for public financial statements). Thus, Standard secured through the Niles assistance agreement only a contractual right to use the pooling, and not the purchase, method of accounting for regulatory purposes.

In fact, Standard's October 21, 1981 letter to the FHLBB requesting authority to use purchase accounting for regulatory purposes as well as in public financial statements, acknowledges that, until then, it was *not* authorized to do so.

**\*9** Moreover, in proposing to acquire Niles, Standard's stated reasons for the merger are not supervisory goodwill, but "logical expansion.. consistent with [its] long-range policy of developing a broader geographical base" and a fear that not acquiring Niles would preclude Standard "from new Michigan markets by [its] larger savings and loan competitor." (Similarly, Standard's merger agreement obligations are expressly conditioned on "[FHLBB approval permitting the [merged entity] to maintain [Niles'] home office and all of [its] existing branch offices as branch offices of [the merged thrift].").

Given FSLIC's up to $50 million cash assistance, the $20 million loan on favorable terms, and a five-year forbearance from enforcing regulatory capital requirements, entering into the Niles merger absent permission to use goodwill for regulatory purposes was not, unlike the transactions in *Winstar,* "madness" on Standard's part. As "one of the largest thrift institutions in America with assets in excess of $3 billion," which had successfully taken over other problem thrifts in the past, the merger of Niles into Standard, as the Office of Examinations and Supervision stated "pose[d] no

supervisory concern." Therefore, the success of the Niles merger obviously was not dependent upon the use of goodwill for regulatory accounting purposes and Standard's "very existence" would not then have been "in jeopardy from the moment [the merger agreement] w[as] signed," *see, Winstar, 518 U.S. at 910,* if it had not received purchase accounting treatment of goodwill for regulatory purposes.

Standard argues, nevertheless, that the October 21, 1981 letter and the SA's December 29, 1981 response, constitute an "understanding agreed to in writing by the parties" within the meaning of the integration clause of the assistance agreement. [6]

The plain language of the integration clause rebuffs Standard's position. Even assuming, *arguendo,* that the September 21, 1981 request and the response to it constituted an "understanding agreed to in writing by the parties," such an understanding does not, under the terms of the integration clause, supersede letters issued contemporaneously with the agreement by the FHLBB. The clause states (emphases added): "[A]ny ... understanding agreed to in writing by the parties, ... supersedes all prior agreements and understandings of the parties in connection herewith, *excepting ... resolutions or letters issued contemporaneously herewith by the [FHLBB]."* Because the October 15, 1980 forbearance letter, which prohibited the use of purchase accounting for regulatory purposes, was issued concurrently with the assistance agreement, it may not be superseded by any later inconsistent written understandings of the parties such as the October 21, 1981 letter.

Alternatively, Standard argues that the September 21, 1981 request and the SA's response constitute a written modification to the assistance agreement. Apart from the fact that neither the request nor the SA's response refer to the assistance agreement or otherwise purport to modify any previous agreement, it is well-established that a modification must be supported by consideration. *See Aviation Contractor Employees, Inc. v. United States,* 945 F.2d 1568, 1574 (Fed.Cir.1994) ("In [g]overnment contracts, [lack of consideration] most often occurs when the [g]overnment modifies a contract to benefit the contractor but receives no additional or different promise or performance in return. Under Restatement, Second, Contracts § 73 (1981), such modifications are without consideration since they involve performance of a pre-existing duty which is neither doubtful nor the subject of honest dispute.") (quoting J.

Cibinic, Jr. and R. Nash, Jr., *Formation of Government Contracts* 189 (2d ed.1989) (emphasis omitted)).

**\*10**  On its face, the December 29, 1981 SA approval of purchase accounting retroactive to the Niles merger consummated 14 months earlier was not in exchange for an additional or different promise to the government, nor the subject of any dispute, honest or otherwise. Although the SA issued the letter in response to Standard's request, the record contains and plaintiff points to no evidence of any negotiations or other indicia of a bargained-for exchange. Unlike in the *Winstar* or *Cal. Fed. II* transactions, at the time purchase accounting was approved, the merger here already had been agreed upon expressly and unambiguously without the inducement of counting goodwill toward regulatory capital. Thus, there was no consideration for the SA's approval of purchase accounting for regulatory purposes.

Of course, one may modify an executory contract without providing new consideration, but only in such limited situations, when circumstances arise that were not anticipated when the contract was made. *See McCallum Highlands v. Washington Capital Dus,* 66 F .3d 89, 94-95 (5th Cir.1995). Using purchase accounting to account for the merger for regulatory purposes clearly was anticipated, however, as is clear from Standard's own letter to the FHLBB proposing to acquire Niles, which expressly requested, but ultimately did not receive, permission to use such treatment.

While Standard contends that it agreed to proceed with the merger only because it was assured by FHLBB and FSLIC officials that the accounting treatment "would be revisited" after the merger, it provides no specifics regarding the time, parties, or circumstances of such alleged assurances. *See* RCFC 56(e) ( "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials ... but ... must set forth specific facts showing that there is a genuine issue for trial.")

Moreover, even if such extra-contractual promises were made, the court may not, in light of the integration clause in the assistance agreement, consider extrinsic evidence of them unless they are relevant to an ambiguity in the contract language, *City of Tacoma v. United States,* 31 F.3d 1130, 1134 (Fed.Cir.1994) (extrinsic evidence of prior contracts could not be considered absent identification of an ambiguity). No such ambiguity has been brought to the court's attention.

Clearly, the facts and circumstances of the Niles transaction do not support the conclusion that Standard entered into a contract with the FHLBB or FSLIC to permit the use of purchase accounting of goodwill for regulatory purposes.

### The Landmark Transaction

#### Facts

In the fall of 1981, Landmark-another Michigan thrift-was experiencing a rapid decline in its net worth and almost insolvent. [7] Before any attempt by the FHLBB to find a buyer, to initiate regulatory action, or otherwise to become involved, Standard independently entered into a merger agreement with Landmark . [8]

 **\*11** The September 14, 1981 merger agreement between Landmark and Standard, to which neither the FHLBB nor the FSLIC was a party, stated that the thrifts wished to "increase the combined associations' deposit base, achieve operating economies and improve their savings, mortgage and other services."

While the merger agreement conditioned performance on receiving regulatory approval, it did not specify: purchase accounting; use of goodwill towards meeting minimum regulatory net worth requirements; or the amounts and expected amortization periods of any such goodwill.

The October 9, 1981, application for merger stated that it would be accounted for "as a purchase in accordance with [GAAP]," and provided an accountant's opinion reciting the general conditions for purchase accounting for goodwill under GAAP.

By letter to Standard of October 23, 1981, an FHLBB SA, Mr. Ronald R. Morphew, stated that "the application [met] the conditions ... for delegated authority approval set forth in Federal Regulation 546.2(h)" and approved the merger, subject to certain conditions, including the submission of a statement of financial condition and a certification from legal counsel. The SA made no reference, however, to purchase accounting, goodwill, amortization periods, or regulatory net worth requirements.

On December 2, 1981, the SA informed Standard that, because "all conditions of the approvals have been satisfactorily fulfilled," the FHLBB was closing its files on the merger. The SA's January 14, 1982, letter to Standard indicated that the FHLBB had been advised that the merger with Landmark was effective as of October 26, 1981. Neither letter referred to purchase accounting, goodwill, amortization periods, or regulatory net worth requirements.

There is no allegation or documentary evidence of negotiations over the use of purchase method accounting of goodwill for regulatory purposes or to support Standard's allegation that as a result of the merger it was entitled to record $13.2 million of goodwill and to amortize it over 40 years.

In the summer of 1982, Standard requested the FHLBB to issue a certification that at the time of the merger Landmark's financial difficulties threatened the thrift's insolvency and, accordingly, would have justified appointing a conservator or receiver under 12 U .S.C. § 1464(d)(6)(A), which authorizes such an appointment on grounds, *inter alia,* of "insolvency in that the assets of the association are less than its obligations to its creditors and others, including its members...." 12 U.S.C. § 1464(d)(6)(A)(i). Standard claimed that the certification was necessary to classify the merger as a tax-free reorganization under Section 368 of the Internal Revenue Code of 1954. The FHLBB issued the certification.

#### Discussion

The Landmark transaction is distinguishable from those at issue in *Winstar* and *Cal. Fed. II* because: 1) the plan of merger did not request purchase method accounting; 2) there were no negotiations regarding regulatory goodwill; 3) the letter approving the merger does not mention purchase accounting or goodwill or contain an integration clause incorporating other documents; 4) the merger agreement did not call for purchase method accounting; 5) no FHLBB resolution was issued; 6) no assistance agreement was involved; 7) no forbearance agreement was issued; 8) neither Landmark nor the surviving entity (Standard) faced insolvency absent permission to use purchase method accounting for goodwill; and 9) plaintiff had other valid business reasons for entering into this transaction, such as the potential for an increased deposit base and operating economies.

**\*12**  In sum, the record of the Landmark merger contains no document issued by the government, internally or to Standard, that refers to purchase or any other form of accounting treatment. For example, the internal memorandum from an SA to the PSA recommending approval of the merger goes into some detail regarding the transaction (including such specifics as the $37,400 per annum post-merger level of compensation for Landmark's President), but makes no mention of purchase accounting or the $13.2 million of supervisory goodwill that Standard alleges to have been promised it would be allowed to amortize over 40 years and to count toward regulatory capital. Similarly, the SA's letter approving the merger never refers to supervisory or other goodwill or to purchase accounting.

The accountant's letter submitted with the application for merger and the application itself are the only two documents the court has uncovered that actually mention purchase accounting. However, the application merely states that "the merger will be accounted for as a purchase in accordance with [GAAP]," and that the accounting treatment will conform with FHLBB rules and regulations. It then paraphrases an enclosed accountant's opinion letter. Yet, neither document specifies the amount of goodwill contemplated or requests any particular amortization period, as required by FHLBB Office of Examinations and Supervision, Memorandum # R 31b (September 1, 1981) (period of amortization for goodwill should not exceed forty years; there should be "a description of any resulting intangible assets.... Identifying the fair value of ... [intangible assets]....) [9]

The accountant's opinion technically describes the general operation of purchase accounting, but is couched in conspicuously conditional or theoretical terms: "*if* [purchase] accounting treatment is followed, the recording of the proposed transaction will conform with [GAAP];" "[s]ince it is *probable* that the fair market value of Landmark's assets *would be* less that its liabilities, a goodwill account for such a difference *would be* recorded." (Emphases added). [10]

Even if the SA's letter, which states that the merger application is approved, but does not mention purchase accounting, were intended as approval of the merger and of the request to use purchase accounting in accordance with Memorandum # R 31b and the APB Opinions, it cannot form the basis of a contract with the government because it contained a requirement to submit further documentation describing and substantiating the goodwill amounts and amortization periods, which, as far as can be told, since

Standard has presented no evidence that it ever submitted such documentation, was not satisfied.

Thus, there are ample grounds to distinguish the facts and circumstances of the Landmark transaction from those at issue in *Winstar* and *Cal. Fed. II.* Were the right to count $13.2 million in goodwill towards regulatory capital the "principal inducement" for the merger, as Standard now claims, it is remarkable that the merger application described the availability of goodwill as merely "probable" and was completely silent on the question of whether Standard would be able to count goodwill towards regulatory capital or, if so, the amount of goodwill, or the length of the amortization period, permitted. As the Supreme Court suggested in *Winstar*, when "it was not obvious that regulators would accept purchase accounting in determining compliance with regulatory criteria, ... it [would have been] clearly prudent to get agreement on the matter." *Winstar*, 518 U.S. at 855.

**\*13**  In short, if the right to count $13.2 million in goodwill towards regulatory capital were critical to the merger and not clearly permitted by the regulations in effect at the time of the merger, it seemingly would have been, not only prudent, but essential, for Standard to obtain clear agreement from the FHLBB permitting the use of a specified amount of regulatory goodwill for a set period of time (not merely its own accountant's letter opining that it was 'probable' that some unspecified amount might be allowed under accounting rules).

Where the parties leave the principal term of a contract incomplete, there is a strong presumption that there was no intent to be contractually bound and, therefore, that no contract was formed. *See* Restatement (Second) of Contracts § 33 (1981); Uniform Commercial Code § 2-305(4). To be valid and enforceable, a contract must have sufficient definiteness to "provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Ace-Federal Reporters, Inc. v. Barram,* 226 F.3d 1329, 1332 (Fed.Cir.2000) (quoting Restatement (Second) of Contracts § 33 (1981).

A contract that does not fix the amount of consideration, to be binding, must provide an objective method for determining the amount. *Barry v. Liddle, O'Connor, Finkelstein & Robinson,* 98 F.3d 36, 40 (2d Cir.1996). (Memorandum # R 31b, however, expressly states that "identifying the fair value of ... intangible factors, whether separately identified or included in goodwill, is a *subjective* task...." While

it strives to make any "assumptions used in determining [goodwill] amounts realistic, the factors it looks to are equally subjective: the resulting association's "management philosophies, practices, and abilities.")

As the Federal Circuit has stated, the *Winstar*-type contracts arise "once specific terms as to the amount of supervisory goodwill and its amortization periods under that regulatory policy were incorporated in a negotiated arm's length contract." *Cal. Fed. II,* 245 F.3d at 1347 (quoting *Winstar II,* 64 F.3d at 1542). Standard has presented no documentary or other evidence of any intent by the government to enter into a contract in the Landmark transaction permitting Standard to count any specified amounts of goodwill toward meeting its regulatory capital requirements.

### *The Peoples Transaction*

### *Facts*

On December 2, 1981, Standard entered into an agreement and plan of merger with Peoples, a thrift located in Detroit, Michigan. During the first eleven months of 1981, the net worth of Peoples had declined from approximately $6.23 million to $3.17 million. Standard also was experiencing operating losses-in the first eleven months of the year it generated a net loss of over $45 million, and, as of February 3, 1982, it was projected to be insolvent within 16 months. The agreement and plan of merger stated that the parties desired to merge in order to increase the combined deposit base, achieve operating economies, and improve services. The agreement provided that the merger was conditioned upon "the approval by the [FHLBB] of the method of accounting to be used by Standard Federal with respect to the merger," but did not refer to the use of a goodwill purchase accounting method.

 **\*14**  On December 18, 1981, Standard sent the FHLBB a letter and an application for merger. Both requested that "the FHLBB approve the purchase method of accounting for this merger." The application described in detail the business purposes for the merger: 1) to reduce Peoples' operating losses by using Standard's unexhausted "loss-carry backs;" [11]  2) to save costs through eliminating duplicative expenses; 3) to use purchase accounting treatment for the merger; 4) to close under-performing branches; and 5) to better compete with large thrifts, banks, and other financial services companies in the state.

The application stated that the merger would be accounted for using the purchase method, in accordance with GAAP, and enclosed an independent accountant's opinion letter, issued December 15, 1981, stating that "if [purchase accounting] is followed, the recording of the proposed transaction will conform with [GAAP]," that it was "probable" that a goodwill account would be recorded, and that under Memorandum # R 31b, accounting for any goodwill for regulatory purposes "should be" in accordance with GAAP." An exhibit attached to the application showed that Standard proposed to amortize $27,631,400 in goodwill over 40 years.

On January 7, 1982, the FHLBB Office of Examination and Supervision sent an internal memorandum to an FHLBB Regional Director stating that, while purchase accounting appeared appropriate based on the merger application, the *pro forma* statements shown by the Standard-Peoples merger documents "do not reflect application of the purchase method of accounting." The memorandum suggested that any approval of the merger be conditioned upon Standard submitting analyses from its independent accountant describing any goodwill or discount arising from the merger and substantiating the amounts as well as amortization periods and methods attributed to them.

On February 5, 1982, FHLBB adopted resolution No. 82-91, approving the Standard-Peoples merger provided that, within 120 days of the resolution, Standard:

> ... furnish analyses, accompanied by a concurring opinion from its independent accountant, satisfactory to the Supervisory Agent of the [FHLBB] and to the Office of Examinations and Supervision, which (a) specifically describe, as of the effective date of the merger, any intangible assets, including goodwill, or discount of assets arising from the merger to be recorded on Standard's books, and (b) substantiate the reasonableness of amounts attributable to intangible assets, including goodwill, and the discount of assets and the related amortization periods and methods.

On February 9, 1982, the FHLBB issued a certification that in the absence of such a merger, there would be grounds for the appointment of a conservator or receiver for Peoples in the near future, based on insolvency, as set forth in 12 U.S.C. § 1464(d)(6)(A)(i).

On February 16, 1982, SA David L. Hostetler sent Standard a copy of FHLBB Resolution No. 82-91 and a letter repeating the conditions described above. The SA also required Standard, within 30 days of the merger, to submit a consolidated statement of the financial condition of the merged entity immediately after the merger.

**\*15** The merger took place on March 1, 1982. The record does not show whether the statements were provided within the required 120 days. However, Standard apparently was using the purchase method of accounting for public financial reporting (but not regulatory reporting) purposes in April 1982.

Almost seven months later, on September 29, 1982, Standard wrote PSA Gordon Husk to request "approval to account for the [Standard-Peoples] business combination by the purchase method of accounting *for regulatory accounting purposes,*" based on Memorandum # R 31b. (Emphasis added.) The letter attached several schedules describing the nature and results of goodwill calculations and included a copy of a letter from its independent accountant giving an opinion that the use of the purchase method to account for the merger, the goodwill amounts, and the amortization periods would be in accordance with GAAP. The financial statements attached to the letter disclosed amortization of $42,593,547 worth of goodwill over 40 years.

On October 8, 1982, in a two-sentence letter, the PSA wrote: "This letter will acknowledge your submission of materials to comply with condition number one of Federal Home Loan Bank Board Resolution No. 82-91, dated February 5, 1982. We are closing our files on the application." None of these documents mentions regulatory core capital or net worth requirements.

### *Discussion*

The Peoples transaction is distinguishable from those at issue in *Winstar* and *Cal. Fed. II* because: 1) there is no evidence of negotiations between plaintiff and FHLBB

regarding purchase accounting for the goodwill generated by the merger for purposes of meeting minimum regulatory capital requirements; 2) the FHLBB documents themselves do not evidence any agreement to permit plaintiff to use purchase accounting or goodwill for regulatory purposes; 3) plaintiff's application was never incorporated into a merger or assistance or other agreement between Standard and FSLIC or the FHLBB and the accompanying accountant's letter merely stated that it was 'probable' goodwill would be used for regulatory purposes; 4) no FHLBB resolution approved purchase accounting for regulatory purposes of any specified amounts of goodwill or any specific amortization period; 5) plaintiff conceded, by later requesting regulatory purchase accounting, that it had permission to use purchase accounting for public financial accounting purposes only; and 6) plaintiff had many valid business reasons for entering into this transaction apart from any inducement to be allowed to employ purchase accounting.

The documents submitted to the FHLBB by Standard in the Peoples transaction contain several references to purchase accounting and goodwill. The accountants' letter submitted to FHLBB with the application stated that purchase accounting would be used, in accordance with GAAP, and an attachment to the application indicated a specific amount of, and amortization period for, the goodwill generated by the merger. [12]

**\*16** However, the February 5, 1982 FHLBB resolution, forwarded by letter of February 16, 1982, approving the Standard-Peoples merger does not agree to the use of purchase accounting, or to any particular treatment of goodwill, but merely requires Standard to submit various accounting analyses of goodwill within 120 days of the resolution. The February 16, 1982, letter from the SA adds nothing to those requirements.

Several features of this transaction undermine plaintiff's contention that a contract for the use of supervisory goodwill for regulatory purposes was formed. First, the very fact that a request was made, eight months after the merger, to use such accounting is rather persuasive evidence that Standard did not already have that right, and did not even think it had the right, either then or at the time of the merger.

Nor is there any indication that Standard intended the September 29, 1982 letter to serve as the 120-day submission required by the FHLBB resolution approving the merger. First, it was not submitted on time. Second, it never mentions

that it was being submitted to satisfy the conditions stated in the FHLBB resolution. Third, it appears on its face to be an independent letter seeking permission, for the first time, to use purchase accounting for regulatory minimum capital purposes rather than public financial reporting. (In the final paragraph, Standard acknowledges that the February 16, 1982 letter from the SA "permitt[ed] the application of purchase accounting principles in all *public financial statements* [only] providing [Standard's] independent accountants issue a conforming opinion.")

Finally, this letter greatly resembles the one sent by Standard after the Niles merger, in which, as here, Standard first received permission to use purchase accounting only in public financial statements, and significantly later-a year after consummating the Nile merger-sought and was granted permission to use that treatment for regulatory purposes as well. The relevant section of Standard's letter in the Niles transaction also acknowledged a letter from the FHLBB (dated October 30, 1980) "permitting the application of purchase accounting principles *in all public financial statements* providing [Standard's] independent accountants issue a conforming opinion."

An April 2, 1982 FHLBB Report of Examination of Standard's deteriorating financial condition, submitted recently by Standard, states that the Peoples "acquisition was accounted for by the purchase method" and includes Standard's consolidated Financial Statements and Pro-Forma Income Statements and other schedules showing that Standard was amortizing $42,571,672 million in goodwill over 40 years. App. E to Pl.'s Resp. filed May 20, 2002, at PL-0027778, 798, 799. This only confirms the statement in the September 29, 1982 letter that Standard interpreted the FHLBB approval of the merger to allow purchase accounting in its public financial statements only.

**\*17** As discussed in connection with the Niles merger, either a modification or a new contract requires consideration. Because the September 29, 1982 letter was sent approximately eight months after the merger was consummated, whatever benefit the government received from the merger already had accrued and granting a new accounting treatment to Standard was not a bargained-for exchange.

Furthermore, there is no evidence of any negotiations or inducement. In fact, an internal FHLBB memo of February 3, 1982 states that "[Standard] is projected to be insolvent

in sixteen months." This supports defendant's argument that plaintiff had sufficient independent business reasons-such as loss-carry backs" and economies of scale, as well as preserving its own viability-for merging with other thrifts.

In light of the above, even the multiple references to purchase accounting in the documents surrounding the Peoples transaction do not rise to the level of clear, bargained-for contractual promises present in *Winstar* or *Cal. Fed. II.* In *Cal. Fed. II,* for example, plaintiffs specifically requested in their merger applications that FHLBB allow purchase accounting for regulatory purposes and the forbearance letter issued by the FHLBB in *Cal. Fed. II* included a detailed description of purchase accounting of regulatory goodwill and the periods for goodwill amortization and accretion of discount. This specificity sharply contrasts with the documents in the record of the Peoples transaction, especially the October 8, 1982 letter, which merely acknowledges the submission of documents and announces the closing of the merger application file.

Accordingly, Standard's short-form motion for summary judgment on liability with respect to the Peoples transaction is denied and defendant's cross-motion is granted.

### CONCLUSION

Plaintiff's motion for partial summary judgment on liability for breach of contract arising from Standard's acquisition of the four Indiana thrifts is GRANTED. Plaintiff's motions for partial summary judgment on liability for breach of contract arising from Standard's acquisition of Niles, Landmark, and Peoples are DENIED and defendant's respective cross-motions are GRANTED. On or before January 31, 2003, plaintiff shall respond to defendant's October 10, 2000 motion to dismiss counts I, II, III, V, VI, VII, and VIII. Defendant shall reply to plaintiff's response on or before February 17, 2003. Following the resolution of the motion to dismiss, the court will schedule further proceedings to determine any remaining issues of liability and damages.

The clerk of the court shall enter judgment for plaintiff on its "Short Form Motion for Partial Summary Judgment on Liability: The Acquisition by Plaintiff Standard Federal Bank of American Savings and Loan Ass'n of Fort Wayne, First Federal Savings and Loan Ass'n of Fort Wayne, Fort Wayne Federal Savings and Loan Ass'n of Fort Wayne, and South Bend Federal Savings and Loan Ass'n of South Bend" and

enter judgment for defendant on its cross-motions for partial summary judgment on the Niles, Landmark and Peoples transactions.

Footnotes

1   So-called "short-form" motions for summary judgment were required to be filed by Paragraph 5 of the Omnibus Case Management Order issued on September 18, 1996, by then-Chief Judge Loren A. Smith and by that court's order in *California Federal Bank v. United States,* 39 Fed. Cl. 753,779 (1997) (*Cal.Fed.I* ); *aff'd in part, vacated in part and rem'd, California Federal Bank, FSB v. United States,* 245 F.3d 1342 (Fed.Cir.2001) (*Cal.Fed.II* ) that the government, apparently in each case similar to *United States v. Winstar,* 518 U.S. 839 (1996), show cause why summary judgment should not be entered against it, on liability only:

   "In all Winstar-related cases where there are pending summary judgment motions or cross-motions filed by the plaintiffs, the United States shall show cause, within 60 days, why those motions should not be granted, and liability found on all Winstar contract issues based upon the instant decision. In all cases where the government has a pending summary judgment motion or cross-motion the government shall show cause within 60 days, why those motions should be denied, for the same reasons. Following the submission of any summary judgment motion on liability in any Winstar-related case the United States shall have 90 days to show cause why that motion should not be granted on the same basis.

   The government in responding to this order shall not raise issues that have been resolved by opinions in the original Winstar cases as clarified by this decision. Irrespective of ultimate attorneys fee issues in these cases, failure to follow this order will require the government to reimburse the plaintiffs for attorneys fees spent litigating issues that have already been resolved by this court, the Federal Circuit or the Supreme Court." *See also* paragraph III of Procedural Order No. 1: Master Litigation Plan (August 11, 1997).

2   The Court in *Winstar* noted, however, the opinions of some analysts that the costs of the acquisitions may have approximated 70% of the liquidation expense. *See Winstar,* 518 U.S. at 847 n. 3 (citing remarks by H. Brent Beasley, Director of FSLIC, before the California Savings and Loan League Management Conference (Sept. 9, 1982).

3   *See* Salam, Ahmad W. and Tucker, James T., *Congress, Regulators, RAP, and the savings and loan debacle,* CPA Journal online (Jan.1994), at *www.nysscpa.org/cpajournal/old/14979917.htm* . In 1983, the GAAP rules applicable to thrift mergers reduced the amortization period to the length of time the acquired asset produced income and required amortization by the interest method. Statement of Financial Accounting Standards No. 72; *Winstar,* 518 U.S. at 855.

4   The supervisory authority of the FHLBB, located in Washington, DC, was dispersed among 12 regional "Federal Home Loan Banks." The president of each was termed the "supervisory agent" (SA) for thrifts in the region and the Principal Supervisory Agent was an officer or employee designated to that position by the FHLBB. *See* 39 FR 45260 (December 31, 1974) (codified at 12 C.F.R. §§ 501.10 and 501.11)

5   The October 9, 1980 FHLBB memorandum estimated that the comparative cost to the FSLIC of the assistance was approximately $11 million.

6   The integration clause provided:

   This agreement, together with any interpretation thereof or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties hereto and supersedes all prior agreements and understandings of the parties in connection herewith, excepting only the plan of merger and any resolutions or letters issued contemporaneously herewith by the [FHLBB] or the [FSLIC], *provided,* however that in the event of any conflict, variance, or inconsistency between this [a]greement and the plan of merger, the provisions of this [a]greement shall govern and be binding.... No modification or termination of this [a]greement shall be binding unless executed in writing by the parties thereto or their successors.

7   Landmark's net worth had declined from $898,000 (or 1.8% of approximately $50 million in assets) on June 30, 1981, to $274,194 (or .55% of assets) on October 26, 1981.

8   Standard claims approximately $3.4 billion in assets and a $109 million net worth at the time.

9   Memorandum # R 31b provides, in part (emphasis added):

   Identifying the fair value of ... intangible factors, whether separately identified or included in goodwill, is a subjective task. It can be based on marketing and other demographic studies, analysis of the resulting association's liabilities to cross sell services, or analysis of past and expected behavior and lives of the acquired association's savings and loan accounts.... Any assumptions used in determining these amounts must be *realistic* in light of the resulting association's management philosophies, practices, and abilities.

   ...

   An application from an association requesting approval for a business combination to be accounted for by the purchase method of accounting, from which intangible assets will result, *should include a description of any resulting intangible assets and the*

*plan for their amortization.* This description should discuss the nature and results of management's analysis of the underlying intangible assets *and the resulting amortization periods and methods.*

APB Opinion No. 17 provides (emphasis added) that, in discussing the estimated life of intangible assets, "analysis of all factors should result *in a reasonable estimate of the useful life of most intangible assets.* A reasonable estimate of the useful life may often be based on upper and lower limits, even though a fixed existence is not determinable. The period of amortization should not, however, exceed forty years."

**10**  The letter states in pertinent part (emphasis added):

Applying the purchase method to the merger ... *would require* that the assets and liabilities of Landmark be recorded on Standard's books on the merger date at their respective values.... Goodwill account *would be amortized* to expense in accordance with the provisions of APB Opinion No. 17. The discount resulting from the determination of the fair value of Landmarks assets *would be amortized* into income over the estimated lives of the respective assets.

**11**  According to the application, "loss-carry backs" allow a business to offset current losses against prior year's profits so that it may recover a portion of federal income taxes paid during prior profitable years.

**12**  A January 7, 1982 internal FHLBB memorandum indicates that the government clearly recognized the fact that Standard requested to use purchase accounting in its merger application and that such accounting treatment seemed appropriate. However, like the February 5, 1982 resolution, the internal memo expressed the opinion that approval of purchase accounting for the merger should be conditional on Standard's submission of a statement by an independent accountant, describing the goodwill created by the merger by amount as well as amortization period and methods.

---

**End of Document**                          © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 141

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

2005 CarswellOnt 1188
Ontario Court of Appeal

Stelco Inc., Re

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253
D.L.R. (4th) 109, 2 B.L.R. (4th) 238, 75 O.R. (3d) 5, 9 C.B.R. (5th) 135

# In the Matter of the Companies' Creditors
Arrangement Act, R.S.C., c. C-36, as amended

And In the Matter of a proposed plan of compromise or arrangement
with respect to Stelco Inc. and the other Applicants listed in Schedule "A"

Application under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended

Goudge, Feldman, Blair JJ.A.

Heard: March 18, 2005
Judgment: March 31, 2005
Docket: CA M32289

Proceedings: reversed *Stelco Inc., Re* ((2005)), 2005 CarswellOnt 742, [2005] O.J. No. 729, 7 C.B.R. (5th) 307 ((Ont. S.C.J. [Commercial List])); reversed *Stelco Inc., Re* ((2005)), 2005 CarswellOnt 743, [2005] O.J. No. 730, 7 C.B.R. (5th) 310 ((Ont. S.C.J. [Commercial List])); additional reasons to *Stelco Inc., Re* ((2005)), 2005 CarswellOnt 742, [2005] O.J. No. 729, 7 C.B.R. (5th) 307 ((Ont. S.C.J. [Commercial List]))

Counsel: Jeffrey S. Leon, Richard B. Swan for Appellants, Michael Woollcombe, Roland Keiper
Kenneth T. Rosenberg, Robert A. Centa for Respondent, United Steelworkers of America
Murray Gold, Andrew J. Hatnay for Respondent, Retired Salaried Beneficiaries of Stelco Inc., CHT Steel Company Inc., Stelpipe Ltd., Stelwire Ltd., Welland Pipe Ltd.
Michael C.P. McCreary, Carrie L. Clynick for USWA Locals 5328, 8782
John R. Varley for Active Salaried Employee Representative
Michael Barrack for Stelco Inc.
Peter Griffin for Board of Directors of Stelco Inc.
K. Mahar for Monitor
David R. Byers (Agent) for CIT Business Credit, DIP Lender

Subject: Corporate and Commercial; Insolvency; Property; Civil Practice and Procedure

### Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

### Headnote

**Business associations --- Specific corporate organization matters — Directors and officers — Appointment — General principles**

Corporation entered protection under Companies' Creditors Arrangement Act — K and W were involved with companies who made capital proposal regarding corporation — Companies held approximately 20 per cent of corporation's shares — K and W, allegedly with support of over 30 per cent of shareholders, requested to fill two vacant directors' positions of corporation, and be appointed to review committee — K and W claimed that their interest as shareholders would not

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

be represented in proceedings — K and W appointed directors by board, and made members of review committee — Employees' motion for removal of K and W as directors was granted and appointments were voided — Trial judge found possibility existed that K and W would not have best interests of corporation at heart, and might favour certain shareholders — Trial judge found interference with business judgment of board was appropriate, as issue touched on constitution of corporation — Trial judge found reasonable apprehension of bias existed, although no evidence of actual bias had been shown — K and W appealed — Appeal allowed — K and W reinstated to board — Court's discretion under s. 11 of Act does not give authority to remove directors, which is not part of restructuring process — Trial judge erred in not deferring to corporation's business judgment — Trial judge erred in adopting principle of reasonable apprehension of bias.

### Bankruptcy and insolvency --- Proposal — Companies' Creditors Arrangement Act — Miscellaneous issues

Corporation entered protection under Companies' Creditors Arrangement Act — K and W were involved with companies who made capital proposal regarding corporation — Companies held approximately 20 per cent of corporation's shares — K and W, allegedly with support of over 30 per cent of shareholders, requested to fill two vacant directors' positions of corporation and be appointed to review committee — K and W claimed that their interest as shareholders would not be represented in proceedings — K and W appointed directors by board, and made members of review committee — Employees' motion for removal of K and W as directors was granted and appointments were voided — Trial judge found possibility existed that K and W would not have best interests of corporation at heart, and might favour certain shareholders — Trial judge found interference with business judgment of board was appropriate, as issue touched on constitution of corporation — Trial judge found reasonable apprehension of bias existed, although no evidence of actual bias had been shown — K and W appealed — Appeal allowed — K and W reinstated to board — Court's discretion under s. 11 of Act does not give authority to remove directors, which is not part of restructuring process — Trial judge erred in not deferring to corporation's business judgment — Trial judge erred in adopting principle of reasonable apprehension of bias.

### Table of Authorities

#### Cases considered by *Blair J.A.*:

*Alberta-Pacific Terminals Ltd., Re* (1991), 8 C.B.R. (3d) 99, 1991 CarswellBC 494 (B.C. S.C.) — referred to

*Algoma Steel Inc., Re* (2001), 2001 CarswellOnt 1742, 25 C.B.R. (4th) 194, 147 O.A.C. 291 (Ont. C.A.) — considered

*Algoma Steel Inc. v. Union Gas Ltd.* (2003), 2003 CarswellOnt 115, 39 C.B.R. (4th) 5, 169 O.A.C. 89, 63 O.R. (3d) 78 (Ont. C.A.) — referred to

*Babcock & Wilcox Canada Ltd., Re* (2000), 2000 CarswellOnt 704, 5 B.L.R. (3d) 75, 18 C.B.R. (4th) 157 (Ont. S.C.J. [Commercial List]) — referred to

*Baxter Student Housing Ltd. v. College Housing Co-operative Ltd.* (1975), [1976] 2 S.C.R. 475, [1976] 1 W.W.R. 1, 20 C.B.R. (N.S.) 240, 57 D.L.R. (3d) 1, 5 N.R. 515, 1975 CarswellMan 3, 1975 CarswellMan 85 (S.C.C.) — referred to

*Blair v. Consolidated Enfield Corp.* (1995), 128 D.L.R. (4th) 73, 187 N.R. 241, 86 O.A.C. 245, 25 O.R. (3d) 480 (note), 24 B.L.R. (2d) 161, [1995] 4 S.C.R. 5, 1995 CarswellOnt 1393, 1995 CarswellOnt 1179 (S.C.C.) — considered

*Brant Investments Ltd. v. KeepRite Inc.* (1991), 1 B.L.R. (2d) 225, 3 O.R. (3d) 289, 45 O.A.C. 320, 80 D.L.R. (4th) 161, 1991 CarswellOnt 133 (Ont. C.A.) — considered

*Catalyst Fund General Partner I Inc. v. Hollinger Inc.* (2004), 1 B.L.R. (4th) 186, 2004 CarswellOnt 4772 (Ont. S.C.J.) — referred to

Stelco Inc., Re, 2005 CarswellOnt 1188

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 86 of 493

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

*Country Style Food Services Inc., Re* (2002), 2002 CarswellOnt 1038, 158 O.A.C. 30 (Ont. C.A. [In Chambers]) — considered

*Dylex Ltd., Re* (1995), 31 C.B.R. (3d) 106, 1995 CarswellOnt 54 (Ont. Gen. Div. [Commercial List]) — referred to

*Hongkong Bank of Canada v. Chef Ready Foods Ltd.* (1990), 51 B.C.L.R. (2d) 84, 4 C.B.R. (3d) 311, *(sub nom. Chef Ready Foods Ltd. v. Hongkong Bank of Canada)* [1991] 2 W.W.R. 136, 1990 CarswellBC 394 (B.C. C.A.) — referred to

*Ivaco Inc., Re* (2004), 3 C.B.R. (5th) 33, 2004 CarswellOnt 2397 (Ont. S.C.J. [Commercial List]) — referred to

*Lehndorff General Partner Ltd., Re* (1993), 17 C.B.R. (3d) 24, 9 B.L.R. (2d) 275, 1993 CarswellOnt 183 (Ont. Gen. Div. [Commercial List]) — considered

*London Finance Corp. v. Banking Service Corp.* (1922), 23 O.W.N. 138, [1925] 1 D.L.R. 319 (Ont. H.C.) — referred to

*Olympia & York Developments Ltd. v. Royal Trust Co.* (1993), 17 C.B.R. (3d) 1, *(sub nom. Olympia & York Developments Ltd., Re)* 12 O.R. (3d) 500, 1993 CarswellOnt 182 (Ont. Gen. Div.) — considered

*People's Department Stores Ltd. (1992) Inc., Re* (2004), *(sub nom. Peoples Department Stores Inc. (Trustee of) v. Wise)* 244 D.L.R. (4th) 564, *(sub nom. Peoples Department Stores Inc. (Bankrupt) v. Wise)* 326 N.R. 267 (Eng.), *(sub nom. Peoples Department Stores Inc. (Bankrupt) v. Wise)* 326 N.R. 267 (Fr.), 4 C.B.R. (5th) 215, 49 B.L.R. (3d) 165, 2004 SCC 68, 2004 CarswellQue 2862, 2004 CarswellQue 2863 (S.C.C.) — considered

*R. v. Sharpe* (2001), 2001 SCC 2, 2001 CarswellBC 82, 2001 CarswellBC 83, 194 D.L.R. (4th) 1, 150 C.C.C. (3d) 321, 39 C.R. (5th) 72, 264 N.R. 201, 146 B.C.A.C. 161, 239 W.A.C. 161, 88 B.C.L.R. (3d) 1, [2001] 6 W.W.R. 1, [2001] 1 S.C.R. 45, 86 C.R.R. (2d) 1 (S.C.C.) — referred to

*Richtree Inc., Re* (2005), 2005 CarswellOnt 255, 7 C.B.R. (5th) 294 (Ont. S.C.J. [Commercial List]) — referred to

*Rizzo & Rizzo Shoes Ltd., Re* (1998), 1998 CarswellOnt 1, 1998 CarswellOnt 2, 154 D.L.R. (4th) 193, 36 O.R. (3d) 418 (headnote only), *(sub nom. Rizzo & Rizzo Shoes Ltd. (Bankrupt), Re)* 221 N.R. 241, *(sub nom. Adrien v. Ontario Ministry of Labour)* 98 C.L.L.C. 210-006, 50 C.B.R. (3d) 163, *(sub nom. Rizzo & Rizzo Shoes Ltd. (Bankrupt), Re)* 106 O.A.C. 1, [1998] 1 S.C.R. 27, 33 C.C.E.L. (2d) 173 (S.C.C.) — referred to

*Royal Oak Mines Inc., Re* (1999), 1999 CarswellOnt 792, 7 C.B.R. (4th) 293 (Ont. Gen. Div. [Commercial List]) — considered

*Sammi Atlas Inc., Re* (1998), 1998 CarswellOnt 1145, 3 C.B.R. (4th) 171 (Ont. Gen. Div. [Commercial List]) — referred to

*Skeena Cellulose Inc., Re* (2003), 43 C.B.R. (4th) 187, 184 B.C.A.C. 54, 302 W.A.C. 54, 2003 BCCA 344, 2003 CarswellBC 1399, 13 B.C.L.R. (4th) 236 (B.C. C.A.) — followed

*Stephenson v. Vokes* (1896), 27 O.R. 691 (Ont. H.C.) — referred to

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

*Westar Mining Ltd., Re* (1992), 70 B.C.L.R. (2d) 6, 14 C.B.R. (3d) 88, [1992] 6 W.W.R. 331, 1992 CarswellBC 508 (B.C. S.C.) — referred to

**Statutes considered:**

*Canada Business Corporations Act*, R.S.C. 1985, c. C-44
   Generally — referred to

   s. 2(1) "affairs" — considered

   s. 102 — referred to

   s. 106(3) — referred to

   s. 109(1) — referred to

   s. 111 — referred to

   s. 122(1) — referred to

   s. 122(1)(a) — referred to

   s. 122(1)(b) — referred to

   s. 145 — referred to

   s. 145(2)(b) — referred to

   s. 241 — referred to

   s. 241(3)(e) — referred to

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36
   Generally — referred to

   s. 11 — considered

   s. 11(1) — considered

   s. 11(3) — considered

   s. 11(4) — considered

   s. 11(6) — considered

   s. 20 — considered

APPEAL by potential board members from judgments reported at *Stelco Inc., Re* (2005), 2005 CarswellOnt 742, 7 C.B.R. (5th) 307 (Ont. S.C.J. [Commercial List]) and at *Stelco Inc., Re* (2005), 2005 CarswellOnt 743, 7 C.B.R. (5th) 310 (Ont. S.C.J. [Commercial List]), granting motion by employees for removal of certain directors from board of corporation under protection of *Companies Creditors' Arrangement Act*.

***Blair J.A.:***

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

## Part I — Introduction

1    Stelco Inc. and four of its wholly owned subsidiaries obtained protection from their creditors under the *Companies' Creditors Arrangement Act* [1] on January 29, 2004. Since that time, the Stelco Group has been engaged in a high profile, and sometimes controversial, process of economic restructuring. Since October 2004, the restructuring has revolved around a court-approved capital raising process which, by February 2005, had generated a number of competitive bids for the Stelco Group.

2    Farley J., an experienced judge of the Superior Court Commercial List in Toronto, has been supervising the CCAA process from the outset.

3    The appellants, Michael Woollcombe and Roland Keiper, are associated with two companies — Clearwater Capital Management Inc., and Equilibrium Capital Management Inc. — which, respectively, hold approximately 20% of the outstanding publicly traded common shares of Stelco. Most of these shares have been acquired while the CCAA process has been ongoing, and Messrs. Woollcombe and Keiper have made it clear publicly that they believe there is good shareholder value in Stelco in spite of the restructuring. The reason they are able to take this position is that there has been a solid turn around in worldwide steel markets, as a result of which Stelco, although remaining in insolvency protection, is earning annual operating profits.

4    The Stelco board of directors ("the Board") has been depleted as a result of resignations, and in January of this year Messrs. Woollcombe and Keiper expressed an interest in being appointed to the Board. They were supported in this request by other shareholders who, together with Clearwater and Equilibrium, represent about 40% of the Stelco common shareholders. On February 18, 2005, the Board appointed the appellants directors. In announcing the appointments publicly, Stelco said in a press release:

> After careful consideration, and given potential recoveries at the end of the company's restructuring process, the Board responded favourably to the requests by making the appointments announced today.

> Richard Drouin, Chairman of Stelco's Board of Directors, said: "I'm pleased to welcome Roland Keiper and Michael Woollcombe to the Board. Their experience and their perspective will assist the Board as it strives to serve the best interests of all our stakeholders. We look forward to their positive contribution."

5    On the same day, the Board began its consideration of the various competing bids that had been received through the capital raising process.

6    The appointments of the appellants to the Board incensed the employee stakeholders of Stelco ("the Employees"), represented by the respondent Retired Salaried Beneficiaries of Stelco and the respondent United Steelworkers of America ("USWA"). Outstanding pension liabilities to current and retired employees are said to be Stelco's largest long-term liability — exceeding several billion dollars. The Employees perceive they do not have the same, or very much, economic leverage in what has sometimes been referred to as 'the bare knuckled arena' of the restructuring process. At the same time, they are amongst the most financially vulnerable stakeholders in the piece. They see the appointments of Messrs. Woollcombe and Keiper to the Board as a threat to their well being in the restructuring process, because the appointments provide the appellants, and the shareholders they represent, with direct access to sensitive information relating to the competing bids to which other stakeholders (including themselves) are not privy.

7    The Employees fear that the participation of the two major shareholder representatives will tilt the bid process in favour of maximizing shareholder value at the expense of bids that might be more favourable to the interests of the Employees. They sought and obtained an order from Farley J. removing Messrs. Woollcombe and Keiper from their short-lived position of directors, essentially on the basis of that apprehension.

8    The Employees argue that there is a reasonable apprehension the appellants would not be able to act in the best interests of the corporation — as opposed to their own best interests as shareholders — in considering the bids. They say this is so because of prior public statements by the appellants about enhancing shareholder value in Stelco, because of the appellants' linkage

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

to such a large shareholder group, because of their earlier failed bid in the restructuring, and because of their opposition to a capital proposal made in the proceeding by Deutsche Bank (known as "the Stalking Horse Bid"). They submit further that the appointments have poisoned the atmosphere of the restructuring process, and that the Board made the appointments under threat of facing a potential shareholders' meeting where the members of the Board would be replaced en masse.

9    On the other hand, Messrs. Woollcombe and Keiper seek to set aside the order of Farley J. on the grounds that (a) he did not have the jurisdiction to make the order under the provisions of the CCAA, (b) even if he did have jurisdiction, the reasonable apprehension of bias test applied by the motion judge has no application to the removal of directors, (c) the motion judge erred in interfering with the exercise by the Board of its business judgment in filling the vacancies on the Board, and (d) the facts do not meet any test that would justify the removal of directors by a court in any event.

10    For the reasons that follow, I would grant leave to appeal, allow the appeal, and order the reinstatement of the applicants to the Board.

**Part II — Additional Facts**

11    Before the initial CCAA order on January 29, 2004, the shareholders of Stelco had last met at their annual general meeting on April 29, 2003. At that meeting they elected eleven directors to the Board. By the date of the initial order, three of those directors had resigned, and on November 30, 2004, a fourth did as well, leaving the company with only seven directors.

12    Stelco's articles provide for the Board to be made up of a minimum of ten and a maximum of twenty directors. Consequently, after the last resignation, the company's corporate governance committee began to take steps to search for new directors. They had not succeeded in finding any prior to the approach by the appellants in January 2005.

13    Messrs. Woollcombe and Keiper had been accumulating shares in Stelco and had been participating in the CCAA proceedings for some time before their request to be appointed to the Board, through their companies, Clearwater and Equilibrium. Clearwater and Equilibrium are privately held, Ontario-based, investment management firms. Mr. Keiper is the president of Equilibrium and associated with Clearwater. Mr. Woollcombe is a consultant to Clearwater. The motion judge found that they "come as a package".

14    In October 2004, Stelco sought court approval of its proposed method of raising capital. On October 19, 2004, Farley J. issued what has been referred to as the Initial Capital Process Order. This order set out a process by which Stelco, under the direction of the Board, would solicit bids, discuss the bids with stakeholders, evaluate the bids, and report on the bids to the court.

15    On November 9, 2004, Clearwater and Equilibrium announced they had formed an investor group and had made a capital proposal to Stelco. The proposal involved the raising of $125 million through a rights offering. Mr. Keiper stated at the time that he believed "the value of Stelco's equity would have the opportunity to increase substantially if Stelco emerged from CCAA while minimizing dilution of its shareholders." The Clearwater proposal was not accepted.

16    A few days later, on November 14, 2004, Stelco approved the Stalking Horse Bid. Clearwater and Equilibrium opposed the Deutsche Bank proposal. Mr. Keiper criticized it for not providing sufficient value to existing shareholders. However, on November 29, 2004, Farley J. approved the Stalking Horse Bid and amended the Initial Capital Process Order accordingly. The order set out the various channels of communication between Stelco, the monitor, potential bidders and the stakeholders. It provided that members of the Board were to see the details of the different bids before the Board selected one or more of the offers.

17    Subsequently, over a period of two and a half months, the shareholding position of Clearwater and Equilibrium increased from approximately 5% as at November 19, to 14.9% as at January 25, 2005, and finally to approximately 20% on a fully diluted basis as at January 31, 2005. On January 25, Clearwater and Equilibrium announced that they had reached an understanding jointly to pursue efforts to maximize shareholder value at Stelco. A press release stated:

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

Such efforts will include seeking to ensure that the interests of Stelco's equity holders are appropriately protected by its board of directors and, ultimately, that Stelco's equity holders have an appropriate say, by vote or otherwise, in determining the future course of Stelco.

18    On February 1, 2005, Messrs. Keiper and Woollcombe and others representatives of Clearwater and Equilibrium, met with Mr. Drouin and other Board members to discuss their views of Stelco and a fair outcome for all stakeholders in the proceedings. Mr. Keiper made a detailed presentation, as Mr. Drouin testified, "encouraging the Board to examine how Stelco might improve its value through enhanced disclosure and other steps". Mr. Keiper expressed confidence that "there was value to the equity of Stelco", and added that he had backed this view up by investing millions of dollars of his own money in Stelco shares. At that meeting, Clearwater and Equilibrium requested that Messrs. Woollcombe and Keiper be added to the Board and to Stelco's restructuring committee. In this respect, they were supported by other shareholders holding about another 20% of the company's common shares.

19    At paragraphs 17 and 18 of his affidavit, Mr. Drouin, summarized his appraisal of the situation:

17. It was my assessment that each of Mr. Keiper and Mr. Woollcombe had personal qualities which would allow them to make a significant contribution to the Board in terms of their backgrounds and their knowledge of the steel industry generally and Stelco in particular. In addition I was aware that their appointment to the Board was supported by approximately 40% of the shareholders. In the event that these shareholders successfully requisitioned a shareholders meeting they were in a position to determine the composition of the entire Board.

18. I considered it essential that there be continuity of the Board through the CCAA process. I formed the view that the combination of existing Board members and these additional members would provide Stelco with the most appropriate board composition in the circumstances. The other members of the Board also shared my views.

20    In order to ensure that the appellants understood their duties as potential Board members and, particularly that "they would no longer be able to consider only the interests of shareholders alone but would have fiduciary responsibilities as a Board member to the corporation as a whole", Mr. Drouin and others held several further meetings with Mr. Woollcombe and Mr. Keiper. These discussions "included areas of independence, standards, fiduciary duties, the role of the Board Restructuring Committee and confidentiality matters". Mr. Woollcombe and Mr. Keiper gave their assurances that they fully understood the nature and extent of their prospective duties, and would abide by them. In addition, they agreed and confirmed that:

a) Mr. Woollcombe would no longer be an advisor to Clearwater and Equilibrium with respect to Stelco;

b) Clearwater and Equilibrium would no longer be represented by counsel in the CCAA proceedings; and

c) Clearwater and Equilibrium then had no involvement in, and would have no future involvement, in any bid for Stelco.

21    On the basis of the foregoing — and satisfied "that Messrs. Keiper and Woollcombe would make a positive contribution to the various issues before the Board both in [the] restructuring and the ongoing operation of the business" — the Board made the appointments on February 18, 2005.

22    Seven days later, the motion judge found it "appropriate, just, necessary and reasonable to declare" those appointments "to be of no force and effect" and to remove Messrs. Woollcombe and Keiper from the Board. He did so not on the basis of any actual conduct on the part of the appellants as directors of Stelco but because there was some risk of anticipated conduct in the future. The gist of the motion judge's rationale is found in the following passage from his reasons (at para. 23):

In these particular circumstances and aside from the Board feeling coerced into the appointments for the sake of continuing stability, I am not of the view that it would be appropriate to wait and see if there was any explicit action on behalf of K and W while conducting themselves as Board members which would demonstrate that they had not lived up to their obligations to be "neutral". They may well conduct themselves beyond reproach. But if they did not, the fallout would

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 91 of 493

Stelco Inc., Re, 2005 CarswellOnt 1188
2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

be very detrimental to Stelco and its ability to successfully emerge. What would happen to the bids in such a dogfight? I fear that it would be trying to put Humpty Dumpty back together again. The same situation would prevail even if K and W conducted themselves beyond reproach but with the Board continuing to be concerned that they not do anything seemingly offensive to the bloc. The risk to the process and to Stelco in its emergence is simply too great to risk the wait and see approach.

## Part III — Leave to Appeal

23   Because of the "real time" dynamic of this restructuring project, Laskin J.A. granted an order on March 4, 2005, expediting the appellants' motion for leave to appeal, directing that it be heard orally and, if leave be granted, directing that the appeal be heard at the same time. The leave motion and the appeal were argued together, by order of the panel, on March 18, 2005.

24   This court has said that it will only sparingly grant leave to appeal in the context of a CCAA proceeding and will only do so where there are "serious and arguable grounds that are of real and significant interest to the parties": *Country Style Food Services Inc., Re* (2002), 158 O.A.C. 30, [2002] O.J. No. 1377 (Ont. C.A. [In Chambers]), at para. 15. This criterion is determined in accordance with a four-pronged test, namely,

> a) whether the point on appeal is of significance to the practice;

> b) whether the point is of significance to the action;

> c) whether the appeal is *prima facie* meritorious or frivolous;

> d) whether the appeal will unduly hinder the progress of the action.

25   Counsel agree that (d) above is not relevant to this proceeding, given the expedited nature of the hearing. In my view, the tests set out in (a) - (c) are met in the circumstances, and as such, leave should be granted. The issue of the court's jurisdiction to intervene in corporate governance issues during a CCAA restructuring, and the scope of its discretion in doing so, are questions of considerable importance to the practice and on which there is little appellate jurisprudence. While Messrs. Woollcombe and Keiper are pursuing their remedies in their own right, and the company and its directors did not take an active role in the proceedings in this court, the Board and the company did stand by their decision to appoint the new directors at the hearing before the motion judge and in this court, and the question of who is to be involved in the Board's decision making process continues to be of importance to the CCAA proceedings. From the reasons that follow it will be evident that in my view the appeal has merit.

26   Leave to appeal is therefore granted.

## Part IV — The Appeal

### *The Positions of the Parties*

27   The appellants submit that,

> a) in exercising its discretion under the CCAA, the court is not exercising its "inherent jurisdiction" as a superior court;

> b) there is no jurisdiction under the CCAA to remove duly elected or appointed directors, notwithstanding the broad discretion provided by s. 11 of that Act; and that,

> c) even if there is jurisdiction, the motion judge erred:

>> (i) by relying upon the administrative law test for reasonable apprehension of bias in determining that the directors should be removed;

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

(ii) by rejecting the application of the "business judgment" rule to the unanimous decision of the Board to appoint two new directors; and,

(iii) by concluding that Clearwater and Equilibrium, the shareholders with whom the appellants are associated, were focussed solely on a short-term investment horizon, without any evidence to that effect, and therefore concluding that there was a tangible risk that the appellants would not be neutral and act in the best interests of Stelco and all stakeholders in carrying out their duties as directors.

28    The respondents' arguments are rooted in fairness and process. They say, first, that the appointment of the appellants as directors has poisoned the atmosphere of the CCAA proceedings and, secondly, that it threatens to undermine the even-handedness and integrity of the capital raising process, thus jeopardizing the ability of the court at the end of the day to approve any compromise or arrangement emerging from that process. The respondents contend that Farley J. had jurisdiction to ensure the integrity of the CCAA process, including the capital raising process Stelco had asked him to approve, and that this court should not interfere with his decision that it was necessary to remove Messrs. Woollcombe and Keiper from the Board in order to ensure the integrity of that process. A judge exercising a supervisory function during a CCAA proceeding is owed considerable deference: *Algoma Steel Inc., Re* (2001), 25 C.B.R. (4th) 194 (Ont. C.A.), at para. 8.

29    The crux of the respondents' concern is well-articulated in the following excerpt from paragraph 72 of the factum of the Retired Salaried Beneficiaries:

The appointments of Keiper and Woollcombe violated every tenet of fairness in the restructuring process that is supposed to lead to a plan of arrangement. One stakeholder group — particular investment funds that have acquired Stelco shares during the CCAA itself — have been provided with privileged access to the capital raising process, and voting seats on the Corporation's Board of Directors and Restructuring Committee. No other stakeholder has been treated in remotely the same way. To the contrary, the salaried retirees have been completely excluded from the capital raising process and have no say whatsoever in the Corporation's decision-making process.

30    The respondents submit that fairness, and the perception of fairness, underpin the CCAA process, and depend upon effective judicial supervision: see *Olympia & York Developments Ltd. v. Royal Trust Co.* (1993), 12 O.R. (3d) 500 (Ont. Gen. Div.); *Ivaco Inc., Re* (2004), 3 C.B.R. (5th) 33 (Ont. S.C.J. [Commercial List]), at para.15-16. The motion judge reasonably decided to remove the appellants as directors in the circumstances, they say, and this court should not interfere.

### *Jurisdiction*

31    The motion judge concluded that he had the power to rescind the appointments of the two directors on the basis of his "inherent jurisdiction" and "the discretion given to the court pursuant to the *CCAA*". He was not asked to, nor did he attempt to rest his jurisdiction on other statutory powers imported into the CCAA.

32    The CCAA is remedial legislation and is to be given a liberal interpretation to facilitate its objectives: *Babcock & Wilcox Canada Ltd., Re*, [2000] O.J. No. 786 (Ont. S.C.J. [Commercial List]), at para. 11. See also, *Hongkong Bank of Canada v. Chef Ready Foods Ltd.* (1990), 4 C.B.R. (3d) 311 (B.C. C.A.), at p. 320; *Lehndorff General Partner Ltd., Re* (1993), 17 C.B.R. (3d) 24 (Ont. Gen. Div. [Commercial List]). Courts have adopted this approach in the past to rely on inherent jurisdiction, or alternatively on the broad jurisdiction under s. 11 of the CCAA, as the source of judicial power in a CCAA proceeding to "fill in the gaps" or to "put flesh on the bones" of that Act: see *Dylex Ltd., Re* (1995), 31 C.B.R. (3d) 106 (Ont. Gen. Div. [Commercial List]), *Royal Oak Mines Inc., Re* (1999), 7 C.B.R. (4th) 293 (Ont. Gen. Div. [Commercial List]); and *Westar Mining Ltd., Re* (1992), 70 B.C.L.R. (2d) 6 (B.C. S.C.).

33    It is not necessary, for purposes of this appeal, to determine whether inherent jurisdiction is excluded for all supervisory purposes under the CCAA, by reason of the existence of the statutory discretionary regime provided in that Act. In my opinion, however, the better view is that in carrying out his or her supervisory functions under the legislation, the judge is not exercising

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

inherent jurisdiction but rather the statutory discretion provided by s. 11 of the CCAA and supplemented by other statutory powers that may be imported into the exercise of the s. 11 discretion from other statutes through s. 20 of the CCAA.

*Inherent Jurisdiction*

34    Inherent jurisdiction is a power derived "from the very nature of the court as a superior court of law", permitting the court "to maintain its authority and to prevent its process being obstructed and abused". It embodies the authority of the judiciary to control its own process and the lawyers and other officials connected with the court and its process, in order "to uphold, to protect and to fulfill the judicial function of administering justice according to law in a regular, orderly and effective manner". See I.H. Jacob, "The Inherent Jurisdiction of the Court" (1970) 23 Current Legal Problems 27-28. In Halsbury's Laws of England, 4 th ed. (London: Lexis-Nexis UK, 1973 - ) vol. 37, at para. 14, the concept is described as follows:

> In sum, it may be said that the inherent jurisdiction of the court is a virile and viable doctrine, and has been defined as being the reserve or fund of powers, a residual source of powers, which the court may draw upon as necessary whenever it is just or equitable to do so, in particularly to ensure the observation of the due process of law, to prevent improper vexation or oppression, to do justice between the parties and to secure a fair trial between them.

35    In spite of the expansive nature of this power, inherent jurisdiction does not operate where Parliament or the Legislature has acted. As Farley J. noted in *Royal Oak Mines Inc.*, *supra*, inherent jurisdiction is "not limitless; if the legislative body has not left a functional gap or vacuum, then inherent jurisdiction should not be brought into play" (para. 4). See also, *Baxter Student Housing Ltd. v. College Housing Co-operative Ltd.* (1975), [1976] 2 S.C.R. 475 (S.C.C.) at 480; *Richtree Inc., Re*, [2005] O.J. No. 251 (Ont. S.C.J. [Commercial List]).

36    In the CCAA context, Parliament has provided a statutory framework to extend protection to a company while it holds its creditors at bay and attempts to negotiate a compromised plan of arrangement that will enable it to emerge and continue as a viable economic entity, thus benefiting society and the company in the long run, along with the company's creditors, shareholders, employees and other stakeholders. The s. 11 discretion is the engine that drives this broad and flexible statutory scheme, and that for the most part supplants the need to resort to inherent jurisdiction. In that regard, I agree with the comment of Newbury J.A. in *Skeena Cellulose Inc., Re*, [2003] B.C.J. No. 1335, 43 C.B.R. (4th) 187 (B.C. C.A.) at para. 46, that:

> . . . the court is not exercising a power that arises from its nature as a superior court of law, but is exercising the discretion given to it by the CCAA. . . . This is the discretion, given by s. 11, to stay proceedings against the debtor corporation and the discretion, given by s. 6, to approve a plan which appears to be reasonable and fair, to be in accord with the requirements and objects of the statute, and to make possible the continuation of the corporation as a viable entity. It is these considerations the courts have been concerned with in the cases discussed above, [2] rather than the integrity of their own process.

37    As Jacob observes, in his article "The Inherent Jurisdiction of the Court", *supra*, at p. 25:

> The inherent jurisdiction of the court is a concept which must be distinguished from the exercise of judicial discretion. These two concepts resemble each other, particularly in their operation, and they often appear to overlap, and are therefore sometimes confused the one with the other. There is nevertheless a vital juridical distinction between jurisdiction and discretion, which must always be observed.

38    I do not mean to suggest that inherent jurisdiction can never apply in a CCAA context. The court retains the ability to control its own process, should the need arise. There is a distinction, however — difficult as it may be to draw — between the *court's* process with respect to the restructuring, on the one hand, and the course of action involving the negotiations and corporate actions accompanying them, which are the *company's* process, on the other hand. The court simply supervises the latter process through its ability to stay, restrain or prohibit proceedings against the company during the plan negotiation period "on such terms as it may impose". [3] Hence the better view is that a judge is generally exercising the court's statutory discretion under s. 11 of the Act when supervising a CCAA proceeding. The order in this case could not be founded on inherent jurisdiction because it is designed to supervise the company's process, not the court's process.

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

*The Section 11 Discretion*

39    This appeal involves the scope of a supervisory judge's discretion under s. 11 of the CCAA, in the context of corporate governance decisions made during the course of the plan negotiating and approval process and, in particular, whether that discretion extends to the removal of directors in that environment. In my view, the s. 11 discretion — in spite of its considerable breadth and flexibility — does not permit the exercise of such a power in and of itself. There may be situations where a judge in a CCAA proceeding would be justified in ordering the removal of directors pursuant to the oppression remedy provisions found in s. 241 of the CBCA, and imported into the exercise of the s. 11 discretion through s. 20 of the CCAA. However, this was not argued in the present case, and the facts before the court would not justify the removal of Messrs. Woollcombe and Keiper on oppression remedy grounds.

40    The pertinent portions of s. 11 of the CCAA provide as follows:

**Powers of court**

11. (1) Notwithstanding anything in the *Bankruptcy* and Insolvency Act or the Winding-up Act, where an application is made under this Act in respect of a company, the court, on the application of any person interested in the matter, may, subject to this Act, on notice to any other person or without notice as it may see fit, make an order under this section.

**Initial application court orders**

(3) A court may, on an initial application in respect of a company, make an order on such terms as it may impose, effective for such period as the court deems necessary not exceeding thirty days.

(a) staying, until otherwise ordered by the court, all proceedings taken or that might be taken in respect of the company under an Act referred to in subsection (1);

(b) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

(c) prohibiting, until otherwise ordered by the court, the commencement of or proceeding with any other action, suit or proceeding against the company.

**Other than initial application court orders**

(4) A court may, on an application in respect of a company other than an initial application, make an order on such terms as it may impose.

(a) staying, until otherwise ordered by the court, for such period as the court deems necessary, all proceedings taken or that might be taken in respect of the company under an Act referred to in subsection (1);

(b) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

(c) prohibiting, until otherwise ordered by the court, the commencement of or proceeding with any other action, suit or proceeding against the company.

**Burden of proof on application**

(6) The court shall not make an order under subsection (3) or (4) unless

(a) the applicant satisfies the court that circumstances exist that make such an order appropriate; and

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

(b) in the case of an order under subsection (4), the applicant also satisfied the court that the applicant has acted, and is acting, in good faith and with due diligence.

41    The rule of statutory interpretation that has now been accepted by the Supreme Court of Canada, in such cases as *R. v. Sharpe*, [2001] 1 S.C.R. 45 (S.C.C.), at para. 33, and *Rizzo & Rizzo Shoes Ltd., Re*, [1998] 1 S.C.R. 27 (S.C.C.), at para. 21 is articulated in E.A. Driedger, *The Construction of Statutes*, 2nd ed. (Toronto: Butterworths, 1983) as follows:

Today, there is only one principle or approach, namely, the words of an Act are to be read in their entire context and in their grammatical and ordinary sense harmoniously with the scheme of the Act, the object of the Act, and the intention of Parliament.

See also Ruth Sullivan, *Sullivan and Driedger on the Construction of Statutes*, 4th ed. (Toronto: Butterworths, 2002) at page 262.

42    The interpretation of s. 11 advanced above is true to these principles. It is consistent with the purpose and scheme of the CCAA, as articulated in para. 38 above, and with the fact that corporate governance matters are dealt with in other statutes. In addition, it honours the historical reluctance of courts to intervene in such matters, or to second-guess the business decisions made by directors and officers in the course of managing the business and affairs of the corporation.

43    Mr. Leon and Mr. Swan argue that matters relating to the removal of directors do not fall within the court's discretion under s. 11 because they fall outside of the parameters of the court's role in the restructuring process, in contrast to the company's role in the restructuring process. The court's role is defined by the "on such terms as may be imposed" jurisdiction under subparagraphs 11(3)(a)-(c) and 11(4)(a)-(c) of the CCAA to stay, or restrain, or prohibit proceedings against the company during the "breathing space" period for negotiations and a plan. I agree.

44    What the court does under s. 11 is to establish the boundaries of the playing field and act as a referee in the process. The company's role in the restructuring, and that of its stakeholders, is to work out a plan or compromise that a sufficient percentage of creditors will accept and the court will approve and sanction. The corporate activities that take place in the course of the workout are governed by the legislation and legal principles that normally apply to such activities. In the course of acting as referee, the court has great leeway, as Farley J. observed in *Lehndorff General Partner Ltd.*, *supra*, at para 5, "to make order[s] so as to effectively maintain the status quo in respect of an insolvent company while it attempts to gain the approval of its creditors for the proposed compromise or arrangement which will be to the benefit of both the company and its creditors". But the s. 11 discretion is not open-ended and unfettered. Its exercise must be guided by the scheme and object of the Act and by the legal principles that govern corporate law issues. Moreover, the court is not entitled to usurp the role of the directors and management in conducting what are in substance *the company's* restructuring efforts.

45    With these principles in mind, I turn to an analysis of the various factors underlying the interpretation of the s. 11 discretion.

46    I start with the proposition that at common law directors could not be removed from office during the term for which they were elected or appointed: *London Finance Corp. v. Banking Service Corp.* (1922), 23 O.W.N. 138 (Ont. H.C.); *Stephenson v. Vokes* (1896), 27 O.R. 691 (Ont. H.C.). The authority to remove must therefore be found in statute law.

47    In Canada, the CBCA and its provincial equivalents govern the election, appointment and removal of directors, as well as providing for their duties and responsibilities. Shareholders elect directors, but the directors may fill vacancies that occur on the board of directors pending a further shareholders meeting: CBCA, ss. 106(3) and 111.[4] The specific power *to remove* directors is vested in the shareholders by s. 109(1) of the CBCA. However, s. 241 empowers the court — where it finds that oppression as therein defined exists — to "make any interim or final order it thinks fit", including (s. 241(3)(e)) "an order appointing directors in place of or in addition to all or any of the directors then in office". This power has been utilized to remove directors, but in very rare cases, and only in circumstances where there has been actual conduct rising to the level of

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

misconduct required to trigger oppression remedy relief: see, for example, *Catalyst Fund General Partner I Inc. v. Hollinger Inc.*, [2004] O.J. No. 4722 (Ont. S.C.J.).

48      There is therefore a statutory scheme under the CBCA (and similar provincial corporate legislation) providing for the election, appointment, *and removal* of directors. Where another applicable statute confers jurisdiction with respect to a matter, a broad and undefined discretion provided in one statute cannot be used to supplant or override the other applicable statute. There is no legislative "gap" to fill. See *Baxter Student Housing Ltd. v. College Housing Co-operative Ltd.*, *supra*, at p. 480; *Royal Oak Mines Inc. (Re)*, *supra*; and *Richtree Inc. (Re)*, *supra*.

49      At paragraph 7 of his reasons, the motion judge said:

> The board is charged with the standard duty of "manage[ing], [*sic*] or supervising the management, of the business and affairs of the corporation": s. 102(1) CBCA. *Ordinarily the Court will not interfere with the composition of the board of directors. However, if there is good and sufficient valid reason to do so, then the Court must not hesitate to do so to correct a problem*. The directors should not be required to constantly look over their shoulders for this would be the sure recipe for board paralysis which would be so detrimental to a restructuring process; thus interested parties should only initiate a motion where it is reasonably obvious that there is a problem, actual or poised to become actual.
>
> [emphasis added]

50      Respectfully, I see no authority in s. 11 of the CCAA for the court to interfere with the composition of a board of directors on such a basis.

51      Court removal of directors is an exceptional remedy, and one that is rarely exercised in corporate law. This reluctance is rooted in the historical unwillingness of courts to interfere with the internal management of corporate affairs and in the court's well-established deference to decisions made by directors and officers in the exercise of their business judgment when managing the business and affairs of the corporation. These factors also bolster the view that where the CCAA is silent on the issue, the court should not read into the s. 11 discretion an extraordinary power — which the courts are disinclined to exercise in any event — except to the extent that that power may be introduced through the application of other legislation, and on the same principles that apply to the application of the provisions of the other legislation.

*The Oppression Remedy Gateway*

52      The fact that s. 11 does not itself provide the authority for a CCAA judge to order the removal of directors does not mean that the supervising judge is powerless to make such an order, however. Section 20 of the CCAA offers a gateway to the oppression remedy and other provisions of the CBCA and similar provincial statutes. Section 20 states:

> The provisions of this Act may be applied together with the provisions of any Act of Parliament or of the legislature of any province that authorizes or makes provision for the sanction of compromises or arrangements between a company and its shareholders or any class of them.

53      The CBCA is legislation that "makes provision for the sanction of compromises or arrangements between a company and its shareholders or any class of them". Accordingly, the powers of a judge under s. 11 of the CCAA may be applied together with the provisions of the CBCA, including the oppression remedy provisions of that statute. I do not read s. 20 as limiting the application of outside legislation to the provisions of such legislation dealing specifically with the sanctioning of compromises and arrangements between the company and its shareholders. The grammatical structure of s. 20 mandates a broader interpretation and the oppression remedy is, therefore, available to a supervising judge in appropriate circumstances.

54      I do not accept the respondents' argument that the motion judge had the authority to order the removal of the appellants by virtue of the power contained in s. 145(2)(b) of the CBCA to make an order "declaring the result of the disputed election or appointment" of directors. In my view, s. 145 relates to the procedures underlying disputed elections or appointments, and not to disputes over the composition of the board of directors itself. Here, it is conceded that the appointment of Messrs. Woollcombe

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

and Keiper as directors complied with all relevant statutory requirements. Farley J. quite properly did not seek to base his jurisdiction on any such authority.

*The Level of Conduct Required*

55    Colin Campbell J. recently invoked the oppression remedy to remove directors, without appointing anyone in their place, in *Catalyst Fund General Partner I Inc. v. Hollinger Inc.*, *supra* The bar is high. In reviewing the applicable law, C. Campbell J. said (para. 68):

> Director removal is *an extraordinary remedy* and certainly should be *imposed most sparingly*. As a starting point, I accept the basic proposition set out in Peterson, "Shareholder Remedies in Canada" [5]:

>> SS. 18.172 *Removing and appointing directors to the board is an extreme form of judicial intervention*. The board of directors is elected by the shareholders, vested with the power to manage the corporation, and appoints the officers of the company who undertake to conduct the day-to-day affairs of the corporation. [Footnote omitted.] It is clear that the board of directors has control over policymaking and management of the corporation. *By tampering with a board, a court directly affects the management of the corporation*. If a reasonable balance between protection of corporate stakeholders and the freedom of management to conduct the affairs of the business in an efficient manner is desired, altering the board of directors should be *a measure of last resort*. The order could be suitable where the continuing presence of the incumbent directors is harmful to both the company and the interests of corporate stakeholders, and where the appointment of a new director or directors would remedy the oppressive conduct without a receiver or receiver-manager.

> [emphasis added]

56    C. Campbell J. found that the continued involvement of the Ravelston directors in the *Hollinger* situation would "significantly impede" the interests of the public shareholders and that those directors were "motivated by putting their interests first, not those of the company" (paras. 82-83). The evidence in this case is far from reaching any such benchmark, however, and the record would not support a finding of oppression, even if one had been sought.

57    Everyone accepts that there is no evidence the appellants have conducted themselves, as directors — in which capacity they participated over two days in the bid consideration exercise — in anything but a neutral fashion, having regard to the best interests of Stelco and all of the stakeholders. The motion judge acknowledged that the appellants "may well conduct themselves beyond reproach". However, he simply decided there was a risk — a reasonable apprehension — that Messrs. Woollcombe and Keiper would not live up to their obligations to be neutral in the future.

58    The risk or apprehension appears to have been founded essentially on three things: (1) the earlier public statements made by Mr. Keiper about "maximizing shareholder value"; (2) the conduct of Clearwater and Equilibrium in criticizing and opposing the Stalking Horse Bid; and (3) the motion judge's opinion that Clearwater and Equilibrium — the shareholders represented by the appellants on the Board — had a "vision" that "usually does not encompass any significant concern for the long-term competitiveness and viability of an emerging corporation", as a result of which the appellants would approach their directors' duties looking to liquidate their shares on the basis of a "short-term hold" rather than with the best interests of Stelco in mind. The motion judge transposed these concerns into anticipated predisposed conduct on the part of the appellants as directors, despite their apparent understanding of their duties as directors and their assurances that they would act in the best interests of Stelco. He therefore concluded that "the risk to the process and to Stelco in its emergence [was] simply too great to risk the wait and see approach".

59    Directors have obligations under s. 122(1) of the CBCA (a) to act honestly and in good faith with a view to the best interest of the corporation (the "statutory fiduciary duty" obligation), and (b) to exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances (the "duty of care" obligation). They are also subject to control under the oppression remedy provisions of s. 241. The general nature of these duties does not change when the company

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

approaches, or finds itself in, insolvency: *People's Department Stores Ltd. (1992) Inc., Re*, [2004] S.C.J. No. 64 (S.C.C.) at paras. 42-49.

60     In *Peoples* the Supreme Court noted that "the interests of the corporation are not to be confused with the interests of the creditors or those of any other stakeholders" (para. 43), but also accepted "as an accurate statement of the law that in determining whether [directors] are acting with a view to the best interests of the corporation it may be legitimate, given all the circumstances of a given case, for the board of directors to consider, *inter alia*, the interests of shareholders, employees, suppliers, creditors, consumers, governments and the environment" (para. 42). Importantly as well — in the context of "the shifting interest and incentives of shareholders and creditors" — the court stated (para. 47):

> In resolving these competing interests, it is incumbent upon the directors to act honestly and in good faith with a view to the best interests of the corporation. In using their skills for the benefit of the corporation when it is in troubled waters financially, the directors must be careful to attempt to act in its best interests by creating a "better" corporation, and not to favour the interests of any one group of stakeholders.

61     In determining whether directors have fallen foul of those obligations, however, more than some risk of anticipated misconduct is required before the court can impose the extraordinary remedy of removing a director from his or her duly elected or appointed office. Although the motion judge concluded that there was a risk of harm to the Stelco process if Messrs Woollcombe and Keiper remained as directors, he did not assess the level of that risk. The record does not support a finding that there was a sufficient risk of sufficient misconduct to warrant a conclusion of oppression. The motion judge was not asked to make such a finding, and he did not do so.

62     The respondents argue that this court should not interfere with the decision of the motion judge on grounds of deference. They point out that the motion judge has been case-managing the restructuring of Stelco under the CCAA for over fourteen months and is intimately familiar with the circumstances of Stelco as it seeks to restructure itself and emerge from court protection.

63     There is no question that the decisions of judges acting in a supervisory role under the CCAA, and particularly those of experienced commercial list judges, are entitled to great deference: see *Algoma Steel Inc. v. Union Gas Ltd.* (2003), 63 O.R. (3d) 78 (Ont. C.A.) at para. 16. The discretion must be exercised judicially and in accordance with the principles governing its operation. Here, respectfully, the motion judge misconstrued his authority, and made an order that he was not empowered to make in the circumstances.

64     The appellants argued that the motion judge made a number of findings without any evidence to support them. Given my decision with respect to jurisdiction, it is not necessary for me to address that issue.

### *The Business Judgment Rule*

65     The appellants argue as well that the motion judge erred in failing to defer to the unanimous decision of the Stelco directors in deciding to appoint them to the Stelco Board. It is well-established that judges supervising restructuring proceedings — and courts in general — will be very hesitant to second-guess the business decisions of directors and management. As the Supreme Court of Canada said in *Peoples, supra*, at para. 67:

> Courts are ill-suited and should be reluctant to second-guess the application of business expertise to the considerations that are involved in corporate decision making . . .

66     In *Brant Investments Ltd. v. KeepRite Inc.* (1991), 3 O.R. (3d) 289 (Ont. C.A.) at 320, this court adopted the following statement by the trial judge, Anderson J.:

> Business decisions, honestly made, should not be subjected to microscopic examination. There should be no interference simply because a decision is unpopular with the minority. [6]

WestlawNext CANADA   Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 99 of 493

Stelco Inc., Re, 2005 CarswellOnt 1188

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

67    McKinlay J.A then went on to say:

> There can be no doubt that on an application under s. 234 [7] the trial judge is required to consider the nature of the impugned acts and the method in which they were carried out. That does not meant that the trial judge should substitute his own business judgment for that of managers, directors, or a committee such as the one involved in assessing this transaction. Indeed, it would generally be impossible for him to do so, regardless of the amount of evidence before him. He is dealing with the matter at a different time and place; it is unlikely that he will have the background knowledge and expertise of the individuals involved; he could have little or no knowledge of the background and skills of the persons who would be carrying out any proposed plan; and it is unlikely that he would have any knowledge of the specialized market in which the corporation operated. In short, he does not know enough to make the business decision required.

68    Although a judge supervising a CCAA proceeding develops a certain "feel" for the corporate dynamics and a certain sense of direction for the restructuring, this caution is worth keeping in mind. See also *Skeena Cellulose Inc., Re*, *supra*, *Sammi Atlas Inc., Re* (1998), 3 C.B.R. (4th) 171 (Ont. Gen. Div. [Commercial List]); *Olympia & York Developments Ltd. (Re)*, *supra*; *Alberta-Pacific Terminals Ltd., Re* (1991), 8 C.B.R. (3d) 99 (B.C. S.C.). The court is not catapulted into the shoes of the board of directors, or into the seat of the chair of the board, when acting in its supervisory role in the restructuring.

69    Here, the motion judge was alive to the "business judgment" dimension in the situation he faced. He distinguished the application of the rule from the circumstances, however, stating at para. 18 of his reasons:

> With respect I do not see the present situation as involving the "management of the business and affairs of the corporation", but rather as a quasi-constitutional aspect of the corporation entrusted albeit to the Board pursuant to s. 111(1) of the CBCA. I agree that where a board is actually engaged in the business of a judgment situation, the board should be given appropriate deference. However, to the contrary in this situation, I do not see it as a situation calling for (as asserted) more deference, but rather considerably less than that. With regard to this decision of the Board having impact upon the capital raising process, as I conclude it would, then similarly deference ought not to be given.

70    I do not see the distinction between the directors' role in "the management of the business and affairs of the corporation" (CBCA, s. 102) — which describes the directors' overall responsibilities — and their role with respect to a "quasi-constitutional aspect of the corporation" (i.e. in filling out the composition of the board of directors in the event of a vacancy). The "affairs" of the corporation are defined in s. 1 of the CBCA as meaning "the relationships among a corporation, it affiliates and the shareholders, directors and officers of such bodies corporate but does not include the business carried on by such bodies corporate". Corporate governance decisions relate directly to such relationships and are at the heart of the Board's business decision-making role regarding the corporation's business *and* affairs. The dynamics of such decisions, and the intricate balancing of competing interests and other corporate-related factors that goes into making them, are no more within the purview of the court's knowledge and expertise than other business decisions, and they deserve the same deferential approach. Respectfully, the motion judge erred in declining to give effect to the business judgment rule in the circumstances of this case.

71    This is not to say that the conduct of the Board in appointing the appellants as directors may never come under review by the supervising judge. The court must ultimately approve and sanction the plan of compromise or arrangement as finally negotiated and accepted by the company and its creditors and stakeholders. The plan must be found to be fair and reasonable before it can be sanctioned. If the Board's decision to appoint the appellants has somehow so tainted the capital raising process that those criteria are not met, any eventual plan that is put forward will fail.

72    The respondents submit that it makes no sense for the court to have jurisdiction to declare the process flawed only after the process has run its course. Such an approach to the restructuring process would be inefficient and a waste of resources. While there is some merit in this argument, the court cannot grant itself jurisdiction where it does not exist. Moreover, there are a plethora of checks and balances in the negotiating process itself that moderate the risk of the process becoming irretrievably tainted in this fashion — not the least of which is the restraining effect of the prospect of such a consequence. I do not think that this argument can prevail. In addition, the court at all times retains its broad and flexible supervisory jurisdiction — a

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 100 of 493

Stelco Inc., Re, 2005 CarswellOnt 1188

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

jurisdiction which feeds the creativity that makes the CCAA work so well — in order to address fairness and process concerns along the way. This case relates only to the court's exceptional power to order the removal of directors.

### The Reasonable Apprehension of Bias Analogy

73    In exercising what he saw as his discretion to remove the appellants as directors, the motion judge thought it would be useful to "borrow the concept of reasonable apprehension of bias . . .with suitable adjustments for the nature of the decision making involved" (para. 8). He stressed that "there was absolutely no allegation against [Mr. Woollcombe and Mr. Keiper] of any actual 'bias' or its equivalent" (para. 8). He acknowledged that neither was alleged to have done anything wrong since their appointments as directors, and that at the time of their appointments the appellants had confirmed to the Board that they understood and would abide by their duties and responsibilities as directors, including the responsibility to act in the best interests of the corporation and not in their own interests as shareholders. In the end, however, he concluded that because of their prior public statements that they intended to "pursue efforts to maximize shareholder value at Stelco", and because of the nature of their business and the way in which they had been accumulating their shareholding position during the restructuring, and because of their linkage to 40% of the common shareholders, there was a risk that the appellants would not conduct themselves in a neutral fashion in the best interests of the corporation as directors.

74    In my view, the administrative law notion of apprehension of bias is foreign to the principles that govern the election, appointment and removal of directors, and to corporate governance considerations in general. Apprehension of bias is a concept that ordinarily applies to those who preside over judicial or quasi-judicial decision-making bodies, such as courts, administrative tribunals or arbitration boards. Its application is inapposite in the business decision-making context of corporate law. There is nothing in the CBCA or other corporate legislation that envisages the screening of directors in advance for their ability to act neutrally, in the best interests of the corporation, as a prerequisite for appointment.

75    Instead, the conduct of directors is governed by their common law and statutory obligations to act honestly and in good faith with a view to the best interests of the corporation, and to exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances (CBCA, s. 122(1)(a) and (b)). The directors also have fiduciary obligations to the corporation, and they are liable to oppression remedy proceedings in appropriate circumstances. These remedies are available to aggrieved complainants — including the respondents in this case — but they depend for their applicability on the director having engaged in conduct justifying the imposition of a remedy.

76    If the respondents are correct, and reasonable apprehension that directors may not act neutrally because they are aligned with a particular group of shareholders or stakeholders is sufficient for removal, all nominee directors in Canadian corporations, and all management directors, would automatically be disqualified from serving. No one suggests this should be the case. Moreover, as Iacobucci J. noted in *Blair v. Consolidated Enfield Corp.*, [1995] 4 S.C.R. 5 (S.C.C.) at para. 35, "persons are assumed to act in good faith unless proven otherwise". With respect, the motion judge approached the circumstances before him from exactly the opposite direction. It is commonplace in corporate/commercial affairs that there are connections between directors and various stakeholders and that conflicts will exist from time to time. Even where there are conflicts of interest, however, directors are not removed from the board of directors; they are simply obliged to disclose the conflict and, in appropriate cases, to abstain from voting. The issue to be determined is not whether there is a connection between a director and other shareholders or stakeholders, but rather whether there has been some conduct on the part of the director that will justify the imposition of a corrective sanction. An apprehension of bias approach does not fit this sort of analysis.

### Part V — Disposition

77    For the foregoing reasons, then, I am satisfied that the motion judge erred in declaring the appointment of Messrs. Woollcombe and Keiper as directors of Stelco of no force and effect.

78    I would grant leave to appeal, allow the appeal and set aside the order of Farley J. dated February 25, 2005.

79    Counsel have agreed that there shall be no costs of the appeal.

2005 CarswellOnt 1188, [2005] O.J. No. 1171, 196 O.A.C. 142, 253 D.L.R. (4th) 109...

**Goudge J.A.:**

I agree.

**Feldman J.A.:**

I agree.

*Appeal allowed.*

Footnotes

1    R.S.C. 1985, c. C-36, as amended.

2    The reference is to the decisions in *Dyle, Royal Oak Mines, and Westar*, cited above.

3    See paragraph 43, *infra*, where I elaborate on this distinction.

4    It is the latter authority that the directors of Stelco exercised when appointing the appellants to the Stelco Board.

5    Dennis H. Peterson, Shareholder Remedies in Canada (Markham: LexisNexis — Butterworths — Looseleaf Service, 1989) at 18-47.

6    Or, I would add, unpopular with other stakeholders.

7    Now s. 241.

---

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 142

**CITATION:** Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300
**COURT FILE NO.:** CV-08-7809-00CL
**DATE:** 20130301

2013 ONSC 1300 (CanLII)

## ONTARIO
## SUPERIOR COURT OF JUSTICE
## COMMERCIAL LIST

| | | |
|---|---|---|
| **B E T W E E N :** | ) | |
| | ) | |
| STETSON OIL & GAS LTD. | ) | *William J. Burden, Arthur Hamilton and* |
| | ) | *Lara Jackson,*, for the Plaintiff |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| | ) | |
| - and - | ) | |
| | ) | |
| | ) | |
| STIFEL NICOLAUS CANADA INC. | ) | *Joseph Groia, Kellie Seaman* and *David* |
| | ) | *Sischy* for the Defendant |
| | ) | |
| Defendant | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | **HEARD:** January 9, 10, 11, 16, 18, 21, 22, |
| | | 23, 24, 28 and February 5, 2013 |

**Newbould J.**

[1]    The plaintiff Stetson Oil & Gas Ltd. ("Stetson") sues for breach of a "bought deal" underwriting agreement contained in a signed letter agreement (the "engagement letter") under which Thomas Weisel Partners Canada Inc. ("Weisel")[1] agreed to purchase for resale 45,454,600 subscription receipts in the capital of Stetson at a price of 55 cents per subscription receipt for aggregate gross proceeds of approximately $25,000,030. Weisel did not close the agreement.

---

[1] At the conclusion of the trial, the name of the defendant was changed from Thomas Weisel Partners Canada Inc. to Stifel Nicolaus Canada Inc. For ease of reference, the defendant will be referred to as Weisel.

Page: 2

Stetson then made an agreement with Canaccord Capital Corporation for financing which resulted in gross proceeds to Stetson of $12,000,000 for the issuance of 60,000,000 units (each consisting of a share and warrant) at 20 cents per unit. Stetson claims damages for breach of contract against Weisel, being the difference between the proceeds it should have received under the engagement letter and the proceeds raised in the Canaccord financing, plus interim financing costs.

[2]    For the reasons that follow, the action is allowed and Stetson is entitled to judgment against Weisel for $16,042,669 and interest.

**Pertinent History**

[3]    Stetson is a junior oil and gas exploration company which trades on the TSX Venture Exchange.[2]    Weisel at material times operated as an investment bank and securities dealer specializing in the growth sectors of the economy.

[4]    In June, 2008 Stetson made a proposal to the Fort Berthold Tribe of North Dakota to lease tribal lands to explore in the Bakken Formation in North Dakota. In 2008 the Bakken was one of the hottest oil and gas plays in the United States, due in part to new horizontal fracturing technology that allows for exploration and development in property that under conventional techniques could not be profitably explored. The Bakken in North Dakota and Saskatchewan has the potential to become a world class producer of oil and gas.  Today it produces over 700,000 barrels of oil a day, mostly in North Dakota.

[5]    Stetson needed to raise funds in order to pursue the Bakken opportunity.  Stetson's market capitalization at the time was $15 to $20 million

[6]    Stetson wanted to raise funds through a bought deal financing because it wanted a guarantee with no financing risk.  In a bought deal, the underwriter agrees to purchase the issuer's securities at a fixed price and takes the risk of selling them in the market at a profit. A bought deal in this respect is fundamentally different from an agency or best efforts underwriting in which an underwriter makes best efforts to sell the securities of the issuer but provides no

---

[2] Statements of fact in these reasons are findings of fact unless stated otherwise.

guarantee of the amount or value of the securities that will be sold. The issuer takes the market risk.

[7]     Stetson began canvassing the underwriting market in June, 2008 in anticipation of acquiring the lease rights in the Bakken. Mr. Stan Bharti, the founder and Chairman of Forbes & Manhattan, a very successful resource merchant bank, had been a director of Stetson since 2006. Forbes & Manhattan and Mr. Bharti had existing investment banking relationships with, among others, Canaccord and Macquarie Capital Markets Inc., but had no relationship with Weisel.

[8]     Weisel was very interested in doing business with Mr. Bharti as he was viewed as a very successful businessman who had been involved in many successful start-up ventures. When Weisel learned of his involvement in Stetson and Stetson's interest in the Bakken play in North Dakota, Weisel reached out to Mr. Bharti and Stetson. They viewed Mr. Bharti as the key decision maker for Stetson.

[9]     Mr. Alex Wylie of Calgary acted as the lead banker for Weisel in dealing with Stetson. Mr. Alec Rowlands of Weisel had known Mr. Bharti since 1993 and he and Mr. Wylie agreed to pursue Mr. Bharti and Stetson. Meetings were arranged for the president of Stetson, Mr. Bill Ward, to meet with Mr. Wylie and after that there were a number of meetings between Stetson and Weisel.

[10]     Weisel had detailed research coverage on the Bakken play.  It had extensively analyzed Kodiak Oil & Gas Corp. ("Kodiak"), a successful oil exploration company with lands near the lands that Stetson was pursuing. After his meeting with Mr. Ward, Mr. Wylie sent him several research reports Weisel had done on Kodiak and on another company involved in the Bakken named Tristar Oil & Gas.

[11]     Weisel promoted its expertise and knowledge of the Bakken formation as something that would be of assistance to Stetson. Messrs. Wylie and Rowlands told Mr. Bharti that they and their analysts knew the Bakken well, and that Weisel wanted to get involved in the deal and to build a relationship with Mr. Bharti and Forbes & Manhattan.

[12]     Weisel understood from discussions with Mr. Bharti and Mr. Said, another director of Stetson, that Stetson was looking to raise $25 million through a bought deal and that it could be

2013 ONSC 1300 (CanLII)

Page: 4

expected that obtaining an underwriting agreement would be a competitive situation. There is no question but that Weisel was very anxious to get the business. An internal Weisel e-mail of July 4, 2008 from Mr. Wylie was indicative of this:

> Stetson is a Stan Bhardhi [sic] company with assets in the Bakken…
>
> …
>
> They are ging [sic] to want a bought deal…Stan's last deal out here was a few weeks back for Vast…Niko took a big chunk…apparently they had $75MM in orders on a $25MM deal… Stan is going to be the decision maker on this .. they will have a syndicate but you need to put up a deal to get in the game on this one …

[13]    Vast Exploration was a company in the Forbes & Manhattan group and the reference to it was to a recent financing for Vast that had received $75 million in orders for a limited $25 million financing.

[14]    On July 7, shortly after Mr. Ward met with the sales force of Weisel in Toronto, Mr. Wylie said in another internal Stetson e-mail that Stan Bharti was clearly the decision maker and that Mr. Rowlands "has the best relationship with Stan and he needs to start working him over". Mr. Wylie's evidence that all he was indicating was that he wanted Weisel to be prepared in case Stetson won the lands was not convincing. More indicative of Weisel's frame of mind was an e-mail from Mr. Rowlands to Mr. Bharti of July 9 which said "…this is a deal we want to lead, we believe that our coverage of the Bakken and the US players in the area will benefit Stetson, let's talk today, when are u available?" On the same day Mr. Wylie e-mailed Mr. Said of Stetson and said "The firm is very enthusiastic about getting behind the Stetson story and will be putting up a deal to Stetson once you are ready for bids."

[15]    The lease sought by Stetson required approval by the Tribal Council which was expected in early July. On July 11, 2008 Stetson announced that it had received Tribal Council approval to the lease of 8,570 acres of what were referred to as tribal lands that were adjacent to another 4,500 acres of freehold lands that it was leasing, subject to approval of the Bureau of Indian Affairs.

2013 ONSC 1300 (CanLII)

Page: 5

2013 ONSC 1300 (CanLII)

[16]    On that day, the Commitment Committee of Weisel met and decided to offer 50 cents a share on a bought deal that would see Stetson receive $25 million less fees to Weisel.  Mr. Wylie called Mr. Bharti and Mr. Said and said that Weisel was prepared to deliver a bought deal letter at 50 cents a share. Mr. Bharti said that 50 cents was not enough and proposed 55 cents. The Commitment Committee of Weisel met a second time and agreed to the price of 55 cents a share.

[17]    At 8:53 p.m. on July 11, 2008, Weisel e-mailed a signed engagement letter from Mr. Wylie to Mr. Bharti and others.  In the e-mail, Mr. Wylie outlined the terms of the "bought deal letter", including the following:

> Syndicate:   65% TWP [Weisel], 35% Canaccord – the deal is not subject to syndication

[18]    This arose as a result of discussions between Messrs. Bharti and Mr. Said of Stetson and Messrs. Rowlands and Wylie of Weisel who knew that Forbes & Manhattan had a close relationship with Canaccord and that Canaccord was very interested in the financing. Canaccord had been the lead banker for oil and gas deals that Forbes & Manhattan had done. Weisel thought that it would be easier to obtain Mr. Bharti's agreement to use Weisel for the financing if Weisel offered some of the deal to Canaccord. In early discussions Weisel had said to Mr. Bharti that if Stetson wanted syndication they could do that. Syndication means that the underwriter brings in other underwriters to reduce its liability or risk. Weisel told Mr. Bharti that if he felt syndication was important because of his relationships with other bankers, they would be open to it.

[19]    The engagement letter stated that the deal was not subject to syndication, and all Weisel witnesses confirmed that the deal did not require that Canaccord participate in it and that Weisel was quite prepared to proceed with the deal alone. It is quite clear that the participation of Canaccord was not required, or even asked for, by Weisel. Weisel told Mr. Bharti that their first preference was to go without any syndication. Mr. Bharti told Weisel that if Canaccord agreed, he would like to see Canaccord in the syndicate because of their long-term relationship and over the week-end after the engagement letter was sent by Weisel, he told them that he would like to see Canaccord with 40% rather than 35% but that it would be entirely up to Weisel how they would structure the syndicate.

Page: 6

[20]     Over the week-end there were communications between Mr. Gleeson, Stetson's in-house counsel, and Mr. Wylie of Weisel regarding terms of the engagement letter. Some terms were changed. On Sunday, July 13, 2008 at 11:11 pm Mr. Gleeson e-mailed to Mr. Wylie a copy of the engagement letter signed by him on behalf of Stetson. The terms had been changed somewhat from the previous version signed and sent by Weisel on July 11, 2008.

[21]     The engagement letter provided that Weisel, as the Lead Underwriter, would on a bought deal basis purchase by way of private placement for resale 45,454,600 subscription receipts in the capital of Stetson at a price of 55 cents per subscription receipt for aggregate gross proceeds of approximately $25,000,030. Weisel was granted an option to purchase an additional 9,091,000 subscription receipts for 55 cents each. Each subscription receipt was to be automatically exchanged for one common share of Stetson upon approval of the Bureau of Indian Affairs to the lease of the 8,570 acres already approved by the Tribal Council.

[22]     One of the terms of the engagement letter was that it was subject to reconfirmation by 5 a.m. Calgary time on July 14, 2008. It is apparently quite common if a bought deal is done at night that there must be reconfirmation in the morning. That is done to give a party time to react to something that may happen overnight before the morning. In this case Mr. Wylie of Weisel reconfirmed the deal at 5 a.m. Calgary time in a call to Mr. Said of Stetson.

[23]     Shortly before 7 a.m. Toronto time Mr. Pocrnic of Weisel telephoned Canaccord to invite Canaccord to participate in a syndicate. He recalls little of the discussion. A few minutes later he got a call back from Canaccord saying they were going to pass on the transaction. Mr. Wylie called Mr. Said who suggested he call Genuity as Genuity had indicated late on Sunday evening that if Canaccord did not participate, which Genuity though highly remote, Genuity would certainly play a syndicate role. Mr. Pocrnic then spoke to the head of institutional sales at Genuity who indicated they would not participate. Mr. Wylie informed Mr. Said of this and said that Weisel was going ahead with the marketing of the deal.

[24]     At 7:31 a.m. Toronto time, Weisel released a press release announcing on behalf of Stetson that Stetson had entered into an agreement with Weisel as lead underwriter on behalf of a syndicate of underwriters to purchase on a bought deal private placement basis 45,454,600

2013 ONSC 1300 (CanLII)

2013 ONSC 1300 (CanLII)

subscription receipts in the capital of Stetson at a price of 55 cents per subscription receipt for aggregate gross proceeds of approximately $25,000,030. In the parlance of the underwriting market, the deal at that point went "live".

[25]    On July 13, Weisel advised its sales and trading personnel that it would be going live on a bought deal for Stetson the next morning at 7:30 a.m. Weisel intended and expected to sell the entire bought deal by 9:15 am, within two hours of announcing the deal, and fifteen minutes before the TSX opened at 9:30am.  This was consistent with both the timelines for a bought deal in Weisel's Deal Book, the guide used by Weisel to conduct its business. Mr. Wylie testified that once Canaccord backed out, Weisel was not sure that the entire position would sell by the opening of the market that day. I have some trouble with that evidence. Mr. Wylie had said that putting a provision in the engagement letter that the deal was not subject to syndication had been intended to show a sign of strength on the part of Weisel and that Weisel did not need Canaccord in the deal but could do it alone.

[26]    Weisel was not able to sell any of its position in Stetson on the 13th. Mr. Rowlands, the managing director of institutional equity sales for Weisel, said that at the same time the Stetson press release was issued to announce the bought deal with Weisel, Shell Canada announced it was going to buy Duvernet Oil, an oil and gas play in Alberta, for $6.5 billion dollars. Most of the people Weisel wanted to talk to were shareholders of either Shell or Duvernet and it was very difficult to get them on the telephone as they were pre-occupied with the larger deal. There was no suggestion that the fact that Canaccord was not part of the syndicate was any impediment to the deal. Mr. Rowlands kept Mr. Bharti informed on a daily basis that week and for the first half of the week told Mr. Bharti that they were confident that the deal would be sold.

[27]    However, by July 17, 2008 Weisel had managed to place only $2 million of its position. Mr. Bharti's evidence, which I accept, was that in his experience involving 30 or 40 bought deals, they can sell out in one hour, sometimes in two or three days and usually are always sold out in the first four or five days. He said it was that it was in no one's interest for a bought deal to be a hung deal, meaning for the underwriters to be holding the stock. The market would understand that the stock could not be sold and it would hurt the price of the stock.

Page: 8

[28]    Mr. Bharti offered later that month to have Aberdeen, a Forbes & Manhattan fund, buy $2 million of Weisel's position if the rest was sold, and said that Stetson was open to discussions if Weisel wanted to change some terms to help them resell the deal. He testified that he made it clear to Weisel that Stetson needed the money by the end of July or early August to meet their obligations, that Stetson had to be pragmatic, and that if Weisel came back with a proposal that would help them sell the deal, for example with a different price or incentives, Stetson would be open to looking at. Weisel never came back with any new fixed proposal before closing.

[29]    The engagement letter provided that the deal was to close on July 31, 2008. On that date Stetson was to receive the agreed amount from Weisel. However, on July 28, 2008 Weisel's lawyers wrote to Stetson's lawyers and said that Weisel did not intend to close the deal on July 31, 2008. No reason was provided.

[30]    By letter of July 31, 2008 e-mailed on August 1, 2008, Stetson's lawyers wrote to Weisel's lawyers and said that Stetson "agrees to allow the extension of the closing past July 31, 2008 to a later date that reasonably coincides with the Corporation's capital expenditure requirements". There had been no request for an extension from Weisel and it cannot be said that the extension was made by agreement with Weisel. Mr. Bharti's evidence, which I accept, was that Stetson had no choice but to state that there was an extension as Weisel had gone silent and had not said why they would not close or provided new terms. He said that Stetson had commitments and that its business was in jeopardy. Because they had had some discussion on terms, he felt an extension would give time to perhaps come to new terms that would allow them to fulfill their commitments. He said he had to be practical and pragmatic and was trying to look for a solution. Mr. Said's evidence, which I also accept, was to the same effect.

[31]    A press release announcing the extension was made on August 8th. Mr. Bharti's evidence, which I accept, was that they had not heard back from Weisel regarding the extension letter and they had statutory disclose requirements to announce the extension contained in the July 31, 2008 letter e-mailed the following day. Mr. Said testified that Stetson was stuck because of the failure of Weisel to close the transaction and that announcing anything other than that the deal was extended would be terrible for Stetson. He said that there was no agreement with Weisel

2013 ONSC 1300 (CanLII)

about the extension. I accept that evidence. I do not accept the evidence of Mr. Wylie that he had discussions with Mr. Bharti and Mr. Said regarding the extension or that Weisel agreed or participated in extended the closing. There was no discussion in the conversation between Stetson and Weisel people on August 1, 2008 about any extension of the closing. Weisel had no interest or intention of closing the deal reached in the engagement letter. It sought a new deal for much less and for terms more favourable to it.

[32]     Around the time of the extension, Mr. Bharti received a call from Mr. Lionel Conacher, the president and chief operating office of Weisel, who was based in San Francisco at the time. They met in Toronto on August 13, 2008. They differ as to what exactly was said. I viewed Mr. Bharti as having the better recollection, but it is perhaps unimportant. No new agreement was reached. On August 14, 2008 Weisel offered to make a debt investment of $8 million in return for a release of its obligations under the engagement letter. On August 18, 2008 the solicitors for Stetson replied that Stetson would not release Weisel from the terms of the engagement letter and that if Weisel did not fulfill its obligations, it would take action.

[33]     As early as August 1, 2008 Stetson began to consider alternatives to the Weisel deal. On that day they received a proposal from First Energy that was not acceptable. They went to Canaccord and Macquarie for advice. Canaccord suggested considering a strategic partner and Mr. Said met with Crescent Point at Canaccord's suggestion. However Mr. Said testified that Stetson had no leverage and Crescent Point knew they had a financing problem. No agreement was made. They also met with Tristar and although it looked promising at the outset, Tristar knew that Stetson had no leverage and in Mr. Said's words, were trying to squeeze Stetson. Tristar knew that if Stetson did not get financing, they could go themselves to the Tribal Council and get the lands themselves.

[34]     Eventually Stetson signed an agreement with Canaccord effective August 28, 2008 pursuant to which Canaccord agreed to provide a $12 million financing on a "best efforts" basis in exchange for 60,000,000 units, each unit consisting of a share and warrant of Stetson, at 20 cents per unit. In addition, Stetson agreed to issue approximately 85 million preferred shares to every existing shareholder of Stetson who would be entitled to "the proceeds of any final

2013 ONSC 1300 (CanLII)

judgment or settlement monies paid to and received by the Corporation in connection with its claim against Thomas Weisel…". The preferred shares were the idea of Canaccord as a sweetener to assist the sale of the Stetson shares.

[35]    Mr. Said testified that Canaccord was doing Stetson, and particular Mr. Bharti, a favour. He testified that Stetson was tainted because of the failed bought deal and that Canaccord were uncertain what they could do. Stetson trusted Canaccord would do its best. I accept this evidence.

[36]    The Canaccord financing closed on September 17, 2008 for net proceeds to Stetson of $11,215,928.92 after fees paid to Canaccord.

[37]    Before the closing, Stetson had to obtain two bridge loans from Longford Energy Inc., a public company that is a member of the Forbes & Manhattan group, to make lease payments that had become due.  These bridge loans and the associated fees ($100,000) and accrued interest ($33,559) were repaid from the proceeds received on closing of the Canaccord financing.

[38]    There were not sufficient funds from the Canaccord financing for Stetson to undertake its development in the Bakken. Another $23 or $24 million was needed. Mr. Ward, the president of Stetson, thought a strategic partner was needed and he canvassed potential parties. Eventually a proposal was made in early October 2008 by Red Willow Great Plains, LLC. Red Willow was a business enterprise of the Southern Ute Indian Tribe with sizeable oil and gas production.

[39]    Under the Red Willow deal, Stetson assigned 50% of its oil and gas mineral rights in the allotment lands and 60% of its rights in the tribal lands to Red Willow. In exchange, Red Willow agreed to pay for Stetson's first $3,500,000 of drilling costs and also to pay for its share of all land, drilling and exploration costs, to provide its considerable technical expertise and to act as the operator of the programme.

[40]    Eventually only one well was drilled before Red Willow decided not to proceed further, and the project was terminated and the leases lost. During the trial, a ruling was made refusing a motion by Weisel to amend its pleading to rely on the Red Willow transaction and subsequent activity under it, and thus geological evidence regarding the leased lands and their economic potential was not led.

2013 ONSC 1300 (CanLII)

Page: 11

## Was there a binding agreement?

[41]    Weisel takes the position that the engagement letter was not a binding agreement, but only an agreement to agree, and that before there could be a binding agreement, there had to be an underwriting agreement signed by the parties prior to closing.

[42]    The principles to be considered in assessing whether the parties entered into a binding agreement or merely agreed to agree were recently discussed by Pepall J. (as she then was) in *UBS Securities Canada Inc. v. Sands Brothers Canada Ltd.* (2008), 45 B.L.R. (4th) 105 at paras. 40 to 43; aff'd (2009), 95 O.R. (3d) 93 (C.A.). I take from her discussion the following principles:

> (a)    The test as to whether there was *consensus ad idem* is an objective one. The parties will be found to have reached a meeting of the minds where it is clear to the objective reasonable bystander, in light of all the material facts, that the parties intended to contract and the essential terms of that contract can be determined within a reasonable degree of certainty.

> (b)    The investigation to determine whether a reasonable observer would think that two parties intended to contract extends to all the circumstances of the agreement. This has been held to include words and conduct, future actions and representations by both parties and reliance. This determination frequently involves an assessment of the credibility of witnesses

> (c)    An agreement is not incomplete simply because it calls for some further agreement between the parties or because it provides for the execution of a further formal document. It is a question of construction whether the execution of the further contract is a condition or term of the bargain, or whether it is a mere expression of the desire of the parties as to the manner in which the transaction already agreed to will in fact go through.

[43]    In *Canada Square Corp. v. VS Services Ltd.* (1981), 34 O.R. (2d) 250 (C.A.), which involved an issue as to whether a letter sufficed to make a binding agreement or required a formal contract, Morden J.A. cited Professor Waddams for the proposition that subsequent conduct of the parties, while not conclusive and to be looked at with caution, may be helpful in showing what meaning the parties attached to the document after its execution, and this in turn may suggest that they took the same view at the earlier date. He also cited Corbin on Contracts for the proposition that the fact that the parties have acted by rendering some substantial

2013 ONSC 1300 (CanLII)

Page: 12

performance or by taking other material action in reliance upon their existing expressions of agreement is itself a circumstance bearing upon the question of completeness of their agreement.

[44]    Morden J.A. also said, quoting Cardozo J., that it is important to consider, as a part of the context of the document, "the genesis and aim of the transaction".

[45]    There are a number of provisions in the engagement letter that suggest it constitutes a binding agreement. There is also a provision requiring an underwriting agreement to be made prior to closing. Included are the following provisions:

> Thomas Weisel Partners Canada Inc. ("Thomas Weisel" or the "Lead Underwriter"), hereby offers, on a "bought deal" basis by way of private placement, to purchase for resale…
>
> **1.    Terms of Engagement**
>
> …The Offer shall be open for acceptance by the Company until 10 a.m. (Calgary time) on July 13, 2008 unless otherwise extended…and is subject to reconfirmation prior to 5 a.m. (Calgary time) on July 14, 2008. Upon the reconfirmation of this engagement letter, the Company authorizes Thomas Weisel to disseminate the press release attached in Schedule C…The Company agrees upon reconfirmation of this engagement letter to have the trading of its securities halted, if necessary,…
>
> **3.    Underwriting Agreement**
>
> The definitive terms of this agreement will be governed by a formal underwriting agreement to be entered into prior to closing of the purchase by Thomas Weisel (the "Underwriting Agreement") in respect of the Offering. The Underwriting Agreement will be negotiated in good faith between the Company and Thomas Weisel, on behalf of the Underwriters, and will contain representations, warranties, covenants, conditions (including, without limitation, the delivery of certificates of responsible officers of the Company on behalf of the Company, and legal opinions from counsel to the Company regarding relevant corporate and securities matters with respect to the Offering, and the principal subsidiaries and properties of the Company, together with other relevant corporate and securities matters, acceptable to Thomas Weisel and its counsel), indemnity and termination provisions (including without limitation, standard "due diligence-out", "disaster-out",

2013 ONSC 1300 (CanLII)

Page: 13

"material adverse change-out", and "regulatory-out" rights) customary in agreements of this type and will be consistent in all material respects with this letter agreement, unless otherwise agreed between the parties.

**5.  Indemnification**

The Company agrees to indemnity the Underwriters in accordance with Schedule B attached hereto, which Schedule forms part of this agreement and the consideration of which is the entering into this agreement. Such indemnity shall be executed and delivered to Thomas Weisel on the execution of this agreement. The Underwriting Agreement shall contain more comprehensive indemnity provisions consistent with Schedule B. This agreement and the indemnity provisions contained in Schedule B shall enure to the benefit of the respective successors and assigns of the parties hereto and of the indemnified parties, and the obligations and liabilities assumed in the agreement and in the indemnity contained in Schedule B shall be binding upon their respective successors and assigns. …

**8.  Other matters**

(e)   Any dispute arising out of this agreement (including any Schedule) will exclusively be submitted to an arbitrator for binding and conclusive resolution.…[3]

**9.  Acceptance**

Please confirm that the foregoing is in accordance with the Company's understanding by signing and returning the attached duplicate copy of this letter, which shall thereupon constitute a binding agreement between the Company and Thomas Weisel. (Underlining added)

[46]    The language of this engagement letter certainly indicates an intention that it be a binding agreement. It states so expressly in paragraph 9 and the expression "this agreement" is referred to many times. The provision in paragraph 3 calling for the negotiation of an underwriting agreement does not state that until there is such an underwriting agreement there is no binding agreement between the parties.

---

[3] The parties agreed to litigate rather than arbitrate this dispute.

Page: 14

[47]    The inclusion of an arbitration clause is a clear indication that a binding agreement was made. Otherwise there would be no purpose in an arbitration provision. The same is the case with respect to the indemnity provided in the engagement letter.

[48]    What is the "genesis and aim" of the transaction? It was a bought deal underwriting transaction that was intended to be acted upon within hours of the signing of the engagement letter. The time for acceptance by Stetson of the offer contained in the engagement letter was very short. The price of 55 cents per share (or subscription receipt) had been settled by Weisel after taking into account the trading price of Stetson's shares late on the afternoon of Friday, July 11, 2008 with the intention that if the engagement letter was signed by Stetson the deal would go "live" before the opening of the markets on Monday morning, and if normal events occurred, would be sold out shortly thereafter.

[49]    The engagement letter was to be reconfirmed by Weisel by 5 a.m. Calgary time, Monday morning, which it was. There would be no need for a reconfirmation if there were no binding agreement. Weisel intended to thereupon contact Canaccord to offer them part of the Stetson position that it had agreed to underwrite, which it did, and to issue the press release announcing the agreement by the parties to a bought deal, which it did. All of this before the market opened in Toronto at 9:30 a.m. Weisel then met with a number of its institutional clients to try to sell them a position. Weisel could not have taken these steps if it thought that it had no binding agreement with Stetson. It would make no commercial sense to view things differently.

[50]    The form of the engagement letter was a standard form used by Weisel, and any substantive changes had to be approved by its Commitment Committee. The form of the letter was contained in Weisel's Deal Book, the guide used by Weisel to conduct its business. That Deal Book also contained the following statement about the engagement letter:

> "The engagement letter specifies the terms of the deal and serves as the primary agreement defining the obligations of the dealer to the issuer and vice versa."

[51]    Mr. Wylie, the lead banker for Weisel on this transaction, agreed on cross-examination that the statement was a correct statement at the time the engagement letter was signed. That is, Weisel itself acted on the basis that the engagement letter was the primary agreement that

2013 ONSC 1300 (CanLII)

Page: 15

defined the obligations of Stetson and Weisel. While the test as to whether there was a binding agreement is not a subjective test, this evidence is consistent with what a reasonable observer would consider to have occurred, i.e. that a binding agreement had been made by the parties. The same can be said for the lack of evidence of any Weisel witness that the engagement letter was not a binding agreement. No Weisel witness testified that Weisel acted as it did on the basis that the engagement letter was not a binding agreement or that the engagement letter was viewed by them as not being a binding agreement.

[52]    There are other indications that Weisel understood that it was making a binding agreement. Mr. Wylie testified that at the first meeting of the Weisel Commitment Committee dealing with Stetson on July 11, 2008, the thrust of the conversation was that Weisel had to be confident in putting up the firm's capital that the deal "would sell" in the market place, i.e. not that they would be committing capital only after they had gone to the market and learned that the deal had sold, but before.

[53]    After Weisel had gone to the market and had had difficulty in selling its position, Mr. Conacher, the president and chief operating officer of Weisel, e-mailed Mr. Pocrnic, the managing director and head of syndication and equity capital markets in Toronto, and others at Weisel on July 19, 2008. He stated:

> Nick - I'd like to have a review first thing on Monday of exactly which accounts we've approached on Stetson, which ones are outstanding, which accounts are likely buyers of the deal and for you to review the action plan for the coming week.  I think we should include Seth and/Mo in the discussion so that we make sure we are thinking about ALL possible alternatives to get off this liability.  This is by far the most important thing we need to do between now and month end and I want to make sure that we are utilizing all of the Firm's resources to manage this situation.  Going forward I want a full daily report that includes all of the above.  I want a full Court press on this. Nobody goes on vacation until this deal is sold. If people are on vacation, call them back. (Underlining added)

[54]    This was a clear indication that Weisel was acting on an understanding that it had a liability to Stetson and that it wanted to sell out the position before it was required to close the deal with Stetson on July 31, 2008. No reasonable observer could view it otherwise.

2013 ONSC 1300 (CanLII)

Page: 16

[55]    Stetson clearly acted on the basis that it had a binding agreement with Weisel and it relied on the agreement being binding. Stetson consented to the press release announcing the bought deal to be released in its name on July 14, 2008 and Stetson personnel attended the meetings set up by Weisel with prospective purchasers in accordance with the terms of the engagement letter. No reasonable observer would expect Stetson to have done these things if there was no binding agreement.

[56]    This is not a case such as two U.S. cases relied upon by Weisel[4] in which the parties clearly provided that the imposition of legal obligations must be preceded by execution of an underwriting agreement.

[57]    Weisel contends that its offer was subject to due diligence and the execution of an underwriting agreement, and that was an indication that a formal agreement was necessary, absent which the engagement letter was merely an agreement to agree. However, this is not what the language of the engagement letter says.

[58]    So far as due diligence is concerned, the engagement letter stated that "completion of the offering was subject to due diligence to be completed prior to the closing", which was to be on July 31, 2008, a little over two weeks after the engagement letter was open for acceptance and long after it was expected that the Stetson position would have been sold by Weisel. Due diligence was not a condition for the offer in the engagement letter and its acceptance to be binding, but a potential reason for Weisel not to close the transaction if there were material matters undisclosed at the time of the acceptance of the engagement letter affecting Stetson's affairs.

[59]    So far as the requirement for an underwriting agreement is concerned, it was also something to be negotiated prior to closing. The engagement letter did not state that it was a condition of the engagement letter being binding.  It is ironic that such reliance is made by Weisel of the need for an underwriting agreement. Weisel made no attempt at all to negotiate

---

[4] *Health & Community Living, Inc. v. Goldis Financial Group, Inc.*, 1998 WL 117928 at *4 (E.D.N.Y March 13, 1998) and *Café La France, Inc. v. Schneider Securities, Inc.*, 281 F.Supp.2d 361 (2003).

Page: 17

one, and a request by Stetson's solicitors on July 24, 2008 to Weisel's solicitors for a draft of the underwriting agreement went unanswered.

[60]    While the engagement letter contemplated that an underwriting agreement would be made prior to closing, the underwriting agreement, in the language of Parker J. in *Hatzfeldt-Wildenburg v. Alexander* quoted by Judson J. in *Calvan Consolidated Oil & Gas Co. v. Manning*, [1959] S.C.R. 253 at page 5, was not a condition of the bargain but rather it was an expression of the desire of the parties as to the manner in which the transaction already agreed to was to go through.

[61]    Stetson called as an expert witness Mr. Stephen Halperin, a lawyer practising at the Toronto law firm of Goodmans LLP, where he is a partner, member of the firm's executive committee and co-chair of the corporate securities group. Mr. Halperin was called to give evidence as to how a "Reasonable Market Actor" would view the engagement letter in the circumstances of this case. His Reasonable Market Actor was a proxy for how he believed a reasonably sophisticated participant in an underwriting process would have construed the situation. His qualifications as an expert witness were not challenged by Mr. Groia, but surprisingly in light of that concession, the weight to be placed on his evidence is now challenged on the basis that he has little experience in what he testified to.

[62]    Mr. Halperin was an impressive witness. It is the case that he is a highly regarded lawyer in his field, which no doubt was the reason why he was not challenged as an expert, but it is also the case that he has had business experience in the area and dealings in his career with the issues involved in this case. He has been involved in a variety of significant transactions in the areas of corporate finance and mergers and acquisitions and as acted for both issuers and underwriters.  In his capacity as a director, he has participated in probably 6 private placements and has been involved in bought deals.  He is currently a member of the OSC's Senior Securities Lawyers Advisory Group and is a past member of the OSC's Securities Advisory Committee. It was evident throughout his testimony that he is very knowledgeable and I accept his views without qualification.

2013 ONSC 1300 (CanLII)

Page: 18

[63]    Mr. Halperin was clear to say that he was not offering a legal opinion as to whether the engagement letter constituted a binding contract, but an opinion of whether a Reasonable Market Actor would consider the engagement letter to be a binding agreement. I expressed some concern that he was trespassing on the purview of the judge who is to decide this issue, but was reminded that as the case law has developed, particularly in *R. Mohan*, [1994] 2 S.C.R. 9, the rule which excluded expert evidence on the ultimate issue before a court is no longer of general application, although the concerns underlying it remain.

[64]    In determining whether expert evidence is a necessity in assisting the trier of fact, what is required is that the opinion be necessary in the sense that it provides information which is likely to be outside the experience and knowledge of a judge or jury. See *R v. Mohan* at para. 26.

[65]    It is Mr. Halperin's opinion that a Reasonable Market Actor would view the engagement letter as being a binding obligation of Stetson and Weisel. I appreciate that Mr. Halperin does not purport to opine on the legal meaning of the engagement letter but rather how a Reasonable Market Actor would view it. In that sense, he is looking at it from the perspective of a reasonable man, or put differently, from the perspective of what objectively can be taken from the engagement letter and the surrounding circumstances. That however is not really something that is outside the experience and knowledge of a judge. It is commonplace for judges to consider whether parties have arrived at a meeting of the minds to form a binding contract. The tests for doing so are contained in the jurisprudence, some of which I have referred to.

[66]    Mr. Levy, who filed an expert report on behalf of Weisel and who testified at the trial, referred in his report to the engagement letter as a letter of intent. He stated in his report that the letter of intent "is an agreement" used within the Canadian securities industry to set the intended terms, conditions and indemnifications of a financing. On cross-examination, Mr. Levy said he agreed with the statement in the Weisel Deal Book that the engagement letter serves as the primary agreement defining the obligations of the dealer and issuer. Thus in that regard his evidence on this point was not inconsistent with Mr. Halperin's opinion.

[67]    In the circumstances I decline to rely on Mr. Halperin's opinion that a Reasonable Market Actor would view the engagement letter as being a binding obligation of Stetson and Weisel. I

2013 ONSC 1300 (CanLII)

Page: 19

also decline to rely on Mr. Levy's statement that the engagement letter was an agreement. These are not matters for which evidence is necessary in order for a judge understand and deal with the issue.

**Applicability of the "out clauses"**

[68]   The engagement letter provided in paragraph 5 that the definitive terms of "this" agreement would be governed by a formal underwriting agreement to be entered into prior to closing of the purchase, to be negotiated in good faith between the parties, and that the underwriting agreement would contain certain terms, including standard "due diligence out", "disaster out", "material adverse change-out", and "regulatory out" rights customary in agreements of this type, to be consistent in all material respects with "this" letter agreement.

[69]   In the first offer from Weisel sent to Stetson, the word "broad" preceded the out clauses. This word was changed in the final signed engagement letter at the request of Mr. Gleeson of Stetson to "standard", so that the clauses were to be standard out clauses customary in agreements of this type.

[70]   Weisel contends that the inclusion of the out provisions in the underwriting agreement was a fundamental term of its participation in the financing and that it would not have committed to any obligation with respect to the financing unless an agreement explicitly included standard out clauses. Two things can be said to that argument. First, Weisel did commit to the obligation by reason of the language and provisions in the engagement letter that I have already discussed. Second, the engagement letter in paragraph 5 provided that what was to be contained in the underwriting agreement regarding out clauses were to be standard provisions customary in agreements of this type. Presumably Weisel must have been satisfied with this description.

[71]   Weisel relies on two of the clauses in its closing argument, being the "material adverse change-out" and "disaster out" clauses. In my view, it is not open for Weisel to rely on these clauses.

[72]   First, Weisel never attempted to negotiate an underwriting agreement before it failed to close the transaction on July 31, 2008 as required by the engagement letter. The Weisel Deal Book checklist for bought deals in which Weisel was the lead underwriter required Weisel to

2013 ONSC 1300 (CanLII)

2013 ONSC 1300 (CanLII)

draft an underwriting agreement with legal counsel. Counsel for Stetson's request for Weisel's draft underwriting agreement went unanswered. Therefore there was no agreement containing these out clauses that Weisel could rely on in refusing to close.

[73]    Second, at no time did Weisel purport to rely on these clauses. They were first raised during this litigation. The form of clauses relied on by Weisel as being the standard clauses were by their language to be available to Weisel to refuse to close the transaction (i) if Weisel came to the opinion that the conditions in them were not met and (ii) written notice to that effect was given prior to the time of closing. When Weisel announced through its lawyers on July 28, 2008 that it did not intend to close on July 31, 2008, no suggestion was made by its lawyers that Weisel had formed the opinion that it had a right to refuse to close because of any out clause nor was anything said by anyone at Weisel to anyone at Stetson that it was relying on any out clause in deciding not to close on July 31, 2008.

[74]    Mr. Levy, Weisel's expert witness, in discussing the out clauses, stated that if Weisel determined as a result of its ongoing review of the Bakken project that the potential profitability had been materially reduced as a result of an oil price decline (which Weisel relied on at the trial), Weisel could consider termination by use of the due diligence out clause and/or the material change out clause. While I disagree with Mr. Levy's opinion that these clauses could have been relied on by Weisel, it is noteworthy that he said that before considering termination of the agreement, Weisel had to first make a determination after reviewing the Stetson Bakken project that its profitability had been materially reduced. Weisel had made no review of Stetson's Bakken project after signing the engagement letter nor had it made any determination that its profitability had been reduced before it announced that it was not going to close on July 31, 2008 as required by the engagement letter. Thus even according to Weisel's own expert, there was no basis to be purporting to rely on the out clauses.

[75]    Mr. Levy's opinion reflects the two clauses relied on by Weisel. The clauses require that in order to terminate its obligations, the underwriter must form an opinion prior to the time of closing that the conditions in the clause have occurred and must give written notice of its exercise of the rights contained in the clauses. None of that occurred in this case.

2013 ONSC 1300 (CanLII)

[76]    The standard material adverse change out clause relied on by Weisel provides:

> If, after the date hereof and prior to the Time of Closing, there shall occur any material change or change in a material fact which, in the reasonable opinion of the Underwriters (or any of them), would be expected to have a significant adverse effect on the market price or value of the Securities, any Underwriter shall be entitled, at its option, to terminate its obligation under this agreement by written notice to that effect, given to the Company at or prior to the Time of Closing.

[77]    The standard disaster out clause relied on by Weisel provides:

> The obligations of the Underwriter (or any of them) to purchase the Securities under this agreement may be terminated by the Underwriter at its option by written notice to that effect to the Company at any time prior to the Closing if there should develop, occur or come into effect or existence any event, action state, condition or major financial occurrence of national or international consequence or any law or regulation which in the opinion of the Underwriter seriously adversely affects, or involves, or will seriously affect, or involve, the financial markets or the business, operations or affairs of the Company and its subsidiaries taken as a whole.

[78]    Weisel argues that oil price changes were sufficient to enable it to rely on these clauses. It points to no evidence, and there is none, that prior to July 31, 2008 it formed an opinion required by the material change out clause that oil price changes would be expected to have a significant adverse effect on the market price or value of the Stetson securities. Nor is there any evidence that prior to July 31, 2008 Weisel formed an opinion required by the disaster out clause that because of oil price changes there had developed, occurred or come into effect or existence any event, action state, condition or major financial occurrence of national or international consequence or any law or regulation which seriously adversely affected, or involved, or would seriously affect, or involve, the financial markets or the business, operations or affairs of Stetson.

[79]    Nor did Weisel give written notice that it was terminating its obligations under the engagement letter because of the out clauses. On August 1, 2008 there was a conference call participated in by Messrs. Bharti and Said and others on behalf of Stetson and by Messrs. Conacher, Wylie, Rowlands and others on behalf of Weisel. During that call there was nothing

Page: 22

said by anyone on behalf of Weisel about the price of oil, or the state of the markets or the Stetson share price, and nothing was said about using any out clause to terminate their obligations under the engagement letter.

[80]    This argument of Weisel that the out clauses entitle it to deny liability to Stetson because of oil price declines is nothing more than a *post facto* attempt to rely on something said to fall within the material adverse change and disaster out clauses. It is supported by no plausible evidence. No Weisel witness testified that Weisel refused to close because of any drop in oil prices.

[81]    When one looks at the oil prices changes, they can hardly be said to rise to the level that would support any reasonable opinion that the out clauses now relied on by Weisel permitted the termination of the engagement letter.

[82]    Weisel argues that as at July 14, 2008, the price of oil reached a near-peak price of $145.16 per barrel. As at September 5, 2008, the price of oil had dropped to $106.47 per barrel, representing a 27% drop in less than two months and said to be the first substantive material decline in oil prices since December 2006.

[83]    However, Stetson was an exploration play and the daily price of oil was of less importance than for an oil producer. Stetson would likely have not been in production for four years. The evidence of Mr. Bharti, which I accept, was that with an exploration play such as Stetson's project, short term price movements were not important when compared to the long term view on oil pricing and that the long term view of oil was bullish with oil prices staying at or above $80 to $85 per barrel.  Mr. Said's evidence, which I also accept, was to the same effect. What was of importance to Stetson, and fully recognized by Weisel, was that oil prices would not likely drop below the forecasted oil prices used in their future value models.

[84]    In its various reports at relevant times, Weisel used conservative oil prices much below market prices in forecasting future values of oil plays. Also, Mr. Wylie, the lead banker for Weisel on this transaction, acknowledged that oil by nature has a high beta, i.e. high volatility and that he would look at pricing over a one or two month period to give him a trend line. It was

2013 ONSC 1300 (CanLII)

Page: 23

only two weeks after the deal went live on July 14, 2008 that Weisel through its lawyers said on July 28, 2008 that it would not close on July 31, 2008.

[85]    On March 12, 2008, Weisel prepared a research report in respect of Kodiak Oil & Gas Corp.    Under the heading Unproven Resource Potential, Weisel stated that it estimated Kodiak's unproven Bakken resource potential based on a number of assumptions. The assumption for oil was an average NYMEX oil price of $75 per barrel and an average realized oil price of $65 per barrel.    Kodiak was also an exploration play in the Bakken and no drilling had yet occurred. On the day of its report the spot price for WTI oil closed at $109.86.

[86]    On April 25, 2008, Weisel prepared a research report with respect to another Bakken player, TriStar Oil & Gas Ltd, an oil producer, and used as commodity prices in its valuation a WTI price of $110 per barrel for 2008 and $100 per barrel for 2009. On that day, April 25, 2008, the WTI spot price for oil closed at $132.99.

[87]    On May 21, 2008, Weisel produced another research report on Kodiak.    In its net asset value sensitivity analysis, it used three price point cases – the low case at $75 per barrel, the mid-range case at $85 per barrel, and the high case at $95 per barrel. On May 21, 2008 the WTI spot price for oil closed at $132.99.

[88]    In an investor presentation dated July 3, 3008 which was provided to Weisel shortly afterwards, Stetson used initial production price assumptions in its two forecasted cases of WTI $90 and $115 per barrel. On that date, the spot price for WTI oil closed at $145.31. After this report was made to the Weisel sales team on July 8, 2008, Mr. Wylie told Stetson that Weisel was very enthusiastic about Stetson and would be putting up a deal to Stetson once it was ready for bids. By July 10, 2008 Weisel had prepared a presentation to be used by its sales team that used the same price assumptions of $90 and $115 that Stetson had used. On July 28, 2008, the date that Weisel's lawyers advised Stetson that it would not close, the spot price for TWI oil closed at $124.72.

[89]    Throughout July, Weisel's equity sales team used its sales presentation in trying to market the Stetson position. As well, Weisel continued to promote Stetson as being similar to Kodiak. On July 21, 2008 Weisel sent to potential equity investors the two Kodiak reports of

2013 ONSC 1300 (CanLII)

Page: 24

March 12 and 21 which contained the price assumptions already referred to. On that date Weisel was valuing the Stetson shares, which it had agreed to purchase for 55 cents, at $1.50. It would hardly be right for Weisel to now take the position that the oil prices had dropped to the point that the material adverse market and disaster out clauses were applicable when at the same time it was marketing its Stetson position with oil price forecast assumptions that were lower than the then current price of oil.

[90]    What also belies Weisel's argument on oil pricing is how it reacted to oil pricing at relevant times. On July 3, 2008, oil closed at its highest price to date, at $145.31 per barrel. However, in the next two trading days, oil retreated by more than $9 per barrel to close on July 8 at a price of $136.06 per barrel. July 8 was the day Stetson made its presentation to Weisel's sales desk.    There is no evidence that anyone within Weisel, whether connected with the sales desk or otherwise, registered any concern about the drop in the price of oil and it was after this presentation that Mr. Wylie stated, in an e-mail to Mr. Said of Stetson that Weisel was very enthusiastic about getting behind the Stetson story and would be putting up a deal to Stetson once Stetson was ready for bids.

[91]    In light of all of this, it is not surprising that no one from Weisel testified that Weisel refused to close because of any drop in oil prices. To have asserted that would not have been plausible or reasonable.

[92]    Mr. Rowlands did testify that the markets began to turn around negatively at about the time that oil prices hit their high. Both he and Mr. Conacher testified that the markets were buoyant leading up to the engagement letter but that by the end of July (Mr. Conacher) or third week of July (Mr. Rowlands), they had turned negative. This evidence was given to support a case that it was oil pricing that caused a turn in the markets. I have considerable doubt about the admissibility of this evidence, which is opinion evidence.

[93]    Mr. Rowlands also asserted that by July 28 the decline in oil pricing from July 14th was a reflection of a growing concern for the debt crisis. I do not think he had any qualifications to make such a statement. He was a trader of stocks, not an economist or someone trained in the analysis of markets and the cause and effect of factors on those markets.

2013 ONSC 1300 (CanLII)

Page: 25

[94]    In any event, I think the evidence of Mr. Rowlands and Mr. Conacher on these issues is unreliable. Their assertions were made baldly, with no objective evidence given by them to support them. While they testified in chief that the markets were buoyant at the time of the engagement letter, in fact the major indices such as the TSX, the Dow and the S & P 500 were down considerably since their highs earlier in the year. Mr. Conacher could not recall the date of the major economic event that year, the collapse of Lehman Brothers that occurred on September 15, 2008 and he acknowledged that it had an immense impact on the financial markets. The world financial markets, of course, suffered from the debt crisis much earlier than July, 2008, as witness the collapse of the asset backed commercial paper market in 2007. I do not accept the implication of their evidence that the failure of Weisel to sell its position in Stetson was caused by the price of oil starting to drop shortly after the engagement letter was agreed on the evening of July 13, 2008.

[95]    In my view, and I so find, even if the out clauses relied on by Weisel were applicable, there were no facts present that would have entitled Weisel to rely on them or that entitle Weisel to rely on them in this trial.

### (i)    Material adverse change out clause

[96]    On the premise, however, that the out clauses were a part of the agreement between the parties, I will consider material adverse change out and disaster out clauses as they are the two clauses relied on by Weisel.

[97]    In this connection the expert opinions of Mr. Halperin and Mr. Levy must be considered. What would be considered to be standard material adverse change or disaster out clauses is something that is not within the knowledge of a judge and is the proper purview of expert evidence. For the reasons that follow, I prefer the evidence of Mr. Halperin rather than Mr. Levy.

[98]    The engagement letter provided that the underwriting agreement was to contain "a standard material adverse change-out... customary in agreements of this type". I assume, although it is not clear, that "agreements of this type" refers to a bought deal by way of a private

2013 ONSC 1300 (CanLII)

placement. A material adverse change out provision is referred to in the jargon of the industry as a "MAC out" provision.

[99]    The handbook of the Investment Industry Association of Canada (IIAC), which sets out the standard features of an underwriting agreement and the particular wording that "parties in the business have come to expect", contains a "material change out" clause that would be applicable to both a bought deal and an agency best efforts deal. It says that "material change out" clause means a provision substantially in the following form:

> If, after the date hereof and prior to the Time of Closing, there shall occur any <u>material change or change in a material fact</u> which, in the reasonable opinion of the Underwriters (or any of them), <u>would be expected to have a significant adverse effect on the market price or value of the Securities</u>, any Underwriter shall be entitled, at its option, to terminate its obligation under this agreement by written notice to that effect, given to the Company at or prior to the Time of Closing. (Underlining added).

[100]    There are two other MAC out clauses in the record that apply to agency agreements and not bought deals. I view them as not determinative, although the one in the Weisel Deal Book is some indication of what Weisel would want in a negotiated material adverse change out clause.[5]

[101]    The IIAC material change out clause does not define what is meant by material change or change in a material fact. These are not loose terms but have particular meaning in the securities industry.

[102]    Mr. Halperin's opinion is that MAC out clauses in the securities underwriting context (again subject to the specific language of the relevant provision) would typically be expected to be interpreted by reference to the legal definition of "material change" in the

---

[5]  Weisel has a material adverse change out clause in its Deal Book precedent for an agency agreement. The clause applies only to a change in the business of the issuer. In the Canaccord agency agreement made by Stetson with Canaccord, it contains a material adverse change clause that applies to a material adverse change or change to a material fact that could have a material adverse effect on the business of Stetson or the market price of the offered units. The evidence indicates that in an agency agreement less attention is paid to the language of a material change out provision as the underwriter is not obliged to buy the position of the issuer but only make best efforts to sell the position on behalf of the issuer. Mr. Halperin's opinion, which I accept, is that the Canaccord agreement should not be looked at in considering the issues in this case.

Page: 27

*Securities Act* (Ontario) and comparable provisions under other Canadian provincial securities legislation, which define a "material change", in pertinent part, as: "a change in the business, operations or capital of the issuer that would reasonably be expected to have a significant effect on the market price or value of any of the securities of the issuer ... ". He went on to say:

> In my experience, "MAC out" provisions in underwriting agreements tend to be based upon the statutory definition of material change (adding the adjective "adverse"). Thus, in the underwriting context, Reasonable Market Actors would expect that a "MAC out" would be available to the underwriter in the event of a change in the business, operations or capital of the issuer of the securities that would rise to the level of a defined material change, with the change "trigger" being the price or value of the issuer's securities, without regard to whether the change is permanent or transformational.

[103]        Mr. Halperin went on to say that there is some debate and uncertainty as to whether a MAC out in this context only gives rise to an underwriter termination right if the MAC out is specific to the issuer as opposed to being of general application. Mr. Halperin said that the issue is sometimes addressed through specific drafting of the provision in the underwriting agreement. In this case Weisel never attempted to negotiate an underwriting agreement.

[104]        Mr. Halperin's opinion is that in the absence of drafting specificity, the Reasonable Market Actor would derive some guidance on the issue from two sources, being National Policy 51-201 of the Canadian Securities Administration dealing with disclosure standards for reporting issuers and a decision of the Supreme Court of Canada in *Kerr v. Danier Leather Inc.* [2007] 3 S.C.R. 331 which he said became well known in the business community.

[105]        National Policy 51-201 states that it is only external developments that have a direct effect on a business not generally experienced by other business in the same industry that require disclose of changes, as follows:

> Companies are not generally required to interpret the impact of external political, economic and social developments on their affairs. However, if an external development will have or has had a direct effect on the business and affairs of a company that is both material and uncharacteristic of the effect generally experienced by other companies engaged in the same business or industry, the company is urged to explain, where practical, the particular impact on them. For

Page: 28

example, a change in government policy that affects most companies in a particular industry does not require an announcement, but if it affects only one or a few companies in a material way, such companies should make an announcement.

[106]　　　　In *Danier*, the trial judge held that a significant change in weather patterns was not a change in the business of *Danier* and thus not a material change within the definition of material change in the Securities Act. The Supreme Court agreed with that finding and pointed out that the distinction between a material fact and a material change was deliberate. Binnie J. stated:

> The distinction between "material change" and "material fact" is deliberate and policy-based, as explained by a former chairman of the O.S.C.:
>
>> The term "material fact" is necessary when an issuer is publishing a disclosure document, such as a prospectus or a take-over bid circular, where all material information concerning the issuer at a point in time is published in one document which is convenient to the investor. The term "material change" is limited to a change in the business, operations or capital of the issuer. This is an attempt to relieve reporting issuers of the obligation to continually interpret external political, economic and social developments as they affect the affairs of the issuer, unless the external change will result in a change in the business, operations or capital of the issuer, in which case, timely disclosure of the change must be made.

[107]　　　　Thus the purport of Mr. Halperin's opinion is that absent a specific contractual provision to the contrary, a Reasonable Market Actor would consider that a standard material adverse change out clause would require a change to the business of Stetson and not a change in oil pricing generally in order for Weisel to attempt to rely on the clause.

[108]　　　　Weisel takes the position that a MAC out clause as contained in the IIAC form of clause is applicable and that any material change in oil prices is not required to have an effect on the business of the issuer, in this case Stetson. This position is somewhat ironic as the form of MAC out clause in Weisel's Deal Book for an agency agreement restricts its applicability to a material change in the business of the issuer, and one would think that in any negotiations that clause would be the starting position for Weisel and accepted by Stetson. The language of the engagement letter was changed between the first draft and the signed letter to change the out

clauses to be included in the underwriting agreement from "broad" to "standard" out clauses.[6] No evidence was given as to what that difference would be so far as a material adverse change out clause is concerned, but it suggests that perhaps the clause would have been restricted to changes to the business of Stetson rather than to the industry in general.

[109]    Weisel says that there is a distinction between materiality in a legislative context and in contractual context, and that the objectives behind legislative provisions to protect the public are different from contractual objectives. It relies on the following passage from *Inmet Mining Corp. v. Homestake Canada Inc.*, 2002 BCSC 61, 2002:

> There is an important distinction to be made between the tests for materiality that the courts have applied in cases of legislated disclosure, such as that found in the Securities Act, Real Estate Act, etc., and the test for materiality in a contract. In the former cases the tests have to be more objective because the legislation is aimed at protection of the general public. It would be impossible to know what would affect the mind of every purchaser. <u>By contrast, the parties to a contract have the opportunity to tailor make their own terms and a purchaser is able to build in its own protections. In a contract the court is bound to use a more subjective standard in determining what was material and adverse to a particular purchaser's decision to buy.</u> (Underlining added)

[110]    I take the point of the underlined passage relied on by Weisel. However, unlike the situation posited in *Inmet*, there was no material adverse change out clause tailored by Weisel. Another case relied on by Weisel, *Mull v. Dynacare Inc.*, (1998), 44 B.L.R. (2d) 211 makes clear that whether the defendant purchaser could refuse to close because of changes to the business being acquired was to be determined on the wording of the agreement. See Sanderson J. at paras. 113 to 125.

[111]    In this case, where there was no material adverse change out clause negotiated by the parties, other than a reference in the engagement letter to the parties negotiating in good faith an underwriting agreement that was to contain a standard material change out clause, I accept the

---

[6] Schedule A to the engagement letter is an "indicative term sheet", which contains in summary form the terms of the offer. It refers to "broad" rather than "standard" out clauses. No evidence was given why there was this difference between the engagement letter and Schedule A. One can perhaps infer that it was overlooked when the change was made to paragraph 3 of the engagement letter. However, the indicative term sheet was a document intended to be given by Weisel to any underwriter who joined the syndicate, and presumably would have been the

Page: 30

opinion of Mr. Halperin that a Reasonable Market Actor would be guided by the provisions that he referred to in thinking that a material adverse change out clause would restrict changes to those that materially affected Stetson rather than just affecting businesses in the industry generally.

[112]    There is another reason why Mr. Halperin considered this to be so, and it has to do with the difference between a market out clause and a material adverse change out clause.

[113]    A market out clause allows an underwriter to refuse to close if the securities to be acquired by the underwriter cannot be marketed profitably. A typical clause is contained in the IIAC Handbook as follows:

> If, after the date hereof and prior to the Time of Closing, the state of financial markets in Canada or elsewhere where it is planned to market the Securities is such that, in the reasonable opinion of the Underwriters (or any of them), the Securities cannot be marketed profitably, any Underwriter shall be entitled, at its option, to terminate its obligations under this agreement by notice to that effect given to the Company at or prior to the Time of Closing.

[114]    All witnesses agreed that a bought deal cannot contain a market out clause. This is because a principal element of a bought deal is that the market risk is transferred to the underwriter on the execution of the agreement. Whether the underwriter will be able to sell the securities for more than it paid to the issuer is entirely the risk of the underwriter. For that reason a market out clause is never contained in a bought deal agreement, and is inconsistent with a bought deal.

[115]    Mr. Halperin's opinion, which I accept, is that Reasonable Market Actors would understand that, on balance, in the context of a "bought deal" arrangement where there is axiomatically no "market out" in favour of the underwriter, the MAC out clause should not be construed so as to effectively provide the underwriters with a "market out" by another name. Stetson contends that that is what Weisel is effectively doing in this case by arguing that because it could not sell its Stetson position profitably, it should be relieved of its obligation to purchase

subject of negotiations between Weisel and the particular underwriter. It was not argued that the out clauses so far as Stetson and Weisel are concerned should have been "broad" out clauses.

2013 ONSC 1300 (CanLII)

the Stetson shares (or subscription receipts). I agree with Stetson on this point. What Weisel says would fall within a MAC out clause would also fall within a market out clause.

[116]    This notion that a MAC out clause should not be construed so as to effectively provide an underwriter with a market out clause is particularly important in this case in which no specific MAC out clause was negotiated. I would not construe the language of a "standard material adverse change out clause" contained in the engagement letter as to be negotiated by the parties as permitting a market out clause by another name. No reasonable market actor would think otherwise.

[117]    Finally, even if the form of MAC out clause contended by Weisel should govern, I do not think that it would be of assistance to Weisel. That is because any change would have to be material, and in my view the evidence on this point is against Weisel.

[118]    First, Weisel knew that the price of oil was very volatile, that it had a high beta. It could not possibly think that when it reached an all-time high that it would stay there. The oil prices during the second half of July, 2008 continued to be above the assumed pricing used by Weisel in its analysis of the share price of Stetson as well as other companies such as Kodiak, and no witness testified that at the time it was thought that the oil pricing would drop below those levels.

[119]    Second, Weisel did not believe that the oil pricing had materially affected the value of Stetson. On July 21, 2008 Mr. Pocrnic, the managing director and head of syndication and equity capital markets in Toronto, said in an internal engagement letter-mail that based on the Stetson land package and a comparison to the Kodiak Bakken lands "we come to a valuation of approximately $1.50 per share (with $.31 in cash)." When this is compared to the 55 cents per share that Weisel agreed to pay Stetson, it hardly can be said that if there were an adverse change by reason of the oil price movements, it was material to the risk that Weisel had taken on, or that it would be reasonable to conclude that the change would expect to have a significant adverse effect on the market price or value of the Stetson shares.

[120]    It is significant, in my view, that there is no evidence that the reasons given to Weisel by prospective purchasers of the Stetson position for not wanting to purchase Stetson

Page: 32

shares was any concern for oil pricing. Mr. Pocrnic prepared an account tracking document that listed the feedback Weisel sales personnel had received from various accounts concerning the Stetson offering. A significant majority of the feedback from those accounts that had passed on the Stetson offering reported "too small", and Mr. Pocrnic confirmed that this feedback referred to Stetson's market capitalization size or size of the deal.   None of the feedback listed in the account tracking maintained by Mr. Pocrnic, and distributed by e-mail on July 23, disclosed any account that expressed concern about the current price of oil.

[121]        Mr. Levy in his report referred to the WTI spot price of oil on July 11, 2008 of $144.96 and on August 15, 2008 of $113.46, a drop of 21.73%. He then referred to five corporations in the energy sector and compared their share prices on July 11, 2008 and August 15, 2008, which had a drop in trading of between 7.56 % and 58.62%. He then stated that it was his opinion that:

> (i)   If Weisel determined as a result of its ongoing review of the Bakken project, that the potential profitability had been materially reduced as a result of the oil price decline, they could consider termination by use of the due diligence out clause and/or the material change out clause.

> (ii)   If Weisel's analysis determined as a result of this initial oil price decline that the exploration relating to the Bakken leases was no longer viable, then the material change out clause and/or the disaster out clause could be considered.

[122]        I have considerable concerns with Mr. Levy's opinions. It was unclear whether Mr. Levy had any or much relevant experience in bought deals, or what that experience was. He acknowledged that he is not an expert in the oil and gas industry. He is now a consultant but when in business was involved in areas of management, compliance and supervision.

[123]        Of considerable concern are the five corporations he chose for his comparison to oil price declines. It is clear that he knew very little of these corporations and he admitted he did no analysis to determine if the companies were comparable to Stetson. On cross-examination he said he did not say they were true comparables. He acknowledged that many factors affect share prices and that he did not look at the individual companies to consider what other factors might

2013 ONSC 1300 (CanLII)

2013 ONSC 1300 (CanLII)

have affected their share prices. His use of the date of August 15, 2008 was not explained other than a reference in his report to negotiations going on between Stetson and Weisel at the time. It was July 31, 2008 that was the date for closing and it was three days earlier on July 28, 2008 that Weisel announced through its lawyers that it was not going to close.

[124]        Mr. Levy acknowledged that the failure of a bought deal would be viewed as a negative for the Stetson share price. The expectation was that the Stetson position would be closed on the day it went live on July 14, 2008. As time passed and the position had not sold, Mr. Bharti's evidence, which I accept was that the failure was viewed as a negative for Stetson. The Stetson shares closed at 60 cents on Friday, July 11, 2008 when Weisel made its offer at 55 cents, and on July 14, 2008, the date that the deal went live. By July 28, 2008 when Weisel announced it was not going to close on July 31, 2008, the closing price of the Stetson shares had drifted down to 44 cents at the close on light volume. It is possible that the slide was because of the bought deal going awry. It may have been because of falling oil prices, although if that were the case it would mean the market was not valuing the exploration play on a longer term basis, or any other factor that causes share prices to go up or down. Two days later the shares closed on July 30, 2008 at fifty cents.

[125]        Mr. Levy in my view had no basis to state, as he did, that the price decline in oil from July 11 to August 15, 2008 "had immediate and significant impact on the trading prices of energy related securities, especially junior issuer's securities, many of which suffered material declines in prices." He was not qualified to express such an opinion and his analysis (or lack of analysis) did not support it. Nor did he have a basis to state that Weisel could rely on a market adverse change out clause or a disaster out clause. He did say, which I have previously discussed, that in order for Weisel to rely on such clauses, it would have had to consider the issues referred to in those clauses, which Weisel did not do.

[126]        Mr. Halperin's opinion was that Reasonable Market Actors would not have an expectation that a bought deal underwriter would be entitled to terminate its commitment by invoking standard disaster out or MAC out provisions solely on the basis of a decline in the price of oil which neither results in or leads to a serious deterioration in financial markets generally,

Page: 34

nor affects the issuer in question in a manner disproportionate to its effect upon other entities in the issuer's industry sector. I accept that opinion. I am not prepared to find on the evidence that any decline in oil prices at the relevant times led to a serious deterioration in financial markets generally, nor affected Stetson in a manner disproportionate to its effect upon other entities in Stetson's sector. Weisel has not established those things.

[127]    In all the circumstances, I find that Weisel may not rely on a material adverse change out clause to contend that it was entitled to terminate its obligations under the engagement letter.

### (ii)    Disaster out clause

[128]    Weisel relies on a form of disaster out clause contained in the IIAC Handbook:

> The obligations of the Underwriter to purchase the Securities under this agreement may be terminated by the Underwriter at its option by written notice to that effect to the Company at any time prior to the Closing if there should develop, occur or come into effect or existence any event, action state, condition or major financial occurrence of national or international consequence or any law or regulation which in the opinion of the Underwriter seriously adversely affects, or involves, or will seriously affect, or involve, the financial markets or the business, operations or affairs of the Company and its subsidiaries taken as a whole.

[129]    Weisel asserts that the 27% drop in oil price from July 14, 2008 to September 5, 2008 and the 62% drop in the value of Stetson's common shares in the same time period entitled Weisel to terminate any obligations it had under the engagement letter pursuant to the disaster-out clause.

[130]    Even assuming that Weisel formed the necessary opinion and acted pursuant to a disaster out clause, which I have held it did not, I cannot accept the argument that it had grounds to act under such a clause.

[131]    The relevant date is not September 5, 2008, but July 28 or the latest July 31, 2008. The drop in oil from July 14 to July 31, 2008 was from $145.16 to $124.17, or approximately

2013 ONSC 1300 (CanLII)

Page: 35

14.5% and the price of the shares of Stetson during that period declined from 60 cents to 50 cents, or 16.67%.

[132]     On what basis can one conclude that the drop in the price of oil of 14.5% was a major financial occurrence of national or international consequence that seriously adversely affected or involved the financial markets or the business, operations or affairs of Stetson? There was no evidence to support such an assertion. With oil having a high beta, or volatility, one would expect prices to go up or down and even Mr. Wylie said he would want to look at a longer period of over one or two months to see a trend line. I have already disregarded the assertion of Mr. Levy that the price decline in oil from July 11 to August 15, 2008 had immediate and significant impact on the trading prices of energy related securities, especially junior issuer's securities.

[133]     Mr. Halperin's opinion is that a disaster out clause in the underwriting context is generally understood by Reasonable Market Actors to be somewhat analogous to a *force majeure* provision in other contractual contexts.   The clause contemplates termination of an underwriting obligation, and Reasonable Market Actors would expect that it could only be invoked, in the event of a catastrophic "macro" event, circumstance or change in law of national or international general application which is not specific to a particular issuer or (except in the most extraordinary circumstances) industry.   That opinion is consistent with the IIAC form of disaster out clause and I accept it.

[134]     Mr. Halperin further opined that most significantly, in the context of a "bought deal" arrangement which is typified by the absence of a "market out" provision, Reasonable Market Actors would have an expectation that a disaster out clause would not be used by, or interpreted as being available to, underwriters to terminate commitments, in the absence of a "disaster" properly so called, on the basis solely of facts and circumstances that affect the state of the financial markets such that the underwriters have determined that the underwritten securities, in the language of standard "market out" provisions, cannot be marketed profitably.   I accept that opinion as well.

2013 ONSC 1300 (CanLII)

Page: 36

[135]        Without discussing any of the specifics of the disaster out clause contained in the IIAC Handbook, Mr. Levy asserted:

> If however, Weisel's analysis determined as a result of this initial oil price decline that the exploration relating to the Bakken leases was no longer viable, then in our opinion, as to CSI practice that termination under the due diligence out clause, the material change out clause and/or the disaster out clause could be considered.

[136]        Weisel made no analysis or determination that the exploration relating to Stetson's Bakken leases was no longer viable. But even had it done so, Mr. Levy has not explained how the oil price decline reached the level required by the disaster out clause. I do not accept his opinion that the disaster out clause could be considered.

[137]        In all the circumstances, I find that Weisel may not rely on a disaster out clause to contend that it was entitled to terminate its obligations under the engagement letter.

**Indemnity agreement**

[138]        Section 5 of the engagement letter provided, in part:

> **5.  <u>Indemnification</u>**
>
> The Company agrees to indemnity the Underwriters in accordance with Schedule B attached hereto, which Schedule forms part of this agreement and the consideration of which is the entering into this agreement. …The Underwriting Agreement shall contain more comprehensive indemnity provisions consistent with Schedule B. …

[139]        What those more comprehensive indemnity provisions would have been in the underwriting agreement is unknown as there was no underwriting agreement.

[140]        Schedule B contained an indemnity provision, portions of which are as follows:

> In connection with the engagement (the "Engagement") of Thomas Weisel Partners Canada Inc. ("Thomas Weisel") pursuant to an engagement letter (the "Engagement Letter") between Thomas Weisel and Stetson Oil & gas Ltd. (the "Company") dated July 11, 2008, the Company agrees to indemnify and hold harmless Thomas Weisel and other members of the syndicate formed in connection with the Engagement, and any of their respective affiliates (herein

2013 ONSC 1300 (CanLII)

referred to collectively as the "Underwriters") and the Underwriters' respective directors, officers, employees, partners, each other person, if any, controlling any of the Underwriters or any of their respective subsidiaries and each shareholder of the Underwriters (collectively, the "Indemnified Parties" and individually, an Indemnified party"), from and against any and all losses (other than lost profits), claims (including shareholder actions, derivative or otherwise), actions, suits, proceedings, damages, liabilities or expenses of whatever nature or kind, joint or several, including the aggregate amount paid in reasonable settlement of any actions, suits, proceedings, investigation or claims and the reasonable fees, expenses and taxes of their counsel that may be incurred for advising with respect to and/or defending any action, suit, proceedings, investigation or claim that may be made or threatened against any Indemnified Party or in enforcing this indemnity (collectively the "Claims") to which any Indemnified Party may become subject or otherwise involved in any capacity insofar as the Claims relate to, are caused by, result from, arise out of or are based upon, directly or indirectly, the Engagement whether performed before or after the Company's execution of the Engagement Letter and to reimburse each Indemnified Party forthwith, upon demand, for any legal or other expenses reasonably incurred by such Indemnified Party in connection with any Claim. <u>The Company agrees that in no event will any Indemnified Party be liable or obligated in any manner for any damages (including, without limitation, actual, consequential, exemplary or punitive damages or lost profits) in excess of fees actually received by Thomas Weisel pursuant to Section 4 of this Engagement Letter (captioned "Fees"), and the Company agrees not to seek or claim any such damages or profits in any circumstance.</u> (Underlining added)

[141]        Weisel contends that the underlined words prevent Stetson from suing Weisel for more than the fees actually received by Weisel, which in this case were nothing as Weisel did not close the transaction. Thus, if it is the case that Weisel breached the engagement letter by failing to close, Weisel reads the indemnity provision to prevent Stetson from suing Weisel for breach of contract.

[142]        The issue therefore is to interpret this contractual provision. The principles of contract interpretation are well known and were recently summarized by Winkler C.J.O. in *Salah v. Timothy's Coffees of the World Inc.* (2010), 74 B.L.R. (4th) 161 at para. 16 as follows:

2013 ONSC 1300 (CanLII)

Page: 38

16.    The basic principles of commercial contractual interpretation may be summarized as follows. When interpreting a contract, the court aims to determine the intentions of the parties in accordance with the language used in the written document and presumes that the parties have intended what they have said. The court construes the contract as a whole, in a manner that gives meaning to all of its terms, and avoids an interpretation that would render one or more of its terms ineffective. In interpreting the contract, the court must have regard to the objective evidence of the "factual matrix" or context underlying the negotiation of the contract, but not the subjective evidence of the intention of the parties. The court should interpret the contract so as to accord with sound commercial principles and good business sense, and avoid commercial absurdity. If the court finds that the contract is ambiguous, it may then resort to extrinsic evidence to clear up the ambiguity. Where a transaction involves the execution of several documents that form parts of a larger composite whole -- like a complex commercial transaction -- and each agreement is entered into on the faith of the others being executed, then assistance in the interpretation of one agreement may be drawn from the related agreements.

[143]        I do not read Schedule B as being the only relevant provision. Paragraph 5 of the engagement letter is also part of the agreement, and it provides that Stetson agrees to indemnify the underwriters in accordance with Schedule B. One cannot read paragraph 5 in any way other than that what was intended by the parties was an indemnity.

[144]        The language of Schedule B is hardly a model of draftsmanship. The portions relied on by Weisel are not all of its contents. Its form is contained in Weisel's Deal Book and was apparently drafted by its outside counsel (not Mr. Groia's firm). The language is prolix, difficult to follow and unclear.

[145]        The language of Schedule B provides that the indemnified parties include Weisel, any other underwriter who becomes a member of the syndicate and the directors, employees, partners, etc. of Weisel or other syndicate underwriters. It contains many clauses typical of indemnities, including requirements to notify Stetson of a claim made against an indemnified party and the right of Stetson to approve any settlement of a claim. Down to the underlined portion of the quoted part of Schedule B relied on by Weisel, it is relatively clear that the indemnity refers to losses etc. caused to an indemnified party by some third party other than the indemnified party. That is the nature of an indemnity.

[146]        For ease of reference, the last sentence of the quoted part of Schedule B states:

2013 ONSC 1300 (CanLII)

> The Company agrees that in no event will any Indemnified Party be liable or obligated in any manner for any damages (including, without limitation, actual, consequential, exemplary or punitive damages or lost profits) in excess of fees actually received by Thomas Weisel pursuant to Section 4 of this Engagement Letter (captioned "Fees"), and the Company agrees not to seek or claim any such damages or profits in any circumstance.

[147]    By agreeing that an indemnified party will not be liable or obligated for any damages in excess of fees received by Weisel, the Company, being Stetson, could not literally restrict what a third party could successfully claim against an indemnified party, and that could not have been the purpose of that provision. Stetson argues, and I tend to agree, that in the context of an indemnity given to an indemnified party, the provision means (i) that Stetson must pay to the indemnified party any liability of the indemnified party to a third party in excess of the fees actually received by Weisel and (ii) Stetson may not sue or claim against any such third party any amount in excess of those fees. Thus if Weisel were the indemnified party in any situation, the issuer, in this case Stetson, would have to indemnify Weisel against any liability it had to a third party in excess of the fees received by Weisel and Stetson could not sue the third party for anything in excess of those fees.

[148]    The reference in the provision limiting liability to the amount of fees actually received by Weisel pursuant to the engagement letter suggests that the provision is intended to apply only if the engagement letter has been closed. Weisel could not have actually received any fees if the engagement letter did not close. Mr. Groia in argument said that if Weisel were found to be in breach of agreement, it would not object to a judgment against it in the amount of the fees that it would have received had the agreement closed. However, that would be providing a result not in accordance with the language of the agreement. The concession, however, was a reflection I believe of the difficulty in arguing that Schedule B means that a breach of agreement by Weisel results in no damages payable to Stetson.

[149]    There is another provision in Schedule B that lends support to the interpretation of the provision as not applying to a claim by Stetson against Weisel for failure to close the engagement letter. Schedule B contains the following:

2013 ONSC 1300 (CanLII)

Page: 40

> The foregoing indemnity shall not apply to the extent that a court of competent jurisdiction in a final judgment that has become non-appealable shall determine that such losses, expenses, claims, actions, damages or liabilities to which the Indemnified Party may be subject were caused by the negligence or wilful misconduct of the Indemnified Party.

[150]      This provision clearly would mean that if Weisel is the indemnified party, it may not be indemnified for something caused by its negligence or wilful misconduct. Wilful means intentional as opposed to accidental. Misconduct is defined in the Concise Oxford English Dictionary as "unacceptable or improper behaviour". The American Heritage Dictionary includes in its definition of misconduct "Behaviour not conforming to prevailing standards or laws; impropriety". Businessdictionary.com defines wilful misconduct as "Conscious or intentional disregard of the rights or the safety of others; misconduct in which an individual is doing what he or she intends to do".

[151]      It is hard to think that wilful misconduct could not include intentional breach of contract. Breach of contract is certainly unacceptable and improper in the eyes of the law and it disregards the rights of the other party to the contract. The sense of the provision that the indemnity does not cover damages caused by Weisel's negligence or wilful conduct is clear. If Weisel was involved in such conduct as found by a court, it is not entitled to be indemnified. In this case, Weisel has been involved in intentional breach of contract by not closing the engagement letter on July 31, 2008 and thus the provision relied on by Weisel, even if it did otherwise prevent Stetson from suing Weisel, could not apply.

[152]      Mr. Groia argued that the provision dealing with wilful misconduct does not apply to the provision Weisel relies on regarding damages in excess of the fees actually received by Weisel. This is because, he says, the provision dealing with wilful misconduct begins by stating that the foregoing "indemnity" shall not apply if there is wilful misconduct, whereas the provision regarding damages in excess of fees is not an indemnity. The reason why this latter provision is not an indemnity, he says, is because it refers to "damages", which is to be distinguished from a Claim that is the subject of the indemnification in the lengthy paragraph that precedes the sentence Weisel relies on.

2013 ONSC 1300 (CanLII)

Page: 41

[153]        This interpretation appears to me to be a completely strained and artificial interpretation, one that might be made by wordsmiths but which lacks any commercial or common sense. Technically it ignores the definition of "Claim" in the indemnity that includes the word "damages". The sentence relied on by Weisel begins with the words "The Company agrees that in no event will any Indemnified Party be liable or obligated in any manner for any "damages"…in excess of fees actually received…". This is a reference obviously to a claim for damages and it is part of the indemnity provisions contained in the paragraph.  The provision regarding wilful misconduct begins with the words "The foregoing indemnity shall not apply…". There is no basis to say that "the foregoing indemnity" was anything but the indemnity provision contained earlier in Schedule B, including the sentence dealing with no liability or obligation in excess of fees received by Weisel.

[154]        There is another reason why the clause should not prevent Stetson from suing Weisel in this case. One of the principles of contract interpretation as summarized by Winkler C.J.O. in *Salah v. Timothy's Coffees of the World Inc., supra,* is that a court should interpret a contract so as to accord with sound commercial principles and good business sense, and avoid commercial absurdity. It would be a commercial absurdity to conclude that the parties intended that Weisel would have a free pass to break the contract by not closing it without any liability. That would make no commercial sense, and any such result would have to be expressly and explicitly stated in the agreement. In my view, the language of the paragraph 5 of the engagement letter and Schedule B is not so explicit.

[155]        Finally, Stetson points out that the arbitration provision dealing with disputes between Stetson and Weisel provides that the arbitrator will have no power to award consequential (including lost profits), punitive or exemplary damages. Stetson contends that the arbitration provision is the only provision dealing directly with claims between the parties, that it is an indication that the parties directed their minds to what damages the arbitrator could not award, and that there is no limitation of damages against Weisel to its fees received.[7] Weisel

---

[7] This argument was made by correspondence following the conclusion of oral argument. Weisel contends that it was improper for Stetson to make the argument in this manner without giving counsel for Weisel advance notice. It may have been preferable for Mr. Burden to have given advance notice to Mr. Groia, but I fail to see what difference

Page: 42

2013 ONSC 1300 (CanLII)

contends that the arbitration clause is not the only provision in the agreement dealing with claims between the parties and there is nothing in the arbitration provision that affects, limits or supersedes the indemnity agreement in Schedule B.

[156]      I think there is force to this argument of Stetson. The parties directed their mind in the arbitration clause to the kinds of damages that could not be awarded. There was no limitation of the damages that could be awarded against Weisel to only the fees received by Weisel. I recognize that it is a general arbitration clause, and if the provision in Schedule B clearly and explicitly provided that Weisel could not be sued by Stetson for its breach of contract when it had not received any fees, that might survive in spite of the language of the arbitration provision. However in my view it does not so explicitly provide.

[157]      Weisel led evidence from some if its witnesses as to what protection was sought by the indemnity agreement. In my view, this evidence does not affect the issue. While there may have been some ambiguity in the language of Schedule B, any such ambiguity could be resolved without the need to consider extrinsic evidence. In any event, evidence of Weisel's intentions regarding an indemnity would be inadmissible. See Geoff R. Hall, *Canadian Contractual Interpretation,* 2d ed. (LexisNexus) at 2.4.3.

[158]      In the result, any damages suffered by Stetson are not to be reduced to nil by reason of Weisel not actually receiving any fees.

## Damages

[159]      Stetson claims damages based on the difference between the 55 cents per share that Weisel agreed to pay and the 20 cents per share that Canaccord paid, after taking into account the extra shares that Stetson had to sell to Canaccord, plus expenses incurred in obtaining the interim loans pending the Canaccord underwriting.

---

that would have made. It would have been counter-productive to have an oral hearing on this point, and Mr. Groia does not suggest he wanted an oral hearing. He made his reply argument by letter. Mr. Groia also contended that by his letter, Mr. Burden was attempting to file new evidence about the arbitration provision. I do not understand that. It is not a matter of evidence but an argument about the proper interpretation of the agreement, which in this case is a legal rather than an evidentiary matter.

Page: 43

[160]        Losses recoverable for breach of contract are limited to those that will put the injured party in the same position as he or she would have been in had the wrongdoer performed the contract. See *Baud Corp., N.V. v. Brook*, [1979] 1 S.C.R. 633 at para. 18. What are the damages that a seller of an asset may be entitled to on a breach by the purchaser to complete the purchase? The authorities make clear that the seller is entitled to the difference between the contract price and the market price subject to the obligation of the seller to take reasonable steps to mitigate the loss by selling on the market. See S.M. Waddams, *The Law of Damages*, Looseleaf, (Canada Law Book, November 2012) at para. 13.110. See also *Jamal v. Moola Dawood, Sons & Co.*, [1916] 175 (P.C.)

[161]        Normally the seller has an obligation to mitigate damages by selling on the date of the breach for the best price possible. But that is not always the case if the shares could not be sold on that date. In *Leitch Transport Ltd. v. Neonex International Ltd.,* [1979] O.J. No. 1093 (C.A.) the defendant Neonex failed to purchase a large block of shares of Maple Leaf Mills Limited, a public company trading on the Toronto Stock Exchange. It was not realistic to sell the shares on the stock exchange on the date of the breach, but rather the block had to be sold to an investment dealer who would make a secondary offer. It was held that the law permits a realistic approach to valuation and does not insist upon an arbitrary sale on the date of the breach. The Court stated:

> Under a contract for the sale of shares in a company upon a breach by the purchaser, the measure of damages is the difference between the contract price and the market price at the date of the breach; the seller has, however, an obligation to mitigate damages by selling the shares for the best price obtainable on that date: *Jamal v. Moolla Dawood & Sons & Co.* [1916] A.C. 175. Since Maple Leaf was a public company whose shares traded on the TSE, the market price would ordinarily be the price at which the shares were trading on the Exchange on the date of the breach. Here, however, because of the limited market for the shares and the large quantity that was being sold under the contract, it was not possible to sell the shares on the Exchange. In these circumstances, the law permits a realistic approach to the valuation of shares and does not insist upon an arbitrary sale on the date of the breach: *Hooper v. Herts,* [1906] 1 Ch. 549. We agree with the trial judge that the only realistic way to have disposed of the directly held shares was to sell them to a broker or investment dealer who would have made a secondary offering of them, and that the amount which could have been obtained by such a sale constituted the market price in this case.

2013 ONSC 1300 (CanLII)

Page: 44

[162]        See also *Treaty Group Inc. v. Drake International Inc.* (2007), 86 O.R. (3d) (C.A.) and *Johnson v. Agnew*, [1980] A.C. 367. In the latter case, in a passage adopted in *Semelhago v. Paramadevan*, [1996] 2 S.C.R. 415, Lord Wilberforce stated:

> (2)   The general principle for the assessment of damages is compensatory, i.e., that the innocent party is to be placed, so far as money can do so, in the same position as if the contract had been performed. Where the contract is one of sale, this principle normally leads to assessment of damages as at the date of the breach -- a principle recognised and embodied in section 51 of the Sale of Goods Act 1893. But this is not an absolute rule: if to follow it would give rise to injustice, the court has power to fix such other date as may be appropriate in the circumstances.

[163]        Weisel contends that the shares of Stetson traded at fifty cents on or about July 31, 2008, five cents less than what Weisel had agreed to pay, and therefore if damages for breach of contract are to be awarded, the damages should be limited to five cents per share on the 45,454,600 shares that Weisel agreed to purchase, for damages of $2,272,730.

[164]        Apart from the fact that the shares of Stetson traded on July 31, 2008 at a closing price of 45 cents, which on the argument of Weisel would double the damages to approximately $4.5 million, this argument is completely unrealistic. Stetson was a company with a very small market cap. The volume of shares of Stetson that traded that day was 56,000. No one suggests that Stetson could have issued 45,454,600 shares and sold them that day on the TSX. To suggest that such a large block of stock had a market value that day equal to what a minute fraction of those shares traded for defies common sense and no evidence was led to support this value for such a large block of stock.

[165]        Stetson had to consider how to proceed to raise the money it was supposed to have received from Weisel, including obtaining advice from Canaccord and Macquarie, and negotiating with other companies such as Crescent Point and Tristar.  Stetson had been damaged by the failure of the bought deal to close and did not have a lot of leverage. After canvassing the market it was able to conclude an underwriting on a best efforts basis with Canaccord, which was uncertain as to what could be done but was doing Stetson and Mr. Bharti a favour.

2013 ONSC 1300 (CanLII)

Page: 45

[166]        The steps taken by Stetson to mitigate their damages by entering into the agreement with Canaccord were reasonable. Taking into account the principles discussed in *Leitch Transport Ltd. v. Neonex International Ltd.* and *Johnson v. Agnew,* the appropriate measure of damages in my view is the amount per share that Stetson would have received from Weisel had the engagement letter closed on July 31, 2008 less the amount per share received by Stetson from the Canaccord transaction.

[167]        Mr. Groia contended at the end of the trial that the Bakken project for Stetson had no prospect of success as after only one well was drilled, Red Willow decided not to proceed further. He contends therefore that had Weisel provided funding under the engagement letter, Stetson would have ended up with nothing, and thus will gain a windfall if successful in this action. This issue has already been the subject of a ruling I made after the first week of trial refusing leave to the defendant to amend its pleading. Evidence regarding the feasibility of the project was not led as a result, and during argument Mr. Groia conceded that as no expert evidence was called, I was in no position to be making a finding that the property had no prospect of success.

[168]        In any event, the authorities make clear, as discussed, that the damages for failure to purchase shares is the difference between the purchase price and the value of the shares at the time of the breach, subject to an obligation to mitigate and to a discretion as to the appropriate date. What the plaintiff would have done with its money had it been received under the contract, or what it did with the replacement money, is not relevant.

[169]        In principle as well, I do not think the argument of Weisel is correct. Suppose instead of issuing equity shares, Stetson had agreed to borrow the necessary funds from a lender at say 5% interest but after the lender reneged, Stetson was only able to borrow the money at 10% interest. Suppose Stetson then took all of the borrowed money and drilled nothing but empty wells and ended up with nothing. Stetson still would have suffered damages to the tune of the extra 5% in interest payments it had to pay for the loan. In this case, Stetson had to issue shares at 20 cents instead of 55 cents. It received less for its shares than it would have had Weisel not breached its contract. It has suffered those damages.

Page: 46

[170]        At the opening of trial Weisel contended that it was not Stetson that would suffer any damages but rather the holders of the preferred shares issued at the time of the Canaccord financing on the advice of Canaccord as a sweetener to entice the market to accept the Stetson shares sold by Canaccord. These holders will be entitled to the proceeds of any final judgment or settlement money paid to Stetson for this action. This argument was not pursued at the conclusion of the case. In any event, there is nothing to it. What Stetson does with its money is its business. Whether it pays the money from the judgment to its bankers, its common shareholders or its preferred shareholders is irrelevant.

[171]        Stetson acknowledges that there are two possible ways that its damages can be calculated. The first is based on the difference between the 55 cents that Weisel was to pay to purchase the Stetson shares and the 20 cents that Canaccord agreed to pay, which is 35 cents, multiplied by the 45,454,600 shares provided for in the bought deal.  This results in an award of $15,909,110.  Stetson contends that damages should be calculated on a per share, rather than an aggregate basis so that Weisel does not obtain the benefit of the fact that Stetson was required to sell 14,545,400 more shares for lower proceeds under the Canaccord transaction.  Stetson had to sell these additional shares and is entitled to consideration for that fact.

[172]        The second method is to calculate damages on an aggregate basis, which would simply involve taking the difference between the $25,000,030 contract price that Weisel was to pay Stetson under the engagement letter and the $12 million Stetson received from the Canaccord transaction, which results in an award of $13,000,030.

[173]        I agree with Stetson that the first method is the appropriate method as it reflects the fact that it had to sell far more shares to Canaccord than it would have to Weisel. It is not in a company's interest to issue more shares than necessary to obtain equity financing. Weisel did not argue otherwise and, as discussed, contended that the damages, if to be awarded, should be on the same basis as the first method chosen by Stetson, albeit by using five cents a share rather than 35 cents.

[174]        Stetson is also entitled to the expenses it had to incur in borrowing money on an interim basis that it needed to comply with its lease obligations, which borrowing would not have

2013 ONSC 1300 (CanLII)

been required had Weisel not breached the engagement letter. The interim loans were repaid from the money received from Canaccord. These expenses were incurred by Stetson to mitigate its loss and totaled $133,559.

[175]        Stetson is therefore entitled to judgment for $15,909,110 and $133,559, totalling $16,042,669.

[176]        Stetson is entitled to interest. No argument was made as to what basis interest should be awarded. If interest cannot be agreed, Stetson may make written submissions within 10 days and Weisel will have a further 10 days to make submissions.

[177]        Stetson is entitled to its costs. If these cannot be agreed, Stetson may make written submissions within 10 days, including a cost outline in accordance with the rules, and Weisel will have a further 10 days to make submissions.

_____
Newbould J.

**Released:**    March 1, 2013

**CITATION:** Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc., 2013 ONSC 1300
**COURT FILE NO.:** CV-08-7809-00CL
**DATE:** 20130301

2013 ONSC 1300 (CanLII)

# ONTARIO

# SUPERIOR COURT OF JUSTICE

# COMMERCIAL LIST

**B E T W E E N:**

STETSON OIL & GAS LTD.

Plaintiff

**- and -**

STIFEL NICOLAUS CANADA INC.

Defendant

_____

REASONS FOR JUDGMENT

_____

Newbould_J.

Released:       March 1, 2013

TAB 143

172 P.3d 1252, 2007 MT 309

340 Mont. 116
Supreme Court of Montana.

John STOWERS, Plaintiff and Appellant,

v.

COMMUNITY MEDICAL CENTER,
INC., Defendant and Appellee.

No. DA 06−0361.   |   Submitted on Briefs
Jan. 24, 2007.   |   Decided Dec. 4, 2007.

Synopsis
**Background:** Physician brought action against hospital,
alleging that his termination violated the state Wrongful
Discharge from Employment Act (WDEA). The District
Court, 4th Judicial District, Missoula County, John S.
Henson, J., granted hospital's motion for summary judgment,
and physician appealed.

**Holdings:** The Supreme Court, John Warner, J., held that:

[1] physician was bound by terms of employment contract
addendum even if physician failed to read the addendum
before signing;

[2] hospital argued in trial court that original employment
agreement was ratified and thus could be granted summary
judgment on that basis;

[3] execution of addendum ratified original employment
agreement; and

[4] employment term contained in original employment
agreement's recitals was part of the contract such that
addendum had a specific expiration date.

Affirmed.

Cotter, J., dissented with opinion in which Nelson, J., joined.

West Headnotes (17)

**[1]**   **Appeal and Error**
          🔑   Cases Triable in Appellate Court

Review of a district court's grant of summary
judgment is de novo, and the Supreme Court
applies the same evaluation as the district court.
Rules Civ.Proc., Rule 56(c).

1 Cases that cite this headnote

**[2]**   **Health**
          🔑   Officers and Employees

Physician was bound by terms of employment
contract addendum he signed with hospital, even
if physician failed to read the addendum before
signing.

Cases that cite this headnote

**[3]**   **Contracts**
          🔑   Signing in ignorance of contents in general

One who executes a written contract is presumed
to know the contract's contents.

2 Cases that cite this headnote

**[4]**   **Labor and Employment**
          🔑   Termination; cause or reason in general

A claim for relief which is predicated on
discharge from employment is barred if the
employment is for a specific term under a
written contract of employment and that term has
expired. MCA 39−2−912(2), 39−2−913.

Cases that cite this headnote

**[5]**   **Estoppel**
          🔑   Acquiescence

"Ratification" is defined as the confirmation of
a previous act done by the party himself and
it necessarily supposes knowledge of the thing
ratified.

Cases that cite this headnote

**[6]**   **Contracts**
          🔑   Estoppel and Ratification
          **Contracts**
          🔑   What constitutes ratification

Generally, "contract ratification" is the adoption of a previously formed contract, notwithstanding a quality that rendered it relatively void; by the ratification the party affirming it becomes bound by it and is also entitled to all the property benefits from it.

Cases that cite this headnote

[7]   **Contracts**

🔑 What constitutes ratification

Subsequent recognition of a contract is the equivalent of ratification.

Cases that cite this headnote

[8]   **Judgment**

🔑 Motion or Other Application

Hospital argued in trial court that original employment agreement with physician was ratified and thus could be granted summary judgment on that basis in wrongful termination action; hospital's brief in support of its motion for summary judgment argued that contract addendum constituted a contract for a specific term and attached both the original employment agreement and the addendum, which specifically stated that it ratified the original employment agreement, hospital's reply brief argued that the original employment agreement had been ratified, and trial court also held oral argument on the summary judgment motion.

Cases that cite this headnote

[9]   **Labor and Employment**

🔑 Particular cases

Physician's and hospital's execution of employment agreement addendum ratified original employment agreement, which called for employment for a specific term, where addendum specifically stated that employment agreement was ratified and remained in full force, and addendum also provided that the parties agreed to the addendum terms "in consideration of the covenants and agreements set forth herein and in the Employment Agreement." MCA 28–3–303.

Cases that cite this headnote

[10]   **Labor and Employment**

🔑 Particular cases

Employment term contained in contract recitals in original employment agreement, which was ratified by contract addendum, was part of the contract such that addendum was an employment contract with a specific expiration date; addendum refers to the recitals when it stated that the parties agreed "in consideration of the foregoing and in consideration of the covenants and agreements set forth herein and in the Employment Agreement." MCA 28–2–202.

Cases that cite this headnote

[11]   **Contracts**

🔑 Construction as a whole

The whole of a contract is to be taken together so as to give effect to every part if reasonably practicable. MCA 28–2–202.

Cases that cite this headnote

[12]   **Contracts**

🔑 Construction as a whole

A contract must be viewed from beginning to end.

Cases that cite this headnote

[13]   **Contracts**

🔑 Recitals

Recitals in a contract should be reconciled with the operative clauses of the contract and given effect as far as possible.

1 Cases that cite this headnote

[14]   **Contracts**

🔑 Recitals

While "whereas" clauses cannot be permitted to control over the express provisions of a contract, they are to be read in conjunction with the

172 P.3d 1252, 2007 MT 309

operative portions of the contract in order to ascertain the intention of the parties.

1 Cases that cite this headnote

[15] **Contracts**
👈 Nature and Essentials in General

The essential feature of a contract is the promise.

Cases that cite this headnote

[16] **Contracts**
👈 Language of contract
**Contracts**
👈 Recitals

When the court can collect from the writing the intention of the parties, it amounts to a covenant, whether it be contained in the recital or in any other part of the instrument.

Cases that cite this headnote

[17] **Contracts**
👈 Intention of Parties
**Contracts**
👈 Recitals

While general or limited terms may be restrained by particular recitals, each contract must be construed according to its meaning and no rigid rules of construction can be applied that will do violence to the intention of the parties.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*\*1253** For Appellant: Peter Michael Meloy and Robin A. Meguire, Meloy Law Firm, Helena, Montana.

For Appellee: William J. Gregoire and Robert J. Vermillion, Smith, Walsh, Clarke & Gregoire, Great Falls, Montana.

**Opinion**

Justice JOHN WARNER delivered the Opinion of the Court.

**\*117** ¶ 1 Plaintiff John Stowers (Stowers) appeals an order from the Fourth Judicial District Court, Missoula County, granting Community Medical Center's (CMC) motion for summary judgment. We affirm.

¶ 2 We restate the issue on appeal: Did the District Court err in granting summary judgment to Community Medical Center because Stowers' employment was for a specified term under a written contract?

**BACKGROUND**

¶ 3 Stowers is a medical doctor, specializing in emergency care. He entered into an employment agreement (Employment Agreement or Agreement) with CMC which provided that Stowers was to be employed for one year, from January 1, 2000, to December 31, 2000. The Agreement also provided that it could be extended or renewed by a mutual agreement in writing.

**\*118** ¶ 4 For more than two years beyond its expiration date the parties did not extend the Employment Agreement in writing. Nevertheless, Stowers continued to work for CMC.

¶ 5 On July 1, 2003, Stowers and CMC executed an "Addendum to Employment **\*\*1254** Agreement" (Addendum). After setting forth the parties, the Addendum states:

WHEREAS, the Medical Center and Physician entered into an Employment Agreement with an effective date of January 1, 2000 ("Employment Agreement") a copy of which is attached as Exhibit "A"; and

WHEREAS, the parties have orally extended that Employment Agreement; and

WHEREAS, the Employment Agreement currently has an expiration date of midnight January 31, 2004; and

WHEREAS, the parties wish to amend the Employment Agreement by modifying the compensation and benefits provisions.

NOW, THEREFORE, in consideration of the foregoing and in consideration of the covenants and agreements set forth herein and in the Employment Agreement the parties hereto agree as follows:

172 P.3d 1252, 2007 MT 309

¶ 6 Thereafter the Addendum set forth changes to the original Employment Agreement. The Addendum concluded by stating:

> Except as modified herein, all of the other terms and conditions of the Employment Agreement shall remain in full force and effect and are hereby ratified by the parties hereto.

¶ 7 Stowers continued working at CMC for several months until, on January 27, 2004, he received a letter from CMC terminating his employment effective January 31, 2004.

¶ 8 Stowers' complaint alleges that his termination violated Montana's Wrongful Discharge from Employment Act (WDEA). CMC moved for summary judgment, arguing that because the Addendum provided for a specific term of employment, Stowers had no claim under the WDEA.

¶ 9 The District Court granted CMC's motion for summary judgment, holding that the Addendum ratified the original Employment Agreement which was for a specific term of employment, that the term of employment expired, and thus Stowers had no claim under the WDEA. Stowers appealed.

**\*119  STANDARD OF REVIEW**

[1]    ¶ 10 Our review of a district court's grant of summary judgment is de novo and we apply the same evaluation as the district court under M.R. Civ. P. 56(c). N. 93 Neighbors, Inc. v. Bd. of Co. Commr., 2006 MT 132, ¶¶ 17, 332 Mont. 327, ¶ 17, 137 P.3d 557, ¶ 17.

**DISCUSSION**

¶ 11 Stowers concedes that the original Employment Agreement was for a specific term. However, he argues that the original Agreement expired, was not renewed, and the District Court erred in holding that the Addendum was a ratification of that Agreement. Thus, he posits that his employment was not for a specific term. Stowers goes on to argue that since the expiration date for his employment was in the Addendum's recitals, and recitals are not operative terms of a contract, his employment was not for a specific term.

[2]   [3]    ¶ 12 Stowers also argues that because he failed to read the Addendum before signing, he should not be held to its terms. However, it is well established in Montana that one who executes a written contract is presumed to know the contract's contents. See Gliko v. Permann, 2006 MT 30, ¶ 35, 331 Mont. 112, ¶ 35, 130 P.3d 155, ¶ 35 (citation omitted). Thus, this argument is without merit.

[4]    ¶ 13 In Montana, a claim for relief which is predicated on discharge from employment is barred if the employment is for a specific term under a written contract of employment and that term has expired. Sections 39–2–912(2), 39–2–913, MCA; Basta v. Crago, Inc., 280 Mont. 408, 413, 930 P.2d 78, 81 (1996). Thus, if the Addendum does constitute a contract for a specific term of employment, the District Court's grant of summary judgment to CMC must be affirmed.

[5]   [6]   [7]    ¶ 14 The District Court is correct that the Addendum constitutes a ratification of the original Employment Agreement which provided for a specific term of employment. Ratification is defined as the confirmation of a previous act done by the party himself and it necessarily supposes knowledge of the thing ratified. Koerner v. N. Pac. Ry. Co., 56 Mont. 511, 520, 186 P. 337, 340 (1919) (citations omitted). "Generally, **\*1255** contract ratification is the adoption of a previously formed contract, notwithstanding a quality that rendered it relatively void. By the ratification the party affirming it becomes bound by it and is also entitled to all the property benefits from it." Wyman v. Wyman, 208 Mont. 57, 64, 676 P.2d 181, 184–85 (1984) (citing Schagun v. Scott Mfg. Co., 162 F. 209, 219 (8th Cir.1908)).  **\*120** Subsequent recognition of a contract is the equivalent of ratification. Wyman, 208 Mont. at 64, 676 P.2d at 185.

[8]    ¶ 15 Stowers claims on appeal, and the dissent agrees, that CMC never argued in the District Court that the original Employment Agreement was ratified. However, CMC's District Court brief in support of its motion for summary judgment argued that the Addendum constituted a contract for a specific term, and in support of this argument CMC attached the original Employment Agreement, as well as the Addendum. As noted above at ¶ 6, the Addendum specifically states that it ratified the original Employment Agreement. In Stowers' District Court brief opposing summary judgment, he specifically states the Addendum "did not resurrect" the original Employment Agreement. In response to that argument, CMC's reply brief to the District Court argued that the original Employment Agreement had been ratified. The District Court also held oral argument on CMC's summary

Stowers v. Community Medical Center, Inc., 340 Mont. 116 (2007)

172 P.3d 1252, 2007 MT 309

judgment motion. Although Stowers has not provided this Court with a transcript of the oral argument, ratification may also have been argued to the District Court at this hearing. Ratification of the original Employment Agreement was a theory which was presented to the District Court and its adoption should not have been a surprise to Stowers.

[9]  ¶ 16 The Addendum specifically says, "Except as modified herein, all of the other terms and conditions of the Employment Agreement shall remain in full force and effect and are hereby ratified by the parties hereto." The Addendum also contains the wording, "[I]n consideration of the foregoing and in consideration of the covenants and agreements set forth herein and in the Employment Agreement the parties hereto agree as follows...." The Addendum is not ambiguous; it contains the unequivocal statement that it is the intention of both parties to ratify all of the terms and conditions of the original Employment Agreement, to which it specifically refers. It is the manifestation of Stowers' intent that controls. *Wyman,* 208 Mont. at 64, 676 P.2d at 185. The writing expresses his intention and his intent is clear. The plain language of the Addendum must be construed as the parties themselves stated therein. Section 28–3–303, MCA; *see Abstract & Title v. Smith Livestock,* 2006 MT 265, ¶ 16, 334 Mont. 172, ¶ 16, 146 P.3d 732, ¶ 16 (citation omitted).

¶ 17 We conclude that by executing the Addendum, Stowers and CMC ratified the original Employment Agreement calling for employment for a specific term.

[10]  [11]  [12]  [13]  [14]  [15]  [16]  [17]  ¶ 18 Stowers goes on to argue that even if the original Employment Agreement was ratified by the Addendum, the date it specifies for the termination of his employment is in its recitals. Because introductory recitals to a contract are background statements and generally do not form a part of the agreement, he argues that the Addendum did not constitute a contract for a specific term. *See McKinnon v. Baker,* 220 Neb. 314, 370 N.W.2d 492, 494 (1985). However, the whole of a contract is to be taken together so as to give effect to every part if reasonably practicable. Section 28–2–202, MCA. The contract must be viewed from beginning to end. *State v. Rosman,* 84 Mont. 207, 217, 274 P. 850, 853 (1929). Recitals in a contract should be reconciled with the operative clauses of the contract and given effect as far as possible. While "whereas" clauses cannot be permitted to control over the express provisions of a contract, they are to be read in conjunction with the operative portions of the

contract in order to ascertain the intention of the parties. 17A *C.J.S.,* Contracts § 317 (1999). The essential feature of a contract is the promise. When the court can collect from the writing the intention of the parties, it amounts to a covenant, whether it be contained in the recital or in any other part of the instrument. While general or limited terms may be restrained by particular recitals, each contract must be construed according to its meaning and no rigid rules of **1256 construction can be applied that will do violence to the intention of the parties. *Hunt v. United Bank & Trust Co.,* 210 Cal. 108, 291 P. 184, 187 (1930). Furthermore, it has also been held that recitals become an operative part of the contract when they include language indicating the contract is being formed in consideration of those recitals. *Wilson v. Wilson,* 217 Ill.App.3d 844, 160 Ill.Dec. 752, 577 N.E.2d 1323, 1329 (1 Dist.1991) (citing *American Natl. Bank & Trust Co. v. Chicago Title & Trust Co.,* 134 Ill.App.3d 772, 89 Ill.Dec. 719, 481 N.E.2d 71, 74 (1 Dist.1985)) (recitals themselves deemed operative when contract stated " '[f]or and in consideration of the premises set forth in the foregoing Recitals....' ").

¶ 19 Immediately following the recitals, the Addendum refers to such recitals when it says, "NOW, THEREFORE, in consideration of the foregoing and in consideration of the covenants and agreements set forth herein and in the Employment Agreement the parties hereto agree as follows...." This language is a deliberate reference to the recitals and indicates that the information contained in them is a basis of the parties' agreement. CMC agreed to employ Stowers and Stowers agreed to work for CMC for the pay and *121 the other terms and conditions of employment stated in the Addendum for the time stated therein. Either party could insist that the terms and conditions of the *122 contract be renegotiated at the end of the term. And either party could terminate the employment at the end of the specified term without causing legal damage to the other.

¶ 20 We conclude that, in considering the Addendum as a whole and noting that it states the recitals are consideration for the agreement, the parties intended that the termination date found in the recitals be a part of the agreement. Therefore, the Addendum was an employment contract with a specific expiration date of January 31, 2004.

## CONCLUSION

172 P.3d 1252, 2007 MT 309

¶ 21 Because Stowers and CMC ratified the original Employment Agreement in writing and because the termination date in the Addendum is an operative portion of an agreement for employment for a specific term, the District Court did not err in holding that Stowers' claim fell outside the WDEA. Affirmed.

We Concur: KARLA M. GRAY, C.J., BRIAN MORRIS, W. WILLIAM LEAPHART and JIM RICE, JJ.

Justice PATRICIA O. COTTER dissents.

¶ 22 In my judgment, the District Court's reliance on the theory of ratification was misplaced, and this Court errs in accepting it. As this Court points out, the Addendum specified an employment expiration date which was four years later than the expiration date set forth in the original Employment Agreement. This being so, the Addendum does not "ratify the original Employment Agreement," as the Court posits (¶ 16)—it changes it. However, now that the District Court and this Court have applied the ratification theory, it is imperative that the theory be applied correctly under the law. I would conclude we have not done so.

¶ 23 It is important to note that CMC did not argue contract ratification as a basis for its request for summary judgment. Thus, Stowers had no reason to argue the elements of ratification in resisting summary judgment. It was only when he received the District Court's order of summary judgment adopting the theory that Stowers realized the necessity of presenting evidence of his intent; however, his Motion to Alter or Amend Judgment to present such evidence was denied by the District Court.

¶ 24 Stowers argues on appeal and I agree, that, in order to constitute a contract ratification, there must be an acceptance of the act of ratification with an intent to ratify, made "with full knowledge of all the material circumstances." *123 *Koerner v. Northern Pac. Ry. Co.,* 56 Mont. 511, 520, 186 P. 337, 340 (1919). *See also Wyman v. Wyman,* 208 Mont. 57, 64, 676 P.2d 181, 185 (1984). Thus, evidence of whether Stowers intended to ratify, or acted "with full knowledge of all the material circumstances" is directly relevant to the question of whether a ratification occurred. This being so, Stowers' contention that the Addendum was handed to him during a dinner **1257 party with assurances that the purpose of the document was to increase his compensation, and his argument that he had no intent to "ratify" a new contract expiration date, was—by law—relevant to the court's analysis. The District Court erred in adopting a theory not urged by the moving party, and then in refusing to consider evidence relevant to that theory's application.

¶ 25 Because there is a genuine issue of material fact regarding Stowers' intent in executing the Addendum, the District Court erred in granting summary judgment to CMC. I would reverse the District Court's order of summary judgment and remand with instructions that the court take account of Stowers' intent evidence. I dissent from our refusal to do so.

Justice JAMES C. NELSON joins in the Dissent of Justice PATRICIA O. COTTER.

**Parallel Citations**

172 P.3d 1252, 2007 MT 309

---

**End of Document**                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 144

110 F.2d 468
Circuit Court of Appeals, Second Circuit.

SYRACUSE ENGINEERING CO., Inc., et al.

v.

HAIGHT.

No. 230.    |    March 4, 1940.

Appeal from the District Court of the United States for the Northern District of New York.

Bankruptcy proceedings by Syracuse Engineering Company, Inc., and others, as petitioning creditors, against Julian S. Brown, wherein First Trust & Deposit Company and Claire D. Lawton, executrix, intervened as additional petitioning creditors, and George M. Haight, receiver of Sale Springs National Bank of Syracuse, a creditor, opposed the petition. From an order adjudging defendant Brown a bankrupt, Haight, receiver, appeals.

Affirmed.

West Headnotes (11)

**[1]**    **Bankruptcy**

    Intervention Curing Deficiency

Whether two or three original petitioners in involuntary bankruptcy proceedings had valid claims was academic where two additional creditors with valid claims had been allowed to intervene and join in the petition. Bankr.Act § 59, sub. b, 11 U.S.C.A. § 95, sub. b.

3 Cases that cite this headnote

**[2]**    **Bankruptcy**

    Intervention Curing Deficiency

Creditors who intervene before adjudication may be counted in determining whether the necessary three petitioning creditors exist. Bankr.Act § 59, sub. f, 11 U.S.C.A. § 95, sub. f.

2 Cases that cite this headnote

**[3]**    **Bankruptcy**

    Intervention

**Bankruptcy**

    Discretion

Intervention to join in an involuntary petition in bankruptcy is a matter of right, but even if granting of leave is discretionary, district court's ruling will not be reversed except for clear cause shown. Bankr.Act, § 59, sub. f, 11 U.S.C.A. § 95, sub. f.

Cases that cite this headnote

**[4]**    **Bankruptcy**

    Intervention

Permitting two creditors with valid claims to intervene to join in involuntary petition in bankruptcy was not an abuse of discretion. Bankr.Act § 59, sub. f, 11 U.S.C.A. § 95, sub. f.

2 Cases that cite this headnote

**[5]**    **Bankruptcy**

    Evidence and Fact Questions

Where alleged involuntary bankrupt consented to examination, burden of proving insolvency rested on petitioning creditors.

2 Cases that cite this headnote

**[6]**    **Bankruptcy**

    Findings of Fact

In involuntary bankruptcy proceedings, findings of bankruptcy court as to assets and liabilities of alleged bankrupt would not be reversed where they were not clearly erroneous and the evidence was sharply conflicting. Rules of Civil Procedure for District Courts, rule 52(a), 28 U.S.C.A. following section 723c.

2 Cases that cite this headnote

**[7]**    **Bankruptcy**

    Insolvency;  Current Payment of Debts

As respects insolvency, where alleged involuntary bankrupt 49 years of age was

beneficiary of spendthrift trust created for benefit of himself and brother with right to one-half of income until he reached 60, when he was to be paid one-half of principal, alleged bankrupt's interest in both income and principal must be considered in determining value of his property.

Cases that cite this headnote

**[8]    Bankruptcy**
👈 Evidence and Fact Questions

In involuntary bankruptcy proceedings, finding that interest of alleged bankrupt, 49 years of age, in one-half of principal of $1,000,000 trust fund payable upon his reaching 60 years of age was worth not more than $50,000, in view of beneficiary's refusal to consent to insurance, was sustained by the evidence.

Cases that cite this headnote

**[9]    Bankruptcy**
👈 Insolvency;  Current Payment of Debts

As respects insolvency, where beneficiary of trust fund was to receive principal upon reaching 60 years of age, value of his interest in principal could not rest on assumption that insurance was obtainable where beneficiary expressly refused to assent to taking out of insurance.

Cases that cite this headnote

**[10]    Bankruptcy**
👈 Insolvency;  Current Payment of Debts

Under the "balance sheet tests" "insolvency" results when the aggregate of a debtor's property is not sufficient at a fair valuation to pay his debts, which means a fair market price that can be made available for payment of debts within a reasonable period of time, and "fair market value" implies not only a willing buyer, but a willing seller. Bankr.Act § 1(15) now (19), 11 U.S.C.A. § 1(15) now (19).

33 Cases that cite this headnote

**[11]    Bankruptcy**
👈 Insolvency;  Current Payment of Debts

In determining whether alleged involuntary bankrupt 49 years of age was insolvent, his interest in income of spendthrift trust paying about $22,000 a year was without substantial present value in view of concession that beneficiary's minimum living expenses amounted to $7,000 yearly and beneficiary's refusal to assent to insurance. Personal Property Law N.Y. § 15(1);  Real Property Law N.Y. §§ 98, 103;  Civil Practice Act N.Y. § 684;  Bankr.Act § 1(15) now (19), 11 U.S.C.A. § 1(15) now (19).

Cases that cite this headnote

**Attorneys and Law Firms**

**\*469**  Stewart F. Hancock, of Syracuse, N.Y. (Morris Berman and Lionel O. Grossman, both of Syracuse, N.Y., on the brief), for petitioning creditors-appellees.

George R. Fearon, of Syracuse, N.Y. (Keith F. Driscoll and Costello, Cooney & Fearon, all of Syracuse, N.Y., on the brief), for objecting creditor-appellant.

Gerald H. Henley, of Syracuse, N.Y. (Hiscock, Cowie, Bruce & Lee and A. J. & A. P. Oot, all of Syracuse, N.Y., on the brief), for intervening creditors-appellees.

Before SWAN, CLARK, and PATTERSON, Circuit Judges.

**Opinion**

CLARK, Circuit Judge.

The appellant herein, a creditor having a judgment lien against Julian S. Brown, appeals from Brown's adjudication as an involuntary bankrupt on the grounds (1) that there were not three petitioning creditors with provable claims and (2) that the alleged bankrupt was not insolvent.

The creditors of Julian S. Brown have been fighting over his considerable estate for nine years. Brown himself is not disposed to help them; with an annual income in excess of $20,000 under a trust, their efforts to tie up his other assets have not proven too embarrassing to him. An attempt of one creditor group to set up a receivership for Brown proved abortive. He was then placed in involuntary bankruptcy, but the petition was dismissed and we affirmed. In re Brown,

2 Cir., 87 F.2d 306. A second involuntary petition resulted in an adjudication. We vacated that ruling for errors below, and remanded the proceedings for a new hearing. Syracuse Engineering Co., Inc. v. Haight, 2 Cir., 97 F.2d 573. It is from the adjudication made after the new hearing that this appeal is taken.

The questions now before use resolve themselves in the main into problems of valuing assets and liabilities, i.e., decisions of fact made on sharply disputed testimony produced at an extensive trial. There is no reason to believe that we can reach any sounder results than did the district judge who was familiar with this estate from long association with it, as well as with the local conditions in and around Syracuse, where the physical assets are located. That an objecting creditor can so long prevent administration of an estate while he endeavors to preserve his priority perhaps indicates the wisdom of the change made in the bankruptcy statute by the Chandler Act in omitting creditors from those who may plead in answer to an involuntary petition. Section 18, sub. b, 11 U.S.C.A. § 41, sub. b. These long drawn out proceedings have engendered hard feeling among counsel, leading to unsupported charges of bad faith in the briefs wholly out of place in appellate argument.

[1] [2] [3] [4] First, however, we must note appellant's claim that two of the three original petitioners did not have provable claims as required by Sec. 59, sub. b, 11 U.S.C.A § 95, sub. b. The District Court supported one of these claims on disputed testimony; while the other, asserted to be barred by the statute of limitations, was not so barred when the petition was filed. But their status becomes academic here, since between the last appeal to this court and the new hearing below, two additional creditors with unquestionably valid claims have been allowed to intervene and join in the petition. Creditors who intervene before adjudication may be counted in determining whether the necessary three petitioning creditors exist. Canute S.S. Co. v. Pittsburgh & West Virginia Coal Co., 263 U.S. 244, 44 S.Ct. 67, 68 L.Ed. 287. Appellant's only reply is that under Sec. 59, sub. f, intervention to join in an involuntary petition is a matter of right, Canute S.S. Co. v. Pittsburgh & West Virginia Coal Co., supra; Guterman v. C. D. Parker & Co., 1 Cir., 87 F.2d 546, certiorari denied, 300 U.S. 677, 57 S.Ct. 670, 81 L.Ed. 882, though compare In re Brown, supra, F.2d at page 308. Even if the granting of leave to intervene is discretionary, we have said that we will not upset the ruling of the District Court except for clear cause shown. In re Tidewater Coal Exchange, 2 Cir., 280 F. 638, certiorari denied, Delaware S.S. Co., v. New England Coal & Coke Co., 259 U.S. 584, 42 S.Ct. 587,

66 L.Ed. 1075. No satisfactory reason has been presented why intervention should not have been allowed here.

[5] We turn next to the issue of Brown's solvency. The alleged act of bankruptcy is that Brown, while insolvent, permitted **\*470** the present objecting creditor, Haight, to obtain a lien against his property by judicial proceedings- the lien which Haight is here trying to preserve- and failed to discharge it within thirty days thereafter. Bankruptcy Act, Sec. 3, sub. a(3), 11 U.S.C.A. §21, sub. a(3). Since Brown consented to examination, the burden of proving insolvency, as we ruled before, rests on the petitioning creditors. Syracuse Engineering Co., v. Haight, 2 Cir., 97 F.2d 573, 575. Whether the burden would fall on the objecting creditor if Brown had refused to undergo examination, we declined to decide on the last appeal, and we decline again. In any event, we think petitioners have this time sustained their burden.

The parties are apart to the extent of almost $900,000 in their claims as to the values in this estate. Petitioners assert assets of a trifle over $116,000 and liabilities of $388,000. The objecting creditor appraises assets at about $800,000 and liabilities at $183,452. The trial court took a middle course, with a finding of $204,000 in assets, and $319,000 in liabilities. To overrule the district judge, we must therefore find aggregate error (and in one direction only) of $115,000 in his valuations.

Liabilities. The largest single liability is the judgment of $131,641.97 in favor of the objecting creditor. We need consider only three other items; the validity of all the rest cannot be seriously questioned. These three are claims asserted against Brown for deficiencies under mortgages on which he was personally obligated. The mortgage debt owed to the Thalheimer estate was $123,000. Under N.Y. Civil Practice Act, Sec. 1083-a, a deficiency judgment could be taken only for this sum less the fair market value of the property. A witness for petitioning creditors appraised fair market value at $65,000; appellant claims a value up to $180,000. The District Court arrived at a figure of $73,000, and placed Brown's deficiency liability at $50,000.

Two other deficiency claims are asserted by the First Trust & Deposit Co., which holds the Pack and Schumacher mortgages. The court found the claim against Brown on the Pack mortgage to be at least $5,000. Evidence for the petitioning creditors showed that the correct sum might even be $9,000. The Schumacher mortgage was a second mortgage, and the previous foreclosure of the senior mortgage

had left no surplus. Brown was surety on the second mortgage, but his principal had no assets. Consequently the District Court found Brown liable for the full mortgage debt of $67,500.

[6]   We shall not reverse any of these findings. The evidence was sharply conflicting; nothing in the record persuades us that the court's estimates were erroneous. Certainly they were not 'clearly erroneous,' as they must be to justify reversal. Federal Rule of Civil Procedure 52(a), 28 U.S.C.A.following section 723c; cf. In re Connecticut Co., 2 Cir., 107 F.2d 734; In re United Finance Corp., 7 Cir., 104 F.2d 593, 598.

Assets. Except for the trust fund to be discussed below, most of the assets of Julian S. Brown were parcels of real estate in the City of Syracuse. What we have said above applies equally to the District Court's appraisals of these properties. We accept its figure of $154,000 for all assets exclusive of the trust fund.

[7]   The principal dispute now, as on the former appeal, concerns the trust fund created by Julian S. Brown's mother for the benefit of Julian and his brother and valued at more than $1,000,000. By the terms of the will creating the trust, each brother receives one-half the income until he reaches the age of 60, at which time he receives one-half the principal; but if one brother dies before becoming 60, the entire principal goes to the other upon attaining that age. No provision is made for the contingency that both die before 60; but it is agreed that the principal will then pass in equal parts to the estates of the two brothers as sole distributees. At the time of the adjudication Julian S. Brown was 49 and his brother 51. The expectancy that a man of 49 will live for 10 years is about 84 per cent by the American Mortality Tables. Both Julian's interest in the principal and his interest in the income must be considered in determining the value of his property. Syracuse Engineering Co. v. Haight, 2 Cir., 97 F.2d 573, 576.

[8]   The principal. Both sides offered expert testimony to show a market for the purchase of vested and contingent remainders and as to the fair price that Julian S. Brown's remainder would bring. Appellant's witness Martindell gave such price as $200,000 if no insurance could be secured on Brown's life by the purchaser. Under the same conditions, Rosenberg, the witness for petitioning creditors, would hazard no more than $20,000. A bank officer **471 also testified that banks would loan nothing on such an interest. Rosenberg's testimony was far more credible than Martindell's. He had been a decade in the business,

while Martindell was an adviser who had engaged only in occasional adventures. Without insurance, the purchase of the remainder would not be an investment, but a gamble. According to Rosenberg, a $500,000 vested remainder subject to no contingency whatsoever but the lapse of time could be purchased for less than the sum at which Martindell appraised Brown's contingent interest. The District Court allowed a 'speculative or gambling value' to Brown's interest of not over $50,000.

Much is made of the possibility of avoiding the speculative nature of the investment by insurance. It clearly appeared, however, that Brown would not consent to insurance. He did not believe in insurance- perhaps naturally under the circumstances. He had none himself. Without Brown's signature on the application, a purchaser of the interest could not procure insurance on his life in New York. Insurance Law (Consol. Laws, c. 28) Sec. 55. Furthermore, it would be necessary that Brown take a physical examination and be accepted as a proper risk by an insurance company. Lloyd's of London was said to be a possibility, but it was not licensed to act in New York and no evidence was offered of its willingness to accept such risks. A scheme of self-insurance by the purchaser such as proposed by Martindell is not insurance at all. It would not shift a penny of the risk.

Nevertheless, appellant argues that in valuing the interest Brown's assistance in obtaining insurance must be assumed. Even on this assumption valuation is not clear, and it still may be doubtful that the value of the asset is then increased so far above $50,000 as to offset the additional margin of $115,000 allowable in the District Court's figures before the adjudication becomes erroneous. A heavy charge must be incurred for insurance before adequate protection is secured. According to the testimony, insurance on Brown's life would cost $30 per thousand. To determine his actual investment a purchaser would have to add loss of interest, necessary attorney's fees, and the cost of insurance to his original payment; unless he protected himself on these items, he would be out of pocket on the unsuccessful termination of his venture. [1] And if he won, the income tax gatherer would be at hand to reduce his gains sadly. In view of these uncertainties, we might well hesitate to overthrow the District Court's conclusion in any event

[9]   [10]   We do not believe, however, that this asset should be valued on the assumption that insurance is obtainable. Here involved are some fundamental conceptions of the role of valuation in determining insolvency. Under 'the balance

sheet test' of the Bankruptcy Act Sec. 1, (15), now (19), 11 U.S.C.A. § 1(15), now (19) (In re United Finance Corp., supra, 104 F.2d at page 598), insolvency results when the 'aggregate' of a debtor's property is not sufficient 'at a fair valuation' to pay his debts. Fair valuation of an estate such as this might conceivably be based on forced sale prices, or on fair market prices, or on so-called intrinsic values, irrespective of sale. A proper regard for the interests of the bankrupt, as well as for the interests of his creditors, compels the conclusion that fair market price is the most equitable standard. Bonbright and Pickett, Valuation to Determine Solvency under the Bankruptcy Act, 29 Col.L.Rev. 582, 597, 598; 1 Collier on Bankruptcy (14th Ed. 1940) 74-81, collecting cases. It involves a value that can be made available for payment of debts within a reasonable period of time. In re United Finance Corp., supra; Babbitt v. Read, 2 Cir., 236 F. 42, 47, certiorari denied 243 U.S. 648, 37 S.Ct. 475, 61 L.Ed. 946; Stern v. Paper, D.C.N.D., 183 F. 228, 230, 231, affirmed 8 Cir., 198 F. 642. And fair market value implies not only a 'willing buyer,' but a 'willing seller.' Grandison v. National Bank of Commerce, 2 Cir., 231 F. 800, 804, certiorari denied 242 U.S. 644, 37 S.Ct. 213, 61 L.Ed. 542; Irving Trust Co. v. Manufacturers' Trust Co., D.C.S.D.N.Y., 6 F.Supp. 185; Collier, supra at 77.

The 'willing seller' could be either Brown or his trustee in bankruptcy. Whatever might be the fair market value of this interest with Brown agreeing to take out insurance, Brown's refusal presents a different situation. We do not believe that **\*472** the concept of fair market value requires us to conceive of a willing seller as one able and willing to take out insurance when we know that no such person exists. Hence we cannot say that the District Court's valuation of this interest is clearly erroneous.

[11]    The income. The income from the trust fund has averaged roughly $22,000 a year. Appellant concedes that Brown needs a minimum of $7,000 for living expenses, but it is claimed that the $15,000 surplus must be included as one of Brown's assets. An absolute right to receive $15,000 a year for a period of years has a substantial present value; if it be computed at 4 per cent for eleven years it would be at least $131,000. But Brown's right to income could not be sold for a figure approaching this sum. As before, the risk that Brown might die must be offset by insurance to attract a purchaser, and Brown will have none of insurance. Even if we disregard the risk of death and Brown's refusal to insure, this right to income has little or no market value. A voluntary assignment by Brown would not be enforceable against the

trustee of his mother's estate. N.Y. Personal Property Law (Consol. Laws, c. 41) Sec. 15(1); cf. Real Property Law (Consol. Laws, c. 50) Sec. 103; Judis v. Martin, 218 App.Div. 4u2, 218 N.Y.S. 423, appeal dismissed 244 N.Y. 605, 155 N.E. 916; Matter of Ungrich, 201 N.Y. 415, 94 N.E. 999. Brown as a willing seller could hardly find a willing buyer, for no sensible buyer would pay for a right good against Brown alone. And if we consider the trustee in bankruptcy as the willing seller, additional difficulties arise. A judgment creditor, by appropriate equitable proceedings, may secure 10 per cent of Brown's income under N.Y. Civil Practice Act, Sec. 684, plus whatever surplus exists above Brown's suitable living expenses under Real Property Law, Sec. 98; and the bankruptcy trustee should have like rights. See In re Morris, 2 Cir., 204 F. 770; Jenks v. Title Guarantee & Trust Co., 170 App.Div. 830, 156 N.Y.S. 478. But just what the bankruptcy trustee can actually sell and transfer, if anything, is not clear; it has been held that he cannot make an assignment giving the right of garnishee execution. Matter of Towne, 278 N.Y. 597, 16 N.E.2d 117, affirming 253 App.Div. 795, 1 N.Y.S.2d 1016. And we could hardly require a bankruptcy administration of eleven years while the trustee collected the income himself.

Appellant would have us overcome all these difficulties by the simple expedient of resort to the rule that property exempt from attachment and execution must nevertheless be computed as a part of the defendent's assets under Bankruptcy Act, Sec. 1(15), now (19), 11 U.S.C.A. § 1(15), now (19); Lasswell v. Stein-Block Co., 5 Cir., 93 F.2d 322; Bonbright and Pickett, supra at page 590; Collier, supra at 71, 72. Appellant admits that Brown needs $7,000 a year for suitable living expenses; this sum is the maximum we can consider exempt, in view of N.Y. Real Property Law, Sec. 98. Should we concede that exempt property be included in our valuation, we must appraise the value of Brown's right to receive $7,000 annually for eleven years. But we have already concluded that Brown's right to receive $22,000 for eleven years has no present market value, and the same must be said of his right to receive the exempt portion of that sum. As we have ruled above, valuation for purposes of straight bankruptcy contemplates sale for payment of debts within a reasonable period of time. Neither the accessible nor the exempt portion of Brown's right to receive income has any sale value of substance.

Being thus unwilling to substitute our uncertain guess for the findings of the District Court on these items of doubtful and disputed value, particularly in the light of the substantial

margin of insolvency thus disclosed, we hold that the adjudication of bankruptcy must be affirmed.

Footnotes

1    Appellees assert that on an original purchase price of $200,000, and with insurance to return only that amount, a purchaser would
     have additional expenses of $137,000 by the end of ten years- $66,000 for loss of interest at 3 per cent; $5,000 for administration
     expenses and attorney's fees; and $66,000 for insurance premiums.

---

**End of Document**                                              © 2014 Thomson Reuters. No claim to original U.S. Government Works.

 © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 145

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 166 of 493

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

2010 SCC 60
Supreme Court of Canada

Ted Leroy Trucking [Century Services] Ltd., Re

2010 CarswellBC 3419, 2010 CarswellBC 3420, 2010 SCC 60, [2010] 3 S.C.R. 379, [2010]
G.S.T.C. 186, [2011] 2 W.W.R. 383, [2011] B.C.W.L.D. 533, [2011] B.C.W.L.D. 534, 12
B.C.L.R. (5th) 1, 196 A.C.W.S. (3d) 27, 2011 D.T.C. 5006 (Eng.), 2011 G.T.C. 2006 (Eng.), 296
B.C.A.C. 1, 326 D.L.R. (4th) 577, 409 N.R. 201, 503 W.A.C. 1, 72 C.B.R. (5th) 170, J.E. 2011-5

## Century Services Inc. (Appellant) and Attorney General of Canada on behalf of Her Majesty The Queen in Right of Canada (Respondent)

Deschamps J., McLachlin C.J.C., Binnie, LeBel, Fish, Abella, Charron, Rothstein, Cromwell JJ.

Heard: May 11, 2010
Judgment: December 16, 2010
Docket: 33239

Proceedings: reversing *Ted Leroy Trucking Ltd., Re* (2009), 2009 CarswellBC 1195, 2009 G.T.C. 2020 (Eng.), 2009 BCCA 205, 270 B.C.A.C. 167, 454 W.A.C. 167, [2009] 12 W.W.R. 684, 98 B.C.L.R. (4th) 242, [2009] G.S.T.C. 79 (B.C. C.A.); reversing *Ted Leroy Trucking Ltd., Re* (2008), 2008 CarswellBC 2895, 2008 BCSC 1805, [2008] G.S.T.C. 221, 2009 G.T.C. 2011 (Eng.) (B.C. S.C. [In Chambers])

Counsel: Mary I.A. Buttery, Owen J. James, Matthew J.G. Curtis for Appellant
Gordon Bourgard, David Jacyk, Michael J. Lema for Respondent

Subject: Estates and Trusts; Goods and Services Tax (GST); Tax — Miscellaneous; Insolvency

### Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

### Headnote

#### Tax --- Goods and Services Tax — Collection and remittance — GST held in trust

Debtor owed Crown under Excise Tax Act (ETA) for unremitted GST — Debtor sought relief under Companies' Creditors Arrangement Act (CCAA) — Under order of BC Supreme Court, amount of GST debt was placed in trust account and remaining proceeds of sale of assets paid to major secured creditor — Debtor's application for partial lifting of stay of proceedings to assign itself into bankruptcy was granted, while Crown's application for payment of tax debt was dismissed — Crown's appeal to BC Court of Appeal was allowed — Creditor appealed to Supreme Court of Canada — Appeal allowed — Analysis of ETA and CCAA yielded conclusion that CCAA provides that statutory deemed trusts do not apply, and that Parliament did not intend to restore Crown's deemed trust priority in GST claims under CCAA when it amended ETA in 2000 — Parliament had moved away from asserting priority for Crown claims under both CCAA and Bankruptcy and Insolvency Act (BIA), and neither statute provided for preferred treatment of GST claims — Giving Crown priority over GST claims during CCAA proceedings but not in bankruptcy would reduce use of more flexible and responsive CCAA regime — Parliament likely inadvertently succumbed to drafting anomaly — Section 222(3) of ETA could not be seen as having impliedly repealed s. 18.3 of CCAA by its subsequent passage, given recent amendments to CCAA — Court had discretion under CCAA to construct bridge to liquidation under BIA, and partially lift stay of proceedings to allow entry into liquidation — No "gap" should exist when moving from CCAA to BIA — Court order segregating funds did not have certainty that Crown rather than creditor would be beneficiary sufficient to support express trust — Amount

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 167 of 493

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419...

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

held in respect of GST debt was not subject to deemed trust, priority or express trust in favour of Crown — Excise Tax Act, R.S.C. 1985, c. E-15, ss. 222(1), (1.1).

## Tax --- General principles — Priority of tax claims in bankruptcy proceedings

Debtor owed Crown under Excise Tax Act (ETA) for unremitted GST — Debtor sought relief under Companies' Creditors Arrangement Act (CCAA) — Under order of BC Supreme Court, amount of GST debt was placed in trust account and remaining proceeds of sale of assets paid to major secured creditor — Debtor's application for partial lifting of stay of proceedings to assign itself into bankruptcy was granted, while Crown's application for payment of tax debt was dismissed — Crown's appeal to BC Court of Appeal was allowed — Creditor appealed to Supreme Court of Canada — Appeal allowed — Analysis of ETA and CCAA yielded conclusion that CCAA provides that statutory deemed trusts do not apply, and that Parliament did not intend to restore Crown's deemed trust priority in GST claims under CCAA when it amended ETA in 2000 — Parliament had moved away from asserting priority for Crown claims under both CCAA and Bankruptcy and Insolvency Act (BIA), and neither statute provided for preferred treatment of GST claims — Giving Crown priority over GST claims during CCAA proceedings but not in bankruptcy would reduce use of more flexible and responsive CCAA regime — Parliament likely inadvertently succumbed to drafting anomaly — Section 222(3) of ETA could not be seen as having impliedly repealed s. 18.3 of CCAA by its subsequent passage, given recent amendments to CCAA — Court had discretion under CCAA to construct bridge to liquidation under BIA, and partially lift stay of proceedings to allow entry into liquidation — No "gap" should exist when moving from CCAA to BIA — Court order segregating funds did not have certainty that Crown rather than creditor would be beneficiary sufficient to support express trust — Amount held in respect of GST debt was not subject to deemed trust, priority or express trust in favour of Crown.

## Taxation --- Taxe sur les produits et services — Perception et versement — Montant de TPS détenu en fiducie

Débitrice devait à la Couronne des montants de TPS qu'elle n'avait pas remis, en vertu de la Loi sur la taxe d'accise (LTA) — Débitrice a entamé des procédures judiciaires en vertu de la Loi sur les arrangements avec les créanciers des compagnies (LACC) — En vertu d'une ordonnance du tribunal, le montant de la créance fiscale a été déposé dans un compte en fiducie et la balance du produit de la vente des actifs a servi à payer le créancier garanti principal — Demande de la débitrice visant à obtenir la levée partielle de la suspension de procédures afin qu'elle puisse faire cession de ses biens a été accordée, alors que la demande de la Couronne visant à obtenir le paiement des montants de TPS non remis a été rejetée — Appel interjeté par la Couronne a été accueilli — Créancier a formé un pourvoi — Pourvoi accueilli — Analyse de la LTA et de la LACC conduisait à la conclusion que le législateur ne saurait avoir eu l'intention de redonner la priorité, dans le cadre de la LACC, à la fiducie réputée de la Couronne à l'égard de ses créances relatives à la TPS quand il a modifié la LTA, en 2000 — Législateur avait mis un terme à la priorité accordée aux créances de la Couronne sous les régimes de la LACC et de la Loi sur la faillite et l'insolvabilité (LFI), et ni l'une ni l'autre de ces lois ne prévoyais que les créances relatives à la TPS bénéficiaient d'un traitement préférentiel — Fait de faire primer la priorité de la Couronne sur les créances découlant de la TPS dans le cadre de procédures fondées sur la LACC mais pas en cas de faillite aurait pour effet de restreindre le recours à la possibilité de se restructurer sous le régime plus souple et mieux adapté de la LACC — Il semblait probable que le législateur avait par inadvertance commis une anomalie rédactionnelle — On ne pourrait pas considérer l'art. 222(3) de la LTA comme ayant implicitement abrogé l'art. 18.3 de la LACC, compte tenu des modifications récemment apportées à la LACC — Sous le régime de la LACC, le tribunal avait discrétion pour établir une passerelle vers une liquidation opérée sous le régime de la LFI et de lever la suspension partielle des procédures afin de permettre à la débitrice de procéder à la transition au régime de liquidation — Il n'y avait aucune certitude, en vertu de l'ordonnance du tribunal, que la Couronne était le bénéficiaire véritable de la fiducie ni de fondement pour donner naissance à une fiducie expresse — Montant perçu au titre de la TPS ne faisait l'objet d'aucune fiducie présumée, priorité ou fiducie expresse en faveur de la Couronne.

## Taxation --- Principes généraux — Priorité des créances fiscales dans le cadre de procédures en faillite

Débitrice devait à la Couronne des montants de TPS qu'elle n'avait pas remis, en vertu de la Loi sur la taxe d'accise (LTA) — Débitrice a entamé des procédures judiciaires en vertu de la Loi sur les arrangements avec les créanciers des compagnies (LACC) — En vertu d'une ordonnance du tribunal, le montant de la créance fiscale a été déposé dans un compte en fiducie et la balance du produit de la vente des actifs a servi à payer le créancier garanti principal — Demande de la débitrice visant

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

à obtenir la levée partielle de la suspension de procédures afin qu'elle puisse faire cession de ses biens a été accordée, alors que la demande de la Couronne visant à obtenir le paiement des montants de TPS non remis a été rejetée — Appel interjeté par la Couronne a été accueilli — Créancier a formé un pourvoi — Pourvoi accueilli — Analyse de la LTA et de la LACC conduisait à la conclusion que le législateur ne saurait avoir eu l'intention de redonner la priorité, dans le cadre de la LACC, à la fiducie réputée de la Couronne à l'égard de ses créances relatives à la TPS quand il a modifié la LTA, en 2000 — Législateur avait mis un terme à la priorité accordée aux créances de la Couronne sous les régimes de la LACC et de la Loi sur la faillite et l'insolvabilité (LFI), et ni l'une ni l'autre de ces lois ne prévoyaient que les créances relatives à la TPS bénéficiaient d'un traitement préférentiel — Fait de faire primer la priorité de la Couronne sur les créances découlant de la TPS dans le cadre de procédures fondées sur la LACC mais pas en cas de faillite aurait pour effet de restreindre le recours à la possibilité de se restructurer sous le régime plus souple et mieux adapté de la LACC — Il semblait probable que le législateur avait par inadvertance commis une anomalie rédactionnelle — On ne pourrait pas considérer l'art. 222(3) de la LTA comme ayant implicitement abrogé l'art. 18.3 de la LACC, compte tenu des modifications récemment apportées à la LACC — Sous le régime de la LACC, le tribunal avait discrétion pour établir une passerelle vers une liquidation opérée sous le régime de la LFI et de lever la suspension partielle des procédures afin de permettre à la débitrice de procéder à la transition au régime de liquidation — Il n'y avait aucune certitude, en vertu de l'ordonnance du tribunal, que la Couronne était le bénéficiaire véritable de la fiducie ni de fondement pour donner naissance à une fiducie expresse — Montant perçu au titre de la TPS ne faisait l'objet d'aucune fiducie présumée, priorité ou fiducie expresse en faveur de la Couronne.

The debtor company owed the Crown under the Excise Tax Act (ETA) for GST that was not remitted. The debtor commenced proceedings under the Companies' Creditors Arrangement Act (CCAA). Under an order by the B.C. Supreme Court, the amount of the tax debt was placed in a trust account, and the remaining proceeds from the sale of the debtor's assets were paid to the major secured creditor. The debtor's application for a partial lifting of the stay of proceedings in order to assign itself into bankruptcy was granted, while the Crown's application for the immediate payment of the unremitted GST was dismissed.

The Crown's appeal to the B.C. Court of Appeal was allowed. The Court of Appeal found that the lower court was bound by the ETA to give the Crown priority once bankruptcy was inevitable. The Court of Appeal ruled that there was a deemed trust under s. 222 of the ETA or that an express trust was created in the Crown's favour by the court order segregating the GST funds in the trust account.

The creditor appealed to the Supreme Court of Canada.

**Held:** The appeal was allowed.

Per Deschamps J. (McLachlin C.J.C., Binnie, LeBel, Charron, Rothstein, Cromwell JJ. concurring): A purposive and contextual analysis of the ETA and CCAA yielded the conclusion that Parliament could not have intended to restore the Crown's deemed trust priority in GST claims under the CCAA when it amended the ETA in 2000. Parliament had moved away from asserting priority for Crown claims in insolvency law under both the CCAA and Bankruptcy and Insolvency Act (BIA). Unlike for source deductions, there was no express statutory basis in the CCAA or BIA for concluding that GST claims enjoyed any preferential treatment. The internal logic of the CCAA also militated against upholding a deemed trust for GST claims.

Giving the Crown priority over GST claims during CCAA proceedings but not in bankruptcy would, in practice, deprive companies of the option to restructure under the more flexible and responsive CCAA regime. It seemed likely that Parliament had inadvertently succumbed to a drafting anomaly, which could be resolved by giving precedence to s. 18.3 of the CCAA. Section 222(3) of the ETA could no longer be seen as having impliedly repealed s. 18.3 of the CCAA by being passed subsequently to the CCAA, given the recent amendments to the CCAA. The legislative context supported the conclusion that s. 222(3) of the ETA was not intended to narrow the scope of s. 18.3 of the CCAA.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    3

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

The breadth of the court's discretion under the CCAA was sufficient to construct a bridge to liquidation under the BIA, so there was authority under the CCAA to partially lift the stay of proceedings to allow the debtor's entry into liquidation. There should be no gap between the CCAA and BIA proceedings that would invite a race to the courthouse to assert priorities.

The court order did not have the certainty that the Crown would actually be the beneficiary of the funds sufficient to support an express trust, as the funds were segregated until the dispute between the creditor and the Crown could be resolved. The amount collected in respect of GST but not yet remitted to the Receiver General of Canada was not subject to a deemed trust, priority or express trust in favour of the Crown.

Per Fish J. (concurring): Parliament had declined to amend the provisions at issue after detailed consideration of the insolvency regime, so the apparent conflict between s. 18.3 of the CCAA and s. 222 of the ETA should not be treated as a drafting anomaly. In the insolvency context, a deemed trust would exist only when two complementary elements co-existed: first, a statutory provision creating the trust; and second, a CCAA or BIA provision confirming its effective operation. Parliament had created the Crown's deemed trust in the Income Tax Act, Canada Pension Plan and Employment Insurance Act and then confirmed in clear and unmistakable terms its continued operation under both the CCAA and the BIA regimes. In contrast, the ETA created a deemed trust in favour of the Crown, purportedly notwithstanding any contrary legislation, but Parliament did not expressly provide for its continued operation in either the BIA or the CCAA. The absence of this confirmation reflected Parliament's intention to allow the deemed trust to lapse with the commencement of insolvency proceedings. Parliament's evident intent was to render GST deemed trusts inoperative upon the institution of insolvency proceedings, and so s. 222 of the ETA mentioned the BIA so as to exclude it from its ambit, rather than include it as the other statutes did. As none of these statutes mentioned the CCAA expressly, the specific reference to the BIA had no bearing on the interaction with the CCAA. It was the confirmatory provisions in the insolvency statutes that would determine whether a given deemed trust would subsist during insolvency proceedings.

Per Abella J. (dissenting): The appellate court properly found that s. 222(3) of the ETA gave priority during CCAA proceedings to the Crown's deemed trust in unremitted GST. The failure to exempt the CCAA from the operation of this provision was a reflection of clear legislative intent. Despite the requests of various constituencies and case law confirming that the ETA took precedence over the CCAA, there was no responsive legislative revision and the BIA remained the only exempted statute. There was no policy justification for interfering, through interpretation, with this clarity of legislative intention and, in any event, the application of other principles of interpretation reinforced this conclusion. Contrary to the majority's view, the "later in time" principle did not favour the precedence of the CCAA, as the CCAA was merely re-enacted without significant substantive changes. According to the Interpretation Act, in such circumstances, s. 222(3) of the ETA remained the later provision. The chambers judge was required to respect the priority regime set out in s. 222(3) of the ETA and so did not have the authority to deny the Crown's request for payment of the GST funds during the CCAA proceedings.

La compagnie débitrice devait à la Couronne des montants de TPS qu'elle n'avait pas remis, en vertu de la Loi sur la taxe d'accise (LTA). La débitrice a entamé des procédures judiciaires en vertu de la Loi sur les arrangements avec les créanciers des compagnies (LACC). En vertu d'une ordonnance du tribunal, le montant de la créance fiscale a été déposé dans un compte en fiducie et la balance du produit de la vente des actifs de la débitrice a servi à payer le créancier garanti principal. La demande de la débitrice visant à obtenir la levée partielle de la suspension de procédures afin qu'elle puisse faire cession de ses biens a été accordée, alors que la demande de la Couronne visant à obtenir le paiement immédiat des montants de TPS non remis a été rejetée.

L'appel interjeté par la Couronne a été accueilli. La Cour d'appel a conclu que le tribunal se devait, en vertu de la LTA, de donner priorité à la Couronne une fois la faillite inévitable. La Cour d'appel a estimé que l'art. 222 de la LTA établissait

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 170 of 493
Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

une fiducie présumée ou bien que l'ordonnance du tribunal à l'effet que les montants de TPS soient détenus dans un compte en fiducie créait une fiducie expresse en faveur de la Couronne.

Le créancier a formé un pourvoi.

**Arrêt:** Le pourvoi a été accueilli.

Deschamps, J. (McLachlin, J.C.C., Binnie, LeBel, Charron, Rothstein, Cromwell, JJ., souscrivant à son opinion) : Une analyse téléologique et contextuelle de la LTA et de la LACC conduisait à la conclusion que le législateur ne saurait avoir eu l'intention de redonner la priorité, dans le cadre de la LACC, à la fiducie réputée de la Couronne à l'égard de ses créances relatives à la TPS quand il a modifié la LTA, en 2000. Le législateur avait mis un terme à la priorité accordée aux créances de la Couronne dans le cadre du droit de l'insolvabilité, sous le régime de la LACC et celui de la Loi sur la faillite et l'insolvabilité (LFI). Contrairement aux retenues à la source, aucune disposition législative expresse ne permettait de conclure que les créances relatives à la TPS bénéficiaient d'un traitement préférentiel sous le régime de la LACC ou celui de la LFI. La logique interne de la LACC allait également à l'encontre du maintien de la fiducie réputée à l'égard des créances découlant de la TPS.

Le fait de faire primer la priorité de la Couronne sur les créances découlant de la TPS dans le cadre de procédures fondées sur la LACC mais pas en cas de faillite aurait pour effet, dans les faits, de priver les compagnies de la possibilité de se restructurer sous le régime plus souple et mieux adapté de la LACC. Il semblait probable que le législateur avait par inadvertance commis une anomalie rédactionnelle, laquelle pouvait être corrigée en donnant préséance à l'art. 18.3 de la LACC. On ne pouvait plus considérer l'art. 222(3) de la LTA comme ayant implicitement abrogé l'art. 18.3 de la LACC parce qu'il avait été adopté après la LACC, compte tenu des modifications récemment apportées à la LACC. Le contexte législatif étayait la conclusion suivant laquelle l'art. 222(3) de la LTA n'avait pas pour but de restreindre la portée de l'art. 18.3 de la LACC.

L'ampleur du pouvoir discrétionnaire conféré au tribunal par la LACC était suffisant pour établir une passerelle vers une liquidation opérée sous le régime de la LFI, de sorte qu'il avait, en vertu de la LACC, le pouvoir de lever la suspension partielle des procédures afin de permettre à la débitrice de procéder à la transition au régime de liquidation. Il n'y avait aucune certitude, en vertu de l'ordonnance du tribunal, que la Couronne était le bénéficiaire véritable de la fiducie ni de fondement pour donner naissance à une fiducie expresse, puisque les fonds étaient détenus à part jusqu'à ce que le litige entre le créancier et la Couronne soit résolu. Le montant perçu au titre de la TPS mais non encore versé au receveur général du Canada ne faisait l'objet d'aucune fiducie présumée, priorité ou fiducie expresse en faveur de la Couronne.

Fish, J. (souscrivant aux motifs des juges majoritaires) : Le législateur a refusé de modifier les dispositions en question suivant un examen approfondi du régime d'insolvabilité, de sorte qu'on ne devrait pas qualifier l'apparente contradiction entre l'art. 18.3 de la LACC et l'art. 222 de la LTA d'anomalie rédactionnelle. Dans un contexte d'insolvabilité, on ne pourrait conclure à l'existence d'une fiducie présumée que lorsque deux éléments complémentaires étaient réunis : en premier lieu, une disposition législative qui crée la fiducie et, en second lieu, une disposition de la LACC ou de la LFI qui confirme l'existence de la fiducie. Le législateur a établi une fiducie présumée en faveur de la Couronne dans la Loi de l'impôt sur le revenu, le Régime de pensions du Canada et la Loi sur l'assurance-emploi puis, il a confirmé en termes clairs et explicites sa volonté de voir cette fiducie présumée produire ses effets sous le régime de la LACC et de la LFI. Dans le cas de la LTA, il a établi une fiducie présumée en faveur de la Couronne, sciemment et sans égard pour toute législation à l'effet contraire, mais n'a pas expressément prévu le maintien en vigueur de celle-ci sous le régime de la LFI ou celui de la LACC. L'absence d'une telle confirmation témoignait de l'intention du législateur de laisser cette fiducie présumée devenir caduque au moment de l'introduction de la procédure d'insolvabilité. L'intention du législateur était manifestement de rendre inopérantes les fiducies présumées visant la TPS dès l'introduction d'une procédure d'insolvabilité et, par conséquent, l'art. 222 de la LTA mentionnait la LFI de manière à l'exclure de son champ d'application, et non de l'y inclure, comme le faisaient les autres lois. Puisqu'aucune de ces lois ne mentionnait spécifiquement la LACC, la mention

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

explicite de la LFI n'avait aucune incidence sur l'interaction avec la LACC. C'était les dispositions confirmatoires que l'on trouvait dans les lois sur l'insolvabilité qui déterminaient si une fiducie présumée continuerait d'exister durant une procédure d'insolvabilité.

Abella, J. (dissidente) : La Cour d'appel a conclu à bon droit que l'art. 222(3) de la LTA donnait préséance à la fiducie présumée qui est établie en faveur de la Couronne à l'égard de la TPS non versée. Le fait que la LACC n'ait pas été soustraite à l'application de cette disposition témoignait d'une intention claire du législateur. Malgré les demandes répétées de divers groupes et la jurisprudence ayant confirmé que la LTA l'emportait sur la LACC, le législateur n'est pas intervenu et la LFI est demeurée la seule loi soustraite à l'application de cette disposition. Il n'y avait pas de considération de politique générale qui justifierait d'aller à l'encontre, par voie d'interprétation législative, de l'intention aussi clairement exprimée par le législateur et, de toutes manières, cette conclusion était renforcée par l'application d'autres principes d'interprétation. Contrairement à l'opinion des juges majoritaires, le principe de la préséance de la « loi postérieure » ne militait pas en faveur de la présance de la LACC, celle-ci ayant été simplement adoptée à nouveau sans que l'on ne lui ait apporté de modifications importantes. En vertu de la Loi d'interprétation, dans ces circonstances, l'art. 222(3) de la LTA demeurait la disposition postérieure. Le juge siégeant en son cabinet était tenu de respecter le régime de priorités établi à l'art. 222(3) de la LTA, et il ne pouvait pas refuser la demande présentée par la Couronne en vue de se faire payer la TPS dans le cadre de la procédure introduite en vertu de la LACC.

## Table of Authorities

### Cases considered by *Deschamps J.*:

*Air Canada, Re* (2003), 42 C.B.R. (4th) 173, 2003 CarswellOnt 2464 (Ont. S.C.J. [Commercial List]) — referred to

*Air Canada, Re* (2003), 2003 CarswellOnt 4967 (Ont. S.C.J. [Commercial List]) — referred to

*Alternative granite & marbre inc., Re* (2009), *(sub nom. Dep. Min. Rev. Quebec v. Caisse populaire Desjardins de Montmagny)* 2009 G.T.C. 2036 (Eng.), *(sub nom. Quebec (Revenue) v. Caisse populaire Desjardins de Montmagny)* [2009] 3 S.C.R. 286, 312 D.L.R. (4th) 577, [2009] G.S.T.C. 154, *(sub nom. 9083-4185 Québec Inc. (Bankrupt), Re)* 394 N.R. 368, 60 C.B.R. (5th) 1, 2009 SCC 49, 2009 CarswellQue 10706, 2009 CarswellQue 10707 (S.C.C.) — referred to

*ATB Financial v. Metcalfe & Mansfield Alternative Investments II Corp.* (2008), 2008 ONCA 587, 2008 CarswellOnt 4811, *(sub nom. Metcalfe & Mansfield Alternative Investments II Corp., Re)* 240 O.A.C. 245, *(sub nom. Metcalfe & Mansfield Alternative Investments II Corp., Re)* 296 D.L.R. (4th) 135, *(sub nom. Metcalfe & Mansfield Alternative Investments II Corp., Re)* 92 O.R. (3d) 513, 45 C.B.R. (5th) 163, 47 B.L.R. (4th) 123 (Ont. C.A.) — considered

*Canadian Airlines Corp., Re* (2000), [2000] 10 W.W.R. 269, 20 C.B.R. (4th) 1, 84 Alta. L.R. (3d) 9, 9 B.L.R. (3d) 41, 2000 CarswellAlta 662, 2000 ABQB 442, 265 A.R. 201 (Alta. Q.B.) — referred to

*Canadian Red Cross Society / Société Canadienne de la Croix Rouge, Re* (2000), 2000 CarswellOnt 3269, 19 C.B.R. (4th) 158 (Ont. S.C.J.) — referred to

*Doré c. Verdun (Municipalité)* (1997), *(sub nom. Doré v. Verdun (City))* [1997] 2 S.C.R. 862, *(sub nom. Doré v. Verdun (Ville))* 215 N.R. 81, *(sub nom. Doré v. Verdun (City))* 150 D.L.R. (4th) 385, 1997 CarswellQue 159, 1997 CarswellQue 850 (S.C.C.) — distinguished

*Dylex Ltd., Re* (1995), 31 C.B.R. (3d) 106, 1995 CarswellOnt 54 (Ont. Gen. Div. [Commercial List]) — considered

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 172 of 493

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

*First Vancouver Finance v. Minister of National Revenue* (2002), [2002] 3 C.T.C. 285, *(sub nom. Minister of National Revenue v. First Vancouver Finance)* 2002 D.T.C. 6998 (Eng.), *(sub nom. Minister of National Revenue v. First Vancouver Finance)* 2002 D.T.C. 7007 (Fr.), 288 N.R. 347, 212 D.L.R. (4th) 615, [2002] G.S.T.C. 23, [2003] 1 W.W.R. 1, 45 C.B.R. (4th) 213, 2002 SCC 49, 2002 CarswellSask 317, 2002 CarswellSask 318, [2002] 2 S.C.R. 720 (S.C.C.) — considered

*Gauntlet Energy Corp., Re* (2003), 30 Alta. L.R. (4th) 192, 2003 ABQB 894, 2003 CarswellAlta 1735, [2003] G.S.T.C. 193, 49 C.B.R. (4th) 213, [2004] 10 W.W.R. 180, 352 A.R. 28 (Alta. Q.B.) — referred to

*Hongkong Bank of Canada v. Chef Ready Foods Ltd.* (1990), 51 B.C.L.R. (2d) 84, 1990 CarswellBC 394, 4 C.B.R. (3d) 311, *(sub nom. Chef Ready Foods Ltd. v. Hongkong Bank of Canada)* [1991] 2 W.W.R. 136 (B.C. C.A.) — referred to

*Ivaco Inc., Re* (2006), 2006 C.E.B. & P.G.R. 8218, 25 C.B.R. (5th) 176, 83 O.R. (3d) 108, 275 D.L.R. (4th) 132, 2006 CarswellOnt 6292, 56 C.C.P.B. 1, 26 B.L.R. (4th) 43 (Ont. C.A.) — referred to

*Komunik Corp., Re* (2010), 2010 CarswellQue 686, 2010 QCCA 183 (Que. C.A.) — referred to

*Komunik Corp., Re* (2009), 2009 QCCS 6332, 2009 CarswellQue 13962 (Que. S.C.) — referred to

*Nova Metal Products Inc. v. Comiskey (Trustee of)* (1990), 1990 CarswellOnt 139, 1 C.B.R. (3d) 101, *(sub nom. Elan Corp. v. Comiskey)* 1 O.R. (3d) 289, *(sub nom. Elan Corp. v. Comiskey)* 41 O.A.C. 282 (Ont. C.A.) — considered

*Ottawa Senators Hockey Club Corp., Re* (2005), 2005 G.T.C. 1327 (Eng.), 6 C.B.R. (5th) 293, 2005 D.T.C. 5233 (Eng.), 2005 CarswellOnt 8, [2005] G.S.T.C. 1, 193 O.A.C. 95, 73 O.R. (3d) 737 (Ont. C.A.) — not followed

*Pacific National Lease Holding Corp., Re* (1992), 72 B.C.L.R. (2d) 368, 19 B.C.A.C. 134, 34 W.A.C. 134, 15 C.B.R. (3d) 265, 1992 CarswellBC 524 (B.C. C.A. [In Chambers]) — referred to

*Philip's Manufacturing Ltd., Re* (1992), 9 C.B.R. (3d) 25, 67 B.C.L.R. (2d) 84, 4 B.L.R. (2d) 142, 1992 CarswellBC 542 (B.C. C.A.) — referred to

*Quebec (Deputy Minister of Revenue) c. Rainville* (1979), *(sub nom. Bourgeault, Re)* 33 C.B.R. (N.S.) 301, *(sub nom. Bourgeault's Estate v. Quebec (Deputy Minister of Revenue))* 30 N.R. 24, *(sub nom. Bourgault, Re)* 105 D.L.R. (3d) 270, 1979 CarswellQue 165, 1979 CarswellQue 266, *(sub nom. Quebec (Deputy Minister of Revenue) v. Bourgeault (Trustee of))* [1980] 1 S.C.R. 35 (S.C.C.) — referred to

*Reference re Companies' Creditors Arrangement Act (Canada)* (1934), [1934] 4 D.L.R. 75, 1934 CarswellNat 1, 16 C.B.R. 1, [1934] S.C.R. 659 (S.C.C.) — referred to

*Royal Bank v. Sparrow Electric Corp.* (1997), 193 A.R. 321, 135 W.A.C. 321, [1997] 2 W.W.R. 457, 208 N.R. 161, 12 P.P.S.A.C. (2d) 68, 1997 CarswellAlta 112, 1997 CarswellAlta 113, 46 Alta. L.R. (3d) 87, *(sub nom. R. v. Royal Bank)* 97 D.T.C. 5089, 143 D.L.R. (4th) 385, 44 C.B.R. (3d) 1, [1997] 1 S.C.R. 411 (S.C.C.) — considered

*Skeena Cellulose Inc., Re* (2003), 2003 CarswellBC 1399, 2003 BCCA 344, 184 B.C.A.C. 54, 302 W.A.C. 54, 43 C.B.R. (4th) 187, 13 B.C.L.R. (4th) 236 (B.C. C.A.) — referred to

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 173 of 493

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

*Skydome Corp., Re* (1998), 16 C.B.R. (4th) 118, 1998 CarswellOnt 5922 (Ont. Gen. Div. [Commercial List]) — referred to

*Solid Resources Ltd., Re* (2002), [2003] G.S.T.C. 21, 2002 CarswellAlta 1699, 40 C.B.R. (4th) 219 (Alta. Q.B.) — referred to

*Stelco Inc., Re* (2005), 253 D.L.R. (4th) 109, 75 O.R. (3d) 5, 2 B.L.R. (4th) 238, 9 C.B.R. (5th) 135, 2005 CarswellOnt 1188, 196 O.A.C. 142 (Ont. C.A.) — referred to

*United Used Auto & Truck Parts Ltd., Re* (1999), 12 C.B.R. (4th) 144, 1999 CarswellBC 2673 (B.C. S.C. [In Chambers]) — referred to

*United Used Auto & Truck Parts Ltd., Re* (2000), 2000 BCCA 146, 135 B.C.A.C. 96, 221 W.A.C. 96, 2000 CarswellBC 414, 73 B.C.L.R. (3d) 236, 16 C.B.R. (4th) 141, [2000] 5 W.W.R. 178 (B.C. C.A.) — referred to

**Cases considered by *Fish J.*:**

*Ottawa Senators Hockey Club Corp., Re* (2005), 2005 G.T.C. 1327 (Eng.), 6 C.B.R. (5th) 293, 2005 D.T.C. 5233 (Eng.), 2005 CarswellOnt 8, [2005] G.S.T.C. 1, 193 O.A.C. 95, 73 O.R. (3d) 737 (Ont. C.A.) — not followed

**Cases considered by *Abella J.* (dissenting):**

*Canada (Attorney General) v. Canada (Public Service Staff Relations Board)* (1977), [1977] 2 F.C. 663, 14 N.R. 257, 74 D.L.R. (3d) 307, 1977 CarswellNat 62, 1977 CarswellNat 62F (Fed. C.A.) — referred to

*Doré c. Verdun (Municipalité)* (1997), *(sub nom. Doré v. Verdun (City))* [1997] 2 S.C.R. 862, *(sub nom. Doré v. Verdun (Ville))* 215 N.R. 81, *(sub nom. Doré v. Verdun (City))* 150 D.L.R. (4th) 385, 1997 CarswellQue 159, 1997 CarswellQue 850 (S.C.C.) — referred to

*Ottawa Senators Hockey Club Corp., Re* (2005), 2005 G.T.C. 1327 (Eng.), 6 C.B.R. (5th) 293, 2005 D.T.C. 5233 (Eng.), 2005 CarswellOnt 8, [2005] G.S.T.C. 1, 193 O.A.C. 95, 73 O.R. (3d) 737 (Ont. C.A.) — considered

*R. v. Tele-Mobile Co.* (2008), 2008 CarswellOnt 1588, 2008 CarswellOnt 1589, 2008 SCC 12, *(sub nom. Tele-Mobile Co. v. Ontario)* 372 N.R. 157, 55 C.R. (6th) 1, *(sub nom. Ontario v. Tele-Mobile Co.)* 229 C.C.C. (3d) 417, *(sub nom. Tele-Mobile Co. v. Ontario)* 235 O.A.C. 369, *(sub nom. Tele-Mobile Co. v. Ontario)* [2008] 1 S.C.R. 305, *(sub nom. R. v. Tele-Mobile Company (Telus Mobility))* 92 O.R. (3d) 478 (note), *(sub nom. Ontario v. Tele-Mobile Co.)* 291 D.L.R. (4th) 193 (S.C.C.) — considered

**Statutes considered by *Deschamps J.*:**

*Bank Act*, S.C. 1991, c. 46
    Generally — referred to

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3
    Generally — referred to

    s. 67(2) — referred to

Case 09-10138-MFW   Doc 14225-51   Filed 08/15/14   Page 174 of 493

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

s. 67(3) — referred to

s. 81.1 [en. 1992, c. 27, s. 38(1)] — considered

s. 81.2 [en. 1992, c. 27, s. 38(1)] — considered

s. 86(1) — considered

s. 86(3) — referred to

*Bankruptcy Act and to amend the Income Tax Act in consequence thereof, Act to amend the*, S.C. 1992, c. 27
  Generally — referred to

  s. 39 — referred to

*Bankruptcy and Insolvency Act, the Companies' Creditors Arrangement Act and the Income Tax Act, Act to amend the*, S.C. 1997, c. 12
  s. 73 — referred to

  s. 125 — referred to

  s. 126 — referred to

*Canada Pension Plan*, R.S.C. 1985, c. C-8
  Generally — referred to

  s. 23(3) — referred to

  s. 23(4) — referred to

*Cités et villes, Loi sur les*, L.R.Q., c. C-19
  en général — referred to

*Code civil du Québec*, L.Q. 1991, c. 64
  en général — referred to

  art. 2930 — referred to

*Companies' Creditors Arrangement Act, Act to Amend*, S.C. 1952-53, c. 3
  Generally — referred to

*Companies' Creditors Arrangement Act, 1933*, S.C. 1932-33, c. 36
  Generally — referred to

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36
  Generally — referred to

  s. 11 — considered

  s. 11(1) — considered

s. 11(3) — referred to

s. 11(4) — referred to

s. 11(6) — referred to

s. 11.02 [en. 2005, c. 47, s. 128] — referred to

s. 11.09 [en. 2005, c. 47, s. 128] — considered

s. 11.4 [en. 1997, c. 12, s. 124] — referred to

s. 18.3 [en. 1997, c. 12, s. 125] — considered

s. 18.3(1) [en. 1997, c. 12, s. 125] — considered

s. 18.3(2) [en. 1997, c. 12, s. 125] — considered

s. 18.4 [en. 1997, c. 12, s. 125] — referred to

s. 18.4(1) [en. 1997, c. 12, s. 125] — considered

s. 18.4(3) [en. 1997, c. 12, s. 125] — considered

s. 20 — considered

s. 21 — considered

s. 37 — considered

s. 37(1) — referred to

*Employment Insurance Act*, S.C. 1996, c. 23
Generally — referred to

s. 86(2) — referred to

s. 86(2.1) [en. 1998, c. 19, s. 266(1)] — referred to

*Excise Tax Act*, R.S.C. 1985, c. E-15
Generally — referred to

s. 222(1) [en. 1990, c. 45, s. 12(1)] — referred to

s. 222(3) [en. 1990, c. 45, s. 12(1)] — considered

*Fairness for the Self-Employed Act*, S.C. 2009, c. 33
Generally — referred to

*Income Tax Act*, R.S.C. 1985, c. 1 (5th Supp.)
s. 227(4) — referred to

s. 227(4.1) [en. 1998, c. 19, s. 226(1)] — referred to

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 176 of 493

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

*Interpretation Act*, R.S.C. 1985, c. I-21
    s. 44(f) — considered

*Personal Property Security Act*, S.A. 1988, c. P-4.05
    Generally — referred to

*Sales Tax and Excise Tax Amendments Act, 1999*, S.C. 2000, c. 30
    Generally — referred to

*Wage Earner Protection Program Act*, S.C. 2005, c. 47, s. 1
    Generally — referred to

    s. 69 — referred to

    s. 128 — referred to

    s. 131 — referred to

**Statutes considered *Fish J.*:**

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3
    Generally — referred to

    s. 67(2) — considered

    s. 67(3) — considered

*Canada Pension Plan*, R.S.C. 1985, c. C-8
    Generally — referred to

    s. 23 — considered

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36
    Generally — referred to

    s. 11 — considered

    s. 18.3(1) [en. 1997, c. 12, s. 125] — considered

    s. 18.3(2) [en. 1997, c. 12, s. 125] — considered

    s. 37(1) — considered

*Employment Insurance Act*, S.C. 1996, c. 23
    Generally — referred to

    s. 86(2) — referred to

    s. 86(2.1) [en. 1998, c. 19, s. 266(1)] — referred to

*Excise Tax Act*, R.S.C. 1985, c. E-15

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 177 of 493

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

Generally — referred to

s. 222 [en. 1990, c. 45, s. 12(1)] — considered

s. 222(1) [en. 1990, c. 45, s. 12(1)] — considered

s. 222(3) [en. 1990, c. 45, s. 12(1)] — considered

s. 222(3)(a) [en. 1990, c. 45, s. 12(1)] — considered

*Income Tax Act*, R.S.C. 1985, c. 1 (5th Supp.)
Generally — referred to

s. 227(4) — considered

s. 227(4.1) [en. 1998, c. 19, s. 226(1)] — considered

s. 227(4.1)(a) [en. 1998, c. 19, s. 226(1)] — considered

**Statutes considered *Abella J.* (dissenting):**

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3
Generally — referred to

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36
Generally — referred to

s. 11 — considered

s. 11(1) — considered

s. 11(3) — considered

s. 18.3(1) [en. 1997, c. 12, s. 125] — considered

s. 37(1) — considered

*Excise Tax Act*, R.S.C. 1985, c. E-15
Generally — referred to

s. 222 [en. 1990, c. 45, s. 12(1)] — considered

s. 222(3) [en. 1990, c. 45, s. 12(1)] — considered

*Interpretation Act*, R.S.C. 1985, c. I-21
s. 2(1)"enactment" — considered

s. 44(f) — considered

*Winding-up and Restructuring Act*, R.S.C. 1985, c. W-11
Generally — referred to

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 178 of 493

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

APPEAL by creditor from judgment reported at 2009 CarswellBC 1195, 2009 BCCA 205, [2009] G.S.T.C. 79, 98 B.C.L.R. (4th) 242, [2009] 12 W.W.R. 684, 270 B.C.A.C. 167, 454 W.A.C. 167, 2009 G.T.C. 2020 (Eng.) (B.C. C.A.), allowing Crown's appeal from dismissal of application for immediate payment of tax debt.

**Deschamps J.:**

1    For the first time this Court is called upon to directly interpret the provisions of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("*CCAA*"). In that respect, two questions are raised. The first requires reconciliation of provisions of the *CCAA* and the *Excise Tax Act*, R.S.C. 1985, c. E-15 ("*ETA*"), which lower courts have held to be in conflict with one another. The second concerns the scope of a court's discretion when supervising reorganization. The relevant statutory provisions are reproduced in the Appendix. On the first question, having considered the evolution of Crown priorities in the context of insolvency and the wording of the various statutes creating Crown priorities, I conclude that it is the *CCAA* and not the *ETA* that provides the rule. On the second question, I conclude that the broad discretionary jurisdiction conferred on the supervising judge must be interpreted having regard to the remedial nature of the *CCAA* and insolvency legislation generally. Consequently, the court had the discretion to partially lift a stay of proceedings to allow the debtor to make an assignment under the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 ("*BIA*"). I would allow the appeal.

## 1. Facts and Decisions of the Courts Below

2    Ted LeRoy Trucking Ltd. ("LeRoy Trucking") commenced proceedings under the *CCAA* in the Supreme Court of British Columbia on December 13, 2007, obtaining a stay of proceedings with a view to reorganizing its financial affairs. LeRoy Trucking sold certain redundant assets as authorized by the order.

3    Amongst the debts owed by LeRoy Trucking was an amount for Goods and Services Tax ("GST") collected but unremitted to the Crown. The *ETA* creates a deemed trust in favour of the Crown for amounts collected in respect of GST. The deemed trust extends to any property or proceeds held by the person collecting GST and any property of that person held by a secured creditor, requiring that property to be paid to the Crown in priority to all security interests. The *ETA* provides that the deemed trust operates despite any other enactment of Canada except the *BIA*. However, the *CCAA* also provides that subject to certain exceptions, none of which mentions GST, deemed trusts in favour of the Crown do not operate under the *CCAA*. Accordingly, under the *CCAA* the Crown ranks as an unsecured creditor in respect of GST. Nonetheless, at the time LeRoy Trucking commenced *CCAA* proceedings the leading line of jurisprudence held that the *ETA* took precedence over the *CCAA* such that the Crown enjoyed priority for GST claims under the *CCAA*, even though it would have lost that same priority under the *BIA*. The *CCAA* underwent substantial amendments in 2005 in which some of the provisions at issue in this appeal were renumbered and reformulated (S.C. 2005, c. 47). However, these amendments only came into force on September 18, 2009. I will refer to the amended provisions only where relevant.

4    On April 29, 2008, Brenner C.J.S.C., in the context of the *CCAA* proceedings, approved a payment not exceeding $5 million, the proceeds of redundant asset sales, to Century Services, the debtor's major secured creditor. LeRoy Trucking proposed to hold back an amount equal to the GST monies collected but unremitted to the Crown and place it in the Monitor's trust account until the outcome of the reorganization was known. In order to maintain the *status quo* while the success of the reorganization was uncertain, Brenner C.J.S.C. agreed to the proposal and ordered that an amount of $305,202.30 be held by the Monitor in its trust account.

5    On September 3, 2008, having concluded that reorganization was not possible, LeRoy Trucking sought leave to make an assignment in bankruptcy under the *BIA*. The Crown sought an order that the GST monies held by the Monitor be paid to the Receiver General of Canada. Brenner C.J.S.C. dismissed the latter application. Reasoning that the purpose of segregating the funds with the Monitor was "to facilitate an ultimate payment of the GST monies which were owed pre-filing, but only if a viable plan emerged", the failure of such a reorganization, followed by an assignment in bankruptcy, meant the Crown would lose priority under the *BIA* (2008 BCSC 1805, [2008] G.S.T.C. 221 (B.C. S.C. [In Chambers])).

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 179 of 493

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

6      The Crown's appeal was allowed by the British Columbia Court of Appeal (2009 BCCA 205, [2009] G.S.T.C. 79, 270 B.C.A.C. 167 (B.C. C.A.)). Tysoe J.A. for a unanimous court found two independent bases for allowing the Crown's appeal.

7      First, the court's authority under s. 11 of the *CCAA* was held not to extend to staying the Crown's application for immediate payment of the GST funds subject to the deemed trust after it was clear that reorganization efforts had failed and that bankruptcy was inevitable. As restructuring was no longer a possibility, staying the Crown's claim to the GST funds no longer served a purpose under the *CCAA* and the court was bound under the priority scheme provided by the *ETA* to allow payment to the Crown. In so holding, Tysoe J.A. adopted the reasoning in *Ottawa Senators Hockey Club Corp. (Re)*, [2005] G.S.T.C. 1, 73 O.R. (3d) 737 (Ont. C.A.), which found that the *ETA* deemed trust for GST established Crown priority over secured creditors under the *CCAA*.

8    Second, Tysoe J.A. concluded that by ordering the GST funds segregated in the Monitor's trust account on April 29, 2008, the judge had created an express trust in favour of the Crown from which the monies in question could not be diverted for any other purposes. The Court of Appeal therefore ordered that the money held by the Monitor in trust be paid to the Receiver General.

## 2. Issues

9      This appeal raises three broad issues which are addressed in turn:

(1) Did s. 222(3) of the *ETA* displace s. 18.3(1) of the *CCAA* and give priority to the Crown's *ETA* deemed trust during *CCAA* proceedings as held in *Ottawa Senators*?

(2) Did the court exceed its *CCAA* authority by lifting the stay to allow the debtor to make an assignment in bankruptcy?

(3) Did the court's order of April 29, 2008 requiring segregation of the Crown's GST claim in the Monitor's trust account create an express trust in favour of the Crown in respect of those funds?

## 3. Analysis

10      The first issue concerns Crown priorities in the context of insolvency. As will be seen, the *ETA* provides for a deemed trust in favour of the Crown in respect of GST owed by a debtor "[d]espite ... any other enactment of Canada (except the *Bankruptcy and Insolvency Act*)" (s. 222(3)), while the *CCAA* stated at the relevant time that "notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be [so] regarded" (s. 18.3(1)). It is difficult to imagine two statutory provisions more apparently in conflict. However, as is often the case, the apparent conflict can be resolved through interpretation.

11      In order to properly interpret the provisions, it is necessary to examine the history of the *CCAA*, its function amidst the body of insolvency legislation enacted by Parliament, and the principles that have been recognized in the jurisprudence. It will be seen that Crown priorities in the insolvency context have been significantly pared down. The resolution of the second issue is also rooted in the context of the *CCAA*, but its purpose and the manner in which it has been interpreted in the case law are also key. After examining the first two issues in this case, I will address Tysoe J.A.'s conclusion that an express trust in favour of the Crown was created by the court's order of April 29, 2008.

### 3.1 Purpose and Scope of Insolvency Law

12      Insolvency is the factual situation that arises when a debtor is unable to pay creditors (see generally, R. J. Wood, *Bankruptcy and Insolvency Law* (2009), at p. 16). Certain legal proceedings become available upon insolvency, which typically allow a debtor to obtain a court order staying its creditors' enforcement actions and attempt to obtain a binding compromise with creditors to adjust the payment conditions to something more realistic. Alternatively, the debtor's assets may be liquidated and debts paid from the proceeds according to statutory priority rules. The former is usually referred to as reorganization or restructuring while the latter is termed liquidation.

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 180 of 493

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

13      Canadian commercial insolvency law is not codified in one exhaustive statute. Instead, Parliament has enacted multiple insolvency statutes, the main one being the *BIA*. The *BIA* offers a self-contained legal regime providing for both reorganization and liquidation. Although bankruptcy legislation has a long history, the *BIA* itself is a fairly recent statute — it was enacted in 1992. It is characterized by a rules-based approach to proceedings. The *BIA* is available to insolvent debtors owing $1000 or more, regardless of whether they are natural or legal persons. It contains mechanisms for debtors to make proposals to their creditors for the adjustment of debts. If a proposal fails, the *BIA* contains a bridge to bankruptcy whereby the debtor's assets are liquidated and the proceeds paid to creditors in accordance with the statutory scheme of distribution.

14      Access to the *CCAA* is more restrictive. A debtor must be a company with liabilities in excess of $5 million. Unlike the *BIA*, the *CCAA* contains no provisions for liquidation of a debtor's assets if reorganization fails. There are three ways of exiting *CCAA* proceedings. The best outcome is achieved when the stay of proceedings provides the debtor with some breathing space during which solvency is restored and the *CCAA* process terminates without reorganization being needed. The second most desirable outcome occurs when the debtor's compromise or arrangement is accepted by its creditors and the reorganized company emerges from the *CCAA* proceedings as a going concern. Lastly, if the compromise or arrangement fails, either the company or its creditors usually seek to have the debtor's assets liquidated under the applicable provisions of the *BIA* or to place the debtor into receivership. As discussed in greater detail below, the key difference between the reorganization regimes under the *BIA* and the *CCAA* is that the latter offers a more flexible mechanism with greater judicial discretion, making it more responsive to complex reorganizations.

15      As I will discuss at greater length below, the purpose of the *CCAA* — Canada's first reorganization statute — is to permit the debtor to continue to carry on business and, where possible, avoid the social and economic costs of liquidating its assets. Proposals to creditors under the *BIA* serve the same remedial purpose, though this is achieved through a rules-based mechanism that offers less flexibility. Where reorganization is impossible, the *BIA* may be employed to provide an orderly mechanism for the distribution of a debtor's assets to satisfy creditor claims according to predetermined priority rules.

16      Prior to the enactment of the *CCAA* in 1933 (S.C. 1932-33, c. 36), practice under existing commercial insolvency legislation tended heavily towards the liquidation of a debtor company (J. Sarra, *Creditor Rights and the Public Interest: Restructuring Insolvent Corporations* (2003), at p. 12). The battering visited upon Canadian businesses by the Great Depression and the absence of an effective mechanism for reaching a compromise between debtors and creditors to avoid liquidation required a legislative response. The *CCAA* was innovative as it allowed the insolvent debtor to attempt reorganization under judicial supervision outside the existing insolvency legislation which, once engaged, almost invariably resulted in liquidation (*Reference re Companies' Creditors Arrangement Act (Canada)*, [1934] S.C.R. 659 (S.C.C.), at pp. 660-61; Sarra, *Creditor Rights*, at pp. 12-13).

17      Parliament understood when adopting the *CCAA* that liquidation of an insolvent company was harmful for most of those it affected — notably creditors and employees — and that a workout which allowed the company to survive was optimal (Sarra, *Creditor Rights*, at pp. 13-15).

18      Early commentary and jurisprudence also endorsed the *CCAA's* remedial objectives. It recognized that companies retain more value as going concerns while underscoring that intangible losses, such as the evaporation of the companies' goodwill, result from liquidation (S. E. Edwards, "Reorganizations Under the Companies' Creditors Arrangement Act" (1947), 25 *Can. Bar Rev.* 587, at p. 592). Reorganization serves the public interest by facilitating the survival of companies supplying goods or services crucial to the health of the economy or saving large numbers of jobs (*ibid.*, at p. 593). Insolvency could be so widely felt as to impact stakeholders other than creditors and employees. Variants of these views resonate today, with reorganization justified in terms of rehabilitating companies that are key elements in a complex web of interdependent economic relationships in order to avoid the negative consequences of liquidation.

19      The *CCAA* fell into disuse during the next several decades, likely because amendments to the Act in 1953 restricted its use to companies issuing bonds (S.C. 1952-53, c. 3). During the economic downturn of the early 1980s, insolvency lawyers and courts adapting to the resulting wave of insolvencies resurrected the statute and deployed it in response to new economic

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 181 of 493

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

challenges. Participants in insolvency proceedings grew to recognize and appreciate the statute's distinguishing feature: a grant of broad and flexible authority to the supervising court to make the orders necessary to facilitate the reorganization of the debtor and achieve the *CCAA's* objectives. The manner in which courts have used *CCAA* jurisdiction in increasingly creative and flexible ways is explored in greater detail below.

20    Efforts to evolve insolvency law were not restricted to the courts during this period. In 1970, a government-commissioned panel produced an extensive study recommending sweeping reform but Parliament failed to act (see *Bankruptcy and Insolvency: Report of the Study Committee on Bankruptcy and Insolvency Legislation* (1970)). Another panel of experts produced more limited recommendations in 1986 which eventually resulted in enactment of the *Bankruptcy and Insolvency Act* of 1992 (S.C. 1992, c. 27) (see *Proposed Bankruptcy Act Amendments: Report of the Advisory Committee on Bankruptcy and Insolvency* (1986)). Broader provisions for reorganizing insolvent debtors were then included in Canada's bankruptcy statute. Although the 1970 and 1986 reports made no specific recommendations with respect to the *CCAA*, the House of Commons committee studying the *BIA*'s predecessor bill, C-22, seemed to accept expert testimony that the *BIA*'s new reorganization scheme would shortly supplant the *CCAA*, which could then be repealed, with commercial insolvency and bankruptcy being governed by a single statute (*Minutes of Proceedings and Evidence of the Standing Committee on Consumer and Corporate Affairs and Government Operations*, Issue No. 15, October 3, 1991, at pp. 15:15-15:16).

21    In retrospect, this conclusion by the House of Commons committee was out of step with reality. It overlooked the renewed vitality the *CCAA* enjoyed in contemporary practice and the advantage that a flexible judicially supervised reorganization process presented in the face of increasingly complex reorganizations, when compared to the stricter rules-based scheme contained in the *BIA*. The "flexibility of the *CCAA* [was seen as] a great benefit, allowing for creative and effective decisions" (Industry Canada, Marketplace Framework Policy Branch, *Report on the Operation and Administration of the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act* (2002), at p. 41). Over the past three decades, resurrection of the *CCAA* has thus been the mainspring of a process through which, one author concludes, "the legal setting for Canadian insolvency restructuring has evolved from a rather blunt instrument to one of the most sophisticated systems in the developed world" (R. B. Jones, "The Evolution of Canadian Restructuring: Challenges for the Rule of Law", in J. P. Sarra, ed., *Annual Review of Insolvency Law 2005* (2006), 481, at p. 481).

22    While insolvency proceedings may be governed by different statutory schemes, they share some commonalities. The most prominent of these is the single proceeding model. The nature and purpose of the single proceeding model are described by Professor Wood in *Bankruptcy and Insolvency Law*:

> They all provide a collective proceeding that supersedes the usual civil process available to creditors to enforce their claims. The creditors' remedies are collectivized in order to prevent the free-for-all that would otherwise prevail if creditors were permitted to exercise their remedies. In the absence of a collective process, each creditor is armed with the knowledge that if they do not strike hard and swift to seize the debtor's assets, they will be beat out by other creditors. [pp. 2-3]

The single proceeding model avoids the inefficiency and chaos that would attend insolvency if each creditor initiated proceedings to recover its debt. Grouping all possible actions against the debtor into a single proceeding controlled in a single forum facilitates negotiation with creditors because it places them all on an equal footing, rather than exposing them to the risk that a more aggressive creditor will realize its claims against the debtor's limited assets while the other creditors attempt a compromise. With a view to achieving that purpose, both the *CCAA* and the *BIA* allow a court to order all actions against a debtor to be stayed while a compromise is sought.

23    Another point of convergence of the *CCAA* and the *BIA* relates to priorities. Because the *CCAA* is silent about what happens if reorganization fails, the *BIA* scheme of liquidation and distribution necessarily supplies the backdrop for what will happen if a *CCAA* reorganization is ultimately unsuccessful. In addition, one of the important features of legislative reform of both statutes since the enactment of the *BIA* in 1992 has been a cutback in Crown priorities (S.C. 1992, c. 27, s. 39; S.C. 1997, c. 12, ss. 73 and 125; S.C. 2000, c. 30, s. 148; S.C. 2005, c. 47, ss. 69 and 131; S.C. 2009, c. 33, ss. 25 and 29; see also *Alternative granite & marbre inc., Re*, 2009 SCC 49, [2009] 3 S.C.R. 286, [2009] G.S.T.C. 154 (S.C.C.); *Quebec (Deputy*

*Minister of Revenue) c. Rainville* (1979), [1980] 1 S.C.R. 35 (S.C.C.); *Proposed Bankruptcy Act Amendments: Report of the Advisory Committee on Bankruptcy and Insolvency* (1986)).

24      With parallel *CCAA* and *BIA* restructuring schemes now an accepted feature of the insolvency law landscape, the contemporary thrust of legislative reform has been towards harmonizing aspects of insolvency law common to the two statutory schemes to the extent possible and encouraging reorganization over liquidation (see *An Act to establish the Wage Earner Protection Program Act, to amend the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act and to make consequential amendments to other Acts*, S.C. 2005, c. 47; *Gauntlet Energy Corp., Re*, 2003 ABQB 894, [2003] G.S.T.C. 193, 30 Alta. L.R. (4th) 192 (Alta. Q.B.), at para. 19).

25      Mindful of the historical background of the *CCAA* and *BIA*, I now turn to the first question at issue.

### *3.2 GST Deemed Trust Under the CCAA*

26      The Court of Appeal proceeded on the basis that the *ETA* precluded the court from staying the Crown's enforcement of the GST deemed trust when partially lifting the stay to allow the debtor to enter bankruptcy. In so doing, it adopted the reasoning in a line of cases culminating in *Ottawa Senators*, which held that an *ETA* deemed trust remains enforceable during *CCAA* reorganization despite language in the *CCAA* that suggests otherwise.

27      The Crown relies heavily on the decision of the Ontario Court of Appeal in *Ottawa Senators* and argues that the later in time provision of the *ETA* creating the GST deemed trust trumps the provision of the *CCAA* purporting to nullify most statutory deemed trusts. The Court of Appeal in this case accepted this reasoning but not all provincial courts follow it (see, e.g., *Komunik Corp., Re*, 2009 QCCS 6332 (Que. S.C.), leave to appeal granted, 2010 QCCA 183 (Que. C.A.)). Century Services relied, in its written submissions to this Court, on the argument that the court had authority under the *CCAA* to continue the stay against the Crown's claim for unremitted GST. In oral argument, the question of whether *Ottawa Senators* was correctly decided nonetheless arose. After the hearing, the parties were asked to make further written submissions on this point. As appears evident from the reasons of my colleague Abella J., this issue has become prominent before this Court. In those circumstances, this Court needs to determine the correctness of the reasoning in *Ottawa Senators*.

28      The policy backdrop to this question involves the Crown's priority as a creditor in insolvency situations which, as I mentioned above, has evolved considerably. Prior to the 1990s, Crown claims largely enjoyed priority in insolvency. This was widely seen as unsatisfactory as shown by both the 1970 and 1986 insolvency reform proposals, which recommended that Crown claims receive no preferential treatment. A closely related matter was whether the *CCAA* was binding at all upon the Crown. Amendments to the *CCAA* in 1997 confirmed that it did indeed bind the Crown (see *CCAA*, s. 21, as am. by S.C. 1997, c. 12, s. 126).

29      Claims of priority by the state in insolvency situations receive different treatment across jurisdictions worldwide. For example, in Germany and Australia, the state is given no priority at all, while the state enjoys wide priority in the United States and France (see B. K. Morgan, "Should the Sovereign be Paid First? A Comparative International Analysis of the Priority for Tax Claims in Bankruptcy" (2000), 74 *Am. Bank. L.J.* 461, at p. 500). Canada adopted a middle course through legislative reform of Crown priority initiated in 1992. The Crown retained priority for source deductions of income tax, Employment Insurance ("EI") and Canada Pension Plan ("CPP") premiums, but ranks as an ordinary unsecured creditor for most other claims.

30      Parliament has frequently enacted statutory mechanisms to secure Crown claims and permit their enforcement. The two most common are statutory deemed trusts and powers to garnish funds third parties owe the debtor (see F. L. Lamer, *Priority of Crown Claims in Insolvency* (loose-leaf), at § 2).

31      With respect to GST collected, Parliament has enacted a deemed trust. The *ETA* states that every person who collects an amount on account of GST is deemed to hold that amount in trust for the Crown (s. 222(1)). The deemed trust extends to other property of the person collecting the tax equal in value to the amount deemed to be in trust if that amount has not been remitted in accordance with the *ETA*. The deemed trust also extends to property held by a secured creditor that, but for the security interest, would be property of the person collecting the tax (s. 222(3)).

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 183 of 493
Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

32    Parliament has created similar deemed trusts using almost identical language in respect of source deductions of income tax, EI premiums and CPP premiums (see s. 227(4) of the *Income Tax Act*, R.S.C. 1985, c. 1 (5th Supp.) ("*ITA*"), ss. 86(2) and (2.1) of the *Employment Insurance Act*, S.C. 1996, c. 23, and ss. 23(3) and (4) of the *Canada Pension Plan*, R.S.C. 1985, c. C-8). I will refer to income tax, EI and CPP deductions as "source deductions".

33    In *Royal Bank v. Sparrow Electric Corp.*, [1997] 1 S.C.R. 411 (S.C.C.), this Court addressed a priority dispute between a deemed trust for source deductions under the *ITA* and security interests taken under both the *Bank Act*, S.C. 1991, c. 46, and the Alberta *Personal Property Security Act*, S.A. 1988, c. P-4.05 ("*PPSA*"). As then worded, an *ITA* deemed trust over the debtor's property equivalent to the amount owing in respect of income tax became effective at the time of liquidation, receivership, or assignment in bankruptcy. *Sparrow Electric* held that the *ITA* deemed trust could not prevail over the security interests because, being fixed charges, the latter attached as soon as the debtor acquired rights in the property such that the *ITA* deemed trust had no property on which to attach when it subsequently arose. Later, in *First Vancouver Finance v. Minister of National Revenue*, 2002 SCC 49, [2002] G.S.T.C. 23, [2002] 2 S.C.R. 720 (S.C.C.), this Court observed that Parliament had legislated to strengthen the statutory deemed trust in the *ITA* by deeming it to operate from the moment the deductions were not paid to the Crown as required by the *ITA*, and by granting the Crown priority over all security interests (paras. 27-29) (the "*Sparrow Electric* amendment").

34    The amended text of s. 227(4.1) of the *ITA* and concordant source deductions deemed trusts in the *Canada Pension Plan* and the *Employment Insurance Act* state that the deemed trust operates notwithstanding any other enactment of Canada, except ss. 81.1 and 81.2 of the *BIA*. The *ETA* deemed trust at issue in this case is similarly worded, but it excepts the *BIA* in its entirety. The provision reads as follows:

> **222.** (3) Despite any other provision of this Act (except subsection (4)), any other enactment of Canada (except the *Bankruptcy and Insolvency Act*), any enactment of a province or any other law, if at any time an amount deemed by subsection (1) to be held by a person in trust for Her Majesty is not remitted to the Receiver General or withdrawn in the manner and at the time provided under this Part, property of the person and property held by any secured creditor of the person that, but for a security interest, would be property of the person, equal in value to the amount so deemed to be held in trust, is deemed ....

35    The Crown submits that the *Sparrow Electric* amendment, added by Parliament to the *ETA* in 2000, was intended to preserve the Crown's priority over collected GST under the *CCAA* while subordinating the Crown to the status of an unsecured creditor in respect of GST only under the *BIA*. This is because the *ETA* provides that the GST deemed trust is effective "despite" any other enactment except the *BIA*.

36    The language used in the *ETA* for the GST deemed trust creates an apparent conflict with the *CCAA*, which provides that subject to certain exceptions, property deemed by statute to be held in trust for the Crown shall not be so regarded.

37    Through a 1997 amendment to the *CCAA* (S.C. 1997, c. 12, s. 125), Parliament appears to have, subject to specific exceptions, nullified deemed trusts in favour of the Crown once reorganization proceedings are commenced under the Act. The relevant provision reads:

> **18.3** (1) Subject to subsection (2), notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

This nullification of deemed trusts was continued in further amendments to the *CCAA* (S.C. 2005, c. 47), where s. 18.3(1) was renumbered and reformulated as s. 37(1):

> **37.** (1) Subject to subsection (2), despite any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as being held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

38    An analogous provision exists in the *BIA*, which, subject to the same specific exceptions, nullifies statutory deemed trusts and makes property of the bankrupt that would otherwise be subject to a deemed trust part of the debtor's estate and available to creditors (S.C. 1992, c. 27, s. 39; S.C. 1997, c. 12, s. 73; *BIA*, s. 67(2)). It is noteworthy that in both the *CCAA* and the *BIA*, the exceptions concern source deductions (*CCAA*, s. 18.3(2); *BIA*, s. 67(3)). The relevant provision of the *CCAA* reads:

> **18.3** (2) Subsection (1) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act*....

Thus, the Crown's deemed trust and corresponding priority in source deductions remain effective both in reorganization and in bankruptcy.

39    Meanwhile, in both s. 18.4(1) of the *CCAA* and s. 86(1) of the *BIA*, other Crown claims are treated as unsecured. These provisions, establishing the Crown's status as an unsecured creditor, explicitly exempt statutory deemed trusts in source deductions *(CCAA*, s. 18.4(3); *BIA*, s. 86(3)). The *CCAA* provision reads as follows:

> **18.4** (3) Subsection (1) [Crown ranking as unsecured creditor] does not affect the operation of
>
> (a) subsections 224(1.2) and (1.3) of the *Income Tax Act*,
>
> (b) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution ....

Therefore, not only does the *CCAA* provide that Crown claims do not enjoy priority over the claims of other creditors (s. 18.3(1)), but the exceptions to this rule (i.e., that Crown priority is maintained for source deductions) are repeatedly stated in the statute.

40    The apparent conflict in this case is whether the rule in the *CCAA* first enacted as s. 18.3 in 1997, which provides that subject to certain explicit exceptions, statutory deemed trusts are ineffective under the *CCAA*, is overridden by the one in the *ETA* enacted in 2000 stating that GST deemed trusts operate despite any enactment of Canada except the *BIA*. With respect for my colleague Fish J., I do not think the apparent conflict can be resolved by denying it and creating a rule requiring both a statutory provision enacting the deemed trust, and a second statutory provision confirming it. Such a rule is unknown to the law. Courts must recognize conflicts, apparent or real, and resolve them when possible.

41    A line of jurisprudence across Canada has resolved the apparent conflict in favour of the *ETA*, thereby maintaining GST deemed trusts under the *CCAA*. *Ottawa Senators*, the leading case, decided the matter by invoking the doctrine of implied repeal to hold that the later in time provision of the *ETA* should take precedence over the *CCAA* (see also *Solid Resources Ltd., Re* (2002), 40 C.B.R. (4th) 219, [2003] G.S.T.C. 21 (Alta. Q.B.); *Gauntlet*

42    The Ontario Court of Appeal in *Ottawa Senators* rested its conclusion on two considerations. First, it was persuaded that by explicitly mentioning the *BIA* in *ETA* s. 222(3), but not the *CCAA*, Parliament made a deliberate choice. In the words of MacPherson J.A.:

> The *BIA* and the *CCAA* are closely related federal statutes. I cannot conceive that Parliament would specifically identify the *BIA* as an exception, but accidentally fail to consider the *CCAA* as a possible second exception. In my view, the omission of the *CCAA* from s. 222(3) of the *ETA* was almost certainly a considered omission. [para. 43]

43    Second, the Ontario Court of Appeal compared the conflict between the *ETA* and the *CCAA* to that before this Court in *Doré c. Verdun (Municipalité)*, [1997] 2 S.C.R. 862 (S.C.C.), and found them to be "identical" (para. 46). It therefore considered *Doré* binding (para. 49). In *Doré*, a limitations provision in the more general and recently enacted *Civil Code of Québec*, S.Q. 1991, c. 64 ("*C.C.Q.*"), was held to have repealed a more specific provision of the earlier Quebec *Cities and Towns Act*, R.S.Q., c. C-19, with which it conflicted. By analogy, the Ontario Court of Appeal held that the later in time and more general provision, s. 222(3) of the *ETA*, impliedly repealed the more specific and earlier in time provision, s. 18.3(1) of the *CCAA* (paras. 47-49).

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 185 of 493

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

44    Viewing this issue in its entire context, several considerations lead me to conclude that neither the reasoning nor the result in *Ottawa Senators* can stand. While a conflict may exist at the level of the statutes' wording, a purposive and contextual analysis to determine Parliament's true intent yields the conclusion that Parliament could not have intended to restore the Crown's deemed trust priority in GST claims under the *CCAA* when it amended the *ETA* in 2000 with the *Sparrow Electric* amendment.

45    I begin by recalling that Parliament has shown its willingness to move away from asserting priority for Crown claims in insolvency law. Section 18.3(1) of the *CCAA* (subject to the s. 18.3(2) exceptions) provides that the Crown's deemed trusts have no effect under the *CCAA*. Where Parliament has sought to protect certain Crown claims through statutory deemed trusts and intended that these deemed trusts continue in insolvency, it has legislated so explicitly and elaborately. For example, s. 18.3(2) of the *CCAA* and s. 67(3) of the *BIA* expressly provide that deemed trusts for source deductions remain effective in insolvency. Parliament has, therefore, clearly carved out exceptions from the general rule that deemed trusts are ineffective in insolvency. The *CCAA* and *BIA* are in harmony, preserving deemed trusts and asserting Crown priority only in respect of source deductions. Meanwhile, there is no express statutory basis for concluding that GST claims enjoy a preferred treatment under the *CCAA* or the *BIA*. Unlike source deductions, which are clearly and expressly dealt with under both these insolvency statutes, no such clear and express language exists in those Acts carving out an exception for GST claims.

46    The internal logic of the *CCAA* also militates against upholding the *ETA* deemed trust for GST. The *CCAA* imposes limits on a suspension by the court of the Crown's rights in respect of source deductions but does not mention the *ETA* (s. 11.4). Since source deductions deemed trusts are granted explicit protection under the *CCAA*, it would be inconsistent to afford a better protection to the *ETA* deemed trust absent explicit language in the *CCAA*. Thus, the logic of the *CCAA* appears to subject the *ETA* deemed trust to the waiver by Parliament of its priority (s. 18.4).

47    Moreover, a strange asymmetry would arise if the interpretation giving the *ETA* priority over the *CCAA* urged by the Crown is adopted here: the Crown would retain priority over GST claims during *CCAA* proceedings but not in bankruptcy. As courts have reflected, this can only encourage statute shopping by secured creditors in cases such as this one where the debtor's assets cannot satisfy both the secured creditors' and the Crown's claims (*Gauntlet*, at para. 21). If creditors' claims were better protected by liquidation under the *BIA*, creditors' incentives would lie overwhelmingly with avoiding proceedings under the *CCAA* and not risking a failed reorganization. Giving a key player in any insolvency such skewed incentives against reorganizing under the *CCAA* can only undermine that statute's remedial objectives and risk inviting the very social ills that it was enacted to avert.

48    Arguably, the effect of *Ottawa Senators* is mitigated if restructuring is attempted under the *BIA* instead of the *CCAA*, but it is not cured. If *Ottawa Senators* were to be followed, Crown priority over GST would differ depending on whether restructuring took place under the *CCAA* or the *BIA*. The anomaly of this result is made manifest by the fact that it would deprive companies of the option to restructure under the more flexible and responsive *CCAA* regime, which has been the statute of choice for complex reorganizations.

49    Evidence that Parliament intended different treatments for GST claims in reorganization and bankruptcy is scant, if it exists at all. Section 222(3) of the *ETA* was enacted as part of a wide-ranging budget implementation bill in 2000. The summary accompanying that bill does not indicate that Parliament intended to elevate Crown priority over GST claims under the *CCAA* to the same or a higher level than source deductions claims. Indeed, the summary for deemed trusts states only that amendments to existing provisions are aimed at "ensuring that employment insurance premiums and Canada Pension Plan contributions that are required to be remitted by an employer are fully recoverable by the Crown in the case of the bankruptcy of the employer" (Summary to S.C. 2000, c. 30, at p. 4a). The wording of GST deemed trusts resembles that of statutory deemed trusts for source deductions and incorporates the same overriding language and reference to the *BIA*. However, as noted above, Parliament's express intent is that only source deductions deemed trusts remain operative. An exception for the *BIA* in the statutory language establishing the source deductions deemed trusts accomplishes very little, because the explicit language of the *BIA* itself (and the *CCAA*) carves out these source deductions deemed trusts and maintains their effect. It is however noteworthy that no equivalent language maintaining GST deemed trusts exists under either the *BIA* or the *CCAA*.

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 186 of 493

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

50     It seems more likely that by adopting the same language for creating GST deemed trusts in the *ETA* as it did for deemed trusts for source deductions, and by overlooking the inclusion of an exception for the *CCAA* alongside the *BIA* in s. 222(3) of the *ETA*, Parliament may have inadvertently succumbed to a drafting anomaly. Because of a statutory lacuna in the *ETA*, the GST deemed trust could be seen as remaining effective in the *CCAA*, while ceasing to have any effect under the *BIA*, thus creating an apparent conflict with the wording of the *CCAA*. However, it should be seen for what it is: a facial conflict only, capable of resolution by looking at the broader approach taken to Crown priorities and by giving precedence to the statutory language of s. 18.3 of the *CCAA* in a manner that does not produce an anomalous outcome.

51     Section 222(3) of the *ETA* evinces no explicit intention of Parliament to repeal *CCAA* s. 18.3. It merely creates an apparent conflict that must be resolved by statutory interpretation. Parliament's intent when it enacted *ETA* s. 222(3) was therefore far from unambiguous. Had it sought to give the Crown a priority for GST claims, it could have done so explicitly as it did for source deductions. Instead, one is left to infer from the language of *ETA* s. 222(3) that the GST deemed trust was intended to be effective under the *CCAA*.

52     I am not persuaded that the reasoning in *Doré* requires the application of the doctrine of implied repeal in the circumstances of this case. The main issue in *Doré* concerned the impact of the adoption of the *C.C.Q.* on the administrative law rules with respect to municipalities. While Gonthier J. concluded in that case that the limitation provision in art. 2930 *C.C.Q.* had repealed by implication a limitation provision in the *Cities and Towns Act*, he did so on the basis of more than a textual analysis. The conclusion in *Doré* was reached after thorough contextual analysis of both pieces of legislation, including an extensive review of the relevant legislative history (paras. 31-41). Consequently, the circumstances before this Court in *Doré* are far from "identical" to those in the present case, in terms of text, context and legislative history. Accordingly, *Doré* cannot be said to require the automatic application of the rule of repeal by implication.

53     A noteworthy indicator of Parliament's overall intent is the fact that in subsequent amendments it has not displaced the rule set out in the *CCAA*. Indeed, as indicated above, the recent amendments to the *CCAA* in 2005 resulted in the rule previously found in s. 18.3 being renumbered and reformulated as s. 37. Thus, to the extent the interpretation allowing the GST deemed trust to remain effective under the *CCAA* depends on *ETA* s. 222(3) having impliedly repealed *CCAA* s. 18.3(1) because it is later in time, we have come full circle. Parliament has renumbered and reformulated the provision of the *CCAA* stating that, subject to exceptions for source deductions, deemed trusts do not survive the *CCAA* proceedings and thus the *CCAA* is now the later in time statute. This confirms that Parliament's intent with respect to GST deemed trusts is to be found in the *CCAA*.

54     I do not agree with my colleague Abella J. that s. 44(*f*) of the *Interpretation Act*, R.S.C. 1985, c. I-21, can be used to interpret the 2005 amendments as having no effect. The new statute can hardly be said to be a mere re-enactment of the former statute. Indeed, the *CCAA* underwent a substantial review in 2005. Notably, acting consistently with its goal of treating both the *BIA* and the *CCAA* as sharing the same approach to insolvency, Parliament made parallel amendments to both statutes with respect to corporate proposals. In addition, new provisions were introduced regarding the treatment of contracts, collective agreements, interim financing and governance agreements. The appointment and role of the Monitor was also clarified. Noteworthy are the limits imposed by *CCAA* s. 11.09 on the court's discretion to make an order staying the Crown's source deductions deemed trusts, which were formerly found in s. 11.4. No mention whatsoever is made of GST deemed trusts (see Summary to S.C. 2005, c. 47). The review went as far as looking at the very expression used to describe the statutory override of deemed trusts. The comments cited by my colleague only emphasize the clear intent of Parliament to maintain its policy that only source deductions deemed trusts survive in *CCAA* proceedings.

55     In the case at bar, the legislative context informs the determination of Parliament's legislative intent and supports the conclusion that *ETA* s. 222(3) was not intended to narrow the scope of the *CCAA's* override provision. Viewed in its entire context, the conflict between the *ETA* and the *CCAA* is more apparent than real. I would therefore not follow the reasoning in *Ottawa Senators* and affirm that *CCAA* s. 18.3 remained effective.

56     My conclusion is reinforced by the purpose of the *CCAA* as part of Canadian remedial insolvency legislation. As this aspect is particularly relevant to the second issue, I will now discuss how courts have interpreted the scope of their discretionary powers

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

in supervising a *CCAA* reorganization and how Parliament has largely endorsed this interpretation. Indeed, the interpretation courts have given to the *CCAA* helps in understanding how the *CCAA* grew to occupy such a prominent role in Canadian insolvency law.

### *3.3 Discretionary Power of a Court Supervising a CCAA Reorganization*

57     Courts frequently observe that "[t]he *CCAA* is skeletal in nature" and does not "contain a comprehensive code that lays out all that is permitted or barred" (*ATB Financial v. Metcalfe & Mansfield Alternative Investments II Corp.*, 2008 ONCA 587, 92 O.R. (3d) 513 (Ont. C.A.), at para. 44, *per* Blair J.A.). Accordingly, "[t]he history of CCAA law has been an evolution of judicial interpretation" (*Dylex Ltd., Re* (1995), 31 C.B.R. (3d) 106 (Ont. Gen. Div. [Commercial List]), at para. 10, *per* Farley J.).

58     *CCAA* decisions are often based on discretionary grants of jurisdiction. The incremental exercise of judicial discretion in commercial courts under conditions one practitioner aptly describes as "the hothouse of real-time litigation" has been the primary method by which the *CCAA* has been adapted and has evolved to meet contemporary business and social needs (see Jones, at p. 484).

59     Judicial discretion must of course be exercised in furtherance of the *CCAA's* purposes. The remedial purpose I referred to in the historical overview of the Act is recognized over and over again in the jurisprudence. To cite one early example:

> The legislation is remedial in the purest sense in that it provides a means whereby the devastating social and economic effects of bankruptcy or creditor initiated termination of ongoing business operations can be avoided while a court-supervised attempt to reorganize the financial affairs of the debtor company is made.

> (*Nova Metal Products Inc. v. Comiskey (Trustee of)* (1990), 41 O.A.C. 282 (Ont. C.A.), at para. 57, *per* Doherty J.A., dissenting)

60     Judicial decision making under the *CCAA* takes many forms. A court must first of all provide the conditions under which the debtor can attempt to reorganize. This can be achieved by staying enforcement actions by creditors to allow the debtor's business to continue, preserving the *status quo* while the debtor plans the compromise or arrangement to be presented to creditors, and supervising the process and advancing it to the point where it can be determined whether it will succeed (see, e.g., *Hongkong Bank of Canada v. Chef Ready Foods Ltd.* (1990), 51 B.C.L.R. (2d) 84 (B.C. C.A.), at pp. 88-89; *Pacific National Lease Holding Corp., Re* (1992), 19 B.C.A.C. 134 (B.C. C.A. [In Chambers]), at para. 27). In doing so, the court must often be cognizant of the various interests at stake in the reorganization, which can extend beyond those of the debtor and creditors to include employees, directors, shareholders, and even other parties doing business with the insolvent company (see, e.g., *Canadian Airlines Corp., Re*, 2000 ABQB 442, 84 Alta. L.R. (3d) 9 (Alta. Q.B.), at para. 144, *per* Paperny J. (as she then was); *Air Canada, Re* (2003), 42 C.B.R. (4th) 173 (Ont. S.C.J. [Commercial List]), at para. 3; *Air Canada, Re* [2003 CarswellOnt 4967 (Ont. S.C.J. [Commercial List])], 2003 CanLII 49366, at para. 13, *per* Farley J.; Sarra, *Creditor Rights*, at pp. 181-92 and 217-26). In addition, courts must recognize that on occasion the broader public interest will be engaged by aspects of the reorganization and may be a factor against which the decision of whether to allow a particular action will be weighed (see, e.g., *Canadian Red Cross Society / Société Canadienne de la Croix Rouge, Re* (2000), 19 C.B.R. (4th) 158 (Ont. S.C.J.), at para. 2, *per* Blair J. (as he then was); Sarra, *Creditor Rights*, at pp. 195-214).

61     When large companies encounter difficulty, reorganizations become increasingly complex. *CCAA* courts have been called upon to innovate accordingly in exercising their jurisdiction beyond merely staying proceedings against the debtor to allow breathing room for reorganization. They have been asked to sanction measures for which there is no explicit authority in the *CCAA*. Without exhaustively cataloguing the various measures taken under the authority of the *CCAA*, it is useful to refer briefly to a few examples to illustrate the flexibility the statute affords supervising courts.

62     Perhaps the most creative use of *CCAA* authority has been the increasing willingness of courts to authorize post-filing security for debtor in possession financing or super-priority charges on the debtor's assets when necessary for the continuation of the debtor's business during the reorganization (see, e.g., *Skydome Corp., Re* (1998), 16 C.B.R. (4th) 118 (Ont. Gen. Div. [Commercial List]); *United Used Auto & Truck Parts Ltd., Re*, 2000 BCCA 146, 135 B.C.A.C. 96 (B.C. C.A.), aff'g (1999),

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

12 C.B.R. (4th) 144 (B.C. S.C. [In Chambers]); and generally, J. P. Sarra, *Rescue! The Companies' Creditors Arrangement Act* (2007), at pp. 93-115). The *CCAA* has also been used to release claims against third parties as part of approving a comprehensive plan of arrangement and compromise, even over the objections of some dissenting creditors (see Metcalfe & Mansfield). As well, the appointment of a Monitor to oversee the reorganization was originally a measure taken pursuant to the *CCAA's* supervisory authority; Parliament responded, making the mechanism mandatory by legislative amendment.

63      Judicial innovation during *CCAA* proceedings has not been without controversy. At least two questions it raises are directly relevant to the case at bar: (1) what are the sources of a court's authority during *CCAA* proceedings? (2) what are the limits of this authority?

64      The first question concerns the boundary between a court's statutory authority under the *CCAA* and a court's residual authority under its inherent and equitable jurisdiction when supervising a reorganization. In authorizing measures during *CCAA* proceedings, courts have on occasion purported to rely upon their equitable jurisdiction to advance the purposes of the Act or their inherent jurisdiction to fill gaps in the statute. Recent appellate decisions have counselled against purporting to rely on inherent jurisdiction, holding that the better view is that courts are in most cases simply construing the authority supplied by the *CCAA* itself (see, e.g., *Skeena Cellulose Inc., Re*, 2003 BCCA 344, 13 B.C.L.R. (4th) 236 (B.C. C.A.), at paras. 45-47, *per* Newbury J.A.; *Stelco Inc. (Re)* (2005), 75 O.R. (3d) 5 (Ont. C.A.), paras. 31-33, *per* Blair J.A.).

65      I agree with Justice Georgina R. Jackson and Professor Janis Sarra that the most appropriate approach is a hierarchical one in which courts rely first on an interpretation of the provisions of the *CCAA* text before turning to inherent or equitable jurisdiction to anchor measures taken in a *CCAA* proceeding (see G. R. Jackson and J. Sarra, "Selecting the Judicial Tool to get the Job Done: An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters", in J. P. Sarra, ed., *Annual Review of Insolvency Law 2007* (2008), 41, at p. 42). The authors conclude that when given an appropriately purposive and liberal interpretation, the *CCAA* will be sufficient in most instances to ground measures necessary to achieve its objectives (p. 94).

66      Having examined the pertinent parts of the *CCAA* and the recent history of the legislation, I accept that in most instances the issuance of an order during *CCAA* proceedings should be considered an exercise in statutory interpretation. Particularly noteworthy in this regard is the expansive interpretation the language of the statute at issue is capable of supporting.

67      The initial grant of authority under the *CCAA* empowered a court "where an application is made under this Act in respect of a company ... on the application of any person interested in the matter ..., subject to this Act, [to] make an order under this section" (*CCAA*, s. 11(1)). The plain language of the statute was very broad.

68      In this regard, though not strictly applicable to the case at bar, I note that Parliament has in recent amendments changed the wording contained in s. 11(1), making explicit the discretionary authority of the court under the *CCAA*. Thus in s. 11 of the *CCAA* as currently enacted, a court may, "subject to the restrictions set out in this Act, ... make any order that it considers appropriate in the circumstances" (S.C. 2005, c. 47, s. 128). Parliament appears to have endorsed the broad reading of *CCAA* authority developed by the jurisprudence.

69      The *CCAA* also explicitly provides for certain orders. Both an order made on an initial application and an order on subsequent applications may stay, restrain, or prohibit existing or new proceedings against the debtor. The burden is on the applicant to satisfy the court that the order is appropriate in the circumstances and that the applicant has been acting in good faith and with due diligence (*CCAA*, ss. 11(3), (4) and (6)).

70      The general language of the *CCAA* should not be read as being restricted by the availability of more specific orders. However, the requirements of appropriateness, good faith, and due diligence are baseline considerations that a court should always bear in mind when exercising *CCAA* authority. Appropriateness under the *CCAA* is assessed by inquiring whether the order sought advances the policy objectives underlying the *CCAA*. The question is whether the order will usefully further efforts to achieve the remedial purpose of the *CCAA* — avoiding the social and economic losses resulting from liquidation of an insolvent company. I would add that appropriateness extends not only to the purpose of the order, but also to the means

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

it employs. Courts should be mindful that chances for successful reorganizations are enhanced where participants achieve common ground and all stakeholders are treated as advantageously and fairly as the circumstances permit.

71     It is well-established that efforts to reorganize under the *CCAA* can be terminated and the stay of proceedings against the debtor lifted if the reorganization is "doomed to failure" (see *Chef Ready*, at p. 88; *Philip's Manufacturing Ltd., Re* (1992), 9 C.B.R. (3d) 25 (B.C. C.A.), at paras. 6-7). However, when an order is sought that does realistically advance the *CCAA's* purposes, the ability to make it is within the discretion of a *CCAA* court.

72     The preceding discussion assists in determining whether the court had authority under the *CCAA* to continue the stay of proceedings against the Crown once it was apparent that reorganization would fail and bankruptcy was the inevitable next step.

73     In the Court of Appeal, Tysoe J.A. held that no authority existed under the *CCAA* to continue staying the Crown's enforcement of the GST deemed trust once efforts at reorganization had come to an end. The appellant submits that in so holding, Tysoe J.A. failed to consider the underlying purpose of the *CCAA* and give the statute an appropriately purposive and liberal interpretation under which the order was permissible. The Crown submits that Tysoe J.A. correctly held that the mandatory language of the *ETA* gave the court no option but to permit enforcement of the GST deemed trust when lifting the *CCAA* stay to permit the debtor to make an assignment under the *BIA*. Whether the *ETA* has a mandatory effect in the context of a *CCAA* proceeding has already been discussed. I will now address the question of whether the order was authorized by the *CCAA*.

74     It is beyond dispute that the *CCAA* imposes no explicit temporal limitations upon proceedings commenced under the Act that would prohibit ordering a continuation of the stay of the Crown's GST claims while lifting the general stay of proceedings temporarily to allow the debtor to make an assignment in bankruptcy.

75     The question remains whether the order advanced the underlying purpose of the *CCAA*. The Court of Appeal held that it did not because the reorganization efforts had come to an end and the *CCAA* was accordingly spent. I disagree.

76     There is no doubt that had reorganization been commenced under the *BIA* instead of the *CCAA*, the Crown's deemed trust priority for the GST funds would have been lost. Similarly, the Crown does not dispute that under the scheme of distribution in bankruptcy under the *BIA*, the deemed trust for GST ceases to have effect. Thus, after reorganization under the *CCAA* failed, creditors would have had a strong incentive to seek immediate bankruptcy and distribution of the debtor's assets under the *BIA*. In order to conclude that the discretion does not extend to partially lifting the stay in order to allow for an assignment in bankruptcy, one would have to assume a gap between the *CCAA* and the *BIA* proceedings. Brenner C.J.S.C.'s order staying Crown enforcement of the GST claim ensured that creditors would not be disadvantaged by the attempted reorganization under the *CCAA*. The effect of his order was to blunt any impulse of creditors to interfere in an orderly liquidation. His order was thus in furtherance of the *CCAA's* objectives to the extent that it allowed a bridge between the *CCAA* and *BIA* proceedings. This interpretation of the tribunal's discretionary power is buttressed by s. 20 of the *CCAA*. That section provides that the *CCAA* "may be applied together with the provisions of any Act of Parliament... that authorizes or makes provision for the sanction of compromises or arrangements between a company and its shareholders or any class of them", such as the *BIA*. Section 20 clearly indicates the intention of Parliament for the *CCAA* to operate *in tandem* with other insolvency legislation, such as the *BIA*.

77     The *CCAA* creates conditions for preserving the *status quo* while attempts are made to find common ground amongst stakeholders for a reorganization that is fair to all. Because the alternative to reorganization is often bankruptcy, participants will measure the impact of a reorganization against the position they would enjoy in liquidation. In the case at bar, the order fostered a harmonious transition between reorganization and liquidation while meeting the objective of a single collective proceeding that is common to both statutes.

78     Tysoe J.A. therefore erred in my view by treating the *CCAA* and the *BIA* as distinct regimes subject to a temporal gap between the two, rather than as forming part of an integrated body of insolvency law. Parliament's decision to maintain two statutory schemes for reorganization, the *BIA* and the *CCAA*, reflects the reality that reorganizations of differing complexity require different legal mechanisms. By contrast, only one statutory scheme has been found to be needed to liquidate a bankrupt debtor's estate. The transition from the *CCAA* to the *BIA* may require the partial lifting of a stay of proceedings under the *CCAA*

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 190 of 493

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

to allow commencement of the *BIA* proceedings. However, as Laskin J.A. for the Ontario Court of Appeal noted in a similar competition between secured creditors and the Ontario Superintendent of Financial Services seeking to enforce a deemed trust, "[t]he two statutes are related" and no "gap" exists between the two statutes which would allow the enforcement of property interests at the conclusion of *CCAA* proceedings that would be lost in bankruptcy *Ivaco Inc. (Re)* (2006), 83 O.R. (3d) 108 (Ont. C.A.), at paras. 62-63).

79      The Crown's priority in claims pursuant to source deductions deemed trusts does not undermine this conclusion. Source deductions deemed trusts survive under both the *CCAA* and the *BIA*. Accordingly, creditors' incentives to prefer one Act over another will not be affected. While a court has a broad discretion to stay source deductions deemed trusts in the *CCAA* context, this discretion is nevertheless subject to specific limitations applicable only to source deductions deemed trusts (*CCAA*, s. 11.4). Thus, if *CCAA* reorganization fails (e.g., either the creditors or the court refuse a proposed reorganization), the Crown can immediately assert its claim in unremitted source deductions. But this should not be understood to affect a seamless transition into bankruptcy or create any "gap" between the *CCAA* and the *BIA* for the simple reason that, regardless of what statute the reorganization had been commenced under, creditors' claims in both instances would have been subject to the priority of the Crown's source deductions deemed trust.

80      Source deductions deemed trusts aside, the comprehensive and exhaustive mechanism under the *BIA* must control the distribution of the debtor's assets once liquidation is inevitable. Indeed, an orderly transition to liquidation is mandatory under the *BIA* where a proposal is rejected by creditors. The *CCAA* is silent on the transition into liquidation but the breadth of the court's discretion under the Act is sufficient to construct a bridge to liquidation under the *BIA*. The court must do so in a manner that does not subvert the scheme of distribution under the *BIA*. Transition to liquidation requires partially lifting the *CCAA* stay to commence proceedings under the *BIA*. This necessary partial lifting of the stay should not trigger a race to the courthouse in an effort to obtain priority unavailable under the *BIA*.

81      I therefore conclude that Brenner C.J.S.C. had the authority under the *CCAA* to lift the stay to allow entry into liquidation.

### *3.4 Express Trust*

82      The last issue in this case is whether Brenner C.J.S.C. created an express trust in favour of the Crown when he ordered on April 29, 2008, that proceeds from the sale of LeRoy Trucking's assets equal to the amount of unremitted GST be held back in the Monitor's trust account until the results of the reorganization were known. Tysoe J.A. in the Court of Appeal concluded as an alternative ground for allowing the Crown's appeal that it was the beneficiary of an express trust. I disagree.

83      Creation of an express trust requires the presence of three certainties: intention, subject matter, and object. Express or "true trusts" arise from the acts and intentions of the settlor and are distinguishable from other trusts arising by operation of law (see D. W. M. Waters, M. R. Gillen and L. D. Smith, eds., *Waters' Law of Trusts in Canada* (3rd ed. 2005), at pp. 28-29 especially fn. 42).

84      Here, there is no certainty to the object (i.e. the beneficiary) inferrable from the court's order of April 29, 2008, sufficient to support an express trust.

85      At the time of the order, there was a dispute between Century Services and the Crown over part of the proceeds from the sale of the debtor's assets. The court's solution was to accept LeRoy Trucking's proposal to segregate those monies until that dispute could be resolved. Thus there was no certainty that the Crown would actually be the beneficiary, or object, of the trust.

86      The fact that the location chosen to segregate those monies was the Monitor's trust account has no independent effect such that it would overcome the lack of a clear beneficiary. In any event, under the interpretation of *CCAA* s. 18.3(1) established above, no such priority dispute would even arise because the Crown's deemed trust priority over GST claims would be lost under the *CCAA* and the Crown would rank as an unsecured creditor for this amount. However, Brenner C.J.S.C. may well have been proceeding on the basis that, in accordance with *Ottawa Senators*, the Crown's GST claim would remain effective if reorganization was successful, which would not be the case if transition to the liquidation process of the *BIA* was allowed. An amount equivalent to that claim would accordingly be set aside pending the outcome of reorganization.

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

87    Thus, uncertainty surrounding the outcome of the *CCAA* restructuring eliminates the existence of any certainty to permanently vest in the Crown a beneficial interest in the funds. That much is clear from the oral reasons of Brenner C.J.S.C. on April 29, 2008, when he said: "Given the fact that [*CCAA* proceedings] are known to fail and filings in bankruptcy result, it seems to me that maintaining the status quo in the case at bar supports the proposal to have the monitor hold these funds in trust." Exactly who might take the money in the final result was therefore evidently in doubt. Brenner C.J.S.C.'s subsequent order of September 3, 2008, denying the Crown's application to enforce the trust once it was clear that bankruptcy was inevitable, confirms the absence of a clear beneficiary required to ground an express trust.

**4. Conclusion**

88    I conclude that Brenner C.J.S.C. had the discretion under the *CCAA* to continue the stay of the Crown's claim for enforcement of the GST deemed trust while otherwise lifting it to permit LeRoy Trucking to make an assignment in bankruptcy. My conclusion that s. 18.3(1) of the *CCAA* nullified the GST deemed trust while proceedings under that Act were pending confirms that the discretionary jurisdiction under s. 11 utilized by the court was not limited by the Crown's asserted GST priority, because there is no such priority under the *CCAA*.

89    For these reasons, I would allow the appeal and declare that the $305,202.30 collected by LeRoy Trucking in respect of GST but not yet remitted to the Receiver General of Canada is not subject to deemed trust or priority in favour of the Crown. Nor is this amount subject to an express trust. Costs are awarded for this appeal and the appeal in the court below.

***Fish J. (concurring)*:**

**I**

90    I am in general agreement with the reasons of Justice Deschamps and would dispose of the appeal as she suggests.

91    More particularly, I share my colleague's interpretation of the scope of the judge's discretion under s. 11 of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("*CCAA*"). And I share my colleague's conclusion that Brenner C.J.S.C. did not create an express trust in favour of the Crown when he segregated GST funds into the Monitor's trust account (2008 BCSC 1805, [2008] G.S.T.C. 221 (B.C. S.C. [In Chambers])).

92    I nonetheless feel bound to add brief reasons of my own regarding the interaction between the *CCAA* and the *Excise Tax Act*, R.S.C. 1985, c. E-15 ("*ETA*").

93    In upholding deemed trusts created by the *ETA* notwithstanding insolvency proceedings, *Ottawa Senators Hockey Club Corp. (Re)* (2005), 73 O.R. (3d) 737, [2005] G.S.T.C. 1 (Ont. C.A.), and its progeny have been unduly protective of Crown interests which Parliament itself has chosen to subordinate to competing prioritized claims. In my respectful view, a clearly marked departure from that jurisprudential approach is warranted in this case.

94    Justice Deschamps develops important historical and policy reasons in support of this position and I have nothing to add in that regard. I do wish, however, to explain why a comparative analysis of related statutory provisions adds support to our shared conclusion.

95    Parliament has in recent years given detailed consideration to the Canadian insolvency scheme. It has declined to amend the provisions at issue in this case. Ours is not to wonder why, but rather to treat Parliament's preservation of the relevant provisions as a deliberate exercise of the legislative discretion that is Parliament's alone. With respect, I reject any suggestion that we should instead characterize the apparent conflict between s. 18.3(1) (now s. 37(1)) of the *CCAA* and s. 222 of the *ETA* as a drafting anomaly or statutory lacuna properly subject to judicial correction or repair.

**II**

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

96    In the context of the Canadian insolvency regime, a deemed trust will be found to exist only where two complementary elements co-exist: first, a statutory provision *creating* the trust; and second, a *CCAA* or *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 ("*BIA*") provision *confirming* — or explicitly preserving — its effective operation.

97    This interpretation is reflected in three federal statutes. Each contains a deemed trust provision framed in terms strikingly similar to the wording of s. 222 of the *ETA*.

98    The first is the *Income Tax Act*, R.S.C. 1985, c. 1 (5th Supp.) ("*ITA*") where s. 227(4) *creates* a deemed trust:

**227 (4) Trust for moneys deducted** — Every person who deducts or withholds an amount under this Act is deemed, notwithstanding any security interest (as defined in subsection 224(1.3)) in the amount so deducted or withheld, to hold the amount separate and apart from the property of the person and from property held by any secured creditor (as defined in subsection 224(1.3)) of that person that but for the security interest would be property of the person, in trust for Her Majesty and for payment to Her Majesty in the manner and at the time provided under this Act. [Here and below, the emphasis is of course my own.]

99    In the next subsection, Parliament has taken care to make clear that this trust is unaffected by federal or provincial legislation to the contrary:

**(4.1) Extension of trust** — Notwithstanding any other provision of this Act, the *Bankruptcy and Insolvency Act* (except sections 81.1 and 81.2 of that Act), any other enactment of Canada, any enactment of a province or any other law, where at any time an amount deemed by subsection 227(4) to be held by a person in trust for Her Majesty is not paid to Her Majesty in the manner and at the time provided under this Act, property of the person ... equal in value to the amount so deemed to be held in trust is deemed

   (a) to be held, from the time the amount was deducted or withheld by the person, separate and apart from the property of the person, in trust for Her Majesty whether or not the property is subject to such a security interest, ...

   ...

... and the proceeds of such property shall be paid to the Receiver General in priority to all such security interests.

100    The continued operation of this deemed trust is expressly *confirmed* in s. 18.3 of the *CCAA*:

**18.3** (1) Subject to subsection (2), notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as being held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

(2) Subsection (1) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act*....

101    The operation of the *ITA* deemed trust is also confirmed in s. 67 of the *BIA*:

**67** (2) Subject to subsection (3), notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a bankrupt shall not be regarded as held in trust for Her Majesty for the purpose of paragraph (1)(*a*) unless it would be so regarded in the absence of that statutory provision.

(3) Subsection (2) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act*....

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

102    Thus, Parliament has first *created* and then *confirmed the continued operation of* the Crown's *ITA* deemed trust under *both* the *CCAA* and the *BIA* regimes.

103    The second federal statute for which this scheme holds true is the *Canada Pension Plan*, R.S.C. 1985, c. C-8 ("*CPP*"). At s. 23, Parliament creates a deemed trust in favour of the Crown and specifies that it exists despite all contrary provisions in any other Canadian statute. Finally, and in almost identical terms, the *Employment Insurance Act*, S.C. 1996, c. 23 ("*EIA*"), creates a deemed trust in favour of the Crown: see ss. 86(2) and (2.1).

104    As we have seen, the survival of the deemed trusts created under these provisions of the *ITA*, the *CPP* and the *EIA* is confirmed in s. 18.3(2) the *CCAA* and in s. 67(3) the *BIA*. In all three cases, Parliament's intent to enforce the Crown's deemed trust through insolvency proceedings is expressed in clear and unmistakable terms.

105    The same is not true with regard to the deemed trust created under the *ETA*. Although Parliament creates a deemed trust in favour of the Crown to hold unremitted GST monies, and although it purports to maintain this trust notwithstanding any contrary federal or provincial legislation, it does not *confirm* the trust — or expressly provide for its continued operation — in either the *BIA* or the *CCAA*. The second of the two mandatory elements I have mentioned is thus absent reflecting Parliament's intention to allow the deemed trust to lapse with the commencement of insolvency proceedings.

106    The language of the relevant *ETA* provisions is identical in substance to that of the *ITA*, *CPP*, and *EIA* provisions:

**222. (1) [Deemed] Trust for amounts collected** — Subject to subsection (1.1), every person who collects an amount as or on account of tax under Division II <u>is deemed,</u> for all purposes and despite any security interest in the amount, <u>to hold the amount in trust for Her Majesty</u> in right of Canada, <u>separate and apart</u> from the property of the person and from property held by any secured creditor of the person that, but for a security interest, would be property of the person, until the amount is remitted to the Receiver General or withdrawn under subsection (2).

...

**(3) Extension of trust** — <u>Despite</u> any other provision of this Act (except subsection (4)), <u>any other enactment of Canada (except the *Bankruptcy and Insolvency Act*)</u>, any enactment of a province or any other law, <u>if at any time an amount deemed</u> by subsection (1) <u>to be held</u> by a person <u>in trust for Her Majesty is not remitted</u> to the Receiver General or withdrawn in the manner and at the time provided under this Part, <u>property of the person</u> and property held by any secured creditor of the person that, but for a security interest, would be property of the person, <u>equal in value to the amount so deemed to be held in trust, is deemed</u>

(a) <u>to be held,</u> from the time the amount was collected by the person, <u>in trust for Her Majesty,</u> separate and apart from the property of the person, whether or not the property is subject to a security interest, ...

...

... and the proceeds of the property shall be paid to the Receiver General in priority to all security interests.

107    Yet no provision of the *CCAA* provides for the continuation of this deemed trust after the *CCAA* is brought into play.

108    In short, Parliament has imposed *two* explicit conditions, or "building blocks", for survival under the *CCAA* of deemed trusts created by the *ITA*, *CPP*, and *EIA*. Had Parliament intended to likewise preserve under the *CCAA* deemed trusts created by the *ETA*, it would have included in the *CCAA* the sort of confirmatory provision that explicitly preserves other deemed trusts.

109    With respect, unlike Tysoe J.A., I do not find it "inconceivable that Parliament would specifically identify the *BIA* as an exception when enacting the current version of s. 222(3) of the *ETA* without considering the *CCAA* as a possible second exception" (2009 BCCA 205, 98 B.C.L.R. (4th) 242, [2009] G.S.T.C. 79 (B.C. C.A.), at para. 37). *All* of the deemed trust provisions excerpted above make explicit reference to the *BIA*. Section 222 of the *ETA* does not break the pattern. Given the

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 194 of 493

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

near-identical wording of the four deemed trust provisions, it would have been surprising indeed had Parliament not addressed the *BIA* at all in the *ETA*.

110     Parliament's evident intent was to render GST deemed trusts inoperative upon the institution of insolvency proceedings. Accordingly, s. 222 mentions the *BIA* so as to *exclude* it from its ambit — rather than to *include* it, as do the *ITA*, the *CPP*, and the *EIA*.

111     Conversely, I note that *none* of these statutes mentions the *CCAA* expressly. Their specific reference to the *BIA* has no bearing on their interaction with the *CCAA*. Again, it is the confirmatory provisions *in the insolvency statutes* that determine whether a given deemed trust will subsist during insolvency proceedings.

112     Finally, I believe that chambers judges should not segregate GST monies into the Monitor's trust account during *CCAA* proceedings, as was done in this case. The result of Justice Deschamps's reasoning is that GST claims become unsecured under the *CCAA*. Parliament has deliberately chosen to nullify certain Crown super-priorities during insolvency; this is one such instance.

## III

113      For these reasons, like Justice Deschamps, I would allow the appeal with costs in this Court and in the courts below and order that the $305,202.30 collected by LeRoy Trucking in respect of GST but not yet remitted to the Receiver General of Canada be subject to no deemed trust or priority in favour of the Crown.

*Abella J. (dissenting)*:

114     The central issue in this appeal is whether s. 222 of the *Excise Tax Act*, R.S.C. 1985, c. E-15 ("*EIA*"), and specifically s. 222(3), gives priority during *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 ("*CCAA*"), proceedings to the Crown's deemed trust in unremitted GST. I agree with Tysoe J.A. that it does. It follows, in my respectful view, that a court's discretion under s. 11 of the *CCAA* is circumscribed accordingly.

115     Section 11 [1] of the *CCAA* stated:

**11**. (1) Notwithstanding anything in the *Bankruptcy and Insolvency Act* or the *Winding-up Act*, where an application is made under this Act in respect of a company, the court, on the application of any person interested in the matter, may, subject to this Act, on notice to any other person or without notice as it may see fit, make an order under this section.

To decide the scope of the court's discretion under s. 11, it is necessary to first determine the priority issue. Section 222(3), the provision of the *ETA* at issue in this case, states:

**222 (3) Extension of trust** — Despite any other provision of this Act (except subsection (4)), any other enactment of Canada (except the *Bankruptcy and Insolvency Act)*, any enactment of a province or any other law, if at any time an amount deemed by subsection (1) to be held by a person in trust for Her Majesty is not remitted to the Receiver General or withdrawn in the manner and at the time provided under this Part, property of the person and property held by any secured creditor of the person that, but for a security interest, would be property of the person, equal in value to the amount so deemed to be held in trust, is deemed

(a) to be held, from the time the amount was collected by the person, in trust for Her Majesty, separate and apart from the property of the person, whether or not the property is subject to a security interest, and

(b) to form no part of the estate or property of the person from the time the amount was collected, whether or not the property has in fact been kept separate and apart from the estate or property of the person and whether or not the property is subject to a security interest

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

and is property beneficially owned by Her Majesty in right of Canada despite any security interest in the property or in the proceeds thereof and the proceeds of the property shall be paid to the Receiver General in priority to all security interests.

116    Century Services argued that the *CCAA's* general override provision, s. 18.3(1), prevailed, and that the deeming provisions in s. 222 of the *ETA* were, accordingly, inapplicable during *CCAA* proceedings. Section 18.3(1) states:

**18.3** (1) ... [N]otwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

117    As MacPherson J.A. correctly observed in *Ottawa Senators Hockey Club Corp. (Re)* (2005), 73 O.R. (3d) 737, [2005] G.S.T.C. 1 (Ont. C.A.), s. 222(3) of the *ETA* is in "clear conflict" with s. 18.3(1) of the *CCAA* (para. 31). Resolving the conflict between the two provisions is, essentially, what seems to me to be a relatively uncomplicated exercise in statutory interpretation: does the language reflect a clear legislative intention? In my view it does. The deemed trust provision, s. 222(3) of the *ETA*, has unambiguous language stating that it operates notwithstanding any law except the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3 ("*BIA*").

118    By expressly excluding only one statute from its legislative grasp, and by unequivocally stating that it applies despite any other law anywhere in Canada *except* the *BIA*, s. 222(3) has defined its boundaries in the clearest possible terms. I am in complete agreement with the following comments of MacPherson J.A. in *Ottawa Senators*:

The legislative intent of s. 222(3) of the *ETA* is clear. If there is a conflict with "any other enactment of Canada (except the *Bankruptcy and Insolvency Act*)", s. 222(3) prevails. In these words Parliament did two things: it decided that s. 222(3) should trump all other federal laws and, importantly, it addressed the topic of exceptions to its trumping decision and identified a single exception, the *Bankruptcy and Insolvency Act* .... The *BIA* and the *CCAA* are closely related federal statutes. I cannot conceive that Parliament would specifically identify the *BIA* as an exception, but accidentally fail to consider the *CCAA* as a possible second exception. In my view, the omission of the *CCAA* from s. 222(3) of the *ETA* was almost certainly a considered omission. [para. 43]

119    MacPherson J.A.'s view that the failure to exempt the *CCAA* from the operation of the *ETA* is a reflection of a clear legislative intention, is borne out by how the *CCAA* was subsequently changed after s. 18.3(1) was enacted in 1997. In 2000, when s. 222(3) of the *ETA* came into force, amendments were also introduced to the *CCAA*. Section 18.3(1) was not amended.

120    The failure to amend s. 18.3(1) is notable because its effect was to protect the legislative *status quo*, notwithstanding repeated requests from various constituencies that s. 18.3(1) be amended to make the priorities in the *CCAA* consistent with those in the *BIA*. In 2002, for example, when Industry Canada conducted a review of the *BIA* and the *CCAA*, the Insolvency Institute of Canada and the Canadian Association of Insolvency and Restructuring Professionals recommended that the priority regime under the *BIA* be extended to the *CCAA* (Joint Task Force on Business Insolvency Law Reform, *Report* (March 15, 2002), Sch. B, proposal 71, at pp. 37-38). The same recommendations were made by the Standing Senate Committee on Banking, Trade and Commerce in its 2003 report, *Debtors and Creditors Sharing the Burden: A Review of the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act*; by the Legislative Review Task Force (Commercial) of the Insolvency Institute of Canada and the Canadian Association of Insolvency and Restructuring Professionals in its 2005 *Report on the Commercial Provisions of Bill C-55*; and in 2007 by the Insolvency Institute of Canada in a submission to the Standing Senate Committee on Banking, Trade and Commerce commenting on reforms then under consideration.

121    Yet the *BIA* remains the only exempted statute under s. 222(3) of the *ETA*. Even after the 2005 decision in *Ottawa Senators* which confirmed that the *ETA* took precedence over the *CCAA*, there was no responsive legislative revision. I see this lack of response as relevant in this case, as it was in *R. v. Tele-Mobile Co.*, 2008 SCC 12, [2008] 1 S.C.R. 305 (S.C.C.), where this Court stated:

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 196 of 493
Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

While it cannot be said that legislative silence is necessarily determinative of legislative intention, in this case the silence is Parliament's answer to the consistent urging of Telus and other affected businesses and organizations that there be express language in the legislation to ensure that businesses can be reimbursed for the reasonable costs of complying with evidence-gathering orders. I see the legislative history as reflecting Parliament's intention that compensation not be paid for compliance with production orders. [para. 42]

122    All this leads to a clear inference of a deliberate legislative choice to protect the deemed trust in s. 222(3) from the reach of s. 18.3(1) of the *CCAA*.

123    Nor do I see any "policy" justification for interfering, through interpretation, with this clarity of legislative intention. I can do no better by way of explaining why I think the policy argument cannot succeed in this case, than to repeat the words of Tysoe J.A. who said:

I do not dispute that there are valid policy reasons for encouraging insolvent companies to attempt to restructure their affairs so that their business can continue with as little disruption to employees and other stakeholders as possible. It is appropriate for the courts to take such policy considerations into account, but only if it is in connection with a matter that has not been considered by Parliament. Here, Parliament must be taken to have weighed policy considerations when it enacted the amendments to the *CCAA* and *ETA* described above. As Mr. Justice MacPherson observed at para. 43 of *Ottawa Senators*, it is inconceivable that Parliament would specifically identify the *BIA* as an exception when enacting the current version of s. 222(3) of the *ETA* without considering the *CCAA* as a possible second exception. I also make the observation that the 1992 set of amendments to the *BIA* enabled proposals to be binding on secured creditors and, while there is more flexibility under the *CCAA*, it is possible for an insolvent company to attempt to restructure under the auspices of the *BIA*. [para. 37]

124    Despite my view that the clarity of the language in s. 222(3) is dispositive, it is also my view that even the application of other principles of interpretation reinforces this conclusion. In their submissions, the parties raised the following as being particularly relevant: the Crown relied on the principle that the statute which is "later in time" prevails; and Century Services based its argument on the principle that the general provision gives way to the specific (*generalia specialibus non derogani*).

125    The "later in time" principle gives priority to a more recent statute, based on the theory that the legislature is presumed to be aware of the content of existing legislation. If a new enactment is inconsistent with a prior one, therefore, the legislature is presumed to have intended to derogate from the earlier provisions (Ruth Sullivan, *Sullivan on the Construction of Statutes* (5th ed. 2008), at pp. 346-47; Pierre-André Côté, *The Interpretation of Legislation in Canada* (3rd ed. 2000), at p. 358).

126    The exception to this presumptive displacement of pre-existing inconsistent legislation, is the *generalia specialibus non derogant* principle that "[a] more recent, general provision will not be construed as affecting an earlier, special provision" (Côté, at p. 359). Like a Russian Doll, there is also an exception within this exception, namely, that an earlier, specific provision may in fact be "overruled" by a subsequent general statute if the legislature indicates, through its language, an intention that the general provision prevails (*Doré c. Verdun (Municipalité)*, [1997] 2 S.C.R. 862 (S.C.C.)).

127    The primary purpose of these interpretive principles is to assist in the performance of the task of determining the intention of the legislature. This was confirmed by MacPherson J.A. in *Ottawa Senators*, at para. 42:

[T]he overarching rule of statutory interpretation is that statutory provisions should be interpreted to give effect to the intention of the legislature in enacting the law. This primary rule takes precedence over all maxims or canons or aids relating to statutory interpretation, including the maxim that the specific prevails over the general (*generalia specialibus non derogant*). As expressed by Hudson J. in *Canada v. Williams*, [1944] S.C.R. 226, ... at p. 239 ...:

The maxim *generalia specialibus non derogant* is relied on as a rule which should dispose of the question, but the maxim is not a rule of law but a rule of construction and bows to the intention of the legislature, if such intention can reasonably be gathered from all of the relevant legislation.

(See also Côté, at p. 358, and Pierre-Andre Côté, with the collaboration of S. Beaulac and M. Devinat, *Interprétation des lois* (4th ed. 2009), at para. 1335.)

128    I accept the Crown's argument that the "later in time" principle is conclusive in this case. Since s. 222(3) of the *ETA* was enacted in 2000 and s. 18.3(1) of the *CCAA* was introduced in 1997, s. 222(3) is, on its face, the later provision. This chronological victory can be displaced, as Century Services argues, if it is shown that the more recent provision, s. 222(3) of the *ETA*, is a general one, in which case the earlier, specific provision, s. 18.3(1), prevails (*generalia specialibus non derogant).* But, as previously explained, the prior specific provision does not take precedence if the subsequent general provision appears to "overrule" it. This, it seems to me, is precisely what s. 222(3) achieves through the use of language stating that it prevails despite any law of Canada, of a province, or "any other law" *other than the BIA.* Section 18.3(1) of the *CCAA*, is thereby rendered inoperative for purposes of s. 222(3).

129    It is true that when the *CCAA* was amended in 2005,[2] s. 18.3(1) was re-enacted as s. 37(1) (S.C. 2005, c. 47, s. 131). Deschamps J. suggests that this makes s. 37(1) the new, "later in time" provision. With respect, her observation is refuted by the operation of s. 44(f) of the *Interpretation Act*, R.S.C. 1985, c. I-21, which expressly deals with the (non) effect of re-enacting, without significant substantive changes, a repealed provision (see *Canada (Attorney General) v. Canada (Public Service Staff Relations Board)*, [1977] 2 F.C. 663 (Fed. C.A.), dealing with the predecessor provision to s. 44(f)). It directs that new enactments not be construed as "new law" unless they differ in substance from the repealed provision:

> **44.** Where an enactment, in this section called the "former enactment", is repealed and another enactment, in this section called the "new enactment", is substituted therefor,
>
> ...
>
> (f) except to the extent that the provisions of the new enactment are not in substance the same as those of the former enactment, the new enactment shall not be held to operate as new law, but shall be construed and have effect as a consolidation and as declaratory of the law as contained in the former enactment;

Section 2 of the *Interpretation Act* defines an enactment as "an Act or regulation or *any portion of an Act or regulation*".

130    Section 37(1) of the current *CCAA* is almost identical to s. 18.3(1). These provisions are set out for ease of comparison, with the differences between them underlined:

> **37.**(1) Subject to subsection (2), underline despite any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as being held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

> **18.3** (1) Subject to subsection (2), notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

131    The application of s. 44(f) of the *Interpretation Act* simply confirms the government's clearly expressed intent, found in Industry Canada's clause-by-clause review of Bill C-55, where s. 37(1) was identified as "a technical amendment to reorder the provisions of this Act". During second reading, the Hon. Bill Rompkey, then the Deputy Leader of the Government in the Senate, confirmed that s. 37(1) represented only a technical change:

> On a technical note relating to the treatment of deemed trusts for taxes, the bill [*sic*] makes no changes to the underlying policy intent, despite the fact that in the case of a restructuring under the CCAA, sections of the act [*sic*] were repealed and substituted with renumbered versions due to the extensive reworking of the CCAA.

(*Debates of the Senate*, vol. 142, 1st Sess., 38th Parl., November 23, 2005, at p. 2147)

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

132    Had the substance of s. 18.3(1) altered in any material way when it was replaced by s. 37(1), I would share Deschamps J.'s view that it should be considered a new provision. But since s. 18.3(1) and s. 37(1) are the same in substance, the transformation of s. 18.3(1) into s. 37(1) has no effect on the interpretive queue, and s. 222(3) of the *ETA* remains the "later in time" provision (Sullivan, at p. 347).

133    This means that the deemed trust provision in s. 222(3) of the *ETA* takes precedence over s. 18.3(1) during *CCAA* proceedings. The question then is how that priority affects the discretion of a court under s. 11 of the *CCAA*.

134    While s. 11 gives a court discretion to make orders notwithstanding the *BIA* and the *Winding-up Act*, R.S.C. 1985, c. W-11, that discretion is not liberated from the operation of any other federal statute. Any exercise of discretion is therefore circumscribed by whatever limits are imposed by statutes *other* than the *BIA* and the *Winding-up Act*. That includes the *ETA*. The chambers judge in this case was, therefore, required to respect the priority regime set out in s. 222(3) of the *ETA*. Neither s. 18.3(1) nor s. 11 of the *CCAA* gave him the authority to ignore it. He could not, as a result, deny the Crown's request for payment of the GST funds during the *CCAA* proceedings.

135    Given this conclusion, it is unnecessary to consider whether there was an express trust.

136    I would dismiss the appeal.

*Appeal allowed.*

*Pourvoi accueilli.*

## Appendix

### *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (as at December 13, 2007)

**11. (1) Powers of court** — Notwithstanding anything in the *Bankruptcy and Insolvency Act* or the *Winding-up Act*, where an application is made under this Act in respect of a company, the court, on the application of any person interested in the matter, may, subject to this Act, on notice to any other person or without notice as it may see fit, make an order under this section.

...

**(3) Initial application court orders** — A court may, on an initial application in respect of a company, make an order on such terms as it may impose, effective for such period as the court deems necessary not exceeding thirty days,

(a) staying, until otherwise ordered by the court, all proceedings taken or that might be taken in respect of the company under an Act referred to in subsection (i);

(b) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

(c) prohibiting, until otherwise ordered by the court, the commencement of or proceeding with any other action, suit or proceeding against the company.

**(4) Other than initial application court orders** — A court may, on an application in respect of a company other than an initial application, make an order on such terms as it may impose,

(a) staying, until otherwise ordered by the court, for such period as the court deems necessary, all proceedings taken or that might be taken in respect of the company under an Act referred to in subsection (1);

(b) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

(c) prohibiting, until otherwise ordered by the court, the commencement of or proceeding with any other action, suit or proceeding against the company.

...

**(6) Burden of proof on application** — The court shall not make an order under subsection (3) or (4) unless

(a) the applicant satisfies the court that circumstances exist that make such an order appropriate; and

(b) in the case of an order under subsection (4), the applicant also satisfies the court that the applicant has acted, and is acting, in good faith and with due diligence.

**11.4 (1) Her Majesty affected** — An order made under section 11 may provide that

(a) Her Majesty in right of Canada may not exercise rights under subsection 224(1.2) of the *Income Tax Act* or any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, in respect of the company if the company is a tax debtor under that subsection or provision, for such period as the court considers appropriate but ending not later than

(i) the expiration of the order,

(ii) the refusal of a proposed compromise by the creditors or the court,

(iii) six months following the court sanction of a compromise or arrangement,

(iv) the default by the company on any term of a compromise or arrangement, or

(v) the performance of a compromise or arrangement in respect of the company; and\

(b) Her Majesty in right of a province may not exercise rights under any provision of provincial legislation in respect of the company where the company is a debtor under that legislation and the provision has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

(i) has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(ii) is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection,

for such period as the court considers appropriate but ending not later than the occurrence or time referred to in whichever of subparagraphs (*a*)(i) to (v) may apply.

**(2) When order ceases to be in effect** — An order referred to in subsection (1) ceases to be in effect if

(a) the company defaults on payment of any amount that becomes due to Her Majesty after the order is made and could be subject to a demand under

(i) subsection 224(1.2) of the *Income Tax Act*,

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 200 of 493

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

(ii) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(iii) under any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

 (A) has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

 (B) is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection; or

(b) any other creditor is or becomes entitled to realize a security on any property that could be claimed by Her Majesty in exercising rights under

(i) subsection 224(1.2) of the *Income Tax Act*,

(ii) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(iii) any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

 (A) has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

 (B) is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection.

**(3) Operation of similar legislation** — An order made under section 11, other than an order referred to in subsection (1) of this section, does not affect the operation of

(a) subsections 224(1.2) and (1.3) of the *Income Tax Act*,

(b) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(c) any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 201 of 493

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

(i) has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(ii) is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection,

and for the purpose of paragraph (*c*), the provision of provincial legislation is, despite any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as subsection 224(1.2) of the *Income Tax Act* in respect of a sum referred to in subparagraph (*c*)(i), or as subsection 23(2) of the *Canada Pension Plan* in respect of a sum referred to in subparagraph (*c*)(ii), and in respect of any related interest, penalties or other amounts.

**18.3 (1) Deemed trusts** — Subject to subsection (2), notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

**(2) Exceptions** — Subsection (1) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act* (each of which is in this subsection referred to as a "federal provision") nor in respect of amounts deemed to be held in trust under any law of a province that creates a deemed trust the sole purpose of which is to ensure remittance to Her Majesty in right of the province of amounts deducted or withheld under a law of the province where

(a) that law of the province imposes a tax similar in nature to the tax imposed under the *Income Tax Act* and the amounts deducted or withheld under that law of the province are of the same nature as the amounts referred to in subsection 227(4) or (4.1) of the *Income Tax Act*, or

(b) the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan*, that law of the province establishes a "provincial pension plan" as defined in that subsection and the amounts deducted or withheld under that law of the province are of the same nature as amounts referred to in subsection 23(3) or (4) of the *Canada Pension Plan*,

and for the purpose of this subsection, any provision of a law of a province that creates a deemed trust is, notwithstanding any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as the corresponding federal provision.

**18.4 (1) Status of Crown claims** — In relation to a proceeding under this Act, all claims, including secured claims, of Her Majesty in right of Canada or a province or any body under an enactment respecting workers' compensation, in this section and in section 18.5 called a "workers' compensation body", rank as unsecured claims.

...

**(3) Operation of similar legislation** — Subsection (1) does not affect the operation of

(a) subsections 224(1.2) and (1.3) of the *Income Tax Act*,

(b) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 202 of 493

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

(c) any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

(i) has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(ii) is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection,

and for the purpose of paragraph (*c*), the provision of provincial legislation is, despite any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as subsection 224(1.2) of the *Income Tax Act* in respect of a sum referred to in subparagraph (*c*)(i), or as subsection 23(2) of the *Canada Pension Plan* in respect of a sum referred to in subparagraph (*c*)(ii), and in respect of any related interest, penalties or other amounts.

...

**20. [Act to be applied conjointly with other Acts]** — The provisions of this Act may be applied together with the provisions of any Act of Parliament or of the legislature of any province, that authorizes or makes provision for the sanction of compromises or arrangements between a company and its shareholders or any class of them.

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (as at September 18, 2009)

**11. General power of court** — Despite anything in the *Bankruptcy and Insolvency Act* or the *Winding-up and Restructuring Act*, if an application is made under this Act in respect of a debtor company, the court, on the application of any person interested in the matter, may, subject to the restrictions set out in this Act, on notice to any other person or without notice as it may see fit, make any order that it considers appropriate in the circumstances.

...

**11.02 (1) Stays, etc. — initial application** — A court may, on an initial application in respect of a debtor company, make an order on any terms that it may impose, effective for the period that the court considers necessary, which period may not be more than 30 days,

(a) staying, until otherwise ordered by the court, all proceedings taken or that might be taken in respect of the company under the *Bankruptcy and Insolvency Act* or the *Winding-up and Restructuring Act*;

(b) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

(c) prohibiting, until otherwise ordered by the court, the commencement of any action, suit or proceeding against the company.

**(2) Stays, etc. — other than initial application** — A court may, on an application in respect of a debtor company other than an initial application, make an order, on any terms that it may impose,

(a) staying, until otherwise ordered by the court, for any period that the court considers necessary, all proceedings taken or that might be taken in respect of the company under an Act referred to in paragraph (1)(*a*);

(b) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 203 of 493

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

(c) prohibiting, until otherwise ordered by the court, the commencement of any action, suit or proceeding against the company.

**(3) Burden of proof on application** — The court shall not make the order unless

(a) the applicant satisfies the court that circumstances exist that make the order appropriate; and

(b) in the case of an order under subsection (2), the applicant also satisfies the court that the applicant has acted, and is acting, in good faith and with due diligence.

...

**11.09 (1) Stay — Her Majesty** — An order made under section 11.02 may provide that

(a) Her Majesty in right of Canada may not exercise rights under subsection 224(1.2) of the *Income Tax Act* or any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, in respect of the company if the company is a tax debtor under that subsection or provision, for the period that the court considers appropriate but ending not later than

(i) the expiry of the order,

(ii) the refusal of a proposed compromise by the creditors or the court,

(iii) six months following the court sanction of a compromise or an arrangement,

(iv) the default by the company on any term of a compromise or an arrangement, or

(v) the performance of a compromise or an arrangement in respect of the company; and

(b) Her Majesty in right of a province may not exercise rights under any provision of provincial legislation in respect of the company if the company is a debtor under that legislation and the provision has a purpose similar to subsection 224(1.2) of the *Income Tax Act*, or refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, and the sum

(i) has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(ii) is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection,

for the period that the court considers appropriate but ending not later than the occurrence or time referred to in whichever of subparagraphs (*a*)(i) to (v) that may apply.

**(2) When order ceases to be in effect** — The portions of an order made under section 11.02 that affect the exercise of rights of Her Majesty referred to in paragraph (1)(*a*) or (*b*) cease to be in effect if

(a) the company defaults on the payment of any amount that becomes due to Her Majesty after the order is made and could be subject to a demand under

(i) subsection 224(1.2) of the *Income Tax Act*,

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 204 of 493

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

(ii) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(iii) any provision of provincial legislation that has a purpose similar to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, and the sum

(A) has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(B) is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection; or

(b) any other creditor is or becomes entitled to realize a security on any property that could be claimed by Her Majesty in exercising rights under

(i) subsection 224(1.2) of the *Income Tax Act*,

(ii) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(iii) any provision of provincial legislation that has a purpose similar to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, and the sum

(A) has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(B) is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection.

**(3) Operation of similar legislation** — An order made under section 11.02, other than the portions of that order that affect the exercise of rights of Her Majesty referred to in paragraph (1)(*a*) or (*b*), does not affect the operation of

(a) subsections 224(1.2) and (1.3) of the *Income Tax Act*,

(b) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts, or

(c) any provision of provincial legislation that has a purpose similar to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, and the sum

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 205 of 493

Ted Leroy Trucking [Century Services] Ltd., Re, 2010 SCC 60, 2010 CarswellBC 3419

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

(i) has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(ii) is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection,

and for the purpose of paragraph (*c*), the provision of provincial legislation is, despite any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as subsection 224(1.2) of the *Income Tax Act* in respect of a sum referred to in subparagraph (*c*)(i), or as subsection 23(2) of the *Canada Pension Plan* in respect of a sum referred to in subparagraph (*c*)(ii), and in respect of any related interest, penalties or other amounts.

**37. (1) Deemed trusts** — Subject to subsection (2), despite any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a debtor company shall not be regarded as being held in trust for Her Majesty unless it would be so regarded in the absence of that statutory provision.

**(2) Exceptions** — Subsection (1) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act* (each of which is in this subsection referred to as a "federal provision"), nor does it apply in respect of amounts deemed to be held in trust under any law of a province that creates a deemed trust the sole purpose of which is to ensure remittance to Her Majesty in right of the province of amounts deducted or withheld under a law of the province if

(a) that law of the province imposes a tax similar in nature to the tax imposed under the *Income Tax Act* and the amounts deducted or withheld under that law of the province are of the same nature as the amounts referred to in subsection 227(4) or (4.1) of the *Income Tax Act*, or

(b) the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan*, that law of the province establishes a "provincial pension plan" as defined in that subsection and the amounts deducted or withheld under that law of the province are of the same nature as amounts referred to in subsection 23(3) or (4) of the *Canada Pension Plan*,

and for the purpose of this subsection, any provision of a law of a province that creates a deemed trust is, despite any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as the corresponding federal provision.

*Excise Tax Act*, **R.S.C. 1985, c. E-15 (as at December 13, 2007)**

**222. (1) [Deemed] Trust for amounts collected** — Subject to subsection (1.1), every person who collects an amount as or on account of tax under Division II is deemed, for all purposes and despite any security interest in the amount, to hold the amount in trust for Her Majesty in right of Canada, separate and apart from the property of the person and from property held by any secured creditor of the person that, but for a security interest, would be property of the person, until the amount is remitted to the Receiver General or withdrawn under subsection (2).

**(1.1) Amounts collected before bankruptcy** — Subsection (1) does not apply, at or after the time a person becomes a bankrupt (within the meaning of the *Bankruptcy and Insolvency Act*), to any amounts that, before that time, were collected or became collectible by the person as or on account of tax under Division II.

...

**(3) Extension of trust** — Despite any other provision of this Act (except subsection (4)), any other enactment of Canada (except the *Bankruptcy and Insolvency Act*), any enactment of a province or any other law, if at any time an amount deemed by subsection (1) to be held by a person in trust for Her Majesty is not remitted to the Receiver General or withdrawn

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

in the manner and at the time provided under this Part, property of the person and property held by any secured creditor of the person that, but for a security interest, would be property of the person, equal in value to the amount so deemed to be held in trust, is deemed

(a) to be held, from the time the amount was collected by the person, in trust for Her Majesty, separate and apart from the property of the person, whether or not the property is subject to a security interest, and

(b) to form no part of the estate or property of the person from the time the amount was collected, whether or not the property has in fact been kept separate and apart from the estate or property of the person and whether or not the property is subject to a security interest

and is property beneficially owned by Her Majesty in right of Canada despite any security interest in the property or in the proceeds thereof and the proceeds of the property shall be paid to the Receiver General in priority to all security interests.

**Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3 (as at December 13, 2007)**

**67. (1) Property of bankrupt** — The property of a bankrupt divisible among his creditors shall not comprise

(a) property held by the bankrupt in trust for any other person,

(b) any property that as against the bankrupt is exempt from execution or seizure under any laws applicable in the province within which the property is situated and within which the bankrupt resides, or

(b.1) such goods and services tax credit payments and prescribed payments relating to the essential needs of an individual as are made in prescribed circumstances and are not property referred to in paragraph (*a*) or (*b*),

but it shall comprise

(c) all property wherever situated of the bankrupt at the date of his bankruptcy or that may be acquired by or devolve on him before his discharge, and

(d) such powers in or over or in respect of the property as might have been exercised by the bankrupt for his own benefit.

**(2) Deemed trusts** — Subject to subsection (3), notwithstanding any provision in federal or provincial legislation that has the effect of deeming property to be held in trust for Her Majesty, property of a bankrupt shall not be regarded as held in trust for Her Majesty for the purpose of paragraph (1)(*a*) unless it would be so regarded in the absence of that statutory provision.

**(3) Exceptions** — Subsection (2) does not apply in respect of amounts deemed to be held in trust under subsection 227(4) or (4.1) of the *Income Tax Act*, subsection 23(3) or (4) of the *Canada Pension Plan* or subsection 86(2) or (2.1) of the *Employment Insurance Act* (each of which is in this subsection referred to as a "federal provision") nor in respect of amounts deemed to be held in trust under any law of a province that creates a deemed trust the sole purpose of which is to ensure remittance to Her Majesty in right of the province of amounts deducted or withheld under a law of the province where

(a) that law of the province imposes a tax similar in nature to the tax imposed under the *Income Tax Act* and the amounts deducted or withheld under that law of the province are of the same nature as the amounts referred to in subsection 227(4) or (4.1) of the *Income Tax Act*, or

(b) the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan*, that law of the province establishes a "provincial pension plan" as defined in that subsection and the amounts deducted or withheld under that law of the province are of the same nature as amounts referred to in subsection 23(3) or (4) of the *Canada Pension Plan*,

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

2010 SCC 60, 2010 CarswellBC 3419, 2010 CarswellBC 3420, [2010] 3 S.C.R. 379...

and for the purpose of this subsection, any provision of a law of a province that creates a deemed trust is, notwithstanding any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as the corresponding federal provision.

**86. (1) Status of Crown claims** — In relation to a bankruptcy or proposal, all provable claims, including secured claims, of Her Majesty in right of Canada or a province or of any body under an Act respecting workers' compensation, in this section and in section 87 called a "workers' compensation body", rank as unsecured claims.

...

**(3) Exceptions** — Subsection (1) does not affect the operation of

(a) subsections 224(1.2) and (1.3) of the *Income Tax Act*;

(b) any provision of the *Canada Pension Plan* or of the *Employment Insurance Act* that refers to subsection 224(1.2) of the *Income Tax Act* and provides for the collection of a contribution, as defined in the *Canada Pension Plan*, or an employee's premium, or employer's premium, as defined in the *Employment Insurance Act*, and of any related interest, penalties or other amounts; or

(c) any provision of provincial legislation that has a similar purpose to subsection 224(1.2) of the *Income Tax Act*, or that refers to that subsection, to the extent that it provides for the collection of a sum, and of any related interest, penalties or other amounts, where the sum

(i) has been withheld or deducted by a person from a payment to another person and is in respect of a tax similar in nature to the income tax imposed on individuals under the *Income Tax Act*, or

(ii) is of the same nature as a contribution under the *Canada Pension Plan* if the province is a "province providing a comprehensive pension plan" as defined in subsection 3(1) of the *Canada Pension Plan* and the provincial legislation establishes a "provincial pension plan" as defined in that subsection,

and for the purpose of paragraph (*c*), the provision of provincial legislation is, despite any Act of Canada or of a province or any other law, deemed to have the same effect and scope against any creditor, however secured, as subsection 224(1.2) of the *Income Tax Act* in respect of a sum referred to in subparagraph (*c*)(i), or as subsection 23(2) of the *Canada Pension Plan* in respect of a sum referred to in subparagraph (*c*)(ii), and in respect of any related interest, penalties or other amounts.

Footnotes

1    Section 11 was amended, effective September 18, 2009, and now states:

**11.** Despite anything in the *Bankruptcy and Insolvency Act* or the *Winding-up and Restructuring Act*, if an application is made under this Act in respect of a debtor company, the court, on the application of any person interested in the matter, may, subject to the restrictions set out in this Act, on notice to any other person or without notice as it may see fit, make any order that it considers appropriate in the circumstances.

2    The amendments did not come into force until September 18, 2009.

---

**End of Document**
Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

 Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 146

2010 SCC 4 (CanLII)

**Tercon Contractors Ltd.**  *Appellant*

*v.*

**Her Majesty The Queen in Right of the Province of British Columbia, by her Ministry of Transportation and Highways**  *Respondent*

and

**Attorney General of Ontario**  *Intervener*

INDEXED AS: TERCON CONTRACTORS LTD. *v.* BRITISH COLUMBIA (TRANSPORTATION AND HIGHWAYS)

**2010 SCC 4**

File No.: 32460.

2009: March 23; 2010: February 12.

Present: McLachlin C.J. and Binnie, LeBel, Deschamps, Fish, Abella, Charron, Rothstein and Cromwell JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR BRITISH COLUMBIA

*Contracts — Breach of terms — Tender — Ineligible bidder — Exclusion of liability clause — Doctrine of fundamental breach — Province issuing tender call for construction of highway — Request for proposals restricting qualified bidders to six proponents — Province accepting bid from ineligible bidder — Exclusion clause protecting Province from liability arising from participation in tendering process — Whether Province breached terms of tendering contract in entertaining bid from ineligible bidder — If so, whether Province's conduct fell within terms of exclusion clause — If so, whether court should nevertheless refuse to enforce the exclusion clause because of unconscionability or some other contravention of public policy.*

The Province of British Columbia issued a request for expressions of interest ("RFEI") for the design and construction of a highway. Six teams responded with submissions including Tercon and Brentwood. A few months later, the Province informed the six proponents

**Tercon Contractors Ltd.**  *Appelante*

*c.*

**Sa Majesté La Reine du chef de la Colombie-Britannique, représentée par le ministère des Transports et de la Voirie**  *Intimée*

et

**Procureur général de l'Ontario**  *Intervenant*

RÉPERTORIÉ : TERCON CONTRACTORS LTD. *c.* COLOMBIE-BRITANNIQUE (TRANSPORTS ET VOIRIE)

**2010 CSC 4**

Nᵒ du greffe : 32460.

2009 : 23 mars; 2010 : 12 février.

Présents : La juge en chef McLachlin et les juges Binnie, LeBel, Deschamps, Fish, Abella, Charron, Rothstein et Cromwell.

EN APPEL DE LA COUR D'APPEL DE LA COLOMBIE-BRITANNIQUE

*Contrats — Inexécution — Appel d'offres — Soumissionnaire inadmissible — Clause de non-responsabilité — Principe d'inexécution fondamentale — Appel d'offres lancé par la province pour la construction d'une route — Demande de propositions tenant seulement six entreprises pour admissibles — Acceptation par la province de la proposition d'un soumissionnaire inadmissible — Clause de non-recours protégeant la province contre toute responsabilité découlant de la participation à l'appel d'offres — La province s'est-elle rendue coupable d'inexécution du contrat issu de l'appel d'offres en considérant la proposition d'un soumissionnaire inadmissible? — Dans l'affirmative, son comportement tombait-il sous le coup de la clause de non-recours? — Dans l'affirmative, un tribunal devrait-il néanmoins refuser de faire respecter la clause en raison de son iniquité ou pour quelque autre atteinte à l'ordre public?*

La province de la Colombie-Britannique a lancé une demande d'expression d'intérêt (« DEI ») pour la conception et la construction d'une route. Elle a reçu six soumissions, dont celles de Tercon et de Brentwood. Quelques mois plus tard, la province a fait savoir aux

that it now intended to design the highway itself and issued a request for proposals ("RFP") for its construction. The RFP set out a specifically defined project and contemplated that proposals would be evaluated according to specific criteria. Under its terms, only the six original proponents were eligible to submit a proposal; those received from any other party would not be considered. The RFP also included an exclusion of liability clause which provided: "Except as expressly and specifically permitted in these Instructions to Proponents, no Proponent shall have any claim for compensation of any kind whatsoever, as a result of participating in this RFP, and by submitting a Proposal each Proponent shall be deemed to have agreed that it has no claim." As it lacked expertise in drilling and blasting, Brentwood entered into a pre-bidding agreement with another construction company ("EAC"), which was not a qualified bidder, to undertake the work as a joint venture. This arrangement allowed Brentwood to prepare a more competitive proposal. Ultimately, Brentwood submitted a bid in its own name with EAC listed as a "major member" of the team. Brentwood and Tercon were the two short-listed proponents and the Province selected Brentwood for the project. Tercon successfully brought an action in damages against the Province. The trial judge found that the Brentwood bid was, in fact, submitted by a joint venture of Brentwood and EAC and that the Province, which was aware of the situation, breached the express provisions of the tendering contract with Tercon by considering a bid from an ineligible bidder and by awarding it the work. She also held that, as a matter of construction, the exclusion clause did not bar recovery for the breaches she had found. The clause was ambiguous and she resolved this ambiguity in Tercon's favour. She held that the Province's breach was fundamental and that it was not fair or reasonable to enforce the exclusion clause in light of the Province's breach. The Court of Appeal set aside the decision, holding that the exclusion clause was clear and unambiguous and barred compensation for all defaults.

*Held* (McLachlin C.J. and Binnie, Abella and Rothstein JJ. dissenting): The appeal should be allowed. The Court agreed on the appropriate framework of analysis but divided on the applicability of the exclusion clause to the facts.

*The* Court: With respect to the appropriate framework of analysis the doctrine of fundamental breach

six entreprises intéressées qu'elle entendait désormais concevoir elle-même la route et demander des propositions pour sa construction. La demande de propositions (« DP ») décrivait un projet précis et indiquait que les propositions seraient considérées au regard de certains critères. Elle stipulait que seules les six entreprises intéressées initialement étaient admises à soumissionner et que les propositions présentées par d'autres personnes ne seraient pas examinées. La DP renfermait également une clause de non-recours, dont le texte était le suivant : « Sauf ce que prévoient expressément les présentes instructions, un proposant ne peut exercer aucun recours en indemnisation pour sa participation à la DP, ce qu'il est réputé accepter lorsqu'il présente une soumission. » Comme elle n'avait pas d'expertise dans le forage et le dynamitage, Brentwood a conclu avec une autre entreprise de construction (« EAC ») — qui n'était pas admise à soumissionner — une entente préalable à la soumission prévoyant qu'elles réaliseraient les travaux en coentreprise. De la sorte, elle pouvait présenter une proposition plus concurrentielle. Elle a finalement soumissionné en son nom, présentant EAC comme un « membre important » de son équipe. La liste des adjudicataires possibles a été ramenée à deux entreprises — Brentwood et Tercon —, puis le ministère a finalement opté pour la première. Tercon a intenté une action en dommages-intérêts contre la province et elle a eu gain de cause. La juge de première instance a conclu que la soumission de Brentwood était en fait celle de la coentreprise formée avec EAC, et que la province, qui le savait, avait contrevenu aux stipulations expresses du contrat intervenu avec Tercon en acceptant la soumission d'une autre entreprise qui n'était pas admissible, puis en confiant les travaux à cette même entreprise. Elle a aussi statué que le libellé de la clause de non-recours ne faisait pas obstacle à l'indemnisation pour les inexécutions relevées. La clause était équivoque et elle l'a interprétée en faveur de Tercon. Elle a estimé que l'inexécution reprochée à la province était fondamentale et qu'il n'était ni juste ni raisonnable de faire respecter la clause de non-recours étant donné la nature de l'inexécution. La Cour d'appel a annulé sa décision, statuant que la clause de non-recours était claire et non équivoque et qu'elle faisait obstacle à l'indemnisation pour toute inexécution.

*Arrêt* (la juge en chef McLachlin et les juges Binnie, Abella et Rothstein sont dissidents) : Le pourvoi est accueilli. Les juges de la Cour conviennent du cadre de l'analyse qui s'impose, mais ils sont partagés sur l'applicabilité de la clause de non-recours aux faits de l'espèce.

*La* Cour : Pour ce qui concerne le cadre d'analyse approprié, il convient de donner le « coup de grâce » au

2010 SCC 4 (CanLII)

should be "laid to rest". The following analysis should be applied when a plaintiff seeks to escape the effect of an exclusion clause or other contractual terms to which it had previously agreed. The first issue is whether, as a matter of interpretation, the exclusion clause even applies to the circumstances established in evidence. This will depend on the court's interpretation of the intention of the parties as expressed in the contract. If the exclusion clause applies, the second issue is whether the exclusion clause was unconscionable and thus invalid at the time the contract was made. If the exclusion clause is held to be valid at the time of contract formation and applicable to the facts of the case, a third enquiry may be raised as to whether the court should nevertheless refuse to enforce the exclusion clause because of an overriding public policy. The burden of persuasion lies on the party seeking to avoid enforcement of the clause to demonstrate an abuse of the freedom of contract that outweighs the very strong public interest in their enforcement. Conduct approaching serious criminality or egregious fraud are but examples of well-accepted considerations of public policy that are substantially incontestable and may override the public policy of freedom to contract and disable the defendant from relying upon the exclusion clause. Despite agreement on the appropriate framework of analysis, the court divided on the applicability of the exclusion clause to the facts of this case as set out below.

*Per* LeBel, Deschamps, Fish, Charron and Cromwell JJ.: The Province breached the express provisions of the tendering contract with Tercon by accepting a bid from a party who should not even have been permitted to participate in the tender process and by ultimately awarding the work to that ineligible bidder. This egregious conduct by the Province also breached the implied duty of fairness to bidders. The exclusion clause, which barred claims for compensation "as a result of participating" in the tendering process, did not, when properly interpreted, exclude Tercon's claim for damages. By considering a bid from an ineligible bidder, the Province not only acted in a way that breached the express and implied terms of the contract, it did so in a manner that was an affront to the integrity and business efficacy of the tendering process.

Submitting a compliant bid in response to a tender call may give rise to "Contract A" between the bidder and the owner. Whether a Contract A arises and what its terms are depends on the express and implied terms and conditions of the tender call and the legal consequences of the parties' actual dealings in each case.

principe de l'inexécution fondamentale. L'analyse qui suit vaut lorsque le demandeur tente de se soustraire à l'application d'une clause d'exonération ou d'une autre stipulation contractuelle dont il a précédemment convenu. Il faut d'abord déterminer, par voie d'interprétation, si la clause de non-recours s'applique aux faits mis en preuve, ce qui dépend de l'intention des parties qui se dégage du contrat. Lorsque la clause s'applique, il faut en deuxième lieu se demander si elle était inique et de ce fait invalide au moment de la formation du contrat. Lorsqu'elle est jugée valide au moment de la formation du contrat et applicable aux faits de l'espèce, le tribunal peut se demander dans un troisième temps s'il devrait tout de même refuser de la faire respecter en raison d'une considération d'ordre public prépondérante. Il incombe à la partie qui tente de se soustraire à l'application de la clause de prouver un abus de la liberté contractuelle qui l'emporte sur le très grand intérêt public lié au respect des contrats. Le comportement qui se rapproche de l'acte criminel grave ou de la fraude monumentale n'est qu'un exemple de considération d'ordre public bien établie et « foncièrement incontestable » pouvant primer la liberté contractuelle, elle aussi d'ordre public, et empêcher le défenseur de se retrancher derrière la clause de non-recours. Même si les juges de la Cour conviennent du cadre de l'analyse qui s'impose, ils sont partagés sur l'applicabilité de la clause de non-recours aux faits de l'espèce, comme il appert ci-après.

*Les* juges LeBel, Deschamps, Fish, Charron et Cromwell : La province a contrevenu aux stipulations expresses du contrat issu de l'appel d'offres et intervenu avec Tercon en acceptant la proposition d'une entreprise qui n'était pas admise à prendre part au processus d'appel d'offres, puis en confiant les travaux à cette même entreprise inadmissible. Par ce comportement inacceptable, la province a également manqué à son obligation tacite d'équité envers les soumissionnaires. Correctement interprétée, la clause de non-recours, qui écartait toute demande d'indemnisation « pour [l]a participation » à l'appel d'offres, ne faisait pas obstacle au recours en dommages-intérêts de Tercon. En considérant l'offre d'un soumissionnaire inadmissible, la province a non seulement manqué à ses obligations contractuelles expresses et tacites, mais elle l'a fait d'une manière qui portait outrageusement atteinte à l'intégrité et à l'efficacité commerciale du processus d'appel d'offres.

Le dépôt d'une soumission conforme en réponse à un appel d'offres peut faire naître un « contrat A » entre le soumissionnaire et le propriétaire. L'existence d'un tel contrat et sa teneur dépendent des conditions expresses et tacites de l'appel d'offres ainsi que des conséquences juridiques des échanges intervenus entre les parties.

2010 SCC 4 (CanLII)

Here, there is no basis to interfere with the trial judge's findings that there was an intent to create contractual obligations upon submission of a compliant bid and that only the six original proponents that qualified through the RFEI process were eligible to submit a response to the RFP. The tender documents and the required ministerial approval of the process stated expressly that the Province was contractually bound to accept bids only from eligible bidders. Contract A therefore could not arise by the submission of a bid from any other party. The trial judge found that the joint venture of Brentwood and EAC was not eligible to bid as they had not simply changed the composition of their team but, in effect, had created a new bidder. The Province fully understood this and would not consider a bid from or award the work to that joint venture. The trial judge did not err in finding that in fact, if not in form, Brentwood's bid was on behalf of a joint venture between itself and EAC. The joint venture provided Brentwood with a competitive advantage in the bidding process and was a material consideration in favour of the Brentwood bid during the Province's evaluation process. Moreover, the Province took active steps to obfuscate the reality of the true nature of the Brentwood bid. The bid by the joint venture constituted "material non-compliance" with the tendering contract and breached both the express eligibility provisions of the tender documents, and the implied duty to act fairly towards all bidders.

When the exclusion clause is interpreted in harmony with the rest of the RFP and in light of the commercial context of the tendering process, it did not exclude a damages claim resulting from the Province unfairly permitting an ineligible bidder to participate in the tendering process. The closed list of bidders was the foundation of this RFP and the parties should, at the very least, be confident that their initial bids will not be skewed by some underlying advantage in the drafting of the call for tenders conferred only upon one potential bidder. The requirement that only compliant bids be considered and the implied obligation to treat bidders fairly are factors that contribute to the integrity and business efficacy of the tendering process. The parties did not intend, through the words found in this exclusion clause, to waive compensation for conduct, like that of the Province in this case, that strikes at the heart of the tendering process. Clear language would be necessary to exclude liability for breach of the implied obligation, particularly in the case of public procurement where

transparency is essential. Furthermore, the restriction on eligibility of bidders was a key element of the alternative process approved by the Minister. When the statutory provisions which governed the tendering process in this case are considered, it seems unlikely that the parties intended through this exclusion clause to effectively gut a key aspect of the approved process. The text of the exclusion clause in the RFP addresses claims that result from "participating in this RFP". Central to "participating in this RFP" was participating in a contest among those eligible to participate. A process involving other bidders — the process followed by the Province — is not the process called for by "this RFP" and being part of that other process is not in any meaningful sense "participating in this RFP".

*Per* McLachlin C.J. and Binnie, Abella and Rothstein JJ. (dissenting): The Ministry's conduct, while in breach of its contractual obligations, fell within the terms of the exclusion compensation clause. The clause is clear and unambiguous and no legal ground or rule of law permits a court to override the freedom of the parties to contract with respect to this particular term, or to relieve Tercon against its operation in this case. A court has no discretion to refuse to enforce a valid and applicable contractual term unless the plaintiff can point to some paramount consideration of public policy sufficient to override the public interest in freedom of contact and defeat what would otherwise be the contractual rights of the parties. The public interest in the transparency and integrity of the government tendering process, while important, did not render unenforceable the terms of the contract Tercon agreed to.

Brentwood was a legitimate competitor in the RFP process and all bidders knew that the road contract would not be performed by the proponent alone and required a large "team" of different trades and personnel to perform. The issue was whether EAC would be on the job as a major sub-contractor or identified with Brentwood as a joint venture "proponent" with EAC. Tercon has legitimate reason to complain about the Ministry's conduct, but its misconduct did not rise to the level where public policy would justify the court in depriving the Ministry of the protection of the exclusion of compensation clause freely agreed to by Tercon in the contract.

en l'espèce, un comportement qui porte directement atteinte à l'intégrité de l'appel d'offres. Seul un libellé clair peut écarter la responsabilité consécutive au non-respect de l'obligation tacite, spécialement dans le cas de la passation de marchés publics, où la transparence est de rigueur. Qui plus est, l'admissibilité restreinte constituait un élément essentiel de l'autre processus approuvé par le ministre. Au regard du cadre législatif régissant l'appel d'offres en l'espèce, il est peu probable que les parties aient vraiment voulu, en stipulant la clause de non-recours, supprimer un aspect essentiel de ce processus. Le texte de la clause de non-recours de la DP vise les demandes d'indemnité d'un préjudice découlant de la « participation à la DP ». La participation à un concours ouvert aux seules personnes admises à y prendre part était donc au cœur de la « participation à la DP ». Un processus ouvert à d'autres entreprises — ce qui était le cas du processus suivi par la province — ne saurait s'entendre de « la DP », et le fait d'y prendre part ne saurait véritablement être considéré comme une « participation à la DP ».

*La* juge en chef McLachlin et les juges Binnie, Abella et Rothstein (dissidents) : Même s'il n'a pas respecté ses obligations contractuelles, le ministère bénéficie de la clause de non-recours en indemnisation. La clause est claire et non équivoque, et aucune règle de droit ou autre fondement juridique ne permet aux tribunaux de passer outre à la liberté des parties de convenir de cette condition ni de soustraire Tercon à son application en l'espèce. Le tribunal n'a pas le pouvoir discrétionnaire de refuser de faire respecter une clause contractuelle valide et applicable, sauf lorsque le demandeur fait valoir une considération d'ordre public prépondérante qui l'emporte sur l'intérêt public lié à la liberté de contracter et qui fait obstacle à ce qui, autrement, constitueraient les droits contractuels des parties. L'intérêt public lié à la transparence et à l'intégrité du processus gouvernemental d'appel d'offres, même s'il est important, n'a pas rendu inapplicables les clauses du contrat auxquelles Tercon avait consenti.

Brentwood était un concurrent légitime dans le processus de DP. Tous les soumissionnaires savaient que le contrat de construction routière ne serait pas exécuté seulement par le proposant retenu, mais bien par une grande « équipe » pluridisciplinaire. La question était celle de savoir si EAC serait sous-traitant principal ou « proposant » dans le cadre de la coentreprise avec Brentwood. Tercon a raison de dénoncer le comportement du ministère, mais celui-ci n'était pas répréhensible au point que l'ordre public justifie le tribunal de refuser au ministère la protection de la clause de non-recours en indemnisation à laquelle Tercon avait librement consenti.

TERCON CONTRACTORS LTD. *v.* B.C.

Contract A is based not on some abstract externally imposed rule of law but on the presumed (and occasionally implied) intent of the parties. At issue is the intention of the actual parties not what the court may project in hindsight would have been the intention of reasonable parties. Only in rare circumstances will a court relieve a party from the bargain it has made.

The exclusion clause did not run afoul of the statutory requirements. While the *Ministry of Transportation and Highways Act* favours "the integrity of the tendering process", it nowhere prohibits the parties from negotiating a "no claims" clause as part of their commercial agreement and cannot plausibly be interpreted to have that effect. Tercon — a sophisticated and experienced contractor — chose to bid on the project, including the risk posed by an exclusion of compensation clause, on the terms proposed by the Ministry. That was its prerogative and nothing in the "policy of the Act" barred the parties' agreement on that point.

The trial judge found that Contract A was breached when the RFP process was not conducted by the Ministry with the degree of fairness and transparency that the terms of Contract A entitled Tercon to expect. The Ministry was at fault in its performance of the RFP, but the process did not thereby cease to be the RFP process in which Tercon had elected to participate.

The interpretation of the majority on this point is disagreed with. "[P]articipating in this RFP" began with "submitting a Proposal" for consideration. The RFP process consisted of more than the final selection of the winning bid and Tercon participated in it. Tercon's bid was considered. To deny that such participation occurred on the ground that in the end the Ministry chose a Brentwood joint venture (an ineligible bidder) instead of Brentwood itself (an eligible bidder) would be to give the clause a strained and artificial interpretation in order, indirectly and obliquely, to avoid the impact of what may seem to the majority *ex post facto* to have been an unfair and unreasonable clause.

Moreover, the exclusion clause was not unconscionable. While the Ministry and Tercon do not exercise the same level of power and authority, Tercon is a major contractor and is well able to look after itself in a commercial context so there is no relevant imbalance of bargaining power. Further, the clause is not as draconian as Tercon portrays it. Other remedies for breach of Contract A were available. The parties expected, even if they did not like it, that the "no claims" clause would

L'assise du contrat A demeure l'intention présumée (et parfois inférée) des parties, et non quelque règle de droit abstraite imposée par un tiers. C'est l'intention des parties elles-mêmes qui importe, et non ce qui, à l'issue d'une analyse rétrospective du tribunal, aurait été l'intention de parties raisonnables. Ce n'est qu'en de rares circonstances que le tribunal relève une partie de ses engagements.

La clause de non-recours ne dérogeait pas aux exigences légales. La *Ministry of Transportation and Highways Act* favorise « l'intégrité du processus d'appel d'offres », mais aucune de ses dispositions n'empêche les parties de faire figurer dans leur accord commercial une clause « écartant toute indemnisation » ni ne peut vraisemblablement être interprétée comme ayant cet effet. Tercon — une entreprise avertie et expérimentée — a décidé de participer au processus aux conditions proposées par le ministère malgré le risque posé par la clause de non-recours en indemnisation. C'était sa décision, et la « raison d'être de la Loi » ne faisait aucunement obstacle à la convention des parties sur ce point.

La juge du procès a conclu à l'inexécution du contrat A du fait que, dans sa DP, le ministère n'a pas agi avec l'équité et la transparence auxquelles Tercon était en droit de s'attendre vu le libellé du contrat A. Le ministère a été fautif dans sa mise en œuvre de la DP, mais le processus n'a pas cessé pour autant d'être la DP à laquelle Tercon avait décidé de prendre part.

Les juges dissidents ne souscrivent pas à l'interprétation des juges majoritaires à cet égard. La « participation à la DP » a commencé par la « présent[ation d']une soumission ». Le processus de DP ne se résumait pas au choix final de l'adjudicataire, et Tercon y a participé. La soumission de Tercon a été considérée. Nier cette participation au motif que le ministère a finalement choisi la coentreprise inadmissible dont faisait partie Brentwood, et non Brentwood elle-même (qui était admissible), équivaut à une interprétation forcée et artificielle visant à éviter, par des moyens indirects et détournés, les conséquences de ce qui peut sembler aux juges majoritaires, *ex post facto*, avoir été une clause injuste et déraisonnable.

En outre, la clause de non-recours n'était pas inique. Tercon n'a ni le pouvoir ni l'autorité du ministère, mais c'est une entreprise importante parfaitement en mesure de défendre ses intérêts commerciaux. Il n'y avait donc pas d'inégalité déterminante du pouvoir de négociation. Aussi, la clause de non-recours n'est pas aussi draconienne que le laisse entendre Tercon. L'inexécution du contrat A donnait ouverture à d'autres recours. Les parties s'attendaient, même si cette éventualité ne les

TERCON CONTRACTORS LTD. *c.* C.-B.

operate even where the eligibility criteria in respect of the bid (including the bidder) were not complied with.

Finally, the Ministry's misconduct did not rise to the level where public policy would justify the court in depriving the Ministry of the protection of the exclusion of compensation clause freely agreed to by Tercon in the contract.

**Cases Cited**

By Cromwell J.

**Applied:** *M.J.B. Enterprises Ltd. v. Defence Construction (1951) Ltd.*, [1999] 1 S.C.R. 619; *Martel Building Ltd. v. Canada*, 2000 SCC 60, [2000] 2 S.C.R. 860; **considered:** *Hunter Engineering Co. v. Syncrude Canada Ltd.*, [1989] 1 S.C.R. 426; *Cahill (G.J.) & Co. (1979) Ltd. v. Newfoundland and Labrador (Minister of Municipal and Provincial Affairs)*, 2005 NLTD 129, 250 Nfld. & P.E.I.R. 145; *Guarantee Co. of North America v. Gordon Capital Corp.*, [1999] 3 S.C.R. 423; *Fraser Jewellers (1982) Ltd. v. Dominion Electric Protection Co.* (1997), 34 O.R. (3d) 1; **referred to:** *Canadian Pacific Hotels Ltd. v. Bank of Montreal*, [1987] 1 S.C.R. 711; *Double N Earthmovers Ltd. v. Edmonton (City)*, 2007 SCC 3, [2007] 1 S.C.R. 116; *Hillis Oil and Sales Ltd. v. Wynn's Canada, Ltd.*, [1986] 1 S.C.R. 57.

By Binnie J. (dissenting)

*Hunter Engineering Co. v. Syncrude Canada Ltd.*, [1989] 1 S.C.R. 426; *The Queen in right of Ontario v. Ron Engineering & Construction (Eastern) Ltd.*, [1981] 1 S.C.R. 111; *M.J.B. Enterprises Ltd. v. Defence Construction (1951) Ltd.*, [1999] 1 S.C.R. 619; *Naylor Group Inc. v. Ellis-Don Construction Ltd.*, 2001 SCC 58, [2001] 2 S.C.R. 943; *Martel Building Ltd. v. Canada*, 2000 SCC 60, [2000] 2 S.C.R. 860; *Double N Earthmovers Ltd. v. Edmonton (City)*, 2007 SCC 3, [2007] 1 S.C.R. 116; *Tercon Contractors Ltd. v. British Columbia* (1993), 9 C.L.R. (2d) 197, aff'd [1994] B.C.J. No. 2658 (QL); *Karsales (Harrow) Ltd. v. Wallis*, [1956] 1 W.L.R. 936; *Guarantee Co. of North America v. Gordon Capital Corp.*, [1999] 3 S.C.R. 423; *ABB Inc. v. Domtar Inc.*, 2007 SCC 50, [2007] 3 S.C.R. 461; *Re Millar Estate*, [1938] S.C.R. 1; *Plas-Tex Canada Ltd. v. Dow Chemical of Canada Ltd.*, 2004 ABCA 309, 245 D.L.R. (4th) 650.

**Statutes and Regulations Cited**

*Ministry of Transportation and Highways Act*, R.S.B.C. 1996, c. 311, ss. 4, 23.

enchantait guère, à ce que la clause « écartant toute indemnisation » s'applique advenant même le non-respect des critères d'admissibilité de la soumission (et de son auteur).

Enfin, l'inconduite n'était pas répréhensible au point que l'ordre public justifie le tribunal de refuser au ministère la protection de la clause de non-recours en indemnisation à laquelle Tercon a librement consenti.

**Jurisprudence**

Citée par le juge Cromwell

**Arrêts appliqués :** *M.J.B. Enterprises Ltd. c. Construction de Défense (1951) Ltée*, [1999] 1 R.C.S. 619; *Martel Building Ltd. c. Canada*, 2000 CSC 60, [2000] 2 R.C.S. 860; **arrêts examinés :** *Hunter Engineering Co. c. Syncrude Canada Ltée*, [1989] 1 R.C.S. 426; *Cahill (G.J.) & Co. (1979) Ltd. c. Newfoundland and Labrador (Minister of Municipal and Provincial Affairs)*, 2005 NLTD 129, 250 Nfld. & P.E.I.R. 145; *Guarantee Co. of North America c. Gordon Capital Corp.*, [1999] 3 R.C.S. 423; *Fraser Jewellers (1982) Ltd. c. Dominion Electric Protection Co.* (1997), 34 O.R. (3d) 1; **arrêts mentionnés :** *Société hôtelière Canadien Pacifique Ltée c. Banque de Montréal*, [1987] 1 R.C.S. 711; *Double N Earthmovers Ltd. c. Edmonton (Ville)*, 2007 CSC 3, [2007] 1 R.C.S. 116; *Hillis Oil and Sales Ltd. c. Wynn's Canada, Ltd.*, [1986] 1 R.C.S. 57.

Citée par le juge Binnie (dissident)

*Hunter Engineering Co. c. Syncrude Canada Ltée*, [1989] 1 R.C.S. 426; *La Reine du chef de l'Ontario c. Ron Engineering & Construction (Eastern) Ltd.*, [1981] 1 R.C.S. 111; *M.J.B. Enterprises Ltd. c. Construction de Défense (1951) Ltée*, [1999] 1 R.C.S. 619; *Naylor Group Inc. c. Ellis-Don Construction Ltd.*, 2001 CSC 58, [2001] 2 R.C.S. 943; *Martel Building Ltd. c. Canada*, 2000 CSC 60, [2000] 2 R.C.S. 860; *Double N Earthmovers Ltd. c. Edmonton (Ville)*, 2007 CSC 3, [2007] 1 R.C.S. 116; *Tercon Contractors Ltd. c. British Columbia* (1993), 9 C.L.R. (2d) 197, conf. par [1994] B.C.J. No. 2658 (QL); *Karsales (Harrow) Ltd. c. Wallis*, [1956] 1 W.L.R. 936; *Guarantee Co. of North America c. Gordon Capital Corp.*, [1999] 3 R.C.S. 423; *ABB Inc. c. Domtar Inc.*, 2007 CSC 50, [2007] 3 R.C.S. 461; *Re Millar Estate*, [1938] R.C.S. 1; *Plas-Tex Canada Ltd. c. Dow Chemical of Canada Ltd.*, 2004 ABCA 309, 245 D.L.R. (4th) 650.

**Lois et règlements cités**

*Ministry of Transportation and Highways Act*, R.S.B.C. 1996, ch. 311, art. 4, 23.

**Authors Cited**

Hall, Geoff R. *Canadian Contractual Interpretation Law*. Markham, Ont.: LexisNexis, 2007.

Kain, Brandon, and Douglas T. Yoshida. "The Doctrine of Public Policy in Canadian Contract Law", in Todd L. Archibald and Randall Scott Echlin, eds., *Annual Review of Civil Litigation, 2007*. Toronto: Thomson Carswell, 2007, 1.

McCamus, John D. *The Law of Contracts*. Toronto: Irwin Law, 2005.

Waddams, S. M. *The Law of Contracts*, 5th ed. Aurora, Ont.: Canada Law Book, 2005.

APPEAL from a judgment of the British Columbia Court of Appeal (Donald, Mackenzie and Lowry JJ.A.), 2007 BCCA 592, 73 B.C.L.R. (4th) 201, 40 B.L.R. (4th) 26, 289 D.L.R. (4th) 647, [2008] 2 W.W.R. 410, 249 B.C.A.C. 103, 414 W.A.C. 103, 66 C.L.R. (3d) 1, [2007] B.C.J. No. 2558 (QL), 2007 CarswellBC 2880, setting aside a decision of Dillon J., 2006 BCSC 499, 53 B.C.L.R. (4th) 138, [2006] 6 W.W.R. 275, 18 B.L.R. (4th) 88, 51 C.L.R. (3d) 227, [2006] B.C.J. No. 657 (QL), 2006 CarswellBC 730. Appeal allowed, McLachlin C.J. and Binnie, Abella and Rothstein JJ. dissenting.

*Chris R. Armstrong*, *Brian G. McLean*, *William S. McLean* and *Marie-France Major*, for the appellant.

*J. Edward Gouge*, *Q.C.*, *Jonathan Eades* and *Kate Hamm*, for the respondent.

*Malliha Wilson* and *Lucy McSweeney*, for the intervener.

The judgment of LeBel, Deschamps, Fish, Charron and Cromwell JJ. was delivered by

CROMWELL J. —

I.  Introduction

[1]  The Province accepted a bid from a bidder who was not eligible to participate in the tender and then took steps to ensure that this fact was not disclosed. The main question on appeal, as I see it, is whether the Province succeeded in excluding

**Doctrine citée**

Hall, Geoff R. *Canadian Contractual Interpretation Law*. Markham, Ont. : LexisNexis, 2007.

Kain, Brandon, and Douglas T. Yoshida. « The Doctrine of Public Policy in Canadian Contract Law », in Todd L. Archibald and Randall Scott Echlin, eds., *Annual Review of Civil Litigation, 2007*. Toronto : Thomson Carswell, 2007, 1.

McCamus, John D. *The Law of Contracts*. Toronto : Irwin Law, 2005.

Waddams, S. M. *The Law of Contracts*, 5th ed. Aurora, Ont. : Canada Law Book, 2005.

POURVOI contre un arrêt de la Cour d'appel de la Colombie-Britannique (les juges Donald, Mackenzie et Lowry), 2007 BCCA 592, 73 B.C.L.R. (4th) 201, 40 B.L.R. (4th) 26, 289 D.L.R. (4th) 647, [2008] 2 W.W.R. 410, 249 B.C.A.C. 103, 414 W.A.C. 103, 66 C.L.R. (3d) 1, [2007] B.C.J. No. 2558 (QL), 2007 CarswellBC 2880, qui a infirmé une décision de la juge Dillon, 2006 BCSC 499, 53 B.C.L.R. (4th) 138, [2006] 6 W.W.R. 275, 18 B.L.R. (4th) 88, 51 C.L.R. (3d) 227, [2006] B.C.J. No. 657 (QL), 2006 CarswellBC 730. Pourvoi accueilli, la juge en chef McLachlin et les juges Binnie, Abella et Rothstein sont dissidents.

*Chris R. Armstrong*, *Brian G. McLean*, *William S. McLean* et *Marie-France Major*, pour l'appelante.

*J. Edward Gouge*, *c.r.*, *Jonathan Eades* et *Kate Hamm*, pour l'intimée.

*Malliha Wilson* et *Lucy McSweeney*, pour l'intervenant.

Version française du jugement des juges LeBel, Deschamps, Fish, Charron et Cromwell rendu par

LE JUGE CROMWELL —

I.  Introduction

[1]  La province a accepté la soumission d'une entreprise non admise à participer à l'appel d'offres, puis elle a pris des mesures pour dissimuler ce fait. De mon point de vue, la principale question que soulève le pourvoi est celle de savoir si, grâce à

its liability for damages flowing from this conduct through an exclusion clause it inserted into the contract. I share the view of the trial judge that it did not.

[2]   The appeal arises out of a tendering contract between the appellant, Tercon Contractors Ltd., who was the bidder, and the respondent, Her Majesty the Queen in Right of the Province of British Columbia, who issued the tender call. The case turns on the interpretation of provisions in the contract relating to eligibility to bid and exclusion of compensation resulting from participation in the tendering process.

[3]   The trial judge found that the respondent (which I will refer to as the Province) breached the express provisions of the tendering contract with Tercon by accepting a bid from another party who was not eligible to bid and by ultimately awarding the work to that ineligible bidder. In short, a bid was accepted and the work awarded to a party who should not even have been permitted to participate in the tender process. The judge also found that this and related conduct by the Province breached the implied duty of fairness to bidders, holding that the Province had acted "egregiously" (2006 BCSC 499, 53 B.C.L.R. (4th) 138, at para. 150). The judge then turned to the Province's defence based on an exclusion clause that barred claims for compensation "as a result of participating" in the tendering process. She held that this clause, properly interpreted, did not exclude Tercon's claim for damages. In effect, she held that it was not within the contemplation of the parties that this clause would bar a remedy in damages arising from the Province's unfair dealings with a party who was not entitled to participate in the tender in the first place.

[4]   The Province appealed and the Court of Appeal reversed (2007 BCCA 592, 73 B.C.L.R. (4th) 201). Dealing only with the exclusion clause issue, it held that the clause was clear and unambiguous and barred compensation for all defaults.

la clause de non-recours en indemnisation (« clause de non-recours ») qu'elle a insérée dans le contrat, la province parvient à échapper à la responsabilité civile découlant de ces actes. À l'instar de la juge de première instance, je conclus par la négative.

[2]   Le pourvoi fait suite au contrat issu de l'appel d'offres et intervenu entre l'appelante Tercon Contractors Ltd., le soumissionnaire, et l'intimée Sa Majesté la Reine du chef de la Colombie-Britannique (la « province »), l'auteur de l'appel d'offres. Le dénouement de l'affaire tient à l'interprétation des clauses du contrat relatives à l'admissibilité à soumissionner et à l'exclusion de toute indemnité pour la participation à la demande de propositions.

[3]   La juge de première instance conclut que la province a contrevenu aux stipulations expresses du contrat intervenu avec Tercon en acceptant la proposition d'un autre soumissionnaire qui n'était pas admissible, puis en confiant les travaux à ce même soumissionnaire. Pour faire court, une proposition a été acceptée et le marché a été accordé à une entreprise qui n'aurait même pas dû être admise à participer au processus. La juge de première instance conclut également que par ces actes et d'autres mesures connexes, la province a manqué à son obligation tacite d'équité envers les soumissionnaires et qu'elle a agi [TRADUCTION] « de manière inacceptable » (2006 BCSC 499, 53 B.C.L.R. (4th) 138, par. 150). Elle se penche ensuite sur la clause de non-recours qui, selon la province, ferait obstacle à toute demande d'indemnisation [TRADUCTION] « pour [l]a participation » à l'appel d'offres. Elle estime que, correctement interprétée, la clause ne faisait pas obstacle au recours en dommages-intérêts de Tercon. Elle statue en effet que les parties n'ont pas envisagé que la clause empêche un tel recours intenté pour l'iniquité dont a fait preuve la province en se mettant en rapport avec une entreprise qui n'était même pas admise à soumissionner.

[4]   La province s'est adressée à la Cour d'appel, qui lui a donné raison, se prononçant uniquement sur la clause de non-recours et statuant qu'elle était claire et non équivoque et qu'elle faisait obstacle à l'indemnisation pour toute inexécution (2007 BCCA 592, 73 B.C.L.R. (4th) 201).

[5]   On Tercon's appeal to this Court, the questions for us are whether the successful bidder was eligible to participate in the request for proposals ("RFP") and, if not, whether Tercon's claim for damages is barred by the exclusion clause.

[6]   In my respectful view, the trial judge reached the right result on both issues. The Province's attempts to persuade us that it did not breach the tendering contract are, in my view, wholly unsuccessful. The foundation of the tendering contract was that only six, pre-selected bidders would be permitted to participate in the bidding. As the trial judge held, the Province not only acted in a way that breached the express and implied terms of the contract by considering a bid from an ineligible bidder, it did so in a manner that was an affront to the integrity and business efficacy of the tendering process. One must not lose sight of the fact that the trial judge found that the Province acted egregiously by "ensuring that [the true bidder] was not disclosed" (para. 150) and that its breach "attacke[d] the underlying premise of the [tendering] process" (para. 146), a process which was set out in detail in the contract and, in addition, had been given ministerial approval as required by statute.

[7]   As for its reliance on the exclusion clause, the Province submits that the parties were free to agree to limitations of liability and did so. Consideration of this submission requires an interpretation of the words of the clause to which the parties agreed in the context of the contract as a whole. My view is that, properly interpreted, the exclusion clause does not protect the Province from Tercon's damage claim which arises from the Province's dealings with a party not even eligible to bid, let alone from its breach of the implied duty of fairness to bidders. In other words, the Province's liability did not arise from Tercon's participation in the process that the Province established, but from the Province's unfair dealings with a party who was not entitled to participate in that process.

[8]   I would allow the appeal and restore the judgment of the trial judge.

[5]   Dans le pourvoi formé par Tercon, la Cour est appelée à déterminer si l'adjudicataire était admis à participer à la demande de propositions (« DP ») et, dans la négative, si la clause de non-recours fait obstacle au recours en dommages-intérêts de Tercon.

[6]   En toute déférence, j'estime que la juge de première instance tranche correctement les deux questions. La province n'est pas du tout parvenue, selon moi, à convaincre la Cour qu'elle n'avait pas manqué à ses obligations contractuelles. Suivant le contrat issu de l'appel d'offres, seules six entreprises présélectionnées pouvaient prendre part à l'appel d'offres. La juge statue qu'en considérant l'offre d'un soumissionnaire inadmissible, la province a manqué à ses obligations contractuelles expresses et tacites, et ce, d'une manière qui portait outrageusement atteinte à l'intégrité et à l'efficacité commerciale du processus d'appel d'offres. Sans oublier qu'à son avis, la province a agi de manière inacceptable en [TRADUCTION] « veillant à ce que [l'identité du véritable soumissionnaire] ne soit pas révélée » (par. 150). La juge ajoute que cette inexécution [TRADUCTION] « a sapé l'assise du processus [d'appel d'offres] » (par. 146), lequel était décrit en détail dans le contrat et, qui plus est, avait obtenu l'approbation ministérielle exigée par la loi.

[7]   Pour ce qui concerne l'application de la clause de non-recours, la province soutient que les parties étaient libres de limiter leur responsabilité comme elles l'ont fait. Statuer sur cette prétention exige que l'on interprète le libellé de la clause dont les parties ont convenu, au vu du contrat dans son entier. J'estime que, correctement interprétée, la clause de non-recours ne protège pas la province contre l'action en dommages-intérêts intentée par Tercon pour la mise en rapport de la province avec une entreprise qui n'était même pas admise à soumissionner, sans compter le manquement à son obligation tacite d'équité envers les soumissionnaires. Autrement dit, la responsabilité de la province ne résulte pas de la participation de Tercon au processus, mais bien de l'iniquité dont la province s'est rendue coupable en se mettant en rapport avec une entreprise non admise à prendre part à ce processus.

[8]   Je suis d'avis d'accueillir le pourvoi et de rétablir le jugement de première instance.

## II.  Brief Overview of the Facts

[9]   I will have to set out more factual detail as part of my analysis. For now, a very brief summary will suffice. In 2000, the Ministry of Transportation and Highways (also referred to as the "Province") issued a request for expressions of interest ("RFEI") for designing and building a highway in northwestern British Columbia. Six teams made submissions, including Tercon and Brentwood Enterprises Ltd. Later that year, the Province informed the six proponents that it now intended to design the highway itself and would issue a RFP for its construction.

[10]   The RFP was formally issued on January 15, 2001. Under its terms, only the six original proponents were eligible to submit a proposal. The RFP also included a clause excluding all claims for damages "as a result of participating in this RFP" (s. 2.10).

[11]   Unable to submit a competitive bid on its own, Brentwood teamed up with Emil Anderson Construction Co. ("EAC"), which was not a qualified bidder, and together they submitted a bid in Brentwood's name.  Brentwood and Tercon were the two short-listed proponents and the Ministry ultimately selected Brentwood as the preferred proponent.

[12]   Tercon brought an action seeking damages, alleging that the Ministry had considered and accepted an ineligible bid and that, but for that breach, it would have been awarded the contract. The trial judge agreed and awarded roughly $3.5 million in damages and prejudgment interest. As noted, the Court of Appeal reversed and Tercon appeals by leave of the Court.

## III.  Issues

[13]   The issues for decision are whether the trial judge erred in finding that:

1.  the Province breached the tendering contract by entertaining a bid from an ineligible bidder.

## II.  Bref aperçu des faits

[9]   Je reviendrai plus en détail sur les faits, mais pour l'heure, en voici un bref résumé. En 2000, le ministère des Transports et de la Voirie (également appelé la « province ») a lancé une demande d'expression d'intérêt (« DEI ») pour la conception et la construction d'une route dans le nord-ouest de la Colombie-Britannique. Elle a reçu six soumissions, dont celles de Tercon et de Brentwood Enterprises Ltd. Plus tard la même année, la province a fait savoir aux six entreprises intéressées qu'elle entendait désormais concevoir elle-même la route et demander des propositions pour sa construction.

[10]   Lancée officiellement le 15 janvier 2001, la DP précisait que seules les six entreprises intéressées initialement étaient admises à soumissionner. Elle comportait aussi une clause écartant tout recours en indemnisation [TRADUCTION] « pour [l]a participation à la DP » (clause 2.10).

[11]   Incapable de présenter seule une soumission concurrentielle, Brentwood s'est jointe à Emil Anderson Construction Co. (« EAC »), qui n'était pas un soumissionnaire admissible, et une proposition commune a été présentée au nom de Brentwood. La liste des adjudicataires possibles a été ramenée à deux entreprises — Brentwood et Tercon —, puis le ministère a finalement opté pour la première.

[12]   Tercon a intenté une action en dommages-intérêts, alléguant que le ministère avait examiné puis accepté une soumission inadmissible et que, n'eût été ce manquement, elle aurait obtenu le contrat. Elle a eu gain de cause en première instance et obtenu une indemnité d'environ 3,5 millions de dollars plus l'intérêt avant jugement, mais elle a été déboutée en Cour d'appel. Tercon se pourvoit devant notre Cour sur autorisation.

## III.  Les questions en litige

[13]   Notre Cour doit déterminer si la juge de première instance a eu tort ou non de tirer les conclusions suivantes :

1.  la province a manqué à une obligation contractuelle en considérant la proposition d'un soumissionnaire inadmissible;

2. the exclusion clause does not bar the appellant's claim for damages for the breaches of the tendering contract found by the trial judge.

## IV.  Analysis

### A.  *Was the Brentwood Bid Ineligible?*

[14]   The first issue is whether the Brentwood bid was from an eligible bidder. The judge found that the bid was in substance, although not in form, from a joint venture of Brentwood and EAC and that it was, therefore, an ineligible bid. The Province attacks this finding on three grounds:

(i)  a joint venture is not a legal person and therefore the Province could not and did not contract with a joint venture;

(ii)  it did not award the contract to EAC and EAC had no contractual responsibility to the Province for failure to perform the contract;

(iii) there was no term of the RFP that restricted the right of proponents to enter into joint venture agreements with others; this arrangement merely left Brentwood, the original proponent, in place and allowed it to enhance its ability to perform the work.

[15]   While these were the Province's main points, its position became more wide-ranging during oral argument, at times suggesting that it had no contractual obligation to deal only with eligible bidders. It is therefore necessary to take a step back and look at that threshold point before turning to the Province's more focussed submissions.

### 1.  The Province's Contractual Obligations in the Bidding Process

[16]   The judge found, and it was uncontested at trial, that only the six original proponents that

2. la clause de non-recours ne faisait pas obstacle au recours en dommages-intérêts de l'appelante pour les inexécutions contractuelles relevées par le tribunal.

## IV.  Analyse

### A.  *La proposition de Brentwood était-elle admissible?*

[14]   La première question est celle de savoir si la proposition de Brentwood était présentée par un soumissionnaire admissible. La juge de première instance conclut que, malgré sa forme, la proposition provenait essentiellement d'une coentreprise formée de Brentwood et d'EAC et qu'elle était donc inadmissible. La province invoque trois motifs à l'encontre de cette conclusion :

(i)  une coentreprise étant dépourvue de la personnalité morale, elle ne pouvait contracter avec une telle entité et elle ne l'a pas fait;

(ii)  elle n'a pas adjugé le marché à EAC, et EAC n'avait envers elle aucune responsabilité en cas d'inexécution contractuelle;

(iii) aucune disposition de la DP n'interdisait aux proposants de s'associer à des tiers en coentreprise : Brentwood, proposant initial, demeurait simplement en lice et accroissait sa capacité d'exécuter les travaux.

[15]   Ce sont les principaux arguments invoqués par la province, mais celle-ci a défendu une thèse beaucoup plus large en plaidoirie orale, faisant valoir à certains moments qu'elle n'était pas contractuellement tenue de se mettre en rapport seulement avec des soumissionnaires admissibles. Il faut donc revenir sur cette question préliminaire avant d'analyser les points plus précis de son argumentation.

### 1.  Les obligations contractuelles de la province dans le processus d'appel d'offres

[16]   La juge de première instance conclut — ce qui n'a pas été contesté au procès — que seules les

2010 SCC 4 (CanLII)

qualified through the RFEI process were eligible to submit a response to the RFP. This finding is not challenged on appeal, although there was a passing suggestion during oral argument that there was no contractual obligation of this sort at all. The trial judge also held, noting that this point was uncontested, that a joint venture between Brentwood and EAC was ineligible to bid. This is also not contested on appeal. These two findings are critical to the case and provide important background for an issue that is in dispute, namely whether the Brentwood bid was ineligible. It is, therefore, worth reviewing the relevant background in detail. I first briefly set out the legal framework and then turn to the trial judge's findings.

### 2.  Legal Principles

[17]  Submitting a compliant bid in response to a tender call *may* give rise to a contract — called Contract A — between the bidder and the owner, the express terms of which are found in the tender documents. The contract may also have implied terms according to the principles set out in *Canadian Pacific Hotels Ltd. v. Bank of Montreal*, [1987] 1 S.C.R. 711; see also *M.J.B. Enterprises Ltd. v. Defence Construction (1951) Ltd.*, [1999] 1 S.C.R. 619, and *Martel Building Ltd. v. Canada*, 2000 SCC 60, [2000] 2 S.C.R. 860. The key word, however, is "may". The Contract A/Contract B framework is one that arises, if at all, from the dealings between the parties. It is not an artificial construct imposed by the courts, but a description of the legal consequences of the parties' actual dealings. The Court emphasized in *M.J.B.* that whether Contract A arises and if it does, what its terms are, depend on the express and implied terms and conditions of the tender call in each case. As Iacobucci J. put it, at para. 19:

   What is important . . . is that the submission of a tender in response to an invitation to tender may give

six entreprises intéressées initialement, devenues admissibles à l'issue de la DEI, pouvaient donner suite à la DP. Cette conclusion n'est pas contestée en appel même si, en plaidoirie orale, la province a laissé entendre qu'elle n'avait pas d'obligation contractuelle concomitante. La juge estime également — et relève l'absence de contestation sur ce point — que la coentreprise formée de Brentwood et d'EAC n'était pas un soumissionnaire admissible. Cette conclusion n'est pas non plus contestée en appel. Ces deux conclusions sont cruciales en l'espèce et elles offrent une toile de fond importante pour trancher une question en litige, à savoir l'admissibilité de la proposition de Brentwood. Il convient donc d'examiner ce contexte en détail. Je ferai brièvement état du cadre juridique applicable avant de me pencher sur les conclusions de la juge de première instance.

### 2.  Les principes juridiques

[17]  Le dépôt d'une soumission conforme en réponse à un appel d'offres *peut* faire naître entre le soumissionnaire et le propriétaire un contrat — le contrat A — dont les conditions sont celles figurant dans le dossier d'appel d'offres. Le contrat peut également comporter des clauses tacites, suivant les principes formulés dans l'arrêt *Société hôtelière Canadien Pacifique Ltée c. Banque de Montréal*, [1987] 1 R.C.S. 711; voir aussi les arrêts *M.J.B. Enterprises Ltd. c. Construction de Défense (1951) Ltée*, [1999] 1 R.C.S. 619, et *Martel Building Ltd. c. Canada*, 2000 CSC 60, [2000] 2 R.C.S. 860. L'élément clé réside toutefois dans l'emploi du mot « peut ». L'existence d'un contrat A et d'un contrat B dépend entièrement des échanges entre les parties. Il ne s'agit pas d'une conception artificielle imposée par les tribunaux, mais d'une description des conséquences juridiques des échanges intervenus entre les parties. Dans l'arrêt *M.J.B.*, la Cour souligne que ce sont les conditions expresses et tacites de l'appel d'offres qui déterminent chaque fois s'il y a ou non un contrat A et, le cas échéant, quelles en sont les conditions. Comme le dit le juge Iacobucci au par. 19 :

   L'important [. . .] c'est que la présentation d'une soumission en réponse à un appel d'offres peut donner

Case 09-10138-MFW   Doc 14225-51   Filed 08/15/14   Page 222 of 493

82        TERCON CONTRACTORS LTD. *v.* B.C.   *Cromwell J.*        [2010] 1 S.C.R.

rise to contractual obligations, quite apart from the obligations associated with the construction contract to be entered into upon the acceptance of a tender, <u>depending upon whether the parties intend to initiate contractual relations by the submission of a bid</u>. If such a contract arises, its terms are governed by the terms and conditions of the tender call. [Emphasis added.]

naissance à des obligations contractuelles tout à fait distinctes des obligations découlant du contrat d'entreprise qui doit être conclu dès l'acceptation de la soumission, <u>selon que les parties auront voulu établir des rapports contractuels par la présentation d'une soumission</u>. Advenant la formation d'un tel contrat, ses modalités sont régies par les conditions de l'appel d'offres. [Je souligne.]

### 3.  The Trial Judge's Findings Concerning the Existence of Contract A

[18]   The question of whether Tercon's submission of a compliant bid gave rise to contractual relations between it and the Province was contested by the Province at trial. The trial judge gave extensive reasons for finding against the Province on this issue. We are told that the Province did not pursue this point in the Court of Appeal but instead premised its submissions on the existence of Contract A. The Province took the same approach in its written submissions in this Court. However, during oral argument, there was some passing reference in response to questions that there was no Contract A. In light of the position taken by the Province on its appeal to the Court of Appeal and in its written submissions in this Court, it is now too late to revisit whether there were contractual duties between Tercon and the Province. Even if it were open to the Province to make this argument now, I can see no error in legal principle or any palpable and overriding error of fact in the trial judge's careful reasons on this point.

[19]   The trial judge did not mechanically impose the Contract A/Contract B framework, but considered whether Contract A arose in light of her detailed analysis of the dealings between the parties. That was the right approach. She reviewed in detail the provisions of the RFP which supported her conclusion that there was an intent to create contractual relations upon submission of a compliant bid. She noted, for example, that bids were to be irrevocable for 60 days and that security of $50,000 had to be paid by all proponents and was to be increased to $200,000 by the successful proponent. Any revisions to proposals prior to the closing date had to be in writing, properly executed and received before the closing time. The RFP also set

### 3.  Les conclusions de la juge de première instance concernant l'existence du contrat A

[18]   La province a nié au procès que la présentation d'une soumission conforme par Tercon a fait naître un lien contractuel entre elles. La juge du procès motive abondamment sa décision de donner tort à la province sur ce point. Il appert que la province n'aurait pas persisté dans cette voie devant la Cour d'appel, mais aurait plutôt invoqué l'existence d'un contrat A. La province défend la même thèse dans l'argumentation écrite présentée à notre Cour, mais en réponse à des questions posées lors de sa plaidoirie, elle a laissé entendre qu'il n'existait pas de contrat A. Vu la position de la province en Cour d'appel et l'argumentation écrite qu'elle nous a présentée, il est désormais trop tard pour revenir sur la question de l'existence d'obligations contractuelles entre Tercon et la province. Et même s'il était loisible à la province de faire valoir cet argument aujourd'hui, je ne relève pas d'erreur de droit ni d'erreur de fait manifeste et dominante dans les motifs soigneusement rédigés par la juge de première instance sur ce point.

[19]   La juge de première instance n'a pas mécaniquement appliqué le modèle du contrat A et du contrat B. Elle s'est plutôt demandé si l'examen détaillé des échanges entre les parties révélait qu'un contrat A en avait résulté. C'est ce qu'il convenait de faire. Elle conclut à l'issue d'un examen minutieux des dispositions de la DP qu'il y avait intention que la présentation d'une soumission conforme crée un lien contractuel. Par exemple, elle relève que les soumissions devaient être irrévocables pendant 60 jours et que chaque soumissionnaire devait verser 50 000 $ à titre de garantie, montant qui passait à 200 000 $ si sa proposition était retenue. Toute modification de la proposition avant la date de clôture devait être faite par écrit, porter les

out detailed evaluation criteria and specified that they were to be the only criteria to be used to evaluate proposals. A specific form of alliance agreement was attached. There were detailed provisions about pricing that were fixed and non-negotiable. A proponent was required to accept this form of contract substantially, and security was lost if an agreement was not executed. The Ministry reserved a right to cancel the RFP under s. 2.9 but in such event was obliged to reimburse proponents for costs incurred in preparing their bids up to $15,000 each. Proponents had to submit a signed proposal form, which established that they offered to execute an agreement substantially in the form included in the RFP package. Further, they acknowledged that the security could be forfeited if they were selected as the preferred proponent and failed to enter into good faith discussions with the Ministry to reach an agreement and sign the alliance agreement.

[20]  In summary, as the trial judge found, the RFP set out a specifically defined project, invited proposals from a closed and specific list of eligible proponents, and contemplated that proposals would be evaluated according to specific criteria. Negotiation of the alliance construction contract was required, but the negotiation was constrained and did not go to the fundamental details of either the procurement process or the ultimate contract.

[21]  There is, therefore, no basis to interfere with the judge's finding that there was an intent to create contractual obligations upon submission of a compliant bid. I add, however, that the tender call in this case did not give rise to the classic Contract A/Contract B framework in which the bidder submits an irrevocable bid and undertakes to enter into Contract B on those terms if it is accepted. The alliance model process which was used here was more complicated than that and involved good faith negotiations for a Contract B in the form set out in the tender documents. But in my view, this should not distract us from the main question here. We do not have to spell out all of the terms of Contract A, let alone of Contract B, so as to define all of the duties and obligations of both

signatures requises et être reçue avant cette date. La DP donnait en outre le détail des critères d'évaluation, précisant qu'il s'agissait des seuls applicables. L'ébauche d'un accord de partenariat y était jointe. Des dispositions précises et non négociables sur les coûts y étaient prévues. Le soumissionnaire devait adhérer en substance à cette forme de contrat, sinon il perdait le montant de la garantie. À la clause 2.9, le ministère se réservait le droit d'annuler la DP, mais il devait alors rembourser les proposants des frais engagés pour la préparation des propositions, jusqu'à concurrence de 15 000 $ chacun. Le formulaire de proposition que devait signer le soumissionnaire portait qu'il s'engageait à signer un accord revêtant essentiellement la forme de celui compris dans les documents de la DP. Le proposant reconnaissait en outre que si son offre était retenue, l'omission de négocier de bonne foi avec le ministère en vue de la conclusion d'une entente et de signer l'accord de partenariat pouvait entraîner la perte du dépôt de garantie.

[20]  En résumé, comme le conclut la juge, la DP décrivait un projet précis, invitait un certain nombre de proposants admissibles à soumissionner et indiquait que les propositions seraient considérées au regard de critères établis. Il devait y avoir négociation de l'accord de construction en partenariat, mais à l'intérieur de certaines limites et elle ne devait pas porter sur les éléments fondamentaux du processus d'appel d'offres ou du contrat final.

[21]  Il n'y a donc pas lieu de modifier la conclusion de la juge selon laquelle il y avait intention de faire en sorte que la présentation d'une soumission conforme fasse naître des obligations contractuelles. J'ajoute cependant que l'appel d'offres considéré en l'espèce ne correspondait pas au modèle classique du contrat A et du contrat B où le soumissionnaire présente une offre irrévocable et s'engage à conclure le contrat B aux mêmes conditions s'il est choisi. Le modèle du partenariat adopté en l'espèce était plus complexe et supposait des négociations de bonne foi en vue de la conclusion du contrat B revêtant la forme indiquée dans les documents de l'appel d'offres. Toutefois, cette particularité ne doit pas nous faire perdre de vue la principale question en litige. Point n'est besoin d'exposer

2010 SCC 4 (CanLII)

the bidders and the Province. The question here is much narrower: did contractual obligations arise as a result of Tercon's compliant bid and, if so, was it a term of that contract that the Province would only entertain bids from eligible bidders? The trial judge found offer, acceptance and consideration in the invitation to tender and Tercon's bid. There is no basis, in my respectful view, to challenge that finding even if it were open to the Province to try to do so at this late stage of the litigation.

#### 4.   The Trial Judge's Finding Concerning Eligibility

[22]   It was not contested at trial that only the six original proponents that qualified through the RFEI process were eligible to bid. This point is not in issue on appeal; the question is what this eligibility requirement means. It will be helpful, therefore, to set out the background about this limited eligibility to bid in this tendering process.

[23]   To begin, it is worth repeating that there is no doubt that the Province was contractually bound to accept bids only from eligible bidders. This duty may be implied even absent express stipulation. For example, in *M.J.B.*, the Court found that an implied obligation to accept only compliant bids was necessary to give business efficacy to the tendering process, noting, at para. 41, that a bidder must expend effort and incur expense in preparing its bid and must submit bid security and that it is "obvious" that it makes "little sense" for the bidder to comply with these requirements if the owner "is allowed, in effect, to circumscribe this process and accept a non-compliant bid". But again, whether such a duty should be implied in any given case will depend on the dealings between the parties. Here, however, there is no need to rely on implied terms. The obligation to consider only bids from eligible bidders

toutes les conditions du contrat A, encore moins celles du contrat B, pour circonscrire les obligations respectives du soumissionnaire et de la province. La question qu'il nous faut trancher est beaucoup plus étroite : la présentation d'une soumission conforme par Tercon a-t-elle fait naître des obligations contractuelles et, dans l'affirmative, l'obligation que la province n'examine que les propositions de soumissionnaires admissibles en faisait-elle partie? La juge de première instance estime qu'il y a eu offre, acceptation et contrepartie dans l'appel d'offres et dans la présentation d'une soumission par Tercon. Même si la province pouvait contester cette conclusion à ce stade avancé de l'instance, elle n'aurait à mon avis aucun motif valable de le faire.

#### 4.   La conclusion de la juge de première instance sur l'admissibilité

[22]   Nulle partie n'a contesté en première instance que seules les six entreprises intéressées initialement, qui s'étaient rendues admissibles en répondant à la DEI, étaient admises à soumissionner. Ce point échappe donc au présent pourvoi. La question est de savoir ce qu'il en est de cette condition d'admissibilité. Le contexte de cette limitation de l'admissibilité au processus d'appel d'offres est donc susceptible de nous éclairer.

[23]   D'abord, il convient de répéter qu'il ne fait aucun doute que la province était contractuellement tenue de n'accepter que les propositions de soumissionnaires admissibles. Même en l'absence d'une stipulation expresse, cette obligation peut être inférée. Dans l'arrêt *M.J.B.*, par exemple, notre Cour a statué que l'obligation tacite de n'accepter que les soumissions conformes était nécessaire à l'efficacité commerciale du processus d'appel d'offres, signalant au par. 41 qu'un soumissionnaire doit consacrer efforts et sommes d'argent à la préparation de sa soumission et verser une garantie, de sorte qu'il est « évident » qu'il serait « déraisonnable » qu'il doive satisfaire à ces exigences si le propriétaire « peut, dans les faits, contourner ce processus et accepter une soumission non conforme ». Mais encore une fois, ce sont les échanges entre les parties qui déterminent s'il y a lieu d'inférer l'existence d'une telle

2010 SCC 4 (CanLII)

was stated expressly in the tender documents and in the required ministerial approval of the process which they described.

[24]    As noted, in early 2000, the Province issued a RFEI based on a design-build model; the contractor would both design and build the highway. The RFEI contemplated that a short list of three qualified contractors, or teams composed of contractors and consultants, would be nominated as proponents. Each was to provide a description of the legal structure of the team and to describe the role of each team member along with the extent of involvement of each team member as a percentage of the total scope of the project and an organization chart showing each team member's role. Any change in team management or key positions required notice in writing to the Province which reserved the right to disqualify the proponent if the change materially and negatively affected the ability of the team to carry out the project.

[25]    Expressions of interest ("EOI") were received from six teams including Tercon and Brentwood. The evaluation panel and independent review panel recommended a short list of three proponents with Tercon topping the evaluation. Brentwood was evaluated fifth and was not on the short list. Brentwood was known to lack expertise in drilling and blasting and so its EOI had included an outline of the key team members with that experience. EAC did not participate and had no role in the Brentwood submission. The results of this evaluation were not communicated and the process did not proceed because the Province decided to design the project itself and issue an RFP for an alliance model contract to construct the highway.

[26]    It was clear from the outset that only those who had submitted proposals during the RFEI process would be eligible to submit proposals under the RFP. This was specified in the approval of the process by the Minister of Transportation and

obligation. Cependant, en l'espèce, toute inférence est inutile, car l'obligation de considérer seulement les propositions de soumissionnaires admissibles figurait expressément dans le dossier d'appel d'offres et dans l'approbation ministérielle requise du processus qui y était décrit.

[24]    Rappelons qu'au début de l'année 2000, la province a lancé une DEI pour un projet où l'entrepreneur était appelé à concevoir une route puis à la construire. Suivant la DEI, le nombre de proposants devait être ramené à trois, qu'il s'agisse d'entrepreneurs ou d'équipes d'entrepreneurs et de consultants, tous qualifiés. Chaque proposant devait préciser la structure juridique de l'équipe, le rôle de chacun de ses membres ainsi que le pourcentage de sa contribution à l'ensemble du projet, et remettre un organigramme indiquant la tâche de chacun. Toute modification touchant la direction de l'équipe ou les postes clés devait être notifiée par écrit à la province, qui se réservait le droit d'écarter le proposant si la modification compromettait substantiellement l'aptitude à mener le projet à bien.

[25]    Six équipes, dont Tercon et Brentwood, ont manifesté leur intérêt. Le comité d'évaluation et le comité de révision indépendant ont recommandé de retenir trois proposants, dont Tercon en tête de liste. Classée cinquième, Brentwood ne figurait pas sur cette liste. Comme elle n'avait pas d'expertise dans les domaines du forage et du dynamitage, Brentwood avait énuméré les membres clés de son équipe dotés de cette expertise. EAC n'a pas participé au processus ni joué de rôle dans la soumission de Brentwood. Les résultats de cette évaluation n'ont pas été communiqués, et la province a mis fin au processus après avoir décidé de se charger elle-même de la conception du projet et de demander des propositions en vue de la mise sur pied d'un partenariat pour la construction de la route.

[26]    Il était clair dès le départ que seules les entreprises qui avaient manifesté leur intérêt pourraient présenter une proposition. C'est ce que prévoyait l'approbation du processus donnée par le ministre des Transports et de la Voirie (« ministre ») avant le

Highways ("Minister") before the RFP was issued. It is worth pausing here to briefly look at the Minister's role.

[27] Pursuant to s. 23 of the *Ministry of Transportation and Highways Act*, R.S.B.C. 1996, c. 311, the legislation in force at the relevant time, the Minister was required to invite public tenders for road construction unless he or she determined that another process would result in competitively established costs for the work. The section provided:

23 (1)    <u>The minister must invite tenders</u> by public advertisement, or if that is impracticable, by public notice, <u>for the construction and repair of</u> all government buildings, <u>highways</u> and public works, <u>except for the following</u>:

.   .   .

(c)    <u>if the minister determines that an alternative contracting process will result in competitively established costs for the performance of the work</u>.

(2)    The minister must cause all tenders received to be opened in public, at a time and place stated in the advertisement or notice.

(3)    The prices must be made known at the time the tenders are opened.

(4)    <u>In all cases where the minister believes it is not expedient to let the work to the lowest bidder, the minister must report to and obtain the approval of the Lieutenant Governor in Council before passing by the lowest tender, except if delay would be injurious to the public interest</u>.

.   .   .

[28]    These provisions make clear that the work in this case had to be awarded by public tender, absent the Minister's approval of an alternative process, and had to be awarded to the lowest bidder, absent approval of the Lieutenant Governor in Council. As noted, ministerial approval was given for an alternative process under s. 23(1)(c). The Minister issued

lancement de la DP. Il convient de se pencher brièvement sur le rôle du ministre.

[27]    Suivant l'article 23 de la loi applicable à l'époque — la *Ministry of Transportation and Highways Act*, R.S.B.C. 1996, ch. 311 —, le ministre devait lancer un appel d'offres pour la construction d'une route, sauf s'il était d'avis qu'un autre moyen permettrait la réalisation des travaux à un coût concurrentiel. L'article prévoyait notamment ce qui suit :

[TRADUCTION]

23 (1)    <u>Le ministre procède à un appel d'offres</u> par annonce publique ou, lorsque c'est impossible, par avis public, <u>pour la construction et la réparation</u> d'un immeuble gouvernemental, d'une <u>route</u> ou d'un ouvrage public, <u>sauf dans les cas suivants</u> :

.   .   .

c)    <u>il estime qu'un autre processus d'adjudication de marché permettra la réalisation des travaux à un coût concurrentiel</u>.

(2)    Le ministre veille à ce que toutes les soumissions reçues soient ouvertes en public à la date, à l'heure et à l'endroit indiqués dans l'annonce ou dans l'avis.

(3)    Les prix doivent être communiqués lors de l'ouverture des soumissions.

(4)    <u>Lorsqu'il estime qu'il n'est pas opportun d'adjuger le marché au soumissionnaire le moins disant, le ministre en informe le lieutenant-gouverneur en conseil et obtient l'autorisation de ne pas retenir ce soumissionnaire, sauf s'il en résulte un retard préjudiciable à l'intérêt public</u>.

.   .   .

[28]    Il ressort de ces dispositions qu'à défaut de l'approbation d'un autre processus par le ministre, le marché devait en l'espèce être attribué par voie d'appel d'offres et que, sauf autorisation du lieutenant-gouverneur de choisir un autre adjudicataire, le marché devait être adjugé au soumissionnaire le moins disant. Un autre processus

a notice that, pursuant to that section, he approved the process set out in an attached document and had determined it to be an alternative contracting process that would result in competitively established costs for the performance of the work. The attached document outlined in seven numbered paragraphs the process that had been approved.

[29]    The document described the background of the public RFEI (which I have set out earlier), noting that *only those firms identified through the EOI process would be eligible to submit proposals for the work* and that they would receive invitations to do so. The Minister's approval in fact referred to the firms who had been short-listed from the RFEI process as being eligible. If this were taken to refer only to the three proponents identified by the evaluation process of the RFEI, Tercon would be included but Brentwood would not. However, no one has suggested that anything turns on this and it seems clear that ultimately all six of the RFEI proponents — including both Tercon and Brentwood — were intended to be eligible. The ministerial approval then briefly set out the process. Proposals "by short-listed firms" were to be evaluated "using the considerations set out in the RFP".

[30]    It is clear, therefore, that participation in the RFP process approved by the Minister was limited to those who had participated in the RFEI process.

[31]    The Province's factum implies that the Minister approved inclusion of the exclusion clause in the RFP. However, there is no evidence of this in the record before the Court. The Minister's approval is before us. It is dated as having been prepared on August 23, 2000 and signed on October 19, 2000, and approves a process outlined in a two-page document attached to it. It says nothing about exclusion of the Province's liability. The RFP, containing the exclusion clause in issue here, is dated January 15, 2001 and was sent out to eligible bidders under cover of a letter of the

d'adjudication a fait l'objet d'une approbation ministérielle conformément à l'al. 23(1)*c*). Le ministre a donné avis de son approbation, en vertu de cette disposition, du processus décrit dans un document joint en annexe et de sa conclusion qu'il s'agissait d'un processus d'adjudication de marché permettant la réalisation des travaux à un coût concurrentiel. Le document joint en annexe décrivait en sept paragraphes numérotés le processus approuvé.

[29]    Ce document faisait état du contexte (mentionné précédemment) de la DEI publique, précisant que *seules les entreprises retenues à l'issue du processus d'expression d'intérêt pourraient présenter une proposition* et seraient invitées à le faire. L'approbation ministérielle visait en fait les entreprises jugées admissibles par suite de la DEI. S'il s'agissait seulement des trois proposants sélectionnés dans le cadre de cette première évaluation, Tercon en faisait partie, mais non Brentwood. Or, nul ne laisse entendre que ce point est décisif à quelque égard, et il semble clair que, finalement, les six entreprises ayant donné suite à la DEI, dont Tercon et Brentwood, étaient tenues pour admissibles. L'approbation ministérielle décrit ensuite brièvement le processus. Les propositions des entreprises présélectionnées devaient être évaluées [TRADUCTION] « en fonction des critères énoncés dans la DP ».

[30]    Il ne fait donc aucun doute que la participation au processus de DP approuvé par le ministre était réservée aux entreprises qui avaient répondu à la DEI.

[31]    Dans son mémoire, la province laisse entendre que le ministre a approuvé la clause de non-recours figurant dans la DP. Or, selon le dossier de la Cour, aucun élément n'étaye sa prétention. Nous disposons du texte de l'approbation ministérielle. Suivant la date qui y est apposée, elle aurait été rédigée le 23 août 2000 et signée le 19 octobre de la même année. Elle vise le processus énoncé dans le document de deux pages qui y est joint. Aucune mention n'y est faite de la non-responsabilité de la province. La DP, qui renferme la clause de non-recours litigieuse, porte la date du 15 janvier 2001

same date, some three months after the Minister's approval.

[32]   The RFP is a lengthy document, containing detailed instructions to proponents, required forms, a time schedule of the work, detailed provisions concerning contract pricing, a draft of the ultimate construction contract and many other things. Most relevant for our purposes are the terms of the instructions to proponents and in particular the eligibility requirements for bidders.

[33]   The RFP reiterates in unequivocal terms that eligibility to bid was restricted as set out in the ministerial approval. It also underlines the significance of the identity of the proponent.  In s. 1.1, the RFP specifies that only the six teams involved in the RFEI would be eligible. The term "proponent", which refers to a bidder, is defined in s. 8 as "a team that has become eligible to respond to the RFP as described in Section 1.1 of the Instructions to Proponents". Section 2.8(a) of the RFP stipulates that *only* the six proponents qualified through the RFEI process were eligible and that *proposals received from any other party would not be considered*. In short, there were potentially only six participants and "Contract A" could not arise by the submission of a bid from any other party.

[34]   The RFP also addressed material changes to the proponent, including changes in the proponent's team members and its financial ability to undertake and complete the work. Section 2.8(b) of the RFP provided in part as follows:

If in the opinion of the Ministry a material change has occurred to the Proponent since its qualification under the RFEI, including if the composition of the Proponent's team members has changed . . . or if, for financial or other reasons, the Proponent's ability to undertake and complete the Work has changed, then the

et elle a été envoyée aux soumissionnaires admissibles avec lettre d'accompagnement datée du même jour quelque trois mois après l'approbation ministérielle.

[32]   La DP est un document volumineux renfermant des instructions détaillées à l'intention des proposants, des formulaires à remplir, un calendrier des travaux, des dispositions précises sur la fixation du prix du contrat, une ébauche de l'accord final de construction en partenariat et bien d'autres éléments. Toutefois, ce qui importe le plus pour les besoins du présent pourvoi c'est le libellé des instructions aux proposants et, plus particulièrement, les conditions d'admissibilité des soumissionnaires.

[33]   La DP rappelle de manière non équivoque que l'admissibilité à soumissionner est limitée comme le prévoit l'approbation ministérielle. Elle souligne aussi que l'identité du proposant importe. Le paragraphe 1.1 dispose que seules les six équipes ayant répondu à la DEI sont admissibles. L'article 8 prévoit que [TRADUCTION] « proposant » — l'équivalent de « soumissionnaire » — [TRADUCTION] « s'entend d'une équipe admise à répondre à la DP suivant le libellé du par. 1.1 des instructions aux proposants ». L'alinéa 2.8a) de la DP précise que *seuls* les six proposants devenus admissibles en répondant à la DEI peuvent soumissionner et qu'*aucune proposition d'une autre personne ne sera examinée*. En somme, il ne pouvait y avoir que six participants, et le « contrat A » ne pouvait naître de la présentation d'une proposition présentée par une autre personne.

[34]   La DP aborde aussi la question de la modification substantielle visant un proposant, notamment en ce qui concerne la composition de son équipe et son aptitude financière à entreprendre les travaux et à les mener à bien. L'alinéa 2.8b) prévoit notamment ce qui suit :

[TRADUCTION] Lorsque de l'avis du ministère, depuis que le proposant est devenu admissible en répondant à la DEI, une modification substantielle le concernant s'est produite, notamment en ce qui a trait à la composition de son équipe [. . .] ou à son aptitude financière ou autre à entreprendre les travaux ou à les mener à bien, il peut

2010 SCC 4 (CanLII)

Ministry may request the Proponent to submit further supporting information as the Ministry may request in support of the Proponent's qualification to perform the Work. If in the sole discretion of the Ministry as a result of the changes the Proponent is not sufficiently qualified to perform the Work then the Ministry reserves the right to disqualify that Proponent, and reject its Proposal.

[35]    The proponent was to provide an organization chart outlining the proponent's team members, structure and roles. If the team members were different from the RFEI process submission, an explanation was to be provided for the changes: s. 4.2(b)i. A list of subcontractors and suppliers was also to be provided and the Ministry had to be notified of any changes: s. 4.2(e).

[36]    The RFP provided proponents with a mechanism to determine whether they remained qualified to submit a proposal. If a proponent was concerned about its eligibility as a result of a material change, it could make a preliminary submission to the Ministry describing the nature of the changes and the Ministry would give a written decision as to whether the proponent was still qualified: s. 2.8(b).

[37]    Brentwood tried to take advantage of this process. The trial judge thoroughly outlined this, at paras. 17-23 of her reasons. In brief, Brentwood lacked expertise in drilling and blasting and by the time the RFP was issued, it faced limited local bonding capacity due to commitments to other projects, a shorter construction period, the potential unavailability of subcontractors and limited equipment to perform the work. It in fact considered not bidding at all. Instead, however, it entered into a pre-bidding agreement with EAC that the work would be undertaken by a joint venture of Brentwood and EAC and that upon being awarded the work, they would enter into a joint venture agreement and would share 50/50 the costs, expenses, losses and gains. The trial judge noted that it was common in the industry for contractors to agree to a joint venture on the basis of a pre-bid agreement with the specifics of the joint venture to be worked out once the contract was awarded and that Brentwood and EAC

exiger du proposant d'autres renseignements établissant qu'il est en mesure d'exécuter les travaux. Lorsque, à son seul gré, il estime que la modification fait en sorte que le proposant n'est pas suffisamment apte à exécuter les travaux, le ministère se réserve le droit de l'écarter et de rejeter sa proposition.

[35]    Le proposant devait fournir un organigramme indiquant la composition et la structure de son équipe et le rôle de ses membres. Lorsque les membres de son équipe n'étaient pas les mêmes que ceux mentionnés dans sa réponse à la DEI, il devait s'en expliquer : sous-al. 4.2b)i). Une liste de sous-traitants et de fournisseurs devait également être remise, et tout changement qui y était apporté devait être notifié au ministère : al. 4.2e).

[36]    La DP prévoyait un mécanisme permettant au proposant de s'assurer qu'il était toujours admissible. Le proposant désireux de savoir si un changement substantiel compromettait son admissibilité à soumissionner pouvait en communiquer la nature au ministère en vue d'obtenir une décision préalable confirmant ou non qu'il était toujours admissible : al. 2.8b).

[37]    Brentwood a tenté de se prévaloir de ce mécanisme, et la juge de première instance relate sa démarche en détail aux par. 17 à 23 de ses motifs. Pour résumer, Brentwood n'avait pas d'expertise en matière de forage et de dynamitage et lorsque la DP a été lancée, le cautionnement qu'elle pouvait offrir était limité par d'autres engagements, la période de construction était écourtée, des sous-traitants pouvaient ne plus être disponibles et le matériel dont elle disposait pour exécuter les travaux était restreint. Elle a d'ailleurs envisagé de ne pas présenter de proposition du tout. Elle a cependant conclu avec EAC une entente préalable à la soumission prévoyant qu'elles réaliseraient les travaux en coentreprise et que, dès l'adjudication du marché, elles concluraient un accord de coentreprise et se répartiraient à parts égales les coûts, les dépenses, les pertes et les bénéfices. La juge signale qu'il est courant dans ce secteur d'activité qu'avant le dépôt d'une soumission, des entrepreneurs conviennent

2010 SCC 4 (CanLII)

acted consistently throughout in accordance with this industry standard.

[38]    Brentwood sent the Province's project manager, Mr. Tasaka, a preliminary submission as provided for in s. 2.8(b) of the RFP, advising of a material change in its team's structure in that it wished to form a joint venture with EAC. This was done, the trial judge found, because Brentwood thought it would be disqualified if it submitted a proposal as a joint venture without the Ministry's prior approval under this section of the RFP. The Province never responded in writing as it ought to have according to s. 2.8(b).

[39]    It seems to have been assumed by everyone that a joint venture of Brentwood and EAC was not eligible because this change would not simply be a change in the composition of the bidder's team, but in effect a new bidder. Without reviewing in detail all of the evidence referred to by the trial judge, it is fair to say that although Brentwood ultimately submitted a proposal in its own name, the proposal in substance was from the Brentwood/EAC joint venture and was evaluated as such. As the trial judge concluded:

The substance of the proposal was as a joint venture and this must have been apparent to all. The [project evaluation panel] approved Brentwood/EAC as joint venturers as the preferred proponent. The [panel] was satisfied that Tercon had the capacity and commitment to do the job but preferred the joint venture submission of Brentwood/EAC. [para. 53]

[40]    There was some suggestion by the Province during oral argument that the trial judge had wrongly imposed on it a duty to investigate Brentwood's bid, a duty rejected by the majority of the Court in *Double N Earthmovers Ltd. v. Edmonton (City)*, 2007 SCC 3, [2007] 1 S.C.R. 116. In my view, the trial judge did no such thing. As her detailed findings make clear, the Province: (1) fully understood that the Brentwood bid was in fact on behalf of a joint venture of Brentwood and EAC; (2) thought

de la création d'une coentreprise dont les modalités seront arrêtées dès l'adjudication du contrat. Elle ajoute que Brentwood et EAC ont toujours agi dans le respect de cette pratique établie.

[38]    Conformément à l'al. 2.8b) de la DP, Brentwood a fait parvenir au gestionnaire du projet, M. Tasaka, une proposition préliminaire qui signalait la modification substantielle de la structure de son équipe résultant de son intention de former une coentreprise avec EAC. Selon la juge de première instance, Brentwood l'a fait parce qu'elle pensait que sa proposition serait rejetée si elle était présentée au nom d'une coentreprise sans que le ministère n'ait donné son approbation au préalable en application de cette disposition de la DP. La province n'a jamais répondu par écrit comme elle était censée le faire suivant l'al. 2.8b).

[39]    Tous les intéressés semblent avoir tenu la coentreprise Brentwood/EAC pour inadmissible du fait que la composition de l'équipe n'était pas simplement modifiée, mais qu'un nouveau soumissionnaire voyait en fait le jour. Sans analyser en détail tous les éléments de preuve mentionnés par la juge de première instance, on peut à juste titre affirmer que même si la proposition de Brentwood a été présentée en son seul nom, elle provenait essentiellement de la coentreprise Brentwood/EAC et elle a été considérée en conséquence. Selon la juge,

[TRADUCTION] [l]a proposition était essentiellement celle d'une coentreprise, ce qui a dû être évident pour tout le monde. Le [comité d'évaluation du projet] a arrêté son choix sur la coentreprise Brentwood/EAC. Il estimait que Tercon avait les moyens et la détermination nécessaires pour réaliser les travaux, mais il a préféré la proposition de Brentwood/EAC. [par. 53]

[40]    Dans sa plaidoirie orale, la province a laissé entendre que la juge lui avait imputé à tort l'obligation de vérifier la soumission de Brentwood, ce qui allait à l'encontre de l'avis des juges majoritaires de notre Cour dans l'arrêt *Double N Earthmovers Ltd. c. Edmonton (Ville)*, 2007 CSC 3, [2007] 1 R.C.S. 116. Je ne crois pas que cela ait été le cas. Il ressort des conclusions détaillées de la juge que la province (1) savait pertinemment que la soumission de Brentwood était en fait celle d'une coentreprise

2010 SCC 4 (CanLII)

that a bid from that joint venture was not eligible; and (3) took active steps to obscure the reality of the situation. No investigation was required for the Province to know these things and the judge imposed no duty to engage in one.

### 5.   The Province's Submissions

[41]   I will address the Province's first two points together:

(i)   a joint venture is not a legal person and therefore the Province could not and did not contract with a joint venture; and

(ii)   it did not award the contract to EAC and EAC had no contractual responsibility to the Province for failure to perform the contract.

[42]   I cannot accept these submissions. The issue is not, as these arguments assume, whether the Province contracted with a joint venture or whether EAC had contractual obligations to the Province. The issue is whether the Province considered an ineligible bid; the point of substance is whether the bid was from an eligible bidder.

[43]   At trial there was no contest that a bid from a joint venture involving an ineligible bidder would be ineligible. The Province's position was that there was no need to look beyond the face of the bid to determine who was bidding: the proposal was in the name of Brentwood and therefore the bid was from a compliant bidder. Respectfully, I see no error in the trial judge's rejection of this position. There was a mountain of evidence to support the judge's conclusions that first, Brentwood's bid, in fact if not in form, was on behalf of a joint venture between itself and EAC; second, the Province knew this and took the position that it could not consider a bid from or award the work to that joint venture; third, the existence of the joint venture was a material consideration in favour of the Brentwood bid during the evaluation process; and finally, that steps were taken by revising and drafting documentation to obfuscate the reality of the situation.

formée avec EAC, (2) qu'elle estimait que la proposition de cette coentreprise était inadmissible et (3) qu'elle s'est activement employée à gommer ce fait. Nulle vérification ne s'imposait à cet égard, et la juge n'a pas imputé d'obligation de vérification à la province.

### 5.   La thèse de la province

[41]   Je me penche maintenant sur les deux premiers arguments de la province :

(i)   une coentreprise étant dépourvue de la personnalité morale, la province ne pouvait contracter avec elle et elle ne l'a pas fait;

(ii)   elle n'a pas adjugé le marché à EAC, et EAC n'avait envers elle aucune responsabilité en cas d'inexécution du contrat.

[42]   Je ne peux faire droit à ces prétentions. Il ne s'agit pas de savoir si la province a contracté avec une coentreprise ou si EAC avait des obligations contractuelles envers elle, mais bien si la province a considéré une proposition inadmissible. Il faut déterminer si la proposition provenait d'un soumissionnaire admissible.

[43]   Au procès, nul n'a contesté l'inadmissibilité d'une coentreprise comptant en son sein un soumissionnaire inadmissible. La province affirme qu'elle n'avait pas à se demander si la proposition provenait d'une autre entreprise que celle nommée : la proposition était présentée au nom de Brentwood, un soumissionnaire admissible. Je suis pourtant d'avis que la juge de première instance n'a pas eu tort d'écarter cet argument. Une preuve plus qu'abondante étayait ses conclusions selon lesquelles (1) la soumission de Brentwood, en dépit des apparences, était en fait présentée par la coentreprise avec EAC, (2) la province le savait et estimait qu'elle ne pouvait ni considérer la proposition de cette coentreprise ni adjuger le contrat à celle-ci, (3) l'existence de la coentreprise jouait en faveur de Brentwood dans le cadre du processus d'évaluation des propositions et, enfin, (4) la province s'est employée à masquer cette réalité en révisant et en rédigeant la documentation.

[44]  Brentwood was one of the original RFEI proponents and was of course eligible to bid, subject to material changes in the composition of its team. EAC had not submitted a proposal during the RFEI process. It had been involved in advising the Ministry in relation to the project in 1998 and, in the fall of 2000, the Ministry had asked EAC to prepare an internal bid for comparison purposes (although EAC did not do so) as EAC was not entitled to bid on the Project.

[45]  As noted earlier, after the RFP was issued, Brentwood and EAC entered into a pre-bidding agreement that provided that the work would be undertaken in the name of Brentwood/Anderson, a joint venture, that the work would be sponsored and managed by the joint venture and that upon being awarded the contract, the parties would enter into a joint venture agreement. Brentwood advised the Ministry in writing that it was forming a joint venture with EAC "to submit a more competitive price"; this fax was in effect a preliminary submission contemplated by s. 2.8(b) of the RFP and was written, as the trial judge found, because Brentwood assumed that it could be disqualified if it submitted a proposal as a joint venture unless prior arrangements had been made. The Province never responded in writing to this preliminary submission, as required by s. 2.8(b). There were, however, discussions with the Province's project manager, Mr. Tasaka who, the trial judge found, understood that a joint venture from Brentwood and EAC would not be eligible. As the judge put it, the Province's position appears to have been that the Brentwood/EAC proposal could proceed as long as the submission was in the name of Brentwood.

[46]  In the result, EAC was listed in the ultimate submission as a "major member" of the team. The legal relationship with EAC was not specified and EAC was listed as a subcontractor even though, as the trial judge found, their relationship bore no resemblance to a standard subcontractor agreement. The trial judge found as facts — and these findings are not challenged — that Brentwood and EAC always intended between themselves to form a joint venture and to formalize that arrangement once the contract was secured, and further, that the

[44]  Comme Brentwood faisait partie des entreprises ayant initialement répondu à la DEI, elle était bien sûr admise à soumissionner, sauf modification substantielle de la composition de son équipe. EAC n'avait pas donné suite à la DEI. En 1998, elle avait conseillé le ministère relativement au projet et, à l'automne 2000, ce dernier lui avait demandé de préparer une soumission interne aux fins de comparaison (ce qu'elle n'a cependant pas fait) puisqu'elle n'était pas admise à soumissionner.

[45]  Rappelons qu'après le lancement de la DP, Brentwood et EAC ont conclu un accord préalable à la proposition prévoyant que les travaux seraient entrepris au nom de la coentreprise, que celle-ci les financerait et les gérerait et qu'un accord de coentreprise interviendrait si le contrat leur était adjugé. Brentwood a informé le ministère par écrit qu'elle formait une coentreprise avec EAC [TRADUCTION] « afin de présenter une soumission plus concurrentielle ». Le document télécopié constituait en fait la proposition préliminaire visée à l'al. 2.8b) de la DP et, suivant la juge de première instance, Brentwood l'avait envoyé parce qu'elle pensait que faute de démarches préalables, la soumission présentée au nom de la coentreprise pouvait être rejetée. La province n'y a jamais donné suite par écrit comme l'exigeait l'al. 2.8b). Cependant, des discussions ont eu lieu avec le gestionnaire du projet, M. Tasaka, qui, selon la juge de première instance, était conscient de l'inadmissibilité d'une coentreprise formée de Brentwood et d'EAC. Comme le dit la juge, la province paraît avoir estimé que la soumission de Brentwood/EAC pouvait être considérée si elle était présentée au nom de Brentwood.

[46]  Dans la proposition finale, EAC a donc été qualifiée de [TRADUCTION] « membre important » de l'équipe. Le lien juridique entre Brentwood et EAC n'était pas précisé, et EAC figurait dans la liste des sous-traitants, même si, comme l'indique la juge de première instance, la relation entre les deux parties ne s'apparentait en rien à celle créée par un contrat de sous-traitance. La juge conclut — et nul ne conteste — que Brentwood et EAC ont toujours eu l'intention commune de former une coentreprise et de rendre celle-ci officielle une fois le contrat

role of EAC was purposefully obfuscated in the bid to avoid an apparent conflict with s. 2.8(a) of the RFP.

[47]    During the selection process, it became clear that the bid was in reality on behalf of a joint venture. The project evaluation panel ("PEP") requested better information than provided in the bid about the structure of the business arrangements between Brentwood and EAC. Brentwood responded by disclosing the pre-bid agreement between them to form a 50/50 joint venture if successful. The PEP understood from this that Brentwood and EAC had a similar interest in the risk and reward under the contract and that this helped satisfy them that the "risk/reward" aspect of the alliance contract could be negotiated with them flexibly. The PEP clearly did not consider EAC to be a subcontractor although shown as such in the bid. In its step 6 report, the PEP consistently referred to the proponent as being a joint venture of Brentwood and EAC or as "Brentwood/EAC" and the trial judge found that it was on the basis that they were indeed a joint venture that PEP approved Brentwood/EAC as the preferred proponent. This step 6 report was ultimately revised to refer only to the Brentwood team as the official proponent. The trial judge found as a fact that this revision was made because "it was apparent that a joint venture was not eligible to submit a proposal" (para. 56).

[48]    The findings of the trial judge and the record make it clear that it was no mere question of form rather than a matter of substance whether the bidder was Brentwood with other team members or, as it in fact was, the Brentwood/EAC joint venture. As she noted, at para. 121 of her reasons, the whole purpose of the joint venture was to allow submission of a more competitive price than it would have been able to do as a proponent with a team as allowed under s. 2.8(b) of the RFP. The joint venture permitted a 50/50 sharing of risk and reward and co-management of the project while at the same time avoiding the restrictions on subcontracting in the tendering documents. As the judge put it, the bid by the joint venture constituted "material non-compliance" with the tendering contract: ". . .

obtenu et que le rôle d'EAC a été occulté à dessein dans la proposition afin d'éviter toute inobservation apparente de l'al. 2.8a) de la DP.

[47]    Il est apparu clairement au cours du processus de sélection que la soumission était en fait présentée au nom d'une coentreprise. Le comité d'évaluation du projet (« CEP ») a demandé plus de précisions sur les liens d'affaires entre Brentwood et EAC. Brentwood a alors révélé l'existence de l'accord préalable prévoyant la formation d'une coentreprise à parts égales si sa soumission était retenue. Le CEP en a déduit que Brentwood et EAC avaient une même participation aux risques et aux bénéfices découlant du marché, ce qui a contribué à le convaincre qu'elles pourraient faire preuve de souplesse dans la négociation du volet « risques/bénéfices » de l'accord de partenariat. Manifestement, le CEP n'a pas considéré EAC comme un sous-traitant même si elle était présentée de la sorte dans la soumission. Dans son rapport de l'étape 6, le CEP renvoie systématiquement à la coentreprise formée de Brentwood et d'EAC ou à « Brentwood/EAC » pour parler du proposant. La juge de première instance conclut que c'est bien parce qu'elles formaient une coentreprise que le CEP a arrêté son choix sur elles. Le rapport a par la suite été modifié de façon que seule l'équipe Brentwood y figure comme proposant officiel. La juge de première instance y voit [TRADUCTION] « l'évidence qu'une coentreprise n'était pas admissible à soumissionner » (par. 56).

[48]    Il ressort des conclusions de la juge de première instance et du dossier que la question de savoir si le soumissionnaire était Brentwood avec l'appui des autres membres de l'équipe ou — comme c'était effectivement le cas —, la coentreprise, ne tenait pas seulement à la forme, mais également au fond. La juge indique au par. 121 de ses motifs que la raison d'être de la coentreprise était essentiellement d'arriver à un prix plus concurrentiel que celui qu'aurait pu offrir un proposant appuyé d'une équipe comme le permettait l'al. 2.8b) de la DP. La coentreprise rendait possible le partage à parts égales des risques et des bénéfices ainsi que de la gestion du projet tout en soustrayant le soumissionnaire aux limitations de la sous-traitance prévues dans le dossier d'appel d'offres. Comme

the joint venture with EAC allowed Brentwood to put forward a more competitive price than contemplated under the RFEI proposal. This went to the essence of the tendering process" (para. 126).

[49]   The Province suggests that the trial judge's reasons allow form to triumph over substance. In my view, it is the Province's position that better deserves that description. It had a bid which it knew to be on behalf of a joint venture, encouraged the bid to proceed and took steps to obfuscate the reality that it was on behalf of a joint venture. Permitting the bid to proceed in this way gave the joint venture a competitive advantage in the bidding process, and the record could not be clearer that the joint venture nature of the bid was one of its attractions during the selection process. The Province nonetheless submits that so long as only the name of Brentwood appears on the bid and ultimate Contract B, all is well. If ever a submission advocated placing form above substance, this is it.

[50]   It is true that the Province had legal advice and did not proceed in defiance of it. However, the facts as found by the trial judge about this legal advice hardly advance the Province's position. The judge found that the Province's lawyer was not aware of the background relevant to the question of whether the Brentwood bid was eligible, never reviewed the proponent eligibility requirements in the RFP and was not asked to and did not direct his mind to the question of eligibility. As the trial judge put it, the lawyer "appears to have operated on the assumption that Brentwood had been irreversibly selected" (para. 70).

[51]   The Brentwood/EAC joint venture having been selected as the preferred proponent, negotiations for the alliance contract ensued. The trial judge found that by this time, all agreed that a joint venture

l'explique la juge, la présentation d'une proposition par une coentreprise constituait une [TRADUCTION] « inexécution importante » du contrat issu de l'appel d'offres : [TRADUCTION] « . . . en formant une coentreprise avec EAC, Brentwood pouvait proposer un prix plus concurrentiel que celui offert en réponse à la DEI, ce qui touchait à l'essence même du processus d'appel d'offres » (par. 126).

[49]   La province reproche à la juge de première instance de faire primer la forme sur le fond. À mon avis, c'est plutôt à sa thèse qu'on peut imputer pareille dérive. Elle avait en main une soumission qu'elle savait provenir d'une coentreprise, elle a encouragé sa présentation et elle a pris des mesures pour masquer le fait qu'elle était formulée par une coentreprise. Elle a ainsi conféré un avantage concurrentiel à celle-ci dans le processus d'appel d'offres, et il appert on ne peut plus clairement du dossier que l'existence de la coentreprise a été considérée comme un atout lors du processus de sélection. La province soutient néanmoins qu'il n'y a là rien d'irrégulier dans la mesure où le nom de Brentwood figurait sur la soumission, puis dans le contrat B. S'il est un argument qui fait primer la forme sur le fond, c'est bien celui-là.

[50]   Certes, la province avait obtenu un avis juridique et elle n'a pas agi à l'encontre de celui-ci. Or, les faits établis selon la juge de première instance relativement à cet avis juridique n'appuient pas vraiment la prétention de la province. La juge relève que le conseiller juridique de la province ne disposait pas des éléments de contexte nécessaires pour déterminer si la soumission de Brentwood était admissible, il n'a jamais examiné les conditions d'admissibilité à soumissionner énoncées dans la DP et on ne lui a pas demandé de se pencher sur la question de l'admissibilité, ce qu'il n'a pas fait de son propre chef non plus. Comme le dit la juge, le conseiller juridique [TRADUCTION] « paraît avoir supposé au départ que Brentwood avait été irrévocablement retenue » (par. 70).

[51]   La proposition de la coentreprise Brentwood/EAC ayant été retenue, les négociations en vue de la conclusion de l'accord de partenariat ont commencé. De l'avis de la juge de première instance,

2010 SCC 4 (CanLII)

was not an eligible proponent and the Ministry was taking the position that the contract could not be in the name of the joint venture. Brentwood and EAC executed a revised pre-contract agreement that provided, notwithstanding the letter of intent from the Ministry addressed to Brentwood indicating that the legal relationship between them would be contractor/subcontractor, the contract would be performed and the profits shared equally between them. The work was to be managed by a committee with equal representation, the bond required by the owner was to be provided by both parties and EAC indemnified Brentwood against half of any loss or cost incurred as a result of performance of the work. According to schedule B4 of the RFP, all subcontracts were to be attached to the RFP but no contract between Brentwood and EAC was ever provided or attached to the proposal.

[52]  The Province has identified no palpable and overriding error in these many findings of fact by the trial judge. I conclude, therefore, that we must approach the case on the basis of the judge's finding that the bid was in fact, if not in form, submitted by a joint venture of Brentwood and EAC, that the Ministry was well aware of this, that the existence of the joint venture was a material consideration in favour of the bid during the evaluation process and that by bidding as a joint venture, Brentwood was given a competitive advantage in the bidding process.

[53]  I reject the Ministry's submissions that all that matters is the form and not the substance of the arrangement. In my view, the trial judge's finding that this bid was in fact on behalf of a joint venture is unassailable.

[54]  I turn to the Province's third point:

(iii)  there was no term of the RFP that restricted the right of proponents to enter into joint venture agreements with others; this arrangement merely left Brentwood, the original

tous convenaient alors que la coentreprise n'était pas un soumissionnaire admissible, et le ministère estimait que le contrat ne pouvait être conclu avec elle. Brentwood et EAC ont signé un accord préalable modifié stipulant que, malgré la lettre d'intention du ministère adressée à Brentwood et selon laquelle la relation juridique entre les deux entreprises serait celle existant entre un entrepreneur et un sous-traitant, le contrat serait exécuté par les deux entreprises, et les bénéfices partagés entre elles à parts égales. L'accord prévoyait aussi que la gestion des travaux relèverait d'un comité constitué d'un nombre égal de représentants des deux entreprises, que le cautionnement exigé par le propriétaire serait fourni par les deux entreprises et qu'EAC dédommagerait Brentwood de la moitié des pertes ou des coûts découlant de l'exécution des travaux. Suivant l'annexe B4 de la DP, tous les sous-contrats devaient être joints à la proposition, mais nul contrat intervenu entre Brentwood et EAC ne l'avait été.

[52]  La province ne relève aucune erreur manifeste et dominante dans ces nombreuses conclusions de fait tirées en première instance. J'estime donc qu'il nous faut trancher en tenant pour acquis, conformément à ces conclusions, que malgré les apparences, le soumissionnaire était en fait la coentreprise formée de Brentwood et d'EAC, le ministère le savait, l'existence de la coentreprise a été considérée comme un atout lors du processus d'évaluation et la présentation d'une proposition par une coentreprise a fait bénéficier Brentwood d'un avantage concurrentiel dans le processus d'appel d'offres.

[53]  La prétention du ministère voulant que tout ce qui importe c'est la forme de l'accord, et non sa teneur, ne saurait tenir. Je conviens avec la juge de première instance que la proposition était en fait présentée par une coentreprise. Sa conclusion est inattaquable.

[54]  Je passe maintenant au troisième argument de la province :

(iii)  aucune disposition de la DP n'empêchait un proposant de conclure un accord de coentreprise; cette mesure permettait seulement à Brentwood, l'un des proposants initiaux, de

proponent in place and allowed it to enhance its ability to perform the work.

[55]    This submission addresses the question of whether the joint venture was an eligible bidder. The Province submits that it is, arguing that s. 2.8(b) of the RFP shows that the RFP contemplated that each proponent would be supported by a team, that the composition of the team might change and that the Province under that section retained the right to approve or reject changes in the team of any proponent. I cannot accept these submissions.

[56]    Section 2.8 must be read as a whole and in light of the ministerial approval which I have described earlier. Section 2.8(a), consistent with that approval, stipulates that only the six proponents qualified through the RFEI process were eligible to submit responses and that proposals from any other party "shall not be considered". The word "proponent" is defined in s. 8 as a team that has become eligible to respond to the RFP. The material change provisions in s. 2.8(b) should not be read as negating the express provisions of the RFP and the ministerial approval of the process. When read as a whole, the provisions about material change do not permit the addition of a new entity as occurred here. The process actually followed was not the one specified in the bidding contract and was not authorized by the statute because it was not the one approved by the Minister.

[57]    Moreover, even if one were to conclude (and I would not) that this change from the Brentwood team that participated in the RFEI to the Brentwood/EAC joint venture by whom the bid was submitted could fall within the material change provisions of s. 2.8(b), the Province never gave a written decision to permit this change as required by that provision. As the trial judge noted, in fact the Province's position was that such a bid would not be eligible and its agents took steps to obfuscate the true proponent in the relevant documentation.

[58]    The trial judge also found that there was an implied obligation of good faith in the contract and

demeurer en lice et d'accroître sa capacité d'exécuter les travaux.

[55]    L'argument soulève la question de savoir si la coentreprise était un soumissionnaire admissible. La province prétend que c'était le cas, car selon elle, il appert de l'al. 2.8b) de la DP que chacun des soumissionnaires bénéficierait de l'appui d'une équipe, que la composition de cette équipe pouvait changer et que la province se réservait le droit d'approuver ou non la modification d'une équipe. Je ne puis adhérer à ce raisonnement.

[56]    Il faut considérer l'art. 2.8 dans son ensemble et au vu de l'approbation ministérielle dont il est question précédemment. Conformément à cette approbation, l'al. 2.8a) prévoit que seuls les six proposants tenus pour admissibles à l'issue de la DEI peuvent présenter une proposition et que les propositions présentées par d'autres personnes [TRADUCTION] « ne seront pas examinées ». Suivant l'article 8, [TRADUCTION] « proposant » s'entend d'une équipe admise à répondre à la DP. L'alinéa 2.8b) — relatif aux changements substantiels — ne saurait être interprété de façon à contrecarrer les dispositions expresses de la DP et l'approbation ministérielle du processus. Considérées globalement, les dispositions relatives aux changements substantiels ne permettent pas l'adjonction d'une nouvelle entité comme celle qui a eu lieu en l'espèce. La procédure suivie dans les faits n'a pas été celle prévue dans le dossier d'appel d'offres et, n'ayant pas été approuvée par le ministre, elle n'était pas légalement autorisée.

[57]    Qui plus est, à supposer même (et je ne suis pas disposé à le faire) que le passage de l'équipe Brentwood ayant répondu à la DEI à la coentreprise Brentwood/EAC qui a présenté la soumission constituait un changement substantiel pour les besoins de l'al. 2.8b), il reste que la province ne l'a jamais avalisé par écrit comme l'exigeait cette disposition. La juge du procès fait observer que la province jugeait la soumission inadmissible et que ses préposés ont occulté la véritable identité du proposant dans les documents en cause.

[58]    La juge de première instance conclut également qu'il y avait une obligation contractuelle

that the Province breached this obligation by failing to treat all bidders equally by changing the terms of eligibility to Brentwood's competitive advantage. This conclusion strongly reinforces the trial judge's decision about eligibility. Rather than repeating her detailed findings, I will simply quote her summary at para. 138:

The whole of [the Province's] conduct leaves me with no doubt that the [Province] breached the duty of fairness to [Tercon] by changing the terms of eligibility to Brentwood's competitive advantage. At best, [the Province] ignored significant information to its [i.e. Tercon's] detriment. At worst, the [Province] covered up its knowledge that the successful proponent was an ineligible joint venture. In the circumstances here, it is not open to the [Province] to say that a joint venture was only proposed. Nor can the [Province] say that it was unaware of the joint venture when it acted deliberately to structure contract B to include EAC as fully responsible within a separate contract with Brentwood, so minimizing the [Province's] risk that the contract would be unenforceable against EAC if arrangements did not work out. . . . The [Province] was . . . prepared to take the risk that unsuccessful bidders would sue: this risk did materialize.

[59]  To conclude on this point, I find no fault with the trial judge's conclusion that the bid was in fact submitted on behalf of a joint venture of Brentwood and EAC which was an ineligible bidder under the terms of the RFP. This breached not only the express eligibility provisions of the tender documents, but also the implied duty to act fairly towards all bidders.

B.  *The Exclusion Clause*

   1.  Introduction

[60]  As noted, the RFP includes an exclusion clause which reads as follows:

**2.10** . . .

Except as expressly and specifically permitted in these Instructions to Proponents, no Proponent shall

tacite d'agir de bonne foi et que la province a manqué à cette obligation en ne traitant pas tous les soumissionnaires sur un pied d'égalité du fait de la modification des conditions d'admissibilité et de l'octroi d'un avantage concurrentiel à Brentwood. Cette conclusion de la juge affermit considérablement celle qu'elle tire au sujet de l'admissibilité. Je m'abstiens de reprendre ses conclusions détaillées, mais j'en cite le résumé (par. 138) :

[TRADUCTION] Au vu de l'ensemble de la conduite [de la province], il ne fait pour moi aucun doute que celle-ci a manqué à son obligation d'équité à l'endroit de [Tercon] lorsqu'elle a modifié les conditions d'admissibilité à l'avantage de Brentwood du point de vue concurrentiel. Au mieux, elle a fait abstraction de renseignements importants au détriment de Tercon. Au pire, elle a dissimulé le fait que le soumissionnaire retenu était une coentreprise inadmissible. Dans ces circonstances, la province ne saurait faire valoir que la formation d'une coentreprise était seulement envisagée. Elle ne peut non plus prétendre avoir ignoré l'existence de la coentreprise alors qu'elle a délibérément conçu le contrat B de façon qu'EAC en accepte les modalités dans un contrat distinct conclu avec Brentwood, réduisant ainsi le risque [pour la province] que le contrat ne puisse être opposable à EAC si les accords projetés tournaient court. [. . .] [La province] était [. . .] prête à courir le risque que les soumissionnaires non retenus la poursuivent : ce risque s'est matérialisé.

[59]  Pour clore sur ce point, sa conclusion selon laquelle la soumission était en fait celle d'une coentreprise formée de Brentwood et d'EAC qui n'était pas admise à soumissionner suivant la DP n'est à mon avis entachée d'aucune erreur. L'inobservation qui en découle touche non seulement les conditions d'admissibilité énoncées dans le dossier d'appel d'offres, mais aussi l'obligation tacite d'agir équitablement vis-à-vis de tous les soumissionnaires.

B.  *La clause de non-recours*

   1.  Introduction

[60]  Rappelons que la DP renferme une clause de non-recours, dont voici le texte :

[TRADUCTION]

**2.10** . . .

Sauf ce que prévoient expressément les présentes instructions, un proposant ne peut exercer aucun

have any claim for compensation of any kind what-soever, as a result of participating in this RFP, and by submitting a Proposal each Proponent shall be deemed to have agreed that it has no claim. [Empha-sis added.]

[61]    The trial judge held that as a matter of con-struction, the clause did not bar recovery for the breaches she had found. The clause, in her view, was ambiguous and, applying the *contra profer-entem* principle, she resolved the ambiguity in Tercon's favour. She also found that the Province's breach was fundamental and that it was not fair or reasonable to enforce the exclusion clause in light of the nature of the Province's breach. The Province contends that the judge erred both with respect to the construction of the clause and her application of the doctrine of fundamental breach.

[62]    On the issue of fundamental breach in rela-tion to exclusion clauses, my view is that the time has come to lay this doctrine to rest, as Dickson C.J. was inclined to do more than 20 years ago: *Hunter Engineering Co. v. Syncrude Canada Ltd.*, [1989] 1 S.C.R. 426, at p. 462. I agree with the analytical approach that should be followed when tackling an issue relating to the applicability of an exclusion clause set out by my colleague Binnie J. However, I respectfully do not agree with him on the question of the proper interpretation of the clause in issue here. In my view, the clause does not exclude Tercon's claim for damages, and even if I am wrong about that, the clause is at best ambigu-ous and should be construed *contra proferentem* as the trial judge held. As a result of my conclusion on the interpretation issue, I do not have to go on to apply the rest of the analytical framework set out by Binnie J.

[63]    In my view, the exclusion clause does not cover the Province's breaches in this case. The RFP process put in place by the Province was prem-ised on a closed list of bidders; a contest with an ineligible bidder was not part of the RFP process and was in fact expressly precluded by its terms. A "Contract A" could not arise as a result of sub-mission of a bid from any other party. However, as

recours en indemnisation pour sa participation à la DP, ce qu'il est réputé accepter lorsqu'il présente une soumission. [Je souligne.]

[61]    La juge de première instance statue que le libellé de la clause ne fait pas obstacle à l'indem-nisation pour les inexécutions relevées. À son avis, la clause est équivoque et, conformément à la règle *contra proferentem*, elle l'interprète en faveur de Tercon. Elle opine en outre que l'inexécution repro-chée à la province est fondamentale et qu'il n'est ni juste ni raisonnable de faire respecter la clause de non-recours étant donné la nature de l'inexécution. La province fait valoir que la juge a interprété erro-nément la clause et qu'elle a eu tort de recourir au principe de l'inexécution fondamentale.

[62]    En ce qui concerne son application aux clau-ses d'exonération, je crois que le temps est venu de donner le coup de grâce au principe de l'inexécution fondamentale comme le juge en chef Dickson y était enclin il y a plus de 20 ans : *Hunter Engineering Co. c. Syncrude Canada Ltée*, [1989] 1 R.C.S. 426, p. 462. Je souscris à la démarche analytique qui s'impose, selon mon collègue le juge Binnie, pour s'attaquer à une question touchant à l'applicabilité d'une clause d'exonération. Malheureusement, je ne puis faire mienne son interprétation de la clause litigieuse en l'espèce. À mon sens, la clause ne fait pas obstacle au recours en dommages-intérêts de Tercon et, même si j'ai tort sur ce point, la clause est au mieux équivoque et doit être interprétée *contra proferentem* comme le préconise la juge de première instance. Vu ma conclusion concer-nant l'interprétation, je n'ai pas à appliquer les autres volets de la démarche analytique du juge Binnie.

[63]    J'estime que la clause de non-recours ne s'applique pas aux inexécutions imputées à la pro-vince. Le processus de DP mis en place par celle-ci supposait la participation d'un nombre limité d'en-treprises. La mise en concurrence avec un soumis-sionnaire inadmissible n'en faisait pas partie et elle était même expressément exclue. La présenta-tion d'une proposition par une autre entreprise ne

a result of how the Province proceeded, the very premise of its own RFP process was missing, and the work was awarded to a party who could not be a participant in the RFP process. That is what Tercon is complaining about. Tercon's claim is not barred by the exclusion clause because the clause only applies to claims arising "as a result of participating in [the] RFP", not to claims resulting from the participation of other, ineligible parties. Moreover, the words of this exclusion clause, in my view, are not effective to limit liability for breach of the Province's implied duty of fairness to bidders. I will explain my conclusion by turning first to a brief account of the key legal principles and then to the facts of the case.

### 2.  Legal Principles

[64]  The key principle of contractual interpretation here is that the words of one provision must not be read in isolation but should be considered in harmony with the rest of the contract and in light of its purposes and commercial context. The approach adopted by the Court in *M.J.B.* is instructive. The Court had to interpret a privilege clause, which is somewhat analogous to the exclusion clause in issue here. The privilege clause provided that the lowest or any tender would not necessarily be accepted, and the issue was whether this barred a claim based on breach of an implied term that the owner would accept only compliant bids. In interpreting the privilege clause, the Court looked at its text in light of the contract as a whole, its purposes and commercial context. As Iacobucci J. said, at para. 44, "the privilege clause is only one term of Contract A and must be read in harmony with the rest of the tender documents. To do otherwise would undermine the rest of the agreement between the parties."

[65]  In a similar way, it is necessary in the present case to consider the exclusion clause in the RFP in light of its purposes and commercial context as well as of its overall terms. The question is whether the exclusion of compensation for claims resulting

pouvait faire naître un « contrat A ». La province a donc ignoré le fondement même de sa propre DP et elle a attribué le marché à une entreprise non admise à y prendre part. C'est ce dont Tercon lui fait grief. La clause de non-recours ne fait pas obstacle au recours de Tercon, car elle ne s'applique qu'à l'indemnisation demandée [TRADUCTION] « pour [l]a participation à la DP », et non au recours qui fait suite à la participation d'une autre entreprise, elle inadmissible. De plus, le texte de la clause ne limite pas selon moi la responsabilité de la province pour le manquement à son obligation tacite de faire preuve d'équité à l'égard des soumissionnaires. Je m'explique en exposant brièvement les principes juridiques essentiels, puis en les appliquant aux faits de l'espèce.

### 2.  Les principes juridiques

[64]  Le principe fondamental d'interprétation applicable en l'espèce veut qu'une clause contractuelle ne doive pas être considérée isolément mais en harmonie avec les autres et à la lumière de son objet et du contexte commercial dans lequel elle s'inscrit. La démarche suivie dans l'arrêt *M.J.B.* est éclairante. La Cour devait y interpréter une clause de réserve qui s'apparentait quelque peu à la clause de non-recours qui nous intéresse. La clause de réserve stipulait que le marché ne serait pas nécessairement attribué au soumissionnaire le moins disant ni même attribué du tout. La question était celle de savoir si elle faisait obstacle à une action en justice pour non-respect de la clause tacite voulant que le propriétaire n'accepte que les soumissions conformes. Pour l'interpréter, la Cour examine son libellé au vu du contrat dans son ensemble, de son objet et de son contexte commercial. Le juge Iacobucci conclut au par. 44 : « . . . la clause de réserve n'est qu'une condition du contrat A et elle doit être interprétée de façon à s'harmoniser avec le reste du dossier d'appel d'offres. Agir autrement, ce serait saper le reste de l'entente entre les parties. »

[65]  De même, il faut en l'espèce examiner la clause de non-recours de la DP à la lumière de son objet et du contexte commercial dans lequel elle s'inscrit, ainsi que de l'ensemble de ses conditions. Il faut se demander si l'exclusion de toute

from "participating in this RFP", properly interpreted, excludes liability for the Province having unfairly considered a bid from a bidder who was not supposed to have been participating in the RFP process at all.

### 3.  Application to This Case

[66]  Having regard to both the text of the clause in its broader context and to the purposes and commercial context of the RFP, my view is that this claim does not fall within the terms of the exclusion clause.

[67]  To begin, it is helpful to recall that in interpreting tendering contracts, the Court has been careful to consider the special commercial context of tendering. Effective tendering ultimately depends on the integrity and business efficacy of the tendering process: see, e.g., *Martel*, at para. 88; *M.J.B.*, at para. 41; *Double N Earthmovers*, at para. 106. As Iacobucci and Major JJ. put it in *Martel*, at para. 116, "it is imperative that all bidders be treated on an equal footing . . . . Parties should at the very least be confident that their initial bids will not be skewed by some underlying advantage in the drafting of the call for tenders conferred upon only one potential bidder."

[68]  This factor is particularly weighty in the context of public procurement. In that context, in addition to the interests of the parties, there is the need for transparency for the public at large. This consideration is underlined by the statutory provisions which governed the tendering process in this case. Their purpose was to assure transparency and fairness in public tenders. As was said by Orsborn J. (as he then was) in *Cahill (G.J.) & Co. (1979) Ltd. v. Newfoundland and Labrador (Minister of Municipal and Provincial Affairs)*, 2005 NLTD 129, 250 Nfld. & P.E.I.R. 145, at para. 35:

The owner — in this case the government — is in control of the tendering process and may define the

indemnisation pour [TRADUCTION] « [l]a participation à la DP », correctement interprétée, soustrait la province à sa responsabilité lorsqu'elle se rend coupable d'iniquité en prenant en considération la proposition d'une entreprise qui n'était pas du tout censée participer à la DP.

### 3.  Application à la présente espèce

[66]  Compte tenu du libellé de la clause dans son contexte plus général ainsi que de l'objet et du contexte commercial de la DP, j'estime que le recours échappe à la clause de non-recours.

[67]  D'abord, il convient de rappeler que pour interpréter le contrat issu de l'appel d'offres, la Cour tient dûment compte du contexte commercial particulier de la demande de propositions. Au final, le caractère fructueux du processus dépend de son intégrité et de son efficacité commerciale : voir, p. ex., les arrêts *Martel*, par. 88; *M.J.B.*, par. 41, et *Double N Earthmovers*, par. 106. Comme l'affirment les juges Iacobucci et Major dans l'arrêt *Martel*, au par. 116 : « Il est [. . .] impératif que tous les soumissionnaires soient traités sur un pied d'égalité [. . .] Un soumissionnaire devrait à tout le moins être assuré que l'évaluation de sa soumission initiale ne sera pas biaisée par quelque avantage sous-entendu dans le dossier d'appel d'offres et dont ne bénéficie qu'un seul soumissionnaire éventuel. »

[68]  Ce facteur importe particulièrement dans le contexte de la passation de marchés publics. C'est pourquoi il faut non seulement protéger les intérêts des parties, mais également assurer la transparence du processus vis-à-vis des citoyens en général. Ce souci ressort des dispositions législatives qui régissaient le processus dans la présente affaire et dont l'objectif était d'assurer la transparence et l'équité des appels d'offres. Comme le dit le juge Orsborn (maintenant Juge en chef) dans l'arrêt *Cahill (G.J.) & Co. (1979) Ltd. c. Newfoundland and Labrador (Minister of Municipal and Provincial Affairs)*, 2005 NLTD 129, 250 Nfld. & P.E.I.R. 145, par. 35 :

[TRADUCTION] Le propriétaire — en l'occurrence l'État — est maître du processus d'appel d'offres. Il peut

parameters for a compliant bid and a compliant bidder. The corollary to this, of course, is that once the owner — here the government — sets the rules, it must itself play by those rules in assessing the bids and awarding the main contract.

[69]   One aspect that is generally seen as contributing to the integrity and business efficacy of the tendering process is the requirement that only compliant bids be considered. As noted earlier, such a requirement has often been implied because, as the Court said in *M.J.B.*, it makes little sense to think that a bidder would comply with the bidding process if the owner could circumscribe it by accepting a non-compliant bid. Respectfully, it seems to me to make even less sense to think that eligible bidders would participate in the RFP if the Province could avoid liability for ignoring an express term concerning eligibility to bid on which the entire RFP was premised and which was mandated by the statutorily approved process.

[70]   The closed list of bidders was the foundation of this RFP and there were important competitive advantages to a bidder who could side-step that limitation. Thus, it seems to me that both the integrity and the business efficacy of the tendering process support an interpretation that would allow the exclusion clause to operate compatibly with the eligibility limitations that were at the very root of the RFP.

[71]   The same may be said with respect to the implied duty of fairness. As Iacobucci and Major JJ. wrote for the Court in *Martel*, at para. 88, "[i]mplying an obligation to treat all bidders fairly and equally is consistent with the goal of protecting and promoting the integrity of the bidding process." It seems to me that clear language is necessary to exclude liability for breach of such a basic requirement of the tendering process, particularly in the case of public procurement.

déterminer les paramètres de la conformité d'une soumission et de l'admissibilité d'un soumissionnaire. Il s'en suit évidemment que lorsque le propriétaire — en l'occurrence l'État — établit les règles, il doit les respecter au moment d'évaluer les offres et d'attribuer le contrat principal.

[69]   L'exigence que seules soient examinées des soumissions conformes est généralement considérée comme un élément favorisant l'intégrité et l'efficacité commerciale du processus d'appel d'offres. J'ai déjà mentionné que cette exigence est souvent inférée parce que, pour reprendre les propos de la Cour dans l'arrêt *M.J.B.*, il est déraisonnable qu'un soumissionnaire doive se conformer au processus d'appel d'offres si le propriétaire peut le contourner en acceptant une soumission non conforme. J'ajoute qu'il est encore moins concevable qu'un soumissionnaire admissible prenne part à une DP si la province peut échapper à toute responsabilité malgré l'inobservation d'une condition expresse relative à l'admissibilité à soumissionner, une condition qui formait l'assise de la DP en entier et qui bénéficiait de l'approbation ministérielle requise par la loi.

[70]   La limitation du nombre de soumissionnaires admissibles constituait l'assise de la DP, et l'entreprise admise à soumissionner malgré cette restriction se voyait conférer un avantage concurrentiel considérable. À mon sens, l'intégrité et l'efficacité commerciale du processus d'appel d'offres commandent donc une interprétation qui permet une application de la clause de non-recours compatible avec la limitation du nombre de soumissionnaires admissibles, laquelle formait l'assise même de la DP.

[71]   Il en va de même de l'obligation tacite d'équité. Comme le disent les juges Iacobucci et Major au nom de la Cour dans l'arrêt *Martel*, « [l]'existence présumée d'une obligation de traiter tous les soumissionnaires équitablement et sur un pied d'égalité est compatible avec l'objectif de protéger et de promouvoir l'intégrité du mécanisme d'appel d'offres » (par. 88). J'estime que seul un libellé clair peut écarter la responsabilité consécutive au non-respect d'une exigence aussi fondamentale applicable au processus d'appel d'offres, spécialement lorsqu'il s'agit de passer un marché public.

[72]    The proper interpretation of the exclusion clause should also take account of the statutory context which I have reviewed earlier. The restriction on eligibility of bidders was a key element of the alternative process approved by the Minister. It seems unlikely, therefore, that the parties intended through this exclusion clause to effectively gut a key aspect of the approved process. Of course, it is true that the exclusion clause does not bar all remedies, but only claims for compensation. However, the fact remains that as a practical matter, there are unlikely to be other, effective remedies for considering and accepting an ineligible bid and that barring compensation for a breach of that nature in practical terms renders the ministerial approval process virtually meaningless. Whatever administrative law remedies may be available, they are not likely to be effective remedies for awarding a contract to an ineligible bidder. The Province did not submit that injunctive relief would have been an option, and I can, in any event, foresee many practical problems that need not detain us here in seeking such relief in these circumstances.

[73]    The Province stresses Tercon's commercial sophistication, in effect arguing that it agreed to the exclusion clause and must accept the consequences. This line of argument, however, has two weaknesses. It assumes the answer to the real question before us which is: what does the exclusion clause mean? The consequences of agreeing to the exclusion clause depend on its construction. In addition, the Province's submission overlooks its own commercial sophistication and the fact that sophisticated parties can draft very clear exclusion and limitation clauses when they are minded to do so.  Such clauses contrast starkly with the curious clause which the Province inserted into this RFP. The limitation of liability clause in *Hunter*, for example, provided that "[n]otwithstanding any other provision in this contract or any applicable statutory provisions neither the Seller nor the Buyer shall be liable to the other for special or consequential damages or damages for loss of use arising directly or indirectly from any breach of this contract, fundamental or otherwise" (p. 450). The Court found this to be clear and unambiguous. The limitation clause in issue in *Guarantee Co. of North*

[72]    La juste interprétation de la clause de non-recours doit aussi s'appuyer sur le cadre législatif examiné précédemment. L'admissibilité restreinte constituait un élément essentiel de l'autre processus approuvé par le ministre. Il est donc peu probable que les parties aient vraiment voulu, en stipulant la clause de non-recours, supprimer un aspect essentiel de ce processus. La clause ne fait évidemment obstacle qu'aux demandes d'indemnisation. Cependant, il demeure peu probable que l'examen et l'acceptation d'une soumission inadmissible confèrent un autre recours efficace, sans compter que l'exclusion de l'indemnisation du préjudice causé par un tel manquement supprime en fait toute la raison d'être du processus d'approbation ministérielle. Quel que soit le recours possible en droit administratif, il est peu probable qu'il permette d'obtenir réparation pour l'octroi d'un marché à un soumissionnaire inadmissible. La province ne plaide pas qu'une injonction aurait pu être obtenue et, de toute manière, je peux concevoir de nombreuses difficultés d'ordre pratique qui justifient de ne pas s'attarder davantage à cette avenue possible.

[73]    La province insiste sur l'expérience commerciale de Tercon. Elle soutient en fait que l'entreprise a convenu de la clause de non-recours et qu'elle doit en accepter les conséquences. L'argument comporte toutefois deux failles. Il préjuge du règlement par la Cour de la véritable question en litige : quelle est la portée de la clause de non-recours? Les conséquences résultant de l'adhésion à cette clause dépendent de son interprétation. En outre, la province passe sous silence sa propre expérience commerciale et le fait que des parties rompues aux usages commerciaux peuvent rédiger des clauses très claires de non-recours ou de responsabilité limitée lorsqu'elles entendent le faire. Ce n'est manifestement pas le cas de la curieuse clause que la province a insérée dans sa DP. À titre d'exemple, la clause de responsabilité limitée visée dans l'arrêt *Hunter* disposait que « [n]onobstant toute autre disposition du présent contrat ou toute disposition législative applicable, ni le vendeur ni l'acheteur n'est tenu de verser à l'autre des dommages-intérêts spéciaux ni des dommages-intérêts pour un préjudice indirect ou encore pour la perte d'usage résultant directement ou indirectement d'une inexécution, fondamentale

*America v. Gordon Capital Corp.*, [1999] 3 S.C.R. 423, provided that legal proceedings for the recovery of "any loss hereunder shall not be brought . . . after the expiration of 24 months from the discovery of such loss" (para. 5). Once again, the Court found this language clear. The Ontario Court of Appeal similarly found the language of a limitation of liability clause to be clear in *Fraser Jewellers (1982) Ltd. v. Dominion Electric Protection Co.* (1997), 34 O.R. (3d) 1. The clause provided in part that if the defendant "should be found liable for loss, damage or injury due to a failure of service or equipment in any respect, its liability shall be limited to a sum equal to 100% of the annual service charge or $10,000.00, whichever is less, as the agreed upon damages and not as a penalty, as the exclusive remedy" (p. 4). These, and many other cases which might be referred to, demonstrate that sophisticated parties are capable of drafting clear and comprehensive limitation and exclusion provisions.

[74]   I turn to the text of the clause which the Province inserted in its RFP. It addresses claims that result from "participating in this RFP". As noted, the limitation on who could participate in this RFP was one of its premises. These words must, therefore, be read in light of the limit on who was eligible to participate in this RFP. As noted earlier, both the ministerial approval and the text of the RFP itself were unequivocal: only the six proponents qualified through the earlier RFEI process were eligible and *proposals received from any other party would not be considered*. Thus, central to "participating in this RFP" was participating in a contest among those eligible to participate. A process involving other bidders, as the trial judge found the process followed by the Province to be, is not the process called for by "this RFP" and being part of that other process is not in any meaningful sense "participating in this RFP".

ou autre, du présent contrat » (p. 450). La Cour a jugé ce texte clair et non équivoque. Dans l'affaire *Guarantee Co. of North America c. Gordon Capital Corp.*, [1999] 3 R.C.S. 423, la clause en litige prévoyait que des procédures judiciaires en vue de l'indemnisation de « tout sinistre visé aux présentes ne doivent pas être engagées [. . .] après l'expiration d'un délai de 24 mois suivant la découverte du sinistre » (par. 5). Là encore, la Cour conclut à la clarté du libellé. Dans l'arrêt *Fraser Jewellers (1982) Ltd. c. Dominion Electric Protection Co.* (1997), 34 O.R. (3d) 1, la Cour d'appel de l'Ontario conclut également au caractère non équivoque de la clause de responsabilité limitée, qui disposait notamment que si la défenderesse [TRADUCTION] « était tenue responsable d'un préjudice consécutif à une défaillance du service ou du matériel, quelle qu'elle soit, elle n'était tenue de verser que la totalité des frais de service annuels ou 10 000 $, selon le moindre des deux montants, à titre d'indemnité convenue, et non de pénalité, à l'exclusion de toute autre réparation » (p. 4). Ces exemples et bien d'autres que l'on pourrait citer montrent que des parties expérimentées sont en mesure de rédiger des clauses de responsabilité limitée ou de non-recours à la fois claires et exhaustives.

[74]   Passons maintenant au texte de la clause insérée au contrat par la province. Il vise les demandes d'indemnisation d'un préjudice découlant de la [TRADUCTION] « participation à la DP ». Rappelons que l'une des assises de la DP était la limitation du nombre d'entreprises admises à y prendre part. Il faut donc interpréter ce texte au regard de cette limitation. Tant l'approbation ministérielle que le texte de la DP elle-même sont clairs : seuls les six proposants s'étant rendus admissibles en répondant à la DEI pouvaient soumissionner, et *aucune proposition d'une autre personne ne serait examinée*. La participation à un concours ouvert aux seules personnes admises à y prendre part était donc au cœur de la « participation à la DP ». Un processus ouvert à d'autres entreprises — ce qui était le cas du processus suivi dans les faits selon la juge de première instance — ne saurait s'entendre de « la DP », et le fait d'y prendre part ne saurait véritablement être considéré comme une « participation à la DP ».

2010 SCC 4 (CanLII)

[75]    The Province would have us interpret the phrase excluding compensation "as a result of participating in this RFP" to mean that compensation is excluded that results from "submitting a Proposal". However, that interpretation is not consistent with the wording of the clause as a whole. The clause concludes with the phrase that "by submitting a Proposal each Proponent shall be deemed to have agreed that it has no claim". If the phrases "participating in this RFP" and "submitting a Proposal" were intended to mean the same thing, it is hard to understand why different words were used in the same short clause to express the same idea. The fact that the Minister had approved a closed list of participants strengthens the usual inference that the use of different words was deliberate so as not to exclude compensation for a departure from that basic eligibility requirement.

[76]    This interpretation of the exclusion clause does not rob it of meaning, but makes it compatible with other provisions of the RFP. There is a parallel between this case and the Court's decision in *M.J.B.* There, the Court found that there was compatibility between the privilege clause and the implied term to accept only compliant bids. Similarly, in this case, there is compatibility between the eligibility requirements of the RFP and the exclusion clause. Not any and every claim based on any and every deviation from the RFP provisions would escape the preclusive effect of the exclusion clause. It is only when the defect in the Province's adherence to the RFP process is such that it is completely outside that process that the exclusion clause cannot have been intended to operate. What is important here, in my view, is that the RFP in its conception, in its express provisions and in the statutorily required approval it was given, was premised on limiting eligibility to the six proponents in the RFEI process. Competition among others was not at all contemplated and was not part of the RFP process; in fact, the RFP expressly excluded that possibility. In short, limiting eligibility of bidders to those who had responded to the RFEI was the foundation of the whole RFP. As the judge found, acceptance of

[75]    La province nous exhorte à conclure que l'énoncé écartant toute indemnisation « pour [l]a participation à la DP » signifie qu'il ne saurait y avoir d'indemnisation d'un préjudice résultant de la [TRADUCTION] « présent[ation d']une soumission », ce qui pourtant serait incompatible avec le texte de la clause dans son ensemble. Il y est d'ailleurs stipulé à la toute fin que le proposant [TRADUCTION] « est réputé accepter [qu'il ne peut exercer aucun recours en indemnisation] lorsqu'il présente une soumission ». Si la « participation à la DP » et la « présent[ation d']une soumission » devaient s'entendre de la même chose, on s'expliquerait difficilement que des termes différents soient employés dans la même clause brève pour exprimer la même idée. L'aval donné par le ministre à la limitation du nombre de participants étaye l'interprétation habituelle voulant que l'emploi des termes différents visait délibérément à ne pas écarter l'indemnisation en cas d'inobservation de cette exigence fondamentale liée à l'admissibilité.

[76]    Pareille interprétation de la clause de non-recours ne la prive pas de sens, mais assure sa compatibilité avec les autres clauses de la DP. Un parallèle peut être établi entre la présente espèce et l'affaire *M.J.B.*, où la Cour conclut à la compatibilité de la clause de réserve avec la condition tacite que seule une soumission conforme puisse être acceptée. Il y a également compatibilité en l'espèce entre les conditions d'admissibilité de la DP et la clause de non-recours. Toute action intentée pour quelque manquement aux dispositions de la DP n'échappe pas à l'application de la clause de non-recours. Ce n'est que lorsque le non-respect du processus de DP par la province est tel que la démarche suivie est totalement étrangère à ce processus qu'on ne peut conclure que les parties ont voulu l'application de la clause de non-recours. Ce qui importe en l'occurrence selon moi c'est que la DP, au vu de sa conception, de ses dispositions expresses et de son approbation légale, avait pour assise l'admissibilité des seuls six proposants ayant répondu à la DEI. La mise en concurrence avec des tiers n'était pas envisagée et elle ne faisait pas partie du processus; en fait, la DP l'excluait expressément. En bref, l'admissibilité des seuls proposants qui avaient répondu à la DEI était l'assise même la DP.

a bid from an ineligible bidder "attacks the underlying premise of the process" established by the RFP: para. 146. Liability for such an attack is not excluded by a clause limiting compensation resulting from participation in this RFP.

[77] This interpretation is also supported by another provision of the RFP. Under s. 2.9, as mentioned earlier, the Province reserved to itself the right to unilaterally cancel the RFP and the right to propose a new RFP allowing additional bidders. If the exclusion clause were broad enough to exclude compensation for allowing ineligible bidders to participate, there seems to be little purpose in this reservation of the ability to cancel the RFP and issue a new one to a wider circle of bidders. It is also significant that the Province did not reserve to itself the right to accept a bid from an ineligible bidder or to unilaterally change the rules of eligibility. The RFP expressly did exactly the opposite. None of this, in my opinion, supports the view that the exclusion clause should be read as applying to the Province's conduct in this case.

[78] To hold otherwise seems to me to be inconsistent with the text of the clause read in the context of the RFP as a whole and in light of its purposes and commercial context. In short, I cannot accept the contention that, by agreeing to exclude compensation for participating in this RFP process, the parties could have intended to exclude a damages claim resulting from the Province unfairly permitting a bidder to participate who was not eligible to do so. I cannot conclude that the provision was intended to gut the RFP's eligibility requirements as to who may participate in it, or to render meaningless the Minister's statutorily required approval of the alternative process where this was a key element. The provision, as well, was not intended to allow the Province to escape a damages claim for applying different eligibility criteria, to the competitive disadvantage of other bidders and for taking

Comme le dit la juge de première instance, l'acceptation de la proposition d'un soumissionnaire inadmissible [TRADUCTION] « sape l'assise du processus » établi par la DP : par. 146. La clause écartant toute indemnisation pour la participation à la DP ne saurait soustraire une partie à la responsabilité découlant d'une telle atteinte.

[77] Une autre disposition de la DP valide cette interprétation. Comme je le signale précédemment, à la clause 2.9, la province se réserve le droit d'annuler unilatéralement la DP et celui de proposer la tenue d'un nouvel appel d'offres ouvert à d'autres soumissionnaires. Si la clause de non-recours avait une portée suffisamment large pour écarter la responsabilité résultant de l'acceptation de propositions présentées par des soumissionnaires non admissibles, point n'aurait été besoin de prévoir cette faculté de mettre fin à la DP et d'en lancer une nouvelle en élargissant le cercle des soumissionnaires éventuels. Il est aussi révélateur que la province ne se soit pas réservé le droit d'accepter la proposition d'un soumissionnaire inadmissible ou de modifier de son seul chef les règles d'admissibilité. La DP prévoit expressément l'exact contraire. À mon sens, rien de tout cela n'appuie la thèse que la clause de non-recours devrait être interprétée de façon à la rendre applicable au comportement de la province en l'espèce.

[78] Selon moi, conclure le contraire va à l'encontre du texte de la clause interprété eu égard au contexte de la DP dans son ensemble et à la lumière de l'objet et du contexte commercial de celle-ci. En somme, je ne peux faire droit à la prétention selon laquelle, en écartant toute indemnité pour la participation à la DP, les parties ont pu vouloir faire obstacle à tout recours en dommages-intérêts intenté pour l'iniquité dont aurait pu faire preuve la province en permettant à une entreprise de participer à un processus auquel elle n'était pas admise à prendre part. Je ne peux conclure que la clause visait à supprimer les conditions d'admissibilité de la DP, à priver de sa raison d'être l'approbation ministérielle du nouveau processus exigée par la loi, dont les conditions d'admissibilité en question formaient un élément clé, non plus qu'à permettre à la province d'échapper à toute responsabilité après avoir

steps designed to disguise the true state of affairs. I cannot conclude that the parties, through the words found in this exclusion clause, intended to waive compensation for conduct like that of the Province in this case that strikes at the heart of the integrity and business efficacy of the tendering process which it undertook.

[79]  If I am wrong about my interpretation of the clause, I would hold, as did the trial judge, that its language is at least ambiguous. If, as the Province contends, the phrase "participating in this RFP" could reasonably mean "submitting a Proposal", that phrase could also reasonably mean "competing against the other eligible participants". Any ambiguity in the context of this contract requires that the clause be interpreted against the Province and in favour of Tercon under the principle *contra proferentem*: see, e.g., *Hillis Oil and Sales Ltd. v. Wynn's Canada, Ltd.*, [1986] 1 S.C.R. 57, at pp. 68-69. Following this approach, the clause would not apply to bar Tercon's damages claim.

V.  Disposition

[80]  I conclude that the judge did not err in finding that the Province breached the tendering contract or in finding that Tercon's remedy in damages for that breach was not precluded by the exclusion clause in the contract. I would therefore allow the appeal, set aside the order of the Court of Appeal and restore the judgment of the trial judge. The parties advise that the question of costs has been resolved between them and that therefore no order in relation to costs is required.

The reasons of McLachlin C.J. and Binnie, Abella and Rothstein JJ. were delivered by

[81]  BINNIE J. (dissenting) — The important legal issue raised by this appeal is whether, and in what

appliqué des critères d'admissibilité différents défavorisant des soumissionnaires sur le plan concurrentiel et pris des mesures pour dissimuler cette réalité. Je ne puis non plus arriver à la conclusion que les parties ont voulu, en employant le libellé de la clause de non-recours, exclure toute indemnité pour le préjudice infligé par un comportement comme celui reproché à la province en l'espèce, un comportement qui porte directement atteinte à l'intégrité de l'appel d'offres lancé et à son efficacité commerciale.

[79]  Si toutefois j'avais tort d'interpréter la clause comme je le fais, je statuerais, à l'instar de la juge de première instance, que son texte est pour le moins équivoque. Si, comme le prétend la province, l'énoncé [TRADUCTION] « participation à la DP » pouvait raisonnablement s'entendre de la « présent[ation d']une proposition », il pourrait aussi bien équivaloir au fait de « se mesurer aux autres participants admissibles ». Toute ambiguïté dans le cadre du contrat commande que la clause soit interprétée au détriment de la province et en faveur de Tercon suivant la règle *contra proferentem* : voir, p. ex., *Hillis Oil and Sales Ltd. c. Wynn's Canada, Ltd.*, [1986] 1 R.C.S. 57, p. 68-69. Dès lors, la clause ne ferait pas obstacle au recours en dommages-intérêts de Tercon.

V.  Dispositif

[80]  Je conclus que la juge de première instance n'a pas commis d'erreur en statuant que la province n'avait pas respecté le contrat issu de l'appel d'offres et que la clause de non-recours figurant dans ce contrat ne faisait pas obstacle à l'action en dommages-intérêts intentée par Tercon pour cette inexécution. Je suis donc d'avis d'accueillir le pourvoi, d'annuler l'ordonnance de la Cour d'appel et de rétablir le jugement de première instance. Les parties ayant réglé entre elles la question des dépens, il n'est donc pas nécessaire de rendre d'ordonnance à ce sujet.

Version française des motifs de la juge en chef McLachlin et des juges Binnie, Abella et Rothstein rendus par

[81]  LE JUGE BINNIE (dissident) — Le présent pourvoi soulève une question de droit importante,

circumstances, a court will deny a defendant contract breaker the benefit of an exclusion of liability clause to which the innocent party, not being under any sort of disability, has agreed. Traditionally, this has involved consideration of what is known as the doctrine of fundamental breach, a doctrine which Dickson C.J. in *Hunter Engineering Co. v. Syncrude Canada Ltd.*, [1989] 1 S.C.R. 426, suggested should be laid to rest 21 years ago (p. 462).

[82]  On this occasion we should again attempt to shut the coffin on the jargon associated with "fundamental breach". Categorizing a contract breach as "fundamental" or "immense" or "colossal" is not particularly helpful. Rather, the principle is that a court has no discretion to refuse to enforce a valid and applicable contractual exclusion clause unless the plaintiff (here the appellant Tercon) can point to some paramount consideration of public policy sufficient to override the public interest in freedom of contract and defeat what would otherwise be the contractual rights of the parties. Tercon points to the public interest in the transparency and integrity of the government tendering process (in this case, for a highway construction contract) but in my view such a concern, while important, did not render unenforceable the terms of the contract Tercon agreed to. There is nothing inherently unreasonable about exclusion clauses. Tercon is a large and sophisticated corporation. Unlike my colleague Justice Cromwell, I would hold that the respondent Ministry's conduct, while in breach of its contractual obligations, fell within the terms of the exclusion clause. In turn, there is no reason why the clause should not be enforced. I would dismiss the appeal.

I.  Overview

[83]  This appeal concerns a contract to build a $35 million road in the remote Nass Valley of British Columbia (the "Kincolith project"). The respondent Ministry accepted a bid from Brentwood

Enterprises Ltd. that did not comply with the terms of tender. Tercon, as the disappointed finalist in the bidding battle, seeks compensation equivalent to the profit it expected to earn had it been awarded the contract.

[84]    Tercon alleged, and the trial judge found, that although the winning bid was submitted in the name of Brentwood (an eligible bidder), Brentwood in fact intended, with the Ministry's knowledge and encouragement, to do the work in a co-venture with an ineligible bidder, Emil Anderson Construction Co. ("EAC"). The respondent Ministry raised a number of defences including the fact that the formal contract was signed in the name of Brentwood alone. This defence was rejected in the courts below. The Ministry's substantial defence in this Court is that even if it failed to abide by the bidding rules, it is nonetheless protected by an exclusion of compensation clause set out clearly in the request for proposals ("RFP"). The clause provided that "no Proponent shall have any claim for compensation of any kind whatsoever, as a result of participating in this RFP" and that "by submitting a Proposal each Proponent shall be deemed to have agreed that it has no claim" (s. 2.10 of the RFP).

[85]    The appeal thus brings into conflict the public policy that favours a fair, open and transparent bid process, and the freedom of contract of sophisticated and experienced parties in a commercial environment to craft their own contractual relations. I agree with Tercon that the public interest favours an orderly and fair scheme for tendering in the construction industry, but there is also a public interest in leaving knowledgeable parties free to order their own commercial affairs. In my view, on the facts of this case, the Court should not rewrite — nor should the Court refuse to give effect to — the terms agreed to by the parties.

[86]    I accept, as did the courts below, that the respondent Ministry breached the terms of its own RFP when it contracted with Brentwood, knowing the work would be carried out by a co-venture with Brentwood and EAC. The addition of EAC, a

accepté de Brentwood Enterprises Ltd. une soumission qui n'était pas conforme aux conditions de son appel d'offres. Écartée à l'étape ultime du processus, Tercon a réclamé une indemnité équivalant au profit escompté advenant l'obtention du contrat.

[84]    Tercon a allégué que même si la soumission retenue avait été présentée au nom de Brentwood, ce soumissionnaire admissible entendait en fait exécuter les travaux en coentreprise avec un soumissionnaire inadmissible, Emil Anderson Construction Co. (« EAC »), au su et avec l'appui du ministère. La juge de première instance lui a donné raison. Le ministère intimé a invoqué divers moyens de défense, dont le fait que Brentwood seule était signataire du contrat intervenu. Ce moyen a été rejeté par les juridictions inférieures. Devant notre Cour, le ministère fait valoir comme moyen de fond qu'en dépit de l'inobservation des règles de l'appel d'offres, il peut se prévaloir de la clause de non-recours en indemnisation que prévoit clairement la demande de propositions (« DP »). Une clause stipule en effet qu'[TRADUCTION] « un proposant ne peut exercer aucun recours en indemnisation pour sa participation à la DP, ce qu'il est réputé accepter lorsqu'il présente une soumission » (clause 2.10 de la DP).

[85]    S'opposent donc en l'espèce des considérations d'ordre public privilégiant un appel d'offres équitable, ouvert et transparent et la liberté de personnes compétentes et expérimentées de définir leurs liens contractuels dans un contexte commercial. Je conviens avec Tercon que, dans le secteur de la construction, il est dans l'intérêt public que les appels d'offres se déroulent de manière ordonnée et équitable. Mais il est également dans l'intérêt public que des personnes rompues aux usages d'un domaine conservent la faculté d'organiser leurs propres affaires. Vu les faits de la présente espèce, la Cour ne devrait pas reformuler les conditions arrêtées par les parties ni refuser de leur donner effet.

[86]    Je conviens avec les juridictions inférieures que le ministère intimé n'a pas respecté les conditions de sa propre DP en accordant le marché à Brentwood alors qu'il savait que les travaux seraient exécutés en coentreprise avec EAC. L'adjonction

bigger contractor with greater financial resources than Brentwood, created a stronger competitor for Tercon than Brentwood alone. However, I also agree with the B.C. Court of Appeal that the exclusion of compensation clause is clear and unambiguous and that no legal ground or rule of law permits us to override the freedom of the parties to contract (or to decline to contract) with respect to this particular term, or to relieve Tercon against its operation in this case.

## II.  The Tendering Process

[87]  For almost three decades, the law governing a structured bidding process has been dominated by the concept of Contract A/Contract B initially formulated in *The Queen in right of Ontario v. Ron Engineering & Construction (Eastern) Ltd.*, [1981] 1 S.C.R. 111. The analysis advanced by Estey J. in that case was that the bidding process, as defined by the terms of the tender call, may create contractual relations ("Contract A") prior in time and quite independently of the contract that is the actual subject matter of the bid ("Contract B"). Breach of Contract A may, depending on its terms, give rise to contractual remedies for non-performance even if Contract B is never entered into or, as in the present case, it is awarded to a competitor. The result of this legal construct is to provide unsuccessful bidders with a *contractual* remedy against an owner who departs from its own bidding rules. Contract A, however, arises (if at all) as a matter of interpretation. It is not imposed as a rule of law.

[88]  In *Ron Engineering*, the result of Estey J.'s analysis was that as a matter of contractual interpretation, the Ontario government was allowed to retain a $150,000 bid bond put up by Ron Engineering even though the government was told, a little over an hour after the bids were opened, that Ron Engineering had made a $750,058 error in the calculation of its bid and wished to withdraw it. Estey J. held:

The contractor was not asked to sign a contract which diverged in any way from its tender but simply to sign a

de cet autre entrepreneur à la taille et aux moyens financiers plus grands que ceux de Brentwood a opposé à Tercon un concurrent plus puissant que Brentwood seule. Toutefois, je conviens aussi avec la Cour d'appel de la Colombie-Britannique que la clause de non-recours en indemnisation est claire et non équivoque et qu'aucune règle de droit ou autre fondement juridique ne nous permet de passer outre à la liberté des parties de convenir (ou non) de cette condition ni de soustraire Tercon à son application en l'espèce.

## II.  Le processus d'appel d'offres

[87]  Depuis près de trois décennies, le modèle du contrat A et du contrat B appliqué pour la première fois dans l'arrêt *La Reine du chef de l'Ontario c. Ron Engineering & Construction (Eastern) Ltd.*, [1981] 1 R.C.S. 111, prédomine dans le droit applicable en matière d'appel d'offres. Suivant l'analyse du juge Estey dans cet arrêt, le processus défini par les conditions de l'appel d'offres peut faire naître des relations contractuelles (« contrat A ») antérieures au marché projeté (« contrat B ») et tout à fait indépendantes de celui-ci. Le non-respect du contrat A, dépendant de sa teneur, peut donner ouverture à un recours contractuel pour inexécution même si le contrat B ne voit pas le jour et même si, comme en l'espèce, il est octroyé à un concurrent. Cette construction juridique permet au soumissionnaire non retenu d'exercer un recours *contractuel* contre le propriétaire qui ne respecte pas les règles de l'appel d'offres qu'il a lui-même établies. Cependant, l'existence du contrat A relève de l'interprétation, elle n'est pas dictée par une règle de droit.

[88]  Dans l'arrêt *Ron Engineering*, le juge Estey conclut que suivant son interprétation du contrat, le gouvernement de l'Ontario pouvait conserver le cautionnement de soumission de 150 000 $ même s'il avait appris un peu plus d'une heure après l'ouverture des soumissions que Ron Engineering avait commis une erreur de 750 058 $ dans le calcul du montant offert et qu'elle souhaitait retirer sa soumission. Le juge Estey dit :

On n'a pas demandé à l'entrepreneur de signer un contrat qui différait en quoi que ce soit de sa soumission, mais

contract in accordance with the instructions to tenders and in conformity with its own tender. [p. 127]

In other words, harsh as it may have seemed to Ron Engineering, the parties were held to their bargain. The Court was not prepared to substitute "fair and reasonable" terms for what the parties had actually agreed to.

[89]   In *M.J.B. Enterprises Ltd. v. Defence Construction (1951) Ltd.*, [1999] 1 S.C.R. 619, Contract A included a "privilege" clause which stated that the owner was not obliged to accept the lowest or *any* tender. The Court implied a term, based on the presumed intention of the parties, that notwithstanding the privilege clause, only compliant bids were open to acceptance. While the owner was not obliged to accept the lowest compliant bid, the privilege clause did not, as a matter of contractual interpretation, give the owner "the privilege" of accepting a non-compliant bid. *M.J.B.* stops short of the issue in the present appeal because in that case, there was a breach of Contract A but no clause purporting to exclude liability on the part of the owner to pay compensation in the event of a Contract A violation.

[90]   In *Naylor Group Inc. v. Ellis-Don Construction Ltd.*, 2001 SCC 58, [2001] 2 S.C.R. 943, the Court enforced the rules of the bid depository system against a contractor whose bid was based on what turned out to be a mistaken view of its collective bargaining status with the International Brotherhood of Electrical Workers. The Court again affirmed that "[t]he existence and content of Contract A will depend on the facts of the particular case" (para. 36). Ellis-Don sought relief from its bid on the basis of a labour board decision rendered subsequent to its bid that upheld, to its surprise, the bargaining rights of the union. This Court held that no relief was contemplated in the circumstances under Contract A and none was afforded, even though this was a costly result when viewed from the perspective of Ellis-Don.

simplement de signer un contrat conforme aux instructions adressées aux soumissionnaires et à sa propre soumission. [p. 127]

Autrement dit, les parties ne pouvaient revenir sur le marché conclu, aussi draconien que cela ait pu paraître à Ron Engineering. La Cour n'était pas disposée à substituer « justes et raisonnables » à celles dont les parties avaient convenu.

[89]   Dans l'arrêt *M.J.B. Enterprises Ltd. c. Construction de Défense (1951) Ltée*, [1999] 1 R.C.S. 619, le contrat A renfermait une clause « de réserve » portant que le propriétaire n'était tenu d'accepter ni la soumission la plus basse ni *aucune* soumission. Invoquant l'intention présumée des parties, la Cour infère du contrat, malgré la clause de réserve, l'obligation tacite du propriétaire de n'accepter qu'une soumission conforme. Le propriétaire n'était pas tenu d'accepter la soumission conforme la plus basse, mais suivant son interprétation, la clause de réserve ne « réservait » pas au propriétaire le droit d'accepter une soumission non conforme. L'arrêt *M.J.B.* ne tranche pas la question soulevée dans le présent pourvoi, car même s'il y avait eu inexécution du contrat A, aucune clause n'avait pour objet d'écarter l'obligation du propriétaire de verser une indemnité en cas de non-respect du contrat A.

[90]   Dans l'arrêt *Naylor Group Inc. c. Ellis-Don Construction Ltd.*, 2001 CSC 58, [2001] 2 R.C.S. 943, la Cour donne effet aux règles régissant le système de soumissions au détriment d'un entrepreneur dont la soumission se fondait sur ce qui s'est révélé être une mauvaise interprétation de l'obligation de négocier collectivement avec la Fraternité internationale des ouvriers en électricité. La Cour y confirme que « [l]'existence et le contenu du contrat A dépendent des faits de chaque affaire » (par. 36). Ellis-Don tentait d'échapper à ses obligations contractuelles en invoquant une décision de la Commission des relations de travail — rendue après le dépôt de sa soumission — qui reconnaissait contre toutes attentes les droits de négociation collective du syndicat. La Cour statue que le contrat A ne prévoyait aucune mesure réparatrice en pareil cas et elle n'en accorde aucune, même si le résultat se révèle coûteux pour Ellis-Don.

2010 SCC 4 (CanLII)

[91]    In *Martel Building Ltd. v. Canada*, 2000 SCC 60, [2000] 2 S.C.R. 860, citing *M.J.B.*, the Court implied a term in Contract A obligating the owner to be fair and consistent in the assessment of tender bids. On the facts, the disappointed bidder's claim of unfair treatment was rejected.

[92]    Finally, in *Double N Earthmovers Ltd. v. Edmonton (City)*, 2007 SCC 3, [2007] 1 S.C.R. 116, the unsuccessful bidder claimed that Edmonton had accepted, in breach of Contract A, a competitor's non-compliant bid to provide heavy equipment of a certain age to move refuse at a waste disposal site. The Court refused to imply a term "requiring an owner to investigate to see if bidders will really do what they promised in their tender" (para. 50). Accepting the existence of a duty of "fairness and equality", the majority nevertheless held that "[t]he best way to make sure that all bids receive the same treatment is for an owner to weigh bids on the basis of what is actually in the bid, not to weigh them on the basis of subsequently discovered information" (para. 52). In other words, the majority's interpretation of the express terms of Contract A was enforced despite Double N Earthmovers' complaint of double dealing by the owner.

[93]    On the whole, therefore, while *Ron Engineering* and its progeny have encouraged the establishment of a fair and transparent bidding process, Contract A continues to be based not on some abstract externally imposed rule of law but on the presumed (and occasionally implied) intent of the parties. Only in rare circumstances will the Court relieve a party from the bargain it has made.

[94]    As to implied terms, *M.J.B.* emphasized (at para. 29) that the focus is "the intentions of the <u>actual</u> parties". A court, when dealing with a claim to an implied term, "must be careful not to slide

[91]    Dans l'arrêt *Martel Building Ltd. c. Canada*, 2000 CSC 60, [2000] 2 R.C.S. 860, s'appuyant sur l'arrêt *M.J.B.*, la Cour conclut que le contrat A obligeait tacitement le propriétaire à évaluer les soumissions de façon équitable et uniforme. Mais au vu des faits, elle rejette la prétention du soumissionnaire éconduit selon laquelle il n'avait pas été traité avec équité.

[92]    Enfin, dans l'affaire *Double N Earthmovers Ltd. c. Edmonton (Ville)*, 2007 CSC 3, [2007] 1 R.C.S. 116, à l'issue d'un appel d'offres pour la fourniture de machinerie lourde devant servir au déplacement des déchets dans une décharge, un soumissionnaire non retenu prétendait que la ville d'Edmonton avait contrevenu au contrat A en acceptant une soumission non conforme pour ce qui était de l'année de fabrication des machines. La Cour refuse de conclure à l'obligation tacite du propriétaire « de vérifier si les soumissionnaires respecteront vraiment les engagements qu'ils ont pris dans leur soumission » (par. 50). Les juges majoritaires reconnaissent que le propriétaire est tenu de traiter tous les soumissionnaires « équitablement et sur un pied d'égalité », mais ils estiment néanmoins que « [l]e meilleur moyen pour le propriétaire de s'assurer que toutes les soumissions sont traitées de façon équitable est de les évaluer d'après leur contenu réel et non en fonction des renseignements révélés ultérieurement » (par. 52). Ainsi, il est donné effet à leur interprétation des conditions expresses du contrat A malgré l'allégation de duplicité formulée par Double N Earthmovers contre le propriétaire.

[93]    Dans l'ensemble, bien que l'arrêt *Ron Engineering* et ceux rendus dans sa foulée préconisent un processus d'appel d'offres équitable et transparent, l'assise du contrat A demeure l'intention présumée (et parfois inférée) des parties, et non quelque règle de droit abstraite imposée par un tiers. Ce n'est qu'en de rares circonstances que le tribunal relèvera une partie de ses engagements.

[94]    Dans l'arrêt *M.J.B.*, la Cour souligne que, pour les conditions implicites, l'accent est mis sur « l'intention des parties <u>elles-mêmes</u> » (par. 29). Le tribunal appelé à statuer sur l'existence alléguée

into determining the intentions of <u>reasonable</u> parties" (emphasis in original). Thus, "if there is evidence of a contrary intention, on the part of either party, an implied term may not be found on this basis".

[95]    Tercon is a large and experienced contractor. As noted by Donald J.A. in the B.C. Court of Appeal, it had earlier "successfully recovered damages from the [Ministry] on a bidding default in a previous case" (2007 BCCA 592, 73 B.C.L.R. (4th) 201, at para. 15). See *Tercon Contractors Ltd. v. British Columbia* (1993), 9 C.L.R. (2d) 197 (B.C.S.C.), aff'd [1994] B.C.J. No. 2658 (QL) (C.A.). Thus Tercon would have been more sensitive than most contractors to the risks posed by an exclusion of compensation clause. It nevertheless chose to bid on the project on the terms proposed by the Ministry.

### III.    <u>Tercon's Claim for Relief From the Exclusionary Clause It Agreed to</u>

[96]    In these circumstances, the first question is whether there is either a statutory legal obstacle to, or a principled legal argument against, the freedom of these parties to contract out of the obligation that would otherwise exist for the Ministry to pay compensation for a breach of Contract A. If not, the second question is whether there is any other barrier to the court's enforcement of the exclusionary clause in the circumstances that occurred. On the first branch, Tercon relies on the *Ministry of Transportation and Highways Act*, R.S.B.C. 1996, c. 311 ("*Transportation Act*" or the "Act"). On the second branch, Tercon relies on the doctrine of fundamental breach.

### A.    *The Statutory Argument*

[97]    Section 4 of the *Transportation Act* provides that before awarding a highway contract, "the minister must invite tenders in any manner that will make the invitation for tenders reasonably available

d'une condition implicite « doit se garder de chercher à déterminer l'intention de parties <u>raisonnables</u> » (souligné dans l'original). Ainsi, « en présence d'une preuve d'intention contraire de la part de l'une ou l'autre des parties, l'on ne peut conclure à l'existence d'une condition implicite sur ce fondement ».

[95]    Tercon est une grande entreprise expérimentée et, comme le fait observer le juge Donald de la Cour d'appel, elle [TRADUCTION] « a déjà obtenu des dommages-intérêts du [ministère] dans une autre affaire d'irrégularité du processus d'appel d'offres » (2007 BCCA 592, 73 B.C.L.R. (4th) 201, par. 15). Voir *Tercon Contractors Ltd. c. British Columbia* (1993), 9 C.L.R. (2d) 197 (C.S.C.-B.), conf. par [1994] B.C.J. No. 2658 (QL) (C.A.). Tercon aurait donc été plus consciente que la plupart des autres entreprises du risque que posait la clause de non-recours en indemnisation. Elle a néanmoins décidé de participer au processus aux conditions proposées par le ministère.

### III.    <u>Demande de Tercon visant à la soustraire à l'application de la clause de non-recours à laquelle elle a consenti</u>

[96]    Dans ces circonstances, il faut premièrement se demander si un élément législatif ou un argument juridique valable s'oppose à la liberté des parties d'exclure dans leur contrat l'obligation qu'aurait le ministère de verser une indemnité en cas d'inexécution du contrat A. S'il n'y en a pas, il convient deuxièmement de déterminer si, au vu des faits de l'espèce, il existe un autre obstacle à l'application de la clause de non-recours. Pour le premier volet, Tercon invoque la *Ministry of Transportation and Highways Act*, R.S.B.C. 1996, ch. 311 (« *Loi sur les transports* » ou « Loi »), pour le second, le principe de l'inexécution fondamentale.

### A.    *L'argument de nature législative*

[97]    L'article 4 de la *Loi sur les transports* dispose qu'avant d'accorder un contrat de voirie, [TRADUCTION] « le ministre lance l'appel d'offres de manière à informer raisonnablement le public de

to the public", but then provides for several exceptions: "The minister need not invite tenders for a project . . . if . . . (c) the minister believes that an alternative contracting process will result in a competitively established cost for the project". Here the required ministerial authorization was obtained for an "alternative process". The reason is as follows. As noted by Cromwell J., the Ministry's original idea was to use a "design-build" model where a single contractor would design and build the highway for a fixed price. The Ministry issued a request for expressions of interest ("RFEI") which attracted six responses. One was from Tercon. Another was from Brentwood. EAC declined to bid because it did not think the "design-build" concept was appropriate for the job.

[98]   On further reflection, the Ministry decided not to pursue the design-build approach. It decided to design the highway itself. The contract would be limited to construction, as EAC had earlier advocated. EAC was not allowed to bid despite the Ministry coming around to its point of view on the proper way to tender the project. The Ministry limited bidding on the new contest to the six respondents to the original RFEI, all of whom had been found capable of performing the contract. But to do so, it needed, and did obtain, the Minister's s. 4 approval.

[99]   A question arose during the hearing of the appeal as to whether the Minister actually approved an "alternative process" that not only restricted eligibility to the six participants in the RFEI process (an advantage to Tercon and the other five participants), but also contained the "no claims" clause excluding compensation for non-observance of its terms (no doubt considered a disadvantage). In its factum, the Ministry states:

In this case, the Minister approved an alternate process under [s. 4(2) of the B.C. *Transportation Act*]. That process was set out in the Instructions to Proponents, which included the No Claim Clause. Having been approved by the Minister, the package (including the No Claim

sa tenue », sauf dans certains cas, notamment lorsque [TRADUCTION] « c) le ministre estime qu'un autre processus d'adjudication de marché permettra la réalisation des travaux à un coût concurrentiel ». En l'espèce, le ministre a approuvé un « autre processus ». La raison en est — comme le signale le juge Cromwell — que le ministère prévoyait initialement qu'un seul entrepreneur se chargerait de la conception et de la construction de la route moyennant un prix fixe. Il a lancé une demande d'expression d'intérêt (« DEI ») et reçu six réponses, dont celles de Tercon et de Brentwood. Estimant que les travaux ne se prêtaient pas au modèle « conception-construction », EAC n'a pas manifesté son intérêt.

[98]   Après réflexion, le ministère a renoncé à ce modèle. Il a décidé de concevoir lui-même la route et de ne passer un marché que pour sa construction, comme l'avait préconisé EAC. Cette dernière ne pouvait cependant pas soumissionner même si le ministère s'était rangé à son avis sur les modalités qu'il convenait d'établir pour l'appel d'offres. Le ministère a réservé la participation au nouveau processus aux six entrepreneurs ayant initialement répondu à la DEI, qu'il avait tous jugés aptes à exécuter les travaux. Il devait toutefois obtenir du ministre l'approbation visée à l'art. 4, et il l'a obtenue.

[99]   Lors de l'audition du pourvoi, la question s'est posée de savoir si le ministre avait effectivement approuvé un « autre processus » qui non seulement tenait pour admissibles les six participants à la DEI (conférant ainsi un avantage à Tercon et aux cinq autres entreprises), mais renfermait également une clause « écartant tout recours » en indemnisation d'un préjudice découlant du non-respect de ses conditions (assurément perçue comme un élément défavorable). Dans son mémoire, le ministère soutient ce qui suit :

[TRADUCTION] Dans la présente affaire, le ministre a approuvé un autre processus [en application du par. 4(2) de la *Transportation Act* de la Colombie-Britannique]. Ce processus était énoncé dans les instructions aux proposants, qui comprenaient la clause « écartant tout

Clause) complied with section 4 of the *Transportation Act*. [para. 70]

[100]    Tercon argued at the hearing of this appeal that as a matter of *law*, Contract A could not have included the exclusion clause because

   [t]he policy of the [*Transportation Act*] is to ensure that the Ministry is accountable; to preserve confidence in the integrity of the tendering process. To ensure that is so and that the Minister is accountable, the Ministry must be held liable for its breach of Contract A in considering and accepting a proposal from the joint venture . . . .

. . .

   **MADAM JUSTICE ABELLA:** Can I just ask you one question. Is it your position, sir, that you can never have -- that a government can never have a no claims clause?

   **MR. McLEAN:** Yes. Under this statute because of the policy of the statute. [Transcript, at p. 27]

[101]    While it is true that the Act favours "the integrity of the tendering process", it nowhere prohibits the parties from negotiating a "no claims" clause as part of their commercial agreement, and cannot plausibly be interpreted to have that effect.

[102]    In the ordinary world of commerce, as Dickson C.J. commented in *Hunter*, "clauses limiting or excluding liability are negotiated as part of the general contract. As they do with all other contractual terms, the parties bargain for the consequences of deficient performance" (p. 461). Moreover, as Mr. Hall points out, "[t]here are many valid reasons for contracting parties to use exemption clauses, most notably to allocate risks" (G. R. Hall, *Canadian Contractual Interpretation Law* (2007), at p. 243). Tercon, for example, is a sophisticated and experienced contractor and if it decided that it was in its commercial interest to proceed with the bid despite the exclusion of compensation clause, that was its prerogative and nothing in the "policy of the Act" barred the parties' agreement on that point.

recours ». Avalisé par le ministre, l'ensemble des conditions (dont la clause « écartant tout recours ») était conforme à l'article 4 de la *Transportation Act*. [par. 70]

[100]    Tercon a soutenu à l'audience que le contrat A ne pouvait *légalement* comprendre la clause de non-recours, car

   [TRADUCTION] [l]a raison d'être de la [*Transportation Act*] est de rendre le ministre responsable de ses actes, de protéger la foi dans l'intégrité du processus d'appel d'offres. C'est pourquoi le ministre doit engager sa responsabilité en cas d'inexécution du contrat A lorsqu'il considère puis accepte la proposition d'une coentreprise . . .

. . .

   **MADAME LA JUGE ABELLA :** Puis-je seulement vous poser une question? Allez-vous jusqu'à prétendre, Maître, qu'il ne peut jamais y avoir de clause « écartant tout recours », qu'un gouvernement ne peut jamais stipuler une telle clause?

   **MAÎTRE McLEAN :** Oui. Sous le régime de cette loi, à cause de sa raison d'être. [Transcription, p. 27]

[101]    Certes la Loi favorise « l'intégrité du processus d'appel d'offres », mais aucune de ses dispositions n'empêche les parties de faire figurer dans leur accord commercial une clause écartant toute indemnisation ni ne peut vraisemblablement être interprétée comme ayant cet effet.

[102]    Dans l'arrêt *Hunter*, le juge en chef Dickson fait observer que dans le contexte ordinaire du commerce, « les clauses de limitation ou d'exclusion de responsabilité sont négociées dans le cadre de l'ensemble du contrat. Comme elles le font pour les autres conditions du contrat, les parties négocient les conséquences de l'exécution insuffisante » (p. 461). De plus, Hall fait remarquer que [TRADUCTION] « [b]on nombre de raisons valables justifient les parties contractantes de recourir à une clause exonératrice, le plus souvent pour répartir le risque » (G. R. Hall, *Canadian Contractual Interpretation Law* (2007), p. 243). Tercon est une entreprise avertie et expérimentée, et si elle a jugé commercialement opportun de présenter une soumission malgré la clause de non-recours en indemnisation, c'était sa décision. La « raison d'être de la Loi » ne faisait aucunement obstacle à la convention des parties sur ce point.

[103]    To the extent Tercon is now saying that as a matter of *fact* the Minister, in approving the RFP, did not specifically approve the exclusion clause, and that the contract was thus somehow *ultra vires* the Ministry, this is not an issue that was either pleaded or dealt with in the courts below. The details of the ministerial approval process were not developed in the evidence. It is not at all evident that s. 4 *required* the Minister to approve the actual terms of the RFP. It is an administrative law point that Tercon, if so advised, ought to have pursued at pre-trial discovery and in the trial evidence. We have not been directed to any exploration of the matter in the testimony and it is too late in the proceeding for Tercon to explore it now. Accordingly, I proceed on the basis that the exclusion clause did not run afoul of the statutory requirements.

### B.    *The Doctrine of the Fundamental Breach*

[104]    The trial judge considered the applicability of the doctrine of fundamental breach. Tercon argued that the Ministry, by reason of its fundamental breach, had forfeited the protection of the exclusion of compensation clause.

[105]    The leading case is *Hunter* which also dealt with an exclusion of liability clause. The appellants Hunter Engineering and Allis-Chalmers Canada Ltd. supplied gearboxes used to drive conveyor belts at Syncrude's tar sands operations in Northern Alberta. The gearboxes proved to be defective. At issue was a broad exclusion of warranty clause that limited time for suit and the level of recovery available against Allis-Chalmers (i.e. no recovery beyond the unit price of the defective products). Dickson C.J. observed: "In the face of the contractual provisions, Allis-Chalmers can only be found liable under the doctrine of fundamental breach" (p. 451).

[106]    This doctrine was largely the creation of Lord Denning in the 1950s (see, e.g., *Karsales*

[103]    Tercon prétend aujourd'hui devant nous que, dans les *faits*, lorsqu'il a approuvé la DP, le ministre n'a pas approuvé la clause de non-recours comme telle, si bien que le contrat était en quelque sorte *ultra vires* du pouvoir du ministère. Or, cette thèse n'a été ni formulée devant les tribunaux inférieurs ni examinée par eux. Le détail du processus d'approbation ministérielle n'a pas été mis en preuve. Il n'est pas du tout évident que l'art. 4 *exigeait* du ministre qu'il approuve les conditions précises de la DP. Il s'agit d'un point de droit administratif que Tercon aurait dû soulever, si elle le souhaitait, à l'interrogatoire préalable ou lors de la présentation de la preuve au procès. La preuve ne nous a pas incités à explorer la question, et il est désormais trop tard pour que Tercon s'engage dans cette voie. Je poursuis donc l'analyse en tenant pour acquis que la clause de non-recours ne dérogeait pas aux exigences légales.

### B.    *La notion d'inexécution fondamentale*

[104]    La juge de première instance s'est penchée sur l'applicabilité de cette notion. Tercon soutenait qu'en raison de l'inexécution fondamentale dont il s'était rendu coupable, le ministère n'avait plus droit à la protection découlant de la clause de non-recours en indemnisation.

[105]    *Hunter* est l'arrêt de principe en la matière. Une clause d'exonération de la responsabilité y était également en cause. Les appelantes Hunter Engineering et Allis-Chalmers Canada Ltd. fournissaient des boîtes d'engrenage pour les convoyeurs à courroie utilisés par Syncrude pour l'exploitation de sables bitumineux dans le nord de l'Alberta. Le matériel s'est révélé défectueux. L'objet du litige était une clause générale d'exclusion de la garantie limitant le délai de poursuite et plafonnant au prix unitaire du produit défectueux le montant de l'indemnité qu'Allis-Chalmers pouvait être tenue de verser. Le juge en chef Dickson conclut que « [c]ompte tenu des dispositions du contrat, Allis-Chalmers ne peut être tenue responsable qu'aux termes du principe de l'inexécution fondamentale » (p. 451).

[106]    Ce principe de droit datant des années 1950 était en grande partie attribuable à lord Denning

TERCON CONTRACTORS LTD. *v.* B.C.    *Binnie J.*    [2010] 1 S.C.R.

*(Harrow) Ltd. v. Wallis*, [1956] 1 W.L.R. 936 (C.A.)). It was said to be a rule of law that operated independently of the intention of the parties in circumstances where the defendant had so egregiously breached the contract as to deny the plaintiff substantially the whole of its benefit. In such a case, according to the doctrine, the innocent party was excused from further performance but the defendant could still be held liable for the consequences of its "fundamental" breach even if the parties had excluded liability by clear and express language. See generally S. M. Waddams, *The Law of Contracts* (5th ed. 2005), at para. 478; J. D. McCamus, *The Law of Contracts* (2005), at pp. 765 *et seq.*

[107]  The five-judge *Hunter* Court was unanimous in the result and gave effect to the exclusion clause at issue. Dickson C.J. and Wilson J. both emphasized that there is nothing inherently unreasonable about exclusion clauses and that they should be applied unless there is a compelling reason not to give effect to the words selected by the parties. At that point, there was some divergence of opinion.

[108]  Dickson C.J. (La Forest J. concurring) observed that the doctrine of fundamental breach had "spawned a host of difficulties" (p. 460), the most obvious being the difficulty in determining whether a particular breach is fundamental. The doctrine obliged the parties to engage in "games of characterization" (p. 460) which distracted from the real question of what agreement the parties themselves intended. Accordingly, in his view, the doctrine should be "laid to rest". The situations in which the doctrine is invoked could be addressed more directly and effectively through the doctrine of "unconscionability", as assessed at the time the contract was made:

It is preferable to interpret the terms of the contract, in an attempt to determine exactly what the parties agreed. If on its true construction the contract excludes liability for the kind of breach that occurred, the party in breach will generally be saved from liability. Only where the contract is unconscionable, as might arise from situations of unequal bargaining power between the parties,

(voir, p. ex., *Karsales (Harrow) Ltd. c. Wallis*, [1956] 1 W.L.R. 936 (C.A.)). Il devait s'appliquer indépendamment de l'intention des parties lorsque le défendeur avait à ce point manqué à ses obligations contractuelles qu'il avait privé le demandeur de la quasi-totalité du bénéfice censé découler du contrat. Ainsi, le cocontractant innocent était dès lors relevé de ses obligations, et le défendeur pouvait en outre être tenu responsable des conséquences de son inexécution « fondamentale » même si les parties avaient clairement et expressément écarté toute responsabilité. Voir de façon générale S. M. Waddams, *The Law of Contracts* (5ᵉ éd. 2005), par. 478; J. D. McCamus, *The Law of Contracts* (2005), p. 765 et suiv.

[107]  Dans l'arrêt *Hunter*, les cinq juges de la Cour s'entendent sur l'issue du pourvoi et donnent effet à la clause d'exclusion. Le juge en chef Dickson et la juge Wilson font tous deux ressortir qu'une telle clause n'est pas intrinsèquement déraisonnable et qu'il faut la faire respecter sauf motif impérieux de ne pas donner effet au libellé employé par les parties. Certaines divergences d'opinions apparaissent ensuite.

[108]  Le juge en chef Dickson (avec l'accord du juge La Forest) fait remarquer que le principe de l'inexécution fondamentale a « engendré un grand nombre de difficultés » (p. 460), la plus évidente tenant à la détermination du caractère fondamental de l'inexécution. Les parties devaient en effet se livrer à des « jeux de caractérisation » (p. 460) qui détournaient leur attention de la question véritable, celle de savoir ce dont elles avaient elles-mêmes voulu convenir. Il est donc d'avis de « donner le coup de grâce » au principe, les situations où il est invoqué pouvant être réglées plus directement et plus efficacement sous l'angle de l'« iniquité » considérée au moment de la formation du contrat :

Il est préférable d'interpréter les conditions du contrat dans le but de déterminer exactement ce que les parties ont convenu. Si d'après son interprétation juste, le contrat écarte la responsabilité pour le genre d'inexécution qui s'est produit, la partie fautive sera généralement soustraite à la responsabilité. Ce n'est que lorsque le contrat est inique, comme cela pourrait se produire

should the courts interfere with agreements the parties have freely concluded. [p. 462]

Dickson C.J. explained that "[t]he courts do not blindly enforce harsh or unconscionable bargains" (p. 462), but "there is much to be gained by addressing directly the protection of the weak from over-reaching by the strong, rather than relying on the artificial legal doctrine of 'fundamental breach'" (p. 462). To enforce an exclusion clause in such circumstances could tarnish the institutional integrity of the court. In that respect, it would be contrary to public policy. However, a *valid* exclusion clause would be enforced according to its terms.

[109]   Wilson J. (L'Heureux-Dubé J. concurring) disagreed. In her view, the courts retain some residual discretion to refuse to enforce exclusion clauses in cases of fundamental breach where the doctrine of *pre*-breach unconscionability (favoured by Dickson C.J.) did not apply. Importantly, she rejected the imposition of a general standard of reasonableness in the judicial scrutiny of exclusion clauses, affirming that "the courts . . . are quite unsuited to assess the fairness or reasonableness of contractual provisions as the parties negotiated them" (p. 508). Wilson J. considered it more desirable to develop through the common law a *post*-breach analysis seeking a "balance between the obvious desirability of allowing the parties to make their own bargains . . . and the obvious undesirability of having the courts used to enforce bargains in favour of parties who are totally repudiating such bargains themselves" (p. 510).

[110]   Wilson J. contemplated a two-stage test, in which the threshold step is the identification of a fundamental breach where "the foundation of the contract has been undermined, where the very thing bargained for has not been provided" (p. 500). Having found a fundamental breach to exist, the exclusion clause would *not* automatically be set

dans le cas où il y a inégalité de pouvoir de négociation entre les parties, que les tribunaux devraient modifier les conventions que les parties ont formées librement. [p. 462]

Le juge en chef Dickson explique que « [l]es tribunaux n'appliquent pas aveuglément les conventions draconiennes ou iniques » (p. 462), mais qu'« il y a beaucoup à gagner à aborder directement la question de la protection des plus faibles contre l'exploitation des plus forts, plutôt que de s'en remettre au principe juridique artificiel de l'"inexécution fondamentale" » (p. 462). Faire respecter une clause de non-recours en pareil cas pourrait porter atteinte à l'intégrité de l'appareil judiciaire. Sous ce rapport, ce serait contraire à l'ordre public. Toutefois, une clause de non-recours *valide* sera appliquée conformément à son libellé.

[109]   La juge Wilson (avec l'appui de la juge L'Heureux-Dubé) exprime son désaccord, opinant que les tribunaux doivent continuer d'exercer un certain pouvoir discrétionnaire et refuser d'appliquer une clause d'exclusion en cas d'inexécution fondamentale lorsque le principe de l'iniquité *préalable* à l'inexécution (privilégié par le juge en chef Dickson) ne s'applique pas. Elle s'oppose surtout à ce que l'examen judiciaire d'une clause d'exonération se fasse au regard d'une norme générale de raisonnabilité : « . . . les tribunaux [. . .] sont fort mal placés pour déterminer le caractère juste ou raisonnable de dispositions contractuelles négociées par les parties » (p. 508). Elle préconise plutôt une démarche *a posteriori* fondée sur la common law visant à établir « un équilibre entre ce qui est manifestement souhaitable, c'est-à-dire permettre aux parties de conclure leurs propres contrats [. . .] et ce qui est manifestement peu souhaitable, c'est-à-dire recourir aux tribunaux pour faire respecter des contrats en faveur de parties qui elles-mêmes refusent catégoriquement de les exécuter » (p. 510).

[110]   La juge Wilson propose un double critère dont le premier volet consiste à déterminer l'existence d'une inexécution fondamentale, à savoir une situation « où le fondement même du contrat a été miné, c'est-à-dire lorsque l'objet même du contrat n'a pas été réalisé » (p. 500). Le tribunal qui conclut à l'existence d'une inexécution fondamentale

2010 SCC 4 (CanLII)

aside, but the court should go on to assess whether, having regard to the circumstances of the breach, the party in fundamental breach should escape liability:

Exclusion clauses do not automatically lose their validity in the event of a fundamental breach by virtue of some hard and fast rule of law. They should be given their natural and true construction so that the meaning and effect of the exclusion clause the parties agreed to at the time the contract was entered into is fully understood and appreciated. But, in my view, the court must still decide, having ascertained the parties' intention at the time the contract was made, whether or not to give effect to it <u>in the context of subsequent events such as a fundamental breach</u> committed by the party seeking its enforcement through the courts. . . . [T]he question essentially is: in the circumstances that have happened should the court lend its aid to A to hold B to this clause? [Emphasis added; pp. 510-11.]

[111]   Wilson J. reiterated that "as a general rule" courts should give effect to exclusion clauses *even in the case of fundamental breach* (p. 515). Nevertheless, a residual discretion to withhold enforcement exists:

Lord Wilberforce [in *Photo Production Ltd. v. Securicor Transport Ltd.*, [1980] A.C. 827 (H.L.)] may be right that parties of equal bargaining power should be left to live with their bargains regardless of subsequent events. I believe, however, that there is some virtue in a residual power residing in the court to withhold its assistance <u>on policy grounds</u> in appropriate circumstances. [Emphasis added; p. 517.]

Wilson J. made it clear that such circumstances of disentitlement would be rare. She acknowledged that an exclusion clause might well be accepted with open eyes by a party "very anxious to get" the contract (p. 509). However, Wilson J. did not elaborate further on what such circumstances might be because she found in *Hunter* itself that no reason existed to refuse the defendant Allis-Chalmers the benefit of the exclusion clause.

[112]   The fifth judge, McIntyre J., in a crisp two-paragraph judgment, agreed with the conclusion of

*n*'écarte *pas* automatiquement la clause d'exclusion, mais il poursuit son examen pour déterminer si l'auteur de l'inexécution fondamentale devrait, compte tenu des circonstances de celle-ci, échapper à sa responsabilité :

Il n'y a aucune règle de droit absolue qui dit que les clauses d'exclusion sont automatiquement frappées d'invalidité en cas d'inexécution fondamentale. Il faut leur donner une interprétation naturelle et juste afin de pouvoir saisir et apprécier parfaitement le sens et l'effet de la clause d'exclusion sur laquelle les parties se sont accordées au moment de la passation du contrat. J'estime toutefois qu'après avoir déterminé l'intention qu'avaient les parties au moment où elles ont conclu le contrat, la cour doit encore décider si elle appliquera ce contrat <u>dans le contexte d'événements subséquents tels qu'une inexécution fondamentale</u> de la part de la partie qui s'adresse aux tribunaux pour la faire respecter. [. . .] [L]a question qui se pose est essentiellement celle de savoir si, suite aux faits survenus, la cour devrait prêter son concours à A pour obliger B à respecter cette clause. [Je souligne; p. 510-511.]

[111]   La juge Wilson rappelle qu'« en règle générale », les tribunaux doivent faire respecter la clause d'exclusion *même en cas d'inexécution fondamentale* (p. 515), sous réserve de leur pouvoir résiduel d'écarter son application :

Il se peut que [dans *Photo Production Ltd. c. Securicor Transport Ltd.*, [1980] A.C. 827 (H.L.)] lord Wilberforce ait raison d'affirmer qu'on devrait laisser des parties ayant négocié à armes égales vivre avec leurs contrats, quels que soient les événements subséquents. Je crois cependant qu'il y a un certain intérêt à ce que les tribunaux soient revêtus d'un pouvoir résiduel de refuser <u>pour des motifs de principe</u> de prêter leur concours à une partie, lorsque cela est indiqué. [Je souligne; p. 517.]

La juge Wilson précise qu'il sera rarement indiqué d'écarter une clause d'exclusion. Elle ajoute qu'une telle clause peut très bien avoir été acceptée en pleine connaissance de cause par une partie qui « tenait beaucoup à [. . .] avoir » le contrat (p. 509). Elle ne précise toutefois pas les circonstances dans lesquelles il conviendrait de l'écarter, car dans *Hunter*, elle ne voit pas de raisons d'empêcher la défenderesse Allis-Chalmers de bénéficier de son application.

[112]   Dans un jugement incisif de deux paragraphes, le juge McIntyre, le cinquième à se prononcer,

2010 SCC 4 (CanLII)

Wilson J. in respect of the exclusion clause issue but found it "unnecessary to deal further with the concept of fundamental breach in this case" (p. 481).

[113]   The law was left in this seemingly bifurcated state until *Guarantee Co. of North America v. Gordon Capital Corp.*, [1999] 3 S.C.R. 423. In that case, the Court breathed some life into the dying doctrine of fundamental breach while nevertheless affirming (once again) that whether or not a "fundamental breach prevents the breaching party from continuing to rely on an exclusion clause is a matter of construction rather than a rule of law" (para. 52). In other words, the question was whether the parties *intended* at the time of contract formation that the exclusion or limitation clause would apply "in circumstances of contractual breach, whether fundamental or otherwise" (para. 63). The Court thus emphasized that what was important was not the label ("fundamental or otherwise") but the intent of the contracting parties when they made their bargain. "The only limitation placed upon enforcing the contract as written in the event of a fundamental breach", the Court in *Guarantee Co.* continued,

would be to refuse to enforce an exclusion of liability in circumstances where to do so would be unconscionable, according to Dickson C.J., or [note the disjunctive "or"] unfair, unreasonable or otherwise contrary to public policy, according to Wilson J. [Emphasis added; para. 52.]

(See also para. 64.)

What has given rise to some concern is not the reference to "public policy", whose role in the enforcement of contracts has never been doubted, but to the more general ideas of "unfair" and "unreasonable", which seemingly confer on courts a very broad after-the-fact discretion.

[114]   The Court's subsequent observations in *ABB Inc. v. Domtar Inc.*, 2007 SCC 50, [2007] 3 S.C.R. 461, should be seen in that light. *Domtar* was a products liability case arising under the civil

souscrit à la conclusion de la juge Wilson en ce qui concerne la clause d'exclusion, mais il trouve « inutile de s'arrêter davantage à la notion d'inexécution fondamentale en l'espèce » (p. 481).

[113]   Cette orientation apparemment bicéphale du droit a valu jusqu'à ce que, dans l'arrêt *Guarantee Co. of North America c. Gordon Capital Corp.*, [1999] 3 R.C.S. 423, la Cour ravive la notion moribonde d'inexécution fondamentale tout en (ré)affirmant que « la question de savoir si l'inexécution fondamentale empêche la partie qui en est l'auteur de continuer d'invoquer une clause d'exclusion est une question d'interprétation plutôt que de règle de droit » (par. 52). En d'autres termes, la question est celle de savoir si les parties ont *voulu*, lors de la formation du contrat, que la clause d'exclusion (prévoyant le délai de prescription) s'applique « à la suite d'une inexécution de contrat, qu'elle soit fondamentale ou autre » (par. 63). La Cour souligne donc que ce n'est pas la qualification qui compte (« fondamentale ou autre »), mais bien l'intention des parties au moment de contracter. Elle ajoute :

En cas d'inexécution fondamentale, la seule restriction à l'exécution du contrat tel que rédigé consisterait à refuser d'appliquer une exonération de responsabilité dans le cas où il serait inique de le faire, selon le juge en chef Dickson, ou [notez l'emploi du *ou* disjonctif] injuste, déraisonnable ou par ailleurs contraire à l'ordre public, selon l[a] juge Wilson. [Je souligne; par. 52.]

(Voir aussi le par. 64.)

La difficulté n'a pas résulté du renvoi à l'« ordre public », une notion dont la pertinence en matière d'exécution des contrats n'a jamais été mise en doute, mais bien des considérations plus générales évoquées par les mots « injuste » et « déraisonnable », qui paraissent ouvrir la voie à l'exercice a posteriori d'un très grand pouvoir judiciaire discrétionnaire.

[114]   Les observations subséquentes de la Cour dans l'arrêt *ABB Inc. c. Domtar Inc.*, 2007 CSC 50, [2007] 3 R.C.S. 461, doivent être considérées dans ce contexte. L'arrêt porte sur la responsabilité du

law of Quebec, but the Court observed with respect to the common law:

> Once the existence of a fundamental breach has been established, the court must still analyse the limitation of liability clause in light of the general rules of contract interpretation. If the words can reasonably be interpreted in only one way, it will not be open to the court, <u>even on grounds of equity or reasonableness</u>, to declare the clause to be unenforceable since this would amount to rewriting the contract negotiated by the parties. [Emphasis added; para. 84.]

While the *Domtar* Court continued to refer to "fundamental breach", it notably repudiated any judicial discretion to depart from the terms of a valid contract upon vague notions of "equity or reasonableness". It did not, however, express any doubt about the residual category mentioned in *Guarantee Co.*, namely a refusal to enforce an exclusion clause on the grounds of public policy.

[115]    I agree with Professor Waddams when he writes:

> [I]t is surely inevitable that a court must reserve the ultimate power to decide when the values favouring enforceability are outweighed by values that society holds to be more important. [para. 557]

[116]    While memorably described as an unruly horse, public policy is nevertheless fundamental to contract law, both to contractual formation and enforcement and (occasionally) to the court's relief *against* enforcement. As Duff C.J. observed:

> It is the duty of the courts to give effect to contracts and testamentary dispositions according to the settled rules and principles of law, since we are under a reign of law; but there are cases in which rules of law cannot have their normal operation because the law itself recognizes some paramount consideration of public policy which over-rides the interest and what otherwise would be the rights and powers of the individual.

(*Re Millar Estate*, [1938] S.C.R. 1, at p. 4)

See generally B. Kain and D. T. Yoshida, "The Doctrine of Public Policy in Canadian Contract

fabricant en droit civil québécois, mais la Cour y signale ce qui suit au sujet de la common law :

> Une fois l'inexécution fondamentale constatée, le tribunal doit encore analyser la clause limitative selon les règles générales d'interprétation des contrats. Dans la mesure où les termes sont raisonnablement susceptibles d'une seule interprétation, le tribunal ne pourra déclarer la clause limitative de responsabilité inapplicable, <u>même pour des motifs d'équité ou de raisonnabilité</u>, puisque cela reviendrait à réécrire le contrat négocié entre les parties. [Je souligne; par. 84.]

Même si elle renvoie encore à la notion d'« inexécution fondamentale », la Cour exclut nettement tout pouvoir discrétionnaire de passer outre aux conditions d'un contrat valide pour de vagues considérations « d'équité ou de raisonnabilité ». Elle ne remet cependant pas en cause le pouvoir résiduel — mentionné dans l'arrêt *Guarantee Co.* — de refuser de donner effet à une clause de non-recours pour des motifs liés à l'ordre public.

[115]    Je conviens avec le professeur Waddams de ce qui suit :

> [TRADUCTION] [I]l est certes incontournable que les tribunaux se réservent le pouvoir suprême de déterminer si des valeurs privilégiées par la société l'emportent sur celles favorables à l'applicabilité. [par. 557]

[116]    L'ordre public, qu'on a pourtant mémorablement comparé à un « cheval rétif », joue un rôle fondamental en droit contractuel pour ce qui est de la formation et de l'exécution du contrat, mais aussi (parfois) lorsqu'un tribunal est appelé à déclarer un contrat *non* applicable. Comme l'a signalé le juge en chef Duff :

> [TRADUCTION] Dans un système soumis à la règle de droit, il incombe aux tribunaux de donner effet aux stipulations contractuelles et testamentaires suivant les règles et les principes de droit établis. Or, il arrive parfois que l'on ne puisse appliquer ceux-ci normalement parce que le droit lui-même reconnaît une considération d'ordre public prépondérante qui prime les intérêts de l'intéressé et ce qui, autrement, constituerait ses droits.

(*Re Millar Estate*, [1938] R.C.S. 1, p. 4)

Se reporter généralement à B. Kain et D. T. Yoshida, « The Doctrine of Public Policy in Canadian

2010 SCC 4 (CanLII)

Law", in T. L. Archibald and R. S. Echlin, eds., *Annual Review of Civil Litigation, 2007* (2007), 1.

[117]  As Duff C.J. recognized, freedom of contract will often, but not always, trump other societal values. The residual power of a court to decline enforcement exists but, in the interest of certainty and stability of contractual relations, it will rarely be exercised. Duff C.J. adopted the view that public policy "should be invoked only in clear cases, in which the harm to the public is substantially incontestable, and does not depend upon the idiosyncratic inferences of a few judicial minds" (p. 7). While he was referring to public policy considerations pertaining to the nature of the *entire contract*, I accept that there may be well-accepted public policy considerations that relate directly to the nature of the *breach*, and thus trigger the court's narrow jurisdiction to give relief against an exclusion clause.

[118]  There are cases where the exercise of what Professor Waddams calls the "ultimate power" to refuse to enforce a contract may be justified, even in the commercial context. Freedom of contract, like any freedom, may be abused. Take the case of the milk supplier who adulterates its baby formula with a toxic compound to increase its profitability at the cost of sick or dead babies. In China, such people were shot. In Canada, should the courts give effect to a contractual clause excluding civil liability in such a situation? I do not think so. Then there are the people, also fortunately resident elsewhere, who recklessly sold toxic cooking oil to unsuspecting consumers, creating a public health crisis of enormous magnitude. Should the courts enforce an exclusion clause to eliminate contractual liability for the resulting losses in such circumstances? The answer is no, but the contract breaker's conduct need not rise to the level of criminality or fraud to justify a finding of abuse.

Contract Law », dans T. L. Archibald et R. S. Echlin, dir., *Annual Review of Civil Litigation, 2007* (2007), 1.

[117]  Le juge en chef Duff reconnaît donc que la liberté contractuelle prime souvent les autres valeurs sociétales, mais pas toujours. Le pouvoir résiduel du tribunal d'écarter l'application existe bien, mais la certitude et la stabilité des rapports contractuels commandent de l'exercer rarement. Le juge en chef Duff adopte le point de vue selon lequel l'ordre public [TRADUCTION] « ne doit être invoqué que lorsqu'il est manifeste que le préjudice infligé au public est foncièrement incontestable et ne tient pas seulement aux conclusions bien personnelles de quelques magistrats » (p. 7). Même s'il renvoie à des considérations d'ordre public liées à la nature du *contrat en entier*, je reconnais qu'il peut y avoir des considérations d'ordre public bien établies se rapportant directement à la nature de l'*inexécution* et conférant alors au tribunal le pouvoir limité d'écarter la clause de non-recours.

[118]  Il arrive que l'exercice de ce que le professeur Waddams appelle le [TRADUCTION] « pouvoir suprême » de refuser de faire respecter un contrat puisse se justifier, même en contexte commercial. On peut abuser de la liberté contractuelle comme de toute autre liberté. Considérons le cas de fournisseurs de lait qui, pour accroître leur profit, altèrent une formule pour nourrissons en y ajoutant une substance toxique, causant ainsi maladies et décès. En Chine, de tels fournisseurs sont fusillés. Au Canada, les tribunaux devraient-ils en pareil cas faire respecter une clause contractuelle écartant la responsabilité civile? Je ne crois pas. Considérons également le cas de ces gens sans scrupules — résidant heureusement dans un autre pays — qui ont vendu de l'huile de cuisson toxique à des consommateurs qui ne se doutaient de rien, créant ainsi une crise sanitaire publique d'une ampleur considérable. Dans de telles circonstances, nos tribunaux devraient-ils faire respecter une clause de non-recours de façon à écarter la responsabilité contractuelle pour le préjudice ainsi causé? Je ne le crois pas non plus. Cependant, point n'est besoin que l'inexécution contractuelle équivaille à un acte criminel ou à une fraude pour qu'il y ait véritablement abus.

[119]   A less extreme example in the commercial context is *Plas-Tex Canada Ltd. v. Dow Chemical of Canada Ltd.*, 2004 ABCA 309, 245 D.L.R. (4th) 650. The Alberta Court of Appeal refused to enforce an exclusion clause where the defendant Dow knowingly supplied defective plastic resin to a customer who used it to fabricate natural gas pipelines. Instead of disclosing its prior knowledge of the defect to the buyer, Dow chose to try to protect itself by relying upon limitation of liability clauses in its sales contracts. After some years, the pipelines began to degrade, with considerable damage to property and risk to human health from leaks and explosions. The court concluded that "a party to a contract will not be permitted to engage in unconscionable conduct secure in the knowledge that no liability can be imposed upon it because of an exclusionary clause" (para. 53). (See also McCamus, at p. 774, and Hall, at p. 243.) What was demonstrated in *Plas-Tex* was that the defendant Dow was so contemptuous of its contractual obligation and reckless as to the consequences of the breach as to forfeit the assistance of the court. The public policy that favours freedom of contract was outweighed by the public policy that seeks to curb its abuse.

[120]   Conduct approaching serious criminality or egregious fraud are but examples of well-accepted and "substantially incontestable" considerations of public policy that may override the countervailing public policy that favours freedom of contract. Where this type of misconduct is reflected in the breach of contract, all of the circumstances should be examined very carefully by the court. Such misconduct may disable the defendant from hiding behind the exclusion clause. But a plaintiff who seeks to avoid the effect of an exclusion clause must identify the overriding public policy that it says outweighs the public interest in the enforcement of the contract. In the present case, for the reasons discussed below, I do not believe Tercon has identified a relevant public policy that fulfills this requirement.

[119]   L'affaire *Plas-Tex Canada Ltd. c. Dow Chemical of Canada Ltd.*, 2004 ABCA 309, 245 D.L.R. (4th) 650, constitue un cas d'inexécution contractuelle moins extrême. La Cour d'appel de l'Alberta a refusé d'appliquer une clause de responsabilité limitée au bénéfice de la défenderesse, Dow, qui avait sciemment fourni de la résine plastique défectueuse à un client qui s'en était servi pour la fabrication de conduites de gazoducs. Au lieu de signaler à l'acheteur la défectuosité dont elle connaissait l'existence, Dow avait tenté de se protéger en limitant sa responsabilité dans les contrats de vente. Après quelques années, les gazoducs ont commencé à se fissurer, causant d'importants dommages matériels et compromettant la santé de la population ainsi exposée à un risque grave de fuites et d'explosions. La Cour d'appel a conclu qu'un [TRADUCTION] « contractant ne saurait agir de façon inique avec la certitude qu'il pourra échapper à toute responsabilité grâce à une clause d'exonération » (par. 53). (Voir également McCamus, p. 774, et Hall, p. 243.) Ainsi, dans cette affaire, la défenderesse Dow a manifesté un tel mépris pour ses obligations contractuelles et fait preuve d'une telle insouciance pour les conséquences du non-respect de celles-ci qu'il était exclu que les tribunaux lui prêtent leur concours. Les considérations d'ordre public visant à réprimer l'abus de la liberté contractuelle l'emportaient sur celles qui privilégient celle-ci.

[120]   Le comportement qui se rapproche de l'acte criminel grave ou de la fraude monumentale n'est qu'un exemple de considération d'ordre public bien établie et « foncièrement incontestable » pouvant primer la liberté de contracter, elle aussi d'ordre public. Lorsque l'inexécution du contrat se traduit par des actes répréhensibles de cette nature, le tribunal doit examiner très attentivement les circonstances. De tels actes peuvent empêcher le défendeur de se retrancher derrière la clause de non-recours. Mais le demandeur désireux de se soustraire à l'application d'une telle clause doit faire valoir la considération d'ordre public prépondérante qui, à son avis, l'emporte sur l'intérêt public lié à l'application des contrats. Pour les motifs qui suivent, je ne crois pas que Tercon invoque une considération d'ordre public applicable qui satisfait à cette exigence.

[121]   The present state of the law, in summary, requires a series of enquiries to be addressed when a plaintiff seeks to escape the effect of an exclusion clause or other contractual terms to which it had previously agreed.

[122]   The first issue, of course, is whether as a matter of interpretation the exclusion clause even *applies* to the circumstances established in evidence. This will depend on the Court's assessment of the intention of the parties as expressed in the contract. If the exclusion clause does not apply, there is obviously no need to proceed further with this analysis. If the exclusion clause applies, the second issue is whether the exclusion clause was unconscionable at the time the contract was made, "as might arise from situations of unequal bargaining power between the parties" (*Hunter*, at p. 462). This second issue has to do with contract formation, not breach.

[123]   If the exclusion clause is held to be valid and applicable, the Court may undertake a third enquiry, namely whether the Court should nevertheless refuse to enforce the valid exclusion clause because of the existence of an overriding public policy, proof of which lies on the party seeking to avoid enforcement of the clause, that outweighs the very strong public interest in the enforcement of contracts.

IV.   Application to the Facts of This Case

[124]   I proceed to deal with the issues in the sequence mentioned above.

A.   *Did the Ministry Breach Contract A?*

[125]   The trial judge found that the parties intended to create contractual relations at the bidding stage (i.e. Contract A): 2006 BCSC 499, 53 B.C.L.R. (4th) 138, at para. 88. I agree with that conclusion. If there were no intent to form Contract A, there would be no need to exclude liability for compensation in the event of its breach.

[126]   The Ministry argued that Contract A was not breached. It was entitled to enter into Contract B

[121]   En résumé, dans l'état actuel du droit, le tribunal doit répondre à plusieurs questions lorsqu'une partie lui demande de la soustraire à l'application d'une clause de non-recours ou d'une autre stipulation contractuelle à laquelle elle a précédemment consenti.

[122]   Évidemment, il lui faut d'abord déterminer, par voie d'interprétation, si même la clause de non-recours *s'applique* aux faits mis en preuve, ce qui dépend de l'intention des parties qu'il dégage du contrat. De toute évidence, lorsque la clause ne s'applique pas, point n'est besoin de poursuivre l'examen. Lorsqu'elle s'applique, il doit en deuxième lieu se demander si la clause était inique au moment de la formation du contrat, « comme cela pourrait se produire dans le cas où il y a inégalité de pouvoir de négociation entre les parties » (*Hunter*, p. 462). Cette deuxième considération touche à la formation du contrat, non à l'inexécution.

[123]   Lorsque la clause de non-recours est jugée valide et applicable, le tribunal peut se demander dans un troisième temps s'il convient tout de même de refuser de la faire respecter en raison d'une considération d'ordre public prépondérante, dont la preuve incombe à la partie qui veut se soustraire à l'application de la clause, qui l'emporte sur le très grand intérêt public lié à l'application des contrats.

IV.   Application aux faits de l'espèce

[124]   J'examine maintenant les questions en litige dans l'ordre susmentionné.

A.   *Le ministère a-t-il respecté le contrat A?*

[125]   La juge de première instance conclut que les parties ont voulu faire naître un lien contractuel dès le dépôt de la soumission (le contrat A) : 2006 BCSC 499, 53 B.C.L.R. (4th) 138, par. 88. Je suis d'accord. Si les parties n'avaient pas eu l'intention de conclure le contrat A, il n'aurait pas été nécessaire d'écarter toute obligation d'indemnisation en cas d'inexécution.

[126]   Le ministère soutient qu'il n'y a pas eu inexécution du contrat A. Il lui était loisible de

with Brentwood and it did so. There was no privity between the Ministry and EAC. The Ministry would have had no direct claim against EAC in the event of deficient performance. I accept as correct that Brentwood, having obtained Contract B, was in a position of considerable flexibility as to how and with whom it carried out the work. Nevertheless, it was open to the trial judge to conclude, as she did, that the RFP process was not conducted by the Ministry with the degree of fairness and transparency that the terms of Contract A entitled Tercon to expect. At the end of an unfair process, she found, Contract B was not awarded to Brentwood (the eligible bidder) but to what amounted to a joint venture consisting of Brentwood and EAC. I therefore proceed with the rest of the analysis on the basis that Contract A was breached.

B.  *What Is the Proper Interpretation of the Exclusion of Compensation Clause and Did the Ministry's Conduct Fall Within Its Terms?*

[127]   It is at this stage that I part company with my colleague Cromwell J. The exclusion clause is contained in the RFP and provides as follows:

**2.10** . . .

Except as expressly and specifically permitted in these Instructions to Proponents, no Proponent shall have any claim for compensation of any kind whatsoever, as a result of participating in this RFP, and by submitting a Proposal each Proponent shall be deemed to have agreed that it has no claim.

In my view, "participating in this RFP" began with "submitting a Proposal" for consideration. The RFP process consisted of more than the final selection of the winning bid and Tercon participated in it. Tercon's bid *was* considered. To deny that such participation occurred on the ground that in the end the Ministry chose a Brentwood joint venture (ineligible) instead of Brentwood itself (eligible) would, I believe, take the Court up the dead end identified by Wilson J. in *Hunter*:

. . . exclusion clauses, like all contractual provisions, should be given their natural and true construction.

conclure le contrat B avec Brentwood, et il l'a fait. Il n'avait pas de lien contractuel avec EAC. Il n'aurait eu aucun recours direct contre EAC en cas d'exécution insuffisante. J'estime qu'après avoir obtenu le contrat B, Brentwood jouissait effectivement d'une grande latitude pour arrêter les modalités d'exécution des travaux et choisir ses partenaires. La juge du procès pouvait néanmoins conclure comme elle le fait que, dans sa DP, le ministère n'a pas agi avec l'équité et la transparence auxquelles Tercon était en droit de s'attendre au vu du libellé du contrat A. Elle conclut qu'au terme d'un processus inéquitable, le contrat B n'a pas été adjugé à Brentwood (le soumissionnaire admissible), mais bien à une coentreprise formée de Brentwood et d'EAC. Je conclus donc qu'il y a eu inexécution du contrat A et je poursuis l'analyse en conséquence.

B.  *Quelle est la juste interprétation de la clause de non-recours en indemnisation, et les actes du ministère tombent-ils sous le coup de celle-ci*?

[127]   C'est à cette étape que je me dissocie de mon collègue le juge Cromwell. La clause de non-recours figurant dans la DP est libellée comme suit :

[TRADUCTION]

**2.10** . . .

Sauf ce que prévoient expressément les présentes instructions, un proposant ne peut exercer aucun recours en indemnisation pour sa participation à la DP, ce qu'il est réputé accepter lorsqu'il présente une soumission.

À mon avis, la « participation à la DP » a débuté par la « [présentation d']une soumission ». Le processus ne se résumait pas au choix final de l'adjudicataire, et Tercon y a participé. La soumission de Tercon *a été* considérée. Selon moi, nier la participation de Tercon au motif que le ministère a finalement choisi la coentreprise inadmissible dont faisait partie Brentwood, et non Brentwood elle-même (qui était admissible), mène la Cour dans l'impasse relevée par la juge Wilson dans l'arrêt *Hunter* :

. . . les clauses d'exclusion, comme toutes les stipulations d'un contrat, doivent recevoir une interprétation

Great uncertainty and needless complications in the drafting of contracts will obviously result if courts give exclusion clauses strained and artificial interpretations in order, indirectly and obliquely, to avoid the impact of what seems to them *ex post facto* to have been an unfair and unreasonable clause. [p. 509]

Professor McCamus expresses a similar thought:

. . . the law concerning exculpatory clauses is likely to be more rather than less predictable if the underlying concern is openly recognized, as it is in *Hunter*, rather than suppressed and achieved indirectly through the subterfuge of strained interpretation of such terms. [p. 778]

[128]  I accept the trial judge's view that the Ministry was at fault in its performance of the RFP, but the conclusion that the process thereby ceased to be the RFP process appears to me, with due respect to colleagues of a different view, to be a "strained and artificial interpretatio[n] in order, indirectly and obliquely, to avoid the impact of what seems to them *ex post facto* to have been an unfair and unreasonable clause".

[129]  As a matter of interpretation, I agree with Donald J.A. speaking for the unanimous court below:

   The [trial] judge said the word "participating" was ambiguous. With deference, I do not find it so. The sense it conveys is the contractor's involvement in the RFP/ contract A <u>stage</u> of the process. I fail to see how "participating" could bear any other meaning. [Emphasis added; para. 16.]

Accordingly, I conclude that on the face of it, the exclusion clause applies to the facts described in the evidence before us.

C.  *Was the Claim Excluding Compensation Unconscionable at the Time Contract A Was Made?*

[130]  At this point, the focus turns to contract formation. Tercon advances two arguments: firstly, that it suffered from an inequality of bargaining power and secondly, (as mentioned) that the

juste et naturelle. Il est évident que, si les tribunaux donnent aux clauses d'exclusion des interprétations forcées et artificielles afin d'éviter, par des moyens indirects et détournés, les conséquences de ce qui leur semble *ex post facto* avoir été une clause injuste et déraisonnable, il en résultera une grande incertitude et des complications inutiles dans la rédaction de contrats. [p. 509]

Le professeur McCamus va dans le même sens :

[TRADUCTION] . . . le droit régissant les clauses d'exonération sera assurément plus prévisible, et non moins, si la considération sous-jacente est ouvertement reconnue, comme elle l'est dans *Hunter*, au lieu d'être occultée et prise en compte indirectement par le moyen détourné de l'interprétation forcée du libellé en cause. [p. 778]

[128]  Je conviens avec la juge de première instance que le ministère a été fautif dans la mise en œuvre de la DP. Cependant, en toute déférence pour les tenants de l'avis contraire, sa conclusion selon laquelle le processus a cessé dès lors d'être la DP me paraît être le fruit d'« interprétations forcées et artificielles afin d'éviter, par des moyens indirects et détournés, les conséquences de ce qui leur semble *ex post facto* avoir été une clause injuste et déraisonnable ».

[129]  Sur le plan de l'interprétation, je suis d'accord avec le juge Donald qui exprime l'avis unanime de la Cour d'appel :

   [TRADUCTION] La juge de première instance dit que le mot « participation » est ambigu. Avec déférence, je ne suis pas d'accord. Il renvoie à la part que prend l'entrepreneur à l'<u>étape</u> du contrat A du processus de DP. Je ne vois pas quel autre sens pourrait avoir ce mot. [Je souligne; par. 16.]

Par conséquent, je conclus qu'à première vue, la clause de non-recours s'applique aux faits établis selon le dossier de la Cour.

C.  *La clause de non-recours était-elle inique au moment de la formation du contrat A?*

[130]  Pour ce volet, l'accent est mis sur la formation du contrat. Tercon avance deux arguments : premièrement, son pouvoir de négociation était moins grand que celui du ministère et, deuxièmement (je

exclusion clause violates public policy as reflected in the *Transportation Act*.

### (1) Unequal Bargaining Power

[131]    In *Hunter*, Dickson C.J. stated, at p. 462: "Only where the contract is unconscionable, as might arise from situations of unequal bargaining power between the parties, should the courts interfere with agreements the parties have freely concluded." Applying that test to the case before him, he concluded:

I have no doubt that unconscionability is not an issue in this case. Both Allis-Chalmers and Syncrude are large and commercially sophisticated companies. Both parties knew or should have known what they were doing and what they had bargained for when they entered into the contract. [p. 464]

While Tercon is not on the same level of power and authority as the Ministry, Tercon is a major contractor and is well able to look after itself in a commercial context. It need not bid if it doesn't like what is proposed. There was no relevant imbalance in bargaining power.

### (2) Policy of the *Transportation Act*

[132]    As mentioned earlier, Tercon cites and relies upon the policy of the Act which undoubtedly favours the transparency and integrity of the bidding process. I have already discussed my reasons for rejecting Tercon's argument that this "policy" operates as a bar to the ability of the parties to agree on such commonplace commercial terms as in the circumstances they think appropriate. In addition, the exclusion clause is not as draconian as Tercon portrays it. Other remedies for breach of Contract A (specific performance or injunctive relief, for example) were available.

[133]    In this case, injunction relief *was* in fact a live possibility. Although Tercon was not briefed on the negotiations with other bidders, the trial judge found that Glenn Walsh, the owner of Tercon, "had seen representatives of EAC with Brentwood following [the Brentwood/EAC interviews with the

le rappelle), la clause de non-recours va à l'encontre de la raison d'être de la *Loi sur les transports*.

### (1) Inégalité du pouvoir de négociation

[131]    Dans l'arrêt *Hunter*, le juge en chef Dickson affirme à la p. 462 : « Ce n'est que lorsque le contrat est inique, comme cela pourrait se produire dans le cas où il y a inégalité de pouvoir de négociation entre les parties, que les tribunaux devraient modifier les conventions que les parties ont formées librement. » Appliquant ce critère à l'espèce dont la Cour était saisie, il conclut :

Je n'ai aucun doute que l'iniquité n'est pas en cause en l'espèce. Allis-Chalmers et Syncrude sont d'importantes sociétés commerciales ayant une grande expérience des affaires. Les deux parties savaient ou auraient dû savoir ce qu'elles faisaient et ce qu'elles avaient négocié au moment de conclure le contrat. [p. 464]

Tercon n'a ni le pouvoir ni l'autorité du ministère, mais c'est une entreprise importante parfaitement en mesure de défendre ses intérêts commerciaux. Elle n'a pas à donner suite à un appel d'offres dont les conditions ne lui conviennent pas. Il n'y avait pas d'inégalité déterminante du pouvoir de négociation.

### (2) Raison d'être de la *Loi sur les transports*

[132]    J'ai déjà signalé que Tercon s'en remet à la raison d'être de la Loi, qui favorise indubitablement la transparence et l'intégrité du processus d'appel d'offres. J'ai également fait état des motifs pour lesquels je rejette la thèse de Tercon selon laquelle cette « raison d'être » fait obstacle à la faculté des parties de convenir des conditions commerciales courantes qu'elles jugent indiquées dans les circonstances. En outre, la clause de non-recours n'est pas aussi draconienne que le laisse entendre Tercon. L'inexécution du contrat A donnait ouverture à d'autres recours (dont l'exécution en nature et l'injonction).

[133]    En l'espèce, l'injonction *était* effectivement une avenue possible. Bien que Tercon n'ait pas été informée des négociations avec les autres soumissionnaires, la juge de première instance relève que son propriétaire, Glenn Walsh, [TRADUCTION] « avait rencontré des représentants d'EAC et de

Ministry and Bill Swain of Brentwood]", and when asked whether Tercon was going to sue, Walsh had said "no" without further comment. Had Tercon pushed for more information and sought an injunction (as a matter of private law, not public law), at that stage the exclusion clause would have had no application, but Tercon did not do so. This is not to say that estoppel or waiver applies. Nor is it to say that injunctive relief would be readily available in many bidding situations (although if an injunction had been sought here, the unavailability of the alternative remedy of monetary damages might have assisted Tercon). It is merely to say that the exclusion clause is partial, not exhaustive.

[134]    The Kincolith road project presented a serious construction challenge on a tight time frame and within a tight budget. Contract A did not involve a bid for a fixed price contract but for the right to negotiate the bid details once the winning proponent was selected. In such a fluid situation, *all* participants could expect difficulties in the contracting process. Members of the construction bar are nothing if not litigious. In the circumstances, the bidders might reasonably have accepted (however reluctantly) the Ministry's need for a bidding process that excluded compensation, and adjusted their bids accordingly. The taxpayers of British Columbia were not prepared to pay the contractor's profit twice over — once to Brentwood/EAC for actually building the road, and now to Tercon, even though in Tercon's case the "profit" would be gained without Tercon running the risks associated with the performance of Contract B. The Court should not be quick to declare such a clause, negotiated between savvy participants in the construction business, to be "contrary to the Act".

D.  *Assuming the Validity of the Exclusion Clause at the Time the Contract Was Made, Is There Any Overriding Public Policy That Would Justify the Court's Refusal to Enforce It?*

[135]    If the exclusion clause is not invalid from the outset, I do not believe the Ministry's performance

Brentwood après [les rencontres de Brentwood et d'EAC avec le ministère et Bill Swain, de Brentwood] »; interrogé quant à savoir si Tercon allait poursuivre, M. Walsh avait répondu « non » sans autre commentaire. Si Tercon avait alors tenté d'en savoir plus et sollicité une injonction (en droit privé, et non en droit public), la clause de non-recours ne se serait pas appliquée, mais Tercon ne l'a pas fait. Il n'y a pas pour autant préclusion ou renonciation. Certes, il n'est pas facile d'obtenir une injonction dans bon nombre de processus d'appel d'offres (quoique, en l'espèce, l'impossibilité d'obtenir des dommages-intérêts aurait sans doute joué en faveur de Tercon). Simplement, l'absence de recours est partielle, et non totale.

[134]    Le projet de Kincolith, dont le calendrier et le budget étaient serrés, présentait un défi de taille. En décrochant le contrat A, le soumissionnaire n'obtenait pas un marché à prix fixe, mais bien le droit de négocier le détail du contrat de construction. Dans un cadre aussi mouvant, *tous* les participants pouvaient s'attendre à des difficultés lors du processus d'adjudication. Le droit de la construction n'existerait pas sans les litiges. Dans les circonstances, il est raisonnable de penser que les soumissionnaires ont accepté (même avec réticence) que l'appel d'offres du ministère exclue toute indemnisation et qu'ils ont rajusté leurs soumissions en conséquence. Les contribuables de la Colombie-Britannique n'étaient pas disposés à payer deux fois le profit de l'entrepreneur — d'abord à la coentreprise Brentwood/EAC pour la construction effective de la route, puis à Tercon, qui réalisait le « profit » sans avoir couru le risque associé à l'exécution du contrat B. La Cour ne doit pas s'empresser de déclarer « contraire à la Loi » une clause de non-recours négociée par des entreprises rompues aux usages du domaine de la construction.

D.  *À supposer que la clause de non-recours était valable au moment de la formation du contrat, une considération d'ordre public prépondérante justifie-t-elle le tribunal de refuser de la faire respecter?*

[135]    Si la clause de non-recours n'était pas invalide au départ, je ne crois pas que l'exécution du

can be characterized as so aberrant as to forfeit the protection of the contractual exclusion clause on the basis of some overriding public policy. While there is a public interest in a fair and transparent tendering process, it cannot be ratcheted up to defeat the enforcement of Contract A in this case. There *was* an RFP process and Tercon participated in it.

[136]    Assertions of ineligible bidders and ineligible bids are the bread and butter of construction litigation. If a claim to defeat the exclusion clause succeeds here on the basis that the owner selected a joint venture consisting of an eligible bidder with an ineligible bidder, so also by a parity of reasoning should an exclusion clause be set aside if the owner accepted a bid ineligible on other grounds. There would be little room left for the exclusion clause to operate. A more sensible and realistic view is that the parties here expected, even if they did not like it, that the exclusion of compensation clause would operate even where the eligibility criteria in respect of the bid (including the bidder) were not complied with.

[137]    While the Ministry's conduct was in breach of Contract A, that conduct was not so extreme as to engage some overriding and paramount public interest in curbing contractual abuse as in the *Plas-Tex* case. Brentwood was not an outsider to the RFP process. It was a legitimate competitor. All bidders knew that the road contract (i.e. Contract B) would not be performed by the proponent alone. The work required a large "team" of different trades and personnel to perform. The issue was whether EAC would be on the job as a major sub-contractor (to which Tercon could not have objected) or identified with Brentwood as a joint venture "proponent" with EAC. All bidders were made aware of a certain flexibility with respect to the composition of any proponent's "team". Section 2.8(b) of the RFP provided that if "a material change has occurred to the Proponent since its qualification under the RFEI, including if the composition of the Proponent's team members has changed, . . . the Ministry may

contrat par le ministère s'éloigne à ce point de la norme qu'une considération d'ordre public prépondérante justifie le tribunal d'écarter la protection découlant de la clause contractuelle de non-recours. Il est certes dans l'intérêt public que le processus d'appel d'offres soit équitable et transparent, mais cette considération ne suffit pas à justifier le refus de faire respecter le contrat A en l'espèce. Un processus de DP *s'est* déroulé et Tercon y a participé.

[136]    En droit de la construction, les litiges naissent souvent à la suite d'allégations d'inadmissibilité de soumissionnaires et de soumissions. Si, dans la présente affaire, on faisait droit à la demande parce que le propriétaire a choisi une coentreprise formée de deux soumissionnaires dont un était admissible et l'autre non, par souci de cohérence, faudrait-il également écarter la clause de non-recours lorsque le propriétaire accepte une soumission inadmissible sous quelque autre rapport, laissant ainsi peu de place à l'application d'une telle clause? D'un point de vue plus réaliste et rationnel, les parties s'attendaient en l'espèce, même si cette éventualité ne les enchantait guère, à ce que la clause excluant toute indemnisation s'applique advenant même le non-respect des critères d'admissibilité de la soumission (et de son auteur).

[137]    Les actes du ministère ont certes contrevenu au contrat A, mais j'estime qu'ils n'étaient pas répréhensibles au point de faire un sorte qu'une considération d'ordre public prépondérante justifie la répression d'un abus contractuel comme dans l'affaire *Plas-Tex.* Brentwood n'était pas étrangère au processus de DP. Il s'agissait d'un concurrent légitime. Tous les soumissionnaires savaient que le proposant retenu n'exécuterait pas seul le contrat de construction routière (le contrat B). Il fallait pouvoir compter sur une « équipe » pluridisciplinaire pour mener le projet à bien. La question était celle de savoir si EAC serait sous-traitant principal (ce à quoi Tercon n'aurait pu s'opposer) ou « proposant » dans le cadre de la coentreprise avec Brentwood. Une certaine latitude était accordée à tous les soumissionnaires pour la constitution de leur « équipe ». L'alinéa 2.8b) de la DP prévoyait en effet que lorsque [TRADUCTION] « depuis que le proposant est devenu admissible en répondant à la

request [further information and] . . . reserves the right to disqualify that Proponent, and reject its Proposal". Equally, "[i]f a qualified Proponent is concerned that it has undergone a material change, the Proponent can, at its election, make a preliminary submission to the Ministry, in advance of the Closing Date, and before submitting a Proposal. . . . The Ministry will, within three working days of receipt of the preliminary submission give a written decision as to whether the Proponent is still qualified to submit a Proposal."

[138] The RFP issued on January 15, 2001. The Ministry was informed by Brentwood of a "proposed material change to our team's structure" in respect of a joint venture with EAC by fax dated January 24, 2001. From the Ministry's perspective, the change was desirable. EAC was a bigger company, had greater expertise in rock drilling and blasting (a major part of the contract) and a stronger balance sheet. EAC was identified in Brentwood's amended proposal as a sub-contractor. In the end, the Ministry did not approve the January 14, 2001 request, presumably because it doubted that a change in the "composition of the Proponent's team's members" could , according to the terms of the RFP, include a change in the Proponent itself.

[139] The Ministry did obtain legal advice and did not proceed in defiance of it. On March 29, 2001, the Ministry noted in an internal e-mail that a Ministry lawyer (identified in the e-mail) had come to the conclusion that the joint venture was not an eligible proponent but advised that Contract B could lawfully be structured in a way so as to satisfy both Brentwood/EAC's concerns and avoid litigation from disappointed proponents.

[140] I do not wish to understate the difference between EAC as a sub-contractor and EAC as a joint-venturer. Nor do I discount the trial judge's condemnation of the Ministry's lack of fairness

DEI, une modification substantielle le concernant s'est produite, notamment en ce a trait à la composition de son équipe [. . .], [le ministère] peut exiger du proposant d'autres renseignements [. . .] et [il] se réserve le droit de l'écarter et de rejeter sa soumission ». Puis, « le proposant admissible qui estime qu'une modification substantielle le concernant a pu se produire peut à son gré présenter au ministère une soumission préliminaire avant la date de clôture et avant de formuler une proposition. [. . .] Dans les trois jours ouvrables qui suivent la réception de la soumission préliminaire, le ministère lui fait savoir par écrit s'il est toujours admissible. »

[138] La DP a été lancée le 15 janvier 2001. Dans une télécopie datée du 24 janvier 2001, Brentwood a informé le ministère de la [TRADUCTION] « modification substantielle qu'elle se proposait d'apporter à la composition de son équipe » en vue de la formation d'une coentreprise avec EAC. Le ministère voyait le changement d'un bon œil. EAC était une société de plus grande taille, dotée d'une plus grande expertise dans le forage de roches et le dynamitage (ce qui comptait pour une grande partie des travaux) et elle affichait une meilleure santé financière. Elle figurait à titre de sous-traitant dans la proposition modifiée de Brentwood. Finalement, le ministère n'a pas approuvé la modification signalée le 14 janvier 2001, vraisemblablement parce qu'il craignait que la modification de la « composition de [l']équipe [du proposant] » ne puisse, suivant la DP, englober la modification du proposant lui-même.

[139] Le ministère a obtenu un avis juridique, et il n'a pas agi à l'encontre de celui-ci. Le 29 mars 2001, le ministère signalait dans un courriel interne qu'un avocat du ministère (nommé dans le courriel) avait conclu que la coentreprise n'était pas un proposant admissible, mais que le contrat B pouvait en toute légalité être rédigé de façon à tenir compte des préoccupations de Brentwood et d'EAC et à éviter toute contestation des proposants non retenus.

[140] Je ne veux pas minimiser la différence entre le fait, pour EAC, d'être un sous-traitant ou un coentrepreneur. Je ne mésestime pas non plus les conclusions de la juge de première instance

and transparency in making a Contract B which on its face was at odds with what the trial judge found to be the true state of affairs. Tercon has legitimate reason to complain about the Ministry's conduct. I say only that based on the jurisprudence, the Ministry's misconduct did not rise to the level where public policy would justify the court in depriving the Ministry of the protection of the exclusion of compensation clause freely agreed to by Tercon in the contract.

[141]  The construction industry in British Columbia is run by knowledgeable and sophisticated people who bid upon and enter government contracts with eyes wide open. No statute in British Columbia and no principle of the common law override their ability in this case to agree on a tendering process including a limitation or exclusion of remedies for breach of its rules. A contractor who does not think it is in its business interest to bid on the terms offered is free to decline to participate. As Donald J.A. pointed out, if enough contractors refuse to participate, the Ministry would be forced to change its approach. So long as contractors are willing to bid on such terms, I do not think it is the court's job to rescue them from the consequences of their decision to do so. Tercon's loss of anticipated profit is a paper loss. In my view, its claim is barred by the terms of the contract it agreed to.

## V.  Disposition

[142]   I would dismiss the appeal without costs.

*Appeal allowed,* McLachlin C.J. *and* Binnie, Abella *and* Rothstein JJ. *dissenting.*

*Solicitors for the appellant: McLean & Armstrong, West Vancouver.*

*Solicitor for the respondent: Attorney General of British Columbia, Victoria.*

selon lesquelles le ministère a fait preuve d'un manque d'équité et de transparence en établissant un contrat B qui ne correspondait manifestement pas à la réalité. Tercon a raison de dénoncer le comportement du ministère. Seulement, au vu de la jurisprudence, l'inconduite n'était pas répréhensible au point que l'ordre public justifie le tribunal de refuser au ministère la protection de la clause de non-recours en indemnisation à laquelle Tercon a librement consenti.

[141]  Dans le secteur de la construction de la Colombie-Britannique, des gens compétents dotés d'une grande expérience répondent à des appels d'offres et concluent des contrats avec l'État en toute connaissance de cause. Aucune loi de cette province et aucun principe de common law ne l'emporte en l'espèce sur leur faculté de convenir d'un processus d'appel d'offres, y compris d'une responsabilité limitée ou d'une absence de recours advenant le non-respect des conditions applicables. L'entrepreneur qui estime qu'il n'est pas dans son intérêt commercial de répondre à un appel d'offres aux conditions proposées est libre de s'en abstenir. Comme le fait observer le juge Donald, si un nombre suffisant d'entrepreneurs refusent de soumissionner, le ministère sera bien obligé de modifier sa façon de faire. Tant que des entrepreneurs seront disposés à soumissionner à de telles conditions, je ne crois pas qu'il revienne aux tribunaux de les soustraire aux conséquences de leurs actes. La perte du profit escompté par Tercon est théorique. Selon moi, les conditions du contrat auxquelles elle a consenti font obstacle à sa demande.

## V.  Dispositif

[142]  Je suis d'avis de rejeter le pourvoi sans dépens.

*Pourvoi accueilli, la juge en chef* McLachlin *et les juges* Binnie, Abella *et* Rothstein *sont dissidents.*

*Procureurs de l'appelante : McLean & Armstrong, West Vancouver.*

*Procureur de l'intimée : Procureur général de la Colombie-Britannique, Victoria.*

TERCON CONTRACTORS LTD. *c.* C.-B.

*Solicitor for the intervener: Attorney General of Ontario, Toronto.*

*Procureur de l'intervenant : Procureur général de l'Ontario, Toronto.*

2010 SCC 4 (CanLII)

TAB 147

2012 ONCA 862 (CanLII)

# COURT OF APPEAL FOR ONTARIO

CITATION: The Canada Trust Company v. Browne, 2012 ONCA 862
DATE: 20121207
DOCKET: C53262

Feldman, Simmons and Cronk JJ.A.

In the Matter of the Primo Poloniato Grandchildren's Trust

BETWEEN

The Canada Trust Company
Trustee of the Primo Poloniato Grandchildren's Trust

Applicant
(Respondent)

and

Russell Browne, <u>John Mori Jr.</u>, Andrea L. Mori-Mickus, Laura Lee,
<u>Marla L. Ashmore</u>, <u>Teresa O'Neil</u>, Michael Poloniato, Kristen Wiley,
Brandon Ashmore, and <u>The Children's Lawyer</u> on behalf of the minors,
Rachel Browne, Hailey Browne, Michelle Wiley, Jessica Ashmore, Julia Mickus,
Robert Mickus, Olivia Mickus, John Mickus, Marissa Lee, Erica Lee and on
behalf of the unborn and unascertained beneficiaries of the Primo Poloniato
Grandchildren's Trust

Respondents
(<u>Appellant</u>/<u>Respondents</u>)

Earl A. Cherniak, Q.C. and Cynthia B. Kuehl, for the appellant

Archie J. Rabinowitz, David Lobl, and Jeremy C. Millard, for the respondent
Canada Trust Company

Mark Abradjian, Christopher R. Durdan and Brad Wiseman, for the respondents
John Mori Jr., Marla L. Ashmore and Teresa O'Neil

Heard: April 11, 2012

On appeal from the order of Justice Laurence A. Pattillo of the Superior Court of
Justice, dated October 5, 2011, with reasons reported at 2011 ONSC 731.

**Feldman J.A.:**

2012 ONCA 862 (CanLII)

Page: 2

## INTRODUCTION

[1]    The Children's Lawyer brings this appeal on behalf of the minor, unborn and unascertained beneficiaries of the Primo Poloniato Grandchildren's Trust (the "Trust"). The Trust was settled in October 1980 by Primo Poloniato, the founder of Primo Foods Ltd., in favour of his grandchildren (the income beneficiaries) and their issue, his great-grandchildren (the capital beneficiaries). The Trust's principal asset is shares in 679312 Alberta Ltd. (the "Holding Company"), a private investment company controlled by the Trust. While the value of the Trust has fluctuated over the years, at its peak it was worth in excess of $130 million.

[2]    Since its inception, the Trust has been varied with court approval twice - in December 1988 and again by a deed of arrangement, dated December 1997, which was approved in March 1998. Both variations were made based on the agreement and consent of all parties, including the Children's Lawyer (in 1988, the Official Guardian) on behalf of minor, unborn and unascertained beneficiaries.

[3]    The application that gives rise to this appeal was brought by Canada Trust, the Trust's current trustee, for the court's advice and direction to clarify the trustee's obligations under the Trust agreement as varied by the 1997 trust deed (the "Trust Deed as Varied"). That variation changed the nature of the Trust to a

2012 ONCA 862 (CanLII)

Page: 3

"percentage trust" or a "unitrust". It allowed the trustee to have a freer hand to make investments within the Holding Company in order to maximize the value of the Trust for the benefit of all beneficiaries, without concern as to whether those investments were income-producing or growth-oriented.

[4]    The Trust Deed as Varied provides that the income beneficiaries receive a fixed percentage of the net fair market value of a defined percentage of the Trust's assets as their distribution each year. This provides the income beneficiaries with a guaranteed annual income, allowing them to be able to plan their spending priorities and obligations with confidence. As a percentage trust, if the income-producing investments chosen by the trustee do not produce sufficient income to make the distributions, the trustee may sell equities or other capital investments held by the Holding Company in order to generate sufficient funds to make the percentage payments to the income beneficiaries.

[5]    For the residuary capital beneficiaries, the benefit of the 1997 variation is that the trustee may invest in equities and other appreciating assets, which will ultimately be available for the capital beneficiaries, rather than being constrained by the obligation to earn income and preserve capital.

[6]    The 1997 variation application was based on accounting projections of the future value of the Trust that were prepared by Ernst & Young based on past market performance. Those projections saw the value of the Trust continue to increase over time.

2012 ONCA 862 (CanLII)

Page:  4

[7]    Unfortunately, because economic conditions since 2001 have resulted in lower than expected investment returns, the trustee has had to continue to sell a significant portion of the underlying assets owned by the Holding Company in order to make the annual percentage distributions to the income beneficiaries, resulting in an ongoing depletion of the value of the Trust as a whole.

[8]    The application judge interpreted the Trust Deed as Varied to require the trustee to make the percentage distributions to the income beneficiaries in spite of the downturn in the market and its effect on the capital value of the Trust.

[9]    The Children's Lawyer appeals from the application judge's decision, arguing that the application judge ignored trust principles and failed to take into account the proper factual matrix in interpreting the terms of the Trust Deed as Varied. Counsel submits that the effect of the decision is to erode the interests of the capital beneficiaries to the point of elimination, which could not have been what was intended when the 1997 variation received court approval.

[10]   For the reasons that follow, I would dismiss the appeal. In my view, the application judge interpreted the Trust Deed as Varied in accordance with proper trust principles and in the way it was understood and intended by all the consenting parties and by the approving court at the time.

2012 ONCA 862 (CanLII)

Page: 5

## FACTS

[11]  Mr. Poloniato, who died in 1984, had seven grandchildren. All are now of full age and capacity. At the time of the application there were 12 great-grandchildren, six of full age and capacity and six minors.

[12]  The Trust was settled as part of an estate freeze. Initially, the Trust held the growth shares of Primo Foods through an Ontario numbered company. Upon Mr. Poloniato's death, the shares were sold and the proceeds were invested in securities and near cash equivalents, which are now held by the Holding Company.

[13]  Under the original terms of the Trust, income from the Trust would be accumulated until the earlier of the expiration of 21 years from the settling of the Trust, or the death of the settlor's first grandchild (the latter defined as the "Time of Division"). At the Time of Division, the Trust would be split equally into sub-trusts for each grandchild then living or who had issue living. Subsequent to the Time of Division, the income from each sub-trust would be paid to each grandchild during his or her lifetime and, on the death of the grandchild, the capital of each sub-trust would be payable to one or more of the grandchild's issue as designated by him or her pursuant to a power of appointment. The trustee was given no specific power to encroach on capital.

2012 ONCA 862 (CanLII)

Page:  6

[14]  By the mid-1980s, the value of the Trust had grown significantly. The grandchildren, who were the income beneficiaries, sought earlier access to some of the income from the Trust to assist them in addressing their immediate financial needs and to prepare them for the anticipated receipt of a large sum of money beginning in October 2001 (the expiration of 21 years from the settlement of the Trust).

[15]  In December 1988, the court approved a trust variation that accelerated payment of income to the income beneficiaries beginning in 1988 and continuing to 2001. The variation sought by the trustee was consented to by all the adult beneficiaries and the Official Guardian.

[16]  The main elements of the 1988 variation (also referred to as the Settlement) were the  following:

- The income beneficiaries became entitled to receive 1/7 of the "gross annual income" of the Trust in 1988 and an increasing percentage each year up to 1/3 of the gross annual income for the years 1998, 1999 and 2000; the distributable income was to be paid to those grandchildren alive in each of those years, divided in equal shares *per capita*.

- From January 1, 2001 onwards on an annual basis, all the net income from the Trust fund was to be divided in equal shares *per capita* among the grandchildren.

2012 ONCA 862 (CanLII)

Page: 7

- The trustee was permitted to encroach on capital to a maximum of $200,000 for each family unit for the benefit of the great-grandchildren.

- The income beneficiaries released their power of appointment in respect of their capital interests under the Trust so that every one of their issue (all the great-grandchildren) would be equal capital beneficiaries.

[17]  Some problems arose following the 1988 variation, including uncertainty about the meaning of the term "gross annual income". Also, the grandchildren (the income beneficiaries) wanted to receive a predictable annual amount of money so that they could plan and live knowing what amount would be available each year. Finally, because by 1997 the equity markets were performing very well while interest rates were in decline, it was felt that both classes of beneficiaries were losing out on overall returns because of the investment restrictions on the trustee regarding the need for income-producing assets. The trustee was not able to maximize the value of the Trust at a time when there were significant growth opportunities in the market for those with a more unconstrained investment mandate.

[18]  According to an affidavit on the motion to approve the 1997 variation sworn by Mike Ruf, a trust officer of the then trustee, National Trust Company, the second variation in 1997 was meant to resolve the interpretive issue, to give the trustee more discretion as to the management of the investments, and to make distributions to income beneficiaries more predictable.

Page: 8

[19]   Among other things, the 1997 variation was designed as a percentage trust or a unitrust, a new type of trust that had been recommended by the Ontario Law Reform Commission's *Report on the Law of Trusts* (Ministry of the Attorney General, 1984).  The percentage trust or unitrust would allow the trustee to use a balanced portfolio strategy of investing. Paragraph 26 of the Ruf affidavit explains:

> The principal advantage of the revised method of distribution is that it will enable the Trustee to adopt a balanced portfolio strategy which most likely in the longer term will provide the greatest asset base for the capital beneficiaries, being the minor children and unborn issue of the Grandchildren.

[20]   As counsel for the trustee at the time of the 1997 variation, Mr. Martin Rochwerg explained in his evidence on this application that the advantage of a percentage trust is that it allows the trustee to invest for maximum returns, regardless of whether they result in capital gains or income. The total growth is then split between the income and capital beneficiaries on a specified percentage basis. He explained further that the interests of the income and capital beneficiaries would therefore be "in tandem", because they would "either both benefit or they both lose." The effect of the conversion to a percentage trust was that the income beneficiaries were no longer entitled to receive income from the Trust; instead they would receive a fixed amount of money from the Trust each

2012 ONCA 862 (CanLII)

Case 09-10138-MFW    Doc 14225-51    Filed 08/15/14    Page 281 of 493


Page: 9

year, based on a percentage formula that included mandatory minimum and maximum limits.

[21]  Prior to the approval of the 1997 variation, a "no-tax" ruling was sought and obtained from Revenue Canada (now the Canada Revenue Agency or "CRA"). By letter of June 1997 addressed to Revenue Canada, Mr. Rochwerg enclosed a memorandum that explained the reasons for the proposed variation and that addressed the issue whether the proposed variation would result in a disposition of a capital interest for tax purposes.

[22]  One of the points covered in the memorandum was the legal requirement that the arrangement be for the benefit of minors and unborn and unascertained beneficiaries, who, in this case, were the capital beneficiaries. The memorandum opined that the court would not approve the proposed arrangement on behalf of those beneficiaries if the result was that their interest would be diminished. In this case, the benefit to the capital beneficiaries was said to come "primarily from the Trustee being freed from restrictions on investing so that the Trustee [could] adopt an investment policy which will further enhance the value of the Trust."

[23]  After some back and forth between the CRA and the Trust's advisors, the CRA granted an advance tax ruling based on the facts as set out in the ruling letter, which included the following paragraph:

> 10. In no event will the annual distribution [to the Income Beneficiaries] be less than the previous year's

2012 ONCA 862 (CanLII)

Page:  10

distribution. Where it is determined that the amount to be distributed based on the formula is less than the previous year's distribution, the current year's distribution will be adjusted to the amount of the prior year's distribution. The new system will also provide that the current year's distribution cannot exceed 115% of the previous year's distribution. *The Deed of Arrangement will also limit income distributions in any one year to the amount of cash dividends the Trust receives from [the] Holding Company in that year, ensuring there will be no encroachment on capital of the Trust on behalf of the Income Beneficiaries*. These provisions will have the effect of providing the Income Beneficiaries with a stable annual income, and ensuring some growth to the Capital Beneficiaries. In determining the appropriate Distribution Percentage (70%) for the years 2001 and onward, various asset mixes were tested and compared with the results using a rigid asset mix.  Rates of return for the last 10 years were used in these projections.  Provided these rates of return are a reasonable indication of future rates of return, the new formula will provide an after-tax increase for the Capital Beneficiaries and should also provide a slightly greater after-tax return for the Income Beneficiaries over the longer term. [Emphasis added.]

[24]  The basis for selecting 70 per cent in setting the Yearly Income to be distributed to income beneficiaries starting in 2002, which was the amount recommended and accepted as part of the arrangement, was explained in the Ruf affidavit at para. 23.  The distribution percentages of 25 per cent for 1997 and 33-1/3 per cent for 1998-2000 were the same as in the Trust deed as varied in 1988, which he refers to as the Settlement. He then states: "In all years thereafter the Distribution Percentage represents a reduction of 30% from that set out in the Settlement." This was because the Settlement provided that,

2012 ONCA 862 (CanLII)

beginning in 2001, the trustee was to administer the Trust Fund's annual income by dividing 100 per cent of the net income among the grandchildren on a *per capita* basis. Therefore, a 70 per cent distribution represented a 30 per cent reduction from what they would have received under the Settlement.

[25]  The CRA ruling required that income distributions be in the form of cash dividends paid by the Holding Company to the Trust in any year in order to ensure that there would be no encroachment on the capital of the Trust (the shares of the Holding Company). On that basis, the CRA was prepared to give the ruling that "[t]here will not be a disposition of any income or capital interest in the Trust as a result of the proposed transactions". This ruling was needed in order to implement the proposed 1997 variation without adverse tax consequences.

[26]  The Children's Lawyer consented to the 1997 variation on behalf of the capital beneficiaries who were unable to consent, namely those who were minor, unborn or unascertained persons.

[27]  Ernst & Young had prepared a number of calculations for the purpose of advising on the proposed variation, including a comparison of the projected capital using the then existing portfolio mix of 70 per cent debt and 30 per cent equities, and comparing that to an asset mix of 70 per cent equities and 30 per cent debt. Those calculations, which were provided to the Children's Lawyer,

2013 ONCA 852 (CanLII)

showed an expected benefit to the capital beneficiaries of approximately $2 million after five years and $12 million after ten years.

[28]  In a 1996 letter to the Children's Lawyer explaining the background to the proposal, Mr. Rochwerg summarized five benefits of the proposed variation for the capital beneficiaries. It would: 1) increase growth from better investment performance; 2) reduce costs of administration; 3) address the issue of 21-year planning to reduce imminent tax liability; 4) impose a cap on the income entitlement that would leave more growth for the capital beneficiaries; and 5) accelerate the use of significant tax-free and refundable tax amounts.

[29]  This letter also explained the concept of the percentage trust that had been endorsed in 1984 by Ontario's Law Reform Commission in its *Report on the Law of Trusts*. The percentage trust allows the trustee to invest to increase the overall value of the trust and to allocate funds to the income or capital beneficiaries without regard to whether those funds themselves are income or capital of the trust.  In that regard, the *Report* recommended that the percentage payment to the income beneficiaries come first from the annual income, and if insufficient, then from capital: p. 303.

[30]  Justice Donna Haley, a Superior Court judge with significant expertise in wills and trusts, approved the 1997 variation. In her endorsement, she found that the proposed variation was in the best interests of the great-grandchildren as they would benefit "both directly as capital beneficiaries and by the certainty of

2012 ONCA 862 (CanLII)

Page:  13

income provided by the variation to their parents who are all grandchildren under the trust".

[31]  Commenting on the context in which the 1997 variation application was made, the application judge below observed that at the time, interest rates were declining and capital markets were heating up. "It was anticipated by all parties", he noted, "that the rates of return which had been historically achieved on the assets of the Holding Company would be equalled or exceeded in the future."

[32]  However, a few years after the 1997 variation was approved, it transpired that investment returns were not consistently as strong as predicted, which has had a significant effect on the Trust and its value.

[33]  The application judge further observed:

> [A] decrease in market performance of the Trust's assets has resulted in the calculation of Yearly Income in each year being less than the Yearly Income which was paid to the income beneficiaries in 2002. Because the definition of "Yearly Income" in clause 0.1(g) of the Trust Deed as Varied provides that the Yearly Income cannot be less than the prior year's Yearly Income, the result has been that the amount the Trust has distributed to the income beneficiaries for each year after 2002 has been the 2002 amount.

In order to be able to pay the Yearly Income to the income beneficiaries as required, the trustee was obliged to cause the Holding Company to sell assets.

[34]  In 2003, the trustee commissioned a report on the expected life of the Trust, assuming distributions were maintained at then current levels.  The report

2012 ONCA 862 (CanLII)

Page: 14

indicated that, depending on investment returns, the capital of the Trust would be expended in 18 to 20 years.

[35]   The respondent income beneficiaries rely on a more recent report obtained by the trustee in 2007 that estimates that the projected value of the Trust in 2022 could be about $90 million depending on investment returns.

[36]   Because of the concerns of the trustee, the Children's Lawyer and other beneficiaries that the minimum annual percentage distributions to the income beneficiaries were depleting the Trust capital, the trustee applied to the court for direction on the extent of the trustee's discretion not to make the minimum percentage distributions to the income beneficiaries in order to preserve the value of the Trust corpus for the capital beneficiaries.

[37]   In particular, the trustee wanted to know whether it retained a duty to maintain an even hand between the income and capital beneficiaries in managing Trust distributions, and therefore a discretion to stop making the prescribed percentage payments to the income beneficiaries that were eroding the value of the Trust.

**APPLICATION JUDGE'S DECISION AND REASONS**

[38] The application judge provided detailed reasons explaining his interpretation of the Trust Deed as Varied. The relevant provisions of the Trust deed are set out in the Appendix to these reasons.

2012 ONCA 862 (CanLII)

Page:  15

[39]  He found the provisions of the Trust Deed as Varied to be clear and unequivocal and thus all that needed to be considered apart from the agreement was the factual matrix. In his view, the Ruf affidavit best summarized the circumstances at the time of the 1997 variation. He concluded that the evidence of the discussions leading up to the agreement and subsequent approval of the 1997 variation, communications with the CRA, the parties' understandings as to what was intended by the 1997 variation or what was communicated to them subsequently, and any legal opinions as to what the 1997 variation means, constituted extrinsic evidence that was inadmissible for the purposes of interpreting the Trust Deed as Varied.

[40]  In bringing the application, the trustee set out two questions to be answered by the application judge. The first question was: does the trustee have the discretion to cause the Holding Company that is controlled by the Trust to distribute sufficient income to the Trust to meet the minimum annual distribution requirements to the income beneficiaries? In order to answer that question, the application judge was required to consider the meaning of the following provisions of the Trust Deed as Varied: the definitions of "Yearly Income", "Applicable Percentage", "Net Income", and paras. 1(a), 1(c) and 5(vi).

[41]  The application judge first found that clause 1(a) together with the definition of "Yearly Income" in clause 0.1(g)(vi) are clear and unambiguous. He concluded

2012 ONCA 862 (CanLII)

Page:  16

that the requirement in clause 1(a) to pay the Yearly Income and associated

taxes to the income beneficiaries was mandatory. Those provisions read:

"Yearly Income" for a calendar year shall mean the
amount equal to:

…

(vi) in 2002, and in each year thereafter, 70% of the
Applicable Percentage for the year of the Net Fair
Market Value of the trust's assets valued as of the first
business day of the calendar year, provided further that
the Yearly Income *shall not be less than the Yearly
Income of the previous calendar year, nor greater than
115% of the Yearly Income of the previous calendar
year…*.

1.   The Trustee shall keep invested the Trust Fund until
the date of the death of the first of the grandchildren of
Primo Poloniato alive at the date of this agreement
(hereinafter    collectively    referred    to    as    the
"Grandchildren" and individually as a "Grandchild") to
die (hereinafter referred to as the "time of division") and
until the time of division, the Trustee shall deal with the
Trust Fund as follows:

(a) *the Trustee shall pay the Yearly Income* to or for the
benefit of the Grandchildren in equal shares in each
calendar year…. The Trustee shall also from time to
time as determined by the Trustee but at least annually
pay amounts out of the income of the trust to a
Grandchild to compensate him or her for any taxes
payable by such Grandchild or withheld by the Trustees
from such Grandchild pursuant to the Income Tax Act in
respect of the Yearly Income from the trust.    The
Trustee shall also have the discretion to additionally
compensate a Grandchild, who is a non-resident of
Canada for purposes of the *Income Tax Act*, for any
foreign taxes or similar amounts paid or payable by the
Grandchild on account of the receipt by the Grandchild

Page:  17

> of a distribution hereunder … Any income of the trust for
> a calendar year in excess of the Yearly Income ... shall
> be added to the capital; [Emphasis added.]

[42]   He observed that the mandatory duty created in clause 1(a) is qualified by clause 1(c), which ensures that the mandatory payments are made from the Net Income of the Trust, which means cash dividends paid by the Holding Company (or income from other assets of the trust) and not from a sale or other disposition of the shares of the Holding Company, which would constitute a disposition of the capital of the trust. Paragraph 1(c) provides:

> (c)  notwithstanding the foregoing subparagraphs of this
> paragraph 1, the total of all amounts on account of
> Yearly Income and any additional payments to a
> Grandchild paid in a year, shall not exceed the Net
> Income of the trust.

[43]   The application judge then turned to clause 5(vi) which reads:

> 5.   The Trustee in addition to all other powers
> available to it by law or otherwise, shall have the
> following powers, authorities and discretions:
>
> ...
>
> (vi)  to determine whether any payments made by the
> Trustee in the due administration of the Trust Fund shall
> be charged against the capital of the Trust Fund or
> against the income therefrom or partly against capital
> and partly against the income and such determination
> shall be final and binding upon all persons concerned
> and *to manage the investments of the trust, including
> any distributions from any corporations controlled by the
> Trustee in order that the Net Income, of any trust
> hereunder shall be no less than the amount required to*

2012 ONCA 862 (CanLII)

Page:  18

> *be distributed to a Grandchild during a calendar year*;
> [Emphasis added.]

[44]  He concluded that this clause grants powers to the trustee, including the power to manage the investments and pay the distributions, in a manner that will achieve the objective of creating sufficient net income to pay the minimum annual amounts to the income beneficiaries. The highlighted portion of clause 5(vi) did not create a duty or obligation on the trustee, but an objective or purpose to guide the trustee.

[45]  The application judge found that the power to manage investments in clause 5(vi) carried with it a discretion in the trustee to determine the way in which the investments would be managed. It followed that the power to manage distributions, which by the wording of clause 5(vi) was included in the power to manage investments, must also give rise to discretion in the trustee to determine how distributions were managed.

[46]  Moreover, clause 5(vi) made clear that the trustee's discretion to manage investments, including distributions from the Holding Company of cash dividends, was guided by the investment objective to ensure that the Net Income "shall be no less than the amount required to be distributed to a Grandchild during a calendar year".

[47]  Based on this analysis, the application judge concluded in answer to the first question that, under the Trust Deed as Varied, the trustee does have a discretion regarding both the investment and distribution of the Trust assets.

[48]  The second question put to the application judge was: if the answer to the first question is "yes", is the trustee still subject to the duty to maintain an even hand between the income beneficiaries and the capital beneficiaries when exercising the discretion to manage distributions?

[49]  Citing *Waters' Law of Trusts in Canada*, the application judge noted that the duty to maintain an even hand could be excluded by the terms of the trust deed. The duty can be ousted either by express words or by implication. In every case it is a matter of construction: Donovan W.M. Waters, Mark R. Gillen & Lionel D. Smith, *Waters' Law of Trusts in Canada*, 3d ed. (Toronto: Thomson Carswell, 2005) at pp. 966 – 969.

[50]  In this case, the application judge considered whether the even hand principle continued to apply in two contexts - the investment of the Trust assets and their distribution to the beneficiaries.

[51]  Dealing first with the trustee's duty with respect to the investment of the Trust assets, the application judge found it was clear that, when read together, the terms of the Trust Deed as Varied ousted the duty on the trustee to maintain an even hand. Because the income beneficiaries were now entitled to receive their percentage share from the total return on investment, whether by income or

2012 ONCA 862 (CanLII)

Page:  20

capital appreciation, there was no longer any necessity to maintain a distinction between interest and capital for investment purposes. Instead, the trustee could invest in a balanced portfolio for the benefit of all. He noted that this finding was consistent with the intentions of the parties as reflected in the Trust Deed as Varied.

[52]  The application judge came to a similar conclusion regarding the trustee's obligation to maintain an even hand in managing distributions. He found that, too, had been ousted by the terms of the Trust Deed as Varied and the way it was designed to operate with a prescribed minimum payment to the income beneficiaries each year.

[53]  The power to manage distributions in clause 5(vi) was included in the power to manage investments. He reasoned that if the duty to maintain an even hand did not apply to the power to manage the investments of the Trust, it could not apply to the included power to manage distributions.

[54]  The application judge found that the wording of the Trust Deed as Varied clearly required that capital assets held by the Holding Company would be sold, if necessary, to fund the obligations to the income beneficiaries. For the trustee to meet the obligation to pay the Yearly Income to the income beneficiaries, it must require the Holding Company to pay sufficient cash dividends to the Trust and those dividends must be sourced from the Holding Company's returns on its investments, which included both income and capital appreciation. To the extent

2012 ONCA 862 (CanLII)

Page:  21

that the obligations of the Trust could not be met from the income earned on investments, it was intended that they would be met from the sale of assets in the Holding Company sufficient to generate the required cash dividends.

[55]   The application judge also found that to interpret the Trust deed to require the trustee to maintain an even hand between income and capital in respect of the distribution of monies from the Holding Company, so that the trustee could distribute only income from the Holding Company to the Trust to fund the obligations to the income beneficiaries, would render the clear language of clause 1(a) and the definition of "Yearly Income" in clause 0.1(g) completely ineffective.

[56]   He further concluded that that interpretation would also fly in the face of the stated objective of the parties to the 1997 variation – to permit the income beneficiaries to share (with the capital beneficiaries) in the overall appreciation of the Trust's assets on an annual basis, while still providing them with a degree of certainty in respect of the annual amount they would receive.

[57]   The application judge rejected the submission that the settlor's original intent, as discerned from the original Trust deed, was relevant to the interpretation of the Trust Deed as Varied. He also rejected the relevance of the court approval of the 1997 variation by Haley J. He said that it had no bearing on the issue before the court on the application, as the issue before the court was

2012 ONCA 862 (CanLII)

Page: 22

whether the 1997 variation was in the best interests of the capital beneficiaries and the material before the court at that time "clearly confirmed that it was".

[58]  Finally, he did not agree that the 1997 variation would "obliterate" the interests of the capital beneficiaries. There was an indirect benefit to the capital beneficiaries – who were all children of the income beneficiaries – and, as well, a return to previously projected rates of return would "no doubt go a long way to maintaining and perhaps increasing the capital." The negative projections were all based on the assumption that current low rates would continue.

[59]   To conclude, in answer to the second question, the application judge found that the duty to maintain an even hand was ousted by the terms and necessary operation of the Trust Deed as Varied.

## ISSUE ON APPEAL

[60]  The issue on appeal is whether the application judge made a fundamental error in his interpretation of the Trust Deed as Varied by finding that minimum percentage payments to the income beneficiaries were mandatory and that the even hand rule had been ousted with respect to the management of Trust distributions, leaving open the potential for depletion of the capital of the Trust to the detriment of the capital beneficiaries.

[61]  The appellant takes the position that the application judge erred in the following specific ways:

2012 ONCA 862 (CanLII)

Page:  23

> 1) He erred in law by applying only contractual as opposed to trust interpretation principles to the interpretation of the Trust Deed as Varied and in particular:
>
> a) He narrowly construed the factual matrix so as to exclude any consideration of the role of the court and its jurisdiction in approving the 1997 variation.
>
> b) He excluded other evidence relevant to the factual matrix, specifically the CRA ruling.
>
> c) He ignored the intention of the settlor in the interpretive exercise.
>
> d) He made inconsistent interpretive findings concerning the trustee's ability to encroach.
>
> e) He failed to consider the objective of the 1997 variation that there be capital growth.
>
> f) He failed to consider whether his interpretation was consistent with the language of the Trust agreement when read as a whole.
>
> 2) He erred in law by finding, contrary to trust principles and the language of the Trust Deed as Varied, when read as a whole, that the obligation of the trustee to maintain an even hand with respect to the management of Trust distributions was ousted.

[62]  Three of the income beneficiaries participated in this appeal. They take the position that the appellant is essentially asking the court to find that the trustee may pay less than the stipulated Yearly Income in the years in which the investment portfolio does not create sufficient returns in the form of income to fund the Yearly Income. They say that there is nothing in the wording of the Trust Deed as Varied or the factual matrix to support this interpretation.

2012 ONCA 862 (CanLII)

Page: 24

[63]   The current trustee says it takes a "neutral" position on this appeal.

## ANALYSIS

## Principles of Interpretation

[64]   The appellant argues that the application judge erred by interpreting the Trust Deed as Varied only as a contract, and that he failed to apply trust principles as part of the interpretive process. When the court is interpreting a trust that has been varied on consent of the beneficiaries, contractual interpretation principles are applied to determine the objective intent of the parties. However, because the agreement is a trust, trust principles must also inform that interpretation.

[65]   Before he embarked on the interpretation of the Trust Deed as Varied, the application judge acknowledged that "regard must also be had to the fact that the document under review is a trust deed and not strictly a commercial instrument." The appellant's specific concerns will be addressed individually in the course of the following analysis.

## Issue 1- Factual Matrix – General Principles

[66]   Before addressing the appellant's specific arguments, it is important to review what is meant by the factual matrix of an agreement.

[67]   It is well established that in interpreting a contract, the court may consider the "factual matrix" surrounding the contract, even where there is no ambiguity.

2012 ONCA 862 (CanLII)

Page:  25

"Indeed, because words always take their meaning from their context, evidence of the circumstances surrounding the making of a contract has been regarded as admissible in every case": *Hi-Tech Group Inc. v. Sears Canada Inc.* (2001), 52 O.R. (3d) 97 (C.A.), at para. 23.

[68]   In *Dumbrell v. The Regional Group of Companies Inc.* (2007), 85 O.R. (3d) 616, at para. 53, this court affirmed the relevance of the factual matrix to contractual interpretation:

> [53] The text of the written agreement must be read as a whole and in the context of the circumstances as they existed when the agreement was created. The circumstances include facts that were known or reasonably capable of being known by the parties when they entered into the written agreement …

[69]   This court noted in *Dumbrell,* at para. 55, that while there is some debate about the outer limits of the scope of factual matrix, it clearly encompasses "the genesis of the agreement, its purpose, and the commercial context in which the agreement was made".

[70]   In *Glaswegian Enterprises Inc. v. BC Tel Mobility Cellular Inc.* (1997), 49 B.C.L.R. (3d) 317, at para. 18, the British Columbia Court of Appeal described the factual matrix as the "background" of the contract:

> The factual matrix is the background of relevant facts, that the parties must clearly have been taken to have known and to have had in mind when they composed the written text of their agreement. It can throw light on

2012 ONCA 862 (CanLII)

Page: 26

> what the parties must have meant by the words they
> chose to express their intention….
>
> The factual matrix is the background which may deepen
> an understanding of what the parties meant by the
> language they used, but the Court cannot make a new
> agreement.

[71]  While the scope of the factual matrix is broad, it excludes evidence of

negotiations, except perhaps in the most general terms, and evidence of a

contracting party's subjective intentions: Geoff R. Hall, *Canadian Contractual*

*Interpretation Law*, 2d ed. (Markham: LexisNexis, 2012), at p. 27.  As the cases

above suggest, the factual matrix includes only objective facts known to the

parties at or before the date of the agreement, and what is common to both

parties: Hall, p. 30.  Hall goes on to state that while the factual matrix can "be

used to clarify the parties' intentions as expressed in a written agreement, it

cannot be used to contradict that intention, create an ambiguity which otherwise

does not exist in the written document, or have the effect of making a new

agreement": p. 31 (footnotes omitted). Ultimately, the words of the agreement are

paramount.

**Issue 1(a) - Court Approval of the 1997 Variation**

[72]  The appellant's position is that if the interpretation of the 1997 variation is

not one that could have been approved by the court, then it could not have been

what the parties intended or the court understood or approved at that time. The

2012 ONCA 862 (CanLII)

Page: 27

appellant submits that the application judge erred in finding that the approval of the variation "has no bearing on the issue before the Court in this application". To the contrary, the basis for the court's approval must form part of the factual matrix.

[73]  Under s. 2 of the *Variation of Trusts Act*, R.S.O. 1990, c. V.1, the court must be assured that any variation approved constitutes a benefit for those whose interests it has a duty to protect. It cannot ever have been intended, argues the appellant, that the interests of the capital beneficiaries would be diminished or defeated entirely. Had that been the intention or considered a reasonable consequence of the proposed variation, it would not have been approved by the court, nor could the Children's Lawyer have consented to it.

[74]  The problem with the appellant's submission is that the variation application was brought on a record that explained how the variation would be beneficial to the capital beneficiaries, primarily by increasing the value of the capital through investment in equities with growth potential as part of a balanced portfolio. The expert evidence suggested that, based on past performance, such a portfolio would increase in value in the future. The Children's Lawyer agreed to the variation on that basis and the court approved it on that basis.

[75]  The application from which this appeal is brought is not a variation application, nor is it a late appeal from that application. Rather, it is an application to the court to interpret the Trust Deed as Varied.

2012 ONCA 862 (CanLII)

Page: 28

[76]  The appellant's submission is that the approving court would not have found the variation to be for the benefit of the minor, unborn and unascertained capital beneficiaries had it known that markets would fall and not continue to perform as they did through the late 1990's. Therefore this court should interpret the words of the variation in a manner that would allow the trustee to disregard the mandatory provisions of the Trust Deed as Varied. Instead, the court should read the deed as implicitly giving the trustee a discretion to reduce the payments to the income beneficiaries in order to preserve the capital of the Trust for the capital beneficiaries, on the basis that the even hand principle remains in effect under the Trust Deed as Varied.

[77]  Stated another way, the appellant submits in para. 47 of its factum that: "if [the application judge's] interpretation of the 1997 Variation is not one that could have been approved by the court, then of necessity, it could not have been what the parties intended or the court understood or approved at that time."

[78]  The appellant's first argument to support this submission is that the application judge erred by stating that the variation approval and its basis were irrelevant to his interpretation of the Trust Deed as Varied. The appellant says the factual matrix includes the court approval and the record that formed the basis of the approval application and that the application judge was required to consider those factors as part of the factual matrix.

2012 ONCA 862 (CanLII)

Page:  29

[79]  I agree with the appellant's submission that the court approval of the 1997 variation and the material that supported it are an important part of the factual matrix that informs the interpretation of the Trust Deed as Varied. And I agree that it would have been an error for the application judge to ignore the court approval of the 1997 variation in his analysis. However, it is clear that that is not what occurred.

[80]  As the basis for the factual matrix he considered, the application judge relied on the affidavit of Mr. Ruf that was used to support the court approval variation application. The application judge explicated in detail how the variation had to benefit the capital beneficiaries before it could be approved and that the court found, and the material stated, that it did so.

[81]  What the application judge stated near the end of his reasons is that, on the application before him, the court was not performing an approval function but an interpretation function. In other words, on this application – as distinct from the 1997 variation application – the court was not deciding what was in the best interests of the capital beneficiaries.

[82]  That said, the application judge also went on to dispute the position of the appellant that the effect of the 1997 variation would necessarily be to "obliterate" the interests of the capital beneficiaries. The value of the Trust did increase for a few years following 1997. Although markets later took a downturn, the appellant's pessimistic forecasts are based on a continuation of that downturn. The

2012 ONCA 862 (CanLII)

Page:  30

application judge observed that a return to previously projected rates of return "would go a long way to maintaining and possibly even increasing the capital". Obviously no one knows the future. However, it was open to the application judge to make this observation based on the evidence in the record before him, including the 2007 projection report.

## Issue 1(b) - CRA Tax Ruling

[83]  The second aspect of the factual matrix that the appellant says the application judge failed to consider was the CRA tax ruling and related correspondence. In the appellant's submission, the CRA ruling made explicit that the definition of "Net Income" was included to ensure that there would be no disposition of the capital assets of the Trust for the benefit of the income beneficiaries. Moreover, the CRA stated that the purpose of the 1997 variation was to ensure growth of the capital assets for the benefit of the capital beneficiaries and trustee's counsel confirmed in correspondence to the CRA that capital assets would not be diminished as a result of the 1997 variation.

[84]  Contrary to this submission, it is clear that the application judge considered, as part of the factual matrix, the CRA ruling that was appended to the Ruf affidavit, as important relevant background.

[85]  To the extent that the application judge did not consider the correspondence to the CRA and from the tax authorities, I agree with the

2012 ONCA 862 (CanLII)

Page: 31

appellant that this correspondence is helpful in understanding the full factual context of the 1997 variation and I have included some references to it in the statement of facts in these reasons. However, the appellant has not pointed to anything in the ruling or in that correspondence that contradicts or changes the factual matrix as described by the application judge or the basis on which the court approval was obtained in 1998.

[86]  The appellant also argues that the CRA inserted clause 1(c) and the definition of "Net Income" as cash dividends from the Holding Company into the Trust Deed as Varied to ensure that the trustee would not encroach on capital to the detriment of the capital beneficiaries.

[87]  I would not accede to this argument. This interpretation is not supported by anything in the correspondence from the CRA. That correspondence was directed to ensuring that cash dividends would be paid from the Holding Company to the Trust. It was the form of those dividends as income to the Trust that would govern their tax treatment, which was the sole concern of the CRA. This is consistent with the "form rule", used in the administration of trusts, which says that for trust accounting purposes, the form of a distribution determines its characterization as income or capital: *Report on the Law of Trusts*, p. 292. In its submission to the CRA dated November 26, 1997, Ernst & Young stated:

> The Deed of Arrangement will also limit income distributions in any one year to the amount of cash

dividends the Trust receives from Holding Company in that year, ensuring there will be no encroachment on capital of the Trust on behalf of Income Beneficiaries.

[88]  The "capital of the Trust" being referred to is the shares of the Holding Company. Their disposal would amount to a capital disposition that would be taxable as such. Clause 1(c) ensures that income distributions will only come from cash dividends paid by the Holding Company, taking the form of income.

## Other Correspondence that is Part of the Factual Matrix

[89]  In my view, the correspondence by the trustee's lawyer and by the income beneficiaries' lawyer with the Children's Lawyer that explained the purpose of the variation and its intended effect and benefits also forms part of the factual matrix. In that correspondence, reference was made to the fact that the variation was to be a percentage trust, a new financial approach to the investment and disbursement of trust funds by trustees that was approved by the Ontario Law Reform Commission in its 1984 *Report on the Law of Trusts*.

[90]  In *Waters' Law of Trusts in Canada*, the authors explain that a percentage trust allows the trustee to maximize the overall value of the trust assets for the benefit of all beneficiaries. It dispenses with the distinction between income and capital, instead guaranteeing the "income beneficiary" "a regular return of a fixed percentage on the value of the trust property": p.1059. If, in a particular year, the traditional income from investments exceeds the percentage to be paid to the

2012 ONCA 862 (CanLII)

income beneficiaries, the excess "remains part of the trust property". However, "if the income is less, the percentage is made up out of the trust property": p. 1059.

## Issue 1(c) - Intention of the Settlor

[91]  The appellant next submits that the application judge erred in finding the intention of the settlor was irrelevant in interpreting the Trust Deed as Varied. Relying on *Re Irving* (1975), 11 O.R. (3d) 443 (H.C.J.), the appellant argues that before a trust can be varied, one of the issues is whether the variation keeps intact the settlor's basic intention. Here the basic intention of the settlor was to benefit two generations of the Poloniato family through the creation of income and capital beneficiaries. Yet the interpretation of the 1997 variation by the application judge, the appellant argues, permits unlimited capital encroachment, thus possibly destroying any benefit of the Trust for the second generation.

[92]  In my view, there are three responses to this submission. The first is one already referred to - that this was not an application for a variation, but an application to interpret a Trust Deed as Varied. Therefore, if the varying court approved a variation that did not take the settlor's intent into account, and its meaning is clear, it is not the role of the interpreting court to distort the meaning of the deed as varied.

[93]  Second, the case law both in Ontario since *Re Irving*, as well as in other provinces, suggests that the original intention of the settlor need not be

2012 ONCA 862 (CanLII)

Page: 34

considered when the court approves a variation as long as the necessary criteria are met: See *Russ v. British Columbia (Public Trustee)* (1994), 89 B.C.L.R. (2d) 35 (C.A.); *Teichman v. Teichman Estate* (1996), 134 D.L.R. (4th) 155 (Man. C.A.); *Finnell v. Schumacher Estate* (1990), 74 O.R. (2d) 583 (C.A.). However, because of my first and third responses to the appellant's submission, it is not necessary in this case to finally decide this issue.

[94]  The third response is that I do not agree with the appellant's suggestion that the intent and effect of the 1997 variation was to benefit only the income beneficiaries at the expense of the capital beneficiaries. That was clearly not the intent of the approving court, which was obliged to approve the variation only if it was for the benefit of the capital beneficiaries on whose behalf the approval was given. As the application judge was entitled to find, if the economy improves, the value of the trust should also see improvement. Moreover, the capital beneficiaries have had the indirect benefit, referred to by Haley J., of a consistent income flowing to their parents since the date of the variation.

**Issue 1(d) - Inconsistent Findings**

[95]  The appellant contends that the application judge erred in making an inconsistent finding. On the one hand, he found the parties intended that the trustee would have the power to encroach on capital assets of the Trust by selling the assets of the Holding Company. That finding is inconsistent, says the

2012 ONCA 862 (CanLII)

appellant, with his earlier finding, at para. 50 of his reasons, that the purpose of the definition of "Net Income" was to ensure that there would be no encroachment on the capital of the Trust.

[96]  As discussed above, the premise of this submission is incorrect. This submission has been answered in the section dealing with the factual matrix surrounding the CRA ruling.

## Issue 1(e) - Objective of 1997 Variation

[97]  In the appellant's view, the application judge erred in failing to take into account an important objective of the 1997 variation: to ensure some growth to the capital beneficiaries. There is no merit in this submission. The application judge did not fail to take this objective into account: see, for example, paras. 37-39 of his reasons. For economic reasons, the trustee has been unable, at least up until the application, to continue to achieve the hoped for growth of the Trust corpus, despite the clear objective of the Trust and of the trustee to do so.

## Issue 1(f) - Interpretation of the Trust Deed as Varied, Read as a Whole

[98]  In the appellant's submission, the application judge erred in failing to consider whether his interpretation was consistent with the language of the Trust Deed as Varied, when read as a whole. For instance, counsel points to the fact that the 1988 variation gave the trustee an express power of encroachment on capital to a limited amount for the purpose of benefitting capital beneficiaries. It is

argued that when the parties intended to permit encroachment on the capital of the Trust, they did so in clear and unequivocal terms.

[99]   In my view, this submission fails. In his analysis, which is set out in detailed and comprehensive reasons, the application judge takes into account the agreement as a whole. The appellant has provided no suggestion as to how to read the Trust Deed as Varied without giving full effect to the mandatory language to which it objects.

[100] The Trust document is internally consistent in providing the mandatory percentage distribution scheme to the income beneficiaries. As already explained, to the extent that satisfaction of the percentage distribution may require using capital assets, this is a function of the balanced investment strategy employed in a percentage trust to achieve overall growth of the trust corpus. It is not an encroachment on capital in the traditional sense, which is a discretionary exercise by a trustee to benefit a specific beneficiary for specific or general needs, over and above that beneficiary's regular entitlement under the trust.

## Issue 2 - Even Hand Rule

[101] The appellant submits that the application judge erred in his interpretation of the Trust Deed as Varied by failing to recognize and give effect to the duty of the trustee to maintain an even hand between the interests of the income and capital beneficiaries. The obligation of a trustee to treat different classes of

2012 ONCA 862 (CanLII)

Page:  37

beneficiaries fairly and impartially can only be displaced, contends the appellant, by an express intention to the contrary in the trust deed. In the appellant's submission, the 1997 variation did not displace the duty to maintain an even hand in managing distributions.

[102] It is trite law that executors and trustees have a duty to maintain an even hand between the interests of the income and the capital beneficiaries, unless that duty is ousted explicitly or implicitly by the words of the instrument. Justice Middleton described this duty in the following way in *Armstrong (Re),* [1924] O.L.R. 639 (C.A.), at p. 8:

> [I]t must be borne in mind by trustees that they are trustees not for the remaindermen alone in disregard of the rights of the life-tenant, nor for the life-tenant disregarding the interests of the remaindermen. Trustees must preserve an even hand as between these two conflicting interests. The duty towards the capital is to preserve it intact. The duty towards the tenant for life is to obtain as large a yield as is consistent with safety and the observance of the law under the instrument of trust as to the class of investment made; and, furthermore, so to adjust the investments that the life-tenant will receive annually his due proportion.

[103] However, in a percentage trust, the trustee's duty is not to obtain a large income yield while preserving the capital but, instead, to increase the size of the entire trust for the benefit of both classes of beneficiaries. This includes increasing the capital rather than preserving it, and therefore involves an

2012 ONCA 862 (CanLII)

Page:  38

investment strategy that may include more risk. Because in a percentage trust

the trustee is investing to increase the entire value of the trust to benefit all, the

issue is not whether the trustee's even hand duty is ousted in respect of the

management of the trust's investments. What is disputed is whether the duty has

been ousted in respect of the obligation of the trustee to make distributions to the

beneficiaries.

[104] The role of the even hand duty in the administration of a percentage trust

was addressed in the Law Reform Commission's *Report on the Law of Trusts*.

That *Report* recommends that when trustees administer a percentage trust, they

continue to maintain an even hand in the periodic valuation of the trust and when

making the distributions. Specifically, the *Report* states at p. 303:

> We therefore recommend that the revised [Trustee] Act
> should contain a provision to the effect that, where
> trustees are expressly directed by the trust instrument to
> hold trust assets "on percentage trusts", they shall value
> the assets periodically and, instead of any income
> arising from the assets, pay to the person who would
> otherwise be the income beneficiary a percentage of
> that valuation in each year of the valuation period. *In so
> doing, trustees should be required to maintain an even
> hand between income and capital beneficiaries*.
> [Emphasis added.][1]

[105] There is no clear explanation as to what the Commission means when it

says that the trustees should maintain an even hand when valuing the assets

-------------------

[1] This recommendation has not been incorporated into the *Trustee Act*, R.S.O. 1990, c. T.23.

2012 ONCA 862 (CanLII)

and making the annual percentage payment to the income beneficiaries. My interpretation is that the Commission contemplates a periodic review and, if necessary, a re-set of the percentage payable to income beneficiaries, based on the value of the trust assets and on the even hand rule.

[106] The problem here is that in the Trust Deed as Varied, the percentage payable to the income beneficiaries is based on a fixed formula for determining the "Applicable Percentage" and the amount to be paid can never go below the highest amount previously paid in a year.  That is why the trustee continues to be obliged to cause the Holding Company to sell assets, if necessary, to meet the obligation to the income beneficiaries, despite the effect on the Trust corpus.

[107] To the extent the Trust Deed as Varied sets forth a minimum annual payment to the income beneficiaries, the even hand duty on the trustee has been ousted, implicitly, by the words and intended operation of the Trust Deed as Varied. The application judge made no error in making that finding.

**Conclusion**

[108] The experience of this Trust has reinforced the need for percentage trusts to be drafted with specific safeguard mechanisms in place that will allow the trustee to review and revise the annual percentage payable to the income beneficiaries based on the changing value of the trust to ensure that one set of beneficiaries is not favoured over the other. Commentators on the percentage

2012 ONCA 862 (CanLII)

Page:  40

trust concept have recommended including a "force majeure" clause to protect against unforeseen anomalies: see for example, Anne Werker, "The Percentage Trust – Uniting the Objectives of the Life Tenant and Remainderperson in Total Return Investing by Trustees" (Paper delivered at the Law Society of Upper Canada's 8th Annual Estates and Trusts Summit, November 30, 2005), p. 251.

[109] Two options would be to include a clause providing for a periodic reset by the trustee of the percentage payable to income beneficiaries, or an option for the trustee to apply to the court for advice and directions on such a reset.

[110] It is also clear that the material provided to the court in support of a variation application seeking to convert a trust into a percentage trust must include not only upside projections but also potential downside projections that take into account a possible future market downturn. This will give the approving court the basis to include the appropriate safeguards that will ensure, to the extent possible, that the variation will in fact continue to be for the benefit of the future capital beneficiaries.

[111] However, there are no such provisions in this Trust Deed as Varied. The trustee is obliged to continue to make the minimum percentage distributions provided by its terms.

Page: 41

## DISPOSITION OF THE APPEAL

[112] For these reasons, I would dismiss the appeal. In the circumstances of this case, I would award full indemnity costs in accordance with their Bills of Costs to each of the parties, payable out of the estate. To the Children's Lawyer, $116,855.13; to the trustee, $145,061.32; to the respondents on the appeal, $122,473.29 all inclusive of disbursements and H.S.T.

Released:   DEC 0 7 2012                    K. Feldman J.A.

I agree                    J.A

I agree. E.A. Cronk J.A.

2012 ONCA 862 (CanLII)

Page:  42


# APPENDIX

0.1  In this Trust Deed ... the following terms shall have the following meanings: ...

(a)    "**Applicable Percentage**" for a calendar year shall mean the average Rate of Return of the trust over the previous three calendar years.

…

(d)    "**Net Fair Market Value**" shall mean the fair market value of the trust's assets at the particular time, provided that where the trust owns shares in a private corporation, the fair market value of such shares shall be deemed to be equal to the fair market value of the assets of the corporation less all the corporation's liabilities, including an amount equal to the current tax liabilities of the corporation with respect to unrealized capital gains on its assets, less:

    (i)    liabilities of the trust;

    (ii)    an amount equal to the current tax liabilities of the trust with respect to unrealized capital gains on its assets other than shares in a private corporation; and

    (iii)    the value of any outstanding interest-free loans to Grandchildren;

(e)    "**Net Income**" of the trust for a calendar year shall mean the cash dividends received by the trust in the calendar year from 679312 Alberta Limited ... and any income that is earned on the other assets of the trust, net of expenses incurred and taxes paid by the Trustee in the calendar year on account of the income of the trust;

(f)    "**Rate of Return**" for a calendar year shall mean the resulting percentage when [sic] the difference determined when

(A)    the Fair Market Value of the trust calculated on the first business day of the next calendar year is added to the Yearly Income Distribution and other permissible distributions to beneficiaries in respect of the calendar year, and is reduced by receipts during the calendar year for life insurance proceeds

is then reduced by

2012 ONCA 862 (CanLII)

Page: 43

(B)      the Fair Market Value if the trust calculated on the first business day of the calendar year,

is then divided by

(C)      the Fair Market Value of the trust on the first business day of the calendar year;

(g)      "**Yearly Income**" for a calendar year shall mean the amount equal to:

…

(vi)      in 2002, and in each year thereafter, 70% of the Applicable Percentage for the year of the Net Fair Market Value of the trust's assets valued as of the first business day of the calendar year, provided further that the Yearly Income shall not be less than the Yearly Income of the previous calendar year, nor greater than 115% of the Yearly Income of the previous calendar year.

1.      The Trustee shall keep invested the Trust Fund until the date of the death of the first of the grandchildren of Primo Poloniato alive at the date of this agreement (hereinafter collectively referred to as the "Grandchildren" and individually as a "Grandchild") to die (hereinafter referred to as the "time of division") and until the time of division, the Trustee shall deal with the Trust Fund as follows:

(a)      the Trustee shall pay the Yearly Income to or for the benefit of the Grandchildren in equal shares in each calendar year…. The Trustee shall also from time to time as determined by the Trustee but at least annually pay amounts out of the income of the trust to a Grandchild to compensate him or her for any taxes payable by such Grandchild or withheld by the Trustees from such Grandchild pursuant to the *Income Tax Act* in respect of distributions of the Yearly Income from the trust.  The Trustee shall also have the discretion to additionally compensate a Grandchild, who is a non-resident of Canada for purposes of the *Income Tax Act*, for any foreign taxes or similar amounts paid or payable by the Grandchild on account of the receipt by the Grandchild of a distribution hereunder … Any income of the trust for a calendar year in excess of the Yearly Income ... shall be added to the capital;

…

2012 ONCA 862 (CanLII)

Page:  44

(c)      notwithstanding the foregoing subparagraphs of this paragraph 1, the
total of all amounts on account of Yearly Income and any additional payments to
a Grandchild paid in a year, shall not exceed the Net Income of the trust.

5.       The Trustee in addition to all other powers available to it by law or
otherwise, shall have the following powers, authorities and discretions: ...

(vi)     to determine whether any payments made by the Trustee in the due
administration of the Trust Fund shall be charged against the capital of the Trust
Fund or against the income therefrom or partly against capital and partly against
the income and such determination shall be final and binding upon all persons
concerned and to manage the investments of the trust, including any distributions
from any corporations controlled by the Trustee in order that the Net Income, of
any trust hereunder shall be no less than the amount required to be distributed to
a Grandchild during a calendar year;

TAB 148

381 F.3d 1039
United States Court of Appeals,
Tenth Circuit.

TIME WARNER ENTERTAINMENT COMPANY,
L.P., a Delaware limited partnership; and Liberty
Cable of Missouri, Inc., a Missouri corporation,
Plaintiffs–Counter Defendants–Appellants,

v.

EVEREST MIDWEST LICENSEE, L.L.C., dba
Everest Connections Corp., Defendant–Appellee,
Atrium Partners, L.P., a Kansas limited partnership,
Defendant–Counter Claimant–Appellee.
National Multihousing Council, Community
Associations Institute, Institute of Real
Estate Management, National Apartment
Association, National Association of Real Estate
Investment Trusts, Real Estate Roundtable,
and Real Access Alliance, Amici Curiae.

No. 03–3005.    |    Aug. 27, 2004.

**Synopsis**

**Background:** Franchised cable television operator brought
action against owner of multiple dwelling unit (MDU)
building seeking declaration that Federal Communications
Commission (FCC) regulation did not require it to abandon,
remove, or sell home run wiring in MDU. Owner filed
counterclaim seeking declaration that operator had to
abandon, remove, or sell wiring. The United States District
Court for the District of Kansas, Carlos Murguia, J., 232
F.Supp.2d 1257, denied operator's motion for preliminary
injunction to prevent owner from invoking FCC home run
wiring regulation, and operator appealed.

**Holdings:** The Court of Appeals, Lucero, Circuit Judge, held
that:

[1] operator's standard license agreement affected the public
interest, and would therefore be liberally construed to favor
the public;

[2] license agreement granted operator right to maintain its
home run wiring to a particular unit in MDU only when it was
providing cable services to that unit; and

[3] FCC regulation required provider to abandon, remove,
or sell home run wiring in individual units in MDUs upon
request.

Affirmed.

Hartz, Circuit Judge, filed dissenting opinion.

West Headnotes (15)

**[1]    Federal Courts**
 Supplemental jurisdiction in general

State law claims before a federal court on
supplemental jurisdiction are governed by state
law.

3 Cases that cite this headnote

**[2]    Federal Courts**
 State or local law in general

Court of Appeals reviews a federal district court's
determination of state law de novo.

3 Cases that cite this headnote

**[3]    Federal Courts**
 Contracts

Whether a contract's language is ambiguous is
reviewed de novo.

1 Cases that cite this headnote

**[4]    Contracts**
 Application to Contracts in General
**Contracts**
 Existence of ambiguity

Under Kansas law, when the parties have
negotiated and entered into a written contract
which addresses the issues negotiated between
them, the written contract determines their
rights, and no interpretation by the court is
necessary; however, if the language of a contract
is susceptible to conflicting interpretations, the
contract is ambiguous, and interpretation is
required.

1 Cases that cite this headnote

**[5]    Contracts**

    Intention of Parties

Under Kansas law, in interpreting a contract, the primary role of the court is to ascertain and effectuate the parties' intentions where possible.

1 Cases that cite this headnote

**[6]    Contracts**

    Reasonableness of construction

Under Kansas law, reasonable rather than unreasonable interpretations of contracts are favored, and accordingly, interpretations which lead to absurdity or negate the purpose of the contract should be avoided.

4 Cases that cite this headnote

**[7]    Contracts**

    Construction as a whole

Under Kansas law, all provisions of an agreement should be read together and in harmony with each other.

Cases that cite this headnote

**[8]    Contracts**

    Construction against party using words

Under Kansas law, when a contract's terms are ambiguous, those terms should be construed strictly against the drafter and liberally toward the non-drafting party.

2 Cases that cite this headnote

**[9]    Telecommunications**

    Apartments and multi-unit dwellings

Under Kansas law, cable television service provider's standard license agreement to provide service to multiple dwelling unit (MDU) building affected the public interest, and would therefore be liberally construed to favor the public; agreement involved interpretation of a license granted to a public franchise,

and it implicated MDU owner's right to avail itself of regulations promulgated by the Federal Communications Commission (FCC) to encourage competition amongst cable services providers in the MDU market. Communications Act of 1934, § 601(6), as amended, 47 U.S.C.A. § 521(6); Restatement (Second) of Contracts § 207.

1 Cases that cite this headnote

**[10]    Contracts**

    Subject, object, or purpose as affecting construction

Under Kansas law, contracts affecting the public's interest generally are liberally interpreted to favor the public. Restatement (Second) of Contracts § 207.

Cases that cite this headnote

**[11]    Telecommunications**

    Apartments and multi-unit dwellings

Cable television service provider's standard license agreement for multiple dwelling unit (MDU) building, which granted provider license to maintain its facilities in MDU "in order to serve those tenants who shall from time to time pay [it] for its services," gave provider legally enforceable right to maintain its home run wiring to a particular unit in MDU only when it was providing service to that unit, for purposes of Federal Communications Commission (FCC) regulation requiring a cable services provider to abandon, remove, or sell home run wiring in MDU unless it had enforceable right to maintain its home run wiring with respect to particular unit. 47 C.F.R. § 76.804(b).

1 Cases that cite this headnote

**[12]    Federal Courts**

    Statutes, regulations, and ordinances, questions concerning in general

The Court of Appeals reviews a district court's interpretation of federal regulations de novo, applying general rules of statutory construction,

beginning with the plain language of the regulations.

3 Cases that cite this headnote

[13]    **Administrative Law and Procedure**
👉    Construction

As with statutory construction, in interpreting regulations, courts strive to construe the text so that all of its provisions are given effect and no part is rendered superfluous.

4 Cases that cite this headnote

[14]    **Administrative Law and Procedure**
👉    Construction

A regulation must be interpreted in such a way as to not conflict with the objective of its organic statute.

2 Cases that cite this headnote

[15]    **Telecommunications**
👉    Apartments and multi-unit dwellings

Cable television service provider's lack of legally enforceable right to maintain its home run wiring to individual units, in multiple dwelling unit (MDU) building, which it did not currently serve triggered Federal Communications Commission (FCC) regulation requiring multichannel video programming distributors (MVPDs) to abandon, remove, or sell home run wiring in individual units in MDUs upon request. 47 C.F.R. § 76.804(b)(1).

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1041** Michael W. Quinn (Bernard J. Rhodes, Lathrop & Gage, L.C., Kansas City, MO, with him on the briefs), Time Warner Cable, Stamford, CT, for the Plaintiffs–Appellants.

Lee M. Smithyman (Rachel Lipman Reiber, Everest Midwest Licensee, L.L.C., Kansas City, MO, with him on the brief), Smithyman & Zakoura, Chartered, Overland Park, KS, for the Defendant–Appellee.

Matthew C. Ames, Gerard Lavery Lederer, Miller & Van Eaton, P.L.L.C., Washington, DC; Roger Platt, Vice President & Counsel, The Real Estate Roundtable, Washington, DC; Molly Foley–Healey, Community Associations Institute, Alexandria, VA; Tony Edwards and Robert Cohen, National Association of Real Estate Investment Trusts, Washington, DC, on the brief for the Amici Curiae.

Before LUCERO, McKAY, and HARTZ, Circuit Judges.

**Opinion**

LUCERO, Circuit Judge.

At issue in this case is the application of the Federal Communication Commission's ("FCC") cable television "inside wiring rules" under an agreement which grants an incumbent cable provider, Time Warner, a license to maintain the cable wiring its predecessor installed within an apartment complex, The Atriums. The Atriums argues that the license is limited to the wiring currently being used to provide cable **\*1042** television services, and therefore that it may invoke an FCC regulation which requires the incumbent cable provider to sell, abandon, or remove wiring the incumbent cable provider no longer has an legally enforceable right to maintain. *See* 47 C.F.R. § 76.804. The district court agreed, finding that the license between Time Warner and The Atriums did not extend to wiring not in use providing cable services, and accordingly that The Atriums could invoke the regulations against Time Warner. Exercising jurisdiction under 28 U.S.C. § 1291, we **AFFIRM.**

**I**

In April 1987, Joseph Tutera, representing The Atriums, a multi-unit retirement complex, entered into a non-exclusive license agreement with TeleCable of Overland Park ("TeleCable"), Time Warner's predecessor, to provide cable television to The Atriums. The Atriums and TeleCable (now Time Warner [1]) executed the standard license agreement, without change; according to the agreement Time Warner received "the right, license and permission to install, operate and maintain" the equipment necessary "to provide CATV and Pay TV services" to The Atriums' tenants. (I App. at 17.) By the contract's terms Time Warner retains property ownership of the equipment installed.

Pursuant to the agreement, Time Warner installed a cable distribution system at The Atriums. There are three general parts to a cable distribution system. First, there is the riser, a large cable that runs into the building through a utility closet on the ground floor, and up through utility closets on each of the floors. Next runs the "home run wiring" at issue in this litigation, which consists of wires that run from the riser through the hallway ceilings on each floor and toward each individual apartment. Finally, there are "home wires"; approximately twelve inches outside each apartment the "home run wiring" becomes "home wires" (there is no physical demarcation between "home run wires" and "home wires"). The "home wires" run into each individual apartment unit. *See* 47 C.F.R. § 76.5(ll-mm).

In June 2002, The Atriums sent a letter to Time Warner, stating that it intended to allow Everest Midwest Licensee ("Everest"), which received a franchise to provide telecommunication services in Overland Park in the summer of 2001, to compete with Time Warner in the provision of cable television and high speed internet services in The Atriums. To accomplish this goal, The Atriums demanded Time Warner elect to abandon, sell, or remove its home run wires in The Atriums which were not currently being used by Time Warner subscribers, pursuant to recently enacted FCC regulations, specifically 47 C.F.R. § 76.804(b). Section 76.804(b)(1) states:

> Where an MVPD [multichannel video programming distributor] owns the home run wiring in an MDU [multiple dwelling unit] and does not (or will not at the conclusion of the notice period) have a legally enforceable right to maintain any home run wire dedicated to an particular unit on the premises against the MDU owner's wishes, the MDU owner may permit multiple MVPDs to compete for the right to use the individual home run wires dedicated to each unit in the MDU.... The incumbent MVPD will then have ... to provide a single written election to the MDU owner as to whether, for each and every one **\*1043** of its home run wires dedicated to a subscriber who chooses an alternative provider's service, the incumbent MVPD will: remove the wiring and restore the MDU building

consistent with state law; abandon the wiring without disabling it; or sell the wiring to the MDU owner. If the MDU owner refuses to purchase the home run wiring, the MDU owner may permit the alternative provider to purchase it. If the alternative provider is permitted to purchase the wiring, it will be required to make a similar election ... for each home run wire solely dedicated to a subscriber who switches back from the alternative provider to the incumbent MVPD.

47 C.F.R. § 76.804(b)(1).

In its letter invoking § 76.804(b), The Atriums expressed hope that Time Warner would agree to sell the home run wiring to Everest, as it perceived that such an outcome would "facilitate the ability of tenants to switch from Time Warner to Everest and vice versa on a seamless basis." (I App. at 165.) Time Warner refused, arguing that an MDU owner may invoke the regulations only when the incumbent provider lacks a legally enforceable interest in maintaining the home run wires on the property. Claiming that it retained a legally enforceable interest, Time Warner relied on its interpretation of the license agreement between The Atriums and Time Warner, which stated, in part, that:

> 1. Subject to the terms and conditions hereinafter set out, Owner [The Atriums] hereby grants to TeleCable [Time Warner] the right, license and permission to install, operate and maintain such of the facilities as TeleCable [Time Warner] deems necessary or desirable in or on the Owner's [The Atriums'] property and in the Project in order to provide CATV and Pay TV services to tenants in the Project. TeleCable [Time Warner] shall have the right to enter the Project at any time to perform maintenance on and make repairs and replacements of the facilities, or any part thereof, and to install or disconnect customers.

(I App. at 17.) As a result, Time Warner concluded that under the license agreement it retained a legal right to maintain

all of its home run wiring. Under this interpretation of the agreement, The Atriums could allow Everest into the building to construct its own cable services facilities, i.e., lay its own wiring; however, Time Warner was not obligated under § 76.804(b) to abandon, sell, or remove its home run wiring in The Atriums.

Time Warner proceeded to file suit in federal district court in July 2002, seeking a declaratory judgment that 47 C.F.R. § 76.804(b) did not apply to its home run wiring in The Atriums. [2] Specifically, Time Warner maintained that it had a preexisting, legally enforceable right to maintain its wires on the property. Time Warner also requested a preliminary injunction preventing The Atriums from invoking the regulations. The parties agreed to consolidate the hearing on Time Warner's preliminary injunction motion with a hearing on the merits. *Time Warner Entertainment Co., LP v. Atriums Partners, LP,* 232 F.Supp.2d 1257, 1258 (D.Kan.2002). On November 26, 2002, the district court denied the request for the preliminary injunction and found that Time Warner had a legal right only to the home run wires running to apartments of current Time Warner subscribers. *Id.* at 1268. For the ***1044** home run wires running to apartments of non-subscribers, the district court found that The Atriums could invoke § 76.804(b), thereby requiring Time Warner to abandon, sell, or remove those home run wires. *Id.* at 1269. Time Warner appeals.

## II

Because the federal home run wiring regulations only apply if an incumbent provider no longer has a legally enforceable right to maintain its home run wires in an MDU, our interpretation of the license agreement necessarily implicates whether the federal regulations apply in this circumstance. However, in addition to analyzing the license agreement between Time Warner and The Atriums, we must also interpret the federal regulations in order to determine if the regulations apply to the facts before us. The FCC regulations contain two provisions potentially relevant to the home run wiring at issue: the building-by-building provision and the unit-by-unit provision. *See* 47 C.F.R. § 76.804(a) & (b). Under either of the two home run wiring provisions, Time Warner is not obligated to abandon, sell, or remove its home run wiring if it has a legally enforceable right to either remain on the premises (in the building-by-building context) or maintain any particular home run wiring (in the unit-by-unit context). *Id.* Accordingly, we begin with an analysis

of the license agreement between Time Warner and The Atriums, followed by an analysis of the federal regulations at issue.

## A

**[1]  [2]  [3]  [4]**  State law claims [3] before a federal court on supplemental jurisdiction are governed by state law, *Olcott v. Del. Flood Co.,* 327 F.3d 1115, 1126 (10th Cir.2003), and we review a federal district court's determination of state law de novo. *Salve Regina Coll. v. Russell,* 499 U.S. 225, 231, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991). Whether a contract's language is ambiguous is also reviewed de novo. *Sanpete Water Conservancy Dist. v. Carbon Water Conservancy Dist.,* 226 F.3d 1170, 1178 (10th Cir.2000). "Where the parties have negotiated and entered into a written contract which addresses the issues negotiated between them, the written contract determines their rights," *Flight Concepts Ltd. P'ship v. Boeing Co.,* 38 F.3d 1152, 1157 (10th Cir.1994) (citing *Albers v. Nelson,* 248 Kan. 575, 809 P.2d 1194, 1197 (1991)), and no interpretation by the court is necessary. However, if the language of a contract is susceptible to conflicting interpretations, the contract is ambiguous, *Liggatt v. Employers Mutual Casualty Co.,* 273 Kan. 915, 46 P.3d 1120, 1125 (2002), and interpretation is required.

**[5]  [6]  [7]  [8]**  In interpreting a contract, the primary role of the court is to ascertain and effectuate the parties' intentions where possible. *In re Villa West Assoc.,* 146 F.3d 798, 803 (10th Cir.1998) (citing *Ryco Packaging Corp. v. Chapelle Int'l, Ltd.,* 23 Kan.App.2d 30, 926 P.2d 669, 674 (1996)). "Reasonable rather than unreasonable interpretations of contracts are favored," and accordingly, interpretations which lead to absurdity or negate the purpose ***1045** of the contract should be avoided. *In re Villa,* 146 F.3d at 803 (quoting *Kansas State Bank & Trust Co. v. DeLorean,* 7 Kan.App.2d 246, 640 P.2d 343, 349 (1982)). All provisions of the agreement should be read "together and in harmony with each other." *Berry v. Farmland Indust., Inc.,* 114 F.Supp.2d 1150, 1157 (D.Kan.2000) (quoting *In re Cherokee County, Kansas Health Care Facility Revenue Bonds,* 262 Kan. 941, 946 P.2d 83, 91 (1997)). Where a contract's terms are ambiguous, those terms should be construed strictly against the drafter and liberally toward the non-drafting party. *Dillard Dep't Stores, Inc. v. Kan. Dept. of Human Res.,* 28 Kan.App.2d 229, 13 P.3d 358, 363 (2000).

The Atriums argues on appeal that our interpretation of the contract should be informed by three factors: (1) Time Warner drafted the agreement; (2) the agreement was a contract of adhesion; and (3) the anticompetitive nature of Time Warner's interpretation of the agreement is against the public interest. Therefore, The Atriums urges, we must read the agreement narrowly, any ambiguity should be construed strictly against Time Warner, and the agreement should be liberally construed to favor the public. Addressing the interpretation of the contract between Time Warner and The Atriums, the district court noted that its construction was informed by those factors. First, the district court found, because Time Warner drafted the license agreement, any ambiguity found therein must be construed strictly against Time Warner. Second, because there was essentially no competition in the cable services market when The Atriums signed the licensing agreement, the district court concluded that the contract was an adhesion contract, which also required that the agreement be strictly construed against Time Warner. Last, because this license agreement affected the public interest, the court liberally construed the contract to favor the public.

[9]   [10]   Neither party disputes that Time Warner drafted the agreement, and we agree that under Kansas law any ambiguity in the agreement is to be construed against the drafter, *Dillard Dep't Stores,* 13 P.3d at 363. Accordingly, we will do so where appropriate. We also agree that this license agreement affects the public interest and should therefore be liberally construed, where appropriate, to favor the public. [4] "[C]ontracts affecting the public's interest generally are liberally interpreted to favor the public." *Simon v. Farmland Indus., Inc.,* 505 F.Supp. 59, 61 (D.Kan.1980) (citation omitted); Restatement (Second) of Contracts § 207 (1981) ("In choosing among the reasonable meanings of a promise or agreement or a term thereof, a meaning that serves the public interest is generally preferred."); 5 A. Corbin, *Corbin on Contracts* § 24.25 (rev.1998) ("[C]ourts favor a construction in the public interest.... [C]ontracts by which the public interest is affected should be interpreted in the manner most favorable to the public.... [T]his rule is often applied to contracts involving public franchises.").

Not only does this contract involve the interpretation of a license granted to a public franchise; in this case, the contract implicates The Atriums' right to avail itself of regulations promulgated by the FCC to encourage competition amongst cable services providers in the MDU market. *See* 47 U.S.C. § 521(6) (purposes of cable regulations). The FCC estimates

that as of 1997, thirty million Americans resided in MDUs, and there were approximately **\*1046** 600,000 MDUs in the United States. *Inside Wiring,* 62 Fed.Reg. 61016, 1997 WL 704275 at \*61018 (Jan. 29, 2003) (to be codified at 47 C.F.R. pt. 76) ("Final Rule"). Moreover, when the city of Overland Park licensed Time Warner, it considered in its franchise grants whether the franchise "provide[s] to the residents of the City a useful and desirable service for the benefit of the public welfare of the residents." (I App. at 104.) Finally, both the Everest and Time Warner franchise grants are subject to city regulation of the services provided and rates charged. (*See, e.g., id.;* I App. at 48; I App. at 88.) Given this evidence, we conclude that this contract affects the public interest and where appropriate, we will construe it accordingly.

The Atriums contends that under such a reading the license agreement granted Time Warner only the right to provide cable television to a tenant; therefore, if Time Warner is not actually providing cable television to such tenant, it retains no legally enforceable right to maintain any wiring to that tenant's residence. Time Warner counters that, when read as a whole the license agreement is unambiguous and grants Time Warner a legally enforceable right to maintain all of its home run wires at The Atriums, regardless of whether the home run wires are currently in use by Time Warner to provide cable television to tenants.

[11]   With respect to the question of whether Time Warner retains a legally enforceable right to maintain its home run wiring at The Atriums, the following clauses of the license agreement between Time Warner and The Atriums are particularly relevant:

**PREMISES:**

...

    C. TeleCable [Time Warner] desires to install, operate and maintain its cable, junction boxes, and other facilities incidental or related to the provision of its services to tenants in the Project ("the facilities") in order to serve those tenants of Owner [The Atriums] who shall from time to time pay TeleCable [Time Warner] for its services; ...

    D. Owner [The Atriums] recognizes that the provision of TeleCable [Time Warner] of cable television and Pay TV service to tenants in the Project is of benefit to Owner [The Atriums], and accordingly, Owner [The Atriums] is

willing to grant the license and permissions hereinafter set forth:

NOW, THEREFORE, the parties hereto agree as follows:

1. Subject to the terms and conditions hereinafter set out, Owner [The Atriums] hereby grants to TeleCable [Time Warner] the right, license and permission to install, operate and maintain such of the facilities as TeleCable [Time Warner] deems necessary or desirable in or on the Owner's [The Atriums'] property and in the Project in order to provide CATV and Pay TV services to tenants in the Project. TeleCable [Time Warner] shall have the right to enter the Project at any time to perform maintenance on and make repairs and replacement of the facilities, or any part thereof, and to install or disconnect customers.

2.... It is agreed that the facilities installed by TeleCable [Time Warner] in the Project or elsewhere on Owner's [The Atriums] property shall be and remain the sole and exclusive property of TeleCable [Time Warner] and shall be treated as personal property of TeleCable [Time Warner] for all purposes.

(I App. at 17–18.)

These considerations in mind, we must determine whether Time Warner retains a legally enforceable right under its license **\*1047** agreement to maintain all of its home run wiring in The Atriums. The district court relied in part upon section C of the "PREMISES" of the license agreement, which states:

> TeleCable [Time Warner] desires to install, operate and maintain its cable, junction boxes, and other facilities incidental or related to the provision of its services to tenants in the Project ("the facilities") in order to serve those tenants of Owner [The Atriums] who shall from time to time pay TeleCable [Time Warner] for its services[.]

(I App. at 17.) Accordingly, the district court concluded that the license granted Time Warner the right to maintain its facilities only when it was providing service to a tenant. Reasoning that "provide" does not mean that Time Warner can "store" its wires in anticipation of offering services to new tenants, the district court determined that "provide" limits Time Warner's rights to only those home run wires

currently in use by Time Warner subscribers. *Time Warner, 232 F.Supp.2d at 1267.* As a result, the court determined, Time Warner simply has no license pertaining to the home run wires running to apartments not currently subscribing to Time Warner's cable television services. In addition, the district court reasoned that the phrase "in order to serve those tenants of Owner who shall from time to time pay [Time Warner] for its services" is ambiguous and best resolved against Time Warner to refer to tenants who periodically pay (i.e. monthly) Time Warner for its services. *Id.* Finally, the district court concluded that while Time Warner maintains ownership of unused wiring, its license extends to the *provision* of cable services; because Time Warner clearly has no right to provide cable services to tenants who have not requested such services, its ability under the license agreement to maintain facilities in order to provide service extends only to current subscribers of Time Warner. *Id.* at 1268.

On appeal, Time Warner contests the district court's interpretation of the license agreement on three main grounds: (1) the agreement is unambiguous; (2) the clear language supports Time Warner's interpretation of the agreement; and (3) the district court's interpretation results in absurdity. First, Time Warner argues that the agreement is not ambiguous, and that the parties' intent is easily determined in the context of the entire agreement; that intent, Time Warner contends, was to grant Time Warner a license to maintain all of its home run wiring in The Atriums, including unused home wiring, in anticipation of offering its services to tenants in the future. Bolstering its argument that this interpretation reflects the parties' intent as measured when the agreement was entered into in 1987, Time Warner draws our attention to the fact that for the fifteen years following its entry into the agreement, The Atriums allowed Time Warner to maintain all of its home run wires, regardless of whether the particular apartment's tenant was a current subscriber. However, this objection ignores The Atriums' contention that Time Warner was the only available cable services provider in Overland Park when the agreement was signed; therefore, The Atriums could not have sought to allow another provider to buy or use Time Warner's home run wires to provide cable service in the building. Also notable is the fact that Everest was granted a license to offer cable services in Overland Park only a year before The Atriums sought to introduce Everest as a competitor to Time Warner in the building. As a result, we consider Time Warner's argument that The Atriums' fifteen year acquiescence in Time Warner's exclusive provision of cable services as inconclusive **\*1048** evidence of the parties' intent. [5]

Second, Time Warner argues that the clear language of the agreement granted it the right to operate and maintain such facilities as necessary or desirable for Time Warner to be able to provide cable services to the tenants of The Atriums. Because the agreement clearly contemplated that Time Warner would retain ownership of the wiring and was given access to maintain those facilities, and because, according to Time Warner, numerous provisions in the license agreement contemplate that it would not be continually supplying cable services to all units, it insists that the agreement unambiguously grants it a legally enforceable right to maintain all the home run wires. The district court's interpretation, Time Warner stresses, improperly emphasizes the phrase "in order to provide" service at the expense of the other clauses of the agreement. In fact, Time Warner insists that "in order to provide" was a mere "descriptive clause" which "cannot reasonably be read to limit the term of the license granted." (Appellant Br. at 26.)

We disagree; to the contrary, the license agreement's purpose is clearly stated in the "PREMISES" section of the agreement, i.e., The Atriums grants Time Warner a license in order to provide cable television services. (*See* License Agreement C ("TeleCable [Time Warner] desires to install, operate and maintain ... facilities incidental or related to the provision of its services to tenants ... in order to serve those tenants of Owner [The Atriums] who shall from time to time pay TeleCable [Time Warner] for its services") and D ("Owner [The Atriums] recognizes that the provision of ... cable television and Pay TV service to tenants ... is of benefit to Owner [The Atriums], and accordingly, Owner [The Atriums] is willing to grant the license and permissions hereinafter set forth"), I App. at 17.) The installation and maintenance of the cable wiring is expressly incidental and related to the primary purpose of the license—the provision of cable services to tenants of The Atriums. Indeed, "in order to serve those tenants ... who shall from time to time pay TeleCable" seems best read to mean that the license is limited to the maintenance of wiring related to the *provision* of cable services to *current* Time Warner subscribers. We are simply not persuaded that the district court was incorrect in focusing on the primary purpose of the agreement—the provision of cable services— in its analysis. [6]

**\*1080**    Next, Time Warner argues that the district court's interpretation of the contract leads to absurdity in that the logical conclusion of its reading is that Time Warner's license vanishes each time a tenant moves out, a tenant cancels

its subscription with Time Warner, or a tenant chooses a competing cable service. Not only do we disagree with Time Warner that the district court's interpretation of the contract is absurd; we consider it to be the most reasonable interpretation. First, the license agreement explicitly provides Time Warner access to The Atriums during transition periods such as the installation or cancellation of services. "TeleCable [Time Warner] shall have the right to enter the Project at any time ... to install or disconnect customers." (License Agreement, 2, I App. at 17.) Thus, the license anticipates that subscriptions to cable services will be periodically entered into and cancelled, and provides for that eventuality. If Time Warner had a right to enter The Atriums at any time to maintain unused wires, it would be unnecessary to include a clause that ensured that it had access to The Atriums to start and stop service, for Time Warner could simply enter at any time to maintain any wiring. Moreover, the installation clause makes perfect sense when the agreement is read as the district court indicated, to wit, that Time Warner's license to maintain the wires extends only to those wires which are currently in use to provide cable television services, and that the installation clause extends the license granted to Time Warner to enter the building to those periods required to start and stop service. [7]

Further, subsection C of the license agreement conditions the installation, operation, and maintenance of cable wiring on the provision of cable services. (*See* License Agreement, C, I App. at 17.) The installation, operation, and maintenance of the wiring is for the sole purpose of "serv[ing] those tenants ... who shall from time to time pay [Time Warner] for its services." *Id.* Nothing in this clause, or any other clause of the agreement, implies that Time Warner has a license to install, operate, or maintain wiring for any purpose other than providing cable television services, nor is there any indication that Time Warner could refuse to provide cable television services, yet continue to maintain its wiring. In fact, section 1 of the license agreement reiterates that the license is granted "in order to provide CATV and Pay TV services to tenants" of The Atriums. (License Agreement, 1, I App. at 17.)

Additionally, Time Warner is required, under the new FCC regulations, to sell, abandon, or remove home run wiring which it lacks a legally enforceable right to maintain. *See* 47 C.F.R. § 76.804(a) & (b). As a result, under our reading of the license agreement, should a tenant cancel service with Time Warner, Time Warner would have to sell its lines to a competitor. [8] Similarly, if the tenant then cancelled its subscription with a competitor, and wished to

subscribe with Time Warner, that competitor would then be obligated **\*1050** to sell the lines to Time Warner under the regulations. [9] We recognize that the FCC's regulations were not in existence at the time the parties entered into the agreement; however, as demonstrated above, the license itself anticipated that Time Warner's right to enter the premises would be conditioned on whether it was actively providing service to a particular unit. We observe only that our interpretation of the agreement, even following the promulgation of the FCC regulations, results in a logical and tenable outcome.

Finally we note that Time Warner's interpretation suffers from the same fault it attributes to the present reading; specifically, it reads clauses of the agreement out of existence. Under Time Warner's reading, it would retain a license to maintain home run wiring even if it was providing no cable television services to any resident of The Atriums, or if it were to lose its franchise rights in Overland Park. Time Warner's interpretation would therefore read out of the agreement the phrases "facilities incidental or related to the *provision* of its services to tenants ... *in order to serve* those tenants ... *who shall from time to time pay [Time Warner] for its services* ", "*in order to provide* CATV and Pay TV services to tenants." (License Agreement C, 1, I App. at 17 (emphasis added).)

We conclude that the overriding purpose of the license agreement was the provision of cable television services to the residents of The Atriums; any interpretation of the license agreement which would allow the license to continue without the provision of cable services is directly contrary to the purpose of the agreement and must be disfavored. Consequently, we agree with the district court that the license agreement grants Time Warner a legally enforceable right to maintain its home run wiring to a particular unit only when Time Warner is providing cable services to that unit.

**B**

**[12]  [13]  [14]**    Having decided that the district court's interpretation of the license agreement was correct, we turn to whether the district court properly interpreted the FCC's home run wiring regulations to deny Time Warner's request to permanently enjoin The Atriums from invoking the procedures outlined in § 76.804(b). We review the district court's interpretation of federal regulations de novo, *United States v. Brown,* 348 F.3d 1200, 1208 (10th Cir.2003),

applying general rules of statutory construction, beginning with the plain language of the regulations. *Valley Camp of Utah, Inc. v. Babbitt,* 24 F.3d 1263, 1270 (10th Cir.1994), *see also, Aspenwood Investment Co. v. Martinez,* 355 F.3d 1256, 1261 (10th Cir.2004). As with statutory construction, in interpreting regulations, we strive to construe the text so that all of its provisions are given effect and no part is rendered superfluous. *APWU, AFL–CIO v. Potter,* 343 F.3d 619, 626 (2d Cir.2003). Additionally, a regulation must be interpreted in such a way as to not conflict with the objective of its organic statute. *Joy Technologies, Inc. v. Sec. of Labor,* 99 F.3d 991, 996 (10th Cir.1996).

To set the proper stage for our analysis, we review briefly the context under which the federal regulations were enacted. The home run wiring regulations at issue were developed under the auspices of the Cable Television Consumer Protection and Competition Act, Pub.L. 102–385, 106 Stat. 1460 (1992), which instructed the FCC to promulgate rules which would "enable consumers to utilize the wiring with an alternative **\*1051** multichannel video delivery system and avoid any disruption the removal of such wiring may cause." H.R.Rep. No. 102–628 at 118 (1992). *See* 47 U.S.C. § 544(i) (directing the FCC to prescribe rules regarding the disposition of cable wiring upon termination of cable service). "The new rules were intended to foster opportunities for multichannel video programming distributors ('MVPDs') to provide service in multiple dwelling unit buildings ('MDU's') by establishing procedures regarding how and under what circumstances the existing cable home run wiring would be made available to alternative cable service providers." FCC First Order on Reconsideration and Second Report and Order, *In the Matter of Telecommunications Services Inside Wiring: Implementation of the Cable Television Consumer Protection and Competition Act of 1992; Cable Home Run Wiring,* CS Docket No. 95–184, MM Docket No. 92–260, 2003 WL 183999, at \*1343 (Jan. 29, 2003) ("FCC Second Report"); 47 C.F.R. § 76.800 (Definitions). Moreover, the rules were "adopted for the purpose of facilitating competition between and among MVPDs. Competition is welcome." FCC Second Report at \*1355.

To foster competition, the home run wiring rules establish the procedures used to require "the sale, removal, or abandonment of home run wiring in MDU's where the incumbent provider no longer has an enforceable right to remain in the building or serve particular units," and the MDU owner intends either to terminate service by the incumbent for the entire building or to allow more than one MVPD

to compete to use the home run wiring on a unit-by-unit basis. *Id.* at *1344; 47 C.F.R. § 76.804(a) & (b). The new home run wiring rules also require that "[a]fter the effective date of this rule, MVPDs shall include a provision in all service contracts entered into with MDU owners for the disposition of any home run wiring in the MDU upon the termination of the contract." 47 C.F.R. § 76.804(d). Thus, the rules attempt to remove an impediment to competition among cable providers in multiple dwelling units—the reluctance of MDU owners to allow the installation of multiple home run wires by alternative cable service providers in their buildings due to concerns regarding aesthetics and possible property damage, disruption and inconvenience to residents, and space constraints. *See* Final Rule at *61018. "By facilitating the entry of new providers into MDU communities" the cable inside wiring rules are intended to advance Congress's directive to provide a "pro-competitive, de-regulatory national policy framework" to encourage the provision of "advanced information technologies and services to all Americans." FCC Second Report at *1344.

Section 76.804 of the "cable inside wiring rules" addresses the disposition of home run wiring. 47 C.F.R. § 76.804. The rule is divided into two parts: building-by-building disposition of home run wiring (subsection (a)), and unit-by-unit disposition of home run wiring (subsection (b)). Under § 76.804(a), the building-by-building section, a multichannel video programming distributor ("MVPD"), which does not have "a legally enforceable right to remain on the premises against the wishes" of the multiple dwelling unit ("MDU") building owner, must upon receiving notice from the MDU that it intends to invoke the procedures of this section, either remove all the home run wiring inside the MDU, abandon the home run wiring without disabling it, or sell the wiring to the building owner. 47 C.F.R. § 76.804(a)(1). Thus, the home run wiring regulations allow a building owner under an exclusive contract with a single incumbent provider to contract with a new cable **\*1052** services company to provide exclusive services to the entire building if the incumbent provider no longer has a legally enforceable right to remain on the premises. Under such circumstances, the incumbent, who is no longer providing cable service to the building, has the option of selling, abandoning, or removing its home run wires.

Under the unit-by-unit section, § 76.804(b), the same options regarding the home run wiring are found: the MVPD must remove, abandon, or sell its home run wiring. This subsection varies only in that the MVPD's obligation is triggered when it

receives notice from the MDU if the MVPD does not "have a legally enforceable right to maintain *any particular home run wire dedicated to a particular unit* on the premises against the MDU owner's wishes." 47 C.F.R. § 76.804(b)(1) (emphasis added). Thus, under this provision, the owner could choose to allow competition among MVPD's for the right to provide service in an individual unit, if the incumbent has no right to maintain the home run wire running to that particular unit. Under this regulation more than one cable services provider will be present and competing within an individual building.

**[15]** The relevant issue for our purposes is whether § 76.804(b)'s unit-by-unit provisions should apply in this case, given our conclusion that Time Warner does not have a legally enforceable right to maintain home run wiring to units to which it does not provide cable service. One federal district court has addressed a similar situation. Although its conclusion is not binding on us, we consider it in some detail. In *CSC Holdings,* the district court for the Southern District of New York found that as long as a provider "retains the right to service so much as one customer in the building" the home run wiring regulations—both § 76.804(a) & (b)—are inapplicable. *CSC Holdings, Inc. v. Westchester Terrace at Crisfield Condo., et al,* 235 F.Supp.2d 243, 248 (S.D.N.Y.2002). Applying this logic to the case before us, Time Warner argues that because it retains a license to provide cable services to current subscribers, The Atriums can invoke neither the building-by-building nor unit-by-unit home run wiring regulations.

To support its conclusion that the home run wiring regulations do not apply in situations where the incumbent cable provider retains the right to service at least one subscriber in the building, the *CSC Holdings* court relied upon paragraph 69 of the FCC's Report and Order and Second Further Notice [10] of Proposed Rulemaking in the Matter of Telecommunications Services Inside Wiring, 1997 WL 644031, FCC No. 97–376 (Oct. 17, 1997) ("FCC Second Further Notice"). *See CSC Holdings,* 235 F.Supp.2d at 248. Paragraph 69 reiterates the explicit reservation contained in the regulations, specifically that the home run wiring provisions "will not apply where the incumbent provider has a contractual, statutory or common law right to maintain its home run wiring on the property." FCC Second Further Notice at *3693 ¶ 69 (Application of Procedural Framework). In addition, the report states that the FCC "adopt[s] specific procedural mechanisms requiring the sale, removal or abandonment of the home run wiring where the MDU owner (1) terminates service for the entire building and wishes to use the home run wiring for an alternative

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

video service provider, or (2) wants to permit more than one multichannel **\*1053** video programming distributor ("MVPD") to compete for the right to use the home run wiring on a unit-by-unit basis." FCC Second Further Notice ¶ 2 at \*3661–62. The correct interpretation of this language, according to *CSC Holdings,* leads to the conclusion that neither the building-by-building or unit-by-unit regulation applies, even against the MDU owner's wishes, as long as the incumbent has a legal right to maintain its home wiring to any subscriber, because the incumbent maintains the right to remain on the premises under either provision.

We disagree with this conclusion. The plain language of 47 C.F.R. § 76.804(a) & (b) demonstrates that under (a), the provisions apply when the cable provider "does not ... have a legally enforceable right *to remain on the premises* " (emphasis added) while under (b), the provisions apply when the cable provider "does not ... have a legally enforceable right *to maintain any particular home run wire dedicated to a particular unit,*" (emphasis added). In our view, the *CSC Holdings* reading conflates these two provisions. Taken to its logical conclusion, if the MVPD has a right to remain on the premises to serve even one cable subscriber, a building owner may invoke neither provision of the regulations. Under such an interpretation, moreover, the unit-by-unit provision would apply only when the MVPD has lost any right "to remain on the premises." This reading contravenes the specific language of § 76.804(b) and reads the language of § 76.804(a) into § 76.804(b). As noted above, we interpret the language of regulations as we construe the language of statutes; accordingly, we must read the regulations such that every word is operative. *See Potter,* 343 F.3d at 626; *Finley v. United States,* 123 F.3d 1342, 1347 (10th Cir.1997) (stating that we must construe statutes "in such a manner that every word has some operative effect"). As a result, we reject the *CSC Holdings* interpretation limiting § 76.804 to only those circumstances where the incumbent provider has been, or will be imminently, ejected from the building.

More convincing, in our view, is the district court's interpretation of the regulations in the instant case.[11] We agree that under the building-by-building regulation, where the incumbent provider retains a right to remain on the premises, the regulation cannot by its terms be invoked. This conclusion is amply supported not only by the plain language of § 76.804(a) (§ 76.804(a)'s provisions apply when the cable provider "does not ... have a legally enforceable right *to remain on the premises* " (emphasis added)), but is also

supported by the FCC Second Further Notice, which makes clear the distinction between the building-by-building and unit-by-unit context. Specifically, it states "[i]n the building-by-building context, the procedures will not apply where the incumbent provider has a legally enforceable right to maintain its home run wiring on the premises.... In the unit-by-unit context, the procedures will not apply where the incumbent provider has a legally enforceable right to keep a particular home run wire dedicated to a particular unit ... on the premises." FCC Second Further Notice at \*3693 ¶ 69. This distinction is again reiterated in the FCC's **\*1054** discussion of the procedures applicable in mandatory access states. *Id.* at \*3699 ¶ 79.

Thus, it is apparent that the FCC did not intend to divest an incumbent cable operator of its right to service customers in the building by allowing building owners to invoke the building-by-building regulations to eject the incumbent and install another competitor, with exclusive rights to service the entire building, when the incumbent still retained a legal right to service the building. Rather, the building-by-building regulation applies only when the incumbent no longer retains a legal right to service any customer in the building; in that circumstance, the building owner becomes free to negotiate with other cable providers and enter into an agreement allowing a new provider the right to "convert the entire building to a new service provider." FCC Second Further Notice, \*3680 ¶ 39.

The unit-by-unit regulation, however, is not intended to be limited only to situations where the incumbent provider no longer has a legal right to service any customer in the building. The FCC's discussion of the Procedures for the Disposition of Home Run Wiring bolsters this conclusion. FCC Second Notice at \*3680–93 ¶ 39–68. The report explains that the underlying purpose of the procedures regulating the disposition of home run wiring is to "promote competition and consumer choice by bringing order and certainty to the disposition of the MDU home run wiring upon termination of service." *Id.* at \*3680 ¶ 39. When discussing the unit-by-unit disposition, the report instructs that the regulation allows an MDU owner to permit head-to-head competition "in the building for the right to use the individual home run wires dedicated to each unit." *Id.* at \*3685 ¶ 49. After the MDU owner has informed the incumbent cable service provider of its decision to invoke the unit-by-unit regulations, the incumbent provider must

> make a single election for how it
> will handle the disposition of the

individual home run wires whenever a subscriber wishes to switch video service providers; the election will then be implemented each time an individual subscriber switches service providers. If the MDU owner permits the alternative service provider to purchase the home run wiring, the alternative service provider will be required to make a similar election ... for any home run wiring that the alternative provider subsequently owns ... and that is solely dedicated to a subscriber who switches back from the alternative provider to the incumbent.

*Id.* at \*3685–86 ¶ 49. Consequently, under the unit-by-unit regulations, once an MDU owner has properly notified an incumbent cable service provider, which does not have a legally enforceable right to maintain its home run wiring to any particular unit on the premises, of its intention to allow head-to-head competition in the provision of cable services in the building, the incumbent cable services provider must make a determination of how it will dispose of the home run wiring: remove the wiring, abandon the wiring, or sell the wiring.

Notably, the incumbent provider's election is not effective immediately as to all of the incumbent's home run wiring; rather, the home run wiring will be disposed of, according to the incumbent's election, as the need arises, i.e., as individual tenants elect to terminate cable service with the incumbent and begin service with the alternative cable provider. *See* § 76.804(b)(3); Second Further Notice at \*3688 ¶ 54. Further, the alternative provider must also make an election as to the disposition of any home run wiring it may own; thus, if the incumbent sells to the **\*1055** alternative provider, the alternative provider must decide how it will dispose of the home run wiring it owns should any of its subscribers terminate service and, for example, resume service with the incumbent. *See* § 76.804(d). Under this scenario, the FCC anticipated that in the unit-by-unit context, individual subscribers would have the opportunity to switch from the incumbent provider to the alternative provider, but that this transition would not be mandatory, nor would the entire building be switched simultaneously. It follows that the unit-by-unit regulation anticipates that the incumbent provider may still be providing services in the building, contemporaneously and in competition with the alternative provider. This differs from the building-by-

building provision, which does not contemplate continued cable service from the incumbent provider, but addresses the complete cessation of service by the incumbent, to be replaced by an alternative service provider.

Explaining further the precise process contemplated in the regulations, the FCC Second Further Notice clarifies the difference between the building-by-building context and the unit-by-unit context. Incumbent providers, under the unit-by-unit option, will not be expected to remove, abandon, or sell *all* of their home run wiring once the building owner has chosen to allow head-to-head competition. *Id.* at \*3688 ¶ 54. Instead, the report notes that the incumbent, if it has chosen to remove its home run wiring, will have only seven days following notification by the subscriber that the subscriber intends to terminate service in favor of an alternative provider, to remove the subscriber's wiring. This limited time frame, reasoned the FCC, is adequate because "unlike in the building-by-building context, the provider will only be required to remove a single home run wire" when the building owner has invoked the unit-by-unit regulation. *Id.* at \*3688 ¶ 54.

Finally, we note that the FCC refused to require the incumbent service provider to remove its home run wiring, when removal was the option selected by the incumbent, when a subscriber terminated service, but did not indicate it was switching to an alternative service provider. *See* § 76.804(b)(4). The FCC Second Further Notice explains that "[i]n such cases, we do not believe that it would be appropriate to require the incumbent to sell, remove, or abandon the home run wiring when it might have every reasonable expectation that the next tenant will request its service." FCC Second Further Notice at \*3688 ¶ 56. Again, it is clear that the regulations do not anticipate that the incumbent provider, in the unit-by-unit context, has lost *all* rights to provide cable service to tenants in the building. Rather, the regulations accommodate both the incumbent provider and any alternative provider who enters subsequent to the building owner's invocation of the unit-by-unit regulation. Therefore, we conclude, based on the foregoing, that the unit-by-unit regulation is appropriately invoked by the building owner in order to allow head-to-head competition from an alternative video services provider when the incumbent cable services provider no longer has the legally enforceable right to maintain the wires servicing a particular unit.

### III

Applying this interpretation of the license agreement and the federal regulations to the case at hand, we conclude that under the license agreement between The Atriums and Time Warner, The Atriums may invoke the procedures outlined in 47 C.F.R. § 76.804(b) as to the home run wiring dedicated to units not subscribing to Time Warner's services. Accordingly, **\*1056** the decision of the district court is **AFFIRMED.**

HARTZ, Circuit Judge, dissenting.

I respectfully dissent. I agree with the majority opinion's analysis and discussion of the FCC's home run wiring rules. But I disagree with the application of the rules to this case because I read the licensing agreement differently than the majority does.

The majority opinion states that Time Warner (for simplicity I shall refer to both TeleCable and Time Warner as Time Warner) has a license to maintain home run wires to each apartment in The Atriums but that this license is conditional —it exists only so long as the tenant subscribes to Time Warner's cable service. Before explaining why I think that this is not a proper construction of the terms of the license agreement, I should note that it would be rather surprising if the parties had in fact imposed the condition that the majority opinion reads into the agreement. Without a license, Time Warner would be a trespasser, and hence could be required to remove its home run wires at the whim of The Atriums. The Atriums, however, would have had no legitimate reason to require Time Warner to remove the wires whenever an individual tenant canceled service. To be sure, under the new FCC regulations The Atriums might have a good reason to restrict Time Warner's license—the restriction would enable The Atriums to require Time Warner to compete with other cable providers for the patronage of the tenants. But no one suggests that the new regulations were foreseeable when the license agreement was executed.

In my view, the majority opinion errs in (1) reading too much into the preamble of the agreement, (2) failing to consider the clear operative language of the agreement, (3) overlooking the parties' initial construction of the agreement, and (4) misconceiving the "access" provision of the agreement, which merely sets forth the time during which Time Warner can enter The Atriums in connection with its license.

### 1. *The Preamble*

Rather than relying on the operative terms of the agreement —the numbered paragraphs following the words "NOW, THEREFORE, the parties hereto agree as follows"—the majority opinion relies on language in the preamble. It focuses on the language in Paragraph C of the preamble stating that "[Time Warner] desires to install, operate and maintain its ... facilities ... in the Project ... *in order to serve those tenants ... who shall from time to time pay [Time Warner] for its services.*" (emphasis added). According to the majority opinion, the emphasized language shows that the license for maintaining the home run wire to an apartment is limited to those periods during which the apartment's tenant is a paid subscriber to Time Warner's services.

I cannot agree. Although the purpose of the agreement undoubtedly is to provide cable service to the tenants while they are paid subscribers, that purpose does not fully determine the scope of the license. Perhaps that purpose could be adequately served by terminating the license to maintain the home run wire whenever the tenant cancels service. But that purpose could also be properly served by permitting continuation of the license to maintain those wires even when the tenant cancels. Continuation of the license despite cancellation would free Time Warner from the risk that The Atriums would whimsically demand removal of the wires; Time Warner could then be sure that it could promptly resume service (without the need to reinstall the home run wire) if a new **\*1057** tenant desired cable television. When the agreement was executed, continuation of the license would have served the convenience of Time Warner and tenants while causing no inconvenience or harm to The Atriums.

One must therefore look to the operative provisions of the agreement to determine the scope of the license. Indeed, the preamble to a contract does not define the rights and duties of the parties; it serves only as an aid in interpretation. *See Grynberg v. FERC,* 71 F.3d 413, 416 (D.C.Cir.1995) ( "[I]t is standard contract law that a Whereas clause, while sometimes useful as an aid to interpretation, cannot create any right beyond that arising from the operative terms of the document." (internal quotation marks omitted)). A leading treatise on contract law approves the statement that " '[t]he generally accepted interpretive rule is that a general, preliminary clause should not ordinarily take precedence over specific provisions of a contract.' " 11 Williston on Contracts § 32:15 (4th ed.) (quoting *Parkhurst v. Gibson,* 133 N.H. 57, 573 A.2d 454, 458 (N.H.1990)); *see Rose v. M/V "Gulf*

*Stream Falcon,"* 186 F.3d 1345, 1350 (11th Cir. 1999) ("under Florida law ... 'whereas' or other prefatory clauses are not binding").

## 2. *Operative Language*

The relevant operative provision of the license agreement is the first sentence of Paragraph 1:

> Subject to the terms and conditions hereinafter set out, [The Atriums] hereby grants to [Time Warner] the right, license and permission to install, operate and maintain such of the facilities as [Time Warner] *deems necessary or desirable* in or on [The Atriums'] property and in the Project in order to provide CATV and Pay TV services to tenants in the Project.

(emphasis added). (Although the majority opinion quotes Paragraph 1 when it sets forth most of the agreement, it never addresses this language.) There can be no dispute that Time Warner deems it desirable to keep its home run wire on the premises even after a tenant cancels service. Leaving the wire in place enables Time Warner to provide service to an apartment more readily if the tenant (or a new tenant) decides to resume service.

One could argue that when the agreement was executed Time Warner did not need a license that would prevent The Atriums from ordering removal of the home run wire whenever a tenant discontinued service. Such protection at that time would have seemed unnecessary because The Atriums would surely not have made the purposeless, destructive demand that Time Warner remove the wire. But that argument demonstrates why The Atriums would not have resisted an unconditional license—one that continues even when a tenant terminates service. Accordingly, I would read the agreement to grant a license to maintain the home run wire to an apartment regardless of whether the tenant is a current paid subscriber. In my view, this construction of the agreement is compelled even if the agreement is read strictly against the interests of Time Warner.

To say that the license is "unconditional" is not to say that the "in order to provide [cable] services" clause of Paragraph 1 is meaningless. It has at least two important functions. First, when Time Warner can no longer provide cable service—for

example, it might lose its franchise—the license is useless and becomes void, so Time Warner could not reasonably "deem[ ][it] necessary or desirable" to maintain home run wires. Second, and **\*1058** more importantly, the license is limited to cable service. Time Warner would not be permitted to use the license for, say, telephone service.

## 3. *Initial Construction of Agreement*

There is an additional compelling reason not to construe Paragraph 1 as limiting the home-run-wire license to the period when the tenant subscribes to Time Warner service. Such a construction of Paragraph 1 would be contrary to the conduct of the parties at the outset of the agreement's operation. The home run wiring was installed before there were tenants. Yet the phrase "in order to provide CATV and Pay TV services to tenants in the Project" applies not only to maintenance of the home run wires but also to their initial installation. To quote again the first sentence of Paragraph 1:

> Subject to the terms and conditions hereinafter set out, [The Atriums] hereby grants to [Time Warner] the right, license and permission *to install,* operate and maintain such of the *facilities* as [Time Warner] deems necessary or desirable in or on [The Atriums'] property and in the Project *in order to provide CATV and Pay TV services to tenants in the Project.*

(emphasis added). If the "in order to provide" language limits the privilege granted to Time Warner to the period when it is serving a current subscriber, then home run wiring to an apartment could not have been *installed* until the apartment's tenant became a subscriber. Moreover, it would be remarkable for The Atriums to permit Time Warner to install home run wire to an unoccupied apartment but then deny a license to keep the installed wire in place if the first tenant decided not to subscribe. The parties' construction of the agreement so close to the time of the agreement's execution is strongly probative of the parties' understanding of the agreement at the time of execution. *See Heyen v. Hartnett,* 235 Kan. 117, 679 P.2d 1152, 1157 (1984).

## 4. *"Access" Provision*

I fail to understand the majority opinion's reliance on the "access" provision in the agreement, the second sentence of

Paragraph 1: "[Time Warner] shall have the right to enter the Project at any time to perform maintenance on and make repairs and replacements of the facilities, or any part thereof, and to install or disconnect customers." Focusing on the words giving Time Warner "the right to enter the Project at any time ... to install or disconnect customers," the majority opinion contends that this provision would be unnecessary if Time Warner "had a right to enter The Atriums at any time to maintain unused wires." Op. at 1049.

This argument misconceives the access provision. The provision merely clarifies Time Warner's right of entry onto The Atriums' premises to perform work in connection with its license. It is one thing to grant a license to install and maintain wiring, and quite another to set the times when the licensee can enter the premises in connection with the license. The access provision addresses only the latter issue. Without the access provision one might interpret the agreement to allow access onto the premises only at "reasonable" times—such as during regular business hours. Indeed, the following sentence of Paragraph 1 restricts the time during which Time Warner can market its services on the premises: "[Time Warner] shall have the right between the hours of 9:00 AM and 5:00 PM to enter the Project to solicit new customers."

Footnotes

1    As Time Warner is TeleCable's successor, all references in the opinion going forward will be to Time Warner.

2    47 C.F.R. § 76.804(c) provides that "[t]he procedures set forth in paragraphs (a) and (b) of this section shall apply unless and until the incumbent provider obtains a court ruling or an injunction within forty-five (45) days following the initial notice enjoining its displacement."

3    Time Warner filed suit in the United States District Court, District of Kansas pursuant to 28 U.S.C. §§ 1331 & 2201, and as required by the home run wiring regulations, 47 C.F.R. § 76.804(c), seeking a declaratory judgment regarding the applicability of the FCC home run wiring regulations under the license between Time Warner and The Atriums. Because the interpretation of the license agreement was necessary to Time Warner's request for a declaratory judgment, the district court properly had jurisdiction over the contract claims under 28 U.S.C. § 1367. Neither party disputes that Kansas law governs the license interpretation in this case.

4    Because we will construe any ambiguity strictly and against Time Warner as drafter, we need not reach the issue of whether the license agreement was one of adhesion.

5    Suggesting that The Atriums would not have demanded Time Warner remove any unused cable wiring, and accordingly that The Atriums would not have objected to an unconditional license, the dissent suggests that the agreement should be read to grant Time Warner an unconditional license. However, we agree with the dissent that The Atriums would not have demanded the costly and purposeless removal of wiring in the absence of an alternative cable provider because it would have been plainly against its self-interest. However, this observation explains just as persuasively why Time Warner would not have demanded an unconditional license when the contract was entered into—viz., it would have been unnecessary. Thus, the license is more reasonably read as being conditioned on the provision of cable services. Moreover, as noted above, in the event of ambiguity the license must be read strictly against Time Warner.

6    The dissent argues that our reliance on language in the preamble of the contract is erroneous and leads to an unjustified emphasis on the purpose of the contract—provision of cable TV services to tenants of The Atriums. Notably, the preamble's emphasis on the provision of cable services is echoed in the numbered provisions of the contract, i.e., Time Warner has the right to "install, operate and maintain such of the facilities as [Time Warner] deems necessary or desirable ... *in order to provide* CATV and Pay TV services to tenants." (License Agreement 1, I App. at 17.) (emphasis added.) The scope of the contract is therefore limited by the purpose of the contract—to provide cable TV services—in the operative sections just as it is informed by the purpose in the preamble.

7    The license agreement specifically grants Time Warner "permission to install [its cable equipment] ... in order to provide CATV and Pay TV services to tenants" of The Atriums. (License Agreement, 1, I App. at 17.) Given this express provision, the dissent's suggestion that our reading would not allow Time Warner to install cable wiring in the absence of a subscription is unpersuasive.

8    Or abandon or remove its home run wiring.

9    Or abandon or remove its home run wiring.

10   The FCC Second Further Notice is a report and order issued to address concerns raised in the notice of proposed rulemaking regarding proposed telephone and cable wiring rules. *See* FCC Second Further Notice ¶ 1.

11   In *Coxcom, Inc. v. Picerne Real Estate Group,* 2003 WL 22048781 (R.I.Super.2003), the Superior Court of Rhode Island, in an unpublished opinion, also rejected the *CSC Holdings* interpretation of the regulations and concluded that "[a] thorough and complete analysis of the federal regulations reveals that the *Time Warner* court reached the only conclusion that would be consistent with the purpose of the FCC in enacting the legislation." 2003 WL 22048781 at *11.

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 149

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1



1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)

The Toronto-Dominion Bank, Plaintiff and Peat Marwick Thorne Inc. in its capacity as Trustee of the Estate of Leigh In-
struments Limited, a bankrupt; The Plessey Company plc; GEC Siemens plc; and The General Electric Company plc,
Defendants

Ontario Court of Justice, General Division [Commercial List]

Winkler J.

Heard: January 13, 1997-May 1, 1998
Judgment: June 24, 1998[FN*][FN**]
Docket: 51353/90, B195/94

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Proceedings: additional reasons at *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (October 26, 1998),
51353/90, B195/94, 98-BK001066 (Ont. Gen. Div. [Commercial List])

Counsel: *John A. Campion*, *Peter Downard* and *Paul F. Monahan*, for Plaintiff.

*Earl A. Cherniak, Q.C.*, *Robert J. Morris*, *Susan B. Wortzman* and *Lisa C. Munro*, for Defendant The Plessey Company
plc.

*Peter F.C. Howard*, *Johanna Superina* and *Adrian C. Lang*, for Defendant The General Electric Company plc.

Subject: Contracts; Corporate and Commercial; Torts

Banking and banks --- Loans and discounts — General

Bank opened line of credit for subsidiary of parent company — Line of credit was unsecured — Parent Co. did not form-
ally guarantee loan but gave bank comfort letter — Subsidiary borrowed $40.5 million from bank before it went into
bankruptcy — Parent Co. was taken over by corporation — Bank brought action against parent Co. and corporation to re-
cover amount advanced to subsidiary — Action dismissed — No binding contract existed between bank and parent Co.
— Comfort letter contained policy statement that subsidiary would be managed to always meet financial obligations —
Comfort letter contained explicit statement that it was not legally binding commitment — Policy was self evident state-
ment that subsidiary was under own management — Comfort letter was not contractual promise by parent Co. to cause
subsidiary to meet its financial obligations — Comfort letter did not bind parent Co. to pay debts of its subsidiary — No
collateral contract or collateral warranty existed.

Contracts --- Construction and interpretation — Resolving ambiguities — Contra proferentem rule

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

Bank opened line of credit for subsidiary of parent company — Subsidiary borrowed $40.5 million from bank before it went into bankruptcy — Line of credit was unsecured — Parent Co. did not formally guarantee loan but gave bank comfort letter — Parent Co. was taken over by corporation — Bank brought action against parent Co. and corporation to recover amount advanced to subsidiary — Action dismissed — Comfort letter contained explicit statement that it was not legally binding commitment — Comfort letter did not bind parent Co. to pay debts of subsidiary — Comfort letter was unambiguous — Bank agreed to language contained in comfort letter — Doctrine of contra proferentem did not apply.

Contracts --- Rectification or reformation — General

Bank opened line of credit for subsidiary of parent company — Subsidiary borrowed $40.5 million before went into bankruptcy — Line of credit was unsecured — Parent Co. did not formally guarantee loan but gave bank comfort letter — Parent Co. was taken over by corporation — Bank brought action against parent Co. and corporation to recover amount advanced to subsidiary — Action dismissed — Comfort letter contained explicit statement that it was not legally binding commitment — Bank read and accepted comfort letter upon receipt — Bank failed to make comment or complaint from time of delivery up to bankruptcy of subsidiary — Parent Co. reasonably concluded bank accepted revised comfort letter — Rectification of letter, to remove statement, was denied.

Fraud and misrepresentation --- Negligent misrepresentation (Hedley Byrne principle) — Detrimental reliance

Bank opened line of credit for subsidiary of parent company — Subsidiary borrowed $40.5 million from bank before it went into bankruptcy — Line of credit was unsecured — Parent Co. did not formally guarantee loan but gave bank letter of comfort — Parent Co. was taken over by corporation — Bank brought action against parent Co. and corporation to recover amount advanced to subsidiary, based in part on negligent misrepresentation — Action dismissed — Comfort letter contained policy statement that subsidiary be managed to always be in position to meet financial obligations — Policy statement disclosed parent Co. was not required to do anything to ensure subsidiary could pay bank — Policy remained in place through material time, until bankruptcy of subsidiary — No negligent misrepresentations were made — Conduct which did amount to misrepresentation was not relied upon by bank.

Fraud and misrepresentation --- Fraudulent misrepresentation — Specific elements — Recklessness of truth or falsity

Bank opened line of credit for subsidiary of parent company — Subsidiary borrowed $40.5 million from bank before went into bankruptcy — Line of credit was unsecured — Parent Co. did not formally guarantee loan but gave bank comfort letter — Parent Co. was taken over by corporation — Bank brought action against parent Co. and corporation to recover amount advanced to subsidiary, based in part on fraudulent misrepresentation — Action dismissed — Comfort letter contained policy statement that subsidiary would be managed to always be in position to meet its financial obligations — Comfort letter contained explicit statement that it did not constitute legally binding commitment — Parent Co.'s representative did not fraudulently misrepresent to bank that financial statements were not available — Representative did not act deliberately or recklessly when statement made — Dishonest intent, sufficient to attract liability to parent Co. or corporation, was not established.

**Cases considered by *Winkler J.*:**

*Abel v. McDonald,* [1964] 2 O.R. 256, 45 D.L.R. (2d) 198 (Ont. C.A.) — considered

*Alampi v. Swartz,* [1964] 1 O.R. 488, 43 D.L.R. (2d) 11 (Ont. C.A.) — applied

*Alex Duff Realty Ltd. v. Eaglecrest Holdings Ltd.,* [1983] 5 W.W.R. 61, 26 Alta. L.R. (2d) 133, 30 R.P.R. 207, 146 D.L.R. (3d) 731, 44 A.R. 67 (Alta. C.A.) — applied

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

*Anns v. Merton London Borough Council* (1977), [1978] A.C. 728, [1977] 2 W.L.R. 1024, *(sub nom. Anns v. London Borough of Merton)* [1977] 2 All E.R. 492 (U.K. H.L.) — applied

*Arthur Andersen Inc. v. Toronto Dominion Bank* (1994), 13 C.L.R. (2d) 185, *(sub nom. Andersen (Arthur) Inc. v. Toronto Dominion Bank)* 71 O.A.C. 1, 17 O.R. (3d) 363, 14 B.L.R. (2d) 1 (Ont. C.A.) — applied

*Asiatic Petroleum Co. v. Lennard's Carrying Co.* (1914), [1915] A.C. 705, [1914-15] All E.R. Rep. 280, 13 Asp. Mar. Law Cas. 81, 31 T.L.R. 294 (U.K. H.L.) — considered

*Atlantic Computers plc, Re,* [1995] B.C.C. 696 (Eng. Ch. Div.) — applied

*Banque Brussels Lambert S.A. v. Australian National Industries Ltd.* (1989), 21 N.S.W.L.R. 502 (New South Wales Sup. Ct.) — distinguished

*BG Checo International Ltd. v. British Columbia Hydro & Power Authority,* 41 C.L.R. 1, 4 C.C.L.T. (2d) 161, 44 B.C.L.R. (2d) 145, [1990] 3 W.W.R. 690 (B.C. C.A.) — considered

*BG Checo International Ltd. v. British Columbia Hydro & Power Authority,* [1993] 2 W.W.R. 321, [1993] 1 S.C.R. 12, 147 N.R. 81, 75 B.C.L.R. (2d) 145, 99 D.L.R. (4th) 577, 20 B.C.A.C. 241, 35 W.A.C. 241, 14 C.C.L.T. (2d) 233, 5 C.L.R. (2d) 173 (S.C.C.) — referred to

*Brownlie v. Campbell* (1880), 5 App. Cas. 925 (U.K. H.L.) — considered

*Canadian Pacific Hotels Ltd. v. Bank of Montreal,* 77 N.R. 161, [1987] 1 S.C.R. 711, 21 O.A.C. 321, 41 C.C.L.T. 1, 40 D.L.R. (4th) 385 (S.C.C.) — referred to

*Caparo Industries plc v. Dickman,* [1990] 1 All E.R. 568, [1990] 2 W.L.R. 358, [1990] 2 A.C. 605 (U.K. H.L.) — applied

*Charles P. Rowen & Associates Inc. v. Ciba-Geigy Canada Ltd.,* 14 B.L.R. (2d) 125, [1994] I.L.R. 1-3068, *(sub nom. Charles P. Rowen & Associates Inc. v. Ciba-Geigy Canada Inc.)* 19 O.R. (3d) 205, *(sub nom. Rowen (Charles P.) & Associates Inc. v. CIBA-Geigy Canada Inc.)* 72 O.A.C. 321 (Ont. C.A.) — referred to

*Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), *(sub nom. Exportations Consolidated-Bathurst Ltée c. Mutual Boiler & Machinery Insurance Co.)* [1980] 1 S.C.R. 888, 112 D.L.R. (3d) 49, 32 N.R. 488, [1980] I.L.R. 1-1176 (S.C.C.) — applied

*Craighampton Investments Ltd. v. Ayerswood Developments Ltd.* (1984), 4 O.A.C. 124 (Ont. C.A.) — applied

*Esso Petroleum Co. v. Mardon,* [1976] Q.B. 801, [1976] 2 All E.R. 5, 2 Lloyd's Rep. 305 (Eng. C.A.) — referred to

*H.L. Bolton Engineering Co. v. T.J. Graham & Sons Ltd.* (1956), [1957] 1 Q.B. 159, [1956] 3 All E.R. 624 (Eng. C.A.) — considered

*Hawrish v. Bank of Montreal,* [1969] S.C.R. 515, 2 D.L.R. (3d) 600, 66 W.W.R. 673 (S.C.C.) — referred to

*Hercules Management Ltd. v. Ernst & Young,* [1997] 2 S.C.R. 165, 211 N.R. 352, 115 Man. R. (2d) 241, 139 W.A.C. 241, *(sub nom. Hercules Managements Ltd. v. Ernst & Young)* 146 D.L.R. (4th) 577, 35 C.C.L.T. (2d) 115, 31 B.L.R. (2d) 147, [1997] 8 W.W.R. 80 (S.C.C.) — applied

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

*Hill v. Nova Scotia (Attorney General)*, 142 D.L.R. (4th) 230, 206 N.R. 299, [1997] 1 S.C.R. 69, 157 N.S.R. (2d) 81, 462 A.P.R. 81, 60 L.C.R. 161 (S.C.C.) — applied

*Hillis Oil & Sales Ltd. v. Wynn's Canada Ltd.*, [1986] 1 S.C.R. 57, 25 D.L.R. (4th) 649, 65 N.R. 23, 71 N.S.R. (2d) 353, 171 A.P.R. 353 (S.C.C.) — referred to

*Kleinwort Benson Ltd. v. Malaysia Mining Corp. Bhd.*, 43 B.L.R. 40, [1989] 1 All E.R. 785 (Eng. C.A.) — considered

*Kleinwort Benson Ltd. v. Malaysia Mining Corp. Bhd.*, [1989] 1 All E.R. 785 at 798 (Eng. C.A.) — referred to

*Kripps v. Touche Ross & Co.*, 89 B.C.A.C. 288, 145 W.A.C. 288, 35 C.C.L.T. (2d) 60, [1997] 6 W.W.R. 421, 33 B.C.L.R. (3d) 254 (B.C. C.A.) — considered

*Kripps v. Touche Ross & Co.* (1997), 102 B.C.A.C. 238 (note), 166 W.A.C. 238 (note), 225 N.R. 236 (note) (S.C.C.) — referred to

*Leitch Gold Mines Ltd. v. Texas Gulf Sulphur Co.* (1968), [1969] 1 O.R. 469, 3 D.L.R. (3d) 161 (Ont. H.C.) — applied

*Peek v. Derry*, 38 W.R. 33, 1 Meg. 292, 14 App. Cas. 337, [1889] All E.R. Rep. 1, 58 L.J. Ch. 864, 61 L.T. 265, 54 J.P. 148, 5 T.L.R. 625 (Eng. H.L.) — applied

*Prenn v. Simmonds*, [1971] 3 All E.R. 237, [1971] 1 W.L.R. 1381 (U.K. H.L.) — applied

*Queen v. Cognos Inc.*, 45 C.C.E.L. 153, 93 C.L.L.C. 14,019, 99 D.L.R. (4th) 626, 60 O.A.C. 1, 14 C.C.L.T. (2d) 113, [1993] 1 S.C.R. 87, 147 N.R. 169 (S.C.C.) — applied

*R. v. McNamara (No. 1)*, *(sub nom. Canadian Dredge & Dock Co. v. R.)* 45 C.R. (3d) 289, *(sub nom. Canadian Dredge & Dock Co. v. R.)* 9 O.A.C. 321, *(sub nom. Canadian Dredge & Dock Co. v. R.)* 19 C.C.C. (3d) 1, *(sub nom. Canadian Dredge & Dock Co. v. R.)* 19 D.L.R. (4th) 314, *(sub nom. Canadian Dredge & Dock Co. v. R.)* 59 N.R. 241, *(sub nom. R. v. Canadian Dredge & Dock Co.)* [1985] 1 S.C.R. 662 (S.C.C.) — applied

*R. v. Mohan*, 29 C.R. (4th) 243, 71 O.A.C. 241, 166 N.R. 245, 89 C.C.C. (3d) 402, 114 D.L.R. (4th) 419, [1994] 2 S.C.R. 9, 18 O.R. (3d) 160 (note) (S.C.C.) — referred to

*Rainbow Industrial Caterers Ltd. v. Canadian National Railway* (1988), 46 C.C.L.T. 112, *(sub nom. Rainbow Industrial Caterers Ltd. v. C.N.R. Co.)* 54 D.L.R. (4th) 43, 30 B.C.L.R. (2d) 273, [1989] 1 W.W.R. 673 (B.C. C.A.) — considered

*Rainbow Industrial Caterers Ltd. v. Canadian National Railway*, 8 C.C.L.T. (2d) 225, 59 B.C.L.R. (2d) 129, [1991] 6 W.W.R. 385, 84 D.L.R. (4th) 291, 126 N.R. 354, 3 B.C.A.C. 1, 7 W.A.C. 1, [1991] 3 S.C.R. 3, [1991] R.R.A. 850 (S.C.C.) — referred to

*Reardon Smith Line v. Hansen-Tangen*, [1976] 1 W.L.R. 989, [1976] 3 All E.R. 570 (U.K. H.L.) — applied

*Smith v. Scrimgeour Vickers*, [1996] 4 All E.R. 769 (Eng. H.L.) — referred to

*Spinks v. R.*, 19 C.C.E.L. (2d) 1, 12 C.C.P.B. 81, *(sub nom. Spinks v. Canada)* 134 D.L.R. (4th) 223, *(sub nom.*

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

*Spinks v. Canada)* 195 N.R. 184, *(sub nom. Spinks v. Canada)* [1996] 2 F.C. 563 (Fed. C.A.) — considered

*Standard Investments Ltd. v. Canadian Imperial Bank of Commerce* (1985), 52 O.R. (2d) 473, 22 D.L.R. (4th) 410, 11 O.A.C. 318, 30 B.L.R. 193 (Ont. C.A.) — considered

*Standard Investments Ltd. v. Canadian Imperial Bank of Commerce* (1986), 53 O.R. (2d) 663 (note), 65 N.R. 78 (note), 15 O.A.C. 237 (note) (S.C.C.) — referred to

*Tesco Supermarkets v. Nattrass* (1971), [1972] A.C. 153, 2 W.L.R. 1166, [1971] 2 All E.R. 127 (U.K. H.L.) — considered

*TransCanada Pipelines Ltd. v. Northern & Central Gas Corp.* (1983), 41 O.R. (2d) 447, 146 D.L.R. (3d) 293 (Ont. C.A.) — applied

*White v. Central Trust Co.* (1984), 7 D.L.R. (4th) 236, 54 N.B.R. (2d) 293, 17 E.T.R. 78, 140 A.P.R. 293 (N.B. C.A.) — applied

**Statutes considered:**

*Canada Evidence Act*, R.S.C. 1985, c. C-5

    s. 9 — referred to

*Courts of Justice Act*, R.S.O. 1990, c. C.43

    Generally — referred to

*Evidence Act*, R.S.O. 1990, c. E.23

    s. 5 — referred to

ACTION by bank against parent company and corporation for monies advanced to subsidiary.

***Winkler J.***:

1     This is an action on a comfort letter brought by *The Toronto-Dominion Bank against The Plessey Company plc.*, the U.K. parent of a Canadian company Leigh Instruments Ltd., and one of Plessey's shareholders General Electric Company plc.. The claim is for damages for breach of contract and in the alternative damages for the tort of negligent misrepresentation. The bank alleges fraud.

**Part I**

*Introduction*

2     The short unhappy life of Leigh Instruments Ltd. provides the centre-piece for this action. Leigh was a high-tech company on the leading edge of the Canadian defence industry. The events described here occurred during the brief period of two years from April 1988 to April 1990.

3     In April 1988, Leigh was acquired as the result of a successful takeover bid by The Plessey Company plc., a large U.K. company with a focus on electronics and defence products.  A year and a half later, in September 1989, GEC

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

Siemens plc, a joint venture consisting of General Electric Company plc. and Siemens A.G., completed a hostile takeover of Plessey. GEC has been described as the largest industrial enterprise in the U.K., Siemens is a vast German multinational company. Both companies are heavily into the electronics and defence businesses.

4      The Toronto-Dominion Bank is one of Canada's five main chartered banks with operations world wide. TD is the plaintiff in this action and was banker to Leigh. Over the two-year period in question Leigh's borrowing increased from nil at the time of the take-over by Plessey in April 1988, to $40.5 million in April 1990 when Leigh went into bankruptcy.

5      Although the Bank's line of credit to Leigh was unsecured and the parent company had not formally guaranteed the loan, the Bank did have a letter of comfort issued in its favour by Plessey in respect of the Leigh loan.

6      In this proceeding, TD seeks to recover from Plessey and GEC the amount advanced by it to Leigh. It bases its claim on the letter of comfort and alleges breach of contract and negligent misrepresentation. The bank also alleges fraud. My overview of the facts, key findings and points of argument follow.

*Overview*

7      Leigh's banking relationship with TD dated back to 1982. At that time Leigh was a public company with operations at Kanata, Ontario. In 1983 the bank had been concerned about Leigh's financial condition and the reliability of its security for the borrowing, to the extent that it considered forcing Leigh into bankruptcy or ridding itself of Leigh as a customer. With the assistance of a bank work-out specialist and the bank's co-operation, Leigh survived this crisis.

8      The relationship continued and on March 1, 1988, Leigh and TD entered into a facility agreement pursuant to which Leigh had a $5.4 million loan facility, secured by a floating charge debenture and an assignment of book debts. Leigh, however, did not draw down on the facility and had approximately $10 million in its treasury. At the same time, Leigh had entered into a number of long-term, fixed-price contracts with the Canadian government to design and build defence products. Two of the largest programs were the Ship Interior Communications System Program (SHINCOM) and Tactical Air Navigational System Program (TACAN). All of this must have seemed attractive because at least two takeover bids for Leigh were mounted in the early spring of 1988.

9      The bid by the Plessey Company plc. through its acquisition vehicle Plessey Canada (1988) Inc. was successful and Leigh was acquired for $104 million in April 1988.

10      In order partially to assist with the financing of the acquisition, TD made available to Plessey Canada a $10 million uncommitted loan facility. This was a short-term acquisition loan, unsecured and payable on demand. It was understood that this facility would be re-paid from the $10 million in the Leigh treasury once Plessey had complete ownership of Leigh, expected to occur about three months later.

11      The loan was based on the creditworthiness of the parent company, since there were no financial statements for the acquisition vehicle, Plessey Canada. Operating in the mistaken belief, at least initially, that Plessey did not provide guarantees for loans to its subsidiaries but more pointedly because a guarantee from the parent company was not on offer, TD proposed that Plessey supply it with a letter of comfort, which Plessey agreed to provide. TD noted that a "strong letter of comfort" would be obtained by TD in London and forwarded to the bank in Toronto. The first comfort letter dated April 20, 1988 was sent to TD on April 27, two to three weeks after the funds were drawn down.

12      The internal structure of the bank was such that Corporate Banking Division was responsible for direct customer

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

contact, monitoring accounts, preparation of credit applications and documentation. Credit Division, on the other hand, was charged with reviewing credit risks to the bank and approving loans subject to whatever terms it felt appropriate.

13      TD's willingness to accommodate Plessey, as demonstrated above, was it seems motivated to no small extent by its desire to retain the Leigh business in Canada, since it had no prior relationship with Plessey, TD also hoped to use this as a bridgehead for development of business with Plessey itself in Canada and abroad. Therefore, although the line with Plessey Canada was clearly a short-term bridge loan, TD put it through as an operating line. The facility contained no financial reporting provision.

14      Letters of comfort are at the heart of this proceeding. A letter of comfort is an  improvisation of the banking industry which grew out of the increased competitiveness between banks, making it more difficult for banks to obtain parent company guarantees for loans to subsidiaries. A comfort letter may be described as a letter provided by a parent company to a bank concerning the borrowings of a subsidiary intended to give to the bank a degree of comfort about the transaction but also intended to fall short of a guarantee to repay the debts of the subsidiary. Comfort letters generally are not legally binding in terms of imposing an obligation to repay the debt of the subsidiary, and are perceived in the business world as moral agreements.

15      Typically a comfort letter may contain statements or obligations such as an acknowledgment of awareness of the debt facility, an obligation to maintain ownership of the subsidiary or to provide notice of any change in such ownership. It may contain a statement of general corporate policy.

16      Those commercial considerations which might impact on a bank's decision to accept a comfort letter as opposed to insisting on a formal and legally enforceable guarantee could include the overall relationship of the bank with the corporate group involved, its general reputation, the volume of business and profit margins that the bank enjoyed from them as well as the degree of risk inherent in the instant transaction. In short, the terms which comprise a letter of comfort will likely be negotiated individually, address some or all of the above issues and be somewhat idiosyncratic reflecting the respective bargaining power of the parties.

17      Moving from the general to the particular, the Plessey letter of comfort referenced the  loan to Plessey Canada. It stated that Plessey would not change its ownership position in the subsidiary without providing prior notice to TD. Finally, it contained a policy paragraph which stated:

> It is our policy that our wholly-owned subsidiaries, including Plessey Canada (1988) Inc., be managed in such a way as to be always in a position to meet their financial obligations, including repayment of all amounts owing under the above facility.

Two points were clear. The Plessey letter of comfort was not formal security and it was not a formal guarantee. Nonetheless, Plessey included it in its guarantee register for convenience.

18      On June 30, 1988, Plessey Canada was amalgamated with Leigh; the new entity was known as of July 1, 1988 as Leigh Instruments Limited. When it came time, however, to pay down the Plessey Canada loan from the funds in the Leigh treasury, as had been the plan, it was determined that the cash had been depleted. As a consequence, the loan was rolled over, with Plessey acknowledging on August 1, 1988, that the comfort letter applied to what was now a loan to Leigh. This became known as the second comfort letter.

19      The financial structure of Leigh was settled by Plessey and Leigh, largely in accordance with the initial plan, with approximately $25 million in equity and $69 million in inter-company debt owed to Plessey, plus the $10 million loan

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

from TD. As a result of acquisition accounting adjustments made to bring Leigh's accounting policies into line with those of Plessey, the book value of the assets of Leigh was devalued from $51 million to $13 million. All of this was known to TD.

20      Deloitte, Haskins and Sells, Plessey's auditors, had prepared a due diligence report for Plessey prior to the acquisition of Leigh, in March, 1988. The report stated that Plessey's policies regarding valuation of inventory and revenue recognition were more conservative than those of Leigh. It noted also that there were missed milestones and projected margins regarding certain of Leigh's major contracts. It drew attention to liquidated damages consequences in certain of the contracts for delays. These prognostications boded ill for the future, for in the summer and fall of 1988 the bank loan began an upward climb due to these very problems, culminating ultimately in the bankruptcy of Leigh on April 12, 1990.

21      Although the bank was aware of all of this, it is clear to me that the pre-occupation of the bank throughout this period was with its relationship with Plessey and business development. At the same time, the bank's credit division was concerned about the need for financial information from Leigh. The corporate banking division was less than diligent in obtaining such information for them.

22      In September 1988, it became apparent to Leigh and Plessey that Leigh would require an increase in its borrowing limit to $30 million to the end of December, due to slippage in production in the two major contracts, SHINCOM and TACAN. Notwithstanding that an existing facility letter between Leigh and the bank provided security for the demand loan in the form of a floating charge debenture and an assignment of book debts, and notwithstanding the existence of Plessey comfort letter number two, the bank extended the line of $15.4 million on a temporary basis only to October 31, 1988, due to the absence of audited financial statements, and in order to obtain fresh documentation and a new letter of comfort.

23      On October 6, 1988, Jonathan Exton manager of corporate finance at the bank's office in London, together with a Toronto-based vice-president of the bank, made a courtesy call on Ian Musgrave, group treasurer of Plessey. Leigh was discussed only briefly, the conversation centering on the bank's £5 million participation in a Plessey £200 million Multi-Option Facility.

24      By the beginning of November, what had begun as a short-term bridge loan of $10 million to assist Plessey with the Leigh acquisition had been transformed in a little more than seven months into an operating line of about $17 million to Leigh. The bank continued to be driven by a desire to retain the Leigh business, obtain the Plessey business in Canada from the Bank of Montreal, and to position itself to obtain $2 billion of business which it projected Plessey would generate in Canada over the next ten years. This hope had been expanded by TD's participation in the Multi-Option Facility. However, Leigh had not repaid the $10 million acquisition loan as planned, the acquisition accounting would significantly affect Leigh's balance sheet and income statement negatively, and Leigh's financial situation was deteriorating, as evidenced by the increasing bank loan. Although the bank's motivation had not changed, the underlying purpose and circumstances relating to the loan had shifted dramatically, without, it seems, the bank's Corporate Banking Division adjusting its approach to reflect this reality. Credit Division, mindful of the problem flew storm warnings throughout the bank saying that the facility should be regularized, and the bank should avoid being dragged along.

25      In the fall of 1988, Plessey requested that the bank release the Leigh security. A further temporary increase or "bulge" to $20 million in the bank line was required in November, and it was expected that Leigh might need a further extension to $30 million. In this period Leigh went into an overdraft position several times. On December 16 Credit Division approved an increase to $25 million to regularize the exposure of more than $24 million, pending fresh documentation.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

26      The bank appeared to concede internally that the comfort letter did not amount to a formal guarantee, noting "we are confident Plessey will support Leigh as required". The concern was expressed that the parent might not honour the comfort letter in the event of a hostile takeover. In the context of commenting on the lack of reliable financials for Leigh, the comfort letter was characterized by a Senior Vice-President Credit Division in a November note as "support, albeit informal" from Plessey. More conclusively, in the Corporate Credit Reviews of Leigh prepared by Corporate Banking Division and sent to Credit Division for processing, the bank consistently rated the risk of Leigh as opposed to that of Plessey thus making it clear that they did not hold the belief that the comfort letter was in the nature of a guarantee or that it constituted a legally binding obligation to pay.

27      In November, 1988, GEC Siemens launched a hostile takeover bid for Plessey, an earlier bid by GEC having failed in 1985. The bid was referred to the U.K. Mergers and Monopolies Commission in January, 1989. Jonathan Exton of the bank's London office met with a Plessey representative the day after the bid was announced and offered the bank's support in resisting the hostile takeover bid. Also around this time, the bank's account manager for Leigh, Greg Young expressed a concern in an internal memorandum that the comfort letter for Leigh might not be honoured in the event of a successful hostile takeover.

28      Leigh's borrowing came up for annual review by the bank in January 1989. Credit Division reviewed the request for an increase in the bank line to $35 million, and approved the requested release of security contingent upon a post-ponement of the inter-company debt of $69 million. This would subordinate the inter-company debt to the bank loan which would now be unsecured. Also required was a "strong" comfort letter in the same form as the second letter. The audited financial statements for Leigh as at June 30, 1988 and an unaudited balance sheet at September 30, 1988 were provided to the bank at this time.

29      As background, at the time of the January review, both Corporate Banking and the Credit Division were aware that: Leigh faced cash and working capital deterioration: Leigh had problems with major contracts; and that in light of the known details of the financial structure, debt and tax considerations of Leigh, Leigh could not support the debt on its own. The bank noted that the relationship with Plessey was growing, but remained cognizant of the outstanding hostile takeover bid.

30      Ultimately, over the next three months, the Corporate Banking Division took it upon itself to waive the Credit Division's condition that the inter-company debt be postponed and agreed to release its security over the assets of Leigh. Meanwhile however, because of its effect on the Leigh balance sheet and tax considerations, reasons entirely unrelated to the banking issues, Plessey decided to convert the Leigh intercompany debt to equity, capitalizing the debt as preferred shares, and thereby rendering the postponement of debt problem moot, effective April 1, 1989. The bank did not agree to remove its security over the assets of Leigh based on anything that Plessey said or did but rather for its own purposes.

31      On March 29, 1989, TD revised the $35 million facility, deleting reference to the inter-company debt. Security was to be released upon receipt of a revised comfort letter. On April 4 and 10, the form of the third comfort letter was approved by Plessey and TD respectively. On April 20, 1989 an executed comfort letter dated March 31, 1989 was delivered to the bank. The third comfort letter by its terms replaced the prior two. The $34 million facility letter was executed by Leigh on June 27, 1989, and an executed copy was received by the bank on July 21, accompanied by Leigh's year-end and quarterly financial. With this process completed Leigh had fulfilled the conditions set out in the April 7 letter from the bank for release of the security over its assets.

32      In the months that followed, attention within Plessey began to focus on defending against the hostile GEC Siemens bid. At Leigh the cash problems continued with a request of TD for a $4 million bulge from $34 to $38 million.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

33      The negotiation and delivery of the new facility between Leigh and TD and third comfort letter between TD and Plessey took place over a period of some six months in early 1989. While this was happening two events of note occurred. The first was the launching of the GEC Siemens takeover bid of which mention has been made. The second was a decision of the English Court of Appeal, released February 2, 1989, which has a direct bearing in several ways on the instant case. *Kleinwort Benson Ltd. v. Malaysia Mining Corp. Bhd.*, [1989] 1 All E.R. 785 (Eng. C.A.) (Leave to appeal to the House of Lords refused [[1989] 1 All. E.R. 785 at 798 (Eng. C.A.)]) involved the enforceability of a letter of comfort, and overturned the trial decision which had held that the comfort letter was enforceable. This was a landmark decision in the world of banking and commerce, not because of the result, which seems not to have been unexpected, but rather due to the dearth of court authority on the subject. All parties to this proceeding were aware generally of both the trial and appeal decisions in *Kleinwort Benson*. The timing of the decision as it pertains to the case at bar is striking especially in light of the bank's decision some six weeks later in March of 1989 to rest its exposure with Leigh solely on the comfort letter from Plessey.

34      In the summer of 1989, Leigh requested and received approval for a further temporary $4 million bulge from the bank, necessary due to delays in the SHINCOM and TACAN contracts. Plessey did not provide another comfort letter to secure the additional borrowing, although it undertook to do so if the funds were required beyond the end of August. Although TD made no request for delivery of the further comfort letter, Plessey nevertheless on September 7, forwarded a fourth comfort letter dated August 31, 1989, revised to cover the full amount of the Leigh borrowings. The letter was sent, in part, as a consequence of the impending hostile takeover. This letter was the same as the prior one except for the amount and by its terms replaced the earlier letters. Approval of the comfort letter was one of the last acts performed by Plessey group treasurer Ian Musgrave, before leaving the company on August 31, 1989.

35      During this period, Leigh also underwent personnel changes at the executive level. On August 8, 1989 Frank Driscoll took over as president of Leigh from Barry Flower who had departed Leigh for Plessey in June. At the very outset of his tenure, Driscoll began a review of progress on all major outstanding Leigh contracts. This revealed that the estimates to completion for both the SHINCOM and TACAN contracts were woefully inaccurate.

36      Slightly more than one week later, on August 17, 1989, GEC Siemens submitted its final offer for Plessey. The bid was successful on September 8, 1989, and GEC Siemens took over Plessey in late September.

37      Somewhat obliquely, the TD account manager Greg Young reported to Credit Division at TD on August 30, 1989 that the bank has enjoyed a long relationship with Leigh and a good relationship with Plessey. He commented mistakenly that the GEC Siemens takeover was unlikely to succeed before October 31st. He reported as well that he had met the new president of Leigh. He concluded with reference to goodwill generation and potential new business. He characterized the comfort letter as "quite strong" and his superiors concurred that the letter was "strong".

38      Shortly after the takeover, Young referred in a corporate credit review of Leigh to the hostile takeover, stated he was comfortable with the quality of GEC Siemens' credit, and expressed the hope of developing a relationship with GEC. On the other hand he identified a "significant weakness" in terms of the uncertain fate of Leigh as a result of the takeover. Canadian Marconi, a GEC subsidiary and client of the Royal Bank of Canada, might be merged with Leigh. Young noted TD had been unable to establish a relationship with GEC in London, despite several attempts. As of October 2, 1989, the Leigh loan was about $36 million.

39      September was a long month at GEC Siemens. Plessey was not a single business enterprise. It consisted, between 1988 and 1989 of between 80 and 100 companies located in 43 different countries around the world. The strategy of the joint venture was a matter of public record. In the bid document made public in August 1989, the proposal was to dis-

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

band Plessey and divide the spoils between GEC and Siemens 50-50; certain of its businesses were intended to be trans-
ferred 100 per cent to GEC: others 100 per cent to Siemens, with the remainder to remain within Plessey, where they
would be operated jointly until such time as they were sold or otherwise disposed of.

40      The bid package revealed that Leigh was intended to be owned 100 per cent by GEC. Also noteworthy was the
fact that Leigh was but a tiny piece of the Plessey pie. To put this in perspective, Leigh had comprised two per cent of
the group sales of Plessey and three and a half per cent of its group assets. Plessey was a £1.5 billion to £1.8 billion com-
pany. The significance of Leigh paled even further in the context of GEC Siemens. GEC alone was a £6.5 billion com-
pany, and held over 100 companies world-wide prior to the Plessey acquisition. Both Plessey and GEC were holding
companies with small, central staffs. Plessey was headquartered at Ilford, England. GEC maintained its head office at
Stanhope Gate, in London. Plessey had arranged that the MOF would fund its acquisitions. GEC, on the other hand, was
cash rich and referred to as a cash mountain with over £1 billion in cash reserves on its balance sheet. Thus, in either
case, Leigh and its borrowings did not make a significant impact within the framework of Plessey or GEC Siemens.

41      It was understood in a firm sense between GEC Siemens and the UK regulatory agencies that the Plessey com-
panies would be divided or "hived-up" between the two parent companies by March 8, 1990. Additionally, there were
constraints as to which company could acquire certain parts of Plessey. Indeed, it was a requirement of the bid approval
by the Mergers and Monopolies Commission that Siemens, as a German company, was not permitted to own certain of
the defence industry businesses. As a consequence, GEC and Siemens had to decide the ultimate destinations, and trans-
fer ownership of all the Plessey companies by this deadline. As part of this process. GEC and Siemens had to agree on
valuations for all the Plessey companies, since the division was to be approximately 50-50. The purchase price of Plessey
was £2.2 billion. Since the takeover was a hostile one, the new parents had very little information about the financial
situation of the Plessey businesses. In essence, they walked into Plessey "blind". In addition, shortly after the takeover
most of those Plessey executives who had not already resigned were terminated by the new owners. The departure of
these executives signaled the departure of valuable information about the operation of the Plessey empire, and created
hurdles for the new owners both in terms of valuing the companies and also their ongoing administration.

42      To fill this vacuum, each shareholder appointed a point person to act in concert as managing directors of Plessey.
GEC's representative was Simon Weinstock, a GEC executive and manager and son of the GEC managing director Lord
Weinstock. Siemens appointed Dr. Philip Gerdine, an experienced mergers and acquisitions accountant from its U.S. op-
eration. Those companies slated to be transferred 100 per cent to either GEC or Siemens were to be supervised directly
by the intended parent until the transfer was completed, while the companies to be held jointly within Plessey were su-
pervised through it.

43      Leigh was earmarked in the bid document to go to GEC, GEC in turn was considering a possible merger of Leigh
with one of its Canadian subsidiaries, Canadian Marconi where there would be obvious synergies. Jonathan Exton
learned of this possibility for Leigh on a goodwill call to David Newlands, finance director at GEC on October 3, 1989,
although it was clear a final decision on the merger was not expected until mid-1990. The bank was made aware of GEC
Siemens plan for Plessey when it received a refinancing package from the joint venture, containing a copy of the bid doc-
ument. As a consequence of the takeover, it was necessary to refinance Plessey, and on October 30, 1989, the joint ven-
ture company and Plessey invited some 40 banks on the open market to provide quotes for the refinancing. One of these
was TD.

44      Due to the possible merger of Leigh with CMC, it was natural that GEC Marconi, also a GEC subsidiary would
provide technical and finance people to assume responsibility for evaluating Leigh. To this end, David Newlands, GEC
finance director, and David Rickard, finance director for GEC Marconi, visited Leigh on October, 20, 1989, to appraise

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

Leigh.  Newlands had in hand a briefing document from Colin Justice at Plessey who was assigned to Leigh, in which Justice alerted Newlands to the fact that the technical baseline at Leigh was sufficiently insecure that the financial results of the company could not be relied upon. Newlands was quick to identify problems at Leigh. He was critical of management, in particular David Dean, the vice-president of finance. Newlands concluded that Plessey's budgets for Leigh were hopelessly optimistic. Included in the material presented to Newlands and Rickard were the draft six-month financial results for the period ended September 30, 1989, which showed a cumulative loss of $2.858 million to the end of September and the bank line outstanding at approximately $36 million. Leigh was trading at a loss, absorbing cash, and there was no indication it would improve.

45      Plessey described Leigh internally in the August 1989 as a "major loss maker". Between the October 20 meeting at Kanata with Newlands and Rickard, and the end of November, Frank Driscoll provided numerous reports and financial information to GEC and GEC Marconi, as well as to Lord Weinstock personally. These included a President's report for October and revised half-yearly reports to September 30, 1989 with forecasts to the end of the financial year in March 1990. The seriousness of the problems at Leigh was apparent to Driscoll and the recipients of his reports, and were underscored by the variances from previous budgets and forecasts. Leigh was pursuing explanations for the variances from budget and was seeking cost-cutting solutions. As of mid-November 1989 there was a variance from budgeted profit of negative $19 million.

46      Back at the bank, on October 3, 1989 account manager Greg Young sent to Leigh the  facility letter for $38 million, which was to become the last facility agreement entered into by the bank and Leigh. Young stated that the facility was contingent upon the year-end financials at July 31, 1990. This package contained the final offer for Plessey, financial data on all three companies, and the proposed restructuring of Plessey. GEC and Siemens were offering 50-50 several guarantees to secure the proposed facilities. On November 17 Jonathan Exton forwarded a £50 million facility for Plessey to Ross Anderson, group treasurer for GEC, Plessey never drew down on the facility.

47      Jonathan Exton, in England, was pursuing larger fish, and met with David Newlands on October 3 at Stanhope Gate to discuss possible new business with GEC, in his words. "to further our marketing relationship with GEC". They discussed the plan to dismantle Plessey and also Leigh's tax position and low profits.

48      As noted earlier, GEC, Siemens and Plessey on October 30, 1989 wrote to some 40 banks including TD with a view to replacing the Plessey MOF, which was to be canceled on November 23. This package contained the final offer for Plessey, financial data on all three companies, and the proposed restructuring of Plessey. GEC and Siemens were offering 50-50 several guarantees to secure the proposed facilities. On November 17 Jonathan Exton forwarded a £50 million facility for Plessey to Ross Anderson, group treasurer for GEC, Plessey never drew down on the facility.

49      On October 31, 1989, Greg Young, the account manager for Leigh, left the bank's employ. He was replaced by Rob Wilson. Wilson was given the sparest of briefing by Young on  his hand over, but was left on his own to review the files. Young and Wilson met once with Dean at Leigh. Wilson's supervisor at TD, Wendy Leaney also gave him little help in familiarizing himself with his accounts, which included the troubled Leigh. Wilson did not see or review the comfort letter.

50      Upon Ian Musgrave's departure from the position of finance director at Plessey on August 31, 1989, his duties had been assumed by his former assistant, Denise Beard. On November 3, 1989, Denise Beard also left Plessey. Beard had been deeply involved in Leigh's affaris, particularly the first comfort letter and the details surrounding the lifting of security on the Leigh assets at the time of the negotiation of the facility agreement and the third comfort letter in early 1989. The exit of Musgrave, Young and Beard from the scene all at about the same time did not enhance the ability of

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

TD and Plessey to adapt to the GEC Siemens takeover. To make matters worse, all Plessey's senior management left following the takeover, including managing director Stephen Walls, signatory to the first four comfort letters. As replacement TD account manager Rob Wilson observed in a memorandum to file in late November 1989, Leigh's numbers were getting worse and the comfort letter was from the old Plessey management.

51      The unaudited quarterly financial statements of Leigh were due to be provided to the bank of Leigh, according to the terms of the facility agreement, by the end of October for the quarter ending September 30, 1989. These were not sent. On November 8, 1989, in a meeting with Young and Wilson, David Dean advised them the financial statements were unavailable due to the implementation of the purchase accounting adjustments necessitated by the GEC Siemens takeover. The bankers did not ask for any alternative financial information. Colin Justice of Plessey assisting at Leigh gave this identical explanation to the bank on December 21, 1989. Dean left Leigh on December 18, 1989, as part of a cost-cutting general layoff. Dean was replaced by his assistant, Patrick Smith. Frank Driscoll, president of Leigh, was personally unaware of this reporting obligation to the bank. The bank was not provided with financial statements until March 21, 1990.

52      The figures reported by Leigh in October and November indicate the state of disarray of Leigh. At the October 20 meeting with Newlands and Rickard, Leigh reported a cumulative loss to September 30 of $2.85 million and the bank line at $36.081 million. Six days later in the President's Report for September, Driscoll reported a revised loss, to date, of $15.634 million and a bank loan of $37.17 million. Financial results for that period were due to the bank four days later. On November 17 in the President's Report for October, he reported a loss for the seven months to October 27 of $16.677 million and the loan at $38.534 million. At the end of November, at the six-month review at Stanmore, he reported a cumulative loss to September 30 of $18.850 million and a bank line of $38.745 as at November 24.

53      Leigh was in breach of the facility agreement by not providing to TD the unaudited quarterly financial statements, given that there were in fact some statements in existence, albeit not in the form that Leigh wished to provide. However, up until his departure in December, Dean spoke by telephone with Wilson, and conveyed to him some details of Leigh's cash flow position and the contract overruns. Although the messages were at best mixed, they were such that they ought to have given rise to questions which inexplicably were never put by the bank to Leigh.

54      The half-year review for Leigh was to take place at Stanmore in the U.K., the home of GEC Marconi, on November 28 and 29, 1989. In attendance were representatives of Leigh, GEC Marconi and GEC. Although Driscoll's approach was seen as positive, two serious problems were presented. To begin with, Leigh predicted a $19.6 million loss for the year. As a cost-cutting measure they proposed a staff reduction of 250 persons. Also, Leigh was preparing a plan for sale of its components division. Problems with the SHINCOM and TACAN contracts were reported in detail. Leigh was asked to re-attend later to deal with the operational problems.

55      To make matters worse however, Leigh was anticipating a problem meeting its payroll, and submitted a proposal for approval of an increase in its bank line from $38 million to $45 million. An increase to the borrowing limit of Leigh required prior approval of Plessey and GEC, in order for Leigh to make a request to the bank. David Newlands and Simon Weinstock considered the request and Newlands "reluctantly" approved the increase in the Leigh bank line, on the basis that any drawdown over $41 million had to be approved specifically by Anderson or someone else with similar authority. Leigh was given the go-ahead to request the increase from the bank.

56      Wilson at TD meanwhile, produced a detailed corporate credit review of Leigh on December 6, 1989, in which he referred to the proposed layoffs, an $8.4 million contract payment due to Leigh in early January, 1990, the support by Plessey in converting the inter-company debt to equity, and the possible sale to or merger with Canadian Marconi. As

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

negatives, he referred to the dynamic of the defence industry, delays and slow payments, and uncertainty about Leigh ultimate ownership. His recommendation of approval for the request for an increase to $45 million was accepted by Credit Division on the condition that the fifth comfort letter be delivered by Plessey in the same form and substance as the fourth letter of August 31, 1989, especially the third paragraph, the policy paragraph noted above. These conditions were never communicated to Leigh. Plessey or GEC by anyone at TD. Wilson included reference in the CCR to TD's intention to bid on providing a fairness opinion in the event that the CMC purchase of Leigh proceeded, and reference to the London office's continued attempts to build a relationship with GEC.

57      At GEC, Ross Anderson was advised that David Newlands had approved the increase to Leigh's bank line. Anderson was charged with preparing the fifth comfort letter. Working on his prior experience, he revised the existing comfort letter, adding among other things an additional phrase which stated that the letter "... does not constitute a legally binding commitment". The policy paragraph was unchanged. This letter, as had its predecessors, by its terms replaced the prior letters. Anderson ran the draft of the revised letter past David Newlands, who approved the wording, in a brief meeting in the corridor outside his office. Anderson then forwarded the letter to Plessey company secretary Bernard Huntbatch for his review and processing. Copies were sent to a number of GEC and Siemens executives, including the Siemens treasury person Andy Hafner and Dr. Gerdine. There were no representations to TD by anyone on behalf of Plessey that the letter would be in the same form as the prior letters. Nor were the conditions stipulated by Noonan regarding the comfort letter communicated by Wilson or anyone else to Plessey or to Anderson. The signed letter became the fifth comfort letter in the piece, dated December 15, 1989, received by the bank's London office on December 27, TD filed the letter without commenting on the changes to either Leigh, Plessey, GEC or Siemens. No one at TD acknowledges having read the comfort letter until sometime in April 1990. I find, however, that Wendy Leaney received, read and accepted the letter on behalf of the bank in January 1990.

58      The Leigh President's Report for November, dated December 14, 1989, recorded a loss of $18.6 million, $21.4 million below budget. The report was not sent to the bank.

59      On January 8 and 9, 1990 representatives of Leigh re-attended in London for budget meetings and to review Leigh's status. Leigh management were dispatched at the conclusion of this meeting to review five options available to the company. At the same time, GEC and Siemens were engaged in valuing the Plessey companies. On January 8, Exton and Wilson called Anderson at GEC from Canada to advise of Leigh's loan balance and to introduce Wilson. On January 11. Newlands wrote to Dr. Mackenrodt Vice President at Siemens, describing Leigh's situation as "very serious". Appended to the letter was a proposal showing Leigh in the Plessey rump of jointly-held companies rather than going to GEC.

60      In late January, representatives of Leigh and GEC Marconi were debating the intended future of Leigh, which had been expressed as a series of options at the meetings in early January. These options included shut down or wind down of Leigh, sale to a third party or fold in to Canadian Marconi, the original plan. One of the options considered was to renegotiate the  TACAN and SHINCOM contracts with the Canadian Government. Newlands and Gerdine based on their experience still thought this was a possibility. An $8.4 million payment was received from Paramax in mid-January, with a corresponding effect on the bank loan. One executive noted 'so far so good'. On February 1 and 2, 1990 representatives of Leigh and GEC Marconi met again to discuss Leigh's analysis of the five options.

61      Bill Alexander of GEC Marconi met Canadian government officials in Ottawa on January 22 and 23, 1990, in an attempt to negotiate some relief from the provisions of the government contracts. The government was advised of the "desperate situation" at Leigh, heavy losses on SHINCOM and acute cash problems. He reported back that there was some sympathy and that he was less pessimistic than previously. Simon Weinstock, appearing to be losing patience, contacted Shearson. Lehmann, an American investment banking firm, seeking an evaluation of Leigh. Copying Gerdine,

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

Weinstock described the viability of the company as being in question. Others at GEC and Siemens disagreed. The prospect of Leigh going to CMC was still being debated.

62      On February 8, 1990, GEC and Siemens met to finalize the valuations and disposition of the Plessey companies. It was agreed that Leigh would be placed in the Plessey rump, to be held 50-50 until sold. Leading up to this, Dr. Gerdine had become involved with Leigh at the end of January 1990, at the insistence of Dr. Mackenrodt of Siemens. Shortly thereafter at the instance of Simon Weinstock, he met with Shearson Lehmann, the investment banking firm, to canvas the possibility of selling the three Plessey companies in North America, including Leigh,  together as a package. By late January it is clear that GEC had decided not to take 100 per cent ownership of Leigh. Dr. Gerdine knew this around this same time, at least by February 8, 1990.

63      Newlands, since his visit to Leigh on October 20, 1989 had seen Leigh's long-term, fixed price contracts with the Canadian government as a problem. Dr. Gerdine was of the same view after becoming involved with Leigh in late January. Both were highly experienced in the defence industry and felt relief through contract re-negotiations was possible. It was commonplace in the industry for the customer to agree to re-negotiation, so why not here? This had been broached at the meetings held with the Canadian government on January 22 and 23, 1990. Further such meetings, attended by Dr. Gerdine, took place on March 27.

64      A more serious problem however, was the technical problem with the contracts, in particular SHINCOM, and the issue of whether they could be performed by Leigh at all. As a consequence, the GEC Marconi technical review of Leigh was pivotal in the decision as to what was to be done with Leigh. The technical team assigned this task was dubbed the Red Team and their report was expected in early April, 1990. On February 28, Dr. Gerdine visited Leigh on behalf of Siemens, and was shocked by the projected year-end loss of $68.3 million. If this was accurate, he felt bankruptcy for Leigh was not out of the question. On March 6, Shearson Lehmann concluded Leigh was unsaleable to a third party, a view with which Simon Weinstock and Dr. Gerdine reluctantly agreed.

65      Frank Driscoll inadvertently brought the matter to a head. On February 26 he had become  aware for the first time of the reporting obligation of Leigh contained in the facility letter with the Bank. For some unexplained reason, he felt he needed the direction of GEC and Siemens before complying with this obligation. Despite repeated requests for such a direction, none was forthcoming, although Dr. Gerdine is adamant that he advised Driscoll orally to do so on at least two occasions, at the February 28 meeting and again on March 15. Finally, on March 21, 1990, not having heard from GEC, Driscoll instructed Pat Smith to send the financials to the bank.

66      In fact, the six-month results forwarded were outdated numbers which had been presented to Newlands when he visited Leigh on October 20, 1989. However, the financial statements provided to TD also included the nine-month results to the end of December, 1989, which showed a loss of $21.3 million. Even this information was not sufficient to prod TD into action. It was not until Dr. Gerdine telephoned Wendy Leaney and Rob Wilson at the bank on March 26th or 27th, to inquire whether they knew what was going on at Leigh financially that they reacted to the data. As a consequence, the bank line was frozen on March 27, 1990 following Gerdine's indication that GEC and Siemens might not commit to the Plessey comfort letter.

67      GEC Siemens did not give up on Leigh without further effort. On April 9, 1990, Dr. Gerdine and others met again with Government officials in Ottawa, in the hope of negotiating contract relief, but to no avail. By this time, on April 3, the GEC Marconi technical RED Team had completed its review of SHINCOM, confirming that Leigh had serious technical problems and casting doubt on its ability to complete the contracts, absent new personnel and funding. When GEC and Siemens refused to guarantee the Leigh loan, the bank called the loan on April  11, 1990. The next day, on April 12,

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

Leigh made an assignment in bankruptcy. Thus ended ignominiously the short, unhappy life of Leigh instruments and set the stage for this lawsuit.

68      This concludes the basic chronology. The following observations emerge.

69      The transitional effect of the movement of personnel on and off of the scene was highly disruptive to all parties. Frank Driscoll arrived as president of Leigh on August 8, 1989. One month later to the day the hostile takeover occurred. Ian Musgrave left Plessey at the end of August after approving the fourth comfort letter. Almost all of the senior management at Plessey departed at this time. GEC and Siemens people were required to assist. The account manager at TD. Greg Young left at the end of October. The treasury person at Plessey. Denise Beard, left on November 3. All of these people filled critical roles at a material time in the life of Leigh. However, the most significant change from the standpoint of the fifth, operative comfort letter, was the change in the management group at Plessey, as noted by Rob Wilson in late November 1989.

70      The bank at the same time as it was advancing funds to Leigh was pre-occupied with the parent companies' business potential and appeared heedless of its exposure at Leigh. The bank paid scant attention to detail at Leigh and reaped the consequences.

71      From the time of the third comfort letter in April, 1989 and the decision of the bank to remove its security over Leigh's assets, the bank rested its risk solely on the comfort letter.  Although at first glance it might appear from the bank's lack of diligence in monitoring the financial situation at Leigh, that Wilson and Leaney were not acting as prudent bankers, rather, the approach by TD toward Leigh makes it plain and obvious that TD was not relying upon the financial condition of Leigh or any representations in that regard, since it knew Leigh was not capable of repaying the loan without assistance. The bank assumed this assistance would come from Leigh's parents, and to that end, relied upon the moral obligation they believed the comfort letter to contain. The final proof of this lies in the fact that TD did not cap the loan until it was advised by Dr. Gerdine in March, 1990 that Plessey might not honour the comfort letter.

72      There were many victims of the disaster which befell Leigh. One such victim was certainly the TD bank. But also victims of almost equal proportion were Plessey and ultimately GEC Siemens which lost their total investment. On a personal level, Frank Driscoll and the other employees of Leigh were casualties. The Government of Canada likewise suffered losses at the hands of Leigh.

73      The question in this proceeding is, simply put, whether Plessey and GEC are responsible to TD for the losses of the bank.

### The Trial

74      This trial commenced January 13, 1997 and concluded on May 1, 1998. There are more than 15,000 pages of trial transcript, and thousands of pages of exhibits some lengthy and many  detailed. The parties submitted extensive written argument consisting of more than 1200 pages, followed by oral submissions.

75      During the openings by counsel it was stated that the amended amended statement of claim contained more than one hundred and fifty alleged causes of action. During the trial the issues were not narrowed, even though the court urged the plaintiff to do so. This did not occur until the time of filing of written submissions. Any alleged causes of action not pursued in argument are abandoned.

### Disposition

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

*The Claim in Contract*

76      I have concluded that Wendy Leaney received, read and accepted on behalf of the bank the fifth comfort letter dated December 15, 1989 in January 1990. This letter by its terms supersedes all prior comfort letters. There was no representation that the fifth comfort letter would be in the same form as the prior ones. There are no collateral agreements or warranties. Hence, the operative comfort letter is the fifth comfort letter which was delivered to the bank by Plessey in December 1989.

77      The bank asserts that this comfort letter contains in paragraph three, the policy paragraph, a contractual commitment by Plessey to directly or indirectly pay the bank the amount of the  Leigh loan. The added words in the fifth comfort letter that "The letter ... does not constitute a legally binding commitment." are a complete answer to this contention and dispose of the claim in contract. Moreover, even disregarding those words, a literal reading of the paragraph which I find to be clear and unambiguous is to like effect. The paragraph does not contain a contractual promise enforceable in law. Rather it is a statement of present policy of Plessey. The added words do not alter that meaning. Indeed, the extrinsic evidence, if admitted, does not assist the bank. Instead it confirms two things: first, the paragraph does not contain a latent ambiguity, and second, the literal reading of the paragraph discloses its true meaning. The claim in contract fails.

*The Claim in Tort*

78      The bank asserts a number of causes of action in negligent and fraudulent misrepresentation, based on the statement of policy in the third paragraph of all of the comfort letters, and in the alternative, based solely on the policy statement in the fifth letter. For the reasons that follow, I find that the statement of policy in the comfort letters was not misleading and the claim in this respect is dismissed. The bank also claims damages for misrepresentation based on certain alleged statements made by Justice, Anderson and Musgrave to the bank. For the reasons below, I find that none of these claims have been made out, either because the statements did not take place, were not misleading, or were not relied upon by the bank.

79      The bank has alleged fraud against Plessey and GEC based on their conduct in failing to  direct Leigh to provide the financial statements, and also based upon alleged statements by Colin Justice and Ross Anderson to the bank. There is no basis in the evidence for a finding of fraud. Accordingly, and in light of my appreciation of the totality of the evidence, I decline to make a finding of fraud against Plessey, GEC or either of Justice and Anderson. The claim in fraud is dismissed.

80      A review of the evidence, my findings and reasons follow.

## Part II

### *The Evidence*

*The Bank and Leigh prior to April 1988.*

81      The relationship between TD and Leigh dates back to the early 1980s, when Leigh acquired a company called Marsland Engineering Limited. At that time, Marsland had been a client of TDs for several years, however Leigh terminated the relationship with TD following the takeover. In consequence, TD solicited the business of Leigh and eventually succeeded in bringing Leigh in as a client. From the outset however, the bank had concerns about Leigh's financial performance. By July of 1983, the Leigh account had been classified by the bank as unsatisfactory and removed from the discretion of the branch manager. In an internal bank memo, F.G. McDowell, then vice-chairman of the bank, described

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

the Leigh account as a  "persistent worry" and recommended that the bank divest itself of the relationship with Leigh.

82      In 1983 the bank appointed management consultants Woods Gordon to review the Leigh contracts and manage-ment. Following on recommendations of Woods Gordon, Leigh sold certain subsidiaries, raised capital and changed management. The company began to turn a profit and the bank decided to continue the banking relationship.

83      In March of 1984 the Leigh risk was again classed as unsatisfactory, and the bank expressed concern that the working capital of Leigh was being used to pay off secured debt, to the detriment of the bank's position.

*Spring 1988- The Takeover by Plessey, First Comfort Letter and Amalgamation*

84      Leigh Instruments was a supplier of high-technology products and systems for the defence and aerospace mar-kets. The company's main products included secure voice communications systems, ground-based navigation systems and flight data recording systems.

85      The bulk of Leigh's business was composed of contracts to supply two sophisticated products, SHINCOM and TACAN, SHINCOM was a ship interior communications system program and TACAN was a tactical air navigation pro-gram. The bulk of Leigh's contracts were with the Canadian Department of National Defence either directly or as subcon-tractor to other  companies with government contracts, and were long-term contracts for fixed prices. SHINCOM was be-ing installed by the Canadian Navy as part of its program to refit older destroyers.

86      In January 1988, Leigh acquired all the shares of a Nova Scotia based company known as Micronav Ltd. for $2.8 million. Micronav had developed a microwave landing system, which was a leading-edge airport landing system. TD was the banker for Micronav both before and after the takeover, and noted in a credit review of Leigh on February 29th, 1988 that "MLS is widely recognized as the next generation of airport landing systems with a world market estimated to be several billion dollars during the next decade. For example, Transport Canada has recommended MLS for up to 40 air-ports in Canada."

87      At this time, Leigh was a publicly traded company. In late February of 1988, a Halifax based Aerospace com-pany, IMP Group Ltd., made a public offer of $80 million for all the shares of Leigh. Leigh's board of directors rejected the bid and retained Dominion Securities and First Boston to advise it on defensive strategies.

88      In order to assist in the defence of the takeover bid, TD offered Leigh a $10 million operating line with a number of conditions attached. In approving the credit application on February 29, 1988 however, senior vice president James Laitner noted: "this is not the type of company that should have a lot of debt." The bank rated the risk of this borrowing at 3A and included as a condition that Leigh provide to the bank quarterly unaudited financial statements and audited year end statements. Leigh did not accept this offer, but chose instead to accept the  straight renewal of its existing oper-ating facility of $5.4 million, which to date had not been drawn upon. That facility included a requirement that Leigh provide to the bank its quarterly/annual financial statements within $^{30}/_{90}$ days from the end of the respective financial period.

89      In early March, 1988, while the hostile IMP takeover bid was still outstanding, Plessey announced a friendly takeover bid for Leigh, offering $96.4 million for the outstanding shares of Leigh. When TD learned of the bid. Howard Baker of TD's London office immediately telephoned the Plessey treasury department, and then wrote to Ian Musgrave, group treasurer of Plessey, offering to provide financial assistance in connection with the takeover. On March 24, Plessey increased its offer for Leigh to $104 million, leading IMP to drop out of the running and withdraw its offer on April 5th. The Plessey bid succeeded that same day.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

90      In connection with the bid, Plessey retained Deloitte, Haskins & Sells to prepare a due diligence report on Leigh, which was delivered on March 6th. This report was reviewed in detail by Ian Musgrave, who was in charge of structuring Leigh's acquisition, and others at Plessey. The report noted that Leigh's major source of revenue was from government contracts associated with the TACAN, SHINCOM, and LSI programs, and that Leigh's revenue recognition policies for the contract were, from an accounting perspective, less conservative than Plessey's. Other accounting policies were also less conservative than Plessey's and the report cautioned that application of the accounting principles used by Plessey would result in a significant writedown of the value of Leigh's inventories. Deloitte's also noted that Leigh had failed to meet certain  contract milestones for the TACAN program, had not yet filed its corporate tax return for 1987, and had made no payments towards its tax liabilities for the 1987 or 1988 fiscal years. The report failed to note the security held by TD over Leigh's assets.

91      As treasurer, Ian Musgrave was responsible for the structure of the Leigh acquisition. In evidence, he explained the structure was designed to provide the most favorable tax results for Plessey. In order to minimize the amount of profit on which Leigh would have to pay tax, Plessey imposed a capital structure on Leigh of 25 percent equity and 75 percent interest-bearing intercompany debt. The intercompany debt was payable to Plessey, with the notion that the interest payments on the debt would reduce or eliminate Leigh's taxable profits. In the final analysis, the structure consisted of $69 million intercompany debt, $25 million in equity, plus the TD loan for the total purchase price of $104 million. There was a $3 million acquisition cost for a total outlay of $107 million.

92      In order to facilitate the transition, Plessey incorporated a holding company called Plessey Canada (1988) Inc., with the 75-25 debt to equity capital structure. This company was to be used to purchase the shares of Leigh and then the two companies were to be amalgamated, with the merged company assuming the intercompany debt held by the acquisition vehicle. At the time of the acquisition, the Leigh balance sheet showed approximately $10 million in cash. Accordingly, Plessey decided to borrow $10 million of the acquisition financing from the TD bank, through Plessey Canada, with the intention that this $10 million would be re-paid to the bank from Leigh's cash balances following the amalgamation.

93      TD had approached Plessey immediately after the announcement of the takeover bid, and offered to assist with acquisition financing. Initially, TD offered Plessey a $50 million facility, with the provision that $10 million be made available to Plessey Canada (1988) Inc. directly.

94      The procedures and responsibilities within the bank in terms of processing and approving credit applications for customers was addressed by numerous bank witnesses in the course of the trial. The Corporate Banking Division ("Corporate Banking") had responsibility for direct customer contact. It was charged with the responsibility for preparing documentation of a credit request which was then submitted to the Credit Division. Corporate Banking had no lending authority. The Credit Division's role was that of decision maker - it had no liaison with customers or documentation role after a credit was approved. Those duties were left to Corporate Banking, and included responsibility for ensuring that any condition placed on an approval of a credit by the Credit Division was implemented. There was no procedure in place within the bank by which the Credit Division could ensure that its conditions had been complied with, and the Credit Division simply relied on Corporate Banking to do so. For example, the account manager in Corporate Banking was responsible for obtaining the requisite security or other documentation for a loan, in keeping with the bank's requirements. Similarly, if a loan went into an overdraft position, it was the responsibility of the account manager to obtain approval of an increased loan limit from the Credit Division. Once that approval was obtained, the account manager was charged with obtaining a new facility agreement from the customer reflecting the increased amount, and obtaining any other associated documentation.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

95      For the purpose of standardizing credit applications, the bank had in place a Credit Procedures Manual. This manual was described by bank witnesses as a "guideline" on how to complete a Corporate Credit Review (CCR). Although its purpose was described variously by bank witnesses as to standardize the format of submissions for ease of processing or as being "mechanical", there were aspects of it which were admitted to be requirements, as opposed to discretionary guidelines. Portions of the manual were for use by Corporate Banking and were available to every manager responsible for the Leigh account, and certainly Wendy Leaney.

96      The manual expressly provided that a corporate guarantee be accompanied by a solicitor's opinion and a resolution of the board of directors authorizing the guarantee. No such stipulation applied to comfort letters, which the manual described as "documentation" rather than "security", unlike a guarantee. It stated that comfort letters were "not legally enforceable in the collection of our loan." In contrast, guarantees were to be in the bank's standard form. Guarantees not conforming with the standard form were to be vetted and approved by the bank's legal counsel.

97      Within the Credit Division, each person had an authorized credit approval limit, which conferred upon them the discretion to approve any loan which fell within that limit, as long as they were satisfied with the risk. If a credit application exceeded the authorized limit, the person to whom it had been sent would review it and add whatever comments were appropriate. The application would be forwarded up the chain to someone with a higher limit, and this might happen several times before the credit was approved by the ultimate decision maker. Each person who signed off on a credit would review it and the comments of the persons below them in the  chain of approval. Persons reviewing a credit also had the authority to recommend changes in the terms and conditions of the credit, or to recommend rejection.

98      Once the credit was approved, the application was returned to the Corporate Banking Division, along with the comments or conditions added by the Credit Division. It fell then to the Corporate Banking people to ensure that the conditions were complied with and documentation obtained, and Wendy Leaney testified the department had its own internal procedures in this regard. If these terms and conditions were not complied with, it was the responsibility of the account manager to report this to the Credit Division.

99      Patrick Noonan senior vice president. Credit Division, testified that he assumed everyone below him on a credit approval application had read all of the material he received, because any recommendation was based upon it. Since a recommendation could be approved with conditions attached, he assumed it would be read by everyone on its way back down the chain. There was no process by which Credit Division could ensure those below adhered to conditions it imposed so that the responsibility for this rested on the account manager in Corporate Banking. Hence, it was not for Credit Division to pass on a comfort letter. It was for the account manager to see to it that a comfort letter was satisfactory to the bank. Noonan testified that he had never spoken to anyone at Plessey, GEC, GEC Marconi or CMC at any time material to this proceeding.

100      In accordance with standard bank procedure for the approval of credit applications, a Corporate Credit Review of Plessey was prepared by the account manager, in this case Howard  Baker, manager of corporate finance in the Bank's London office. The account was given a risk rating of 2, a rate which the bank reserved for corporate borrowers with strong balance sheets, strong earnings, good access to public markets and a top corporate credit. Although the CCR indicated the bank had had a relationship with Plessey since 1982, it listed facilities then available to Plessey, none of which had been drawn upon. In the section entitled purpose of review/use of credit, Baker noted "We view Plessey risk as entirely acceptable for this transaction. A successful bid will enhance our relationship with Plessey in London (which currently consists only of occasional FX business), and of course in Canada where we hope to maintain our relationship with Leigh, and further build on Plessey's growth in Canada. ...Plessey intends to use Leigh as its platform to sell communications, avionics and defence equipment in Canada, estimating that it would be able to bid for £500 million of Canadian

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

Page 21

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

contracts over the next five years." Under pricing Baker noted "we would therefore seek your guidance on lowering the pricing ... on the basis of our relationship with Leigh in Canada and the important one-off opportunity we have been presented with." The security for the $50 million short-term, uncommitted line was listed as nil, with the explanatory note "Borrowings by Plessey Canada (1988) Inc. will not be guaranteed by the parent. Plessey & Co. plc do not provide guarantees for any subsidiaries borrowing." The CCR was sent to the bank's Credit Division in Toronto for approval.

101    Ian Musgrave testified that Baker's observation was incorrect, and while Plessey had a group policy of ordinarily avoiding guarantees, that Plessey did guarantee the borrowings of its subsidiaries in certain circumstances. I accept his evidence, Although Musgrave was not  involved in negotiation of the terms of this facility, he was treasurer of the Company at the time. The negotiations were conducted largely by Denise Beard, who reported directly to Musgrave. No evidence was led as to the source of Baker's mistaken conclusion that Plessey did not give guarantees. This observation was critical however, in that it led Patrick Noonan, then a senior vice president in TDs Credit Division, to recommend as a condition of the credit approval, that a letter of comfort be obtained from the parent, Plessey Company plc. Musgrave did confirm in evidence that bank was correct in noting that a Plessey guarantee was not on offer for the Plessey Canada borrowing.

102    In recommending that the credit be approved, Noonan noted:

> Credit risk of U.K. parent acceptable. Appl'n requests Cdn $10MM to Plessey Canada (1988) Inc. which is obviously a new vehicle for this investment. It is not listed as a subsidiary of the U.K. parent in last annual report. No gtee will be provided.

> As there are no financials we should have an appropriate comfort letter from parent. Would agree on this basis in light of interim finance requested.

103     In this period, Noonan testified he was reviewing well over 1000 CCRs a year. Noonan explained he was not surprised to see that a guarantee was not on offer because "it was common for major companies not to guarantee borrowings of subsidiaries and I was aware that the common practice was to provide comfort letters in some cases". He testified that he specified an "appropriate comfort letter" because the bank had no financials for Plessey Canada and therefore no basis upon which to assess the company's debt service capacity, its ability to repay, nor at that  time, information on how the loan was to be re-paid. Hence, he explained that he wanted "a clear undertaking from the Plessey Company Plc that they would see the bank whole on any portion that may be taken by the Canadian company." Regarding his reference to an ongoing Canadian bank role, Noonan testified that since they were the sole bankers for Leigh and had no active relationship with Plessey, he hoped the bank would preserve the relationship with Leigh. He described this aspect of the credit as a marketing aspect between the corporate account manager at the bank and Plessey. He explained that each member of the bank's Credit Division had a discretionary lending limit. If the credit application was for an amount within that limit, then the person reviewing it had authority to approve the risk. If not, the application would be passed to a more senior member of the department who had a higher lending limit. Noonan testified that he reviewed the Plessey application from the perspective of acceptance of credit risk. As the $50 million limit was in excess of his discretionary lending authority, he recommended that the credit be approved, and forwarded the CCR to the senior executive.

104    In the case of the $50 million Plessey facility, the CCR was passed above to William T. Brock, Executive Vice President, Credit, who recommended that the application be approved and noted "this is a short term bridge loan and we are bankers to Leigh which will now be expanded by Plessey. We would not want to lose this to a Canadian competitor." The credit application was ultimately approved by the chairman of the bank himself, Richard Thomson, and the requirement that an appropriate comfort letter be obtained was left unchanged.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

105      The credit was approved the same day as the application was made. In notifying the  London office of the approval, Noonan advised:

Insofar as CDN $10,000,000 being available under the name of Plessey Canada (1988) Inc., which is obviously a new vehicle for this investment, as there are no financials, we should have an appropriate comfort letter from the parent. We note your remarks that no guarantee would be available. However in light of short-term requested, we are agreeable on the above basis.... We would not want to lose this financing to Canadian competitor, particularly with our long-standing account relationship in Canada where we are the sole bankers to Leigh.

106      Noonan explained in evidence that while it was his idea to obtain a comfort letter, he did not provide any of the language or participate in the drafting of the letter. Nor could he recall indicating what, in his view constituted an appropriate comfort letter. He explained that according to bank procedure it was the responsibility of the account manager, in consultation with legal counsel, to obtain the appropriate documentation, including in this case, the comfort letter. While on occasion he would provide some verbal guidance to Corporate Banking officers if approached by them. Noonan said he could not recall having spoken to Baker or his assistant J.A. Read concerning the Plessey letter.

107      The bank learned subsequently that Plessey did not intend to use the $50 million loan facility, but did wish to draw upon the $10 million amount which had been carved out for use by Plessey Canada.

108      Howard Baker, of TDs London office, and Greg Young, a manager of Corporate Banking  in Toronto, were responsible for obtaining an "appropriate letter of comfort" from Plessey. Young had been in charge of the Leigh account in Toronto since early 1987, and was responsible for determining that the comfort letter was acceptable. Since Baker was the bank officer then in charge of the relationship with Plessey, he was charged with obtaining the letter from Plessey and forwarding it to Young for approval. Young testified it was reasonable to assume that Baker had received Noonan's comments when he contacted Plessey.

109      Baker had available to him a draft comfort letter, which he used as a template for drafting the Plessey letter. The template letter stated:

We understand that Toronto-Dominion Bank has agreed to place at the disposal of [blank] a subsidiary of [blank] banking facilities of C$3,750.000 (three million seven hundred and fifty thousand Canadian dollars).

This letter will confirm that [blank] is aware of and approves of the above-mentioned facilities. We also wish to assure you that during the period of such financial assistance we expect to provide adequate financial support in order that the affairs of [blank] will be conducted on a sound basis. Furthermore, we undertake to retain control of this subsidiary company as long as any indebtedness to you may be outstanding.

It is our policy that our subsidiary companies including [blank] be managed and operated in such a way as to be always in a position to meet their financial obligations when they become due and in this particular instance we will ensure that sufficient liquid resources are available to discharge any liabilities at maturity.

110      Baker did not use the template letter verbatim, and instead sent Plessey an amended version. No evidence was led as to the reason for these changes. On April 7, 1988, Baker faxed  to Ms. Beard a draft of a proposed comfort letter which stated:

We understand that the Toronto-Dominion Bank ("the bank") has in place at the disposal of Plessey Canada (1988) Inc., a wholly-owned subsidiary of The Plessey Company PLC, borrowing facilities of up to C$10,000,000 (ten mil-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

lion Canadian dollars).

This letter confirms that The Plessey Company Plc is aware of and approves of this facility, and undertakes to advise the Bank if any reduction in ownership of Plessey Canada (1988) Inc. is contemplated. We also wish to assure you that during the period of such financial assistance we expect to provide adequate financial support in order that the affairs of Plessey Canada (1988) Inc. will be conducted on a sound basis.

That same day, Denise Beard responded by sending Baker the following draft comfort letter, which was in a form Plessey had used on other occasions:

This is to confirm that The Plessey Company plc has full knowledge of the facility of c$10,000,000 (ten million Canadian dollars) which has been granted by Toronto-Dominion Bank to Plessey Canada (1988) Inc.

Plessey Canada (1988) Inc is currently a wholly-owned subsidiary of Plessey Overseas Limited which is a wholly-owned subsidiary of The Plessey Company plc. No change in the ownership of Plessey Canada (1988) Inc or Plessey Overseas Limited is contemplated and we undertake not to reduce our share-holding during the term of the above mentioned facility without prior notification to yourselves

It is our policy that our wholly-owned subsidiaries, including Plessey Canada (1988) Inc. be managed in such a way as to be always in a position to meet their financial obligations, including repayment of all amounts due under the above facility.

111      In evidence, Musgrave said it was common for Plessey to negotiate the language of the comfort letters it gave, and that quite often the bank concerned would produce a form and Plessey would then respond with its own form of letter. He said there was some degree of negotiation in most cases and that Plessey's comfort letters were reviewed by its in-house counsel, Tony Noon, "as a matter of course." In respect of comfort letter number one, no party called Baker or Beard to give evidence about the extent of the negotiations.

112      Upon receipt of the Plessey draft, Baker in London forwarded the letter to Young in Toronto with a note saying that Plessey wanted the line in place by the next day. Young had previously been involved in several other files involving comfort letters, however this was his first experience in actually taking one. Upon receipt of the draft, Young showed it to Alex Norton, in-house counsel at the bank. Young testified that following the brief meeting with Norton, he believed the Plessey letter was "a strong comfort letter" and "legally binding." Neither Plessey's counsel. Tony Noon, nor TD's counsel. Alex Norton, testified at trial.

113      Young did not show the draft letter to Noonan in the Credit Division, nor did Noonan see the first comfort letter until after it had been executed. On April 7, Baker faxed a letter to Beard confirming that TD had made available a short-term $10 million facility for use by Plessey Canada, noting "documentation to formalize this facility will follow due course."

114      On April 11, 1988, Young sent a facility letter to J. Palazzi of Plessey U.S. containing the terms of the $10 million loan facility. This term sheet described the borrower as Plessey Canada,  noted that repayment was on demand, that the loan was unsecured, and did not contain any financial reporting requirements. It listed that documentation would include "a Comfort Letter from the Plessey Company PLC in the form attached." The attached comfort letter was in the same form as that which Plessey had forwarded to the bank and which Young had shown to Norton. On April 12, prior to receipt of an executed comfort letter by the bank, Plessey Canada drew down the amount of $10 million from the bank, which it used as part of the acquisition financing for Leigh. Plessey group treasurer Ian Musgrave explained in evidence

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

that from time to time the drawdown of cash would precede completion of the formal documentation with a bank. He said that normally by that time all the terms and conditions would be pretty well agreed, and there would be no contentious items left unresolved. The documentation would amount to the completion of paperwork in the terms agreed. Plessey Canada accepted the terms as offered and signed the facility letter on April 15, 1988.

115     In connection with this facility, the bank prepared a second, separate Corporate Credit Review of Plessey Canada, on April 19, after the loan facility had been offered by the bank and accepted by Plessey Canada. The CCR was prepared by Randi Winston, of the Corporate Banking Division in Toronto. It rated the risk of the borrowing as 2 low risk, which was the same as the risk rating given to Plessey Plc in the April 5 CCR, and listed security as nil. Documentation was "to be obtained" and included "comfort letter from The Plessey Company PLC."

116     The April 19 CCR enclosed the draft Plessey comfort letter and a copy of the April 5 CCR of Plessey Plc. In the remarks section Winston noted:

The purchase of Leigh should enable Plessey Company to bid for about $2 billion in Canadian contracts over the next 10 years. The Department of National Defence proposes to spend several billion dollars to acquire a fleet of nuclear powered submarines which should provide Plessey with an opportunity to market its sonar equipment, currently used on the British submarines.

While Bank of Montreal is Plessey Canada's banker, the company has expressed in interest in adding another financial institution and splitting their banking business. For the time being. Plessey has indicated that Leigh's facilities with the TD bank will remain intact.

Under "Use of Credit and Repayment" the CCR noted that the loan was to assist in the purchase of Leigh and that repayment of the advances under the facility was to be derived from Leigh's cash balances. The loan was to mature in 90 days, on July 11. Winston also observed:

Plessey Canada has advised us that this is a short-term need and have not requested a formal operating line of credit. However, having available an authorized facility would place TD in good standing in the event that Plessey decides to split its banking business. At this time we note that EMEA division was unsuccessful in winning Plessey Company PLC's $50 million deal.

The security section stated that "While there is no security per se, a strong comfort letter from the Plessey Company Plc will be obtained by EMEA division and forwarded to us shortly." Winston explained the risk assessment as follows: "Given the short term nature of this facility and the comfort letter to be obtained the risk is acceptable to the bank. Given the strong financial position of the Plessey Company PLC we are recommending account rating of 2." Young also signed the CCR which was ultimately approved by Noonan, who stipulated that the bank should obtain financials of the borrowing entity as soon as possible.

117     In reviewing the credit application Noonan testified that he noted the purchase of Leigh should enable Plessey to bid for Canadian contracts over the next 10 years and that while Bank of Montreal were the bankers for Plessey Canada, there might be opportunity for TD to be involved in their ongoing banking requirements. He testified that while this was a noteworthy point, it had no bearing on his risk assessment. Noonan testified that he noted the facility was for a short-term and that a formal operating line was not requested by the customer. He said other points of note were that the $10 million was to be repaid from Leigh's cash balances once Plessey had obtained the 100 percent ownership, and that while there was no security per se, a strong comfort letter would be forwarded by Plessey.

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

118      Noonan said he read the attached draft comfort letter, and in particular, paragraph 3. He said that, at the time, he took the view that the language of the comfort letter provided a commitment from Plessey to see that Plessey Canada was in funds or solvent to meet its financial obligations, including the amounts due under the TD facility. Noonan testified he formed this view based on the wording of the third paragraph and based also on the standing, strength and reputation of Plessey, which he described as "of paramount importance." In that regard, he said when a draft comfort letter was given by a company with a reputation that, enjoyed access to the public markets of the world, then he believed it was a company which valued its reputation, and  that the bank in turn could believe in its word. As well, he said he took Plessey at its word, as expressed in the letter, because the comfort letter had been signed by two authorized signatories, and because he believed the people who gave the comfort letter also controlled finances and were in a position to provide the flow of funds to the appropriate subsidiaries. He said "in my view it's a quasi-solvency guarantee that they, in turn, will always meet their financial obligations." He elaborated that while he did not view the comfort letter as a guarantee per se, he viewed it as a quasi-guarantee from the point of view of ensuring that the subsidiary was in a solvent position.

119      Meanwhile, within Plessey, Denise Beard was arranging for formal approval of the comfort letter. While group treasurer Musgrave was not involved in negotiating the comfort letter, he testified that Beard would "almost certainly" have shown him the final draft before it was signed. Musgrave explained that Plessey controlled the borrowings of its subsidiaries and that approval of the Plessey main board was required for both a borrowing limit and a guarantee limit for each of its subsidiaries. Once approved by the board, the borrowing limit would entitle the subsidiary to borrow in amounts up to that limit, without exceeding it. The guarantee limit was Musgrave's authority to negotiate with the banks the degree of support Plessey could offer in connection with those borrowings. He said the degree of support to be offered by Plessey was within his discretion, and that he could choose to offer no support, a comfort letter, or a guarantee if one was necessary. Once a guarantee limit had been approved, it was not necessary to have the support approved by the main board, although in light of the group policy, Musgrave testified that if a guarantee was offered, he would consult with Stephen Walls, managing director of Plessey, first. He said the main board would not have seen the wording of the comfort letter  itself.

120      On April 20, Denise Beard sent a memo to Stephen Walls requesting authorization of the comfort letter by him and one other board member, and the letter was in fact signed by Walls and Mayes. Musgrave explained that it was somewhat unusual to issue a comfort letter without prior main board approval of a guarantee limit, but that this happened from time to time if a transaction was taking place at high speed and there wasn't a board meeting scheduled in time. Hence, on April 29, after the letter had already been issued, Musgrave placed the issue of retrospective approval of a guarantee limit for Plessey Canada on the agenda of the next main board meeting. On May 6, 1988, the Plessey main board retrospectively approved both a borrowing limit and guarantee limit for Plessey Canada of $10 million.

121      Musgrave testified that the Plessey treasury department maintained a "guarantee register" in which it recorded all guarantees and comfort letters, including the comfort letter provided to TD. Although designated as a guarantee register, Musgrave explained in evidence that the title of the register did not mean every document recorded there was a guarantee. He said that in addition to guarantees, comfort letters were recorded there for the sake of convenience, but were separately identified. Musgrave testified that the register included documents which did not require Plessey to pay the debt of a subsidiary. I accept Musgrave's explanation, and hence his evidence on this point.

122      Although the TD comfort letter was recorded in the guarantee register, Musgrave stated in  evidence that his personal intention at the time was that the comfort letter would not bind Plessey to repay the indebtedness of Plessey Canada. Further, he testified that while he could not recall discussing the question specifically with Stephen Walls, Walls was a highly experienced finance director and Musgrave stated he would be very surprised if Walls did not understand the difference between a comfort letter and a guarantee.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

123     Notwithstanding this however, Musgrave testified that in his view, the comfort letter still had value for the bank. In respect of the first paragraph of the letter, Musgrave said the statement that Plessey was aware of the facility should prevent the bank from feeling vulnerable that it was advancing money to a subsidiary without knowledge of the parent. Regarding paragraph 2, Musgrave said it was his belief at the time that this statement would have significant value to the bank. He said notification of any intention of Plessey's to reduce its shareholding would give the bank the opportunity to withdraw its facility, which was a demand loan. He said the third paragraph would also have value for the bank in that Plessey was stating its policy that its subsidiaries are expected to manage their affairs so as to be always in position to meet their financial obligations. Musgrave testified that he expected the bank to take the statements into account in deciding whether to make the facility available to Plessey Canada, that he expected the bank to rely upon the statements as being factually correct, and that they were intended to give the bank a degree of comfort about the proposed facility. He said he and Plessey would have known that the bank would not advance the funds without the comfort letter.

124     On April 27, 1988, Plessey forwarded to the bank a comfort letter dated April 20, 1988  executed by authorized signatories Stephen Walls and Derek Mayes, which was identical to the draft previously submitted to the bank by Beard. This the first comfort letter, stated:

> This is to confirm that The Plessey Company plc has full knowledge of the facility of C$10,000,000 (Ten million Canadian dollars) which has been granted by Toronto Dominion Bank to Plessey Canada (1988) Inc.

> Plessey Canada (1988) Inc is currently a wholly owned subsidiary of Plessey Overseas Limited which is a wholly owned subsidiary of The Plessey Company plc. No change in the ownership of Plessey Canada (1988) Inc or Plessey Overseas Limited is contemplated and we undertake not to reduce our share-holding during the term of the above mentioned facility without prior notification to yourselves.

> It is our policy that our wholly-owned subsidiaries, including Plessey Canada (1988) Inc. be managed in such a way as to be always in a position to meet their financial obligations, including repayment of all amounts due under the above facility.

125     By this time the acquisition of Leigh had been completed, and Plessey Canada held the shares of Leigh. As an acquisition vehicle, Plessey Canada simply held the shares of Leigh. It did not carry on business and was run by Plessey's lawyers in Canada acting on direction from Plessey in London. Once the transaction had been completed, Musgrave said all the cash holdings in Plessey Canada were paid out, and conceded that Plessey Canada would not have had the cash to pay the TD loan, if payment had been demanded. He said there were options available to Plessey Canada however, and at least one other bank was interested in assisting. At the time of the takeover, Leigh had available to it a $5.4 million facility from TD, although it had not drawn down upon it, and the amount outstanding was nil.

126     Although Plessey paid $104 million for the shares of Leigh, when the transaction was completed Plessey determined that the book value of Leigh's assets was about $50 million. Of that $104 million, $10 million was drawn down on the TD bank line. The remaining $94 million was structured as $69 million intercompany debt held by Plessey and $25 million equity. In consequence, Leigh's total debt load was within the order of $79 million.

*The Second Comfort Letter*

127     Following the acquisition. Plessey commenced a process of purchase accounting adjustments, whereby the Leigh balance sheet was adjusted to reflect the introduction of Plessey accounting principles. Although this process was not completed until several months later, it spoke as of the date of the takeover. Due to the fact that Plessey's accounting principles were more conservative than Leigh's, their introduction led to a $38.5 million reduction in the book value of

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

Leigh's assets, leaving Leigh with a book value, on paper, of $13.1 million.

128     On June 30, 1988, Leigh and Plessey Canada were amalgamated under the name Leigh Instruments Limited. Thus, Leigh became responsible for the $10 million acquisition loan from TD held by Plessey Canada. Around this time, Musgrave spoke to Greg Young, the account manager for Leigh at TD's Corporate Banking Division in Toronto, and assured him the bank needn't worry about the amalgamation and that "as far as we were concerned, the letter of comfort still stood."

129     Following the amalgamation, Plessey determined that, in fact, Leigh did not have the anticipated $10 million in cash on its books. At the same time, Leigh advised Plessey it required an additional $2 million working capital. As a result, Leigh was unable to repay the $10 million facility to TD on its maturity date of July 11. On July 4, Musgrave sent a memo to Stephen Walls, apprising him of the situation and proposing that the $10 million facility be rolled over. As well, he requested permission from Walls to advance the additional $2 million to Leigh. Walls approved both requests.

130     Musgrave then requested an explanation for the Leigh shortfall from Andrew Akerman the financial analyst at PESL, the group to which Leigh belonged. Akerman reported that most of the shortfall was due to adverse phasing variances on the TACAN contract. In evidence, Musgrave explained this sort of shortfall was fairly common within Plessey. He said most of Plessey's business consisted of long-term advanced technology contracts, and that it would not be unusual at any point in time for several of these contracts to experience difficulties on a technical level. He said such technical difficulties resulted in cash flow variances, since often the customer would only make progress payments on the contract once specific technical milestones had been met. If there was a delay in meeting these milestones, it would affect the company's cash flow. Musgrave testified that while Leigh did not have sufficient cash to repay the loan at this point, it did have other options available to it. He said if TD had called the loan, Leigh could have sold some of its assets or perhaps approached the Bank of Montreal, which he said was keen to get involved.

131     In a July 11 memo to Noonan at TD Credit Division, Young reported the conversation with Musgrave about the comfort letter and that he had confirmed with the bank's legal department that the comfort letter would continue to apply. He also noted that contrary to prior expectation. Leigh did not have the $10 million to repay the outstanding loan, and that Leigh's cash balances had declined due to a temporary delay on a major contract. Young requested that the existing loan be rolled over for a further 90 days and continued in the name of Leigh, concluding "We are satisfied that the risk is still acceptable based on the comfort letter".

132     Plessey delivered written confirmation to the bank in a letter dated August 1, 1988, that the comfort letter applied to Leigh. This letter was vetted by Plessey in-house counsel before being sent, and was signed by Walls and Huntbatch. This second comfort letter stated: "We confirm that the comfort letter dated April 20, 1988 remains valid and now applies to Leigh Instruments Limited."

*The Multi-Option Facility*

133     In August 1988, Jonathan Exton of the Bank's London office received an invitation from Plessey to submit a bid to participate in a £250 million multi-option facility, which Exton explained was a "facility which permitted the borrower to draw down in different currencies of its choice". Due to the size of the facility, this invitation had been extended to a number of banks. Exton testified that when he received the invitation, he prepared a Corporate Credit Review of Plessey, which he sent to the Credit Division in Toronto. The CCR, dated August 24, described its purpose as a request for approval to underwrite £5 million of the £200/250 million five-year multi-option facility, arranged for Plessey by Barclays de Zoete Wedd Limited. The CCR gave Plessey a risk rating of 2 (unchanged). Under documentation, Exton noted that the MOF agreement included standard events of default, including a material adverse change clause and a negative

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

pledge.

134    In the section pertaining to use of credit. Exton noted that TD had been invited to participate due to its "close relationship in Canada as the principal banker of its subsidiary Leigh Instruments of Canada ... since the acquisition TD has also taken the banking business of Plessey Canada, who were formerly with the bank of Montreal." Exton went on to state that the pricing on the MOF would not provide much profit for the bank. Nevertheless, he was seeking approval to participate for "relationship reasons and the opportunity to gain future business," and added that the bank had recently offered Plessey a £20 million uncommitted short-term facility which had been fully drawn down. In his financial summary of Plessey, Exton observed that the company's turnover had fallen by 9 percent as senior management had devoted resources to fighting off a recent hostile takeover bid by GEC. Also, Plessey's net worth had been reduced by £335 million from £623 million as a result of a write-off of goodwill associated with a series of recent acquisitions, one of which was Leigh. Despite this, Exton described the company as "financially strong". The CCR was also signed by Hugh Rising, vice president of corporate finance for the EMEA division, who added: "We are proposing to participate in this facility at the minimum level for existing relationship reasons, feeling as well opportunities will be presented going forth. This will assure our prominent position as bankers to the Canadian operations and afford us with opportunities in the US and specifically the UK relative to FX and Capital Market products." The application was approved by McDowell, who noted that the bank should obtain a capital adequacy clause. In evidence, McDowell said concern about losing the Plessey business to a competitor would not have affected his decision, but agreed that building up the relationship with Plessey was an important consideration for the bank. The MOF was signed on September 20, 1988.

*September 1988 to April 1989 - The Third Comfort Letter*

135    Plessey completed the purchase accounting adjustments for Leigh by early September 1988. The opening balance sheet showed Leigh's assets were valued at $51.66 million on March 31, 1988. This figure was arrived at using Leigh's accounting principles. Once the asset value had been calculated using Plessey's more conservative accounting principles, Leigh's assets were reduced to $13.16 million as at April 5, 1988. Musgrave explained in evidence that Plessey took a more conservative view than Leigh on the valuation of contracts in progress. He explained that Leigh and Plessey were both involved in large long-term contracts, and with such contracts it was necessary to book profit on the contract as it progressed. He said if the contract ran over a period of several years, profit would accrue over the life of the contract and there was a certain amount of discretion as to how and when the profit was booked or recognized on the balance sheet. Plessey was more conservative than Leigh in recognizing profit, so when Leigh's balance sheet  was adjusted according to Plessey principles, it resulted in the write-down to $13.16 million.

136    In late September 1988, only five months after the Leigh acquisition, Leigh advised that it would have a total borrowing requirement for the quarter ended December 1988, of $30 million. Leigh's cash requirements included $3.55 million for the payment to Plessey of interest on the $69 million intercompany debt which had been imposed following the acquisition.

137    Although the interest payment on the intercompany debt was payable on September 15, Leigh did not make this payment. Plessey was not pleased at this turn of events. In a memo to file in late October. Musgrave recorded that he had been informed by David Dean, the vice president, finance at Leigh, that the loan interest payments to Plessey might have to be further deferred due to contract slippages. Musgrave noted "we cannot allow trading cash flow slippages to be accommodated by the deferral of loan obligations."

138    In late September, Andrew Akerman, financial analyst at PESL, advised Musgrave that Leigh required increased working capital due to delays in start-up of the TACAN program, and due to technical problems plaguing the SHINCOM

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

program. However, Leigh was forecasting that its bank borrowings would decrease from $30 million at the end of December, to $19.89 million by the end of March 1989.

139      Based on the information from Akerman, Musgrave drafted a submission to Plessey's main board, requesting an increase in Leigh's borrowing and guarantee limit to $30 million.  Board approval was granted on September 30, 1988.

140      On September 26, Greg Young at TD prepared a Corporate Credit Review of Leigh for the purpose of renewing the outstanding facilities, and placing the $10 million acquisition facility in Leigh's name, since it had previously been in the name of Plessey Canada. The total of Leigh's outstanding borrowings at the date of the review was $13.782 million.

141      In the CCR, the Leigh account was given the risk rating of 3A for all the facilities which. Noonan explained, denoted a normal banking risk, with the A indicating an improving trend. It is significant that this was the same risk rating which had been applied by the bank to the Leigh operating line prior to the acquisition. The $10 million acquisition facility had been given a lower risk rating of 2 when it was held by Plessey Canada, 2 being the same rating as the parent, Plessey Plc. In evidence, Noonan testified that the $10 million acquisition facility, as secured by the comfort letter, was still rated at 2, but that the practice and policy of the bank was that if a portion of the credit facilities of the borrower had a more adverse rating than any other, then the total account rating for the borrower would receive the higher risk.

142      Notwithstanding Noonan's evidence, it is clear that the risk rating applied by the bank to all the facilities was that of Leigh and not Plessey. Plessey Canada was merely a shell company incorporated for the sole purpose of the Leigh acquisition. Since it was not an operating company, there was no basis for a risk rating other than the risk of the parent. Once the acquisition loan had been placed in Leigh's name following the amalgamation, the risk was rated  as that of Leigh rather than Plessey. This conclusion is further reinforced by the risk rating given by the bank subsequently in the January 10, 1989 CCR. As is set out in more detail below, in that CCR the bank merged all the Leigh facilities into one operating line, released all its formal security and rested its exposure solely on the comfort letter. The risk rating of the account remained that of Leigh however. This risk rating is inconsistent with the bank's subsequently professed view that the comfort letter contained an obligation to pay or was in the nature of a guarantee.

143      Security was listed in the September 26 CCR as a registered general assignment of book debts and documentation for the $5.4 million operating line was listed as a loan agreement containing normal representations, warranties and covenants. For the second line of credit, documentation was described as a letter agreement and the comfort letter from Plessey. Repayment was "As funds permit on demand (subject to contract maturities)."

144      In the remarks section. Young noted that Leigh's financing requirements had increased substantially due to the acquisition and subsequent amalgamation, and that Leigh had advised they would request an increased operating facility of $25 million. Young reported that the introduction of Plessey accounting principles had altered Leigh's balance sheet significantly, but recommended the risk as acceptable, despite the deterioration in Leigh's financial position. He made his recommendation, in part, on the basis that the lines were payable on demand and fully secured by receivables, and because "facility #2 is backed by a strong comfort letter from Plessey and we are confident that Plessey will support Leigh as required". The review concluded that the  low pricing on the $10 million facility had been recommended by Credit Division to ensure that the bank kept the Leigh relationship.

145      Although this CCR was intended to serve as Leigh's annual review, Noonan refused to approve it on that basis. He renewed Leigh's facilities only until October 31 and noted that based on a review of Leigh's balance sheet, outside security such as a comfort letter would be required for the expected loan increase.

146      Noonan testified that he limited the renewal period of the facilities to Oct. 31 because the bank had only the

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

draft accounts, and he wanted to see a full set of audited financials for the company. Noonan said he specified a new comfort letter because the amount of the anticipated increase would exceed the value of the receivables over which the bank held a charge.

147    A subsequent Credit for Executive Circulation dated September 30, 1988, reviewed the Leigh facilities and concluded "our lines are fully secured by the assets of the company and supported by comfort letter from Plessey. We are confident that Plessey will support Leigh as required." This document was initialed by Brock, McDowell, and Noonan.

148    That same day, Young sent Noonan a memo requesting a temporary increase or bulge in Leigh's operating line of $1 million, until the company could provide the amalgamated financials. Young reported that the Leigh borrowings were at $15.8 million (an increase of $2 million over the past four days), some $400,000 in excess of the authorized limit. In recommending approval of the bulge. Wendy Leaney, general manager, Corporate Banking Division and Young's immediate superior, described Plessey as a "valued connection." The request was approved, and initialed by both Noonan and McDowell.

149    On October 6, 1988, Brock, who was visiting the U.K., attended a meeting with Musgrave at Plessey, accompanied by Jonathan Exton, manager, corporate finance in the bank's London office. Musgrave explained that this sort of visit happened quite frequently. He said someone senior would visit from overseas and would be taken around to meet major customers or potential customers of the bank. In fact, requests for appointments like this were so common. Musgrave had instructed his secretary to limit them to two per week.

150    In his reporting memo following the meeting. Exton commented that the bank's last visit to Plessey had been more than two and a half years earlier. Plessey had not been prepared to accept visits, despite repeated attempts, and so he was pleased to be able to make this call. Exton did not record any discussion about Leigh, but did note that Plessey intended to drawdown on the MOF sometime in the next month.

151    By the first of November, Leigh again requested a temporary increase in its loan facility, this time of $4 million. In a memorandum to Noonan on that date, Young stated the bank was still awaiting a copy of the amalgamated financial statements, which they expected to receive by mid-November. The total outstandings to Leigh at this point were $16.851 million. No explanation was provided in the memo regarding the need for an increase, however Young did point out that the London office felt the Leigh relationship had assisted in the efforts with Plessey, and that Brock had recently called on the company. As well, he reported that Plessey's board had approved Leigh's request for an increased operating line of $30 million. Included in the description of security was the comfort letter.

152    In recommending the increase, Young's supervisor Wendy Leaney, noted that while the Leigh relationship was taking a long time to "regularize", this was the bank's only relationship with Plessey, although this latter observation was in error. Leaney explained in evidence that she did not object to the inclusion of the comfort letter under security, because she considered it part of the security package.

153    This particular credit did not go to Noonan, who was away from the office. Instead, it was reviewed by Sid Owen, senior vice president, Credit Division. Owen approved the requested increase until months end, but commented that the lack of presentation of reasonable figures was difficult to understand, and that they must be tabled if the bank was to consider restructuring the loan. He concluded cautiously "the combination of Plessey's support, albeit informal, and receivables should provide adequate protection but all must work to regularize this company's facilities by Nov 30/88. We must resist being dragged along."

154    When asked in evidence about the reference to informal support, Noonan said that, although he had not seen the

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

note at that time, the comfort letter in his view amounted to a quasi-guarantee. He explained that while a comfort letter might not be supported by a formal resolution and all the protective clauses that accompany a guarantee, he believed it could convey a quasi-guarantee to perform certain functions.

155      Meanwhile, on November 16, GEC announced a second hostile takeover bid for Plessey, this time in partnership with Siemens, a German company. The two companies formed GEC Siemens plc as a vehicle for the joint venture. As Musgrave explained, this was the second such hostile bid from GEC, and it was most certainly not welcomed by Plessey, which wished to remain independent. Also, Musgrave said there had been a long-standing adversarial relationship between the chairman of Plessey and the chairman of GEC. Exton at the bank's London office wasted no time in offering the bank's support to Plessey. He met with Denise Beard of Plessey's Treasury Department on Nov, 17. In evidence, Exton explained the purpose of the call was to develop further business opportunities with Plessey. In his report of the meeting, Exton described the purpose of the call as, among other things, to advise of the bank's willingness to support Plessey in any defence strategy against the hostile bid, and to follow up on amendments to credit facilities for Leigh. Exton reported that Plessey would put a freeze on meeting other bankers while the bid was on, and that they were Plessey's last visitors for the time being. He noted that the bank's pledge of support was greatly appreciated by Plessey, and that Plessey's main need was credit facilities.

156      Also in this meeting, Beard requested that the bank release its formal security over the assets of Leigh. Exton testified that he understood the request for release of security was related to the terms of the MOF, which restricted negative pledges on the assets of Plessey. He said it was his understanding that Plessey was concerned about its level of encumbrances, which was approaching the percentage allowable under the MOF, and consequently it wished to reduce them.

157      This contrasts with the evidence of Musgrave, who indicated it was merely Plessey's preference not to have security over the assets of its subsidiaries, as it restricted Plessey's ability to deal with these assets, and because if security was granted to one bank, others might wish to follow suit. He explained that the Deloitte's due diligence report on Leigh had omitted any reference to the security TD held over Leigh's assets. Plessey only discovered the security when preparing for the MOF, since as an appendix to the MOF. Plessey had to list all the secured assets in the group at the time of signing. He said the MOF was signed with the Leigh security in place and listed in the appendix. As well, he testified that Plessey was well within the allowable limit in secured assets contained in the MOF. As such, the terms of the MOF did not require that the security be released. However, when Musgrave became aware of the security, he asked Beard to try and have it removed. He said it was simply a matter of good housekeeping that the security be released.

158      To the extent that Musgrave's evidence conflicts with that of Exton regarding the reason for the requested release of security, I prefer the evidence of Musgrave. He was intimately acquainted with Plessey's policy on secured assets as group treasurer. Moreover, although Ms. Beard did not testify, she would have been aware that TD was a signatory to the MOF, and thus would have a copy of the MOF agreement. Accordingly, I conclude that Plessey requested the security be released simply because it preferred not to grant security over assets of the group, and not because it was required to do so by the MOF.

159      Leigh continued to experience cash flow problems and on November 18, Dean at Leigh advised A.G. Finnis, group taxation manager at Plessey, that the $3.5 million in interest owing on the intercompany debt, which had been due September 15, would not be paid before January. Leigh also advised that it would require a further increase in its borrowing limit. Musgrave responded to Finnis in a memo dated November 28 that a request would be submitted to the Plessey main board for an increase in the borrowing limit, in part to enable Leigh to pay the interest on the intercompany debt. In evidence however, Musgrave explained that payment of the interest had always been factored into Leigh's financing re-

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

quirements, and that the need for an increased borrowing limit stemmed from cash flow problems related to Leigh's contracts.

160      By November 28, Leigh was in an "out of order" position on its TD facility. This prompted Leaney to write to the senior vice president advising that Leigh's credit had been renewed to November 30, with an operating line increased to $10 million in addition to the $10 million acquisition loan. On November 29, Young advised Leigh's local account manager in Ottawa that a credit exposure for Leigh of $21 million had been verbally approved by the bank and was not to be exceeded.

161      In his record of the conversation, the account manager noted "the bank is concerned that the letter of comfort provided by Leigh Instruments' parent company (Plessey) will not be  honoured in the event of a successful hostile takeover from G.E. and Simmons [sic] group."

162      The credit authorization was followed by a memo from Leaney and Young to the Ottawa account manager on November 30, authorizing a temporary renewal of the Leigh facilities, with the operating line at $11 million for total of $21 million. The memo observed that the bank was still awaiting updated financial information, expected on December 5, before proceeding with Leigh's request for lines totaling $30 million. Leaney added a handwritten note that "in the interim, no security is to be released."

163      Leigh's cash flow difficulties did not abate however, and by December 12th Leigh was again in an out of order position, with a credit exposure of over $22 million. The branch manager in Ottawa called Leaney concerning this, and Leaney authorized the branch to manage the account over the $21 million which had been authorized. At the same time, she stipulated the Leigh position be reported to Corporate Banking Division on a daily basis. In evidence, Leaney said this was a judgment call she made, knowing Plessey had approved a $30 million limit, and that she knew it was only a matter of time before the bank received an increased comfort letter. Leaney conceded that it was beyond her authority to grant approval to manage the account above the authorized limit, and that she should have obtained approval from Credit Division. She said it was a judgment call she made, given that she had been delegated responsibility to manage the relationship, and she took it upon herself to give the approval. Leaney said she wasn't concerned about the account in view of the security package the bank had, but was annoyed at the way the account was being managed.

164      By December 16, the Leigh outstandings had risen to $24 million, and accordingly, Young and Leaney met with Noonan on that date and sought from him an exceptional approval of an increase in the Leigh limit to $25 million, to regularize the company's position on the books. Leaney advised Noonan that Plessey had approved a borrowing limit of $30 million, and that a credit review of Leigh was underway. Noonan approved the increase, on the basis that the credit review would be received in the week of December 19. Leaney and Young failed to provide the credit review within the stipulated time.

165      At Plessey, Musgrave was taking steps to have the Leigh borrowing limit increased even further, to $34 million, following a request from Dean on December 12. In his record of the conversation with Dean, Musgrave noted that the bank was "getting a little uneasy about the security for the local borrowings, in light of the GEC bid for Plessey," despite the $10 million letter of comfort and floating charge on inventory and receivables. Musgrave told Dean he would prefer to secure the bank's position by an increased letter of comfort, "matched at the same time by an elimination of the bank's security on the inventory and receivables."

166       Musgrave prepared a main board submission in the name of Walls, requesting that the Leigh borrowing and guarantee limits be increased from $30 million to $34 million. The need for the increase was attributed to delivery slippages and higher costs on the TACAN and SHINCOM programs. The submission noted that technical problems plaguing

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

SHINCOM had been resolved and borrowing levels were expected to fall to $29 million by March 1989. The increase was approved by Plessey's executive committee on December 21.

167     Meanwhile, at Leigh, steps were being taken to find a new president of the company. To that end, Barry Flower and John Shepherd, president and chairman of the board of Leigh, respectively, met with Frank Driscoll, an engineer with an army background and long experience working for the military and later in the defence industry. Driscoll ultimately was to become president of Leigh in August, 1989. In that initial meeting however, both Flower and Shepherd expressed concern to Driscoll about the performance of David Dean. Driscoll testified that they expressed reservations to him about Dean's ability to perform in his role as vice president of finance, in view of the growth they had planned for Leigh.

168     On January 10, 1989. Leaney and Young finally submitted the credit review Noonan had expected in the week of December 19. By this time, Leigh had again exceeded its authorized credit of $25 million and had outstanding $25.552 million. The purpose of the review was to cancel the separate operating line and $10 million acquisition facility, and re-place them with a single operating line of $35 million. The credit was ultimately approved by McDowell upon Noonan's recommendation, however both imposed changes and conditions in the proposal as submitted by Young. Young and Leaney had proposed that the account risk rating remain at 3 A. however Noonan changed the rating to 3 B, denoting a stable rather than improving trend. I note at this stage that the prior $10 million acquisition facility was given a risk rating of 2 by the bank, based on the comfort letter. However this new facility, which was also to be supported by a comfort letter, was given a much lower risk rating though still normal. This reinforces my conclusion above that the risk rating applied by the bank was clearly that of Leigh rather than that of Plessey. As such, the risk rating was inconsistent with any belief on the part of the bank that  the comfort letter contained an obligation to pay Leigh's debts or amounted to a guarantee.

169     Security was listed in the credit review as the general assignment of book debts and floating charge debenture. Leaney had handwritten next to the description of security that it was to be released, however Noonan struck out her note and substituted "No! See below," in reference to his lengthy typewritten additional recommendations, set out below.

170     Under documentation, Young had listed the letter and loan agreements and comfort letter from Plessey Company. Beside the reference to the loan agreements for the canceled facilities, Leaney had handwritten "to be released." to which Noonan added "only when new security package is in place." To the reference to the comfort letter, Noonan added the handwritten notations: "for $35 million and in the same form, wording and sign off as existing letter, including final paragraph." and "with negative pledge by Leigh Instruments Limited." Noonan explained in evidence his reason for adding this condition was to ensure, if the bank gave up its security on these assets, that Leigh would not be in a position to place security on them in favor of another party.

171     In the conditions section, Young included a requirement that Plessey maintain a majority interest in the voting stock of Leigh. In evidence, Young explained that he included this condition in view of the GEC/Siemens takeover bid and the uncertainty surrounding the ownership of Leigh. Even though the comfort letter contained an ownership clause, he explained that he wished to be able to trigger the loan agreement in the event that Leigh was no longer a  subsidiary of Plessey. Young also included a condition that the intercompany debt be postponed in priority to the TD debt, to which Noonan added the word "formally." Attached as enclosures to the review were Leigh's audited financial statements for the period ending June 30, 1988, draft financials as at September 30 and a copy of the existing comfort letter.

172     Under use of credit and repayment, Young noted that while Leigh's balance sheet indicated some of Leigh's debt should be "termed out" they were prepared to increase Leigh's operating line based on the comfort letter from Plessey,

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

noting as well that the facility was payable on demand. In the security section. Young commented that Plessey had requested that the security be released, since it was Plessey's policy that all its debt and that of its subsidiaries be unsecured. He recommended acceding to this request in return for the comfort letter. In fact, Young's observation on this point was in error, as Musgrave testified. I accept Musgrave's evidence that Plessey did, on occasion, provide guarantees and other security where circumstances warranted. In support of this finding. I note that in April 1989, Musgrave issued a memo permitting a creditor of Micronav to maintain security over Micronav's assets in the amount of $700,000. Musgrave explained in evidence that there were good commercial reasons in that instance to leave the Micronav security in place.

173    In the section on risk assessment. Young observed that the six month delay in the TACAN project had adversely affected Leigh's cash flow and earnings to tune of about $5 million per month. He stated that the acquisition by Plessey and related financing has had a "major negative impact on Leigh's financial position" and that of the $81 million in debt carried by Leigh, $71 million of it was intercompany debt. "Clearly Leigh cannot support this level of debt on its own and consequently this credit depends on the support of Plessey," Young stated, noting that Plessey was prepared to provide a "strong" comfort letter similar to the one attached, and that the risk rating for Plessey itself was 2-low risk. He added that the bank's relationship with Plessey was growing and the Leigh account must be considered in that context, noting again that Plessey was the target of hostile takeover bid.

174    Leaney recommended the credit be approved, although she observed that "there is no question that the Plessey support is required here and on that basis, credit is recommended."

175    Noonan appended lengthy comments to the credit review and was clearly cautious about the risk. In respect of the request to release the security, he noted that the existing security predated the negative pledge in the MOF and should not be released until acceptable security package was in place. Noonan also observed that the existing comfort letter was "indeed strong," but stipulated that Corporate Banking Division request subordination of the intercompany debt to the TD facility. He recommended the credit on the basis, among other things, that the comfort letter be in the "same form, wording and sign-off as the existing letter, particularly paragraph 3". In cross-examination, Noonan said that although the facility was for an increased amount, and although it was now an operating line, rather than a short-term acquisition loan, he did not see any need to change the wording of the comfort letter, which was substantially the same as comfort letter number one.

176    Noonan also noted in the credit review that if a negative pledge was obtained from Leigh he would be flexible on the debt subordination. He retracted this suggestion in handwriting however, in light of the comments of McDowell, who ultimately approved the credit. Noonan testified that he added his own written retraction because he wanted to be absolutely sure the account manager realized that McDowell had overruled and wanted a full subordination of the intercompany debt.

177    McDowell noted "it is preferable to have full subordination of the inter-company loan because Leigh will be in no position to repay for some time and in the absence of a call on assets, subordination adheres to spirit of the comfort letter." McDowell testified that it was not his practice to review the documentation accompanying a credit review, and that responsibility rested with the senior vice president who recommended the credit, in this case Noonan. McDowell said he had tremendous respect for Noonan and trusted him implicitly. In the board sheet remarks relating to the CCR, it was noted in reference to the comfort letter: "We are confident that Plessey will support Leigh as required."

178    In evidence, Noonan testified he felt the comfort letter was strong, in part because it was signed by people with authority to commit the company, and because in his view the third paragraph, coming from a company with the stature

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

to fulfill its obligations, was a clear commitment to the bank that they would see that Leigh was in funds to repay the amounts due under the loan facility. He said the reputation of Plessey was significant to him, and that with its standing the bank could believe in what Plessey said.

179    Accordingly, the bank agreed to release its security and rest its risk on the comfort letter, without stipulating any changes to the wording of the comfort letter, notwithstanding that the form and substance of the letter had been initially approved in the context of a short-term acquisition facility. I must infer from all of this evidence that the bank made this decision based on a desire to foster its relationship with Plessey, as noted in the CCR.

180    On February 2 1989, less than a month after the credit was approved, and before a new facility agreement was in place, the English Court of Appeal released its decision in *Kleinwort Benson Ltd. v. Malaysia Mining Corp. Bhd.*, [1989] 1 All E.R. 785 (Eng. C.A.) (leave to appeal to the House of Lords refused), overturning the trial decision and refusing to enforce payment on a letter of comfort. Noonan testified that he was aware of both the trial and appeal decisions, but that the appeal decision did not change his approach to comfort letters, as he had always practiced a policy of handling comfort letters with caution.

181    At this point, TD did not have an updated facility agreement to cover the outstanding Leigh borrowings. Indeed, the bank had not obtained a facility agreement with Leigh since its amalgamation with Plessey Canada following the acquisition, and the most recent facility agreement had been executed by Plessey Canada the previous April regarding the acquisition loan. The other facility agreement outstanding was for the $5.4 million Leigh operating line, which was dated March 1, 1988, and also predated the acquisition. On February 9, Dean forwarded to Beard at Plessey a proposed facility letter received from TD, which contained a clause requiring the subordination of the intercompany debt and attached a draft resolution to that end. Plessey did not wish to enter into this agreement. Musgrave explained in evidence that Plessey did not wish to subordinate the debt for reasons similar to their reluctance to grant security, and that if subordination had been agreed to, it would restrict Plessey's ability to deal as it liked with the capital structure of the group.

182    On the January 10 CCR, Young made a handwritten note on the last page, which he dated March 6 1989, and which read: "Plessey has refused to provide postponement of the intercompany loan as they view comfort letter as tantamount to a guarantee, which it is. In consultation with WAL, we have agreed to waive that condition." In the body of the CCR, beside the reference to the request for postponement. Young wrote "Plessey has refused, since comfort letter is very strong. We waived postponement."

183    In evidence, Mr. Young testified that he wrote this note following a telephone conversation with Ian Musgrave, and that someone from the bank's London office was also on the line, although he could not recall who. Young said Musgrave told him the bank did not need the postponement, that Plessey viewed the comfort letter as tantamount to a guarantee, and that Musgrave's words were exactly as he had recorded them. He said the words "which it is" reflected his own view, arrived at after consultation with the bank's in-house counsel, Norton. This was the extent of Mr. Young's recollection.

184    Ms. Leaney testified that Young told her about this conversation immediately after it took place. She said that she and Young had discussed the question of the postponement, and that she had approved the decision to waive that requirement. I note that this was despite McDowell's condition that subordination be obtained.

185    This conversation, alleged to have taken place between Young and Musgrave, was a contentious issue in this trial, particularly the statement attributed to Musgrave that the comfort letter was "tantamount to a guarantee". Mr. Musgrave testified that he had no recollection of any conversation with the bank, apart from the call in spring of 1988, when he advised that the first comfort letter would continue to apply following the amalgamation. He said specifically he could

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

not recall ever discussing the meaning and intent of the comfort letter with the bank, and that he did not hold the views expressed in the note. Musgrave conceded on cross-examination that it was possible he spoke to Young and told him there would be no postponement of the intercompany loan, although he could not recall doing so.

186      Musgrave said that comfort letters and guarantees were quite different, and that he would be "amazed" if anyone at Plessey had said that a comfort letter was "tantamount to a guarantee". He elaborated that he and Beard had developed a standard response to the question of what a comfort letter meant, which was to tell anyone who asked that, as a matter of fact, in the entire time he had been at Plessey, the main board had never walked away from a comfort letter. He said the statement was intended to give the banks a degree of comfort, but at the same time they would make it quite clear as part of the response that the board saw comfort letters and guarantees as something quite different. Musgrave said he "certainly" didn't believe that the Leigh comfort letter was tantamount to a guarantee. In cross-examination, he had to concede that  since he had no recollection of such a conversation, it was possible the conversation took place, however he thought it was highly unlikely.

187      I have considered the evidence of both Mr. Young and Mr. Musgrave on this point, and I prefer the evidence of Mr. Musgrave. Mr. Musgrave was group treasurer of Plessey, and used to dealing with banks and bank security on a daily basis. He was intimately acquainted with Plessey's policy and views regarding comfort letters. He had no recollection of saying a comfort letter was tantamount to a guarantee and thought it was highly unlikely that he had done so. Such a statement was contrary to his set response. Further, he testified that it was his practice, when he had dealings on a file in which someone else was involved, to dictate a note concerning the conversation. Musgrave said he had no recollection of making such a note, nor was he aware of the existence of one.

188      There is no reference in Young's note to Musgrave, nor indeed to a telephone call. Jonathan Exton, formerly of the bank's London office, gave evidence in this trial. He was the contact person for Plessey, and Young testified it was "a reasonable assumption" that Exton was the other person on the call. Yet Exton testified he could not recall any telephone conversation with Musgrave up to March 6, 1989, nor could he recall any conversation jointly with Musgrave and Young. No one else was ever identified as being the person from the bank's London office on the line.

189      Mr. Young himself, had very little recollection of this conversation, apart from the note.  He conceded in cross-examination that the note was not contemporaneous with the phone call, but was made on March 6, 1989, following a conversation with Ms. Leaney. He could not recall how much time had elapsed between the phone call and when he wrote the note. The plaintiff did not produce any contemporaneous note of the phone call. Further, the note was made to record the decision which Young and Leaney had taken it upon themselves to make, to waive the requirement that Plessey postpone the intercompany debt, despite the strong comments from McDowell.

190      Finally, Young never again referred to the phone call, or to Plessey's alleged description of the comfort letter as tantamount to a guarantee, in any subsequent bank documentation. Nor did he refer to it in any other communication, written or oral, with Plessey. This description, as attributed to Plessey, would have been significant, and would certainly have been recorded in internal bank documents or raised by the bank upon renewal of the comfort letter. However, there is no evidence that the bank ever made any further reference to the alleged statement, although it would have been in the bank's interest to have done so, had the statement actually been made. Since it is improbable that such a key statement, if made, would not have been referred to again in some fashion, the allegation lacks any ring of credibility. I conclude that the conversation between Young and Musgrave and the unnamed third person, did not take place, and that Musgrave did not state to Young that the comfort letter was tantamount to a guarantee. I find that TD did not give up its security, nor did it make any further advances to Leigh after this date, on the basis that such a statement had been made or was purported to have been made by Musgrave.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

191      In the meantime, unbeknownst to the bank, Plessey was considering an alteration to Leigh's capital structure. In a February 16 memo to Musgrave, Alan Jones the managing director of PESL, expressed concern about the capital structure of Leigh and the high level of interest-bearing debt which had been imposed upon Leigh for tax reasons. He informed Musgrave the government, as Leigh's main customer had expressed concerns about Leigh's long-term viability in the context of the debt load. At this point in time, Leigh had still not paid any of the interest owing on the intercompany debt from September 15, 1988, despite the increases in its bank line. Musgrave testified that in this period, Plessey began to realize that the financial structure of Leigh was not appropriate. He said that at some point in February or March, Plessey decided to waive any further payments of the interest owing on the debt, and on April 1, converted the intercompany debt into preference shares. He explained the debt had been put in place initially, to offset taxation of Leigh's profits, however Leigh was not generating enough profit to cover the expense. Conversion of the debt to equity removed the burden of the interest expense from Leigh.

192      This conversion essentially supplied the bank with the subordination they had requested, since the conversion of debt to equity removed the threat to priority of the bank's loan posed by the intercompany debt. Musgrave testified, however, that the decision was taken purely for tax reasons, and not in response to the bank's request for subordination.

193      At the same time, TD was continuing its efforts to generate business with Plessey on other fronts. On March 16, Exton met again with Musgrave and Beard, and presented them with a revised facility letter for a short-term loan to Plessey of £20 million. At this meeting, Exton also tried to interest Plessey in participating in a Canadian commercial paper program in connection with Leigh. Exton noted Plessey was interested in such a program, but wished to wait until the GEC/Siemens bid situation was over. Exton discussed the bid with Beard and Musgrave and noted that "the tables may be turning in favor of Plessey." They also discussed the Leigh account briefly. Leigh and TD had not yet agreed upon terms for the new facility agreement and Plessey requested a revised copy of the facility be sent to them.

194      On March 29, Young forwarded a fresh proposed facility to Exton, who in turn sent it to Beard the following day. By this point the Leigh borrowings were about $29 million and the bank still did not have a facility in place. Moreover. Young conceded on cross-examination that Leigh was well in excess of its authorized credit. Although the January 10 CCR had been approved, the conditions in it had not yet been fulfilled and Young agreed the approval was not operative. The prior authorization was only for $25 million, some $4 million less than the amount outstanding.

195      The revised facility letter did not contain a subordination clause. It provided an operating line of $35 million, payable on demand, and noted that the existing security was to be released upon receipt of a new comfort letter. The facility contained a negative pledge against Leigh's assets and requirement that Plessey maintain a majority interest in the voting stock of Leigh. The facility agreement also contained a reporting clause, requiring Leigh to provide the bank with audited financial statements within 90 days of Leigh's fiscal year end unaudited financial statements within 30 days of the end of each quarter.

196      On April 4, Beard responded by sending Exton a proposed draft of the comfort letter, asking him to confirm that its content was acceptable, and that the security held by TD would be released as of March 31, 1989 (Plessey's year end and the date proposed for the comfort letter). Exton wrote Beard on April 10, enclosing a copy of a letter from Young confirming that the draft comfort letter was acceptable to the bank and that the bank would treat the Leigh facility as unsecured as of March 31, provided that Leigh accepted the proposed credit facility and that the letter of comfort was dated the 31st March.

197      On April 20, Beard sent Exton an executed copy of the letter of comfort, signed by Walls and Huntbatch and dated March 31. This, the third letter, stated:

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

To this is to confirm that The Plessey Company plc has full knowledge of the facility of C$34,000.000 (Thirty four million Canadian dollars) which has been granted by Toronto Dominion Bank to Leigh Instruments Limited.

Leigh Instruments Limited is currently a wholly owned subsidiary of Plessey Overseas Limited which is a wholly owned subsidiary of The Plessey Company plc. No change in the ownership of Leigh Instruments Limited or Plessey Overseas Limited is contemplated and we undertake not to reduce our share-holding during the term of the above mentioned facility without prior notification to yourselves.

It is our policy that our wholly-owned subsidiaries, including Leigh Instruments Limited, be managed in such a way as to be always in a position to meet their financial obligations, including repayment of all amounts due under the above facility.

This letter replaces our letters of 20th April 1988 and 1st August 1988.

198     Exton testified that when he received the letter, he simply checked to ensure the letter was for the right amount, and then forwarded it to Young in Toronto. He said he took no steps to determine whether the letter was acceptable to the bank, because this was the responsibility of the account manager. This proposed facility letter was never executed by Leigh.

199     Four days later, on April 24, Leigh received its audited financial statements for the year ending March 31, 1989, which showed a profit for the year, before taxes and one extraordinary item, of $4.659 million. The net income for the period was the same figure.

200     Meanwhile, the GEC/Siemens bid for Plessey was proceeding apace. Plessey had obtained an injunction to prevent GEC and Siemens for making the offer to its shareholders in December, however the injunction was overturned and GEC/Siemens issued the offer in late December. The GEC/Siemens bid document indicated that the existing Plessey businesses were intended to be divided between GEC and Siemens and that GEC intended to take a majority interest in Plessey's North American defence electronics industries. The offer was referred to the British Monopolies and Mergers Commission in January, and in April the commission ruled the bid could proceed. The Commission stipulated, however, that certain of the Plessey businesses could not go to Siemens, a German company, for security reasons. Similarly, UK monopoly restrictions prevented certain of the businesses from going to GEC.

201      In response, Plessey continue to resist the bid. In a May 2 memo to all Plessey's businesses, managing director Stephen Walls stated:

As part of our defence we will almost certainly be publishing a profit forecast to demonstrate the financial benefits starting to flow from strategies we have adopted.

The provisional budget does not yet represent a sufficiently strong performance to fully achieve our objectives. The timing of our forecast requirements is as yet unclear but it is vital that we use forecast to be submitted with April results as the first opportunity to add profit improvement plans onto the budget to create a better platform for our bid defence. Would you please ensure, therefore that profit forecasts and improvements are closely scrutinized to enable us to maximise performance.

Musgrave said that while he did not recall seeing this memo at the time, he would expect it to be sent to stand alone subsidiaries like Leigh.

*The Fourth Comfort Letter and the Bulge*

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

202    By the 13th of June, Leigh was again experiencing financial difficulties. Dean contacted Musgrave and reques-
ted authorization for a further $4 million bulge in the bank line. That same day, Musgrave sent a memo to Walls asking
for approval of "an emergency increase in the borrowing limit". Musgrave explained in evidence that although he could
not recall the precise reason for the urgency, the request had to be turned around very quickly. He said Dean would have
needed the money fairly rapidly, and could not wait until the next scheduled board meeting for approval of the increase.
Walls approved the request, and Beard informed Dean on June 15 that the borrowing and guarantee limits had been in-
creased by $4 million to $38 million. The increase was approved to the end of August only, at which time it would revert
back to $34 million.

203    Having received Plessey approval, Dean then wrote to Young at TD and requested the $4 million bulge, leading
Young to prepare a CCR of Leigh dated June 15. Young described the submission as urgent and requested a decision as
soon as possible. The purpose of the CCR was to lower the amount of the operating line from $35 million to $34 million,
which was the amount supported by the third comfort letter, and to obtain approval for a temporary $4 million line until
August 31st. The risk rating remained unchanged at 3B (normal risk). In the remarks section, Young noted that Leigh had
missed milestones on both the TACAN and SHINCOM contracts, with a consequent impact on cash flow leading to the
bulge request. Young pointed out that the bulge had been approved by Plessey, but that Plessey was reluctant to amend
the comfort letter for such a short period. However, "Plessey has agreed to provide a new comfort letter if outstandings
are not back in order by August 31/89." Young then observed that the general assignment of book debts and floating
charge debenture over Leigh's assets had not yet been released, despite the fact the bank had received the new third com-
fort letter from Plessey, and that the security would not be released until the outstandings were back in order. He noted
that TD London confirmed Plessey's account rating of 2 - low risk - and concluded "believe the risk is acceptable."
Leaney recommended approval of the credit, which was then forwarded to James Laitner, senior vice president, Credit
Division. Although he recommended approval as well, he stipulated that the security was not to be released until the
bulge was repaid or a new comfort letter received for the increased amount. The credit was ultimately approved by Willi-
am Brock, the executive vice president, Credit Division, without comment.

204    On June 26, Young sent Noonan a memo updating him on Leigh's credit situation and the condition that security
not be released. He reported that in-house counsel had advised TD would be in a conflict of interest if it retained the se-
curity, given that TD had signed the MOF containing a negative pledge, and given the agreement in writing to release the
security. Noting that Plessey had agreed to provide a new comfort letter if the bulge was required beyond the end of Au-
gust, he stated "We have a good relationship with Plessey and believe the risk is acceptable. Although the hostile
takeover bid by Siemens and GEC is a concern, it will likely take beyond Aug. 31/89 to complete or resolve. We request
that the condition for the approval of the bulge, that our security not be released, be waived."

205     Leaney agreed, although she observed "clearly a higher comfort letter is the best solution but for relationship
reasons would go along." Noonan added his own comments: "The new comfort letter is certainly strong & I am told by
CBD actually boarded by Plessey Co PLC." He added that the bulge was clearly to the end of August only, but pointed
out that the MOF did permit encumbrance of 10 percent of Plessey's group assets and that the bank security predated the
MOF in any event. He concluded that he would agree to release the security "if it is the Co *request* to do so." The de-
cision to release the security was alternately taken by Brock: "We have agreed to release the security and would proceed
to do so, resting the exposure on the comfort letter." An executive review sheet regarding the release of security was ini-
tialed by Noonan, Brock, McDowell, bank president Robin Korthalls and Thomson, the chairman and CEO of the bank.
It noted the risk rating of Leigh at 3B (unchanged) and specified the audited year-end financials be obtained prior to
Leigh's annual review date of September 30, 1989. I note that Young's letter sent to Beard on April 10 stated the security
would be released when the comfort letter was delivered and the credit facility accepted by Leigh. This latter condition
had not yet been met.

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

206      On June 27, Young sent a new facility letter to Leigh. At this point, the most recent executed facilities remained that accepted by Plessey Canada in April, 1988 and the Leigh facility executed March 1, 1988. The facility offered an operating line of $34 million, was payable on demand, and listed security as nil, with a note that the existing security was to be released. The facility contained the same terms and conditions regarding Plessey majority interest in Leigh's voting stock and Leigh's financial reporting requirements as had been contained in the last proposed letter. In a separate letter, Young offered the $4 million temporary bulge, on the understanding that Plessey would provide a further comfort letter if the funds were required past the end of August. Both facility letters were accepted by Leigh the same day.

207      In London, Exton wrote to Beard on June 29, enclosing a draft letter of undertaking for Plessey to sign regarding the possible extension of the comfort letter at the end of August. Musgrave executed the letter without any change to the draft:

> We are writing to confirm our agreement with Mr. Michael Walzak on the telephone last week with respect to the temporary increase in the operating facilities for Leigh. We are aware that Leigh requires its operating line to be increased from C$34 million to C$38 million for a period of two months. Since at this time this is only a temporary requirement we will not revise the Letter of Comfort (dated 31st March 1989) to reflect the increased amount. However, should Leigh require the higher level of operating facilities beyond the end of August 1989, then The Plessey Company plc undertakes to amend the Letter of Comfort accordingly.

Exton forwarded the letter to Young on June 30th. The $34 million guarantee limit and $38 million borrowing limit for Leigh received retrospective approval of the Plessey main board on July 28.

208      On July 8, Leigh received its unaudited first-quarter financial statements for the quarter ending June 30. These financials showed net earnings for the quarter of $131,000 before deductions for taxes and an internal Plessey Group payment. After deductions, the financials showed a loss of $181,000 the financial statements included a quarterly forecast to the end of the fiscal year, projecting net earnings as at March 31, 1990 of $8.379 million. The information contained in these financial statements was sent to the bank pursuant to Leigh's reporting obligations, by letter of July 21, 1989, together with the executed facilities for the $34 million operating line and the $4 million bulge.

209      By the end of July however, Leigh was showing an increased loss. In the Plessey corporate finance report for the month of August, Leigh was listed under the heading "major loss makers". Leigh had budgeted a profit of £1.246 million for the period to the end of July, but in fact reported a loss of £326,000. Hence Leigh reported a negative variance from its budget of £1.572 million. The Plessey corporate finance reports were produced monthly by the Plessey treasury department. In evidence, Binnie Sammon, group chief accountant at Plessey, testified that the corporate finance reports were distributed to a restricted list of recipients, including Walls, Musgrave and Huntbatch. Musgrave testified that while Leigh was showing a loss in that period, there were other subsidiaries with worse numbers, and there was nothing in the report which would have caused him to get "too excited".

210      On August 17, GEC and Siemens released their proposals for the Plessey businesses in the event that the takeover was successful. David Newlands, the GEC finance director, explained in evidence that there were two components of the Plessey businesses which particularly interested GEC and Siemens; the telecommunications aspect of the business and the defence electronics aspect. He said the original plan had been for GEC and Siemens to operate the Plessey businesses in partnership, however the Monopolies and Mergers Commission in Britain refused to permit Siemens to participate in certain defence businesses and refuse to allow GEC takeover other of the Plessey businesses for monopoly reasons. The conditions imposed by the commission led to the GEC/Siemens final offer document on August 17. In that document, GEC and Siemens set out their plans for restructuring Plessey and indicated that Leigh was inten-

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

ded to be wholly-owned by GEC if the bid was successful.

211    In TD's annual Corporate Credit Review of Plessey, dated August 25, the bank noted that  a £20 million facility and the MOF were still in place, but had not been drawn upon. The CCR of Plessey also contained an update on the status of the takeover bid, however Brock noted "financial covenants protect if there were a takeover and restructuring."

212    Frank Driscoll had assumed his new role as president of Leigh on Aug. 8, and on August 23 had a short meeting with Young and Leaney, although he described it as a social, get acquainted meeting rather then a business meeting.

213    On August 29, Pat Smith of the Leigh finance department contacted Beard at Plessey and requested that the $4 million bulge be extended past the end of August to the end of November. The Leigh outstandings at that date were $34.8 million. The next day, Young relayed to Noonan a request for extension of the bulge to the end of October.

214    Young recommended approval of the request provided Leigh supply their written acknowledgment, and added that he did not believe it was necessary to obtain a new undertaking from Plessey. He based this recommendation on the fact that Leigh's balance sheet had improved dramatically with the conversion of intercompany debt, and noted that he and Leaney had met with Driscoll and believed this gesture would demonstrate the bank's support, thus generating good-will and new business. Although he referred to the hostile takeover bid, he erroneously stated that it was unlikely to be completed before October 31st. Young noted in conclusion that the potential market for Leigh's MLS program was $300 million in Canada and $4 billion worldwide. The request was reviewed by Owen, who recommended the bulge be extended as  long as Plessey was notified of the extension and Leigh formally requested it. Brock approved the extension without comment.

215    Meanwhile, several weeks earlier Musgrave had informed Walls he was leaving Plessey at the end of August. Notwithstanding that the bank had not requested a further comfort letter relating to the bulge extension, Plessey nevertheless prepared one on its own initiative, in substantially the same form as the earlier letters. One of Musgrave's last acts before leaving the company was to review a draft of this letter. The comfort letter was executed by Walls and Huntbatch on behalf of Plessey and sent to Exton, who faxed it on to Young on September 7, with the explanation that "Plessey appreciated that the Bank was not requesting a revised Letter of Comfort, but as they had promised one, if the facility was required beyond August, and in view of GEC/Siemens bid, it was considered appropriate to do so." Exton testified he simply checked the amount and that the document was a comfort letter before forwarding it to Young. The fourth comfort letter stated:

This is to confirm that The Plessey Company plc has full knowledge of the facility of C$38,000,000 (Thirty eight million Canadian dollars) which has been granted by Toronto Dominion Bank to Leigh Instruments Limited.

Leigh Instruments Limited is currently a wholly owned subsidiary of Plessey Overseas Limited which is a wholly owned subsidiary of The Plessey Company plc. No change in the ownership of Leigh Instruments Limited or Plessey Overseas Limited is contemplated and we undertake not to reduce our share-holding during the term of the above mentioned facility without prior notification to yourselves.

It is our policy that our wholly-owned subsidiaries, including Leigh Instruments Limited, be managed in such a way as to be always in a position to meet their financial obligations, including repayment of all amounts due under the above facility.

This letter replaces our letters of 31st March 1989 and 30th June 1989.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

*The GEC Siemens Takeover*

216      On September 8, 1989 the GEC/Siemens offer to purchase the shares of Plessey was accepted by more than 50 percent of Plessey's shareholders, and the hostile takeover of Plessey succeeded. GEC and Siemens ultimately paid £2.2 billion for Plessey shares. On September 22nd the new owners held a Plessey board meeting, at which they elected a new Board of Directors composed of representatives of GEC and Siemens, including GEC finance director David Newlands. Shortly following the takeover a great many of the Plessey senior management left the company, either having resigned or having been terminated by the new owners. Stephen Walls left on October 6th and Denise Beard left on November 3rd.

217      On September 28, each of GEC and Siemens put forward a candidate for managing director of Plessey. The two nominees were to work together to manage Plessey from that date forward. Simon Weinstock was appointed by GEC and Phillip Gerdine by Siemens. Gerdine testified that from the outset he and Weinstock proceeded with several goals in mind. He said they intended to separate the Plessey businesses into units to be acquired by GEC and by  Siemens. Those businesses remaining in the Plessey "rump" following this "hive-up" of the Plessey companies were to be liquidated. Gerdine explained that GEC and Siemens had purchased Plessey for about $4.5 billion U.S. and held the interest roughly 50-50. He stated that the hive-up exercise was a two-step process. The first step was that GEC and Siemens had to decide what companies would go where and then, how much the companies were valued at. He said allocation of the companies fell into two categories; those mandated by the U.K. government and those which were discretionary. Because it was a hostile takeover, the discretionary companies had been allocated preliminarily on the basis of very little information. Gerdine said GEC and Siemens put in place teams of people to determine the fair value of Plessey's assets, and each of the subsidiaries was subject to a review based on revenue earnings and net book value. Those values then had to be re-conciled within the $4.5 billion purchase price.

218      Gerdine testified GEC and Siemens each took responsibility at the outset for the companies intended ultimately to be held solely by them. He said he took responsibility for the Siemens companies, Simon Weinstock for the GEC com-panies, and companies remaining in the rump were administered jointly. At the time of the takeover, Plessey had in place a set of rules and procedures governing financial reporting of the subsidiaries to the parent, and the new owners left those in place for the purpose of public filing of Plessey's financial reports. Each of GEC and Siemens applied additional in-ternal financial reporting requirements in accordance with their respective practice.

219      News of the takeover was greeted by Exton as a further opportunity to develop business.  He forwarded the ori-ginal of the fourth comfort letter to Young in mid-September with the note: "As you know the GEC/Siemens bid for Plessey has been successful, and we now hope to develop our relationship with GEC. Hugh Rising and I will be visiting David Newlands, Finance Director, on 3rd October, 1989 and if you have any items for discussion, please advise me."

220      Almost immediately, the bank began to consider the effect of the takeover on Leigh. Ernest Mercier, executive vice president of the Corporate Banking Division contacted the bank's Montreal office which in turn contacted Canadian Marconi, which was owned 51 percent by GEC. A Montreal based vice-president of Corporate Banking wrote to Mercier on September 13, noting that CMC had accepted in principal the notion of a merger with Leigh, in view of the similarity in their product lines.

221      On September 19, Mercier had an executive luncheon with Leigh president Frank Driscoll, the purpose of which was to solicit any business opportunities arising out of the takeover. In a briefing memo prepared in advance of the luncheon, Young advised Mercier of Leigh's contract related cash flow problems and of the Plessey comfort letters. Young pointed out the possibilities for merger with CMC, and repeated the market estimates for the MLS system. He re-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

minded Mercier that TD was Leigh's only banker, and that CMC did all its banking with the Royal Bank. He concluded that the London office had been unable to establish a meaningful relationship with GEC and "In addition to identifying opportunities arising out of the Plessey acquisition (e.g. fairness opinion on Leigh), we have a substantial interest to protect." Driscoll testified that when he met with Mercier, the discussion focused on the prospects for Micronav, and on the future of Leigh's banking relationship with TD in light of the possible CMC merger. The comfort letter was not discussed.

222     Driscoll testified that Leigh was aware it was intended to be wholly-owned by GEC fairly shortly after the takeover, if not earlier. He said that Dean attended a briefing on GEC accounting policies in England in late September or the first week of October.

223     The day after Driscoll's lunch with Mercier, on September 20, 1989, Young prepared a new CCR of Leigh in order to renew the existing facilities on the same terms, and to downgrade Leigh's risk rating from 3B to 4. In the remarks section, Young noted the recent acquisition of Plessey by GE Siemens and that Leigh was slated to go to GEC. "Although we were aware of the hostile takeover bid by GEC/Siemens, we are comfortable with the quality of their credit and hope to use our positions with Leigh/Plessey to develop a relationship with GEC." Young describe the uncertainty about Leigh's ownership and possible merger with CMC as a weakness however, leading to the revised risk rating of 4.

224     This CCR also mentioned the contract delays and missed milestones on SHINCOM and TACAN, observing that "A restructuring of the company's debt is clearly required". Young speculated that in view of GEC's cash resources and Leigh's tax position, it was likely that Leigh would receive an equity injection to pay out the bank. Young elaborated in evidence that Leigh had a number of research and development tax credits and carryforwards and that they were not taxable as a result. In that situation, he said it made sense for a parent with taxable cash to put in into the nontaxable subsidiary. He testified he vaguely recalled discussing this issue with Dean. The CCR concluded that TD Montreal would solicit opportunities arising out of the Plessey acquisition, including the possibility of providing a fairness opinion to CMC. Young explained in evidence that given 49 percent of CMC was publicly held, a fairness opinion on any acquisition or merger with Leigh would be required.

225     Leaney reviewed the CCR and recommended renewal of the facility but suggested, while the risk was increasing, that a rating of 3C was more appropriate, and Young agreed. Noonan in turn recommended the rating remain at 3 B in light of the "strong and renewed comfort letter" and the intercompany debt conversion. He testified that he reviewed the attached comfort letter at this time. McDowell agreed and authorized the credit.

226     An October 2 Credit for Executive Circulation distributed to senior bank executives regarding the Leigh credit misstated the terms of a comfort letter, describing it as at commitment "to maintain ownership and to manage Leigh Instruments in such a way as to be always in a position to meet their financial obligations."

227     Just two weeks after the new Plessey board was in place, on October 3, Exton and Rising met with Newlands and reported GEC's intention to integrate Plessey's operating subsidiaries into its own businesses. Exton pointed out the bank's relationship with Leigh and observed that Newlands was familiar with Leigh's tax position and low profits, however Newlands advised refinancing of Leigh was premature. Exton noted GEC had not yet decided whether to sell Leigh to CMC but that Newlands noted the bank's interest in providing a fairness opinion. As follow-up, Exton advised that the bank should maintain close contact with Leigh and CMC in Canada, and attempt to develop a relationship with GEC Treasury Department in the U.K.. Newlands testified they did not discuss the Leigh comfort letter.

*Fall 1989 and the Fifth Comfort Letter*

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

228      Back at Leigh, by mid-October Driscoll had received some financial results for the month of September, which revealed a further deterioration. In September, shortly after arriving at Leigh, Driscoll had initiated an ETC review of all Leigh's SHINCOM and TACAN contracts in progress to estimate the cost of completing the contracts. The review involved the calculation of the ETC or estimate of the cost of completing the contract. That figure, combined with the actual cost incurred to date, would generate an estimated cost at completion of the contract of EAC. The EAC would then be compared to the contract price to measure the financial success of the contract. Driscoll testified that to the extent that a business had a fixed price contract, periodic calculation of EAC's was an important indicator of performance.

229      Driscoll explained that he attended reviews of Leigh's programs in August and became aware that the actual cost spent on SHINCOM had already exceeded the most recent EAC for that project, and there were several months left before completion of the contracts. He said this information, combined with the fact that there had not been a rigorous ETC review since early in the year, led him to implement the review. He said quarterly ETC reviews were ordinarily standard on larger contracts. When he arrived at Leigh, he said the company had about 20 major contracts and that the SHINCOM and TACAN programs comprised the larger part of the business.

230      David Newlands, finance director of GEC, visited Leigh in person on October 20, 1989, accompanied by David Rickard, finance director at GEC Marconi to learn more about the new acquisition. In preparation for the meeting, Newlands received a briefing memorandum on Leigh prepared by Colin Justice, divisional finance director at PESL, who was at Leigh participating the fair value exercise for the GEC Siemens hive up of Plessey. In addition, on October 2nd, very shortly after the takeover, Newlands had reviewed the opening balance sheet for Leigh incorporating the purchase accounting adjustments implemented by Plessey as of April 5.

231      Justice's briefing memo to Newlands noted the difficulties with SHINCOM and expressed the concern that Leigh's performance might not be technically adequate. He pointed out SHINCOM had failed to meet some technical tests in the contract, giving rise to a need for additional program management and engineering expense. Justice observed that this was an area where they should be highly conservative in the fair value exercise. Newlands explained in evidence that accounting provision should be made for the contract risks in the context of the fair value exercise.

232      The Justice memo pointed out that there had been major program deterioration for both TACAN and SHINCOM and that the EAC's had worsened substantially. Regarding SHINCOM, Justice wrote that the product was not "technically secure and underwritten". Newlands testified that this statement put him on notice that all the financial information about the project was open to "extreme doubt." He said if the program was not technically secure, it could not produce a reliable EAC. The memo showed a forecast loss for the year ending March 1990, of $2.316 million.

233      The Newlands and Rickard visit took place in Leigh's Kanata, Ontario offices on Oct. 20. Leigh prepared a presentation for Newlands and Rickard on the company's programs and financial condition, including the ongoing ETC review and fair value exercise. The transition to GEC accounting principles was also discussed and Newlands instructed the company to take care to distinguish between operational issues, such as the ETC results, and adjustments to the balance sheet resulting from the fair value exercise.

234      Included in the material presented to Newlands and Rickard at the meeting were second-quarter financial statements, in Leigh accounting format, to the end of September. These results showed an actual loss to the end of September of $2.85 million and a forecast loss of $1.5 million to the end of the fiscal year. Newlands was also given a preliminary draft of the purchase accounting adjustments following the GEC takeover, and a copy of Leigh's cash requirements forecast. The forecast showed the bank line outstanding at $36.081 million as at October 16, with a forecast overdraft of $35.774 million at the year-end on March 31st 1990.

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

235      Newlands drafted a memo to file following his visit to Leigh in which he recorded his view that the business was in poor shape and, using GEC accounting principles, trading at a loss and absorbing cash. He noted that "The businesses have prepared September management accounts in GEC format but do not reflect current contract cost to complete reviews and changes to GEC accounting policies. As a result of the half year reviews, adoption of GEC accounting principles and purchase accounting, there will be significant changes to the results to 30 September, and the Balance Sheet will have to be restated in the October management accounts." Newlands added that these changes would leave Leigh showing a "significant loss."

236      He observed that, in his view, the Plessey budgets for the business were "hopelessly optimistic and should be disregarded," and that support from Marconi would be required to turn the business around. Newlands noted that Driscoll was "showing the right attitude," but that Dean was under pressure and in Newlands view not up to the job.

237      Six days later on Oct. 26, Leigh produced a revised half year forecast, which showed an actual loss of $15.634 million to Sept. 30 and forecast a loss for the year of $12.813 million. Driscoll testified that these figures reflected an incorporation of some of the ETC results, including a loss on the SHINCOM program of $6.88 million. The report noted that the results would likely require further re-statement to reflect purchase accounting adjustments, and that a number of unquantifiable risks regarding SHINCOM and TACAN had not been provided for. This report was forwarded to Rickard, Justice, Flower and Shepherd.

238      Pursuant to the financial reporting obligations contained in Leigh's facility agreement, Leigh was obliged to provide TD with unaudited quarterly financial statements within 30 days of the end of the quarter. Thus, the quarterly statements for the period ending September 30 were due on October 30, four days after Driscoll's six-month results were prepared. Driscoll conceded in cross-examination that the six-month results did constitute an unaudited interim quarterly report.

239      Also on October 26, Young wrote to Dean, to confirm that the bank had agreed to discharge its security and would do so forthwith. The next day Dean wrote to Young and requested a further extension of the $4 million bulge to July 31, 1990, due to persisting problems with the SHINCOM program. Dean attached a copy of the cash flow forecast which had been presented to Newlands on Oct. 20 and which showed an estimate of the bank line at $35.57 million as at the end of December, and $35.774 million as at March 31, 1990. He enclosed an executed facility agreement renewing the operating line on the same terms and conditions, and a facility executed September 18 regarding extension of the bulge. The bulge facility offered an extension only until October 31st however, and the offer to extend had expired on September 15. The package sent to Young did not include the October 26 half year results, with their actual and forecast losses.

240      In a letter dated October 30, and sent to Exton along with about 40 other banks, GEC, Siemens and Plessey invited TD to provide Plessey with an uncommitted bank facility. The invitation was signed by Anderson, Huntbatch and Gerdine. Anderson testified that following the takeover, GEC and Siemens decide to cancel Plessey's MOF and instead borrow from one of a number of available bank facilities, depending on terms offered on any particular day. The package included a copy of the GEC Siemens final offer for Plessey with details of the proposed restructuring of Plessey. The letter noted "Siemens and GEC are prepared to guarantee, on a $50/50$ several basis, such new borrowings. Therefore the terms of these new borrowing facilities should be based on the creditworthiness of Siemens and GEC." The letter added that in view of the security offered and the reduction in treasury staff at Plessey, preference would be given to those banks who accept the shortest, simplest, standard documentation. A committee of the GEC board passed a resolution prior to the issuance of this letter, authorizing Anderson to sign, on behalf of the company, this letter which included a commitment to provide a several guarantee.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

241     Several of the key players in the piece changed at the end of October. On November 3, Denise Beard, who had been assistant treasurer, left Plessey. On the same day, Greg Young, who had been in charge of the Leigh account since 1987, left TD and was replaced by Rob Wilson. His evidence was that there was a two or three week period when he overlapped with Young. During that period, he said he shadowed Young day-to-day to "assimilate" the relationships he would be taking over. Wilson said he familiarized himself with Leigh account by discussing it with Young and reviewing the file. He said he did not discuss the Leigh file with his supervisor Leaney, nor did he review the comfort letters. Also during this period, GEC treasurer Ross Anderson began to receive weekly cash reports from Plessey.

242     On November 8, Young and Wilson met with David Dean at Leigh. In the meeting, Dean  advised the bankers that Leigh's numbers were getting worse, and told them there were legal disputes with some of the contractors involved in the SHINCOM program. Wilson said Dean told them he could live with a $38 million operating line, but if there was no change, Leigh might require further funds from TD or GEC. In his notes of the meeting, Wilson jotted "new forecast forthcoming". In evidence, he said at this point in the meeting he asked Dean for financial statements. He said Dean told him there would be a new forecast forthcoming but that the financial statements were not available because the acquisition accounting issues had not been resolved. Wilson also noted "fold in or fund $10 million or more". He said Dean told him Leigh had a couple of options available to it. One was an acquisition by CMC, or in the alternative they would need further funding of $10 million. Wilson testified Dean told them if other money was required from TD another comfort letter could be provided: "Q.. From Whom? A. He said GEC, once they took it over, but I understood at this time that it would be a Plessey comfort letter consistent with the previous ones." Young testified he had no recollection of this meeting.

243     On November 15, Exton and three other managers of Corporate Banking produced a CCR of Plessey in relation to the invitation of Oct. 30 to provide Plessey with an uncommitted facility. The risk rating was 1 and was described as that of the parents, and the proposal was to increase the £20 million facility already available to Plessey to £50 million. Under security, they noted that GEC and Siemens were offering unconditional and irrevocable 50-50 several guarantees. Documentation referred to a facility agreement containing a material adverse change clause. In the remarks section they noted that despite the fine pricing, TD had enjoyed a strong relationship with Plessey but had not had a relationship with GEC, and they hoped to forge such a relationship through Plessey. They noted other opportunities with CMC and Leigh merited this business for relationship reasons. Senior vice president, credit division, Sid Owen recommended the credit on the basis that the guarantees be supported by a directors' resolution and solicitors' letters of opinion. Brock also recommend the credit, which was ultimately approved by McDowell who reduced the risk rating to 2 on the basis that 1 was reserved for governments.

244     In mid-November, the corporate finance report for October showed a cumulative Leigh loss of $15.6 million to the end of October, and a forecast loss to year end of £8.45 million. On Nov. 17, Driscoll forwarded a copy of the October President's Report to Lord Weinstock, managing director of GEC, directly. The financial results to October 27, which were attached, showed a cumulative loss to October 27 of $16.677 million, and the Leigh loan outstanding at $38.5 million, some $500,000 in excess of the authorized credit.

245     In the week of November 20, Leigh completed the ETC review process and Justice returned to Leigh to assist in preparation for the half-year review meetings to be held at GEC's Marconi's offices in Stanmore, U.K. the following week. Wilson testified he had a conversation with Dean on November 23rd, in which Dean indicated his concern that Leigh might go into overdraft the next day. He said Dean also advised that Paramax, the major contractor in connection with SHINCOM, wished to withhold a $5 million payment due to Leigh until early in the new year. As a consequence, Dean asked for a further $5 million from the bank. Wilson said he wasn't concerned as Dean advised they would be invoicing Paramax about $10 million in December. Wilson's note of the call stated: "full comfort from Plessey, even

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

GEC." He said  Dean told him any additional borrowings would have full comfort from Plessey, and even GEC. Wilson said he did not ask about the overdue financial statements. It is clear to me, and I so find, that the term "full comfort" refers to the full amount of the authorized line of credit.

246      In late November, Dean called Wilson. Justice was on the call and since Wilson and Justice had not met previously, Dean introduced him to Wilson as the PESL divisional finance director. There was discussion concerning additional short term borrowing up to $41 million. Justice raised the possibility of a floating letter of comfort, but Wilson rejected this concept. Wilson testified that either Dean or Justice confirmed that the Paramax payments would be coming in January. Wilson was advised that Leigh planned to reduce its work force in the near future, possibly in March, but perhaps earlier, with consequent severance obligations. Wilson did not commit to the increased borrowings. He took the layoff as "somewhat positive". There was no discussion of Leigh's financial statements.

247      Wilson stated in cross-examination that Justice had "indicated" to him during this conversation that "We'd get the same comfort letter." He conceded when pressed that Justice did not "expressly say that." "He did not say those words" but he said "we'd get full comfort" and "I clearly understood that we were getting the same comfort letter." Wilson said it was clear to him what Justice meant, and he took it the letter would be in the same form. He conceded further that Justice did not say the comfort letter would be in the same form. His note was silent on this point.

248      I am not satisfied that there was any discussion during this telephone conversation in late November concerning the form of the comfort letter or that it would be in the same form as the previous letters, and I find that Justice made no such statements, or representations to this effect to Wilson.

249      On November 28 and 29 Driscoll, Dean and Justice attended a series of meetings at GEC Marconi offices in Stanmore. The purpose of these meetings was the GEC half-year review. The first day, Driscoll testified they met with representatives of GEC Marconi and the second meeting was attended as well by Simon Weinstock and David Newlands. He said they presented a package of financial material on the first day and essentially responded to questions. The material had been prepared in Canada with the assistance of Justice and then finally revised the day before the meetings in England.

250      The financial information presented at the meeting disclosed a forecast loss to year end of $19.608 million. Driscoll said this increase in the projected loss from the October estimates was due in large part to the ETC review. The revised six-month figures to the end of September, also included in the package, showed an actual loss of $18.85 million.

251      Driscoll testified that the meeting on November 28 was largely a fact-finding meeting and that the GEC Marconi representatives commented from time to time but gave no broad reaction to the size of the losses, nor did they comment on any options for Leigh for the future. On the second day, the meeting was attended by Simon Weinstock and David Newlands. Driscoll said  this meeting was much shorter and that Newlands zeroed in on SHINCOM and TACAN which Driscoll said were the largest components of the losses. He said again there was no comment on any future options for Leigh, but that Leigh's position in the GEC group could be characterized at this time as uncertain.

252      Driscoll testified that at the conclusion of the second day, he with the assistance of Justice, presented a written request for an increase in the bank line. He said some combination of Justice, Newlands, and Rickard said they would take care of the request, and that Justice and Rickard were charged with doing further work on the issue.

253      In cross-examination, Driscoll was asked whether Newlands was left in charge of the issue and he answered that he was not sure Newlands was. This is consistent with the evidence of Newlands, who testified that he probably led the discussion, and that Leigh and Marconi management were then charged with producing more support for the request. He

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

said the request would have come back to him because he had led the discussion, but that treasury actually reported to Simon Weinstock. Newlands also testified that he had no recollection of any mention in the meeting that Leigh ought to be allowed to go bankrupt. Following the meetings Leigh was instructed to provide a weekly cash report to GEC, which Newlands explained was an attempt put pressure on the business to utilize its cash resources as sparingly as possible.

254     Driscoll testified that following these meetings he was of the opinion that Leigh was terminal, absent a significant change in its capital structure or relief from contractual  requirements. There was no evidence that he expressed this view to anyone at Plessey or GEC at the time. In cross-examination, Newlands disagreed with Drisoll's assessment that the company was terminal on the basis that the technical baseline was not secure and hence, Driscoll didn't necessarily have all the information he needed to reach such a conclusion. However, I do note that a concerted effort to negotiate contract relief with the Canadian government was commenced by Leigh in early January, with the assistance of GEC and Plessey. These efforts continued right up until Leigh's bankruptcy.

255     Rickard wrote to Newlands on December 1 that Leigh had now demonstrated a need for essential payments, particularly payroll. He noted Justice would visit Leigh the following week to review the cash requirement in depth, and report back to him. In the meantime, he wrote that it would be sensible to extend the limit to $41 million and monitor it weekly. He closed by noting that this would require an uplift in the comfort letter.

256     On November 30, Derek Thorn, Plessey finance director, group services, faxed GEC treasurer Ross Anderson, with information on Leigh's line of credit and cash forecast, and a copy of the fourth comfort letter. Anderson and Hafner had been made available to assist the Plessey treasury department on an as-needed basis in view of the depletion of their personnel following the takeover. Regarding the proposed increase in the bank line, Thorn noted that Leigh had asked for an increase to $45 million but Justice had recommended it only be increased to $41 million. Thorn suggested that if Simon Weinstock and David Newlands approved the increase to $45 million, the company be instructed not to exceed $41 million without a specific approval from  the U.K.. In conclusion, Thorn asked Anderson to notify him when the increase had been approved, and "can we then discuss the mechanics, particularly the form of comfort letter that may be required."

257     Anderson said when he received the memo he probably looked at the attached cash forecast but it did not indicate anything of significance to him. He said he could not recall discussing the increase with Newlands or Simon Weinstock but that he must have done to get their approval. Newlands reluctantly approved the requested increase, and Justice, who was at Leigh, was informed of the approval on Dec. 6.

258     Upon receiving the package from Thorn, Anderson said he reviewed the copy of the fourth comfort letter which was included and made some changes to it. He explained in evidence that he did this in order to make the letter as accurate and as clear as he could. Anderson did two different markups on the comfort letter. He testified he would have done the first one at the same time or immediately after receiving the comfort letter and a second, more detailed markup a few days later. Anderson added to the third paragraph of the letter the words: "and does not constitute a legally binding commitment."

259     Anderson testified that he did not make any inquiries into the terms of the Leigh facility, the history of the loan, or how the comfort letter had been arrived at. He did not view the comfort letter as a legally binding commitment, but testified that he added the words "does not constitute a legally binding commitment" to eliminate any doubt or uncertainty. He said he did not consider it to be a change of any substance, but he felt that with the added words, it was 100 percent certain that the letter was not binding, and without them it was slightly less certain. David Newlands testified that Anderson stopped him in the hall and showed him the comfort letter with the handwritten changes. He said Anderson

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

asked him to read and "bless" it, which he did.

260      Exton testified that Anderson called him on December 6 or 7 and advised that permission had been granted to increase the loan facility to $45 million but that the borrowings were not to go above $41 million without Anderson's explicit approval. Exton said this struck him as being an unusual request as Anderson was taking direct control of the advances to be made to a subsidiary of a joint venture involving GEC, and that he had never received such a request in his banking career.

261      Exton testified that he and Anderson also discussed the possibility of TD providing a fairness opinion on the possible Leigh CMC merger. As well, he said Anderson told him he would forward to Exton a revised comfort letter for $45 million, and that this would be done with the full knowledge and approval of GEC and Siemens. Exton passed this information on to Wilson.

262      Anderson testified in relation to this conversation that he might well have told Exton he would forward a new comfort letter. Although he could not recall the conversation, he did not believe he would have told Exton the comfort letter would be revised with respect to the amount  of the facility alone, because he had already started to amend the comfort letter by this time. He said he did not discuss the changes in the comfort letter with Exton, nor did he tell him about the added words "does not constitute a legally binding commitment." Anderson testified that if he had felt he was making changes of substance, he likely would have told Exton. He said he had expected the bank to read the letter, which was only a one page document, and said if the bank had not agreed to any of the language of the comfort letter, he had expected they would indicate this upon receipt of it. I accept Anderson's evidence. He was a credible and forthright witness.

263      Wilson at TD prepared a CCR of Leigh dated December 6, to formally cancel the $4 million bulge and authorize an increased operating line of $45 million. The risk rating remained at 3B and security was listed as nil. Documentation was described as a $45 million comfort letter and letter agreement. The terms and conditions remained the same as the prior facility.

264      In the remarks section, Wilson noted that the funding was necessary due to the delays in receiving cash payments from Paramax, the main contractor on the SHINCOM contracts. He observed that:

> Any additional borrowings will be fully supported by a Plessey letter of comfort. Jonathan Exton of TD-London has been in contact with Ross Anderson, Group Treasurer of GEC regarding this. Anderson is providing a letter of comfort from Plessey with the full knowledge and approval of GEC and Siemens to cover Leigh borrowings up to $45.0 million. Internally, Plessey will cap Leigh's borrowings on a weekly basis at levels below the $45.0 MM to keep pressure on Leigh to manage its cash flow; consequently, while we will have authorized availability of $45.0 MM, Anderson will personally approve any excess borrowing requirements above $41.0 MM and he does not plan to disclose to Leigh the full extent of Plessey's letter of comfort support.

265      In the next paragraph, Wilson referred to Leigh's revised cash flow forecasts projecting peak borrowings of $43.3 million in December, and expected to fall below $36 million upon receipt of the Paramax payments in January.

266      Wilson noted as well that TD intended to bid on a fairness opinion for CMC regarding its potential acquisition of Leigh, and that the bank had recently offered Plessey a £50 million uncommitted facility. Under strengths, Wilson observed that the revised comfort letter covered borrowings of Leigh, and that Plessey was ultimately owned by GEC and had access to significant parent company resources. He listed Leigh's weaknesses as delayed contract payments which had impacted cash flow and dependence on defence industry expenditures which had suffered cutbacks. Finally, he

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

noted: "There is still continued uncertainty over Leigh's ultimate ownership; however, we believe that this does not represent a significant credit risk in view of strong existing parent company support." Leaney concurred and recommended approval with the note "the support letter justifies."

267      Noonan reviewed the application on December 8th and recommended the credit on condition that the comfort letter was in the same form and substance as the Aug. 31/89 letter attached to the review, "particularly to include para.3", and that no borrowings be extended beyond $41 million without the prior approval of GEC's group treasurer. These conditions were never communicated to Leigh. McDowell approved the credit on the assumption the bank was satisfied with the financial condition of Paramax and its ability to pay the amounts owing to Leigh.

268      Noonan testified it was incumbent on the Corporate Banking Division personnel to obtain a new facility agreement as condition of the credit, and that he received no request from Corporate Banking Division that this requirement be waived. He said he also expected Corporate Banking to read both the Aug. 31 comfort letter and the one received in connection with the credit. McDowell testified that he agreed with Noonan's expectation of the Corporate Banking department. McDowell said he expected they would read and compare the comfort letters, and if the new document was in a different form than that stipulated, Corporate Banking would have to seek authorization from the Credit Division before accepting it. Noonan testified he received no such request.

269      Wilson sent a letter to Leigh's Ottawa branch advising of the approval on December 8 and cautioned that the $45 million limit was not to be disclosed to Leigh, "as it is an internal matter how GEC/Plessey manages a subsidiary's borrowings. Therefore, Leigh should be informed that availability only totals $41.0 MM."

270      On December 13, a Credit for Executive Circulation relating to the Leigh line was circulated among the bank's senior executive. The document referred to the GEC takeover and contained the same erroneous description of the comfort letter as had been included in the earlier  Credit for Executive Circulation. The document was initialed by Noonan, McDowell, president Robin Korthalls, and the chairman and CEO of the bank, Richard Thomson.

271      Driscoll had completed the Presidents Report for the month of November by December 14. This report, which was forwarded to GEC, disclosed an actual loss as at November 24 of $20.301 million with an outstanding bank line of $38.745 million. Driscoll attributed these figures to the results of the ETC review and SHINCOM and TACAN contract delays.

272      On approximately the 14th of December, in the course of revising the comfort letter, Anderson called Dean at Leigh to ascertain whether there was a holding company in the corporate structure between Leigh and Plessey. Anderson testified he did not discuss Leigh's financial condition with Dean.

273      Anderson sent the revised comfort letter to Bernard Huntbatch at Plessey on December 15, with a copy to Andy Hafner, treasurer at Siemens' offices in London, Rickard, Justice, Simon Weinstock and Newlands. Anderson testified he sent the letter to everyone who had an interest in it, to give them an opportunity to comment. Mr. Huntbatch, who is now deceased, was Plessey's Company Secretary, a solicitor, and one of the few remaining members of the Plessey old guard. He had signed the second, third and fourth comfort letters as well. Anderson said in evidence that Huntbatch did not call him to comment on the letter or query it. Anderson said he would expect Huntbatch to review the letter and if he had any comments, to make them or to change the letter if necessary.

274      The other signatory to the letter was Brendan Sammon, group chief accountant at Plessey. Sammon testified that he knew the final paragraph constituted a change from the fourth letter and discussed this with Huntbatch. He said they concluded Plessey had never considered comfort letters to be binding, that this was simply GEC's "belt and braces", and

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

hence they signed the letter. The letter was not forwarded to TD's London office until December 27. The fifth comfort letter stated:

> This is to confirm that The Plessey plc has full knowledge of the facility of C$45,000,000 (Forty Five Million Canadian dollars) which has been granted by the Toronto-Dominion Bank to Leigh.

> Leigh is currently a wholly owned subsidiary of 160956 Canada Inc. Which is a wholly owned subsidiary of Plessey Overseas Limited which in turn is a wholly owned subsidiary of The Plessey Company plc. We undertake not to reduce our share-holding in Leigh or its holding company without prior notification to yourselves.

> It is Plessey's policy that Leigh be managed in such a way as to be always in a position to meet its financial obligations, including repayments of all amounts owed under the above facility to yourselves on their due dates.

> The letter replaces our letters of 31st August 1989, 31st March 1989 and 30th June 1989 and does not constitute a legally binding commitment.

275      On December 18, Leigh laid off 80 people, including David Dean, the vice-president of finance and the bank's main contact person. Pat Smith took over his role. Driscoll testified the layoff was due in part to a decline in manufacturing, which meant Leigh had excess staff for its needs. He said it was also due in part to Leigh's losses.

276      Colin Justice had been traveling back and forth between Britain and Canada throughout the fall and was back at Leigh during this period. On December 21 Justice called Wilson at the bank to advise him of the staff layoff and that Dean was no longer with the company. Justice attributed the layoff to difficult market conditions and told Wilson a second wave of layoffs might be forthcoming. In a memo to file following phone call, which he copied to Leaney and others, Wilson reported details of the call, including the staff layoff and the termination of Dean. Wilson noted that Justice would continue to be actively involved in the affairs of Leigh, having spent four of the past seven weeks in Canada, that he expected to be in Canada regularly, and would be returning for budget meetings in January. Wilson noted he took the opportunity to discuss with Justice the possibility of a Leigh merger with CMC in some detail, indicating TD would be "very interested" in providing a fairness opinion. Justice told him the question of the CMC acquisition of Leigh would be reviewed early in the new year. Wilson recorded in detail the aspects of the conversation dealing with the layoff and the fairness opinion.

277      In evidence, Wilson testified that although he had not recorded this in his memo, he had asked Justice in this conversation for Leigh's financial statements. He said Justice told him the financial statements were not ready due to the acquisition accounting issues related to the GEC/Siemens takeover. Wilson said he did not ask him about the accounting issues because this was consistent with what he had been told by Dean. This conversation is admitted by the defendant Plessey, who did not call Justice as a witness.

278      Also on December 21, Driscoll forwarded a draft budget for Leigh to Bill Alexander, managing director at GEC Marconi, in which Driscoll commented that "cash flow is awful" and that dramatic improvement would likely come only from a politically directed renegotiation of the TACAN and SHINCOM contracts, or a radical restructuring of their operations. The draft budget projected a worsening overdraft of $39 million in March of 1990 and $62 million by March of 1991. It estimated the bank line would be at $41.576 million by December 31st of the current year.

279      Justice had requested authorization from Newlands on December 19 to increase Leigh's line to $42.5 million, and on December 22, Anderson called Exton to tell him the increase had been approved. Exton did not receive the fifth comfort letter however, until December 27, at which point he sent it on to Wilson. Exton testified that when he received

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

the letter he checked to see the amount was correct and that was the extent of his review of the comfort letter. He did not notice the added line that the comfort letter did not constitute a legally binding commitment. Exton said that his role regarding the letter was merely to pass it on to the account manager and no more. I accept his evidence on this point.

280    Wilson's evidence was that when he received the comfort letter, he advised his supervisor Leaney of its arrival and sent her a copy for her information, but did not discuss it with her any further.

281    Wilson testified that following the December 6 conversation with Anderson, Exton advised him that Anderson had said the new comfort letter would be the same form and substance as the prior letters, revised only as to amount. Wilson said that as a consequence, when he received the fifth comfort letter, he simply checked to see the amount was accurate and instructed his secretary to file it. He said he felt he had fulfilled his responsibilities by doing this. Although he had never read the prior comfort letters, he did not compare the wording of the 4th and fifth comfort letters, nor did he notice the changed wording. Wilson said he felt Anderson made a verbal commitment that the letter would be changed only in amount, and so that was the only part of the letter he checked. He said he felt Noonan's condition that the comfort letter be in the same form and substance was satisfied based on his confirmation of the amount. He conceded in cross-examination he had not advised anyone at Leigh or Plessey about Noonan's condition.

282    I am unable to accept his explanation for this. Wilson did not record this alleged representation by Anderson in any note, credit review, or other document. Wilson was not party to the conversation between Anderson and Exton. None of the exhibits corroborates Wilson's evidence. Jonathan Exton was a witness at this trial and gave evidence about the conversation with Anderson. He did not testify that Anderson had said the letter would be in the same form and substance. Anderson also testified at trial and said he did not believe he would have said such a thing, as he had already changed the language of the letter by the time he spoke to Exton.

283    I accept the evidence of Anderson and Exton and I find as a fact that Anderson did not represent or state to Exton that the letter would be the same form and substance as the previous comfort letter. Hence, any failure on Wilson's part to read the fifth comfort letter was not due to the representation Wilson attributed to Anderson. I accept Wilson's statement that he had not read the prior letters before receiving comfort letter number five. Hence, either Wilson read the letter and did not realize the letter had been changed, or he did not read the letter at all. Even if he had read the letter, not having read the fourth comfort letter, he had no basis for comparison, and likely would not have noticed the alteration. In my view, however, responsibility for this oversight lies squarely on the shoulders of Wendy Leaney.

284    Leaney was general manager, corporate Banking and Wilson's direct supervisor. She knew he had only been in his position for two months. She testified in another context that responsibility for managing the relationship had been delegated to her. She was aware of Leigh's climbing bank line, contracts difficulties, and of the recent hostile takeover, with the consequent changes in management personnel at Plessey. Wilson told her the letter had arrived and sent her a copy to review. She, at least, was familiar with the language of the prior letters, and knew of Noonan's condition that the fifth letter be of the same form and substance. She received the letter and placed her initials on the covering memo from Wilson to which the comfort letter was attached.

285    Leaney's evidence is that she did not read the comfort letter on or about December 28 when it was transmitted by Exton in London to Wilson in Toronto. She stated the covering memo from Wilson with the executed comfort letter attached was passed up to her "...in January 1990 when I returned from Christmas vacation, and it was just -- it was passed to me by Rob [Wilson]." She stated that she did not read it. "I expected that he would have read it and I -- I  didn't read it myself."

286    She said she first heard about the words "does not constitute a legally binding obligation" the day she went on

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

vacation on March 29, 1900, from Ernest Mercier, who had been in touch with the bank's office in London. She testified she was concerned about the words. She had not seen the letter, had not been "apprised" by Plessey "that there was going to be any change, that we assumed the letter was the same as we'd had before."

287      Leaney's evidence on discovery was that she had been told by Wilson in December that the bank had received the comfort letter, but in January she did not "look at it." Leaney testified at trial that she subsequently realized she did see the memo, but did not read the comfort letter. She conceded on cross examination that her evidence on discovery had been mistaken. The covering memo has "Wendy FYI" handwritten on it in red ink, and the initials "W.L." in her hand-writing in blue ink. She acknowledged on cross-examination she had only discovered the memo several months prior to trial, and then realized that she must have looked at the covering memo.

288      In cross-examination when asked to explain her initials on the covering memorandum she stated: "I didn't read the comfort letter for certain, and the covering memo I don't recall specifically reading. Obviously I saw it because my initials are there. But it was one of many pieces of paper that came across my desk, especially after coming back from vacation." "It was a piece of paper ... that was it. It was just information only."

289      Other exhibits in this trial contain Leaney's handwritten initials, which she testified meant she had read the doc-ument in question. Of all the 20 documents initialed by Leaney and made exhibits at this trial, neither she nor her counsel could point to one other she had initialed but not reviewed. The bank's outstanding exposure for some $40 million rested solely on the comfort letter and she conceded that she knew the letter was an important document. Nevertheless, Ms. Leaney maintained that when she received the fifth comfort letter, she merely glanced at it, and did not review it in depth because it had been sent to her for information purposes.

290      In the CCR of March 28, internal memos, and conversations with Anderson and Gerdine subsequently, no bank official ever raised the issue of the added sentence in comfort letter number five. Leaney had no explanation for this, nor could she explain the reference by Wilson to "the integrity of both GEC and Siemens, consistently demonstrated to us" in an April 5 letter to Newlands and Gerdine.

291      I find that Ms. Leaney read and accepted the fifth comfort letter dated December 15, 1989, when she received the letter and covering memo and initialed it in January, 1990. She could point to no other document she had initialed without reading it. Her explanation of relying on Wilson to read it is not credible. He was new on the job and had no in-volvement with the previous comfort letters. This was a large loan and the line was increasing steadily. The bank was resting its position entirely on the comfort letter and knew Leigh could not pay the debt itself.

292      The issue of the form and content of the comfort letter was never raised prior to the bankruptcy of Leigh on April 12, 1990. It was not referred to in any internal bank document, including the March 28 CCR. Nor was it raised in the subsequent conversations with GEC and Siemens concerning Leigh. The reference in Wilson's April 5 letter to the in-tegrity of GEC and Siemens is not consistent with the behaviour of a party upon whom a fraud has just been perpetrated. All of these facts are consistent however, with Leaney having read and accepted the comfort letter when she received it in January.

293      Leaney was disciplined by Ernest Mercier in June, 1990, and did not receive the bonus part of her compensation package that year, on the basis that she had accepted the fifth comfort letter. Mercier wrote to Leaney on June 25:

**Re: Credit Portfolio Management**

Referring to your memorandum of May 22nd, 1990, and our discussions with regard to the captioned situation.

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

Upon review of your memorandum as well as the events surrounding the four accounts mentioned in said corres-pondence, we acknowledge that your actions on these accounts have generally demonstrated a positive commitment towards exercising appropriate credit judgment. *The one situation which falls short of this standard is in the case of Leigh Instruments, and the acceptance of the Comfort Letter in December 1989 that was deficient in form from previous Comfort Letters we had received as a Bank.* This was a serious oversight. This matter and its severity is accentuated by the significant exposure which the Bank has in regard to this credit facility.

Given the serious nature of this situation it has been decided that no Incentive Compensation Award will be granted to you this year.

A review of future Long Term Incentive Plan Awards will be considered at the appropriate time.

This letter will be placed in your Human Resource file and we ask that you acknowledge receipt by signing below. [Emphasis added]

294    This reprimand letter supports my conclusion that Ms. Leaney read and accepted the fifth comfort letter when it was received by TD, and that the bank shared this view.

*Winter-Spring 1990 - The Bankruptcy of Leigh*

295    GEC and Siemens were continuing the hive-up process and the valuation of the Plessey businesses. By January 8, a further valuation proposal exchanged between Siemens and GEC showed Leigh in the category of businesses to be held 50-50 or to be sold, and not in the list of businesses to go to GEC. In that document, GEC did not place a value on Leigh, but inserted a question mark rather than a number. Siemens, who had had little direct involvement with Leigh to that point, had assigned it a value of £70 million.

296    GEC Marconi budget meetings were held annually within the first three or four months of the calendar year. Driscoll and Smith attended meetings at GEC Marconi's Stanmore offices in England on January 8 and 9, including a meeting January 9 chaired by Dr. Ian McBean, managing director of GEC Marconi, to discuss the preliminary Leigh budget for 1991.  Following this review, at the end of the meeting, future options for Leigh were discussed very briefly. McBean instructed Driscoll and Smith to return to Canada and develop a series of options for Leigh, to be reviewed later in the month. Most of the options were identified in a brief discussion at the meeting, and included a restructuring of Leigh, integration with CMC, sale of Leigh to a third party, controlled shutdown and windup of the business, and immediate closing. Driscoll testified these were intended to cover the range of available options.

297    By January 11, Newlands' evidence was that he was of the view that the Leigh situation was serious. He said his initial impression from his visit in the fall was that the North American businesses were in poor shape and the monthly management accounts had not shown the position to be improving. He explained that GEC Marconi were analyzing the position and that McBean would have to determine whether the management of Leigh and personnel were capable of completing their contracts in a sensible time, or at all. He said no conclusion regarding the future of Leigh had been reached by this time in January, however he conceded that GEC was uncertain by this time whether they wanted to take Leigh, and in a further valuation proposal had listed it under 50-50 or to be sold.

298    Meanwhile, Leigh's financial position was still grim. The Plessey finance reports for December, available mid-January, showed a cumulative loss for Leigh to the end of December of £10.721 million or roughly $20 million. By the 16th of January however, Leigh had received the expected Paramax payments and applied them to its overdraft, thus reducing the bank line to $31.646 million

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

299      Driscoll and Shepherd had written several letters to the Canadian government in early January, outlining Leigh's financial situation, in the hope that relief could be negotiated on the TACAN and SHINCOM contracts. To that end, Driscoll, Shepherd, and Alexander attended a series of meetings with various Canadian government officials from Investment Canada, The Department of Industry, Trade and Technology and the Department of National Defence on January 22 and 23. At these meetings, Driscoll advised that there was a serious threat to the viability of Leigh and that one of the options under consideration was the closure of Leigh. Driscoll also presented financial information on Leigh's situation giving a clear indication of the gravity of the situation. At the conclusion of the meeting with the Department of National Defence, Driscoll and Alexander were advised that the government would deal with the Leigh issues on an urgent basis.

300      On January 25th, Driscoll forwarded to GEC his presidents report for December, which showed a cumulative loss to the end-of that month of $21.387 million.

301      Driscoll, Smith and Justice re-attended at Stanmore February 1 and 2 to review the list of options for Leigh, which they had prepared pursuant to McBean's direction in early January. Also present at the meeting were Rickard, McBean and Alexander. The options tabled for discussion included a restructuring of Leigh with a recapitalization to eliminate the bank debt; an integration with Canadian Marconi; sale of the company to a third party; a controlled shutdown and windup of the business; and immediate closure. Payment of the bank debt was listed as one of the steps to be taken pursuant to the last option and Driscoll testified it was discussed briefly. No decision was arrived at concerning what, if any option would be chosen for Leigh, and GEC Marconi took the matter under advisement.

302      Rickard wrote to Justice on February 6 as a follow-up to the options meeting held at Stanmore earlier in the week, and advised that the financial data presented at that meeting represented an "unacceptable deterioration over what appeared to have been a firmly established position on January 9th." He asked Driscoll to respond to McBean's requirement for a concise explanation for each item of deterioration.

303      On February 1, Gerdine was contacted by Simon Weinstock, who expressed concern that Leigh was losing a lot of money. Shortly after that he received a copy of Alexander's memorandum concerning the Ottawa meetings with government in which Alexander observed that Leigh was "running out of money" and "could be insolvent." On February 2nd, Rickard sent Simon Weinstock a copy of the preliminary purchase accounting adjustments for Leigh, which showed a writedown in Leigh's assets of $33 million.

304      Driscoll's evidence was that during this period he felt the likely outcome would be consolidation with CMC. However, on or about February 2, 1990, G. Stuurop, treasurer of CMC and Anderson met. Stuurop told Anderson that upon seeing the comfort letter, CMC seriously considered advising Plessey to walk away. Anderson had no recollection of this but testified he thought it meant that CMC no longer wanted to buy Leigh.

305      On February 8, GEC and Siemens formally decided to place Leigh in the Plessey rump, pending sale, closure or other solution. As a result, Philip Gerdine, the Siemens representative who was co-managing director of Plessey, became more involved with Leigh. Gerdine testified that prior to this time he did not pay much attention to Leigh.

306      Gerdine also testified that by early February, Siemens and GEC were considering selling three of Plessey's North American companies, including Leigh, to a third party. To that end, Simon Weinstock wrote to investment bankers Shearson Lehman in New York, to arrange assistance in the sale of the companies. Gerdine had had previous dealings with the Shearson bankers and thus was asked to attend two meetings with them in early February, to discuss due diligence on the companies and preparation of a sales package.

307      Meanwhile, on other fronts the negotiations with the Canadian government were continuing. The government

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

had not responded directly to the earlier approaches by Leigh, and on February 13, Driscoll and others again met with of-ficials in the Department of National Defence in the hope of negotiating some contract relief. Driscoll presented the gov-ernment with a detailed package of financial material, including analysis of the five options being considered for Leigh's future, and a revised a six-month balance sheet showing a loss as at September 30 1989, of $63.628 million. The projec-ted loss to March 31st, 1990 was $67.7 million. Driscoll testified that these figures included adjustments reflecting both the ETC reviews, which were operational losses, and GEC fair value adjustments. On Feb. 14 Driscoll reported to Alex-ander on the outcome of the meeting and noted that "some assurance will be required from GEC before the government will proceed in any significant contractual areas."

308      Gerdine met with Justice the next day, on Feb. 15, to be briefed on the Leigh situation. Justice informed him of the projected $68 million loss, leading Gerdine to write to Simon Weinstock "we are appalled at the projected losses and bankruptcy is not out of the question if much of this is true." He questioned in the letter whether the sale of Leigh would even be possible. Weinstock had written on Feb. 5 to Shearson Lehman, copying Gerdine, stating that there were "major problems in the business" and noting that the future viability of the company was in question.

309      Wilson at TD telephoned Smith at Leigh on February 21, to get an update on the company's progress, find out more information about Leigh's contracts, and ask about the financial statements. In a memorandum of the conversation made the same day, Wilson noted that Smith told him there was some difficulty with the SHINCOM qualification testing, and that this might have an impact on the profitability of Leigh's fixed-price contracts if costs escalate, but that Leigh was negotiating with the Department of National Defence in this regard.

310      Wilson recorded that Smith had told him the budget for the fiscal year ending March 31, 1991 had not yet been finalized, but that Smith was predicting the sales for the year would be relatively flat, with a modest profit pre-debt ser-vice. Wilson testified that this meant a modest profit prior to interest payment on the outstanding debt. Wilson testified that he asked Smith for updated financial statements and Smith told him that the current year's results were difficult to  forecast in view of the GEC Siemens takeover, but that he believed GEC would adopt conservative accounting, re-quiring Leigh to take up-front provisions for projects such as SHINCOM on Leigh's opening balance sheet. Wilson noted that "this is still under active discussion and results are therefore difficult to predict." Wilson testified this did not con-cern him as there had also been a delay in producing financial statements following the Plessey takeover of Leigh.

311      Smith told Wilson that a merger with CMC was not imminent, given that GEC and Siemens had not yet decided how to divide Leigh's assets, and that Colin Justice was no longer actively involved with Leigh, as he was concentrating on the hive-up and valuation of Plessey's assets. Wilson noted that Siemens was scheduled to visit Leigh the following week. Wilson concluded the memo, referring to the current fiscal year: "In summary, Smith will therefore be closely managing his cash position, but acknowledged that it will be a "tight" year for Leigh.... Smith expects to operate within his budget but is concerned with the high level of debt and related servicing burden. I confirmed that we are comfortable with the support provided by Plessey for Leigh's borrowings." Wilson testified that he took the reference to "tight" to mean modest profit to break even, although he conceded that Smith had not said that. Wilson noted as follow-up to keep Anderson informed, through Exton, which he testified referred to the Leigh borrowing levels. As follow up Wilson also listed a reminder to schedule a visit to Leigh in mid-March, although he testified that this visit never took place, but he could not recall why. Wilson testified that following this conversation he still had the same view that Leigh was perform-ing satisfactorily, and that Smith did not tell him anything which would lead him to think otherwise.  At the bottom of the memo, Wilson noted that a copy was to go to Exton.

312      In London, Exton met with Anderson in person on February 22 for the first time. He testified that he advised Anderson of the amount outstanding on the Leigh loan and discussed the bank generally. No evidence was led at trial that

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

Anderson and Exton discussed the conversation between Smith and Wilson which had taken place the previous day. Nor did Anderson tell Exton of Leigh's financial condition, although he knew of the deterioration. Anderson testified that he asked Exton for a £50 million facility for GEC at this meeting.

313      Driscoll learned for the first time on February 23 that Leigh had a financial reporting requirement in its facility with the bank, and that Leigh was in violation of this term of the facility. He also discovered that the most recent financial information the bank had was the quarterly financial statements to the end of June 1989 and the 1989 year-end financials, which showed Leigh trading at a modest profit.

314      This discovery prompted Driscoll to write to Alexander on February 26, informing him that Leigh had not fulfilled its reporting requirements for the September and December quarters and noting that, although the bank had not requested the financial statements, he expected a request in light of the continually rising bank line. He asked Alexander for direction as to what information should be provided to the bank in terms of Leigh's current financial position and projected cash flow. He sent a copy of the letter to Justice and Rickard, and Rickard noted in handwriting on the side of his copy of the memo "must tell if they ask". All parties agreed on this  transcription of Rickard's note, although he was not called to give evidence about it. Driscoll testified that he expected some guidance from Alexander, but that he never received any response to the letter.

315      Also on February 26, Exton wrote Anderson at GEC, thanking him for the recent meeting and undertaking to keep him advised of Leigh outstanding levels of borrowing.

316      Two days later, Gerdine visited Leigh with Shearson Lehman as part of the due diligence process for the potential sale of Leigh through the investment bankers. This was his first visit to the company. Driscoll and Smith presented him with a detailed financial package similar to the material presented to the Department of National Defence earlier in the month. Gerdine became aware for the first time in this meeting of the depth and seriousness of the problems facing Leigh, including the TACAN and SHINCOM delays and technical problems. Gerdine testified that they advised him Leigh was in violation of its reporting requirements to the bank and Gerdine stated in evidence that he suggested forcibly to them that they send the financial information to the bank. In contrast, Driscoll's evidence was that while he did discuss reporting requirements with Gerdine, Gerdine gave him no direction he could recall. If he had received direction, he testified that he thought he would have acted upon it. Driscoll's version of events is supported by the memo he wrote to both Gerdine and Alexander on March 1, reiterating his request for guidance on the question of the information to be provided to the bank. Driscoll testified he could not recall receiving any guidance in response to the memo. Although I do not prefer his version of events to that of Gerdine, it is clear that if Driscoll thought any guidance was required, he  thought it was required from both GEC and Siemens. Given Siemens' relatively recent involvement with Leigh, it seems unlikely that Driscoll would have acted on Gerdine's direction alone.

317      Also in this meeting, Gerdine became aware of the comfort letter in connection with the $37 million TD loan. Although he had seen the draft comfort letter in December, he testified he had not connected it with the Leigh loan.

318      Gerdine concluded following the meeting that, based on Leigh's losses, the company was technically insolvent and its future uncertain, although its ultimate viability was still unclear. Also uncertain was whether Leigh could pay its debts on a standalone basis without some form of financial assistance. Gerdine had not, by this point, given up on Leigh as a going concern, and felt that Driscoll and Shepherd were taking positive steps regarding Leigh's future.

319      On March 5, following his visit, Gerdine reported to Simon Weinstock that he had found Leigh to be out of financial control, and confirmed that Shearson had informed him that morning Leigh was "unsellable at this time". He noted however that shutting Leigh down "might hurt us all" in light of Leigh's close ties to the Canadian government.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

320      The process of valuing and allocating the Plessey businesses was continuing, and by Feb. 22, GEC and Siemens had finalized division of the companies between GEC and Siemens, and determined which companies would remain in the Plessey "rump" ultimately to be liquidated or sold. The destination of each company was a matter of negotiation between the parties, with a view to the value allocated to each company and the overall acquisition cost of Plessey. Leigh was relegated to the Plessey "rump". As the companies in the "rump" were assigned one, lump sum value, the parties never agreed on a specific valuation for Leigh. The hive-up transaction closed on March 8.

321      Driscoll flew to New York to meet with Gerdine, who was there on other business, on March 12. Driscoll testified he once again raised the issue of the financial reporting to the bank with Gerdine but received no direction he could recall. Gerdine testified, to the contrary, that he instructed Driscoll again to send the statements, although his note of the meeting does not record such an instruction. It is apparent that Driscoll received no direction from GEC, but I am not prepared to find that Gerdine did not so direct.

322      On March 15 Driscoll wrote to Gerdine, Alexander, and Rickard, regarding guidance about the reporting requirements and noting "I propose to provide a copy of our September and December results and discuss our present cash flow position with the bank unless you advise otherwise." Driscoll testified he again received no response and on March 21st, acting on his own initiative, he instructed Smith to forward the financial statements to the bank. In view of Driscoll's repeated requests in writing, his evidence that if he had received instruction to provide the statements to the bank he likely would have done so, and in view of the fact that he did ultimately provide the statements to the bank on his own initiative, I accept his evidence that he received no response to his requests for guidance from GEC. That said, the obligation to provide the financial statements to the bank was that of Leigh and not the parent companies. Driscoll was the president of Leigh and thus ultimately responsible for delivering the statements to the bank. I must infer that his repeated requests for direction from GEC and Siemens were an attempt to transfer responsibility to them for his oversight in not knowing of the obligation to provide the statements to the bank, and for Leigh's failure to comply with the reporting requirements in the facility. GEC's failure to respond is understandable in this light. This inference is supported by the fact that Driscoll ultimately did provide the statements to the bank without any direction to do so from GEC.

323      On March 21, at Driscoll's direction, Smith sent a package of financial data to Wilson at the bank. The documents sent by Smith included financial information for the quarters ending September 30 and the end of December, 1989, and cash flow forecasts. Unfortunately, the financial statements that Smith sent to the bank were inaccurate. The six-month results to the end of September only reflected the Leigh financial position as it was known in October, and did not reflect the magnitude of the losses as they were known on March 21st. Indeed, the six-month results were the same figures as had been presented to David Newlands on October 20, 1989, when he visited Leigh, and showed an actual loss, as at September 30, 1989 of $2.858 million. The third-quarter results were more up-to-date, and included the president's report for the month of December. The consolidated management report for the quarter, included in the package, disclosed an actual loss to December 29, 1989 of $21.387 million. The cash flow forecast projected an overdraft of $40.976 million at the end of March 1990. All the financial statements were, according to Driscoll, prepared in Plessey format, and not using GEC accounting principles.

324      Driscoll conceded on cross-examination that the information provided to the bank did not reflect all the information Leigh knew at the time, and did not include the revised loss figure of $63.628 which had been disclosed by that time to GEC, Siemens, Plessey, and the Government of Canada. Driscoll testified that he did not review the financial statements before they were sent to the bank, but simply instructed Smith to send them. The president's report prepared only two days previously showed an operational loss to the end of February of $24.402 million, although this data was not sent to the bank.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

325      Wilson's evidence was that he received the financial information on or about March 22, and reviewed the financial statements and enclosures, particularly the profit and loss statements. He testified that he had not been aware of the technical and manufacturing problems associated with SHINCOM and TACAN, although I note that he had referred to contract delays in prior CCRs.

326      Gerdine attended a board meeting at Leigh on March 26, 1990, at which a number of proposals regarding the future of Leigh were discussed, including a five-year plan for the company. The issue of the reporting requirement to the bank was also placed on the agenda. Following the meeting, Gerdine testified that he telephoned the bank, and spoke to Wilson and Leaney. Gerdine asked Leaney if she was aware of the serious financial situation at Leigh, and that she sounded surprised that anything was wrong. He said it seemed evident to him that she had not seen the financial package which had been sent to the bank. He said she then brought up the subject of the letter of comfort and asked if GEC and Siemens would countersign it. Gerdine testified that he did not know what the legal effect of that would be, but that it seemed to be a "quick fix" to a lot of the problems. He testified that Leaney pointed out Leigh was near its authorized credit limit, and indicated that the bank would be willing to increase the line to $50 million if GEC and Siemens signed the comfort letter. Gerdine testified that he told Leaney he would look into the question of whether the comfort letter would be signed by the parents. Gerdine said he suggested that the bank arrange for the assistance of a work-out specialist for Leigh, and that Leaney was receptive to the idea, suggesting the same specialist who had worked with Leigh in the early 1980s. He said the conversation concluded that he would speak to the treasury department at Siemens and the bank would look into arranging a work-out specialist.

327      Gerdine testified that the next day, he again spoke with Leaney and Wilson and that the tone of the conversation "suddenly changed about 180 degrees." Leaney advised Gerdine she was freezing the loan, and Gerdine said the potential to involve a work-out specialist seemed to evaporate at that point. Gerdine ultimately told Leaney that a letter of comfort was "just that" and that parent company signatures on the letter of comfort were not "going to be forthcoming" in his estimation.

328      Leaney testified that she felt Gerdine was "back-pedalling" from association with Leigh. She testified regarding this conversation:

Well, I brought the comfort letter up because I felt that at this point, given the serious situation at Leigh and the fact that Dr. Gerdine seemed to be back-pedalling from the association with Leigh, I -- I can't put specific words in his mouth, but he -- the impression I got was they were not -- Siemens was not fully in support of the comfort letter that we had, uhm, from Plessey and, uhm, we -- we said, you know, the only reason we were lending was because we had the comfort letter, *and he said, Well, a comfort letter was just that*, and, uhm, — but he did agree that he would review -

329      Later that day, Gerdine attended a meeting with the Canadian government, which he described as more positive than he would have expected. He said he proposed a "save Leigh" program which would require participation from all the various parties, and that he thought at this time there was still a chance that Leigh could be saved. He said the government indicated it would want parent company guarantees. On the 29th of March, Gerdine composed a list of possible options for Leigh, which he forwarded to Driscoll.

330       Following the conversations with Gerdine, Wilson at the bank prepared a memo to Noonan, in which he summarized the discussion with Gerdine. Apart from a number of minor discrepancies and the fact that the memo appears to collapse the two conversations into one, Gerdine confirmed in evidence that the memo accurately reflected the conversations. Wilson noted in the memo, which was incorporated into a CCR of Leigh dated March 28, that Gerdine had indic-

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

ated Siemens felt there were two potential alternatives in dealing with Leigh; to do nothing and go away, or to inject capital and turn the company around. The CCR recommended that the risk rating for Leigh be reclassified at 5, and that Leigh be placed on the "watch list".  The  CCR was reviewed by Yovhan Burega, vice president of corporate banking, who noted "GEC and Siemens will have to provide us with a *very strong* letter of comfort. They do not have an option to do nothing. If that was the case we should immediately call the loan; also, we will not provide any concessions and GEC/ Siemens must honour all of Plessey's commitments." Pierre Boulanger, senior vice president in the Credit Division, noted that "The situation is of concern and a firm stance is needed. We agree that we should make it very clear to Siemens that we do not view the "do nothing" option as a viable alternative for the company and we agree with Mr. Burega's position that unless we can shore-up our position we should immediately call the loan in order to force their hand." He concluded that the bank should not advance further funds to help the company pay interest when it was operating at a loss. The CCR was initialed by Brock and Thomson. Wilson confirmed in evidence that the bank decided in this period it would not offer Leigh any concessions, nor would it intercede with the Canadian government to seek concessions on behalf of Leigh.

331    Wilson sent Exton a copy of the memo regarding the conversation with Gerdine, and indicated he would be interested to hear the views expressed by GEC. In consequence, Exton called Anderson on March 29th, and advised him of the bank's concern following the conversation with Gerdine. He said Anderson told him Gerdine did not have authority to speak for the joint venture, and that "the original intention for GEC is not abandoned, but has not happened," which Exton interpreted as Anderson telling him GEC still intended to take over Leigh. After speaking to Anderson, Exton called Wilson, who told him the line had been capped at $41 million. Exton then called Anderson back the same day to advise him of this development. He said Anderson was "upset and disappointed" that the bank had decided not to stand by their arrangement. Exton testified that he told Anderson the bank definitely wanted the Plessey comfort letter to be acknowledged by GEC and Siemens, and that Anderson told him this was unlikely. Exton told Anderson someone from the bank in Toronto would call him.

332    Wendy Leaney did call Anderson shortly thereafter, and gave the following evidence regarding the call:

I talked to him about the situation at Leigh and the fact that we capped the line of credit, and we had a conversation. He said that GEC had never reneged on any of its obligations and a number of other things, such as commenting about social life, that he and his wife would not be invited anywhere if they did renege on any of their obligations, and we just left it at that.

333    Anderson testified that while he did have a conversation with Leaney, he would not have made the remarks attributed to him, particularly since his wife had died of brain cancer five years earlier. His evidence in this regard was as follows:

Q. ...Mr. Anderson, it is alleged by the bank that during a phone call with Ms. Leaney on or about March 29 you said to her that you and your wife could not show up at social functions if such a letter of comfort was not honoured. Do you have any recollection of making that statement to her?

A. No recollection of saying that.

Q. Do you have any belief as to whether it is possible you said that?

A. Well, I think now that it's inconceivable I could have said that.

Q. Why do you say that, sir?

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

A. Well, this is what date, March, 1990. My wife had died five years before then and it was not a very nice death and I haven't gone to a social function with ladies since then so I just feel that I couldn't have said such a thing.

334     Although Ms. Leaney was told of the death of Mrs. Anderson, in cross-examination she insisted that Mr. Anderson had made the statements in question:

Q. Ms Leaney, have you become aware since the date of that conversation that Mr. Anderson was, at the time, widowed and his wife had died of brain cancer?

A. No.

Q. I suggest to you that -- is it possible your memory in that regard is mistaken?

A. Absolutely not. He talked about his -- he and his wife had been -- they were guests all the time at functions, and business -- corporate functions, if they did not honour their obligations, they wouldn't be invited. It was a bizarre statement. That's why I'm so strongly -

Q. You agree especially bizarre for a man who was a widower whose wife had died of brain cancer?

A. Maybe he was talking in the past. I don't know. He might well have been.

335      In my view, Ms. Leaney's evidence on this point is incapable of belief. I observed the demeanor of Mr. Anderson when questioned on this point. He was visibly upset by the line of questioning. Although Mr. Anderson had no recollection of the substance of the conversation, I  prefer his evidence. Moreover, he testified in a different context that he did not view comfort letters as binding obligations. Accordingly I find as a fact that he did not make the statements attributed to him by Ms. Leaney, and in particular those concerning the comfort letter.

336      Ms. Leaney testified that following the conversation with Anderson, she met with Ernest Mercier, to update him on the situation. She said Mercier told her of the added line in the comfort letter, which she said was the first indication she had that the letter had been amended. In light of my finding above that she had read and accepted the letter when it was received, I do not accept her evidence on this point. She testified she told Mercier they had not been advised of the change by Plessey and she had assumed the letter would be the same as the prior letters. Leaney left on vacation following the conversation with Mercier and did not return until April 16, by which time Leigh had made an assignment in bankruptcy.

337      Meanwhile, on April 3, the Red Team delivered its report on Leigh, at a meeting attended by Simon Weinstock and Gerdine, among others. The Red Team was composed of technical people from GEC Marconi who had been hand-picked by MacBean and put in place in mid-February to review the technical assumptions underlying the Leigh contracts and the cost estimates of completing the SHINCOM contracts. Driscoll testified that this was a technical review rather than financial, and that it validated his belief about the state of the contracts. The report concluded that there were numerous engineering problems in relation to the contracts that would require significant investment, and that without changes in both investment and personnel, Leigh would not be able to deliver the product. David Newlands testified that he concluded from  the review that Leigh had terminal problems unless Leigh could negotiate some relief from its customer, the Canadian government.

338      Also on April 3, Exton testified that he called Anderson concerning a shareholders meeting. Exton reported the call to Wilson by facsimile, stating that "given Leigh's financial performance and position, a joint guarantee would obviously be preferable, but I doubt whether this would be forthcoming." Exton explained himself in his testimony, stating

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

"...I was aware that Toronto was very concerned about the letter of comfort that they had and whether or not it would be good security..."

339      Wilson drafted a new comfort letter in consultation with Norton, the bank's in-house counsel, and sent it to Newlands and Gerdine on April 5, 1990. In his covering letter, he requested that the letter be executed by both GEC and Siemens, noting: "Our comfort and support for Leigh has been based on the integrity of both GEC and Siemens, consistently demonstrated to us." Wilson made no mention of the added wording in the fifth comfort letter, nor that Musgrave had allegedly told Young the comfort letter was tantamount to a guarantee, explaining in evidence that they were trying to be conciliatory and co-operative. The proposed letter stated:

This is to confirm that we have full knowledge of the facility of C$45 million (Forty Five million Canadian dollars) which has been granted by the Toronto-Dominion Bank to Leigh Instruments Limited ("Leigh").

Leigh is currently a wholly owned subsidiary of 160956 Canada Inc which is a wholly owned subsidiary of Plessey Overseas Limited which is in turn a wholly owned subsidiary of The Plessey Company plc which is owned jointly by GEC plc and Siemens AG. We undertake not to reduce out respective share-holdings in Leigh or its holding companies without your prior consent.

We undertake to ensure that Leigh be managed in such a way, so long as your credit facility remains outstanding, as to be in a position to meet its financial obligations, including repayment of all amounts owed under the above facility to yourselves on their due dates.

340      On cross-examination, Wilson conceded there was no reference in the letter to the added language of the fifth comfort letter, namely that it did not constitute a legally binding obligation. Given that he testified that he felt "shock and dismay" when he read the fifth letter, his explanation of the reference to the integrity of GEC and Siemens is not believable. He was hard pressed to explain this apparent inconsistency, saying only that the reference to the parents' integrity was "somewhat of an overstatement on my part".

341      In late March or early April, TD decided that it would not offer concessions as part of an overall solution for Leigh. Wilson testified that the bank had indicated it would not provide any concessions and would not approach the government with the shareholders to seek concessions.

342      On April 6, Wilson and Anderson spoke. Wilson testified that Anderson told him "the news was not good" and that it was possible that neither GEC or Siemens would take Leigh. During the conversation, Wilson did not complain about the added words in the fifth comfort  letter. His explanation for not doing so was that it should have been clear to Anderson by the deletion of the words from the proposed letter. Wilson makes no reference to this issue in his note of the call. I find his explanation unconvincing and that no complaint was registered concerning the added words.

343      On April 9, Gerdine and Alexander came to Canada to meet with members of the Canadian government. Gerdine testified that the government officials refused any assistance, following which he concluded the only alternative was bankruptcy for Leigh. He said the group returned to the offices of their legal counsel and that Gerdine then called the bank. He spoke to Yovhan Burega, who he said was insistent that the parent companies sign "some kind of an instrument" regarding the Leigh borrowings and Gerdine told him that they might not be able to do it. He said he told Burega "we will all have to do what we have to do" which ended the call. He said that since it was manifest that the shareholders were not going to put any cash into Leigh, following the call bankruptcy was the only alternative. During these final calls no mention was made of the wording of the fifth comfort letter by anyone at the bank. On April 10 Hugh Rising of the bank's London office called David Newlands. Newlands testified that Rising was seeking comfort that GEC would stand

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

behind the Leigh loan. Newlands did not give him the comfort he was seeking.

344     On April 11, 1990, Exton, in a memorandum recording discussions between himself, Rising, Walzak, Burega and Wilson, concerning events between April 5 and April 11, outlined "key strategic areas identified by Rob Wilson." These included, "GEC & Siemens worldwide reputation - negative publicity, if the companies do not stand behind the Comfort Letter," government pressure, and poor relations with the Canadian government. Also a possible injunction which could "cause costly delays and be a major nuisance factor." In a separate memorandum of the same date, Wilson adverted to the these factors and added "Need to give GEC/Siemens lessons on doing business in Canada ... moreover, they are reneging on a commitment to a major Canadian bank, with public sympathy clearing [sic] falling on the side of TD rather than 2 European multinationals."

345     On April 11 and 12, abortive discussions were held between the government and Leigh in a last attempt to save Leigh. When these failed, Leigh applied for bankruptcy protection on April 12, 1990.

346     Newlands took part in GEC's decision not to pay TD. He could not recall who was in attendance at the meeting, but he believes it took place in Lord Weinstock's office. He testified they had a brief discussion and concluded that there was no reason why GEC should pay. Newlands participated in the a similar discussion regarding whether Plessey should pay TD and the same conclusion was reached.

347     The process followed by both the Plessey board and GEC accords with Musgrave's view of what a company issuing a letter of comfort ought to do when demand is made. Musgrave testified that, while he never saw a legal obligation for Plessey to pay under a comfort letter of this kind, he personally felt that the board of directors of the issuer had a moral obligation at least to consider a bank's request for payment. If the directors reviewed the matter but decided not to pay the borrower's outstanding loan, then they had, in his view, discharged that obligation.

*The Parties' Understanding of Comfort Letters.*

348     At the outset, I note that where the views of the witnesses constitute legal conclusions on issues before this court, I place no weight on their evidence.

349     The bank and Plessey were both large and sophisticated business organizations. Their states of mind was placed squarely in issue in this trial. Their knowledge of the use of comfort letters in the marketplace in which they both operated was the subject of considerable evidence.

350     Dealing first with the bank, Noonan testified that he used comfort letters with caution. It was he who first proposed that a comfort letter be obtained from Plessey, given that a guarantee was not on offer. The bank characterized the Plessey comfort letter as "strong" throughout, and knew that comfort letters varied in strength, according to their wording.

351     F.G. McDowell, vice chairman of the Credit Division and the most senior credit person involved with the Leigh facility (other than the chairman of the bank), testified that the bank was aware of the distinction between a comfort letter binding a parent to pay a subsidiary's debt and one that did not, even though he did not review the specific comfort letters accepted by the bank.

352     TD's Legal department was mindful of concerns about the enforceability of comfort letters. In a memo and dated September 8, 1982, as senior member TD's legal department, T. G. O'Connor identified a series of weaknesses and legal technicalities which accompanied comfort letters and concluded that "comfort letters are only of use where political as-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

surances are better than legal assurances (which is seldom the case) or where a shadow of a guarantee is better than noth-ing at all. They are inappropriate for lenders who require a serious legal claim."

353      Neither Noonan nor McDowell had seen this memorandum but McDowell was aware that the TD legal depart-ment had "reservations" about comfort letters. Young did not know of the memorandum either but was aware of the "un-certainty of enforceability" of comfort letters.

354      On September 16, 1988 a "head office circular" emanated from the bank's general counsel and secretary, R. G. Bumstead, dealing with the use of comfort letters. Bumstead stated that comfort letters "invariably" fall short of a guar-antee, are not a suitable substitute for a standard form of guarantee, and should not "normally" be used unless the bank is "otherwise well protected or secured." Where a comfort letter is all that is on offer and the bank is prepared to lend on that basis, he advised as to procedures to be followed. McDowell testified that this permanent circular reflected the legal department's opinion of comfort letters, he would have seen it and it would have been circulated to staff, including to the corporate bank banking department, and retained by them. He added that it was merely an opinion however, and not binding. Evaluating credits was a matter of personal judgment, he stated, but the circular should have been read and con-sidered.

355      McDowell stated that he did not agree with everything in the legal department memos, although he did not see them at the time. Noonan's evidence was substantially in line with that of McDowell. Leaney testified that she was not aware of the circular or the views expressed in it, either through the circular or other sources. Exton, Young and Wilson all testified that they also had not seen the circular. Leaney Young and Wilson differed somewhat as to what effect know-ledge of the memo would have had on their actions, but all agreed they would have had to at least consider it.

356      In a memorandum dated March 16, 1989 the bank's legal department reported on the decision of the English Court of Appeal in *Kleinwort Benson*, stating that "the enforceability of comfort letters is limited." The memorandum concluded:

> If a fully protected legal obligation is sought, a standard guarantee, resolution and solicitor's letter of opinion should be obtained. The Bank cannot rely on comfort letters to do more than state a fact, which may or may not change in the future. If there is misrepresentation in the letter, the Bank may have an action against the signatory for misrepres-entation but not in contract. A comfort letter is cold comfort for the Bank.

357      This document was addressed to the Credit Division, Corporate Banking Division, and senior vice presidents of the Line Division, and bore the handwritten notation "Sent -Mar 28" with the names of McDowell and Mercier, and "all Division SVPs".

358      McDowell and Noonan both testified they could not recall having received this memo.  Noonan would have felt obliged to follow it he said, but not necessarily where existing customers or comfort letters were involved. McDowell would have expected persons required to deal with comfort letters to receive it, however, Leaney apparently did not. Ex-ton, Young and Wilson had not seen the memo either. Exton and Young knew of *Kleinwort Benson* independently of the memo, but Wilson did not know of the case.

359      Noonan testified that he was aware of the trial decision in *Kleinwort Benson* and had, indeed drawn to the atten-tion of Bumstead a financial Times of London clipping dealing with *Kleinwort Benson* in January, 1988. Noonan and Young were both involved in the first four Plessey comfort letters. Both testified that they were aware of the trial de-cision in *Kleinwort Benson*, and also of the subsequent Court of Appeal decision, reversing it. Young had consulted with a lawyer in the bank's legal department, Alex Norton, when he learned of the appellate decision. Leaney testified she

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

never learned of the *Kleinwort Benson* decision at any time. Young however, said he thought it "likely" he would have discussed the case with her. Young recalled that at least one source of his knowledge of *Kleinwort Benson* was from a law firm circular, and any information circulated to him would have gone to Leaney as well.

360    TD had used comfort letters in other facilities and examples were introduced in evidence. McDowell stated that he expected the legal department to keep on top of developments in commercial law, including comfort letters, and advise the lending and credit officers of developments to the extent they felt appropriate. Non-lawyers were not expected to keep abreast of developments in the law on their own.

361    McDowell and Noonan agreed the bank would be or ought to be aware of major developments affecting the usefulness and enforceability of comfort letters, to the extent this received attention in the marketplace. There was evidence of a plethora of law firm circulars, articles, and other documents dealing with comfort letters, over and above those generated within the bank.

362    Noonan and Young had a general working familiarity with comfort letters based on their experience, but no formal education regarding them.

363    Noonan testified that his characterization of the comfort letter as strong was based on the language in the letter, the fact that two authorized persons signed it, and the company's reputation and ability pay. He testified he believed Plessey would do what it had said in the letter, although, as he stated, he never spoke to anyone at any of the corporate defendants. He stated that of paramount importance was the reputation of the giver of the letter, whether it had access to world markets, valued its reputation, and whether the bank could believe their word. He felt Plessey met all the above criteria; it was a "major world corporation" with the resources to flow money to the subsidiary to see the commitment fulfilled. Noonan said he thought the language of the comfort letter was appropriate and Plessey's reputation was such that the bank could take it at its word. He said he thought the same was true after the GEC Siemens takeover.

364    McDowell testified that he knew Plessey as a very respectable U.K. corporation. Sir Alastair Frame was a director of both Plessey and the bank. The bank was soliciting an  opportunity to do business with Plessey. McDowell noted, on a September, 1988 Group Credit for Board Presentation for the Plessey group including Leigh, that Plessey was "a leading U.K. high tech company and the parent of Leigh Instruments Ltd. in Canada. Well capitalized, profitable, and considered responsible. Loans to Leigh are supported by comfort letter."

365    McDowell's personal view was that a well-written comfort letter was one which was from a responsible corporation and signed by its authorized officers, which acknowledged the borrowing, confirmed ownership of the borrower, and stated the intention to keep the borrower in sound financial condition. In his view, such a letter would be a very good comfort letter, and he would view it as an undertaking. In his words: "my word is my bond, and if I make a commitment, I expect to fulfill it." McDowell did not see any of the Plessey comfort letters, and thus these views were of comfort letters generally and not a construction of any particular letter.

366    I turn next to Plessey, and its knowledge of and experience with comfort letters.

367    Musgrave was head of Plessey's Treasury Department. He was responsible for all comfort letters issued by Plessey. Since becoming group treasurer in 1982, he had acquired knowledge of comfort letters from varied sources ranging from professional organizations such as the Association of Corporate Treasurers, discussions with Plessey in-house counsel, a review of all of the Plessey comfort letters on file, and by following the literature on the subject. He learned of the *Kleinwort Benson* decisions through this professional literature, but testified that the decisions and subsequent comment upon them did not lead him to alter his views on comfort letters.

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

368      Musgrave testified that he knew the essential nature of a guarantee, which he described as a direct obligation to pay someone else's debt. Conversely, a comfort letter in most cases was intended to provide, in his view, "a degree of comfort" to the bank about a transaction, while falling short of the guarantee to repay the debt of a subsidiary. There was, he said, a "clear distinction between a comfort letter and a guarantee". He was aware of the range of language used in comfort letters, from mere awareness of a facility to "just short of a guarantee". He said comfort letters could include legal or moral obligations.

369      Musgrave stated comfort letters were a means of avoiding giving a guarantee, and that Plessey did not like to give guarantees, except where necessary, such as for a large contract or at government insistence. His and Plessey's view was that a comfort letter did not impose an obligation to repay a subsidiary's debt. Lenders, he testified, accepted such letters based on commercial considerations such as the overall relationship with the lending group, the amount of business from the group, and an overall assessment of the risk in the transaction. He expected that a bank would look at the particular comfort letter and the overall relationship with the group in arriving at its decision.

370      Musgrave testified that during the period of his involvement from 1982 to 1989, it was a buyers market, and since Plessey was credit worthy, many banks wished to do business with it. He testified that comfort letters would be negotiated between the bank and Plessey in any given transaction. Since Plessey was reluctant to give guarantees, comfort letters were sought from time to time, as a lesser form of support for the facility sought by the subsidiary. Plessey produced several comfort letters it had used over the years, and Musgrave testified about two examples where Plessey had paid on a non-binding comfort letter. He said on one of those occasions, Plessey paid for relationship reasons, because public knowledge they had walked away could make future dealings with banks difficult. He stated that he would be "embarrassed" if Plessey signed a comfort letter and decided not to pay the debt associated with it, without first giving a request for payment reasonable consideration, because Plessey would have failed to live up to the spirit of the letter. He said he viewed comfort letters as imparting a moral obligation to consider whether or not to pay the debt of the subsidiary, and that as long as Plessey gave the comfort letter that consideration, that was all that was required. He said once Plessey had given that consideration, a decision not to pay would not embarrass him.

371      The evidence of Musgrave, Noonan and McDowell was not inconsistent in substance. Each of them essentially viewed comfort letters as gentlemen's agreements, and placed emphasis on considerations of reputation in the business community and ability to pay, when assessing a comfort letter.

### The Witnesses

372      In light of my evidentiary findings, it is perhaps useful to share my impressions of the  witnesses called by the three parties to the action.

373      This is a fact driven case, however there was no significant controversy about much of the evidence, with the exception of the evidence of the three witnesses to whom I now turn. It is necessary to make adverse credibility findings in respect of these three witnesses only.

### The Bank Witnesses

374      I must comment generally on the evidence of the three bank witnesses from the Corporate Banking Division; Mr. Young, Mr. Wilson, and their supervisor, Ms. Leaney. Ms. Leaney graduated from the University of Toronto with a B.A. (Hons.) and immediately thereafter joined the TD Bank. After a brief training period she became a senior accounting officer at a branch and then moved up the ranks into middle management. She held a series of positions and gained experience in lending, credit and marketing. She had been involved with Leigh in 1983, in the period when it had experi-

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

enced financial difficulties, resolved with the help of a work-out specialist. After a period in Corporate Finance, she returned to the Corporate Banking Division in 1988 as a general manager. The account manager responsible for the Leigh account, Young, and then Wilson, reported to her. She herself reported to Ernest Mercier, executive vice president of Corporate Banking. In 1990 she moved to the Corporate and Investment Banking Group as a vice president, and then into TD Securities Inc., from which she retired in 1996. I found Ms. Leaney to be alternatively aggressive, argumentative and defensive when giving evidence. Her evidence at trial contained a plethora of inconsistencies and contradictions with the evidence she gave on discovery.

375    Greg Young also has an MBA and worked as a chartered accountant at Clarkson Gordon until 1980. From 1981 until 1987 when he joined TD he held a series of positions at the Bank of Montreal, Citibank Canada and Royal Trust. He remained in TDs Corporate Banking Department until November, 1989, when he was replaced by Rob Wilson. He is presently self-employed as a management consultant.

376    Rob Wilson obtained a B.A. from University of Toronto in 1978 and an M.B.A. in 1980. He joined the Continental Illinois Bank following graduation and stayed there until the fall of 1983, when he entered a forestry program at the University of Toronto. Upon obtaining his diploma in resource management from the Department of Forestry, he attempted unsuccessfully to obtain employment in the forestry industry, and then joined the Bank of Nova Scotia in 1984. In 1985 he rejoined the Corporate Banking department of the Continental Illinois Bank, where he remained until 1987 when he again moved, this time to a merchant bank called Canadian Corporate Funding Limited. He left that position and joined TD in October, 1989. He is presently a vice president of TD Securities, where he has been since 1994.

377    These three members of the Corporate Banking Department were involved in management of the Leigh account during the period of time material to this proceeding. During that interval their handling of the account for the bank left much to be desired. In December, 1988 Leaney and Young extended credit to Leigh with Noonan's authorization, on condition that a revised credit review was received the following week. The credit review was not prepared until almost one month later.

378    On the occasion of the taking of the third comfort letter, Young and Leaney acted contrary to the specific direction of the Credit Division in waiving the requirement that the intercompany debt be postponed of their own volition, and releasing the security notwithstanding that the debt had not been postponed. Upon the assumption of Young's responsibilities by Wilson, the degree of supervision provided by Leaney to ensure continuity was unsatisfactory. From time to time the account was out of order, facility letters were not updated and fresh documentation not obtained as directed by Credit Division, and good banking practice not always followed. Ms. Leaney authorized an extension of the authorized credit for Leigh when Leigh was in an overdraft position without consulting the Credit Division, and even though, as she conceded, she did not have the authority to do so. Mr. Wilson did not read the fourth comfort letter when he took over responsibility for the Leigh account, nor did he do so upon receipt of the fifth comfort letter. Thus, while he failed to read the fifth comfort letter, he would not, in any event, have been able to draw an informed comparison if he had done so. Ms. Leaney claims not to have read the comfort letter, which was the only support for a loan of over $40 million, even though her initials appear on the covering memorandum, and she was responsible for the account. When the Leigh situation came to a head, with Leigh on the brink of bankruptcy and the parent companies "back-pedalling" from the association with Leigh, Leaney left for a two-week vacation without, she maintains, having bothered to read the fifth comfort letter.

379    Throughout, the monitoring of the Leigh account was less than diligent, although it is apparent all three knew a good deal more about Leigh than they admitted to. There was a pre-occupation with maintaining existing business and generating new business which pervaded their  approach and clouded their judgment. These three bank witnesses were

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

the persons directly responsible for supervision and control of the Leigh account. All of this resulted, to varying degrees, in a retrospective reconstruction of events by each of these three witnesses in testimony, perhaps inadvertently, in an attempt to explain or minimize their errors and oversights and to cover their mistakes.

380      For all of these reasons, I must conclude that, where the evidence of these three witnesses conflicts with that of any other witness, I cannot rely on the evidence of the Corporate Banking witnesses, and I prefer the evidence of the others. These observations have no bearing, however, upon my perception of the evidence of the witnesses from the bank's Credit Division or that of Mr. Exton.

381      The other bank witnesses were Patrick Noonan and Ted McDowell. McDowell joined the bank out of high school in 1947 and rose through the ranks by dint of hard work. He was the senior credit officer for the bank, a post he had held from 1972 until his retirement in 1990. He was appointed vice-chair of the bank in 1981, and reported directly to the chairman and chief executive officer of the bank. He remained on the board of directors of the bank until 1995. Patrick Noonan began his banking career in 1948 with the Canadian Imperial Bank of Commerce, and joined TD in 1968. He held numerous senior positions in the bank, and was posted in the U.K. and Singapore, as well as Canada. He was appointed senior vice president, credit, in 1982, a position he held until his retirement in 1991. In 1986 he became one of only four senior vice presidents responsible for all credit, globally. Both these witnesses were  seasoned professional bankers, who conducted themselves with integrity, and I found them to be knowledgeable and credible.

382      Jonathan Exton is a graduate of the City of London Business school, and received his MBA from the University of British Columbia in Canada. He held positions with Canadian Pacific and the Bank of Montreal, before joining TDs London office in 1988 as manager of corporate finance. He subsequently was promoted to the position of director of corporate finance, a position he held until he left TD in 1994. He is presently the head of the European multi-nationals group for the Industrial Bank of Japan. I found him to be an honest, credible and forthright witness.

*The Plessey Witnesses*

383      Ian Musgrave is a chartered accountant, and joined Plessey in 1978. He became group finance director seven months later and group treasurer in 1982, a post he held until August, 1989, when he resigned shortly before the hostile takeover succeeded. He was an informed and experienced businessman, who gave his evidence in a responsive, forthright and credible manner. The word which comes to mind in connection with his evidence and his demeanor is honourable.

384      Brendon Sammon was Plessey group chief accountant from 1972 until he left in September, 1990. His, experience, duties and responsibilities at Plessey were in the accounting area and not general management. He executed the fifth comfort letter, not because it fell  naturally within his purview, but more because the senior management of Plessey was depleted following the GEC Siemens takeover. He was a forthright witness, but I gave little, if any, weight to his evidence where it went beyond his area of experience and responsibility, for instance in the area of the general enforceability of comfort letters.

385      Dr. Philip Gerdine is a vice president of Siemens in New York, seconded to Siemens in Munich, in the mergers and acquisitions department. Dr. Gerdine has both an MBA and a Ph.D. and is a certified public accountant. Prior to joining Siemens, he served for about five years as manager in charge of acquisitions services for Price Waterhouse. Following the GEC Siemens acquisition of Plessey in September, 1990, he became the co-managing director of Plessey, along with Simon Weinstock. I found him to be a candid, forthright and credible witness, with a high degree of business acumen and sophistication.

*The GEC Witnesses*

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

386      David Newlands was finance director and a director of GEC plc until his retirement last year. He and Gerdine were both highly involved in the integration of the Plessey businesses into GEC and Siemens. This was a gargantuan task, especially given the lack of prior knowledge of Plessey due to the information constraints associated with a hostile takeover. Leigh was a minute portion of the Plessey whole, and more so in context of the size of the two parents, GEC and  Siemens. The GEC group comprised some 145,000 employees, and the group sales in the 1989-90 fiscal year were £6.5 billion, with a profit of £797 million. GEC had cash reserves at the time of about £1 billion and no borrowings. Newlands testified that a "miniscule" amount of his time, less than one per cent of it, was taken up with Leigh matters. I found his evidence to be straightforward, informed, and credible.

387      Ross Anderson joined GEC in London as deputy treasurer in 1975, and was promoted to treasurer in 1979. He has an M.A. from Oxford in jurisprudence and is a chartered accountant. His principal duty as treasurer was the regular, almost daily, investment of GECs sizable resources. I found him to be a responsive, ingenuous witness who was believable in his testimony.

388      Simon Weinstock, who is now deceased, was a manager and executive director of GEC in the period of time material to this action, and reported directly to Lord Weinstock, the managing director of GEC and his father. He was the GEC appointee to act as co-managing director of Plessey following the hostile takeover and was intimately involved in the GEC Siemens hive-up of Plessey. Simon Weinstock was originally named as a defendant to this action and was examined for discovery prior to his death. At trial, the plaintiff vigorously cross-examined David Newlands on a number of areas touching upon the conduct of Simon Weinstock as a directing mind of Plessey. As a consequence, GEC moved to introduce the discovery transcript of Simon Weinstock, which I allowed. I have placed little weight on this discovery evidence however, in view of the fact that I did not have an opportunity to observe his viva voce evidence, and because  the cross-examination of Simon Weinstock on discovery was likely less extensive than would have been the case at trial.

*The Leigh Witness*

389      Frank Driscoll became president and CEO of Leigh on August 8, 1989. His background was in the technical area with little, if any, experience in finance. At or about the time of the Stanmore meetings on Nov. 28 and 29, 1989, Driscoll became aware that the past president of Leigh, Barry Flower, who was then working with Plessey, was attempting to place blame for Leigh's contractual and other difficulties on Driscoll. Driscoll was of the view that these difficulties had their genesis prior to his arrival at Leigh, during Flower's watch. It is apparent that he felt taken advantage of and vulnerable, and felt in retrospect he had been deceived about the condition of Leigh when he was hired. Prior to the collapse of Leigh he asked for and was given an indemnity agreement by GEC and Siemens. Driscoll was originally named as a defendant in this action. When he was called by the bank to testify, the bank stated that though it had discontinued the action against him, it reserved the right to reinstate or recommence those claims at the end of trial. Prior to testifying, Driscoll invoked the protection of s. 9 of the *Canada Evidence Act* and s. 5 of the *Ontario Evidence Act*. His evidence must be considered in the light of all of these circumstances, and I have apportioned weight to it accordingly.

*The Expert Banking Witness*

390      The defendants proffered as expert banking evidence the report and testimony of Robert Wickham. He is a retired banker who spent 25 years with the Royal Bank of Scotland, based in London, until his retirement in 1993. This court ruled he was qualified as an expert in the area of banking, and particularly corporate lending in England, subject to later argument on admissibility.

391      Wickham's expert evidence related to banking practices generally and the use of comfort letters during the peri-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

od of time material to this action. His evidence also describes the commercial context in which the Plessey letters were delivered to the bank. TD, through its bank witnesses, continually characterised the Plessey letters as strong. TD has pleaded and argued in the alternative that the comfort letters are ambiguous. Wickham's evidence was intended to counter these characterizations. In my opinion, Wickham's evidence meets the test of relevance necessary to assist the trier of fact, and is not subject to an exclusionary rule. It is given by a properly qualified expert. See: *R. v. Mohan*, [1994] 2 S.C.R. 9 (S.C.C.) at 20 per Sopinka J.. It is accordingly admissible. Wickham's evidence was useful in respect of the commercial context in which the comfort letters were exchanged and buttressed other evidence in that regard, but was not essential to any findings. Where his evidence overlapped with issues which were to be decided by this Court, it was given no weight.

**Part III**

*Issues and Law*

*Overview*

392     The plaintiff submits that several causes of action arise from Leigh and Plessey's failure to pay the TD loan and Leigh' assignment in bankruptcy, and has advanced claims against the defendants in both contract and tort. In the statement of claim, the plaintiff asserted approximately 150 causes of action against the defendants, however in argument many of these claims were abandoned. As set out below, the plaintiff's claims against Plessey in contract and tort remain outstanding, as do the claims against GEC in tort. All claims of the plaintiff other than those dealt with below have been abandoned.

*The Claims in Contract*

393      The bank claims as against Plessey for breach of contract, and submits that the comfort letters, properly construed in their factual matrix, constitute contractual promises by Plessey to cause Leigh to be managed so as to be always in a position to meet its financial obligations, including all amounts owed to the bank pursuant to the bank's loan to Leigh. The plaintiff asserts  that Plessey is in breach of this contractual promise to cause Leigh to be so managed, and is therefore liable to the bank in contract. The bank also seeks an order that the fifth comfort letter be rectified to conform with the agreement between the parties, or that it be set aside.

*The Claims in Tort*

394     The plaintiff submits that Plessey is liable to the bank in misrepresentation on the basis that the third paragraph of the Plessey comfort letters misrepresented the Plessey policy regarding management of its wholly-owned subsidiaries. Specifically, the plaintiff claims that the letters misrepresented the policy because the letters did not disclose the following: that the policy was regarding the management of the subsidiaries by their own management rather than by Plessey; that the policy in the third paragraph did not require Plessey to do anything so that the subsidiaries would always be in a position to pay their debts; that the letters were only a statement of Plessey's policy as at the date of the letter; and that the letter was so "commercially hollow" Leigh could go bankrupt and the bank would receive nothing under its loan facility. In the alternative, the plaintiff claims the third paragraph of each letter was a material misrepresentation because Plessey had adopted no policy regarding the management of its subsidiaries.

395      The bank claims in the alternative that if the policy did exist, it had ceased to exist or was subject to material qualifications by or after December 27, 1989. The plaintiff submits that GEC and Plessey knew the policy statement in the fourth comfort letter had been made and "knew,  recklessly disregarded or should have known" of these material

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

qualifications, and should not have made the statement of policy in the third comfort letter, or should have disclosed the material qualifications. The plaintiff submits the defendants' actions in this regard amount to fraud or negligent misrepresentation.

*Conduct outside the Comfort Letters*

396      In the further alternative, the plaintiff claims the defendants are liable in contract and tort for conduct separate and apart from the comfort letters. In particular, the bank submits that the alleged statement of Ian Musgrave, Plessey group treasurer, that the comfort letters were "tantamount to a guarantee" amounted to a misrepresentation upon which the bank relied to its detriment. Further, the plaintiff claims that certain statements of Colin Justice, made to the bank in November and December 1989, regarding the Leigh financial statements, were negligently or fraudulently made. In addition, the bank claims that certain statements allegedly made by Ross Anderson to Exton constituted negligent misrepresentations.

397      Finally, the bank claims that from no later than February 26, 1990, Plessey and GEC were aware that Leigh was knowingly withholding its unaudited financial statements from the bank, in breach of its express contractual requirements to deliver them. The plaintiff submits that Leigh's conduct in knowingly withholding the statements while continuing to take further funds constituted a deceit upon the bank, and that Plessey and GEC were parties to this deceit through their silence.

**The Claims in Contract**

398      The plaintiff submits that the comfort letters, properly construed in their factual matrix, constitute contractual promises by Plessey to cause Plessey Canada and Leigh to be managed so as to be always in a position to meet their financial obligations, including all amounts due pursuant to the banks loan to Leigh. The bank claims that Plessey is in breach of that contractual promise to cause Leigh to be so managed and is liable to the bank for the amount of the bank's advances to Leigh.

399      In addition, the bank submits it is entitled to rectification of the fifth comfort letter to eliminate the words "and does not constitute a legally binding commitment" on the basis that it does not reflect the agreement of the parties. In the alternative, the plaintiff seeks an order that the defendants cannot rely upon those words, or that the fifth comfort letter be set aside in its entirety.

400      In response, Plessey submits that the operative document is the fifth comfort letter, and asserts that the letter creates no legally binding obligation upon Plessey to directly or indirectly make good the indebtedness of Leigh to TD, regardless of the concluding words which, it submits, simply reinforce the plain meaning of the document.

401      Regarding the bank's assertions as to the contractual promises contained in the comfort letters, Plessey argues that such an interpretation would require the court to insert words into the third paragraph which are not there, and which would, if added, convert a statement of policy or representation into a promise amounting to a guarantee.

402      Plessey resists the request for rectification on the basis that the fifth comfort letter accurately records the understanding between Plessey and TD that the comfort letter did not create a binding legal obligation to pay Leigh's debt to the bank.

*Principles of Contractual Interpretation*

403      The aim of the court, in construing a written agreement, is to determine the intentions of the parties to the agree-

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

ment, and in this regard, the cardinal presumption is that the parties have intended what they have said. Their words must be construed as they stand. See: *Chitty on Contracts* Volume 1, General Principles, 27th ed. (1994) at 580.

404    Where the agreement has been reduced to writing, the parol evidence rule operates to prohibit the introduction of extrinsic evidence to vary the written contract. This rule of interpretation is enunciated in G.H.L. Fridman, *The Law of Contract in Canada*, 3rd ed. (Toronto: Carswell, 1994) at pp. 455-456:

> The fundamental rule is that if the language of the written contract is clear and unambiguous, then no extrinsic parol evidence may be admitted to alter, vary, or interpret in any way the words used in the writing.

See also: *Hawrish v. Bank of Montreal*, [1969] S.C.R. 515 (S.C.C.) per Judson J..

405    This is consistent with the principle that where a document purports on its face to be the final and conclusive expression of the parties' agreement, the document will be taken to be a reliable record of the parties' latest agreement, and evidence of the negotiations leading up to it will not be admissible. See: S.M. Waddams, *The Law of Contracts* (3rd ed.) (Toronto: Canada Law Book, 1993) at 210. This principle was articulated by Lord Wilberforce in *Prenn v. Simmons*, [1971] 1 W.L.R. 1381 (U.K. H.L.) at 1384-1385:

> The reason for not admitting evidence of these exchanges is not a technical one or even mainly one of convenience, (though the attempt to admit it did greatly prolong the case and add to its expense). It is simply that such evidence is unhelpful. By the nature of things, where negotiations are difficult, the parties' positions, with each passing letter, are changing and until the final agreement, though converging, still divergent. It is only the final document which records a consensus. If the previous documents use different expressions, how does construction of those expressions, itself a doubtful process, help on the construction of the contractual words? If the same expressions are used, nothing is gained by looking back; indeed, something may be lost since the relevant surrounding circumstances may be different. And at this stage there is no consensus of the parties to appeal to.

406    These principles were adopted by the Court of Appeal for Ontario in *Craighampton Investments Ltd. v. Ayerswood Developments Ltd.* (1984), 4 O.A.C. 124 (Ont. C.A.) at 126:

> This case obviously demonstrates the practical sense of the parol evidence rule. When equals negotiate at length and arrive at a written agreement which can be interpreted by itself or by reference to matters which must be taken to have been known to both of them and which show the sense or meaning that the words must be taken to have had when the agreement was made, it verges on idle activity for a court to rehash the negotiations, activities and conduct of the parties and hear their now professed expression of what their intentions were at an earlier time.

*Factual Matrix*

407    The court need not be confined to a strict, literal interpretation of the language of the document however, and may admit evidence of the "factual matrix" or circumstances surrounding the conclusion of the agreement as an aid in interpretation. Lord Wilberforce stated in *Prenn v. Simmons, supra* at 1383-4:

> In order for the agreement of July 6, 1960, to be understood, it must be placed in its context. The time has long passed when agreements, even those under seal, were isolated from the matrix of facts in which they were set and interpreted purely on internal linguistic considerations. ...We must ... inquire beyond the language and see what the circumstances were with reference to which the words were used, and the object, appearing from those circumstances, which the person using them had in view. Moreover, at any rate since 1859 ... it has been clear enough that evidence

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

of mutually known facts may be admitted to identify the meaning of a descriptive term.

He rejected the notion, however, that evidence of the parties' subjective intentions ought to be admissible, at 1385:

> And if it can be shown that one interpretation completely frustrates that object, to the extent of rendering the contract futile, that may be a strong argument for an alternative interpretation, if that can reasonably be found. But beyond that it may be difficult to go: it may be a matter of degree, or of judgment, how far one interpretation, or another, gives effect to a common intention: the parties, indeed, may be pursuing that intention with differing emphasis, and hoping to achieve it to an extent which may differ, and in different ways. The words used may, and often do, represent a formula which means different things to each side, yet may be accepted because that is the only way to get "agreement" and in the hope that disputes will not arise. The only course then can be to try to ascertain the "natural" meaning. *Far more, and indeed totally, dangerous is it to admit evidence of one party's objective -- even if this is known to the other party. However strongly pursued this may be, the other party may only be willing to give it partial recognition, and in a world of give and take, men often have to be satisfied with less than they want.* So, again, it would be a matter of speculation how far the common intention was that the particular objective should be realised...

> In my opinion, then, evidence of negotiations, or of the parties' intentions, and a fortiori of Dr. Simmonds' intentions, ought not to be received, and evidence should be restricted to evidence of the factual background known to the parties at or before the date of the contract, including evidence of the "genesis" and objectively the "aim" of the transaction. [Emphasis added]

Lord Wilberforce returned to this theme and elaborated upon the notion that evidence of the factual matrix may be admitted to construe a term in *Reardon Smith Line v. Hansen-Tangen*, [1976] 3 All E.R. 570 (U.K. H.L.) at 574-575:

> When it comes to ascertaining whether particular words apply to a factual situation or, if one prefers, whether a factual situation comes within particular words, it is undoubtedly proper, and necessary, to take evidence as to the factual situation.

> . . . . .

> It is less easy to define what evidence may be used in order to enable a term to be construed. ...[I]t does not follow that ...one must be confined within the four corners of the document. No contracts are made in a vacuum: there is always a setting in which they have to be placed. The nature of what is legitimate to have regard to is usually described as 'the surrounding circumstances' but this phrase is imprecise: it can be illustrated but hardly defined. In a commercial contract it is certainly right that the court should know the commercial purpose of the contract and this in turn presupposes knowledge of the genesis of the transaction, the background, the context, the market in which the parties are operating.

> . . . . .

> It is often said that, in order to be admissible in aid of construction, these extrinsic facts must be within the knowledge of both parties to the contract, but this requirement should not be stated in too narrow a sense. When one speaks of the intention of the parties to the contract, one is speaking objectively - the parties cannot themselves give direct evidence of what their intention was - and what must be ascertained is what is to be taken as the intention which reasonable people would have had if placed in the situation of the parties. Similarly, when one is speaking of aim, or object, or commercial purpose, one is speaking objectively of what reasonable persons would have in mind in the situation of the parties. It is in this sense and not in the sense of constructive notice or of estopping fact that

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

judges are found using words like 'knew or must be taken to have known'....

. . . . .

I think that all of their Lordships are saying, in different words, the same thing - what the court must do must be to place itself in thought in the same factual matrix as that in which the parties were. All of these opinions seem to me implicitly to recognize that, in the search for the relevant background, there may be facts, which form part of the circumstances in which the parties contract, in which one or both may take no particular interest, their minds being addressed to or concentrated on other facts, so that if asked they would assert that they did not have these facts in the forefront of their mind, but that will not prevent those facts from forming part of an objective setting in which the contract is to be construed.

408      The Supreme Court of Canada has adopted the notion that a court may look at evidence of the surrounding circumstances when construing a document. In *Hill v. Nova Scotia (Attorney General)*, [1997] 1 S.C.R. 69 (S.C.C.), the court cited with approval the *dicta* of LaForest J. (as he then was), in *White v. Central Trust Co.* (1984), 54 N.B.R. (2d) 293 (N.B. C.A.) at 310-311:

What the statement quoted means is that in determining what was contemplated by the parties, the words used in a document need not be looked at in a vacuum. The specific context in which a document was executed may well assist in understanding the words used. It is perfectly proper, and indeed may be necessary, to look at the surrounding circumstances in order to ascertain what the parties were really contracting about.

409      From these authorities can be gleaned certain principles which should guide the court in interpreting an agreement. The document should be looked at as a whole, with each contractual term considered in the context of the entire document. See: G.H.L. Fridman, *The Law of Contract in Canada*, 3rd ed. (Toronto: Carswell, 1994) at 469. The court should make every effort to construe the document on its face, without regard to extrinsic evidence.

410      Where an agreement is clear and unambiguous on its face, the parol evidence rule  operates to prohibit admission of evidence to alter or vary the written terms of the contract. However, the court may admit evidence of the surrounding circumstances, including evidence of the commercial purpose of the contract, the genesis of the transaction, the background, the context and the market in which the parties were operating. In this regard, evidence to be admitted must be objective in the sense of what reasonable persons in the position of the parties would have had in mind, rather than subjective evidence of the parties' actual intentions.

*Ambiguity*

411      A contract which appears clear and unambiguous on its face may, nevertheless, contain a latent ambiguity. Such an ambiguity may only become apparent when the court seeks to apply the language of the agreement to the facts. Extrinsic evidence of the factual matrix of the agreement may also disclose such an ambiguity, by revealing a meaning attributable to the language of the document apparent only in light of evidence of the commercial context. Where the court determines that a document contains a latent ambiguity, further extrinsic evidence is admissible to clear up the ambiguity. See: *Leitch Gold Mines Ltd. v. Texas Gulf Sulphur Co.* (1968), [1969] 1 O.R. 469 (Ont. H.C.). The role of the court in interpreting an ambiguous commercial contract was stated by Estey J. in *Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888 (S.C.C.) at 901:

[T]he normal rules of construction lead a court to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract. Consequently,

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

literal meaning should not be applied where to do so would bring about an unrealistic result or a result which would not be contemplated in the commercial atmosphere in which the insurance was contracted. Where words may bear two constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation of the policy which promotes a sensible commercial result.

412    The nature of the evidence to be admitted as an aid to interpretation was considered by the Court of Appeal for Ontario in the seminal case of *Alampi v. Swartz,* [1964] 1 O.R. 488 (Ont. C.A.). In that case, McGillivray J. A. for the court held that extrinsic evidence was not admissible to vary the terms of a written contract, but could be admitted to explain the document and to prove the facts upon which interpretation of the document depends, including the validity of the document, the identity of the parties and to explain technical terms or commercial usage. Mr. Justice McGillivray held that such evidence may not contradict a term of the contract, but is adduced to relate the terms of the contract to the proper subject matter or to assign to the terms a definite meaning. Once such evidence is admitted, it may disclose that a term of the contract is ambiguous and capable of more than one meaning. In that case, he noted at p. 493, "Such an ambiguity, a "latent ambiguity", because not apparent on the face of the writing, demands evidence of intention to establish whether there was an agreement at all, or if the parties intended a particular one of alternate meanings to prevail." Evidence of intention may only be admitted however, once the latent ambiguity has been established.

413     This issue was later considered by Cory J.A. (as he then was), in *TransCanada Pipelines Ltd. v. Northern & Central Gas Corp.* (1983), 41 O.R. (2d) 447 (Ont. C.A.), who noted that every effort should be made to construe the contract based on the wording. Where, however, a doubt arises as to the true sense and meaning of the words or there is difficulty in their application to the circumstances, resort may be had to extrinsic evidence. Mr. Justice Cory held that once the court is of the opinion the contract is difficult to interpret, extrinsic evidence may be admitted to determine whether, in fact, the agreement contains a latent defect, and noted that if, at a later stage, another court was able to interpret the document without regard to that evidence, no harm would result from its admission. At p. 452 Cory J.A. adopted and paraphrased the reasoning of Gale C.J.O. in *Leitch Gold Mines Ltd. v. Texas Gulf Sulphur Co.*, *supra*:

(1) The extrinsic evidence admitted may establish that there is no latent ambiguity in the written document relevant to the issue in dispute. In such a case obviously the written document governs.

(2) The extrinsic evidence may demonstrate that there is latent ambiguity in the terms of the written document which are in dispute. Nonetheless, upon a consideration of all the surrounding circumstances, it requires the choice to be made in favour of the meaning of the agreement which would appear from a reading of the whole document without any extrinsic evidence to show ambiguity.

(3) The extrinsic evidence establishes that there is a latent ambiguity. However, a consideration of the surrounding circumstances requires the choice of a meaning consistent with the words of the document but different from their patent meaning. The party contending that there is a latent ambiguity must not only establish that there is such an ambiguity but also resolve that ambiguity by evidence from which the court can find what agreement was made and what the choice of alternative meanings should be. The party contending for the latent ambiguity must show that the extrinsic evidence dictates the selection of a meaning which is generally consistent with the wording of the written document but different from its patent meaning.

(4) The extrinsic evidence indicates that there is a latent ambiguity of such an extent that the true agreement between the parties is different from the agreement expressed in the written document. That is, the extrinsic evidence estab-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

lished that there is a case of mistake.

(5) The extrinsic evidence establishes that there is a latent ambiguity and goes further and demonstrates that the minds of the parties never really met upon the subject matter concerning which there is an agreement. In other words, there is in fact no agreement upon the terms which would decided the issue between the parties. The court then cannot, on the balance of probabilities, make the necessary finding of *consensus ad idem*.

Similarly in *Arthur Andersen Inc. v. Toronto Dominion Bank* (1994), 17 O.R. (3d) 363 (Ont. C.A.), Grange and McKinlay JJ.A. stated at 372:

First, the words of the contract must be analyzed "in its factual matrix", and a conclusion arrived at that there are two possible interpretations of the contract. Then, and only then, may the trial judge look at other facts, including facts leading up to the making of the agreement, circumstances existing at the time the agreement was made, and evidence of subsequent conduct of the parties to the agreement.

414    Accordingly, where there is some doubt as to the meaning of language used in the contract, or the court has difficulty in applying it to the facts, the court should, in light of the factual matrix, search for an interpretation which would appear to advance the true intent of the parties. The more reasonable construction of the words, which produces a fair result consistent with the commercial atmosphere, is the interpretation which the court should adopt.

415    The court may have regard to extrinsic evidence in order to resolve the ambiguity, and no harm will come from its admission, however extrinsic evidence of facts leading up to the making of the agreement, circumstances existing at the time of the agreement and subsequent conduct of the parties may only be considered once an ambiguity has been found. Extrinsic evidence demonstrating the intention of the parties is only admissible however, once an ambiguity has been found, and in my view, should be objective, rather than subjective evidence of the parties' intentions.

*Application to the Circumstances of This Case*

*Interpretation of the Comfort Letter on its Face*

416    The starting point of any analysis must be identification of the document to be construed. In the present case, the operative document is clearly the fifth comfort letter, dated December 15, 1989 and delivered to the bank on December 27, 1989. This was the last comfort letter delivered to TD prior to the bankruptcy of Leigh in April, 1990. Moreover, the letter states on its face "This letter replaces our letters of 31st August 1989, 31st March 1989 and 30th June 1989...." Applying the principles enunciated by Professor Waddams, *supra*, the fifth comfort letter purports on its face to be the most recent iteration of the parties' agreement. Subject to the plaintiff's submission that the letter should be rectified or set aside, the fifth letter is the document to be construed by the court in the context of the claim in contract.

417    Applying the principles of contractual interpretation set out above, the first step in any analysis must be an attempt on the part of the court to construe the document according to the language on its face, without reference to extrinsic evidence of any sort. The fifth comfort letter states, in its entirety:

This is to confirm that The Plessey plc has full knowledge of the facility of C$45,000,000 (Forty Five Million Canadian dollars) which has been granted by the Toronto-Dominion Bank to Leigh.

Leigh is currently a wholly owned subsidiary of 160956 Canada Inc. Which is a wholly owned subsidiary of Plessey Overseas Limited which in turn is a wholly owned subsidiary of The Plessey Company plc. We undertake not to reduce our share-holding in Leigh or its holding company without prior notification to yourselves.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

It is Plessey's policy that Leigh be managed in such a way as to be always in a position to meet its financial obligations, including repayments of all amounts owed under the above facility to yourselves on their due dates.

The letter replaces our letters of 31st August 1989, 31st March 1989 and 30th June 1989 and does not constitute a legally binding commitment.

418     The last line of the letter is, in my view, dispositive of the plaintiff's contract argument. Having regard to the principle that contracting parties are presumed to intend what they say, the fifth comfort letter states on its face that it replaces all prior comfort letters, and must therefore  be taken to be a reliable record of the parties' latest agreement. Moreover, the letter states that it does not constitute a legally binding agreement and must be taken as conclusive of Plessey's intention that it not be so bound. This is a full and complete answer to the plaintiff's claim in contract.

*The Statement of Policy in the Third Paragraph*

419     The plaintiff submits that the statement of policy in the third paragraph of the comfort letter amounts to a contractual promise by Plessey that it had and would have a policy, as long as the bank's loans were outstanding, to cause Leigh to be managed in such a way that it could pay the bank when called upon to do so. Hence, the plaintiff asserts that the added words in the last line of the document operate to eliminate the contractual promise contained in the third paragraph.

420     In response, Plessey asserts that, notwithstanding the added words in the last line, the statement in the third paragraph is merely a representation as to its policy speaking as at the date of the letter, and not a binding contractual promise. As such, the added words in the last line do not change the effect or alter the meaning of the third paragraph. Plessey argues that the interpretation urged by the plaintiff amounts to a contractual promise that Plessey would see to it that the bank be paid, either directly or indirectly, and that in order to arrive at such an interpretation, the court would have to read into the comfort letter words that are not there.

421     The difference between a contractual promise and a representation was articulated by Professor Fridman in *The Law Of Contract in Canada, supra*, at 3-4 as follows:

Promises are fundamental to the idea of contract. A promise is an *undertaking* as to the future conduct of the party promising, the promisor, with respect to the party to whom the promise is given, the promisee. ...It is the idea of promise which distinguishes contract from representation. A representation is not an undertaking, although, sometimes, it may resemble a promise in its form, for example, where a seller of goods states that the goods in question are "top quality". Representations are statements as to an existing or past fact, not promises as to future events or states of affairs. Although representations can have legal consequences, if made falsely or negligently, or, on occasion, without either fraud or negligence on the part of the representor, such consequences are non-contractual in their nature. They stem from the misleading nature of a statement, not from any promissory character.

[Emphasis added]

422     The leading case on the interpretation of comfort letters in the decision of the English court of appeal in *Kleinwort Benson Ltd. v. Malaysia Mining Corp. Bhd.*, [1989] 1 All E.R. 785 (Eng. C.A.) (leave to appeal to the House of Lords refused). In that case, Ralph Gibson L.J. held that a comfort letter given in support of a subsidiaries borrowing did not have contractual effect.

423     The plaintiffs seek to rely upon the decision of Rogers C.J. in *Banque Brussels Lambert S.A. v. Australian Na-*

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

*tional Industries Ltd.* (1989), 21 N.S.W.L.R. 502 (New South Wales Sup. Ct.), in which the Supreme Court of New South Wales held that a comfort letter was a legally enforceable obligation. In my view that case can have no application to the facts before me. In this regard I adopt the reasoning of Chadwick J. in *Atlantic Computers plc, Re,* [1995] B.C.C. 696 (Eng. Ch. Div.) at 699:

I was referred also, understandably, to the decision of Rogers CJ in the Supreme Court of New South Wales in the case of *Banque Brussels Lambert SA v. Australian National Industries Ltd.* (1989) 21 NSWLR 502. It is clear from remarks on p. 523 that the Chief Justice found the approach of the Court of Appeal in *Kleinwort Benson* somewhat unreal. He took the view that the construction reached by the Court of Appeal rendered the document in that case nothing but a scrap of paper.

It would not be open to me to follow the Chief Justice's decision, even if I were to accept his criticism of the Court of Appeal's approach; but I draw attention to the fact that, as he acknowledged, the test prescribed by the law of Australia to determine whether a statement is promissory or only representational is different from that in England (see p. 524A). In my view, the law of England is clear. A document in the terms of these two letters of comfort does not impose a contractual promise as to future conduct.

424     In *Kleinwort Benson*, as in the present case, the paragraph in issue was the third paragraph containing a statement of policy of the parent company that: "*It is our policy to ensure* that the business of MMC Metals Limited is at all times in a position to meet its liabilities to you under the above arrangements." I note in passing that the language used in that comfort letter, including the word "ensure" is arguably stronger than that used in the comfort letter before me.

425     The question before the court in *Kleinwort Benson* was whether the paragraph was a contractual promise as to the parent company's future conduct, or, whether it was simply a statement of present fact regarding the company's intentions. Although the wording and factual matrix of that comfort letter differ from those in the case at bar, nevertheless I find the reasoning to be instructive. In holding that the paragraph was a representation, the court stated at 792:

In my judgment the defendants made a statement as to what their policy was, and did not in para 3 of the comfort letter expressly promise that such policy would be continued in future. It is impossible to make up for the lack of express promise by implying such a promise, and indeed, no such implied promise is pleaded. My conclusion rests on what, in my judgment, is the proper effect and meaning which, on the evidence, is to be given to para 3 of the comfort letters.

426     In my view, the statement in the third paragraph of the comfort letter is, on its face, a representation and not a contractual promise or warranty. The paragraph does not use promissory language or language of undertaking. It simply contains a statement or representation as to Plessey policy at the time the letter was executed, and does not contain a contractual promise that it will cause Leigh to be so managed nor a promise that the bank will be paid. Moreover, the paragraph must be construed in the context of the document as a whole. A comparison of the wording in the second and third paragraphs is instructive in this regard. The second paragraph states: "We undertake not to reduce our share-holding in Leigh..." The use of words of promise or undertaking stands in sharp contrast to the wording of paragraph three: "It is our policy...."

427     In order to arrive at the construction urged by the plaintiff, it would be necessary to add or imply the words "It is Plessey's policy to *cause Leigh to be managed* in such a way..." or "Plessey *undertakes to ensure* that Leigh be managed..." or other, similar language. The word policy itself, given its common usage, means a guideline or principle, and does not amount to a promise to do anything or a requirement that the terms of the policy be adhered to. A consideration of the policy statement, placed in the context of the letter as a whole, supports this construction of the word, for the reas-

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

ons set out below. Further, the words "it is our policy" are, in my view, a representation of present policy and not a contractual undertaking to have the policy in the future. The paragraph does not say "it is *and will be* our policy", and in order to construe the statement of policy as a statement of future intention, it would again be necessary to imply into it words which are not there. The word "always" in the third paragraph has the effect of making the representation as to policy a continuing representation, although subject to change. Absent the word "always", the policy statement could be taken as speaking only as at the date of the letter. The word "always" does not have the effect of elevating the policy statement to the level of a contractual promise to have the policy in the future.

428    If the construction urged by the plaintiff is adopted, namely that Plessey promises to have the policy as long as the loan is outstanding and that Plessey will cause Leigh to be managed in accordance with the policy, the effect is to emasculate the preceding two paragraphs of the comfort letter. In this regard, the reasoning in *Kleinwort Benson* at 795-796 is apposite:

> Next, the first draft of the comfort letter was produced by the plaintiffs. Paragraph 1 contained confirmation that the defendants knew of and approved of the granting of the facilities in question by the plaintiffs to Metals, and para 2 contained the express confirmation that the defendants would not reduce their current financial interest in Metals until (in effect) facilities had been paid or the defendants consented. Both are relevant to the present and future moral responsibility of the defendants. *If the words of para 3 are to be treated as intended to express a contractual promise by the defendants as to their future policy, which Hirst J. held the words to contain, then the recitation of the plaintiffs' approval and the promise not to reduce their current financial interest in Metals would be of no significance. If the defendants have promised that at all times in the future it will be the defendants' policy to ensure that Metals is in a position to meet its liabilities to the plaintiffs under the facility, it would not matter whether they had approved or disapproved, or whether they had disposed of their shares in Metals.* Contracts may, of course, contain statements or promises which are caused to be of no separate commercial importance by the width of a later promise in the same document. Where, however, the court is examining a statement which is by its express words no more than a representation of fact, in order to consider whether it is shown to have been intended to be of the nature of a contractual promise or warranty, it seems to me to be a fact suggesting at least the absence of such intention if, as in this case, to read the statement as a contractual promise is to reduce to no significance two paragraphs included in the plaintiff's draft, both of which have significance if the statement is read as a representation of fact only. [Emphasis added]

429    Similarly, in the case at bar, the first paragraph of the comfort letter contains a statement of Plessey's awareness of the facility extended by TD to Leigh, and the second paragraph contains an undertaking on the part of Plessey not to reduce its shareholding without prior notification to the bank. If the third paragraph is read as a contractual obligation that Plessey will continue to have the policy while the facility is outstanding, and that it will cause Leigh to be managed so that it can meet its obligations under the facility, the preceding two paragraphs would become irrelevant. To paraphrase Ralph Gibson L.J., there would be no reason to waste ink or paper on the first two paragraphs.

430    Finally, in interpreting the document as a whole, the third paragraph must also be construed in light of the last line, stating that the comfort letter (and thus the third paragraph) does not constitute a legally binding commitment. Hence, the fifth comfort letter is clear and unambiguous on its face, does not contain any contractual promise, and the bank's claim in contract must fail.

*The Factual Matrix*

431    A consideration of the comfort letter in its factual matrix does not alter this conclusion. Plessey and TD have

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

both made submissions as to the appropriate evidence of the surrounding circumstances which the court ought to consider. I have reviewed the evidence carefully, and having regard to the principles outlined above, in my view the following evidence is admissible to place the comfort letter in its factual matrix. Plessey was a large, multinational corporation with subsidiaries in 43 countries. TD is a Canadian Bank with branches throughout the world. Both are large, sophisticated parties, and both were intimately familiar with commercial lending transactions and the various forms of security used in such transactions, including loan guarantees. Prior to the delivery of the Leigh comfort letters, both parties had been involved in other transactions involving comfort letters. Both parties knew that there was no single "standard form" of comfort letter in use in the financial marketplace, and both knew that the legal effect of a comfort letter depended on the wording of the letter. Plessey and the Bank were both aware that in the commercial context in which they were operating, a confirmation by a parent company that it was aware of the borrowings of its subsidiary was considered to have some significance, as was an undertaking to notify the bank of any reduction by the parent in its shareholding in the subsidiary. It would also have been known to both parties that banks competed for the business of companies of the size and prominence of Plessey and actively solicited them to develop business opportunities. TD had solicited Plessey for business unsuccessfully in the past. The aim of the transaction was to arrange bank financing for Leigh on terms that were acceptable to both parties.

432    Regarding the specific transaction in issue and its genesis, as is outlined above the bank approached Plessey when the Leigh takeover bid was announced, and offered to assist in financing the purchase of Leigh. Plessey ultimately availed itself of a $10 million short-term acquisition loan, to be used by the acquisition vehicle, Plessey Canada (1988) Inc.. Plessey also provided a letter of comfort to the bank, in a form which was agreed upon following negotiation, and which the bank accepted. The first comfort letter was in substantially the same form as the fifth letter, absent the last sentence.

433    The factual matrix surrounding the comfort letter does not alter my conclusion that the comfort letter is clear and unambiguous. The parties were sophisticated and accustomed to operating in international financial markets. The comfort letter contained statements of commercial significance to the bank. The first paragraph contained a representation that Plessey was aware of the facility which had been granted to Leigh by the bank. The second paragraph contained an undertaking, using express contractual language, that Plessey would not reduce its shareholding in Leigh without prior notification to the bank. Such notification would provide the bank with an opportunity to call the loan or take whatever steps it deemed necessary.

434    The third paragraph contained a representation as to the policy of Plessey. The paragraph does not contain express promissory language, in direct contrast with the contractual undertaking given in the second paragraph. This contrast is significant given that both parties were  sophisticated and used to negotiating the terms of security. Both parties also knew what a guarantee was and the appropriate language of guarantee. The comfort letter was arrived at in a commercial marketplace in which banks, including TD, solicited large companies like Plessey for business, and competed with other banks for that business. In that context, to construe the third paragraph as a promise to do anything, including a promise to pay the bank, in the absence of express language to that effect, defies both legal and commercial sense.

435    The plaintiff asserts that to construe the third paragraph as a representation makes no commercial sense, in that the bank would be no better off than it would have been with a letter from Leigh itself, saying that it intended to manage its own affairs in such a way as to be always in a position to meet its financial obligations. I do not agree with this submission. While Plessey is not obliged to pay the bank, nor to have the policy stated, the letter nevertheless has commercial value. Delivery of the letter provides the bank with a recourse it would not otherwise have had, namely, to approach the parent company and ask it to pay. The possibility that the parent will consider paying must give the bank more comfort than such a letter from Leigh standing alone, without potential recourse to a parent. Moreover, to interpret the third

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

paragraph as a representation rather than a contractual promise is not to render it commercially hollow or devoid of meaning. An interpretation of the paragraph as not obliging Plessey to do anything to have or enforce such a policy does not mean that, in fact, Plessey did not take such steps. A comfort letter containing a representation as to policy must, in my view, have more commercial value than a letter which did not contain such a statement.

436      The third paragraph does not amount to a contractual promise by Plessey to have the policy described, either at the date of the letter or in the future. Nor is it a promise by Plessey to cause Leigh to be managed in accordance with the policy, or that Plessey would cause the bank to be paid. In order to reach such conclusions, it would be necessary to read into the paragraph words which are not there, and there is no basis in the evidence for the implication of such terms. See: *Canadian Pacific Hotels Ltd. v. Bank of Montreal*, [1987] 1 S.C.R. 711 (S.C.C.); *Charles P. Rowen & Associates Inc. v. Ciba-Geigy Canada Ltd.* (1994), 19 O.R. (3d) 205 (Ont. C.A.). My conclusion is reinforced when the paragraph is viewed in the context of the entire letter, including the final sentence disavowing any binding legal obligation.

*Ambiguity*

437      Both the bank and Plessey assert that the comfort letter is not ambiguous, although each urges the court to adopt a different construction of the third paragraph, based upon the same wording. The bank asserts that the third paragraph amounts to an ongoing contractual promise to have the policy set out in the paragraph for as long as the loan was out-standing, and a contractual promise that Plessey would cause Leigh to be managed so that it could pay the bank. Plessey, on the other hand, submits that the paragraph contains no contractual obligation, and is simply a statement of present in-tention. In their submission, the paragraph is merely a representation that on the date of the comfort letter Plessey had the policy described, and that a policy, as opposed to a obligation of some kind, merely speaks to Plessey's expectation as to the management of Leigh, and not to any requirement that it be so managed.

438      As was noted by Cory J.A. (as he then was) in *TransCanada Pipelines Ltd. v. Northern & Central Gas Corp.*, *supra*, a document which appears clear on its face, may nevertheless disclose an ambiguity if a doubt arises as to the true meaning of the words, or if the court has difficulty in applying the language to the facts. I agree with the submissions of both parties that the letter is not ambiguous on its face and, for the reasons outlined above, a consideration of the letter in its factual matrix does not disclose any ambiguity, nor any reason to depart from a construction of the document based upon its express wording. I find the document contains no latent ambiguity. However, even had I found there was such an ambiguity, the extrinsic evidence which would then be admissible does not assist the plaintiff. Although it is not ne-cessary that I review it, the extrinsic evidence supports the conclusion that there is no latent ambiguity and defeats the construction urged by the plaintiff. The salient details of this extrinsic evidence are outlined below.

*Circumstances Leading up to the First Comfort Letter*

439       The starting point must be that the bank knew from the outset that a guarantee was not on offer by Plessey. When Plessey announced its friendly takeover bid for Leigh, the bank approached Plessey and offered to assist with funding for the acquisition. Although the bank had made loan facilities available to Plessey prior to this, none had been drawn upon, and Baker referred to the possibilities for developing business opportunities with Plessey in his CCR re-commending that the loan be approved. Baker also noted in the CCR that a guarantee was not on offer for the borrowing, which would be unsecured. Indeed, it was this notation which led Noonan in the Credit Division to stipulate that an ap-propriate comfort letter be obtained from Plessey, instead.

440      The form of comfort letter which was ultimately delivered to the bank was the subject of negotiation between the bank and Plessey. Drafts were exchanged. Howard Baker sent an initial draft to Plessey, based on a template comfort letter. The template Baker was working from included a line which contained language which, in my view, amounted to a

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

contractual promise: "and in this particular instance, we will ensure that sufficient liquid resources are available to discharge any liabilities at maturity." Baker deleted this line from the proposed draft which he sent to Plessey. Baker's draft concluded "We also wish to assure you that during the period of such financial assistance we expect to provide adequate financial support in order that the affairs of Plessey Canada (1988) Inc. will be conducted on a sound basis." Plessey responded with its own draft, which was accepted by the bank without amendment.

441       I can only conclude from the foregoing that the bank was aware Plessey was not prepared to provide a guarantee for the borrowings of Plessey Canada, that the bank agreed to accept a comfort letter rather than a guarantee in order to develop the business relationship with Plessey, and that the bank was consulted as to the terms of the comfort letter to be provided. In this regard, it is significant that in October 1989, the bank was invited to (and did) tender a bid to  provide Plessey with an uncommitted facility, security for which was offered as the unconditional and irrevocable 50-50 several guarantees of GEC and Siemens. In my opinion, none of this evidence supports a finding that the comfort letter contains a latent ambiguity, nor that the third paragraph of the letter contains any contractual promise.

*Evidence Regarding the Subsequent Comfort Letters.*

442       The corporate credit reviews of the Leigh account are replete with references to the bank's relationship with Plessey and later GEC, and to the bank's desire to generate further business with these companies. Throughout, the comfort letter is listed as documentation rather than security, in accordance with the bank's Credit Procedures Manual. At the same time, from the time of delivery of the third comfort letter, the risk rating in these credit reviews is clearly that of Leigh, and not that of the parent companies. The risk rating deteriorates as the Leigh bank line grows, a fact which is inconsistent with an understanding on the part of the bank that they had a guarantee or enforceable contractual commitment from Plessey that they would be paid. Indeed, the bank explicitly recognized that the support from Plessey was informal. In his comment on the Nov. 1, 1988 request that the Leigh line be extended by $4 million, Sid Owen noted: "the combination of Plessey's support, albeit informal, and receivables should provide adequate protection but all must work to regularize this company's facilities by November 30, 1988. We must resist being dragged along." This observation is, in my view, completely  inconsistent with the notion that the bank thought it had a contractual promise from Plessey that it be paid.

443       In the fall of 1988, Plessey discovered that the bank held security over the assets of Leigh in the form of a general assignment of book debts and a floating charge debenture. Plessey requested that the bank release this security and the bank agreed. The Credit Division required as a term of this agreement that Plessey subordinate its intercompany debt in priority to the debt of the bank. Plessey refused to do this, and the Corporate Banking Division agreed to waive that condition, and also agreed to release its security over Leigh's assets. At no time did the bank suggest that the wording of the comfort letter be altered or amended in any way, notwithstanding that the line of credit was now an operating loan rather than a short-term acquisition loan, and that the amount of the loan had increased substantially. This is so even though Plessey forwarded a draft of the third comfort letter to the bank and requested confirmation that its terms were acceptable, thus providing TD with an opportunity to suggest changes in the wording. It is noteworthy that the loan was repayable on demand, and thus could have been called by the bank at any time.

444       Prior to delivery of the fourth comfort letter, the bank agreed to extend credit to Leigh in excess of the amount referred to in the comfort letter. Plessey executed a letter to this effect which had been provided in draft form by the bank, without amending its terms, which stated: "However, should Leigh require the higher level of operating facilities beyond the end of August 1989, then The Plessey Company plc undertakes to amend the letter of comfort accordingly." This document contains words which amount to a contractual promise to provide a further comfort letter if one was needed, in language which was supplied by the bank. Plessey complied with the terms of this undertaking, and for-

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

warded the fourth comfort letter to the bank, despite the fact the bank had not requested it. This is significant, both be-
cause the bank clearly was familiar with promissory language and requested it when it felt such language was appropri-
ate, and also because having given an enforceable undertaking, Plessey honoured it.

445        In the fall of 1989, Plessey was the subject of a successful hostile takeover. The bank was aware of this, and
noted the GEC Siemens plan to divide up the assets of Plessey in the September 20, 1989 CCR. Almost all of the senior
personnel at Plessey left shortly after the takeover, and were replaced by representatives of GEC and Siemens. The bank
viewed this as an opportunity to develop a business relationship with GEC, and made no effort to renegotiate the terms of
the comfort letter or call the loan.

446        Finally, as I have found above, the bank read and accepted the fifth comfort letter, including the last line which
stated that the comfort letter did not constitute a legally binding obligation.

447        All of this extrinsic evidence displays a clear focus on the part of the bank on generation of further business with
Plessey and GEC, and, in a competitive marketplace, indicates to me that the bank was prepared to assume risks and
make concessions in order to further that goal. Moreover, all of this evidence, including Plessey's refusal to provide a
guarantee at the outset;  the descriptions of the support from Plessey as informal; the fact that the relevant risk rating was
that of Leigh rather than Plessey; the parties' use of contractual language prior to delivery of the fourth comfort letter;
and the offer of joint and several guarantees in the October 1989 Plessey uncommitted facility; all of this is inconsistent
with an understanding on the part of the bank that they had obtained a contractual promise in the comfort letter that they
would be paid directly or indirectly by Plessey. It is also inconsistent with a belief by the bank that it had obtained a
promise that Leigh would remain solvent.

*Evidence of Subsequent Conduct.*

448        The bank read and accepted the fifth comfort letter. At no time up until the bankruptcy of Leigh on April 12,
1990, did anyone from the bank comment or complain to any of the defendants regarding the additional wording in the
last line, let alone ask that the language be deleted. In conversations with Gerdine and Anderson, the bank requested that
GEC and Siemens formally acknowledge the existing Plessey comfort letter. On April 5, 1990, the bank sent both GEC
and Siemens a letter enclosing a draft comfort letter which it requested that they execute. The covering letter stated: "Our
comfort and support for Leigh has been based on the integrity of both GEC and Siemens, consistently demonstrated to
us." The bank's reference to its reliance on the integrity of the parent companies is, in my view, inconsistent with an un-
derstanding on their  part that they were in possession of a binding contract in the comfort letter. Further, the accompany-
ing comfort letter contained no reference to Plessey's policy, but did contain express promissory language which might
well have amounted to a contractual obligation, had the letter been executed: "We undertake to ensure that Leigh be man-
aged in such a way, so long as your credit facility remains outstanding, as to be in a position to meet its financial obliga-
tions, including repayment of all amounts owed under the above facility to yourselves on their due dates."

449        The subsequent conduct of the bank is consistent with an understanding on its part that it did not have a binding
contract with Plessey. It is also consistent with an understanding that the third paragraph did not contain a promise that
the bank would be paid, nor a promise that Plessey would cause Leigh to be managed in accordance with the policy. In
light of all of my findings above, there is no basis in the evidence for a finding of any collateral contract or collateral
warranty. See: *Hawrish v. Bank of Montreal, supra*, and *Esso Petroleum Co. v. Mardon*, [1976] 2 All E.R. 5 (Eng. C.A.).
For all of the foregoing reasons, I conclude that the comfort letter is clear and unambiguous, and the construction of the
comfort letter urged by the plaintiff is not supported either by the wording of the document or the evidence.

*Contra Proferentem*

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

450      TD seeks to rely upon the doctrine of contra proferentem and argues that any ambiguity in the comfort letters should be resolved in favour of the bank. In my view, even had I found an ambiguity in the comfort letter, the doctrine of *contra proferentum* would have no application on these facts.

451      Only where the court finds an ambiguity and the other rules of construction fail to resolve that ambiguity may the court invoke the *contra proferentem* doctrine and interpret the document strictly against its drafter. *Contra proferentem* is a principle of last resort. See *Hillis Oil & Sales Ltd. v. Wynn's Canada Ltd.*, [1986] 1 S.C.R. 57 (S.C.C.) at 68-69; *Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888 (S.C.C.) at 900-901; and *Alex Duff Realty Ltd. v. Eaglecrest Holdings Ltd.*, [1983] 5 W.W.R. 61 (Alta. C.A.). In *Hillis Oil & Sales Ltd. v. Wynn's Canada Ltd., supra*, at p. 69, Le Dain J. speaking for the court, quoted from Anson's *Law of Contract*, 25th ed., (1979) at p. 151, as follows:

The words of written documents are construed more forcibly against the party using them. The rule is based on the principle that a man is responsible for ambiguities in his own expression and has no right to induce another to contract with him on the supposition that his words mean one thing while he hopes the court will adopt a construction by which they would mean another thing, more to his advantage.

452      Le Dain J., in *Hillis Oil*, also made it clear that, as a general principle relevant to the construction of all contracts, *contra proferentem* may only be applied where there has been no opportunity for the other side to review and modify the disputed or ambiguous terms. He said (at p. 68):

[T]he rule is, however, one of general application whenever, as in the case at bar, there is ambiguity in the meaning of a contract which one of the parties as the author of the document offers to the other, with no opportunity to modify its wording.

453      Even if I had found the comfort letter to be ambiguous, which I have not, TD cannot rely upon the doctrine of *contra proferentem* on the facts of this case. The bank was consulted on the wording of the first and third comfort letters, and given an opportunity to modify the language used. The bank agreed to the language contained in the third paragraph, and accepted the comfort letters as drafted. The bank read and accepted the fifth comfort letter. If it was dissatisfied with the language used, it could have requested a revision, refused to advance further funds until the revision was obtained, or indeed, it could have called the loan, which was repayable on demand. It did none of these things. Accordingly, in my view, the comfort letter is not ambiguous and in any event, the plaintiff had a full opportunity to modify its wording. The doctrine of *contra proferentum* has no application.

*Rectification*

454      The plaintiff requests an order of this court that the fifth comfort letter be rectified to conform with the agreement between the parties by striking out the last line, or in the alternative, seeks an order that the fifth comfort letter be set aside in its entirety. It is not necessary to deal with these arguments in depth, in light of my finding above, that the bank, and specifically Wendy Leaney, read and accepted the fifth comfort letter upon its receipt. In light of the bank's failure to make any comment or complaint regarding the last line of the letter at the time of its delivery or at any time up to the bankruptcy of Leigh on April 12, 1990, it was reasonable for Plessey to conclude that the bank had accepted the revised comfort letter, including the final sentence. It is not now open to the bank to claim rectification.

455      In any event, in view of my conclusions above regarding the interpretation of the third paragraph of the comfort letter, the orders sought by the plaintiff would be of no effect. All parties concede that the fourth comfort letter is substantially the same as the fifth, but for the last line, and I agree. While an order granting rectification might have some ef-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

fect on the promissory wording contained in the second paragraph, that paragraph is not in issue, and in my view the third paragraph does not contain any contractual promise. Hence, rectification would be of no assistance to the plaintiff.

### Negligent and Fraudulent Misrepresentation

456     In the alternative to its claim in contract, the plaintiff has advanced a number of causes of action in negligent and fraudulent misrepresentation. The bank claims that the statement in  paragraph three of all five of the comfort letters amounted to a material misrepresentation because, it submits, the paragraph failed to disclose the following: that the policy was not a policy as to how Plessey managed Plessey Canada and Leigh, but rather a policy as to how Plessey Canada and Leigh were managed by their own management; that the policy did not require Plessey to do anything so that its subsidiaries would always be in a position to pay their debts; that the letters were only statements of Plessey policy as at the date of the letters, and as such, could not be taken as statements of Plessey policy as at the date of receipt of the letters, when the policy "might or might not" be the same; and that the policy was so commercially hollow that the policy could be in place. Leigh could go bankrupt, and the bank would receive nothing under its loan facility.

457     In the alternative, TD claims that the third paragraph of each of the letters of comfort was a material misrepresentation because Plessey had, in fact, adopted no policy regarding any of its subsidiaries, including Leigh. In support of this allegation, the bank asserts that nowhere in any of Plessey's internal documentation is it demonstrated that the Board of Plessey actually adopted the policy described in the letters.

458     In the further alternative, TD claims that even if Plessey had a policy which was accurately described in the letters of comfort, that policy ceased to exist or became subject to material qualifications prior to receipt by the bank of the fifth comfort letter on December 27, 1989. In the alternative, the bank pleads that the policy ceased to exist or became subject to material qualifications between receipt by the bank and the bankruptcy of Leigh on April 12,  1990. The bank submits that Plessey and GEC knew, recklessly disregarded or should have known of these material qualifications to the statement of policy in the August 31, 1989 letter, and had an obligation to disclose them to the bank. The bank alleges that GEC and Plessey's conduct in this regard amounts to fraudulent misrepresentation or negligent misrepresentation.

459     In addition to claims arising out of the comfort letters, the plaintiff alleges certain representations made by representatives of GEC and Plessey amount to fraudulent or negligent misrepresentation.

### The Law

### Negligent Misrepresentation

460     The law of negligent misrepresentation in Canada was set out by the Supreme Court of Canada in the seminal case of *Queen v. Cognos Inc.*, [1993] 1 S.C.R. 87 (S.C.C.). In that case, Iacobucci J., speaking for the court, stated the five elements of a claim in negligent misrepresentation at 110:

The required elements for a successful *Hedley Byrne* claim have been stated in many authorities, sometimes in varying forms. The decisions of this court cited above suggest five general requirements:

(1) There must be a duty of care based on a "special relationship" between the representor and the representee;

(2) The representation in question must be untrue, inaccurate or misleading;

(3) The representor must have acted negligently in making said misrepresentation;

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

(4) The representee must have relied, in a reasonable manner, on said negligent misrepresentation; and

(5) The reliance must have been detrimental to the representee in the sense that damages resulted.

461     Each of these elements must be made out in order for the plaintiff to be successful in its claim of negligent misrepresentation.

*1. There must be a Duty of Care based on a "Special Relationship"*

462     In *Queen*, *supra*, Iacobucci J. considered the nature of the special relationship that must exist between the parties before a duty of care will arise, and applied the approach adopted by the House of Lords in *Caparo Industries plc v. Dickman*, [1990] 1 All E.R. 568 (U.K. H.L.), in which their Lordships held that three criteria determine the imposition of a duty of care, and hence, the existence of a "special relationship": forseeability of damage, proximity of relationship and the reasonableness of imposing a duty. In so doing, he noted at p. 117-118 that the duty of care is no longer restricted to situations of reliance on professional advice:

> In my opinion, confining this duty of care to "professionals" who are in the business of providing information and advice, such as doctors, lawyers, bankers, architects and engineers, reflects an overly simplistic view of the analysis required in cases such as the present one. The question of whether a duty of care with respect to representations exists depends on a number of considerations including, but not limited to, the representor's profession. While this factor may provide a good indication as to whether a "special relationship" exists between the parties, it should not be treated in all cases as a threshold requirement. There may be situations where the surrounding circumstances provide sufficient *indicia* of a duty of care, notwithstanding the representor's profession.

463     The Supreme Court revisited and refined the criteria for establishment of a "special relationship" in the recent case *Hercules Management Ltd. v. Ernst & Young*, [1997] 2 S.C.R. 165 (S.C.C.). In that case, LaForest J. held for the court that there ought not, in principle, to be any difference between the criteria used to establish a duty of care in negligent misrepresentation and the criteria applied in any other negligence case, and adapted the two-part test first described in *Anns v. Merton London Borough Council* (1977), [1978] A.C. 728 (U.K. H.L.). The *Anns* test mandates that where there is a sufficient relationship of proximity between the parties such that carelessness on the part of one may be likely to cause damage to the other, it will give rise to a *prima facie* duty of care. Once the court has found that such a duty of care exists, it is then necessary to consider whether there are any considerations which ought to limit the scope of the duty or the class of persons to whom it is owed.

464     In adapting the notion of proximity to cases of negligent misrepresentation, LaForest J. stated at 188:

> In cases of negligent misrepresentation, the relationship between the plaintiff and defendant arises through reliance by the plaintiff on the defendant's words. Thus, if "proximity" is meant to distinguish the cases where the defendant has a responsibility to take reasonable care of the plaintiff from those where he or she has no such responsibility, then in negligent misrepresentation cases, it must pertain to some aspect of the relationship of reliance. *To my mind, proximity can be seen to inhere between a defendant-representor and a plaintiff-representee when two criteria relating to reliance may be said to exist on the facts: (a) the defendant ought reasonably to foresee that the plaintiff will rely on his or her representations: and (b) reliance by the plaintiff would, in the particular circumstances of the case, be reasonable.* To use the term employed by my colleague, Iacobucci J., in *Cognos*, ... the plaintiff and the defendant can be said to be in a "special relationship" whenever these two factors inhere. [Emphasis added]

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

465    Regarding the second limb of the *Anns* test, Mr. Justice LaForest held at p. 197 that the court, in a claim of neg-ligent misrepresentation, may look to such factors as "knowledge of the plaintiff (or an identifiable class of plaintiffs) on the part of the defendant" and "use of the statements at issue for the precise purpose or transaction for which they were prepared", in order to determine whether there are any policy considerations which should limit the scope of the duty, such as the potential for indeterminate liability on the part of the defendants.

*2. The Representation in Question must be Untrue, Inaccurate or Misleading*

466    In order to satisfy the second requirement of a claim in misrepresentation, the plaintiff  must establish that the statement relied upon was untrue, inaccurate or misleading. In this regard, Iacobucci J. held in *Cognos, supra*, at p. 653 that failure to divulge highly pertinent information may, in some circumstances, amount to a negligent misrepresentation.

467    In addition, the court held at p. 658-659 that in some circumstances, an implied representation, as opposed to an actual representation, may give rise to actionable negligence:

In my view, there is no compelling reason in principle, authority or policy for the proposition that, as a general rule, an implied representation cannot under any circumstances give rise to actionable negligence.... On the other hand, there is considerable authority for the more flexible view that, *in appropriate circumstances*, implied representations can and often do, give rise to actionable negligence.

In my opinion, a flexible approach to this issue is preferable. It is arbitrary and premature to declare as a general rule that nothing less than express or direct representations can succeed under the *Hedley Byrne* doctrine. ...It is unneces-sary for me to set out in detail the circumstances in which so-called implied representations can be enough to sustain an action in tort for negligent misrepresentation. I prefer to leave this task to trial judges dealing with specific factual situations. [Emphasis in original]

468    This reasoning was followed by Mr. Justice Linden in *Spinks v. R.* (1996), 134 D.L.R. (4th) 223 (Fed. C.A.) who noted that silence as to a fact may give rise to an implied representation. He stated at 236;

A person may be "misled" by a failure to divulge as much as by advice that is inaccurate or untrue. In the same way that absent information can be "erroneous", as discussed above, missing information can be misleading. ...Consequently, the duty may be breached not only by positive misstatements but also my omissions, for they may be just as misleading.

469    In *Cognos*, it was argued that only representations of existing facts, and not those relating to future occurrences, can give rise to actionable negligence. Mr. Justice Iacobucci noted that there were a number of authorities cited in sup-port of this proposition, and proceeded on the assumption that these authorities were correct, without deciding the point, on the basis that the representations at the heart of the case before him concerned representations of existing fact.

470    The question of when a representation will amount to a material misrepresentation was considered by the British Columbia Court of Appeal in *Kripps v. Touche Ross & Co.* (1997), 35 C.C.L.T. (2d) 60 (B.C. C.A.) (Leave to appeal to the Supreme Court of Canada refused Nov. 7, 1997 [Reported (1997), 102 B.C.A.C. 238 (note) (S.C.C.)]). Following a review of the case law, Finch J.A. stated at 85:

From these submissions it would appear that there are two or three different tests for materiality. The first test is whether a representation *might possibly* affect a decision [made by a representee]; the second is whether a represent-ation *is capable* of affecting a decision; and the third is whether a representation *would probably* affect a decision. I

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

think that the first two tests are the same, and that the real distinction is between a representation that *might possibly* affect a decision and one that *would probably* affect a decision. [Emphasis in original]

471    The court did not decided which of these two tests was applicable, as on the facts before it. Finch J.A. was of the view that even the higher standard was met. In either case, the test is an objective one of the effect that the statement would have had on a reasonable person in the circumstances of the representee.

### 3. The Representor must have acted Negligently in Making the Misrepresentation

472    The standard of care to be exercised by the representor is the same standard as is applied in other negligence cases, that of the reasonable person. This standard of care is an objective one, namely, what a reasonable person would do in the circumstances. The duty requires not only that the representor be honest and truthful, but that the representor exercise such reasonable care as the circumstances of the case dictate, to ensure that representations made are accurate and not misleading. See: *Queen v. Cognos, supra*. At p. 651-652 Iacobucci J. cited with approval the following passage from L.N. Klar, *Tort Law* (Toronto: Thomson Professional Publishing Canada, 1991) at 160:

An advisor does not guarantee the accuracy of the statements made, but is only required to exercise reasonable care with respect to it. As with the issue of standard of care in negligence in general, this is a question of fact which must be determined in the circumstances of the case. Taking into account the nature of the occasion, the purpose for which the statement was made, the foreseeable use of the statement, the probable damage which will result from an inaccurate statement, the status of the advisor and the level of competence generally observed by others similarly placed, the trier of fact will determine whether the advisor was negligent.

Iacobucci J. elaborated upon the requirements of the duty, noting that it was not a duty of full disclosure, but rather a duty to take reasonable care. He added at p. 654 that the representor's belief in the truth of his representations is not relevant to a determination of whether the duty has been breached:

Although the representor's subjective belief in the accuracy of the representations and his moral blameworthiness, or lack thereof, is highly relevant when considering whether or not a misrepresentation was fraudulently made, it serves little, if any, purpose in an inquiry into negligence. As noted above, the applicable standard of care is that of the objective reasonable person. The representor's belief in the truth of his or her representations is irrelevant to that standard of care. The position adopted by the Court of Appeal seems to absolve those who make negligent misrepresentations from liability if they believe that their representations are true. Such a position would virtually eliminate liability for negligent misrepresentation as liability would result only where there is actual knowledge that the representation made is not true; the basis of *fraudulent* misrepresentation. [Emphasis in original]

### 4. The Representee must have Relied, in a Reasonable Manner, on the Negligent Misrepresentation

473    The fourth element of the tort is that the plaintiff must reasonably have relied upon the  representation made by the defendant. As Mr. Justice Linden observed in *Spinks v. R.*, *supra*, at p. 239, this is simply the universal requirement of proof of causation, necessary in all negligence cases in order to found liability.

474    In *Kripps*, *supra*, the British Columbia Court of Appeal considered the nature of reasonable reliance in a negligent misrepresentation case, and concluded that in some circumstances, reliance may be inferred by the court. However, the circumstances in that case were unusual, in that the trial judge had heard no oral evidence but proceeded on the basis of affidavits and transcripts of cross-examinations. As well, the trial judge had made no findings on the reliance issue, having previously found there was no misrepresentation. In addition, the plaintiff's claims of presumed or deemed reli-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

ance had been struck at the pleadings stage of the action, leaving only the claims of actual reliance. Hence, the court of appeal held it was in as good a position to draw these inferences as the trial judge had been. Finch J.A. stated at 89-90:

> Whether a representation was made negligently or fraudulently, reliance upon that representation is an issue of fact as to the representee's state of mind. There are cases where the representee may be able to give direct evidence as to what, in fact, induced him to act as he did. Where such evidence is available, its weight is a question for the trier of fact. In many cases however, as the authorities point out, it would be unreasonable to expect such evidence to be given, and if it were it might well be suspect as self-serving. This is such a case.

> The distinction between cases of negligent and fraudulent misrepresentation is that proof of a dishonest or fraudulent frame of mind on the defendant's part is required in actions of deceit. That, too, is an issue of fact and one which may also, of necessity, fall to be resolved by way of inference. There is, however, nothing in that which touches on the issue of the plaintiff's reliance. I can see no reason why the burden of proving reliance by the plaintiff, and the drawing of inferences with respect to the plaintiff's state of mind, should be any different in cases of negligent misrepresentation than it is in cases of fraud.

475    The court concluded that it was sufficient, in a negligent misrepresentation action, for the plaintiff to prove that the misrepresentation was at least one factor which induced the plaintiff to act to his or her detriment. Where the misrepresentation was one which was calculated to induce the plaintiff to act, or one which would naturally induce the plaintiff to act, the court held that reliance may be inferred. The inference of reliance may be rebutted by the representor.

476    Proof of the element of reliance on a misrepresentation involves a two step test. The first is a factual test, namely, whether the plaintiff relied upon the representation in fact. The second limb of the test requires a determination by the court, on an objective basis, as to whether the reliance was reasonable. This second requirement was described in Allen M. Linden, *Canadian Tort Law*, 6th ed (Butterworths: Toronto, 1997) at 445-446:

> Reliance not only must be proven in fact but also must be demonstrated to be *reasonable*. The second part of the fourth requirement, therefore, means that only those injuries resulting from reliance reasonably placed on a defendant will be compensable. It follows that, to the extent injuries were sustained as a result of unreasonable reliance, recovery may be barred. In most cases, however, a plaintiff will be barred from recovery only to the extent the reliance was unreasonable. The notion of unreasonableness here simply suggests a limit on the degree of reliance a given factual scenario may bear. It does not suggest that, if a plaintiff steps beyond that limit, all recovery must be lost.

> Nevertheless, where the facts suggest that any reliance whatsoever is unreasonable, recovery is rightly barred.

*Fraudulent Misrepresentation*

477    Fraud is the most serious civil tort which can be alleged, and must be both strictly pleaded and strictly proved. The main distinction between the elements of fraudulent misrepresentation and negligent misrepresentation has been touched upon above, namely the dishonest state of mind of the representor. The state of mind was described in the seminal case *Peek v. Derry* (1889), 14 App. Cas. 337 (Eng. H.L.) which held fraud is proved where it is shown that a false representation has been made knowingly, or without belief in its truth, or recklessly, without caring whether it is true or false. The intention to deceive or reckless disregard for the truth is critical.

478    Where fraudulent misrepresentation is alleged against a corporation, the intention to deceive must still be strictly proved. Further, in order to attach liability to a corporation for fraud, the fraudulent intent must have been held by an individual person who is either a directing mind of the corporation, or who is acting in the course of their employment

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

through the principle of respondeat superior or vicarious liability. In *BG Checo International Ltd. v. British Columbia Hydro & Power Authority* (1990), 4 C.C.L.T. (2d) 161 (B.C. C.A.) at 223 (Aff'd, [1993] 1 S.C.R. 12 (S.C.C.)), Hinkson J.A., writing for the majority, traced the jurisprudence on corporate responsibility in the context of a claim in fraudulent misrepresentation at 222-223:

Subsequently, in *H.L. Bolton (Engineering) Co. v. T.J. Graham & Sons Ltd.*, [1957] 1 Q.B. 159, [1956] 3 All E.R. 624 (Eng. C.A.), Denning L.J. said at p. 172:

. . . . .

A company may in many ways be likened to a human body. It has a brain and nerve centre which controls what it does. It also has hands which hold the tools and act in accordance with directions from the centre. Some of the people in the company are mere servants and agents who are nothing more than hands to do the work and cannot be said to represent the mind or will. Others are directors and managers who represent the directing mind and will of the company, and control what it does. The state of mind of these managers is the state of mind of the company and is treated by the law as such. So you will find that in cases where the law requires personal fault as a condition of liability in tort, the fault of the manager will be the personal fault of the company. That is made clear by Lord Haldane's speech in *Leonard's Carrying Co. Ltd. v. Asiatic Petroleum Co. Ltd.*

. . . . .

In the field of criminal law, corporate responsibility has its roots in civil law. In *R. v. McNamara (No. 1)*, [1985] 1 S.C.R. 662 (S.C.C.) ...Estey J., speaking for the Supreme Court of Canada, discussed the directing mind or identification theory and the respondeat superior approaches to corporate liability in a criminal context.

In tracing the development of the law, Estey J. referred to the decision of the Lord Chancellor, Viscount Haldane in *Asiatic Petroleum Co. v. Lennard's Carrying Co.* [(1914), [1915] A.C. 705 (U.K. H.L.)] supra. He also made reference to the decision in *Tesco Supermarkets v. Nattrass* [(1971), [1972] A.C. 153 (U.K. H.L.)], supra. After analyzing the previous decisions in this field of the law, Estey J. said at p. 311 [of C.R., p. 691 of S.C.R.]:

In summary, therefore, the courts in this country can be said to this date to have declined generally to apply the principle of respondeat superior in the determination of corporate criminal responsibility. Criminal responsibility in our courts thus far has been achieved in the mens rea offences by the attribution to the corporation of the acts of its employees and agents on the more limited basis of the doctrine of the directing mind or identification. Corporate responsibility in both strict and absolute liability offences has been found to arise on the direct imposition of a primary duty in the corporation in the stature in question, as construed by the court. By what appears to be the same purely pragmatic reasoning, the courts of the United Kingdom find criminal liability in a corporation only by the attribution to it of the conduct of its employees and agents where those natural persons represent the core, mind and spirit of the corporation. The United States federal courts are inclined, as we have seen, to find criminal liability in the corporation by vicarious liability where any employee-agent commits in the course of his employment, the criminal act.

. . . . .

It is apparent that the law in Canada dealing with the responsibility of a corporation for the tort of deceit is still evolving. In view of the English decisions and the decision of the Supreme Court of Canada in the *R. v. McNamara*

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

*(No. 1)*, supra, it would appear that the concept of vicarious responsibility based upon respondeat superior is too narrow a basis to determine the liability of a corporation. The structure and operations of corporations are becoming more complex. However, the fundamental proposition that the plaintiff must establish an intention to deceive on the part of the defendant still applies.

See also: *Standard Investments Ltd. v. Canadian Imperial Bank of Commerce* (1985), 52 O.R. (2d) 473 (Ont. C.A.) (Leave to appeal to Supreme Court of Canada refused Feb. 3, 1986) [Reported (1986), 53 O.R. (2d) 663 (note) (S.C.C.)].

479     In the case of fraudulent misrepresentation, there are circumstances where silence may attract liability. If a material fact which was true at the time a contract was executed becomes false while the contract remains executory, or if a statement believed to be true at the time it was  made is discovered to be false, then the representor has a duty to disclose the change in circumstances. The failure to do so may amount to a fraudulent misrepresentation. See: P. Perell, "False Statements", [1996] 18 *Advocates' Quarterly* 232 at 242.

480     In *Rainbow Industrial Caterers Ltd. v. Canadian National Railway* (1988), 54 D.L.R. (4th) 43 (B.C. C.A.) (Aff'd on other grounds [1991] 3 S.C.R. 3 (S.C.C.)), the British Columbia Court of Appeal overturned the trial judge's finding of fraud through non-disclosure on the basis that the defendant did not remain silent as to the changed fact but was simply slow to respond to the change, and could only be criticized for its "communications arrangements". In so doing, the court adopted the approach to fraud through silence established by the House of Lords in *Brownlie v. Campbell* (1880), 5 App. Cas. 925 (U.K. H.L.) at 950. Esson J.A. stated at 67-68:

> There is much emphasis in the plaintiff's submissions and in the reasons of the trial judge on the circumstance that this is not a case of fraud "of the usual-kind" involving positive representations of fact but is, rather, one concerned only with non-disclosure by a party which has become aware of an altered set of circumstances. It is, I think, potentially misleading to regard these as different categories of fraud rather than as a different factual basis for a finding of fraud. Where the fraud is alleged to arise from failure to disclose, the plaintiff remains subject to all of the stringent requirements which the law imposes upon those who allege fraud. The authority relied upon by the trial judge was the speech of Lord Blackburn in *Brownlie v. Campbell*. ...The trial judge quoted this excerpt:

>> ...when a statement or representation has been made in the *bona fide* belief that it is true, and the party who has made it afterwards comes to find out that it is untrue, and discovers what he should have said, he can no longer honestly keep up that silence on the subject after that has come to his knowledge, thereby allowing the other party to go on, and still more, inducing him to go on, upon a statement which was honestly made at the time at which it was made, but which he has not now retracted when he has become aware that it can be no long honestly perservered in.

> The relationship between the two bases for fraud appears clearly enough if one reads that passage in the context of the passage which immediately precedes it:

>> I quite agree in this, that whenever a man in order to induce a contract says that which is in his knowledge untrue with the intention to mislead the other side, and induce them to enter into the contract, that is downright fraud; in plain English, and Scotch also, it is a downright lie told to induce the other party to act upon it, and it should of course be treated as such. I further agree in this: that when a statement or representation...

481     Fraud through "active non-disclosure" was considered by the Court of Appeal for Ontario in *Abel v. McDonald*, [1964] 2 O.R. 256 (Ont. C.A.) in which the court held at 259: "By active nondisclosure is meant that the defendants, with

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

knowledge that the damage to the premises had occurred actively prevented as far as they could that knowledge from coming to the notice of the appellants."

*Application to the Facts of this Case*

*Misrepresentation in the First Four Comfort Letters*

482      The plaintiff asserts a cause of action in negligent misrepresentation against Plessey based on the wording of the third paragraph of the first four comfort letters. In particular, the bank claims that the paragraph did not disclose that the policy referred to the management of Plessey Canada and Leigh by their own management, rather than by Plessey; that the policy did not require Plessey to do anything so that its subsidiaries would be in a position to pay their debts: that the letters were only statements of policy as at the date of the letters, and could not be taken to be statements of Plessey's policy as at the date of receipt of the letters by the bank, when the policy "might or might not" be that stated in the letter; and that the policy was so commercially hollow that the policy could be in place, Leigh could go bankrupt, and the bank receive nothing. In the alternative, the bank pleads that the third paragraph was a material misrepresentation because Plessey had, in fact, adopted no policy regarding Leigh, and asserts that there was no direct evidence led at trial that the board of Plessey had adopted the policy. I propose to deal with the latter submission first.

*Existence of a "Special Relationship"*

483      Plessey concedes that there exists a special relationship between it and the bank regarding  the text of the comfort letters, and I agree. Applying the principles set out in *Hercules Management, supra*, it is reasonably forseeable that the bank would rely on the statements in the comfort letter and reliance upon those statements, in the circumstances, would be reasonable. There are no policy considerations, such as indeterminate liability of the defendant, to preclude a finding that Plessey owed TD a duty of care.

*The Representation Must be Untrue, Inaccurate or Misleading*

*The Plaintiff's Interpretation of the Comfort Letter.*

484      The plaintiff submits that the third paragraph of the letters is materially misleading because Plessey had, in fact, adopted no policy with respect to any of its subsidiaries, including Leigh. TD's misrepresentation argument is premised on the same interpretation of the comfort letter as was advanced above in the contract argument, namely that the bank understood the policy paragraph to mean that Plessey would manage its subsidiaries, including Leigh so that the subsidiaries would always be in a position to meet their financial obligations, and that Plessey had not adopted this policy. Hence, they assert that the policy paragraph was misleading. I have rejected this construction of the comfort letter above, in the contract portion of these reasons, and I adopt and reiterate that reasoning here. The interpretation urged by the plaintiff requires that words be implied into the third paragraph which are not there. In my view there is no basis in the evidence to find such an implied representation.

485      The bank's interpretation of the comfort letter is based upon the testimony of Patrick Noonan that this was his subjective understanding of the policy paragraph. The proper test however, is not what the plaintiff subjectively thought of the representation, but what a reasonable person, in all of the circumstances of the plaintiff, would have thought. See: *Cognos, supra*, at 131-132. In my view, the bank's interpretation of the comfort letter is not reasonable in the circumstances, nor is it supported by the totality of the evidence of Noonan and McDowell.

486      Noonan testified that he read the letter with a high regard for Plessey's standing, strength and reputation, and

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

financial capacity to give effect to the stated policy. This is consistent with McDowell's evidence as to what constituted a strong comfort letter. McDowell testified that a well-written comfort letter was one from a responsible corporation and signed by its authorized officers, which acknowledged the borrowing, confirmed ownership of the borrower, and stated the intention to keep the borrower in sound financial condition. In his view, such a letter would be a very good comfort letter, and he would view it as an undertaking. In his words: "my word is my bond, and if'l make a commitment, I expect to fulfill it." These criteria are consistent with a perception of comfort letters as moral, rather than legal obligations.

487      Noonan testified that he was not involved in the negotiation or drafting of the first comfort letter, he never discussed the wording of the letter with anyone at Leigh, Plessey or GEC, nor did he direct the terms to be used in it. It was not his practice to discuss the wording of comfort letters with bank counsel, nor did he do so regarding the Leigh letter. He did not discuss the letter with Baker, who negotiated the letter from the bank's London office. In fact, it was  never the responsibility of Noonan or anyone else in the Credit Division to negotiate the terms of documents like comfort letters. That responsibility rested with the account manager in the Corporate Banking Division.

488      Further, Howard Baker, who did negotiate the wording of the first letter, worked from a template comfort letter, which contained in the policy paragraph the additional words: "and in this particular instance we will ensure that sufficient liquid resources are available to discharge any liabilities at maturity." Those words were deleted by Baker from the draft comfort letter he sent to Plessey and were never included in the Leigh letters.

489      Finally, a Plessey guarantee was not on offer for the Leigh loan, and the bank knew this prior to negotiating the first comfort letter. I am of the view that the interpretation urged by the bank, based on the evidence of Patrick Noonan's subjective view of the letter, is not one which would be held by a reasonable person in all the circumstances. The evidence does not support a finding that Plessey impliedly represented that it would cause Leigh to be managed in accordance with the policy. Such an interpretation amounts to a promise that directly or indirectly, the bank would be paid, and both parties knew a guarantee was not on offer.

*Untrue, Inaccurate or Misleading*

490       The plaintiff submits that the statement of policy in the third paragraph of the comfort  letters was materially misleading because Plessey had adopted no policy at all with respect to Leigh. In this regard, the plaintiff asserts that nowhere in the internal Plessey documentation produced was there any evidence that the Plessey board had adopted a formal policy regarding management of its subsidiaries. The bank argues that if Plessey had such a company-wide policy, it would have to have been in writing and published throughout the company so that everyone required to know about the policy would be aware of it and understand it. I do not accept this submission, and the evidence is to the contrary.

491      I find as a fact that Plessey did have the policy stated in the third paragraph of the comfort letter. Indeed, such a policy is virtually axiomatic from a business management perspective. While the Plessey board may not have published a company-wide policy statement to the effect of paragraph three, Musgrave prepared a submission for the Plessey main board regarding each of the comfort letters, and the board did formally approve the issuance of each. The Plessey board did authorize the signatories to sign the comfort letters on behalf of the company, and this, in my view, is sufficient formal confirmation that Plessey had the policy.

492       It was the evidence of Ian Musgrave, which I accept, that Plessey did have the policy set out in the third paragraph, regarding both Plessey Canada and later Leigh, for the duration of his tenure at Plessey. Musgrave gave the following evidence regarding board's adoption of the policy:

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

Q. So just to be absolutely certain, the general instructions in writing dealt with the company policy that the wholly-owned subsidiaries of Plessey Company plc would be managed in such a way as to always be in a - or to be - such as to always be in a position to pay or to meet their financial obligations.

A. That's my understanding. Yes.

Q. Now, we - where is that written general instruction?

A. The section I'd always read as covering this is actually in general instruction number 215, which is at tab "C" in 227. ...It reads:

This instruction supersedes all current General Instructions in matters relating to levels of delegated authority where in conflict. However, it must be noted that it does not remove any statutory, legal or contractual obligations of the directors or employees of The Plessey Company or any of its subsidiaries.

Certainly in the context of U.K. company law, it was a statutory, legal obligation of the directors of U.K. subsidiaries to manage the affairs of the company concerned so that they could meet all their obligations as they fell due. If they didn't, I think they were trading illegally, going under U.K. company law, and they should legally stop trading. So that's the section I had always looked at on that point. There is another section in the finance manual itself. Let me just find this, if I might. Yes. If you look at Exhibit 227, 1C. ...This section is headed "Policies Financial Accounting Balance Sheet". ...And then on the third page there's a paragraph at the top headed "Creditors":

It is company policy to pay suppliers in accordance with the agreed credit terms. It is not permitted to take excessive credit, which may damage the Group's reputation or result in difficulty in obtaining supplies or services. Creditors and liabilities are recorded by reference to goods delivered and services received...

Now, I fully expect that was written with trade creditors in mind, but I think the principle equally applies to any supply of services, which would include supply of credit.

So those are the bits I looked at to, if you like, to back up the claim that the company had a policy in that area. It's not something that I'm looking at post the event. These are sections which I looked at at the time to justify that type of statement.

Musgrave was pressed on the point and said:

A. The policy is not defined precisely in the general instruction, nor anywhere else, as far as I can see, in precisely the same words that were used in Paragraph 3 of the comfort letter. However, my view at the time was that the second paragraph of the introduction section to GIP. 215 set out a policy which had the same meaning, did not use the same words, or it didn't get there in quite the same way, but the meaning is the same. I don't think there was any particular need in the comfort letter to use precisely the same words as might have appeared in an internal company document.

493    In addition, Musgrave testified as to the application of the policy to the Plessey group:

A. Yes, I do. This was a policy that Plessey applied to the whole group, to all its subsidiaries and to joint venture companies where it was able to apply it. Essentially, the policy was that the management of the company concerned should manage the business of that company in such a way as to be always in a position, etc., etc.

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

Q. What role did the Plessey plc management have in that policy?

A. Well, they laid down the policy in the first place and I think if it came to their attention that the policy was not being applied by the management of any particular subsidiary, they would clearly, at least in the first instance, remind the management of the policy. That would hopefully be enough to ensure policy was applied by the management.

Q. During your time, and did that policy pre-date this day, December 22nd, 1988?

A. I'm certain it did.

Q. And in your time at Plessey till you left Plessey at the end of August, 1989, did that policy ever change?

A. No.

Musgrave elaborated on the meaning of the policy under cross-examination:

THE WITNESS: Excuse me, your Honour. There's actually something I'd like to say just before we start. There was an answer I gave to Mr. Campion on Thursday afternoon which, at the time, I wasn't comfortable with. I've reflected quite a lot on the weekend and I think - I gave him the wrong answer. It concerns the area of participation in a company's management. I think Mr. Campion suggested that a parent company, by setting down through policies, procedures, levels of delegated authority, but the parent company was actually participating in the management of the subsidiary concerned. I agreed with that. I was uncomfortable with it at the time. I have reflected on it. I don't now agree with the suggestion. *It seems to me that the legal responsibility for managing the affairs of a subsidiary lies with the board of the subsidiaries concerned. That is certainly the case in English law, and I expect it is in Canadian law, as well. And nobody can take that away from them.*

Now, having said that, the management has to manage the affairs of the company, manage the business within a whole series of constraints. They might be constraints laid down by the government in the form of law, environmental laws, labour laws, customer protection laws. The management has to have regard to all of those. The management may have to regard - have regard to policies laid down by a regulator, if it's operating a regulated industry. The management might have to have regard to policies and procedures laid down by some professional body, if that's relevant. In the case of a company which is a subsidiary within a group, almost certainly it will have to have regard to the policies and procedures laid down by the parent company of the group. But I don't see any difference with any of that - I don't think any of those situations involve the person who is setting out the policies, procedures, laws, regulations, whatever, participating in the management of the group. I think the management of the subsidiary have to manage the affairs of the company concerned within those policies and procedures.

So, on reflection, I disagree with Mr. Campion's suggestion. I think you can actually take it a stage further. *As I said earlier, certainly in the U.K. it is the board of a company who are responsible for the management of that company. And they can't give away that responsibility. If they allowed someone else who wasn't a member of that board or didn't report to that board to participate in the management of the company, I think they would be in a very shaky legal position, and I'm certain that Plessey did not structure its delegated authorities to put the members of all its subsidiaries' boards in that sort of position.* So I'm afraid I have got to change my mind on that one. [Emphasis added]

494    In addition to the evidence of Musgrave, I note that shortly following its takeover of Leigh. Plessey implemented a series of financial controls, in order to monitor Leigh's performance. These included a requirement that Leigh

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

provide Plessey with key financial data on a monthly basis, including external sales, operating profit, profit before tax and cash flow. Binnie Sammon testified that Plessey would have begun receiving this information from Leigh by July, 1988. In addition, Plessey controlled the borrowing and guarantee limits of Leigh, which were set by the Plessey main board. Leigh could not exceed these limits without main board approval. Leigh, along with the other Plessey subsidiaries, was required to produce an annual budget, for approval by Plessey. This requirement was continued by GEC following the takeover of Plessey. When it became apparent, in the spring of 1989, that Leigh could not support the interest payments associated with the intercompany debt, Plessey converted the debt to preference shares, thus increasing the equity capital on Leigh's books and eliminating the interest payments. Finally, throughout the period of the first four comfort letters, Leigh did meet its financial obligations, and no evidence has been led to the contrary. All of this evidence supports the finding that Plessey did have the policy as stated on the face of the comfort letters, and acted in accordance with it, even though it had no legal obligation to do so. Accordingly, I find that the comfort letter was not misleading in this respect, and the bank's claim in this regard must fail.

495     In the alternative, the bank claims that the comfort letter was materially misleading because the policy paragraph did not disclose that: 1. the policy was not a policy as to how Plessey managed Plessey Canada and Leigh, but rather a policy as to how Plessey Canada and Leigh were managed by their own management; 2. that the policy did not require Plessey to do anything so that its subsidiaries would always be in a position to pay their debts; 3. that the letters were only statements of Plessey policy as at the date of the letters, and as such, could not be taken as statements of Plessey policy as at the date of receipt of the letters, when the policy "might or might not" be the same; and 4. that the policy was so commercially hollow that the policy could be in place, Leigh could go bankrupt, and the bank would receive nothing under its loan facility. These submissions are premised upon an acceptance by the bank of the evidence of Ian Musgrave as to the interpretation of the comfort letters and an assertion that this evidence is inconsistent with the bank's interpretation of the comfort letters. I have rejected the bank's interpretation for the reasons set out above.

496     Ian Musgrave left Plessey in 1989 prior to the hostile takeover by GEC Siemens, and prior to Leigh's demise. He was approached by National Power plc in 1989 and accepted an offer from them. For the past three years he has been employed as group cash manager for a Norwegian company called Kvaerner, which has between 400 and 500 subsidiaries worldwide. In that position, Musgrave is responsible for setting up the group banking systems globally and controlling the day to day liquidity of the entire group. Borrowings for the group are in the range of £1.5 billion, and Musgrave testified that he deals with banks on a daily basis. I accept Musgrave's evidence, which in my view is in accord with a reasonable, objective interpretation of the comfort letter. In addition, I note that Musgrave's evidence was consistent with that of Robert Wickham, the expert banking witness.

497     The first of the bank's assertions is that the policy statement was misleading because it did not disclose that Leigh was to be managed by its own officers and directors. I cannot accede to this submission. In my view, it is self evident, and would be to any reasonable person in the circumstances of the bank, that Leigh was to be managed by its own management. In this regard, I note the evidence of Musgrave, above, that it would be an improper delegation of authority of the board of directors of Leigh to permit the company to be managed by a party other than an office holder of the company. I agree. A bank is a commercially sophisticated plaintiff, and a reasonable party in the position of the bank would have been aware of this provision of company law.

498     The second assertion of the bank is that the paragraph was misleading in that it did not disclose that the policy did not require Plessey to do anything so that its subsidiaries would always be in a position to pay the bank. On the contrary, I am of the view that this is exactly what the policy paragraph says, clearly and on its face. I have set out the reasons for this conclusion in the section on contract, and need not repeat them again here. Similarly, the comfort letter does carry a degree of value in the commercial context, and for the reasons outlined above, is not commercially hollow.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

499      Regarding the third assertion, while I found above that the wording of the third paragraph does not contain a contractual promise by Plessey to have the policy into the future, I am of the view that the comfort letter does contain a continuing representation as to Plessey policy. The letter is not misleading in this respect, as this is consistent with the bank's reading of the letter and also with Musgrave's evidence:

Q. I take it that it was your understanding that this was a statement of continuing policy.

A. I think, as the word stands, it's a statement of our policy at that point in time. It is our policy. We don't say our policy will continue to be. But I think, if the policy changed, if it had changed at any point in time, I would, I think almost certainly, have gone back to the bank, this bank and any other bank who had a similar comfort letter, and say; Look, our policy has changed

Q. I see. So you'd feel obliged to go to the bank, policy changed?

A. Yes. I don't think we were obliged in the legal sense, because it's simply a statement of policy at the time saying it doesn't commit us to notify the bank of a change of policy. But as a matter of good practice, I think I would have gone back and informed the banks, not just Toronto-Dominion but any bank, if policy in this area had changed.

Q. But you weren't legally obliged here?

A. I don't think we were.

Hence, for all of the above reasons, I find that the first four comfort letters are neither untrue, inaccurate, nor misleading, and the bank's claim in negligent misrepresentation must fail.

*Fraud and Negligent Misrepresentation in the Fifth Comfort Letter*

500      In the alternative, the bank claims that even if Plessey had a policy which was accurately described in the first four comfort letters, that policy ceased to exist or became subject to "material qualifications" prior to the bank's receipt of the fifth letter. In the further alternative, the bank asserts that the policy changed at some time following receipt of the letter on December 27, 1989 and the bankruptcy of Leigh on April 12, 1990. The bank claims that Plessey and GEC knew, recklessly disregarded, or should have known of the "material qualifications" to the policy, and had an obligation to disclose them to TD. Their failure to do so, the bank asserts, amounts to fraudulent or negligent misrepresentation.

501      The bank submits, as the basis for this claim, that GEC, knowing of Leigh's financial results following the Stanmore meetings in late November, had not adopted any settled policy with respect to Leigh. I cannot accede to these submissions. While GEC, in the months following the Stanmore meetings, may have had reservations as to whether it wanted to become 100 per cent owner of Leigh, these reservations and the uncertainty as to Leigh's ultimate ownership, were unrelated to the management policy for Leigh as stated in the fifth comfort letter, and the letter is not misleading in this respect.

502      The bank also asserts, as the basis for this claim, that Plessey, GEC and Siemens did not have a common understanding of what their policy was for Leigh and that GEC and Siemens  never discussed or came to a specific agreement as to what Plessey's policy for Leigh was to be. I disagree. Anderson testified that following his revisions to the comfort letter, he sent a copy of it to everyone at GEC, Siemens and Plessey who had an interest in the letter, in order that they might comment upon it. Both Andy Hafner and Philip Gerdine received a copy of the letter, and neither commented upon it to Anderson, who interpreted this as approval from Siemens. Moreover, I find that the evidence of Gerdine and Newlands is consistent as to the application and substance of the policy.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

503      The policy stated in the third paragraph was a policy as to Leigh's management, and I find as a fact, based on a consideration of all the evidence, that policy remained in place throughout the material period of time, right up until immediately before the bankruptcy of Leigh.

504      Both David Newlands and Philip Gerdine gave evidence in this trial, and both testified that Plessey continued to have the policy stated in the third paragraph of the comfort letter following the takeover. Gerdine, who was the co-managing director of Plessey following the takeover, stated in evidence:

Q. I'm suggesting to you that in April, 1990, as you look back on the period September '89 to April '90, you must have concluded that Plessey never had the policy referred to in the third paragraph of the letter we have just referred to during that period, namely September '89 to April '90. Do you agree with me?

A. I don't agree for this reason: That I think that with respect to worldwide operations, Plessey had this policy, which is a very simple policy, which says that we are going to supply the direction on the resources so that - and delegate to the 178 affiliates of Plessey so that they would be in a position to be managed in this way to meet financial obligations, because there are just so many alternatives available. The opposite one is simply unacceptable, that they would be unable to meet any financial obligations. So that would not be acceptable. There's another one which is Plessey's policy to run each of these subsidiaries, and it certainly didn't do that, it delegated. And I thought about this at some length about what this policy meant. It had to be in place during the entire period, and then come shortly before all the facts were in, that there was something terribly wrong here, that policy would change with respect to Leigh on that day. And that was a unique event. But frankly, even today, Plessey's policy is as stated here, in my opinion.

Gerdine also testified as to the substance of the policy:

Q. Do I take it that what you're saying is, is that Plessey had a policy that - Plessey would see that Leigh would be managed in such a way as to always be in a position to meet its financial obligations?

A. Well, yes, again, it's just slightly different from that. It's that Plessey would provide the resources in management, in financial instruction, in various things that would permit Leigh to run its business in a position to meet its financial obligations. And there is an important distinction there of what Plessey was doing, because there is a policy at Plessey on delegation which is important, that these people operate their own businesses, and Plessey sets the guidelines.

Q. As I understand your answer, as part of that, Plessey would supply resources, management, and financial instructions and various things to Leigh as part of that policy.

A. Yes.

Q. And when you use the term "resources", that would include the financial support from Plessey.

A. It would include basic investment, because the way Plessey or any parent would manage a subsidiary, at least in my view, is, it provides the management and the basic financial resource to carry on its business. And it - then the business itself does the business itself.

Q. And when you say that, it would, in this resources, provide financial support if needed.

A. I'm not sure you can say that. It might or it might not, depending on the circumstances.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

Q. And I take it, then, having regard to those answers, that I'm correct in saying that you read this policy as saying - read this paragraph as saying that as long as the policy was in place, Leigh would be able to pay The Toronto-Dominion Bank.

A. I'm not sure if that follows. I mean, the policy was in place for the fundamental input, but I'm not sure that the last part of that sentence would apply necessarily. We would hope it would apply, but what Plessey did was provide this fundamental policy guidance and support by making the investment and putting the management, and that was Plessey's policy. What they do with it is their business. That's how I understood it.

505      David Newlands was the finance director of GEC and the person who "blessed" Anderson's revisions of the comfort letter prior to its signature and delivery. His evidence was, in substance, the same as that of Gerdine:

A. Thirdly, that it was Plessey's policy that Leigh be managed so that it could pay its bills as they fell due.

Q. Yes.

A. And fourthly, the letter replaced earlier letters and did not constitute a legally binding commitment.

Q. And again, I want you to focus on what you thought at the time. Do you recall anything further as to why you thought it was fine?

A. I thought all those statements were explicit and statements that Plessey could properly make. This was from a common sense point of view.

Q. I take it that except by agreement during the period takeover date to the corridor conversation date, this policy, as stated in the latter August 31, 1989 found at tab 21, was not in place.

A. I wouldn't take that at all. I can't envisage how, when a company has a policy, that its subsidiaries be managed in such a way that they meet their bills as and when they fall due can ever be a policy that wouldn't exist. It would be a very odd company that didn't have such a policy. Any company - I mean, it's almost a statement of the obvious, that you would seek to have your subsidiaries run in such - in that sort of way, which is why I didn't have any problem with the policy in the 31st of August letter, and I don't believe that Ross's changes actually changed the meaning of that statement, either. So it seemed to me - I don't mean to put it the wrong way, but a motherhood statement, it seems a sensible policy for any company to have.

. . . . .

Q. Now, obviously in the letter, in the third paragraph, there is the Plessey policy statement.

A. Yes.

Q. Or statement about the Plessey policy. I take it that the policy, as far as you understood, was in place certainly when the letter was sent and was true when the letter was sent.

A. Yes.

506      In addition to the evidence of Newlands and Gerdine, I find that Plessey and GEC acted  in accordance with the policy throughout the material time. Colin Justice, divisional finance director of PESL was dispatched to Leigh to assist with the transition to GEC accounting principles and to assist the Plessey management with the ETC reviews, which

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

were ongoing. Justice visited Leigh periodically through the fall of 1989 and assisted in the preparation of financial data presented at the Nov. 28 and 29 meetings at Stanmore, and at the meetings with Dr. MacBean in early January, 1990. At these January meetings, MacBean, who by then was aware of the increasingly bleak financial picture at Leigh, tasked Driscoll with preparation of a feasibility analysis of the various options available to Leigh. While these options did include closure of the business, other options contemplated the continued viability of Leigh, including restructuring, integration with Canadian Marconi, and sale to a third party. Justice assisted in the analysis. It is clear that Plessey and GEC were still trying to find solutions which would enable Leigh to continue as a viable entity. In this period, Driscoll, along with various representatives of Plessey and GEC Marconi met repeatedly with the Canadian government. The government was Leigh's main customer, and the purpose of the meetings was to negotiate some contractual relief for Leigh.

507    In the same period, the Red Team review was initiated to investigate the technical situation at Leigh and to ascertain the source of Leigh's contractual difficulties. Throughout this period, Leigh continued to meet its obligations as they became due.

508    Once Plessey co-managing director Philip Gerdine became involved with Leigh, he too made vigorous efforts on Leigh's behalf, attending a number of meetings with the Canadian government, and meeting with Leigh management. Even after the bank had frozen the loan, Gerdine prepared a "save Leigh" proposal. In early April, the Red Team had reported that Leigh had numerous serious engineering problems in relation to the SHINCOM contracts, and that Leigh was incapable of performing its contracts from a technological perspective. Nevertheless, Gerdine and others continued their efforts on Leigh's behalf and made further attempts to negotiate relief from the Canadian government. It was not until the government finally indicated on April 9 that no relief would be forthcoming, that the decision was taken to place Leigh into bankruptcy. Throughout this period, Leigh continued to meet its obligations as they became due.

509    Accordingly, if Plessey did change its stated policy regarding the management of Leigh, I find that such change did not take place until the decision was taken that Leigh was terminal and bankruptcy was the only option. Only then did the policy of Plessey, as stated in the third paragraph of the comfort letter, become misleading. Up until that point, Plessey had actively supervised the management of Leigh and endeavored to solve its problems. By the time the decision was made to abandon Leigh, the bank had already frozen the loan, no further funds had been advanced, and no damages incurred by the bank. Hence, there is no basis for a finding of negligent or fraudulent misrepresentation in the fifth comfort letter.

510    Even if I had found that the statement of policy in the fifth comfort letter was materially misleading, I am of the view that any reliance placed upon the statement of policy by the bank was not reasonable, having regard to all the evidence.

511    Plessey became the target of a hostile takeover bid by GEC and Siemens in November, 1988. The bank was aware of this from the time the hostile bid was announced, and was also aware that GEC and Siemens intended to dismantle Plessey and divide up its assets between them. One of Musgrave's last acts at Plessey was to review the fourth comfort letter, which Plessey sent to the bank even though the bank had not asked for it. When Exton forwarded the letter to Young, he noted that Plessey felt it was "appropriate" to send the letter, due in part to the hostile takeover bid.

512    Following the success of the hostile takeover bid in September 1989, the Plessey management was decimated. Virtually all of the prior Plessey executive and managers either resigned or were terminated by the new owners. These were the people with whom the bank had been dealing regarding Leigh. The new owners, and particularly GEC, were large companies with whom TD had no existing relationship, despite repeated attempts to develop one over the years.

513    Plessey was a borrower of funds from banks, while GEC was referred to as a "cash mountain" with over £1 bil-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

lion in cash reserves, over and above its other assets. One of Anderson's main responsibilities was the daily investment of this surplus on the most favourable terms possible. Rather than being dependant on banks and their goodwill for funding, GEC dealt with banks as a depositor of huge sums of money. Banks eagerly vied for GEC's business, including TD.

514        Throughout the piece, both before and after the hostile takeover, Leigh kept the bank informed of its contract difficulties, including delays and missed milestones, all of which had a negative impact on Leigh's cash flow. The bank knew that the Leigh loan was continually climbing. On several occasions Leigh exceeded its authorized credit and went into an overdraft position. Leigh provided cash flow forecasts to the bank, including a forecast in late November projecting a peak of borrowings in December of $43.3 million. In December, the bank was informed that Leigh had laid off 80 people, and that a second tranche of layoffs was anticipated early in the new year.

515        Finally, Leaney read and accepted the fifth comfort letter, which included the added language in the last paragraph that the letter did not constitute a legally binding commitment. This was the first comfort letter received from Plessey since the hostile takeover, and the change from the wording of the four prior letters should have signaled a warning to the bank.

516        In all of these circumstances, I find that any reliance placed upon the policy paragraph by the bank was not reasonable, and hence the claim in misrepresentation must be dismissed.

*Conduct Outside the Letters*

517        In addition to the causes of action arising out of delivery of the comfort letters, the bank asserts a number of causes of action in negligent or fraudulent misrepresentation arising out of the conduct of several individuals.

*Tantamount to a Guarantee*

518        In particular, the bank asserts that Plessey is liable in negligent misrepresentation for the alleged statement by Ian Musgrave to Greg Young at TD that the Plessey comfort letter was "tantamount to a guarantee". Following a careful consideration of all the evidence, and for reasons which are set out above in my recounting of the evidence. I have found as a fact, on a balance of probabilities, that Musgrave did not make this statement to Wilson. Consequently, the bank's claim in this regard must fail.

*The Justice Statements*

519        In addition, the bank claims that statements made by Colin Justice in two telephone conversations with Wilson of the bank constituted fraudulent or negligent misrepresentations. Regarding both conversations, the evidence is uncontroverted. TD urges the court to draw an adverse inference from the fact that Plessey chose not to call Justice as a witness, though the nature of the inference to be drawn is not particularized. I decline to draw an adverse inference, on the basis that the statements attributed to Justice were admitted by the defendant, and his evidence was not necessary. I observe that the plaintiff did not call Smith or Dean from Leigh's finance department to testify.

520        The bank alleges that in the first conversation, which took place in late November, Justice and Dean were both on the call. Either Justice or Dean discussed the financial condition of Leigh and advised Wilson that Leigh would be receiving payments totaling $11.4 million in January. The bank alleges that Justice was aware at the time of the call that Leigh was reporting a loss to the end of September, 1989 of $18.85 million, and knew of the ETC results regarding Leigh's contracts. The bank asserts that "Justice was conveying to the bank that the Bank could increase the line to Leigh because Leigh was merely suffering cash flow problems" and that Justice's statements amount to negligent misrepresent-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

ations.

521     I am unable to accede to this submission. This conversation must be placed in context. The late November conversation was the first of only two occasions on which Justice ever spoke to the bank. On November 8, Wilson met with Dean at Leigh's offices, and Dean informed him that "Leigh's numbers are getting worse" that there were legal disputes with some of the SHINCOM contractors, and that Leigh might require a further $10 million from the bank. On November 23, Wilson had a conversation with Dean alone, in which Dean requested a further $5 million from the bank, as Paramax was withholding payments owed to Leigh. In that conversation, Dean informed Wilson that Leigh would invoice Paramax for about $10 million in December, which they expected to receive in January.

522      Regarding the conversation in which Justice participated, this was the first time Justice  had had any contact with anyone at TD. Wilson was unable to recall who had said Leigh would receive Paramax payments in January, Justice or Dean. On this basis alone, I am not prepared to find that Justice made a negligent misrepresentation to TD. Moreover, regardless of who made the statement, it was true. Leigh did expect to receive the payments, did in fact receive them in early January, and applied them to pay down the TD operating line. Finally, I am not persuaded that even if Justice had said the payments were due in January, that Wilson would have relied upon the statement from Justice. Wilson had never spoken to Justice before. He knew that Dean was the vice president of finance at Leigh and had spoken to him on several occasions. Dean was the person who had previously broached the subject of the extended line of credit and the expected payments in January. If Wilson did rely on these representations, it is more probable that he relied on the statements made by Dean, and I so find.

523     The second conversation between Justice and Wilson took place on December 21. In that conversation, Wilson asked Justice for financial statements for Leigh, and Justice responded that the statements were "not available", "due to the takeover with acquisition accounting issues". The fact that Justice made these statements is admitted by Plessey. The bank asserts that to Justice's knowledge, some financial statements for Leigh were available and that this statement by Justice was intentionally false, or made so recklessly as to amount to fraud. In the alternative, the bank asserts that the statement amounted to a negligent misrepresentation.

524      In my view, the explanation given by Justice to Wilson, that the financial statements were not ready due to the acquisition accounting issues, was misleading. Although the explanation was  accurate as far as it went, in that the adjusted financial statements were not available (and indeed were never finalized prior to Leigh's bankruptcy), the statement was misleading in what it failed to disclose. By the time Justice made this statement to Wilson, he had assisted in the preparation of the financial information presented at the Stanmore meetings on November 28 and 29. He had attended those meetings with Dean and Driscoll, and knew that Leigh had some financial data available, even though the reports were not finalized using GEC format. He also knew that by this time, Leigh was reporting a loss to the end of September 1989 of more than $16 million, and that it was the quarterly financial statements for this same period, to the end of September, which had been due to the bank almost two months earlier. In these circumstances, it was misleading of Justice to simply tell Wilson that the statements were not available due to the purchase accounting issues, and to omit any reference to the financial results Leigh did have.

525      However, while the statement made by Justice was misleading, I am not prepared, on the evidence before me, to find that the bank relied upon it. Again, the December conversation must be placed in context. At the November 8 meeting at Leigh, Dean was asked for the financial statements for the third quarter and he responded that they were not available "due to the acquisition accounting issues had not been resolved." As noted above, Dean told Wilson at this meeting that Leigh's numbers were getting worse, that there were difficulties with the SHINCOM program, and that Leigh might require an increase in its bank line. Dean also said that a new cash flow forecast would be forthcoming, and subsequently

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

sent the bank a revised forecast projecting peak borrowings of $43.3 million in December.

526      In the late November phone call, Justice was introduced to Wilson as the Plessey Divisional Finance Director. His explanation of his role was that he was "assisting GEC with respect to Leigh," without further elaboration. In this phone call, Wilson was advised of the intended layoff at Leigh, which he considered somewhat positive. He did not ask about the overdue financial statements. By December 6, Wilson had received the revised cash flow forecast from Leigh, and also knew that Ross Anderson at GEC was personally monitoring the Leigh borrowings weekly, and that Plessey had authorized availability of $45 million but had only advised Leigh of a $41 million limit in order to "keep pressure on Leigh to manage its cash flow".

527      The conversation on December 21 was initiated by Justice to tell Wilson of the layoff at Leigh and to advise him that Dean had been terminated and replaced by Pat Smith. This was the second and final conversation Justice had with the bank. Wilson noted in his memo of the call that he took the opportunity to discuss with Justice "in some detail" the possibility of TD providing a fairness opinion in connection with the potential merger with Canadian Marconi, and that he told Justice TD "would be very interested" in providing the opinion. In his detailed record of the call, Wilson devoted half of his memo to discussion of the layoff at Leigh, and the other half to the fairness opinion issue. Wilson made no reference whatever in his memo to the request for financial statements or Justice's reply that they were not ready due to the acquisition accounting issues. Nor did he ask Justice any questions about the accounting issues in the phone call, or if there were any financial statements available in some other format.

528      Justice told Wilson that he would return to Canada in January to assist with Leigh's budget meetings. Implicit in the notion of budget meetings is that there is a budget to be discussed, yet Wilson never followed up on this. He neither asked for the results of the budget meetings in January, nor did he ask for a copy of the budget or any underlying documentation. Indeed, he did not contact Leigh to ask about the financial statements again until February 21, two months later.

529      Finally, when the bank did receive the financial statements in March, 1990, they did not react to them. It was not until Gerdine called the bank himself, several days after the statements had been delivered, that anyone from the bank made any comment upon them. Even then it was Gerdine's evidence that Leaney sounded surprised that anything was wrong, and he testified that it was evident to him she had not seen the financial package. In all of these circumstances, and particularly in light of the scant contact between Justice and the bank; the fact that Wilson failed to record any reference to the statement by Justice in his detailed memo of the call; the fact that the responsibility for providing the statements lay with Leigh and not Justice; the fact that the bank did not know the extent of Justice's involvement with Leigh's finances; the fact that Dean had made the same statement to the bank himself two months earlier; and in light of the bank's failure to react to the statements until contacted by Gerdine, I am unable to find that the bank relied or acted upon the statement made by Justice. Hence, one of the essential elements of negligent and fraudulent misrepresentation has not been made out. Further, the Justice statement was not a representation of a continuing nature and, as is set out below, the plaintiff has suffered no damages. The claims in negligent and fraudulent misrepresentation are dismissed.

530      I note in passing that the question of any liability which may attach to Leigh for misrepresentation or fraud is not before this court, and thus I make no comment upon it.

531      Even if I had found that the remarks made by Justice amounted to a negligent misrepresentation, I would not have found the statement to be fraudulent. I am mindful of the requirement that fraud must be strictly pleaded and strictly proved. In order to prove fraud, the dishonest mind must be established. The statements made by Justice were, strictly speaking, true. Leigh never produced a finalized set of financial statements adjusted for purchase accounting issues prior

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

to the bankruptcy. In addition, Newlands testified that Justice had provided him with a memo in October, 1989 indicating the technical baseline at Leigh was insecure, thus casting doubt on the accuracy of all the numbers Leigh produced. For these reasons, and given the paucity of evidence, I am not prepared, on a balance of probabilities, to draw the inference that Justice acted deliberately or recklessly in making the statement to Wilson.

532    Moreover, applying the principles set out in *Canadian Dredge & Dock Co.*, and *supra, B.G. Checo, supra*, I am not persuaded, on the basis of the evidence before me, that Justice was a directing mind of either GEC or Plessey, such that the corporations should be liable in fraud. Justice was not directly employed by GEC. He was the divisional finance director for PESL, however, no evidence was led as to the nature or scope of his responsibilities in that position. I am unable to conclude that he represented a directing mind of either GEC or Plessey, nor that he was acting within the scope of his authority as an employee when he discussed the financial statements of Leigh with the bank. For this reason as well, the claim in fraud must fail.

*The Anderson Statement*

533    On February 22, 1990, at a meeting in London, Anderson told Exton that the possibilities for Leigh "include Marconi acquisition or Siemens acquisition but the main problem is valuation of Leigh's worth to GEC or Siemens." The bank asserts that prior to this conversation, on February 2, Anderson had been told by the treasurer of CMC, Gerry Stuurop, that "Leigh will owe banks $50 to $60 million soon and is worth about negative C$30 million versus cost $110 million" and that Stuurop had told him, as he recorded in a note: "CMC very seriously considered advising Plessey to walk away when they saw "my" letter of support to Toronto Dominion." The bank had asserted a cause of action against GEC in fraud based upon these statements, however, the fraud allegation was abandoned by the plaintiff in argument. In any event, I find that there is absolutely no evidence to support such an allegation.

534    The bank submits that Anderson did not convey this information to Exton and that as a consequence, GEC is liable in negligent misrepresentation. I am not persuaded by this submission. Mr. Anderson had virtually no recollection of either the meeting with Stuurop or the meeting with Exton, and his evidence regarding both was purely reconstructed. He said under cross-examination that he did not recall receiving the information from Stuurop on Feb. 2, but that it was possible. He gave this evidence based on an entry in his diary, and because his notes of the information from Stuurop were written on the face of a memo dated December 21. The next document on top of this in his file was a letter from Wilson dated Feb. 21. Anderson  testified his practice was to make notes on the top memo in his file until the document was superceded by a new addition to the file, although he also testified that the documents were sometimes out of order, as they were simply placed loosely in a plastic file and were not held together in order by any kind of document clip.

535    Further, the meeting must be placed in context. Mr. Exton was not responsible for the Leigh account. Anderson was the treasurer of a huge multinational corporation, with whom the bank, and particularly Mr. Exton, had been attempting to develop a direct business relationship for some time. Leigh was a minuscule part of the GEC group. Leigh was purchased by Plessey for $107 million cdn.. Plessey was itself purchased by GEC and Siemens for $4.5 billion U.S., and GEC alone was worth £6.5 billion. The purpose of the meeting was not to discuss Leigh and I find that Leigh was discussed in the meeting only in passing. Exton used the Leigh relationship only as a door-opener with GEC, in order to develop business opportunities with the company. Indeed, Anderson asked Exton for a separate £50 million loan facility in the meeting.

536    In these circumstances, I cannot find that Anderson owed Exton a duty of care. In my view, it was not reasonably forseeable that Exton or the bank would rely on the statement about the valuation of Leigh, or any omission from that statement, to its detriment. This claim in negligent misrepresentation is dismissed.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

*The February 26 Memo*

537     The bank asserts that GEC and Plessey are liable in fraud for their failure to direct Driscoll to deliver the financial statements due to the bank, following his February 26 memo asking for direction in this regard. The bank argues that Leigh's behaviour in knowingly failing to produce the financial statements amounts to fraud and deceit, and that Plessey and GEC were parties to this deception, as "Plessey and GEC must be taken to have known that Leigh was not going to deliver the financial statements to the bank without their direction." I cannot accede to this submission.

538     In the first instance, I note that TD raised this allegation of fraud for the very first time in its written argument submitted at the conclusion of trial. It was not pleaded in the statement of claim, although the claim has been amended twice, most recently in April, 1996 when several new claims were added. The parties spent over six years in pre-trial preparation. The statement of claim does refer to Driscoll's February 26 memo, and hence, the bank could have pleaded the fraud allegation, since it was aware of the document upon which it is based.

539     The defendants were denied the opportunity to respond to this very serious allegation through cross-examining witnesses or calling witnesses of their own in order to refute it. The prejudice to the defendants in this regard is considerable.

540     Moreover, the bank has not identified any specific person at GEC or Siemens who is alleged to have had the dishonest mind which is an integral part of any fraud claim. In order to attach liability to a corporation for fraud, as noted above, the fraudulent intent must be  established on the part of a natural person. I reiterate that fraud must be strictly pleaded and strictly proved.

541     Notwithstanding that the defendants have not had an opportunity to properly meet this allegation, in my view the plaintiff has failed to establish a case for fraud. The contractual obligation to provide the financial statements was that of Leigh and not of either GEC or Plessey. The memo was sent by Driscoll to Rickard and Alexander, both of GEC Marconi, and to Justice. None of these people gave evidence at this trial, nor was detailed evidence led about the nature or scope of their duties and responsibilities. No evidence was led as to their reaction, if any, to the memo. The only evidence of any response to Driscoll's memo is a copy of the memo, produced by GEC, with the handwritten notation "must tell if they ask". This notation is admitted by GEC to be in the handwriting of David Rickard. Rickard and Alexander were not employed by GEC, but by GEC Marconi, a GEC subsidiary which is not a party to this action. The plaintiff has failed to establish a dishonest intent on the part of any person sufficient to attach liability to either GEC or Plessey. I am not prepared to draw an inference of dishonest intent in these circumstances, and this claim in fraud must fail. In this respect, the observation of Essen J.A. in *Rainbow Industrial, supra* at p. 69 is apt:

It seems, most regrettably, to have become fashionable to allege fraud in commercial cases without much regard for the fundamental rule that fraud must be strictly pleaded and strictly proven. To some extent, this may be an off-shoot of the mistaken notion, to which I referred earlier, that those stringent requirements do not apply to fraud by non-disclosure.

**Part IV**

*Damages*

542     I have not found either GEC or Plessey liable in either contract or tort under any of the causes of action asserted. However, if I had done so, I would have assessed the damages in the following amounts.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

543     The applicable principles concerning the measure of damages in contract and for the tort of negligent misrepresentation are set out by the majority of the Supreme Court of Canada in *BG Checo International Ltd.*, *supra* at 37:

> The measure of damages in contract and for the tort of negligent misrepresentation are:
>
> Contract  The plaintiff is to be put in the position it would have been in had the contract been performed as agreed.
>
> Tort  The plaintiff is to be put in the position it would have been in had the misrepresentation not been made.

See also *MacGregor on Damages*, 15th ed. (London: Sweet & Maxwell, 1997) at pp. 9-11.

544     I assess the damages in respect of each of the plaintiffs claims as follows:

*The Claim in Contract*

545      I have held that the comfort letter does not contain a contractual obligation on Plessey to pay the bank nor to have the policy referenced in the third paragraph. I have also found that there was no breach of the policy paragraph. If there was a contract which was breached, the plaintiff should be placed in the same position as it would have been had the contract been performed. I assess the damages flowing from a breach of that contract as follows. The amount of the Leigh loan outstanding at the time of the bankruptcy was $40,489,427.09. Leigh had in its account a positive cash balance of $1 million, which the bank seized and applied to the outstanding loan. Accordingly, the damages must be reduced by this amount. As well, the bank recovered $398,710.87 in an action against Leigh's auditors Deloitte. Haskins & Sells regarding the Leigh loan. The damages should be reduced by this amount as well. Accordingly, I assess damages for breach of contract at $39,090,716.22.

546      I am not prepared to reduce the damages by the amount of any taxation provision taken by the bank on account of the loss. The evidence does not establish with certainty what the bank's tax treatment of the Leigh loan was, nor the amount of any tax saving which may have accrued to the bank. In the event that damages were awarded the bank, any recapture of this provision could be adjusted for in future tax returns.

*The Claim in Misrepresentation based on the Comfort Letters*

547      I have held that the comfort letters did not contain a misrepresentation from their inception in April 1988 forward. If I had held Plessey liable in misrepresentation from the date of the first comfort letter, I would assess the damages in the same amount as in the contract claim above, that is $39,090,716.22.

548      I have held that the fifth comfort letter dated December 15, 1989 and delivered on December 27, 1989 did not amount to a negligent or fraudulent misrepresentation and could not be reasonably relied upon by the bank. Had I held otherwise, I would assess the damages so as to put the plaintiff in the same position it would have been in if the misrepresentation had not been made. Given that this representation was a continuing representation, in my view the plaintiff would be entitled to recovery of all amounts advanced in reliance on the representation. In this case, Leigh received payments which reduced its loan balance in January, however further amounts were advanced by the bank thereafter. In fact, the full amount of funds advanced following the reduction in the Leigh loan and prior to the bankruptcy was $8,843,140.04, although the loan balance was actually slightly higher at the date of delivery of the comfort letter than it was at the date of the bankruptcy. Accordingly, I would assess damages at $8,843,140.04, less the plaintiff's recovery of $1 million from the Leigh bank account and $398,710.87 from the Deloitte's settlement for a total of $7,444,429.17.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

*Conduct Outside the Letters*

549      I have found that the bank did not give up its security at the time of delivery of the third comfort letter in April 1989 nor did it make advances thereafter based on the alleged statements by Musgrave that the letter was tantamount to a guarantee. I have found such statement was not made by him. The bank did not give up its security or make further advances based on anything Plessey said or did at that time. Had I found liability on the basis of the alleged statement by Musgrave, I would assess damages flowing from such a claim as follows. The value of TD's security over Leigh's assets was $14,300.000.00. Assuming that the bank would have called the Leigh loan as at the date of the representation by Musgrave, from March 6, 1989 to the date of bankruptcy, the bank advanced to Leigh the sum of $12,279,290.03, for a total of $26,579,290.03. I would subtract the sums recovered from the Deloitte's settlement and the Leigh bank account above, for a total damages award of $25,180,579.16.

550      Had I found liability on the basis of the statements made by Colin Justice to the bank in late November, 1989 and on December 21, 1989, I would have assessed damages as at November 30 at $919,698.09, being the difference between the loan balance on that date of $38,171,018.13 and at the date of bankruptcy, less the recovery above. Applying the same calculation to December 21, I would assess the damages at that date as ($330,052.04). Hence, the plaintiff would have suffered no damages.

551      Regarding the Anderson meeting with Exton, applying the same calculation to the loan  balance outstanding on February 22 of $36,482,251.92, I would assess damages at $2,608,464.30.

552      TD claims damages in respect of Plessey's and GEC failure to direct Leigh to provide to the bank the financial information which Leigh was required to provide pursuant to the terms of the facility letter reporting provisions. I would assess any damages flowing therefrom if liability had been found, at $2,544,543.81, based on a loan balance of $36,546,172.41 on February 26, 1990, and applying the calculation above.

553      The bank has pleaded fraud against GEC and Plessey. I have found that there is a total absence of any evidence of fraud and I have rejected this assertion by TD. Nevertheless, the measure of damages would be the same as for negligent misrepresentation. See *Smith v. Scrimgeour Vickers,* [1996] 4 All E.R. 769 (Eng. H.L.) at 792 and S.M. Waddams. *The Law of Damages*, 2nd ed. (Toronto: Canada Law Book, 1993) at 5-19.M

*Interest*

554      During the period up to the freezing of the line by the bank interest was either included in the amount of the loan or paid. Accordingly, I would assess pre-judgment interest from March 30, 1990. I would assess both pre-judgment and post judgment interest in accordance with the Courts of Justice Act.

**Part V**

*Conclusion*

555      Letters of comfort are just that, comfort. They are not guarantees or formal security nor are they enforceable as such. They are gentlemen's agreements and moral obligations. This is common knowledge in the business community. The bank recognized this fact of life in its credit manual and in its references to comfort letters in its CCRs and other internal documents

556      Mr. McDowell, one of the most senior officers of the bank, stated that he expected the bank's legal department to follow and provide updates on issues such as comfort letters to those persons at the bank making and approving loans.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

Noonan, Leaney, Young and Wilson acknowledged that this would be important to them although they either could not recall or denied receiving information from the legal department. If those opinions were not circulated, or if circulated not paid due attention, this is sparse consolation. The opinions of the bank's highly qualified legal department accurately reflected the quality, in law, of comfort letters.

557      One might rightfully ask why it is that parties exchange language such as that in the policy paragraph of the Plessey comfort letter. More so, when the language conspicuously lacks  words of promise or contract, and where there has been no attempt to provide otherwise. In such circumstances one may only conclude that it was not intended that such words be enforceable as a contract. These were both, after all, large commercially sophisticated parties.

558      The defendants criticize the bank for its characterization of the comfort letters as "strong". It seems to me that this censure is unfair. To begin with, the bank did not state the letters to be strong in law. This would have been wrong, both in the face of the bank's legal advice and in general principle. A comfort letter may nevertheless be strong, even though not legally strong because its essence is that of a gentleman's agreement or moral obligation. Hence the test of the true strength of such a document is whether it will be honoured and paid on when presented for payment. Musgrave testified that Plessey had paid pursuant to two comfort letters which were not legally enforceable. Whether Plessey, prior to the GEC-Siemens hostile takeover, would have paid on their letter to TD is a matter for speculation.

559      As Musgrave, and the expert banker Wickham testified, companies may pay on nonbinding comfort letters based on commercial considerations, such as corporate reputation and concern that a refusal to honour a comfort letter may undercut the company's relationship with the affected bank or become public knowledge and make future dealings with other banks difficult. Plessey paid on one comfort letter for these exact reasons, although this was not known to TD. Based on such considerations of which McDowell and Noonan were certainly mindful, TD was perhaps justified in regarding the Plessey comfort letter as "strong" given the reputation of Plessey in the marketplace, up to the time of the hostile takeover in September 1989.

560      The takeover is a clear break point in this chronology. Although not a factor in anything that followed, TD had backed Plessey in its losing gamut to fend off the GEC-Siemens bid. It had no prior relationship with the new Plessey shareholders. It also knew that the takeover proposal was to dismantle Plessey and distribute the Plessey companies between GEC and Siemens. The Plessey management with whom TD had been dealing, as is to be expected in such circumstances, was decimated after the takeover. TD, lacking any relationship with the GEC and Siemens personnel, attempted to use the Plessey situation as a beachhead to develop a relationship and generate new business with GEC. In this environment, however, for the bank to rest its risk on a comfort letter which in turn depends for its integrity on relationship, was not only decidedly unwise, it was foolhardy. It is not as though TD was without options. Its facility with Leigh was payable on demand. As such it could have called the loan prior to the takeover. Or, it could have re-negotiated the arrangement with Plessey immediately afterwards by broaching the subject directly.

561      The leverage available to the lender in enforcing a comfort letter is that stated above - a possible impairment, in the event of refusal to honour the letter, of the creditworthiness of the giver of the letter in the marketplace. In short, the reputation of the giver is on the line should it fail to honour a moral commitment, notwithstanding it is unenforceable at law. Plessey, pre takeover, was a user of credit. GEC, on the other hand, was variously described as a cash mountain, debt free, and one of the richest companies in the U.K. The GEC treasurer Ross Anderson had as one of his main duties the almost daily investment of the company's cash surplus measured in billions of pounds. Such a company was not dependent on the banking  industry for its goodwill. It was a lender not a borrower. Thus leverage of reputation among and access to the banking industry was not a factor in the case of GEC. TD overlooked this critical distinction.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

562      Nevertheless, when TD asked Plessey to pay on the comfort letter and was met with a refusal, it sought to fall back on the traditional strategy in such a situation, marketplace pressure and the threat of its consequences, only to learn to its chagrin that Plessey with its new shareholders was immune to such tactics. This trial appears to be the last move by TD in its execution of this strategy.

563      At the beginning of these reasons I said that this case had at the center Leigh Instruments and TD, a bank and its customer. It also involves TD and, like itself, Plessey, another large multinational company, not in a banker-customer relationship and an effort by one to recover on a moral commitment, unsuccessfully.

564      It is not the role of the courts to re-write bargains, to substitute a better bargain than the one that the parties made for themselves or to enforce moral obligations and gentlemen's agreements. McDowell stated that, in his world, his word was his bond and if he made a commitment he expected to fulfill it. Unfortunately, the converse of that proposition is that if one accepts another person's word instead of taking their bond, one does so at their own peril. This does not however, condone the actions of a large multinational company with over a billion pounds sterling in cash reserves in walking away from a gentleman's business agreement to  support its subsidiary.

565      I may be spoken to regarding costs.

*Action dismissed.*

## Appendix A

**Dramatis Personae**

***The Toronto-Dominion Bank***

| | |
|---|---|
| Baker, Howard M. | Manager, Corporate Finance, London, England |
| Boulanger, Pierre de G. | Senior Vice-President, Credit Division (from September 1988) |
| Brock, William T. | Executive Vice-President, Credit |
| Bumstead, R. Glenn | Senior Vice-President & General Counsel and Secretary |
| Burega, Yovhan M. | Vice-President, Corporate Banking Division |
| Exton, Jonathan | Manager, Corporate Finance, London, England (from May 1988 to end of 1989) |
| | Director, Corporate Finance, London, England (from end of 1989) |
| Klingenstierna, Goran G. | Manager, Corporate Banking Division |
| Kriss, Merle | Assistant General Manager, Corporate Banking Division |
| Laitner, James | Senior Vice-President, Credit Division |
| Leaney, Wendy A. | General Manager, Corporate Banking Division |
| Mercier, Ernest C. | Executive Vice-President, Corporate Banking Division |
| McDowell, F.G. (Ted) | Vice-Chairman, Credit Division |
| Noonan, Patrick C. | Senior Vice-President, Credit Division |
| Norton, Alec I. | Assistant General Counsel |

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

| | |
|---|---|
| Owen, Sidney C. | Senior Vice-President, Credit Division |
| Read, J.A. | Assistant General Manager, London, England |
| Rising, Hugh | Vice-President, Corporate Finance, London, |
| England | |
| Thomson, Richard | Chairman and CEO |
| Walzak, Mike | Assistant General Manager, Credit, London, |
| England | |
| Wilson, Robert | Manager, Corporate Banking (as of October 31, 1989) |
| Winston, Randi | Assistant Manager, Corporate Banking Division |
| Young, Gregory G. | Manager, Corporate Banking Division |

### *Leigh Instruments Limited*

| | |
|---|---|
| Dean, David | Vice-President, Finance (laid off on December 20, 1989) |
| Driscoll, Frank | President and CEO (from August 8, 1989) |
| Flower, Barry | President and CEO (to June, 1989) |
| Plumley, Kent | Secretary |
| Shepherd, John | Chairman/Director |
| Smith, Pat | Finance Director (replaced Dean) |

### *The Plessey Defendants*

*The Plessey Company plc:*

| | |
|---|---|
| Beard, Denise | Treasury Department: |
| | Group Banking Manager (to August 31, 1989); |
| | Assistant Treasurer (Sept. 1, 1989); |
| | (left Plessey November 3, 1989) |
| Finnis. A. G. | Group Taxation Manager |
| Dr. Gerdine, Philip V. | (a director, as of February, 1990); Co-managing Director of Plessey (Siemens representative) after GEC/Siemens takeover of Plessey |
| Huntbatch, Kenneth Bernard | Company Secretary and Director of Administration (to Jan. 3, 1989); |
| | Director of Administration (from Jan. 3, 1989) (Company Secretary until his resignation on June 29, 1990) (died in latter part of 1990) (a director) |
| Musgrave. Ian C. | Group Treasurer (previously Group Finance Director) resigned as Group Treasurer on August 31, 1989 |
| Noon, Anthony J. | Director of Legal and Contract Services |
| Sammon, Brendon P. (Binny) | Group Chief Accountant (to September 1990) |
| Thorn, Derek G. | Finance Director, Group Services (deceased- December, 1989) |
| Walls, Stephen R. | Managing Director (a director) (promoted from Finance Director in 1988) (resigned October 6, 1989) |

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

*Plessey Incorporated, White Plains, New York*

| | |
|---|---|
| Palazzi. J.L. | Finance Director |

*Plessey Electronic Systems Limited ("PESL")*

| | |
|---|---|
| Akerman, Andrew C. | Financial Analyst (to February, 1989) |
| Flower, Barry | Managing Director - International Defense (from July 1, 1989) |
| Justice, Colin J. | Finance Director (from Aug. 1, 1988) |

### *The Gec Defendants*

*The General Electric Company plc*

| | |
|---|---|
| Anderson, Ross K. | Treasurer |
| Bates, Malcolm | Deputy Managing Director/Director |
| MacBean, Ian | Director |
| Newlands, David | Finance Director/Director (from September 1989) |
| Robinson, Tony | Assistance Finance Director |
| Weinstock, Lord | Managing Director/Director |
| Weinstock, Simon | Commercial Director/Director |

*GEC Marconi*

| | |
|---|---|
| Alexander, Bill | Managing Director, GEC Avionics |
| MacBean, Ian | Managing Director, GEC Marconi |
| Rickard, David | Finance Director, GEC Marconi |

*Canadian Marconi*

| | |
|---|---|
| Simons, John | President |
| Stuurop, G. | Treasurer |

### *Siemens Aktiengesellschaft*

| | |
|---|---|
| Baumann, Dr. Karl | Executive Vice-President, Finance |
| Gerdine, Dr. Philip | Executive Director |
| Hafner, Andreas | Treasurer |
| Mackenrodt, Dr. Jochen | Vice-President, Central Finance, Foreign Affiliates |

**Appendix B**

**Corporate Structure**

Tabular or graphic material set at this point is not displayable.**Graphic 1**

**Appendix C**

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

**Leigh Loan Balances**

May 17, 1990

LEIGH BORROWINGS:

| MONTH | | B/A's | OVERDRAFT | TOTAL |
|---|---|---|---|---|
| January 1989 | | | | |
| | 1 | 10,600,000 | 12,517,600.37 | 23,117,600.37 |
| | 2 | 10,600,000 | 12,517,600.37 | 23,117,600.37 |
| | 3 | 10,600,000 | 12,176,688.72 | 22,776,688.72 |
| | 4 | 10,600,000 | 12,214,143.35 | 22,814,143.35 |
| | 5 | 10,600,000 | 12,333,052.16 | 22,933,052.16 |
| | 6 | 10,600,000 | 13,129,833.44 | 23,729,833.44 |
| | 7 | 10,600,000 | 13,129,833.44 | 23,729,833.44 |
| | 8 | 10,600,000 | 13,129,833.44 | 23,729,833.44 |
| | 9 | 10,600,000 | 13,146,357.80 | 23,746,357.80 |
| | 10 | 10,600,000 | 13,255,838.06 | 23,855,838.06 |
| R/O-11 | | 20,000,000 | 4,200,956.94 | 24,200,956.94 |
| | 12 | 20,000,000 | 4,274,752.88 | 24,274,752.88 |
| | 13 | 20,000,000 | 4,277,027.45 | 24,277,027.45 |
| | 14 | 20,000,000 | 4,277,027.45 | 24,277,027.45 |
| | 15 | 20,000,000 | 4,277,027.45 | 24,277,027.45 |
| | 16 | 20,000,000 | 4,513,489.16 | 24,513,489.16 |
| | 17 | 20,000,000 | 4,805,016.65 | 24,805,016.65 |
| | 18 | 20,000,000 | 4,955,113.19 | 24,955,113.19 |
| | 19 | 20,000,000 | 4,920,040.60 | 24,920,040.60 |
| | 20 | 20,000,000 | 5,175,640.37 | 25,175,640.37 |
| | 21 | 20,000,000 | 5,175,640.37 | 25,175,640.37 |
| | 22 | 20,000,000 | 5,175,640.37 | 25,175,640.37 |
| | 23 | 20,000,000 | 5,892,985.50 | 25,892,985.50 |
| | 24 | 20,000,000 | 5,989,040.15 | 25,989,040.15 |
| | 25 | 20,000,000 | 6,282,432.32 | 26,282,432.32 |
| | 26 | 20,000,000 | 6,878,134.17 | 26,878,134.17 |
| | 27 | 20,000,000 | 6,736,230.90 | 26,736,230.90 |
| | 28 | 20,000,000 | 6,736,230.90 | 26,736,230.90 |
| | 29 | 20,000,000 | 6,736,230.90 | 26,736,230.90 |
| | 30 | 20,000,000 | 6,898,160.20 | 26,898,160.20 |

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

|  |  |  |  |  |
|---|---|---|---|---|
|  | 31 | 20,000,000 | 7,021,523.63 | 27,021,523.63 |
| February 1989 |  |  |  |  |
|  | 1 | 20,000,000 | 7,126,693.17 | 27,126,693.17 |
|  | 2 | 20,000,000 | 7,413,772.56 | 27,413,772.56 |
|  | 3 | 20,000,000 | 8,203,459.85 | 28,203,459.85 |
|  | 4 | 20,000,000 | 8,203,459.85 | 28,203,459.85 |
|  | 5 | 20,000,000 | 8,203,459.85 | 28,203,459.85 |
|  | 6 | 20,000,000 | 8,290,740.86 | 28,290,740.86 |
|  | 7 | 20,000,000 | 8,328,058.19 | 28,328,058.19 |
|  | 8 | 20,000,000 | 8,289,384.74 | 28,289,384.74 |
|  | 9 | 20,000,000 | 8,426,878.83 | 28,426,878.83 |
|  | 10 | 20,000,000 | 8,457,334.03 | 28,457,334.03 |
|  | 11 | 20,000,000 | 8,457,334.03 | 28,457,334.03 |
|  | 12 | 20,000,000 | 8,457,334.03 | 28,457,334.03 |
|  | 13 | 20,000,000 | 9,421,372.38 | 29,421,372.38 |
|  | 14 | 20,000,000 | 9,666,167.87 | 29,666,167.87 |
| R/O-15 |  | 25,200,000 | 3,529,973.98 | 28,729,973.98 |
|  | 16 | 25,200,000 | 3,627,371.46 | 28,827,371.46 |
|  | 17 | 25,200,000 | 3,659,017.88 | 28,859,017.88 |
|  | 18 | 25,200,000 | 3,659,017.88 | 28,859,017.08 |
|  | 19 | 25,200,000 | 3,659,017.88 | 28,859,017.88 |
|  | 20 | 25,200,000 | 3,797,809.52 | 28,997,809.52 |
|  | 21 | 25,200,000 | 3,971,011.66 | 29,171,011.66 |
|  | 22 | 25,200,000 | 3,978,941.88 | 29,178,941.88 |
|  | 23 | 25,200,000 | 4,450,248.60 | 29,650,248.60 |
|  | 24 | 25,200,000 | 4,450,248.60 | 29,650,248.60 |
|  | 25 | 25,200,000 | 4,450,248.60 | 29,650,248.60 |
|  | 26 | 25,200,000 | 4,450,248.60 | 29,650,248.60 |
|  | 27 | 25,200,000 | 4,479,813.36 | 29,679,813.36 |
|  | 28 | 25,200,000 | 2,645,394.72 | 27,845,394.72 |
| March 1989 |  |  |  |  |
|  | 1 | 25,200,000 | 2,778,153.15 | 27,978,153.15 |
|  | 2 | 25,200,000 | 2,347,556.87 | 27,547,556.87 |
|  | 3 | 25,200,000 | 3,034,892.22 | 28,234,892.22 |
|  | 4 | 25,200,000 | 3,034,892.22 | 28,234,892.22 |
|  | 5 | 25,200,000 | 3,034,892.22 | 28,234,892.22 |
|  | 6 | 25,200,000 | 3,010,137.06 | 28,210,137.06 |

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

| | | | |
|---|---|---|---|
| 7 | 25,200,000 | 2,942,566.24 | 28,142,566.24 |
| 8 | 25,200,000 | 875,753.18 | 26,075,753.18 |
| 9 | 25,200,000 | 613,084.43 | 25,813,084.43 |
| 10 | 25,200,000 | 960,205.40 | 26,160,205.40 |
| 11 | 25,200,000 | 960,205.40 | 26,160,205.40 |
| 12 | 25,200,000 | 960,205.40 | 26,160,205.40 |
| 13 | 25,200,000 | 967,037.38 | 26,167,037.38 |
| 14 | 25,200,000 | 1,019,345.36 | 26,219,345.36 |
| 15 | 25,200,000 | 1,385,809.09 | 26,585,809.09 |
| 16 | 25,200,000 | 1,393,298.34 | 26,593,298.34 |
| 17 | 25,200,000 | 1,258,199.42 | 26,458,199.42 |
| 18 | 25,200,000 | 1,258,199.42 | 26,458,199.42 |
| 19 | 25,200,000 | 1,258,199.42 | 26,458,199.42 |
| 20 | 25,200,000 | 2,185,732.95 | 27,385,732.95 |
| R/O-21 | 25,300,000 | 2,459,049.45 | 27,759,049.45 |
| 22 | 25,300,000 | 1,654,251.16 | 26,954,251.16 |
| 23 | 25,300,000 | 2,067,089.24 | 27,367,089.24 |
| 24 | 25,300,000 | 2,067,089.24 | 27,367,089.24 |
| 25 | 25,300,000 | 2,067,089.24 | 27,367,089.24 |
| 26 | 25,300,000 | 2,067,089.24 | 27,367,089.24 |
| 27 | 25,300,000 | 2,147,265.65 | 27,447,265.85 |
| 28 | 25,300,000 | 2,106,861.67 | 27,406,861.67 |
| 29 | 25,300,000 | 2,113,873.01 | 27,413,873.01 |
| 30 | 25,300,000 | 1,881,398.58 | 27,181,398.58 |
| 31 | 25,300,000 | 2,438,391.74 | 27,738,391.74 |
| April 1989 | | | |
| 1 | 25,300,000 | 2,438,391.74 | 27,738,391.74 |
| 2 | 25,300,000 | 2,438,391.74 | 27,738,391.74 |
| 3 | 25,300,000 | 2,442,323.39 | 27,742,323.39 |
| 4 | 25,300,000 | 2,536,700.93 | 27,836,700.93 |
| 5 | 25,300,000 | 2,296,313.54 | 27,596,313.54 |
| 6 | 25,300,000 | 2,384,335.89 | 27,684,335.89 |
| 7 | 25,300,000 | 2,587,594.42 | 27,887,594.42 |
| 8 | 25,300,000 | 2,587,594.42 | 27,887,594.42 |
| 9 | 25,300,000 | 2,587,594.42 | 27,887,594.42 |
| 10 | 25,300,000 | 3,512,317.61 | 28,812,317.61 |
| 11 | 25,300,000 | 3,732,516.46 | 29,032,516.46 |

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

|           |    |            |              |               |
| --------- | -- | ---------- | ------------ | ------------- |
|           | 12 | 25,300,000 | 3,761,812.59 | 29,061,812.59 |
|           | 13 | 25,300,000 | 3,773,262.71 | 29,073,262.71 |
|           | 14 | 25,300,000 | 4,534,060.18 | 29,834,060.18 |
|           | 15 | 25,300,000 | 4,534,060.18 | 29,834,060.18 |
|           | 16 | 25,300,000 | 4,534,060.18 | 29,834,060.18 |
|           | 17 | 25,300,000 | 4,685,046.55 | 29,985,046.55 |
|           | 18 | 25,300,000 | 4,729,857.98 | 30,029,857.98 |
|           | 19 | 25,300,000 | 4,828,939.81 | 30,128,939.81 |
|           | 20 | 25,300,000 | 2,782,380.50 | 28,082,380.50 |
|           | 21 | 25,300,000 | 2,899,300.79 | 28,199,300.79 |
|           | 22 | 25,300,000 | 2,899,300.79 | 28,199,300.79 |
|           | 23 | 25,300,000 | 2,899,300.79 | 28,199,300.79 |
|           | 24 | 25,300,000 | 2,914,336.09 | 28,214,336.09 |
| R/O-25    |    | 30,000,000 | 615,774.45   | 30,615,774.45 |
|           | 26 | 30,000,000 | 595,369.26   | 30,595,369.26 |
|           | 27 | 30,000,000 | 1,611,577.04 | 31,611,577.04 |
|           | 28 | 30,000,000 | 930,467.56   | 30,930,467.56 |
|           | 29 | 30,000,000 | 930,467.56   | 30,930,467.56 |
|           | 30 | 30,000,000 | 930,467.56   | 30,930,467.56 |
| May 1989  |    |            |              |               |
|           | 1  | 30,000,000 | 572,124.83   | 30,572,124.83 |
|           | 2  | 30,000,000 | 312,673.05   | 30,312,673.05 |
|           | 3  | 30,000,000 | 332,028.81   | 30,332,028.81 |
|           | 4  | 30,000,000 | 316,847.53   | 30,316,847.53 |
|           | 5  | 30,000,000 | 161,261.05   | 30,161,261.05 |
|           | 6  | 30,000,000 | 161,261.05   | 30,161,261.05 |
|           | 7  | 30,000,000 | 161,261.05   | 30,161,261.05 |
|           | 8  | 30,000,000 | 446,373.25   | 30,446,373.25 |
|           | 9  | 30,000,000 | 330,426.43   | 30,330,426.43 |
|           | 10 | 30,000,000 | 3,369.55     | 30,003,369.55 |
|           | 11 | 30,000,000 | 165,814.06   | 30,165,814.06 |
|           | 12 | 30,000,000 | 1,089,795.02 | 31,089,795.02 |
|           | 13 | 30,000,000 | 1,089,795.02 | 31,089,795.02 |
|           | 14 | 30,000,000 | 1,089,795.02 | 31,089,795.02 |
|           | 15 | 30,000,000 | 1,314,848.53 | 31,314,848.53 |
|           | 16 | 30,000,000 | 1,464,716.98 | 31,464,716.98 |
|           | 17 | 30,000,000 | 1,631,817.02 | 31,631,817.02 |

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

|  |  |  |  |
|---|---|---|---|
| 18 | 30,000,000 | 1,221,046.01 | 31,221,046.01 |
| 19 | 30,000,000 | 1,277,309.62 | 31,277,309.62 |
| 20 | 30,000,000 | 1,277,309.62 | 31,277,309.62 |
| 21 | 30,000,000 | 1,277,309.62 | 31,277,309.62 |
| 22 | 30,000,000 | 1,277,309.62 | 31,277,309.62 |
| 23 | 30,000,000 | 1,862,398.81 | 31,862,398.81 |
| 24 | 30,000,000 | 1,984,855.44 | 31,984,855.44 |
| 25 | 30,000,000 | 2,450,199.76 | 32,450,199.76 |
| 26 | 30,000,000 | 3,140,392.90 | 33,140,392.90 |
| 27 | 30,000,000 | 3,140,392.90 | 33,140,392.90 |
| 28 | 30,000,000 | 3,140,392.90 | 33,140,392.90 |
| 29 | 30,000,000 | 3,169,024.65 | 33,169,024.65 |
| 30 | 30,000,000 | 3,272,847.14 | 33,272,847.14 |
| 31 | 30,000,000 | 3,421,007.24 | 33,421,007.24 |
| June 1989 |  |  |  |
| 1 | 30,000,000 | 3,807,906.22 | 33,807,906.22 |
| 2 | 30,000,000 | 3,494,903.39 | 33,494,903.39 |
| 3 | 30,000,000 | 3,494,903.39 | 33,494,903.39 |
| 4 | 30,000,000 | 3,494,903.39 | 33,494,903.39 |
| 5 | 30,000,000 | 4,183,246.54 | 34,183,246.54 |
| 6 | 30,000,000 | 4,221,107.60 | 34,221,107.60 |
| 7 | 30,000,000 | 4,286,095.12 | 34,286,095.12 |
| 8 | 30,000,000 | 4,276,486.77 | 34,276,486.77 |
| 9 | 30,000,000 | 3,927,642.68 | 33,927,642.68 |
| 10 | 30,000,000 | 3,927,642.66 | 33,927,642.68 |
| 11 | 30,000,000 | 3,927,642.68 | 33,927,642.68 |
| 12 | 30,000,000 | 3,869,384.91 | 33,869,384.91 |
| 13 | 30,000,000 | 3,870,629.94 | 33,870,629.94 |
| 14 | 30,000,000 | 3,906,792.83 | 33,906,792.83 |
| 15 | 30,000,000 | 3,901,483.73 | 33,901,483.73 |
| 16 | 30,000,000 | 3,949,557.44 | 33,949,557.44 |
| 17 | 30,000,000 | 3,949,557.44 | 33,949,557.44 |
| 18 | 30,000,000 | 3,949,557.44 | 33,949,557.44 |
| 19 | 30,000,000 | 1,326,243.09 | 31,326,243.09 |
| 20 | 30,000,000 | 1,792,483.59 | 31,792,483.59 |
| 21 | 30,000,000 | 1,940,661.74 | 31,940,661.74 |
| 22 | 30,000,000 | 114,015.07 | 30,114,015.07 |

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

| | | | |
|---|---|---|---|
| 23 | 30,000,000 | 1,362,525.52 | 31,362,525.52 |
| 24 | 30,000,000 | 1,362,525.52 | 31,362,525.52 |
| 25 | 30,000,000 | 1,362,525.52 | 31,362,525.52 |
| 26 | 30,000,000 | 1,699,284.94 | 31,699,264.94 |
| 27 | 30,000,000 | 1,740,425.93 | 31,740,425.93 |
| 28 | 30,000,000 | 1,619,155.96 | 31,619,155.96 |
| 29 | 30,000,000 | 1,645,231.57 | 31,645,231.57 |
| R/O-30 | 30,000,000 | 1,659,173.91 | 31,659,173.91 |
| July 1989 | | | |
| 1 | 30,700,000 | 1,659,173.91 | 32,359,173.91 |
| 2 | 30,700,000 | 1,659,173.91 | 32,359,173.91 |
| 3 | 30,700,000 | 1,659,173.91 | 32,359,173.91 |
| 4 | 30,700,000 | 904,935.09 | 31,604,935.09 |
| 5 | 30,700,000 | 1,132,744.32 | 31,832,744.32 |
| 6 | 30,700,000 | 1,933,687.99 | 32,633,687.99 |
| 7 | 30,700,000 | 2,765,740.22 | 33,465,740.22 |
| 8 | 30,700,000 | 2,765,740.22 | 33,465,740.22 |
| 9 | 30,700,000 | 2,765,740.22 | 33,465,740.22 |
| 10 | 30,700,000 | 3,362,740.73 | 34,062,740.73 |
| 11 | 30,700,000 | 3,219,776.51 | 33,919,776.51 |
| 12 | 30,700,000 | 3,210,332.88 | 33,910,332.88 |
| 13 | 30,700,000 | 3,481,122.61 | 34,181,122.61 |
| 14 | 30,700,000 | 3,550,969.80 | 34,250,969.80 |
| 15 | 30,700,000 | 3,550,969.80 | 34,250,969.80 |
| 16 | 30,700,000 | 3,550,869.80 | 34,250,969.80 |
| 17 | 30,700,000 | 2,887,189.99 | 33,587,189.99 |
| 18 | 30,700,000 | 2,920,771.73 | 33,620,771.73 |
| 19 | 30,700,000 | 3,013,625.52 | 33,713,625.52 |
| 20 | 30,700,000 | 3,712,734.07 | 34,412,734.07 |
| 21 | 30,700,000 | 3,712,734.07 | 34,412,734.07 |
| 22 | 30,700,000 | 3,712,734.07 | 34,412,734.07 |
| 23 | 30,700,000 | 3,712,734.07 | 34,412,734.07 |
| 24 | 30,700,000 | 4,588,772.15 | 35,286,772.15 |
| 25 | 30,700,000 | 5,023,958.06 | 35,723,958.06 |
| 26 | 30,700,000 | 4,762,514.74 | 35,462,514.74 |
| 27 | 30,700,000 | 4,828,507.48 | 35,528,507.48 |
| 28 | 30,700,000 | 4,659,731.62 | 35,359,731.62 |

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

| | | | |
|---|---|---|---|
| 29 | 30,700,000 | 4,659,731.62 | 35,359,731.62 |
| 30 | 30,700,000 | 4,659,731.62 | 35,359,731.62 |
| 31 | 30,700,000 | 4,280,482.57 | 34,980,482.57 |
| August 1989 | | | |
| 1 | 30,700,000 | 6,059,098.65 | 36,759,098.65 |
| R/O- 2 | 30,700,000 | 6,004,154.56 | 36,704,154.56 |
| 3 | 30,700,000 | 2,375,802.44 | 33,075,802.44 |
| 4 | 30,700,000 | 3,047,364.30 | 33,747,364.30 |
| 5 | 30,700,000 | 3,047,364.30 | 33,747,364.30 |
| 6 | 30,700,000 | 3,047,364.30 | 33,747,364.30 |
| 7 | 30,700,000 | 3,104,314.68 | 33,804,314.68 |
| 8 | 30,700,000 | 3,164,696.67 | 33,864,896.67 |
| 9 | 30,700,000 | 3,000,534.07 | 33,700,534.07 |
| 10 | 30,700,000 | 3,365,019.83 | 34,065,019.83 |
| 11 | 30,700,000 | 3,313,923.56 | 34,013,923.56 |
| 12 | 30,700,000 | 3,313,923.56 | 34,013,923.56 |
| 13 | 30,700,000 | 3,313,923.56 | 34,013,923.56 |
| 14 | 30,700,000 | 3,474,923.56 | 34,174,923.56 |
| 15 | 30,700,000 | 3,561,681.48 | 34,261,681.48 |
| 16 | 30,700,000 | 3,751,602.27 | 34,451,602.27 |
| 17 | 30,700,000 | 3,780,700.45 | 34,480,700.45 |
| 18 | 30,700,000 | 4,253,846.23 | 34,953,846.23 |
| 19 | 30,700,000 | 4,253,846.23 | 34,953,846.23 |
| 20 | 30,700,000 | 4,253,846.23 | 34,953,846.23 |
| 21 | 30,700,000 | 4,392,378.08 | 35,092,378.08 |
| 22 | 30,700,000 | 4,904,112.81 | 35,604,112.81 |
| 23 | 30,700,000 | 5,006,737.32 | 35,706,737.32 |
| 24 | 30,700,000 | 5,308,323.67 | 36,008,323.67 |
| 25 | 30,700,000 | 5,746,268.34 | 36,446,268.34 |
| 26 | 30,700,000 | 5,746,268.34 | 36,446,268.34 |
| 27 | 30,700,000 | 5,746,268.34 | 36,446,268.34 |
| 28 | 30,700,000 | 4,364,417.93 | 35,064,417.93 |
| 29 | 30,700,000 | 4,228,592.01 | 34,928,592.01 |
| 30 | 30,700,000 | 4,306,706.93 | 35,006,706.93 |
| 31 | 30,700,000 | 3,184,768.20 | 33,884,768.20 |
| September 1989 | | | |
| 1 | 30,700,000 | 3,184,768.20 | 33,884,768.20 |

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

| | | | |
|---|---|---|---|
| 2 | 30,700,000 | 4,050,491.60 | 34,750,491.60 |
| 3 | 30,700,000 | 4,050,491.60 | 34,750,491.60 |
| 4 | 30,700,000 | 4,050,491.60 | 34,750,491.60 |
| R/O- 5 | 30,700,000 | 4,210,666.17 | 34,910,666.17 |
| 6 | 30,700,000 | 4,312,993.41 | 35,012,993.41 |
| R/O- 7 | 30,700,000 | 4,312,993.41 | 35,012,993.41 |
| 8 | 30,700,000 | 4,750,775.23 | 35,450,775.23 |
| 9 | 30,700,000 | 4,750,775.23 | 35,450,775.23 |
| 10 | 30,700,000 | 4,750,775.23 | 35,450,775.23 |
| 11 | 30,700,000 | 3,735,418.60 | 34,435,418.60 |
| R/O-12 | 30,700,000 | 3,841,093.34 | 34,541,093.34 |
| 13 | 30,700,000 | 4,418,509.99 | 35,118,509.99 |
| R/O-14 | 30,700,000 | 4,478,971.44 | 35,178,971.44 |
| 15 | 30,700,000 | 5,459,126.43 | 36,159,126.43 |
| 16 | 30,700,000 | 5,459,126.43 | 36,159,126.43 |
| 17 | 30,700,000 | 5,459,126.43 | 36,159,126.43 |
| 18 | 30,700,000 | 5,515,347.94 | 36,215,347.94 |
| R/O-19 | 30,700,000 | 4,152,908.82 | 34,852,908.82 |
| 20 | 30,700,000 | 4,307,175.52 | 35,007,175.52 |
| R/O-21 | 31,000,000 | 4,023,254.92 | 35,023,254.92 |
| 22 | 31,000,000 | 4,542,997.42 | 35,542,997.42 |
| 23 | 31,000,000 | 4,542,997.42 | 35,542,997.42 |
| 24 | 31,000,000 | 4,542,997.42 | 35,542,997.42 |
| 25 | 31,000,000 | 5,139,590.56 | 36,139,590.56 |
| 26 | 31,000,000 | 5,170,884.55 | 36,170,884.55 |
| 27 | 31,000,000 | 5,265,858.00 | 36,265,858.00 |
| 28 | 31,000,000 | 5,109,688.79 | 36,109,688.79 |
| R/O-29 | 31,000,000 | 4,927,237.95 | 35,927,237.95 |
| 30 | 31,000,000 | 4,927,237.95 | 35,927,237.95 |
| October 1989 | | | |
| 1 | 31,000,000 | 4,927,237.95 | 35,927,237.95 |
| 2 | 31,000,000 | 5,005,795.86 | 36,005,795.86 |
| 3 | 31,000,000 | 5,064,463.04 | 36,064,463.04 |
| 4 | 31,000,000 | 5,108,529.51 | 36,108,529.51 |
| 5 | 31,000,000 | 3,147,895.01 | 34,147,895.01 |
| R/O- 6 | 30,000,000 | 4,446,893.01 | 34,446,893.01 |
| 7 | 30,000,000 | 4,446,893.01 | 34,446,893.01 |

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

|  |  |  |  |
|---|---|---|---|
| 8 | 30,000,000 | 4,446,893.01 | 34,446,893.01 |
| 9 | 30,000,000 | 4,446,893.01 | 34,446,893.01 |
| 10 | 30,000,000 | 5,071,166.84 | 35,071,186.84 |
| 11 | 30,000,000 | 5,032,946.25 | 35,032,946.25 |
| 12 | 30,000,000 | 5,025,761.02 | 35,025,761.02 |
| 13 | 30,000,000 | 5,911,510.55 | 35,911,510.55 |
| 14 | 30,000,000 | 5,911,510.55 | 35,911,510.55 |
| 15 | 30,000,000 | 5,911,510.55 | 35,911,510.55 |
| 16 | 30,000,000 | 6,148,109.84 | 36,148,109.84 |
| 17 | 30,000,000 | 6,272,575.37 | 36,272,575.37 |
| 18 | 30,000,000 | 6,475,771.31 | 36,475,771.31 |
| 19 | 30,000,000 | 6,520,320.96 | 36,520,320.96 |
| R/O-20 | 30,000,000 | 7,249,339.24 | 37,249,339.24 |
| 21 | 30,000,000 | 7,249,339.24 | 37,249,339.24 |
| 22 | 30,000,000 | 7,249,339.24 | 37,249,339.24 |
| 23 | 30,000,000 | 6,937,449.81 | 36,937,449.81 |
| 24 | 30,000,000 | 6,756,758.68 | 36,756,758.68 |
| 25 | 30,000,000 | 7,246,658.57 | 37,246,658.57 |
| 26 | 30,000,000 | 7,177,329.10 | 37,177,329.10 |
| R/O-27 | 30,000,000 | 9,243,466.88 | 39,243,466.88 |
| 28 | 30,000,000 | 9,243,466.88 | 39,243,466.88 |
| 29 | 30,000,000 | 9,243,466.88 | 39,243,466.88 |
| 30 | 30,000,000 | 9,192,083.03 | 39,192,083.03 |
| 31 | 30,000,000 | 9,111,727.71 | 39,111,727.71 |
| November 1989 |  |  |  |
| 1 | 30,000,000 | 9,177,322.75 | 39,177,322.75 |
| 2 | 30,000,000 | 9,093,386.46 | 39,093,386.46 |
| 3 | 30,000,000 | 6,604,835.68 | 36,604,835.88 |
| 4 | 30,000,000 | 6,604,835.88 | 36,604,835.88 |
| 5 | 30,000,000 | 6,604,835.88 | 36,604,835.88 |
| 6 | 30,000,000 | 6,770,013.70 | 36,770,013.70 |
| 7 | 30,000,000 | 6,794,751.71 | 36,794,751.71 |
| 8 | 30,000,000 | 6,910,148.70 | 36,910,148.70 |
| 9 | 30,000,000 | 6,983,774.72 | 36,983,774.72 |
| 10 | 30,000,000 | 7,281,922.99 | 37,281,922.99 |
| 11 | 30,000,000 | 7,281,922.99 | 37,281,922.99 |
| 12 | 30,000,000 | 7,281,922.99 | 37,281,922.99 |

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

| | | | |
|---|---|---|---|
| 13 | 30,000,000 | 7,281,922.99 | 37,281,922.99 |
| 14 | 30,000,000 | 7,357,647.97 | 37,357,647.97 |
| 15 | 30,000,000 | 7,532,161.84 | 37,532,161.84 |
| 16 | 30,000,000 | 7,554,032.80 | 37,554,032.80 |
| 17 | 30,000,000 | 7,569,149.60 | 37,569,149.60 |
| 18 | 30,000,000 | 7,569,149.60 | 37,569,149.60 |
| 19 | 30,000,000 | 7,569,149.60 | 37,569,149.60 |
| 20 | 30,000,000 | 7,808,426.72 | 37,808,426.72 |
| 21 | 30,000,000 | 7,757,066.84 | 37,757,066.84 |
| 22 | 30,000,000 | 7,915,046.19 | 37,915,046.19 |
| 23 | 30,000,000 | 7,940,170.04 | 37,940,170.04 |
| 24 | 30,000,000 | 8,651,457.84 | 38,651,457.84 |
| 25 | 30,000,000 | 8,651,457.84 | 38,651,457.84 |
| 26 | 30,000,000 | 8,651,457.84 | 38,651,457.84 |
| 27 | 30,000,000 | 8,087,463.15 | 38,087,463.15 |
| 28 | 30,000,000 | 8,071,525.94 | 38,071,525.94 |
| 29 | 30,000,000 | 8,192,922.73 | 38,192,922.73 |
| 30 | 30,000,000 | 8,171,018.13 | 38,171,018.13 |
| December 1989 | | | |
| 1 | 30,000,000 | 8,172,202.80 | 38,172,202.80 |
| 2 | 30,000,000 | 8,172,202.80 | 38,172,202.80 |
| 3 | 30,000,000 | 8,172,202.80 | 38,172,202.80 |
| 4 | 30,000,000 | 8,317,144.93 | 38,317,144.93 |
| 5 | 30,000,000 | 8,398,592.62 | 38,398,592.62 |
| 6 | 30,000,000 | 8,482,020.38 | 38,482,020.38 |
| 7 | 30,000,000 | 8,501,066.61 | 38,501,066.61 |
| 8 | 30,000,000 | 9,293,161.61 | 39,293,161.61 |
| 9 | 30,000,000 | 9,293,161.61 | 39,293,161.61 |
| 10 | 30,000,000 | 9,293,161.61 | 39,293,161.61 |
| 11 | 30,000,000 | 9,419,747.97 | 39,419,747.97 |
| 12 | 30,000,000 | 9,353,653.80 | 39,353,653.80 |
| 13 | 30,000,000 | 9,401,980.70 | 39,401,980.70 |
| 14 | 30,000,000 | 9,482,030.69 | 39,482,030.69 |
| 15 | 30,000,000 | 9,672,803.33 | 39,672,803.33 |
| 16 | 30,000,000 | 9,672,803.33 | 39,672,603.33 |
| 17 | 30,000,000 | 9,672,803.33 | 39,672,803.33 |
| 18 | 30,000,000 | 9,399,857.48 | 39,399,857.48 |

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

| | | | |
|---|---|---|---|
| 19 | 30,000,000 | 9,527,175.77 | 39,527,175.77 |
| 20 | 30,000,000 | 9,552,579.42 | 39,552,579.42 |
| 21 | 30,000,000 | 9,420,768.26 | 39,420,768.26 |
| 22 | 30,000,000 | 10,508,266.94 | 40,508,266.94 |
| 23 | 30,000,000 | 10,508,266.94 | 40,508,266.94 |
| 24 | 30,000,000 | 10,508,266.94 | 40,508,266.94 |
| 25 | 30,000,000 | 10,508,266.94 | 40,508,266.94 |
| 26 | 30,000,000 | 10,508,266.94 | 40,508,266.94 |
| 27 | 30,000,000 | 10,635,970.30 | 40,635,970.30 |
| 28 | 30,000,000 | 10,697,291.73 | 40,697,291.73 |
| 29 | 30,000,000 | 10,766,437.10 | 40,766,437.10 |
| 30 | 30,000,000 | 10,766,437.10 | 40,766,437.10 |
| 31 | 30,000,000 | 10,766,437.10 | 40,766,437.10 |

January 1990

| | | | |
|---|---|---|---|
| 1 | 30,000,000 | 10,766,437.10 | 40,766,437.10 |
| 2 | 30,000,000 | 10,754,186.13 | 40,754,186.13 |
| 3 | 30,000,000 | 11,481,214.94 | 41,481,214.94 |
| 4 | 30,000,000 | 9,818,104.83 | 39,818,104.83 |
| 5 | 30,000,000 | 8,446,340.99 | 38,446,340.99 |
| 6 | 30,000,000 | 8,446,340.99 | 38,446,340.99 |
| 7 | 30,000,000 | 8,446,340.99 | 38,446,340.99 |
| 8 | 30,000,000 | 8,519,719.51 | 38,519,719.51 |
| 9 | 30,000,000 | 8,793,567.82 | 38,793,567.82 |
| 10 | 30,000,000 | 9,391,486.94 | 39,391,486.94 |
| 11 | 30,000,000 | 4,519,480.36 | 34,519,480.36 |
| 12 | 30,000,000 | 4,636,852.71 | 34,519,852.71 |
| 13 | 30,000,000 | 4,636,852.71 | 34,519,852.71 |
| 14 | 30,000,000 | 4,636,852.71 | 34,519,852.71 |
| 15 | 30,000,000 | 4,859,292.27 | 34,859,292.27 |
| 16 | 30,000,000 | 1,646,287.05 | 31,646,287.05 |
| 17 | 30,000,000 | 1,760,211.90 | 31,760,211.90 |
| 18 | 30,000,000 | 1,787,825.23 | 31,787,825.23 |
| 19 | 30,000,000 | 2,698,729.75 | 32,698,729.75 |
| 20 | 30,000,000 | 2,698,729.75 | 32,698,729.75 |
| 21 | 30,000,000 | 2,698,729.75 | 32,698,729.75 |
| 22 | 30,000,000 | 2,934,734.46 | 32,934,734.46 |
| 23 | 30,000,000 | 3,207,365.71 | 33,207,365.71 |

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

| | | | |
|---|---|---|---|
| 24 | 30,000,000 | 3,906,014.36 | 33,906,014.36 |
| 25 | 30,000,000 | 3,976,907.17 | 33,976,907.17 |
| 26 | 30,000,000 | 3,165,852.02 | 33,165,852.02 |
| 27 | 30,000,000 | 3,165,852.02 | 33,165,852.02 |
| 28 | 30,000,000 | 3,165,852.02 | 33,165,852.02 |
| R/O-29 | 30,000,000 | 3,377,469.60 | 33,377,469.60 |
| 30 | 30,000,000 | 3,487,811.03 | 33,487,811.03 |
| 31 | 30,000,000 | 3,604,761.96 | 33,604,761.96 |
| February 1990 | | | |
| 1 | 30,000,000 | 3,783,285.08 | 33,783,285.08 |
| 2 | 30,000,000 | 4,579,377.41 | 34,579,377.41 |
| 3 | 30,000,000 | 4,579,377.41 | 34,579,377.41 |
| 4 | 30,000,000 | 4,579,377.41 | 34,579,377.41 |
| 5 | 30,000,000 | 4,494,132.41 | 34,494,132.41 |
| 6 | 30,000,000 | 4,132,872.96 | 34,132,872.96 |
| 7 | 30,000,000 | 4,507,118.28 | 34,507,118.28 |
| 8 | 30,000,000 | 4,608,245.77 | 34,608,245.77 |
| 9 | 30,000,000 | 4,806,967.72 | 34,806,967.72 |
| 10 | 30,000,000 | 4,806,967.72 | 34,806,967.72 |
| 11 | 30,000,000 | 4,806,967.72 | 34,806,967.72 |
| 12 | 30,000,000 | 4,781,593.95 | 34,781,593.95 |
| 13 | 30,000,000 | 4,774,292.88 | 34,774,292.88 |
| 14 | 30,000,000 | 4,775,563.95 | 34,775,563.95 |
| 15 | 30,000,000 | 4,907,788.81 | 34,907,788.81 |
| 16 | 30,000,000 | 5,600,621.06 | 35,600,621.06 |
| 17 | 30,000,000 | 5,600,621.06 | 35,600,621.06 |
| 18 | 30,000,000 | 5,600,621.06 | 35,600,621.06 |
| 19 | 30,000,000 | 5,821,451.91 | 35,821,451.91 |
| 20 | 30,000,000 | 5,982,391.96 | 35,982,391.96 |
| 21 | 30,000,000 | 6,430,392.55 | 36,430,392.55 |
| 22 | 30,000,000 | 6,482,251.92 | 36,482,251.92 |
| 23 | 30,000,000 | 6,490,160.60 | 36,490,160.60 |
| 24 | 30,000,000 | 6,490,160.60 | 36,490,160.60 |
| 25 | 30,000,000 | 6,490,160.60 | 36,490,160.60 |
| 26 | 30,000,000 | 6,546,172.41 | 36,546,172.41 |
| 27 | 30,000,000 | 7,070,969.01 | 37,070,969.01 |
| 28 | 30,000,000 | 7,179,650.03 | 37,179,650.03 |

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1998 CarswellOnt 2565, 40 B.L.R. (2d) 1, [1998] O.J. No. 2637, 81 A.C.W.S. (3d) 117, 63 O.T.C. 1

March 1990

|  | | | | |
|---|---|---|---|---|
| | 1 | 30,000,000 | 7,161,620.64 | 37,161,620.64 |
| | 2 | 30,000,000 | 7,297,703.11 | 37,297,703.11 |
| | 3 | 30,000,000 | 7,297,703.11 | 37,297,703.11 |
| | 4 | 30,000,000 | 7,297,703.11 | 37,297,703.11 |
| R/O- 5 | | 30,000,000 | 7,822,176.33 | 37,822,176.33 |
| | 6 | 30,000,000 | 7,941,922.94 | 37,941,922.94 |
| | 7 | 30,000,000 | 8,286,889.99 | 38,286,889.99 |
| | 8 | 30,000,000 | 8,480,590.42 | 38,480,590.42 |
| | 9 | 30,000,000 | 8,567,789.11 | 38,567,789.11 |
| | 10 | 30,000,000 | 8,567,789.11 | 38,567,789.11 |
| | 11 | 30,000,000 | 8,567,789.11 | 38,567,789.11 |
| | 12 | 30,000,000 | 8,709,952.06 | 38,709,952.06 |
| | 13 | 30,000,000 | 8,537,558.70 | 38,537,558.70 |
| | 14 | 30,000,000 | 8,712,265.42 | 38,712,265.42 |
| | 15 | 30,000,000 | 8,542,273.30 | 38,542,273.30 |
| | 16 | 30,000,000 | 9,374,689.38 | 38,374,689.38 |
| | 17 | 30,000,000 | 9,374,689.38 | 38,374,689.38 |
| | 18 | 30,000,000 | 9,374,689.38 | 38,374,689.38 |
| | 19 | 30,000,000 | 9,443,816.07 | 39,443,816.07 |
| | 20 | 30,000,000 | 9,565,672.22 | 39,565,672.22 |
| | 21 | 30,000,000 | 9,926,127.87 | 39,926,127.87 |
| | 22 | 30,000,000 | 10,210,851.53 | 40,210,851.53 |
| | 23 | 30,000,000 | 10,204,423.29 | 40,204,423.29 |
| | 24 | 30,000,000 | 10,204,423.29 | 40,204,423.29 |
| | 25 | 30,000,000 | 10,204,423.29 | 40,204,423.29 |
| | 26 | 30,000,000 | 10,216,162.75 | 40,216,162.75 |
| | 27 | 30,000,000 | 10,425,698.00 | 40,425,698.00 |
| | 28 | 30,000,000 | 10,409,060.50 | 40,409,060.50 |
| | 29 | 30,000,000 | 10,482,581.14 | 40,482,581.14 |
| | 30 | 30,000,000 | 10,489,427.09 | 40,489,427.09 |

FN* Additional reasons at (October 26, 1998), Doc. 51353/90, B195/94, 98-BK001066 (Ont. Gen. Div.).

FN** A corrigendum delivered by the court on September 3, 1998 has been incorporated herein.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

TAB 150

1999 CarswellOnt 2812, 124 O.A.C. 87, 45 O.R. (3d) 417, 178 D.L.R. (4th) 634, 50 B.L.R. (2d) 64, [1999] O.J. No. 3290

1999 CarswellOnt 2812, 124 O.A.C. 87, 45 O.R. (3d) 417, 178 D.L.R. (4th) 634, 50 B.L.R. (2d) 64, [1999] O.J. No. 3290

Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)

The Toronto-Dominion Bank, Plaintiff/Appellant and Peat Marwick Thorne Inc. in its capacity as Trustee of the Estate of Leigh Instruments Limited, a bankrupt; The Plessey Company plc; Gec Siemens plc; The General Electric Company plc, Defendants/Respondents

Ontario Court of Appeal

Doherty, Austin, Sharpe JJ.A.

Heard: August 30 and 31, 1999
Judgment: September 13, 1999
Docket: CA C30288

© Thomson Reuters Canada Limited or its Licensors (excluding individual court documents). All rights reserved.

Proceedings: affirming (1998), 40 B.L.R. (2d) 1 (Ont. Gen. Div. [Commercial List]); additional reasons at (October 26, 1998), Doc. 51353/90, B195/94, 98-BK001066 (Ont. Gen. Div. [Commercial List]); and affirming (October 26, 1998), Doc. 51353/90, B195/94, 98-BK001066 (Ont. Gen. Div. [Commercial List])

Counsel: *Bryan Finlay, Q.C.* , *John A. Campion* , *Peter A. Downard* and *Paul F. Monahan* , for the appellant.

*Earl A. Cherniak, Q.C.* , *Robert J. Morris* , *Susan B. Wortzman* and *Lisa C. Munro* , for the respondents, Plessey.

*Peter F.C. Howard* and *Adrian C. Lang* , for the respondents, GEC.

Subject: Contracts; Insolvency; Torts; Corporate and Commercial; Civil Practice and Procedure

Banking and banks --- Loans and discounts — General

Bank opened line of credit for subsidiary company of parent company — Parent company did not guarantee loan, but gave bank five comfort letters — Subsidiary borrowed $40,500,000 from bank before going bankrupt — Parent company was taken over by corporation — Trial judge dismissed bank's action against parent company, corporation and subsidiary to recover loan — Trial judge found bank failed to establish negligent misrepresentation by parent company — Trial judge found parent company represented that subsidiaries managed own affairs — Bank appealed — Appeal dismissed — Bank knew that comfort letters were not security and that commercial value of letter depended on relationship between bank and parent — Comfort letters avoided suggestion of legal responsibility of parent company for loans — Trial judge's interpretation of comfort letters did

1999 CarswellOnt 2812, 124 O.A.C. 87, 45 O.R. (3d) 417, 178 D.L.R. (4th) 634, 50 B.L.R. (2d) 64, [1999] O.J. No. 3290

not render it valueless and did not yield commercial absurdity.

Fraud and misrepresentation --- Fraudulent misrepresentation — Specific elements — Recklessness of truth or falsity

Bank opened line of credit for subsidiary company of parent company — Parent company did not guarantee loan, but gave bank comfort letters — Subsidiary borrowed $40,500,000 from bank before going bankrupt — Parent company was taken over by corporation — Trial judge dismissed bank's action against parent company, corporation and subsidiary to recover loan — Trial judge found that bank failed to establish misrepresentation by parent company — Trial judge found that parent company represented policy to bank that subsidiaries managed own affairs — Bank appealed — Appeal dismissed — Parent company had policy in operation throughout relevant time — Bank knew comfort letters were not security and parent company did not provide guarantee of loan — Language of letters did not contain material misrepresentation — Bank could not reasonably rely on any representation in letters.

Fraud and misrepresentation --- Negligent misrepresentation (Hedley Byrne principle) — Detrimental reliance

Bank opened line of credit for subsidiary company of parent company — Parent company did not guarantee loan, but gave bank comfort letters — Subsidiary borrowed $40,500,000 from bank before going bankrupt — Parent company was taken over by corporation — Trial judge dismissed bank's action against parent company, corporation and subsidiary to recover loan — Trial judge found that bank failed to establish negligent misrepresentation by parent company — Trial judge found that parent company had policy that subsidiaries managed own affairs — Bank appealed — Appeal dismissed — Bank knew comfort letters were not security and parent company did not provide guarantee of loan to subsidiary — Parent company was not required to put bank on notice that subsidiary was unable to manage own affairs — Existence of policy was not inconsistent with existence of circumstances which interfered with subsidiary's ability to manage affairs in accordance with policy — Parent company made extensive efforts to salvage subsidiary business — Policy remained in place throughout relevant period — Bank could not reasonably rely on any representation in letters.

Practice --- Costs — Particular orders as to costs — Costs on solicitor and client basis — Grounds for awarding — Unfounded allegations

Bank opened line of credit for subsidiary company of parent company — Parent company did not guarantee loan, but gave bank comfort letters — Subsidiary borrowed $40,500,000 from bank before going bankrupt — Parent company was taken over by corporation — Trial judge dismissed bank's action against parent company, corporation and subsidiary to recover loan — Trial judge found letter of comfort was not security and parent company did not provide guarantee of loan to subsidiary — Trial judge found allegations of fraud and deceit were wholly unfounded — Trial judge awarded solicitor and client costs to defendant — Bank sought leave to appeal costs — Leave granted and appeal dismissed — Appropriate order of costs was within discretion of trial judge — Trial judge referred to appropriate statutory authorities.

**Cases considered:**

*Eli Lilly & Co. v. Novopharm Ltd.*, 227 N.R. 201, 161 D.L.R. (4th) 1, [1998] 2 S.C.R. 129, 152 F.T.R. 160 (note) (S.C.C.) — referred to

*Kleinwort Benson Ltd. v. Malaysia Mining Corp. Bhd.*, 43 B.L.R. 40, [1989] 1 All E.R. 785 (Eng. C.A.) — referred to

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1999 CarswellOnt 2812, 124 O.A.C. 87, 45 O.R. (3d) 417, 178 D.L.R. (4th) 634, 50 B.L.R. (2d) 64, [1999] O.J. No. 3290

APPEAL by bank from judgment reported at (1998), 40 B.L.R. (2d) 1 (Ont. Gen. Div. [Commercial List]), dismissing claim against parent company for recovery of loan made to subsidiary company.

*Per curiam*:

1    This is an appeal from the judgment of Winkler J. dismissing all of the appellant's claims. Those claims were based on five letters of comfort provided to the appellant (the Bank) by the Plessey Company plc (Plessey) in connection with a series of loans made at the time of and following Plessey's take-over of Leigh Instruments Limited (Leigh). The respondent, General Electric Company plc (GEC) was in effective control of Plessey when the fifth letter of comfort was provided (December 19, 1989) and the claims against it arise out of that letter.

2    The court dismissed the appeal at the conclusion of oral argument with reasons to follow. These are the reasons.

3    Justice Winkler's reasons are reported at (1999), 40 B.L.R. (2d) 1 (Ont. Gen. Div. [Commercial List]). His detailed and careful review of the evidence and analysis of the issues have proved most helpful on the hearing of this appeal. The factual background necessary to an understanding of these reasons can be found in the reasons of Winkler J.

4    The trial took over a year. The wide ranging attack launched by the Bank at trial has been replaced on appeal by a focussed challenge to the trial judge's finding that the appellant had failed to establish negligent misrepresentation by Plessey in respect of any of the five letters of comfort or by GEC in respect of the fifth letter of comfort.

**The Main Appeal**

5    Mr. Finlay, with his usual consummate skill, advanced five grounds of appeal on behalf of the Bank. Four require him to convince us that the trial judge erred in his interpretation of the meaning of paragraph 3 of the letters of comfort provided by Plessey. Paragraph 3 reads:

> It is our policy that our wholly owned subsidiaries, including Leigh Instruments Limited, be managed in such a way as to be always in a position to meet their financial obligations including repayment of all amounts due under the above facility.

6    "The above facility" refers to the line of credit made available by the Bank to Leigh. That amount varied and reached $45 million when the fifth comfort letter was provided by Plessey in December 1989.

7    Throughout his submissions, Mr. Finlay stressed the differences between the contract claim advanced by the Bank and the tort claim in so far as they related to paragraph 3 of the comfort letters. He did not take issue with the trial judge's analysis of the contract claim, but submitted that the trial judge erroneously applied the same analysis when interpreting paragraph 3 for the purposes of the negligent misrepresentation claim.

8    No doubt there are important differences between the two claims, however, the task of determining the meaning to be given to the words in paragraph 3 was common to both. Before considering the legal effect of those words, the trial judge had to determine what they meant. The same words in the same document cannot have one meaning in the context of a contract claim and a different meaning in the context of a tort claim. Once the meaning of the words is fixed, the legal effect of those words must be considered. It is at this stage of the interpretative process that distinctions between contract and tort claims can become important.

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1999 CarswellOnt 2812, 124 O.A.C. 87, 45 O.R. (3d) 417, 178 D.L.R. (4th) 634, 50 B.L.R. (2d) 64, [1999] O.J. No. 3290

9    The process of determining the meaning to be given to words in a document is governed by the same prin-
ciples regardless of whether the process is engaged in the context of a contract claim or a tort claim. Those prin-
ciples are identified by the trial judge at pp. 105-111 and recently reviewed by the Supreme Court of Canada in
*Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 (S.C.C.) at 166-167. Essentially, the process is captured
in the following question:

> Bearing in mind the relevant background, the purpose of the document, and considering the entirety of the
> document, what would the parties to the document reasonably have understood the contested words to
> mean?

10    The Bank contends, and the respondents agree, that paragraph 3 contained a representation by Plessey to
the Bank as to its policy with respect to the business affairs of Leigh. It is also common ground that the repres-
entation was a continuing one. The dispute centers on what the policy was represented to be. The Bank reads
paragraph 3 as a representation by Plessey that it would manage Leigh's affairs in such a way that Leigh would
always be in a position to meet its obligations to the Bank. The Bank contends that it was entitled to rely on this
representation as to Plessey's policy unless and until given notice of a change in that policy.

11    The respondents, emphasizing the words "be managed" in paragraph 3, submit that the paragraph was not
a representation that Plessey would manage the affairs of Leigh, but rather a representation that it was Plessey's
policy that its subsidiaries, including Leigh, should manage their own affairs in such a way as to be able to meet
their financial obligations. The respondents rely not only on the language of paragraph 3, but on basic corporate
law principles which they submit fixed the responsibility of management with the properly appointed officers of
Leigh even though ultimate control of the company rested with the sole shareholder, Plessey.

12    Winkler J. accepted the respondents' interpretation of paragraph 3. In reaching that conclusion, he em-
phasized the language of paragraph 3 considered in the context of the entire letter (pp. 111-16). He further held
that his conclusion as to the meaning of the words in paragraph 3 was fortified by a consideration of the relevant
background facts (pp. 116-18).

13    Winkler J. construed paragraph 3 in the course of his consideration of the contract claim and applied that
construction to both the contract claim and the tort claim. For the reasons set out above, we think this was a
proper approach.

14    There is some uncertainty as to the standard of review to be applied when addressing the appellant's sub-
mission that the trial judge misconstrued paragraph 3 of the comfort letters. We will assume that no deference is
due to the trial judge's conclusion and that a correctness standard of review should be applied.

15    After giving careful consideration to Mr. Finlay's submissions, we come to the same conclusion as the
trial judge. We agree with the trial judge's observation, at p. 141, that the appellant's interpretation is inconsist-
ent with the words "be managed" and would require that additional words be inserted in paragraph 3. The parties
chose not to insert any such language. The phrase "be managed" does not suggest that Plessey itself would man-
age the affairs of Leigh.

16    Whatever doubt might exist if only the words of paragraph 3 are considered is dispelled by a considera-
tion of the relevant factual background. The Bank and Plessey were sophisticated commercial entities. Both
were familiar with letters of comfort. The Bank knew full well that the letter of comfort was not security in the
traditional sense and that its commercial value depended very much on the relationship which existed between

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1999 CarswellOnt 2812, 124 O.A.C. 87, 45 O.R. (3d) 417, 178 D.L.R. (4th) 634, 50 B.L.R. (2d) 64, [1999] O.J. No. 3290

the lender and the provider of the letter of comfort. The Bank was very anxious to establish an ongoing relationship with Plessey, a very large multinational corporation. It was well known that Plessey would not provide any guarantee on loans made to Leigh by the Bank. The letter was crafted to avoid any suggestion that Plessey had any legal responsibility for the loans. The interpretation of paragraph 3 now advanced by the Bank would effectively put Plessey in the position of a guarantor subject to Plessey's ability, on notice to the Bank, to change its "policy." The interpretation urged by the Bank would give it almost exactly the security which it knew full well was not available to it when it chose to proceed with the loan in the hopes of doing more business with Plessey and its many subsidiaries.

17    It was argued before Winkler J. and here that the respondents' interpretation of paragraph 3 meant that it amounted to no more than a "motherhood" statement having no real commercial purpose or value to the Bank. The trial judge, at pp. 116-18, considered and rejected this argument. He observed that other paragraphs in the letters contained valuable representations and undertakings by Plessey and that the third paragraph gave the Bank a basis, *albeit* not a legal one, upon which to request that Plessey stand behind the commercial activities of Leigh and honour Leigh's debts. That request, while not based on any legal obligation, had substance and value in the commercial world revealed by the extensive evidence heard by the trial judge.

18    The trial judge, drawing on the language used by the English Court of Appeal in *Kleinwort Benson Ltd. v. Malaysia Mining Corp. Bhd.*, [1989] 1 All E.R. 785 (Eng. C.A.) , referred to paragraph 3 of the letter as imposing a "moral obligation" on Plessey or as constituting a "gentleman's agreement" between the Bank and Plessey. We prefer the description of the commercial value of comfort letters in general and this one in particular provided in the factum of the respondent GEC. Counsel wrote:

> ... In this marketplace, both parties have experience in situations where a parent, for reasons it deems appropriate, refuses to give a legally binding assurance and a bank, for reasons it similarly considers appropriate agrees to accept something less, perhaps believing that when, and if, "push comes to shove", the parent would pay for any or all of the "non-legal" commercial considerations of reputation, fear of adverse publicity, higher future borrowing costs and a myriad other reasons and possibilities depending on the circumstances.

19    The interpretation given to paragraph 3 by the trial judge did not render the letters of comfort valueless and it cannot be said that his interpretation yields a commercial absurdity. The Bank's primary submission must be rejected. The trial judge correctly construed paragraph 3 of the letters of comfort.

20    The second ground of appeal assumes that the Bank's interpretation of paragraph 3 of the comfort letters is correct and goes on to contend that as Plessey had no such policy, paragraph 3 contained a misrepresentation. Obviously, the accuracy of the representation in paragraph 3 must be considered in the light of the meaning given to that paragraph by Winkler J. and affirmed by this court. The trial judge considered whether Plessey had a policy as he had found it described in paragraph 3. After an extensive review of the evidence (pp. 136-42), he concluded that Plessey had such a policy and that it remained in operation throughout the relevant time. This finding is clearly one of fact to which deference is due. There was ample evidence to support the finding.

21    The Bank's third submission relates only to the fifth letter of comfort. The trial judge found that the fifth letter, like the first four, did not contain a material misrepresentation. He further held, at p. 146, that in the circumstances existing when the fifth letter was provided, the Bank could not reasonably have relied on any representation in the letter. In coming to that conclusion, the trial judge placed considerable emphasis on the conclud-

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1999 CarswellOnt 2812, 124 O.A.C. 87, 45 O.R. (3d) 417, 178 D.L.R. (4th) 634, 50 B.L.R. (2d) 64, [1999] O.J. No. 3290

ing language of the fifth letter. In that letter Plessey indicated that the letter "does not constitute a legally bind-ing commitment." That language did not appear in the earlier letters.

22      As we are satisfied that the fifth letter contained no misrepresentation, it is not necessary to address the reliance argument. We will do so for the sake of completeness. The trial judge was entitled on all of the evid-ence to come to the conclusion that he did. His finding was reached not only on the basis of the closing language in the letter, but on all of the circumstances existing as of December 1989 when the fifth letter was provided. By that date, Plessey had been the subject of a hostile takeover and was controlled by commercial entities, one of which was the respondent, GEC, which had no ongoing working relationship with the Bank and no apparent need to look to the Bank for financing in the future. The commercial considerations which may have prompted Plessey to respond favourably to the Bank's request that Plessey honour these debts were not operative after Plessey itself was acquired by GEC and another corporate entity.

23      The fourth submission made by the Bank is directed at GEC. The Bank seeks to hold GEC jointly liable with Plessey, the author of the letter, for negligent misrepresentation. This ground of appeal must fail as we are satisfied that the fifth letter did not contain any misrepresentation, and in any event any representation in that letter could not reasonably be relied on by the Bank.

24      The Bank's fifth submission is somewhat different. For the purpose of this submission, the Bank accepts the interpretation of paragraph 3 given by the trial judge and adopted by this court. Counsel submits that even on that interpretation, the representation became untrue or at least misleading by January or February 1990 when Plessey realized that Leigh's continued fiscal viability was uncertain. Counsel submits that the continuing nature of the representation in paragraph 3 of the letters required Plessey to put the Bank on notice when it became clear to Plessey that Leigh might not be able to manage itself so as to meet its obligations to the Bank. If this submission is accepted, the Bank is entitled to recover the advances made to Leigh after Plessey knew that Leigh's prospects were not good.

25      We cannot accept this submission. There is nothing inconsistent with the continued existence of a policy that Leigh should manage its affairs so as to be able to meet its financial obligations and the existence of circum-stances which imperiled Leigh's ability to conduct its affairs in accordance with that policy. The policy may re-main extant even if circumstances make compliance difficult or doubtful.

26      The trial judge conducted an extensive review of the evidence surrounding Leigh's slide into insolvency in late 1989 and early 1990. He reviewed the extensive efforts made by Plessey and its owners to salvage Leigh's business. He concluded, at p. 142, that the policy referred to in paragraph 3 of the letters remained in place throughout the material period of time right up until immediately before the bankruptcy of Leigh. We see no basis for interfering with that finding.

27      There is a second reason why this submission must fail. It is premised on the representations made in the fifth letter of comfort. As indicated above, we agree with the trial judge's conclusion that the Bank could not reasonably rely on any representation in that letter. Consequently, even if we accepted the Bank's argument that the representations in paragraph 3 became misleading some time in January or February 1990, the Bank could still not establish the requisite reliance on the representations.

28      We affirm the order of Winkler J. dismissing the Bank's action.

**The Costs Appeal**

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

1999 CarswellOnt 2812, 124 O.A.C. 87, 45 O.R. (3d) 417, 178 D.L.R. (4th) 634, 50 B.L.R. (2d) 64, [1999] O.J. No. 3290

29    The Bank also seeks leave to appeal the costs order made by Winkler J. He ordered that the respondents should have their costs on a solicitor-and-client scale. The Bank submits that the trial judge should have awarded costs on a party-and-party basis.

30    The determination of an appropriate costs order is within the discretion of the trial judge. This court will only interfere with the exercise of that discretion if it is satisfied that the order is unreasonable or premised on some error in principle.

31    The trial judge referred to the appropriate statutory authorities and instructed himself that an order of costs on a solicitor-and-client level should be made only in "exceptional" and "rare" cases.

32    In holding that this was a case for costs, the trial judge said:

In my view, this is one of the "rare" and "exceptional" cases where an award of solicitor and client costs is warranted. The plaintiff advanced numerous allegations of fraud and deceit on the part of the defendants. These allegations included: allegations that Colin Justice intentionally make false and misleading statements to the bank regarding Leigh' financial statements; that Justice intentionally misrepresented Leigh's financial condition to the bank; that Plessey, GEC and GEC Siemens plc intentionally misrepresented the affairs of Leigh to the Bank in order to induce the bank to lend money to Leigh; and that the fifth and last comfort letter was delivered to the bank fraudulently, and that this fraud was perpetrated, in part, by Ross Anderson. These allegations were pursued unrelentingly through to the conclusion of trial. Indeed, the plaintiff raised a novel allegation of fraud concerning Mr. Anderson in its written argument, despite the fact that it had not been pleaded and the defendants had no opportunity to lead evidence to refute it. All of these allegations of fraud and deceit were held to be wholly unsupported by the evidence.

33    The above-quoted observations of the trial judge are fully supported in the record and, in our view, provide ample reason for the costs order made by the trial judge.

34    Mr. Finlay submitted that the trial judge erroneously accepted the respondents' submission that their offer to settle the action by the payment of $15 million made in 1996 was evidence that they did not simply "walk away" from their "moral obligation" under the comfort letters. We agree that the offer of payment made some 6 years after the litigation commenced says little about the respondents' sense of their "moral obligations." We do not think, however, that this mischaracterization of the motivation for the settlement offer warrants interference with the costs order made by the trial judge. That order was fully justified in the light of the unfounded allegations made by the Bank and the conduct of the trial by the Bank.

35    We would grant leave to appeal the costs order, but dismiss that appeal.

36    The respondents are entitled to their costs on the appeal on a party-and-party basis.

*Appeal dismissed.*

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. Govt. Works

# TAB 151

1983 CarswellOnt 214
Ontario Supreme Court, In Bankruptcy

Touche Ross Ltd. v. Weldwood of Canada Sales Ltd.

1983 CarswellOnt 214, 48 C.B.R. (N.S.) 83

# TOUCHE ROSS LIMITED v. WELDWOOD OF CANADA SALES LIMITED

Smith J.

Judgment: July 6, 1983

Counsel: *F. Highley* , for applicant.
*W. Meyer, Q.C.* , for respondent.

Subject: Corporate and Commercial; Insolvency; Civil Practice and Procedure

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

    Bankruptcy --- Avoidance of transactions prior to bankruptcy — Fraudulent preferences — View to prefer — Intention other than to prefer — Transaction in ordinary course of business

    Bankruptcy --- Practice and procedure in courts — Costs — Award of costs — Payable by trustee personally

    Avoidance of transactions prior to bankruptcy — Fraudulent preferences — Statutory presumption — Burden of proof — Debtor taking advantage of 2 per cent discount by paying within 30 days — Payment by certified cheque — Presumption rebutted.

    The question arose whether certain payments made by the bankrupt company to a creditor within three months before bankruptcy constituted a fraudulent preference. The debtor took advantage of a 2 per cent discount by paying within 30 days and paid the debt of the creditor in question on 16th July and 29th July 1980. The petition in bankruptcy was issued on 6th October 1980.

**Held:**

    The prima facie presumption contained in s. 73(2) was rebutted and the payments should stand. It should be taken as laudable that a company should meet its obligations promptly and particularly this is so when a discount is offered in consideration of prompt payment after the goods have been shipped. The court should therefore be extremely loathe to label any of such payments as fraudulent preferences even when made within the three-month period. It was not the intention of the framers of s. 73 that the prima facie presumption would play a significant role when the challenge was directed against the suppliers who were dealing at arm's length with the debtor company. On the other hand, the court does not confer any priority upon suppliers of goods and if a predominant intent to prefer is established by convincing and credible evidence, then the innocent supplier must suffer the same fate as all other innocent creditors. In this case, the receivables ledger disclosed that the payments did not constitute anything but a record of ordinary course of business transactions. It was not a proof of a design or a plan to prefer. Also, the fact that the cheques were certified by the payor did not lead to the conclusion that the debtor intended to prefer the creditor.

1983 CarswellOnt 214, 48 C.B.R. (N.S.) 83

The court criticized the behaviour of the representative of the trustee on the witness stand because "he assumed an adversarial and even slightly hostile role from the witness stand which I considered to be dissonant having regard to the nature of his duties as an officer of the court".

**Table of Authorities**

**Cases considered:**

*Van der Liek, Re* (1969), 13 C.B.R. (N.S.) 28 , time to appeal extended 13 C.B.R. (N.S.) 200 (Ont. S.C.) — *referred to*

**Statutes considered:**

Bankruptcy Act, R.S.C. 1970, c. B-3, ss. 2 "insolvent person", 73(1), (2), 112.

Application by trustee to declare payment to creditor a fraudulent preference.

*Smith J.*:

1      This is a trial of an issue directed by order of Anderson J. dated 8th September 1981 in which he defined the question as one of whether the payments made by the now bankrupt Mainland Lumber Limited to its creditor, Weldwood of Canada Sales Limited ("the creditor"), subsequent to 6th July 1980 constitute a fraudulent preference within the meaning of s. 73 of the Bankruptcy Act, R.S.C. 1970, c. B-3.

2      I will need to recite all the pertinent facts with some care since the trustee's contention is that the payments, two in number totalling $5,340.61, are but a small part of a total amount of the order of $132,000 in accounts payable to suppliers which were paid in priority to a large debt owing to the Bank of Montreal. The allegation is that an entire class of creditors was preferred although the specific concern on this issue relates to the two cheques only.

3      Section 73 reads as follows:

73.(1) Every conveyance or transfer of property or charge thereon made, every payment made, every obligation incurred, and every judicial proceeding taken or suffered by any insolvent person in favour of any creditor or of any person in trust for any creditor with a view to giving such creditor a preference over the other creditors shall, if the person making, incurring, taking, paying or suffering the same becomes bankrupt within three months after the date of making, incurring, taking, paying or suffering the same, be deemed fraudulent and void as against the trustee in the bankruptcy.

(2) Where any such conveyance, transfer, payment, obligation or judicial proceeding has the effect of giving any creditor a preference over other creditors, or over any one or more of them, it shall be presumed *prima facie* to have been made, incurred, taken, paid or suffered with a view to giving such creditor a preference over other creditors, whether or not it was made voluntarily or under pressure and evidence of pressure shall not be receivable or avail to support such transaction.

4      The petition in bankruptcy was issued 6th October 1980. The accounts which the cheques were meant to cover were in the respective amounts of $2,736 and $2,713.60. The debtor took advantage of a 2 per cent discount by paying within 30 days. It paid the debt in two approximately equal instalments on 16th July 1980 and 29th July 1980. The payments were then clearly made within the three-month period.

5      The second question to be addressed according to *Re Van Der Liek; Owen v. Royal Bank* (1969), 13 C.B.R. (N.S.) 28 , time to appeal extended 13 C.B.R. (N.S.) 200 (Ont. S.C.) , is that of insolvency. Reliance is placed upon the following part of the definition section [s. 2] contained in the Act:

"insolvent person" means a person who is not bankrupt and who resides or carries on business in Canada, whose liabilities to creditors provable as claims under this Act amount to one thousand dollars, and ...

(*c* ) the aggregate of whose property is not, at a fair valuation, sufficient, or, if disposed of at a fairly conducted sale under legal process, would not be sufficient to enable payment of all his obligations, due and accruing due; ...

6      The evidence of Robert Merkley, a chartered accountant in the employ of Touche Ross Limited, the trustee, is very convincing. His examination of the books of the company revealed an excess of liabilities over assets at book value in the amount of $52,857.50. The assets were predominantly inventory and receivables. Out of a total of $243,738.43 in receivables, only the relatively small amount of $19,000 was collected. Included in the total was a sum exceeding $113,000 owing by Midway Manufacturing Ltd., a company related to Mainland with the same principals at the helm. The latter company went bankrupt and no distribution was made. The inventory at book value was $107,693.95. The trustee realized $13,000 after taking over the company as receiver following appointment by the Bank of Montreal on 29th September 1980. I accept the opinion of Mr. Merkley that the company was insolvent as of 30th June 1980 and almost certainly for a considerable number of months prior thereto.

7      We are left with the third and in this instance, as in most others, the most crucial element to be established and perhaps the most difficult to determine, namely, that of the intent to prefer, or in other words, preference in fact.

8      There is no evidence that the Weldwood account was treated any differently than a normal supplier account in the ordinary course of business. Goods were ordered and shipped on 11th and 20th June, respectively, and were paid for within the time required to entitle the debtor to take advantage of the 2 per cent discount if paid within 30 days and seven days' grace. Another shipment of goods took place in September valued at $2,105.60. The trustee accepts that payment would likely have been made about 9th October to take advantage of the discount had receivership not intervened. The area manager for Weldwood never met the principals of Mainland and has not done business with them since.

9      Leaving aside for the moment the prima facie presumption contained in s. 73(2), the trustee alleges that Mr. William Taylor, the president and general manager of Mainland, embarked upon a deliberate strategy to pay his trade suppliers in full at a time when he was insolvent, to the detriment of the Bank of Montreal. The clear purpose, as implied and expressed in the course of the trustee's evidence, was to pave the way for future dealings with the same suppliers. The allegation is serious and I propose accordingly to scrutinize the evidence with care. Before doing so, I must confess to a measure of discomfort at seeing the trustee take up the cudgels for one creditor, albeit a substantial one, namely the Bank of Montreal, against others after he had served the former as a privately appointed receiver. He assumed an adversarial and even slightly hostile role from the witness stand which I considered to be dissonant having regard to the nature of his duties as an officer of the court. His avowed purpose, expressed through his counsel, was to honour the spirit of the Act as set out in s. 112, of payment pari passu to all creditors. I would have preferred a total absence of previous involvement with the Bank of Montreal in respect of this estate. I do not wish to imply that there is any impropriety on the part of the trustee. Discretion, however, might have dictated that the trustee's employee take a less militant stand.

10      Upon assuming responsibility under the private appointment on 29th September 1980, Mr. Merkley, on behalf of Touche Ross Limited, reviewed the cash disbursements to date and found them to have been significant and mainly in favour of suppliers. Indeed, all suppliers had been paid except for Weldwood's last shipment as to which the date allowed for discount purposes had not passed, excepting further an account of $10,000 in favour of Forex. Taylor is said to have expressed annoyance that this account had not been paid. There was a third account outstanding to Hornby. The evidence in this regard was to the effect that communications had broken down between Hornby and a principal in Mainland.

11      The trustee also came upon certain letters in September which he termed highly unusual. Most of them are dated 9th September 1980. They are addressed to certain debtors of Mainland and they direct them to make payment of their outstanding accounts either directly to Midway, the related company referred to above, or to creditors of Mainland.

12    Reference must equally be made to the fact that, in July and August, a practice was engaged in by Mainland of dispatching couriers to the bank with regular deposits and with a number of cheques in favour of suppliers that were presented for immediate certification. The cheques to Weldwood, however, were forwarded by mail and had not been certified.

13    The trustee's suspicions were understandably aroused. He ultimately recommended a petition for a receiving order. Prior to the petition being issued, Merkley took notes of conversations with Taylor. He commenced taking notes on 1st October, from memory, of exchanges that took place 29th and 30th September and also 1st October. In these conversations, Taylor admitted the practice of depositing funds and immediately withdrawing them by requesting certification of a number of cheques. He admitted transfers to Midway. Taylor is also reported to have said on 30th September that "he looked after his friends" and on 1st October that "he looked after his suppliers" and that "I am going to be in this business for a while yet".

14    To complete the summary of the facts, I must add that Taylor and his associate, Grenier, had both guaranteed payment of the debt to the Bank of Montreal and not to the suppliers. Taylor's guarantee was worthless. Grenier was called upon to retire a portion of the Bank of Montreal debt. Taylor and Grenier had had a falling out. The debt to the bank, incidentally, pursuant to a note signed on 28th July, which consolidated all previous notes, stands at $318,000.90.

15    This case presents a unique problem. It must surely be taken as eminently laudable that a company should meet its obligations promptly, and particularly is this so when a discount is offered in consideration of prompt payment after the goods have been shipped. The court should therefore be extremely loathe to label any of such payments as fraudulent preferences even when made within the three-month period. It could hardly have been the intention of the framers of s. 73 that the prima facie presumption would play a significant role when the challenge was directed against the suppliers who were dealing at arm's length with the debtor company.

16    On the other hand, the Act does not confer any priority upon suppliers of goods, and if a predominant intent to prefer is established by convincing and credible evidence then the innocent supplier must suffer the same fate as all other innocent creditors.

17    In this instance, there are, in my view, only two circumstances that could give rise to a reasonable inference of an intent to prefer: the practice of certifying cheques concomittantly with the making of deposits and the absence of any outstanding accounts payable at the end of September other than those which were explained in a manner consistent with the alleged intent. I say this because I am in large measure discounting the letters dated 9th September and the conversations which took place several weeks later. These latter two additional circumstances, whatever their evidentiary weight in relation to transactions in September, can only lead to speculation as to what the intent might have been in July. Their probative value, if any, would be extremely light in any case for the July period.

18    Taking the matter one step further, the court is really left with the certification of cheques, because the payment of accounts in excess of $100,000 over a three-month period, standing alone, is neutral. It ought to be considered normal for a company to pay its accounts when due. I have reviewed Ex. 8, the receivables ledger, and it does not constitute anything but a record of ordinary course of business transactions. It is not proof of a design or of a plan to prefer.

19    As for the cheque certification practice at some time in July and August, it does not enable me to conclude that the debtor intended to prefer Weldwood in particular and very possibly no one else either. The evidence, therefore, is clearly insufficient. In the result, the payments will stand and Weldwood should have its costs out of the estate on a solicitor-and-client basis, as should also the trustee.

*Presumption rebutted and application dismissed.*

---

**End of Document**                Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 152

563 F.3d 1271
United States Court of Appeals,
Federal Circuit.

TRANSCORE, LP and TC License,
Ltd., Plaintiffs–Appellants,

v.

ELECTRONIC TRANSACTION CONSULTANTS
CORPORATION, Defendant–Appellee.

No. 2008–1430.   |   April 8,
2009.   |   Rehearing and Rehearing
En Banc Denied June 5, 2009.

**Synopsis**

**Background:** Holder of patents relating to automated toll collection systems brought infringement action against toll collection service provider. The United States District Court for the Northern District of Texas, James Edgar Kinkeade, J., 2008 WL 2152027, entered summary judgment in provider's favor, and holder appealed.

**Holdings:** The Court of Appeals, Gajarsa, Circuit Judge, held that:

[1] doctrine of patent exhaustion barred holder's patent infringement claims against provider;

[2] parol evidence of parties' intent not to provide downstream rights to customers was irrelevant; and

[3] holder's rights to patent that had not yet issued, and was thus not identified in settlement agreement, were exhausted.

Affirmed.

West Headnotes (8)

[1]     **Patents**
        👉 Rights and powers of patentees as to making, use, or sale of invention

        Toll collection service provider's sales of toll collection systems were authorized by settlement agreement between patent holder and provider's

supplier, and thus doctrine of patent exhaustion barred holder's patent infringement claims against provider, where holder had agreed not to bring any suit for future infringement, but did not place any restriction on sales.

7 Cases that cite this headnote

[2]     **Patents**
        👉 Rights and powers of patentees as to making, use, or sale of invention

        Doctrine of patent exhaustion provides that initial authorized sale of patented item terminates all patent rights to that item.

8 Cases that cite this headnote

[3]     **Patents**
        👉 Construction and Operation of Licenses

        Patentee, by license or otherwise, cannot convey affirmative right to practice patented invention by way of making, using, selling, etc.; patentee can only convey freedom from suit. 35 U.S.C.A. § 154(a)(1).

16 Cases that cite this headnote

[4]     **Courts**
        👉 Particular questions or subject matter

        Evidentiary rulings, which are procedural in nature, are reviewed by Court of Appeals for Federal Circuit according to regional circuit's law.

2 Cases that cite this headnote

[5]     **Federal Courts**
        👉 Taking case or question from jury; judgment as a matter of law
        **Federal Courts**
        👉 Admission of Evidence
        **Federal Courts**
        👉 Exclusion of Evidence

        Under Fifth Circuit law, unless trial court has abused its discretion and substantial right of defendant has been affected, Court of Appeals

will not reverse on basis of evidentiary ruling in question.

1 Cases that cite this headnote

**[6]    Patents**
        👉 Rights and powers of patentees as to making, use, or sale of invention

Only issue relevant to patent exhaustion is whether sales of patented items were authorized, not whether patent holder and seller intended, expressly or impliedly, for covenant to extend to seller's customers, and thus parol evidence of parties' intent not to provide downstream rights to customers was irrelevant in patent infringement action against customers.

9 Cases that cite this headnote

**[7]    Patents**
        👉 Rights and powers of patentees as to making, use, or sale of invention

Patent holder's rights to patent that had not yet issued, and was thus not identified in its settlement agreement with competitor, were exhausted by competitor's authorized sales under implied license to practice that patent by virtue of legal estoppel, where later-issued patent was broader than, and necessary to practice, patent that was included in settlement agreement.

10 Cases that cite this headnote

**[8]    Patents**
        👉 Original utility

4,303,904, 5,086,389, 5,144,553, 5,253,162, 5,289,183, 5,347,274, 5,351,187, 5,406,275, 5,751,973, 5,805,082, 6,653,946. Cited.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*1272** William J. Robinson, Foley & Lardner LLP, of Los Angeles, CA, argued for plaintiffs-appellants. With him on the brief was Grant E. Kinsel.

John R. Emerson, Haynes and Boone, LLP, of Dallas, TX, argued for defendant-appellee. With him on the brief were Phillip B. Philbin, Jacob G. Hodges, and William D. White.

Before GAJARSA, DYK, and MOORE, Circuit Judges.

**Opinion**

GAJARSA, Circuit Judge.

TransCore, LP and TC License, Ltd. (collectively "TransCore") appeal from a final judgment of the U.S. District Court for the Northern District of Texas that was entered upon the district court's grant **\*1273** of summary judgment. *See Transcore, LP v. Electronic Transaction Consultants Corp.,* No. 3:05–CV–2316–K, 2008 WL 2152027 (N.D.Tex. May 22, 2008). Specifically, the District Court found that TransCore's patent infringement claims against Electronic Transaction Consultants Corp. ("ETC") were barred by patent exhaustion, implied license and legal estoppel, in view of a settlement agreement between TransCore and the supplier of the products ETC installed, Mark IV. Because we agree with the district court and find that Mark IV's sales were authorized and exhausted TransCore's patent rights, thus barring TransCore's claims against ETC, we affirm.

## BACKGROUND

TransCore is engaged in the manufacture, sale and installation of automated toll collection systems—the tags and readers that communicate as a vehicle passes through an automated toll plaza (e.g., E–ZPass). TransCore is the assignee of several patents to related technologies.

In 2000, TransCore sued a competitor, Mark IV Industries, for infringement of several TransCore patents. That action was resolved by a settlement agreement, in which Mark IV agreed to pay \$4.5M in exchange for an unconditional covenant not to sue and a release of all existing claims. The covenant and release, which are central to the dispute here, read:

3. In exchange for the payment set forth in paragraph 1, TCI hereby agrees and covenants not to bring any demand, claim, lawsuit, or action against Mark IV for future infringement of any of United States Patent Nos. 5,805,082; 5,289,183; 5,406,275; 5,144,553; 5,086,389; 5,751,973; 5,347,274; 5,351,187; 5,253,162; and 4,303,904, or any foreign counterparts of the aforesaid

United States Patents, for the entire remainder of the terms of the respective United States Patents and their foreign counterparts. This Covenant Not To Sue shall not apply to any other patents issued as of the effective date of this Agreement or to be issued in the future.

\* \* \*

8. TCI, TII and GRAVELLE, for themselves and their respective predecessors, successors, heirs and assigns, fully and forever release, discharge and dismiss all claims, demands, actions, causes of action, liens and rights, in law or in equity (known, unknown, contingent, accrued, inchoate or otherwise), existing as of June 26, 2001, that they have against MARK IV, and its officers, directors, employees, representatives and attorneys of MARK IV, but excluding any claims for breach of this Agreement. No express or implied license or future release whatsoever is granted to MARK IV or to any third party by this Release.

Several years later, ETC, a firm engaged in consulting and systems integration related to toll-collection systems, won a bid with the Illinois State Toll Highway Authority (ISTHA) to install and test a new open-road tolling system. As part of the contract, ETC agreed to set up and test toll-collection systems purchased by the ISTHA from Mark IV.

TransCore sued ETC for infringement of three patents that had previously been in suit against Mark IV (U.S. Patent Nos. 5,805,082; 5,289,183; and 5,406,275 (the #082, #183, and #275 patents)) as well as U.S. Patent No. 6,653,946 (the #946 patent), a related patent that was pending **\*1274** before the Patent and Trademark Office but had not yet issued at the time of the TransCore—Mark IV settlement. During a hearing, the district court questioned the legal impact of the TransCore—Mark IV settlement agreement on the TransCore—ETC lawsuit and ordered the parties to brief the issue. ETC responded by filing a motion for summary judgment with the district court, asserting that its activities were permitted by the TransCore—Mark IV settlement agreement under the related doctrines of patent exhaustion, implied license and legal estoppel.

On May 22, 2008, the district court granted ETC's motion, dismissed TransCore's claims with prejudice and directed the entry of final judgment. TransCore timely appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a) (1).

## DISCUSSION

Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also* *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). We review a district court's grant of summary judgment without deference, reapplying the same standard as the district court. *Micro Chem., Inc. v. Lextron, Inc.,* 318 F.3d 1119, 1121 (Fed.Cir.2003). "In deciding whether summary judgment was appropriate, we view the evidence in a light most favorable to the party opposing the motion with doubts resolved in favor of the opponent...." *Ethicon Endo–Surgery, Inc. v. U.S. Surgical Corp.,* 149 F.3d 1309, 1315 (Fed.Cir.1998).

## I.

[1] The district court found that Mark IV's sales of the toll collection systems installed by ETC were authorized by the TransCore—Mark IV settlement agreement, such that TransCore's patent rights were exhausted as to those systems. We agree. [1]

## A.

[2] Recently, in *Quanta Computer, Inc. v. LG Electronics, Inc.,* 553 U.S. 617, 128 S.Ct. 2109, 170 L.Ed.2d 996 (2008), the Supreme Court reiterated unequivocally that "[t]he longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item," *id.* at 2115, and that "[e]xhaustion is triggered only by a sale authorized by the patent holder," *id.* at 2121. The question for this court is whether an unconditional covenant not to sue authorizes sales by the covenantee for purposes of patent exhaustion. We hold that it does.

TransCore asserts that sales under a covenant not to sue are not "authorized," relying heavily on *Jacobs v. Nintendo of America, Inc.,* 370 F.3d 1097 (Fed.Cir.2004). In *Jacobs,* a panel of this court addressed the respective roles of a license term and a covenant not to sue in a settlement agreement. Explicitly considering downstream customer liability, the panel explained:

If all that [the patent holder] intended to do through the settlement agreement **\*1275** was to free [the infringing manufacturer] of its liability for infringement, paragraph 5 of the agreement (the covenant not to sue) would have been fully sufficient to serve that purpose. Paragraph 3 [the license provision], however, goes much further by granting [the infringing manufacturer] an affirmative right to engage in the manufacture and sale of accelerometers to be used in tilt-sensitive control boxes. That grant comes without restriction of any kind.

*Id.* at 1101. The court in *Jacobs* was differentiating between settlement terms for the express purpose of determining the contracting parties' intent in the context of an implied license analysis. As the Supreme Court explained in *Quanta,* however, the parties' intent with respect to downstream customers is of no moment in a patent exhaustion analysis. *See Quanta,* 128 S.Ct. at 2122 ("But the question whether third parties received implied licenses is irrelevant because [the downstream customer] asserts its right to practice the patents based not on implied license but on exhaustion. And exhaustion turns only on [licensee's] own license to sell products practicing the [licensor's] Patents."). The analysis in *Jacobs,* therefore, does not apply here.

 [3]    Rather, our analysis begins with the premise that one cannot convey what one does not own. This principle is particularly important in patent licensing, as the grant of a patent does not provide the patentee with an affirmative right to practice the patent but merely the right to exclude. *See* 35 U.S.C. § 154(a)(1) ("Every patent shall contain ... a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States ...."); *see also Leatherman Tool Group Inc. v. Cooper Indus., Inc.,* 131 F.3d 1011, 1015 (Fed.Cir.1997) ("In fact, the federal patent laws do not create any affirmative right to make, use, or sell anything.... [T]he Supreme Court made clear that the patent laws provide a limited right to exclude others from making, using, or selling a claimed invention for a limited period of time, but afford no affirmative right to make, use, and sell a patented invention." (citing *Bloomer v. McQuewan,*

55 U.S. (14 How.) 539, 548, 14 L.Ed. 532 (1852) ("The franchise which the patent grants, consists altogether in the right to exclude every one from making, using, or vending the thing patented, without the permission of the patentee. This is all that he obtains by the patent."))). It follows, therefore, that a patentee, by license or otherwise, cannot convey an affirmative right to practice a patented invention by way of making, using, selling, etc.; the patentee can only convey a freedom from suit.

For this reason, the Supreme Court in *De Forest Radio Telephone & Telegraph Co. v. United States,* reiterated: "As a license passes no interest in the monopoly, it has been described as a mere waiver of the right to sue by the patentee." 273 U.S. 236, 242, 47 S.Ct. 366, 71 L.Ed. 625 (1927) (treating a covenant not to enjoin infringing acts as a license). To like effect, this court and its predecessors have on numerous occasions explained that a non-exclusive patent license is equivalent to a covenant not to sue:

    As a threshold matter, a patent license agreement is in essence nothing more than a promise by the licensor not to sue the licensee. Even if couched in terms of "[l]icensee is given the right to make, use, or sell X," the agreement cannot **\*1276** convey that absolute right because not even the patentee of X is given that right. His right is merely one to exclude others from making, using or selling X. Indeed, the patentee of X and his licensee, when making, using, or selling X, can be subject to suit under other patents. In any event, patent license agreements can be written to convey different scopes of promises not to sue, e.g., a promise not to sue under a specific patent or, more broadly, a promise not to sue under any patent the licensor now has or may acquire in the future.

*Spindelfabrik Suessen–Schurr, Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft,* 829 F.2d 1075, 1081 (Fed.Cir.1987) (citations omitted); *see also U.S. Philips Corp. v. Int'l Trade Comm'n,* 424 F.3d 1179, 1189 (Fed.Cir.2005) ("A nonexclusive patent license is simply a promise not to sue for infringement."); *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings,* 370 F.3d 1354, 1369 (Fed.Cir.2004) ( "This license is, in essence, a licensor's covenant not to sue the licensee."); *Hilgraeve Corp. v. Symantec Corp.,* 265 F.3d 1336, 1346 (Fed.Cir.2001) ("This court has stated that 'licenses are considered as nothing more than a promise by the licensor not to sue the licensee.' " (quoting *Jim Arnold Corp. v. Hydrotech Sys., Inc.,* 109 F.3d 1567, 1577 (Fed.Cir.1997))); *Intell. Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.,* 248 F.3d 1333, 1345 (Fed.Cir.2001)

90 U.S.P.Q.2d 1372

(defining "a nonexclusive license or 'bare' license" as "a covenant by the patent owner not to sue the licensee for making, using, or selling the patented invention and under which the patent owner reserves the right to grant similar licenses to other entities"); *Ortho Pharm. Corp. v. Genetics Inst., Inc.,* 52 F.3d 1026, 1031 (Fed.Cir.1995) ("A license may amount to no more than a covenant by the patentee not to sue the licensee for making, using or selling the patented invention, the patentee reserving the right to grant others the same right."); *W. Elec. Co. v. Pacent Reproducer Corp.,* 42 F.2d 116, 118 (2d Cir.1930) ("In its simplest form, a license means only leave to do a thing which the licensor would otherwise have a right to prevent. Such a license grants to the licensee merely a privilege that protects him from a claim of infringement by the owner of the patent monopoly."). The real question, then, is not whether an agreement is framed in terms of a "covenant not to sue" or a "license." That difference is only one of form, not substance—both are properly viewed as "authorizations." Rather, the pertinent question here is not whether but what the TransCore—Mark IV settlement agreement authorizes. More specifically, does the TransCore—Mark IV settlement agreement authorize *sales*? We conclude that it does.

The language of the TransCore—Mark IV settlement agreement is unambiguous: "[TransCore] agrees and covenants not to bring any demand, claim, lawsuit, or action against Mark IV for future infringement...." This term, without apparent restriction or limitation, thus authorizes all acts that would otherwise be infringements: making, using, offering for sale, selling, or importing. TransCore did not, as it could have, limit this authorization to, for example, "making" or "using." And indeed, at oral argument, TransCore conceded that the TransCore—Mark IV settlement agreement does not include a restriction on sales. *See* Audio Recording of Oral Arg. at 40:54–42:25, *TransCore, LP v. Elec. Transaction Consultants Corp.,* No. 2008–1430 (Fed.Cir. Feb. 5, 2009), *available at* http://oralarguments.cafc.uscourts.gov/mp 3/2008–1430.mp3; *cf.* **\*1277** *Quanta,* 128 S.Ct. at 2121 (applying patent exhaustion where "[n]othing in the License Agreement restricts [licensee's] right to sell its microprocessors and chipsets to purchasers who intend to combine them with non-Intel parts. It broadly permits Intel to 'make, use, [or] sell' products free of [licensor's] patent claims." (internal quotation marks omitted)). As a result, the district court correctly found that Mark IV's sales to ISTHA were authorized and that TransCore's patent rights are exhausted. The inclusion of the language "No express or implied license

or future release whatsoever is granted to MARK IV or to any third party by this Release" refers only to the effect of the Release provision and thus does not require a different result.

## B.

As a subordinate issue to the proper interpretation of the covenant not to sue, TransCore argues that the district court abused its discretion by excluding parol evidence of TransCore's and Mark IV's intent at the time they entered into the settlement agreement. We disagree.

**[4]  [5]**  Evidentiary rulings, which are procedural in nature, are reviewed by this court according to the law of the regional circuit. *See Sulzer Textil A.G. v. Picanol N.V.,* 358 F.3d 1356, 1363 (Fed.Cir.2004). Applying Fifth Circuit law, "unless the trial court has abused its discretion and a substantial right of the defendant has been affected, we will not reverse on the basis of [an] evidentiary ruling in question." *United States v. Saldana,* 427 F.3d 298, 306 (5th Cir.2005).

**[6]**  The district court's decision to exclude TransCore's parol evidence has not affected any substantial right of TransCore. On this point *Quanta* is clear. The only issue relevant to patent exhaustion is whether Mark IV's sales were authorized, not whether TransCore and Mark IV intended, expressly or impliedly, for the covenant to extend to Mark IV's customers. *See Quanta,* 128 S.Ct. at 2122. TransCore's proffered evidence of the parties' intent not to provide downstream rights to Mark IV's customers is, therefore, irrelevant and could not impact the outcome reached by the district court and affirmed here.

Moreover, California law, which governs the TransCore—Mark IV settlement agreement, prohibits the admission of parol evidence: (i) to insert an additional term into a written contract, if the contract is a complete and exclusive statement of the terms of the agreement, Cal.Civ.Proc.Code § 1856(b), (d); and/or (ii) to influence the meaning of contract terms where no ambiguity exists, *id.* § 1856(g); *see also Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 69 Cal.Rptr. 561, 442 P.2d 641, 644–45 (Cal.1968).[2] The district court correctly concluded that the settlement agreement is a final, complete and exclusive agreement, and that the settlement agreement is unambiguous. We, therefore, find no error in the district court's decision not to admit TransCore's parol evidence.

**\*1278 C.**

TransCore further argues that several material facts remain in dispute: (1) which Mark IV entity actually sold the products to ISTHA for installation by ETC; (2) whether the sale from Mark IV to ISTHA occurred within the United States; and (3) assuming Mark IV U.S. (referred to by the parties, at times, as "IVHS") is found to have actually sold the products to ISTHA, whether Mark IV U.S. was included within the terms of the TransCore—Mark IV settlement agreement, which extended coverage to "sister" companies of Mark IV Canada. Based on the record before the district court, as viewed in the light most favorable to TransCore (the non-movant), we disagree.

Although the parties do not agree about which Mark IV entity actually sold the toll collection products—the irrevocable offer was made by Mark IV US, but the purchase order was placed with (and the order was ultimately filled by) Mark IV Canada—there is no dispute that a Mark IV entity was responsible for the sale.

Moreover, there is no dispute that the toll collection products were sold and shipped to ISTHA. Even if we accept TransCore's assertions that the products were shipped from Canada, this does not alter the essential fact that the transaction as a whole ultimately occurred "to" the United States. *See Lightcubes, LLC v. N. Light Prods., Inc.,* 523 F.3d 1353, 1369–71 (Fed.Cir.2008) (finding that a sale "to" the United States is sufficient to support infringement liability).

Finally, as to the third "disputed" fact—whether Mark IV U.S. is covered by the terms of the TransCore—Mark IV settlement agreement—the parties do not dispute that both Mark IV U.S. and Mark IV Canada are wholly-owned subsidiaries of Mark IV Industries. Because the term "sister company" is commonly used and generally understood to refer to a subsidiary company that shares common ownership (i.e., a common "parent") with another subsidiary company, *see generally, e.g., Poly–America, L.P. v. GSE Lining Tech., Inc.,* 383 F.3d 1303 (Fed.Cir.2004) (referring to two corporations that share a common parent as "sister corporations"); *Humana Inc. v. Comm'r,* 881 F.2d 247 (6th Cir.1989) (referring to *all* subsidiaries of Humana, Inc. as "brother-sister" corporations), we find it to be beyond dispute that Mark IV U.S. is a "sister" company of Mark IV Canada and thus has the same express authority under

the TransCore—Mark IV settlement agreement as any other "sister" company.

## II.

[7]    The district court further found that TransCore's rights to the # 946 patent—which had not yet issued and was thus not identified in the TransCore—Mark IV settlement agreement—were exhausted by Mark IV's authorized sales under an implied license to practice that patent by virtue of legal estoppel. Again, we agree with the district court.

As explained by our predecessor court in *AMP Inc. v. United States,* 182 Ct.Cl. 86, 389 F.2d 448 (1968):

> [W]hen a person sells a patent which employs an invention which infringes a prior patent, the person selling is estopped from bringing an action against his grantee for that infringement, even though the earlier patent is acquired after the sale of the later patent. The same principle applies to the grant of a patent right by license as well as assignment.

**\*1279** *Id.* at 451 (citation omitted). Although TransCore argues that this form of legal estoppel only applies to "prior" or "earlier" patents, we see no reason for so fine a distinction—the timing of patent issuance is no more relevant to this inquiry than the timing of acquisition. Indeed, the court in *AMP* explained the policy rationale underlying the legal estoppel doctrine in the following manner:

> The essence of legal estoppel that can be found in the estoppel of the implied license doctrine involves the fact that the licensor (or assignor) has licensed (or assigned) a definable property right for valuable consideration, and then has attempted to derogate or detract from that right. The grantor is estopped from taking back in any extent that for which he has already received consideration.

*Id.* at 452. The basic principle is, therefore, quite simple: "Legal estoppel refers to a narrow[ ] category of conduct encompassing scenarios where a patentee has licensed or

assigned a right, received consideration, and then sought to derogate from the right granted." *Wang Labs., Inc. v. Mitsubishi Elecs. Am., Inc.,* 103 F.3d 1571, 1581 (Fed.Cir.1997).

On summary judgment, ETC asserted, and TransCore did not dispute, [3] that TransCore's later-issued #946 patent was broader than, and necessary to practice, at least the #082 patent that was included in the TransCore—Mark IV settlement agreement. Indeed, during discovery TransCore adopted its # 082 patent infringement contentions as its contentions related to the # 946 patent. [4] Absent argument to the contrary, the district court properly concluded that in order for Mark IV to obtain the benefit of its bargain with TransCore, it must be permitted to practice the #946 patent to the same extent it may practice the #183, #275 and #082 patents. TransCore is, therefore, legally estopped from asserting the #946 patent against Mark IV in derogation of the authorizations granted to Mark IV under the #183, #275 and #082 patents. And Mark IV is, in turn, an implied licensee of the # 946 patent. The language of the TransCore—Mark IV settlement agreement, which states that "[t]his Covenant Not To Sue shall not apply to any other patents ... to be issued in the future," is not to the contrary. This language may protect TransCore against broad claims that future patents generally are impliedly licensed, but it does not permit TransCore to derogate from the rights it has expressly granted and thus does not preclude a finding of estoppel.

Mark IV's rights under its implied license to the #946 patent are necessarily coextensive with the rights it received in *1280 the TransCore—Mark IV license agreement. Mark IV's sales to ISTHA were thus authorized and, accordingly, exhausted TransCore's patent rights in the products sold.

## CONCLUSION

The district court's decision, granting summary judgment and thus dismissing TransCore's claims, is affirmed.

*AFFIRMED*

## COSTS

No costs.

### Parallel Citations

90 U.S.P.Q.2d 1372

---

Footnotes

1   Because we agree with the district court that TransCore's claims are barred by the doctrine of patent exhaustion, we need not address the district court's decision on the related doctrine of implied license by no non-infringing use.

2   We note that, under California law, the district court may *receive* and *consider* extrinsic evidence to determine whether one or more terms of a contract is reasonably susceptible to multiple meanings, *see Dore v. Arnold Worldwide, Inc.,* 39 Cal.4th 384, 46 Cal.Rptr.3d 668, 139 P.3d 56, 60 (2006), but once the district court determines that no ambiguity exists, as it did here, extrinsic evidence is properly not *admitted, see Pac. Gas,* 69 Cal.Rptr. 561, 442 P.2d at 644–45.

3   On appeal, TransCore claims that it is possible to practice the #183, #275 and #082 patents without infringing the #946 patent. TransCore did not, however, raise this argument to the district court. We, therefore, deem it waived. *See Sage Prods., Inc. v. Devon Indus., Inc.,* 126 F.3d 1420, 1426 (Fed.Cir.1997) ("If a litigant seeks to show error in a trial court's overlooking an argument, it must first present that argument to the trial court. In short, this court does not 'review' that which was not presented to the district court.").

4   At oral argument, TransCore argued that "a contention of infringement ... is not enough for an implied license." Oral Arg. at 39:31–39:35. This argument misses the mark. TransCore's contentions did not create the implied license; they merely serve as evidence that TransCore sought to enforce the #946 patent in derogation of the rights it granted under the TransCore—Mark IV settlement agreement. That attempted derogation is prevented by legal estoppel, which gives rise to the implied license.

---

# TAB 153

purpose. Only a reservation of that kind may fall within the description "other like reservations", in my opinion.

I am of the view that the reservation made in Order in Council P.C. 1986-2764 falls within the language of s. 13(1) of the *Yukon Quartz Mining Act* in that the lands reserved are for a broad public purpose, *i.e.*, "to facilitate the settlement of native land claims". Also, although the reservation is not as an "Indian reserve", the stated purpose is similar in that the lands reserved will be for Indians in the event they should become part of a final settlement of existing land claims.

I would allow the appeal and set aside the order of the Trial Division of February 12, 1990, with costs both here and in the Trial Division.

*Appeal allowed.*

---

## Turbocristal Inc. et al. v. Handfield; Industries SMI Canada Ltée, mis-en-cause

[Indexed as: Turbocristal Inc. v. Handfield]

*Quebec Superior Court, Philippon J.*      *August 9, 1991.*

Patents — Ownership — Contract to assign — Licence — Declaration of ownership — Patents pertaining to method and apparatus for manufacture of artificial snow — Exclusive right to use

Patents — Licences — Voluntary licences — Declaration of ownership — Patents pertaining to method and apparatus for manufacture of artificial snow — Exclusive right to use

The applicant corporation is active in the field of artificial snow-making, both on the national and international markets, and is in the process of improving its market position.

The defendant inventor conveyed the right to use his patents for a method and apparatus pertaining to the manufacture of artificial snow in 1985, to the plaintiff Turbocristal Inc. in consideration of $2,500 in share capital. At the time of the agreement the defendant was the sole shareholder and director of the plaintiff Turbocristal. The plaintiff company was incorporated in 1985 specifically to ensure eligibility for funding to complete development of the apparatus which was in fact obtained. Control of the plaintiff subsequently passed to a third party although the defendant remained a director and employee of the plaintiff until resigning in 1989.

The plaintiff took action for a declaration as to its right under the agreement with the defendant.

The defendant claims that he conveyed to the plaintiff nothing more than a non-exclusive, perpetual right to use the patents, rather than ownership of the patents. He further claims that the patents do not cover the whole machine, but only a combination of elements contained in the machine. By way of counterclaim, he

claims a royalty of 5% on machines manufactured, and sold since December 18, 1989 (the date of his resignation) and an accounting.

*a*    The issue is whether the agreement transferred to the plaintiff an exclusive right and further, the effect of the subsequent conduct of the defendant.

**Held**, the action is maintained in part; the counterclaim is dismissed.

*Assignment or licence*

Nowhere in the agreement does the word "assignment" appear. The corporate resolution as well as the agreement refers to a right to use the patents. The
*b*    Canadian patent had not issued at the date of the agreement.

The right to use does not amount to a sale of the whole interest, nor to an assignment under the *Patent Act*, R.S.C. 1985, c. P-4. There is no mention of exclusivity in the agreement, and exclusivity is not presumed. The agreement did, however, include a substantial interest in the intellectual property in the invention. The plaintiff Turbocristal had to have all of the patent rights to obtain financial aid
*c*    and the defendant was acceding to these requirements by accepting financial aid.

With the arrival of new investors, a tacit agreement could be inferred from the conduct of the parties. The investors were told by the broker that there was a patent. Certain facts were consistent with the defendant having reserved ownership, while others were not.

*d*    However, the attitude, comportment, facts and acts as well as writings, of which the defendant had knowledge and approval show at least exclusivity of a right to use the patents, as well as, in many circumstances, a right of ownership of the intellectual aspect of the invention.

**Cases referred to**

*Marchand v. Péloquin* (1978), 45 C.P.R. (2d) 48, [1978] Que. C.A. 266; *Amfac*
*e*    *Foods Inc. v. Irving Pulp & Paper Ltd.* (1984), 80 C.P.R. (2d) 59, 2 C.I.P.R. 115 [aff'd 12 C.P.R. (3d) 193, 9 C.I.P.R. 265, 72 N.R. 290]; *Granit Bussière Ltée v. Columbia Granit Inc.* (1991), 25 A.C.W.S. (3d) 1136 [leave to appeal to S.C.C. refused 44 Q.A.C. 321*n*]; *Trudeau v. Cochrane*, [1977] 2 S.C.R. 55, 10 N.R. 295

**Statutes referred to**

*f*    *Bankruptcy Act*, R.S.C. 1985, c. B-3
*Code of Civil Procedure*, R.S.Q., c. C-25, art 760
*Patent Act*, R.S.C. 1985, c. P-4

APPEAL for a declaration as to rights in a patent; action maintained in part, counterclaim dismissed (No. 200-05-000067-905).

*g*
*Jean Lemelin*, for plaintiffs.
*Louis Huot*, for defendant.
*François Grenier*, for mis-en-cause.

PHILIPPON J. (translation):—The solution to the present litiga-
*h*    tion depends upon the effect of the following agreement on the exclusivity of the rights assigned [translation]:

CONTRACT OF SALE

BETWEEN:    LOUIS HANDFIELD
            95 Sault Au Matelot, apt. 5
            Quebec City, G1K 3Y9,

hereinafter called THE VENDOR

AND:   TURBOCRISTAL INC.
a corporation having its head office at 95 Sault Ay Matelot, apt. 5, Quebec City, Quebec, G1K 3Y9, herein represented by Louis Handfield, its president, being duly authorized as he so declares, hereinafter called THE PURCHASER

---

### AGREEMENT

1. The vendor sells, assigns, and transfers to the purchaser, who so purchases, the right to use his patents on a snow making machine;

2. This right is sold for $2,500.00, which is payable by the issuance and distribution to Louis Handfield, the vendor, of 2,500.00 class "A", no par value shares of the share-capital of Turbocristal Inc., the purchaser, for $2,500.00;

QUEBEC CITY, this 1st day of July 1985

_____
LOUIS HANDFIELD

TURBOCRISTAL INC.

By: _____
LOUIS HANDFIELD

This machine is an artificial snow-making machine (snow gun), a blower type, said to employ an innovative and unique method of mixing the water with cold air.

At the time that this agreement was entered into on July 1, 1985, Louis Handfield, an engineer, the inventor, was also the sole shareholder and director of Turbocristal Inc. which he had incorporated in March, 1985, specifically to satisfy the requirements of the Canada Industrial Research Assistance Program (CIRAP) under which a grant was sought (the program was administered by the National Research Council of Canada (NRC)), in order to complete the research and development of the machine: see document P-4 — presentation and technical report on the project.

In June, 1985, $29,500 in financial assistance was granted to the company for the year 1985-86: see document P-5. Thereafter, further financial assistance was granted of an amount not to exceed $100,000.

In 1988, the company progressively became an active business in the area of artificial snow-making and hoped to improve the position of its machines on the national, and even international, market. The company had an important receivable which it considered to be bad and needed new sources of financing. The search for new investors was carried out with the assistance of the

brokers Lévesque Beaubien Inc., through the intermediary of the Société d'investissements Turbocristal Inc. (the "Company") which

*a*  was accredited as a Quebec business investment company (SPEQ): see documents P-10 and P-14 for the presentation of the project to investors.

$600,000 was subscribed for in the Company; half of this amount was subscribed for by Laurier Pedneault who thereby

*b*  ensured himself control of Turbocristal in which the Company had invested all its funds.

Thereafter, and at the time of a proposal made under the *Bankruptcy Act*, R.S.C. 1985, c. B-3, control of Turbocristal passed into the hands of Laurier Pedneault, but Louis Handfield

*c*  always remained closely connected with it as a director and employee, up until December, 1989, at which time after unfruitful discussions as to his remuneration (see hand written document D-2 for the pertinent details in this regard) and his participation in the company, and after feeling squeezed out by the sale of the Pierre-

*d*  Bertrand building to another company belonging to Laurier Pedneault (see document D-4), he resigned and announced that he had not assigned all his rights in his invention. It was on December 18, 1989, that the defendant wrote the following two relevant letters [translations]:

*e*

<div align="center"><em>Exhibit P-18</em></div>

<div align="right">December 18, 1989</div>

TURBOCRISTAL INC.

*f*  6055, Pierre Bertrand North
Quebec City, Quebec
G2K 1M1

ATTENTION: PIERRE-PAUL DUFOUR
        Managing Director

*g*

Sir:

We hereby inform you of our intention to leave the company in order to form a competing company with other shareholders.

As a result, please consider the present as our letter of resignation both as

*h*  directors and employees of the company.

This resignation will be effective as of December 21, 1989, at 5:00 PM unless, in order to ensure continuity, you consider it necessary to extend our employment for several days, in which case we are willing to discuss this with you for the purposes of fixing the terms and conditions of our employment.

Yours truly,

LOUIS HANDFIELD

PIERRE LAFRANCE                                        *a*

*Exhibit P-19*

December 18, 1989                                      *b*

TURBOCRISTAL INC.
6055, Pierre Bertrand North
Quebec City, Quebec
G2K 1M1

ATTENTION: PIERRE-PAUL DUFOUR
            Managing Director

Sir:                                                  *c*

In light of my letter of resignation both as a director and employee of the company which I sent to you today, I hereby remind you that the rights to the invention and patents to the method and apparatus for making snow is my personal property.

I authorized its non-exclusive use by the company in the past for an indeterminent period. I intend to put an end to this as of November 30, 1990.    *d*

I am at your disposal to discuss this matter with you, the costs and terms and conditions of its use for the period between the date of the present letter and November 30, 1990.

Yours truly,                                          *e*

LOUIS HANDFIELD

As a result, in January, 1990, the present action was instituted for a declaration of exclusivity and ownership of the rights which Turbocristal claims in the Canadian and American patents and in the application for a European patent, as well as an order for a permanent injunction protecting its rights.    *f*

A provisional injunction was issued on January 11, 1990, and renewed on January 25th, to continue in effect until the rendering of the present judgment.

In defence, Louis Handfield submits that he only assigned a right to use the patents, which was not exclusive and not limited as to time, without ever having assigned them in accordance with the *Patent Act*, R.S.C. 1985, c. P-4, with the result that he still remains owner of the patents. He submitted that the patents do not cover the entire snow-making machine but only a combination of the particular elements inside of this machine. In his counter-claim, he claims a 5% royalty on the machines made and sold since December 18, 1989, and an accounting in order to clarify the situation.    *g*

*h*

*a*  In order to determine whether the agreement transferred an exclusive right, it is necessary to analyze the submissions made by the co-plaintiffs. All the submissions and the entire issue concern the nature of the contract or, failing which, the existence of a subsequent agreement based on the conduct of the defendant.

*Sale or licence*

*b*  No where, except in the title of the resolution of Turbocristal (produced as ex. P-2), does one find the expression "sale of patents" [translation]:

> Whereas Louis Handfield has subscribed for 2,500 class "A" shares of the share-capital of the company in consideration of $2,500;

*c*
> WHEREAS Louis Handfield wishes to sell to the company which wishes to purchase, the right to use his patents on a snow making machine in consideration of $2,500;

> AND WHEREAS Louis Handfield asks that this sale of the right to use his patents be accepted as complete payment of the above-mentioned consideration;

*d*  IT IS UNANIMOUSLY RESOLVED:

> •    •    •    •    •

> 4.- To accept the above-mentioned sale in complete payment of the above-mentioned consideration, and to confirm that this sale constitutes the fair money equivalent of the amount of this consideration;

*e*  The texts, much more so than the title of the resolution, must be used to discover the true intention of the parties. Both the resolution and the agreement concern the right to use the patents. It should be noted that at the time that the agreement was entered into, no Canadian patent had been issued but that an application *f*  for a Canadian patent, which was made after confirmation of the NRC financial assistance, was submitted in June, 1985, and accepted in November, 1990. The plural, "patents", is explained by the applications for patents in the United States and in Europe.

*g*  The plaintiffs, based on the title of the resolution, want to add to the text of the agreement and thereby establish an assignment, a warranty against eviction, and exclusivity of exploitation flows from the sale of the whole, which would lead to the application of the well-known principles expressed, for example, by the author Michel Pourcelet in *La Vente*, at p. 104 [translation]:

*h*
> A vendor must not trouble or interfer with the enjoyment of the purchaser. This positive or imperative obligation is of public order (public policy). "Whoever must give a warranty may not evict." *It is a duty to abstain from doing something or a negative obligation.* The vendor cannot directly or indirectly interfere with the exercise of the right that he has conveyed to the purchaser.

Similarly, the honourable Albert Mayrand, then a judge in the Court of Appeal, in *Marchand v. Péloquin* (1978), 45 C.P.R. (2d) 48 at p. 60, [1978] Que. C.A. 266, wrote [translation]:

> ... the privilege of challenging persons other than himself who exploit the invention. In this sense, the owner has a negative right, a right to prohibit. But this right also has a positive aspect because it confers on the owner exclusivity of exploitation.

However, the right to use something is not the same as the sale of the whole, nor to an assignment within the meaning of the *Patent Act*. The plaintiffs make reference to the case of *Amfac Foods Inc. v. Irving Pulp & Paper Ltd.* (1984), 80 C.P.R. (2d) 59 at p. 69, 2 C.I.P.R. 115 (F.C.T.D.), where the operative passage reads as follows:

> "LAMB hereby agrees to sell and hereby sells to MCCAIN for the life of this agreement its PATENT RIGHT in AGREEMENT METHOD and APPARATUS throughout AGREEMENT TERRITORY for the processing of potatoes for french frying, but only pursuant to the terms and conditions set forth in this agreement."

In the present case, the defendant certainly assigned less because the expression "the right to use" itself entails less than the assignment of the whole. One is therefore lead to understand that it is only speaks of use, unless the article "the" is sufficient to include exclusivity, which appears doubtful.

We believe that the agreement as drafted does not have the necessary effect of completely buying out the ownership in the invention and patents thereon. Exclusivity is no where mentioned and it is not to be presumed: *Granit Bussière Ltée v. Columbia Granit Inc.*, Que. C.A., Nos. 200-09-000649-860, 200-09-000711-868, 200-09-000712-866, J.E. 91-468, February 28, 1991 (Bisson C.J.Q. LeBel and Mailhot JJ.A) [also summarized 25 A.C.W.S. (3d) 1136]. We believe that it is therefore far from evident that the defendant assigned all his rights upon the conclusion of the agreement P-2-A.

It is therefore necessary to analyze the testimonies, the context and the facts and actions of the defendant.

*Up to July 1, 1985*

First, at the time of the entering into of the agreement of July 1, Louis Handfield was the sole actor, the inventor, the eventual patentee and sole shareholder and director of Turbocristal.

Principally, the plaintiffs submit that Turbocristal needed to have all the rights to the patents in order to obtain the assistance under the IRAP program. The defendant submitted to this requirement when he accepted the financial assistance granted. One finds the

signature of the defendant on document P-5 which granted this
assistance. In so doing, he accepted the following condition of

**a**  participation (see document P-5), at p. 4 of the conditions of
participation, para. 23 [translation]:

> The documents, patents and other results of the project are the property of
> the company. It must obtain at its own expense the required patents for the
> inventions discovered by the research financed by IRAP. If, within a reason-
> able time after the discovery of the invention, the company decides not to
**b**  > apply for patents in a given country, the NRC can enjoin the company to
> transfer all its rights in the invention in the country in question to the Crown.

It is obvious that the approval of the NRC found in the letter P-5
of June 14, 1985, makes reference to the proposal submitted by
Louis Handfield in May, 1985, before any application for a patent
**c**  had been made. The acceptance of the conditions of participation
therefore necessarily entails an undertaking to obtain the patents.

Two witnesses in aposition to give approvals under the program
testified to a certain flexibility with respect to this requirement.
David Ellis, who was called by the plaintiffs, and who was the co-
**d**  ordinator of the program in Quebec where there were 40 counsel-
lors, attached particular importance to the undertaking to exploit
the invention in Canada and, by application of Condition 23,
expected that the business would not assign its right to exploit it to
someone outside of Canada. He was not in direct contact with
**e**  Louis Handfield but others such as Claude Desaulniers, a witness
called by the defence, were in contact. The latter suggested that he
make an assignment — "a non-exclusive one, as a company can
always go bankrupt, etc.". It was sufficient for him that the
business had the right to use the products manufactured from the
**f**  invention.

The program was perhaps administered more flexibly than
participation clause 23, mentioned above, required and which the
defendant accepted.

The defendant's evidence is to the same effect when he testified
**g**  that he wanted to keep his invention and that he remembers the
words of Desaulniers recommending that he only grant a right to
use it which was not necessarily exclusive. In drafting it up, the
defendant testified that instructions were given along the lines of
the suggestions of Desaulniers who had mentioned to him the
**h**  possibility of bankruptcy and the loss of control of the company,
which lead him to try and protect his own rights. He believes that
his lawyers drafted resolution P-2 but he does not know who
drafted the agreement P-2-A.

Louis Handfield at that point in time did not have any apparent
interest in assigning more than was necessary and the sale the

same day of the prototype of the snow-making machine at a price
equal to the amount invested to produce it (see resolution P-3
between Transcable Inc., another company belonging to the
defendant and Turbocristal Inc.) is not a determinative factor
which would allow one to conclude that all the rights in the
invention then passed to Turbocristal. None the less, as the co-
plaintiffs point out, the two concurrent events (P-3 and P-2-A)
favour the theory that the agreement P-2-A of July 1, 1985,
included a good part of the intellectual property to the invention.

*Post July 1, 1985, and the arrival of the new investors*

If up until that point in time the ambiguity arising from the
agreement P-2-A was not dissipated, a subsequent agreement
involving acknowledgment of the rights conveyed may be discov-
ered in the conduct and actions taken afterwards. This is the
meaning of the expression used by Beetz J., then a member of the
Supreme Court in *Trudeau v. Cochrane*, [1977] 2 S.C.R. 55 at
p. 66, 10 N.R. 295, where he wrote: "This was only done to
establish the existence of a tacit understanding subsequent to the
written agreement and which could be inferred from the behaviour
of the parties".

The two principal witnesses have different stories on this aspect.
Laurier Pedneault, the present president and general manager of
the co-plaintiffs, an investor in the Company, testified about his
first questions to the broker Louis Paquet: "Is there any protec-
tion?" — Answer: "There is no problem, there is a patent". Laurier
Pedneault testified that Louis Handfield never invoked his owner-
ship rights to the invention nor did he make any claim in this
regard before December, 1989.

He testified that he relied on the answer given by Louis Paquet
and the network of counsellors called upon to verify the protection
granted by the documents presenting the investment project.

For his part, the defendant said that in response to a question
from Laurier Pedneault, he had said that the patents were in his
name and that Turbo only had a right to use them. This is not
strictly in accordance with the text of the agreement P-2-A. He
would have said the same thing to the brokers from Lévesque
Beaubien. As a result, there is not any acknowledgment whatso-
ever on his part and Laurier Pedneault and the investment
counsellors had, on the basis of the evidence, access to all the
documents that they considered necessary to consult.

Of the facts and conduct mentioned by the co-plaintiffs which it
is alleged would have the effect of creating a subsequent agree-
ment or an acknowledgment of the conveyance of rights, certain

ones are neutral or do not depend upon the defendant such as the opinions of the professionals or business people who had access to
*a*  the relevant documents. For example, the cost of the patent application (see the invoices and documents filed as ex. P-7), as well as the defence to an infringement action brought by an American company (see document filed as ex. P-9) are both compatible with the desire of Turbocristal to protect its right of
*b*  use.

On the other hand, there are events which are irreconcilable with the reservation of rights by the defendant:

— As of May, 1985, the defendant stated at p. 5, of an annex to a document to be presented to the NRC dated July 17, 1985, the
*c*  following (ex. P-4) [translation]:

> 7. Project team
>
> The project team will be principally made up of Louis Handfield, an engineer, who is the designer of the machine and the owner of the patent applications assigned to TURBOCRISTAL.

*d*  — The large amounts of money spent on research and development and marketing, as it so appears from the financial statements filed as ex. P-6, for a total of nearly $400,000, make it more likely that the defendant believed that Turbocristal was the owner of the rights under the patents in
*e*  question.

— Turbocristal became the owner of the trade mark SNOW WARRIOR, as it so appears from the document filed as ex. P-8.

— Since July 1, 1985, Turbocristal has made applications, prepared by the defendant, for loans, grants, and at the time of
*f*  the negotiation of an investment by way of share subscriptions for its share-capital in the amount of $610,000 in which Turbocristal was presented as the owner of the patents without any restriction or reservation being mentioned. At p. 10 of the prospectus concerning the Company, the machines are
*g*  described as belonging to Turbocristal and one reads in the following paragraph [translation]:

> The Turbocristal machines are patented in the United States (issued on December 8, 1987) and are on the verge of being patented in Canada and in Europe. They are the only ones of this type to be manufactured in Canada."

*h*  (Exhibit P-10.) This passage indicates that the defendant, both vis-à-vis Turbocristal as well as vis-à-vis third parties, never indicated the existence of any reservation with respect to the rights to exploit the patents which were represented as belonging to Turbocristal.

— In an undated letter provided to the brokers at Lévesque Beaubien Inc. for the purposes of filing an attestation dated August 2, 1988, the defendant signed, as president of Turbocristal, a statement which was also signed by Laurier Pedneault, both as managers of Turbocristal Inc. (The attestation was filed as ex. P-16.) Essentially, one finds there an affirmation that the prospectus does not contain any information which is false or misleading and which is likely to affect the company and the value of the shares and that no event is likely to influence the activities of the company in an unfavourable and significant manner. It is not necessary to show that the threat that the letter P-19 sent by the defendant to Turbocristal in December, 1989 contains, constitutes one of these events.

— The defendant, acting on behalf of Turbocristal Inc., negotiated and concluded three exclusive distribution contracts. (These three contracts were filed as ex. P-12.) The Leewood contract leaves it to be understood that Turbocristal owns all the rights to the trade marks and grants exclusivity in Japan and in Korea.

The exclusive distribution contract with Nichimen Corporation, a Tokyo company, contains cl. 10.1:

> TCI guarantees the validity of the trademarks and trade names which designate and identify the Products and further guarantees that TCI is the exclusive owner of such marks and names in Canada.

With respect to this contract, the defendant alleged in para. 35 of his defence that this was for the protection of Turbocristal. This is one quite acceptable way of seeing things but it does not preclude one from noting the protection that Nichimen have from such affirmation so as not to infringe the exploitation of products protected in favour of persons other than Turbocristal.

— In document P-13, which was presented by the plaintiffs as having been prepared for the purposes of an application for a grant in the context of a PRO-PME program operated by the Quebec Department of Industry and Commerce, the title should be noted: "TURBOCRISTAL designed and marketed SNOW WARRIOR". The defendant therein affirms without reserve, the rights that Turbocristal has, not only on the trade mark, but also to the design, manufacture, and marketing of the machines.

These are some of the important facts which attracted the court's attention. No mention will be made of the documents and

mentions appearing in Turbocristal's financial statements with respect to the patents which are listed as assets. The court is of the

*a* view that it would not be appropriate to draw conclusions from these documents and mentions as they depend on the opinion of the company's accountants who were not really called upon, according to the evidence heard from Paul-André Michaud, to consider the legal implications of the agreement P-2-A and the consequences

*b* flowing therefrom.

Even if one adopts Turbocristal's ambiguous position which is based on the resolution P-2 and the agreement P-2-A, it follows from the attitude, the comportment, the facts and actions and writings which the defendant was aware of and approved, and

*c* which he signed, that a subsequent agreement was reached or at the very least, that there was an acknowledgment of the exclusivity of the rights granted to Turbocristal to use the patents and even, in several cases, of the ownership of the intellectual part of the invention.

*d* As has been seen, several statements by, and certain conduct of the defendant can be set up against the claims that he made in his letter P-19 and, finally that for more than four years, he more than once confirmed Turbocristal's ownership and exclusive use of the patents.

*e* The defendant undoubtedly was prudent at the time of the drafting and signing of the agreement P-2-A and the co-plaintiffs have had to bear the effects of the uncertainty or the precariousness of their rights which have only been established over time.

The defendant has lost the protection that he believed that he

*f* had kept when, with the arrival of circumstances which favoured the interests that he had in common with Turbocristal and even the Company, he took a position which favoured Turbocristal.

The defendant cannot both claim for himself, and recognize as belonging to Turbocristal, the rights which flow from the use and

*g* ownership of the patents in question.

It would not be appropriate to rule on the relief of immediate execution of the present judgment notwithstanding an appeal because of art. 760 of the *Code of Civil Procedure*, R.S.Q., c. C-25.

In the circumstances, the court is of the view that the action is

*h* well-founded in part in so far as the ownership of the patents and the exclusive right of use are concerned.

In light of the preceding, the counterclaim is without merit.

AS A RESULT, THE COURT:

DISMISSES the counterclaim with costs;

GRANTS the action in part;

DECLARES Turbocristal to be the owner of the patents as of January 8, 1990, and as of July 1, 1985, the exclusive owner of the right to use the following patents or patent applications:

— Canada: patent No. 1,275,815 granted on November 6, 1990;

— United States of America: U.S. patent No. 4,771,395 granted on December 8, 1987;

— Europe: European patent application bearing number 86304593.6 filed on June 16, 1986, and designating the following countries: Austria, Switzerland, Germany, France, Italy, Liechtenstein and Sweden; and such patents as have been granted pursuant to this patent application or which may be so in the future;

ISSUES a permanent injunction enjoining the defendant, the mis-en-cause, their representatives, officers, agents or employees, as well as any other person who may have knowledge of the present judgment, subject to all penalties provided for by law:

— to abstain from manufacturing, selling or offering for sale snow-making machines incorporating the method described in the claims contained in the above-mentioned patents;

— to abstain from exploiting directly or indirectly, from selling, assigning or otherwise alienating, either gratuitously or for consideration, said patents.

The whole with costs.

*Judgment accordingly.*

---

### Willett Foods Ltd. v. Greengrocer, Inc.

*Trade Marks Opposition Board, D.J. Martin          February 28, 1992.*

**Trade marks — Opposition — Confusing trade mark — Surrounding circumstances — GREEN GROCER & Design marks for retail store services and related wares — Words "green grocer" disclaimed — Opponent relying on registrations for MR. GROCER & Design for similar services — Parties' marks inherently weak — Services essentially the same — Trades similar — Opponent's mark not resembling either of applicant's marks to any great extent — No party able to claim exclusivity in descriptive term "grocer" or in idea of grocer or green grocer — Given difference between marks, absence of reputation for opponent's mark, marks not confusing — Opposition is rejected.**

The applicant applied to register the trade mark GREEN GROCER & Design based on proposed use for the services of the "operation of retail fruit and vegetable stores" and the following wares: "packaged and bulk packed fresh