TAB 154

Case 09-10138-MFW    Doc 14225-52    Filed 08/15/14    Page 2 of 108
Unique Broadband Systems, Inc., Re, 2014 ONCA 538, 2014 CarswellOnt 9327

2014 ONCA 538, 2014 CarswellOnt 9327, 13 C.B.R. (6th) 278

2014 ONCA 538
Ontario Court of Appeal

Unique Broadband Systems, Inc., Re

2014 CarswellOnt 9327, 2014 ONCA 538, 13 C.B.R. (6th) 278

# In the Matter of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended

In the Matter of a Plan of Compromise or Arrangement of Unique Broadband Systems, Inc.

Robert J. Sharpe, E.E. Gillese, C.W. Hourigan JJ.A.

Heard: June 17, 2014
Judgment: July 10, 2014
Docket: CA C57884

Proceedings: reversing in part *Unique Broadband Systems Inc., Re* (2013), 5 C.B.R. (6th) 1, 2013 ONSC 2953, 2013 CarswellOnt 6926, Mesbur J. (Ont. S.C.J. [Commercial List]); additional reasons at *Unique Broadband Systems Inc., Re* (2013), 5 C.B.R. (6th) 241, 2013 ONSC 5121, 2013 CarswellOnt 11112, Mesbur J. (Ont. S.C.J. [Commercial List])

Counsel: Clifford I. Cole, Benjamin Na for Appellant, Unique Broadband Systems, Inc.
Joseph Groia, Tatsiana Okun for Respondents, Jolian Investments Limited and Gerald McGoey

Subject: Civil Practice and Procedure; Corporate and Commercial; Insolvency; Torts

## Related Abridgment Classifications

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

## Headnote

**Bankruptcy and insolvency --- Companies' Creditors Arrangement Act — Arrangements — Approval by court — Miscellaneous**

UBS alleged decisions relating to executive compensation made by former board were made in breach of fiduciary obligations to UBS and should be set aside — CEO and chairman sought payment of compensation and other amounts CEO claimed were due to CEO from UBS — CEO submitted proofs of claim against UBS totalling $9.5 million, which were denied — CEO sought to have claims, as amended, approved — Trial judge found SAR cancellation award and deferred bonus award in favour of CEO were set aside — Trial judge found there was no business rational for CEO's bonus — Trial judge found it was unclear how it was in best interests of UBS to pay large amount to CEO in order to incentivize CEO to remain with UBS — Trial judge found UBS breached fiduciary duties in failing to consider interests of shareholders when UBS came to decisions concerning SAR cancellation pool and deferred bonus pool — Trial judge found CEO was terminated without cause and was entitled to enhanced termination benefits — Trial judge found CEO's actions did not constitute cause — Trial judge found CEO not being elected to UBS board or being appointed CEO constituted termination without cause — Trial judge found potentially oppressive acts were cured — Trial judge found CEO breached fiduciary duties to UBS in setting enhanced benefits for himself and UBS had no obligation to indemnify — Any money UBS paid on account ordered repaid — UBS appealed — Appeal allowed in part — Findings of breach of fiduciary duties to UBS driven by self-interest were well supported, and actions were not protected by business judgment rule — Finding that price of SAR units was unrealistic was reasonable — Trial judge properly found that bonus pool was breach of fiduciary duty — Removal from office of CEO did not affect his liability, as breach of duty is wrongdoing whether or not result can be foreseen — Trial judge properly found that indemnification provisions were not operative in

face of breach of duty — Trial judge did not specifically state that director acted in bad faith, but did properly conclude that he was ineligible to receive indemnification because he had not met standard of acting honestly and in good faith — Trial judge erred in finding management services contract was not breached — Finding contract for management services was not breached was absurd result and ignored requirements under s. 134(3) of Ontario Business Corporations Act — Cause under agreement was not limited to enumerated grounds of fraud, theft, or misappropriation, but included all serious misconduct that was materially injurious to UBS.

**Business associations --- Specific matters of corporate organization — Directors and officers — Miscellaneous**

UBS alleged decisions relating to executive compensation made by former board were made in breach of fiduciary obligations to UBS and should be set aside — CEO and chairman sought payment of compensation and other amounts CEO claimed were due to CEO from UBS — CEO submitted proofs of claim against UBS totalling $9.5 million, which were denied — CEO sought to have claims, as amended, approved — Trial judge found SAR cancellation award and deferred bonus award in favour of CEO were set aside — Trial judge found there was no business rational for CEO's bonus — Trial judge found it was unclear how it was in best interests of UBS to pay large amount to CEO in order to incentivize CEO to remain with UBS — Trial judge found UBS breached fiduciary duties in failing to consider interests of shareholders when UBS came to decisions concerning SAR cancellation pool and deferred bonus pool — Trial judge found CEO was terminated without cause and was entitled to enhanced termination benefits — Trial judge found CEO's actions did not constitute cause — Trial judge found CEO not being elected to UBS board or being appointed CEO constituted termination without cause — Trial judge found potentially oppressive acts were cured — Trial judge found CEO breached fiduciary duties to UBS in relation to setting enhanced benefits for himself and UBS had no obligation to indemnify — Any money UBS paid on account ordered repaid — UBS appealed — Appeal allowed in part — Findings of breach of fiduciary duties to UBS driven by self-interest were well supported, and actions were not protected by business judgment rule — Finding that price of SAR units was unrealistic was reasonable — Trial judge properly found that bonus pool was breach of fudiciary duty — Removal from office of CEO did not affect his liability, as breach of duty is wrongdoing whether or not result can be foreseen — Trial judge properly found that indemnification provisions were not operative in face of breach of duty — Trial judge did not specifically state that director acted in bad faith, but did properly conclude that he was ineligible to receive indemnification because he had not met standard of acting honestly and in good faith — Trial judge erred in finding management services contract was not breached — Finding contract for management services was not breached was absurd result and ignored requirements under s. 134(3) of Ontario Business Corporations Act — Cause under agreement was not limited to enumerated grounds of fraud, theft, or misappropriation, but included all serious misconduct that was materially injurious to UBS.

**Business associations --- Specific matters of corporate organization — Directors and officers — Liabilities — Oppression**

UBS alleged decisions relating to executive compensation made by former board were made in breach of fiduciary obligations to UBS and should be set aside — CEO and chairman sought payment of compensation and other amounts CEO claimed were due to CEO from UBS — CEO submitted proofs of claim against UBS totalling $9.5 million, which were denied — CEO sought to have claims, as amended, approved — Trial judge found SAR cancellation award and deferred bonus award in favour of CEO were set aside — Trial judge found there was no business rational for CEO's bonus — Trial judge found it was unclear how it was in best interests of UBS to pay large amount to CEO in order to incentivize CEO to remain with UBS — Trial judge found UBS breached fiduciary duties in failing to consider interests of shareholders when UBS came to decisions concerning SAR cancellation pool and deferred bonus pool — Trial judge found CEO was terminated without cause and was entitled to enhanced termination benefits — Trial judge found CEO's actions did not constitute cause — Trial judge found CEO not being elected to UBS board or being appointed CEO constituted termination without cause — Trial judge found potentially oppressive acts were cured — Trial judge found CEO breached fiduciary duties to UBS in relation to setting enhanced benefits for himself and UBS had no obligation to indemnify — Any money UBS paid on account ordered repaid — UBS appealed — Appeal allowed in part — Findings of breach of fiduciary duties to UBS driven by self-interest were well supported, and actions were not protected by business judgment rule — Finding that price of SAR units was unrealistic was reasonable — Trial judge properly found that bonus pool

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

was breach of fudiciary duty — Removal from office of CEO did not affect his liability, as breach of duty is wrongdoing whether or not result can be foreseen — Trial judge properly found that indemnification provisions were not operative in face of breach of duty — Trial judge did not specifically state that director acted in bad faith, but did properly conclude that he was ineligible to receive indemnification because he had not met standard of acting honestly and in good faith — Trial judge erred in finding management services contract was not breached — Finding contract for management services was not breached was absurd result and ignored requirements under s. 134(3) of Ontario Business Corporations Act — Cause under agreement was not limited to enumerated grounds of fraud, theft, or misappropriation, but included all serious misconduct that was materially injurious to UBS.

## Table of Authorities

### Cases considered by *C.W. Hourigan J.A.*:

*BCE Inc., Re* (2008), *(sub nom. Aegon Capital Management Inc. v. BCE Inc.)* 383 N.R. 119, 71 C.P.R. (4th) 303, 52 B.L.R. (4th) 1, *(sub nom. Aegon Capital Management Inc. v. BCE Inc.)* 301 D.L.R. (4th) 80, 2008 SCC 69, *(sub nom. BCE Inc. v. 1976 Debentureholders)* [2008] 3 S.C.R. 560, 2008 CarswellQue 12595, 2008 CarswellQue 12596 (S.C.C.) — referred to

*Boy Scouts of Canada, Provincial Council of Newfoundland v. Doyle* (1997), *(sub nom. Boy Scouts of Canada v. Doyle)* 149 D.L.R. (4th) 22, 151 Nfld. & P.E.I.R. 91, 471 A.P.R. 91, 1997 CarswellNfld 325 (Nfld. C.A.) — referred to

*Canson Enterprises Ltd. v. Boughton & Co.* (1991), [1992] 1 W.W.R. 245, 9 C.C.L.T. (2d) 1, 39 C.P.R. (3d) 449, 131 N.R. 321, 85 D.L.R. (4th) 129, 61 B.C.L.R. (2d) 1, 6 B.C.A.C. 1, 13 W.A.C. 1, [1991] 3 S.C.R. 534, 43 E.T.R. 201, 1991 CarswellBC 269, 1991 CarswellBC 925 (S.C.C.) — considered

*Cantor Art Services v. Kenneth Bieber Photography* (1969), [1969] 1 W.L.R. 1226 (Eng. C.A.) — referred to

*Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.* (1979), *(sub nom. Exportations Consolidated-Bathurst Ltée c. Mutual Boiler & Machinery Insurance Co.)* [1980] 1 S.C.R. 888, 112 D.L.R. (3d) 49, 1979 CarswellQue 157, 1979 CarswellQue 157F, 32 N.R. 488, [1980] I.L.R. 1-1176 (S.C.C.) — considered

*Corporacion Americana de Equipamientos Urbanos S.L. v. Olifas Marketing Group Inc.* (2003), 2003 CarswellOnt 3186, 38 B.L.R. (3d) 156, 66 O.R. (3d) 352 (Ont. S.C.J.) — referred to

*Cytrynbaum v. Look Communications Inc.* (2013), 2013 ONCA 455, 116 O.R. (3d) 241, 307 O.A.C. 152, 366 D.L.R. (4th) 415, 2013 CarswellOnt 9090 (Ont. C.A.) — referred to

*Cytrynbaum v. Look Communications Inc.* (2014), 2014 CarswellOnt 1702, 2014 CarswellOnt 1703 (S.C.C.) — referred to

*Dumbrell v. Regional Group of Cos.* (2007), 55 C.C.E.L. (3d) 155, 220 O.A.C. 64, 85 O.R. (3d) 616, 2007 CarswellOnt 407, 25 B.L.R. (4th) 171, 279 D.L.R. (4th) 201, 2007 ONCA 59 (Ont. C.A.) — referred to

*Eli Lilly & Co. v. Novopharm Ltd.* (1998), 227 N.R. 201, 152 F.T.R. 160 (note), 1998 CarswellNat 1061, 1998 CarswellNat 1062, 161 D.L.R. (4th) 1, [1998] 2 S.C.R. 129, 80 C.P.R. (3d) 321 (S.C.C.) — referred to

*H.H. Vivian & Co. v. Clergue* (1909), 41 S.C.R. 607, 1909 CarswellOnt 781 (S.C.C.) — referred to

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW    Doc 14225-52    Filed 08/15/14    Page 5 of 108
Unique Broadband Systems, Inc., Re, 2014 ONCA 538, 2014 CarswellOnt 9327

2014 ONCA 538, 2014 CarswellOnt 9327, 13 C.B.R. (6th) 278

*Mannai Investment Co. v. Eagle Star Life Assurance Co.* (1997), [1997] 3 All E.R. 352, [1997] A.C. 749, [1997] 2 W.L.R. 945 (Eng. H.L.) — considered

*Manulife Bank of Canada v. Conlin* (1996), 1996 CarswellOnt 3941, 1996 CarswellOnt 3942, 6 R.P.R. (3d) 1, 94 O.A.C. 161, 203 N.R. 81, [1996] 3 S.C.R. 415, 139 D.L.R. (4th) 426, 30 O.R. (3d) 577 (note), 30 B.L.R. (2d) 1 (S.C.C.) — considered

*Moffat v. Wetstein* (1996), 1996 CarswellOnt 2148, 135 D.L.R. (4th) 298, 29 O.R. (3d) 371, 5 C.P.C. (4th) 128, 4 O.T.C. 364 (Ont. Gen. Div.) — considered

*People's Department Stores Ltd. (1992) Inc., Re* (2004), *(sub nom. Peoples Department Stores Inc. (Bankrupt) v. Wise)* 326 N.R. 267 (Eng.), *(sub nom. Peoples Department Stores Inc. (Bankrupt) v. Wise)* 326 N.R. 267 (Fr.), 4 C.B.R. (5th) 215, [2004] 3 S.C.R. 461, 2004 SCC 68, 2004 CarswellQue 2862, 2004 CarswellQue 2863, *(sub nom. Peoples Department Stores Inc. (Trustee of) v. Wise)* 244 D.L.R. (4th) 564, 49 B.L.R. (3d) 165 (S.C.C.) — referred to

*Plan Group v. Bell Canada* (2009), 2009 CarswellOnt 3807, 2009 ONCA 548, *(sub nom. Bell Canada v. The Plan Group)* 96 O.R. (3d) 81, 81 C.L.R. (3d) 9, 62 B.L.R. (4th) 157, 252 O.A.C. 71 (Ont. C.A.) — referred to

*UPM-Kymmene Corp. v. UPM-Kymmene Miramichi Inc.* (2002), 2002 CarswellOnt 2096, 19 C.C.E.L. (3d) 203, 27 B.L.R. (3d) 53, 214 D.L.R. (4th) 496, 32 C.C.P.B. 120 (Ont. S.C.J. [Commercial List]) — referred to

*UPM-Kymmene Corp. v. UPM-Kymmene Miramichi Inc.* (2004), *(sub nom. UPM-Kymmene Corp. v. Repap Enterprises Inc.)* 183 O.A.C. 310, 42 B.L.R. (3d) 34, 2004 CarswellOnt 691, 32 C.C.E.L. (3d) 68, 40 C.C.P.B. 114, 250 D.L.R. (4th) 526 (Ont. C.A.) — referred to

*Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust* (2007), 2007 CarswellOnt 1705, 222 O.A.C. 102, 2007 ONCA 205, 29 B.L.R. (4th) 312, 85 O.R. (3d) 254, 56 R.P.R. (4th) 163 (Ont. C.A.) — considered

**Statutes considered:**

*Business Corporations Act*, R.S.O. 1990, c. B.16
    Generally — referred to

    s. 122 — referred to

    s. 134(1) — considered

    s. 134(3) — considered

    s. 136(4.1) [en. 2006, c. 34, Sched. B, s. 26] — referred to

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36
    Generally — referred to

    s. 20 — referred to

    s. 20(1) — referred to

**Words and phrases considered:**

2014 ONCA 538, 2014 CarswellOnt 9327, 13 C.B.R. (6th) 278

**business judgment rule**

It must be remembered that the business judgment rule is really just a

rebuttable presumption that directors or officers act on an informed basis, in good

faith, and in the best interests of the corporation. Courts will defer to business

decisions honestly made, but they will not sit idly by when it is clear that a board

is engaged in conduct that has no legitimate business purpose and that is in

breach of its fiduciary duties

APPEAL by corporation from judgment reported at *Unique Broadband Systems Inc., Re* (2013), 2013 ONSC 2953, 2013 CarswellOnt 6926, 5 C.B.R. (6th) 1 (Ont. S.C.J. [Commercial List]), regarding claims under Companies' Creditors Arrangement Act.

*C.W. Hourigan J.A.*:

1      Unique Broadband Systems Inc. ("UBS") appeals the judgment of Justice Mesbur, dated May 21, 2013, rendered in connection with a claim made by Gerald McGoey and his personal company, Jolian Investments Limited ("Jolian"), pursuant to s. 20 of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "*CCAA*").

2      The trial judge ordered UBS to pay Jolian and Mr. McGoey's claim for an enhanced severance payment that was the equivalent of 300% of Mr. McGoey's compensation (the "Enhanced Severance"). That order is the subject of UBS' appeal.

3      The trial judge dismissed Mr. McGoey and Jolian's claims for payment of a SAR Cancellation Award, a Bonus Award, and indemnification for legal and other professional Services expenses. [1] That order is the subject of a cross-appeal by Mr. McGoey and Jolian.

4      For the reasons that follow, I would grant the appeal and dismiss the cross-appeal.

**Facts**

5      UBS is a public company listed on the TSX Venture Exchange. It is incorporated under the Ontario *Business Corporations Act*, R.S.O. 1990, c. B.16 (the "*OBCA*").

6      In 2002, Mr. McGoey was appointed a director and acting CEO of the corporation. Eventually, Mr. McGoey took on the role of CEO on a permanent basis. His employment relationship with UBS was first governed by a personal employment contract and later by a management services agreement between UBS and Jolian dated May 3, 2006 (the "Jolian Management Services Agreement"). Both the personal employment contract and the Jolian Management Services Agreement contained a "golden parachute" provision which granted Mr. McGoey enhanced termination benefits in certain situations.

7      Since November 2006, UBS had in place an incentive-driven share appreciation rights plan ("SAR Plan") for its directors and senior management. Upon certain triggering events, a SAR unit holder would be paid an amount equal to the difference between the market trading price of a UBS share and a strike price specified in the SAR Plan.

8      In 2003, UBS acquired a controlling 51.8% equity interest in Look Communications Inc. ("Look"), a telecommunications company. Mr. McGoey also served as a director and CEO of Look. UBS and Look were parties to a services agreement pursuant to which Mr. McGoey performed management services for Look. Other than those services, UBS was essentially a holding company and did not engage in any active business.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

9    Look's primary asset was a band of telecommunications spectrum. In early 2009, Look engaged in a process to sell the spectrum through a court-supervised plan of arrangement. Ultimately the spectrum was sold for $80 million on May 4, 2009 to Inukshuk Wireless Partnership ("Inukshuk"), a consortium of Rogers Communications Inc. ("Rogers") and Bell Canada (the "Spectrum Sale"). Mr. McGoey expected that the sale would generate a significantly higher sale price and was very disappointed with the figure offered by Inukshuk.

10    The board of directors of UBS (the "UBS Board") resolved to treat the Spectrum Sale as a triggering event pursuant to the SAR Plan. Prior to the announcement of the Spectrum Sale, UBS's shares were trading at approximately $0.15 per share. The UBS shares were anticipated to appreciate as a consequence of the Spectrum Sale's announcement. However, the anticipated share price increase did not materialize and the shares continued to trade at the $0.15 range after the announcement.

11    After court approval of the Spectrum Sale on May 14, 2009, Mr. McGoey engaged in negotiations with Rogers for a potential purchase of the balance of Look's assets, including roughly $300 million in tax losses and similar assets, subscribers, and real estate. Rogers withdrew from the negotiations on July 20, 2009 and the transaction never came to fruition.

12    Also after the Spectrum Sale, the UBS Board's compensation committee, which consisted of Mr. McGoey and two other UBS Board members, began reviewing the SAR Plan. Each member of the compensation committee had a considerable number of SAR units.

13    Executive compensation was on the agenda for the UBS Board meeting of June 17, 2009. In anticipation of that meeting, Mr. McGoey sought the advice of UBS' outside legal counsel, David McCarthy, regarding board approval of executive bonuses. Mr. McCarthy advised that, while s. 3.15 of National Policy 58-201 (which deals with the Corporate Governance Guidelines) says that a board should appoint a compensation committee entirely of independent directors, this was a guideline only and was not a requirement either pursuant to securities law or TSX Rules.

14    Mr. McGoey also requested that Mr. McCarthy provide the UBS Board with a letter outlining its authority, duties, and obligations in making payments to officers and employees. Mr. McCarthy provided such a letter, dated June 17, 2009. In that letter, he specifically advised the UBS Board that, in exercising its power to compensate officers and employees, the directors were obliged to meet their fiduciary obligations to the corporation.

15    At the June 17, 2009 UBS Board meeting, the directors considered the issue of the SAR Plan. Mr. McCarthy's letter was before the UBS Board and Mr. McCarthy was present for a portion of the meeting. Mr. McCarthy was not asked to opine on the UBS Board's decision at the meeting. He also did not provide the UBS Board with advice regarding the UBS Board's process or about the quantum of the benefits being considered.

16    At the meeting, each director disclosed his conflict of interest regarding their SAR unit holdings. The directors then unanimously resolved to cancel the SAR units and establish a SAR cancellation payment pool of $2,310,000, based on a fixed unit price of $0.40 per share. Under this new arrangement, Mr. McGoey, along with three other directors and one member of management, would receive a SAR cancellation award (the "SAR Cancellation Awards") based upon the $0.40 per unit figure.

17    The payment was contingent on: Look receiving the full compensation of $80 million from the Spectrum Sale; UBS receiving adequate cash resources; Mr. McGoey and the other SAR Plan unit holders relinquishing all rights to the SAR units awarded to them as of May 31, 2009; and the SAR Plan unit holders executing releases with respect to the SAR Plan and a stock option plan established in 2002.

18    The UBS Board met on July 8 and 9, 2009. At that meeting, the directors considered the issue of awarding bonuses for certain personnel. Mr. McGoey proposed the establishment of a bonus pool of $7 million. That plan was not approved. However, the UBS Board did approve the establishment of a bonus pool in the amount of $3.4 million (the "Bonus Pool").

19    The SAR Cancellation Awards and the Bonus Pool were allocated to the recipients in August 2009. Under the SAR Cancellation Awards, Mr. McGoey was allocated to receive $600,000 and, under the Bonus Pool, he was allocated to receive $1,200,000.

20    In addition to the SAR Cancellation Awards and the Bonus Pool, Mr. McGoey and the other directors of Look also established a SAR cancellation payment pool and a bonus pool for that company. The total amount funded directly by UBS or indirectly, through its 51.8% equity interest in Look, in the new compensation plans of the two companies was $14,637,025, or approximately 97.6% of the market capitalization of UBS.

21    The disclosure of the SAR Cancellation Awards and the Bonus Pool was met with resistance by UBS share holders. Faced with this resistance, Mr. McGoey caused UBS to advance to him $200,000 for the payment of anticipated legal fees.

22    A special shareholders' meeting was held pursuant to s. 122 of the *OBCA* on July 5, 2010. At that meeting, Mr. McGoey and the other directors were removed and not re-elected as directors of UBS. Mr. McGoey then resigned as CEO of UBS and took the position that he was terminated without cause because he was not re-elected to the UBS Board.

23    Mr. McGoey commenced an action against UBS seeking, *inter alia*, payment of Enhanced Severance in the amount of $9,500,000. He successfully moved for partial summary judgment before Marrocco J. on the issue of the payment of legal fees. However, Marrocco J.'s decision was subject to any finding of misfeasance that the court might make against Mr. McGoey.

24    On July 5, 2011, UBS was granted *CCAA* protection. It was ordered that Mr. McGoey's lawsuit be determined pursuant to the claims process under s. 20(1) of the *CCAA*. Mr. McGoey filed a proof of claim in the amount of $10,112,648, which the monitor disallowed in its entirety. Mr. McGoey sought to reverse that denial and a trial was ordered on the issue. That trial is the subject of this appeal and cross-appeal.

**Decision of the Trial Judge**

25    After thoroughly reviewing the underlying facts, the trial judge considered the law with respect to the business judgment rule. She concluded that the business judgment rule would only be of assistance to Mr. McGoey if he acted honestly and in good faith, with a view towards the best interests of the corporation.

26    The trial judge then examined Mr. McGoey's actions to determine whether they would be protected by the business judgment rule or whether they constituted a breach of his fiduciary duty. She noted that, since Mr. McGoey was the only UBS director who testified, she had no independent evidence of what the compensation committee or the UBS Board discussed and considered when deciding on the SAR Cancellation Awards and the Bonus Pool. In particular, she had no evidence as to how or if the UBS Board followed Mr. McCarthy's advice that the directors were obliged to meet their fiduciary duties to the corporation when setting executive compensation.

27    The trial judge accepted the evidence of Michael Thompson, a partner at Mercer, who was qualified as an expert regarding executive compensation and best practices for establishing executive compensation. She noted that Mr. Thompson opined that Mr. McGoey's compensation package did not pass any test of reasonableness and that she had heard no other independent evidence to refute Mr. Thompson's opinion. The trial judge found that Mr. Thompson's evidence gave her a "helpful context" to consider the UBS Board's decision-making process as part of her fiduciary duty analysis.

28    The trial judge focused on the decision of the UBS Board to cancel the SAR Plan and set a price of $0.40 per unit "at a time when the board knew, or ought to have known, that the market had not reacted to the Inukshuk sale as they had hoped": at para. 140.

29    The trial judge noted that the UBS compensation committee did not have any independent members, as all of the directors on that committee held SAR units.

Case 09-10138-MFW    Doc 14225-52    Filed 08/15/14    Page 9 of 108
Unique Broadband Systems, Inc., Re, 2014 ONCA 538, 2014 CarswellOnt 9327

2014 ONCA 538, 2014 CarswellOnt 9327, 13 C.B.R. (6th) 278

30     The trial judge made the following findings with respect to the SAR Cancellation Awards and the Bonus Pool, at paras. 145-147:

> The decision to cancel the SAR plan really came out of the blue, and only when it was apparent to the board members, who were the majority of the SAR unit holders that their SARs units would have little or no value on the triggering date.

> Absent any evidence to the contrary (and there is really none), I am led to the inescapable conclusion the decision to cancel [the] SARs and replace them with a fixed amount must have been driven by the board's own self interest, and not the interests of the corporation. There was nothing in it for UBS shareholders.

> As for Mr. McGoey's bonus, there was no business rationale for it. UBS was a holding company. It had no real employees, other than bookkeeping and secretarial staff. I fail to see how it was in UBS' interests to pay such a staggering amount of money to Mr. McGoey in order to "incentivize" him to remain with UBS. The situation at Look might be viewed differently; that issue, however, is not for me to decide.

31     The trial judge went on to find that the $0.40 unit value was not determined by any objective means, did not reflect the actual market price for the shares, and "represented more of a hope for share value based in large part on a Rogers sale transaction that was fraught with difficulty, and nowhere near a firm transaction": at para. 154. She stated that any valuation based on the possible Rogers transaction "should have been discounted for the real possibility the transaction might not close, or the purchase price might be significantly reduced": at para. 155.

32     With respect to the Bonus Pool, the trial judge found that it was not based on any objective criteria. She noted that, previously, Mr. McGoey's bonuses had been in the range of $400,000 to $440,000 and stated that she had "heard no evidence to support any reasonable rationale for a bonus at the level of $1.2 million": at para. 157.

33     The trial judge rejected the argument advanced by Mr. McGoey that the UBS Board's actions were done on the advice of Mr. McCarthy, finding that he "was not asked to opine on the reasonableness of the changes to the SAR and bonus plans": at para.159.

34     The trial judge concluded that the UBS Board breached its fiduciary duties to UBS in establishing the SAR Cancellation Awards and the Bonus Pool. She set aside the allocations to Mr. McGoey and Jolian pursuant to the SAR Cancellation Awards and the Bonus Pool.

35     The next issue was whether Mr. McGoey and Jolian triggered the default provisions in the Jolian Management Services Agreement, such that they were disentitled to the golden parachute benefits under the agreement. Specifically, Mr. McGoey and Jolian are disentitled to golden parachute benefits if Mr. McGoey and Jolian are in default as that term is defined in the agreement. The trial judge concluded that a breach of fiduciary duty did not qualify as a default under the Jolian Management Services Agreement and, therefore, UBS was obliged to pay the amounts due under the golden parachute provisions of the agreement.

36     UBS relied upon the oppression remedy provisions in the *OBCA*. However, the trial judge found, at para. 180, as follows:

> Since I have determined the enhanced benefits represented a breach of the board's fiduciary duties and have set those benefits aside, it seems to me the potentially oppressive acts have been cured and I need not deal with whether the board's actions might also constitute oppressive conduct.

37     The trial judge concluded that UBS had no obligation to indemnify Mr. McGoey for his legal fees because he had breached his fiduciary duties to the corporation.

38     In her costs decision, the trial judge found that there was divided success at trial and ordered that there be no costs.

**Issues**

WestlawNext CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

39    The appeal and cross-appeal raise the following issues:

> (i) Did the trial judge err in finding that Mr. McGoey breached his fiduciary duties to UBS?

> (ii) Did the trial judge err in finding that Mr. McGoey is not entitled to indemnification from UBS?

> (iii) Did the trial judge err in finding that Mr. McGoey is entitled to Enhanced Severance under the Jolian Management Services Agreement? and

> (iv) Did the trial judge err in failing to consider the oppression remedy argument advanced by UBS?

**Positions of the Parties**

40    UBS submits that the trial judge did not err in finding that Mr. McGoey had breached his fiduciary duties to UBS by virtue of his involvement in establishing the SAR Cancellation Awards and the Bonus Pool. Nor did the trial judge err in finding that, as a consequence of the breach, Mr. McGoey was not entitled to indemnification from UBS. However, UBS submits that the trial judge erred in finding that Mr. McGoey's conduct did not amount to "Cause" or a "Jolian Default" under the Jolian Management Services Agreement and that Mr. McGoey was entitled to Enhanced Severance. Specifically, UBS argues that the trial judge's interpretation of the Jolian Management Services Agreement is inconsistent with s. 134(3) of the *OBCA* and leads to a commercially absurd result. In addition, UBS submits that the trial judge, having rejected UBS's interpretation of the Jolian Management Services Agreement, was obliged to consider the oppression remedy argument it had advanced.

41    In his cross-appeal, Mr. McGoey submits that the trial judge erred in finding a breach of fiduciary duty. His position is that the actions taken regarding the SAR Cancellation Awards and the Bonus Pool were within a range of commercially reasonable decisions and are, therefore, protected by the business judgment rule. He also submits that the trial judge erred in finding that he was not entitled to indemnification from UBS under the terms of the Jolian Management Services Agreement. Mr. McGoey argues that the trial judge otherwise correctly interpreted the Jolian Management Services Agreement and that, because the oppression remedy does not apply, the trial judge was under no obligation to consider that argument.

**Analysis**

*(i) Breach of Fiduciary Duty*

42    As mentioned above, Mr. McGoey asserts that the trial judge erred in finding that he had breached his fiduciary duties. At the heart of Mr. McGoey's submission is that the decisions he made with respect to the SAR Cancellation Awards and the Bonus Award were done with the advice of experienced legal counsel and are protected by the business judgment rule.

43    In my view, the trial judge's finding that Mr. McGoey's breached his fiduciary duties to UBS was well supported in the evidence before her and by the lack of any clear explanation from Mr. McGoey as to how the UBS Board decided to establish the SAR Cancellation Awards and the Bonus Pool. For the reasons set forth below, I see no error in the trial judge's reasoning and in her conclusion that Mr. McGoey's actions were driven by self-interest, unsupported by any reasonable or objective criteria, and contrary to the best interests of UBS.

44    Below I consider the general principles of the law of fiduciary duties, an analysis of the trial judge's decision regarding the SAR Cancellation Awards and Bonus Pool, and the defences raised by Mr. McGoey.

*General Principles*

45    It is undisputed that, Mr. McGoey, as a director and CEO of UBS, owed the company fiduciary duties. The imposition of fiduciary duties on directors and officers of a corporation is consistent with the origins of the doctrine in trust law. A director or senior officer of a corporation is in a position of trust. He or she is charged with managing the assets of a corporation honestly

and in a manner that is consistent with the objects of the corporation. Courts will be loath to interfere with the legitimate exercise of corporate duties, but they will intervene where a fiduciary breaches the trust reposed in him or her.

46    Mr. McGoey's fiduciary duties included an obligation to act in good faith and in the best interests of the corporation. He had a specific obligation to scrupulously avoid conflicts of interest with the corporation and not to abuse his position for personal gain: *People's Department Stores Ltd. (1992) Inc., Re*, 2004 SCC 68, [2004] 3 S.C.R. 461 (S.C.C.), at paras. 35 and 42; and *BCE Inc., Re*, 2008 SCC 69, [2008] 3 S.C.R. 560 (S.C.C.), at paras. 39 and 89.

47    As Granger J. stated in *Moffat v. Wetstein* (1996), 29 O.R. (3d) 371 (Ont. Gen. Div.), at p. 390:

Subsumed in the fiduciary's duties of good faith and loyalty is the duty to avoid a conflict of interest. The fiduciary must not only avoid a direct conflict of interest but must also avoid the appearance of a possible or potential conflict. The fiduciary is barred from dividing loyalties between competing interests, including self-interest.

48    Disclosure of a directors' interest in a transaction is just the first step. Disclosure does not relieve a director of his or her obligation to act honestly and in the best interests of the corporation: *UPM-Kymmene Corp. v. UPM-Kymmene Miramichi Inc.* (2002), 214 D.L.R. (4th) 496 (Ont. S.C.J. [Commercial List]), aff'd (2004), 183 O.A.C. 310 (Ont. C.A.).

49    It is against these standards that the trial judge was obliged to consider the actions of Mr. McGoey.

*SAR Cancellation Awards*

50    With respect to the SAR Cancellation Awards, the trial judge concluded that there was no evidence as to how the UBS Board arrived at the non-market price of $0.40 per unit and how it determined that it was in the best interests of the corporation. The UBS Board provided no credible analysis to justify why they considered that these payments, which represented a significant percentage of UBS market capitalization, were fair and reasonable in the circumstances.

51    In considering the reasonableness of the UBS Board's actions in this regard, I find that the following facts are germane.

52    As of May 4, 2009, when the UBS Board resolved to treat the Spectrum Sale as a triggering event pursuant to the SAR Plan, it anticipated that the trading price of UBS shares would rise from $0.15 to a range of $0.30 to $0.50 per share.

53    On June 17, 2009, the shares of UBS were still trading at $0.15 per share. Thus, the anticipated gains between the strike price and the trading price had not materialized. It was in these circumstances that the UBS Board decided to implement the SAR Cancellation Awards without the benefit of any independent or third party advice that could speak to the reasonableness of their decision.

54    As found by the trial judge, the potential Rogers share transaction never went beyond the negotiation stage and was completely off the table by July 20, 2009 and could not serve as a justification for the $0.40 unit price.

55    Mr. McGoey's SAR Cancellation Award was allocated to him on August 28, 2009, pursuant to which he was entitled to receive a payment from UBS of $600,000, whereas, under the SAR Plan, he would have been entitled to a payment of $75,000.

56    Given these facts, and in the absence of any credible evidence regarding the *bona fides* of the SAR Cancellation Awards or the process by which they were created, the trial judge reached the reasonable conclusion that the decision to implement the new scheme was driven by UBS Board's self-interest. I see no error in that conclusion.

57    I also agree with the trial judge's conclusion that the $0.40 unit value was unjustified and unrealistic. It was notionally based on a transaction with Rogers that was far from certain and which had been terminated at the time when the SAR Cancellation Awards were allocated. What the SAR Cancellation Awards really achieved was the removal of the uncertainty that was part of the SAR Plan. Under this new scheme, the recipients' awards were not dependant on an increase in the share price, the awards would be granted regardless of the trading price of the shares. This removal of the uncertainty was to the benefit of the recipients and was of no benefit to the corporation.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

*Bonus Pool*

58     The trial judge rejected the position of Mr. McGoey that there was a reasonable rationale for the establishment of the Bonus Pool and his allocation of $1.2 million. This finding was well supported by the evidence at trial, including the following.

59     The UBS Board did not seek or receive any expert advice on an appropriate bonus structure. Nor did they have any comparable or other data regarding executive compensation in the marketplace.

60     There was no documentation that stipulated the performance factors or criteria by which Mr. McGoey's performance would be evaluated. The trial judge rejected Mr. McGoey's evidence that the services he provided for Look qualified as the criteria under which he could be awarded a bonus by UBS. She concluded that, when the UBS bonus was awarded, there were, in fact, no criteria.

61     Similarly, there was no documentation that showed how the Bonus Pool was quantified. The best evidence we have is that Mr. McGoey went to a UBS Board meeting seeking to establish a $7 million bonus pool but the UBS Board found that amount "too high" and established a $3.4 million bonus pool instead.

62     In my view, on these facts, the trial judge was correct to conclude that Mr. McGoey's establishment of the Bonus Pool and the allocation of a part of the Bonus Pool to him breached his fiduciary duties to UBS.

*Defences*

63     I do not accept Mr. McGoey's rather novel argument that there can be no finding of a breach of fiduciary duty because, before he could be paid under the SAR Cancellation Awards or the Bonus Pool, he was removed from office by the shareholders of UBS. Counsel for Mr. McGoey suggests that the breach is incomplete because no damages have been suffered.

64     This submission is not correct at law. As stated by Mark Ellis in his text, *Fiduciary Duties in Canada*, [2] in the context of a discussing conflicts of interest:

> Entering into a *potential* conflict of interest is a breach whether or not the conflict is operative; once such a conflict becomes operative to jeopardize the beneficiary or his property, the fiduciary breach would then give rise to the remedies available in law. The point is important: to wait until damage or prejudice actually occurs is to prejudice the beneficiary's right to utmost loyalty and avoidance of conflict. If such a schism in theory is allowed, the law would be encouraging a finding that the duty "piggy-backs" the damage caused rather than premising damage on the basis of duty. [Emphasis in original.]

65     Similarly, in *Canson Enterprises Ltd. v. Boughton & Co.*, [1991] 3 S.C.R. 534 (S.C.C.), at p. 553, McLachlin J. (as she then was) stated that "[a] breach of fiduciary duty is a wrong in itself, regardless of whether a loss can be foreseen".

66     It would be a remarkable result if a fiduciary could be allowed to act in a manner contrary to his duty with impunity, on the basis that he was prevented by the beneficiary's vigilance from receiving a personal benefit.

67     Mr. McGoey's counsel also argued that the trial judge erred in simply comparing the payments under the SAR Plan and the SAR Cancellation Awards, without considering that the SAR Cancellation Awards also required the recipients to execute releases and were contingent upon Look receiving the full payment of funds from the Spectrum Sale and UBS having sufficient resources.

68     I do not find this argument persuasive. The last payment under the Spectrum Sale was received on September 11, 2009. Mr. McGoey's release was executed four days later. It is true that the funds from the Spectrum Sale had not been paid over to UBS; however, it was hardly a doubtful proposition that the money would have found its way to UBS, given Mr. McGoey and his associates' control over Look's board.

69     The trial judge also rejected Mr. McGoey's argument that his actions were undertaken with the assistance of independent legal advice from Mr. McCarthy and, therefore, could not constitute a breach of his fiduciary duties. I agree with the trial judge's conclusion on this issue. The UBS Board never sought an opinion from Mr. McCarthy regarding the reasonableness of the changes to the SAR Plan and the bonuses. Indeed, the evidence is clear that Mr. McCarthy did not have any information during the relevant time regarding the quantity of the Bonus Award or the SAR Cancellation Awards allocated to Mr. McGoey or to any other director or officer of UBS.

70     Finally, the trial judge carefully considered Mr. McGoey's argument that his actions were protected by the business judgment rule. She reviewed the law and identified the critical issue at para. 122 of her reasons:

> I must now examine the board's and Mr. McGoey's actions and decide whether business judgment is what was exercised here, or whether it was self help, or worse, breach of fiduciary duty, dressed in business judgment's clothes.

71     The trial judge properly concluded that the business judgment rule was of no assistance to Mr. McGoey because he did not satisfy the rule's preconditions of honesty, prudence, good faith, and a reasonable belief that his actions were in the best interests of the company: *Corporacion Americana de Equipamientos Urbanos S.L. v. Olifas Marketing Group Inc.* (2003), 66 O.R. (3d) 352 (Ont. S.C.J.), at paras. 13 and 14.

72     It must be remembered that the business judgment rule is really just a rebuttable presumption that directors or officers act on an informed basis, in good faith, and in the best interests of the corporation. Courts will defer to business decisions honestly made, but they will not sit idly by when it is clear that a board is engaged in conduct that has no legitimate business purpose and that is in breach of its fiduciary duties. In the present case, there was ample evidence upon which the trial judge could base her conclusion that the presumption had been rebutted.

73     In summary, I conclude that the trial judge did not err in finding that Mr. McGoey breached his fiduciary duties to UBS.

### *(ii) Eligibility for Indemnification*

74     The trial judge noted that UBS' indemnity obligations arise under various sources and documents: the Jolian Management Services Agreement; Article 7 of the UBS by-laws; specific indemnity agreements between Mr. McGoey and UBS; and s. 134(4.1) of the *OBCA*.

75     The trial judge also referred to Marrocco J.'s finding that the indemnification provisions under the UBS by-laws are "only available if the director or officer acted honestly and in good faith with a view to the best interests of the Corporation": at para. 183.

76     The trial judge concluded that, given her finding of a breach of fiduciary duty, the indemnity obligations were not operative.

77     I see no error in this finding. The purpose of statutory and contractual indemnity provisions is to ensure that officers and directors who are acting in good faith and in the best interests of a corporation are not exposed to legal costs. It is commercially sensible and good public policy to offer this protection. The rationale for offering the protection is eliminated, however, where the officer or director has not acted in good faith and in the best interests of the corporation.

78     In a related case, this court upheld an application judge's decision to refuse advanced funding for the legal costs of Look's directors and officers because the corporation had established a strong *prima facie* case of bad faith on the part of the parties seeking the funding: *Cytrynbaum v. Look Communications Inc.*, 2013 ONCA 455, 116 O.R. (3d) 241 (Ont. C.A.), leave to appeal refused, (2014), [2013] S.C.C.A. No. 377 (S.C.C.).

79     In the present case, while the trial judge did not specifically state that Mr. McGoey acted in bad faith, she did conclude that he was ineligible to receive indemnification because he had not met the standard of acting honestly and in good faith. This decision was open to the trial judge to make on the evidence before her and there is no basis for appellate interference.

2014 ONCA 538, 2014 CarswellOnt 9327, 13 C.B.R. (6th) 278

### *(iii) Interpretation of the Jolian Management Services Agreement*

80    The trial judge held that, pursuant to the terms of the Jolian Management Services Agreement, a breach of fiduciary duty did not constitute "Cause" or a "Jolian Default" as defined in the agreement, and, consequently, Mr. McGoey was entitled to receive Enhanced Severance. However, this payment was to be calculated on the basis of what the entitlement would have been prior to the SAR Plan cancellation and the establishment of the Bonus Pool.

81    Mr. McGoey and Jolian were directed to file a revised proof of claim within 30 days to reflect the trial judge's finding. The revised claim filed pursuant to this direction was in excess of $4 million.

82    For the reasons that follow, I am of the view that the trial judge erred in law in her interpretation of the Jolian Management Services Agreement and in her finding that Mr. McGoey was entitled to Enhanced Severance under the contract. Set forth below, I consider some general principles of contractual interpretation, the specific terms of the Jolian Management Services Agreement, and the trial judge's analysis of the agreement.

*General Principles*

83    The following principles of contractual interpretation are relevant in considering the trial judge's analysis of the Jolian Management Services Agreement.

84    In *Manulife Bank of Canada v. Conlin*, [1996] 3 S.C.R. 415 (S.C.C.), at pp. 439-40, quoting Ruth Sullivan, *Driedger on the Construction of Statutes*, 3d. ed. (Toronto: Butterworths, 1994), at p. 131, L'Heureux-Dubé J., dissenting, described the interpretation of statutes in the following way that applies equally to contractual interpretation:

There is only one rule in modern interpretation, namely, courts are obliged to determine the meaning of [that which is to be judicially interpreted] in its *total context*, having regard to [its] purpose ..., the *consequences of proposed interpretations*, the *presumptions and special rules of interpretation*, as well as *admissible external aids*. In other words, the *courts must consider and take into account all relevant and admissible indicators of [...] meaning. After taking these into account, the court must then adopt an interpretation that is appropriate* [Emphasis added by L'Heureux-Dubé J.]

85    The subjective intent of one party to a contract "has no independent place" in interpreting contractual provisions: *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 (S.C.C.), at para. 54.

86    While the plain meaning of the words used by the contracting parties is important, the contract must be read as a whole and in the context of the circumstances as they existed when the contract was created: *Dumbrell v. Regional Group of Cos.*, 2007 ONCA 59, 85 O.R. (3d) 616 (Ont. C.A.), at para. 52.

87    Courts will avoid a contractual interpretation which results in rendering the agreement unlawful. As Blair J.A. discussed in *Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205, 85 O.R. (3d) 254 (Ont. C.A.), at para. 57, quoting John D. McCamus, *The Law of Contracts* (Toronto: Irwin Law, 2005), at p. 729, [3] "where an agreement admits of two possible constructions, one of which renders the agreement lawful and the other of which renders it unlawful, courts will give preference to the former interpretation"; see also *Cantor Art Services v. Kenneth Bieber Photography*, [1969] 1 W.L.R. 1226 (Eng. C.A.).

88    A commercial contract will be interpreted in a manner that is consistent with commercial principles and that avoids a commercial absurdity. In *Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888 (S.C.C.), at p. 901, Estey J. stated:

[w]here words may bear two constructions, the more reasonable one, that which produces a fair result, must certainly be taken as the interpretation which would promote the intention of the parties. Similarly, an interpretation which defeats the intentions of the parties and their objective in entering into the commercial transaction in the first place should be discarded in favour of an interpretation of the policy which promotes a sensible commercial result.

2014 ONCA 538, 2014 CarswellOnt 9327, 13 C.B.R. (6th) 278

89      As stated by the House of Lords in *Mannai Investment Co. v. Eagle Star Life Assurance Co.*, [1997] 2 W.L.R. 945 (Eng. H.L.), at p. 964, commercial contracts should be "interpreted in the way in which a reasonable commercial person would construe them. And the standard of the reasonable commercial person is hostile to technical interpretations and undue emphasis on niceties of language".

90      The interpretation of a contract is a question of law. Accordingly, the standard of review by an appellate court is correctness: *Plan Group v. Bell Canada*, 2009 ONCA 548, 96 O.R. (3d) 81 (Ont. C.A.) .

*Jolian Management Services Agreement*

91      UBS and Jolian entered into the Jolian Management Services Agreement in 2006. However the terms of the agreement were not disclosed to UBS shareholders until May 2010, when it was filed on SEDAR.

92      The relevant sections of the agreement are as follows:

"**Cause**" means an act of fraud, embezzlement or misappropriation or other act which constitutes "Cause" at common law and, in each case, which is materially injurious to the Company.

"**CEO Designee**" means Gerald T. McGoey or such other individual designated by the parties in conformity with Section 1.3 of this Agreement.

"**CEO Services**" means the duties typically performed by, and responsibilities assumed by the chief executive officer of a company, including, without limitation, the overseeing of:

(a) the preparation and administration of the annual budget;

(b) the hiring, firing and supervising of all senior staff;

(c) UBS' compliance with all regulatory requirements and shareholder communication;

(d) the monitoring and, where appropriate, the updating of UBS' broadcast and information technology; and

(e) customer service.

. . .

**"Jolian Default"** means:

(a) an act of fraud, theft or misappropriation or other act which constitutes "Cause" at common law committed by the CEO designee; and

(b) the material failure by the CEO Designee to perform the CEO Services after having received written notice of such material failure and been given reasonable time to correct same;

in each case, which is materially injurious to USB or which has not been waived by UBS.

*Interpretation by the Trial Judge*

93      The trial judge's analysis of the Jolian Management Services Agreement was limited to considering the term "Jolian Default". After setting out the definition of that term found in the agreement, the trial stated, at paras. 172-77:

As I read the definition, both parts must be met before actions constitute "Jolian Default". I say this because the drafters clearly chose to use "and" between the two paragraphs, thus making them conjunctive.

**WestlawNext** CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Here, regardless of whether subsection (a) of the definition has been met, there is no question subsection (b) has not. No one provided Mr. McGoey with written notice of any "material failure to perform the CEO services" together with a reasonable time to correct any such material failure.

As to subsection (a), in my view it has not been met either. It would have been an easy matter for the drafters to include "breach of fiduciary duty" or "bad faith" as enumerated items of cause. They did not.

It also would have been an easy matter for the drafters to define "cause" simply as "cause at common law". They did not.

From this I infer that "cause at common law" in the context of this provision means acts of fraud and defalcation of the types enumerated. I cannot conclude breach of fiduciary duty falls into this category.

In any event, since both provisions of the section have not been met I therefore conclude there has been no "Jolian Default" under the Jolian Management Services Agreement. Thus UBS remains bound to pay the amounts due under the golden parachute provisions of the agreement. This is so unless there is another reason to find the obligation no longer exists.

94    In my view, the trial judge erred in law in her interpretation of the agreement for the following reasons.

95    First, the trial judge's interpretation of the agreement ignores the provisions of s. 134(3) of the *OBCA*. That section provides:

Subject to subsection 108(5), no provision in a contract, the articles, the by-laws or a resolution relieves a director or officer from the duty to act in accordance with this Act and the regulations or relieves him or her from liability for a breach thereof.

96    Pursuant to s. 134(1) of the act, a director or officer of an *OBCA* corporation is required to act honestly and in good faith with a view to the best interests of the corporation. In addition, the director or officer must exercise the care, diligence, and skill that a reasonably prudent person would exercise in comparable circumstances.

97    The effect of the trial judge's interpretation is to eviscerate the prohibition found in s. 134(3). If her interpretation were accepted, Mr. McGoey would be relieved of his obligation to act in manner that is consistent with his duties under the legislation (*i.e.* he could breach his fiduciary duties to the company). Such conduct would not constitute a "Jolian Default" under the agreement and he would be entitled to receive Enhanced Severance.

98    Second, the trial judge's interpretation of the Jolian Management Services Agreement leads to a commercially absurd result. Given her finding that subparagraphs (a) and (b) are conjunctive, Mr. McGoey could commit theft from the company but such conduct would not constitute a "Jolian Default" under the agreement unless UBS gave Mr. McGoey written notice of the theft and provided him with the opportunity to cure the fraud.

99     Clearly this type of result could not be consistent with the intentions of reasonable business people entering into a commercial transaction. While the word "and" generally imports a conjunctive sense, this is not an inexorable cannon of construction. In some cases the word "and" will be interpreted as "or", in order to make sense and give effect to the contract: *H.H. Vivian & Co. v. Clergue* (1909), 41 S.C.R. 607 (S.C.C.); and *Boy Scouts of Canada, Provincial Council of Newfoundland v. Doyle* (1997), 149 D.L.R. (4th) 22 (Nfld. C.A.). This was one of those cases.

100    Third, the trial judge's interpretation of the agreement has the effect of ignoring the phrase "or other act which constitutes 'Cause' at common law". If the intention of the parties was to limit the prohibited conduct to the enumerated grounds of fraud, theft, or misappropriation, this additional phrase would be unnecessary.

101    When the contract is read as a whole, it is evident that the parties sought to ensure that a "Jolian Default" would be limited to serious misconduct that was materially injurious to UBS. The enumerated grounds of fraud, theft and misappropriation are examples of the types of conduct which would constitute a default.

**Westlaw**Next® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

102     A serious breach of fiduciary duty would logically meet this definition, as it would constitute a breach of Mr. McGoey's statutory and common law duties to the corporation and would amount to cause at common law. The conduct of Mr. McGoey, in establishing the SAR Cancellation Awards and the Bonus Pool and thereby preferring his own interests to the interests of UBS, qualifies as a serious breach of fiduciary duty.

103     Given the amount of money involved in the SAR Cancellation Awards and the Bonus Pool, these plans would have been materially injurious to UBS had the payouts been made. Again, in my view, the fact that Mr. McGoey was prevented by shareholder vigilance from receiving the funds allocated to him cannot serve as a defence. It would be commercially absurd to interpret the agreement to mean that UBS would be obligated to pay Jolian and Mr. McGoey an amount equivalent to 300% of Mr. McGoey's compensation because he had not succeeded in wrongfully diverting funds for his own benefit.

104     Interpreting "Jolian Default" to include a serious breach of fiduciary duty that was materially injurious to UBS, gives effect to the entirety of the words used in the definition of the term in their context. It is also commercially sensible and does not result in an interpretation that is inconsistent with the *OBCA*.

105     The trial judge erred in law in her contractual interpretation, and her finding that Mr. McGoey was entitled to Enhanced Severance cannot stand.

### *(iv) Oppression Remedy*

106     Given my finding regarding the proper interpretation of the Jolian Management Services Agreement, it is not necessary to consider UBS's argument that the trial judge erred in failing to consider the oppression remedy argument advanced by UBS. I only note that the trial judge, having concluded that Mr. McGoey was entitled to receive Enhanced Severance, had an obligation to consider the oppression argument. Contrary to her conclusion, the setting aside of the SAR Cancellation Award and the Bonus Award did not cure Mr. McGoey's wrongful conduct. It was still necessary to determine whether the entitlement to Enhanced Severance was oppressive.

107     The oppression remedy is a flexible, equitable remedy that affords the court broad powers to rectify corporate malfeasance. It is an important remedy for shareholders and other corporate stakeholders. In the circumstances of this case, it may well have provided a remedy to protect the interests of the shareholders.

108     It was an error in law not to consider the oppression remedy in these circumstances.

### Disposition

109     I would allow the appeal and substitute paragraph 2 of the judgment with a finding that Mr. McGoey's actions constitute "Cause" and a "Jolian Default" under the Jolian Management Services Agreement, set aside paragraph 3 of the judgment, and substitute paragraph 4 of the judgment with a finding that Jolian/Mr. McGoey are not entitled to Enhanced Severance. I would dismiss the cross-appeal.

110     On the issue of costs of the trial, the trial judge's decision that there be no order as to costs was premised on her finding that both parties had achieved some measure of success at trial. Given my findings, the costs order cannot stand. As the successful party, UBS is entitled to costs of the trial. If the parties cannot agree on the scale and/or quantum of the costs, they may attend before the trial judge to fix the costs.

111     The parties agreed that, if one party were successful on both the appeal and the cross appeal, then that party would be entitled to costs of the appeal in the amount of $60,000. Accordingly, I would order that Mr. McGoey and Jolian are jointly and severally liable to UBS for the costs of the appeal in the amount of $60,000, inclusive of fees, disbursements, and H.S.T.

*Robert J. Sharpe J.A.*:

I agree

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

*E.E. Gillese J.A.*:

I agree

*Appeal allowed in part.*

Footnotes

1    The capitalized terms are defined below.

2    Mark Ellis, *Fiduciary Duties in Canada*, loose-leaf (consulted on 25 June 2014), (Carswell, Toronto: 2014), ch. 1 at 5.

3    See also John D. McCamus, *The Law of Contracts* (Toronto: Irwin Law, 2012), at p. 773.

---

**End of Document**
Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    17

# TAB 155

Case 09-10138-MFW    Doc 14225-52    Filed 08/15/14    Page 20 of 108

U.S. v. 50 Acres of Land, 469 U.S. 24 (1984)

105 S.Ct. 451, 21 ERC 2105, 83 L.Ed.2d 376, 15 Envtl. L. Rep. 20,117

105 S.Ct. 451
Supreme Court of the United States

UNITED STATES, Petitioner,
v.
50 ACRES OF LAND, etc., et al.

No. 83-1170.    |    Argued Oct. 2,
1984.    |    Decided Dec. 4, 1984.

In an eminent domain action, condemnee city appealed from judgment of the United States District Court for the Northern District of Texas, Robert M. Hill, J., 529 F.Supp. 220, basing recovery on market value rather than the substitute facility approach. The Court of Appeals for the Fifth Circuit, 706 F.2d 1356, reversed and remanded. Certiorari was granted. The Supreme Court, Justice Stevens, held that: (1) reference to "private property" in the Fifth Amendment encompasses property of state and local governments, and (2) public condemnee is not entitled to compensation measured by the cost of acquiring a substitute facility when market value of the condemned facility is ascertainable, notwithstanding that condemnee has a duty to replace the condemned facility.

Judgment of Court of Appeals reversed.

Justice O'Connor with whom Justice Powell joined, filed concurring opinion.

West Headnotes (6)

**[1]    Eminent Domain**
        👉 Taking Entire Tract or Piece of Property

Public condemnee is not entitled to compensation measured by cost of acquiring a substitute facility if it has a duty to replace the condemned facility in the case where market value of the condemned property is ascertainable and, hence, where federal Government condemned land that had been used by city as sanitary landfill the city was not entitled to recover all costs incurred in acquiring a substitute, more expensive and extensive site and developing it as a landfill but was entitled only to market value of the taken facility, as market for landfill property existed in the area

and there was expert testimony as to value. U.S.C.A. Const.Amend. 5.

37 Cases that cite this headnote

**[2]    Eminent Domain**
        👉 Taking Entire Tract or Piece of Property

For the most part, cases where measure of compensation is something other than fair market value involve properties that are seldom sold on the open market. U.S.C.A. Const.Amend. 5.

21 Cases that cite this headnote

**[3]    Eminent Domain**
        👉 Property and Rights Subject of Compensation

Reference to "private property" in the takings clause of the Fifth Amendment encompasses property of state and local governments and the same principles of just compensation presumptively apply with private and public condemnees. U.S.C.A. Const.Amend. 5.

13 Cases that cite this headnote

**[4]    Eminent Domain**
        👉 Taking Entire Tract or Piece of Property

The "substitute facilities doctrine" as identified in dictum in the *Brown* taking case does not mean that a distinction must be drawn between public and private condemnees and does not imply that the federal government has a duty to provide a public condemnee with something more than fair market value of the condemned property. U.S.C.A. Const.Amend. 5.

37 Cases that cite this headnote

**[5]    Eminent Domain**
        👉 Necessity of Just or Full Compensation or Indemnity

Just compensation must be measured by objective standard that disregards subjective values which are only of a significance to an individual owner. U.S.C.A. Const.Amend. 5.

Case 09-10138-MFW    Doc 14225-52    Filed 08/15/14    Page 21 of 108

U.S. v. 50 Acres of Land, 469 U.S. 24 (1984)

105 S.Ct. 451, 21 ERC 2105, 83 L.Ed.2d 376, 15 Envtl. L. Rep. 20,117

3 Cases that cite this headnote

**[6]    Eminent Domain**
👉 Value of Property

Admissibility of testimony on reproduction cost, as offered on issue of fair market value, must be evaluated under generally applicable rules of evidence. Fed.Rules Evid.Rules 401-403, 701-705, 28 U.S.C.A.; U.S.C.A. Const.Amend. 5.

2 Cases that cite this headnote

**\*\*451   \*24 *Syllabus* \***

In connection with a flood control project, the United States filed proceedings **\*\*452** in Federal District Court to condemn approximately 50 acres of land owned by respondent city of Duncanville, Tex., that had been used as a sanitary landfill. The court awarded compensation in the amount of the condemned property's fair market value as determined by the jury, rather than the larger amount fixed by the jury as the reasonable cost to the city of acquiring and developing a substitute facility, which was larger and better than the condemned facility. The court found no basis for departing from the normal market value standard for determining the amount of compensation, but the Court of Appeals reversed and remanded.

*Held:* The Fifth Amendment does not require that the United States pay a public condemnee compensation measured by the cost of acquiring a substitute facility that the condemnee has a duty to acquire, when the market value of the condemned property is ascertainable and when there is no showing of manifest injustice. Pp. 455-458.

(a) "Just compensation" under the Fifth Amendment normally is to be measured by the market value of the property at the time of the taking, and this case is not one in which an exception is required because fair market value is not ascertainable. The testimony at trial established a fairly robust market for sanitary landfill properties. Nor is an award of compensation measured by market value here fundamentally inconsistent with the basic principles of indemnity embodied in the Just Compensation Clause. P. 455.

(b) The text of the Fifth Amendment does not mandate a more favorable rule of compensation for public condemnees than for private parties. The reference to "private property" in the Takings Clause of the Fifth Amendment encompasses the property of state and local governments when it is condemned by the United States, and under this construction the same principles of just compensation presumptively apply to both private and public condemnees. Pp. 455-456.

(c) When the dictum in *Brown v. United States,* 263 U.S. 78, 44 S.Ct. 92, 68 L.Ed. 171-which is the source of the "substitute-facilities doctrine"-is read in the context of the decision in that case, it lends no support to the suggestion that a distinction should be drawn between public and private condemnees. **\*25** Nor does it shed any light on the proper measure of compensation in this case. *Brown* merely indicates that it would have been constitutionally permissible for the Federal Government to provide the city with a substitute landfill site instead of compensating it in cash. Pp. 456-457.

(d) The city's legal obligation to maintain public services that are interrupted by a federal condemnation does not justify a distinction between public and private condemnees for the purpose of measuring "just compensation." The risk that a private condemnee might receive a "windfall" if its compensation were measured by the cost of a substitute facility that was never acquired or was later sold or converted to another use is not avoided by the city's obligation to replace the facility. If the replacement facility is more costly than the condemned facility, it presumably is more valuable, and any increase in the quality of the facility may be as readily characterized as a "windfall" as the award of cash proceeds for a substitute facility that is never built. Moreover, the substitute-facilities doctrine, if applied in this case, would diverge from the principle that just compensation must be measured by an objective standard that disregards subjective values which are only of significance to an individual owner. Pp. 457-458.

706 F.2d 1356 (CA5 1983), reversed.

**Attorneys and Law Firms**

*Joshua I. Schwartz* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Habicht, Deputy Solicitor General Claiborne, Deputy Assistant Attorney General*

U.S. v. 50 Acres of Land, 469 U.S. 24 (1984)

Case 09-10138-MFW    Doc 14225-52    Filed 08/15/14    Page 22 of 108

105 S.Ct. 451, 21 ERC 2105, 83 L.Ed.2d 376, 15 Envtl. L. Rep. 20,117

*Liotta, Raymond N. Zagone, Dirk D. Snel,* and *Thomas H. Pacheco.*

*H. Louis Nichols* argued the cause for respondents.*

* Briefs of *amici curiae* urging affirmance were filed for the Council of State Governments et al. by *Lawrence R. Velvel* and *Elaine Kaplan;* and for Open Lands Project et al. by *Young Kim, Ruth E. Van Demark, George W. Overton, T.S.L. Perlman,* and *Adam Yarmolinsky.*

**Opinion**

Justice STEVENS delivered the opinion of the Court.

[1]   The Fifth Amendment requires that the United States pay "just compensation" **\*\*453** -normally measured by fair market value [1] -WHenever it takes private property for public **\*26** use. [2] This case involves the condemnation of property owned by a municipality. The question is whether a public condemnee is entitled to compensation measured by the cost of acquiring a substitute facility if it has a duty to replace the condemned facility. We hold that this measure of compensation is not required when the market value of the condemned property is ascertainable.

**I**

In 1978, as part of a flood control project, the United States condemned approximately 50 acres of land owned by the city of Duncanville, Texas. [3] The site had been used since 1969 as a sanitary landfill. In order to replace the condemned landfill, the city acquired a 113.7-acre site and developed it into a larger and better facility. [4] In the condemnation proceedings, the city claimed that it was entitled to recover all of the costs incurred in acquiring the substitute site and developing it as a landfill, an amount in excess of $1,276,000. The United States, however, contended that just compensation should be determined by the fair market value of the **\*27** condemned facility and deposited $199,950 in the registry of the court as its estimation of the amount due.

Before trial the Government filed a motion *in limine* to exclude any evidence of the cost of the substitute facility, arguing that it was not relevant to the calculation of fair market value. Record, Doc. No. 62. The District Court denied the motion, noting that this Court had left open the question of the proper measure of compensation for the condemnation

of public property. See *United States v. 564.54 Acres of Land, 441 U.S. 506, 509, n. 3, 99 S.Ct. 1854, 1856, n. 3, 60 L.Ed.2d 435 (1979)* (*Lutheran Synod*). The court concluded that "a complete factual record should be developed from which an independent determination of the appropriate measure of compensation can be made." Record, Doc. No. 111.

At trial, both parties submitted evidence on the fair market value of the condemned property [5] and on the cost of the substitute landfill facility. [6] Responding to special interrogatories, **\*\*454** the jury found that the fair market value of the **\*28** condemned property was $225,000, and that the reasonable cost of a substitute facility was $723,624.01. Record, Doc. Nos. 199, 200. The District Court entered judgment for the lower amount plus interest on the difference between that amount and the sum already paid. [7] *529 F.Supp. 220 (ND Tex.1981).* The District Court explained that the city had not met its "burden of establishing what would be a reasonable cost of a substitute facility." [8] In addition, the court was of the view that "substitute facilities compensation should not be awarded in every case where a public condemnee can establish a duty to replace the condemned property, at least where a fair market value can be established." *Id., at 222.* The court found no basis for departing from the market value standard in this case, and reasoned that the application of the substitute-facilities measure of compensation would necessarily provide the city with a "windfall." [9]

The Court of Appeals reversed and remanded for further proceedings. *706 F.2d 1356 (CA5 1983).* It reasoned that the city's loss attributable to the condemnation was "the amount of money reasonably spent ... to create a functionally equivalent facility." *Id., at 1360.* If the city was required, either as a matter of law or as a matter of practical **\*29** necessity, to replace the old landfill facility, the Court of Appeals believed that it would receive no windfall. The court, however, held that the amount of compensation should be adjusted to account for any qualitative differences in the substitute site. Finding that the trial judge's instructions had not adequately informed the jury of its duty to discount the costs of the substitute facility in order to account for its increased capacity and superior quality, see n. 4, *supra,* the Court of Appeals remanded for a new trial. [10] We granted the Government's petition for certiorari, [11] *465 U.S. 1098, 104 S.Ct. 1590, 80 L.Ed.2d 122 (1984),* and we now reverse with instructions to direct the District Court to enter judgment based on the jury's finding of fair market value.

105 S.Ct. 451, 21 ERC 2105, 83 L.Ed.2d 376, 15 Envtl. L. Rep. 20,117

## II

The Court has repeatedly held that just compensation normally is to be measured by "the market value of the property at the time of the taking contemporaneously paid in money." **455 *Olson v. United States,* 292 U.S. 246, 255, 54 S.Ct. 704, 708, 78 L.Ed. 1236 (1934). "Considerations that may not reasonably be held to affect market value are excluded." *Id.,* at 256, 54 S.Ct., at 709. Deviation from this measure of just compensation has been required only "when market value has been too difficult to find, or when its application would result in manifest injustice to owner or public." *United States v. Commodities Trading Corp.,* 339 U.S. 121, 123, 70 S.Ct. 547, 549, 94 L.Ed. 707 (1950); *Kirby Forest Industries, Inc. v. United States,* 467 U.S. 1, 10, n. 14, 104 S.Ct. 2187, 2194, n. 14, 81 L.Ed.2d 1 (1984).

[2]    *30  This case is not one in which an exception to the normal measure of just compensation is required because fair market value is not ascertainable. Such cases, for the most part, involve properties that are seldom, if ever, sold in the open market. [12]  Under those circumstances, "we cannot predict whether the prices previously paid, assuming there have been prior sales, would be repeated in a sale of the condemned property." *Lutheran Synod,* 441 U.S., at 513, 99 S.Ct., at 1858. In this case, however, the testimony at trial established a fairly robust market for sanitary landfill properties, see n. 5, *supra,* and the jury's determination of the fair market value of the condemned landfill facility is adequately supported by expert testimony concerning the sale prices of comparable property. Cf. 441 U.S., at 513-514, 99 S.Ct., at 1858-1859.

The city contends that in this case an award of compensation measured by market value is fundamentally inconsistent with the basic principles of indemnity embodied in the Just Compensation Clause. If the city were a private party rather than a public entity, however, the possibility that the cost of a substitute facility exceeds the market value of the condemned parcel would not justify a departure from the market value measure. *Lutheran Synod,* 441 U.S., at 514-517, 99 S.Ct., at 1858-1860. The question-which we expressly reserved in the *Lutheran Synod* case [13] -is whether a substitute-facilities measure of compensation is mandated by the Constitution [14] *31  when the condemnee is a local governmental entity that has a duty to replace the condemned facility.

## III

[3]    The text of the Fifth Amendment certainly does not mandate a more favorable rule of compensation for public condemnees than for private parties. To the contrary, the language of the Amendment only refers to compensation for "private property," and one might argue that the Framers intended to provide greater protection for the interests of private parties than for public condemnees. That argument would be supported by the observation that many public condemnees have the power of eminent domain, and thus, unlike private parties, need not rely on the availability of property on the market in acquiring substitute facilities.

When the United States condemns a local public facility, the loss to the public entity, to the persons served by it, and to the local taxpayers may be no less acute than the loss in a taking of private property. Therefore, it is most reasonable to construe the reference to "private property" in the Takings Clause of the Fifth Amendment as **456  encompassing the property of state and local governments when it is condemned by the United States. [15]  Under this construction, the same principles of just compensation presumptively apply to both private and public condemnees.

## IV

[4]    The Court of Appeals correctly identified a dictum in *Brown v. United States,* 263 U.S. 78, 44 S.Ct. 92, 68 L.Ed. 171 (1923), as the source  *32  of what has become known as the "substitute-facilities doctrine." [16]  When that passage is read in the context of the Court's decision in that case, it lends no support to the suggestion that a distinction should be drawn between public and private condemnees. Nor does it shed any light on the proper measure of compensation in this case.

The facts of the *Brown* case were, in the Court's word, "peculiar." [17]  The construction of a reservoir on the Snake River flooded approximately three-quarters of the town of American Falls, Idaho, an area of some 640 acres. To compensate both the public and private owners of the flooded acreage, the Government undertook to relocate most of the town to the other side of the river. The owners of a large tract to be included within the limits of the reconstructed town challenged the Government's power to condemn their

Case 09-10138-MFW    Doc 14225-52    Filed 08/15/14    Page 24 of 108

U.S. v. 50 Acres of Land, 469 U.S. 24 (1984)
105 S.Ct. 451, 21 ERC 2105, 83 L.Ed.2d 376, 15 Envtl. L. Rep. 20,117

property, contending that the transfer of their property to other private persons was not a "public use" as required by the Fifth Amendment. Cf. *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 239-244, 104 S.Ct. 2321, 2328-2331, 81 L.Ed.2d 186 (1984).

In rejecting that contention, the Court held that the Government's method of compensating the owners of the flooded property was legitimate. Writing for the Court, Chief Justice Taft observed:

> "The usual and ordinary method of condemnation of the lots in the old town, and of the streets and alleys as town property, would be ill adapted to the exigency.... A town is a business center. It is a unit. If three-quarters **\*33** of it is to be destroyed by appropriating it to an exclusive use like a reservoir, all property owners, both those ousted and those in the remaining quarter, as well as the State, whose subordinate agency of government is the municipality, are injured. A method of compensation by substitution would seem to be the best means of making the parties whole. *The power of condemnation is necessary to such a substitution.*" 263 U.S., at 82-83, 44 S.Ct., at 93-94 (emphasis added).

Taken in context, the apparent endorsement of compensation by substitution is made in support of the Government's power to condemn the property in *Brown* and does not state the proper measure of compensation in another case. *Lutheran Synod,* 441 U.S., at 509, n. 3, 99 S.Ct., at 1856, n. 3.

*Brown* merely indicates that it would have been constitutionally permissible for the Federal Government to provide the city with a substitute landfill site instead of compensating it in cash. Nothing in **\*\*457** *Brown* implies that the Federal Government has a duty to provide the city with anything more than the fair market value of the condemned property.

## V

In this case, as in most, the market measure of compensation achieves a fair "balance between the public's need and

the claimant's loss." *United States v. Toronto, Hamilton & Buffalo Navigation Co.,* 338 U.S. 396, 402, 70 S.Ct. 217, 221, 94 L.Ed. 195 (1949). This view is consistent with our holding in *Lutheran Synod* that fair market value constitutes "just compensation" for those private citizens who must replace their condemned property with more expensive substitutes and with our prior holdings that the Fifth Amendment does not require any award for consequential damages arising from a condemnation.[18]

**\*34**  The city argues that its responsibility for municipal garbage disposal justifies a departure from the market value measure in this case. This responsibility compelled the city to arrange for a suitable replacement facility or substitute garbage disposal services.[19]  This obligation to replace a condemned facility, however, is no more compelling than the obligations assumed by private citizens. Even though most private condemnees are not legally obligated to replace property taken by the Government, economic circumstances often force them to do so. When a home is condemned, for example, its owner must find another place to live. The city's legal obligation to maintain public services that are interrupted by a federal condemnation does not justify a distinction between public and private condemnees for the purpose of measuring "just compensation."[20]

Of course, the decision in *Lutheran Synod* was based, in part, on a fear that a private condemnee might receive a "windfall" if its compensation were measured by the cost of a substitute facility and "substitute facilities were never acquired, or if acquired, were later sold or converted to another use." 441 U.S., at 516, 99 S.Ct., at 1859. The Court of Appeals suggested that the city's obligation to replace the facility avoids this risk, 706 F.2d, at 1360, but we do not agree. If the replacement facility is more costly than the condemned facility, it presumably is more valuable,[21] and any increase in the quality **\*35** of the facility may be as readily characterized as a "windfall" as the award of cash proceeds for a substitute facility that is never built.

The Court of Appeals, however, believed that the risk of any windfall could be reduced by discounting the cost of the substitute facility to account for its superior quality. *Id.,* at 1362-1363. This approach would add uncertainty and complexity to the valuation proceeding without any necessary improvement in the process. In order to implement the Court of Appeals' approach, the factfinder would have to make at least two determinations: (i) the reasonable (rather than the

U.S. v. 50 Acres of Land, 469 U.S. 24 (1984)

Case 09-10138-MFW    Doc 14225-52    Filed 08/15/14    Page 25 of 108

105 S.Ct. 451, 21 ERC 2105, 83 L.Ed.2d 376, 15 Envtl. L. Rep. 20,117

actual) replacement cost, which would require an inquiry into the fair market value of the second facility; and (ii) the extent to which the new facility is superior to the old, which would require an analysis of the qualitative differences between the new and the old. It would also be necessary to determine the **458 fair market value of the old property in order to provide a basis for comparison. There is a practical risk that the entire added value will not be calculated correctly; moreover, if it is correctly estimated, the entire process may amount to nothing more than a roundabout method of arriving at the market value of the condemned facility. [22]

[5]    Finally, the substitute-facilities doctrine, as applied in this case, diverges from the principle that just compensation must be measured by an objective standard that disregards subjective values which are only of significance to an individual owner. As the Court wrote in *Kimball Laundry Co. v. United States,* 338 U.S. 1, 5, 69 S.Ct. 1434, 1437, 93 L.Ed. 1765 (1949):

> "The value of property springs from subjective needs and attitudes; its value to the owner may therefore differ widely from its value to the taker. Most things, however, *36 have a general demand which gives them a value transferable from one owner to another. As opposed to such personal and variant standards as value to the particular owner whose property has been taken, this transferable value has an external validity which makes it a fair measure of public obligation to compensate the loss incurred by an owner as a result of the taking of his property for public use. In view, however, of the liability of all property to condemnation for the common good, loss to the owner of nontransferable values deriving from his unique need for property or idiosyncratic attachment to it, like loss due to an exercise of the police power, is properly treated as part of the burden of common citizenship."

[6]    The subjective elements in the formula for determining the cost of reasonable substitute facilities would enhance the risk of error and prejudice. [23] Since the condemnation contest is between the local community and a National Government that may be thought to have unlimited resources, the open-ended character of the substitute-facilities standard increases the likelihood that the city would actually derive the windfall that concerned both the District Court and the Court of Appeals. [24] "Particularly is this true where these issues are to be left for jury determination, for juries should not be given sophistical and abstruse formulas as the basis for their findings nor be left to apply even sensible formulas to factors that are too elusive." *Id.,* at 20, 69 S.Ct., at 1445.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

*37  Justice O'CONNOR, with whom Justice POWELL joins, concurring.

I concur in the Court's opinion and judgment that, on the facts of this case, the city of Duncanville is justly compensated by the payment of the market value for the sanitary landfill that was condemned by the Government. I write separately to note that I do not read the Court's opinion to preclude a municipality or other local governmental entity from establishing that payment of market value in a particular case is manifestly unjust and therefore inconsistent with the Just Compensation Clause. See *ante,* at 455. When a local governmental entity can prove that the **459 market value of its property deviates significantly from the make-whole remedy intended by the Just Compensation Clause and that a substitute facility must be acquired to continue to provide an essential service, limiting compensation to the fair market value in my view would be manifestly unjust. Because the city of Duncanville did not establish that the market value in this case deviated significantly from the indemnity principle, I agree that the decision of the Court of Appeals should be reversed.

**Parallel Citations**

105 S.Ct. 451, 21 ERC 2105, 83 L.Ed.2d 376, 15 Envtl. L. Rep. 20,117

Footnotes

Case 09-10138-MFW    Doc 14225-52    Filed 08/15/14    Page 26 of 108

U.S. v. 50 Acres of Land, 469 U.S. 24 (1984)

105 S.Ct. 451, 21 ERC 2105, 83 L.Ed.2d 376, 15 Envtl. L. Rep. 20,117

\*  The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1  *United States v. Miller,* 317 U.S. 369, 374, 63 S.Ct. 276, 280, 87 L.Ed. 336 (1943) ("what a willing buyer would pay in cash to a willing seller").

2  "[N]or shall private property be taken for public use, without just compensation." U.S.Const., Amdt. 5.

3  The United States initiated the condemnation proceedings by filing a declaration of taking under 40 U.S.C. § 258a. Under that procedure the Government deposits the estimated value of the land in the registry of the court. "Title and right to possession thereupon vest immediately in the United States. In subsequent judicial proceedings, the exact value of the land (on the date the declaration of taking was filed) is determined, and the owner is awarded the difference (if any) between the adjudicated value of the land and the amount already received by the owner, plus interest on that difference." *Kirby Forest Industries, Inc. v. United States,* 467 U.S. 1, 5, 104 S.Ct. 2187, 2191, 81 L.Ed.2d 1 (1984).

4  The new landfill site is larger in acreage than the old facility and because of superior soil and water table conditions it can be excavated to a greater depth. As a result, the capacity of the new facility is 2,100,000 cubic yards while the remaining capacity of the old facility was 650,000 cubic yards. The new facility is expected to remain in service for 41.6 years, or 28.8 years longer than the condemned facility would have remained in service. Tr. 395-397, 399, 402.

5  Experts for both the United States and the city agreed that a market for landfill properties existed in the area. A Government witness, for example, testified that there are "private owners of solid waste companies in the market for land for their own solid waste disposal sites. You've got the major corporations in the marketplace securing sites for landfill operations and then you've got all of your City Governments, they're seeking locations to deposit solid waste. And all of these people at one time or another are in the marketplace looking for a site for solid waste disposal." *Id.,* at 297.

   Based on their evaluation of the recent sale prices of comparable parcels, the experts for the city estimated the value of the condemned facility as between $367,500 and $370,000; experts for the United States estimated its value as between $160,410 and $190,000. *Id.,* at 173, 182, 276, 353.

6  The city's Director of Public Works admitted on cross-examination that the city had condemnation powers, but did not use them in acquiring the land for the new facility. Nor did the city bargain over the seller's asking price or have the land appraised prior to the acquisition: "This was the price that he had asked for, what we ended up paying for it." *Id.,* at 93-94. The Government's expert witnesses testified that the city paid considerably more than fair market value for the new land. *Id.,* at 282, 321, 357.

7  The District Court awarded interest at the statutory rate of six percent, 40 U.S.C. § 258a, because the city had not offered any evidence indicating that a higher rate of interest prevailed. 529 F.Supp. 220, 223-224 (ND Tex.1981).

8  *Id.,* at 221.

9  Relying on Justice WHITE's concurring opinion in *United States v. 564.54 Acres of Land,* 441 U.S. 506, 518, 99 S.Ct. 1854, 1860, 60 L.Ed. 435 (1979) (*Lutheran Synod*), the District Court wrote:

   "When the doctrine of cost of substitute facilities is applied, a windfall *necessarily* accrues to the condemnee who is awarded an amount sufficient to replace ancient or depleted facilities with brand new facilities. [441 U.S., at 517, 99 S.Ct., at 1860] (Justice WHITE concurring). *See also [United States v.] 564.54 Acres,* 576 F.2d 983, 996-1000 (3d Cir.1978) (Judge Stern concurring). By definition, a market value represents approximately what it would cost to purchase the same or similar property in the marketplace." 529 F.Supp., at 222 (emphasis in original).

10  "In light of [the remand for a new trial]," the Court of Appeals instructed the District Court to allow the city a second opportunity to present evidence on whether the rate of interest on the condemnation award should exceed the statutory rate of six percent. 706 F.2d, at 1364. In view of our disposition of the case, the Court of Appeals' rationale for a new hearing on that issue is no longer valid.

11  We denied the petition for certiorari filed by the city challenging the order of a new trial and seeking the entry of judgment on the jury's finding of the cost of the substitute facility. *City of Duncanville v. United States,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984).

12  "This might be the case, for example, with respect to public facilities such as roads or sewers." *Lutheran Synod,* 441 U.S., at 513, 99 S.Ct., at 1858.

13  "This Court has not passed on the propriety of substitute-facilities compensation for public condemnees.... In light of our disposition of this case, we express no opinion on the appropriate measure of compensation for publicly owned property." *Id.,* at 509, n. 3, 99 S.Ct., at 1856, n. 3.

14  Congress, of course, has the power to authorize compensation greater than the constitutional minimum. See *United States v. General Motors Corp.,* 323 U.S. 373, 382, 65 S.Ct. 357, 361, 89 L.Ed. 311 (1945); see, *e.g.,* Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 84 Stat. 1894, 42 U.S.C. § 4601 *et seq.* (requiring the payment of relocation assistance to specified persons and businesses displaced as a result of federal and federally assisted programs).

15  See *United States v. Carmack,* 329 U.S. 230, 242, 67 S.Ct. 252, 257, 91 L.Ed. 209 (1946):

Case 09-10138-MFW    Doc 14225-52    Filed 08/15/14    Page 27 of 108

U.S. v. 50 Acres of Land, 469 U.S. 24 (1984)

105 S.Ct. 451, 21 ERC 2105, 83 L.Ed.2d 376, 15 Envtl. L. Rep. 20,117

"[W]hen the Federal Government ... takes for a federal public use the independently held and controlled property of a state or of a local subdivision, the Federal Government recognizes its obligation to pay just compensation for it and it is conceded in this case that the Federal Government must pay just compensation for the land condemned."

See also *Block v. North Dakota ex rel. Board of University and School Lands,* 461 U.S. 273, 291, 103 S.Ct. 1811, 1822, 75 L.Ed.2d 840 (1983).

16    See, *e.g., United States v. Certain Property in Borough of Manhattan,* 403 F.2d 800, 803 (CA2 1968); *United States v. Board of Education of Mineral County,* 253 F.2d 760, 763 (CA4 1958).

17    "An important town stood in the way of a necessary improvement by the United States. Three-quarters of its streets, alleys and parks and of its buildings, public and private, would have to be abandoned.... American Falls is a large settlement for that sparsely settled country and it was many miles from a town of any size in any direction. It was a natural and proper part of the construction of the dam and reservoir to make provision for a substitute town as near as possible to the old one." 263 U.S., at 81, 44 S.Ct., at 93.

18    See *United States v. General Motors Corp.,* 323 U.S., at 382, 65 S.Ct., at 361; see generally J. Gelin & D. Miller, Federal Law of Eminent Domain § 2.4(B) (1982).

19    The Court of Appeals left open the question whether the city was, in fact, under an obligation to replace its landfill facility, 706 F.2d, at 1360, n. 6, but for purposes of our decision we assume that it was obligated to do so.

20    In holding that the substitute-facilities measure of compensation was appropriate in this case, the Court of Appeals did not rely solely on the city's legal obligations to arrange for garbage disposal within the municipality, but also on "any practical, economic or logistical advantages of the city's operation and control of its own sanitary landfill." *Ibid.*

21    "Obviously, replacing the old with a new facility will cost more than the value of the old, but the new facility itself will be more valuable and last longer." *Lutheran Synod,* 441 U.S., at 518, 99 S.Ct., at 1860 (WHITE, J., concurring).

22    Indeed, one might infer from the record that this would be the result here. See nn. 4 and 6, *supra.* The District Court, in fact, found that an award of fair market value would place the city "in as good a position pecuniarily as if its property had not been taken." 529 F.Supp., at 223.

23    Cf. R. Posner, Economic Analysis of Law 402 (2d ed. 1977) ("The vogue of cost-benefit analysis has created inflated notions of the effectiveness of analytical techniques in resolving questions of cost and demand").

24    Of course, we express no view on the admissibility of testimony on reproduction cost when it is offered on the issue of fair market value. Cf. *United States v. Commodities Trading Corp.,* 339 U.S. 121, 126, 70 S.Ct., 547, 551, 94 L.Ed. 707 (1950). The admissibility of such evidence must be evaluated under the generally applicable rules of evidence. *E.g.,* Fed.Rules Evid. 401-403, 701-705.

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 156

93 S.Ct. 1713
Supreme Court of the United States

UNITED STATES, Petitioner,

v.

Douglas B. CARTWRIGHT, as Executor
of the Estate of Ethel B. Bennett.

No. 71-1665.    |    Argued Jan.
16, 1973.    |    Decided May 7, 1973.

Federal estate tax refund action. The United States District Court, for the Western District of New York, 323 F.Supp. 769, held applicable Treasury regulation invalid and appeal was taken. The Court of Appeals, 457 F.2d 567, affirmed, and the Government's petition for certiorari was granted. The Supreme Court, Mr. Justice White, held that where, under statutory scheme created by Investment Company Act, initial purchases by the public of shares of open-end mutual fund with a sales load are made from the fund at the 'asked' price which includes the load but shareholders sell their shares back to the fund at statutorily defined redemption or 'bid' price set by the Act at approximately the fractional value per share of fund's net assets at time of redemption, Treasury regulation that such shares are to be valued for federal estate tax purposes at their public offering price or 'asked' price at date of death was inconsistent with provisions of Investment Company Act, imposed an unreasonable and unrealistic measure of value and was invalid.

Judgment of Court of Appeals affirmed.

Mr. Justice Stewart, with whom The Chief Justice and Mr. Justice Rehnquist joined, filed dissenting opinion.

West Headnotes (2)

[1]    Internal Revenue
        👉 Making, Requisites and Validity

Regulations promulgated under authority of Secretary of the Treasury, if found to implement congressional mandate in some reasonable manner, must be upheld. 26 U.S.C.A. (I.R.C.1954) § 7805(a).

100 Cases that cite this headnote

[2]    Internal Revenue
        👉 Rules and Regulations

Where, under statutory scheme created by Investment Company Act, initial purchases by the public of shares of open-end mutual fund with a sales load are made from the fund at the "asked" price which includes the load but shareholders sell their shares back to the fund at statutorily defined redemption or "bid" price set by the Act at approximately the fractional value per share of fund's net assets at time of redemption, Treasury regulation that such shares are to be valued for federal estate tax purposes at their public offering price or "asked" price at date of death was inconsistent with provisions of Investment Company Act, imposed an unreasonable and unrealistic measure of value and was invalid. 26 U.S.C.A. (I.R.C.1954) §§ 2031, 7805(a); Investment Company Act of 1940, §§ 1 et seq., 2(a)(32, 35), 15, 22(e) as amended 15 U.S.C.A. §§ 80a-1 et seq., 80a-2(a)(32, 35), 80a-15, 80a-22(e).

417 Cases that cite this headnote

**1714 *546 Syllabus [*]

Shares in mutual funds can be 'sold' by the shareholder only back to the fund and only at a set redemption price. Treas.Reg. s 20.2031-8(b), requiring that such shares be valued for federal estate tax purposes at the current public offering ('asked') price, which is determined by adding a load or sales charge to the net asset value, is clearly inconsistent with the Investment Company Act of 1940, and is therefore invalid. Pp. 1716-1720.

2 Cir., 457 F.2d 567, affirmed.

**Attorneys and Law Firms**

Sol. Gen. Erwin N. Griswold for petitioner.

Ralph J. Gregg, Buffalo, N.Y., for respondent.

93 S.Ct. 1713, 36 L.Ed.2d 528, 31 A.F.T.R.2d 73-1461, 73-1 USTC P 12,926...

## Opinion

Mr. Justice WHITE delivered the opinion of the Court.

The Internal Revenue Code of 1954 requires that, for estate tax purposes, the 'value' of all property held by a decedent at the time of death be included in the gross estate. 26 U.S.C. s 2031. By regulation, the Secretary of the Treasury has determined that shares in open-end investment companies, or mutual funds, are to be valued at their public offering price or 'asked' price at the date **\*547** of death. Treas.Reg. on Estate Tax s 20.2031-8(b) (1963). The question this case presents is whether that determination is reasonable in the context of the market for mutual fund shares.

At the time of her death in 1964, Ethel B. Bennett owned approximately 8,700 shares of three mutual funds that are regulated by the Investment Company Act of 1940, 54 Stat. 789, as amended, 15 U.S.C. s 80a-1 et seq.[1] The 1940 Act **\*\*1715** seeks generally to regulate publicly held companies that are engaged in investing in securities. Open-end investment companies, or mutual funds, 'dominate' this industry. 1966 SEC Report 43. Unquestionably, the unique characteristic of mutual funds is that they are permitted, under the Act, to market their shares continuously to the public, but are required to be prepared to redeem outstanding shares at any time. s 80a-22(e). The redemption 'bid' price that a shareholder may receive is set by the Act at approximately the fractional value per share of the fund's net assets at the time of redemption. s 80a-2(a)(32). In contrast, the 'asked' price, or the price at which the fund initially offers its shares to the public, includes not only the net asset value per share at the time of sale, but also a fixed sales charge or 'sales load' assessed by the fund's principal underwriter who acts as an agent in marketing the fund's shares. **\*548** s 80a-2(a) (35).[2] Sales loads vary within fixed limits from mutual fund to mutual fund, but all are paid to the funds' underwriters; the charges do not become part of the assets of the fund.[3] The sales loads of the funds held by the decedent ranged from seven and eight percent to one percent of the fractional net asset value of the funds' shares.

**\*549** Private trading in mutual fund shares is virtually nonexistent.[4] Thus, at any given time, under the statutory scheme created by the Investment Company Act, shares of any open-end mutual fund with a sales load are being sold at two distinct prices. Initial purchases by the public are made from the fund, at the 'asked' price, which includes the load.

But shareholders 'sell' their shares **\*\*1716** back to the fund at the statutorily defined redemption or bid price.

Respondent is the executor of the decedent's estate. On the federal estate tax return, he reported the value of the mutual fund shares held by the decedent at their redemption price, which amounted to about $124,400. The Commissioner assessed a deficiency based upon his valuation of the shares at their public offering or asked price, pursuant to Treas.Reg. s 20.2031-8(b).[5] Valued **\*550** on that basis, the shares were worth approximately $133,300. Respondent paid the deficiency of about $3,100, including interest, filed a timely claim for a refund, and, when that claim was denied, commenced a refund action in Federal District Court on the ground that the valuation based on s 20.2031-8(b) was unreasonable. The District Court agreed with respondent and held the Regulation invalid. 323 F.Supp. 769. The Court of Appeals affirmed. 2 Cir., 457 F.2d 567. We granted the Government's petition for certiorari, 409 U.S. 840, 93 S.Ct. 61, 34 L.Ed.2d 79, because of the conflict among the circuits.[6]

[1] We recognize that this Court is not in the business of administering the tax laws of the Nation. Congress has delegated that task to the Secretary of the Treasury, 26 U.S.C. s 7805(a), and regulations promulgated under his authority, if found to 'implement the congressional mandate in some reasonable manner,' must be upheld. United States v. Correll, 389 U.S. 299, 307, 88 S.Ct. 445, 449, 19 L.Ed.2d 537 (1967). See Bingler v. Johnson, 394 U.S. 741, 749-751, 89 S.Ct. 1439, 1444, 22 L.Ed.2d 695 (1969); Commissioner v. South Texas Lumber Co., 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948). But that principle is to set the framework for judicial analysis; it does not displace it. We find that the contested regulation is unrealistic and unreasonable, and therefore affirm the judgment of the Court of Appeals.

In implementing 26 U.S.C. s 2031, the general principle of the Treasury Regulations is that the value of **\*551** property is to be determined by its fair market value at the time of the decedent's death. 'The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.' Treas.Reg. s 20.2031-1(b). The willing buyer-willing seller test of fair market value is nearly as old as the federal income, estate, and gifts taxes themselves, **\*\*1717** and is not challenged here.[7] Under this test, is is clear that if the decedent had owned ordinary corporate

stock listed on an exchange, its 'value' for estate tax purposes would be the price the estate could have obtained if it had sold the stock on the valuation date, that price being, under Treas. Reg. s 20.2031-2(b), the mean between the highest and lowest quoted selling prices on that day. Respondent urges that similar treatment be given mutual fund shares and that, accordingly, their value be measured by the redemption price at the date of death, the only price that the estate could hope to obtain if the shares had been sold.

Respondent's argument has the clear ring of common sense to it, but the United States maintains that the redemption price does not reflect the price that a willing buyer would pay, inasmuch as the mutual fund is under a statutory obligation to redeem outstanding shares whenever they are offered. According to the Government, the only market for mutual fund shares that has both willing buyers and willing sellers is the public offering market. Therefore, the price in that market, the asked **\*552** price, is an appropriate basis for valuation. The central difficulty with this argument is that it unrealistically bifurcates the statutory scheme for the trading in mutual fund shares. To be sure, the fund is under an obligation to redeem its shares at the stated price. 15 U.S.C. s 80a-22(e). But, at the time of the original purchases, both the fund and the purchasers are aware of that duty and both willingly enter into the sale transactions nonetheless. As Judge Winner correctly observed in Hicks v. United States, 335 F.Supp. 474, 481 (Colo.1971):

> 'Viewing the contract in this light meets every test of the 'willing buyer-willing seller' definition usually applied in the determination of market value. The 'willing buyer' is the fully informed person who agrees to buy the shares, agreeing at that time to sell them to the fund-the only available repurchaser-at the redemption price. The 'willing seller' is the fund which sells the shares at market value plus a load charge, and which agrees to buy the shares back at market less the load charge. That is the market, and it is the only market. It is a market made up of informed buyers and an informed seller, all dealing at arm's length.'

In the context of the Investment Company Act, the redemption price may thus be properly viewed only as the final step in a voluntary transaction between a willing buyer and a willing seller. As a matter of statutory law, holders of mutual fund shares cannot obtain the 'asked' price from the fund. That price is never paid by the fund; it is used by the fund when selling its shares to the public-and even then the fund receives merely the net asset value per share from the sale, with the sales load being paid directly to the underwriter. In short, the only price that a shareholder may realize and that the fund-the only buyer-will pay is the redemption **\*553** price. In the teeth of this fact, Regulation s 20.2031-8(b) purports to assign a value to mutual fund shares that the estate could not hope to obtain and that the fund could not offer.

In support of the Regulation, the Government stresses that many types of property are taxed at values above those which could be realized during an actual sale. For example, ordinary corporate stock is valued at its fair market price without taking into account the brokerage commission that a seller must generally pay in order to sell the stock. Respondent does not contend that that approach is inappropriate or that, for example, **\*\*1718** the value of ordinary stock in an estate should be the market price at the time less anticipated brokerage fees. But s 20.2031-8(b) operates in an entirely different fashion. The regulation includes as an element of value the commission cost incurred in the hypothetical purchase of the mutual fund shares already held in the decedent's estate. If that principle were carried over to the ordinary stock situation, then a share traded at $100 on the date of death would be valued, not at $100 as it now is, but at, say, $102, representing the 'value' plus the fee that a person buying the stock on that day would have to pay. It hardly need be said that such a valuation method is at least inconsistent with long-established Treasury practice and would appear at odds with the basic notions of valuation embodied in the Internal Revenue Code. [8] See Estate of Wells v. Commissioner, 50 T.C. 871, 880 (1968) (Tannenwald, J., dissenting).

Even if it were assumed that the public offering price were somehow relevant to the value of mutual fund shares **\*554** privately held, there would still be the difficulty that shares so held are, in important respects, similar to ordinary corporate stock held subject to a restrictive agreement (such as a first-refusal right at a specified price). With respect to the value of such stock, the Treasury Regulations have provided that the price that may be obtained in the marketplace does not control. Rather, so long as the restriction is a bona fide one, the value of the shares in the hands of the restricted stockholder is determined in accordance with the terms of the

restriction. Treas.Reg. s 20.2031-2(h). Outstanding mutual funds share are likewise held subject to a restriction, as the Court of Appeals noted. 457 F.2d at 571. Those shares may not be 'sold' at the public offering price. By statute, they may be 'sold' back to the mutual fund only at the redemption price. We see no valid justification for disregarding this reality connected with the ownership of mutual fund shares.

The Government nevertheless argues that Treas.Reg. s 20.2031-8(b) reasonably values the 'bundle of rights' that is transferred with the ownership of the mutual fund shares.[9] For this argument, heavy reliance is placed on this Court's decisions in Guggenheim v. Rasquin, 312 U.S. 254, 61 S.Ct. 507, 85 L.Ed. 813 (1941); Powers v. Commissioner, 312 U.S. 259, 61 S.Ct. 509, 85 L.Ed. 817 (1941); United States v. Ryerson, 312 U.S. 260, 61 S.Ct. 479, 85 L.Ed. 819 (1941), which held that the cash-surrender value of a single-premium life insurance policy did not necessarily represent its only taxable value for federal gift tax purposes. *555
[10] In Guggenheim, the lead case, the taxpayer purchased single-premium life insurance policies with an aggregate face value of one million dollars for approximately $852,000 and, shortly thereafter, gave the policies to her children. On the gift tax return, the policies were listed at their cash-surrender **1719 value of about $717,000-admittedly the only amount the donor or the donees could receive, if the policies were surrendered. But the Commissioner valued the gift at the cost of the policies, and this Court upheld that valuation: 'the owner of a fully paid life insurance policy has more than the mere right to surrender it; he has the right to retain it for its investment virtues and to receive the face amount of the policy upon the insured's death. That these latter rights are deemed by purchasers of insurance to have substantial value is clear from the difference between the cost of a single-premium policy and its immediate or early cash-surrender value . . ..' 312 U.S., at 257, 61 S.Ct. at 509. Because the 'entire bundle of rights in a single-premium policy' is so difficult to give a realistic value to, the Court deferred to the Commissioner's determination and permitted valuation to be based on cost: 'Cost is cogent evidence of value.' Id., at 258, 61 S.Ct. at 509. But as the District Court observed, 323 F.Supp., at 773, shares in mutual funds are quite unlike insurance policies, particularly in light of the policyowner's right to receive the full face value of the policy upon the insured's death. Moreover, mutual fund shares present no analogous difficulties in *556 valuation. On any given day, their commercial value may be determined by turning to the financial pages of a newspaper. Obviously, with respect to mutual funds, there are 'investment virtues' and the

prospects of capital gains or dividends. But that is true of any corporate security. Nonetheless, shareholders in mutual funds are singled out by the Regulation and their holdings valued at an unrealistic replacement cost-which includes 'brokers' commissions'-while other shareholdings are valued without regard to such commissions.

The unrealistic nature of this difference in treatment may be demonstrated by comparing the treatment of shares in load funds, such as the decedent's with shares in no-load funds. Obviously, even if it could be argued that there are relevant differences between mutual fund shares generally and corporate stock, there are no differences in terms of 'investment virtues' or related interests between no-load and load fund shares. Indeed, as the terms imply, the only real distinction between the two is that one imposes an initial sales charge and the other does not.[11] Nonetheless, under the Regulation, a share in a noload fund is valued at its net asset value while a share in a load fund is valued at net asset value plus sales charge. To further illustrate, consider a decedent who had purchased one share in each of two no-load mutual funds, at $100 per share. The decedent died before either appreciated, but after one of the funds had changed to a load fund. Although both shares are still worth $100, and could be redeemed for only that amount, the Regulation would require that one be valued at $100 and the other at $100 plus the new load charge. A regulation that results in such differing treatment of identical property should be supported by something more than a transparent analogy to life insurance.

*557 [2] We recognize that normally 'Treasury regulations must be sustained unless unreasonable and plainly inconsistent with the revenue statutes.' Commissioner v. South Texas Lumber Co., 333 U.S., at 501, 68 S.Ct., at 698. But even if the Regulation contested here is not, on its face, technically inconsistent with s 2031 of the Internal Revenue Code, it is manifestly inconsistent with the most elementary provisions of the Investment Company Act of 1940 and operates without regard for the market in mutual fund shares that the Act created and regulates. Cf. L. E. Shunk Latex Products, Inc. v. Commissioner, 18 T.C. 940 (1952). Congress surely could not have intended s 2031 to be interpreted in such a manner. The Regulation also imposes **1720 an unreasonable and unrealistic measure of value. We agree with Judge Tannenwald, who stated at the very outset of the dispute over Regulation s 20.2031-8(b), that 'it does not follow that, because (the Commissioner) has a choice of alternatives, his choice should be sustained where

Case 09-10138-MFW    Doc 14225-52    Filed 08/15/14    Page 33 of 108

U.S. v. Cartwright, 411 U.S. 546 (1973)
93 S.Ct. 1713, 36 L.Ed.2d 528, 31 A.F.T.R.2d 73-1461, 73-1 USTC P 12,926...

the alternative chosen is unrealistic. In such a situation the regulations embodying that choice should be held to be unreasonable.' Estate of Wells v. Commissioner, 50 T.C., at 878 (dissenting opinion).

The judgment of the Court of Appeals is affirmed.

It is so ordered.

Judgment affirmed.

Mr. Justice STEWART, with whom THE CHIEF JUSTICE and Mr. Justice REHNQUIST join, dissenting.

This case presents a narrow issue of law regarding the valuation of certain assets-shares in an open-end investment company or 'mutual fund'-for purposes of the federal estate tax. The case turns upon a single question of law: whether or not s 20.2031-8(b) of the Treasury Regulations, which provides a specific method for valuing such shares, represents a reasonable implementation of the legislation enacted by Congress.

*558  On December 4, 1964, Mrs. Ethel Bennett died testate leaving, among other property several thousand shares in three separate mutual funds. Each of the funds in question is managed by a firm known as Investors Diversified Services, Inc., and all are subject to regulation by the Securities and Exchange Commission under the Investment Company Act of 1940. In his tax return for the estate, the respondent, Mrs. Bennett's executor, valued these shares at their so-called 'net asset value,' that is, the amount at which the estate is entitled, as a matter of law, to have the shares redeemed by the issuer. The net asset value of a mutual fund share is calculated daily by the issuing company, and is equivalent to the fractional value per share of the fund's total net assets on that day. In addition to serving as a gauge for the redemption value of fund shares already issued, net asset value is also employed by the issuing companies in determining the price at which they will offer new shares in the fund to the public on any given day. In general, such shares are sold to the public at their net asset value plus a sales charge or 'load.' The load is a varying percentage of the value of the shares sold, and fluctuates in accordance with the size of the purchase. In the case of Mrs. Bennett's shares, the maximum allowable sales load at the time of her death ranged between 7% and 8%, and the minimum was 1%.

Upon receipt of respondent's return, the Commissioner, acting in accordance with Treas.Reg. s 20.2031-8(b), [*] assessed a deficiency, contending that the value of  *559  Mrs. Bennett's shares for federal estate tax purposes was their public offering price on the date of her death, that is, the price which a member of the public would have had to pay to acquire similar shares from the issuer. This price would, of course, encompass not only the net asset value of the shares, but also the applicable sales load. Such a method of valuation for mutual fund shares is expressly prescribed by the Treasury Regulation noted above. Thus, the sole question before us is whether that Regulation constitutes a reasonable exercise by the Commissioner of his statutory power to prescribe 'all needful rules' for the proper enforcement of the tax laws, see 26 U.S.C. s 7805, or whether the Regulation is  **1721  so inherently unreasonable and inconsistent with the statute as to be invalid. United States v. Correll, 389 U.S. 299, 88 S.Ct. 445, 19 L.Ed.2d 537; Bingler v. Johnson, 394 U.S. 741, 89 S.Ct. 1439, 22 L.Ed.2d 695. Upon the facts presented by this case, I cannot say that the Commissioner's Regulation is invalid, and I therefore dissent from the decision of the Court.

At the outset, it may be well to note the basic general rule with respect to valuation that prevails under our estate tax laws. This rule is embodied in Treas.Reg. s 20.2031-1(b), and provides that the value of property includable in a decedent's estate shall be the fair market value of such property at the date of the decedent's death. 'The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.' 26 CFR s 20-2031-1(b).

The difficulty in applying this rule to mutual fund shares-a difficulty which, no doubt, led the Commissioner to promulgate Regulation s 20.2031-8(b)-is that such shares once issued are not subject to disposition in a market of 'willing buyers' and 'willing sellers.' Indeed, as both the District Court and the Court of Appeals  *560  noted, the only practical means of disposing of mutual fund shares once acquired is redemption, and redemption cannot be deemed a sale of the sort described in the general rule (26 CFR s 20-2031-1(b)), since the party purchasing (the issuing company) is under an absolute obligation to redeem the shares when tendered, and the party selling has no practical alternative, if he wishes to liquidate his holdings, other than to offer them to the issuing company for redemption.

Case 09-10138-MFW    Doc 14225-52    Filed 08/15/14    Page 34 of 108

U.S. v. Cartwright, 411 U.S. 546 (1973)
93 S.Ct. 1713, 36 L.Ed.2d 528, 31 A.F.T.R.2d 73-1461, 73-1 USTC P 12,926...

This being the case, the Commissioner was faced with the problem of establishing a method of valuing the shares most nearly equal to their inherent worth. In doing so, he chose not to treat their redemption value as dispositive of this question. In promulgating his Regulation, he might rationally have considered that 'on demand' redemption at net asset value is but one of many rights incident to the ownership of mutual fund shares.

For example, in the case of Mrs. Bennett's shares, her estate had not only the right to redeem them 'on demand,' but also to retain them; and if it had done so it would have possessed not only the normal dividend and capital gains rights associated with most investments, but also the right to have such dividends and capital gains as accrued applied toward the purchase of additional shares at a price below that which a member of the general public would have had to pay for such shares. In addition, under the investment contracts involved here, Mrs. Bennett's estate would have had the right to exchange her shares in any one of the three mutual funds involved for those of either or both of the other funds managed by Investors Diversified Services, Inc.-without paying the usual sales charge or load.

The Commissioner has determined that the proper method of valuing all the rights, both redemptive and otherwise, incident to the ownership of mutual fund shares is to determine what a member of the general public, **\*561** acting under no constraints, would have had to pay for these rights if purchased on the open market. And, as noted earlier, although no such market exists for mutual fund shares once issued to an investor, a perfectly normal market of willing buyers and sellers does exist with respect to such shares prior to their issuance. Thus, the Commissioner took the price at which the shares would have sold on this market as fairly reflective of their inherent worth. I cannot say that this method of valuation adopted by the Commissioner, and embodied in Regulation s 20.2031-8(b), is so unreasonable and inconsistent with the statute as to render it invalid.

**\*\*1722** The respondent's claim that the regulation is invalid is grounded upon two principal arguments. First, he says, the estate is being taxed on an amount in excess of what it can, as a practical matter, realize from the disposition of the mutual fund shares. But this is equally true of many other assets subject to taxation under our estate tax laws. For example, real property passing into an estate is taxed upon its full fair market value, despite the fact that as a practical matter the estate must usually pay some percentage of that sum in

brokerage fees if it wishes to dispose of the property and receive cash in its stead. This attack upon the Regulation thus amounts to no less than an attack upon the whole system of valuation embodied in the Treasury Regulations on Estate Tax, based as it is upon fair value in an open market. I am not ready to hold that this long-established and long-accepted system is basically invalid.

The respondent's second argument is that the Regulation places a higher valuation on mutual fund shares than is placed upon registered common stock shares and other similarly traded securities. This argument assumes that the redemption or net asset value of a mutual fund share is identical to the fair market value of a traded security, and, by a parity of reasoning, that the sales **\*562** charge or load associated with mutual fund purchases is equivalent to the commission that a stockbroker charges a purchaser of securities. Under this view, the Commissioner would be entitled to tax mutual fund shares passing into an estate only on their net asset value, since in the allegedly comparable situation of common stock shares no consideration may be given to brokers' commissions in arriving at an appropriate valuation for estate tax purposes. See 26 CFR s 20.2031-2(b).

Although this argument has a certain superficial appeal, the analogy on which it relies is hardly an exact one. For an estate in disposing of marketable securities must pay a brokerage commission on their sale, and will thus realize less than the amount at which the securities have been valued, while an estate turning in mutual fund shares for redemption pays no commission or other surcharge whatever. Moreover, unlike traditional securities, there is no open trading market for mutual fund shares once issued and in the hands of an investor. If such a market of willing buyers and sellers did exist, the Commissioner would doubtless be bound to treat mutual fund shares exactly like other securities. But where no market for an asset exists, there simply is no market price to provide a readily identifiable standard for valuation. Under these circumstances, it is the Commissioner's duty under the statute to establish criteria for determining the true worth of the totality of rights and benefits incident to ownership of the asset. This the Commission has done in Regulation s 20.2031-8(b) by providing that the value of a mutual fund share for federal estate tax purposes shall be the price a member of the general public would have to pay to acquire such share. Such an approach to the valuation of assets not regularly traded in a market of willing buyers and sellers has already been sustained by this Court in a case closely akin

Case 09-10138-MFW    Doc 14225-52    Filed 08/15/14    Page 35 of 108

U.S. v. Cartwright, 411 U.S. 546 (1973)
93 S.Ct. 1713, 36 L.Ed.2d 528, 31 A.F.T.R.2d 73-1461, 73-1 USTC P 12,926...

to the case before us. See Guggenheim v. Rasquin, 312 U.S. 254, 61 S.Ct. 507, 85 L.Ed. 813.

 **\*563**  Given the peculiar characteristics of mutual fund shares, it is arguable that the Commissioner might reasonably have adopted a method of valuation different from that which he has chosen. But that is a question that is not for us to decide. '(We) do not sit as a committee of revision to perfect the administration of the tax laws. Congress has delegated to the Commissioner, not to the courts, the task of prescribing 'all needful rules and regulations for the enforcement' of the Internal Revenue Code. 26 U.S.C. s 7805(a). In this area of limitless factual variations, 'it is the province of Congress and

the Commissioner, not the courts, to make the appropriate adjustments.'' **\*\*1723**  United States v. Correll, 389 U.S., at 306-307, 88 S.Ct., at 449. See Bingler v. Johnson, 394 U.S., at 750, 89 S.Ct., at 1445.

I would reverse the judgment of the Court of Appeals and sustain the validity of the Regulation.

### Parallel Citations

93 S.Ct. 1713, 36 L.Ed.2d 528, 31 A.F.T.R.2d 73-1461, 73-1 USTC P 12,926, 1973-1 C.B. 400

---

### Footnotes

\*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 287, 50 L.Ed. 499.

1    The decedent owned 2,568.422 shares of Investors Mutual, Inc., in her own name, and 2,067.531 shares as trustee for her daughter. The decedent also owned 2,269.376 shares of Investors Stock Fund, Inc., and 1,869.159 shares of Investors Selective Fund, Inc.
     For thorough discussions of the operations of open-end investment companies, see SEC Report on Public Policy Implications of Investment Company Growth, H.R.Rep.No.2337, 89th Cong., 2d Sess. (1966) (hereinafter 1966 SEC Report); SEC Report of Special Study of Securities Markets, c. XI, Open-End Investment Companies (Mutual Funds), H.R.Doc.No. 95, pt. 4, 88th Cong., 1st Sess. (1963) (hereinafter 1963 Special Study).

2    A number of mutual funds are so-called 'no-load funds'; in such cases the bid and asked prices are the same. See 1966 SEC Report 58-59. The underwriter for all three funds involved in this case is Investors Diversified Services, Inc. (IDS), which is not itself an open-end investment company. IDS also serves as the investment manager of the funds, for which it receives separate management fees. See 15 U.S.C. s 80a-15.

3    The 1963 Special Study 96-97 explained the trading in mutual fund shares as follows:
     'Mutual fund shares are not traded on exchanges or generally in the over-the-counter market, as are other securities, but are sold by the fund through a principal underwriter, and redeemed by the fund, at prices which are related to 'net asset value.' The net asset value per share is normally computed twice daily by taking the market value at the time of all portfolio securities, adding the value of other assets and subtracting liabilities, and dividing the result by the number of shares outstanding. Shares of most funds are sold for a price equal to their asset value plus a sales charge or commission, commonly referred to as the 'sales load,' and usually ranging from 7.5 to 8.5 percent of the amount paid, or 8.1 to 9.3 percent of the amount invested. A few funds, however, known as 'no-load' funds, offer their shares for sale at net asset value without a sales charge. Shares of most funds are redeemed or repurchased by the funds at their net asset value, although a few funds charge a small redemption fee. The result of this pricing system, it is apparent, is that the entire cost of selling fund shares is generally borne exclusively by the purchaser of new shares and not by the fund itself. In this respect the offering of mutual fund shares differs from, say, the offering of new shares by a closed-end investment company or an additional offering 'at the market' of shares of an exchange-listed security, where at least a portion of the selling cost is borne by the company selling the shares.' (Footnote omitted.)

4    See Estate of Wells v. Commissioner, 50 T.C. 871, 873 (1968), aff'd sub nom. Ruehlmann v. Commissioner, 418 F.2d 1302 (CA6 1969), cert. denied, 398 U.S. 950, 90 S.Ct. 1869, 26 L.Ed.2d 290 (1970); 1966 SEC Report 42; and 1963 Special Study 96.

5    The regulation reads, in part, as follows:
     '(b) Valuation of shares in an openend investment company. (1) The fair market value of a share in an open-end investment company (commonly known as a 'mutual fund') is the public offering price of a share, adjusted for any reduction in price available to the public in acquiring the number of shares being valued. In the absence of an affirmative showing of the public offering price in effect at the time of death, the last public offering price quoted by the company for the date of death shall be presumed to be the applicable public offering price. . . .
     '(2) The provisions of this paragraph shall apply with respect to estates of decedents dying after October 10, 1963.'

U.S. v. Cartwright, 411 U.S. 546 (1973)

Case 09-10138-MFW    Doc 14225-52    Filed 08/15/14    Page 36 of 108

93 S.Ct. 1713, 36 L.Ed.2d 528, 31 A.F.T.R.2d 73-1461, 73-1 USTC P 12,926...

This regulation was promulgated in 1963, T.D. 6680, 28 Fed.Reg. 10872, after some years of confusion within the Treasury Department and between that Department and the Department of Justice. See the District Court's opinion, 323 F.Supp. 769, 777. A corresponding regulation was adopted for gift tax purposes. Treas.Reg. s 25.2512-6(b).

6    In Estate of Wells v. Commissioner, supra, the Tax Court sustained the regulation, with six judges dissenting. That decision was affirmed by the Sixth Circuit in Ruehlmann v. Commissioner, 418 F.2d 1302 (1966), cert. denied, 398 U.S. 950, 90 S.Ct. 1869, 26 L.Ed.2d 290 (1970). The companion gift tax regulation was upheld in Howell v. United States, 414 F.2d 45 (CA7 1969). Regulation s 20.2031-8(b) was held invalid in Davis v. United States, 460 F.2d 769 (CA9 1972), aff'g 306 F.Supp. 949 (CDCal.1969). See also Hicks v. United States, 335 F.Supp. 474 (Colo.1971), appeal pending in the Tenth Circuit, No. 72-1360.

7    See Treas.Reg. 63 Relating to Estate Tax Under the Revenue Act of 1921, Art. 13 (1922 ed.) ('The criterion of such value is the price which a willing buyer will pay to a willing seller for the property in question under the circumstances existing at the date of the decedent's death . . .'); Treas.Reg. 105 Relating to the Estate Tax Under the Internal Revenue Code (of 1939), s 81.10 (1942).

8    Whatever the situations may be where it is realistic and appropriate under Treas.Reg. s 20.2031-1(b) to use a standardized retail price to measure value for estate tax purposes, it is sufficient to note here that for the reasons given, the valuation of mutual fund shares does not present one of those situations.

9    The Government argues that, as a practical matter, an estate would rarely be hurt by valuation of mutual fund shares at the asked price, because Treas.Reg. s 20.2053-3(d)(2) permits an estate to deduct the difference between the asked and bid prices if the shares are sold to pay certain enumerated expenses. By its terms, however, that regulation applies only if 'the sale is necessary' to pay those expenses. (Emphasis added.) In any event, the regulation is inapplicable altogether if the shares are transferred in kind to an heir or legatee.

10   It is coincidence that the contested regulation was placed in Treas.Reg. s 20.2031-8, which deals with '(v)aluation of certain life insurance and annuity contracts . . . .' But we agree with Judge Winner:

'The Commissioner cannot cross-breed life insurance and investment trust shares by the simple expedient of discussing them in separate paragraphs of a single regulation.' Hicks v. United States, 335 F.Supp., at 482.

11   See 1966 SEC Report 51-59.

*    The text of the regulation, insofar as relevant here, reads as follows: 'The fair market value of a share in an open-end investment company (commonly known as a 'mutual fund') is the public offering price of a share, adjusted for any reduction in price available to the public in acquiring the number of shares being valued. . . .' There is a companion Gift Tax Regulation of identical import. See 26 CFR s 25.2512-6(b).

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 157

70 A.F.T.R.2d 92-5657, 61 USLW 2147, 92-2 USTC P 50,465, 23 Bankr.Ct.Dec. 734...

976 F.2d 123
United States Court of Appeals,
Third Circuit.

UNITED STATES of America, Appellant,

v.

Lewis PEPPERMAN, Trustee for Keith T. Sorensen,

Keith T. Sorensen, Debtor,

US Trustee, Trustee.

No. 91-6000.  |  Argued July
9, 1992.  |  Decided Sept. 3, 1992.

Trustee for individual Chapter 7 debtor filed motion to have individual debtor's tax liability for corporate trust fund taxes reduced by amount of corporate Chapter 7 debtor's partial tax payment to the Internal Revenue Service (IRS). The Bankruptcy Court granted that motion, and the IRS appealed. The United States District Court for the District of New Jersey, Anne E. Thompson, J., affirmed, and the IRS appealed. The Court of Appeals, Sloviter, Chief Judge, held that: (1) payments made to IRS out of Chapter 7 debtor's estate were involuntary, as trustee was not free to withhold payment for taxes, and accordingly, trustee did not have authority to designate application of corporate Chapter 7 debtor's partial tax payment to trust fund taxes for which individual debtor was also liable instead of to nontrust fund taxes; (2) bankruptcy court presiding over individual Chapter 7 debtor's case had power to determine that debtor's individual tax liability, including allocation of corporate Chapter 7 debtor's partial tax payment to the IRS; but (3) showing had not been made that crediting of corporate Chapter 7 debtor's partial tax payment to IRS to trust fund taxes was necessary or appropriate to carry out provisions of the Bankruptcy Code so as to justify such order by bankruptcy court in individual debtor's Chapter 7 case.

Reversed with directions to remand.

Rosenn, J., disagreed in part.

West Headnotes (5)

[1]   **Internal Revenue**
      🔑 Period and Taxes Covered by Payments;
      Application of Payments

Payments made to Internal Revenue Service (IRS) out of Chapter 7 debtor's estate were involuntary, as trustee was not free to withhold payment for taxes, and accordingly, trustee did not have authority to designate application of corporate Chapter 7 debtor's partial tax payment to trust fund taxes for which individual debtor was also liable instead of to nontrust fund taxes.

19 Cases that cite this headnote

[2]   **Internal Revenue**
      🔑 Period and Taxes Covered by Payments;
      Application of Payments

Bankruptcy court presiding over individual Chapter 7 debtor's case had power to determine that debtor's individual tax liability, including allocation of corporate Chapter 7 debtor's partial tax payment to the Internal Revenue Service (IRS) to trust fund taxes for which individual debtor was also liable instead of to nontrust fund taxes, pursuant to statute authorizing court to determine amount of tax. Bankr.Code, 11 U.S.C.A. § 505; 26 U.S.C.A. § 6672.

14 Cases that cite this headnote

[3]   **Internal Revenue**
      🔑 Period and Taxes Covered by Payments;
      Application of Payments

Showing had not been made that crediting of corporate Chapter 7 debtor's partial tax payment to Internal Revenue Service (IRS) to trust fund taxes for which individual Chapter 7 debtor was also liable, rather than to nontrust fund taxes was necessary or appropriate to carry out provisions of the Bankruptcy Code so as to justify such order by bankruptcy court in individual debtor's Chapter 7 case, although individual debtor's creditors could be benefited by reduction in IRS's tax claim against that debtor. Bankr.Code, 11 U.S.C.A. § 105; 26 U.S.C.A. § 6672.

19 Cases that cite this headnote

[4]   **Bankruptcy**
      🔑 Carrying Out Provisions of Code

      **Internal Revenue**

U.S. v. Pepperman, 976 F.2d 123 (1992)

Case 09-10138-MFW    Doc 14225-52    Filed 08/15/14    Page 39 of 108

70 A.F.T.R.2d 92-5657, 61 USLW 2147, 92-2 USTC P 50,465, 23 Bankr.Ct.Dec. 734...

👉 Period and Taxes Covered by Payments; Application of Payments

Absent showing of need for reorganization or similar purpose, bankruptcy court is not free to, under aegis of statute authorizing order necessary or appropriate to carry out provisions of the Bankruptcy Code, direct allocation of tax payments in contravention of policy behind tax statute and long-standing Internal Revenue Service (IRS) procedure. Bankr.Code, 11 U.S.C.A. § 105; 26 U.S.C.A. § 6672.

30 Cases that cite this headnote

[5]    Internal Revenue
👉 Period and Taxes Covered by Payments; Application of Payments

Internal Revenue Service (IRS) would not be equitably estopped from denying alleged agreement to credit corporate Chapter 7 debtor's partial payment of taxes to trust fund taxes for which individual Chapter 7 debtor was also liable rather than to nontrust fund taxes; letter upon which estoppel argument was based was at most ambiguous as to what taxes payment would be applied to, further explanation was immediately sent once IRS learned of trustee's erroneous interpretation of letter, and trustee had not established affirmative misconduct or rare and extreme circumstances necessary to allow estoppel claim to run against government. 26 U.S.C.A. § 6672.

20 Cases that cite this headnote

**Attorneys and Law Firms**

*124 Gary R. Allen, Joel A. Rabinovitz (argued), Kenneth L. Greene, U.S. Dept. of Justice, Washington, D.C., for appellant.

Elizabeth W. Kreger (argued), Stark & Stark, Princeton, N.J., for appellee.

Before: SLOVITER, Chief Judge, STAPLETON and ROSENN, Circuit Judges.

**Opinion**

**OPINION OF THE COURT**

SLOVITER, Chief Judge.

The question presented is whether the bankruptcy court erred as a matter of law in crediting a corporate debtor's partial tax payment made in a Chapter 7 proceeding against the trust fund liability of the individual debtor, who was a "responsible person" under the Internal Revenue Code.

**I.**

*Factual History and Procedural Posture*

Keith T. Sorensen (Sorensen) was an officer and director of Sorensen Industries, Inc. Sorensen Industries failed to pay both the social security and income taxes it withheld from its employees' pay checks (together commonly referred to as "trust fund" taxes) for the third and fourth quarters of 1984, all of 1985, and the first quarter of 1986. Sorensen Industries also did not pay its own social security taxes to the government (commonly referred to as "non-trust fund" taxes). The IRS determined, and Sorensen does not challenge, that he was a "responsible person" of Sorensen Industries, and that therefore, under section 6672 of the Internal Revenue Code, [1]  *125 Sorensen was liable for a penalty equal to the total amount of the tax not paid over. On August 25, 1986, the IRS assessed against Sorensen the amount equal to Sorensen Industries' unpaid trust fund taxes, $54,364.08, and on December 29, 1986, it filed against him its notice of federal tax lien in that amount, plus interest.

Sorensen filed a petition for liquidation in the bankruptcy court under Chapter 7 of the Bankruptcy Code on May 12, 1988. Sometime prior to this filing, Sorensen Industries had also filed a Chapter 7 bankruptcy petition for liquidation. Lewis J. Pepperman was appointed trustee in both bankruptcy cases. On August 30, 1988, the IRS filed its proof of claim against Sorensen for the taxes due under section 6672 in the amount of $64,184.71. On June 6, 1989, the bankruptcy court entered a consent order setting the amount of the government's tax lien at $58,742.64 and directed that

the real property belonging to the debtor known as Block 29, Lot 2,

U.S. v. Pepperman, 976 F.2d 123 (1992)

Case 09-10138-MFW    Doc 14225-52    Filed 08/15/14    Page 40 of 108

70 A.F.T.R.2d 92-5657, 61 USLW 2147, 92-2 USTC P 50,465, 23 Bankr.Ct.Dec. 734...

127 Pension Road, Manalapan, New Jersey, be sold *free and clear of the liens of the United States of America, Internal Revenue Service,* with said liens to attach to the proceeds of sale in the respective order of priority, subject to the reasonable costs of sale and administration.

App. at 31 (emphasis added).

Apparently in response to a query by Pepperman regarding the effect that Sorensen Industries' payment of taxes would have on Sorensen's personal tax liability under section 6672, Special Assistant United States Attorney Patricia H. Delzotti sent a letter dated February 28, 1990, stating:

any payment that is made to the Internal Revenue Service on behalf of Sorensen Industries, Inc. for withholding/FICA taxes due for the taxable periods ending September 30, 1984 through March 31, 1986, inclusive, will also reduce the Service's claim against Keith Sorensen individually by the same amount.

App. at 32.

On October 25, 1990, Pepperman, as trustee in the Sorensen Industries' bankruptcy proceeding, mailed a check for $33,922.16 to the IRS on the corporation's behalf "representing the pro rata payment of first and final dividends paid to creditors in the Sorensen Industries, Inc. matter." App. at 42. Pepperman also included a proposed consent order reducing the government's tax lien against Sorensen's individual liability by the amount of that check. The consent order was apparently based on Pepperman's interpretation of Delzotti's February 28 letter that all payments made by Sorensen Industries would necessarily reduce Sorensen's individual section 6672 liability in an equal amount.

On November 14, 1990, Delzotti responded to Pepperman, explaining that he had misunderstood her prior letter; that Sorensen's individual liability would be reduced only to the extent that the payment from Sorensen Industries reduced its trust fund liabilities, *i.e.* its liabilities for "withholding/FICA taxes"; that the IRS would not apply Sorensen Industries' payment of approximately $34,000 to its trust fund liabilities because its non-trust fund liabilities would not be satisfied;

and that "[i]t is the government's position that the [IRS] is entitled to apply payments received in a Chapter 7 proceeding in its best interest." App. at 36.

On December 27, 1990, Pepperman, as trustee of Sorensen's bankruptcy estate, filed a motion, styled as a consent order, to have the bankruptcy court presiding over Sorensen's bankruptcy reduce Sorensen's individual tax liability by the amount of Sorensen Industries' payment on the ground that the February 28 letter from Delzotti was a contract between the United States and the trustee to that effect. The IRS argued that it had not entered into any contract with the trustee, and that since **\*126** the payment was made pursuant to a bankruptcy proceeding, it was necessarily an involuntary payment which the IRS could allocate to the corporation's non-trust fund tax liability.

After a hearing, the bankruptcy court granted the trustee's motion. The court held that under *United States v. Energy Resources Co.,* 495 U.S. 545, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990), the trustee has the power to designate whether the $34,000 payment, which the court characterized as "voluntary," should be applied to reduce Sorensen Industries' trust fund liability. The bankruptcy court explained, "a debtor has a certain degree of leverage, and that leverage includes the ability to make the designation as a voluntary payment as opposed to just simply letting the lien ride." App. at 12. The court rejected the government's argument that by its plain language and reasoning *Energy Resources* applies only to Chapter 11 reorganizations and not to liquidations, concluding that the general principle of that case indicated to it that the bankruptcy court's equitable power applied in all instances. The court did not address the trustee's estoppel arguments.

The IRS appealed to the district court, which rejected the government's contention that the holding in *Energy Resources* does not apply in a Chapter 7 liquidation proceeding. The district court agreed with the bankruptcy court that the decision in *Energy Resources* rested on the equitable powers of the bankruptcy court, including those set forth in section 105 of the Bankruptcy Code. The district court then reasoned that under these general equitable powers, the bankruptcy court had the authority to designate the application of the tax payment made by Sorensen Industries. Like the bankruptcy court, the district court did not reach the trustee's estoppel arguments.

U.S. v. Pepperman, 976 F.2d 123 (1992)

Case 09-10138-MFW    Doc 14225-52    Filed 08/15/14    Page 41 of 108

70 A.F.T.R.2d 92-5657, 61 USLW 2147, 92-2 USTC P 50,465, 23 Bankr.Ct.Dec. 734...

We have jurisdiction over this appeal under 28 U.S.C. §§ 158(d) and 1291, *see In re Technical Knockout Graphics, Inc.,* 833 F.2d 797, 800-01 (9th Cir.1987), and review *de novo* the legal question whether the bankruptcy court had the power to designate the payment at issue so as to reduce Sorensen's section 6672 liability.

## II.

### *Discussion*

### A.

### *General Legal Principles*

[1]    As the Supreme Court has recognized, the trust fund taxes that employers are required to collect from their employees' wages and pay over to the government "can be a tempting source of ready cash to a failing corporation beleaguered by creditors." *Slodov v. United States,* 436 U.S. 238, 243, 98 S.Ct. 1778, 1783, 56 L.Ed.2d 251 (1978). The loss to the U.S. Treasury when a corporate employer fails to pay over its trust fund taxes can be substantial because the employees are credited with the amounts withheld even if the taxes were not paid over to the government. *See* 26 U.S.C. § 31(a) (1988).

Because of this concern, *see United States v. Sotelo,* 436 U.S. 268, 277 n. 10, 98 S.Ct. 1795, 1801 n. 10, 56 L.Ed.2d 275 (1978), Congress, through section 6672 of the Internal Revenue Code, enacted the stringent measure of imposing personal liability on those individuals whose control over the financial affairs of a business entity requires them to collect and pay over taxes withheld from the employees. *See Slodov,* 436 U.S. at 244-45, 98 S.Ct. at 1784; *Quattrone Accountants, Inc. v. IRS,* 895 F.2d 921, 927 (3d Cir.1990). The provision making a responsible person liable for an amount equal to the trust fund taxes that were not paid over to the government establishes an alternative means of collection for the government to make the public fisc whole. *Slodov,* 436 U.S. 243-45, 98 S.Ct. at 1783-84. To ensure further that the government will, in fact, be paid, liability under section 6672 is not dischargeable in bankruptcy. *See* 11 U.S.C. §§ 523(a) (1)(A), 507(a)(7)(C) (1988).

Although denominated a "penalty" in the statute, the liability imposed under section 6672 is not penal in nature, but rather is a means of ensuring that withholding taxes are paid.  ***127 *Sotelo,* 436 U.S. at 275, 98 S.Ct. at 1800; *In re Ribs-R-Us,* 828 F.2d 199, 200-01 (3d Cir.1987). The IRS need not attempt to collect the withholding taxes from the employer before seeking to collect from the responsible person. *Ribs-R-Us,* 828 F.2d at 201; *United States v. Pomponio,* 635 F.2d 293, 298 (4th Cir.1980). However, under long-standing IRS policy, the government will retain only one satisfaction of the unpaid trust fund taxes, whether collected in part from each responsible person and the corporate employer, or entirely from one source. *See* Policy Statement P-5-60 (approved May 30, 1984), *reprinted in* Policies of the Internal Revenue Service Handbook, 1 CCH Administration, Internal Revenue Manual at 1305-14; *see also Sotelo,* 436 U.S. at 279-80 n. 12, 98 S.Ct. at 1802 n. 12. Thus, each responsible person will be relieved of separate liability to the extent that the corporation pays its trust fund taxes.

Under another long-standing IRS policy, taxpayers may designate the application of tax payments that are voluntarily made, but may not designate the application of involuntary payments. Rev.Rul. 79-284, 1979-2 C.B. 83; Rev.Rul. 73-304, 1973-2 C.B. 42; *Ribs-R-Us,* 828 F.2d at 201. This policy stems from the common law rule generally recognized between creditors and debtors that the debtor may indicate which debt it intends to pay when it voluntarily submits a payment to a creditor, but may not dictate the application of funds that the creditor involuntarily collects from it. *See O'Dell v. United States,* 326 F.2d 451, 456 (10th Cir.1964); *In re R.L. Inge Dev. Corp.,* 78 B.R. 793, 794 (Bankr.E.D.Va.1987).

An involuntary payment traditionally has been defined as "any payment received by agents of the United States as a result of distraint or levy *or from a legal proceeding* in which the Government is seeking to collect its delinquent taxes or file a claim therefor." *Amos v. Commissioner,* 47 T.C. 65, 69 (1966) (emphasis added). Most courts that have considered the issue have concluded that payments made in the bankruptcy context are involuntary. *See In re Frank Meador Buick, Inc.,* 946 F.2d 885 (Table), 1991 WL 209824, at *3, 1991 U.S.App. LEXIS 24802, at *8 (4th Cir. Oct. 21, 1991) (memorandum opinion) (per curiam) (Chapter 7 liquidation); *In re Optics of Kansas, Inc.,* 132 B.R. 446, 448 (Bankr.D.Kan.1991) (same); *In re F.A. Dellastatious, Inc.,* 121 B.R. 487, 492 (Bankr.E.D.Va.1990) (same); *In re Clements Elec., Inc.,* 102 B.R. 101, 102 (Bankr.S.D.Tex.1988) (same); *In re Jehan-Das, Inc.,* 925 F.2d 237, 238 (8th Cir.) (Chapter 11 liquidation), *cert. denied,*

U.S. v. Pepperman, 976 F.2d 123 (1992)

Case 09-10138-MFW    Doc 14225-52    Filed 08/15/14    Page 42 of 108

70 A.F.T.R.2d 92-5657, 61 USLW 2147, 92-2 USTC P 50,465, 23 Bankr.Ct.Dec. 734...

502 U.S. 810, 112 S.Ct. 55, 116 L.Ed.2d 32 (1991); *see also Ribs-R-Us*, 828 F.2d at 203 (Chapter 11 reorganization); *In re Energy Resources Co.*, 871 F.2d 223, 230 (1st Cir.1989) (same), *aff'd on other grounds, 495 U.S. 545, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990); In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir.1988) (per curiam) (same); *Technical Knockout Graphics*, 833 F.2d at 802 (same). *But see In re Lifescape, Inc.*, 54 B.R. 526 (Bankr.D.Colo.1985) (payment in Chapter 11 reorganization voluntary); *In re Tom LeDuc Enters.*, 47 B.R. 900, 902 (W.D.Mo.1984) (payment in Chapter 11 reorganization pursuant to agreement with IRS voluntary). The Supreme Court left this issue open in *Energy Resources*, 495 U.S. at 548-49, 110 S.Ct. at 2141-42 (bankruptcy court in Chapter 11 proceeding can direct designation "whether or not the payments ... are rightfully considered to be involuntary").

In this case, the bankruptcy court characterized the payment of taxes as a "voluntary payment." App. at 14. It is unclear whether, and to what extent, that may have influenced its holding that the trustee could designate the payment to be applied to the corporate debtor's trust fund liability. In any event, we conclude in line with the overwhelming authority that payments made to the IRS out of a Chapter 7 debtor's estate are involuntary. As counsel for the trustee conceded at the argument before us, the trustee was not free to withhold payment for taxes. *Energy Resources* is not to the contrary since the issue in that case was whether the bankruptcy court (as distinguished from the debtor or trustee) had the authority to direct the IRS to allocate the tax payments **\*128** as trust fund payments. We turn to that issue.

## B.

### *Jurisdiction*

 **[2]**  We must consider preliminarily the IRS's argument that the bankruptcy court that entered the order lacked jurisdiction. The tax payment at issue was made by Pepperman as trustee for Sorensen Industries pursuant to the order of the bankruptcy court supervising its liquidation, which is now complete. However, Pepperman filed the motion with respect to the designation of that payment in the bankruptcy court in Sorensen's separate and distinct liquidation proceeding, presided over by a different bankruptcy judge. It happens that they were both in the district of New Jersey, but they need not have been. Thus, the IRS contends that only the bankruptcy court in charge of

Sorensen Industries' case could have made the order directing the manner in which the IRS should allocate the payment.

Certainly that court would have had jurisdiction in that respect. However, the action taken by the bankruptcy court in this case was somewhat different. It did not order the IRS to allocate the Sorensen Industries' tax payment in any particular manner, but rather made what amounted to a determination of Sorensen's section 6672 tax liability as permitted by section 505(a)(1) of the Bankruptcy Code. [2] We need not decide which bankruptcy court would have had jurisdiction had the same issue been brought before both of them. It wasn't, and Sorensen Industries' liquidation proceeding is now closed. Thus, we conclude that the bankruptcy court presiding over Sorensen's liquidation proceeding did have the power to determine his individual tax liability. *See, e.g.*, *In re Brooks*, 129 B.R. 484, 485-86 (Bankr.N.D.Ohio 1991) (ruling in chapter 13 proceeding on motion of debtors under section 505 for determination of their section 6672 tax liability following liquidation of former corporate employer); *cf. In re Grant*, 90-2 U.S. Tax Cas. (CCH) ¶ 50,504 (Bankr.W.D.Pa.1990) (denying merits of Chapter 13 debtor's section 505 motion that he was not responsible person for section 6672 liability purposes), *aff'd, 91-2 U.S. Tax Cas. (CCH) ¶ 50,324 (W.D.Pa.1991)*, *aff'd mem., 958 F.2d 363 (3d Cir.1992).* [3]

## C.

### *The Scope of* Energy Resources

 **[3]**  The district court based its affirmance of the bankruptcy court's order reducing the amount of the IRS's tax lien on its interpretation of the Supreme Court's decision in *Energy Resources*, an interpretation the IRS contends is erroneous. In *Energy Resources* the Supreme Court resolved a conflict between the First Circuit, which held that although payments made pursuant to a chapter 11 reorganization plan were involuntary, the bankruptcy court had the authority to direct the IRS to allocate a corporate debtor's tax payments **\*129** to its trust fund liability prior to its non-trust fund liability, *see Energy Resources Co.*, 871 F.2d at 230, and this court, which held that because tax payments in a Chapter 11 reorganization were involuntary, the IRS, and not the bankruptcy court, was entitled to allocate tax payments in any manner it saw fit. *See Ribs-R-Us*, 828 F.2d at 204. The Supreme Court affirmed the judgment of the First Circuit, holding that "whether or not the

payments at issue are rightfully considered to be involuntary, a bankruptcy court has the authority to order the IRS to apply the payments to trust fund liabilities if the bankruptcy court determines that this designation is necessary to the success of a reorganization plan." *Energy Resources,* 495 U.S. at 548-49, 110 S.Ct. at 2141-42. [4]

The Court noted that various provisions of the Bankruptcy Code "are consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships." *Id.* (citing 11 U.S.C. §§ 1123(b)(5), 1129, 105). It was this language, as well as the Supreme Court's reference to section 105, [5] on which the district court relied in this case. *See* App. at 5-7.

The IRS argues that the Supreme Court's holding should not be expanded beyond the Chapter 11 reorganization context because it was conditioned on a finding by the bankruptcy court that such action would aid the reorganization. The trustee responds that the broad powers available to the bankruptcy court under section 105 to oversee the administration of the bankruptcy estate are not limited to either Chapter 11 or to ensuring the success of a reorganization under Chapter 11. He notes that both sections 507(a)(7) and 523(a)(1)(A) (establishing the priority and nondischargeability of specified tax claims), which the Court in *Energy Resources* concluded did not preclude the allocation orders in that case, apply in Chapter 7 liquidations as well as Chapter 11 reorganizations. Thus, according to Pepperman, the bankruptcy court in this case had the authority under section 105 to credit Sorensen Industries' tax payments against Sorensen's section 6672 liability.

The vast majority of courts that have addressed the issue of the scope of the *Energy Resources* decision have declined to extend its application beyond the Chapter 11 reorganization context. *See In re Kare Kemical, Inc.,* 935 F.2d 243, 244 (11th Cir.1991) (Chapter 11 liquidation); *Jehan-Das,* 925 F.2d at 238 (same); *In re Equipment Fabricators,* 127 B.R. 854, 858 (D.Ariz.1991) (same); *In re Visiting Nurse Ass'n,* 128 B.R. 835, 837 (Bankr.M.D.Fla.1991) (same); *Frank Meador Buick,* 1991 WL 209824, at *3, 1991 U.S.App. LEXIS 24802, at *8 (Chapter 11 liquidation); *In re Gregory Engine & Mach. Servs.,* 135 B.R. 807, 810 (Bankr.E.D.Tex.1992) (same); *Optics of Kansas,* 132 B.R. at 449 (same); *Brooks,* 129 B.R. at 486-87 (same); *Dellastatious,* 121 B.R. at 493 & n. 3 (same); **\*130** *In re Arie Enters.,* 116 B.R. 641, 643 (Bankr.S.D.Ill.1990) (same); *cf. In re T.M. Prods. Co.,* No. 90-6734, 1992 U.S.Dist. LEXIS 9404, at *7 (S.D.Fla. June 4,

1992) ("payments made after reorganization attempts ceased should not be subject to the Debtor's choice of designation"). *But see In re Deer Park, Inc.,* 136 B.R. 815, 818 (9th Cir.BAP 1992) (*Energy Resources* does apply to Chapter 11 liquidation plans).

The IRS offers forceful arguments to support its position that absent reorganization, a bankruptcy court lacks the authority to order the IRS to credit a corporate debtor's tax payments against an individual debtor's section 6672 liability. Indeed, the Court in *Energy Resources* consistently linked its holding with the fact of reorganization and the debtor's need for rehabilitation. *See Energy Resources,* 495 U.S. at 546, 549, 551, 110 S.Ct. at 2140, 2142, 2143. In resolving the tension between the revenue protection goals of IRS policy and the preference for debtor rehabilitation favored by Chapter 11 of the Bankruptcy Code, the Court noted that where a debtor is being reorganized, the tax debt must be paid off within six years, *see* 11 U.S.C. § 1129(a)(9)(C), and "therefore ... the IRS, in all likelihood, will collect the tax debt owed." *Energy Resources,* 495 U.S. at 549, 110 S.Ct. at 2142. The Court further noted that while the IRS was correct

> that, if it can apply a debtor corporation's tax payments to non-trust-fund liability before trust fund liability, it stands a better chance of debt discharge because the debt that is not guaranteed [i.e., the non-trust-fund liability] will be paid off before the guaranteed debt.... [T]his result ... is an added protection not specified in the Code itself.

*Id.* at 550, 110 S.Ct. at 2142. According to the Court, if a bankruptcy court concludes that an allocation of a tax payment is necessary to the success of a reorganization, *see id.* at 549, 110 S.Ct. at 2142 (citing 11 U.S.C. § 1129(a) (11)), the appropriate balance between the goals of revenue protection and debtor rehabilitation must be struck in favor of rehabilitation.

Such considerations have no application where Chapter 7 liquidation is involved because designation of tax payments cannot aid the debtor's reorganization efforts. *Cf. T.M. Prods. Co.,* No. 90-6734, 1992 U.S.Dist. LEXIS 9404, at *4 (observing that in "involuntary liquidation, after which the debtor will not exist, there is no policy reason for allowing the debtor to designate payments"). In addition, although trust fund taxes technically are nondischargeable in bankruptcy,

U.S. v. Pepperman, 976 F.2d 123 (1992)

70 A.F.T.R.2d 92-5657, 61 USLW 2147, 92-2 USTC P 50,465, 23 Bankr.Ct.Dec. 734...

*see* 11 U.S.C. § 523(a)(1)(A), corporate dissolution has the practical effect of discharging the corporate debtor from its unpaid tax liabilities, *Sotelo,* 436 U.S. at 278, 98 S.Ct. at 1801. Thus, unlike the situation presented in *Energy Resources,* permitting the IRS to allocate such a payment to non-trust fund liability first cannot be characterized as an *added* assurance that its tax claim will be satisfied. There is far less assurance in a Chapter 7 proceeding that the corporate debtor will satisfy its tax debt in full.

We need not decide in this case whether there may be some unusual circumstances in which we could apply the broad reading of *Energy Resources* urged by Pepperman to authorize a bankruptcy court in a Chapter 7 proceeding to credit a corporate debtor's tax payments against an individual debtor's section 6672 liability. The underlying premise of such authority must be a finding that such an order "is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105; *see In re C.M.R. Assocs., Inc.,* No. 90-00590, 1992 WL 59029, at *2, 1992 Bankr.LEXIS 435, at *7 (Bankr.D.Vt. Mar. 25, 1992) (declining to designate tax payments because debtor had not "provided ... any information about why reallocation 'is necessary to the success of [its] reorganization plan,' or to some other appropriate bankruptcy purpose" (quoting *Energy Resources,* 495 U.S. at 546, 110 S.Ct. at 2140)).

There has been no such showing here. Although Sorensen's creditors could be benefitted by a reduction in the IRS's tax claim against him, such benefits would be secured at the expense of the IRS, a preferred creditor. Were that effected, the general rule that the government is entitled to priority over general creditors for **131 the payment of section 6672 liability would be weakened. *See* 11 U.S.C. § 507(a)(7)(C).

Pepperman has offered no persuasive argument to show how credit of the Sorensen Industries' tax payment against Sorensen's section 6672 tax liability would further an appropriate bankruptcy purpose in either Sorensen's case or that of Sorensen Industries. In response to Pepperman's contention that reduction of Sorensen's section 6672 liability would facilitate the sale of his residence and realize funds to benefit creditors which could not have otherwise been received, the government correctly points out that the sale of the residence free and clear of all liens, which would then attach to the proceeds of the sale, was ordered by the bankruptcy court in the original consent decree of June 6, 1989. *See* App. at 31. Even if Sorensen abandoned the residence because his equity only exceeded his tax liability

if it were reduced by the amount of the Sorensen Industries' payment, the government would have sold it and incurred similar administrative expenses, which would have been deducted from the proceeds of the sale. Thus we have no occasion to speculate on the bankruptcy court's authority were it presented with different facts in a Chapter 7 proceeding.

[4]    There is nothing in *Energy Resources* which would derogate from our prior observations that section 105 does not "give the court the power to create substantive rights that would otherwise be unavailable under the Code." *In re Morristown & Erie R.R. Co.,* 885 F.2d 98, 100 (3d Cir.1989); *see also United States v. Sutton,* 786 F.2d 1305, 1308 (5th Cir.1986); *Southern Ry. Co. v. Johnson Bronze Co.,* 758 F.2d 137, 141 (3d Cir.1985). "The fact that a [bankruptcy] proceeding is equitable does not give the judge a free-floating discretion to redistribute rights in accordance with his [or her] personal views of justice and fairness, however enlightened those views may be." *In re Chicago, Milwaukee, St. Paul & Pac. R.R.,* 791 F.2d 524, 528 (7th Cir.1986). In our view, in the absence of a showing of need for a reorganization or similar purpose, a bankruptcy court is not free under the aegis of section 105 to direct the allocation of tax payments in contravention of the policy behind section 6672 and long-standing IRS procedure.

### D.

### *Estoppel*

[5]    We need consider only briefly Pepperman's argument that the IRS should be equitably estopped from denying what Pepperman asserts was its agreement to credit the trust fund. Had Pepperman shown the kind of "affirmative misconduct," as opposed to mere omission or negligent failure, which must be shown before estoppel against the government could even be contemplated, *see, e.g., United States v. Asmar,* 827 F.2d 907, 912 (3d Cir.1987), we would be required to remand this issue because neither the bankruptcy court nor the district considered it.

However, the Delzotti letter upon which the estoppel argument is based is at most ambiguous. It did not explicitly promise or suggest that the IRS would allocate payments received in the Sorensen Industries bankruptcy proceeding to the "withholding/FICA taxes" before the non-trust fund liability was satisfied, although it was not unreasonable for Pepperman to have interpreted it in that manner. Once

Case 09-10138-MFW    Doc 14225-52    Filed 08/15/14    Page 45 of 108

U.S. v. Pepperman, 976 F.2d 123 (1992)

70 A.F.T.R.2d 92-5657, 61 USLW 2147, 92-2 USTC P 50,465, 23 Bankr.Ct.Dec. 734...

Delzotti learned of Pepperman's erroneous interpretation of her letter, she immediately sent him a further explanation.

The apparent misunderstanding between Pepperman and Delzotti cannot be said to have imperiled the "interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government." *Heckler v. Community Health Servs.,* 467 U.S. 51, 61, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). Because Pepperman has not established the affirmative misconduct or rare and extreme circumstances necessary to allow an estoppel claim to run against the government we need not consider whether he proffered adequate evidence of the other elements of estoppel.

**\*132 III.**

### Conclusion

For the foregoing reasons, we will reverse the order of the district court with directions to remand to the bankruptcy court for further proceedings not inconsistent with this opinion.

### Parallel Citations

70 A.F.T.R.2d 92-5657, 61 USLW 2147, 92-2 USTC P 50,465, 23 Bankr.Ct.Dec. 734, Bankr. L. Rep. P 74,925, Unempl.Ins.Rep. (CCH) P 16858A

Footnotes

1    This provision states in pertinent part:

(a) General Rule.-Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C.A. § 6672 (West Supp.1992).

2    Section 505 states in pertinent part:

(a)(1) Except as provided in paragraph (2) of this subsection, the court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.

(2) The court may not so determine-

(A) the amount or legality of a tax, fine, penalty, or addition to tax if such amount or legality was contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction before the commencement of the case under this title.

11 U.S.C. § 505 (1988).

The government does not contend, and the record does not indicate, that Sorensen's section 6672 tax liability was determined "by a judicial or administrative tribunal of competent jurisdiction" before the institution of his Chapter 7 case.

3    Judge Rosenn believes that the bankruptcy court's jurisdiction under 11 U.S.C. § 505 is questionable. *See In re Vermont Fiberglass, Inc.,* 88 B.R. 41, 44-45 (Bankr.D.Vt.1988). He would base jurisdiction solely upon 28 U.S.C. § 157(b)(2)(K) under which the bankruptcy court properly exercised jurisdiction to determine the extent of the IRS lien on Sorensen's property. Because there is no disagreement by the panel with the exercise of jurisdiction under this section, he would not reach the question of jurisdiction under section 505.

4    As one recent commentator has recognized:

The successful reorganization of a company depends in large part on the existing management's cooperation, effort and, in certain cases, capital infusion. A financially distressed company often does not have the time and resources to expend on the search for and installation of new management. New management would not only have to confront the difficult task of becoming intimately familiar with the company's operations, but also would have to direct the company through a turbulent period. Therefore, unless existing management has been grossly negligent or incompetent, their retention can be crucial to the successful restructuring of a company.

Comment, *Responsible Officers Get Green Light at the Intersection of the Tax and Bankruptcy Codes; Bankruptcy Code Section 105 Can Be Used to Order the IRS to Apply Debtor Tax Payments to Trust Fund Taxes,* 21 Seton Hall L.Rev. 868, 869 (1991) (footnotes omitted); *see also* David G. Jaeger, *The Allocation of Tax Payments in Bankruptcy: In* Energy Resources Co., Inc., *the Supreme Court Resolves Conflict Among the Circuits,* 6-91 Tax Adviser 383 (June 1991) (responsible persons may be more

70 A.F.T.R.2d 92-5657, 61 USLW 2147, 92-2 USTC P 50,465, 23 Bankr.Ct.Dec. 734...

    willing to advance funds to rehabilitate corporation if corporate tax payments are allocated to trust fund liability before non-trust fund liability).

5     Under this section, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105 (1988).

---

**End of Document**                                          © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 158

944 F.2d 870
United States Court of Appeals,
Federal Circuit.

VAUPEL TEXTILMASCHINEN KG and
Vaupel North America, Plaintiffs–Appellants,

v.

MECCANICA EURO ITALIA S.P.A. and American
Trim Products, Inc., Defendants/Cross–Appellants.

Nos. 90–1397, 90–1422.   |   Sept. 13, 1991.

Licensee filed action for alleged infringement of a patent for a weaving method and machine. The United States District Court for the Western District of North Carolina, Woodrow Wilson Jones, J., found infringement, but also found that laches and estoppel barred the action. Appeal and cross appeal were taken. The Court of Appeals, Lourie, Circuit Judge, held that: (1) the patent licensing agreement transferred sufficient rights to the licensee so that it could be treated as an assignee and had standing; (2) delay during reissue proceedings was not to be considered in deciding whether the action was barred by laches or estoppel; and (3) the district court did not clearly err in finding that the patent had been infringed.

Affirmed in part and reversed in part.

West Headnotes (15)

**[1]** **Patents**
 Construction and Operation of Licenses

**Patents**
 Persons entitled to sue

Patent licensing agreement transferred all substantial rights under patent, giving licensee status of assignee that had standing to bring infringement action; although inventor retained right to veto sublicensing, and agreement as limited in scope to United States, agreement transferred right to sue for all infringements, past, present, and future. 35 U.S.C.A. § 261; Fed.Rules Civ.Proc.Rules 19, 19(a), 28 U.S.C.A.

178 Cases that cite this headnote

**[2]** **Patents**
 Laches

Laches and estoppel are equitable defenses in patent infringement action and are within district court's discretion.

Cases that cite this headnote

**[3]** **Patents**
 Laches

Key factor in finding laches is length of patentee's delay in bringing suit from time he knew, or in exercise of reasonable diligence should have known, of alleged infringement.

3 Cases that cite this headnote

**[4]** **Patents**
 Effect of prior or pending litigation

Patent owner may avoid consequences of what would otherwise be unreasonable delay in filing infringement action by establishing that he or she was engaged in "other litigation" such as reissue proceedings.

11 Cases that cite this headnote

**[5]** **Patents**
 Effect of prior or pending litigation

For other litigation to excuse patent holder's delay in bringing infringement action, accused infringer must have adequate notice of existing proceedings.

17 Cases that cite this headnote

**[6]** **Patents**
 Effect of prior or pending litigation

For "other litigation" to excuse patentee's delay in bringing infringement action until conclusion of another lawsuit, alleged infringer must have had proper notice of existing suit so as to permit alleged infringer to change his activities to avoid liability or to bring declaratory judgment action if delay would be burdensome.

31 Cases that cite this headnote

**[7]** **Patents**

 Effect of prior or pending litigation

Alleged infringer had sufficient notice of patentee's ongoing reissue proceeding and of patentee's intent to sue and, therefore, delay consumed by reissue proceeding could be excused in deciding whether infringement action was barred by laches; not only was alleged infringer aware of reissue proceeding, but it actively participated and it would have been superfluous to tell alleged infringer of intent to sue after conclusion of reissue proceeding.

8 Cases that cite this headnote

**[8]** **Patents**

 Effect of prior or pending litigation

Delay caused by patentee's reissue proceeding could be excused in deciding whether laches barred infringement action, despite infringer's alleged knowledge that reissue proceeding would affirm original patent allowance; patentability issues were not resolved until nearly three and one-half years later and, without valid and enforceable patent, there could be no obligation to sue in order to avoid laches.

7 Cases that cite this headnote

**[9]** **Patents**

 Specific period

Delay of three and one-half years after conclusion of reissue proceeding and commencement of patent infringement action did not result in laches where licensee did not have knowledge to whom alleged infringer had sold infringing devices.

39 Cases that cite this headnote

**[10]** **Patents**

 Defenses

Continuing conflict between licensee and alleged infringer barred determination that infringement action had been barred by estoppel; alleged

infringer could not reasonably have drawn inference of abandonment, it did not rely on any purported abandonment, and alleged infringer repeatedly asserted its right to sell allegedly infringing devices.

11 Cases that cite this headnote

**[11]** **Patents**

 Comparison with claims of patent

Liability for patent infringement requires that accused device contain every limitation of claim or its substantial equivalent.

9 Cases that cite this headnote

**[12]** **Patents**

 Claims

Preamble language in patent for weaving method and machine did not involve structural limitation of claims and, thus, absence of specified loom parts from accused device did not preclude liability for patent infringement; loom "parts" were not illustrated in any figures of patent or otherwise described in specification.

15 Cases that cite this headnote

**[13]** **Patents**

 Particular patents

District court did not clearly err in finding that accused device literally infringed claim of patent for weaving method and machine by guiding fabric through use of spreader bar, take-up roll, pressure rollers, guide rollers, and drive cloth roll, all of which kept tension on fabric and produced tensile stresses.

11 Cases that cite this headnote

**[14]** **Patents**

 Rejection and Amendment of Claims

Evidence did not show that threaded temple bar limitation had been added to apparatus claim for guiding station, cutting station, and thermostabilizing station of weaving method and machine merely to avoid obviousness rejection

and, therefore, prosecution history estoppel did not bar enforcement of claim.

11 Cases that cite this headnote

[15]    **Patents**
👉  Original utility

3,961,650. Infringed.

Cases that cite this headnote

**Attorneys and Law Firms**

*871 Melvin M. Goldenberg, Christensen, O'Connor, Johnson & Kindness, Seattle, Wash., argued, for plaintiffs-appellants. With him on the brief, were Michael W. Bocianowski and Jeffrey W. Reis. Also on the brief, was Charles W. Helzer, Arnold, Md.

Gregory B. Wood, Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst, Los Angeles, Cal., and Susan Lerner, Los Angeles, Cal., argued, for defendants/cross-appellants.

Before NEWMAN, LOURIE and RADER, Circuit Judges.

**Opinion**

LOURIE, Circuit Judge.

This appeal and cross-appeal are from the June 1, 1990, judgment of the United States District Court for the Western District of North Carolina, ST–C–88–127. The court, in a suit brought by Vaupel Textilmaschinen KG (Vaupel KG) and Vaupel North America (Vaupel NA) (collectively Vaupel), found that Meccanica Euro Italia, S.P.A. and American Trim Products (collectively MEI) infringed U.S. Patent 3,961,650 ('650 patent), but that Vaupel was barred from maintaining its infringement action by laches and estoppel. Vaupel appeals the court's conclusion that its infringement action is barred. MEI cross-appeals, alleging *872 that Vaupel, as a mere licensee, has no standing to bring suit and that the district court clearly erred in finding infringement. We reverse that part of the judgment relating to laches and estoppel and affirm the judgment in all other respects.

**BACKGROUND**

The '650 patent, entitled "Weaving Method and Machine" and issued to Ruthard Marowsky, discloses a method for use on what is commonly called a "broad weaving loom," which produces cut strips of woven labels for garments. For many years prior to the invention of the '650 patent, labels were woven on narrow loom machines. Because of the physical constraints of narrow looms, any label manufacturer who wanted to offer a wide variety of label widths had to maintain a number of narrow looms of different sizes.

Marowsky's invention took advantage of the faster weaving ability of the modern broad loom to make a woven label. The prior art had taught that the materials used to make labels could be cut by heat and that such fibers could be severed by using electrically heated blades which would also melt and fuse together the weft threads of the fiber. Marowsky envisioned that the cutting means could be made adjustable across the width of the fabric, so that adjustment of the cutters would permit labels in a variety of widths to be woven on a single machine. He improved upon this art and found a way to not only cut the fibers into the desired width, but also to melt and fuse the ends of the weft threads and thereby form a solid edge or "selvage" so there would be no loose ends. He also knew that it was important that the finished label not be lopsided, so he envisioned the use of a guiding station extending across the weft yarns in a rectilinear position. In addition, he used heat to thermostabilize the labels after they were cut to provide a smooth finish of the product.

On January 22, 1974, Marowsky filed a patent application in the United States Patent and Trademark Office (PTO). The application issued as the '650 patent on June 8, 1976. Only Claims 1 and 2 are at issue in this appeal.

Claim 1 is directed to a process involving weaving and cutting fabric in such a way as to avoid weft arching, *i.e.,* to ensure that the warp and weft threads are at right angles to each other. The broad woven fabric is then transformed into individual strips whose edges are simultaneously cut and welded by heated blades. The strips are then thermostabilized by heating at a temperature lower than the cutting and welding temperature before being removed from the loom. Claim 1 reads as follows:

1. A method of forming a plurality of patterned strips of fabric woven from threads of synthetic material using a broad weaving machine having a sley and a breast beam, which method comprises:

weaving on the broad weaving machine a unitary broad fabric with said strips to be formed extending in parallel relation along the warp direction of said fabric;

conveying said fabric from the position where the sley of said machine beats up the fabric at a sufficiently low warp tension that a boxing condition occurs to obviate weft arching;

guiding the woven fabric leaving the position where the sley beats up the fabric to allow movement towards the breast beam of said machine, but not in the opposite direction;

cutting the guided woven fabric in the warp direction with a heated cutting blade means maintained at a first temperature of at least about 300°C to form strips whereby the edges are welded by the heat and thereby avoids ripping;

separating said strips;

and thereafter further heating the entire body of said separated strips at a second temperature lower than said cutting temperature to relieve varying tensile stress therein by thermostabilization.

Claim 2 is an apparatus claim:

2. In a broad fabric weaving machine having a sley and a breast plate for forming a plurality of strips of fabric from threads of synthetic fiber, the improvement comprising:

**\*873** a fabric guiding station extending across the width of said machine at the output from the machine where the sley beats up the fabric and ahead of the breast plate, said fabric guiding station comprising a slot and a rounded guide bar there-behind to define a re-entrant part-annular path for passage of woven fabric into said slot, round said bar and back out of said slot;

said guide bar being formed with a left-hand fabric guided thread over the right-hand half of its length in the direction towards a cutting station, and a right-hand guiding thread over its left-hand half;

a heating and cutting station downstream from said guiding station in the fabric path to said breast plate, which station includes a plurality of electrically heated cutting wires successively spaced across the width of said machine in the direction of the weft and extending into the path of the

fabric for heating and cutting said woven fabric into desired width separated strips parallel to the warp of the fabric and for heating the cut edges of said strips to weld the same;

and a second heating station comprising an elongated heating member to heat said separated strips extending across the width of said machine downstream from said hot wire cutting and cut edge heating station towards said breast beam for heating the strips at a temperature lower than said cutting temperature to effect thermostabilization of said strips.

Before trial, MEI moved to dismiss under Fed.R.Civ.P. 19(b) on the ground that Vaupel KG and Vaupel NA were mere licensees of the '650 patent and as such could not maintain an infringement action without the joinder of Marowsky. The district court concluded that by virtue of a series of agreements, the Vaupel companies were assignees of the patent and had the right to bring suit without joining Marowsky.

At trial the issues were narrowed to include only infringement and the defenses of laches and estoppel. The district court held that MEI had directly infringed, contributorily infringed, and induced infringement of the '650 patent. It further held, however, that Vaupel was barred from maintaining the action and from any relief because of laches and estoppel. These appeals followed.

### DISCUSSION

*A. License v. Assignment*

 [1]    MEI contends in its cross appeal that this suit must be dismissed because Vaupel KG and Vaupel NA were mere licensees under the '650 patent and could not maintain an infringement action without the joinder of Marowsky. As mentioned above, MEI first raised this issue in a pretrial motion, and the district court concluded that by virtue of a series of agreements, Vaupel KG and Vaupel NA were the assignees of the '650 patent and therefore had the right to bring this action without the joinder of Marowsky. MEI again raised this issue at trial and the district court again concluded that Vaupel had standing.

MEI's contention requires us to decide as a matter of law whether the district court was correct in concluding that Vaupel KG and Vaupel NA were assignees of the '650

patent, or, in any event, could maintain suit without joining Marowsky as an indispensable party.

The Patent Act provides that "patents shall have the attributes of personal property ... [;] any interest therein, shall be assignable in law by an instrument in writing." 35 U.S.C. § 261. The right to sue under a patent was discussed by the Supreme Court one hundred years ago:

> The patentee or his assigns may, by instrument in writing, assign, grant and convey, either, 1st, the whole patent, comprising the exclusive right to make, use, and vend the invention throughout the United States; or, 2d, an undivided part or share of that exclusive right; or, 3d, the exclusive right under the patent within and throughout a specified part of the United States. A transfer of either of these three kinds of interests is an assignment, properly speaking, and vests in the assignee a title in so much of the **874** patent itself, with a right to sue infringers; in the second case, jointly with the assignor; in the first and third cases, in the name of the assignee alone. Any assignment or transfer, short of one of these, is a mere license, giving the licensee no title in the patent and no right to sue at law in his own name for an infringement.

*Waterman v. Mackenzie,* 138 U.S. 252, 255, 11 S.Ct. 334, 335, 34 L.Ed. 923 (1891) (citations omitted).

To determine whether a provision in an agreement constitutes an assignment or a license, one must ascertain the intention of the parties and examine the substance of what was granted. "An assignment of an interest in an invention secured by letters-patent, is a contract, and like all other contracts is to be construed so as to carry out the intention of the parties to it." *Nicolson Pavement Co. v. Jenkins,* 81 U.S. (14 Wall.) 452, 456, 20 L.Ed. 777 (1871). One of our predecessor courts has also made this point:

> Whether a transfer constitutes a sale or license is determined by the *substance of the transaction* and a transfer will suffice as a sale if it appears

from the agreement and surrounding circumstances that the *parties intended* that the patentee surrender all his substantial rights to the invention.

*Bell Intercontinental Corp. v. United States,* 381 F.2d 1004, 1011, 180 Ct.Cl. 1071, 152 USPQ 182, 184 (1967) (emphasis added). We must therefore examine whether the agreements transferred all substantial rights to the '650 patent and whether the surrounding circumstances indicated an intent to do so.

In 1973, Marowsky entered into an agreement with Theobald Vaupel oHG, the predecessor to Vaupel KG, wherein Marowsky granted "the exclusive right, to solely use [the label weaving machine and process embodied in the '650 patent]." The agreement provided further that "[a] sublicensing agreement given by Vaupel needs a written consent"; that "Marowsky has the right ... to register patents in all countries of his choice in reference to the invention which forms the basis of this contract"; and that "the contract is cancelled automatically on the same day on which Vaupel files for bankruptcy or stops production of [the machine]." It also provided that:

> A possibly necessary litigation to sue for violation of the patent registrations which are the basis of this contract will have to be dealt with among the parties, case by case. In principle, both parties will work together towards prohibiting third parties of making use of the object of this contract.

In January, 1977, the agreement was modified to include Vaupel KG, and provided that "VAUPEL KG will handle the production and distribution of the contractual product as of January 1, 1975 according to all the rights and responsibilities of the contract."

On March 21, 1988, Marowsky and Vaupel KG entered into another agreement which provided in pertinent part:

> 1. MAROWSKY hereby grants to VAUPEL an exclusive license under United States Patent 3,961,650 to make, have made, use, sell, lease, rebuild and maintain in the United States and its territories weaving machines which practice the inventive method and apparatus covered by the claims of patent 3,961,650, and with the prior written consent of MAROWSKY, to grant sublicenses to others under the patent.

2. MAROWSKY hereby grants to VAUPEL the rights to sue for past, present and future infringements of patent 3,961,650 (if any) including the right to seek injunctions and/or money damages, in any effort by VAUPEL to protect the invention covered by the patent against encroachment by third parties; provided, however, that VAUPEL first notifies MAROWSKY in writing of its intention to sue for enforcement of the patent against a particular party. The final decision, whether or not a particular party is to be sued lies, however, solely with VAUPEL. All costs arising in connection with any infringement are carried by VAUPEL.

**\*875** The agreement further provided that Vaupel agrees "to pay to MAROWSKY any money damages obtained from third parties based on infringement of [the '650 patent]" up to a maximum of five percent of third party sales.

Finally on August 2, 1988, Marowsky entered into another agreement nearly identical to the March 1988 agreement except that Vaupel NA was joined with Vaupel KG as a grantee. The 1988 agreements thus purported to grant to Vaupel the exclusive right to make, use, and sell in the United States weaving machines and practice the method covered by the claims of the '650 patent. As we shall discuss, Marowsky retained certain other rights.

It is well settled that "[w]hether a transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name by which it calls itself, but upon the legal effect of its provisions." *Waterman,* 138 U.S. at 256, 11 S.Ct. at 335. Therefore, the use of the term "exclusive license" in the 1988 agreements is not dispositive; what the documents in fact recite is dispositive. However, the term "assignment" has a particular meaning in patent law, implying formal transfer of title. We conclude that the subject agreements here, although not constituting a formal assignment of the U.S. patent, were a grant of all substantial rights and, in accordance with Rule 19, permitted Vaupel to sue without joining Marowsky.

A patent provides its owner with the right to exclude others from making, using, and selling the claimed invention. 35 U.S.C. § 154 (1988); *Bloomer v. McQuewan,* 55 U.S. (14 How.) 539, 549, 14 L.Ed. 532 (1852). It is, in effect, a bundle of rights which may be divided and assigned, or retained in whole or part. In determining whether a grant of *all* substantial rights was intended, it is helpful to look at what rights have been retained by the grantor, not only what was

granted. The agreements show that Marowsky retained 1) a veto right on sublicensing by Vaupel; 2) the right to obtain patents on the invention in other countries; 3) a reversionary right to the patent in the event of bankruptcy or termination of production by Vaupel; and 4) a right to receive infringement damages. However, as the district court properly held, none of these reserved rights was so substantial as to reduce the transfer to a mere license or indicate an intent not to transfer all substantial rights.

The sublicensing veto was a minor derogation from the grant of rights. It did not substantially interfere with the full use by Vaupel of the exclusive rights under the patent, and it has been held not to bar capital gains treatment. *Bell,* 381 F.2d at 1017, 152 USPQ at 189 (citing *Rollman v. Commissioner,* 244 F.2d 634, 639–40 (4th Cir.1957)). Nor did the right to obtain patents in other countries affect Vaupel's rights arising from the '650 patent, which are limited to the United States. Further, the termination provisions in the agreements were entirely consistent with an assignment. An assignment of a patent "may be either absolute, or by way of mortgage and liable to be defeated by non-performance of a condition subsequent...." *Waterman,* 138 U.S. at 256, 11 S.Ct. at 336. Finally, the right to receive infringement damages was merely a means of compensation under the agreement; this was not inconsistent with an assignment. *See Rude v. Westcott,* 130 U.S. 152, 162–63, 9 S.Ct. 463, 467, 32 L.Ed. 888 (1889) (retention of portion of "sales, royalties, or settlements, or other sources" does not limit the assignment of patent).

The agreements also transferred the right to sue for infringement of the '650 patent, subject only to the obligation to inform Marowsky. This grant is particularly dispositive here because the ultimate question confronting us is whether Vaupel can bring suit on its own or whether Marowsky must be joined as a party. The policy underlying the requirement to join the owner when an exclusive licensee brings suit is to prevent the possibility of two suits on the same patent against a single infringer. *Crown Die & Tool Co. v. Nye Tool & Mach. Works,* 261 U.S. 24, 38, 43 S.Ct. 254, 257, 67 L.Ed. 516 (1923) (citing *Gayler v. Wilder,* 51 U.S. (10 How.) 477, 13 L.Ed. 504 (1850)). This policy is not undercut **\*876** here because the right to sue rested solely with Vaupel.

Under Rule 19, a court must undertake a two-step analysis to determine whether a person in question should be joined. Fed.R.Civ.P. 19(a). A person is necessary if "complete relief cannot be accorded among those already parties," or if the disposition of an action may leave "persons already

parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations." *Id.* The district court's decision, and our affirmance thereof, assure that the provisions of this rule have not been transgressed: complete relief can be afforded among those already parties and there is no substantial risk of a party incurring double obligations. [1]

Based on the above, we hold that the district court was correct in concluding that Vaupel KG and Vaupel NA had standing to sue for infringement without joinder of Marowsky. The contractual documents constituted a transfer of all substantial rights under the patent, thereby permitting Vaupel to sue; the agreements expressly granted Vaupel the sole right to sue for all infringements, past, present, and future as well.

### B. Laches and Estoppel

[2]    Laches and estoppel are both equitable defenses, matters within the trial court's discretion; they depend on the particular factual circumstances of a case. *Jamesbury Corp. v. Litton Indus. Prods.,* 839 F.2d 1544, 1551, 5 USPQ2d 1779, 1785 (Fed.Cir.), *cert. denied,* 488 U.S. 828, 109 S.Ct. 80, 102 L.Ed.2d 57 (1988); *Studiengesellschaft Kohle mbH v. Eastman Kodak Co.,* 616 F.2d 1315, 1325, 206 USPQ 577, 586 (5th Cir.), *cert. denied,* 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980). We review the trial court's exercise of discretion to determine whether (1) the decision was clearly unreasonable, arbitrary, or fanciful; (2) the decision was based on an erroneous conclusion of law; (3) the court's findings were clearly erroneous; or (4) the record contains no evidence upon which the court rationally could have based its decision. *Western Elec. Co. v. Piezo Technology,* 860 F.2d 428, 430–31, 8 USPQ2d 1853, 1855 (Fed.Cir.1988).

[3]    A finding of laches can occur when an accused infringer shows unreasonable and unexcused delay in filing suit and material prejudice or injury as a result of the delay. *See Leinoff v. Louis Milona & Sons,* 726 F.2d 734, 741, 220 USPQ 845, 850 (Fed.Cir.1984). A key factor in considering this question is the length of the patentee's delay in bringing suit from "the time the patentee knew, or in the exercise of reasonable diligence should have known, of the alleged infringing activity." *Jamesbury,* 839 F.2d at 1552, 5 USPQ2d at 1785 (footnote omitted).

In this case, the parties dispute whether Vaupel's period of delay began in 1980, when MEI first displayed and sold the accused infringing machines in the United States, or

sometime after early 1985, when reissue proceedings on the '650 patent were terminated. Since Vaupel brought the instant suit August 26, 1988, Vaupel's unexcused delay was either zero to 3 ½ years or approximately 8 years. Vaupel argues that its delay was excused by the reissue proceedings in the PTO, and thereafter because it neither knew nor should have known of MEI's alleged infringing activity until late 1987. Relying on a presumption of laches after a delay of longer than six years, the district court found that Vaupel did not show evidence sufficient "to excuse their failure to institute this action within six years of the time they knew or should have known of the infringement" by MEI. In so finding, the district court erred.

[4]    A patent owner may avoid the consequences of what would otherwise be an unreasonable delay in filing suit by establishing **\*877** that he or she was engaged in "other litigation." *Watkins v. Northwestern Ohio Tractor Pullers Ass'n,* 630 F.2d 1155, 1162, 208 USPQ 545, 551 (6th Cir.1980). Although here we are dealing with a reissue proceeding, such proceedings should be treated similarly to infringement litigation for purposes of laches. There is no demonstrable distinction for this purpose between judicial proceedings raising the issue of patent validity and a PTO proceeding involving patentability.

[5]    For other litigation to excuse a delay in bringing suit, there must be adequate notice of the proceedings to the accused infringer. *Hottel Corp. v. Seaman Corp.,* 833 F.2d 1570, 1573, 4 USPQ2d 1939, 1940–41 (Fed.Cir.1987). The notice must also inform the alleged infringer of the patentee's intention to enforce its patent upon completion of that proceeding. *Id.* (citing *Watkins,* 630 F.2d at 1162–63, 208 USPQ at 551–52).

[6]    The "other litigation" excuse normally applies when a patentee defers suit against an alleged infringer until the conclusion of another lawsuit. If the party is ultimately sued and had received proper notice, the time delay consumed by the original proceeding may be excused in evaluating whether laches occurred.

Notice is important for several reasons. It informs the accused infringer of the existence of the suit and that a subsequent suit will be filed against him. He can then change his activities to avoid liability. He can also bring a declaratory judgment action if the delay in waiting for a judicial determination would be a burden upon his proposed activities. To establish whether such notice was given, the district court must look

not at the actions of the patentee, but also at evidence showing whether the alleged infringer was *in fact* on notice of an existing lawsuit.

[7]    In this case, on December 14, 1979, Marowsky filed a reissue application pursuant to the then-existing "no-fault" reissue practice. [2] One month later, Marowsky notified MEI that the reissue application had been filed and that MEI was invited to participate if it desired. During the reissue proceeding, MEI (through a related company, Nastroficio Eurotessile S.R.I. (NE)) [3] actively and continuously opposed maintenance of the patent claims. Based on these protests, the PTO issued an order stating that the Office would review not only the patentability of Marowsky's claims, but also any possible inequitable conduct in procuring the '650 patent. The issues of patentability and enforceability were finally resolved in favor of the '650 patent, and the PTO effectively confirmed the patent as originally issued and terminated the proceedings in February 1985.

During the reissue proceeding, from October 18 to October 25, 1980, MEI exhibited its accused machine at a textile machinery show in South Carolina. Representatives from Vaupel inspected the machine and determined that it infringed the '650 patent. Two of the allegedly infringing machines were then sold to Universal Label Company. Vaupel sent Universal a letter warning that the purchased machines infringed the '650 patent. The parties settled the dispute when Universal purchased parts from Vaupel to replace MEI parts.

MEI, apparently concerned about the loss of Universal's business, demanded that Vaupel withdraw its warning letter. It asserted that the accused devices were manufactured according to one of its own patents and noted that the validity and enforceability of the '650 patent remained subject to the reissue proceedings. MEI also threatened Vaupel with litigation, as evidenced from its April 20, 1982 letter:

> It is evident that we can no longer delay the initiation of court proceedings.

> **878** We intend to have our rights protected and to obtain compensation for the enormous damages that we have suffered.

> We are, therefore, compelled to inform you in all clarity that we are going to initiate court proceedings if we do not receive a conclusive and satisfactory response from you within fifteen days from today (April 20, 1982[) ].

Rather than filing suit, MEI continued with its opposition in the PTO.

MEI argues that our decision in *Hottel* requires that to excuse the delay during the period the '650 patent was in reissue proceedings, notice must not only have informed MEI of the reissue proceeding, but also have stated Vaupel's intention of enforcing its patent upon completion of the reissue proceeding. Both parties agree that Vaupel did not explicitly inform MEI that Vaupel would sue after the reissue proceedings. However, Vaupel argues that its actions clearly satisfied the notice requirement for such an excuse, that all the communications showed that Vaupel intended to enforce its rights, and that MEI knew of those intentions. We agree.

Our decision in *Hottel* does not require that notice of other litigation *and* of a patentee's intent to sue after that other litigation is terminated be expressly stated in writing. What is important is whether MEI had reason to believe it was likely to be sued. A review of the extensive communications between MEI and Vaupel leaves no doubt that MEI was concerned about being sued by Vaupel. Among these communications was a July 1982 letter from NE to the Commissioner wherein MEI stated that there were "continued threats of infringement by applicant's attorney against prospective purchasers of the apparatus manufactured and sold by the protester." A May 1982 letter from Vaupel KG to MEI stated that "[w]e will protect our patent No. 3,961,650 and look after our rights.... [and] highly recommend an elucidating discussion before plunging into court proceedings...." Also, as previously mentioned, in an April 1982 letter to Vaupel, MEI threatened a declaratory judgment action. These are but a sampling of the communications indicating that MEI believed during the years in question that it was threatened. Where there is explicit notice of a reissue proceeding in which an alleged infringer actively participated, and the evidence as a whole shows that the accused infringer was in fear of suit, there is no further requirement to notify the alleged infringer of an intent to sue after the reissue proceeding has been concluded in order to avoid a holding of laches. Such a notification would be superfluous, telling the accused infringer what he already knew.

In the instant case, MEI was deeply involved in protesting the reissue proceeding and acknowledged a continuing conflict between it and Vaupel. The present lawsuit is part of that conflict. We therefore hold that the district court erred in concluding that MEI lacked notice concerning Vaupel's

intention to sue and that Vaupel's delay in filing suit during the proceeding was not excused.

[8] The district court also found that the period the '650 patent was in reissue could not be excused because Vaupel "knew in 1980 or 1981 that the reissue proceeding would affirm the original patent allowance." The record shows that patentability issues were resolved in September 1981. However, the record also shows that enforceability was not resolved until early 1985. Without a valid and enforceable patent, Vaupel could not reasonably be held to an obligation to sue in order to avoid a laches holding. MEI itself stated, as a protestor in the PTO proceedings, that "[a] final decision on this [enforceability] issue is vital to the resolution of the ongoing conflict between protestor and applicant." Patentees should be encouraged to avoid litigation when their patents are being reevaluated in the PTO rather than being forced into premature litigation on penalty of being held to have been guilty of laches.

[9] We next examine the circumstances existing during the 3 ½ year period between the end of the reissue proceeding and the filing of the instant suit. Between April 25 and May 3, 1985, after the reissue proceeding was terminated, MEI again displayed **879 its accused infringing machine at a trade show in South Carolina. Vaupel representatives attended the show, inspected MEI's machine, and explained to MEI representatives how its machine infringed the '650 patent. None of the alleged infringing machines was sold as a result of the trade show; consequently, Vaupel took no further action to protect its patent rights.

In October 1987, MEI again displayed its accused infringing machine, this time at a trade show in Paris, France. After Vaupel warned MEI that shipment of its accused machine to the United States would constitute infringement, MEI responded that it was protected by its own patents and that MEI had already shipped accused infringing machines to the United States. After discovering the identity of the buyer of the alleged infringing machines, as well as observing other subsequent sales, Vaupel filed suit on August 26, 1988. Vaupel thus took prompt action to protect its rights once it learned of renewed infringing activity. Given the undisputed facts, it would have been an abuse of discretion for the district court to have held that these circumstances resulted in laches.

We therefore conclude that Vaupel was not guilty of laches. Because of this disposition, we need not address the district

court's finding and the parties' arguments relating to MEI's alleged material prejudice or injury.

[10] With respect to estoppel, the district court found that "the delay from 1981–1982 until 1988 is an extended period of non-enforcement and constitutes affirmative conduct from which [MEI] could infer the claims against them had been abandoned." In light of our determination regarding laches and the extensive communications evidencing a continuing conflict between the parties and the fear of imminent suit, the district court erred in holding that Vaupel's suit was barred by estoppel.

"Estoppel requires representations or conduct by the patentee from which the alleged infringer could reasonably infer that the patentee had abandoned his claim." Jamesbury, 839 F.2d at 1554, 5 USPQ2d at 1787. In this case, MEI could reasonably have drawn no such inference. MEI did not rely on any purported abandonment by Vaupel of its patent rights or any intentionally misleading silence to suggest abandonment, but relied on the existence of MEI's own patents. In MEI's communications with Vaupel and its customers, it repeatedly stated that because its own patent covered its loom, not Vaupel's '650 patent, it had the right to sell its allegedly infringing looms in the United States. [4] Vaupel's actions did not constitute affirmative conduct from which defendants could reasonably have inferred that the claims of infringement against them had been abandoned.

## C. Infringement

[11] In order to determine a question of patent infringement, a district court must (1) determine as a matter of law the scope and meaning of the claims at issue and (2) determine as a factual matter whether the properly construed claims encompass or "read on" the accused device. ZMI Corp. v. Cardiac Resuscitator Corp., 844 F.2d 1576, 1578, 6 USPQ2d 1557, 1559 (Fed.Cir.1988). Liability for infringement requires that an accused device contain every limitation of a claim or its substantial equivalent. Lemelson v. United States, 752 F.2d 1538, 1551, 224 USPQ 526, 533 (Fed.Cir.1985). We review an issue of claim interpretation de novo, ZMI, 844 F.2d at 1578, 6 USPQ2d at 1559, and the factual application of a properly interpreted claim to an accused structure under the clearly erroneous standard. SRI Int'l v. Matsushita Elec. Corp. of America, 775 F.2d 1107, 1118, 227 USPQ 577, 583 (Fed.Cir.1985) (in banc).

[12]   MEI argues that the preamble language "breast beam" and "breast plate" of Claims 1 and 2, respectively, requires a specific loom part which is absent from its  **880**  accused device, and that the district court erred in concluding that the terms were used "only to fix the direction of movement of the woven fabric on the loom" and not to constitute claim limitations. After reviewing the claims, the specification and drawings, the prosecution history, and the expert testimony, we conclude that the district court was correct. "Breast beam" and "breast plate" are not structural limitations of Claims 1 and 2; as used in Claims 1 and 2, they indicate a reference point to fix the direction of movement of the woven fabric from the loom. Such alleged loom "parts" are not illustrated in any of the figures of the '650 patent or otherwise described in the specification.

[13]   The district court interpreted Claim 1 and concluded that the claim does not require that "the steps of cutting and thermostabilizing be carried out in the specific manner contained in the preferred embodiment of the invention appearing in the patent description and drawings...." It also interpreted Claim 2 as not requiring that "the heating and cutting station and the thermostabilizing station be located before the take-up roll, breast beam or breast plate." We agree. The plain language of the claims supports the district court's construction. Even MEI recognized, when it was advantageous to do so, that the order of steps in Claim 1's method was not specifically set forth. In its July 31, 1980 protest, NE argued that Claim 1, as written, did not require that the cutting step take place before the take-off roll or breast plate:

> There is no specific language, nor any intimation whatsoever in Marowsky's

claim 1 that the cutting step takes place *before* the take-off roll or breast plate.

(Emphasis in original). In its March 18, 1982 protest, NE argued that Claims 1 and 2, as written, do not limit the steps or stations to any particular location or sequence:

> It is quite clear, even from a cursory reading of the Marowsky patent and the instant reissue application, that the location of Marowsky's invention relative to the breast beam or breast plate is not specifically set forth in the claims[.]

The Examiner rejected NE's arguments, allowed the claims, and reemphasized that the location of the cutter between the breast beam and the sley was not the "critical factor" for patentability, that the applicant was entitled to claim the "broadest concept" of his invention.

We also agree that the step of heating to relieve "varying tensile stresses" does not require that the heating be done between the guide bar and the take-up roll of the loom. The claims do not require the limitations MEI suggests.

At trial the parties stipulated that MEI's off-loom machines did not infringe the '650 patent, and that MEI's accused device was represented by the following drawings:

**881**

20 U.S.P.Q.2d 1045



_____

MEI argues that the district court clearly erred in finding that Claim 1 was literally infringed, because the MEI device does not perform the step of "cutting the guided woven fabric" and because MEI's heated setting bar does not "relieve varying tensile stresses." However the court found, relying on expert testimony, that the MEI machine guides the fabric using the spreader bar, take-up roll, pressure rollers, guide rollers, and the drive cloth roll, and that these various rolls keep a tension on the fabric and produce tensile stresses. Because the guiding of the woven fabric in the MEI device extends through and beyond a cutting step, and varying tensile stresses also continue up to the cloth roll, the district court properly found Claim 1 to be infringed.

MEI has not shown the district court's findings relating to guiding to be clearly erroneous, and it offers no factual support for its argument that somehow the tensile stresses in its machine are relaxed downstream of the take-up roll. Given this complete lack of proof, we cannot say that the district court clearly erred. The district court first properly interpreted Claim 1, and then properly found that the MEI machine performed each and every step of Claim 1. Therefore, the district court was correct in finding that MEI's purchaser, ATP, directly infringed method Claim 1 and MEI contributorily infringed and induced infringement of Claim 1.

[14]    MEI next argues that the district court clearly erred in holding that apparatus Claim 2 was infringed under the doctrine of equivalents. The apparatus in Claim 2 comprises a "guiding station," a "cutting station," and a "thermostabilizing station." The district court found each of these three elements to have equivalent structure in the MEI machine. MEI argues that the district court failed to properly apply the doctrine of prosecution history estoppel when it found the spreader bar to be equivalent to the "guiding station" in Claim 2. It specifically argues that the threaded temple bar limitation was added "to avoid an obviousness rejection." We disagree.

There is no indication in the file history as to why the threads were added to the guide bar. The threaded guide bar limitation was already present in original Claim 6, which seems to have been combined with original Claim 5 to become Claim 2 of **882** the '650 patent. The doctrine of prosecution history estoppel bars "a patentee from enforcing its claims against otherwise legally equivalent structures if those structures were excluded by claim limitations added in order to avoid prior art." *Mannesmann Demag Corp. v. Engineered Metal Prods. Co.,* 793 F.2d 1279, 1284, 230 USPQ 45, 48 (Fed.Cir.1986) (citations omitted). In determining whether prosecution history estoppel applies because of a change in claim language during prosecution, the court must consider not only what was changed, but the *reason* for such change. *See Sun Studs, Inc. v. ATA*

*Equip. Leasing,* 872 F.2d 978, 987, 10 USPQ2d 1338, 1345 (Fed.Cir.1989).

Here, because the record does not indicate that the threaded guide bar limitation was added to avoid prior art, it does not support overturning the district court's finding that there is no estoppel against the combination of the smooth temple bar and the threaded spreader bar in the MEI machine being held to be the equivalent of the threaded guide bar limitation of Claim 2.

MEI also argues that the district court erred in finding equivalence of the "cutting station" and the "thermostabilizing station" in its accused device. MEI's argument must fail here too, because it hinges on its prior argument that the cutting and thermostabilizing stations are location-specific. We have already determined that the district court did not clearly err in finding that the claims did not require a specific sequence of the various stations.

The district court did not clearly err in finding that Claim 2 of the '650 patent was infringed under the doctrine of equivalents. Every limitation of Claim 2 has an equivalent in the MEI machine.

We have considered all the other arguments and conclude that they lack merit.

### COSTS

Costs to Vaupel.

### CONCLUSION

The judgment as it relates to laches and estoppel is reversed; in all other respects it is affirmed.

AFFIRMED–IN–PART, REVERSED–IN–PART.

### Parallel Citations

20 U.S.P.Q.2d 1045

---

Footnotes

1    Only if a person is deemed necessary under Rule 19(a) must a court undertake the second step of the analysis. In other words, if a party is deemed necessary under Rule 19(a), but cannot be joined because it is not subject to process, then the court must consider in equity and good conscience whether the party is indispensable and dismissal appropriate. Fed.R.Civ.P. 19(b). In this case, the district court correctly held that Marowsky was not a necessary party under Rule 19(a) and thus analysis under Rule 19(b) was unnecessary.

2    This discontinued practice allowed an applicant to have his patent reexamined to allow the PTO to determine the effect of newly discovered prior art not previously before the examiner. *See* 37 C.F.R. § 1.175(a)(4) (1981).

3    The district court found that NE was related to MEI and treated NE as the equivalent of MEI throughout the trial. MEI has not disputed this; therefore, we impute knowledge to MEI of all actions taken in the PTO and communications received by NE.

4    MEI's statements are evidence of its fear of suit, even though it is well-established that the existence of one's own patent does not constitute a defense to infringement of someone else's patent. It is elementary that a patent grants only the right *to exclude others* and confers no right on its holder to make, use, or sell. *See* 35 U.S.C. § 154 (1988).

---

**End of Document**                                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 159

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

2007 ONCA 205
Ontario Court of Appeal

Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust

2007 CarswellOnt 1705, 2007 ONCA 205, [2007] O.J. No. 1083, 222
O.A.C. 102, 29 B.L.R. (4th) 312, 56 R.P.R. (4th) 163, 85 O.R. (3d) 254

# VENTAS, INC., 2124678 ONTARIO INC., and 2124680 ONTARIO INC. (Applicants / Respondents in Appeal) and SUNRISE SENIOR LIVING REAL ESTATE INVESTMENT TRUST, SUNRISE REIT TRUST, SUNRISE REIT GP, INC., SUNRISE SENIOR LIVING INC., and HEALTH CARE PROPERTY INVESTORS, INC. (Respondents / Appellants in Appeal)

SUNRISE SENIOR LIVING REAL ESTATE INVESTMENT TRUST, SUNRISE REIT TRUST, and SUNRISE REIT GP, INC. (Applicants / Appellants in Appeal) and VENTAS SSL ONTARIO II, INC. (FORMERLY 2124678 ONTARIO INC.), VENTAS SSL ONTARIO I, INC. (FORMERLY 2124680 ONTARIO INC.), VENTAS INC., SUNRISE SENIOR LIVING, INC., and HEALTH CARE PROPERTY INVESTORS, INC. (Respondents / Respondents in Appeal / Ventas Inc. and numbered companies) (Appellant by Cross-Appeal / Health Care Property Investors, Inc.)

R.A. Blair, J. MacFarland, H.S. LaForme JJ.A.

Heard: March 20, 2007
Judgment: March 23, 2007
Docket: CA C46790, C46791

Proceedings: affirming *Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust* (2007), 2007 CarswellOnt 1704, 29 B.L.R. (4th) 292 (Ont. S.C.J.)

Counsel: Peter F.C. Howard, Eliot Kolers for Appelants, Sunrise Senior Living Real Estate Investment Trust, Sunrise REIT Trust, Sunrise REIT GP Inc.
Jeffrey S. Leon, Derek J. Bell for Appellants, Health Care Property Investors Inc.
Mark A. Gelowitz, Laura K. Fric for Respondents, Ventas Inc., Numbered Companies
Luis G. Sarabia, Cynthia Spry for Respondent, Sunrise Senior Living Inc.

Subject: Corporate and Commercial; Contracts; Property; Public

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

**Business associations --- Powers, rights and liabilities — Contracts by corporations — Miscellaneous issues**

Real estate investment trust was publicly traded entity — Board of trustees decided to sell assets and developed two-stage auction process to maximize value of units — Parties interested in purchasing were required to enter into confidentiality agreements with trust — Confidentiality agreements contained standstill terms prohibiting contact between either potential purchaser and trust's subsidiary — Corporation entered into agreement with trust to purchase assets — Third party learned of agreement and sent last-ditch proposal to trust — Trust told third party to enter discussions with representatives from its subsidiary — Corporation refused to waive standstill terms of agreement — Corporation's application for declaration that trust was obliged to enforce standstill terms in confidentiality agreement was granted — Trust appealed — Third

Case 09-10138-MEW   Doc 14225-52   Filed 08/15/14   Page 62 of 108

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

party cross-appealed for declaration that communications between it and subsidiary of trust were permitted — Appeal dismissed; cross-appeal dismissed — Trust was obliged to enforce standstill terms — Judge correctly outlined and applied principles of contract interpretation — Judge was correct that important purpose of s. 4.4 of purchase agreement was to ensure enforcement of standstill agreements entered into by previous players in auction process — Fiduciary out clause did not apply where unsolicited proposal was tendered in breach of non-solicitation provisions of purchase agreement — Fiduciary out clause did not allow trust to resile from terms of its standstill agreements with earlier bidders — Judge was sensitive to fiduciary out provisions that permitted other bona fide written unsolicited acquisition proposals — Judge found this was balanced by requirement that trust ensure enforcement of standstill agreements signed as part of auction process in order to protect successful bidder — This interpretation made commercial sense — Judge did not err in her assessment and use of term "bona fide" — Issue on cross-appeal was moot since ruling precluded third party proposal from being pursued.

**Table of Authorities**

**Cases considered by *R.A. Blair J.A.*:**

*ACE Ltd. v. Capital Re Corp.* (1999), 747 A.2d 95 (U.S. Del. Ch.) — referred to

*BG Checo International Ltd. v. British Columbia Hydro & Power Authority* (1993), 1993 CarswellBC 1254, [1993] 2 W.W.R. 321, [1993] 1 S.C.R. 12, 147 N.R. 81, 75 B.C.L.R. (2d) 145, 99 D.L.R. (4th) 577, 20 B.C.A.C. 241, 35 W.A.C. 241, 14 C.C.L.T. (2d) 233, 5 C.L.R. (2d) 173, 1993 CarswellBC 10 (S.C.C.) — referred to

*Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.* (1979), (sub nom. *Exportations Consolidated-Bathurst Ltée c. Mutual Boiler & Machinery Insurance Co.)* [1980] 1 S.C.R. 888, 112 D.L.R. (3d) 49, 1979 CarswellQue 157, 1979 CarswellQue 157F, 32 N.R. 488, [1980] I.L.R. 1-1176 (S.C.C.) — referred to

*CW Shareholdings Inc. v. WIC Western International Communications Ltd.* (1998), 39 O.R. (3d) 755, 160 D.L.R. (4th) 131, 1998 CarswellOnt 1891, 38 B.L.R. (2d) 196 (Ont. Gen. Div. [Commercial List]) — referred to

*Eli Lilly & Co. v. Novopharm Ltd.* (1998), 227 N.R. 201, 152 F.T.R. 160 (note), 1998 CarswellNat 1061, 1998 CarswellNat 1062, 161 D.L.R. (4th) 1, [1998] 2 S.C.R. 129, 80 C.P.R. (3d) 321 (S.C.C.) — referred to

*Kentucky Fried Chicken Canada v. Scott's Food Services Inc.* (1998), 1998 CarswellOnt 4170, 41 B.L.R. (2d) 42, 114 O.A.C. 357 (Ont. C.A.) — considered

*Paramount Communcations Inc. v. QVC Network Inc.* (1994), 637 A.2d 34, 62 U.S.L.W. 2530, Fed. Sec. L. Rep. P 98,063 (U.S. Del. Super.) — referred to

*Pente Investment Management Ltd. v. Schneider Corp.* (1998), 113 O.A.C. 253, (sub nom. *Maple Leaf Foods Inc. v. Schneider Corp.)* 42 O.R. (3d) 177, 1998 CarswellOnt 4035, 44 B.L.R. (2d) 115 (Ont. C.A.) — considered

*Scanlon v. Castlepoint Development Corp.* (1992), 29 R.P.R. (2d) 60, 59 O.A.C. 191, 11 O.R. (3d) 744, 99 D.L.R. (4th) 153, 1992 CarswellOnt 633 (Ont. C.A.) — referred to

*Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1998), 1998 CarswellOnt 2565, 40 B.L.R. (2d) 1 (Ont. Gen. Div. [Commercial List]) — referred to

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MEW   Doc 14225-52   Filed 08/15/14   Page 63 of 108

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

*Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1999), 45 O.R. (3d) 417, *(*sub nom. *Toronto-Dominion Bank v. Leigh Instruments Ltd. (Bankrupt))* 124 O.A.C. 87, 178 D.L.R. (4th) 634, 50 B.L.R. (2d) 64, 1999 CarswellOnt 2812 (Ont. C.A.) — referred to

*Venture Capital USA Inc. v. Yorkton Securities Inc.* (2005), 2005 CarswellOnt 1875, 197 O.A.C. 264, 75 O.R. (3d) 325, 4 B.L.R. (4th) 324 (Ont. C.A.) — referred to

APPEAL by public real estate trust from decision reported at *Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust* (2007), 56 R.P.R. (4th) 184, 2007 CarswellOnt 1704, 29 B.L.R. (4th) 292 (Ont. S.C.J.), granting application by corporation for declaration that trust was obligated to enforce confidentiality agreement; CROSS-APPEAL by third party for declaration that communications between it and subsidiary of trust were permitted.

*R.A. Blair J.A.*:

**Overview**

1    Sunrise REIT is a Canadian public real estate investment trust whose units are traded on the Toronto Stock Exchange. It owns and invests in senior living communities in Canada and the United States. In September 2006, Sunrise's board of trustees determined that a strategic sale process of its assets would be beneficial to its unitholders, thus effectively putting Sunrise "in play" on the public markets.

2    To carry out this plan, the Trustees developed a two-stage auction process with a view to maximizing the value of Sunrise's units. Ventas, Inc. ("Ventas") and Health Care Property Investors, Inc. ("HCPI") were two of seven initially interested prospective purchasers in the auction process. They emerged from the preliminary round as the only two potential bidders asked to participate in the final round.

3    Ventas submitted a successful bid to acquire all of Sunrise's assets for a total purchase price of $1,137,712,410 (representing a price of $15 per unit), subject to unitholder approval. HCPI withdrew from the auction process and did not bid at that time. Instead, it put forward a post-auction bid — after it knew what Ventas had offered — "topping up" the Ventas offer by twenty per cent to $18 per unit. This increased offer represents an additional $227.5 million for the unitholders, who are to meet on March 30, 2007, to consider the Ventas proposal.

4    Hence the urgency of this appeal.

5    The appeal turns on the interpretation of the terms of the purchase agreement executed by Sunrise and Ventas following acceptance of the Ventas bid. The issue is whether Sunrise is obliged to enforce the terms of a prior standstill agreement entered into between it and HCPI in the course of the auction process and which prohibits HCPI from making an offer for the Sunrise assets without Sunrise's consent. If the answer to that question is "Yes", Sunrise will be precluded from considering or accepting the richer HCPI offer pending the unitholders' meeting.

6    Following an urgent application, determined on March 6, 2007, Justice Pepall answered the foregoing question in the affirmative. Sunrise and HCPI appeal from that decision. Ventas supports it.

7    For the reasons that follow, I would dismiss the appeal and uphold the decision of the application judge.

**Facts**

8    As mentioned above, Sunrise owns and invests in senior living communities in Canada and the United States. The properties are managed by Sunrise Senior Living, Inc. ("SSL"), a U.S. public company whose shares are traded on the New York Stock Exchange.

WestlawNext® CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MEW    Doc 14225-52    Filed 08/15/14    Page 64 of 108

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

9    HCPI is a self-administered real estate investment trust that also invests in healthcare facilities. Ventas is a U.S.-based health care real estate investment trust whose shares are listed on the New York Stock Exchange.

10    In September 2006, after Sunrise's board of trustees determined that a strategic sale process of the Trust's assets would be beneficial to its unitholders, it began an auction process with a view to maximizing unitholder value.

11    Parties who were interested in acquiring Sunrise (including HCPI and Ventas) were required to enter into a confidentiality agreement with it in order to prevent non-public information exchanged by the parties from being publicly disclosed (the "Confidentiality Agreements"). The Confidentiality Agreements contained restrictions preventing each prospective acquiring party from attempting a hostile (unsolicited) takeover bid (the "Standstill Agreements").

12    Although the parties' Confidentiality Agreements were largely similar, Ventas's Standstill Agreement was worded differently from HCPI's in that the Ventas standstill ceased to apply if, among other things, Sunrise entered into an agreement to sell more than twenty per cent of its assets to a third party. Notably, HCPI's Standstill Agreement did not contain a similar termination clause.

13    On November 21, 2006, Sunrise invited potential bidders to submit bids in the non-binding preliminary round of an auction. After the first round of bids, Sunrise invited HCPI and Ventas to engage in further negotiations and on December 29, 2006, it invited them to submit final binding bids in the second round of the auction by January 8, 2007. Sunrise waived the Standstill Agreements with those bidders for that purpose, and HCPI and Ventas were expressly told not to assume that the "winning" bid was assured of actually acquiring Sunrise at the price agreed upon or that they would be given an opportunity to rebid, renegotiate, or improve the terms of their proposal.

14    Ventas submitted a second bid on January 8, but HCPI withdrew from the auction and did not.

15    On January 14, 2007, Ventas and Sunrise signed an agreement contemplating the purchase by Ventas of all of Sunrise's assets for a total purchase price of $1,137,712,410 (representing a price of $15.00 per Unit), subject to Unitholder approval (the "Purchase Agreement"). This price represented a 35.8% premium over the closing price of the units on January 12, 2007. The Purchase Agreement contemplated subsequent third-party unsolicited bids and allowed Sunrise to accept such a bid if it was financially superior to Ventas's bid.

16    On January 17, 2007, Sunrise notified HCPI of the agreement with Ventas and asked for the return of Sunrise's confidential materials. In the letter, Sunrise's solicitor reminded HCPI of the terms of the Confidentiality Agreement it signed in November 2006.

17    On February 14, 2007, HCPI submitted a proposal to acquire all of Sunrise's assets for $18.00 per unit (the "HCPI Proposal"), conditional on HCPI's ability to reach a management agreement with SSL. Sunrise treated the HCPI Proposal as an unsolicited third-party bid, but it concluded that it was not in a position to determine whether the bid was a superior bid because of the SSL condition.

18    The Confidentiality Agreements entered into in the course of the auction process contained a provision prohibiting prospective purchasers from communicating with SSL. This was because SSL was viewed as a possible bidder. Following the preliminary round of the auction, in late November 2006, and after realizing that SSL was not an interested purchaser, Sunrise had authorized its financial advisors to arrange to allow HCPI and Ventas to contact SSL for purposes of the second round of bidding. On February 15, 2007, however — after learning of the HCPI Proposal — Ventas advised Sunrise that, if it permitted communications between SSL and HCPI, Sunrise would be in breach of the Purchase Agreement. It did not assert that HCPI would be in breach of its Standstill Agreement because it apparently assumed that HCPI's Standstill Agreement was worded similarly to the Ventas Standstill Agreement, which meant that the restraint on an unsolicited bid was no longer enforceable since Sunrise had entered into an agreement with a third party.

19    On February 18, 2007, Sunrise served application materials upon Ventas, HCPI and SSL indicating its intention to seek the court's interpretation of the Purchase Agreement, specifically on the issue of communications between HCPI and SSL. It is at this point that Ventas learned of the specific terms of HCPI's Confidentiality Agreement and realized that HCPI's Standstill Agreement did not contain the same termination clause as Ventas's Standstill Agreement. On February 21, 2007, Ventas brought the within Application seeking a declaration that Sunrise was required to enforce its Standstill Agreement with HCPI, thereby preventing it from considering the HCPI Proposal.

20    The application judge found that Sunrise had agreed with Ventas that it would enforce existing Standstill Agreements and that any bid made in breach of an existing Standstill Agreement would not be *bona fide*. She then concluded that Sunrise was required to enforce the Standstill Agreement with HCPI and that HCPI did not have prior written consent to submit its bid. She dismissed Sunrise's application on the grounds that the issue was moot in light of her earlier conclusion.

**The Provisions of the Agreement**

21    Section 4 of the Purchase Agreement deals generally with the covenants of the parties. Section 4.4 deals with Sunrise's "Covenants Regarding Non-Solicitation". Because of their importance, I reproduce the provisions of section 4.4 in their entirety (the underlining is mine):

4.4(1) Following the date hereof, Sunrise REIT shall not, directly or indirectly, through any trustee, officer, director, agent or Representative of Sunrise REIT or any of its Subsidiaries, and shall not permit any such Person to,

(i) solicit, initiate, encourage or otherwise facilitate (including by way of furnishing information or entering into any form of agreement, arrangement or understanding or providing any other form of assistance) the initiation of any inquiries or proposals regarding, or other action that constitutes, or may reasonably be expected to lead to, an actual or potential Acquisition Proposal,

(ii) participate in any discussions or negotiations in furtherance of such inquiries or proposals or regarding an actual potential Acquisition Proposal or release any Person from, or fail to enforce, any confidentiality or standstill agreement or similar obligations to Sunrise REIT or any of its Subsidiaries,

(iii) approve, recommend or remain neutral with respect to, or propose publicly to approve, recommend or remain neutral with respect to, any Acquisition Proposal,

(iv) accept or enter into any agreement, arrangement or understanding, related to any Acquisition Proposal (other than a confidentiality agreement contemplated in Section 4.4(2)), or

(v) withdraw, modify or qualify, or publicly propose to withdraw, modify or qualify, in any manner adverse to the Purchasers, the approval or recommendation of the Board (including any committee thereof) of this Agreement or the transactions contemplated hereby.

(2) Notwithstanding anything contained in Section 4.4(1), until the Unitholder Approval, nothing shall prevent the Board from complying with Sunrise REIT's disclosure obligations under applicable Laws with regard to a bona fide written, unsolicited Acquisition Proposal or, following the receipt of any such Acquisition Proposal from a third party (that did not result from a breach of this Section 4.4), from furnishing or disclosing non-public information to such Person if and only to the extent that:

(i) the Board believes in good faith (after consultation with its financial advisor and legal counsel) that such Acquisition Proposal if consummated could reasonably be expected to result in a Superior Proposal; and

(ii) such third party has entered into a confidentiality agreement containing terms in the aggregate no more favourable to such third party than those in the Confidentiality Agreement as are then in effect in accordance with its terms.

WestlawNext. CANADA  Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Case 09-10138-MFW  Doc 14225-52  Filed 08/15/14  Page 66 of 108

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

(3) Notwithstanding anything, contained in Section 4.4(1), until the Unitholder Approval, nothing shall prevent the Board from withdrawing or modifying, or proposing publicly to withdraw or modify its approval and recommendation of the transactions contemplated by this Agreement, or accepting, approving or recommending or entering into any agreement, understanding or arrangement providing for a bona fide written, unsolicited Acquisition Proposal (that did not result from a breach of this Section 4.4) ("Proposed Agreement") if and only to the extent that:

(i) it has provided the Purchasers with a copy of all of the documents relating to the Acquisition Proposal,

(ii) the Board, believes in good faith (after consultation with its financial advisor and legal counsel) that such Acquisition Proposal constitutes a Superior Proposal and has promptly notified the Purchasers of such determination,

(iii) a period of at least five Business Days (the "Matching Period") has elapsed following the later of (x) the date the Purchasers received written notice advising the Purchasers that the Board has resolved, subject to compliance with this Section 4.4(3), to withdraw, modify its approval and recommendation of the transactions contemplated by this Agreement or accept, approve or recommend or enter into a Proposed Agreement in respect of such Superior Proposal and (y) the date the Purchasers received a copy of the documentation related to such Superior Proposal pursuant to Section 4.4(3)(i),

(iv) if the Purchasers have proposed to amend the transactions contemplated under this Agreement in accordance with Section 4.4(6), the Board has again made the determination in Section 4.4(3)(ii) taking into account such proposed amendments; and

(v) if Sunrise REIT proposes to enter into a Proposed Agreement (other than a confidentiality agreement referred to in Section 4.4(2)) after complying with this Section 4.4(3), Sunrise REIT shall have complied with Section 5.2 and 5.3. For the purposes of this Section 4.4(3) the preparation and delivery of a directors' circular pursuant to Section 99 of the *Securities Act* relating to an Acquisition Proposal shall be deemed to be a qualification, withdrawal or modification, of the Board's recommendation of the transactions contemplated hereby unless the Board expressly, and without qualification, reaffirms its recommendation of the transactions contemplated hereby in such disclosure.

(4) If the expiry of the Matching Period referred to in Section 4.4(3)(iii) falls on a date which is less than five Business Days prior to the Unitholder Meeting, Sunrise REIT shall, at the request of the Purchasers, adjourn the Unitholder Meeting to a date that is not more than 10 Business Days following such expiry date.

(5) Sunrise REIT acknowledges and agrees that each successive amendment to any Acquisition Proposal shall constitute a new Acquisition Proposal for purposes of section 4.4.

(6) During the Matching Period, the Purchasers shall have the right, but not the obligation, to propose to amend the terms of this Agreement. The Trustees will review any proposal by the Purchasers to amend the terms of this Agreement in good faith in order to determine (after consultation with their financial advisor and legal counsel) whether the transactions contemplated by this Agreement, taking into account the Purchasers' proposed amendments would, if consummated in accordance with its terms, result in the Superior Proposal ceasing to be a Superior Proposal. If the Trustees so determine, Sunrise REIT will enter into an amending agreement with the Purchasers reflecting such proposed amendment.

(7) Sunrise REIT shall, as promptly as practicable, notify the Purchasers of any relevant details relating to any Acquisition Proposal, or inquiry that could reasonably be expected to lead to any Acquisition Proposal, or any amendments to any Acquisition Proposal (including the identity of the parties and all material terms thereof), or any request for non-public information relating to Sunrise REIT or any of its Subsidiaries in connection with an Acquisition Proposal or inquiry that could reasonably be expected to lead to any Acquisition Proposal, or for access to the properties, books or records of Sunrise REIT or any of its Subsidiaries by any Person that informs Sunrise REIT or such Subsidiary that it is considering making, or has made, an Acquisition Proposal, or inquiry that could reasonably be expected to lead to any Acquisition Proposal, in each case which any of Sunrise REIT, any of its Subsidiaries or any officer, trustee, director, employee or

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

Representative may receive after the date hereof relating to an Acquisition Proposal. Sunrise REIT shall promptly and fully keep the Purchasers informed of the status on a current basis, including any change to any of the terms, of any such Acquisition Proposal.

(8) Sunrise REIT shall

(i) ensure that its officers and Trustees and its Subsidiaries and their respective officers and directors and any Representatives retained by it or its Subsidiaries in connection herewith are aware of the provisions of this Section 4.4, and Sunrise REIT shall be responsible for any breach of this Section 4.4 by its and its Subsidiaries' officers, directors, trustees or representatives;

(ii) immediately cease and cause to be terminated any existing activities, discussions or negotiations with any parties conducted heretofore with respect to any Acquisition Proposal;

(iii) require all Persons other than the Purchasers who have been furnished with confidential information regarding Sunrise REIT or its Subsidiaries in connection with the solicitation of or discussion regarding any Acquisition Proposal within 12 months prior to the date hereof promptly to return or destroy such information, in accordance with and subject to the terms of the confidentiality agreement entered into with such Persons;

(iv) terminate access for all Persons (other than the Purchasers and its Representatives) of the electronic dataroom accessible through Merrill Datasite's website; and

(v) <u>not amend, modify, waive or fail to enforce any of the standstill terms or other conditions included in any of the confidentiality agreements between Sunrise REIT and any third parties.</u>

22    The Purchase Agreement defines "Acquisition Proposal" and "Superior Proposal" as follows:

"Acquisition Proposal" means any proposal or offer made by any Person other than the Purchasers (or any affiliate of the Purchasers or any Person acting jointly and/or in concert with the Purchasers or any affiliate of the Purchasers) with respect to the acquisition, directly or indirectly, of assets, securities or ownership interests of or in Sunrise REIT or any of its Subsidiaries representing 20% or more of the consolidated assets of Sunrise REIT and its Subsidiaries taken as a whole, in a single transaction or a series of transactions, or, of equity interests representing a 20% or greater economic interest in Sunrise REIT or such Subsidiaries taken as a whole, in a single transaction or a series of transactions pursuant to any merger, amalgamation, tender offer, share exchange, business combination, liquidation, dissolution, recapitalization, take-over or non-exempt issuer bid, amendment to the Declaration of Trust, redemption of units, extraordinary distribution, sale, lease, exchange, mortgage, pledge, transfer, purchase, or issuance as consideration or similar transaction or series of transactions involving Sunrise REIT or any of such Subsidiaries or any other transaction the consummation of which would reasonably expected to impede, interfere with, prevent or materially delay the transactions contemplated hereby.

"Superior Proposal" means any unsolicited bona fide written Acquisition Proposal made by a third party that in the good faith determination of the Trustees, after consultation with its financial advisors and with outside counsel:

(a) is reasonably capable of being completed without undue delay having regard to financial, legal, regulatory and other matters;

(b) in respect of which adequate arrangements have been made to ensure that the required funds will be available to effect payment in full of the consideration; and

(c) would, if consummated in accordance with its terms, result in a transaction more favourable to Unitholders from a financial point of view (including financing terms, any termination fee or expenses reimbursement payable under this Agreement, any conditions to the consummation thereof) than the transactions contemplated by this Agreement; provided, however, that for purposes of this definition the references in the definition of Acquisition Proposal to "20%" shall be deemed to be references to "100%".

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.    7

Case 09-10138-MEW   Doc 14225-52   Filed 08/15/14   Page 68 of 108

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

## Analysis

23      The central issue on this appeal, as it was before the application judge, is whether the provisions of section 4.4 of the Purchase Agreement impose an obligation on Sunrise to enforce the Standstill Agreement between it and HCPI, thus precluding it from considering the Acquisition Proposal submitted by HCPI following the close of the auction and after the Ventas bid had been accepted. In my view, they do.

24      Counsel accept that the application judge correctly outlined the principles of contractual interpretation applicable in the circumstances of this case. I agree. Broadly stated — without reproducing in full the relevant passages from her reasons (paras. 29-34) in full — she held that a commercial contract is to be interpreted,

> (a) as a whole, in a manner that gives meaning to all of its terms and avoids an interpretation that would render one or more of its terms ineffective; [1]

> (b) by determining the intention of the parties in accordance with the language they have used in the written document and based upon the "cardinal presumption" that they have intended what they have said; [2]

> (c) with regard to objective evidence of the factual matrix underlying the negotiation of the contract, but without reference to the subjective intention of the parties; [3] and (to the extent there is any ambiguity in the contract),

> (d) in a fashion that accords with sound commercial principles and good business sense, and that avoid a commercial absurdity. [4]

25      The appellants assert, however, that the application judge misapplied the principles of contractual interpretation that she had properly enunciated. They say she did so essentially,

> a) by misapprehending the interplay between sections 4.4(1), 4.4(2), 4.4(3) and 4.4(8)(v) of the Purchase Agreement and, in particular by failing to appreciate, and to reconcile, the differences between the wording of sections 4.4(1) and 4.4(8), and more generally,

> b) by failing to understand the "architecture" of section 4.4 of the Purchase Agreement and to consider it against the background of the factual matrix in which the Agreement was negotiated.

26      I do not agree.

### The Application Judge's Reasoning

27      The thrust of the application judge's reasoning in this regard is found at paragraphs 35, 36, 38 and 39 of her reasons:

> 35 Sunrise REIT expressly and unambiguously agreed that it would not amend, modify, waive or fail to enforce any of the standstill terms or other conditions included in any of the confidentiality agreements between Sunrise REIT and any third parties. The standstill enforcement obligations are found in sections 4.4(1) and 4.4(8) of the Purchase Agreement.

> 36 Sections 4.4(2) and 4.4(3) address Sunrise REIT's obligations with regard to "a bona fide written, unsolicited Acquisition Proposal (that did not result from a breach of this section 4.4)." Sections 4.4(2) and 4.4(3) are prefaced with the words "notwithstanding anything contained in section 4.4(1)." Sections 4.4(2) and (3) do not say "notwithstanding anything contained in section 4.4(1) or 4.4(8)." If it had been the parties' contractual intention to exempt the circumstances described in sections 4.4(2) and (3) from the operation of section 4.4(8), they could have so provided but they did not. Similarly, unlike sections 4.7 and 4.8 which commence with the words "notwithstanding any other term of the Agreement", sections 4.4(2) and 4.4(3) do not use this language.

Case 09-10138-MFW    Doc 14225-52    Filed 08/15/14    Page 69 of 108

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

38 It seems to me that the clear scheme of this Purchase Agreement was [to] ensure enforcement of standstill agreements that had been signed as part of the auction process. This strikes me as being objectively reasonable and was a form of protection afforded to the purchaser, Ventas. This was part of the package negotiated between it and Sunrise REIT.

39 Such an interpretation derives from the words used by the parties to the Purchase Agreement and gives effect to the parties' intention. It is also consistent with the context of the transaction including the auction process which was the genesis of the Purchase Agreement. The Purchase Agreement does not preclude bona fide written unsolicited Acquisition Proposals nor does it preclude such a proposal from a party whose standstill agreement operated to permit such a proposal. It simply precludes a proposal from anyone who is in breach of its standstill agreement. While creative, I view Sunrise REIT's and HCP's interpretation arguments to be strained. They disregard the parties' intention and the true meaning of the subject sections and the Purchase Agreement as a whole.

[Footnote omitted.]

### The Scheme and Interpretation of Section 4.4

28      I agree with the application judge that an important purpose of this part of the Purchase Agreement is to ensure the enforcement of standstill agreements entered into by previous players in the auction process. The negotiating context demonstrates that Ventas has been skilful in protecting its own position with respect to competition and standstills — unlike the HCPI Standstill, the Ventas/Sunrise Standstill Agreement expired at the conclusion of the auction — and it is objectively reasonable, given this background, that it would seek protection against competition from those who were unsuccessful in the auction, particularly its principle competitor.

29      From Sunrise's perspective, the safety valve lies in the unitholders' meeting. If the unitholders believe that there is a more favourable offer available — one worth the risk of rejecting the Ventas proposal — they may well vote to reject the Ventas proposal at their meeting on March 30.

30      The language used by the parties in the Purchase Agreement supports this interpretation.

31      Viewed contextually, sections 4.4(1), 4.4(2), 4.4(3) and 4.4(8) form part of a section of the Purchase Agreement that deals with the general covenant of Sunrise not to shop for other offers pending unitholder consideration of the Ventas bid. Viewed in light of the factual matrix in which the Agreement was negotiated, the provisions provide deal protection for Ventas, as the successful bidder in the auction, subject to Sunrise REIT's fiduciary out obligations.

32      As I read section 4.4 of the Agreement, it has four major components. First, it contains the overriding obligation of Sunrise not to solicit other bids, buttressed by the commitment of Sunrise to enforce existing standstill agreements that may be in place with bidders who have already engaged in the auction process (section 4.4(1)). Secondly, it contains the "fiduciary out" protection for the Sunrise Trustees (and unitholders), permitting the Trustees to consider *bona fide* unsolicited Acquisition Proposals from third parties (*that are not in breach of the provisions of section 4.4*) (sections 4.4(2) and 4.4(3)). Thirdly, it contains a series of provisions dealing with how the parties are to address a situation where a permitted Acquisition Proposal is received (sections 4.4(3)-4.4(7)). [5] Lastly, section 4.4(8)(v) returns to the general non-solicitation obligation, reinforcing it by ensuring that Sunrise will (i) ensure all of its officers, Trustees and agents are aware of the non-solicitation provisions, (ii) immediately stop negotiating with anyone previously involved in the bidding process, (iii) require those bidders to return any confidential documentation and information they may have received during the process, (iv) terminate access to the data room by anyone other than Ventas and its representatives, and finally (a reiteration of the requirement set out in section 4.4(1)):

(v) not amend, modify, waive or fail to enforce any of the standstill terms or other conditions included in any of the confidentiality agreements between Sunrise REIT and any third parties ...

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

33    Contrary to the appellants' submissions, however, it is not *any* Acquisition Proposal that the Trustees are free to consider as part of the fiduciary out scenario; it is only an Acquisition Proposal from a third party *that is not in breach of section 4.4 of the Agreement*.

34    Properly understood in this fashion, then, a reading of section 4.4 demonstrates that there is no *conflict* between the provisions of sections 4.4(1)(ii), 4.4(2), 4.4(3) and 4.4(8)(v). The repeated standstill enforcement terms *complement* one another. As the application judge pointed out, the opening phrases of sections 4.4(2) and 4.4(3) — "notwithstanding anything contained in Section 4.4(1)" — do not have the words "or Section 4.4(8)(v)" added to them. This reinforces the interpretation that section 4.4(8)(v) is there to clarify that Sunrise's obligation to enforce its Standstill Agreements with third parties is not negated by the fiduciary out clause. An unsolicited proposal by a prior bidder bound by a Standstill Agreement is a proposal that is otherwise in breach of section 4.4, because it violates section 4.4(8)(v), and therefore is not immunized by the fiduciary out provisions.

35    In that sense, contrary to the appellants' submissions, the application judge's reading of the Purchase Agreement does not reduce section 4.4(8)(v) to simply the functional equivalent of section 4.4(1)(ii). Nor is it a case of section 4.4(8)(v) continuing to require the enforcement of a Standstill Agreement even when the fiduciary out clause is otherwise applicable. The fiduciary out clause does not apply where the unsolicited proposal is tendered in breach of the non-solicitation provisions of the Purchase Agreement, i.e., in breach of a Standstill Agreement that Sunrise is obliged to enforce. The fiduciary out formula is an important feature of the non-solicitation format, but it does not allow Sunrise to resile from the terms of its Standstill Agreements with earlier bidders, in my opinion.

### The Difference in Wording between Sections 4.4(1)(ii) and 4.4(8)(v)

36    Mr. Howard emphasized what he argued was a difference in wording between those two provisions. He points out that section 4.4(1)(ii) expressly refers to situations involving "an actual or potential Acquisition Proposal" whereas section 4.4(8)(v) contains no such reference, and further, that other subsections of section 4.4(8) — namely, sections 4.4(8)(ii) and (iii) — refer to Acquisition Proposals as well, although not in the context of standstill agreements (4.4(8)(ii) and 4.4(8)(iii)). Because section 4.4(8)(v) does not refer to "Acquisition Proposals", Mr. Howard submits it does not apply in the context of such a proposal and therefore does not apply in the context of the HCPI Acquisition Proposal.

37    There are several problems with this argument. First, it misapprehends the fact that *any* proposal to acquire more than twenty percent of the assets of Sunrise — whether made before or after the close of the auction — constitutes an "Acquisition Proposal" as defined in the Agreement. Consequently, section 4.4(8)(v) can only apply in the context of an Acquisition Proposal of some sort, regardless of its wording.

38    Secondly, the argument appears to be founded on the unarticulated premise that an Acquisition Proposal, as referenced in sections 4.4(1)(ii), 4.4(2) and 4.4(3), is the equivalent of a Superior Proposal. The appellants' theory of the Agreement is that the Trustees are entitled to consider any Acquisition Proposal received after the close of the auction, and that the commitment in section 4.4(8)(v) to enforce standstill agreements only applies in the event that a subsequent Acquisition Proposal received by the Trustees does not make the grade as a Superior Proposal. The function of section 4.4(8)(v), they say, is to permit the Trustees in such circumstances to prevent a bidder in such a case — whether a prior bidder or not — from continuing to participate in the bidding process.

39    It is not the case, however, that an Acquisition Proposal and a Superior Proposal are the same thing. The latter is a narrower concept than the former. While an Acquisition Proposal is essentially an offer by anyone to acquire more than twenty percent of the assets of Sunrise, a Superior Proposal is an Acquisition Proposal [6] that is more favourable to the unitholders from a financial point of view than the Ventas bid. Sunrise submits, at paragraph 43 of its factum, that section 4.4(8)(v) "is part of the filtering protection for both Ventas and Sunrise REIT that allows and obliges Sunrise REIT to deal summarily with offers that do not meet the Acquisition Proposal threshold." Sunrise does not mean the "Acquisition Proposal threshold" in this statement, however; it means the "Superior Proposal threshold." To support the appellants' argument, the reference to "Acquisition Proposal" in section 4.4(1)(ii) would have to be read as "Superior Proposal". That is not what it says.

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

40    Moreover, and in any event, a careful reading of section 4.4(1)(ii) does not bear out the nexus between the reference to "Acquisition Proposal" and the commitment to enforce the standstill agreements. For ease of reference I repeat the wording of section 4.4(1)(ii) here:

> 4.4(1) Following the date hereof, Sunrise REIT shall not ...
>
> > (ii) participate in any discussions or negotiations in furtherance of such inquiries or proposals or regarding an actual or potential Acquisition Proposal or release any Person from, or fail to enforce, any confidentiality or standstill agreement or similar obligation to Sunrise REIT or any of its Subsidiaries.

41    Section 4.4(1)(ii) in reality contains two prohibitions, not one. The language does not work otherwise. Sunrise agrees not to participate in discussions or negotiations regarding actual or potential Acquisition Proposals. It also agrees not to release anyone from, or fail to enforce, existing Standstill Agreements. The drafters could well have divided section 4.4(1) into six general prohibitions rather than five. The commitment to enforce the Standstill Agreements is not, therefore, tied to "Acquisition Proposals" in a way that section 4.4(8)(v) is not.

42    Accordingly, I agree with the application judge's observation that while the appellants' interpretation arguments are creative, they are strained. As she said, "They disregard the parties' intention and the true meaning of the subject sections and the Purchase Agreement as a whole."

### An Interpretation that Reflects the "Factual Matrix", is "Commercially Sensible", and Accords with the Fiduciary Obligations of the Sunrise Trustees

43    Nor do I accept the submission that the application judge failed to consider the factual matrix underlying the negotiation of the Purchase Agreement, or that she failed to give effect to the "commercial sense" component of contract interpretation.

44    In a blended argument, the appellants submit that the application judge's interpretation of the Purchase Agreement ignores the factual matrix in which the Agreement was negotiated, defies commercial sense and reasonableness, and eviscerates the fiduciary out mechanism that was central to the parties' agreement. Respectfully, I do not read the application judge's reasons in this fashion.

### The Factual Matrix

45    Contracts are not made in a vacuum, and there is no dispute that the surrounding circumstances in which a contract is negotiated are relevant considerations in interpreting contracts. As this court noted in *Kentucky Fried Chicken*, *supra*, at para. 25, "[w]hile the task of interpretation must begin with the words of the document and their ordinary meaning, the general context that gave birth to the document or its 'factual matrix' will also provide the court with useful assistance."

46    Sunrise points to a number of surrounding circumstances which it says the application judge ignored in arriving at her decision. These include that:

> a) the Purchase Agreement was entered into at the conclusion of the second stage of a private sale auction process where it was clear that the overall objective of Sunrise was to maximize value for it unitholders;
>
> b) the expectations of the bidders, objectively determined, could not have been that the "winner" of the auction was assured of acquiring the Sunrise assets, because everyone was aware that there would be a fiduciary out clause and that superior proposals could displace the winning bid;
>
> c) Ventas's own standstill terms ceased to apply in the event that Sunrise entered into a sales transaction with a third party, and Ventas could not know whether the other Standstill Agreements rested on the same footing (and did not know that HCPI's did not);

Case 09-10138-MFW    Doc 14225-52    Filed 08/15/14    Page 72 of 108

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

d) Ventas never told Sunrise it believed the participants in the auction would be excluded from the operation of the fiduciary out provision; and

e) Ventas had bargained for, and achieved, considerable deal protection, in the form of the "no shop" provision, the right to match any Superior Proposal, and the right to receive a $39.8 million break fee if it chose not to match such an offer.

47    Matters involving the factual matrix underlying a contract are matters of fact, or at least matters of mixed fact and law. A judge is owed considerable deference in her assessment of such matters. Here, the experienced Commercial List judge was exercising a function common to that role — the interpretation of a commercial contract — and, while she may not have dealt with the foregoing themes expressly as the appellants would like, her reasons, read as a whole, indicate that she was alive to most, if not all, of them. She was certainly aware of the facts contained in points (a), (b), (c) and (e) above, as she dealt with them at one time or another in the reasons. The factor mentioned in (d) is not dispositive of anything.

48    At the conclusion of her consideration of the interpretation issue, as noted earlier, the application judge said (at paras. 38 and 39):

38 It seems to me that the clear scheme of this Purchase Agreement was [to] ensure enforcement of standstill agreements that had been signed as part of the auction process. This strikes me as being objectively reasonable and was a form of protection afforded to the purchaser, Ventas. This was part of the package negotiated between it and Sunrise REIT.

39 Such an interpretation derives from the words used by the parties to the Purchase Agreement and gives effect to the parties' intention. It is also consistent with the context of the transaction including the auction process which was the genesis of the Purchase Agreement. The Purchase Agreement does not preclude bona fide written unsolicited Acquisition Proposals nor does it preclude such a proposal from a party whose standstill agreement operated to permit such a proposal. It simply precludes a proposal from anyone else who is in breach of its standstill agreement. [Emphasis added, footnote omitted.]

49    I can find no basis for concluding the applications judge was not attuned to the need to keep the factual matrix in mind when conducting her interpretative exercise.

50    Nor do I accept that she either ignored the need to interpret the contract in a way that reflected sound commercial sense, or that she failed to give it such an interpretation. It is apparent from her recitation of the principles of contract interpretation that she was aware of the relevance of the "sound commercial sense" theme. She cited the following passage from this Court's decision in *Kentucky Fried Chicken*, *supra*, at para. 27:

Where, as here, the document to be construed is a negotiated commercial document, the court should avoid an interpretation that would result in a commercial absurdity: [*City of Toronto v. W.H. Hotel Ltd.* (1966), 56 D.L.R. (2d) 539 at 548 (S.C.C.)]. Rather, the document should be construed in accordance with sound commercial principles and good business sense: [*Scanlon v. Castlepoint Development Corporation et al.* (1992), 11 O.R. (3d) 744 at 770 (Ont.C.A.)]. Care must be taken, however, to do this objectively rather than from the perspective of one contracting party or the other, since what might make good business sense to one party would not necessarily do so for the other.

51    The appellants' argument that the application judge failed to interpret the Purchase Agreement in a fashion that accords with sound commercial sense is grounded in the belief that she overlooked the importance of the "maximizing value" principle and the centrality of the Trustees' fiduciary obligations in that regard, in cases of this nature. She did neither, in my view.

52    As noted above, the application judge was sensitive to the fiduciary out provisions that permitted other *bona fide* written unsolicited Acquisition Proposals. In her view, however, this was balanced, objectively and reasonably, by the requirement that Sunrise ensure enforcement of Standstill Agreements that had been signed as part of the auction process in order to protect the successful bidder. This interpretation makes commercial sense, in my view.

Case 09-10138-MFW    Doc 14225-52    Filed 08/15/14    Page 73 of 108

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

53     On behalf of HCPI, Mr. Leon placed great emphasis on the sanctity of the fiduciary out mechanism in acquisition agreements of this nature. There is no doubt that the directors of a corporation that is the target of a takeover bid — or, in this case, the Trustees — have a fiduciary obligation to take steps to maximize shareholder (or unitholder) value in the process: see *CW Shareholdings Inc. v. WIC Western International Communications Ltd.* (1998), 39 O.R. (3d) 755 (Ont. Gen. Div. [Commercial List]), at 768 and 774. That is the genesis of the "fiduciary out" clauses in situations such as the case at hand. They enable directors or trustees to comply with their fiduciary obligations by ensuring that they are not precluded from considering other *bona fide* offers that are more favourable financially to the shareholders or unitholders than the bid in hand.

54     It is not necessary — nor would it be wise, in my view — to go as far as HCPI suggests this court might go, and adopt the principle gleaned from some American authorities, that the target vendor can place no limits on the directors' right to consider superior offers and that any provision to the contrary is invalid and unenforceable: see *Paramount Communcations Inc. v. QVC Network Inc.*, 637 A.2d 34 (U.S. Del. Super. 1994), and *ACE Ltd. v. Capital Re Corp.*, 747 A.2d 95 (U.S. Del. Ch. 1999) at 105. That is not what happened in this case.

55     The Trustees did not contract away their fiduciary obligations. Rather, they complied with them by setting up an auction process, in consultation with their professional advisers, that was designed to maximize the unit price obtained for Sunrise's assets, in a fashion resembling a "shotgun" clause, by requiring bidders to come up with their best price in the second round, subject to a fiduciary out clause that allowed them to consider superior offers from anyone save only those who had bound themselves by a Standstill Agreement in the auction process not to make such a bid. In this case, that turned out to be only HCPI.

56     An auction process is well-accepted as being one — although only one — "appropriate mechanism to ensure that the board of a target company acts in a neutral manner to achieve the best value reasonably available to shareholders in the circumstances": *Pente Investment Management Ltd. v. Schneider Corp.* (1998), 42 O.R. (3d) 177 (Ont. C.A.) at 200. Here, the trustees, acting reasonably and on professional advice, formed the view that an auction process was the best way to maximize value, and conducted such an auction to the point where they attracted a successful bidder. This is not a case where the Trustees were unable to judge the adequacy of the bid (*Schneider*, at 200). They had dealt with seven prospective purchasers in the course of the two auction rounds, and had received preliminary proposals. Ventas's $15.00-per-unit price represented a 35.8% increase over the market price of the Units on the date the auction closed. I do not think the Trustees can be said to have failed in the exercise of their fiduciary obligations to their unitholders in these circumstances simply by agreeing in the Purchase Agreement to preclude earlier bidders, who had bound themselves under Standstill Agreements not to do so, from coming in after the auction was concluded and the "successful" bidder had showed its cards and attempting to "top up" that bid.

57     It is well accepted that "where an agreement admits of two possible constructions, one of which renders the agreement lawful and the other of which renders it unlawful, courts will give preference to the former interpretation": John D. McCamus, *The Law of Contracts* (Toronto: Irwin Law, 2005) at 729. Advancing this principle, the appellants argue that we should be loathe to adopt an interpretation of the Purchase Agreement that is inconsistent with overarching fiduciary obligations. While I accept the principle put forward, however, I do not think it applies in the context of this case for the reasons outlined above. The interpretation given to the Purchase Agreement by the application judge is not inconsistent with the Trustee's fiduciary obligation to maximize unitholder value. Indeed, it is consistent with that obligation.

58     Finally, Mr. Leon emphasizes the importance of the word "nothing" in the opening language of sections 4.4(2) and 4.4(3) of the Purchase Agreement. Both provisions open with the words "Notwithstanding anything contained in Section 4.4(1), until the Unitholder Approval, *nothing* shall prevent the Board from ..." [emphasis added]. Mr. Leon submits that "nothing" means what it says, and must be given the full scope of that meaning, in order to ensure that "nothing" in the Purchase Agreement or otherwise is permitted to stand in the way of the Trustees performing their duty to maximize shareholder value. This point involves parsing the Purchase Agreement in a microscopic fashion that is a little too fine, in my view. The use of the word "nothing" in sections 4.4(2) and 4.4(3) is nothing more than a different way of saying "Notwithstanding anything contained in Section 4.4(1) ... *the Board is not prevented from ...*". I would not ascribe to it the expanded role that HCPI proposes.

*The Meaning of "Bona Fide"*

Case 09-10138-MFW    Doc 14225-52    Filed 08/15/14    Page 74 of 108

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

59     The appellants also attack the conclusion of the application judge that the HCPI Acquisition Proposal was not a "*bona fide*" offer. She accepted the Ventas submission that "a proposal made in breach of a contractual obligation not to make such a proposal cannot be considered to be *bona fide*," noting that sections 4.4(2) and 4.4(3) of the Purchase Agreement contemplate an Acquisition Proposal from a third party "that did not result from a breach of ... Section 4.4".

60     There was much debate about the meaning of "*bona fide*". The application judge viewed it as meaning acting "in good faith; sincere, genuine", relying upon *The Oxford English Dictionary*. [7] She found that the HCPI Acquisition Proposal was not *bona fide* because it was made in breach of the HCPI Standstill Agreement, which Sunrise was obliged by s. 4.4 to enforce. The appellants agree that *bona fide* means "genuine" or "made in good faith" but submit that a *bona fide* Acquisition Proposal, as contemplated by the Purchase Agreement, is one that is "genuine" or "authentic" in the sense that it is not a sham and is reasonably capable of becoming a Superior Proposal, and that this decision must be made in the context of the entire situation.

61     In the end, there is not much difference between the parties as to the meaning of the term "*bona fide*". As with the principles of contract interpretation, they differ on the application of the term in the circumstances of this case. Given the language of the Purchase Agreement, and the context in which it was negotiated — particularly the language "that did not result from a breach of this Section 4.4" in sections 4.4(2) and 4.4(3) — I do not think the application judge erred in her assessment and use of the term "*bona fide*" here.

### *Miscellaneous*

62     Two additional points were made by the appellants, but need not be dealt with at length.

63     First, HCPI argued that Sunrise had given its prior consent to HCPI to make its subsequent Acquisition Proposal following completion of the auction process and the execution of the Purchase Agreement. This consent is said to derive from the waiver Sunrise gave to both HCPI and Ventas as part of the invitation to bid in the second round. The application judge made a specific finding against this position, however, concluding that the December 29, 2006 letter "cannot possibly be construed as constituting Sunrise REIT's prior written consent as that term is used in the Standstill Agreement." There is no basis for interfering with this finding.

64     Secondly, HCPI submitted that the position of Ventas on these applications was tantamount to saying that the benefit of the HCPI Standstill Agreement had been assigned to it. The application judge correctly found that there was no merit in this argument. I agree with her that neither the Standstill Agreement nor its benefits had been assigned to anyone, and no one was taking the position that they had.

### *The HCPI Cross-Appeal*

65     HCPI applied for a declaration that communications between it and SSL regarding Sunrise were permitted. The application judge declined to deal with this request, given her ruling which effectively precluded the HCPI Acquisition Proposal from being pursued. She concluded the application moot.

66     I agree and for the same reason find it unnecessary to deal with the cross-appeal for the same relief.

### Conclusion

67     For the foregoing reasons, then, I would dismiss both the appeal and the cross-appeal.

68     If the parties are unable to agree as to costs, they may make brief written submissions in that regard, not to exceed five pages in length.

69     In closing, I would like to thank all counsel for their able presentations and assistance.

### *J. MacFarland J.A.*:

Case 09-10138-MFW   Doc 14225-52   Filed 08/15/14   Page 75 of 108

Ventas Inc. v. Sunrise Senior Living Real Estate..., 2007 ONCA 205, 2007...

2007 ONCA 205, 2007 CarswellOnt 1705, [2007] O.J. No. 1083, 222 O.A.C. 102...

I agree.

**H.S. LaForme J.A.:**

I agree.

*Appeal dismissed; cross-appeal dismissed.*

Footnotes

1   *BG Checo International Ltd. v. British Columbia Hydro & Power Authority,* [1993] 1 S.C.R. 12 (S.C.C.) at 23-24; *Scanlon v. Castlepoint Development Corp.* (1992), 11 O.R. (3d) 744 (Ont. C.A.) at 770.

2   *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1998), 40 B.L.R. (2d) 1 (Ont. Gen. Div. [Commercial List]) at para. 403, aff'd (1999), 45 O.R. (3d) 417 (Ont. C.A.); *Venture Capital USA Inc. v. Yorkton Securities Inc.* (2005), 75 O.R. (3d) 325 (Ont. C.A.) at para. 26; *Eli Lilly & Co. v. Novopharm Ltd.,* [1998] 2 S.C.R. 129 (S.C.C.) at 166-68 [*Eli Lilly*].

3   *Eli Lilly, ibid.* at 166; *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.* (1998), 114 O.A.C. 357 (Ont. C.A.) at paras. 25-27 [*Kentucky Fried Chicken*].

4   *Consolidated-Bathurst Export Ltd. c. Mutual Boiler & Machinery Insurance Co.* (1979), [1980] 1 S.C.R. 888 (S.C.C.) at 901; *Kentucky Fried Chicken, ibid.*

5   The Proposal has to be a Superior Proposal; Sunrise has to notify Ventas of the Proposal and provide it with all relevant documentation; Ventas had the right to match the Proposal within five days (as defined) and, if it chooses not to, to terminate the Agreement and receive the break fee (see also, section 5.3 and Schedule "B" (definition of "Termination Payment")).

6   That meets the section 4.4(2) requirements of being *bona fide* and unsolicited.

7   2d ed., *s.v.* "bona fide".

---

**End of Document**                    Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 160

**CITATION: VERDELLEN** v. **MONAGHAN MUSHROOMS LTD**, 2011 ONSC 5820
**COURT FILE NO.:** CV-11-9162-CL
**DATE:** 20111007

2011 ONSC 5820 (CanLII)

### ONTARIO

### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

| | | |
|---|---|---|
| BETWEEN:<br><br>**JACK VERDELLEN**<br><br><br>Applicant<br><br>– and –<br><br>**MONAGHAN MUSHROOMS LTD.,**<br>**PRICEWATERHOUSECOOPERS INC.**<br><br>Respondents | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Patrick J. Cotter, for the applicant<br><br><br><br>Paul J. Martin and Sarah J. Armstrong, for<br>the respondent Monaghan Mushrooms Ltd.<br><br>T. Van Klink, for the respondent<br>PricewaterhouseCoopers Inc.<br><br><br>**HEARD:** September 27, 2011 |

**Newbould J.**

[1]     The applicant Jack Verdellen applies for a declaration that he is the owner of certain patent rights outside of North America for an invention which involves a method of inhibiting green mould in mushrooms. The invention was said to have occurred while Mr. Verdellen was employed by Rol-land Farms Limited ("Rolland"). Mr. Verdellen claims ownership under an agreement between him and Rolland said to have been negotiated orally and put in writing dated December 1, 2008

[2]     Rolland applied for protection under the CCAA on December 10, 2008 and the Initial Order was made that day. A sale process in the CCAA proceedings was undertaken and the respondent Monaghan Mushrooms Ltd. ("Monaghan") purchased the business of Rolland under

an agreement of purchase and sale dated September 21, 2009. That agreement closed on November 6, 2009 under an amended vesting order dated October 27, 2009. Monaghan takes the position that Mr. Verdellen cannot establish an agreement between him and Rolland and that Monaghan acquired the patent rights in question in good faith for value without notice of any rights of Mr. Verdellen to the patent rights under a court ordered process that provided Monaghan with a vesting order. Monaghan also takes the position that if there were an agreement, it would be void under s. 51 of the Patent Act and as a preference under s. 95 of the BIA.

**Existence of agreement**

[3]     Mr. Verdellen's evidence is that he commenced work at Rolland as a consultant in 1994-1995 and became Vice-President, Production in November 2006. His evidence is that at that time, he orally agreed with Mr. Vander Pol, the president and chief executive officer of Rolland, that he would own the rights to whatever he invented provided that Rolland was able to get the benefit of the rights in North America. In July 2007 he and another Rolland employee invented materials and methods to be used for the prevention and/or control of green mould in the production of mushrooms.

[4]     Mr. Verdellen's further evidence is that in late 2008 he told Mr. Vander Pol that he intended to leave the company and go back to Holland but that in order to keep him, a proposal was made by Rolland in writing in a document dated December 1, 2008 which confirmed his ownership of the invention and the patent rights outside of North America. The contractual rights claimed by Mr. Verdellen are contained in a document dated December 1, 2008 signed by Mr. Vander Pol on behalf of Rolland and by Mr. Verdellen. Mr. Verdellen is unable to say when he signed the document. He has never produced the original document. The date of December 1, 2008 is three days after BMO delivered a notice of intention to enforce security against Rolland and shortly before Rolland commenced its CCAA proceedings.

[5]     The December 1, 2008 document includes the following:

2011 ONSC 5820 (CanLII)

2011 ONSC 5820 (CanLII)

The information below summarizes how the R&D findings are to be handled to the mutual benefit of Rol-land Farms and Jack Verdellen:

It is jointly recognized that the R&D activities carried on to date would not have been possible without the combined efforts of Jack Verdellen, Nader Gheshlaghi and Rol-land Farms.   Jack has provided the ideas, Nader has carried out the research and Rol-land has funded the activities.

…

Given Jack's contributions to Rol-land's operations over the past 3 years, and given Rol-land's contributions to the R&D program over that same time period, Rol-land and Jack agree to the following settlement:

- Rol-land will transfer the world rights to "Pepe" to Jack to continue with a world  application.
- Rol-land must retain the North American rights to "Pepe" in order to protect its competitive advantage.

…

This agreement is not transferable without the written consent of both Jack Verdellen and Rol-land Farms

[6]     Monaghan refers to several pieces of evidence and suspicious circumstances to assert that there was never any agreement between Mr. Verdellen and Rolland. It also asserts that there was no agreement on all essential terms, there was no consideration flowing to Rolland and there is no evidence of communication of any acceptance by Mr. Verdellen to Rolland.

[7]     This is an application. In my view there are too many contested factual issues to determine at this stage whether or not there was a binding agreement between Mr. Verdellen and Rolland. During the course of the oral argument I made that determination.

[8]     What remains is whether on the assumption that a binding agreement as claimed by Mr. Verdellen was made, there are any grounds available to support a declaration of the rights of the parties.

**Purchase agreement and vesting order**

Page: 4

[9]     The agreement of purchase and sale dated September 21, 2009 between Rolland and Monaghan closed on November 6, 2009. Approval to the agreement and a vesting order was made on October 5, 2009 and an amended approval and vesting order was made on October 27, 2009. Mr. Verdellen takes the position that the agreement of purchase and sale did not transfer to Monaghan the rights to the patent outside of North America and further takes the position that if necessary, the vesting order should be amended to make that clear.

[10]     The agreement of purchase and sale provided for the sale of a number of assets, including the Intellectual Property. Intellectual Property was broadly defined as follows, in part:

> "Intellectual Property" means all of the intellectual property of whatever nature and kind owned by or licensed to the Vendor in respect of or associated with the Business as presently constituted, including all domestic and foreign trademarks,… and all patents… whether registered or unregistered, and all applications for registration thereof, and… inventions…; in which, for further certainty, includes… all products, processes and inventions developed by or for or used by the Business in connection with the control or eradication of green mould disease, including any patent applications for strains of biological control for green mould for the treatment of spawn;

[11]     It is to be noted that this definition of Intellectual Property is in respect of the "Business". Mr. Verdellen asserts that the definition of Business in the agreement of purchase and sale excludes any patent rights outside of North America. Business is defined in the agreement to have the meaning set out in the recitals. The recital refers to the order under which the Monitor was authorized and directed to conduct a sale process for offers for the sale "of the mushroom production and marketing business" of Rolland. Mr. Verdellen asserts that because Rolland only carried on its mushroom business in North America, any patent rights outside of North America were not included in the agreement of purchase and sale.

[12]     I cannot accept that contention. The definition of Business in the agreement of purchase and sale as being "the mushroom production and marketing business" of Rolland by its language did not restrict that business to any particular locality or jurisdiction. The business of Rolland included making patent applications for the invention in question, being an invention to control or eradicate green mould disease. Prior to the sale, Rolland had filed an international PCT

2011 ONSC 5820 (CanLII)

2011 ONSC 5820 (CanLII)

application, which was an application to commence exploiting patent rights throughout the world. That was part of its business.

[13]    On the day of the closing, Rolland executed and delivered to Monaghan an assignment of patent rights that specifically contained worldwide rights to the invention in question. The recitals in the assignment referred to the invention for which PCT and U.S. applications had been filed and recited that under the agreement of purchase and sale Rolland had agreed to sell that invention to Monaghan. The operative provisions of the assignment contained, in part, the following:

> The Assignor does hereby sell, assign and transfer to Monaghan and its successors and assigns:
>
> (i)    all of Assignor's entire right, title and interest to the Patent, including any and all inventions described therein, and in any and all national phase patent applications, continuations-in-part, continuations, divisions, substitutes, re-issues, re-examinations, or extensions thereof, and all other applications for the Patent relating thereto which have been filed, or hereafter shall be filed in all the countries of the world, including in Canada;

[14]    It is clear in my view that the agreement of purchase and sale covered the worldwide patent rights for the invention in question.

[15]    The vesting order as amended vested in Monaghan the assets described in the agreement of purchase and sale. This included the worldwide patent rights for the invention in question. Thus the vesting order should not be amended.

**Purchaser for value without notice**

[16]    The evidence appears clear that prior to the closing of the purchase of the mushroom business by Monaghan from Rolland, the publicly available information regarding ownership of the invention in question and any related patent applications disclosed Rolland as the owner.

[17]    On February 26, 2008, a U.S. patent application was filed in which Mr. Verdellen and another Rolland employee named Nader Gheshlaghi were named as the applicants and inventors

2011 ONSC 5820 (CanLII)

and Rolland was named as the assignee for the patent application. On March 18, 2008 Mr. Verdellen and Mr. Gheshlaghi executed a written assignment in favour of Rolland in which they assigned to Rolland Farms their entire right, title and an interest throughout the world in the inventions which were the subject of the U.S. patent application. This assignment was recorded in the U.S. patent office on May 13, 2008. Also on March 18, 2008 a power of attorney was signed by Rolland as assignee which indicated that Rolland was the owner of the U.S. application and this power of attorney was also recorded in U.S. patent office on May 13, 2008.

[18]    Prior to the closing of the purchase, Monaghan and its advisers conducted due diligence regarding the business to be acquired, including information on patents. All of the information provided to Monaghan was consistent with the publicly available information that Rolland held the ownership interest in the patent rights in question. Also, at no relevant time was the Monitor aware of any interest of any third party, including Mr. Verdellen, in the patent rights and Mr. Verdellen never told the Monitor of his alleged interest even though a representative of the Monitor met with Mr. Verdellen on a number of occasions. At no relevant time did representatives of Rolland advice the Monitor or Monaghan of any alleged interest of Mr. Verdellen in the patent, including at a meeting on November 2, 2009, four days before the closing of the sale, which was held in part to address an issue of an apparent deletion of research and development from Rolland's computer system.

[19]    Counsel for Mr. Verdellen refers to evidence that on October 2, 2009 Mr. Verdellen met with a lawyer at Gowlings, the solicitors for Rolland dealing with patent applications for the invention in question, and told the lawyer that an international patent application filed under the Patent Cooperation Treaty by Rolland belonged to him. The lawyer, who was a junior lawyer not acting on the matter, advised Mr. Verdellen that there was a conflict and that the firm could not act for him. The lawyer made a memorandum to file. Although Rolland had authorized Gowlings to disclose all of the information in their patent files to Monaghan prior to closing, the physical files were not received by Monaghan until early December 2009, at least one month after the sale transaction closed. There is no evidence, however, that Monaghan was told by Gowlings or anyone else prior to the closing of Mr. Verdellen's alleged ownership interest in the patent.

2011 ONSC 5820 (CanLII)

Page: 7

[20]    In my view, it is clear from the evidence that prior to the closing of the purchase of the business by Monaghan from Rolland, Monaghan was never provided, nor did it learn of, any information of Mr. Verdellen's alleged interest in the patent, in spite of Monaghan's due diligence process.

[21]    Monaghan contends that if there is a binding agreement between Mr. Verdellen and Rolland regarding patent rights, the interest of Mr. Verdellen is equitable and that as Monaghan, is a *bona fide* purchaser for value without notice of the agreement between Mr. Verdellen and Rolland, it took title to the patent rights free and clear of any equitable interest of Mr. Verdellen.

[22]    The doctrine of *bona fide* purchaser for value without notice is described by Prof. Ziff in B. Ziff, *Principles of Property Law*, 5th ed. (Carswell: Toronto, 2010) at page 460 as follows:

> Equity acts on the conscience of the relevant parties; that is why a *bona fide* purchaser for value of the legal title who buys land without notice of an equitable interest will not be bound by that interest.  The good faith purchaser has what we would now call a clear conscience, and the present of such a person can alter the ordering of rights.

[23]    Although this statement refers to land, there is no principled reason why the principle would not apply to any form of property. A contractual right to intellectual property is property not taken by physical possession. It is a chose in action. This is made clear from the judgment of Morden J.A. in *DiGuilo v. Boland*, [1958] O.R. 384 in which he sated the following:

> To determine the legal issue thus presented, it is necessary to consider the law relating to choses in action and their assignability, first in England then in Ontario. In *Torkington v. Magee*, [1902] 2 K.B. 427, Channell, J., said, at p. 430:-
>
>> 'Chose in action' is a known legal expression used to describe all personal rights of property which can only be claimed or enforced by action, and not in taking physical possession.
>
> The term covers multifarious rights, many diverse in their essential nature, such as debts, company shares, negotiable instruments and rights of action founded on tort or breach of contract.
> …
> The nature of the rights of a purchaser under an agreement of sale of land should, at this point, be briefly considered. His rights are choses in action and are capable

of assignment in equity: *Wood v. Griffith* (1818), 1 Swan. 43, at pp. 55-6. The right to specific performance was and is an equitable chose and the right to damages a legal chose in action.

[24]    See also Prof. Ziff at p. 76 in which he states that the right to assign choses took a long time to mature but eventually the scope of the category was extended to include a wide range of other intangibles, including copyrights, trademarks, patents etc.

[25]    Gordon Henderson, Q.C., at one time the undoubted leader of the intellectual property bar in Canada, described the doctrine of a *bona fide* purchaser for value without notice as it related to patents in G. Henderson, "Problems Involved in the Assignment of Patents and Patent Rights", *Canadian Patent Reporter,* Vol. 60, p. 237 at pp. 248-9 as follows:

> An equitable assignment exists where there is an agreement rather than a complete and absolute assignment.
>
> In equity (and therefore apart from s. 53 of the Patent Act) an assignee of a patent takes title subject to the equities.  Accordingly, a subsequent purchaser of a patent who has knowledge of a prior equitable assignment takes title subject to the prior equitable interest.  But an assignee who purchases a patent for valuable consideration without notice of a prior equitable assignment takes free and clear of it.

[26]    The doctrine of *bona fide* purchaser for value without notice has been applied in intellectual property cases. See *R Griggs Group Ltd v. Evans (No 2),* [2005] Ch. 153, [2004] at para. 54.

[27]    What is the interest of Mr. Verdellen in his contract with Rolland, assuming the contract to exist? Mr. Verdellen takes the position that the agreement transferred the patent rights to him with no necessity for any further transfer, and he has attempted to have his rights under the agreement recognized in the European Patent Office based on that agreement.

[28]    Monaghan contends that Mr. Verdellen's interest under the agreement, assuming it to exist, is an equitable interest as the agreement states that Rolland "will transfer" the world patent rights to Mr. Verdellen. That is, it is an agreement to transfer those rights rather than an

2011 ONSC 5820 (CanLII)

agreement under which the rights have been transferred to Mr. Verdellen. Monaghan compares the contract with an agreement of purchase and sale of land in which it is clear that the interest of the purchaser before closing is an equitable interest.

[29]    The agreement between Mr. Verdellen and Rolland is not as clear as a typical agreement of purchase and sale in which a future closing date is specified. However in my view, in the circumstances in which the agreement was made, and taking into account the express language "The information below summarizes how the R&D findings are to be handled…" and "Rol-and will transfer…to Jack", the agreement was an executory agreement in that the transfer did not take place in the agreement itself but rather was a promise that it would take place at some time in the future. Thus the interest of Mr. Verdellen under the contract was a chose in action and the right to specific performance was, as stated by Morden J.A., an equitable chose an action. That is, Mr. Verdellen rights under the contract, assuming they existed, were equitable rather than legal.

[30]    This notion of Mr. Verdellen's interest being an equitable interest is captured by the maxim when something is to be done under an agreement that "equity considers done what ought to be done". See *Re: Grant Forest Products Inc*. (2010), 101 O.R. (3d) 383 (C.A.), aff'g (2009), 59 C.B.R. (5th) 127.

[31]    In the circumstances, in my view, Monaghan is correct in its position that even if Mr. Verdellen had a binding contract with Rolland covering the patent rights in issue, Monaghan acquired those patent rights as a good faith purchaser without notice of Mr. Verdellen's rights and thus acquired them free and clear of any interest Mr. Verdellen might otherwise have had in them.

**Section 51 of the Patent Act**

[32]    Apart from the doctrine of being a bona fide purchaser for value without notice, Monaghan relies upon section 51 of the Patent Act to defeat any interest that Mr. Verdellen

2011 ONSC 5820 (CanLII)

might otherwise have in the patent rights in dispute. That section, and the preceding two sections provide:

> **49**. (2)  Where an applicant for a patent has, after filing the application, assigned his right to obtain the patent, or where the applicant has either before or after filing the application assigned in writing the whole or part of his property or interest in the invention, the assignee may register the assignment in the Patent Office in such manner as may be determined by the Commissioner, and no application for a patent may be withdrawn without the consent in writing of every such registered assignee.

> **50.** (2)  Every assignment of a patent, and every grant and conveyance of any exclusive right to make and use and to grant to others the right to make and use the invention patented, within and throughout Canada or any part thereof, shall be registered in the Patent Office in the manner determined by the Commissioner.

> **51.** Every assignment affecting a patent for invention, whether it is one referred to in section 49 or 50, is void against any subsequent assignee, unless the assignment is registered as prescribed by those sections, before the registration of the instrument under which the subsequent assignee claims.

[33]    The effect of section 51 of the Patent Act seems obvious. In *Apotex Inc. v. Wellcome Foundation Ltd*., [2000] F.C.J. No. 1771 (F.C.A.) Rothstein J.A. stated at para. S00:

> Having regard to both sections [Sections 50(2) and 51], it is clear that a purpose of registration under subsection 50(2) is to secure an assignee's priority as against subsequent assignees. Failure to register will deprive an assignee of priority against subsequent assignees and, as between them, an unregistered assignment is "void".

[34]    Mr. Verdellen takes the position that section 51 has no application to the patent rights in question, being the worldwide rights outside of North America, as he asserts that the section deals only with registration in Canada.

[35]    Monaghan looks to the process in which a foreign patent application was made and then brought into Canada and contends that the effect of the Patent Rules under the Patent Act makes section 51 of the Patent Act applicable to the foreign patent rights outside of North America.

Page: 11

[36]    The Patent Cooperation Treaty ("PCT") is an international patent law treaty to which Canada is a signatory providing a unified procedure for filing patent applications to protect inventions in each of its contracting states.  A patent application filed under the PCT is called an international application, or PCT application. The PCT provides for the filing of one patent application, in one language, with effect in each of its contracting states, instead of filing several separate national and/or regional patent applications. A PCT application does not itself result in the grant of a patent, since there is no such thing as an "international patent" or a "PCT patent". A PCT application, which establishes a filing date in all contracting states, must be followed up with the step of entering into national and/or regional phases in order to proceed towards the grant of national and/or regional patents.

[37]    On February 26, 2009, a PCT application was filed by Rolland in the Canadian Intellectual Property Office. On August 10, 2010, after the completion of its purchase from Rolland, Monaghan caused the PCT application to enter the national phase in Canada so as to become a Canadian patent application. This was filed with the Canadian Intellectual Property Office. At the same time Monaghan registered with that office the assignment of patent rights that it had acquired from Rolland on the closing of its purchase from Rolland.

[38]    Section 59 of the Patent Rules under the Patent Act provide:

> 59.    When an international application becomes a PCT national phase application, the application shall thereafter be deemed to be an application filed in Canada and the Act and these Rules shall thereafter apply in respect of that Application.

[39]    Thus by virtue of that section, when the PCT application became a Canadian national phase application on August 10, 2010, the application was deemed to be an application filed in Canada and the Patent Act thereafter applied to it.

[40]    Monaghan asserts that once engaged, section 51 does not merely prohibit a prior unregistered assignment from affecting title to a Canadian patent or application in respect of which a subsequent assignment has been registered but rather renders the entire prior unregistered assignment "void as against any subsequent assignee".   Therefore, Monaghan

2011 ONSC 5820 (CanLII)

asserts, the December 1, 2008 agreement relied upon by Mr. Verdellen, which was not registered before August 10, 2010, is void as against the assignment from Rolland registered on that day by Monaghan both in respect of Canadian patent or application rights and such rights elsewhere in the world.

[41]    It is understandable that when an international PCT application becomes a national phase application in Canada, the national phase application becomes subject to the Patent Act and a contest between two claimants to those Canadian patent rights would be governed by the registration provisions in section 51 of the Patent Act. Can it be said, however, that a contest between those two claimants to foreign patent rights would be governed by section 51 of the Patent Act?  In my view it cannot.

[42]    While the Parliament of Canada has the legislative competence to enact laws having extraterritorial effect, it is presumed not to intend to do so, in the absence of clear words or necessary implication to the contrary. See *Society of Composers, Authors & Music Publishers of Canada v. Canadian Assn. of Internet Providers,* [2004] 2 S.C.R. 427 at para. 54 per Binnie J. Neither section 51 of the Patent Act nor section 59 of the Patent Rules expressly state that the provisions of section 51 are applicable to a contest between patent claimants in a foreign jurisdiction, nor can it be said that it is a necessary implication to come to that result. In my view it would be in the interests of international comity to leave such foreign contests to the laws of the foreign states in question.

[43]    Monaghan refers to the European Patent Convention which provides that the applicable law in each Contract State in Europe governs a patent application and to the provisions of the U.K. Patent Act which contain provisions similar to section 51 of the Canadian Patent Act. It also refers to similar provisions in the Australian Patent Act. It does so because Mr. Verdellen has asserted ownership of the patent rights in both Europe and in Australia. Monaghan asserts that the application of section 51 of the Patent Act would thus be consistent with international patent practice. To my mind the fact that these other jurisdictions have provisions governing a contest between patent claimants in those jurisdictions is all the more reason based on principles

2011 ONSC 5820 (CanLII)

Page: 13

of international comity to construe section 59 of the patent rules and section 51 of the Patent Act as not being applicable to disputes between patent claimants in those jurisdictions.

[44]    Thus in my view Monaghan gains no protection for its patent rights against Mr. Verdellen under section 51 of the Patent Act insofar as those rights involve the rights to Europe or elsewhere outside of Canada.

## S. 95 preference

[45]    Monaghan takes the position that the purported agreement relied upon by Mr. Verdellen is dated December 1, 2008, within three months of the filing of the CCAA application, and is therefore void under section 95 of the BIA. Section 95 of the BIA is applicable to a proceeding under the CCAA by virtue of section 36.1 of the CCAA.

[46]    In my view Monaghan has no status to act under section 95 the BIA. The right under section 95 to commence an application is one that in bankruptcy can only be brought by a trustee in bankruptcy. See *Tucker v. Aero Inventory (UK) Ltd.* [2011] O.J. No. 3816 per Morawetz J. at paras. 137 and 166. By virtue of section 36.1 of the CCAA, it is the Monitor who would have the right to make an application under section 95 of the BIA. Monaghan is not a creditor and thus would not be in a position to apply under section 38 of the BIA, also applicable to a CCAA proceeding, to acquire any right of action under section 95 of the BIA from the Monitor.

[47]    Even if Monaghan had status to act under section 95 the BIA, it would not be possible on an application to make a determination of the matter as there are facts in dispute.

## Conclusion

[48]    The application of Mr. Verdellen is dismissed. The cross-application of Monaghan is allowed in part. It is declared that the purported agreement of December 1, 2008 between Mr. Verdellen and Rolland and any purported oral agreement between them regarding the same matters, is void as against Monaghan as a *bone fide* purchaser for value from Rolland without notice of any such agreements,

2011 ONSC 5820 (CanLII)

Page: 14

[49]    Monaghan is entitled to its costs. If the costs cannot be agreed, Monaghan may make written submissions, not exceeding three pages in length, along with a proper cost outline, within 10 days and Mr. Verdellen may make reply submissions, no longer than three pages in length, within a further 10 days.

_____

Newbould J.

**Released:**    October 7, 2011

2011 ONSC 5820 (CanLII)

**CITATION: VERDELLEN** v. **MONAGHAN MUSHROOMS LTD**, 2011 ONSC 5820
**COURT FILE NO.:** CV-11-9162-CL
**DATE:** 20111007

2011 ONSC 5820 (CanLII)

## ONTARIO

## SUPERIOR COURT OF JUSTICE

## COMMERCIAL LIST

**B E T W E E N:**

**JACK VERDELLEN**

Applicant

**– and –**

**MONAGHAN MUSHROOMS LTD.,
PRICEWATERHOUSECOOPERS INC.**

Respondents

_____

REASONS FOR JUDGMENT
_____

Newbould J.

Released:        October 7, 2011

TAB 161

2008 CarswellOnt 4218
Ontario Superior Court of Justice

Walt Disney Co. (Canada) Ltd. v. Philhobar Design Canada Ltd.

2008 CarswellOnt 4218, 169 A.C.W.S. (3d) 403, 47 B.L.R. (4th) 306

# The Walt Disney Company (Canada) Ltd. (Applicant) and Philhobar Design Canada Ltd. (Respondent)

Kiteley J.

Heard: May 20, 2008
Judgment: July 14, 2008
Docket: 08CV351408PD1

Counsel: Timothy M. Lowman for Applicant
Kevin L. MacDonald for Respondent

Subject: Corporate and Commercial; Civil Practice and Procedure; Contracts

**Related Abridgment Classifications**

For all relevant Canadian Abridgment Classifications refer to highest level of case via History.

**Headnote**

### Guarantee and indemnity --- Indemnity — When entitled to indemnity — Miscellaneous issues

Warranty and indemnity term in license agreement — Licensor and licensee were Canadian corporations — Licensor was subsidiary of US parents ("parents") — Licensor and licensee entered agreement ("agreement") for specified intellectual properties ("properties") — Agreement contained warranty and indemnity term ("W&I term") requiring licensee to defend and indemnify licensor and parents — Plaintiff commenced action against parents in US state ("action") in relation to some of properties — Licensee refused to defend action — Parents did not file defence but challenged jurisdiction of state court — Licensor brought application to compel compliance with W&I term — Application allowed in part — Licensee was declared to have obligation to defend and indemnify parents in action — Obligation under W&I term was not limited to territory covered by agreement, namely, Canada — W&I term was silent as to geographical limitation — Further, limiting W&I term to Canada was not commercially reasonable, as it would allow licensee to sell outside territory without consequences — Licensor "defended" action so as to trigger obligation under W&I term — Definition of "defend" was sufficiently broad to encompass parents' conduct in contesting jurisdiction of state court — Licensor did not waive enforcement of W&I term by entering appearance in action and failing to bring application at bar for seven months — Licensee was also ordered to pay parents' costs on action as damages for breach of W&I term — However, injunctive relief sought by licensor was not granted.

### Remedies --- Damages — Damages in contract — Miscellaneous

Breach of warranty and indemnity term in license agreement.

### Remedies --- Injunctions — Availability of injunctions — Mandatory injunctions — Enforcement of contractual terms — Miscellaneous

Warranty and indemnity term in license agreement.

2008 CarswellOnt 4218, 169 A.C.W.S. (3d) 403, 47 B.L.R. (4th) 306

**Table of Authorities**

**Cases considered by *Kiteley J.*:**

*Coolbreeze Air Conditioning & Heating v. McCarthy & McCarthy* (1991), 1991 CarswellOnt 3460 (Ont. Gen. Div.) — referred to

*Dumbrell v. Regional Group of Cos.* (2007), 55 C.C.E.L. (3d) 155, 220 O.A.C. 64, 85 O.R. (3d) 616, 2007 CarswellOnt 407, 25 B.L.R. (4th) 171, 279 D.L.R. (4th) 201 (Ont. C.A.) — considered

*Mewburn v. MacKelcan* (1892), 19 O.A.R. 729 (Ont. C.A.) — considered

*RJR-MacDonald Inc. v. Canada (Attorney General)* (1994), [1994] 1 S.C.R. 311, 1994 CarswellQue 120F, 1994 CarswellQue 120, 54 C.P.R. (3d) 114, *(*sub nom. *RJR-MacDonald Inc. c. Canada (Procureur général))* 164 N.R. 1, *(*sub nom. *RJR-MacDonald Inc. c. Canada (Procureur général))* 60 Q.A.C. 241, 111 D.L.R. (4th) 385 (S.C.C.) — followed

*Saskatchewan River Bungalows Ltd. v. Maritime Life Assurance Co.* (1994), [1994] 2 S.C.R. 490, 1994 CarswellAlta 744, [1994] 7 W.W.R. 37, 20 Alta. L.R. (3d) 296, 168 N.R. 381, *(*sub nom. *Maritime Life Assurance Co. v. Saskatchewan River Bungalows Ltd.)* [1994] I.L.R. 1-3077, 155 A.R. 321, 73 W.A.C. 321, 115 D.L.R. (4th) 478, 23 C.C.L.I. (2d) 161, 1994 CarswellAlta 769 (S.C.C.) — referred to

*Traynor v. UNUM Life Insurance Co. of America* (2003), 65 O.R. (3d) 7, [2003] I.L.R. I-4204, 172 O.A.C. 359, 228 D.L.R. (4th) 228, 2003 CarswellOnt 2144, 2 C.C.L.I. (4th) 91 (Ont. Div. Ct.) — referred to

**Statutes considered:**

*Courts of Justice Act*, R.S.O. 1990, c. C.43
s. 128 — referred to

s. 129 — referred to

*Solicitors Act*, R.S.O. 1990, c. S.15
s. 9 — referred to

s. 9(1) — considered

**Rules considered:**

*Rules of Civil Procedure*, R.R.O. 1990, Reg. 194
R. 14.05(3)(d) — referred to

R. 14.05(3)(g) — referred to

R. 14.05(3)(h) — referred to

R. 38.10(1)(a) — referred to

R. 54.02(2)(e) — referred to

WestlawNext® CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

Walt Disney Co. (Canada) Ltd. v. Philhobar Design Canada Ltd., 2008 CarswellOnt 4218

2008 CarswellOnt 4218, 169 A.C.W.S. (3d) 403, 47 B.L.R. (4th) 306

APPLICATION by licensor to compel licensee to comply with warranty and indemnity term in license agreement.

*Kiteley J.*:

**Background**

1     This is an application to enforce certain provisions of a consumer product license agreement. Walt Disney Company (Canada) Ltd. ("Disney Canada") and Philhobar Design Canada Ltd. ("Philhobar"), entered into an agreement ("the License Agreement") effective January 1, 2006 which granted to Philhobar the non-exclusive use of certain defined Creative Works, Trademarks, Branded Icons and Disney Character Artwork (collectively "the Properties") in association with specified consumer goods, including t-shirts.

2     Disney Canada is a wholly owned subsidiary of Disney Enterprises, Inc.("DEI"). The Properties were licensed by Disney Canada from DEI.

3     The Walt Disney Company ("TWDC") and DEI are corporations incorporated pursuant to the laws of the State of Delaware, U.S.A. DEI is a wholly owned subsidiary of TWDC.

4     In or about August, 2007, TWDC and DEI received notice of legal proceedings commenced against them in California by New Name, Inc. ("New Name"). The plaintiff asserted that it is the owner of copyright and trademark rights in the "Reason" design and "Sweet & Toxic", both in Canada and the United States. The plaintiff alleged that certain t-shirts contained unauthorized use of its intellectual property. The t-shirts were designed, manufactured or sold by Philhobar. The t-shirts also display certain intellectual property licensed to Philhobar pursuant to the License Agreement.

5     TWDC gave Philhobar written notice of the action commenced by New Name. Philhobar refused to defend the action, notwithstanding a Warranty and Indemnity term in the License Agreement.

6     TWDC and DEI are represented in that action. They have not filed a defence to the action but have taken steps to challenge the jurisdiction of the California court.

7     In this application, Disney Canada seeks declaratory and other relief to compel Philhobar to comply with the Warranty and Indemnity term of the License Agreement.

**The License Agreement**

8     The relevant terms of the License Agreement are as follows:

**5. Grant of Rights**

5.1 Disney grants to Licensee a non-exclusive license, at Licensee's sole expense, to use the Licensed Material to design, create, manufacture or source, and sell the Products to Authorized Customers as specified in this Agreement or applicable Schedule, during the Term and *in the Territory*, in accordance with the terms of this Agreement.

5.5 . . . As used in this Agreement, "Affiliate" shall mean, with regard to either party, any corporation or other entity that directly or indirectly controls, is controlled by, or is under common control with a party. "Control" of an entity shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies of such entity, whether through ownership of voting securities, by contract or otherwise.

**6. Distribution**

6.1 Licensee agrees to sell the Products only to Authorized Customers in the Distribution Channels as provided in the Agreement or the relevant Schedule. If internet-based selling is permitted hereunder, no orders may be shipped to customers who are located *outside of the Territory*. . .

WestlawNext CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

### 15. Warranty and Indemnity

*15.1 Licensee*

Licensee warrants to Disney that it will conduct its activities under this Agreement in accordance with all applicable Laws. Licensee shall defend and indemnify Disney and its licensors as applicable, and it and their Affiliates, successors and the officers, directors, employees and agents of each of them ("Disney Indemnified Entities") against and hold them harmless from any and all claims, actions, liabilities, losses, expenses of any nature (including without limitation reasonable attorneys' fees), and costs arising out of any third party claim in respect of any actual or alleged breach by Licensee of any representation, warranty or covenant made in this Agreement, or otherwise arising out of Licensee's activities or omissions under this Agreement, including but not limited to claims of product liability and/or claims arising out of Licensee's failure to obtain the full assignment of rights from third parties as described in Paragraphs 11 and 20, provided that:

15.1.1. Disney shall notify Licensee as soon as reasonably practicable of any such claim against any of the Disney Indemnified Entities of which it becomes aware.

15.1.2 Licensee's choice of counsel must be acceptable to Disney and not in conflict with any interest of any of the Disney Indemnified Entities, though Disney's acceptance shall not be unreasonably withheld. Licensee shall have control of the defense of any claims or actions provided that Licensee shall consult in a meaningful way with Disney in respect of the defense of any claim, and further provided that Licensee shall obtain Disney's consent prior to making any admissions, entering into any settlement or compromise, or otherwise taking any steps that would prejudice the interests of Disney Indemnified Entities (such consent not to be unreasonably withheld). . . .

### 16. Termination

16.2 Disney shall have the right at any time to terminate this Agreement . . if one or more of the following events occur . . . :

16.2.2 Licensee delivers Products *outside the Territory* or knowingly sells Products to a third party when Licensee knows or should know in the exercise of prudent business judgment that such sales ultimately will result in delivery *outside the Territory*, . . .

16.4 If Licensee has breached the Agreement by selling Products *outside of the Distribution Channels* authorized herein,. . . [double royalties payable]

### 26. General

. . . This Agreement contains the entire agreement between the parties concerning the subject matter hereof and supersedes any pre-existing or contemporaneous agreement and any oral or written communications between the parties. This Agreement shall be deemed to be an executory agreement entered into in the province of Ontario and the parties agree that the laws and jurisdiction of the Province of Ontario applicable to contracts made and to be fully performed in the Province of Ontario shall apply in all respects to and in the interpretation of this Agreement . . . (*emphasis added*)

9    In Schedule #1 to the License Agreement, the *Territory* is described in paragraph 2 as Canada. At paragraph 10, under the heading "authorized customers and distribution channels", Philhobar is authorized to sell products utilizing the Properties "*in the Territory*" to retailers for resale to the public. Philhobar agreed that it would "not sell the Products to unauthorized Retailers, or to Wholesalers".

*Issue #1: Is the Warranty and Indemnity term of the License Agreement limited to Canada?*

10    The New Name action was commenced in California. Philhobar argued that it's obligation to indemnify is limited to the Territory in the License Agreement, namely Canada. It becomes necessary to interpret paragraph 15.1 to determine whether it is limited to the "Territory" as so defined. As the Ontario Court of Appeal indicated in *Dumbrell v. Regional Group of Cos.* [1]:

The aim is to determine the meaning of the contract against its objective contextual scene.

11    The plain meaning is the starting point. Paragraph 15.1 is silent as to geographical limitation of the indemnity. The plain meaning therefore suggests that the Warranty and Indemnity is not territorially limited.

12    I must consider that plain meaning "against its objective contextual scene". It is the case that Philhobar enjoyed a license in Canada only. It's rights were situated in Canada. But that does not mean that it's obligations were territorially limited. I note that in paragraph 16.2.2, Disney Canada had the right to terminate if Philhobar delivered products *outside the Territory*. In paragraph 16.4, if the Licensee sold outside the Distribution Channels *in the Territory*, it was liable for increased royalty payments. The License Agreement clearly contemplated that Philhobar might breach by selling *outside of Canada*.

13    The interpretation suggested by counsel for Philhobar is not commercially reasonable because it would allow a Licensee to sell *outside the Territory* without consequences. It is only logical that the Warranty and Indemnity term of the License Agreement would be engaged regardless of the location of the breach.

14    I am satisfied that the interpretation of the License Agreement is resolved on that basis. However, since the respondent raised a further issue, I will address it. The affidavit of the President of Philhobar indicates that he was directly involved in the negotiations with Disney Canada. He was presented with the applicant's standard form licensing agreement and "was advised that [he] could not amend the Agreement, and [he] had to execute it as it was". He was also "specifically advised that [their] rights and obligations under the Agreement only applied to Canada". He was "advised and the Agreement specifically stated, that the territory was "Canada".

15    Counsel for the plaintiff rightly challenges that evidence. Assuming the President has personal knowledge and therefore his evidence on what might be a material point is not hearsay, it is fatal that the affidavit failed to provide the identity of the person or persons who gave that advice. Indeed, it isn't clear that all of that "advice" emanated from a representative of Disney Canada or from another source, such as Philhobar's counsel. It is impossible for the applicant to respond under those circumstances. The respondent has failed to provide sufficient evidence on which the strength of this assertion can be assessed.

### Issue #2: Are TWDC and DEI "affiliates"?

16    Disney Canada is not named in the California action. On behalf of the applicant, the affidavit of David K. Thompson indicates that TWDC and DEI are "affiliates" within the meaning of s. 5.5 of the License Agreement. Thompson is Senior Vice President, Deputy General Counsel — Corporate and Assistant Secretary of TWDC and Senior Vice President, Counsel and Secretary of DEI.

17    In the affidavit filed on behalf of Philhobar, the President takes no issue with that evidence. In the factum and in submissions, counsel for the respondent argued that a party is required to introduce the best evidence and, by failing to introduce corporate and other relevant documentation to establish the extent and degree of affiliation (if any), the applicant has failed to demonstrate it is entitled to bring this application.

18    If the evidence of Thompson had been challenged, I might be sympathetic to this submission. However, a senior official of both corporations has deposed to facts. The President of the respondent did not challenge those facts. There is nothing in the record to the contrary. In these circumstances, I am satisfied that TWDC and DEI are "affiliates" and that Disney Canada is therefore entitled to invoke the Warranty and Indemnity term of the License Agreement.

### Issue #3: Has Disney Canada "defended" the New Name action?

19    As indicated above, paragraph 15.1 requires the Licensee to "defend" and indemnify. Counsel for the respondent takes the position that "defend" means to deny, contest, or oppose an allegation or claim [2] and that, by resisting jurisdiction in California, TWDC and DEI have not "defended" and therefore the Warranty and Indemnity obligation does not apply.

WestlawNext. CANADA Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

20      I disagree. The definition of "defend" is sufficiently broad to encompass contesting the jurisdiction in which the action was brought.

### Issue #4: Has Disney Canada waived its rights under the License Agreement?

21      Counsel for the respondent argued that by retaining counsel, entering an appearance in the California action and then failing to bring this application in Ontario for seven months, the applicant must be taken to have waived its entitlement to enforce the Warranty and Indemnity term.

22      Waiver occurs where the party waiving had full knowledge of contractual rights and had an unequivocal and conscious intention to abandon them. [3]

23      The evidence on behalf of the applicant is that by letter dated August 15, 2007, TWDC notified Philhobar of the claim pursuant to paragraph 15.1 of the License Agreement. As a result of Philhobar's failure to defend the action and its failure to agree to indemnify TWDC and DEI, Disney Canada assumed responsibility for the payment of costs, fees and expenses of the defense of DEI and TWDC.

24      On behalf of the respondent, the President's affidavit indicates that by letter dated September 14, 2007, it's counsel advised that it did not have an obligation to indemnify when the proceedings were launched in the United States.

25      The evidence on this record falls far short of establishing waiver.

### Issue #5: Is the application premature?

26      The affidavit on behalf of the applicant includes invoices from the law firm dated October 23, 2007, November 15, 2007, January 7, 2008, January 31, 2008, and February 29, 2008. According to the affidavit of Noonan, the total as of the date of the affidavit in March, 2008 was $79, 241.02. The invoices indicate that considerable effort has been expended in motions to dismiss.

27      Counsel for the respondent argued that the application is premature for two reasons. First, because the action is in its early stages. The amount of the costs is undetermined. Second, TWDC and DEI are seeking to recover costs in the California action. If the respondent is obligated to comply with the indemnity, the extent of its obligation will not be known until the recovery of costs is established.

28      As counsel for the applicant argues based on *Mewburn v. MacKelcan* [4], "indemnify" may mean either to prevent loss, so that it does not occur, or to make reimbursement or compensation after the loss has occurred. But in that case, a judgment had been granted against the plaintiff. The court held that it was not necessary for the plaintiff to *pay* the judgment before looking for the indemnification. The trial judge issued a declaration that the plaintiff was entitled to be indemnified and he ordered a reference to the Master to take an account of how much was due and payable under that judgment. The Court of Appeal dismissed the appeal.

29      I do not agree that the application is premature. The applicant is entitled to declaratory relief. But the fact that the amount of the legal fees and disbursements is uncertain and that the exposure of Disney Canada (through its affiliates TWDC and DEI) to paying the fees and disbursements charged by its own counsel is subject to recovery of costs in the California action if TWDC and DEI are successful has an impact on how the damages will be addressed.

### Issue #6: Relief sought

30      The applicant seeks the following:

   (a) A declaration that the Respondent is obliged to defend The Walt Disney Company "TWDC" and Disney Enterprises, Inc. ("DEI") in U.S. District Court for the Central District of California, no. CV 07-5034 PA (RZx) (the

"Action") pursuant to the terms of a written Consumer Products License Agreement dated effective January 1, 2006 ("the Agreement");

(b) A declaration that the Respondent is obliged to indemnify and hold harmless TWDC and DEI pursuant to the terms of the Agreement, in respect of any amount that they, or either of them, may be adjudged liable to pay in the Action, including damages, pre and post-judgment interest, costs and other relief;

(c) An interim, interlocutory and permanent mandatory order requiring the Respondent to defend and indemnify TWDC and DEI in the Action;

(d) Special damages, in an amount to be determined, for all costs, fees and expenses incurred by Walt Disney Company (Canada) Ltd. in defending the Action, together with pre and post-judgment interest pursuant to sections 128 and 129 respectively of the Courts of Justice Act, R.S.O. 1990, c. C.43;

(e) The costs of this Application on a substantial indemnity basis; and

(f) Such further and other relief as Counsel may advise and this Honourable Court may permit.

31    This is an appropriate application under rules 14.05(3)(d),(g) and (h) for the determination of rights that depend on the interpretation of a contract. No material facts are in dispute.

32    The applicant seeks a declaration that the respondent is obliged to defend, indemnify and hold harmless *the affiliates of Disney Canada*, namely TWDC and DEI. By its terms, the License Agreement is between Disney Canada and Philhobar. The declaration must reflect the contractual relationship.

33    The applicant is not asking for an interim or interlocutory injunction where the test in *RJR-MacDonald Inc. v. Canada (Attorney General)* [5] must be satisfied. The applicant seeks a permanent mandatory order compelling Philhobar to comply with a term of the Licence Agreement. Counsel must establish that the respondent has infringed the legal rights of the applicant. While I am satisfied that the respondent has breached paragraph 15.1, a mandatory order does not necessarily follow. Mandatory injunctive relief is ordered in exceptional circumstances. Furthermore, injunctive relief is not an appropriate remedy if an award of damages can afford adequate relief. [6] The court has wide discretion whether to impose an equitable remedy.

34    If I were persuaded to make such an order, it would be to require the respondent to defend in accordance with the term in the License Agreement. As paragraph 15.1.2 indicates, there are issues as to choice of counsel, meaningful consultation, and consent prior to admissions or settlement. A mandatory order requiring the respondent to defend would likely lead to compliance issues.

35    I agree with the applicant that a declaration ought to be made as to the obligations of the respondent. I also agree that an order for damages is appropriate. However, the plaintiff has not satisfied me that it is entitled to additional relief.

36    The applicant seeks special damages for "all costs, fees and expenses" incurred by Disney Canada in an amount to be determined. According to the invoices, the amount owing and for which Disney Canada was responsible at the time of the affidavit was $79,241.02. That is not a judgment. Many factors may affect the final amount to be paid to the lawyers: whether there is any agreement between TWDC and DEI as to the amount of the fees and disbursements; whether there is any agreement between Disney Canada (who is entitled to the indemnity) and TWDC and DEI as to the amount of the fees and disbursements for which Disney Canada is responsible; success in the proceedings; and recovery of costs as against New Name, Inc.

37    The only item of "costs, fees and expenses" claimed as damages is legal fees and disbursements. Unlike the judgment in *Mewburn supra*, the amount for which Philhobar is obligated to pay is uncertain. Counsel for the applicant suggests that I direct a reference pursuant to rule 54.02(2)(e) for the purpose of determining the amount to be paid by Philhobar. Indeed, that was the relief ordered in *Mewburn, supra*, where, it appears, the plaintiff had made some payment on account of the judgment.

38    Paragraph 26 of the License Agreement provides that the law of Ontario applies. Counsel for the respondent therefore argues that Philhobar is entitled to an assessment pursuant to subsection 9(1) of the *Solicitors' Act*[7] which provides as follows:

> Where a person, not being chargeable as the principal party, is liable to pay or has paid a bill either to the solicitor, his or her assignee, or personal representative, or to the principal party entitled thereto, the person so liable to pay or paying, the person's assignee or personal representative, may apply to the court for an order referring to assessment as the party chargeable therewith might have done, and the same proceedings shall be had thereupon as if the application had been made by the party so chargeable.

39    Counsel for the applicant resists an assessment and argued in favour of a reference as indicated above or the trial of an issue under rule 38.10(1)(a). I agree with counsel for the respondent that Philhobar is entitled to the benefit of an assessment.[8]

**Order to Go as Follows**

40    Pursuant to paragraph 15.1 of the License Agreement, this Court declares that the respondent is obliged to defend Disney Canada (and/or its affiliates TWDC and DEI) in the action commenced by New Name, Inc. in California.

41    Pursuant to paragraph 15.1 of the License Agreement, this Court declares that the respondent is obliged to indemnify and hold harmless Disney Canada (and/or its affiliates TWDC and DEI) in the action commenced by New Name, Inc. in California. The respondent shall pay to the applicant such amount as is ordered to be paid by the affiliates TWDC and DEI in the action commenced by New Name, Inc. in California on account of the conduct of the respondent.

42    The respondent shall pay damages for the breach of paragraph 15.1 which consist of the legal fees and disbursements incurred by Disney Canada (and/or its affiliates TWDC and DEI) in connection with the action commenced by New Name, Inc. in California. When the final account has been rendered by counsel, the Master at Toronto shall conduct an assessment pursuant to s. 9 of the *Solicitors Act* and judgment shall issue against the respondent in the amount assessed less the amount of the legal fees and disbursements recovered in the action in California.

43    The motion for a mandatory order is dismissed.

44    The respondent shall pay to the applicant costs of this motion fixed at $7500.00 including fees, disbursements and GST.

*Application allowed in part.*

Footnotes

1    (2007), 85 O.R. (3d) 616 (Ont. C.A.), para. 56

2    *Black's Law Dictionary*, 8th ed. At 450

3    *Saskatchewan River Bungalows Ltd. v. Maritime Life Assurance Co.*, [1994] 2 S.C.R. 490 (S.C.C.)

4    (1892), 19 O.A.R. 729 (Ont. C.A.)

5    [1994] 1 S.C.R. 311 (S.C.C.)

6    *Traynor v. UNUM Life Insurance Co. of America* (2003), 65 O.R. (3d) 7 (Ont. Div. Ct.) at para. 12

7    R.S.O. 1990. c. S. 15

8    *Coolbreeze Air Conditioning & Heating v. McCarthy & McCarthy* (1991), 2 W.D.C.P. (2d) 105 (Ont. Gen. Div.) [1991 CarswellOnt 3460 (Ont. Gen. Div.)]

**End of Document**        Copyright © Thomson Reuters Canada Limited or its licensors (excluding individual court documents). All rights reserved.

TAB 162



[Home] [Databases] [World Law] [Multidatabase Search] [Help] [Feedback]

# United Kingdom House of Lords Decisions



---

**You are here:** [BAILII](#) >> [Databases](#) >> [United Kingdom House of Lords Decisions](#) >> Westdeutsche Landesbank Girozentrale v Islington LBC [1996] UKHL 12 (22 May 1996)
URL: *http://www.bailii.org/uk/cases/UKHL/1996/12.html*
Cite as: [1996] 2 WLR 802, [1996] UKHL 12, [1996] 2 All ER 961, [1996] 2 AC 669, [1996] 5 Bank LR 341, [1996] AC 669

---

[New search] [Buy ICLR report: [1996] 2 WLR 802] [Buy ICLR report: [1996] 2 AC 669] [Help]

---

JISCBAILII_CASE_TRUSTS

Parliamentary Archives,
HL/PO/JU/18/256

## Westdeutsche Landesbank Girozentrale (Respondents) v. Council of the London Borough of

## Islington (Appellants)

### JUDGMENT

### Die Mercurii 22° Mali 1996

Upon Report from the Appellate Committee to whom was referred the Cause Westdeutsche Landesbank Girozentrale against the Council of the London Borough of Islington, That the Committee had heard Counsel as well on Monday the 10th as on Tuesday the 11th, Wednesday the 12th and Thursday the 13th days of July last upon the Petition and Appeal of the Council of the London Borough of Islington, of 122 Upper Street, Islington, London N1, praying that the matter of the Order set forth in the Schedule thereto, namely an Order of Her Majesty's Court of Appeal of the 17th day of December 1993, might be reviewed before Her Majesty the Queen in Her Court of Parliament and that the said Order might be reversed, varied or altered or that the Petitioners might have such other relief in the premises as to Her Majesty the Queen in Her Court of Parliament might seem meet; as upon the case of Westdeutsche Landesbank Girozentrale lodged in answer to the said Appeal; and due consideration had this day of what was offered on either side in this Cause:

It is *Ordered* and *Adjudged,* by the Lords Spiritual and Temporal in the Court of

Parliament of Her Majesty the Queen assembled, That the said Order of Her Majesty's Court of Appeal of the 17th day of December 1993 complained of in the said Appeal and the Order of Mr Justice Hobhouse of the 18th day of February 1993 be, and the same are hereby, so **Varied** that:

(i) the amount payable by the Appellants to the Respondents is £1,145,525 and 93 pence together with interest on the balance outstanding at the relevant time between the amount of £2.5 million received by the Respondents on the 18th day of June 1987 and the amounts paid from time to time under the swaps contract and pursuant to the Orders of the Court of Appeal and Mr Justice Hobhouse by the Appellants to the Respondents;

(ii) the interest payable shall be simple interest at average seven day rates applicable from time to time on the outstanding balance, as from the 18th day of June 1987;

(iii) the Appellants having paid to the Respondents pursuant to the Orders of the Court of Appeal and Mr Justice Hobhouse £1,599,745 and 18 pence on the 24th day of February 1993 and £987,208 and 14 pence on 4th day of April 1994, if it should appear that by either of these payments the Appellants have paid more than was due the Respondents shall pay to the Appellants the amount of the overpayment together with simple interest at average seven day rate from the date of overpayment to the date of payment:

And it is further *Ordered,* That the Respondents do pay or cause to be paid to the said Appellants the Costs incurred by them in respect of the said Appeal to this House, the amount of such Costs to be certified by the Clerk of the Parliaments if not agreed between the parties.

Cler: Parliamentor:

**HOUSE OF LORDS**

**OPINIONS OF THE LORDS OF APPEAL FOR JUDGMENT**

**IN THE CAUSE**

*WESTDEUTSCHE LANDESBANK GIROZENTRALE*
*(REPONDENTS)*

*v.*

*COUNCIL OF THE LONDON BOROUGH OF ISLINGTON*

*(APPPELLANT)*

**ON 22 MAY 1996**

Lord Goff of Chieveley
Lord Browne-Wilkinson
Lord Slynn of Hadley
Lord Woolf
Lord Lloyd of Berwick


## LORD GOFF OF CHIEVELEY

My Lords,

     This appeal is concerned with a transaction known as an interest rate swap. Under such a transaction, one party (the fixed rate payer) agrees to pay the other over a certain period interest at a fixed rate on a notional capital sum; and the other party (the floating rate payer) agrees to pay to the former over the same period interest on the same notional sum at a market rate determined in accordance with a certain formula. Interest rate swaps can fulfil many purposes, ranging from pure speculation to more useful purposes such as the hedging of liabilities. They are in law wagers, but they are not void as such because they are excluded from the regime of the Gaming Acts by section 63 of the Financial Services Act 1986.

     One form of interest rate swap involves what is called an upfront payment, i.e. a capital sum paid by one party to the other, which will be balanced by an adjustment of the parties' respective liabilities. Thus, as in the present case, the fixed rate payer may make an upfront payment to the floating rate payer, and in consequence the rate of interest payable by the fixed rate payer is reduced to a rate lower than the rate which would otherwise have been payable by him. The practical effect is to achieve a form of borrowing by, in this example, the floating rate payer through the medium of the interest rate swap transaction. It appears that it was this feature which, in particular, attracted local authorities to enter into transactions of this kind, since they enabled local authorities subject to rate-capping to obtain upfront payments uninhibited by the relevant statutory controls.

- 1 -

     At all events, local authorities began to enter into transactions of this kind soon after they came into use in the early 1980s. At that time, there was thought to be no risk involved in entering into such transactions with local authorities. Financially, they were regarded as secure: and it was assumed that such transactions were within their powers. However, as is well-known, in *Hazell v. Hammersmith and Fulham London Borough Council* [1992] 2

A.C. 1 your Lordships' House, restoring the decision of the Divisional Court, held that such transactions were ultra vires the local authorities who had entered into them. It is unnecessary for present purposes to examine the basis of that decision; though I wish to record that it caused grave concern among financial institutions, and especially foreign banks, which had entered into such transactions with local authorities in good faith, with no idea that a rule as technical as the ultra vires doctrine might undermine what they saw as a perfectly legitimate commercial transaction. There then followed litigation in which banks and other financial institutions concerned sought to recover from the local authorities with which they had dealt the balance of the money paid by them, together with interest. Out of the many actions so commenced, two

were selected as test cases. These were the present case, *Westdeutsche Landesbank Girozentrale v. Islington Borough Council,* and *Kleinwort Benson Ltd. v. Sandwell Borough Council.* Both cases came on for hearing before Hobhouse J. Your Lordships are concerned only with the former case. In a powerful judgment Hobhouse J, held that the plaintiffs ("the Bank") were entitled to recover from the defendants ("the Council") the net balance outstanding on the transaction between the parties, viz., the difference between the upfront payment of £2.5m. paid by the Bank to the Council on 18 June 1987, and the total of four semi-annual interest payments totalling £1,354,474.07 paid by the Council to the Bank between December 1987 and June 1989, leaving a net balance of £1,145,525.93 which the judge ordered the Council to pay to the Bank. He held the money to be recoverable by the Bank either as money had and received by the Council to the use of the Bank, or as money which in equity the Bank was entitled to trace into the hands of the Council and have repaid out of the Council's assets. He decided that the Bank's right to restitution at common law arose from the fact that the payment made by the Bank to the Council was made under a purported contract which, unknown to both parties, was ultra vires the Council and so void, no consideration having been given for the making of the payment. The decision by the judge, which was affirmed by the Court of Appeal, raised important questions in the law of restitution, which are of great interest to lawyers specialising in this field. Yet it is an extraordinary feature of the present appeal to your Lordships' House that the judge's decision on the substantive right of recovery at common law does not fall for consideration by your Lordships' House. The appeal of the Council is confined to one point only - the question of interest.

　　　The judge ordered that the Council should pay compound interest on the sum awarded against them, calculated at six-monthly rests from 1 April 1990 to the date of judgment. The Court of Appeal affirmed the judge's decision to award compound interest but, allowing a cross-appeal by the Bank,

ordered that interest should run from the date of receipt of the upfront payment. Both the judge and the Court of Appeal held that they were entitled to invoke against the Council the equitable jurisdiction to award compound interest, on the basis that the Bank was entitled to succeed against the Council in an equitable proprietary claim. The foundation for the Bank's equitable proprietary claim lay in the decision of this House in *Sinclair v. Brougham* [1914] A.C. 398. Since that decision has for long been controversial, the Appellate Committee invited argument on the question whether the House should depart from the decision despite the fact that it has stood for many years.

<u>The shape of the case</u>

Once the character of an interest swap transaction has been identified and understood, and it is appreciated that, because the transaction was beyond the powers of the Council, it was void ab initio, the basic question is whether the law can restore the parties to the position they were in before they entered into the transaction. That is, of course, the function of the law of restitution. I feel bound to say that, in the present case, there ought to be no difficulty about that at all. This is because the case is concerned solely with money. All that has to be done is to order that each party should pay back the money it has received - or, more sensibly, to strike a balance, and order that the party who has received most should repay the balance; and then to make an appropriate order for interest in respect of that balance. It should be as simple as that. And yet we find ourselves faced with a mass of difficult problems, and struggling to reconcile a number of difficult cases.

I must confess that, like all the judges who have been involved in these cases, I too have found myself struggling in this way. But in the end I have come to realise the importance of keeping my eyes on the simple outline of the case which I have just described; and I have discovered that, if one does that - if one keeps one's eyes open above the thicket of case law in which we can so easily become enclosed - the solution of the problem in the present case becomes much more simple. In saying this, I do not wish in any way to criticise the judges who have been grappling with the case at first instance and in the Court of Appeal, within the confines of the doctrine of precedent by which they are bound. On the contrary, they are entitled to our gratitude and respect. The masterly judgment of Hobhouse J., in particular, has excited widespread admiration. But it is the great advantage of a supreme court that, not only does it have the great benefit of assistance from the judgments of the courts below, but also it has a greater freedom to mould, and remould, the

authorities to ensure that practical justice is done within a framework of principle. The present case provides an excellent example of a case in which this House should take full advantage of that freedom.

- 3 -

### The three problems

There are three reasons why the present case has become so complicated. The first is that, in our law of restitution, there has developed an understanding that money can only be recovered on the ground of failure of consideration if that failure is total. The second is that because, in particular, of the well known but controversial decision of this House in *Sinclair v. Brougham* [1914] A.C. 398. it has come to be understood that a trust may be imposed in cases such as the present where the incapacity of one of the parties has the effect that the transaction is void. The third is that our law of interest has developed in a fragmentary and unsatisfactory manner, and in consequence insufficient attention has been given to the jurisdiction to award compound interest.

I propose at the outset to devote a little attention to each of these matters.

### (1) Total failure of consideration.

There has long been a desire among restitution lawyers to escape from the unfortunate effects of the so-called rule that money is only recoverable at common law on the ground of failure of consideration where the failure is total, by reformulating the rule upon a more principled basis: and signs that this will in due course be done are appearing in judgments throughout the common law world, as appropriate cases arise for decision. It is fortunate however that, in the present case, thanks (I have no doubt) to the admirable researches of counsel, a line of authority was discovered which had escaped the attention of the scholars who work in this field. This line of authority was concerned with contracts for annuities which were void if certain statutory formalities were not complied with. They were not therefore concerned with contracts void by reason of the incapacity of one of the parties. Even so, they were concerned with cases in which payments had been made, so to speak, both ways; and the courts had to decide whether they could, in such circumstances, do justice by restoring the parties to their previous positions. They did not hesitate to do so, by ascertaining the balance of the account

between the parties, and ordering the repayment of the balance. Moreover the form of action by which this was achieved was the old action for money had and received what we nowadays call a personal claim in restitution at common law. With this precedent before him, Hobhouse J. felt free to make a similar order in the present case; and in this he was self-evidently right.

The most serious problem which has remained in this connection is the theoretical question whether recovery can here be said to rest upon the ground of <u>failure</u> of consideration. Hobhouse J. thought not. He considered that the true ground in these cases, where the contract is void, is to be found in the absence, rather than the failure, of consideration; and in this he was followed by the Court of Appeal. This had the effect that the courts below were not

- 4 -

troubled by the question whether there had been a <u>total</u> failure of consideration.

The approach so adopted may have found its origin in the idea, to be derived from a well known passage in the speech of Viscount Simon L.C. in the *Fibrosa* case [1943] A.C. 32, 48, that a failure of consideration only occurs where there has been a failure of performance by the other party of his obligation under a contract which was initially binding. But the concept of failure of consideration need not be so narrowly confined. In particular it appears from the annuity cases themselves that the courts regarded them as cases of failure of consideration; and concern has been expressed by a number of restitution lawyers that the approach of Hobhouse J. is contrary to principle and could, if accepted, lead to undesirable consequences: (see Professor Birks in (1993) 23 W.A.L.R. 195; Mr. W. J. Swadling in [1994] R.L.R. 73; and Professor Burrows in [1995] R.L.R. 15). However since there is before your Lordships no appeal from the decision that the Bank was entitled to recover the balance of the payments so made in a personal claim in restitution, the precise identification of the ground of recovery was not explored in argument before the Appellate Committee. It would therefore be inappropriate to express any concluded view upon it. Even so, I think it right to record that there appears to me to be considerable force in the criticisms which have been expressed; and I shall, when considering the issues on this appeal, bear in mind the possibility that it may be right to regard the ground of recovery as failure of consideration.

(2) <u>A proprietary claim in restitution</u>