between the parties, and ordering the repayment of the balance. Moreover the form of action by which this was achieved was the old action for money had and received what we nowadays call a personal claim in restitution at common law. With this precedent before him, Hobhouse J. felt free to make a similar order in the present case; and in this he was self-evidently right.

The most serious problem which has remained in this connection is the theoretical question whether recovery can here be said to rest upon the ground of failure of consideration. Hobhouse J. thought not. He considered that the true ground in these cases, where the contract is void, is to be found in the absence, rather than the failure, of consideration; and in this he was followed by the Court of Appeal. This had the effect that the courts below were not

- 4 -

troubled by the question whether there had been a total failure of consideration.

The approach so adopted may have found its origin in the idea, to be derived from a well known passage in the speech of Viscount Simon L.C. in the *Fibrosa* case [1943] A.C. 32, 48, that a failure of consideration only occurs where there has been a failure of performance by the other party of his obligation under a contract which was initially binding. But the concept of failure of consideration need not be so narrowly confined. In particular it appears from the annuity cases themselves that the courts regarded them as cases of failure of consideration; and concern has been expressed by a number of restitution lawyers that the approach of Hobhouse J. is contrary to principle and could, if accepted, lead to undesirable consequences: (see Professor Birks in (1993) 23 W.A.L.R. 195; Mr. W. J. Swadling in [1994] R.L.R. 73; and Professor Burrows in [1995] R.L.R. 15). However since there is before your Lordships no appeal from the decision that the Bank was entitled to recover the balance of the payments so made in a personal claim in restitution, the precise identification of the ground of recovery was not explored in argument before the Appellate Committee. It would therefore be inappropriate to express any concluded view upon it. Even so, I think it right to record that there appears to me to be considerable force in the criticisms which have been expressed; and I shall, when considering the issues on this appeal, bear in mind the possibility that it may be right to regard the ground of recovery as failure of consideration.

(2) A proprietary claim in restitution

I have already stated that restitution in these cases can be achieved by means of a personal claim in restitution. The question has however arisen whether the Bank should also have the benefit of an equitable proprietary claim in the form of a resulting trust. The immediate reaction must be - why should it? Take the present case. The parties have entered into commercial transaction. The transaction has, for technical reasons, been held to be void from the beginning. Each party is entitled to recover its money, with the result that the balance must be repaid. But why should the plaintiff Bank be given the additional benefits which flow from a proprietary claim, for example the benefit of achieving priority in the event of the defendant's insolvency? After all, it has entered into a commercial transaction, and so taken the risk of the defendant's insolvency, just like the defendant's other creditors who have contracted with it, not to mention other creditors to whom the defendant may be liable to pay damages in tort.

I feel bound to say that I would not at first sight have thought that an equitable proprietary claim in the form of a trust should be made available to the Bank in the present case, but for two things. The first is the decision of this House in *Sinclair v. Brougham* [1914] A.C. 398, which appears to provide authority that a resulting trust may indeed arise in a case such as the present. The second is that on the authorities there is an equitable jurisdiction

- 5 -

to award the plaintiff compound interest in cases where the defendant is a trustee. It is the combination of those two factors which has provided the foundation for the principal arguments advanced on behalf of the Bank in support of its submission that it was entitled to an award of compound interest. I shall have to consider the question of availability of an equitable proprietary claim, and the effect of *Sinclair v. Brougham,* in some depth in a moment. But first I wish to say a few words on the subject of interest.

(3) Interest.

One would expect to find, in any developed system of law, a comprehensive and reasonably simple set of principles by virtue of which the courts have power to award interest. Since there are circumstances in which the interest awarded should take the form of compound interest, those principles should specify the circumstances in which compound interest, as well as simple interest, may be awarded; and the power to award compound interest should be available both at law and in equity. Nowadays, especially since it has been established (see *National Bank of Greece S.A. v. Pinios*

*Shipping Co. No. 1. The Maira* [1990] 1 A.C. 637) that banks may, by the custom of bankers, charge compound interest upon advances made by them to their customers, one would expect to find that the principal cases in which compound interest may be awarded would be commercial cases.

Sadly, however, that is not the position in English law. Unfortunately, the power to award compound interest is not available at common law. The power is available in equity; but at present that power is, for historical reasons, exercised only in relation to certain specific classes of claim, in particular proceedings against trustees for an account. An important I believe the most important - question in the present case is whether that jurisdiction should be developed to apply in a commercial context, as in the present case.

Equitable proprietary claims

I now turn to consider the question whether an equitable proprietary claim was available to the Bank in the present case.

Ever since the law of restitution began, about the middle of this century, to be studied in depth, the role of equitable proprietary claims in the law of restitution has been found to be a matter of great difficulty. The legitimate ambition of restitution lawyers has been to establish a coherent law of restitution, founded upon the principle of unjust enrichment; and since certain equitable institutions, notably the constructive trust and the resulting trust, have been perceived to have the function of reversing unjust enrichment, they have sought to embrace those institutions within the law of restitution, if necessary moulding them to make them fit for that purpose. Equity lawyers, on the other hand, have displayed anxiety that in this process the equitable principles underlying these institutions may become illegitimately distorted;

- 6 -

and though equity lawyers in this country are nowadays much more sympathetic than they have been in the past towards the need to develop a coherent law of restitution, and of identifying the proper role of the trust within that rubric of the law, they remain concerned that the trust concept should not be distorted, and also that the practical consequences of its imposition should be fully appreciated. There is therefore some tension between the aims and perceptions of these two groups of lawyers, which has manifested itself in relation to the matters under consideration in the present case.

In the present case, however, it is not the function of your Lordships'
House to write the agenda for the law of restitution, nor even to identify the
role of equitable proprietary claims in that part of the law. The judicial
process is neither designed for, nor properly directed towards, such
objectives. The function of your Lordships' House is simply to decide the
questions at issue before it in the present case; and the particular question now
under consideration is whether, where money has been paid by a party to a
contract which is ultra vires the other party and so void ab initio, he has the
benefit of an equitable proprietary claim in respect of the money so paid.
Moreover the manner in which this question has arisen before this House
renders it by no means easy to address. First of all, the point was not debated
in any depth in the courts below, because they understood that they were
bound by *Sinclair v. Brougham* to hold that such a claim was here available.
But second, the point has arisen only indirectly in this case, since it is relevant
only to the question whether the court here has power to make an award of
compound interest. It is a truism that, in deciding a question of law in any
particular case, the courts are much influenced by considerations of practical
justice, and especially by the results which would flow from the recognition
of a particular claim on the facts of the case before the court. Here, however,
an award of compound interest provides no such guidance, because it is no
more than a consequence which is said to flow, for no more than historical
reasons, from the availability of an equitable proprietary claim. It therefore
provides no guidance on the question whether such a claim should here be
available.

In these circumstances I regard it as particularly desirable that your
Lordships should, so far as possible, restrict the inquiry to the actual questions
at issue in this appeal, and not be tempted into formulating general principles
of a broader nature. If restitution lawyers are hoping to find in your
Lordships' speeches broad statements of principle which may definitively
establish the future shape of this part of the law, I fear that they may be
disappointed. I also regard it as important that your Lordships should, in the
traditional manner, pay particular regard to the practical consequences which
may flow from the decision of the House.

With these observations by way of preamble, I turn to the question of
the availability of an equitable proprietary claim in a case such as the present.
The argument advanced on behalf of the Bank was that the money paid by

- 7 -

them under the void contract was received by the Council subject to a

resulting trust. This approach was consistent with that of Dillon L.J. in the Court of Appeal: see [1994] 1 W.L.R. 938, 947. It is also consistent with the approach of Viscount Haldane L.C. (with whom Lord Atkinson agreed) in *Sinclair v. Brougham* [1914] A.C. 398, 420-421.

I have already expressed the opinion that, at first sight, it is surprising that an equitable proprietary claim should be available in a case such as the present. However before I examine the question as a matter of principle. I propose first to consider whether *Sinclair v. Brougham* supports the argument now advanced on behalf of the Bank.

### *Sinclair v. Brougham*

The decision of this House in *Sinclair v. Brougham* has loomed very large in both the judgments in the courts below and in the admirable arguments addressed to the Appellate Committee of this House. It has long been regarded as a controversial decision, and has been the subject of much consideration by scholars, especially those working in the field of restitution. I have however reached the conclusion that it is basically irrelevant to the decision of the present appeal.

It is first necessary to establish what the case was about. The Birkbeck Permanent Benefit Building Society decided to set up a banking business, known as the Birkbeck Bank. The banking business was however held to be ultra vires the objects of the building society; and there followed a spate of litigation concerned with solving the problems consequent upon that decision. *Sinclair v. Brougham* was one of those cases.

The case has been analysed in lucid detail in the speech of my noble and learned friend. Lord Browne-Wilkinson, which I have read (in draft) with great respect. In its bare outline, it was concerned with the distribution of the assets of the Society, which was insolvent. There were four classes of claimants. First, there were two classes of shareholders - the A shareholders (entitled to repayment of their investment on maturity) and the B shareholders (whose shares were permanent). Next, there was a numerous class of people who had deposited money at the bank, under contracts which were ultra vires and so void. Finally, there were the ordinary trade creditors of the Society. By agreement, the A shareholders and the trade creditors were paid off first, leaving only the claims of the depositors and the B shareholders. There were sufficient assets to pay off the A shareholders, but not the depositors and certainly not both. The question of how to reconcile their competing claims arose for consideration on a summons by the liquidator for directions.

The problem arose from the fact that the contracts under which the depositors deposited their money at the bank were ultra vires and so void. That prevented them from establishing a simple contractual right to be repaid, in which event they would have ranked with the ordinary trade creditors of the

- 8 -

Society in the liquidation. As it was, they claimed to be entitled to repayment in an action for money had and received in the same way as the Bank claimed repayment in the case now before your Lordships. But the House of Lords held that they were not entitled to claim on this ground. This was in substance because to allow such a claim would permit an indirect enforcement of the contract which the policy of the law had decreed should be void. In those days, of course, judges still spoke about the common law right to restitution in the language of implied contract, and so we find Lord Sumner saying in a much quoted passage, at p. 452:

> To hold otherwise would be indirectly to sanction an ultra
> vires borrowing. All these causes of action are common species of the
> genus assumpsit. All now rest, and long have rested, upon a notional
> or imputed promise to repay. The law cannot de jure impute promises
> to repay, whether for money had and received or otherwise, which, if
> made de facto, it would inexorably avoid."

This conclusion however created a serious problem because, if the depositors had no claim, then, in the words of Lord Dunedin, at p. 436:

> "The appalling result in this very case would be that the society's
> shareholders, having got proceeds of the depositors' money in the form
> of investments, so that each individual depositor is utterly unable to
> trace his money, are enriched to the extent of some 500 per cent."

As a matter of practical justice, such a result was obviously unacceptable: and it was to achieve justice that the House had recourse to equity to provide the answer. It is, I think, apparent from the reasoning of the members of the Appellate Committee that they regarded themselves, not as laying down some broad general principle, but as solving a particular practical problem. In this connection it is, in my opinion, significant that there was a considerable variation in the way in which they approached the problem. Viscount Haldane, with whom Lord Atkinson agreed, did so, at p. 421, on the basis that there arose in the circumstances "a resulting trust, not of an active character." Lord Dunedin based his decision upon a broad equity of

restitution, drawn from Roman and French law. He asked himself the
question, at p. 435: "Is English equity to retire defeated from the task which
other systems of equity have conquered?" - a question which he answered in
the negative. Lord Parker of Waddington, at pp. 441-442, attempted to
reconcile his decision with the established principles of equity by holding that
the depositors' money had been received by the directors of the Society as
fiduciaries, with the effect that the depositors could thereafter follow their
money in equity into the assets of the Society. Lord Sumner, at p. 458,
considered that the case should be decided on equitable principles on which
there was no direct authority. He regarded the question as one of
administration, in which "the most just distribution of the whole must be
directed, so only that no recognised rule of law or equity be disregarded."
Setting on one side the opinion of Lord Parker, whose approach I find very

- 9 -

difficult to reconcile with the facts of the case. I do not discern in the
speeches of the members of the Appellate Committee any intention to impose
a trust carrying with it the personal duties of a trustee.

For present purposes. I approach this case in the following way. First,
it is clear that the problem which arose in *Sinclair v. Brougham,* viz. that a
personal remedy in restitution was excluded on grounds of public policy, does
not arise in the present case, which is not of course concerned with a
borrowing contract. Second, I regard the decision in *Sinclair v. Brougham* as
being a response to that problem in the case of ultra vires borrowing
contracts, and as not intended to create a principle of general application.
From this it follows, in my opinion, that *Sinclair v. Brougham* is not relevant
to the decision in the present case. In particular it cannot be relied upon as
a precedent that a trust arises on the facts of the present case, justifying on
that basis an award of compound interest against the Council.

But I wish to add this. I do not in any event think that it would be
right for your Lordships' House to exercise its power under the Practice
Statement *(Practice Statement (Judicial Precedent)* [1966] 1 W.L.R. 1234) to
depart from *Sinclair v. Brougham.* I say this first because, in my opinion,
any decision to do so would not be material to the disposal of the present
appeal, and would therefore be obiter. But there is a second reason of
substance why, in my opinion, that course should not be taken. I recognise
that nowadays cases of incapacity are relatively rare, though the swaps
litigation shows that they can still occur. Even so, the question could still
arise whether, in the case of a borrowing contract rendered void because it