equitable jurisdiction to award compound interest to cases where the claim is
proprietary in nature to be both technical and unrealistic. This is shown by
the reasoning and conclusion of Hobhouse J. in *Kleinwort Benson Ltd. v.
South Tyneside Metropolitan Borough Council* [1994] 4 All E.R. 972, another
swap transaction case, in which the plaintiff bank had no proprietary claim.
The judge upheld the submission of the defendant council that, although they
were under a personal liability to make restitution both at law and in equity,
nevertheless the court had no jurisdiction to award compound interest on the
sum adjudged due. He said, at p. 994:

> "If ... the plaintiff is only entitled to a personal remedy which
> will be the case where, although there was initially a fiduciary
> relationship and the payer was entitled in equity to treat the sum
> received by the payee as his, the payer's, money and to trace it, but
> because of subsequent developments he is no longer able to trace the
> sum in the hands of the payee, then there is no subject matter to which
> the rationale on which compound interest is awarded can be applied.
> The payee cannot be shown to have a fund belonging to the payer or
> to have used it to make profits for himself."

This reasoning is logical, assuming the restricted nature of the equitable
jurisdiction to award compound interest. But if, as Lord Brandon of
Oakbrook stated, the jurisdiction is founded upon the demands of justice, it
is difficult to see the sense of the distinction which Hobhouse J. felt compelled
to draw. It seems strange indeed that, just because the power to trace
property has ceased, the court's jurisdiction to award compound interest
should also come to an end. For where the claim is based upon the unjust
enrichment of the defendant, it may be necessary to have power to award
compound interest to achieve full restitution, i.e. to do full justice, as much
where the plaintiff's claim is personal as where his claim is proprietary in
nature. Furthermore I know of no authority which compelled Hobhouse J. to
hold that he had no jurisdiction to award compound interest in respect of the
personal claim in equity in the case before him.

For these reasons I am satisfied that there is jurisdiction in equity to
award compound interest in the case of personal claims as well as proprietary
claims.

- 17 -

I turn next to the question whether the equitable jurisdiction can be

exercised in aid of common law remedies such as, for example, a personal remedy in restitution, to repair the deficiencies of the common law. Here I turn at once to *Snell's Equity,* 29th ed. (1990), at p.28, where the first maxim of equity is stated to be that "Equity will not suffer a wrong to be without a remedy". The commentary on this maxim in the text reads as follows:

> "The idea expressed in this maxim is that no wrong should be allowed to go unredressed if it is capable of being remedied by courts of justice, and this really underlies the whole jurisdiction of equity. As already explained, the common law courts failed to remedy many undoubted wrongs, and this failure led to the establishment of the Court of Chancery. But is must not be supposed that every <u>moral</u> wrong was redressed by the Court of Chancery. The maxim must be taken as referring to rights which are suitable for judicial enforcement, but were not enforced at common law owing to some technical defect."

To this maxim is attributed the auxiliary jurisdiction of equity. The commentary reads as follows:

> "Again, to this maxim may be traced the origin of the auxiliary jurisdiction of the Court of Chancery, by virtue of which suitors at law were aided in the enforcement of their legal rights. Without such aid these rights would often have been 'wrongs without remedies.' For instance, it was often necessary for a plaintiff in a common law action to obtain discovery of facts resting in the knowledge of the defendant, or of deeds, writings or other things in his possession or power. The common law courts, however, had no power to order such discovery, and recourse was therefore had to the Court of Chancery, which assumed jurisdiction to order the defendant to make discovery on his oath."

The question which arises in the present case is whether, in the exercise of equity's auxiliary jurisdiction, the equitable jurisdiction to award compound interest may be exercised to enable a plaintiff to obtain full justice in a personal action of restitution at common law.

I start with the position that the common law remedy is, in a case such as the present, plainly inadequate, in that there is no power to award compound interest at common law and that without that power the common law remedy is incomplete. The situation is therefore no different from that in which, in the absence of jurisdiction at common law to order discovery, equity stepped in to enable justice to be done in common law actions by ordering the defendant to make discovery on oath. The only difference

between the two cases is that, whereas the equitable jurisdiction to order discovery in aid of common law actions was recognised many years ago, the possibility of the equitable jurisdiction to award compound interest being exercised in aid of common law actions was not addressed until the present

- 18 -

case. Fortunately, however, judges of equity have always been ready to address new problems, and to create new doctrines, where justice so requires. As Sir George Jessel M.R. said, in a famous passage in his judgment in *In re Hallett's Estate* (1880) 13 Ch. D. 696. 710:

> "I intentionally say modern rules, because it must not be forgotten that the rules of Courts of Equity are not, like the rules of the Common Law, supposed to have been established from time immemorial. It is perfectly well known that they have been established from time to time - altered, improved, and refined from time to time. In many cases we know the names of the Chancellors who invented them. No doubt they were invented for the purpose of securing the better administration of justice, but still they were invented."

I therefore ask myself whether there is any reason why the equitable jurisdiction to award compound interest should not be exercised in a case such as the present. I can see none. Take, for example, the case of fraud. It is well established that the equitable jurisdiction may be exercised in cases or fraud. Indeed it is plain that, on the same facts, there may be a remedy both at law and in equity to recover money obtained by fraud: see *Johnson v. The King* (1904) A.C. 817. 822. *per* Lord Macnaghten. Is it to be said that, if the plaintiff decides to proceed in equity, compound interest may be awarded: but that if he chooses to proceed in an action at law, no such auxiliary relief will be available to him? I find it difficult to believe that, at the end of the twentieth century, our law should be so hidebound by forms of action as to be compelled to reach such a conclusion.

For these reasons I conclude that the equitable jurisdiction to award compound interest may be exercised in the case of personal claims at common law, as it is in equity. Furthermore I am satisfied that, in particular, the equitable jurisdiction may, where appropriate, be exercised in the case of a personal claim in restitution. In reaching that conclusion, I am of the opinion that the decision of Hobhouse J. in the *Kleinwort Benson* case that the court had no such jurisdiction should not be allowed to stand.

I recognise that, in so holding, the courts would be breaking new
ground, and would be extending the equitable jurisdiction to a field where it
has not hitherto been exercised. But that cannot of itself be enough to prevent
what I see to be a thoroughly desirable extension of the jurisdiction, consistent
with its underlying basis that it exists to meet the demands of justice. An
action of restitution appears to me to provide an almost classic case in which
the jurisdiction should be available to enable the courts to do full justice.
Claims in restitution are founded upon a principle of justice, being designed
to prevent the unjust enrichment of the defendant: see *Lipkin Gorman v.
Karpnale Ltd.* [1991] 2 A.C. 548. Long ago, in *Moses v. Macferlan* (1760)
2 Burr. 1005, 1012, Lord Mansfield said that the gist of the action for money
had and received is that "the defendant, upon the circumstances of the case.

- 19 -

is obliged by the ties of natural justice and equity to refund the money." It
would be strange indeed if the courts lacked jurisdiction in such a case to
ensure that justice could be fully achieved by means of an award of compound
interest, where it is appropriate to make such an award, despite the fact that
the jurisdiction to award such interest is itself said to rest upon the demands
of justice. I am glad not to be forced to hold that English law is so
inadequate as to be incapable of achieving such a result. In my opinion the
jurisdiction should now be made available, as justice requires, in cases of
restitution, to ensure that full justice can be done. The seed is there, but the
growth has hitherto been confined within a small area. That growth should
now be permitted to spread naturally elsewhere within this newly recognised
branch of the law. No genetic engineering is required, only that the warm sun
of judicial creativity should exercise its benign influence rather than remain
hidden behind the dark clouds of legal history.

I wish to add that I for my part do not consider that the statutory
power to award interest, either under section 3 of the Law Reform
(Miscellaneous Provisions) Act 1934 or under section 35A of the Supreme
Court Act 1981 (which, pursuant to section 15 of the Administration of Justice
Act 1982, superseded section 3 of the Act of 1934), inhibits the course of
action which I now propose. It is true that section 3(1) of the Act of 1934,
when empowering courts of record to award interest in proceedings for the
recovery of any debt or damages, did not authorise the giving of interest upon
interest. But I cannot see that it would be inconsistent with the intention then
expressed by Parliament later to extend the existing equitable jurisdiction to
award compound interest to enable courts to ensure that full restitution is
achieved in personal actions of restitution at common law. It is of course

common knowledge that, until the latter part of this century, the existence of
a systematic law of restitution, founded upon the principle of unjust
enrichment, had not been recognised in English law. The question whether
there should be a power to award compound interest in such cases, in order
to achieve full restitution, simply did not arise in 1934 and cannot therefore
have been considered by Parliament in that year. To hold that, because
Parliament did not then authorise an award of compound interest in
proceedings the nature of which was not then recognised, the Courts should
now be precluded from exercising the ordinary judicial power to develop the
law by extending an existing jurisdiction to meet a newly recognised need
appears to me to constitute an unnecessary and undesirable fetter upon the
judicial development of the law. It is not to be forgotten that there is
jurisdiction in equity, as well as at common law, to order restitution on the
ground of unjust enrichment; and I cannot see that section 3(1) of the 1934
Act would have precluded any extension of the existing equitable jurisdiction
to award compound interest to enable full restitution to be achieved in such
a case. Accordingly neither would section 3(1), which applied to all courts
of record, have precluded a similar extension of the jurisdiction to enable full
restitution to be achieved in actions at common law. Section 35A of the Act
of 1981 no doubt perpetuated the position as established by section 3(1) of the
Act of 1934, in that it too did not confer a power on the courts to award

- 20 -

compound interest: but I cannot see that this affects the position. In so far as
it is relevant to refer to the Report of the Law Commission (Cmnd. "229 of
7 April 1978) which preceded that enactment, it appears from the Report that
it was generally opposed to the introduction of any general power to award
compound interest: but there was no intention of interfering with the equitable
jurisdiction, and the problem which has arisen in the present case was not
addressed. I wish to add that such an extension of the equitable jurisdiction
as I propose would, in my opinion, be a case of equity acting in aid of the
common law. There is in my opinion no need, and indeed no basis, for
outlawing such a development as a case of equity acting in aid of the
legislature simply because the legislature, in conferring upon courts the power
to award simple interest, did not authorise the giving of compound interest.

      It remains for me to say that I am satisfied, for the reasons given by

Hobhouse J., that this is a case in which it was appropriate that compound
interest should be awarded. In particular, since the Council had the free use
of the Bank's money in circumstances in which, if it had borrowed the money
from some other financial institution, it would have had to pay compound

interest for it, the Council can properly be said to have profited from the Bank's money so as to make an award of compound interest appropriate. However, for the reasons given by Dillon L.J., at pp. 947-949. I agree with the Court of Appeal that the interest should run from the date of receipt of the money.

> ### Conclusion

> For these reasons I would dismiss the appeal.


## LORD BROWNE-WILKINSON

My Lords,

In the last decade many local authorities entered into interest rate swap agreements with banks and other finance houses. In *Hazell v. Hammersmith and Fulham London Borough Council* [1992] 2 A.C. 1 your Lordships held that such contracts were *ultra vires* local authorities and therefore void. Your Lordships left open the question whether payments made pursuant to such swap agreements were recoverable or not. The action which is the subject matter of this appeal is one of a number in which the court has had to consider the extent to which monies paid under such an agreement are recoverable.

An interest rate swap agreement is an agreement between two parties by which each agrees to pay the other on a specified date or dates an amount calculated by reference to the interest which would have accrued over a given

- 21 -

period on a notional principal sum. The rate of interest payable by each party (on the same notional sum) is different. One rate of interest is usually fixed and does not change (and the payer is called "the fixed rate payer"); the other rate is a variable or floating rate based on a fluctuating interest rate such as the six-month London Inter-bank Offered Rate ("LIBOR") and the payer is known as "the floating rate payer." Normally the parties do not make the actual payments they have contracted for but the party owing the higher amount pays to the other party the difference between the two amounts.

In the present case the swap contract was concluded between the respondent bank, Westdeutsche Landesbank Girozentrale ("the Bank"), and the

appellant, the Council of the London Borough of Islington ("the local authority"), on 16 June 1987. The arrangement was to run for ten years starting on 18 June 1987. The interest sums were to be calculated on a notional principal sum of £25m. and were to be payable half-yearly. The Bank was to be the fixed rate payer at a rate of 7.5 per cent. per annum and the local authority was to be the floating rate payer at the domestic sterling LIBOR rate. In addition, the Bank was to pay to the local authority on 18 June 1987 a sum of £2.5m. ("the upfront payment") which payment was made. As a result of the provision of the upfront payment the rate of interest payable by the Bank as the fixed rate payer was agreed to be lower than what would have been appropriate (9.43 per cent.) if the upfront payment had not been made.

made:

Pursuant to the terms of the agreement, the following payments were

Date

18.06.87

18.12.87

20.06.88

19.12.88

19.06.89

Total :

Payment by Bank
    to Council


    £2,500,000



    £2,500,000

Payment by Council
    to Bank

£ 172,345.89

£ 229,666.09

£ 259,054.56

£ 693,407.53

£1,354,474.07


Therefore the payments made by the Bank to the local authority exceed those made by the local authority to the Bank to the extent of £1,145,525.93.

On 1 November 1989 the Divisional Court gave judgment in *Hazell* declaring void swap transactions entered into by local authorities. The decision applied to the contract between the parties in the present case.


- 22 -

As will appear it is of central importance to note the way in which the local authority dealt with the upfront payment of £2.5m. made to it on 18 June 1987. The money was credited to a bank account of the local authority in which there were other monies of the local authority, i.e. into a mixed account. That account itself became overdrawn overnight on several dates in June and July 1987. There was an overall debit balance on the account on 16 November 1987. The monies in the mixed account were used by the local authority for its general expenditure. If the upfront payment had not been received, the local authority would have had to borrow more money if it could. The local authority had been, and was likely to be in the future, rate-capped and one of the attractions to the local authority in the swap agreement was that it obtained the upfront payment in a form which did not attract statutory controls.

The Bank in this action sought recovery of the amounts paid by it under the void agreement together with interest. On 12 February 1993 Hobhouse J. gave judgment in the Commercial Court for the Bank ordering payment by the local authority to the Bank of the balance together with compound interest on the balance as from 1 April 1990 with six-monthly rests.

The council appealed to the Court of Appeal against that order and the Bank cross-appealed contending that compound interest should have been ordered as from the date of receipt of the principal sum. i.e. 18 June 1987.