account went into overdraft in June 1987. At that date, the local authority had no knowledge of the invalidity of the contract but regarded the monies as its own to spend as it thought fit. There was therefore never a time at which both (a) there was defined trust property and (b) the conscience of the local authority in relation to such defined trust property was affected. The basic requirements of a trust were never satisfied.

I turn then to consider the Bank's arguments in detail. They were based primarily on principle rather than on authority. I will deal first with the Bank's argument from principle and then turn to the main authorities relied upon by the Bank. *Sinclair v. Brougham* and *Chase Manhattan Bank*.

The Retention of Title Point

It is said that, since the Bank only intended to part with its beneficial ownership of the monies in performance of a <u>valid</u> contract, neither the legal nor the equitable title passed to the local authority at the date of payment. The legal title vested in the local authority by operation of law when the monies became mixed in the bank account but, it is said, the Bank "retained" its equitable title.

I think this argument is fallacious. A person solely entitled to the full beneficial ownership of money or property, both at law and in equity, does not enjoy an equitable interest in that property. The legal title carries with it all rights. Unless and until there is a separation of the legal and equitable estates, there is no separate equitable title. Therefore to talk about the Bank "retaining" its equitable interest is meaningless. The only question is whether the circumstances under which the money was paid were such as, in equity, to impose a trust on the local authority. If so, an equitable interest arose for the first time under that trust.

This proposition is supported by *In re Cook* [1948] Ch. 212; *Vandervell v. I.R.C.* [1967] 2 A.C. 291, 311g, *per* Lord Upjohn, and 317F, *per* Lord Donovan; *Commissioner of Stamp Duties (Queensland) v. Livingston* [1965] A.C. 694, 712B-E; Underhill and Hayton, Law of Trusts and Trustees, 15th ed. (1995), p. 866.

- 30 -

The Separation of Title Point

The Bank's submission, at its widest, is that if the legal title is in A but the equitable interest in B. A holds as trustee for B.

Again I think this argument is fallacious. There are many cases where B enjoys rights which, in equity, are enforceable against the legal owner, A. without A being a trustee, e.g. an equitable right to redeem a mortgage, equitable easements, restrictive covenants, the right to rectification, an insurer's right by subrogation to receive damages subsequently recovered by the assured: *Lord Napier and Ettrick v. Hunter* [1993] A.C. 713. Even in cases where the whole beneficial interest is vested in B and the bare legal interest is in A. A is not necessarily a trustee, e.g. where title to land is acquired by estoppel as against the legal owner: a mortgagee who has fully discharged his indebtedness enforces his right to recover the mortgaged property in a redemption action, not an action for breach of trust.

The Bank contended that where, under a pre-existing trust, B is entitled in an equitable interest in trust property, if the trust property comes into the hands of a third party. X (not being a purchaser for value of the legal interest without notice). B is entitled to enforce his equitable interest against the property in the hands of X because X is a trustee for B. In my view the third party, X, is not necessarily a trustee for B: B's equitable right is enforceable against the property in just the same way as any other specifically enforceable equitable right can be enforced against a third party. Even if the third party, X, is not aware that what he has received is trust property B is entitled to assert his title in that property. If X has the necessary degree of knowledge, X may himself become a constructive trustee for B on the basis of knowing receipt. But unless he has the requisite degree of knowledge he is not personally liable to account as trustee: *In re Diplock* [1948] Ch. 465 at page 478: In *re Montagu's Settlement* [1987] Ch. 264. Therefore, innocent receipt of property by X subject to an existing equitable interest does not by itself make X a trustee despite the severance of the legal and equitable titles. *Underhill and Hayton, Law of Trusts and Trustees,* 15th ed., pp. 569-370, whilst accepting that X is under no personal liability to account unless and until be becomes aware of B's rights, does describe X as being a constructive trustee. This may only be a question of semantics: on either footing, in the present case the local authority could not have become accountable for profits until it knew that the contract was void.

Resulting Trust

This is not a case where the Bank had any equitable interest which pre-dated receipt by the local authority of the upfront payment. Therefore, in order to show that the local authority became a trustee, the Bank must

demonstrate circumstances which raised a trust for the first time either at the date on which the local authority received the money or at the date on which payment into the mixed account was made. Counsel for the Bank specifically

- 31 -

disavowed any claim based on a constructive trust. This was plainly right because the local authority had no relevant knowledge sufficient to raise a constructive trust at any time before the monies, upon the bank account going into overdraft, became untraceable. Once there ceased to be an identifiable trust fund, the local authority could not become a trustee: *In re Goldcorp Exchange Ltd* [1995] 1 A.C. 74. Therefore, as the argument for the Bank recognised, the only possible trust which could be established was a resulting trust arising from the circumstances in which the local authority received the upfront payment.

Under existing law a resulting trust arises in two sets of circumstances:

1. Where A makes a voluntary payment to B or pays (wholly or in part) for the purchase of property which is vested either in B alone or in the joint names of A and B. there is a presumption that A did not intend to make a gift to B: the money or property is held on trust for A (if he is the sole provider of the money) or in the case of a joint purchase by A and B in shares proportionate to their contributions. It is important to stress that this is only a presumption, which presumption is easily rebutted either by the counter-presumption of advancement or by direct evidence of A's intention to make an outright transfer: see *Underhill and Hayton (supra)* p. 317 *et seq.; Vandervell v. I.R.C.* [1967] 2 A.C. 291 at 312 *et seq.; In re Vandervell (No. 2)* [1974] Ch. 269 at 288 *et seq.*

2. Where A transfers property to B on express trusts, but the trusts declared do not exhaust the whole beneficial interest: *ibid.* and *Barclays Bank v. Quistclose Investments Ltd.* [1970] A.C. 567.

Both types of resulting trust are traditionally regarded as examples of trusts giving effect to the common intention of the parties. A resulting trust is not imposed by law against the intentions of the trustee (as is a constructive trust) but gives effect to his presumed intention. Megarry J. in *In re Vandervell (No. 2)* suggests that a resulting trust of type (B) does not depend on intention

but operates automatically. I am not convinced that this is right. If the settlor has expressly, or by necessary implication, abandoned any beneficial interest in the trust property, there is in my view no resulting trust: the undisposed-of equitable interest vests in the Crown as *bona vacantia:* see *In re West Sussex Constabulary's Widows, Children and Benevolent (1930) Fund Trusts* [1971] Ch. 1.

Applying these conventional principles of resulting trust to the present case, the Bank's claim must fail. There was no transfer of money to the local authority on express trusts: therefore a resulting trust of type (B) above could

- 32 -

not arise. As to type (A) above, any presumption or resulting trust is rebutted since it is demonstrated that the Bank paid, and the local authority received, the upfront payment with the intention that the monies so paid should become the absolute property of the local authority. It is true that the parties were under a misapprehension that the payment was made in pursuance of a valid contract. But that does not alter the actual intentions of the parties at the date the payment was made or the monies were mixed in the bank account. As the article by William Swadling (supra) demonstrates the presumption of resulting trust is rebutted by evidence of any intention inconsistent with such a trust, not only by evidence of an intention to make a gift.

Professor Birks, whilst accepting that the principles I have stated represent "a very conservative form" of definition of a resulting trust (page 360), argues from restitutionary principles that the definition should be extended so as to cover a perceived gap in the law of "subtractive unjust enrichment' (p. 368) so as to give a plaintiff a proprietary remedy when he has transferred value under a mistake or under a contract the consideration for which wholly fails. He suggests that a resulting trust should arise wherever the money is paid under a mistake (because such mistake vitiates the actual intention) or when money is paid on a condition which is not subsequently satisfied.

As one would expect, the argument is tightly reasoned but I am not persuaded. The search for a perceived need to strengthen the remedies of a plaintiff claiming in restitution involves, to my mind, a distortion of trust principles. First, the argument elides rights in property (which is the only proper subject matter of a trust) into rights in "the value transferred": see p. 361. A trust can only arise where there is defined trust property: it is

therefore not consistent with trust principles to say that a person is a trustee of property which cannot be defined. Second, Professor Birks' approach appears to assume (for example in the case of a transfer of value made under a contract the consideration for which subsequently fails) that the recipient will be deemed to have been a trustee from the date of his original receipt of money, i.e. the trust arises at a time when the "trustee" does not, and cannot, know that there is going to be a total failure of consideration. This result is incompatible with the basic premise on which all trust law is built, *viz.* that the conscience of the trustee is affected. Unless and until the trustee is aware of the factors which give rise to the supposed trust, there is nothing which can affect his conscience. Thus neither in the case of a subsequent failure of consideration nor in the case of a payment under a contract subsequently found to be void for mistake or failure of condition will there be circumstances, at the date of receipt, which can impinge on the conscience of the recipient, thereby making him a trustee. Thirdly, Professor Birks has to impose on his wider view an arbitrary and admittedly unprincipled modification so as to ensure that a resulting trust does not arise when there has only been a failure to perform a contract, as opposed to total failure of consideration: see pp. 356-359 and 362. Such arbitrary exclusion is designed to preserve the rights of creditors in the insolvency of the recipient. The fact

- 33 -

that it is necessary to exclude artificially one type of case which would logically fall within the wider concept casts doubt on the validity of the concept.

If adopted, Professor Birks' wider concepts would give rise to all the practical consequences and injustices to which I have referred. I do not think it right to make an unprincipled alteration to the law of property (i.e. the law of trusts) so as to produce in the law of unjust enrichment the injustices to third parties which I have mentioned and the consequential commercial uncertainty which any extension of proprietary interests in personal property is bound to produce.

The Authorities

Three cases were principally relied upon in direct support of the proposition that a resulting trust arises where a payment is made under a void contract.

(A) *Sinclair v. Brougham* [1914] A.C. 398

The case concerned the distribution of the assets of the Birkbeck Building Society, an unincorporated body which was insolvent. The Society had for many years been carrying on business as a bank which, it was held, was *ultra vires* its objects. The bank had accepted deposits in the course of its *ultra vires* banking business and it was held that the debts owed to such depositors were themselves void as being *ultra vires*. In addition to the banking depositors, there were ordinary trade creditors. The Society had two classes of members, the A shareholders who were entitled to repayment of their investment on maturity and the B shareholders whose shares were permanent. By agreement, the claims of the ordinary trade creditors and of the A shareholders had been settled. Therefore the only claimants to the assets of the Society before the Court were the *ultra vires* depositors and the B shareholders, the latter of which could take no greater interest than the Society itself.

The issues for decision arose on a summons taken out by the liquidator for directions as to how he should distribute the assets in the liquidation. In the judgments, it is not always clear whether this House was laying down general propositions of law or merely giving directions as to the proper mode in which the assets in that liquidation should be distributed. The depositors claimed, first, in quasi contract for money had and received. They claimed secondly, as the result of an argument suggested for the first time in the course of argument in the House of Lords (at p. 404), to trace their deposits into the assets of the Society.

- 34 -

Money had and received

The House of Lords was unanimous in rejecting the claim by the ultra *vires* depositors to recover in quasi-contract on the basis of monies had and received. In their view, the claim in quasi-contract was based on an implied contract. To imply a contract to repay would be to imply a contract to exactly the same effect as the express *ultra vires* contract of loan. Any such implied contract would itself be void as being *ultra vires*.

Subsequent developments in the law of restitution demonstrate that this reasoning is no longer sound. The common law restitutionary claim is based not on implied contract but on unjust enrichment: in the circumstances the law imposes an obligation to repay rather than implying an entirely fictitious agreement to repay: *Fibrosis v. Fairborn* [1943] A.C. 32, 63-64 *per* Lord

Wright; *Peavey & Matthews Pty. Ltd. v. Paul* [1987] 69 I.E. 579, 583, 603: *Lipkin Gorman v. Karpnale Ltd* [1991] 2 A.C. 548, 578C: *Woolwich Equitable Building Society v. I.R.C.* [1993] A.C. 70. In my judgment, Your Lordships should now unequivocally and finally reject the concept that the claim for monies had and received is based on an implied contract. I would overrule *Sinclair v. Brougham* on this point.

It follows that in *Sinclair v. Brougham* the depositors should have had a personal claim to recover the monies at law based on a total failure or consideration. The failure of consideration was <u>not</u> partial: the depositors had paid over their money in consideration of a promise to repay. That promise was *ultra vires* and void: therefore the consideration for the payment of the money wholly failed. So in the present swaps case (though the point is not one under appeal) I think the Court of Appeal were right to hold that the swap monies were paid on a consideration that wholly failed. The essence of the swap agreement is that, over the whole term of the agreement, each party thinks he will come out best: the consideration for one party making a payment is an obligation on the other party to make counter-payments over the whole term of the agreement.

If in *Sinclair v. Brougham* the depositors had been held entitled to recover at law, their personal claim would have ranked *part passu* with other ordinary unsecured creditors, in priority to the members of the Society who could take nothing in the liquidation until all creditors had been paid.

The claim *in rem.*

The House of Lords held that, the ordinary trade creditors having been paid in full by agreement, the assets remaining were to be divided between the *ultra vires* depositors and the members of the Society *pro rata* according to their respective payments to the Society. The difficulty is to identify any single *ratio decidendi* for that decision. Lord Haldane (with whom Lord Atkinson agreed) and Lord Parker gave fully reasoned judgments (considered

- 35 -

below). Lord Dunedin apparently based himself on some "super-eminent" equity (not a technical equity) in accordance with which the Court could distribute the remaining assets of the Society: see pp. 434 and 436. The members (by which presumably he means the Society) were not in a fiduciary relationship with the depositors: it was the directors not the Society which

had mixed the monies: 438. This indicates that he was adopting the approach of Lord Parker: yet he concurred in the judgment of Lord Haldane: 438. I can only understand his judgment as being based on some super-eminent jurisdiction in the Court to do justice as between the remaining claimants in the course of a liquidation.

Lord Sumner plainly regarded the case as a matter of doing justice in administering the remaining assets in the liquidation, all other claims having been eliminated: p. 459. He said, at p. 458:

> The question is one of administration. The liquidator, an officer of the Court, who has to discharge himself of the assets that have come to his hands, asks for directions, and, after hearing all parties concerned, the Court has the right and the duty to direct him how to distribute all the assets. ... In my opinion, if precedent fails, the most just distribution of the whole must be directed, so only that no recognised rule of law or equity be disregarded."

Lord Haldane (p. 418) treated the case as a tracing claim: could the depositors follow and recover property with which, in equity, they had "never really parted": p. 418. After holding that the parties could not trace at law (pp. 418-420) he said that the monies could be traced in equity "based upon trust": p. 420. The only passage in which he identifies the trust is at p. 421: "The property was never converted into a debt, in equity at all events, and there has been throughout a resulting trust, not of an active character, but sufficient, in my opinion, to bring the transaction within the general principle." He treats the Society itself (as opposed to its directors) as having mixed the depositors' money with its own money, but says that such mixing was not a breach of fiduciary duty by the Society but authorised by the depositors: it was intended that "the Society should be entitled to deal with [the depositors' money] freely as its own": pp. 422-423. On that ground he distinguished *In re Hallett's Estate* case (a trustee is taken to have drawn his own money first) and held that the mixed monies therefore belonged to the depositors and members *pro rata.*

Like others before me, I find Lord Haldane's reasoning difficult, if not impossible, to follow. The only equitable right which he identifies arises under "a resulting trust, not of an active character" which, as I understand it, existed from the moment when the Society received the money. Applying the conventional approach, the resulting trust could only have arisen because either the depositors were treated as contributors to a fund (a resulting trust of type (A) above) or because the "trust" on which the monies were paid to the Society had failed (a resulting trust of type (B)). Yet the finding that the