- 36 -

Society was not in breach of fiduciary duty because it was the intention or the parties that the Society should be free to deal with the money as its own (p. 423) is inconsistent with either type of resulting trust. Such an intention would rebut the <u>presumption</u> of resulting trust of type (A) and is inconsistent with a payment on express trusts which fail, i.e. with a type (B) resulting trust. Therefore the inactive resulting trust which Lord Haldane was referring to was, as Professor Birks points out, not a conventional one: indeed there is no trace of any such trust in earlier or later authority. The question is whether the recognition of such a trust accords with principle and the demands

of certainty in commercial dealings.

    As to the latter, Lord Haldane's theory, if correct, gives rise to all the difficulties which I have noted above. Nor does the theory accord with principle. First, it postulates that the Society became a trustee at a time when it was wholly ignorant of the circumstances giving rise to the trust. Second, since the depositors' money was <u>intended</u> to be mixed with that of the Society, there was never any intention that there should be a separate identifiable trust fund, an essential feature of any trust. Third, and most important, if Lord Haldane's approach were to be applicable in an ordinary liquidation it is quite incapable of accommodating the rights of ordinary creditors. Lord Haldane's inactive resulting trust, if generally applicable, would give the depositors (and possibly the members) rights having priority not only to those of ordinary trade creditors but also to those of some secured creditors, e.g. the common form security for bank lending, a floating charge on the company's assets. The monies of both depositors and members are, apparently, trust monies and therefore form no part of the company's assets available to pay creditors, whether secured or unsecured. This seems to be an impossible conclusion. Lord Haldane appreciated the difficulty, but did not express any view as to what the position would be if there had been trade creditors in competition: see at pp. 421-422 and 425-426.

    Lord Parker analysed the matter differently. He held that the depositors had paid their money not to the Society itself but to the directors, who apparently held the monies on some form of *Quistclose* trust: the money had been paid by the depositors to the directors to be applied by them in making valid deposits with the Society and, since such deposit was impossible, the directors held the monies on a trust for the depositors: see pp. 441-442 and 444. It is to be noted that Lord Parker does not at any time spell out the

nature of the trust. However, he held that the directors owed fiduciary duties both to the depositors and to the members of the Society. Therefore it was not a case in which a trustee had mixed trust monies with his own monies (to which *Hallett's* case would apply) but of trustees (the directors) mixing the monies of two innocent parties to both of whom they owed fiduciary duties: the depositors and members therefore ranked *part passu:* p. 442.

I find the approach of Lord Parker much more intelligible than that of Lord Haldane: it avoids finding that the Society held the money on a resulting trust at the same time as being authorised to mix the depositors' money with

- 37 -

its own. In *In re Diplock* [1948] Ch. 465 the Court of Appeal found the ratio of *Sinclair v. Brougham* to lie in Lord Parker's analysis. But, quite apart from the fact that no other member of the House founded himself on Lord Parker's analysis, it is in some respects very unsatisfactory. First, the finding that the depositors' monies were received by the directors, as opposed to the Society itself, is artificial. Although it was *ultra vires* the Society to enter into a contract to repay the monies, it was not *ultra vires* the Society to receive monies. Second, Lord Parker's approach gives depositors and members alike the same priority over trade creditors as does that of Lord Haldane. The fact is that any analysis which confers an equitable proprietary interest as a result of a payment under a void contract necessarily gives priority in an insolvency to the recovery of the *ultra vires* payment. Lord Parker too was aware of this problem: but he left the problem to be solved in a case where the claims of trade creditors were still outstanding. Indeed he went further than Lord Haldane. He appears to have thought that the Court had power in some cases to postpone trade creditors to *ultra vires* depositors and in other cases to give the trade creditors priority: which course was appropriate he held depended on the facts of each individual case: pp. 444 and 445. There is much to be said for the view that Lord Parker, like Lord Haldane and Lord Sumner, was dealing only with the question of the due administration of assets of a company in liquidation. Thus he says, at p.449 "Nor, indeed, am I satisfied that the equity to which effect is being given in this case is necessarily confined to a liquidation. It is, however, unnecessary for your Lordships to decide these points." This makes it clear that he was not purporting to do more than decide how the assets of that society in that liquidation were to be dealt with.

As has been pointed out frequently over the 80 years since it was decided, *Sinclair v. Brougham* is a bewildering authority: no single ratio

decidendi can be detected: all the reasoning is open to serious objection: it was only intended to deal with cases where there were no trade creditors in competition and the reasoning is incapable of application where there are such creditors. In my view the decision as to rights *in rem* in *Sinclair v. Brougham* should also be overruled. Although the case is one where property rights are involved, such overruling should not in practice disturb long-settled titles. However, Your Lordships should not be taken to be casting any doubt on the principles of tracing as established in *In re Diplock*.

If *Sinclair v. Brougham,* in both its aspects, is overruled the law can be established in accordance with principle and commercial common sense: a claimant for restitution of monies paid under an *ultra vires,* and therefore void, contract has a personal action at law to recover the monies paid as on a total failure of consideration; he will not have an equitable proprietary claim which gives him either rights against third parties or priority in an insolvency; nor will he have a personal claim in equity, since the recipient is not a trustee.

- 38 -

(B) <u>*Chase Manhattan Bank N.A. v. Israel-British Bank (London) Ltd.* [1981] Ch. 105</u>

In that case Chase Manhattan, a New York bank, had by mistake paid the same sum twice to the credit of the defendant, a London bank. Shortly thereafter, the defendant bank went into insolvent liquidation. The question was whether Chase Manhattan had a claim *in rem* against the assets of the defendant bank to recover the second payment.

Goulding J. was asked to assume that the monies paid under a mistake were capable of being traced in the assets of the recipient bank: he was only concerned with the question whether there was a proprietary base on which the tracing remedy could be founded: p. 116b. He held that, where money was paid under a mistake, the receipt of such money <u>without more</u> constituted the recipient a trustee: he said that the payer "retains an equitable property in it and the conscience of [the recipient] is subjected to a fiduciary duty to respect his proprietary right": p. 119d-e.

It will be apparent from what I have already said that I cannot agree with this reasoning. First, it is based on a concept of retaining an equitable property in money where, prior to the payment to the recipient bank, there

was no existing equitable interest. Further, I cannot understand how the recipient's "conscience" can be affected at a time when he is not aware of any mistake. Finally, the Judge found that the law of England and that of New York were in substance the same. I find this a surprising conclusion since the New York law of constructive trusts has for a long time been influenced by the concept of a remedial constructive trust, whereas hitherto English law has for the most part only recognised an institutional constructive trust: see *Metall & Rohstoff v. Donaldson Inc.* [1990] 1 Q.B. 391, 478-480. In the present context, that distinction is of fundamental importance. Under an institutional constructive trust, the trust arises by operation of law as from the date of the circumstances which give rise to it: the function of the court is merely to declare that such trust has arisen in the past. The consequences that flow from such trust having arisen (including the possibly unfair consequences to third parties who in the interim have received the trust property) are also determined by rules of law, not under a discretion. A remedial constructive trust, as I understand it, is different. It is a judicial remedy giving rise to an enforceable equitable obligation: the extent to which it operates retrospectively to the prejudice of third parties lies in the discretion of the court. Thus for the law of New York to hold that there is a remedial constructive trust where a payment has been made under a void contract gives rise to different consequences from holding that an institutional constructive trust arises in English law.

However, although I do not accept the reasoning of Goulding J., *Chase Manhattan* may well have been rightly decided. The defendant bank knew of the mistake made by the paying bank within two days of the receipt of the monies: see at p. 115a. The judge treated this fact as irrelevant (p. 114f)

- 39 -

but in my judgment it may well provide a proper foundation for the decision. Although the mere receipt of the monies, in ignorance of the mistake, gives rise to no trust, the retention of the monies after the recipient bank learned of the mistake may well have given rise to a constructive trust: see *Snell's Equity* p. 193: *Pettit Equity and the Law of Trusts* 7th edn. 168: *Metall and Rohstoff v. Donaldson Inc.* [1990] 1 Q.B. 391 at pp. 473-474.

(C) *In re Ames' Settlement* [1946] 1 Ch. 217.

In this case the father of the intended husband, in consideration of the son's intended marriage with Miss H., made a marriage settlement under which the income was payable to the husband for life and after his death to

the wife for life or until her remarriage, with remainder to the issue of the intended marriage. There was an ultimate trust, introduced by the words "If there should not be any child of the said intended marriage who attains a vested interest . . . ," for an artificial class of the husband's next of kin. The marriage took place. Many years later a decree of nullity on the grounds of non-consummation had the effect of rendering the marriage void *ab initio.* The income was paid to the husband until his death which occurred 19 years after the decree of nullity. The question was whether the trust capital was held under the ultimate trust for the husband's next-of-kin or was payable to the settlor's estate. It was held that the settlor's estate was entitled.

The judgment is very confused. It is not clear whether the judge was holding (as I think correctly) that in any event the ultimate trust failed because it was only expressed to take effect in the event of the failure of the issue of a non-existent marriage (an impossible condition precedent) or whether he held that all the trusts of the settlement failed because the beneficial interests were conferred in consideration of the intended marriage and that there had been a total failure of consideration. In either event, the decision has no bearing on the present case. On either view, the fund was vested in trustees on trusts which had failed. Therefore the monies were held on a resulting trust of type (B) above. The decision casts no light on the question whether, there being no express trust, monies paid on a consideration which wholly fails are held on a resulting trust.

The stolen bag of coins

The argument for a resulting trust was said to be supported by the case of a thief who steals a bag of coins. At law those coins remain traceable only so long as they are kept separate: as soon as they are mixed with other coins or paid into a mixed bank account they cease to be traceable at law. Can it really be the case, it is asked, that in such circumstances the thief cannot be required to disgorge the property which, in equity, represents the stolen coins? Monies can only be traced in equity if there has been at some stage a breach of fiduciary duty, i.e. if either before the theft there was an equitable proprietary interest (e.g. the coins were stolen trust monies) or such interest arises under a resulting trust at the time of the theft or the mixing of the

- 40 -

monies. Therefore, it is said, a resulting trust must arise either at the time or the theft or when the monies are subsequently mixed. Unless this is me law, there will be no right to recover the assets representing the stolen monies once

the monies have become mixed.

I agree that the stolen monies are traceable in equity. But the proprietary interest which equity is enforcing in such circumstances arises under a constructive, not a resulting, trust. Although it is difficult to find clear authority for the proposition, when property is obtained by fraud equity imposes a constructive trust on the fraudulent recipient: the property is recoverable and traceable in equity. Thus, an infant who has obtained property by fraud is bound in equity to restore it: *Stocks v. Wilson* [1913] 2 K.B. 235, 244: *R. Leslie Ltd. v. Shiell* [1914] 3 K.B. 607. Monies stolen from a bank account can be traced in equity: *Bankers Trust Co. v. Shapira* [1980] 1 W.L.R. 1274, 1282c-e. See also *McCormick v. Grogan* L.R. 4 H.L. 82, 97.

Restitution and equitable rights

Those concerned with developing the law of restitution are anxious to ensure that, in certain circumstances, the plaintiff should have the right to recover property which he has unjustly lost. For that purpose they have sought to develop the law of resulting trusts so as to give the plaintiff a proprietary interest. For the reasons that I have given in my view such development is not based on sound principle and in the name of unjust enrichment is capable of producing most unjust results. The law of resulting trusts would confer on the plaintiff a right to recover property from, or at the expense of, those who have not been unjustly enriched at his expense at all, e.g. the lender whose debt is secured by a floating charge and all other third parties who have purchased an equitable interest only, albeit in all innocence and for value.

Although the resulting trust is an unsuitable basis for developing proprietary restitutionary remedies, the remedial constructive trust, if introduced into English law, may provide a more satisfactory road forward. The court by way of remedy might impose a constructive trust on a defendant who knowingly retains property of which the plaintiff has been unjustly deprived. Since the remedy can be tailored to the circumstances of the particular case, innocent third parties would not be prejudiced and restitutionary defences, such as change of position, are capable of being given effect. However, whether English law should follow the United States and Canada by adopting the remedial constructive trust will have to be decided in some future case when the point is directly in issue.

The date from which interest is payable

The Court of Appeal held that compound interest was payable by the local authority on the balance for the time being outstanding, such interest to

- 41 -

start from the date of the receipt by the local authority of the upfront payment of £2.5m. on 18 June 1987. Although, for the reasons I have given, I do not think the Court should award compound interest in this case. I can see no reason why interest should not start to run as from the date of payment of the upfront payment. I agree with the judgment of Leggatt L.J. in the Court of Appeal (at p. 955) that there is no good ground for departing from the general rule that interest is payable as from the date of the accrual of the cause of action.

Equity acting in aid of the common law

Since drafting this speech I have seen, in draft, the speeches of my noble and learned friends Lord Goff of Chieveley and Lord Woolf. Both consider that compound interest should be awarded in this case on the grounds that equity can act in aid of the common law and should exercise its jurisdiction to order compound interest in aid of the common law right to recover monies paid under an *ultra vires* contract.

I fully appreciate the strength of the moral claim of the bank in this case to receive full restitution, including compound interest. But I am unable to accept that it would be right in the circumstances of this case for your Lordships to develop the law in the manner proposed. I take this view for two reasons.

First, Parliament has twice since 1934 considered what interest should be awarded on claims at common law. Both the Law Reform (Miscellaneous Provisions) Act, 1934, section 3(1) and its successor, section 35A of the Supreme Court Act, 1981, make it clear that the Act does not authorise the award of compound interest. However both Acts equally make it clear that they do not impinge on the award of interest in equity. At the time those Acts were passed, and indeed at all times down to the present day, equity has only awarded compound interest in the limited circumstances which I have mentioned. In my judgment, your Lordships would be usurping the function of Parliament if, by expanding the equitable rules for the award of compound interest, this House were now to hold that the court exercising its equitable jurisdiction in aid of the common law can award compound interest which the statutes have expressly not authorised the court to award in exercise of its common law jurisdiction.

Secondly, the arguments relied upon by my noble and learned friends were not advanced by the Bank at the hearing. The local authority would have a legitimate ground to feel aggrieved if the case were decided against them on a point which they had had no opportunity to address. Moreover, in my view it would be imprudent to introduce such an important change in the law without this House first having heard full argument upon it. Although I express no concluded view on the points raised, the proposed development of the law bristles with unresolved questions. For example, given that the right to interest is not a right which existed at common law but is solely the

- 42 -

creation of statute, would equity in tact be acting in aid of the common law or would it be acting in aid of the legislature? Does the principle that equity acts in aid of the common law apply where there is no concurrent right of action in equity? If not, in the absence of any trust or fiduciary relationship what is the equitable cause of action in this case? What were the policy reasons which led Parliament to provide expressly that only the award of simple interest was authorised? In what circumstances should compound interest be awarded under the proposed expansion of the equitable rules? In the absence of argument on these points it would in my view be imprudent to change the law. Rather, the whole question of the award of compound interest should be looked at again by Parliament so that it can make such changes, if any, as are appropriate.

For these reasons, which are in substance the same as those advanced by my noble and learned friend Lord Lloyd of Berwick. I am unable to agree with the views of Lord Goff of Chieveley and Lord Woolf.

Conclusion

I would allow the appeal and vary the judgment of the Court of Appeal so as to order the payment of simple interest only as from 18 June 1987 on the balance from time to time between the sums paid by the Bank to the local authority and the sums paid by the local authority to the Bank.

**LORD SLYNN OF HADLEY**

My Lords,