TAB 163

# NOVA SCOTIA COURT OF APPEAL

**Citation:** *White v. E.B.F. Manufacturing Ltd.*, 2005 NSCA 167

2005 NSCA 167 (CanLII)

**Date:** 20051230
**Docket:** CA 238176
**Registry:** Halifax

**Between:**

E.B.F. Manufacturing Limited

Appellant/Respondent
by Cross-Appeal

- and -

Eric White

Respondent/Appellant
by Cross-Appeal

- and -

ElectroBraid Fence Ltd.

Intervenor

| | |
|---|---|
| **Judge(s):** | Bateman, Freeman & Saunders, JJ.A. |
| **Appeal Heard:** | September 29, 2005, in Halifax, Nova Scotia |
| **Held:** | Appeal and Cross-Appeal dismissed, as per reasons for judgment of Saunders, J.A.; Bateman & Freeman, JJ.A. concurring. |
| **Counsel:** | George W. MacDonald, Q.C. & C. Peter McLellan, Q.C., Solicitors for the Appellant/Respondent by Cross-Appeal, and the Intervenor |
| | David P. S. Farrar, Q.C. & Colin D. Piercey, Solicitors for the Respondent/Appellant by Cross-Appeal |

2005 NSCA 167 (CanLII)

<u>Reasons for judgment</u>:

[1]     This appeal calls into question a trial judge's interpretation of certain contractual terms which resulted in the payment of royalties for a very profitable invention, and a finding that because the contract had not been repudiated, it remains valid and enforceable.

## Background

[2]     The case arises out of a contract and business dispute between the parties to this appeal.  EBF Manufacturing Limited (EBF) is a Nova Scotia company which manufactures and markets braided electrical fencing.  ElectroBraid Fence Limited ("FENCE") is a Nova Scotia company which markets and sells EBF's product.

[3]     The respondent, Eric White, ("White") is the inventor, and holder of a patent in a product known commercially as "ElectroBraid," a braided polyester rope interwoven with conductive copper wire that is used for the rail component of a fence.  When an electric current is applied to ElectroBraid, it becomes a charged electrical fence, designed to pen or contain animals.  This dispute centres mainly upon the method of calculating royalties to White on sales of Electrobraid and related products.

[4]     On January 29, 1988, White granted EBF an irrevocable and exclusive licence to all patents and patents pending related to the manufacture of "braided electrical fencing."

[5]     E. David Bryson ("Bryson") is the sole shareholder, officer and director of EBF and FENCE.  Initially Bryson, White and White's wife Jennifer Fried, were all shareholders in EBF.  Subsequently, White exercised a shotgun provision in EBF's shareholder agreement, and Bryson bought all of the shares held by White and Fried.  White commenced an action against EBF claiming unpaid royalties and seeking a declaration that the licence agreement had been repudiated.  McDougall, J. dismissed the claim for repudiation but found that royalties were due to White based on the sales of both FENCE and EBF.

2005 NSCA 167 (CanLII)

[6]     Following trial, by order dated January 7, 2005, McDougall, J. ordered EBF to have an independent accountant calculate the past royalties due and owing to White.  EBF was obliged to make payment within 60 days of receipt of the accountant's report.  The accountant's report was received March 29, 2005.  Calculations revealed that with past royalties, together with additional amounts of interest, costs and disbursements, EBF owed White a total of $241,255.87.

[7]     On January 6, 2005 EBF appealed the trial judge's decision.  On January 20, 2005 EBF applied for a stay of that decision until this appeal could be heard.  That application for a stay was dismissed by a member of this court in chambers on January 26, 2005.

[8]     After discovering that White had incorporated a new company known as White Rhino Inc. and had begun to compete with EBF and FENCE, those latter two companies applied for a further stay of McDougall, J.'s decision pending the hearing of this appeal.  That application for a stay was dismissed by another member of this court in chambers on June 29, 2005.

[9]     In addition to the matters leading to the within appeal, the parties have commenced other proceedings, both in the Nova Scotia Supreme Court against White and White Rhino Inc. seeking damages and a permanent injunction with respect to that competition, and in the Federal Court of Canada.  The issues complained of, and the status of those other proceedings need not concern us here.

[10]   In appealing Justice McDougall's decision, EBF submits that he was wrong to involve FENCE by forcing that company to open its books to inspection, or requiring it to include its gross revenue when calculating royalty payments to White.

**Issues**

[11]   The grounds of appeal in the main appeal may be succinctly stated:

> (i)     *Did the trial judge err in finding that in calculating the royalty payments owed to White by EBF, the gross revenue of FENCE was to be included?*

2005 NSCA 167 (CanLII)

> *(ii)*    *Did the trial judge err in ordering FENCE to make its books and records available for review by an accounting professional for the purposes of calculating the royalty payments owing to White by EBF?*

[12]   For his part White has cross-appealed claiming that the trial judge seriously erred in finding that the agreement had not been repudiated by the actions and conduct of the appellants, and that as a consequence their agreement continues to bind them to it.

[13]   The single ground of appeal advanced in the cross-appeal may be simply stated:

> *(i)*    *Did the trial judge err in determining that the Licence Agreement was not repudiated, and remains "valid and enforceable"?*

[14]   Whereas, to a certain extent, the issues on appeal and cross-appeal involve different matters arising from the evidence, different legal principles, and different standards of review, I propose to deal with the appeal and the cross-appeal separately in this judgment.

## THE APPEAL

## Standard of Review

[15]   In **Housen v. Nikolaisen**, [2002] 2 S.C.R. 235, the Supreme Court of Canada considered the standard of review on appeal from a trial court.  Iacobucci and Major J.J., writing for the majority, summarized the standard as follows:

> (a)    The standard of review for a question of law is one of correctness (¶ 8);

> (b)    The standard of review for findings of fact is one of "palpable and overriding error," meaning that the error must be readily or plainly seen (¶ 10);

    (c)      Factual inferences from underlying findings of fact are subject to a "palpably wrong" test as well (¶ 25);

    (d)      The standard of review for mixed questions of fact and law can vary depending on the circumstances. An incorrect application of the legal standard can expose the mixed question of fact and law to a correctness standard of review (¶ 31).

[16]   The interpretation of an agreement is a matter of law.  The standard for appellate review is one of correctness.  Here the trial judge was obliged to apply proper legal principles when interpreting the contract between the parties.  However, contractual agreements are not examined in a vacuum.  As part of the exercise, the trial judge was required to carefully review the evidence and make certain findings of fact.  When considering the trial judge's reasons while he was in the fact finding mode, the standard for appellate review is one of "palpable and overriding error."  The standard of review applicable to inferences drawn from fact is no less and no different than the standard applied to the trial judge's findings of fact.  Again, such inferences are immutable unless shown to be the result of palpable and overriding error.  If there is no such error in establishing the facts upon which the trial judge relies in drawing the inference, then it is only when palpable and overriding error can be shown in the inference drawing process itself that an appellate court is entitled to intervene.  Thus, we are to apply the same standard of review in assessing Justice McDougall's findings of fact, and the inferences he drew from those facts.  **Housen**, supra; **H.L. v. Canada (Attorney General)**, [2005] 1 S.C.R. 401, 2005 S.C.C. 25; and **McPhee v. Gwynne-Timothy** (2005) N.S.C.A. 80.

[17]   An error is said to be palpable if it is clear or obvious.  An error is overriding if, in the context of the whole case, it is so serious as to be determinative when assessing the balance of probabilities with respect to that particular factual issue.  Thus, invoking the "palpable and overriding error" standard recognizes that a high degree of deference is paid on appeal to findings of fact at trial.  See, for example, **Housen**, supra, at ¶ 1 - 5.  Not every misapprehension of the evidence or every error of fact by the trial judge will justify appellate intervention.  The error must not only be plainly seen, but be "overriding and determinative."  **Delgamuukw v. British Columbia**, [1997] 3 S.C.R. 1010 at ¶ 78 and 80.

**Issue No. 1**

2005 NSCA 167 (CanLII)

> ***(i)     Did the trial judge err in finding that in calculating the royalty
> payments owed to White by EBF, the gross revenue of FENCE is to
> be included?***

[18]   At the hearing before us counsel for EBF characterized the Licence
Agreement as "fundamentally important to the case," the principal document that
"had to be interpreted" by the trial judge, and that it was the "very reason for this
lawsuit" since it "forms the basis of the royalties payable to White."  EBF says the
entire agreement between the parties is contained in the Licence Agreement and
therefore it was improper for McDougall, J. to look outside the document in
deciding its meaning.

[19]   In complaining that the judge erred when he referred to extrinsic evidence in
order to interpret the agreement between the parties, EBF was especially critical of
Justice McDougall for relying upon the evidence of Mr. Douglas Reid, FCA, the
regional managing partner of the accounting firm KPMG, and an opinion Mr. Reid
had prepared for Bryson at Bryson's request dated November 12, 1999.  Counsel
criticized what they described as the "musings of Mr. Reid" and says his evidence
ought not to have been received, let alone relied upon, since no attempt had been
made to qualify Mr. Reid to present expert evidence at trial.

[20]   The thrust of EBF's complaint is that the License Agreement was clear on its
face and that it ought to have been given its plain meaning by the trial judge.  The
appellant says there was no need for the trial judge to stray beyond the text of the
document in order to interpret its terms.  Specifically, counsel for the appellant
state in their factum:

> 28.     The plain words of the License Agreement provide that a royalty is to be
> paid to White equal to 2% of the Company's gross revenues.   The recitals to the
> License Agreement refer to the Shareholders Agreement and in particular article
> 4.02 which refers to the granting by White of an exclusive license to the
> Company.  The Company is clearly EBF.

> . . .

> 30.     The Learned Trial Judge relied on a letter written by Mr. Reid some two
> years after the License Agreement was executed <u>to amend the unambiguous
> provisions of the License Agreement</u>.  [Underlining mine]

2005 NSCA 167 (CanLII)

Counsel then refer to leading authorities for what are said to be the rare and special circumstances which limit the application of the parol evidence rule and the admittance of extrinsic evidence, none of which - it is argued - arose here.

[21]    With respect, it does not behoove the appellant to now allege, on appeal, that the trial judge erred in applying the parol evidence rule or in looking to extrinsic evidence to interpret the agreement between the parties, or in considering and attaching some weight to the evidence of Mr. Reid, when he was invited by EBF's trial lawyer to do precisely that during final arguments at the end of the trial.

[22]    While not part of the appeal book, we as a panel or any member of the public for that matter, have access to submissions made by counsel in open court as part of the public record.  Often considerable insight is gleaned by comparing the manner in which the theories of the parties were presented at trial or the way in which particular issues were (if at all) put before the trial judge for resolution, to the way in which the case is argued on appeal.  This exercise can be especially illuminating where, as here, different counsel take the matter on appeal than those who acted at trial.

[23]    In his final arguments following trial, EBF's then lawyer, properly, I would suggest, acknowledged ambiguity in the License Agreement by encouraging Justice McDougall to look beyond the document in order to interpret the agreement and ascertain what the parties to it had decided.  In that same submission EBF's trial counsel specifically referred to Mr. Reid and his *viva voce* and documentary evidence, commending it to the attention of the trial judge as being credible and independent and - so counsel argued - tending to corroborate Bryson's version of events.  For example, at one point in his submissions, counsel said in part:

> . . . The first question which I think is one of the most important questions is when was the royalty payment to commence and as you know, Mr. Bryson's testimony is that it was to commence at the time that the patent was issued.  Mr. White's testimony was that it was to start being payable as a monthly payment on a monthly basis starting in October of 1997.  Now if you look at the License Agreement itself . . . what does this agreement say about timing of payment?  Well, Ms. Brennan in her letter to the parties when she sent the draft, the agreement doesn't have a date.  Mr. Bryson says . . . that clearly royalty payments are not to start until there's a patent because there is to be a royalty in respect of each patent.  And Mr. White, of course, takes the view that notwithstanding the

2005 NSCA 167 (CanLII)

silence of the agreement, there were discussions between the parties to say it was going to be on a monthly basis.  Well, I think, My Lord, that the licensing agreement is vague on the point . . . if it was specific it would have had a clause that says royalty payments are to be made on a monthly basis . . .  It could have said royalty payments are to be commenced upon the issuance of a patent . . . So the licensing agreement is vague on the point which means that you do need to look beyond the licensing agreement to see what the parties had decided.  And I think when you look at what was happening, you look at the objective evidence, you try to assess what the reasonable parties would have been thinking at the time.  . . . this interpretation that royalties were not to be paid until after the patent was issued, it wasn't something new that Mr. Bryson came up with this legal maneuvering that started occurring in 2000.  This wasn't a change in position.  This was the view that he held throughout and I can illustrate that for you by talking about the evidence of Doug Reid.  Mr. Reid is obviously a professional.  He is independent of the parties.  His evidence is certainly credible and it is also supported by documentation . . .

(Underlining mine)

[24]    Having been urged by the appellant's trial counsel to look beyond the four corners of the License Agreement, and in interpreting the document take into account extrinsic evidence in order to fathom what the parties had decided, the appellant cannot now suggest that the same trial judge erred by applying the parol evidence rule and by looking to other extrinsic evidence so as to give meaning to any ambiguity in the same agreement.

[25]    In any event - and quite apart from this background to the appellant's contradictory submissions - I see no error in the manner in which he interpreted the agreement between the parties.  It is vague, in certain respects.  As Ms. Brennan, the lawyer who drafted it in the first place acknowledged in her file materials and correspondence to her clients, she was not a patent lawyer, and the date for commencement of royalty payments had not been stipulated.  This was one of the principal questions put before the trial judge in this litigation to resolve.  He had no choice but to look beyond the document.  To interpret the agreement he had every reason to consider evidence beyond its text.  He made no error in principle in deciding to do so.  That decision was correct.

[26]    The question then becomes whether any of the factual findings made by the trial judge reveal palpable and overriding error, such that his determinations with

respect to the calculation of royalties, and authorizing a review of FENCE's accounting records for the purposes of calculating royalties, ought to be reversed.

[27]   In his decision, McDougall, J. was certainly alert to the issues that now give rise to this appeal.  He carefully reviewed and summarized the material evidence that had been presented over the course of the eight day trial and then, as he was bound to do, made certain critical findings leading ultimately to his disposition and order.  He said in part:

> [15]    This license agreement dated the 29th day of January, 1998 was signed by White, Fried and Bryson both in their personal capacity and on behalf of EBFML It is interesting to note that the exclusive license was granted only to EBFML. However, on the same day the shareholders' agreement was signed -- September 4, 1997 -- White, Fried and Bryson had also signed another one-page agreement that made reference to clause 4.02 of the shareholders' agreement. In the second paragraph of this one-page agreement it was stated:
>
>> In that event we agree promptly to form another company, with identical voting common shares as EBF Manufacturing Limited, to which Eric White will grant a similar exclusive license.
>
> The event referred to was the insolvency of EBFML or any other company that might possibly be granted such an exclusive license in the event EBFML actually did become insolvent.
>
> [16]     The license agreement was drafted by a lawyer retained by EBFML. In the cover letter sent to the three principals of EBFML enclosing a draft of the license agreement counsel wisely suggested two things:
>
>> ... As discussed with you, I do not have experience with patents and it would be prudent to have the document reviewed by your patent lawyer. Also, you may want to add further details - for example, paragraph 4 does not specify when royalty payments are to be made, including the commencement date for such payments.
>
> One other interesting comment in this letter (which was tendered as an exhibit without calling the author) is:

2005 NSCA 167 (CanLII)

My understanding is that all of the equipment is to be owned by E.B.F. (by E.B.F. she meant E.B.F. Manufacturing Limited - my comment) and that Electrobraid (by Electrobraid she meant ElectroBraid Fence Limited - my comment) simply acts as an agent on behalf of E.B.F. I have prepared the document on this basis.

[17]     The manner in which royalty payments were to be calculated and the timing of those payments, formed the basis of this law suit.

. . .

ISSUES TO BE DECIDED

. . .

(2)     Based on the agreements between the parties (both the shareholders' agreement and the license agreement) <u>when and how should royalties be calculated</u>?

. . .

[23]     <u>Although the term "gross revenues" was not defined, there is nothing to suggest that it should not be given its ordinary accounting definition. This was even suggested to Mr. E.C. Harris, Q.C. in correspondence sent to him by Mr. Douglas Reid, C.A. on the 12th day of November 1999. That definition states</u>:

'Gross revenues' represents the total sales, net of sales discounts, of the Company. They will be reported on the financial statements of the Company as 'sales', or 'revenue'.

The corporate structure that the Company currently operates within raises an issue. In our view it is reasonable that the agreements contemplated 'gross revenues' to be sales to the consumer, or third

2005 NSCA 167 (CanLII)

party sales. <u>The current management structure sees the Company selling the product to Electrobraid Fence Limited, a company with identical ownership to the Company, at a price that may not be representative of the sales made to the third party purchaser.</u>

<u>Therefore, we believe the parties to the agreement should clarify that 'gross revenues' be the gross sales, net of sales discounts, as reported by Electrobraid Fence Limited, using generally accepted accounting principles.</u>

[24]     Both Messrs. Harris and Reid had been called upon at one time or another to provide professional legal and/or accounting advice to the companies and its shareholders.

[25]     It is interesting to note that the <u>lawyer who had previously drafted the license agreement identified some shortcomings in the agreement</u> related to the timing of royalty payments but she did not express any concerns about the method of calculation. <u>It is 2% of gross revenues defined as the total sales or revenue to third party buyers. If the sale was made either by EBFML or ElectroBraid Fence directly to the end user or discounted to an agent of the companies then that is the amount that should be used in calculating gross revenues. It should not be some potentially arbitrary transfer price from EBFML to ElectroBraid Fence. Sales to end-users or the discounted price offered to company agents, as long as it reflects fair market value, should not be open to manipulation that could potentially harm the patent(s) owner</u>.

[26]     . . .  <u>In order to determine the gross revenues of the companies for purposes of calculating the total amount of royalties owing to Mr. White, EBFML and ElectroBraid Fence will be required to hire a qualified accounting professional</u> to review the financial records of the companies since they began operations in or about September of 1997. <u>All sales of the companies products to end users or the discounted prices given to agents of the companies, for both patented and patent pending products, should be included in</u> the calculation of this amount.

. . .

[41]     I also earlier indicated that a proper review of the companies' financial records should be conducted in order to calculate total gross revenues from the

time the companies first began operations.  If the parties cannot agree on who to appoint for this purpose, the court will select a qualified individual or firm after hearing further submissions from counsel.  The process of selecting the appropriate individual or firm should be completed within 60 days of the date of this decision. White is also entitled to interest on all unpaid royalties at a rate equal to the average interest that EBFML would have had to pay on any monies borrowed from its bank during the period from its inception in September, 1997 up to the present day.  Interest is not to be compounded.

. . .

[43]    <u>All future royalty payments should be paid by EBFML/ElectroBraid Fence to White on a monthly basis</u> in the manner described herein unless the parties mutually agree to some other arrangement.

(Underlining mine)

[28]    There was ample evidence to support the interpretation and disposition of the trial judge.  In no way can it be said that his findings are the result of palpable and overriding error.  I will review, in some detail, the evidence supportive of the judge's interpretation.

[29]    The first formal written contract that makes reference to royalties is the Shareholders' Agreement of September 4, 1997. The preamble specifically states that EBF was incorporated for the purpose of manufacturing and marketing ElectroBraid Fence products.   A second company, FENCE, was incorporated simultaneously and with the same share ownership structure as EBF, to market the products.  As the business developed, EBF did not "market" products to third parties but "transferred" ElectroBraid to FENCE at a wholesale price.

[30]    Clause 4.01 of the Shareholders' Agreement states that the nature of the business of the company shall consist of manufacturing and selling braided fencing <u>and associated products</u>.  FENCE was to be responsible for selling associated products.

[31]    In September 1997, for whatever reason, the parties never turned their minds to drafting a separate shareholders' agreement for FENCE.  Therefore, by preparing the Shareholders' Agreement, it cannot be said that the parties intended to clearly delineate the roles of EBF as manufacturer and FENCE as marketer. At the time the Shareholders' Agreement was prepared, as I have already pointed out, the parties were dealing, generally, with the manufacturing and distribution of ElectroBraid.  As matters developed they incorporated FENCE to do the end selling.  For whatever reason the parties never turned their minds to drafting a separate shareholders' agreement for FENCE.  The fact that the agreement that was prepared does not refer to FENCE, cannot be interpreted to mean that the royalties were payable only on EBF's "sales."

[32]    In the fall of 1998, more than one year after the preparation of the Shareholders' Agreement, the parties signed a letter agreement indicating that the Shareholders' Agreement for EBF applied equally to FENCE.  A separate formal written contract with distinct terms was not prepared for FENCE.

[33]    White argued that royalties should be calculated based on sales to arm's length third parties, whether they be wholesalers, end users, fence installers, sales agents, sales partners or whatever.  This strikes me as a commercially reasonable position to have taken. Evidently, so did the trial judge.

[34]    Bryson argued that royalties should be calculated based on a wholesale transfer price between two companies with the same sole shareholder, officer and director.  Obviously the potential exists to manipulate the transfer price between the two, thereby disentitling White from a royalty at fair market value.  In my view this is not commercially reasonable nor, according to the trial judge's assessment of the evidence, in accordance with what the parties intended.  As he determined, the royalty should be based upon sales to third parties thereby subject to the demands of the marketplace and "not open to manipulation that could potentially harm the patent(s) owner."

[35]    The behaviour of EBF, FENCE and Bryson subsequent to the executing of the Agreement clearly support the trial judge's finding that Bryson's understanding (as well as White's) was that the royalties be based on sales to third parties by

FENCE.  For example, the fiscal years ended September 30, 1999 and September 30, 2000 show the royalties were carried on the books of FENCE, not EBF.  The two royalty cheques of May and June of 1999, in the amount of $10,000 each, (signed by Bryson well before the involvement of KPMG) were both drawn on the account of FENCE.  If FENCE had no responsibility to pay royalties, why were cheques for royalties being drawn on the account of FENCE?

[36]   Similarly, the January 25, 2002 letter from the appellant's trial counsel enclosed two cheques for royalties, drawn on the account of FENCE, not EBF.

[37]   The management and ownership structure of both EBF and FENCE is identical.  EBF sells *exclusively* to FENCE.  Bryson sets the price at which EBF sells ElectroBriad to FENCE.  Surely the parties did not intend that White would receive royalties based only on the sales from EBF to FENCE.  For example, Bryson could sell ElectroBriad FENCE to FENCE for $1, and yet set the price for the consumer at $200.  White would only receive royalties on that $1.  This is not only inconsistent with the evidence of the parties' intention, it is not commercially reasonable.

[38]   The appellant argues that "Company" in the License Agreement is clearly EBF.  There is no definition of the term "Company" in the January 29, 1998 License Agreement.  "Company" is defined in the September 4, 1997 Shareholders' Agreement to mean EBF. At no time was a separate shareholders' agreement prepared with respect to FENCE.  Again the parties subsequently agreed in September 1998 that the Shareholders' Agreement for EBF would apply equally to FENCE.

[39]   EBF emphasizes that the License Agreement does not name FENCE as a party thereto.  However, one cannot ignore the fact that Bryson is personally named as a party to the document.  In other words, Bryson is bound thereby, and cannot circumvent the terms of the License Agreement.  Bryson has 100% control of both companies, and as the trial judge inferred, he cannot be permitted to circumvent a commercially reasonable interpretation of the License Agreement by paying royalties only on a wholesale transfer price between EBF and FENCE, a price which is entirely within his control.

2005 NSCA 167 (CanLII)

[40]   Further, all parties testified that the basic agreement between them with respect to royalties had been concluded by June 30, 1997.  In particular, Bryson agreed on cross-examination that the Shareholders' Agreement and License Agreement did not change any of the terms of the agreement on royalties that had been concluded by the parties by June 30, 1997.  In June 1997, the parties were only premising their discussions on the February 1997 Business Plan of EBF as prepared by White and Fried without reference or regard to the existence of FENCE.

[41]   In summary, there was ample evidence in the record to support the trial judge's findings that although FENCE:

> . . . never became party to the shareholders' agreement, nor was a separate shareholders' agreement even created for it, its share structure mirrored that of EBF . . .  FENCE would be used to sell the product and act as a buffer between "EBF and its customers".  This would be particularly important when the company began marketing its products in the United States . . .  as a shield against any law suits that might arise in what the shareholders perceive to be a more litigious market.  Although sales of "EBF" products were made by both companies most of the sale to end-users were eventually funneled through "FENCE".

[42]   In **Investors Compensation Scheme Ltd. v. West Bromwich Building Society**, [1998] 1 W.L.R. 896 (H.L.), at page 913, Lord Hoffman summarises the principles of interpretation of a written contract.  He says:

> (1)      Interpretation is the ascertainment of the meaning which the document would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract.

> . . .

> (4)      The meaning which a document (or any other utterance) would convey to a reasonable man is not the same thing as the meaning of its words.

The meaning of words is a matter of dictionaries and grammars; the meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean.  The background may not merely enable the reasonable man to choose between the possible meanings of words which are ambiguous but even (as occasionally happens in ordinary life) to conclude that the parties must, for whatever reason, have used the wrong words or syntax: see Mannai Investments Co. Ltd. v. Eagle Star Life Assurance Co. Ltd. [1997] A.C. 749.

[43]    In **Kentucky Fried Chicken Canada v. Scott's Food Services Inc.**, 1998 CarswellOnt 4170 (C.A.) at ¶ 27, the Court states:

> Where, as here, the document to be construed is a negotiated commercial document, the court should avoid an interpretation that would result in a commercial absurdity [FN1].  Rather, the document should be construed in accordance with sound commercial principles and good business sense [FN2].  Care must be taken, however, to do this objectively rather than from the perspective of one contracting party or the other, since what might make good business sense to one party would not necessarily do so for the other.

[44]    I concur with those observations and statement of principles.  In my view they were clearly in the mind of the trial judge in disposing of this aspect of the case as he did.  I see no error in the manner in which he handled it, and would dismiss this ground of appeal.

**Issue No. 2**

> *(ii)    Did the trial judge err in ordering FENCE to make its books and records available for review by an accounting professional for the purposes of calculating the royalty payments owing to White by EBF?*

[45]    Here EBF and FENCE argue that in ordering that FENCE's gross revenue be included in the calculation of royalties to be paid to White, the judge erred in law by not recognizing that FENCE was not a party to the agreement, or the litigation,

and that being a separate and distinct legal entity, the judge was wrong to lift the corporate veil so as to grant White the relief he sought.

[46]   I disagree.  First, I do not accept the appellant's characterization that FENCE is not a party to either the Shareholders' Agreement or the License Agreement.  As previously noted, "Company" is defined in the Shareholders' Agreement to be EBF, which in turn is incorporated into the License Agreement.  However, the parties confirmed by way of a letter agreement dated September 29, 1998 that the Shareholders' Agreement applied equally to FENCE.  Thus, on these facts, FENCE ought to be considered a party to both the Shareholders' Agreement and the License Agreement.

[47]   In any event and even assuming that FENCE is not a party, nor intended to be a party to the agreements, it is my opinion that it was appropriate for the trial judge in these unique circumstances to lift the corporate veil, and make the order he did.

[48]   The concept that corporations are separate legal entities, despite the fact they may have the same shareholders, has been fundamental to the common law since the House of Lords decision in **Salomon v. Salomon & Co.**, [1897] A.C. 22 (H.L.).  A more recent commentary on this principle can be found in the Supreme Court of Canada decision in **Kosmopoulos v. Constitution Insurance Co. of Canada**, [1987] 1 S.C.R. 2, where Wilson, J. stated at ¶ 12:

> As a general rule a corporation is a legal entity distinct from its shareholders: Salomon v. Salomon & Co., [1897] A.C. 22 (H.L.). The law on when a court may disregard this principle by "lifting the corporate veil" and regarding the company as a mere "agent" or "puppet" of its controlling shareholder or parent corporation follows no consistent principle. The best that can be said is that the "separate entities" principle is not enforced when it would yield a result "too flagrantly opposed to justice, convenience or the interests of the Revenue": L.C.B. Gower, *Modern Company Law* (4th ed. 1979) at p. 112. I have no doubt that theoretically the veil could be lifted in this case to do justice, as was done in American Indemnity Co. v. Southern Missionary College *supra*, cited by the Court of Appeal of Ontario. But a number of factors lead me to think it would be unwise to do so.

2005 NSCA 167 (CanLII)

[Underlining mine]

[49]   At the hearing before us counsel for the appellant and intervenor urged that the corporate veil ought not to be lifted except in the most serious of cases where fraud, or deceit, or use of a corporation for an improper purpose is both pleaded and proved.  With respect, I think that submission invites a far too restrictive approach, implying that only the most egregious or criminally unlawful circumstance will entitle a court to lift the corporate veil.  I do not understand that to be the law.

[50]   In **Littlewoods Mail Order Stores Ltd. v. Inland Revenue Commissioners**, [1969] 1 W.L.R. 1241 (C.A.) Lord Denning declared at page 1255:

> . . .  The doctrine laid down in Salomon v. Salomon & Co. [1897] A.C. 22, has to be watched very carefully.  It has often been supposed to cast a veil over the personality of a limited company through which the courts cannot see. But that is not true. The courts can and often do draw aside the veil. They can, and often do, pull off the mask.  They look to see what really lies behind.  . . .

[51]   In **Le Car GmbH v. Dusty Roads Holdings Ltd.**, 2004 CarswellNS 138 (S.C.),  Murphy, J. accurately  identified three situations where courts have lifted the corporate veil:

(a)    where failure to do so would be unfair and lead to a result "flagrantly opposed to justice";

(b)    where representations are made or activities undertaken for a fraudulent or other objectionable, illegal or improper purpose to facilitate doing something that would be illegal or improper for an individual to do personally; and

(c)    where the corporation is merely acting as the controlling shareholder's agent.

2005 NSCA 167 (CanLII)

[52]    Courts will often pierce the corporate veil where the company is an agent or the mere alter-ego of the controlling shareholder or parent company.  There was certainly evidence before McDougall, J. to support a conclusion that FENCE was merely the alter-ego of Bryson and EBF.  In **Aluminum Co. of Canada v. Toronto (City)**, 1944 CarswellOnt 71 (S.C.C.), at ¶ 15-16, Rand, J., referred to the Court's earlier decision in the case of **Toronto v. Famous Players Canadian Corp.**, [1936] 2 D.L.R. 129 as having:

> 15  . . .  settled that the business of one company can embrace the apparent or nominal business of another company where the conditions are such that it can be said that the second company is in fact the puppet of the first; when the directing mind and will of the former reaches into and through the corporate façade of the latter and becomes, itself, the manifesting agency.

> . . .

> 16     The question, then, in each case, apart from formal agency which is not present here, is whether or not the parent company is in fact in such an intimate and immediate domination of the motions of the subordinate company that it can be said that the latter has, in the true sense of the expression, no independent functioning of its own.

[53]    EBF and FENCE are inextricably linked.  EBF is the manufacturing arm of the enterprise and FENCE is the distributing arm. In his testimony Bryson agreed that FENCE was a "mere sales station."  He agreed it had no employees, very little assets other than its inventory, and limited capitalization.

[54]    The evidence at trial established that Bryson is the sole shareholder, director and officer of both companies.  When FENCE was created, it was decided that EBF would own all the business assets and FENCE would be used to sell the product and act as a buffer between EBF and its customers.  FENCE has no independent functioning.  The directing mind of EBF (Bryson) penetrates the corporate facade so that FENCE becomes the agent of EBF.  Indeed in her covering letter referring to the License Agreement, Ms. Marcia Brennan, the

parties' corporate lawyer who drafted the documentation, states that FENCE is an agent of EBF and that she drafted the License Agreement on that basis.

[55]  EBF manufactures ElectroBraid Fence.  Its only customer is FENCE, a company controlled and operated by the same individual.  Though FENCE does sell other products other than ElectroBraid, these products are all part of the ElectroBraid fencing system.  Without ElectroBraid, FENCE would not be able to function.  FENCE is a mere agent of EBF.

[56]  In my opinion all of these unique circumstances confirm the soundness of the trial judge's decision.  I see no error in his treating EBF and FENCE - for the purpose of calculating the royalties to which White was entitled - as being, essentially, one and the same thing.  More fundamentally, however, the appellant's and intervenor's submission that the judge erred in failing to separate the two corporate entities ignores the position asserted on their behalves at trial.  A key issue is whether the royalties would be calculated on the "sales" to EBF or those of FENCE.  At no time did the appellant suggest to the trial judge that FENCE should be made a formal party to the action, or that FENCE was not properly before the court, or that he was not entitled to conclude that royalties be calculated on the sales of FENCE.  Throughout the trial all parties conducted the proceeding as if FENCE and EBF were parties to the litigation.

[57]  Lastly, the appellant has argued that the trial judge erred by considering Mr. Reid's interpretation of gross revenues.  Whether or not Mr. Reid was qualified as an "expert" at trial is irrelevant, as Mr. Reid's "opinion" is a commercially reasonable interpretation that the agreements between the parties can bear.

[58]  The appellant now seeks to distance itself from the opinion of Mr. Reid, when that opinion was sought at the behest of Bryson.  Bryson was apparently satisfied with Mr. Reid's opinion for a period of time, since - as I have already explained - he reflected royalties on the financial statements of FENCE, and drew the payments from the accounts of FENCE.  In these circumstances I see no error on the part of the trial judge in directing that EBF and FENCE make their corporate financial records available for inspection "in order to calculate total gross revenues from the time the companies first began operations" and thereby

determine the amount of royalties to which White was entitled.  I would dismiss this ground of appeal.

## Disposition:  The Appeal

[59]   For all of these reasons I see no error on the part of the trial judge in finding that in order to calculate the royalties owed to White by EBF the gross revenue of FENCE ought to be included, or in compelling FENCE to make its records available for review to complete that calculation.  I would dismiss the appeal with costs to the respondent, White.

## THE CROSS-APPEAL

## Standard of Review

[60]   Here too there are mixed standards of review to be applied.  When deciding, as he did, that the License Agreement had not been repudiated, the trial judge was obliged to apply proper legal principles.  In that sense the standard for our review on appeal, to that segment of his decision making, is one of correctness.  However, in arriving at that conclusion he was also obliged to carefully consider the evidence and make certain key findings.  Such findings are reviewable on a palpable and overriding error basis, as discussed earlier.

## Analysis

**Issue No. 1:**        *Did the trial judge err in determining that the License Agreement was not repudiated?*

[61]   White contends that the refusal of EBF to pay royalties resulted in a repudiation of the licence agreement. He attacks the trial judge's dismissal of his cross-appeal on a number of fronts. Owing to their variety and specificity I feel obliged to address them in some detail.

2005 NSCA 167 (CanLII)

[62]   White says the trial judge erred in finding that there had never been a denial by EBF of his entitlement to receipt of eventual royalties.  In his decision McDougall, J. said:

> [35]    Based on the evidence presented before me I do not find that there has been a repudiation of the agreement.  The parties might not have agreed on exactly when royalty payments should have begun but <u>clearly there has never been a denial of White's entitlement to receipt of eventual payment</u>.

> [Underlining mine]

[63]   White argues that EBF took the position, on February 7, 2000, in a letter from its lawyer on that date, that royalties were not yet due and owing.  This - so it is argued - constituted a denial of White's entitlement to the receipt of eventual royalties and it is at this point that White says the repudiation of the agreement "crystalized."

[64]   I share the trial judge's view that some significance ought to be attached to the fact that White's plea that EBF had repudiated the contract <u>was not</u> advanced in his first statement of claim filed in May, 2000.  At that point in the litigation - notwithstanding the fact that this pleading was filed some three months <u>after</u> the repudiation is said to have taken place - the claim was restricted to royalties said to be owing for patents and patents pending invented by White and utilized by EBF.

[65]   In the alternative White says that "the repudiation crystalized when EBF defended the action in its first defence filed May 30, 2000."  I note parenthetically that the words "repudiate" or "repudiation" do not appear in either pleading at this stage of the litigation.

[66]   The defence put forward by EBF at that time was that under the terms of their agreements, royalties to White would not commence unless and until he was granted a patent related to the technologies described in those agreements.  Thus, EBF pled that since White had not obtained any such patents, he was not entitled to

any royalty payments.  EBF counterclaimed for damages said to have been caused by White's conduct in delaying and frustrating all attempts to secure patent protection.

[67]   It wasn't until White filed an amended statement of claim on March 28, 2001 that any relief for repudiation was asserted.  White alleged, *inter alia*:

> 13.    As a result of the failure of EBF Manufacturing Limited to make payments pursuant to the Licence Agreement, EBF Manufacturing Limited has repudiated the agreement and, as of May 3, 2000, was no longer entitled to a licence for the use of certain patents and patents pending owned by White.  EBF Manufacturing Limited has continued to manufacture and distribute its products using White's patents and patents pending without permission to use White's intellectual property.
>
> . . .
>
> 15.    White therefore claims:
>
> . . .
>
>     iv.  a declaration that the Licence Agreement has been repudiated by EBF Manufacturing Limited, is now null and void and White is relieved from any further obligations thereunder;
>
> [Underlining in original]

[68]   EBF filed an amended defence and counterclaim on June 6, 2001.  In response to White's claim of repudiation, EBF responded in particular as follows:

> 6.    The Plaintiff knew or ought to have known that the Defendant interpreted the Agreements as not requiring payment to the Plaintiff prior to granting of a patent.  The Plaintiff was in agreement or acquiesced to the non-payment by the Defendant pursuant to the Agreements.  In the alternative, the Plaintiff engaged in conduct which reasonably led the Defendant to believe that he was acquiescing to the non-payment of royalties pursuant to the Agreements.  In the event that the

2005 NSCA 167 (CanLII)

Agreements entitled the Plaintiff to payment prior to granting of a patent, which is not admitted but specifically denied, then the Plaintiff is estopped from relying on such non-payment as a breach of the Agreements.

[Underlining in original]

[69]   White also complains that the judge erred in finding that White "did very little to demand payment of what he claims is being withheld from him."  On the contrary, the appellant by cross-appeal says he asked for his first royalty payment in December 1997 (not December 1998 as found by the judge).  He argues that the evidence of both Bryson and himself was that a $5,000 payment was made to him in December 1997, and that Bryson simply disagreed that this sum constituted a royalty payment. White argues that the evidence given by Mr. Currie, a CGA hired by Bryson as the company's accountant provided independent corroboration of White's claim.  In conducting his review of the books to reconcile business expenses and royalty payments Mr. Currie prepared a memo dated April 21, 1999 in which he identified one royalty payment of *$5,000 from April 30, 1998 or before*.  Mr. Currie testified that he ascertained this to be a royalty payment from his review of the books of the companies.  Mr. Currie's evidence was not challenged at trial.  Thus, in the circumstances, White argues that the trial judge made a palpable and overriding error of fact in concluding that White's first demand for royalties occurred in December 1998 as opposed to 1997.

[70]   Further, while it is true that he did not place his demands in writing, White testified that he continually made verbal demands throughout late 1998 and early 1999 for payment of his royalties.  The constant excuse he received from Bryson was that royalties could not be paid as the books had not been brought up to date.

[71]   White says his actions in first demanding royalty payments in December 1997 and then continuously throughout 1999 cannot be fairly characterized (as did the judge) as doing "very little to demand payment."

[72]   White says the judge's finding that a "misunderstanding" had developed is seriously in error.  The evidence is compelling - White argues - that this is not a case where there had been a misunderstanding or confusion between the parties.

Rather, Bryson knew that royalties were due and owing, but simply conjured up excuses to avoid paying.

[73]   Whatever the interpretation - whether a failure to demand, or a refusal to pay - it is clear that EBF failed to pay any royalties between June 1999 and March 2001.  Although not put forward as an alternative argument, White says that this non-payment constituted a fundamental breach entitling him to terminate the agreement.  **Anne of Green Gables Licencing Authority Inc. v. Avonlea Traditions Inc.**, [2000] O.J. No. 740 (S.C.);  and **Neostyle Envelope Co. v. Barber-Ellis Ltd.**, [1914] O.J. No. 598 (S.C.A.D.).

[74]   Repudiation has two parts: an unambiguous demonstration by one party that it intends to default, and a clearly communicated acceptance of that default by the innocent party.  If either element is missing, repudiation has not been made out.  It is a well recognized principle that if a repudiation has occurred, the non-defaulting party must indicate acceptance of that repudiation in order to treat the contract as at an end.  Thus, if there had been a repudiation of the agreement by EBF, White was required to indicate his acceptance of that repudiation in order to treat their contract as terminated.  **Canada Egg Products Ltd. v. Canadian Doughnut Co.**, [1955] S.C.R. 398.

[75]   White argues that if one were to conclude that the correspondence between the parties or subsequently between their counsel was insufficient to declare White's acceptance of the repudiation by EBF, then relying upon the Supreme Court of Canada's decision in **Canada Egg**, supra, service of the statement of claim may be sufficient notice of the election to treat the contract as at an end. White argues that the trial judge erred in failing to consider **Canada Egg**, supra, and whether service of the statement of claim in this case constituted sufficient notice of White's election to treat the contract as at an end.

[76]   Finally, White says the trial judge seriously erred in looking at factors said to be entirely irrelevant when concluding that Bryson's actions did not constitute repudiation.  McDougall, J. said:

> [40]    To order the declarative relief now being sought by White would, in
> effect, put EBF . . . and . . . Fence out of business.  This would strip Bryson of any
> benefit he should have received under the shot-gun provisions of the
> shareholders' agreement which was used to buy out White and Fried's shares in
> the companies.  . . .   If EBF . . . could not rely on the exclusive license it held
> over White's patent(s), what would it manufacture and sell?  For the reasons
> previously stated I do not think the actions of Bryson as president of EBF . . .
> amounted to a repudiation of the license agreement.  It is therefore still valid and
> enforceable.

These factors clearly motivated the judge in his conclusion that Bryson's actions as
president of EBF did not amount to a repudiation.  However, White argues that
such considerations were entirely irrelevant to decide - as a matter of law, whether
a repudiation had occurred, and if it had, with what consequence.

[77]   In summary, and regardless of how one characterizes his actions in 1999,
White says formal demands for payment were clearly made in writing once his
counsel had been retained, as early as February 2000.  Whatever the case, White
says a formal demand for payment of royalties was not required.  White says the
judge erred in faulting him  for a "failure" to adequately demand payment.  The
agreement stipulated that future royalties should be paid on a monthly basis - and
that in fact is what the trial judge found.  Consequently it was not necessary for
White to demand payment of his royalties, and the non-payment thereof was
sufficient to effect a repudiation.

[78]   In support of his submissions White refers to ***The Law of Contracts, S. M.
Waddams, 4th ed. (1999, Canada Law Book: Toronto)*** the following appears:

> [599]   Another question is whether the party not in breach is required to warn the
> other before terminating.  As a general rule performance is due without request.
> The debtor must seek out the creditor.[73] Consequently, if performance is
> substantially defective, the other party may terminate, even if ignorant of the
> deficiency at the time of termination.[74] It may, however, be a harsh result for a
> party in breach to lose the whole benefit of the contract, and in some cases a duty
> to warn has evolved.  A buyer of goods is obliged, if no delivery date is fixed, to
> take delivery within a reasonable time, but a seller is not allowed quietly to let a
> reasonable time elapse and then terminate without warning.[75] The seller must give
> notice requiring the buyer to take delivery before terminating.  Where, under a

2005 NSCA 167 (CanLII)

> land sale agreement, no closing date is fixed, or the original date has passed,
> either party may fix a new closing date by giving reasonable notice.[76]  Where a
> condition is waived, the party waiving it may resume strict rights, but only on
> reasonable notice.[77]  Similarly, where an employee might not realize that work is
> seriously deficient, an employer must give a warning before summary dismissal.[78]
> These cases appear to be instances of a limited right to "cure" defective
> performance, a right more widely recognized in American jurisdictions.[79]

(Citations omitted)

[79]   In response, EBF says there is no merit to White's plethora of complaints.
The trial judge referred to and properly applied the leading jurisprudence on the
subject of repudiation and recognized the heavy burden upon a party claiming such
a result. White is really attempting to retry the case and replace the judge's finding
that the licence agreement remains "valid and unenforceable," with a finding that
EBF's conduct was so egregious that it amounted to a repudiation of the agreement
by conduct as of May 3, 2000.

[80]   In my opinion the cases relied upon by White are distinguishable in that
there, the breaching party evinced a clear and continuing unwillingness to be
bound by the terms of their agreements, whereas in this case, nothing in the factual
findings of McDougall, J. suggest that EBF or Bryson ever reached that level of
non-compliance.  In fact the trial judge found that the areas which gave rise to the
various disputes between Messrs. White and Bryson were largely unprovided for in
the agreement between them, and that there was a legitimate dispute as to
interpretation.  The trial judge found as a fact that the timing and calculation of
royalties were left unprovided for in the agreement, and that they were topics of
legitimate dispute between the parties.  To find that a contract had been repudiated,
owing to a legitimate disagreement over interpretation would, in my opinion, be a
wholly erroneous conclusion.

[81]   Further, as White acknowledges in his submissions, even if there had been
such a serious breach as to justify repudiation, that would also require a finding
that White had signalled his adoption or acceptance of a repudiation.  Relying upon
**Canada Egg**, supra, White argues that such an "acceptance" ought to be inferred
as found in the service of the originating notice (action) and statement of claim he

filed in May, 2000.  In my opinion, **Canada Egg**, supra, does not help the cross-appellant's position.

[82]   The circumstances in that case were entirely different.  The matter arose following a dispute between the parties under a contract providing for the delivery of a substantial quantity of powdered egg yolk and powdered egg albumen.  The respondent brought an action against the appellant for a declaration that a valid contract had been entered into between the parties, and claiming damages for an anticipatory repudiation thereof.  In February 1951 the appellant agreed to sell and the respondent agreed to buy one hundred thousand pounds of powdered egg yolk to be delivered on July 15, 1951 and July 31, 1951, and ten thousand pounds of powdered egg albumen, delivery to be made as required to March 31, 1952.  About the middle of April, the appellant, either because of an inability to buy sufficient eggs, or because it could not purchase eggs at a suitable price, decided it would not carry out its obligations under the contract.  The appellant's representatives intimated this likelihood to the respondent during some preliminary discussions and finally on May 7, 1951 declared to the respondent that a valid contract had not been concluded, and that in any event the appellant could not make its deliveries as required.  The parties continued to hold without prejudice discussions in May and June 1951 in an attempt to reach an amicable settlement.  Ultimately the respondent determined that future negotiations with the appellant would be futile and that it would, as in fact it did, go to the marketplace and buy whatever egg products it could find.  However, the respondent did not make known to the appellant, either expressly or by appropriate conduct, that it did not intend to negotiate further, or to go into the market.  The respondent issued its statement of claim on June 25, 1951.

[83]   Among the several issues to be determined by the Court, the one most central to this case, was whether on June 25, 1951, when the respondent issued its writ, it was open to the respondent to adopt the appellant's repudiation; and if so, did the issuance of the writ on that date constitute an adoption?  When Kerwin, C.J.C., declared at ¶ 6:

> Once it is found that the repudiation was still alive, the respondent was not
> obliged to say in so many words, orally or in writing, that it treated the

repudiation as putting an end to the contract, but it was sufficient to bring this action while the matter remained in that position.

the phrase "this action" must surely have been intended to refer to an action alleging repudiation of the contract, by conduct.  In this case there was neither an allegation of repudiation by conduct, nor an acceptance of repudiation, pleaded in the original statement of claim filed on May 9, 2000.  As noted earlier in these reasons, there was no reference to either circumstance in the defence filed a few weeks later.

[84]   White's alternative submission that correspondence mentioning potential litigation can somehow amount to a repudiation just as effectively (even as counsel prepares, files and serves a statement of claim which pointedly <u>omits</u> to allege repudiation) is unsupported by any authority of which I am aware.

[85]   In this case there was no action alleging repudiation until <u>after</u> the issuance of the patent on March 28, 2001, and the amended statement of claim which followed.  As is noted in the concurring opinion of Estey, J., in **Canada Egg**, supra, the acceptance of the repudiation must be made "with every reasonable dispatch."  In my view, alleging and purporting to accept repudiation in March 2001 in respect of breaches said to have occurred and continued since 1997 or 1998 does not meet such a standard.

[86]   Certain scholars treat repudiation as a *type* of anticipatory breach, or discuss fundamental breach, anticipatory breach, and repudiation as being synonymous terms.  See, for example, **Chitty on Contracts**, 28th ed. (London: Suite & Maxwell, 1999), Vol. 1; and **G.H.L. Fridman**, *The Law of Contract in Canada*, 4th ed. (Toronto: Carswell, 1999).  See, as well, the dissenting opinion of MacKeigan, C.J.N.S. in **Canso Chemicals Ltd. v. Canadian Westinghouse Co.** (1974), 54 D.L.R. (3d) 517.  This conjunction, as it were, of terms is how it was pitched to the trial judge during counsel's final arguments.  For example, EBF's trial counsel said this when dealing with this issue in his final submissions:

Now, my lord, the next area I was going to get into dealt with the law on fundamental breach . . . Repudiation, my lord, really is a question, as we indicated

in our brief, of fundamental breach . . .  If you decide that royalty payments were due at some point before the issuance of the patent, then what Mr. White will say to you is you then (sic) to say that EBF has demonstrated an intention not to be bound by the terms of that agreement such that they have repudiated and I have elected to treat the contract at an end.  That's the contract language for what the issue is before you.  On the issue of the calculation of payment . . . that can't possibly be an issue of fundamental breach . . .  The only question that is material at all to that is the timing in our submission . . . but not a question of fundamental difference that would justify terminating the contract.  So when you look at the time periods during 1997, 1998, 1999 and the year 2000, was EBF, you have to ask yourself, engaged in practice that would demonstrate an intention not to be bound by the contract.  Clearly not.  They were continuing to move ahead . . . They were making advances to Mr. White.  Is that the actions of someone who is snubbing their nose at a contract and saying I'm not going to be bound by this license?  No.  . . . That's not a fundamental breach.  Mr. Bryson has been consistent in his interpretation of when royalties were to be paid.  Maybe he was wrong.  Does that mean it's a fundamental breach?  No.  You have to take the next step and say well, if there's something that demonstrates that EBF had no intention to be bound by the terms of that licence agreement as evidenced by the non-payment.  No.  There is nothing to demonstrate an intention on them, in fact, just the contrary.  Clearly this is a company that intended to live up to obligations under the contract and the only issue, only issue when the payment was to be made . . .

[87]   I do not believe McDougall, J. was led astray by the way in which the point was argued.  I prefer to deal with repudiation as a different side to the same coin, that being a specific circumstance in law whereby the conduct of the defaulting party will permit the innocent party to treat the contract as discharged, before performance is due or before it has been fully performed.  This distinguishes it from a situation where the defaulting party commits what may be termed a fundamental breach.  In the former circumstance the conduct of the parties is key.  In the latter circumstance the nature of the promise that has been violated and its consequence take on much more significance.  See, for example, **M.P. Furmston, Cheshire, Fifoot & Furmston's** *Law of Contract*, **11**[th] **ed. (London: Butterworths, 1986)**.

[88]   Repudiation occurs where a party intimates by words or conduct that he does not intend to honour his obligations when they fall due.  Repudiation can be either explicit or implicit.  It is implicit "where the reasonable inference from the

defendant's conduct is that he no longer intends to perform his side of the contract." **Furmston**, supra, at p. 522.

[89]   What has to be established is that the defaulting party has made his intention clear beyond a reasonable doubt that he no longer intends to perform his side of the bargain.  Proof of such an intention requires an investigation into the nature of the contract, the attendant circumstances, and the motives which prompted the breach. **Furmston**, supra, at p. 523. **Furmston** quotes from the case of **Mersey Steel and Iron Co. v. Naylor Benzon & Co.**, (1884) 9 App Cas 434 at 438-439:

> You have to look at the actual circumstances of the case in order to see whether the one party to the contract is relieved from its future performance by the conduct of the other; you must examine what that conduct is so as to see whether it amounts to a renunciation, <u>to an absolute refusal to perform</u> the contract . . .and whether the other party may accept it as a reason for not performing his part.

> (Underlining mine)

[90]   In order for repudiation to be established there must be acceptance.  As Fridman points out in **The Law of Contract in Canada**, supra, at pp. 647-648:

> "An unaccepted repudiation" said Asquit L.J. in one English case, "is a thing writ in water and of no value to anybody; it confers no legal rights of any sort or kind."  Although this graphic expression has said to be limited by the facts of the case in which it occurred, the phrase does have some merit, and does put succinctly an important aspect of the law relating to discharge by repudiation or anticipatory breach.  Such repudiation will not effectively terminate the contract unless the innocent party does accept the repudiation, and is prepared to treat the contract as ended.  The innocent party, in effect, has an election whether or not to treat the contract as continuing or as ended, once the party has committed an act which, in accordance with what has been said above, can be regarded as repudiating the contract.

[91]   As to what constitutes "acceptance" of repudiation, the learned authors of **Chitty on Contracts**, supra, observe at 25-012:

> Where there is an anticipatory breach, or the breach of an executory contract, and the innocent party wishes to treat himself as discharged, he must "accept the repudiation."  It is usually done by communicating the decision to terminate the party in default although it may be sufficient to lead evidence of an "unequivocal overt act which is inconsistent with the subsistence of the contract...without any concurrent manifestation of intent directed to the other party."  Unless and until the repudiation is accepted the contract continues in existence for "an unaccepted repudiation is a thing writ in water."  <u>Acceptance of a repudiation must be clear and unequivocal</u> and mere inactivity or acquiescence will generally not be regarded as acceptance for this purpose.  But there may be circumstances in which a continuing failure to perform will be sufficiently unequivocal to constitute acceptance of a repudiation.  It all depends on "the particular contractual relationship and the particular circumstances of the case."

(Underlining mine)

[92]   While a more detailed enunciation of the principles that guided him would have been helpful, I am satisfied after reviewing the entire record as well as the submissions made by trial counsel that McDougall, J.'s analysis and application of the law was correct.  **Children's Aid Society of Cape Breton-Victoria v. J.C. & A.C.**, 2005 NSCA 161.

[93]   It appears to me that McDougall, J. had these principles in mind when reviewing the conduct of both Bryson and White, their motives, the nature of the agreement between the parties, and all of the attendant circumstances.  I am not persuaded that he erred in his analysis or his ultimate conclusion that a repudiation had not in fact occurred.

[94]   His strong findings that there "was never a refusal to pay;" that "White's own approach to payment might have influenced" Bryson's "position that royalties would only be payable once the patent(s) had been granted"; that "White had ample opportunity to demand payment of royalties he felt he was owed but chose not to"; that the parties "might not have agreed on exactly when royalty payments should have begun but clearly there has never been a denial of White's entitlement to receipt of eventual payment"; that White's "conduct in allowing this to continue was tacit acceptance of the timing of payments . . ."; that Bryson "never denied that royalties would eventually be paid"; that White's own conduct contributed to

2005 NSCA 167 (CanLII)

the misunderstanding that developed"; leading to the judge's conclusion that he did "not think the actions of Bryson as president of EBF amounted to a repudiation" are entirely inconsistent with White's submission that a repudiation had occurred and that he had effectively communicated his acceptance thereof.  In light of the trial judge's strong findings, which find support in the record, I see no merit to the cross-appeal and would dismiss it.

[95]   While my own view of the evidence may have led me to a different conclusion with respect to whether or not the contract had been repudiated, that is not the test.  Rather, the question is: has the cross-appellant shown that Justice McDougall's determination that the contract was not repudiated and is therefore enforceable, the result of palpable and overriding error?  I am not persuaded that it was.  This judge had the distinct advantage of seeing and hearing the parties and their witnesses over the course of an eight day trial.  Evidently he was not prepared to characterize Bryson's behaviour in the manner White has suggested, and thereby conclude that Bryson's conduct amounted to repudiation. I am unable to find that the trial judge's conclusions that Bryson "never denied that royalties would eventually be paid," that White's "own conduct contributed to the misunderstanding that developed," or declaring "I do not think the actions of Bryson as president of EBF . . . amounted to a repudiation of the licence agreement" arose from an error in principle or a material and obvious error of fact. Consequently I would not disturb the trial judge's finding that the agreement between the parties is still valid and enforceable.

**Disposition: The Cross-Appeal**

[96]   I would therefore dismiss the cross-appeal with costs to the respondent by cross-appeal, EBF, only.  I am not persuaded that there were significant added steps taken, nor independent participation on the part of the intervenor FENCE that would warrant its entitlement to separate costs on the cross-appeal.

**Conclusion**

[97]   For all of these reasons I would dismiss the appeal with costs of $10,000 to the respondent White (40% of the costs he was awarded at trial), together with

disbursements as taxed or agreed.  I would dismiss the cross-appeal with costs of $6,000 to the respondent by cross-appeal, EBF only, together with disbursements as taxed or agreed.


Saunders, J.A.

Concurred in:

Bateman, J.A.

Freeman, J.A.

TAB 164

45 U.S. 646

Supreme Court of the United States

JAMES G. WILSON, PLAINTIFF,

v.

LEWIS ROUSSEAU AND CHARLES EASTON.

January Term, 1846

**Opinion**

THIS case, and the three subsequent ones, namely, Wilson *v.* Turner, Simpson et al. *v.* Wilson, and Woodworth & Bunn *v.* Wilson, were argued together, being known as the patent cases. * Many of the points of law involved were common to them all, and those which were fully argued in the first case which came up were but incidentally touched in the discussion of the subsequent cases. **\*647** They all related to the rights which were derived under a patent for a planing-machine, taken out by Woodworth, and renewed and extended by his administrators. The validity of the original patent was questioned only in one case, namely, that which came from Kentucky, which was the last argued. There were four cases in all, namely, one from New York, one from Maryland, one from Louisiana, and one from Kentucky. In the course of the argument, counsel referred indiscriminately to the four records, as some documents were in one which were not to be found in another.

The eighteenth section of the patent act of 1836 authorized the extension of a patent, on the application of the executor or administrator of a deceased patentee.

Such an extension does not inure to the benefit of assignees under the original patent, but to the benefit of the administrator (when granted to an administrator), in his capacity as such. But those assignees who were in the use of the patented machine at the time of the renewal have still a right to use it.

The extension could be applied for and obtained by the administrator, although the original patentee had, in his lifetime, disposed of all his interest in the then existing patent. Such sale did not carry any thing beyond the term of the original patent.

A covenant by the patentee, made prior to the law authorizing extensions, that the covenantee should have the benefit of any improvement in the machinery, or alteration or renewal of the patent, did not include the extension by an administrator, under the act of 1836. It must be construed to include only renewals obtained upon the surrender of a patent on account of a defective specification. Parties to contracts look to established and general laws, and not to special acts of Congress.

A plaintiff, therefore, who claims under an assignment from the administrator, can maintain a suit against a person who claims under the covenant.

An assignee of an exclusive right to use two machines within a particular district can maintain an action for an infringement of the patent within that district, even against the patentee.

In the case of Woodworth's planing-machine, the patent granted to the administrator was founded upon a sufficient specification and proper drawings, and is valid.

The decision of the Board of Commissioners, to whom the question of renewal is referred, by the act of 1836, is not conclusive upon the question of their jurisdiction to act in a given case.

The Commissioner of Patents can lawfully receive a surrender of letters patent for a defective specification, and issue new letters patent upon an amended specification, after the expiration of the term for which the original patent was granted, and pending the existence of an extended term of seven years. Such surrender and renewal may be made at any time during such extended term.

West Headnotes (18)

**[1]    Patents**

    **Extension**

An extension of a patent on the application of the executor or administrator of a deceased patentee does not inure to the benefit of the assignees under the original patent.

Cases that cite this headnote

**[2]    Patents**

    **Extension**

The eighteenth section of the patent act of 1836, 5 Stat. 124, authorized the extension of a patent on the application of the executor or administrator of a deceased patentee.

4 How. 646, 11 L.Ed. 1141

**[3]    Patents**

🔑 **Extension**

Under Patent Act 1836, § 18, 5 Stat. 124, authorizing the extension of the patent on application by the executor or administrator of the deceased patentee, the extension could be applied for and obtained by an administrator; although the original patentee had, in his lifetime, disposed of all his interest in the then existing patent, such sale does not carry anything beyond the terms of the original patent.

2 Cases that cite this headnote

**[4]    Patents**

🔑 **Extension**

The decision of the board of commissioners, to whom the question of renewal is referred by the act of 1836, 5 Stat. 117, is not conclusive on the question of their jurisdiction to act in a given case.

7 Cases that cite this headnote

**[5]    Patents**

🔑 **Time of Making Application**

The commissioner of patents can lawfully receive a surrender of letters patent for a defective specification, and issue new letters patent upon an amended specification, after the expiration of the term for which the original patent was granted, and pending the existence of an extended term for seven years. Such surrender and renewal may be made at any time during such extended term.

6 Cases that cite this headnote

**[6]    Patents**

🔑 **Construction and Operation of Assignments and Grants**

Though the extension of a patent, under the act of 1836, 5 Stat. 117, authorizing extensions on application of the executor or administrator of the deceased patentee, does not inure to the benefit of assignees under the original patent, but to the administrator as such, such assignees who are in use of the machine at the time of renewal have the right to continue the use, but not to vend.

41 Cases that cite this headnote

**[7]    Patents**

🔑 **Construction and Operation of Assignments and Grants**

Under Patent Act 1836, § 18, 5 Stat. 124, authorizing the extension of a patent on the application of an executor or administrator of the deceased patentee, such patent does not inure to the benefit of assignees under the original patent, but to the administrator as such.

Cases that cite this headnote

**[8]    Patents**

🔑 **Construction and Operation of Assignments and Grants**

A sale by the original patentee in his lifetime, of all his interest in the then existing patent, passes nothing beyond the term of the original patent, and does not prevent his administrator from applying for and obtaining such extension.

2 Cases that cite this headnote

**[9]    Patents**

🔑 **Construction and Operation of Assignments and Grants**

A covenant by the patentee with his assignee, made prior to the law authorizing extensions, that the covenantee should have the benefit of any improvement in the machinery, or alteration or renewal of the patent, does not include the extension by an administrator under the act of 1836, 5 Stat. 117; it must be construed to include only renewals upon the surrender of a patent on account of a defective specification.

5 Cases that cite this headnote

**[10]    Patents**

🔑 **Persons entitled to sue**

4 How. 646, 11 L.Ed. 1141

An assignee of an exclusive right to use two machines within a particular district can maintain an action for an infringement of the patent within that district, even against the patentee.

31 Cases that cite this headnote

[11]    **Patents**

    🔑 Persons entitled to sue

An assignee of an administrator, who has obtained an extension of a patent under that act, may maintain a suit against one claiming under such covenant, for an infringement.

1 Cases that cite this headnote

[12]    **Patents**

    🔑 What constitutes abandonment in general

At common law, right of property of inventor to his invention or discovery passed from him as soon as it went into public use with his consent, it being then regarded as having been dedicated to the public as common property and subject to common use and enjoyment of all.

2 Cases that cite this headnote

[13]    **Patents**

    🔑 Validity in general

Patent for a planing machine held not invalid for uncertainty, ambiguity, multiplicity of claims, or any other cause.

2 Cases that cite this headnote

[14]    **Patents**

    🔑 Transfer by succession or inheritance

Congress has impressed on discovery all qualities and characteristics of property for specified period and has enabled inventor to hold and deal with discovery as with any other property, and on inventor's death, it passes with other personalty to inventor's legal representatives and becomes part of the assets.

2 Cases that cite this headnote

[15]    **Statutes**

    🔑 Purpose and intent;  determination thereof

In case of obscure and doubtful words or phraseology in statutes, intention of lawmakers is to be resorted to, if discoverable from the context, in order to fix and control their meaning so as to reconcile it, if possible, with the general policy of the law.

Cases that cite this headnote

[16]    **Statutes**

    🔑 Purpose and intent;  determination thereof

Between two different interpretations resting upon judicial expositions of ambiguous and involved phraseology, that which will result in what may be regarded as coming nearest to intention of legislature should be preferred.

2 Cases that cite this headnote

[17]    **Statutes**

    🔑 Construction in View of Effects, Consequences, or Results

Court will hesitate before giving construction to statute which will prove deeply harsh and unjust in its consequences both as it respects public and individual rights and interests.

1 Cases that cite this headnote

[18]    **Statutes**

    🔑 Construction in View of Effects, Consequences, or Results

The consequences of any different construction than the one proposed to be given are always to be regarded by courts when dealing with statute of doubtful meaning.

2 Cases that cite this headnote

The cases will be taken up and reported *seriatim*, and the documents which are cited in the first will not be repeated in the others.

The first in order was the case from New York, the titling of which is given at the head of this report.

It came up from the Circuit Court of the United States for the Northern District of New York, on a certificate of division in opinion.

On the 26th of November, 1828, William Woodworth presented the following petition.

### 'To the Honorable Henry Clay,
### Secretary of State of the United States.

'The petition of William Woodworth, of the city of Hudson, in the county of Columbia and State of New York, respectfully represents:

'That your petitioner has invented a new and improved method of planing, tonguing, grooving, and cutting into mouldings, or either, plank, boards, or any other material, and for reducing the same to an equal width and thickness; and also for facing and dressing brick, and cutting mouldings on, or facing, metallic, mineral, or other substances, not known or used before the application by him, the advantages of which he is desirous of securing to himself and his legal representatives. He therefore prays that letters patent of the United States may be issued, granting unto your petitioner, his heirs, administrators, or assigns, the full and exclusive right of making, constructing, using, and vending to others to be used, his aforesaid new and improved method, agreeably to the acts of Congress in such case made and provided; your petitioner having paid thirty dollars into the treasury of the United States, and complied with the other provisions of the said acts.

WILLIAM WOODWORTH.

'*November* 26*th*, 1828.'

On the 4th of December, 1828, Woodworth executed to James Strong the following assignment.

'Whereas I, William Woodworth, of the city of Hudson, in the State of New York, heretofore, to wit, on the 13th day of **\*648** September, 1828, assigned and transferred, for a legal and valuable consideration, the one equal half of all my right, title, claim, and interest in and to the invention or improvement mentioned and intended in the foregoing petition, oath, and specification, to James Strong, of the city of Hudson.

'And whereas, also, the subjoined assignment is intended only to convey and assign the same interest transferred and assigned in the assignment of the 13th of September above mentioned, without any prejudice to my one equal half part of said invention or improvement, which is expressly reserved to myself and my legal representatives.

'Now, know all men, that I, the said William Woodworth, for and in consideration of the sum of ten dollars, and other valuable considerations me moving, have, and do hereby, for myself and legal representatives, give, assign, transfer, and assure to the said James Strong and his legal representatives the one full and equal half of all my right, title, interest, and claim in and to my new and improved method of planing, tonguing, grooving, and cutting into mouldings, either plank, boards, or any other material, and for reducing the same to an equal width and thickness, and also for facing and dressing brick, and cutting mouldings on, or facing, metallic, mineral, or other substances, mentioned and intended to be secured by the foregoing petition, oath, and specification, together with all the privileges and immunities, as fully and absolutely as I do or shall enjoy or possess the same; to have and to hold and enjoy the same, to the said James Strong, and his legal representatives, do or may.

'In witness whereof, I have hereunto set my hand and seal, the 4th day of December, 1828.

WILLIAM WOODWORTH. [SEAL.]

'Witnesses:——

HENRY EVERTS,

DAVID GLEASON.'

On the 6th of December, 1828, Woodworth took the following oath.

'*State of New York, Rensselaer County, ss.:*

'On this sixth day of December, A. D. 1828, before the subscriber, a justice of the peace in and for the county of Rensselaer aforesaid, personally appeared the aforesaid William Woodworth, and made solemn oath, according to law, that he verily believes himself to be the true and original inventer of the new and improved method, above described and specified, for planing, tonguing, grooving, and cutting into mouldings, or either, plank, boards, or any other material, and for reducing the same to an equal width and thickness; and also for facing and dressing brick, **\*649** and

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

cutting mouldings on, or facing, metallic, mineral, or other substances; and that he is a citizen of the United States.

JOHN THOMAS, *Justice of the Peace*.'

The above documents appear to be recorded in the third volume of Transfers of Patent Rights, pages 155, 156, in the patent-office of the United States.

On the 27th of December, 1828, a patent was issued as follows.

#### '*Letters Patent to W. Woodworth.*

#### '*The United States of America to all to whom these letters patent shall come:*

'Whereas William Woodworth, a citizen of the United States, hath alleged that he has invented a new and useful improvement in the method of planing, tonguing, grooving, and cutting into mouldings, or either, plank, boards, or any other material, and for reducing the same to an equal width and thickness; and also for facing and dressing brick, and cutting mouldings on, or facing, metallic, mineral, or other substances, which improvements, he states, have not been known or used before his application; hath made oath that he does verily believe that he is the true inventer or discoverer of the said improvement; hath paid into the treasury of the United States the sum of thirty dollars, delivered a receipt for the same, and presented a petition to the Secretary of State, signifying a desire of obtaining an exclusive property in the said improvements, and praying that a patent may be granted for that purpose. These are, therefore, to grant, according to law, to the said William Woodworth, his heirs, administrators, or assigns, for the term of fourteen years from the 27th of December, 1828, the full and exclusive right and liberty of making, constructing, using, and vending to others to be used, the said improvement, a description whereof is given in the words of the said William Woodworth himself, in the schedule hereto annexed, and is made a part of these presents.

'In testimony whereof, I have caused these letters to be made patent, and the seal of the United States to be hereunto affixed. Given under my hand, at the city of Washington, this 27th day of December, in the year of our Lord 1828, and of the independence of the United States of America, the fifty-third.

(Signed,) J. Q. ADAMS

[L. S.]

'By the President.

(Signed,) H. CLAY, *Secretary of State*.'

*Certificate of Wm. Wirt, Attorney-General of the United States.*

'*City of Washington, to wit:*

'I do hereby certify, that the foregoing letters patent were delivered **\*650** to me on the 27th day of December, in the year of our Lord 1828, to be examined; that I have examined the same, and find them conformable to law; and I do hereby return the same to the Secretary of State, within fifteen days from the date aforesaid, to wit, on this 27th day of December, in the year aforesaid.

WM. WIRT,

*Attorney-General of the United States*.'

#### *Schedule.*

'The schedule referred to in these letters patent, and making part of the same, containing a description, in the words of the said William Woodworth himself, of his improvement in the method of planing, tonguing, grooving, and cutting into mouldings, or either, plank, boards, or any other material, and for reducing the same to an equal width and thickness; and also for facing and dressing brick, and cutting mouldings on, or facing, metallic, mineral, or other substances.

'The plank, boards, or other material, being reduced to a width by circular saws or friction-wheels, as the case may be, is then placed on a carriage, resting on a platform, with a rotary cutting-wheel in the centre, either horizontal or vertical. The heads or circular plates, fixed to an axis, may have one of the heads movable, to accommodate any length of knife required. The knife fitted to the head with screws or bolts, or the knives or cutters for moulding fitted by screws or bolts to logs, connecting the heads of the cylinder, and forming with the edges of the knives or cutters a cylinder. The knives may be placed in a line with the axis of the cylinder, or diagonally. The plank, or other material resting on the carriage, may be set so as to reduce it to any thickness required; and the carriage, moving by a rack and pinion, or rollers, or any lateral motion, to the edge of the knives or cutters on the periphery of the cylinder or wheel, reduces it to any given thickness. After passing the planing and reducing wheel, it

then approaches, if required, two revolving cutter-wheels, one for cutting the groove, and the other for cutting the rabbets that form the tongue; one wheel is placed directly over the other, and the lateral motion moving the plank, or other material, between the grooving and rabbeting wheels, so that one edge has a groove cut the whole length, and the other edge a rabbet cut on each side, leaving a tongue to match the groove. The grooving-wheel is a circular plate fixed on an axis, with a number of cutters attached to it to project beyond the periphery of the plate, so that when put in motion it will perform a deep cut or groove, parallel with the face of the plank or other material. The rabbeting-wheel, also of similar form, having a number of cutters on each side of the plate, projecting like those on the grooving-wheel, cuts the rabbet on the side of the edge of the plank, and leaves the tongue or match for the **\*651** groove. By placing the planing-wheel axis and cutter-knives vertical, the same wheel will plane two planks or other material in the same time of one, by moving the plank or other material opposite ways, and parallel with each other against the periphery of the planing or moulding wheel. The groove and tongue may be cut in the plank or other material at the same time, by adding a grooving and rabbeting wheel.

'Said William Woodworth does not claim the invention of circular saws or cutter-wheels, knowing they have long been in use; but he claims as his invention the improvement and application of cutter or planing wheels to planing boards, plank, timber, or other material; also his improved method of cutters for grooving and tonguing, and cutting mouldings on wood, stone, iron, metal, or other material, and also for facing and dressing brick; as all the wheels may be used single and separately for moulding, or any other purpose before indicated. He also claims, as his improved method, the application of circular saws for reducing floor-plank, and other materials, to a width.

'*Dated Troy, December* 4*th*, 1828.

WILLIAM WOODWORTH.

'HENRY EVERTS,

D. S. GLEASON,}

Witnesses.'

On the 25th of April, 1829, one Uri Emmons obtained a patent for a new and useful improvement in the mode of planing floor-plank, and grooving, and tonguing, and straightening the edges of the same, planing boards, straightening and

planing square timber, &c., by machinery, at one operation, called the cylindrical planing-machine. The said letters patent, and specification attached thereto, being in the following words and figures.

### *Uri Emmons's Patent.*

### 'United States of America to all to whom these letters patent shall come:

'Whereas, Uri Emmons, a citizen of the United States, hath alleged that he has invented a new and useful improvement in the mode of planing floor-plank and grooving and tonguing the edges of the same, planing boards, straightening and planing square timber, &c., by machinery, at one operation, called 'the cylindrical planing-machine,' which improvement he states has not been known or used before his application, hath made oath that he does verily believe that he is the true inventer or discoverer of the said improvement, hath paid into the treasury of the United States the sum of thirty dollars, delivered a receipt for the same, and presented a petition to the Secretary of State, signifying a desire of obtaining an exclusive property in the said improvement, and praying that a patent may be granted for that purpose. These are therefore to grant, according to law, to the said Uri Emmons, his **\*652** heirs, administrators, or assigns, for the term of fourteen years from the twenty-fifth day of April, one thousand eight hundred and twenty-nine, the full and exclusive right and liberty of making, constructing, using, and vending to others to be used, the said improvement, a description whereof is given, in the words of the said Uri Emmons himself, in schedule hereto annexed, and is made a part of these presents.

'In testimony whereof, I have caused these letters to be made patent, and the seal of the United States to be hereunto affixed.

'Given under my hand, at the city of Washington, this twenty-fifth day of April, in the year of our Lord one thousand eight hundred and twenty-nine, and of the independence of the United States of America the fifty-third.

[SEAL.] (Signed,) ANDREW JACKSON.

'By the President.

(Signed,) M. VAN BUREN.'

'*City of Washington, to wit:*——

'I do hereby certify that the foregoing letters patent were delivered to me on the twenty-fifth day of April, in the year

of our Lord one thousand eight hundred and twenty-nine, to be examined; that I have examined the same, and find them conformable to law; and I do hereby return the same to the Secretary of State, within fifteen days from the date aforesaid, to wit, on the twenty-fifth day of April in the year aforesaid.

(Signed,) J. MACPHERSON BERRIEN, *Attorney-General of the United States*.'

### Schedule.

'The schedule referred to in these letters patent, and making part of the same, containing a description, in the words of the said Uri Emmons himself, of his improvement in the mode of planing floor-plank, and grooving, and tonguing, and straightening the edges of the same, planing boards, straightening and planing square timber, &c., by machinery, at one operation, called the cylindrical planing-machine.

'The machinery for the improvement consists,——

'1st. Of a frame of wood or metal.

'2d. Of the gear and fixtures combined and connected together for the above-named operation, the principle of which consists in running the plank, boards, or timber over, under, or at the sides of a cylinder of wood or metal, on which knives are placed, straight or spiral, with their edges exactly corresponding with each other, having from two to twelve knives or edges; also burrs or saws, similar to those used for cutting teeth in brass wheels, to groove and tongue the edge of the boards or plank as they pass through between rollers, or on a carriage, by the surface of the cylinder. **\*653** The shape, form, and construction of the above principle may be varied in shape and position, dimensions, &c., still the same in substance,—the same principle producing the same effect. I have, by experimental operation, found that the following mode in form is the best:——

'1st. A frame composed of two pieces of timber, from twelve to eighteen feet long, about six by ten inches broad, placed about fifteen inches apart, framed together with four girths, one at each end, and at equal distances from the centre, and flush with the under side. This frame is supported by posts of a proper length, framed into the under side of the above pieces of timber, and braced so as to be of sufficient strength to maintain the operative posts. There is placed a roller in the centre, of metal or hard wood, across the frame, the surface of the roller being even with the surface of the frame; directly above, and parallel with this roller, is hung the cylinder, with

two or four spiral edges or knives, six to ten inches diameter, and hung on a cast-steel arbor, resting in movable boxes attached to the sides of the frame, so as to set the cylinder up and down from the roller, to give the thickness of the timber to be planed. On each side of the cylinder is placed a pair of feeding-rollers, of hard wood or metal, the under one of each pair being level with the centre one. The upper ones are hung in boxes, which are pressed down with springs or weights, so that when the timber comes between them, they will hug and carry it through. These rollers are connected and turned by wheels, at a velocity of about twelve feet surface of the roller per minute. The cylinder with two edges to make about two thousand five hundred revolutions per minute, cutting five thousand strokes every twelve feet; this can be varied according to the number of edges, power, and velocity of the different parts. The power is attached to the cylinder by a bolt running on a pulley, on the outward end of the cylinder shaft. Each way from the feeding-rollers is placed rollers about two feet apart for the timber to rest on while running through. On one side of the frame is fastened a straight edge, to serve as a guide, lined with metal; on the other side, rollers are placed in a piece of timber, which is pressed up to the plank or board to keep it close to the guide or straight edge by a spring. The grooving and tonguing is done by burrs or circular cutters similar to a saw; these burrs are hung on perpendicular spindles, the arbors of which rest in boxes attached to the inward side of the frame, a burr on one side to cut the groove, and on the other is placed two burrs, just as far apart as the thickness of the above one, for cutting the groove. At or near one end of the frame is hung a shaft, with a drum or roller, from which belts pass over to pulleys on each spindle of the burrs or circular cutters, which must have about the same velocity of the cylinder. These burrs are placed on one side of the cylinder, opposite to each **\*654** other, so as to cut the tongue to match the groove; on the other side of the cylinder is an arbor parallel with the cylinder, on which is placed circular cutters for planing the edges of the board or plank as they pass through. The cutter on the side next to the guide is stationary on the arbor; the opposite one is movable in the arbor, but fastened with screws to set it for different widths. A belt runs from a pulley on the end of the arbor, outside the frame, to the said drum, as also the same from the cylinder, each having about the same motion. The feeding-rollers are put in motion by a belt from the slow part of the driving power. I have also put in operation a carriage for feeding, but rollers save the time of running the carriage back.

'Now, what I, the said Uri Emmons, consider and claim as my improvement, and for which I solicit a patent, is as follows, namely:——

Westlaw Next © 2014 Thomson Reuters. No claim to original U.S. Government Works.

'1st. The principle of planing boards and plank with a rotary motion, with knives or edges on a cylinder, placed upon the same, straight or spiral, as before described, which I put in operation at Syracuse, in the county of Onondaga, in the State of New York, in the early part of the year 1824.

'2d. The burrs for grooving and tonguing, in contradistinction from the mode used by William Woodworth, he using the duckbill cutters.

'3d. The feeding, by running the timber through on a carriage, or between feeding-rollers, guided by a straight edge, as before described.

'In testimony that the aforegoing is a true specification of my said improvement, as before described, I have hereunto set my hand and seal, the eighth day of April, in the year of our Lord one thousand eight hundred and twenty-nine.

(Signed,) URI EMMONS.

'Witnesses,—THOS. THOMAS.

SILAS HATHAWAY.'

On the 16th of May, 1829, the said Emmons sold his entire interest in the last-mentioned patent to Daniel H. Toogood, Daniel Halstead, and William Tyack, by the following instrument:——

### Deed from Emmons to Toogood, Halstead, and Tyack.

'Whereas Uri Emmons, of the State of New York, machinist, has received letters patent of the United States of America, dated April 25th, one thousand eight hundred and twenty-nine, [for] the full and exclusive right and liberty of making, constructing, using, and vending to others to be used, a new and useful improvement in the mode of planing floor-plank, and grooving and tonguing, and straightening the edges of the same, planing boards, straightening and planing square timber, &c., by machinery, at one operation, called the cylindrical planing-machine. **\*655**

'Now, know all men by these presents, that I, Uri Emmons, of the city of New York, in consideration of five dollars, to me in hand paid by Daniel H. Toogood, Daniel Halstead, and William Tyack, all of said city of New York, who fully viewed and considered the said improvement, and the said patent and specifications therein contained, have granted, sold, and conveyed, and by these presents do grant, sell, and convey, to the said Daniel H. Toogood, Daniel Halstead,

and William Tyack, their heirs, executors, administrators, and assigns, the full and exclusive right and liberty derived from the said patent, of making, using, and vending to others to be made, used, and sold, the said improvement, within and throughout the United States of America. To have and to hold and enjoy all the privileges and benefits which may in any way arise from the said improvement by virtue of said letters patent. And I do hereby empower the said Daniel H. Toogood, Daniel Halstead, and William Tyack, their heirs, executors, administrators, and assigns, to commence and prosecute to final judgment and execution, at their own cost, any suit or suits against any person or persons who shall make, use, or vend the said improvement, contrary to the intent of the said letters patent and law in such case made and provided, and to receive, for their own benefit, the avails thereof, in such manner as I might do.

'In witness whereof, I have hereunto set my hand and seal, this sixteenth day of May, in the year of our Lord one thousand eight hundred and twenty-nine.

URI EMMONS. [SEAL.]

'Witnesses,—THOMAS AP THOMAS.

ALEX. DEDDER.'

'*City and County of New York, ss.*:

'Be it remembered, that on the sixteenth day of May, in the year of our Lord one thousand eight hundred and twenty-nine, before me, personally appeared Uri Emmons, known to me to be the person described in, and who executed, the within deed, and acknowledged that he executed the same for the purposes therein mentioned; and there being no material alterations, erasures, or interlineations, I allow the same to be recorded.

THOMAS THOMAS, *Commissioner, &c.*'

On the 28th of November, 1829, the following mutual deed of assignment was executed between Woodworth and Strong, on the one part, and Toogood, Halstead, Tyack, and Emmons, on the other part, by which Woodworth and Strong convey to Toogood, Halstead, and Tyack all their interest in the patent of December 27th, 1828, in the following places, namely:— In the city and county of Albany, in the State of New York; in the State of Maryland, except the western part which lies west of the Blue Ridge; in Tennessee, Alabama, South Carolina, Georgia, the Floridas, **\*656** Louisiana, Missouri, and the territory west of the Mississippi; and Toogood, Halstead, Tyack, and Emmons conveyed to Strong and Woodworth all

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

their interest in Emmons's patent of 25th April, 1829, for the rest and residue of the United States; by which mutual deed of assignment the parties agreed, that any improvement in the machinery, or alteration, or renewal of either patent, such improvement, alteration, or renewal should accrue to the benefit of the respective parties in interest, and might be applied and used within their respective districts.

### Mutual Deed between Woodworth, Strong, Toogood, Halstead, Tyack, and Emmons.

'Know all men by these presents, that William Woodworth, now of the city of New York, the patentee of an improved method of planing, tonguing, grooving, & c., &c., plank, boards, &c., by letters patent from the United States, dated December 29th, 1828, and James Strong, of the city of Hudson, in the State of New York, the assignee of one equal half of the rights and interests secured by the aforesaid letters patent, of the one part, and Uri Emmons, of the city of New York, the patentee of an improvement in the mode of planing floor-plank, and grooving, tonguing, and straightening the edges of the same, &c., by letters patent from the United States, dated April 25th, 1829, and Daniel H. Toogood, Daniel Halstead, and William Tyack, of the city of New York, the assignees, by deed dated the 16th day of May, 1829, of all the rights and interest secured by the last aforesaid patent to said Emmons, of the other part, in consideration of the following covenants and agreements, do hereby covenant and agree as follows:——

'First. The said Woodworth and Strong, and their assigns, have, and hereby do assign to the said Toogood, Halstead, and Tyack, and their assigns, all their right and interest in the aforesaid patent to William Woodworth, to be sold and used, and the plank or other materials prepared thereby to be vended and used, in the following places, namely:—In the city and county of Albany, in the State of New York; in the State of Maryland, except the western part thereof which lies west of the Blue Ridge; in Tennessee, Mississippi, Alabama, South Carolina, Georgia, the Floridas, Louisiana, and the territory west of the River Mississippi, and not in any other State or place within the limits of the United States or the Territories thereof. To have and to hold the rights and privileges hereby granted to them and their assigns for and during the term of fourteen years from the date of the patent; and they are also authorized to prosecute, at their own costs and charges, any violation of the said patent, in the same manner as the patentee, Woodworth, might lawfully do.

'Secondly. The said Emmons, Toogood, Halstead, and Tyack, *657 in consideration aforesaid, have, and hereby do covenant and agree to assign, and do assign, for themselves and assigns, to the said Woodworth and Strong and their assigns, all their right and interest in the aforesaid patent granted to the said Uri Emmons, to be sold and used, and the plank or other material prepared thereby to be vended and used, in all and singular the rest and residue of the United States, and the Territories thereof, that is to say, in all places other than in those especially assigned to the said Toogood, Halstead, and Tyack, as aforesaid. To have and to hold the said rights and privileges hereby granted to them and their assigns for and during the term of fourteen years from the date of the said letters patent to the said Uri Emmons; and they are also authorized to prosecute, at their own costs and charges, any violation of the said patent, in the same manner as the patentee, Uri Emmons, might lawfully do.

'Thirdly. And the two parties further agree, that any improvement in the machinery, or alteration, or renewal of either patent, such alteration, improvement, or renewal shall accrue to the benefit of the respective parties in interest, and may be applied and used within their respective districts as hereinbefore designated.

'Witness our hands and seals, at the city of New York, the 28th of November, 1829.

WILLIAM WOODWORTH. [SEAL.]

JAMES STRONG. [SEAL.]

WILLIAM TYACK. [SEAL.]

D. H. TOOGOOD. [SEAL.]

DANIEL HALSTEAD. [SEAL.]

URI EMMONS. [SEAL.]

'Sealed and delivered, in presence of

THOMAS AP THOMAS,

Witness to the signing of Toogood, Tyack, Halstead, and Emmons.'

Under this mutual assignment, the respective parties and their assignees would possess the following rights, namely: if they claimed under Woodworth's patent, to use the same for fourteen years from the 29th of December, 1828, that is to say, until the 29th of December, 1842; and if they claimed

under Emmons's patent, to use the same for fourteen years from the 25th of April, 1829, that is to say, until the 25th of April, 1843.

On one or the other of these days, therefore, if things had remained in the same condition, all rights either in the patentees or their assignees would have ceased, as far as respected an exclusive use of the thing patented.

In 1836, Congress passed an act from which the following is an extract, and the construction of which was the chief controversy. (Act approved 4th July, 1836, ch. 357, 5 Lit. & Brown's ed. 117, **\*658** § 18.) 'And be it further enacted, that whenever any patentee of an invention or discovery shall desire an extension of his patent beyond the term of its limitation, he may make application therefor, in writing, to the Commissioner of the Patent-office, setting forth the grounds thereof; and the Commissioner shall, on the applicant's paying the sum of forty dollars to the credit of the treasury, as in the case of an original application for a patent, cause to be published in one or more of the principal newspapers in the city of Washington, and in such other paper or papers as he may deem proper, published in the section of country most interested adversely to the extension of the patent, a notice of such application, and of the time and place when and where the same will be considered, that any person may appear and show cause why the extension should not be granted. And the Secretary of State, the Commissioner of the Patent-office, and the Solicitor of the Treasury shall constitute a board to hear and decide upon the evidence produced before them, both for and against the extension, and shall sit for that purpose at the time and place designated in the published notice thereof. The patentee shall furnish to the said board a statement in writing, under oath, of the ascertained value of the invention, and of his receipts and expenditures, sufficiently in detail to exhibit a true and faithful account of loss and profit in any manner accruing to him from and by reason of said invention. And if, upon a hearing of the matter, it shall appear to the full and entire satisfaction of said board, having due regard to the public interest therein, that it is just and proper that the term of the patent should be extended, by reason of the patentee, without neglect or fault upon his part, having failed to obtain, from the use and sale of his invention, a reasonable remuneration for the time, ingenuity, and expense bestowed upon the same, and the introduction thereof into use, it shall be the duty of the Commissioner to renew and extend the patent, by making a certificate thereon of such extension, for the term of seven years from and after the expiration of the term; which certificate, with a certificate of said board of their judgment and opinion as aforesaid, shall be entered on record

in the patent-office; and thereupon the said patent shall have the same effect in law as though it had been originally granted for the term of twenty-one years. And the benefit of such renewal shall extend to assignees and grantees of the right to use the thing patented, to the extent of their respective interest therein. Provided, however, that no extension of a patent shall be granted after the expiration of the term for which it was originally issued.'

On the 3d of February, 1839, William Woodworth, the patentee, died; and on the 14th of February, 1839, William W. Woodworth took out letters of administration upon his estate, in the county of New York.

In 1842, William W. Woodworth, the administrator, applied for **\*659** an extension of the patent under the above-recited act of 1836, and on the 16th of November, 1842, the board issued the following certificate.

'In the matter of the application of William W. Woodworth, administrator on the estate of William Woodworth, deceased, in writing to the Commissioner of Patents for the extension of the patent for a new and useful improvement in the method of planing, tonguing, and grooving, and cutting into mouldings, or either, plank, boards, or any other material, and for reducing the same to an equal width and thickness; and also for facing and dressing brick, and cutting mouldings on, or facing, metallic, mineral, or other substances, granted to the said William Woodworth, deceased, on the 27th day of December, 1828, for fourteen years from said 27th day of December.

'The applicant having paid into the treasury the sum of forty dollars, and having furnished to the undersigned a statement in writing, under oath, of the ascertained value of the invention, and of the receipt and expenditures thereon, sufficiently in detail to exhibit a true and faithful account of loss and profits in any manner accruing to said patentee from or by reason of said invention; and notice of application having been given by the Commissioner of Patents, according to law, said board met at the time and place appointed, namely, at the patent-office, on the 1st September, 1842, and their meetings having been continued by regular adjournments until this 16th day of November, 1842, they, on that day, heard the evidence produced before them, both for and against the extension of said patent, and do now certify, that, upon hearing of the matter, it appears to their full and entire satisfaction, having due regard to the public interest therein, that it is just and proper that the term of said patent should be extended, by reason of the patentee, without neglect

on his part, having failed to obtain from the use and sale of his invention a reasonable remuneration for the time, ingenuity, and expense bestowed upon the same, and the introduction thereof into use.

'Washington city, Patent-office, November 16th, 1842.

DANIEL WEBSTER, *Secretary of State*.

CHAS. B. PENROSE, *Solicitor of the Treasury*.

HENRY L. ELLSWORTH, *Commissioner of Patents*.'

And on the same day the Commissioner of Patents issued the following certificate.

'Whereas, upon the petition of William W. Woodworth, administrator of the estate of William Woodworth, deceased, for an **\*660** extension of the within patent, granted to William Woodworth, deceased, on the 27th day of December, 1828. The Board of Commissioners, under the eighteenth section of the act of Congress approved the 4th day of July, 1836, entitled an act to promote the progress of useful arts, to repeal all acts and parts of acts heretofore made for that purpose, did, on the 16th day of November, 1842, certify that the said patent ought to be extended.

'Now, therefore, I, Henry L. Ellsworth, commissioner of patents, by virtue of the power vested in me by said eighteenth section, do renew and extend said patent, and certify that the same is hereby extended for the term of seven years from and after the expiration of the first term, namely, the 27th day of December, 1842, which certificate of said Board of Commissioners, together with this certificate of the Commissioner of Patents, having been duly entered of record in the patent-office, the said patent now has the same effect in law as though the term had been originally granted for the term of twenty-one years.

'In testimony whereof, I have caused the seal of the patent-office to be hereunto affixed, this 16th day of November, 1842.

HENRY L. ELLSWORTH, *Commissioner of Patents*.'

[SEAL.]

On the 2d of January, 1843, William W. Woodworth, the administrator, filed the following disclaimer.

'To all men to whom these presents shall come, I, William W. Woodworth, of Hyde Park, in the county of Duchess and State of New York, Esq., as I am administrator of the goods and estate which were of William Woodworth, deceased, hereinafter named, send greeting:

'Whereas letters patent, bearing date on the twenty-seventh day of December, in the year of our Lord eighteen hundred and twenty-eight, were granted by the United States to William Woodworth, now deceased, for an improvement in the method of planing, tonguing, grooving, and cutting into mouldings, or either, boards, plank, or any other material, and for reducing the same to an equal width and thickness; and also for facing and dressing brick, and cutting mouldings on, or facing, metallic, mineral, or other substances. And whereas, before the term of fourteen years, for which the said letters patent were granted, had fully expired, such proceedings were had that, pursuant to the act of Congress in such case made and provided, the said letters patent were renewed or extended for the term of seven years from and after the expiration of the said term of fourteen years, and to the certificate granting the said extension and renewal unto me in my said capacity, bearing date on the sixteenth day of November now last past, and which is duly recorded according to act of Congress in that behalf, reference is **\*661** hereby made, as showing my title and interest in and to the said letters patent.

'And whereas the said William Woodworth, through inadvertence, accident, or mistake in his application for letters patent, made his specification of claim too broad, in this, namely, that he, the said William Woodworth, claimed as his improved method the application of circular saws for reducing floor-plank and other material to width, of which he was not the original and first inventer. And whereas some material and substantial part of the said patented thing was justly and truly the invention and improvement of the said William Woodworth.

'Now therefore know ye, that I, the said William Woodworth, in my capacity aforesaid, and as the person to whom the said certificate was granted as aforesaid, have disclaimed, and do by these presents, for myself, and for all claiming under me, disclaim, all and any exclusive right, title, property, or interest of, in, or to the application of circular saws for reducing floor-plank or other materials to a width, by reason of the aforesaid letters patent, and the aforesaid renewal or extension thereof.

'In testimony whereof, I have hereto, in my capacity aforesaid, set my hand and seal, on this second day of January, in the year eighteen hundred and forty-three.

WILLIAM W. WOODWORTH, *Administrator of W. Woodworth, deceased*. [SEAL.]

'Executed in presence of

CHAS. W. EMESN.

B. R. CURTIS.'

In March, 1843, Woodworth, the administrator, made an assignment of his patent rights in some of the States to James G. Wilson, the plaintiff. At what time the assignment was made for New York, the record in that case did not state, but it was one of the admitted facts that he was the grantee. The assignment first referred to was recorded in the patent-office in Liber 4, pp. 291, 292, on the 20th of March, 1843.

On the 9th of August, 1843, the administrator assigned his right to Wilson, in and for the State of Maryland.

On the 26th of February, 1845, Congress passed the following act.

### 'An Act to extend a Patent heretofore granted to William Woodworth.

'Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the patent granted to William Woodworth on the twenty-seventh day of December, in the year one thousand eight hundred and twenty eight, for his improvement on the method of planing, tonguing, grooving, and cutting into mouldings, or either, plank, boards, or **\*662** any other material, and for reducing the same to an equal width and thickness; and also for facing and dressing brick, and cutting mouldings on and facing several other substances, a description of which is given in a schedule annexed to the letters patent granted as aforesaid, be, and the same is, hereby extended for the term of seven years from and after the 27th day of December in the year one thousand eight hundred and forty-nine; and the Commissioner of Patents is hereby directed to make a certificate of such extension in the name of the administrator of the said William Woodworth, and to append an authenticated copy thereof to the original letters patent, whenever the same shall be requested by the said administrator or his assigns.

'Approved February 26, 1845.

'A true copy from the roll of this office.

R. K. CRALLE, *Chief Clerk*.

'*Department of State, March* 3, 1845.'

And on the 3d of March, 1845, the following certificate was issued.

'In conformity, therefore, with the directions in the said act contained, I, Henry L. Ellsworth, Commissioner of Patents, do hereby certify, that the patent therein described is, by the said act, extended to William W. Woodworth, administrator of said William Woodworth, for the term of seven years from and after the twenty-seventh day of December in the year one thousand eight hundred and forty-nine; and this certificate of such extension is made on the original letters patent, on the application of William W. Woodworth, the administrator of the said William Woodworth.

'In testimony whereof, I have caused the seal of the patent-office to be hereunto affixed, this 3d day of March, 1845.

HENRY L. ELLSWORTH, *Commissioner of Patents*.'

[L. S.]

On the 8th of July, 1845, a new patent was issued, with an amended specification, as follows

### 'The United States of America to all to whom these letters patent shall come:

'Whereas, William W. Woodworth, administrator of William Woodworth, deceased, of Hyde Park, N. Y., has alleged that said William Woodworth invented a new and useful improvement in machines for planing, tonguing, and grooving, and dressing boards, &c., for which letters patent were granted, dated the 27th day of December, 1828, which letters patent have been extended (as will appear by the certificates appended thereto, copies of which are hereunto attached) for fourteen years from the expiration of said letters patent; and which letters patent are hereby cancelled on **\*663** account of a defective specification, which he states has not been known or used before said William Woodworth's application; has made oath that he is, and that said William Woodworth was, a citizen of the United States; that he does verily believe that said William Woodworth was the original and first inventer or discoverer of the said improvement, and that the same hath not, to the best of his knowledge and belief, been previously known or used; has paid into the treasury of the United States the sum of fifteen dollars, and presented a petition to the Commissioner of Patents, signifying a desire of obtaining an exclusive property in the said improvement, and praying that a patent may be granted for that purpose.

'These are therefore to grant, according to law, to the said William W. Woodworth, in trust for the heirs at law of said W. Woodworth, their heirs, administrators, or assigns, for the term of twenty-eight years from the twenty-seventh day of December, one thousand eight hundred and twenty-eight, the full and exclusive right and liberty of making, constructing, using, and vending to others to be used, the said improvement, a description whereof is given in the words of the said William W. Woodworth, in the schedule hereunto annexed, and is made part of these presents.

'In testimony whereof, I have caused these letters to be made patent, and the seal of the patent-office has been hereunto affixed.

[L. S.]

'Given under my hand, at the city of Washington, this eighth day of July, in the year of our Lord one thousand eight hundred and forty-five, and of the independence of the United States of America the seventieth.

JAMES BUCHANAN, *Secretary of State*.'

'Countersigned, and sealed with the seal of the patent-office.

HENRY H. SYLVESTER, *Acting Com'r of Patents*.'

'The schedule referred to in these letters patent, and making part of the same:——

'To all whom it may concern:—Be it known, that the following is a full, clear, and exact description of the method of planing, tonguing, and grooving plank or boards, invented by William Woodworth, deceased, and for which letters patent of the United States were granted to him on the 27th day of December, in the year one thousand eight hundred and twenty-eight; the said letters patent having been surrendered for the purpose of describing the same invention, and pointing out in what it consists, in more clear, full, and exact terms than was done in the original specification. **\*664**

### '*Amended Specification*.

'The plank or boards which are to be planed, tongued, or grooved are first to be reduced to a width by means of circular saws, by reducing-wheels, or by any other means. When circular saws are used for this purpose, two such saws should be placed upon the same shaft, on which they are to be capable of adjustment, so that they may be made to stand at any required distance apart; under these the board or plank is to

be forced forward, and brought to the width required; this apparatus and process do not require to be further explained, they being well understood by mechanicians.

'When what has been above denominated reducing-wheels are used, these are to consist of revolving cutter-wheels, which resemble in their construction and action the planing and reducing wheel to be presently described; these are to be made adjustable like the circular saws, but the latter are preferred for this purpose. The plank may be reduced to a width on a separate machine.

'When the plank or boards have been thus prepared (on a separate machine), they may be placed on or against a suitable carriage, resting on a frame or platform, so as to be acted upon by a rotary cutting or planing and reducing wheel; which wheel may be made to revolve either horizontally or vertically, as may be preferred. The carriage which sustains the plank or board to be operated upon may be moved forwards by means of a rack and pinion, by an endless chain or band, by geared friction-rollers, or by any of the devices well known to machinists for advancing a carriage or materials to be acted upon in machines for various purposes. The plank or board is to be moved on towards the cutting edges of the cutters or knives, on the planing-cylinder, so that its knives or cutters, as they revolve, may meet and cut the plank or board in a direction contrary to that in which it is made to advance; the edges of the cutters are, in this method, prevented from coming first into contact with its surface, and are made to cut upwards from the reduced part of the plank towards said surface, by which means their edges are protected from injury by gritty matter, and the board or plank is more evenly and better planed than when moved in the reversed direction.

'After the board or plank passes the planing-cylinder, and as soon, or fast, as the planing-cylinder has done its work on any part of the board or plank, the edges are brought into contact with two revolving cutter-wheels, one of which wheels is adapted to the cutting of the groove, and the other to the cutting of the two rebates that form the tongue. When the axis of the planing and reducing wheel stands vertically, the grooving and tonguing wheels are placed one above the other, with the plank edgewise between **\*665** them; when the axis of the planing-wheel stands horizontally, these wheels are on the same horizontal plane with each other, standing on perpendicular spindles.

'The grooving-wheel consists of a circular plate fixed on an axis, and having one, two, three, four, or more cutters, which are to be screwed, bolted, or otherwise attached to it, the edges

of which cutters project beyond the periphery of the plate to such distance as is required for the depth of the groove; their thickness may be such as is necessary for its width; the are, of course, so situated as to cut the groove in the middle of the edge of the board, or as nearly so as may be required. The tonguing-wheel is similar in form to the grooving-wheel, but it has cutters on each of its sides, or otherwise, so formed and arranged as to cut the two rebates which are necessary to the formation of the tongue.

'The grooving and tonguing cutters, at the same time and by the same operation, reduce the board or plank to an exact width throughout. When the axis of the planing-wheel is placed vertically, the knives or cutters may be made to plane two planks at the same time; the planks being in this case moved in contrary directions, and so as to meet the edges of the revolving knives or cutters. When the machine is thus constructed, a second pair of grooving and tonguing wheels may be made to operate in the same way with those above described. A machine to operate upon a single plank or board, and having the axis of the planing-wheel placed horizontally, will however be more simple and less expensive than that intended to operate on two planks simultaneously.

'In the accompanying drawing, fig. 1 is a perspective representation of the principal operating parts of the machine when arranged and combined for planing, tonguing, and grooving; and when so arranged as to be capable of planing two planks at the same time, the axis of the planing-wheel being placed vertically. A A is a stout substantial frame of the machine, which may be of wood or of iron, and may be varied in length, size, and strength, according to the work to be done. B B are the heads of the planing-cylinder, and C C, the knives or cutters, which extend from one to the other of said heads, to the peripheries of which they may be attached by means of screws. The knives C C, with the faces forming a planing angle, may be placed in a line with the axis, J, of the cylinder, or they may stand obliquely thereto, as may be preferred; but in the latter case the edge should form the segment or portion of a helix; *b* represents a pulley near to the upper end of the axis J; and I, a pulley or drum, which may be made to revolve by horse, steam, or other motive power, and from which a belt may extend around the pulley *b*, to drive the planingcylinder and other parts of the machinery; G is the carriage, which is represented as being driven forward by means of a rack **\*666** and pinion, H; against this carriage, the plank K, which is to be planed, tongued, and grooved, is placed, and is made to advance with it. It will be manifest, however, that the plank may be moved forward by other means, as, for example, by an endless chain or band, passing around drums or chain-wheels,

or by means of geared friction-wheels borne up against it. To cause the carriage and plank to move forward readily, there may be friction-rollers, *f f f*, placed horizontally, and extending under them; the rollers, *f f f*, which stand vertically, are to be made to press against the plank and keep it close to the carriage, and thus prevent the action of the cutters from drawing the plank up from its bed in cutting from the planed surface upwards; they may be borne against it by means of weights or springs, in a manner well known to machinists. In a single horizontal machine, the horizontal friction-rollers may be geared, and the pressure-rollers placed above them to feed the board with or without the carriages, a bed-plate being used directly under the planing-cylinder.

'Fig. 2 is a separate view of the planing-cylinder, with its knives or cutters; and fig. 3, an end view of one of the heads. E E are the revolving cutters, or tonguing and grooving wheels, and D D, whirls upon their shafts, which may be driven by bands, or otherwise, so as to cause said wheels to revolve in the proper direction.

'Fig. 4 is a side view of one of these wheels; fig. 5 is an edge view of the tonguing-wheel; and fig. 6, an edge view of the grooving-wheel; the latter being each shown with two cutters in place. The number of cutters on these wheels may be varied, but they are represented as furnished with four. The cutters may be fixed on the sides of circular plates, with their edges projecting beyond the periphery of said plate.

'The edges of the plank, as its planed part passes the planing-cylinder, are brought in contact with the above-described tonguing and grooving wheels, which are so placed upon their shafts as that the tongue and groove shall be left at the proper distance from the face of the plank, the latter being sustained against the planing-cylinder by means of the carriage or bed-plate, or otherwise, so that it cannot deviate, but must be reduced to a proper thickness, and correctly tongued and grooved.

'In fig. 1, above referred to, only one carriage and one pair of cutter-wheels are shown, it not being deemed necessary to represent those on the opposite side, they being similar in all respects.

'Fig. 7 represents the same machine, with the axis of the planing-cylinder placed horizontally, and intended to operate on one plank only at the same time. A A is the frame; B B, the heads of the planing-cylinder; C C, the knives or cutters attached to said heads. To meet the different thicknesses of the planks **\*667** or boards, the bearings of the shaft or cylinder may be made movable, by screws or other means, to adjust

4 How. 646, 11 L.Ed. 1141

it to the work; or the carriage or bed-plate may be made so as to raise the board or plank up to the planing-cylinder. E and E# are the revolving cutters, or tonguing and grooving wheels, which are placed upon vertical shafts, having upon them pulleys, D D, around which pass belts or bands from the main drum, I, to which a revolving motion may be given by any adequate motive power.

'From the drum, I, a belt, L, passes also around the pulley, b, on the shaft of the planing-cylinder, and gives to it the requisite motion. There may in this machine be a horizontal carriage moved forward by a rack and pinion, in a manner analogous to that represented in fig. 1; but in the present instance the plank is supposed to be advanced by means of one or two pairs of friction or feed rollers, shown at f f#; the uppermost, f# f#, of the pairs of rollers may be held down by springs, or weighted levers, which it has not been thought necessary to show in this drawing, as such are in common use. The lowermost of these rollers may be fluted or made rough on their surfaces, so as to cause friction on the under side of the plank. M M# are pulleys on the axles of these lower rollers which are embraced by bands, N N#, which also pass around a pulley, O, on a shaft which crosses the frame, A A, and has a pulley, T, on it, which is embraced by the belt, P, on a pulley, Q, on the shaft of the main drum, I; these bands and pulleys serve to give motion to the feed-rollers, as will be readily understood by inspecting the drawing. R R are guide-strips, used in place of the rollers used for the same purpose, and also for bearing or friction rollers, when the machine is vertical, to direct one edge of the plank, and against its opposite edge; any pressure may be used equal to the weight of the board or plank, when worked in a vertical position. One of the cutter-wheels should be made adjustable, to adapt it to stuff of different widths.

'The planing-cylinder, and likewise the cutter or tonguing and grooving wheels, may be constructed in the manner represented in figures 2, 3, 4, 5, and 6, and hereinbefore fully described. One of the heads of the planing-wheel may be made movable, to accommodate its width to the width of the boards or plank to be planed.

'The respective parts of this machine may be varied in size, as may also the velocity of the motion of the planing-cylinders and cutter-wheels; but the following has been found to answer well in practice. The planing-cylinder, having four knives or cutters, may be twelve inches in diameter, and may make two thousand and upwards revolutions in a minute. In a machine like that shown in fig. 7, the main drum, I, may be two feet in diameter, and may be driven with the speed of five hundred

and upwards revolutions in a minute. The pulleys on the planing-cylinder, and on the **\*668** cutter-wheels, may be six inches in diameter. The plank should be moved forward at the rate of about one foot for every hundred revolutions of the cutter-wheel; and, of course, the diameter of the feed-rollers and of the pulleys by which they are turned must be so graduated as to produce this result. The size and speed of the above parts of this machine may be in some degree varied; but the above have been found to work well.

'Having thus fully described the parts and combination of parts, and operation of the machine for planing, tonguing, and grooving boards or plank, and shown various modes in which the same may be constructed and made to operate without changing the principle or mode of operation of the machine, what is claimed therein as the invention of William Woodworth, deceased, is the employment of rotating planes, substantially such as herein described, in combination with rollers, or any analogous device, to prevent the boards from being drawn up by the planes when cutting upwards, or from the reduced or planed to the unplaned surface, as described.

'And also the combination of the rotating planes with the cutter-wheels for tonguing and grooving, for the purpose of planing, tonguing, and grooving boards, &c., at one operation, as described. And also the combination of the tonguing and grooving cutter-wheels for tonguing and grooving boards, and at one operation, as described.

'And, finally, the combination of either the tonguing or the grooving cutter-wheel for tonguing or grooving boards, &c., with the pressure-rollers, as described, the effect of the pressure-rollers in these operations being such as to keep the boards, &c., steady, and prevent the cutters from drawing the boards towards the centre of the cutter-wheels, whilst it is moved through by machinery. In the planing operation, the tendency of the plane is to lift the boards directly up against the rollers; but in the tonguing and grooving, the tendency is to overcome the friction occasioned by the pressure of the rollers.

WILLIAM W. WOODWORTH, *Administrator of William Woodworth, deceased.*

'Witnesses:——

JAMES MILHOLLAND,

CHS. M. KELLER.'

The above papers show the title of the administrator, who was the grantor of Wilson, the plaintiff in the suit. The record in the New York case was exceedingly brief, and contained neither the declaration nor pleas, but only the state of the pleadings and the existence of demurrers. But from the eighth fact in the statement of facts, in which it is said that 'the defendants trace no title to themselves to a right to use said machines from the assignment **\*669** made by William Woodworth and James Strong to Halstead, Toogood, and Tyack,' the inference must be, that their defence was in showing an outstanding title.

The following is the entire case presented by the New York record.

'*United States of America, Northern District of New York:*

'At a Circuit Court of the United States, begun and held at Albany, for the Northern District of New York, on Tuesday, the twenty-first day of October, in the year of our Lord one thousand eight hundred and forty-five, and in the seventieth year of American independence.

'Present, the Honorable Samuel Nelson and Alfred Conkling, Esquires.

'JAMES G. WILSON

*v.*

LEWIS ROUSSEAU AND CHARLES EASTON.

## '*State of the Pleadings*.

'This is an action on the case to recover damages for the alleged infringement of letters patent issued to William Woodworth, on the 27th day of December, 1828, for the term of fourteen years, for an improvement in machinery for planing, tonguing, and grooving boards and plank at one operation; which letters patent were, on the 16th day of November, 1842, extended for seven years more, such extension being granted to William W. Woodworth, as administrator of said William Woodworth.

'To the first count of the plaintiff's declaration, the defendants interposed three several special pleas in bar, to each of which pleas the plaintiff demurred, and the defendants joined in demurrer. To the second count of the plaintiff's declaration, the defendants demurred, and the plaintiff joined in demurrer.

'The case coming on to be argued at this term, the following questions occurred for decision, to wit:——

'1. Whether the eighteenth section of the patent act of 1836 authorized the extension of a patent on the application of the executor or administrator of a deceased patentee.

'2. Whether, by force and operation of the eighteenth section of the act of July 4th, 1836, entitled 'An act to promote the progress of the useful arts,' & c., the extension granted to William W. Woodworth, as administrator, on the 16th day of November, 1842, inured to the benefit of assignees, under the original patent granted to William Woodworth, on the 27th day of December, 1828, or whether said extension inured to the benefit of the administrator only, in his said capacity.

'3. Whether the extension specified in the foregoing second point inured to the benefit of the administrator to whom the same **\*670** was granted, and to him in that capacity exclusively; or whether, as to the territory specified in the contract of assignment made by William Woodworth and James Strong to Toogood, Halstead, and Tyack, on the 28th day of November, 1829 (and set forth in the second plea of the defendants to the first count of the declaration), and by legal operation of the covenants contained in said contract, the said extension inured to the benefit of the said Toogood, Halstead, and Tyack, or their assigns.

'4. Whether the plaintiff, claiming title under the extension from the administrator, can maintain an action for an infringement of the patent right within the territory specified in the contract of assignment to Toogood, Halstead, and Tyack, against any person not claiming under said assignment; or whether the said assignment be of itself a perfect bar to the plaintiff's suit.

'5. Whether the extension specified in the second point could be applied for and obtained by William W. Woodworth, as administrator of William Woodworth, deceased, if the said William Woodworth, the original patentee, had, in his lifetime, disposed of all his interest in the then existing patent, having, at the time of his death, no right or title to, or interest in, the said original patent; or whether such sale carried with it nothing beyond the term of said original patent; and, if it did not, whether any contingent rights remained in the patentee or his representatives.

'6. Whether the plaintiff, if he be an assignee of an exclusive right to use two of the patented machines within the town of Watervliet, has such an exclusive right as will enable him to

maintain an action for an infringement of the patent within said town; or whether, to maintain such action, the plaintiff must be possessed, as to that territory, of all the rights of the original patentee.

'7. Whether the letters patent of renewal issued to William W. Woodworth, as administrator aforesaid, on the 8th day of July, 1845, upon the amended specification and explanatory drawings then filed, be good and valid in law; or whether the same be void, for uncertainty, ambiguity, or multiplicity of claim, or any other cause.

'8. Whether the court can determine, as matter of law, upon an inspection of the said two patents and their respective specifications, that the said new patent of the 8th of July, 1845, is not for the same invention for which the said patent of 1828 was granted.

'9. Whether the decision of the Board of Commissioners, who are to determine upon the application for the extension of a patent, under the eighteenth section of the act of 1836, is conclusive upon the question of their jurisdiction to act in the given case.

'10. Whether the Commissioner of Patents can lawfully receive a surrender of letters patent for a defective specification, and issue new letters patent upon an amended specification, after the expiration of the term for which the original patent was granted, and **\*671** pending the existence of an extended term of seven years; or whether such surrender and renewal may be made at any time during such extended term.

'On which questions the opinions of the judges were opposed.

'Whereupon, on a motion of the plaintiff, by William H. Seward, his counsel, that the points on which the disagreement hath happened may, during the term, be stated under the direction of the judges, and certified under the seal of the court to the Supreme Court, to be finally decided.

'It is ordered that the foregoing state of the pleadings, and the following statement of facts, which is made under the direction of the judges, be certified, according to the request of the plaintiff by his counsel, and the law in that case made and provided, to wit:——

'1. That William Woodworth, as the inventer of a machine, or improvement in machinery, for planing, tonguing, and grooving boards and plank at one operation, on the 27th day of December, in the year 1828, applied to the proper department

of the government for a patent for said invention, and upon the same day, on filing his specifications and explanatory drawings, and complying with the other legal prerequisites, letters patent, signed by the President, and under the seal of the United States, were duly issued to the said William Woodworth, granting to him the exclusive right, throughout the United States, to construct and use, and vend to others to be used, the machine or improvement patented, for and during the term of fourteen years from the said 27th day of December, 1828.

'2. That subsequently, to wit, on the 28th day of November, 1829, the said William Woodworth and James Strong, who had become jointly interested with said Woodworth in the rights secured by the said letters patent by contract of assignment of that date, transferred to Daniel H. Toogood, Daniel Halstead, and William Tyack all their right and interest in and to the said patent for certain parts and portions of the United States in said contract specifically set forth, including the city and county of Albany, in the State of New York, which is the domicile of the defendants.

'3. That the *habendum* in said contract of assignment is in the words following, to wit:——

"To have and to hold the rights and privileges hereby granted for and during the term of fourteen years from the date of the patent.'

'And that the third clause in said contract of assignment is in the following words, to wit:——

"And the two parties further agree, that any improvement in the machinery, or alteration or renewal of either patent, such improvement, alteration, or renewal, shall inure to the benefit of the respective parties interested, and may be applied and used within their respective districts, as hereinbefore designated.' **\*672**

'4. That previous to the expiration of the fourteen years' limitation of said patent, William Woodworth, the patentee, died, to wit, on the 9th of February, 1839; that William W. Woodworth was thereupon duly appointed, and now is, administrator of the estate of the said William Woodworth, and that said Woodworth, in his lifetime, had sold all his interest in the said original patent.

'5. That William W. Woodworth, as administrator aforesaid, on the 16th day of November, 1842, under the eighteenth section of the act of Congress of July 4th, 1836, applied to the Board of Commissioners created by the said section for

an extension of said patent; and that, upon complying with the requisites in said section prescribed, an extension of said patent was granted by said board to William W. Woodworth, as administrator of the estate of William Woodworth, on said 16th day of November, 1842, and letters patent of extension were on said day duly issued to him, granting to him, in his aforesaid capacity, the exclusive right to make and use, and vend to others to be used, the said invention or improvement, for the term of seven years from and after the term of limitation of said original patent.

'6. That on the 8th day of July, 1845, the said William W. Woodworth, in his capacity as administrator aforesaid, and in accordance with the provisions of the thirteenth section of the said act of July 4th, 1836, made a surrender to the Commissioner of Patents of the letters patent to him granted on the 16th day of November, 1842, for an insufficiency of the specification upon which said original patent was issued, and upon filing a corrected and amended specification, with explanatory drawings, a copy of which is annexed hereto and made a part of this statement, the said Commissioner, on said 8th day of July, 1845, issued to the said William W. Woodworth new letters patent of said invention for the unexpired term of the first extension thereof, and of the extension granted by special act of Congress on the 26th day of February, 1845.

'7. That the defendants in this action have erected and put in operation, in the town of Watervliet, which is within the county of Albany and State of New York, one or more machines for planing, tonguing, and grooving boards and plank, substantially the same in principle and mode of operation as that the subject of the patent granted to William Woodworth.

'8. That the defendants trace no title to themselves to a right to use said machines from the assignment made by William Woodworth and James Strong to Halstead, Toogood, and Tyack.

'9. That the plaintiff in this action is the grantee of William W. Woodworth, as administrator, of the exclusive right to construct and use, and vend to others to be used, two of said patented machines within said town of Watervliet, in said county of Albany and State of New York.'   *673

**Attorneys and Law Firms**

The case was argued by *Mr. Seward, Mr. Latrobe*, and *Mr. Webster* (the two latter dividing the points), on behalf of the plaintiff, and *Mr. Stevens*, for the defendants. The reporter has

been kindly furnished with the arguments of these gentlemen, but his limits will not permit their publication *in extenso*, and he is unwilling to take the responsibility of condensing them

Mr. Justice NELSON delivered the opinion of the court.

The questions in this case come before us on a certificate of division of opinion from the Circuit Court of the United States for the Northern District of New York, involving the construction of various provisions of the act of Congress to promote the progress of useful arts, commonly called the patent act. We shall examine the questions in the order in which they appear on the record. The first is as follows:——

1. Whether the eighteenth section of the act of 1836 authorized the extension of a patent on the application of the executor or administrator of a deceased patentee.

The eighteenth section provides, in substance, that whenever any patentee of an invention or discovery shall desire an extension of his patent beyond the term of its limitation, he may make application therefor, in writing, to the Commissioner of the Patent-office, setting forth the grounds thereof. That the Secretary of State, the Commissioner of the Patent-office, and the Solicitor of the Treasury shall constitute a board to hear and decide upon the application; the patentee shall furnish to the board a statement in writing, under oath, of the value and usefulness of the invention, and of his receipts and expenditures, sufficiently in detail to exhibit a true and faithful account of loss and profit in any manner accruing to him from and by reason of the invention; and if, upon a hearing of the matter, it shall appear to the satisfaction of the board, having a due regard to the public interest, that it is just and proper the term of the patent should be extended, by reason of the patentee, without neglect or fault on his part, having failed to obtain, from the use and sale of his invention, a reasonable remuneration for the time, ingenuity, and expense bestowed upon the same, and the introduction thereof into use, it shall be the duty of the commissioner to renew and extend the patent, by making a certificate thereof of such extension for the term of seven years from and after the expiration of the first term, &c.

This is the substance of the section, so far as is material to the consideration of the question; and it will be seen, that, according to the words of the provision, the application is to be made by, and the new term to be granted to, the patentee himself, and hence the objection on account of its having been granted to the administrator.

The main argument relied on to support the objection is, that the patentee had no interest or right of property in the extended term at **674** the time of his death. That all he had was a mere possibility, too remote and contingent to be regarded as property, or any right of property, in the sense of the law, and therefore not assets or rights in the hands of the administrator which would authorize an application within the meaning of the statute.

At common law, the better opinion, probably, is, that the right of property of the inventer to his invention or discovery passed from him as soon as it went into public use with his consent; it was then regarded as having been dedicated to the public, as common property, and subject to the common use and enjoyment of all.

The act of Congress for the encouragement of inventers, and to promote the progress of the useful arts, and for the purpose of remedying the imperfect protection, or rather want of protection, of this species of property, has secured to him, for a limited term, the full and exclusive enjoyment of his discovery.

The law has thus impressed upon it all the qualities and characteristics of property, for the specified period; and has enabled him to hold and deal with it the same as in case of any other description of property belonging to him, and on his death it passes, with the rest of his personal estate, to his egal representatives, and becomes part of the assets.

Congress have not only secured to the inventer this absolute and indefeasible interest and property in the subject of the invention for the fourteen years, but have also agreed, that upon certain conditions occurring and to be shown, before the expiration of this period, to the satisfaction of a board of commissioners, an indifferent tribunal designated for the purpose, this right of property in the invention shall be continued for the further term of seven years. Subject to this condition, the right of property in the second term is as perfect, to the extent of the intent, as the right of property in the first.

The circumstances upon which the condition rests, and the occurrence of which gives effect and operation to the further grant of the government, are by no means uncommon, or difficult to be shown. They have often happened to inventers in the course of their dealings with this species of property. The act of Congress contemplates their occurrence again, and has therefore provided further security and protection, by

enlarging the interest and right of property in the subject of their invention.

The provision is founded upon the policy of the government to encourage genius, and promote the progress of the useful arts, by holding out an additional inducement to the enjoyment of the right secured under the first term; and as an act of justice to the inventers for the time, ingenuity, and expense bestowed in bringing out the discovery, frequently of incalculable value to the business interests of the country. And it is apparent, therefore, unless the executor or administrator is permitted to take the place of the **675** patentee in case of his death, and make application for the grant of the second term, which continues the exclusive enjoyment of the right of property in the invention, the object of the statute will be defeated, and a valuable right of property, intended to be secured, lost to his estate.

The statute is not founded upon the idea of conferring a mere personal reward and gratuity upon the individual, as a mark of distinction for a great public service, which would terminate with his death; but of awarding to him an enlarged interest and right of property in the invention itself, with a view to secure to him, with greater certainty, a fair and reasonable remuneration. And to the extent of this further right of property, thus secured, whatever that may be, it is of the same description and character as that held and enjoyed under the patent for the first term. In its nature, therefore, it continues, and is to be dealt with, after the decease of the patentee, the same as an interest under the first, and passes, with other rights of property belonging to him, to the personal representatives, as part of the effects of the estate.

It would seem, therefore, from the nature of this interest in an extended term itself, as well as from a consideration of the object and purpose of the statute, plainly expressed upon its face, in providing for the prolonged enjoyment and protection of this species of property, that the Board of Commissioners were well warranted in making the renewed grant to the administrator, upon his complying with the conditions.

An argument has been urged against this conclusion, grounded upon the tenth and thirteenth sections of the patent law. The former provides in express terms for the issuing of a patent to the executor or administrator, in case of the death of the inventer before it is taken out; and the latter, for a surrender of a patent defective by reason of an insufficient description, and the reissuing of a new one. These are supposed to be analogous cases, and manifest the sense of Congress, that, without the express provisions of law, the

patent in the one case, and the surrender in the other, could not be issued to, or be made by, the legal representative. The argument is no doubt a proper one, and entitled to consideration; but is not necessarily conclusive.

As it respects the provision for a surrender by the executor or administrator, which is most analogous to the question in hand, we think there could be no great doubt that the right would exist in the absence of any such express authority, regard being had to the nature of the property, and the rights and duties of the legal representative, within the spirit and object of the patent law. It would be the surrender of a patent, the legal interest and property in which had become vested in him as part of the assets, which he was bound to take care of, and protect against waste; a step necessary to perfect the title and give value to the property  **\*676**  would seem to be not only directly within the line of his duty, but in furtherance of the chief object of the law, namely, to secure remuneration to the meritorious inventer.

It has also been argued, that the executor or administrator could not comply with the terms and conditions of the eighteenth section, upon which the right of property in the extended term is made to depend. In other words, that he would be unable to furnish to the Board of Commissioners a statement under oath of the usefulness of the invention, and of the receipts and expenditures of the patentee, exhibiting a true and faithful account of the loss and profit in any manner accruing from, and by reason of, the invention. This argument assumes as a matter of fact that which may well be denied. Suppose the dealings of the patentee in the subject of his discovery have been carried on through the instrumentality of agents or clerks, or, if not, that the patentee himself, as business men usually do, has kept an accurate account of his receipts and expenditures, all difficulty at once disappears. The accountbooks of a deceased party, in many of the States of the Union, identified and the handwriting proved, are received as legal evidence of the demand in the courts of justice, and afford full authority, upon legal principles, for the admission of the books before the board, in support of the application. We perceive no great difficulty in a substantial compliance with the terms of the section, on the part of the executor or administrator.

The second question is, Whether, by force and operation of the eighteenth section already referred to, the extension granted to W. W. Woodworth, as administrator, on the 16th day of November, 1842, inured to the benefit of assignees under the original patent granted to William Woodworth, on the 27th day of December, 1828, or whether said extension

inured to the benefit of the administrator only, in his said capacity.

The most of this section has already been recited in the consideration of the first question, and it will be unnecessary to repeat it. It provides for the application of the patentee to the commission for an extension of the patent for seven years; constitutes a board to hear and decide upon the application; and if his receipts and expenditures, showing the loss and profits accruing to him from and on account of his invention, shall establish, to the satisfaction of the board, that the patent should be extended by reason of the patentee, without any fault on his part, having failed to obtain from the use and sale of his invention a reasonable remuneration for his time, ingenuity, and expense bestowed upon the same, and the introduction of it into use, it shall be the duty of the commissioners to extend the same by making a certificate thereon of such extension for the term of seven years from and after the first term; 'and thereupon the said patent shall have the same effect in law as though it had been originally granted for the term of twenty-one  **\*677**  years.' And then comes the clause in question:—'*And the benefit of such renewal shall extend to assignees and grantees of the right to use the thing patented, to the extent of their respective interests therein*.'

The answer to the second question certified depends upon the true construction of the above clause respecting the rights of assignees and grantees.

Various and conflicting interpretations have been given to it by the learned counsel, on the argument, leading to different and opposite results, which it will be necessary to examine.

On one side, it has been strongly argued, that the legal operation and effect of the clause save and protect all the rights and interests of assignees and grantees in the patent existing at the time of the extension; and thus secure and continue the exclusive use and enjoyment of these rights and interests for the seven years, to the same extent, and in as ample a manner, as held and enjoyed under the first term. That if A. holds an assignment of a moiety of the patent, he will hold the same for the new term of seven years; if of the whole patent, then the whole interest for that period. And that as soon as the new grant is made to the patentee, the interest therein passes, by operation of this clause, to the assignees of the old term, in proportion to their respective shares.

On the other side, it has been argued, with equal earnestness, that, according to the true construction and legal effect of the clause, protection is given, and intended to be given, only to the rights and interests of assignees and grantees acquired

and held by assignments and grants from the patentee in and under the second or new term; and that it does not refer to, or embrace, or in any way affect the rights and interests of assignees or grantees holding under the old.

In connection with this view, it is said that the rights thus protected in the new term may be acquired by means of the legal operation of the clause, either from a direct assignment or grant after the extension of the patent, or by an appropriate provision for that purpose, looking to an extension, contained in the assignment or grant under the old.

It is not to be denied, but that, upon any view that has been taken or that may be taken of the clause, its true meaning and legal effect cannot be asserted with entire confidence; and, after all, must depend upon such construction as the court can best give to doubtful phraseology and obscure legislation, having a due regard to the great object and intent of Congress, as collected from the context and general provisions and policy of the patent law.

The rule is familiar and well settled, that, in case of obscure and doubtful words or phraseology, the intention of the law-makers is to be resorted to, if discoverable from the context, in order to fix and control their meaning so as to reconcile it, if possible, with the general policy of the law.

 *678  Now, the serious difficulty in the way, and which renders the first interpretation inadmissible, except upon the most explicit and positive words, is, that it subverts at once the whole object and purpose of the enactment, as is plainly written in every line of the previous part of the section. It gives to the assignees and grantees of the patent, as far as assigned under the old term, the exclusive right and enjoyment of the invention—the monopoly—in the extended term for the seven years; when, by the same provision, it clearly appears that it was intended to be secured to the patentee as an additional remuneration for his time, ingenuity, and expense in bringing out the discovery, and in introducing it into public use. It gives this remuneration to parties that have no peculiar claims upon the government or the public, and takes it from those who confessedly have.

The whole structure of the eighteenth section turns upon the idea of affording this additional protection and compensation to the patentee, and to the patentee alone, and hence the reason for instituting the inquiry before the grant of the extension, to ascertain whether or not he has failed to realize a reasonable remuneration from the sale and use of the discovery,—the production of an account of profit and loss to enable the board

to determine the question; and as it comes to the one or the other conclusion, to grant the extended term or not.

It is obvious, therefore, that Congress had not at all in view protection to assignees. That their condition on account of dealing in the subject of the invention, whether successful or otherwise, was not in the mind of that body, nor can any good reason be given why it should have been.

They had purchased portions of the interest in the invention, and dealt with the patent rights as a matter of business and speculation; and stood in no different relation to the government or the public, than other citizens engaged in the common affairs of life.

Nothing short of the most fixed and positive terms of a statute could justify an interpretation so repugnant to the whole scope and policy of it, and to wise and judicious legislation.

We think this construction not necessarily required by the language of the clause, and is altogether inadmissible.

Then as to the second interpretation, namely, that the clause refers to, and includes, assignees and grantees of interests acquired in the new term, either by an assignment or grant from the patentee after the extension, or by virtue of a proper clause for that purpose, in the assignment under the old term.

The difficulty attending this construction lies in the uselessness of the clause upon the hypothesis,—the failure to discover any subject-matter upon which to give reasonable operation and effect to it,—and hence, to adopt the construction is to make the clause  *679  virtually a dead letter, the grounds for which conclusion we will proceed to state.

The eleventh section of the patent act provides, that every patent shall be assignable, in law, either as to the whole interest, or any undivided part thereof, by an instrument in writing; which assignment, and also every grant and conveyance of the exclusive right under any patent, &c., shall be recorded in the patent-office. And the fourteenth section authorizes suits to be brought in the name of the assignee or grantee, for an infringement of his rights, in a court of law.

One object of these provisions found in the general patent system is to separate the interest of the assignee and grantee from that which may be held by the patentee, and to make each fractional interest held under the patent distinct and separate; in other words, to change a mere equitable into a

legal title and interest, so that it may be dealt with in a court of law.

Now, in view of these provisions, it is difficult to perceive the materiality of the clause in question, as it respects the rights of assignees and grantees held by an assignment or grant in and under the new term, any more than in respect to like rights and interests in and under the old.

The eleventh and fourteenth sections embrace every assignment or grant of a part or the whole of the interest in the invention, and enable these parties to deal with it, in all respects, the same as the patentee. They stand upon the same footing, under the new term, as in the case of former assignments under the old. Nothing can be clearer. It is impossible to satisfy the clause by referring it to these assignments and grants; or to see how Congress could, for a moment, have imagined that there would be any necessity for the clause, in this aspect of it. It would have been as clear a work of supererogation as can be stated.

The only color for the argument in favor of the necessity of this clause, in the aspect in which we are viewing it, is as respects the contingent interest in the new term, derived from a provision in an assignment under the old one, looking to the extension. As the right necessarily rested on contract, at least till the contingency occurred, there may be some doubt whether, even after its occurrence, the eleventh and fourteenth sections had the effect to change it into a vested legal interest, so that it could be dealt with at law; and that a new assignment or grant from the patentee would be required, which could be enforced only in a court of equity. To this extent there may be some color for the argument,—some supposed matter to give operation and effect to the clause.

But what is the amount of it? Not that the clause creates or secures this contingent interest in the new term, for that depends upon the contract between the parties, and the contract alone, and which, even if the general provisions of the law respecting  *680  the rights of assignees and grantees could not have the effect to change into a legal right, might be enforced in a court of equity.

The only effect, therefore, of the provision in respect to assignees and grantees of this description would be, to change the nature of the contingent interest after the event happened, from a right resting in contract to a vested legal interest; or, to speak with more precision, to remove a doubt about the nature of the interest in the new term, after the happening of a certain contingency, which event in itself was quite remote. This seems to be the whole amount of the effect that even ingenious

and able counsel have succeeded in finding, to satisfy the clause. It presupposes that Congress looked to this scintilla of interest in the new term, which might or might not occur, and cast about to provide for it, for fear of doubts as to its true nature and legal character, and the effect of the general system upon it.

We cannot but think a court should hesitate before giving a construction to the clause so deeply harsh and unjust in its consequences, both as it respects the public and individual rights and interests, upon so narrow a foundation.

But there are other difficulties in the way of this construction.

The eleventh section, regulating the rights of assignees and grantees, provides, 'that every patent shall be assignable at law,' &c., 'which assignment, and also every grant and conveyance of the exclusive right under any patent to make and use, and to grant to others to make and use, the thing patented within and throughout any specified part or portion of the United States,' &c., 'shall be recorded.'

Now it will be apparent, we think, from a very slight examination of the clause in question, that it does not embrace assignees or grantees, in the sense of the eleventh section, at all; nor in the sense in which they are referred to when speaking of these interests generally under the patent law, without interpolating words or giving a very forced construction to those composing it.

The clause is as follows:—'And the benefit of such renewal shall extend to assignees and grantees of the right to use the thing patented, to the extent of their respective interests therein.'

It will be seen that the word 'exclusive,' used to qualify the right of a grantee in the eleventh section, and, indeed, always when referred to in the patent law (§ 14), and also the words 'to make,' 'and to grant to others to make and use,' are dropped, so that there is not only no exclusive right in the grantee, in terms, granted or secured by the clause, but no right at all,—no right whatever,—to make or to grant to others to make and use the thing patented; in other words, no exclusive right to make or vend. And it is, we think, quite obvious, from the connection and phraseology, that assignees and grantees are placed, and were intended to be placed, in this respect, upon the same footing. We should scarcely be  *681  justified in giving to this term a more enlarged meaning as to the right to make and sell, as it respects the one class, than is given to the others, as they are always used as correlative in the patent laws, to the extent of the

interests held by them. The clause, therefore, in terms, seems to limit studiously the benefit, or reservation, or whatever it may be called, under or from the new grant to the naked right to use the thing patented; not an exclusive right even for that, which might denote monopoly, nor any right at all, much less exclusive, to make and vend. That seems to have been guardedly omitted. We do not forget the remaining part of the sentence, 'to the extent of their respective interests therein,' which is relied on to help out the difficulty. But we see nothing in the phrase, giving full effect to it, necessarily inconsistent with the plain meaning of the previous words. The exact idea intended to be expressed may be open to observation; but we think it far from justifying the court in holding, that the grant or reservation of a right to use a thing patented, well known and in general use at the time, means an exclusive right to make and use it; and not only this, but an exclusive right to grant to others the right to make and use it, meaning an exclusive right to vend it.

The court is asked to build up a complete monopoly in the hands of assignees and grantees in the thing patented, by judicial construction, founded upon the grant of a simple right to use it to the extent of the interest possessed; for the argument comes to this complexion. A simple right to use is given, and we are asked to read it an exclusive right, and not only to read it an exclusive right to use, but an exclusive right to make and vend, the patented article.

Recurring to the patent law, it will be seen that Congress, in granting monopolies of this description, have deemed it necessary to use very different language. The grant in the patent must be in express terms, for 'the full and exclusive right and liberty of making, using, and vending,' in order to confer exclusive privileges. The same language is also used in the act when speaking of portions of the monopoly in the hands of assignees and grantees. (§§ 11, 14).

We cannot but think, therefore, if Congress had intended to confer a monopoly in the patented article upon the assignees and grantees by the clause in question, the usual formula in all such grants would have been observed, and that we should be defeating their understanding and intent, as well as doing violence to the language, to sanction or uphold rights and privileges of such magnitude by the mere force of judicial construction.

We conclude, therefore, that the clause has no reference to the rights or interest of assignees and grantees under the new and extended term, upon the ground,——

1. Because, in that view, giving to the words the widest construction, **682** there is nothing to satisfy the clause, or upon which any substantial effect and operation can be given to it; it becomes virtually a dead letter, and work of legislative superfluity; and

2. Because the clause in question, upon a true and reasonable interpretation, does not operate to vest the assignees and grantees named therein with any exclusive privileges whatever, in the extended term, and therefore cannot be construed as relating to or embracing such interests in the sense of the law.

The extension of the patent under the eighteenth section is a new grant of the exclusive right or monopoly in the subject of the invention for the seven years. All the rights of assignees or grantees, whether in a share of the patent, or to a specified portion of the territory held under it, terminate at the end of the fourteen years, and become reinvested in the patentee by the new grant.

From that date he is again possessed of 'the full and exclusive right and liberty of making, using, and vending to others the invention,' whatever it may be. Not only portions of the monopoly held by assignees and grantees as subjects of trade and commerce, but the patented articles or machines throughout the country, purchased for practical use in the business affairs of life, are embraced within the operation of the extension. This latter class of assignees and grantees are reached by the new grant of the exclusive right to use the thing patented. Purchasers of the machines, and who were in the use of them at the time, are disabled from further use immediately, as that right became vested exclusively in the patentee. Making and vending the invention are prohibited by the corresponding terms of his grant.

Now, if we read the clause in question with reference to this state of things, we think that much of the difficulty attending it will disappear. By the previous part of the section, the patentee would become reinvested with the exclusive right to make, use, and vend the thing patented; and the clause in question follows, and was so intended as a qualification. To what extent, is the question. The language is, 'And the benefit of such renewal shall extend to assignees and grantees of the right to use the thing patented, to the extent of their respective interests therein'; naturally, we think, pointing to those who were in the use of the patented article at the time of the renewal, and intended to restore or save to them that right which; without the clause, would have been vested again exclusively in the patentee. The previous part of the section

operating in terms to vest him with the exclusive right to use, as well as to make and vend, there is nothing very remarkable in the words, the legislature intending thereby to qualify the right in respect to a certain class only, leaving the right as to all others in the patentee, in speaking of the benefit of the renewal extending to this class. The renewal vested him with the whole right to use, and therefore there is no great impropriety of language, if intended to protect **\*683** this class, by giving them in terms the benefit of the renewal. Against this view it may be said that 'the thing patented' means the invention or discovery, as held in McClurg *v.* Kingsland, 1 How. 202, and that the right to use the 'thing patented' is what, in terms, is provided for in the clause. That is admitted, but the words, as used in the connection here found, with the right simply to use the thing patented, not the exclusive right, which would be a monopoly, necessarily refer to the patented machine and not to the invention; and, indeed, it is in that sense that the expression is to be understood generally throughout the patent law, when taken in connection with the right to use, in contradistinction to the right to make and sell.

The 'thing patented' is the invention; so the machine is the thing patented, and to use the machine is to use the invention, because it is the thing invented and in respect to which the exclusive right is secured, as is also held in McClurg *v.* Kingsland. The patented machine is frequently used as equivalent for the 'thing patented,' as well as for the invention or discovery, and no doubt, when found in connection with the exclusive right to make and vend, always means the right of property in the invention, the monopoly. But when in connection with the simple right to use, the exclusive right to make and vend being in another, the right to use the thing patented necessarily results in a right to use the machine, and nothing more. Then, as to the phrase 'to the extent of their respective interests therein,' that obviously enough refers to their interests in the thing patented, and in connection with the right simply to use, means their interests in the patented machines, be that interest in one or more at the time of the extension.

This view of the clause, which brings it down in practical effect and operation to the persons in the use of the patented machine or machines at the time of the new grant, is strengthened by the clause immediately following, which is, 'that no extension of the patent shall be granted after the expiration of the term for which it was originally issued.' What is the object of this provision? Obviously, to guard against the injustice which might otherwise occur to a person who had gone to the expense of procuring the patented article, or changed his business upon the faith of using or dealing with

it, after the monopoly had expired, which would be arrested by the operation of the new grant. To avoid this consequence, it is provided that the extension must take place before the expiration of the patent, if at all. Now, it would be somewhat remarkable if Congress should have been thus careful of a class of persons who had merely gone to the expense of providing themselves with the patented article for use or as a matter of trade, after the monopoly had ceased, and would be disappointed and exposed to loss if it was again renewed, and at the same time had overlooked the class who in addition to this expense and change of business **\*684** had bought the right from the patentee, and were in the use and enjoyment of the machine, or whatever it might be, at the time of the renewal. These provisions are in juxtaposition, and we think are but parts of the same policy, looking to the protection of individual citizens from any special wrong and injustice on account of the operation of the new grant.

The consequences of any different construction than the one proposed to be given are always to be regarded by courts, when dealing with a statute of doubtful meaning. For between two different interpretations, resting upon judicial expositions of ambiguous and involved phraseology, that which will result in what may be regarded as coming nearest to the intention of the legislature should be preferred.

We must remember, too, that we are not dealing with the decision of the particular case before us, though that is involved in the inquiry; but with a general system of great practical interest to the country; and it is the effect of our decision upon the operation of the system that gives to it its chief importance.

The eighteenth section authorizes the renewal of patents in all cases where the Board of Commissioners is satisfied of the usefulness of the invention, and of the inadequacy of remuneration to the patentee. Inventions of merit only are the subject of the new grant; such as have had the public confidence, and which it may be presumed have entered largely, in one way and another, into the business affairs of life.

By the report of the Commissioner of Patents it appears, that five hundred and two patents were issued in the year 1844,—for the last fourteen years, the average issue yearly exceeded this number,—and embrace articles to be found in common use in every department of labor or art, on the farm, in the workshop, and factory. These articles have been purchased from the patentee, and have gone into common use. But, if the construction against which we have been contending

should prevail, the moment the patent of either article is renewed, the common use is arrested, by the exclusive grant to the patentee. It is true the owner may repurchase the right to use, and doubtless would be compelled from necessity; but he is left to the discretion or caprice of the patentee. A construction leading to such consequences, and fraught with such unmixed evil, we must be satisfied, was never contemplated by Congress, and should not be adopted unless compelled by the most express and positive language of the statute.

The third question certified is, whether the extension of the patent granted to W. W. Woodworth, as administrator, on the 16th of November, 1842, inured to the benefit of the administrator exclusively, or whether, as to certain territory specified in the contract of assignment made by W. Woodworth and James Strong to Toogood, Halstead, and Tyack, on the 28th of November, 1829, and **685** by legal operation of the covenants contained in said contract, the said extension inured to the benefit of said Toogood, Halstead, and Tyack, or their assigns?

William Woodworth was the original patentee, and took out letters patent on the 27th of December, 1828; and soon after conveyed a moiety of them to James Strong. One Uri Emmons also obtained a patent for a similar machine on the 25th of April, 1829, and soon after conveyed all his interest in the same to Toogood, Halstead, and Tyack. With a view to avoid litigation, both parties mutually assigned to each other their interests in the respective patents to different and separate portions of the United States; and in the assignment from Woodworth and Strong to Toogood, Halstead, and Tyack, the following covenant was entered into by the parties. 'And the two parties further agree, that any improvement in the machinery, or alteration, or renewal of either patent, such improvement, alteration, or renewal shall inure to the benefit of the respective parties interested, and may be applied and used within their respective districts, as herein before designated.'

At the time this covenant was entered into, there was no provision in the patent laws authorizing an extension or renewal of the same beyond the original term of fourteen years. The first act providing for it was passed in July, 1832. Before this time, the only mode of prolonging the term beyond the original grant was by means of private acts of Congress upon individual applications.

A construction had been given by the Circuit Court of the United States, in New York, as early as 1824, by which the

patentee, on surrendering his patent on account of a defective specification, would be entitled to take out a new patent correcting the defect, which construction was afterwards upheld by this court in Grant *v.* Raymond, 6 Peters, 218, and the principle since ingrafted into the patent law by the act of 1832.

The court is of the opinion, that the covenant in question should be construed as having been entered into by the parties, with a reference to the known and existing rights and privileges secured to patentees under the general system of the government established for that purpose; that the parties would naturally look to the established system of law on the subject in arranging their several rights and obligations, in dealing with property of this description, rather than to any possible change that might be effected by private acts of Congress upon individual application. Contracts are usually made with reference to the established law of the land, and should be so understood and construed, unless otherwise clearly indicated by the terms of the agreement. If the parties in this case contemplated any alteration or modification of their rights, more advantageous, by the further legislation of Congress, we think some more specific provision having reference to it should have been **686** inserted in their covenant. The term renewal may be satisfied by a reference to the law as it then stood. The patentee might surrender his patent, and take out a new one, within the fourteen years; and the term was used, probably, to guard against any question that might be raised as to the right under the assignment in the new patent, if a surrender and new issue should become necessary. The specification accompanying the patent was a complicated one, and has been the subject of much controversy, and the necessity of a surrender for correction and amendment might very well have been anticipated.

We think this view satisfies the use of the term, and that no right is acquired in the new grant by virtue of the assignment or covenant.

The fourth and fifth questions certified are answered by the opinion of the court upon the first and second questions.

The sixth question certified is as follows:—Whether the plaintiff, if he be an assignee of an exclusive right to use two of the patented machines within the town of Watervliet, has such an exclusive right as will enable him to maintain an action for an infringement of the patent within the said town; or whether, to maintain such action, the plaintiff must be possessed, as to that territory, of all the rights of the original patentee.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

The plaintiff is the grantee of the exclusive right to construct and use, and to vend to others to be used, two of the patented machines within the town of Watervliet, in the county of Albany.

The fourteenth section of the patent law authorizes any person, who is a grantee of the exclusive right in a patent within and throughout a specified portion of the United States, to maintain an action in his own name for an infringement of the right.

The plaintiff comes within the very terms of the section. Although limited to the use of two machines within the town, the right to use them is exclusive. No other party, not even the patentee, can use a right under the patent within the territory without infringing the grant.

The seventh question certified is as follows:—Whether the letters patent of renewal issued to W. W. Woodworth, as administrator, on the 8th of July, 1845, upon the amended specification and explanatory drawings then filed, be good and valid in law, or whether the same be void for uncertainty, ambiguity, or multiplicity of claim, or any other cause.

The court is satisfied, upon an examination of the specification and drawings referred to in the question certified, that it is sufficiently full and explicit, and is not subject to any of the objections taken to it.

The remaining questions will be sufficiently answered by the certificate sent to the court below.

### *687 *Order.*

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Northern District of New York, and on the points and questions on which the judges of the said Circuit Court were opposed in opinion, and which were certified to this court for its opinion, agreeably to the act of Congress in such case made and provided, and was argued by counsel. On consideration whereof, it is the opinion of this court,——

1. That the eighteenth section of the patent act of 1836 did authorize the extension of a patent on the application of the executor or administrator of a deceased patentee.

2. That, by force and operation of the eighteenth section of the act of July 4th, 1836, entitled 'An act to promote the progress of the useful arts,' &c., the extension granted to

William W. Woodworth, as administrator, on the 16th day of November, 1842, did not inure to the benefit of assignees under the original patent granted to William Woodworth on the 27th day of December, 1828, but that the said extension inured to the benefit of the administrator, only, in his said capacity.

3. That the extension specified in the foregoing second point did inure to the benefit of the administrator, to whom the same was granted, and to him in that capacity exclusively; and that, as to the territory specified in the contract of assignment made by William Woodworth and James Strong to Toogood, Halstead, and Tyack, on the 28th day of November, 1829 (and set forth in the second plea of the defendants to the first count of the declaration), and by legal operation of the covenants contained in said contract, the said extension did not inure to the benefit of the said Toogood, Halstead, and Tyack, or their assigns.

4. That the plaintiff, claiming title under the extension from the administrator, can maintain an action for an infringement of the patent right within the territory specified in the contract of assignment to Toogood, Halstead, and Tyack, against any person not claiming under said assignment. And that the said assignment is not, of itself, a perfect bar to the plaintiff's suit.

5. That the extension specified in the second point could be applied for and obtained by William W. Woodworth, as administrator of William Woodworth, deceased, although the said William Woodworth, the original patentee, had in his lifetime disposed of all his interest in the then existing patent, having at the time of his death no right or title to or interest in the said original patent; and that such sale did not carry any thing beyond the term of said original patent; and that no contingent rights remained in the patentee or his representatives.

6. That the plaintiff, if he be an assignee of an exclusive right *688 to use two of the patented machines within the town of Watervliet, has such an exclusive right as will enable him to maintain an action for an infringement of the patent within said town.

7. That the letters patent of renewal issued to William W. Woodworth, as administrator as aforesaid, on the 8th day of July, 1845, upon the amended specification and explanatory drawings then filed, are good and valid in law; and are not void for uncertainty, ambiguity, or multiplicity of claim, or any other cause.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

8. That the question involved in the eighth point propounded does not present any question of law which this court can answer.

9. That the decision of the Board of Commissioners, who are to determine upon the application for the extension of a patent under the eighteenth section of the act of 1836, is not conclusive upon the question of their jurisdiction to act in a given case.

10. That the Commissioner of Patents can lawfully receive a surrender of letters patent for a defective specification, and issue new letters patent upon an amended specification, after the expiration of the term for which the original patent was granted, and pending the existence of an extended term of seven years; and that such surrender and renewal may be made at any time during such extended term.

It is thereupon now here ordered and adjudged by this court, that it be so certified to the said Circuit Court.

Mr. Justice McLEAN.

As I dissent from the opinion of the court, in their answer to to the second question certified, I will state, in few words, the reasons of my dissent.

The question is, whether the extension of the patent, under the act of 1836, to William W. Woodworth, the administrator, inured to the benefit of the assignees of the first patent.

I had occasion to consider this question in the case of Brooks and Morris *v.* Bicknell and Jenkins, on my circuit, and on a deliberate examination of the eighteenth section of the above act, I came to the conclusion, that unless the assignment gave to the assignee the right in the extended or renewed patent, his interest expired with the limitation of the original patent.

The lamented Justice Story, without any interchange of opinion between us, about the same time, gave the same construction to the section. The late Mr. Justice Thompson, and several of the district judges of the United States, have construed the act in the same way.

The eleventh section of the act makes the patent assignable in law, either as to the whole interest or any undivided part thereof, by any instrument of writing, which is required to be recorded in the patent-office within three months from the date.

By the eighteenth section, the patentee may make application **\*689** or the extension of his patent to the Commissioner, who is required to publish a notice of such application 'in one or more of the principal newspapers in the city of Washington, and in such other paper or papers as he may deem proper, published in the section of country most interested adversely to the extension of the patent.' 'And the Secretary of State, the Commissioner of the Patent-office, and the Solicitor of the Treasury shall constitute a board to hear and decide upon the evidence produced before them both for and against the extension, and shall sit for that purpose at the time and place designated in the published notice thereof. The patentee shall furnish to said board a statement in writing, under oath, of the ascertained value of the invention, and of his receipts and expenditures, sufficiently in detail to exhibit a true and faithful account of loss and profit in any manner accruing to him from and by reason of said invention. And if, upon a hearing of the matter, it shall appear to the full and entire satisfaction of the said board, having due regard to the public interest therein, that it is just and proper that the term of the patent should be extended by reason of the patentee, without neglect or fault on his part, having failed to obtain, from the use and sale of his invention, a reasonable remuneration for the time, ingenuity, and expense bestowed upon the same, and the introduction thereof into use, it shall be the duty of the Commissioner to renew and extend the patent,' &c.; 'and thereupon the said patent shall have the same effect in law as though it had been originally granted for the term of twenty-one years. And the benefit of such renewal shall extend to assignees and grantees of the right to use the thing patented, to the extent of their respective interest therein.'

This section embraces patents previously issued, and the construction now to be given to it operates on all cases of extensions under it, whether the assignments were made before or after the passage of the act.

The object of this section is so clearly expressed as not to admit of doubt. It was for the exclusive benefit of the patentee; for the extension can only be granted when it shall be made to appear that the patentee, 'without neglect or fault on his part, having failed to obtain, from the use and sale of his invention, a reasonable remuneration for his time, ingenuity, and expense,' &c. This, then, being the clear intent of Congress, expressed in this section, it must have a controlling influence in the construction of other parts of the section. A statute is construed by the same rule as a written contract. The intent of law-makers, and of the persons contracting, where that intent clearly appears, must be carried

4 How. 646, 11 L.Ed. 1141

into effect. Where the statute or the contract is so repugnant in its language as not to show the intent, then no effect can be given to it. If the words used be susceptible of such a construction as **\*690** not only to show the intent, but to enable the court to give effect to it, it is the duty of the court so to construe it.

Bacon, on the construction of statutes, says,—'The most natural and genuine way of construing a statute is to construe one part by another part of the same statute; for this best expresseth the meaning of the makers.' And,—'If any part of a statute be obscure, it is proper to consider the other parts; for the words and meaning of one part of a statute frequently lead to the sense of another.' 'A statute ought, upon the whole, to be so construed, that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'

That the patentee may have his patent extended, though the assignee held the entire interest in it, is undoubted. He has only to show that he has not been reimbursed, &c., within the meaning of the section, to establish his claim for an extension. And, in such a case, if the benefit of the extension go to the assignee, he having the entire interest in the patent, how is the patentee benefited? And yet the law was enacted exclusively for his benefit. Does not such a construction defeat the object of the law? And if it does, can it be maintained? Where the assignment of the patent has been for less than the whole, the same objection lies, though the object of the law is subverted only to the extent of the assignment.

The interest of the assignee, it is supposed, is protected by the provision, that 'the benefit of such renewal shall extend to assignees and grantees of the right to use the thing patented, to the extent of their respective interest therein.' There can be no doubt that the words, 'to the extent of their respective interest therein,' refer to their right to use the thing patented; and this, it is contended, is the benefit which results to the assignee from the renewal. That this would seem to be the import of these words, disconnected from other parts of the section, is admitted; but such a construction is wholly inadmissible, when the object of the section is considered.

The patent is extended for the benefit of the patentee. This is so obvious that no one will deny it. And the above construction gives the benefit to the assignee. Here is a direct repugnancy, and there is no escape from it; for the same repugnancy exists, though in a less degree, where a part of the patent only has been assigned. Under such circumstances, we must inquire whether this repugnancy may not be avoided by

giving another and a different application to the provision, of which the words may be susceptible.

The benefit of the renewal is given to the assignees; but to what extent?—to the extent of their interest in the renewal. But it is said, that this cannot be the true construction, as it renders the provision inoperative. If, by the assignment, there was an express **\*691** contract that the assignee should enjoy the same interest in the renewal or extension of a patent, this would secure such interest, without the provision.

To this it may be answered, that such an assignment of a thing not *in esse* would, at most, only be a contract to convey the legal right. But, under the eighteenth section, the assignment after the extension becomes a legal transfer. In addition to this, the right under the extension being legal, all purchasers would be affected with notice, where the assignment had been recorded in the patent-office. This view gives effect to the section, and harmonizes its provisions. The other construction makes the parts of the section repugnant, and nullifies the whole of it. Now, which is the more reasonable view? But, in addition to this, what conceivable motive could Congress have had to give a boon to the assignee? How is he injured by the extension?

Without the extension, the assignee would only have a right, in common with all others, to use the invention. This could be of no more value to him than the worth of his machinery; for competition equally open to all cannot be estimated of any value. Under the assignment, the assignee claims a monopoly. Now, did Congress intend to give him this boon? Why should he be an object of public munificence? He laid out his money in the purchase of the patent right, because he believed it would be profitable. And, in most cases, the assignee speculates upon the poverty of the inventer. Inventers are proverbially poor and dependent. The history of this patent illustrates strongly this fact. Half of the right was originally assigned to pay the expense and trouble of taking out the patent. Another part of the patent was assigned to compromise a pretended claim to a similar invention.

The hardship complained of by the assignee is more imaginary than real. If the patentee takes all the benefit of the extension, the assignee loses, it is said, the value of his machinery. This does not necessarily follow. For if the machinery has been judiciously selected, and put in operation at a proper place, it will sell for its value generally, if not always. If the invention be of great value, as is undoubtedly the case in this instance, the machinery will be wanted by any one who may wish to continue the business, under the

extended patent. So that the loss in the sale of the machinery would not be greater than would have been suffered by a sale if the patent had not been extended.

This construction, then, inflicts little or no injury on the assignee, whilst the other construction, as has been shown, defeats the object of the statute. But this inconvenience or loss to the assignee is duly considered and weighed, under the statute, as the board, in granting the extension, must have a due regard to the public interest. Notice is to be given, as far as practicable, to all persons interested against the extension of the patent, who may **\*692** appear before the board and oppose it. And it was stated in the argument, that the assignees of this patent did oppose the extension of it. Little did they suppose at the time that they were resisting a boon secured to them by the above section. Whatever loss, real or imaginary, the assignee may suffer from the extension of the patent, is a loss or inconvenience which results from the general advancement of the public good, and for which society does not, and indeed cannot, make compensation. The price of property is affected by general legislation. An embargo is laid, and ships, during its continuance, are valueless. The increase or diminution of the tariff affects beneficially or injuriously the value of machinery used in manufactures. The reduction of the price of the public lands affects the price of lands generally in the new States. An act authorizing a company or individual to construct a railroad renders useless turnpike roads in its neighbourhood, and the public houses established thereon; but for these injuries no compensation is made. Indeed, it is difficult to find any great public enterprise which does not, in a greater or less degree, affect injuriously private rights. But these must yield to the general welfare of society.

All enlightened governments reward the inventer. He is justly considered a public benefactor. Many of the most splendid productions of genius, in literature and in the arts, have been conceived and elaborated in a garret or hovel. Such results not only enrich a nation, but render it illustrious. And should not their authors be cherished and rewarded?

If the assignee under the eighteenth section take any thing, in my judgment he takes the whole extent of his interest,—the whole or nothing. And it appears to me the construction given by the court is, if possible, less warranted by the section, than to hold that the assignee takes under the extension the entire interest assigned.

The words, 'and the benefit of such renewal shall extend to assignees and grantees of the right to use the thing patented,

to the extent of their respective interest therein,' cannot, it seems to me, by any known rule of construction, be held to give to the assignee or grantee the right to use the machine he may have had in operation at the time the extension took effect. The words, 'to use the thing patented,' are descriptive of the right assigned or granted, and refer to such right, not to the mere use of the machine. 'The extent of their respective interest therein' undoubtedly covers the whole interest, and cannot refer merely to the number of machines the individual may have in operation.

Mr. Justice WAYNE expressed his dissent from that part of the opinion of the court which, in answer to the second question, gave a right to an assignee to continue the use of the patented **\*693** machine, and said he would probably file his reasons with the clerk.

Mr. Justice WOODBURY.

There is one of the leading questions certified to us in this cause, in the decision of which I have the misfortune to differ from a majority of the court.

As that decision bears on several of the other questions, and also disposes entirely of some of the four causes connected with this matter, which have been so long and so ably under argument before us, I consider it due to the importance of this subject to the parties and the public, as well as just to myself, to state the reasons for my dissent.

The difference in our views arises in the construction of the eighteenth section of the patent law of July 4th, 1836, and relates to the benefits which may be enjoyed under it by assignees and grantees.

Before the passage of that law, a patent could not, under any circumstances, be extended in its operation for the benefit of any body beyond its original term, except by a special act of Congress. But this section allowed a patentee to apply to a board of officers and obtain from them a renewal of his patent for seven years longer, provided he offered to them satisfactory proofs that his expenses and labor in relation to the patent had not been indemnified. It provided further, that the renewal be indorsed on the back of the original patent; 'and thereupon the said patent shall have the same effect in law as though it had been originally granted for the term of twenty-one years.' It then added, 'And the benefit of such renewal shall extend to assignees and grantees of the right to use the thing patented, to the extent of their respective interests therein.' This last clause creates the chief embarrassment. In this case, the patentee having died, and

we having just decided that a renewal was legally granted to his administrator, the controverted question about which we differ is, whether that renewal inures exclusively to the use of the patentee through his administrator, or goes either in full or in part to his assignees and grantees under the old patent. In the present case it is conceded, that by the contract of assignment or grant, nothing is expressly conveyed but the old patent, and in words, only for the original term of 'fourteen years.'

The question is not, then, whether, when assigning an interest in the old term, before or after the passage of the act of 1836, it might not be competent and easy to use language broad and explicit enough to transfer an interest in any subsequent extension by means of the contract of assignment, and this is confirmed by the words of the eighteenth section; but whether those words alone transfer it, or were intended to transfer it, when the contract of assignment, **\*694** as in this case, was made before the act of 1836 passed, and referred, *eo nomine*, only to the old patent, and expressly limited the time for which the patent was assigned to the old term.

In such case, it seems to me that both the language and spirit of this section restrain its operation to the patentee or his legal representatives, and convey no rights in the extension to assignees or grantees, whether prior or subsequent, except where the patentee had clearly contracted that they should have an interest beyond the original term.

But the majority of the court hold here, that this clause, independent of any expression in the assignment, transfers an interest in the extension to all assignees and grantees, so that they may continue to use any machines already in operation during the new term, without any new contract, or any new compensation for such farther use.

The argument on the part of the assignees, in all the cases before us, on this subject, has been, that by force of this section all assignees before authorized to make, vend, or use these machines, for fourteen years, could continue to make and vend, as well as use them, for seven more, without any new contract or new consideration; and that 'grantees of the right to use' should have a like prolongation of all their interests. And such seems to have been the opinion of the Circuit Court in Maryland, in Wilson *v.* Turner, October term, 1844, Chief Justice Taney presiding, though other points besides arose there, and were disposed of in that opinion.

But now, for the first time, it is believed, since the passage of the patent law, this court, by force of the last clause in the eighteenth section, not only give to assignees and grantees

a greater or longer interest in the thing patented than was given in the contract of assignment to them, but undertake to introduce a novel discrimination, not seeming to me to be made in the clause itself, and give to assignees of the patent right itself an extension of only a part of their former interest, but to 'grantees of the right to use' the patent, an extension of all their former interests.

We propose to examine the objections to this decision of the court, first, on the principle of giving to old assignees and grantees an extension of their interests to the new patent at all, unless the contract of assignment to them was manifestly meant to embrace any new term; and, after that, to examine the propriety of the discrimination in allowing a right in the renewed patent to grantees of the use, to the extent of all their old interests, and withholding a like privilege from assignees of the patent itself.

First, it has been repeatedly decided, that 'a thing which is in the *letter* of a statute is not within the statute, unless it be within the intention of the makers.' Dwarris on Statutes, 692; Bac. Abr. *Statute*, T; 2 Instit. 107, 386.

 **\*695** Here the great design of the whole section was to extend assistance to an unfortunate and needy class of men of genius, who had failed to realize any profits from their valuable inventions during the first term of their patents. The intention of the makers of this law is usually conceded to have been relief to such patentees, and not to assignees or grantees.

It was the former, and not the latter, who were sufferers, and whom Congress had before, by special acts of extension, occasionally tried to indemnify for their losses; and to whom now, in a more summary way, on application and proof by them alone, an extension was authorized to be given by a board of officers, in order that they and not others might reap the profits of such extension.

But, by allowing the benefit of it to go to the former assignees of only the old patent, the intention of the makers appears to be defeated, and those profited who have not proved any loss or suffering, but, on the contrary, may have already derived great advantages from the assignment.

It might thus happen, likewise, where, in a case like this, the patentee has assigned all his old patent before the extension, and the use of it under the extension would constitute all or its chief value, that neither he nor his representatives— he whose genius had produced the whole invention, at the sacrifice of time and toil, and whose sufferings, losses, and disappointments the law is expressly made to indemnify—

would receive the smallest pittance from it; but those reap all its advantages who may already have grown rich by the assignment to them of the old patent, and who nobody can pretend were the particular or principal objects of relief. Under such a construction, how absurd would it be for such a patentee ever to apply for an extension, when he must do it at new cost and expense, and then have the whole fruits of it stripped from him by persons who had neither paid for the extension, nor had it conveyed to them. It is an equal violation of the leading intention of this section, and of most of these principles and of much of this reasoning, to allow, as the opinion of the court does, such persons to take, unpaid for and unbought, a *part* of the benefits of the renewal, as to take the *whole* of them.

Secondly, by the construction of the court, contracts and vested rights seem to be radically encroached upon. Under it, an assignee of an old patent, limited in the contract conveying it to fourteen years, will, for some purposes, get it for twenty-one years, directly in conflict with the express stipulation of the parties. Congress will, in this way, be made unworthily to tamper with the private obligations of individuals, and will impair them by taking from the rights of one, and enlarging or adding to the rights of the other; and this without any new consideration or new engagement passing between them, but, on the contrary, against the wishes, assent, and interests of one. That view, also, involves us in the unreasonable inference, **\*696** that Congress intended to violate a solemn compact, to disturb the vested rights and written agreements of parties, when the language used is susceptible of a different construction, and one that is consistent with what is just, and with the spirit of the whole section.

By that view, an assignee or grantee will obtain 'a right to use the thing patented' for a term of seven years longer than he contracted or paid for, while the patentee, without any such agreement in his contract assigning or granting the right to use, and without any new consideration, will be deprived of all his new and vested rights in the extension, so far as regards that use, and will have his former contract impaired virtually in its whole vitality, by making him part with the use for a term of twenty-one years, when the contract says but fourteen, and making him do it, also, without any application by other for the extension, any proof by others of not being indemnified, any payment by others of the costs and expenses for procuring the additional seven years, and when the avowed and cardinal object of the renewal was to indemnify him alone for losses which he and not others had sustained. Well may he say, as to these new and extended

interests attempted to be conferred on assignees and grantees beyond the contract of assignment, *in haec federa non veni.*

Thirdly, the construction I contend for seems to me the only one consistent with the language used in the latter portion of the eighteenth section. By this, no part of those troublesome four lines is senseless, or expunged, or ungrammatical, or contradictory to the object of the previous portion of the section. While the construction opposed to this must, in my view, require interpolations or extirpations of words, and a violation of the object of the rest of the section, in order to give to the clause the meaning the advocates of that construction impute to it. Look at the phraseology of the clause. '*The benefit of such renewal shall extend to assignees and grantees of the right to use the thing patented, to the extent of their respective interests therein,*' but surely to no more than that *extent*. It would violate both the words and design to have them enjoy more than the extent of their interests therein, quite as much as not to let them enjoy all of the extent of them. In the construction of statutes it is a well settled axiom, that, 'to bring a case within the statute, it should be not only within the mischief contemplated by the legislature, but also within the plain, intelligible import of the words of the act of parliament.' Brandling *v.* Barrington, 6 Barn. & Cressw. 475. In this case the assignees and grantees were not within either the mischief intended to be remedied, that is, a want of indemnity for losses by the patentee; or within the 'plain, intelligible import of the words,' as their contract of assignment or grant did not extend to the renewed term at all, for any purpose whatever, but was expressly limited to the fourteen years of the original patent.

There must be some measure of their respective interests, when **\*697** the act passed. What was it? Clearly, the contracts under which they had been acquired. Nothing had been done, either in other acts or previous portions of this, to increase those interests beyond the contracts, but merely to enable assignees and grantees of exclusive rights to protect them by suits in their own names. The present clause, also, does not profess to increase those interests, but simply to let assignees and grantees enjoy them under the renewal, if by their extent by the contract which limits and defines them they run into the extended term. Various hypotheses and metaphysical refinements have been resorted to for the purpose of putting a meaning on the words of this clause differing from this, which is so plain and so consistent with the spirit of the section; and virtually making it provide, that assignees and grantees shall have more benefits under the renewal in the thing patented than the 'extent of their respective interests therein.'

But before testing more critically the extent of those interests by the only standard applicable to them, it will be necessary to consider separately the true meaning of two of the words employed in this clause, namely, '*renewal*' and '*therein*.'

Much research has been exhibited, in attempting to draw distinctions in this case between the words *renewal* and *extension*. But I am not satisfied that any exist, when these words are employed as in this act of Congress, or in contracts relating to this subject. It is true, that some 'renewals' are not 'extensions,' in the sense of prolonging the term of the patent, —that is, when an old patent is surrendered and a new one taken out, or a renewal made for the rest of the term,—while all *extensions* prolong the term. But still 'renewals' are as often used for a prolongation of the term, or for a new term, as *extensions* are, and in this very section, '*to renew and extend*' is used as if synonymous, and this in sound analogy to the use of the word *renewal* on several other subjects. Thus, to renew a lease is to extend it another term. To renew an office is to extend it another term. To renew griefs, *revocare dolores*, is to extend them. Again; the second '*therein*,' at the close of the clause, has been considered by some as meaning 'in the *renewal*,' and by others, 'in *the right to use*,' and by others still, 'in the thing patented.' But, grammatically, it refers to the 'thing patented,' and hence the 'interests therein' are 'the interests in the *thing patented*.'

Phillips treats it as a matter of course to mean 'in the *patent*,' and uses that as synonymous to 'therein,' and though, in regard to my construction of the whole clause, the result is much the same, whether 'therein' is considered to mean in 'the thing patented,' or 'the patent,' or 'the renewal,' yet I incline to the first view of it as that most strictly grammatical and the most natural, as well as coming nearest to the views of this court in **\*698** M'Clurg *v.* Kingsland, 1 How. 210. Further objections to its meaning 'in the right to use' will be stated hereafter, under another head. Passing, then, to a more careful scrutiny of the whole clause, it would seem, that there could be but one rational test of 'the extent' of the interests of assignees and grantees in the thing patented, and that such test must be the previous contract of assignment or grant, under which alone they hold any interests.

If that contract grants to them one fourth or one half of the old patent, or the use of it in one State or county, and for a term of five years, or ten, or fourteen, from the issue of the patent, then such and such alone is the extent of their interests, and they will not run into the new term. But if the contract goes further, and grants one half or all of the old patent to assignees, and

for a term not only of fourteen years, but twenty-one years, or any number to which the patentee may afterwards become entitled by any extension or new grant, then such is the extent of their interests, and they will in such case run into the new term. This view gives meaning and spirit to every word, and excludes or alters none. This, too, conforms to the design of the section in taking away no part of the benefit intended to be conferred by it on the patentee, unless he has chosen to dispose of it clearly and deliberately, and receive therefor, either in advance or after actually granted, such additional consideration as he deemed adequate and contracted to be sufficient.

If after the word '*extent*' in this clause, there had been added, what is the legal inference, *both in time and quantity*, this meaning might have been still more clear to some. But without those words, the extent of interest seems to me to depend as much on the length of time the patent is granted to the assignee, as on the dimensions of territory over which he may use it, or the proportion of the whole patent he is authorized to use. It is like a leasehold interest in land, or a grant of it. The extent of interest by such a grant of land is more or less, as the term is shorter or longer, quite as much as if the land conveyed is more or less in quantity.

The word 'extent,' in common parlance, varies somewhat in meaning, according to the subject to which it is applied, and as that changes, it may as well refer to time as to space, or proportion; and more especially so, when applied to interests, as in patents, for a particular term of years.

There is another analogy in support of this view, that has not been urged in the ingenious arguments offered, but has struck me with some force. A patent was the description once applied to commissions for office; and the records of this court at first speak of the commissions of the judges as patents.

Now what is the extent of interest the incumbent has in any **\*699** office under his commission or patent? Clearly, in part, the length of time it is to run, whether four years, during good behaviour, or for life, and in part only its yearly profits; often quite as much depending on that length of time, as the amount of the salary or fees annually attached to the office.

What is the chief objection in reply to all this? Nothing, except that the assignee could get protected to the extent of his interest, in this view, by the contract alone, without the aid of the provision at the close of the eighteenth section, and hence that the provision is in this view unnecessary or nugatory, and must have been inserted for some other

purpose. But were it in reality unnecessary, that would not require us to consider it as intending something different from its words, or different from the previous contracts of the parties. Legislatures often add clauses to acts, which do not prove to be in reality necessary, but are inserted from abundant caution and to remove future doubts or litigation. So, in this very act, in the eleventh section, it is declared, that a patent may be assigned. Yet this is probably unnecessary, as an interest like that of a patentee can of course be assigned, on common law principles, without the aid of a statute.

When we look, however, to another circumstance,—that, though a contract of assignment would, without any clause in the statute, pass the interest to the assignee, yet it would not enable him to sue in his own name,—we can discover another reason for this provision still more effective. A clause had been inserted in a previous part of the act to enable the assignee to sue in his own name on the old patent, if violated; and, probably in doubt whether such provision would be extended to assignees under the renewal, when having any interest therein, it was provided further, that 'the benefit of the renewal' should reach them to the extent of their interests therein,—a part of which benefit would be to sue in their own name for any infringement on their rights to it, as fully as they could do for a violation of their rights in the original patent, and as if that had been for twenty-one years. The provision thus would be far from nugatory, by clearly conferring on them every power and privilege to sue under the extension which they possessed under the original patent.

By means of this provision, also, in another view, the condition of the parties might be changed, from a reliance on a contract alone that they should have a certain interest in the new patent, to a vested interest in it; or, in another view still, from an executory to an executed right.

There is, in the construction given by some of the majority of the court to the clause immediately preceding this, another ample reason for inserting such a provision.

The previous clause, stating, that 'thereupon the said patent shall have the same effect in law as though it had been originally granted for **\*700** the term of twenty-one years,' would, it is argued, if the section had there ended, have conferred on any assignee or grantee of the old patent, or any part of it, the extended term, so as to enable them to use the patent as if it originally had been granted for twenty-one years instead of fourteen.

Suppose, then, for a moment, that this construction was considered by Congress proper, or only possible, it is

manifest that the additional clause which follows had a second and most pregnant object,—no less than to prevent that consequence, so hostile to the design of inserting the whole section,—to grant an extended term for the benefit and indemnity of the patentee, and not of the assignee. In this view, the last clause might well be added, as a limitation on what would otherwise be the inference from that just preceding it; and might well declare, instead of this inference, that assignees of the old patent should not hold it, in all cases, as if originally granted for twenty-one years, though patentees might; but that assignees should hold only in conformity to 'the extent of their respective interests' in the thing patented. In other words, if by contract they had acquired clearly an interest for twenty-one years, they should hold for that time; but if by contract they had acquired an interest for only five or fourteen years, they should hold it only to that extent. This is rational, consistent with the great object of the section, and gives new and increased force and necessity to the clause. The assignees would then, after the renewal, hold the patent for all the time they had stipulated, and for all they had paid, but for no more.

It will be perceived, that very few assignees or grantees, prior to the passage of the act of 1836, would in this view be likely to come under this provision, and be benefited by it; because, not knowing that any future law would pass allowing an extension, very few would be likely to anticipate one, and provide in their contract and pay for a contingent interest in its benefits.

This would make the provision, in practice, apply chiefly to future assignees, who, knowing that such a provision existed, might be willing to give something for a right to any extension which might ever take place under it; and therefore might expressly stipulate in the assignment for that right. Indeed, the arguments on the part of the patentee in this case have mostly proceeded on the ground that this provision was intended to apply solely and exclusively to future assignees. Considering that any other construction is in some degree retrospective, and that this would give force to the provision, as well as preserve the spirit of the section, I should be inclined to adopt it, if mine did not produce a like effect, and was not alike free from objection, as limited by me; because I do not make the provision retrospective except in cases where the parties had expressly contracted that the prior assignee should receive the benefit of any extension, and in that case it has the preference in its operation **\*701** over the other view, as it carries into effect that express compact, and does not cramp the force of it to the future alone, where the language and the consideration are equally applicable to past engagements of this character.

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.

This conclusion is also strengthened by being in harmony with all the leading rules of construction applicable to statutes, while that adopted by the court seems, to my mind, to violate some of the most important of them.

Beside those already referred to, it is well settled, that 'if a particular thing be given or limited in the preceding parts of a statute, this shall not be taken away or altered by any subsequent general words of the same statute.' Dwarris, 658; Standen *v.* The University of Oxford, 1 Jones, 26; 8 Coke, 118, *b.* Here a particular benefit is, by the former part of the eighteenth section, conferred on a patentee, for reasons applicable to him alone; and yet, in this case, by the opposite construction, a few general words towards the close are construed so as in some respects to destroy entirely all those benefits to the patentee; and that, too, when the language is susceptible of a different construction, more natural and perfectly consistent with the previous particular grant to the patentee.

Some collateral considerations have been urged in support of the conclusions of the court on this branch of the construction, which deserve notice. On a close scrutiny, they appear to me to amount to less in any respect than is supposed, and in some particulars strengthen the grounds of dissent. Thus, it has been said that the English act of the 5th and 6th of William the Fourth, passed September 18th, 1835, was before Congress in 1836, and was intended to be copied or adopted; and as, under that, assignees have been allowed to participate in the extended time, it has been argued that such was the intention here. But it is doubtful whether that act was before the committee when they reported the bill in 1836, as the intervening time had been short, and the eighteenth section, on examining the journals and files, appears not to have been in the bill at all as originally introduced, or as originally reported; but was afterwards inserted as an amendment in the Senate. The consideration of this section, therefore, does not seem to have been so full as of the rest of the bill; and it is very far, in language, from being a copy of the English act. Assignees are not named at all in that act; and though, in extensions under it, assignees have in two or three cases been allowed to participate, it has only been where an enlarged equity justified it,—as where the patentee consented, or was to receive a due share in the benefits, or had clearly conferred a right in the extension by the assignment; and where, also, the assignees are expressly named in the new grant or patent as entitled to a share of it. See Webster's Patent Cases, 477.

There, also, an assignee, under like circumstances, would doubtless **\*702** benefit by the renewal, under its ordinary operations; and the practice in England, thus limited, will fortify rather than weaken the construction I adopt of the true design of the last clause in our own law.

There is much, also, in another collateral consideration here, which does not apply in Great Britain, and which restricts conferring the benefit of an extension, or an extension itself, on an assignee by or under any statute, if it goes beyond what a patentee had himself contracted to do.

Here the Constitution limits the powers of Congress to give patents to inventers alone.

'The Congress shall have power to promote the progress of science and the useful arts, by securing, for limited times, to authors and inventers, the exclusive right to their respective writings and discoveries.'—Article I., § 8.

No authority is conferred to bestow exclusive rights on others than 'authors and inventers' themselves.

Hence a patent could not probably be granted to an assignee, nor an extension bestowed on one, independent of the assent or agreement of the patentee, or of its inuring to his benefit, without raising grave doubts as to its being a violatin of the Constitution. But so far as inventers have expressly agreed that assignees shall be interested in their patents, or in the extensions of them, the latter may well be protected; and so, as far as administrators represent the inventer or patentee, when deceased, the grant to them is substantially a grant to the inventer, as the benefit then inures to his estate and heirs. But to grant an exclusive right to an assignee would confer no benefit on the patentee, or his estate; and it would violate the spirit as well as letter of the Constitution, unless the inventer had himself agreed to it, and had substituted the assignee for himself by plain contract, whether for the original term or any extension of it.

Cases have been cited in this country, likewise, where Congress, in ten or twelve instances, have renewed patents to the inventers; but they have never done it to assignees. And though in two out of the whole, which were renewed after the term had expired and the assignees and the public were in the free use of the patent, some limitations have been imposed on requiring further payments from the assignees for the longer use of the old patent; yet in these only, and under such peculiar circumstances, has it been done, and in these no term was granted by Congress directly to the assignee

rather than the patentee; and this limitation or condition in favor of the assignee, in the grant to the patentee, is of very questionable validity, unless it was assented to by the patentee. In this case it is most significant of the views of Congress to relieve the patentee rather than assignees, that by a special law, passed February 26th, 1845, they have conferred on the representative of the  **\*703**  original patentee still another term of seven years, without mentioning the assignees in any way, and without any pretence that the benefits of this extension were designed for them.

The argument, that the assignee is sometimes a partner, and makes liberal advances, furnishes a good reason, in a pecuniary view, why an assignment should be made to him of such an interest in the old patent as will indemnify him, but furnishes none for giving him, even if he regards money above public spirit or benevolence, more than an indemnity; or for giving him a benefit in any renewal, which it has never been agreed he should have, and for which he never has paid.

So the reasoning, that the assignee stands in the shoes or in the place of the patentee, and represents him, and therefore should have an interest in the extension, applies very well, so far as he is assignee, or so far as the contract extends. But he no more stands in the shoes of the patentee beyond the extent of his contract, than an entire stranger does. Such are the cases of Herbert v. Adams, 4 Mason, 15, and that cited in 1 Hawk. P. C. 477, note.

In one, the assignee of the old patent represented the patentee as to that, and that only; and in the other, where by law a further copyright was authorized in all cases, and the patentee assigned his whole interest, the second term passed also; because the law had previously given it absolutely, without contingency or evidence of losses, but in connection with, or appurtenant to, the first copyright.

Again, it has been urged that the assignee should have the benefit of the extension; otherwise he may have made large expenditures, in preparing for a free use of the patent after the original term expires, and will loose them in a great degree, or be obliged to pay largely for the continued use of the patent. But this same reasoning applies equally well to the whole world as to the assignee; because any individual, not an assignee, may have incurred like expenditures in anticipation of the expiration and free use of the old patent. In fact, the argument is rather a legislative than judicial one, and operates against the policy of the whole section, rather than the construction put on the last clause.

But the hardship to any person, in such case, is more apparent than real. The price to be paid for the new patent is not so much as the gain by it, and hence those who have proposed to use it and do use it after the extension, and pay anew for a new or further term, gain rather than loose, or they would have employed the old machinery in operation before this invention.

Nor is it any relief to the community at large, as seems by some to have been argued, to hold that the renewal, or a large part of it, vests in the assignee and grantee rather than in the patentee. For the great mass of the people must still purchase the patent, or the  **\*704**  right to use it, of some one, and must pay as much for it to the assignee as to the patentee.

Finally, the construction of the court, by conferring any privilege whatever on assignees and grantees beyond the extent of their interests in the thing patented, when those interests, as in this case, were expressly limited in the contract to the term of the old patent, goes, in my view, beyond the language of the act, beyond the contract of assignment, beyond the consideration paid for only the old term, and beyond any intention in the legislature for relief or indemnity to others than unfortunate patentees.

I feel not a little fortified in these views on the case, by several decisions and opinions that have heretofore been made, in substantial conformity to them. Indeed, independent of opinions in some of the actions now before us (from which an appeal has been taken, or the cause has come up on a certificate of division), every reported case on this subject has been settled substantially in accordance with these views. See Woodworth v. Sherman, and Woodworth v. Cheever et al., Cir. Ct. for Mass., May Term, 1844, decided by Justice Story; Van Hook v. Wood, Cir. Ct. for New York, October Term, 1844, by Justice Betts; Wilson v. Curteis & Grabon, Cir. Ct. for Louisiana, by Justice McCaleb; Brooks & Morris v. Bicknell et al., Cir. Ct. for Ohio, July Term, 1844, by Justice McLean (Western Law Journal, October, 1845); Butler's opinion, as Attorney-General, in Blanchard's case (Opinions of Attorneys-General, pp. 1134 and 1209).

All that remains for me is to advert a moment to that branch of the construction adopted by the majority of the court, which, after giving to both assignees and grantees a benefit in the new patent or term beyond 'the extent of their interests' under the contract of assignment, undertakes to go still farther, and make a discrimination between assignees and grantees, as to the enjoyment, under the renewal, of their different original interests. It gives to the latter, the grantees, by the mere force

of this last clause in the eighteenth section, the enjoyment of all their old interests during the whole of the new term; but it gives to the former, the assignees, the enjoyment of only about a third portion of their old interests during that term. In other words, it gives to 'grantees of the right to use the thing patented' a continuance of all their interests; but to assignees, whose interests extended to the right to make and to vend, as well as use, the thing patented, a continuance of only a part of theirs. In such a discrimination, uncountenanced and unwarranted, as it seems to me, by either the words or the spirit of the act of Congress, I am sorry to find another strong ground of dissent to the opinion of the court. The act does not say, as is their construction, that 'the benefit' of only 'the right to use the thing patented' shall extend to any one, whether an assignee or grantee; but that the benefit of the renewal **\*705** shall extend to both, 'to the extent of their respective interests,' though differing clearly in extent as they do, and as will soon be more fully shown.

'Judges are bound to take the act of parliament as the legislature have made it.' 1 D. & E. 52, and Dwarris on Statutes, 711.

But the words in this act, 'the right to use the thing patented,' must be transposed, and other words altered in their ordinary meaning, to make these a description of the interests conferred.

They are now a description of one kind of purchasers, that is 'grantees of the right to use the thing patented,' to whom the renewal should extend, if they had stipulated for any interests therein by their contracts. The clause refers to two classes, who may in such case be benefited by the renewal. 'Assignees' are one class, and 'grantees of the right to use the thing patented' are the other class. This accords with the language itself, and also with the punctuation of this clause, as examined by me in manuscript on file in the Senate, and as printed by the State department, having no comma or other pointing in it except after the word 'patented.' It accords, too, with what is well understood to be the fact, that assignees and grantees usually constitute two distinct classes of purchasers, the former being those who buy a part or all of the patent right itself, and can protect their interests by suits in their own name; and the latter being those who buy only 'the right to use the thing patented,' and generally, except where the use is exclusive (fourteenth section), cannot institute suits in their own name for encroachments upon it. In the face of this, to hold that assignees and grantees mean the same thing here, and that the words 'of the right to use the thing patented' apply equally to both, is a departure from

the above established usage in employing those terms, and gives a different meaning to them from what is previously twice given in this very act. Thus in the eleventh section an 'assignment' is mentioned as one thing, and 'a grant and conveyance of the exclusive right,' & c., as another, and in the fourteenth section, 'assigns' are spoken of as if one class, and 'grantees of the exclusive right,' &c., as if another. And why does the conclusion to this clause say 'to the extent of their *respective* interests therein,' if such assignees and grantees as to patents were not in this very clause considered by Congress as having different interests, and that these were to be protected according to their *respective* extents? It would have said, and must be made to say, if sustaining the construction of the court, 'to the extent of that *right*,' or 'to the extent of that *interest*,' and there stop. Manifestly, then, there is not conferred on these two classes, by this clause, either in its spirit or *in totidem verbis*, merely 'the right to use the thing patented,' but on the contrary, 'the benefit of the renewal,' 'to the extent of their respective interests in the **\*706** thing patented.' The interests of the grantees may be limited to the use, and those of the assignees may not be, but include the right to make and vend as well as use; yet large or long as may be the interests of either, the benefit of the renewal is to cover them, if *the extent* of them, under the original assignment or grant, reached to the new term. One is not to have the whole of his interests protected and the other a part only, when their equities are the same. But the assignee is to have to the extent of his, which is to make, vend, and use; and the grantee only 'of the right to use' is to have to the extent of his.

This, to my apprehension, is unquestionably the substance of what Congress has said on this topic; and yet it is only by supposing new language not in the act, or by transposing some of the old, so as not to be in harmony with the original structure of the sentence, or by giving a meaning to words different from what has been established and, in my view, only by doing this, that any foundation can be laid in support of this part of the construction approved by the court. But 'it is safer,' said Mr. J. Ashurst, 'to adopt what the legislature have actually said, than to suppose what they meant to say.' 1 D. & E. 52; 6 Adolph. & Ellis, 7.

It may be well, also, not to forget, that it is always more judicial, and less like legislation, to adhere to what Congress have actually said, and that it is more imperative to do this when by adhering to it you carry out, as in this case, the manifest intention of the previous part of the section. Nor can the inconsistency produced by the construction of the court be without influence in creating doubts as to its correctness; as by it 'the benefit of the renewal' will be extended to assignees

and grantees not in a ratio with 'their respective interests,'— the words of the law,—nor in conformity to their respective contracts, nor according to the respective considerations they have paid, nor in proportion to the respective losses they have sustained, but, under the same general permission as to the extent of the 'respective interests' of both, one class will be allowed to the full extent of his previous interests, and the other to only a part of that extent.

By what authority, let me respectfully ask, is this general permission thus divided, and in one class or case limited and in the other not? By what legal authority are assignees cut off from a valuable portion of their interests in a patent, while grantees to use the thing patented are allowed to exercise the whole of theirs, and both under one and the same general permission, covering all 'their *respective* interests'? To make this discrimination, and allow to one class the full extent of their interests and to the other not the full extent of theirs, when the law says it shall be 'to the extent of their *respective* interests,' and when their respective contracts and equities show that this should include both the duration and quantity of their interests, looks like a distinction in a great degree arbitrary, **\*707** and not a little in conflict with the plain words and design of the act of Congress.

But, beside this further departure from what seems to me the obvious meaning of the eighteenth section, caused by this branch of the construction of the court, it will fail, I fear, as any compromise of the difficulties arising under this section, if any compromise be expected from it. It is not likely to avert ruin from most of those indigent inventers, who have in their distresses resorted for aid to the delusive provisions of that section. Their very necessities and embarrassments, which are the justification for granting the renewal to them, have usually forced them to sell and assign all the original patent, as was the case with Woodworth in this instance; and if in such circumstances the law is to strip them of all benefits under the renewal, and, without any contract to that effect, confer those benefits on the assignees and grantees of the old patent, the law is perfectly suicidal as to the only design to be effected by its bounty. But if, seeing this, the construction is modified, as here, by the court, so as to deprive the patentee in such cases of only the benefits of the use of his old patent or old machines during the new term, this qualification in the operation of the law will, it is apprehended, usually prove a mere mockery, working, in most cases, as fully as the court's construction without the qualification would, the entire defeat of the laudable object of the renewal towards patentees. In one or two of the cases now before us, the patentee, under this construction, will still be subjected to defeat and burdensome

costs. In relation to its effect on the present patent as a whole, all the consequences cannot now be ascertained. But it is admitted, that the inventer had assigned the whole of the old patent, so that no right whatever to use will remain in his representatives to dispose of; or if a right remains where machines are not now in actual use, probably enough are now in use to supply for some time the public wants in most parts of the United States.

The right to continue to use them will probably last during the whole seven years the renewal runs, as the machine will usually, with proper repairs, do service beyond that time. It will not, then, be very difficult to calculate what value, during the seven years, will be derived from the right to make and vend machines, when the use of others already in existence is scattered over every section of the country, and they may be employed all the time of the extended patent, without the assignees or grantees ever having paid or being obliged to pay a dollar for that extended use.

Looking, then, to the beneficient design of the eighteenth section, to enforce the Constitution, by advancing science and the arts, and protecting useful inventions, through the security for a longer term to men of genius of a property in their own labors, in cases where they had not been already remunerated for their time and expenses, I cannot but fear that the construction given by the majority **\*708** of the court will prove most unfortunate. It will tend to plunge into still deeper embarrassment and destitution, by losses in litigation and by deprivation of a further extended sale of their inventions, those whose worth and poverty induced Congress to attempt to aid them.

Nor would a different construction tie up, as some suppose, the future use of numerous patents. Of the fourteen thousand five hundred and twenty-six heretofore issued, since the Constitution was adopted, I am enabled, by the kindness of the Commissioner of Patents, to state, that only ten have been renewed under the eighteenth section during nearly ten years it has been in operation.

And if the individuals who use the improved machines, the fruit of the toil and expense and science of others, were obliged in but one case in a year, over the whole country, to pay something for that further use, is it a great grievance? They are not obliged to employ the patent at all, and will not unless it is better by the amount they pay than what was in use before. And is it a great hardship or inequitable, where they are benefited by another's talents, money, and labor, to compensate him in some degree therefor?

4 How. 646, 11 L.Ed. 1141

While other countries, and Congress, and our State courts are adopting a more liberal course yearly towards such public benefactors as inventers, I should regret to see this high tribunal pursue a kind of construction open to the imputation of an opposite character, or be supposed by any one to evince a feeling towards patentees which belongs to other ages rather than this (and which I am satisfied is not cherished), as if patentees were odious monopolists of the property and labors of others, when in truth they are only asking to be protected in the enjoyment and sale of their own, -- as truly their own as the wheat grown by the farmer, or the wagon built by the mechanic.

Nor should we allow any prejudices against the utility of patents generally, and much less against the utility of the invention now under consideration, to make our constructions more rigid in this case. The settled doctrine of the courts now, under the lights of longer experience, though once otherwise, is in doubtful cases to incline to constructions most favorable to patentees. Grant et al. v. Raymond, 6 Peters, 218; 1 Sumner, 485; Wyeth v. Stone, 1 Story's Rep. 287; Blanchard v. Sprague, 2 Story's Rep. 169. Nor is it strange that this should be the case in the nineteenth century, however different it was some generations ago, when we daily witness how the world has been benefited since by the patented inventions and discoveries in steam, in all its wonderful varieties and utilities, and in cleaning, spinning, and weaving cotton by machinery for almost half the human race, and in myriads of other improvements in other things, shedding so

benign a light over the age in which we live, and most of them excited and matured only **\*709** under the protection secured to their inventers by an enlightened government.

Some estimate can be formed of the usefulness of the present patent, and its title to favor, when one machine is computed to perform the labor of planing and grooving in one day that would require fifty days by a man, and which is supposed to reduce near seven tenths the expense of such work in every building where the improved method is used,—as it ere long will be by the many millions of our own population, and in time over the civilized world. Every honest social system must shield such inventions, and every wise one seeks undoubtedly to encourage them.

To be liberal, then, in the protection of patentees, is only to be just towards the rights of property. To stimulate them in this and other ways to greater exertions of ingenuity and talent is to increase the public wealth, and hasten the progress of practical improvements, as well as of science. And to discountenance encroachments on their rights, and defeat piracies of their useful labors, is calculated in the end to better the condition of every rank in society, and introduce wider and faster all the benefits of a superior state of civilization and the arts.

### Parallel Citations

4 How. 646, 1846 WL 5724 (U.S.N.Y.), 11 L.Ed. 1141

Footnotes

\*      The reporter intended to publish the arguments of counsel in these patent cases *in extenso*, and with that view applied for and obtained from many of the counsel their arguments prepared by themselves; but circumstances beyond his control prevent him from executing this purpose. He returns his thanks to those gentlemen who so kindly furnished him with their arguments, and regrets that his original design has been frustrated.

**End of Document**                          © 2014 Thomson Reuters. No claim to original U.S. Government Works.

TAB 165

# DRAFTING PATENT LICENSE AGREEMENTS

## Seventh Edition

Brian G. Brunsvold
D. Patrick O'Reilley
D. Brian Kacedon

# DRAFTING PATENT LICENSE AGREEMENTS

## Seventh Edition

### *With Forms on CD-ROM*

**Brian G. Brunsvold**
**D. Patrick O'Reilley**
**D. Brian Kacedon**

*Finnegan, Henderson, Farabow,*
*Garrett & Dunner, L.L.P.*
*Washington, D.C.*

Bloomberg
BNA

Arlington, VA



LIBRARY OF

JUL 1 7 2013

CLEARY GOTTLIEB
STEEN & HAMILTON LLP

KF
3145
.M29
2012



eilley,

*Chief*

PIA
on

Conway

n,

ey and

Welkowitz

slides

Copyright © 1971, 1984, 1991, 1998, 2004, 2008, 2012

The Bureau of National Affairs, Inc.
Arlington, VA 22202

**Library of Congress Cataloging-in-Publication Data**

Brunsvold, Brian G., 1938-
    Drafting patent license agreements / Brian G. Brunsvold, D. Patrick O'Reilley
D. Brian Kacedon. -- 7th ed
        pages cm.
    Includes bibliographical references and index.
    ISBN 978-1-61746-121-7
    1. Patent licenses--United States. 2. Trade secrets--Law and legislation--United
States. I. O'Reilley, Dennis P., 1943- II. Kacedon, D. Brian. III. Title

    KF3145.B78 2008
    346.7304'86--dc23

                                                    2012001859

All rights reserved. Photocopying any portion of this publication is strictly prohibited
unless express written authorization is first obtained from The Bureau of National
Affairs, Inc., 1801 S. Bell Street, Arlington, VA 22202, *bna.com/bnabooks*. Authorization
to photocopy items for internal or personal use, or the internal or personal use of
specific clients, is granted by The Bureau of National Affairs, Inc. for libraries and
other users registered with the Copyright Clearance Center (CCC) Transactional
Reporting Service, provided that $1.00 per page is paid directly to CCC, 222 Rosewood
Dr., Danvers, MA 01923, *copyright.com,* Telephone: 978-750-8400, Fax: 978-646-8600.

Published by Bloomberg BNA
1801 S. Bell Street, Arlington, VA 22202
*bna.com/bnabooks*

ISBN 978-1-61746-121-7
*Printed in the United States of America*

Pre

then only under the terms of the contract with the licensee.[37] The licensee remains responsible for the actions of the contractor.

By contrast, a sublicense, which must be expressly granted and cannot be implied, permits the sublicensee to act independently of the licensee (subject to the terms of the sublicense agreement). A sublicensee is in effect another licensee. The licensee generally is not responsible for the actions of the sublicensee unless the license agreement specifically provides for such responsibility.

Since the right to "have made" is generally implied and rarely expressly excluded, some have tried to use that right to overcome the lack of a right to grant sublicenses.[38] If the net effect of a transaction is that a licensed product made by a contractor is not sold and delivered to the licensee, it may be an unauthorized or "sham" sublicense.

## 5.04    The Compulsory License

A license compelled by law is compulsory. While such licenses are not as common in the United States as in other countries, several U.S. laws provide for compulsory licenses or their equivalent.

The Clean Air Act[39] has a provision that can be used to compel licenses under patents if the patent owner is unwilling or unable to satisfy demand for a product deemed to be in the public interest. In addition, eminent domain, the government's right to take property (such as patent rights) for reasonable compensation, is a form of compulsory license.[40]

In each of these examples, the patent owner is entitled to reasonable compensation or damages for the license. The patent statute, however, provides for the equivalent of compulsory licenses in the form of intervening rights. These equitable rights may arise as the result of a reissue patent[41] or the grant of a reexamination certificate.[42] Depending on the equities, a patent owner against whom intervening rights are awarded may not be entitled to compensation.

Another form of compulsory license occurs when a court refuses to grant an injunction after finding the patent valid and infringed.

---

1985); Velos Grp. v. Centocor, Inc., No. Civ. JFM-92-2722, 1996 WL 34477671, at *10, 1996 U.S. Dist. LEXIS 19743, at *32 (D. Md. 1996) ("resale of a product by a patent licensee does not itself constitute a license or sublicense, even when resale is by an exclusive distributor").

[37] *See* Cyrix Corp. v. Intel Corp., 77 F.3d 1381, 37 USPQ2d 1884 (Fed. Cir. 1996).

[38] *See* Westinghouse Elec. & Mfg. Co., 23 F.2d at 632–36; E.I. du Pont de Nemours & Co. v. Shell Oil Co., 498 A.2d 1108, 1114, 227 USPQ 233, 236 (Del. 1985).

[39] 42 U.S.C. §7608 (2006) (mandatory licensing).

[40] *See* Calhoun v. United States, 453 F.2d 1385, 1391, 172 USPQ 438, 443 (Ct. Cl. 1972) ("[T]he Government, when a patented device or invention is made or used by or for the United States, *ipso facto* takes by eminent domain a compulsory compensable license in the patent [and] the patentee obtains his Fifth Amendment just compensation for that taking....").

[41] 35 U.S.C. §252 (2006).

[42] 35 U.S.C. §307(b) (2006).

---

While this had
would harm the
the Supreme C
The Court man
before granting
Thus, a patent
entitled to an
compensated fo
resulting in de
"on-going royal
license,[47] even
license.

## 5.05    The Sh

The shop ri
an employer and
time, materials,
to a nonexclusi
to the invention

A shop rigl
to invent. If the
contract exists
ployer, under tl

---

[43] *See* Foster v.

[44] *See* Activated
137 (N.D. Ill. 1946).

[45] 547 U.S. 388,

[46] *See* Bard Peri
1641 (Fed. Cir. 2012)
ing royalty); Paice L
2007) (affirming den
but remanding for re
v. Microsoft Corp., 4
monwealth Scientific
(E.D. Tex. 2007) (gr
institution) had show

[47] *Compare* Bar
plies that anyone wh
is licensed. By contr
lar'... defendant[]; tl
manufacturer to follo
imprimatur."), *with* F
license an 'ongoing rc
the disruptive implic:
exclusion, the trial cc
opportunity to set th

[48] *See* United St
Solomons v. United S
F.2d 1576, 27 USPQ2

TAB 166

# COLUMBIA LAW REVIEW

| VOL. 113 | JANUARY 2013 | NO. 1 |

## ARTICLE

### NO EXIT?
### WITHDRAWAL RIGHTS AND THE LAW OF CORPORATE REORGANIZATIONS

*Douglas G. Baird\* & Anthony J. Casey\*\**

> *Bankruptcy scholarship is largely a debate about the comparative merits of a mandatory regime on one hand and bankruptcy by free design on the other. By the standard account, the current law of corporate reorganization is mandatory. Various rules that cannot be avoided ensure that investors' actions are limited and they do not exercise their rights against specialized assets in a way that destroys the value of a business as a whole. These rules solve collective action problems and reduce the risk of bargaining failure. But there are costs to a mandatory regime. In particular, investors cannot design their rights to achieve optimal monitoring as they could in a system of bankruptcy by free design.*

> *This Article suggests that the academic debate has missed a fundamental feature of the law. Bankruptcy operates on legal entities, not on firms in the economic sense. For this reason, sophisticated investors do not face a mandatory regime at all. The ability of investors to place assets in separate entities gives them the ability to create specific withdrawal rights in the event the firm encounters financial distress. There is nothing mandatory about rules like the automatic stay when assets can be partitioned off into legal entities that are beyond the reach of the*

\* Harry A. Bigelow Distinguished Service Professor, University of Chicago Law School. The John M. Olin Foundation and the Lynde and Harry Bradley Foundation provided research support.

\*\* Assistant Professor of Law, University of Chicago Law School. The Milton and Miriam Handler Foundation and the Jerome F. Kutak Faculty Fund provided research support. We thank Kelli A. Alces, Kenneth M. Ayotte, Adam B. Badawi, Scott A. Baker, M. Todd Henderson, Robert M. Lawless, Larry Ribstein, Andres Sawicki, Julia Simon-Kerr, Richard Squire, participants at the Annual Meeting of the American Law and Economics Association, participants at the Annual Meeting of the Midwestern Law and Economics Association, participants at the Conference on Creditors and Corporate Governance at the University of Chicago, participants at the Junior Business Law Conference at Colorado Law School, and participants at the faculty workshops at the University of Chicago Law School, the University of Illinois College of Law, the Marquette University Law School, and Tulane University Law School for helpful comments. Mark Sater, Matthew Olson, and David Frankenfield provided excellent research assistance.

1

*bankruptcy judge. Thus, by partitioning assets of one economic enterprise into different legal entities, investors can create a tailored bankruptcy regime. In this way, legal entities serve as building blocks that can be combined to create specific and varied but transparent investor withdrawal rights. This regime of tailored bankruptcy has been unrecognized and underappreciated and may be preferable to both mandatory and free design regimes. By allowing a limited number of investors to opt out of bankruptcy in a particular, discrete, and visible way, investors as a group may be able to both limit the risk of bargaining failure and at the same time enjoy the disciplining effect that a withdrawal right brings with it.*

INTRODUCTION ................................................................................ 2
I. WITHDRAWAL RIGHTS, ENTITY PARTITIONING, AND BANKRUPTCY
     TAILORING ............................................................................... 7
     A. The Benefits of Withdrawal Rights.................................. 8
     B. Bankruptcy Tailoring ...................................................... 11
II. BARGAINING AFTER THE FALL ................................................... 14
     A. Bargaining Without Bankruptcy...................................... 15
     B. Bargaining in Bankruptcy Without Entity Partitioning............... 17
     C. Bargaining in Bankruptcy with Entity Partitioning ..................... 17
     D. The Bargained-For Share ................................................ 19
III. THE COSTS OF WITHDRAWAL RIGHTS....................................... 20
     A. Limiting the Problem of Technical Default ................... 20
     B. Multiple Parties and the Risk of Bargaining Failure ................... 21
IV. WITHDRAWAL RIGHTS AND THE BANKRUPTCY CODE ............................ 24
     A. Withdrawal Rights and *General Growth Properties* .......................... 25
     B. Withdrawal Rights and *Charter Communications*............................ 31
V. WITHDRAWAL RIGHTS AND THIRD PARTIES.................................. 35
     A. Withdrawal Rights, True Lessors, and True Bailors ..................... 35
     B. Collective Withdrawal .................................................... 42
     C. Executory Contracts and Withdrawal Rights ............................ 45
CONCLUSION ................................................................................... 48

## INTRODUCTION

When the Los Angeles Dodgers entered bankruptcy, the filing revealed that its income depended crucially on three assets: the team itself, its stadium, and the adjoining parking lot. The team cannot play without a stadium to house the spectators, and the spectators need a place to park.[1] None of the assets is worth much without the other two. No other

---

1. Stadiums in other cities (such as Wrigley Field in Chicago) are accessible by public transportation or by foot, but not Dodger Stadium. It is located in Chavez Ravine. Apart

stadium in Los Angeles is suitable for baseball, and Dodger Stadium is not well suited for anything other than baseball. The parking lot is necessary for those who want to watch baseball at Dodger Stadium but useless to everyone else. Different investors hold interests in each of these three assets.

By the standard account, the law of corporate reorganizations is well equipped to handle a financially distressed enterprise with such a configuration of highly specialized assets. Chapter 11 prevents investors from exercising their rights in a way that destroys the value of the business as a whole.[2] Various rules—especially the automatic stay[3]—keep the firm together while its financial affairs are sorted out. Investors thus lose the ability to withdraw from their investment and must instead work together to create a new capital structure for the firm.[4] Bankruptcy law respects the value of each investor's rights while preventing investors from taking actions that reduce the value of the business as a whole.[5] Closer examination of the Dodgers, however, tells a rather different story. Bankruptcy was doing little to keep the assets together. While the Dodgers were one economic enterprise, the critical assets—the parking lot, the stadium, and the team—were housed in separate legal entities.[6] The limited liability company that owned the team filed one bankruptcy petition, the

---

from an express bus from Union Station, the only way there is by car. The frequently asked questions page on the part of the Dodgers' website devoted to transportation focuses only on parking. See Transportation—FAQs, Dodgers.com, http://mlb.mlb.com/la/ballpark/transportation/index.jsp?content=faq (on file with the *Columbia Law Review*) (last visited Oct. 9, 2012).

2. The idea that bankruptcy exists to solve this kind of collective action problem among creditors is one of the foundational ideas of bankruptcy law. See, e.g., Thomas H. Jackson, The Logic and Limits of Bankruptcy Law 5 (1986) (noting goal of bankruptcy "is to permit the owners of assets to use those assets in a way that is most productive to them *as a group* in the face of incentives by individual owners to maximize their own positions").

3. 11 U.S.C. § 362 (2006).

4. The right to withdraw an investment upon default is a common characteristic of debt agreements. See infra note 37 and accompanying text (describing common use of covenants that trigger withdrawal rights). The suspension of these withdrawal rights is a central principle of bankruptcy law. See supra note 2.

5. See supra note 2 (noting collective action problem).

6. At the time of bankruptcy, through a variety of holding companies, they were all owned by The McCourt-Broderick Limited Partnership ("TMBLP"). Los Angeles Dodgers LLC housed the team. LA Real Estate LLC owned Dodger Stadium. Blue Landco LLC, a direct subsidiary of TMBLP, owned the parking lot. Los Angeles Dodgers and LA Real Estate (and a number of the intervening holding companies between them and TMBLP) filed for bankruptcy. Blue Landco did not, nor did TMBLP. TMBLP was owned ninety percent by Frank H. McCourt, Jr., and ten percent by The McCourt Company, Incorporated. See Emergency Motion for Interim & Final Orders (i) Authorizing Debtors To Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 362, & 364, & (ii) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(B) & 4001(C) at 3, In re L.A. Dodgers LLC, 457 B.R. 308 (Bankr. D. Del. 2011) (No. 11-12010), 2011 WL 2535793, at *3 (discussing ownership structure). The ownership of TMBLP was further complicated by divorce proceedings between Frank and Jamie McCourt. Id. at 11.

limited liability company that owned the stadium another, and the limited liability company that owned the parking lot stayed out of bankruptcy entirely.[7] While overseeing the team's bankruptcy, the bankruptcy judge had no power over the investors in the stadium. When making decisions in the bankruptcy of the stadium entity, the judge was bound to maximize the value of the stadium, not the joint value of the stadium and the team together.[8] The parking lot was never in bankruptcy, and bankruptcy's automatic stay had no effect on the rights of its investors. Moreover, the team itself was utterly dependent on its franchise rights with Major League Baseball.[9] The ability of the Dodgers to retain those franchise rights was not at all clear.[10] In short, the Dodgers bankruptcy was emphatically not a world in which all the stakeholders had to work together and no one had a right to leave the scene.

Thus, while the standard account of bankruptcy focuses on protecting economic enterprises,[11] or what many would call "Coasean firms,"[12] and equates that enterprise with the debtor that files the bankruptcy petition, the corporate structure of the Dodgers showed that the two are not always one and the same. Bankruptcy operates on legal entities, not

---

7. See Debtors' Motion for an Order Directing Joint Administration of the Debtors' Chapter 11 Cases at 1, *L.A. Dodgers*, 457 B.R. 308 (No. 11-12010) (June 27, 2011), 2011 WL 2678239, at *1 (identifying various debtor entities). The parking lot alone carried a debt of $67 million. See Declaration of Jeffrey J. Ingram in Support of Debtors' Chapter 11 Petitions & First Day Motions at 6 n.3, *L.A. Dodgers*, 457 B.R. 308 (No. 11-12010) (June 27, 2011) [hereinafter Declaration of Ingram] (describing debt structure of parking lot). Several hundred million dollars' worth of debt was in a subsidiary of the entity that owned the stadium. See id. at 5 (noting financing taken on by subsidiary of LA Real Estate LLC).

8. As discussed in Part IV, judges at the margin push back against this feature of the law and allow the law to operate on corporate groups rather than on individual debtor entities when gaps in the law permit. Part of the purpose of this Article is to examine whether this move is a good or a bad idea.

9. See Major League Baseball, Major League Constitution, art. IX, § 1 (2005), available at http://bizofbaseball.com/docs/MLConstitutionJune2005Update.pdf (on file with the *Columbia Law Review*) (providing that games will be scheduled by Commissioner and no Major League Club may play games without approval of Commissioner); see also id. art. VIII, § 4 (providing grounds for involuntary termination of rights of Major League Club).

10. See infra notes 206–207 and accompanying text (discussing legal uncertainty about assumability of nonassignable contracts).

11. See Jackson, supra note 2, at 2 ("Bankruptcy law can and should help a firm stay in business when it is worth more to its owners alive than dead.").

12. Coase famously defined the firm as coming into existence when one manager owns and directs the use of resources in a project. R.H. Coase, The Nature of the Firm, 4 Economica 386, 393 (1937) (noting firm "consists of the system of relationships which comes into existence when the direction of resources is dependent on an entrepreneur"). Legal entities, on the other hand, are artificial boundaries that may be unrelated to economic activity. An economic enterprise directed by a single entrepreneur can be split into several legal entities, or conversely, several disconnected enterprises can be brought under one legal umbrella. See Edward M. Iacobucci & George G. Triantis, Economic and Legal Boundaries of Firms, 93 Va. L. Rev. 515, 518–19 (2007) (defining differences between legal and economic theories of firm boundaries).

on firms. Investors are free to place the critical assets of the same eco-
nomic firm into whatever legal entities they want, and they frequently do.
This feature of modern corporate structures must be part of any coher-
ent account of the law of corporate reorganizations. This Article focuses
on an important and neglected feature of a world in which highly spe-
cialized assets of a single firm can be placed in multiple legal entities: the
way in which it allows investors to opt out of the standard bankruptcy re-
gime.[13]

   In contrast to a regime of free contracting,[14] existing law allows
investors to acquire the right to opt out of bankruptcy only if they take
particular steps that are discrete and visible. Investors must use legal enti-
ties as building blocks.[15] For this reason, the existing regime possesses a
number of conspicuous virtues that a regime of free contracting does
not.[16] Withdrawal rights in their current form, far from being incon-
sistent with a coherent law of corporate reorganizations, may be an
affirmatively desirable part of it. Giving investors the ability to create exit
rights, but limiting the shape they can take, may make investors as a
group better off.

   This Article unites a number of different strands of thought in cor-
porate law and corporate reorganizations. Most obviously, it connects to
the literature on the way corporate form allows investors to separate as-
sets from each other.[17] The focus of much of this work, however, is on a
corporate group in which the individual legal entities contain various
stand-alone businesses, rather than a single business with assets placed in
separate legal entities.[18] Hence, this line of work examines such questions
as spin-offs, carve-outs, and tracking stocks.[19] This work has also explored

---

   13. A conspicuous exception is an excellent paper by Ayotte and Gaon. See Kenneth
Ayotte & Stav Gaon, Asset-Backed Securities: Costs and Benefits of "Bankruptcy Remote-
ness," 24 Rev. Fin. Stud. 1299, 1301–04 (2011) (focusing on ability of parties to put assets
in bankruptcy-remote entities in context of securitization of accounts and other nonspe-
cialized assets).

   14. See, e.g., Alan Schwartz, A Contract Theory Approach to Business Bankruptcy,
107 Yale L.J. 1807, 1819 (1998) (encouraging bankruptcy regime that allows parties to
contract for bankruptcy system of their choice to reduce costs of debt).

   15. See infra note 46 and accompanying text (noting existing law provides investors
"building blocks" to tailor their rights).

   16. See infra Part I.A (discussing benefits of bankruptcy regime that utilizes legal
entities as building blocks).

   17. Hansmann and Kraakman are most responsible for developing this idea. See,
e.g., Henry Hansmann & Reinier Kraakman, Organizational Law as Asset Partitioning, 44
Eur. Econ. Rev. 807, 810 (2000) (identifying and analyzing significance of asset partition-
ing through corporate form).

   18. See, e.g., Iacobucci & Triantis, supra note 12, at 558–65 (examining separation of
different economic activities into different legal entities within same corporate group).

   19. See, e.g., id. at 567–69 (discussing spin-offs, carve-outs, and tracking stocks).

COLUMBIA LAW REVIEW [Vol. 113:1

bankruptcy-remote vehicles in which liquid assets such as accounts are placed in separate legal entities.[20]

This Article also connects to the work that examines the way in which the law allows parties to opt out of legal rules. One needs to worry not merely about whether a rule is a default but also the way in which parties are allowed to opt out of it.[21] At the same time, this Article links with work that focuses on the way that some legal rights, particularly those associated with property, tend to come in a finite number of discrete forms that cannot be broken down.[22]

The use of discrete and visible legal entities limits the information search costs for potential lenders. To assess these withdrawal rights, a lender need only inform itself as to the legal boundaries of the debtor. This information is already indispensable to a lender under any alternative system.[23] Thus, the use of legal entities as building blocks allows investors to adopt valuable withdrawal rights that might substitute for costly monitoring while limiting the information costs associated with bankruptcy by free contract. The account this Article offers of withdrawal rights reconciles the apparent inconsistency between the standard approach to corporate reorganizations (which views a denial of withdrawal rights as essential to solving a collective action problem) with the conventional story of debt (which relies on the need for creditor opt-out rights to discipline debtors).[24]

Part I lays out the basic structure of the argument. Part II uses a simplified version of the Dodgers reorganization to identify the bargaining dynamics that these withdrawal rights create. The costs of withdrawal rights are the focus of Part III. Part IV looks at how courts have treated withdrawal rights. At the margin, they have inclined against enforcing them. The Part argues that this instinct, while completely understandable, is likely a mistake, resting as it does on the unstated assumption

20. See, e.g., Ayotte & Gaon, supra note 13, at 1301–04 (discussing separate legal entities in context of securitization of accounts and other nonspecialized assets).

21. See Ian Ayres, Regulating Opt-Out: An Economic Theory of Altering Rules, 121 Yale L.J. 2032, 2036 (2012) (showing attention must be paid not merely to default rules but also to "altering rules," the path one must follow to opt out of background regime).

22. See Thomas W. Merrill & Henry E. Smith, Optimal Standardization in the Law of Property: The Numerus Clausus Principle, 110 Yale L.J. 1, 24–42 (2000) (setting out their theory of numerus clausus, which provides that having limited set of known, available options or building blocks establishes optimal balance between parties' frustration costs and third-party monitoring costs).

23. See infra text accompanying notes 49–50 (explaining it is easy for investors to discover separate legal entities).

24. Barry Adler discusses this inconsistency in depth and—accepting it as unreconciled in the current system—proposes a novel solution mechanism. See Barry E. Adler, Game-Theoretic Bankruptcy Valuation, 41 J. Legal Stud. 209, 212 (2012) (suggesting debtors with junior interests would propose take-it-or-leave-it reorganization plan that would have debtor retain collateral and include sale of debtor's assets). This Article suggests that the existing regime may already provide a solution to the problem.

that, wherever possible, bankruptcy law works best if it operates on the economic firm as a whole, rather than on the separate legal entities that constitute it.

The last Part of this Article examines—through a withdrawal-rights lens—other devices stakeholders use to control a critical asset when the business enters bankruptcy. An investor in a manufacturer, for example, may own tooling critical to a plant's operation.[25] An investor in a restaurant can own the building and lease it to the restaurateur, rather than taking a mortgage on it. A sports league might control a professional team's ability to play other teams. The way in which existing law treats these withdrawal rights is suspect, as it focuses on issues (such as whether a transaction is a "true bailment") that are largely orthogonal to the challenge at hand,[26] which is ensuring that they serve to discipline the debtor before the fact without imposing excessive bargaining costs after the fact.

## I. WITHDRAWAL RIGHTS, ENTITY PARTITIONING, AND BANKRUPTCY TAILORING

There are, of course, a number of reasons to place assets in different corporate entities.[27] This Article focuses on how such partitioning can

---

25. See infra Part V.A (analyzing relationship between Chrysler and Plastech, where Chrysler owned tooling that was located and used at Plastech plant).

26. See infra Part V (discussing how law deals with various withdrawal rights, such as leases, bailments, and nonassignable contracts).

27. A firm might attempt to isolate the business as a whole from the tort liabilities of one of its divisions. See, e.g., In re Owens Corning, 419 F.3d 195, 200 (3d Cir. 2005) (acknowledging some entities within corporate group exist to limit liability concerns with respect to asbestos); Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.), 450 B.R. 432, 437–38 (Bankr. S.D.N.Y. 2011) (detailing how company separated oil and gas assets from rest of company holdings to reduce liability for acquisition of bulk of company).

Sometimes it may make sense to put highly liquid assets that require little management and are more or less subject to exogenous risks, such as accounts receivable, into a separate legal entity. Those who invest in this entity can look to these assets without having a stake in the rest of the business. See Iacobucci & Triantis, supra note 12, at 568–69 (highlighting greater transparency and ease of asset valuation as benefits of separate legal entities). Corporate groups can also arise when a large business has several different divisions. Each division might be a stand-alone business that is best served with a different capital structure. One might be highly regulated and enjoy stable returns, while the other may be a high-technology company with highly variable returns. The optimal leverage ratios for the two may be radically different. Everyone may be better off by placing each division into a separate legal entity. See id. at 552–53 (showing inefficiency arises when assets with different risk profiles are combined in one legal entity).

These alternative explanations for the use of multiple legal entities within the same economic enterprise are not exhaustive. The tax consequences of every corporate structure, of course, must be taken into account. In addition, Richard Squire suggests that debtor opportunism may sometimes be at work in the structure of corporate groups where different subsidiaries are guaranteeing the debts of others. Richard Squire, Strategic Liability in the Corporate Group, 78 U. Chi. L. Rev. 605, 622–43 (2011). Other factors may be at work as well.

give individual investors the ability to withdraw assets from a business that encounters financial distress, notwithstanding bankruptcy law.

The standard justification for forcing all investors to participate in the bankruptcy process and not allowing anyone to exit focuses on the costs that arise when everyone acts unilaterally. A valuable business can be torn apart when investors act in their individual interests but contrary to the interests of creditors as a group.[28] Withdrawal rights, however, can bring substantial benefits when their exercise is limited. This Part focuses first on these benefits and then on how the ability to place assets in discrete legal entities allows these benefits to be captured.

A. *The Benefits of Withdrawal Rights*

Consider a firm that has multiple assets, each of which is essential to the business continuing as a going concern. Assume that an investor has the right to withdraw a critical asset, such as a sports franchise's stadium, in the event of default, notwithstanding bankruptcy law. The exercise of this right will shut down the firm.

The existence of this withdrawal right is costly only if it is actually exercised *and* the firm has value as a going concern. When a single investor possesses this right, however, there is no collective action problem. This is not a situation in which many disparate investors will find it in their individual interests to seize assets even when it is contrary to the interests of the group. If the investor who holds the withdrawal right and the managers of the firm are equally well informed about the value of the franchise, and if they can bargain with each other costlessly, the investor and the managers will strike a bargain in which the firm remains intact if and only if the firm is worth keeping intact as a going concern. If the franchise has no value as a going concern, the withdrawal right will be exercised and the firm will be shut down.

Far from destroying value, giving the investor the withdrawal right ensures that assets are quickly put to their best use. If one is confident that the risk of bargaining failure is small, the withdrawal right provides an acid test of whether the firm should be saved. A bankruptcy judge will likely reach the same conclusion, but only more slowly and at greater cost.[29] It might be in the interests of parties before the fact to give an

---

28. See supra note 2 and accompanying text (discussing bankruptcy and collective action problem).

29. Morrison conjectures that bankruptcy judges shut down firms in the same fashion as a rational decisionmaker subject to the same constraints and provides empirical support. See Edward R. Morrison, Bankruptcy Decision Making: An Empirical Study of Continuation Bias in Small Business Bankruptcies, 50 J.L. & Econ. 381, 411 (2007) (refuting conventional wisdom that bankruptcy judges delay resolution because of continuation bias); see also Elizabeth Warren & Jay Lawrence Westbrook, The Success of Chapter 11: A Challenge to the Critics, 107 Mich. L. Rev. 603, 627–30 (2009) (providing further empirical evidence of Morrison's conjecture).

investor a withdrawal right, to provide a mechanism for shutting the firm down quickly when it turns out not to be worth saving.[30] If the number of investors who possess withdrawal rights is limited, they avoid the collective action problem that arises when multiple investors have withdrawal rights, as well as the costs that come with a drawn-out bankruptcy process and the uncertainties associated with judicial valuation.[31]

Withdrawal rights also give a creditor a way to ensure that the firm's managers act in the creditor's interest when the creditor cannot monitor them effectively. A key feature of a sensibly crafted withdrawal right is that it is state-contingent. The withdrawal right lies dormant in good states of the world. The investor can withdraw from the enterprise only when the loan is in default, and the agreement is written such that default occurs if and only if things are going poorly. Knowing that the investor has a withdrawal right only in bad states of the world, the debtor will have an incentive to prevent these states from arising. Knowing the debtor possesses this incentive, the investor will not have to monitor the debtor's behavior as much.[32] The debtor's ability to give an individual investor the right to withdraw a critical asset has the same virtue that is commonly associated with the ability to give a hostage.[33]

Taking a hostage—acquiring the right to take the stadium away from the sports franchise—substitutes for costly monitoring of human capi-

---

30. As Adler explains, the right of cramdown may allow the threat of inefficient continuation and the extraction of concessions in light of that threat. Adler, *supra* note 24, at 209–10; *see also infra* note 40 (defining "cramdown"). By providing a market test, withdrawal rights prevent these outcomes.

31. *See* Adler, *supra* note 24, at 216–17 (discussing costs of unfettered withdrawal rights); *id.* at 213–15 (discussing costs of judicial valuation error).

32. For an analysis of how debt brings with it the benefits of state-contingent rights, *see generally* Jaime F. Zender, *Optimal Financial Instruments*, 46 J. Fin. 1645 (1991) (modeling how "state-contingent transfer of control relaxes an incentive constraint that would bind if bankruptcy were not allowed, enhancing the value of the firm as a going concern"). Patrick Bolton develops this idea in several important papers in the early 1990s. *See* Philippe Aghion & Patrick Bolton, *An Incomplete Contracts Approach to Financial Contracting*, 59 Rev. Econ. Stud. 473, 490 (1992) (contending withdrawal rights in debt agreements can be used to allow creditors to induce profitable behavior); Patrick Bolton & David S. Scharfstein, *Optimal Debt Structure and the Number of Creditors*, 104 J. Pol. Econ. 1, 5–8 (1996) (modeling effects of state-contingent control and showing that borrowing from many creditors lowers payoff of strategic default by managers).

33. The hostage is a commitment mechanism. By giving value that can be destroyed by another in certain states, the debtor provides a valuable and credible commitment to act in a certain way. *See* Robert E. Scott, *A Relational Theory of Secured Financing*, 86 Colum. L. Rev. 901, 927–28 (1986) [hereinafter Scott, *Relational Theory*] ("When monitoring costs, such as direct supervision, are high relative to actions by the debtor that reassure the creditor, both parties will agree ex ante to substitute cost-effective bonding alternatives."); *see also* Oliver E. Williamson, *Credible Commitments: Using Hostages To Support Exchange*, 73 Am. Econ. Rev. 519, 522 (1983) (offering general discussion of how parties can use hostages to advance their mutual interests).

*COLUMBIA LAW REVIEW*                    [Vol. 113:1

tal.[34] The investors with rights to these assets no longer need to pay as much attention to the way the team is managed.[35] In the event of default, investors will use their right to withdraw the stadium as negotiation leverage. The credible threat of withdrawal will force the debtor to negotiate with them anew. The withdrawal right matters because, even though the stadium is never actually withdrawn, the ability to withdraw gives the investor leverage whenever there is a default. This leverage allows the investor to capture a share of the firm's value as a going concern. This prospect gives the managers a strong incentive to avoid default, just as someone who gives a hostage is less inclined to misbehave. The managers want to avoid sharing a large part of the value of the firm with someone else. Even if no one is looking over their shoulders, the managers will be less likely to divert assets to themselves (such as by hosting lavish events for themselves with the team's resources) and more attentive to ensuring the success of the team (such as by firing bad coaches and hiring better players).

A withdrawal right, like the ability to hold a hostage, is more valuable to some investors than others.[36] Those who are well positioned to monitor do not need a withdrawal right. They can put covenants in their contracts that give them control over the levers of corporate governance. They can use these covenants to curb misbehavior.[37] But these investors may protect their own position to the disadvantage of other investors and to the disadvantage of the investors as a group.[38] These other investors can counterbalance this power by acquiring withdrawal rights.

---

34. When the key asset is worth comparatively little elsewhere, the ability of the investor to liquidate it is not what is driving the bargaining dynamic. Instead, what matters is that the firm has value only if the "hostage" is returned. It is in the mutual interest of the investor on the one hand and the managers (and the other investors) on the other to preserve that value. The potential loss of value to the firm drives the bargaining after the fact and instills the discipline beforehand. What matters is not how puny the prince is, but rather that the kingdom is worthless without him. See Robert E. Scott, Rethinking the Regulation of Coercive Creditor Remedies, 89 Colum. L. Rev. 730, 733 (1989) (suggesting greater potential loss in value in losing "hostage" leads to greater effectiveness in advancing cooperation).

35. See Aghion & Bolton, supra note 32, at 490–91 (explaining state-contingent rights can create incentives that substitute for other control mechanisms as optimal governance structures).

36. See Scott, Relational Theory, supra note 33, at 932–33 (summarizing characteristics that create value for hostage function of secured credit).

37. See Douglas G. Baird & Robert K. Rasmussen, Private Debt and the Missing Lever of Corporate Governance, 154 U. Pa. L. Rev. 1209, 1211–13 (2006) (describing mechanisms for creditor control in and out of bankruptcy); Michael R. Roberts & Amir Sufi, Control Rights and Capital Structure: An Empirical Investigation, 64 J. Fin. 1657, 1667, 1690–91 (2009) (showing how covenants allow control rights to shift as firms encounter financial distress).

38. See Kenneth M. Ayotte & Edward R. Morrison, Creditor Control and Conflict in Chapter 11, 1 J. Legal Analysis 511, 538–39 (2009) (finding evidence of creditor control leading to inefficient sales in bankruptcy).

Binding the managers to good behavior not only makes the investor better off, but it also improves the value of the overall enterprise. The increase in the value of the business may more than offset the costs from the risk of bargaining failure.[39] Withdrawal rights make the most sense when there are hard-to-monitor assets and a greater need to discipline managers. These are the cases where one of the key investors may be more likely to opt out of traditional bankruptcy. In these cases, the risk of default should be primarily in the hands of the managers.

On the flip side, the more likely exogenous financial cycles are to cause default, the more parties will find it in their interest to subject investors to the "cramdown" power.[40] There is no point in risking bargaining failure to create withdrawal rights when external events are the likely cause of any default.[41] Finally, of course, withdrawal rights only substitute for monitoring when the withdrawal has the potential to destroy value— that is, when the partitioned asset is actually tied to the going-concern value of the enterprise as a whole.[42]

### B. *Bankruptcy Tailoring*

The benefits of withdrawal rights set out above must be balanced against the costs they bring. If multiple investors possess withdrawal rights, the risk of bargaining failure rises, and they face the collective-action problem that bankruptcy is intended to solve.[43] Similarly, the benefits of withdrawal rights are lost if they are invisible to other investors. The familiar arguments against a regime of free contracting rest on both of these costs. If everyone is able to contract for a withdrawal right and no one has the ability to tell whether anyone else has the right, each investor assumes the worst.[44] A "menu approach" to bankruptcy[45] may avoid these difficulties, but does not allow structures that are tuned to

---

39. See Adler, supra note 24, at 217 (discussing bargaining failure and negotiation costs); see also infra Part III.B (discussing risk of bargaining failure among investors with withdrawal right).

40. "Cramdown" is the power to impose a plan of reorganization over the objections of some creditors. 11 U.S.C. § 1129(b) (2006); see also Kenneth N. Klee, All You Ever Wanted To Know About Cram Down Under the New Bankruptcy Code, 53 Am. Bankr. L.J. 133, 134 (1979) (defining cramdown as what happens when reorganization plan is confirmed over dissent of some creditors, including those with secured interests).

41. See Bolton & Scharfstein, supra note 32, at 14 (suggesting when default risk is high, one creditor will result in higher liquidation value).

42. When this is not true, the cost and benefit of the withdrawal right is zero. In these cases, other motivations to explain entity partitioning should be considered.

43. See infra Part III (discussing costs associated with withdrawal rights); see also supra note 2 and accompanying text (noting collective action problem).

44. See, e.g., Robert K. Rasmussen, Debtor's Choice: A Menu Approach to Corporate Bankruptcy, 71 Tex. L. Rev. 51, 53–54 (1992) (setting forth approach where firms publicly select one bankruptcy regime from menu of several options).

45. See id. (discussing "menu approach").

the needs of individual investors. It does not cleanly distinguish between investors who can monitor effectively and those who cannot.

The ability to craft withdrawal rights by putting assets of the same business in different legal entities largely overcomes these difficulties. Legal entities provide a way for some investors to enjoy withdrawal rights without creating a collective action problem or imposing hidden costs on others. This use of legal entities and structure to transform the rights of investors during bankruptcy is what this Article refers to as bankruptcy tailoring.

From this perspective, existing reorganization law provides investors with a set of building blocks. The ability to opt out comes from the ability to put together these building blocks in different ways.[46] Investors cannot opt out of bankruptcy altogether, but the collective set of investors' rights can be tailored. Investors acquire the right to withdraw only through discrete changes to the corporate structure. It is not the equivalent of a bankruptcy-by-contract regime in which investors can craft any withdrawal right they please in the bargain they strike with their debtor.[47] Nor is it a menu approach to bankruptcy. Far from being a limited number of choices, there are many different ways of putting these building blocks together, as the Dodgers bankruptcy illustrates.[48]

---

46. While the use of different legal entities in the same corporate group is the most important way of allowing individual investors to opt out, it is not the only one. Part V of this Article examines other devices.

47. See Schwartz, supra note 14, at 1819 (laying out system of free contracting to allow investors and debtors to opt in to chosen bankruptcy system).

48. Of course, other reasons for creating this structure may also be at work in cases like the Dodgers'. Partitioning specialized assets into separate legal entities is a way to establish priority among investors. An investor in a sports franchise might want to be able to look to the stadium as collateral for its loan, but creating a security interest in a stadium is not easy. The stadium, independent of the team, produces a number of different revenue streams (e.g., concessions, sky boxes, and advertising). An investor who wants to protect itself by obtaining priority with respect to all these assets can do so, but it requires a variety of security interests. It is easier to segregate the assets for priority purposes by placing the assets in a separate subsidiary. By lending to the subsidiary, the investor obtains structural priority over any investors in the parent. Creating structural priority in this fashion may make it easier to securitize part of the revenue stream. See Iacobucci & Triantis, supra note 12, at 567–68 (discussing securitization and asset partitioning).

Major League Baseball itself has rules that drive franchises toward particular capital structures. This was evident in *In re Texas Rangers Baseball Partners*, where limits on the debt load that the League permitted the team to carry drove the capital structure and much of the dynamics of the bankruptcy. 434 B.R 393, 398 (Bankr. N.D. Tex. 2010) (noting limiting effects of debtors' prepetition agreements with Major League Baseball respecting financing); see also 2012–2016 Basic Agreement Between Major League Clubs and Major League Baseball Players Association 208 (Dec. 12, 2011), available at http://mlb.mlb.com/pa/pdf/cba_english.pdf (on file with the *Columbia Law Review*) (setting forth Debt Servicing Rule).

Of course, many of the standard explanations for asset partitioning are not at work here. For example, shielding assets from tort liability was not the motivation for putting the team, the stadium, and the parking lot in separate legal entities. The tort risks that

Requiring investors to use discrete corporate entities as building blocks makes the withdrawal right readily visible to other investors. Separate legal entities are relatively easy to discover. A public filing of some kind is needed for each one. An investor cannot obtain an exit right and expect to keep it secret. The partition is visible in a way that an ordinary contract between the debtor and an investor is not. Indeed, a transfer to a separate legal entity is equivalent to a sale of the asset to a third party. That sale alters the ownership of the asset, and that property right can be verified more easily than the myriad contractual rights that might exist in the asset. And, of course, verification of ownership is a common and necessary practice under any bankruptcy regime.[49]

Entity partitioning allows a lender to focus on where the entity ends to understand its exit rights and the rights that might be asserted against it. Put another way, the lender on one asset may focus less on the rights of particular lenders in other assets. This is a major benefit of tailored bankruptcy over bankruptcy by contract.[50] Moreover, the existence of the withdrawal right reduces the need for the lender to inform itself on the management and the capital structure of the enterprise. The investor's exit right aligns incentives in a way that substitutes for that information gathering and subsequent monitoring. In contrast, bankruptcy by free design (without building blocks) requires investors to do much deeper investigations of the contractual capital structures of all assets in the enterprise.

Withdrawal rights, of course, impose costs on other lenders. They must understand how all the assets fit together and what priority and withdrawal rights others might have in those assets. Ideally, debtors (driven by capital markets) will offer investors withdrawal rights only if their benefits exceed the costs they impose on everyone else. Critical to such a regime is the way in which bargaining plays out. It must give the debtor the right set of incentives while at the same time ensuring that assets are still put to their best use. The next two Parts of this Article turn to these dynamics.

---

render a sports franchise insolvent are remote and in any event easily insured against. More to the point, as the management and control of both the parking lot and the stadium lie with the team, it is exceedingly unlikely tort liability could arise from either without the team itself also being independently liable.

49. See Douglas G. Baird, *Notice Filing and the Problem of Ostensible Ownership*, 12 J. Legal Stud. 53, 55–58 (1983) (exploring relative importance, costs, and nuances of creditor's attempts to verify ownership).

50. Because bankruptcy by contract allows parties to design any set of bankruptcy rules, it might also be thought of as bankruptcy by free design. See *supra* note 47 and accompanying text (explaining bankruptcy by free design).

*COLUMBIA LAW REVIEW* [Vol. 113:1

## II. Bargaining After the Fall

Consider the following hypothetical. Entrepreneur wants to establish a sports franchise. To create it, Entrepreneur must spend $7 on human capital and intangible assets. Entrepreneur must also acquire Stadium, which costs $3. Once Team is formed and Stadium is acquired, the sports franchise will generate an expected revenue stream of $10. Without the ability to use Stadium, Team is worthless. Team has nowhere else to play, and Entrepreneur has no ability to build another stadium in a timely fashion and still keep Team together. Entrepreneur has $4. Hence, to start Team, Entrepreneur must find outside investors.[51] Bank and HedgeFund are each willing to put up $3. Bank is able to monitor Team's ongoing operations closely and is confident it can protect its interests without having the ability to reach hard assets.[52] By contrast, HedgeFund has no particular ability to oversee Team. It wants to have the ability to reach Stadium in the event of default.[53]

To give HedgeFund a priority right to Stadium, there are two possible structures. Entrepreneur can create TeamCorp. TeamCorp can borrow $3 from HedgeFund and grant HedgeFund a security interest in the Stadium. It can then borrow $3 from Bank and give Bank a security interest in everything else.[54] Alternatively, Entrepreneur can create TeamCorp and have TeamCorp create StadiumCo as a wholly owned subsidiary. StadiumCo can borrow $3 from HedgeFund on a secured basis. TeamCorp can also borrow the same amount from Bank and grant Bank a security interest in TeamCorp's own assets, including TeamCorp's equity stake in StadiumCo. StadiumCo can then use its funds to build Stadium and enter a related-party lease allowing TeamCorp full use and control of the asset. The lease will set the payment obligations from TeamCorp to StadiumCo in an amount sufficient to service the debt.

---

51. See Aghion & Bolton, supra note 32, at 475–79 (developing model of financial contracting based on need of entrepreneur to obtain outside funding).

52. The assumption that Bank is better positioned to monitor is not essential. When there are two investors, neither with any special monitoring ability, it may still make sense for one of them to have a priority right that is tied to a particular asset. The one without the right receives a higher rate of interest and a lower return in bad states, but both creditors benefit from having a debtor who is less likely to misbehave. See Randal C. Picker, Security Interests, Misbehavior, and Common Pools, 59 U. Chi. L. Rev. 645, 658 (1992) (analyzing positive externalities of creditor monitoring).

53. At this level of abstraction, the standard account of secured credit developed in the early 1980s explains the capital structure of Team and the allocation of assets to Bank and HedgeFund. See Saul Levmore, Monitors and Freeriders in Commercial and Corporate Settings, 92 Yale L.J. 49, 56 (1982) (developing now conventional account of secured creditor as monitor).

54. In this first structure, HedgeFund would have a deficiency claim against TeamCorp in the event that Stadium was not worth enough to pay HedgeFund in full. Nothing of moment turns on this. Bank is the only other creditor and will exhaust all the other assets in the event that TeamCorp proves insolvent.

The differences in these structures matter only in bad states of the world. Let us imagine therefore that things go poorly, and Team's fortunes decline. If Team were shut down, Stadium would fetch only $2 and no other assets could fetch anything. When Team encounters financial distress, Bank is able to exercise control. It can either displace or make common cause with Entrepreneur. But Team does not engage in any workout with HedgeFund, and Team defaults on its obligations to HedgeFund.

This Article focuses only on how the withdrawal right will affect the investors when Team is worth more than Stadium and there is no doubt that the firm as a whole is worth saving. Here the withdrawal right, if exercised, would destroy value.[55] But if the investors create the right only when the risk of bargaining failure is low, the right will rarely be exercised. It changes only the way the bargain is struck among the different parties.[56]

A. *Bargaining Without Bankruptcy*

Let us assume that the enterprise altogether is worth $6 and Stadium alone is still worth $2. The synergy of keeping these assets together is worth $4. It is the difference between the value of keeping the assets together with the human capital ($6) and the liquidation value of the hard assets ($2). In the absence of bankruptcy, the default gives HedgeFund the ability to sell Stadium to someone else for $2. With this power in hand, it can enter into negotiations with Entrepreneur. Because the highest-valued use of Stadium is with Team, one would expect HedgeFund and Entrepreneur to negotiate and reach a deal of some kind.

---

55. Of course, when exercising the withdrawal right increases value by putting assets to better use, it is easy to justify.

56. The way that the right to withdraw assets affects bargaining has been well explored. See, e.g., Christopher Avery & Peter B. Zemsky, Money Burning and Multiple Equilibria in Bargaining, 7 Games & Econ. Behav. 154, 155 (1991) (modeling potential equilibria that arise when "at least one player has the ability to take some action that reduces the value of the asset after her own offer is rejected"); Douglas G. Baird & Randal C. Picker, A Simple Noncooperative Bargaining Model of Corporate Reorganizations, 20 J. Legal Stud. 311, 328–40 (1991) [hereinafter Baird & Picker, Bargaining Model] (modeling general bargaining dynamics of rights in bankruptcy between debtor's manager and senior creditors); Alberto Dalmazzo, Outside Options in a Bargaining Model with Decay in the Size of the Cake, 40 Econ. Letters 417, 418–21 (1992) (modeling effect of cake shrinking faster than outside options on bargaining); Avner Shaked & John Sutton, Involuntary Unemployment as a Perfect Equilibrium in a Bargaining Model, 52 Econometrica 1351, 1352 (1984) (modeling how "allow[ing] agents to freely revise their plans at each instant" will affect what type of agreement parties enter); John Sutton, Non-Cooperative Bargaining Theory: An Introduction, 53 Rev. Econ. Stud. 709, 709–10 (1986) [hereinafter Sutton, Non-Cooperative Bargaining] (comparing effect of choosing noncooperative bargaining model against traditional bargaining model on bargaining outcome).

The simplest way to model the bargaining problem is to assume that HedgeFund is able to start the negotiations. It proposes a share of Team that it will accept. Entrepreneur (acting on its own behalf and Bank's) can accept the offer or make a counteroffer. On hearing a counteroffer, HedgeFund can again either sell Stadium to a third party or make a counteroffer itself. Suppose also that it costs them nothing to make offers, but delay is equally costly to each. The value of Team and value of Stadium to any third party are reduced the longer the negotiations take. Under these conditions, as the periods between rounds become arbitrarily short, the unique subgame perfect equilibrium is one in which HedgeFund will propose to keep an amount arbitrarily close to half the value of Team (or $3) at the outset and Entrepreneur will accept.[57] The equilibrium of $3 assumes uniform discount factors across parties and assets. With different assumptions, the numbers change, but the outcome is consistent: HedgeFund is able to capture part of the value of the firm over and above the value of Stadium.[58]

---

57. This is a standard Rubinstein bargaining model. See generally Ariel Rubinstein, Perfect Equilibrium in a Bargaining Model, 50 Econometrica 97 (1982). For an application of such a model in bankruptcy renegotiations, see Baird & Picker, Bargaining Model, supra note 56, at 312. This Article's model assumes that the bilateral negotiations are between the investor with the withdrawal right and those currently in control of the debtor, which in the typical case will include a creditor with control rights like Bank.

Baird and Picker's model focuses on HedgeFund's ability to exit. See id. at 329 (modeling bargaining problem as "two-person noncooperative game of altering offers with exit options"). What matters for the purposes of this Article, however, is not primarily HedgeFund's ability to exit, but rather Entrepreneur's inability to cramdown HedgeFund outside of bankruptcy. This Article refers to HedgeFund's ability to exit and its ability to resist cramdown collectively as its "withdrawal right."

58. For example, it seems reasonable to assume that the value of Team decays faster than the value of Stadium. If Team cannot get its financial house in order, it may quickly lose all its value. Stadium, however, will remain available for concerts regardless of what happens to Team. All that is lost is a few concert dates. Unlike Team, it is not a melting ice cube. In the limiting case in which the liquidation value of Stadium does not decay at all, HedgeFund always gets the value of Stadium and bargains with Entrepreneur (who works in concert with Bank) over the value of the franchise over and above the value of Stadium as a concert venue. This difference is the relevant pie, and the natural dynamics of bargaining will lead them to split it. With that assumption, the bargained-for share here would be $4 ($2 for Stadium plus $2 as half of the remainder). The intuition is that the nondecaying exit option is not up for grabs. It is like money in your pocket. This equilibrium is shown in Dalmazzo, supra note 56, at 419.

If it is assumed alternatively that the value of the exit option decays at the same rate as the value of Team, the ability to liquidate puts a floor on the bargaining game. Team and HedgeFund are dividing the value of TeamCorp between them. HedgeFund will never take less than the liquidation value of its collateral, but its threat to demand more is not credible. This is Baird and Picker's assumption. Baird & Picker, Bargaining Model, supra note 56, at 333. Baird and Picker did not consider the possibility that the value of the exit option decays at a different rate. But regardless of the outcome of any particular bargain, putting Stadium into a separate legal entity allows HedgeFund to capture a part of the going-concern value that would otherwise be divided between Entrepreneur and Bank.

B. *Bargaining in Bankruptcy Without Entity Partitioning*

When the initial deal is structured as a secured loan from HedgeFund to TeamCorp and TeamCorp files for bankruptcy, the outcome is completely different. Once the bankruptcy petition is filed, the automatic stay prevents HedgeFund from selling Stadium. In bankruptcy, Entrepreneur can propose a plan of reorganization that gives HedgeFund a share of Team that is worth the value of its collateral. The standard law-and-economics assumption is that the value should be the amount that HedgeFund would have received if it had exercised its non-bankruptcy foreclosure right,[59] but regardless of the yardstick one uses, the amount HedgeFund receives is tied to the value of Stadium, not Team as a whole. HedgeFund can argue that it is entitled to a share of the going-concern surplus, the synergy created by combining the other assets with Stadium, but this argument is hard to make. Even if it could be measured with precision, there is no metric by which to divide the going-concern surplus among multiple claimants.

What matters is that the Bankruptcy Code authorizes "cramdown."[60] Even if HedgeFund opposes the plan of reorganization, Entrepreneur can force HedgeFund to accept a share of the reorganized firm and cancel its security interest as long as one impaired creditor (in this case Bank) accepts the plan.[61] Even if HedgeFund is fully secured, the structure of the payment terms can be completely transformed. The value of this share need only equal the value of the asset in which it holds a security interest.[62]

C. *Bargaining in Bankruptcy with Entity Partitioning*

If the separateness of legal entities is meticulously respected in bankruptcy, a different result arises if the transaction is structured as a loan from HedgeFund to StadiumCo, and Entrepreneur places TeamCorp in bankruptcy. Because Stadium is housed in StadiumCo, TeamCorp can use Stadium only if it can cure past defaults and honor all the terms of the lease between StadiumCo and TeamCorp going forward, as shown below. The lease requires TeamCorp to pay StadiumCo $3, an

---

59. See Douglas G. Baird & Thomas H. Jackson, Bargaining After the Fall and the Contours of the Absolute Priority Rule, 55 U. Chi. L. Rev. 738, 782 (1988) (defending liquidation value as creditor's entitlement).

60. See supra note 40 (defining "cramdown").

61. 11 U.S.C. § 1129(a)(10) (2006).

62. More precisely, HedgeFund is entitled to retain its lien on Stadium and a stream of cash payments equal in value to its lien or their "indubitable equivalent." Id. § 1129(b)(2)(A). The circumstances under which Entrepreneur can avoid providing a lien are contested. See Anthony Sexton, Indubitably Uncertain: *Philadelphia Newspapers* and the Role of Valuation Uncertainty in Attempted Cramdown of All-Equity Plans, 28 Emory Bankr. Dev. J. 55, 73–79 (2011) (exploring courts' uncertainty in application of "indubitable equivalent" standard and arguments for different approaches).

amount sufficient to repay the loan from HedgeFund in full. The lease obligations are geared to the amount HedgeFund is owed, not to the value of Team or Stadium. Corporate formalities are strictly observed, but StadiumCo has no independent identity. The firm is still integrated in the Coasean sense—all assets are controlled and managed together.[63] Indeed, StadiumCo may have no operations and no employees. Its only activity consists of signing the lease.

Entrepreneur can try to file a bankruptcy petition on behalf of StadiumCo, but parties can structure things in a way that makes this hard.[64] And even if Entrepreneur could place StadiumCo in bankruptcy and impose a reorganization plan over its objection, that plan is supposed to maximize the value of StadiumCo, which requires it to insist that TeamCorp cure the defaults and assume the lease or bargain for the best deal that StadiumCo can get from TeamCorp.[65]

Even if the value of Team and Stadium were less than $3, HedgeFund can still insist on being paid everything it is owed. HedgeFund's withdrawal right gives it a veto over any reorganization of the team. While bankruptcy forces creditors of the same debtor to stay their hands and work together cooperatively, it does not oblige third parties to deal with a debtor, even if everyone knows that a deal between them would be mutually beneficial. If one focuses on legal entities rather than the business, StadiumCo is merely a third party that is free to do

---

63. See supra note 12 and accompanying text (explaining Coasean firm).

64. The corporate charter of StadiumCo might provide, for example, that independent directors must sign any bankruptcy petition. HedgeFund can take steps to ensure that these directors never file bankruptcy petitions. See, e.g., infra notes 97–100 and accompanying text (discussing independent managers' role in In re General Growth Properties, Inc., 409 B.R. 43 (Bankr. S.D.N.Y. 2009)). The parties can also create a structure such that the loan is made to a holding company that in turn owns StadiumCo and that HedgeFund is the only creditor of the holding company. A debtor with only one creditor may not be able to file a bankruptcy petition at all and, even if it does, may not be able to confirm a plan that impairs the rights of that creditor without its consent. See 11 U.S.C. § 1129(a)(10) (providing that plan can only be approved "[i]f a class is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider"). A court that is inclined to view the corporate group as the entity on which bankruptcy acts, however, might see matters differently. See infra Part IV.B (discussing judge's decision in In re Charter Communications, 419 B.R. 221 (Bankr. S.D.N.Y. 2009), to treat sole creditor of affiliate entity as member of class of creditors of entire enterprise in joint plan).

65. Again, this assumes that one adopts an approach that respects corporate form. Judge Gropper in *General Growth* explicitly rejects the idea that the bankruptcy of StadiumCo must focus on maximizing StadiumCo's value when it is solvent. See 409 B.R. at 63 (noting decision of "whether to file a Chapter 11 petition can be based in good faith on consideration of the interests of the group as well as the interests of the individual debtor").

business with TeamCorp as it wishes. Bankruptcy law leaves its exit option unaffected.[66]

D. *The Bargained-For Share*

That the amount HedgeFund receives in bargain in the last scenario ($3) is equal to the amount lent (and the amount due under the lease from StadiumCo to TeamCorp) is an artifact of the numbers used. Imagine instead that the original loan from HedgeFund was $4 and TeamCorp owes $4 under the lease. Holding all the distressed numbers constant (enterprise value at $6 and asset liquidation value at $2), HedgeFund will still receive $3. TeamCorp will not assume the lease, but rather will bargain with HedgeFund and reach a deal where it still pays $3. This amount is HedgeFund's bargained-for share of the enterprise value and thus independent of the amount of the initial loan.

If the enterprise were worth $7 and the initial loan $3 (and the lease obligation still $3 as well), the amount of the loan would put a ceiling on the ultimate payout. TeamCorp has the right to assume the obligations under its lease with StadiumCo and pay it according to the lease terms. The amount of bargaining power HedgeFund enjoys turns on these terms. The longer the lease and the fewer events of default, the less power HedgeFund will enjoy.

HedgeFund's bargaining power comes not merely from being able to insist on being paid $3, but on being paid according to the terms of the lease. A secured creditor in bankruptcy can be paid in any coin as long as it is equal to the value of its secured claim.[67] By contrast, a lessor can insist on being paid in the coin for which it bargained. In the example, it was assumed that TeamCorp can pay what it owes HedgeFund in cash. That is not likely to be the case. TeamCorp is almost certainly liquidity-constrained at the moment of bankruptcy. If TeamCorp cannot meet the obligations in the contract or if nonbankruptcy law prevents it from assuming the contract, it will need to bargain with HedgeFund. In

---

66. In the actual *Dodgers* case, things appear to have played out this way with respect to the parking lot. The parking lot never entered bankruptcy. See supra note 6. After reorganization, the lease of the parking lot (with its $14 million annual payment) was not only respected in full but its term was extended from twenty-five to ninety-nine years. Some early reports suggest that the owners of the parking lot may have negotiated for new flexibility in future development rights. As a result the stakeholders in the parking lot suffered no loss from the reorganization. Indeed some of them may have benefited. It is noteworthy that, while McCourt's ownership of the team and the stadium do not continue after the bankruptcy, he still owns a fifty-percent interest in the parking lot. Bill Shaikin, *Parking Costs: $14 Million a Year*, L.A. Times, May 5, 2012, at C1. It is likely that his control over withdrawal rights of the parking lot played a role in the bargaining that went on with respect to the rest of the enterprise.

67. See 11 U.S.C. § 1129(b)(2)(A) (requiring those holding secured claim to receive note for value of collateral and lien or proceeds from sale of collateral, or their "indubitable equivalent").

driving that bargain, HedgeFund is not limited by the amount it was owed under the lease. The amount it receives in the end turns on the debtor's liquidity and the asset value relative to enterprise value. If the franchise is worth $10, the full loan payment is $3, and the asset is worth $2, then HedgeFund gets $3 if TeamCorp can meet the terms of the original contract[68] and $5 if it cannot.[69]

## III. The Costs of Withdrawal Rights

Withdrawal rights will inure to everyone's benefit only if the costs that come with them can be contained. For its part, an investor that has a withdrawal right will have every incentive to exploit the right once triggered. It will try to capture a part of the value of the firm as a going concern. The investor will possess this incentive even when the default is merely a technical one that has nothing to do with any of the difficulties that the firm actually faces. Problems seem even more likely to arise when multiple investors are in the picture and a bargain must be struck among all of them. Ensuring that parties can bargain effectively in such environments is harder. This Part explores these two potential costs and suggests that they are smaller than they might at first appear.

### A. *Limiting the Problem of Technical Default*

Because HedgeFund can exercise its withdrawal right only if things go badly, it has only a limited ability to use the leverage that the withdrawal right gives it. Entrepreneur can protect itself by ensuring that the business has the resources needed to pay HedgeFund in full. Similarly, while HedgeFund may have an incentive to call a technical default just to get a chance to negotiate for the going concern, its ability to do so is quite limited. HedgeFund's legal relationship is with StadiumCo. Its abil-

---

68. To be precise, StadiumCo receives the payments under the lease. The terms of the deal between HedgeFund and StadiumCo will determine how much of this revenue HedgeFund receives.

69. In all of these examples, Stadium's liquidation value is less than the bargained-for share that HedgeFund could capture. Consider now the case in which the liquidation value exceeds the bargained-for share. HedgeFund lends $8 to StadiumCo, and StadiumCo leases Stadium to TeamCorp for $8. TeamCorp encounters financial distress. The business as a going concern is worth $10. Without Team, Stadium's next best use is as a concert venue that will bring expected revenues of only $6. The business has a going-concern surplus of $4, the difference between the value of the operating business and the liquidation value of its only asset. What will be the outcome of bargaining between HedgeFund and Team?

If it is assumed, as above, that the assets have uniform discount factors, then the liquidation value is a floor on the bargaining and HedgeFund demands and gets $6. If it is assumed the enterprise value decays while Stadium's liquidation value does not, then HedgeFund takes the $6 and bargains for half the remainder and takes a total of $8. See supra note 58 (discussing effects that varied rates of value decay have on bargaining dynamic).

ity to declare a default on StadiumCo does not necessarily give it any right to interfere with TeamCorp's ability to continue to use Stadium. All TeamCorp needs to do is comply with the terms of the lease.

Entrepreneur enjoys two levels of protection. First, Entrepreneur takes steps to ensure that StadiumCo does not default on its obligation to HedgeFund in the first instance. Among other things, Entrepreneur can protect itself against this by avoiding or curing technical defaults (or limiting the terms of default in the original agreement) or maintaining solid credit to allow StadiumCo to pay off or refinance the loan.

Moreover, the parties can structure the deal to ensure that even when HedgeFund forecloses on Stadium because of a default of StadiumCo, it lacks the ability to disturb the lease with TeamCorp.[70] Only TeamCorp's failure to pay the rent on Stadium would terminate the lease. HedgeFund's acceleration of the debt against StadiumCo will give it no more than a right to take over StadiumCo. It will get assets that it financed in the first place, and those assets will be subject to a lease with TeamCorp.

In this way, legal separation actually provides added protection for the debtor as well as the creditor. When Stadium is an asset within TeamCorp with no related-party contracts or leases, a technical default on a security interest would require a bankruptcy to avoid giving HedgeFund the ability to withdraw. The existence of the separate legal entity, StadiumCo, can make HedgeFund's accession to Stadium a non-event as far as TeamCorp is concerned.[71]

## B. *Multiple Parties and the Risk of Bargaining Failure*

The stylized facts involving TeamCorp and HedgeFund illustrate bilateral bargaining. Any reorganization of a large firm will involve multiple players. Modeling this bargaining is harder.[72] Moreover, when many of the players control assets that contribute to the value of the firm as a

---

70. In other contexts, it is common for parties to use a Non-Disturbance Agreement. It can be part of a larger Subordination and Non-Disturbance Agreement (SNDA) that sets out the relationship between the lender and the lessee. The nondisturbance part of the agreement is a promise that the lease will remain valid even after a creditor forecloses on the property. The point here is not the precise mechanism parties choose, but rather that the trigger empowering HedgeFund to take control over the parking lot can be finely tuned and dramatically limit the ability of HedgeFund to hold up Entrepreneur.

71. All that said, the higher the risk of technical default (and the more costly it is to contract against it), the more one would expect parties to adopt traditional security interests. Cramdown protects against this form of misbehavior by creditors where there is a traditional security interest.

72. It is possible that a unique equilibrium does not exist. Without limiting assumptions, a Rubinstein model for multilateral bargaining does not produce one. See Vijay Krishna & Roberto Serrano, Multilateral Bargaining, 63 Rev. Econ. Stud. 61, 61–62 (1996) (reconciling Rubinstein bargaining model with multilateral bargaining); Sutton, Non-Cooperative Bargaining, supra note 56, at 720–21 (finding certain ranges of discount factors do not lead to unique equilibrium).

going concern, there is the potential for an empty core problem.[73] Many coalitions of investors are possible, and none of them may be stable.[74] But even if one cannot model this process with precision, one can observe that the ability to tailor the extent of the bankruptcy cloak allows parties to exercise control over this problem.

Firms that enter bankruptcy today are rarely in freefall. To return to the example, Bank and Entrepreneur will typically begin their negotiations long before the petition is filed. If a negotiation with HedgeFund would be too costly or introduce too great a risk of bargaining failure, Bank can provide the financing needed to keep the lease of Stadium in place or allow someone else to provide it.[75] There is no risk of bargaining failure because HedgeFund will be a spectator to the bankruptcy and nothing more. Altering the dynamics of an impending bankruptcy is costly, but the ability to alter these dynamics means that the risk of bargaining failure in bankruptcy is one that can be controlled.[76]

If courts respect entity partitioning, the debtor can eliminate the costs associated with bargaining with someone who holds withdrawal rights by paying that investor off. If Bank and Entrepreneur foresee a major risk of bargaining failure, they can jointly agree to assume the contract with Stadium (and thus pay off HedgeFund). This is true even if Bank is a creditor of a partitioned entity itself. It may be that the major players agree to simplify the bargaining by financing the debtor's assumption of contracts with multiple small entities. This works especially well where the small players' loans are less than their bargained-for share.[77] By providing liquidity for the payments, Bank can increase the

---

73. See Douglas G. Baird & Robert K. Rasmussen, Antibankruptcy, 119 Yale L.J. 648, 688–92 (2010) (defining empty core problem as situation in which no focal point exists around which to form agreement).

74. See id. at 690 n.190 ("An 'empty core' exists when three or more parties cannot reach a stable agreement with each other because some other agreement always exists that at least one party prefers.").

75. In the Dodgers bankruptcy, for example, debtor-in-possession financing was needed in part to make payments to parking lot and its creditors. See Declaration of Ingram, supra note 7, at 8–12.

76. This strategy would resemble bargaining models where multiple parties can conduct sequential binding bilateral negotiations. See Suchan Chae & Jeong-Ae Yang, An N-Person Pure Bargaining Game, 62 J. Econ. Theory 86, 87–88 (1994) (envisioning one player promising certain share of overall pie to others in succession in exchange for giving up their negotiating rights); Krishna & Serrano, supra note 72, at 62–64 (describing "exit" game where one player's acceptance of proposal removes itself from negotiations, leaving other players to haggle); Sutton, Non-Cooperative Bargaining, supra note 56, at 721–23 (modeling negotiations between players who respond to proposals in turn, with earlier responders being bound unless later responders veto entire deal). The dynamics of that bargain is such that negotiations will reduce the risk of bargaining failure without allowing the debtor to selectively allocate shares of the pie.

77. The ability to assume the contract is the key. In the terms of a bargaining model, it creates the ability, not usually present, to create a binding side deal. See Chen-Ying Huang, Multilateral Bargaining: Conditional and Unconditional Offers, 20 Econ. Theory

size of the pie that it is bargaining for and the other creditors get their full payment.[78]

In this system, the opportunity for debtor misbehavior is limited. The entity that is "bought off" gets the amount it is owed under the contract and has no ability to reject that deal. To the extent that the entity is losing some bargained-for share of the going concern, it is only because the exit option worked and ensured that it was paid in full. To be sure, the debtor might favor one creditor over another when no creditor's bargained-for share was greater than its contract share. The potential for this misbehavior is limited, however. First, and most importantly, the debtor will likely need to have financing by the major creditors of the estate, and they have an incentive to curb this misbehavior. Second, bargaining models suggest no benefit to the debtor from such favoritism. The debtor just reduces its own share of the going concern.[79] There is a risk that management (as debtor's agent) will try to obtain a side payment from the favored creditor,[80] but any decision to assume a contract will go before the judge and can be challenged.[81]

---

401, 401–04 (2002) (modeling scenario where one player makes private unconditional offer to buy out another's proposal rights that would not require other players' consent); Sandeep Baliga & Roberto Serrano, Multilateral Negotiations with Private Side-Deals: A Multiplicity Example, 3 Econ. Bull., no. 1, 2001, at 1, 1 (approaching problem of multi-party negotiations in context of joint and several liability). It will not make sense to buy out parties whose bargained-for share is less than the amount they are owed unless the premium for avoiding bargaining failure makes up the difference.

78. A similar strategy appears to have been employed by Major League Baseball in the Dodgers bankruptcy. One of the largest fights in that bankruptcy was over whether Major League Baseball was to provide debtor-in-possession financing or whether the team could obtain it from a new lender. See In re L.A. Dodgers LLC, 457 B.R. 308, 311 (Bankr. D. Del. 2011) (noting Major League Baseball objected to terms proposed by new lenders). Major League Baseball was willing to make a loan on better terms than any lender in the market, perhaps because the cost of providing a below-market loan was more than offset by the more powerful bargaining position it would enjoy without another large player on the scene who also possessed withdrawal rights. Only Major League Baseball could make this below-market offer because it was going to be part of the bargaining in every event: Its participation as lender simplified the bargaining dynamic in a way that no other lender's participation could.

79. See Huang, supra note 77, at 401–04 (modeling buyout of one party in three-party bargain).

80. Such side deals are more common when a lender seeks to confirm a plan and asks for the support of the existing managers and at the same time offers continued payments, whether the manager continues working for the firm or not. See, e.g., In re Bush Indus., Inc., 315 B.R. 292, 304–05 (Bankr. W.D.N.Y. 2004) (noting lender's promise to continue paying CEO where CEO has already moved out of state and has right to quit after one year and continue receiving same payment for another three).

81. See, e.g., id. at 304–07 (finding plan proposed in bad faith because, among other things, of promise to continue paying CEO and releasing him from various debts owed to firm). Also misbehavior by debtor's management is most likely to occur when things are particularly bad. That is likely to correlate with a lack of liquidity. But, as noted, a lack of liquidity will be a limiting constraint on the ability to favor creditors here.

The danger that the debtor will favor some creditors over others looms largest when courts partially disregard the characteristics of legal entities. For example, a court might allow the debtor to bring some legal entities into a bankruptcy proceeding while leaving others out and not fully collapsing the corporate structure. Such an alteration of the bargaining dynamics is more problematic. The choice between who is in and out is solely in the debtor's hands and is not constrained by law or liquidity. Priority among investors arises not out of the original bargain, but because of jockeying for position on the eve of bankruptcy. This Article returns to the issues such preferences raise in the next Part.

## IV. WITHDRAWAL RIGHTS AND THE BANKRUPTCY CODE

Judges are reluctant to disregard legal form entirely. They rarely permit substantive consolidation over the strong objection of any of the major players.[82] Nevertheless, judges are tempted to overlook the niceties of corporate form and tend to treat investors in separate entities as if they were secured creditors of a single debtor. As shown in this Part, they administer the cases jointly and make decisions that in fact look to the value of the corporate group, rather than that of the individual entities. Indeed, there is a tendency among the most able bankruptcy judges, where ambiguities in the law permit, to treat those who invest in a common enterprise subject to common control and management as if they were investors of a common debtor.[83] Apart from respecting the priority rights created by putting assets in separate corporations, the firm is treated as if it were a single corporate entity. Investors in each entity are treated as investors in the whole. This approach may give us the worst of both worlds. By failing to acknowledge squarely the ability to opt out that existing law allows, the law may lose the advantages of an opt-out regime without securing the advantages of a regime in which all investors are required to participate.

---

82. See In re Owens Corning, 419 F.3d 195, 215 (3d Cir. 2005) ("[S]ubstantive consolidation should be used defensively to remedy identifiable harms, not offensively to achieve advantage over one group . . . ."). It should be noted, however, that substantive consolidation is commonplace when the major players all find it in their interest. See William H. Widen, Corporate Form and Substantive Consolidation, 75 Geo. Wash. L. Rev. 237, 252 (2007) [hereinafter Widen, Corporate Form] (observing, as empirical matter, negotiated Chapter 11 reorganization plans frequently employ substantive consolidation); William H. Widen, Report to the American Bankruptcy Institute: Prevalence of Substantive Consolidation in Large Public Company Bankruptcies from 2000 to 2005, 16 Am. Bankr. Inst. L. Rev. 1, 8–9 (2008) (finding in course of larger study that majority of large public bankruptcy cases used substantive consolidation).

83. The manifestation of this trend is most explicit in Judge Gropper's opinion in *General Growth*, which is discussed at length in Part IV.A below. See In re Gen. Growth Props., Inc., 409 B.R. 43, 61 (Bankr. S.D.N.Y. 2009) (declining to examine issue of good faith as if each debtor were independent, instead evaluating based on "interests of the Group as a whole").

A. *Withdrawal Rights and* General Growth Properties

Withdrawal rights were the central focus of the *General Growth* bankruptcy.[84] General Growth Properties was a complicated corporate group consisting of a parent, which was a publicly traded real estate investment trust, and hundreds of subsidiaries and affiliates, some wholly owned and others not.[85] But even though made up of many legal entities, General Growth operated as a single enterprise. It owned or managed 200 shopping centers in forty-four states in addition to several commercial office buildings and five master-planned communities.[86] General Growth employed several thousand people to manage these assets exclusive of those employed at the various property sites.[87] It enjoyed the economies of scale associated with the centralized leasing and management of these properties.[88] National retailers were attracted with system-wide deals, and once brought into the fold, they were limited in their ability to misbehave at any one site because of potential repercussions elsewhere. Maintenance and construction planning were controlled centrally. In addition, all the cash was centrally managed.[89]

In the wake of the financial crisis of 2008, the company as a whole found itself in financial distress. Quite a number of the subsidiaries, however, remained in sound financial health. These included Harborplace, the premier shopping mall in Baltimore, close to its Inner Harbor.[90] Harborplace contained a variety of stores, from a Gap and an Urban Outfitters to Ann Taylor and Brooks Brothers, and from a Sunglass Hut and Bath & Body Works to Swarovski.[91] Harborplace, like a number of other highly successful shopping malls, enjoyed positive cash flows and was able to service all of its debt.[92] When General Growth entered bankruptcy, investors in Harborplace and other solvent subsidiaries sought to prevent their subsidiaries from entering bankruptcy and, once

---

84. For an account of General Growth's corporate structure and capital structure, see id. at 47–53.

85. Id. at 47.

86. Id.

87. Id. at 47–48.

88. Id. at 48.

89. Id.

90. Harborplace & The Gallery, General Growth Properties, http://www.ggp.com properties/mall-properties/harborplace-the-gallery (on file with the *Columbia Law Review*) (last visited Oct. 9, 2012).

91. See Harborplace & The Gallery—Tenant Information, General Growth Properties, http://www.ggp.com/properties/tenant-list/harborplace-the-gallery (on file with the *Columbia Law Review*) (last visited Oct. 9, 2012).

92. See *Gen. Growth Props.*, 409 B.R. at 55 ("Debtors did not dispute that the . . . shopping center business had a stable and generally positive cash flow and that it had continued to perform well, despite the current financial crisis.").

there, sought to prevent any of their assets from being used to finance the reorganization of the entity as a whole.[93]

The threshold question in the case was whether the bankruptcy filing of a healthy and solvent subsidiary was in good faith when its purpose was to protect the health of the larger corporate group of which it is a part.[94] This question turns on whether one can take into account the health of the corporate group as a whole, or whether one's focus should be limited to the debtor itself. The second question turned on the extent to which Harborplace's assets could be used to fund the reorganization of the rest of General Growth.[95] The investors in Harborplace insisted that it was under no greater obligation to help out the rest of General Growth than it was to help any stranger in financial distress.[96]

Harborplace's operating agreement provided that independent managers had to approve any bankruptcy filing.[97] The independent managers were picked in a way to make it extremely unlikely that they would ever agree to such a filing.[98] Moreover, the operating agreements or charters of the various subsidiaries provided explicitly that the duty of the

---

93. See id. at 54–55 (chronicling procedural posture).

94. See id. at 55 (noting several motions filed by lenders of subsidiaries arguing cases "should be dismissed because they were filed in bad faith in that there was no imminent threat to the financial viability of the Subject Debtors").

95. See id. ("Many of these parties argued that it would be a violation of the separateness of the individual companies for the Debtors to upstream cash from the individual properties for use at the parent-level entity.").

96. See The Prudential Insurance Co. of America's & Prudential Retirement Insurance & Annuity Co.'s: (I) Objection to the Debtors' Motion Requesting (A) Entry of (i) Interim & Final Orders (a) Authorizing the Debtors' Use of Cash Collateral & Granting Adequate Protection Therefore Pursuant to Sections 361 & 363 of the Bankruptcy Code & Bankruptcy Rule 4001, & (b) Modifying the Automatic Stay, & (ii) a Final Order Authorizing Borrowing With Priority Over Administrative Expenses & Secured by Liens on Property of the Estates Pursuant to Section 364(c) of the Bankruptcy Code, & (B) Scheduling a Final Hearing on Each Requested Final Order & (II) Request for (A) Determination that Certain Debtors are Single Asset Real Estate Debtors, (B) Adequate Protection, (C) Segregation & Accounting for Its Cash Collateral, (D) Entry of an Order Recognizing the Establishment of All Prerequisites for a Section 507(b) Claim, & (E) Granting Relief from the Automatic Stay or Dismissing Cases of Certain Debtors for Cause at 24, *Gen. Growth Props.*, 409 B.R. 43 (No. 09-11977) ("This would allow the Debtors to take money from the Prudential Borrowers to pay the debts and obligations of another Debtor.").

97. See *Gen. Growth Props.*, 409 B.R. at 63 ("Article XIII (p) requires the 'unanimous written consent of the Managers of the Company, including both of the Independent Managers' before the SPE can take any action to file or consent to the filing, as debtor, of any bankruptcy proceeding.").

98. This mechanism failed to keep Harborplace out of bankruptcy because the managers of General Growth were able to take advantage of a provision in the operating agreement that allowed them to replace the independent managers. The managers did not even know they had been removed until after the bankruptcy petition was filed. Id. at 67–68.

managers or directors[99] was to maximize the value of the subsidiaries, not General Growth.[100]

Allowing Harborplace to file for bankruptcy was tantamount to limiting the withdrawal right for which the investors in Harborplace had bargained. There was no suggestion that the investors wanted to take Harborplace away from General Growth. It seems Harborplace was worth more under General Growth's management than under anyone else's. To be sure, Harborplace is not as much a firm-specific asset as the parking lot is for the Dodgers. Nevertheless, the basic dynamic is the same.[101] The thousands who work at General Growth and the systems it has put in place have no value without properties to manage. These systems have been tuned, to at least some extent, to accommodate the particular challenges of running Harborplace, with its many businesses and hundreds of residents. The synergy that exists between Harborplace and General Growth gives the investors in Harborplace the ability to extract part of the overall value of General Growth as a going concern. This is a power that they would not have if General Growth owned Harborplace outright and the investors merely had a security interest in it.

The managers of General Growth make decisions that affect the overall welfare of both General Growth as a whole and Harborplace in particular. By contrast, Harborplace's investors care about the actions of the managers that affect Harborplace. But those actions are difficult to monitor and hard to control through contract. General Growth might mismanage Harborplace or make changes that reduce its liquidation value solely for the purpose of strengthening General Growth's expected payout from cramdown. And it may do so in ways that the investors in Harborplace cannot detect.

General Growth adds value to the properties it controls and manages because of the expertise it possesses. Monitoring the exercise of that expertise is hard. The monitor is unlikely to have the same expertise, and the decisions of management may not be observable. This problem exists whenever specialized human capital is a primary asset of an enterprise. But with their withdrawal rights, the investors in Harborplace have less need to observe what the managers of General Growth are doing. Even in bad states of the world, the managers will have an incentive to ensure that the Harborplace investors are paid everything to which their contract entitles them, even when there is not enough to pay others.

---

99. Because many of the subsidiaries were limited liability companies, they were governed by operating agreements rather than by corporate charters or bylaws and run by "managers" who served a similar role to corporate directors.

100. See *Gen. Growth Props.*, 409 B.R. at 63–64 (explaining subsidiary operating agreements provided independent managers "shall consider only" interests of subsidiary and its creditors in making decisions, including decision to file bankruptcy).

101. See supra Part II (explaining bargaining dynamics).

On the other side of the equation, there are risks of bargaining fail-ure and opportunistic behavior by Harborplace. But these are likely to be small. The going-concern surplus associated with keeping Harborplace in General Growth derives from the economies of scale in managing a large number of properties at the same time. Harborplace has a relatively high alternate use. Moreover, the slice of General Growth's value as a going concern that withdrawing Harborplace can destroy is small relative to the entire enterprise.[102] Withdrawing Harborplace and putting it under other management will not shut down General Growth, but the incentive for General Growth to avoid overall distress will persist as its value to the going concern is still greater than its liquidation value and General Growth's managers have an incentive to ensure that they do not have to bargain part of it away to the Harborplace investors.[103]

The bankruptcy judge in *General Growth*, however, was inclined to see Harborplace and the other solvent entities as part of an integrated whole and thus to slight the withdrawal right.[104] In his view, the corporate struc-ture had the effect of giving the investors in Harborplace priority with respect to those assets, but it did not allow them to withdraw from the reorganization.[105] In his approach, the judge followed conventional prac-tice and expectations. Commentators were surprised that the devices de-signed to keep Harborplace out of bankruptcy did not work,[106] but there was nothing unusual in the way Harborplace was treated once it was in bankruptcy.

When a corporate group files for bankruptcy, there is typically only a single lawyer representing the many corporate debtors and a single cred-

---

102. Of course, if there is no synergy connecting General Growth and Harborplace, the withdrawal rights have no cost. The lack of synergy appeared to be present with an-other property that General Growth managed, Faneuil Hall. After bringing Faneuil Hall into the bankruptcy, General Growth offered it for sale in 2011. According to the Boston Redevelopment Authority, the buyer had a "closer fit" because of its experience with "his-toric marketplaces." See Jenn Abelson, N.Y. Firm in Deal for Faneuil Hall Shops, Bos. Globe (May 10, 2011), http://www.boston.com/business/articles/2011/05/10/ny_firm_in_deal_for_faneuil_hall_shops (on file with the *Columbia Law Review*) (discussing General Growth's sale of Faneuil Hall lease).

103. As Bolton and Scharfstein note, there is often a trade-off between risk of bargaining failure and improved ex ante incentives to avoid financial distress. See Bolton & Scharfstein, supra note 32, at 2 (tying manager's incentive to strategically default to expected liquidation value of firm).

104. 409 B.R. at 63 ("[A] judgment on an issue as sensitive and fact-specific as whether to file a Chapter 11 petition can be based in good faith on consideration of the interests of the group as well as the interests of the individual debtor.").

105. See id. at 69 (explaining creditors' rights do not include avoiding bankruptcy but rather avoiding substantive consolidation that would eliminate their priority in bank-ruptcy).

106. See W. Rodney Clement Jr. & H. Scott Miller, *General Growth*: Special Purpose Entities (Barely) Survive First Bankruptcy Test, Prob. & Prop., Mar.–Apr. 2011, at 31, 32 (observing decision has "led some to conclude that SPEs were not quite the bankruptcy shield that lenders had envisioned them to be").

itors committee representing the creditors of the many different corporations.[107] A single plan of reorganization is proposed that provides for substantive consolidation of the many legal entities. More precisely, the plan calls for "deemed" substantive consolidation in which the entities are treated for purposes of reorganization as if they were collapsed. The plan of reorganization, however, provides for payouts to the various creditor groups that respect the priority that they would have enjoyed had there not been substantive consolidation. Put differently, the common practice reinforces the basic idea that the corporate structure is merely a means of providing for priority among creditors.[108] As long as the priority is respected, it does not matter whether there is substantive consolidation. Under this view, nothing turns on whether business is done as a single corporation or as a corporate group. It operates the same way, and the priority rights of its investors are identical. But if withdrawal rights in fact provide a means to curb ex ante misbehavior of managers, this approach may be mistaken.

The most telling lesson in *General Growth* may lie not in the treatment of the solvent entities that were brought into bankruptcy, but in those that were not.[109] In the current regime, where courts allow separate legal entities to be brought along in a bankruptcy at the whim of the debtor, the debtor's ability to modify the bargaining landscape is more problematic. A court's disregard for the separate legal entities gives the debtor an option to choose which entities have withdrawal rights and which do not, and that choice is essentially unreviewable. There are, of course, many legitimate reasons to keep some entities out of bankruptcy. Some subsidiaries may not be wholly owned, but may rather be a joint venture.[110] The financing of some ventures may be put at risk by a bank-

---

107. *General Growth* was an exception to this. In part because of the differing issues facing the parent corporation and its subsidiaries, including the challenge that the bankruptcy filings of General Growth's subsidiaries were in bad faith, separate law firms were retained to focus on the different levels of the economic enterprise. See Debtors' & Jointly Represented Debtors' Response to the United States Trustee's: (A) Objection to the Debtors' Application to Employ Kirkland & Ellis LLP as Co-Counsel for the Debtors & (B) Response to the Debtors' Application to Employ Weil, Gotshal & Manges LLP as Counsel for the Debtors at 5–7, *Gen. Growth Props.*, 409 B.R. 43 (No. 09-11977) (setting forth specific roles to be served by law firms and noting Weil's focus on enterprise level matters and Kirkland's focus on subsidiary issues such as "the resolution of various motions to dismiss certain . . . [subsidiaries'] chapter 11 cases").

108. See Widen, Corporate Form, supra note 82, at 244, 248 & n.32 (discussing "deemed consolidation" and "structural priority").

109. 409 B.R. at 47 n.6 (noting 388 of 750 subsidiaries filed for bankruptcy). Two notable subsidiaries that did not file bankruptcy, Water Tower Place and Towson Commons, are discussed below. See infra notes 117–119 and accompanying text.

110. *General Growth* relied crucially on the argument that the directors of a wholly owned entity have to pay attention to the group as a whole. 409 B.R. at 64–65. This does not apply when minority shareholders are also in the picture.

*COLUMBIA LAW REVIEW* [Vol. 113:1

ruptcy filing.[111] In others, the maturity of the debt may be far enough off that a bankruptcy filing brings no benefits.[112] But the differential treatment of withdrawal rights under existing law allows the debtor to direct the disfavored entities to file for bankruptcy but keep the favored entities out of bankruptcy. Indeed this may be what happened in the General Growth bankruptcy.

At the time of filing, General Growth had hundreds of subsidiaries.[113] Some had more complicated capital structures than others. Some were wholly owned, and some were partially owned.[114] And some were subject to complicated litigation. General Growth—presumably in an attempt to simplify the bankruptcy and the bargaining—had the less complicated entities file bankruptcy petitions.[115] The court fight revolved around the propriety of those filings, and the judge found them to be proper.[116] No great thought was attached to the significance of the various entities that did *not* file for bankruptcy. And the judge did not see any need to pull them into the bankruptcy.[117]

This approach creates a world in which the investor's withdrawal rights are respected if the managers choose to keep the entity that houses their collateral out of bankruptcy, but not otherwise. For example, compare the fate of the creditors of Harborplace to that of creditors of Towson Commons. Towson Commons was a smaller mall eight miles

---

111. In contrast to an ordinary executory contract, a lender's obligation to extend credit in the future cannot be assumed in bankruptcy. 11 U.S.C. § 365(c)(2) (2006).

112. When a loan is on favorable terms and is secured, the best course for the debtor may be to keep that loan in place. The Bankruptcy Code allows the debtor to do this. Id. § 1124(2). But if the relevant entity has no other debt and if the covenants do not otherwise limit the debtor, apart from its costs, bankruptcy may do no more than maintain the status quo.

113. *Gen. Growth Props.*, 409 B.R. at 47.

114. Id.

115. It appears that the Dodgers followed this strategy when it put the stadium entity into bankruptcy, but not the subsidiary holding the right to general admission ticket revenues. See supra notes 6–7 and accompanying text (discussing which entities of Dodgers were in bankruptcy). A bankruptcy that had to deal with hundreds of millions in securitized debt and the attendant difficulties of negotiating it would be much more complicated. The parties controlling the bankruptcy likely decided that this did not make sense.

116. *Gen. Growth Props.*, 409 B.R. at 72.

117. One notable example was Water Tower Place. It was kept out of the bankruptcy. Several years before the bankruptcy filing, the minority owner of that entity had sued for mismanagement by the majority owner (a subsidiary of General Growth). Motion for Order Pursuant to Sections 362 & 105(a) of the Bankruptcy Code & Bankruptcy Rule 7065 Enforcing or Extending the Automatic Stay or, Alternatively, Granting a Preliminary Injunction Enjoining the Urban Litigation Pending a Determination of the Relief Requested in this Adversary Proceeding & Memorandum of Law in Support Thereof at 9–10, *Gen. Growth Props.*, 409 B.R. 43 (No. 09-11977). General Growth never disclaimed Water Tower Place as part of the enterprise. Rather it filed a motion to stay the Water Tower litigation precisely because it was part of the enterprise and the litigation would complicate the reorganization. Id. But no one in control of General Growth's bankruptcy process ever attempted to bring Water Tower into it.

from Harborplace and was not brought into the bankruptcy.[118] Because Towson Commons did not file, its creditors could (and did) exercise their withdrawal rights by foreclosing and forcing a sale of the property for $28.5 million. In the end, it was those very lenders who purchased the property.[119] Thus, while the creditors of Harborplace sat on the sidelines with no bargaining power, the creditors of Towson Commons exited the relationship with collateral in hand. We confront the odd situation in which the entity that is economically flourishing and successful (Harborplace) enters bankruptcy, while the one that is distressed does not (Towson Commons).

Very few limitations are placed on the debtor's ability to choose between partitioned entities and their creditors. When legal entities are not fully respected, the debtor's choice is largely unconstrained.[120] In addition to giving the debtor the ability to prefer some investors over others, the differential treatment gives perverse incentives to those creditors. They have an incentive to create complications—such as initiating prebankruptcy litigation—to make it less likely that the debtor will want to bring them into a reorganization. The distribution of the debtor's assets again turns not on the bargain struck before the fact that was readily visible to other creditors but rather on decisions made on the eve of bankruptcy.[121]

## B. *Withdrawal Rights and* Charter Communications

Bankruptcy judges are not asked to endorse a general principle, but rather interpret particular provisions of the Bankruptcy Code. But judges' understanding of general principles drive the outcome. This understanding led the judge in *General Growth* to find that the filing was in good faith and that the directors could and were indeed obliged to look

---

118. See Sam Eckstein, Harbor Mall Owner Files Bankruptcy Due to Debt, Johns Hopkins News-Letter (Apr. 29, 2009), http://www.jhunewsletter.com/2009/04/29/harbor-mall-owner-files-bankruptcy-due-to-debt-12558 (on file with the *Columbia Law Review*) ("GGP also owns Towson Commons, which has not filed for bankruptcy."). It appears that Towson Commons may have been left out of the bankruptcy because it had little to add to the going-concern value of General Growth, and therefore General Growth was not concerned with its withdrawal. See Loni Ingraham, Decision on Towson Commons Auction Greeted with Optimism, Towson Times (Mar. 2, 2011), http://archives.explore baltimorecounty.com/news/111790/decision-towson-commons-auction-greeted-with-optimism (on file with the *Columbia Law Review*) (noting retail space at Towson Commons had been "vacant for some time").

119. See Ingraham, supra note 118 (detailing foreclosure and auction processes for Towson Commons).

120. Cf. supra notes 79–81 and accompanying text (contrasting constraints on debtor misbehavior of favoring one creditor over another when separate legal entities are treated as one enterprise with constraints from when they are treated separately).

121. Cf. supra note 49 and accompanying text (noting under bankruptcy tailoring approach, withdrawal rights are readily visible to investors before the fact).

to the interests of other members of the corporate group.[122] The same force can be seen at work in two key judicial decisions in the reorganization of Charter Communications. The first involved the question of how creditors of separate legal entities would be classified for purposes of approving the plan. The second involved the question of how the default of the primary debtor would affect creditors' rights against other solvent affiliates.

Charter Communications was the fourth largest cable television provider in the country.[123] Under the leadership of Microsoft cofounder Paul Allen, it possessed an elaborate capital structure and became seriously overleveraged.[124] In late 2008 and early 2009, Charter found itself unable to meet its obligations.[125] It proposed a restructuring of its debt that many of its creditors accepted, but some did not.[126]

The first issue of interest arose because one of its most recalcitrant creditors was the only creditor of a legal entity in Charter's corporate group.[127] The reorganization plan for Charter as a whole required restructuring this creditor's debt and doing this over its objection was difficult under existing law when it was the debtor's sole creditor.

Section 1129(a)(10) of the Bankruptcy Code provides that a court cannot confirm a plan unless at least one class of impaired claims approves the plan.[128] The recalcitrant creditor argued that this was a showstopper. As it was the only creditor of the relevant legal entity, no plan could be confirmed without its consent, and its consent, it promised, would never be forthcoming. That its debtor was part of a larger corporate group was irrelevant.[129] Nor did it matter that the legal entity was a holding company that was not an operating business and had no independent existence. Bankruptcy operated on legal entities, not on firms.[130]

The debtor insisted that the Bankruptcy Code, properly understood, required looking at the firm as a whole. The debtor argued that it was wrong to focus narrowly on a legal entity that was, by all accounts, seam-

---

122. See *Gen. Growth Props.*, 409 B.R. at 66–70.

123. JPMorgan Chase Bank v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns), 419 B.R. 221, 230 (Bankr. S.D.N.Y. 2009).

124. Id. at 232.

125. Id. at 233.

126. Id.

127. Id. at 266.

128. 11 U.S.C. § 1129(a)(10) (2006).

129. See *Charter Commc'ns*, 419 B.R. at 266 (noting creditor's argument that section 1129(a)(10) must be applied on per-debtor and not per-plan basis).

130. See Redacted Objection of Law Debenture Trust Co. of New York to the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code at 35–39, *Charter Commc'ns*, 419 B.R. 221 (No. 09-11435) ("[U]nless and until [subsidiary's] creditors . . . have been paid in full . . . no other creditors of any other entity can share in such distributions.").

lessly folded into the large cable and broadband business.[131] Because creditors of the larger corporate group overwhelmingly favored the plan, a narrow focus on a single legal entity that had one creditor was inappropriate. Chapter 11 was about preserving the value of the business as a whole, not about a holding company embedded inside of it.[132]

The bankruptcy judge accepted the debtor's argument:

[I]t is appropriate to test compliance with section 1129(a)(10) on a per-plan basis, not . . . on a per-debtor basis. Here, the evidence supports a finding that the business of Charter is managed . . . on an integrated basis making it reasonable and administratively convenient to propose a joint plan. That joint Plan has been accepted by numerous other impaired accepting classes, thereby satisfying the requirement of section 1129(a)(10).[133]

There is a little hand-waving here. While it may be "reasonable" and "convenient" to allow all investors in a firm to decide on the plan of reorganization, there is nothing in the Bankruptcy Code that deals explicitly with "joint plans" at all, let alone anything to suggest that the confirmation standards of a "joint plan" look to the firm as a whole rather than the legal entity. Treating the plans of all the legal entities as if there were one joint plan dampens withdrawal rights.

*Charter Communications* raised a second issue about the treatment of legal entities in a corporate group that is reorganized under the Bankruptcy Code. It involved the same objecting creditor and the same legal entity. The debtor was obliged to pay the objecting creditor in full because of the absolute priority rule.[134] There was, however, a dispute over the form that the repayment had to take. In particular, the debtor wanted to reimpose the terms of the original loan. (These were far more favorable to the debtor than what loan terms would be under existing market conditions.) For its part, the creditor wanted to exercise its right to terminate the loan and be paid its principal at the existing market rate. The creditor argued that the debtor had lost its right to reinstate the original terms of the loan because of an incurable default under the terms of the loan agreement.[135] The loan agreement included a covenant that a bankruptcy petition filed by any entity related to the debtor ter-

---

131. Reorganizing Debtors' Post-Trial Brief in Support of Confirmation of the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code at 85–87, *Charter Commc'ns*, 419 B.R. 221 (No. 09-11435).

132. Id.

133. *Charter Commc'ns*, 419 B.R. at 266 (internal citations omitted).

134. The absolute priority rule is the core bankruptcy principle that requires that all assets be "distributed in strict adherence to the contractual priority that exists for liquidation outside bankruptcy." Anthony J. Casey, The Creditors' Bargain and Option Preservation Priority in Chapter 11, 78 U. Chi. L. Rev. 759, 763–65 (2011) (examining effects of absolute priority and suggesting potential alternative priority rule).

135. *Charter Commc'ns*, 419 B.R. at 243.

minated the loan, and there were many such entities in Charter's corporate group.[136] Once such a default has occurred, it cannot be cured,[137] and incurable defaults, if enforceable, limit a debtor's reinstatement right.[138]

The Bankruptcy Code says nothing explicitly about defaults linked to the bankruptcy filings of third parties. It does, however, refuse to enforce defaults linked to the debtor's own insolvency or financial question.[139] Investors as a group are better off when the Bankruptcy Code renders unenforceable clauses that automatically terminate a contract merely because a bankruptcy petition is filed. Defaults should be triggered by events connected to the economic condition of the firm, not because of its need to use a collective bankruptcy proceeding to sort out issues among its investors.[140] But none of the investors have the ability to monitor the debtor and prevent such "ipso facto" clauses from creeping into agreements. By making such clauses unenforceable, the third party's withdrawal right is effective only if the debtor cannot meet its contractual obligations. As long as the third party is paid everything it is promised on exactly the same terms, it has nothing to complain about.

But again, the twist in *Charter Communications* was that the clause was triggered by the bankruptcy of a related entity and not the legal entity that owed the debt. The crucial legal question was whether bankruptcy law enforces such clauses when they are tied, not to the debtor itself, but to the insolvency of related entities. The lender argued that the Bankruptcy Code renders unenforceable only clauses tied to the bankruptcy of its own debtor, not the bankruptcy of other entities, even when those entities were part of the same corporate group.[141]

The ability to insist on new terms is a type of exit right. It gives an investor the ability to cancel the old deal and insist on a new one. The court in *Charter Communications*, however, rejected this argument, and again focused on the corporate group rather than on the specific entity. Reasoning that "Charter is an integrated enterprise, and the financial

---

136. See id. at 236 (noting loan covenant "referencing the ability of structurally subordinated companies in the capital structure to pay debts as they come due").

137. The cross-default of payment and subsequent bankruptcy filing of a related-entity debtor will be logically incurable—the bell cannot be unrung. More specifically, unless the creditors of that related-entity debtor can be paid in full immediately (unlikely if the related-entity debtor is insolvent), the cross-default cannot be cured.

138. 11 U.S.C. § 1124(2) (2006) (setting forth requirements for reinstatement).

139. Id. § 365(e)(1) ("Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated . . . .").

140. See supra note 2 and accompanying text (noting idea that bankruptcy proceeding makes investors better off as group).

141. See *Charter Commc'ns*, 419 B.R. at 250 (summarizing lender's argument).

condition of one affiliate affects the others," the court forced the lender to remain a lender under the original terms of its loan.[142]

V. WITHDRAWAL RIGHTS AND THIRD PARTIES

Investors possess other ways of creating withdrawal rights in addition to partitioning assets within a corporate group. Investors might be able to achieve the same outcome by slicing off a group of assets and offering ownership (but not control) to a third party. When the slice of assets are integral to the going concern of the enterprise, third-party ownership of the asset will provide the same withdrawal right and incentive alignment that HedgeFund enjoyed with respect to Team. Stakeholders can exercise withdrawal rights because bankruptcy sees them as third parties rather than investors.

Courts have typically distinguished between investors on the one hand and third parties on the other. The former must participate in the bankruptcy process, while the latter can deal with the debtor at arm's length. Courts today typically see the question turning on whether someone is a "true lessor" or a "true bailor" rather than a secured party. In such inquiries, sight of the role that withdrawal rights play is usually lost.[143] What matters should not be so much the attributes of the substantive right upon which courts typically focus. Instead, the important factors are whether the investors in the enterprise as a group understand the nature of the right and whether the party who possesses it can exercise it in a way that has the appropriate disciplining effect on the debtor before the fact. These are the attributes that the withdrawal right has when created through tailoring of the corporate form, and also the attributes that make it a useful tool for investors.

A. *Withdrawal Rights, True Lessors, and True Bailors*

Third parties who own an asset can insist on being paid according to the contract terms, and an investor can try to opt out of bankruptcy by recasting itself as a third party. The trends in bankruptcy cases discussed throughout this Article limit the ability of parties to do this. So do spe-

---

142. Id. at 251. The same judge who presided over *Charter Communications* reached a similar conclusion in the *Lehman Brothers* bankruptcy. See Lehman Bros. Special Fin., Inc. v. BNY Corporate Tr. Servs. (In re Lehman Bros. Holdings Inc.), 422 B.R. 407, 420 (Bankr. S.D.N.Y. 2010) (finding bankruptcy of related entity triggered rule against ipso facto clause).

143. Generally an agreement is deemed a security agreement, despite being characterized by the parties as a lease, if the consideration paid by the lessee is an obligation not subject to termination by the lessee and if several other conditions are met. See, e.g., WorldCom, Inc. v. Gen. Elec. Global Asset Mgmt. Servs. (In re WorldCom, Inc.), 339 B.R. 56, 63–75 (Bankr. S.D.N.Y. 2006) (analyzing whether agreement is lease or security agreement); In re Homeplace Stores, Inc., 228 B.R. 88, 92 (Bankr. D. Del. 1998) (outlining framework for determining if "lease" is security agreement).

cific rules about how the courts treat leases.[144] For example, in the sports franchise scenario, Team may organize itself as a single entity and sell Stadium to HedgeFund, which in turn leases it back to Team. If this deal structure were respected, HedgeFund could again largely insulate itself from the bankruptcy.

But the bankruptcy court might recharacterize HedgeFund as a creditor with a security interest in the stadium rather than a lessor. Once recharacterized as a secured creditor, the lessor has no ability to insist on enforcing the lease according to its terms.[145] In this context, courts have not focused on the question of when and under what circumstances a party should be able to enjoy a withdrawal right. Instead, they have focused more narrowly on the question of how many sticks in the Hohfeldian bundle[146] the owner-lessor must retain in order to be a true lessor rather than a secured creditor.[147]

In many instances, a firm will lease assets that are not highly specialized. In these cases, the difference between finding a transaction to be a lease or a secured transaction will not make much difference.[148] The debtor will have to pay market value even if it is a secured transaction,[149] and the debtor can reject the lease if the lease obligations are above market.[150] Regardless of whether it is a lessor or a secured creditor, the third party can receive no more than what the debtor would have to pay to acquire the same asset from someone else. There are times, however, when the leased asset is highly specialized. Here the characterization can make a big difference and the withdrawal right has the dynamic that has been discussed.

One example of this can be found in the *United Airlines* bankruptcy.[151] There the parties structured the financing of the terminal at

---

144. See, e.g., United Airlines, Inc. v. HSBC Bank USA, N.A., 416 F.3d 609, 618 (7th Cir. 2005) (finding transaction is "secured loan," not "lease" for purpose of section 365 of Bankruptcy Code).

145. Id. at 612.

146. See Wesley Newcomb Hohfeld, Some Fundamental Legal Conceptions as Applied in Judicial Reasoning, 23 Yale L.J. 16, 28–30 (1913) (defining property as combination of rights, privileges, powers, and immunities).

147. See supra note 144 and accompanying text (providing example of how courts apply recharacterization test).

148. To be sure, if the transaction is a true lease, the lessor will not face the same filing obligation that a secured creditor faces, but filing a U.C.C.-1 form is cheap, and well-advised lessors will file one in any event. See Douglas G. Baird & Thomas H. Jackson, Possession and Ownership: An Examination of the Scope of Article 9, 35 Stan. L. Rev. 175, 187–88 (1983) [hereinafter Baird & Jackson, Possession and Ownership] (noting attributes of lease or secured transaction have nothing to do with problem of "ostensible ownership").

149. 11 U.S.C. § 1129(b)(2)(A) (2006) (setting forth requirements that plan must provide for secured creditors).

150. 11 U.S.C. § 365(b) (setting forth debtors' rights to reject unexpired leases).

151. United Airlines, Inc. v. HSBC Bank USA, N.A., 416 F.3d 609 (7th Cir. 2005).

San Francisco airport as a lease.[152] Because the terminal is a tailored asset that United could not readily replace, the lessor would have been able to exact a share of United's value as a going concern had it been able to bargain. Judge Easterbrook recharacterized the lease as a secured loan,[153] and the lessor was therefore unable to use this ability to negotiate for a share of the going concern. Instead, United could continue its use of the facilities while making a fraction of the agreed-upon payments.[154]

Another example can be found in the automobile industry where it is common for carmakers to own their own tooling and lease them to their suppliers.[155] Plastech Engineering was a tier-one automotive-parts supplier that made injected plastic products for Ford, GM, and Chrysler.[156] It employed thousands and had annual sales of over $1 billion.[157] Much of the equipment Plastech operated was tooling specially designed for particular car models and so was worthless for any other use. Plastech encountered financial distress and could not pay its investors in full. It filed for bankruptcy.[158] Chrysler, along with other automobile manufacturers, had the right to withdraw tooling from Plastech and turn it over to another supplier. Chrysler argued that it was free to exercise this right, notwithstanding the bankruptcy filing.[159]

The relationship between Plastech and Chrysler is one of a sort that economists have been studying intensively for many decades. Vertical integration eliminates the tensions that arise when two different firms own assets that must be used in conjunction with one another.[160] Hence, it might be expected that a car manufacturer such as Chrysler would own Plastech outright. Because Plastech's assets are specific to Chrysler's cars, Chrysler should be their residual owner, everything else equal.[161]

But everything else is not equal. A firm such as Plastech enjoys economies of scale that allow it to make injected molding for a number of

---

152. Id. at 611.

153. Id. at 618.

154. Id.

155. See infra note 178 and accompanying text (listing examples).

156. Chrysler LLC v. Plastech Engineered Prods., Inc. (In re Plastech Engineered Prods., Inc.), 382 B.R. 90, 95 (Bankr. E.D. Mich. 2008).

157. Id.

158. Id.

159. Id. at 103–04.

160. See generally Sanford J. Grossman & Oliver D. Hart, The Costs and Benefits of Ownership: A Theory of Vertical and Lateral Integration, 94 J. Pol. Econ. 691 (1986) (developing theory of ownership based on curing distortions of ex post opportunistic behavior on ex ante investment by allocating ownership to one party); see also Benjamin Klein, Robert G. Crawford & Armen A. Alchian, Vertical Integration, Appropriate Rents, and the Competitive Contracting Process, 21 J.L. & Econ. 297, 298–99 (1978) (highlighting relationship-specific investments as situation prone to opportunistic behavior).

161. See Grossman & Hart, supra note 160, at 716–17 ("Integration is . . . optimal when one firm's investment decision is particularly important relative to the other firm's.").

different manufacturers. It might become vertically integrated with Chrysler or Ford or GM, but it cannot vertically integrate with all of them. To take advantage of economies of scale, Plastech needs to enter into contracts with multiple manufacturers,[162] and these contracts need to be designed in a way that minimizes the possibility that Chrysler will seek to take advantage of Plastech or vice versa.

If Plastech commits its capital to tooling useful only for making parts for Chrysler, Chrysler might be able to take advantage of it subsequently.[163] Contracts can minimize this hold-up threat, but they cannot eliminate it.[164] To prevent such advantage-taking, Plastech might require Chrysler to finance its acquisition of the tooling. With such financing, Plastech is not making an enormous relationship-specific investment that might put it at risk of hold-up behavior by Chrysler.

Such an arrangement, however, does not completely solve the problem. Even if Chrysler cannot hold up Plastech, Plastech may still be able to hold up Chrysler. The tooling is hard for others to recreate, and Chrysler's own assembly line depends on a steady stream of parts from Plastech. A small delay from Plastech could be costly. Perhaps because of such risks, in the automobile industry it is common for each automobile manufacturer to retain ownership of the tooling its suppliers use. The parties capture the benefit of customized tooling, but with fewer risks of advantage-taking. Plastech loses the ability to threaten to shut down Chrysler to the extent that Chrysler has the ability to remove the tooling and give it to another supplier.

By the common account,[165] even this solution is imperfect. When there are different owners of assets that are most valuable when used together, one can minimize the hold-up problems, but one cannot elimi-

---

162. The limits that economies of scale and scope can place on vertical integration occur in many contexts. John Morley provides an interesting analysis of this impact in the investment fund industry. See John Morley, The Separation of Investments and Management 3 (Mar. 1, 2012) (unpublished manuscript), available at http://www.law.yale.edu/documents/pdf/cbl/Morley_The_Separation_of_Investments_and_Management.pdf (on file with the *Columbia Law Review*) (arguing that separating investment and management is necessary to reduce resulting liability and risk spillovers as well as to limit managerial conflicts of interest).

163. See Grossman & Hart, supra note 160, at 692 (noting "contractual relationship between a separately owned buyer and seller will be plagued by opportunistic and inefficient behavior" where "asset specificities" exist); Klein, Crawford & Alchian, supra note 160, at 298 (noting ways in which relationship-specific investments are prone to opportunistic behavior).

164. See Klein, Crawford & Alchian, supra note 160, at 325–36 (suggesting ways in which opportunistic behavior can be mitigated).

165. See Philippe Aghion & Richard Holden, Incomplete Contracts and the Theory of the Firm: What Have We Learned over the Past 25 Years?, 25 J. Econ. Persp. 181, 183–85 (2011) (summarizing incomplete contract and vertical integration literature).

nate them entirely.[166] When Chrysler owns the tooling, it has the ability to withdraw the assets and use this threat to capture investments that Plastech has made in the relationship. Plastech may in turn underinvest in the relationship, such as by buying equipment that can be readily used to make other products.

The dynamics explored in this Article, however, suggest that the hold-up costs may not be as large as commonly supposed.[167] As long as the ability to withdraw the tooling is state-contingent, Plastech can protect itself by investing resources to ensure that this state never materializes.[168] Moreover, these investments (such as hiring better managers and otherwise ensuring Plastech stays out of financial distress) may themselves be mutually beneficial. The withdrawal right, in other words, is sufficiently tailored so that the opportunity to capture going-concern value produces healthy incentives. Far from being necessary evils, they may be beneficial.[169]

From the perspective of traditional bankruptcy theory, Chrysler is as much an investor in the venture as someone who provided Plastech with the capital to buy its other equipment. Chrysler is retaining the same rights for which HedgeFund would bargain if it were providing the financing for the equipment and insisted that the equipment be put in a separate legal entity.

Just as the court in *General Growth* was inclined to treat investors in Harborplace as if they were secured creditors of General Growth as a whole,[170] bankruptcy judges may be inclined to treat Chrysler in a way that slights its withdrawal right. Even if ultimately unwilling to recharacterize Chrysler's right as a security interest or otherwise find some other way to deny it the ability to withdraw the equipment, the bankruptcy judge can delay lifting the automatic stay at the very outset of the case just to ponder the question for a time.[171]

A delay of several months effectively deprives Chrysler of its ability to enjoy the benefits that come with its withdrawal right. As seen with HedgeFund and StadiumCo, when the highest and best use of Chrysler's

---

166. See supra note 163 (noting hold-up problem associated with relationship-specific assets).

167. See supra Part II.C (discussing bargaining dynamics in bankruptcy with entity partitioning).

168. See supra notes 32, 33 and accompanying text (explaining state-contingent withdrawal rights).

169. Again, there is nothing revolutionary in this observation. The basic mechanism of structuring state-contingent rights to substitute for costly monitoring is well known. See Aghion & Bolton, supra note 32, at 486 (emphasizing that debt's role in facilitating monitoring arises out of entrepreneur-investor control allocation that debt induces).

170. See supra Part IV.A (analyzing *General Growth*).

171. See Chrysler LLC v. Plastech Engineered Prods., Inc. (In re Plastech Engineered Prods., Inc.), 382 B.R. 90, 109 (Bankr. E.D. Mich. 2008) (explaining that competing interests balancing analysis may change later, compelling different result).

tooling is in Plastech, then the tooling will likely remain with Plastech regardless of whether Chrysler can exercise the withdrawal right. The ability to lift the stay will ordinarily affect the bargaining dynamics, not the ultimate outcome.[172] There is, however, a risk of bargaining failure and the loss of going-concern value that comes with it.[173] This risk is not trivial, but it should be appropriately discounted and weighed against the other costs of limiting Chrysler's ability to assert its withdrawal right.

This discussion focuses on the benefits that withdrawal rights bring even when Chrysler's removal of the tooling would destroy the synergy that existed between the tooling and Plastech's assets. Their benefits are even greater when everyone would be better off if Plastech were shut down and each carmaker bore the short-term costs of removing its tooling and giving it to another supplier. The inability of Plastech to reach a deal with Chrysler may reflect not bargaining failure, but rather Plastech's lack of value as a going concern. The withdrawal right provides a market test. Limiting Chrysler's ability to lift the automatic stay would undercut one of the virtues of the right to withdraw, a right that may work to the collective advantage of all.[174]

Chrysler's desire to enjoy the right to remove its tooling parallels the rights of HedgeFund in StadiumCo. When Chrysler entrusts the production of components to an upstream supplier like Plastech, Chrysler exposes itself to a variety of risks against which it cannot contract perfectly. Chrysler has to worry that Plastech will organize its affairs in a manner that exposes the supplier to the risk of financial distress in ways that Chrysler cannot observe. Chrysler wants to ensure that Plastech will minimize these risks and that Chrysler will not be in a position where it must look for another supplier or finance Plastech's reorganization when Plastech fails. Chrysler can give Plastech the incentive to ensure its financial house is in order through a structure that shifts going-concern value from Plastech to Chrysler in the event of financial distress. The withdrawal right gives such an incentive only if the bankruptcy judge is willing to enforce the right after the fact.

---

172. See supra Part II.A (discussing bargaining dynamics without automatic stay).

173. See supra Part III.B (discussing risk of bargaining failure). Not surprisingly, when the asset has no tie to the going concern, the risk of bargaining failure is zero. In *Plastech*, this could be seen in the consensual motions allowing owners of tooling that had yet to be installed to remove it. See, e.g., Stipulation with Respect to Relief from the Automatic Stay To Permit Johnson Controls, Inc. To Obtain Possession of Certain Tooling, *Plastech Engineered Prods.*, 2008 WL 5233014 (No. 08-42417).

174. Plastech failed several months into the bankruptcy after Chrysler and other buyers had pumped additional millions into it. Unable to reclaim its tooling, Chrysler had no choice but to subsidize its operations until it failed. See Ben Fidler, Plastech Rolls out of Ch. 11, The Deal (Jan. 8, 2009, 3:00 PM), http://pipeline.thedeal.com/tdd/ViewArticle.dl?id=10005223347 (on file with the *Columbia Law Review*) (describing Plastech's liquidation plan and Chrysler's role in it).

Quite apart from whether courts will respect Chrysler's withdrawal right, the right is effective under existing law only if Chrysler qualifies as a true bailor, rather than an investor with a security interest in a highly specialized asset. This question turns on whether Chrysler possesses sufficient attributes of ownership with respect to the tooling.[175] In the case itself, the question is relatively straightforward, given that the tooling is specialized for Chrysler's needs and Chrysler can redeploy it elsewhere.[176] These two factors alone are likely sufficient to make Chrysler a true bailor as opposed to a financing buyer. But this question of how many of the relevant attributes of ownership Chrysler possesses is entirely orthogonal to the question of whether it makes sense to allow a stakeholder such as Chrysler to possess a withdrawal right. While the benefits are the same, the costs may be higher than in those cases in which specialized assets are put in separate legal entities.

When investors create withdrawal rights by putting assets into discrete corporate entities, the withdrawal right is manifest to the relevant stakeholders.[177] Entrepreneur, Bank, and HedgeFund are all aware of the withdrawal rights that exist. Under the specific facts of *Plastech*, the withdrawal right may be similarly unproblematic. Hold-up opportunities and potentially destructive withdrawal rights are common and well understood in the automobile industry.[178] In other contexts, however, investors

---

175. See supra note 146 and accompanying text (noting courts have focused on narrow question of Hohfeldian bundle of sticks).

176. *Plastech*, 382 B.R. at 97 (noting unique use of tooling for specific customer and quoting from parties' agreement).

177. See supra note 49 and accompanying text (noting entity partitioning is readily visible to all investors and easy to verify).

178. The pervasiveness of these types of structures is evidence of this. Moreover, any review of first-day motions in an automotive-parts bankruptcy demonstrates the openness of the intricate web of withdrawal rights. See, e.g., Declaration of Thomas Musgrave in Support of the Debtors' First Day Motions at 5, In re J.L. French Auto. Castings, Inc., No. 09-12445 (Bankr. D. Del. July 13, 2009) ("Debtors generally manufacture highly specialized parts designed for a particular vehicle model or platform . . . . While the Debtors typically enter into long-term supply contracts, their customers do not provide any guarantees of future volumes . . . . Major new business launches . . . often require the Debtors to make substantial investments in new machining equipment."); id. at 41 ("[W]ithout timely delivery of key components, the Debtors' customers [the OEMs] cannot complete the assembly of vehicles they sell. . . . [A]ny delay in the receipt of key parts can cause enormous operational disruption and loss of revenue."); id. at 42 (noting Debtor in turn relies on timely and uninterrupted supply from its component parts suppliers to survive); see also Motion of the Debtors for Entry of Interim & Final Orders (A) Authorizing Them To Pay Prepetition Claims of Certain Suppliers; & (B) Approving Procedures Related Thereto at 5 n.3, In re Visteon Corp., No. 09-11786 (Bankr. D. Del. May 28, 2009) ("Failure to timely deliver parts most assuredly would lead to the temporary shutdown of the production facilities of its customers who . . . typically maintain little in the way of safety stock. The consequential damages—and setoff claims—are outsized and amount rapidly. *The reputational damage from forcing a shutdown is more serious still.*" (emphasis added)); id. at 5 (noting further that Debtors cannot survive without continuous supply of component parts "at their precise design specifications at exactly the right place at exactly the right time").

will not find it so easy to distinguish the true bailor from the financing buyer.

Some have proposed imposing upon true bailors reporting obligations identical to those imposed upon secured creditors.[179] Even this, however, may be insufficient. What matters is not merely making other investors aware of the competing ownership claim, but also that that claim is accompanied by a withdrawal right. As emphasized in Part II, HedgeFund stands in a dramatically different position when it invests in StadiumCo than when it is merely a creditor of TeamCo and holds Stadium as collateral. To work effectively, withdrawal rights need to have clear contours and be visible to all involved.

B. *Collective Withdrawal*

Plastech needed to navigate its relationship with the other automobile manufacturers at the same time it was bargaining with Chrysler. If these manufacturers also have the right to withdraw their tooling, Plastech needs to reach a bargain with all of them simultaneously. On its face, the possibility of bargaining failure is high, but the repeat nature of the relationship between Ford, Chrysler, and GM may mitigate this problem.[180]

Plastech is not the only supplier that provides parts to Chrysler, Ford, and General Motors. Indeed, the automotive supply industry is a complicated web of multilateral suppliers. GM and Ford might be content to let Chrysler play hard ball with Plastech vis-à-vis the Chrysler-specific assets. Chrysler would be reluctant to insist on a deal that would have the effect of diverting value from the other carmakers to it because of the implicit threat that they would respond in kind with other suppliers. Bankruptcies of automotive-parts suppliers arise often enough (and have throughout the history of the industry)[181] that cooperation can arise through repeat play.

In this environment, as in others, the focus of the inquiry needs to be on the ability of parties to tailor the reach of bankruptcy law. As the automobile industry has evolved, a pattern has emerged in which some of the largest parts suppliers (such as Delphi or Visteon) have their principal relationships with one manufacturer while doing business with oth-

---

179. See, e.g., Baird & Jackson, Possession and Ownership, supra note 148, at 189–90 (contending that, in general, both should have obligation to report in order to cure ostensible ownership problems).

180. See e.g., Edward J. Green & Robert H. Porter, Noncooperative Collusion Under Imperfect Price Information, 52 Econometrica 87 (1984) (showing how cooperation can be equilibrium when players interact repeatedly).

181. E.g., *J.L. French Auto. Castings,* No. 09-12445; *Visteon,* No. 09-11786; Kurak v. Dura Auto. Sys., Inc. (In re Dura Auto. Sys., Inc.), 379 B.R. 257 (Bankr. D. Del. 2007); In re J.L. French Automotive Castings, Inc., No. 06-10119 (Bankr. D. Del. filed Mar. 28, 2006); In re Delphi Corp., No. 05-44481 (Bankr. S.D.N.Y. filed Oct. 8, 2005).

ers as well.[182] In these arrangements, the principal customer may fill the role that Bank played vis-à-vis Entrepreneur. In other words, the withdrawal right is valuable to Chrysler both because it may be less able to monitor the supplier than other buyers and also because it needs a mechanism to ensure that the incentives of other buyers are aligned with its own.

The ability to withdraw firm-specific assets arises in other contexts, and again the value of the withdrawal right may turn on the ability of several third parties to act collectively. United's bankruptcy provides another illustration.[183] Special bankruptcy rules[184] give both lessors and secured creditors of aircraft the ability to take possession of the aircraft unless the debtor agrees to continue its obligations in full.

If an airline could readily enter the market and replace its airplanes, the dynamic this Part has been focusing on will not loom large. The lessor can threaten to withdraw the airplane, but this will not allow it to capture any of the going-concern value.[185] The airline can simply acquire another airplane to replace it. Nor can an airline threaten to pay less than the market value of the plane, given the ability of the lessors to take the plane back and lease again to a third party.

The bargaining dynamics arise because the value of an airplane in the hands of one airline is different from its value in the hands of another.[186] Each airline configures its airplanes in a different way. Airline customers pick half of the avionics on the typical plane they acquire.[187] To lease a plane that had once been part of United's fleet, another airline would have to factor in the costs of maintaining different spare parts and training its staff to accommodate the differences. United would face

---

182. See Oren Livne & Josh Simpson, Restructuring Visteon 9 (Apr. 10, 2012), available at http://www.turnaround.org/cmaextras/0.May2012-WinningPaper-NYU.pdf (on file with the *Columbia Law Review*) (showing thirty-eight percent of Visteon's business was with Ford in 2007); David Sedgwick, How Delphi Automotive Beat the Odds in Vast Corporate Turnaround, Crain's Detroit Bus. (Aug. 12, 2012, 1:50 PM), available at http://www.crainsdetroit.com/article/20120806/FREE/120809919/how-delphi-automotive-beat-the-odds-in-vast-corporate-turnaround (on file with the *Columbia Law Review*) (noting nineteen percent of Delphi's business remained with General Motors in 2011).

183. United Airlines, Inc. v. U.S. Bank N.A., 406 F.3d 918 (7th Cir. 2005).

184. 11 U.S.C. § 1110(a) (2006).

185. Cf. supra Part V.A (discussing hold-up problem in Chrysler-Plastech example).

186. See Efraim Benmelech & Nittai K. Bergman, Liquidation Values and the Credibility of Financial Contract Renegotiation: Evidence from U.S. Airlines, 123 Q.J. Econ. 1635, 1644–46 (2008) (exploring bargaining dynamics in wake of American's acquisition of TWA and showing liquidation value affects bargaining game).

187. See Daglar Cizmeci, An Examination of Boeing's Supply Chain Management Practices Within the Context of the Global Aerospace Industry 51 (June 2005) (unpublished M.Eng. thesis, Massachusetts Institute of Technology), available at http://dspace.mit.edu/bitstream/handle/1721.1/33315/62312684.pdf (on file with the *Columbia Law Review*) ("Currently, Boeing supplies approximately 50% of the avionics on its commercial aircraft. The remaining 50% is provided by customer-selected suppliers.").

similar costs in acquiring planes from others. For this reason, the aircraft lessors and the debtor in *United* found themselves in the bargaining game set out above.[188] The limited ability of the lessors to redeploy the airplanes affected the value of their exit option, but at the same time United's inability to replace the airplanes gave the lessors the ability to capture part of the value of the airline over and above the liquidation value of the planes.

At the outset of the case, the individual lessors were disorganized, and United had more planes than it needed. The threat of any individual lessor to withdraw a plane was not credible.[189] With respect to each of them, United could demand better terms on its lease without fearing that they would exercise their right to take their plane back. But eventually the investors in these airplanes organized themselves, and they threatened to withdraw their airplanes from United's fleet if United did not improve the terms it was offering.[190]

In another example of a court disinclined to allow parties to exercise withdrawal rights, the bankruptcy judge stayed the creditors' hands by issuing a temporary restraining order prohibiting the foreclosure of the planes.[191] This action can be viewed as completely consistent with core bankruptcy principles.[192] It was taken to preserve the going-concern value of the airline. A negotiation failure over a fleet of planes could shut an airline down. New aircraft take time to build, and aircraft obtained in the secondary market take time to integrate into an existing fleet. Time was not something United could spare.

On appeal, however, Judge Easterbrook found the legal argument (one based on a violation of antitrust laws) too weak a reed to support the general principle.[193] He reversed, underscoring the statutory "entitlement" of the lessors.[194] The Bankruptcy Code effectively gave both sides access to markets to frame their bargaining. It gave the creditors a withdrawal right that they would not otherwise have possessed if they were

---

188. See supra Part II.C (explaining bargaining dynamics in bankruptcy between debtor and creditor with withdrawal right).

189. See Benmelech & Bergman, supra note 186, at 1644–46 (showing reduction in airline's lease expenses of more than one-third when leases were renegotiated one-by-one).

190. United Airlines, Inc. v. U.S. Bank N.A., 406 F.3d 918, 921 (7th Cir. 2005).

191. Id. at 922.

192. See supra note 2 and accompanying text (explaining idea that "bankruptcy exists to solve . . . collective action problem among creditors").

193. See *United Airlines*, 406 F.3d at 921 ("Competition comes at the time loans are made; cooperation in an effort to collect as much as possible of the amounts due under competitively determined contracts is not the sort of activity with which the antitrust laws are concerned.").

194. Id. at 924; see also supra note 184 and accompanying text (explaining "special bankruptcy rules" for lessors and secured creditors of aircraft).

merely secured creditors of ordinary collateral.[195] Once the withdrawal right was established, it set the terms of the negotiations between the parties. The lessors did not repossess the entire fleet of airplanes, but rather used this power to extract better lease terms.[196]

Return to *General Growth*. If Harborplace's investors have the ability to act collectively with all those who invested in similar properties, their bargaining power would increase like that of the aircraft lessors in the *United* bankruptcy. The effect would be to raise the stakes considerably. Coordination makes the withdrawal right much more powerful in controlling management behavior, but it also raises the cost in the event of bargaining failure.

In a case such as *United*, whether parties should be denied the ability to exercise a withdrawal right turns critically on whether the rights result from a purposeful and well-tailored creditor's bargain, one that both allows for a collective regime, but limits its scope and the parties subject to it.[197] The reaction of the other creditors in the case suggests that the rights were not purposeful and that they were surprised. But one can be skeptical. Aircraft in a commercial fleet are relatively easy to assess, and the senior debt certificates were publicly traded. That made it foreseeable that parties would trade these rights and that they would (as they did) land in the hands of creditors who saw a benefit in acting together.

## C. *Executory Contracts and Withdrawal Rights*

The stylized hypothetical above examined relationships between the investors and Team and Stadium, where, in principle, the withdrawal rights were clear and well defined.[198] But the Dodgers' relationship with Major League Baseball is another matter altogether. It parallels in some ways the relationship between Plastech and Chrysler,[199] but Major League Baseball, unlike Chrysler, is not a true bailor, but rather a party to an executory contract.

The difficulties here can be seen by using a variation on the core hypothetical. In addition to needing Bank and HedgeFund as investors, Entrepreneur needs to find other teams to play against. Entrepreneur

---

195. It should be noted, however, that it took the lessors one more trip to the Seventh Circuit to establish their unequivocal right to remove their planes. See United Airlines, Inc. v. U.S. Bank N.A., 409 F.3d 812, 813 (7th Cir. 2005) (compelling district court to enforce its previous mandate granting immediate possession to lessors).

196. See Ronald Barliant, United's Long Journey into the Far Reaches of § 1110, Bankr. Strategist, Nov.–Dec. 2005, at 1, 6.

197. The intent of the parties might not be as relevant where, as here, the right was statutorily provided and hard to contract around. But the ability to foresee coordination still tells a great deal about whether the withdrawal right would have been priced into the investment agreement and whether it would have affected the debtor's behavior before the fact.

198. See supra Part II (discussing hypothetical Team-Stadium example).

199. See supra Part V.A (discussing this relationship).

will typically do this by entering into a contract with an association of other teams.[200] It enters into an agreement with League. League is an association of teams that want to play with each other. Even if it does not make a direct infusion of cash, League's own financial success—or more precisely the financial success of the other teams—depends crucially on each team being ruled effectively. League, however, has the same problems monitoring Entrepreneur as HedgeFund.

League will certainly be worried about Entrepreneur's management (of Team and Stadium) because it affects the value of League as a whole, just as a well-managed Plastech enhances Chrysler's value.[201] League will place several material default provisions[202] in its contract with Team, and it will no doubt make the contract nonassignable. When the fortune of TeamCorp declines, League may call a default. While League is not likely to withdraw its franchise rights, its ability to do so gives it the power to capture part of the going-concern value. The coin in which League is paid may be something that has the effect of enhancing the joint value of both Team and League. Rather than demand cash, League may, for example, demand a new manager who will be especially attentive to League's needs. To the extent that the old manager was tunneling assets out of the firm, League's exercise of its withdrawal rights does not necessarily leave other investors such as Bank worse off. Again, advantage-taking by League is limited, both because of reputational effects[203] and because the ability to exercise these rights is state-contingent.[204]

---

200. This is not, of course, to suggest that professional sports teams necessarily depend upon membership in a league. Some arrange matches on an entirely ad hoc basis. Indeed, two teams might agree to play only with each other. There is a professional team (the Washington Generals) that has faced only one opponent in its sixty-year history, losing thousands of games and winning only six, most recently in 1971. For additional information, see Player Opportunities, Washington Generals, http://www.washingtongenerals.com/opportunities.html (on file with the *Columbia Law Review*) (last visited Oct. 9, 2012) (emphasizing "important role" of team and "the final score does not always define winners").

201. See supra note 169 and accompanying text (explaining withdrawal right substitutes for costly monitoring by Chrysler and may be mutually beneficial).

202. These provisions could range from maximum debt ratios and minimum revenues to specific operations procedures that must be followed. The key is that League will be able to dictate precise events that will trigger default. And because the contract is nonassignable (and potentially nonassumable, see infra note 206) that default creates a withdrawal right.

203. Because of the close-knitted nature of the teams, their ability to exchange accurate information with one another, combined with repeated interaction with League, present conditions in which advantage-taking by League is minimized. See Robert C. Ellickson, Order Without Law: How Neighbors Settle Disputes 180–81 (1991) (discussing circumstances in which reputation leads to cooperative behavior).

204. See supra note 32 and accompanying text (explaining "state-contingent" feature of withdrawal right).

The type of withdrawal right that League enjoys turns on whether the franchise is assumable.[205] The question here is not whether the League has a withdrawal right but how absolute the right is. In earlier examples the distinction was between a third party who could withdraw upon default and a creditor who could be crammed down. Here the distinction is between withdrawal upon default and absolute withdrawal upon bankruptcy filing. If the franchise is assumable, it is treated like a lease. League enjoys a withdrawal right, but it is called off to the extent that Team cures past defaults. But if the franchise is nonassumable, then League is in the same position as Chrysler. League has the ability to withdraw the franchise notwithstanding the bankruptcy and notwithstanding Team's ability to cure and offer assurances of future performance.[206] As in *General Growth* and *Charter Communications*, everything turns on how the judge interprets the Bankruptcy Code's rules governing the assumption of executory contracts.[207] The judge's core intuitions about the costs and virtues of withdrawal rights will likely affect how the Bankruptcy Code is interpreted.

The conventional wisdom has long been that franchise rights, such as those involved here, should be freely assumable in bankruptcy as long as the debtor was willing and able to adhere to all the conditions of the franchise. The focus on withdrawal rights, as put forward in this Article, suggests a more complicated story. Withdrawal rights are not problematic if the existence of the withdrawal right is both clear and readily apparent to other investors. Under existing law, the Major League Baseball franchise is merely a contract between a third party and the debtor. Other stakeholders have no easy way to learn its contours or how it changes over time.

The problem with the withdrawal rights in cases like *United*, *Plastech*, and *Dodgers* may not be so much about whether they exist, but rather that existing law does too little to make them discrete and readily visible. In the case of the true-lease/lease-intended-for-security divide, the outcome turns on a multifactored test. It looks to many attributes that are invisible to other investors and that can change over time, such as the value of the

---

205. In bankruptcy a debtor has the right with some limitations to assume (continue the obligations on both sides) or reject (and treat as a claim for damages for breach) executory contracts. 11 U.S.C. § 365 (2006).

206. Because the contract is nonassignable, League may argue that it is also nonassumable. The law here is unsettled. The Ninth Circuit has found such contracts nonassumable, relying on what it found to be unequivocal language in the Bankruptcy Code. See Perlman v. Catapult Entm't, Inc., 165 F.3d 747, 753 (9th Cir. 1999) (holding debtor-in-possession may not assume patent licenses over licensor's objection (citing 11 U.S.C. § 365(c)(1) (1994))). Consistent with their impulse not to allow parties to exercise withdrawal rights, bankruptcy judges tend to find such contracts assumable. See, e.g., In re Adelphia Commc'ns Corp., 359 B.R. 65, 72 (Bankr. S.D.N.Y. 2007) ("[T]o the extent applicable law imposes restrictions on the ability to assign the franchise agreements, it does not place restrictions on the ability to assume them.").

207. 11 U.S.C. § 365 (2006).

third party's reversionary interest.[208] Unlike a withdrawal right created through entity partitioning,[209] the right is both infinitely malleable and uncertain. The law has not provided parties with the necessary building blocks.

CONCLUSION

Withdrawal rights are an integral part of the law of corporate reorganizations, and they have been neglected for far too long. There is nothing mandatory about rules like the automatic stay when assets can be partitioned off into legal entities that never enter bankruptcy. Nor are these withdrawal rights necessarily problematic. Courts may have been wrong to treat withdrawal rights as unwelcome intrusions on the collective norms of bankruptcy. At the same time, it should not be thought that they come at little risk.

The justification for withdrawal rights set out in this Article turns crucially on the ability of investors as a group to shape them and use them in a way that is mutually beneficial. This Article has suggested that creating withdrawal rights through entity partitioning seems desirable precisely because the legal rules do not allow such withdrawal rights to be fashioned under the cover of darkness. As long as courts respect corporate form, there is no ambiguity about whether they exist.

By partitioning assets of one economic enterprise into different legal entities, investors can create a tailored bankruptcy regime. In this way, legal entities serve as building blocks that can be combined to create specific and varied but transparent investor withdrawal rights. By allowing a limited number of investors to opt out of bankruptcy in a particular, discrete, and visible way, investors as a group may be able to both limit the risk of bargaining failure and at the same time enjoy the disciplining effect that a withdrawal right brings with it. Whether this preliminary assessment is correct, however, is not nearly as important as understanding the role that withdrawal rights play under existing law and their part in the much larger challenge of integrating a theory of the firm with the law of corporate reorganizations.

---

208. See supra note 146 and accompanying text (noting courts tend to focus on inquiring about attributes of ownership).

209. See supra Part I.B (discussing entity partitioning).

SELECTED BIBLIOGRAPHY

Adler, Barry E., Game-Theoretic Bankruptcy Valuation, 41 J. Legal Stud. 209 (2012).

Aghion, Philippe & Patrick Bolton, An Incomplete Contracts Approach to Financial Contracting, 59 Rev. Econ. Stud. 473 (1992).

Aghion, Philippe & Richard Holden, Incomplete Contracts and the Theory of the Firm: What Have We Learned over the Past 25 Years?, 25 J. Econ. Persp. 181 (2011).

Avery, Christopher & Peter B. Zemsky, Money Burning and Multiple Equilibria in Bargaining, 7 Games & Econ. Behav. 154 (1991).

Ayotte, Kenneth & Stav Gaon, Asset-Backed Securities: Costs and Benefits of "Bankruptcy Remoteness," 24 Rev. Fin. Stud. 1299 (2011).

Ayotte, Kenneth M. & Edward R. Morrison, Creditor Control and Conflict in Chapter 11, 1 J. Legal Analysis 511 (2009).

Ayres, Ian, Regulating Opt-Out: An Economic Theory of Altering Rules, 121 Yale L.J. 2032 (2012).

Baird, Douglas G., Notice Filing and the Problem of Ostensible Ownership, 12 J. Legal Stud. 53 (1983).

Baird, Douglas G. & Thomas H. Jackson, Bargaining After the Fall and the Contours of the Absolute Priority Rule, 55 U. Chi. L. Rev. 738 (1988).

Baird, Douglas G. & Thomas H. Jackson, Possession and Ownership: An Examination of the Scope of Article 9, 35 Stan. L. Rev. 175 (1983).

Baird, Douglas G. & Randal C. Picker, A Simple Noncooperative Bargaining Model of Corporate Reorganizations, 20 J. Legal Stud. 311 (1991).

Baird, Douglas G. & Robert K. Rasmussen, Antibankruptcy, 119 Yale L.J. 648 (2010).

Baird, Douglas G. & Robert K. Rasmussen, Private Debt and the Missing Lever of Corporate Governance, 154 U. Pa. L. Rev. 1209 (2006).

Baliga, Sandeep & Roberto Serrano, Multilateral Negotiations with Private Side-Deals: A Multiplicity Example, 3 Econ. Bull., no. 1, 2001.

Barliant, Ronald, United's Long Journey into the Far Reaches of § 1110, Bankr. Strategist, Nov.–Dec. 2005.

Benmelech, Efraim & Nittai K. Bergman, Liquidation Values and the Credibility of Financial Contract Renegotiation: Evidence from U.S. Airlines, 123 Q.J. Econ. 1635 (2008).

Bolton, Patrick & David S. Scharfstein, Optimal Debt Structure and the Number of Creditors, 104 J. Pol. Econ. 1 (1996).

Casey, Anthony J., The Creditors' Bargain and Option Preservation Priority in Chapter 11, 78 U. Chi. L. Rev. 759 (2011).

Chae, Suchan & Jeong-Ae Yang, An N-Person Pure Bargaining Game, 62 J. Econ. Theory 86 (1994).

Cizmeci, Daglar, An Examination of Boeing's Supply Chain Management Practices Within the Context of the Global Aerospace Industry (June 2005) (unpublished M.Eng. thesis, Massachusetts Institute of Technology), available at http://dspace.mit.edu/bitstream/handle/1721.1/33315/62312684.pdf.

Clement, W. Rodney Jr. & H. Scott Miller, General Growth: Special Purpose Entities (Barely) Survive First Bankruptcy Test, Prob. & Prop., Mar.–Apr. 2011.

Coase, R.H., The Nature of the Firm, 4 Economica 386 (1937).

Dalmazzo, Alberto, Outside Options in a Bargaining Model with Decay in the Size of the Cake, 40 Econ. Letters 417 (1992).

Ellickson, Robert C., Order Without Law: How Neighbors Settle Disputes (1991).

Green, Edward J. & Robert H. Porter, Noncooperative Collusion Under Imperfect Price Information, 52 Econometrica 87 (1984).

Grossman, Sanford J. & Oliver D. Hart, The Costs and Benefits of Ownership: A Theory of Vertical and Lateral Integration, 94 J. Pol. Econ. 691 (1986).

Hansmann, Henry & Reinier Kraakman, Organizational Law as Asset Partitioning, 44 Eur. Econ. Rev. 807 (2000).

Hohfeld, Wesley Newcomb, Some Fundamental Legal Conceptions as Applied in Judicial Reasoning, 23 Yale L.J. 16 (1913).

Huang, Chen-Ying, Multilateral Bargaining: Conditional and Unconditional Offers, 20 Econ. Theory 401 (2002).

Iacobucci, Edward M. & George G. Triantis, Economic and Legal Boundaries of Firms, 93 Va. L. Rev. 515 (2007).

Jackson, Thomas H., The Logic and Limits of Bankruptcy Law (1986).

Klee, Kenneth N., All You Ever Wanted To Know About Cram Down Under the New Bankruptcy Code, 53 Am. Bankr. L.J. 133 (1979).

Klein, Benjamin, Robert G. Crawford & Armen A. Alchian, Vertical Integration, Appropriate Rents, and the Competitive Contracting Process, 21 J.L. & Econ. 297 (1978).

Krishna, Vijay & Roberto Serrano, Multilateral Bargaining, 63 Rev. Econ. Stud. 61 (1996).

Levmore, Saul, Monitors and Freeriders in Commercial and Corporate Settings, 92 Yale L.J. 49 (1982).

Livne, Oren & Josh Simpson, Restructuring Visteon (Apr. 10, 2012), available at http://www.turnaround.org/cmaextras/0.May2012-WinningPaper-NYU.pdf.

Merrill, Thomas W. & Henry E. Smith, Optimal Standardization in the Law of Property: The Numerus Clausus Principle, 110 Yale L.J. 1 (2000).

Morley, John, The Separation of Investments and Management (Mar. 1, 2012) (unpublished manuscript), available at http://www.law.yale.edu/documents/pdf/cbl/Morley_The_Separation_of_Investments_and_Management.pdf.

Morrison, Edward R., Bankruptcy Decision Making: An Empirical Study of Continuation Bias in Small Business Bankruptcies, 50 J.L. & Econ. 381 (2007).

Picker, Randal C., Security Interests, Misbehavior, and Common Pools, 59 U. Chi. L. Rev. 645 (1992).

Rasmussen, Robert K., Debtor's Choice: A Menu Approach to Corporate Bankruptcy, 71 Tex. L. Rev. 51 (1992).

Roberts, Michael R. & Amir Sufi, Control Rights and Capital Structure: An Empirical Investigation, 64 J. Fin. 1657 (2009).

Rubinstein, Ariel, Perfect Equilibrium in a Bargaining Model, 50 Econometrica 97 (1982).

Schwartz, Alan, A Contract Theory Approach to Business Bankruptcy, 107 Yale L.J. 1807 (1998).

Scott, Robert E., A Relational Theory of Secured Financing, 86 Colum. L. Rev. 901 (1986).

Scott, Robert E., Rethinking the Regulation of Coercive Creditor Remedies, 89 Colum. L. Rev. 730 (1989).

Sexton, Anthony, Indubitably Uncertain: Philadelphia Newspapers and the Role of Valuation Uncertainty in Attempted Cramdown of All-Equity Plans, 28 Emory Bankr. Dev. J. 55 (2011).

Shaked, Avner & John Sutton, Involuntary Unemployment as a Perfect Equilibrium in a Bargaining Model, 52 Econometrica 1351 (1984).

Squire, Richard, Strategic Liability in the Corporate Group, 78 U. Chi. L. Rev. 605 (2011).

Sutton, John, Non-Cooperative Bargaining Theory: An Introduction, 53 Rev. Econ. Stud. 709 (1986).

Warren, Elizabeth & Jay Lawrence Westbrook, The Success of Chapter 11: A Challenge to the Critics, 107 Mich. L. Rev. 603 (2009).

Widen, William H., Corporate Form and Substantive Consolidation, 75 Geo. Wash. L. Rev. 237 (2007).

Widen, William H., Report to the American Bankruptcy Institute: Prevalence of Substantive Consolidation in Large Public Company Bankruptcies from 2000 to 2005, 16 Am. Bankr. Inst. L. Rev. 1 (2008).

Williamson, Oliver E., Credible Commitments: Using Hostages To Support Exchange, 73 Am. Econ. Rev. 519 (1983).

Zender, Jaime F., Optimal Financial Instruments, 46 J. Fin. 1645 (1991).

TAB 167

\

G. R. Hall, *Canadian Contractual Interpretation*
(Markham: LexisNexis Canada, 2d ed. 2012)

AVAILABLE IN HARD COPY ONLY

TAB 168

# Falconbridge on Mortgages

## *Fifth Edition*

Walter M. Traub, B.A., LL.B., LL.M.
Editor-in-Chief

## CANADA LAW BOOK

April 2014

© 2014 Thomson Reuters Canada Limited

NOTICE AND DISCLAIMER: All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written consent of the publisher (Canada Law Book).

Canada Law Book and all persons involved in the preparation and sale of this publication disclaim any warranty as to accuracy or currency of the publication. This publication is provided on the understanding and basis that none of Canada Law Book, the author/s or other persons involved in the creation of this publication shall be responsible for the accuracy or currency of the contents, or for the results of any action taken on the basis of the information contained in this publication, or for any errors or omissions contained herein.

No one involved in this publication is attempting herein to render legal, accounting, or other professional advice. If legal advice or other expert assistance is required, the services of a competent professional should be sought. The analysis contained herein should in no way be construed as being either official or unofficial policy of any governmental body.

**A cataloguing record for this publication is available from Library and Archives Canada**

**ISBN 0-88804-367-8**

Printed in Canada by Thomson Reuters

**TELL US HOW WE'RE DOING**
Scan the QR code to the right with your smartphone to send your comments regarding our products and services.
Free QR Code Readers are available from your mobile device app store.
You can also email us at carswell.feedback@thomsonreuters.com



 **THOMSON REUTERS**

**CANADA LAW BOOK, A DIVISION OF THOMSON REUTERS CANADA LIMITED**

| One Corporate Plaza | Customer Relations |
| --- | --- |
| 2075 Kennedy Road | Toronto 1-416-609-3800 |
| Toronto, ON | Elsewhere in Canada/U.S. 1-800-387-5164 |
| M1T 3V4 | Fax 1-416-298-5082 |
| | www.carswell.com |
| | E-mail www.carswell.com/email |

# PART  VI

# MORTGAGE ACTIONS

May 2003

# Chapter 22

# ACTION FOR POSSESSION[*]

§22:10    History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22-1
§22:20    Proviso for Quiet Possession Until Default. . . . . . . . . . . . . . . . . . .  22-3
§22:30    Rights of Mortgagor in Possession . . . . . . . . . . . . . . . . . . . . . . .  22-4
§22:40    Elements of Possession . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22-6
§22:50    Action During Prohibited Period in Section 42 . . . . . . . . . . . . . . . . .  22-10
§22:60    Obtaining Possession . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22-11
§22:70    Possible Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22-13
    §22:70.10      Mortgagor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22-13
    §22:70.20      Spouses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22-13
    §22:70.30      Tenants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22-14
§22:80    Mortgagee's Rights Against Third Parties . . . . . . . . . . . . . . . . . . . .  22-14
§22:90    General — Other Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22-15

## §22:10  History

Historically, at common law a mortgage was a contract whereby the owner of real property transferred the legal title to the property to the mortgagee as security for a debt. The transfer was a deed of conveyance similar to any other deed of conveyance and contained the usual covenants. Essentially, the mortgagee became the legal owner of the property subject to one important qualification. The mortgage contract contained a proviso for redemption in favour of the mortgagor. The proviso for redemption effectively stated that if the mortgage debt were paid in full, strictly in accordance with the mortgage contract, the conveyance of the legal title to the property to the mortgagee would be null and void. In effect, the deed of conveyance to the mortgagee was conditional and would be found to be void once the mortgage debt was repaid in full. The common law courts interpreted the proviso for redemption strictly and required the mortgage debt to be repaid in accordance with the terms of the contract. If on the date for redemption the mortgage moneys were not paid, the mortgagor lost the legal right to redeem the property. Accordingly, at law, if the mortgagor tendered the mortgage proceeds on the day following the maturity date, the mortgagee could refuse the funds and retain the property. The amount owing on the mortgage debt the day after the contractual date of redemption was irrelevant and the mortgagee could retain ownership of the property even if virtually all of the debt had been repaid. The proviso for redemption

---

[*] This chapter has been prepared with the assistance of Eric C. Haslett whose contribution is hereby gratefully acknowledged. We also acknowledge with thanks the assistance of Craig Carter in revising and updating the within chapter.

FALCONBRIDGE ON MORTGAGES

or the ability of the mortgagor to essentially cause the deed of conveyance to be null and void was therefore lost.

The courts of equity concluded this to be immensely unfair and created an equitable right of redemption. This equitable right of redemption could be exercised by the mortgagor at any time up until the rights of the mortgagor were foreclosed by an equitable action for foreclosure. However, the equitable right of the mortgagee to foreclose could be affected by whether the mortgagee had itself acted fairly and come to court with "clean hands".

Essentially, a mortgage at common law was the conveyance to the mortgagee of legal title to the property with an equitable right of the mortgagor to redeem. While this fiction of the conveyance of legal title with an equitable right of redemption was abolished in 1984 pursuant to s. 6(1) of the *Land Registration Reform Act, 1984*, S.O. 1984, c. 32 [now *Land Registration Reform Act*, R.S.O. 1990, c. L.4] (the "LRRA"), all rights and remedies of the mortgagor and all rights and remedies of the mortgagee were preserved pursuant to s. 6(3) of the LRRA. Section 6 of the LRRA provides as follows:

> 6(1) A charge does not operate as a transfer of the legal estate in the land to the chargee.
>
> . . . . .
>
> (3) Despite subsection (1), a chargor and chargee are entitled to all the legal and equitable rights and remedies that would be available to them if the chargor had transferred the land to the chargee by way of mortgage, subject to a proviso for redemption.

Due to the fact that at common law a mortgage was the conveyance to the mortgagee of the legal title to the property and because exclusive possession of property is one of the indices of ownership, the mortgagee at common law was entitled to possession of the mortgaged property. The right is paramount.[1] By contract, however, the mortgagee permits the mortgagor to be in possession until default. The mortgagee's right to possession arises because the legal title to the property is conveyed to the mortgagee. It is not a contractual right. It is inherent in a mortgage being a conveyance.

Possession is one of the rights preserved by s. 6(3) of the LRRA. For the purpose of determining the mortgagee's right to possession, s. 6(3) effectively deems the charge to be a conveyance of the legal title. As such, the mortgagee under a charge has the right to possession even if not expressly set out in the charge.

Section 7(a)(iv) of the *Mortgages Act*, R.S.O. 1990, c. M.40, states that a mortgage is deemed to include a covenant by the mortgagor that "on default, the mortgagee shall have quiet possession of the land, free from all encumbrances". This deemed covenant does not apply to mortgages of land situate in a part of Ontario that has been designated under Part I of the LRRA, where the mortgage is executed after the designation. The entire province has been so designated since April 1, 1985. Accordingly, the deemed covenant in the *Mortgages Act* does not apply to Ontario mortgages executed after April 1, 1985.

---

[1] See *Goodyear Canada Inc. v. Burnhamthorpe Square Inc.* (1997), 32 O.R. (3d) 657 (Gen. Div.), vard 41 O.R. (3d) 321 (C.A.), leave to appeal to S.C.C. refused 173 D.L.R. (4th) vi, for the effect of the mortgagee's paramount right to possession as against a subsequent tenant.

Section 7(1) of the LRRA states that a mortgage in the prescribed form shall be deemed to include a number of covenants by the chargor unless the deemed covenants are specifically excluded or varied in a schedule to the charge. Section 7(1), para. 1(v) states that the "chargee on default of payment for the number of days specified in the charge or in the *Mortgages Act,* whichever is longer, may on giving the notice specified in the charge or required by that Act, whichever is longer, enter on and take possession of, receive the rents and profits of, lease or sell the land".

This deemed covenant requires a period of default and notice before the mortgagee is entitled to take possession. Since the *Mortgages Act* does not provide any default period or notice period for a mortgagee to take possession, the terms of the mortgage will dictate. Most mortgages also do not require any default period or notice period before taking possession. It should be noted, however, that it is still open to the courts to find that the default and notice provisions in s. 7(1) of the LRRA refer to the sale notice provisions in the *Mortgages Act.*

### §22:20  Proviso for Quiet Possession Until Default

In the absence of any provision in the mortgage reserving the right to possession to the mortgagor, or of any agreement express or implied to the same effect, a legal mortgagee is entitled, after the making of the mortgage and by virtue of the conveyance to it of the legal estate, to take possession of the mortgaged lands at any time.[2] Notwithstanding that the mortgagee is entitled by law to possession, it is usual in Ontario to insert in a mortgage a proviso that the mortgagor until default shall have quiet possession of the lands, and in any case, until the mortgagee demands possession, the mortgagor's possession is lawful. In light of s. 7(1) of the LRRA, the mortgagee would have to expressly exclude the mortgagor's covenant for possession.

The mortgagor in possession is in effect a tenant at will or a tenant at sufferance. In *Noyes v. Pollock,*[3] the court states: "When . . . the mortgagor has been left in occupation of the estate by the mortgagee, the mortgagor is either tenant at will or tenant by sufferance to the mortgagee". It is not clear whether categorizing the mortgagee as a tenant at will or a tenant at sufferance is strictly necessary. The covenant in the mortgage to give the mortgagor exclusive possession until default certainly looks like a form of lease. However, the mortgage is a special document and the mortgagor has or should have greater rights than a mere tenant because of the mortgagor's equity of redemption. The courts should be open to discard any rights or obligations of a tenant at will or a tenant at sufferance if those rights do not accord with the mortgagor being in a favoured position. Despite the legal fiction, equity treats the mortgagor as the real owner of the property.

If a mortgagee is entitled to possession as between itself and the mortgagor, and the land is in the occupation of the mortgagor or of any other person whose title is not superior to that of the mortgagee,[4] the mortgagee may enter on the land, if the

---

[2]  *Four-Maids Ltd. v. Dudley Marshall (Properties) Ltd.,* [1957] Ch. 317.
[3]  (1886), 32 Ch. D. 53 (C.A.), at p. 64.
[4]  For example, a tenant under a lease made by a prospective purchaser (mortgagor) before he or she had any title or possession of the property. See *Hughes v. Waite,* [1957] W.L.R. 713 (Ch. D.). Another

mortgagee can do so peaceably,[5] or may bring an action for possession. The mortgagee's right is paramount and he or she can even dispossess subsequent tenants who leased the property with knowledge of the mortgage, even if rent has been paid to the mortgagor.[6] If the land is occupied by a tenant under a lease which is binding on the mortgagee, the mortgagee may take possession by requiring the tenant to pay rent to the mortgagee.[7] In either case, after obtaining possession, the mortgagee becomes liable to account to the mortgagor as a mortgagee in possession for any rents received.

If a mortgage contains a proviso for quiet possession by the mortgagor until default, the mortgagee will be liable in damages if he or she enters prior to default.[8] The proviso operates as a redemise to the mortgagor, but on default the mortgagee may be entitled to enter without previous notice or demand subject to other terms in the mortgage.[9]

If by an attornment clause the mortgagor expressly becomes a tenant of the mortgagee, either at will or from year to year, at a rent, then the mortgagor will have the ordinary right to possession of any such tenant, except insofar as such right may be qualified by the mortgage itself in giving a right to entry without notice on default in payment or non-observance of covenants.[10]

Unless the mortgage provides otherwise, any default under the mortgage no matter how slight gives the mortgagee the right to take possession. If the mortgagor rectifies the default pursuant to s. 22 of the *Mortgages Act*, the mortgagee loses the right to possession.

### §22:30   Rights of Mortgagor in Possession

The position of a mortgagor who remains in possession after the making of the mortgage, if the mortgage does not reserve to him or her the right to possession, or if the mortgagor remains in possession after default, if the mortgage provides that he or she may retain possession until default, is anomalous. In either case, the mortgagee is entitled to take possession at any time, but until the mortgagee demands or takes possession, the mortgagor's continuing possession is still rightful and not by wrong, and the mortgagor is entitled to the rents and profits of the land without account to the mortgagee.[11] The mortgagor is not a trespasser. The mortgagor's right of possession is paramount to everyone except the mortgagee.

It is provided in Ontario by s. 5 of the *Mortgages Act*:

example could be a tenant under a lease made after the mortgage but without the authority of the mortgagee.

[5] *Doe d. Fisher v. Giles* (1829), 5 Bing. 421, 130 E.R. 1123. In order to gain entrance the mortgagee may break open an outer door of a house which is unoccupied or has been vacated: *Lows v. Telford* (1876), 1 App. Cas. 414 (H.L.); *Doe d. Bryant v. Cunard* (1843), 2 Kerr 193, 4 N.B.R. 193.

[6] See Chapter 15, and *Goodyear Canada Inc. v. Burnhamthorpe Square Inc., supra,* footnote 1.

[7] The lease would be binding if prior in registration, if the mortgagee consented to the lease or if the tenant and the mortgagor have an attornment agreement.

[8] *Moore v. Shelley* (1883), 8 App. Cas. 285 (P.C.).

[9] *Doe d. Garrod v. Olley* (1840), 12 Ad. & E. 481, 113 E.R. 894; *Brethour v. Brooke* (1893), 21 O.A.R. 144, affg 23 O.R. 658 (Ch. D.).

[10] E.D. Armour, *A Treatise on the Law of Real Property*, 2nd ed. (Toronto: Canada Law Book, 1916), p. 186.

[11] *Heath v. Pugh* (1881), 6 Q.B.D. 345, at p. 359 (C.A.), affd 7 App. Cas. 235 (H.L.).

> 5. A mortgagor entitled for the time being to the possession or receipt of the rents and profits of any land, as to which no notice of intention to take possession or to enter into receipt of the rents and profits thereof has been given by the mortgagee, may sue for such possession, or sue or distrain for the recovery of such rents or profits, or to prevent or recover damages in respect of any trespass or other wrong relative thereto, in the mortgagor's own name only, unless the cause of action arises upon a lease or other contract made by the mortgagor jointly with any other person, and in that case the mortgagor may sue or distrain jointly with such other person.

Formerly, if a mortgagor was entitled to possession against the mortgagee under a provision in the mortgage giving him or her the right to possession until default, the mortgagor could before default, but not after default, maintain against a third party an action of ejectment or for possession of the land.[12]

On the other hand, a mortgagor in possession, whether before or after default, could formerly, and can still, maintain an action against a third party for trespass or for injury to the mortgaged property, the mortgagor's right to sue depending not upon ownership or right to possession, but upon actual possession, and the third party not being entitled to set up the mortgagee's title or the mortgagor's want of title as a defence.[13]

A mortgagor may maintain an action for possession, even after default, if no notice has been given by the mortgagee of the intention to take possession, but after the giving of such notice the mortgagor's right of action ceases.

Section 7(1), para. 1(v) and (vi) of the LRRA provides a statutory right to possession in favour of the mortgagor until default as follows:

> 7(1) A charge in the prescribed form shall be deemed to include the following covenants by the chargor, for the chargor and the chargor's successors, with the chargee and the chargee's successors and assigns:
>
> 1.  In a charge of freehold or leasehold land by the beneficial owner:
>
>      . . . . .
>
>      v.   That the chargee on default of payment for the number of days specified in the charge or in the *Mortgages Act*, whichever is longer, may on giving the notice specified in the charge or required by that Act, whichever is longer, enter on and take possession of, receive the rents and profits of, lease or sell the land.
>      vi.  That where the chargee enters on and takes possession of the land on default as described in subparagraph v, the chargee shall have quiet enjoyment of the land.

These provisions replace the old rights to possession contained in the *Short Forms of Mortgages Act*, R.S.O. 1980, c. 474 [not consolidated and not repealed].

Note that this provision incorporates a contractual term into every charge unless expressly excluded. By implication it gives the mortgagor possession until default. It is also more restricted than the mortgagee's common law right to possession since it requires the mortgagee to give notice.

---

[12] *Rogers v. Dickson* (1861), 10 U.C.C.P. 481; *Ford v. Jones* (1862), 12 U.C.C.P. 358.
[13] *Selleck v. Smith* (1826), 3 Bing. 603, at pp. 606-607, 130 E.R. 646; *Mann v. English* (1876), 38 U.C.Q.B. 240, at p. 249.

## §22:40  Elements of Possession

A significant issue that arises in mortgage remedy situations is whether a mortgagee exercising remedies against property will be considered a mortgagee in possession. In some situations the mortgagee wants to be in possession. However, in many instances the mortgagee does not want to be so defined.

A mortgagee may want to take possession of property on default for a number of reasons, some of which are as follows:

1. *Capture income stream from property* — Where the property is income generating, the mortgagee will generally want to intercept the income. The income is an important asset to the mortgagee and will often be what supported the original lending decision. Accordingly, the lender generally wants to capture the income, first to reduce its exposure, secondly to provide cash flow to offset realization expenses, thirdly to pay tax arrears which are a prior lien and fourthly to prevent the borrower from using the funds for other purposes, such as paying subsequent encumbrancers or maintaining other assets.

2. *Prevent deterioration of the security* — In some cases the mortgagee may be concerned that the borrower, faced with negative cash flow, is neglecting the property. Besides devaluing the security, this may erode the income from the property if tenants leave or if the property cannot attract tenants due to its condition. While the mortgage usually contains provisions requiring the mortgagor to keep the property in good repair, the mortgagee may deem it necessary to step in and take possession to ensure repairs and maintenance of the property are completed in order to enhance or maintain the value of the security. The risk of losing tenants may be the factor which precipitates the mortgagee to take possession.

3. *Assist in realization* — There are many possible reasons why the mortgagee would want to take possession of the real property in order to assist in the realization process. The mortgagee has certain remedies under the mortgage document and at law which permit the mortgagee to sell, liquidate or acquire the real property asset. However, for those remedies to be meaningful, the mortgagee in most cases will require possession of the property. Possession by the mortgagee will assist in performing appraisals, marketing and refurbishing the property and to provide vacant possession on closing if required.

4. *Remove poor management* — The mortgagee may want possession of the real property in order to remove the borrower or its property manager if the mortgagee is of the opinion that the management of the property is inadequate. Inadequate management can taint the property in the market for realization purposes and can also cause the income from the property to deteriorate. In these circumstances, the mortgagee may, if it cannot replace the management of the property co-operatively with the borrower, require possession in order to do so.

5. *Attract new tenants* — In order to enhance the marketability of the property or the income from the property, the mortgagee may wish to actively seek out tenants, renew existing tenants or provide leasehold improvements and

allowances to new tenants. In order to do this, the mortgagee will require possession of the property.

6.  *Pressuring the borrower* — In some circumstances the mortgagee wants to deprive the borrower of possession to maximize the pressure on the borrower. The threat of taking possession may be sufficient to bring the borrower to the table. This factor may be especially relevant in a residential context or an owner-occupied commercial context.

A mortgagee may not want to take possession of property on default for a number of reasons, some of which are as follows:

1.  *Obligation to act prudently* — The mortgagee will be held to be strictly accountable to all persons with an interest in the property. The mortgagee's obligation to account is significant.[14]

2.  *Environmental damage* — A mortgagee in possession has care, control and management of real property. As such the mortgagee is liable for any past environmental damage. This is an unlimited exposure unless the mortgagee, before taking possession, negotiates an agreement with the Ministry of the Environment limiting liability.

3.  *Improvident realization* — A mortgagee on taking possession of real property is obligated to sell the property as soon as possible. This obligation is akin to an obligation to mitigate. The mortgagee will not be entitled to collect any increase in its debt or costs if it fails to realize providently.

4.  *Subsequent tenants* — By taking possession the mortgagee gives subsequent tenants which have not executed an attornment agreement with the mortgagee the right to terminate their long-term leases.[15]

5.  *Marketplace stigma* — By taking possession, the mortgagee signals to the marketplace that the real estate is distressed. This may lead to a lower recovery on a sale by the mortgagee.

6.  *Stuck with possession* — Once in possession, a mortgagee cannot go out of possession unless another party takes possession from the mortgagee or agrees to do so.

7.  *Liability for realty taxes* — Once in possession a mortgagee has a personal liability for realty taxes. The amount unpaid is not limited to a lien on the land.

The mortgagee has the right under the mortgage contract to take possession of the property and deprive the mortgagor of possession under certain conditions. The issue becomes whether the mortgagee has done enough to be considered to be in possession of the property. In many situations the mortgagee wants to have some control over the property yet not be characterized as a mortgagee in possession. The question becomes: Has the mortgagee gone so far by its actions as to be found to be a mortgagee in possession?

The test of what constitutes a mortgagee in possession is whether the mortgagee has deprived the mortgagor of control and management of the mortgaged premises. In *Noyes v. Pollock*[16] the court sets out the test for a mortgagee in possession:

---

[14]  See Chapter 32.
[15]  See *Goodyear Canada Inc. v. Burnhamthorpe Square Inc.* (1997), 32 O.R. (3d) 657 (Gen. Div.), vard 41 O.R. (3d) 321 (C.A.), leave to appeal to S.C.C. refused 173 D.L.R. (4th) vi.
[16]  (1886), 32 Ch. D. 53 (C.A.), at p. 64.

> But in the case where an estate is let to tenants, of course the mortgagee does not enter upon actual occupation of the demised premises. He may fall under the principle as a person who enters and takes possession of the rents and profits; but only, as it seems to me, if he does something which goes beyond the mere receipt of sums of money to which the rents and profits may amount, and reaches a point at which he displaces, for the purpose of realizing the security, the mortgagor from the control and dominion of the reversion of the estate which is demised . . . He may take the rents; that is not enough unless he takes the rent in such a way as to take upon himself, and out of the hands of the mortgagor, the business and the duty of collecting and being diligent in that respect.

The court also stated:[17]

> . . . and [the mortgagee] is looked upon as if he had taken upon himself the control and management of the estate as between those in actual occupation and the mortgagor, so as to put an end to any right which the mortgagor has of dealing with the estate in the way of management, including letting and making allowances to tenants, and getting the best rent from them he can.

The court then goes on to find the mortgagee must intercept the power of the mortgagor to manage the estate and the mortgagee must manage and receive the rents as part of the management of the estate. For a mortgagee to be found in possession, it must take on the management functions that the mortgagor would be expected to fulfil as the owner of the property. The mortgagor must be deprived of the rights and benefits of a mortgagor in possession of the property. Clearly if a mortgagee changes the locks to the property, hires a property manager, collects the rents, assumes the obligations under the leases as would the owner of property, then the mortgagee will be in possession of the mortgaged security.

In *Modern Realty Co. v. Shantz*[18] it was held that there must be actual re-entry where the mortgaged property is not abandoned and the mortgage contains a provision stating that on default the mortgagee shall have quiet possession of the mortgaged property. In *National Trust Co. v. Carleton Condominium Corp. No. 489*[19] the court found that a mortgagee attorning rents in its own name and not through the mortgagor was a mortgagee in possession. In *Beckstead v. Ball*[20] the mortgagee was not found to be a mortgagee in possession because the mortgagee was collecting rents as agent for the mortgagor and not for its own account.

As discussed, a mortgagee will be found to be in possession of the property where the mortgagee assumes control and management of the property. In *Unican Development Corp. Ltd. v. Settlers Savings and Mortgage Corp.*[21] the court found that the mortgagee was in possession based on the following actions taken by the mortgagee:

    (a)    employing a resident caretaker;

    (b)    making mortgage payments on the senior mortgage;

    (c)    paying utility and other accounts;

    (d)    assuming responsibility for leasing portions of the property and terminating leases;

    (e)    contracting for the supply of services to the building;

---

[17] *Supra*, at p. 61.
[18] [1928] S.C.R. 213.
[19] (1993), 33 R.P.R. (2d) 304 (Ont. Ct. (Gen. Div.)).
[20] [1961] O.R. 127 (H.C.J.).
[21] (1984), 30 Alta. L.R. (2d) 66 (Q.B.).

    (f)    looking after tenant requirements as they arose;

    (g)    performing minor repairs;

    (h)    installing replacement locks;

    (i)    refusing to keep the mortgagor advised about the operation of the building; and

    (j)    attorning and collecting rents under the mortgagee's security.

In *Carter v. Bell*[22] it was held that acts performed by the mortgagee which cannot be distinguished from the acts which would normally be performed by the mortgagor will indicate that the mortgagee is in possession of the property.

In *Abdool v. Somerset Place Developments of Georgetown Ltd.*[23] it was held that a mortgagee appointing a receiver pursuant to a mortgage which stated that any such receiver is the agent of the mortgagor will not by itself cause the mortgagee to be in possession of the property. In *Ontario (Attorney General) v. Tyre King Tyre Recycling Ltd.*[24] it was held that a mortgage providing a contractual right for the mortgagee to enter and repair the property and to accelerate payment of the mortgage debt if the property was not kept in good repair did not cause a mortgagee to be a mortgagee in possession in the absence of the exercise of such powers, management or control of the property. A mortgagee will not be found to be in possession merely due to there being an attornment provision in the mortgage.[25]

In *National Trust Co. v. Saks*[26] the court held that wrongful entry into the property by a mortgagee constitutes a trespass exposing the mortgagee to damages for trespass and conversion.

The obligations of a mortgagee in possession are onerous and the mortgagee may go to significant effort not to be categorized as a mortgagee in possession. As discussed earlier, one risk is that a mortgage in possession may be fully liable for environmental contamination and its clean-up. The mortgagor and subsequent encumbrancers may try to categorize the mortgagee as a mortgagee in possession in order to obtain the right to an accounting and to claim damages for neglect of the property. In order to obtain concessions from the mortgagee or delay the exercising of remedies by the mortgagee, the mortgagor may threaten the mortgagee with becoming a mortgagee in possession if the mortgagee takes certain steps. This is particularly true in the case of the attornment of rents on commercial property. Attornment of rents is often the quickest way to pressure the mortgagor and is very difficult for a mortgagor to defend against. Accordingly, a mortgagor concerned about the mortgagee threatening to attorn could threaten the mortgagee with all the potential liability of being a mortgagee in possession to discourage the mortgagee from taking such action.

Where rents are directed to the mortgagee and the mortgagee is merely the recipient thereof, the mortgagee is not in possession of the property. Where, however, the mortgagee takes active steps to collect the rent and diverts the rent from the mortgagor then the mortgagee may be found to be in possession of the property.

---

[22] (1915), 21 D.L.R. 243 (B.C.C.A.).

[23] (1992), 10 O.R. (3d) 120 (C.A.), leave to appeal to S.C.C. refused 101 D.L.R. (4th) vii.

[24] (1992), 9 O.R. (3d) 318 (Gen. Div.).

[25] *Stanley v. Grundy* (1883), 22 Ch. D. 478.

[26] (1994), 51 A.C.W.S. (3d) 539 (Ont. Ct. (Gen. Div.)),

In order to determine whether a mortgagee is in possession of real property, the courts may consider the nature of the property itself. The test for determining whether a mortgagee is in possession of vacant land will be a different test than in the case of a residential apartment building or an office building. In the case of vacant land it may be sufficient to merely post a sign or install a lock on a gate. In the case of a building occupied by tenants it may be necessary to lock out the property manager, change the locks to the property manager's office, seize the rental files and attorn the rents. The test may also be different where the property is a family dwelling or where the property is industrial or retail premises. In all cases the courts will first examine the indices of possession and ownership that the mortgagor asserts with respect to the particular property and determine whether the mortgagee has usurped any of these.

The intention of the mortgagee in the particular circumstances may also be a relevant factor. Certainly, if the mortgagee intends to take possession of the property, the courts will be more likely to find that whatever steps were taken by the mortgagee were sufficient to cause the mortgagee to go into possession. However, if the mortgagee does not intend to become a mortgagee in possession but effectively deprives the mortgagor of the control or management of the property, the mortgagee will likely be found to be a mortgagee in possession despite its intention.

The intention of the mortgagor may also be relevant. Where the mortgagee and the mortgagor enter into arrangements dealing with the operation of the property and the mortgagor intends to maintain control of the property, then the intention of the mortgagor may be a significant factor. For example, if the mortgagor directs rents from the property to the mortgagee, the intention of the mortgagor is to retain control but to divert funds to the mortgagee. This could well be an important factor in determining that the mortgagee is not in possession of the property.

## §22:50   Action During Prohibited Period in Section 42

If the mortgagee has made a demand for payment or served a notice of sale, judgment should not be signed during either notice period unless the mortgagee has obtained an order pursuant to s. 42(1) of the *Mortgages Act*. Section 42(1) states:

> 42(1) Where, pursuant to any condition or proviso contained in a mortgage, there has been made or given a demand or notice either requiring payment of the money secured by the mortgage, or any part thereof, or declaring an intention to proceed under and exercise the power of sale therein contained, no further proceeding and no action either to enforce the mortgage, or with respect to any clause, covenant or provision therein contained, or to the mortgaged property or any part thereof, shall, until after the lapse of the time at or after which, according to such demand or notice, payment of the money is to be made or the power of sale is to be exercised or proceeded under, be commenced or taken until an order permitting the same has been obtained from a judge of the Superior Court of Justice.

The mortgage will almost always give the mortgagee the right to possession of the property on default and the mortgagee may choose or require the use of the courts to obtain possession of the property. While the mortgage may use self-help measures to take possession, these are limited to their agreement. The mortgagee cannot take

possession by force. If the mortgagee takes possession without a court order and it is found that the mortgagee did not have the right to do so (*i.e.*, no default), then the mortgagee is liable in trespass. Accordingly, the mortgagee may commence an action for possession of the property. The action can be commenced on its own or together with a claim on the covenant for repayment of the debt and/or together with a claim for foreclosure or judicial sale of the property.[27] In all cases, the statement of claim merely provides that the mortgagee is seeking an order granting the mortgagee possession of the property as against the mortgagor and refers to the applicable provisions in the mortgage which give the mortgagee the right to possession of the property after default by the mortgagor. The statement of claim for possession must be served personally on the mortgagor and other defendants pursuant to the Ontario *Rules of Civil Procedure*.

Once the defendants have been served with the statement of claim, the defendants have 20 days within which to file a statement of defence or a notice of intent to defend. If a notice of intent to defend is filed, the defendants have an additional 10 days to file their statement of defence. If the action is not defended the mortgagee will obtain a default judgment for possession.

If a defence has been filed, the matter either proceeds on an application for summary judgment or proceeds to discoveries and then possibly to trial. In the case of a summary judgment application the mortgagee must show that there are no triable issues between the mortgagor and the mortgagee. The opportunities for the mortgagor to delay, hinder or frustrate the mortgagee taking possession are significant, particularly in circumstances where the mortgagor claims a set-off or that the mortgage is not in default. The mortgagor must merely raise genuine issues to be tried between the parties and the process could possibly be delayed for quite some time.

Once the mortgagee obtains a judgment, by default, summary or after trial, the mortgagee must then obtain a writ of possession to enforce the judgment. The writ of possession is a court directive to the appropriate sheriff to deliver possession of the property to the mortgagee.

### §22:60   Obtaining Possession

Once a mortgagee obtains judgment for possession, whether or not that action was combined with a sale or foreclosure judgment, it may be enforced by a writ of possession pursuant to rule 60.03 of the *Rules of Civil Procedure*. The mortgagee may obtain leave to issue a writ of possession by application pursuant to rule 60.10. Leave may be obtained on motion without notice or at the time the judgment for possession is made. The court must be satisfied that all persons in actual possession of the property have received proper notice of the proceedings in which the order for possession was obtained to have allowed them to apply for relief or to bring a motion to set aside the judgment. *Jamort Investments Ltd. v. FitzGerald*[28] refers to the type of evidence which must be brought to satisfy the court that proper notice has been given. An affidavit must be provided which identifies all parties in possession of the

---

[27] *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194, Rule 64.
[28] [1968] 1 O.R. 541 (Master).

mortgaged property, the nature and tenure of their possession, information relating to the relationship between those in occupation and the mortgagee to allow the court to determine priorities, and evidence that notice of the intended eviction has been given to the person who will be evicted with proof of service. It should also state that the property is not a residential rental property. The mortgagee may not be entitled to possession against the following persons:

(a)   prior tenants;
(b)   subsequent tenants if
    (i)   consented to, or
    (ii)   there is a non-disturbance agreement.

Once the judgment for possession is obtained written notice must be given to all persons in possession of the property in order to obtain a writ of possession.

A writ of possession remains in force for one year from the date of the order authorizing its issue. Renewals of one-year terms may be obtained pursuant to rule 60.10(3). The mortgagee may have to send an agent or attend on the property to determine who is in actual possession of the property. If there are tenants and the mortgagee intends to take the property with the tenants in possession of the property, the mortgagee need not serve the tenants with the judgment.

Once the order is issued and entered the mortgagee may prepare a writ of possession and deliver it to the sheriff in the district where the land is located. The sheriff will attend on the premises and provide a notice to the occupants that they are to leave the premises within a stated period of time. If the occupants fail to leave the premises within that time period, the sheriff will re-attend on the premises and arrange for the locks to the property to be changed and remove the persons in occupation of the property. The sheriff is entitled to use force to do so.

The mortgagee can take possession of the property without the aid of the courts and without the borrower's consent. Where the property is vacant land, the mortgagee merely attends at the property and asserts its possession over the property. This may involve installing a gate, posting signs on the property, changing the locks on an existing gate or in some other way asserting possession of the property. Where the property contains an income-generating building where the mortgagor is not physically in possession of the building, the mortgagee may take possession of the building by appointing a property manager to take over and change the locks to the property management office, by changing the locks to the main doors to the premises and informing tenants that the mortgagee has taken possession of the premises and by attorning rents. Where the property is occupied by the borrower, the mortgagee cannot oust the borrower from the property or use physical force to obtain possession of the property. Where, however, the mortgagor has abandoned the property, the mortgagee may merely move in and change the locks. The mortgagee is permitted by law to use a moderate amount of force to take possession, such as breaking locks or breaking doors or windows where the property is vacant.

The mortgagee also has the right under most mortgage contracts to appoint a private receiver to take possession of the property. Before appointing a private receiver the mortgagee must pay particular attention that proper notice is provided.

In most cases the mortgagee must allow the mortgagor reasonable notice to repay the indebtedness before appointing a receiver.

The mortgagee generally has the right to apply to the courts for a court-appointed receiver. A court-appointed receiver would be authorized to take possession of the property from the mortgagor. A court-appointed receiver is the agent of the court and is basically appointed to oversee the liquidation of the property on behalf of all creditors. Even if the mortgage does not permit a receiver to be appointed, the court has jurisdiction to appoint a receiver where there is a concern about deterioration of the property.

Depending on the situation, a mortgagee may petition the mortgagor into bankruptcy and the trustee in bankruptcy may then take possession of the real property. This method is often used where there are environmental concerns.

### §22:70   Possible Defendants

Depending on the nature of the property and the purpose for which it is used, there may be a number of possible defendants to an action for possession.

### §22:70.10   Mortgagor

A mortgagor is entitled to possession provided the mortgagor is not in default of the mortgage. As such, the mortgagor must be named as a defendant in an action for possession. In *Kinross Mortgage Corp. v. Balfour*[29] it was held that, if there are numerous mortgagors, all must be named as defendants.

### §22:70.20   Spouses

Section 19(1) of the *Family Law Act*, R.S.O. 1990, c. F.3, provides that a non-titled spouse has a right to possession of a matrimonial home. As such, a spouse is entitled to receive the same notice of possession proceedings as the spouse who is the mortgagor. If notice of possession proceedings is not given to the spouse, the mortgagee may not obtain a writ of possession. Therefore, it is important that the mortgagee determine if the mortgagor has a spouse and whether or not the property is considered a "matrimonial home as defined in s. 18(1) of the *Family Law Act*.

Sections 18(1) and 19 provide as follows:

> 18(1) Every property in which a person has an interest and that is or, if the spouses have separated, was at the time of separation ordinarily occupied by the person and his or her spouse as their family residence is their matrimonial home.
>
> . . . . .
>
> 19(1) Both spouses have an equal right to possession of a matrimonial home.
> (2) When only one of the spouses has an interest in a matrimonial home, the other spouse's right of possession,
>> (a)   is personal as against the first spouse; and
>> (b)   ends when they cease to be spouses, unless a separation agreement or court order provides otherwise.

---

[29]   (1981), 33 O.R. (2d) 213 (H.C.J.).

Section 22(1) of the *Family Law Act* provides that a spouse is entitled to the same notice as the spouse on title to the property:

> 22(1) When a person proceeds to realize upon a lien, encumbrance or execution or exercises a forfeiture against property that is a matrimonial home, the spouse who has a right of possession under section 19 has the same right of redemption or relief against forfeiture as the other spouse and is entitled to the same notice respecting the claim and its enforcement or realization.

### §22:70.30   Tenants

A tenant in possession of the mortgaged property, whose interest is subsequent to that of the mortgagee and who does not have a landlord and tenant relationship with the mortgagee, is not a necessary party to an action for possession. The tenant will be given notice however to an application for a writ of possession. Rule 60.10(2) states that where the mortgagee seeks a judgment for possession as against the mortgagor rather than the mortgagor's tenant, then the tenant is entitled to receive notice of the proceeding. In order for a tenant to maintain priority over a mortgagee, the tenant must provide evidence that either the mortgagee had actual notice of the tenant's interest or that notice of the lease was registered prior to the registration of the mortgagee's interest.[30]

## §22:80   Mortgagee's Rights Against Third Parties

As discussed earlier, if a mortgagee becomes entitled to possession, it may commence an action for possession against the mortgagor. If there is a tenant under a lease made subsequent to the mortgage without the authority of the mortgagee, the mortgagee may commence an action for possession against the tenant.

If the mortgagor or some one claiming under the mortgagor is in actual possession, the mortgagee cannot commence an action for trespass against a third party.[31] If the property has been left vacant by the mortgagor before a title by possession has been acquired by anyone, and the mortgagee has a right of entry, the constructive possession is in the mortgagee and it is entitled to bring an action for trespass.[32]

After entry by a mortgagee its right of possession relates back to the time at which the mortgagee's legal right to enter accrued so as to enable it to support an action against a wrongdoer for a trespass committed at a time prior to the entry,[33] at least in a case in which the mortgagor himself or herself, while in possession, had the right to sue.[34]

It has been held that a mortgagee is entitled to maintain an action against a stranger for damages for removal of part of the mortgaged premises, without proving that the defendant's act has rendered the security insufficient,[35] and it

[30] *Goldale Investments Ltd. v. Ringlord Holdings Ltd. (No. 2)* (1980), 6 A.C.W.S. (2d) 61 (Master).
[31] *Wheeler v. Montefiore* (1841), 2 Q.B. 133, 114 E.R. 53.
[32] *Delaney v. C.P.R. Co.* (1891), 21 O.R. 11 (Q.B.D.); *Mann v. English* (1876), 38 U.C.Q.B. 240.
[33] *Ocean Accident and Guarantee Corp. Ltd. v. Ilford Gas Co.,* [1905] 2 K.B. 493 (C.A.), approving and applying *Barnett v. Earl of Guildford* (1855), 11 Ex. 19, 156 E.R. 728.
[34] *Reid v. Galbraith,* [1927] 2 D.L.R. 857 (B.C.C.A.).

would appear that the right to maintain the action exists notwithstanding that there has been no default under the mortgage and that the mortgagee is not entitled to possession as against the mortgagor.[36]

## §22:90   General — Other Issues

Generally, before the mortgagee has the right to recover possession of the mortgaged property there must be a default under the mortgage. After default and the expiration of any required notice periods, the mortgagee may enter and take possession of the mortgaged property to the exclusion of other parties with subordinate claims against the property. Default may include such things as failure to make a payment, failure to insure, non-payment of realty taxes or non-payment of condominium expenses. Section 88(1)(b) of the *Condominium Act, 1998*, S.O. 1998, c. 19, deems non-payment of condominium expenses to be an event of default.

The mortgagee may not always have the right to take immediate possession of the property. For example, a court order must first be obtained to allow an equitable mortgagee to take possession of property.[37]

In some cases the mortgagee may be required to give the mortgagor notice of default prior to steps being taken to recover possession. This will occur when default is other than non-payment of the mortgage as required by the mortgage or where the mortgage does not have the proper default provision. If there is no stated notice period requirement the test of "reasonableness" may be applicable.

Section 42 of the *Mortgages Act* prevents any further "proceeding or action during the redemption period following the issuing of a notice of sale. A "proceeding or action includes taking possession either by self-help or court process. Section 42 provides:

> 42(1) Where, pursuant to any condition or proviso contained in a mortgage, there has been made or given a demand or notice either requiring payment of the money secured by the mortgage, or any part thereof, or declaring an intention to proceed under and exercise the power of sale therein contained, *no further proceeding and no action either to enforce the mortgage, or with respect to any clause, covenant or provision therein contained*, or to the mortgaged property or any part thereof, shall, until after the lapse of the time at or after which, according to such demand or notice, payment of the money is to be made or the power of sale is to be exercised or proceeded under, be commenced or taken until an order permitting the same has been obtained from a judge of the Superior Court of Justice.
>
> (2) The order may be obtained without notice or upon such notice as the judge may direct upon such proof as satisfies the judge that it is reasonable and equitable that the proposed action or proceeding should be permitted.
>
> (3) This section does not apply to proceedings to stay waste or other injury to the mortgaged property.

(Emphasis added.)

In *Lee v. Guettler*[38] the mortgagee issued a claim for possession and obtained default judgment for possession during the redemption period set out in a notice of

---

[35]  *Holland Canada Mtge Co. v. Fraser*, [1926] 4 D.L.R. 993 (Sask. C.A.).
[36]  *Gooding v. Shea* (1869), 103 Mass. 360. cited in *Holland Canada Mtge Co. v. Fraser, supra.*
[37]  *Barclays Bank Ltd. v. Bird*, [1954] Ch. 274; *Royal Bank of Canada v. Nicholson* (1980), 28 O.R. (2d) 377 (H.C.J.).

sale. The Court of Appeal concluded that the action was a nullity and set aside the default judgment. The court stated that the right to possession was being exercised pursuant to a provision in the mortgage and was a prohibited proceeding or action.

In *Storm v. Double D. Developments Ltd.*[39] a claim for possession was issued before the notice of sale but the claim was served during the notice period. The court held that service of the claim for possession was a "further proceeding and was therefore a nullity. The claim had to be served again.

In *Jones v. Torgis*[40] the court concluded that a claim for possession served on the same day that the notice of sale was issued was a nullity even if the claim was served before the notice of sale was mailed. On the particular facts, the notice of sale was mailed at 4:30 p.m. and the claim was served at 8:00 p.m. The *Mortgages Act* deems the notice of sale to be received on the day it is mailed.

If a receiver has been appointed by the court as a result of action taken by a subsequent mortgagee and the order prohibits other creditors from exercising their rights without prior court approval, a prior mortgagee will not be permitted to recover possession without obtaining court approval.

Section 2 of the *Mortgages Act* allows a redeeming mortgagor or subsequent encumbrancer to require the mortgagee to assign its mortgage security to the redeeming party or as they may direct rather than discharge the mortgage. This is not available if the mortgagee has taken possession. Section 2(1) and (3) provides as follows:

> 2(1) Despite any stipulation to the contrary, where a mortgagor is entitled to redeem the mortgagor may require the mortgagee, instead of giving a certificate of payment or reconveying and on the terms on which the mortgagee would be bound to reconvey, to assign the mortgage debt and convey the mortgaged property to any third person as the mortgagor directs, and the mortgagee is bound to assign and convey accordingly.
>
> . . . . .
>
> (3) This section does not apply if the mortgagee is or has been in possession.

The purpose of s. 2(3) is that, once the mortgagee is in possession, it is liable thereafter for the management of the property and may continue to be liable even if it transfers possession to a subsequent encumbrancer.

A mortgagee contemplating taking possession of the mortgaged security must review the mortgage documentation in order to determine if there are any conditions or limitations on the mortgagee's right to possession.

Not all events of default will necessarily give the mortgagee a right to possession. Some mortgage documentation may only give a right to possession in the event of a monetary default under the mortgage. This is the case with the implied covenants under s. 7(1), para. 1(v) of the LRRA which states: "That the chargee on default of payment . . . may . . . enter on and take possession of . . . the land."

If there is a non-monetary default under the mortgage such as the failure to insure, the failure to keep the property in a good state of repair, the failure to provide for financial statements, the failure to pay realty taxes or the failure to keep prior encumbrances in good standing, these may not in themselves give rise to a right to

---

[38] (1975), 10 O.R. (2d) 257 (C.A.).
[39] (1977), 16 O.R. (2d) 717 (S.C.).
[40] (1978), 22 O.R. (2d) 123 (S.C.).

possession. However, most mortgages will permit the mortgagee to accelerate the debt for a non-monetary default and on acceleration the right to possession will almost certainly be triggered because the accelerated principal and interest are immediately due and if unpaid default occurs.

Notice provisions may be required before possession can be taken. For instance, notice of acceleration for a non-monetary default may have to be provided before the right to possession can be exercised. Most mortgages provide that on default the mortgagee has an immediate right of possession and that no notice is required before possession can be taken. However, some mortgages may provide that a demand for possession must be made before it may be exercised or that the default must continue for a period of time before possession can be taken.

Consideration must be given to whether possession is under the mortgage or under collateral security such as an assignment of rents. The choice of the document may ultimately impact on the procedure for taking possession and the results and obligations which flow from taking possession. For instance, taking possession under the mortgage may give the tenants the right to terminate their leases whereas if possession is taken pursuant to an assignment of leases, the tenants may not have the right to terminate their leases.

# TAB 169

\

J. Walker, ed., Castel & Walker, Canadian Conflict of Laws
(Markham: LexisNexis Canada, 6th ed. 2005)
AVAILABLE IN HARD COPY ONLY