# TAB 171

**Ibbotson® SBBI®**

2010 Valuation Yearbook

Market Results for
Stocks, Bonds, Bills, and Inflation
1926–2009





**2010 Ibbotson® Stocks, Bonds, Bills, and Inflation® Valuation Yearbook**

Stocks, Bonds, Bills, and Inflation® and SBBI® are registered trademarks of Morningstar, Inc. Ibbotson®
and Ibbotson Associates® are registered trademarks of Ibbotson Associates, a wholly owned subsidiary
of Morningstar, Inc., and are used with permission.

The information presented in this publication has been obtained with the greatest of care from sources believed
to be reliable, but is not guaranteed to be complete, accurate or timely. Morningstar and its affiliated companies
expressly disclaim any liability, including incidental or consequential damages, arising from the use of this
publication or any errors or omissions that may be contained in it.

©2010 Morningstar. All rights reserved. No part of this publication may be reproduced or used in any other
form or by any other means—graphic, electronic, or mechanical, including photocopying, recording, taping, or
information storage and retrieval systems—without Morningstar's prior, written permission. To obtain permission,
please call Product Sales or write to the address below. Your request should specify the data or other inform-
ation you wish to use and the manner in which you wish to use it. In addition, you will need to include copies of
any charts, tables, and/or figures that you have created based on that information. There is a $1500 processing
fee per request. There may be additional fees depending on your proposed usage.

Published by:
Morningstar, Inc.
22 W. Washington
Chicago, Illinois 60602

Main (312) 696-6000
Product Sales (888) 298-3647
Fax (312) 696-6010
global.morningstar.com/SBBIYearbooks

ISBN 978-0-9792402-7-0
ISSN 1523-343x

Ibbotson Associates® is a leading authority on asset allocation with expertise in capital market expectations
and portfolio implementation. Approaching portfolio construction from the top-down through a research-based
investment process, its experienced consultants and portfolio managers serve mutual fund firms, banks, broker-
dealers, and insurance companies worldwide. Ibbotson Associates' methodologies and services address all
investment phases, from accumulation to retirement and the transition between the two. Visit Ibbotson.com
for contact information, published research, product fact sheets and other information.

For more information about Morningstar's software and data products for individuals, advisors, and institutions,
see "Investment Tools and Resources" at the back of this book, or call (800) 735-0700.

Additional copies of the *2010 Ibbotson® SBBI® Valuation Yearbook* may be obtained for $165 per book,
plus shipping and handling. Archived editions (2009 and prior) are available in limited quantities for
$200 per book, plus shipping and handling. For purchasing or other information related to volume
discounts or companion publications, please call (888) 298-3647, or write to the address above.


M.I.T. LIBRARIES
FEB 9 - 2011
RECEIVED

# Chapter 1
# Business Valuation

Valuation, at its purest, is the act of placing a value or worth on an asset. Stock analysts determine an equity's value based on its earnings outlook, market value, and other economic variables. Public companies are typically easier to value than private ones due to availability of data. The practice of assigning value, considered a combination of science and art, can be more difficult for non-public companies. This book provides empirical data for many areas of valuation; future editions will continue to integrate expanding knowledge that serves as the basis for a scientific approach to assigning value. Although this chapter focuses on the specifics of business valuation, the data presented throughout the entire book can be applied to many other areas of valuation, such as corporate treasury, capital budgeting, and security analysis.

The three most commonly used approaches to valuing a business are the income, market, and asset-based approaches. In the income approach, a company's cash flows are projected into the future and discounted at an appropriate cost of capital rate to determine present value. The cost of capital, or discount rate, used in the denominator can have a dramatic effect on the ultimate value of a business and is the topic of discussion throughout much of this book. The market approach to valuation uses financial ratio analysis from comparable guideline companies to determine value. Finally, the asset-based approach requires a comprehensive revaluation of all of a company's assets and liabilities, both tangible and intangible. This chapter discusses all three approaches to valuation, focusing mainly on the income approach and other areas where Ibbotson has contributed in the past.

## Preparation
Determining a business entity's worth is a complicated process where preparation demands as much attention as the actual analysis. Prior to examining financial statements and assessing company risk factors, ample time and care must be taken to lay out the valuation process road map. Before discussing the three approaches to business valuation, we will first discuss some of the decision process that provides direction to the valuation process. The following

guidelines and definitions are meant to serve as an outline, the details and procedures of which may vary across different organizations that certify valuation practitioners.

## Standard of Value
While the obvious driving force behind business valuation is determining the value of a business, defining "value" is not so straightforward. Value can mean many things. So for the purpose of valuing a business, certain standards of value have been formulated. One of the first choices to make when mapping out a business valuation is to determine the standard of value appropriate for the situation at hand.

## Definitions and Guidelines
*Fair market value* is defined by IRS Revenue Ruling 59-60 as "...the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts."

*Fair value* is the amount that will compensate an owner involuntarily deprived of property. Commonly there is a willing buyer but not a willing seller, and the buyer may have more knowledge than the seller. Fair value is a legal term left to judicial interpretation. Many consider fair value to be fair market value without discounts.

*Investment value* is the value to a particular investor based on individual investment requirements and expectations.[1]

*Book value* with respect to a business enterprise is the difference between total assets (net of accumulated depreciation, depletion, and amortization) and total liabilities as they appear on the balance sheet (synonymous with "shareholder's equity"). With respect to a specific asset, book value is the capitalized cost less accumulated amortization or depreciation as it appears on the books of account of the business enterprise.[1]

*Intrinsic value* is the value that an investor considers, on the basis of an evaluation or available facts, to be the "true" or "real" value that will become the market value when other investors reach the same conclusion.[1]

*Going concern value* is the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of going concern value result from

factors such as having a trained work force, an operational plant, and the necessary licenses, systems, and procedures in place.[1]

*Liquidation value* is the net amount that would be realized if the business is terminated and the assets are sold piecemeal. Liquidation can be either "orderly" or "forced."[1]

Fair market value is the standard most often used in business valuation; hence, much of the analysis throughout this book is based on this assumption. Most of the data presented in this book also assumes that the company being valued is a going concern. Going concern and liquidation value are concepts that extend beyond the "standards of value" and into the "premise of value." The premise of value is a choice between valuing a company as an ongoing entity or one facing liquidation. At times a firm may be valued assuming that the company is a going concern only to find that the business is worth more if liquidated. This information should be stated in the valuation report, and is the reason why it is necessary to exhaust all reasonable possibilities when performing analysis on a company.

### Ownership Interest

To accurately apply the correct data and formulas in the approach to valuation, the practitioner must have knowledge of the ownership interest to be valued. The two terms commonly used to describe ownership interest are "control" and "minority." Someone with a controlling interest in a company has the ability to direct the firm's management and policies. An interest in a business of more than 50 percent is considered to be a controlling interest. Typically, an owner with a controlling interest can affect both the equity and debt of the company. Ownership of less than 50 percent in a company is considered a minority interest and typically does not include the ability to direct management.

### Valuation Date

IRS Revenue Ruling 59-60 changed the way business is valued and is the cornerstone of the valuation process. Among other things, Ruling 59-60 states that valuation is a forward-looking process but must be based on facts available as of the required date of appraisal. Some carry this out to the letter of the law and assume that only data available as of the relevant valuation date should be used. Others claim that events happening after the valuation date can be considered relevant if they were reasonably foreseeable as of the valuation date.

The *Ibbotson® Stocks, Bonds, Bills, and Inflation® Valuation Yearbook* provides data critical to the valuation process as far back as 1926, such as the equity risk premia and size premia presented in Appendix A of this book. Appendix A can be used to develop a cost of equity as of a previous date. Assuming that the historical data presented in Appendix A was available to the public as of the date of valuation, then many people would argue that the data from the current book can be used in valuations as of a previous date. Others would argue that only yearbooks published as of the valuation date are appropriate. Now part of Morningstar, Ibbotson has been calculating and publishing data since 1976. In addition to vastly improving our methodology for calculating size premia over the years, we have recently introduced an alternative approach to calculate the equity risk premium. It is up to the valuation practitioner to decide whether to use a current book with data from prior years or whether a book published as of the valuation date is the appropriate resource.[2]

### Fundamental Factors

A number of relevant factors should be considered carefully when appraising a business to fair market value—especially when valuing a closely held corporation whose owners have a controlling interest and whose stock quotations are sparse or lacking. According to IRS Revenue Ruling 59-60, there are eight such factors:

1. The nature of the business and the history of the enterprise from its inception.
2. The economic outlook in general and the condition and outlook of the specific industry in particular.
3. The book value of the stock and the financial condition of the business.
4. The earning capacity of the company.
5. The dividend-paying capacity of the company.
6. Whether or not the enterprise has goodwill or other intangible value.
7. Sales of the stock and the size of the block of stock to be valued.
8. The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.

Morningstar publishes information that can help in many of these areas. The *Ibbotson® Stocks, Bonds, Bills, and Inflation® Classic Yearbook* begins with a chapter on highlights of the past year and decade, describing the economic climate for the given year by outlining major economic events as well as headlining mergers and acquisitions. Market performance is also presented to complete the picture on short- and intermediate-term economic performance. The *Ibbotson® Cost of Capital Yearbook* and the related online data available in the Cost of Capital Resources section at http://global.morningstar.com/US/CofCResources provide analyses that expose the strengths and weaknesses across industries. Included in this data are five-year earnings growth rate forecasts and one- and five-year financial ratios. See Graph 1-2 for a sample *Ibbotson Cost of Capital Yearbook* page.

Once all of the preparation has been completed—the standard of value selected and the ownership interest, valuation date, and fundamental factors addressed—the approach to valuation must be decided. For each approach, the appropriate calculation method must also be applied.

### Income Approach to Valuation
One of the most common business valuation methodologies is the income approach. Under the income approach, the analyst must first identify future cash flows to be generated by the asset being valued. Second is the identification of the appropriate rate to use in discounting the cash flows to present value. The discount rate, or cost of capital, should reflect the level of risk inherent in the cash flows being valued. The income approach can be expressed in the following formula:

$$PV_s = \frac{CF_1}{(1+k_s)^1} + \frac{CF_2}{(1+k_s)^2} + \ldots + \frac{CF_i}{(1+k_s)^i}$$

where:

$PV_s$ = the present value of the expected cash flows for company **s**;

$CF_i$ = the cash flow (or dividend) expected to be received at the end of year **i**; and

$k_s$ = the cost of capital for company **s**.

While the basic concept of the income approach to valuation is fairly straightforward, implementing it can be quite arduous. The two most commonly used methods for applying the income approach are the discounted cash flow (DCF)

and capitalization of earnings methods. The DCF method is used when future returns are expected to be substantially different from current operations. In this case, the cost of capital with which to discount is the total expected return that a buyer would demand on the purchase price of an ownership interest in the company, given the risk of that interest. The capitalization of earnings method takes the same discount rate the DCF uses, but subtracts the company's expected annual growth rate. This is most appropriate when a company's current operations are indicative of its future operations. Chapter 4 discusses estimated growth rates in detail.

### Free Cash Flow
In the field of business valuation, the appropriate cash flows used in the equation are the free cash flows generated by the entity that is being valued. Free cash flow represents a company's after-tax cash once adjustment is made for non-cash accounting entries and capital expenditures required to maintain the company as a going concern. To be clear, free cash flow is after corporate taxes and before individual taxes. Free cash flow for the entire invested capital of a firm is most often determined by the following formulas:

**Cash Flow Formula**

|   |   |
|---|---|
|   | EBIT × (1−t) |
| + | Depreciation and Amortization |
| + | Deferred Taxes |
| − | Capital Expenditures |
| − | Changes in Working Capital |
| = | **Free Cash Flow** |

**Alternate Cash Flow Formula**

|   |   |
|---|---|
|   | Net Income |
| + | Depreciation and Amortization |
| + | Deferred Taxes |
| − | Capital Expenditures |
| − | Changes in Working Capital |
| + | Interest Expense × (1−t) |
| = | **Free Cash Flow** |

Free cash flow represents the total amount of cash that can potentially flow to the shareholders and long-term interest bearing debt holders of the company; it is thus the free cash flow that drives the value for all equity and debt holders of the entity.

Several things can be noted about free cash flow. First, it is an after-tax concept. While the equation starts with earnings before interest and taxes (EBIT), this number is

tax adjusted to get to an after-tax value. The equation starts with tax-adjusted EBIT because we want to focus on cash flows independently of capital structure. We must therefore start with earnings before interest expenses and then tax adjust those earnings. Secondly, pure accounting adjustments need to be added back into the analysis. It is for this reason that depreciation expense and deferred tax expense are added back into the after-tax EBIT. Finally, cash flows necessary to keep the company going forward must be subtracted from the equation. These cash flows represent necessary capital expenditures to maintain plant, property, and equipment or other capital expenditures that arise out of the ordinary course of business. Another common subtraction is reflected in changes in working capital. The assumption in most business valuation settings is that the entity in question will remain a long-term going concern that will grow over time. As companies grow, they accumulate additional accounts receivable and other working capital elements that require additional cash to support.

Free cash flow is the relevant cash flow stream because it represents the broadest level of earnings that can be generated by the asset. With free cash flow as a starting point, the owners of a firm can decide how much of the cash flow stream should be diverted toward new ventures, capital expenditures, interest payments, and dividend payments. It is incorrect to focus on earnings as the cash flow stream to be valued because earnings contain a number of accounting adjustments and already include the impact of capital structure.

### Weighted Average Cost of Capital

Since free cash flow represents the cash flow stream flowing from the entire entity, the appropriate discount rate to use in the income approach model is the weighted average cost of capital (WACC). The WACC is represented by the following equation:

$$WACC = W_D k_D (1-t) + W_E k_E$$

where:
$W_D$ = weight of debt in the capital structure;
$k_D$ = cost of debt capital;
$t$ = effective tax rate for the company;
$W_E$ = weight of equity in the capital structure; and
$k_E$ = cost of equity capital.

Ideally, a firm's target or optimal capital structure should be used in weighting the cost of equity and cost of debt. Unfortunately, many companies are either not able to obtain their target capital structure, or information to support the target capital structure is not available (as may be the case for a minority-interest shareholder). In the absence of a reliable target capital structure, the capital structure weights should be market value weighted. While it is typically a straightforward process to measure the market value of equity capital for a public company, it usually is not so simple for debt capital because so little debt is publicly traded. Therefore, in most cases the market value of debt in the capital structure is assumed to be the book value of debt. The weights are calculated from the market values as follows:

$$W_D = \frac{D}{D+E}, \quad W_E = \frac{E}{D+E}$$

where:
$W_D$ = weight of debt in the capital structure;
$W_E$ = weight of equity in the capital structure;
$D$ = the market value of debt outstanding; and
$E$ = the market value of equity outstanding.

Together the weights should add up to 100 percent. An excellent source for industry average capital structure weights is the *Ibbotson Cost of Capital Yearbook*.

The WACC formula above is primarily applicable to a controlling interest valuation. For a minority interest, adjustments may be made to both the numerator and the denominator of the present value formula. The free cash flow in the numerator should be adjusted to remove the effect of debt, as a minority owner does not have the power to influence capital structure and the issuance of debt. For this reason, net changes in long-term debt should be added (add new debt principal in and subtract debt principal out). If tax-effected interest expense has been added to the formula, make sure to subtract it back out. Once free cash flow has been recalculated to remove the effect of debt, the cost of capital must be calculated independent of debt as well. One way to do this is to simply discount using the cost of equity in the denominator. This is the same as using a capital structure of 100 percent equity and 0 percent debt in the WACC formula.

**Chapter 1: Business Valuation**

There may also be times when the WACC formula will apply to a minority interest valuation. In these cases, the actual capital structure of the company should be used, as opposed to an industry average or target structure, since minority shareholders will not have the power to change it.

Determining value for an S corporation or other pass-through entity can be even trickier. An S corporation is a corporation that has elected to be taxed as a pass-through entity (similar to a partnership). For an S corporation, all taxes are passed through to the shareholder level (no taxes on business income at the corporate level). However, the concept of "useable income" described above still applies: The S corporation can only reinvest and use for growth income that is available after taxes on business profits have been satisfied. The fact that it has to pay those income taxes via its shareholders makes no difference to the S corporation's value proposition. Therefore, business income taxes are still deducted from the income stream. However, an S corporation (and other pass-through entities) may have an advantage with respect to the avoidance of dividend and capital gains taxes that public market investors pay. As the Morningstar data is derived from the public market, the data includes the affects of such dividend and capital gains tax.

There has been much controversy regarding the extent to which S corporations should be adjusted for the effects of shareholder taxes, with several models designed to make adjustments to accommodate the difference. New guidance based on a broad array of academic research on the extent to which shareholder taxes effect market returns and value suggests that this adjustment may not be as large as previously thought.[3] The valuation practitioner should evaluate each case individually to determine what adjustments, if any, should be made.

**Tax Rate Assumptions**

In calculating the WACC, one important element that is often overlooked is the tax rate. While it has been known for quite some time that companies do not necessarily pay the top statutory rate, it has been common practice to use the top marginal statutory rate in cost of capital calculations.[4] One reason the use of the marginal tax rate has persisted is the difficulty in accurately measuring what the firm's expected tax rate will be.

The tax rate is an important determinant of the WACC. Its significance is demonstrated in the following simple example:

Assume a company is financed with 50 percent debt and 50 percent equity. The cost of equity ($k_E$) is 15 percent, and the cost of debt ($k_D$) is 10 percent. Calculating the WACC using a tax rate ($t$) of 35 percent results in a value of 10.75 percent:

$$WACC = W_D k_D (1-t) + W_E k_E = \left[0.5 \times 0.1 \left(1 - 0.35\right)\right] + (0.5 \times 0.15) = 10.75 \text{ percent}$$

However, if the company does not expect to pay the statutory rate and instead has a tax rate of 10 percent, the WACC increases to 12.0 percent—a change of 125 basis points:

$$WACC = W_D k_D (1-t) + W_E k_E = \left[0.5 \times 0.1 \left(1 - 0.1\right)\right] + (0.5 \times 0.15) = 12.0 \text{ percent}$$

Research by John Graham provides a way for practitioners to determine more accurate estimates of expected future tax rates.[5] Under Graham's methodology, expected future earnings are simulated using current tax code provisions. The Graham methodology shows that a majority of firms can expect to pay less than the top marginal rate. Under the current tax code, over 58 percent of firms can expect to pay tax rates under 10 percent, substantially less than the top marginal rate. Graph 1-1 shows the distribution of tax rates for over 7,000 companies.



**Graph 1-1:** Effective Tax Rate Distribution

Number of Companies

Data from fiscal year 2008

### Market Approach to Valuation

The market approach to valuation uses data from comparable guideline companies to develop a measure of value for a particular subject company. Two types of data are used to implement the market approach. The first is data from guideline publicly traded companies. A wealth of data exists for the publicly traded equity market, including the type of financial ratios applied when determining value using the market approach. Transaction data for private and public companies can also be used in computing value using the market approach. In this case, a database of bought and sold companies is used to base transaction prices and financial fundamentals on companies similar to the subject company. Data derived from guideline public companies should be used when determining a minority interest value because the shareholders of publicly traded companies usually have a minority stake in the company. Merger and acquisition data is typically used to derive a controlling interest value because data concerns the sale of an entire company, equity and debt.

### Guideline Public Companies

Implementation of the market approach using publicly traded companies typically relies on the use of financial ratios that compare the stock price of a company to its various accounting measures of fundamental data. Many ratios contain stock price or market value of equity and work well in the market approach to determining value:

---

- Price to Earnings
- Price to Cash Flow
- Price to Shareholders' Equity

---

The above ratios can be used to determine a value of equity, but sometimes it may be desirable to determine the entire market value of invested capital (MVIC). Market value of invested capital is the combination of both equity and debt of a given company. Some common ratios used to determine market value of invested capital are:

---

- MVIC to Sales
- MVIC to EBIT (earnings before interest and taxes)
- MVIC to EBITDA (earnings before interest, taxes, depreciation, and amortization)

---

### Other Income Approach Considerations

One important aspect of the income approach model is that the discount rate and the cash flows need to be estimated on the same basis. For instance, if pre-tax cash flows are projected in the model, they must be discounted to present value using a pre-tax cost of capital (as opposed to an after-tax cost of capital). If nominal cash flows are projected in the model, then a nominal cost of capital should be used in the discount rate. Failure to properly match the discount rate with the cash flows will produce an inaccurate value.

Another common mistake in the income approach is the use of a "most likely"—as opposed to an expected—cash flow. The calculation of an expected cash flow requires the estimation of future cash flows under different scenarios, to which probabilities are then attached. For instance, suppose there are only two possible scenarios affecting the expected cash flow, economic boom and recession. The likelihood of these economic scenarios is 75 percent and 25 percent, respectively. Also suppose that under an economic boom, the projected cash flow is $100, while in a recession the projected cash flow is $50. The expected cash flow is calculated by multiplying the projected cash flow under each economic scenario by its corresponding probability, then summing these products ($100 × 0.75) + ($50 × 0.25) = $87.50. The result is a probability-weighted projection of cash flow, rather than the "most likely" cash flow of $100.

**Graph 1-2:** SIC 42 from *2009 Ibbotson® Cost of Capital Yearbook*: Data Through March 2009

## Statistics For SIC Code 42

Data through March 2009

**Motor Freight Transportation and Warehousing**
This Industry Comprises 24 Companies

**Industry Description**

This major group includes establishments furnishing local or long-distance trucking or transfer services, or those engaged in the storage of farm products, furniture and other household goods, or commercial goods of any nature.

**Sales** (million$)

| | |
|---|---|
| Total | 83,023 |
| Average | 3,459.3 |

**Three Largest Companies**

| | |
|---|---|
| UNITED PARCEL SERVICE INC | 51,486.0 |
| YRC WORLDWIDE INC | 8,940.4 |
| HUNT (JB) TRANSPRT SVCS INC | 3,731.9 |

**Three Smallest Companies**

| | |
|---|---|
| PATRIOT TRANSN HOLDING INC | 172.0 |
| TRAILER BRIDGE INC | 133.0 |
| AUTOINFO INC | 110.3 |

**Total Capital** (million$)

| | |
|---|---|
| Total | 66,708 |
| Average | 2,779.5 |

**Three Largest Companies**

| | |
|---|---|
| UNITED PARCEL SERVICE INC | 43,918.6 |
| IRON MOUNTAIN INC | 7,720.0 |
| HUNT (JB) TRANSPRT SVCS INC | 3,673.6 |

**Three Smallest Companies**

| | |
|---|---|
| FROZEN FOOD EXPRESS INDS | 50.4 |
| AUTOINFO INC | 22.0 |
| US 1 INDUSTRIES INC | 13.0 |

**SIC vs. S&P 500 for Last 10 Years (%)**



**Number of Companies & Total Capital** (billion$)

| S&P Debt Rating | Large Cap | Mid Cap | Low Cap | Micro Cap | Totals | |
|---|---|---|---|---|---|---|
| AAA, AA, A | 1 | 0 | 0 | 0 | 1 | (companies) |
| | 43.9 | 0.0 | 0.0 | 0.0 | 43.9 | (capital) |
| BBB | 0 | 1 | 1 | 0 | 2 | |
| | 0.0 | 3.7 | 0.5 | 0.0 | 4.2 | |
| BB, B, CCC, CC, D | 0 | 1 | 0 | 3 | 4 | |
| | 0.0 | 7.7 | 0.0 | 2.2 | 9.9 | |
| Not Rated | 0 | 0 | 5 | 12 | 17 | |
| | 0.0 | 0.0 | 6.7 | 2.0 | 8.7 | |
| Totals | 1 | 2 | 6 | 15 | 24 | |
| | 43.9 | 11.4 | 7.2 | 4.2 | 66.7 | |

**Annualized Statistics for Last 10 Years (%)**

| | Avg Return | Std Deviation |
|---|---|---|
| S&P 500 | -1.76 | 15.64 |
| SIC Composite | 8.29 | 19.92 |
| Large Composite | 0.21 | 20.72 |
| Small Composite | 26.73 | 46.42 |

**Compound Annual Equity Return (%)**

| | 5 Years | 10 Years |
|---|---|---|
| 75th Percentile | 7.99 | 18.67 |
| Median | -4.81 | 9.80 |
| 25th Percentile | -14.95 | -1.27 |
| SIC Composite | -0.03 | 19.47 |
| Large Composite | -3.39 | 13.09 |
| Small Composite | 9.43 | 19.83 |

**Sales, Income & Market Capitalization** (billion$)

| | Sales | Operating Income | Net Income | Equity Capital | Debt Capital |
|---|---|---|---|---|---|
| Current Yr. | 83.0 | 10.9 | 2.7 | 50.0 | 16.8 |
| Last Yr. | 80.7 | 12.3 | 0.7 | 71.2 | 18.2 |
| 2 Yrs. Ago | 77.4 | 12.2 | 5.5 | 70.2 | 9.9 |
| 3 Yrs. Ago | 70.0 | 11.3 | 5.0 | 74.6 | 9.3 |
| 4 Yrs. Ago | 59.6 | 9.5 | 4.1 | 65.5 | 8.8 |

**Growth Over Last 5 Years (%)**

| | Net Sales | Operating Income | Net Income |
|---|---|---|---|
| Median | 9.11 | 8.10 | 8.82 |
| SIC Composite | 10.35 | 5.94 | -4.91 |
| Large Composite | 10.48 | 5.46 | -5.98 |
| Small Composite | 14.77 | 16.61 | NMF |

**Capital Structure Ratios (%)**

| | Debt/Total Capital | | Debt/MV Equity | |
|---|---|---|---|---|
| | Latest | 5-Year Avg | Latest | 5-Year Avg |
| Median | 22.88 | 17.44 | 29.67 | 21.12 |
| SIC Composite | 24.52 | 15.71 | 32.49 | 18.64 |
| Large Composite | 24.11 | 13.93 | 31.76 | 16.18 |
| Small Composite | 45.24 | 35.31 | 82.61 | 54.59 |

**Distribution of Sales & Total Capital** (million$)

| | Distribution of Sales | | Total Capital | |
|---|---|---|---|---|
| | Latest | 5-Year Avg | Latest | 5-Year Avg |
| 90th Percentile | 3,528.9 | 3035.9 | 3137.5 | 3,634.0 |
| 75th Percentile | 1,892.6 | 1828.9 | 1284.0 | 1,490.4 |
| Median | 659.8 | 527.7 | 343.0 | 394.8 |
| 25th Percentile | 412.5 | 349.9 | 137.5 | 218.5 |
| 10th Percentile | 175.8 | 149.3 | 64.7 | 131.9 |

**Margins (%)**

| | Operating Margin | | Net Margin | | Asset Turnover | | Return on Inv. Cap. | | Return on Assets | | Return on Equity | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Latest | 5-Year Avg | Latest | 5-Year Avg | Latest | 5-Year Avg | Latest | 5-Year Avg | Latest | 5-Year Avg | Latest | 5-Year Avg |
| Median | 10.03 | 11.96 | 1.57 | 3.55 | 165.51 | 166.10 | 3.88 | 6.91 | 3.04 | 5.74 | 4.83 | 6.11 |
| SIC Composite | 13.03 | 15.14 | 3.22 | 4.85 | 146.03 | 138.54 | 8.28 | 9.46 | 4.71 | 6.72 | 5.34 | 5.37 |
| Large Composite | 13.19 | 15.57 | 3.47 | 5.17 | 153.48 | 141.88 | 10.72 | 10.97 | 5.33 | 7.34 | 5.97 | 5.81 |
| Small Composite | 12.00 | 14.69 | 1.52 | 3.68 | 101.82 | 94.88 | 1.31 | 3.75 | 1.55 | 3.49 | 2.60 | 3.70 |

**Equity Valuation Ratios (Multiples)**

| | Price/Earnings | | Market/Book | | Price/Sales | | Price/Cash Flow | | Price/Operating Income | | Dividend Yield (% of Price) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Latest | 5-Year Avg | Latest | 5-Year Avg | Latest | 5-Year Avg | Latest | 5-Year Avg | Latest | 5-Year Avg | Latest | 5-Year Avg |
| Median | 20.70 | 16.37 | 1.40 | 1.47 | 0.26 | 0.51 | 47.02 | NMF | 4.45 | 4.62 | 0.00 | 0.00 |
| SIC Composite | 18.72 | 24.67 | 3.03 | 2.62 | 0.60 | 0.90 | 28.31 | 34.72 | 4.63 | 5.97 | 3.53 | 2.65 |
| Large Composite | 16.76 | 23.03 | 4.19 | 2.72 | 0.58 | 0.89 | 25.99 | 26.30 | 4.41 | 5.72 | 4.26 | 3.24 |
| Small Composite | 38.40 | 45.77 | 1.38 | 2.30 | 0.59 | 1.00 | NMF | NMF | 4.88 | 6.78 | 0.00 | 0.00 |

**Growth Rates (%)**

| | Analysts' Estimate |
|---|---|
| Median | 12.49 |
| SIC Composite | 12.49 |
| Large Composite | 11.39 |
| Small Composite | 12.49 |

**Cost of Equity Capital (%)**

| | CAPM | CAPM + Size Prem | 3-Factor Fama-French | Discounted Cash Flow 1-Stage | Discounted Cash Flow 3-Stage |
|---|---|---|---|---|---|
| Median | 9.40 | 12.23 | 12.10 | 13.65 | 12.40 |
| SIC Composite | 9.17 | 10.11 | 10.07 | 12.70 | 14.90 |
| Large Composite | 9.26 | 9.26 | 9.88 | 12.88 | 16.40 |
| Small Composite | 10.40 | 14.14 | 10.17 | 12.49 | 9.80 |

**Weighted Average Cost of Capital (%)**

| | CAPM | CAPM + Size Prem | 3-Factor Fama-French | Discounted Cash Flow 1-Stage | Discounted Cash Flow 3-Stage |
|---|---|---|---|---|---|
| Median | 10.27 | 12.86 | 12.84 | 14.42 | 12.76 |
| SIC Composite | 9.61 | 10.34 | 10.31 | 12.37 | 14.08 |
| Large Composite | 9.34 | 9.34 | 9.82 | 12.14 | 14.87 |
| Small Composite | 12.25 | 14.62 | 12.61 | 13.57 | 11.86 |

**Betas**

| | Levered Raw Beta | Adjusted Beta | Unlevered Adjusted Beta |
|---|---|---|---|
| Median | 0.91 | 0.90 | 0.64 |
| SIC Composite | 0.87 | 0.87 | 0.71 |
| Large Composite | 0.88 | 0.88 | 0.73 |
| Small Composite | 1.08 | 1.06 | 0.68 |

© 2009 Morningstar, Inc. All rights reserved. The information herein is not represented or warranted to be accurate, correct, complete or timely. Past performance is no guarantee of future results.

M⋆RNINGSTAR®

### Gathering Data

Publicly traded companies offer many options for obtaining relevant data. Determining value using a price/earnings multiple requires obtaining the current market price of the guideline company's equity as well as the company's earnings. Stock price data is rather easy to find, but earnings data can be more difficult. Moody's and Standard & Poor's both provide this type of data in a variety of products. Morningstar's database contains comprehensive financial data on over 20,000 U.S. and global equities.

Once data has been gathered, determining the appropriate financials to use requires some analysis. For example, earnings are needed to compute a price/earnings ratio, but what exactly should be used to represent earnings? In the *Ibbotson Cost of Capital Yearbook*, income before extraordinary items is used to represent earnings because this is the item that focuses on the reoccurring income stream. Income that includes one-time charges can be misleading on a forward-looking basis.

Time periods for both the numerator and the denominator of any ratio must match as closely as possible. Mismatching time periods from which data is gathered can result in drastic distortion of results, especially when market conditions have changed significantly. While values for stock price can usually be obtained as of the valuation date, values from a company's financial statements are often from the latest fiscal year-end or latest four quarters. While some analysts use only the most recent financials, others prefer to use an average from a number of years (commonly five years). The decision on an appropriate time frame from which to gather fundamental data depends heavily on the quality and availability of the data and the stability of market conditions.

### Example Using the P/E Ratio

In this hypothetical example, assume that the subject company is a privately held publisher with $2 million in earnings. Using a page from the *Ibbotson® Cost of Capital Yearbook*, an appropriate peer group represented by SIC 42 (Motor Freight Transportation and Warehousing) is identified, as seen in Graph 1-2. The median price/earnings ratio for the group is 20.70. To solve for the implied market value of equity of the subject company, solve for the price of the subject company as follows:

$$\frac{\text{Price}_{\text{Subject Company}}}{\text{Earnings}_{\text{Subject Company}}} = \frac{\text{Price}_{\text{Peer Group}}}{\text{Earnings}_{\text{Peer Group}}}$$

**Table 1-1:** Mergers and Acquisitions

| Name of Publication/Database | Vendors |
| --- | --- |
| Acquisitions Monthly | Thomson Reuters |
| BIZCOMPS | BIZCOMPS |
| Corporate Growth Report | NVST, Inc |
| Done Deals | Thomson Reuters |
| IBA Market Database | Institute of Business Appraisers |
| Industry Valuation Update | Business Valuation Resources |
| Merger & Acquisition Sourcebook | NVST, Inc |
| Mergers & Acquisitions Report | SourceMedia |
| Mergers & Acquisitions Report, The Dealmaker's Journal | SourceMedia |
| Mergerstat Review | FactSet MergerStat |
| Mergerstat®/BVR Control Premium Study | Business Valuation Resources |
| Pratt's Stats | Business Valuation Resources |
| Public Stats | Business Valuation Resources |
| SDC Platinum | Thomson Reuters |

Since the P/E for the peer group is obtained from the *Ibbotson Cost of Capital Yearbook* (20.70), all we need is the earnings for the subject company and the terms can be rearranged to solve for the implied value of equity for the subject company.

$$\frac{Price_{Subject\ Company}}{\$2,000,000} \approx 20.70$$

so;

The market value of equity for the subject company is approximated at $41,400,000. The importance of choosing an appropriate group of guideline companies is evident.

**Guideline Transaction Data**

In addition to publicly traded company data, transaction or sales data can be used to determine value with the market approach. Mergers and acquisitions provide much of the comparable sales data necessary to implement this approach. For publicly traded companies, their 8-K statement can be a good source of information. The statement is used to report to shareholders the occurrence of major changes, including mergers, acquisitions, and management shake-ups. Table 1-1 is a partial list of providers. The implementation of the market approach is the same whether using data on publicly traded companies or merger and acquisition transactions. Multiples used to derive value with transaction data ordinarily use the market value of invested capital (MVIC) in the numerator, since the entire capital structure of the company is typically being sold and reported in the merger and acquisition data. Instead of using market prices, the transaction or deal price is used to represent invested capital. When the entire invested capital is sold, the value derived is typically that for a majority ownership with a controlling interest.

**Asset-Based Approach to Valuation**

With this approach, the value of a business is determined by valuing each component of the business separately. Taking the sum of the asset values, both tangible and intangible, and subtracting the value of liabilities derives the ultimate value of the business. The asset-based approach to valuation is primarily used when appraising a holding company, family limited partnership, or entities in bankruptcy proceedings.

The asset-based approach revaluation is organized into a balance sheet where each asset is revalued at fair market value. The presentation of results in this format is one of the benefits of the asset approach. Many potential purchasers of a business are familiar with the balance sheet format, making it easy to identify where the value of a business is coming from. While all three major valuation approaches should arrive at similar values for a company, the asset-based approach is the only one that allows identification of the areas producing the greatest value. For example, the fair market value of a business may be 50 percent greater than its historical cost value according to its balance sheet. A direct comparison of historical costs and fair market value using the asset-based approach will show where that 50 percent is located.

The greatest disadvantage of the asset-based approach is that it can be time-consuming and expensive. It may also require more involvement from the subject company's management team. Of course, the analyst will also need extensive training in accounting and may require the aid of outside experts to help value certain types of assets and liabilities that may be outside of his/her expertise. Also, the asset-based approach is the least desirable approach for minority-interest valuations because minority shareholders rarely have access to the necessary level of information and cooperation from management. Valuing intangible assets, such as goodwill, is very difficult and the resulting value may not actually explain much. Unrecorded intangible assets will not show up in the asset-based approach, but may be captured in the cash flows of the income approach. For this reason, when a substantial portion of the assets cannot be valued with accuracy, the asset-based approach is not ideal. ▌▐

**Endnotes**

1 **Page 11, 12** International Glossary of Business Valuation Terms.

2 **Page 12** Contact Product Sales at 888-298-3647 for information on obtaining prior editions of the *Ibbotson Stocks, Bonds, Bills, and Inflation Yearbooks* (Classic and Valuation Editions).

3 **Page 15** Nancy J. Fannon, *The Impact of Taxes on Value in the Private Capital Markets*, Business Valuation Resources (BVR), available Summer 2010.

4 **Page 15** Cordes, Joseph and Steven Sheffrin."Estimating the Tax Advantage of Corporate Debt," *Journal of Finance*, Vol. 38, 1983, 95–105.

5 **Page 15** Graham, John. "Debt and the Marginal Tax Rate," *Journal of Financial Economics*, Vol. 41, 1996a, 41–73.

Graham, John. "Proxies for the Corporate Marginal Tax Rate," *Journal of Financial Economics*, Vol. 42, 1996, 187–221.

Graham, John, Michael Lemon, and James Schallheim. "Debt, Leases, Taxes and the Endogeneity of Corporate Tax Status," *Journal of Finance*, Vol. 53, 1998.

TAB 172

# BVR's Guide to Intellectual Property Valuation

## 2009 Edition



Authored by:
## Michael Pellegrino





**What It's Worth**

Copyright © 2009 by Business Valuation Resources, L.L.C. (BVR). All rights reserved.

Printed in the United States of America.

No part of this publication may be reproduced, stored in a retrieval system or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, scanning or otherwise, except as permitted under Sections 107 or 108 of the 1976 United States Copyright Act, without either the prior written permission of the Publisher or authorization through payment of the appropriate per copy fee to the Publisher. Requests for permission should be addressed to the Permissions Department, Business Valuation Resources, LLC, 1000 SW Broadway St., Suite 1200, Portland, OR, 97205, (503) 291-7963, fax (503) 291-7955.

Information contained in this book has been obtained by Business Valuation Resources from sources believed to be reliable. However, neither Business Valuation Resources nor its authors guarantee the accuracy or completeness of any information published herein and neither Business Valuation Resources nor its authors shall be responsible for any errors, omissions, or damages arising out of use of this information. This work is published with the understanding that Business Valuation Resources and its authors are supplying information but are not attempting to render business valuation or other professional services. If such services are required, the assistance of an appropriate professional should be sought.

Editor: Colin Murcray
Production Editor: Laurie Morrisey
Publisher: Doug Twitchell
Copy Editor: Andrea M. Nash

Chair and CEO: David Foster
President: Lucretia Lyons
Sales: Linda Mendenhall
Customer Service Manager: Stephanie Crader
ISBN: 978-935081-12-8

Applied Valuation Approaches

approach to value IP in general carries substantial challenges to generating a credible value opinion (more on this shortly).

## The Income Approach

Valuation analysts typically use the income approach for intellectual property valuation assignments. A valuation analyst using the income approach bases his or her opinion on the intellectual property owner's business plan, marketing and operational inputs, and other external references. Using this method, the valuation analyst projects the economic income generated solely from the intellectual property over a discrete period, known as the remaining useful life (RUL).

The RUL is generally one of the most difficult attributes of the intellectual property's value to determine when using the income approach. It is also one of the most significant drivers for the intellectual property's value. All else the same, intellectual property with a long RUL is worth more than intellectual property with a shorter RUL. The RUL will vary based on the intellectual property under review. Certain intellectual property may have a longer RUL than others (e.g., a patent for a truck gas tank mount versus a patent on a software search algorithm) because of technological risk or the potential for substitutions.

To determine economic income, the valuation analyst projects the revenue (or cost savings or other economic benefit) generated from the intellectual property over the RUL, and then offsets that revenue with costs related directly to the intellectual property's exploitation, such as labor, materials, required capital investment, and any appropriate economic rents or capital charges. Valuation analysts employ several methods to measure economic income associated with a given piece of intellectual property.

The income discount rate that the valuation analyst uses has, aside from the RUL, one of the largest value impacts. There is an inverse relationship between the discount rate and value. Higher discount rates lower value, and vice versa. This is desirable, as it mirrors classic risk/reward principles when determining an appropriate discount rate. Early-stage intellectual property with little proven market power commands a higher discount rate than proven intellectual property because the risk of the early-stage intellectual property generating no economic income is higher than with proven intellectual property.

## The Assignment/Approach Match

In many of the examples presented thus far in this guide, the cost and market approaches both would have failed to account with any measure of precision or defensibility the value of the IP. For example, the cost and market approaches cannot account for the value loss of the Prozac® patent to Eli Lilly, the loss in value associated with failing to pay patent maintenance fees, the value of the Morton Salt brand, or the patent value associated with the mower sales. In the simplest sense, the IP valuation assignment encompasses a consid-

# TAB 173

# TECHNOLOGY CONTRACTING: LAW, PRECEDENTS AND COMMENTARY

**P. Bradley Limpert**
LL.B., M.A. Sc., B. Engineering

**CARSWELL**®

TORYS LLP

LIBRARY • TORONTO

# Publisher's Note

**2011 – Release 1**
Previous release was 2010-2



---

Limpert

# Technology Contracting

This publication provides comprehensive, invaluable information relating to transactions and agreements that technology-oriented companies enter into throughout their life cycle. Each chapter includes a discussion on the law that is relevant to negotiating and drafting particular types of agreements, and practical suggestions for drafting and negotiating clauses and provisions within the agreements. The publication includes key contracts and transactions that are of interest to technology-oriented companies.

This release features the addition of sample patent license agreements to Chapter 5 (Patent Licensing).

## Commentary Highlights

The following sample patent license agreements have been added as appendices to Chapter 5 (Patent Licensing):

- Production Patent License Agreement

- Rapid Data License Agreement

- Exclusive Field-Of-Use Patent License Agreement

- Patent License Agreement

- License Agreement

---

**CARSWELL**®    **Customer Relations**
Toronto 1-416-609-3800
Elsewhere in Canada/U.S. 1-800-387-5164 Fax 1-416-298-5082
www.carswell.c

This publisher's    KF 905 C6 L56 2005+
for the purpose    Limpert, Brad, 1963-
Technology contracting : law, precedents
and materials /
Toronto

© 2005 Thomson Reuters Canada Limited

NOTICE AND DISCLAIMER: All rights reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, recording or otherwise, without the prior written consent of the publisher (Carswell).

Carswell and all persons involved in the preparation and sale of this publication disclaim any warranty as to accuracy or currency of the publication. This publication is provided on the understanding and basis that none of Carswell, the author/s or other persons involved in the creation of this publication shall be responsible for the accuracy or currency of the contents, or for the results of any action taken on the basis of the information contained in this publication, or for any errors or omissions contained herein.

No one involved in this publication is attempting herein to render legal, accounting or other professional advice. If legal advice or other expert assistance is required, the services of a competent professional should be sought. The analysis contained herein should in no way be construed as being either official or unofficial policy of any governmental body.

**Library and Archives Canada Cataloguing in Publication**

Limpert, P. Bradley
     Technology contracting : law, precedents and commentary.

Updated annually.
Includes index.
ISBN 0-459-25506-1 (loose-leaf)
ISSN 1714-7379

     1. Technology and law—Canada. 2. Computer contracts—Canada. 3. License agreements—Canada. 4. Technology transfer—Law and legislation—Canada. I. Title.

KE1387.5.L55 2005          346.7102          C2005-901236-6
KF4270.L45 2005

Composition: Computer Composition of Canada Inc.



**THOMSON REUTERS**

**CARSWELL, A DIVISION OF THOMSON REUTERS CANADA LIMITED**

One Corporate Plaza                                   **Customer Relations**
2075 Kennedy Road                          Toronto 1-416-609-3800
Toronto, Ontario                 Elsewhere in Canada/U.S. 1-800-387-5164
M1T 3V4                                            Fax: 1-416-298-5082
                                                   www.carswell.com
                                     Online www.carswell.com/email

be registered.[76] The assignor of a patent has no right to sue for infringement occurring after an entire assignment, as an assignee receives the exclusive rights under s. 42 on assignment. Subsection 55(1) provides authority that an assignee is entitled to sue for patent infringement occurring prior to an assignment, as a party that infringes a patent is liable to an assignee for infringement damages "sustained . . . after the grant of the patent."

### (v) *Partial Assignment*

The *Patent Act* contemplates partial assignments of inventions, applications and patents.[77] For example, an assignment may transfer 50% of the entire interest in an invention, application or patent. The assignee of a partial patent assignment is legally a co-owner. The entire interest of a co-owner of a patent may be assigned without the consent of other patent co-owners.[78] The grant of a license of a co-owner of a patent requires co-owner consent.[79] In addition, partial assignments of subject matter or fields of use, and partial assignments of the regional application of a patent within Canada are possible.

### (vi) *Stanford v. Roche: Assignment Clauses*

In *Board of Trustees of Leland Stanford Junior University v. Roche*, the US Court of Appeal for the Federal Circuit ruled that the specific language used to assign a patent in an agreement profoundly affects the specific time that the assignment actually occurs.[79.1] This decision emphasizes the importance of careful use of language when drafting agreements for the assignment of patents.

### (A) Background

The dispute in *Stanford v. Roche* concerned the ownership of rights in several patents that claim methods for quantifying the occurrence of HIV in human blood and using the measurements to determine the efficacy of antiretroviral drugs that have been administered to a subject. The patents used a technique called polymerase chain reaction ("PCR") to measure levels of HIV in the blood.

The technology behind the patents was developed by a research fellow at Stanford University ("Stanford") named Mark Holodniy ("Holodniy"). Upon

---

76  *Ibid.* at s. 50(2).
77  *Ibid.* at ss. 49(2), 50(1).
78  *Forget, supra* note 67.
79  *Ibid.*
79.1  583 F.3d 832, 249 Ed. Law Rep. 612, 92 U.S.P.Q.2d 1442 (Fed. Cir. 2009) [*Stanford v. Roche*].

commencing employment at Stanford, Holodniy signed a Copyright and Patent Agreement ("CPA") where it was stated "I agree to assign or confirm in writing to Stanford and/or Sponsors that right, title and interest in . . . such inventions as required by Contracts or Grants".[79.2]

During the course of Holodniy's research, he sought assistance from Cetus, a company with expertise in PCR techniques. Holodniy signed a Visitor's Confidentiality Agreement ("VCA") with Cetus in which he agreed that "I will assign and do hereby assign to Cetus, my right, title, and interest in each of the ideas, inventions and improvements".[79.3]

In 1991, Roche acquired Cetus' PCR division, which included agreements with Stanford and with Holodniy. Holodniy finally filed for a patent in 1992 for the HIV measurement technology he had been researching but it was not until 1995 that Holodniy assigned the patent to Stanford.

Several years later, Roche marketed an HIV detection kit. Stanford sued Roche for infringement of Holodniy's patented technology and Roche countersued Stanford for not having standing to bring an action for infringement. The District Court for the Northern District of California held that the patents were invalid for obviousness.

### (B) Federal Circuit

The Court of Appeal vacated the District Court's decision by reasoning that Stanford did not own the patent rights and so the lower court did not have jurisdiction to rule on the validity of the patents.[79.4]

### (C) Agreements

The Federal Circuit analyzed the various agreements between Stanford, Holodniy and Cetus and concluded that Cetus, and subsequently Roche, were the proper assignees of the patents.

The court held that Stanford did not acquire Holodniy's patent by execution of the CPA. The language of the CPA was that Holodniy would "agree to assign" the patents, which the court understood to mean that Holodniy merely "agreed only to assign his invention rights to Stanford at an undetermined time" when Holodniy would take further action to complete the assignment.[79.5] Thus, Stanford "gained certain equitable rights against Holodniy" but "did not immediately gain title to Holodniy's inventions as a result of the CPA, nor at the time the inventions were created".[79.6]

---

79.2  *Ibid.* at 841 [F.3d].
79.3  *Ibid.* at 842 [F.3d].
79.4  *Ibid.* at 848 [F.3d].
79.5  *Ibid.* at 841 [F.3d].
79.6  *Ibid.* at 841-42 [F.3d].

The language in the VCA, by contrast, used the phrase "do hereby assign", which the Court interpreted as having "effected a present assignment of Holodniy's future inventions to Cetus".[79.7] In contrast with the limited set of equitable rights Stanford had against Holodniy, "Cetus immediately gained equitable title to Holodniy's inventions".[79.8]

Once the patent had been filed, however, "Cetus's equitable title converted to legal title no later than the parent application's filing date".[79.9] In the court's view, Cetus had complete ownership of the patent rights. Although Holodniy later executed an assignment of his title in the patent rights to Stanford, the court held that Holodniy no longer had the right to do so and negated the assignment to Stanford.

(D)  Recordation with the USPTO and *bona fide* second purchaser

Stanford attempted to assert ownership over the patent rights by taking advantage of s. 261 of the *US Patent Act* which states:[79.10]

> An assignment, grant or conveyance shall be void as against any subsequent purchaser or mortgagee for a valuable consideration, without notice, unless it is recorded in the Patent and Trademark Office within three months from its date or prior to the date of such subsequent purchase or mortgage.

> Cetus never recorded its assignment of Holodniy's patents. Stanford attempted to portray itself as a *bona fide* subsequent purchaser of the patent rights by saying it gave valuable consideration and received no notice of Cetus' rights in the patents. The Federal Circuit did not accept this argument and found that Stanford "had at least constructive or inquiry notice of the VCA" since Holodniy's supervisor had directed him to work with Cetus.[79.11]

(E)  Implications

The exact language used in agreements to assign can have a profound impact on establishing priority of ownership of the assigned patent rights. In *Stanford v. Roche*, the phrase "agree to assign" means that the assignment will occur at a later date while the phrase "do hereby assign" is an immediate assignment of future rights. In addition, an assignee in the United States should

---

79.7  *Ibid.* at 842 [F.3d].
79.8  *Ibid.* at 842 [F.3d].
79.9  *Ibid.* at 842 [F.3d].
79.10  35 U.S.C § 261 (2006).
79.11  *Board of Trustees of Leland Stanford Junior University v. Roche, supra* note 1 at 843 [F.3d].

record the assignment with the USPTO in order to bolster its claim over the patent rights. The U.S. Supreme Court has granted leave to appeal this decision.

## (b) Licenses

In addition to being assigned, a patent may be licensed. Unless otherwise specified, licenses are voluntary, whereby a licence is entered into by the agreement of the patentee or licensor and the licensee. Voluntary licenses are to be distinguished from the compulsory licences, which historically were available under Canadian patent law for pharmaceutical patents under former s. 39 of the *Patent Act*, or which can be granted where a patent holder is liable for abuse of patent rights under s. 65 of the *Patent Act*. Under a licence the owner of a patent, the licensor, does not transfer any property interest or title to the patent to the licensee. A licence is a contract establishing a personal right, which is a right enforceable against the person (patent owner or licensor) that is the other party to the licensing contract. A license does not create an "in rem" or legal property right in the subject matter of the licence (the patent rights licensed), but rather provides permission from the licensor to the licensee to practice a patented invention, activity that would otherwise constitute infringement.

The licensor remains the owner of a patent. Even under an exclusive licence of all patent rights for the duration of the term of a patent, a licensor typically retains a reversionary interest in the patent rights. At a minimum, this reversionary interest may provide the right to reclaim the use of the patent

*(Continued on page 5-31)*

should the licensee default on various obligations under the licence, including royalty payments.

Generally under Canadian law, contractual rights and obligations can be assigned by a contracting party without the permission of other contracting parties unless there is an express bar to assignment under the terms of the contract. There are of course certain exceptions to this principle, such as contracts for personal services. As such, in a patent licence both the licensor and the licensee can typically assign their rights and obligations under the contract unless there is a specific contractual provision preventing assignment. Typically under a license agreement a licensor will have an interest in restricting the capacity of licensees to assign licensee rights and obligations. In addition, under Canadian law a licensee generally has the right to sub-license its rights to third parties in whole or in part. As discussed below, this is not true for patent rights but may be true for other intellectual property rights. A licensor will typically have an interest in restricting the right of licensees right to sub-license contractual rights. Therefore, the rights of licensees to assign rights and obligations or sub-license rights must be explicitly addressed in a license agreement.

A licensor may assign its interest in licensed rights, subject to a licensee's interest. As a result, the assignee from the licensor will receive the licensor's legal interest in the patent subject to the terms of the pre-existing licence. A license may be general or limited according to numerous factors, including subject matter or field of use and region, and the provisions of the contract granting the license define the terms of use.

Licenses should be in writing and carefully drafted to reflect the interests and intentions of the parties, and a properly drafted patent license can limit potential disputes relating to the rights and obligations of the licensor and licensee. Although the rights under a license are generally limited to written terms of the license, certain rights under a license can be implied by the conduct of the licensor.

## 5.5 IMPLIED LICENSES

Under certain circumstances, patent licenses can be implied by the relationship and transactions between parties. For example, under U.S. law a patent owner's conduct when dealing with an alleged infringer has been held to create an implied license to practice the invention claimed in the patent.[80] In *Wang Laboratories*, a single in-line memory module or SIMM, a circuit board that secures an assembly of memory chips, had been developed and patented by Wang Laboratories. Wang Laboratories sought industry approval for the SIMM as a new standard and conducted approximately 60 meetings with

---

80 *Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc.*, 103 F.3d 1571, 41 U.S.P.Q.2d 1263 (Fed. Cir., 1997) [*Wang Laboratories*].

Mitsubishi over the course of six years, subsequently supplied Mitsubishi with specifications and requested that Mitsubishi manufacture the SIMM. The U.S. Federal Circuit concluded that because Wang Laboratories had consented to Mitsubishi's use of the invention, granted Mitsubishi the right to make, use and sell the patented SIMM and received consideration, Mitsubishi acquired a royalty-free patent license.

The use of implied licenses has received considerably more judicial review in the U.S. than in Canada. U.S. jurisprudence demonstrates that implied licenses may arise from the conduct of the parties absent a written agreement.[81] The existence of an implied license is dependent on the intention of the parties,[82] and the scope of an implied license is determined on the basis of the circumstances surrounding its formation.[83] A general principle under U.S. law is that the terms of an implied license are restricted to the extent of rendering the contract effective.[84] An implied license may be established on the basis of acquiescence, conduct, equitable or legal estoppel.

In *Bandag*[85] a third party purchased used machinery from the franchisee of a patent holder and assumed authorization to practice a patented method that utilized the machinery.[86] The U.S. Federal Circuit considered whether an implied license could be inferred from the purchase of products from the franchisee, where the product was used as part of a patented method or as part of a combination patent. Under the U.S. Federal Circuit ruling in *Bandag*, a license to practice a patented method or combination may be implied from the authorized sale of an article utilized in the patented method or combination provided an alleged infringer can demonstrate: (1) that there are no noninfringing uses of the article external to the patent claims; and (2) that the circumstances of the sale "plainly indicate that the grant of a license should be inferred."[87]

The Federal Circuit has broadly interpreted the definition of a noninfringing use as a use that is "reasonable" or "practical," even if the use would be inconsistent with the purchaser's intent.[88] In examining noninfringing uses in *Bandag*, the Federal Circuit noted that the machinery could have been sold to existing licensees, sold as spare parts or modified so as not to practice the patented method.[89] The Federal Circuit further found that even though the

---

81  See *B&M Corp. v. Miller*, 150 F. Supp. 942, 114 U.S.P.Q. 217 (W.D. Ky., 1957).
82  *Lukens Steel Co. v. American Locomotive Co.*, 197 F.2d 939 (2nd Cir., 1952), affirmed 197 F.2d 939 (2nd Cir., 1952).
83  *Ibid.*
84  *Waterman v. Mackenzie*, 138 U.S. 252 (1891).
85  *Bandag, Inc. v. Al Bosler's Tire Stores, Inc.*, 750 F.2d 903 (Fed. Cir., 1984) [*Bandag*].
86  *Ibid.* at 923.
87  *Ibid.* at 924-925.
88  See *Glass Equip. Dev., Inc. v. Besten, Inc.*, 174 F.3d 1337 (Fed. Cir., 1999) at 1342 [*Glass*]; see also *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 99 F.3d 1160 (Fed. Cir., 1996).
89  *Bandag, supra* note 85 at 925.

# TAB 174

# Halsbury's
# Laws of Canada

## First Edition



TORY'S LLP

LIBRARY • TORONTO



Halsbury's Laws of Canada, First Edition
Patents, Trade Secrets and Industrial Designs (2012 Reissue)
© LexisNexis Canada Inc. 2012
August 2012

All rights reserved. No part of this publication may be reproduced or stored in any material form (including photocopying or storing it in any medium by electronic means and whether or not transiently or incidentally to some other use of this publication) without the written permission of the copyright holder except in accordance with the provisions of the *Copyright Act*. Applications for the copyright holder's written permission to reproduce any part of this publication should be addressed to the publisher.

Warning: The doing of an unauthorized act in relation to a copyrighted work may result in both a civil claim for damages and criminal prosecution.

Library and Archives Canada Cataloguing in Publication

Hughes, Roger T., 1941-
    Patents, trade secrets and industrial designs / Roger Hughes, Dino P. Clarizio, Arjay Brecher.

(Halsbury's Laws of Canada)
Includes bibliographical references and index.
ISBN 978-0-433-47111-0

    1. Patent laws and legislation—Canada. 2. Trade secrets—Law and legislation—Canada. 3. Design, Industrial—Law and legislation—Canada. I. Clarizio, Dino II. Brecher, Arjay III. Title. IV. Series.

KE2919.H84 2007          346.7104'8          C2007-904214-7
KF3114.H84 2007

Published by LexisNexis Canada, a member of the LexisNexis Group
LexisNexis Canada Inc.
123 Commerce Valley Dr. E., Suite 700
Markham, Ontario
L3T 7W8

Customer Service
Telephone: (905) 479-2665 • Fax: (905) 479-2826
Toll-Free Phone: 1-800-668-6481 • Toll-Free Fax: 1-800-461-3275
Email: customerservice@lexisnexis.ca
Web Site: www.lexisnexis.ca


Printed and bound in Canada.

2

32. *Allseas Engineering BV v. Marine Structure Consultants (MSC) BV* (1986), 13 C.P.R. (3d) 84 (Que. S.C.); see also *Digital Recording Corp. v. Optical Recording Corp.*, [1990] O.J. No. 1092, 31 C.P.R. (3d) 489 (Ont. H.C.J.) where the court interpreted obligations under a licence agreement.

## (3)  Licence

### (a)  By Agreement

**▼HPT-138▼ Granting of licence.** A patentee may grant an exclusive or non-exclusive licence, subject to whatever terms and conditions upon which the parties may agree, to use the patented invention.[1] By the grant of a licence, the patentee grants to the licensee the right to act in a certain way *vis-à-vis* the patented article, a right which, but for the licence, the licensee would not enjoy. The licensed rights are not equivalent to those of the patentee but are limited to and qualified by the express terms of the licence. Unless the intention is express, there is no right to sub-license; by a sub-licence, the licensee transfers or licences some or all of its rights to the sub-licensee, thereby indirectly granting a licence of certain of the rights of the licensee.[2] An exclusive licence is simply giving leave to someone to do something, and a promise not to give leave to anybody else to do the same thing; it conveys no interest or property in the thing itself.[3] The *Patent Act* requires that any grant or conveyance of an exclusive right be registered but it does not require that such grant be in writing and is silent as to the effects, if any, of failure to register.[4] A co-owner can sell its interest in a patent to another, whereby the new purchaser becomes a co-owner. A patent is not infringed by a co-owner who, without the consent of the other, makes or sells the invention in Canada. A co-owner cannot grant a valid licence to a third party without the consent of the co-owner: such a purported licence is invalid and the purported licensee will be an infringer if it makes the patented invention.[5] A co-owner of a patent cannot assign a portion of its share without the consent of the other co-owner.[6] When granted, a licence operates like a deed executed by the patentee and all other necessary parties.[7]

*Rights of licensee.* At common law it may have been open to question whether a licensee or even an exclusive licensee could bring an action as plaintiff for infringement of a patent; however the words "patentee and . . . all persons claiming under him" in the *Patent Act*[8] have been held to be sufficiently broad as to enable both an exclusive and a non-exclusive li-

censee to bring such an action for damages.[9] A licence may be oral but there may well be disputes as to the terms of the licence.[10] A licence may be implied by reason of corporate relationship between the parties, if such relationship is clear and proved, and may be proved in evidence by testimony of witnesses as to the nature of the corporate relationship; an exclusive licence need not be registered in order to still have a right to claim for damages.[11] A purchaser of an article is also a person claiming under the patentee; a purchaser acquires a right to use the article and not a right to sue under the patent.[12] An absolute, unconditional sale of a patented article may carry with it an unlimited licence to use it;[13] however the patentee may, upon sale of the goods, impose conditions and restrictions that will run with the goods.[14] An inventor does not acquire any "moral right", such as provided by copyright, and cannot insist that his name be associated with the invention.[15]

**Obligations of licensee.** The obligations of a licensee under a licence agreement may be independent of the duration or validity of the claims of the licensed patent.[16] A licence may impose restrictions on a licensee by way of restricting the area within Canada, or by restricting the nature of manufacturing done, or by restricting export, for example, and a licensee who acts outside the scope of the restrictions is an infringer of the patent.[17] Any use prior to the obtaining of a licence is an infringement.[18]

**Challenging validity of patent.** A licensee cannot dispute the validity of a patent, and its invalidation is not a defence to an action for royalties in the absence of a warranty of validity; in the absence of fraud, such a warranty will not be implied.[19] However, when sued for infringement, a licensee may challenge the validity of the patent;[20] also, where the licensee is acting outside the licence, it may challenge validity.[21] An acknowledgement by a licensee that a patent is valid and that he or she will not, during the term of the licence or thereafter contest the validity of the patent, has been held to be a valid and enforceable covenant.[22] In an action for breach of a licence, it is rare that punitive damages would be awarded.[23]

**Interpretation of licensing agreement.** A patentee and licensee are free to make an arrangement between themselves as to how the patented invention is to be used — the function of the courts being no more than to determine the rights between them as expressed by the intention of the parties.[24] The terms of the licence should be sufficiently clear, failing which the court may refuse to enforce the agreement.[25] The court, in construing a licence agreement, will look to its terms and not merely to the

fact that a patent is involved. An agreement to pay royalties may be based on a foreign patent and need not terminate when the patent expires as the question will probably be one of contract, not just a simple patent licence.[26] However, where there is an agreement to pay royalties in multiple jurisdictions until "the expiry of the principals' patent rights", it has been held that the obligation to pay royalties ceases in each jurisdiction as the patent rights expire in that jurisdiction, rather than continuing until all rights in all jurisdictions have expired.[27]

### Notes

1. There is no restriction in the (CAN) *Patent Act*, R.S.C. 1985, c. P-4 as to licensing and the cases referred to herein all deal with licences; see ▼HPT-3▼ as to possible restrictions imposed by (CAN) *Competition Act*, R.S.C. 1985, c. C-34.

2. *Eli Lilly and Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59, 80 C.P.R. (3d) 321 at paras. 48-50 (S.C.C.).

3. *Merck & Co. v. Apotex Inc.*, [2010] F.C.J. No. 1646, 91 C.P.R. (4th) 1 at para. 49 (F.C.), affd [2011] F.C.J. No. 1866, 2011 FCA 363 (F.C.A.).

4. (CAN) *Patent Act*, R.S.C. 1985, c. P-4, s. 50(2); *Electric Chain Co. of Canada v. Art Metal Works Inc.*, [1933] S.C.R. 581 at 585 (S.C.C.).

5. *Forget v. Specialty Tools of Canada Inc.*, [1993] B.C.J. No. 822, 48 C.P.R. (3d) 323 at 330-31 (B.C.S.C.).

6. *Forget v. Specialty Tools of Canada Inc.*, [1995] B.C.J. No. 1653, 62 C.P.R. (3d) 537 at 542-43 (B.C.C.A.).

7. (CAN) *Patent Act*, R.S.C. 1985, c. P-4, s. 70.

8. (CAN) *Patent Act*, R.S.C. 1985, c. P-4, s. 55.

9. *Armstrong Cork Canada Ltd. v. Domco Industries Ltd.*, [1982] S.C.J. No. 45, [1982] 1 S.C.R. 907 (S.C.C.); *Spun Rock Wools Ltd. v. Fiberglas Canada Ltd.*, [1947] A.C. 313 (P.C.).

10. *Apotex Inc. v. Wellcome Foundation Ltd.*, [1998] F.C.J. No. 382, 79 C.P.R. (3d) 193 at 300-03 (F.C.T.D.), affd [2000] F.C.J. No. 1770, 10 C.P.R. (4th) 65 at paras. 95-102 (F.C.A.), affd without discussion as to this point [2002] S.C.J. No. 78, 21 C.P.R. (4th) 499 (S.C.C.).

11. *Reveen v. Dorion*, [2000] N.B.J. No. 242, 7 C.P.R. (4th) 103 (N.B.Q.B.); *Jay-Lor Int'l Inc. v. Penta Farm Systems Ltd.*, [2007] F.C.J. No. 688, 59 C.P.R. (4th) 228 at paras. 23-38 (F.C.); *Apotex Inc. v. Sanofi-Aventis*, [2011] F.C.J. No. 1813, 2011 FC 1486 at paras. 33-57 (F.C.).

12. *Signalisation de Montréal Inc. v. Services de Béton Universels Ltée*, [1992] F.C.J. No. 1151, [1993] 1 F.C. 341 (F.C.A.).

13. *Hatton v. Copeland-Chatterson Co.*, [1906] S.C.J. No. 40, 37 S.C.R. 651 at 653 (S.C.C.); *Union Industries Inc. v. Beckett Packaging Ltd.*, [1993] O.J. No. 1050, 48 C.P.R. (3d) 523 at 543 (Ont. Gen. Div.); *Eli Lilly and Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59, 80 C.P.R. (3d) 321 at para. 100 (S.C.C.).

14. *North American Systemshops Ltd. v. King*, [1989] A.J. No. 512, 27 C.P.R. (3d) 367 at 375 (Alta. Q.B.); *Eli Lilly and Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59, 80 C.P.R. (3d) 321 at para. 100 (S.C.C.).

15. *Balanyk v. University of Toronto*, [1999] O.J. No. 2162, 1 C.P.R. (4th) 300 at paras. 135-152 (Ont. S.C.J.).

16. *Trubenizing Process Corp. v. John Forsyth Ltd.*, [1943] S.C.J. No. 35, [1943] S.C.R. 422 at 432-33 (S.C.C.); *Bull v. Williams Piano Co.* (1925), 29 O.W.N. 304; *Culzean Inventions Ltd. v. Midwestern Broom Co.*, [1984] S.J. No. 116, 82 C.P.R. (2d) 175 at 92-195 (Sask. Q.B.) where the court held that an agreement requiring a licensee to pay royalties beyond the term of the patent was not in restraint of trade. Note also *Promotions Atlantique Inc. v. Laurent*, [1992] J.Q. no 300, 43 C.P.R. (3d) 401 (Que. C.A.) where the court would not permit a licensor to compete with a licensee simply because the validity of the patent was questioned in other proceedings.

17. *McCracken v. Watson*, [1932] Ex. C.R. 83 (Ex. Ct.); *Canadian Marconi Co. v. Nordmende Phoenix Ltd.* (1962), 39 C.P.R. 185 (Ex. Ct.); *Rhone-Poulenc SA v. Micro Chemicals Ltd.*, [1964] Ex. C.R. 819 (Ex. Ct.), affd [1964] S.C.J. No. 64, [1965] S.C.R. 284 (S.C.C.).

18. See ▼HPT-75▼.

19. *Bull v. Williams Piano Co.*, [1925] O.J. No. 323, 29 O.W.N. 304 at 306 (Ont. H.C.); *Rymland v. Regal Bedding Co.* (1966), 51 C.P.R. 137 (Man. C.A.); *Dableh v. Ontario Hydro*, [1993] F.C.J. No. 924, 50 C.P.R. (3d) 290 at 350-56 (F.C.T.D.), affd on this point without discussion [1996] F.C.J. No. 767, [1996] 3 F.C. 751 (F.C.A.).

20. *Bayer AG v. Apotex Inc.*, [1995] O.J. No. 141, 60 C.P.R. (3d) 58 at 73-74 (Ont. Gen. Div.), affd [1998] O.J. No. 3849, 82 C.P.R. (3d) 526 (Ont. C.A.).

21. *Apotex v. Tanabe Seiyaku & Nordic*, [1994] O.J. No. 2613, 59 C.P.R. (3d) 38 (Ont. Gen. Div.); *Merck & Co. v. Apotex Inc.*, [2006] F.C.J. No. 671, 282 F.T.R. 161 at paras. 190-192 (F.C.), affd without reference to this point [2006] F.C.J. No. 1490, 55 C.P.R. (4th) 1 (F.C.A.).

22. *Curtiss-Wright Corp. v. The Queen*, [1968] 1 Ex. C.R. 519 at 524-30 (Ex. Ct.).

23. *Bayer AG v. Apotex Inc.*, [1995] O.J. No. 141, 60 C.P.R. (3d) 58 at 75 (Ont. Gen. Div.), affd [1998] O.J. No. 3849, 82 C.P.R. (3d) 526 (Ont. C.A.).

24. *Hatton v. Copeland-Chatterson Co.*, [1906] S.C.J. No. 40, 37 S.C.R. 651 at 653-56 (S.C.C.); see ▼HPT-3▼ as to (CAN) *Competition Act*, R.S.C. 1985, c. C-34.

25. *First Plasmic Energy Corp. v. Cornish*, [1988] B.C.J. No. 75, 19 C.P.R. (3d) 353 (B.C.S.C.); *Molnlycke AB v. Kimberly-Clark of Canada Ltd.*, [1991] F.C.J. No. 532, 36 C.P.R. (3d) 493 (F.C.A.).

26. *Kirchmeier v. P.M. Wright Ltd.*, [1996] J.Q. no 1113,73 C.P.R. (3d) 428 (Que. C.A.).

27. *Lauren International, Inc. v. Reichert*, [2008] O.J. No. 1891, 70 C.P.R. (4th) 377 (Ont. C.A.), leave to appeal refused [2008] S.C.C.A. No. 327 (S.C.C.).

### (b)  *Compulsory Licence*

### (i)  *Statutory Framework*

**▼HPT-139▼** **Process for obtaining compulsory licence.** The *Patent Act*[1] provides that, after three years from the date of grant of the

# TAB 175



COLUMBIA LAW SCHOOL LIBRARY

3  5005  01349  070.

# Principles of Corporate Insolvency Law

## Fourth Edition

### Roy Goode

**SWEET & MAXWELL**

# PRINCIPLES OF CORPORATE INSOLVENCY LAW

by

## Roy Goode

**SWEET & MAXWELL**

 THOMSON REUTERS

,0 257836 X

First edition 1990
Second edition 1997
Third edition 2005

Published in 2011 by Sweet & Maxwell, 100 Avenue Road, London NW3 3PF
part of Thomson Reuters (Professional) UK Limited
(Registered in England & Wales, Company No 1679046. Registered Office and
address for service: Aldgate House, 33 Aldgate High Street, London EC3N 1DL)

Typeset by LBJ Typesetting Ltd
Printed in the UK by CPI William Clowes Ltd, Beccles, NR34 7TL

For further information on our products and services, visit
www.sweetandmaxwell.co.uk
A CIP catalogue record for this book is available from the British Library

ISBN: 978-0-414-04787-7 (Paperback)
ISBN: 978-0-421-96610-9 (Hardback)

For Catherine

All rights reserved. Crown copyright material is reproduced with the permission of
the Controller of HMSO and the Queen's Printer for Scotland.

Only European Union legislation printed in the paper edition of the Official
Journal of the European Union is deemed authentic.
http://eur-lex.europa.eu, © European Union, 1998–2011

No part of this publication may be reproduced or transmitted, in any form or by any
means, or stored in any retrieval system of any nature, without prior written
permission, except for permitted fair dealing under the Copyright, Designs and
Patents Act 1988, or in accordance with the terms of a licence issued by the Copyright
Licensing Agency in respect of photocopying and/or reprographic reproduction.
Application for permission for other use of copyright material including permission
to reproduce extracts in other published works shall be made to the publishers.
Full acknowledgment of author, publisher and source must be given.

No natural forests were destroyed to make this product, only farmed timber was
used and replanted.

Thomson Reuters and the Thomson Reuters Logo are trademarks of Thomson
Reuters.
Sweet & Maxwell® is a registered trademark of Thomson Reuters (Professional)
UK Limited.

4.3, Flee

K.D
2149
.G65
2011

© 2011 Roy Goode

## Equity and debt[9]

1-04    For the purpose of insolvency law there is a vitally important difference between equity and debt. Shareholders are not creditors. Unlike creditors they have no claim to payment from the company except when a dividend is declared or there is a surplus of assets over liabilities on the winding up of the company. In general, creditors are entitled to be paid ahead of shareholders in the event of a company going into liquidation; only when creditors have been paid in full (which is rarely the case) do shareholders come in to participate in the surplus remaining.[10] Neither group is homogeneous. Frequently debt is multi-tiered, with one or more layers of senior debt at the top, several layers of junior debt underneath and at the bottom mezzanine debt, a form of hybrid which typically consists of either preferential shares carrying an entitlement to a fixed dividend ahead of ordinary shareholders or convertible warrants, which carry an interest coupon and a right to convert into shares. Only shareholders rank below mezzanine creditors.

Other forms of hybrid security, which combine debt and equity, are: convertible bonds or notes; payment in kind (PIK) loans, in which an amount equal to the interest is paid in stock in the borrower company or interest is rolled into the capital at maturity and which carry a detachable warrant; and income security, a mixture of debt and equity in which the debt part pays interest and the equity part dividends. The ranking of creditors among themselves may be influenced by the grant of security, which vis-à-vis the debtor[11] may leave a junior creditor in a better position than an unsecured senior creditor, or by subordination techniques, which may be contractual or structural,[12] shares may be ordinary, preferred or deferred, depending on the terms of issue; and insolvency law itself distinguishes between different categories of creditor in the priority stakes.

A more recent form of financing is second lien financing, in which agreement is reached between the first lien lender and the second lien lender as to rights of enforcement and the allocation of proceeds of realisation of collateral. Second lien financing differs from contractual subordination in that there is no formal subordination of the second lien to the first. Instead, there is an allocation of specific rights and duties designed to give the first lien lender control without a contractual subordination as such. Agreements commonly include restrictions on enforcement of the security by the second lien lender and allocation of the whole or most of the proceeds of realisation to repayment of the debt due to the first lien lender, coupled with a waiver by the second lien lender of any right it might otherwise have to challenge the first lien lender's security. Second lien lending has been widely used to overcome legal restrictions on investment in contractually subordinated debt.

## Security and quasi-security

A financially strong company will often be able to obtain credit simply on the    1-05
strength of its undertaking to pay without providing any security. But banks and other lenders frequently feel the need to buttress this undertaking with security in order to ensure that if by mischance the borrower company does become insolvent, they will be able to jump ahead of other creditors. Security may be real or personal. Real security is security in an asset or pool of assets and typically takes the form of a mortgage or charge covering specific assets or a class of existing and future assets.[13] Personal security consists of the reinforcement of the debtor company's undertaking by that of a third party, usually in the form of a guarantee of the debt, or by a stronger undertaking by the debtor himself, for example, in a negotiable instrument, claims on which are less easily resisted than those based on the underlying transaction.

### Nature of security

Real security in the true sense involves the grant of rights by the debtor    1-06
company in an asset which it owns or in which it has an interest. Consensual security takes four forms: mortgage, fixed or floating charge, pledge and contractual lien.[14] The trust, if created for the purpose of securing an obligation, is not an independent security device, but a form of equitable mortgage or charge, which may be effected either by the debtor declaring itself to be trustee of the asset or by transfer of the asset by the debtor to a trustee to hold on trust for the creditor (which could be the trustee itself)[15] as security for payment.[16] But there are other types of transaction which fulfil the

---

[9] See generally Louise Gullifer and Jennifer Payne, *Corporate Finance Law: Principles and Policy* (Oxford: Hart Publishing, 2011), Chs 2 and 3.
[10] Insolvency Act 1986 ss.107, 154.
[11] But not normally vis-à-vis the senior creditor, because the subordination agreement will usually control the junior creditor's freedom of action with regard to collection and the application of proceeds of his debt.
[12] Structural subordination results from lending to a holding company rather than the operating company. If the operating company becomes insolvent, its creditors will be paid ahead of the holding company, which is not a creditor but a shareholder, so that creditors of the holding company have to look primarily to dividends received in the winding up of the holding company. See further below, para.8–08, as to subordination.

[13] See *Goode on Legal Problems of Credit and Security*, edited by Louise Gullifer, 4th edn (2008), Ch.1.
[14] See *Goode on Legal Problems*, paras 1–42 et seq. As to the distinction between a fixed and a floating charge see below, para.10–16.
[15] See *Re Gray v G-T-P Group Ltd, F2G Realisations Ltd* [2010] EWHC 1772 (Ch). For a discussion of this case in the context of perfection under the Financial Collateral Directive, see below, para.1–67.
[16] *Goode on Legal Problems*, 2008, para.1–53.

TAB 176



**United States Patent and Trademark Office**

Guides > Glossary

## [A] [B] [C] [D] [E] [F] [G] [H] [I] [J] [K] [L] [M] [N] [O] [P] [Q] [R] [S] [T] [U] [V] [W] [X] [Y] [Z]

**An alphabetized, hyperlinked glossary of terms used on the USPTO web site and a continual "work in progress"-** *suggest terms for the glossary to the* webmaster@uspto.gov

(Note - **plain** links go to related definitions on this page, *italicized* links go to supplemental materials on the website.)

| Term | Definition | Context |
|---|---|---|
| | **KEY** | **g**eneral |
| | =online business system   $=fees   =forms   =help   =laws/regulations   =definition (glossary) | **i**nfotech **p**atent **t**rademark |
| AAU | **amendment to allege use** | t |
| ABA # | **A**merican **B**ankers **A**ssociation number - often referred to as the "transit routing number", is the nine (9) digit electronic address of a financial institution. The **ABA** number is encoded in the MICR (Magnetic Ink Character Recognition) line of all checks, and is assigned to each financial institution and each branch office of that financial institution. | i |
| abandonment | A patent application becomes abandoned for failure to file a complete and proper reply as the condition of the application may require within the time period provided under 37 **CFR** § 1.134 and § 1.136 unless an Office action indicates otherwise.<br><br>Abandonment may be either of the **invention** or of an **application**. An abandoned application, in accordance with 37 **CFR** §§ 1.135 and 1.138, is one which is removed from the Office docket of pending applications.<br><br>-- see **MPEP 711** for more<br>-- see **express abandonment** | p |
| abandonment | A trademark application that has been declared abandoned is "**dead**" and no longer pending. ***Abandonment*** occurs under several circumstances. The most common reason is when the USPTO does not receive a response to an **Office Action** letter from an applicant within 6 months from the date the Office action letter was mailed. Another instance is when the USPTO does not receive a **Statement of Use** (or request for an extension of time to file a statement of use) from an applicant within 6 months from the issuance of a **Notice of Allowance**). Applications abandoned for failure to respond to an Office Action or a Notice of Allowance can be revived or reinstated in certain circumstances. For more information, see **Petition to Revive** and **Request for Reinstatement**. | t |

| | | |
|---|---|---|
| abstract of the disclosure | A concise statement of the technical **disclosure** including that which is new in the art to which the invention pertains<br><br>*-- see* **MPEP 608.01(b)** *for more* | p |
| ABC | **a**ctivity **b**ased **c**ost accounting - an accrual-based accounting method for determining unit-based costs of delivering services by allocating the costs to budgetary resources; it measures the performance and costs related to a specific activity or function. | g |
| ABM | **a**ctivity **b**ased **m**anagement - a management methodology that combines **ABC** with business process analysis techniques to run, improve and measure performance for a business or organization. | g |
| ABSS | **A**utomated **B**iotechnology **S**equence **S**earch<br><br>*See* **PSIPS** *to access sequence searching online* | p, i |
| Acceptable Identification of Goods and Services Manual | This manual lists numerous examples of identifications of **goods and services** that are acceptable to the USPTO for inclusion in trademark applications and registrations. The manual is not exhaustive and is meant as a guide to aid applicants and their attorneys in formulating acceptable identifications of goods and/or services.<br><br>*Use* **Acceptable Identification of Goods and Services Manual** *online* | t |
| ACH | **A**utomated **C**learing **H**ouse - a nationwide batch-oriented electronic funds transfer system governed by the NACHA (National Automated Clearing House Association) | g |
| Administrative Instructions | set out the provisions and requirements in relation to the filing and processing of the international (patent) application under the **PCT** and are established by the Director General of **WIPO** | p |
| ADS | **Application Data Sheet** | p |
| agent (patent) | (may be referred to as a practitioner or representative) - one who is not an **attorney** but is authorized to act for or in place of the applicant(s) before the Office, that is, an individual who is registered to practice before the Office.<br><br>*-- See 37* **CFR** *§ 10.6 and the searchable online* **Patent Attorney Agent Roster** | p |
| AIA | **A**merica **I**nvents **A**ct<br><br>*-- see* **MORE** | p |
| AIPA | **A**merican **I**nventors **P**rotection **A**ct of 1999 | p |

*-- see MORE*

| AIPLA | American Intellectual Property Law Association | g |
| AIS | automated information system | i |
| ALC # | Agency Location Code - an eight (8) digit code assigned to U.S. government agencies by the Department of Treasury. | i |

| allegation of use | a sworn statement signed by the applicant or a person authorized to sign on behalf of the applicant attesting to use of the mark in commerce. The *allegation of use* must include one **specimen** showing **use of the mark in commerce** for each class of **goods/services** included in the application, and the required fee. If filed before the **examining attorney** approves the mark for publication, the allegation of use is also called an "**Amendment to Allege Use**". If filed after issuance of the **Notice of Allowance**, the allegation of use is also called a **Statement of Use**. The Amendment to Allege Use and the Statement of Use include the same information, and differ only as to the time when filed. The applicant may not file either an Amendment to Allege Use or a Statement of Use between the date the examining attorney approves the **mark** for **publication** and the date of issuance of the notice of allowance. | t |

| amendment to allege use (**AAU**) | a sworn statement signed by the applicant or a person authorized to sign on behalf of the applicant attesting to **use of the mark in commerce**. With the *AAU*, the owner must submit one **specimen** showing use of the mark in commerce for each class of **goods/services** included in the **application**, and the required **fee**. | t |

*AAU*s must be filed before the date the **examining attorney** approves the mark for publication in the Official Gazette.

You should check the status of the **application** before filing the *AAU* to make sure that is timely. An *AAU* filed after the mark is **approved for publication** but before a **notice of allowance** has been issued (during the "blackout period") is untimely and cannot be accepted.

*-- see file an AAU online*

| Annex F | written specifications of the application-body **document type definition** (*EFS' filename is application-body.dtd*) agreed to by the **USPTO**, **WIPO**, **EPO**, and **JPO** | p |

*-- see MPEP Appendix AI for instructions on how to locate Annex F on the WIPO website*

| APMS | automated project management system | i |
| appeal (patent) | *-- see BPAI for info on patent appeals* | p |
| appeal (trademark) | | t |

An applicant who wants to **contest a final refusal** from an examining attorney may file an **appeal** to the Trademark Trial and Appeal Board. An appeal is taken by filing a **Notice of Appeal** and paying the appeal **fee** within six months of the mailing date of the action from which the appeal is taken. *15 U.S.C. Section 1070; 37 C.F.R. Section 2.142(a).*

*-- see Trademark Trial and Appeal Board Manual of Procedure (TBMP) Section 1202.03.*

| | | |
|---|---|---|
| applicant | **inventor** or joint inventors who are applying for a **patent** on their own **invention**, or the person mentioned in 37 **CFR** 1.42, 1.43 or 1.47 who is applying for a patent in place of the **inventor**. *-- see 37 CFR 1.41 and MPEP 605* | p |
| application (patent) | an application for patent filed under *35 **U.S.C.** 111(a)* that includes all types of ***patent applications*** (i.e., utility, design, plant, and reissue) except **provisional** applications. The **nonprovisional** application establishes the **filing date** and initiates the examination process. A nonprovisional **utility** patent application must include a **specification**, including a **claim** or claims; drawings, when necessary; an oath or declaration; and the prescribed filing **fee**. *-- see How to Get a Patent for guides for each type of patent application* | p |
| application (trademark) | a document by which a person requests a federal trademark **registration**. To receive a filing date, an application must include (1) the applicant's name, (2) a name and address for correspondence, (3) a clear **drawing** of the mark sought to be registered, (4) a list of the **goods or services**, and (5) the application filing **fee**. *-- see File a Trademark Application* | t |
| application number (patent) | the unique number assigned to a patent application when it is filed. The application number includes a two digit **series code** and a six digit **serial number**. | p |
| arbitrary marks | comprise words that are in common linguistic use but, when used to identify particular **goods or services**, do not suggest or describe a significant ingredient, quality or characteristic of the goods or services (e.g., **APPLE** for computers; **OLD CROW** for whiskey). | t |
| ASEAN | Association of South East Asian Nations | g |
| assignment | a transfer of ownership of a **patent application** or **patent** from one entity to another. Record all assignments with the USPTO Assignment Services Division to maintain clear | p |

title to pending patent applications and patents.

-- read *more about Patent Assignments*
-- see *Assign a Patent Application or Patent* 🔗
-- see *Search Patent Assignments online* 🔗

| | | |
|---|---|---|
| assignment | a transfer of ownership of a **trademark application** or trademark **registration** from one entity to another. The USPTO recommends recording assignments with the USPTO Assignment Services Division to maintain clear title to pending trademark applications and registrations. For information on how to record an assignment, see **Recordation Form Cover Sheet**.<br><br>-- see *Assign a Trademark Application or Registration* 🔗<br>-- see *Search Trademark Assignments online* 🔗 | t |
| assignee | the entity that is the recipient of a transfer of a **patent application**, **patent**, **trademark application** or trademark **registration** from its owner of record (**assignor**) | p,t |
| assignor | the owner of record of a **patent application**, **patent**, **trademark application** or trademark **registration** who is transferring (assigning) ownership to another entity (**assignee**) | p,t |
| ATO | **a**uthority **t**o **o**perate | g |
| attorney | (may be referred to as a practitioner or representative) - an individual who is a member in good standing of the bar of any United States court or the highest court of any State and who is registered to practice before the Office.<br><br>-- see *37 CFR § 10.1(c); § 11.6(a); and § 10.14(a)* and the *searchable online* **Patent Attorney Agent Roster** | p |

**>> TOP**

| Term | Definition | Context |
|---|---|---|
| benefit claim | the claiming by an **applicant** in a **nonprovisional** application of a benefit of an **invention disclosed** in a prior-filed copending *(under examination at the same time)* **provisional** or nonprovisional application, or **international application** designating the U.S. for the purposes of securing an earlier-effective **filing date** for the nonprovisional application.<br><br>-- see *35* **USC** *§ 119(e), 120, 121 and 365(c) for more* | p |
| BIA | **b**usiness **i**mpact **a**nalysis | g |
| bio-sequence listings | a document that must be included only if a nucleotide or amino acid sequence is part of the invention. With **EFS**, paper documents are not required for **bio-sequence** or **subsequent bio-sequence** submissions. | p |
| blackout period | the period between the date the **examining attorney** | t |

approves the **mark for publication** and the date of issuance of the **Notice of Allowance**. The applicant may not file an **Allegation of Use** during this period.

| | | |
|---|---|---|
| Boolean | **Boolean logic** (named for the British-born Irish mathematician George Boole) is way to express relationships in logic arguments using the following three **operators**: "**and**", "**or**", "**not**". | i |
| | The patent search systems use "AND", "OR", and "ANDNOT" as Boolean operators, in combination with parentheses to build nested logical subsets - example: needle ANDNOT ((record AND player) OR sewing), which would return anything with the word "needle" in a document as long as it does not also contain the word "record" and "player" in the same document or the word "sewing" in the same document. . It also uses some symbols such as "->" to indicate a range, where you enter the field code and start date, ->, and then the end date - example: ISD/1/1/1995->2/14/1995. | |
| | *-- see* **help for patent searches** *for more on how to use Boolean operators in a patent search* | |
| BPAI | *Board of Patent Appeals and Interferences* | p |
| BPAIIS | Board of Patent Appeals and Interferences Information System | p |
| BRM | **b**usiness **r**eference **m**odel - an organized, hierarchical way to describe the day-to-day business operations of the Federal government; this model presents the business using a functionally driven approach regardless of organizational structure. | i |
| | *-- see* **Federal Enterprise Architecture** *for more* | |

**>> TOP**

| Term | Definition | Context |
|---|---|---|
| C&A | **c**ertification **a**nd **a**ccreditation | i |
| cancellation proceeding | a proceeding before the Trademark Trial and Appeal Board in which the plaintiff seeks to cancel an existing registration of a mark. The proceeding may only be filed after issuance of a registration. A petition for cancellation may be filed by any person who believes that he or she is or will be damaged by the registration of the mark. | t |
| canceled | trademark registration is no longer active. It may be due to the registrant's failure to file the required continued use affidavit under Section 8 of the **Trademark Act**, to a cancellation proceeding at the **Trademark Trial and Appeal Board** or to the outcome of a civil court action. | t |
| canceled claim | A **claim** that is canceled or deleted. "**Canceled**" is the status identifier that should be used when a claim is canceled in an application | p |
| CD | a type of form designation such as *Form* CD435, meaning | g |

a Commerce Department form

| | | |
|---|---|---|
| CD | a compact disc (electronic data storage media) | i |
| CEAR | Certificate of Excellence in Accountability Reporting | g |
| certificate of mailing | a certificate for each piece of correspondence mailed, *prior to the expiration of the set period of time for response,* stating the date of deposit with the U.S. Postal Service and including a signature | p |
| certificate of registration | official document from the USPTO evidencing that a mark has been registered. | t |
| certification mark | any word, name, symbol, device, or any combination, used, or intended to be used, in commerce by someone other than its owner, to certify regional or other origin, material, mode of manufacture, quality, accuracy, or other characteristics of such person's goods or services, or that the work or labor on the goods or services was performed by members of a union or other organization.<br><br>*-- see* **File Certification Mark** | t |
| CFC | **Combined Federal Campaign**<br><br>an annual government-wide campaign for charitable contributions from Federal employees | g |
| CFO/CAO | **Chief Financial Officer/Chief Administrative Officer** | g |
| CFR | **Code of Federal Regulations**<br><br>*-- see* **MORE INFO** | g |
| CFS | **core financial system** | i |
| change of name | Sometimes, owners of trademark applications and registrations change their names, even though the actual ownership of the application or registration has not been transferred. When this occurs, trademark owners should record the name change with the USPTO Assignment Branch to maintain a clear record of ownership. Name changes are recorded in the same manner as assignments. For information on how to record an assignment, *-- see* **Recordation Form Cover Sheet**. | t |
| Chapter I | the first, mandatory phase under the **Patent Cooperation Treaty** that includes performance of an international-type search, issuance of an **International Search Report**, and publication of the application and Search Report by the International Bureau of **WIPO** | p |
| Chapter II | the second, optional phase under the **Patent Cooperation Treaty** that includes examination of the international application and issuance of an **International Preliminary Examination Report**. | p |
| CIO | **Chief Information Officer** | g |
| CIP | | p |

|  | an application filed during the lifetime of an earlier **nonprovisional application,** repeating some substantial portion or all of the earlier nonprovisional application and adding matter not disclosed in the earlier nonprovisional application |  |
|---|---|---|
|  | *-- see* **MPEP 201.08** *for more* |  |

| CIS | **c**ustomer **i**nformation **s**ystem | i |
|---|---|---|
| claims | define the **invention** and are what aspects are legally enforceable. The **specification** must conclude with a **claim** particularly pointing out and distinctly claiming the subject matter which the applicant regards as his **invention** or discovery. The claim or claims must conform to the invention as set forth in the remainder of the specification and the terms and phrases used in the claims must find clear support or antecedent basis in the description so that the meaning of the terms in the claims may be ascertainable (*clearly understood* ) by reference to the description. (See 37 **CFR** § 1.58(a)). | p |
|  | *-- see* **MPEP 608.01(i)** *for more* |  |

| classification | patents are classified (*organized*) in the U.S. by a system using a 3 digit class and a 3 digit subclass to describe every similar grouping of patent art. A single invention may be described by multiple classification codes. | p |
|---|---|---|
|  | *-- see* **Manual of Patent Classification** |  |

| classification of goods and services | **Goods and services** are classified by an international system, according to international treaties to which the United States is a signatory. All goods and services included in trademark applications are classified by the Office according to this system. | t |
|---|---|---|
|  | *-- see* **TMEP 1401** *for more information on the classification of goods and services* |  |
|  | *-- see the* **Trademark Acceptable Identification of Goods and Services Manual** *for a listing of the classes* |  |

| coinventor | an **inventor** who is named with at least one other inventor in a patent application, wherein each inventor contributes to the conception (*creation*) of the **invention** set forth in at least one **claim** in a **patent application**. | p |
|---|---|---|
|  | *-- see* **MPEP 2137.01**, *also* **joint application**, **joint inventor.** |  |

| collective mark | a **trademark** or **service mark** used, or intended to be | t |
|---|---|---|

used, **in commerce**, by the members of a cooperative, an association, or other collective group or organization, including a mark that indicates membership in a union, an association, or other organization.

-- see **File a Collective Mark** ✎

| | | |
|---|---|---|
| combination patent | a **patent** granted for an **invention** that unites existing components in a novel way | p |
| common inventor | an **inventor** whose name is listed on multiple patent applications or granted patents, making the inventions at least partially the work of the same person. | p |
| common law rights | property or other legal rights that do not absolutely require formal registration in order to enforce them. Proving such rights for a trademark in court can be very difficult, requires meticulous documentation, and places a heavy burden on the individual. Active Federal registration of trademark can provide a higher degree of legal protection and readily-demonstrated evidence of ownership of a mark. | g |
| composed of | (used when defining the **scope** of a **claim**)<br><br>A transitional phrase that is interpreted in the same manner as either "**consisting of**" or "**consisting essentially of**," depending on the facts of the particular case *(context)*<br><br>-- see **MPEP 2111.03** for more | p |
| comprising | (used when defining the **scope** of a **claim**)<br><br>A *transitional phrase* that is synonymous with *(means the same thing as)* "**including**," "**containing**" or "**characterized by**;" is inclusive or open-ended and does **not** exclude additional, unrecited elements or method steps. *Comprising* is a **term of art** used in **claim** language which means that the named elements are essential in describing the **invention**.<br><br>-- see **MPEP 2111.03** for more | p |
| concept | an idea or design | p |
| confirmation number | a four-digit number that is assigned to each newly filed patent application. The *confirmation number*, in combination with the **application number**, is used to verify the accuracy of the application number placed on correspondence filed with the Office to avoid misidentification of an application due to a transposition error (misplaced digits) in the application number. The Office recommends that applicants include the application's confirmation number (in addition to the application number) on all correspondence submitted to the Office concerning the application.<br><br>-- see **MPEP 503** for more | p |

| | | |
|---|---|---|
| conflicting marks | -- see **likelihood of confusion** | t |
| CONFU | | g |
| | **C**onference **on F**air **U**se | |
| | -- see **National Information Infrastructure Report on Intellectual Property Rights** for more | |
| consisting essentially of | | p |
| | A **transitional phrase** that limits the **scope** of a **claim** to the specified materials or steps and those that do not materially affect the basic and novel characteristics of the claimed **invention**. | |
| | For the purposes of searching for and applying **prior art** under *35 **U.S.C.** 102 and 103*, absent *(without)* a clear indication in the **specification** or claims of what the basic and novel characteristics actually are, "*consisting essentially of*" will be construed *(understood)* as equivalent to "**comprising**." | |
| | -- see **MPEP 2111.03** for more | |
| consisting of | | p |
| | a **transitional phrase** that is closed *(only includes exactly what is stated)* and excludes any element, step, or ingredient not specified in the **claim**. | |
| | -- see **MPEP 2111.03** for more | |
| contracting party | A country or intergovernmental organization that is a member of the **Madrid Protocol**. | t |
| Contracting State | a national Office or an intergovernmental organization which is party to the **Patent Cooperation Treaty**. | p |
| continuation | | p |
| | a second application for the same **invention** claimed in a prior **nonprovisional application** and filed before the first application becomes **abandoned** or **patented**. | |
| | -- see **MPEP 201.07** for more | |
| continued use | -- see **Section 8 Declaration of Continued Use** | t |
| continuing application | a **continuation**, **divisional**, or **continuation-in-part** patent application | p |
| Control No. | unique number assigned to a patent **reexamination** request when it is filed, having a 2-digit series code (90 for **ex parte** reexamination requests; 95 for **inter partes** reexamination requests), and a 6-digit control number. | p |
| copyrights | | g |
| | protect works of authorship, such as writings, music, and works of art that have been tangibly expressed. The *Library of Congress* registers copyrights which last for the life of the author plus 70 years. | |
| | -- see **Copyrights** for more | |
| | As a work of the United States Government, this glossary falls under the provisions of 17 U.S.C. § 403, which | |

requires that works including all or part of this material in a copyrighted work contain a **statement in their copyright that clearly identifies what portions** of the work consist of a work of the U.S. Government. **Failure to do so could result in loss of copyright protection** for the entire work.

*-- see Editorial Standards for more*

COTS                                                                                  g

**c**ommercial **o**ff-**t**he-**s**helf

an acquisition term refering to commercially available ready to use products that require no customization in order to meet performance requirements.

counterpart                                                                           p

an application filed in a foreign patent office that is substantially similar to (like) the patent application filed with the USPTO and is based upon some or all of the same invention. The two applications would generally have the same applicant.

*-- see 37 CFR 1.97 for more*

CPA                                                                                   p

**C**ontinued **P**rosecution **A**pplication

a **continuation** or **divisional** application filed in a **design application** under 37 CFR 1.53(d)* *-- see MPEP 201.06(d) for more*

* NOTE: **CPA**s may no longer be filed in **utility** and **plant** patent applications, effective 14 July 2003.

*-- see 1271 OG 43, 24 June 2003.*

CPIC                                                                                  i

**c**apital **p**lanning and **i**nvestment **c**ontrol

Envisioned in the *Clinger-Cohen Act of 1996*, *OMB Circular A-130 (Management of Federal Information Resources)* and other related guidance, this is a management process for ongoing identification, selection, control, and evaluation of investments in information resources. The process links budget formulation and execution, and is focused on agency missions and achieving specific program outcomes.

CRF      **C**omputer **R**eadable **F**ormat                                          i
CRU      *Central Reexamination Unit*                                                 p
CSR      *Customer Service Representative*                                            p
CSS      **C**ascading **S**tyle **S**heet - a technology used for webpages            i
         to format fonts and control layouts on the computer display.

current filing basis                                                                  t

In applications under §§1 and 44 of the **Trademark Act**, the applicant may claim more than one basis, and may

add or substitute a basis **after** filing the **application**. The "*current filing basis*" means the basis, as **amended** (changed after the initial or **original filing**). If the basis has not been amended, the current filing basis is the same as the original filing basis.

-- see **filing basis**

| customer number | (previously referred to as "*payor number*") - a number assigned by the Office that is used to simplify the submission of an address change, to appoint a practitioner, or to designate the **fee** address for a **patent**. *Customer numbers* are primarily used by **attorneys** and law firms, and must be requested using the **"Request for Customer Number" form (PTO/SB/125)**.<br><br>-- see 37 **CFR** § 1.33(a), 1.76 and **MPEP 403** for more | p |

**>> TOP**

| Term | Definition | Context |
|---|---|---|
| dead | a **dead** or **abandoned** status for a trademark application means that specific *application* is no longer under prosecution within the USPTO, and would not be used as a bar against your filing. It does *not* necessarily mean that there are not other marks that the trademark **examining attorney** would cite. It is also possible to revive an abandoned application (for example, if the USPTO declared the application abandoned for failure of the applicant to respond to an **Office action**, but the applicant later proved that a response was sent and the USPTO simply failed to match it with the file in a timely manner, then the case could be revived). Also, regardless of the status of an application within the USPTO, the owner may still claim **common law rights,** i.e, the mark may still be in use in commerce. | t |
| deceased inventor | a named **inventor** who has died prior to the filing of a **patent application** or during the prosecution of a patent application.<br><br>-- see 37 **CFR** 1.42 and **MPEP 409** | p |
| declaration | a document in which an applicant for patent declares, under penalty of fine or imprisonment, or both (18 **USC** 1001), that (1) he or she is the original or sole **inventor**, (2) shall state of what country he or she is a citizen, (3) that he or she has reviewed and understands the contents of the **specification** and **claims** which the **declaration** refers to, and (4) acknowledges the duty to disclose information that is material to patentability as defined by 37 **CFR** § 1.56. An **oath** or **declaration** must be filed in each nonprovisional **patent application**.<br><br>-- see **oath**; 35 **USC** § 115; 37 **CFR** §§ 1.63 - 1.69; **MPEP 602** and the **PTO/SB/01** form for more | p |
| Demand | **Form PCT/IPEA/401**, filed with an **International Preliminary** | p |

**Examining Authority**, demanding that an international application shall be the subject of an international preliminary examination.

| | | |
|---|---|---|
| dependent claim | a **claim** that refers back to (*depends on*) and further limits a preceding *dependent* or **independent claim**. A dependent claim shall include every limitation of the claim from which it depends. | p |

| | | |
|---|---|---|
| deposit account | an account that is established in the U.S. Patent and Trademark Office (USPTO), upon payment of a **fee** for establishing such an account, for the convenience in paying any fees due, in ordering services offered by the USPTO, copies of records, etc. | g |

--*see* **MPEP 509.01** *for more or view* **deposit accounts**

| | | |
|---|---|---|
| descriptive mark | A **mark** is considered merely descriptive if it describes an **ingredient**, **quality**, **characteristic**, **function**, **feature**, **purpose** or **use** of the specified goods or services. If a mark is **merely descriptive** or **deceptively misdescriptive** of the goods or services to which it relates, the mark will be **refused registration** on the Principal Register under §2(e)(1) of the Trademark Act, *15 U.S.C. §1052(e)(1)*. | t |

Examples of descriptive marks include: **MEDICAL GUIDE** for website services featuring medical guides, **DENIM** for jeans, and **SPICY SAUCE** for salsa.

-- *see* **TMEP §1209** *for more info*

| | | |
|---|---|---|
| Design Search Code Manual | lists the numerical codes for searching designs in the USPTO's trademark database (**TESS**). | t |

-- *see* **Design Search Code Manual**

| | | |
|---|---|---|
| design patent application | an application for a patent to protect against the unauthorized use of new, original, and ornamental designs for articles of manufacture | p |

-- *see also* **application (patent)**
-- *see also* **nonprovisional patent application**

| | | |
|---|---|---|
| design patent | may be granted to anyone who invents a new, original, and ornamental design for an article of manufacture | p |

-- *see also* **patent**

| | | |
|---|---|---|
| designation | an indication made by applicant, in the Request for an International Application filed under the **Patent Cooperation Treaty**, as to the Contracting States in which protection for an invention is desired. | p |

| | | |
|---|---|---|
| DHCP | **d**ynamic **h**ost **c**onfiguration **p**rotocol | i |
| DiD | **d**efense **i**n **d**epth - multiple layers of security to provide added protection to **IT** resources | i |
| disclaimer | A patentee, whether of the whole or any sectional interest therein, may, on payment of the **fee** required by law, make disclaimer (*give | p |

up all or part of the owner's rights to enforce claims) of any complete **claim** , stating therein the extent of their interest in such patent. Such disclaimers are required to be in writing and recorded in the USPTO, and are considered as part of the original **patent** to the extent of the interest actually **possessed** by the disclaimant and by those claiming under him. Any patentee or applicant may disclaim or dedicate to the public the entire term, or any terminal part of the term *(from a certain point in time through the projected end of the entire term)*, of the patent granted or to be granted. There are two types of disclaimers: a **statutory disclaimer** and a **terminal disclaimer**.

-- *see **MPEP 1490*** *for more*

disclaimer

a statement that the applicant or registrant does not claim the exclusive right to use a specified element or elements of the **mark.** The purpose of a disclaimer is to permit the registration of a mark that is registrable as a whole but contains matter that would not be registrable standing alone, without creating a false impression of the extent of the registrant's right with respect to certain elements in the mark.

t

disclosure

in return for a **patent**, the **inventor** gives as consideration a complete revelation (describes it) or *disclosure* of the **invention** for which protection is sought.

-- *see **MPEP 608*** *for more*

p

disclosure document

**The USPTO eliminated its Disclosure Document Program on February 1, 2007. For more information, see the Federal Register notice:** *http://www.uspto.gov/web/offices/com/sol/notices/71fr64636.pdf [PDF].*

A document disclosing an **invention**, and signed by the **inventor** or inventors, that is forwarded to the USPTO only as evidence of the date of conception of the invention. The *disclosure document* may be forwarded to the USPTO by the inventor (or by any one of the inventors when there are joint inventors), by the owner of the invention, or by the **attorney** or **agent** of the inventor(s) or owner. A disclosure document is not the only type (and not necessarily the best type) of evidence of the date of conception of an invention. Notarized records or a conventional, witnessed, permanently bound, and page-numbered laboratory notebook may also serve as evidence of the date of conception of an invention.

A Disclosure Document will be retained for **two years**, and then be destroyed unless it is referred to in a separate letter in a related patent application filed within those two years. **A Disclosure Document is not a patent application, and the date of its receipt in the USPTO will <u>not</u> become the effective filing date of any patent application subsequently filed.**

-- *see **MPEP 1706*** *and the **disclosure document program*** *for more*

**Filers after 01FEB2007: see provisional patent application**

p

| | | |
|---|---|---|
| divisional application | a later application for an independent or distinct **invention** disclosing and **claim**ing (*only a portion of and*) only subject matter disclosed in the earlier or parent **application**.<br><br>--*see* **MPEP 201.06** *for more* | p |
| DNS | **d**omain **n**aming **s**ervice | i |
| DO | **D**esignated **O**ffice<br><br>the national Office or intergovernmental organization of or acting for the Contracting State designated by the applicant under Chapter I of the **Patent Cooperation Treaty**. | p |
| DOC | ***Department of Commerce*** | g |
| docket | a list of cases (**applications**) awaiting office actions | g |
| doctrine of equivalents | a judicially created theory for finding **patent infringement** when the accused process or product falls outside the literal scope of the patent **claims**. The essential objective inquiry is: "Does the accused product or process contain elements identical or equivalent to each claimed element of the patented invention?"<br><br>-- *see* **MPEP 2186** *for more* | p |
| domestic representative | a person residing within the United States who is appointed by a patentee or assignee of a trademark application or registration that does not reside in or is not domiciled within the United States. A **domestic representative** may be served process or notice of proceedings affecting the application, patent or trademark registration, or related rights.<br><br>--*see* **35 USC 293, 37 CFR 3.61** *and* **MPEP 302.02** *for more* | g |
| drawing | Patent drawings must show every feature of the **invention** as specified in the **claims**. Omission of drawings **may** cause an **application** to be considered incomplete but are **only required** if drawings are necessary for the understanding of the subject matter sought to be patented.<br><br>-- *see* **Drawing Requirements** *for more info* | p |
| drawing | -- *see* **representation of mark** | t |
| DRM | **d**ata **r**eference **m**odel - also known as a "data and information reference model" - describes the data and information that support program and line operations. Helps describe the types of interactions that occur between the Federal Government and others. Purpose of a **DRM** is to establish a commonly understood classification for Federal data that will lead to the identification of duplicative data resources. | i |

*-- see Federal Enterprise Architecture for more*

| | | |
|---|---|---|
| DTD | **d**ocument **t**ype **d**efinition - a format specification file that accompanies documents prepared according to SGML (standard generalized markup language), including XML (extensible markup language). It lists the tags or structural labelling for each distinctive section of text, images, or other embedded file object (examples: title, author, etc.) so that the document can be easily shared and worked with in different operating environments. | i |

**>> TOP**

| Term | Definition | Context |
|---|---|---|
| EA | enterprise architecture | i |
| EAI | enterprise application integration | i |
| EAST | **E**xaminer **A**utomated **S**earch **T**ools - a system used by patent examiners within the USPTO | p,i |
| EBC | *Electronic Business Center* - includes links to Patents EBC and Trademarks EBC | g |
| | a web page containing hyperlinks to all online systems for conducting electronic commerce with the USPTO | |
| eComm | electronic commerce portal | i |
| e-Commerce | electronic commerce | i |
| eDAN | Electronic Desktop Application Navigator | p,i |
| EDS | Enterprise Directory Services | i |
| EDW | Enterprise Data Warehouse | i |
| EFP | Electronic Filing Partnership | p,i |
| EFS | *Electronic Filing System* (for patent applications) | p |
| | supports secure electronic filing of Patent application documents via the Internet | |
| EFS-ABX | Electronic Filing System – Application Body eXtensible Markup Language authoring tool (for patent applications); superceded by EFS-Web | p,i |
| EFS-Web | Electronic Filing System - web-based filing using PDF files | p,i |
| | *See About EFS-Web for more* | |
| EFT | **E**lectronic **F**unds **T**ransfer | i |
| e-Gov | electronic government | i |
| election (PCT) | an indication made by applicant, in the Demand for an **International Application** filed under the **Patent Cooperation Treaty**, as to the Contracting States in which applicant intends to use the results of the **international preliminary examination**. | p |
| electronic file wrapper | a system that provides a way to access electronic copies of the correspondence, documents and other pertinent records used in considering a particular case | i |
| element | a discretely claimed component of a patent **claim** | p |

| | | |
|---|---|---|
| embodiment | a manner in which an **invention** can be made, used, practiced or expressed | p |
| enforceability of patent | the right of the **patent** owner to bring an **infringement** suit against a party who, without permission, makes, uses or sells the claimed **invention**. The period of enforceability of a patent is the length of the term of the patent plus the six years under the statute of limitations for bringing an infringement action.<br><br>*-- see 35 **USC** 286-296* | p |
| EO | **E**lected **O**ffice - the national Office or intergovernmental organization of or acting for the Contracting State elected by the applicant under Chapter II of the **Patent Cooperation Treaty**. | p |
| ePAS | **E**lectronic **P**atent **A**ssignment **S**ystem<br><br>*-- see **ePAS*** 🔗 | p |
| EPO | **E**uropean **P**atent **O**ffice | g |
| ESD | **E**xamination **S**upport **D**ocument<br><br>*-- see **Guidelines for Examination Support Document (ESD) under § 1.265** [PDF]* | p |
| ESTTA | Electronic System for Trademark Trials and Appeals | t,i |
| eTAS | **E**lectronic **T**rademark **A**ssignment **S**ystem<br><br>*-- see **eTAS*** 🔗 | t |
| ETC | Emerging Technology Center | i |
| ETD | Enterprise Training Division | i |
| eTEAS | **e**lectronic **T**rademark **E**xamination **A**pplication **S**ystem - electronic trademark filing system. It allows the public to complete various trademark filings and transactions on-line. For example, *eTEAS* allows you to complete **trademark applications**, preliminary amendments, **amendments to allege use**/**statements of use**, responses to **Office actions**, and post registration filings online, and then submit them directly over the Internet, paying by credit card, electronic funds transfer or an existing USPTO **deposit account**.<br><br>*-- see **eTEAS*** 🔗 | t |
| EU | **E**uropean **U**nion | g |
| examination copy | a copy of an **international application** filed under the **Patent Cooperation Treaty** maintained by the **International Preliminary Examining Authority**. | p |
| examiner's amendment | a written confirmation of an amendment made to a trademark application. The trademark **examining** | t |

**attorney** assigned to the application will make the amendment after consultation with an applicant or the applicant's **attorney**. The examiner's amendment is merely a written confirmation of the agreement between the examining attorney and the applicant as to the amendment, and it is also a notice that the amendment will be made. The applicant need not respond to the examiner's amendment unless the applicant wishes to make further changes to the application.

| | | |
|---|---|---|
| examining attorney | a USPTO employee who examines (reviews and determines compliance with the legal and regulatory requirements of) an application for registration of a federally registered trademark | t |
| excusable nonuse | -- see **Section 8 Declaration of Excusable Nonuse** | t |
| *ex parte* reexamination | -- see **reexamination proceeding** | p |

If the request for **ex parte reexamination** is filed by a third party and not the patent owner, the third party may not participate in the *ex parte* proceedings beyond the filing of a reply to the patent owner's statement under **37 CFR § 1.530**, if the patent owner files a statement. No other reply or submission by a third party will be considered in **ex parte reexamination**.

-- see **MPEP 2200, 37 CFR §§ 1.501**-1.570 and **inter partes reexamination** *for more*

| | | |
|---|---|---|
| express abandonment | | p |

A patent application may be **expressly abandoned** by filing a written declaration of abandonment identifying the application in the United States Patent and Trademark Office. **Express abandonment** becomes effective when an appropriate official of the Office takes action thereon. **Express abandonment** of the application may not be recognized by the USPTO before the date of issue or publication unless it is actually received by appropriate officials in time to act. Abandonment may be either of the **invention** or of an **application**. An abandoned application, in accordance with 37 CFR 1.135 and 1.138, is one which is removed from the USPTO **docket** of pending applications.

-- see **MPEP 711.01** *for more*

| | | |
|---|---|---|
| expired | | t |

Trademark registration is no longer active. The registrant failed to renew the trademark registration at the end of the registration period.

| | | |
|---|---|---|
| express mail mailing label | | p |

patent correspondence delivered to the USPTO via the "Express Mail Post Office to Addressee" service of the United States Postal Service (USPS) which is considered filed in the Office on the date of deposit with the USPS, shown by the "date-in" on the "Express Mail" mailing label.

| | | t |
| express mail mailing label | The filing date for Trademark documents is *not* the same as for patent documents | |
| | -- see *Trademarks express mail* for specific guidance | |
| extension request | -- see *Request for Extension of Time to File a Statement of Use* | t |

**>> TOP**

| Term | Definition | Context |
| --- | --- | --- |
| family (patent) | -- see *patent family* | p |
| fanciful marks | comprise terms that have been invented for the sole purpose of functioning as a **trademark** or **service mark**. Such marks comprise words that are either unknown in the language (e.g., **PEPSI**, **KODAK**, **EXXON**) or are completely out of common usage (e.g., **FLIVVER**). | t |
| FAQ | *Frequently Asked Questions* | g |
| FAS | **F**oreign **A**gricultural **S**ervice | g |
| FASAB | **F**ederal **A**ccounting **S**tandards **A**dvisory **B**oard | g |
| FAST | **F**irst **A**ction **S**ystem for **T**rademarks | t,i |
| Fastener Quality Act | | t |
| | Fastener Quality Act (15 U.S.C. 5401 et seq., as amended by Public Law 104-113, Public Law 105-234, and Public Law 106-34); implementing regulations: 15 C.F.R. Part 280 | |
| | Purpose: Protects against the sale of mismarked, misrepresented, and counterfeit fasteners. | |
| | -- see *Fastener Quality Act* for more | |
| FDC | **F**inal **D**ata **C**apture | p |
| | Once the fee, any correspondence, and/or drawings are matched with the application and all requirements have been met for issuance as a patent, the application is then forwarded to the Final Data Capture (FDC) stage of the process . An "Issue Notification" would be the next step in the processing of a patent and is mailed approximately 3 weeks prior to the issue date of the patent. | |
| FEA | | i |
| | **F**ederal **E**nterprise **A**rchitecture | |
| | -- see *Federal Enterprise Architecture* for more | |
| fee | | g |
| | an amount of money charged for a particular service or product supplied by the USPTO. | |
| | -- see *How to Pay Fees* 💲 | |
| FFMIA | **F**ederal **F**inancial **M**anagement **I**mprovement **A**ct | g |
| FICC | **F**ederal **I**dentity **C**redentialing **C**ommittee | i |
| file wrapper | | p |
| | The folder into which papers for a particular **application** are collected and maintained. | |

It contains a complete record of proceedings in the USPTO from the filing of the initial patent application to the issued **patent**. The *file wrapper* of a patent application that is maintained by the Office is the "official record."

filing basis                                                                                    t

The legal basis for filing an application for registration of a **mark**. The **Trademark Act** sets out five filing bases, and an applicant must specify and meet the requirements of one or more bases before the mark will be approved for publication for opposition or registration on the Supplemental Register. The five bases are: (1) **use of a mark in commerce** under §1(a) of the Act; (2) bona fide **intention to use** a mark in commerce under §1(b) of the Act; (3) a claim of priority, based on an earlier-filed foreign application under §44(d) of the Act; (4) registration of a mark in the applicant's country of origin under §44(e) of the Act; and (5) extension of protection of an international registration to the United States, under §66(a) of the Act and the **Madrid Protocol**. The requirements for the bases are set forth in *Trademark Rule 2.34*.

-- see *TMEP §806*.

If no basis is set forth in the original **application** for registration, the examining attorney will issue an **Office action** requiring the applicant to specify a basis and meet all requirements for the basis. In applications under §§1 and 44, the applicant may claim more than one basis, and/or may add or substitute a basis after filing the application.

filing date                                                                                     p

the date of receipt in the Office of an **application** which includes (1) a **specification** containing a description and, if the application is a **nonprovisional application**, at least one **claim**, and (2) any required **drawings**

-- see *MPEP 506 for more*

filing receipt                                                                                  t

When an **application** is submitted via **e-TEAS**, the Office immediately issues a confirmation of filing via e-mail that includes the serial number and filing date, and a summary of all the data provided by applicant in the application. This serves as evidence of filing. Applicants who file paper applications receive printed filing receipts that list the application serial number and filing date, the mark, the applicant's name, the goods and/or services, the filing bases, if available; the international class(es); and the address to be used for correspondence.

filing refusal                                                                                  t

also known as a final **Office action**, which makes "final" any outstanding refusals or requirements. A proper response to a final Office action is a) compliance with the requirements or b) appeal to the **Trademark Trial and Appeal Board**.

final office action (rejection)                                                                 p

an Office action on the second or any subsequent

examination or consideration by an examiner that is intended to close the prosecution of a **nonprovisional patent** application.

*-- see MPEP 706.07(b) for a final rejection and when it is proper on a first Office action*

Applicant's reply under 37 **CFR** 1.113 to a final rejection is limited either to an **appeal** in the case of rejection of any claim to the Board of Patent Appeals and Interferences (37 **CFR** 1.191) or to an **amendment** complying with the requirements set forth in the Office action (37 **CFR** 1.114 or 1.116). Reply to a **final rejection** must comply with 37 **CFR** 1.114 or include cancellation of, or appeal from the rejection of, each rejected **claim**. If any claim stands allowed, the reply to a final rejection must comply with any requirements or objections as to form (37 **CFR** 1.113(c)).

*-- see MPEP 706.07 for more*

| | | |
|---|---|---|
| FISMA | **F**ederal **I**nformation **S**ecurity **M**anagement **A**ct | i |
| FMFIA | **F**ederal **M**anagers' **F**inancial **I**ntegrity **A**ct | g |
| FOIA | | g |
| | **F**reedom **o**f **I**nformation **A**ct | |

*-- see Electronic Freedom of Information Act for more*

| | | |
|---|---|---|
| forms | Forms are provided as either official or unofficial (optional) formats to facilitate providing all information required to initiate desired procedures or respond to official procedural correspondence. Control numbers are assigned to identify each form and customers are usually instructed to locate forms by short **form numbers** rather than lengthy form titles. For a list of fillable and printable **PDF** forms divided by major office process and sorted by form number please see *Forms* | g |
| FQA | **Fastener Quality Act** | t |
| FR | | g |
| | **F**ederal **R**egister | |

*-- see News & Notices for links*

| | | |
|---|---|---|
| FTAA | **F**ree **T**rade **A**greement of the **A**mericas | g |
| FWC | | p |
| | **F**ile **W**rapper **C**ontinuing application | |

a **continuation**, **continuation-in-part**, or **divisional** application filed under 37 **CFR** 1.62*, which uses the **specification**, **drawings** and oath or declaration from a prior **nonprovisional** application, which is complete as defined by 37 **CFR** 1.51(a)(1)

*-- see MPEP 201.06(b) for more*

\* NOTE: 37 CFR 1.62 was deleted effective December 1, 1997. See 1203 OG 63, October 21, 1997.

| | | |
|---|---|---|
| FY | fiscal year - the federal **fiscal year** extends from October 1 through September 30. | g |

**>> TOP**

| Term | Definition | Context |
|---|---|---|
| GAU | **Group Art Unit** | p |
| generic term | | t |
| | terms that the relevant purchasing public understands primarily as the common or class name for the **goods or services**. These terms are incapable of functioning as trademarks denoting source, and are not registrable on the Principal Register under §2(f) or on the Supplemental Register. Examples include: **CLASSES ONLINE** for classes provided via the Internet, **PIZZA.COM** for pizza ordering and delivery services, and **LIVE PLANTS** for plant nurseries. | |
| | *-- see **TMEP** for more info* | |
| GI | | t |
| | **G**eographical **I**ndications | |
| | *-- see **MORE*** | |
| GICP | ***General Information Concerning Patents*** | p |
| goods and services | | t |
| | **goods** are products. | |
| | In the context of **service marks**, a **service** (1) must be a real activity; (2) must be performed to the order of, or for the benefit of, someone other than the applicant; and (3) the activity performed must be qualitatively different from anything necessarily done in connection with the sale of the applicant's goods or the performance of another service. | |
| | *-- see **TMEP 1301.01 "What is a service?"** for more information on services* | |
| | *-- see **classification of goods and services** for more* | |
| GPRA | **G**overnment **P**erformance and **R**esults Act | g |
| Group | (also referred to as a **Technology Center** or **TC**) - a unit of several **Group Art Units** in the mechanical, electrical, chemical or design area, managed by one or more Group Directors. Groups are more properly referred to as **Technology Centers**, or TCs. | p |
| Group Art Unit | (may be abbreviated "AU," "GAU" or "Grp Art Unit" on Office correspondence) - a working unit responsible for a cluster of related patent art. Staffed by one supervisory patent examiner (SPE) and a number of patent examiners who determine patentability on applications for a patent. Group Art Units are currently identified by a four digit number, i.e., 1642. | p |
| GSA | **G**eneral **S**ervices **A**dministration, an agency of the U. S. government. | g |

**>> TOP**

| Term | Definition | Context |
|---|---|---|
| having | (used when defining the **scope** of a **claim**) | p |
| | A **transitional phrase** that is synonymous with *(means the same thing as)* "**including**," "**containing**" or "**characterized by**;" is inclusive or open-ended and does *not* exclude additional, unrecited elements or method steps. | |
| | *-- see* **MPEP 2111.03** for more | |
| HLA | High Level Architecture | i |
| home copy | a copy of an **international application** filed under the **Patent Cooperation Treaty** maintained by the **receiving Office** where the international application was filed. | p |

**>> TOP**

| Term | Definition | Context |
|---|---|---|
| IAC | **I**nventors **A**ssistance **C**enter (formerly Patent Assistance Center). | p |
| | **1-800-786-9199** | |
| IB | **I**nternational **B**ureau - the secretariat of the **WIPO** which, among other functions, centralizes information of various kinds relating to the protection of **intellectual property**. | p |
| IC | **I**nternational **C**lass - class(es) assigned to a mark under the International Classification of Goods and Services (Nice Agreement); used in the United States since 1 September 1973 | t |
| | *-- see* **TMEP 1401.02** for more | |
| *id.* | short for "*ibid*", meaning same as previously cited | g |
| IDC | **I**nitial **D**ata **C**apture | p |
| | Initial Data Capture (IDC) is the first phase of the publication process for a patent where the patent file is electronically captured. It takes approximately 6 weeks from the date that the allowed file is received for the completion of the Initial Data Capture of the application. The application is then sent to the File Maintenance Facility (FMF) for matching of the issue fee and any other correspondence. The application may stay in the FMF for approximately 1-2 weeks. However, if all requirements are not yet fulfilled the application will remain at the FMF until the requirements are met. Once all files are matched, the application will move to the **FDC**. | |
| IDE | **I**ntegrated **D**evelopment **E**nvironment | i |
| identification of goods and/or services | a written statement of the **goods** and/or **services** included in an application. Every application must include an identification of goods and/or services. If you fail to list any recognizable goods or services, the USPTO will return the | t |

application and refund the fee. When specifying the goods and/or services, applicants should use clear, concise terms, i.e., common commercial names and language that the general public easily understands.

Please note that the terms in the class headings or short titles of the classes in the "International Classification of Classes of Goods and Services" are generally too broad and should not be used alone as an identification. Also, an international class number alone is never an acceptable listing. For a listing of acceptable wording for goods and services.

*-- see **Trademark Acceptable Identification of Goods and Services Manual***

| | | |
|---|---|---|
| IDS | *-- see **Information Disclosure Statement*** | p |
| IFW | | p |
| | **I**mage **F**ile **W**rapper -- an electronic version of a patent application, including image and/or text versions of the bibliographic information, all papers as filed, and all office actions and correspondence related to that application. *-- see **File Wrapper** for more* | |
| IG | **I**nspector **G**eneral - 57 statutory OIGs were created by an act of Congress in 1978 to independently detect fraud or instances of waste, abuse or misuse of federal funds and identify operational deficiencies within each of the Departments. | g |
| incontestability | *-- see **Section 15 Declaration of Incontestability*** | t |
| independent claim | a **claim** that does not refer back to or depend on another claim. | p |
| informal application | an application that has been filed without one or more of the elements required to receive a filing date. The USPTO will return informal applications to applicants. Please see the entry for "**application**" above for a list of the required elements. | t |
| information disclosure statement (IDS) | a list of all patents, publications, U.S. applications, or other information submitted for consideration by the Office in a **non-provisional patent application** filed under *35 U.S.C. § 111(a)* to comply with applicant's duty to submit to the Office information which is material to patentability of the invention claimed in the non-provisional application. | p |

For patent applications filed under *35 U.S.C. § 111(a)*, applicants and other individuals who are substantively involved in preparing or prosecuting a patent application must submit to the Office information which is material to patentability *(could render a claim unpatentable)* as defined in *37 CFR § 1.56*. The provisions of *37 CFR § 1.97* and *37 CFR § 1.98* provide a mechanism for compliance with the duty of disclosure provided in 37 CFR § 1.56.

The **IDS** must include a list of all **patents**, **publications**,

**U.S. applications**, or **other information submitted** for consideration by the Office. The USPTO provides **forms** for use in the submission of an IDS, the **PTO/SB/08a** and **PTO/SB/08b**.

-- see 37 CFR §§§ **1.56**, **1.97** and **1.98** and **MPEP 609** for more

| | | |
|---|---|---|
| infringement | -- see **patent infringement** | p |
| INTA | **I**nternational **T**rademark **A**ssociation | t |
| intellectual property | Creations of the mind - creative works or ideas embodied in a form that can be shared or can enable others to recreate, emulate, or manufacture them. There are four ways to protect **intellectual property** - **patents**, **trademarks**, **copyrights** or **trade secrets**. | g |
| intent to use | **ITU** - refers to the **intent-to-use** filing basis provided for in Trademark Act Section 1(b), 15 U.S.C. 1051(b). Applicants who have not yet used (in commerce that can be regulated by Congress) the mark they wish to register may file a trademark application under this filing basis. An "intent to use" application must include a **sworn statement** (usually in the form of a declaration) that applicants have a bona fide intention to use the mark in commerce. A properly worded declaration is included in the trademark application form for registration. The **applicant or a person authorized** to sign on behalf of the applicant **must sign the declaration**.<br><br>Applicants who file based on "intent to use" must begin actual use of the mark in commerce and file an Allegation of Use before the USPTO will register the mark. See definitions of **"Amendment to Allege Use"** and **"Statement of Use"**. There is an additional filing fee for the Allegation of Use. | t |
| interference | a proceeding, conducted before the Board of Patent Appeals and Interferences (Board), to determine priority of invention between a pending application and one or more pending applications and/or one or more unexpired patents<br><br>-- see **MPEP 2300** for more | p |
| international application | an application filed under the **Patent Cooperation Treaty**. | p |
| international application | allows a trademark owner to seek registration in any of the countries that have joined the **Madrid Protocol** by filing a single application | t |
| *inter partes* reexamination | -- see **reexamination proceeding**<br><br>***Inter partes* reexamination** practice primarily differs from ***ex parte*** practice in that the third party requestor may file written comments addressing issues raised by the patent owner in a response to **Office action**. | p |

-- see *35 USC 311* and **37 CFR 1.902**-1.997 and **MPEP 2600** for more

| | | |
|---|---|---|
| invention | | p |

any art or process *(way of doing or making things)*, machine, manufacture, design, or composition of matter, or any new and useful improvement thereof, or any variety of plant, which is or may be patentable under the patent laws of the United States.

-- see *35* **USC** *100 for more*

| | | |
|---|---|---|
| inventor | | p |

one who contributes to the conception of an invention. The patent law of the United States of America requires that the applicant in a patent application must be the inventor.

-- see also **applicant**.

| | | |
|---|---|---|
| IP | **intellectual property** | g |
| IP | | i |

Internet Protocol

The term "IP address" or "ips" refers to the unique network address of a visitor to a website

| | | |
|---|---|---|
| IPA | Internet Purchasing Application | i |
| IPEA | International Preliminary Examining Authority - either a national Office or an intergovernmental organization whose tasks include the establishment of examination reports on inventions which are the subject of international applications. | p |
| IPER | International Preliminary Examination Report (Form PCT/IPEA/409), produced by an International Preliminary Examining Authority, is a preliminary and non-binding opinion on whether the invention claimed in an international application appears to be novel, to involve an inventive step (to be non-obvious), and to be industrially applicable. | p |
| IPO | Intellectual Property Owners Association | g |
| IPR | Intellectual Property Rights | g |
| IRB | Investment Review Board | i |
| ISA | International Search Authority - either a national Office or an intergovernmental organization whose tasks include the establishment of documentary search reports on prior art with respect to inventions which are the subject of international applications. | p |
| ISR | International Search Report (Form PCT/ISA/210), produced by an International Searching Authority, is a report listing citations of published documents that might affect the patentability of the invention claimed in an international application. | p |
| issue date | | p |

the date that a patent application becomes a US patent.

The issue date is the date that patent rights can be

exercised. U.S. patents are always issued on Tuesdays.

| | | |
|---|---|---|
| IT | information technology | i |
| ITU | | t |

**Intent to Use**

*-- see MORE INFO*

**>> TOP**

| Term | Definition | Context |
|---|---|---|
| J2EE | Java 2 Enterprise Edition | i |
| JCCT | Joint Commission on Commerce and Trade | g |
| joint application | | p |
| | an application in which the invention is presented as that of two or more persons | |
| | *-- see MEPEP 201.02 and MEPEP 605.07 for more; also joint inventor* | |
| joint inventor | an **inventor** who is named with at least one other inventor in a **patent application**, wherein each inventor contributes to the conception of the **invention** set forth in at least one **claim** in a patent application. *See MEPEP 2137.01 See also coinventor.* | p |
| jpg | **.jpg** file type extension or **JPEG** - "Joint Photographic Experts Group" - is one of several digital image formats that are viewable in web browsers. JPEG image files are encoded using a standard for file compression (making the files smaller) that preserves essential color and display information in a fairly photorealistic way, with smooth edges, shapes and color blends. JPEG files are generally preferred for displaying still image photographs in digital form. The JPEG format is "lossy", meaning some information is lost when an image is compressed. This accounts for the "fuzziness" and patchy color areas what you may see when lower resolution JPEG images are enlarged to fill a space on the screen. | i |
| JPO | Japan Patent Office | g |
| JPTOS | Journal of the Patent and Trademark Office Society | g |

**>> TOP**

| Term | Definition | Context |
|---|---|---|
| kind codes | | p |
| | WIPO Standard ST. 16 codes (kind codes) include a letter, and in many cases a number, used to distinguish the kind of patent document (e.g., publication of an application for a utility patent (patent application publication), patent, plant patent application publication, plant patent, or design patent) and the level of publication (e.g., first publication, second publication, or corrected publication). | |
| | *-- see more about USPTO kind codes (PDF)* | |
| | *-- see a list of kind codes* | |
| | Detailed information on Standard ST. 16 and the use of | |

kind codes by patent offices throughout the world is available on the WIPO web site at **http://www.wipo.int/scit/en**, under the links for WIPO standards and other documentation.

| | | |
|---|---|---|
| KSA | knowledge, skills and abilities (job qualifications) | g |

**>> TOP**

| Term | Definition | Context |
|---|---|---|
| lawyer | -- see **attorney** | p |
| letters patent | -- see **patent** | p |
| LIE | Legal Instruments Examiner - a position classification for USPTO employees charged with docketing cases and other administrative processing that support the workflow and examination of applications | g |
| likelihood of confusion | a statutory basis (*Trademark Act Section 2(d), 15 U.S.C. Section 1052(d),* **TMEP §1207 et seq.**) for refusing registration of a trademark or service mark because it is **likely to conflict with a mark or marks already registered or pending** before the USPTO. After an application is filed, the assigned examining attorney will search the USPTO records to determine if such a conflict exists between the mark in the application and another mark that is registered or pending before the USPTO. The USPTO will not conduct any preliminary searches for conflicting marks before an applicant files an application and cannot provide legal advice on whether a particular mark can be registered. | t |

The principal factors considered by the examining attorney in determining whether there is a likelihood of confusion are: (1) the **similarity** of the marks; and (2) the **commercial relationship** between the goods and/or services listed in the application.

To find a conflict, the marks do not have to be identical, and the goods and/or services do not have to be the same. It may be enough that the marks are similar and the goods and/or services related. If a conflict exists between your mark and a registered mark, the examining attorney will refuse registration on the ground of likelihood of confusion. If a conflict exists between your mark and a mark in a pending application that was filed before your application, the examining attorney will notify you of the potential conflict and possibly suspend action on your application. If the earlier-filed application registers, the Examining Attorney will refuse registration of your mark on the ground of likelihood of confusion.

**>> TOP**

| Term | Definition | Context |
|---|---|---|
| Madrid Protocol | The "Protocol Relating to the Madrid Agreement Concerning the International Registration of Marks" (Madrid Protocol) is an international treaty that allows a trademark owner to seek registration in any of the countries that have | t |

joined the Madrid Protocol by filing a single application, called an "**international application**."

*-- see* **TMEP Chapter 1900** *for more*

| | | |
|---|---|---|
| maintenance fees | fees for maintaining in force a patent based on an application filed on or after December 12, 1980 --*see* **MPEP 2500** *for more* | p |
| mark | *-- see* **trademark** | t |
| Markush doctrine | | p |
| | When materials recited in a **claim** are so related as to constitute claiming the members of the claimed group in the alternative, such as "selected from the group consisting of A, B and C." | |
| | *-- see MPEP* **803.02** *and* **2173.05(h)** *for more* | |
| MARS | Machine Assisted Reference Section | i |
| mask work | images that are used to create the layers of a semiconductor chip product -- *see* **MPEP Appendix R §150.1 (d)** *for more* | p |
| mere descriptiveness | statutory basis (*Trademark Act Section 2(e)(1), 15 U.S.C. Section 1052(e)(1),* **TMEP 1209 et seq)** for refusing registration of trademarks and service marks because the proposed mark merely describes an **ingredient, quality, characteristic, function, feature, purpose** or **use** of the specified goods or services. With regard to trademark significance, matter may be categorized along a continuum, ranging from marks that are highly distinctive to matter that is a generic name for the goods or services. | t |
| | The degree of descriptiveness can be determined only by considering it in relation to the specific goods or services. At one extreme are marks that are completely arbitrary or fanciful. Next on the continuum are suggestive marks, followed by merely descriptive matter. Finally, generic terms for the goods or services are at the opposite end of the continuum from arbitrary or fanciful marks. | |
| | The major reasons for not protecting descriptive marks are: (1) to **prevent the owner of a mark from inhibiting competition** in the sale of particular goods or services; and (2) to **maintain freedom of the public to use the language** involved, thus avoiding the possibility of harassing infringement suits by the registrant against others who use the mark when advertising or describing their own products. (See also **Descriptive Mark**) | |
| MiTEAS | Madrid International Trademark Electronic Application Submission | i |
| MPEP | *Manual of Patent Examining Procedure* | p |
| multiple dependent claim | | p |
| | a dependent claim which further limits and refers back in the alternative to more than one preceding independent or dependent claim. Acceptable multiple dependent claims shall refer to preceding claims using the terms "or, any one | |

of, one of, any of, either." A multiple dependent claim may not depend on another multiple dependent claim, either directly or indirectly.

-- see 37 **CFR 1.75** and **MPEP 608.01(n)**.

**>> TOP**

| Term | Definition | Context |
|---|---|---|
| national stage application | an application which has entered the national phase of the **Patent Cooperation Treaty** by the fulfillment of certain requirements in a national Office, which is an authority entrusted with the granting of national or regional patents. Such an application is filed under **35 U.S.C. §371** in the United States and is referred to as a "**371 application.**" | p |
| Native American Tribal Insignia | insignia that various federally and state recognized Native American tribes have identified as their official tribal insignia<br><br>-- see **Native American Tribal Insignia FAQ** | t |
| NIPLECC | National Intellectual Property Law Enforcement Coordination Council | g |
| NOA | **Notice of Allowance** | p |
| NOA | **Notice of Allowance** | t |
| NOCC | Network Operations Control Center | i |
| non-final office action (rejection) | an Office action made by the examiner where the applicant is entitled to reply and request reconsideration or further examination, with or without making an amendment<br><br>On taking up an application for examination or a patent in a **reexamination** proceeding, the examiner is required to make a thorough study of the application and of the available **prior art** relating to the subject matter of the claimed **invention**. This examination must be complete with respect to:<br><br>• compliance of the application or patent under reexamination with the applicable statutes and rules<br>• the patentability of the invention as claimed<br>• matters of form, unless otherwise indicated. | p |
| non-final office action | an Office action letter that raises new issues and usually is the first phase of the examination process. An examining attorney will issue a non-final Office action after reviewing the application for the first time. If a new issue arises after the applicant responds to the first non-final Office action, the examining attorney will issue another non-final Office action that sets forth the new issue(s) and continues any that remain outstanding. Applicants must respond to non-final Office action letters within 6 months from the date they are issued to avoid abandonment of the application. | t |
| non-lawyer | a person who is not an **attorney** or lawyer. | p |

-- see 37 **CFR** § 10.14(b)

| nonprofit organization | for purposes of small entity determination per **MPEP 509.02** - (1) a university or other institution of higher education located in any country; (2) an organization of the type described in section 501(c)(3) of the Internal Revenue Code of 1954 (26 U.S.C. 501(c)(3)) and exempt from taxation under section 501(a) of the Internal Revenue Code (26 U.S.C. 501(a)); (3) any nonprofit scientific or educational organization qualified under a nonprofit organization statute of a state of this country (35 U.S.C. 201(i)); or (4) any nonprofit organization located in a foreign country which would qualify as a nonprofit organization under paragraphs (e) (2) or (3) of **MPEP section 509.02** if it were located in this country | p |

-- see **MPEP 509.02** for more

| nonprovisional patent application | an application for patent filed under 35 U.S.C. 111(a) that includes all patent applications (i.e., utility, design, plant, and reissue) except **provisional** applications. The *nonprovisional* application establishes the **filing date** and initiates the examination process. A *nonprovisional* utility patent application must include a **specification**, including a **claim** or claims; **drawings**, when necessary; an oath or declaration; and the prescribed filing **fee** | p |

-- see **application (patent)**
-- see **How to Get a Patent** for guides for each type of patent application

| non-responsive amendment | an amendment filed by the applicant that does not fully respond to the examiner's office action in accordance with 37 CFR 1.111 | p |

-- see **MPEP 714.02**

| normal publication | regular 18-month publication or redacted publication. | p |
| notice of abandonment | a written notification from the USPTO that an application has been **declared abandoned** or, in other words, is no longer pending. If the application was abandoned unintentionally or due to Office error, the applicant has a deadline of two months from the issue date of the notice of abandonment to file either (1) a petition to revive the application or (2) a request to reinstate the application. | t |

-- see see 37 **CFR** 1.181(f) for more

| notice of allowability | a notification to the patent applicant that the application has been placed in condition for allowance | p |

-- see **MPEP 1302.03 Notice of Allowability** for more

| | | |
|---|---|---|
| notice of allowance and fees due | **NOA**, a notification to the applicant that they are entitled to a patent under the law and requesting payment of a specified issue fee (and possibly a publication fee as well) within three months (non-extendable) from the mailing date of the notice of allowance<br><br>-- see **MPEP 1303 Notice of Allowance** for more | p |
| notice of allowance | **NOA** - a written notification from the USPTO that a specific mark has **survived the opposition period** following publication in the **Official Gazette**, and has consequently been **allowed for registration**. It **does not mean that the mark has registered** yet. Receiving a notice of allowance is another step on the way to registration.<br><br>Notices of allowance are **only issued for applications** that have been **filed based on "intent to use"**. The notice of allowance is important because the issue date of the **Notice of Allowance establishes the due date for filing a statement of use**. After receiving the Notice of Allowance, the applicant must file a statement of use or a request for an extension of time to file a statement of use within 6 months from the issue date of the notice. **If the applicant fails to timely file a statement of use or a request for an extension** of time to file a statement of use, the **application will be abandoned.** | t |
| notice of publication | a written statement from the USPTO notifying an applicant that its mark will be published in the **Official Gazette**. If the examining attorney assigned to an application raises no objections to registration, or if the applicant overcomes all objections, the examining attorney will approve the mark for publication. The notice of publication provides the date of publication. **Any party who believes it may be damaged by registration of the mark has thirty (30) days from the publication date to file either an opposition to registration or a request to extend the time to oppose.**<br><br>If no opposition is filed or if the opposition is unsuccessful, the application enters the next stage of the registration process. A **Certificate of Registration will issue for applications based on use or on a foreign registration under §44,** or a **Notice of Allowance will issue for intent-to-use applications**. | t |
| notice of references cited | also known as a **PTO-892 form**. A list of relevant references cited by a patent examiner in an **Office action**. The following are some examples of such references: domestic patents, domestic patent application publications, foreign patents or patent publications, publications, electronic documents, and affidavits.<br><br>--see **37 CFR 1.104** and **MPEP 707.05** for more | p |

| Term | Definition | Context |
|------|-----------|---------|
| NPL | **N**on **P**atent **L**iterature -- documents and publications that are not patents or published patent applications but are cited as references for being relevant in a patent prosecution. For example, a magazine article or doctoral thesis relevant to a claimed invention might be cited as non-patent literature. Typically, references cited in an application are grouped into: domestic patents and patent application publications; foreign patents; and **non-patent literature**. | p |

**>> TOP**

| Term | Definition | Context |
|------|-----------|---------|
| OACS | **O**ffice **A**ction **C**orrespondence **S**ystem - used by patent examiners to generate office actions. | p,i |
| oath | a solemn declaration before another, complying with the laws of the state or country where made, that the document in which an applicant for patent declares that (1) he or she is the original or sole inventor, (2) shall state of what country he or she is a citizen, (3) that he or she has reviewed and understands the contents of the specification and claims which the declaration refers to, and (4) acknowledges the duty to disclose information that is material to patentability as defined by 37 **CFR** § 1.56. An oath or **declaration** must be filed in each nonprovisional **patent application**.<br><br>-- see **declaration**; 35 **USC** §115; 37 **CFR** §§ 1.63, 1.64, and 1.66; **MPEP 604** and the **PTO/SB/01** form for more | p |
| OBRA | **O**mnibus **B**udget and **R**econciliation **A**ct | g |
| OBI | **O**riginating **B**eneficiary **I**nformation - the informational portion of a wire (electronic) transfer of funds. It is a necessary and important element, providing the USPTO information as to why the "wire" was sent, by whom, and how to apply the payment. | i |
| OEIP | Office of Electronic Information Products | g |
| OED | *Office of Enrollment and Discipline* | p |
| Office | in the context of actions or activities involving the USPTO this refers to the United States Patent and Trademark Office (USPTO) itself | g |
| Office action | a letter from a trademark examining attorney setting forth the legal status of a trademark application. There are several types of Office actions: examiner's amendments, priority actions, non-final Office actions, final Office actions, and suspension inquiry letters. | t |
| OG | *Official Gazette* - weekly publication of the USPTO that includes regular and special notices of the Office | g |
| OG - Patents | *Official Gazette eOG:P* - weekly publication of the USPTO that permits you to browse issued patents and view important notices | p |
| OG - Trademarks | *Official Gazette eOG:T* - weekly publication of the USPTO that includes marks that have been published for opposition. The five most recent issues are available online. | t |

| OGC | *Office of General Counsel* | g |
| OIG | see **IG** | g |
| OHIM | Office for Harmonization in the Internal Market | g |
| OHR | *Office of Human Resources* | g |
| OIIP | | g |
| | Office of Independent Inventors Programs (prior), now part of the Inventors Assistance Center | |
| | *-- see Inventors Resources for more* | |
| OIPE | Office of Initial Patent Examination | p |
| OLIA *(superceded)* | Office for Legislative and International Affairs - currently known as *Administrator for External Affairs, comprised of Office of International Relations, Office of Congressional Relations, and Office of Enforcement* | g |
| OMB | | g |
| | *Office of Management and Budget*, a branch of The Executive Office of the President | |
| | *-- see OMB for more* | |
| OPF | Official Personnel File | g |
| OPLA | *Office of Patent Legal Administration* | p |
| OPM | *Office of Personnel Management* - an agency of the U. S. Government | g |
| opposition proceeding | | t |
| | a proceeding before the **Trademark Trial and Appeal Board** in which the plaintiff seeks to prevent the issuance of a registration of a mark. An opposition is similar to a proceeding in a federal court, but is held before the Trademark Trial and Appeal Board, a USPTO administrative tribunal. | |
| | Any person who believes that he or she will be damaged by the registration of a mark may file an opposition, but the opposition may only be filed in response to the publication of the mark in the **Official Gazette**. | |
| OPR | Formerly, Office of Public Records; now known as Public Records Division (PRD) | g |
| original application | | p |
| | "Original" is used in the patent statute and rules to refer to an application which is not a reissue application. An original application may be a first filing or a continuing application | |
| | *-- see MPEP 201.04(a)* | |
| | *-- see also nonprovisional patent application* <br> *-- see also provisional patent application* | |
| original filing basis | | t |
| | the basis set forth in the application as initially filed | |

*-- see* **filing basis**

| Term | Definition | Context |
|---|---|---|
| OTPP | *Office of Technical Plans and Policy* | g |

**>> TOP**

| Term | Definition | Context |
|---|---|---|
| PAC | Patent Assistance Center (prior), now the ***Inventors Assistance Center*** or **IAC**, call (toll-free) 1-800-786-9199 *or* 703-308-4357 | p |
| PAC | *Public Advisory Committee* | g |
| PAIR | Patent Application Information Retrieval<br><br>*-- see* **Patent EBC** *for more*<br><br>provides secure access for customers who want to view current patent application status electronically via the Internet | p,i |
| PALM | **P**atent **A**pplication **L**ocating and **M**onitoring system - an internal USPTO system that is the source of status information displayed in PAIR | p,i |
| PAR | Performance and Accountability Report<br><br>*-- see* **Annual Reports** *for more* | g |
| parent application | The term "parent" is applied to an earlier application of the inventor disclosing a given invention<br><br>*--see* **MPEP 201.04** *for more* | p |
| PASAT | Patent Application Specification Authoring Tool -- no longer used as of 22 August 2004 | p,i |
| patent | a property right granted by the Government of the United States of America to an inventor "to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States" for a limited time in exchange for public disclosure of the invention when the patent is granted.<br><br>*-- see also* **design patent**, **nonprovisional patent application**, **plant patent**, **provisional patent application**, **reexamination proceedings**, **reissue application**, **utility patent** | p |
| Patent and Trademark Depository Library | a library designated by the USPTO to receive copies of patents, CD-ROMs containing registered and pending marks, and patent and trademark materials that are made available to the public for free. The libraries also actively disseminate patent and trademark information and offer internet access to USPTO's online collections.<br><br>*-- see* **PTRC** *for a list of locations and more info* | g |

| | | |
|---|---|---|
| patent application | -- see **application (patent)** | p |
| | -- see **How to Get a Patent** *for guides for each type of patent application* | |
| patent application publication | Pre-Grant Publication of patent application at 18 months from priority date | p |
| | -- see **Search online** | |
| patent family | A patent family is the same **invention** disclosed by a **common inventor**(s) and patented in more than one country. | p |
| | -- see **patent family** | |
| patent infringement | unauthorized making, using, offering to sell, selling or importing into the United States any **patent**ed **invention** | p |
| | -- see **35 USC § 271(a)** | |
| patent number | unique number assigned to a patent application when it issues as a patent -- *see* **list** | p |
| | -- see **patent numbering formats** *for an explanation of the codes that appear in a patent number* | |
| patent pending | A phrase that often appears on manufactured items. It means that someone has applied for a patent on an invention that is contained in the manufactured item. It serves as a warning that a patent may issue that would cover the item and that copiers should be careful because they might infringe if the patent issues. Once the patent issues, the patent owner will stop using the phrase "patent pending" and start using a phrase such as "covered by U.S. Patent Number XXXXXXX." Applying the patent pending phrase to an item when no patent application has been made can result in a fine. | p |
| patentable | suitable to be patented; entitled by law to be protected by the issuance of a patent. | p |
| payor number | -- see **customer number** | p |
| PBG | Patent Business Goals | p |
| PBG Final Rule | **Patent Business Goals Final Rule** - implement streamlined patent practice; a result of the **American Inventors Protection Act of 1999** | p |
| PBX | Private Branch Exchange - a telephony term describing a private telephone network used within an **enterprise**. Users of the PBX share a certain number of *outside lines* for making external telephone calls. | i |
| PCT | **Patent Cooperation Treaty** *(more)* | p |
| | provides a mechanism by which an applicant can file a single application that, when certain requirements have | |

been fulfilled, is equivalent to a regular national filing in each designated Contracting State. There are currently over 112 PCT Contracting States.

| | | |
|---|---|---|
| PCT Regulations | provide rules concerning matters expressly refers to in the **Patent Cooperation Treaty**, any administrative requirements, matters, or procedures, and concerning any details useful in the implementation of the provisions of the **Patent Cooperation Treaty**. The rules must be adopted by the Assembly of WIPO. | p |
| PDF | Portable Document Format - a common proprietary document format from Adobe used for documents having mixtures of text and images that preserves the look and feel of a printed page and permits the user to zoom and magnify the pages when viewing; not "archival" because of its proprietary nature.<br><br>*-- see **PDF viewers*** | i |
| PEAI | Patent Enterprise Access Integration | p,i |
| person | for purposes of small entity determination per **MPEP 509.02**, a person is defined as any inventor or other individual (e.g., an individual to whom an inventor has transferred some rights in the invention), who has not assigned, granted conveyed, or licensed, and is under no obligation under contract or law to assign, grant, convey, or license any rights in the invention<br><br>*-- see **MPEP 509.02** for more* | p |
| petitions (patent matters) | *-- see **MPEP 711.03** and **Petitions Practice within the USPTO on Patent Matters** for information* | p |
| petition to revive an application (trademark matters) | a formal request for the USPTO to return an abandoned application to active status. These petitions are handled by the Office of the Commissioner for Trademarks, and must be received in the USPTO within two (2) months from the issue date of the notice of abandonment. The standard used for deciding a petition to revive is unintentional delay, that is, whether the applicant's delay in responding to an **Office action** or **Notice of Allowance** was unintentional.<br><br>*-- see **forms for filing a petition to revive***<br>*-- see **petition information sheet*** | t |
| PG Pub | Pre-Grant Publication of patent application at 18 months from priority date | p |
| PKI | Public Key Infrastructure - a system of administrative procedures and methods, combined with secure information technologies, that is used to manage secure electronic commerce. Provides for a means of securely identifying participants in electronic transactions as well as secure transmission and handling of data. | i |
| plant application (patent) | are applications to protect invented or discovered, | p |

Glossary

asexually reproduced plant varieties.

-- *see also* **nonprovisional patent application**
-- *see also* **provisional patent application**

| | | |
|---|---|---|
| plant patent | may be granted to anyone who invents or discovers and asexually reproduces any distinct and new variety of plant. --*see also* **patent** | p |
| PLT | Patent Law Treaty | p |
| PMA | President's Management Agenda | g |
| PMO | Program Management Office | g |
| POA | Power of Attorney - formal assignment to another of the right to legally act on your behalf | g |
| POIS | Patent Cooperation Treaty Operations Imaging System | p,i |
| postcard receipt | a self-addressed, stamped postcard with itemized list of parts of patent application and number of pages per *MPEP 503*; used as a receipt for what was submitted in an application | p |
| POWER | Patent Cooperation Treaty Operations Workflow and Electronic Review | p,i |
| PPAC | Patent Public Advisory Committee | p |
| PPS | PowerPoint Show file - a type of encapsulated, non-editable Microsoft slideshow | i |
| PPT | PowerPoint file - a native, editable type of Microsoft slideshow file | i |
| practitioner | one who stands for or acts on behalf of another. A patent attorney or patent agent may represent the inventors named in a patent application.<br><br>-- *see also* **attorney**, **agent**. | p |
| precautionary designation | designation of a Contracting State in an international application filed under the **Patent Cooperation Treaty** which must be confirmed prior to 15 months from the priority date. | p |
| primary examiner | a patent examiner who is fully authorized to sign office actions (signatory authority) regarding patentability | p |
| Principal Register | primary trademark register of the USPTO. When a mark has been registered on the Principal Register, the mark is entitled to all the rights provided by the Trademark Act. The advantages of owning a registration on the Principal Register include the following:<br><br>1. Constructive notice to the public of the registrant's claim of ownership of the mark (15 U.S.C. Section 1072);<br>2. A legal presumption of the registrant's ownership of the mark and the registrant's exclusive right to use the mark nationwide on or in connection with the goods and/or services listed in the registration (15 U.S.C. Sections 1057(b) and 1115(a);<br>3. A date of constructive use of the mark as of the | t |

filing date of the application (15 U.S.C. Section 1057(c); TMEP Section 201.02);
4. The ability to bring an action concerning the mark in federal court (15 U.S.C. Section 1121);
5. The ability to file the U.S. registration with the U.S. Customs Service to prevent importation of infringing foreign goods (15 U.S.C. Section 1124);
6. The registrant's exclusive right to use a mark in commerce on or in connection with the goods or services covered by the registration can become "incontestable," subject to certain statutory defenses (15 U.S.C. Sections 1065 and 1115(b)); and
7. The use of the U.S. registration as a basis to obtain registration in foreign countries.

PrinTEAS                                                                    t

a former feature of the USPTO's electronic filing system that allowed applicants to complete a trademark application on-line, and then print it out for mailing to the USPTO.

PrinTEAS was removed from production on 2 November 2003.

*To file a trademark online see eTEAS*

PRD

Public Records Division

PRM                                                                        i

**P**erformance **R**eference **M**odel - a standardized framework to measure the performance of major IT investments and their contribution to program performance

-- *see Federal Enterprise Architecture for more*

prior art (reference)          *See MPEP 900 for information*                p

priority action                a letter in which an examining attorney sets forth specific    t
requirements that the applicant must meet before an application can be approved for publication. An examining attorney will issue a priority action after consulting with an applicant or the applicant's attorney. Unlike an examiner's amendment, the priority action does not confirm resolution of the issues; instead, it explains the requirements still outstanding.

The applicant must respond to a priority action within 6 months from the date the priority action is mailed. If the applicant fails to do so, the application will be abandoned. Please note that examining attorneys have no discretion to extend the time for filing a response to an Office action.

The benefit of a priority action is that, if the applicant responds within 2 months, the application will be given priority in processing the response.

| priority claim | claims under 35 USC 119(a)-(e) and 35 USC 120 for the benefit of the filing date of earlier filed applications. | p |
| Pro Se | used to designate an independent inventor who has elected to file an application by themselves without the services of a licensed representative. | p |
| provisional patent application | a *provisional* application for patent is a U. S. national application for patent filed in the USPTO under 35 **U.S.C.** § 111(b). It allows filing without a formal patent **claim**, oath or declaration, or any **information disclosure** (prior art) statement. It provides the means to establish an early effective filing date in a **nonprovisional** patent application filed under 35 **U.S.C** § 111(a) and automatically becomes abandoned after one year. It also allows the term "**Patent Pending**" to be applied. *-- see **Provisional Patent Application** for more* | p |
| pseudo mark | A way of locating a **word mark** that is comprised of an alternative or intentionally corrupted spelling of an English word. The pseudo mark search locates spellings that are very similar or phonetically equivalent to the **word mark**. *-- see **Trademark Tips on Field Searching** for more* | t |
| PSIPS | **Publication Site for Issued and Published Sequences** *-- also see **bio-sequence listings*** | p,i |
| PSTN | Public Switched Telephone Network | i |
| PTA | **P**atent **T**erm **A**djustment *-- see **MPEP 2700** for more* *-- see **PTA Calculation** for more* | p |
| PTRC | Patent and Trademark Resource Center-- *see* **PTRC** program | g |
| PTE | **P**atent **T**erm **E**xtension *-- see **MPEP 2700** for more* *-- see **PTE Calculation** for more* | p |
| PTO | Patent and Trademark Office, former designation for USPTO also a type of form designation for forms generated by the USPTO (as in PTO-892) | g |
| PTOL | a type of *form* designation such as Form PTOL, meaning a Patent and Trademark Office Legal form | g |
| PTOS | Patent and Trademark Office Society | g |
| publication for opposition | | t |

If the examining attorney raises no objections to registration, or if the applicant overcomes all objections, the examining attorney will approve the mark for publication in the **Official Gazette**.

The USPTO will send a **Notice of Publication** to the applicant stating the date of publication. Any party who believes it may be damaged by registration of the mark has thirty (30) days from the publication date to file either an **opposition** to registration or a request to extend the time to oppose.

If no opposition is filed or if the opposition is unsuccessful, the application enters the next stage of the registration process. A **Certificate of Registration** will issue for applications based on use, or on a foreign registration under §44, or a **Notice of Allowance** will issue for **intent-to-use** applications.

| | | |
|---|---|---|
| publication number | a number assigned to the publication of patent applications filed on or after November 29, 2000. It includes the year, followed by a seven digit number, followed by a **kind code**. Example 200011234567A1 | p |
| Pubs | Patent Publication, Office of<br><br>-- see **Patent Publication** for more | p |

**>> TOP**

| Term | Definition | Context |
|---|---|---|
| RAM | **R**evenue **A**ccounting and **M**anagement **S**ystem | i |
| RCE | Request for Continued Examination<br><br>a request filed in an application in which prosecution is closed (e.g., the application is under final rejection or a notice of allowance) that is filed to reopen prosecution and continue examination of the application; requires the filing of a submission and payment of a fee -- see 37 CFR 1.114 | p |
| RE | **reexamination** | p |
| record copy | original copy of an international application filed under the **Patent Cooperation Treaty** maintained by the International Bureau of the World Intellectual Property Organization. | p |
| recordation form cover sheet | USPTO form that trademark owners use to record trademark assignments (changes in ownership of marks for applications and registrations) and a trademark owner's change of entity name. The form is **PTO-TM-1594**. It may be submitted in hard copy to the following address:<br><br>Mail Stop Assignment Recordation Services<br>Director of the US Patent and Trademark Office<br>PO Box 1450 | t |

*Locate the current fee schedule at How to Pay Fees to determine the current fee for assignment recordation (Trademark Services Fee Code 8521)*

| | | |
|---|---|---|
| redacted publication | a patent application publication that omits material that was present in the specification or claims of the nonprovisional patent application filed in the USPTO.  See **37 CFR 1.217** and **MPEP 1132** for more information. | p |
| reexamination proceeding | at any time during the **enforceability of a patent** any person may file a request for the USPTO to conduct a second examination of any **claim** of the patent on the basis of **prior art** patents or printed publications which that person states to be pertinent and applicable to the patent and believes to have a bearing on the patentability (*see* **37 CFR 1.501**). In order for the request for *reexamination* to be granted, a substantial new question of patentability must be present with regard to at least one patent claim. The request must be in writing and must be accompanied by payment of a reexamination request filing fee as set forth in **37 CFR 1.20(c)**.<br><br>-- *see 37 U.S.C. 302,* **MPEP 2209**, *et seq., for more* | p |
| reference (prior art) | -- *see* **MPEP 900** *for information* | p |
| registration | Federal registration of trademarks involves the establishment of rights in a mark based on legitimate use of the mark. Although federal registration of trademarks is not required to use a trademark, owning a federal trademark registration has several advantages, including **notice to the public of the registrant's claim of ownership** of the mark, a **legal presumption of ownership nationwide**, the **exclusive right to use the mark on or in connection with the goods or services set forth in the registration**, the **ability to bring an action concerning the mark in federal court**, the use of the U.S. registration as a **basis to obtain registration in foreign countries**, and the **ability to file the U.S. registration with the U.S. Customs Service to prevent importation of infringing foreign goods**.<br><br>-- *see* **International Intellectual Property** *for links to enforcement assistance* | t |
| registration number | a registered patent **attorney**/**agent** is assigned a **registration number** that they must include on patent correspondence and forms when representing others before the USPTO; individual applicants do not have a registration number and should leave this field blank on patent forms.<br><br>-- *see the searchable online* **Patent Attorney Agent Roster** *to locate registered patent attorneys and agents* | p |

| | | |
|---|---|---|
| reissue application | an application for a patent to take the place of an unexpired patent that is defective in one or more particulars *(items or details)* --see **MPEP 201.05** and **MPEP 1400**. | p |
| | -- *see also* **nonprovisional patent application**<br>-- *see also* **provisional patent application** | |
| rejoinder | The rejoining *(returning to active consideration)* of **claims** previously withdrawn from consideration to due to an election requirement *(see* **restriction***)*. | p |
| | -- *see* **MPEP 821.04** | |
| renewal | *see* **Section 9 Renewal Application** | t |
| representation of mark | a clear depiction of the mark an applicant seeks to register. Every application must include a representation of the mark. The USPTO uses representations of marks to file marks in the USPTO search records and to print marks in the **Official Gazette (eOG:T)** and on registration certificates. | t |
| | For **TEAS** applications, if the mark is in **standard character** form, a separate page depicting the mark is not required. If the mark is **special form**, (i.e., includes a design or **stylized** lettering), the applicant must attach a digitized image of the mark in **.jpg** format to the electronic submission. | |
| | *For further information about stylized marks see* **TMEP §807** | |
| representative | one who stands for or acts on behalf of another. A patent attorney or patent agent may represent the inventors named in a patent application. | p |
| | -- *see also* **attorney, agent.** | |
| REPS | Re-examination Processing System | p,i |
| Request (PCT) | *Form PCT/RO/101*, filed with an international application in a receiving Office, which includes an indication of applicant(s) and a designation of one or more Contracting States. | p |
| request for extension of time to file a statement of use | **Extension Request** - a sworn statement signed by the owner or a person authorized to sign on behalf of the owner, stating that the applicant still has a bona fide intention to use the mark in commerce, and needs additional time to use the mark in commerce. A filing fee per class of goods/services must accompany the Extension Request. *(see the current fee schedule at* **How to Pay Fees** *to determine the current fee for Code 6004/7004)* | t |
| | The Extension Request, if granted, gives the owner an | |

additional six (6) months to either: (1) use the mark in commerce and file a Statement of Use; or (2) file another Extension Request.

You may continue to file Extension Requests every six (6) months. However, you must use the mark and file a **Statement of Use** within three (3) years of the issue date of the **Notice of Allowance**. The USPTO will not register a mark if, after thirty-six (36) months of the issue date of the Notice of Allowance, a Statement of Use has not been filed.

| Term | Definition | Context |
|---|---|---|
| request to reinstate an application | If an application is abandoned due to a USPTO Office error, an applicant may file a request to reinstate the application, instead of a petition to revive. There is no fee for a request for reinstatement. You must file a request for reinstatement within two months of the issue date of the notice of abandonment. You must include a true copy of the document that was timely submitted, and a copy of an acceptable form of proof of receipt in the USPTO.<br><br>*-- see TMEP §1712.01 for a list of evidence that may be considered in support of a request for reinstatement* | t |
| restriction | if two or more independent and distinct **inventions** are **claimed** in a single application, the examiner may require the applicant to elect (designate) a single invention to which the claims will be restricted (limited to). This requirement is known as a **requirement for restriction** (also known as a requirement for **division**). Such requirement will normally be made before any action on the merits; however, it may be made at any time before **final action** (final rejection). (-- *see 37* **CFR** *§ 1.141 and § 1.142*) | p |
| RO | Receiving Office - the national Office or the intergovernmental organization with which an international application has been filed. | p |
| RPO | Recovery Point Objective | i |
| RTO | Recovery Time Objective | i |
| RUP | Rational Unified Process | i |

**>> TOP**

| Term | Definition | Context |
|---|---|---|
| S&T | science and technology | g |
| SAFE | Secure Application Filed Electronically | i |
| SAN | Storage Area Network | i |
| SB | "SB" is used today as part of the label in our form designations (e.g., **PTO/SB/05** ). The origin of this notation is a *Specimen Book* (no longer in use) that included all of the forms. | g |
| scope | what is included - as in the **scope** of a **claim** | p |
| SCORE | **S**upplemental **C**omplex **R**epository for **E**xaminers | p,i |
| SCP | Standing Committee on the Law of Patents | g |
| SDM | System Development Manager | i |

| | | |
|---|---|---|
| search | After a trademark application is filed, the USPTO will conduct a **search** of USPTO records for conflicting marks as part of the official examination process. The official search is not done for the applicant but rather to determine whether the mark applied for can be registered. The USPTO advises applicants and/or their representatives to search the records before filing the application. A search may be conducted through **TESS**, or by visiting the Trademark Public Search Library, between 8:00 a.m. and 8:00 p.m. at Madison East, 1st Floor, 600 Dulany Street, Alexandria, VA 22313. Use of the Public Search Library is free to the public. Also, certain information may be searched at a **Patent and Trademark Depository Library**. These libraries have CD-ROMS containing the database of registered and pending marks, and Internet access to the **Trademark Electronic Search System (TESS)**. (However, the CD-ROMS do not contain images of the design marks.)<br><br>*-- locate your nearest* **PTRC** | t |
| search copy | copy of an international application filed under the **Patent Cooperation Treaty** maintained by the International Searching Authority. | p |
| SEAS | Secure Environment Access Solution | i |
| Section 8 Declaration of Continued Use | a sworn statement, filed by the owner of a registration that the mark is in use in commerce. Section 8 of the Trademark Act, 15 U.S.C. §1058. It must be filed by the current owner of the registration and the USPTO must receive it during the following time periods: 1) At the end of the 6th year after the date of registration (or the date of publication under 15 U.S.C. §1062(c) for registrations issued under the Acts of 1905 or 1881 that have claimed the benefits of the Act of 1946),<br>*AND*<br>2) At the end of each successive 10-year period after the date of registration. There is a six-month grace period. If these rules and deadlines are not met, the USPTO will cancel the registration.<br><br>*-- see* **File a §8 Declaration** | t |
| Section 8 Declaration of Excusable Nonuse | a sworn statement, filed by the owner of a registration, that the mark is not in use in commerce due to special circumstances that excuse such nonuse and is not due to any intention to abandon the mark. Section 8 of the Trademark Act, 15 U.S.C. 1058. It must be filed by the current owner of the registration and the USPTO must receive it during the following time periods: 1) At the end of the 6th year after the date of registration (or the date of publication under 15 U.S.C. §1062(c) for registrations issued under the Acts of 1905 or 1881 that have claimed the benefits of the Act of 1946), *AND* 2) At the end of each successive 10-year period after the date of registration. | t |

There is a six-month grace period. If these rules and deadlines are not met, the USPTO will cancel the registration.

Once the USPTO accepts the Section 8 Declaration of Excusable Nonuse, the owner of the registration is not required to file another Section 8 Declaration until the next statutory filing period.

*-- see* **File a §8 Declaration**

| | |
|---|---|
| Section 9 Renewal Application | a sworn document, filed by the owner of a registration, to avoid the expiration of a registration. Federal trademark registrations issued on or after November 16, 1989, remain in force for 10 years, and may be renewed for 10-year periods. Trademark registrations issued or renewed prior to November 16, 1989 remain in force for 20 years, and may be renewed for 10-year periods. Trademark owners have a total of 18 months to file a §9 Renewal Application. The §9 Renewal Application may be filed one year prior to the registration expiration date or during the 6-month grace period immediately after the date of expiration. If the §9 Renewal Application is not filed or is filed after the grace period ends, the registration will expire. |

Because the due date of the 10-year §8 Declaration coincides with the due date of the §9 Renewal Application, the USPTO created a form entitled "Combined Declaration of Use in Commerce and Application for Renewal of Registration of a Mark Under Sections 8 & 9"

*-- see* **File a §8 & §9 Combined Declaration**

| | |
|---|---|
| Section 15 Declaration of Incontestability | a sworn statement, filed by the owner of a mark registered on the Principal Register, claiming "incontestable" rights in the mark for the goods/services specified. An "incontestable" registration is conclusive evidence of the validity of the registered mark, of the registration of the mark, of the owner's ownership of the mark and of the owner's exclusive right to use the mark with the goods/services. The claim of incontestability is subject to certain limited exceptions set forth in §§15 and 33(b) of the Trademark Act, 15 U.S.C. §§1065 and 1115(b). 15 U.S.C. §1065. |

Filing a Section 15 Declaration is optional. However, there are certain rules governing when one may be filed. A §15 Affidavit may not be filed until the mark has been in continuous use in commerce for at least five consecutive years subsequent to the date of registration for marks registered under the Act of 1946 (and subsequent to the date of publication under §12(c) of the Trademark Act, 15 U.S.C. §1062(c), for marks registered under the Acts of 1905 and 1881 for which the benefits of the Act of 1946 have been claimed). The §15 Affidavit must be executed and filed within one year following a 5-year period of

continuous use of the mark in commerce.

*Marks registered on the Supplemental Register are not eligible for claims of incontestable rights under §15.*

*-- see* **File a §15 Declaration** 🔗

| | | |
|---|---|---|
| sequence listing | *-- see* **bio-sequence listing** | p |
| serial number | a number assigned to a patent application when it is filed. A serial number is usually used together with a two digit **series code** to distinguish between applications filed at different times. | p |
| series code | a two digit code representing a period of time. Application Filing Date - examples: *01/01/1979-12/31/1986* Series 06; *01/01/1987-12/31/1992* Series 07; *01/01/1993-12/31/1997* Series 08; *01/01/1998-November 2001* Series 09; *December 2001-Present* Series 10 | p |
| service component | a self contained business process or service with predetermined functionality that may be exposed through a business or technology interface<br><br>*-- see* **SCM** *[PDF] for a more detailed explanation and examples* | i |
| service mark | a word, name, symbol or device that is to indicate the source of the services and to distinguish them from the services of others. A service mark is the same as a trademark except that it identifies and distinguishes the source of a service rather than a product. The terms "trademark" and "mark" are often used to refer to both trademarks and service marks. | t |
| SF | a type of form designation such as Form SF51, meaning a Standard Form used throughout the Federal Government | g |
| SFFAC | Statements of Federal Financial Accounting Concepts | g |
| SFFAS | Statements of Federal Financial Accounting Standards | g |
| SIR | a published statutory invention registration contains the specification and drawings of a regularly filed nonprovisional application for a patent *without examination* if the applicant - (1) meets the requirements of section 112 of this title; (2) has complied with the requirements for printing, as set forth in regulations of the Commissioner; (3) waives the right to receive a patent on the invention within such period as may be prescribed by the Commissioner; and (4) pays application, publication, and other processing fees established by the Commissioner. A request for a statutory invention registration (SIR) may be filed at the time of filing a nonprovisional application for patent, or may be filed later during pendency of the nonprovisional application.<br><br>*-- see* **MPEP 1100** *for more* | p |
| SIRA | | p |

Search and Information Resources Administration, an organizational unit of the Patent business area.

*-- see **Patent Resources and Planning** for more*

| | | |
|---|---|---|
| SITP | Strategic Information Technology Plan | i |
| SM | **service mark** | t |
| small business concern | | g |
| | for purposes of small entity determination per **MPEP 509.02** - any business concern meeting the size standards set forth in 13 CFR Part 121 to be eligible for reduced patent fees. Questions related to size standards for a small business concern may be directed to: Small Business Administration, Size Standards Staff, 409 Third Street, SW, Washington, DC 20416. | |
| | *-- see **MPEP 509.02** for more* | |
| small entity | | g |
| | for purposes of small entity determination per **MPEP 509.02** - means an independent inventor, a small business concern, or a nonprofit organization eligible for reduced patent fees | |
| | *-- see **MPEP 509.02** for more* | |
| SMART | Standards, Mentor, Attempt, Review, Transition -- an informal development program used for USPTO's **OCIO** employees that identifies standards to work towards and establishes a mentoring relationship between managers and their employees who must meet these standards. | i, g |
| SOU | **Statement of Use** | t |
| specification | | p |
| | a written description of the invention and the manner and process of making and using the same | |
| | *-- see **MPEP 608.01** for more* | |
| specimen | | t |
| | a real-world example of how the **mark** is actually used on goods or in the offer of services. | |
| | Labels, tags, or containers for goods are considered to be acceptable specimens of use for a trademark. For a **service mark**, specimens may be advertising such as magazine advertisements or brochures. Actual specimens, rather than facsimiles, are preferred. However, if the actual specimens are bulky, or larger than 8½" x 11", then the applicant must submit facsimiles, (e.g., photographs or good photocopies) of the specimens. Facsimiles may not exceed 8½" x 11". One specimen is required for each **class** of goods or services specified in the trademark application. | |
| | Specimens are required in applications based on actual **use in commerce**, Section 1(a), 15 U.S.C. §1051(a), and | |

must be filed with the Amendment to Allege Use, 15 U.S.C. §1051(c) , or the Statement of Use, 15 U.S.C. §1051(d), in applications based on a bona fide intention to use the mark in commerce, Section 1(b), 15 U.S.C. §1051(b). Specimens are not required for applications based on a foreign application or registration under Section 44 of the Trademark Act, 15 U.S.C. §1126, or for applications based on an extension of protection of an international registration to the United States under Section 66(a) of the Trademark Act, 15 U.S.C. §1141f.

SRM
i

Service Reference Model - also known as a Service Component Reference Model -- a business and performance-driven, functional framework that classifies **Service Components** with respect to how they support business and/or performance objectives; structured across horizontal and vertical service domains that, independent of the business functions, can provide a leverage-able foundation to support the reuse of applications, application capabilities, components, and business services.

*-- see* **Federal Enterprise Architecture** *for more*

SSP
p

Shortened Statutory Period

*-- see* **MPEP §710.02(b)** *for more*

standard character format
t

An applicant may submit a standard character format representation of a mark if (1) All letters and words in the mark are depicted in **Latin** characters; (2) all numerals in the mark are depicted in **Roman** or **Arabic** numerals; (3) the mark includes only **common punctuation** or **diacritical marks**; and (4) the mark does **not** include a design element.

*-- see* **TMEP §§807.03** *for more*

statement of net cost
g

compares fees earned to costs incurred during a specific period of time

*--locate Financial Statements in the* **Annual Performance and Accountability Reports**

statement of use
t

**SOU** - a sworn statement signed by the applicant or a person authorized to sign on behalf of the applicant attesting to use of the mark in commerce. With a statement of use, the owner must submit: (1) a filing fee of $100 per class of goods/services; and (2) one specimen showing use of the mark in commerce for each class of goods/services.

Statements of use must be filed within 6 months from the date the USPTO issues a notice of allowance. Failure to

submit the statement of use in a timely manner results in abandonment of the application.

The Amendment to Allege Use and the Statement of Use include the same information, and differ only as to the time when it is filed.

-- see **File an SOU** 🔗

| statutory disclaimer | | p |
| --- | --- | --- |

Under 35 USC § 253 (paragraph 1) and 37 CFR 1.321(a), the owner (in part or in entirety) of a patent may relinquish all rights to a complete claim or claims of the owner's patent.

-- see **MPEP 1490** and **37 CFR 1.321(a)** for more

| stylized mark | | t |
| --- | --- | --- |

one type of depiction of the mark sought to be registered. Another name for this type of mark is "**special form**." If the mark includes a particular style of lettering, or a design or logo, the mark is considered to be **stylized** or in special form. Therefore, applicants must select the "stylized or special form" mark format when applying for these types of marks. The representation of the mark's page should show a black and white image of the mark, no larger than 3.5 inches by 3.5 inches (8 cm by 8 cm). The mark in special form must be a substantially exact representation of the mark as it appears on the specimen or on the foreign registration, as appropriate.

| subsequent designation | | t |
| --- | --- | --- |

A request by the holder of an international trademark registration for an extension of protection of the registration to additional Contracting Parties.

-- see **TMEP §1902.08** for more

| substantive reasons for refusal | | t |
| --- | --- | --- |

There are several substantive reasons for refusing registration of a mark. These include: likelihood of confusion; primarily merely descriptive or deceptively misdescriptive of the goods/services; primarily geographically descriptive or primarily geographically deceptively; misdescriptive of the goods/services; primarily merely a surname; or mere ornamentation. This is not a complete list of all possible grounds of refusal.

-- see **TMEP Chapter 1200** for a complete discussion of the grounds for refusal of registration of a mark.

| substitute patent application | | p |
| --- | --- | --- |

an application which is in essence a duplicate of a prior (earlier filed) application by the same applicant abandoned before the filing of the substitute (later filed) application; a substitute application does not obtain the benefit of the filing date of the prior application

-- see **MPEP 201.09** for more

| Term | Definition | Context |
|---|---|---|
| suggestive mark | a mark that, when applied to the goods or services at issue, requires imagination, thought or perception to reach a conclusion as to the nature of those goods or services<br><br>-- see **TMEP 1209.01(a)** for more | t |
| supplemental register | secondary trademark register for the USPTO. It allows for registration of certain marks that are not eligible for registration on the Principal Register, but are capable of distinguishing an applicant's goods or services. Marks registered on the Supplemental Register receive protection from conflicting marks and other protections, but are excluded from receiving the advantages of certain sections of the Trademark Act of 1946. The excluded sections are listed in 15 U.S.C. §1094.<br><br>If the applicant seeks registration on the Supplemental Register, the application should state that registration is requested on the Supplemental Register. If no register is specified, the Office will presume that the applicant seeks registration on the Principal Register. To register a mark on the Supplemental Register, applicants must either be using the mark or filing under Trademark Act Section 44 based on a foreign registration. | t |
| surcharge due | an additional fee that may be required due to late or insufficient payment of fees | g |
| suspension letter | suspends the action on an application. An application may be suspended for a variety of reasons. These include waiting for the disposition of a cited prior pending application to be determined or waiting for an assignment of ownership to be recorded. Applicants do not need to respond to suspension letters. | t |
| suspension inquiry letter | an Office action inquiring as to the status of the matter that is the basis for suspension of an application. The examining attorney will issue a suspension inquiry letter after an application has been suspended for six months or more, unless the information is available to the examining attorney in the Office's databases. If the applicant does not respond to the suspension inquiry letter, the application will be abandoned. | t |

**>> TOP**

| Term | Definition | Context |
|---|---|---|
| TARR | **Trademark Application and Registration Retrieval** system -- see **TARR**<br><br>USPTO's online database for monitoring federal trademark applications and registrations. Using TARR, applicants, trademark owners and the public may check the status of pending trademark applications and registrations. To access information about a specific mark, users must provide the associated serial number or registration number of the record they seek. | t |
| TC | -- see **technology center** | p |

| | | |
|---|---|---|
| TD | -- see **terminal disclaimer** | p |
| TDR | | t,i |

**Trademark Document Retrieval** system -- see **TDR** 🔗

Online retrieval of documents from the electronic case file for federal trademark applications and registrations. To access information about a specific mark, users must provide the associated serial number,registration number, reference number, or international registration number of the record they seek.

| | | |
|---|---|---|
| Technology Center | (or TC, also referred to as a Group) - a unit of several **Group Art Units** in the mechanical, electrical, chemical or design area, managed by one or more Group Directors. Formerly referred to as Groups. | p |
| TEAS | | t |

**Trademark Electronic Application System** -- *see* **TEAS** 🔗

USPTO's electronic filing system. It may be used to file a variety of documents with the USPTO, including new trademark applications, amendments to allege use, statements of use, responses to Office actions, and changes of address, just to name a few.

| | | |
|---|---|---|
| term of art | an expression or phrase that has a defined meaning when used in a particular context or knowledge environment *(such as the patenting process, pharmaceuticals, computers, etc.)* | p |
| terminal disclaimer | | p |

also "**TD**": a statement filed by an owner under 35 USC § 253 (paragraph 2) and 37 CFR § 1.321(b) or (c) to disclaim or dedicate to the public the entire term or any portion of the term of a patent or patent to be granted. A TD may be filed for the purpose of overcoming a judicially created double patenting rejection.

-- see **MPEP 1490** and **37 CFR § 1.321** for more

| | | |
|---|---|---|
| TESS | | t |

**Trademark Electronic Search System** -- *see* **TESS** 🔗

USPTO's online database for searching pending, registered and dead federal trademarks. TESS is free and intended for use by the general public. Due to limitations of equipment and bandwidth, TESS is not intended to be a source for bulk downloads of USPTO data. Bulk data may be purchased from USPTO at cost (see the USPTO Products and Services Catalog). Individuals, companies, IP addresses, or blocks of IP addresses who, in effect, deny service to the general public by generating unusually high numbers of daily TESS accesses (searches, pages, or hits), whether generated manually or in an automated fashion, may be denied access to these servers without notice.

| | | |
|---|---|---|
| TICRS | | t |

**Trademark Image Capture & Retrieval System**

A system used within the USPTO to scan, store and provide access to images of papers associated with trademark registrations.

| | | |
|---|---|---|
| TIFF | | i |
| | a lossless, archival image file format - a type using G4 compression is used for patent images | |
| | *-- choose a TIFF viewer from* **list of all available plug-ins** | |
| TIS | Trademark Information System | t,i |
| TLT | Trademark Law Treaty | t |
| TMEP | **Trademark Manual of Examining Procedure** | t |
| TMOG | ***Trademark Official Gazette*** | t |
| TPAC | Trademark Public Advisory Committee | t |
| TPostal | Trademark Postal System | t,i |
| trade dress | | t |
| | a product's design, product packaging, color, or other distinguishing nonfunctional element of appearance | |
| | *-- see* **TMEP 1202.02** *for more* | |
| trade secret | information that companies keep secret to give them an advantage over their competitors | t |
| trademark | | t |
| | protect words, names, symbols, sounds, or colors that distinguish goods and services from those manufactured or sold by others and to indicate the source of the goods. Trademarks, unlike patents, can be renewed forever as long as they are being used in commerce. | |
| | *-- see* **TMEP 1202** *for more* | |
| Trademark Act | | t |
| | Trademark Act of 1946, as Amended (PUBLIC LAW 79-489, CHAPTER 540, APPROVED JULY 5, 1946; 60 STAT. 427)- currently contained in Chapter 22 of Title 15 of the United States Code (**USC**); the major body of U.S. law that governs federal registration of trademarks | |
| | *-- see* **Trademark Rules of Practice and Federal Statutes** *for links to the applicable sections of Title 15 and a more detailed citation history of the Trademark Act.* | |
| Trademark Application and Registration Retrieval | **TARR** | t,i |
| Trademark Electronic Application System | **TEAS** | t,i |
| Trademark Electronic Search System | **TESS** | t,i |
| Trademark Manual of Examining Procedure | | t |
| | **TMEP** - a reference work on the practices and procedures relative to prosecution of applications to register marks in the USPTO. It contains guidelines for USPTO examining | |

attorneys, trademark applicants and owners, and attorneys and representatives for trademark applicants and owners. The TMEP contains information about the trademark examination process, and outlines the procedures which examining attorneys are required or authorized to follow in the examination of trademark applications.

*-- use the* **TMEP** *online*

| | | |
|---|---|---|
| Trademark Trial and Appeal Board | **TTAB** | t |
| TRAM | Trademark Reporting And Monitoring - a system used by trademark examiners within USPTO. | t,i |
| transitional phrase | | g |
| | a word or phrase that serves to link or create a relationship between one idea or concept and another. | |
| | In the following example, "*consisting of*" is the transitional phrase between "*an item*" and "*one or more parts*": | |
| |       EXAMPLE: an item consisting of one or more parts. | |
| TRB | Technical Review Board - an internal **OCIO** group that reviews **IT** project development at critical stages for conformance with USPTO standards and guidance. | i |
| TRIPs | Trade Related Aspects of Intellectual Property | g |
| TRM | Technical Reference Model | i |
| TSG | Technology Standards and Guidelines | i |
| TSS | **T**echnical **S**upport **S**taff -- USPTO employees who support examination workflow processing | g |
| TTAB | | t |
| | ***Trademark Trial and Appeal Board*** -- an administrative tribunal at the USPTO. It has jurisdiction over appeals from decisions of the Trademark Office, as well as opposition proceedings and cancellation proceedings | |
| | *-- see* **TTABvue** 🖝 *for decisions of the TTAB* | |
| TTY | teletypewriter: also known as a TDD (Telecommunications Device for the Deaf) | g |
| TW@H | Trademark Work-at-Home - a telecommuting work alternative for Trademark employees | t,g |
| typed mark | | t |
| | term no longer in use | |
| | *-- see* **standard character drawing** | |

## >> TOP

| Term | Definition | Context |
|---|---|---|
| UDRP | Uniform Domain Name Dispute Resolution Policy | i |
| UEA | USPTO Enterprise Architecture | i |
| UML | Unified Modeling Language | i |
| UPR | | p |

Utility, Plant, and Reissue

-- see **patent** for more

| | | |
|---|---|---|
| US | United States | g |
| USC | | g |
| | United States Code | |

-- see **MORE INFO**

use-based application

There are 4 filing bases on which an application may be based. One filing basis is **use of the mark in commerce** (the other three are filing based on an **intent-to-use** the mark in commerce, filing based on a **pending foreign application**, and filing based on a **foreign registration**). Applicants who file based on **use in commerce** must be using the mark they wish to register with the **goods or services** in the application prior to or at the time of filing the application.

To base the application on the applicant's use of the mark in commerce, the applicant must **submit** the following four items: (1) A **statement** that the mark is in use in commerce, as defined by *15 U.S.C. §1127*, and was in use in such commerce on or in connection with the goods or services listed in the application on the application filing date; (2) The date of the applicant's **first use of the mark anywhere** on or in connection with the goods or services; (3) The date of the applicant's **first use of the mark in commerce** as a trademark or service mark; and (4) One **specimen** for each **class** showing how the applicant actually uses the mark in commerce. If the specimen is not filed with the initial application, applicant must submit a statement that the specimen was in use in commerce at least as early as the application filing date. These items must be verified by the applicant, i.e., supported either by an affidavit or by a declaration under 37 C.F.R. §§2.20 and 2.33. Trademark Act Section 1(a), 15 U.S.C. §1051(a); 37 C.F.R. §§2.34(a)(1) and 2.59(a); TMEP §806.01(a).

t

use in commerce

For the purpose of obtaining federal registration, "**commerce**" means all commerce that the U.S. Congress may lawfully regulate; for example, interstate commerce or commerce between the U.S. and another country. "**Use in commerce**" must be a bona fide use of the mark in the ordinary course of trade, and not use simply made to reserve rights in the mark. Generally, acceptable use is as follows:

For **goods**: the mark must appear on the goods, the container for the goods, or displays associated with the goods, and the goods must be sold or transported in commerce.

For **services**: the mark must be used or displayed in the sale or advertising of the services, and the services must be rendered in commerce. If you have already started using

t

the mark in commerce, you may file based on that use.

A "**use**" based application must include a **sworn statement**(usually in the form of a **declaration**) that the mark is in use in commerce, listing the **date of first use** of the mark **anywhere and** the **date of first use** of the mark **in commerce**. A properly worded declaration is included in the USPTO **standard application form**. The applicant or a person authorized to sign on behalf of the applicant must sign the statement. The application should include a **specimen** showing use of the mark in commerce.

| Term | Definition | Context |
|---|---|---|
| USPS | *United States Postal Service* | g |
| USPTO | United States Patent and Trademark Office, designation became effective April 3, 2000; a result of the **American Inventors Protection Act of 1999** | g |
| USTR | United States Trade Representative<br><br>*-- see International Intellectual Property for more* | g |
| utility patent application | protect useful processes, machines, articles of manufacture, and compositions of matter.<br><br>*-- see also application (patent)* | p |
| utility patent | may be granted to anyone who invents or discovers any new, useful, and nonobvious process, machine, article of manufacture, or composition of matter, or any new and useful improvement thereof.<br><br>*-- see also patent* | p |

**>> TOP**

| Term | Definition | Context |
|---|---|---|
| WCT | **WIPO** Copyright Treaty | g |
| window close | time period after which a utility patent (that issues from an application filed on or after 12 December 1980) expires if a **maintenance fee** has not been paid. A petition must be filed along with the appropriate fees to reinstate an expired patent.<br><br>*-- see MPEP 2590* | g |
| window open | time period when a **maintenance fee** can be paid with or without a **surcharge**.<br><br>*-- see MPEP 2506* | g |
| WINS | Windows Internet Naming Service | i |
| WIPO | World Intellectual Property Organization | g |

an intergovernmental organization of the United Nations system. WIPO is responsible for the promotion of the protection of intellectual property throughout the world and for the administration of various multilateral treaties dealing with the legal and administrative aspects of intellectual property.

-- see **MORE INFO** about *International Intellectual Property protection*

| | | |
|---|---|---|
| withdrawn claim | | p |

a non-elected **claim**

"Withdrawn" is the status identifier that should be used for claims that were not elected *(chosen by the applicant to remain under consideration)* in response to a **restriction** requirement.

-- see **MPEP 803.01**, *803.02 and 803.03*

Further, an appellant *(one who is appealing an examiner's final rejection to the Board of Patent Appeals and Interferences)* may withdraw some of the appealed claims, resulting in **cancellation** of the **withdrawn claims**

-- see **MPEP 1214.05**

| | | |
|---|---|---|
| withdrawn patent | | p |

an allowed application for patent in which the applicant files correspondence to withdraw the patent from issue; ;thus preventing it from issuing on the patent issue date.
The printed document is sometimes available on the day of publication, but is later retracted and will not be available in the patent database.  No copy of the patent document will appear on the official USPTO web site.

-- see **37 CFR 1.313** and **1.114** for more

| | | |
|---|---|---|
| word mark | a type of **trademark** comprised of text | t |
| workflow | | g |

the "flow of work"

**Workflow diagrams** are a formal way to identify procedural steps and the logic employed in a process used to complete a task or job. **Workflow diagrams** include each interim step and product(s); the direction of movement through the process (indicated by arrows); decision points, alternative processes and repeated steps, and dependencies (steps or processes that must be completed before, during or after completion of a particular step); and can include the estimated time required for each step, who performs or reviews each step, and resource requirements. Depending on the type of **workflow** diagramming method used, the start and end points of each interim step may be listed separately or the entire process step can be indicated by a single notation.

| | | |
|---|---|---|
| workflow incoming amendment | from Public **PAIR**/**IFW** - designates the point in time when | p |

| Term | Definition | Context |
|---|---|---|
| IFW | an amendment is received in the Office and the paper scanning process may be started at the USPTO; does not indicate whether scanning has actually started. | |
| WPPT | **WIPO** Performances and Phonograms Treaty | g |
| WTO | World Trade Organization | g |
| | -- see **MORE INFO** about International Intellectual Property protection | |

**>> TOP**

| Term | Definition | Context |
|---|---|---|
| XML | eXtensible Markup Language - a subset of SGML, or standard generalized markup language; a structured language that facilitates the standardized representation of format and representation and organization of data in an automated environment, such as the use of a browser on a webpage. | i |
| X patent | In the 46 years prior to the **Great Fire of 1836**, the United States government had issued about 10,000 patents. Most of these could never be revived again, but Congress acted to restore those records that could be reconstructed from private files and reproduce models which were deemed critical. Patents whose records were not restored were cancelled. There were a total of 2,845 patents restored, most of which were eventually given a number beginning with "X". All patents after the date of the establishment of the Patent Office in July 1836 were numbered as a new series (without the X), beginning with a new Patent No. 1 to John Ruggles. A small number of the new series patents had been destroyed in the Great Fire but they were quickly recovered from their owners' records. X files bear numbers that range from X000001 to X011280. **X0000001** is the first patent, issued to Samuel Hopkins in 1790. | p |

**>> TOP**

**>> Plug-ins and Viewers**

**TOP**

**KEY:** 🌐 =online business system  💲 =fees  🖨 =forms  🔑 =help  ⚖ =laws/regulations  📖 =definition (glossary)

*Send questions about USPTO programs and services to the* **USPTO Contact Center (UCC)**. *You can suggest USPTO webpages or material you would like featured on this section by E-mail to the* **webmaster@uspto.gov** . *While we cannot promise to accommodate all requests, your suggestions will be considered and may lead to other improvements on the website.*

| .HOME | SITE INDEX | SEARCH | *eBUSINESS* | HELP | PRIVACY POLICY

Last Modified: 09/04/2013 16:27:16