**EXHIBIT A**

CITATION: Re Nortel Networks Corporation et al, 2014 ONSC 4777
COURT FILE NO.: 09-CL-7950
DATE: 20140819

## SUPERIOR COURT OF JUSTICE – ONTARIO
## COMMERCIAL LIST

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

**BEFORE:** Newbould J.

**COUNSEL:** *Benjamin Zarnett* and *Graham Smith*, for the Monitor and Canadian Debtors

*Ken Rosenberg*, for the Canadian Creditors' Committee

*Michael Barrack*, *D.J. Miller* and *Michael Shakra*, for the UK Pension Claimants

*Tracy Wynne*, for EMEA Debtors

*Kenneth Kraft*, for the Wilmington Trust, National Association

*Richard Swan*, *Gavin Finlayson* and *Kevin Zych*, for the Ad Hoc Group of Bondholders

*Shayne Kukulowicz*, for the US Unsecured Creditors' Committee

*John D. Marshall*, for Law Debenture Trust Company of New York

*Brett Harrison*, for Bank of New York Mellon

*Andrew Gray* and *Scott Bomhof*, for the US Debtors

HEARD:    July 25, 2014

# ENDORSEMENT

[1]    Nortel Networks Corporation ("NNC") and other Canadian debtors filed for and were granted protection under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. c-36, ("CCAA") on January 14, 2009. On the same date, Nortel Network Inc. ("NNI") and other US debtors filed petitions in Delaware under the United States Bankruptcy Code, 11 U.S.C., Chapter 11.

[2]    Beginning in 1996, unsecured *pari passu* notes were issued under three separate bond indentures, first by a US Nortel corporation guaranteed by Nortel Networks Limited ("NNL"), a Canadian corporation, and then by NNL in several tranches jointly and severally guaranteed by NNC and NNI (the "crossover bonds"). Thus all of the notes are payable by Nortel entities in both Canada and the US, either as the maker or guarantor. Under claims procedures in both the Canadian and US proceedings, claims by bondholders for principal and pre-filing interest in the amount of US$4.092 billion have been made against each of the Canadian and US estates. The bondholders also claim to be entitled to post-filing interest and related claims under the terms of the bonds which, as of December 31, 2013, amounted to approximately US$1.6 billion.

[3]    The total assets realized on the sale of Nortel assets worldwide which are the subject of the allocation proceedings amongst the Canadian, US, and European, Middle East and African estates ("EMEA") are approximately US$7.3 billion, and thus the post-filing bond interest claims of now more than US$1.6 billion represent a substantial portion of the total assets available to all three estates. While the post-filing bond interest grows at various compounded rates under the terms of the bonds, the US$7.3 billion is apparently not growing at any appreciable rate because of the very conservative nature of the investments made with it pending the outcome of the insolvency proceedings. Apart from the bondholders, the main claimants against the Canadian debtors are Nortel disabled employees, former employees and retirees.

[4]     The bond claims in the Canadian proceedings have been filed pursuant to a claims procedure order in the CCAA proceedings dated July 30, 2009. The order contemplated that the claims filed under it would be finally determined in accordance with further procedures to be authorized, including by a further claims resolution order. By order dated September 16, 2010, a further order was made in the CCAA proceedings that authorized procedures to determine claims for all purposes.

[5]     By direction of June 24, 2014, it was ordered that the following issues be argued:

> (a)     whether the holders of the crossover bond claims are legally entitled in each jurisdiction to claim or receive any amounts under the relevant indentures above and beyond the outstanding principal debt and pre-petition interest (namely, above and beyond US$4.092 billion); and
>
> (b)     if it is determined that the crossover bondholders are so entitled, what additional amounts are such holders entitled to so claim and receive.

[6]     The hearing in the US Bankruptcy Court was scheduled to proceed at the same time as the hearing in this Court but was adjourned due to an apparent settlement between the US Debtors and the US Unsecured Creditors Committee.

[7]     The Monitor and Canadian debtors, supported by the Canadian Creditors' Committee, the UK Pension Claimants, the EMEA debtors, and the Wilmington Trust take the position that in a liquidating CCAA proceeding such as this, post-filing interest is not legally payable on the crossover bonds as a result of the "interest stops" rule. The Ad Hoc Group of Bondholders, supported by the US Unsecured Creditors' Committee, Law Debenture Trust Company of New York and Bank of New York Mellon take the position that there is no "interest stops" rule in CCAA proceedings and that the right to interest on the crossover bonds is not lost on the filing of CCAA proceedings and can be the subject of negotiations regarding a CCAA plan of reorganization. They take the position that no distribution of Nortel's sale proceeds that fails to recognize the full amount of the crossover bondholders' claims, including post-filing interest,

can be ordered under the CCAA except under a negotiated CCAA plan duly approved by the requisite majorities of creditors and sanctioned by the court.

[8] For the reasons that follow, I accept the position and hold that post-filing interest is not legally payable on the crossover bonds in this case.

**The interest stops rule**

[9] In this case, the bondholders have a contractual right to interest. The other major claimants, being pensioners, do not. The Canadian debtors contend that the reason for the interest stops rule is one of fundamental fairness and that the rule should apply in this case.

[10] The Canadian debtors contend that the interest-stops rule is a common law rule corollary to the *pari passu* rule governing rateable payments of an insolvent's debts and that while the CCAA is silent as to the right to post-filing interest, it does not rule out the interest-stops rule.

[11] The bondholders contend that to deny them the right to post-filing interest would amount to a confiscation of a property right to interest and that absent express statutory authority the court has no ability to interfere with their contractual entitlement to interest. I do not see their claim to interest as being a property right, as the bonds are unsecured. See *Thibodeau v. Thibodeau* (C.A.), 104 O.R. (3d) 161, at para. 43. However, the question remains as to whether their contractual rights should prevail.

[12] It is a fundamental tenet of insolvency law that all debts shall be paid *pari passu* and all unsecured creditors receive equal treatment. See *Shoppers Trust Co. (Liquidator of) v. Shoppers Trust Co.* (2005), 74 O.R. (3d) 652 (C.A.) at para. 25, per Blair J.A. and *Indalex Ltd. (Re)* (2009), 55 C.B.R. (5th) 64 (Ont. S.C.), at para. 16 per Morawetz J. This common law principle has led to the development of the interest stops rule. In *Canada (Attorney General) v. Confederation Life Insurance Co.*, [2001] O.J. No. 2610, (Ont. S.C.), Blair J. (as he then was) stated the following:

**20**   One of the governing principles of insolvency law - including proceedings in a winding-up - is that the assets of the insolvent debtor are to be distributed amongst classes of creditors rateably and equally, as those assets are found at the date of the insolvency. This principle has led to the development of the "interest stops rule", i.e., that no interest is payable on a debt from the date of the winding-up or bankruptcy. As Lord Justice James put it, colourfully, in *Re Savin* (1872), L.R. 7 Ch. 760 (C.A.), at p. 764:

> I believe, however, that if the question now arose for the first time I should agree with the rule [i.e. the "interest stops rule"], seeing that the theory in bankruptcy is to stop all things at the date of the bankruptcy, and to divide the wreck of the man's property as it stood at that time.

[13]   This rule is "judge-made" law. See *In re Humber Ironworks and Shipbuilding Company* (1869), L.R. 4 Ch. App. 643 at 647, per Sir G. M. Giffard, L.J.

[14]   In *Shoppers Trust*, Blair J.A. referred to *pari passu* principles in the context of the interest stops rule and the common law understanding of those rules in liquidation proceedings. He stated:

> 25. The rationale underlying this approach rests on a fundamental principle of insolvency law, namely, that "in the case of an insolvent estate, all the money being realized as speedily as possible, should be applied equally and rateably in payment of the debts as they existed at the date of the winding-up": *Humber Ironworks, supra*, at p. 646 Ch. App. Unless this is the case, the principle of *pari passu* distribution cannot be honoured. See also *Re McDougall*, [1883] O.J. No. 63, 8 O.A.R. 309, at paras. 13-15; *Principal Savings & Trust Co. v. Principal Group Ltd. (Trustee of)* (1993), 109 D.L.R. (4th) 390, 14 Alta. L.R. (3d) 442 (C.A.), at paras. 12-16; and *Canada (Attorney General) v. Confederation Trust Co.* (2003), 65 O.R. (3d) 519, [2003] O.J. No. 2754 (S.C.J.), at p. 525 [O.R.] While these cases were decided in the context of what is known as the "interest stops" rule, they are all premised on the common law understanding that claims for principal and interest are provable in liquidation proceedings to the date of the winding-up.

[15]   The interest stops rule has been applied in winding-up cases in spite of the fact that the legislation did not provide for it. In *Shoppers Trust*, Blair J.A. stated:

> 26. Thus, it was of little moment that the provisions of the *Winding-up Act* in force at the time of the March 10, 1993 order did not contain any such term. The 1996 amendment to s. 71(1) of the *Winding-up and Restructuring Act*, establishing that claims against the insolvent estate are to be calculated as at the

date of the winding-up, merely clarified and codified the position as it already existed in insolvency law.

[16] In *Abacus Cities Ltd. (Trustee of) v. AMIC Mortgage Investment Corp.* (1992), 11 C.B.R. (3d) 193 (Alta. C.A.), Kerans J.A. applied the interest stops rule in a bankruptcy proceeding under the BIA even although, in his view, the BIA assumed that interest was not payable after bankruptcy but did not expressly forbid it. He did so on the basis of the common law rule enunciated in *Re Savin,* quoted by Blair J. in *Confederation Life*. Kerans J.A. stated:

> 19. ... I accept that *Savin* expresses the law in Canada today: claims provable in bankruptcy cannot include interest after bankruptcy.

[17] In *Confederation Life*, Blair J. was of the view that the Winding-Up Act and the BIA could be interpreted to permit post-filing interest. Yet he held that the common law insolvency interest stops rule applied. He stated:

> **22**  This common law principle has been applied consistently in Canadian bankruptcy and winding-up proceedings. This is so notwithstanding the language of subsection 71(1) of the Winding-Up Act and section 121 of the BIA, which might be read to the contrary, in my view....
>
> **23**  Yet the "interest stops" principle has always applied to the payment of post-insolvency interest, and the provisions of subsection 71(1) have never been interpreted to trump the common law insolvency "interest stops rule".

[18] Thus I see no reason to not apply the interest stops rule to a CCAA proceeding because the CCAA does not expressly provide for its application. The issue is whether the rule should apply to this CCAA proceeding.

**Nature of the CCAA proceeding**

[19] When the Nortel entities filed for CCAA protection on January 14, 2009, and filed on the same date in the US and the UK, the stated purpose was to stabilize the Nortel business to maximize the chances of preserving all or a portion of the enterprise. However that hope quickly evaporated and on June 19, 2009 Nortel issued a news release announcing it had sold its CMDA business and LTE Access assets and that it was pursuing the sale of its other business interests. Liquidation followed, first by a sale of Nortel's eight business lines in 2009-2011 for US$2.8

billion and second by the sale of its residual patent portfolio under a stalking-horse bid process in June 2011 for US$4.5 billion. The sale of the CMDA and LTE assets was approved on June 29, 2009.

[20]  The Canadian debtors contend that this CCAA proceeding is a liquidating proceeding, and thus in substance the same as a bankruptcy under the BIA. The bondholders contend that there is no definition of a "liquidating" CCAA proceeding and no distinct legal category of a liquidating CCAA, essentially arguing that like beauty, it is in the eyes of the beholder.

[21]  In this case, I think there is little doubt that this is a liquidating CCAA process and has been since June, 2009, notwithstanding that there was some consideration given to monetizing the residual intellectual property in a new company to be formed (referred to as IPCO) before it was decided to sell the residual intellectual property that resulted in the sale to the Rockstar consortium for US$4.5 billion. In *Re Nortel Networks Corp.*, 2012 ONSC 1213, 88 C.B.R. (5th) 111, Morawetz J. referred to his recognizing in his June 29, 2009 Nortel decision approving the sale of the CMDA and LTE assets that the CCAA can be applied in "a liquidating insolvency". See also Dr. Janis P. Sarra, *Rescue! The Companies' Creditors Arrangement Act*, 2nd ed. (Toronto: Carswell, 2013) at p. 167, in which she states "increasingly, there are 'liquidating CCAA' proceedings, whereby the debtor corporation is for all intents and purposes liquidated".

[22]  In *re Lehndorff General Partners Ltd.* (1993), 17 C.B.R. (3d) 24 (Ont. S.C.), Farley J. recognized in para. 7 that a CCAA proceeding might involve liquidation. He stated:

> It appears to me that the purpose of the CCAA is also to protect the interests of creditors and to enable an orderly distribution of the debtor company's affairs. This may involve a winding-up or liquidation of a company ... provided the same is proposed in the best interests of the creditors generally.

[23]  It is quite common now for there to be liquidating CCAA proceedings in which there is no successful restructuring of the business but rather a sale of the assets and a distribution of the proceeds to the creditors of the business. Nortel is unfortunately one of such CCAA proceedings.

## Can the interest stops rule apply in a CCAA proceeding?

[24] There is no controlling authority in Canada in a case such as this in which there is a contested claim being made by bondholders for post-filing interest against an insolvent estate under the CCAA, let alone under a liquidating CCAA process, or in which the other creditors are mainly pensioners with no contractual right to post-filing interest. Accordingly, it is necessary to deal with first principles and with various cases raised by the parties.

[25] The Canadian debtors contend that the rationale for the interest stops rule is equally applicable to a liquidating CCAA proceeding as it is in a BIA or Winding-Up proceeding. They assert that the reason for the interest stops rule is one of fundamental fairness. An insolvency filing under the CCAA stays creditor enforcement. Accordingly, it is unfair to permit the bondholders with a contractual right to receive a payment on account of interest, and thus compensation for the delay in receipt of payment, while other creditors such as the pension claimants, who have been equally delayed in payment by virtue of the insolvency, receive no compensation. They cite Sir G. M. Giffard, L.J. in *Humber Ironworks*:

> I do not see with what justice interest can be computed in favour of creditors whose debts carry interest, while creditors whose debts do not carry interest are stayed from recovering judgment, and so obtaining a right to interest.

[26] In *Century Services Inc. v. Canada (Attorney General)*, 2010 SCC 60, [2010] 3 S.C.R. 379, Deschamps J. reaffirmed that the purpose of a CCAA stay of proceedings is to preserve the *status quo*. She stated at para. 77:

> The *CCAA* creates conditions for preserving the *status quo* while attempts are made to find common ground amongst stakeholders for a reorganization that is fair to all.

[27] If post-filing interest is available to one set of creditors while the other creditors are prevented from asserting their rights and obtaining post-judgment interest, the Canadian Creditors' Committee contend that the *status quo* has not been preserved.

[28] It has long been recognized that the federal insolvency regime includes the CCAA and the BIA and that the two statutes create a complimentary and interrelated scheme for dealing

dealing with the property of insolvent companies. See *Re Ivaco Inc.* (2006), 83 O.R. (3d) 108 (C.A.), at paras. 62 and 64, per Laskin J.A.

[29]  Recently the Supreme Court of Canada analysed the CCAA and indicated that the BIA and CCAA are to be considered parts of an integrated insolvency scheme, the court will favour interpretations that give creditors analogous entitlements under the CCAA and BIA, and the court will avoid interpretations that give creditors incentives to prefer BIA processes.

[30]  In *Century Services*, Deschamps J. enunciated guiding principles for interpreting the CCAA. Deschamps J. also stated that the case was the first time that the Supreme Court was called upon to directly interpret the provisions of the CCAA. The case involved competing interpretations of the federal *Excise Tax Act* ("ETA") and the CCAA in considering a deemed trust for GST collections. The ETA expressly excluded the provisions in the BIA rendering deemed trusts ineffective, but did not exclude similar provisions in the CCAA. In holding in favour of a stay under the CCAA, Deschamps J. was guided in her interpretation of the relevant CCAA provision by the desire to have similar results under the BIA and CCAA.

[31]  In her analysis, Deschamps J. made a number of statements, including

> Because the CCAA is silent about what happens if reorganization fails, the *BIA* scheme of liquidation and distribution necessarily supplies the backdrop for what will happen if a CCAA reorganization is ultimately unsuccessful. (para. 23)
>
> With parallel CCAA and BIA restructuring schemes now an accepted feature of the insolvency law landscape, the contemporary thrust of legislative reform has been towards harmonizing aspects of insolvency law common to the two statutory schemes to the extent possible and encouraging reorganization over liquidation. (para. 24)
>
> Moreover, a strange asymmetry would arise if the interpretation giving the ETA priority over the CCAA urged by the Crown is adopted here: the Crown would retain priority over GST claims during CCAA proceedings but not in bankruptcy. As courts have reflected, this can only encourage statute shopping by secured creditors in cases such as this one where the debtor's assets cannot satisfy both the secured creditors' and the Crown's claims (*Gauntlet*, at para. 21). If creditors' claims were better protected by liquidation under the BIA, creditors' incentives would lie overwhelmingly with avoiding proceedings under the CCAA and not risking a failed reorganization. Giving a key player in any insolvency such

> skewed incentives against reorganizing under the CCAA can only undermine that statute's remedial objectives and risk inviting the very social ills that it was enacted to avert. (para. 47)
>
> Notably, acting consistently with its goal of treating both the BIA and the CCAA as sharing the same approach to insolvency, Parliament made parallel amendments to both statutes… (para. 54)
>
> The CCAA and BIA are related and no gap exists between the two statutes which would allow the enforcement of property interests at the conclusion of CCAA proceedings that would be lost in bankruptcy. (para. 78)

[32]   In *Re Indalex*, [2013] S.C.R. 271, a case involving a competition between a deemed trust under provincial pension legislation and the right of a lender to security granted under the DIP lending provisions of the CCAA, Deschamps J. had occasion to refer to the *Century Services* case and her statement in Century Services in para 23 referred to above. She then stated:

> In order to avoid a race to liquidation under the BIA, courts will favour an interpretation of the CCAA that affords creditors analogous entitlements.

[33]   Thus it is a fair comment taken the direction of the Supreme Court in *Century Services* and *Indalex* regarding the aims of insolvency law in Canada to say that if the common law principle of the interest stops rule was applicable to proceedings under the BIA and *Winding-Up Act* before legislative amendments to those statutes were made, (or if the comments of Blair J. in *Confederation Life* are accepted that the BIA still might be read to prevent its application but does not trump the application of the rule), there is no reason not to apply the interest stops rule in liquidating CCAA proceedings. I accept this and note that there is no provision in the CCAA that would not permit the application of the rule.

[34]   There are also policy reasons for this result, and they flow from *Century Services* and *Indalex*. I accept the argument of the Canadian Creditors' Committee that to permit some creditors' claims to grow disproportionately to others during the stay period would not maintain the *status quo* and would encourage creditors whose interests are being disadvantaged to immediately initiate bankruptcy proceedings, threatening the objectives of the CCAA.

[35]   In my view, there is no need for there to be a "liquidating" CCCAA proceeding in order for the interest stops rule to apply to a CCAA proceeding. The reasoning for the application of the common law insolvency rule, being the desire to prevent a stay of proceedings from militating against one group of unsecured creditors over another in violation of the *pari passu* rule, is equally applicable to a CCAA proceeding that is not a liquidating proceeding. In such a proceeding, the parties would of course be free to include post-filing interest payments in a plan of arrangement, as is sometimes done.

[36]   The bondholders contend, however, that *Re Stelco Inc.*, 2007 ONCA 483, 32 C.B.R. (4th) 77 is binding authority that the interest stops rule does not apply in any CCAA proceeding. I do not agree. The facts of the case were quite different and did not involve a claim for post-filing interest against the debtor. Stelco was successfully restructured under the CCAA by a plan of compromise and arrangement approved by the creditors. The sanctioned plan did not provide for payment of post-petition interest. As among senior unsecured debenture holders, subordinated (junior) debenture holders and ordinary unsecured creditors, the plan treated all in the same class and *pro rata* distributions were calculated on the basis that no post-filing interest was allowed. That result was not challenged.

[37]   The relevant pre-filing indenture in *Stelco* provided that in the event of any insolvency, the holders of all senior debt would first be entitled to receive payment in full of the principal and interest due thereon, before the junior debenture holders would be entitled to receive any payment or distribution of any kind which might otherwise be payable in respect of their debentures. While the plan cancelled all Stelco debentures, subject to section 6.01(2) of the plan, that section provided that the rights between the debenture holders were preserved. The plan was agreed to by the junior debenture holders. After the plan had been sanctioned, the junior debenture holders challenged the senior debt holders' right to receive the subordinated payments towards their outstanding interest.

[38]   Wilton-Siegel J. rejected the argument, holding that the subordination agreement continued to operate independently of the sanctioned plan and was not affected by it. While it is not clear why, the junior Noteholders contended that interest stopped accruing in respect of the claims of the senior debenture holders against Stelco after the CCAA filing. There was no issue

about a claim against Stelco for post-filing interest, as no such claim had ever been made. The issue was a contest between the two levels of debenture holders. However, Wilton-Siegel J. stated that in situations in which there was value to the equity, a CCAA plan could include post-filing interest. I take this statement to be *obiter*, but in any event, it is not the situation in Nortel as there is no equity at all. At the Court of Appeal, O'Connor A.C.J.O, Goudge and Blair JJ.A. agreed that the interest stops rule did not preclude the continuation of interest to the senior note holders from the subordinated payments to be made by the junior note holders under the binding inter-creditor arrangements.

[39] In the course of its reasons, the Court of Appeal stated that there was no persuasive authority that supports an interest stops rule in a CCAA proceeding, and referred to statements of Binnie J. in *Canada 3000 Inc., Re; Inter Canadian (1991) Inc. (Trustee of)*, 2006 SCC 24, [2006] 1 S.C.R. 865, [*NAV Canada*]. A number of comments can be made.

[40] First, *Stelco* did not involve proceeding or claims against the debtor for post-filing interest. Second, the decision in *Stelco* was derived from the terms of negotiated inter-creditor agreements in the note indenture that were protected by plan. There was nothing about the common law interest stops rule that precluded one creditor from being held to its agreement to subordinate its realization to that of another creditor including foregoing its right to payment until the creditor with priority received principal and interest. That is what the Court of Appeal concluded by stating "We do not accept that there is a 'Interest Stops Rule' that precludes such a result". Third, the general statements made in *Stelco* and *NAV Canada* must now be considered in light of the later direction in *Century Services* and *Indalex*. I now turn to *NAV Canada*.

[41] In *NAV Canada*, Canada 3000 Airlines filed for protection under the CCAA. Three days later the Monitor filed an assignment in bankruptcy on its behalf. Federal legislation gave the airport authorities a right to apply to the court authorizing the seizure of aircraft for outstanding payments owed by an airline for using an airport. The contest in the case was between the airport authorities and the owners/lessors of the aircraft as to the extent that the owners/lessors were liable for those payments and whether a seizure order could be made against the aircraft leased to the airline. It was ultimately held that the owners/lessors were not liable for the outstanding payments owed by the airline but that the aircraft could be seized.

[42]  Interest on the arrears was raised in the first instance before Ground J. He held that the airport authorities were entitled as against the bankrupt airline to detain the aircraft until all amounts with interest were paid in full or security for such payment was posted under the provisions of the legislation, i.e. interest continued to accrue and be payable after bankruptcy. The Court of Appeal did not deal with interest as in their view it was relevant only if the airport authorities had a claim against the owners/lessors of the aircraft, which the court held they did not.

[43]  In the Supreme Court, which also dealt with an appeal from Quebec which dealt with the same issues, nearly the entire reasons of Binnie J. dealt with the issues as to whether the owners/lessors of the aircraft were liable for the outstanding charges and whether the aircraft could be seized by the airport authorities. It was held that the owners/lessors were not directly liable for the charges owed by the airline but that the aircraft could be seized until the charges were paid.

[44]  At the end of his reasons, Binnie J. dealt with interest and held that it continued to run until the earlier of payment, the posting of security, or bankruptcy. The bondholders rely on the last two sentences of the following paragraph from the reasons of Binnie J. which refer to the running of interest under the CCAA:

> **96**  Given the authority to charge interest, my view is that interest continues to run to the first of the date of payment, the posting of security or bankruptcy. If interest were to stop accruing before payment has been made, then the airport authorities and NAV Canada would not recover the full amount owed to them in real terms. Once the owner, operator or titleholder has provided security, the interest stops accruing. The legal titleholder is then incurring the cost of the security and losing the time value of money. It should not have to pay twice. While a *CCAA* filing does not stop the accrual of interest, the unpaid charges remain an unsecured claim provable against the bankrupt airline. The claim does not accrue interest after the bankruptcy: ss. 121 and 122 of the *Bankruptcy and Insolvency Act*.

[45]  The Quebec airline in question had first filed to make a proposal under the BIA and when that proposal was rejected by its creditors, it was deemed to have made an assignment in bankruptcy as of the date its proposal was filed. Thus the comments of Binnie J. regarding the CCAA could not have related to the Quebec airline, but only to Canada 3000, which had been

under the CCAA for only three days before it was assigned into bankruptcy. It is by no means clear how much effort, if any, was spent in argument on the three days' interest issue. Binnie J. did not refer to any argument on the point.

[46] There was no discussion of the common law interest stops rule and whether it could apply during the three day period in question or whether it should apply to a liquidating CCAA proceeding. Nor was there any discussion of the definition of claim in the CCAA, being a claim provable within the meaning of the BIA, and how that might impact a claim for post-filing interest under the CCAA. The statement regarding interest under the CCAA was simply conclusory. It may be fair to say that the statement of Binnie J. was *per incuriam*.

[47] In my view, the statement of Binnie J. should not be taken as a blanket statement that interest always accrues in a CCAA proceeding, regardless of whether or not it is a liquidating proceeding. The circumstances in *NAV Canada* were far different from Nortel involving several years of compound interest in excess of US$1.6 billion out of a total world-wide asset base of US$7.3 billion. The statement of Binnie J. should now be construed in light of *Century Services* and *Indalex*.

**Need for a CCAA plan**

[48] The bondholders contend that there is no authority under the CCAA to effect a distribution of a debtor's assets absent a plan of arrangement or compromise that must be negotiated by the debtor with its creditors, and that as a plan can include payment of post-filing interest, it is not possible for a court to conclude that the bondholders have no right to post-filing interest. They assert that there is no jurisdiction for a court to compromise a creditor's claim in a CCAA proceeding except in the context of approving a plan approved by the creditors. They also assert that plan negotiations cannot meaningfully take place "in earnest" until the allocation decision as to how much of the US$7.3 billion is to be allocated to each of the Canadian, US, or EMEA estates.

[49] One may ask what is left over in this case to negotiate. The assets have long been sold and what is left is to determine the claims against the Canadian estate and, once the amount of

the assets in the Canadian estate are known, distribute the assets on a *pari passu* basis. This is not a case in which equity is exchanged for debt in a reorganization of a business such as *Stelco*.

[50]   However, even if there were things to negotiate, they would involve creditors compromising some right, and bargaining against those rights. What those rights are need to be determined, and often are in CCAA proceedings.

[51]   In this case, compensation claims procedure orders were made by Morawetz J. The order covering claims by bondholders is dated July 30, 2009. It was made without any objection by the bondholders. That order provides for a claim to be proven for the purposes of voting and distribution under a plan. The claims resolution order of Morawetz J. dated September 16, 2010 provides for a proven claim to be for all purposes, including for the purposes of voting and distribution under any plan. The determination now regarding the bondholders claim for post-filing interest is consistent with the process of determining whether these claims by the bondholders are finally proven. Contrary to the contention of the bondholders, it is not a process in which the court is being asked to compromise the bondholders' claim for post-filing interest. It is rather a determination of whether they have a right to such interest.

[52]   It is perhaps not necessary to determine at this stage how the assets will be distributed and whether a plan, or what type of plan, will be necessary. However, in light of the argument advanced on behalf of the bondholders, I will deal with this issue.

[53]   I first note that the CCAA makes no provision as to how money is to be distributed to creditors. This is not surprising taken that plans of reorganization do not necessarily provide for payments to creditors and taken that the CCAA does not expressly provide for a liquidating CCAA process. There is no provision that requires distributions to be made under a plan of arrangement.

[54]   A court has wide powers in a CCAA proceeding to do what is just in the circumstances. Section 11(1) provides that a court may make any order it considers appropriate in the circumstances. Although this section was provided by an amendment that came into force after Nortel filed under the CCAA, and therefore by the amendment the new section does not apply to

Nortel, it has been held that the provision merely reflects past jurisdiction. In *Century Services*, Deschamps J. stated:

> **65** I agree with Justice Georgina R. Jackson and Professor Janis Sarra that the most appropriate approach is a hierarchical one in which courts rely first on an interpretation of the provisions of the *CCAA* text before turning to inherent or equitable jurisdiction to anchor measures taken in a *CCAA* proceeding (see G. R. Jackson and J. Sarra, "Selecting the Judicial Tool to get the Job Done: An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters", in J. P. Sarra, ed., *Annual Review of Insolvency Law 2007* (2008), 41, at p. 42). The authors conclude that when given an appropriately purposive and liberal interpretation, the *CCAA* will be sufficient in most instances to ground measures necessary to achieve its objectives (p. 94).
>
> **67** The initial grant of authority under the *CCAA* empowered a court "where an application is made under this Act in respect of a company ... on the application of any person interested in the matter ..., subject to this Act, [to] make an order under this section" (*CCAA*, s. 11(1)). The plain language of the statute was very broad.
>
> **68** In this regard, though not strictly applicable to the case at bar, I note that Parliament has in recent amendments changed the wording contained in s. 11(1), making explicit the discretionary authority of the court under the *CCAA*. Thus in s. 11 of the *CCAA* as currently enacted, a court may, "subject to the restrictions set out in this Act, ... make any order that it considers appropriate in the circumstances" (S.C. 2005, c. 47, s. 128). <u>Parliament appears to have endorsed the broad reading of *CCAA* authority developed by the jurisprudence.</u> (underlining added)

[55] I note also that payments to creditors without plans of arrangement or compromises are often ordered. In *Timminco Limited (Re)*, 2014 ONSC 3393, Morawetz J. noted at para. 38 that the assets of Timminco had been sold and distributions made to secured creditors without any plan and with no intention to advance a plan. In that case, there was a shortfall to the secured creditors and no assets available to the unsecured creditors. The fact that the distributions went to the secured creditors rather than to an unsecured creditor makes no difference to the jurisdiction under the CCAA to do so.

[56] In *AbitibiBowater Inc., (Re)*, 2009 QCCS 6461, Gascon J.C.S. (as he then was) granted a large interim distribution from the proceeds of a sale transaction to senior secured noteholders ("SSNs"). The bondholders opposed the distribution on the same grounds as advanced by the bondholders in this case:

Case 09-10138-MFW    Doc 14241-1    Filed 08/21/14    Page 18 of 19
- Page 17 -

56      The Bondholders claim that the proposed distribution violates the CCAA. From their perspective, nothing in the statute authorizes a distribution of cash to a creditor group prior to approval of a plan of arrangement by the requisite majorities of creditors and the Court. They maintain that the SSNs are subject to the stay of proceedings like all other creditors.

57      By proposing a distribution to one class of creditors, the Bondholders contend that the other classes of creditors are denied the ability to negotiate a compromise with the SSNs. Instead of bringing forward their proposed plan and creating options for the creditors for negotiation and voting purposes, the Abitibi Petitioners are thus eliminating bargaining options and confiscating the other creditors' leverage and voting rights.

58      Accordingly, the Bondholders conclude that the proposed distribution should not be considered until after the creditors have had an opportunity to negotiate a plan of arrangement or a compromise with the SSNs.

[57]    Justice Gascon did not accept this argument. He stated:

71      Despite what the Bondholders argue, it is neither unusual nor unheard of to proceed with an interim distribution of net proceeds in the context of a sale of assets in a CCAA reorganization. <u>Nothing in the CCAA prevents similar interim distribution of monies. There are several examples of such distributions having been authorized by Courts in Canada.</u> (underlining added)

[58]    Justice Gascon was persuaded that the distribution should be made as it was part and parcel of a DIP loan arrangement that he approved. Whatever the particular circumstances were that led to the exercise of his discretion, he did not question that he had jurisdiction to make an order distributing proceeds without a plan of arrangement. I see no difference between an interim distribution, as in the case of *AbitibiBowater*, or a final distribution, as in the case of *Timminco*, or a distribution to an unsecured or secured creditor, so far as a jurisdiction to make the order is concerned without any plan of arrangement.

[59]    There is a comment by Laskin J.A. in *Ivaco Inc., (Re)* (2006), 83 O.R. (3d) 108 (C.A.) that questions the right of a judge to order payment out of funds realized on the sale of assets under a CCAA process, in that case to pension plan administrators for funding deficiencies. He stated:

> [I]n my view, absent an agreement, I doubt that the CCAA even authorized the motions judge to order this payment. Once restructuring was not possible and the CCAA proceedings were spent, as the motions judge found and all parties acknowledged, I question whether the court had any authority to order a distribution of the sale proceeds.

[60] This was an *obiter* statement. But in any event Justice Laskin was discussing a situation in which all parties agreed that the CCAA proceedings "were spent". That is, there was effectively no CCAA proceeding any more. This is not the situation with Nortel and I do not see the *obiter* statement as being applicable. As stated by Justice Gascon , distribution orders without a plan are common in Canada.

[61] While it need not be decided, I am not persuaded that it would not be possible for a court to make an order distributing the proceeds of the Nortel sale without a plan of arrangement or compromise.

**Conclusion**

[62] I hold and declare that holders of the crossover bond claims are not legally entitled to claim or receive any amounts under the relevant indentures above and beyond the outstanding principal debt and pre-petition interest (namely, above and beyond US$4.092 billion).

[63] Those seeking costs may make cost submissions in writing within 10 days and responding submissions may be made in writing within a further 10 days. Submissions are to be brief and include a proper cost outline for costs sought.

_____
Newbould J.

**Date:** August 19, 2014