Court File No. 09-CL-7950

## *ONTARIO*
## SUPERIOR COURT OF JUSTICE
## (COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. c-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL
NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL
CORPORATION and NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Nortel Networks Inc., *et al.*,[1] | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |

## INITIAL POST-TRIAL BRIEF (ALLOCATION)
## OF THE MONITOR AND CANADIAN DEBTORS

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre 333
Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Benjamin Zarnett**  LSUC#: 17247M
bzarnett@goodmans.ca
**Jay A. Carfagnini**  LSUC#: 22293T
jcarfagnini@goodmans.ca
**Peter Ruby**  LSUC#: 38439P
pruby@goodmans.ca
**Joseph Pasquariello** LSUC#: 38390C
jpasquariello@goodmans.ca
Tel:    (416) 979-2211
Fax:    (416) 979-1234
*Lawyers for the Monitor*

**GOWLING LAFLEUR HENDERSON LLP**
Barristers & Solicitors
1 First Canada Place
100 King Street West, Suite 1600
Toronto, ON  M5X 1G5

**Derrick Tay**  LSUC#: 21152A
derrick.tay@gowlings.com
**Jennifer Stam** LSUC#: 46735J
jennifer.stam@gowlings.com
Tel:    (416) 862-5691
Fax:    (416) 862-7661

*Lawyers for the Canadian Debtors*

August 7, 2014

**BUCHANAN INGERSOLL & ROONEY PC**
919 North Market Street, Suite 1500
Wilmington, Delaware 19801

**Mary F. Caloway** (No. 3059)
mary.caloway@bipc.com
**Kathleen A. Murphy** (No. 5215)
kathleen.murphy@bipc.com
Tel:    (302) 552-4200
Fax:    (302) 552-4295

*Attorneys for Ernst & Young Inc., as Monitor
and Foreign Representative of the Canadian
Debtor*

**ALLEN & OVERY LLP**
1221 Avenue of the Americas
New York, NY 10020

**Jacob S. Pultman**
jacob.pultman@allenovery.com
**Paul B. Keller**
paul.keller@allenovery.com
**Laura R. Hall**
laura.hall@allenovery.com
**Ken Coleman**
ken.coleman@allenovery.com
**Daniel Guyder**
david.guyder@allenovery.com
Tel:    (212) 610-6300
Fax:    (212) 610-6399

*Attorneys for Ernst & Young Inc., as Monitor
and Foreign Representative of the Canadian
Debtor*

**TO:    THE CORE PARTIES SERVICE LIST**

---

[1]     The US Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Nortel Networks Inc. (6332), Nortel Networks Capital Corporation (9630), Nortel Altsystems Inc. (9769), Nortel Altsystems International Inc. (5596), Xros, Inc. (4181), Sonoma Systems (2073), Qtera Corporation (0251), CoreTek, Inc. (5722), Nortel Networks Applications Management Solutions Inc. (2846), Nortel Networks Optical Components (3545), Nortel Networks HPOCS Inc. (3546), Architel Systems (U.S.) Corporation (3826), Nortel Networks International Inc. (0358), Northern Telecom International Inc. (6286), Nortel Networks Cable Solutions Inc. (0567) and Nortel Networks (CALA) Inc. (4226)

# TABLE OF CONTENTS

**Page**

PART I – OVERVIEW ...................................................................................................1

PART II – PROPOSED FINDINGS OF FACT ............................................................4

PART III – RECITATION OF FACTS ........................................................................4
A.    Pre-Petition ............................................................................................................4
    (a)    Nortel's Corporate Structure and Organization .......................................4
    (b)    Research & Development and the Importance of Ottawa ..........................8
    (c)    Intellectual Property...............................................................................13
    (d)    Transfer Pricing Arrangements including CSAs and the MRDA.........15
    (e)    The APA Process ....................................................................................24
B.    Post-Petition.........................................................................................................27
    (a)    Commencement of Proceedings ..............................................................27
    (b)    Decision to Liquidate..............................................................................29
    (c)    IFSA.......................................................................................................31
    (d)    Business Sales.........................................................................................38
    (e)    Residual Patent Portfolio .......................................................................44
    (f)    Expansion of Monitor's Powers..............................................................50
    (g)    Allocation Litigation ...............................................................................52

PART IV – PROPOSED CONCLUSIONS OF LAW ..................................................55
    (a)    Ontario Law of Contractual Interpretation ...........................................55
    (b)    The MRDA confirms NNL's Legal Title to the IP................................61
    (c)    The Consequences of NNL's Ownership ................................................62
    (d)    NNL Did Not Merely Hold "Bare Legal Title" or Legal Title Merely for "Administrative Convenience" ...............................................................63
    (e)    NNI and NNUK Were Granted Licenses Restricted to "Products"......63
    (f)    The Extrinsic Evidence Relied upon by the U.S. Debtors Is Not Admissible Under the Rubric of Factual Matrix.........................................................64
    (g)    Calling the License Rights "Beneficial Ownership" Does Not Expand Their Scope......................................................................................................65
    (h)    The EMEA Debtors' Theory of "Joint Ownership" Is Without Foundation .........67
    (i)    If Admissible, the Expert Evidence on the Interpretation of the MRDA Supports the Monitor's Position ............................................................67
    (j)    The Parties' Agreements Explicitly Reserved Their Rights As To Their Allocation Positions................................................................................68
    (k)    Statements Made During Mediation And Settlement Negotiations Are Inadmissible In These Proceedings.........................................................69
    (l)    The Monitor And Canadian Debtors Are Not Estopped From Asserting Their Allocation Position..................................................................................70

PART V – ALLOCATION SHOULD BE BASED ON THE RIGHTS OF THE PARTIES .......71

PART VI – THE MRDA AND THE PARTIES' RIGHTS TO NORTEL IP ..............................73
 (a) Ontario Law of Contractual Interpretation ...........................................73
 (b) The Parties' Positions as to the Rights Held by Each in Nortel's IP ...................80
 (c) The MRDA Is the Sole Source of the Licensed Participants' Rights Under Nortel's IP...........................................................................................84
 (d) The MRDA Recognized that NNL Held Legal Title to the IP .............................87
 (e) "Legal Title" in the MRDA Means Ownership ................................................87
 (f) The Consequences of NNL's Ownership ............................................91
 (g) NNL Did Not Merely Hold "Bare Legal Title" or Legal Title Merely for "Administrative Convenience" ....................................................................92
 (h) NNI and NNUK Were Granted Licenses Restricted to "Products".......................99
 (i) The Extrinsic Evidence Relied upon by the U.S. Debtors Is Not Admissible Under the Rubric of Factual Matrix..................................................109
 (j) Calling the License Rights "Beneficial Ownership" Does Not Expand Their Scope.........................................................................................114
 (k) The Evidence of Catherine Tucker Does Not Assist the U.S. Debtors................122
 (l) The EMEA Debtors' Theory of "Joint Ownership" Is Without Foundation .......123
 (m) Other MRDA Terms Important to Valuation.....................................................129
 (n) If Admissible, the Expert Evidence on the Interpretation of the MRDA Supports the Monitor's Position ..........................................................131

PART VII – ALLOCATION OF THE PROCEEDS OF THE BUSINESS LINE SALES.........138
 (a) Overview of the Methodology Proposed by the Monitor's Experts...................138
 (b) Allocation of the Proceeds Attributable to the Transfer of Tangible Assets .......140
 (c) Allocation of Proceeds Attributable to In-Place Workforce..............................142
 (d) Allocation of Proceeds Attributable to Wholly Owned Subsidiaries .................144
 (e) Allocation of Proceeds Attributable to the Transfer or Surrender of IP Rights...145
 (f) Allocation of Proceeds Attributable to Customer Relationships ........................152
 (g) Total Allocations Related to the Business Sales..................................................154
 (h) Alternative Valuation of Property Interests in Business Sales ...........................155

PART VIII – ALLOCATION OF THE PROCEEDS FROM THE ROCKSTAR TRANSACTION .....................................................................................157
 (a) The Other Parties' Criticisms With Respect to the Rockstar Allocation are Groundless .............................................................................160
 (b) Alternative Approach to Residual IP Sale Valuation .........................................165
 (c) Total Allocations of Sale Proceeds .......................................................166

PART IX – THE ALLOCATIONS PROPOSED BY THE U.S. AND EMEA DEBTORS ARE NOT SUPPORTABLE .....................................................................168
 (a) Introduction.........................................................................................168
 (b) The Allocation Proposed by Mr. Kinrich Is Not Supportable ...........................169
 (c) Other Flaws With Allocation Proposed by the U.S. Debtors of the Rockstar Transaction Proceeds .......................................................................178
 (d) The Allocation Proposed by the EMEA Debtors Should Be Rejected................183

PART X – THE MONITOR'S POSITION SHOULD BE CONSIDERED ON ITS MERITS ..201

    (a)    The Parties' Agreements Explicitly Reserved Their Rights As To Their Allocation Positions.............................................................................................202

    (b)    Statements Made During Mediation And Settlement Negotiations Are Inadmissible In These Proceedings.......................................................................207

    (c)    There Is No Prejudice To The Other Estates In Allowing The Canadian Debtors' Position On Allocation...........................................................................210

    (d)    The Monitor And Canadian Debtors Are Not Estopped From Asserting Their Allocation Position................................................................................................215

PART XI – CONCLUSION .....................................................................................219

**PART I – OVERVIEW**

1.       These Courts must decide upon the correct basis to allocate, among the three Debtor

Estates, the approximately $7.3 billion in sale proceeds that were realized on the sales of Nortel

assets following the insolvency filings in 2009.[1]

2.       The Courts are very familiar with the matters at issue in this proceeding, having received

unusually voluminous and detailed opening arguments, heard extensive fact and expert evidence,

and been provided with a great deal of deposition and documentary evidence.  Therefore, the

Monitor intends this overview as an outline of this post-trial brief and not yet another summary

of the parties' positions, evidence and arguments.[2]

3.       Part II refers the Courts to the places in which proposed findings of fact are set out.

4.       Part III outlines the main facts arising from the key witness testimony and documents

with respect to which the Monitor requests that the Courts find as fact.  These proposed findings

of fact cover both pre-petition and post-petition matters, including background matters.  In this

proceeding, the key central issue is the interpretation of the MRDA and the correct allocation

flowing from that interpretation.  Both these topics are addressed in detail in Parts VI to IX, with

proposed findings of fact and law woven throughout the argument – presented in this manner

because of the relationship of the MRDA, its factual matrix and the expert evidence.  Discussion

of certain evidence proffered by other parties and its bearing on the interpretation of the MRDA

is largely found in Part VI and not reproduced in Part III because that evidence is almost entirely

inadmissible for the reasons described in Part VI.  Factual evidence related to the allocation

---

[1] For definitions of some capitalized terms used in this closing, see the Glossary of Terms
attached at Schedule "A".

[2] Reference to the Monitor in this closing includes the Canadian Debtors.

arguments is found in Parts VII to IX, including the presentation of and argument about expert evidence.

5.      As the Courts are aware, the key issues in this proceeding concern the legal grounding for allocating the proceeds of the Business Sales and Rockstar Transaction, the proper interpretation of the MRDA (the legal basis for the allocation of Nortel's very valuable intellectual property), and the allocation methodology and calculations.

6.      Part IV sets out the Monitor's proposed conclusions of law.

7.      Part V provides the cornerstone argument of the Monitor that allocation should be based on the rights of the parties.

8.      Part VI examines in detail the correct interpretation of the central agreement in this proceeding, the MRDA. Because the MRDA is expressly governed by the laws of Ontario, the Part presents the applicable principles of Ontario law, in context, and applies those principles to the MRDA.  This includes consideration of the appropriate factual matrix, the evidence relied upon by other parties and consideration of why it is inadmissible, and purposive and textual analyses of the MRDA.  It also includes discussion of why the allocation theories of the U.S. Debtors and EMEA Debtors are legally unsupported.

9.      Parts VII and VIII, respectively, address the allocation of the proceeds of the Business Sales and Rockstar Transaction.  These parts deal extensively with the expert evidence adduced on these topics by the Monitor and why it should be accepted.

10.     Part IX critiques the allocations proposed by the U.S. Debtors and EMEA Debtors, focussing largely on the evidence of Messrs. Kinrich, Malackowski and Huffard.

- 3 -

11.    Part X rebuts the vague complaint made in the openings of the U.S. Debtors and the U.S. Bondholders about when the Monitor provided its allocation position.  This complaint is completely without foundation, inconsistent with the many agreements made by the parties and orders of the Courts about deferring the allocation matters until after the Business Sales, and based in part on the U.S. Debtors' breach of settlement privilege and mediation confidentiality.

12.    Part XI summarizes the total allocation sought by the Monitor.

13.    In summary, the Monitor seeks the following allocation:[3]

| Allocation of Sale Proceeds *(In Millions of USD)* | | | | |
|---|---|---|---|---|
| **Asset** | **Canada** | **U.S.** | **EMEA** | **Total** |
| Tangible Assets | $121.74 | $317.59 | $94.86 | $534.19 |
| IP Rights and Customer Relationship | 1,379.85 | 438.20 | 164.20 | 1,982.25 |
| In-Place Workforce | 79.07 | 135.17 | 41.91 | 256.15 |
| Wholly-Owned Businesses | - | 110.97 | - | 110.97 |
| Residual Intellectual Property | 4,453.45 | - | - | 4,453.45 |
| **Total Allocation** | **$6,034.11** | **$1,001.93** | **$300.97** | **$7,337.01** |
| % of Total – Excluding Residual IP | 54.8% | 34.7% | 10.4% | |
| % of Total – Including Residual IP | 82.2% | 13.7% | 4.1% | |

---

[3] TR00043 (Exh. 43, Rebuttal Report of Philip Green, February 28, 2014) p. 44, updating TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014) p. 65

- 4 -

**PART II – PROPOSED FINDINGS OF FACT**

14.     Part III outlines the main facts arising from the key witness testimony and documents with respect to which the Monitor requests that the Courts find as fact.

15.     Proposed factual findings related to the allocation arguments can also be found in Parts VI to IX, including in the presentation of and argument about expert evidence.

16.     Part XI summarizes the total allocation sought by the Monitor.

**PART III – RECITATION OF FACTS**

**A.**     **Pre-Petition**

**(a)**     **Nortel's Corporate Structure and Organization**

17.     As of January 14, 2009, Nortel Networks Corporation ("NNC"), a publicly-traded Canadian company, was the indirect parent of more than 130 subsidiaries, located in more than 100 countries, collectively known as the "Nortel Group" or "Nortel".[4]

18.     NNC was the successor of a long line of technology companies, always headquartered in Canada, dating back to the founding of Bell Telephone Company of Canada in 1883.[5]

19.     NNC's principal, direct operating subsidiary, also a Canadian company, was Nortel Networks Limited ("NNL"), which in turn was the direct or indirect parent of operating companies located around the world.[6]

---

[4] TR43999 (Nortel Networks Corporation Form 10-K for fiscal year ended December 31, 2008) p. 1, Exhibit 21.  A corporate chart showing the relevant corporate entities and the Debtor Estate to which each belongs is attached as Schedule "B".

[5] TR00002 (Exh. 2, Affidavit of Clive Allen, April 11, 2014) para. 12

- 5 -

20.      Together with NNL, the principal companies that performed research and development ("R&D") were Nortel Networks Inc. ("NNI", a U.S. company), Nortel Networks (UK) Ltd. ("NNUK", a United Kingdom company), Nortel Networks S.A. ("NNSA", a French company) and Nortel Networks Ireland ("NN Ireland", an Irish company).  These were known as Residual Profit Entities ("RPEs") due to their participation from 2001 in a residual profit pool in connection with Nortel's transfer pricing arrangements.[7]

21.      Other operating companies performed sales and distribution functions and were known as Limited Risk Distributors or Entities ("LRDs").[8]  LRDs were incorporated in most of the countries where Nortel products were sold, including in the Europe, Middle East and Africa ("EMEA") region.[9]

22.      The Nortel Group was organized on a matrix basis, where each entity was integrated into regional and product line management structures to share information and perform R&D, sales and other common functions across geographic boundaries and across legal entities.  The matrix structure was designed to enable Nortel to function more efficiently, drawing on employees from

---

[6] TR43999 (Nortel Networks Corporation Form 10-K for fiscal year ended December 31, 2008) p. 1; TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) paras. 32, 36

[7] TR11055B (Economic Analysis of Nortel Networks' Intercompany Transactions by Horst Frisch, March 14, 2002) p. 1-3; TR21003 (MRDA and addenda)

[8] TR11055B (Economic Analysis of Nortel Networks' Intercompany Transactions by Horst Frisch, March 14, 2002) p. 1-3.  The term LRDs here include other Cost-Plus Entities that performed work for other members of the Nortel Group on a "cost-plus" basis, as well as entities that were created as joint ventures and subsequently became wholly owned by the Nortel Group, which also had different transfer pricing arrangements.

[9] *S ee e.g.,* TR40150 (2001 Distribution Agreement between NNL and NN Austria, effective January 1, 2001); TR40151 (2001 Distribution Agreement between NNL and NN Portugal, effective January 1, 2001); TR40155 (2001 Distribution Agreement between NNL and NN Spain, effective January 1, 2001); TR40122 (2001 Distribution Agreement between NNL and NN Asia, effective January 1, 2001)

different functional disciplines worldwide, allowing them to work together to develop products and attract and provide service to customers, fulfilling their demands globally.[10]

23.    The matrix structure was reflected in the Nortel Group's R&D, sales organization, distribution channels and transfer pricing arrangements.[11]

24.    As a result of Nortel's matrix structure, no single Nortel entity or region – not NNUK or any of the other EMEA Debtors[12] in Europe, not NNI or any of the other U.S. Debtors[13] in the United States, and not even NNL or any of the other Canadian Debtors[14] in Canada – was able to provide the full line of Nortel products and services, including R&D capabilities, on a stand-alone basis.[15]

---

[10] TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) paras. 22-28; TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) paras. 31-38

[11] TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) paras. 22-28; TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) paras. 45-52

[12] The EMEA Debtors are the 23 Nortel entities that, on January 15, 2009, were granted administration orders in the U.K. under the *Insolvency Act, 1986* and whose registered offices were in England, Europe, the Middle East and Africa, including NNUK, NNSA and NN Ireland.

[13] The U.S. Debtors are the U.S. Nortel companies that, on January 14, 2009, filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware for protection under Chapter 11 or Title 11 of the U.S. *Code*, being NNI and several of its U.S. affiliates.

[14] The Canadian Debtors are the Canadian Nortel companies that, on January 14, 2009, filed for and obtained protection under the *Companies' Creditors Arrangement Act* from the Ontario Superior Court of Justice being, NNC, NNL, Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation.

[15] TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) para. 7; TR00001 (Exh. 1, Affidavit of Peter Currie, April 11, 2014) paras. 23-28; TR22078 (NNL and NNI Joint Request for U.S.-Canada Bilateral APA: 2007-2011, October 31, 2008) p. 8-13, Appendix B (p. 8-13, 72 of 209 of PDF)

- 7 -

25.     As of January 2009, Nortel's lines of business ("LOBs") were:

(a)     Carrier Networks – wireless networking solutions for providers of mobile voice,

data and multimedia communications services over technologies including:

(i)     Global System for Mobile Communications ("GSM");

(ii)    Code Division Multiple Access ("CDMA");

(iii)   Carrier Voice Over Internet Protocol Applications Solutions ("CVAS"); and

(iv)    the development of long-term evolution ("LTE") wireless technology;

(b)     Enterprise Solutions – enterprise communications solutions addressing the

headquarters, branch and home office needs of large and small businesses; and

(c)     Metro Ethernet Networks – optical networking and carrier grade ethernet data

networking solutions, including:

(i)     Carrier Ethernet switching products;

(ii)    optical networking products; and

(iii)   multi-service switching products.[16]

26.     At the time the EMEA, U.S. and Canadian Debtors (collectively, the "Debtors") filed for

creditor protection in January 2009, only the GSM and CDMA lines of business were

---

[16] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 9-13 (*but note*, at para. 9, that "[a] fourth business segment, Global Services (essentially Nortel's support and services arm), was a separate reportable segment until December 31, 2008, before being integrated into the other LOBs.")

profitable.[17]  Overall, Nortel was losing vast sums of money, its customers were, in large part, no

longer supporting it, and NNC had, in the fall of 2008, written off all of its goodwill.[18]

**(b)      Research & Development and the Importance of Ottawa**

27.      R&D was the primary driver of Nortel's value and profit.[19]  All of the RPEs accepted

this in the MRDA, which explicitly stated that the transfer pricing methodology it adopted

"acknowledges the fact that the key profit driver in the Nortel business is the development and

maintenance of rapidly depreciating intellectual property."[20]  Indeed, even the U.S. Debtors'

expert, Jeffrey Kinrich, admitted on cross-examination that in 2009, Nortel's past R&D was the

"single most important fact that drove Nortel's ability to generate its 2009 revenues".[21]  As a

result, Nortel spent significant amounts on R&D; in 2004, for example, Nortel spent more on

R&D as a percentage of revenue than its competitors.[22]

---

[17] TR00042 (Exh. 42, Expert Report of Philip Green, Reissued February 28, 2014) Appendices
A-E Carve-out statements

[18] TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) paras. 21, 47; TR46789
(Verizon Press Release regarding Global LTE Ecosystem, February 17, 2009); TR43999 (Nortel
Networks Corporation Form 10-K for fiscal year ended December 31, 2008)

[19] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 28; TR11084 (Nortel
Networks Functional Analysis for the years ended December 31, 2000-2004) p. 3 (p. 17 of 192
of PDF), *see also* p. 6, 17-18, 29, 91, 94; TR50653 (Nortel Multilateral APA Responses to Joint
IRS/CRA Inquiry, October 23, 2006) p. 21-22; TR22078 (NNL and NNI Joint Request for U.S.-
Canada Bilateral APA: 2007-2011, October 31, 2008) p. 11 (p. 11 of 209 of PDF), Appendix C
(p. 2) (p. 104 of 209 of PDF)

[20] TR21003 (MRDA and addenda) Schedule A

[21] Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4308:20-4309:10

[22] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 28, citing TR44900
(Email regarding Competitor Comparisons, February 19, 2004)

28.     In addition to developing new and improved products and services, R&D played a critical role in the sales process of each business line.[23]  For example, prospective customers were given tours of the Ottawa R&D facility because of the "shock and awe" of its scale and magnitude of facilities and demonstrated R&D capability, and sales presentations were often made jointly by both sales teams and R&D teams.[24]

29.     The Canadian Debtors were massive contributors to R&D, although by no means the only important contributor.

30.     Before the 1980s, all of Nortel's R&D was performed in Ottawa – R&D which led to revolutionary telecommunications products that established Nortel's reputation.[25]

31.     Subsequently, Nortel opened R&D facilities in other jurisdictions, seeding their work with the foundational R&D performed and resulting intellectual property ("IP") created in Ottawa, which remained the largest Nortel R&D center through 2009.[26]  NNL's Ottawa campus

---

[23] Gregory Mumford Deposition, October 24, 2013, p. 202:19-204:15, regarding TR21226 (Email discussing Harlow Input, October 28, 2003)

[24] Darryl Edwards Deposition, October 31, 2013, p. 60:4-61:18; TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) paras. 28-30

[25] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 16

[26] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 16; TR21188 (PowerPoint regarding Global R&D Investment Strategy and Recommendations for Nortel Networks) Slide 4 (p.4), showing R&D locations for employees as of 2002; TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) paras. 7-8; TR44077 (PowerPoint for Nortel Pre-Filing Conference with CRA, October 2, 2007) Slide 5 (p. 5); Gregory Mumford Deposition, October 24, 2013, p. 101:9-14; Paul Karr Deposition, November 14, 2013, p. 118:3-9; TR11279 (Welcome to Ottawa PowerPoint, May 2, 2007) Slide 3 (p. 4)

was home to the largest concentration of Nortel's R&D employees, nearly all of whom were employed by the Canadian Debtors.[27]

32.    Nortel also acquired numerous technology companies during the 1990s and early 2000s (often paying for those corporate acquisitions with NNC shares), and merged their R&D organizations into those of the Nortel subsidiaries operating in their jurisdictions, such as the acquisition in the United States of Bay Networks in June 1998 for $9.06 billion, which added a substantial business and R&D facilities to NNI.[28]

33.    The leadership from Canada enabled subsidiaries to commence their operations and produce "state of the art" products which allowed them to become important, and frequently dominant, players in their markets, as well as access the results of R&D which would not have been economically viable for a stand-alone company.[29]

34.    Nortel's R&D organization changed somewhat over time, but in general R&D was coordinated through two different management structures, depending on the type of work being performed, but R&D was never managed by the legal entities that were party to the MRDA.[30]

35.    On the one hand, decisions about the majority of R&D funding were made by the LOBs to create, develop and improve technology for products within their particular technology areas.[31]

---

[27] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 15; TR44794 (Email regarding Draft Note to CIOs, November 11, 2005)

[28] TR40259 (Nortel Networks Corporation Form 10-K for fiscal year ended December 31, 2000) p. F14-F16

[29] TR00002 (Exh. 2, Affidavit of Clive Allen, April 11, 2014) paras. 38-39

[30] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) paras. 19-21; TR00023 (Exh. 23, Affidavit of Simon Brueckheimer, April 9, 2014) para. 10

- 11 -

36.     On the other hand, advanced technology research, which was intended to develop novel, cutting edge technologies with a longer time horizon to product creation (if successful) was coordinated by Nortel's Chief Technology Officer ("CTO") and allocated funding through a central budget.[32]  Of all Nortel R&D programs, the advanced technology research produced the greatest impact in terms of innovation and patent filings.[33]

37.     The Ottawa facilities performed most of the advanced research, as well as R&D for all of the LOBs; other facilities typically focused on a narrower range of technologies.[34]

38.     No major decision regarding R&D direction or funding was taken without approval from Ottawa.[35]

39.     The geographic location in which R&D for a given LOB or CTO project was carried out was selected based on criteria such as the particular skills available, the need for "localization" of technology developed elsewhere to a particular market's needs (a common focus of the NNUK laboratories with respect to technology developed in Ottawa) and cost.[36]

---

[31] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) paras. 19-21; TR00023 (Exh. 23, Affidavit of Simon Brueckheimer, April 9, 2014) para. 10

[32] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) paras. 12, 17, 20, 22-23; Simon Brueckheimer Deposition, October 1, 2013, p. 165:6-166:19; Peter Newcombe Trial Testimony, Day 7, May 22, 2014, p. 1608:10-22

[33] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 22

[34] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 15; TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) para. 8; TR11279 (Welcome to Ottawa PowerPoint, May 2, 2007) Slide 3 (p. 4); TR21188 (PowerPoint regarding Global R&D Investment Strategy and Recommendations for Nortel Networks) Slide 4 (p. 4)

[35] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 15

[36] TR00004 (Exh. 4, Affidavit of Brian McFadden, April 10, 2014) para. 21

- 12 -

40.     Between R&D performed in Canadian facilities and contract R&D performed on NNL's behalf in low-cost jurisdictions, NNL accounted for nearly half of all Nortel R&D spend for the years 2000 to 2009.  As reported to the tax authorities in 2004, NNL's R&D spend for the years 2000 to 2003 in comparison to the other RPEs was as follows:[37]

| R&D Spend | NNL | NNI | EMEA |
|-----------|-----|-----|------|
| 2000 | 42% | 42% | 16% |
| 2001 | 43% | 39% | 18% |
| 2002 | 39% | 41% | 20% |
| 2003 | 42% | 38% | 20% |

41.     Similarly, for the years 2005 to 2009 NNL accounted for 49.8 percent of Nortel's R&D spend, while NNI accounted for 38.5 percent and the EMEA RPEs the remaining 11.7 percent.[38]

42.     Approximately 50 percent of all patents and patent applications in NNL's portfolio had primary inventors who worked in a Canadian entity's research laboratory.[39]

---

[37] TR11084 (2004 Functional Analysis, November 30, 2004) p. 23

[38] TR45645 (Spreadsheet of 2010 Transfer Pricing Adjustments, July 7, 2010) Tab "R&D Asset Table (new)" (which is based on Tab "IP owner R&D")

[39] TR00006 (Exh. 6, Affidavit of Angela de Wilton, April 11, 2014) para. 14

(c)    **Intellectual Property**

43.    Some Nortel R&D yielded intellectual property, including patents.  However, not all R&D was successful.  R&D expenditure could fail to generate innovations that could be protected as IP, and IP could fail to be incorporated into Nortel products.[40]

44.    This fact was represented to the tax authorities.  For example, Ryan Stark, Nortel's Senior VP of technology, explained to the tax authorities in a submission in 2003 that "a substantial portion of Nortel's efforts are invested in determining which R&D projects to undertake and which emerging technologies should be explored further" and that a return on Nortel's R&D investment was not certain even for approved R&D projects as "[g]enerally, only 70% of all approved R&D projects result in a commercially viable product being released."[41] Nortel further explained to the tax authorities: "As discussed previously, a considerable amount of R&D efforts are expended in endeavors that do not result in a product being offered for sale."[42]  Nortel also explained to the tax authorities in 2005 that "the risk of R&D failure is a normal business risk shared by all the RPS participants".[43]

---

[40] Simon Brueckheimer Trial Testimony, Day 7, May 22, 2014, p. 1595:3-12; Peter Newcombe Trial Testimony, Day 7, May 22, 2014, p. 1637:21-24, 1641:25-1642:6

[41] TR21080 (Nortel Networks APA Responses to Questions Posed by Inland Revenue, IRS and CCRA, September 2003) p. 10 (Footnote 8)

[42] TR21080 (Nortel Networks APA Responses to Questions Posed by Inland Revenue, IRS and CCRA, September 2003) p. 11

[43] TR21033 (Email attaching Nortel Multilateral APA Responses to IRS Information and Document Request, May 6, 2005) p. 10 (Response to Question 14)

- 14 -

45.      Thus, only a fraction of Nortel's billions in R&D expenditures over the decades

preceding January 2009 generated the IP, but it is impossible to trace which R&D expenses

produced which IP.[44]

46.      As at January 14, 2009, NNL held legal title to nearly all IP created or acquired by the

Nortel Group, and licensed IP to the other Nortel subsidiaries, pursuant to the terms of the

MRDA.[45]   The interpretation of the MRDA is described in detail below at Part VI, including the

MRDA's role with respect to both intellectual property and transfer pricing.

47.      As of January 2009, and as discussed in Angela de Wilton's evidence, NNL held

approximately 8,800 worldwide patents and applications.[46]

48.      The overwhelming majority of all rights, title and interest in inventions by Nortel

employees worldwide were assigned directly or indirectly to NNL.[47]   As a result, virtually all of

the patents and applications were assigned to Canadian entities; with respect to the

approximately 7000 patents and applications in the portfolio sold in the "Rockstar Transaction"

---

[44] Michael Orlando Trial Testimony, Day 6, May 21, 2014, p. 1315:21-1316:1; TR11084 (2004 Functional Analysis, November 30, 2004) p. 28-29; TR22078 (Joint Request for US-Canada BAPA 2007-2011 (with rollback to 2006), October 31, 2008) p. 50, Appendix B

[45] TR21003 (MRDA and addenda) Articles 4-5.  Due to acquisitions and joint ventures, certain Nortel IP was held in the names of non-operating acquired companies such as NNC, Nortel Networks SAS (a French subsidiary of NNSA) and Nortel Networks GmbH (a German subsidiary) (*see*, TR40197 (List of Transferred Patents in Rockstar Transaction) Tab "AllActive20110728" ("Assignee/Owener (sic)" Column) and TR47338 (Patent Excel File, January 7, 2009) Tab "All" ("App Assignee" Column))

[46] TR00006 (Exh. 6, Affidavit of Angela de Wilton, April 11, 2014) para. 12, citing TR47338 (Patent Excel File, January 7, 2009); *see also* TR11151 (Nortel's IP Team and Patent Portfolio PowerPoint, August 2010) Slide 11 (p. 11)

[47] TR00006 (Exh. 6, Affidavit of Angela de Wilton, April 11, 2014) paras. 8-12; Timothy Collins Deposition, November 15, 2013, p. 40:10-41:20

(further described below), as discussed in Ms de Wilton's evidence, at least 98 percent had been assigned to NNL.[48]

49.     NNL's IP licenses to its subsidiaries, which were embodied pre-January 1, 2001 in cost sharing agreements and post-January 1, 2001 in the MRDA[49], were premised on NNL's ownership of all rights in the licensed IP and permitted the subsidiaries to have access to a much greater pool of technology on an exclusive basis in their territories than they could ever have afforded otherwise, without substantial up-front costs to either create or license the technology.[50]

50.     Nortel's IP ownership structure, whereby its patent applications were filed as a general rule in the name of NNL and whereby IP was owned by the parent operating company and licensed to subsidiaries, was typical of multinational companies.[51]

**(d)    Transfer Pricing Arrangements including CSAs and the MRDA**

51.     Like nearly all multinational groups, the Nortel Group had transfer pricing arrangements that governed how it reported income in each of the jurisdictions in which it did business.[52]

_____

[48] TR00006 (Exh. 6, Affidavit of Angela de Wilton, April 11, 2014) paras. 8-12; TR40197 (List of Transferred Patents in Rockstar Transaction); TR47338 (Patent Excel File, January 7, 2009)

[49] TR21003 (MRDA and addenda) Articles 4-5; TR21002 (1992 R&D CSA, January 1, 1992) Articles 4-6, 10-11, 13; _see also_ TR45741 (1985 Amended R&D CSA between NNL and NNI, January 1, 1985); TR44284 (R&D CSA between NNL and NN Ireland, January 1, 1985); TR45742 (1988 R&D Agreement between NNL and NT Communications (French), January 2, 1988); TR11411 (1995 R&D CSA between NNL and Nortel Limited (U.K.), January 1, 1995); TR46945 (2000 R&D CSA between NNL and NNSA, January 1, 2000)

[50] TR00002 (Exh. 2, Affidavit of Clive Allen, April 11, 2014) para. 36; Walter Henderson Trial Testimony, Day 5, May 20, 2014, p. 1157:21-1159:2

[51] TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) para. 10; Angela Anderson Trial Testimony, Day 10, May 29, 2014, p. 2171:4-9, 2178:15-2179:4, 2194:7-11, 2195:20-2196:13; _see also_ the testimony of Nicholas DeRoma who worked at Nortel and at IBM for 25 years that at IBM, IP ownership was held by the parent company, Nicholas DeRoma Deposition, October 16, 2013, p. 163:24-164:7; _see also_ TR00002 (Exh. 2, Affidavit of Clive Allen, April 11, 2014) para. 27

- 16 -

52.     The transfer pricing experts largely agreed on the following basic principles:

(a)     The "purpose" of transfer pricing from a multinational enterprise or group's perspective is compliance with tax laws in the jurisdictions in which it operates, and the avoidance of double taxation.[53]

(b)     The arm's length standard is the fundamental principle of transfer pricing, as codified in the OECD guidelines and the tax laws of most jurisdictions.[54]

(c)     Transfer pricing guidance recognizes that there are a range of arm's length results and any point within the range may be considered an arm's length price.[55]

(d)     Transfer pricing addresses the allocation of operating income within a multinational group as a going concern and does not address the allocation of assets on insolvency.[56]

---

[52] TR00049 (Exh. 49, Expert Report of Dr. Timothy Reichert, January 24, 2014) p. 16; TR21389 (Email attaching Memo regarding Nortel's Transfer Pricing Policy, March 18, 2003) p. 1

[53] TR00037 (Exh. 37, Expert Report of Steven Felgran, January 24, 2014) p. 7; Steven Felgran Trial Testimony, Day 12, June 2, 2014, p. 2873:13-20; Dr. Lorraine Eden Trial Testimony, Day 21, June 24, 2014, p. 4992:5-12, 5022:6-5025:2; Dr. Richard Cooper Trial Testimony, Day 11, May 30, 2014, p. 2632:4-14; TR00062 (Exh. 62, Expert Report of Dr. Lorraine Eden, January 24, 2014) p. 7-11; TR00049 (Exh. 49, Expert Report of Dr. Timothy Reichert, January 24, 2014) p. 16

[54] TR00037 (Exh. 37, Expert Report of Steven Felgran, January 24, 2014) p. 7; Steven Felgran Trial Testimony, Day 12, June 2, 2014, p. 2872:5-11; Dr. Richard Cooper Trial Testimony, Day 11, May 30, 2014, p. 2636:11-25, 2675:24-2676:1; TR00049 (Exh. 49, Expert Report of Dr. Timothy Reichert, January 24, 2014) p. 3; TR00062 (Exh. 62, Expert Report of Dr. Lorraine Eden, January 24, 2014) p. 11

[55] Dr. Richard Cooper Trial Testimony, Day 11, May 30, 2014, p. 2637:7-15; TR00049 (Exh. 49, Expert Report of Dr. Timothy Reichert, January 24, 2014) p. 18; Dr. Lorraine Eden Trial Testimony, Day 21, June 24, 2014, p. 4986:10-4987:9, 4992:18-4993:13, 5056:16-5057:13; Steven Felgran Trial Testimony, Day 12, June 2, 2014, p. 2863:21-2864:7

53.     Transfer pricing's "arm's length principle" is, by the OECD guidelines' definition, limited to the tax context: "[t]he international standard that OECD member countries have agreed should be used for determining transfer prices *for tax purposes*" [emphasis added].[57]  In this regard, transfer pricing focusses on the *ex ante* expectations of the parties, rather than the *ex post* results.[58]

54.     The arm's length principle does not purport to dictate legal or property interests either in a going concern or in an insolvency.[59]  Transfer pricing guidance and regulation proceeds from a presumption in favor of respecting the parties' legal arrangements, which may be disregarded only in exceptional circumstances because "[multinational entities] are free to organise their business operations as they see fit.  Tax administrations do not have the right to dictate to an [multinational entity] how to design its structure…"[60]  The arm's length principle applies only to the pricing of transactions for tax purposes and does not restrict the form of the parties'

---

[56] TR00037 (Exh. 37, Expert Report of Steven Felgran, January 24, 2014) p. 25; Steven Felgran Deposition, March 25, 2014, p. 55:11-18; Steven Felgran Trial Testimony, Day 12, June 2, 2014, p. 2853:6-14, 2873:1-6; Dr. Richard Cooper Trial Testimony, Day 12, June 2, 2014, p. 2725:10-21; 2772:22-2773:6; Dr. Lorraine Eden Trial Testimony, Day 21, June 24, 2014, p. 4982:16-4983:2, 4983:22-4984:7, 5044:23-5045:8, 5077:3-11, 5085:1-10; Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3834:12-3835:5, 4031:20-4032:1, 4058:14-4059:4

[57] TR11391 (OECD Transfer Pricing Guidelines, July 2010) p. 23 (Glossary, p. 25 of 375 of PDF)

[58] Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3889:15-3890:5; TR00049 (Exh. 49, Expert Report of Dr. Timothy Reichert, January 24, 2014) p. 18-19 (p. 22-23 of 601 of PDF)

[59] TR00062 (Exh. 62, Expert Report of Dr. Lorraine Eden, January 24, 2014) p. 60; Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3834:12-3835:5

[60] TR11391 (OECD Transfer Pricing Guidelines, July 2010) para. 9.163; *see also* Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3829:13-17; 3832:23-3834:11; 3864:13-3881:16

dealings—entities in multinational groups may enter into contracts or arrangements relating to the group's resources in ways that uncontrolled entities would not.[61]

55.    Prior to 2001, the RPEs (and Nortel Networks Japan and NN Australia) were each party to several Cost Sharing Agreements  ("CSA") with NNL which covered tangible property, R&D and headquarters costs.[62]  These CSAs were, in part designed to embody Nortel's transfer pricing arrangements at the time.  They also dealt with the ownership and licensing of IP.

56.    Nortel had several "generations" of R&D CSAs, each built on and intended to continue the rights granted in the prior agreements.[63]

57.    Specifically, nearly all of the operative terms regarding the license were the same between the 1985 R&D CSA and the 1992 version because the parties intended to keep in place the pre-existing license.[64]

58.    The primary change between the 1985 and 1992 versions was in the defined terms, which broadened the categories of Nortel IP that were licensed.[65]

---

[61] Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3830:17-3831:4; Dr. Richard Cooper Trial Testimony, Day 11, May 30, 2014, p. 2633:24-2634:17

[62] TR00002 (Exh. 2, Affidavit of Clive Allen, April 11, 2014) paras. 25-28

[63] Walter Henderson Trial Testimony, Day 5, May 20, 2014, p. 1150:2-6

[64] Walter Henderson Trial Testimony, Day 5, May 20, 2014, p. 1153:19-1154:9

[65] TR21002 (1992 R&D Cost Sharing Agreement, January 1, 1992); TR45741 (1985 R&D Cost Sharing Agreement, January 1, 1985); TR46880 (1983 Amending Agreement, January 1, 1983); TR46881 (1980 R&D Cost Sharing Agreement, January 1, 1980); TR46882 (1978 R&D Cost Sharing Agreement, January 1, 1978)

- 19 -

59.    Under the R&D CSAs, legal title to the Nortel Group's technology vested in NNL (then

Northern Telecom Limited).  This vesting began with the 1978 R&D CSA between NNL and

NNI (then Northern Telecom, Inc.), which stated:

> The parties hereto acknowledge that all Northern Telecom Technical
> Information and patents (except patents currently owned by [NNI])
> relating to the Products now possessed or issued or to be developed, or in
> the case of patents to be issued, during the term of this Agreement, are and
> shall continue to be the property of [NNL].
>
> …[NNL], in consideration of [NNI]'s sharing of costs of Research and
> Development activities…agrees to make the Technical Information and
> Nortel Telecom Patents available to [NNI], and grants to [NNI] a non-
> exclusive right to use the Technical Information and the Northern Telecom
> Patents developed pursuant to this Agreement…for the manufacture, use,
> lease and sale of the products within the United States of America
> (including the Commonwealth of Puerto Rico) and such other place or
> places as [NNL] may from time to time determine.[66]

60.    Thereafter, as ultimately recorded in the 1992 Amended Research and Development Cost

Sharing Agreement referenced in the MRDA's recital (the "1992 CSA"), "in consideration of

[NNI and certain subsidiaries] sharing the costs of Research and Development" NNL granted the

licensees "an exclusive royalty-free license, including the right to sublicense, which, except as

hereinafter provided, shall be in perpetuity to make, have made, use, lease and sell Products

embodying NT Technology in and for the United States, and to all rights to patents, industrial

designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as

necessary or appropriate in connection therewith."[67]

61.    In communications to the tax authorities and internal communications, Nortel

consistently described the license under the R&D CSA as a limited license that included the right

---

[66] TR46882 (1978 R&D Cost Sharing Agreement, January 1, 1978) Article 4

[67] TR21002 (1992 R&D Cost Sharing Agreement, January 1, 1992) Article 5

to use Nortel IP to sell products embodying such technology to end customers in the participant's designated jurisdiction:

    (a)    "The R&D CSA gave the UK group formal rights to sell product on an exclusive basis and with clear rights to exploit current and future NN Canada technology, which it did not previously have. That and the accompanying agreements also gave the UK group an underwritten return on its manufacturing activities in supplying product to other participants in the R&D CSA."[68]

    (b)    "[A] CSA participant obtained a royalty-free license to use the technology developed under the CSA."[69]

62.    Horst Frisch was retained by Nortel in connection with the CSAs and also described the scope of the license under the R&D CSA as a right to make and use NT Technology, stating:

    (a)    "Under the arrangement, each cost sharing participant ("CSP") had the right to use the intangible property developed pursuant to the R&D cost sharing arrangement (*i.e.*, the NT Technology") in its respective market."[70]

    (b)    The license provided under the R&D CSA was "to make, have made, use, less and sell products embodying NT Technology in their specific territory."[71]

---

[68] TR33041 (NNUK Paper regarding Acquisition of STC, Post STC UK Business and R&D) p. NNI_00713065-00713066

[69] TR21031 (Letter regarding Nortel Networks Multilateral APA Responses to IRS Information and Document Request, April 26, 2004) p. 5

[70] TR11055B (Economic Analysis of Nortel Networks' Intercompany Transactions by Horst Frisch, March 14, 2002) p. 10

63.     As the tax authorities reviewed the cost sharing methodology in connection with the CSA

APA and audits in the 1990's, the authorities raised concerns with the application of the method

and none of the major tax authorities (the IRS, CRA, or Inland Revenue) wanted to renew the

cost sharing method in a new APA for years subsequent to 1999.[72]

64.     By 2001, it was recognized that the cost sharing methodology was no longer the best

method to address Nortel's transfer pricing issues; the best method was the residual profit split

method (the "RPSM").[73]  The RPSM is one component of the MRDA, which was entered into

effective in 2001.

65.     The RPSM applied only to operating income, and not to the proceeds of sales of assets or

businesses.[74]  There is no evidence that Nortel told tax authorities how allocation of proceeds

from the future sale of a business or assets would be made.[75]

66.     Under the MRDA, the parties did not retain the revenue generated in their respective

territory; rather, profits or losses from global operating revenues were shared amongst all of the

RPEs.[76]

---

[71] TR11055B (Economic Analysis of Nortel Networks' Intercompany Transactions by Horst
Frisch, March 14, 2002) p. 12

[72] TR11058 (Email regarding Overview of Objectives for Meeting to Discuss RPSM, December
3, 2001) p. 4

[73] Walter Henderson Trial Testimony, Day 8, May 20, 2014, p. 1174:19-1175:16, 1176:15-
1177:13, 1181:3-22; TR21026 (Horst Frisch Report regarding Economic Analysis of Nortel
Networks' Intercompany Transactions, March 14, 2002) p. 3; TR11068 (Email regarding Filing
of the IRS APA Submission, March 17, 2002)

[74] Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 4029:18-4031:5, 4031:15-
4031:19; TR11055B (Economic Analysis of Nortel Networks' Intercompany Transactions by
Horst Frisch, March 14, 2002) p. 37; TR21003 (MRDA and addenda) Schedule A (Step 3(ii))
("The resulting operating earnings/loss is then further adjusted to deduct the following items not
related to Nortel's operations […] gain/loss on the sale of business")

[75] Michael Orlando Trial Testimony, Day 6, May 21, 2014, p. 1344:11-1348:5

67.     The residual profit split methodology first rewarded routine activities with routine returns (determined by reference to comparable activities performed by comparable companies), then allocates the remaining profit or loss among participants in accordance with an "allocation key" tied to the intangibles that generated the profit or loss.[77]

68.     The RPSM allocation key selected by Nortel, with the assistance of its professional advisors including Horst Frisch, was R&D expenditure, which was used as a proxy for contributions to the development of the intellectual property that drove the sales of Nortel products.[78]

69.     In the 2001-2005 period, R&D expenditure (initially including expenditure during the period preceding the implementation of the RPSM) was calculated as R&D capital stock,

---

[76] Dr. Richard Cooper Trial Testimony, Day 12, June 2, 2014, p. 2719:19-2720:1

[77] Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3972:13-3973:8; TR21003 (MRDA and addenda) Schedule A; TR11055B (Economic Analysis of Nortel Networks' Intercompany Transactions by Horst Frisch, March 14, 2002) p. 34-48; TR22078 (NNL and NNI Joint Request for U.S.-Canada Bilateral APA: 2007-2011, October 31, 2008) p. 41-55 (p. 41-55 of 209 of PDF)

[78] TR11055B (Economic Analysis of Nortel Networks' Intercompany Transactions by Horst Frisch, March 14, 2002) p. 4, 39; Steven Felgran Trial Testimony, Day 12, June 2, 2014, p. 2874:23-2875:5; Dr. Richard Cooper Trial Testimony, Day 11, May 30, 2014, p. 2652:10-22; Dr. Timothy Reichert Deposition, March 20, 2014, p. 191:20-192:17, 198:25-199:21; Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3967:20-3968:10; Dr. Lorraine Eden Trial Testimony, Day 21, June 24, 2014, p. 4989:7-4990:22

amortized at a rate of 30%.[79]  For the period starting in 2006, Nortel changed the RPSM to reduce the R&D capital stock period to a 5-year rolling average.[80]

70.      The 30% amortization applicable to R&D capital stock between 2001-2005 and the 5-year rolling average (with 1-year lag) applicable to 2006-2009, represents an average economic life of R&D expense, as distinct from the economic or legal life of the IP that such expense may (or may not) generate.[81]

71.      The economic life of the R&D expense is the period over which an investment in R&D is reflected in the company's residual profit.[82]

72.      Because R&D may not result in IP, and IP may or may not be incorporated in products or otherwise generate value, application of a patent life period to R&D expense would greatly overvalue the expenditures that generated no IP or IP that could not be put to use.[83]

73.      It is undisputed that the RPSM and MRDA did not contemplate and did not dictate a particular result in the event of insolvency of all parties.[84]  Not only is transfer pricing limited to

---

[79] TR11055B (Economic Analysis of Nortel Networks' Intercompany Transactions by Horst Frisch, March 14, 2002) p. 34-40; *see also* TR21003 (MRDA and addenda) Schedule A; TR11393 (Memorandum of Understanding, December 31, 2008) para. 6 (By "grand-fathering" in the past R&D efforts with compensation through the R&D Activity Payments, the parties agreed "their respective ownership interests in NN Technology and their respective R&D Activity have been … adequately and fairly compensated…")

[80] TR22078 (NNL and NNI Joint Request for U.S.-Canada Bilateral APA: 2007-2011, October 31, 2008) p. 49 (p. 49 of 209 of PDF)

[81] TR21080 (Nortel Networks APA Responses to Questions Posed by Inland Revenue, IRS and CCRA, September 2003) p. 10 (Footnote 8); TR21031 (Letter regarding Nortel Networks Multilateral APA Responses to IRS Information and Document Request, April 26, 2004) p. 9-12; TR22078 (NNL and NNI Joint Request for U.S.-Canada Bilateral APA: 2007-2011, October 31, 2008) p. 49-50, Appendix B (p. 49-50, 72-102 of 209 of PDF)

[82] TR00049 (Exh. 49, Expert Report of Dr. Timothy Reichert, January 24, 2014) p. 72-73

[83] Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3891:4-16

the tax context, there is consensus among the transfer pricing experts that transfer pricing principles have not, to their knowledge and in all their years of experience, ever been applied to allocate assets in the case of insolvency proceedings.[85]

(e)     **The APA Process**

74.     Some countries have adopted Advanced Pricing Agreement ("APA") processes, which allow a taxpayer to voluntarily approach a tax authority and receive approval of the taxpayer's transfer pricing approach outside of the audit context.[86]

75.     At the request of the IRS and CRA when the APAs covering the CSAs were expiring, Nortel prepared an APA request based on a residual profit split methodology, which was ultimately codified in the MRDA.[87]

76.     In March 2002, APA submissions were made by NNL, NNI and NNUK in their respective jurisdictions requesting that the authorities approve the proposed residual profit split methodology for tax years 2000-2004.[88]

---

[84] Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 4030:4-8; Dr. Lorraine Eden Trial Testimony, Day 21, June 24, 2014, p. 4982:1-4985:25; Steven Felgran Trial Testimony, Day 12, June 2, 2014, p. 2852:12-2853:14, 2853:21-2854:11; Dr. Richard Cooper Trial Testimony, Day 12, June 2, 2014, p. 2717:20-2717:24 ("the purpose of the MRDA was to allow the participants to share in the profit or loss from an ongoing common endeavor"), p. 2853:21– 2854:11; Mark Weisz Trial Testimony, Day 9, May 28, 2014, p. 1877:18-1878:1; Michael Orlando Trial Testimony, Day 6, May 21, 2014, p. 1324:19-1325:3; Walter Henderson Trial Testimony, Day 5, May 20, 2014, p. 1143:15-1144:2

[85] Dr. Richard Cooper Trial Testimony, Day 12, June 2, 2014, p. 2772:22-2773:5; Dr. Lorraine Eden Trial Testimony, Day 21, June 24, 2014, p. 5078:16-22; Steven Felgran Trial Testimony, Day 12, June 2, 2014, p. 2853:15-2854:6; Dr. Timothy Reichert Trial Testimony, Day 16, June 17, 2014, p. 3834:12-3838:8

[86] TR11053 (Overview of Transfer Pricing APA and Recommendation, December 12, 2001) p. 3

[87] TR21031 (Letter regarding Nortel Networks Multilateral APA Responses to IRS Information and Document Request, April 26, 2004) p. 5

77.     In 2004, at the request of the IRS, Nortel filed a functional analysis evidencing the key roles and risks of the APA applications in support of the use of the RPSM.[89]

78.     Thereafter, in 2008, Nortel submitted a further request to the IRS and CRA for a U.S.– Canada bilateral APA in respect of a proposed revised RPSM (as ultimately codified in the MRDA) for the tax years 2007-2011 (with a rollback to 2006).[90] Prior to the insolvency filing, Nortel had planned to submit a similar request to Inland Revenue and the French Tax Authority.[91]

79.     The APA for the 2001-2005 tax years ultimately was resolved by the IRS and CRA.  In 2009, following the Nortel bankruptcy, NNL and NNI were advised that the agreement between the tax authorities sought a reallocation of income from NNL to NNI in the amount of U.S. $2 billion for the tax years ending 2001 to 2005.[92] The $2 billion settlement was presented to NNL and NNI as being a numerical settlement that needed to be accepted "as is" without an

---

[88] TR22122 (Letter regarding Nortel Networks' Request to UK Inland Revenue to Enter APA, March 27, 2002)

[89] TR11084 (Nortel Networks: Functional Analysis for the years ended December 31, 2000-2004) p. 2

[90] TR45100.01 (Letter to IRS regarding NNI and NNL Joint Request for US-Canada Bilateral APA, October 31, 2008); TR45100.02 (Letter to CRA regarding NNI and NNL Joint Request for US-Canada Bilateral APA, November 5, 2008); TR22078 (Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement 2007-2011 (with rollback to 2006), October 31, 2008)

[91] Ultimately, as a result of the restructuring, Nortel was unable to complete its filings and withdrew those applications that had been filed: TR50574.02 (Letter to IRS regarding Withdrawal of Bilateral APA Request with Canada, March 9, 2010); TR48633 (Letter to CRA regarding Withdrawal of Bilateral APA Request with United States, March 25, 2010); TR47109 (Letter to CRA regarding Withdrawal of Bilateral APA Request with France, April 1, 2010)

[92] TR48634 (Settlement Stipulation between Nortel Networks and IRS, December 23, 2009)

explanation as to the technical positions underlying the adjustment[93] and the tax authorities did not specify on what basis the $2 billion figure was calculated.[94]

80.    The APAs were approved by the U.S. and Canadian Courts on January 21 and 22, 2010.[95]

81.    The transfer pricing experts agreed that the $2 billion settlement does not provide any specific criticism of Nortel's transfer pricing system and settlements among tax authorities frequently have little to do with the taxpayer.[96]

82.    No party to this litigation contends that Nortel should have used a different transfer pricing methodology for the 2001-2009 period; to the contrary, there is agreement that the RPSM was the most appropriate method for Nortel, in light of the facts and circumstances.[97]

---

[93] TR21285 (Letter to CRA regarding CCAA Proceedings and APA) p. 5; TR44575.01 (Email regarding UCC Tax Update, July 2, 2009), attaching TR44575.02 (Tax Update PowerPoint presented to UCC, July 2, 2009); Vincent Raimondo Deposition, October 4, 2013, p. 57:6-58:6; Jeffrey Wood Deposition, November 1, 2013, p. 79:7-80:8, 86:12-86:16; John Doolittle Deposition, December 5, 2013, p. 236:8-236:10

[94] Walter Henderson Trial Testimony, Day 6, May 21, 2014, p. 1320:25-1321:7

[95] TR21543 (Document containing Order of Canadian Court, January 21, 2010) Appendix B (paras. 8-10, being pg. 54 of 92 of PDF); NNI_00207809 (Order of U.S. Court Approving the Settlement Stipulation Between NNI and the IRS, Entry Into the APA and Related Relief, January 21, 2010) paras. 2-4

[96] Steven Felgran Trial Testimony, Day 12, June 2, 2014, p. 2881:22-2883:7; Dr. Richard Cooper Trial Testimony, Day 12, June 2, 2014, p. 2768:2-2769:17; Dr. Timothy Reichert Deposition, March 20, 2014, p. 233:8-235:19; Dr. Lorraine Eden Trial Testimony, Day 21, June 24, 2014, p. 5038:19-5039:11

[97] Steven Felgran Trial Testimony, Day 12, June 2, 2014, p. 2851:13-2852:11, 2889:1-9; TR00038 (Exh. 38, Rebuttal Report of Steven Felgran, February 28, 2014) p. 1, 3-4; Dr. Richard Cooper Trial Testimony, Day 11, May 30, 2014, p. 2641:25-2646:17, 2671:7-2672:10; Dr. Richard Cooper Trial Testimony, Day 12, June 2, 2014, p. 2762:8-14, 2766:8-2768:15; TR00035 (Exh. 35, Expert Report of Dr. Richard Cooper, January 24, 2014) p. 22; Dr. Lorraine Eden Trial Testimony, Day 21, June 24, 2014, p. 5028:6-5029:3, 5037:4-5038:10; Dr. Timothy Reichert

**B.**    <u>**Post-Petition**</u>

**(a)**    **Commencement of Proceedings**

83.     On January 14, 2009, NNC, NNL, Nortel Networks Technology Corporation, Nortel

Networks International Corporation and Nortel Networks Global Corporation (namely, the

Canadian Debtors) filed for and obtained protection from the Court under the *Companies'*

*Creditors Arrangement Act* and Ernst & Young Inc. was appointed as Monitor.[98]

84.     On that same day, NNI and certain of its U.S. subsidiaries and affiliates concurrently

filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy *Code* in the United States

Bankruptcy Court for the District of Delaware.[99]  As required by U.S. law, an official committee

of unsecured creditors (the "UCC") was established in January 2009.

85.     Nortel Networks (CALA) Inc. ("NN CALA" together with NNI and certain of its

subsidiaries and affiliates that filed on January 14, 2009 comprise the U.S. Debtors) also filed a

voluntary petition under Chapter 11 of the U.S. Bankruptcy *Code* in the U.S. Court on July 14,

2009.

86.     An ad hoc group of holders of bonds issued by NNL, NNC and Nortel Networks Capital

Corporation has been organized and is participating in these U.S. and Canadian court

proceedings (the "Bondholder Group") along with Law Debenture Trust Company of New York,

as Trustee, and The Bank of New York Mellon, as Trustee, which are trustees under indentures

covering cross-over bonds, which trustees have advanced claims against one or more of the

---

Trial Testimony, Day 16, June 17, 2014, p. 3967:8-19; TR00049 (Exh. 49, Expert Report of Dr.
Timothy Reichert, January 24, 2014) p. 28

[98] NNC-NNL07160800 (Initial Order, January 14, 2009)

[99] TR40664 (NNI Voluntary Petition, January 14, 2009)

Canadian Debtors and one or more of the U.S. Debtors. Wilmington Trust, National Association as Successor Trustee is a trustee under an indenture issued by NNL and has advanced claims against only NNL and is also participating in these proceedings.

87.    In addition, pursuant to orders of the Canadian Court, representative counsel was appointed on behalf of the former employees of the Canadian Debtors, the continuing employees of the Canadian Debtors and the LTD Beneficiaries (together with certain other Canadian creditors, the "Canadian Creditors' Committee" or the "CCC") and representative counsel was also appointed on behalf of the former officers and directors of the Canadian Debtors (the "D&O") and each of these groups is participating in these proceedings.

88.    Furthermore, the Board of the UK Pension Protection Fund and Nortel Networks UK Pension Trust Limited (together, "UKPC") are also participating in these proceedings.

89.    On January 14, 2009, NNUK, NNSA, NN Ireland and certain of NNUK's European subsidiaries (namely, the EMEA Debtors) were granted administration orders (the "UK Administration Proceedings") in the U.K. under the *Insolvency Act, 1986* and Alan Bloom, Christopher Hill, Alan Hudson and Stephen Harris of Ernst & Young LLP were appointed as Joint Administrators of the EMEA Debtors (except for NN Ireland, whose Joint Administrators are Alan Bloom and David Hughes).[100]

90.    Subsequent to the filing date, Nortel Networks SA ("NNSA") commenced secondary insolvency proceedings within the meaning of Article 27 of the European Union's Council Regulation (EC) No 1346/2000 on Insolvency Proceedings in the Republic of France.

---

[100] TR31625 (Witness Statement of Alan Bloom, July 23, 2010) para. 2

91.     The CCAA proceedings and the UK Administration Proceedings of NNUK and the other

EMEA Debtors have been recognized by the U.S. Court as foreign main proceedings under

Chapter 15 of the Code.

92.     Subsequent to the filing date, certain other Nortel subsidiaries have filed for creditor

protection or bankruptcy proceedings in the local jurisdiction in which they are located.

93.     Certain solvent indirect subsidiaries of NNUK are not in administration, but are

represented in these proceedings by the Joint Administrators with respect to the allocation

issues.[101]

**(b)      Decision to Liquidate**

94.     Following the insolvency filings, the focus was on "right-sizing" Nortel and two main

restructuring options were considered.[102]

95.     The first option considered was a restructured Nortel focused on the legacy CDMA

wireless business and a potential business based on LTE wireless technology with all other

Nortel business lines being sold.[103]

96.     At the time, the CDMA business, which was based on an aging technology, was

profitable but its business was mature, and its revenue was forecast to decline over the coming

years as customers transitioned to the next generation LTE technology.[104]

---

[101] Allocation Position of the Joint Administrators Regarding the Allocation Entitlement of the
EMEA Debtors, May 16, 2013, Schedule 1

[102] TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) para. 42

[103] TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) para. 43

[104] TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) paras. 44-45

97.     The second restructuring option considered was the sale of all of Nortel's business lines and other assets, *i.e.* a liquidating insolvency.[105]

98.     The primary reason why the first option was not pursued was that in February 2009, Verizon Communications, a major CDMA customer and a prospective customer for Nortel's LTE technology, advised Nortel that it had not been selected as an LTE provider to Verizon.[106]

99.     Verizon further advised Nortel that it preferred that the CDMA business be moved into "safe hands" (*i.e.*, to another telecommunications provider with a strong balance sheet), failing which Verizon would direct a significant amount of its CDMA purchases to its other CDMA supplier on a going-forward business.[107]

100.    As a result of Verizon's lack of support, the prospective business model for Nortel continuing to operate the CDMA and LTE business was seriously undermined.[108]

101.    In addition to Verizon, other customers such as AT&T and Comcast also had concerns about awarding contracts to Nortel on a going-forward basis.[109]

102.    Ultimately, following significant review by NNC's senior management and board of directors, and following consultation with Lazard Freres & Co (which was Nortel's financial advisor), as well as consultation with all other stakeholders, a decision was made relatively early

---

[105] TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) para. 43

[106] TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) para. 47; TR46789 (Verizon Press Release regarding Global LTE Ecosystem, February 17, 2009)

[107] TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) paras. 9-12

[108] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 23

[109] Paviter Binning Trial Testimony, Day 5, May 20, 2014, p. 1085:1-11

in the restructuring process that the best means to realize value for creditors would be to sell all of the business lines along with any other assets.[110]

103.    No party suggested that it was a viable option to restructure along geographic lines or for a country-specific entity to independently continue in Nortel's business.[111]

104.    Eleven months into insolvency proceedings, and well after the decision not only to liquidate but also to sell Nortel's significant lines of business, John Ray was engaged as Principal Officer of NNI to oversee the winding up of the businesses of the U.S. Debtors.[112]

105.    By the date of Mr. Ray's engagement in December 2009, Nortel's largest LOBs had already been divested and its remaining significant LOBs were under contract to be sold (for a combined value of $3.218 billion).  After he was hired, the remaining business lines were divested for only $67 million.[113]

**(c)    IFSA**

106.    Since January 2009, as a result of the insolvency proceedings, NNL had not received any payments from its subsidiaries pursuant to the RPSM provisions of the MRDA.[114]

---

[110] TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) paras. 49-50

[111] TR00015 (Exh. 15, Reply Affidavit of Paviter Binning, April 24, 2014) paras. 4-11

[112] TR11358 (John Ray Employment Agreement, December 7, 2009); John Ray Trial Testimony, Day 6, May 21, 2014, p. 1398:21-23

[113] John Ray Trial Testimony, Day 6, May 21, 2014, p. 1404:9-1413:9; TR00010A (Exh. 10, Reply Affidavit of Sharon Hamilton, April 25, 2014) paras. 6-8; DEM00007 (Demonstrative for Ray Trial Cross-Examination Testimony)

[114] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 28 (NNL had received one $30 million payment from NNI in January 2009)

107.     NNL had continued to incur significant R&D costs to preserve the enterprise value of the business lines for either ongoing business or sale; for example, in 2009, the Canadian Debtors spent $180 million in R&D on the CDMA and LTE business (as compared to $120 million spent by the U.S. Debtors).[115]

108.     NNL was also incurring significant expenses in respect of corporate overhead, as it worked to coordinate the global restructuring efforts for the benefit of Nortel's global stakeholders.  The resulting negative cash flow was projected to continue unabated over the next few months.[116]

109.     The parties also appreciated that if determining the allocation of proceeds from Nortel's assets were a precondition to their sale, sales would be substantially delayed, and the value of the assets would depreciate, resulting in less money for all creditors.  Avoiding a dispute during the sale processes about how to allocate the proceeds allowed the parties to obtain the highest monetary value for the assets being sold.[117]

110.     All parties recognized that fighting over allocation would have prevented the sale of the assets, resulting in a smaller pot of proceeds to allocate between the Debtors.[118]

---

[115] TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) p. 17, Exhibit 7; Jeffrey Kinrich Trial testimony, Day 17, June 18, 2014, p. 4314:9-4316:24

[116] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 29

[117] Trial Transcript, Day 1, May 12, 2014, p. 169:10-25 *per* Sheila Block on behalf of the U.S. Debtors ("[T]he parties cooperated to obtain the highest amount of money, and the aim of the process for each estate was to maximize the recovery."); TR50223 (Allocation Position of U.S. Debtors and Official Committee of Unsecured Creditors, May 16, 2013) p. 18 ("The estates and creditors ultimately decided that, to maximize value, the pursuit of the sale of the Residual Patent Portfolio was the best option. This decision proved incredibly successful.")

[118] TR50886 (Transcript of Proceedings, June 7, 2011) p. 36, 43-44 *per* Mr. Bromley on behalf of the U.S. Debtors; *see also* TR21509 (Transcript of Proceedings, June 11, 2011) p. 51-52 *per*

111.    Accordingly, on June 9, 2009, NNL, NNI, NNUK and the Joint Administrators (among

other parties) entered into the Interim Funding and Settlement Agreement (the "IFSA"), which

addressed these funding issues for an interim period.[119]

112.    More specifically, under the IFSA, which is governed by New York law, the Estates

agreed:

    (a)    that their execution of sale documentation or the closing of a sale transaction

would not be conditioned upon reaching agreement either on allocation of the sale

proceeds or on a binding procedure for determining the allocation question;

    (b)    that the sale proceeds would be deposited into escrow, and that there would be no

distribution out of escrow without either the agreement of all of the selling

debtors or the determination of any dispute relating thereto by the relevant dispute

resolver;

    (c)    that the agreement would not have any impact on the allocation of proceeds to any

Debtor from any asset sale and would not prejudice a party's rights to seek its

entitlement to the proceeds from any sale; and

---

Mr. Botter on behalf of the Official Committee ("I think all parties agree that the IFSA
contemplated cooperation amongst the selling parties in the sales efforts to maximize value
without reference to any allocation disputes of which we heard so much about the last time.
Your Honor, I think that the efforts of all of the selling parties ought to be applauded here. We
truly did maximize value."); TR50223 (Allocation Position of U.S. Debtors and Official
Committee of Unsecured Creditors, May 16, 2013) p. 16 ("[T]he sale process would not succeed
if a selling party could hold up a sale pending agreement on the allocation of the sale proceeds.")

[119] TR43794 (Interim Funding and Settlement Agreement, June 9, 2009)

(d)      that, in order to facilitate the Business Sales, the U.S. and EMEA Debtors would enter into appropriate license termination agreements which would provide for the termination of the license rights granted by NNL under the MRDA.[120]

113.     The certainty that this structure allowed in the context of going-concern sales in a real-time, worldwide, insolvency proceeding was central to maximizing the sale proceeds received from the LOB sales with all the Estates cooperating.[121]

114.     The parties also agreed that a Debtor would not be required to enter into a sale transaction, if it reasonably determined in good faith that the transaction was not in the best economic interest of its creditors.[122]

115.     Indeed, the Debtor Estates understood that allocation was deferred until after the asset sale. Alan Bloom, one of the Joint Administrators of the EMEA Debtors, explicitly confirmed this central outcome of the IFSA on his deposition:

> Q.     And you'll agree with me that the parties did collaborate on the asset sales?
>
> A.     Yes.
>
> Q.     And they were doing so pursuant to the IFSA. Correct?
>
> A.     Yes.

---

[120] TR43794 (Interim Funding and Settlement Agreement, June 9, 2009) s. 10(a), 11, 12(a), 12(b), 12(f), 16(a)

[121] Murray McDonald Deposition, November 26, 2013, p. 137:12-139:4; Cosme Rogeau Deposition, December 12, 2013, p. 141:21-144:3; Sharon Hamilton Trial Testimony, Day 4, May 15, 2014, p. 925:16-926:9; Alan Bloom Deposition, December 5, 2013, p. 217:18-220:3, referring to TR31625 (Witness Statement of Alan Bloom, July 23, 2010) para. 34; TR50886 (Transcript of Proceedings, June 7, 2011) p. 36:16-24, 43:18-44:1 *per* Mr. Bromley; Paviter Binning Trial Testimony, Day 5, May 20, 2014, p. 1054:13-1055:13

[122] TR43794 (Interim Funding and Settlement Agreement, June 9, 2009) s. 12(e); TR00009 (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 44

Q.      And that the issue of allocation was deferred until after the asset sales?

A.      Yes.

Q.      And that was to allow the parties a latitude to cooperate in order to maximise the amounts of the asset sales?

A.      Yes. That was the objective of the exercise.

Q.       And purposely done to allow the asset sales to happen first and allocation to go second?

A.      Yes.[123]

116.    It was under this framework that Nortel proceeded with the liquidation of its assets, and ultimately, the prosecution of this trial whereby the parties' positions on allocation were required to be disclosed after all of Nortel's assets were sold.

117.    Although section 11(a) of the IFSA does state that the U.S. Debtors and EMEA Debtors agree to enter into license termination agreements "in consideration of a right to an allocation", even the evidence of Mr. Ray of the U.S. Debtors makes clear this does not act as a guarantee to a specific allocation or that such an allocation would not be zero.[124]  Indeed, Section 12 of the IP Transaction Side Agreement, signed by the parties in conjunction with the Rockstar Sale, states that termination of the license rights have no effect on the allocation dispute and reserved rights to "present any arguments, methodologies, legal or factual theories in support of a proposed

---

[123] Alan Bloom Deposition, December 5, 2013, p. 219:8-220:3 (Objections not pursued removed); *see also* John Ray Deposition, December 13, 2013, p. 96:23-98:4

[124] John Ray Deposition, December 13, 2013, p. 108:25-111:2

allocation of the IP Sale Proceeds or the proceeds of any other transaction", and that all parties' rights continue to be preserved.[125]

118.    NNI agreed in the IFSA to pay $157 million to the Canadian Debtors in satisfaction of any claims by NNL for corporate overhead and R&D costs incurred by NNL for the benefit of the U.S. Debtors for the period from the filing date to September 30, 2009.[126]

119.    The IFSA also provided a framework for the Debtor Estates to complete the contemplated sale transactions of Nortel's assets without reference to allocation.[127]  This was purposefully done to avoid the detrimental infighting that would have taken place if the allocation dispute had taken place prior to the assets being sold.[128]

120.    The U.S. Debtors have admitted that the Canadian Debtors' ownership of any rights, property or other assets were not "altered in any way" by the IFSA.[129]

121.    Based on the explicit understanding – including by NNI – that every party had reserved their rights to make any argument on allocation later on, each Debtor that entered into a sale

---

[125] TR46858 (IP Transaction Side Agreement, April 4, 2011) s. 12 (note it is governed by New York law, s. 17); TR00009B (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 98-100; TR00010C (Exh. 10, Reply Affidavit of Sharon Hamilton, April 25, 2014) paras. 45-47

[126] TR00009B (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 30

[127] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 38, 43

[128] TR50523 (Opinion of the U.S. Court, April 3, 2013) p. 4 ("The IFSA provided the necessary mechanism to allow the planned sales of the Nortel Parties' businesses and assets to proceed without dispute among the Nortel Parties. The IFSA, inter alia, provided that the parties to the IFSA would not condition the execution of any sale agreement with a third party upon allocation or even a binding procedure for allocation of the sale proceeds.")

[129] TR50223 (Allocation Position of U.S. Debtors and Official Committee of Unsecured Creditors, May 16, 2013) p. 16-17

transaction and, in the case of the U.S. and EMEA Debtors, terminated their license rights under the MRDA, did so without any guarantee of the allocation it would receive.[130]

122.    The reservation of "allocation arguments" was made in the agreements to each subsequent sale both directly and by reference to the IFSA, were repeatedly reiterated to the Courts, and were acknowledged in orders of the Courts.[131]

---

[130] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 43; Alan Bloom Deposition, December 5, 2013, p. 219:8-220:3; John Ray Trial Testimony, Day 6, May 21, 2014, p. 1443:13-1444:24 ("Q. And I'm correct, am I not, that you believed that the parties had reserved all rights to make any and all arguments a party could muster in its favor under these reservations of rights? Isn't that right? A. Yes."); John Ray Deposition, December 13, 2013, p. 96:23-98:4, 108:18-109:8; TR50223 (Allocation Position of U.S. Debtors and Official Committee of Unsecured Creditors, May 16, 2013) p. 16, citing TR43794 (IFSA, June 9, 2009) paras. 12(a)-(b); TR50223 (Allocation Position of U.S. Debtors and Official Committee of Unsecured Creditors, May 16, 2013) p. 17 ("[N]othing in the IFSA altered in any way the parties' rights vis-à-vis each other regarding the ownership of any rights, property or other assets beyond an agreement to sell or relinquish those rights, property or other assets together to or for the benefit of the buyers.")

[131] TR40835 (Supplemental Submission of the U.S. Debtors and Official Committee of Unsecured Creditors on Allocation Protocol Issues, March 7, 2012) p. 1 (pg. 31 of 53 of PDF) ("[The U.S., Canadian and EMEA Debtors] also recognized that the sale process would not succeed if a selling party could hold up an asset sale pending agreement on the allocation of the Sale Proceeds. The three failed mediations over the past years demonstrate the wisdom of the parties' agreement in the IFSA not to condition the joint sale of Nortel's assets on a prior agreement regarding allocation."); TR50114 (Order of the U.S. Court, July 28, 2009) para. 38 ("[N]othing herein (a) shall, or be deemed to, determine ratify, or adopt, or have any impact whatsoever on, the allocation or distribution of Sale Proceeds"); TR21510 (Order of the U.S. Court, June 11, 2011) para. 45 ("In accordance with this Court's order approving and authorizing the transactions contemplated by the IFSA, the proceeds in the Escrow Account shall not be distributed in advance of either (a) agreement of all the Selling Debtors . . . as to the distribution of such proceeds . . . or (b) in the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) in accordance with the terms of the Interim Sales Protocol . . . which . . . shall be approved by the Court."); TR50214 (Order (A) Approving the [IFSA], and (b) Granting Related Relief, June 29, 2009) s. 8 ("Nothing in this Order or in the [IFSA] shall determine the allocation of proceeds from a Sale Transaction among the Selling Debtors or shall constitute a Protocol for determining the allocation of proceeds from a Sale Transaction among the Selling Debtors."); TR50057 (Order (Interim Funding Agreement), June 29, 2009) s. 3 (Section 3 approved the IFSA "including without limitation, all of the settlements and reservations of rights provided for therein")

123.    The Final Canadian Funding and Settlement Agreement, signed in December 2009, also reserved the rights of NNL to make any argument regarding allocation of sale proceeds.[132]

**(d)    Business Sales**

124.    With the IFSA framework in place, the Debtor Estates embarked on a process that resulted in a series of sales of the various business lines (the "Business Sales"), which occurred from mid-2009 through late 2010, with the last transaction closing in March 2011.  The following chart summarizes the Business Sales:

| Business Sale | Purchaser | Signing Date | Closing Date | Sale Price |
|---|---|---|---|---|
| Layer 4-7[133] | Radware | 2/19/2009 | 3/31/2009 | $17.7 million |
| CDMA/LTE[134] | Ericsson | 7/24/2009 | 11/13/2009 | $1.13 billion |
| Enterprise[135] | Avaya | 9/14/2009 | 12/18/2009 | $900 million |
| Next Generation Packet Core[136] | Hitachi | 10/25/2009 | 12/8/2009 | $10 million |

---

[132] TR46910 (Final Canadian Funding and Settlement Agreement, December 23, 2009) s. 23 ("Nothing in this Agreement shall bar, prohibit or in any way hinder the rights of the Parties to this Agreement to present any arguments, methodologies, legal or factual theories in support of a proposed allocation of the proceeds of any Sale Transaction or IP Transaction").

[133] TR49810 (Asset Purchase Agreement among Nortel Networks Limited and Radware Ltd., et al., February 19, 2009)

[134] TR44138 (Asset Purchase Agreement among Nortel Networks Limited and Telefonaktiebolaget L M Ericsson (publ), et al., July 24, 2009)

[135] TR44163 (Amended and Restated Asset and Share Sale Agreement among Nortel Networks Limited and Avaya Inc., et al., September 14, 2009)

[136] TR45015 (Transaction Agreement among Nortel Networks Limited and Hitachi, Ltd., et al., October 25, 2009)

| Business Sale | Purchaser | Signing Date | Closing Date | Sale Price |
|---|---|---|---|---|
| Metro Ethernet Networks[137] | Ciena | 11/24/2009 | 3/19/2010 | $775 million |
| GSM/GSM-R[138] | Ericsson & Kapsch CarrierCom | 11/24/2009 | 3/31/2010 | $103 million |
| CVAS[139] | GENBAND | 12/22/2009 | 5/28/2010 | $282.6 million |
| GSM Retained Contracts[140] | Ericsson | 5/11/2010 | 6/4/2010 | $2 million |
| Multi Service Switch[141] | Ericsson | 9/25/2010 | 3/11/2011 | $65 million |
| Patent Portfolio[142] | Rockstar Bidco | 6/30/2011 | 7/29/2011 | $4.5 billion |

---

[137] TR44172 (Amended and Restated Asset Sale Agreement among Nortel Networks Limited and Ciena Corporation, et al., November 24, 2009)

[138] TR44245 (Asset Sale Agreement among Nortel Networks Limited and Telefonaktiebolaget L M Ericsson (publ), et al., November 24, 2009)

[139] TR44113 (Asset Sale Agreement among Nortel Networks Limited and GENBAND, Inc., et al., December 22, 2009)

[140] TR45006 (Asset Sale Agreement among Nortel Networks Limited and Telefonaktiebolaget L M Ericsson (publ), et al., May 11, 2010)

[141] TR44200 (Asset Sale Agreement among Nortel Networks Limited and Telefonaktiebolaget L M Ericsson (publ), et al., September 24, 2010)

[142] TR44220 (Asset Sale Agreement among Nortel Networks Limited and Rockstar Bidco, LP, et al., June 30, 2011)

- 40 -

125.    In order to sell the lines of businesses separately, Nortel engaged in a "carve-out process" to identify the bundle of assets, rights and obligations that would have to be conveyed in each sale to enable the lines of business to function on a stand-alone basis.[143]

126.    A key aspect of the carve-out process was the identification of which IP rights – principally patent rights – needed to be conveyed; each prospective purchaser wished to obtain as many patents as possible as part of each sale transaction and, conversely, the Nortel sellers wanted to ensure that the only patents transferred were those incorporated exclusively or principally in the business line in question so as to retain value within Nortel and not to jeopardize the ability to sell the other business lines that might require rights to the same patents.[144]

127.    Ultimately, those patents that were predominantly used in any given LOB were transferred to the purchaser of that LOB as part of the transaction.[145]

128.    In the end, 2,700 patents were transferred as part of the Business Sales.[146]

129.    For all other patents that were used in that LOB, a license was granted to the purchaser for use of the patents in the operations of the particular business line being purchased.[147]

130.    NNL retained ownership of the patents licensed to the business sale purchasers.[148]

---

[143] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 51

[144] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 59-60; John Veschi Deposition, November 7, 2013, p. 128:11-25

[145] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 61; John Veschi Deposition, November 7, 2013, p. 122:6-127:10

[146] TR11151 (Nortel's IP Team and Patent Portfolio PowerPoint, August 2010) Slide 11 (p. 11)

[147] John Veschi Deposition, November 7, 2013, p. 128:11-25

131.    The sales agreements provided for the transfer of all of the sellers' "right, title and interest in and to" the enumerated IP "subject to any and all licenses" (referring to third party licenses and not to licenses under the MRDA, which were terminated).[149]

132.    Through the carve-out process, it was agreed that the sale of each significant business line would generally include the following conveyances of assets, rights and obligations, which would be reflected in the purchase price:

(a)    the transfer of those patents that were "predominantly used" in the particular business line;

(b)    a non-exclusive license for any other patent that was used in that particular business line;

(c)    the transfer or license of other forms of IP, such as trademarks or software, used in the business line;

(d)    the transfer of tangible assets (such as inventory, R&D equipment, computer equipment) used in the business line;

(e)    the transfer of unbilled or in-process receivables and prepaid expenses related to the business line;

---

[148] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 65

[149] *See, e.g.,* TR44138 (ASA regarding CDMA/LTE Assets, July 24, 2009) Articles 2.1.1, 2.1.1(g)

- 42 -

(f)    the transfer of a significant portion of the workforce employed in connection with the business line, including management, R&D personnel, and sales and supply chain personnel;

(g)    the assignment of contracts (or portions thereof) related to the business line, including customer contracts, supply contracts, and license agreements with third parties, and including any warranty rights;

(h)    the sale, lease or sub-lease of real property related to the business line; and

(i)    the assumption of certain liabilities related to the business line, particularly warranty obligations to customers and all liabilities of the business line arising after the closing of the transaction.[150]

133.    Thousands of R&D personnel, principally in Canada but also in the other RPE jurisdictions, were transferred to the purchasers of the lines of business.[151]  The transfer of the valuable assembled workforce, including R&D personnel, enabled the purchasers to continue to operate the businesses without interruption.

134.    Peter Newcombe, a witness for the EMEA Debtors at trial, testified in this regard about Nortel's MEN business and its sale to Ciena.[152]  Newcombe confirmed that to continue in the MEN business required R&D, and that of the R&D employees that were marketed to be sold with the business, 15 were in the United Kingdom, 3 were in the U.S. and 981 were in

---

[150] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 52

[151] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 52(f)

[152] Peter Newcombe Trial Testimony, Day 7, May 22, 2014, p. 1633:11-1634:10

Canada.[153]  The U.S. Debtors could not have run the MEN business without the Canadian R&D employees.[154]

135.    Coleman Bazelon, who was an expert for the UKPC, testified at trial and in his expert report that most of the assets sold by Nortel were IP.[155]  In Mr. Bazelon's expert opinion, any value in the sales to goodwill and customer relationships were entangled with IP and took their value in "large part" from the IP.[156]

136.    IP also generated the value of IP-related asset categories, such as customer relationships and goodwill.[157]

137.    Although certain purchasers of Nortel's lines of business wanted to move the Nortel customers to the purchasers' products and platforms[158] there is no doubt that the central reason those customers were with Nortel in the first place was because of Nortel's IP and the products created from that IP.[159]

---

[153] Peter Newcombe Trial Testimony, Day 7, May 22, 2014, p. 1649:11-1650:19; TR48945 (MEN Management PowerPoint, October 2009) Slide 54

[154] Peter Newcombe Trial Testimony, Day 7, May 22, 2014, p. 1651:3-14

[155] Coleman Bazelon Trial Testimony, Day 12, June 2, 2014, p. 2984:5-8; TR00040 (Exh. 40, Rebuttal Report of Coleman Bazelon, February 28, 2014) p. 10-11 (Footnote 20)

[156] Coleman Bazelon Trial Testimony, Day 12, June 2, 2014, p. 2985:14-21

[157] Coleman Bazelon Trial Testimony, Day 12, June 2, 2014, p. 2984:5-8; TR00040 (Exh. 40, Rebuttal Report of Coleman Bazelon, February 28, 2014, p. 10-11 (Footnote 20); Coleman Bazelon Trial Testimony, Day 12, June 2, 2014, p. 2985:14-21

[158] Paviter Binning Trial Testimony, Day 5, May 20, 2014, p. 1119:8-11

[159] Paviter Binning Trial Testimony, Day 5, May 20, 2014, p. 1118:9-13; *see* Philippe Albert-Lebrun Trial Testimony, Day 6, May 21, 2014, p. 1485:25-1486:9, in making the same point that R&D and products were more important than Nortel's salesforce in the success of Nortel, which contradicted his own affidavit which emphasized customer relationships as critical to NNSA's success, with no mention of R&D and products; TR00022 (Exh. 22, Affidavit of Phillipe Albert-Lebrun, May 9, 2014) para. 37

138.    Any purchaser that wanted to keep Nortel's customers would need to have technology relevant to that customer.[160]

139.    The licenses granted under the MRDA to NNI, NNUK, NNSA and NN Ireland were not among the assets sold to the purchasers of the LOBs or Residual IP, but were instead terminated. The MRDA was not assigned under the Business Sales and Residual IP Sale.  Where license termination agreements formed part of the sales, in accordance with the IFSA the Licensed Participants executed license termination agreements with respect to the IP being transferred.[161]

**(e)    Residual Patent Portfolio**

    *(i)    After the Business Sales*

140.    By the time that all of the Business Sales were completed in March 2011, Nortel had no remaining operating businesses.  What it did retain was a residual patent portfolio, consisting of approximately 7000 patents and patent applications.[162]

141.    These were principally patents and applications that were not used in any of the lines of business and therefore were not subject to licenses to the Business Sale purchasers.[163]  In

---

[160] Paviter Binning Trial Testimony, Day 5, May 20, 2014, p. 1118:14-18

[161] TR00009B (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 54; John Ray Trial Testimony, Day 6, May 21, 2014, p. 1431:25-1433:9; TR44149 (CDMA/LTE Sale License Termination Agreement) Articles 2.01, 2.06, 2.08; TR44186 (MEN Sale License Termination Agreement) Articles 2.01, 2.06, 2.08; TR45019 (NGPC Sale License Termination Agreement) Articles 2.01, 2.06, 2.08; TR43642.03 (GSM Retained Contracts Sale License Termination Agreement) Articles 2.01, 2.06, 2.08; TR31671 (MSS Sale License Termination Agreement) Articles 2.02, 2.04, 2.01; TR44186 (MEN Sale License Termination Agreement) Articles 2.01, 2.06, 2.08; TR21508 (Rockstar Transaction IP License Termination Agreement) Articles 2.01, 2.02, 2.04

[162] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 56, 67

[163] Gillian McColgan Deposition, November 8, 2013, p. 141:12-24; TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 65-67; TR11151 (Nortel's IP Team and

addition, the residual IP portfolio included patents used by multiple LOBs and licensed to the purchasers of those LOBs.

142.    Even before the conclusion of the Business Sales, representatives of the Debtor Estates began to consider how best to maximize the value of what was expected to be a sizable residual patent portfolio.  Two options were considered:

(a)    the sale of the residual patents through a competitive sale process, such as was followed for the sale of the business lines; or

(b)    the creation of a new licensing/litigation business, which would seek to license the residual patents to various technology companies who were believed to be infringing one or more patents.  This potential new licensing business was referred to as "IP Co."[164]

143.    Both of these options were considered in parallel from mid-2009 through early 2011.  At no point did any Debtor Estate or any major creditor group propose any other means of monetizing the patent portfolio.[165]

*(ii)    IP Co. Model*

144.    In January 2009, the Nortel Group was in the technology and telecommunications business, developing new technologies and selling products incorporating that technology to customers along with related services.  Nortel had no material business licensing its technology

---

Patent Portfolio PowerPoint, August 2010) Slide 11 (p. 11) ( "~6,100 patent assets remain, covering wide variety of technologies […] Strict limits on licenses granted (narrow fields of use/product-line limitations")

[164] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 68-69

[165] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 69

(i.e., its IP) or monetizing its technology by suing others, either before or after filing for

protection from creditors in early 2009.[166]

145.    John Veschi had been hired in July 2008 to take responsibility for Nortel's IP group and

to look at options for licensing its IP.[167]    Six months later, most Nortel entities filed for creditor

protection, and the focus quickly became selling Nortel's assets – not retaining them.[168]

146.    Consideration, study and development of the "IP Co." option was led by John Veschi,

which started after filing.  The premise of IP Co. was that the residual patents would be

monetized by attempting to license them to various technology companies, in exchange for the

payment of royalties.  The licensing attempts would be backed by the threat of patent

infringement litigation and, if necessary, actual infringement proceedings.  It was considered

important that IP Co. not carry on any telecommunications or other technology business,

because, if it did, it would be vulnerable to counterclaims for alleged infringement being brought

by the targets of its infringement litigation, which would undercut its revenue generating

ability.[169]

147.    Over the course of 2009 and 2010, Mr. Veschi and his team, assisted by Lazard and

Global IP (a law firm specializing in patent sales), prepared several versions of a preliminary

financial model, in an attempt to forecast the operating profit that could be earned by IP Co. so

---

[166] Paviter Binning Trial Testimony, Day 5, May 20, 2014, p. 1055:24-1056:6, 1073:23-1077:8; TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) para. 40

[167] Paviter Binning Trial Testimony, Day 5, May 20, 2014, p. 1073:2-22; John Veschi Deposition, November 7, 2013, p. 38:6-39:10

[168] John Ray Trial Testimony, Day 6, May 21, 2014, p. 1394:1-1395:13, 1398:18-1399:7, 1404:9-1412:14; TR11358 (John Ray Employment Agreement, December 7, 2009); TR00010A (Exh. 10, Reply Affidavit of Sharon Hamilton, April 25, 2014) paras. 6-8, 11

[169] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 73

that the potential economic benefits could be weighed against value expected to be received on a sale of the portfolio.[170]

148.    The various versions of the preliminary financial model had three sub-models, with differing assumptions relating to how much litigation IP Co. would pursue.  The scenarios were dubbed "Harvest" (assuming very little litigation), "Litigation Light" and "Litigation Heavy"—more litigation resulted in greater forecast revenues, at greater forecast cost.[171]

149.    The projected cash flows for IP Co. were largely guesswork, given that Nortel had little experience in licensing and there were no good precedents about the estimated cash flow.[172] Even Mr. Ray admitted at trial that there was no certainty in the recoveries projected for IP Co. in the models that were prepared.[173]

150.    The costs to capitalize an IP Co. concept were estimated to have been between $269 million and $417 million.[174]

151.    Ultimately, the Canadian Debtors and the Monitor advised the representatives of the other estates and the other stakeholders that the Canadian Debtors would not provide any funding to establish IP Co.[175]

---

[170] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 74

[171] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 74

[172] Sharon Hamilton Trial Testimony, Day 4, May 15, 2014, p. 908:8-12, 911:16-912:9, 915:19-919:13; TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 78; TR00010A (Exh. 10, Reply Affidavit of Sharon Hamilton, April 25, 2014) paras. 34-35

[173] John Ray Trial Testimony, Day 6, May 21, 2014, p. 1420:12-20

[174] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 79-80; John Ray Trial Testimony, Day 6, May 21, 2014, p. 1416:19-1420:12

[175] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 78-80

152.    If any Estate or other interested party wished to pursue IP Co., they would need to purchase the residual patents from NNL.[176]  No Estate or other interested party ever sought to effect such a purchase.  Instead, all of the Estates agreed to pursue a sale process for the residual patents and to terminate consideration of the IP Co. option.

### (iii)    *Rockstar Sale*

153.    During discussions concerning the structuring of the sale of the residual patent portfolio, the Monitor suggested to the U.S. Debtors that the transaction should be structured with NNL being the only seller and asserted, including in a conversation between Sharon Hamilton and counsel for the U.S. Debtors, that the residual IP was solely a Canadian asset.[177]

154.    The sale process leading to the Rockstar Sale was similar to that followed for the Business Sales.  On April 4, 2011, after significant negotiations with two prospective purchasers, certain Nortel entities (including NNC, NNL, NNI and NNUK) entered into a stalking horse asset sale agreement with a wholly owned subsidiary of Google Inc.[178]

155.    The stalking horse agreement with Google placed a value of $900 million on the residual patent portfolio, a value that all of the Debtor Estates agreed exceeded the expected value of the

---

[176] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 80

[177] TR00010A (Exh. 10, Reply Affidavit of Sharon Hamilton, April 25, 2014) paras. 39-41, which notes that the Canadian Debtors and Monitor agreed to work with NNI together on the Residual IP sales to avoid time consuming litigation that could disrupt the sale process; Sharon Hamilton Trial Testimony, Day 4, May 15, 2014, p. 899:2-19

[178] TR45578 (Sixty-Third Report of the Monitor, Google Stalking Horse ASA, April 4, 2011) para. 19, Appendix A

IP Co. model, particularly in view of the certainty the Google sale provided versus the risks of IP Co.[179]

156.    As part of the stalking horse agreement, the U.S., Canadian and EMEA Debtors agreed to forego the ability to pursue the IP Co. model, though the bondholders retained the ability to become qualified bidders.[180]

157.    Ultimately, no bondholder became a qualified bidder or put in a bid to run the IP Co. within Nortel or in any other way.[181]

158.    An auction was held at the end of June 2011, with the residual patents ultimately being sold to Rockstar, a single purpose entity backed by a consortium of major technology companies (Apple, Microsoft, Ericsson, Blackberry, Sony and EMC), for $4.5 billion.[182]

159.    In connection with the Rockstar Sale and pursuant to the IFSA, the MRDA license rights of the Licensed Participants were not transferred.[183]

160.    Instead, NNI, NNUK, NNSA and NN Ireland, among others, executed a License Termination Agreement with respect to any MRDA license rights that they may have had in relation to the patents and applications in the residual portfolio.[184]

---

[179] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) paras. 82-85

[180] TR45578 (Sixty-Third Report of the Monitor, Google Stalking Horse ASA, April 4, 2011) Appendix A (s. 5.5(d)); John Ray Trial Testimony, Day 6, May 21, 2014, p. 1421:5-1423:20

[181] TR00021 (Exh. 21, Reply Declaration of John Ray, April 25, 2014) para. 19; TR45578 (Sixty-Third Report of the Monitor, Google Stalking Horse ASA, April 4, 2011) Appendix A (s. 5.5(d))

[182] TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 96; TR44220 (Rockstar Transaction ASA, June 23, 2011)

[183] John Ray Trial Testimony, Day 6, May 21, 2014, p. 1431:25-1433:9; TR21508 (Rockstar Transaction IP License Termination Agreement) Article 2.01

161.    Section 2.02 of the License Termination Agreement signed in connection with the

Rockstar Sale states: "This Agreement shall not affect the ownership rights that each Seller may

have to any intellectual property."[185]

162.    The same License Termination Agreement reserved each party's rights to "seek its

entitlement" to an allocation of the sale proceeds, consistent with the IFSA.[186]

**(f)    Expansion of Monitor's Powers**

163.    In addition to the powers and duties set out in the CCAA Initial Order dated January 14,

2009, the Monitor's powers were expanded by order dated August 14, 2009 ("the First

Expansion of Monitor Powers Order").[187]  As noted in the Monitor's Nineteenth Report dated

August 11, 2009,  the  Canadian Debtors indicated that the Board of Directors of NNC and

NNL  and the Chief Executive Officer believed that Nortel had reached an appropriate transition

point for its governance structure.[188]  By that time, the business operations were stabilized,

progress had been made with respect to the sale of the various business units, organizational

changes had been made towards stand-alone business units and a business unit was established to

provide transitional services with respect to the sale of the business.[189]  Furthermore, Nortel had

announced that effective August 10, 2009 its CEO was stepping down and the number of Board

---

[184] TR21508 (Rockstar Transaction IP License Termination Agreement)

[185] TR21508 (Rockstar Transaction IP License Termination Agreement) Article 2.02.  Indeed, s.
2.04 of the License Termination Agreement repeats that each Seller "shall have a right to an
allocation" of the sale proceeds that is "to be determined in accordance with the provisions of the
IFSA."

[186] TR21508 (Rockstar Transaction IP License Termination Agreement) Article 2.04; TR43794
(Interim Funding and Settlement Agreement, June 9, 2009) s. 12(f)

[187] TR50631 (Order of the Ontario Superior Court of Justice, August 14, 2009)

[188] TR21505 (Nineteenth Report of the Monitor, August 11, 2009) para. 27

[189] TR21505 (Nineteenth Report of the Monitor, August 11, 2009) para. 27

members was being reduced from 9 to 3.[190]  The First Expansion of Monitor Powers Order

provides, among other things, the Monitor with the authority to cause the Canadian Debtors to

take various actions in connection with the sale of the business units and to conduct, supervise

and direct any procedure regarding the allocation and/or distribution of proceeds of any sale.[191]

164.    In its Eighty-Eighth Report dated September 26, 2012, following the sale of the business

units and the Residual IP, the Monitor reported that, in light of the cessation of public reporting

obligations, the directors and officers of the Canadian Debtors indicated they would resign their

positions.[192]  The Monitor indicated, at that point in the restructuring, it was not practical or

necessary to replace the directors and officers of the Canadian Debtors.[193]  Therefore, the

Monitor sought and obtained an order expanding its powers again in the event that prior orders

were not all encompassing in this regard.  By order dated October 3, 2012 (the "Second

Expansion of Monitor Powers Order"), the Court added to the powers of the Monitor by, among

other  things,  authorizing and  empowering, but not obligating, the Monitor to exercise any

powers which may be properly exercised by a board of directors of any of the Canadian

Debtors.[194]  The Second Expansion of Monitor Powers Order in no way limited the powers and

protections provided to the Monitor under prior orders of the Court, the CCAA or applicable

law.[195]

---

[190] TR21505 (Nineteenth Report of the Monitor, August 11, 2009) para. 28

[191] TR50631 (Order of the Ontario Superior Court of Justice, August 14, 2009) para 3.

[192] NNC-NNL11755843 (Eighty-Eighth Report of the Monitor, September 26, 2012) para. 36

[193] NNC-NNL11755843 (Eighty-Eighth Report of the Monitor, September 26, 2012) para. 36

[194] Order (Monitor's Expansion of Power Order # 2) of the Ontario Superior Court of Justice, October 3, 2012, para. 3

[195] Order (Monitor's Expansion of Power Order # 2) of the Ontario Superior Court of Justice, October 3, 2012, para. 3

(g)     **Allocation Litigation**

165.     Under the IFSA (as explicitly confirmed in the scheduling orders subsequently entered in 2013 with respect to the allocation litigation), the parties were not required to assert allocation positions until sometime after all of the coordinated asset sales had occurred.[196]

166.     On June 7, 2011, the Canadian Debtors brought a motion requesting approval of an allocation protocol.  A similar motion was brought at the same time by the U.S. Debtors and a joint hearing was held.[197]

167.     Pending a ruling on the motion, the Courts directed the parties to engage in mediation.[198]

168.     The Canadian Court's order and endorsement regarding the mediation explicitly mandated that the parties' positions were inadmissible in this court proceeding.[199]

169.     Mediation, unfortunately, proved unsuccessful.[200]

---

[196] TR43794 (Interim Funding and Settlement Agreement, June 9, 2009) s. 12(a); TR50027 (Amended and Restated Order (Allocation Protocol), April 3, 2013) Schedule A (s. 4(a)) ("There shall be no restriction on the ability of any Core Party to advance or oppose any theory of allocation."); TR50102 (Order Entering Allocation Protocol of the U.S. Court, May 17, 2013) Exhibit 1 (s. 4(a)); TR50058 (Order (Allocation Protocol – Litigation Timetable and Discovery Plan of the Canadian Court, May 15, 2013) Schedule A; Order Entering Litigation Timetable and Discovery Plan of the U.S. Court, May 17, 2013, Exhibit 1

[197] *Nortel Networks Corp.*, *Re*, 2011 ONSC 3805 at paras. 1-3 (S.C.J.).

[198] *Nortel Networks Corp.*, *Re*, 2011 ONSC 3805 at paras. 14-15 (S.C.J.); *Nortel Networks Corp.*, *Re*, 2011 ONSC 4012 at para. 18 (S.C.J.).

[199] TR50050 (Order of the Honourable Justice Morawetz regarding Mediation, June 29, 2011) para. 4(c) ("All offers, promises, conduct and statements, whether written or oral, made in the course of the mediation proceedings, are inadmissible in any arbitration or court proceeding."); *Nortel Networks Corp.*, *Re*, 2011 ONSC 4012 at para. 24 (S.C.J.) ("The parties shall recognize that mediation proceedings are settlement negotiations, and that all offers, promises, conduct and statements, whether written or oral, made in the course of the proceedings, are inadmissible in any arbitration or court proceeding, to the extent allowed by law.")

[200] *Nortel Networks Corporation (Re)*, 2013 ONSC 1757 at para. 3 (S.C.J.)

170.    As the parties were unable to reach agreement on the allocation of the sale proceeds, in
April and May 2013, the Courts approved an Allocation Protocol to govern the litigation of the
allocation issues.[201] Section 4(a) of that Allocation Protocol provided for the exchange of
pleadings and that "[t]here shall be no restriction on the ability of any Core Party to advance or
oppose any theory of allocation."[202]

171.    Pursuant to the Allocation Protocol, a Litigation Timeline and Discovery Plan was
approved by the Courts on May 15 and 17, 2013, which required delivery of opening allocation
positions or pleadings by May 16, 2013.[203]

172.    None of the Canadian, U.S. or EMEA Debtors (or any other Core Party) were required to
disclose its litigation position prior to that date.

173.    Unsurprisingly, the Monitor and Canadian Debtors along with the other parties acted
pursuant to the ordered schedule of disclosure of litigation allocation positions, and did not
disclose their litigation allocation position prior to that date.

---

[201] TR50027 (Amended and Restated Order (Allocation Protocol) of the Canadian Court, April 3, 2013); TR50102 (Order Entering Allocation Protocol of the U.S. Court, May 17, 2013)

[202] TR50027 (Amended and Restated Order (Allocation Protocol), April 3, 2013) Schedule A (s. 4(a)); TR50102 (Order Entering Allocation Protocol of the U.S. Court, May 17, 2013) Exhibit 1 (s. 4(a))

[203] TR50058 (Order (Allocation Protocol – Litigation Timetable and Discovery Plan of the Canadian Court, May 15, 2013) Schedule A; Order Entering Litigation Timetable and Discovery Plan of the U.S. Court, May 17, 2013, Exhibit 1 ("Any Core Party who wishes to participate in the Allocation dispute shall serve a pleading or opening submission…which will set out with reasonable particularity the relief sought with respect to allocation, the material facts relied upon and legal bases for the allocation position being advanced by that Core Party")

174.    For example, the U.S. Debtors did not disclose prior to May 16, 2013 that their litigation allocation position was that the Canadian Debtors should receive only 11 percent of the total proceeds from the Business Sales and Rockstar Sales.[204]

175.    Even after May 16, 2013, the U.S. Debtors refused to state the amounts (if any) that they contended should be allocated to the Canadian Debtors until the January 24, 2014 report of their valuation expert was delivered.[205]

176.    Various elements of the Monitor and Canadian Debtors' allocation position, however, had been disclosed earlier than the schedule required.  For example, the Monitor and Canadian Debtors' position that NNL was the sole owner of Nortel's IP was widely recognized and disclosed in these proceedings before the parties' allocation positions were required to be shared.[206]  In a meeting in May 2010 attended by Sharon Hamilton and others, Murray McDonald on behalf of the Monitor said to Mr. Ray that the Monitor could take the position that NNL owned all of Nortel's IP and should therefore get all the proceeds from its sale.[207]

_____

[204] John Ray Trial Testimony, Day 6, May 21, 2014, p. 1453:10-1454:17

[205] John Ray Deposition, December 13, 2013, p. 106:6-108:2; John Ray Trial Testimony, Day 6, May 21, 2014, p. 1446:24-1448:5; TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) para. 15, p. 17 (Table 2), Exhibits 7, 9

[206] *See* Schedule "C" for excerpts of Monitor's Reports; TR11366 (Motion of the U.S. Debtors for an Order (A) Approving the Interim Funding and Settlement Agreement and (B) Granting Related Relief, June 9, 2009) paras. 14, 16, 31 (*see also* paras. 27, 30) ("NNL is the owner of the vast majority of Nortel's intellectual property assets" and under the IFSA the U.S. Debtors would continue to receive "use of intellectual property owned by NNL that is crucial to the US Debtors' business".); TR31622 (Report of Alan Robert Bloom, Alan Michael Hudson, Stephen John Harris, David Hughes and Christopher John Wilkinson Hill of Ernst & Young LLP, January 14, 2009) s. 3.3; John Doolittle Deposition, December 5, 2013, p. 149:17-150:12, 150:25-151:24, 152:8-16

[207] Murray McDonald Deposition, November 26, 2013, p. 100:2-101:10, 102:15-103:14, 104:19-25, 120:20-123:25, 147:5-148:7; TR00010A (Exh. 10, Reply Affidavit of Sharon Hamilton, April 25, 2014) paras. 42-44

## PART IV – PROPOSED CONCLUSIONS OF LAW

177.    This Part extracts in one place for the convenience of the Courts the conclusions of law the Monitor proposes be reached by the Courts, organized by topic. The same content is also addressed in Parts VI to X, in the context of the Monitor's arguments.

### (a)    Ontario Law of Contractual Interpretation

178.    The interpretation of the MRDA is governed by Ontario law.  Article 14(f) of the MRDA so provides.  Such a choice of law provision is binding under Ontario law, and also under U.S. law.[208]

179.    The basic principles of contractual interpretation were set out by the Ontario Court of Appeal in *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust*.  In that case, the Court of Appeal stated that a contract is to be interpreted:

(a)    as a whole, in a manner that gives meaning to all of its terms and avoids an interpretation that would render one or more of its terms ineffective;

(b)    by determining the intention of the parties in accordance with the language they have used in the written document and based upon the "cardinal presumption" that they have intended what they have said;

(c)    with regard to objective evidence of the factual matrix underlying the negotiation of the contract, but without reference to the subjective intention of the parties; and (to the extent that there is any ambiguity in the contract)

---

[208] *Hilgraeve Corp. v. Symantec Corp.* 265 F.3d 1336, 1340-1341 (Fed. Cir. 2001), cert. denied 535 U.S. 906 (2002); *Vasquez v. Delcan Corp.* (1998), 38 C.C.E.L. (2d) 230 at paras. 30-31 (Ont. S.C., Gen. Div.), citing *Vita Food Products Inc. v. Unus Shipping Co.*, [1939] A.C. 277 (Canada P.C.); *see also* Janel Walker, Canadian Conflicts of Laws, Vol. 2, 6th ed. looseleaf (Markham: LexisNexis, 2005), p. 31-5 to 31-6

(d)     in a fashion that accords with sound commercial principles and good business

sense, and that avoids a commercial absurdity.[209]

180.    The "cardinal presumption" about the primacy of the language of the contract involves

determining the parties' intentions in accordance with the language that they have used.  The

court's goal in interpreting a contract is to determine the parties' intent as expressed by the words

that they have chosen.  As the Supreme Court of Canada said in the seminal *Eli Lilly v.*

*Novopharm* case:

> [T]he contractual intent of the parties is to be determined by reference to
> the words they used in drafting the document . . .[210]

181.    Evidence of subjective intention – i.e., evidence of what a party "understood" the contract

to mean – is wholly inadmissible.  The interpretive inquiry does not seek to determine what the

parties actually intended, nor does it seek to determine what they believed the words of their

contract to mean.  As the author of the leading text on contractual interpretation explained:

> [T]he exercise is not to determine what the parties subjectively intended
> but what a reasonable person would objectively have understood from the
> words of the document read as a whole and from the factual matrix.[211]

182.    The Ontario Court of Appeal in *Dumbrell* held that the interpretive exercise should focus

on the words used, and not on the parties' subjective beliefs:

---

[209] *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205 at para.
24

[210] *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 at para. 54 (S.C.C.); *See also Merck
& Co. Inc. v. Apotex Inc.*, 2010 FC 1265 at para. 47

[211] Geoff Hall, *Canadian Contractual Interpretation Law* (2012) at para. 2.4.1; *see also Ontario
v. Imperial Tobacco Canada Ltd.*, 2012 ONSC 6027 at para. 29

> *Eli Lilly* instructs that the words of the contract drawn between the parties must be the focal point of the interpretative exercise. The inquiry must be into the meaning of the words and not the subjective intentions of the parties.[212]

183.   The prohibition on evidence of subjective intention means that the court simply will not consider evidence of what a party says he or she intended to agree to at the time of contracting, nor will it consider evidence of what a party understands the words of the contract to mean.  As succinctly explained in *Zaccardelli v. Kraus*:

> What [a party] thinks the documents mean is irrelevant and so not admissible. . . . What [a party] understood or intended is not relevant and so not admissible.[213]

184.   Subjective understandings of the meaning of a contract do not become admissible simply because a party tries to characterize those understandings as forming part of the factual matrix. The authorities are clear that the factual matrix does <u>not</u> include subjective intent or understanding.  Thus, throwing about the term "factual matrix" cannot open a "back door" to the introduction of such evidence.  As the Court of Appeal stated in *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*:

> While the scope of the factual matrix is broad, it ***excludes*** evidence of negotiations, except in the most general terms, ***and evidence of a contracting party's subjective intentions.*** [emphasis added][214]

185.   To similar effect are the Court of Appeal's words in *Ventas*:

---

[212] *Dumbrell v. The Regional Group of Companies Inc.*, 2007 ONCA 59 at para. 51; *see also Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 at para. 54

[213] *Zaccardelli v. Kraus*, [2003] A.J. No. 442 at paras. 29-30 (Master); *see also* Geoff Hall, *Canadian Contractual Interpretation Law* (2012) at para. 2.4.3; *see also Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 at para. 54, 58 (S.C.C.); *see also Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205 at para. 24

[214] *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862 at para. 71

- 58 -

> [A] commercial contract is to be interpreted . . . with regard to objective evidence of the factual matrix underlying the negotiation of the contract, **but without reference to the subjective intention of the parties** [emphasis added].[215]

186.    There are other limitations on what type of evidence might form part of the factual matrix.  Only "objective facts that are known to the parties at or before the date of the agreement" can form part of the factual matrix.[216]

187.    Even when factual matrix evidence is proven and admissible, there are clear limits on the use to which it can be put.  As the Court of Appeal explained:

> [W]hile the factual matrix can "be used to clarify the parties' intentions as expressed in a written agreement, it cannot be used to contradict that intention, create an ambiguity which otherwise does not exist in the written document, **or have the effect of making a new agreement".** . . . **Ultimately, the words of the agreement are paramount**. [emphasis added][217]

188.    To similar effect is a statement made in a recent decision of the Supreme Court:

> While the surrounding circumstances will be considered in interpreting the terms of a contract, they must never be allowed to overwhelm the words of that agreement. . . . While the surrounding circumstances are relied upon in the interpretive process, courts cannot use them to deviate from the text such that the court effectively creates a new agreement.[218]

189.    Evidence of the parties' post-contracting conduct by definition is not part of the factual matrix and is generally inadmissible to interpret the contract.  It is only to be considered if the

---

[215] *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205 at para. 24

[216] *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862 at para. 71

[217] *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862 at para. 71

[218] *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 57

- 59 -

court has first determined the agreement to be ambiguous.  A finding of ambiguity is a

precondition to the admissibility of such evidence.  As set out in *Canadian Contractual*

*Interpretation Law*:

> Ambiguity is an absolute prerequisite to the admissibility of evidence of
> subsequent conduct.[219]

190.    Similarly, as stated by the British Columbia Court of Appeal:

> [P]ost-contracting dealings are not admissible in the absence of
> ambiguity.[220]

191.    The courts have made it clear that a contract is not ambiguous merely because it is

difficult to interpret.  As set out in *Geoffrey L. Moore Realty Inc. v. Manitoba Motor League*:

> Difficulty in interpreting a contract is not synonymous with ambiguity.[221]

192.    Rather, a contractual provision is only ambiguous if it is "reasonably susceptible of more

than one meaning".[222]

193.    Given the lack of ambiguity in the MRDA, evidence of subsequent conduct (such as the

conduct of patent infringement proceedings or agreements concerning the UMTS or other sale

transactions) is not admissible to assist in its interpretation and should be disregarded.

---

[219] Geoff R. Hall, *Canadian Contractual Interpretation Law* (2012) at para. 3.2.2; *York Bremner Development Ltd. v. FHR Properties Inc*., [2007] O.J. No. 3484 at paras. 31-32 (S.C.J.)

[220] *Gilchrist v. Western Star Trucks Inc*., 2000 BCCA 70 at para. 23 ; *Keefer Laundry Ltd. v. Pellerin Milnor Corp*., 2009 BCCA 273 at para. 66; *Dinney v. Great-West Life Assurance Co*., 2009 MBCA 29 at para. 59, leave to appeal to SCC refused [2009] S.C.C.A. 257

[221] *Geoffrey L. Moore Realty Inc. v. Manitoba Motor League*, 2003 MBCA 71 at para. 25; *Paddon Hughes Development Co. v. Pancontinental Oil Ltd*., 1998 ABCA 333 at para. 29

[222] *Geoffrey L. Moore Realty Inc. v. Manitoba Motor League*, 2003 MBCA 71 at para. 25

194.     The principle of contractual interpretation that the court will avoid an interpretation of a contract that involves a commercial absurdity will only be applied where the interpretation would create a true absurdity (as opposed to a contract that in some situations works advantageously to one party and disadvantageously to the other party).  As the Supreme Court has said:

> [I]t is not the function of the court to rewrite a contract for the parties. Nor is it their role to relieve one of the parties against the consequences of an improvident contract.[223]

195.     The primacy of the language of an agreement is all the stronger when the agreement contains an "entire agreement" clause.  The law prevents parties to an agreement from using parol evidence to add to, vary or contradict the terms of a written agreement, or from seeking to prove a collateral understanding, agreement or obligation that is inconsistent or at variance with the written contract.  Thus, evidence that the real terms of the agreement are different than those recorded in the written contract, or that there are collateral rights and obligations which differ from those established by the written contract, is inadmissible and arguments that seek to rely upon such evidence must be rejected.  They are precluded by the entire agreement clause, which makes the agreement a complete code.[224]

196.     The Canadian Debtors submit that the following conclusions flow from the application of the aforementioned principles of contract interpretation:

    (a)     NNL owned the IP;

---

[223] *Pacific National Investments Ltd. v. Victoria (City)*, 2004 SCC 75 at para. 31; *Jedfro Investments (U.S.A.) Ltd. v. Jacyk*, 2007 SCC 55 at para. 34

[224] *Bauer v. Bank of Montreal*, [1980] 2 S.C.R. 102 at paras. 18-19 (Westlaw); *Hawrish v. Bank of Montreal*, [1969] S.C.R. 515 at paras. 17-18 (Westlaw)

(b)      the sole source of the U.S. and EMEA Debtors' rights under the Nortel IP is the MRDA itself.  They have only those rights that were granted to them pursuant to the MRDA;

(c)      the U.S. and EMEA Debtors' interests in the IP were restricted to license rights granted to them by NNL pursuant to the terms of the MRDA; and

(d)      those license rights were not unlimited, as they did not cover <u>all</u> rights in the IP in question, but rather covered only a subset (albeit a substantial subset) of the IP rights, on certain terms, all of which have valuation implications.

**(b)      The MRDA confirms NNL's Legal Title to the IP**

197.     "Title" and "ownership" are legally equivalent concepts.  *Black's Law Dictionary* (10th edition) defines "title" as:

> The union of all elements (as ownership, possession, and custody) constituting the legal right to control and dispose of property.[225]

198.     Similarly, it defines "own" as:

> To rightfully have or possess as property; to have legal title to.[226]

199.     Under Ontario law, the right to grant a license is a right enjoyed by the owner of the IP:

> It is a consent ***by the owner of a right*** that another person should commit an act which, but for that license, would be an infringement of the right of the person who gives the license.[227]

---

[225] *Black's Law Dictionary*, 10th ed. (Thomson West, 2014) p. 1712

[226] *Black's Law Dictionary*, 10th ed. (Thomson West, 2014) p. 1280

[227] *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 at para. 49 (S.C.C.), quoting Harold G. Fox, *The Canadian Law and Practice Relating to Letters Patent for Inventions*, 4th ed. (1969)

- 62 -

200.    Reading the terms of the MRDA in accordance with the rules of contractual interpretation, it is clear that legal title meant ownership.

**(c)    The Consequences of NNL's Ownership**

201.    Ownership embraces a full panoply of rights, including the right to possess, to use, to manage, to exclude others from use, as well as the right to the operating profit of the thing, the right to the capital of the thing, and the right to transfer the thing to others.[228]

202.    It was ownership of the patents and patent applications that was transferred to the purchasers in the Rockstar Transaction, who thereby obtained the "union of all elements" constituting "the legal right to control and dispose of" the IP (see *Black's Law Dictionary*). Ownership of patents was also transferred in the Business Sales.

203.    The law is clear that, in granting a license, the owner may choose to permit the licensee to enjoy only some of the customary rights of ownership, as opposed to all of those privileges. As the Supreme Court of Canada explained in *Eli Lilly v. Novopharm*:

> The licensee's rights, however, are not necessarily equivalent to those of the patentee; rather, they are limited to, and qualified by, the express terms of the license.[229]

204.    To the extent that a licensee's rights are not as extensive as the owner's rights, the residual rights (i.e. those not granted to the licensee) continue to reside with the patent's owner.

---

[228] With respect to the nature of ownership, *see* Bruce Ziff, *Principles of Property Law*, 5th ed. (Toronto: Thomson Reuters Canada, 2010) at 2-3, 6; *see also* the definition of "own", "ownership" and "title", *Black's Law Dictionary*, 10th ed. (Thomson West, 2014) p. 1280, 1712

[229] *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 at para. 49 (S.C.C.)

- 63 -

**(d)    NNL Did Not Merely Hold "Bare Legal Title" or Legal Title Merely for "Administrative Convenience"**

205.    "Bare legal title" is a concept taken from trust law, describing a trustee's interest in property that he holds on trust for others.[230]

206.    There must be evidence of an intention to create a before a trust will be found to exist.[231]

207.    If there is no fiduciary relationship, there cannot be a trust.[232]  As noted below, the MRDA disclaims any fiduciary relationship.

**(e)    NNI and NNUK Were Granted Licenses Restricted to "Products"**

208.    A sublicense cannot extend beyond the scope of the license.[233]

209.    A licensee's rights are "limited to, and qualified by, the express terms of the license".[234]

210.    The jurisprudence accepts that some redundancy or repetition in a contract is normal and expected.  For example, in *Long v Delta Catalytic Industrial Services Inc.*, the court stated:

---

[230] *See e.g., Re: Axelrod*, [1994] O.J. No. 2277 at para. 16 (C.A.), quoting with approval from Ground J. in the court below, referring to "trust property … that is to say, property in which the bankrupt holds a bare legal title but has no beneficial interest"; *see also* the definition of "trust ownership" also termed "bare ownership", *Black's Law Dictionary*, 10th ed. (Thomson West, 2014) p. 1280-1281

[231] *See* Donovan Waters, Mark Gillen and Lionel Smith, eds., *Waters' Law of Trusts in Canada*, 4th ed. (Toronto: Thomson Reuters Canada, 2012) at 140

[232] With respect to the fact that the trust creates a fiduciary relationship between the trustee and the beneficiary, *see* Donovan Waters, Mark Gillen and Lionel Smith, eds., *Waters' Law of Trusts in Canada*, 4th ed. (Toronto: Thomson Reuters Canada, 2012) at 42; *and see* the reasons of Wilson J. in *Lac Minerals Ltd. v. International Corona Resources Ltd.*, [1989] S.C.J. No. 83 at para. 117; *and see Alberta v. Elder Advocates of Alberta*, 2011 SCC 24 at para. 33

[233] *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 at paras. 48-51 (S.C.C.)

[234] *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 at para. 49 (S.C.C.)

> Some might argue that this interpretation makes the provision redundant…That may well be the case, but it won't be the first time that a repetitive provision has been inserted into an agreement.[235]

211.    Similarly, as Lord Hoffman stated in *Beaufort Developments (NI) Ltd. v. Gilbert-Ash NI Ltd.*:

> I think, my Lords, that the argument from redundancy is seldom an entirely secure one. The fact is that even in legal documents (or, some might say, especially in legal documents) people often use superfluous words. Sometimes the draftsmanship is clumsy; more often the cause is a lawyer's desire to be certain that every conceivable point has been covered. One has only to read the covenants in a traditional lease to realise that draftsmen lack inhibition about using too many words.[236]

212.    It is submitted that the license rights (including the right to sublicense) granted by Article 5(a) of the MRDA are limited to:

    (a)    the right to make, use and sell Products that use or embody Nortel's IP; and

    (b)    the right to use patents, industrial designs, copyrights and know-how as necessary in connection with the making, using and selling of Products.

**(f)    The Extrinsic Evidence Relied upon by the U.S. Debtors Is Not Admissible Under the Rubric of Factual Matrix**

213.    Evidence of the factual matrix does <u>not</u> include subjective intent or understanding.  As the Court of Appeal stated in *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*:

---

[235] *Long v Delta Catalytic Industrial Services Inc.*, [1998] 6 W.W.R. 792 at para. 19

[236] *Beaufort Developments (NI) Ltd. v. Gilbert-Ash NI Ltd.*, [1999] A.C. 266 at 274

> While the scope of the factual matrix is broad, it excludes . . . evidence of a contracting party's subjective intentions.[237]

214.　There is no basis in law for stating that evidence of subjective intention is admissible if it is consistent with the words of the written agreement. Even if the evidence were sufficient to establish that certain individuals understood the scope of the licenses to be unrestricted and were testifying about that understanding in the right context, the evidence would still not form part of the "factual matrix" and would still be entirely inadmissible.

215.　Patent infringement proceedings that predated the MRDA do not fall within the scope of factual matrix, because they do not form part of "background of the contract";[238] they are not part of the "genesis of the agreement, its purpose, [or] the commercial context in which the agreement was made".[239] Patent infringement proceedings that post-dated the MRDA cannot form part of the factual matrix for an additional reason, which is that the factual matrix only includes those facts that were known at the date that the contract was entered into.[240]

**(g)　Calling the License Rights "Beneficial Ownership" Does Not Expand Their Scope**

216.　The words in a recital may not expand upon prescribed license rights.[241]

217.　In *Eli Lilly* the Court quoted a description of an exclusive license as follows:

---

[237] *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862 at para. 71; *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205 at para. 24

[238] *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862 at para. 70

[239] *Dumbrell v. The Regional Group of Companies Inc.*, 2007 ONCA 59 at para. 55

[240] *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862 at para. 71

[241] *Re Elliott Estate*, [1962] O.J. No. 164 at para. 11 (C.A.); *PUC Distribution Inc. v. Brascan Energy Marketing Inc.*, 2008 ONCA 176 at para. 31. With respect to the paramountcy of the operative provisions of a contract, *see Merck & Co. Inc. v. Apotex Inc.*, 2010 FC 1265 at paras. 53-54; *and see 1124980 Ontario Inc. v. Liberty Mutual Insurance Co.*, [2003] O.J. No. 1468 at para. 57 (S.C.J., Commercial List)

- 66 -

> A license is the transfer of a beneficial interest to a limited extent, whereby the transferee acquires an equitable right in the patent. A licence prevents that from being unlawful which, but for the license, would be unlawful; it is a consent by an owner of a right that another person should commit an act which, but for that license, would be an infringement of the right of the person who gives the license. A license gives no more than the right to do the thing actually licensed to be done.[242]

218.    However, the Court was clear that such an exclusive license was not equivalent to the patentee's ownership. The use of the word "equitable" or "beneficial" did not change this key point:

> The licensee's rights, however, are not necessarily equivalent to those of the patentee; rather, they are limited to, and qualified by, the express terms of the license.[243]

219.    Moreover, cases of high authority, both before and after the *Eli Lilly* decision, have noted that an exclusive license is a contractual, and not a property, right.[244]

220.    The clear words of the MRDA establish that the IP was owned by NNL, and that the Licensed Participants each had (as their name would suggest) exclusive license rights which, in the aggregate, permitted them to use the IP to make, use or sell "Products", an important right, but not one which is as broad as the full panoply of ownership rights.

---

[242] *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 at para. 49

[243] *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 at para. 49

[244] *Heap v Hartley*, (1889) 42 Ch.D. 461 at 470, adopted and followed in Canada in, for example, *Electric Chain Company of Canada Limited v. Art Metal Works Inc.*, [1933] S.C.R. 581 at paras. 25-29, *Armstrong Cork Canada Limited v. Domco Industries Limited*, [1982] 1 S.C.R. 907 at paras. 14-15, 28, *Merck & Co. Inc. v. Apotex Inc.*, 2010 FC 1265 at para. 49 , and *Kraft Canada Inc. v. Euro Excellence Inc.*, 2007 SCC 37 at para. 27

- 67 -

**(h)    The EMEA Debtors' Theory of "Joint Ownership" Is Without Foundation**

221.    There is no legal basis for an assertion that the parties "deserve" a joint ownership right, particularly in light of the express provisions of the MRDA that directly contradict any notion of joint ownership.

**(i)    If Admissible, the Expert Evidence on the Interpretation of the MRDA Supports the Monitor's Position**

222.    Expert evidence is admissible only if relevant and necessary to assist the trier of fact.  To be necessary, an opinion must provide information that is likely to be outside a judge's experience and knowledge.[245]  The criteria of relevance and necessity have been applied strictly to exclude expert evidence as to an ultimate issue.[246]

223.    Questions of domestic law are properly the subject of submissions by counsel and determination by the judge; opinion evidence on them is not necessary and will not be received.[247]

224.    As has been noted in the American jurisprudence, foreign law experts "add . . . an adversary's spin, which the court then must discount."[248]

_____

[245] *R. v. Mohan*, [1994] SCR 9 at 20; *Doubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993) (to be admissible, expert testimony must assist the trier of fact in understanding or determining a fact in issue); *U.S. v. Bennett*, 161 F.3d 171, 182 (3rd Cir. 1998) (noting that Rule 702 of the Federal Rules of Evidence require expert opinion evidence to be helpful to the trier of fact, and opinions "which would merely tell the jury what result to reach" are not helpful)

[246] *R. v. Mohan*, [1994] SCR 9 at 24; *Berckeley Inv. Group, Ltd. V. Colkitt*, 455 F.3d 195, 217 (3rd Cir. 2006) (finding that "an expert witness is prohibited from rendering a legal opinion" because "it would usurp the District Court's pivotal role in explaining the law to the jury")

[247] *Sopinka, Lederman & Bryant: The Law of Evidence in Canada,* 3d ed. by Alan W. Bryant, Sidney N. Lederman and Michelle K. Fuerst (Markham, Ontario: LexisNexis Canada, 2009), at p. 832, para 12.155

225.    U.S. Courts have recognized that legal opinion evidence offered under the guise of "custom and practice" will not be admitted.[249]

226.    Where an expert's analysis of foreign law does not set out the relevant foreign law itself, courts in the U.S. will not rely on that analysis.[250]

227.    Where a contract contains little jargon or technical matters, and is composed almost entirely of ordinary English, expert evidence of how to interpret its clauses is unnecessary:[251]

> What right is assigned or licensed is a matter of negotiation, and the ordinary principles of contract interpretation apply to the result.[252]

228.    The reports of three legal experts were exchanged by the parties and filed with the Courts.   None of these reports should be given any weight because they are legal opinion relating to Ontario law, which is inadmissible in the Canadian proceedings and unnecessary in the U.S. proceedings.

**(j)    The Parties' Agreements Explicitly Reserved Their Rights As To Their Allocation Positions**

229.    A court may not modify a contract for the sake of fairness, or because a party to the agreement has decided with hindsight that should have made a different deal.[253]

---

[248] *Bodum USA, Inc. v. La Cafetiere, Inc.*, 621 F.3d 624, 629 (7th Cir. 2010) (Posner, J. concurring)

[249] *Safeway, Inc. v. Sugarload Partnership, LLC*, 423 F. Supp. 2d 531, 538-39 (D. Md. 2006); *United Rentals, Inc. v. RAM Holdings, Inc.,* 2007 Del. Ch. LEXIS 179, p. 2-3 (Del. Ch. December 13, 2007)

[250] *Pfizer Inc. v. Elan Pharm. Research Corp.*, 812 F. Supp. 1352, 1360-61 (D. Del. 1993); *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 209 (2d Cir. 2003)

[251] *Canadian National Railway Company v. Volker Stevin Contracting Ltd.*, 1991 CarswellAlta 8 at pg. 4 (C.A.) (WL)

[252] David Vaver, *Intellectual Property Law* (Toronto: Irwin Law, 2011) at 559

- 69 -

### (k)     Statements Made During Mediation And Settlement Negotiations Are Inadmissible In These Proceedings

230.    Under Rule 408(a) of the U.S. Federal Rules of Evidence ("FRE"), communications made during settlement discussions are inadmissible "either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction".[254]

231.    Under Canadian law, all communications made in the course of settlement negotiations are inadmissible and protected by settlement privilege.  The Supreme Court of Canada recently reiterated the need for settlement privilege, noting "[settlement] privilege wraps a protective veil around the efforts parties make to settle their disputes by ensuring that communications made in the course of these negotiations are inadmissible."[255]

232.    By adducing through Mr. Ray information about the Monitor's settlement position and suggesting that it was different at mediation than its position at trial, the U.S. Debtors breached settlement privilege, the FRE and the order of Justice Morawetz.  They should not be permitted to rely on information impermissibly adduced and their argument based on that information should be rejected.

---

[253] *See Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (N.Y. 2002); *Lease Corp. of Am., Inc. v. Resnick*, 288 A.D.2d 533, 535, 732 N.Y.S.2d 266, 269 (N.Y. App. Div. 3rd Dep't 2001)

[254] Fed. R. Evid. 408

[255] *Sable Offshore Energy Inc. v. Ameron International Corp.*, 2013 SCC 37 at para. 2

**(l)      The Monitor And Canadian Debtors Are Not Estopped From Asserting Their Allocation Position**

     *(i)      Equitable Estoppel*

233.    The doctrine of equitable estoppel, or estoppel *in pais* "requires that one may not repudiate an act where that action works an injustice upon another who has relied thereon."[256]

234.    Proving equitable estoppel requires establishing that "(1) a representation of fact was made to them, (2) upon which they had a right to rely, and (3) the denial of the represented fact by the party making the representation would result in injury to the relying party."[257]

235.    The Monitor and Canadian Debtors are not equitably estopped from asserting their allocation position in these proceedings.

     *(ii)      Judicial Estoppel*

236.    The doctrine of judicial estoppel "bars a party that has previously asserted a legal position from asserting an inconsistent or contrary legal position in a later proceeding."[258]

237.    In order to apply judicial estoppel in this case, the U.S. and EMEA Debtors would have to demonstrate that: (1) the Monitor and Canadian Debtors are asserting an allocation position that is irreconcilably inconsistent with an allocation position they asserted in a prior proceeding; (2) the Monitor and Canadian Debtors changed their allocation position in bad faith, *i.e.*, in a culpable manner threatening to the Courts' authority or integrity; and (3) disregarding the

---

[256] *Hodge v. Bluebeard's Castle, Inc.*, 392 Fed. Appx. 965, n. 6 (3d Cir. 2010), *see also*, *In re Gravure paper & Board Corp.*, 234 F.2d 928, 931-32 (3d Cir. 1956)

[257] *In re RFE Industries, Inc.*, 283 F.3d 159, 164 (3d Cir. 2002) [internal citation omitted] [258] *Yetter v. Wise Power Systems, Inc.*, 929 F.Supp.2d 329, 331 (D. Del. 2013), citing *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419 (3d Cir. 1988).

Monitor and Canadian Debtors' allocation position is a remedy tailored to address the "affront to the court's authority or integrity" that results from the change in position.[259]

238.    Judicial estoppel is "not intended to eliminate all inconsistencies no matter how slight or inadvertent."[260]    To the contrary, "[j]udicial estoppel is only appropriate when the inconsistent positions are tantamount to a knowing misrepresentation to or even fraud on the court."[261]

239.    The Monitor and Canadian Debtors are not judicially estopped from asserting their allocation position.

## PART V – ALLOCATION SHOULD BE BASED ON THE RIGHTS OF THE PARTIES

240.    The question as to how to allocate the $7.3 billion in sale proceeds has at its core a legal question: What is the scope of the legal rights of the parties in the assets transferred or surrendered in connection with the sales?  This is reflected in the Monitor's formulation of the allocation question which is to allocate the proceeds based upon the value of the ***property rights*** transferred or surrendered by each Debtor Estate in connection with the various sales.  The determination of the nature and scope of those property rights is a legal determination.

241.    The U.S. Debtors are in apparent agreement with this basic approach.  For example, the Allocation Position of the U.S. Debtors and the Official Committee of Unsecured Creditors states as follows:

---

[259] *Montrose Medical Group Participating Savings Plan v. Bulger*, 243 F.3d 773, 777-78 (3d Cir. 2001).

[260] *In re Kane*, 628 F.3d 631, 638 (3d Cir. 2010).

[261] *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314, 324 (3d Cir. 2003) [internal quotation and citation omitted].

> Each Selling Debtor is entitled to receive the fair market value of the assets and rights it sold or relinquished in connection with the sale of Nortel's businesses and residual patent portfolio. The Courts must determine the value of the assets and rights transferred by each of the separate and legally distinct Selling Debtors to allocate over $7 billion in sale proceeds now sitting in escrow.[262]

The nature and scope of the rights and assets of each "legally distinct Selling Debtor" must, to be meaningful, be a legal determination.

242.    Similarly, the EMEA Debtors appear, at least from their pleading and from certain statements made by their expert witnesses, to agree with this basic approach. The Allocation Position of the EMEA Debtors states:

> [T]he Business Sales require an asset based allocation methodology – in which (a) the assets that comprise the Business Sales are ascertained . . . (b) those assets are valued and reconciled to the purchase price achieved in each Business Sale; (c) the entities which own (or are otherwise entitled to) these assets are identified; and (d) sale proceeds in respect of these assets are allocated to the entities which own (or are otherwise entitled to) the assets.[263]

The concept of ownership or being "otherwise entitled" to assets, to be meaningful, should refer to the legal concepts of ownership and entitlement.

243.    What follows from this is that the legal extent of the parties' rights and interests in assets must be correctly characterized for the valuation of them, and any resulting allocation, to be sound. The U.S. Debtors' allocation position is based upon a fundamental mischaracterization of those rights and of the MRDA. And, at the heart of the position of the EMEA Debtors is an

---

[262] TR50223 (Allocation Position of U.S. Debtors and Official Committee of Unsecured Creditors, May 16, 2013) p. 1

[263] Allocation Position of the Joint Administrators Regarding the Entitlement of the EMEA Debtors to Proceeds of the Sales of the Business and Residual Patent Assets, May 16, 2013, para. 45

alleged "joint ownership" of the Nortel IP – said to arise independently of the rights granted by the MRDA – for which there is no basis in law.  These legally erroneous theories undermine the allocation positions those parties put forward.

244.    The Monitor's allocation position is based on, and gives effect to, the legal rights of the parties and, in particular, the legal rights of the parties as reflected in the MRDA to Nortel's IP, which was the most valuable assets sold by Nortel.  The MRDA and the proper interpretation of it thus lie at the heart of this litigation.  Accordingly, a careful consideration of the contract and its terms in accordance with its governing law is required.

## PART VI – THE MRDA AND THE PARTIES' RIGHTS TO NORTEL IP

### (a)    Ontario Law of Contractual Interpretation

245.    The interpretation of the MRDA is governed by Ontario law.  Article 14(f) of the MRDA so provides.  Such a choice of law provision is binding under Ontario law, and also under U.S. law.[264]

246.    The basic principles of contractual interpretation were set out by the Ontario Court of Appeal in *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust*.  In that case, the Court of Appeal stated that a contract is to be interpreted:

> (a)    as a whole, in a manner that gives meaning to all of its terms and avoids an
>
>         interpretation that would render one or more of its terms ineffective;

---

[264] *Hilgraeve Corp. v. Symantec Corp.* 265 F.3d 1336, 1340-1341 (Fed. Cir. 2001), cert. denied 535 U.S. 906 (2002); *Vasquez v. Delcan Corp.* (1998), 38 C.C.E.L. (2d) 230 at paras. 30-31 (Ont. S.C., Gen. Div.), citing *Vita Food Products Inc. v. Unus Shipping Co.*, [1939] A.C. 277 (Canada P.C.); *see also* Janet Walker, *Canadian Conflicts of Laws,* Vol. 2, 6th ed. looseleaf (Markham: LexisNexis, 2005), p. 31-5 to 31-6**.**

- 74 -

(b)     by determining the intention of the parties in accordance with the language they

have used in the written document and based upon the "cardinal presumption"

that they have intended what they have said;

(c)     with regard to objective evidence of the factual matrix underlying the negotiation

of the contract, but without reference to the subjective intention of the parties; and

(to the extent that there is any ambiguity in the contract)

(d)     in a fashion that accords with sound commercial principles and good business

sense, and that avoids a commercial absurdity.[265]

247.    It is necessary to emphasize certain aspects of the foregoing principles, given attempts by

the U.S. and EMEA Debtors to introduce certain types of evidence in an attempt to contradict,

modify or vary the terms of the MRDA.

248.    First, the "cardinal presumption" about the primacy of the language of the contract – i.e.

determining the parties' intentions in accordance with the language that they have used – is

fundamental.  The court's goal in interpreting a contract is to determine the parties' intent as

expressed by the words that they have chosen.  As the Supreme Court of Canada said in the

seminal *Eli Lilly v. Novopharm* case:

> [T]he contractual intent of the parties is to be determined by reference to
> the words they used in drafting the document . . .[266]

249.    Second, evidence of subjective intention – i.e., evidence of what a party "understood" the

contract to mean – is wholly inadmissible.  The interpretive inquiry does not seek to determine

---

[265] *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205 at para. 24

[266] *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 at para. 54 (S.C.C.); *See also Merck & Co. Inc. v. Apotex Inc.*, 2010 FC 1265 at para. 47**.**

what the parties actually intended, nor does it seek to determine what they believed the words of

their contract to mean.  As the author of the leading text on contractual interpretation explained:

> [T]he exercise is not to determine what the parties subjectively intended
> but what a reasonable person would objectively have understood from the
> words of the document read as a whole and from the factual matrix.[267]

250.    Similarly, the Ontario Court of Appeal in *Dumbrell* held that the interpretive exercise

should focus on the words used, and not on the parties' subjective beliefs:

> *Eli Lilly* instructs that the words of the contract drawn between the parties
> must be the focal point of the interpretative exercise. The inquiry must be
> into the meaning of the words and not the subjective intentions of the
> parties.[268]

251.    The prohibition on evidence of subjective intention means that the court simply will not

consider evidence of what a party says he or she intended to agree to at the time of contracting,

nor will it consider evidence of what a party understands the words of the contract to mean.  As

succinctly explained in *Zaccardelli v. Kraus*:

> What [a party] thinks the documents mean is irrelevant and so not
> admissible. . . . What [a party] understood or intended is not relevant and
> so not admissible.[269]

252.    Third, although the factual matrix may be considered, subjective understandings of the

meaning of a contract do not become admissible simply because a party tries to characterize

---

[267] Geoff Hall, *Canadian Contractual Interpretation Law*, 2d ed. (2012) at para. 2.4.1; *see also
Ontario v. Imperial Tobacco Canada Ltd.*, 2012 ONSC 6027 at para. 29

[268] *Dumbrell v. The Regional Group of Companies Inc.*, 2007 ONCA 59 at para. 51; *see also Eli
Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 at para. 54

[269] *Zaccardelli v. Kraus,* [2003] A.J. No. 442 at paras. 29-30 (Master); *see also* Geoff Hall,
*Canadian Contractual Interpretation Law*, 2d ed. (2012) at para. 2.4.3; *see also Eli Lilly & Co.
v. Novopharm Ltd.*, [1998] S.C.J. No. 59 at para. 54, 58 (S.C.C.); *see also Ventas, Inc. v. Sunrise
Senior Living Real Estate Investment Trust*, 2007 ONCA 205 at para. 24

those understandings as forming part of the factual matrix.  The authorities are clear that the

factual matrix does <u>not</u> include subjective intent or understanding.  Thus, throwing about the

term "factual matrix" cannot open a "back door" to the introduction of such evidence.  As the

Court of Appeal stated in *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*:

> While the scope of the factual matrix is broad, it **excludes** evidence of
> negotiations, except in the most general terms, **and evidence of a
> contracting party's subjective intentions.** [emphasis added][270]

253.    To similar effect are the Court of Appeal's words in *Ventas*:

> [A] commercial contract is to be interpreted . . . with regard to objective
> evidence of the factual matrix underlying the negotiation of the contract,
> **but without reference to the subjective intention of the parties** [emphasis
> added].[271]

254.    The U.S. and EMEA Debtors' repeated attempts to lead evidence from witnesses with

respect to what those witnesses intended, or understood (and, as hearsay, what other persons

allegedly understood) the provisions of the MRDA to mean, or understood or intended the legal

rights of the parties on matters covered by the MRDA to be, should not be considered.  As the

jurisprudence clearly establishes, none of that evidence is relevant and none is admissible.

255.    Fourth, in addition to excluding evidence of subjective intention and understanding, there

are other limitations on what type of evidence might form part of the factual matrix.  Only

"objective facts that are known to the parties at or before the date of the agreement" can form

part of the factual matrix.[272]  The U.S. and EMEA Debtors' attempts to lead evidence to inform

---

[270] *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862 at para. 71

[271] *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205 at para.
24

[272] *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862 at para. 71

the Courts' interpretation frequently violated this principle and should be rejected.  For example, the U. S. and EMEA Debtors seek to rely on various statements made to the tax authorities in connection with certain transfer pricing documentation or APA applications after the MRDA was signed,[273] as well as certain other financial reporting, including a goodwill analysis of NNSA and 2010 (post-petition) financial statements.[274]

256.    Even when factual matrix evidence is proven and admissible, there are clear limits on the use to which it can be put.  As the Court of Appeal explained:

> [W]hile the factual matrix can "be used to clarify the parties' intentions as expressed in a written agreement, it cannot be used to contradict that intention, create an ambiguity which otherwise does not exist in the written document, *or have the effect of making a new agreement".* . . . *Ultimately, the words of the agreement are paramount.* [emphasis added][275]

257.    To similar effect is a statement made in a recent decision of the Supreme Court:

> While the surrounding circumstances will be considered in interpreting the terms of a contract, they must never be allowed to overwhelm the words of that agreement. . . . While the surrounding circumstances are relied upon in the interpretive process, courts cannot use them to deviate from the text such that the court effectively creates a new agreement.[276]

258.    As is apparent, the U.S. and EMEA Debtors attempt to use evidence of what they term the "factual matrix" (leaving aside whether it is so) to effectively make a new agreement

---

[273] *See* Pre-Trial Brief of the EMEA Debtors, May 2, 2014, para. 90; Pre-Trial Brief of the U.S. Interests, May 2, 2014, p. 45

[274] *See* Pre-Trial Brief of the EMEA Debtors, May 2, 2014, paras. 89, 108

[275] *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862 at para. 71

[276] *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 57

contradicting the MRDA.  This is discussed more fully below.  As the jurisprudence makes clear, evidence cannot be used this way.

259.    Fifth, evidence of the parties' post-contracting conduct, which by definition is not part of the factual matrix, is generally inadmissible to interpret the contract.  It is only to be considered if the court has first determined the agreement to be ambiguous.  In other words, a finding of ambiguity is a precondition to the admissibility of such evidence.  As set out in *Canadian Contractual Interpretation Law*:

> Ambiguity is an absolute prerequisite to the admissibility of evidence of subsequent conduct.[277]

260.    Similarly, as stated by the British Columbia Court of Appeal:

> [P]ost-contracting dealings are not admissible in the absence of ambiguity.[278]

261.    The courts have made it clear that a contract is not ambiguous merely because it is difficult to interpret.  As set out in *Geoffrey L. Moore Realty Inc. v. Manitoba Motor League*:

> Difficulty in interpreting a contract is not synonymous with ambiguity.[279]

262.    Rather, a contractual provision is only ambiguous if it is "reasonably susceptible of more than one meaning".[280]

---

[277] Geoff Hall, *Canadian Contractual Interpretation Law*, 2d ed. (2012) at para. 3.2.2; *York Bremner Development Ltd. v. FHR Properties Inc.*, [2007] O.J. No. 3484 at paras. 31-32 (S.C.J.)

[278] *Gilchrist v. Western Star Trucks Inc.*, 2000 BCCA 70 at para. 23 ; *Keefer Laundry Ltd. v. Pellerin Milnor Corp.*, 2009 BCCA 273 at para. 66; *Dinney v. Great-West Life Assurance Co.*, 2009 MBCA 29 at para. 59, leave to appeal to SCC refused [2009] S.C.C.A. 257

[279] *Geoffrey L. Moore Realty Inc. v. Manitoba Motor League*, 2003 MBCA 71 at para. 25; *Paddon Hughes Development Co. v. Pancontinental Oil Ltd.*, 1998 ABCA 333 at para. 29

263.    Given the lack of ambiguity in the MRDA (and given that no party asserts it to be ambiguous), evidence of subsequent conduct is not admissible to assist in its interpretation. Thus, that the U.S. and EMEA Debtors point to certain post-contract patent infringement proceedings,[281] or that the EMEA Debtors further point to certain pre-petition transactions (the UMTS sale to Alcatel and Project Swift)[282] is of no assistance and should be disregarded.

264.    Sixth, the principle of contractual interpretation that the court will avoid an interpretation of a contract that involves a commercial absurdity, as described in *Ventas*, is limited in its scope. It will only be applied where the interpretation would create a true absurdity (as opposed to a contract that in some situations works advantageously to one party and disadvantageously to the other party).  As the Supreme Court has said:

> [I]t is not the function of the court to rewrite a contract for the parties.
> Nor is it their role to relieve one of the parties against the consequences of
> an improvident contract.[283]

265.    Thus, it does not assist the U.S. and EMEA Debtors to argue that the provisions of the MRDA result in an allocation that is more advantageous to NNL than to them.  Such a result does not constitute a commercial absurdity; it does not offend any principle of commercial reasonableness.  And no rule of contractual interpretation will apply so as to alter the unambiguous agreement that the parties made.

---

[280] *Geoffrey L. Moore Realty Inc. v. Manitoba Motor League*, 2003 MBCA 71 at para. 25

[281] *See* Pre-Trial Brief of the U.S. Interests, May 2, 2014, p. 45-46; Pre-Trial Brief of the EMEA Debtors, May 2, 2014, para. 107

[282] *See* Pre-Trial Brief of the EMEA Debtors, May 2, 2014, p. 49-55

[283] *Pacific National Investments Ltd. v. Victoria (City)*, 2004 SCC 75 at para. 31; *Jedfro Investments (U.S.A.) Ltd. v. Jacyk*, 2007 SCC 55 at para. 34

266.     Seventh, the primacy of the language of an agreement is all the stronger when the

agreement contains an "entire agreement" clause.  The law prevents parties to an agreement from

using parol evidence to add to, vary or contradict the terms of a written agreement, or from

seeking to prove a collateral understanding, agreement or obligation that is inconsistent or at

variance with the written contract.  Thus, evidence that the real terms of the agreement are

different than those recorded in the written contract, or that there are collateral rights and

obligations which differ from those established by the written contract, is inadmissible and

arguments that seek to rely upon such evidence must be rejected.  They are precluded by the

entire agreement clause, which makes the agreement a complete code.[284]

**(b)     The Parties' Positions as to the Rights Held by Each in Nortel's IP**

267.     In this litigation, the essential differences in allocation positions advanced by the parties

flow from the different manner in which each characterizes the terms of the MRDA, the interests

held by the parties in Nortel's IP, and the applicability of terms of the MRDA to the value

ascribed to various assets.

268.     The Canadian Debtors submit that NNL owned the IP, that the MRDA so provided, and

that the U.S. and EMEA Debtors' interests therein were restricted to license rights granted to

them by NNL pursuant to the terms of the MRDA.  The Canadian Debtors further submit that the

license rights were not unlimited, as they did not cover all rights in the IP in question, but rather

covered only a subset (albeit a substantial subset) of the IP rights, on certain terms, all of which

have valuation implications.  Moreover, the Canadian Debtors assert that, when valuing MRDA

license rights, one must consider the discounted cash flows that could be earned by exploiting the

---

[284] *Bauer v. Bank of Montreal*, [1980] 2 S.C.R. 102 at paras. 18-19 (Westlaw); *Hawrish v. Bank of Montreal*, [1969] S.C.R. 515 at paras. 17-18 (Westlaw)

rights.  The determination of the discounted cash flows, in turn, requires a consideration of the costs, including the RPSM obligations to share profits and losses, that would be associated with those cash flows.

269.    By contrast, the U.S. Debtors assert that each of NNI and the EMEA Debtors held all of the rights and all of the value in the IP in their respective exclusive territories as defined in the MRDA.  The U.S. Debtors assert that the license rights that they held were not subject to any field of use or scope restriction or limitation, resulting in an assertion that all of the economic value in the IP in the exclusive territory belonged to the licensee.  Thus, the allocation expert who testified on behalf of the U.S. Debtors, Mr. Jeffrey Kinrich, described his understanding of the rights held by the U.S. Debtors as follows:

> [E]ach IE received an exclusive, royalty-free license in perpetuity to all NN Technology in its own territory, which included the exclusive right to exploit and sub-license the NN Technology in its Exclusive Territory.[285]

270.    And, at trial, Mr. Kinrich confirmed that the allocations for which the U.S. Debtors contend are based upon an assumption that the license granted by the MRDA was not subject to any scope or field of use restriction:

> Q.    And one of the assumptions that you made that you told Mr. Luft about this morning was an assumption about the scope of the license rights; correct?  That the license rights were not limited by any scope restriction; that is correct?
>
> A.    That is right.[286]

---

[285] TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) p. 6; TR00052 (Exh. 52, Rebuttal Report of Jeffrey Kinrich, February 28, 2014, para. 21

[286] Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4291:10-15

271.    Accordingly, Mr. Kinrich assumed that the U.S. and EMEA Debtors held all of the value of the IP in their exclusive territories:

> [A]ll the economic value of Nortel's IP in Exclusive Territories was held by the IE in that territory.[287]

272.    According to the position taken by the U.S. Debtors, NNL's interest in the IP is purely formal, bare or nominal, and has no value.

273.    Moreover, according to the U.S. Debtors' position, when valuing the rights granted to them by the MRDA, none of the other MRDA terms (such as the obligation to share profits and losses pursuant to the RPSM) apply, even when one is considering the cash flows that those rights generated or would have generated.

274.    As for the EMEA Debtors, their position is that each of the parties to the MRDA jointly owned all of the IP in proportion to their financial contributions to research and development, and that all share in the sale proceeds attributable to IP in those same proportions.  The joint ownership is said to arise notwithstanding, or independent of, the MRDA; the measurement of the joint ownership shares is said to be done using some, but not all, terms of the MRDA.

275.    For example, Dr. Richard Cooper, an expert who testified on behalf of EMEA, explained that, in his view, the ownership rights arose not from the MRDA itself, but rather from the fact that the various Licensed Participants spent money on R&D that ultimately created the intellectual property in question:

> Q.    In your view, what is the source of that beneficial ownership interest?  Does it come from the terms of the MRDA?

---

[287] TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) p. 42

A.    It comes from the concept underlying the RPS.  The MRDA simply tries to memorialize that, but it does not come from the MRDA itself.

Q.    And you have testified that the beneficial ownership that is gained is based on the percentage of R&D spending that each of the entity does, obviously, for certain periods and so on.  Is that based on the actual R&D costs that are borne by each entity?

A.    Yes…[288]

276.    Another EMEA expert, James Malackowski, testified as to how he believed that the alleged joint ownership shares should be measured.  As is discussed more fully in Part IX below, Mr. Malackowski (like Dr. Cooper) proceeded on the basis that the parties jointly owned the Nortel IP in proportion to their respective contributions to the creation of the IP, as measured by relative spending on R&D.[289]  Mr. Malackowski testified that this measurement was "consistent with" the terms of the MRDA.[290]  However, the importance that he attaches to such consistency is more apparent than real, as he chose to measure the Participants' contribution not by the method prescribed by the MRDA, but rather by a different method.  Whereas the MRDA prescribes measuring the Participants' R&D spending using a five-year look-back period, Mr. Malackowski chooses a number of different look-back periods, which generally stretch from approximately the early 1990s through 2008.[291]

277.    Therefore, in order to begin resolving the differences between the foregoing allocation positions, it is necessary to analyse the following:

---

[288] Dr. Richard Cooper Trial Testimony, Day 12, June 2, 2014, p. 2829:4-17

[289] TR00033 (Exh. 33, Expert Report of James Malackowski, January 24, 2014) p. 6, 39

[290] James Malackowski Trial Testimony, Day 10, May 29, 2014, p. 2369:14-18; DEM00011 (Demonstrative for James Malackowski Trial Testimony) Slide 34 (p. 34)

[291] TR00033 and TR40870 (Exh. 33, Expert Report of James Malackowski, January 24, 2014), p. 48, Exhibit B.1.2.1 (which set out the look-back periods that Mr. Malackowski applied to the proceeds from the various Line of Business Sales), p. 49 (which sets out a number of different possible look-back periods for the Residual IP Sale proceeds)

(a)     the nature of NNL's interest in the IP;

(b)     the nature of NNI's and the EMEA Debtors' interests in the IP;

(c)     whether a theory of ownership that is independent of the MRDA, based on "contribution" (i.e. R&D spending), is legally permissible; and

(d)     whether other terms of the MRDA can be ignored or applied only selectively.

**(c)     The MRDA Is the Sole Source of the Licensed Participants' Rights Under Nortel's IP**

278.    The sole source of the U.S. and EMEA Debtors' rights under the Nortel IP is the MRDA itself.  They have only those rights that were granted to them pursuant to the MRDA.

279.    This point is conclusively made by the MRDA, which is, according to Article 14(d), the parties' entire agreement on the subject matter addressed therein, a subject matter that includes ownership of the IP, the rights of Licensed Participants under the IP, and the rights flowing from the performance of R&D by any Participant.

280.    Even if one were permitted to look outside of the terms of the MRDA (contrary to the entire agreement clause in Article 14(d)), the same conclusion would follow, since the very witnesses put forward to assert the elaborate interests that the U.S. and EMEA Debtors claim candidly acknowledged that the parties' rights arose solely out of the MRDA.  For example, Mark Weisz who testified on behalf of the U.S. Debtors stated as follows:

> Q.    [T]he only source of NNI's IP rights is in the MRDA?  We can agree on that?
>
> A.    Yes.
>
> Q.    And there was no other legal document that was a source of any form of ownership related to Nortel's IP other than the MRDA; correct?
>
> A.    That would be correct, other than NNI was performing R&D.  And the idea was that for administrative purposes, NNL would be legal title,

but the economic benefit would stay with the participants in their local countries.

Q.    We'll get to that in a minute, but I just want to make sure I have an answer to my question.  No other legal document is a source of any form of ownership related to Nortel's IP other than the MRDA; correct?

A.    Not that I'm aware of.[292]

281.    Michael Orlando, another witness called by the U.S. Debtors, gave similar testimony:

Q.    [T]he only source of the rights of NNI in connection with Nortel's intellectual property is the MRDA, correct?

A.    It's the only contractual source that I am aware of, yes.

Q.    Sure. And when you describe rights as economic ownership or beneficial ownership, you are referring to the bundle of rights contained in the MRDA, correct?

A.    Well, I'm referring to the contractual rights in the MRDA.  I'm also referring to the business reality, you know, what I represented to the tax authorities as how our business operates.

Q.    But in terms of the rights, you're not aware of any other legal document that creates a source of ownership or anything like that other than the MRDA, correct?

A.    I'm not aware of any other contractual arrangement, no.[293]

282.    Similarly, Kerry Stephens, who testified on behalf of the EMEA Debtors, testified as follows:

Q.    And you have agreed with me already, but just so we have it now that you have provided your understanding, that it is the MRDA that governs the participant's individual interest in intellectual property and their participation in profits derived from the exploitation of Nortel technology or intellectual property; correct?

A.    Yes.

. . .

---

[292] Mark Weisz Trial Testimony, Day 9, May 28, 2014, p. 1890:19-1891:13

[293] Michael Orlando Trial Testimony, Day 6, May 21, 2014, p. 1327:25-1328:19

- 86 -

> Q.      And as far as you know, it is the only source of rights that NNUK has in connection with Nortel's intellectual property; correct?
>
> A.      I am not a lawyer; therefore, I can't comment on that, as to whether there is any other formal agreement.  But I am not aware of anything else.[294]

283.    Other testimony, to the same effect, was given by a number of witnesses on their respective depositions.[295]

284.    Moreover, those same witnesses explained during their *viva voce* testimony that, to the extent that they referred to the licensees having "beneficial" or "economic" ownership of Nortel's IP, they were using those terms simply in reference to the rights that were granted by the MRDA.  For example, Michael Orlando gave the following testimony:

> Q.      And so if we look at your affidavit, sir, paragraph 16, when you refer there - if you're holding it far enough, sir, so you can see it - when you refer to the words "economic and beneficial ownership of Nortel's IP in their respective geographic regions" . . . you're referring to the rights in the MRDA?
>
> A.      I am referring to the rights in the MRDA.[296]

285.    Indeed, no witness suggested that there was any other document that gave rise to any rights under Nortel's IP held by the U.S. and EMEA Debtors.  Moreover, there has been no suggestion by counsel for any party that such other document exists.  Therefore, it is beyond serious controversy that the MRDA is the only document that gives rise to the U.S. and EMEA Debtors' rights under Nortel's IP.

---

[294] Kerry Stephens Trial Testimony, Day 8, May 27, 2014, p. 1779:11-1780:3; *see also* Philippe Albert-Lebrun Trial Testimony, Day 6, May 21, 2014, p. 1511:8-1512:9

[295] Giovanna Sparagna Deposition, December 10, 2013, p. 191:8-24; Jeffrey Wood Deposition, November 1, 2013, p. 149:19-150:17; Karina O Deposition, November 9, 2013, p. 221:16-21

[296] Michael Orlando Trial Testimony, Day 6, May 21, 2014, p. 1328:20-1329:6

286.    Applying the rules of contractual interpretation, the court looks to the MRDA to determine the U.S. and EMEA Debtors' rights.  Contrary to the apparent suggestions of the U.S. and EMEA Debtors, the court does not determine the parties' rights by looking to the testimony of witnesses as to what they think the MRDA means, or what they think the MRDA should have said.  Nor does the court impose such subjective understandings or aspirations upon the words of the agreement.

**(d)      The MRDA Recognized that NNL Held Legal Title to the IP**

287.    NNL's legal title to the IP – both before and after the execution of the MRDA – is reflected in the MRDA's first recital, which states: "Whereas legal title to all NN Technology is held in the name of NNL."

288.    Article 4(a) of the MRDA states:

> Except as otherwise specifically agreed, legal title to any and all NN Technology whether now in existence or hereafter acquired or developed pursuant to the terms of this Agreement shall be vested in NNL.

289.    NNL's legal title is not subject to temporal limitations.  Article 9(c) of the MRDA provides that it survives notwithstanding the expiry or termination of the MRDA:

> The provisions of Article 4 (Legal Title to NN Technology) with respect to NN Technology acquired or developed pursuant to this Agreement from the Effective Date of this Agreement up to an including its expiry or termination date . . . shall survive notwithstanding the expiry of this Agreement, or any termination of this Agreement for any cause whatsoever.

**(e)      "Legal Title" in the MRDA Means Ownership**

290.    Reading the terms of the MRDA in accordance with the rules of contractual interpretation, it is clear that legal title meant ownership.

291.    First, "title" and "ownership" are legally equivalent concepts.  *Black's Law Dictionary* (10th edition) defines "title" as:

> The union of all elements (as ownership, possession, and custody) constituting the legal right to control and dispose of property.[297]

292.    Similarly, it defines "own" as:

> To rightfully have or possess as property; to have legal title to.[298]

293.    Second, the word "legal", when used to modify "title", is not a term of limitation.  The definitions above make that clear.  In the absence of other express language and a very different context, it does not connote that there is a beneficial title that is held by another party.  The separation of legal and beneficial title is what occurs in a trust.  The MRDA does not create a trust.  Indeed, it disclaims[299] a trust's most critical element, namely, a fiduciary relationship.[300] Reading the MRDA in its entirety (as the jurisprudence directs), it is clear that "legal title" means title for the purposes recognized by law.  It means the legal right to control and dispose of property.  It means, to own it.  It is not a limiting term.

294.    Third, other terms of the MRDA describing the rights of NNL are consistent with ownership.  These include:

---

[297] *Black's Law Dictionary*, 10th ed. (Thomson West, 2014) p. 1712

[298] *Black's Law Dictionary*, 10th ed. (Thomson West, 2014) p. 1280

[299] TR21003 (MRDA and addenda) Article 13

[300] With respect to the fact that the trust creates a fiduciary relationship between the trustee and the beneficiary, *see* Donovan Waters, Mark Gillen and Lionel Smith, eds., *Waters' Law of Trusts in Canada*, 4th ed. (Toronto: Thomson Reuters Canada, 2012) p. 42; *and see*, the reasons of Wilson J. in *Lac Minerals Ltd. v. International Corona Resources Ltd.*, [1989] S.C.J. No. 83 at para. 117; *and see*, *Alberta v. Elder Advocates of Alberta*, 2011 SCC 24 at para. 33

- 89 -

(a)    NNL's sole and exclusive right (without the obligation to anyone else, including

the Licensed Participants) to file and prosecute patent applications (in the absence

of which right, intellectual property could not be protected in the form of valuable

patents);[301]

(b)    the fact that the Licensed Participants owed to NNL (but NNL did <u>not</u> owe to the

Licensed Participants) obligations of confidentiality regarding the IP;[302] and

(c)    the fact that, if a Participant "retired" (i.e. withdrew) from the MRDA, its

exclusive license would terminate and be cancelled (rather than be transferred)

and NNL would be able to exercise all rights in the former Participant's exclusive

territory,[303] not because it received any transfer of rights, but rather because it

owned them and because the encumbrance on those rights (i.e. the license) had

been cancelled.

295.    Fourth and fundamentally, the fact that NNL owned the IP is apparent from the fact that

NNL granted license rights to that IP to the U.S. and EMEA Debtors, pursuant to Article 5(a)(i)

of the MRDA.  Under Ontario law, the right to grant a license is a right enjoyed by the owner of

the IP:

> It is a consent **by the owner of a right** that another person should commit
> an act which, but for that license, would be an infringement of the right of
> the person who gives the license.[304]

---

[301] TR21003 (MRDA and addenda) Article 4(d)

[302] TR21003 (MRDA and addenda) Article 6(a)

[303] TR21003 (MRDA and addenda) Article 11(d)

[304] *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 at para. 49 (S.C.C.), quoting Harold
G. Fox, *The Canadian Law and Practice Relating to Letters Patent for Inventions*, 4th ed. (1969)

296.    This is made all the more apparent by the fact that, regardless of where the IP was created, it was NNL that granted the licenses to that IP pursuant to the MRDA.  Thus, for example, IP originating in the EMEA territories was licensed to NNI for use in the United States *by NNL*.  The EMEA Debtors did not grant any license rights to NNI (or, for that matter, to each other), even for the IP that they created.  Given that NNL granted the license to that IP to NNI, it must have enjoyed <u>all</u> of the rights with respect to the IP in question.  Otherwise, it would not have been able to grant licenses that encompassed any of those rights.

297.    Fifth, the MRDA contemplates and the other parties concede that NNL had exclusive rights to the IP in Canada.[305]  The MRDA does not grant any license to NNL.  Accordingly, its rights can only flow from its ownership of the IP.

298.    What is the relevant factual matrix, comprising objective facts that were known to the parties at or before the date of the agreement?  The most compelling aspect of the factual matrix is that:

(a)    before the MRDA was signed, rights in inventions were assigned directly or indirectly to NNL, with the assignment documentation invariably providing that the entire right, title and interest in and to the invention was assigned to NNL;[306] and

---

[305] TR21003 (MRDA and addenda) Third Addendum, s. II (definition of "Non-Exclusive Territory", which refers to NNL retaining its exclusive rights in Canada)

[306] TR00006 (Exh. 6, Affidavit of Angela de Wilton, April 11, 2014) paras. 8-12; Timothy Collins Deposition, November 15, 2013, p. 40:10-41:20; TR40197 (List of Transferred Patents in Rockstar Transaction) Column E, called "Assignee/Owner" showing NNL as owner for the vast majority of the patents; TR45736 (Agreement Relating to Intellectual Property and Confidentiality, February 20, 2006); TR45734 (Assignment of Patent to NNL, April 30, 2002); TR40236 (Patent Assignment Abstract of Title), showing assignment to NNL

(b)    NNL was named as the patentee on virtually all patents (ultimately, including the approximately 8,800 patents and patent applications that were sold in the Business Sales and the Rockstar Transaction).

299.    Thus, both the documentation of ownership of Nortel's IP with national patent offices and the documentation evidencing the transfer of ownership within Nortel were consistent only with NNL owning the IP.

**(f)    The Consequences of NNL's Ownership**

300.    Ownership embraces a full panoply of rights, including the right to possess, to use, to manage, to exclude others from use, as well as the right to the operating profit of the thing, the right to the capital of the thing, and the right to transfer the thing to others.[307]  The importance of this to the allocation issues before the Courts is evident from the fact that it was ownership of the patents and patent applications that was transferred to the purchaser, for example, in the Rockstar Transaction, who thereby obtained the "union of all elements" constituting "the legal right to control and dispose of" the IP (to borrow the words of *Black's Law Dictionary*).  Ownership of patents was also transferred in the Business Sales.

301.    NNL as the owner of the IP was entitled to grant to its subsidiaries, by means of the MRDA, a contractual right to do some of the things that are ordinarily the exclusive right of the owner.  More specifically, NNL was entitled to grant to its subsidiaries the right, by license, to use the proprietary technology for specified purposes within their respective territories.  It was entitled to do so "exclusively", in the sense of excluding itself contractually from exercising the

---

[307] With respect to the nature of ownership, *see* Bruce Ziff, *Principles of Property Law*, 5th ed. (Toronto: Thomson Reuters Canada, 2010) at 2-3, 6; *see also* the definition of "own", "ownership" and "title", *Black's Law Dictionary*, 10th ed. (Thomson West, 2014) p. 1280, 1712

rights that it had licensed.  However, such a license did not remove from NNL all rights as

"owner" of the IP; it only removed from NNL those rights that were licensed.  Nor did the

license endow the subsidiaries with any rights beyond those that were expressly granted to them

(which rights are discussed more fully below).  The law is clear that, in granting a license, the

owner may choose to permit the licensee to enjoy only some of the customary rights of

ownership, as opposed to all of those privileges.  As the Supreme Court of Canada explained in

*Eli Lilly v. Novopharm*:

> The licensee's rights, however, are not necessarily equivalent to those of
> the patentee; rather, they are limited to, and qualified by, the express terms
> of the license.[308]

302.    In other words, to the extent that a licensee's rights are not as extensive as the owner's

rights, the residual rights (i.e. those not granted to the licensee) continue to reside with the

patent's owner.

303.    In short, NNL's ownership of the IP is a fundamental aspect of the allocation exercise

before the Courts.  It means that the value of the IP flows on its sale to NNL except to the extent

that NNI and the relevant EMEA Debtors held (and gave up) licenses that had value.  The value

of those licenses is, of course, dependent upon the proper interpretation of the licenses' scope

and terms, discussed below.

**(g)    NNL Did Not Merely Hold "Bare Legal Title" or Legal Title Merely for
"Administrative Convenience"**

304.    The U.S. and EMEA Debtors each seem to base their respective positions to some degree

on an assertion that NNL held only "bare legal title" or that it held title merely for

---

[308] *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 at para. 49 (S.C.C.)

"administrative convenience".  In that regard, the opening briefs of both the U.S. and EMEA

Debtors' repeatedly refer to NNL holding "bare legal title" to the Nortel IP.[309]  Similar

characterizations are found in some of the written evidence given in advance of trial by certain of

the witnesses, including expert valuation witnesses, who testified on behalf of the U.S. and

EMEA Debtors.[310]  And such characterizations were also made by counsel for both groups

during their oral openings.[311]

305.    These efforts by the U.S. and EMEA Debtors to diminish NNL's ownership by referring

to it as "bare" legal title are telling, in that they carry with them an implicit recognition that the

positions advanced by the U.S. and EMEA Debtors cannot succeed based upon the actual words

of the MRDA.  The U.S. and EMEA Debtors consequently need to persuade the Courts to read

additional words into the MRDA that are simply not there.

306.    There is absolutely no basis in law for reading such additional words into the MRDA.

The word "bare" does not appear in the agreement, nor do the words "administrative

convenience".  Reading those words into the agreement in an attempt to diminish NNL's legal

ownership, as confirmed by the words that are actually in the agreement, would be inconsistent

with the cardinal presumption that the parties expressed their intent through the words that they

---

[309] Pre-Trial Brief of the U.S. Interests, May 2, 2014, p. 3 (which refers to "NNL's holding of *bare legal title*"), p. 69 (which refers to the MRD granting NNL "bare legal title to Nortel's IP"), p. 83 (which states that "NNL's bare legal title … was not marketable"); Pre-Trial Brief of the EMEA Debtors, para. 66 (which refers to the various Nortel entities transferring "bare legal title to new inventions to NNL")

[310] TR00020 (Exh. 20, Declaration of John Ray, April 11, 2014) para. 64; TR00052 (Exh. 52, Rebuttal Report of Jeffrey Kinrich, February 28, 2014) para. 110; TR00034 (Exh. 34, Rebuttal Report of James Malackowski, February 28, 2014) p. 6 (s. 2.4), p. 8 (s. 3.1); TR00031 (Exh. 31, Rebuttal Report of Paul Huffard, February 28, 2014) para. 7

[311] Sheila Block (U.S. Estate) Trial Transcript, Day 1, May 12, 2014, p. 168:3; Bill Maguire (EMEA Estate) Trial Transcript, Day 1, May 12, 2014, p. 30:7-11;

chose. It would be inconsistent with the entire agreement clause in Article 14(d) of the MRDA. The attempt to do so suffers from all of the fundamental interpretive problems that arise from its failure to recognize and give effect to NNL's ownership of the IP (which ownership is discussed above). Two problems in particular stand out.

307.    First, the U.S. and EMEA Debtors' attempt to diminish NNL's legal title is inconsistent with the license grant in Article 5(a), which is the sole source of the U.S. and EMEA Debtors' rights to use the IP. If NNL had only "bare" legal title – i.e. if it held title but did not hold the customary rights of ownership – it would not have been able to license any of those rights of ownership (such as a right to use the IP) to the Licensed Participants.[312]

308.    Second, "bare legal title" is a concept taken from trust law, describing a trustee's interest in property that he holds on trust for others.[313] This apparent attempt by the U.S. and EMEA Debtors to characterize the parties' relationship as a trust under which NNL held title to the IP in trust for the Licensed Participants (such that it merely had "bare legal title", while the licensees were the beneficial owners) is fundamentally flawed. Not only are there no words in the MRDA which so provide, but Ontario law's strict requirements for the creation of a trust are negated here. There is no evidence of an intention to create a trust and no evidence that the "settlor" employed the necessary language clearly showing the requisite intention to create a trust.[314] Moreover, there are a number of provisions of the MRDA which are fundamentally inconsistent

---

[312] See also the discussion above, at paras. 298-299

[313] *See e.g., Re: Axelrod*, [1994] O.J. No. 2277 at para. 16 (C.A.), quoting with approval from Ground J. in the court below, referring to "trust property … that is to say, property in which the bankrupt holds a bare legal title but has no beneficial interest"; *see also* the definition of "trust ownership" also termed "bare ownership", *Black's Law Dictionary*, 10th ed. (Thomson West, 2014) p. 1280-1281

[314] *See* Donovan Waters, Mark Gillen and Lionel Smith, eds., *Waters' Law of Trusts in Canada*, 4th ed. (Toronto: Thomson Reuters Canada, 2012) at 140

- 95 -

with any intention to create a trust whereby NNL was the trustee and the Licensed Participants were the beneficiaries, including:

(a)     the granting of a license by NNL;

(b)     NNL having sole authority to file and hold patents in its name (Article 4(d)); and

(c)     the Licensed Participants (but not NNL) being required to hold NN Technology in confidence and being permitted to use or disclose NN Technology only "as permitted by" the provisions of the MRDA (Article 6(a)).

309.    In addition, Article 13 of the MRDA expressly disclaims any fiduciary relationship between any of the parties – which, of course, is the hallmark and *sine qua non* of a trust.  If there is no fiduciary relationship, there cannot be a trust.[315]

310.    Given that the words of the MRDA make it clear that NNL did not hold "bare" legal title and that it did not hold title merely for "administrative convenience", and given that multiple provisions of the MRDA are fundamentally inconsistent with any trust relationship (such as might entail one party holding "bare" legal title), it is unnecessary to go further to examine the quality of the evidence used to support the arguments advanced by the U.S. and EMEA Debtors. But, if one does so, it should be noted that the witnesses who used the term "bare legal title" or "administrative convenience" had to concede that the term was not drawn from the MRDA,[316]

---

[315] With respect to the fact that the trust creates a fiduciary relationship between the trustee and the beneficiary, *see* Donovan Waters, Mark Gillen and Lionel Smith, eds., *Waters' Law of Trusts in Canada*, 4th ed. (Toronto: Thomson Reuters Canada, 2012) at 42; *and see* the reasons of Wilson J. in *Lac Minerals Ltd. v. International Corona Resources Ltd.*, [1989] S.C.J. No. 83 at para. 117; *and see Alberta v. Elder Advocates of Alberta*, 2011 SCC 24 at para. 33

[316] TR00016 (Exh. 16, Declaration of Walter Henderson, April 11, 2014) paras. 23, 55; Walter Henderson Trial Testimony, Day 5, May 20, 2014, p. 1142:21-24, 1155:19-1156:3, 1159:19-24; TR00028 (Exh. 28, Declaration of Mark Weisz, April 11, 2014) para. 12; Mark Weisz Trial Testimony, Day 9, May 28, 2014, p. 1895:17-22

which they also conceded was the sole source of the licensees' rights (a concession wholly inconsistent with an attempt to broaden those rights by reducing NNL's ownership with words not found in the MRDA).

311.    For example, Michael Orlando, who testified on behalf of the U.S. Debtors, did not dispute that the words "administrative convenience" do not appear in the MRDA:

> Q.    All right. Now, in paragraph 24 of your affidavit you refer to legal title for administrative convenience.
>
> A.    Yes.
>
> Q.    All right.  And you'll agree, sir, that those words are not in the MRDA, correct?
>
> A.    I don't recall
>
> Q.    All right.  And when you worked on amendments to the MRDA, you didn't suggest or successfully suggest inserting them; is that correct?
>
> A.    If they're not in there, then I didn't suggest them.[317]

312.    Moreover, better positioned witnesses, whose work at Nortel entailed direct dealings with Nortel's IP and, in particular, its patents categorically denied that NNL's ownership was solely for "administrative convenience".  Both Angela De Wilton (who testified on behalf of the Canadian interests) and Angela Anderson (who testified on behalf of the EMEA Debtors) were directly involved in dealing with Nortel's patents on an ongoing basis.  Ms Anderson testified as follows (which was much more forthcoming than the evidence in her affidavit[318]):

> Q.    And the patent offices were not advised when a patent was registered in NNL's name that it was being registered that way just for administrative convenience; right?
>
> A.    Oh, I wouldn't have said it was just for administrative convenience.  The patents were all assigned to NNL as a matter of best

---

[317] Michael Orlando Trial Testimony, Day 6, May 21, 2014, p. 1333:17-1334:4

[318] TR00032 (Exh. 32, Reply Affidavit of Angela Anderson, April 25, 2014) paras. 18-19

practice as much as anything. It is very useful to have everything in the same name. It makes management of the portfolio much easier. So there are some clear administrative advantages of having everything in the name of NNL. But there are other good reasons for it being in the name of NNL, and that's if you wanted to do a cross-license, you couldn't do it unless you had all the patents in the same entity. So it is best practices. And I don't know a company that doesn't do it, and I have worked for quite a few and experienced others.[319]

313.    Similar testimony was given by Ms De Wilton:

Q.    [W]ould you agree that with the thousands and thousands of patents that Nortel had, administering those patents, all of the work that went into doing that, there was a convenience in having all of those patents registered in the name of one company, specifically Nortel Networks Limited, rather than having those thousands of patents registered in the name of five companies?

A.    I disagree that it was merely a matter of convenience. It is a matter of good corporate practice that one entity owns the patent portfolio and therefore has ownership and control over those patent rights. In a large multinational corporation covering many countries, where patent and IP law rules and laws can differ, you couldn't have one part of the company in one country, another part in another country, or different business units owning separate parts of the portfolio when those patents could be applicable more generally. So it's standard practice at a corporate level to maintain ownership and control so that the holding company, Nortel Networks Limited, is able to decide what rights, if any, are licensed to other entities.[320]

314.    As well, Dr. Timothy Reichert concluded: "There is no economic theory, transfer pricing principle, or "real-world" basis that would suggest, let alone compel, a treatment of NNL's ownership as merely for administrative convenience, or of the license rights incorporating an unstated right to equity or residual interest in the IP, including to proceeds of any sale."[321]

315.    NNL was assigned ownership of the IP for a number of compelling reasons that recognized NNL's central role in developing, acquiring and managing the group's IP. The

---

[319] Angela Anderson Trial Testimony, Day 10, May 29, 2014, p. 2195:20-2196:13

[320] Angela De Wilton Trial Testimony, Day 3, May 14, 2014, p. 761:24-762:24

[321] TR00050 (Exh. 50, Rebuttal Report of Dr. Timothy Reichert, February 28, 2014) p. 134

- 98 -

evidence, including the evidence of Clive Allen who, unlike the other witnesses who purported to testify about the issue, was actually employed by Nortel when the decision was made to vest legal ownership of IP in NNL's name (or that of a predecessor), demonstrated that NNL's ownership of IP:

(a)     allowed NNL to control the use of the IP, to settle differences between subsidiaries and licensees, to determine the strategic direction of R&D, and to enter into advantageous licensing and cross-licensing arrangements with third parties;[322]

(b)     was a matter of "best practice" that was done at other major companies;[323] and

(c)     resulted because historically NNL developed, acquired and owned the IP.[324]

316.    Accordingly, NNL's ownership rights, although encumbered by the licenses granted to the Licensed Participants, were not limited to "bare legal title", nor were they held merely for "administrative convenience".  Any assertions to the contrary are fundamentally inconsistent with the terms of the MRDA and, in any event, cannot be made out factually.

317.    Because NNL's ownership rights were encumbered by licenses granted to the U.S. and EMEA Debtors, the scope of those license rights is of crucial importance to the matters in issue in this proceeding and is discussed in the section which follows.

---

[322] TR00002 (Exh. 2, Affidavit of Clive Allen, April 11, 2014) paras. 27, 35; Angela Anderson Trial Testimony, Day 10, May 29, 2014, p. 2195:20-2196:13

[323] Angela Anderson Trial Testimony, Day 10, May 29, 2014, p. 2171:4-9, 2178:15-2179:4, 2194:7-11, 2195:20-2196:13; Nicholas DeRoma Deposition, October 16, 2013, p. 163:24-164:7; TR00014 (Exh. 14, Affidavit of Paviter Binning, April 10, 2014) para. 10

[324] Angela Anderson Trial Testimony, Day 10, May 29, 2014, p. 2196:15-2197:6; TR00002 (Exh. 2, Affidavit of Clive Allen, April 11, 2014) paras. 26, 29

**(h)    NNI and NNUK Were Granted Licenses Restricted to "Products"**

318.    In determining the rights of the licensees, the interpretive exercise begins with the words

of the MRDA and, in particular, with the words of Article 5(a), which contains the grant of

license rights by NNL to NNI and NNUK (and the other Licensed Participants).  Article 5(a)

grants two licenses: an exclusive license and a non-exclusive license.  Those two licenses confer

rights to do the same activities, with those rights being granted on an exclusive basis to the

Licensed Participants in their respective "exclusive territories", and the rights being granted on a

non-exclusive basis in the designated "non-exclusive territories".  Article 5(a) states as follows:

> To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby:
>
> (i)    continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Exclusive License"); and
>
> (ii)    grants to each Licensed Participant, as of January 1, 2009 (the "Non-Exclusive License Effective Date"), a non-exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Non-Exclusive Territory, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Non-Exclusive License").

319.    Contrary to the position being advanced by the U.S. and (albeit in a slightly different

form) the EMEA Debtors, the license is ***not*** a license to "NN Technology" generally.  This

position is found, for example, in the Pre-Trial Brief of the U.S. Debtors, which asserts that

"NNI held the exclusive rights to exploit the NN Technology" in the United States.[325]  Similarly,

the U.S. Debtors assert that the MRDA conveys "all substantial rights" in the Nortel IP to the

licensees.[326]  The same type of characterization of the rights held by the Licensed Participants is

found in the EMEA Pre-Trial Brief, which states:

> Each participant was granted an unrestricted, exclusive license to all of
> Nortel's IP in its operating territory.[327]

320.   However, these characterizations are incorrect.  NNL did not grant licenses of all rights to

the Nortel IP.  The licenses are not "unrestricted".  Rather, NNL granted a license about Products

– to make "Products" that use or embody such IP.  Article 5(a) states that the license is "to make,

have made, use, lease, license, offer to sell, and sell ***Products*** . . ." and "rights to patents . . . as

necessary or appropriate in connection therewith" (i.e., in connection with the rights to make, use

or sell Products).

321.   Accordingly, the MRDA definition of "Products" is of central importance.  "Products" is

defined to mean, in essence, products, software or services that were made or sold by, or for, any

of the Participants (as that term is defined in the MRDA).  The definition of "Products" at Article

1(g) of the MRDA states:

> "**Products**" shall mean all products, software and services designed,
> developed, manufactured or marketed, or proposed to be designed,
> developed, manufactured or marketed, at any time ***by, or for, any of the***
> ***Participants***, and all components, parts, sub-assemblies, features, software
> associated with or incorporated in any of the foregoing, and all
> improvements, upgrades, updates, enhancements or other derivatives

---

[325] Pre-Trial Brief of the U.S. Interests, May 2, 2014, p. 89

[326] Pre-Trial Brief of the U.S. Interests, May 2, 2014, p. 95

[327] Pre-Trial Brief of the EMEA Debtors, May 2, 2014, para. 64

associated with or incorporated in any of the foregoing. [bold and italics emphasis added]

322.    "Participants" is defined in the MRDA to mean the signatories to the agreement.[328]

323.    The license rights can be conveniently grouped into two arms.  The first arm consists of a right is to make, use or sell products, software or services that used or embodied Nortel IP and that were made or sold (or proposed to be made or sold) by, or for, any of the parties to the MRDA.

324.    Article 5(a) then goes on to provide a second arm – that the licensees may use certain Nortel IP as necessary or appropriate in connection with the making, using or selling of "Products":

> . . . and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate *in connection therewith*. [emphasis added]

325.    Together, the two arms grant to the Licensed Participants all the rights that they would need to carry on their respective businesses, which, of course, consisted of making and selling Products.

326.    The scope of the license makes perfect sense as one given by a parent to operating subsidiaries.  The MRDA was about an operating relationship.  What the license did not include was rights beyond making, using or selling Products, or beyond rights to patents, know-how, etc. as necessary in connection with making, using or selling Products.

---

[328] TR21003 (MRDA and addenda) p. 1-2

327.    The license included a right to sublicense.  However, by definition, a sublicense cannot extend beyond the scope of the license (and no one argues to the contrary).[329]  Licensed Participants could thus, within certain limits, authorize others to do only what they themselves could do under their license.  However, they could not authorize someone, by sublicense, to do anything else with the NN Technology.

328.    The MRDA also stated, in Article 4(e), that Licensed Participants could assert actions and recover damages in their respective territories for infringement or misappropriation of NN Technology by others.  Yet plainly, within the terms of the MRDA read as a whole, the exercise of such a right must relate to matters within the scope of the license, as the right is given to them as "Licensed Participants".  It is not a right separate from, or which expands, the license.

329.    Nor is there any other provision which would allow some set of rights beyond what the MRDA license granted to the Licensed Participants to be put, by the Licensed Participants, into the hands of third parties.  They could not do so by means of their right to sublicense; they could not assign their license and other rights under the MRDA (without consent).[330]  Even if they did assign their license and other rights under the MRDA, they could not endow the assignee with any rights beyond those that they themselves had been granted under the MRDA, nor could they free those rights from the corresponding obligations to which the Licensed Participants were subject under the MRDA.

330.    The U.S. and EMEA Debtors both deny that the license granted by the MRDA is restricted in any way.  Both assert that the license was unrestricted, that it granted the right to the

---

[329] *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 at paras. 48-51 (S.C.C.)
[330] TR21003 (MRDA and addenda) Article 14(a)

licensees to use the IP in any way that they chose and, by sublicense, to permit another to do anything that person chose with the IP. On their argument, the reference to, and definition of, "Products" is meaningless. On their argument, it is as though Article 5(a) said that the licensees were granted all of the rights in the IP in their respective exclusive territories. However, the licenses clearly did not say this and the arguments advanced by the U.S. and EMEA Debtors in support of their interpretation do not withstand scrutiny.

331.    The interpretive arguments relied upon by the U.S. Debtors were detailed in the U.S. Debtors' Pre-Trial Brief and in the opening argument made by their counsel. The argument has two main prongs. First, the U.S. Debtors assert that all of the provisions following the word "including" in Article 5(a) do not constitute the license grant, but are merely illustrative of it; and, second, the U.S. Debtors assert that the words "as necessary or appropriate in connection therewith" in the second arm of the license grant do <u>not</u> refer back to the right to make, use or sell Products.[331]    There are a number of serious flaws with the U.S. Debtors' assertions.

332.    It is helpful here first to repeat the actual words of Article 5(a):

> To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby:
>
> (i)        continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Exclusive License"); and

---

[331] See in this regard, the opening argument made by counsel for the U.S. Interests (Sheila Block (U.S. Estate) Trial Transcript, Day 1, May 12, 2014, p. 248:19-252:22); *see also* DEM00003 (Demonstrative for U.S. Estate Opening Argument) Slide 97 (p. 97)

(ii)    grants to each Licensed Participant, as of January 1, 2009 (the "Non-Exclusive License Effective Date"), a non-exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Non-Exclusive Territory, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Non-Exclusive License").

333.    With respect to the assertion that all of the provisions following the word "including" in Article 5(a) do not constitute the license grant, but are merely illustrative of it and that, accordingly, the scope of the license grant extends beyond the bounds that are indicated by the terms that follow the word "including", the U.S. Debtors' Pre-Trial Brief states:

> The word "including" does not create a limitation. . . . Here, "including" follows the words "exclusive, royalty-free license" and thus the words that follow cannot – and do not purport to – limit the broad Exclusive Licenses to Nortel Group IP granted to the Licensed Participants under the MRDA.[332]

334.    Thus, the U.S. Debtors would read the words before "including" as constituting a complete grant of a license, as though the words, "grant to each Licensed Participant an exclusive, royalty-free license", were, on their own, a complete grant.[333]  In other words, the U.S. Debtors would read Article 5(a) as follows (with the salient words being highlighted):

> To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby continues to grant to each Licensed Participant an exclusive, royalty-free license, *some non-exhaustive examples of the license rights being* the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease,

---

[332] Pre-Trial Brief of the U.S. Interests, May 2, 2014, p. 90

[333] See in this regard, the opening argument made by counsel for the U.S. Interests (Sheila Block (U.S. Estate) Trial Transcript, Day 1, May 12, 2014, p. 248:19-252:22); *see also* DEM00003 (Demonstrative for U.S. Estate Opening Argument) Slide 97 (p. 97)

license, offer to sell, and sell Products using or embodying NN
Technology in and for the Exclusive Territory designated for that Licensed
Participant, and all rights to patents, industrial designs (or equivalent) and
copyrights, and applications therefor, and technical know-how, as
necessary or appropriate in connection therewith.

335.    This cannot be correct.  First, the words "continues to grant an exclusive, royalty-free

license", on their own, do not say what the license is to, or what it is for, or for how long.  Given

that a licensee's rights are "limited to, and qualified by, the express terms of the license",[334] a

license grant of uncertain scope, such as is proposed by the U.S. Debtors, would be void for

uncertainty.

336.    Second, the U.S. Debtors' assertion that the words following "including" do not limit the

exclusive license is wrong.  The words "in and for the Exclusive Territory designated for that

Licensed Participant" appear <u>after</u> "including".  On the U.S. Debtors' reading of the license, the

territorial limitation would only apply to the license to make Products, and would not apply to

their posited "broad exclusive license" that they say is already created before one gets to the

word "including".

337.    Since even the U.S. Debtors concede that the entirety of their exclusive license was

limited to their designated Exclusive Territory, their interpretive approach is misconceived.

338.    Third, the reading advocated by the U.S. Debtors would seem to apply the words "in

perpetuity" only to the right to sublicense and not to the license itself.  The "in perpetuity"

language follows the word "including" and therefore, on the U.S. Debtors' approach, would not

modify the license.  This makes no sense.

---

[334] *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 at para. 49 (S.C.C.)

339.    Moreover, the possibility of such an interpretation is expressly denied by the U.S.

Debtors, who repeatedly refer to the main license as being granted in perpetuity.  For example, in

their Pre-Trial Brief, the U.S. Debtors refer to "NNI's exclusive, royalty-free and ***perpetual***

license to exploit [NNL's] patents in the United States".[335]

340.    With respect to the second prong to the U.S. Debtors' interpretive argument, the U.S.

Debtors attempt to read the words "all rights to patents, industrial designs (or equivalent) and

copyrights, and applications therefore, and technical know-how, as necessary or appropriate in

connection therewith" as constituting a free-standing grant of "all rights to patents, industrial

designs (or equivalent) and copyrights, and applications therefore, and technical know-how",

unconnected to the license right to make, use or sell Products.  This attempt is similarly flawed.

341.    This argument would give no meaning to the words "in connection therewith".  Those

words, read in accordance with the punctuation of the phrase, can only refer back to the first arm

and relate to the grant of a right to make Products.  Those words cannot be ignored.  To do so

would be to run afoul of the contractual principle that the court should strive to give meaning to

all of the words of a contract.[336]

342.    Disconnecting the second arm (as the U.S. Debtors would do) from the first arm of the

grant gives rise to another fundamental problem.  It renders the second arm vague, if not

meaningless.  The first arm of the grant refers to Products using or embodying NN Technology, a

defined term in the MRDA.  If the second arm is not "in connection therewith", it would be

---

[335] Pre-Trial Brief of the U.S. Interests, May 2, 2014, p. 3; *see also* p. 7-8, 34, 39-40, 68, 70, 75, 82, 85, 88, 97, 103, 112-113

[336] *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205 at para. 24

unclear which patents, know-how, etc. are referred to, as nothing would relate them to the definition of "NN Technology".

343.    Against this, the U.S. Debtors raise an argument that the interpretation of Article 5(a) advocated by the Canadian Debtors should be rejected, on the grounds that it would create a redundancy in Article 5(a).  For example, during the oral opening argument, counsel for the U.S. Debtors stated:

> In paragraph 109 of the Monitor's pre-trial brief, they told you that Article 5 goes on after the products clause to make it clear that you can use patents, industrial designs, copyrights, applications and technical know-how.  Well, that's wrong to say it is from the last clause because it's already embedded in the products clause.
>
> So, in addition to products, which is a broad term, in any event, in addition to that there are unrestricted, unrestricted to products, all rights to patents, industrial designs, copyrights, applications and technical know-how; otherwise you are offending the principle that my friends rightly cite to you that you have to give meaning to the clauses, to all words.[337]

344.    There are a number of answers to this.  First, even if it were correct, the jurisprudence accepts that some redundancy or repetition in a contract is normal and expected.  For example, in *Long v Delta Catalytic Industrial Services Inc.*, the Alberta Court of Queen's Bench stated:

> Some might argue that this interpretation makes the provision redundant…That may well be the case, but it won't be the first time that a repetitive provision has been inserted into an agreement.[338]

345.    Similarly, as Lord Hoffman stated in *Beaufort Developments (NI) Ltd. v. Gilbert-Ash NI Ltd.*:

---

[337] Sheila Block (U.S. Estate) Trial Transcript, Day 1, May 12, 2014, p. 252:4-19

[338] *Long v Delta Catalytic Industrial Services Inc.*, [1998] 6 W.W.R. 792 at para. 19

> I think, my Lords, that the argument from redundancy is seldom an
> entirely secure one. The fact is that even in legal documents (or, some
> might say, especially in legal documents) people often use superfluous
> words. Sometimes the draftsmanship is clumsy; more often the cause is a
> lawyer's desire to be certain that every conceivable point has been
> covered. One has only to read the covenants in a traditional lease to realise
> that draftsmen lack inhibition about using too many words.[339]

346.    Accordingly, even if the Courts were to accept that, on the Monitor's reading of Article 5(a), the second arm of the license grant overlaps with, or is repetitive of, the rights granted in the first arm, such repetition does not render the Monitor's proffered interpretation unsound.

347.    Moreover, the U.S. Debtors' approach would not remove redundancy.  In fact, it would visit on Article 5(a) a more severe redundancy.  To explain, the U.S. Debtors would read the second arm of the license grant as covering all rights to patents, know-how, etc., without any restriction.  If such a reading were correct, if the second arm granted unrestricted and all-encompassing rights to use patented technology, then the first arm of the grant and the definition of Products would be redundant; there would be no need to grant a right to make, use or sell Products embodying patented technology, nor would there be a need to define what Products are.

348.    In any event, contrary to the argument advanced by the U.S. Debtors, there is not, in fact, redundancy or repetition inherent in the Monitor's reading of Article 5(a).  Under that reading, the first arm of the license grants the rights to make, use or sell Products that use or embody NN Technology (including patents, etc.).  The second arm ensures that the licensees are granted all rights that they need in order to carry out the activities (and <u>only</u> the activities) contemplated by the first arm.

---

[339] *Beaufort Developments (NI) Ltd. v. Gilbert-Ash NI Ltd.*, [1999] A.C. 266 at 274 (H.L.)

349.    For all of these reasons, it is submitted that the license rights (including the right to

sublicense) granted by Article 5(a) are limited to:

(a)      the right to make, use and sell Products that use or embody Nortel's IP; and

(b)      the right to use patents, industrial designs, copyrights and know-how as necessary

in connection with the making, using and selling of Products.

350.    Given that the definition of "Products" is restricted to those products made or proposed

by or for the Participants, the license decidedly does not grant to the licensees all of the rights

enjoyed by the patents' owner.  Ownership has no such restriction.

**(i)      The Extrinsic Evidence Relied upon by the U.S. Debtors Is Not Admissible Under
the Rubric of Factual Matrix**

351.    Given that their arguments as to the proper interpretation of the license rights are not

supported by the words of Article 5(a), nor are they supported by proper evidence of the factual

matrix, and given that their arguments on the allocation question depend upon their interpretation

of Article 5(a) being accepted, the U.S. Debtors must necessarily seek to expand upon the license

rights that were granted by Article 5(a), by resorting to various types of extrinsic evidence,

attempting to show that their license covers not merely the right to make Products, but extends to

all rights under Nortel's IP exclusively in their Exclusive Territory.  In support of these attempts,

the U.S. Debtors suggest that the Courts consider evidence of what various Nortel employees

such as John Doolittle, Karina O, Michael Orlando, Kerry Stephens and Peter Look thought that

the MRDA meant and what they understood the scope of the license rights to be.  For example,

the U.S. Debtors point to evidence that NNL employee, John Doolittle, understood that the

Licensed Participants had "beneficial ownership" that "constituted the right to exploit the Nortel

technology" in their respective territories.[340]  They point to evidence that Karina O, an NNL

employee, understood that the Licensed Participants had "exclusive rights to exploit the

intellectual property" in their respective territories.[341]  They point to evidence of Mark Weisz

that he was not aware of any restriction on the scope of the license rights other than with respect

to geographic territory.[342]

352.    However, the U.S. Debtors take this evidence out of context.  All of the witnesses, when

they gave the evidence, for example, as to "beneficial ownership", or as to "rights to exploit the

intellectual property", or as to the allegedly unlimited scope of the license rights, were testifying

as to their understanding of how the license rights functioned within Nortel's actual operating

context, wherein the Licensed Participants were making, using or selling Products.  The

testimony in no way related to any context wherein the Licensed Participants were carrying on

any other activity.  For example, on his deposition, Michael Orlando made it clear that, when he

used the term "beneficial ownership", he was speaking in the context of tax and transfer pricing,

which, of course, arose in the context of the Participants' ongoing business operations.[343]  In any

event, the parsing and weighing of such evidence and, in particular, the consideration of each

witnesses' ability meaningfully to speak to these topics should be unnecessary.  The evidence is

inadmissible to change the meaning of the MRDA.

353.    The U.S. Debtors argue that this type of evidence is admissible as part of the factual

matrix.  That is entirely incorrect.  As noted above, evidence of the factual matrix does not

---

[340] Pre-Trial Brief of the U.S. Interests, May 2, 2014, p. 42

[341] Pre-Trial Brief of the U.S. Interests, May 2, 2014, p. 43

[342] Pre-Trial Brief of the U.S. Interests, May 2, 2014, p. 43

[343] Michael Orlando Deposition, November 5, 2013, p. 58:10-13

include subjective intent or understanding.  As the Court of Appeal stated in *Primo Poloniato*

*Grandchildren's Trust (Trustee of) v. Browne*:

> While the scope of the factual matrix is broad, it excludes . . .  evidence of
> a contracting party's subjective intentions.[344]

354.    The U.S. Debtors suggest that they can circumvent that strict exclusionary rule by

arguing that it does not apply to evidence that is "consistent" with the contractual documents.[345]

There is no legal basis whatsoever for such an argument, which is a model of circularity.  One

could only decide that extrinsic evidence is consistent with the written agreement by first

construing the written agreement without reference to the extrinsic evidence.  Once that it done,

the extrinsic evidence serves no purpose.  If it is consistent with the written agreement, one is no

further ahead.  If it is not consistent with the written agreement, then it is not admissible.  There

is simply no basis for stating that evidence of subjective intention is admissible if it is consistent

with the words of the written agreement.  The U.S. Debtors' arguments to the contrary should be

rejected.

355.    Accordingly, even if the evidence were sufficient to establish that certain individuals

understood the scope of the licenses to be unrestricted and were testifying about that

understanding in the right context, the evidence would still not form part of the "factual matrix"

and would still be entirely inadmissible.

356.    In another attempt to broaden the scope of the license rights beyond the terms of Article

5(a) of the MRDA, the U.S. Debtors point to certain patent infringement proceedings that were

---

[344] *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862 at para. 71;
*Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205 at para. 24

[345] Sheila Block (U.S. Estate) Trial Transcript, Day 1, May 12, 2014, p. 254:4-14

brought in the United States in respect of Nortel's patents.  The U.S. Debtors assert that "Nortel's legal department recognized that NNI was the essential plaintiff" in these proceedings. The U.S. Debtors further argue that this supports their interpretation of the MRDA as granting unrestricted licenses to all of Nortel's IP in the relevant exclusive territories.[346]

357.    This argument should be also rejected.

358.    First, for those infringement proceedings that predated the MRDA, they do not fall within the scope of factual matrix, because they do not form part of "background of the contract";[347] they are not part of the "genesis of the agreement, its purpose, [or] the commercial context in which the agreement".[348]  And for those infringement proceedings that post-dated the MRDA, they cannot form part of the factual matrix for an additional reason, which is that the factual matrix only includes those facts that were known at the date that the contract was entered into.[349]

359.    In any event, even if admissible, this evidence does not support the U.S. Debtors' proffered interpretation of the MRDA.  The U.S. Debtors point to the complaints filed in four different legal actions commenced in the United States in respect of Nortel's patents.  In three of the actions, NNL was named as a plaintiff along with NNI.  NNL was pleaded to be the owner of the patents in question,[350] a fact which is fundamentally inconsistent with the U.S. Debtors' contention that legal title does not equate to ownership.  And in each of the cases, all of which

---

[346] *See* Pre-Trial Brief of the U.S. Interests, May 2, 2014, p. 45-46

[347] *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862 at para. 70

[348] *Dumbrell v. The Regional Group of Companies Inc.*, 2007 ONCA 59 at para. 55

[349] *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862 at para. 71

[350] TR22084 (Complaint for Patent Infringement, March 14, 2001) para. 14; TR40777 (Complaint for Patent Infringement, March 14, 2001) para. 14; TR40788 (Amended Complaint for Patent Infringement, March 15, 2002) para. 10

related to infringement of U.S. patents, NNL was alleged to have suffered damages,[351] a fact that is inconsistent with the U.S. Debtors' theory that NNL had no valuable interest in connection with U.S. patent rights.  Moreover, in each proceeding, NNI was pleaded to be a licensee.[352] There is certainly nothing in any of this that elevates NNI's, or lessens NNL's, rights under the MRDA.

360.    In addition to the proceedings upon which the U.S. Debtors rely, there is evidence of at least two other patent infringement actions brought in the United States in respect of infringement of Nortel's patents.  In those proceeding, as in the other proceedings referenced above, both NNI and NNL were named as plaintiffs.[353]

361.    The U.S. Debtors state in their Pre-Trial Brief that, if a license conveys "all substantial rights" under a patent, then the patentee need not be named as a plaintiff in any infringement action.[354]

362.    The fact that, in all but one of the foregoing patent infringement proceedings, NNI joined NNL as a plaintiff suggests an understanding that NNI's exclusive license did not convey "all substantial rights" under NNL's patents.  This, of course, directly contradicts the U.S. Debtors'

---

[351] TR22084 (Complaint for Patent Infringement, March 14, 2001) para 11, 17, 23, 29, 35 and 41; TR40777 (Complaint for Patent Infringement, March 14, 2001) para. 11, 17, 23, 29, 35 and 41; TR40788 (Amended Complaint for Patent Infringement, March 15, 2002) para. 15.  In the first two cases, NNL and NNI were collectively defined as "Nortel", and Nortel was alleged to have suffered damages.  In the third case, NNL was specifically alleged to have suffered damages.

[352] TR22084 (Complaint for Patent Infringement, March 14, 2001) para 8, 14, 20, 26, 32 and 38; TR40777 (Complaint for Patent Infringement, March 14, 2001) para. 8, 14, 20, 26, 32 and 38; TR40788 (Amended Complaint for Patent Infringement, March 15, 2002) para. 11.

[353] TR11158 (Original Complaint for Patent Infringement, April 17, 2006); TR40632 (Answer and Counterclaims, December 14, 2007)

[354] Pre-Trial Brief of the U.S. Interests, May 2, 2014, p. 94-95

contention that the license rights were unrestricted, granting to the Licensed Participants <u>all</u> rights under Nortel's IP.

363.    The only patent infringement proceeding to which the U.S. Debtors can point in which NNL was not joined is an action brought in Texas by Vonage Holdings Corp. in which NNI was named <u>as a defendant</u>.  It would appear that NNI brought a motion for leave to amend its defence in order to assert a counterclaim for patent infringement, without joining NNL as a plaintiff by counterclaim.[355]  The outcome of that attempt is unclear.  However, it should be noted that another action was subsequently commenced in which the same patents were asserted against Vonage (by way of counterclaim) and, in that later-commenced proceeding, both NNI and NNL were named as plaintiffs and both were alleged to have suffered damages,[356] a fact which (as discussed above) is not consistent with the interpretation of the license advocated by the U.S. Debtors.

364.    Accordingly, even if this evidence were found to be admissible, it still would not support the interpretation of the MRDA put forward by the U.S. Debtors.

**(j)    Calling the License Rights "Beneficial Ownership" Does Not Expand Their Scope**

365.    Similarly flawed are the related attempts by the U.S. and EMEA Debtors to expand upon the scope of their license rights by referring to them as "beneficial" or "economic" ownership.

366.    These attempts can be seen in the written openings delivered by the U.S. and EMEA Debtors, both of which are replete with assertions that U.S. and EMEA Debtors enjoyed

---

[355] TR50518 (Reply to Opposition to Motion for Leave, August 22, 2007)

[356] TR40632 (Answer and Counterclaim for Patent Infringement, December 14, 2007), para. 20, 26, 31, 36, 41, 46, 51, 56, 61, 66, 70, 76 and 81

"beneficial ownership" of Nortel's IP, either within their respective territories (as argued by the U.S. Debtors), or on some joint ownership basis (as argued by the EMEA Debtors).[357]

367.     The words of the MRDA do not support the U.S. and EMEA Debtors' argument.  The provisions about ownership and license rights (addressed above) do not give the U.S. and EMEA Debtors beneficial ownership, nor does any other provision.  For example, one of the recitals to the MRDA upon which the U.S. and EMEA Debtors rely states as follows:

> WHEREAS each Licensed Participant held and enjoyed equitable and beneficial ownership of certain exclusive rights under NT Technology for a Specified Territory pursuant to the Amended Research and Development Cost Sharing Agreement entered into on January 1, 1992, and it is the intent of NNL and the Licensed Participants that the Licensed Participants continue, as of the effective date of this Agreement, to hold and enjoy such rights.

368.     The 1992 CSA referenced in the MRDA's recital was entered into by the predecessors of NNL and NNI.  Like the MRDA, it provided that NNL held legal title to Nortel IP and that NNL "is the legal owner" of the IP.[358]  Like the MRDA, it also contained a grant by NNL to NNI of certain license rights under the Nortel IP.[359]  It did not grant beneficial ownership of the Nortel IP to the U.S. or EMEA Debtors.  The reference in the MRDA recital to NNI's "equitable and beneficial ownership of *rights* under NT Technology . . . pursuant to the" 1992 R&D Cost

---

[357] There are literally dozens of such statements made in the written openings of the two Estates. Indeed, the Pre-Trial Brief of the U.S. Interests has an entire section entitled "The MRDA Granted Equitable and Beneficial Ownership of Nortel Technology to NNI in the US." (Pre-Trial Brief of the U.S. Interests, May 2, 2014, p. 87) Similarly, the Pre-Trial Brief of the EMEA Debtors has an entire section entitled "Nortel's Statements And Conduct Confirmed That The RPS Entities Were The Beneficial Owners Of Nortel's IP …" (Pre-Trial Brief of the EMEA Debtors, May 2, 2014, p. 43)

[358] TR21002 (1992 R&D Cost Sharing Agreement, January 1, 1992) Articles 4, 6

[359] TR21002 (1992 R&D Cost Sharing Agreement, January 1, 1992) Article 5

- 116 -

Sharing Agreement, can only be a reference to NNI's "ownership" of exclusive license rights, nothing more.[360]

369.    Moreover, the recital cannot be read to expand upon the rights that are granted to the Licensed Participants by the operative provisions of the MRDA.  The interpretive use of a recital is limited.  It cannot be used to override the operative words of an agreement, or to add words to them.  And, of course, the operative provision in the MRDA contains a clear grant of license rights in respect of Products, not a grant of beneficial ownership of the IP.  Any attempt to use the words in the recital as somehow expanding upon those license rights should be rejected.[361]

370.    The U.S. Debtors claim that there are other references to ownership or "beneficial ownership" in the MRDA, but they similarly do not assist the U.S. and EMEA Debtors.  For example, they point to Schedule A to the MRDA, as well as the Second Amendment to Schedule A, both of which refer to the Participants bearing risks such as those "attendant with the substantial and continuous development and ownership of the NN Technology".[362]  However, that provision of Schedule A says nothing about who owns the NN Technology, and certainly does not purport to change ownership rights that were expressly confirmed earlier in the MRDA.

371.    As a further example, the U.S. and EMEA Debtors point to the Agreement with Respect to Certain NN Technology and, in particular, to that agreement's second recital, which refers to

---

[360] TR21002 (1992 R&D Cost Sharing Agreement, January 1, 1992); *see also* TR33067 (R&D Cost Sharing Agreement between predecessors to NNL and NNUK, January 1, 1995) and TR46945 (R&D Cost Sharing Agreement between NNL and NNSA, January 1, 2000)

[361] *Re Elliott Estate*, [1962] O.J. No. 164 at para. 11 (C.A.); *PUC Distribution Inc. v. Brascan Energy Marketing Inc.*, 2008 ONCA 176 at para. 31.  With respect to the paramountcy of the operative provisions of a contract, *see Merck & Co. Inc. v. Apotex Inc.*, 2010 FC 1265 at paras. 53-54; *and see 1124980 Ontario Inc. v. Liberty Mutual Insurance Co.*, [2003] O.J. No. 1468 at para. 57 (S.C.J., Commercial List)

[362] TR21003 (MRDA and addenda) Schedule A, Second Amendment to Schedule A

the "sale of a specific NNL global business . . . beneficially owned by the Participants in their respective Territories in accordance with the terms of the [MRDA]".[363]  The words "in accordance with the terms of the [MRDA]" must refer to the ownership and license rights that are granted by the MRDA.  The words do not purport to change those rights.

372.    The U.S. and EMEA Debtors also point to the December 14, 2007 Addendum to the MRDA, the second recital of which states that "each Participant holds and enjoys equitable and beneficial ownership of NN Technology as defined in the [MRDA]".[364]  However, the provision in question is a recital, which does not purport to (and, indeed, cannot) grant substantive rights. In addition, its terms are not repeated in any of the operative provisions of the Addendum. Furthermore, the words "as defined in the [MRDA]" make it clear that the parties did not intend in any way to change the rights set out in the MRDA, a fact which is underlined by the following recital which states that the Addendum "*continues* each Participant's rights and obligations in the NN Technology" [emphasis added].[365]

373.    Similarly, the U.S. and EMEA Debtors point to the language of the Memorandum of Understanding executed by the parties dated December 31, 2008 ("MOU").  The MOU, however, seeks only to memorialize certain "operating arrangements and understandings of NNL and the *Licensed Participants*" [emphasis added]; it "creates no liability or obligation or rights among the parties thereto."[366]

---

[363] TR44356 (Agreement With Respect to Certain NN Technology) Second Recital (p. 2)

[364] TR21003 (MRDA and addenda) Addendum to Master R&D Agreement, December 14, 2007

[365] TR21003 (MRDA and addenda) Addendum to Master R&D Agreement, December 14, 2007

[366] TR11393 (Memorandum of Understanding, December 31, 2008) Opening Recital

374.     In addition, as noted above, the U.S. Debtors seek to rely on extrinsic evidence, namely

evidence of the use by NNI tax department employees of the words "beneficial ownership", in

the context of discussions with tax authorities about Nortel's transfer pricing arrangements.

Among other things, the U.S. Debtors point to statements by Nortel employees and advisors

provided to tax authorities as part of the APA process.  For example, they point to an excerpt

from the Horst Frisch transfer pricing economic analysis,[367] which refers to the CSA Agreement

that was the predecessor to the MRDA and states as follows:

> Under the arrangement, each cost sharing participant had the right to use
> the intangible property developed pursuant to the R&D cost sharing
> arrangement in its respective market.  From an economic standpoint, each
> R&D cost sharing participant could be considered to "own" the NT
> technology as it related to its specific region.[368]

375.     The U.S. Debtors argue that such extrinsic evidence supports a contention of beneficial or

economic ownership.  However, as discussed above, none of this extrinsic evidence can change

the meaning of the MRDA, let alone graft onto it a new agreement that confers upon the

Licensed Participants beneficial ownership in addition to their licenses.  Moreover, the content

and the context of the statements relied upon are important.  The Horst Frisch statement refers to

an agreement (the 1992 CSA) that grants licenses, and to a right to use IP pursuant to that

license, and then applies a view from an economic (but not a legal) perspective, putting the word

"own" in quotation marks.  This could not possibly change the legal meaning of the 1992 CSA,

to which it referred.  And it certainly could not impose a different meaning on the words of the

MRDA.

---

[367] Pre-Trial Brief of the U.S. Interests, May 2, 2014, p. 35, 44

[368] TR11055B (Economic Analysis of Nortel Networks' Intercompany Transactions by Horst
Frisch, March 14, 2002) p. 10

376.    The MRDA was itself given to the tax authorities and was represented to be the legal

arrangements between the parties.[369]  Descriptive language in statements made to tax authorities

could not change the meaning of the very agreement that the parties made and that the parties

told the tax authorities they had made.

377.    In any event, all of the evidence drawn from discussions or communications surrounding

the approval process relating to Nortel's transfer pricing mechanism has to be understood in the

transfer pricing context.  "Beneficial ownership" is a transfer pricing term, which refers to a

party's right to benefit from some or all of an operating profit stream attributable to a defined

undertaking or activity.  As Dr. Timothy Reichert explained:

> A central concept in transfer pricing is that of "economic ownership"
> (referred to, alternatively, as "beneficial ownership," and simply
> "ownership").  Economic ownership is not a reference to ownership in a
> legal sense, but rather refers to a party's right to benefit from an income
> stream attributable to a defined undertaking or activity.[370]

378.    In Nortel's case, the defined activity was limited to the manufacture and sale of

"Products" made by or for the Participants.  Accordingly, "beneficial ownership" describes, in a

short-hand form, the fact that the Licensed Participants had rights in respect of the operating

profit stream that was generated as a result of the sale of Nortel Products that embodied the

licensed IP, in accordance with the profit sharing provisions set out in the MRDA.

379.    Thus, describing the U.S. and EMEA Debtors' rights as "beneficial ownership" in the

transfer pricing context merely indicates that they held exclusive licenses.  Indeed, the U.S.

Debtors candidly acknowledge this in their opening brief (albeit in a footnote), where they state:

---

[369] Mark Weisz Trial Testimony, Day 9, May 28, 2014, p. 1896:3-16

[370] TR00049 (Exh. 49, Expert Report of Dr. Timothy Reichert, January 24, 2014) p. 4

> The rights an exclusive licensee holds are also referred to as "beneficial ownership".[371]

380.     A similar acknowledgement is found in the report of Jeffrey Kinrich, the allocation expert who testified on behalf of the U.S. Debtors.  He states:

> Exclusivity in licensing is the legal basis for beneficial ownership of a right by the licensee since it transfers to the licensee some of the patentee's monopoly rights […] In the case of an exclusive license, the licensee becomes the only person entitled to make use of the patent in the fields specified in the license.[372]

381.     In other words, and as admitted by the U.S. Debtors, "beneficial ownership" may be a way of describing an exclusive license right, but it does not change or expand upon the right granted.  The Licensed Participants had exclusive license rights.  Describing the rights for some purposes as "beneficial ownership" or "economic ownership" does not provide any further information about the nature or scope of those rights; it does not provide any further information about the nature or scope of the exclusive license, which can only be determined by reference to the license's terms, as set out in Article 5(a).

382.     The U.S. Debtors cannot put their case beyond the language of the Supreme Court in *Eli Lilly*.  There, the Court quoted a description of an exclusive license as follows:

> A license is the transfer of a beneficial interest to a limited extent, whereby the transferee acquires an equitable right in the patent.  A licence prevents that from being unlawful which, but for the license, would be unlawful; it is a consent by an owner of a right that another person should commit an act which, but for that license, would be an infringement of the

---

[371] Opening Brief of the U.S. Debtors, May 2, 2014, p. 96 (Footnote 347)

[372] TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) p. 31 (Footnote 83)

right of the person who gives the license.  A license gives no more than the right to do the thing actually licensed to be done.[373]

383.    However, the Court was clear that such an exclusive license was not equivalent to the patentee's ownership.  The use of the word "equitable" or "beneficial" did not change this key point:

> The licensee's rights, however, are not necessarily equivalent to those of the patentee; rather, they are limited to, and qualified by, the express terms of the license.[374]

384.    Moreover, cases of high authority, both before and after the *Eli Lilly* decision, have noted that an exclusive license is a contractual, and not a property, right.[375]

385.    For all of these reasons, there is simply no basis for the arguments being advanced by the U.S. and EMEA Debtors that NNL did not own the IP, or that its rights to the IP were limited to the rights of a bare legal title holder or a trustee of trust property, or that the exclusive license rights of the U.S. and EMEA Debtors are somehow enlarged or expanded by use of the term "beneficial ownership".  Rather, the clear words of the MRDA establish that the IP was owned by NNL, and that the Licensed Participants each had (as their name would suggest) exclusive license rights which, in the aggregate, permitted them to use the IP to make, use or sell "Products", an important right, but not one which is as broad as the full panoply of ownership rights.

---

[373] *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 at para. 49

[374] *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] S.C.J. No. 59 at para. 49

[375] *Heap v Hartley*, (1889) 42 Ch.D. 461 at 470, adopted and followed in Canada in, for example, *Electric Chain Company of Canada Limited v. Art Metal Works Inc.*, [1933] S.C.R. 581 at paras. 25-29, *Armstrong Cork Canada Limited v. Domco Industries Limited*, [1982] 1 S.C.R. 907 at paras. 14-15, 28, *Merck & Co. Inc. v. Apotex Inc.*, 2010 FC 1265 at para. 49 , and *Kraft Canada Inc. v. Euro Excellence Inc.*, 2007 SCC 37 at para. 27

**(k)    The Evidence of Catherine Tucker Does Not Assist the U.S. Debtors**

386.    In a final attempt to enlarge upon the scope of the license granted by the MRDA, the U.S. Debtors led the evidence of Catherine Tucker.  Professor Tucker opines on what arms-length third parties would have intended by the words used in the MRDA, if their intention had been to create incentives for the Participants to make forward-looking innovations.

387.    Ms Tucker's evidence is opinion evidence on the interpretation of a contract and is, therefore, irrelevant, unnecessary and inadmissible.[376]

388.    Even if it were admissible, the evidence suffers from another fundamental flaw.  Most importantly, there is no basis for Professor Tucker's foundational assumption, i.e. that the MRDA was intended to create incentives for the Participants to make forward-looking innovations.  As described in more detail above, the majority of Nortel R&D was directed by the Business Lines, which had to prepared annual R&D plans for approval.  The remaining R&D – the advanced technology research (the "leap from one S-curve to the next" that Professor Tucker describes)[377] – was coordinated by the CTO.[378]   In other words, the MRDA did not deal with R&D incentives and, accordingly, Professor Tucker's entire opinion founders.  Her attempt to remedy this failing by referring to the foregoing as an "operational detail" was not persuasive.[379]

---

[376] *R. v. Mohan,* [1994] S.C.R. 9 at 23-24;   *Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc.*, 2013 ONSC 1300 at paras. 61-65, 67 (S.C.J., Commercial List)

[377] TR00056 (Exh. 56, Expert Report of Professor Catherine Tucker, February 28, 2014), paras. 24 and 28-29; Professor Catherine Tucker Trial Testimony, Day 19, June 20, 2014, p. 4659:22-4665:2.

[378] TR00004 (Affidavit of Brian McFadden, April 10, 2014) paras. 19-23; TR31300 (Nortel Corporate Procedure No. 601.01, R&D Program)

[379] Professor Catherine Tucker Trial Testimony, Day 19, June 20, 2014, p. 4730:8-4733:2

- 123 -

**(l)      The EMEA Debtors' Theory of "Joint Ownership" Is Without Foundation**

389.      Like the U.S. Debtors, the EMEA Debtors seek to expand their rights under Nortel's IP

beyond the scope of what is granted by the MRDA.  However, the theory that underlies the

EMEA Debtors' position is somewhat different from that underlying that of the U.S. Debtors.

390.      On the one hand, the EMEA Debtors acknowledge that they held exclusive licenses under

Nortel's IP (and, indeed, it would strain all bounds of credulity to argue to the contrary).[380]  On

the other hand, the EMEA Debtors rest their allocation position on an argument that NNL's

relationship with the other Licensed Participants was <u>not</u> one of licensor/licensee; but rather that

they were all "joint owners" of all of the IP.[381]

391.      For example, the EMEA Debtors' Pre-Trial Brief states as follows:

> Nortel consistently acted on the basis that the RPS entities were joint
> owners of the IP by virtue of their contributions to the R&D that created
> the IP.[382]

392.      Similarly, during the opening argument, counsel for the EMEA Debtors referred to the

Participants' "joint ownership of the IP based on their R&D spend".[383]

393.      This joint ownership theory forms the foundation upon which the EMEA experts'

opinions are built.  In particular, the contribution approach advocated by both James

Malackowski and Paul Huffard rests upon the theory that R&D spending by each Participant

---

[380] *See e.g.,* Pre-Trial Brief of the EMEA Debtors, May 2, 2014, paras. 11, 29, 73, 76

[381] *See e.g.,* Pre-Trial Brief of the EMEA Debtors, May 2, 2014, paras. 76, 95, 106, 108; *see also* Matt Gottlieb (NNUK Joint Administrators) Trial Transcript, Day 1, May 12, 2014, p. 67:11-12, 111:23-24, 112:10-12, 113:10-11

[382] Pre-Trial Brief of the EMEA Debtors, May 2, 2014, para. 95

[383] Matt Gottlieb (NNUK Joint Administrators) Trial Transcript, Day 1, May 12, 2014, p. 112:10-12

gave rise to an ownership right in all of the IP, with each party's ownership right being measured by its relative share of R&D spending from 1991 through 2008.[384]  As Mr. Malackowski stated in his rebuttal report:

> The EMEA Debtors' position is that they (and each of the other RPE MRDA "Participants") had an ownership interest in Nortel's IP, based on their contributions to R&D activity during the period in which it was created.[385]

394.    The EMEA joint ownership theory founders on the terms of the MRDA, which prescribes exactly what a party gets in return for R&D Activity, i.e. for performing (or for spending money on) R&D.  What the MRDA prescribes is <u>not</u> joint ownership of the IP.

395.    "R&D Activity" is defined in Article 1(h) of the MRDA as follows:

> **"R&D Activity"** shall mean all research and development activity (determined in accordance with U.S. GAAP) performed by, or for, any Participant including, without limitation, development of Products and methods, processes, procedures and tools related to manufacturing, installation, operation, interoperability, maintenance and use of Products.

396.    The MRDA also provides that each Participant is to use its best efforts to perform R&D Activity in accordance with the "ongoing needs of the Nortel Networks business":

> Each Participant hereby agrees to use its best efforts to perform R&D Activity at a level consistent with past practices and the ongoing needs of the Nortel Networks business for its respective territory.[386]

---

[384] TR00030 (Exh. 30, Expert Report of Paul Huffard, January 24, 2014), para. 92; TR00034 (Exh. 34, Rebuttal Report of James Malackowski, February 28, 2014), p. 9

[385] TR00034 (Exh. 34, Rebuttal Report of James Malackowski, February 28, 2014) p. 9

[386] TR21003 (MRDA and addenda) Article 2(a), p. 4

397.    The MRDA then goes on expressly to address the compensation that each Participant is

to receive in exchange for its R&D Activity.  It is noteworthy that the compensation does <u>not</u>

include any ownership interest in the technological fruits of that activity, i.e. in the IP.  Rather,

the sole compensation for carrying out R&D is the right to receive operating profit-sharing

payments pursuant to the RPSM.  Thus, Article 3(a) states:

> For and as a consequence of the performance of R&D Activity, each
> Participant shall be entitled to receive a payment in an amount equal to the
> allocation determined under the RPSM (the "R&D Allocation") as ***the***
> measure of the benefit to which it is entitled commensurate with its
> performance of, and contribution to, R&D Activity. [emphasis added]

398.    Lest there be any doubt as to whether the RPSM payment prescribed by Article 3(a) was

to be the only compensation for performing R&D Activity, Article 2(c) answers that question as

follows:

> All costs incurred directly or indirectly by each Participant for R&D
> Activity shall be borne exclusively by it.  Any reimbursement for costs
> including any other compensation shall be provided to such Participant for
> its R&D Activity ***solely*** as provided in Article 3 below. [emphasis added]

399.    The fact that the sole compensation for R&D was the right to receive RPSM payments is

further reinforced by the MRDA's definition of "RPSM", set out in Article 1(i) as follows:

> **"RPSM"** shall mean the transfer pricing methodology which establishes
> the fair market value of the compensation to be received by each
> Participant for its R&D Activity . . .

400.    The RPSM provides to each Participant a share of operating profits, not ownership and

not a share in one of the fruits of ownership, i.e. proceeds of disposition or sale proceeds.  In fact,

Schedule A to the MRDA expressly provided that, in calculating the operating earnings (or loss),

adjustments were to be made to deduct and "gain/loss on the sale of business", as such a gain (or loss) was "not related to Nortel's operations".[387]

401.    Accordingly, the MRDA clearly provides that the <u>only</u> consideration to which the Licensed Participants were entitled for performing R&D was their respective rights to share in the operating profits of the Nortel business, according to the formula laid out in the RPSM.  To argue for some additional compensation to the Licensed Participants in return for their performance of R&D, such as an ownership interest, would yield a result wholly inconsistent with the terms of the MRDA.

402.    The EMEA theory of joint ownership is also inconsistent with those provisions of the MRDA that deal with the ownership of IP and with the licensing of rights under that IP, as described above.  The EMEA joint ownership theory would require reading the MRDA as providing that not only does NNL have legal title (i.e. ownership), but so too do the licensees. The EMEA theory would also require reading the MRDA as providing that not only is a license granted to the EMEA and U.S. Debtors, but so too is joint ownership.  This would violate all principles of contractual interpretation.

403.    The EMEA theory cannot be supported by explaining it as existing outside of the MRDA. There is no evidence that the parties had entered into some other agreement, arrangement or understanding collateral to the MRDA, whereby they agreed to establish such a joint ownership right.  Even if there were, such a collateral agreement would be precluded by the MRDA's entire agreement clause.

---

[387] TR21003 (MRDA and addenda) Second Amendment to Schedule A

404.    In short, there is simply no basis for any allegation that the parties agreed to joint ownership of the Nortel IP, in return for the performance of R&D activity.

405.    Instead of attempting to base their joint ownership theory in the words of the MRDA (which is clearly impossible), the EMEA Debtors point to various statements made – both before and after the signing of the MRDA – by various Nortel employees.  Some of those statements were found in internal memos or emails, while others were made to tax authorities.  The content of these statements is quite varied, ranging from representations about the Participants sharing in the residual profits and losses of Nortel[388] (which would more sensibly relate to operating profits), to statements about the Licensed Participants having "beneficial ownership" of the Nortel IP[389] (in respect of which, see the discussion at paragraphs 368-388 above), to an early proposed statement to the tax authorities about how the Participants would share in the proceeds generated by the sale of IP[390] (in respect of which there is no evidence that the statement was ever actually made to the tax authorities and which, in any event, is completely overtaken by the words of the MRDA, which provide that there would be no such sharing).[391]

406.    However, what the EMEA Debtors cannot do is point to any legal principle whereby such statements can be found to create legal rights in the parties.  The statements are, quite simply, irrelevant.  There is no legal principle whereby such statements – which are not even alleged to evidence the formation of any contract – could create a "joint ownership" of the type alleged by the EMEA Debtors.

---

[388] Pre-Trial Brief of the EMEA Debtors, May 2, 2014, para. 85

[389] Pre-Trial Brief of the EMEA Debtors, May 2, 2014, para. 88

[390] Pre-Trial Brief of the EMEA Debtors, May 2, 2014, para. 87

[391] TR21003 (MRDA and addenda) Second Amendment to Schedule A

407.    In support of their joint ownership theory, the EMEA Debtors also appear to rely upon

the opinion given by Dr. Richard Cooper, who testified as follows about the relationship created

by the MRDA:

> I think it really is very similar to really a joint venture is probably what it's
> most analogous to.  It may not be literally a joint venture or legally a joint
> venture, but it really operates and behaves like a joint venture.[392]

408.    However, as acknowledged by Dr. Cooper, the relationship between the MRDA

Participants was expressly stated <u>not</u> to be a joint venture.  Article 13 of the MRDA states:

> The relationship of the Participants under this Agreement shall not
> constitute a partnership or joint venture for any purpose.

409.    Dr. Cooper went on to testify that, in his view, the EMEA Debtors' alleged ownership

rights arose not from the MRDA itself, but rather from the fact that the EMEA Debtors spent

money on R&D that ultimately created the intellectual property in question:

> Q.    In your view, what is the source of that beneficial ownership
> interest? Does it come from the terms of the MRDA?
>
> A.    It comes from the concept underlying the RPS. The MRDA simply
> tries to memorialize that, but it does not come from the MRDA itself.
>
> Q.    And you have testified that the beneficial ownership that is gained
> is based on the percentage of R&D spending that each of the entity does,
> obviously, for certain periods and so on.  Is that based on the actual R&D
> costs that are borne by each entity?
>
> A.    Yes.[393]

---

[392] Dr. Richard Cooper Trial Testimony, Day 11, May 30, 2014, p. 2648:14-18

[393] Dr. Richard Cooper Trial Testimony, Day 12, June 2, 2014, p. 2829:4-20

410.    Dr. Cooper conceded that, in purporting to ascribe some "joint ownership" to the

Licensed Participants, he was conferring upon them additional rights that go above and beyond

those granted by the MRDA:

> Q.    So in your construct here, from a transfer pricing world, you are
> adding rights beyond what are in the MRDA; correct?
>
> A.    Yes.  I believe the MRDA -- yes, I am adding rights.  I am adding,
> yes, ownership rights.  Yes, I am.  I am saying that they deserve a greater
> economic ownership than the MRDA conveys as it was utilized.[394]

411.    Leaving aside whether Dr. Cooper possesses the requisite expertise to give such an

opinion (which he does not), there is simply no legal basis for him to make such a statement or

for the Courts to act upon it.  There is no legal basis for an assertion that the parties "deserve" a

joint ownership right, particularly in light of the express provisions of the MRDA that directly

contradict any notion of joint ownership.

412.    Accordingly, the EMEA Debtors' joint ownership theory has no basis, either in the words

of the MRDA (with which it is entirely inconsistent), or in any other legal principle.  The joint

ownership theory should, therefore, be rejected in its entirety.

**(m)    Other MRDA Terms Important to Valuation**

413.    In addition to confirming NNL's ownership of the Nortel IP and the terms of the licenses

granted to the Licensed Participants, the MRDA contained additional terms that are relevant to

determining the value of the rights surrendered by the U.S. and EMEA Debtors in the various

asset sales.

---

[394] Dr. Richard Cooper Trial Testimony, Day 12, June 2, 2014, p. 2756:11-18

414.    The MRDA provided that each Participant was entitled (and obliged) to share in the residual operating profits (or losses), that is, each had to accept and settle profit (or loss) sharing allocations calculated in accordance with the RPSM, set out in Schedule A to the MRDA.

415.    Accordingly, neither the U.S. Debtors nor the EMEA Debtors had a right, while operating, to retain all of the operating revenues that might be earned from activities carried out, or that could be carried out, pursuant to the Article 5(a) license in their respective territories. Rather, each was obliged to share such revenues with the other parties to the MRDA, in accordance with the RPSM.  This obligation becomes important when valuing the license rights surrendered in the asset sales, because the license rights had value only in connection with their ability to be used by, and to generate income for, the Licensed Participants, and that income could only be retained net of required RPSM sharing payments.

416.    There is no legal basis upon which a party can claim the value of a contractual right that it had (and gave up), giving effect to some terms of the contract, while ignoring other terms that impose costs or expenses.  This flows as a matter of law from the proposition that contracts are to be read as a whole[395] and it flows as a matter of valuation from the proposition that the best method to calculate the value of an income producing asset is a discounted cash flow (DCF) analysis, which involves considering "revenue less costs".[396]

417.    It is within this framework of the parties' legal rights that the allocation exercise (and the valuation exercise that is part of it) must be undertaken.

---

[395] *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205 at para. 24

[396] TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) paras. 89-90

**(n)      If Admissible, the Expert Evidence on the Interpretation of the MRDA Supports the Monitor's Position**

418.      The reports of three legal experts were exchanged by the parties and filed with the

Courts.    Purportedly as a rebuttal to the assumptions in Mr. Green's report, the U.S. Debtors

proffered the expert report of Daniel Bereskin and the UKPC proffered the expert report of

Bruce Stratton.[397]   In response, the Monitor and Canadian Debtors proffered the expert report of

Sheldon Burshtein.[398]   None of the legal experts testified at the trial.   None of these reports

should be given any weight because they are legal opinion relating to Ontario law, which is

inadmissible in the Canadian proceedings and unnecessary in the U.S. proceedings.

419.      To the extent the Courts decide to consider the reports, Mr. Burshtein's opinion is

supportive of, and consistent with, the Monitor and Canadian Debtors' position set out in this

closing submission.   By contrast, the opinions offered by Mr. Bereskin and Mr. Stratton are

flawed, and the interpretations of the MRDA that they advocate are unsupported and are

inconsistent with the Ontario law of contractual interpretation, in that they do not give effect to

the express language of the MRDA.[399]

420.      Expert evidence is admissible only if relevant and necessary to assist the trier of fact.   To

be necessary, an opinion must provide information that is likely to be outside a judge's

---

[397] Expert Rebuttal Report of Daniel R. Bereskin, February 28, 2014; TR21663 (Rebuttal Report of Bruce W. Stratton, February 28, 2014)

[398] TR11445 (Expert Report of Sheldon Burshtein, March 24, 2014)

[399] TR11445 (Expert Report of Sheldon Burshtein, March 24, 2014), in particular paras. 61, 142-149

- 132 -

experience and knowledge.[400]  The criteria of relevance and necessity have been applied strictly

to exclude expert evidence as to an ultimate issue.[401]

421.    Questions of domestic law are properly the subject of submissions by counsel and

determination by the judge; opinion evidence on them is not necessary and will not be

received.[402]  The legal opinions of Messieurs Stratton and Bereskin are therefore inadmissible in

the Canadian proceedings and unnecessary in the U.S. proceedings, as the U.S. Court does not

need assistance in understanding the Ontario law of contractual interpretation.  Pursuant to the

Joint Trial Protocol, Ontario law does not need to be proved in the U.S. Proceedings, and

pursuant to the Cross-Border Insolvency Protocol, the Courts are allowed to coordinate their

decisions on the law of their respective jurisdictions.[403]  As has been noted in the American

jurisprudence, foreign law experts "add . . . an adversary's spin, which the court then must

discount."[404]  The Canadian Court is, therefore, the preferable source for Ontario law.

---

[400] *R. v. Mohan*, [1994] SCR 9 at 23-24; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993) (to be admissible, expert testimony must assist the trier of fact in understanding or determining a fact in issue); *U.S. v. Bennett*, 161 F.3d 171, 182 (3rd Cir. 1998) (noting that Rule 702 of the Federal Rules of Evidence require expert opinion evidence to be helpful to the trier of fact, and opinions "which would merely tell the jury what result to reach" are not helpful)

[401] *R. v. Mohan*, [1994] SCR 9 at 24; *Berckeley Inv. Group, Ltd. V. Colkitt*, 455 F.3d 195, 217 (3rd Cir. 2006) (finding that "an expert witness is prohibited from rendering a legal opinion" because "it would usurp the District Court's pivotal role in explaining the law to the jury")

[402] *Sopinka, Lederman & Bryant: The Law of Evidence in Canada,* 3d ed. by Alan W. Bryant, Sidney N. Lederman and Michelle K. Fuerst (Markham, Ontario: LexisNexis Canada, 2009), at p. 832, para 12.155

[403] Joint Trial Protocol, section V(D); TR50048 (Fifth Amended and Restated Initial Order including Schedule "A" Cross-Border Insolvency Protocol, January 14, 2009), s. 12 and 14

[404] *Bodum USA, Inc. v. La Cafetiere, Inc.*, 621 F.3d 624, 629 (7th Cir. 2010) (Posner, J. concurring)

422.    Mr. Stratton's report does not purport to be anything other than an opinion on Ontario

law.  Mr. Stratton understood that opinions on Ontario law such as those contained in his report

were inadmissible in the Ontario Court,[405] and the UKPC subsequently confirmed that they are

not seeking to have Mr. Stratton's report admitted in the Canadian proceedings.

423.    Even if the U.S. Court were minded to consider Mr. Stratton's report, the report is

flawed, in that Mr. Stratton does not apply the very principles of contractual interpretation that

he cites.  Notably, despite stating that there is no need for extrinsic evidence to interpret the

MRDA as it is unambiguous (which is a correct statement), Mr. Stratton nonetheless goes on to

rely extensively (and selectively) on extrinsic evidence in interpreting the MRDA.[406]

424.    With respect to Mr. Bereskin's report, it purports to relate to "custom and practice" in IP

licensing.  However, like Mr. Stratton's report, Mr. Bereskin's report is legal opinion.  He opines

as to what he says is the proper interpretation of the MRDA, and then goes on to discuss the

advice that he would have given a prospective purchaser of Nortel's intellectual property

portfolio based on that interpretation of the MRDA.  Mr. Bereskin acknowledged that he did not

and could not distinguish between himself as a business advisor and as a lawyer.[407]  U.S. Courts

have recognized that legal opinion evidence offered under the guise of "custom and practice"

will not be admitted.[408]  As a legal opinion, Mr. Bereskin's report does not cite any case law.

---

[405] Bruce Stratton Deposition, April 4, 2014, p. 98:15-100:2

[406] TR21663 (Rebuttal Report of Bruce Stratton, February 28, 2014), para 75-78; TR11445 (Expert Report of Sheldon Burshtein, March 24, 2014), para. 61; Bruce Stratton Deposition, April 4, 2014, p. 105:17-116:23

[407] Daniel Bereskin Deposition, March 27, 2014, p. 59:13-64:9, 66:7-20 and 67:16-70:12

[408] *Safeway, Inc. v. Sugarloaf Partnership, LLC*, 423 F. Supp. 2d 531, 538-39 (D. Md. 2006); *United Rentals, Inc. v. RAM Holdings, Inc.,* 2007 Del. Ch. LEXIS 179 p. 2-3 (Del. Ch. December 13, 2007)

Where an expert's analysis of foreign law does not set out the relevant foreign law itself, courts in the U.S. will not rely on that analysis.[409]

425.    Mr. Bereskin makes no reference to any industry standards or publications to ascribe meaning to the terms of the MRDA.  To the contrary, he acknowledged that many license agreements are "one-off" and that there is no "one size fits all" – "every deal is different".[410]  For example, Mr. Bereskin acknowledges that there is no rule which states that a field of use restriction must be in the definition section, and that the restriction can be embodied in the grant (a practice Mr. Burshtein agrees with and is the case in the MRDA).[411]  Where a contract contains little jargon or technical matters, and is composed almost entirely of ordinary English, expert evidence of how to interpret its clauses is unnecessary.[412]  Mr. Bereskin does not identify, let alone elucidate, any technical terminology or jargon such as might require expert assistance to interpret and, indeed, there are none.

426.    Instead, he provides his opinion as to what a "sophisticated business person" would understand the license grant in the MRDA to mean.[413]  However, as a leading Canadian author in the field of intellectual property has stated:

> What right is assigned or licensed is a matter of negotiation, and the
> ordinary principles of contract interpretation apply to the result.[414]

---

[409] *Pfizer Inc. v. Elan Pharm. Research Corp.*, 812 F. Supp. 1352, 1360-61 (D. Del. 1993); *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 209 (2d Cir. 2003)

[410] Daniel Bereskin Deposition, March 27, 2014, p. 54:7-14 and 44:24-25

[411] Daniel Bereskin Deposition, March 27, 2014, p. 46:17-48:3; TR11445 (Expert Report of Sheldon Burshtein, March 24, 2014), para 92

[412] *Canadian National Railway Company v. Volker Stevin Contracting Ltd.*, 1991 CarswellAlta 8 (C.A.), p. 4

[413] Expert Rebuttal Report of Daniel R. Bereskin, February 28, 2014, para. 34

427.    There is simply no need for any expert assistance in interpreting such an agreement.  The

Ontario Court has declined to rely on evidence from a lawyer purporting to opine as a

"reasonably sophisticated participant in an underwriting process" as to whether an engagement

letter constituted a binding opinion, since such an issue was within the experience and

knowledge of a judge; the only issue on which the Court allowed the expert to testify was what

would constitute "standard" "material adverse change" and "disaster out" clauses in the security

industry, as the parties has expressly agreed to include such "standard" clauses in the contract

and that was not within the knowledge of the judge.[415]

428.    Indeed, Mr. Bereskin himself acknowledged that his evidence as to "custom and practice"

 was, in fact, "pretty self-evident" and "pretty basic common sense".  He stated on his deposition:

> "All I'm saying is what I believe is self-evident, that you have to identify
> in the agreement what you are talking about" and that defining rights
> unclearly "would not be a sensible custom and practice" in any
> industry.[416]

429.    These are not matters on which the Courts require expert evidence.  In any event, Mr.

Burshtein confirms that there is no "custom and practice" that is applicable to determining the

scope of a grant of license rights, and that the express terms actually agreed by the parties are

what governs.[417]

---

[414] David Vaver, *Intellectual Property Law* (Toronto: Irwin Law, 2011) at 559

[415] *Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc.*, 2013 ONSC 1300 at paras. 61-65, 67 and 97

[416] Daniel Bereskin Deposition, March 27, 2014, p. 27:17-28:13, 31:21-33:14, 39:9-15 and 55:5-58:9

[417] TR11445 (Expert Report of Sheldon Burshtein, March 24, 2014) paras. 94, 111 and 113

430.    To the extent that the U.S. Court determines that expert evidence on the interpretation of the license grant would be of assistance to the Court, then the evidence of Mr. Burshtein is to be preferred to that of Mr. Stratton or Mr. Bereskin.  Without recourse to inadmissible extrinsic evidence, Mr. Burshtein provides a careful analysis of the provisions of the MRDA, giving effect to all of the agreement's terms, and explains that a license grant such as the one in Article 5(a) of the MRDA is drafted to address six issues: the who, the where, the when, the what, the how, and the why:

(a)    ***Who*** – the Licensed Participant (i.e., NNI, NNUK, etc.)

(b)    ***Where*** – the Exclusive Territory (i.e., U.S. and Puerto Rico of NNI, United Kingdom for NNUK, etc.) or the Non-Exclusive Territory (rest of the world other than Canada and the exclusive territories)

(c)    ***When*** – in perpetuity except as hereinafter provided (e.g., the termination provisions)

(d)    ***What*** – rights to make, have made, use, lease, license, offer to sell, and sell Products (essentially products, software or services that were, or were proposed to be, made or sold by, or for, any of the parties to the MRDA)

(e)    ***How*** **–** using or embodying NN Technology

(f)    ***Why*** – the Licensed Participant needs permission to do the *what* and the *how* set out above because NNL otherwise exclusively holds those rights; the grant therefore provides the rights to patents, industrial designs (or equivalent) and

copyrights, and applications therefor, and technical know-how, as necessary or
appropriate in connection with the above grant. [418]

431.   Mr. Burshtein goes on to interpret the first arm of the Article 5(a) license grant as
follows:

> The first arm comprises the "rights to make, have made, use, lease,
> license, offer to sell, and sell Products using or embodying NN
> Technology". The scope of this arm is the performance of an enumerated
> list of manufacturing and commercial activities with certain products that
> use or embody certain intangible assets. Those products are defined as
> "Products" and the intangible assets are defined as "NN Technology".
>
> . . .
>
> Under the first arm of the grant, a licensee may perform enumerated
> activities. However, a licensee is not licensed to perform any activities
> other than those that are set out in the first arm. Similarly, a licensee may
> perform the enumerated activities in respect of Products that use or
> embody NN Technology but is not licensed to perform those activities in
> respect of anything other than Products that use or embody NN
> Technology. [419]

432.   Mr. Burshtein then explains the second arm of the license grant as follows:

> Under the second arm of the grant, a licensee may exercise the IPRs "as
> necessary or appropriate in connection therewith," namely in connection
> with the rights in the first arm related to the Products. [420]

433.   As is apparent from the foregoing, Mr. Burshtein's opinion is wholly consistent with the
Monitor's position on the proper interpretation of the MRDA, discussed in the foregoing
sections.

---

[418] Sheldon Burshtein Deposition, June 11, 2014, p. 106:24-109:8

[419] TR11445 (Expert Report of Sheldon Burshtein, March 24, 2014) paras. 66 and 69

[420] TR11445 (Expert Report of Sheldon Burshtein, March 24, 2014) para. 70

- 138 -

## PART VII – ALLOCATION OF THE PROCEEDS OF THE BUSINESS LINE SALES

**(a)        Overview of the Methodology Proposed by the Monitor's Experts**

434.        The expert evidence of Messrs. Berenblut, Cox and Green was proffered by the Monitor

to answer the valuation aspect of the question, "What portion of the proceeds realized in each of

the [sale] transactions was due to the transfer of, or surrender by, the Canadian Debtors, EMEA

Debtors or U.S. Debtors, as the case may be, of property interest in the assets that were the

subject of that transaction?"[421]  All three valuators addressed the valuation theory and

methodology to be applied in formulating an answer.  Mr. Green proceeded independently from

Mr. Berenblut and Dr. Cox, and vice versa.[422]  And Mr. Green went on to carry out the valuation

exercise.  In answering the question, these experts brought to bear their extensive valuation and

accounting expertise.[423]  They are the only experts to have addressed the allocation of sale

proceeds in a manner consistent with the correct interpretation of the MRDA set out above.

---

[421] TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014) p. 2; TR00047 (Exh. 47, Expert Report of Mark Berenblut and Alan Cox, January 24, 2014) para. 3.  The experts proffered by the other Debtor Estates were asked to opine on a similar question - TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) para. 3 ("I have been asked by counsel to the U.S. Debtors to determine the value relinquished by each of the Nortel entities for each of the "Post-Petition Sales"); TR00030 (Exh. 30, Expert Report of Paul Huffard, January 24, 2014) paras. 3-4 ("I have been asked to provide my expert opinion regarding (i) what approach would be appropriate for the Courts to use in determining how to allocate the proceeds of the Nortel asset sales among the various legal entities that transferred interests or relinquished rights in each sale (the "Selling Debtors"), and (ii) based on the application of that approach, how much each of the Selling Debtors is entitled to receive from the Sale Proceeds of each of eight sales of operating global business lines of the Nortel group (the "Business Sales") and from the sale of Nortel's residual patents (the "Residual Patents Sale," and together with the Business Sales, the "Asset Sales").  Based on the allocation position papers submitted in this case, I understand it to be common ground among the parties that the Sale Proceeds of the Business Sales and Residual Patents Sale should be allocated among the Selling Debtors according to the value of the interests each of them transferred and rights each of them relinquished in connection with each sale.)

[422] Mark Berenblut Trial Testimony, Day 15, June 16, 2014, p. 3613:24-3614:13

[423] Philip Green Trial Testimony, Day 13, June 5, 2014, p. 3099:22-3100:5, 3100:11-18

- 139 -

435.    All three valuators explained that, in order to carry out the valuation exercise, it is first necessary to identify the specific assets owned, or the specific interests held, by each Debtor Estate.[424]  Only after that identification has been carried out can the appropriate valuation methodology be selected and applied.[425]  They explained that a valuator cannot do any appropriate valuation without first identifying the property interests to value.  As Mr. Berenblut testified:

> So the first question is, what were the property interests in the assets? And in order to do a valuation, the first question one [has] to ask is, What is it that I'm valuing?[426]

436.    Accordingly, the first step carried out by Mr. Green was to identify each of the assets and rights to be valued, and the associated valuation methodology, which he did as follows:[427]

| Asset / Right | Valuation Method |
|---|---|
| Tangible Assets | Net Book Value |
| In-Place Workforce | Replacement Cost |
| Wholly-Owned Subsidiaries | Contemporaneous FMV Valuations |

---

[424] *See e.g.,* TR00047 (Exh. 47, Expert Report of Mark Berenblut and Alan Cox, January 24, 2014) para. 54 ("The economic benefits forgone by the U.S. Debtors and the EMEA Debtors in surrendering their property rights depends on the nature and scope of those property interests which, in turn, are dictated by the organization and legal arrangements of the Nortel Group at the time the decision was made to sell its assets rather than to continue its operations.")  *See also* TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014) p. 3-4, 14

[425] Philip Green Trial Testimony, Day 13, June 5, 2014, p. 3100:21-3101:23

[426] Mark Berenblut Trial Testimony, Day 15, June 16, 2014, p. 3612:24-3613:2; Philip Green Trial Testimony, Day 13, June 5, 2014, p. 3102:10-20

[427] Philip Green Trial Testimony, Day 13, June 5, 2014, p. 3102:21-3111:15

| Asset / Right | Valuation Method |
|---|---|
| Intellectual Property | IP License (U.S. and EMEA) <br><br> • Discounted Cash Flow <br> IP Ownership (CA) <br><br> • Total IP Value Less License Value |
| Customer Relationships | Valued with the IP Licenses |

437.    The valuation of each of these assets and rights is addressed below.

**(b)    Allocation of the Proceeds Attributable to the Transfer of Tangible Assets**

438.    With respect to the allocation of proceeds attributable to the transfer of tangible assets by each Debtor Estate, the tangible assets generally consisted of inventory, prepaid expenses and plant, property and equipment.[428]   In the Business Sale agreements, generally the price paid by the purchaser was allocated to tangible assets based on their net book value, with the balance being allocated to intangible assets.[429]

439.    In order to identify precisely which transferred assets were owned by each Debtor Estate and to value those assets, Mr. Green utilized Nortel's "gain/loss" financial statements and "carve-out" financial statements, both of which were organized by business line sale transaction and by legal entity.  These showed the book values of the tangible assets that were "de-booked" in relation to the sales of Nortel's assets.  For ownership, Mr. Green treated the legal entity shown on the financial statements as the owner of the relevant tangible assets. As for the value,

---

[428] TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014) p. 41-42

[429] *See e.g.,* TR44138 (ASA regarding CDMA/LTE Assets, July 24, 2009) Article 6.7(a)

Mr. Green opined that book value represented the most reliable value of the tangible assets that had been owned by each Debtor.[430]

440.    Applying that methodology, Mr. Green concluded that the following allocation of proceeds attributable to the transfer of tangible assets was appropriate:[431]

| Debtor Estate | Allocation |
|---|---|
| Canada | $121.74 million |
| U.S. | $317.59 million |
| EMEA | $94.86 million |
| **Total attributable to transfer of tangible assets** | **$534.19 million** |

441.    No one has disputed Mr. Green's methodology of determining the owner of each tangible asset.  Indeed, Mr. Huffard, a witness tendered as a valuation expert by the EMEA Debtors, also used book value by owner in order to value and allocate for the tangible assets and thus approached ownership in a similar fashion.

442.    The difference between Mr. Huffard and Mr. Green regarding tangible assets was in respect of their value.  (Mr. Kinrich, the U.S. expert, did not provide any allocation of the tangible assets.)  Mr. Huffard deducted liabilities, primarily deferred revenues, from that book

---

[430] TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014) p. 41, Appendix H (p. 1)

[431] TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014) p. 51

- 142 -

value in order to arrive at his tangible asset valuation.  Mr. Huffard's approach should be rejected.

443.    Mr. Green opined that such deduction should not be made, because deferred revenue is not a form of liability that can be properly associated with tangible assets.  As Mr. Green explained:

> These deferred revenue assets are – deferred revenue liabilities are essentially amounts that would be due that are related to projects that have already been billed and perhaps paid for.  And so they don't really offset the physical assets, the intangible [sic. tangible] – the accounts receivable, the other things that were sold.[432]

444.    Interestingly, Mr. Green's approach of not off-setting tangible assets with these liabilities, was of relative benefit to the U.S. Debtors because they had the highest deferred revenues and, accordingly, deducting the liabilities would most significantly decrease the U.S. Debtors' share of the value of net tangible assets.[433]  Thus, the approach taken by Mr. Green with respect to the tangible assets actually increased the amount allocated to the U.S. Debtors and decreased the amount that would otherwise be allocated to the Canadian Debtors.

445.    Mr. Green's approach was conservative vis-à-vis the Canadian Debtors and should be accepted.

**(c)    Allocation of Proceeds Attributable to In-Place Workforce**

446.    In addition to the transfer of tangible assets, each Business Sale also involved the transfer of the relevant workforce to the purchaser.  The employees in question were employed by

---

[432] Philip Green Trial Testimony, Day 13, June 5, 2014, p. 3105:20-3106:7

[433] Philip Green Trial Testimony, Day 13, June 5, 2014, p. 3105:10-3106:19; TR00043 (Exh. 43, Rebuttal Report of Philip Green, February 28, 2014) p. 39

various Debtors.  The transfer of the assembled workforce enabled the purchasers to continue to operate the businesses without interruption.  Therefore, there was a value associated with the workforce.  Mr. Green explained that the proper approach to valuing an in-place workforce is the "cost approach":

> Generally speaking, the cost approach is applied to the valuation of an assembled or in-place workforce.[434]

447.    Mr. Green further explained that the cost approach involves measuring the cost that would have to be incurred to replace the workforce:

> [V]aluations of in-place workforces usually include the recruiting expenses, human resources costs to manage the process, and the cost associated with lost efficiency.[435]

448.    Mr. Green identified the relevant employees of each involved Debtor.  He then performed the requisite analysis so as to calculate the proceeds attributable to the transfer of the in-place workforce by each Debtor Estate:

| Debtor Estate | Allocation |
|---|---|
| Canada | $79.07 million |
| U.S. | $135.17 million |
| EMEA | $41.91 million |

---

[434] TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014) p. 44

[435] TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014) p. 45

| Debtor Estate | Allocation |
|---|---|
| **Total attributable to transfer of in-place workforce** | **$256.15 million**[436] |

449.    Pursuant to GAAP, workforce is typically valued as part of the goodwill of a business, but, as Mr. Green opined, other than this component of goodwill, there were no indications of goodwill attributable to Nortel's businesses that were sold in the Business Sales.[437]  In fact, all of Nortel's goodwill was written-off in 2008 and it was losing customers and money (it had no excess earnings) at the time of the Business Sales.[438]  Mr. Green's approach of valuing and allocating a specific amount for in-place workforce, and not otherwise allocating amounts for goodwill, should be accepted.

**(d)**    **Allocation of Proceeds Attributable to Wholly Owned Subsidiaries**

450.    In the context of the sale of the Enterprise business, several corporate entities owned by NNI were sold.  Mr. Green valued these assets based on contemporaneous fair market valuations done at the time these businesses were sold.[439] There is no evidence that these assets had a value other than as set out by Mr. Green.

---

[436] TR00043 (Exh. 43, Rebuttal Report of Philip Green, February 28, 2014), p. 44, updating TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014) p. 53, Appendix I (p. 1)

[437] Philip Green Trial Testimony, Day 13, June 5, 2014, p. 3113:4-16

[438] Philip Green Trial Testimony, Day 13, June 5, 2014, p. 3113:17-3114:15; TR43999 (Nortel Networks Corporation Form 10-K for fiscal year ended December 31, 2008) p. 148, 151; TR00009A (Exh. 9, Affidavit of Sharon Hamilton, April 11, 2014) para. 14

[439] TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014) Appendix B (p. 10); Philip Green Trial Testimony, Day 13, June 5, 2014, p. 3108:2-10

451.    Following that methodology, Mr. Green made an allocation to NNI of proceeds attributable to the sale of its subsidiaries in the amount of $110,970,000.[440]

**(e)    Allocation of Proceeds Attributable to the Transfer or Surrender of IP Rights**

   *(i)    Surrender of the U.S. and EMEA License Rights*

452.    Crucial to the generation of proceeds in the Business Sales was the fact that they involved the transfer of IP.  Mr. Green treated NNL as the owner of that IP.  He considered the U.S. and EMEA Debtors as licensees holding licenses with the specific terms set out in the MRDA.  He proceeded to determine the value that those licenses had when they were terminated as the measure of the IP portion of proceeds to be attributed to the licensees.  The balance remaining would be attributable to the owner.

453.    As contemplated by the IFSA, in connection with the Business Sales, the U.S. and EMEA Debtors surrendered their MRDA license rights, in so far as the licenses related to the IP that was the subject of the asset sale in question and to the extent necessary to facilitate the sale. A full description of the facts of the Business Sales is set out above.  As Mr. Green opined, the license rights are contractual rights; as such they are generally valued based upon the operating profit or cash flow that that the holder of the license expects to obtain from the exploitation of the contractual right.[441]

---

[440] TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014) p. 7

[441] TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014) p. 54.  The U.S. Debtors' valuation expert agrees that license rights are valued based on the profits a licensee could earn by using the licensed technology, although he did not do such a valuation (TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) para. 69)

454.    Even though the license rights were not transferred (the purchasers did not buy them), the U.S. and EMEA Debtors' surrender of the license rights allowed ownership of the IP to be transferred without the MRDA licenses continuing.   Accordingly, Mr. Green opined that a portion of the sale proceeds attributable to IP should be allocated to the licensees to the extent there had been value in the licenses that were given up.[442]  Mr. Berenblut and Dr. Cox shared this view.[443]

455.    These experts approached the matter on the basis that the U.S. and EMEA Debtors only had license rights to make, sell, or license "Products" and only "by or for the Participants". Neither they nor any other party to whom the right might be sublicensed could use those license rights for other purposes.  As a result, the value of the license rights was to be determined based upon the operating profit that the license holders (i.e. the U.S. and EMEA Debtors) would have realized had they continued in business, exercising their license rights, instead of surrendering them.

456.    In this regard, Mr. Green provided expert evidence about the value of the licensed rights surrendered using a discounted cash flow approach.   In order to implement the valuation methodology, it was necessary to estimate the operating results that would have been achieved by continuing to operate the Nortel businesses, and the resulting amounts that would have been earned by each licensee given the MRDA.  This involved the following steps:

    (a)      projecting revenues and expenses for each major business sold;

---

[442] TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014) p. 47

[443] TR00047 (Exh. 47, Expert Report of Mark Berenblut and Alan Cox, January 24, 2014) para. 21

(b)     deriving the cumulative operating profits that would have been earned based on projected revenues, and then aggregating them by Debtor;

(c)     computing the MRDA-imposed adjustments that would be due for each Debtor pursuant to the RPSM;

(d)     computing operating profits after the MRDA-imposed adjustments; and

(e)     discounting the earnings to present value.[444]

457.    With respect to (a) and (b) above, the particular forecasts that were used to project the future revenues of the Nortel businesses were forecasts that are referred to as "Retained by Nortel" forecasts.  They projected the revenues that would have been earned and the expenses that would have been incurred, if the operating businesses had been retained by Nortel.  These particular forecasts were the most appropriate basis to use for the valuation of the license rights. The value of the surrendered license rights was directly related to the profits that the licensees could have earned had they retained those rights.  Accordingly, the forecasts that projected the revenues and the corresponding profits that the licensees could have earned provided the relevant foundation for the valuation exercise.[445]

458.    Notably, Mr. Green evaluated how the cash flows of Nortel's businesses would be affected by each of the terms of the MRDA discussed above. With respect to rights of the U.S. and EMEA Debtors that were MRDA Participants, the cash flows associated with their rights to sue and sublicense were accounted for in Mr. Green's valuation and to the extent that

---

[444] TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014) p. 57

[445] TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014) p. 57, 59

sublicensing or litigation had resulted in revenues, those revenues were included in Mr. Green's valuation.[446]

459.    After calculating the operating profits of each business sold, Mr. Green aggregated those profits and applied the RPSM (on the assumption that the MRDA would have remained in place).[447]  This assumption was appropriate because there was no evidence that all the MRDA Participants would have terminated or varied their agreement if they remained in operation.

460.    The RPSM percentage applied by Mr. Green to the aggregated operating profits was the capital stock percentage for the first quarter of 2010 (effectively covering a rolling average from 2005 to 2009).[448]  Mr. Green chose that percentage because it was the most recent information available (appropriate because it was being applied to projections of future revenue) and the valuation was done essentially as of December 31, 2009 (the 2010 percentage matched the date by which most of the business sales had closed or were the subject of binding sale agreements).[449]

461.    As Mr. Green opined, the value of the license rights surrendered by the U.S. and EMEA Debtors for all of the Business Sales is as follows:[450]

---

[446] Philip Green Trial Testimony, Day 13, June 5, 2014, p. 3120:20-3121:6

[447] Philip Green Trial Testimony, Day 13, June 5, 2014, p. 3137:10-3138:25

[448] Philip Green Trial Testimony, Day 13, June 5, 2014, p. 3139:1-21

[449] Philip Green Trial Testimony, Day 13, June 5, 2014, p. 3139:22-3140:16

[450] TR00043 (Exh. 43, Rebuttal Report of Philip Green, February 28, 2014) p. 43

| Debtor Estate | Allocation |
|---|---|
| U.S. | $438.20 million |
| EMEA | $164.20 million |

### (ii)     The Criticisms of the Valuation Approach of Green, Berenblut and Cox to the Business Sales Should be Rejected

462.    Mr. Green's Business Sales allocations should be accepted. The criticisms of some of the Core Parties of the approach proposed by Mr. Green, Mr. Berenblut and Dr. Cox should be rejected.  The criticisms were advanced primarily on three grounds:

(a)     it rests on an interpretation of the MRDA with which they disagree;

(b)     the MRDA, and the U.S. and EMEA Debtors' license rights, were transferrable for the purpose of the valuation exercise; and

(c)     the RPSM obligation cannot form any part of a valuation methodology.

463.    With respect to the interpretation of the MRDA, detailed argument can be found above.

464.    With respect to the transferability of the rights under the MRDA of the U.S. and EMEA Debtors, although there was discussion at trial about the restriction on assignment without consent in s. 14(a) of the MRDA, that discussion is a red herring.  First, the MRDA was not assigned under the Business Sales and Residual IP Sale.  Whether the MRDA Participants consented to the Business Sales and Residual IP Sale is not relevant since they clearly did not consent to, nor was there an, assignment of the MRDA.  Second and most importantly, whether

- 150 -

or not the MRDA licenses were transferable under Article 14(a), as noted above, the licenses

were restricted to activities "by or for the Participants".  Therefore, assessing their value in light

of that restriction, which Mr. Green did, is the correct approach.  No additional value can be

hypothesized if those restricted license rights were put in the hands of another person. [451]  Mr.

Britven, an expert for the CCC put it this way:

> A.      It is my understanding the MRDA and the licenses are not
> transferable, so what is the value in Nortel's hands.  And then we said,
> well, let's go ahead and assume that this can be transferred.  Let's lift that
> restriction on transferability and allow another party to step into the shoes
> of the licensed participant and what does that suggest in terms of value.
>
> And when we do that look, we see that the party that would step into the
> licensed participant's shoes would be subject to the same constraints of the
> licensed participant.  There would be limitations around the field of use
> and around sublicensing.  There would be an obligation to share profits.
> There would be an obligation to transfer ownership of the patents to NNL.
> And then it would not be transferable again.
>
> And so from a third-party businessman's perspective, it is just not
> practical to assume that this would be attractive to a third party.  A
> businessman is not going to want to step into those shoes.
>
> Q.      All right.  And so what did that tell you about value?
>
> A.      Well, that tells me that the value of these surrendered licenses to a
> third party are de minimis and the highest value is in the hands of Nortel,
> which is kind of counterintuitive, but in this case, the highest value is in
> the hands of Nortel, and that's the highest and best use.  And that actually
> becomes fair market value by definition, the highest and best use.[452]

465.    With respect to the use of the RPSM, as described above, the MRDA both granted

licenses to the U.S. and EMEA Debtors (the only source of their rights to Nortel IP) and

provided for obligations, including a specific sharing of operating profits, i.e. the RPSM.  This

contractual requirement to share operating profits is crucial to the valuation exercise because the

source of value of the U.S. and EMEA Debtors' license rights – the manufacture, use or sale of

---

[451] Mark Berenblut Trial Testimony, Day 15, June 16, 2014, p. 3615:9-3616:9

[452] Thomas Britven Trial Testimony, Day 14, June 6, 2014, p. 3389:20-3391:1

Nortel "Products" to generate operating income – is the very activity that gives rise to the RPSM

sharing.  Thus, in calculating value based on projected income, regard must be had to the

licensees' obligation to share any residual operating profits or losses with the other signatories to

the MRDA, as that is an obligation to which they would have been subject if they had continued

to operate and, therefore, their projected income or cash flow must take it into account.[453]

466.    One further unfounded criticism of Mr. Green's approach was made in connection with

the Residual IP Sale (discussed below) but is actually answered in his treatment of the Business

Sales.  Mr. Green was accused of not attributing value for shared patents to the U.S. Debtors and

EMEA Debtors. He did so, properly, in the context of the Business Sales.

467.    This issue turns on the different ways IP was used at Nortel.  There was intellectual

property that was used predominately by a single line of business; intellectual property that was

used by two or more lines of businesses; and intellectual property that was not used by any line

of business.

468.    In each Business Sale, Nortel intellectual property that was specific to the LOB in

question was assigned outright to the purchaser of that LOB, while the intellectual property that

was shared among a number of LOBs was non-exclusively licensed to the purchasers of the

relevant LOBs.  The total price payable by the purchasers of the LOBs thus reflected all of these

rights.

469.    The Business Sale forecasts for the LOBs projected the cash flow that would be received

through, among other things, the specific IP sold to the buyers and the IP shared between

---

[453] TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014) p. 54-55; TR00047 (Exh. 47, Expert Report of Mark Berenblut and Alan Cox, January 24, 2014) para. 65-67

businesses and licensed to the purchasers.  The proceeds allocated to each Licensed Participant

therefore reflects the value of the licenses with respect to specific IP and the shared IP.  Mr.

Kinrich's criticism that the exclusive licenses may have permitted them to do something the non-

exclusive licenses to the purchasers did not, and may have had value, was pure speculation, was

not demonstrated and has no substance.[454]

### (iii)    *Transfer of the IP Rights to the Buyers*

470.    The purchasers in each Business Sale paid for the transfer of the ownership of any Nortel

IP that was used predominantly in the particular business in question, and for the grant of

licenses to any Nortel IP that was used in more than one business.[455]  All of this IP – both that

which was transferred and that which was licensed – was owned by NNL alone.  Because the

value of the U.S. and EMEA Debtors' license rights has already been accounted for, the

remaining sale proceeds are attributable to the transfer of NNL's ownership of IP and, to a lesser

extent, to the transfer of any Canadian-owned customer-related intangibles, and is accordingly

properly allocated to the Canadian Debtors.[456]

### (f)    Allocation of Proceeds Attributable to Customer Relationships

471.    On Mr. Green's approach, the value of the license rights includes within it the value of

customer-related intangibles such as customer relationships and distribution agreements that

were transferred to the purchasers.  There are good reasons for this.  The MRDA defines NN

---

[454] TR00052 (Exh. 52, Rebuttal Report of Jeffrey Kinrich, February 28, 2014) para. 84

[455] TR00009A (Affidavit of Sharon Hamilton, April 11, 2014) para. 52; *see e.g.,* TR44138 (CDMA
Asset Sale Agreement dated July 24, 2009) s. 2.1.1 and TR44142 (CDMA Intellectual Property
License Agreement, November 13, 2009) Articles 1.01(o), 2.01

[456] TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28,
2014) p. 49; TR00047 (Exh. 47, Expert Report of Mark Berenblut and Alan Cox, January 24,
2014) para. 18

- 153 -

Technology (owned by NNL) as "any and all intangible assets . . . ."[457] The value of these

intangibles is based on the expected operating profit or cash flow that they would have generated

through sales to customers.[458]  That is the same as the expected cash flows from sales to

customers that have already been accounted for in valuing the U.S. and EMEA license rights and

its allocation must take into account the sharing methodology under the MRDA.  And it is

difficult to see what independent value can be given to customer relations once IP value is

accounted for.  The UKPC's expert, Dr. Bazelon, opined that goodwill and customer

relationships are IP-related asset categories that are entangled with the IP,[459] an opinion

consistent with Nortel's approach of treating R&D, not customer relations, as the driver of

value[460] and with Mr. Berenblut and Dr. Cox's opinion:

> Those intangible assets were economically comingled with license rights
> to use Nortel's IP under the MRDA because the value from those non-IP
> intangibles (such as Nortel customer relationships) depended on the ability
> to sell products and services embodying the Nortel technology. In
> addition, Nortel's business was organized and managed in global business
> segments, rather than by geographic regions. Consequently, most or all of
> the value, if any, of the non-IP intangible assets of Nortel was not
> separately realizable by particular Nortel entities in specific jurisdictions,
> other than through their share of the global operating profits of Nortel
> through the application of the RPSM. Therefore, the present value of the
> U.S. Debtors' and EMEA Debtors' respective shares of the expected
> operating profits of Nortel, if any, would reflect and incorporate both the

---

[457] TR21003 (MRDA and addenda) Article 1(f)

[458] TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014) p. 49

[459] TR00039 (Exh. 39, Expert Report of Coleman Bazelon, January 24, 2014) p. 1; TR00040 (Exh. 40, Rebuttal Report of Coleman Bazelon, February 28, 2014) Footnote 20; Coleman Bazelon Trial Testimony, Day 12, June 2, 2014, p. 2985:14-17

[460] TR11055B (Economic Analysis of Nortel Networks' Intercompany Transactions by Horst Frisch, March 14, 2002) p. 4, 39; TR11084 (Nortel Networks' Functional Analysis for the years ended December 31, 2000-2004) p. 3, 7, 17-18; TR22078 (NNL and NNI Joint Request for US-Canada Bilateral APA: 2007-2011, October 31, 2008) p. 11

value of any property interests in non-IP intangible assets and the value of the license rights in the IP assets.[461]

472.    Accordingly, the value of the customer relationships is appropriately considered as encompassed within the value of IP and allocated in the same way to the U.S. and EMEA Debtors.[462]

473.    For the reasons set out below, the approach of the EMEA expert, Mr. Huffard, to determining a separate value for customer relationships allocated on a basis different than operating income from those customers would have been shared, is wholly unconvincing.

**(g)    Total Allocations Related to the Business Sales**

474.    Thus, the allocations of the Business Sale proceeds should be as follows:[463]

---

[461] TR00047 (Exh. 47, Expert Report of Mark Berenblut and Alan Cox, January 24, 2014) para. 66

[462] TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014) p. 56

[463] TR00043 (Exh. 43, Rebuttal Report of Philip Green, February 28, 2014), p. 85 of PDF, Updated Exhibit D-2, updating TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014) p. 61

| (Millions of USD) | CA | U.S. | EMEA | TOTAL |
|---|---|---|---|---|
| Tangible Assets | $121.74 | $317.59 | $94.86 | $534.19 |
| In-Place Workforce | 78.68 | 134.74 | 41.91 | 255.33 |
| Wholly-Owned Subsidiaries | - | 110.97 | - | 110.97 |
| IP Rights and Customer Rel. | 1,379.85 | 438.20 | 164.20 | 1,982.25 |
| Total Allocation | $1,580.27 | $1,001.50 | $300.97 | $2,882.74 |
| *Allocation %* | *54.8%* | *34.7%* | *10.4%* | |

**(h)    Alternative Valuation of Property Interests in Business Sales**

475.    Mr. Green also prepared an alternative analysis with respect to the business sales.  He calculated an allocation of the sales proceeds assuming that the proceeds from the Business Sales represented the present value of the businesses' expected future earnings. The table below presents what the allocation of the sale proceeds would be, if the entire excess of the sale price over the value of the tangible assets was treated as the present value of the amount that could have been earned by the continued operation of the Nortel businesses.[464]  This alternative approach reflects "safe hands" projections, i.e. projections as to what a new, well-capitalized owner could earn through operating the businesses, thus giving value to the U.S. and EMEA Debtors based on business success that Nortel was unable to accomplish in the real world.[465]

---

[464] TR00043 (Exh. 43, Rebuttal Report of Philip Green, February 28, 2014), p. 99 of PDF, Updated Exhibit G-2, updating TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014) p. 62

[465] Philip Green Trial Testimony, Day 13, June 5, 2014, p. 3148:14-25

This alternative approach is consistent with what Mr. Berenblut and Dr. Cox called the "upper bound" on the allocation of proceeds from the Business Sales.[466]

| (Millions of USD) | CA | U.S. | EMEA | TOTAL |
|---|---|---|---|---|
| Tangible Assets | $121.74 | $317.59 | $94.86 | $534.19 |
| *Allocation %* | *22.8%* | *59.5%* | *17.8%* | |
| Wholly-Owned Subsidiaries | - | 110.97 | - | 110.97 |
| *Allocation %* | *0.0%* | *100.0%* | *0.0%* | |
| Intangible Assets | 1,116.55 | 861.47 | 259.56 | 2,237.58 |
| *Allocation %* | *49.9%* | *38.5%* | *11.6%* | |
| Total Allocation | $1,238.29 | $1,290.03 | $354.42 | $2,882.74 |
| *Allocation %* | *43.0%* | *44.8%* | *12.3%* | |

476.    Even giving effect to the upper bound still requires application of the RPSM, for the same reasons as set out above.

477.    Mr. Green made a simplifying assumption in order to prepare his alternative analysis of the allocation of Business Sale proceeds, i.e. routine returns would be in approximately the same relative proportion as RPS percentages.

478.    On cross-examination, Mr. Green explained that the information required to properly forecast routine returns was not available – a valuator would require the cash flow projections

---

[466] Mark Berenblut Trial Testimony, Day 15, June 16, 2014, p. 3621:13-3622:15; TR00047 (Exh. 47, Expert Report of Mark Berenblut and Alan Cox, January 24, 2014) paras. 88-91

used by the buyers.[467] Accordingly, his simplifying assumption is appropriate.  Mr. Kinrich's

criticism that in Q1 2010  the routine returns were different than the RPS percentages does not

disprove this assumption for the forecast period.[468]   In any event, even if Mr. Kinrich were right

about the relative proportions of routine returns and RPS percentages, the resulting allocation

percentages would still be closer to Mr. Green's opinion as to the proper allocation percentages

than to Mr. Kinrich's.

**PART VIII – ALLOCATION OF THE PROCEEDS FROM THE ROCKSTAR TRANSACTION**

479.    The basic methodology used by Mr. Green for allocating the proceeds of the residual

patent portfolio sale is the same as that used to allocate the proceeds from the Business Line

sales.  That is, each Debtor Estate is allocated the value of any tangible assets (based on book

value), in-place workforce (based on replacement cost) and, for the U.S. and EMEA Debtors,

their respective license rights (based on the operating profit that each could have earned from the

exercise of the license rights had they not been surrendered).  The balance remaining after those

deductions is properly allocated to the Canadian Estate, as it is solely attributable to the transfer

of the IP that was owned by NNL.

480.    With respect to tangible assets, none were actually transferred as part of the Rockstar

Transaction.  With respect to the in-place workforce, 26 employees were transferred as part of

---

[467] TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014) p. 62; Philip Green Trial Testimony, Day 13, June 5, 2014, p. 3239:20-3240:7

[468] TR00052 (Exh. 52, Rebuttal Report of Jeffrey Kinrich, February 28, 2014) para. 66

the transaction, with a value of less than $1 million.[469]  Mr. Green identified their employers and allocated to them the value of the relevant work force.

481.    The balance – virtually the entirety of the Rockstar sale proceeds – are attributable to the transfer of patents owned by NNL.  The patents that were the subject of the Rockstar sale fell into one of two categories:

(a)    patents that had been used in several business lines and in respect of which licenses had been granted to the Business Line purchasers; and

(b)    the remaining patents, which had not been used in any Nortel business.

482.    Mr. Green considered whether there was value in the U.S. and EMEA Debtors' licenses with respect to each group of patents, as the licenses were surrendered in connection with the Rockstar Transaction.  If there was such value, it should be allocated to the U.S. and EMEA Debtors, respectively.

483.    For the group of patents identified in (a) above – i.e. patents that had been used in several business lines and in respect of which licenses had been granted to the Business Line purchasers – the value of the U.S. and EMEA Debtors' licenses with respect to those patents (which is the value that they would have earned had they continued to operate the businesses) has already been determined (and allocated) as part of Mr. Green's allocation of the Business Line sale proceeds (see paras. 455-473 above).[470]

---

[469] TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014) Appendix I (p. 1-2)

[470] TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014) p. 64

484.    With respect to those patents that were <u>not</u> used in any of Nortel's operating businesses (i.e. those described in (b) above), Mr. Green considered whether there was any evidence that the U.S. and EMEA Debtors had any prospect of generating earnings through the exercise of their license rights in connection with those patents.  He concluded that they did not because the U.S. and EMEA Debtors' license rights were limited to the right to make Products – i.e. products made or designed (or proposed to be made or designed) by or for a Participant, embodying or using the Nortel IP.  He considered the following facts:

(a)      the patents in question were not used in any Nortel business;

(b)      there were no Products – nor was there any prospect of Products – that embodied or used the patented technology; and

(c)      there were no business plans or documents suggesting any potential use of the Residual IP by the U.S. or EMEA Debtors.[471]

485.    The licenses had value only if there were expected cash flows associated with the licenses.  If the licenses would not generate any expected cash flows in respect of the patents in question, then there is no value in respect of the patents in question.  From a valuation perspective, a contractual right that has no prospective cash flow attached to it has no value.[472]

486.    As Mr. Green testified, he looked for such value, but found none.[473]

---

[471] TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014) p. 64-65; Philip Green Trial Testimony, Day 13, June 5, 2014, p. 3149:23-3156:13

[472] TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014) p. 43 and 54; Philip Green Trial Testimony, Day 13, June 5, 2014, p. 3109:11-25

[473] Philip Green Trial Testimony, Day 13, June 5, 2014, p. 3153:8-3156:13

**(a)    The Other Parties' Criticisms With Respect to the Rockstar Allocation are Groundless**

487.    Mr. Green's conclusion cannot be challenged by the U.S. Debtors' purported reliance on an expert report authored by Terrence McGarty.  (Mr. McGarty was not called as a witness at trial.)  With a complete lack of evidentiary foundation, Mr. McGarty opined that NNI could in fact have extracted "considerable value" from the exercise of its license rights under the unused Residual IP by manufacturing and selling products and services.[474]  Although NNI had agreed to sell its businesses, and had found no other businesses to operate, Mr. McGarty speculates that target markets for business opportunities, which would have been available not only to Nortel but to many potential competitors, and in which neither the U.S. nor the EMEA Debtors had shown any interest, could have reached over $10 billion.  Tellingly, Mr. McGarty gives no estimate of what NNI's share of this $10 billion hypothetical market would have been, nor did he develop a business plan for how NNI could have earned anything out of the opportunities.[475]

488.    Mr. McGarty's evidence amounts to nothing more than utter and complete speculation. His opinion as to what products NNI could have developed using the technology claimed by the unused residual patents is entirely unsupported.  Moreover, his opinion is predicated on an assumption that NNI (which would have been developing these hypothetical new products) had $500 million in cash to fund this development process[476] – an assumption that is particularly difficult to credit, given that NNI was a wholly owned subsidiary of NNL, that NNI was going through bankruptcy proceedings along with various other Nortel companies, and that NNI along

_____

[474] Rebuttal Report of Terrence C. McGarty, February 28, 2014, para. 14

[475] Rebuttal Report of Terrence C. McGarty, February 28, 2014, para. 55; Terrence C. McGarty Deposition, March 31, 2014, p. 75:10-77:5, 106:6-11

[476] Terrence McGarty Deposition, March 31, 2014, p. 129:15-130:3

with its various stakeholders and advisors considered monetization options in order to maximize recoveries.

489.    In the circumstances, perhaps it is not surprising that neither Mr. McGarty nor any other expert witness called by the U.S. Debtors actually attempted to value this alleged business opportunity that Mr. McGarty has identified – a business opportunity that consists of NNI developing products using patented technology that no Nortel entity had incorporated into a product notwithstanding the thousands of Nortel R&D staff whose work had been devoted to developing products.

490.    In short, there is simply no basis for Mr. McGarty's speculation.  His evidence should accordingly be given no weight.

491.    Also without foundation is the criticism levelled by Professor Tucker, who assumed that Mr. Green does not give the U.S. or EMEA Debtors credit for forward-looking innovation, which, according to Professor Tucker, would be a flaw in his analysis.[477]  However, Professor Tucker's assumption is incorrect.  Mr. Green's analysis clearly takes into account, to the benefit of the U.S. and EMEA Debtors, profits from future Nortel technology.  Although his projections assume that 100% of the profits in Year 1 will be as a result of existing Nortel technologies, they also assume that, by Year 9, future Nortel technologies will account for 96.1% of the projected revenues.[478]  Accordingly, Mr. Green accounts for the likelihood that Nortel will have emerging

[477] TR00056 (Exh. 56, Expert Report of Professor Catherine Tucker, February 28, 2014), paras. 2, 23, 26 and 110.

[478] TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014 (reissued February 28, 2014)), Appendix K, p. 4

technologies, consistent with Professor Tucker's view that emerging technologies are important for a business such as Nortel.

492.    The other argument advanced by the U.S. Debtors as to the value that they could have realized had NNI not surrendered its license relates to the opportunity to participate in IP Co. – more specifically, the U.S. Debtors' assertion that NNI could have realized value through the operation of IP Co.  Mr. Green considered the information and opined that IP Co. was too speculative to use in a valuation exercise:

> Q.    And was that part of your looking for indications of value in the IP licenses?
>
> A.    Yes, it was.  And we'll talk about this in a few minutes.  But the IPCo models, there were many models.  They make a whole variety of assumptions.
>
> Ultimately, IPCo was never actually done.  The company never went forward for a variety of different reasons, which I understand relate to financing and also to the sort of speculative nature of what this business was going to be.
>
> A licensing business is very hard to manage and to, essentially, operate with any certainty because so much it has to do with litigation and getting other people to take licenses, so –
>
> Q.    So, Mr. Green, what did you conclude with the appropriateness of using the IPCo models in a valuation of the licenses in the Residual IP?
>
> A.    Well, IPCo never operated, unlike the CDMA business or the Enterprise business.  And so, really, IPCo was really a very speculative basis on which to actually try and derive cash flows.  There simply wasn't a reliable basis to do it. [479]

493.    For all of these reasons, Mr. Green concluded that the U.S. and EMEA license rights had no value in so far as they related to those patents that were not used in connection with any of Nortel's Products.

---

[479] Philip Green Trial Testimony, Day 13, June 5, 2014, p. 3153:21-3156:2

494.    Some of the U.S. Debtors' position appeared to be based on the premise that the U.S. Debtors would have received a larger allocation if they had pursued IP Co.  This is wrong. The U.S. and EMEA Debtors are entitled to the value of their licenses. If those licenses, because of their scope, permitted them to pursue a valuable IP Co., and if the IP Co. model was a reliable measure of value, then that should be considered.  Mr. Green did exactly that.  He took all of this into account and concluded that the licenses had no value.

495.    Therefore, there is no additional value allocable to the U.S. or EMEA Debtors in respect of the surrender of their license rights in connection with the Rockstar Transaction.  To the extent that the license rights had any value, that value has already been accounted for in valuing the license rights surrendered as part of the business line sales.[480]

496.    Accordingly, virtually the entirety of the sale proceeds realized from the Rockstar Transaction is properly allocated to the Canadian Debtors.

497.    Finally, in their Pre-Trial Brief, the U.S. Debtors referred to an answer given by Dr. Cox on his deposition.  The answer related to the amount that a fictional buyer would have paid to NNL for its rights in the Residual IP, had NNI and the EMEA Debtors not surrendered their licenses.  As part of a multi-witness arrangement to reduce the number of witnesses testifying at trial and because Mr. Berenblut, the co-author of two reports with Dr. Cox, did testify, Dr. Cox did not appear at trial and explain his views.  Nonetheless, it is important to note that the U.S. Debtors omitted the assumption that Dr. Cox was asked to make in the course of the line of questioning.  Essentially, having been asked to assume that the courts would not require NNI and the EMEA Debtors to transfer their licenses for zero consideration (in other words, having been

---

[480] TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014) p. 64

asked to assume that the licenses had value, i.e. that the licenses encompassed additional rights to those granted by the MRDA), Dr. Cox expressed the view that a fictional buyer of the Residual IP would have paid a lot less than what Rockstar actually paid.  The assumption, question and answer were:

> Q.    Assume with me that the IFSA did not require them to transfer their licenses for zero consideration, that they would not have been required by the courts to do that.  Okay?  So just for purposes of these questions, just make that assumption.
>
> A.    Um-hmm.
>
> Q.    The IFSA does not require that.  Did you undertake to assess the value of what a buyer would have paid to NNL to take all of NNL's rights under the patent portfolio subject to whatever NNI's and the EMEA Debtors' exclusive licenses were?
>
> MR. KELLER: We're still after the line of business sales?
>
> BY MR. ROSENTHAL: Q.   Correct.
>
> A.    I did think about that, yes.
>
> Q.    Did you assess what that fictional buyer would have paid?
>
> A.    Well, I thought about it and amongst the possibilities I thought that they would pay a relatively small amount, certainly a lot less than what was paid in the Rockstar transaction, possibly nothing.[481]

498.    Thus, the entire exchange was predicated on an assumption that the license rights had value in relation to the IP sold in the Rockstar Transaction (which they did not).  Dr. Cox's answer merely confirms that, if the licenses had had value and if they had not been surrendered, the purchaser would have paid less for the IP, which would still have been subject to those licenses.  It is submitted that the answer is of little assistance.

---

[481] Alan Cox Deposition, March 26, 214, p. 156:17-157:17

**(b)    Alternative Approach to Residual IP Sale Valuation**

499.    At Appendix P to his February 28, 2014 Report, Mr. Green also provided an alternative valuation with respect to the Residual IP sale proceeds.  This alternative approach is based on the assumptions that Nortel could have successfully operated IP Co., that the MRDA allowed the U.S. and EMEA Debtors to participate in the profits from an IP Co., and that the cash flows that would have been generated by IP Co. can be measured from the IP Co. models which were never accepted or acted on, and that the profits would have be shared under the RPSM.[482]  This alternative, therefore, would give the U.S. and EMEA Debtors any value they would have obtained in IP Co., if their licenses had allowed them to run such a business.  (Of course the licenses did not allow them to do so, since IP Co. was intended to enforce all rights under the patents, not those limited to the rights given by the MRDA licenses.)

500.    Mr. Green summarized the alternative calculation as follows, using the "middle" number from the range of China-included IP Co. models:[483]

---

[482] Philip Green Trial Testimony, Day 13, June 5, 2014, p. 3163:3-3164:18

[483] Philip Green Trial Testimony, Day 13, June 5, 2014, p. 3157:14-3160:22; *see also* TR00043 (exh. 43, Rebuttal Report of Philip Green, February 28, 2014), p. 251 of PDF, Appendix P, Exhibit 2

*(Millions of USD)*

| | |
|---|---|
| Value of Potential IP Co. | $1,093.47 |
| Total Residual IP Sale Proceeds | 4,454.37 |
| IP License (IP Co. Value x RPSM %) | |
| U.S. Debtors ($1,093 x 38.5%) | (420.99) |
| EMEA Debtors ($1,093 x 11.7%) | (127.94) |
| IP Owned by CA Debtors | $3,905.44 |

**(c)**    **Total Allocations of Sale Proceeds**

501.    Mr. Green's evidence that the total sale proceeds – from both the business line sales and the Rockstar Transaction – should be allocated as follows should be accepted.[484]

| Debtor Estate | Allocation |
|---|---|
| Canada | $6,034.11 million |
| U.S. | $1,001.93 million |
| EMEA | $300.97 million |

---

[484] TR00043 (Exh. 43, Rebuttal Report of Philip Green, February 28, 2014) p. 44

502.    Alternatively, if Mr. Green's alternative Business Sale allocation were accepted instead of his main allocation opinion, the allocation would be:[485]

| Debtor Estate | Allocation |
|---|---|
| Canada | $5,692.56 million |
| U.S. | $1,290.03 million |
| EMEA | $354.42 million |

503.    Finally, if Mr. Green's alternative Business Sale allocation were accepted, and if, for the Residual IP allocation, the "middle" number from the "Including China Enforcement" IP Co. model addressed at trial is used,[486] the allocation would be (adding the two alternative allocations together):

| Debtor Estate | Allocation |
|---|---|
| Canada | $5,143.73 million<br><br>($1238.29 million + $3905.44 million) |
| U.S. | $1,711.02 million<br><br>($1290.03 million + $420.99 million) |

---

[485] TR00043 (Exh. 43, Rebuttal Report of Philip Green, February 28, 2014) Exhibit G

[486]  TR00043  (Exh.  43,  Rebuttal  Report  of  Philip  Green,  February  28,  2014) Appendix P (Exhibit 2); Philip Green Trial Testimony, Day 13, June 5, 2014, p. 3163:3-3164:18; TR00042 (Exh. 42, Expert Report of Philip Green, January 24, 2014, reissued February 28, 2014) p. 62

| Debtor Estate | Allocation |
|---------------|------------|
| EMEA | $482.36 million[487] |
|  | ($354.42 million + $127.94 million) |

## PART IX – THE ALLOCATIONS PROPOSED BY THE U.S. AND EMEA DEBTORS ARE NOT SUPPORTABLE

### (a)    Introduction

504.    Although the U.S. Debtors and the EMEA Debtors together served the reports of ten different experts that relate to the allocation question, three of those reports – one served on behalf of the U.S. Debtors and two served on behalf of the EMEA Debtors – provide the basic framework upon which those parties' respective allocation positions rest.  The U.S. Debtors' expert is Jeffrey Kinrich.  The EMEA Debtors' experts are James Malackowski and Paul Huffard.

505.    The specific approaches taken to the valuation and allocation question by Mr. Kinrich on the one hand, and Messrs. Malackowski and Huffard on the other, differ in many respects and are the subject of criticism that each directs at the other.  However, they share one fundamental flaw: none of them is based upon a valuation of the specific assets and rights transferred and surrendered by each Debtor Estate as part of the asset sale transactions, properly construed.  Instead, the U.S. and EMEA experts provide opinions that are dependent upon a wholly different

---

[487] It is instructive that, using similar assumptions about the scope of the parties' legal rights, but a different methodology, Thomas Britven, the expert valuator retained by the CCC, arrived at allocations that are similar to those of Mr. Green.

legal approach to the parties' rights (ownership and rights with respect to IP being a case in point) and thus to their allocation.

506.    The U.S. and EMEA experts provide opinions with respect to allocation that are based variously on:

(a)    the geographical location where Nortel's revenues were earned in 2009 (Mr. Kinrich for the Business Sales); or

(b)    the geographical location where Nortel's future revenues might have been earned, if Nortel had engaged in different businesses (Mr. Kinrich for the Residual Patent Sale); or

(c)    the relative expenditures made by the various Licensed Participants with respect to Nortel's R&D over an assortment of different time periods (Messrs. Huffard and Malackowski in relation to the IP in all sales).

507.    These approaches are prisoners of the incorrect assumptions or understandings as to the rights of the parties on which they depend.  The application of any of the approaches espoused by the U.S. and EMEA Debtors would result in an allocation of sale proceeds that is unconnected to the legal entitlements of the parties.  And, even on their own terms, these allocation theories as well as their respective applications have additional flaws.

**(b)    The Allocation Proposed by Mr. Kinrich Is Not Supportable**

508.    Mr. Kinrich proceeds on the assumption that NNL held only "nominal legal title" and that the U.S. and EMEA Debtors had "all the economic value" of Nortel IP in their exclusive territories.  In other words, Mr. Kinrich's opinion is based upon the assumption that the license rights granted to the U.S. and EMEA Debtors are broader than a license to make, use and sell

- 170 -

Products, and extend to a license to use Nortel technology for any purpose whatsoever.  In his

report, Mr. Kinrich stated:

> It has been represented to me that under the MRDA each of the five IEs
> had exclusive rights to all NN Technology in its Exclusive Territory . . .
> Although NNL held nominal legal title to all patents subject to the
> MRDA, it did not have the right to exploit or sub-license any patents in
> the Exclusive Territories other than Canada. . . . Thus, all the economic
> value of Nortel's IP in Exclusive Territories was held by the IE in that
> territory.[488]

509.    In his rebuttal report, he stated:

> In contrast, the U.S. and EMEA Debtors' position is that the exclusive,
> perpetual, royalty-free licenses NNI and the EMEA IEs held, which
> included the right to sub-license, gave each of them all economic rights to
> exploit all Nortel IP within their Exclusive Territories, regardless of the
> fact that NNL held nominal legal title.  The U.S. and EMEA Debtors'
> position is that these economic rights in each IE's Exclusive Territory
> were not limited by any scope or field of use restriction.

> Consistent with the U.S. and EMEA Debtors' position, I have been asked
> to assume there is no scope of use restriction on the licenses.[489]

510.    And at trial, he testified as follows:

> Q.    And one of the assumptions that you made that you told Mr. Luft
> about this morning was an assumption about the scope of the license
> rights; correct?  That the license rights were not limited by any scope
> restriction; that is correct?

> A.    That is right.

> Q.    And are you familiar with the term "field of use"?

> A.    I am.

> Q.    And is your assumption the equivalent of assuming that the field of
> use was unlimited?

---

[488] TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) para. 84

[489] TR00052 (Exh. 52, Rebuttal Report of Jeffrey Kinrich, February 28, 2014) paras. 21-22

> A.     I think so.· I think that's a fair probably equivalent statement.  I didn't think about it that way, but that's probably equivalent.[490]

511.    If these assumptions are wrong, the conclusions in Mr. Kinrich's initial report do not follow.  As Mr. Kinrich testified on his deposition:

> I agree that the interpretation of the license rights that I was asked to assume in connection with my initial report is important to my ultimate conclusion . . .

> I would say that if the assumptions are different, the conclusions would be different. . . . Or excuse me, might be different.  It depends on how varied the assumption is.[491]

512.    And at trial, he said:

> Q.     And to the extent that the field of use was limited, there could be implications for the value of the license; correct?

> A.     Yes.

> Q.     And similarly, there could be implications for the value that the patent holder had; correct?

> A.     Correct.[492]

513.    As is discussed above, Mr. Kinrich's assumptions as to the scope of the license rights granted to the U.S. and EMEA Debtors are incorrect.  Contrary to his assumption, the license rights <u>were</u> limited by a field of use restriction.  They were limited to "Products".  This would clearly affect the value of the licenses.  However, the effect of that limitation on the value of the license rights is not reflected in the allocation that he proposes in his initial report.

---

[490] Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4291:10-24; *see also* TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) paras. 12, 84; Jeffrey Kinrich Deposition, April 8, 2014, p. 148:22-151:17

[491] Jeffrey Kinrich Deposition, April 8, 2014, p. 149:8-11, 150:11-17

[492] Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4294:18-25

514.    Moreover, because there were limits on the scope of the licenses, some rights under the IP were not licensed to the Licensed Participants but rather were retained by the IP's owner, NNL.  As even Mr. Kinrich acknowledges, such retained rights can have value.  However, just as Mr. Kinrich failed to consider the effect that a field of use restriction would have on the value of the license rights, the allocation that he proposes in his initial report fails to consider what value should be ascribed to the rights retained by NNL due to the field of use restriction.  For those reasons alone, the U.S. Debtors' proposed allocation based upon his opinion cannot stand.

515.    In addition, even if Mr. Kinrich's assumption as to the scope of the license rights were correct (which it is not), his analysis suffers from other flaws.  Although Mr. Kinrich purports to "determine the value an entity relinquished" in the Business Sales, he does not perform a valuation.  He concedes that a discounted cash flow analysis, that is, a projection of future cash flow (revenues less costs) discounted to the present value at a discount rate is the preferred method, but he does not carry out such a calculation.[493]  He thus does not value the licenses by considering what he himself says is involved in the value of a license – i.e., the profits that could have been earned by exploiting the patented technology.[494]

516.    Instead, he engages in a different type of exercise, wherein he compares the relative revenue earned in each geography by the various Nortel entities for each business line in a single year, namely, 2009.[495]  He then allocates the sale proceeds from each business line sale to each Debtor Estate based upon the claimed proportionate share of the revenues earned in the estates' respective geographies.  For example, with respect to the CDMA/LTE business, Mr. Kinrich

---

[493] TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) paras. 89-90

[494] TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) para. 28; Jeffrey Kinrich Deposition, April 8, 2014, p. 157:22-158:6, 159:11-17, 161:15-22

[495] TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) para. 27

indicates that 90.8% of that business' 2009 revenue was earned in the United States.

Accordingly, Mr. Kinrich allocates 90.8% of the CDMA/LTE sale proceeds to the U.S. Estate.[496]

517.    This approach is plagued by a number of fundamental flaws.

518.    First, although the U.S. Debtors assert that the revenue-based approach is a "standard income-based method" of valuing the assets that were relinquished,[497] Mr. Kinrich acknowledged that this was not the preferred method.  Rather, the preferred method for valuing income-producing assets, such as the IP licenses in the present case, is the discounted cash flow method:

> Q.    Now, let's talk about some more rigorous valuation methods.  Do you agree, sir, that financial economists agree that a discounted cash flow analysis is the preferred technique for asset valuation?
>
> A.    For income-producing assets, generally, yes.[498]

519.    However, this preferred method was not the method employed by Mr. Kinrich.[499]

520.    And although Mr. Kinrich agreed that the value of a license is driven by the profits that the licensee could earn by using the patented technology, he took no steps to determine what those profits would have been in the case of the U.S. and EMEA Debtors:

> Q.    And, sir, you understood that the value of a license is driven by the profits a licensee could obtain by using the patented technology?  And by "using," let's include licensing, sublicensing, et cetera.
>
> A.    Yes.[500]

---

[496] See  e.g., TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) Exhibits 9, 10

[497] See e.g., Pre-Trial Brief of the U.S. Interests, May 2, 2014, p. 76

[498] Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4328:13-20

[499] Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4329:9-14

Nonetheless, in determining the value of those licenses, Mr. Kinrich took no steps to attempt to forecast those profits.[501]

521.    The "authoritative" text relied upon by Mr. Kinrich as supporting his revenue-based methodology in fact made it clear that his approach was not appropriate to the valuation task at hand.  The text Mr. Kinrich cited, *Valuing Small Businesses and Professional Practices* (the title of which suggests its unsuitability for the issues before the Courts), stated that valuing a business based on a revenue approach may be useful:

> (a)    to approximate a range of possible values with a minimum of time and effort;
>
> (b)    to conclude an estimate of value when other data are unavailable or inadequate; or
>
> (c)    as one indicator of value, used in conjunction with other "more rigorous" valuation methods.[502]

522.    Mr. Kinrich did not suggest that his valuation exercise fell within any of these three categories.

523.    The text went on to explain that a revenue approach would require the comparable businesses to have a fairly standard cost structure.[503]  Mr. Kinrich acknowledged that the various Nortel entities, among which he was allocating proceeds based on revenue, did not have a standard cost structure, yet he used a revenue-based approach nonetheless.  He testified as follows:

---

[500] Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4329:15-20

[501] Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4330:3-4331:2

[502] TR00053 (Exh. 53, *Valuing Small Businesses and Professional Practices*, 3d ed., New York: McGraw-Hill, 1998) p. 340

[503] TR00053 (Exh. 53, *Valuing Small Businesses and Professional Practices*, 3d ed., New York: McGraw-Hill, 1998) p. 341-342

Q.      And, sir, if you look over to page 341 to a section below the one you excerpted your quote from, it says:

> "For highly homogeneous industries and professions," it says, "the more similar many businesses or practices within an identifiable industry are, the more valid the indication of value provided by the gross revenue ... multiple method.  If an industry or profession tends to have a fairly standard cost structure, a given level of revenue should be expected to produce a predictable amount of economic income."

Do you see that?

A.      I do.

Q.      And, sir, just from looking at the cost structure relating to research and development that we saw with respect to CDMA, no one could conclude that the cost structure of Nortel Canada was similar to the cost structure of Nortel US; correct?

A.      No.  And that would not be a conclusion I would try to draw.  But I would still apply this, because that isn't the way I read this to apply.[504]

524.    If that were not enough to reject Mr. Kinrich's evidence, there are further fundamental flaws with his analysis.  Although the licenses – and the revenues generated thereby – carried with them an obligation to share in the Nortel Group's operating profits and losses pursuant to the RPSM, Mr. Kinrich did not take into account that obligation.  Although cash flow consists of revenues less costs, he did not take into account the fact that the revenues generated by the U.S. Debtors' exercise of their license rights were subject to a cost, that is, payments to be made pursuant to the MRDA's RPSM sharing obligations.

525.    The very year from which Mr. Kinrich took his revenue numbers, 2009, was one in which the U.S. Debtors had IP rights and were subject to all MRDA obligations.  He ignored those obligations.  And although he assumed that the U.S. and EMEA Debtors' rights under the Nortel IP would persist into the future (if the sales had not taken place), he ignored the obligations that corresponded to those rights – namely the obligations to share in the residual profits and losses

---

[504] Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4326:20-4327:20

pursuant to the RPSM.[505]  The result is that his valuation of the license rights is based upon an

assumption that the license holders could keep all revenues in their territories and had no

obligation to share in Nortel's operating profits or losses.  That is, of course, not the case and

therefore is simply not indicative of the value of their rights.  The licensees were not legally

entitled to retain all of the profits generated within their geographies through their operations

generating revenues.  They were obliged to share profits with the other Participants in

accordance with the formula set out in the RPSM and the value of what they gave up must reflect

that obligation.

526.    Mr. Kinrich offers no justification for his failure to take into account the sharing

obligation imposed by the RPSM, other than to say that he understood that "the sharing

provisions do not apply to sales proceeds".[506]  However, 2009 revenues or future revenues are

not sale proceeds.  The exercise that Mr. Kinrich purports to have undertaken was a

determination of the relative value surrendered by each of the Debtors.  To do that credibly, an

indicator of value would have to be properly chosen.  To determine the value of rights without

taking into account all of the costs and benefits associated with those rights, most notably the

RPSM sharing obligations, is fundamentally and irremediably flawed.  Mr. Kinrich

acknowledged that, for a license that included an obligation to pay a royalty to the patentee, it

would be necessary to take the royalty payment into account when valuing the license.[507]  And

yet, although the same logic applies with equal force to the RPSM sharing obligation and the

U.S. and EMEA license rights, Mr. Kinrich failed to take that sharing obligation into account in

carrying out his valuation exercise.

---

[505] Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4302:7-15

[506] Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4302:7-15

[507] Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4296:15-24

527.    The problem with Mr. Kinrich's revenue approach in the Business Sales and with his refusal to take into account the RPSM sharing obligations becomes all the more apparent when one considers that the revenues of the U.S. Debtors, which he uses to justify their disproportionate allocations, could not have been earned without the R&D expenditures of NNL. For example, with respect to the proceeds from the sale of the CDMA/LTE Line of Business, Mr. Kinrich proposes to allocate only $60 million  (or 5.7% of the sale proceeds) to the Canadian Debtors and to allocate $955 million (or 91% of the sale proceeds) to the U.S. Debtors,[508] based on 2009 CDMA/LTE relative revenue shares.[509]  However, in 2009, the Canadian Debtors spent over $180 million on R&D in connection with the CDMA/LTE business,[510] even though they earned only $78 million in revenues.[511]  By contrast, the U.S. Debtors spent less than $120 million on R&D (or one-third less than the Canadian Debtors) and generated $1.2 billion in revenues.[512]  The U.S. Debtors were only able to generate the revenues they did because of Canada's disproportionate spending on R&D.  As Mr. Kinrich acknowledged, Nortel's R&D was the "single most important factor that drove Nortel's ability to generate its 2009 revenues".[513] The Kinrich approach allows the U.S. to benefit from revenues that it could not have generated without Canada's R&D and it does so without giving effect to the sharing of operating profits and losses derived from those revenues based on R&D spending, which the MRDA required.

---

[508] TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) Exhibit 9

[509] TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) Exhibit 7

[510] Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4316:8-14

[511] TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) Exhibit 7

[512] TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) Exhibit 7

[513] Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4308:20-4309:10

528.    Mr. Kinrich's failure to take into account RPSM sharing obligations is not limited to the

Business Sale proceeds.  In the Rockstar Transaction, he proposes an allocation based on the

geographic location of hypothetical future IP Co. revenues, again without considering how much

of those future forecast revenues each entity would keep, as opposed to having to pay to others,

that is, without considering all costs.

529.    The futility of Mr. Kinrich's approach is illustrated by his inexplicable contention that, by

allocating amounts to the U.S. Debtors based on revenue earned as a result of Canada's R&D, he

was "charging" the U.S. Debtors with the cost of that R&D.  He insisted that this was the case,

even where he gave the U.S. Debtors 90% of the sale proceeds, while Canada incurred over 50%

of the R&D expenditures (in the case of CDMA/LTE).[514]  He even insisted that this would be the

case, if a Line of Business was operated so that the U.S. earned all revenues, while Canada

incurred all of the R&D expenditures.  In that case, Mr. Kinrich would allocate to the U.S.

Debtors 100% of the sale proceeds, while claiming to be "charging it" for the R&D expense.[515]

530.    To allocate based on revenues without taking into account the RPSM sharing obligations

is to hopelessly distort the fundamental business arrangement between NNL and its subsidiaries,

as memorialized in the MRDA, which is yet a further reason to reject Mr. Kinrich's approach in

its entirety.

(c)    **Other Flaws With Allocation Proposed by the U.S. Debtors of the Rockstar
        Transaction Proceeds**

531.    In addition to the foregoing errors (which afflict both the allocation of the Line of

Business Sale proceeds and the allocation of the Rockstar proceeds), the allocation proposed by

---

[514] TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) Exhibit 7

[515] Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4320:10-4321:17

the U.S. Debtors in respect of the Rockstar Transaction proceeds suffers from a number of additional errors.  The analysis performed by Mr. Kinrich results in the owner of the IP, NNL, being allocated only 9.7% of the proceeds from the sale of that IP.[516]

532.    First, Mr. Kinrich proceeds on the assumption that the amount paid by Rockstar for the IP Portfolio is based upon the revenues that could be earned from running a licensing business described in the IP Co. projections.  Indeed, he goes so far as to assume that the amount paid by the Rockstar purchasers can be derived from the cash flow projections that were prepared by Global IP and that are commonly referred to as the "IP Co. Model".[517]

533.    However, there is simply no basis for Mr. Kinrich's assumption in this regard.  He admitted that he does not know whether the Rockstar purchasers in fact based their purchase price upon the IP Co. projections:

> Q.    Well, let's just go to first principles.  You don't know if anyone in the auction process was basing their auction price on these particular cash flows.  You just don't have that particular information?
>
> A.    You are right.  I don't.  They did have the model as part of what was communicated to them, but the royalty rates were not part of that, what they were given.  So they did have the same structure available, each of the bidders did.[518]

534.    Indeed, he admitted that he simply does not know which cash flows formed the basis for the ultimate purchase price:

---

[516] TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) para. 143

[517] TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) paras. 90, 103, 118; Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4125:25-4127:3, 4139:20-4142:12

[518] Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4353:11-20

Q.    But bottom line, you don't know and we don't know what cash flows were used by any of the auction participants that ultimately yielded 4.5 billion?

A.    That's correct.[519]

535.    Mr. Kinrich equates the IP Co. model revenues to the Rockstar purchase price by using a discount rate that matches neither the ones that Global IP and Lazard used nor one that any other expert considers reasonable.[520]

536.    Nonetheless, Mr. Kinrich's proposed allocation of the Rockstar purchase price is based upon the geographical distribution of the IP Co. Model cash flows.  To explain, Mr. Kinrich looked at the IP Co. Model projected cash flows.  Using those cash flows, he purported to determine the relative proportion of revenues that were forecast to be earned in the EMEA territories (as compared to the rest of the world).  With respect to the Canadian and U.S. territories, because the IP Co. Model only provided projections on a North American basis, with no break-down as between Canada and the United States, Mr. Kinrich decided to divide that projected North American cash flow based upon the two countries' relative telecom infrastructure expenditures.[521]  Based upon all of the foregoing, Mr. Kinrich determined the relative proportion of revenues that the IP Co. Model (and Mr. Kinrich's additional information based upon infrastructure expenditures) suggested would be earned in the EMEA, U.S. and Canadian territories, respectively.  And Mr. Kinrich apportioned the Rockstar sale proceeds in accordance with those proportions.  He did not subject these notional cash flows to RPSM

---

[519] Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4354:9-13

[520] TR00043 (Exh. 43, Rebuttal Report of Philip Green, February 28, 2014) p. 9-10 and 17-18; TR00034 (Exh. 34, Rebuttal Report of James Malackowski, February 28, 2014) p. 38-39

[521] TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) para. 116

sharing, even though he stated that an IP Co., had it operated before Nortel's insolvency, would have generated revenues which would have been so shared under the MRDA.[522]

537.    Given that there is no basis to assume that the sale proceeds bore any relation to the IP Co. cash flow projections, or that such cash flows, if earned, would not be subject to RPSM sharing, there is simply no basis for apportioning the sale proceeds in the manner proposed by Mr. Kinrich.

538.    If Mr. Kinrich had considered, instead of assuming away, the fact that, even if Nortel had continued to operate and had generated such royalty revenues, at the very least, those revenues would have been subject to the profit sharing under the MRDA, under which Canada receives approximately 50% of the overall operating profit,[523] he would have reached very different conclusions.  His premise of basing allocation on revenues from a business that was never carried on, and whose hypothetical activities did not fall within the scope of the MRDA licenses, is flawed.

539.    Finally, Mr. Kinrich's analysis fails to take into account the disparity between the parties' respective rights in connection with patent applications.  To explain, the Rockstar Transaction involved the sale of 4,353 patents and 2,786 patent applications.  As noted above, Mr. Kinrich has based his analysis on the assumption that the U.S. and EMEA Debtors were licensees of all of the rights under the patents issued in their respective jurisdictions.  However, although Mr. Kinrich acknowledged that the patent applications as a whole had economic value,[524] Mr.

---

[522] TR00052 (Exh. 52, Rebuttal Report of Jeffrey Kinrich, February 28, 2014) para. 27; Jeffrey Kinrich Deposition Testimony, April 8, 2014, p.167:24-170:2

[523] TR44138 (ASA regarding CDMA/LTE Assets, July 24, 2009)

[524] Jeffrey Kinrich Trial Testimony, Day 17, June 18, 2014, p. 4331:17-20

Kinrich failed to consider the fact that, pursuant to Article 4(d) of the MRDA, NNL had "the exclusive right but not the obligation" to prosecute all patent applications. Thus, he failed to consider that, at the time of the Rockstar sale, NNL had the sole and exclusive control over the patent applications; the exclusive right to decide whether to abandon those applications. Mr. Kinrich failed to ascribe any value whatsoever to that right, despite the fact that the applications accounted for over one-third of the entire portfolio transferred to Rockstar.

540.    Mr. Green performed a calculation that corrected certain of Mr. Kinrich's errors – specifically, his failure to take into account the RPSM sharing obligation and Mr. Kinrich's selection of an inappropriately low discount rate. His analysis in this regard is set out in Appendix P to his Rebuttal Report, described above in paragraphs 502-503. In summary, Green provided corrected results based on a range of appropriate discount rates, and a range of assumptions as to the degree of success that IP Co. would have enjoyed had it operated and had it commenced litigation against infringing third parties. If one assumed the median discount rate (of 35%) and the median litigation success rate (of 70%), then Mr. Kinrich's allocation of the Rockstar Sale proceeds, as corrected by Mr. Green, would be as follows. (Also shown is the allocation advocated by Mr. Kinrich.)

|  | Corrected Kinrich Allocation of Rockstar Sale Proceeds[525] | Kinrich's Actual Proposed Allocation of Rockstar Sale Proceeds[526] |
|---|---|---|
| Canada | $4,003.06 million | $430 million |
| U.S. | $346.12 million | $3,310 million |

---

[525] TR00043 (Exh. 43, Rebuttal Report of Philip Green, February 28, 2014) Appendix P (Exhibit 1)

[526] TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) p. 73, Table 15

| EMEA | $105.19 million | $710 million |
| Total | $4,454.37 million | |

**(d)      The Allocation Proposed by the EMEA Debtors Should Be Rejected**

541.    In support of their allocation position, the EMEA Debtors have put forward the expert reports of James Malackowski and Paul Huffard.

542.    The opinions of both proceed on the basis that the preferred approach to the allocation of sale proceeds is the "contribution" approach.  Pursuant to this approach (the details of which are discussed more fully below), the sale proceeds that are attributable to Nortel's intellectual property are to be allocated among the various Debtor Estates in proportion to their relative spending on R&D over a given period of time.  The foundation for the contribution approach is that all of the IP was jointly owned.  As discussed above at paragraphs 392-415, there is no basis for such a joint ownership or joint entitlement theory.  Accordingly, the proposed allocations set out in the reports of Mr. Malackowski and Mr. Huffard (to the extent that it incorporates, or is dependent upon, Mr. Malackowski's IP allocations) are without any foundation and should be rejected.

543.    There are other problems with the opinions provided by both witnesses.  Because Mr. Malackowski's opinion forms part of the foundation for Mr. Huffard's, his will be considered first.

*(i)      Mr. Malackowski's Testimony With Respect to the Contribution Approach Should Be Rejected*

544.    Mr. Malackowski values the IP that was transferred or licensed as part of the Business Sales and then proposes an allocation of those sale proceeds based upon his contribution

approach. [527]  As the Residual IP Sale proceeds are all IP-related, Mr. Malackowski allocates the

entirety of those proceeds based on the contribution approach.

545.    Mr. Malackowski describes this "contribution approach" in broad brush strokes as

follows:

> Under the Contribution Approach, sale proceeds should be allocated in
> proportion to the various Nortel entities' contributions towards the
> creation of the IP. [528]

546.    Mr. Malackowski purported to measure the Estates' respective contributions to the IP that

was sold in each of the sale transactions by comparing the Estates' relative R&D spending over

various periods of time, generally stretching from the early 1990s through 2008. [529]

547.    There are a number of flaws in Mr. Malackowski's contribution approach.  First, there is

no basis – either in law or in valuation theory – for such an approach to the allocation question

that is before the Courts.  Indeed, as was candidly admitted by Mr. Huffard, the contribution

approach is based merely on some vague notion of what a fair allocation would be.  Mr. Huffard

testified as follows:

---

[527] It should be noted that Mr. Malackowski also considers an alternate approach (which he calls
the "license approach").  However, Mr. Malackowski goes on to distance himself from this
alternate approach, stating that the contribution approach is more "appropriate" and more
"consistent" with Nortel's contractual arrangements under the MRDA to use R&D spending as a
basis for sharing residual operating profits.  He concedes that the license approach reaches
results that could be termed "unreasonable" (TR00033 (Exh. 33, Expert Report of James
Malackowski, January 24, 2014) p. 50, 54; James Malackowski Trial Testimony, Day 10, May
29, 2014, p. 2357:6-15; James Malackowski Deposition, March 19, 2014, p. 74:23-76:14,
77:14-81:25 )

[528] TR00033 (Exh. 33, Expert Report of James Malackowski, January 24, 2014) p. 6, 39

[529] TR00033 and TR40870 (Exh. 33, Expert Report of James Malackowski, January 24, 2014) p.
48, Exhibit B.1.2.1 (which set out the look-back periods that Mr. Malackowski applied to the
proceeds from the various Line of Business Sales), p. 49 (which sets out a number of different
possible look-back periods for the Residual IP Sale proceeds)

Q.    Whereas in the contribution approach you're not valuing any rights that were contributed to the sale; you're doing an analysis based on somebody's sense of what is an equitable way to allocate the proceeds once received?

A.    I think that's fair.[530]

548.    Similarly, Mr. Malackowski acknowledges that the application of his contribution approach is independent of, and outside of, the MRDA.  He testified as follows:

Q.    You said in your evidence yesterday that the contribution theory is independent of the MRDA?

A.    Yes, in that the principal methodology would still apply regardless of whether or not someone interpreted the MRDA a la the U.S. experts versus a la the Canadian experts.

. . .

Q.    Now, dealing with your contribution analysis, and so that we understand, is your contribution analysis affected if you assume that the MRDA provides that a share of operating profits or losses is the compensation for R&D investment?

A.    I don't believe so.  I don't believe it would change the right method for allocating sale proceeds, which I understand to be outside the scope of the MRDA.[531]

549.    For the reasons given above at paragraphs 547-568, the contribution approach has no foundation that is recognized in law.

550.    The contribution approach also has no basis in valuation theory.  As Mr. Malackowski's evidence makes clear, the contribution theory that he espouses in his reports and in his testimony is one that directly flows from a position given to him by counsel for the EMEA Debtors.  Mr. Malackowski's main report presents the contribution theory as arising from a litigation position taken by the EMEA Debtors:

---

[530] Paul Huffard Trial Testimony, Day 9, May 28, 2014,  p. 2050:8-13

[531] James Malackowski Trial Testimony, Day 11, May 30, 2014, p. 2442:1-7, 2443:8-16

> The Joint Administrators take the position that the RPEs are entitled to
> share in the proceeds from sales of Nortel IP according to the relative
> contribution each of them made to the creation of that IP.[532]

551.    Even in his testimony at trial, Mr. Malackowski conceded that it was not within his

purview to judge the applicability of the contribution approach, even though he believes it to be

"appropriate".  For example, he testified as follows:

> Q.    And your role was not to express an opinion on whether the view
> of entitlement was a correct one; is that right?
>
> A.    Well, my role was not to make the decision which I understand to
> be for the Courts, but in my report I express the opinion that from an
> economic business licensing perspective, I find the contribution approach
> to be most appropriate.[533]

552.    A similar attempt to stamp the contribution theory with the imprimatur of an expert was

made by the EMEA Debtors' other allocation "expert",[534] Mr. Paul Huffard.[535]  However, such

an opinion – i.e. whether it is "appropriate" to allocate the sale proceeds in accordance with the

Debtor Estates' relative R&D spending – is not something that is within either Mr.

Malackowski's or Mr. Huffard's expertise.  Rather, both witnesses have simply adopted the

EMEA Debtors' litigation position as their own.

553.    Mr. Malackowski did attempt to show the relation between the "contribution approach"

as he asserted it and prior transactions within Nortel.  In that regard, he testified as follows:

---

[532] TR00033 (Exh. 33, Expert Report of James Malackowski, January 24, 2014) p. 39

[533] James Malackowski Trial Testimony, Day 10, May 29, 2014, p. 2359:5-12

[534] The extent of Mr. Huffard's expertise is highly dubious.  Although he purported to give
expert testimony on the proper valuation of certain of the classes of assets sold in the Line of
Business Sales, and on the proper allocation of those values, Mr. Huffard holds no accreditation,
and has not pursued any course of study, as a valuator.  His only accreditation is an M.B.A. and
his work as an investment banker (Paul Huffard Trial Testimony, Day 9, May 28, 2014, p.
1996:17-1998:2)

[535] Paul Huffard Trial Testimony, Day 9, May 28, 2014, p. 2049:12-17

[P]art of my conclusion and work was to show how the contribution method is consistent with Nortel's actual experience across a variety of transactional structures.[536]

554.    More specifically, he pointed to a number of examples which he asserted were "consistent with" and therefore support the contribution allocation methodology that he advocates.  Those examples were:

(a)    the RPSM itself;[537]

(b)    the allocation of sale proceeds from the Alcatel transaction;[538]

(c)    the APA kick-off Q&A;[539]

(d)    the IP migration analysis;[540]

(e)    the Foundry litigation settlement proceeds;[541] and

(f)    the method in which Nortel allocated the proceeds of the sale transactions at issue for the purposes of its financial statements.[542]

555.    When questioned about the manner in which Nortel allocated proceeds attributable to, or connected with, its intellectual property in the foregoing examples, Mr. Malackowski said:

[T]hey [i.e. Nortel] used the same measure that I used, which was R&D capital stock.[543]

---

[536] James Malackowski Trial Testimony, Day 10, May 29, 2014, p. 2359:18-21

[537] James Malackowski Trial Testimony, Day 10, May 29, 2014, p. 2369:14-18

[538] James Malackowski Trial Testimony, Day 10, May 29, 2014, p. 2367:3-6

[539] James Malackowski Trial Testimony, Day 11, May 30, 2014, p. 2435:2-5

[540] James Malackowski Trial Testimony, Day 11, May 30, 2014, p. 2437:6-8

[541] James Malackowski Trial Testimony, Day 11, May 30, 2014, p. 2437:21-23

[542] James Malackowski Trial Testimony, Day 10, May 29, 2014, p. 2306:7-11

[543] James Malackowski Trial Testimony, Day 10, May 29, 2014, p. 2366:2-3

556.    However, the "consistency" between Mr. Malackowski's approach and Nortel's past practice is more apparent than real and provides no basis for the allocation results at which Mr Malackowski arrives.

557.    In none of the precedents to which Mr. Malackowski pointed did Nortel allocate proceeds that were attributable to or connected with its intellectual property in accordance with the Participants' relative R&D spending using the same (or even a similar) time period as is advocated by Mr. Malackowski.  As noted above, Mr. Malackowski used time periods that stretch well over fifteen years.  By contrast, as Mr. Malackowski acknowledged, in each of the precedent transactions that he cited in which any allocation was done, Nortel used relative R&D spending in accordance with the RPSM methodology, which, in the period after 2005, used a five year look-back.

558.    Thus, it is apparent that Mr. Malackowski's contribution approach is <u>not</u> consistent with the precedent Nortel transactions upon which he relies.  Thus, even if prior transactions could form a legal basis for allocation in this case, there is no prior transaction that is a basis for his approach.

559.    Mr. Malackowski's argument that he could look beyond the period mandated by the RPSM (even though Nortel had used that period) is not based on a valid distinguishing feature. Even if Nortel's practice in the past were a guide for the Courts for choosing an allocation methodology (as Mr. Malackowski asserts), in all of the precedent transactions upon which Mr. Malackowski relies, Nortel was well aware that much of the technology at issue in those transactions (or operations) had similarly been invented more than five years earlier (which is the

very point upon which Mr. Malackowski relies to justify his extended look-back period).[544]

Notwithstanding the age of the technology, Nortel exercised its business judgment only to

consider the Participants' R&D spending over the preceding five years.

560.    Thus, for example, in the Foundry litigation, many of the patents at issue had a priority

date more than five years prior to the settlement.  Nevertheless, Nortel determined the

Participants' allocation in accordance with the look-back period prescribed by the RPSM, as was

admitted by Mr. Malackowski:

> Q.    Now, sir, if you look at the patents that you have listed on the left-hand side of slide 33 [that were at issue in the Foundry litigation], do you know what the priority dates of those patents were?
>
> A.    I know the patents specifically because they are attachment 1 to the license.  I don't have the applications or the patents themselves to tell you the patent priority from memory.  Some of them have 4 million serial numbers, so they go back quite far, some of them have 6 million serial numbers, so they would be quite current.
>
> Q.    Some of them at least, and the spending of them would fall outside the look-back period, the RPSM/Nortel look-back period?
>
> A.    No, I believe that is correct, absolutely.
>
> Q.    And Nortel would have known that when they decided how to treat this?
>
> A.    Yes, sir.[545]

561.    The same is true for all of the allegedly important precedents upon which Mr.

Malackowski relies in support of his contribution approach.  In each instance (including at the

time that it adopted the RPSM), Nortel was well aware that any amounts to be allocated could

have been attributable to technology that was invented (and therefore was the subject of R&D

spending) well outside of the RPSM look-back period.  Nonetheless, to the extent that there was

_____

[544] TR00033 (Exh. 33, Expert Report of James Malackowski, January 24, 2014) p. 41

[545] James Malackowski Trial Testimony, Day 11, May 30, 2014, p. 2438:22-2439:16

any allocation (or proposed allocation), the look-back period set out in the MRDA was the only look-back period that was used or contemplated.[546]

562.    The appropriateness of the RPSM look-back period was the subject of extensive consideration at Nortel and was the subject of its discussions with the tax authorities.  Nortel concluded and advised the tax authorities in 2008 that "the economic life of technology is difficult to measure".[547]  Moreover, there is some proportion of R&D spending that does not ultimately result in any valuable intellectual property.[548]  In light of these factors, Nortel had estimated the useful life of Nortel intangibles to be approximately five years and determined to base the R&D capital stock upon a five year look-back period.[549]

563.    Nevertheless, and despite the importance that he professes to attach to Nortel's "actual experience", Mr. Malackowski ignored important aspects of that practice.  His approach could not be said to be based on precedent.

564.    If Mr. Malackowski had, in fact, followed the precedents upon which he purports to rely, the proportionate allocations of the IP portion of the Business Sale proceeds, as compared to the allocations that Mr. Malackowski advocates (for the Residual IP proceeds), would be as set out in the chart below.

---

[546] This was acknowledged by Mr. Malackowski at trial (James Malackowski Trial Testimony, Day 11, May 30, 2014, p. 2437:21-2438:21, 2459:2-10)

[547] TR22078 (NNL and NNI Joint Request for U.S.-Canada Bilateral APA: 2007-2011, October 31, 2008) p. 49

[548] TR21080 (Nortel Networks APA Responses to Questions Posed by Inland Revenue, IRS and CCRA, September 2003) p. 9-13; TR21031 (Letter regarding Nortel Networks Multilateral APA Responses to IRS Information and Document Request, April 26, 2004) p. 11-12

[549] TR22078 (NNL and NNI Joint Request for U.S.-Canada Bilateral APA: 2007-2011, October 31, 2008) p. 50

|  | **Canada** | **U.S.** | **EMEA** |
|---|---|---|---|
| Malackowski's Contribution Approach Allocation[550] | 42.9% | 38.9% | 18.2% |
| Nortel's RPSM Allocation Approach<br><br>(Based upon R&D spending, 2005 through 2009)[551] | 49.5% | 38.8% | 11.7% |

565.    Accordingly, the contribution approach that is advocated by the EMEA Debtors for the proceeds attributable to IP does not take into account, or follow, the legal rights of the parties, nor does it follow, nor is it supported by valuation theory, nor is it materially consistent with the very past practice upon which it purports to rely.

    *(ii)*    ***The U.S. Debtors' Attempt to Adjust the Contribution Approach Is Without Merit***

566.    In an effort to adjust Mr. Malackowski's "contribution approach", the U.S. Debtors led the evidence of Laureen Ryan.  Ms Ryan purports to adjust Mr. Malackowski's measurements of relative R&D spending by adding to each Debtor Estate's R&D spending (as calculated by Mr. Malackowski) amounts paid out in the form of transfer pricing payments by the Debtor Estate in question over the relevant time period.

567.    Ms Ryan does not offer any opinion as to whether the "contribution approach" is an appropriate method for allocation.   As noted above, the "contribution approach" has no basis in

---

[550] TR00033 (Exh. 33, Expert Report of James Malackowski, January 24, 2014) p. 49 (Table 19), p. 54

[551] TR40870 (Exh. 33, Expert Report of James Malackowski, January 24, 2014) Exhibit B.1.7.1 (p. 19 of 83 of PDF)

law or in valuation theory and should be rejected.  If that approach is rejected by the Courts, no

consideration of Ms Ryan's work is required.

568.     In any event, Ms Ryan's adjustments are simply a transparent and unfounded attempt to

increase the U.S. Debtors' allocations.  Ms Ryan's methodology reverses the RPSM, giving

credit back to the U.S. Debtors for amounts it was obliged to pay to others under the transfer

pricing regime.  She performs this reversal of the transfer pricing regime despite stating that she

has no opinion regarding whether transfer pricing should be analyzed as part of a valuation

analysis.

569.     Moreover, Ms Ryan's approach suffers from a similar flaw to that which plagues Mr.

Malackowski's attempt to change the look-back period from five years to 17 years (or more).

The contribution theory rests entirely upon the example allegedly set by a number of precedent

transactions.  However, in all of those "precedents", the manner of calculating each Participant's

"contribution" was that prescribed by the RPSM.  Just as Mr. Malackowski's departure from that

crucial aspect of the precedent (which takes the form of lengthening the look-back period)

undermines his entire contribution approach, so too does Ms Ryan's (which takes the form of

adding transfer pricing payments to R&D expenditures).

570.     In addition, even on their own terms, Ms Ryan's calculations are flawed, in that her

adjustments do not account for the $2 billion settlement in favour of NNI.   Specifically, in

giving credit to the U.S. Debtors for transfer pricing payments they made, she did not deduct the

$2 billion that is now an accepted claim in the Canadian bankruptcy proceeding against NNL (as

compared to the $4.5 billion in transfer pricing NNI claims to have paid ).  Therefore, even under

Ms Ryan's own theory, the amount "funded" by NNI is significantly less than what Ms Ryan

opines.

(iii)     *Mr. Malackowski's Evidence With Respect to the Value of the IP in the Business Sales Should Be Rejected*

571.     Mr. Malackowski provided his opinion as to the value of the IP that was transferred in the Line of Business Sales (to which his contribution approach is then applied).

572.     In his initial report, Mr. Malackowski opined that the value of the IP sold in the Line of Business Sales totalled $765 million,[552] accounting for barely 25% of the total Business Sale proceeds of $2.85 billion.  Mr. Malackowski's valuation is difficult to credit for a number of reasons.

573.     As was clearly established by the evidence, IP was the key driver of revenue in Nortel's businesses.  Indeed, EMEA's other expert, Mr. Huffard, acknowledged this both in his report and during his testimony.[553]  It is not credible to assert that the "key driver" of value within the Business Lines would account for barely a quarter of their sale proceeds.

574.     In a separate analysis set out in his rebuttal report, Mr. Malackowski opined that the total value of all of the Nortel IP – both that sold in the Rockstar Transaction and that sold in the Line of Business Sales – could be $10.4 billion (notwithstanding that this amount is well in excess of the total sale proceeds actually received).[554]  As part of that analysis, Mr. Malackowski estimated that the IP sold in the Business Sales accounted for approximately 35% of that total value figure.

---

[552] TR00033 (Exh. 33, Expert Report of James Malackowski, January 24, 2014) p. 50

[553] TR00030 (Exh. 30, Expert Report of Paul Huffard, January 24, 2014) para. 67; Paul Huffard Trial Testimony, Day 9, May 28, 2014, p. 2004:13-17

[554] TR00034 (Exh. 34, Rebuttal Report of James Malackowski, February 28, 2014) p. 20-21

Thus, he estimated that the value of the IP sold in the Line of Business Sales was $3.761 billion.[555]  Mr. Malackowski explained on his deposition:

> Q.    Yeah, but you're the only person who has come up with this $10.4 billion number; is that correct?
>
> A.    I believe so.
>
> Q.    And it's divided, at least in this exhibit, $3.761 billion to the business sale intellectual property.
>
> A.    Yes, sir.[556]

575.    Mr. Malackowski's attempts to explain the disparity between these two analyses – one that arrives at a value of $765 million and another that arrives at a value of almost five times that amount, or $3.761 billion – are not satisfactory.[557]  At trial, he said that he had arrived at this number by following Mr. Green's analysis.[558]  One searches in vain for any point where Mr. Green opined on any such value, nor was such a proposition ever put to Mr. Green in cross-examination.  The fact simply remains that Mr. Malackowski produced two different valuations for the very same assets, which differ from one another by a factor of five.  Such a disparity calls into serious question the reliability of the valuation opinion that he has given.

576.    Third, some explanation as to how Mr. Malackowski's calculations produce the very low figure of $765 million for the Business Line IP comes from an examination of the royalty rates

---

[555] Rebuttal Report of James Malackowski, February 28, 2014, Exhibit 1.2

[556] James Malackowski Deposition, March 19, 2014, p. 122:10-17

[557] For example, Mr. Malackowski states that the $10.4 billion total (and the $3.761 billion for the Business Line IP) was the value that the IP would have generated for Nortel, had it run an IP licensing business such as was envisioned by the IP Co. model.  Of course, the Rockstar purchasers intended to (and did) run an IP licensing business, as Mr. Malackowski acknowledged (James Malackowski Deposition, March 19, 2014, p. 110:4-24)

[558] Malackowski Trial Testimony, Day 11, May 30, 2014, p. 2502:17-2503:13, p. 2614:19-2616:13

that he applied in his relief from royalty valuation method.  Mr. Malackowski did not consider the royalty rates that Nortel actually charged in those instances when it licensed its IP.[559] Instead, he looked at the royalty rates that were proposed in certain of the IP Co. models.[560]

577.    Moreover, in each instance, although the IP Co. model contained a range of royalty rates, Mr. Malackowski selected the lowest of the three possible rates, thereby generating the lowest value.  As Mr. Malackowski explained on his deposition:

> Q.    And you mention that in the Lazard model there were a number of royalty rates that -- from which you selected.  And do I take it what you're referring to is having picked litigation -- the litigation light scenario of rates as opposed to the litigation heavy scenario of rates? Is that one of the selections you made?
>
> A.    That would be part of the selection process.
>
> Q.    And then, within that, the model provided a range of low, medium and high royalty rates within that scenario, correct?
>
> A.    Yes, sir.
>
> Q.    All right. So do I take it that the rates in the litigation light scenario are lower than the rates in the litigation heavy scenario?
>
> A.    Generally speaking, that's true.
>
> . . .
>
> Q.    Just focusing on the business sale valuation for a moment.  Of the two choices you made, litigation heavy and its higher rates, and litigation light and its lower rates, you picked the lower scenario, litigation light, and then of the three selections within litigation light, low, medium and high, you picked the low end for the business sales, correct?
>
> A.    I believe that's all accurate, yes.[561]

578.    For all of these reasons, it is submitted that Mr. Malackowski's evidence that the value of the IP transferred in the Line of Business Sales is $765 million is also unreliable.

---

[559] James Malackowski Deposition, March 19, 2014, p. 96:7-15

[560] James Malackowski Deposition, March 19, 2014, p. 96:16-20

[561] James Malackowski Deposition, March 19, 2014, p. 101:10-103:5

*(iv)*    ***Mr. Huffard's Testimony Should Be Rejected***

579.    While Mr. Malackowski testified as to the value of the IP transferred in the Business

Sales and as to the method that he would recommend for allocating that portion of the Business

Sale proceeds as well as the proceeds of the Rockstar Transaction, Mr. Huffard testified as to the

valuation and allocation of the balance of the Business Sale proceeds.  Given that Mr.

Malackowski proffered an unreasonably low amount for the IP portion of the Business Sale

proceeds, Mr. Huffard had a large amount with which to work.

580.    Nevertheless, Mr. Huffard in fact did very little analysis to come to the opinions he

expressed about the allocation of that amount.  He simply identified the three categories of assets

that were transferred in the Business Sales: tangibles; IP; and a residual category that Mr.

Huffard stated is comprised of goodwill and customer relationships.  And then he did some

simple arithmetic.[562]

581.    With respect to the value of the tangible assets, Mr. Huffard simply took the book value

of the tangible assets.[563]  He netted liabilities (including deferred revenues) against them.  As Mr.

Green pointed out, this is incorrect.  (See above at paragraphs 444-447.)

582.    With respect to the value of the IP, Mr. Huffard simply adopted the opinion given by Mr.

Malackowski:

> Q.    And as I understand it, you did not undertake your own
> independent valuation of the IP, but rather you relied upon and
> incorporated Mr. Malackowski's conclusions?
>
> A.    That is correct.[564]

---

[562] Paul Huffard Trial Testimony, Day 9, May 28, 2014, p. 2010:4-9

[563] Paul Huffard Trial Testimony, Day 9, May 28, 2014, p. 2011:22-2012:5

583.   And with respect to the value of the residual category, Mr. Huffard did not undertake any

valuation analysis with respect to those assets.  Instead, he simply subtracted the value of the

tangible assets and the IP from the total sale proceeds, and concluded, without explanation, that

the difference was all attributable to customer relationships and goodwill.  He stated:

> In each of the Business Sales, there is residual unallocated value
> remaining after valuing the Tangible Assets and IP.  That residual value is
> attributable to Customer-Related Assets and Goodwill not otherwise
> associated with IP.[565]

584.   Similarly, he testified at trial as follows:

> Q.     And then the third step of the Blackstone methodology, as you call
> it, was to add up A and B, the intangibles and Mr. Malackowski's value
> for IP, and subtract them from the sale proceeds?
>
> A.     That is correct.
>
> Q.     You undertook -- and the result of that calculation is what you
> have called the residual category of customer-related assets and goodwill;
> correct?
>
> A.     Correct.
>
> Q.     And you have undertaken no independent or separate valuation of
> that category as a whole or any of its components?
>
> A.     That is correct. . . .[566]

585.   Because Mr. Huffard performed no valuation analysis on the residual category, his

opinion respecting the value of that residual category is wholly dependent upon, and derivative

of, Mr. Malackowski's opinion with respect to the value of the IP.  To the extent that Mr.

Malackowski's conclusions with respect to the value of the IP are wrong, then, even assuming

---

[564] Paul Huffard Trial Testimony, Day 9, May 28, 2014, p. 2012:21-25

[565] TR00030 (Exh. 30, Expert Report of Paul Huffard, January 24, 2014) para. 92

[566] Paul Huffard Trial Testimony, Day 9, May 28, 2014, p. 2013:25-2014:14

that Mr. Huffard correctly identified the components of the residual as goodwill and customer relations, his "valuation" of them is similarly wrong:

> Q.    And to be clear, Mr. Huffard, because your residual category is simply a residual, that if Mr. Malackowski's conclusions about the value of IP change, then automatically the value of the residual category changes as well; correct?
>
> A.    That is correct.[567]

586.    Moreover, Mr. Huffard did not perform any confirmatory analyses with respect to the value of his residual category, to ensure that his conclusions were reasonable.[568] Mr. Huffard's arithmetic (combined with Mr. Malackowski's opinion on the value of the Business Sales IP) produced a value that he posited was due to customer relationships and goodwill that was equal to two-thirds of the total Business Sale proceeds.  Mr. Huffard proceeded this way notwithstanding that most of the businesses in question had been losing money for several years, and notwithstanding that Nortel had, in the preceding years, written off *all* of the goodwill connected to the businesses.[569]  And he proceeded this way notwithstanding that Nortel repeatedly said it was IP, not customer relations, which drove the value of the businesses.  By contrast, on Mr. Huffard's and Mr. Malackowski's analysis, the value of the IP – which Mr. Huffard acknowledged to be the primary driver of value in the Business Lines[570] – was equal to only 22% of the sale proceeds.

---

[567] Paul Huffard Trial Testimony, Day 9, May 28, 2014, p. 2016:22-2017:3

[568] Paul Huffard Trial Testimony, Day 9, May 28, 2014, p. 2017:4-13

[569] TR00030 (Exh. 30, Expert Report of Paul Huffard, January 24, 2014) para. 95; TR43999 (Nortel Networks Corporation Form 10-K for fiscal year ended December 31, 2008) p. 148, 151; TR00042 (Exh. 42, Expert Report of Philip Green, reissued February 28, 2014), p. 22

[570] Paul Huffard Trial Testimony, Day 9, May 28, 2014, p. 2024:14-23

587.    Mr. Malackowski's unreasonably low valuation of the IP, coupled with Mr. Huffard's unquestioning attribution of high value to his residual category and his identification of its components as goodwill and customer relations, unfairly minimizes the allocation to the Canadian Debtors and unduly favours others.  Mr. Huffard advocates allocating his residual category based upon revenues.  Given that, for example,  the EMEA Debtors' proportional share of revenues was greater than their proportional R&D expenditure (which forms the basis of Mr. Malackowski's allocation of the IP value), each additional dollar that is allocated to the residual category increases the ultimate allocation to the EMEA Debtors:

> Q.    . . . But I just want to make sure that everybody understands that every dollar that gets moved from the IP category to the residual category is a dollar away from the Nortel entities that were the generators of the IP and towards those Nortel entities where the revenues ended up being booked.
>
> A.    That mechanically is correct.[571]

588.    Even if Mr. Huffard's valuation of the residual category were correct (which it is not) his proposed method of allocating that value among the three Debtor Estates is unjustified.  First, Mr. Huffard would allocate the value of the residual category, which he says includes the value of the in-place workforce, wholly based upon revenue.  He does so regardless of the fact that the workforce employed by one Debtor Estate (for example, Canada) may, through its R&D work and sales support, be responsible for generating revenues in another jurisdiction:

> Q.    Once again, to be clear, you've used an allocator whereby, if a large percentage of the workforce is in a place like Canada, which does R&D and which does sales support and supports the global organization but doesn't have a large native revenue stream, you're giving the value of those assets to the other entities where there is a revenue stream and not to Canada?

---

[571] Paul Huffard Trial Testimony, Day 9, May 28, 2014, p. 2020:19-2021:1

A.    I'm not giving it as a tactical matter, as you're suggesting.

Q.    But that's the result?

A.    But that is the result.[572]

589.    Mr. Huffard also acknowledged that this allocation method would fail to compensate a Debtor Estate (such as the Canadian Debtors) which had performed a lot of sales support and customer support for other geographies so that they could generate revenue, but which itself had low revenue:

> Q.    So again, if we have a circumstance where, because of decisions made and cost-effectiveness and historic reasons, you have a lot of sales and customer support done in a country which has low domestic revenues, your allocation key for the customer-related assets and goodwill category is not going to compensate them for that because they have low revenues?
>
> A.    Yes, I believe that's mathematically the way it would work.[573]

590.    Finally, in allocating the value of the residual category of assets based upon revenues, Mr. Huffard fails to take into account the fact that the parties were obliged to share operating profits and losses pursuant to the RPSM.  This omission is difficult to understand (and impossible to justify), given that Mr. Huffard agrees that the value of the assets in the residual category is "fundamentally related to their ability to generate profits",[574] and given that such profits would have been subject to sharing among the various Debtor Estates pursuant to the RPSM.  As acknowledged by Mr. Huffard:

> Q.    And therefore in Nortel, the profits that were derived from the customer-related assets and goodwill were allocated amongst the RP entities not according to revenue generated but according to their R&D capital stock; correct?

---

[572] Paul Huffard Trial Testimony, Day 9, May 28, 2014, p. 2032:7-17

[573] Paul Huffard Trial Testimony, Day 9, May 28, 2014, p. 2056:12-21

[574] Paul Huffard Trial Testimony, Day 9, May 28, 2014, p. 2052:24-2053:7

A.      That's correct.  The RPSM did not use revenues as an allocation metric.  It used R&D capital stock.

Q.      And notwithstanding that that is the way Nortel carried on business, and notwithstanding that that was the entitlement of the RP entities, you have used revenue, which is unrelated to profits, as the allocation key for this category of assets; correct?

A.      That is correct.[575]

591.    Mr. Huffard's opinions with respect to the valuation of assets and allocation of sale proceeds in the Business Line Sales should be rejected.

592.    With respect to the allocation of sale proceeds in the Rockstar Transaction, Mr. Huffard does not appear to have performed any analysis whatsoever.  Rather, he simply repeats (in very summary form) what Mr. Malackowski says in his report.[576]  Accordingly, it is submitted that no weight whatsoever should be attached to Mr. Huffard's testimony in that regard

**PART X – THE MONITOR'S POSITION SHOULD BE CONSIDERED ON ITS MERITS**

593.    Finally, it is necessary to address the argument advanced by the U.S. Debtors and the U.S. Bondholders that because the Monitor did not reveal, at the time of the court approval of the Rockstar Sale, what its litigation position would ultimately be, its position should not be assessed by the Courts on its merits.  That argument is an inappropriate attempt to have the Courts draw inferences about what was said or not said in mediation and to portray the Monitor's position as having changed while the U.S. Debtors' position has not.  It asks the Courts to ignore the very agreements and orders of the Courts that were put into place, which repeatedly confirmed that no party was required to disclose their final allocation position until May 2013 and that there was no restriction on what that position might be.  That the U.S. Debtors and the U.S. Bondholders'

---

[575] Paul Huffard Trial Testimony, Day 9, May 28, 2014, p. 2054:10-24

[576] TR00030 (Exh. 30, Expert Report of Paul Huffard, January 24, 2014) paras. 120-123

argument descends to personalized attacks on the Monitor may be an indication of the weakness of their arguments on the merits, but, regardless, the argument is baseless for the four reasons set out below, and should be rejected.  The Monitor's position should be evaluated by the Courts on its merits.

594.    First, the contractual arrangement that the parties reached through the IFSA, which was confirmed in court orders, made clear that the parties reserved all their rights to make arguments on allocation.

595.    Second, positions taken during court-ordered mediations and settlement discussions were without prejudice and are inadmissible in these proceedings.

596.    Third, given the contractual arrangements among the parties, the fact that the Monitor disclosed its position pursuant to the agreed upon timetable and under an order that allowed parties to take any position on allocation without restriction, cannot now be used as a basis to claim some sort of prejudice, and certainly not "undue prejudice".

597.    Finally, the Monitor is not estopped from asserting its allocation position.  Contrary to the arguments of the U.S. Debtors and by the U.S. Bondholders, the Monitor in these proceedings has acted in the best interest of the Canadian Estate, and has done so ethically, responsibly, and tirelessly.

**(a)    The Parties' Agreements Explicitly Reserved Their Rights As To Their Allocation Positions**

598.    Both the IFSA, which was signed in 2009, and the IP Transaction Side Agreement, which was signed in 2011 and concerned the Rockstar Sale, explicitly provided that all parties reserved all rights as to the allocation of proceeds from Nortel asset sales.

- 203 -

599.    Section 12(f) of the IFSA stated "[n]othing in this Section 12 shall prejudice the rights of any Party, or otherwise constitute an amendment, modification or waiver of the rights of any Party, to seek its entitlement to Sale Proceeds from any Sale Transaction."[577]

600.    Section 12 of the IP Transaction Side Agreement likewise reserves the parties' rights to "present any arguments, methodologies, legal or factual theories in support of a proposed allocation of the IP Sale Proceeds or the proceeds of any other transaction".[578]

601.    Both the IFSA and the IP Transaction Side Agreement are governed by New York law,[579] which requires a court to interpret contracts "so as to give effect to the intention of the parties as expressed in the unequivocal language employed".[580]  A court may not modify a contract for the sake of fairness, or because a party to the agreement has decided with hindsight that should have made a different deal.[581]

602.    Moreover, the IFSA and IP Transaction Side Agreement are not the only agreements expressing this reservation of rights.  The Final Canadian Funding and Settlement Agreement dated December 2009 stated in a paragraph titled "Reservation of Rights" that "[n]othing in this

---

[577] TR43794 (IFSA, June 9, 2009) para. 12(f)

[578] TR46858 (IP Transaction Side Agreement, April 4, 2011) para. 12, which references Section 5.13(b) of the Stalking Horse Agreement with Google Inc. which addressed the termination of all license rights granted under the MRDA (TR45060 (Asset Sale Agreement, April 4, 2011) s. 5.13(b) (p. 120 of 283 of PDF)); *see also* TR40725 (U.S. Debtors' Motion For Orders, April 4, 2011) para. 57 (The IP Transaction Side Agreement "makes clear the Sellers' understanding that [terminating license rights] under Section 5.13(b) of the Stalking Horse Agreement will not have any impact, positive or negative, on the rights of the Sellers with respect to the allocation of the proceeds of the Sale or the proceeds of any other transaction.")

[579] TR43794 (IFSA, June 9, 2009) para. 16(a); TR46858 (IP Transaction Side Agreement, April 4, 2011) para. 17

[580] *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355 (N.Y. 1978) [internal quotation and citation omitted]

[581] *See Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (N.Y. 2002)

Agreement shall bar, prohibit or in any way hinder the rights of the Parties to this Agreement to present any arguments, methodologies, legal or factual theories in support of a proposed allocation of the proceeds of any Sale Transaction or IP Transaction".[582]

603.    These Courts have recognized the parties' reservation of rights in the IFSA in their orders approving the IFSA. The U.S. Court's order states that "[n]othing in this Order or in the [IFSA] shall determine the allocation of proceeds from a Sale Transaction among the Selling Debtors or shall constitute a Protocol for determining the allocation of proceeds from a Sale Transaction among the Selling Debtors."[583]   The Canadian Court's order approved the IFSA "including without limitation, all of the settlements and reservations of rights provided for therein".[584]

604.    The Courts' orders that implemented the Allocation Protocol also explicitly undercut the arguments of the U.S. Debtors and by the U.S. Bondholders.

605.    The Allocation Protocol ordered by the Canadian Court on April 3, 2013 and the U.S. Court of May 17, 2013 explicitly stated that "[t]here shall be no restriction on the ability of any Core Party to advance or oppose any theory of allocation."[585]

606.    Moreover, the Canadian Court approved the Litigation Timeline and Discovery Plan as part of the Allocation Protocol on May 15, 2013, which required that allocation positions be

---

[582] TR46910 (Final Canadian Funding and Settlement Agreement, December 23, 2009) s. 23

[583] TR50214 (Order (A) Approving the [IFSA] and (B) Granting Related Relief, June 29, 2009) s. 8

[584] TR50057 (Order (Interim Funding Agreement), June 29, 2009) s. 3

[585] TR50027 (Amended and Restated Order (Allocation Protocol), April 3, 2013) Schedule A (s. 4(a)); TR50102 (Order Entering Allocation Protocol, May 17, 2013) Exhibit 1 (s. 4(a))

delivered on May 16, 2013.[586]  Accordingly, no estate was required to disclose its litigation

position on allocation until May 2013 and, when the position was ultimately disclosed, it was to

be subject to no restriction.

607.    In accordance with these agreements and orders, neither the U.S. nor the Canadian

Debtors disclosed their allocation positions until May 2013 when pleadings were delivered.[587]  In

contrast to the Canadian Debtors' allocation position disclosed in May 2013, which proposed the

precise allocations each Estate was to receive,[588] the U.S. Debtors refused to do so until they

served their initial expert reports in January 2014.[589]  Indeed, when Mr. Ray, the principal officer

of NNI, was deposed in December 2013 he refused to state whether the U.S. Debtors' position

was that the Canadian Debtors should receive *any* allocation greater than zero.[590]

608.    Mr. Ray's testimony also reflected his understanding of the broad nature of the

reservation of rights.  At trial, Mr. Ray testified:

> Q.    Now, you've seen numerous documents that are very similar to
> this [Section 12(f) of the IFSA] in terms of the reservation of rights; isn't
> that right?
>
> A.    Yes.
>
> Q.    And in every way, shape or form imaginable, the parties agreed
> that nothing in the IFSA or in the order would determine allocation
> of proceeds from a sale transaction; isn't that right?

---

[586] TR50058 (Order (Allocation Protocol – Litigation Timetable and Discovery Plan), May 15, 2013) Schedule A

[587] John Ray Trial Testimony, Day 6, May 21, 2014, p. 1446:4-23

[588] TR21283 (Allocation Position of the Monitor and Canadian Debtors, May 16, 2013) paras. 29, 33

[589] TR50223 (Allocation Position of U.S. Debtors and Official Committee of Unsecured Creditors, May 16, 2013) p. 29

[590] John Ray Trial Testimony, Day 6, May 21, 2014, p. 1447:20-1448:5; John Ray Deposition, December 13, 2013, p. 106:16-108:2

A.    Yes.

Q.    And I'm correct that you saw some of those documents before they were entered into; isn't that right?

A.    Yes.

Q.    But not the IFSA, but comparable documents?

A.    Yes.

Q.    And if we wanted to, I could show you more than a dozen, a stack this high of documents that have similar reservations of rights; isn't that right?

A.    I'm sure, yes.

Q.    You understood that a variety of courts heard argument with respect to the Rockstar transaction?  Both the U.S. Court and the Canada Court heard argument about the Rockstar transaction?

A.    Yes. Well, there was motions pending in both jurisdictions.

Q.    And I'm correct, am I not, that you believed that the parties had reserved all rights to make any and all arguments a party could muster in its favor under these reservations of rights? Isn't that right?

A.    Yes.[591]

609.    Ironically in light of the U.S. Debtor's complaint that the Monitor did not provide its

litigation position until May 2013, even in December 2013 Mr. Ray did not believe it was

necessary for NNI to disclose if any other party should get an allocation of more than zero:

Q.    I take it you didn't feel precluded by anything, any agreement that preexisted the delivery of the allocation position from taking the substantial majority position that's advanced in [the U.S. Debtors' allocation position]?

A.    No, I didn't feel any agreement precluded me from taking that position.

Q.    And you don't feel that any preexisting agreement requires you to give any assurance to any party that their percentage is more than zero of the allocation?

A.    Correct.

Q.    And do you agree with me you are also not the beneficiary of any such agreement?

[591] John Ray Trial Testimony, Day 6, May 21, 2014, p. 1443:13-1444:24

A.    Correct.[592]

610.    The Monitor does not take the view that Mr. Ray's position in this regard was improper.

Mr. Ray testified at trial that section 12(d) of the IFSA was the only qualification on the parties'

reservation of rights to make any allocation argument.  Section 12(d) required the parties to try to

negotiate in good faith towards an allocation protocol.  Negotiations were conducted in good

faith but were unsuccessful.[593]

611.    The U.S. Debtors should not be permitted to seek modification of the agreements they

made deferring the allocation issues because they are not happy with the underlying merits of

their adversary's allocation position.[594]  Nor can the orders made, referred to above, now be

challenged or collaterally attacked.

**(b)    Statements Made During Mediation And Settlement Negotiations Are Inadmissible
In These Proceedings**

612.    Mr. Ray in his testimony in-chief at trial explicitly revealed information regarding

mediation negotiations, in the course of suggesting that the Monitor's position with respect to

allocation had changed over time.[595]  Mr. Ray clearly recognized that his testimony was offside,

as he prefaced it by stating "without getting into – and I don't want to get (sic) anything we said

---

[592] John Ray Deposition, December 13, 2013, p. 108:18-109:8 (note that while Ray supplemented his answers by stating that there were agreements that governed the allocation, he ultimately admitted that "there was no assurance agreements, per se, as to allocation positions", *see* p. 109:9-111:2 (quote to p. 110:25-111:2))

[593] John Ray Trial Testimony, Day 6, May 21, 2014, p. 1445:15-1446:23

[594] *Lease Corp. of Am., Inc. v. Resnick*, 288 A.D.2d 533, 535, 732 N.Y.S.2d 266, 269 (N.Y. App. Div. 3rd Dep't 2001)

[595] John Ray Trial Testimony, Day 6, May 21, 2014, p. 1375:18-1376:5

- 208 -

in any of those mediations", but then Mr. Ray proceeded to do just that.[596]  And then, in Mr.

Ray's re-examination, he was asked by his counsel to again reveal without prejudice information

from the mediation, and Mr. Ray again did so.[597]

613.    The purpose of Mr. Ray's evidence was as transparent as it was improper: the U.S.

Debtors' argument that it was misled by the Monitor with respect to its allocation position at trial

turns on comparing it to the Monitor's previous positions on allocation, including at the without

prejudice mediations.[598]  But any testimony or evidence about the mediations is irrelevant and

inadmissible, and cannot form part of these Courts' deliberations.

614.    The Canadian Court's order regarding mediation between the parties, explicitly provided

that "[a]ll offers, promises, conduct and statements, whether written or oral, made in the course

of the mediation proceedings, are inadmissible in any arbitration or court proceeding."[599]

Recognizing that fact, the parties submitted their mediation briefs with legends stating "without

prejudice".

615.    In addition, under Rule 408(a) of the U.S. Federal Rules of Evidence ("FRE"),

communications made during settlement discussions are inadmissible to "either to prove or

---

[596] John Ray Trial Testimony, Day 6, May 21, 2014, p. 1375:22-24

[597] John Ray Trial Testimony, Day 6, May 21, 2014, p. 1458:11-1463:18

[598] Sheila Block (U.S. Estate) Trial Transcript, Day 2, May 13, 2014, p. 330:5-19 ("And I expect the evidence will show first that the Monitor's view that the other estates were entitled to no allocation was never disclosed.  Secondly, that that view would have been highly material … to the other debtor estates as they cooperated on the sales.")

[599] TR50050 (Order of the Honourable Justice Morawetz regarding Mediation, 2001 ONSC 4012) para. 4(c)

disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction".[600]

616.    Moreover, the policy reasons behind FRE 408 support this position.  The Advisory Committee Notes to the FRE observe that statements made during settlement discussions are "irrelevant" evidence of a party's liability because "the offer may be motivated by a desire for peace rather than from any concession of weakness of position."[601]  The Canadian Debtors negotiated in good faith to reach a settlement with the other parties to this case, and there is no suggestion to the contrary.  If for the sake of those negotiations the Canadian Debtors were willing to compromise, such a compromise cannot now be held against them in an attempt to reduce the value to which the Canadian Debtors are legally entitled at trial.

617.    Under Canadian law, all communications made in the course of settlement negotiations are inadmissible and protected by settlement privilege.  The Supreme Court of Canada recently reiterated the need for settlement privilege, noting "[settlement] privilege wraps a protective veil around the efforts parties make to settle their disputes by ensuring that communications made in the course of these negotiations are inadmissible."[602]

618.    By adducing through Mr. Ray information about the Monitor's settlement position and suggesting that it was different at mediation than its position at trial, the U.S. Debtors breach settlement privilege, the FRE and the order of Justice Morawetz.  They should not be permitted to rely on information impermissibly adduced and their argument based on that information should be rejected.

---

[600] Fed. R. Evid. 408

[601] Fed. R. Evid. 408, Notes of Advisory Committee on Proposed Rules, p. 368

[602] *Sable Offshore Energy Inc. v. Ameron International Corp.*, 2013 SCC 37 at para. 2

**(c)    There Is No Prejudice To The Other Estates In Allowing The Canadian Debtors' Position On Allocation**

619.    The U.S. and EMEA Debtors well understood that resolution of allocation was deferred until after the asset sales so as to maximize asset value, as Alan Bloom, one of the Joint Administrators of the EMEA Debtors, readily acknowledged in his deposition.[603]  Similarly, in their opening Allocation Position, the U.S. Debtors explicitly acknowledged:

> [T]he best way to maximize value for their respective creditors was to sell their respective rights, property and other assets together.  The Selling Debtors recognized that the sale process would not succeed if a selling party could hold up a sale pending agreement on the allocation of the sale proceeds.[604]

620.    The U.S. Debtors also explicitly recognized that the IFSA provides for the sale of Nortel assets with all proceeds corresponding to each sale transaction to "be held in escrow accounts pending later agreement on allocation by the parties or a litigated resolution of any allocation dispute."[605]  They further acknowledged that "nothing in the IFSA altered in any way the parties' rights vis-à-vis each other regarding the ownership of any rights, property or other assets beyond an agreement to sell or relinquish those rights, property or other assets together to or for the benefit of the buyers."[606]  As the U.S. Debtors have also admitted, the Canadian Debtors and the Monitor's ownership of any rights, property or other assets were not "altered in any way" by the IFSA, and the U.S. Debtors acknowledge that each Debtor reserved its rights on allocation,

---

[603] Alan Bloom Deposition, December 5, 2013, p. 219:8-220:3

[604] TR50223 (Allocation Position of U.S. Debtors and Official Committee of Unsecured Creditors, May 16, 2013) p. 16; *see also* Sheila Block (U.S. Estate) Trial Transcript, Day 1, May 12, 2014, p. 169:10-25

[605] TR50223 (Allocation Position of U.S. Debtors and Official Committee of Unsecured Creditors, May 16, 2013) p. 16, citing TR43794 (IFSA, June 9, 2009) paras. 12(a)-(b)

[606] TR50223 (Allocation Position of U.S. Debtors and Official Committee of Unsecured Creditors, May 16, 2013) p. 17

which would be determined "by the parties or [through] a litigated resolution of any allocation dispute."[607]

621.    Moreover, the Monitor and Canadian Debtors' position that NNL was the sole owner of Nortel's IP was widely recognized and disclosed in these proceedings long before the parties' allocation positions were required to be shared.  The Monitor's Reports filed in these proceedings consistently state that NNL is the owner of Nortel's IP (in addition to stating repeatedly that the parties have reserved their rights and allocation has yet to be agreed), from the very first report, filed January 14, 2009, which states that "Nortel's intellectual property ("IP") is principally owned by NNL."[608]

622.    In these proceedings, the U.S. Debtors have also explicitly recognized the fact of NNL's ownership of most of Nortel's IP.  In their 2009 motion to approve the IFSA, counsel for the U.S. Debtors stated that "NNL is the owner of the vast majority of Nortel's intellectual property assets", that "NNL is the legal owner of nearly all of the group's intellectual property, which it licenses to its affiliates", and that under the IFSA the U.S. Debtors would continue to receive "use of intellectual property owned by NNL that is crucial to the U.S. Debtors' business".[609]

---

[607] TR50223 (Allocation Position of U.S. Debtors and Official Committee of Unsecured Creditors, May 16, 2013) p. 16-17; *see also* the License Termination Agreement that parties signed in conjunction with Rockstar Sale, which stated that "This Agreement shall not affect the ownership rights that each Seller may have to any intellectual property." (TR21508 (License Termination Agreement) s. 2.02)

[608] TR21278 (First Report of the Monitor, January 14, 2009) para. 42; *see* Schedule "C" for excerpts of Monitor's Reports

[609] TR11366 (Motion of the U.S. Debtors for an Order (A) Approving the Interim Funding and Settlement Agreement and (B) Granting Related Relief, June 9, 2009) paras. 14, 16, 31; *see also* paras. 27, 30

Moreover, the U.S. Debtors understood in February 2010 that ownership of the IP would be at issue as part of the eventual allocation of the sale proceeds.[610]

623.    As for the Joint Administrators of the EMEA Debtors, the first report they filed on January 14, 2009 stated "all intellectual property ("IP") rights belong to NNL, the Canadian company, irrespective of which Group Company originally carried out the research and development activity that generated the IP."[611]

624.    The Monitor's allocation position should also not come as a surprise to the U.S. Debtors.

625.    In a meeting in May 2010 attended by Sharon Hamilton and others, Mr. McDonald on behalf of the Monitor said to Mr. Ray that the Monitor could take the position that NNL owned all of Nortel's IP and should therefore get all the proceeds from its sale.[612]

626.    Moreover, during discussions concerning the structuring of the Rockstar Sale transaction of the Residual IP, the Monitor suggested to the U.S. Debtors that the transaction should be structured with NNL being the only seller and otherwise asserted, including in a conversation between Sharon Hamilton and counsel for the U.S. Debtors, that the Residual IP was a Canadian asset.[613]

---

[610] TR11367 (Declaration of John Ray, February 18, 2010) para. 17

[611] TR31622 (Report of Alan Robert Bloom, Alan Michael Hudson, Stephen John Harris, David Hughes and Christopher John Wilkinson Hill of Ernst & Young LLP, January 14, 2009) s. 3.3; *see also* TR31623 (NNUK Administrators' Statement of Proposals, February 2009) p. 11 and Alan Bloom Deposition, December 5, 2013, p. 186:13-188:9, 188:14-193:10

[612] Murray McDonald Deposition, November 26, 2013, p. 100:2-101:10, 102:15-103:14, 104:19-25, 120:20-123:25, 147:5-148:7; TR00010A (Exh. 10, Reply Affidavit of Sharon Hamilton, April 25, 2014) paras. 42-44

[613] TR00010A (Exh. 10, Reply Affidavit of Sharon Hamilton, April 25, 2014) paras. 39-41; Sharon Hamilton Trial Testimony, Day 4, May 15, 2014, p. 899:2-19

- 213 -

627.    Finally, John Doolittle testified that several times in the post-petition period and before

the Rockstar Sale, he participated in discussions about IP Co. in which "people said that the legal

ownership of the IP rested with NNL and NNL should retain all of the value from the proceeds

of those sales."[614]

628.    Accordingly, the Monitor and Canadian Debtors' allocation position, disclosed in

accordance with the procedural timetable, did not prejudice the Parties to this case.

629.    The entire point of the IFSA was to avoid the detrimental infighting that would have

taken place if this allocation dispute had taken place prior to the assets being sold, a rationale

which the U.S. Court has expressly noted.[615]  Even assuming that a statement by the Monitor,

made before the Residual IP Sale, that its legal position led to an allocation from the proceeds of

that sale to the U.S. Debtors and EMEA Debtors of a nominal amount would have been new and

unexpected information, it is difficult to see what different course would have been followed.  If

the U.S. Debtors believed the position to be ill-founded, they would have reserved their rights,

proceeded with the sale and then contested allocation, which, of course, is precisely what did

occur.  They also could have sought declaratory relief about the parties allocation of the Residual

IP Sale proceeds and thereby become embroiled in the very allocation litigation in which they are

currently engaged, but before the Residual IP Sale occurred.  The allocation question before, and

answer from, the Courts would have been the same as it will be now, yielding the same

percentages as the Courts may decide in this proceeding.  The only difference is that the sale may

---

[614] John Doolittle Deposition, December 5, 2013, p. 149:17-150:12, 150:25-151:24, 152:8-16

[615] TR50523 (Opinion of the U.S. Court, April 3, 2013) p. 4 ("The IFSA provided the necessary mechanism to allow the planned sales of the Nortel Parties' businesses and assets to proceed without dispute among the Nortel Parties. The IFSA, inter alia, provided that the parties to the IFSA would not condition the execution of any sale agreement with a third party upon allocation or even a binding procedure for allocation of the sale proceeds.")

have been jeopardized.  That is not prejudice.  Far from it.  The parties are better off arguing over allocation now, rather than before a sale.

630.    Even if the U.S. Debtors had sought to proceed with an IP Co. instead of a sale of the Residual IP, exactly the same allocation analysis would have been before the Courts with respect to the proceeds of an IP Co. as is being addressed in these proceedings with respect to the Residual IP Sale.  For example, the Courts would still have been required to value the licenses of the U.S. Debtors and EMEA Debtors and the ownership interest of NNL, the value of the IP Co. opportunity, etc.  Those are the same issues as are now before the Courts.

631.    As well, even if the U.S. or EMEA Debtors had refused to participate in a sale of the Residual IP or an IP Co., NNI could not be said to be better off.  If, for the reasons set out above in the Monitor's position, the licenses of the U.S. Debtors and EMEA Debtors had no value in connection with the patents sold to Rockstar, the U.S. and EMEA Debtors are not worse off with the sale as compared to the position that they would have been in had no sale taken place.

632.    In other words, the U.S. Debtors and EMEA Debtors have not identified any prejudice suffered as a result of the alleged late disclosure of the Monitor's litigation position.

633.    The U.S. Debtors argue that the IFSA's reference to the termination of licenses by the "Selling Debtors" to effectuate asset sales "in consideration of a right to an allocation" of the sale proceeds means that each Selling Debtor's allocation must be greater than zero.[616]  But this argument is not credible, as further explained below, as the U.S. Debtors themselves have put

---

[616] TR50223 (Allocation Position of U.S. Debtors and Official Committee of Unsecured Creditors, May 16, 2013) p. 16; TR43794 (IFSA, June 9, 2009) paras. 11(a), 11(d), 12(a); Sheila Block (U.S. Estate) Trial Transcript, Day 1, May 12, 2014, p. 166:16-167:6

forward a position that does not allocate value to every "Selling Debtor" in every sale.[617]  Nor have the U.S. Debtors identified by what amount the allocation must exceed zero in order to comply with this supposed commitment.

**(d)      The Monitor And Canadian Debtors Are Not Estopped From Asserting Their Allocation Position**

*(i)      Equitable Estoppel*

634.    The doctrine of equitable estoppel, or estoppel *in pais* "requires that one may not repudiate an act where that action works an injustice upon another who has relied thereon."[618]

635.    Proving equitable estoppel requires establishing that "(1) a representation of fact was made to them, (2) upon which they had a right to rely, and (3) the denial of the represented fact by the party making the representation would result in injury to the relying party."[619]  None of these factors were present.  As noted above, the Monitor expressly reserved its rights with respect to its allocation position (as did all the other parties), the Courts endorsed this right to put off allocation matters until after the sales (so the other parties knew they could not rely on what they believed was the Monitor's position) and there was no injury caused by the Monitor.

636.    Here, the U.S. Debtors suggest that the Monitor or the Canadian Debtors represented that they would not seek allocation of 100% of the proceeds from the sale of Nortel IP, but the U.S. Debtors have not forwarded a single piece of evidence in support of this claim.  To the contrary, all the parties expressly reserved their rights make any allocation argument when the time

---

[617] TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) Exhibit 33 (p. 136); John Ray Trial Testimony, Day 6, May 21, 2014, p. 1433:10-1440:1

[618] *Hodge v. Bluebeard's Castle, Inc.*, 392 Fed. Appx. 965, n. 6 (3d Cir. 2010), *see also*, *In re Gravure paper & Board Corp.*, 234 F.2d 928, 931-32 (3d Cir. 1956)

[619] *In re RFE Industries, Inc.*, 283 F.3d 159, 164 (3d Cir. 2002) [internal citation omitted]

- 216 -

ultimately came to do so, the Canadian Debtors would have had to affirmatively waive their rights to be estopped from later asserting their allocation claim.

637.    In *In re RFE Industries, Inc.*, the Third Circuit held that language in a dismissal order giving the bankruptcy court "limited jurisdiction to 'enforce and consummate' the Settlement" did not amount to a representation by RFE that it would not object to the settlement order.  The court held that RFE had a right to object to the settlement order at the appropriate time, and the language in the dismissal order did not "plainly state that RFE was waiving any such opportunity."  Therefore, the court found that "RFE's proposal of the language in the Dismissal Order was not a representation by RFE that it would not object to the Settlement."[620]

638.    Nor could the reference to entering into license termination agreements in "consideration of a right to an allocation" in the IFSA give rise to a reasonable belief that the Monitor and Canadian Debtors were waiving their right to assert a position that allocated zero dollars to the U.S. Debtors, or any other Selling Debtor, for any particular assert or sale.  The U.S. Debtors' allocation position demonstrates that they do not consider that language to prevent them from contending that certain Selling Debtors should receive no proceeds from certain sales, as there is no doubt that Nortel GmbH and Nortel Networks France S.A.S. are "Selling Debtors" in the Rockstar Sale and yet the U.S. Debtors' allocation position would not allocate to these two Selling Debtors any of the sale proceeds.[621]  Indeed, Mr. Ray testified that the IFSA's language

---

[620] *In re RFE Industries, Inc.*, 283 F.3d 159, 164-165 (3d Cir. 2002).

[621] TR00051 (Exh. 51, Expert Report of Jeffrey Kinrich, January 24, 2014) Exhibit 33 (p. 136); John Ray Trial Testimony, Day 6, May 21, 2014, p. 1433:10-1440:1

does not provide a guarantee to a specific allocation or that such an allocation would not be zero.[622]

639.     Accordingly, no merit should be given to the suggestions by the U.S. Debtors and EMEA Debtors that while they had reserved the right to make the broadest arguments possible regarding allocation, somehow the Canadian Debtors had a narrower reservation of right arising from precisely the same provisions of the IFSA.

640.     The Monitor and Canadian Debtors, therefore, are not equitably estopped from asserting their allocation position in these proceedings.

### (ii)     Judicial Estoppel

641.     The Monitor and Canadian Debtors are also not judicially estopped from asserting their allocation position.

642.     The doctrine of judicial estoppel "bars a party that has previously asserted a legal position from asserting an inconsistent or contrary legal position in a later proceeding."[623]

643.     In order to apply judicial estoppel in this case, the U.S. and EMEA Debtors would have to demonstrate that: (1) the Monitor and Canadian Debtors are asserting an allocation position that is irreconcilably inconsistent with an allocation position they asserted in a prior proceeding; (2) the Monitor and Canadian Debtors changed their allocation position in bad faith, *i.e.*, in a culpable manner threatening to the Courts' authority or integrity; and (3) disregarding the

---

[622] John Ray Deposition, December 13, 2013, p. 108:25-111:2

[623] *Yetter v. Wise Power Systems, Inc*., 929 F.Supp.2d 329, 331 (D. Del. 2013), citing *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419 (3d Cir. 1988)

Monitor and Canadian Debtors' allocation position is a remedy tailored to address the "affront to the court's authority or integrity" that results from the change in position.[624]

644.    Judicial estoppel is "not intended to eliminate all inconsistencies no matter how slight or inadvertent."[625]    To the contrary, "[j]udicial estoppel is only appropriate when the inconsistent positions are tantamount to a knowing misrepresentation to or even fraud on the court."[626]

645.    This is the most serious complaint made against the Monitor, in light of its implicit accusation that the Monitor breached its duties to the Courts, and is completely unfounded.

646.    The Monitor did not change its position before the Courts.  For example, at the time the Residual IP Sale came before the Courts for approval, as discussed above, it had already publically asserted NNL's ownership of the IP and agreed, in the IFSA, to defer questions of allocation.  It did not expressly or implicitly suggest that the U.S. Debtors and EMEA Debtors were entitled to a substantial allocation of the Residual IP proceeds.  Effectively what all the parties represented to the Courts is that they each had their own positions with respect to allocation, which the Court might or might not accept at a later date.  This meant that at the time of the Residual IP Sale approval the Courts were asked to approve a sale not knowing which of the Debtors owned the assets being sold and which parties would be allocated how much, if anything.  In other words, the Courts were addressing the approval of the Residual IP Sale on a contingency, i.e. contingent on what they would later decide about allocation. Notably, the Canadian Court was not advised by the U.S. Debtors during the sales approval process that they

---

[624] *Montrose Medical Group Participating Savings Plan v. Bulger*, 243 F.3d 773, 777-78 (3d Cir. 2001)

[625] *In re Kane*, 628 F.3d 631, 638 (3d Cir. 2010)

[626] *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314, 324 (3d Cir. 2003) [internal quotation and citation omitted]

would later take the position that they were entitled to the vast majority of the sale proceeds, with less than 11% for the Canadian Debtors. [627]

647.    The Monitor did not act in a manner "threatening to the Courts' authority or integrity".  It acted in compliance and in the spirit of the myriad agreements and court orders selecting when and how to advance their allocation positions.

648.    For all of these reasons, it is submitted that there is no merit to the attempt by the U.S. Debtors and the Bondholders to prevent the Courts from considering this case on its merits.

**PART XI – CONCLUSION**

649.    The Monitor respectfully requests that these Courts order an allocation of the sale proceeds as follows:

| Debtor Estate | Allocation |
|---|---|
| Canada | $6,034.11 million |
| U.S. | $1,001.93 million |
| EMEA | $300.97 million |

---

[627] John Ray Trial Testimony, Day 6, May 21, 2014, p. 1453:10-1454:17

August 7, 2014

**GOODMANS LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Jay A. Carfagnini**  LSUC#: 22293T
jcarfagnini@goodmans.ca
**Benjamin Zarnett**  LSUC#: 17247M
bzarnett@goodmans.ca
**Peter Ruby**  LSUC#: 38439P
pruby@goodmans.ca
**Joseph Pasquariello**  LSUC #: 38390C
jpasquariello@goodmans.ca
Tel:    (416) 979-2211
Fax:    (416) 979-1234
*Lawyers for the Monitor*

**GOWLING LAFLEUR HENDERSON LLP**
Barristers & Solicitors
1 First Canadian Place,
100 King Street West, Suite 1600
Toronto ON M5X 1G5

**Derrick Tay**  LSUC#: 21152A
derrick.tay@gowlings.com
**Jennifer Stam**  LSUC#: 46735J
jennifer.stam@gowlings.com
Tel:    (416) 862-5697
Fax:    (416) 862-7661
*Lawyers for the Canadian Debtors*

**BUCHANAN INGERSOLL & ROONEY PC**
919 North Market Street, Suite 1500
Wilmington, Delaware 19801

Mary F. Caloway (No. 3059)
Kathleen A. Murphy (No. 5215)
(302) 552-4200 (telephone)
(302) 552-4295 (facsimile)
mary.caloway@bipc.com
kathleen.murphy@bipc.com

*Attorneys for Ernst & Young Inc., as Monitor and Foreign Representative of the Canadian Debtors*

**ALLEN & OVERY LLP**
1221 Avenue of the Americas
New York, NY  10020

Jacob S. Pultman
Paul B. Keller
Laura R. Hall
Ken Coleman
Daniel Guyder
(212) 610-6300 (telephone)
(212) 610-6399 (facsimile)
jacob.pultman@allenovery.com
paul.keller@allenovery.com
laura.hall@allenovery.com
ken.coleman@allenovery.com
daniel.guyder@allenovery.com

*Attorneys for Ernst & Young Inc., as Monitor and Foreign Representative of the Canadian Debtors*

**SCHEDULE "A"**

**Glossary of Terms**

| | |
|---|---|
| Business Sales | The post-filing sales in 2009 to 2011 involving tangible and intangible assets of, for the most part, operating Nortel businesses. |
| Canadian Court | The Ontario Superior Court of Justice. |
| Canadian Debtors | The Canadian Nortel companies that, on January 14, 2009, filed for and obtained protection under the *Companies' Creditors Arrangement Act* from the Ontario Superior Court of Justice being, Nortel Networks Corporation (NNC), Nortel Networks Limited (NNL), Nortel Networks Technology Corporation, Nortel Networks International Corporation and Nortel Networks Global Corporation. |
| Canadian Estate | Collectively, the entities that make up the Canadian Debtors. |
| CCC | The Canadian Creditors Committee, which represents the interests of Canadian pensioners and other pension interests, long-term disabled and other employees and former employees of Nortel who have claims against the Canadian Debtors. |
| Courts | The U.S. Court and the Canadian Court. |
| Debtor(s) | The companies or entities comprising the Canadian Debtors, the U.S. Debtors and the EMEA Debtors, either individually or collectively. |
| Debtor Estates | Collectively, the Canadian Debtors, the U.S. Debtors and the EMEA Debtors (equivalent to Estates). |
| EMEA Debtors | The 23 Nortel entities that, on January 15, 2009, were granted administration orders in the U.K. under the *Insolvency Act, 1986* and whose registered offices were in England, Europe, the Middle East and Africa, including Nortel Networks UK Limited (NNUK), Nortel Networks S.A. (NNSA) and Nortel Networks (Ireland) Limited (NN Ireland). |
| EMEA Estate | Collectively, the entities that make up the EMEA Debtors. |
| Estates | Collectively, the Canadian Debtors, the U.S. Debtors and the EMEA Debtors (equivalent to Debtor Estates). |
| IFSA | Interim Funding and Settlement Agreement, June 9, 2009 (TR43794) |
| IP | Intellectual Property. |

- 222 -

| Licensed Participant(s) | As defined in Article 1(e) of the MRDA, a Participant (or all Participants) other than NNL. |
|---|---|
| LOBs | Lines of business |
| LRDs | Limited Risk Distributors which were incorporated in most of the countries where Nortel products were sold, including in the EMEA region |
| Monitor | Ernst & Young Inc. in its capacity as monitor of the Canadian Debtors appointed in the Initial Order granted January 14, 2009.  By various orders, the Ontario Superior Court of Justice expanded the Monitor's powers and authorized it to exercise the powers of the boards of directors of the Canadian Debtors. |
| MRDA | Master R&D Agreement dated December 22, 2004 but with an effective date of January 1, 2001, between NNL, NNI, NNUK, NNSA, NN Australia and NN Ireland, as amended at least four times (TR21003). |
| NNC | Nortel Networks Corporation, being a corporation incorporated under the laws of Canada, which was the publicly traded, parent holding company of NNL and its subsidiaries. |
| NNI | Nortel Networks Inc., being a corporation incorporated under the laws of the State of Delaware, the main U.S. operating entity and a direct subsidiary of NNL. |
| NNL | Nortel Networks Ltd., being a corporation incorporated under the laws of Canada, and the main Canadian operating entity. |
| NNSA | Nortel Networks, S.A., being an entity duly formed under the laws of France, one of the EMEA Debtors, and a direct subsidiary of NNL. |
| NNUK | Nortel Networks UK Limited, being an entity formed under the laws of the United Kingdom, one of the EMEA Debtors, and a direct subsidiary of NNL. |
| NN Ireland | Nortel Networks Ireland, being an entity formed under the laws of the Republic of Ireland, one of the EMEA Debtors, and a direct subsidiary of NNL. |
| NN Australia | Nortel Networks Australia Pty Limited, being an entity formed under the laws of Australia.   NN Australia was one of the signatures to the MRDA but retired from the MRDA effective December 31, 2007. |
| NN Technology | As defined in Article 1(f) of the MRDA, NN Technology "shall mean, any and all intangible assets including but not limited to patents, industrial designs, copyrights and applications thereof, derivative works, |

| | technical know-how, drawings, reports, practices, specifications, designs, software and other documentation or information produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trademarks and any associated goodwill." |
|---|---|
| Nortel | Collectively, NNC and all of its direct and indirect subsidiaries, including the businesses they operated. |
| Nortel Entity(ies) | Any of the companies or entities, either individually or collectively, within the Nortel Group. |
| Nortel Group | Equivalent to "Nortel". |
| Nortel Products | Equivalent to "Products", as defined below. |
| Participant(s) | As defined in the MRDA, any of the parties to the MRDA, namely NNL, NNI, NNUK NNSA, NN Australia, NN Ireland |
| Products | As defined in Article 1(g) of the MRDA, Products "shall mean all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time by, or for, any of the Participants, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing" (equivalent to "Nortel Products"). |
| R&D | Research and Development |
| RPEs | Residual Profit Entities (NNL, NNI, NNUK, NNSA and NN Ireland) |
| Rockstar Transaction | The sale to Rockstar Bidco, LP in 2011 of the residual patent and patent-related assets owned by NNL (equivalent to "Rockstar Sale"). |
| RPSM | Residual profit split methodology – the transfer pricing methodology used by Nortel from 2001. |
| U.S. Court | The United States Bankruptcy Court for the District of Delaware. |
| U.S. Debtors | The U.S. Nortel companies that, on January 14, 2009, filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware for protection under Chapter 11 or Title 11 of the U.S. *Code*, being Nortel Networks Inc. ("NNI") and several of its U.S. affiliates, namely Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel |

- 224 -

| | Networks Cable Solutions Inc. and Nortel Networks (CALA) Inc. |
|---|---|
| U.S. Estate | Collectively, the entities that make up the U.S. Debtors. |
| UKPC | Collectively, the Nortel Networks UK Pension Trust Limited and the Board of Directors of the Pension Protection Fund. |

**Schedule "B" - Organizational Structure of the Nortel Debtors**



# SCHEDULE "C"

## Summary of Monitor's Reports

| Report Information | Excerpts re: IP Ownership Assertion | Excerpts re: Reservation of Rights |
|---|---|---|
| TR21278<br><br>Pre-Filing Report of the Monitor<br><br>January 14, 2009 | Para. 42:<br><br>"Nortel's intellectual property ("IP") is principally owned by NNL." | |
| TR40141<br><br>Second Report of the Monitor<br><br>(Layer 4-7 Stalking Horse)<br><br>February 25, 2009 | Para. 20:<br><br>"The Applicants have an interest in the intellectual property upon which the Layer 4-7 Business products are based. Generally speaking the owner of intellectual property in the Nortel group licenses the intellectual property in question to various other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis." | |

| | | |
|---|---|---|
| | Para. 66:<br><br>"As previously indicated, the Layer 4-7 Business is not operated through a dedicated legal entity or stand-alone division. The Applicants have an interest in intellectual property of the Layer 4-7 Business which, in turn, is subject to various intercompany licensing agreements. Therefore, the task of allocating the sale proceeds stemming from the Purchase Agreement amongst the various Nortel entities in the various jurisdictions is complex. As a result, the proceeds of sale stemming from the Purchase Agreement will be held in escrow with a party acceptable to the Sellers until such time as an allocation is agreed upon." | |
| TR45565<br><br>Fifth Report of the Monitor | Para. 14:<br><br>"As noted in the Second Report, the Layer 4-7 Business is not | Para 18:<br><br>"The Monitor is also of the view that the allocation of proceeds amongst |

| | | |
|---|---|---|
| (Layer 4-7 Final)<br><br>March 26, 2009 | operated through a dedicated legal entity or stand-alone division. For example, the Applicants have an interest in intellectual property of the Layer 4-7 Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. Therefore, the task of allocating the sale proceeds stemming from the Purchase Agreement amongst the various Nortel entities in the various jurisdictions is complex. As a result, the Sellers have agreed that the proceeds of sale stemming from the Purchase Agreement will be held in escrow until such time as an allocation is agreed upon." | the Sellers is complex and requires a significant amount of further analysis before any determination can be made. Accordingly, the Monitor supports the Applicants' request for approval of this Honourable Court to place the proceeds from the closing of the Radware transaction in escrow. This will allow the Sellers time to complete a detailed analysis and engage in discussions with respect to the appropriate method of allocation. Once this process has been completed, the Monitor expects that the Applicants will return before this Honourable Court to seek approval of the allocation and release of the funds from escrow." |
| TR45571<br><br>Fourteenth Report of the Monitor | Para. 18:<br><br>"The Applicants also have an interest in the intellectual property | Para. 69:<br><br>"As previously indicated, the Business is not operated through a |

| | | |
|---|---|---|
| (CDMA/LTE Stalking Horse)<br><br>June 23, 2009 | upon which the CDMA products are based. Generally speaking, the owner of intellectual property in the Nortel group, <u>which in most cases is NNL</u>, licenses the intellectual property in question for sale to customers in the other geographies, to various other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis."<br><br>[Emphasis added] | dedicated legal entity or stand-alone division. The Applicants have an interest in intellectual property of the Business which, in turn, is subject to various intercompany licensing agreements. NNL, NNI and certain of their affiliates have interests in various customer contracts, receivables and other assets. Therefore, the task of allocating the sale proceeds stemming from the Sale Agreement amongst the various Nortel entities in the various jurisdictions is complex. As a result, the net proceeds of sale stemming from the Sale Agreement will be held in escrow with a party acceptable to the Sellers until such time as an allocation is agreed upon." |
| TR49809<br><br>Fifteenth Report of the Monitor re: Interim Funding | | Para. 46(e):<br><br>"The IFSA represents the successful culmination of a lengthy and complicated set of negotiations between the Applicants, U.S. |

| June 25, 2009 | | Debtors, EMEA Debtors, Monitor, U.K. Administrators, UCC and *Ad Hoc* Bondholders' Committee in addressing certain issues, including: […]  (e) to further facilitate potential asset sales, by agreeing that the execution of definitive documentation with a purchaser by each of the Debtors shall not be conditioned upon the Debtors reaching an agreement with respect to the allocation of the proceeds from such a sale." |
| | | Para. 47(l) – (n):  "The significant terms of the agreement include the following: […]  l) Each of the Canadian Debtors, U.S. Debtors, and EMEA Debtors agree their execution of definitive documentation with a purchaser of material assets of any of the Debtors |

|  |  | (a "Selling Debtor") shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds;<br><br>m) In the absence of an agreement regarding the allocation of any sales proceeds, the Debtors agree that the proceeds shall be deposited in an escrow account, and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers pursuant to the dispute resolution protocol referred to in paragraph 47 (n) below;<br><br>n) The Debtors shall negotiate in good faith and attempt to reach an agreement on a sample form of |

| | | agreement to effectuate the termination of IP licenses as contemplated in paragraph 47 (k) above, and an agreement on a protocol for resolving disputes concerning the allocation of sales proceeds, including binding procedures for the allocation of sales proceeds where the Selling Debtors have been unable to reach an agreement regarding such allocation; […]" |
|---|---|---|
| TR21280 Seventeenth Report of the Monitor (CDMA/LTE Final) July 27, 2009 | Para. 37: "As noted in the Fourteenth Report, the CDMA Business and the LTE Business are not operated through a dedicated legal entity or stand-alone division. The Applicants have an interest in intellectual property of the CDMA Business and the LTE Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some | Para. 38: "As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA entities, through their U.K. Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive |

| | | |
|---|---|---|
| | cases on an exclusive basis and in other cases, on a non-exclusive basis. Therefore, the task of allocating the sale proceeds stemming from the Successful Bid amongst the various Nortel entities in the various jurisdictions is complex." | documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers. The parties agreed to negotiate in good faith and attempt to reach an agreement on a protocol for resolving disputes concerning the allocation of sales proceeds, including binding procedures for the allocation of sales proceeds where |

| | | |
|---|---|---|
| | | the Selling Debtors have been unable to reach an agreement regarding such allocation." |
| | | **Para. 39:**<br><br>"As of the current date, no agreement has been reached regarding the allocation of any sales proceeds. Accordingly, the Selling Debtors have determined that the proceeds shall be deposited in an escrow account. The Applicants and the U.S. Debtors are currently in discussions with a major financial institution with respect to having this institution act as escrow agent." |
| | | **Para. 40:**<br><br>"In addition, the terms of a protocol with respect to the resolution of disputes in connection with the allocation of proceeds are still under discussion between the Applicants, the U.S. Debtors, the U.K. Administrators, the Monitor, the UCC and the Bondholder Group. |

| | | Accordingly, the Monitor expects that the Company will return before this Honourable Court prior to closing of the transaction contemplated by the Successful Bid to seek approval of the escrow agreement and a protocol for resolving disputes regarding the allocation of sale proceeds." |
|---|---|---|
| TR45585<br><br>Eighteenth Report of the Monitor<br><br>(Enterprise Stalking Horse)<br><br>July 31, 2009 | Para. 19:<br><br>"In addition, the Applicants have an interest in the intellectual property upon which the products of the Business are based. Generally speaking, the owner of the intellectual property in the Nortel group, which in most cases is NNL, licenses the intellectual property in question to various other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. These Nortel entities in turn license the intellectual property related to the | Para. 86:<br><br>"As set out in the Fifteenth Report, the Applicants, the U.S. Debtors, and certain of the EMEA Debtors, through their U.K. Administrators, entered into the Interim Funding and Settlement Agreement dated June 9, 2009 (the "IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an |

| | Business to customers in their respective geographic regions." [Emphasis added] | agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors (as defined in the IFSA) or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers under the terms of a sales protocol. The parties also agreed to negotiate in good faith and attempt to reach an agreement on a sales protocol for resolving disputes concerning the allocation of sales proceeds, including binding procedures for the allocation of sales proceeds where the Selling Debtors have been unable to reach an |

| | | agreement regarding such allocation." |
|---|---|---|
| | Para. 85:<br><br>"As previously indicated, the Business is not operated through a dedicated legal entity or stand-alone division. The Applicants have an interest in intellectual property of the Business which, in turn, is subject to various intercompany licensing agreements. Therefore, the task of allocating the sale proceeds stemming from a sale agreement amongst the various Nortel entities in the various jurisdictions is complex." | Para. 87:<br><br>"As of the current date, no agreement has been reached regarding the allocation of any sales proceeds. In addition, the terms of a sales protocol with respect to the resolution of disputes in connection with the allocation of proceeds are still under discussion between the Applicants, the U.S. Debtors, the U.K. Administrators, the Monitor, the UCC and the Bondholders' Committee. However, the Monitor expects that Nortel will return before this Honourable Court prior to closing of the transaction contemplated by the Avaya Agreement or any Alternative Transaction to seek approval of these matters including terms of an escrow arrangement and the sales protocol." |
| TR45589 | Para. 33: | Para. 34: |

| | | |
|---|---|---|
| Twentieth Report of the Monitor (Enterprise Final) September 15, 2009 | "As noted in the Eighteenth Report, the Business is not operated through a dedicated legal entity or stand-alone division. Amongst other things, the Applicants have an interest in intellectual property related to the Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. Therefore, the task of allocating the sale proceeds stemming from the Successful Bid amongst the various Nortel entities in the various jurisdictions is complex." | "As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA entities, through the U.K. Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of |

|  |  | all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers. The parties to the IFSA agreed to negotiate in good faith and attempt to reach an agreement on a protocol for resolving disputes concerning the allocation of sales proceeds, including binding procedures for the allocation of sales proceeds where the Selling Debtors have been unable to reach an agreement regarding such allocation." |
|  |  | Para. 35:<br><br>"As of the current date, no agreement has been reached regarding the allocation of any sales proceeds and the terms of a protocol with respect to the resolution of disputes in connection with the allocation of sale proceeds are still under discussion.  Accordingly, the Selling Debtors have determined that |

| | | the proceeds shall be deposited in an escrow account.  The Applicants and the U.S. Debtors are currently in discussions with a major financial institution with respect to having this institution act as escrow agent." |
|---|---|---|
| TR45582<br><br>Twenty-First Report of the Monitor<br><br>(NGPC Sale Process)<br><br>September 24, 2009 | Para. 14:<br><br>"As with other Nortel technologies, the underlying intellectual property associated with the NG-PC Assets is owned by NNL and is subject to various inter-company licensing agreements. NNI owns the fixed assets associated with the NG-PC operations."<br><br>[Emphasis added] | |
| TR45584<br><br>Twenty-Third Report of the Monitor<br><br>(GSM/GSM-R Sale Process)<br><br>October 8, 2009 | Para. 17:<br><br>As with other Nortel technologies, the underlying intellectual property associated with the GSM Business is owned by NNL and is subject to various inter-company licensing | |

|  | <u>agreements</u>. Nortel has made considerable R&D investments in its GSM product offerings<br><br>[Emphasis added] |  |
|---|---|---|
| TR45595<br><br>Twenty-Fourth Report of the Monitor<br><br>(MEN Stalking Horse)<br><br>October 13, 2009 | Para. 20:<br><br>"In addition, the Applicants have an interest in the intellectual property upon which the products of the MEN Business are based. Generally speaking, the owner of the intellectual property in the Nortel group, <u>which in most cases is NNL</u>, licenses the intellectual property in question to various other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. These Nortel entities in turn license the intellectual property related to the MEN Business to customers in their respective geographic regions." | Para. 88:<br><br>"As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA entities, through the U.K. Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties |

| | | |
|---|---|---|
| | [Emphasis added] | agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers. The parties to the IFSA agreed to negotiate in good faith and attempt to reach an agreement on a protocol for resolving disputes concerning the allocation of sales proceeds, including binding procedures for the allocation of sales proceeds where the Selling Debtors have been unable to reach an agreement regarding such allocation." |
| | Para. 87:<br><br>"As previously indicated, the MEN Business is not operated through a | Para. 89:<br><br>"As of the current date, no agreement has been reached |

| | dedicated legal entity or stand-alone division. The Applicants have an interest in intellectual property of the MEN Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. Therefore, the task of allocating the sale proceeds stemming from a sale agreement amongst the various Nortel entities in the various jurisdictions is complex." | regarding the allocation of any sales proceeds and the terms of a protocol with respect to the resolution of disputes in connection with the allocation of sale proceeds are still under discussion." |
|---|---|---|
| TR45583<br><br>Twenty-Sixth Report of the Monitor<br><br>(NGPC Final)<br><br>October 26, 2009 | Para. 14:<br><br>"As with other Nortel technologies, the underlying intellectual property associated with the NG-PC Business is owned by NNL and is subject to various inter-company licensing agreements. NNI owns the fixed assets associated with the NG-PC | Para. 44:<br><br>"As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA entities, through the UK Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. |

| | | |
|---|---|---|
| | Business." | Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors (as defined in the IFSA) or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers. The parties agreed to negotiate in good faith and attempt to reach an agreement on a protocol |
| | [Emphasis added] | |

|  |  | for resolving disputes concerning the allocation of sales proceeds, including binding procedures for the allocation of sales proceeds where the Selling Debtors have been unable to reach an agreement regarding such allocation." |
|  | Para. 43:<br><br>"The NG-PC Business is not operated through a dedicated legal entity or stand-alone division. The Applicants have an interest in intellectual property of the NG-PC Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. Therefore, the task of allocating the sale proceeds stemming from the sale of the NG-PC Business as between the various Nortel entities | Para. 45:<br><br>"As of the current date, no agreement has been reached regarding the allocation of any sales proceeds relating to the NG-PC Business. Accordingly, the Monitor understands that the Applicants and the U.S. Debtors have agreed that the sale proceeds shall be deposited in an escrow account and are currently in discussions with a major financial institution with respect to having this institution act as escrow agent. Accordingly, the Monitor expects that the Applicants will return before this Honourable Court prior to closing of the transaction contemplated by the Transaction |

| | is complex." | Agreement to seek approval of the escrow agreement." |
|---|---|---|
| TR45604<br><br>Twenty-Eighth Report of the Monitor<br><br>(MEN Final)<br><br>November 27, 2009 | Para. 37:<br><br>"As noted in the Twenty-Fourth Report, the MEN Business is not operated through a dedicated legal entity or stand-alone division. Amongst other things, the Applicants have an interest in intellectual property related to the MEN Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. Therefore, the task of allocating the sale proceeds stemming from the Successful Bid amongst the various Nortel entities in the various jurisdictions is complex." | Para. 38:<br><br>"As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA entities, through the UK Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds |

|  |  | shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors (as defined in the IFSA) or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers. The parties to the IFSA agreed to negotiate in good faith and attempt to reach an agreement on a protocol for resolving disputes concerning the allocation of sales proceeds, including binding procedures for the allocation of sales proceeds where the Selling Debtors have been unable to reach an agreement regarding such allocation." |
|  |  | Para. 39:<br><br>"As of the current date, no agreement has been reached regarding the allocation of any sales proceeds and the terms of a protocol |

| | | with respect to the resolution of disputes in connection with the allocation of sale proceeds are still under discussion. Accordingly, the Selling Debtors have determined that the proceeds shall be deposited in an escrow account. Once the terms of the escrow arrangements are finalized, the Applicants will bring a motion before this Honourable Court seeking approval of the escrow agreement." |
| TR45609<br><br>Twenty-Ninth Report of the Monitor (GSM/GSM-R Final)<br><br>November 27, 2009 | Para. 68:<br><br>"As noted in the Twenty-Third Report, the GSM Business is not operated through a dedicated legal entity or stand-alone division. The Applicants have an interest in intellectual property of the GSM Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive | Para. 69:<br><br>"As set out in the Fifteenth Report, the Applicants, the U.S. Debtors, and certain of the EMEA entities, through the UK Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive |

|  |  | basis. Therefore, the task of allocating the sale proceeds stemming from the Successful Bid amongst the various Nortel entities in the various jurisdictions is complex." | documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors (as defined in the IFSA) or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers. The parties agreed to negotiate in good faith and attempt to reach an agreement on a protocol for resolving disputes concerning the allocation of sale proceeds, including binding procedures for the allocation of sale proceeds where the Selling |

| | | |
|---|---|---|
| | | Debtors have been unable to reach an agreement regarding such allocation." |
| | | Para. 70:<br><br>"The Monitor notes that the aggregate purchase price payable in connection with the Successful Bid was negotiated by the Sellers and the UK Administrators and Ericsson and Kapsch on a global basis. The allocation of the overall $103 million purchase price as between the amount payable by Ericsson pursuant to the Ericsson Agreement and Kapsch pursuant to the Kapsch Agreement was determined solely by Ericsson and Kapsch and not discussed with the Sellers. Accordingly, the Selling Debtors have agreed that the allocation as set forth in the two transaction agreements is not determinative or reflective of any allocation amongst the Selling Debtors." |

| | | Para. 71:<br><br>"As of the current date, no agreement has been reached regarding the allocation of any sale proceeds. Accordingly, the Selling Debtors have determined that the proceeds from both transactions shall be deposited in an escrow account. In addition, the terms of a protocol with respect to the resolution of disputes in connection with the allocation of proceeds are still under discussion between the Applicants, the U.S. Debtors, the UK Administrators, the Monitor, the UCC and the Bondholder Group. Accordingly, the Monitor expects that the Company will return before this Honourable Court prior to closing of the transactions contemplated by the Successful Bid to seek approval of the escrow agreement and a protocol for resolving disputes regarding the allocation of sale proceeds." |
| --- | --- | --- |

| | | |
|---|---|---|
| Thirtieth Report of the Monitor<br><br>(ARA)<br><br>November 27, 2009 | | Para. 23(e):<br><br>"The Monitor has participated extensively in the analysis and negotiations of the APAC Agreement. The APAC Agreement addresses a number of critical issues facing the Applicants and the APAC Entities, including:<br>(e) ensuring that the execution of definitive documentation with a purchaser by Nortel shall not be conditioned upon reaching an agreement with respect to the allocation of the proceeds from such a sale." |
| | | Para 25(c):<br><br>"A summary of the significant terms of the APAC Agreement is provided in the paragraphs that follow. Reference should be made directly to the APAC Agreement for a complete understanding of its terms.<br>(c)The APAC Entities have agreed to participate in current and future |

| | | global business and asset sale transactions including entering into agreements to terminate intellectual property licences, and such participation shall not be conditioned on reaching an agreement with the APAC Entities on the allocation of the sales proceeds." |
|---|---|---|
| TR45581 Thirty-Fourth Report of the Monitor (CVAS Stalking Horse) January 3, 2010 | Para. 21: "In addition, the Applicants have an interest in the intellectual property upon which the products of the CVAS Business are based. Generally speaking, <u>the owner of the intellectual property in the Nortel group, which in most cases is NNL,</u> licenses the intellectual property in question to various other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. These Nortel entities in turn license the intellectual property related to the CVAS Business to customers in | Para. 94: "As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA entities, through the UK Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation |

| | | |
|---|---|---|
| | their respective geographic regions." [Emphasis added] | of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors (as defined in the IFSA) or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers. The parties to the IFSA agreed to negotiate in good faith and attempt to reach an agreement on a protocol for resolving disputes concerning the allocation of sales proceeds, including binding procedures for the allocation of sales proceeds where the Selling Debtors have been unable to reach an agreement regarding such |

|  |  | allocation." |
|---|---|---|
|  | Para. 93:<br><br>"As previously indicated, the CVAS Business is not operated through a dedicated legal entity or stand-alone division. The Applicants have, amongst other things, an interest in intellectual property of the CVAS Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. Therefore, the task of allocating the sale proceeds stemming from a sale agreement amongst the various Nortel entities in the various jurisdictions is complex." | Para. 95:<br><br>"As of the current date, no agreement has been reached regarding the allocation of any sale proceeds and the terms of a protocol with respect to the resolution of disputes in connection with the allocation of sale proceeds are still under discussion. Accordingly, the Monitor presently expects that the sale proceeds derived from the sale of the CVAS Business will be paid into an escrow account pursuant to the terms of an escrow agreement which the Applicants will seek approval of at a later date." |
| TR45580<br><br>Thirty-Fifth Report of the Monitor | Para. 33:<br><br>"The continued viability of the Applicants is necessary to the |  |

| January 18, 2010 | Nortel group of companies as NNL provides corporate administrative and management support to its affiliates on a global basis, is contractually obligated to provide transition services to the various purchasers of Nortel's global assets and NNL is the legal owner of substantially all of Nortel's intellectual property, which is licensed to its affiliates. In addition, a significant portion of Nortel's R&D activity, which is necessary to support the on-going business of Nortel, continues to be conducted by the Applicants." | |
| --- | --- | --- |
| TR45568

Fortieth Report of the Monitor

February 26, 2010 | Para. 24:

"As noted in the Thirty-Fourth Report, the CVAS Business is not operated through a dedicated legal entity or stand-alone division. Amongst other things, the Applicants have an interest in intellectual property related to the CVAS Business which, in turn, is | Para. 25:

"As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA entities, through the U.K. Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. |

| | | |
|---|---|---|
| | subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. Therefore, the task of allocating the sale proceeds, stemming from the GENBAND Agreement amongst the various Nortel entities in the various jurisdictions is complex." | Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers. The parties to the IFSA agreed to negotiate in good faith and attempt to reach an agreement on a protocol |

| | | |
|---|---|---|
| | | for resolving disputes concerning the allocation of sales proceeds, including binding procedures for the allocation of sales proceeds where the Selling Debtors have been unable to reach an agreement regarding such allocation." |
| | | Para. 26: "As of the current date, no agreement has been reached regarding the allocation of any sales proceeds and the terms of a protocol with respect to the resolution of disputes in connection with the allocation of sale proceeds are still under discussion. Accordingly, the Selling Debtors (as defined in the IPSA) have determined that the proceeds shall be deposited in an escrow account. Once the terms of the escrow arrangements are finalized, the Applicants will bring a motion before this Honourable Court seeking approval of the escrow |

| | | agreement." |
|---|---|---|
| TR45569<br><br>Forty-Fifth Report of the Monitor<br><br>(CVAS Final)<br><br>May 14, 2010 | | Para. 41:<br><br>"The Applicants and the U.S. Debtors have agreed that the sale proceeds related to the sale of the Business will be placed in an escrow account to be established and governed by an escrow agreement that, among other things, shall provide that the sale proceeds may only be released from the escrow account upon either (a) written instruction delivered by all of the Sellers as to the distribution of such proceeds (subject to the prior consent of the Monitor, the Committee and the Bondholder Group acting in good faith) or (b) upon order of this Honourable Court and the U.S. Court after notice and a joint hearing." |
| | | Para. 42:<br><br>"As of the current date, no agreement has been reached |

| | | regarding the allocation of any sale proceeds in relation to the Business." |
|---|---|---|
| TR45567<br><br>Fifty-Second Report of the Monitor<br><br>(MSS Stalking Horse)<br><br>August 30, 2010 | Para. 17:<br><br>"In addition, the Applicants have an interest in the intellectual property upon which the products of the MSS Business are based. <u>Generally speaking, the owner of the intellectual property in the Nortel group, which in most cases is NNL, licenses the intellectual property in question to various other Nortel legal entities around the world,</u> in some cases on an exclusive basis and in other cases, on a non-exclusive basis. These Nortel entities in turn license the intellectual property related to the MSS Business to customers in their respective geographic regions."<br><br>[Emphasis added] | Para. 86:<br><br>"As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA entities, through the U.K. Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds |

|  |  | shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors (as defined in the IFSA) or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute resolvers" |
|  | Para. 85:<br><br>"As previously indicated, the MSS Business is not operated through a dedicated legal entity or stand-alone division. The Applicants have, amongst other things, an interest in intellectual property of the MSS Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. Therefore, the task of allocating | Para. 87:<br><br>"As of the current date, no agreement has been reached regarding the allocation of any sales proceeds. Accordingly, the Monitor expects that the sale proceeds derived from the sale of the MSS Business will be paid into an escrow account pursuant to the terms of an escrow agreement which the Applicants will seek approval of at a later date." |

| | the sale proceeds stemming from a sale agreement amongst the various Nortel entities in the various jurisdictions is complex." | |
|---|---|---|
| TR45566<br><br>Fifty-Fourth Report of the Monitor<br><br>(MSS Final)<br><br>September 28, 2010 | Para. 40:<br><br>"As noted in the Fifty-Second Report, the MSS Business is not operated through a dedicated legal entity or stand-alone division. Amongst other things, the Applicants have an interest in intellectual property related to the MSS Business which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis. Therefore, the task of allocating the sale proceeds stemming from the Successful Bid amongst the various Nortel entities in the various jurisdictions is complex. Accordingly, as with the proceeds | |

| | | |
|---|---|---|
| | of other sale transactions where certain of the Applicants, the U.S. Debtors and EMEA Debtors were sellers, the proceeds of the sale of the MSS Business will be placed into an escrow account pending agreement of all of the relevant Selling Debtors (as defined in the Interim Funding and Settlement Agreement approved by this Honourable Court on June 29, 2009) as to an appropriate allocation of such proceeds. Once the terms of the escrow arrangements are finalized, the Applicants will bring a motion before this Honourable Court seeking approval of the escrow agreement." | |
| TR21281<br><br>Sixty-Third Report of the Monitor<br><br>(Residual IP Stalking Horse) | Para. 14:<br><br>"In connection with its previous post-filing business unit divestitures, Nortel sold certain patents and intellectual property assets related to such businesses; | Para. 83:<br><br>"As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA entities, through the Joint Administrators, entered into the Interim Funding and |

| April 14, 2011 | however, Nortel retained significant Residual IP, including approximately 6,000 Canadian, U.S. and foreign patents and patent applications spanning wireless, wireless 4G, data networking, optical, voice, internet, service provider, semiconductors and other patent portfolios. <u>Legal title to substantially all such patents is held by and registered in the name of NNL</u>." <br><br> [Emphasis added] | Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the Selling Debtors (as defined in the IFSA) or (ii) in the case where the Selling Debtors fail to reach an agreement, a determination of the allocation by the relevant dispute |

|  |  | resolvers." |
|---|---|---|
|  | Para. 82: | Para. 84: |
|  | "<u>NNL holds legal title to the Residual IP</u> which, in turn, is subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases on a non-exclusive basis." <br><br> [Emphasis added] | "As of the current date, no agreement has been reached regarding the allocation of the Residual IP sale proceeds. Accordingly, the Monitor expects that such proceeds will be paid into an escrow account pursuant to the terms of an escrow agreement which the Applicants will seek approval of at a later date." |
| TR40718 <br><br> Sixty-Seventh Report of the Monitor <br><br> June 2, 2011 | Para. 14: <br><br> "As this Honourable Court well knows, over the course of the past two years, the Canadian Debtors, along with the U.S. Debtors, the EMEA Debtors and certain other Nortel entities, have divested themselves of Nortel's various global operating businesses. The necessity of having various Nortel entities as "sellers" under those transactions resulted from the fact | Para. 42: <br><br> "With the exception of the IP transaction, the auction for which will commence on June 20, 2011, the Canadian Debtors, the U.S. Debtors, the EMEA Debtors and their affiliates have now divested substantially all of Nortel's material worldwide assets. The proceeds of these divestitures - some $3 billion currently with a minimum of a further $900 million expected to be |

| | | |
|---|---|---|
| | that the businesses divested were not operated through a dedicated legal entity, but rather on a worldwide basis across various Nortel legal entities. Amongst other things, the Canadian Debtors held (or hold) legal title to the intellectual property which underpinned Nortel's global businesses, which intellectual property was and is licensed to its affiliates, in some cases on an exclusive basis and in other cases on a non-exclusive basis." | added upon consummation of the patent portfolio and related assets transaction - now sit in escrow awaiting the resolution of allocation." Para. 43: "This issue, together with the resolution of the EMEA Claims and the U.K. Pension Claims, lays at the heart not only of these CCAA proceedings, but also the Chapter 11 Proceedings and the U.K. Proceedings. Simply put, they are matters that must be resolved before any creditor of an Applicant (and likely any other Nortel debtor) can expect to receive a meaningful distribution on account of amounts that have now been outstanding in most cases since January 2009." |
| TR45574 Seventy-First Report of the Monitor | Para. 49: "As noted in the Sixty-Third Report, NNL holds legal title to the Residual IP which, in turn, is | Para. 50: "As set out in the Fifteenth Report, the Applicants, U.S. Debtors, and certain of the EMEA Debtors, |

| (Residual IP Final)<br><br>July 6, 2011 | subject to various intercompany licensing agreements with other Nortel legal entities around the world, in some cases on an exclusive basis and in other cases, on a non-exclusive basis."<br><br>[Emphasis added] | through the Joint Administrators, entered into the Interim Funding and Settlement Agreement ("IFSA") which was approved by this Honourable Court on June 29, 2009. Pursuant to the IFSA, each of the Applicants, U.S. Debtors, and EMEA Debtors agreed that their execution of definitive documentation with a purchaser of any material Nortel assets shall not be conditional upon reaching an agreement regarding the allocation of the sale proceeds or binding procedures for the allocation of the sale proceeds. In addition, the parties agreed that in the absence of any agreement regarding the allocation of any sale proceeds, the proceeds shall be deposited in an escrow account and any distribution from the escrow account shall be contingent upon (i) the agreement of all of the relevant Selling Debtors (as defined in the IFSA), or (ii) in the case where the Selling Debtors fail |
|---|---|---|

|  |  | to reach an agreement, a determination of the allocation by the relevant dispute resolvers." |
|  |  | Para. 51:<br><br>"As no agreement has been reached regarding the allocation of the Residual IP sale proceeds, they will be placed into a distribution escrow account upon Closing. Once the terms of the distribution escrow agreement are finalized, the Applicants will bring a motion before this Honourable Court seeking approval of the distribution escrow agreement." |

6356768

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

Court File No. 09-CL-7950

| ONTARIO SUPERIOR COURT OF JUSTICE COMMERCIAL LIST | IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE |
|---|---|

## INITIAL POST-TRIAL BRIEF (ALLOCATION) OF THE MONITOR AND CANADIAN DEBTORS

**GOODMANS LLP**
Barristers and Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, Canada  M5H 2S7

**Benjamin Zarnett**  LSUC#: 17247M
bzarnett@goodmans.ca
**Jay A. Carfagnini**  LSUC#: 22293T
jcarfagnini@goodmans.ca
**Peter Ruby**  LSUC#: 38439P
pruby@goodmans.ca
**Joseph Pasquariello**  LSUC#: 38390C
jpasquariello@goodmans.ca
Tel:    416.979.2211
Fax:    416.979.1234
Lawyers for the Monitor

**GOWLING LAFLEUR HENDERSON LLP**
Barristers & Solicitors
1 First Canada Place
100 King Street West, Suite 1600
Toronto, ON  M5X 1G5

**Derrick Tay**  LSUC#: 21152A
derrick.tay@gowlings.com
**Jennifer Stam**  LSUC#: 46735J
jennifer.stam@gowlings.com
Tel:    (416) 862-5691
Fax:    (416) 862-7661
*Lawyers for the Canadian Debtors*

**BUCHANAN INGERSOLL & ROONEY PC**
919 North Market Street, Suite 1500
Wilmington, Delaware  19801

**Mary F. Caloway**  (No. 3059)
mary.caloway@bipc.com
**Kathleen A. Murphy**  (No. 5215)
kathleen.murphy@bipc.com
Tel:    (302) 552-4200
Fax:    (302) 552-4295
*Attorneys for Ernst & Young Inc., as Monitor and Foreign Representative of the Canadian Debtor*

**ALLEN & OVERY LLP**
1221 Avenue of the Americas
New York, NY  10020

**Jacob S. Pultman**
jacob.pultman@allenovery.com
**Paul B. Keller**
paul.keller@allenovery.com
**Laura R. Hall**
laura.hall@allenovery.com
**Ken Coleman**
ken.coleman@allenovery.com
**Daniel Guyder**
david.guyder@allenovery.com
Tel:    (212) 610-6300
Fax:    (212) 610-6399
*Attorneys for Ernst & Young Inc., as Monitor and Foreign Representative of the Canadian Debtor*