**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

--------------------------------------------------------------- x
                                                                :
*In re*                                                         :          Chapter 11
                                                                :
Nortel Networks Inc., *et al.*,                                 :          Case No. 09-10138 (KG)
                                                                :
                                     Debtors.                   :          (Jointly Administered)
                                                                :
--------------------------------------------------------------- x

- and the -

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,***
**R.S.C. 1985, C. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,**
**NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS**
**INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY**
**CORPORATION**

**POST-TRIAL BRIEF OF THE *AD HOC* GROUP OF BONDHOLDERS**

# TABLE OF CONTENTS

Page

I.     PRELIMINARY STATEMENT ..................................................................1

II.    CREDITOR RECOVERIES ARE NOT RELEVANT TO ALLOCATION .....................3

    A.     The Allocation Trial is About Allocation, Not Creditor Recoveries ......................4

        i.     The Courts Do Not Have Equitable Discretion to Dictate Creditor Recoveries as Part of the Allocation Trial ....................................................4

        ii.    Numerous Orders and Statements by the Courts Have Established and Reaffirmed that the Allocation Trial is About *Only* Allocation............6

        iii.   Consideration of Creditor Recoveries is Premature Because They Cannot be Ascertained at this Time ............................................................8

    B.     The Courts Should Disregard Arguments Premised on Creditor Recoveries, Including the Pro Rata Distribution Theory........................................................10

III.   THE PRO RATA APPROACH IS LEGALLY AND FACTUALLY UNSUPPORTABLE...........................................................................................12

    A.     The Pro Rata Approach Has No Basis in International or Domestic Law............13

        i.     The Pro Rata Distribution Theory is a Request for Substantive Consolidation .............................................................................................13

        ii.    Cross-Border Substantive Consolidation Has Never Been Ordered..........15

        iii.   A Court-Imposed Global Substantive Consolidation of the Nortel Debtors' Estates Could Negatively Affect Capital Markets ......................17

        iv.    A Court-Imposed Global Substantive Consolidation of the Nortel Debtors' Estates Would Ignore the Courts' Orders Regarding Intercompany and Creditor Claims............................................................18

    B.     The Presumption of Substantive Consolidation Advocated for by Clark & Westbrook Must be Rejected ..............................................................................19

    C.     The Factual Record Does Not Support Substantive Consolidation ......................21

        i.     The Substantive Consolidation Standard .................................................21

        ii.    The Global Sub Con Proponents Cannot Establish a *Prima Facie* Case for Global Substantive Consolidation ................................................23

iii.    Even if a *Prima Facie* Case for Global Substantive Consolidation Could Be Established, it Can Be Defeated by the Bondholder Group and Other Significant Creditors Who Relied on the Separateness of the Nortel Entities ...........................................................25

    (a)    *A Global Substantive Consolidation of the Nortel Debtors' Estates Would Harm Creditors*.....................................................26

    (b)    *Prepetition, Bondholders, and Numerous Other Creditors, Were Told They Could Rely On, and Did Actually Rely On, the Nortel Debtors' Separate Corporate Existence* .....................27

iv.    Global Substantive Consolidation is Not Appropriate Under the Hopeless Entanglement Prong of the *Owens Corning* Test.......................29

    (a)    *It is Not Impossible to Identify the Separate Assets and Liabilities of the Three Major Nortel Debtors' Estates* ................30

    (b)    *The Intercompany Claims of the Three Major Nortel Debtors' Estates Have Been Substantially Resolved* ...................33

    (c)    *Separating the Assets and Liabilities of the Nortel Group is Not So Costly that it Harms all Creditors*......................................34

CONCLUSION .................................................................................................... 35

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Atlantic Yarns Inc. (Re)*,
(2008) 42 C.B.R. (5th) 107 ...............................................................................................21

*Century Services Ltd., Re*,
2010 SCC 60 ......................................................................................................................5

*In re Combustion Eng'g, Inc.*,
391 F.3d 190 (3d Cir. 2004)...............................................................................................4

*Credit Suisse First Boston v. Owens Corning* (*In re Owens Corning*),
419 F.3d 195 (3d Cir. 2005)....................................................................................... *passim*

*Ivaco Inc., Re*,
(2006), 83 O.R. (3d) 108 (C.A.) ........................................................................................5

*MFS Telecom, Inc. v. Motorola, Inc.* (*In re Conxus Commc'ns, Inc.*),
262 B.R. 893 (D. Del. 2001)...............................................................................................4

*In re Nortel Networks Corp.*,
426 B.R. 84 (Bankr. D. Del. 2010) .....................................................................................6

*Re Northland Properties Ltd.*,
(1988), B.C.J. No. 1210 (S.C.)..................................................................................... *passim*

*Skeena Cellulose Inc., Re*,
2003 BCCA 344...................................................................................................................5

*In re Snider Bros., Inc.*,
18 B.R. 230 (Bankr. D. Mass. 1982) .................................................................................23

*Solow v. Kalikow* (*In re Kalikow*),
602 F.3d 82 (2d Cir. 2010)..................................................................................................4

*Stelco Inc., Re*,
(2005), 75 O.R. (3d) 5 (C.A.) .............................................................................................5

*U.S. v. Pepperman*,
976 F.2d 123 (3d Cir. 1992)................................................................................................4

*Union Sav. Bank v. Augie/Restivo Baking Co., Ltd.* (*In re Augie/Restivo Baking
Co., Ltd.*),
860 F.2d 515 (2d Cir. 1988)..............................................................................................21

**Statutes**

11 U.S.C. § 105................................................................................................................4

**Other Authorities**

UNCITRAL Legislative Guide on Insolvency Law, Pt. III: Treatment of
    Enterprise Groups in Insolvency (2010)...............................................................16

TO THE HONORABLE KEVIN GROSS, UNITED STATES BANKRUPTCY JUDGE AND THE HONORABLE JUSTICE F.J.C. NEWBOULD OF THE ONTARIO SUPERIOR COURT OF JUSTICE:

The *ad hoc* group of bondholders (the "Bondholder Group")[1] hereby delivers its post-trial brief in the above-captioned matter to the United States Bankruptcy Court for the District of Delaware (the "U.S. Court") and the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court" and, together with the U.S. Court, the "Courts").

## I.    PRELIMINARY STATEMENT

1.      The Bondholder Group supports allocating the sale proceeds based on the fair market value of the assets and rights relinquished by each estate, as proposed by the U.S. Debtors and the Official Committee of Unsecured Creditors (the "Committee," and together with the U.S. Debtors, the "U.S. Interests"), and joins in their post-trial brief, proposed findings of fact, and proposed conclusions of law.[2]  The Bondholder Group submits this separate brief for two reasons:  (i) to respond to the flawed contention advanced by certain Core Parties that the Courts should consider evidence of creditor recoveries when determining how to allocate the proceeds of the asset sales (the "Sale Proceeds") to the various estates; and (ii) to highlight for the Courts the many fallacies in the "pro rata" distribution theory advanced by the CCC and the UKPC (together, the "Global Sub Con Proponents").

2.      The trial conducted by the Courts (the "Allocation Trial") was intended to determine how to allocate the more than $7 billion of Sale Proceeds to the estates.  As each of

---

[1]     The Bondholder Group consists of entities ("Bondholders") that hold bonds ("Bonds") issued or guaranteed by Nortel Networks Corporation ("NNC" and together with its affiliates worldwide, "Nortel"), Nortel Networks Limited "NNL" and together with NNC and certain of their subsidiaries, the "Canadian Debtors"), Nortel Networks Inc. ("NNI"), and Nortel Networks Capital Corporation ("NNCC" and together with NNI and certain of its subsidiaries, the "U.S. Debtors").

[2]     Terms used but not defined herein have the meanings ascribed to them in the Allocation Protocol [D.I. 10565-1], the Post-Trial Brief of the U.S. Interests, or the Proposed Findings of Fact and Conclusions of Law of the U.S. Interests (the "U.S. Proposed FOF"), as applicable.

the U.S., Canadian, and EMEA Debtors' estates (together, the "Nortel Debtors") and the Courts

have recognized, the task therefore is to determine the value attributable to each estate based on

what it relinquished in those sales.  Two non-estate creditor groups, the CCC and the UKPC,

have urged the Courts to ignore the value each estate gave up in the sales, and instead to

distribute the Sale Proceeds in a manner that would result in their desired level of creditor

recoveries.  This approach ignores the specific task that the Courts ordered, violates settled law

in both the U.S. and Canada, and disregards parties' contractual and legal rights.  The Courts

should therefore reject evidence or arguments regarding creditor recoveries as irrelevant to

allocation and inadmissible in this proceeding.

3.    Even if creditor recoveries were relevant or admissible, the evidence presented to

the Courts does nothing to answer the question of what creditor recoveries may be in any estate

after allocation.  As the testimony revealed, the claims resolution process in every estate except

the U.S. Debtors' remains in its infancy, with billions of dollars in the balance.  Not surprisingly,

the CCC's expert witness, who testified as to creditor recoveries, simply assumed that the CCC

claims against the Canadian estates would be allowed in their full asserted amount (thus

minimizing the recovery of Canadian creditors on a percentage basis under every allocation

scenario), while claims against the U.S. Debtors' estates (*e.g.*, for taxes) were simply ignored

(thus creating the appearance of larger recoveries for creditors of the U.S. Debtors).  This

testimony highlights that, even if the Courts desire to reach a results-oriented outcome, it cannot

be practically done.

4.    The Global Sub Con Proponents presented evidence of creditor recoveries under

the guise of promoting their fundamentally flawed pro rata theory of distribution.  The pro rata

distribution theory, by its proponents' own admission, seeks to fix ***distributions to creditors***, not

allocate the Sale Proceeds among the Nortel Debtors' estates.  If the Courts consider this pro rata distribution theory, they should reject it for at least three reasons.  *First*, the pro rata distribution theory has no basis in either international, U.S., or Canadian law and amounts to nothing more than the global substantive consolidation of the Nortel enterprise across all borders—something that has never before been done.  *Second*, no support exists for the remarkable position advanced by certain witnesses for the UKPC that ***all courts***, including the Courts in this case, should adopt a ***presumption*** in favor of global substantive consolidation.  *Third*, even under the existing standards governing ***domestic*** substantive consolidation in the U.S. and Canada, substantive consolidation is not warranted in these cases because:  (i) it would prejudice the claims of those parties, such as the UKPC and the Bondholders, that bargained for guarantees against specific Nortel entities; and (ii) the respective assets and liabilities of each estate are readily determinable and not "hopelessly entangled."

5.       For these reasons, and those presented by the U.S. Interests in their post-trial brief, the Courts should reject the pro rata distribution theory, as well as the other allocation positions asserted by the Canadian Debtors, CCC, and EMEA Debtors, and instead allocate the Sale Proceeds among the Nortel Debtors' estates according to the fair market value of the assets and rights relinquished by each estate.

**II.      CREDITOR RECOVERIES ARE NOT RELEVANT TO ALLOCATION**

6.       Although the ***only*** question before the Courts is how to allocate the Sale Proceeds among the U.S., Canadian, and EMEA Debtors' estates, certain Core Parties, including the Global Sub Con Proponents, have advocated that the Courts skip the allocation process and instead "back into" an allocation based on pre-determined recoveries for all of Nortel's creditors. This approach is inappropriate.  Addressing issues related to creditor claims and creditor recoveries occurs ***after*** the Courts have allocated to each Debtor's estate its proper percentage of

3

the Sale Proceeds.  Once allocation is completed, the recovery of each creditor will be

determined through the proposal of plans of reorganization or arrangement in each jurisdiction,

and disputes, if any, about those proposed plans will be addressed through ***separate proceedings***

conducted by each Court, not during the Allocation Trial.

**A.    The Allocation Trial is About Allocation, Not Creditor Recoveries**

       i.    <u>The Courts Do Not Have Equitable Discretion to Dictate Creditor Recoveries as
Part of the Allocation Trial</u>

7.    By presenting evidence of creditor recoveries, the Global Sub Con Proponents are

asking the Courts to use undefined equitable powers to order payments to the "most deserving"

creditors, without regard to the legal and contractual rights of any party.  The U.S. and Canadian

Courts do not have the authority, however, through equitable powers or otherwise, to base their

respective decisions on how to allocate the Sale Proceeds on whether the resulting creditor

recoveries would meet the proponents' views of equity.

8.    Although bankruptcy courts in the United States have equitable powers under

section 105 of the Bankruptcy Code, these powers are limited.  "The fact that a [bankruptcy]

proceeding is equitable does not give the judge a free-floating discretion to redistribute rights in

accordance with his [or her] personal views of justice and fairness, however enlightened those

views may be." *U.S. v. Pepperman*, 976 F.2d 123, 131 (3d Cir. 1992) (quotation omitted).[3]

Indeed, "because of their very potency, inherent powers must be exercised with ***restraint and***

***discretion*****.**  *Kalikow*, 602 F.3d at 97 (citation omitted) (emphasis added).  Moreover, section

105 "does not authorize the bankruptcy courts to create substantive rights that are otherwise

unavailable under applicable law, or constitute a roving commission to do equity." *In re*

---

[3]    *See also Solow v. Kalikow* (*In re Kalikow*), 602 F.3d 82, 97 (2d Cir. 2010) (equitable power conferred by
Section 105 is to carry out the provisions of the Bankruptcy Code not to empower the court "to do the right
thing"); *MFS Telecom, Inc. v. Motorola, Inc.* (*In re Conxus Commc'ns, Inc.*), 262 B.R. 893 (D. Del. 2001).

*Combustion Eng'g, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004) (internal quotation and citation omitted).

9.     The Canadian Court equally does not have free-ranging equitable authority to determine allocation in accordance with the Global Sub Con Proponents' views of equity.  The Supreme Court of Canada has recently observed that courts applying the Companies' Creditors Arrangement Act (the "<u>CCAA</u>") should focus on construing the authority provided by the terms of the CCAA itself, rather than attempting to resort to equitable or inherent jurisdiction.  *Century Services Ltd., Re*, 2010 SCC 60 ¶¶ 64-65.  As to residual inherent authority, the Ontario Court of Appeal has held that inherent jurisdiction "does not operate where Parliament or the Legislature has acted" and therefore "if the legislative body has not left a functional gap or vacuum, then inherent jurisdiction should not be brought into play."  *Stelco Inc., Re* (2005), 75 O.R. (3d) 5 (C.A.) ¶ 35; *see also Skeena Cellulose Inc., Re*, 2003 BCCA 344 ¶¶ 45-47.  Importantly, inherent jurisdiction in a CCAA context relates to the court's process in the proceeding; it should not extend to substantive allocation issues.  *See Re Stelco* ¶ 38.

10.     The Ontario Court of Appeal, in a separate decision, has also recognized that the CCAA "does not accord the claims of 'sympathetic' creditors more weight than the claims of 'unsympathetic' ones."  *Ivaco Inc., Re* (2006), 83 O.R. (3d) 108 (C.A.) ¶ 75.  While there may be policy reasons to protect certain rights or claims in an insolvency, "it is for Parliament, not the courts, to do so."  *Id.* at ¶ 75.

11.     Thus, contrary to the suggestions of the CCC and the UKPC, the Courts should not, and indeed cannot, reach an allocation decision that attempts to "reverse engineer" or "back into" creditor recoveries that would be "fair" or "equitable" to their constituency.  Such a decision would greatly exceed the scope of the Courts' authority.

ii.     Numerous Orders and Statements by the Courts Have Established and Reaffirmed that the Allocation Trial is About *Only* Allocation

12.     Beginning with their approval of the Interim Funding and Settlement Agreement (the "IFSA") in 2009,[4] the Courts have been consistently clear:  this trial is solely about *allocation*.

13.     The IFSA provided for the placement of the Sale Proceeds in an escrow account pending an agreed upon, or court-determined, allocation of those proceeds ***among the Selling Debtors***.  (IFSA § 12(b) (TR43794).)  After the Selling Debtors failed to reach an agreement with respect to the distribution of the Sale Proceeds, the Courts issued several orders clearly defining the Allocation Trial as being about ***allocation***, not creditor claims or recoveries.[5]

14.     After the Allocation Protocol and other procedural orders related to the Allocation Trial were put in place, the U.S. Court rebuffed several efforts to resolve creditor claim and recovery issues, prior to the determination of the allocation of the Sale Proceeds, on ripeness and relevance grounds.  On November 15, 2013, the U.S. Court stated that it was "***not the appropriate time***" to address claims-related objections and, instead, it was time to "***move to that Allocation Trial***."  (Hr'g Tr. 39:1-13, 39:22-24, Nov. 15, 2013 (emphasis added).)  On March 31, 2014, the U.S. Court emphasized that "[t]o everything there is a season, and a time to every

---

[4]     The Courts jointly approved the IFSA to facilitate the joint sales of all of Nortel's assets without an agreement on a method or formula for allocating the proceeds of those sales among "Selling Debtors." IFSA § 12(a) (TR43794); *see also* Order (a) Approving the Interim Funding and Settlement Agreement and (b) Granting Related Relief, June 29, 2009 (U.S. Court order) (TR50214); Order (Interim Funding Agreement), June 29, 2009 (Canadian Court order) (TR50057).

[5]     *See, e.g.*, *In re Nortel Networks Corp.*, 426 B.R. 84, 93 (Bankr. D. Del. 2010) (describing the UKPC's efforts to litigate its claims clear of the U.S. Court's jurisdiction as "***inimical*** to the Debtors' effort and those of non-U.S. debtors in a highly complex liquidation to assemble the assets, reduce them to money, ***allocate those assets among numerous entities in many countries and then distribute the assets***.") (emphasis added); Allocation Protocol ¶ 1 [D.I. 10565-1] (providing in relevant part that "[t]he purpose of this Allocation Protocol is for the U.S. and Canadian Courts to set forth binding procedures for determining the ***allocation*** of the Sale Proceeds ***among the Selling Debtors*** . . . .") (emphasis added); *see also* Amended Order Re Allocation Trial Protocol, entered by the U.S. Court on March 21, 2014 [D.I. 13208].

6

purpose under the heavens. This is the season for the Allocation Trial."   (Order Denying

Request for Oral Argument at This Time at 1 [D.I. 13250] (internal citation omitted).)

15.     More recently, the Courts have reaffirmed this reality.  For example, during a

post-trial status conference on June 27, 2014, the Courts rejected the suggestion by counsel for

the UKPC that each party provide claims and recovery information to the Courts in connection

with the Allocation Trial.  According to Judge Gross, "based upon the evidence that I heard, *I*

*don't know how that would be helpful in my determining allocation.  In fact, it may be*

*harmful* . . . ."  (Hr'g Tr. 22:23-23:4, June 27, 2014 (emphasis added).)

16.     That the Allocation Trial was meant to decide allocation can hardly be a surprise

to the Global Sub Con Proponents.  Indeed, the Global Sub Con Proponents agreed to an

allocation trial that was separate from the litigation concerning the EMEA Debtors' and UKPC's

claims,[6] a fact the UKPC explicitly recognized during the Allocation Trial, stating that "this is

not a trial on [creditor] claims."[7]  (Trial Tr. 486:16-18, May 13, 2014 (UKPC Opening

Statement).)[8]

---

[6]     *See also* Notice of Filing Proposed Joint Trial Protocol at 2 (according to the Notice of Filing of the
Proposed Joint Trial Protocol, "the UK Pension Claimants support the *separate litigations* dealing with
Allocation issues and Claims issues. . . .  Their position . . . is that the separation of the trials has already
been ordered by the Courts and that all Core Parties and the Courts should continue to recognize such
Orders." (emphasis added).)

[7]     During opening arguments, the Canadian Court questioned whether the issue is simply one of "language"
and asked if it could technically decide to "allocate" in a way necessary to achieve a pro rata distribution.
(*See* Trial Tr. 342:2-344:4.)  The question, however, is not one of language or labels; it is far more than
that.  First, allocation is a determination by the Courts of the value of the assets that were relinquished by
each of the Nortel Debtors' estates in the asset sales.  The pro rata distribution theory ignores that question
and instead arbitrarily sets a desired level of distributions to creditors (approximately 71%) and then
reverse engineers an allocation of the Sale Proceeds to each estate so as to effect that arbitrarily set level of
distribution.  Second, even if the Courts were to implement the pro rata distribution theory, they would
need to first analyze and determine eventual creditor recoveries at each estate, a process that has not been
completed and is not part of these proceedings.  As discussed *infra*, each estate will need to separately
resolve all such claims issues in subsequent legal proceedings.

[8]     References to "Trial Tr." followed by a page number are to the transcript of the Allocation Trial.  Where
appropriate, and for ease of reference, the name of the witness testifying or the party whose counsel is
speaking is provided as a parenthetical.

iii.    Consideration of Creditor Recoveries is Premature Because They Cannot be
        Ascertained at this Time

17.    Further, it is impossible to meaningfully consider creditor recoveries at this time

because they depend on numerous factors yet to be determined by, or even proposed to, the

Courts, within their separate jurisdictions, including the amount of allowed claims against each

of the Nortel Debtors' estates and what a plan for distributing assets to those creditors might

encompass.

18.    A few of the many open issues that could significantly impact actual creditor

recoveries include:

- in the Canadian Debtors' estates, the "review, analysis, negotiation and
  possible litigation" of 143 claims, including the UKPC's claims currently
  being litigated before the Canadian Court, which in total "represent[] a claim
  value of approximately CAD 24.2 billion;"[9]

- in the U.S. Debtors' estates, determinations by the U.S. Court with respect to
  (i) the allowance of certain claims asserted against the U.S. Debtors by a
  group of former employees of the Canadian Debtors,[10] and (ii) the amount of
  any priority tax claims asserted by the U.S. government which is, at present,
  unknown and unknowable; and

- in the U.K. proceedings, (i) the expiration of a claims bar date (no claims bar
  date has yet been established), (ii) the commencement of a formal claims
  process, and (iii) the resolution of the so-called financial support directive
  claims asserted by the U.K. Pension Authority against 25 separate Nortel
  entities in the EMEA region.[11]

19.    Until these substantial issues are resolved, the recovery of any creditor of any of

the Nortel Debtors' estates cannot be addressed.  The pro rata distribution calculation performed

by Thomas Britven, an expert witness retained by the CCC, and presented to the Courts

---

[9]    One Hundred and Fourth Report of the Monitor ¶ 29 (March 14, 2014).

[10]    *See* Motion of Ad Hoc Committee of Canadian Employees Terminated Pre-Petition for Entry of an Order
Allowing Late File Claims [D.I. 9362].

[11]    Joint Administrators' Progress Report for NNUK for the Period 14 July 2013 to 13 January 2013 at 9)
(TR50310) (noting that due to "the extant issues in respect of" such claims "it is ***not possible to make a
distribution*** to the creditors of [NNUK]" at this time) (emphasis added); *see also* Bloom Dep. Tr. 149:7-11;
Hill Dep. Tr. 80:8-81:19.

illustrates this problem.  Britven's calculation is entirely dependent on unproven assumptions,
provided by counsel, that were used to estimate claim amounts that ultimately would be allowed
against each of the Debtors' estates.  (Trial Tr. 3404:11-20, June 6, 2014 (T. Britven).)  During
cross-examination, Britven conceded that, if the final quantum of claims is different than what he
had chosen and presented to the Courts, the recovery percentages he calculated would change
***across the board***.  (*Id.* at 3496:19-24.)  In some cases, this could produce "***billion-dollar-plus***
adjustment[s]" to his calculations.  (*Id.* at 3491:10-24, 3499:1-10 (emphasis added); *see also id.*
at 3484:9-3486:4, 3500:19-3503:5.)

20.     In addition to the uncertainty of the quantum of creditor claims, the actual
distributions to creditors of any specific estate is a matter strictly within the purview of the
relevant Court, to be decided in accordance with such Court's insolvency laws.  Both in the U.S.
and in Canada, the process for distributions in a chapter 11 proceeding and a CCAA proceeding,
respectively, begins with the proposal of a plan of reorganization or a CCAA plan, which is then
voted on by stakeholders, presented to the Court, and confirmed, before any distribution occurs.
What a plan in either jurisdiction will contain, how the allowed stakeholders will vote on such
plan, and what the Courts will do when those plans are presented is unknowable at this time.
Attempting to fix creditor recoveries under a hypothetical future plan is not only impossible, but
it would also be completely inconsistent with the law in both jurisdictions.  The Global Sub Con
Proponents' requests to do so should be rejected.

21.     Moreover, pursuant to the terms of the Cross-Border Protocol, each Court has
retained its independent jurisdiction and cannot be required to take actions inconsistent with any
applicable laws.  (*See* Cross-Border Protocol ¶¶ 7, 9 (a)-(b) (TR400012.02).)  Thus, the Courts
have no authority to jointly pre-determine ultimate distributions to the creditors of the various

Nortel Debtors' estates.

**B.**      **The Courts Should Disregard Arguments Premised on Creditor Recoveries, Including the Pro Rata Distribution Theory**

22.      The Courts should disregard evidence presented by the Global Sub Con

Proponents regarding creditor recoveries, including the entirety of the pro rata distribution theory,

as irrelevant to allocation.  Both the Global Sub Con Proponents' pro rata distribution theory and

the "waterfall" analysis presented by Thomas Britven, who purported to calculate estimated

recoveries for major creditor groups under each of the allocation approaches advanced at the

Allocation Trial, are, in reality, creditor recovery-based theories.  Both are irrelevant to the actual,

and only, issue before the Courts:  the allocation of the Sale Proceeds among the Nortel Debtors'

estates.

23.      Indeed, during opening statements, counsel to the UKPC specifically asked the

Courts to effect a "pro rata recovery **by creditors**, **not** pro rata recovery **by Estates**."  (*See* Trial

Tr. 160:1-3, May 12, 2014 (emphasis added).)[12]  The expert witnesses offered by the Global Sub

Con Proponents in support of the pro rata approach confirmed this position during their

depositions and at trial.

24.      For example, in the expert report submitted by Leif M. Clark and Jay L.

Westbrook (together, "Clark & Westbrook") submitted on behalf of the UKPC, Clark &

Westbrook advocate for a "a single-pool distribution" of Nortel's assets **to creditors**.  (Expert

Report of Leif M. Clark & Jay L. Westbrook) (the "Clark & Westbrook Report") ¶ 53

(TR11436).)  At his deposition, Westbrook agreed that his proffered approach is not relevant to

the allocation of the Sale Proceeds among the Nortel **Debtors**.  (Westbrook Dep. Tr. 33:4-7,

---

[12]      In its pre-trial brief, the UKPC asks the Courts to determine how "the Lockbox Funds are to be distributed to those entitled to such funds, ***ultimately the creditors*** . . . ."  (UKPC Pre-Trial Brief ¶ 14) (emphasis added).

33:9-18.)[13]  Indeed, in response to questions from counsel to the UKPC (who had retained him),

Westbrook clearly stated that an allocation of lockbox funds to the Debtor entities and then to

their respective creditors would be ***inconsistent*** with his proffered single pool approach.  (*Id.* at

215:4-20.)  Westbrook further admitted that if the Courts seek to allocate the funds to each estate

before distributing them to creditors, his theory is of ***no value*** to the Courts' analysis.  (*See id.*

33:4-7, 33:9-18.)  In Westbrook's own words, "if we've arrived at the point where the decision

has been made to ***allocate***, then the court has decided to pursue a course different from the one

that, in my opinion, should be pursued, so we are, if you will, ***out of the zone of my report***."

(Westbrook Dep. Tr. 36:17-25 (emphasis added).)

       25.     In addition, the testimony of Thomas Britven made clear that the pro rata

approach is a creditor distribution mechanism engineered to provide a specific and pre-

determined distribution to creditors.  When asked to describe the "methodology" used to obtain a

pro rata allocation, Britven responded:

> It is an allocation approach such that a common dividend could be paid.
> And ***we calculated that potential common dividend to be 71 cents on the
> dollar***, and it is based upon a two-step process.  One is the claims relative
> to the available assets.  That's Step 1.  And then Step 2 is we have another
> model that allows us to determine which estates would need to be
> allocated, which portions of the $7.3 billion ***to achieve that projected
> payout***, if you will.

(Trial Tr. 3372:15-25, June 6, 2014 (emphasis added).)  When asked "what would happen if you

changed the claim amounts in the methodology that you used for your pro rata allocation,"

Britven responded that "[t]he [allocation] percentages would change."  (*Id.* at 3373:6-14.)

Indeed, the only fixed element of the pro rata approach is the resulting distribution to creditors,

not the allocation of Sale Proceeds among the Nortel Debtors' estates.

---

[13]     References to "Dep. Tr." followed by a page number are to the transcript of the deposition of the identified witness in the above captioned proceedings.

26.     Although the Global Sub Con Proponents at least attempt to argue—albeit misguidedly—that the pro rata distribution theory is somehow relevant to the Allocation Trial, they make no similar effort—nor could they—with respect to the "waterfall model" presented by Britven.  That model is nothing more than a blatant attempt to inappropriately influence the Courts' allocation ruling through consideration of how such a ruling might ultimately affect creditors.  Importantly, the waterfall analysis completely ignores the reason that creditors will ultimately receive different recoveries following the Allocation Trial; that is, certain creditors have fundamentally different legal and contractual rights than other creditors.

27.     The waterfall analysis appears to have been designed by Britven in an attempt to convince the Courts to disregard legal principles when deciding the allocation issue because of the effect that their decision could have on a particular creditor.  To that extent, the waterfall analysis is wholly inappropriate.  Since their inception, both the U.S. and Canadian legal systems have recognized the fundamental principle that justice requires objectivity and impartiality. Thus, the decision of each Court must be the same one it would reach regardless of which creditors stand to gain or lose from it.  The decision must be the same even if the parties were completely reversed.  The waterfall analysis presented by the Global Sub Con Proponents improperly asks the Courts to consider whether one group of creditors is more deserving of a particular outcome than another.  It should be completely disregarded.

### III.      THE PRO RATA APPROACH IS LEGALLY AND FACTUALLY UNSUPPORTABLE

28.     In addition to being irrelevant, the pro rata approach is flawed as a matter of law and fact.  *First*, the pro rata approach is, in effect, nothing more than a request for global substantive consolidation, which has no basis in either international or domestic law.  *Second*, the presumption in favor of global substantive consolidation advocated for by the UKPC requires

a radical legal shift that is divorced from the exacting standards used by U.S. and Canadian courts in the context of a domestic substantive consolidation. *Third*, assuming, *arguendo*, that the standards used for domestic substantive consolidation could be applied in these cases, the factual record does not support substantive consolidation because (i) the Bondholders, and numerous other creditors *including those proposing substantive consolidation*, actually relied on the separateness of the various Nortel entities when transacting with them, and (ii) there is no evidence that the assets and liabilities of the various Nortel Debtors are entangled, much less "hopelessly entangled," such that all creditors would be harmed absent a global substantive consolidation.

**A.    The Pro Rata Approach Has No Basis in International or Domestic Law**

       i.    <u>The Pro Rata Distribution Theory is a Request for Substantive Consolidation</u>

      29.    The CCC and the UKPC vehemently dispute that the pro rata distribution theory seeks a cross-border substantive consolidation, correctly understanding that, if that label attaches to their theory, they have lost the argument.  But simply calling their theory something else, no matter how frequently they repeat it, does not help them—it is substantive consolidation and must meet the exacting standards for that relief.

      30.    Substantive consolidation "treats separate legal entities as if they were ***merged into a single survivor*** left with all the cumulative assets and liabilities (save for inter-entity liabilities, which are erased).  The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor." *Credit Suisse First Boston v. Owens Corning* (*In re Owens Corning*), 419 F.3d 195, 205 (3d Cir. 2005) (internal quotation and citation omitted) (emphasis added); *see also Re Northland Properties Ltd.* (1988), B.C..J. No. 1210 (S.C.) [*Northland*].  Ignoring the Third Circuit's explanation that substantive consolidation "treats separate legal entities ***as if*** they were merged," the Global Sub Con Proponents argue that

their pro rata distribution theory is somehow different from substantive consolidation because it does not actually consolidate the separate Nortel Debtor estates, instead maintaining their separate legal existence as conduits through which the Sale Proceeds are funneled to effect a pro rata distribution to creditors "regardless of the jurisdiction in which they reside."[14]  The result is the same.

31.    Indeed, the UKPC concedes that its theory is "loosely premised on a substantive consolidation construct that would produce a broadly uniform dividend payable from each debtor estate to proven creditors of the Group."[15]  Rather than allocating the Sale Proceeds according to the value of the assets and rights relinquished by each estate, the Global Sub Con Proponents would, consistent with the *Owens Corning* court's description of substantive consolidation, distribute these proceeds based on the total amount of worldwide claims.[16]  That is, the Global Sub Con Proponents would first "morph" the claims against the various Nortel Debtors' estates into a single pool of claims against the consolidated assets of the Nortel Group.[17]  Then, they would seek to back into their desired uniform distribution by calculating what amount of the consolidated assets (*i.e.*, the Sale Proceeds) must be allocated to each estate to achieve a pro rata distribution to all creditors.[18]

---

[14]    Memorandum of the UK Pension Claimants Opposing the US Interests' Motion to Strike the Pro Rata Experts ¶ 57 [D.I. 13418].

[15]    UKPC Initial Allocation Brief ¶ 61; *see also* CCC Response to the Core Parties' Opening Allocation Positions ¶ 36 (noting that "an allocation resulting in a common recovery to all Nortel creditors" would be the same outcome as if the Nortel Debtors' estates were substantively consolidated).

[16]    UKPC Initial Allocation Brief ¶¶ 54, 68; CCC Initial Allocation Brief ¶¶ 16, 60; Trial Tr. 2940:5-15, June 2, 2014 (C. Bazelon).

[17]    UKPC Initial Allocation Brief ¶ 54; Expert Report of Coleman Bazelon on Behalf of Nortel Networks U.K. Pension Claimants (the "Bazelon Report") at 1 (TR00039); Trial Tr. 3398:1-3399:1, June 6, 2014 (T. Britven).

[18]    Expert Report of Thomas Britven on Valuation and Other Issues Related to the Allocation of Sales Proceeds to the Nortel Debtor Groups (the "Britven Report") ¶¶ 3.13-3.15, 8.3-8.7 (Jan. 24, 2014) (TR00045); *see also id.* at Schedule 3; Trial Tr. 3396:13-3397:11, June 6, 2014 (T. Britven).

32.     In an obvious, but unsuccessful, attempt to evade the "substantive consolidation" label and preserve the argument that they are advocating for an "allocation" among the Nortel Debtors' estates, the Global Sub Con Proponents unnecessarily insert the Nortel Debtors' estates into the distribution process for the ministerial purpose of effectuating the distribution to their respective creditors.  Having the estates act as conduits through which the Sale Proceeds would be distributed to creditors on a global pro rata basis does not in any way transform their approach into an allocation methodology.  Instead, it results in an outcome that is identical to global substantive consolidation.  (*See* Westbrook Dep. Tr. 16:16-21.)

ii.     Cross-Border Substantive Consolidation Has Never Been Ordered

33.     Absent consent from all parties in interest, a court cannot substantively consolidate estates of debtors within that court's jurisdiction with estates of debtors outside that court's jurisdiction.  Indeed, the Bondholder Group knows of ***no court*** in the U.S. or Canada, or in any other jurisdiction for that matter,[19] that has ***ever*** ordered a non-consensual, global substantive consolidation of debtor entities in different countries.  Courts in both the U.S. and Canada have held that substantive consolidation is a "rare" remedy "of last resort" even when applied ***domestically***, and they have never applied the doctrine across international borders without the consent of all parties.  *In re Owens Corning*, 419 F.3d at 212; *Northland*, ¶ 49.[20]

---

[19]     The Bondholder Group is not aware of any court in the U.K. imposing substantive consolidation on a domestic enterprise group over the objection of parties in interest.  Indeed, in support of their statement that "[e]quitable distribution based on relative proven creditor claims" has been applied in the U.K, the U.K. Pension Claimants cite only to ***consensual*** "pooling agreements."  (U.K. Pension Claimants' Initial Allocation Position at ¶ 59(c).)

[20]     This reality explains why NNC did not warn of the risk of a global substantive consolidation in any of its public disclosures filed prior to the commencement of these insolvency cases.  In stark contrast, NNC disclosed the theoretical possibility of a ***domestic*** substantive consolidation of Nortel entities in the U.S. in its Form 10-K for the fiscal year ended December 31, 2008 (the "2008 NNC 10-K").  (TR40269.)  Specifically, the 2008 NNC 10-K, filed after the commencement of these proceedings, disclosed that "an interested party in the Chapter 11 Proceedings, including any of the U.S. Debtors, could request that the assets and liabilities of ***NNI, or those of other U.S. Debtors***, be substantively consolidated with those of one or more ***other U.S. Debtors***."  (*Id.* at CCC0099058 (emphasis added).)  But neither the 2008 NNC 10-

34.    In making its argument for the application of its pro rata distribution theory, the UKPC has even conceded that "this is a case without precedent."  (Trial Tr. 156:16-20, May 12, 2014 (UKPC Opening Statement).)  Thus, faced with the reality of the lack of support for its theory under both U.S. and Canadian law, the UKPC has attempted to point to principles of "international law" by referencing international legal reform bodies.  Yet these very same international legal reform bodies acknowledge that their proposals are just that—proposals which have not been adopted by any legislature.  In fact, to date these international legal reform bodies have not made any legislative recommendations with respect to the application of substantive consolidation to international insolvencies of enterprise groups, and, not surprisingly, no legislature has actually considered, let alone passed, such a sweeping reform.

35.    Similarly, the United Nations Commission on International Trade Law ("UNCITRAL") Working Group V (Insolvency) has not made any headway on the issue.  In July of 2010, a year and a half after the commencement of these insolvency cases, Working Group V adopted Part III of the UNCITRAL Legislative Guide on Insolvency Law, which focuses on *domestic* insolvency cases of enterprise groups.  Part III of the Legislative Guide includes recommended legislative provisions for the purpose of, *inter alia*, specifying "the ***very limited*** circumstances in which the remedy of substantive consolidation may be available" in ***domestic*** insolvency cases.  UNCITRAL Legislative Guide on Insolvency Law, Pt. III: Treatment of Enterprise Groups in Insolvency (2010) at 71 (emphasis added) (TR11438).  With respect to insolvencies of international enterprise groups, such as Nortel, Working Group V has yet to propose or agree on any substantive legislative reforms.  As Westbrook conceded during his deposition, there currently is no law in the U.S. or Canada that would support his proposed

---

K, nor any subsequent 10-Ks filed by NNC, disclosed a risk of ***global*** substantive consolidation of the U.S., Canadian, and EMEA Debtor estates.

"single pool" distribution theory.  (Westbrook Dep. Tr. 170:22-171:18.)

iii.    A Court-Imposed Global Substantive Consolidation of the Nortel Debtors' Estates Could Negatively Affect Capital Markets

36.    Because there is no precedent for cross-border substantive consolidation, an order imposing such a remedy in these cases—thereby rendering worthless the guarantees of the Bonds and those held by other creditors—would be inconsistent with investor expectations and could have a negative impact on capital markets.  The impact could include an increase in the cost of borrowing in capital markets and the arbitrary transfer of wealth from structurally senior creditors to more junior creditors.  (*See* Expert Report of John J. McConnell (the "McConnell Report") ¶¶ 67-70 (TR00057); Trial Tr. 4807:3-9, June 23, 2014 (J. McConnell).)

37.    Embedded in the price investors pay for bonds are bondholders' expectations for future recoveries, including any risks or uncertainties associated with such bonds.  (Trial Tr. 4785:20-4786:6, 4883:15-25, June 23, 2014 (J. McConnell).)  To evaluate these risks, bondholders look to the terms of the bond issuance, including any guarantees associated with the bonds.  (*Id.* at 4881:17-4882:14.)  Bondholders expect that corporate separateness will be respected and, as a result, bondholders expect to receive higher recoveries for bonds with guarantees.  (*See* McConnell Report ¶ 6(c).)

38.    The market prices of the various Nortel debt securities demonstrate this reality.  If investors anticipated the risk of a court-imposed global substantive consolidation of the Nortel Debtors' estates, "all of Nortel's bonds would have traded at similar prices as of Nortel's bankruptcy date."  (*Id.* at ¶ 53; *see also* Trial Tr. 4792:6-4793:4, June 23, 2014 (J. McConnell).)  Since the Petition Date, however, the Bonds guaranteed by NNI have consistently traded at prices ***well above*** those received for the bonds without an NNI guarantee, which have access only to recoveries from NNL's estate.  (McConnell Report ¶¶ 53-56; *see also* DEM00024; Trial

Tr. 4792:6-4793:6, 4795:3-8, June 23, 2014 (J. McConnell).)[21]  Thus, investors and market

participants clearly value the guarantees that would be rendered worthless by an unprecedented

global substantive consolidation of the Nortel Debtors' estates.

39.     For this reason, the impact of a global substantive consolidation order could have

far-reaching implications for capital markets.  As the *Owens Corning* Court recognized, "[t]o

overturn this bargain, set in place by [a debtor's] own pre-loan choices of organizational form,

would cause chaos in the marketplace, as it would make this case the Banquo's ghost of

bankruptcy."  *Owens Corning*, 419 F.3d at 216.

iv.     <u>A Court-Imposed Global Substantive Consolidation of the Nortel Debtors' Estates
        Would Ignore the Courts' Orders Regarding Intercompany and Creditor Claims</u>

40.     The inappropriate, result-oriented nature of the pro rata distribution theory is best

betrayed when the theory is confronted with what should be an obvious question:  how does it

deal with intercompany or creditor claims that have already been allowed or paid?  During

opening statements, when this question was presented to one of the proponents of pro rata, the

answer was surprising:  "I haven't thought that one through completely."  (Trial Tr. 158:24-

160:16 (UKPC Opening Statement).)  By the end of trial, the answer was no more clear.

41.     What was clear, however, was that the adoption of a "pure" pro rata distribution

theory would lead to an absurd result by requiring the Courts, on an *ad hoc* basis, to revoke their

prior orders and rescind distributions made in reliance on such orders.  For example, in an effort

to comport with the Global Sub Con Proponents' self-serving view of "equity," the Courts would

be required to:  (i) revoke their previous orders allowing a $2 billion intercompany claim by NNI

---

[21]     As McConnell testified, prior to the Petition Date there are a host of factors that may influence the price of a bond (*e.g.*, coupon rate, maturity date, etc.).  (Trial Tr. 4786:22-4789:3.)  As of the Petition Date, however, these factors cease to influence the price of a bond because, on that date, all bonds become due and payable.  (*Id.* at 4790:15-4791:19.)  As a result, bond prices in the post-petition period reflect only investors' expected recovery.  (*Id.*)

against NNL;[22] (ii) unwind the effect of the $37.5 million settlement paid by the U.S. Debtors in respect of the intercompany claims advanced by the EMEA Debtors;[23] (iii) remove the economic benefit of any cash settlements received by creditors, including the $37.5 million settlement approved by the U.S. Court and paid by the U.S. Debtors to the UKPC, thereby discouraging cash settlements by the Nortel Debtors' estates;[24] and, (iv) ignore the guarantees held by, *inter alia*, Bondholders and the UKPC under a "pure" pro rata approach or, instead, recognize the guarantees under some yet-undefined, modified pro rata approach.[25]

42.     In short, the theory presented to the Courts was simply "do what you please" with respect to intercompany claims, guarantee claims, and claims that have already been paid, notwithstanding the Courts' prior orders or binding agreements entered into between and among the affected parties.  This is not a theory of allocation.

43.     To the contrary, a theory of allocation should be principled, reasonable, and capable of straight-forward application.  The pro rata distribution approach is none of those things.  Instead, it is a collection of constantly changing inputs meant to ensure only one thing: the Global Sub Con Proponents' desired recoveries.  For this reason, and those discussed above, the pro rata distribution approach should be rejected.

**B.     The Presumption of Substantive Consolidation Advocated for by Clark & Westbrook Must be Rejected**

44.     If the Courts are prepared to consider a non-consensual substantive consolidation across borders, notwithstanding that it has never been done before, the Courts must apply some

---

[22]     Trial Tr. 158:24-159:10 (UKPC Opening Statement); *see also* Order (A) Approving the Final Canadian Funding and Settlement Agreement, and (B) Granting Related Relief [D.I. 234]; Canadian Recognition of the U.S. FCFSA Order (TR50062).

[23]     Trial Tr. 3039:21-3040:22 (C. Bazelon).

[24]     *Id.* at 3040:23-3044:21.

[25]     *Id.* at 3057:12-3058:18.

legal test to evaluate whether consolidation is appropriate under the facts presented.  Remarkably,
Clark & Westbrook advocate for the imposition of cross-border substantive consolidation as the
***default*** rule in a case involving a global enterprise.  This position is so far afield from
international and domestic legal principles and precedent that it must be rejected out of hand.

45.     Although, "[u]nder more traditional rules," the party advocating for substantive
consolidation bears the burden of establishing that the rigorous test has been satisfied, Clark &
Westbrook instruct the Courts to "***begin with the presumption*** that the assets of Nortel, having
been liquidated on a consolidated basis, should now be distributed on a consolidated basis."
(Clark Dep. Tr. 118:11-14; Clark & Westbrook Report ¶ 48 (emphasis added).)   As a result, for
these global enterprises, all guarantees held by unsecured creditors would have ***no effect*** on the
distributions available to them.  (Westbrook Dep. Tr. 21:16-22:3.)  This radical shift is
appropriate, according to Westbrook, because of "the nature of most" global enterprises.
(Westbrook Dep. Tr. 18:19-19:22, 50:5-24.)  Not surprisingly, both Clark & Westbrook
conceded that their remarkable position has no basis in U.S., Canadian, or U.K. law.  (*Id.* at
37:22-38:13, 72:22-73:11; Clark Dep. Tr. 109:25-110:10.)

46.     Recognizing that the default rule set forth in the Clark & Westbrook Report is "a
bridge too far," and drawing on his experience as a bankruptcy judge, Judge Clark subsequently
testified during his deposition that "attaching a presumption [of substantive consolidation]
simply because it is a multi-national insolvency case ***doesn't make sense***."  (Clark Dep. Tr.
114:11-23, 127:13-129:4 (emphasis added).)  Accordingly, when asked whether he wanted to
change his opinion with respect to the presumption, Clark responded:  "Oh, absolutely."  (*Id.* at
97:19-21.)  Westbrook made no effort to reconcile this, or any other, disagreement with his co-
author or address the obvious unreliability of their joint report.  In fact, although required to do

so under the prevailing protocols, Westbrook **refused to testify at trial**.  The Courts should refuse

to take such a dramatic departure from the law in both the U.S. and Canada and reject a

presumption in favor of substantive consolidation.

**C.    The Factual Record Does Not Support Substantive Consolidation**

47.    Assuming that the Courts could implement the global substantive consolidation of

the Nortel Debtors' estates, the standard applied by the Courts should be, at a minimum, no less

onerous than the standards used to evaluate domestic substantive consolidation in the U.S. and

Canada.  Even under those standards, however, the factual record does not support global

substantive consolidation.  *First*, prepetition, the Bondholders, and various other creditors,

actually relied on the separateness of the various Nortel entities when transacting with them.

*Second*, post-petition, there is no evidence that Nortel's assets and liabilities are entangled, much

less "hopelessly entangled," such that all creditors would be harmed absent substantive

consolidation.

i.    The Substantive Consolidation Standard

48.    The Third Circuit's *Owens Corning* decision sets forth the stringent standard for

the substantive consolidation of a **domestic** enterprise group in the United States.  The *Owens

Corning* court warned that "because substantive consolidation is extreme . . . and imprecise, this

'rough justice' remedy should be rare and, in any event, one of last resort after considering and

rejecting other remedies . . . ."  *Owens Corning*, 419 F.3d at 211.[26]  Indeed, even in that seminal

case, the Court declined to substantively consolidate the estates of the separate domestic debtors.

49.    In *Owens Corning*, the Third Circuit adopted and refined the test articulated by

the United States Court of Appeals for the Second Circuit in *Augie/Restivo*.[27]  The Third Circuit

---

[26]    In Canada, courts similarly consider substantive consolidation of domestic debtors to be extraordinary
relief.  *See*, *e.g.*, *Atlantic Yarns Inc. (Re)*, (2008) 42 C.B.R. (5th) 107 [*Atlantic Yarns*]; *Northland*, ¶ 49.

set forth two alternative factors that must be proven by the proponent of substantive

consolidation:

> (1)   Prepetition, debtors disregarded separateness so significantly their
> creditors relied on the breakdown of entity borders and treated
> them as one legal entity; *or*

> (2)   Post-petition, debtors' assets and liabilities are so scrambled that
> separating them is prohibitive and hurts **all** creditors.

*Owens Corning*, 419 F.3d at 211.

50.   The first factor protects prepetition expectations of creditors when a debtor misled

them, causing them to perceive incorrectly that multiple entities were one.  *Id.*  As the Third

Circuit explained:

> A *prima facie* case for [substantive consolidation] typically exists when,
> based on the parties' prepetition dealings, a proponent proves corporate
> disregard creating contractual expectations of creditors that they were
> dealing with debtors as one indistinguishable entity . . . . Proponents who
> are creditors must also show that, in their prepetition course of dealing,
> they **actually and reasonable relied** on debtors' supposed unity.

*Id.* at 212 (emphasis added).

51.   As to the second factor, post-petition "hopeless entanglement," the Third Circuit

made clear that "[n]either the impossibility of perfection in untangling the affairs of the entities

nor the likelihood of some inaccuracies in efforts to do so is sufficient to justify consolidation."

*Id.* at 214.[28]   The Third Circuit further held that consolidation should be ordered only where

**every** creditor will benefit from consolidation.  *Id.*  As the Court explained, "the benefit to

creditors should be from cost savings that make assets available rather than from the shifting of

---

[27]   *Union Sav. Bank v. Augie/Restivo Baking Co., Ltd.* (*In re Augie/Restivo Baking Co., Ltd.*), 860 F.2d 515 (2d Cir. 1988).

[28]   Clark & Westbrook allege "the difficult task of sorting out inter-corporate claims and avoidance actions within the group and among group members, in order to arrive at a properly adjusted allocation of assets among entities and estates, also compels a single distribution."  (Clark & Westbrook Report ¶ 7.)  This argument is entirely contrary to the Third Circuit's holding in *Owens Corning* and the facts of these cases.

assets to benefit one group of creditors at the expense of another." *Id.*

52.    Canadian courts have often referenced U.S. case law when considering whether the extraordinary relief of substantive consolidation should be granted. *See*, *e.g.*, *Atlantic Yarns*, ¶ 34; *Northland*, ¶ 49. *Northland* is the leading case on substantive consolidation pursuant to the CCAA. With reference to *In re Snider Bros., Inc.*, 18 B.R. 230 (Bankr. D. Mass. 1982), the *Northland* Court concluded that "[i]t would be improper to interfere with or appear to interfere with the rights of creditors" through substantive consolidation of the debtors absent a showing that the "elements of consolidation" are satisfied and that the harm prevented through consolidation outweighs the harm resulting from its imposition. *Northland*, ¶ 59.

53.    Generally, where domestic substantive consolidation has been ordered in Canadian cases, it has been done with strong, and most often, unanimous creditor support. There are no cases in which substantive consolidation has been ordered over the objections of a debtor company. There are similarly no Canadian cases where substantive consolidation has been ordered on a cross-border or international basis.

54.    Finally, this discussion of the law of Canada and the U.S. does not even consider the law of the many other jurisdictions that would be implicated in a substantive consolidation of the Nortel Debtors' estates. This omission alone is fatal to the Global Sub Con Proponents' arguments.

ii.    <u>The Global Sub Con Proponents Cannot Establish a *Prima Facie* Case for Global Substantive Consolidation</u>

55.    The Global Sub Con Proponents cannot establish a *prima facie* case for substantive consolidation because even they did not believe that Nortel was a single, unitary entity without regard to the separateness of the various legal entities.

23

56.    For example, the members of the UKPC have asserted claims against NNUK in respect of a funding deficit in the defined benefit pension plan for employees of NNUK.[29]  On two occasions prior to the commencement of these insolvency cases, the Nortel Networks UK Pension Trust Limited (the "Trust") specifically negotiated for and obtained contract-based guarantees from NNL in respect of NNUK's pension plan funding deficit—thus relying on the ability to assert a second claim against another Nortel entity.  The first guarantee (the "Funding Guarantee"), executed by NNL and the Trust on November 21, 2006, "irrevocably and unconditionally" guaranteed performance of certain funding obligations by NNUK.  (TR41344 at EMEAPRIV0300687.)  The second guarantee (the "Insolvency Guarantee"), executed by NNL and the Trust on December 21, 2007, specifically contemplated the potential insolvency of NNUK, obligating NNL to pay the Trust the lesser of $150 million or the amount of the pension plan's deficit, in the event of such insolvency.  (*See* TR21438 at 3, 4.)[30]

57.    It is illogical for the UKPC to argue now that they "actually and reasonably relied" on the supposed unity of all of the Nortel entities.  Both the Funding Guarantee and the Insolvency Guarantee would have been meaningless if the Trust believed that "Nortel globally," and not solely NNUK, was responsible for NNUK's obligations to the UKPC.  Indeed, Nortel employees testified that they understood the Trust was a creditor of just NNUK, and that the Trust sought the guarantees as a means of limiting their exposure to "unforeseen events" at NNUK.[31]

---

[29]    *See* Amended Proofs of Claim of the Trustee of Nortel Networks UK Pension Plan and the Board of the Pension Protection Fund, filed on September 5, 2012 against NNI and Nortel Networks (CALA) Inc., and listed on the U.S. Debtors' claim register as proof of claim numbers 8357 and 8358; *see also* Trial Tr. 120:3-13, May 12, 2014 (UKPC Opening Statement).

[30]    The description herein of the Funding Guarantee and the Insolvency Guarantee is not intended to concede either the validity or the enforceability of either guarantee, which we understand to be disputed by NNL.

[31]    *See, e.g.*, Trial Tr. 845:4-25, May 15, 2014 (M. McCorkle); *see also* Hern Dep. Tr. 75:10-17, 84:21-85:6; Staunton Dep. Tr. 208:17-25.

58.    Similarly, the CCC defines itself as an "ad hoc group of officially authorized representatives of employee and employee benefits creditors asserting direct claims ***solely against the Canadian parent and certain Canadian affiliates***."[32]  In the very definition of their affiliation, the CCC itself recognizes the separateness of the Nortel estates and the fact that its constituents hold claims solely against the Canadian parent and certain Canadian affiliates.[33]  In fact, the CCC has not asserted any direct claims against U.S. or EMEA Debtors.  (*See* DLA Amended 2019 Statement at 1-3.)

      iii.    <u>Even if a *Prima Facie* Case for Global Substantive Consolidation Could Be Established, it Can Be Defeated by the Bondholder Group and Other Significant Creditors Who Relied on the Separateness of the Nortel Entities</u>

59.    Even assuming the Global Sub Con Proponents could establish a *prima facie* case for substantive consolidation of the Nortel Debtors, which they cannot, under U.S. law "[c]reditor opponents of consolidation can nonetheless defeat a *prima facie* showing under the [creditor reliance] rationale if they can prove they are adversely affected and actually relied on debtors' separate existence."  *Owens Corning*, 419 F.3d at 212 (footnote omitted).[34]  As discussed *infra*, the evidence clearly demonstrates that the members of the Bondholder Group, and numerous other creditors, have relied on the separateness of the various Nortel entities and would be seriously harmed if the Nortel Debtors' estates were consolidated.

---

[32]    Amended Verified Statement Pursuant to Bankruptcy Rule 2019 of DLA Piper LLP (US) at 1 [D.I. 10761] ("<u>DLA Amended 2019 Statement</u>") (emphasis added); *see also* Allocation Protocol, Appendix A (defining the CCC as an "ad hoc committee of major creditors having claims ***only against the Canadian Debtors***" (emphasis added).

[33]    *See, e.g.*, CCC Initial Allocation Brief ¶ 1 (stating that the CCC has "asserted approximately $3 billion in Claims against the Canadian Debtors"); Affidavit of Donald Sproule ¶ 2 (TR00008) (testifying that Sproule is a representative appointed on behalf of all former employees of the Canadian Debtors, including NNC, NNL, Nortel Networks Global Corporation, Nortel International, and/or Nortel Networks Technology).

[34]    Similarly, under Canadian law, courts analyze the economic prejudice to creditors of substantive consolidation.  *See Northland* ¶¶ 58, 59.

(a)    *A Global Substantive Consolidation of the Nortel Debtors' Estates Would Harm Creditors*

60.    Global substantive consolidation would have a significant, negative impact on the members of the Bondholder Group and similarly-situated creditors.  Substantive consolidation "restructures (and thus revalues) rights of creditors," as "claims of creditors against separate debtors morph into claims against the consolidated survivor."  *Owens Corning*, 419 F.3d at 205 (internal quotations and citation omitted).  Thus, a global substantive consolidation of the Nortel Group would render the bargained-for guarantees held by members of the Bondholder Group worthless by, in effect, "'[c]ommunizing' assets of affiliated companies to one survivor to feed all creditors of all companies."  *Id.* at 216.

61.    This "communizing" of assets proposed by the Global Sub Con Proponents is specifically designed to harm the holders of the Bonds, whose NNI guarantees were an integral part of the financing bargain embodied in the relevant indentures.  (*See* U.S. Proposed FOF Section II.C.4(a); *see also* McConnell Report ¶¶ 50-52.)  The underwriters of the Bonds guaranteed by NNI, as the proxy for future bondholders, "lawfully bargained prepetition for unequal treatment by obtaining guarantees of separate entities."  *Owens Corning*, 419 F.3d at 216.  The guarantees enabled the issuers of the Bonds to raise funds in the capital markets at prices and on terms (which included the guarantees) that were acceptable to both the issuers and the underwriters.[35]  For example, Nortel executives involved in the $2 billion offering of high yield bonds in 2006 testified that underwriters required an NNI guarantee and that the presence of the guarantee lowered the cost of borrowing.[36]  This financing was critical to Nortel's business,

---

[35]    U.S. Proposed FOF Section II.C.4(a); *see also* Affidavit of Peter Currie, dated April 11, 2014 ("Currie Aff.") ¶¶ 90, 92; Beatty Dep. Tr. 55:5-21; Currie Dep. Tr. 263:13-264:4.

[36]    Trial Tr. 548:15-21, May 14, 2014 (P. Currie); Trial Tr. 1057:12-25, May 20, 2014 (P. Binning); *see also* Williams Dep. Tr. 197:22-200:2; Currie Dep. Tr. 262:14-263:21; Binning Dep. Tr. 149:19-150:16.

at a time when it had limited access to the capital markets.  (Trial Tr. 546:22-548:2 (P. Currie); *see also* K. Stevenson Dep. Tr. 126:18-128:21.)

62.     In addition, global substantive consolidation would likely negatively impact all creditors of the U.S. Debtors.  First, substantive consolidation would dilute the recoveries of all creditors of the U.S. Debtors by forcing such creditors to share their recoveries with creditors of all other entities.  Second, as discussed *supra*, the Global Sub Con Proponents' proposed theories would eliminate the $2 billion allowed claim of NNI against the Canadian Debtors.  The result would be a smaller pool of assets against which a larger pool of creditors would be able to assert claims.

(b)     *Prepetition, Bondholders, and Numerous Other Creditors, Were Told They Could Rely On, and Did Actually Rely On, the Nortel Debtors' Separate Corporate Existence*

63.     The documents evidencing the issuance of the Bonds clearly and unequivocally provide a basis for holders of the Bonds to rely on the separateness of the Nortel entities.  This reliance was based, in part, on the various offering memoranda and/or prospectuses concerning the Bonds.  These documents explicitly provide that the issuers' "subsidiaries are ***separate and distinct legal entities*** and any subsidiary that is not a Guarantor will have no obligation . . . to pay amounts due under the Notes or the Guarantees . . . ."[37]  The guarantees were provided by specific legal entities, as set forth in the relevant indentures.  The Indenture Trustees, cognizant that recourse on the Bonds is limited only to those specific Nortel entities that issued or guaranteed the Bonds, filed claims in respect of the Bonds against each of those entities, but only

---

[37]     TR40117 at CCC0004626 (Offering memorandum for senior notes issued by NNL, and guaranteed by NNC and NNI, in the aggregate principal amount of $2 billion) (emphasis added); *see also* TR40118 at CCC0005276 (Offering memorandum for senior notes issued by NNL, and guaranteed by NNC and NNI, in the aggregate principal amount of $675 million); TR40115 at CCC0004151 (Offering memorandum for convertible senior notes issued by NNC, and guaranteed by NNL and NNI, in the aggregate principal amount of $1 billion).

those entities.[38]

64.     This reliance on corporate separateness is consistent with the understanding of Nortel executives involved in the $2 billion offering of high yield Bonds in 2006.  One former Nortel executive testified that the high-yield market was "highly focused on entities," forcing NNI to attach a guarantee to the Bonds.  (Williams Dep. Tr. 197:22-200:2; *see also* Currie Dep. Tr. 263:14-264:4, 266:3-17.)  Another former Nortel executive testified that, even during the capital raising process, he believed that NNI needed to be involved by guaranteeing the Bonds in order "[t]o get the outcome that we were seeking."  (Trial Tr. 548:3-8, 549:3-23, May 14, 2014 (P. Currie).)  In addition, two former Nortel Chief Financial Officers testified that creditors requested an NNI guarantee because they viewed NNI's assets as support for lending to NNL. (*See* Trial Tr. 1057:12-25, May 20, 2014 (P. Binning); Binning Dep. Tr. 150:3-7; Currie Dep. Tr. 262:25-263:31.)  Those creditors understood that they had access to two separate pools of assets—those of NNL and those of NNI.  (Trial Tr. 1056:20-1057:25, May 20, 2014 (P. Binning).)

65.     Indeed, evidence in the record indicates that, in September of 2005, Nortel employees considering the issuance of new debt from NNI were concerned that such bonds "would be structurally better than all . . . existing bonds at the NNL level," resulting in a split credit rating and requiring the provision of an NNI guarantee to the existing unguaranteed bonds. (TR44287 at 1 (Email from J. Williams to J. Doolittle).)  In May of 2006, certain Nortel employees reconsidered adding an NNI guarantee to existing bonds because, in their view, the "scarcity value" of an NNI guarantee could positively impact the price of the subsequent bond issuance.  (TR21312 (Email from J. Williams to K. Stevenson and others).)

---

[38]     *Compare* TR40050 (Proof of Claim filed by The Bank of New York Mellon against NNI, in its capacity as guarantor of certain Bonds) *with* TR40047 (Proof of Claim filed by The Bank of New York Mellon against NNL, in its capacity as issuer of certain Bonds).

66.    Other Nortel entities, such as NNUK, were not offered as guarantors of the Bonds because they were neither the source of significant revenue nor a repository of significant hard assets.  (*See* Currie Dep. Tr. 263:22-264:4; *see also* Currie Aff. ¶ 90.)  Market participants performed rigorous due diligence to ensure that they were satisfied with Nortel's financial outlook.  (*See* Currie Aff. ¶ 92; Trial Tr. 551:11-17, May 14, 2014 (P. Currie).)  The NNI guarantee provided lenders with added security, thereby lowering the cost of NNL's borrowings.[39]  Notably, not one of the Nortel Debtors' estates is advocating for or supporting substantive consolidation.

iv.    Global Substantive Consolidation is Not Appropriate Under the Hopeless Entanglement Prong of the *Owens Corning* Test

67.    Because the Global Sub Con Proponents have not shown that any creditors actually relied on the unity of the Nortel entities, they must establish that the entities were "hopelessly entangled" to prevail on their theory under U.S. law.  The "hopeless entanglement" prong of the *Owens Corning* test is an extremely difficult standard to meet.  As that court made clear, "[n]either the impossibility of perfection in untangling the affairs of the entities nor the likelihood of some inaccuracies in efforts to do so is sufficient to justify consolidation."  *Owens Corning*, 419 F.3d at 214.  Thus, although "imperfection in intercompany accounting is assuredly not atypical in large, complex company structures," the Third Circuit was "loathe to entertain the argument that complex corporate families should have an expanded substantive consolidation option in bankruptcy."[40]  *Id.* at 215.  For that reason, "commingling justifies consolidation ***only*** when separately accounting for the assets and liabilities of the distinct entities

---

[39]    Trial Tr. 548:15-21, May 14, 2014 (P. Currie); Trial Tr. 1057:12-25, May 20, 2014 (P. Binning); *see also* Binning Dep. Tr. 149:13-150:16; Currie Dep. Tr. 262:25-263:21.

[40]    Notwithstanding this concern expressed by the Third Circuit, Westbrook, in acknowledging that Nortel was run the way many multinational enterprises are run, testified that, in the event of insolvency, such multinational enterprises should be handled with a single-pool distribution.  (Westbrook Dep. Tr. 45:5-16, 48:8-24.)

will reduce the recovery of *every* creditor—that is, when every creditor will benefit from consolidation." *Id.* at 214 (emphasis in original).

68.     There is no evidence suggesting that Nortel's assets and liabilities are entangled, much less "hopelessly entangled," such that all creditors would be harmed absent substantive consolidation.

>     (a)     *It is Not Impossible to Identify the Separate Assets and Liabilities of the Three Major Nortel Debtors' Estates*

69.     The evidence clearly shows that, in the prepetition period, the Nortel Group's assets and liabilities were tracked and accounted for on an entity-by-entity basis.  (*See generally* U.S. Proposed FOF Section II.B.)  For example:

- All Nortel entities maintained separate financial books and records.[41]

- Each entity's cash was kept separate, and there was no intermingling of one entity's cash with any other entity's cash.[42]

- Intercompany loans were created, tracked, and documented according to specific corporate procedures.[43]  When necessary, the relevant entities' boards reviewed and approved the transactions.[44]

- All Nortel entities prepared their own, entity-specific financial statements, which were audited by local auditors and reviewed and approved by their respective boards of directors.[45]

---

[41]     *See, e.g.*, Trial Tr. 544:14-16, 568:15-20, May 14, 2014 (P. Currie); Trial Tr. 815:11-20, May 15, 2014 (M. McCorkle); *see also* Doolittle Dep. Tr. 39:10-40:7; McCorkle Dep. Tr. 160:2-16; Rolston Dep. Tr. 161:13-15.

[42]     *See, e.g.*, Trial Tr. 816:2-4, 817:13-24, May 15, 2014 (M. McCorkle); *see also* Doolittle Dep. Tr. 258:9-259:3.

[43]     *See, e.g.*, Trial Tr. 816:17-25, May 15, 2014 (M. McCorkle); Inter Company Loan Process (TR22049); *see also* Doolittle Dep. Tr. 40:15-23, 43:23-44:8; Widdowson Dep. Tr. 194:3-13.

[44]     Currie Aff. ¶ 75; *see also* Trial Tr. 817:1-12, May 15, 2014 (M. McCorkle).

[45]     *See, e.g.*, Currie Aff. ¶ 39; Trial Tr. 545:19-546:9, May 14, 2014 (P. Currie).  Although NNC typically filed consolidated financial statements with the SEC and Canadian regulators, the 2007 and 2008 NNC 10-Ks, which were filed subsequent to Nortel's final pre-petition public debt offerings, included entity-level financial data.  (TR40268 at CCC0098871-885; TR40269 at CCC0099233-244.)

- All Nortel entities filed and paid taxes in their respective home jurisdictions in accordance with local law.[46]

70.     Although the "hopeless entanglement" test focuses on the post-petition period, the Nortel Group's ability to trace cash on an entity level, account for intercompany loans, and prepare and maintain entity-specific financial statements in the prepetition period is instructive. At his deposition, Judge Clark agreed.  In his view:

> [I]f I had three companies with three sets of financial statements and a clear cash management system that made it possible to, at any given moment in time, determine whose cash was whose, and I could also identify whose assets were whose, and I had no difficulty establishing intercompany payables and receivables, those could easily be adjusted, that's *not a particularly good case for my model*.

(Clark Dep. Tr. 103:3-104:2 (emphasis added).)

71.     It should come as no surprise then that, in the post-petition period, there has been little difficulty separating the assets and liabilities of the various Nortel entities.  Since the commencement of these insolvency cases, the U.S. Debtors, Canadian Debtors, and EMEA Debtors have operated under separate legal regimes, including filing separate required financial information in the relevant insolvency proceedings.[47]  Additionally, in order to sell the business lines, audited carve out financials for the major lines of business were created that show the revenue and cash flow produced by each jurisdictional entity in each business line.  (TR50790

---

[46]     Trial Tr. 568:15-25, 569:15-22, May 14, 2014 (P. Currie); Affidavit of Gordon Davies ¶ 30 (TR00013) ("EMEA Companies prepared and filed, in accordance with local requirements, financial statements and tax returns."); Affidavit of Pavitir Binning ¶ 8 (TR00014) ("While many of the global functions were overseen by corporate officers in North America such as myself, we sought and received regional and country-specific advice including operational, legal and financial advice (including tax and treasury) from employees, management and advisors of each company and region."); Currie Aff. ¶ 75 ("The intercompany funding of Nortel was ultimately managed by the Treasury group, with these two objectives in mind. However, in so doing the Treasury group always ensured that the needs of the subsidiaries were accounted for and that local tax implications and legal considerations were respected."); Declaration of John J. Ray III ("Ray Decl.") ¶ 31 (TR00020) ("NNI is a United States taxpayer and has filed returns on the federal level and in each of the 50 states and Puerto Rico.").

[47]     *See, e.g.*, Monthly Operating Report No. 5 of the U.S. Debtors (TR11360); Monthly Operating Report No. 30 of the U.S. Debtors (TR11365); Eighty-Seventh Report of the Monitor at 9, 10, 45-48 (July 19, 2012).

(Optical and Carrier Ethernet); TR50786 (Carrier VOIP Business); TR50788 (Enterprise).)

72.     This is consistent with the deposition testimony provided by Nortel employees. Jean-Marie Lesur, NNSA's Finance Director, testified that it is not difficult to determine the assets of each entity because "each company had an asset base which was regularly audited both under US GAAP and under local statutory GAAP."  (Lesur Dep. Tr. 110:10-111:4.)  Similarly, Peter Look, former Vice President and Tax Leader of NNL, testified that it would be "difficult but not impossible" to value Nortel entities on their own.  (Look Dep. Tr. 218:4-7, 218:10-11.)

73.     This is also consistent with representations made by the professionals responsible for winding down the affairs of the U.S. Debtors, the Canadian Debtors, and NNSA.  For example, John Ray, the Principal Officer of NNI and its affiliated U.S. Debtors, stated that "NNI and the other US Debtors have maintained their corporate formalities and separateness in the post-filing period."  (Ray Decl. ¶ 32.)  In addition, Murray McDonald, the president of Ernst & Young Inc., in its capacity as the Monitor, testified that "it's clear that the creditors [of Nortel] could identify who owed them money" and that the reconciliation of intercompany transactions within the Nortel Group is "largely done" because the "books and records are reasonably clear on that."  (McDonald Dep. Tr. 206:8-25, 207:2-208:7.)  Similarly, Cosme Rogeau, the liquidator before the French Commercial Court in Versailles for Nortel's French operating company, NNSA, testified that NNSA was "absolutely" able to generate a list of its own creditors and had "no difficulty at all" informing its creditors of the liquidation proceedings.  (Rogeau Dep. Tr. 95:14-19, 95:25-96:6.)  According to Rogeau, NNSA was able to identify its creditors and the amounts of their claims by reference to its books and records.  (*Id.* at 97:12-16, 97:25-98:3, 98:5-8.)

   (b)  *The Intercompany Claims of the Three Major Nortel Debtors'*
       *Estates Have Been Substantially Resolved*

  74.  Even if there was entanglement at any point in time between or among the various

Nortel Debtors' estates—which would be contrary to the evidence presented at trial—there is no

such entanglement today, let alone entanglement so "hopeless" that it would be onerous to

unwind.  In its simplest terms, there are three principal Nortel Debtor estates and, thus, six

possible inter-estate claims that could be asserted among them.[48]  As of this moment, all of these

inter-estate claims have been resolved:

- On December 18, 2009, the U.S. Debtors and the Canadian Debtors reached an agreement, approved by both Courts, allowing the U.S. Debtors a $2 billion claim against the Canadian Debtors and waiving the right of the Canadian Debtors and Monitor to assert any additional pre-petition claims against the U.S. Debtors (unless the U.S. Debtors pursue any additional claims against the Canadian Debtors).[49]

- On January 7, 2014, the U.S. Court approved an agreement between the U.S. Debtors and the EMEA Debtors that resolved all claims between them.[50]

- On July 16, 2014, the Canadian Court approved an agreement between the Canadian Debtors and the EMEA Debtors that resolved all claims between them.[51]

  75.  The fact that all significant intercompany claims among the three Nortel Debtors'

estates have been resolved is not only a testament to the diligence and hard work of the parties

---

[48]  The claims of twenty three non-filed affiliates of NNC, comprising the so-called "Fourth Estate," were settled by agreement among representatives of the Nortel Debtors' estates and the Fourth Estate on June 19, 2012.  *See* Order (I) Authorizing and Approving the Non-Filed Entity Settlement Agreement; (II) Authorizing and Approving the Debtors to Take Certain Actions in Connection Therewith; and (III) Granting Related Relieve [D.I. 7985].  According to Murray McDonald, the Fourth Estate settlement was premised on the fact that there are distinct Nortel entities whose corporate form should be observed. (McDonald Dep. Tr. 214:3-7.)

[49]  Final Canadian Funding and Settlement Agreement §§ 10, 12, 13 (TR46910).

[50]  Order Approving the US Claims Litigation Settlement Agreement By and Among the Debtors, the Creditors' Committee, the Joint Administrators, the EMEA Debtors, Nortel Networks Optical Components Limited, Nortel Telecom France SA, the Liquidator, the French Liquidator, the UK Pension Parties and Certain Affiliates [D.I. 12785].

[51]  Order Approving Agreement Settling EMEA Canadian Claims and Related Claims (July 16, 2014).

involved, but it also should weigh heavily on the Courts' analysis of whether there is or ever was "hopeless entanglement."

76.      Westbrook agrees.  Although he was asked to assume, based on a selectively crafted set of facts provided to him by counsel to the UKPC, that "it was a practical impossibility to tease things apart and reallocate" the assets and liabilities of the Nortel Group by legal entity, when asked to assume the facts that are actually in evidence (*i.e.*, that intercompany claims had been substantially resolved), he conceded that "***if there are no claims left to be sorted out, then that would reduce substantially our concern about the fairness versus the cost of dealing with these entities entity by entity***."  (*Compare* Clark & Westbrook Report ¶ 42 *with* Westbrook Dep. Tr. 138:20-139:13 (emphasis added); *see also* Westbrook Dep. Tr. 136:2-5, 136:13-16.)

        (c)      *Separating the Assets and Liabilities of the Nortel Group is Not So Costly that it Harms all Creditors*

77.      As discussed *supra*, nearly all of the work of separating the assets and liabilities of the Nortel Group and settling the intercompany claims has been completed and the costs have been incurred.  Thus, the cost of any remaining "disentanglement" of assets and liabilities will have little impact on the recovery of ***any*** creditor of ***any*** Nortel Debtor.  In contrast, a global substantive consolidation of the Nortel Debtor estates would severely harm the Bondholders and other creditors who specifically negotiated for guarantees.

78.      The magnitude of this harm is illustrated by considering the report of Thomas Britven.  According to Britven, the Bondholders would recover 100% of their approximately $4.2 billion claim (for principal) under any of the other parties' proffered allocation approaches.[52]  Under the Global Sub Con Proponents' proffered pro rata distribution approach, however, Britven estimates that Bondholders would recover just 71.2% of their claims, or $2.91

---

[52]      Britven Report ¶ 2.9; *see also* Trial Tr. 3371:12-24, 3374:10-17, June 6, 2014 (T. Britven).

billion.[53]  Thus, under Britven's own analysis, global substantive consolidation of the Nortel

Debtor estates would harm the Bondholders by at least $1.182 billion.

79.     Moreover, a global substantive consolidation of the Nortel Debtors' estates would

result in the elimination of the $2 billion judicially allowed claim by NNI against the Canadian

Debtors' estates.  This would harm all creditors of the U.S. Debtors' estates by significantly

reducing the pool of assets available for the U.S. Debtors to distribute to their creditors in an

amount likely exceeding any purported cost of "disentanglement."

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Bondholder Group requests that the

U.S. and Canadian Courts (i) allocate the Sale Proceeds among the Nortel Debtors' estates by

determining the fair market value of each Debtor's share of the assets and rights relinquished in

the various sale transactions, as set forth by the U.S. Interests in their post-trial brief; and

(ii) grant such other and further relief as the Courts deem just and proper.

---

[53]     Britven Report ¶ 8.6, Schedule 3.

Dated: August 7, 2014

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Peter J. Keane*
Laura Davis Jones (No. 2436)
Peter J. Keane (No. 5503)
919 N. Market Street, 17th Floor
PO Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400

-and-

**MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP**
Dennis F. Dunne
Albert A. Pisa
Andrew M. Leblanc
Atara Miller
1 Chase Manhattan Plaza
New York, New York 10005-1413
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219

-and-

Thomas R. Kreller
601 S. Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone: (213) 892-4463
Facsimile: (213) 629-5063

-and-

**BENNETT JONES LLP**
Richard B. Swan
Gavin H. Finlayson
3400 One First Canadian Place, P.O. Box 130
Toronto, Ontario, M5X 1A4
Telephone:  (416) 777-5762
Facsimile:  (416) 863-1716

***Attorneys for Ad Hoc Group of Bondholders***