Court File No. 09-CL-7950

ONTARIO

SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C.
1985, c. C-36, AS AMENDED

- and -

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| In re | Chapter 11 |
| NORTEL NETWORKS INC., et al., | Case No. 09-10138 (KG) |
| Debtors. | (Jointly Administered) |

**CLOSING BRIEF OF THE
CANADIAN CREDITORS' COMMITTEE ("CCC")**

# TABLE OF CONTENTS

**PART I - OVERVIEW** ........................................................................................................1

    A.  Ownership Allocation ...............................................................................................1

    B.  Pro Rata Allocation.................................................................................................6

**PART II - FACTS** ..............................................................................................................9

**PART III - OWNERSHIP ALLOCATION** .....................................................................9

**A.  NNL Owned the NN Technology** ................................................................................9

    1.  NNL Held Title to the NN Technology ..................................................................9

    2.  Licensed Participants Had Limited Contractual Rights.......................................15

        a.      Overview.......................................................................................................15

        b.      Licenses Were Limited to a Field Of Use.................................................21

        c.      Licenses Were Only Enforceable in the Field Of Use...........................27

        d.      Licenses Were Not Transferrable by the Licensed Participants ...........28

        e.      Licenses Were Not "Perpetual" or "Royalty Free"...............................30

        f.      Equitable Principles Did Not Grant the Licensed Participants Ownership ..........31

**B.  NNL's Ownership Entitles it to the Substantial Majority of the Sale Proceeds** .............33

    1.  The Business Sales................................................................................................33

    2.  The Residual IP Sale.............................................................................................36

**PART V - U.S. AND EMEA ALLOCATION THEORIES ARE FLAWED** ........................39

**A.  U.S. and EMEA Allocation Theories are based on Flawed Assumptions** ........................39

**B.  U.S. Revenue Theory is Flawed** ......................................................................................40

    1.  The Business Sales................................................................................................41

    2.  The Residual IP Sale.............................................................................................44

**C.  EMEA Asset Valuation is Flawed** ..................................................................................47

**D.  EMEA License Theory is Flawed** ...................................................................................48

**E.  EMEA Contribution Theory is Flawed** ...........................................................................49

**F.  U.S. Modified Contribution Theory is Flawed** ................................................................54

**PART VI - CCC PRO RATA ALLOCATION** .........................................................................58

**A.  In the Alternative, the Courts Should Adopt the CCC Pro Rata Allocation** ...................58

**B.  Evidence Supports the CCC Pro Rata Allocation** ...........................................................59

**C.  Courts Have Jurisdiction to Order the CCC Pro Rata Allocation** ...................................60

**D.  Jurisprudence Supports Pro Rata Recovery** ...................................................................63

**E.  Guaranteed Bondholders Not Harmed by CCC Pro Rata Allocation** ..............................65

1.  No Evidence of Bondholder Expectations ...........................................................65

2.  Bondholders Purchased Risky and Weakly Protected Bonds ...............................67

3.  Bondholders Purchased Below Par and/or in Connection with Key Market Events and Anticipated Litigation Outcomes ......................................................69

4.  Equities Support the CCC Pro Rata Allocation ...................................................71

**F.  Implementation of CCC Pro Rata Allocation** .................................................................72

**G.  Conclusion** .....................................................................................................................75

**PART VII - ORDERS SOUGHT** ..........................................................................................75

- iii -

# TABLE OF AUTHORITIES

| STATUTES | TAB NO. |
|---|---|
| Bankruptcy Code, 11 U.S.C. §105(a), §363, § 503 | 1 |
| *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, s.11 | 2 |
| *Conveyancing and Law of Property Act*, R.S.O. 1990, c. C-34, s. 5(3) | 3 |
| *Copyright Act*, R.S.C., 1985, c. C-42, s. 41.23(1) | 4 |
| *Patent Act*, R.S.C., 1985, c. P-4, s. 55(1) | 5 |

| CASES | TAB NO. |
|---|---|
| *1124980 Ontario Inc. (c.o.b. Health-Care Pharmacy) v. Liberty Mutual Insurance Co.* (2003), 33 B.L.R. (3d) 206 (Ont. S.C.J.) | 6 |
| *424651 Ontario Ltd. v. Second Lehndorff (Canada) Ltd.*, [1980] O.J. No. 878 (H.C.J.) | 7 |
| *473807 Ontario Ltd. v. TDL Group Ltd.* (2006), 271 DLR (4th) 636 (Ont. C.A.) | 8 |
| *80 Wellesley St. East Ltd. v. Fundy Bay Builders Ltd. et al.*, [1972] 2 O.R. 280 (C.A.) | 9 |
| *A123 Systems, Inc. v. Hydro-Quebec*, 626 F.3d 1213, (Fed. Cir. 2010) | 10 |
| *A&F Baillargeon Express Inc. (Trustee of) (Re)*, [1993] Q.J. No. 884 (S. C.) | 11 |
| *Amfac Foods Inc. v. Irving Pulp & Paper, Ltd.* (1984), 80 C.P.R. (2d) 59 (F.C.), *aff'd* 12 C.P.R. (3d) 193 (F.C.A.) | 12 |
| *Amgen, Inc. v. Chugai Pharmaceutical Co.*, 808 F. Supp. 894, (D. Mass. 1992), *aff'd*, 52 F.3d 1026 (Fed. Cir. 1995), *cert. denied*, 516 U.S. 907 (1995) | 13 |
| *Armstrong Cork Canada v. Domco Industries Ltd.*, [1982] 1 S.C.R. 907 | 14 |
| *Arthur Andersen Inc. v. Toronto-Dominion Bank* (1994), 17 O.R. (3d) 363 (C.A.), (QL), leave to appeal refused, [1994] S.C.C.A. No. 189 | 15 |
| *Ashley v. Marlow Group Private Portfolio Management Inc.*, [2006] O.J. No. 1195 (S.C.J.) | 16 |

| CASES | TAB NO. |
|---|---|
| *Barclays Bank PLC v. Devonshire Trust (Trustee of)* (2011), 82 C.B.R. (5th) 159 (Ont. S.C.J.), *aff'd*, 2013 ONCA 494, *leave to appeal refused*, [2013] S.C.C.A. No. 374 | 17 |
| *Bank of Marin v. England*, 385 U.S. 99, (1966) | 18 |
| *BG Checo International Ltd. v. British Columbia Hydro and Power Authority*, [1993] 1 S.C.R. 12 | 19 |
| *Biosynexus, Inc. v. Glaxo Group Ltd.*, 2006 WL 624896, (Sup. Ct. N.Y. Cty. 2006), *vacated in part on other grounds*, 40 A.D.3d 384 (1st Dep't 2007) | 20 |
| *Bluestone Innovations LLC v. Nichia Corp.*, 2013 WL 1729814 (N.D. Cal. Apr. 22, 2013) | 21 |
| *Cadbury Schweppes Inc. v. FBI Foods Ltd.*, [1999] 1 S.C.R. 142 | 22 |
| *Canadian National Railway Co. v. Royal and Sun Alliance Insurance Co. of Canada*, [2008] 3 S.C.R. 453 | 23 |
| *Carscallen v. FRI Corp.*, [2005] O.J. No. 2400 (S.C.J.) *aff'd*, [2006] O.J. No. 3653 (C.A.) | 24 |
| *Century 21 Canada Limited Partnership v. Rogers Communications Inc.*, 2011 BCSC 1196 | 25 |
| *Century Services Inc. v. Canada (Attorney General)*, 2010 SCC 60 | 26 |
| *Citicorp Trustee Co. Ltd. v. Barclays Bank Plc*, [2013] EWHC 2608 (Ch. D.) | 27 |
| *CivicLife.Com Inc. v. Canada (A.G.)* (2006), 215 O.A.C. 43 (C.A.) | 28 |
| *Cochrane v. Ontario*, 2008 ONCA 718, *leave to appeal refused*, [2009] S.C.C.A. No. 105 | 29 |
| *Commercial Alcohols Inc. v. Suncor Energy Products Inc.* (2006), 17 B.L.R. (4th) 86 (Ont. S.C.J.), *aff'd*, 2008 ONCA 261 | 30 |
| *Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.*, [1980] 1 S.C.R. 888 (WLeC) | 31 |
| *Coventree Inc. v. Lloyds Syndicate 1221 (Millennium Syndicate)*, 2012 ONCA 341, *leave to appeal refused*, [2012] S.C.C.A. No. 276 | 32 |
| *Crystallex Re,* 2012 ONCA 404, *leave to appeal denied*, 2012 CarswellOnt 11931 | 33 |

| CASES | TAB NO. |
|---|---|
| *Cunningham v. Hamilton* (1995), 169 A.R. 132 (C.A.) | 34 |
| *Devefi Pty Ltd. v. Mateffy Perl Nagy Ptd Ltd.*, (1993), 113 A.L.R. 225 (F.C.A.F.C.) | 35 |
| *Dilworth v. New Zealand Commissioner of Stamps*, [1899] A.C. 99 (P.C.) | 36 |
| *Dorrans v. The Shand Partnership*, [2003] ScotCS 313 (O.H.) | 37 |
| *Drosophilinks Consulting Inc. v. Canadian National Railway Co.,* 2010 ONSC 3576, *leave to appeal refused*, 2010 ONSC 5156 (Div. Ct.) | 38 |
| *Dubiner v. Cheerio Toys and Games Ltd.*, [1965] 1 Ex. C.R. 524 (Ex. Ct.), (QL), *aff'd*, [1966] S.C.R. 206 | 39 |
| *Electric Chain Co. of Canada v. Art Metal Works Inc.*, [1933] S.C.R. 581, ) *leave to appeal refused*, [1933] S.C.R. ix (P.C.) | 40 |
| *Eli Lilly and Co. v. Apotex Inc.*, [1996] F.C.J. No. 425 (C.A.), *rev'd on other grounds*, [1998] 2 S.C.R. 129 | 41 |
| *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 | 42 |
| *Euro-Excellence Inc. v. Kraft Canada Inc.*, [2007] 3 S.C.R. 20 | 43 |
| *Forest Hill Real Estate Inc. v. Harvey Kalles Real Estate Ltd.*, 2010 ONCA 884 | 44 |
| *Garland v. Consumers' Gas Co.*, [2004] 1 S.C.R. 629 | 45 |
| *GATX Corp. v. Hawker Siddeley Canada Inc.* (1996), 27 B.L.R. (2d) 251 (Ont. Gen. Div.) | 46 |
| *Gen. Mills, Inc. v. Kraft Foods Global, Inc.*, 487 F.3d 1368, (Fed. Cir. 2007), *rehearing granted on other grounds,* 495 F.3d 1378 (Fed. Cir. 2007) | 47 |
| *Goodyear Canada Inc. v. Burnhamthorpe Square Inc.*, [1997] O.J. No. 1665 (Gen. Div.), *var'd on other grounds*, [1998] O.J. No. 4426 (C.A.) | 48 |
| *Grossman Holdings ltd. v. York Condominium Corp. No. 75* (1999), 124 O.A.C. 318 (C.A.) | 49 |
| *Hilgreave Corp. v. Symantec Corp.*, 265 F.3d 1336, (Fed. Cir. 2001), *cert. denied*, 535 U.S. 906 (2002) | 50 |
| *Hillis Oil & Sales Ltd. v. Wynn's Canada Ltd.*, [1986] 1 S.C.R. 57 | 51 |

| CASES | TAB NO. |
|---|---|
| *Hospital for Sick Children v. Walt Disney Productions*, [1968] Ch. 52 (C.A.) | 52 |
| *Hu v. Sung* (2009), 63 B.L.R. (4th) 286 (Ont. S.C.J.) | 53 |
| *Imoney Corp. v. Quebecor Communications Inc.*, [2002] O.J. No. 4309 (S.C.J.) *aff'd*, [2002] O.J. No. 4447 (C.A.) | 54 |
| *In re ABC Learning Centres Limited*, 728 F.3d 301, (3rd. Cir. 2013) | 55 |
| *In re Aerobox Composite Structures, LLC*, 373 B.R. 135, (Bankr. D. N.M. 2007) | 56 |
| *In re Combustion Eng'g, Inc.,* 391 F.3d 190, (3d Cir. 2004) | 57 |
| *In re Continental Airlines*, 146 B.R. 520, (Bankr. D. Del. 1992) | 58 |
| *In re Coy*, 2011 WL 3667607, (Bankr. D. Del. Aug. 22, 2011) | 59 |
| *In re Direct Response Media, Inc.*, 466 B.R. 626, (Bankr. D. Del. 2012) | 60 |
| *In re Owens Corning,* 419 F.3d 195, (3d Cir 2005) | 61 |
| *In re Tucson Yellow Cab Co., Inc.*, 789 F.2d 701, (9th Cir. 1986) | 62 |
| *In re Wash. Mut. Inc.*, 461 B.R. 200, (Bankr. D. Del. 2011) | 63 |
| *Independent Wireless Telegraph Co. v. Radio Corp. of America*, 269 U.S. 459 (1926) | 64 |
| *Indian Molybdenum Ltd. v. The King*, [1951] 3 D.L.R. 497 (S.C.C.) | 65 |
| *Insituform Technical Services v. Inliner UK*, [1992] R.P.C. 83 (Ch. D.) | 66 |
| *Int'l Gamco, Inc. v. Multimedia Games, Inc.*, 504 F.3d 1273, 1275, 1279 (Fed. Cir. 2007) | 67 |
| *International Nutrition Co. v. Horphag Research Ltd.*, 257 F.3d 1324 (Fed. Cir. 2001) | 68 |
| *Invex Holdings, N. V. v. Equitable Life Ins.*, 179 B.R. 111 (N.D. Ind. 1993) | 69 |
| *Itak International Corp. v. CPI Plastics Group Ltd.* (2006), 20 B.L.R. (4th) 67 (Ont. S.C.J.) | 70 |
| *Jedfro Investments (U.S.A.) Ltd. v. Jacyk*, [2007] 3 S.C.R. 679 | 71 |

| CASES | TAB NO. |
|---|---|
| *Kerr v. Baranow*, [2011] 1 S.C.R. 269 | 72 |
| *Kitchener Frame Ltd.*, 2012 CarswellOnt 1347 (S.C.J.) | 73 |
| *Linden Gardens Trust Ltd. v. Lenesta Sludge Disposals Ltd.*, [1993] 3 All E.R. 417 (U.K.H.L.) | 74 |
| *Martin v. AstraZeneca Pharmaceuticals PLC*, 2012 ONSC 2744, *aff'd*, 2013 ONSC 1169 (Div. Ct.) | 75 |
| *Matter of Chicago, Milwaukee, St. Paul & Pac. R. Co.*, 791 F.2d 524, (7th Cir. 1986) | 76 |
| *Matter of Terry Ltd. P 'ship*, 169 B.R., (Bankr. N.D. Ind. 1993) *aff'd sub nom, Invex Holdings, N. V. v. Equitable Life Ins.*, 179 B.R. 111 (N.D. Ind. 1993) | 77 |
| *Maxwell Commun. Corp v. Barclays Bank (In re Maxwell Commun. Corp.)*, 170 B.R. 800, (Bankr. S.D.N.Y. 1994) | 78 |
| *MDS (Canada) Inc. v. Rad Source Technologies, Inc.*, 2014 Fla. LEXIS 2154 (July 10, 2014) | 79 |
| *Merck & Co v. Apotex Inc.*, 2010 FC 1265, , *aff'd*, 2011 FCA 363, *leave to appeal refused*, [2012] S.C.C.A. No. 82 | 80 |
| *Merchandising Corp. of America Inc. v. Harpbond Ltd.*, [1983] F.S.R. 32 (Eng. C.A.) | 81 |
| *Mitutoyo Corp. v. Central Purchasing, LLC*, 499 F.3d 1284, 1291 (Fed. Cir. 2007) | 82 |
| *M.J.B. Enterprises Ltd. v. Defence Construction (1951) Ltd.*, [1999] 1 S.C.R. 619 | 83 |
| *Montreal Trust Co. v. Gulf Securities Corp.*, [1978] 1 S.C.R. 708 (WLeC) | 84 |
| *Morrow v. Microsoft Corp.*, 499 F.3d 1332, (Fed. Cir. 2007) | 85 |
| *National Carbonising Co. v. British Coal Distillation Ltd.* (1936), 54 R.P.C. 41 (Eng. C.A.) | 86 |
| *Nat'l Wastewater Sys. v. Smith*, 2011 U.S. Dist. LEXIS 47554, at *10, n.3 (W.D. Okla. May 3, 2011) | 87 |
| *Nishi v. Rascal Trucking Ltd.*, [2013] 2 S.C.R. 438 | 88 |
| *Nova Growth Corp. v. Kepinski*, 2014 ONSC 2763 | 89 |

- viii -

| CASES | TAB NO. |
|---|---|
| *Oceanic Exploration Co. v. Denison Mines Ltd.* (1999), 127 O.A.C. 224 (C.A.) | 90 |
| *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548 at 568 (3d Cir. 2003) (en banc) | 91 |
| *Ornge Global GP Inc.*, *Re*, 2013 CarswellOnt 9770 (S.C.J.) | 92 |
| *Pacific National Investments Ltd. v. Victoria (City)*, [2004] 3 S.C.R. 575 | 93 |
| *Peter Kiewit Sons' Co. of Canada v. Eakins Construction Ltd.*, [1960] S.C.R. 361 | 94 |
| *Pirani v. Esmail*, 2014 ONCA 145 | 95 |
| *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, (Fed. Cir. 2000) | 96 |
| *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862, *leave to appeal refused*, [2013] S.C.C.A. No. 68 | 97 |
| *PUC Distribution Inc. v. Brascan Energy Marketing Inc.*, 2008 ONCA 176, *leave to appeal refused*, [2008] S.C.C.A. No. 217 | 98 |
| *R Griggs Group Ltd. v. Evans*, [2005] EWCA Civ 11 | 99 |
| *R. v. Loblaw Groceteria Co. (Manitoba)*, [1961] S.C.R. 138 | 100 |
| *R. v. Gogo*, [2000] O.J. No. 3643 (C.A.) | 101 |
| *Rana v. Maduck*, 2000 SKQB 318 | 102 |
| *Re Akai Holdings Limited* (High Court of the Hong Kong Special Administrative Region, Case No. HCCW 49/2000 and HCCW 50/2000 (6 February 2004) | 103 |
| *Re Canada 3000 Inc.*, [2006] 1 S.C.R. 865 | 104 |
| *Re Canadian Red Cross Society*, [1998] O.J. No. 3306 | 105 |
| *Re Elliott Estate*, [1962] O.J. No. 164 (C.A.), aff'd, [1963] S.C.R. 305 | 106 |
| *Re Fracmaster Ltd.* 237 B.R. 627 (Bankr. E.D. Tex. 1999) | 107 |
| *Re Northstar Aerospace, Inc.*, 2012 ONSC 3974 | 108 |
| *Re ScoZinc Ltd.*, 2009 NSSC 136 | 109 |
| *Re Stelco Inc.* (2005), 75 O.R. (3d) 5 (C.A.) | 110 |

| CASES | TAB NO. |
|-------|---------|
| *Re Unique Broadband Systems, Inc.*, 2014 ONCA 538 | 111 |
| *Rhone Poulenc Agro, S.A. v. Dekalb Genetics Corp.*, 284 F.3d 1323, (Fed. Cir. 2002), *cert. denied sub nom, Monstanto Co. v. Bayer CropScience*, 123 S. Ct. 2668 (2003) | 112 |
| *Righthaven LLC v. Hoehn*, 716 F.3d 1166, (9th Cir. 2013) | 113 |
| *Robinson, Little & Co. (Trustee of) v. Marlowe Yeoman Ltd.*, [1986] B.C.J No. 601 (C.A.) | 114 |
| *Rodaro v. Royal Bank of Canada* (2002), 59 O.R. (3d) 74 (C.A.) | 115 |
| *Rothmans, Benson & Hedges Inc. v. Imperial Tobacco Ltd.* (1991), 42 F.T.R. 68 (T.D.), (WLeC), *aff'd*, [1993] F.C.J. No. 135 (C.A.) | 116 |
| *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215 (1941) | 117 |
| *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 | 118 |
| *Schmidt v. Air Products Ltd.*, [1994] 2 S.C.R. 611 | 119 |
| *Schwark Estate v. Cutting*, 2010 ONCA 61 | 120 |
| *Shaw by Strain v. Stackhouse*, 920 F.2d 1135 (3rd Cir. 1990) | 121 |
| *Shelanu Inc. v. Print Three Franchising Corp.* (2003), 64 O.R. (3d) 533 (C.A.) | 122 |
| *Signalisation de Montréal Inc. v. Services de Béton Universels Ltée*, [1993] 1 F.C. 341 (C.A.), *leave to appeal refused*, [1993] S.C.C.A. No. 82 | 123 |
| *Simmons v. Webb* (2008), 54 B.L.R. (4th) 197 (Ont. S.C.J.), *var'd on other grounds*, 2010 ONCA 584, and aff'd, 2011 ONCA 7 | 124 |
| *Siskinds LLP v. Canadian Imperial Bank of Commerce*, 2014 ONSC 3211 | 125 |
| *Site Microsurgical Systems, Inc. v. Cooper Companies, Inc.*, 797 F.Supp. 333, (D. Del. 1992) | 126 |
| *Skye Properties Ltd. v. Wu*, 2010 ONCA 499 | 127 |
| *STC.UNM v. Intel Corp.*, 2014 U.S. App. LEXIS 10524 (Fed. Cir. June 6, 2014) | 128 |
| *StoneEagle Servs, Inc. v. Gillman*, 2014 U.S. App. LEXIS 5510, (Fed. Cir. March 6, 2014) | 129 |

| CASES | TAB NO. |
|---|---|
| *Stubart Investments Ltd. v. The Queen*, [1984] 1 S.C.R. 536 (QL) | 130 |
| *Sungard Recovery Services, Inc. v. Florists Transworld Delivery, Inc.*, 1999 U.S. Dist. LEXIS 17709, (E.D. Pa. Nov. 17, 1999) | 131 |
| *Tercon Contractors Ltd. v. British Columbia (Transportation and Highways)*, [2010] 1 S.C.R. 69 | 132 |
| *The Plan Group v. Bell Canada*, 2009 ONCA 548 | 133 |
| *Thomas Cook Canada Inc. v. Skyservice Airlines Inc.* (2011), 83 C.B.R. (5th) 106 (Ont. S.C.J.) | 134 |
| *Tiny (Township) v. Battaglia*, 2013 ONCA 274 | 135 |
| *Tomko v. Wawanesa Mutual Insurance Co.*, 2007 MBCA 8 | 136 |
| *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205 | 137 |
| *Verdellen v. Monaghan Mushrooms Ltd.*, 2011 ONSC 5820 | 138 |
| *Wade v. Ukeni*, 2014 ONCA 99 | 139 |
| *Waterfall, Economidis, Caldwell, Hanshaw & Villamana, P.C. v. Pima County*, 2004 Ariz. App. Unpub. LEXIS 9, (April 8, 2004), *review denied and ordered depublished*, 209 Ariz. 200 (2004) | 140 |
| *Wiav Solutions LLC v Motorola, Inc.*, 631 F.3d 1257, (Fed. Cir. 2010) | 141 |
| *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3rd Cir. 2012), *cert. denied*, 133 S. Ct. 2025 (2013) | 142 |

| SECONDARY SOURCES | TAB NO. |
|---|---|
| H.G. Fox, *Canadian Law and Practice relating to Letters Patent for Inventions*, 4th ed. (Toronto: Carswell, 1969) | 143 |
| K.M. Garnett, *Copinger and Skone James on Copyright*, 16th ed. (London: Sweet & Maxwell, 2011), Vol. 1 | 144 |

| SECONDARY SOURCES | TAB NO. |
|---|---|
| Jackson R., and Sarra, J.P., "Selecting the Judicial Tool to get the Job Done: An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters," in Sarra, J.P., ed., 2007, Annual Review of Insolvency Law, (Vancouver: ThomsonCarswell, 2007) | 145 |
| T. Terrell, *Terrell on the Law of Patents*, 17th ed. (London: Sweet & Maxwell, 2011) | 146 |

- 1 -

# PART I - OVERVIEW[1]

1.      The CCC represents the primary domestic creditors of the Canadian Debtors, namely pensioners and other current and former employees and their beneficiaries, as well as disabled employees, the administrator of Nortel's Canadian pension plans and the Ontario Pension Benefits Guarantee Fund.  Canadian creditors have an enormous stake in the outcome of this allocation proceeding.  There are close to $3 billion of employee and pension related claims in Canada alone, as well as domestic trade creditor claims.

2.      The CCC's primary position is based on NNL's ownership of the intellectual property pursuant to Nortel's MRDA.  Should the CCC's primary position not be adopted, the CCC proposes an alternative position that provides for a pro rata distribution among all unsecured creditors.

3.      Both of the CCC's positions are based on legal principles recognized in the U.S. and Canada and produce fair and comparable allocation results.  In contrast, the allocation theories of the U.S. Interests and EMEA Debtors are not supportable and lead to unjust and inequitable outcomes.   The allocations proposed by the U.S. Interests and EMEA Debtors grossly overcompensate certain Debtor Estates and Creditors to the detriment of those individuals, including the Canadian pensioners, who dedicated their working lives to Nortel and helped produce the assets that resulted in the approximately $7.3 billion in Sale Proceeds.

## A.      Ownership Allocation

4.      The CCC submits that the Sale Proceeds should be allocated according to ownership of the assets sold.  The Sale Proceeds were principally generated by Nortel's IP, which was transferred in the sales of Nortel's Lines of Business and Nortel's Residual IP remaining after the Lines of Business had been sold.

5.      The ownership of Nortel's IP is defined by the terms of the MRDA, a contract which binds NNL and its principal operating subsidiaries, the Licensed Participants.

---

[1] Capitalized terms not otherwise defined in this brief have the meaning set out in Appendix A. All figures are in U.S. dollars unless otherwise indicated.

- 2 -

6.      The MRDA is governed by Ontario law.  There is no dispute about the legal principles that apply to interpret the MRDA.  It is presumed that the parties to the MRDA intended what they said in the language they used.  The MRDA is to be interpreted as a whole, in a fashion that accords with sound commercial principles and good business sense.

7.      The ownership terms of the MRDA are found in Articles 4 and 5.  Article 4 confers legal ownership of all Nortel IP on NNL.  The ordinary meaning of Article 5 is that NNL, as owner of Nortel's IP, grants Licenses to the Licensed Participants within a defined Field of Use that enables them to make, use and sell Nortel Products by or for Nortel.  This is a straight-forward licensing regime, not a grant of ownership to the Licensed Participants.

8.      The ordinary meaning of the MRDA makes commercial sense and is consistent with the evidence presented at trial.  NNL could not have granted Licenses to the Licensed Participants unless it owned the IP under which the Licenses were granted.  As the parent company of the Licensed Participants, NNL required control of, and did control, the use of all its IP worldwide, as is typical in multinational technology companies like Nortel.

9.      The U.S. and EMEA Debtors acknowledged NNL's ownership of Nortel's IP prior to this allocation proceeding.  When applying for Court approval of the IFSA, the U.S. Debtors represented to the Courts that: "[w]ithin the Nortel Group, NNL is the owner of the vast majority of Nortel's intellectual property assets."[2]  The Joint Administrators for the EMEA Debtors made similar representations in their application for administration in the U.K.: "all intellectual property ("IP") rights belong to NNL, the Canadian company, irrespective of which Group company originally carried out the research and development activity that generated the IP."[3]

10.     The allocation positions and interpretations now put forward by the U.S. Interests and the EMEA Debtors are untenable.  They offend bedrock principles of contract interpretation under Ontario law and make no commercial sense.  They create uncertainty about ownership and IP license rights in a Canadian-based company that was built on R&D and its commercial exploitation.

---

[2] Motion Pursuant to 11 U.S.C. §105(A), §363, § 503 And Fed. R. Bankr. P. 9019 For An Order (A) Approving the Interim Funding And Settlement Agreement, and (B) Granting Related Relief, June 9, 2009, para. 14 (the "IFSA Motion") (TR11366).

[3] Nortel Networks EMEA Companies' Report of Alan Robert Bloom et al. dated January 14, 2009, p. 6, para. 3.3 (the "Bloom Report") (TR31622).

- 3 -

11.     The confusing interpretation of the MRDA argued for by the U.S. Interests depends upon these Courts accepting inadmissible evidence under the guise that it is part of the "factual matrix". The evidence relied upon by the U.S. Interests consists mainly of statements about what people thought the MRDA meant, passing references to its terms in internal correspondence and statements made by various tax employees at various times to revenue authorities. Much of this evidence post-dates the MRDA. None of it qualifies as objective evidence of the circumstances surrounding the formation of the agreement. All of it should be rejected out of hand as inadmissible. Even if admitted, it has no relevance whatsoever to the interpretation of the MRDA under Ontario law. It certainly cannot overwhelm the plain meaning or commercial purpose of Article 4 and 5 of the MRDA.

12.     Because NNL owned all Nortel IP, the only remaining issue of contract interpretation relevant to the allocation question of the Sale Proceeds is the scope of the Licenses. Once value is attributed to the Licenses, the remainder accrues to NNL as the owner of the underlying IP.

13.     Again, uncontroversial principles of Ontario contract interpretation are engaged to resolve this issue. Regard must be had to all the contract terms, particularly the definitions of "Products" and "NN Technology". The Licensed Participants did not have Licenses to all NN Technology within their Exclusive Territories. They had Licenses within a defined Field of Use that enabled them to make, use and sell Nortel Products embodying NN Technology. The Licenses were further limited by the definition of Products, which is limited to products designed, developed or marketed "*by, or for, any of the Participants*." The ordinary meaning of these words is that the Licenses are limited to Nortel IP necessary to make Products for the Participants, being the Nortel companies who were parties to the MRDA.

14.     This interpretation makes commercial sense and accords with sound business practice. There would be no commercial advantage to NNL granting licenses to Participants that extended beyond Nortel Products. Because no product of a third party could fall within the Products definition, the Licenses would be of little or no commercial interest to a third party.

15.     The argument of the U.S. Interests that their right to sub-license somehow permitted NNI to circumvent the prohibition against assignment of the MRDA without the consent of the other Participants so as to create a *de facto* sale of the Licenses is not supported by a plain reading of

the MRDA or by its commercial purpose.  It would be commercially absurd for a business to arrange its affairs in such a manner.

16.     The result is that the Licenses, though clearly valuable in the context of the Nortel business during ordinary course operations, had little to no value at the point when they were terminated by the Licensed Participants in connection with the Sales.

17.     The U.S. Interests' allocation theory is based not only on flawed interpretations of the MRDA but on a false premise about the way Nortel operated.  NNI was not a freestanding entity, or a "silo" business.  The revenues recorded by NNI were generated from the use of IP which it never owned and which it did not primarily develop.  NNI's ability to earn revenue was dependent on a shared R&D effort, over 50% of which emanated from Canada, and significant administrative support provided by Canada and other regions.  Of particular importance to customers were Nortel's Advanced Technology Programs, which were led out of Canada.  NNI was also bound by Nortel's residual profit split methodology ("RPSM"), which required it to share revenue with the MRDA Participants according to the parties' R&D expenditure over the preceding five years.  Nortel's revenues in the U.S. market quite simply never belonged to NNI.

18.     Under the MRDA, the parties agreed that each Participant's RPSM payments were the sole consideration for its R&D contributions.  This is a full answer to the Contribution Theory proposed by the EMEA Debtors.  That an expert can manufacture a different theory on how the parties might divide profits resulting from a shared R&D effort is unremarkable.  But the Courts should not permit one party to come along after the fact and unwind the contribution regime that the parties actually bargained for and codified in the MRDA for themselves.

19.     Allocating the Sale Proceeds according to ownership achieves an equitable outcome.  The contractual terms of the MRDA reflect what the parties themselves saw as the right balance between contribution and reward.  It is not appropriate to now re-write the bargain the parties made.

20.     The theories of the U.S. Interests and EMEA Debtors are not only unprincipled, but are inequitable.  The U.S. Revenue Theory would allocate approximately 10% of the Sale Proceeds to the Canadian Debtors, who must deal with the largest pool of Claims.  The Revenue Theory

would create a solvent U.S. Estate where U.S. creditors who worked at Nortel would reap 100% recoveries, while their colleagues in Canada, with whom they worked side by side to support the same business, would have to cope with minimal recoveries that are bound to cause real hardship.

21.    The theories proposed by the EMEA Debtors are also inadequate.  While claiming to reward "contribution," the EMEA Debtors' expert, Mr. Malackowski, in fact, admits that he did not undertake the kind of detailed tracing exercise that would be required to determine which IP innovators contributed what to Nortel's success, and to value the contribution that others, such as managers, strategists and salespeople, made to the company's success and value.  Furthermore, the EMEA Debtors ignore the RPSM, the singular process by which the Licensed Participants actually agreed to measure – and did in fact measure – their contributions to Nortel's IP.  Instead, they propose an entirely new, *ad hoc* calculation.

22.    Claims that the Ownership Allocation somehow awards disproportionate value to Canada ring hollow.  The U.S. Interests and EMEA Debtors know that any allocation to Canada will be subject to re-allocation back to them and their Creditors across jurisdictions through the claims process.  This is precisely why the U.S. Debtors are so insistent that the Courts not advert to the Claims into each Debtor Estate, though clearly the only point of allocation is to provide each of the Debtor Estates with cash to satisfy Creditors' Claims.

23.    Though NNL was the owner of the IP and should recover the residual value attributed to that ownership interest, it will also bear, among other things, the following burdens:

(a)    $4.2 billion of Guaranteed Bondholder claims, for which it is the primary debtor;

(b)    a $2.0 billion claim by the U.S. Estate, which has been recognized in Canada;

(c)    a $125 million EMEA Estate Claim, which has been recognized in Canada; and

(d)    a claim of the UKPT, which is currently the subject of litigation before the Canadian Court.

24.    In short, most of the Sale Proceeds allocated to the Canadian Estate under the CCC's Ownership Allocation ultimately flow to other Debtor Estates and will be distributed to Creditors

outside of Canada.  All the Core Parties know this and so no weight should be given to complaints that the Ownership Allocation somehow creates a disproportionate outcome that benefits Canada.

**B.      Pro Rata Allocation**

25.      The CCC recognizes the Courts' desire to achieve an outcome that respects the laws of all jurisdictions while achieving equity among the Core Parties, consistent with the evidence adduced at trial.  If the Courts are not inclined to adopt the CCC's Ownership Allocation, the CCC has advanced an alternative theory whereby sufficient Sale Proceeds are allocated to each Debtor Estate such that the Debtor Estates, if they choose to do so, can pay valid senior claims in full and distribute a common dividend to each general unsecured Creditor.  The CCC's Pro Rata Allocation achieves an equitable outcome that is rational and fair.  It takes account of the global circumstances giving rise to this proceeding while preserving the sovereignty of all jurisdictions to use the amount allocated to satisfy claims in accordance with its laws.

26.      The CCC Pro Rata Allocation also accounts for the fact that there is no credible way to now unwind the enormous historical and worldwide effort and equitably trace who "contributed" to the Nortel IP that was sold in the Business Sales or the Residual IP Sale.  Mr. Malackowski acknowledged this upfront in his testimony and his report.

27.      The methodology proffered by the CCC's expert, Thomas Britven, demonstrated that the CCC's Pro Rata Allocation provides a flexible model to calculate a fair allocation amount to the Debtor Estates for distribution to Creditors.  Relying on the models put forward by Mr. Britven, the CCC proposes a practical solution for the Courts to implement a pro rata allocation.

28.      As Mr. Britven's testimony makes clear, the CCC Pro Rata Allocation model can be easily adapted to accommodate changes to anticipated Claims, including if the Courts determine that Bondholders may recover from both the Canadian and U.S. Estates.

29.      The CCC Pro Rata Allocation accords with the evidence that Nortel operated, achieved international success and liquidated its assets Post-Filing as a multinational business enterprise. The CCC Pro Rata Allocation suffers none of the infirmities ascribed to it by the U.S. Interests.

It does not effect substantive consolidation of the Nortel Debtors. It does not eliminate intercompany claims. It respects the legitimate expectations of all Creditors, including the cross-over bondholders. It does not seek or require the divestment by any Debtor Estate of cash and unliquidated assets in its possession. It is simply a means of calculating an allocation amount.

30.    An equitable allocation is and must be a primary goal of these Courts. More than any other decision of these Courts, any determination on allocation will affect the interests of thousands of employees, former employees, suppliers and creditors of Nortel. Any of the proposed allocations will likely have a negative outcome for Canadian employees who spent their careers at Nortel, leaving them with significant pension reductions and losses of health and disability benefits.

31.    In these circumstances, the Courts should strive to avoid extreme outcomes that would unduly favour one Debtor Estate, while impoverishing others, when a more equitable outcome is available. The Courts should not countenance extreme results where the theories put forward by the CCC would lead to an equitable outcome for each of the parties involved. The illustrative outcomes modelled by Mr. Britven demonstrate how the parties' different allocation theories could ultimately affect the stakeholders whose recoveries depend on the outcome of this allocation proceeding:[4]

| | 1<br><br>CCC<br>Ownership | 2<br><br>Canadian<br>Debtors and<br>Monitor | 3<br><br>US<br>Interests | 4<br><br>EMEA Debtors | 5 | 6<br><br>UK<br>Pension<br>Trust | 7<br><br>CCC<br>Alternative<br>Pro Rata |
|---|---|---|---|---|---|---|---|
| | | | | License<br>Approach | Contribution<br>Approach | | |
| **Key Creditor Group** | **Britven** | **Green** | **Kinrich** | **Malackowski/Huffard** | | **Bazelon** | **Britven** |
| Guaranteed Bondholders | 100% | 100% | 100% | 100% | 100% | | 71% |
| US Creditors | 95% | 100% | 100% | 100% | 100% | | 71% |
| Canadian Creditors | 59% | 61% | 11% | 11% | 25% | | 71% |
| EMEA Creditors | 27% | 19% | 48% | 77% | 50% | | 71% |
| UK Pension Trust | 44% | 37% | 51% | 79% | 58% | | 71% |
| Undistributed Cash in NNI | $0 | $111m | $1,304m | $248m | $536m | | $0 |

[4] Rebuttal Report of Thomas Britven dated February 28, 2013, p. 5, Table 1 and Schedule 1 (TR00046).

- 8 -

32.     These indicative outcomes illustrate that there is nothing inequitable about the CCC's proposed allocations of the Sale Proceeds.

33.     Finally, it cannot go unnoticed that at the core of this trial there is a contest between Creditors: on the one hand, pensioners, disabled workers and other former employees of the Nortel Group who have suffered significant losses and, on the other hand, Nortel's note-holder interests.  Pensioners and other former employees in Canada, the U.S., the U.K. and elsewhere worked for the Nortel Group in common cause throughout their careers and, in exchange, were promised benefits and pensions to fund their retirements.  They have waited patiently for over five years for this case to be resolved.  Testimony in this trial revealed that pensioners and former employees have suffered real hardship through reductions in pension and other anticipated health and retirement benefits.

34.     The legal entitlements argued for by the Guaranteed Bondholders stand in contrast to the rights and interests of Nortel's pensioners and former employees.  Unlike them, the Guaranteed Bondholders are "voluntary creditors," most of whom purchased their notes after the Filing Date at a discount to par and stand to reap windfall profits under any allocation theory.  In some instances, the Guaranteed Bondholders purchased when bonds were trading as low as 30 cents on the dollar.  When balancing these interests, the equities clearly favour erring on the side of an allocation that will reasonably protect the expectations of pensioners.

35.     The Courts' allocation decisions must withstand public scrutiny in all jurisdictions, not just from stakeholders who will be directly affected by the outcome, but by the public at large who know that in this global economy this joint allocation proceeding may be the first such proceeding but is unlikely to be the last.  More than any other single theory, the CCC Pro Rata Allocation attempts to achieve a fair and rational outcome that takes account of the global circumstances giving rise to this problem while preserving the sovereignty of the Courts to use the amount allocated to fairly satisfy Claims in each jurisdiction.

# PART II - FACTS

36.   The CCC adopts and relies upon the facts set out in the Monitor's materials, supplemented by the facts set forth in the CCC's "Proposed Findings of Fact and Conclusions of Law", submitted herewith and incorporated by reference in this Brief.

# PART III - OWNERSHIP ALLOCATION

37.   The CCC adopts and relies upon the submissions of the Monitor and Canadian Debtors regarding the interpretation of the MRDA, NNL's ownership of the IP, and the scope of the Licenses held by the Licensed Participants.  For the reasons set out below, the CCC submits that when the assets sold by each Nortel Debtor are appropriately identified and valued, the amount owing to each Debtor Group is as follows:[5]

| Assets ($ in millions) | Canada | US | EMEA |
|---|---|---|---|
| Tangible Assets | 59 | 42 | 68 |
| Intangible Assets | | | |
| • Customer Relationships | 93 | 393 | 197 |
| • IP | 858 | 219 | 66 |
| • Purchaser Goodwill | 427 | 316 | 110 |
| Total Business Sales | 1,438 | 979 | 432 |
| Residual IP Sale | 4,368 | 30 | 57 |
| **Total** | **5,805** | **1,009** | **488** |

## A.   NNL Owned the NN Technology

### 1.   NNL Held Title to the NN Technology

38.   The interpretation of the MRDA is governed by the following principles of Ontario law:

…[A] commercial contract is to be interpreted,

(a) as a whole, in a manner that gives meaning to all of its terms and avoids an interpretation that would render one or more of its terms ineffective;

[5] Primary Report of Thomas Britven dated January 24, 2014, p. 4, Table 1 and Schedule 2.5 (TR00045).

(b) by determining the intention of the parties in accordance with the language they have used in the written document and based upon the "cardinal presumption" that they have intended what they have said;

(c) with regard to objective evidence of the factual matrix underlying the negotiation of the contract, but without reference to the subjective intention of the parties; and (to the extent there is any ambiguity in the contract);

(d) in a fashion that accords with sound commercial principles and good business sense, and that avoid a commercial absurdity.[6]

39.    The goal is to ascertain the "objective intent" of the parties,[7] "at the time of entry into the contract".[8]  The MRDA must therefore be interpreted objectively at the time of contracting, not at some later date based on what may seem to be fair and reasonable to one party then, in different circumstances.

40.    It is clear that the MRDA gave NNL ownership of the IP.  Article 4(a) provides that "legal title to any and all NN Technology whether now in existence or acquired or developed pursuant to the terms of this Agreement shall be vested in NNL".  This created a full and immediate assignment of all NN Technology to NNL, and no Core Party suggests otherwise.

41.    The fact that Article 4(a) vests "legal" title in NNL does not mean that NNL acquired something less than complete IP ownership.  This is evident from both the language of the MRDA and its broader context.

42.    As the Supreme Court of Canada has noted, "the ordinary and grammatical meaning of 'owner' would include the legal titleholder".[9]  Therefore, the reference to "legal" title in Article 4(a) reflects a transfer of ownership.  This is confirmed by Canada's leading patent commentator, who observes that a transfer of "the legal, as distinguished from the equitable, title" to a patent

---

[6] *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205 at para. 24.  See also: *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at para. 63; *Merck & Co v. Apotex Inc.*, 2010 FC 1265 at para. 51-54, *aff'd*, 2011 FCA 363, *leave to appeal refused*, [2012] S.C.C.A. No. 82; and *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at paras. 47-50 and 57-61.

[7] *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at paras. 49, 55 and 57.

[8] *Consolidated Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.*, [1980] 1 S.C.R. 888 at para. 26 (WLeC); *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at para. 52.

[9] *Re Canada 3000 Inc.*, [2006] 1 S.C.R. 865 at para. 44.  See also *Sattva Capital Corp. v. Creston Moly Corp*, 2014 SCC 53 at para. 47 ("[A] decision-maker must read the contract as a whole, *giving the words used their ordinary and grammatical meaning*").

involves "the transfer of a right leaving nothing in the grantor *qua* that right and bestowing on the grantee the whole of the legal interest in that right".[10]

43.    Further, nothing in Article 4(a) suggests an intention to limit NNL's ownership.[11]  As a result, the MRDA conveyed all the rights which the Licensed Participants had in the IP to NNL.[12]

44.    The fact that NNL received all rights to the IP is reflected in the individual assignments of IP made to it pursuant to Article 4(a).  The applicable assignment documentation invariably provided that the "*entire* right, title and interest" in and to the invention and the application was granted to NNL.[13]

45.    Several other provisions of the MRDA also demonstrate NNL's status as the owner of the NN Technology under Article 4(a):

   (a)    NNL "*retains* its exclusive rights" with respect to the NN Technology for Canada, rather than acquiring those rights through a License like the Licensed Participants (Article 1, "Non-Exclusive Territory", as amended);

   (b)    NNL is made the administrator of the MRDA (Article 3(d));

   (c)    NNL has the exclusive right to file and prosecute applications for patents, copyrights and other NN Technology in every country of the world (Article 4(d));

   (d)    NNL's title to the NN Technology continues to vest in it upon expiry or termination of the MRDA or the retirement of any Licensed Participant (Articles 9(c) and 11(e));

---

[10] H.G. Fox, *Canadian Law and Practice relating to Letters Patent for Inventions*, 4th ed. (Toronto: Carswell, 1969) at 284.

[11] Deposition Testimony of Bruce W. Stratton, April 4, 2014, 104:11-16.

[12] See s. 5(3) of the Ontario *Conveyancing and Law of Property Act*, R.S.O. 1990. C. C.34 ("Where no words of limitation are used, the conveyance passes all the estate, right, title, interest, claim and demand that the conveying parties have in, to, or on the property conveyed, or expressed or intended so to be, or that they have power to convey in, to, or on the same").

[13] Affidavit of Angela de Wilton, sworn April 11, 2014, paras. 8-12 (TR00006). See also: Affidavit of Brian McFadden sworn April 10, 2014, para. 26 (TR00004); Deposition Testimony of Eric Philip Jensen, October 8, 2013, 120:13-121:4, 145:15-22; Deposition Testimony of Gillian McColgan, November 8, 2013, 175:10-14; Trial Testimony of Angela De Wilton, May 14, 2014, 743:9-15; Trial Testimony of Angela Anderson, May 29, 2014, 2178:8-14, 2195:8-19.

- 12 -

(e)      NNL has the exclusive power to grant Licenses to new MRDA Participants (Article 10(b));

(f)      the Licensed Participants are required to execute any documents necessary to perfect NNL's title (Article 4(b)); and

(g)      NNL is owed confidentiality and indemnity obligations from the Licensed Participants regarding the NN Technology, but the Licensed Participants are not reciprocally owed such obligations from NNL (Articles 6(a), 6(b) and 7(b)).

46.      Of particular significance here is Article 5(a), by which NNL grants the Licenses to the Licensed Participants.  As a matter of both law and logic, it would be impossible for NNL to grant a License to permit the actual use and exploitation of the NN Technology unless NNL was the full owner of all the rights in the NN Technology.[14]  Further, no Participant other than NNL granted anyone an IP license,[15] and there is no reference to cross-licensing by the Licensed Participants in the MRDA.  That is a clear indication that the parties intended to vest the full bundle of NN Technology rights in NNL.  If each Licensed Participant retained ownership of the NN Technology they created, or rights to its "beneficial use", no other Licensed Participant could make or exploit Nortel Products involving that NN Technology without a cross-license from them, and the MRDA's unitary licensing structure would be unworkable. This would make no sense in the context of Nortel's business.

47.      Finally, the vesting of IP ownership in NNL is reasonable in the factual matrix.  NNL is the parent company of all the Licensed Participants, and was responsible for a significant portion of the Nortel Group's global support activities.[16]  As well, Nortel's R&D efforts, which were the primary driver of Nortel's profit, were based in Canada, with approximately half of all Nortel

---

[14] *Eli Lilly & Co. v. Novopharm*, [1998] 2 S.C.R. 129 at para. 49 ("A license… is a consent by an *owner* of a right").  See also Deposition Testimony of Bruce W. Stratton, April 4, 2014, 134:11-134:18, 135:5-135:14 ("Q. … And if we take that formulation and apply it to the grant of the license in Article 5 of the MRDA, who's filling the role of the owner granting the consent? A. The *NNL is granting the exclusive license* or the nonexclusive license to the other license participants. Q. *As an owner*? A. *Correct*").

[15] Deposition Testimony of Mark Weisz, November 25, 2013, 70:9-13.

[16] Affidavit of Peter Currie sworn April 11, 2014, para. 35 (TR00001); Primary Report of Philip Green dated January 24, 2014, p. 18 (TR00042); Trial Testimony of Angela De Wilton, May 14, 2014, 758:13-24; Trial Testimony of Michael McCorkle, May 15, 2014, Testimony, 811:18-25, 812:23-813:19.

- 13 -

patents originating there.[17]    Indeed, it was Nortel's Ottawa labs that developed the digital switching technology which led to the creation of the modern Nortel, and NNL has been continuously assigned virtually all Nortel IP since the 1970s.[18]

48.    It thus makes commercial sense that NNL would be granted ownership of the NN Technology under the MRDA.[19]    As the head Nortel operating company, NNL required ownership in order to control the use of the NN Technology, settle differences between subsidiaries and licensees, determine the strategic direction of R&D, and enter into licensing and cross-licensing arrangements with third parties.[20]    This centralized IP ownership and licensing structure is typical of other multinational corporate groups,[21] and was also necessary to NNL's ability to enforce the IP against third parties.[22]

49.    Therefore, contrary to the suggestion of other Core Parties,[23] NNL's ownership of the NN Technology should not be disregarded on the ground that it existed for "tax reasons" or "administrative convenience".[24]    Even if this were a basis for ignoring the legal effect of the

---

[17] Affidavit of Angela de Wilton sworn April 11, 2004, paras. 13-14 (TR00006); Affidavit of Brian McFadden sworn April 10, 2014, paras. 15-18, 23, 27-28 (TR00004); Affidavit of Clive Allen sworn April 11, 2014, (TR00002), para. 15; Affidavit of Peter Currie sworn April 11, 2014, paras. 113, 117 (TR00001); Reply Affidavit of Brian McFadden sworn April 25, 2014, paras. 3, 12 (TR00005); Reply Affidavit of Paviter Binning sworn April 24, 2014, para. 7 (TR00015); Reply Affidavit of Sharon Hamilton sworn April 25, 2014, para. 17 (TR00010); Rebuttal Report of Thomas Britven dated February 28, 2014, p. 29, Table 4 (TR00046); Primary Report of Philip Green dated January 24, 2014, p. 23 (TR00042); Rebuttal Report of James Malackowski dated February 28, 2014, p. 40, Table 12 (TR00034); Primary Report of Coleman Bazelon dated January 24, 2014, p. 18 (TR00039); Deposition Testimony of Khush Dadyburjor, October 3, 2013, 41:5-18; Deposition Testimony of Ryan Smith, October 22, 2013, 296:21-297:7; Deposition Testimony of John J. Roese, November 11, 2013, 49:17-21; Deposition Testimony of Gregory Mumford, October 24, 2013, 32:10-18, 100:20-101:14; Deposition Testimony of Ernie Briard, September 26, 2013, 34:24-35:9; 39:12-14; 101:15-24; Deposition Testimony of Darryl Edwards, October 31, 2013, 61:12-18; Trial Testimony of Brian McFadden, May 14, 2014, 635:7-639:13, 649:10-651:3; Trial Testimony of Angela De Wilton, May 14, 2014, 758:13-24; Trial Testimony of Paviter Binning, May 20, 2014, 1061:17-25; Trial Testimony of Walter Henderson, May 20, 2014, 1179:22-1180:3; Trial Testimony of Christopher Ricaurte, May 20, 2014, 1234:8-1237:1; Trial Testimony of Peter Newcombe, May 22, 2014, 1649:16-1650:19; Trial Testimony of Mark David Weisz, May 28, 2014, 1863:10-15, 1899:8-1900:10; Trial Testimony of Paul Huffard, May 28, 2014, 2004:9-2005:22; Trial Testimony of Steven Felgran, June 2, 2014, 2874:23-2875:5; Trial Testimony of Timothy Reichert, June 17, 2014, 3873:21-23, 3923:8-15.

[18] Affidavit of Angela de Wilton sworn April 11, 2004, paras. 8-12 (TR00006); Affidavit of Clive Allen sworn April 11, 2014, paras. 19 (TR00002); Deposition Testimony of Roy MacLean, October 23, 2013, 228:24; 229:2; Trial Testimony of Clive Allen, May 14, 2014, 622:21-623:13.

[19] Deposition Testimony of John Veschi, November 7, 2013, 169:23-170:15.

[20] Affidavit of Clive Allen sworn April 11, 2014, paras. 27 and 35 (TR00002).

[21] Affidavit of Paviter Binning sworn April 10, 2014, para. 10 (TR00014); Trial Testimony of Angela Anderson, May 29, 2014, 2178:15-2179:4.

[22] As one example, if NNI was a co-owner of the IP, it could not be involuntarily joined by NNL in U.S. enforcement actions: *STC.UNM v. Intel Corp.*, 2014 U.S. App. LEXIS 10524, at *2, *12, *15-17 (Fed. Cir. June 6, 2014).

[23] UKPT's Pleading, paras. 37(c) and 42(a); EMEA Debtors' Response, para. 27; U.S. Debtors' Pre-Trial Brief, p. 7, 39, 68.

[24] Trial Testimony of Angela de Wilton, May 14, 2014, 761:22-764:1; Trial Testimony of Walter Henderson, May 20, 2014, 1155:19-1156:12, 1159:19-24; Trial Testimony of Michael Orlando, May 21, 2014, 1333:17-1334:4; Trial Testimony of Mark Weisz, May 28, 2014, 1894:4-1895:22, 1897:14-1898:23; Trial Testimony of Angela Anderson, May 29, 2014, 2195:20-2196:13;

- 14 -

MRDA – which it clearly is not[25] – NNL's ownership of the IP was a deliberate corporate policy.[26]   At the time that the initial CSAs were entered into, NNL's predecessor owned IP that was the product of nearly 100 years of Nortel's Canadian manufacturing experience.[27]

50.     Nor should the MRDA be minimized on the basis that it was a contract between corporate affiliates, as the U.S. Interests and UKPT suggest.[28]   The ownership and licensing structure it created met applicable arm's length transfer pricing standards for tax purposes,[29] and the Licensed Participants made considerable money from that structure by operating their businesses without needing to incur substantial up-front technology costs.   They were also able to generate revenue in reliance on a far larger pool of technology than they could otherwise afford.[30]   Further, there is no legal principle that permits the Courts to disregard an agreement simply because it is between members of a corporate group.[31]   As judges have noted when rejecting similar submissions in the past, "we are concerned not with economics but with law".[32]

---

Trial Testimony of Timothy Reichert, June 17, 2014, 4025:21-4026:11.  For similar reasons, the suggestion in the U.S. Debtors' Pre-Trial Brief, p. 85 that the MRDA should be construed against NNL based on the doctrine of *contra proferentem* is without merit.  The *contra proferentem* doctrine "applies, if at all, only 'when all other rules of construction fail'", and cannot apply in a case like this where the Licensed Participants were sophisticated entities with the opportunity to negotiate changes to the MRDA: *Hillis Oil & Sales Ltd. v. Wynn's Canada Ltd.*, [1986] 1 SCR 57 at para. 17 (QL); *473807 Ontario Ltd. v. TDL Group Ltd.* (2006), 271 DLR (4th) 636 (Ont. C.A.) at para. 65; *Canadian National Railway Co. v. Royal and Sun Alliance Insurance Co. of Canada*, [2008] 3 SCR 453 at para. 33; *Drosophilinks Consulting Inc. v. Canadian National Railway Co.*, 2010 ONSC 3576 at para. 35, *leave to appeal refused*, 2010 ONSC 5156 (Div. Ct.); *Nova Growth Corp. v. Kepinski*, 2014 ONSC 2763 at para. 65.

[25] *Stubart Investments Ltd. v. The Queen*, [1984] 1 S.C.R. 536 at paras. 5 and 22 (QL); *Schmidt v. Air Products Ltd.*, [1994] 2 S.C.R. 611 at para. 70.  See also: Email from Eric Jensen to Mark Weisz, April 12, 2004 (TR11106); and Email from Eric Jensen to Mark Weisz, May 27, 2004 (TR11108).

[26] Affidavit of Clive Allen sworn April 11, 2014, para. 28 (TR00002); Reply Affidavit of Clive Allen sworn April 23, 2014, para. 6 (TR00003).

[27] Affidavit of Clive Allen sworn April 11, 2014, para. 29 (TR00002).

[28] UKPT's Allocation Position, paras. 3(b), 32-38; U.S. Debtors' Pre-Trial Brief, p. 85-86.

[29] Primary Report of Timothy Reichert dated January 24, 2014 (TR00049); Trial Testimony of Aylwyn Kersey Stephens, May 27, 2014, 1766:20-1767:13.  Notably, the commercial maturity and legal autonomy of the Licensed Participants from NNL is repeatedly emphasized in the U.S. Debtors' Pre-Trial Brief, at pp. 18-20, 27-28, 39 85, 90-91, 120.

[30] Affidavit of Clive Allen sworn April 11, 2014, paras. 36-38 (TR00002).

[31] If anything, the fact that the Nortel Debtors were members of the same corporate group when they executed the MRDA suggests that they "must be taken to have intended the meaning of the agreement they drafted": *Grossman Holdings Ltd. v. York Condominium Corp. No. 75* (1999), 124 O.A.C. 318 (C.A.) at para. 14. There is also no evidence that the representatives of the Licensed Participants failed to act in the best interests of their respective companies when approving the MRDA, and corporate fiduciaries "are assumed to act in good faith unless proven otherwise": *Re Stelco Inc.* (2005), 75 O.R. (3d) 5 (C.A.) at para. 76.

[32] *Cunningham v. Hamilton* (1995), 169 A.R. 132 (C.A.) at para. 4.  See also *Martin v. AstraZeneca Pharmaceuticals PLC*, 2012 ONSC 2744 at para. 121, *aff'd*, 2013 ONSC 1169 (Div. Ct.).

- 15 -

2.      **Licensed Participants Had Limited Contractual Rights**

a.      **Overview**

51.     In contrast to NNL, the Licensed Participants did not acquire title to the NN Technology under the MRDA.  Instead, they acquired limited Licenses to make and exploit Nortel Products with Nortel IP inside their respective Territories.  Therefore, any "ownership interests" the Licensed Participants held in the Nortel IP pursuant to the MRDA are contractual and would necessarily be commensurate with those Licenses.

52.     The U.S. Interests, EMEA Debtors and UKPT are incorrect that the second MRDA recital means otherwise,[33] even assuming it was an operative provision, which it is not.[34]  The recital merely provides that the Licensed Participants "*continue… to hold and enjoy*" the "equitable and beneficial ownership of *certain exclusive rights under* NT Technology for a Specified Territory" which they acquired pursuant to the 1992 Cost-Sharing Agreements ("CSAs").  This is clearly just a reference to the exclusive territorial licenses granted to the Licensed Participants by the CSAs, which affirmed NNL's status as the "legal owner of the NT Technology".[35]  This is apparent from the following:

(a)     as with the second recital, Article 5(a)(i) of the MRDA says the Exclusive Licenses to the Licensed Participants are "*continue[d]*", in contrast to the Non-Exclusive Licenses "grant[ed]" in Article 5(a)(ii), which unlike the exclusive ones were not provided by the CSA;[36]

(b)     the second recital refers to ownership of "certain exclusive rights" rather than of the NN Technology itself, which logically means the exclusive CSA licenses; and

---

[33] U.S. Debtors' Response, p. 11; EMEA Debtors' Allocation Position, para. 54; UKPT Response, para. 7.

[34] *Re Elliott Estate*, [1962] O.J. No. 164 (C.A.) at paras. 11 and 13, *aff'd*, [1963] S.C.R. 305; *PUC Distribution Inc. v. Brascan Energy Marketing Inc.*, 2008 ONCA 176 at para. 31, *leave to appeal refused*, [2008] S.C.C.A. No. 217.

[35] See Article 6 of the 1992 CSA (TR21002).  See also the Trial Testimony of Philippe Albert-Lebrun, May 21, 2014, 1503:11-22.  The same reasoning applies to s. 2 of the 2008 Memorandum of Understanding relied on in the UKPT's Response, para. 9.  While other Core Parties also rely upon the statement in Schedule A of the MRDA and the 2nd amendment thereto that "the Participants bear… the risks attendant with the substantial and continuous development and ownership of the NN Technology", the reference here is to all the Participants rather than just the Licensed Participants, so the ownership in question is that of NNL.  The same point applies to the 2nd recital to the 2nd MRDA Addendum, which also does not purport to extend the rights granted under the MRDA but instead refers to "equitable and beneficial ownership of NN Technology *as defined in the MRDA*".  As well, it is not an operative MRDA provision, and is excluded from the MRDA by the entire agreement clause in Article 14(d).  See also the Trial Testimony of Sharon Hamilton, May 15, 2014, 869:16-870:14.

[36] The meaning of the 2nd recital must be ascertained by reading it in the context of the MRDA as a whole: *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at para. 63.

(c)    the second recital refers to the ownership of those exclusive rights "under" rather than "in" the NN Technology, which is indicative of a license.[37]

53.    The Licenses did not grant the Licensed Participants "equitable" or "beneficial" ownership of the NN Technology, as other Core Parties suggest.[38]    The Supreme Court of Canada has repeatedly affirmed that "[u]nder the common law, a licensee does not enjoy property rights", even where it holds an exclusive license like the Licenses here.[39]    Instead, an exclusive license is "contractual",[40] being "a leave to do a thing, and a contract not to give leave to anybody else to do the same thing",[41] and thus "never conveys an interest in property"[42] nor "the full panoply of rights and interests".[43]

54.    That the Licenses are only contractual is confirmed by several provisions of the MRDA:

---

[37] *Insituform Technical Services v. Inliner UK*, [1992] R.P.C. 83 (Ch. D.) at 105 ("I do not agree that a licence is a right *in* a patent; it is a right *under* a patent").

[38] U.S. Debtors' Allocation Position, pp. 11-12; EMEA Debtors' Allocation Position, paras. 50, 53-54, 57, 79; Bondholder Group's Response, paras. 4 and 20; EMEA Debtors' Response, paras. 27, 31, 33; UKPT's Response, paras. 5-16.  These Core Parties also assert that the Licenses gave them an "economic interest" in the IP: U.S. Debtors' Allocation Position, p. 11-13; EMEA Debtors' Allocation Position, paras. 74-75; U.S. Debtors' Response, p. 3, 9-14 and 15-24; EMEA Debtors' Response, para. 34; Bondholder Group's Response, paras. 19-21.  See also the Horst Frisch Report, p. 16 (TR21026) (stating that "*[f]rom an economic standpoint, each R&D cost sharing participant could be considered to 'own' the NT Technology as it related to its specific region*").  However, as noted in *Citicorp Trustee Co. Ltd. v. Barclays Bank Plc*, [2013] EWHC 2608 (Ch. D.) at paras. 101 and 114, "*The expression 'economic interest' is too vague and will give great hostages to fortune and lead to uncertainty*".  Further, economic ownership in the transfer pricing tax context merely reflects an entitlement to a defined income stream: Trial Testimony of Dr. Timothy Reichert, June 17, 2014, 3829:18-3832:22.

[39] *Euro-Excellence Inc. v. Kraft Canada Inc.*, [2007] 3 S.C.R. 20 at paras. 26-27.  The U.S. Debtors' Pre-Trial Brief at p. 125, footnote 438 suggests that ownership of the IP is determined by the law of the jurisdiction where the IP is registered.  However, they cite no cases for this principle, only for the different proposition that the transferability of and standing to enforce IP is governed by the laws of its registration jurisdiction: see p. 94 and p. 125, footnote 438.  Under Canadian conflict of laws principles, the question of who *owns* a foreign patent as between two contracting parties is determined by the law of the contract: see *Verdellen v. Monaghan Mushrooms Ltd.*, 2011 ONSC 5820 at paras. 1 and 27-31 (applying Ontario law to determine ownership of foreign patents).  Similarly, under federal U.S. conflict of laws principles, "[T]he question of who *owns* the patent rights and on what terms typically is a question exclusively for state courts," *StoneEagle Servs v. Gillman*, 2014 U.S. App. LEXIS 5510, at *8 (Fed. Cir. Mar. 26, 2014), and "the interpretation of patent *license* contracts is generally governed by state law." *Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 284 F.3d 1323 1328 (Fed. Cir. 2002).  Given the Ontario choice of law clause in Article 14(f) of the MRDA, Ontario is the "state" law here: *International Nutrition Co. v. Horphag Research Ltd.*, 257 F.3d 1324, 1329-1330 (Fed. Cir. 2001); *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336, 1341 (Fed. Cir. 2001), *cert. denied*, 535 U.S. 906 (2002).  Ontario law therefore governs both the interpretation of the Licenses and the extent to which they did or did not confer ownership of the NN Technology.

[40] *Euro-Excellence Inc. v. Kraft Canada Inc.*, [2007] 3 S.C.R. 20 at paras. 26-27.

[41] *Electric Chain Co. of Canada v. Art Metal Works Inc.*, [1933] S.C.R. 581 at para. 29 (WLeC), *leave to appeal refused*, [1933] S.C.R. ix (P.C.); *Armstrong Cork Canada v. Domco Industries Ltd.*, [1982] 1 S.C.R. 907 at paras. 15 and 28 (WLeC).

[42] *Id.*

[43] *Euro-Excellence Inc. v. Kraft Canada Inc.*, [2007] 3 S.C.R. 20 at para. 16.

(a)     Article 13 provides that the MRDA does not create a fiduciary relationship, as would be the case if NNL held the NN Technology "beneficially" for the Licensed Participants, e.g., as a trustee;

(b)     the second recital refers to beneficial ownership of *rights*, not ownership, in the *technology* itself, indicating that the Licensed Participants had beneficial rights in their Licenses;

(c)     the seventh recital expresses the parties' intent to enter into a "license agreement", Article 1(e) defines the "Exclusive License" in Article 5(a)(i) as an "exclusive license" rather than an ownership right, the Licensed Participants are defined in Article 1(g) as "Licensed Participants" rather than beneficial owners, and Article 5 is entitled "Grant of Licenses" rather than grant of ownership;

(d)     Article 4(a) grants the Licenses "in consideration" for the NN Technology, which is the language of a contract rather than a beneficial property grant;

(e)     the Licenses are described as being perpetual, yet there would be no need for any temporal rights if the Licensed Participants beneficially owned the NN Technology;

(f)     the restrictions in the MRDA on the Licensed Participants' uses of the NN Technology, such as the confidentiality obligations in Article 6, would not be present if they were beneficial owners, or would have at least applied reciprocally to NNL;

(g)     on termination/expiry of the MRDA or an elective/forced retirement from it, the Licensed Participants do not recover their NN Technology but only a license or payment under Articles 9(b) and 11(d), whereas NNL's ownership rights survive regardless of the reason for termination under Article 9(c);

(h)     the rights granted to new MRDA Participants do not include ownership of the NN Technology but merely an "Exclusive License", pursuant to Article 10(b); and

- 18 -

(i)      the overall scheme of the MRDA, in which each Licensed Participant transfers its
         NN Technology to NNL in exchange for the exclusive right to make and exploit
         Nortel Products in its Territories, is indicative of a license relationship.

55.      The U.S. Interests and EMEA Debtors rely heavily upon extrinsic evidence to qualify the
wording of the MRDA, including declarations of subjective intent[44] and regulatory filings that
post-date the principal sections of the MRDA at issue.[45]   This is not admissible evidence of the
factual matrix, and is contrary to the proper approach to contractual interpretation.   As the
Supreme Court of Canada recently clarified in *Sattva*:

> …[C]ontractual interpretation… directs courts to have regard for the surrounding
> circumstances of the contract — often referred to as the factual matrix — when
> interpreting a written contract…
>
> …
>
> While *the surrounding circumstances* will be considered in interpreting the terms of a
> contract, they *must never be allowed to overwhelm the words of that agreement (Hayes
> Forest Services*, at para. 14; and Hall, at p. 30). The goal of examining such evidence is
> to deepen a decision-maker's understanding of the mutual and objective intentions of the
> parties as expressed in the words of the contract. *The interpretation of a written
> contractual provision must always be grounded in the text and read in light of the entire
> contract* (Hall, at pp. 15 and 30-32). While the *surrounding circumstances* are relied
> upon in the interpretive process, *courts cannot use them to deviate from the text such that
> the court effectively creates a new agreement (Glaswegian Enterprises Inc. v. B.C. Tel
> Mobility Cellular Inc.* (1997), 101 B.C.A.C. 62).
>
> *The nature of the evidence that can be relied upon under the rubric of "surrounding
> circumstances"* will necessarily vary from case to case. It does, however, have its limits.
> It *should consist only of objective evidence of the background facts at the time of the
> execution of the contract (King*, at paras. 66 and 70), *that is, knowledge that was or
> reasonably ought to have been within the knowledge of both parties at or before the date
> of contracting.* …[46]

56.      The Ontario Court of Appeal made the same point in *Browne*:

---

[44] U.S. Debtors' Pre-Trial Brief, pp. 42-44 and 101-104; EMEA Debtors' Pre-Trial Brief, pp. 46-49.

[45] U.S. Debtors' Response, pp. 3, 10-11, 15-17; U.S. Debtors' Pre-Trial Brief, pp. 44-46 and 104-109; EMEA Debtors' Response, para. 28; EMEA Debtors' Pre-Trial Brief, pp. 56-57; Bondholder Group's Pre-Trial Brief, pp. 11-12.

[46] *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at paras. 46 and 57-58, *emphasis added*.  See also: *Coventree Inc. v. Lloyds Syndicate 1221 (Millenium Syndicate)*, 2012 ONCA 341 at para. 17, *leave to appeal refused*, [2012] S.C.C.A. No. 276 ("The court's search for the intention of the parties may be aided by reference to the surrounding circumstances or *factual matrix at the time of the negotiation and execution of the contract, as viewed objectively by a reasonable person*").

- 19 -

While the scope of the factual matrix is broad, it excludes evidence of negotiations, except perhaps in the most general terms, and evidence of a contracting party's subjective intentions: Geoff R. Hall, Canadian Contractual Interpretation Law, 2d ed. (Markham: LexisNexis, 2012), at p. 27. As the cases above suggest, *the factual matrix includes only objective facts known to the parties at or before the date of the agreement*, and what is common to both parties: Hall, p. 30. … [47]

57.     Therefore, the post-MRDA filings relied on by the Licensed Participants cannot be used to interpret the contract as part of the factual matrix.  That is particularly so since the MRDA unambiguously states that the Licensed Participants acquired Licenses to the IP rather than ownership of it, and provides that it is the "entire agreement" in Article 14(d).[48]  As Newbould J. said in *Thomas Cook*:

The receiver also contends that the clause gave the former shareholders the right to have an input as to what KPMG was to do, which the receiver says later occurred, but were not given the right after KPMG had done its review to say that they had to agree on the EBITDA calculation. *What happened after the Amalgamation Agreement took place cannot be considered part of the factual matrix* and would only be admissible if there were an ambiguity. …[49]

58.     Nor are the subjective impressions of the Licensed Participants' witnesses relevant to the interpretation of the MRDA.  As Brown J. accepted in *Siskinds*:

In sharp contrast with civil legal systems the common law adopts a largely objective theory to the interpretation of contracts. *The purpose of the interpretation of a contract is not to discover how the parties understood the language of the text*, which they adopted. *The aim is to determine the meaning of the contract against its objective contextual scene.* …[50]

---

[47] *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862 at para. 71, *leave to appeal refused*, [2013] S.C.C.A. No. 68, *emphasis added*.  See also: *Drosophilinks Consulting Inc. v. Canadian National Railway Co.*, 2010 ONSC 3576 at para. 31, per Newbould J., *leave to appeal refused*, 2010 ONSC 5156 (Div. Ct.) at para. 13 ("*Generally the factual matrix which is admissible does not include evidence of negotiations*"); and *Coventree Inc. v. Lloyds Syndicate 1221 (Millenium Syndicate)*, 2012 ONCA 341 at para. 17, *leave to appeal refused*, [2012] S.C.C.A. No. 276 ("The court's search for the intention of the parties may be aided by reference to the surrounding circumstances or *factual matrix at the time of the negotiation and execution of the contract, as viewed objectively by a reasonable person*").

[48] *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at para. 55.  See also *Barclays Bank PLC v. Devonshire Trust (Trustee of)* (2011), 82 C.B.R. (5th) 159 (Ont. S.C.J.) at para. 55, per Newbould J., aff'd, 2013 ONCA 494, *leave to appeal refused*, [2013] S.C.C.A. No. 374 ("While evidence of the factual matrix is generally admissible and relevant to the construction of a contract, extrinsic evidence as to the meaning of a contract is inadmissible unless there is an ambiguity").

[49] *Thomas Cook Canada Inc. v. Skyservice Airlines Inc.* (2011), 83 C.B.R. (5th) 106 (Ont. S.C.J.) at para. 24.  See also: *Arthur Andersen Inc. v. Toronto-Dominion Bank* (1994), 17 O.R. (3d) 363 (C.A.) at para. 10 (QL), *leave to appeal refused,* [1994] S.C.C.A. No. 189; and *Oceanic Exploration Co. v. Denison Mines Ltd.* (1999), 127 O.A.C. 224 (C.A.) at para. 45.

[50] *Siskinds LLP v. Canadian Imperial Bank of Commerce*, 2014 ONSC 3211 at para. 40, *emphasis added*.

59.     The Supreme Court of Canada recently confirmed in *Sattva* that extrinsic evidence cannot be used to "add to, subtract from, vary, or contradict a contract that has been wholly reduced to writing", and that the parol evidence rule "precludes, among other things, evidence of the subjective intentions of the parties".[51]   Therefore, "[t]he contractual intent of the parties is to be determined by reference to the words they used in drafting the document".[52]

60.     Further, there is extrinsic evidence before the Courts which contradicts the evidence cited by the U.S. Interests and EMEA Debtors.  Numerous witnesses stated that the MRDA gave NNL ownership of the IP,[53] and the parties made several post-MRDA filings – such as pleadings in IP enforcement actions which NNI brought, joining NNL as a party – that identified the owner of the IP as NNL.[54]   As discussed above, the U.S. Debtors and EMEA Debtors admitted that NNL is the owner of Nortel's IP. [55]  Given this record, the Courts should interpret the MRDA based on the wording of the contract itself, not selective extrinsic evidence.[56]   It is precisely because of such concerns over the unreliability of the extrinsic evidence that the parol evidence rule exists:

> … The *purpose of the parol* evidence rule is primarily to achieve finality and certainty in contractual obligations, and secondarily to *hamper a party's ability to use fabricated or unreliable evidence to attack a written contract…*

---

[51] *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 59.  See also: *Indian Molybdenum Ltd. v. The King*, [1951] 3 D.L.R. 497 (S.C.C.) at 502; *Forest Hill Real Estate Inc. v. Harvey Kalles Real Estate Ltd.*, 2010 ONCA 884 at para. 10; and *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862 at para. 71, *leave to appeal refused*, [2013] S.C.C.A. No. 68 ("[W]hile *the factual matrix* can 'be used to clarify the parties' intentions as expressed in a written agreement, it *cannot be used to contradict that intention, create an ambiguity which otherwise does not exist in the written document, or have the effect of making a new agreement*'… Ultimately, the words of the agreement are paramount").

[52] *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at para. 54.  See also *Re Unique Broadband Systems, Inc.*, 2014 ONCA 538 at para. 85 ("The subjective intent of one party to a contract 'has no independent place' in interpreting contractual provisions").

[53] Affidavit of Sharon Hamilton sworn April 11, 2014, para. 34 (TR00009); Reply Affidavit of Brian McFadden sworn April 25, 2014, paras. 5-6 (TR00005); Deposition Testimony of Mark Weisz, November 25, 2013, 70:7-70:8; Deposition Testimony of John Doolittle, December 5, 2013, 161:12-21; Deposition Testimony of Giovanna Sparagna, December 10, 2013, 206:24-207:4; Deposition Testimony of John Ray, December 13, 2013, 87:4-14; Trial Testimony of Sharon Hamilton, May 15, 2014, 895:11-23; Trial Testimony of Paviter Binning, May 20, 2014, 1066:14-23; Trial Testimony of Walter Henderson, May 20, 2014, 1156:21-1159:2; Trial Testimony of Aylwyn Stephens, May 27, 2014, 1789:4-1790:7; Trial Testimony of Mark Weisz, May 28, 2014, 1889:21-1891:13; Trial Testimony of Philip Green, June 5, 2014, 3118:8-23; Trial Testimony of Philip Green, June 6, 2014, 3349:4-3350:1; Trial Testimony of Mark Berenblut, June 16, 2014, 3651:25-3653:13; Trial Testimony of Timothy Reichert, June 17, 2014, 3859:11-3862:5.

[54] Deposition Testimony of Bruce W. Stratton, April 4, 2014, 107:19-114:14; Original Complaint for Patent Infringement, April 17, 2006, paras. 7-12 (TR11158); Letter from E&Y to Tom Ralph, April 26, 2004 (TR21031); Trial Testimony of Lorraine Eden, June 24, 2014, 5063:11-5065:24.

[55] IFSA Motion, para. 14 (TR11366); Bloom Report, para. 3.3 (TR31622).  See also: Trial Testimony of John Ray, May 21, 2014, 1452:9-1453:9.

[56] *Commercial Alcohols Inc. v. Suncor Energy Products Inc.* (2006), 17 B.L.R. (4th) 86 (Ont. S.C.J.) at para. 23, *aff'd*, 2008 ONCA 261.

*The parol evidence rule does not apply to preclude evidence of the surrounding circumstances.* Such evidence is consistent with the objectives of finality and certainty because it is used as an interpretive aid for determining the meaning of the written words chosen by the parties, not to change or overrule the meaning of those words. *The surrounding circumstances are facts known or facts that reasonably ought to have been known to both parties at or before the date of contracting; therefore, the concern of unreliability does not arise.*[57]

61.    Even if the Licenses did grant beneficial or equitable interests in the IP, which is denied, the scope of what they granted is necessarily circumscribed by the terms of the License grants in the MRDA.  As the Supreme Court of Canada accepted in *Eli Lilly*:

A licence, *even though exclusive*, does not give the licensee all the rights of the patentee. … *The licensee's rights*, however, are not necessarily equivalent to those of the patentee; rather, they *are limited to, and qualified by, the express terms of the licence*.[58]

62.    For the reasons below, the limited scope of the Licenses means that whatever rights they created had little value in the context of the Sales.

### b.    Licenses Were Limited to a Field Of Use

63.    Contrary to the position of the U.S. Interests, the Licenses did not grant the Licensed Participants "all valuable rights" to the IP in their Exclusive Territories, such that NNL's only claim to the IP was through its ownership of the Licensed Participants' "equity".[59]  Instead, the Licenses granted under the MRDA were limited to a specific Field of Use, and NNL retained direct ownership of all IP rights which fell outside that Field of Use.[60]

64.    The License grant in Article 5(a)(i) provides:

[5](a) To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby:

(i) continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, *rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for*

---

[57] *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at paras. 59-60, *emphasis added*.

[58] *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at para. 49, *emphasis added*.  See also: Deposition Testimony of Dan Bereskin, March 27, 2014, 46:17-48:3.

[59] U.S. Debtors' Pre-Trial Brief, p. 2, 17 and 89-90.

[60] Deposition Testimony of Dan Bereskin, March 27, 2014, 51:3-5 ("Q … Whatever the licensor doesn't grant to a licensee, it holds those rights? A. Correct").

- 22 -

that Licensed Participant, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefore, and technical know-how, *as necessary or appropriate in connection therewith* ("Exclusive License");[61] [*emphasis added*]

65.    Critically, the Licenses only permitted the Licensed Participants in their Territories to make and exploit "Products" using and embodying NN Technology, and such other rights to IP as are necessary or appropriate in connection with the making and exploitation of those "Products".[62]  This imposes a significant limitation upon the scope of the grant, since "Products" are defined in Article 1(l) as follows:

> [1](g) "Products" shall mean all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time *by, or for, any of the Participants*, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing. [*emphasis added*]

66.    Accordingly, the only "Products" that can be made or exploited with Nortel IP are those that have been created or marketed by or for "the Participants".  This means the Products must have been created or marketed by or for the *Nortel Group*, as is apparent from the following:

    (a)    "Participants" is defined immediately before the recitals to mean the six Nortel entities who are the parties to the MRDA;

---

[61] The Non-Exclusive License grant in Article 5(a)(ii) is virtually identical to this Exclusive License grant, apart from providing that it "grants to each Licensed Participant… a non-exclusive, royalty-free license".

[62] Deposition Testimony of Bruce W. Stratton, April 4, 2014, 67:7-20, 73:15-20.  The U.S. Debtors' Pre-Trial Brief, p. 90, suggests that the term "including" near the outset of Article 5(a)(i) means that all of the words which follow it are illustrative of the License grant only, and do not exhaust the scope of the grant.  This is an incorrect reading.  First, the word "including" may be exhaustive depending on its context: *Dilworth v. New Zealand Commissioner of Stamps*, [1899] A.C. 99 (P.C.) at 105; *R. v. Loblaw Groceteria Co. (Manitoba)*, [1961] S.C.R. 138 at paras. 11 and 18 (WLeC); *Re Canada 3000 Inc.*, [2006] 1 S.C.R. 865 at para. 47; *Cochrane v. Ontario*, 2008 ONCA 718 at para. 52, *leave to appeal refused*, [2009] S.C.C.A. No. 105. Second, the dual commas before and after the phrase "including the right to sublicense" show that the word "including" relates solely to the right to sublicense, and does not modify the remaining terms of the grant.  Were it otherwise, then the words "which except as hereinafter provided shall be in perpetuity" would have to be read as though they related to the sublicense rather than the License as a whole, which is plainly contrary to the U.S. Debtors' characterization of the Licenses as "perpetual".  Third, the reason the parties inserted a provision stating that the Licenses included the right to sub-license is that such a right will not exist unless it is provided for in the license itself: *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at para. 50.  Therefore, provisions "including the right to sublicence" are a common feature of IP licenses: *Rothmans, Benson & Hedges Inc. v. Imperial Tobacco Ltd.* (1991), 42 F.T.R. 68 (T.D.) at para. 5 (WLeC), *aff'd*, [1993] F.C.J. No. 135 (C.A.); *Eli Lilly and Co. v. Apotex Inc.*, [1996] F.C.J. No. 425 (C.A.) at para. 19, *rev'd on other grounds*, [1998] 2 S.C.R. 129. Fourth, the U.S. Debtors' position would create considerable uncertainty, since the parties would not know the scope of the License grant.  A contractual interpretation that promotes uncertainty is to be avoided: *Oceanic Exploration Co. v. Denison Mines Ltd.* (1999), 127 O.A.C. 224 (C.A.) at para. 37-38; *The Plan Group v. Bell Canada*, 2009 ONCA 548 at para. 31; *Skye Properties Ltd. v. Wu*, 2010 ONCA 499 at para. 101.

(b)    Article 10(a) states that a party may only join the MRDA as a "Participant" if it is an "Eligible Party", which Article 1(c) defines as an "Affiliate of NNL" within the meaning of Article 1(a); and

(c)    Articles 11(b) and 11(c)(ii) state that an LP "will automatically be terminated from participation in this Agreement", and hence no longer be a "Participant", if it ceases to be an NNL Affiliate.

67.    In other words, "Participants" means Nortel Group members who are parties to the MRDA, and "Products" created or marketed by or for "Participants" mean products that at any given time are part of the business of Nortel.  No product that was part of a third party's business rather than the business of Nortel could fall within this definition.[63]

68.    This is consistent with the factual matrix and the MRDA as a whole.  As is apparent from its title – the "Master *R&D* Agreement" – the MRDA is designed to create an arm's length allocation of the Nortel Group's residual profits *based on each Participant's R&D contributions to "Nortel Products"*.  The recitals to the MRDA and the definition of "R&D Activity" in Article 1(m) make this clear:

> WHEREAS each Participant bears the full entrepreneurial risks and benefits *for the Nortel Networks business*;
>
> WHEREAS each Participant has performed, in the past, and intends to continue to perform *R&D Activity with respect to the Nortel Products*;
>
> WHEREAS each Participant desires to avoid the duplication of R&D Activity;
>
> WHEREAS each Participant believes that it is appropriate that *each Participant should benefit from its contribution to R&D activity commensurate with the value of its contribution to that R&D activity* in the context of the manner in which the Nortel Networks business is conducted and that the residual profit split methodology (RPSM) is the best arm's length measure, in the circumstances of NNL and the Participants, of such contributions with reference to such benefits;

---

[63] The U.S. Debtors' Pre-Trial Brief, p. 97-98 argues that the words "any time" in the definition of "Products" means that "anything that might be 'designed [or] developed' or 'proposed to be designed [or] developed' at 'any time' would be covered". However, the requirement that the product be designed or developed by or for a "Participant" means that, regardless of when it is designed or developed, it must still be by or for a Nortel affiliate.  Similarly, the fact that Article 5(a) grants the License rights in "perpetuity" only means that the right to make Nortel Products exists in perpetuity (subject to the termination provisions in Articles 9 and 11 of the MRDA).  It does not extend the scope of the License to non-Nortel Products.

…

[1] As used herein:

…

> (m) *"R&D Activity" shall mean* all research and development activity (determined in accordance with US GAAP) performed *by, or for, any Participant* including, without limitation, development of *Products* and methods, processes, procedures and tools related to manufacturing, installation, operation, interoperability, maintenance and use of *Products*. [*emphasis added*]

69.     It would make no commercial sense for the MRDA to grant the Licensed Participants Licenses that extended beyond Nortel Products.  The purpose of the License grant within the overall scheme of the MRDA was to incentivize the Licensed Participants to carry out "R&D Activity" in their Territories – i.e., research and development performed by or for any Nortel "*Participant*" with respect to "*Nortel Products*" for the benefit of the "*Nortel Networks business*" – in exchange for payments under the RPSM and access to Nortel's global IP portfolio.[64]   As Articles 2(a) and 3(a) provide:

> [2](a) *Each Participant hereby agrees to use it best efforts to perform R&D Activity* at a level consistent with past practices and the ongoing needs of the Nortel Networks business *for its respective Territory*.
>
> …
>
> [3](a) *For and as a consequence of the performance of R&D Activity, each Participant shall be entitled to receive a payment* in an amount equal to the allocation determined *under the RPSM* (the "R&D Allocation") as the measure of the benefit to which it is entitled commensurate with its performance of, and contribution to, R&D Activity. [*emphasis added*]

70.     The same point is reflected in Article 6(d), which creates an exception to the Licensed Participants' confidentiality duties regarding suppliers, but only as necessary to make and install *Products*:

> [6](d) Notwithstanding the foregoing, each Participant shall have the right:
>
> (i) to communicate relevant portions of the NN Technology to suppliers in all countries of the world *reasonably necessary for, and solely for*, the procurement by such

---

[64] Trial Testimony of Timothy Reichert, June 17, 2014, 3874:20-3875:17.

Participant of commercially available materials and parts for *use in the manufacture and/or installation of the Products*; … [*emphasis added*]

71.     If the Licenses were intended to do more than encourage the Licensed Participants to maximize R&D Activity for Nortel Products in their Territories, the MRDA would not have been limited to the Nortel Residual Profit Entities ("RPEs"), who performed virtually all of Nortel's R&D.[65]  Instead, it would have included the remaining Nortel entities who performed non-R&D activities like distribution.  But as Schedule A to the MRDA states:

> *Other Nortel Affiliates that are not signatories to the Agreement* and that have signed (or will sign) a distribution agreement with NNL ("Nortel Distribution Entities") generally are the least complex entities in the Nortel group of companies. They *do not perform R&D Activity*, and generally perform routine activities. …[66] [*emphasis added*]

72.     Against this backdrop, the parties would have drafted Article 5(a) very differently if they had intended the Licensed Participants to receive unlimited licenses to NN Technology.   In particular, they would have stated that the Licenses extended to the same matters vested in NNL under Article 4(a), i.e., "any and all NN Technology whether now in existence or acquired or developed pursuant to the terms of this Agreement".[67]  The fact that the MRDA is not framed in these terms, but in a way which only extends the Licenses to Participant Products, shows that Licensed Participants were not intended to have any rights beyond making and exploiting Nortel's own business products.  Such Field of Use limitations within granting clauses are a common feature of IP license agreements.[68]

73.     Contrary to the position of the U.S. Interests, the second arm of the License grant – i.e., "all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefore, and technical know-how, as necessary or appropriate in connection therewith" – does

---

[65] See also Article 1(b), which premises the eligibility requirements for any NNL Affiliate's admission into the MRDA under Articles 1(c) and 10(a) upon its R&D spending meeting a threshold level for the preceding 3 years (TR21003).

[66] The centrality of R&D Activity to the Licenses is also apparent from Article 11(c)(i), which automatically terminates Licensed Participants for failure to perform R&D Activity (TR21003).

[67] See also: Trial Testimony of Walter Henderson, May 20, 2014, 1156:4-11.

[68] Deposition Testimony of Dan Bereskin, March 27, 2014, 47:22-48:3, 48:17-20.  See also: *Int'l Gamco, Inc. v. Multimedia Games, Inc.*, 504 F.3d 1273, 1275, 1279 (Fed. Cir. 2007); *Nat'l Wastewater Sys. v. Smith*, 2011 U.S. Dist. LEXIS 47554, at *10, n. 3 (W. D. Okla. May 3, 2011); *Bluestone Innovations LLC v. Nichia Corp.*, 2013 WL 1729814, at *1, *5 (N.D. Cal. Apr. 22, 2013).

not expand the Field of Use.  Instead, the second arm merely extends the grant to IP that is "necessary or appropriate in connection" with the making and exploitation of Nortel Products. [69]

74.    This is not rendered meaningless by the fact that the first arm already references "patents, industrial designs, copyrights and applications thereof [and] technical know-how" through its reference to Products "using or embodying NN Technology", since that is not a grant of any license to use that IP itself.  Rather, the words "using or embodying" are words of limitation that ensure that the Licenses are confined to making and selling Products that fall within the rights that NNL owns.  After all, NNL could not grant rights to Licensed Participants to create and exploit Products with rights it did not have.  The NN Technology reference in the first arm was therefore an additional limitation to the requirement that the Products be designed, developed, manufactured or marketed by or for a Participant.  The second arm goes beyond this by creating a user right in IP itself (as opposed merely to making and exploiting Products using or embodying it), though as noted, the use of that IP is limited to what is necessary or appropriate in connection with the making and exploitation of Nortel Products.

75.    In summary, the scope of the Licenses is limited by a carefully circumscribed Field of Use.  This has two important consequences for the allocation analysis:

(a)    The Licenses only allowed the Licensed Participants to make and exploit Products of the Nortel Group with Nortel IP.  The Licenses could not be used by a third party to make and exploit its own products.

(b)    To the extent that IP was never used to make or exploit any Product, that IP was not licensed to the Licensed Participants at all. Approximately 59-66% of the IP sold in the Residual IP Sale fell into this category,[70] consisting of patents held for defensive/strategic reasons rather than use and embodiment in Nortel Products.[71]

---

[69] Deposition Testimony of Bruce W. Stratton, April 4, 2014, 148-151.

[70] Primary Report of Thomas Britven dated January 24, 2014, para. 6.63 (TR00045); Primary Report of Mark Berenblut and Alan Cox dated January 24, 2014, para. 50 (TR00047); Deposition Testimony of Gillian McColgan, November 8, 2013, 141:18-24. See also: Trial Testimony of Sharon Hamilton, May 15, 2014, 1009:5-1010:6.

[71] Deposition Testimony of George Riedel, October 10, 2013, 134:11-136:6; Deposition Testimony of John J. Roese (Vol. 2), November 12, 2013, 227:13-25, 228:1-14; Deposition Testimony of Gillian McColgan, November 8, 2013, 59:6-18; Trial Testimony of Brian McFadden, May 14, 2014, 700:24-703:24, 704:18-22; Primary Report of Thomas Britven dated January 24, 2014, para 6.63 (TR00045).

### c.    Licenses Were Only Enforceable in the Field Of Use

76.    The Field of Use also limited the Licensed Participants' ability to enforce the Licenses against third parties.  While the U.S. Interests rely upon Article 4(e) of the MRDA to argue that "only NNI had any right to enforce the patents in the United States",[72] U.S. and Canadian jurisprudence confirms that such provisions are *inter partes* contractual covenants that do not confer any standing rights in the courts.[73]  Article 4(e) could not enlarge the Licensed Participants' enforcement rights beyond those arising from the License grant in Article 5(a)(i), so they were limited to the Field of Use, to the extent that the grants of the IP rights therein were exclusive.[74]

77.    Accordingly, the Licensed Participants did not possess all substantial rights to the IP within their Exclusive Territories as the U.S. Interests allege, but only had standing to enforce the Licenses "within the area of exclusivity" and limited by the Field of Use.[75]  That area of exclusivity was limited in a variety of ways.

78.    *First*, although the Licensed Participants had an exclusive right to create and exploit Nortel Products, their rights were not exclusive as to using the patents which could be used for other purposes.  In this respect, the Licensed Participants' rights in the patents and other IP were non-exclusive.  Accordingly, since the right to sue for patent infringement in the U.S. is premised on having exclusivity in the asserted patent, NNI would have had no standing right to sue third parties for patent infringement based merely on its right to make and exploit Products with Nortel IP.

---

[72] U.S. Debtors' Pre-Trial Brief, p. 93.

[73] *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1381 (Fed. Cir. 2000); *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1342 (Fed. Cir. 2007); *Century 21 Canada Limited Partnership v. Rogers Communications Inc.*, 2011 BCSC 1196 at paras. 176-179; *Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1169 (9th Cir. 2013).

[74] *Independent Wireless Telegraph Co. v. Radio Corp. of America*, 269 U.S. 459 (1926); *Site Microsurgical Sys., Inc. v. Cooper Cos., Inc.*, 797 F.Supp. 333, 337 (D. Del. 1992); *Amgen, Inc. v. Chugai Pharmaceutical Co.*, 808 F. Supp. 894, 899, 901 (D. Mass. 1992; *Wiav Solutions LLC v Motorola, Inc.*, 631 F.3d 1257, 1266-1267 (Fed. Cir. 2010). See also: Rebuttal Report of Dan Bereskin dated February 28, 2014, para. 35; Rebuttal Report of Bruce Stratton dated February 28, 2014, para. 43 (TR11446).  For this reason, the U.S. case law the U.S. Debtors cite at p. 94-97 of their Pre-Trial Brief is of little relevance, since the scope of their enforcement rights depends upon the interpretation of the Ontario-law governed Field of Use.

[75] *Site Microsurgical*, 797 F.Supp. at 337; see also *Amgen*, 808 F. Supp. at 901; *Signalisation de Montréal Inc. v. Services de Béton Universels Ltée*, [1993] 1 F.C. 341 (C.A.) at para. 24 (QL), *leave to appeal refused*, [1993] S.C.C.A. No. 82; *Amfac Foods Inc. v. Irving Pulp & Paper, Ltd.* (1984), 80 C.P.R. (2d) 59 (F.C.), at p. 7(QL), *aff'd* (1986), 12 C.P.R. (3d) 193 (F.C.A.); *Patent Act*, R.S.C. 1985, c. P-4, s. 55(1); *Copyright Act*, R.S.C. 1985, c. C-42, s. 41.23(1).

79.     *Second*, the Licensed Participants had no rights, let alone exclusive rights, regarding the 59-66% of the Residual IP.

80.     *Third*, even assuming a limited area of exclusivity existed for patents in relation to "Products",[76] the right to sue would only have been limited to infringements of exclusively licensed patents within the exclusively licensed Field of Use.[77]

81.     *Fourth*, the Licensed Participants could still not sue without joining NNL as a co-party, since "a field-of-use licensee lacks standing to sue for infringement without joining the patent owner".[78]  This is evidenced by the fact that NNL and NNI were co-plaintiffs in enforcement actions brought in the U.S. prior to the Nortel insolvency filings.[79]

82.     The consequence of the Licensed Participants' limited enforcement rights for the allocation analysis is that, because NNL alone had all of the rights outside of the Field of Use, including rights to sue for infringement, the value relinquished in the Residual IP Sale was solely attributable to the rights held by NNL.

**d.     Licenses Were Not Transferrable by the Licensed Participants**

83.     The Licensed Participants also had no ability to monetize their Licenses by unilaterally transferring them to a purchaser.[80]

84.     This is clear from the very structure of the MRDA, which is an agreement between NNL and the Licensed Participants that creates intercompany rights and obligations.   Under the MRDA, the Licensed Participants are required to conduct R&D (Article 2), make profit sharing payments pursuant to the RPSM (Article 3), and vest ownership of all IP resulting from R&D in NNL (Article 4).   Further, Article 10(a) requires the unanimous consent of the Participants,

---

[76] Even that exclusive right may not have been sufficient to confer standing.  See *Mitutoyo Corp. v. Central Purchasing, LLC*, 499 F.3d 1284, 1291 (Fed. Cir. 2007) ("[T]he pertinent question is whether MAC has the exclusive right to sell products made according to the '902 patent in the United States; *the exclusive right to sell only Mitutoyo's products made according to the '902 patent, however, is not a sufficient basis for standing*.").

[77] See the cases cited at footnote 75 above.

[78] *A123 Systems, Inc. v. Hydro-Quebec*, 626 F.3d 1213, 1217 (Fed. Cir. 2010).

[79] Deposition Testimony of Bruce W. Stratton, April 4, 2014, 107:19-114:14.

[80] Trial Testimony of Philip Green, June 5, 2014, 3119:6-3120:19; Trial Testimony of Mark Berenblut, June 16, 2014, 3647:10-3651:5.

including NNL, for the admission of any "Eligible Party" – who must be an NNL Affiliate[81] – as a new MRDA Participant.

85.    Therefore, the Licenses were personal contractual rights, having been granted only to NNL Affiliates, and could not be assigned without NNL's consent.[82]   Further, Article 14(a) expressly prohibited a unilateral assignment of the "Agreement", including the Licenses created under it,[83] and any attempted assignment in breach of this would be ineffective.[84]

86.    Nor could the Licensed Participants circumvent this prohibition by sublicensing their rights under Article 5(a), as the U.S. Interests seem to allege.[85]   Even if a Licensed Participant could transfer its rights through a sublicense, those rights would never have been broad enough to satisfy what an arm's length purchaser of the IP required.   That purchaser, not being a Nortel Affiliate, could not become a "Participant", and would thus be limited to making or exploiting the "Products" of Nortel rather than its own competing products.[86]   Moreover, no purchaser would buy a business based on a sublicense that was potentially terminable in an insolvency.

---

[81] See the definition of "Eligible Party" in Article 1(c) of the MRDA.

[82] *Rodaro v. Royal Bank of Canada* (2002), 59 O.R. (3d) 74 (C.A.) at 33 (QL). See also, in the IP context: *Merchandising Corp. of America Inc. v. Harpbond Ltd.*, [1983] F.S.R. 32 (Eng. C.A.) at 37; *Devefi Pty Ltd. v. Mateffy Perl Nagy Ptd Ltd.*, (1993), 113 A.L.R. 225 (F.C.A.F.C.) at 234; H.G. Fox, *Canadian Law and Practice relating to Letters Patent for Inventions*, 4th ed. (Toronto: Carswell, 1969) at 287; T. Terrell, *Terrell on the Law of Patents*, 17th ed. (London: Sweet & Maxwell, 2011), at 16-11 and 16-58.

[83] Some of the Core Parties argue that Article 14(a) also precluded the unilateral transfer of the IP by NNL: UKPT's Response, para. 6; U.S. Debtors' Pre-Trial Brief, p. 120.  However, the IP was not part of the contractual "benefits" that form part of the Agreement, but pre-existed it – in contrast to the Licenses themselves – and thus does not fall within the scope of Article 14(a) properly construed: *Linden Gardens Trust Ltd. v. Lenesta Sludge Disposals Ltd.*, [1993] 3 All E.R. 417 (U.K.H.L.) at 427 and 431; *Imoney Corp. v. Quebecor Communications Inc.*, [2002] O.J. No. 4309 (S.C.J.) at para. 11, *aff'd*, [2002] O.J. No. 4447 (C.A.).  The IP could thus be assigned by NNL independently of the MRDA, since "a patentee is fully entitled to assign his rights under the Letters Patent to another": *National Carbonising Co. v. British Coal Distillation Ltd.* (1936), 54 R.P.C. 41 (Eng. C.A.) at 56.

[84] *Imoney Corp. v. Quebecor Communications Inc.*, [2002] O.J. No. 4309 (S.C.J.) at para. 11, *aff'd*, [2002] O.J. No. 4447 (C.A.); *1124980 Ontario Inc. (c.o.b. Health-Care Pharmacy) v. Liberty Mutual Insurance Co.* (2003), 33 B.L.R. (3d) 206 (Ont. S.C.J.) at paras. 52, 99; *Gen. Mills, Inc. v. Kraft Foods Global, Inc.*, 487 F.3d 1368, 1373 (Fed. Cir. 2007), *rehearing granted on other grounds*, 495 F.3d 1378 (Fed. Cir. 2007); *In re Aerobox Composite Structures, LLC*, 373 B.R. 135, 141 (Bankr. D. N.M. 2007). See also, in the IP context: *Hospital for Sick Children v. Walt Disney Productions*, [1968] Ch. 52 (C.A.) at 67, 71-72, 79; *Devefi Pty Ltd. v. Mateffy Perl Nagy Ptd Ltd.*, (1993), 113 A.L.R. 225 (F.C.A.F.C.) at 234; *Dorrans v. The Shand Partnership*, [2003] ScotCS 313 (O.H.) at para. 16; K.M. Garnett, *Copinger and Skone James on Copyright*, 16th ed. (London: Sweet & Maxwell, 2011), Vol. 1, at 5-205; 5-227.

[85] The U.S. Debtors' Pre-Trial Brief, p. 92-93, argues that the right to sublicense must include allowing the sublicensee to make its own products rather than those of Nortel, since Article 5(a) already gives the Licensed Participants the right to "have made" Products for the Licensed Participants.  However, a right to sublicense which limits the sublicensee to making Nortel Products is still not equivalent to a "have made" right, since the sublicensee could make (or have made) the Nortel Products for itself rather than for the sublicensing LP.

[86] Rebuttal Report of Mark Berenblut and Alan Cox dated February 28, 2014, paras. 52-53 (TR00048); Deposition Testimony of James Malackowski, March 19, 2014, 178:6-10 ("Q. In other words, *you couldn't sublicense more than the scope of your license?* A. Generally, I think *that's fair* when used in that linked way of license to sublicense, yes").  See also *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at para. 48 ("[T]he sublicence has similar incidents to the primary licence").

Finally, a purported sublicense that sought to transfer all of an LP's rights would be an attempt to do indirectly what the LP was prohibited from doing directly under Article 14(a).[87]   The sublicense right cannot be construed to achieve such a result.  Even if it could be so construed, exercising the right in this way would constitute a breach of that Licensed Participant's contractual duty of good faith.[88]

### e.      Licenses Were Not "Perpetual" or "Royalty Free"

87.     A final factor which limited the value of the Licenses in the Sales is that they were not "perpetual" or "royalty free", as other Core Parties suggest.[89]  Instead:

(a)     Article 5(a) only states that the Licenses "*except as hereinafter provided* shall be in perpetuity", and Article 11(c) provides several reasons why a Licensed Participant could be automatically terminated as an MRDA Participant and forced to transfer or surrender its "rights in NN Technology" (i.e., its License) for a cash payment, as occurred to the Australian Nortel Participant prior to the insolvency filings;[90] and

(b)     Article 3(b) requires Licensed Participants to remit portions of their License revenues to other Participants as part of the RPSM, which is a royalty in substance if not in name.[91]

88.     These restrictions were yet another reason why a purchaser of the IP would be unwilling to pay a significant amount to the Licensed Participants for the Licenses.

---

[87] *Biosynexus, Inc. v. Glaxo Group Ltd.*, 2006 WL 624896, at *1, *3-*6 (N.Y. Sup. Ct. Mar. 13, 2006).  See also *MDS (Canada) Inc. v. Rad Source Techs., Inc.*, 2014 Fla. LEXIS 2154, at *23 (Fla. July 10, 2014) (holding that "there is no 'bright-line rule'… that automatically distinguishes an assignment from a sublicense").

[88] *GATX Corp. v. Hawker Siddeley Canada Inc.* (1996), 27 B.L.R. (2d) 251 (Ont. Gen. Div.) at paras. 45, 57-73 (QL); *CivicLife.Com Inc. v. Canada (A.G.)* (2006), 215 O.A.C. 43 (C.A.) at paras. 49 and 51.  As para. 52 of *Civiclife.Com* establishes, this duty of good faith was not excluded by the entire agreement clause in Article 14(d) of the MRDA (TR21003).

[89] U.S. Debtors' Allocation Position, pp. 2, 11 and 27-28; U.S. Debtors' Reply, pp. 5, 7, 11, 14-18, 24, 26 and 29; UKPT's Response, para. 14.

[90] Primary Report of Philip Green dated January 24, 2014, p. 25 (TR00042); Rebuttal Report of Philip Green dated February 28, 2014, p. 8 (TR00043); U.S. Debtor's Allocation Position, p. 9, footnote 6.

[91] Rebuttal Report of Philip Green dated February 28, 2014, p. 9 (TR00043); Trial Testimony of Timothy Reichert, June 17, 2014, 3850:20-3851:17, 3943:15-22.

- 31 -

###### f.    Equitable Principles Did Not Grant the Licensed Participants Ownership

89.    The U.S. Interests, EMEA Debtors and UKPT make several arguments based upon equitable principles in an attempt to establish an IP ownership interest outside the MRDA.  The overarching problem with all of these arguments is that they ignore the "primacy of private ordering" under the MRDA,[92] and the fact that "[a]greements between the parties tend to constitute the best evidence of the parties' reasonable expectations".[93]

90.    With respect to the arguments raised by the EMEA Debtors and UKPT:[94]

(a)    There is no implied term granting the Licensed Participants ownership of the IP. Far from being "obvious", any such term would contradict the express MRDA provisions outlined above, including the entire agreement clause in Article 14(d). Further, instead of giving "business efficacy" to the MRDA, such an implied term would render the contract unworkable by prohibiting Licensed Participants from using their License rights absent cross-licenses from each Participant to the others.[95]

(b)    There is no resulting trust, since the Licensed Participants received consideration for their R&D contributions through the RPSM (Article 3(a)), and for their IP through the Licenses (Article 4(a)).[96]

---

[92] *BG Checo International Ltd. v. British Columbia Hydro and Power Authority*, [1993] 1 S.C.R. 12 at para. 16 (QL).  See also *Cadbury Schweppes Inc. v. FBI Foods Ltd.*, [1999] 1 S.C.R. 142 at para. 36.

[93] *Itak International Corp. v. CPI Plastics Group Ltd.* (2006), 20 B.L.R. (4th) 67 (Ont. S.C.J.) at para. 47. See also: *Sungard Recovery Services, Inc. v. Florists Transworld Delivery, Inc.*, 1999 U.S. Dist. LEXIS 17709, at *2 (E.D. Pa. Nov. 17, 1999); *Waterfall, Economidis, Caldwell, Hanshaw & Villamana, P.C. v. Pima County*, 2004 Ariz. App. Unpub. LEXIS 9, at *20 (Apr. 8, 2004), *review denied and ordered depublished*, 209 Ariz. 200 (2004); *Simmons v. Webb* (2008), 54 B.L.R. (4th) 197 (Ont. S.C.J.) at para. 92, *var'd on other grounds*, 2010 ONCA 584 and 2011 ONCA 7; and *Hu v. Sung* (2009), 63 B.L.R. (4th) 286 (Ont. S.C.J.) at para. 50.

[94] EMEA Debtors' Allocation Position, paras. 50-68; UKPT's Allocation Position, paras. 49-53.

[95] *M.J.B. Enterprises Ltd. v. Defence Construction (1951) Ltd.*, [1999] 1 S.C.R. 619 at paras. 27 and 29; *R Griggs Group Ltd. v. Evans*, [2005] EWCA Civ 11 at paras. 14-18.  To imply a term into a contract: 1) the term must be reasonable and equitable; 2) it must be necessary to give business efficacy to the contract so that no term will be implied without it; 3) it must be so obvious that "it goes without saying"; 4) it must be capable of clear expression; and 5) it must not contradict any express term of the contract: *Carscallen v. FRI Corp.*, [2005] O.J. No. 2400 (S.C.J.) at para. 51, aff'd, [2006] O.J. No. 3653 (C.A.).

[96] *Dubiner v. Cheerio Toys and Games Ltd.*, [1965] 1 Ex. C.R. 524 (Ex. Ct.) at paras. 94, 96, 99 (QL), *aff'd*, [1966] S.C.R. 206; *In re Coy*, 2011 WL 3667607, at *6 (Bankr. D. Del. Aug. 22, 2011); *Kerr v. Baranow*, [2011] 1 S.C.R. 269 at paras. 16-17; *Nishi v. Rascal Trucking Ltd.*, [2013] 2 S.C.R. 438 at para. 29; *Wade v. Ukeni*, 2014 ONCA 99 at para. 4.

- 32 -

(c)     There is no constructive trust.  The MRDA is a complete juristic reason for any "enrichment" of NNL arising from the vesting of the IP in it.[97]

(d)     There is no proprietary estoppel.   NNL did not encourage the Licensed Participants to believe they would have a proprietary interest in the IP, nor take "unconscionable" advantage of them as "vulnerable" parties, but simply adhered to its rights under the MRDA.[98]

91.     With respect to the estoppel arguments of the U.S. Debtors,[99] the CCC was under no obligation to disclose its interpretation of the MRDA until it filed its opening Allocation Position at the precise time specified by the Allocation Protocol and Litigation Timetable.  Indeed, the CCC was not even a party to the IFSA, and thus cannot be said to have made any representations about its allocation position, regardless of whether any other party did so.  Further, Article 4(a) of the Allocation Protocol provided that "*[t]here shall be no restriction on the ability of any Core Party to advance or oppose any theory of allocation*", and Articles 10.c and 12.a of the IFSA provided that it "shall not serve as the basis for any claim… in respect of… allocation of any sale proceeds" and that the Sales were not conditional upon the Nortel Debtors "reaching agreement… regarding allocation of the sale proceeds".[100]

92.     There was also no detrimental reliance.  The interpretation of the MRDA is a question of law rather than fact, and the U.S. Debtors were fully capable of forming their own conclusions about its meaning, and developing their litigation position, without the assistance of the CCC.

---

[97] *Peter Kiewit Sons' Co. of Canada v. Eakins Construction Ltd.*, [1960] S.C.R. 361 at 369; *Garland v. Consumers' Gas Co.*, [2004] 1 S.C.R. 629 at para. 44; *Pacific National Investments Ltd. v. Victoria (City)*, [2004] 3 S.C.R. 575 at para. 28; *Jedfro Investments (U.S.A.) Ltd. v. Jacyk*, [2007] 3 S.C.R. 679 at paras. 33-34; *Kerr v. Baranow*, [2011] 1 S.C.R. 239 at paras. 3 and 41; *In re Direct Response Media, Inc.*, 466 B.R. 626, 661 (Bankr. D. Del. 2012).

[98] *Schwark Estate v. Cutting*, 2010 ONCA 61 at para. 34; *Tiny (Township) v. Battaglia*, 2013 ONCA 274 at paras. 131, 138 and 152.  See also Affidavit of Gordon Davies sworn April 11, 2014, para. 6 (TR00013).

[99] U.S. Debtors' Pre-Trial Brief, pp. 113-118.  See also Bondholder Group's Pre-Trial Brief, pp. 5-11.

[100] See also: Trial Testimony of Sharon Hamilton, May 15, 2014, 925:16-931:3, 932:14-934:10, 939:22-941:11, 947:6-25, 948:11-950:6, 970:6-22, 972:11-23, 973:8-974:10, 975:5-9, 1000:22-1003:16; Trial Testimony of Paviter Binning, May 20, 2014, 1054:13-1055:13, 1072:11-14; Trial Testimony of Michael Orlando, May 21, 2014, 1343:17-1344:8; Trial Testimony of John Ray, May 21, 2014, 1385:20-1386:1, 1387:18-1389:11, 1442:19-1444:24, 1447:25-1448:5, 1454:7-17.

- 33 -

**B.      NNL's Ownership Entitles it to the Substantial Majority of the Sale Proceeds**

93.      When the Sale Proceeds are allocated in accordance with NNL's ownership of the NN Technology as recognized under the MRDA, the appropriate amount owing to the Canadian Debtors is $5.805 billion.[101]

**1.      The Business Sales**

94.      The Business Sales consisted of eight transactions, undertaken after the Nortel Group filed for creditor protection and concluded that a restructuring was not viable, in which all of the major Nortel Lines of Business, including approximately 2,700 related Nortel patents and patent applications, were sold to third party purchasers.[102]  This generated approximately USD $2.849 billion in Business Sale Proceeds, of which USD $1.143 billion related to the sale of Nortel IP. The terms of the Business Sales included:

(a)      the transfer to the purchaser of "all of [the] Seller's right, title and interest in and to the assets predominantly used or held for use in the conduct of the Business", including "all the material Intellectual Property that… is used in connection with the conduct and operation of the Business";[103] and

(b)      the granting of "perpetual, irrevocable, non-exclusive… worldwide, royalty-free [and] fully paid-up"[104] licenses to the purchaser to use any IP that was retained by any Nortel Entity but that was necessary to operate the acquired business.[105]

---

[101] Primary Report of Thomas Britven dated January 24, 2014, para. 3.4 (TR00045).  The implied aggregate recovery to each Key Creditor Group based on this allocation is set out in *id.*, para. 3.8.  The discussion below focuses upon the allocation of Sale Proceeds relating to IP, which comprise all of the Residual IP Proceeds and a large portion of the Business Sale Proceeds.  As to the remaining Business Sale Proceeds relating to Tangible Assets, Customer Relationships and Purchaser Goodwill, see *id.*, paras. 6.16, 6.22, 6.42-6.48.  This IP ownership allocation analysis is based upon the fair market value of the assets owned and/or relinquished by the Nortel Debtors in the Sales on or about the date of their relinquishment.  That is the approach taken by most of the Core Parties, and is the one supported by valuation theory: *id.*, paras. 6.2, 6.4; Primary Report of Philip Green dated January 24, 2014, pp. 38-40 (TR00042).  As discussed later in this Brief, the CCC also reserves the right to argue in the alternative that the Sale Proceeds should be allocated on a *pro rata* basis if the Courts conclude that ownership of the NN Technology cannot be determined from NNL's title under the MRDA, or otherwise.

[102] Primary Report of Thomas Britven dated January 24, 2014, paras. 3.41-3.43, 6.12-6.13 (TR00045); Primary Report of Philip Green dated January 24, 2014, p. 8 (TR00042); Affidavit of Sharon Hamilton sworn April 11, 2014, paras. 47-64 (TR00009); Affidavit of Paviter Binning sworn April 10, 2014, paras. 50-53 (TR00014).  As noted at para. 53 of the Binning Affidavit, while assets other than IP were also sold in the Business Sales, IP was the "main driver of value" therein.

[103] See, e.g., Articles 2.1.1, 2.1.1(g) and 4.5(a) of the CDMA Asset Sale Agreement (TR44138).

[104] See, e.g., Article 2.01 of the ███████ Intellectual Property License Agreement ████████.

[105] Primary Report of Philip Green dated January 24, 2014, p. 11 (TR00042); Rebuttal Report of Thomas Britven dated February 28, 2014, para. 3.14 (TR00046); Affidavit of Sharon Hamilton sworn April 11, 2014, paras. 52 and 61 (TR00009).

95.    To facilitate this arrangement, the Licensed Participants executed License Termination Agreements ("LTAs") providing that their Licenses were terminated in relation to all IP either "transferred" or "licensed" to the purchasers.[106]

96.    Accordingly, the Licenses were not transferred by the Sales,[107] as the U.S. Interests allege.[108]  Instead, the IFSA made clear that the LTAs were agreements "for the *termination* of the IP Licenses",[109] and the LTAs confirmed that the Licenses "are hereby *terminated*".[110]  The termination of a contractual right is legally distinct from its assignment.[111]

97.    Indeed, the Asset Sale Agreements ("ASAs") expressly provided for the assignment of *other* contracts as part of the Sales assets.[112]  However, they did not provide for the assignment of the Licenses, but instead contained provisions requiring that the Licenses be terminated.[113]  Therefore, the fact that the LTAs may have referred to all of the Nortel Debtors for convenience as "Sellers" does not mean that the Licensed Participants transferred rather than terminated their Licenses.  Were that the case, the ASAs would have included the Licenses among the assigned contracts.

98.    Given this transaction structure, it was the sale of NNL's ownership interest in the NN Technology, and not the Licenses, that accounted for the substantial majority of the Business Sale Proceeds relating to the IP.[114]  The Licensed Participants did not transfer anything of value to the Purchasers, since their only ownership interest – i.e., in the Licenses themselves – *could not* be transferred under Article 14(a) of the MRDA as discussed above,[115] much less in

---

[106] See, e.g., the 9th recital and Article 2.01 of the CDMA LTA (TR48909).  The Licensed Participants retained a time-limited, non-exclusive, non-transferrable and largely non-sublicensable license to continue using that NN Technology to wind down their businesses: see, e.g., Article. 2.02 and 2.05 of *id*.

[107] Primary Report of Philip Green dated January 24, 2014, p. 4 (TR00042); Trial Testimony of Philip Green, June 5, 2014, 3102:21-3104:19.  The same point applies to the Residual IP Sale: Trial Testimony of John Ray, May 21, 2014, 1431:25-1433:9.

[108] U.S. Debtors' Pre-Trial Brief, pp. 83 and 120.

[109] IFSA, Article 11.b (TR43794).

[110] See, e.g., the CDMA LTA, Article 2.01 (TR48909), and the Rockstar LTA, Article 2.01 (TR44186).

[111] *Montreal Trust Co. v. Gulf Securities Corp,* [1978] 1 S.C.R. 708 at paras. 27 and 40 (WLeC).

[112] See, e.g., the Rockstar LTA, Article 2.1.1(b) (TR48496).

[113] *Id*. Article 5.13(b) (TR48496).

[114] Deposition Testimony of James Malackowski, March 19, 2014, 181:10-19, 182:25; Trial Testimony of Philip Green, June 5, 2014, 3116:21-3117:14, 3224:17-3228:25.

[115] Deposition Testimony of James Malackowski, March 19, 2014, 175:22-176:10, 177:6-8.  The Licensed Participants did not even possess the power to hold up the Business or Rockstar Sales by refusing to surrender their Licenses, since they relinquished this power in the IFSA: Deposition Testimony of Coleman Bazelon, 220:23-221:10, 222:14-17.

circumstances where they expressly agreed to *terminate* their Licenses pursuant to the LTAs.[116] Nor, for the reasons above, could the Licensed Participants have sought to enter into their own version of the Business Sales by sublicensing their License rights. Therefore, "the Surrendered Licenses were of *de minimis* value to a buyer".[117]

99.      As a result of this, the value of the Licenses in the context of the Business Sales could not exceed what the Licensed Participants could have obtained by using the Licenses to continue to operate the Lines of Business.[118] Further, the evidence is clear that Nortel was in a very weak financial position at the date of the Business Sales, and that the Licensed Participants would not have generated significant revenues from the Lines of Business going forward.[119]

100.      Based on Nortel's asset impairment test ("AIT") and financial statements in 2008, which were subject to audit and involved two major independent accounting firms, the fair market value of all Nortel Lines of Business on a go-forward basis was $988 million or less.[120] The maximum the U.S. and EMEA Debtors could have earned was their RPSM share of the $988 million. The combined RPSM shares for the U.S. and EMEA Debtors was 50.2%, or $496 million. Of that $496 million, 57.3%, or $285 million, was attributable to IP and represents the value of the Licenses surrendered by the U.S. and EMEA Debtors.[121] Therefore, the U.S. and EMEA Debtors are only entitled to a combined allocation of $285 million of the $1.143 billion in Business Sale Proceeds relating to the IP. The remaining $858 million in Business Sale IP

---

[116] *424651 Ontario Ltd. v. Second Lehndorff (Canada) Ltd.*, [1980] O.J. No. 878 (H.C.J.) at paras. 3-4 and 6; *Robinson, Little & Co. v. Marlowe Yeoman Ltd.*, [1986] B.C.J. No. 601 (C.A.) at paras. 13-16; *Goodyear Canada Inc. v. Burnhamthorpe Square Inc.*, [1997] O.J. No. 1665 (Gen. Div.) at para. 29, *var'd on other grounds*, [1998] O.J. No. 4426 (C.A.).

[117] Primary Report of Thomas Britven dated January 24, 2014, para. 6.36 (TR00045), *emphasis added*. See also: Rebuttal Report of Thomas Britven dated February 28, 2014, paras. 3.24-3.25 (TR00046). Affidavit of Sharon Hamilton sworn April 11, 2014, para. 62 (TR00009) ("*No [LOB] purchaser suggested that they would have been content to pay the purchase price they did to receive only a license to patents – they advocated for ownership* and only accepted licenses for patents when we were able to show them they were used in other LOBs"); Deposition Testimony of Karina O, November 9, 2013, 222:3-20.

[118] Primary Report of Philip Green dated January 24, 2014, p. 15 (TR00042), *emphasis added*. See also: Rebuttal Report of Thomas Britven dated February 28, 2014, para. 3.20 (TR00046).

[119] Primary Report of Thomas Britven dated January 24, 2014, paras. 3.37, 6.33 (and para. 3.38) (TR00045); Primary Report of Philip Green dated January 24, 2014, pp. 30-38 (TR00042); Affidavit of Sharon Hamilton sworn April 11, 2014, paras. 16-25 (TR00009); Affidavit of Paviter Binning sworn April 10, 2014, para. 30 (TR00014).

[120] Primary Report of Thomas Britven dated January 24, 2014, paras. 6.38-6.40 (TR00045).

[121] *Id.*, para. 6.40.

Proceeds should be allocated to the Canadian Debtors.  A chart summarizing these figures is set out below:[122]

| | |
|---|---|
| Business Value in Nortel's Hands | $988 million |
| U.S. & EMEA RPSM Share | x 50.2% |
| U.S. & EMEA Business Value | $496 million |
| IP Percentage | x 57.3% |
| Value of Licenses surrendered in the hands of U.S. and EMEA Debtors | $285 million |

## 2.    The Residual IP Sale

101.    With the conclusion of the Business Sales, Nortel had:

(a)    sold all of its IP that was used predominantly in specific Lines of Business;[123] and

(b)    licensed all of its IP used across multiple Lines of Business to the Business Sale purchasers.

102.    Therefore, no post-Business Sales purchaser would buy Residual IP to make Nortel Products, but only to use or license that Residual IP outside the Field of Use.  Further, by the time of the proposed sale of the Residual IP, the Licensed Participants had surrendered their own Licenses to the extent that they encompassed IP transferred or licensed in the Business Sales, because the Field of Use restriction in Article 5(a) of the MRDA limited the Licenses to making and exploiting the "Products" of Nortel's own businesses.[124]    As a result, the Licensed

---

[122] *Id.*, p. 6.40; Britven Demonstrative, p. 16 (DEM00016).

[123] Rebuttal Report of Mark Berenblut and Alan Cox dated February 28, 2014, para. 45 (TR00048) ("*[A]ll IP* (whether patents or license rights to patents) that was *related to Nortel's business was sold in the Business Sales*"); Affidavit of Sharon Hamilton sworn April 11, 2014, para. 56 (TR00009) ("*Collectively, the LOBs represented the entirety of the operating business any of the Nortel entities engage in... With the closing... in March 2011, no Nortel entity had any operating business* save for fulfilling its few remaining transition service obligations with a handful of employees").

[124] The U.S. Debtors' Pre-Trial Brief, pp. 84-85, is incorrect to say that the Licensed Participants did not relinquish their rights to any IP not sold in the Business Sales.  As discussed above, the LTAs which they executed in the Business Sales terminated their Licenses with respect to IP not only sold but "licensed" to the purchaser, i.e., the IP retained by Nortel and then sold in the Residual IP Sale.

Participants had no valuable License rights remaining after the Business Sales, and no purchaser would be interested in acquiring their Licenses.[125]

103.     This conclusion is not affected by the IP Co Model.   Contrary to the U.S. Interests' position,[126] the Field of Use does not include the "service" of licensing Nortel IP to third parties in exchange for royalties.   The word "services" in the Article 1(l) definition of Products must be read in its context:[127]

(a)     The term appears at the end of the list "products, software and services", which are capable of having "components, parts, sub-assemblies, features, software… and… improvements, upgrades, updates [and] enhancements".   It is clear from this that the "services" were meant to be services in relation to products of the business, such as providing installation, support, maintenance, repair, or training relating to products and software, i.e., the "methods, processes, procedures and tools related to manufacturing, installation, operation, interoperability, maintenance and use of Products" referenced in the Article 1(m) definition of "R&D Activity".   Such "services" do not include the licensing of IP.[128]

(b)     The services must be "designed, developed, manufactured or marketed" pursuant to Article 1(l).   The act of licensing IP does not fall within the meaning of any of those terms, including the term "marketed", which is not the same as "licensed". The argument of the U.S. Interests requires reading into the definition of "Products" something that is not included therein.

104.     Accordingly, the Licensed Participants had no remaining Licenses to the Residual IP sold to Rockstar.   That Residual IP fell into two categories: (1) IP used across multiple Lines of

---

[125] Trial Testimony of Philip Green, June 5, 2014, 3151:20-3152:22, 3153:8-3154:23, 3156:3-13; Trial Testimony of Mark Berenblut, June 16, 2014, 3669:12-3670:23

[126] U.S. Debtors' Pre-Trial Brief, p. 99.

[127] *BG Checo International Ltd. v. British Columbia Hydro and Power Authority*, [1993] 1 S.C.R. 12 at para. 9 (QL); *Tercon Contractors Ltd. v. British Columbia (Transportation and Highways)*, [2010] 1 S.C.R. 69 at para. 64; *Sattva Capital Corp. v. Creston Moly Corp*, 2014 SCC 53 at paras. 47 and 64.

[128] *Shelanu Inc. v. Print Three Franchising Corp.* (2003), 64 O.R. (3d) 533 (C.A.) at paras. 44-45; *Tomko v. Wawanesa Mutual Insurance Co.*, 2007 MBCA 8 at para. 17 ("[I]n a list of words a word of uncertain scope may take its character from those surrounding it if they have a recognisable characteristic").

Business; and (2) IP never used in any Line of Business.[129]  Importantly, this second category of Residual IP covering inventions that were never used in Products comprised between 59% to 66% of the IP sold in the Residual IP Sale.[130]

105.    In light of this, the U.S. and EMEA Debtors should receive an allocation of 2%,[131] or a combined $87 million, of the $4.454 billion in Residual IP Proceeds attributable to the small amount of Residual IP which they actually owned.  The remaining $4.368 billion should be allocated to NNL.[132]  The reasons for this are as follows.

106.    *First*, as to the Residual IP that had been used in the Lines of Business but not sold in the Business Sales, the Licensed Participants had already surrendered all of their License rights to this through the Business Sale LTAs and the granting of the parallel licenses to the Business Sale purchasers.  Therefore, the Licensed Participants did not relinquish any rights in that Residual IP through the Residual IP Sale other than with respect to the 2% of the Residual IP which they owned.[133]

107.    *Second*, the Residual IP which made up between 59% and 66% of the Residual IP portfolio was never licensed to the Licensed Participants at all.  Those patents were never used to make, use or sell any Products and thus fell outside the Field of Use.  The Licensed Participants thus did not relinquish any rights in that not-used Residual IP by virtue of the Rockstar LTA, and are again only entitled to an allocation representing the 2% of that IP which they actually owned.[134]

108.    The fact that the Licensed Participants executed an LTA in connection with the Residual IP Sale has no bearing on this analysis.  The Rockstar LTA was only entered into because Google "was extremely concerned about excluding any and all potential liabilities or

---

[129] Trial Testimony of Philip Green, June 5, 2014, 3150:1-3151:3.

[130] Primary Report of Thomas Britven dated January 24, 2014, paras. 3.4 and 6.63 (TR00045); Primary Report of Philip Green dated January 24, 2014, p. 12 (TR00042); Primary Report of Mark Berenblut and Alan Cox dated January 24, 2014, para. 50 (TR00047); Deposition Testimony of Gillian McColgan, November 8, 2013, 141:18-24.

[131] Primary Report of Thomas Britven dated January 24, 2014, para. 6.57 (TR00045).

[132] *Id*., para. 6.65; Primary Report of Philip Green dated January 24, 2014, pp. 6, 64-65 (TR00042); Rebuttal Report of Thomas Britven dated February 28, 2014, para. 2.5 (TR00046).

[133] Primary Report of Philip Green dated January 24, 2014, p. 64 (TR00042); Primary Report of Thomas Britven dated January 24, 2014, para. 6.64 (TR00045); Rebuttal Report of Thomas Britven dated February 28, 2014, paras. 3.15-3.16 (TR00046).

[134] Primary Report of Thomas Britven dated January 24, 2014, para. 6.64 (TR00045); Rebuttal Report of Thomas Britven dated February 28, 2014, para. 3.35 (TR00046); Primary Report of Philip Green dated January 24, 2014, p. 64 (TR00042).

encumbrances to the Residual IP (in particular existing license encumbrances), regardless of the degree to which a given liability or encumbrance could be characterized as a realistic concern".[135]  Further, the Rockstar LTA and IFSA both stated that the Residual IP Sale did not impact the Nortel Debtors' ownership rights,[136] and Article 2.01 of the Rockstar LTA expressly left open whether the Licensed Participants had any License rights to the Residual IP at all (providing that the Licenses under the MRDA were terminated only "*to the extent such license rights are under* any of the Transferred Patents").

109.    For these reasons, the amount owing to the Canadian Debtors is $5.805 billion.

## PART V - U.S. AND EMEA ALLOCATION THEORIES ARE FLAWED

110.    The CCC adopts and relies upon the submissions of the Monitor and Canadian Debtors regarding the allocation positions of the U.S. Interests and EMEA Debtors and adds the following.

### A.    U.S. and EMEA Allocation Theories are based on Flawed Assumptions

111.    The expert reports filed by the U.S. and EMEA Debtors and UKPT are based on flawed assumptions about the MRDA.  In particular, Mr. Kinrich (retained by the U.S. Debtors) and Mssrs. Malackowski and Huffard (retained by the EMEA Debtors) ignore that the Licenses:

(a)    only allowed the Licensed Participants to make and exploit Nortel Products in the Field of Use;

(b)    only allowed the Licensed Participants to exercise enforcement rights in the Field of Use;

(c)    were inherently limited to Nortel affiliates and were non-transferable; and

---

[135] Affidavit of Sharon Hamilton sworn April 11, 2014, para. 99 (TR00009).

[136] Rockstar LTA, Article 2.06 (TR44186); IFSA, Article 11.b (TR43794).  See also the IP Transaction Side Agreement, Article 12 (TR46858).

(d)      contained associated obligations that were specific to the Nortel Group, such as the income reallocation provisions under the RPSM.[137]

112.    These erroneous assumptions are critical to the different allocation conclusions reached by these experts,[138] and render them highly unreliable.[139]  Accordingly, the expert reports filed by the U.S. Interests and EMEA Debtors and UKPT should be disregarded.[140]  The Courts cannot make an allocation ruling which fails to take into account the ownership rights created by the MRDA.

113.    The assumptions made by the experts for the U.S. Interests, the EMEA Debtors and UKPT are detailed in Appendix B. Even if the Courts reject the interpretation of the MRDA set out above, the allocation methodologies proposed by these Core Parties are fundamentally flawed and should not form the basis for allocating the Sale Proceeds.  A detailed breakdown of the myriad of assumptions underpinning the U.S. and EMEA experts' approaches to allocation can be found in Appendices C-D.  The significant criticisms of their approaches are described below.

## B.    U.S. Revenue Theory is Flawed

114.    As previously noted, the U.S. Interests start with the proposition that the Sale Proceeds should be allocated "based upon the assets that each Selling Debtor sold or relinquished".[141] However, Mr. Kinrich does no such valuation, and simply allocates the Sale Proceeds by historical revenues.  This approach must be rejected.

---

[137] Rebuttal Report of Thomas Britven dated February 28, 2014, paras. 3.1-3.40 (TR00046).

[138] Deposition Testimony of Jeffrey Kinrich, April 8, 2014, 93:20-25; 94:2-17; 102:6-20; 153:2-21; 154:18-155:24; 156:4-25; 157:7; Deposition Testimony of Paul Huffard, April 3, 2014, 92:4-16; 93:8-93:25; 123:11-124:12; 146:15-147:4; Trial Testimony of Jeffrey Kinrich, June 18, 2014, 4291:10-4295:23

[139] Rebuttal Report of Thomas Britven dated February 28, 2014, paras. 2.4-2.6 and 3.1-3.40 (TR00046); Rebuttal Report of Philip Green dated February 28, 2014, pp. 7-11 and 25-27 (TR00043).

[140] *Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1139 (3d Cir. 1990); *R. v. Gogo*, [2000] O.J. No. 3643 (C.A.) at para. 6; *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 294 (3d Cir. 2012), *cert. denied*, 133 S. Ct. 2025 (2013); *Pirani v. Esmail*, 2014 ONCA 145 at para. 59.

[141] U.S. Debtors' Response, p. 6.

1.     **The Business Sales**

115.    Mr. Kinrich proposes an allocation to the Canadian Debtors of $0.34 billion or 11.9% of the $2.85 billion in Business Sale Proceeds.[142]   His analysis is flawed for the following six reasons.

116.    *First*, Mr. Kinrich does not even attempt to distinguish between and value the different categories of assets.  He simply divides all of the Sale Proceeds among the different estates based upon their relative share of 2009 revenues from Nortel's carve-out financial statements.   His approach differs from every other expert called at trial, including Mr. Britven, Mr. Green, Mssrs. Berenblut and Cox, Mr. Malackowski and Mr. Huffard, all of whom identified and valued asset classes separately. By failing to account for and separately value the relevant asset classes, Mr. Kinrich fails to answer the allocation question and value the assets based on the parties' legal rights. As Green testified:

> Mr. Kinrich, as you can see from this chart, doesn't really analyze the values of any of the assets individually. Essentially what Mr. Kinrich does is he says, well, a business sold for $100, let's just say. The US, for example, might have had 80 percent of those revenues. So 80 percent of the sales proceeds, the $100, would be allocated to the US.
>
> It's indifferent in terms of what the specific assets were that were transferred… and it doesn't analyze… or answer what the allocation question is, because we're trying to figure out what was the value of what was transferred or surrendered.[143]

117.    As Mr. Huffard testified, "different groups of assets have different legal rights that are associated with them", and it is "important to take [the assets] one at a time so you get the right answer… by breaking [the assets] down into smaller asset classes rather than considering them as a whole… you get better visibility on the appropriate information to consider them."[144]

118.    *Second*, there is no legal basis for the assumption that the Business Sale Proceeds should be divided by historical revenues.  The mere fact that NNL allowed NNI to generate profits from the Nortel IP in the United States does not mean that NNI was the IP's owner there.  NNI was simply a licensee holding a limited Field of Use License, and its profits were contingent upon

---

[142] Primary Report of Jeffrey Kinrich dated January 24, 2014, p. 4, Table 1 (TR00051).

[143] Trial Testimony of Philip Green, June 5, 2014, 3142:24-3143:12.

[144] Trial Testimony of Paul Huffard, May 28, 2014, 1958:1-22.

NNL's consent.[145]  It was no more the owner of the IP than any other licensee of property who uses it to earn income.[146]

119.    *Third*, dividing the Business Sale Proceeds by historical revenue is illogical and leads to nonsensical results.  Historical revenue is not a proxy for value relinquished, particularly where, as here, the parties have agreed to incur R&D expenses in exchange for a share in the total profits of the business commensurate with historical R&D spend.  Mr. Kinrich conceded that if Canada did 100% of the R&D and the U.S. generated 100% of 2009 revenues, following his methodology, 100% of the Sale Proceeds would be allocated to the U.S. and zero to Canada:

> Q.      I am sorry. So if Canada did 100 percent of the research and development, spent its dollars, used its personnel to spend – to do all of the research and development, and the business was then sold and the proceeds were allocated solely by revenue and the United States had 100 percent of 2009 revenue, on your methodology, 100 percent of those sale proceeds would be allocated to the US and zero to Canada; correct?
>
> A.      That is correct.[147]

120.    *Fourth*, the Revenue Theory ignores the Nortel matrix structure and seeks to isolate NNI from the expenses and obligations that were necessary to enjoy the right to any revenue at all.[148]  NNI was a subsidiary of a larger organization whose revenue-generating efforts depended almost exclusively on the exploitation of technology that it did not primarily develop and that it never owned.  Absent the R&D spending of NNL – which was the primary driver of Nortel's profit – NNI could not have existed as a revenue-generating entity.[149]  This is precisely why the MRDA required NNI to share any revenues it generated from the IP pursuant to the RPSM.[150]  As

---

[145] Stephens Deposition (Vol. 2), November 8, 2013, 354:11-16.

[146] *Rana v. Maduck*, 2000 SKQB 318 at para. 80.

[147] Trial Testimony of Jeffrey Kinrich, June 18, 2014, June 18, 2014, 4320:22-4321:7.

[148] Trial Testimony of Paul Huffard, May 28, 2014, 2032:7-18, 2069:1-2075:24; Trial Testimony of Jeffrey Kinrich, June 18, 2014, 4260:4-4261:25. The Nortel matrix structure is discussed extensively in connection with the alternative *pro rata* allocation method below.

[149] The evidence is clear that NNL conducted a disproportionate amount of R&D spending: Affidavit of Brian McFadden sworn April 10, 2014, paras. 15-16 (TR00004); Affidavit of Clive Allen sworn April 11, 2014, paras. 19-20 (TR00002); Reply Affidavit of Brian McFadden sworn April 25, 2014, paras. 3 and 11 (TR00005); Reply Affidavit of Sharon Hamilton, April 25, 2014, paras. 4-20 (TR00010); Trial Testimony of Peter Currie, May 14, 2014, 539:20-540:11, 598:15-599:8; Trial Testimony of Clive Allen, May 14, 2014, 623:24-624:3; Trial Testimony of Brian McFadden, May 14, 2014, 728:10-729:25; Trial Testimony of Sharon Hamilton, May 15, 2014, 1001:19-1002:11; Trial Testimony of Peter Newcombe, May 22, 2104, 1649:16-1651:14.

[150] Rebuttal Report of Philip Green dated February 28, 2014, p. 13 (TR00043); Declaration of Walter T. Henderson, Jr. sworn April 11, 2014, paras. 37-38 (TR00016); Affidavit of Paviter Binning sworn April 10, 2014, paras. 32-36 (TR00014); Affidavit of Peter Currie sworn April 11, 2014, paras. 23-28 and 70-72 (TR00001); Trial Testimony of Walter Henderson, May 20, 2014, 1178:11-1181:22, 1185:11-19; Trial Testimony of Paul Huffard, May 29, 2014, 2053:21-2055:21.

Mr. Kinrich acknowledged, NNL's spending on R&D was done "for the benefit of Nortel as a whole", and the single biggest beneficiary of NNL's spending from a revenue standpoint was NNI.[151]  Furthermore, NNL bore a disproportionate share of overhead costs that enabled NNI to earn revenue, including legal, finance, strategic, insurance, procurement, human resources and real estate.[152]

121.    *Fifth*, there is no basis in valuation theory for allocating the Sale Proceeds by revenue.  At trial, Mr. Kinrich attempted to justify his approach with late-breaking references to valuation literature on revenue multiples cited nowhere in his reports.   Some of the literature had no conceivable application to Nortel.  All of the literature undermined his approach.[153]

122.    *Sixth*, Mr. Kinrich merely applies 2009 revenues by jurisdiction to determine what proceeds should go to each Nortel Debtor, without taking into account anticipated future cash flows or the risks inherent in the ability of the Nortel Debtors to continue generating revenue in their respective markets.   That is so even though many of the Lines of Business sold in the Business Sales were not profitable, and had not been for several years.[154]  In short, "there is no valuation work done but simply a mathematical calculation" to divvy up Sale Proceeds by historical 2009 revenue.[155]

---

[151] Trial Testimony of Jeffrey Kinrich, June 18, 2014, 4317:11-24.

[152] IFSA Motion, para. 16 (TR11366); Affidavit of Sharon Hamilton sworn April 11, 2014, para. 17 (TR00009).

[153] Mr. Kinrich cited a text on "Valuing Small Business and Professional Practices", which could have no conceivable application to Nortel in 2009. The full text (not referred to by Mr. Kinrich in his testimony in chief) states that revenue multiples may be useful: (1) to approximate a range of possible values with a minimum of time and effort; (2) to conclude an estimate of value when other data are unavailable or inadequate; or (3) as one indicator of value, used in conjunction with other, more rigorous valuation methods. In addition, it states that "the more similar many business or practices within an identifiable industry are, the more valid the indication of value provided by the gross revenue multiple method. If an industry or profession *tends to have a fairly standard cost structure,* a given level of revenue should be expected to produce a predictable amount of economic income." Of course, NNL and NNI did not have similar cost structures, as discussed above. See Shannon P. Pratt, Robert F. Reilly & Robert P. Schweihs, *Valuing Small Businesses and Professional Practices,* 3d ed. (Toronto: McGraw-Hill, 2009) pp. 341-342 (TR00053) and Trial Testimony of Jeffrey Kinrich, June 18, 2014, 4322:14-4328:16. Mr. Kinrich also cited Aswath Damodaran, *Investment Valuation Tools and Techniques for Determining the Value of Any Asset,* 2d ed. (New York: John Wiley & Sons Inc., 2002) pp. 543-544 (TR51010). The full text (not referred to by Mr. Kinrich in his testimony in chief) goes on to state that: "The biggest disadvantage of focusing on revenues is that it can lull you into assigning high values to firms that are generating high revenue growth while losing significant amounts of money. Ultimately, a firm has to generate earnings and cash flows for it to have value. While it is tempting to use price-sales multiples to value firms with negative earnings and book value, the failure to control for differences across firms in costs and profit margins can lead to misleading valuations."

[154] Rebuttal Report of Philip Green dated February 28, 2014, pp. 12-13 (TR00043).

[155] Rebuttal Report of Thomas Britven dated February 28, 2014, p. 19 (TR00046); Trial Testimony of Thomas Britven, June 6, 2014, 3410:13-18 ("… he doesn't actually perform a valuation; he just allocates based on revenue. Revenue is not a proxy for relative profits, especially in the context of the profit-sharing agreement between these parties.")

- 44 -

2.    **The Residual IP Sale**

123.    With respect to the Residual IP Sale, Mr. Kinrich purports to perform a discounted cash flow ("DCF") analysis to value the Residual IP and then allocates the $4.5 billion in proceeds to the Nortel Debtors based on projected revenues from one version of a financial model for IP Co.,[156] the hypothetical licensing business that was considered and rejected by the Debtor Estates in favour of an asset sale to Rockstar. His analysis is flawed for the following four reasons.

124.    *First*, Mr. Kinrich does not perform a DCF at all. He simply takes the cash flows from a particular version of the IP Co. model, the known value from the Residual IP sale to Rockstar of $4.5 billion, and reverse-engineers a discount rate of between 12.2% (excluding revenues from China) and 15.7% (including revenues from China). Mr. Kinrich does no independent analysis of the projected cash flows that Nortel could have achieved from operating a start-up litigation and licensing business. Nor does he conduct any independent analysis to determine an appropriate discount rate reflecting the risks of the anticipated future stream of cash flows from that business. The result is illogical. Under Mr. Kinrich's model, if additional cash flows are added, the discount rate applied to all cash flows increases, even though there has been no change to the risk associated with the business.[157]

125.    *Second*, the discount rates Mr. Kinrich infers (12.2% to 15.7%)[158] are unjustifiably low, as indicated by the discount rates actually used by Nortel and its professional advisors (25% to 45%)[159] and the evidence of Mr. Green,[160] Mr. Berenblut[161] and the EMEA Debtors' expert, Mr. Malackowski.[162] Mr. Kinrich's only stated justification for his discount rate is a reference to

---

[156] Between approximately March and November 2010, Nortel and Lazard developed various spreadsheets to illustrate potential returns from IP Co. The various iterations of the spreadsheets include myriad different assumptions regarding discount rates, amount of litigation engaged in, probability of litigation success, costs of enforcement and projected future cash flows. No particular spreadsheet model was ever accepted or approved by Nortel or Lazard. Kinrich relies upon a particular spreadsheet (version 3.1, October 25, 2010): see Email from J. Lux to M. Sprag et al. re: Project Iceberg Revised Model 3.0, attaching Model 3.1 Excel, dated October 25, 2010 (TR12012), Primary Report of Jeffrey Kinrich dated January 24, 2014, p. 3, footnote 4 and Exhibits 27A and 27B (TR00051). This version was superseded by a later version (version 4.0, November 18, 2010) and had projected revenues of less than half those contained in version 3.1. See: Rebuttal Report of Philip Green dated February 28, 2014, pp. 22-23 (TR00043).

[157] Trial Testimony of Jeffrey Kinrich, June 18, 2014, 4348:11-4360:25 and 4367:23-4372:5.

[158] Primary Report of Jeffrey Kinrich dated January 24, 2014, para. 118 (TR00051).

[159] See Rebuttal Report of Philip Green dated February 28, 2014, pp. 17-19 (TR00043).

[160] Trial Testimony of Philip Green, June 5, 2014, 3160:23-3161:11.

[161] Trial Testimony of Mark Berenblut, June 16, 2014, 3625:17-3626:4.

[162] Rebuttal Report of James Malackowski dated February 28, 2014, p. 39, Table 11 (TR00034); Trial Testimony of James Malackowski, May 30, 2014, 2608:16-2609:1.

the weighted-average cost of capital for "communications equipment manufacturers."[163]    The cost of capital for established communications equipment manufacturers has no relationship to the risks inherent in a start-up IP litigation and licensing business. As Mr. Malackowski stated in response to cross-examination by counsel for the U.S. Debtors:

> Q.    Now, the last thing you had noted about Mr. Kinrich's model as opposed to your model is that the discount rate that was derived from Mr. Kinrich's model was lower than the one that you used in your model; is that right?
>
> A.    Well, it is arithmetically lower, but importantly he just backed into it by plugging in the 4.5 billion and my criticism was the low discount rate that was generated should have been a red flag to him, that he is obviously not including all the revenues…[164]

126.    *Third*, Mr. Kinrich obviously does not include all of the revenues, as Mr. Malackowski indicated.  There is no basis to assume that the cash flows projected in the IP Co. model were the same cash flows on which Rockstar based its decision to purchase the Residual IP for $4.5 billion. Mr. Kinrich conceded that he had no data from Rockstar about the information they used to support their purchase price of $4.5 billion.[165]  In fact, there is every reason to believe that the Residual IP Proceeds vastly exceeded the revenues that Nortel would have earned had IP Co. been capable of implementation.  The dynamic of the auction and the defensive value of the Residual IP to the members of the Rockstar Consortium made the Residual IP far more valuable to Rockstar than it was in the hands of Nortel.[166]  Rockstar obtained ownership of the Residual IP and each of the members of the consortium (including Apple, Microsoft, Ericsson, Blackberry) received a license to the Residual IP.  The structure enabled Rockstar to exercise all rights of ownership of the Residual IP against third parties, while providing the individual consortium members with the defensive benefits to prevent others from suing them for patent infringement.[167]    As Mr. Malackowski stated on cross-examination by counsel for the U.S. Debtors:

> Q.    Okay. And Mr. Kinrich, instead of using his own discount rate, puts the net present value of that model at 4 and a half billion dollars; that's right?

[163] Primary Report of Jeffrey Kinrich dated January 24, 2014, p. 59, Footnote 172 (TR00051).

[164] Trial Testimony of James Malackowski, May 30, 2014, 2608:16-2609:1.

[165] Trial Testimony of Jeffrey Kinrich, June 18, 2014, 4348:11-24, 4353:11-4354:13 and 4367:23-4372:2.

[166] Affidavit of Sharon Hamilton sworn April 11, 2014, para. 87 (TR00009).

[167] Affidavit of Sharon Hamilton sworn April 11, 2014, paras. 91, 96-97 (TR00009); Rebuttal Report of Mark Berenblut and Alan Cox dated February 28, 2014, paras. 32-44 (TR00048).

- 46 -

A.     And in my view, that is his fatal error, that he is backing into a discount rate which turns out to be extraordinarily low, which makes it clear that the revenue base that Rockstar purchased on was greater than what was within the model.[168]

127.    Accordingly, the IP Co. cash flow projections are not an appropriate basis upon which to allocate the Residual IP Proceeds among the Nortel Debtors.  Even taking the most optimistic cash flows from the IP Co. model, the lowest discount rate used by Nortel and its advisors, and a litigation success rate of 100%, the maximum DCF value of IP Co. is only $2.7 billion, compared to the $4.5 billion paid by Rockstar.[169]

128.    *Fourth*, even if the IP Co. model were relevant to the allocation question (which it is not), there is no basis for Mr. Kinrich's assumption that the Residual IP Proceeds should be split according to territorial licensing revenues forecasted in the models.  The IP Co. models were not prepared for the purpose of allocating revenues among Nortel entities.[170]  IP Co. did not progress to the point where ownership of the Residual IP portfolio, or allocation of the revenues from that portfolio, was agreed or even discussed in any detail.  Even if the Residual IP had been transferred to a new company, there was never any agreement by NNL that NNI would be entitled to keep all U.S. revenues generated by a licensing business.[171]  Accordingly, there is no basis for Mr. Kinrich's assumption that NNI would have held rights to the Residual IP in the U.S. necessary to achieve the U.S. licensing revenues forecasted in the model.[172]  Mr. Kinrich even admitted that if Nortel had operated an IP Co. prior to insolvency, the revenues would have been shared by Nortel entities pursuant to the RPSM.[173]  Yet, in a post-insolvency world, he would allocate less than 10% to the Canadian Debtors whose RPSM share was five times that.[174]

---

[168] Trial Testimony of James Malackowski, May 30, 2014, 2578:20-2579:4.

[169] Rebuttal Report of Philip Green dated February 28, 2014, Appendix N, pp. 3-4 (TR00043); Rebuttal Report of Mark Berenblut and Alan Cox dated February 28, 2014, pp. 7-8 (TR00048); Trial Testimony of Mark Berenblut, June 16, 2014, 3624:16-3626:4.

[170] See Rebuttal Report of Philip Green dated February 28, 2014, p. 16 (TR00043).

[171] Affidavit of Sharon Hamilton sworn April 11, 2014, paras. 72, 76 (TR00009); Trial Testimony of Sharon Hamilton, May 15, 2014, 922:4-924:18; Trial Testimony of Paviter Binning, May 20, 2014, 1118:23-1119:1.

[172] *Id.*, paras. 72, 76; Trial Testimony of Sharon Hamilton, May 15, 2014, 901:2-902:14; Trial Testimony of Paviter Binning, May 20, 2014, 1056:2-6, 1075:2-18, 1118:23-1191:1; Trial Testimony of John Ray, May 21, 2014, 1395:10-1397:20.  NNI had also relinquished all of its interest in the Licenses through the Business Sales, so it would not have any legal rights to the Residual IP used in the IP Co. Model for that reason alone.  The Business Sales had to be completed before any option for monetizing the Residual IP could be pursued: Trial Testimony of Sharon Hamilton, May 15, 2014, 902:10-14; Trial Testimony of Paviter Binning, May 20, 2014, 1074:8-16.

[173] Trial Testimony of Jeffrey Kinrich, June 18, 2014, 4303:10-4306:10.

[174] Primary Report of Jeffrey Kinrich dated January 24, 2014, Table 1, p. 4 (TR00051).

129.    For these reasons, the Revenue Theory should be rejected.

## C.    EMEA Asset Valuation is Flawed

130.    The experts for the EMEA Debtors correctly begin by identifying and categorizing the assets that were sold.  However, they fail to identify and value all relevant asset classes and incorrectly value certain assets, resulting in an over-allocation to the EMEA Debtors.

131.    The EMEA Debtors rely on Mr. Malackowski's valuation of the IP sold in the Business Sales.  They rely on Mr. Huffard to perform the "Blackstone methodology", which consists of nothing more than subtracting from the gross Business Sale Proceeds: (1) the IP value taken as given from Mr. Malackowski; and (2) the net intangible assets taken from Nortel's books and records, to arrive at a residual category of customer relationships and goodwill.[175]

132.    Mr. Huffard incorrectly lumps non-IP intangible assets (customer relationships and goodwill) together and allocates this category based on each Nortel Debtor's proportionate share of 2008 revenue.[176]  His approach departs from the way in which the purchasers of the Lines of Business allocated the assets they acquired,[177] as well as the Alcatel "precedent" that the EMEA Debtors so heavily relied upon at trial. Indeed, Nortel adopted Alcatel's valuation arising from its sale of the UMTS Business to Alcatel, which valued customer relationships and goodwill separately and allocated goodwill based on a multi-factor formula. Yet, Mr. Huffard did neither.[178]

133.    In addition, Mr. Malackowski dramatically undervalues the IP sold in the Business Sales. He values the total Business Sale IP at approximately $765 million,[179] approximately 22.7% of the total Business Sale Proceeds of $2.85 billion.[180]  It is inconceivable that Nortel's IP – which was its most valuable asset and drove the business – would account for less than 23% of the

---

[175] Trial Testimony of Paul Huffard, May 28, 2014, 2011:10-2018:18.

[176] Trial Testimony of Paul Huffard, May 28, 2014, 2074:12-20

[177] See Ericsson Annual Report, Form 20-F, p. CCC0065004 (TR40195); Primary Report of Thomas Britven dated January 24, 2014, Schedule 4, footnote 1 (TR00045).

[178] Trial Testimony of Paul Huffard, May 28, 2014, 2069:6-2070:15; 2070:16-2074:20.

[179] Primary Report of James Malackowski dated January 24, 2014, p. 30, Table 9 (TR00033).

[180] Trial Testimony of Paul Huffard, May 28, 2014, 2021:8-16.

gross proceeds in the Business Sales.[181]  It is telling that Ericsson valued the IP purchased in the CDMA/LTE business alone at $728 million in the PPAs, which contain an independent, objective and reliable assessment of the fair value of the assets it acquired.[182]  By contrast, Mr. Malackowski valued the IP sold to Ericsson at only $256.39 million.[183]

134.    The combined effect of the Malackowski/Huffard analysis (which undervalues IP and overvalues the residual category of customer relationships and goodwill) is an over-allocation to the U.S. and EMEA Debtors at the expense of the Canadian Debtors, who incurred a disproportionate share of R&D expenses in relation to their revenues.[184]

### D.    EMEA License Theory is Flawed

135.    The EMEA Debtors join forces with the U.S. Interests in their alternative allocation, which their own experts concede is not a preferred approach. As Mr. Malackowski testified at his deposition:

> Q. -- you express the view that what you describe as the contribution approach is your preferred method of allocation, correct?
>
> A. Generally, yes.
>
> Q. All right. And one thing you prefer it to is the license-based approach that you also describe in your report, correct?
>
> A. Yes, I think that's fair.
>
> …
>
> Q. Okay. And if we compare that 10.6 percent result for Canada under the license approach to the inventorship analysis, we reach the same conclusion as you reached about Mr. Kinrich's approach, don't we, that the disparity is a cause for concern about that approach?
>
> …

---

[181] Mr. Huffard defended this figure, despite agreeing with Mr. Binning's evidence that Nortel's revenues and customer retention were driven by its technology: Trial Testimony of Paul Huffard, May 28, 2014, 2043:10-2045:20.

[182] Primary Report of Thomas Britven dated January 24, 2014, (TR00045); Trial Testimony of Thomas Britven, June 6, 2014, 3381:14-3382:23.

[183] Primary Report of James Malackowski dated January 24, 2014, p. 30, Table 9 (TR00033); Trial Testimony of James Malackowski, May 30, 2014, 2486:17-2494:25.

[184] Trial Testimony of Paul Huffard, May 28, 2014, 2019:24-2021:1.

A. For the reasons described within my report, the general ratio is similar. So, again, to me, that points to the use of the contribution analysis. But, yes, I think that the numbers speak for themselves in similar proportion.

Q. The same comments that you made in paragraph 41 -- on page 41 of your rebuttal report, comparing Mr. Kinrich's allocation to Canada, which was 9.7 percent, could be made about the license approach, your license approach allocation to Canada of 10.6 percent. The numbers are close enough so that the same conclusions would follow; isn't that fair?

A. The same order of magnitude comparison of the data would apply.[185]

136.    EMEA's License Theory suffers from the same fundamental defects as the U.S. Revenue Theory set out at section IV(B), above.

**E.    EMEA Contribution Theory is Flawed**

137.    The EMEA Debtors' preferred approach for allocating IP-related Sale Proceeds is to divide them based on the parties' relative "contributions" to R&D.[186]  The Contribution Theory is flawed for the following reasons.

138.    *First*, as discussed in section III above, the Contribution Theory is unprincipled and ignores the parties' legal rights.  Mr. Malackowski admitted that the Contribution Theory is not based on the parties' rights under the MRDA, and that the interpretation of the MRDA is irrelevant to it.[187]  The MRDA cannot simply be ignored, as Mr. Malackowski proposes.  It governs the ownership and licensing of the NN Technology and makes clear that the "sole" consideration for each Licensed Participant's R&D contributions were the RPSM payments they received.[188]

139.    *Second*, even if the parties' rights could be ignored (which they cannot), historical R&D expenditure does not accurately measure the relative contributions of the Nortel Debtors. Mr. Malackowski himself admitted that the most accurate process for determining contribution to IP would be "by interviewing all of the firm's R&D staff, and by reviewing all the documentation related to the firm's research (e.g. lab notebooks, invention disclosures, meeting

---

[185] Deposition Testimony of James Malackowski, March 19, 2014, 77:24-789:3; 79:18-80:17. See also: Trial Testimony of James Malackowski, May 30, 2014, 2474:18-2475:23.

[186] See Primary Report of James Malackowski dated January 24, 2014, p. 48 (TR00033).

[187] Trial Testimony of James Malackowski, May 29, 2014, 2319:23-2320:17 and May 30, 2014, 2442:1-2443:17.

[188] See the 6th Recital, Articles 1(i), 2(c) and 3(a), and Schedule A, of the MRDA (TR21003).

minutes, research presentations etc.)", which "would allow one to determine where the conception of the idea for each invention occurred, what resources and data led to the conception of the inventions and what resources were used to reduce each invention to practice."[189] Mr. Malackowski used R&D spend as a proxy for contribution.[190]   Yet, there is no direct correlation between spending on R&D and value,[191] particularly in the case of inventive IP,[192] a fact which Mr. Malackowski himself conceded when rejecting the cost approach to valuing the gross Sale Proceeds related to IP.[193]   Judge Gross had it exactly right:

> THE US COURT:   All right.   Let me ask a question of you that -- it may be oversimplified but it will help me to understand, I think, the contribution theory a little better. Let's assume that research and development, not costing very much money, leads to an enormously successful line; and then let's assume that there is another product that cost a tremendous amount of money and results in very little income.
>
> THE WITNESS:  Correct.
>
> THE US COURT:   Under your allocation theory, would the latter receive more recognition?
>
> THE WITNESS:  Yes….[194]

140.     In addition, R&D spending is not the only input required to create valuable technology. There are other inputs, including strategic oversight, administrative costs, and financing costs, a disproportionate amount of which were borne by the Canadian Debtors.

141.     *Third*, there are other measures of contribution, such as the location of the inventors, that are at least as accurate a measure of contribution as R&D spend.  For instance, Mr. Malackowski uses the location of inventors as a "reasonableness check" on the other Core Parties' proposed

---

[189] Primary Report of James Malackowski dated January 24, 2014, p. 39 (TR00033).

[190] *Id.*, p. 39; Trial Testimony of James Malackowski, May 29, 2014, 2346:23-2348:1; 2365:18-23.

[191] Rebuttal Report of Thomas Britven dated February 28, 2014, p. 27, para. 6.15 (TR00046); Rebuttal Report of Philip Green dated February 28, 2014, p. 34 (TR00043); Trial Testimony of Brian McFadden, May 14, 2014, 667:13-668:6; Trial Testimony of Simon Brueckheimer, May 22, 2014, 1595:3-12; Trial Testimony of Peter Newcombe, May 22, 2014, 1637:10-1638:2, 1641:25-1642:6.

[192] *Cadbury Schweppes Inc. v. FBI Foods Ltd.*, [1999] 1 S.C.R. 142 at paras. 65-66 ("The 'consulting fee' approach uses the putative development costs… as a proxy for the market value of the confidential information… [I]f the information was something special, as, for instance, if it involved an inventive step… then the value of it is… not merely a consultant's fee, but the price which a willing buyer -- desirous of obtaining it -- would pay for it").

[193] Primary Report of James Malackowski dated January 24, 2014, p. 22 (TR00033).

[194] Trial Testimony of Paul Huffard, May 29, 2014, 2162:20-2163:8. See also Trial Testimony of James Malackowski, May 29, 2014, 2361:25-2363:4.

allocations,[195] yet rejects the inventorship analysis on the basis that R&D at Nortel was collaborative.[196] However, the grant of a patent confers a statutory right on a specific inventor in recognition of that inventor's unique idea. The location of the inventors is thus at least as good a proxy for measuring relative contributions as the Nortel entity that incurred the R&D expense.[197] As Nortel's former CTO Brian McFadden testified:

> Q. -- it's really hard to say exactly what was the research that led to the patent application?
>
> A. The authors would probably beg to differ with you.[198]

142. It is noteworthy that 13 of 15 of the most prolific Nortel inventors were Canadian,[199] approximately 50% of all patents and patent applications were invented by Canadian inventors,[200] and approximately 54% of Nortel's "top patents" originated in Canada.[201] While Mr. Malackowski uses the inventorship analysis as a "reasonableness check", he would allocate just 39.5% of the Residual IP Proceeds to Canada despite his own conclusions that Canadian inventors were responsible for 51.9% of the patents in the Residual IP Portfolio and 46.3% of the patents in the Residual IP Portfolio designated as "high interest".[202] In addition, he would allocate 42.9% of the Residual IP to the U.S. Debtors, despite his conclusion that the Americans invented only 27.4%.[203] In short, his proposed allocation fails on his own reasonableness check.

143. *Fourth*, the Contribution Theory is selective and seeks to re-write the parties' contractual bargain for sharing operating profits under the MRDA. The EMEA Debtors' experts rely on the MRDA profit sharing provisions as "support" for the Contribution Theory.[204] While Mr. Malackowski finds support for the notion of contribution in the RPSM, he invents a new

---

[195] Rebuttal Report of James Malackowski dated February 28, 2014, pp. 41-42 (TR00034); Malackowski Testimony, May 30, 2014, 2473:25-2477:2.

[196] Primary Report of James Malackowski dated January 24, 2014, p. 39 (TR00033).

[197] Rebuttal Report of Thomas Britven dated February 28, 2014, para. 6.17 (TR00046).

[198] Trial Testimony of Brian McFadden, May 14, 2014, 688:12-16.

[199] Rebuttal Report of Thomas Britven dated February 28, 2014, para. 6.17 (TR00046).

[200] Affidavit of Angela de Wilton dated April 11, 2014, para. 14 (TR00006).

[201] Primary Report of Coleman Bazelon dated January 24, 2014, p. 18, Table 1 (TR00039).

[202] Rebuttal Report of James Malackowski dated February 28, 2014, p. 40 (TR00034).

[203] *Id*., p. 41. The results are similar when all patents/applications in both the Business Sales and Residual IP Sale are considered: see Rebuttal Report of Thomas Britven dated February 28, 2014, para. 6.17, Table 4 (TR00046).

[204] Primary Report of James Malackowski dated January 24, 2014, p. 6 (TR00033); Trial Testimony of James Malackowski, May 29, 2014, 2240:3-11; Primary Report of Richard V.L. Cooper (Allocation) dated January 24, 2014, para. 4.1 (TR00035).

formula for sharing profits to which the Participants never agreed.  He chooses look-back periods for the patents transferred in the Sales based on one year prior to the oldest unexpired patent in each Sale designated as high interest by Global IP.[205]  The proposed start dates for the look-back periods are as early as 1989 (in the case of the Enterprise Sale) and as late as 2001 (in one scenario considered for the Residual IP Sale), and are a multiple of the effective five year period mandated by the RPSM. The Nortel Participants were fully aware that the RPSM would exclude spending on patents included in Mr. Malackowski's proposed look-back periods when they agreed to share operating profits according to the RPSM.[206]

144.    *Fifth*, the EMEA Debtors draw "support" for the contribution approach from various Pre-Filing "precedents", which they do not even follow. None of these so-called precedents is admissible to interpret the MRDA. In any event, none support an allocation based on R&D spend over the exceedingly long look-back periods advocated by Mr. Malackowski:

(a)     Nortel allocated IP from the sale of its UMTS business to Alcatel on the basis of the original 30% declining balance amortization formula in the RPSM, not on the basis proposed by Mr. Malackowski.[207]

(b)     Nortel tax personnel prepared "Potential Questions and Sample Answers" for a "kick-off meeting" on the Advanced Pricing Agreement with the IRS and CRA. The sample Q&A simply contains a suggestion that proceeds from the sale of IP would be allocated to the RPEs "on the basis of their share of total R&D capital stock in the year of sale" (i.e. the 30% declining balance amortization), not on the basis proposed by Mr. Malackowski.[208]

(c)     Nortel considered transferring certain IP owned by NNUK and NNSA to NNL. Mr. Malackowski stated that the "intellectual property value" in this proposed

---

[205] Primary Report of James Malackowski dated January 24, 2014, pp. 48-49 (TR00033).

[206] Trial Testimony of James Malackowski, May 30, 2014, 2431:25-2434:24.

[207] Trial Testimony of James Malackowski, May 29, 2014, 2271:12-16.

[208] APA Kick Off Meeting: Potential Questions and Sample Answers, p. 39 (TR22020); Trial Testimony of James Malackowski, May 30, 2014, 2435:2-2437:5. There is no evidence that the document was approved by senior Nortel management, was shared with revenue authorities or that the sample question and answer was even discussed with revenue authorities. See: Email from Rob O'Connor dated June 13, 2002 (TR22017); Email from Bill Morgan dated June 14, 2002 (TR50977.01 and TR50977.02); Deposition Testimony of Mary Pahapill, October 3, 2013, 133:24-134:13; 135:20-136:20; 138:25-139:4; 146:18-25; 147:12-15; 149:23-150:2; 158:10-16; 164:23-165:12.

transaction "was to be allocated to NNUK and NNSA based on the contribution approach."[209]  However, the look-back period considered for the calculation, had the transaction been completed, was the RPSM.[210]

(d)    Nortel shared income resulting from patent litigation with Foundry according to the RPSM, not based on the method proposed by Mr. Malackowski. Nortel was fully aware that patents litigated in the Foundry proceedings had priority dates that fell outside of the RPSM period.[211]

(e)    Nortel's consolidated financial statements for 2010 broke out IP-related proceeds from the Business Sales based on the RPSM, not the method proposed by Mr Malackowski.[212]

(f)    The so-called "draft PPAs" relied upon by counsel to the EMEA Debtors in their cross-examination of Mr. Britven listed allocations for the intangible assets based on RPSM percentages, not the method advocated by Mr. Malackowski.[213]

145.    As Mr. Malackowski admitted on cross-examination:

Q.    So, sir, at the end of the day, is it fair to say that there is no example of Nortel ever speaking of the allocation of proceeds, agreeing to an allocation of proceeds or applying an allocation of proceeds with a look-back approach such as you are using?

A.    Within the Nortel documents I have seen, I think they have utilized the RPSM while that was in place for their look-back analysis.

Q.    And not yours?

---

[209] Malackowski Demonstrative, p. 34 (DEM00011).

[210] Trial Testimony of James Malackowski, May 30, 2014, 2437:6-20.

[211] Trial Testimony of James Malackowski, May 30, 2014, 2437:21-2439:16.

[212] Id., 2439:17-2441:25. The financial statements contained a substantial caveat at p. 74 (TR21541): "The ultimate determination of the final allocation of such proceeds among the various Nortel legal entities… has not yet occurred and may be materially different from the NNL classification and related amounts shown in these financial statements. The IFSA and the escrow agreements for sales divestiture proceeds entered into by NNL, NNI and other Nortel legal entities provide for the processes for determining the final allocation of divestiture proceeds among such entities, either through joint agreement, or, failing such agreement, other dispute resolution proceedings. Adjustments to the NNL classification and any related amounts arising from the ultimate allocation will be recognized when finalized. The NNL classification and related amounts shown in these financial statements are not determinative of, and have not been accepted by any debtor estate, any party in interest in the Creditor Protection Proceedings or any court overseeing such proceedings, for the purposes of deciding the final allocation of divestiture proceeds."

[213] Trial Testimony of Thomas Britven, June 6, 2014, 3510:4-3511:2.

A.      Of course.[214]

146.    Mr. Malackowski's choice of look-back period is selective and self-serving to the EMEA Debtors. While he admitted that he did not calculate the allocations to the Debtor Groups based on the RPSM, he conceded that it would likely reduce the allocation to EMEA:

> … I think your question was, if I were to limit my methodology to a five-year look-back, would that, in fact, reduce the ultimate allocation to EMEA. And my sense of that is that it would, given my understanding of the historical incurrence of the data, but I can't tell you by how much.
>
> Q.      And you can't tell us by how much because you didn't do that comparison calculation?
>
> A.      I don't believe that comparison is relevant. *I have not done it*.[215]

147.    For these reasons, the EMEA Contribution Theory should be rejected.

## F.      U.S. Modified Contribution Theory is Flawed

148.    Recognizing the deficiencies in their Revenue Theory, the U.S. Interests propose an alternative theory based on a modification of the Contribution Theory espoused by EMEA, which conveniently results in an allocation to the U.S. Debtors similar to the Revenue Theory supported by Mr. Kinrich.[216]  Laureen Ryan, an expert for the U.S. Interests, proposes to modify the Malackowski/Huffard allocation by adding transfer pricing payments and receipts required to be made by each of the Nortel Participants to the actual R&D spending recorded by the Participants in Nortel's books and records. The result is a drop in Canada's allocation of IP-related Sale Proceeds proposed by EMEA by nearly one half.[217]   In addition to the flaws associated with the EMEA Contribution Theory, the U.S. Modified Contribution Theory suffers from the following further flaws.

149.    *First*, it is contrary to the express terms of the MRDA.  The MRDA expressly required the Participants to allocate profits and losses based on the R&D *performed* by each Participant (what Ryan calls "Direct R&D Spend").  The transfer pricing payments and receipts are the

---

[214] Trial Testimony of James Malackowski, May 30, 2014, 2459:8-12.

[215] Deposition Testimony of James Malackowski, March 19, 2014, 77:24-78:7; 79:18-24; 80:8-17, *emphasis added*. See also: Trial Testimony of James Malackowski, May 30, 2014, 2459:13-2467:9.

[216] Rebuttal Report of Laureen Ryan dated February 28, 2014, p. 3 (TR00055).

[217] Trial Testimony of Laureen Ryan, June 19, 2014, 4518:14-4519:4.

*result* of the RPSM formula by which the Participants agreed to share operating profits.  The following terms of the MRDA make this clear:[218]

(a)    The fourth recital states: "[w]hereas each Participant has *performed*, in the past and intends to continue to *perform* R&D Activity with respect to the Nortel Products."

(b)    The sixth recital states that "each Participant believes that it is appropriate that each Participant should benefit from its contribution to *R&D activity commensurate with the value of its contribution to that R&D activity* in the context of the manner in which the Nortel Networks business is conducted *and that the residual profit split methodology (RPSM) is the best arm's length measure, in the circumstances of NNL and the Participants, of such contributions* with reference to such benefits."

(c)    Article 2(a) requires each Participant to use its best efforts "to *perform* R&D Activity at a level consistent with past practices and the ongoing needs of the Nortel Networks business for its respective Territory."

(d)    "R&D Activity" is defined in Article 1 as "all research and development activity… *performed* by, or for, any Participant."

(e)    Article 2(c) states that "[a]ll costs incurred *directly* or *indirectly* by each Participant for R&D Activity shall be borne exclusively by it. *Any reimbursement for costs* including any other compensation shall be provided to such Participant for its R&D Activity *solely as provided* in Article 3 below."

(f)    Article 3(a) states that "[f]or and as a consequence of the performance of R&D Activity, *each Participant shall be entitled to receive a payment in an amount equal to the allocation determined under the RPSM* (the 'R&D Allocation') as the measure of the benefit to which it is entitled commensurate with its *performance of*, and contribution to, R&D Activity."

---

[218] *Id.*, 4566:24-4572:2, 4590:9-4592:9.

(g)     Article 3(b) states that "*[e]ach Participant hereby accepts and agrees to make the payment determined under the RPSM* in Schedule A *as representing such Participant's share* of the R&D Allocation."

(h)     The Second Amendment to Schedule A states: "whereby a *Participant that holds profits in excess of its attributable share hereunder would be required to pay amounts to Participants that hold profit in an amount less than their attributable share.*"

(i)     Article 11(c)(i) provides that a Participant will be automatically terminated from participation in the MRDA in the even it fails to perform R&D Activity for each of the two previous years.

150.    Adding transfer pricing payments back to the actual R&D expenditures recorded by each Participant does not measure relative contribution at all. It simply assumes, contrary to the MRDA's express terms, that each Participant is entitled to keep all operating revenue generated in its Exclusive Territory and that the transfer pricing payments it is required to make under the agreement are an expense used to "fund" R&D Activity carried out by other Participants. The result is to skew the allocation result towards the U.S. Debtors, which had the highest ratio of recorded revenues to R&D expenditure.[219]

151.    *Second*, the modifications proposed by Ms. Ryan are not only contrary to the MRDA's express terms, but are inconsistent with the U.S. Debtors' own representations to these Courts. In seeking approval of the IFSA, the U.S. Debtors acknowledged that the transfer pricing methodology set out in the MRDA is, in normal times, "the means by which NNL is compensated for the development and use of its intellectual property by affiliates" and that "NNL… has historically been a net recipient under the Nortel Transfer Pricing Regime given that NNL generates lower levels of revenue when compared to the high level of corporate overhead and Research and Development Activity incurred in Canada."[220] Ms. Ryan conducted no analysis whatsoever of the value that NNI derived from the use of NNL's IP or the

---

[219] See Trial Testimony of Laureen Ryan, June 19, 2014, 4588:10-4589:7.
[220] IFSA Motion, para. 14 (TR11366).

disproportionate R&D and corporate overhead activity NNL performed for its subsidiaries, including NNI.[221]

152.    *Third*, even if Ms. Ryan's adjustment to the EMEA Contribution Theory were conceptually correct (which it is not), her estimates of "indirect" R&D are wholly unreliable. For the period 2001-2008, she added to the R&D expenditure actually incurred by the Participants "TP used for R&D".  The latter figure was simply an estimate based on the assumption that R&D from transfer pricing adjustments was used proportionally to fund the R&D and selling, general and administrative (SG&A) expenses by Nortel Entities receiving transfer pricing payments.[222] Nortel never did the calculation that Ms. Ryan put forward,[223] which is unreliable as it excludes large categories of real costs that Nortel entities incurred and does not even attempt to measure how transfer pricing adjustments were actually used.[224]

153.    *Fourth*, Ms. Ryan counted $2 billion in payments made by NNI to NNL as a result of the settlement between Nortel and the IRS and CRA as an R&D contribution made by NNI, ███ ████████████████████████████████████████████████████████████.  The result is to significantly overstate even her own inflated estimates of the contributions to R&D made by NNI.[225]

154.    *Fifth*, Ms. Ryan's approach leads to nonsensical results. By including "indirect" R&D spending, some Nortel entities, whose labs made substantial contributions to R&D, are treated as having *negatively* contributed to Nortel's R&D.[226]

155.    For these reasons, the EMEA Contribution Theory, as modified by the U.S. Interests, is unreliable and should be disregarded by the Courts.

---

[221] Trial Testimony of Laureen Ryan, June 19, 2014, 4592:5-4595:1.
[222] Rebuttal Report of Laureen Ryan dated February 28, 2014, Exhibit D.2, p. 7/10 (TR00055).
[223] Trial Testimony of Laureen Ryan, June 19, 2014, 4524:3-4525:6.
[224] *Id.*, 4525:7-4530:2, 4530:18-4531:8, 4532:23-4533:2.
[225] *Id.*, 4538:16-4539:23.
[226] *Id.*, 4552:20-4557:5.

# PART VI - CCC PRO RATA ALLOCATION

**A.    In the Alternative, the Courts Should Adopt the CCC Pro Rata Allocation**

156.    If the Courts decline to allocate the Sale Proceeds based on the CCC's Ownership Allocation, the Courts should allocate the Sale Proceeds in a manner that most properly and adequately accounts for the undisputed evidence that Nortel functioned globally as a highly integrated organization – "one Nortel."[227]    Nortel's integrated operation was fueled by the collective contributions of all Creditors of all of the Nortel Debtors.

157.    As explained above, the simplistic and self-serving valuation theories proposed by the U.S. Interests and EMEA Debtors' experts fail to adequately account for the assets transferred and relinquished in the transactions that gave rise to the Sale Proceeds.  This is not surprising when one considers that it took the IRS and CRA, even with the full benefit of 20/20 hindsight, some six years to express a position on the allocation of value as between only two of the Nortel Debtors (and even that dispute was ultimately settled, not adjudicated).

158.    Both the U.S. Court and the Canadian Court are fully empowered and justified to allocate the Sale Proceeds to the Debtor Estates so as to provide each estate sufficient funds over and above its cash and unliquidated assets on hand necessary to enable it to: (i) pay its valid senior and priority claims in full; and (ii) thereafter pay the same common dividend as all other Nortel Debtors on its valid Pre-Filing general unsecured claims.

159.    Contrary to the U.S. Interests' extensive misrepresentations and mischaracterizations in their Pre-Trial Brief, and throughout these proceedings, the CCC Pro Rata Allocation: (i) is *not* a bare methodology devoid of any underlying theory;[228] (ii) distributes the Sale Proceeds to the Debtor Estates, *not* directly to Creditors in violation of the IFSA;[229] (iii) does *not* require *any* court to "cede its separate jurisdiction over distribution to creditors" or to "take actions inconsistent with the laws" of its jurisdiction in violation of the parties' Cross-Border Protocol;[230] (iv) neither requests, requires nor effects the substantive consolidation of the Debtor

---

[227] See Section VI(B), below.
[228] Pre-Trial Brief of the U.S. Debtors, p. 129.
[229] *Id.* at 128-129.
[230] *Id.* at 129-130.

- 59 -

Estates;[231] (v) does not impair the reasonable and legitimate expectations of Nortel's Creditors in violation of applicable law;[232] and (vi) is within the power of the Courts to order; and (vii) is fully cable of being effected.

160.    The CCC Pro Rata Allocation maintains the corporate separateness of each Nortel Debtor and does not interfere with its rights to crystallize the asserted Claims against it and distribute recoveries in respect of valid Claims pursuant to the governing laws and practice in each jurisdiction.  Cash on hand in any Nortel Debtor stays there.  No laws or processes of the jurisdiction under which each Nortel Debtor operates are ceded or impacted in any respect.  Each Nortel Debtor and its stakeholders retain all rights they have respecting the ultimate distribution of assets allocated.  Further, the reasonable and legitimate expectations of Nortel's Creditors are respected, as required by applicable law.

## B.    Evidence Supports the CCC Pro Rata Allocation

161.    The CCC Pro Rata Allocation is appropriate where, as here, the evidence is undisputed that Nortel was a highly integrated company that was often referred to as "one Nortel".[233] Indeed, there was no interest in purchasing Nortel's Lines of Business or technology on a "subsidiary by subsidiary" or geographic basis,[234] and the sale of Nortel's assets on an integrated basis enhanced the value recovered collectively by the Nortel Debtors.[235]  Nortel's integrated multinational technology business operated along four Lines of Business that spanned borders and legal entities,[236] with key functions such as Treasury, Finance, Technology and Legal

---

[231] *Id.*

[232] *Id.* at 130, 138-139.

[233] Trial Testimony of Brian McFadden, May 14, 2014, 711:11-712-11; Trial Testimony of Sharon Hamilton, May 15, 2014, 1018:7-25; Trial Testimony of Simon Brueckheimer, May 22, 2014, 1583:11-21; Trial Testimony of Coleman Bazelon, June 2, 2014, 2911:15-21; Deposition Testimony of Ernie Briard, September 26, 2013, 16:18-17:18; 75:14-76:19; 78:6-17; 79:25-80:14; Deposition Testimony of Khush Dadyburjor, October 3, 2013, 19:7-20:12, 37:07-13; Deposition Testimony of Allan Bified, November 25, 2013, 255:21-258:25.

[234] Trial Testimony of Sharon Hamilton, May 15, 2014, 1000:22-1002:22; Reply Affidavit of Sharon Hamilton, sworn April 25, 2014, para. 4, 20 (TR00010); Reply Affidavit of Paviter Binning, sworn April 24, 2014, paras. 4-5 (TR00015).

[235] A primary goal of bankruptcy is enhancing the value of the assets available to creditors.  *In re Owens Corning*, 419 F.3d 195, 211 & n.20 (3d Cir. 2005).

[236] Trial Testimony of Peter Currie, May 14, 2014, 538:5-539:2; Affidavit of Peter Currie sworn April 11, 2014, para. 23 (TR00001); Affidavit of Brian McFadden, sworn April 10, 2014, para. 31 (TR00004); Affidavit of Gordon Davies, sworn April 11, 2014, para. 6 (TR00013).

centrally managed by its Canadian operating parent.[237]   Regional subsidiaries primarily conducted sales and marketing functions, but were not a relevant factor in Nortel's business planning.[238]

162.    The conflicting and widely varying expert testimony on allocation at trial – and the obvious shortcomings in the allocation methodologies proposed by the U.S. and EMEA Debtors' experts – serve to corroborate the impossibility of "unscrambling the egg" within the framework of the trial process agreed by the parties and approved by these Courts.

### C.    Courts Have Jurisdiction to Order the CCC Pro Rata Allocation

163.    Both the U.S. Court and the Canadian Court are fully empowered to adopt the CCC's Pro Rata Allocation given the established evidence, the proposed CCC Pro Rata Allocation implementation methodology, and the governing law.

164.    In Canada, s. 11 of the CCAA provides the court with the general power to make any order that it considers appropriate. The CCAA is designed to be a "flexible instrument," as discussed by Justice Blair (as he then was) in *Re Canadian Red Cross Society*:

> It is not infrequent that judges are told, by those opposing a particular initiative at a particular time, that if they make a particular order that is requested it will be the first time in Canadian jurisprudence (sometimes in global jurisprudence, depending upon the level of the rhetoric) that such an order has made! Nonetheless, the orders are made, if the circumstances are appropriate and the orders can be made within the framework and in the spirit of the CCAA legislation.[239]

165.    Similarly, the Code permits courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Code]".[240]   The Third Circuit has construed this provision to give bankruptcy courts "broad authority" to provide equitable relief appropriate to assure the orderly conduct of reorganization proceedings[241] and to "craft flexible

---

[237] Trial Testimony of Peter Currie, May 14, 2014, 544:17-545:18; Trial Testimony of Michael McCorkle, May 15, 2014, 813:10-19; Affidavit of Paviter Binning, sworn April 10, 2014, para. 7 (TR00014); Affidavit of Peter Currie, sworn April 11, 2014, para. 35 (TR00001).

[238] Trial Testimony of Michael McCorkle, May 15, 2014, 813:10-19; Affidavit of Peter Currie sworn April 11, 2014, paras. 30-31 (TR00001).

[239] *Re Canadian Red Cross Society*, [1998] O.J. No. 3306 at 45.

[240] 11 U.S.C. §105(a).

[241] See, e.g., *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 236 (3d Cir. 2004).

remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain."[242]

166.    Courts in the U.S. have observed that "[t]he 'overriding consideration' in bankruptcy is that 'equitable principles govern.'"[243]  The "function of equitable considerations in a bankruptcy proceeding is to guide the division of a pie that is too small to allow each creditor to get the slice for which he originally contracted."[244]  In carrying out this objective, "[t]he court may diminish one creditor's bargained for rights in order to protect a second creditor's bargained for rights."[245]

167.    This approach extends to multinational corporate groups in international insolvency. As several courts have noted, "the United States…has embraced an approach to international insolvency… accepting the central premise of universalism, that is, that assets should be collected and distributed on a worldwide basis".[246]  These policies are of particular importance where the business is integrated on a global basis.

168.    In Canada, the Ontario Superior Court of Justice has a broad inherent jurisdiction:

> As a superior Court of general jurisdiction, the [Superior Court of Justice] has all of the powers that are necessary to do justice between the parties. Except where provided specifically to the contrary, the Court's jurisdiction is unlimited and unrestricted in substantive law in civil matters.[247]

169.    Under the CCAA, the court has a broad discretion to grant such relief as is necessary to achieve the purposes of the Act.[248]  Furthermore, the court has a broad discretion under the

---

[242] *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (en banc).

[243] *In re Tucson Yellow Cab Co., Inc.*, 789 F.2d 701, 704 (9th Cir. 1986) (quoting *Bank of Marin v. England*, 385 U.S. 99, 103 (1966)).

[244] *Matter of Chicago, Milwaukee, St. Paul & Pac. R. Co*., 791 F.2d 524, 528 (7th Cir. 1986).

[245] *Matter of Terry Ltd. P 'ship*, 169 B.R. 182, 186 (Bankr. N.D. Ind. 1993).

[246] *Maxwell Commc'n. Corp v. Barclays Bank (In re Maxwell Commc'n. Corp.)*, 170 B.R. 800, at 816 (Bankr. S.D.N.Y. 1994). See also *In re ABC Learning Centres Limited*, 728 F.3d 301, 305-306 (3d. Cir. 2013). Several international quasi-governmental organizations [eg, World Bank and IMF] and non-governmental organizations [eg, INSOL International, International Bar Association, American Bankruptcy Institute, American Bar Association] have joined with the United Nations Commission on International Trade Law (UNCITRAL) Working Group V on Insolvency Law to develop guiding principles for dealing with insolvency proceedings of multinational corporate enterprise groups predicated on core universalism principles. See, http://www.uncitral.org/uncitral/en/commission/working_groups/5Insolvency.html; http://www.uncitral.org/uncitral/en/commission/colloquia/insolvency-2013-papers.html.

[247] *80 Wellesley St. East Ltd. v. Fundy Bay Builders Ltd. et al.*, [1972] 2 O.R.280 (C.A.) at para. 9.

[248] *Century Services Inc. v. Canada (Attorney General)*, 2010 SCC 60 at paras. 57-61; *Crystallex Re*, 2012 ONCA 404 at para. 63, leave to appeal denied, 2012 CarswellOnt 11931; Jackson R., and Sarra, J. P., "Selecting the Judicial Tool to get the Job

- 62 -

CCAA to grant such relief as is necessary to achieve the purposes of the CCAA.[249]  In *Century Services*, the Supreme Court of Canada observed:

> Judicial decision making under the CCAA takes many forms. A court must first of all provide the conditions under which the debtor can attempt to reorganize. This can be achieved by staying enforcement actions by creditors to allow the debtor's business to continue, preserving the status quo while the debtor plans the compromise or arrangement to be presented to creditors, and supervising the process and advancing it to the point where it can be determined whether it will succeed....In doing so, the court must often be cognizant of the various interests at stake in the reorganization, which can extend beyond those of the debtor and creditors to include employees, directors, shareholders, and even other parties doing business with the insolvent company.... In addition, courts must recognize that on occasion the broader public interest will be engaged by aspects of the reorganization and may be a factor against which the decision of whether to allow a particular action will be weighed....
>
> When large companies encounter difficulty, reorganizations become increasingly complex. CCAA courts have been called upon to innovate accordingly in exercising their jurisdiction beyond merely staying proceedings against the debtor to allow breathing room for reorganization. They have been asked to sanction measures for which there is no explicit authority in the CCAA.[250]

170.    This equitable power is reflected in the current enactment of the CCAA, which expressly recognizes that a supervising Court "may, subject to the restrictions set out in this Act... make any order that it considers appropriate in the circumstances."[251]  This includes effecting remedies much broader than those sought here, including the actual consolidation of estates and claims in Canadian insolvencies.[252]

171.    This is a novel case.  Equitable principles, however, are not novel.  Equitable *pro rata* outcomes are ordered by courts when it is determined that there is no more coherent and fair measure to apportion value and determine entitlements.  In this case, having regard to the way Nortel operated as established by the evidence, if the CCC's Ownership Allocation is not

---

Done: An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters," in Sarra, J. P., ed., 2007, Annual Review of Insolvency Law, (Vancouver: ThomsonCarswell, 2007).

[249] *Companies' Creditors Arrangement Act*, R.S.C., 1985, c. C-36 ("CCAA"), s. 11; *Crystallex Re*, 2012 ONCA 404 leave to appeal denied, 2012 CarswellOnt 11931; Jackson R., and Sarra, J. P., "Selecting the Judicial Tool to get the Job Done: An Examination of Statutory Interpretation, Discretionary Power and Inherent Jurisdiction in Insolvency Matters," in Sarra, J. P., ed., 2007, Annual Review of Insolvency Law, (Vancouver: ThomsonCarswell, 2007).

[250] *Century Services Inc. v. Canada (Attorney General)*, 2010 SCC 60 at paras. 60-61, *emphasis added*.

[251] *CCAA*, s. 11.

[252] *Ashley v. Marlow Group Private Portfolio Management Inc.*, [2006] O.J. No. 1195 (S.C.J.) at para. 71; *A&F Baillergeon Express Inc. (Trustee of), Re*, [1993] Q.J. No. 884 (S.C.) at paras. 21 and 23.

accepted, there is no more coherent and fair way to apportion the Sale Proceeds than the CCC Pro Rata Allocation.

**D.      Jurisprudence Supports Pro Rata Recovery**

172.    No statute or court decision prohibits the Courts from adopting the CCC Pro Rata Allocation.  In other contexts, courts in both jurisdictions have allocated asset values among corporate affiliates in bankruptcy proceedings to effect a rateable distribution on a domestic basis.[253]  Nothing prevents the Courts from doing so on a global basis where, as here: (i) the appellate courts in both jurisdictions have determined that the Nortel Debtors have empowered the Courts to determine allocation of the Sale Proceeds among them; (ii) the governing laws of both jurisdictions empower the Courts to order the CCC Pro Rata Allocation; and (iii) contrary to the U.S. Interests' continual misrepresentations to the Courts, the CCC Pro Rata Allocation neither provides for, requires, nor effects substantive consolidation globally or otherwise, does not in any manner impair the separateness of the Nortel corporate Entities nor the powers of the Courts or application of the laws and processes of their individual jurisdictions, nor does it damage the reasonable and legitimate expectations of their Creditors.

173.    In *In re Owens Corning*, the U.S. Court of Appeals for the Third Judicial Circuit observes that substantive consolidation "*treats separate legal entities as if they were underlined merged into a single survivor left with all the cumulative assets and liabilities, (save for inter-entity liabilities which are erased. The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor*."[254]  The CCC Pro Rata Allocation does *not* merge the Nortel Debtors into a single survivor and does *not* erase Intercompany Claims.  All Claims against each Nortel Debtor, including Intercompany Claims, are crystallized by and within, and receive distributions from the separate Debtor Estates.

174.    Rather than preventing the Court's adoption of the CCC's Pro Rata Allocation, *Owens Corning supports* it.  In *Owens Corning*, the Third Circuit articulates criteria which, if met, enable courts to sustain the pooling and distribution of assets of affiliated debtors predicated on

[253] See, e.g., *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215 (1941); *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005); *Ashley v. Marlow Group Private PortfolioManagement Inc.*, [2006] O.J. No. 1195 (S.C.J.) at para. 71; *A&F Baillargeon Express Inc. (Trustee of), Re*, [1993] Q.J. No. 884 (S.C.) at paras. 21, 23; *Ornge Global GP Inc.*, Re, 2013 CarswellOnt 9770 (S.C.J.) at paras. 13, 15; *Kitchener Frame Ltd.*, 2012 CarswellOnt 1347 (S.C.J.) at para. 30.
[254] *Owens Corning,* 419 F.3d at 205 (3d Cir. 2005) (emphasis added) (citation omitted).

guiding principles of equity designed to achieve an equitable result where the circumstances presented require equitable resolution.[255]

175.    The Third Circuit rendered this determination in the context of substantive consolidation and its resultant disregard of the corporate separateness of the affiliated *Owens Corning* debtors. The same guiding principles of equity sustain the Courts' adoption of the far less onerous equitable distribution of the collective assets of the Nortel Debtors, *without* consolidation of their estates, afforded by the CCC's Pro Rata Allocation should the Courts determine that allocation based on ownership of such assets is impossible or impracticable due to the highly integrated, entangled nature of Nortel and resultant commingling of its assets.

176.    Further, the facts of *Owens Corning* disabling the debtors in that case from meeting the Third Circuit criteria drastically differ from the Nortel facts -- which *do* justify the CCC Pro Rata Allocation.

177.    In stark contrast to the Nortel Debtors, the affiliated *Owens Corning* entities had different, independent, separate business purposes, logos and trade names, and other features which made separating their assets and liabilities straightforward.[256]    As the Third Circuit observed with respect to the Owens debtors, "*[t]here is no question which entity owns which principal assets and has which material liabilities.*"[257]    In contrast, Nortel was a highly integrated matrix organized along Lines of Business operating for the same purpose under the same logo and trade name, and engaged in the development, manufacture, and sale of various products of a single company – Nortel.  The very *cause* of this litigation is that ownership of Nortel's assets and entitlement to receive the proceeds of their sale has been put into question.

178.    In further contrast to Nortel, *Owens Corning*'s affiliated debtors were contractually bound to maintain their corporate separateness.  The *Owens Corning* loan agreement, entered into by Owens Corning's independent finance corporation and guaranteed by all affiliated debtors, contained a slew of terms "negotiated . . . expressly to limit the ways in which [borrower] could deal with its subsidiaries" and designed to protect corporate separateness:

---

[255] *Id.* at 211 (explaining criteria for substantive consolidation).
[256] *Id.*
[257] *Id.* at 214.

      (a)      the subsidiaries were contractually required to keep separate books and financial records in order to prepare separate financial statements for submission to the lending syndicate;

      (b)      the lending syndicate was permitted to visit each subsidiary and discuss business matters directly with that subsidiary's management;

      (c)      the subsidiaries were prohibited from merging into the parent; and

      (d)      guarantor subsidiaries were prohibited from merging with other subsidiaries unless there would be no effect on the guarantees' value.[258]

179.    The Third Circuit considered the *Owens Corning* contractual prohibitions strong evidence of Owens Corning's lenders' pre-petition reliance on corporate separateness.[259]  The Nortel cross-over bonds indentures do not contain such restrictive characteristics of the guaranteed loan in *Owens Corning*.

## E.      Guaranteed Bondholders Not Harmed by CCC Pro Rata Allocation

180.    The Guaranteed Bondholders, along with the Committee and the U.S. Debtors, have maintained that the bonds' guarantees prevent adoption of the CCC Pro Rata Allocation.[260]  In evaluating the U.S. Interests' arguments, the Courts should consider the nature of the bond instruments, the circumstances of the bondholders' accumulation of bonds, and the lack of *any* evidence offered to support the U.S. Interests' arguments.  These factors have all been deemed relevant in analogous situations.  Further, the evidence establishes that the Guaranteed Bondholders would not be unduly harmed or prejudiced by the CCC Pro Rata Allocation.[261]

### 1.      No Evidence of Bondholder Expectations

181.    As of March 2014, the Bondholder Group members reported approximately $2.22 billion in aggregate holdings of the principal amount of unsecured bonds that were guaranteed by NNI

---

[258] *Id.* at 212-14.

[259] *Id.*

[260] Pre-Trial Brief of the U.S. Debtors, pp. 138-139.

[261] See *Owens Corning*, 419 F.3d at 202-03, 212-13 (analyzing terms of credit agreement and circumstances under which it was entered into in order to determine whether consolidation of estates is appropriate).

or, in one case,[262] issued by a capital corporation subsidiary of NNI and guaranteed by NNL (collectively, the "Guaranteed Bonds").[263]   The Bondholder Group has maintained throughout this proceeding that holders of the Guaranteed Bonds relied on the guarantees (the "Guarantees") and their enforceability, and therefore legitimately expect – and are entitled – to recover from both their primary obligor and their guarantor on their claim for principal plus other asserted entitlements under their Indentures.   The Guaranteed Bondholders would thereby receive more than 100% recovery on their Pre-Filing claims for principal plus interest accrued as of the Filing Date.   There is no evidence, however, that the Nortel bondholders expected any specific outcome, legitimately or otherwise.

182.   The CCC observed in its pre-trial submission that "there is no evidence on the record from any party that the individuals that owned the bonds placed any meaningful reliance on either the guarantee or its enforceability."[264]   After a 21 day trial, nothing has changed.   None of the parties advocating the Guaranteed Bondholders' entitlement has produced *a scintilla of proof* of the Guaranteed Bondholders' alleged reliance on the Guarantees.   Not a single Nortel bondholder was deposed in this case.   Not a single Nortel bondholder testified at the trial.   Very simply, there is no evidence as to what any Nortel bondholder considered or relied upon when purchasing Nortel bonds, particularly those bondholders who purchased during the course of the insolvency proceedings.   There is only speculation and attorney argument.

183.   The only non-lawyer who advocated on behalf of Guaranteed Bondholders during this allocation proceeding was Professor John McConnell, an expert witness proffered by the Committee.[265]   But Professor McConnell testified that he did not speak to any Nortel bondholders, did not know when or generally at what price the Nortel bondholders purchased their bonds, did not review any bondholder's investment guidelines, and could not testify as to any real-world considerations of the Bondholder Group firms or any other Nortel bondholder.[266] All that Professor McConnell did was speculate.

---

[262] 7.875% Notes due in 2026.

[263] *See* Second Supplemental Verified Statement of Milbank, Tweed, Hadley & McCloy LLP, and Pachulski Stang, Ziehl & Jones LLP, Pursuant to Bankruptcy Rule 2019, March 11, 2014 [D.I. 13142] (TR 49184).

[264] CCC Pre-Trial Brief at para. 325.

[265] The Bondholder Group withdrew its expert as a trial witness on the eve of his scheduled testimony.

[266] Trial Testimony of John McConnell, June 23, 2014, 4876:6-4878:12.

184.    Speculation and attorney argument are not enough to establish reliance or that the bondholders expected a certain recovery.[267]   For example, the guaranteed lender in *Owens Corning* adduced "testimony from attorneys and bankers involved in negotiating the Credit Agreement that reflected their assessment of the value of the guarantees."[268]   There is no such testimony to consider here.

### 2.    Bondholders Purchased Risky and Weakly Protected Bonds

185.    Dating back to the time of issue and continuing up through Nortel's insolvency, prospective bond purchasers were put on notice of various risks and uncertainties in the Guaranteed Bonds, including and especially with respect to the Guarantees.

186.    As set forth in the CCC's pre-trial submission, Nortel specifically and explicitly disclosed certain risks associated with the enforceability of the Guarantees in offering memoranda and prospectuses that were disseminated at the time of issue.[269]   At trial, Professor McConnell confirmed that prospective bond purchasers would have reviewed and considered these materials and their warnings.[270]   Professor McConnell further agreed that prospective bond purchasers would have reviewed and taken into account various Moody's reports and their ratings, including Moody's determination – just one month before the Filing Date – that Nortel's non-guaranteed and guaranteed debt were *pari passu*.[271]

187.    The evidence adduced at trial has also confirmed that the unsecured guaranteed bond issuances were sub-investment grade and quite risky.   In his report, Professor McConnell discussed various ways that a borrower can reduce risk to a specific debt by incorporating protective covenants into a loan agreement, including collateral pledges, restrictions on dividends, "restrictions on asset sales, restrictions on leases, limits on the total debt that a

---

[267] See *In re Continental Airlines, Inc.*, 146 B.R. 520, 525 (Bankr. D. Del. 1992) (holding speculative argument in post-trial brief was insufficient to show reliance).

[268] *Owens Corning*, 419 F.3d at 213.

[269] See CCC Pre-Trial Brief at paras. 316-320. See also: Nortel Networks Limited Offering Memorandum dated June 29, 2006, at 18 (TR40117) ("Investing in the Notes involves substantial risks.  You should carefully consider all the information in this offering memorandum prior to investing in the Notes.  In particular, we urge you to consider carefully the factors set forth under "Risk factors" beginning on page 25 of this offering memorandum . . .").

[270] Trial Testimony of John McConnell, June 23, 2014, 4880:18-4882:14.

[271] *Id.*, 4879:17-4880:5, 4901:3-4902:12.

borrower may incur, and minimum ratios of current assets to current liabilities."[272]  On the stand, Professor McConnell agreed that whether these protections were present would inform the expectations of prospective bondholders.[273]  Likewise, as discussed above, the Third Circuit in *Owens Corning* also considered the presence of certain protections and covenants to be strong evidence of the lender's pre-petition reliance on guarantees.[274]

188.    Here, a review of the relevant bond documents establishes that those key provisions are missing and that bondholders received very weak protection.[275]  For example, the Offering Memorandum for the 2011/2013/2016 issues makes clear that "[t]he covenants in the indenture will contain significant exceptions and 'carve-outs' which may provide less protection to holders of Notes than indentures governing securities of comparably rated companies, and many of these covenants will cease to be in effect should the ratings on the Notes increase to investment grade."[276]

189.    Specifically, the 2011/2013/2016 indenture was designed "to provide significant operating flexibility for NNC and its subsidiaries."[277]  To that end, the Offering Memorandum states that the indenture will:

> Not restrict the ability of NNC or its subsidiaries to lend cash or make investments in non-guarantor subsidiaries, joint ventures, customers or other third parties other than in connection with a transfer of all or substantially all of the assets of NNC, the Company or NNI.[278]

190.    Mr. Paviter Binning, the former Executive Vice President and Chief Financial Officer of NNC and NNL (which issued all but one series of Guaranteed Bonds) testified that the Guaranteed Bonds' covenants and protections were "even weaker than the usual non-investment

---

[272] Rebuttal Report of John McConnell dated February 28, 2014, paras. 21-22 (TR00057).

[273] Trial Testimony of John McConnell, June 23, 2014, 4891:20-4892:2.

[274] *Owens Corning,* 419F.3d at 201 (noting that the credit agreement contained a slew of terms "negotiated . . . expressly to limit the ways in which [borrower] could deal with its subsidiaries," to protect corporate separateness and the value of the credit agreement's guarantee).

[275] Mr. McConnell did not know whether the Guaranteed Bonds indentures contained any of the protections he identified in his report.  See Trial Testimony of John McConnell, June 23, 2014, 4890:8-11.

[276] Trial Testimony of John McConnell, June 23, 2014, 4886:22-4887:6; Nortel Networks Limited Offering Memorandum dated June 29, 2006, pp. 29-30 (TR40117).

[277] Nortel Networks Limited Offering Memorandum dated June 29, 2006, pp. 29-30 (TR40117).

[278] *Id.*

grade bonds."[279]    According to Mr. Binning, the Guarantees "gave the bondholders access to the assets in Canada and in the US [but] *without a great degree of comfort as to what those assets would be from time to time*."[280]

### 3. Bondholders Purchased Below Par and/or in Connection with Key Market Events and Anticipated Litigation Outcomes

191.    The Bondholder Group member funds, which hold a majority of the aggregate outstanding principal amount of Nortel unsecured guaranteed bonds, purchased the vast majority of their holdings after the Filing Date and at a significant discount to par.[281]    Certain members purchased when the bonds were trading at as low as 30 cents on the dollar and others received smaller, but still substantial, discounts.[282]    These members and other similarly situated bondholders stand to receive a significant windfall under each of the recovery models presented by the CCC – even if the Guarantees are eliminated.

192.    As discussed in the CCC's pre-trial submission,[283] the Bondholder Group member funds acquired the vast majority of their collective holdings in the period between July 31, 2009, at or around the time when Nortel began to liquidate its assets, and July 18, 2011, at or around the time of the Residual IP Sale:[284]

---

[279] Trial Testimony of Paviter Binning, May 20, 2014, 1113:14-1114:7.

[280] *Id.*, 1111:18-23.

[281] The members of the Bondholder Group from time to time and their positions in the various issuances of Nortel debt are reflected in the three Rule 2019 Statements filed with the court on August 17, 2012 [U.S.D.I. 8204] (TR41982), June 26, 2013 [U.S. D.I. 11035] (TR49183), and March 11, 2014 [U.S. D.I. 13142] (TR49184), as well as in the Bondholder Group's Responses and Objections to the Written Questions and Contention Interrogatories Served By the Canadian Creditors' Committee, dated February 25, 2014 (the "Interrogatory Responses").  Exhibit 1 to the Interrogatory Responses sets forth then current Bondholder Group members and each of their respective positions as of the following dates: January 13, 2009, May 5, 2009, July 31, 2009, July 18, 2011, February 8, 2013 and November 18, 2013. See Identified Ad Hoc Bondholder Group Holdings (January 13, 2009 to March 11, 2014) (TR00059).

[282] *Id.*; Pricing and Identified Ad Hoc Bondholder Group Holdings (January 13, 2009 to March 11, 2014) (TR00060).

[283] CCC Pre-Trial Brief at 307-325.

[284] Identified Ad Hoc Bondholder Group Holdings (January 13, 2009 to March 11, 2014) (TR00059).

US$ millions

| Ad Hoc Bondholder Group Position | 13-Jan-09 | 5-May-09 | 31-Jul-09 | 18-Jul-11 | 17-Aug-12 | 8-Feb-13 | 26-Jun-13 | 18-Nov-13 | 11-Mar-14 |
|---|---|---|---|---|---|---|---|---|---|
| ACP Master Ltd. | | | | $33 | | $33 | | $33 | |
| Angelo, Gordon & Co. | | | | | | $185 | $192 | $192 | $161 |
| Aurelius Capital Master, Ltd. | | | | $46 | | $45 | | $45 | $102 |
| Aurelius Convergence Master, Ltd. | | | | $6 | | $7 | | $7 | |
| CarVal Investors, LLC | $173 | $173 | $153 | $129 | $88 | $123 | $122 | $77 | $100 |
| Centerbridge Partnership, L.P. | | | | $277 | $268 | $288 | $308 | $308 | $308 |
| DW Investment Management LP | | | | $15 | | | | $75 | $110 |
| Franklin Mutual Advisers, LLC | | | | $207 | | $169 | $169 | $178 | $169 |
| Golden Tree Asset Management | | | | $91 | $138 | $141 | $143 | $105 | $105 |
| GS Investment Strategies, LLC | | | | $282 | $311 | $343 | $371 | $371 | $349 |
| King Street Capital Management, L.P | | $43 | | $110 | | $70 | $124 | $124 | $124 |
| Monarch Alternative Capital LP | | | $112 | $206 | $144 | $124 | $124 | $112 | $112 |
| Quantum Partners LP | | | | $122 | $391 | $342 | $375 | $362 | $367 |
| Solus Alternative Asset Management L.P. | $5 | $5 | | $117 | | $132 | $118 | $123 | $102 |
| Tenor Capital Management | | | | $98 | $204 | $194 | $178 | $156 | $134 |
| **Grand Total** | $178 | $220 | $264 | $1,738 | $1,544 | $2,198 | $2,223 | $2,266 | $2,243 |

193.    During the same period of time (July 2009 to July 2011), Nortel bonds were trading at a substantial discount to their present day value; however, prices steadily increased as Nortel was able to sell its Lines of Business and other assets.[285]   At or around the time of the Residual IP Sale, prices sharply increased to more than 100 cents on the dollar.[286]

194.    Thus, purchasers who entered the distressed market before July 2011 were handsomely rewarded.   For example, Monarch Alternative Capital ("Monarch"), one of the Bondholder Group members, is "an established and recognized distressed debt firm."[287]   Monarch acquired $112 million in Nortel bonds in the period between May 5, 2009 and July 31, 2009, when the bond prices for the guaranteed bonds were trading in the $30 to $40 range.[288]   By July 18, 2011 – at which point Nortel's bonds were trading above par – Monarch had nearly doubled its holdings, to $206 million.[289]   Monarch then sold over $60 million in bonds, thereby locking in a significant profit on its initial holdings.[290]   Other similarly situated bondholders are likely to have locked in similarly dramatic profits from their post-petition investments in both the guaranteed and non-guaranteed issues.

---

[285] Pricing and Identified Ad Hoc Bondholder Group Holdings (January 13, 2009 to March 11, 2014) (TR00060).

[286] Id.

[287] See "About Monarch", available at https://www.monarchlp.com/AboutMonarch/Default.aspx

[288] Identified Ad Hoc Bondholder Group Holdings (January 13, 2009 to March 11, 2014) (TR00059); Pricing and Identified Ad Hoc Bondholder Group Holdings (January 13, 2009 to March 11, 2014) (TR00060).

[289] Id.

[290] Id.

195.    These data are in line with Professor McConnell's testimony that as new information came into the Post-Filing marketplace, bondholder expectations shifted in reaction to that information and bond pricing and trading activity ticked up or down in response.[291]    Indeed, trading volume sharply increased at several important points in time between January 13, 2009 through June 19, 2014, including:[292]

      (a)      in the immediate aftermath of the Filing Date when the bonds were trading at very low prices;

      (b)      during the prolonged three-day auction resulting in the Residual IP Sale at the beginning of July 2011 as purchasers placed bets on bond price increases and recoveries following the completion of that sale; and

      (c)      in reaction to Delaware Bankruptcy Court Judge Walrath's September 2011 decision in *In re Washington Mutual*[293] holding that post-petition interest must be awarded at the federal judgment rate.

196.    Accordingly, Monarch and Nortel's other bondholders have freely traded in and out of the Nortel bond market throughout the Post-Filing period.  They have done so based on events they believed would impact the Nortel bond market, including anticipated decisions of the Courts in this case.  For instance, bondholders have continued to actively trade even as prices have held at well above par, placing a bet that the Courts will award them a par recovery plus – in Professor McConnell's words – "cumulative interest."[294]

        **4.**        **Equities Support the CCC Pro Rata Allocation**

197.    As outlined above, all of the Nortel bondholders acquired and held bonds while fully aware of a number of disclosed risks, uncertainties, and weak protections in the sub-investment grade bond indentures.  Further, the majority of Nortel bondholders (measured by aggregate holdings) entered this market when prices were significantly discounted and these bondholders

---

[291] Trial Testimony of John McConnell, June 23, 2014, 4910:22-4911:5.

[292] Illustrative Bond Trading Volumes: January 13, 2009 to June 19, 2014 (TR00061).

[293] *In re Wash. Mut.*, 461 B.R. 200, 243 (Bankr. D. Del. 2011), *vacated in part on other grounds*, 2012 WL 1563880 (D. Del. Feb. 24, 2012).

[294] See *id.* See also: Trial Testimony of John McConnell, June 23, 2014, 4917:6-24.

will receive a windfall no matter how the Courts decide to allocate the Sale Proceeds.  Others knowingly entered the market or increased their holdings for other purposes, such as to bet on future market events or favorable litigation outcomes – including whether and to what extent the Courts will award post-petition interest.

198.    In either case, when balanced, the clear equities favor an allocation that will properly compensate other equally ranked general unsecured creditors, including the Canadian employee creditors.  Unlike the Guaranteed Bondholders, the non-bond Canadian Creditors were not in a position to enter or exit the market at will, and they have not been able to generate profits by gaming the market or placing timely bets.  On the contrary, the non-bond Canadian Creditors are involuntary creditors who have been captive to this bankruptcy process for over five years with no recourse but to wait or to sell their claims to distressed claims purchasers at a disproportionate discount.

**F.      Implementation of CCC Pro Rata Allocation**

199.    The CCC Pro Rata Allocation is a flexible approach capable of efficient implementation in a manner sufficiently adaptable to overcome concerns raised by the U.S. Interests and EMEA Debtors, including with respect to the treatment of (i) solvent and near solvent Debtor Estates, (ii) Intercompany Claims and (iii) guaranteed debt.

200.    Consistent with the protocols approved by the Courts for this trial,[295] the CCC Pro Rata Allocation allocates the Sale Proceeds to the Canadian, EMEA and U.S. Estates.  Allocation is made to the Debtor Estates in the amount necessary to enable their constituent debtors to have sufficient value to pay their valid priority and administrative senior claims in full and to pay their creditors holding valid general unsecured claims the same common dividend on their claims as that payable to all general unsecured creditors of all of the Nortel Debtors.

201.    The CCC Pro Rata Allocation common dividend is calculated by:

---

[295] See, for example, Amended and Restated Order (Allocation Protocol) of the Honourable Mr. Justice Morawetz (Ontario Superior Court of Justice (Commercial List)), April 3, 2013, Schedule A: Allocation Protocol, at para. 1 (TR50025). *Accord*, Pre-Trial Brief of the U.S. Debtors, p. 1 (Preliminary Statement); EMEA Debtors' Pre-Trial Brief, para. 2.

(a)     aggregating the sum of the Sale Proceeds plus the Residual Assets available in all Debtor Estates entitled to receive a distribution from the Sale Proceeds (the "Global Assets");

(b)     deducting from the Global Assets the funds required to satisfy the aggregate of the known and estimated outstanding senior claims entitled to payment in full; and

(c)     dividing the remaining Global Assets into the sum of the known and estimated outstanding valid general unsecured claims within each Debtor Estate, yielding the percentage recovery on each valid general unsecured claim – the common dividend.

202.    The allocation each Debtor Estate is entitled to receive from the Sale Proceeds is the amount required to pay in full the aggregate outstanding valid senior claims within that Debtor Estate plus the amount required to pay the common dividend percentage of aggregate outstanding valid general unsecured claims within that Debtor Estate, less the value of any cash and unliquidated assets within that Debtor Estate.

203.    Court approved Intercompany Claims are recognized.  Distributions thereon form part of the assets held by the Debtor Estate asserting the Intercompany Claim and are factored into the common dividend calculation to ensure that the common dividend rate is maintained within that Debtor Estate.

204.    Claims of holders of guaranteed unsecured bonds should be treated no differently than other general unsecured creditors of Nortel.  As discussed above, the U.S. Interests have failed to present any evidence establishing that such an allocation would be contrary to the legitimate expectations of the Guaranteed Bondholders.  It is up to the statutory and equitable discretion of the Canadian and U.S. Courts to determine whether there is value in the bondholders' contractual guarantees that should be recognized.

205.    It has been estimated that a pure pro rata distribution would yield a 71% dividend to all unsecured creditors, including the Guaranteed Bondholders.[296]  Should the Courts order that the Guaranteed Bondholders are entitled to recover the common dividend or a part thereof from both the obligor and the guarantor, up to a maximum recovery of 100% of their Pre-Filing claim for principal and interest accrued to the Filing Date, the common dividend to which all Nortel general unsecured creditors would be entitled, including the Guaranteed Bondholders, would need to be re-calculated.  As a result, the Guaranteed Bondholders would receive 100% recovery on their Pre-Filing claims and, using Mr. Britven's assumptions, it is estimated that all other Creditors holding valid unsecured claims against the Nortel Debtors would receive 57%, a significantly diminished recovery on their claims.

206.    Although complete allocation to the Debtor Estates from the Sale Proceeds will require completion of the administration of the Debtor Estates' claims processes.  Interim distributions are possible subject to reasonable reserves for contingencies, such as unliquidated assets, disputed claims and administrative expenses.  This is especially important for the predominantly elderly pensioner population and disabled employees who have endured hardship as a result of the loss of their benefits and other creditors who have waited more than five years for a distribution on their Claims.

207.    This process may be facilitated by the Debtor Estates reporting on a regular schedule: (i) the value of their current cash on hand and unliquidated assets, if any, and their estimated burn rate going forward and (ii) the claims asserted against them, by category, including the value of the claims they have determined to be valid, the asserted value of unresolved claims which remain disputed and contingent, the estimated value of unliquidated claims, and their estimate of the date by which all such claims will be determined.

208.    To assist the implementation process, the Courts could order that the Sale Proceeds be transferred to a liquidation trust or similar mechanism managed by an independent fiduciary appointed by the Courts, such as a liquidating trustee or claims officer, who, pursuant to a process ordered by the Courts, would oversee the collection and verification of asset and claim data received from the Estates, determine interim and final allocation distributions to the Estates,

---

[296] Primary Report of Thomas Britven dated January 24, 2014, para 8.6-8.7 (TR00045).

and file regular reports with the Courts.  Both the Courts[297] have the authority to order such mechanisms, appointments, processes, and interim distributions, and often do so, particularly in complex proceedings.  In cross-border insolvencies, courts in both jurisdictions already have approved cross-border protocols and plans that provided for the appointment of a liquidator that the foreign non-main court has recognized.[298]

## G.    Conclusion

209.    A *pro rata* allocation as proposed by the CCC is the only fair and equitable alternative to an allocation based on the legal rights of the Nortel Debtors in the underlying assets sold. Should the Courts conclude that it is not possible or appropriate to otherwise determine the entitlements of individual Debtor Estates, there is no question that the Courts can exercise their jurisdiction to achieve an allocation that ensures a rateable distribution among Creditors. The Courts in both jurisdictions have the authority and flexibility to implement the CCC's Pro Rata Allocation as described above, which will ensure a fair and speedy distribution to creditors who have waited more than five and half years for any recovery on their claims.

# PART VII - ORDERS SOUGHT

210.    For the reasons set out, the CCC seeks the following relief:

> (a)    an Order allocating the Sale Proceeds according to the CCC Ownership Allocation; or

> (b)    in the alternative, an Order allocating the Sale Proceeds pursuant to the CCC Pro Rata Allocation.

211.    The CCC reserves the right to seek costs against any Core Party.

---

[297] See, e.g., *Re Northstar Aerospace Inc.*, 2012 ONSC 3974 at para. 12; *Re ScoZinc Ltd.*, 2009 NSSC 136 at para. 25; §11 U.S.C. 105(a).

[298] See, e.g., *In re Fracmaster Ltd.* 237 B.R. 627 (Bankr. E.D. Tex. 1999) (recognizing the liquidator appointed by a Canadian court); *Re Akai Holdings Limited* (High Court of the Hong Kong Special Administrative Region, Case No. HCCW 49/2000 and HCCW 50/2000 (6 February 2004) and the Supreme Court of Bermuda) (In which the same individual was appointed as an insolvency representative for each company in Hong Kong and Bermuda).

ALL OF WHICH IS RESPECTFULLY SUBMITTED, THIS 7th DAY OF AUGUST,
2014

_____

For All Counsel for the CCC

TO:    THE SERVICE LIST APPENDED

# APPENDIX A - GLOSSARY OF TERMS[1]

"**Advanced Technology Programs**" means Nortel's R&D programs that focused on forward-looking research for the next-generation of technology, that were principally led out of Canada.

"**Affiliate**" has the meaning set out in Article 1 of the MRDA.

"**AIT**" means Nortel's Q3, 2008 Asset Impairment Test, conducted with the assistance of PricewaterhouseCoopers and subject to audit by KPMG, referred to by the CCC's expert, Thomas Britven, in his methodology for calculating the value of the Licenses.

"**Alternative License Theory**" means the theory for allocating Sale Proceeds attributable to intellectual property proposed by the EMEA Debtors as an alternative to their Contribution Theory, as articulated by their expert, James Malackowski.

"**Bondholder Group**" means the *Ad Hoc* Committee of Bondholders that have claims issued and/or guaranteed by NNC, NNL, NNI, and Nortel Networks Capital Corporation (NNCC).

"**Business Sales**" means the sales of Nortel's Lines of Business.

"**Business Sale Proceeds**" means the approximately $2.848 billion in proceeds resulting from the Business Sales.

"**Canadian Court**" means the Ontario Superior Court of Justice (Commercial List).

"**Canadian Creditors**" means creditors having Claims against the Canadian Debtors.

"**Canadian Debtors**" means Nortel Networks Corporation ("NNC"), Nortel Networks Limited ("NNL"), Nortel Networks Technology Corporation ("NNTC"), Nortel Networks International Corporation ("NNIC") and Nortel Networks Global Corporation ("NNGC").

"**Canadian Estate**" has the same meaning as Canadian Debtors.

"**CCAA**" means the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended.

"**CCC**" means the Canadian Creditors Committee, a committee of major creditors having claims against the Canadian Debtors, comprised of: Former and Disabled Canadian Employees of the Canadian Debtors through their court-appointed representatives and the Canadian Auto Workers Union (currently Unifor); Morneau Shepell Ltd., as Administrator of Nortel's Canadian registered pension plans; the Superintendent of Financial Services of Ontario as Administrator of the Pension Benefits Guarantee Fund; and the court-appointed representatives of the Current and Transferred Canadian Employees of the Canadian Debtors.

"**CCC Pro Rata Allocation**" means the alternative allocation methodology proposed by the CCC by which sufficient Sale Proceeds are allocated to each Debtor Estate to enable the Debtor

---

[1] All singular terms have the same meaning in plural. All figures are in U.S. dollars unless otherwise indicated.

Estates to pay valid senior claims in full and distribute a common dividend on all valid general unsecured claims.

"**CDMA**" means code division multiple access, one of Nortel's Lines of Business.

"**Claims**" means claims against any one or more of the Nortel Debtors as at the Filing Date, without duplication (whether pursuant to a guarantee, joint liability or otherwise), excluding Intercompany Claims and claims for post-filing interest, make-whole payments and call premiums.

"**Code**" means the United States Bankruptcy Code, Title 11 of the United States Code.

"**Committee**" means the Official Committee of Unsecured Creditors of the U.S. Debtors.

"**Contribution Theory**" means the theory proposed by the EMEA Debtors for allocating the Sale Proceeds attributable to intellectual property based on relative contributions, as articulated by their expert, James Malackowski.

"**Core Parties**" means the parties in these proceedings as defined in paragraph 2 of the Allocation Protocol, attached as Schedule A of the Amended and Restated Allocation Protocol Order of the Canadian Court on April 3, 2013, including the Selling Debtors, the Committee, the Bondholder Group, the Monitor and Canadian Debtors, the Joint Administrators for the EMEA Debtors, the CCC, the Indenture Trustees, the UKPT, and the Directors and Officers.

"**Courts**" means the Canadian Court and the U.S. Court.

"**CRA**" means the Canada Revenue Agency.

"**Creditors**" means all creditors of any one or more of the Nortel Debtors.

"**CSAs**" means Nortel's bilateral Cost Sharing Agreements between NNL or its predecessor Canadian corporations and certain of its subsidiaries, which predated the MRDA.

"**Debtor Estates**" has the same meaning as Nortel Debtors and means the Canadian Debtors, the U.S. Debtors and the EMEA Debtors.

"**EMEA**" means Europe, Middle East and Africa where Nortel operated.

"**EMEA Debtors**" means NNUK; NN Ireland; NNSA; Nortel Networks NV; Nortel Networks SpA; Nortel Networks BV; Nortel Networks Polska Sp z.o.o.; Nortel Networks Hispania, SA; Nortel Networks (Austria) GmbH; Nortel Networks s.r.o.; Nortel Networks Engineering Service Kft; Nortel Networks Portugal SA; Nortel Networks Slovensko, s.r.o.; Nortel Networks Romania SRL; Nortel GmbH; Nortel Networks OY; Nortel Networks AB; Nortel Networks International Finance & Holding BV; and Nortel Networks France S.A.S. Cosmé Rogeau, who has been appointed Liquidator of NNSA under French secondary proceedings, and who acts jointly with the Joint Administrators with respect to NNSA.

"**EMEA Estate**" has the same meaning as EMEA Debtors.

"**EMEA License Theory**" means the alternative theory proposed by the EMEA Debtors for allocating Sale Proceeds attributable to IP based on a relief from royalty licensing model, as articulated by their expert, James Malackowski.

"**Exclusive License**" has the meaning set out in Article 5(a)(i) of the MRDA.

"**Exclusive Territories**" has the meaning set out in Article 1 and Schedule A of the MRDA.

"**Field of Use**" means the limitations on the Licenses granted by NNL to the Licensed Participants set out in Article 5(a) of the MRDA and the definition of Products incorporated therein by reference.

"**Filing Date**" means January 14, 2009, the date on which Nortel commenced insolvency proceedings.

"**Global Assets**" means the assets of the Debtor Estates at the Filing Date including the Sale Proceeds and the Residual Assets.

"**Guaranteed Bondholders**" means those bondholders holding bonds issued by one Nortel Debtor under indentures containing guarantees of repayment of such bonds undertaken by one or more other Nortel Debtors.

"**Guarantees**" means guarantees held by holders of the Guaranteed Bonds.

"**IFSA**" means the Interim Funding and Settlement Agreement between the Canadian, U.S. and EMEA Debtors dated June 9, 2009.

"**Indenture Trustee**"   is defined in the Allocation Protocol, attached as Schedule A of the Amended and Restated Allocation Protocol Order of the Canadian Court on April 3, 2013, as (a) Wilmington Trust, National Association as successor indenture trustee pursuant to a trust indenture dated as of November 30, 1988, in respect of the 6.875% notes issued by NNL; (b) the Bank of New York Mellon (i) as indenture trustee pursuant to a trust indenture dated as of July 5, 2006 among NNL, as issuer, and NNC and NNI, as guarantors, and (ii) as indenture trustee pursuant to an indenture to an indenture dated as of March 28, 2007 among NNC, as issuer, and NNL and NNI, as guarantors; and (c) Law Debenture Trust Company of New York as successor indenture trust indenture dated as of February 15, 1996, in respect of the 7.875% notes issued by NNL and NNC and guaranteed by NNL.

"**Intercompany Claim**" means a claim of any Nortel Debtor against another Nortel Debtor.

"**IP**" means intellectual property.

"**IP Co.**" means the hypothetical business whereby Nortel would monetize the Residual IP portfolio through litigation and licensing, which was considered and rejected by the Debtor Estates in favour of an asset sale to Rockstar.

"**IP Transaction Side Agreement**" means the agreement to which the Rockstar LTA was subject, and which expressly provided that the termination of the Licensed Participants' Licenses

would have no impact on allocation of the proceeds from the Residual IP Sale among the Debtor Estates.

"**IRS**" means the Internal Revenue Service.

"**Joint Administrators**" is defined in the Allocation Protocol, attached as Schedule A of the Amended and Restated Allocation Protocol Order of the Canadian Court on April 3, 2013, as Alan Robert Bloom, Christopher John Wilkinson Hill, Alan Michael Hudson and Stephen John Harris, as the Administrators in the insolvency proceedings pending in the United Kingdom for all EMEA Debtors except Nortel Networks (Ireland) Limited, and Alan Robert Bloom and David Martin Hughes as Administrators for Nortel Networks (Ireland) Limited.

"**Lazard**" means Lazard Frères & Co., financial advisors to Nortel.

"**Licensed Participant**" has the meaning set out in Article 1 of the MRDA.

"**Licenses**" means the Exclusive Licenses and Non-Exclusive Licenses granted by NNL to the Licensed Participants pursuant to Article 5(a) of the MRDA.

"**Lines of Business**" means Nortel's businesses, which were structured around various product lines. At the Filing Date, the major Lines of Business were CDMA/LTE, Enterprise, MEN, CVAS and GSM/GSM-R.

"**LTAs**" means the License Termination Agreements that were executed by certain of the Nortel Debtors, including NNI and the EMEA Licensed Participants, in connection with the Business Sales and Residual IP Sale.

"**Monarch**" means Monarch Alternative Capital, a member of the Bondholder Group.

"**Monitor**" means Ernst & Young Inc., in its capacity as the court-appointed monitor in the proceedings commenced under the CCAA in respect of the Canadian Debtors.

"**MRDA**" means the Master Research and Development Agreement between NNL and certain of its subsidiaries entered into on December 22, 2004 and effective January 1, 2001, including, where applicable, all amendments and addenda thereto. All references to the MRDA are to TR21003.

"**NNC**" means Nortel Networks Corporation, a Canadian Debtor and the parent reporting corporation of Nortel.

"**NNL**" means Nortel Networks Limited, a Canadian Debtor, the Canadian operating parent corporation of Nortel and a Participant under the MRDA.

"**NNI**" means Nortel Networks, Inc., a U.S. Debtor and a Licensed Participant under the MRDA.

"**NNUK**" means Nortel Networks UK Limited, an EMEA Debtor and one of the three EMEA Licensed Participants under the MRDA.

"**NNSA**" means Nortel Networks S.A., an EMEA Debtor and one of the three EMEA Licensed Participants under the MRDA.

"**NN Ireland**" means Nortel Networks Ireland, an EMEA Debtor and one of the three EMEA Licensed Participants under the MRDA.

"**NN Australia**" means Nortel Networks Australia Pty Limited. NN Australia retired from the MRDA effective December 31, 2007

"**NN Technology**" has the meaning set out in Article 1 of the MRDA.

"**Non-Exclusive Licenses**" has the meaning set out in Article 5(a)(ii) of the MRDA.

"**Non-Exclusive Territory**" has the meaning set out in Article 1 of the MRDA.

"**Nortel**" or the "**Nortel Group**" means NNC and all of its subsidiaries and affiliates, worldwide, and includes all Nortel Debtors and all Nortel Entities.

"**Nortel Debtors**" has the same meaning as Debtor Estates and means the Canadian Debtors, the U.S. Debtors and the EMEA Debtors.

"**Nortel Entity**" means any Nortel entity.

"**Ownership Allocation**" means the allocation of the Sale Proceeds according to ownership of the assets sold as proposed by the CCC.

"**Participants**" has the meaning set out in the preamble to the MRDA. At the Filing Date, the Participants to the MRDA were NNL and the Licensed Participants (NNI, NNUK, NNSA and NN Ireland).

"**Patent Segmentation**" means the process by which Nortel identified patents that were predominantly used by a particular Line of Business, shared across multiple Lines of Businesses or not used in any Line of Business.

"**Post-Filing**" means after the Filing Date.

"**PPAs**" means the Purchase Price Allocations prepared by the purchasers of the Lines of Business.

"**Pre-Filing**" means before the Filing Date.

"**Products**" has the meaning set out in Article 1 of the MRDA.

"**R&D**" means research and development.

"**R&D Activity**" has the meaning set out in Article 1 of the MRDA.

"**Residual Assets**" means assets other than the Sale Proceeds in the possession of the Nortel Debtors as at the Filing Date.

"**Residual IP**" means the approximately 7,000 patents and patent applications retained by NNL following the Business Sales and which were sold to Rockstar in the Residual IP Sale.

"**Residual IP Proceeds**" means the proceeds of the Residual IP Sale, which totaled approximately USD $4.545 billion.

"**Residual IP Sale**" means the sale of the Residual IP to Rockstar.

"**Revenue Theory**" means the theory proposed by the U.S. Interests whereby the Sale Proceeds are allocated to each of the Nortel Debtors based on their proportionate share of revenues as set out in Nortel's 2009 carve-out income statements, as articulated by their expert, Jeffrey Kinrich.

"**Rockstar**" or "**Rockstar Consortium**" means the consortium of technology companies, including Apple, RIM, Sony and Microsoft, that purchased the Residual IP in the Residual IP Sale.

"**Rockstar LTA**" means the LTA entered into by the Debtor Estates in connection with the Residual IP Sale.

"**RPE**" means the Residual Profit Entities. As at the Filing Date, the RPEs were NNL, NNI, NNUK, NNSA and NN Ireland.

"**RPSM**" means Nortel's residual profit sharing methodology set out in Schedule A of the MRDA.

"**Sales**" means the Business Sales and the Residual IP Sale.

"**Sale Proceeds**" means the proceeds from the Sales.

"**Selling Debtors**" means the Canadian Debtors, the U.S. Debtors, EMEA Debtors and Nortel Networks Optical Components Ltd., Nortel Networks AS, Nortel Networks AG, Nortel Networks South Africa (Pty) Limited, and Nortel Networks (Northern Ireland) Limited.

"**UKPT**" means the Trustee of the NNUK Pension Plan and the Board of the Pension Protection Fund.

"**U.S. Court**" means the United States Bankruptcy Court for the District of Delaware.

"**U.S. Debtors**" means NNI, Nortel Networks Capital Corporation, Nortel Altsystems Inc., Nortel Altsystems International Inc., Xros, Inc., Sonoma Systems, Qtera Corporation, CoreTek, Inc., Nortel Networks Applications Management Solutions Inc., Nortel Networks Optical Components Inc., Nortel Networks HPOCS Inc., Architel Systems (U.S.) Corporation, Nortel Networks International Inc., Northern Telecom International Inc., Nortel Networks Cable Solutions Inc., and Nortel Networks (CALA) Inc.

"**U.S. Estate**" has the same meaning as U.S. Debtors.

"**U.S. Interests**" means the U.S. Debtors, the Bondholder Group and the Committee.

## APPENDIX B – ASSUMPTIONS ABOUT THE MRDA
## MADE BY EXPERTS FOR THE U.S INTERESTS, EMEA DEBTORS AND UKPT[1]

| Expert | Kinrich | Bereskin | Stratton | Malackowski[2] | Huffard |
|---|---|---|---|---|---|
| Scope of License – Field of use | No limitations (PR 8, 41-42; RR: 8, 44) | No limitations (RR: 2, 10, 13-14) | No limitations (RR: 13, 23) | No limitations (PR: 5; RR: 8, 11) | No limitations (PR: 49; RR: 15, 19-20) |
| Transferability | Transferable via sublicensing (PR: 42; RR: 8, 11-12, 44) | Transferable via license or sublicense (RR: 15) | Transferable via sublicensing (RR: 4, 22) | Transferable via sublicensing (RR: 13) | Transferable via sublicensing (PR: 49-50; RR: 20) |
| Sublicensing Rights | Effectively unlimited (PR: 42; RR: 8, 13, 44) | Unlimited (RR: 10) | Effectively Unlimited (RR: 3, 11, 19-20) | Effectively unlimited (PR: 5, 51; RR: 13) | Effectively unlimited (PR: 49; RR: 20) |
| Enforcement: Exclusive Territories | Unlimited given broad scope of the licenses (PR: 6, 41-42; RR: 8, 44) | Unlimited (RR: 10) | Unlimited (RR: 3, 9, 12, 22) | Unlimited given broad scope of the licenses (PR: 5; RR: 11, 15) | Unlimited given broad scope of the licenses (PR: 49-50 ) |
| Enforcement: Non-Exclusive Territories | NNL enforcement rights has no value given unlimited sublicensing (PR: 42-43; RR: 8, 44) | NNL enforcement rights has no value given unlimited sublicensing (RR: 17) | Not addressed | NNL enforcement rights has no value given unlimited sublicensing (PR: 51; RR: 12-13) | NNL enforcement rights has no value given unlimited sublicensing (PR: 50; RR: 20-21) |
| IP Subject to the Licenses | All patents included (PR: 6; RR: 8, 44) | All Nortel IP (RR: 11) | No limitations on patent inclusion (RR: 3, 10-12) | All patents included (PR: 5; RR: 14-16) | No limitations on patent inclusion (PR: 49-50; RR: 15, 19) |
| RPSM Income Reallocation | Disregarded | Disregarded | Disregarded | Disregarded | Disregarded |

[1] This Table provides pinpoint citations to pages of the Primary Reports ("PR") and Rebuttal Reports ("RR") for each proposition.  The UKPC's' Expert Bazelon is not included as he rejects the MRDA as an appropriate valuation and allocation mechanism for the Sales Proceeds.

[2] This Table includes the assumptions made under the "License Approach" of Mssrs. Malackowski and Huffard.  Under the Contribution Theory the only relevant assumption was that the parties would jointly share all proceeds in proportion to contribution proxy measures.

## APPENDIX C – FOUNDATIONAL ASSUMPTIONS TO THE KINRICH & ZENKICH REPORTS

The following table provides a list of the major propositions and assumptions forming the basis of Kinrich's and Zenkich's opinions on the allocation of Sale Proceeds.

The table is broken down into five parts:

1. The stated purpose of the report.
2. The stated approach to allocation (N.B. the experts may not have always honoured their stated approach)
3. Background factual assumptions
4. The assumptions related to the allocation of the Sale Proceeds attributable to the Business Sales
5. The assumptions related to the allocation of the Sale Proceeds attributable to the Residual IP Sale

For ease of reference, headings are shaded <mark>yellow</mark>.

The following is a sample of the information found in the chart and an explanation of the manner in which it is organized:



| Report Page#: "K" for Kinrich; "Z" for Zenkich | Para. No. | | Expert's Stated Proposition | Heading |

| **Background Facts** | | | | |
|---|---|---|---|---|
| K6 | 11 | | **Each of NNI, NNL, NNUK, NN Ireland and NNSA was a separate legal entity that maintained its own R&D programs and had sales to non-Nortel entities.** | |
| K6 | 11 | Implied | Assumes or implies silo based R&D and sales | Completely ignores the context of a matrix organization in practice; these were not "separate" legal entities, but highly integrated and interdependent legal entities. |

Type of Assumption: Express vs. Implied

Statement of Assumption

Description of Errors in the Assumption

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| **Purpose of Report** | | | | |
| K1 | 3 | **Objective is to determine value relinquished by each entity ("Value")** | | |
| K1 K11 | 3 21 | Implied | Breaking out by entity is the only or best approach. | True only to the extent that this can be done with reasonable accuracy, having due regard to the amounts at issue and the impact on creditors.  Thus, where the court accepts the interpretation accorded to the MRDA by the CCC and the Canadian Debtors, the exercise of allocating value to legal entities is relatively straight forward and the impact of inaccuracies is tolerable.  Conversely, competing interpretations of the MRDA posited by the other Core Parties put considerably more value at issue, with the result that the impact of inaccuracy on creditors is much more significant and alternative approaches focused on creditor recoveries become appropriate. |
| **Valuation Principles/Methodology** | | | | |
| K2 | 4 | **Value corresponds to revenue, markets, patents filed, and patent quality** | | |
| K2 | 4 | Implied | Ownership of patents, R&D and other support are not factors that add to value. | Kinrich cherry picks indicia of value and seeks to isolate the value of Nortel entirely to the 2008-09 time period without any context to how Nortel was able to generate the revenues upon which he relies.  See Britven Rebuttal Report at p. 19. |
| K2 | 4 | Implied | Location of filing patent is basis to attribute value. | Although the place in which a patent is registered may speak to the value of the patent, it is independent of who owns the patent and is entitled to its value. |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| K2 | 5 | Explicit | Proceeds received equals value relinquished. | Depends on the treatment of goodwill; also, at the asset level need to take account that not all assets had value (e.g., licenses relinquished were of negligible value, if any, to purchasers). |
| K11 | 22 | **Current value is present value of future cash flows** | | |
| K11 | 22 | Implied | NNL's legal ownership of patents outside of license grants has no value. | Based upon a misinterpretation of the MRDA and a misapprehension of the value of the licenses. |
| K11 | 22 | Implied | R&D and other contributions to the generation of revenue have no bearing on value. | Future cash flows are dependent upon payment of inter-company obligations. |
| K13 | 25 | **Methodology is based on relative proportion of value based on income** | | |
| K13 | 25 | Express | All else is, in fact, equal. | Ignores revenue trends and removes all context leading up to a particular year's revenue (no account for any of R&D support, head office strategic oversight and support, inventorship, ownership, etc.). |
| K13 | 25 | Implied | Revenue is a suitable proxy for value. | Revenue is not a proxy for the underlying character, quality, profitability, sustainability and other attributes of a business.  By allocating the Sales Proceeds based on revenue alone, Kinrich ignores all those factors.  See Britven Rebuttal Report at p. 19. |
| K13 | 25 | Implied | Profit margins are identical across IE's. | A simplifying assumption that is almost certainly not true.  Moderately trivial impact by itself, but impact may be magnified when combined with other inaccurate assumptions. |
| K13 | 25 | Implied | Relative expenses are the same across IE's. | A simplifying assumption that is almost certainly not true.  Moderately trivial impact by itself, but impact may be magnified when combined with other inaccurate assumptions. |
| K13 | 25 | Implied | Zero income reallocation per Art.3 MRDA and RPSM. | Kinrich misinterprets the MRDA.  See Britven Rebuttal Report at p. 17. |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| K13 | 25 | Express | Fn 46:  the asset based approach is inapplicable. | To the extent that "asset based approach" refers to an approach whereby the purchased assets are grouped into various categories and then valued separately by category, that is the approach that should be taken, provided that the value of the assets transferred by each debtor group can be determined with reasonable accuracy. |
| | | **Background Facts** | | |
| K6 | 11 | **Each of NNI, NNL, NNUK, NN Ireland and NNSA was a separate legal entity that maintained its own R&D programs and had sales to non-Nortel entities.** | | |
| K6 | 11 | Implied | Assumes or implies silo based R&D and sales. | Completely ignores the context of a matrix organization in practice; these were not "separate" legal entities, but highly integrated and interdependent legal entities.

Without NNL's spending on R&D, NNI could not have existed as a revenue generating entity. NNL bore a disproportionate share of overhead costs that enabled NNI to earn revenue (U.S. Debtors' IFSA Motion, para. 16 (TR11366); Affidavit of Sharon Hamilton sworn April 11, 2014, (TR00009), para. 17.) |
| K6 | 12 | **Licenses were to all NN technology in territory….bankrupt or insolvent party would receive FMV of licenses** | | |
| K6 | 12 | Implied | No limitation or reservation of rights to the grantor of any kind. | Overly broad and inaccurate reading of the MRDA.  Ignores value intrinsic to ownership. NNI was simply a licensee holding a limited Field of Use Licence and its profits were contingent upon NNL's consent (Deposition Testimony of Kerry Stephens (Vol. 2), November 8, 2013, 354:11-354:16). |
| K6 | 12 | Implied | His interpretation of the MRDA is the only or correct interpretation. | Misinterpreted the rights granted to licensees by the MRDA. |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| **Lines of Business Sale** | | | | |
| K2 | 6 | **Fair market value of assets determined by standard valuation techniques based on measures of revenue** | | |
| K2 | 6 | Implied | Revenue is the only or best basis on which to determine value. | Revenue is not a proxy for the underlying character, quality, profitability, sustainability and other attributes of a business.  By allocating the Sales Proceeds based on revenue alone, Kinrich ignores all those factors.  See Britven Rebuttal Report at p. 19. |
| K14 | 27 | **To value LOB's as going concerns, use income approach based on relative amount of customer revenue in each territory** | | |
| K14 | 27 | Implied | Income approach is only or correct approach. | An income approach is one of three commonly accepted methods.  However, it is incorrect to say that it is the only or 'correct' approach based on the hand-picked data points used by Kinrich. See Britven Rebuttal Report at p. 19.

Further, there is no basis in valuation theory for allocating the Sales Proceeds by revenue. The valuation literature does not support Kinrich's approach. Mr. Kinrich cited a text on "Valuing Small Business and Professional Practices", which could have no conceivable application to Nortel in 2009.  See Shannon P. Pratt, Robert F. Reilly & Robert P. Schweihs, Valuing Small Businesses and Professional Practices, 3d ed. (Toronto: McGraw-Hill, 2009) pp. 341-342 (TR00053) and Trial Testimony of Jeffrey Kinrich, June 18, 2014, 4322:14-4328:16. |
| K14 | 27 | Express | This method captures the aggregate value of tangible and intangible business assets. | Kinrich's value fails to consider many other factors that would give context to bare revenue numbers.  See Britven Rebuttal Report at p. 18. |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| K14 | 27 | Express | This method accounts for the value of each LOB's assets. | Kinrich does not perform a "valuation". Rather he performs a very simplistic revenue based allocation. |
| K14 | 28 | **Main approach:  value based on revenue entity earned in LOB relative to total revenue for LOB** | | |
| K14 | 28 | Implied | All revenue is equal, including distributor revenue. | This may be a justifiable simplifying assumption for limited purposes, but it risks ignoring many contextual  factors that make it unsuitable for distributing the entirety of the Sales Proceeds.  See: Green Testimony at 3142:24-3143:12. |
| K14 | 29 | **Alternative approach - different revenue values: IE's assumed risk, funded and conducted R&D, and benefitted from their exclusive licenses for all Nortel IP in their territory** | | |
| K14 | 29 | Implied | No cross LOB/Region R&D work done, or no value to it. | Ignores the matrix organization structure which formed the basis for Nortel's operations and which it routinely publicized.

Kinrich conceded that, under his theory, if Canada were to have performed  100% of the R&D and the US generated 100% of the revenues in 2009, 100% of the Sales Proceeds would be allocated to the US and 0 to Canada. (Kinrich Testimony, June 18, 2014, 4320:22-4321:7). |
| K15 | 30 | **Value relinquished by non-IE distributors determined by reference to industry comparables** | | |
| K15 | 30 | Implied | Non-IE distributors are entitled to a share of NN technology. | Misinterprets rights under the MRDA. |
| K15 | 30 | Implied | Industry comparables are a reasonable benchmark for LRE's. | Inadequate information is provided to assess industry comparables that are used; 'comparables' are inherently speculative. |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| K15 | 30 | Remaining proceeds (after value assigned to non-IEs) distributed amongst IEs based on relative value determined by relative revenue share | | |
| K15 | 30 | Implied | Non-IE distributors should be attributed value before the IEs (or at all). | No reason to treat IEs as residual category. |
| K17 | 35 | CDMA & LTE combined in sale | | |
| K17 | 35 | Express | CDMA proceeds and LTE proceeds should be treated the same for allocation purposes. | CDMA and LTE are distinct technologies, with different markets, and at different stages of their revenue cycle and should not be combined.<br><br>See Britven Rebuttal Report at p. 19. |
| K18 | 37 | 2009 Revenues are the basis for the income analysis | | |
| K18 | 37 | Implied | 2009 is the appropriate or best year to use, as opposed to previous years or multiyear average, trends or projections. | This is a snapshot in time that fails to capture changes in market conditions and anticipated future cash flows.  Many LOBs sold in the Business Sale were not profitable and had not been for years (Green Rebuttal Report, February 28, 2014, pp. 12-13).<br><br>Capturing only 2009 also ignores context and all R&D efforts from years prior.  Ignores trends and bankruptcy effect on revenue. |
| K26 | 53 | Express | 2009 revenues "are the best…and… more appropriate" . | This is a speculative and self-serving assumption that directly affects the entirety of Kinrich's revenue based model. |
| K26 | 54 | 2007 – 2008 revenues are anomalous compared to 2001-2009, showing 2009 more consistent | | |
| K26 | 54 | Implied | These are the only valid comparators or ways of assessing the reliability of historical numbers (as opposed to other years or weighted averages). | There are many ways in which these so-called 'anomalous' years could have been used without focusing exclusively on 2009 revenues. |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| K18 | 38 | Value of relinquished LOB assets is reflected in revenue by entity in LOB | | |
| K18 | 38 | Implied | Revenue is the correct determinant of value. | Revenue is not a proxy for the underlying character, quality, profitability, sustainability and other attributes of a business.  By allocating the Sales Proceeds based on revenue alone, Kinrich ignores all those factors.  See Britven Rebuttal Report at p. 19. |
| K18 | 38 | Implied | There was no shared contribution or it was unnecessary to value any shared contribution between entities, including employees, overhead, common costs etc. | The matrix organization structure dictates otherwise. |
| K20 | 42 | Geographically assigned costs from carve out statements are not as reliable as revenue for determining FMV | | |
| K21-22 | 42 | Implied | Revenues from carve out statements are reliable, but costs are not. | Kinrich cherry picks revenues from carve out statements and ignores costs that do not favor the U.S.  In particular, he ignores costs from carve out statements because NNL's gross margin, and NN Ireland's contribution margin do not precisely match the consolidated financial statements he reviewed. This cherry picking of data is a pattern that Kinrich employs as he promotes the use of 2009 revenues as the basis for allocation (Kinrich Report para 37), while claiming that similar data from 2007 and 2008 are "anomalous" (Kinrich Report at para. 53-54) and therefore not useful.  Kinrich elsewhere claims that the 2007 and 2008 data are useful for "sensitivity analyses" to show that his results using 2009 revenues are "robust."   (Kinrich Report, at para. 37) |
| K28 | 60 | Using US Debtors share of 2009 revenues as basis for calculating reasonable expectations of future profits is conservative | | |
| K27- | 57-64 | Implied | While acknowledging that relative regional performance | This is a speculative assumption., especially |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| K29 | | | may have been expected to change after 2009, in fact assumes it does not. | given the bankruptcy situation and trends. Further shows the flaw of using only 2009 revenue as the allocation key. |
| **Residual Patent Portfolio Sale** | | | | |
| K3 | 7 | **Value determined by DCF analysis based on Lazard and Global IPCo business plan** | | |
| K3 | 7 | Implied | DCF analysis of IP business plan is the appropriate or best method to allocate value. | These analyses are inherently speculative and not reliable for the purposes of allocating the entirety of the Sales Proceeds. Kinrich:<br>• incorporates any flaws in the Global IP report;<br>• misapplies/confuses license rights with ownership;<br>• does not conduct any analysis to arrive at a discount rate, but merely infers a discount rate.<br><br>See Britven Rebuttal Report at p. 21. |
| K3<br>K45<br>K47 | 7<br>93<br>98 | Implied | Lazard/Global IP plan is accurate and reliable. | The Lazard/Global IP forecasts may or may not reflect the best available information. However, they are inherently speculative and therefore form an inadequate basis to allocate material portions of the Sale Proceeds. For example: taking the most optimistic cash flows from the IP Co. model, and the lowest discount rate used by Nortel and its advisors, and a litigation success rate of 100%, the DCF value of IP Co. is only $2.7 billion; Malackowski's model generates a value of $3.5 billion; and, Rockstar valued the residual IP portfolio at $4.5 billion. These are huge swings in value premised on a series of competing assumptions and agendas. |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| | | | | Further, the Lazard/Global IP forecasts are not consistent with what the licensed participants would have received on the valuation date.<br><br>See Britven Rebuttal Report at 21-22. |
| K3<br>K45 | 7<br>93 | Implied | Lazard/Global plan is objective and not biased in favour of any of the debtor groups. | See above. |
| K15 | 31 | Implied | Cash flow projections for IPCo model were reasonable and reliable. | See above.  Further, there is no basis to assume that the cash flows projected for the IP Co. model would be the cash flows on which Rockstar based its decision to purchase the Residual IP for $4.5 billion.  The dynamic of the auction and the defensive value of the Residual IP to the Rockstar Consortium made the Residual IP more valuable to Rockstar than in the hands of Nortel (Affidavit of Sharon Hamilton sworn April 11, 2014, para. 87). |
| K47 | 98 | Express | Nortel/Lazard/Global IP had a highly sophisticated ability to project future cash flows in an IPCo model | See above. |
| K47 | 98 | Express | The amount of effort expended was significant – which in turn makes the results more reliable. | This is a subjective and intangible assumption (significant effort as compared to what?); effort by itself does not imply any measure of reliability. |
| K32 | 70 | Express /Implied | IPCo model was stalled by bankruptcy, and could otherwise have been implemented. | Other evidence and common sense dictate that suing customers is not good for operating business.  Also ignores reality of bankruptcy. See, e.g., Hamilton Testimony (May 15, 2014), 901:17-902:14. |
| K33 | 71 | **Patent Portfolio consists of those not sold in LOB sales but which could be used within or across lines of business in future** | | |
| K33 | 71 | Express | Patents unused at time of LOB sales could be used by or | Speculative and fails to incorporate the narrow |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| | | | across LOBs in future. | license grant provided by the MRDA. |
| | | | | See Britven Rebuttal Report at pp. 21-22. |
| K35 | 75 | IPCo business plan is reliable and was developed with expert third party input and vetted by Debtor groups, management, creditors through multiple iterations | | |
| K35 | 75 | Implied | IPCo business plan was fully developed and ready for implementation. | All of the IPCo models in the record are "drafts" and there was no final version ready for submission; in addition, Nortel expressly chose liquidation over IPCo thereby nullifying its role and minimizing its value in this proceeding.<br><br>The IP Co. models were not prepared for the purpose of allocating revenues among Nortel entities (See: Green Rebuttal Report, February 28, 2014, p. 16). IP Co. did not progress to a point where ownership of the Residual IP portfolio or allocation of resources thereof were agreed to or discussed in detail. There certainly was no agreement by NNL that NNI would be entitled to keep all US revenues generated from the business. |
| K34 | 73 fn97 | Implied | The IPCo model 3.1 that he references is the best or appropriate set of assumptions or projections. | In fact there was a subsequent model 4.0; it was also draft. |
| K49 | 103 | Implied | "Nortel management" was a single unified group with respect to the IPCo model, the cash flow projections, and the expectations of future revenue. | This is directly contradicted by the facts. See, e.g., the affidavit of Sharon Hamilton dated April 11, 2014, at paras. 75-80. |
| K47 | 98 | IPCo model was developed at the request of and under the direction of the three Debtor Groups | | |
| K47 | 98 | Express | The IPCo model reflects the views of the three debtor groups of the projected cash flows by geography and franchise. | The evidence in the record establishes that the Canadian Debtors did not have confidence in the IPCo model. Ms. Hamilton referred to the modeling exercise as "guesswork". See, e.g., |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| | | | | the affidavit of Sharon Hamilton dated April 11, 2014 at paras. 74-75, 77-79. |
| K47 | 98 | Express | The IPCo model reflects the best information available to the parties at the time, and/or that this information was correct and should be relied on. | The Lazard/Global IP forecasts may or may not reflect the best available information. However, they are inherently speculative and therefore form an inadequate basis to allocate material portions of the Sale Proceeds.  See, e.g., the affidavit of Sharon Hamilton dated April 11, 2014 at paras. 74-75, 77-79. |
| K48 | 100 | **IPCo model inputs are reasonable** | | |
| K48 | 100 | Implied | The market sizes assessed were the best available, or the appropriate markets to review. | As noted above, the Lazard/Global IP forecasts, including the data points referred to in these stated assumptions, may or may not reflect the best available information. However, they are inherently speculative and therefore form an inadequate basis to allocate material portions of the Sale Proceeds.

For example:  taking the most optimistic cash flows from the IP Co. model, and the lowest discount rate used by Nortel and its advisors, and a litigation success rate of 100%, the DCF value of IP Co. is only $2.7 billion; Malackowski's model generates a value of $3.5 billion; and, Rockstar valued the residual IP portfolio at $4.5 billion.  These are huge swings in value premised on a series of competing assumptions and agendas.

In addition:  Kinrich and Zenkich ignore value in Chinese patents and essentially marginalize all non-US markets. |
| K48 | 101 | Implied | The support for royalty rates provided by the developers of the IPCo model are reliable, objective, and not influenced by any bias. | |
| K49 | 101 | Implied | The comparable companies used to compare license and revenue and royalty rates were the best available, or the appropriate comparables. | |
| K55 | 111 | Implied | The 8 technology franchises, 24 products and 47 vendors individually modelled in IPCo are an accurate or appropriate sample that are representative of the entire population. | |
| K55 | 112 | Implied | The assumptions made in the IPCo market share and revenue assessment in NA, EMEA and China were the appropriate or best or reliable. | |
| K55 | 113 | Implied | The assumptions made in the IPCo model for total product market size, Regional Addressable Revenue Share, and Service Revenue Scalar were the appropriate or best or reliable. | |
| K56 | 114 | Implied | The assumptions made in the IPCo model for royalty rates corresponding to litigation strategies were the appropriate or best or reliable. | |
| K56 | 114 | Implied | Royalty revenue is relatively equal across vendors and | |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| | | | franchises within each region. | Although the reference to the 30% tax rate is not unreasonable, the 40% rate assumed by Huffard and Malackowski is more reasonable. |
| K57 K59 | 116 121 | Implied | Relative telecom infrastructure expenditures is the appropriate, reliable or best way to apportion revenue between debtor groups. | |
| K57 | 117 | Implied | The four types of costs projected in the IPCo model are correct, and reliable. | See above. |
| K57 | 117 | Express | Litigation costs (contingent and additional associated with heavy litigation strategy) vary directly in proportion to revenue. | |
| K58 | 117 | Express | Fixed litigation costs for the franchises should be allocated in proportion to licensing revenues. | |
| K58 | 117 | Express | A 30% tax rate is applicable and reasonable to assume across all circumstances and all jurisdictions. | |
| K59 | 121 | Implied | The revenues in the IPCo model represent value relinquished by Debtors. | The value relinquished by the Debtors is not tied to the IPCo model, which included a model that did not work at Nortel, and has not worked through 2014.

It is also invalid to assume that what the U.S. Debtors relinquished matches the proceeds received and that those proceeds merely reflect the math in the IPCo model.  There is no evidence demonstrating that the purchase price reflected or was tied to the IPCo model in any way.

Finally, this assumption is, again, based on the invalid notion that the U.S. Debtors would have no duty to account for their revenues pursuant to the RPSM or such other agreement as the Debtors may have reached if they had ever established a patent trolling business |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| | | | | (which they never did). |
| K59 | 121 | Express (Implied) | The reason the IPCo model attributes all revenue from internet advertising and PC franchises to the US Debtors is because almost all of the patents are in the US (and not because it lacks objectivity, or was biased, or designed to favour the US debtors, or was simply not fully negotiated). | The IPCo model is a draft that addresses geographic sources of revenue in the context of a business that was unknown to Nortel, without reference to ownership of patents.  The mere fact that patents are filed in the U.S. does not mean that Nortel intended to attribute all value in patents to US Debtors, or that the Nortel entities would have agreed to expand Licensed Participants' rights to facilitate the operation of an IPCo business, or that they would have done so on the same terms as the MRDA and the RPSM. |
| K58 | 118 | **The discount rate should be 12.2% without China and 15.7% when China included** | | |
| K58 | 118 | Implied | It is appropriate to infer the discount rate from the cash flows of the IPCo model. | A "plugged" discount rate is speculative, unproven and self-serving.  The fallacy of the result is demonstrated by comparison to other businesses having similar discount rates, which include established communications equipment companies whose returns have nowhere near the volatility of an untested patent troll.

See Britven Rebuttal Report at p. 21. |
| K59 | 119 | Implied | It is appropriate to compare the inferred discount rates from IPCo with those of communications equipment manufacturers per the Ibbotson report to establish reliability. | The risk profile of IPCo and the identified telecommunications companies are not at all comparable.  See Britven Rebuttal Report at p. 21. |
| K39 | 80 | **Global IP assessed highest interest patents with significant reliance on location of patent filing (US)** | | |
| K39 | 80 | Implied | Location of filing is indicator of value. | While the location of filing is an indication of the value of the patent, it is an indication of |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| | | | | value to the owner of the patent and not an indication of value to the U.S. Debtors.  Also, location of filing is only one of many factors relevant to filing of a patent. |
| K39 | 80 | Implied | Global IP assessment is correct or reliable. | This assumption requires speculation as to the significance of patents based on a limited sample, imperfect information and speculation regarding future market developments.  Not a basis for allocating material amounts of the Sale Proceeds. |
| K64 | 131 | Express | It is appropriate to rely upon the Global IP assessment of high interest patents to account for the fact that distribution of value in patent collections may be skewed. | Although Kinrich acknowledges that distribution of value in patent collections may be skewed, he did not use the Global IP assessment of high interest patents in his primary analysis.  Instead, he claims to have used it to "corroborate" his opinion.  The "high interest" patent data does not allow for a proper analysis because it is based on a limited sample, imperfect information and speculation regarding future market developments. |
| K65 | 133 | Implied | Zenkich's approval of the Global IP assessment is reasonable, objective, and reliable. | Kinrich is not qualified to opine on Zenkich's credentials or Chinese intellectual property.  His endorsement is self-serving. |
| Z14 | 44-47 | Implied | There is no basis on which to objectively measure the reasonableness of the star assignments, or to say they were *not* reasonable overall. | Nortel had its own internal claims charts that permit one to discern which patents are/were valued through the claims that were asserted in litigation.  Furthermore, Nortel's patent prosecution policies and culling decisions may also be used as indicators of value.<br><br>Zenkich's failure to perform an analysis that |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| | | | | could be checked or reliably reproduced leaves the reader with insufficient information to determine whether Nortel's work was reasonable or not.<br><br>See Britven Rebuttal report at pp. 23-24. |
| K41 | 83 | **The value relinquished by the US Debtor group was greater because of where the patents were filed and the related license rights** | | |
| K41 | 82-83 | Implied | The value Nortel placed on US filings was value to NNI. | We are not aware of any evidence that Nortel believed that NNI owned the value of the patents filed in the U.S.  This is a proposition invented by Kinrich (or the U.S. Interests) based upon an erroneous understanding of the MRDA.<br><br>Also, this is not an indication of the value relinquished by the U.S. Debtors.<br><br>See Britven Rebuttal Report at p. 22. |
| K41 | 83 | Implied | Other debtor groups did not benefit from or have value interest in patents filed in US, either first or exclusively. | Based on the RPSM, other groups did benefit from U.S. revenues.  Also fails to acknowledge that NNL owned all patents, including patents filed in the U.S. |
| K41 K63 | 83 130 | Implied | Relative value of patents is affected by number of registrations in the jurisdiction. | All else equal, more patents should equal more value.  However, Kinrich conflates location of value with ownership by inappropriately assuming that all "value" coming from U.S. sources (i.e., sales in the U.S.) is "owned" by NNI through its license, without any obligation to account through RPSM or otherwise. |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| | | | | |
| K64 | 132 | Express | The high percentage of highest interest patents filed in the US demonstrates that there was more value relinquished by the US debtors. | The location of filing is not determinative of value allocable to U.S. Debtors. |
| K41 | 82 | Express | The fact that more lawsuits from the Rockstar purchaser for infringement arise for patents only patented in US shows that US patents have more value. | The sample size does not justify this conclusion, and unless there is *relatively* more litigation based on number of patents, this is double counting.  Generally, patents filed in the U.S. are valuable because the U.S. is a large market.  However, that does not mean that non-U.S. patents have no value, that litigation over patents filed in the U.S. cannot be used to generate value from patents filed elsewhere, or that the value in the U.S. patents accrues to the U.S. Debtors. |
| K42 | 84 | **All economic value of Nortel's IP in the Exclusive Territories was held by the IE in that territory** | | |
| K42 | 84 | Implied | His interpretation of (or advice as to) the scope of the license rights is the only interpretation and/or is correct. | The US Debtors' interpretation of the MRDA is incorrect. |
| K42 | 84 | Implied | There is no economic value in the IP beyond the license rights. | Ignores the terms of the MRDA/RPSM. |
| K42 | 86 | **NNL's exclusive right to enforce in the non-Exclusive Territories had very little value** | | |
| K42 | 86 | Express | The non-exclusive rights to sub-license held by the IE's removes any value associated with right to enforce. | Misinterprets the MRDA.  Kinrich gives value to US/EMEA for their ability to sub-license in ROW, but assigns no value to NNL's exclusive right to enforce IP rights in the ROW.  The fact that the US Debtors' interpretation of the MRDA would allow them to indirectly undermine rights that directly are reserved to NNL in the agreement is indicative of their misinterpretation.  See Britven Rebuttal Report at pp. 14-15. |

| Page No. | Para. | Proposition | | |
|----------|-------|-------------|---|---|
| | | **Express vs. Implied** | **Related Assumptions** | **Description of Errors in the Assumption** |
| | | | | |
| K42 | 86 | Implied | The hypothetical ability of the IE's to sub-license post sale so as to undermine the exclusive enforcement right is a valid means to determine the pre-sale value of exclusive enforcement rights. | Misinterprets MRDA in a self-serving manner, as per above. |
| K54 | 108 | **IP rights in China are worth significantly less because foreign patents are difficult to enforce and Chinese government policies favor domestic entities** | | |
| K50 | 104 | Implied | He is qualified to undertake a qualitative assessment of the enforceability of patents in China. | Whatever qualifications Kinrich has are negated since he relies almost entirely on Zenkich for his China analysis. Zenkich performed no analysis to tie his "general" statements to Nortel's portfolio: Britven Rebuttal Report at p. 23). |
| K51 | 105 | Implied | Statements from the U.S. Trade Representative regarding the Chinese enforcement regime are objective, not tainted by political motivations, and reliable. | Inconsistent with other evidence, including Nortel's own actions.<br><br>See Britven Rebuttal Report at pp. 2-24. |
| K54 | 109 | Implied | The opinion of Raymond Zenkich reflects the point of view of the "business community" and is objective, accurate, and reliable. | Zenkich performed absolutely no analysis to tie his "general" statements to Nortel's portfolio or circumstances, and his conclusions are inconsistent with the decisions taken by field experts and business leaders at Nortel.  See Britven Rebuttal Report at pp. 23-24). |
| Z9-11 | 28-33 | Express | Zenkich relies on academic literature, his brokerage experience that saw little activity in Chinese patents, and the lack of awareness on his part of any NPE's operating in China. | Out of date literature and anecdotal brokerage experience is an inadequate basis upon which to base a valuation opinion, particularly in the face of competing evidence with respect to the value decisions made by Nortel itself.  See, e.g., Zenkich Testimony, June 19, 2014, pp. 4434:25-4439:18. |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| Z10 | 31 | Implied | The fact that Zenkich's firm saw no expression of interest in Chinese IP assets on the open market during 2009-2010 is indicative or reflective of the entire global market. | Zenkich undertook no Nortel-specific analysis to support his conclusion as to value of Nortel's Chinese patent portfolio, and his anecdotal observations are a poor basis upon which to assess value. |
| K67 | 137 | The remaining terms of patent applications is measured by a 20 year life span | | |
| K67 | 137 | Implied | It is reasonable and reliable to treat all patent applications as having the same revenue generating lifespan. | This is a speculative and unjustifiable simplifying assumption.<br><br>• Not all applications will result in patents, and so some will be worthless.<br>• Not all IP is created equal.  It is unreasonable to treat two patents from different markets or different technologies equally (e.g., a patent on an existing product may be worth more up front and may have short economic life, as compared to a patent for a technology that has not yet been commercialized). |
| K67 | 137 | Implied | There is no more appropriate means to calculate remaining term, or assess the nature of the patents and their life expectancy. | As per the above, the economic life of a patent may be shorter than the term of the patent.  Having regard to the amounts in issue, a market based analysis can and should have been done on individual patents or even patent families.  Having said this, even that analysis would entail a series of speculative assumptions which would be inappropriate for the purposes of allocating the entirety of the proceeds of the Residual IP Sale. |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| K67 | 137 | Express | 20 years is the appropriate period. | As per the above, this is simply the legal term for a patent in the U.S. It ignores abandoned applications, applications that never issue, average grant time, and economic life altogether. |
| K69 | 138 | **Patent Index shows where value resided in the patent portfolio** | | |
| K70 | 140 | Implied | The index is not skewed by the basic assumptions that more registrations = more value. | This is reflected by the basic parameters of the patent index. |
| K70 | 141 | Express | 75% of applications in the patent portfolio is conservative and reasonable – and should be the same - for all jurisdictions. | This may be true for U.S patents but there is no basis to believe that standards in all patent granting jurisdictions are similar. |

## APPENDIX D - FOUNDATIONAL ASSUMPTIONS TO THE HUFFARD & MALACKOWSKI REPORTS

The following table provides a list of the major propositions and assumptions forming the basis of Huffard's and Malackowski's opinions on the allocation of Sale Proceeds.

The table is broken down into four parts:

1. The stated purpose of the report
2. The stated approach to allocation (N.B. the experts may not have always honoured their stated approach)
3. The assumptions related to the allocation of the Sale Proceeds attributable to the Business Sales
4. The assumptions related to the allocation of the Sale Proceeds attributable to the Residual IP Sale

For ease of reference, major headings are shaded yellow, and minor headings are shaded green.

The following is a sample of the information found in the chart and an explanation of the manner in which it is organized:



| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| **PURPOSE OF REPORT** | | | | |
| M4 | 3 | Objective is to determine: <br> 1. the portion of business sale proceeds attributable to IP included in the transactions; <br> 2. which allocation and valuation methodologies are appropriate on the facts of this case in light of valuation theory and economic principles related to IP; and, <br> 3. the portion of the proceeds attributable to IP that should be allocated to the Canadian, U.S. and EMEA Debtors under each of the contribution and license theories. | | |
| **VALUATION PRINCIPLES/METHODOLOGY** | | | | |
| H2 M5 | 4 1 | The Proceeds of the Sales should be allocated to the various legal entities according to the value of the interests transferred or rights relinquished by each relevant party ("Value"). | | |
| | | Implied | Breaking out by entity is the appropriate or best approach. | True only to the extent that this can be done with reasonable accuracy, having due regard to the amounts at issue and the impact on creditors.  Thus, where the court accepts the interpretation accorded to the MRDA by the CCC and the Canadian Debtors, the exercise of allocating value to legal entities is relatively straight forward and the impact of inaccuracies are tolerable.  Conversely, competing interpretations of the MRDA posited by the other Core Parties put considerably more value at issue, with the result that the impact of inaccuracy on creditors is much more significant and alternative approaches focused on creditor recoveries become appropriate. |
| **LINE OF BUSINESS SALES** | | | | |
| H3 | 6 | The interests transferred or rights relinquished by each relevant party consist of the following categories: <br> 1. Net Tangible Assets (monetary assets, inventory, and fixed assets net of assumed liabilities); <br> 2. Intellectual Property; <br> 3. Customer Related Assets; and <br> 4. Goodwill Not Otherwise related to IP | | |
| H3 | 6 | Express | Nortel relinquished goodwill. | This assumption erroneously equates what was relinquished with what was paid for; these are not the same. |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | **Express vs. Implied** | **Related Assumptions** | **Description of Errors in the Assumption** |
| H33 | 72 | Express | Customer Related Assets had significant value and purchasers paid something for them in each business sale where they were transferred. | Although Customer Related Assets do have value, Huffard errs in his approach, as indicated further below, by simply combining them with goodwill and treating them as a residual category.  He does not actually independently value these two distinct asset categories. |
| | | **Treatment of Tangible Assets in the Line of Business Sales** | | |
| H3 | 7 | Tangible Assets are assumed to have Book Value and are allocated in accordance with each entity's Balance Sheets | | |
| | | Implied | Accounting depreciation reflects loss of value in the Market. | This is an inaccurate simplifying assumption that is justified on the basis that the value of the tangible assets is negligible. |
| | | **Treatment of Intellectual Property in the Line of Business Sales** | | |
| | | **Valuation of IP in LOB Sales** | | |
| M10 M20 M22 M24 | 3 2 1-6 4-7 | The value of Nortel's IP in a given business sale ("Value") depends on the future stream of revenue that it could generate, as per the following formula:<br><br>1.  Value = Defensive Value + Synergistic Value<br>2.  Defensive Value   = Price that Nortel would pay to License its own IP<br>                    = Discount Rate 1 x Royalty Rate 1 x Revenue that Nortel would earn from Products/IP<br>3.  Synergistic Value = Value of IP to a hypothetical market participant<br>                    = Discount Rate 2 x Royalty Rate 2 x Revenue that a market participant would earn from Products/IP | | |
| M22 | 1, 2 | Express | The duration and timing of the cashflow stream = the statutory or legal life of the IP. | Malackowski's contribution method does not distinguish the value of R&D based on "age"—this has the effect of overstating value of older R&D to the benefit of the US and EMEA Debtors, and the prejudice of the Canadian Debtors.  See Britven Rebuttal Report at p. 28. |
| M22 | 5 | Express | Revenue Base = the expected revenues to be generated through the life of the IP. | Although this is a valid assumption and definition for the purposes of Malackowski's methodology, the application relies on a series of assumptions that conflict with the approach taken by Britven.  See Britven Rebuttal Report at p. 26. |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| M22 | 6 | Express | Revenue base may be determined by projecting future revenue according to market research. | Malackowski does no work to confirm that the IP would in fact be royalty bearing. |
| M25 | 1 | Express | Nortel Revenue Base derived from:<br>1. forecasted financial information in Nortel deal books;<br>2. forecast growth rates for each business as published by International Data Corporation (IDC), Infonetics, and Nortel Deal Memo CAGRs, and industry CAGRs. | Malackowski's choices for forecasts and "notional" buyer are flawed. See Britven Rebuttal Report at p. 26. |
| M25 | 1 | Implied | Assumes accuracy of Nortel financial forecasts. | The forecasts are inherently speculative and therefore form an inadequate basis to allocate material portions of the Sale Proceeds. |
| M25 | 1 | Implied | Assumes accuracy of IDC, Infonetics, Nortel CAGRs and Industry CAGRs relied upon. | These private analyst reports are inherently speculative. Malackowski does not provide access to these information sources, and he fails to disclose the historical accuracy of the forecasts. They may or may not reflect the best available information, but their speculative nature makes them an inadequate basis to allocate the Sale Proceeds. Indeed, note Huffard's critique (at H41-42) of the use of "theoretical" valuation methodologies requiring "subjective assumptions" such as the expected churn rate for customer relationships and the cost of capital associated with different tangible and intangible assets employed by a company. |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| M27 M28 | 2, 3 1-3 | Express | Market Participant Revenue Base is derived from:<br>1. the weighted average revenue for the market, determined by reference to IDC and Infonetics data for the top four competitors in an industry; and,<br>2. CAGRs for each business as published by IDC and Infonetics. | Based almost entirely on the accuracy of the choice of market participant and the data provided by IDC/Infonetics. The royalty rates used by Malackowski are inconsistent with his "defensive" and "synergistic" positions and the IP being valued.  See Britven Rebuttal Report, at p. 26. |
| M27 M28 | 2, 3 1-3 | Implied | Accuracy of:<br>• selection of market comparables;<br>• IDC/Infonetics revenue forecasts; and,<br>• IDC/Infonetics CAGR forecasts | The validity (or lack thereof) for the selection of market comparables, revenue forecasts and CAGR forecasts is propagated throughout Malackowski's analysis.  If the selections are invalid (as Britven contends that they are), then Malackowski's conclusions are equally flawed.  See Britven Rebuttal Report at p. 26-27. |
| M22 | 5 | Express | Royalty Rate is a percentage applied to net revenues derived from products or services infringing the IP. | Although the definition is technically correct, the application and basis for using the license approach are disputed by Britven.  See Britven Rebuttal Report, at p. 29. |
| M22 | 6 | Express | Royalty Rate may be determined by examining actual transactions between willing licensees and licensors. | This is but one factor in a royalty rate analysis and is not dispositive.  Some other factors include:<br>1. Royalties patentee receives for licensing the patent in suit; 2. Nature and scope of license in terms of exclusivity and territory / customer restrictions; 3. Licensor's established policy and marketing program to maintain patent monopoly by not licensing others to use the invention; 4. Commercial relationship between licensor and |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| | | | | licensee, such as whether they are competitors or inventor and promoter; 5. Effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales; 6. Duration of patent and term of license; 7. Established profitability of the products made under the patent, its commercial success and its current popularity; 8. Utility and advantages of patent property over old modes and devices; 9. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefit of those who have used the invention; 10. The extent to which the infringer has made use of the invention and the value of such use; 11. The portion of profit or selling price customarily allowed for the use of the invention; 12. The portion of realizable profit attributable to the invention as distinguished from non-patented elements, significant features / improvements added by the infringer, the manufacturing process or business risks. Source: *Georgia-Pacific Corp.* v. *United States Plywood Corp.*, 318 F. Supp. 1116, 1119-20 (S.D.N.Y. 1970), modified and aff'd, 446 F.2d 295 (2d Cir.); *Unisplay, S.A.* v. *American Electronic Sign Co., Inc.*, 69 F.3d 512, 517 n.7 (Fed. Cir. 1995). |
| M24 M25 | 6 6 | Express | Royalty Rate 1 = rate derived by Lazard / Global IP. | The Lazard/Global IP rates may or may not reflect the best available information.  However, they are inherently speculative and therefore form an inadequate basis to allocate material portions of the Sale Proceeds.  Further, the Lazard/Global IP rates are used to derive the "synergistic" and "defensive" value of IP, but the resulting rates are inconsistent with the IP being valued.  See Britven Rebuttal Report at 26. |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| M24 M25 | 6 6 | Implied | Assumes accuracy of Lazard/Global IP forecasts. | The Lazard/Global IP forecasts may or may not reflect the best available information. However, they are inherently speculative and therefore form an inadequate basis to allocate material portions of the Sale Proceeds. Further, the Lazard/Global IP forecasts are not consistent with what the Licensed Participants would have received on the valuation date. See Britven Rebuttal Report at 26. |
| M26 | 2 | Implied | Assumes comparability of franchises | There is no basis to assess this. |
| M24 M28 | 6 4 | Express | Royalty Rate 2=implied rates paid by Rockstar Consortium members Apple, RIM and Ericsson, as determined by reference to: 1. each member's contribution to the purchase price of the Residual Patent Portfolio; and, 2. the present value of the consortium members addressable projected revenue. | There is no basis to assess this; further, these rates are inconsistent with the "safe hands" approach and do not reflect what the licensed participants would have been able to command as a royalty rate for the same IP. |
| M26 | 4 | Express | Discount Rate 1 equal to "Industry" Weighted Average Cost of Capital. | The Rockstar business model would not be an active manufacturer in the communications industry—it would only be a licensing entity—so the choice of "industry" represents a material error. Kinrich makes the same error. See Britven Rebuttal Report at p. 21. |
| M26 | 4 | Express | Industry determined by Standard Industrial Classification (SIC) code applicable to each business sale. | As per above, the actual resulting Rockstar licensing business model would not reflect the SIC code used by Malackowski for his rates. |
| M29 | 1 | Express | Discount Rate 2 equal to Discount Rate 1 plus a risk premium; | The selection of the discount rate is inherently speculative and therefore forms an inadequate basis to allocate material portions of the Sale Proceeds. Malackowski essentially admits this, stating that the selection of the discount rate "requires substantial judgment". |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| M29 | 1 | Express | Risk Premium justified by:<br>1. greater risk associated with the ability of acquired IP to cover buyer's current products and services;<br>2. negotiation risk;<br>3. business risk re: commercialization of the IP. | Although these are valid factors for consideration, the selection of the discount rate is inherently speculative and therefore forms an inadequate basis to allocate material portions of the Sale Proceeds. |
| M29 | 2 | Express | Assumes risk premium is 15%, by reference to standard Risk Adjusted Hurdle Rates (discount rates commonly used in IP valuation) | The selection of the risk premium is inherently speculative and therefore forms an inadequate basis to allocate material portions of the Sale Proceeds. |
| M29 | 2 | Implied | Assumes accuracy and relevance of RAHRs. | The selection of the discount rate is inherently speculative and therefore forms an inadequate basis to allocate material portions of the Sale Proceeds. |
| | | **Allocation of IP in LOB Sales** | | |
| H3 | 8 | Intellectual Property Value is to be allocated pursuant to two different approaches:  a "Contribution Approach" and a "License Approach" | | |
| H3 | 8 | Implied | The allocation methodologies are limited to those proposed by the Joint Administrators in their pleadings. | There are alternate preferable approaches to the allocation of the Sale Proceeds.  Britven disagrees with the use of the Contribution and License approaches as allocation methodologies.  See Britven Rebuttal Report at pp. 26-29. |
| | | **Option 1:  Contribution Approach** | | |
| M5 | 1 | Value payable to a Selling Debtor corresponds to the Selling Debtors' relative contribution to the creation of IP (the "Contribution Approach") | | |
| M5 | 1 | Implied | The Selling Debtors retained some residual proprietary interest in the IP.<br><br>--OR-- | Inconsistent with the MRDA, and no basis for residual or constructive trust. |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| | | | Alternatively, the value of the contractual rights of Selling Debtors depends upon the contribution to creation of IP. | Logically the value of a license to IP in the context of a sale to a third party has nothing to do with historical contributions to the creation of IP (however measured). R&D spending, in particular, is only a measure of value in the context of a negotiated formula for compensation (i.e., the MRDA/RPSM. In that context: <br><br> o  it is not open to the courts to write or re-write the bargain between the parties; <br><br> o  in any event, it is speculative and illogical to suggest that a licensee should receive a better return on its surrender of license rights through a liquidating sale than it would  in the ordinary course through the exercise of its license rights in the context of the RPSM (that would re-write the bargain to the prejudice of the owner of the IP). |
| M39 | 3 | It is not possible to accurately determine contributions of the Selling Debtors to the creation of the IP due to the size of Nortel's IP portfolio, time limits and limited access to information. | | |
| M39 | 3 | Implied | Patent rights are not specific to the inventors shown on the patents. | A patent is a statutory right conferred on a specific inventor in recognition of that inventor's unique idea. The location of the inventors is thus at least as good a proxy for measuring relative contributions as the various and sundry R&D expenses incurred by the Debtors.  As Nortel's former CTO Brian McFadden testified: <br> Q.        -- it's really hard to say exactly what was the research that led to the patent application? <br> A.        The authors would probably beg to differ with you. <br> (McFadden Trial Testimony, May 14, 2014, 688:12-688:16) <br> See also Britven Rubuttal Report pp. 28-29. |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | **Express vs. Implied** | **Related Assumptions** | **Description of Errors in the Assumption** |
| M39 | 4 | Inventorship is not a reasonable proxy for a Selling Debtor's contribution towards the creation of IP because: <br> 1. the research effort at Nortel was a commingled and cooperative one; <br> 2. basic research and development can often lead to foundational discoveries that may not be patentable but which would still represent valuable contributions to the development of Nortel's IP as a whole. | | |
| M39 | 4 | Implied | Patent rights encompass contributions beyond those of the inventor. | A patent is a statutory right conferred on a specific inventor in recognition of that inventor's unique idea. The location of the inventors is thus at least as good a proxy for measuring relative contributions as the various and sundry R&D expenses incurred by the Debtors. Britven Rubuttal Report pp. 28-29. |
| M39 | 4 | Implied | The RPEs have not been fully compensated for these contributions through the MRDA and RPSM. | The RPEs have received full value for their R&D contributions through the exchange of consideration reflected in the MRDA, including the grant of licenses to use all Nortel IP creating an opportunity to generate revenue, and through the transfer pricing methodology set out in the MRDA. |
| M6 M40 | 2 | R&D spending is a reasonable proxy for a Selling Debtor's contribution towards the creation of IP for the benefit of the entire Nortel group. | | |
| M6 M40 | 2 | Implied | The various Nortel Debtors had co-extensive beneficial interests in the Nortel IP | NNL was the owner of the majority of the IP; the other Nortel entities held licenses. |
| M6 M40 | 2 | Implied | R&D spend captures other activities that contributed to the creation of IP. | R&D spending is only a proxy for contribution in the context of a negotiated formula for compensation (i.e., the MRDA/RPSM)—there were many contributions made to the Nortel enterprise (debt financing, strategic oversight, administration, etc.), and the MRDA/RPSM bargain used R&D spending as a benchmark in a formula to compensate the various Nortel entities for those various contributions. See Britven Rebuttal Report at pp. 27-28. |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| M6 M40 | 2 | Implied | Every R&D dollar had roughly equal IP generating capacity. | If this were true then, statistically, over a large sample size, we would expect the distribution of patents among the RPE labs to correspond to the RPE's R&D spend—in fact, we can see from the inventors on the patents that this was plainly not the case. See Britven Rebuttal Report, Table 4 at p. 29.

In fact we know from the evidence that the different labs did different kinds of research:  the U.S. labs in particular were focused on development work which tended to support the creation of their operating revenue, whereas the Canadian labs had a greater emphasis on advanced technology, which created patents that increased their capital base (McFadden Reply Affidavit, April 25, 2014, para. 3; McFadden Testimony, May 14, 2014, pp. 636:16-637:5, 638:5-639:13).

See Britven Rebuttal Report at pp. 27-28. |
| M44 | 3 | The Look Back Period:  It is appropriate to determine contribution to the creation of IP in the Line of Business Sales by measuring R&D spending starting the year before the filing of the earliest unexpired patent in each portfolio. | | |
| M42 | 3 | Express | Older patents may be more valuable because of the time it takes for the market to adopt the technology. | This "see saw" routine regarding the relative value of 'older' vs. 'newer' patents serves to demonstrate the arbitrariness of the selection of the contribution period (and related weighting of spending (or lack thereof)).

The assumptions also ignore the *type* of IP.  Treats LTE, Carrier Networks and "dead" technologies equally on the basis that they were created within the same window of time.  Malackowski uses one analysis of the life of a patent to make an extremely broad generalization across all business lines of Nortel. |
| M44 | 1 | Express | Older patents be more valuable because they may be part of industry standard technology. | |
| M43 | 1 | Express | Older patents may be more valuable because competitors move into the space occupied by the patent. | |
| M43 | 2 | Express | New patents may have more value because there is a longer term remaining in the life of the patent. | |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| M44 | 1 | Express | New patents may have more value because the technology to which they relate is less likely to become obsolete. | Moreover, no explanation is offered to justify the selected time period, and no explanation is given for the manner in which the proposed formula accounts for contributions to the creation of R&D aside from R&D spending.  As noted above:   R&D spending is only a measure of value in the context of a negotiated formula for compensation (i.e., the MRDA/RPSM). |
| M44 | 6 | The End Date:  The appropriate end date for measuring R&D contribution for the purpose of the LOB sales is the end of 2008 | | |
| M44 | 6 | Express | "Know How" was continuously being developed up to the termination of the ordinary course operations on January 14, 2009. | "Know how" was being developed right through to the closing of the sale. |
| M45 | 3 | Nortel's calculation of RPS percentages for transfer pricing purposes is not an accurate way to measure each RPE's relative contributions to the creation of Nortel IP. | | |
| M45 | 4, 5 | Express | It is problematic that the RPS look-back period is shorter than the useful life of the patents sold:  "Since the vast majority of high-value patents in Nortel's portfolio are derived from R&D spending that occurred more than five years before the relevant dates, I am aware of no justification for such a restricted approach". | The RPS look-back period makes sense when one considers:<br><br>(a)  the RPE percentages were the same for all parties (i.e., they affected NNL, NNI, etc. the same way);<br><br>(b)  that the RPEs' bargain compensates for more than just the R&D done by the various entities—it necessarily takes account of the entire relationship between the RPEs in its historical context (e.g., NNL kick-started the global enterprise through the contribution of its IP; NNL provided strategic oversight; NNL financed borrowing; etc.)<br><br>(c)  the context of the bargain viewed as a whole:  the RPEs other than NNL are surrendering their individual ownership of IP and thereby assuming a disproportionate risk of insolvency, in exchange for a perpetual license that affords them the significant benefit of participating in the Nortel enterprise and |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| | | | | making profits in any given year, firstly through operations, and only secondarily through the residual profit split or cost-sharing formula. |
| | | **Option 2:  License Approach** | | |
| M49 | 3 | Value payable to a Selling Debtor is equal to the value of the Selling Debtor's license to IP. | | |
| M50 | | The value of the IP license surrendered by an RPE is equal to the revenue generated by an LOB in the RPE's territory, plus an equal share of the revenue generated in unassigned territories | | |
| M50 | 1 | Express | Assumes accuracy of third-party market research data from IDC, Infonetics, Boston Analytics, and Frost & Sullivan for the purpose of geographic revenue projections. | These private analyst reports are inherently speculative . Malackowski does not provide these information sources, and he fails to disclose the historical accuracy of the forecasts.  They may or may not reflect the best available information, but their speculative nature makes them an inadequate basis to allocate the Sale Proceeds.  Indeed, note Huffard's critique (at H41-42) of the use of "theoretical" valuation methodologies requiring "subjective assumptions" such as the expected churn rate for customer relationships and the cost of capital associated with different tangible and intangible assets employed by a company. |
| M50 | 1 | Implied | Assumes that an IE is beneficially entitled to all of the Revenue initially booked by it. | Inconsistent with the CCC interpretation of the MRDA and RPSM, which require a reallocation of revenue at year end to account for R&D spending and other untracked support provided by various entities conducting R&D. |
| M51 | 4 | Express | Assumes that subsidiaries were free to compete with NNL in ROW. | Inconsistent with the CCC  interpretation of MRDA and scope of license rights.  See Britven Rebuttal Report at pp. 13-15. |
| M51 | 5 | Express | Assumes that an IE would have been entitled to hold up a sale by asserting its license rights. | Ignores reality that IEs decided that they were better off not to hold up a sale, and ability of the courts to force a sale. |
| | | **Treatment of Customer Related Assets and Goodwill in LOB Sales** | | |
| H35 | 78 | Customer Related Assets and Goodwill are treated together as a residual balance, after determination and allocation of Net Tangible Assets and Intellectual Property | | |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| H41 | 94 | Express | Theoretical methodologies to value customer related assets are unreliable | All theoretical valuation methodologies are subject to uncertainty—the question is whether they are too unreliable for the intended purpose.  It is ironic that Huffard concludes that the methods for valuing customer related assets are too unreliable, when he relies so heavily on the speculative valuation work that Malackowski undertakes for the purpose of valuing and allocating the vast majority of the Sale Proceeds. |
| H42  H51 | 94  114 | Express | In the absence of a reliable valuation methodology treat Customer Related Assets and Goodwill as a residual category. | This assumption reflects a self-serving approach that, ironically, relies on the accuracy of theoretical methodologies used by Malackowski to value IP rights.  In a nutshell:  use the theoretical methodologies that are beneficial to the EMEA Debtors, and disregard others on the basis that they are "unreliable".  This approach departs from the way in which the purchasers of the LOBs allocated the assets they acquired and the Alcatel "precedent". |
| H51 | 114 | Express | Allocate to the Selling Debtors proportionate to their 2008 revenue in each LOB. | Assumes that each country "owns" its revenue when in fact there are many inter-company contributions to revenue that need to be taken into account through the RPSM payments. |
| H52 | 116 | Express | Transfer pricing mechanisms are designed for tax efficiency and so revenue provides a better proxy for the value generated by the residual assets. | Some transfer pricing is operationally justified—can't ignore inter-company support. |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| **RESIDUAL PATENT PORTFOLIO SALE** | | | | |
| | **Valuation of Patents** | | | |
| M20 | 3 | Actual Value is determined by the Residual Patent Sale. | | |
| | **Allocation of Value** | | | |
| | | **Option 1:  Contribution Approach** | | |
| | | Same series of assumptions as per allocation of IP Value in LOB sales (see pp. 8-13, *supra.*) | | |
| | | **Option 2:  License Approach** | | |
| M49 | 3 | Value payable to a Selling Debtor is equal to the value of the Selling Debtor's license to the Residual IP. | | |
| M50-51 | | The value of a Selling Debtor's license to the Residual IP is equal to the revenue generated through the license of Residual Patents in the Selling Debtor's territory, plus an equal share of the revenue generated in unassigned territories. | | |
| M50-51 | | Implied | It is possible to model the income generating potential of the Residual Patents with reasonable accuracy. | The forecasts are inherently speculative.  For example: taking the most optimistic cash flows from the IP Co. model, and the lowest discount rate used by Nortel and its advisors, and a litigation success rate of 100%, the DCF value of IP Co. is only $2.7 billion;  Malackowski's model generates a value of $3.5 billion;  and, Rockstar valued the residual IP portfolio at $4.5 billion.  These are huge swings in value premised on a series of competing assumptions and agendas. |
| M31 | 1 | Revenue in a Selling Debtor's territory is equal to the sum of the license fees that could be recovered for each franchise in which a patent is used in the given territory. | | |
| M32 | 6 | The recoverable license fees for a franchise = Discount Rate x Royalty Rate x Royalty Base (Revenue) in that Territory | | |
| M31 | 3 | Express | Nortel's IP Portfolio should be analyzed according to the following eight franchises: | Although the franchise framework is not unreasonable, Malackowski ultimately misapplies the analysis incorporating this assumption. |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| | | | ████ ████ ████ █████████ | |
| M33 | 3 | Express | Allocation of patents to each franchise. | The allocation of patents to a particular franchise is unsubstantiated and speculative. Malackowski's allocation is derived almost entirely from these franchises and related royalty rates (below), but there is no basis in fact for believing that these would apply from 2008 onward. Use of technology inevitably evolves over time as new uses are found. This material assumption lacks real world validity. |
| M32 | 1 | Express | Nortel's Residual Patent Portfolio was broad and diverse enough to apply to most if not all of the revenue in the eight franchises. | This assertion is unsubstantiated, and subject to change as the technologies develop. |
| M32 | 3 | Express | For the purposes of the royalty base calculation, revenue is limited to those geographic regions with at least one high interest patent in a given franchise. | There is only limited real-world data to support any conclusion that the "high-value" patents identified by Lazard from a *subset* of the Rockstar portfolio truly are more valuable than the rest of the portfolio. There is no evidence showing how much more valuable Nortel believed that these patents were. Furthermore, this approach emphasizes the importance of the patent allocation exercise and ignores the possibility of future patent registrations. |
| M32 | 2, 4 | Express | The inherently territorial nature of patents justifies ignoring the potential for earning royalties outside of the jurisdiction of registration. | As Malackowski admits, (M32, para. 2-3), a licensor should be able to leverage royalties for use outside of the jurisdiction of registration as a condition of settlement (i.e. focus on global revenue as opposed to territorial revenue). It is possible to license bundles of patents that apply to multiple jurisdictions for one consolidated rate. |
| M34-M35 | | Express | For each of the franchises, Revenue will be as predicted by selected private market research firms, and further as determined by the linear | The basis for these forecasts, and their historical accuracy are not disclosed. They are inherently speculative, as demonstrated by Malackowski's own unexplained guesswork in cases where analyst forecasts were |

16

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| | | | application of growth rates, as selected by Malackowski.<br><br>For example:<br><br>1) ███████<br>  a) 2011-15: Per Infonetics forecasts;<br>  b) 2016-2020: 6% growth as per Infonetics 2015; and,<br>  c) 2021 onwards: 3%<br><br>2) ███████<br>  a) 2011-15 as per Boston Analytics;<br>  b) 2016-2020: 10% growth per Boston Analytics estimate of 13.8% for 2015; and,<br>  c) 2021 onwards: 3% growth;<br><br>3) ███████<br>  a) 2011-215 as per Siemens Enterprise Communications; and<br>  b) 2016 onwards: revenue at 2015 levels based on Siemens 0% growth estimates for 2014 and 2015. | unavailable. This may or may not be the best information available, but it is not a reliable basis upon which to allocate material Sale Proceeds.<br><br>Moreover, Malackowski misapplies these assumptions as he ignores the terms of the MRDA addressing ownership rights and the scope of license grants. |
| M34-M35 | | Implied | Assumes accuracy of forecasts. | Forecasts are inherently speculative, and therefore not a reliable basis upon which to allocate material Sale Proceeds. |
| M32 | 6 | Express | Assumptions as to royalty rates, licensing expenses, tax rates and | These factors are inherently speculative, and therefore not a reliable basis upon which to allocate material Sale Proceeds. |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| | | | discount rates. | |
| M36 | 2 | Express | Royalty Rate is based upon "Litigation Light" model constructed by Nortel/Lazard/Global IP:<br>1. ▬▬▬▬ 0.45%;<br>2. ▬▬▬▬▬▬ 1.85%;<br>3. ▬▬▬ 1.25%;<br>4. ▬▬▬▬▬ 1.85%;<br>5. ▬▬ 0.30%;<br>6. ▬▬ 1.25%;<br>7. ▬▬▬▬▬ 1.25%; and,<br>8. ▬▬▬ 1.25% | These royalty rates are inherently speculative, and therefore not a reliable basis upon which to allocate material Sale Proceeds. |
| M36 | 2 | Implied | Assumes accuracy of the IPCo model. | The Lazard/Global IP forecasts may or may not reflect the best available information. However, they are inherently speculative and therefore form an inadequate basis to allocate material portions of the Sale Proceeds. For example: taking the most optimistic cash flows from the IP Co. model, and the lowest discount rate used by Nortel and its advisors, and a litigation success rate of 100%, the DCF value of IP Co. is only $2.7 billion; Malackowski's model generates a value of $3.5 billion; and, Rockstar valued the residual IP portfolio at $4.5 billion. These are huge swings in value premised on a series of competing assumptions and agendas.<br><br>Further, the Lazard/Global IP forecasts are not consistent with what the licensed participants would have received on the valuation date.<br><br>See Britven Rebuttal Report at 21-22. |
| M37 | 2 | Express | Licensing and Litigation Expenses will be 20% of royalty revenue. | Completely speculative. |

| Page No. | Para. | Proposition | | |
|---|---|---|---|---|
| | | Express vs. Implied | Related Assumptions | Description of Errors in the Assumption |
| M37 M38 | 4 | Express | Assumes Discount Rate of 30% across all franchises, reflecting a moderate to high risk enterprise. | Completely speculative.  Appendix U to Malackowski's Report, refers to a range of Risk Adjusted Hurdle Rates of 10% to 70%, and purports to create an air of legitimacy and reliability by attaching empty words to meaningless numbers. |
| M50 | | Express | Forecast license returns can be allocated based on where the revenue is earned, with the ROW revenue being split equally between the 5 RPEs. | This is in essence a revenue-based allocation that assumes that the proceeds of sale are independent from any duty to account for the support provided for those sales, NNL's exclusive rights to enforce in non-exclusive territories and NNL's unique position as the owner of the Residual Patents. See Britven Rebuttal Report at pp. 29-30. |
| M50 | | Implied | Assumes that an RPE is beneficially entitled to all of the Revenue initially booked by it. | Contrary to the CCC interpretation of the MRDA and RPSM, which require a reallocation of revenue at year end to account for R&D spending and other untracked support provided by various entities conducting R&D. |
| M51 | 4 | Express | Assumes that subsidiaries were free to compete with NNL in ROW. | Inconsistent with CCC interpretation of MRDA and scope of license rights.  See Britven Rebuttal Report at pp. 13-15. |
| M51 | 5 | Express | Assumes that an RPE would have been entitled to hold up a sale by asserting its license rights. | Ignores reality that RPEs decided that they were better off not to hold up a sale, and ability of the courts to force a sale. See Britven Rebuttal Report  at p. 30. |