Court File No. 09-CL-7950

ONTARIO

SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY
CORPORATION

APPLICATION UNDER THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C.
1985, c. C-36, AS AMENDED

- and -

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>NORTEL NETWORKS INC., et al.,<br><br>Debtors. | Chapter 11<br><br>Case No. 09-10138 (KG)<br>(Jointly Administered) |

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW OF THE
CANADIAN CREDITORS' COMMITTEE ("CCC")**

# TABLE OF CONTENTS

FINDINGS OF FACT...................................................................................................1

A.  The Nortel Group ...........................................................................................1

B.  Nortel's Operations ........................................................................................2

    1.  Nortel's Matrix Structure ........................................................................2

    2.  Subsidiaries Were Not Standalone Businesses ......................................6

C.  Research and Development..............................................................................8

D.  The MRDA ...................................................................................................11

    1.  Purpose of the MRDA ...........................................................................11

    2.  The Ownership Terms............................................................................12

    3.  Rationale for NNL's Ownership ...........................................................14

    4.  The Scope of the Licenses ....................................................................15

    5.  The Enforcement Provision ..................................................................17

    6.  Obligations of Licensed Participants ....................................................17

    7.  Non-Transferability...............................................................................18

    8.  Entire Agreement ..................................................................................18

    9.  Governing Law ......................................................................................18

E.  Nortel's Filing and Decision to Liquidate ...................................................18

F.  The IFSA.......................................................................................................19

G.  The Business Sales........................................................................................21

H.  The Patent Segmentation ..............................................................................23

I.  The Residual IP Sale ....................................................................................24

J.  Nortel's Creditors.........................................................................................27

K.  Value of Assets Sold by Each Nortel Debtor Group ...................................28

    1.  The Business Sales................................................................................29

a.   Identification of Assets ...............................................................................................29

b.   Ownership of Assets ....................................................................................................30

c.   Valuation of Assets ......................................................................................................30

2.   The Residual IP Sale .............................................................................................................32

**CONCLUSIONS OF LAW** ....................................................................................................**33**

# FINDINGS OF FACT[1]

1.      The CCC adopts and relies upon the proposed Findings of Fact of the Monitor and Canadian Debtors and adds the following.

## A.      The Nortel Group

2.      Nortel was a Canadian business with global operations, managed from its headquarters in Canada.

3.      As of January 14, 2009 (the "Filing Date"), Nortel Networks Limited ("NNL"), the principal Canadian operating parent corporation, owned, directly or indirectly, 100% of the equity of its principal operating subsidiaries, which were comprised of Nortel Networks Inc. ("NNI"), a U.S. entity, and the three main operating subsidiaries in the EMEA region, Nortel Networks UK Limited ("NNUK"), Nortel Networks, S.A. ("NNSA") and Nortel Networks Ireland ("NN Ireland"). NNL was in turn owned by NNC, a Canadian publicly-traded corporation.[2]

4.      Nortel's history dates back to the mid-1880s, when it commenced operations as the manufacturing department of the Bell Telephone Company of Canada. In 1964, Bell Canada became the owner of all issued and outstanding shares of Nortel. It maintained a significant stake in the company until 2000.[3]

5.      In the 1960s, Nortel began to develop technology through centralized R&D operations in Ottawa and smaller manufacturing facilities in other Canadian cities.[4] In the early 1970s, Nortel incorporated its principal U.S. subsidiary, Northern Telecom Inc. (the predecessor to NNI),[5] as

---

[1] Capitalized terms not otherwise defined herein have the meaning set out in Appendix A. All figures are in U.S. dollars unless otherwise indicated.

[2] Affidavit of John Doolittle sworn January 14, 2009, paras. 20-21, 26 (TR21539); Nortel Networks Corporation Form 10-K for the Fiscal Year Ended December 31, 2008, p. 1 (TR43999); Affidavit of Peter Currie sworn April 11, 2014, paras. 32, 36 (TR00001).

[3] Affidavit of Clive Allen sworn April 11, 2014, paras. 12-13 (TR00002); Affidavit of John Doolittle sworn January 14, 2009, para. 6 (TR21539).

[4] Affidavit of Clive Allen sworn April 11, 2014, para. 15 (TR00002); Affidavit of John Doolittle sworn January 14, 2009, para. 7 (TR21539).

[5] Affidavit of Clive Allen sworn April 11, 2014, para. 16 (TR00002).

well as marketing subsidiaries in Europe, Asia and Latin America. Over the years, additional manufacturing, marketing and service operations were established throughout the world.[6]

6.     Nortel grew in the late 1990s due in large part to acquisitions funded by equity issued by Nortel's Canadian corporations. Between 1998 and 2000, Nortel made acquisitions totaling over $1 billion, including the acquisition of Bay Networks, Inc. for $9,060 million. These acquisitions were financed through equity issued by Nortel's Canadian corporations, including NNC.[7]

7.     Following a corporate reorganization in 2000, NNL became Nortel's operating parent corporation. By 2009, NNL, in turn, owned, directly or indirectly, more than 130 corporate subsidiaries located in various countries, including NNI, NNUK, NNSA and NN Ireland.[8]

**B.     Nortel's Operations**

     **1.     Nortel's Matrix Structure**

8.     While Nortel was always headquartered in Canada and had significant Canadian operations, in the decades before the Filing Date, Nortel operated according to a highly integrated multinational and multidimensional matrix structure that spanned legal entities and geographic boundaries.[9]

9.     NNL's senior executives, including the Chief Executive Officer (CEO), Chief Financial Officer (CFO) and Chief Technology Officer (CTO), all had global responsibility.[10]  Many of the Directors and Officers of NNC and NNL also sat on the boards of Nortel's subsidiaries, including NNI and NNUK.[11]

---

[6] *Id.*, para. 18; Affidavit of John Doolittle sworn January 14, 2009, para. 8 (TR21539).

[7] NNC Form 10-K, December 31, 2000, pp. F-15, F-16 (TR40259); NNC Form 10-K, December 31, 2001, p. F-14 (TR40261); NNC Form 10-K, December 31, 2002, p. F-33 (TR40263).

[8] Affidavit of John Doolittle sworn January 14, 2009, paras. 20-21, 26 (TR21539).

[9] Affidavit of Peter Currie sworn April 11, 2014, para. 28 (TR00001); Trial Transcript of Sharon Hamilton, May 15, 2014, 1000:3-7.

[10] Nortel Networks Limited and Nortel Networks Inc. Joint Request for Bilateral Advanced Pricing Agreement/Arrangement (2007-2011), Appendix A, p. 11, Appendix B, p. 13 (TR22078).

[11] Affidavit of Peter Currie sworn April 11, 2014, para. 40 (TR00001). For example, between 2005 and 2007, while CFO of NNC and NNL, Peter Currie also acted as director of NNUK: *id.*, para. 2 (TR00001).

10.     Nortel described its operational structure in its request for a Bilateral Advance Pricing Agreements from the IRS and CRA for approval of its intercompany transfer pricing arrangements in the following terms:

> Nortel is vertically and horizontally integrated meaning that organizations within Nortel share information and perform common tasks across geographic boundaries.  Fully integrated entities performing R&D, manufacturing support and distribution functions interact together to fulfill customer demand for product and services.[12]

> …

> The matrix organization is intended to foster a collaborative environment where the right resources are brought to an issue, product, proposal, or other organizational need without typical constraints such as where resources are located or reporting lines.[13]

11.     Nortel's matrix structure was based on Lines of Business. Each Line of Business was independently managed, with heads of each Line of Business reporting directly to the CEO in Ottawa.[14] Nortel's senior management, including presidents of the Lines of Business, regional presidents and executive officers, considered the Lines of Business to be the primary organizational divisions within Nortel.[15]

12.     The Lines of Business operated and reported within the Nortel Group on a functional basis.[16] Each Line of Business was responsible for marketing and business activities across geographic borders and had global responsibility for product manufacturing and product development strategy, including R&D.[17]

---

[12]  Nortel Networks Limited and Nortel Networks Inc. Joint Request for Bilateral Advanced Pricing Agreement/Arrangement (2007-2011), p. 13 (TR22078).

[13]  *Id*., p. 38, Appendix J (TR22078).

[14]  Minutes of the Joint Meeting of the Board of Directors of Nortel Networks Corporation and Nortel Networks Limited, September 22, 2004 (TR31594); Minutes of the Nortel Networks Corporation Meeting of the Board of Directors, October 28, 2004 (TR31495); Affidavit of Brian McFadden sworn April 10, 2014, paras. 32-33 (TR00004); Deposition Testimony of Steven Pusey, November 18, 2013, 34:23-36:03.

[15]  Affidavit of Peter Currie sworn April 11, 2014, para. 28 (TR00001); Trial Testimony of Sharon Hamilton, May 15, 2014, 1000:3-1000:7.

[16]  Affidavit of Brian McFadden sworn April 10, 2014, paras. 19, 31 (TR00004).

[17]  Northern Telecom Limited Form 10-K, December 31, 1996, p. 3 (TR40254).

- 4 -

13.    Nortel's operational structure is depicted in the diagram below, which shows the way in which the Lines of Business (across the top), the regions (along the side) and corporate functions (across the very top) functioned together:[18]



14.    Nortel's matrix structure allowed the business to draw on employees from different functional disciplines worldwide (e.g. sales, R&D, operations, finance, general and administrative, etc.), regardless of region or country, and according to need. As a result, Nortel had multiple reporting lines across product lines, functional groups, and regions.[19]

15.    Nortel's R&D efforts were often organized around Lines of Business and particular projects.[20]    While a disproportionate share of Nortel's R&D was conducted in Canada,

---

[18] Trial Testimony of Peter Currie, May 14, 2014, 594:6-24; Business Update – Reshaping Nortel: Former Structure, p. 6 (TR21499).

[19] Affidavit of Peter Currie sworn April 11, 2014, para. 23 (TR00001).

[20] Reply Affidavit of Brian McFadden sworn April 25, 2014, para. 8 (TR0005); Nortel Networks Limited and Nortel Networks Inc. Joint Request for Bilateral Advanced Pricing Agreement/Arrangement (2007-2011), Appendix B, p. 17 (TR22078).

collaboration among laboratories in different jurisdictions was not uncommon and was often encouraged.[21]

16.     Nortel's corporate support functions also operated on an integrated basis. Head office functions were centralized in Canada at NNL (e.g., legal, finance, strategy, insurance, real estate and information services).[22]

17.     Nortel used a global cash management system that monitored cash flows, cash balances and sources of cash for all Nortel entities worldwide.[23]  NNC and NNL also often undertook debt financing on behalf of Nortel, regardless of where in the world, or by which entity, funds were to be deployed. This debt financing was used for various purposes, including to finance the cash costs associated with business acquisitions and to fund R&D. All debt service costs were borne by NNL and did not form part of the operating performance of the subsidiaries, and so were not included in the accounting for profit splitting among the subsidiaries.[24]

18.     Many Nortel employees considered their employer to be "Nortel" regardless of the legal entity that employed them.[25] Employees often did not differentiate between the various corporate Nortel entities[26] and generally sought to advance the interests of the Nortel business as a whole.[27]

---

[21] Trial Testimony of Peter Currie, May 14, 2014, 597:21-598:10; Trial Testimony of Brian McFadden, May 14, 2014, 661:25-662:24; Trial Testimony of Simon Breuckheimer, May 22, 2014, 1567:4-1567:25, 1572:1-1573:25 and 1583:22-1584:7; Trial Testimony of Andrew Jeffries, May 22, 2014, 1662:2-1662:10 and 1678:3-1678:16; Trial Testimony of Geoffrey Hall, May 28, 2014, 1920:6-1921:17.

[22] Affidavit of Peter Currie sworn April 11, 2014, para. 35 (TR00001).

[23] *Id.*, para. 71 (TR00001).

[24] Trial Testimony of Peter Currie, May 14, 2014, 541:2-17; Affidavit of Peter Currie sworn April 11, 2014, para. 34 (TR00001).

[25] Trial Testimony of Sharon Hamilton, May 15, 2014, 1018:7-25; Trial Testimony of Simon Brueckheimer, May 22, 2014, 1583:11-21; Deposition Testimony of Ernie Briard, September 26, 2013, 16:18-17:18, 75:14–76:19, 78:6-78:17, 79:25-80:14; Deposition Testimony of Khush Dadyburjor, October 3, 2013, 19:7–20:12, 37:07–37:13; Deposition Testimony of Allan Bifield, November 25, 2013, 255:21-258:25.

[26] Deposition Testimony of Ernie Briard, September 26, 2013, 79:12-79:16; Deposition Testimony of Graham Richardson, October 28, 2013, 51:7-51:18; Deposition Testimony of Sharon Rolston, Vol. 1, November 20, 2013, 31:10-32:02.

[27] Deposition Testimony of Ernie Briard, September 26, 2013, 78:23-80:17; Deposition Testimony of Khush Dadyburjor, October 3, 2013, 25:8-25:12.

Indeed, upon termination, employees released all Nortel entities even if they had only worked for one Nortel entity.[28]

### 2.    Subsidiaries Were Not Standalone Businesses

19.    Due to the integrated nature of Nortel's business, no single Nortel Entity had the capability to operate as a freestanding unit carrying on business in any particular geographic market. NNI, NNUK, NNSA and NN Ireland were functional subsidiaries of a multinational organization that depended on NNL and the other entities in the Nortel Group to generate revenue and service customers.

20.    Numerous witnesses at trial attested to the fact that no NNL subsidiary, including NNI, could operate as a standalone business. Their evidence was either not seriously challenged or not challenged at all:

(a)    Sharon Hamilton, a Senior Vice-President of Ernst & Young Inc., the Monitor for the Canadian Debtors, described in detail in her affidavits why NNI lacked the capability to operate as a standalone business.[29] Ms. Hamilton was not cross-examined on this evidence.

(b)    Paviter Binning, Nortel's former Chief Restructuring Officer, Executive Vice-President and CFO testified that no Nortel entity had the ability to operate on a standalone basis or to emerge from bankruptcy as an operating entity.[30] Mr. Binning was not cross-examined on this evidence.

(c)    Brian McFadden, who held several senior executive positions at Nortel including President of the Optical Line of Business and CTO, testified that NNI did not have the administrative and operational functions to operate on a standalone basis. In particular, NNI lacked the R&D capacity and advanced technology capabilities

---

[28] Deposition Testimony of Ernie Briard, September 26, 2013, 60:20-70:22; Deposition Testimony of Allan Bifield, November 25, 2013, 255:21-258:25.

[29] Reply Affidavit of Sharon Hamilton sworn April 25, 2014, paras. 4-20 (TR00010).

[30] Reply Affidavit of Paviter Binning sworn April 25, 2014, paras. 1-13 (TR00015).

to create and support Nortel's products in the various Lines of Business.[31] Mr. McFadden was not cross-examined on this evidence.

(d)     Peter Currie, the former CFO of Nortel, who had a twenty year history with the organization, testified that "NNI was a statutory entity that had the ability within its geographic region to sell, market and support products developed by the corporation."[32]

(e)     Clive Allen, the former Chief Legal Officer of Nortel, testified that NNI was a "piece of the puzzle, but the puzzle was much bigger than a piece."[33]

(f)     Peter Newcombe, who began his career at STC plc (subsequently acquired by Nortel) in 1983 and held numerous business development and sales positions throughout his tenure at Nortel, testified that U.S. Nortel entities could not have run the Metro Ethernet Networks ("MEN") business without Canadian employees.[34]

21.     The most telling admission regarding the interdependence within the Nortel Group and NNI's dependence on NNL is contained in the U.S. Debtors' own representation to these Courts in the process of seeking approval for the IFSA:

> *The importance of NNL to the Nortel Group is self-evident. First, NNL is both the historic and actual operational parent of the global Nortel enterprise. From the Nortel Group headquarters in Toronto, Canada, NNL provides corporate overhead support to its affiliates throughout the world.* In particular, a substantial portion of Nortel's legal, finance, strategic, insurance, procurement, human resources and real estate functions are directed on a group-wide basis from NNL's Toronto offices. Second, NNL conducts a disproportionate share of Nortel's Research and Development Activities (when compared to revenue generation) and operates the Carling Facility, the largest Nortel R&D facility

---

[31] Reply Affidavit of Brian McFadden sworn April 25, 2014, para. 3 (TR00005); Trial Testimony of Brian McFadden, May 14, 2014, 638:5-639:13, 728:10-729:25.

[32] Trial Testimony of Peter Currie, May 14, 2014, 599:1-4.

[33] Trial Testimony of Clive Allen, May 14, 2014, 623:24-624:3.

[34] Trial Testimony of Peter Newcombe, May 22, 2014, 1650:13-1651:14.

- 8 -

in the world… Third, *NNL is the legal owner of nearly all of the group's intellectual property…*[35]

22.     The Joint Administrators for the EMEA Debtors acknowledged the same during their application for administration in the U.K.:

> … the Nortel Group's operations are highly integrated and… individual companies do not operate as fully independent and self sufficient entities.[36]

## C.     Research and Development

23.     R&D was the principal driver of Nortel's business and resulted in technology that generated the overwhelming majority of the Sale Proceeds.[37] Indeed, the Nortel parties to the Master R&D Agreement (the "MRDA") expressly acknowledged that "the key profit driver in the Nortel business is the development and maintenance of rapidly depreciating intellectual property ("IP")."[38]

24.     The epicentre of Nortel's R&D was its world-class research facility in Ottawa, Ontario. Before the 1980s, all of Nortel's R&D was performed in Ottawa. While Nortel established laboratories throughout the world in later decades, Ottawa remained the primary centre of R&D throughout Nortel's history.[39]

25.     As of the Filing Date, Nortel had 3,319 regular full-time R&D employees in Canada, compared with just 1,848 R&D employees in the U.S. and 531 R&D employees in EMEA.[40]

---

[35] Motion Pursuant to 11 U.S.C. §105(A), §363, § 503 And Fed. R. Bankr. P. 9019 For An Order (A) Approving the Interim Funding And Settlement Agreement, and (B) Granting Related Relief, June 9, 2009, para. 16 (the "IFSA Motion") (TR11366), *emphasis added*.

[36] Report of Alan Bloom et al. Prepared in Support of Applications for Administration Orders Pursuant to the Insolvency Act 1986, January 14, 2009, p. 6, para. 3.1 (TR31622).

[37] Affidavit of Paviter Binning sworn April 10, 2014, para. 53 (TR00014); Affidavit of Sharon Hamilton sworn April 11, 2014, para. 60 (TR00009); Trial Testimony of Philip Green, June 6, 2014, 3338:22-24; Trial Testimony of Coleman Bazelon, June 2, 2014, 2874:20-2875:5. See also: Affidavit of John Doolittle sworn January 14, 2009, para. 10 (TR21539) (noting that "R&D and new technology are at the core of Nortel's business").

[38] MRDA, Schedule A, p. 15, Amended Schedule A, p. 30 and Second Amendment to Schedule A, p. 48 (TR21003).

[39] Affidavit of Brian McFadden sworn April 11, 2014, para. 16 (TR00004); Affidavit of John Doolittle dated January 14, 2009, para. 189 (TR21539).

[40] Nortel Networks Limited Transfer Pricing Report for 2009, p. 6 (TR44075).

26.     NNL incurred a disproportionate share of Nortel's R&D expenses.[41] Between 2005 and 2009, the proportions of R&D expenditure in each region were as follows:

      (a)      Canada: 49.8%

      (b)      U.S.: 38.5%

      (c)      EMEA: 11.6%[42]

27.     Canadian inventors created the majority of Nortel's patents. Approximately 50% of all patents and patent applications were invented by Canadian inventors,[43] 13 of 15 of the most prolific Nortel inventors were Canadian,[44] and approximately 54% of Nortel's "top patents" originated in Canada.[45] According to the analysis conducted by James Malackowski, an expert for the EMEA Debtors, Canadian inventors were responsible for 51.9% of the patents in the Residual IP Portfolio sold to Rockstar and 46.3% of the patents in the Residual IP portfolio designated as "high interest" by Nortel's IP advisors, Global IP Law Group ("Global IP").[46]

28.     The CTO was one of Nortel's most senior executives and was located in Canada. The CTO was directly accountable to NNL and reported directly to the CEO.[47] The CTO was accountable for Nortel's future network strategy and architectural vision, R&D effectiveness and advanced technology.[48]

---

[41] IFSA Motion, para. 16 (TR11366).

[42] Nortel U.S. GAAP R&D Spend by Year (TR45171); Primary Report of Thomas Britven dated January 24, 2014, Schedule 8 (TR00045); Transfer Pricing Adjustments (TR45645).  Although Nortel commenced creditor protection proceedings in Canada, the U.S. and the U.K. in January 2009, it incurred R&D expenses throughout fiscal 2009.

[43] Affidavit of Angela de Wilton sworn April 11, 2014, para. 14 (TR00006).

[44] Rebuttal Report of Thomas Britven dated February 28, 2014, para. 6.17 (TR00046).

[45] Primary Report of Coleman Bazelon dated January 24, 2014, p. 18, Table 1 (TR00039).

[46] Rebuttal Report of James Malackowski dated February 28, 2014, p. 40 (TR00034).

[47] Affidavit of Brian McFadden sworn April 10, 2014, para. 17 (TR0004); Email from Steve Foster to Brian McFadden re: CTO Program Summary dated August 10, 2005 (TR44792).

[48] Affidavit of Brian McFadden sworn April 10, 2014, paras. 11 and 17 (TR00004).

29.     Nortel's Advanced Technology Programs were principally led out of Canada's Ottawa labs under the direction of the CTO. These programs focused on forward-looking research for the next-generation of technology to meet customer needs.[49]

30.     R&D was critical to the product offerings of each of Nortel's Lines of Business. It was R&D that led to new products that generated revenue for Nortel Entities throughout the world. In addition, R&D personnel played a direct and important role in sales and revenue generation of all Nortel Entities. For instance, prospective customers were often given tours of the Ottawa R&D facility, and sales presentations were often made with the involvement of R&D and sales teams.[50] The Advanced Technology Programs in particular were vital to the development and maintenance of customer relationships that led to revenue for Nortel. As former CTO Brian McFadden testified:

> … Most of our major customers had chief technology officers, and they had advanced technology groups of their own, and they were doing their own research into what the future would look like, and they would rely on interactions with the Nortel CTO office and advanced technology team to validate their thoughts or to understand what our thinking was on the future of their business and networks.[51]

31.     Nortel's R&D led to patent filings in various countries around the world, including Canada, the U.S., the U.K., Germany, France, China, Japan and Australia. Rights in inventions, including patent applications and patents, were assigned to NNL as a matter of course. The assignment documentation invariably provided that the entire right, title and interest in and to the invention and the application was assigned to NNL.[52]

32.     As of 2009, Nortel had over 8,000 active patents and patent applications, approximately 98% of which had been assigned to, and were owned by, NNL.[53]

---

[49] *Id.*, paras. 15-16 (TR00004); Trial Testimony of Brian McFadden, May 14, 2014, 635:1-637:18.

[50] Affidavit of Brian McFadden dated April 10, 2014, paras. 28-30 (TR00004); Trial Testimony of Brian McFadden, May 14, 2014, 637:6-18, 693:21-695:3.

[51] Trial Testimony of Brian McFadden, May 14, 2014, 636:6-636:15.

[52] Affidavit of Angela de Wilton dated April 11, 2014, para. 8 (TR00006); Trial Testimony of Angela de Wilton, May 14, 2014, 736:21-737:10 and 743:9-15; Trial Testimony of Angela Anderson, May 29, 2014, 2178:8-14, 2195:8-19; Deposition Testimony of Eric Jensen, October 8, 2013, 120:13-121:4, 145:15-22; Deposition Testimony of Gillian McColgan, November 8, 2013, 175:10-14.

[53] Affidavit of Angela de Wilton dated April 11, 2014, paras. 8-12 (TR00006); Primary Report of Thomas Britven dated January 24, 2014, para. 6.57 and Appendix E, p. 4 of 8 (TR00045).

D.    **The MRDA**

1.    **Purpose of the MRDA**

33.    Nortel entered into intercompany agreements governing the ownership and licensing of IP resulting from its R&D. Effective January 1, 2001, NNL, NNI, NNUK, NNSA, NN Australia[54] and NN Ireland entered into the Master R&D Agreement (the "MRDA").[55]

34.    The MRDA superseded a series of bilateral cost-sharing agreements (the "CSAs") between NNL and other Nortel Entities.[56]    While the CSAs set forth a different formula for allocating profits and losses among the Nortel Entities, the terms regarding ownership and licensing of Nortel's technology in the CSAs were continued in the MRDA.[57]

35.    One purpose of the MRDA was to document the transfer pricing arrangements for allocating income and losses among Nortel Entities from 2001 onward. The parties to the MRDA were defined as the Participants. The parties to the MRDA other than NNL (i.e. NNI, NNUK, NNSA and NN Ireland) were called the Licensed Participants, since they received technology licenses from NNL on the terms set forth below. The Participants were also referred to as Residual Profit Entities ("RPEs") as a result of their agreement to share profits in accordance with Nortel's residual profit split methodology ("RPSM"). Other Nortel affiliates that were not signatories to the MRDA and did not perform R&D signed distribution agreements with NNL and were called Nortel Distribution Entities.[58]

36.    A second purpose of the MRDA was to govern the ownership and licensing of Nortel's IP. Specifically, the parties agreed in Articles 4 and 5 of the MRDA to continue the legal rights of the parties regarding ownership of Nortel's technology, just as the CSAs had done before.

---

[54] NN Australia ceased to perform R&D as a result of a sale of its R&D facility in August 2005. NN Australia retired from the MRDA effective December 31, 2007: Nortel Networks Limited Transfer Pricing Report for 2009, p. 35, FN16 (TR44075).

[55] (TR21003).

[56] See e.g. Amended Research and Development Cost Sharing Agreement between Northern Telecom Limited (the predecessor to NNL) and Northern Telecom Inc. (the predecessor to NNI) dated January 1, 1992 (TR21002).

[57] *Id.*, arts. 3-4; Deposition Testimony of Giovanna Sparagna, 208:22-208:23, 209:25-212:15; Email Exchange between John Doolittle and Scott Wilkie (TR21528).

[58] See MRDA, Schedule A, p. 15, Amended Schedule A, p. 30, and Second Amendment to Schedule A, p. 48 (TR21003).

- 12 -

37.     The MRDA was therefore not simply a "tax" or "transfer pricing" document. As NNI

employee and former counsel in the IP Law Group, Eric Jensen, stated:

> *The issue of IP ownership is intertwined with the tax issue* as far as I can tell – the
> CSA was a tax document that was created, as I understand it, to benefit from
> certain tax laws, but *which also defined ownership of IP b/w NNL and the subs*…
>
> … Nortel needs to resolve the IP ownership issue, and sooner rather than later – it
> impacts litigations and licensing of IP, among other things.[59]

38.     As Jensen stated to Mark Weisz, Nortel's Director of International Tax, in 2004:

> After the Cost Sharing Agreement (CSA) was terminated effective 1/1/2001, our
> IP-ownership (primarily patents and software/copyrights) became uncertain.
> *According to the CSA, all IP ownership vested in NNL, and in return NNL
> licensed the various CSA participants*. After the CSA was terminated, it is not
> explicitly clear how the subsidiaries obtain rights to NNL's patents and which
> entity has IPR ownership for IP purposes. This comes into play in two primary
> areas, licensing IPR and lawsuits…
>
> … [F]or IP ownership issues it doesn't matter how we are "operating", what
> *matters is what the agreements say* and that we currently don't have an agreement
> and need one to resolve the uncertainty resulting in part from the CSA
> termination.[60]

### 2.     The Ownership Terms

39.     In the MRDA, the parties agreed on two key provisions that define their rights in relation

to Nortel's technology:

(a)     Article 4(a) vests legal title to all NN Technology in NNL; and

(b)     Article 5(a) grants Licenses to the Licensed Participants.

40.     NN Technology is broadly defined in the MRDA as follows:

> "**NN Technology**" shall mean, any and all intangible assets, including but not
> limited to patents, industrial designs, copyrights and applications thereof,
> derivative works, technical know-how, drawings, reports, practices,
> specifications, designs, software and other documentation or information

---

[59] Email from Eric Jensen to Mark Weisz, April 12, 2004 (TR11106), *emphasis added*.
[60] Email from Eric Jensen to Mark Weisz, May 27, 2004 (TR11108), *emphasis added*.

- 13 -

produced or conceived as a result of research and development by, or for, any of
the Participants, but excluding trademarks and any associated goodwill.

41.     NNL was the only party that ever granted licenses to NN Technology to any Participant
under the MRDA. None of NNI, NNUK, NNSA or NN Ireland ever granted licenses to the NN
Technology to any other Participant, nor could they.[61]

42.     In addition to Articles 4 and 5, the MRDA contains the following additional provisions
relevant to NNL's status as owner of the NN Technology:

(a)     The definition of "Non-Exclusive Territory", as amended, provides that NNL
"retains its exclusive rights" with respect to the NN Technology for Canada. NNL
does not acquire any rights by way of a license.[62]

(b)     Article 3(d) provides that NNL is the "administrator" of the MRDA.

(c)     Article 4(b) provides that "[e]ach Licensed Participant shall execute or cause to be
executed such documents reasonably requested by NNL as may be necessary or
desirable" to vest legal title to the NN Technology in NNL.

(d)     Article 4(d) provides that NNL has the exclusive right to file and prosecute
applications for patents, copyrights and other NN Technology in every country of
the world.

(e)     Articles 6(a), 6(b) and 7(b) provide that NNL is owed confidentiality and
indemnity obligations from the Licensed Participants regarding the NN
Technology. The Licensed Participants are not owed reciprocal confidentiality
and indemnity obligations from NNL.

(f)     Article 9(c) provides that the provisions of Article 4 (Legal Title to NN
Technology), including the requirement of the Licensed Participants to execute
documents to perfect NNL's legal title in the NN Technology, survive
notwithstanding expiry or termination of the agreement.

---

[61] Deposition Testimony of Mark Weisz, November 25, 2013, 70:9-13.
[62] MRDA, "Non-Exclusive Territory", p. 40 (TR21003).

- 14 -

(g)     Article 10(b) permits NNL to grant Licenses to new MRDA Participants.

(h)     Article 11(e) provides that the obligations of a retiring Participant under Article 4 (Legal Title to NN Technology), including the requirement of the Licensed Participants to execute documents to perfect NNL's legal title in the NN Technology, continue notwithstanding the retirement of a Participant.

(i)     Article 13 expressly disclaims a partnership or joint venture relationship: "[t]he relationship of the Participants under this Agreement shall not constitute a partnership or joint venture for any purpose…".

### 3.     Rationale for NNL's Ownership

43.     The ownership structure in the MRDA and the CSAs that preceded it was designed to reflect the fact that NNL, as the parent company of a multinational technology organization, owned, controlled and managed the key assets of the business, its technology and IP rights.  As discussed above, Nortel's R&D efforts were principally based in Canada. Nortel's Canadian labs invented the digital switching technology which led to the creation of the modern Nortel, and NNL has been continuously assigned virtually all Nortel IP since the 1970s.[63]

44.     NNL also required ownership in order to control the use of the NN Technology, settle differences between subsidiaries and licensees, determine the strategic direction of R&D and enter into licensing and cross-licensing arrangements with third parties.[64]  This centralized IP ownership and licensing structure is typical of multinational corporate groups.[65]

45.     Accordingly, NNL's ownership was not merely a matter of "administrative convenience" or "administrative simplicity". The MRDA does not say this, a fact which was readily conceded by the U.S. Interests' trial witnesses, including Walter Henderson[66] and Michael Orlando.[67]

---

[63] Affidavit of Angela de Wilton sworn April 11, 2004, paras. 8-12 (TR00006); Affidavit of Clive Allen sworn April 11, 2014, paras. 19 (TR00002); Deposition Testimony of Roy James MacLean, October 23, 2013, 228:24 - 229:2; Trial Testimony of Clive Allen, May 14, 2014, 622:21-623:13.

[64] Affidavit of Clive Allen sworn April 11, 2014, paras. 27, 35 (TR00002).

[65] Affidavit of Paviter Binning sworn April 10, 2014, para. 10 (TR00014).

[66] Trial Testimony of Walter Henderson, May 20, 2014, 1155:19-1156:3. Despite putting himself forward as the "principal draftsperson" of the 1992 CSA between NNL and NNI, Mr. Henderson admitted that virtually every

46.    Rather, NNL held title as a matter of business necessity and good corporate practice.[68] Angela de Wilton, Nortel's former Director of Intellectual Property, explained that it would be unworkable to have divided ownership of a patent portfolio in a large multinational organization like Nortel that operated in different countries and was subject to myriad local laws.[69]    In addition, she explained the numerous complications that would arise from joint ownership of Nortel's patent portfolio.[70]    Angela Anderson, the former head of IP for EMEA, categorically denied that NNL held title for mere administrative convenience as contended by the U.S. Interests and EMEA Debtors in these proceedings.

> … *oh I wouldn't have said it was just for administrative convenience.* The patents were all assigned to NNL as a matter of best practice as much as anything. It is very useful to have everything in the same name. It makes management of the portfolio much easier. So there are some clear administrative advantages of having everything in the name of NNL. But *there are other good reasons for it being in the name of NNL, and that's if you wanted to do a cross-license, you couldn't do it unless you had all the patents in the same entity.*[71]

### 4.    The Scope of the Licenses

47.    The Licenses granted by NNL to the Licensed Participants were defined by a carefully circumscribed field of use (the "Field of Use") set out in Article 5 of the MRDA and the definition of "Products" incorporated therein by reference.

---

relevant provision in the 1992 CSA was carried over from prior agreements drafted long before he became a lawyer. See *id.*, 1145:13-1155:18.

[67] Trial Testimony of Michael Orlando, May 21, 2014, 1333:17-1334:4.

[68] Trial Testimony of Angela de Wilton, May 14, 2014, 761:22-764:1; Trial Testimony of Angela Anderson, May 29, 2014, 2195:20-2196:13, 2178:15-2179:4.

[69] Trial Testimony of Angela de Wilton, May 14, 2014, 762:13-24.

[70] *Id.*, 763:18-764:1.

[71] Trial Testimony of Angela Anderson, May 29, 2014, 2195:20-2196:13, *emphasis added*. See also: *id.*, 2178:15-2179:4 ("it is best practice to have all the patent applications in single entity rather than spotted all around various entities, because if you need to use them in any way, shape or form, you know where they are… you can use them without having to go and secure sublicenses and other things from subsidiaries."). The U.S. Interests and EMEA Debtors rely on an internal Nortel email exchange from 2001 in which a Nortel lawyer, Timothy Collins, noted that "continuing to assign all intellectual property to Nortel Networks Limited may provide some administrative simplicity": Email from Timothy Collins dated November 7, 2001 (TR22079). Mr. Collins was merely making a passing reference to certain advantages from continuing to vest complete ownership of Nortel's technology in NNL. He certainly did not purport to modify the agreements between the parties or to characterize the value of the Licenses, if any: see Trial Testimony of Walter Henderson, May 20, 2014, 1167:6-1170:18. In any event, it does not matter *why* NNL owned the NN Technology; what matters is that *it did*.

48.    Pursuant to Article 5(a)(i), NNL conferred on each Licensed Participant an exclusive license (the "Exclusive License"). Pursuant to Article 5(a)(ii), NNL conferred on each Licensed Participant a non-exclusive license (the "Non-Exclusive License"). The Exclusive Licenses and Non-Exclusive Licenses are collectively referred to herein as the Licenses.

49.    The Exclusive License conferred on each Licensed Participant an exclusive license, including the right to sublicense:

    (a)    to make, have made, use, lease, license, offer to sell and sell Products using or embodying NN Technology in and for its Exclusive Territory (the "first arm"); and

    (b)    all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith (the "second arm").[72]

50.    The Non-Exclusive License conferred on each Licensed Participant a non-exclusive license, including the right to sublicense:

    (a)    to make, have made, use, lease, license, offer to sell and sell Products using or embodying NN Technology in and for the Non-Exclusive Territory (the "first arm"); and

    (b)    all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith (the "second arm").[73]

51.    The term "Products" is defined in Article 1(g) of the MRDA as follows:

[1](g) "**Products**" shall mean all products, software and services designed, developed, manufactured or marketed, or proposed to be designed, developed, manufactured or marketed, at any time *by, or for, any of the Participants*, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates,

---

[72] MRDA, Article 5(a)(i), pp. 41-42 (TR21003).
[73] *Id.*, Article 5(a)(ii), p. 42.

enhancements or other derivatives associated with or incorporated in any of the foregoing.

52.     The Exclusive Territories of the Licensed Participants are:

(a)     NNI – United States and Puerto Rico;

(b)     NNUK – United Kingdom;

(c)     NNSA – France; and

(d)     NN Ireland – Ireland.[74]

53.     The Non-Exclusive Territory is defined in the MRDA as follows:

"**Non-Exclusive Territory**" shall mean, for each Licensed Participant, the entire world except (i) Canada where NNL retains its exclusive rights, and (ii) those geographic areas designated in <u>Schedule B</u> as the Exclusive Territory as another Licensed Participant.[75]

**5.      The Enforcement Provision**

54.     Article 4(e) of the MRDA contained an *inter partes* contractual agreement permitting the Licensed Participants to enforce the NN Technology within the Field of Use. Article 4(e) of the MRDA, contained in the section entitled "Legal Title to NN Technology", reads as follows:

[4](e)  Licensed Participants have the right to assert actions and recover damages or other remedies in their respective Territories for infringement or misappropriation of NN Technology by others.

**6.      Obligations of Licensed Participants**

55.     The MRDA imposed obligations on the Licensed Participants, including the obligation to:

---

[74] MRDA, "Exclusive Territory", p. 40 and Schedule B to the Third Addendum, p. 50 (TR21003).

[75] *Id.,* p. 40

(a)    perform R&D Activity[76] at a level consistent with past practices and the ongoing needs of the Nortel business for its respective Territory (Article 2(a)); and

(b)    make payments determined in accordance with Nortel's RPSM as set out in Schedule A to the MRDA (Article 3 and Schedule A).

56.    The mechanics of the RPSM formula are detailed in Schedule A, as amended, and explained in Appendix F of the report of the CCC's expert witness, Thomas Britven.[77]

### 7.    Non-Transferability

57.    Article 10(a) required the unanimous consent of the Participants, including NNL, for the admission of any "Eligible Party", who must be an Affiliate of NNL, as a new MRDA Participant.

58.    Article 14(a) of the MRDA provides that the MRDA cannot be assigned by any Participant without the written consent of all signatories.

### 8.    Entire Agreement

59.    Article 14(d) provides that "this Agreement sets forth the entire agreement and understanding between the Participants."

### 9.    Governing Law

60.    Article 14(f) provides that the MRDA is governed by Ontario law.

### E.    Nortel's Filing and Decision to Liquidate

61.    As a result of deteriorating market conditions and weakening customer commitments, Nortel commenced formal bankruptcy and insolvency proceedings in Canada, the U.S. and England (in respect of various entities in the EMEA region) on January 14, 2009.[78]

---

[76] "R&D Activity" is defined as follows: "**R&D Activity** shall mean all research and development activity (determined in accordance with US GAAP) performed by, or for, any Participant including, without limitation, development Products and methods, processes, procedures and tools related to manufacturing, installation, operation, interoperability, maintenance and use of Products." *Id.*, Article 1(h), p. 4.

[77] Primary Report of Thomas Britven dated January 24, 2014, Appendix F (TR00045).

62.     Nortel's stakeholders considered various restructuring options, including restructuring the business around Nortel's CDMA business and a sale of the Lines of Business.[79] Ultimately, Nortel elected not to pursue the CDMA restructuring option due to lack of support from its most significant customer of CDMA technology, Verizon, and the inability to obtain the requisite financing.[80]

63.     Following significant review by NNC's senior management and board of directors, and in consultation with Nortel's financial advisor, Lazard Freres & Co. ("Lazard"), the Canadian Monitor, the U.S. Debtors, the Joint Administrators for the EMEA Debtors, the legal and financial advisors to the Committee, the Bondholder Group and various Canadian Creditors, it was determined and agreed in June 2009 that the best means to realize value for creditors would be to sell all of the Lines of Business and other assets through a liquidating insolvency.[81]

## F.     **The IFSA**

64.     In part to facilitate the Sales, the Canadian, U.S. and EMEA Debtors entered into the IFSA on June 9, 2009.

65.      Pursuant to the IFSA, NNI paid $157 million to the Canadian Debtors which, together with a $30 million payment made in January 2009, satisfied NNL's claims for corporate overhead and research incurred by NNL for the benefit of the U.S. Debtors for the period from the Filing Date to September 30, 2009. In addition, NNL agreed to pay $20 million to NNUK on a deferred basis, to settle all transfer pricing obligations between the Canadian Debtors and the EMEA Debtors for the period from the Filing Date to December 31, 2009.[82]

66.     With respect to the Sales, the IFSA provided that:

---

[78] Affidavit of Sharon Hamilton sworn April 11, 2014, paras. 5 and 16-25 (TR00009); Affidavit of Paviter Binning sworn April 11, 2014, para. 41 (TR00014).

[79] Affidavit of Sharon Hamilton sworn April 11, 2014, paras. 17-18 (TR00009); Affidavit of Paviter Binning sworn April 11, 2014, para. 44 (TR00014);.

[80] Affidavit of Sharon Hamilton sworn April 11, 2014, paras. 23-24 (TR00009); Affidavit of Paviter Binning sworn April 11, 2014, paras. 47-48 (TR00014).

[81] Affidavit of Sharon Hamilton sworn April 11, 2014, para. 21 (TR00009); Affidavit of Paviter Binning sworn April 11, 2014, para. 49 (TR00014).

[82] Affidavit of Sharon Hamilton sworn April 11, 2014, para. 30 (TR00009).

(a)    the execution of definitive documentation with a purchaser for, or closing of, any sale of material assets of any Debtor would not be conditioned upon such party reaching agreement with the other parties regarding the allocation of the sale proceeds from such sale transaction, or the binding procedure for the allocation of such sale proceeds;[83]

(b)    for the purpose of facilitating the sale of any material assets of the Canadian and/or U.S. Debtors, the U.S. and EMEA Debtors agreed to enter into appropriate license terminations with respect to the licenses and rights granted by NNL to them under or pursuant to the provisions of the MRDA;[84]

(c)    the license terminations would not affect the ownership rights that any party to the IFSA may have to any IP sold;[85] and

(d)    the license terminations would not be deemed to be, or result in, an expiry or termination of the MRDA.[86]

67.    Thus, pursuant to the IFSA, the Canadian, U.S. and EMEA Debtors agreed that the Sales would be implemented and reserved all rights regarding the allocation of the Sale Proceeds among the Debtor Estates.

68.    Permitting the Sales to proceed immediately while agreeing to reserve all rights regarding allocation permitted the parties to benefit from a liquidation process that generated the highest possible value, which was in the interests of all parties and their creditors.[87]

---

[83] IFSA, s. 12(a) (TR43794).

[84] *Id.*, s. 11(a).

[85] *Id.*, s. 11(b).

[86] *Id.*, s. 11(b).

[87] Affidavit of Sharon Hamilton sworn April 11, 2014, para. 37-38 (TR00009); Trial Testimony of Sharon Hamilton, May 15, 2014, 926:2-9; 931:3, 932:14 - 934:10, 939:22 - 941:11, 948:11 - 950:6, and 957:5 - 975:9; Trial Testimony of Paviter Binning, May 20, 2014, 1054:13 – 1055:13 and 1072:11 – 1072:14.

G.    **The Business Sales**

69.    The Business Sales consisted of eight transactions, undertaken after the Filing Date and the conclusion that a restructuring was not viable, in which all of the major Nortel Lines of Business were sold to third party purchasers. The Business Sales generated approximately USD $2.848 billion in Business Sale Proceeds.[88]

70.    The Business Sales were conducted through cooperative, multi-jurisdictional sales, which were the best and only way to maximize value for Creditors.[89] The value achieved in the Business Sales was the result of the global sales of the assets of Nortel's worldwide, highly integrated Lines of Business.[90] No Debtor Estate or creditor constituent ever proposed to attempt to sell or sublicense its interests in isolation or to maintain its interests while others sold theirs. No purchaser ever expressed interest in acquiring Nortel's Lines of Business or technology on a subsidiary by subsidiary or geographic basis.[91]

71.    Approximately 2,700 related Nortel patents and patent applications were sold to third party purchasers as part of the Business Sales. More value was generated from the assets sold in the Business Sales than could have been generated by any other means possible for Nortel.[92]

72.    The main Business Sales, which generated the vast majority of the Business Sale Proceeds, were as follows:[93]

| Line of Business | Purchaser | Net Sale Proceeds | Closing Date |
|---|---|---|---|
| CDMA/LTE | Ericsson | $1,087.7 million | November 13, 2009 |
| Enterprise | Avaya | $842.84 million | December 19, 2009 |

---

[88] Primary Report of Thomas Britven dated January 24, 2014, paras. 1.3 and 3.46 (TR00045).

[89] Trial Testimony of Sharon Hamilton, May 15, 2014, 1000:22-1001:3.

[90] *Id.*, 1001:9-1002:22.

[91] Affidavit of Sharon Hamilton sworn April 11, 2014, paras. 36-37 (TR00009); Reply Affidavit of Sharon Hamilton sworn April 25, 2014, para. 16 (TR00010); Trial Testimony of Sharon Hamilton, May 15, 2014, 1000:22-1002:22; Reply Affidavit of Paviter Binning, sworn April 24, 2014, para. 4 (TR00015).

[92] *Id.*, paras. 3.41-3.43, 6.12-6.13 (TR00045); Primary Report of Philip Green dated January 24, 2014, p. 8 (TR00042); Affidavit of Sharon Hamilton sworn April 11, 2014, paras. 47-64 (TR00009); Affidavit of Paviter Binning sworn April 10, 2014, paras. 50-53 (TR00014).

[93] Affidavit of Sharon Hamilton sworn April 11, 2014, para. 47 (TR00009).

| MEN | Ciena | $631.85 million | March 19, 2010 |
| CVAS | Genband | $140.07 million | May 28, 2010 |
| GSM/GSM-R | Ericsson and Kapsch Carrier Com AG | $104.47 million | March 31, 2010 |

73.     In addition, Nortel entered into a series of smaller sales transactions in respect of sub-units of Lines of Business or particular technologies or products as follows:[94]

| Line of Business | Purchaser | Net Sale Proceeds | Closing Date |
| --- | --- | --- | --- |
| Layer 4-7 | Radware | $18.1 million | March 31, 2009 |
| NGPC | Hitachi | $10.37 million | December 8, 2009 |
| GSM Retained Contracts | Ericsson | $1.5 million | June 4, 2010 |
| MSS | Ericsson | $46.02 million | March 11, 2011 |

74.     The terms of the Business Sales included:

(a)     the transfer to the purchaser of "all of [the] Seller's right, title and interest in and to the assets predominantly used or held for use in the conduct of the Business", including "all the material Intellectual Property that… is used in connection with the conduct and operation of the Business";[95] and

(b)     the granting of "perpetual, irrevocable, non-exclusive… worldwide, royalty-free [and] fully paid-up"[96] licenses to the purchaser to use any IP that was retained by any Nortel Entity but that was necessary to operate the acquired business.[97]

---

[94] Although these transactions are included as the Lines of Business for ease of reference, only the Layer 4-7 and MSS transactions involved the sale of what could be characterized as an operating business: see *id.*, para. 48 (TR00009).

[95] See, e.g., arts. 2.1.1, 2.1.1(g) and 4.5(a) of the CDMA Asset Sale Agreement (TR44138).

[96] See, e.g., arts. 2.01 of the CDMA Intellectual Property License Agreement (TR44142).

75.    In connection with the Business Sales, the Licensed Participants executed License Termination Agreements ("LTAs") providing that their Licenses were terminated in relation to all IP either "transferred" or "licensed" to the purchasers.[98]

## H.    The Patent Segmentation

76.    Prior to the Business Sales, Nortel went through an extensive patent segmentation exercise (the "Patent Segmentation") to identify patents that were:

(a)    predominantly used by a particular Line of Business;

(b)    shared across multiple Lines of Business; or

(c)    not used in any Line of Business.

77.    The Patent Segmentation was conducted by members of Nortel's IP Law Group under the supervision of Nortel's Chief Intellectual Property Officer, John Veschi, in consultation with the heads of the Lines of Business or their delegates. According to Gillian McColgan, who led the Patent Segmentation under Mr. Veschi's supervision, it was a "shared effort among the entire engineering community within Nortel."[99] The process resulted in objective standards and consensus by "the best minds in Nortel who had the deepest understanding of the products in their business units [and] the revenues attached to their products."[100]

---

[97] Primary Report of Philip Green dated January 24, 2014, p. 11 (TR00042); Rebuttal Report of Thomas Britven dated February 28, 2014, para. 3.14 (TR00046); Affidavit of Sharon Hamilton sworn April 11, 2014, paras. 52 and 61 (TR00009).

[98] See, e.g., the 9th recital and Article 2.01 of the CDMA LTA (TR48909).  The LPs retained a time-limited, non-exclusive, non-transferrable and largely non-sublicensable license to continue using that NN Technology to wind down their businesses: see, e.g., Arts. 2.02 and 2.05 of the CDMA LTA, *id*.

[99] Deposition Testimony of Gillian McColgan, November 8, 2013, 134:4-136:6.

[100] *Id.*, 140:12-141:11. Although an appeals process was established for challenging a designation of a patent or patent application to one of the above standards, in the result, there were no appeals: Deposition Testimony of John Veschi, November 7, 2013, 126:10-127:10.

## I.    The Residual IP Sale

78.    Following the Business Sales, NNL owned Residual IP consisting of approximately 7,000 patents and patent applications.[101] The majority of patents and applications (approximately 59-66%) were not used in any Nortel Line of Business.[102]

79.    After negotiation with two prospective purchasers, on April 4, 2011, Nortel entered into a stalking-horse asset sale agreement with Ranger Inc., a wholly-owned subsidiary of Google Inc., to sell the Residual IP for $900 million.[103]

80.    Following a three-day auction held at the end of June 2011, the Residual IP was sold to Rockstar Bidco. ("Rockstar"), a consortium backed by several major technology companies, for approximately $4.5 billion.[104]

81.    In connection with the Residual IP Sale, the Licensed Participants agreed to terminate any license rights they may have had to the Residual IP owned by NNL.[105] The License Termination Agreement executed in connection with the Residual IP Sale (the "Rockstar LTA") provided that the agreements would not affect ownership rights to any intellectual property sold.[106] In addition, the Rockstar LTA was subject to an IP Transaction Side Agreement which expressly provided that the terminations of the Licenses would have no impact on allocation of the proceeds from the Residual IP Sale among the Debtor Estates.[107]

82.    The Residual IP Sale generated more value than could have been realized from the Residual IP by any other means. Specifically, the sale of the Residual IP to Rockstar was

---

[101] Affidavit of Sharon Hamilton sworn April 11, 2014, para. 67 (TR00009).

[102] Primary Report of Thomas Britven dated January 24, 2014, paras. 3.44, 6.57 and 6.63 (TR00045); Primary Report of Philip Green dated January 24, 2014, p. 12 (TR00042); Primary Report of Mark Berenblut and Alan Cox dated January 24, 2014, para. 50 (TR00047); Deposition Testimony of Gillian McColgan, November 8, 2013, 141:18-24.

[103] Affidavit of Sharon Hamilton sworn April 11, 2014, para. 85 (TR00009).

[104] Id., para. 85

[105] Asset Sale Agreement, June 30, 2011, s. 5.13(b) (TR44220); Closing Date License Agreement, July 29, 2009, s. 2.02 (TR44229).

[106] Rockstar Transaction License Termination Agreement, s. 2.02 (TR21508).

[107] Affidavit of Sharon Hamilton sworn April 11, 2014, para. 100 (TR00009); IP Transaction Side Agreement, s. 12 (TR11371).

approved by the Debtor Estates and their stakeholders over a contemplated business idea whereby Nortel would litigate and license the patents in the Residual IP portfolio ("IP Co."). The following should be noted about IP Co.:

(a)    IP Co. was speculative.[108] Nortel had no historical experience operating a patent licensing business and very little experience in licensing generally.[109] Nortel's former Chief Intellectual Property Officer and NNI employee, John Veschi, testified that when he started at Nortel just months before the Filing Date, Nortel was generating virtually no licensing revenue from its IP.[110] In addition, IP Co. would have required a start-up phase (expected to last several years) whereby little or no revenue would be generated from the portfolio and significant working capital would be required in order to fund litigation.[111]

(b)    It was considered important to the Debtor Estates that IP Co. not be an operating telecommunications or other technology company as it would be susceptible to counterclaims for alleged infringement by technology companies it targeted for licensing or litigation, which would have in turn undercut its ability to generate licensing revenue.[112]

(c)    Even if IP Co. had been capable of implementation (which is not admitted), the projected financial returns paled in comparison to the $4.5 billion generated by the sale to Rockstar.  Nortel, with the assistance of Lazard and Global IP, conducted analyses of the patents and patent applications in Nortel's Residual IP portfolio between 2009-2010. Numerous financial models were prepared between 2009-2010, which contained various assumptions regarding discount rates,

[108] Trial Testimony of Philip Green, June 5, 2014, 3154:24-3156:2, 3157:24-3160:22 and 3257:1-3258:19.

[109] Affidavit of Sharon Hamilton sworn April 11, 2014, para. 78 (TR00009); Trial Testimony of Sharon Hamilton, May 15, 2014, 1008:13-1009:4.

[110] Deposition Testimony of John Veschi, November 7, 2013, 146:18-22.

[111] Trial Testimony of Paviter Binning, May 20, 2014, 1074:11-1074:16 (options for monetizing the Residual IP such as IP Co. could not begin until the Lines of Business Sale had concluded because the purchasers of the Lines of Business "wanted to make sure that they had acquired the IP that related to their business."). See also Trial Testimony of Paviter Binning, May 20, 2014, 1077:13-1078:5 (explaining that IP Co. was "a bit of a longshot" because it would take years to generate income streams from litigation).

[112] Affidavit of Sharon Hamilton sworn April 11, 2014, para. 73 (TR00009); Trial Testimony of Sharon Hamilton, May 15, 2014, 901:2-902:14.

amount of litigation engaged in, probability of litigation success, costs of enforcement and projected future cash flows. No particular spreadsheet or model was ever accepted or approved by Nortel.[113] Based on the discount rates of 25-45% that were used by Nortel and its advisors,[114] the discounted cash flows range between approximately $424 million (on the most conservative assumptions) and $2,694 (on the most optimistic assumptions).[115] Even John Ray, the Principal Officer for the U.S. Debtors, admitted at trial that there was no certainty regarding the projected recoveries for IP Co.[116]

(d)     The Debtor Estates elected to sell the Residual IP to Rockstar when the stalking horse bid was just $900 million.[117]

(e)     No major Creditor ever agreed to provide the requisite start-up capital for IP Co., including the *Ad Hoc* Bondholder Group.[118]

(f)     Even if IP Co. had been capable of implementation (which is denied), there was never any agreement among the Participants or the Debtor Estates regarding: (i) the ownership structure of the patents in the Residual IP portfolio; or (ii) the distribution of revenues among Nortel entities.[119]

---

[113] Affidavit of Sharon Hamilton sworn April 11, 2014, paras. 74-75 (TR0009); Rebuttal Report of Philip Green dated February 28, 2014, Appendix N, pp. 3-4 (TR00043).

[114] Rebuttal Report of Mark Berenblut and Alan Cox dated February 28, 2014, para. 28 (TR00048); Trial Testimony of Mark Berenblut, June 16, 2014, 3624:16-3626:4; Rebuttal Report of Philip Green dated February 28, 2014, Appendix N, pp. 3-4 (TR00043); Trial Testimony of Jeffrey Kinrich, June 18, 2014, 4347:10-4348:7.

[115] Rebuttal Report of Philip Green dated February 28, 2014, Appendix N, pp. 3-4 (TR00043); Rebuttal Report of Mark Berenblut and Alan Cox dated February 28, 2014, p. 8, Table 2 (TR00048); Trial Testimony of Mark Berenblut, June 16, 2014, 3624:16-3626:4.

[116] Trial Testimony of John Ray, May 21, 2014, 1420:12-20.

[117] Affidavit of Sharon Hamilton sworn April 11, 2014, para. 82 (TR00009).

[118] *Id*., para. 80.

[119] *Id*., para. 76; Trial Testimony of Sharon Hamilton, May 15, 2014, 922:4-924:18; Trial Testimony of Paviter Binning, May 20, 2014, 1118:23-1119:1.

**J.**     **Nortel's Creditors**

83.     As a result of the Business Sales and the Residual IP Sale, there is approximately $7.3 billion in Sale Proceeds to be allocated to the Debtor Estates for distribution to Nortel's Creditors.

84.     The Key Creditor Groups of the Nortel Debtors include the following:

(a)     Canadian Unsecured Creditors - there are various Canadian creditors that have claims against the Canadian Debtors. The interests of Canadian Creditors are represented by the CCC, which is comprised of the following interests:

(i)     former employees, pensioners and disabled employees of Nortel through their court-appointed representatives;

(ii)     former employees, pensioners and disabled employees represented by the National Automobile, Aerospace, Transportation, and General Workers Union of Canada (currently Unifor);

(iii)     current and transferred employees of the Canadian Debtors;

(iv)     Morneau Shepell Ltd, in its capacity as administrator of Nortel's two Canadian registered pension plans; and

(v)     the Superintendent of Financial Services for Ontario in his capacity as administrator of the Pension Benefits Guarantee Fund.[120]

Excluding bondholder claims, Canadian  Creditors have claims of approximately $3 billion against the Canadian Debtors.[121]

(b)     Canadian Only Bonds – represented by Wilmington Trust National Association, which hold bonds issued by NNL in the amount of $205 million.[122]

---

[120] Trial Testimony of Don Sproule, May 15, 2014, 853:4-22 and 855:12-15.

[121] Primary Report of Thomas Britven dated January 24, 2014, p. 4, Table 1 and Schedule 6 (TR00045).

[122] Joinder of Wilmington Trust, National Association, as Successor Indenture Trustee , in (I) the Allocation Position of the Monitor and the Canadian Debtors, and (II) the Allocation Position of the Canadian Creditors Committee, at para. 1. See also Primary Report of Thomas Britven dated January 24, 2014, p. 4, Table 1 and Schedule 6 (TR00045).

(c)     Guaranteed Bondholders – represented by the *Ad Hoc* Bondholder Group. The Guaranteed Bondholders hold bonds issued or guaranteed by NNC, NNL, NNCC and NNI. The total face amount of the bonds is approximately $4,092 million.[123]

(d)     Unsecured Claims of U.S. Creditors – the U.S. unsecured claims include a claim by the Pension Benefits Guaranty Corporation ("PBGC") for $400 million and other U.S. unsecured creditors (former employees, trade creditors, etc.) for $900 million.[124]

(e)     EMEA Creditors – creditors having claims against the EMEA Debtors. While the total claims of the EMEA Creditors are not known, they are estimated to be approximately $500 million.[125]

(f)     UK Pension Trust ("UKPT") – the UKPT is the Trustee of the NNUK Pension Plan and the Board of the Pension Protection Fund. The UKPT has claims that are currently the subject of litigation before the Canadian Court.[126]

**K.     Value of Assets Sold by Each Nortel Debtor Group**

85.     The value of the assets sold by each of the Nortel Debtors is as follows:[127]

| Assets ($ in millions) | Canada | US | EMEA |
|---|---|---|---|
| Tangible Assets | 59 | 42 | 68 |
| Intangible Assets | | | |
| • Customer Relationships | 93 | 393 | 197 |
| • IP | 858 | 219 | 66 |
| • Purchaser Goodwill | 427 | 316 | 110 |

---

[123] Trial Testimony of John Ray, May 21, 2014 1442:1-6 and 1455:10-14; Trial Testimony of Sharon Hamilton, May 15, 2014, 1015:11-14; Primary Report of Thomas Britven dated January 24, 2014, p. 4, Table 1 and Schedule 6 (TR00045).

[124] Primary Report of Thomas Britven dated January 24, 2014, p. 4, Table 1 and Schedule 6 (TR00045).

[125] *Id.*

[126] Pre-Trial Brief of the UKPT at para. 1; Primary Report of Thomas Britven dated January 24, 2014, p. 4, Table 1 and Schedule 6 (TR00045).

[127] Primary Report of Thomas Britven dated January 24, 2014, p. 4, Table 1 and Schedule 2.5 (TR00045).

| Total Business Sales | 1,438 | 979 | 432 |
|---|---|---|---|
| Residual IP Sale | 4,368 | 30 | 57 |
| **Total** | **5,805** | **1,009** | **488** |

86.     The above valuation of assets is based on the analysis of the CCC's expert, Thomas Britven, formerly a Managing Director of Duff & Phelps LLC and the firm's National Intellectual Property Consulting Practice Leader.[128] Mr. Britven holds several designations in asset valuation and has over 25 years of experience in the intellectual property field, including the bankruptcy context.[129]

87.     Mr. Britven identified the assets sold in each of the Business Sales and the Residual IP Sale, identified the owners of those assets and determined their value.[130] His methodology and analysis is described in greater detail below.

### 1.      The Business Sales

### a.      Identification of Assets

88.     The Business Sales consisted of the sale of the following assets:

(a)     Net tangible assets such as accounts receivable, property plant and equipment and inventory, net of assumed liabilities;

(b)     Intangible assets in the following categories:

(i)     Customer relationships;

(ii)     Intellectual property; and

(iii)     Purchaser goodwill, a residual asset category.[131]

89.     Mr. Britven's categorization of the assets sold is consistent with the way in which the purchasers of the Lines of Business categorized the assets they acquired.[132]     It represents the

---

[128] Thomas Britven *Curriculum Vitae*, Primary Report of Thomas Britven dated January 24, 2014 (TR00045).

[129] *Id.*; Trial Demonstrative of Thomas Britven, pp. 2-5 (DEM00016).

[130] Primary Report of Thomas Britven dated January 24, 2014, p. 23, para. 6.10 (TR00045).

[131] *Id.*, para. 6.12.

most reasonable valuation of the different categories of assets that were sold in the Business Sales.

### b.       Ownership of Assets

90.     Mr. Britven identified the ownership of the assets as follows:

(a)     The owners of the <u>net intangible assets</u> were easily identifiable from Nortel's business records.[133]

(b)     The owners of the <u>customer relationships</u> were determined according to the ratio of relative revenues (as a proxy for relative contribution margins) generated by each of the Canadian, U.S. and EMEA Debtors, based on the assumption that the owner of a customer relationship is the operating entity that entered into the sales contract with the customer in that particular geographic area.[134]

(c)     In respect of the <u>intellectual property</u>, the Licensed Participants owned the Licenses granted by NNL under the MRDA. NNL owned the underlying NN Technology.[135]

(d)     The residual category of <u>purchaser goodwill</u> was allocated in accordance with the value of identifiable intangible assets (customer relationships and intellectual property).[136]

### c.       Valuation of Assets

91.     Mr. Britven valued the assets sold to the purchasers in the Business Sales by relying in part on information from the Purchase Price Allocations ("PPAs"), prepared by the purchasers of the Lines of Business. The PPAs contain independent and reliable information concerning the fair value of the assets that were sold. PPAs are prepared by unaffiliated third party purchasers,

---

[132] *Id..*, Schedule 4, footnote 1; Ericsson Annual Report, Form 20-F, p. CCC0065004 (TR40195);

[133] Primary Report of Thomas Britven dated January 24, 2014, para. 6.16 (TR00045).

[134] *Id.*, para. 6.22.

[135] *Id.*, para. 6.19.

[136] *Id.*, para. 6.48.

required for financial reporting under U.S. Generally Accepted Accounting Principles ("GAAP") and independently audited. The PPAs contain the purchasers' assessments of the fair value of the assets acquired, which is an objective assessment of value based on a standard definition equivalent to fair market value.[137]

92.     The PPA values utilized by Mr. Britven are conservative and, if anything, undervalue the assets owned by the Canadian Debtors. Given the poor prospects for the Lines of Business within Nortel, the total PPA fair values would generally be higher than what could have been realized by the Licensed Participants through their continuation in business and their sale of Products pursuant to the terms of the Licenses granted by NNL.[138]

93.     Mr. Britven valued the net tangible assets, customer relationships and purchaser goodwill using the PPA values.[139] Intellectual property was broken down into: (1) the Licenses surrendered by the Licensed Participants and; (2) the balance, which enures to NNL as owner of the NN Technology under the MRDA.[140]

94.     Mr. Britven considered the value of the Licenses from two perspectives: from the perspective of a purchaser stepping into the shoes of the Licensed Participant, and from the perspective of the Licensed Participant continuing in the context of Nortel. Given the terms of the MRDA discussed above and below, including the Field of Use restrictions on the Licenses, the lack of transferability and the income reallocation provisions of the MRDA, the Licenses would have been of *de minimis* value to any buyer.[141]

95.     From the perspective of the Licensed Participants, the maximum value of the Licenses was what the Licensed Participants could earn by continuing in business. Based on Nortel's asset impairment test ("AIT") and financial statements in 2008, which were subject to audit and involved two major independent accounting firms, the fair market value of all Nortel Lines of Business on a go-forward basis was $988 million or less.  The combined RPSM share of the U.S.

---

[137] *Id.*, para. 6.28; Trial Testimony of Thomas Britven, June 6, 2014, 3381:14-3382:23.

[138] Primary Report of Thomas Britven dated January 24, 2014, para. 6.28 (TR00045); Trial Testimony of Thomas Britven, June 6, 2014, 3391:5-3392:1.

[139] Primary Report of Thomas Britven dated January 24, 2014, paras. 6.27 and 6.46 (TR00045); Trial Testimony of Thomas Britven, June 6, 2014, 3383:14-3384:25.

[140] Primary Report of Thomas Britven dated January 24, 2014, para. 6.27 (TR00045).

[141] *Id.*, paras. 6.32-6.36.

and EMEA Debtors under the MRDA was 50.2%, or $496 million, of the $988 million that the Lines of Business would have been worth had they continued.  Of that $496 million, 57.3%, or $285 million, represented the value of the IP as opposed to the other Line of Business assets.[142]

96.    Therefore, the U.S. and EMEA Debtors are entitled to a combined allocation of $285 million of the $1.143 billion in Business Sale Proceeds relating to the IP.  The remaining $858 million in Business Sale IP Proceeds belongs to the Canadian Debtors. A chart summarizing these figures is set out below:[143]

| | |
|---|---|
| Business Value in Nortel's Hands | $988 million |
| U.S. & EMEA RPSM Share | x 50.2% |
| U.S. & EMEA Business Value | $496 million |
| IP Percentage | x 57.3% |
| Value of Licenses surrendered in the hands of U.S. and EMEA Debtors | $285 million |

### 2.    The Residual IP Sale

97.    With the conclusion of the Business Sales, Nortel had:

(a)    sold all of its IP that was used predominantly in specific Lines of Business;[144] and

(b)    licensed all of its IP used across multiple Lines of Business to the Business Sale purchasers.

98.    Further, the Licensed Participants had surrendered their own Licenses to the extent that they encompassed either this transferred or licensed IP.[145]  Because the Field of Use restriction in

---

[142] *Id.*, paras. 6.37-6.41.

[143] *Id.*, p. 6.40; Britven Demonstrative, p. 16 (DEM00016).

[144] Primary report of Mark Berenblut and Alan Cox dated January 24, 2014, para. 45 (TR00047) ("*[A]ll IP* (whether patents or license rights to patents) that was *related to Nortel's business was sold in the Business Sales*"); Affidavit of Sharon Hamilton sworn April 11, 2014, para. 56 (TR00009) ("*Collectively, the LOBs represented the entirety of the operating business any of the Nortel entities engage in... With the closing*… in March 2011, *no Nortel entity had any operating business* save for fulfilling its few remaining transition service obligations with a handful of employees").

[145] The U.S. Interests' Pre-Trial Brief, pp. 84-85, is incorrect to say that the LPs did not relinquish their rights to any IP not sold in the Business Sales.  As discussed above, the LTAs which they executed in the Business Sales terminated their Licenses with respect to IP not only sold but "licensed" to the purchaser, i.e., the IP retained by Nortel and then sold in the Residual IP Sale.

Article 5(a) of the MRDA limited the Licenses to making and exploiting the "Products" of Nortel's own businesses, the Licensed Participants had no valuable License rights remaining after the Business Sales.[146]

99.     Accordingly, the Licensed Participants had no remaining Licenses to the Residual IP sold to Rockstar.  That Residual IP fell into two categories: (1) IP used across multiple Lines of Business (the Shared IP); and (2) IP never used in any Line of Business (the Not Used IP).[147] Importantly, this second category of Residual IP covering inventions that were never used in Products comprised 59-66% of the IP sold in the Residual IP Sale.[148]

100.     Therefore, the U.S. and EMEA Debtors should receive an allocation of 2%, or a combined USD $87 million, of the USD $4.454 billion in Rockstar Sale Proceeds attributable to the Residual IP which they actually owned.  The remaining USD $4,368 million should be allocated to NNL.[149]

# CONCLUSIONS OF LAW

101.     The CCC adopts and relies on the Conclusions of Law of the Monitor and Canadian Debtors regarding the interpretation of the MRDA, NNL's ownership of the IP and the scope of the Licenses, and adds the following.

## I.     The Sale Proceeds Should Be Allocated by Ownership

102.     In the context of the sale of a business and its assets, the allocation of the proceeds of that sale should be allocated to the parties who owned the assets that were sold. Where ownership is clear, the owner derives the benefit from the sale of the asset, even if other parties enjoyed some

---

[146] Trial Testimony of Philip Green, June 5, 2014, 3151:20-3152:22, 3153:8-3154:23, 3156:3-13; Trial Testimony of Mark Berenblut, June 16, 2014, 3669:12-3670:23.

[147] Trial Testimony of Philip Green, June 5, 2014, 3150:1-3151:3.

[148] Primary Report of Thomas Britven dated January 24, 2014, paras. 3.44, 6.57 and 6.63 (TR00045); Primary Report of Philip Green dated January 24, 2014, p. 12 (TR00042); Primary Report of Mark Berenblut and Alan Cox dated January 24, 2014, para. 50 (TR00047); Deposition Testimony of Gillian McColgan, November 8, 2013, 141:18-24.

[149] Primary Report of Thomas Britven dated January 24, 2014, para. 6.65 (TR00045); Primary Report of Philip Green dated January 24, 2014, pp. 6, 64-65 (TR00042); Rebuttal Report of Thomas Britven dated February 28, 2014, para. 2.5 (TR00046).

rights or had derived some benefits from the asset before it was sold. To determine to whom the proceeds should be allocated, the Court must therefore look to the categories of assets that were sold and then consider who owned each asset.[150]

## A.    Ownership is Determined by the MRDA

103.    The MRDA is in full force and effect and was in full force and effect at the time of the Business Sales and the Residual IP Sale.

104.    The MRDA governs the ownership of the NN Technology including intellectual property assets sold to the purchasers in the Business Sales and the Residual IP Sale.

105.    There is no admissible evidence of the factual matrix or parol evidence that contradicts the terms of the MRDA as they pertain to the ownership and licensing of the NN Technology. The MRDA must be interpreted objectively at the time of contracting, not at some later date based on what may seem to be fair and reasonable to one party then.

106.    The terms of the MRDA should be enforced.

## B.    NNL Owned the NN Technology

107.    Pursuant to the MRDA, NNL owned the NN Technology. The MRDA conveyed to NNL all the rights the Licensed Participants had or could have had in the NN Technology.

108.    The Licensed Participants did not have any ownership interest in the NN Technology. Specifically, the Licensed Participants did not have "equitable" or "beneficial" ownership of the NN Technology. Prior to the Sales, the only intellectual property asset that the Licensed Participants owned in relation to the NN Technology were the contractual Licenses.

109.    Further, regardless of the nature of the rights the Licenses conferred upon the Licensed Participants with respect to the NN Technology, those rights were necessarily circumscribed by the scope of the Licenses, which were subject to several limitations discussed above and below that seriously impaired their value in the Sales.

---

[150] Primary Report of Thomas Britven dated January 24, 2014, paras. 3.5, 6.1-6.2 (TR00045).

1)    **Licensed Participants Had Limited Contractual Rights**

110.    The Licenses were circumscribed by the Field of Use set out in Article 5(a) of the MRDA and the definition of "Products" incorporated therein by reference.

111.    The first arm of the Licenses conferred on the Licensed Participants a license, including the right to sublicense, that allowed the Licensed Participants to make, have made, use, lease, license, offer to sell or sell Products of the Nortel Group using or embodying the NN Technology owned by NNL.

112.    Pursuant to Article 1(g) of the MRDA, Products must be by or for any of the Participants, being NNL and the Licensed Participants. The Licensed Participants had no right to make, have made, use, lease, license, offer to sell or sell products that were part of a third party's business, or to grant a sublicense to a third party to carry out any of the foregoing.

113.    The second arm of the Licenses conferred on the Licensed Participants all intellectual property rights as necessary or appropriate in connection with the first arm.

114.    The second arm does not expand the Field of Use. The second arm did not permit the Licensed Participants to make, have made, use, lease, lease, license, offer to sell or sell products that were part of a third party's business, or to grant a sublicense to a third party to carry out any of the foregoing.

115.    To the extent that intellectual property was never used to make or exploit any Nortel Product, that intellectual property was not licensed to the Licensed Participants under the MRDA.

2)    **Licenses Were Only Enforceable in the Field of Use**

116.    Article 4(e) of the MRDA is an *inter partes* contractual provision that does not confer standing on any party to assert an action or recover damages or other remedies in any Court.

117.    Article 4(e) of the MRDA is simply a contractual permission by NNL that allowed the Licensed Participants to assert actions and recover damages or other remedies in their respective Territories for infringement or misappropriation of NN Technology by others, within the Field of

Use. However, actual standing to bring infringement proceedings was determined solely by the scope of Licenses held by the Licensed Participants. The Licensed Participants had no right to bring actions or recover damages or other remedies for infringement or misappropriation of NN Technology by others outside the Field of Use or where they had no exclusive right to use the IP right in issue. The Licensed Participants thus had limited rights, if any, to pursue claims for patents used in the businesses and had no enforcement rights at all regarding the 59-66% of the patents in the Residual IP portfolio that were Not Used.  Even within the Field of Use, the Licensed Participants were required to join NNL as a co-plaintiff in enforcement proceedings.

### 3)    <u>Licenses Were Not Transferrable by the Licensed Participants</u>

118.    As a result of the intercompany rights and obligations contained in the MRDA and the prohibition on assignment of the MRDA absent consent by the Participants in Article 14(a), the Licenses were personal contractual rights and could not be transferred to a third party purchaser without the consent of NNL. An assignment of a License absent NNL's consent would be invalid at law.

119.    A *de facto* transfer of a License by a Licensed Participant through a sublicense would be invalid at law.

120.    A *de facto* transfer of a License by a Licensed Participant through a sublicense would be an attempt to do indirectly what the Licensed Participant was prohibited from doing directly under Article 14(a) of the MRDA and would constitute a breach of the Licensed Participant's contractual duty of good faith.

121.    Even if a *de facto* transfer of a License could be effected (which is denied) through a sublicense, or otherwise, the third party transferee, not being a Nortel Affiliate, could not become a Participant, and would be subject to the Field of Use set out in Article 5(a) of the MRDA and the definition of Products incorporated therein by reference.

### 4)    <u>Equitable Principles Did Not Grant the Licensed Participants Ownership</u>

122.    There is no implied term granting the Licensed Participants ownership of the NN Technology. Any such implied term would contradict the express provisions in the MRDA.

123.    There is no resulting trust by which NNL held title to the NN Technology on trust for the Licensed Participants. The Licensed Participants were fully compensated for their R&D Activity by the RPSM payments they received pursuant to Article 3 of the MRDA.

124.    There is no constructive trust by which NNL held title to the NN Technology on trust for the Licensed Participants. NNL was not enriched, the Licensed Participants did not suffer a corresponding deprivation and in any event the MRDA is a complete juristic reason for any enrichment of NNL arising from the vesting in NNL of the NN Technology.

125.    There is no proprietary estoppel. NNL did not encourage the Licensed Participants to believe they would have a proprietary interest in the NN Technology. NNL did not take advantage of them as vulnerable parties. NNL merely adhered to and is asserting its rights under the MRDA.

126.    The CCC is not prevented from asserting that NNL owned the NN Technology by any estoppel or any other equitable principle.

## II.    <u>Alternative Pro Rata Allocation</u>

127.    If the Courts decline to allocate the Sale Proceeds based on the CCC's Ownership Allocation, sufficient Sale Proceeds should be allocated to each Debtor Estate such that the Debtor Estates, if they choose to do so, can pay valid senior claims in full and distribute a common dividend to each general unsecured Nortel Creditor.

128.    The undisputed evidence establishes that Nortel functioned as a highly integrated multinational enterprise along Lines of Business that spanned legal entities and geographic boundaries, fuelled by the collective contributions of all creditors of all of the Debtor Estates, including Nortel's employees.

129.    The evidence further establishes that Nortel's global integration and contribution make it difficult if not impossible to trace with any precision the measurable contribution of each Nortel Entity to the fruits of the integrated operation or its resultant entitlement to share in Nortel profits.

130.    In such circumstances, the most fair and just allocation to the Debtor Estates of the Sale Proceeds is predicated on the equitable treatment of all Creditors of all of the Nortel Debtors, allocating the Sale Proceeds to the Debtor Estates ratably by claims and subject to their priorities in the manner that the CCC has proposed.

131.    The Courts are fully empowered and justified to order allocation in this manner under the facts and circumstances presented.

132.    The guarantees provided in indentures governing bonds issued by Nortel Debtors do not prevent the Court from ordering *pro rata* allocation of the Sale Proceeds as proposed by the CCC.  No rights respecting such guarantees are impaired by such allocation. Any rights arising from the guarantees will be determined by the appropriate court at the appropriate time.  The mechanism proposed by the CCC for implementing *pro rata* allocation is able to accommodate whatever determination is made.

133.    Accordingly, allocation of the Sale Proceeds to each Debtor Estate in the amount necessary to enable their constituent debtors to have sufficient value to pay in full their valid priority and administrative senior claims and to pay their creditors holding valid general unsecured claims the same common dividend on their claims payable to all general unsecured creditors of all of the Nortel Debtors is sustainable as a matter of law and equity.