**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| NORTEL NETWORKS INC., *et al.*, | Case No. 09-10138 (KG) |
| | (Jointly Administered) |
| Debtors. | |

- and -

Court File No.: 09-CL-7950

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**(Commercial List)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED,
NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS
INTERNATIONAL CORPORATION and NORTEL NETWORKS
TECHNOLOGY CORPORATION

APPLICATION UNDER THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

**JOINT ADMINISTRATORS' POST-HEARING SUBMISSION REGARDING**
**ALLOCATION OF THE PROCEEDS OF THE NORTEL ASSET SALES**

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Rodney Square
1000 North King Street
Wilmington, Delaware 19801

Edwin J. Harron (No. 3396)
John T. Dorsey (No. 2988)
Jaime Luton Chapman (No. 4936)

Tel.:   302-571-6600
Fax:   302-571-1253

HUGHES HUBBARD & REED LLP

One Battery Park Plaza
New York, New York 10004

William R. Maguire (admitted *pro hac vice*)
Derek J.T. Adler (admitted *pro hac vice*)
Neil J. Oxford (admitted *pro hac vice*)

Tel.:   212-837-6000
Fax:   212-422-4726

LAX O'SULLIVAN SCOTT LISUS LLP

Suite 2750
145 King Street West
Toronto, ON M5H 1J8

Matthew P. Gottlieb (LSUC#: 32268B)
mgottlieb@counsel-toronto.com

Tel.:   416-598-1744
Fax:   416-598-3730

DAVIES WARD PHILLIPS & VINEBERG LLP

155 Wellington Street West
Toronto, Ontario M5V 3J7

James W.E. Doris (LSUC#:  33236P)
jdoris@dwpv.com
Matthew Milne-Smith (LSUC#: 44266P)
mmilne-smith@dwpv.com

Tel.:   416-863-0900
Fax:   416-863-0871

*Counsel for the Joint Administrators*

# TABLE OF CONTENTS

**Page**

STATEMENT OF POSITION ...................................................................................1

I.     THE RPES' JOINT BENEFICIAL OWNERSHIP OF NORTEL'S IP .................2

II.    CUSTOMER-RELATED ASSETS ARE A DISTINCT ASSET CLASS THAT MUST BE TREATED SEPARATELY IN ORDER TO COMPENSATE ALL DEBTORS, INCLUDING NON-RPES, FOR VALUE TRANSFERRED IN THE BUSINESS SALES ....................................13

III.   CONCLUSION....................................................................................14

PROPOSED FINDINGS OF FACT ...........................................................................16

I.     BACKGROUND AND PROCEDURAL HISTORY...........................................16

    A.    Relevant Corporate Structure....................................................16

    B.    Business and Operations.............................................................17

    C.    The Insolvency Proceedings .....................................................18

    D.    The Business Sales.....................................................................19

    E.    The Residual Patent Sale ..........................................................20

II.    R&D AT NORTEL.................................................................................22

    A.    Nortel's Globally Integrated and Interdependent R&D Function.............22

    B.    Types of R&D Activity at Nortel.............................................28

    C.    The Patent Registration Process................................................29

        1.    Evaluation and TIC Score.............................................29

        2.    Patent Filing Process....................................................29

    D.    The Patent Assignment Process................................................30

        1.    Assignment of Legal Title from Employee-Inventors to NNL ...............................................................................31

        2.    The Nortel Group's Corporate Policy of Vesting Legal Title in NNL.................................................................32

i

# Table of Contents
## (continued)

Page

E.     IP Created by Nortel Entities that Were Not Parties to the MRDA...........34

III.    NORTEL'S IP ARRANGEMENTS PRIOR TO THE MRDA CONFIRM THE PARTIES' BENEFICIAL OWNERSHIP OF GROUP IP .........................34

    A.     The R&D Cost Sharing Agreements.......................................................34

        1.    How the CSAs Worked...................................................35

        2.    IP Ownership Under the CSAs ......................................36

    B.     The Adoption of the Residual Profit Split Methodology..........................36

        1.    The RPS Methodology Was Chosen to Meet the Arm's Length Standard ................................................37

        2.    How the RPS Methodology Worked ..............................39

    C.     The Record Confirms that for the Years Prior to the MRDA, the RPEs Held Beneficial Ownership of the Group's IP According to Their Respective Contributions to R&D.....................................40

        1.    2002 APA Q&A Document ...........................................41

        2.    2002 Memo to Legal Counsel.......................................45

        3.    2003 Joint APA Response ..............................................47

        4.    2003 IP Migration Analysis ..........................................47

        5.    2004 Functional Analysis ..............................................47

        6.    2004 Allocation of Foundry Settlement Proceeds .........................49

    D.     NNL Performed the Same Functions and Received the Same Benefits as the Other RPEs in Relation to IP...............................................50

        1.    NNL Shared Profits and Losses As Did the Other RPEs...............50

        2.    NNL Was Not Entitled to Receive – and Did Not Receive – Any Additional Return for Holding Legal Title to or Administering Nortel's IP ..............................................51

IV.    THE MRDA DRAFTING HISTORY CONFIRMS THE RPES' BENEFICIAL OWNERSHIP OF GROUP IP......................................................52

**Table of Contents**
(continued)

A.    Background .................................................................................52

B.    Legal Title and IP Ownership ..................................................53

C.    Finalizing and Executing the MRDA .......................................54

V.    THE RECORD FROM THE MRDA PERIOD CONFIRMS THAT THE
PROCEEDS FROM EXPLOITING IP WERE SHARED ACCORDING
TO THE RPES' RELATIVE CONTRIBUTIONS TO CREATING THE
IP .......................................................................................................56

A.    2006 NNSA Impairment Test ...................................................56

B.    2006–2008 Royalty Revenue Allocated Among RPEs ............57

C.    2006 UMTS Sale to Alcatel ......................................................58

D.    2007 Project Swift ....................................................................62

E.    2008 NNL-NNI Joint APA Request .........................................63

F.    2008 KPN Settlement Costs ......................................................64

G.    2008–2009 Opinions of Senior NNL Executive Peter Look ....65

H.    2009 Allocation of Postpetition Sale Proceeds in Financial
Statements ................................................................................66

I.    2010 NNL Transfer Pricing Report .........................................68

VI.   THE RECORD ESTABLISHES THAT THE VALUE OF THE IP SOLD
IN THE ASSET SALES WAS $5.3 BILLION ....................................68

A.    Mr. Malackowski Was the Only Expert Who Actually Valued the
IP Sold ......................................................................................68

B.    Mr. Malackowski Valued the IP Transferred in the Business Sales ..........69

C.    Mr. Malackowski Valued the IP Transferred in the Residual Patent
Sale ...........................................................................................70

D.    Mr. Malackowski Used the Timeframe During Which the IP Was
Created ......................................................................................71

E.    The Record Establishes that the Nortel Group's IP Had a Long
Useful Life ................................................................................75

iii

**Table of Contents**
**(continued)**

1.   Priority Dates of the Nortel Patents Sold .......................................76

2.   Patent Maintenance .......................................................................77

3.   Rockstar's Deployment of the Residual Patent Portfolio ..............79

4.   Market Adoption Rate.....................................................................80

5.   Testimony of Fact Witnesses .........................................................81

6.   Testimony of Other Experts............................................................82

F.   The Record Cannot Support A Five-Year Look-Back Period ..................83

1.   The Nortel Group's Reasons for Adopting a Five-Year
     Look-Back........................................................................................84

2.   Expert Witnesses for the Canadian, U.S., and EMEA
     Debtors All Agree that the Courts Should Not Follow the
     Five-Year Look-Back Period ...........................................................86

3.   The Canadian Experts' Opinions on the Useful Life of
     Nortel IP Are Not Reliable .............................................................87

G.   The Record Establishes that 2009 R&D Spending Did Not Create
     Saleable IP ............................................................................................89

VII.   UNDER THE CONTRIBUTION APPROACH, THE COURTS SHOULD
       MEASURE THE PARTIES' RELATIVE CONTRIBUTIONS TO THE
       CREATION OF IP BASED ON ACTUAL R&D SPENDING ...........................91

A.   Ms. Ryan Fundamentally Misunderstands the Contribution
     Approach.................................................................................................92

B.   Ms. Ryan Makes Significant Methodological Errors ...............................93

C.   Ms. Ryan Makes Unfounded Assumptions ...............................................94

D.   Ms. Ryan's Opinion Produces Absurd Results.........................................95

VIII.  THE TESTIMONY OF THE CANADIAN EXPERTS IS UNRELIABLE .........96

A.   Testimony of Mr. Berenblut and Dr. Cox Is Not Persuasive and
     Does Not Assist the Courts .....................................................................96

# Table of Contents
## (continued)

B.    Testimony of Mr. Green is Not Persuasive and Does Not Assist the Courts ...................................................................................................98

    1.    Opinion Based on Own Interpretation of the MRDA ...................99

    2.    Methodological Errors in Valuation and Allocation Approach..................................................................................100

    3.    Opinion Not Tied to the Record................................................102

C.    Testimony of Mr. Britven is Not Persuasive and Does Not Assist the Courts ................................................................................................105

    1.    Opinion Based on Legal Assumptions from Counsel.................105

    2.    No Independent Valuation of IP ................................................106

    3.    Improper Reliance on Annual Impairment Test .........................106

    4.    Opinion Not Tied to the Record................................................108

IX.    IF THE COURTS WERE TO ADOPT A LICENSE APPROACH, THE APPROACH EMPLOYED BY MR. MALACKOWSKI IS THE MOST RELIABLE .......................................................................................109

A.    Mr. Malackowski Valued the IP Transferred in the Business Sales........109

B.    Mr. Malackowski Valued the IP Transferred in the Residual Patent Sale...................................................................................................109

C.    Mr. Malackowski's Alternative License Approach to Allocating Value of IP ...........................................................................................111

X.    NET TANGIBLE ASSETS SHOULD BE VALUED BASED ON NORTEL'S BOOKS AND RECORDS ............................................................114

XI.    CUSTOMER-RELATED ASSETS AND GOODWILL ARE DISTINCT ASSET CLASSES THAT SHOULD BE VALUED BASED ON 2008 REVENUE................................................................................................115

A.    The Record Establishes that Customer-Related Assets Were a Distinct Asset Class that Should Be Valued Separately from IP.............115

    1.    Nortel Executives Recognized the Group's Valuable Customer-Related Assets.........................................................116

**Table of Contents**
(continued)

2.      Nortel's Treatment of Customer-Related Assets in the Alcatel Sale .................................................................................118

3.      Nortel Highlighted the Value of the Group's Customer-Related Assets to Potential Purchasers of the Lines of Business .......................................................................................120

4.      Evidence from Fact Witnesses Demonstrates that Purchasers of the Lines of Business Bought Nortel's Customer Relationships in Order to Sell Nortel's Customers Non-Nortel Technology .............................................123

5.      Purchasers' Treatment of Nortel's Customer-Related Assets ...............................................................................................124

6.      Mr. Huffard and Mr. Britven Agree that Customer-Related Assets Should Be Valued and Allocated Separately from IP ......125

B.      The Record Establishes that Customer-Related Assets Should Be Valued, Along with Goodwill, as a Residual Class ................................126

C.      Mr. Huffard Valued Customer-Related Assets and Goodwill ................129

D.      The Allocation of the Residual Asset Class of Customer-Related Assets and Goodwill ........................................................................................131

PROPOSED CONCLUSIONS OF LAW ..................................................................................134

I.      ALLOCATION OF THE SALE PROCEEDS SHOULD BE DETERMINED SEPARATELY FOR EACH CLASS OF ASSETS ................134

II.      IP SALE PROCEEDS SHOULD BE ALLOCATED IN PROPORTION TO THE RPES' BENEFICIAL OWNERSHIP ...................................................137

A.      The RPEs, as Beneficial Owners, Are Entitled to Share in the IP Sale Proceeds ........................................................................................138

1.      Ontario Law Applies to Determining IP Ownership ...................138

2.      Beneficial Ownership Can Be Held by Someone Other than the Legal Title Holder ................................................................140

3.      The RPEs Were the Beneficial Owners of Nortel's IP. ...............142

## Table of Contents
### (continued)

(a)  As the Employers of the Engineers Who Invented Nortel's IP, Each of the RPEs Was the Beneficial Owner of the IP Created ...................................................142

(i)  All Attributes of Ownership, Legal and Beneficial, Are Initially Held by the Individual Inventor...............................................142

(ii)  An Employer Holds Beneficial Ownership of Inventions Created by Employees Hired to Invent ...............................................................143

(iii)  Because of the Integrated and Indivisible Nature of the R&D Process and the Resulting Portfolio of IP, Each of the RPEs Obtained a Beneficial Ownership Interest in the Entire Nortel IP Portfolio..............................145

(b)  The RPEs All Agreed and Understood that Each of the RPEs Was a Beneficial Owner of the IP Created ......146

(i)  The Nortel Group's Transfer Pricing Arrangements Reflected the RPEs' Common Understanding that They Jointly Held Beneficial Ownership in the IP They Created Together.................................................146

(ii)  NNL Is Estopped from Denying Beneficial Ownership of the Other RPEs, Which It Consistently Acknowledged Before May 2013...................................................................148

(iii)  A Resulting Trust Arises in Favor of Parties that Have Contributed to the Creation of an Asset Without Taking Legal Title.......................151

B.  The EMEA and U.S. Debtors Did Not Transfer Their Beneficial Ownership Rights to NNL ......................................................................153

1.  No Transfer of Beneficial Ownership Rights Occurred Pursuant to the MRDA................................................................155

(a)  Article 4 of the MRDA Vests Only Legal Title in NNL, Which Carries No Right to Proceeds from Sales of Jointly Created IP..............................................157

**Table of Contents**
(continued)

(b)     A Reading of the MRDA as a Whole Confirms that the RPEs Were the Beneficial Owners of Nortel's IP ..................................................................... 162

(c)     The "No Partnership" Clause Does Not Change the Meaning of the MRDA .................................................... 172

(d)     The Entire Agreement Clause Is Not Applicable Because the MRDA Does Not Address How to Allocate Proceeds from Sales of IP ................................. 176

(e)     The Entire Factual Matrix Confirms that the RPEs Were the Beneficial Owners of Nortel's IP and Retained Their Right to Proceeds from Sales of the Jointly Created IP ............................................................. 179

(f)     Construing the MRDA to Deprive the RPEs of Rights to IP Sale Proceeds Would Produce a Commercial Absurdity .................................................... 184

(g)     Construing the MRDA to Deprive the RPEs of Rights to IP Sale Proceeds Would Violate the Arm's Length Principle .................................................... 186

2.     No Transfer of Beneficial Ownership Rights Occurred Pursuant to the Assignments of Individual Patents Signed by Their Inventor Employees ....................................................... 192

III.     THE RPES' RELATIVE BENEFICIAL OWNERSHIP RIGHTS SHOULD BE CALCULATED ACCORDING TO THEIR R&D SPENDING OVER THE PERIOD WHEN THE SALEABLE IP WAS CREATED, WHICH TERMINATED UPON INSOLVENCY ......................... 194

IV.     IN THE ALTERNATIVE, IP SALE PROCEEDS SHOULD BE ALLOCATED BASED ON THE VALUE OF THE RPES' LICENSE RIGHTS ............................................................................... 198

A.     The Canadian Debtors' Narrow Interpretation of the License Is Not Consistent with the MRDA ................................................... 198

B.     The Courts Should Adopt Mr. Malackowski's License Approach .......... 200

V.     THE NORTEL AT-RISK ENTITIES THAT CREATED IP OUTSIDE THE MRDA ARE ENTITLED TO RECEIVE THE VALUE OF THEIR IP .................................................................................... 202

**Table of Contents**
**(continued)**

**Page**

VI.     SALE PROCEEDS ATTRIBUTABLE TO CUSTOMER-RELATED
        ASSETS AND GOODWILL SHOULD BE ALLOCATED BASED ON
        2008 REVENUE ................................................................................................203

VII.    SALE PROCEEDS ATTRIBUTABLE TO TANGIBLE ASSETS
        SHOULD BE ALLOCATED BASED ON NORTEL'S BOOKS AND
        RECORDS ........................................................................................................205

VIII.   ALLOCATION CONCLUSIONS ......................................................................206

        A.      Allocation to the Canadian, U.S., and EMEA Debtors...........................206

        B.      Allocation to the Individual EMEA Entities............................................207

## STATEMENT OF POSITION

1.      Nortel was a multinational enterprise with significant intellectual property and customer assets that were created and owned by its various subsidiaries around the world.   There is no doubt that the U.S. Debtors, Canadian Debtors, and EMEA Debtors (collectively the "Debtors") each contributed to the creation of these assets and Nortel's global business in real and significant ways.    Now that those assets have been sold, the proceeds must be allocated according to the Debtors' rights to those assets.

2.      The EMEA Debtors[1] submit that the $5.3 billion of proceeds attributable to intellectual property ("IP") in the sales of the global businesses of the Nortel Group (the "Lines of Business")[2] and the Nortel Group's residual patent portfolio (the "Residual Patent Sale") should be allocated according to the parties' beneficial ownership of that asset.  The parties' beneficial ownership of the IP – as evidenced by their conduct and their agreements – is in proportion to their contributions to the creation of that asset.

3.      Because Nortel saved its most valuable IP for the Residual Patent Sale, much of the value of the Business Sales was not IP but rather Nortel's customer contracts, support infrastructure, and related personnel ("Customer-Related Assets"), which (along with residual "Goodwill")

---

[1]     The EMEA Debtors are:  Nortel Networks UK Limited ("NNUK"); Nortel Networks S.A. ("NNSA"); Nortel Networks (Ireland) Limited ("NN Ireland"); Nortel GmbH ("Nortel Germany"); Nortel Networks (Austria) GmbH; Nortel Networks AB; Nortel Networks B.V.; Nortel Networks Engineering Service Kft; Nortel Networks France S.A.S. ("Nortel France SAS"); Nortel Networks Hispania, S.A.; Nortel Networks International Finance & Holding B.V.; Nortel Networks N.V.; Nortel Networks Oy; Nortel Networks Polska Sp. z.o.o.; Nortel Networks Portugal S.A.; Nortel Networks Romania SRL; Nortel Networks S.p.A.; Nortel Networks Slovensko, s.r.o.; and Nortel Networks, s.r.o.

[2]     Sold in eight postpetition sales (the "Business Sales"):  Layer 4-7, CDMA and LTE, Next Generation Packet Core, Enterprise, MEN, GSM/GSM-R, CVAS, and MSS.

account for more than $2 billion of the Business Sale proceeds. The parties' rights to those Customer-Related Assets and Goodwill differ from their rights to the IP, so the separate customer and goodwill asset classes must be valued and allocated differently than the IP.

## I.       THE RPES' JOINT BENEFICIAL OWNERSHIP OF NORTEL'S IP

4.       Five entities – Nortel Networks Limited ("NNL"), Nortel Networks Inc. ("NNI"), NNUK, NNSA, and NN Ireland (collectively, the "RPEs") – created IP, which over the course of almost two decades, generated the bulk of the sale proceeds at issue. They owned that IP in proportion to their contributions, both as a matter of law and as evidenced by their own conduct and agreements. They memorialized their common understanding in their Master R&D Agreement (the "MRDA"), which stated that "each Participant should benefit from its contribution" to creating the Nortel Group's IP "commensurate with the value of its contribution."[3] Both before and after they entered into the MRDA, they followed this principle in every aspect of their business, including division of operating profits, division of sale proceeds, division of licensing revenue, representations to tax authorities, and internal company valuations.

5.       Throughout the trial, the Canadian Debtors[4] and the CCC[5] denied joint ownership of the Nortel Group's IP by suggesting that such joint ownership rested on extrinsic evidence or was

---

[3]       TR21003, MRDA at 2 (Dec. 22, 2004), at NNC-NNL06001514/2.

[4]       The Canadian Debtors are:  Nortel Networks Corporation ("NNC"), NNL, Nortel Networks Technology Corporation; Nortel Networks Global Corporation; and Nortel Networks International Corporation.

[5]       The Canadian Creditors' Committee.

somehow inconsistent with the MRDA.  This argument misapprehends the EMEA Debtors' case, as well as the law regarding this evidence.  Joint ownership arose independent of, and in most cases well before, the MRDA as a matter of law.[6]  The MRDA merely recognizes that joint ownership, and structures transfer pricing and various other matters accordingly.  Thus the facts demonstrating that ownership are essential evidence.

6.      Even with respect to the interpretation of the MRDA, a court must consider the factual matrix of a contract,[7] which in this case recognizes pre-existing joint beneficial ownership of IP.  Not surprisingly, the MRDA expressly acknowledges that the RPEs jointly owned the IP.   By way of one example, Schedule A to the MRDA provides that the RPEs "bear the full entrepreneurial risk of the Nortel business such as the risks attendant with the substantial and continuous development and <u>ownership</u> of the NN Technology."[8]

7.      By contrast, the <u>U.S. Debtors</u>[9] do not deny the RPEs' joint ownership of the Nortel Group's IP.  As counsel for the U.S. Debtors eloquently explained in her opening, "They make it, they own it, and then they agreed to share it."[10]

---

[6]      *See* Proposed Conclusions of Law § II.A.3.

[7]      *See* Proposed Conclusions of Law § II.B.1(e).

[8]      Trial Day 2 Tr. 450:3–15, May 13, 2014 (B. Zarnett Opening) (quoting TR21003, MRDA sched. A (Dec. 22, 2004), at NNC-NNL06001514/18) (emphasis added).

[9]      The U.S. Debtors are:  NNI; Nortel Networks Capital Corporation; Nortel Altsystems Inc.; Nortel Altsystems International Inc.; Xros, Inc.; Sonoma Systems; Qtera Corporation; CoreTek, Inc.; Nortel Networks Applications Management Solutions Inc.; Nortel Networks Optical Components Inc.; Nortel Networks HPOCS Inc.; Architel Systems (U.S.) Corporation; Nortel Networks International Inc.; Northern Telecom International Inc.; Nortel Networks Cable Solutions Inc.; and Nortel Networks (CALA) Inc.

8.      As the preceding quotation suggests, the starting point for ownership of IP is its invention.  Under Canadian law, the inventor is the first owner of an invention, and is the legal title holder entitled to apply for any related patent.[11]  However, where the inventor is employed to invent – as the Nortel Group's researchers were – then the employer, by operation of law, beneficially owns any resulting IP.[12]  While the employee inventor who is listed on the patent application holds legal title, the employer is the beneficial owner.  Thus, the starting point in any ownership analysis is that the RPEs beneficially owned the IP resulting from their employees' inventive work.

9.      The nature of the RPEs' beneficial ownership reflected the interrelated nature of research and development ("R&D") at Nortel.  The RPEs did not work in isolation; they operated as a single integrated enterprise spanning the globe.  This was true of R&D as it was of almost every aspect of the business.  The trial evidence was clear and consistent:  any one invention was the product of work from multiple laboratories in multiple countries.  This is also what the Nortel Group contemporaneously represented to the tax authorities.  The 4G technology created by the Wireless Technologies Laboratories ("WTL") – operating out of Ottawa, Canada; Harlow, England; and Richardson, Texas – is but one prominent example of how the RPEs' collective research created an indivisible pool of IP.

---

(Footnote continued from previous page)

[10]     Trial Day 1 Tr. 215:24–25, May 12, 2014 (S. Block Opening).

[11]     *See* Proposed Conclusions of Law § II.A.3(a)(i).

[12]     *See* Proposed Conclusions of Law § II.A.3(a)(ii).

10.     Given the integrated nature of R&D, the Nortel Group never even tried to distinguish which entity owned which particular patents or inventions.  On the contrary, Nortel told the tax authorities that patents filed by Canadian inventors could not be attributed entirely to NNL, because that would not reflect the contributions of other inventors in other jurisdictions.  Thus, each party beneficially owned not the IP created in its jurisdiction (which as a practical matter would have been impossible to determine), but rather a share of the indivisible pool of the Group's IP.[13]

11.     As a matter of corporate policy, the RPEs all agreed that NNL would hold legal title to the jointly created IP.  This was an eminently sensible practice.  For management and enforcement of the Nortel Group's IP, it was far more efficient for legal title to be held in one place.  Applications, maintenance payments, licensing, and enforcement could all be managed centrally without concerns over which entity had standing to enforce and administer the Group's collective rights.

12.     Legal title, however, carries no right to the economic benefits of IP.  Importantly, at no time did the Nortel Group ever act as though holding legal title had any economic significance or granted any benefits.  "Legal title" is a phrase that has a specific legal meaning:  legal title denotes only nominal ownership with no economic rights.  It is  beneficial ownership that carries with it all economic and other benefits deriving from a jointly owned asset.[14]  The parties assigned legal title to NNL, but by explicitly limiting the grant under the MRDA to legal title,

---

[13]     *See* Proposed Conclusions of Law § II.A.3(a)(iii).

[14]     *See* Proposed Conclusions of Law § II.A.2.

they reserved their beneficial ownership.  The EMEA and U.S. RPEs held exclusive licenses in their respective territories so that they could demonstrate their rights to use the IP to third parties, including in litigation.

13.    The manner in which the Nortel Group in fact operated and represented its position in relation to IP ownership (both intra-Group and externally to, for example, tax authorities) confirms that the Group's IP was owned jointly by all of the RPEs.[15]  This is no coincidence.  As a multinational enterprise, the Nortel Group was subject to transfer pricing regulations.  This meant, above all else, that intra-Group transactions had to be made on terms comparable to what independent commercial parties would agree at arm's length.  The revenue authorities in all relevant jurisdictions require that each entity in a group receives market value for the assets and functions it contributes to the group.  NNL may have been the operating parent company, but it was not allowed to unilaterally extract value from the EMEA and U.S. Debtors.  Rather, each RPE had to receive an appropriate return for its contributions.

14.    As a result, from at least 2001, when the Nortel Group adopted the residual profit split ("RPS") methodology, the parties complied with the "arm's length principle" by allocating residual operating profit or loss associated with the creation and exploitation of IP in proportion to relative historical R&D expenditure.  It is an essential ingredient of the RPS methodology that each participant is a beneficial owner of jointly created intangibles.  No revenue authority in any jurisdiction would permit a local company to deduct billions of dollars of R&D expense, and share billions of dollars of losses, to invest in IP that the local company did not own.  Nor would

---

[15]    *See* Proposed Conclusions of Law § II.A.3(b)(i).

any arm's length party agree to spend billions on R&D owned by another party, and share the downside risk of annual losses, without the upside of an ownership stake in the underlying assets and the right to share proceeds of a sale.

15.    As a transfer pricing tool, Nortel's RPS methodology was subject to the review and approval of the various tax authorities around the world in countries where the Nortel Group operated.  These tax authorities had to confirm that the methodology complied with the arm's length principle and any other applicable transfer pricing regulations.  In its various submissions to the tax authorities, Nortel represented repeatedly that the RPEs jointly owned the IP.

16.    For example, when Nortel met with tax authorities from Canada, the United States, and the United Kingdom in 2002 to kick off discussions about a new Advanced Pricing Arrangement ("APA"), it prepared and vetted at the highest level the answer to the very question now before the Courts[16]:  if IP created by the Group were sold, how would the proceeds be allocated?  The answer is telling:  the proceeds would be allocated among the RPEs based on their economic or beneficial ownership of the IP, measured by their historical contribution to R&D spending.  Legal title was then, and is now, utterly irrelevant to the allocation of proceeds of the sale of IP.

17.    Any other result would have breached the arm's length principle.[17]  Because the RPEs shared the R&D risks associated with creating the IP and shared the profit and loss attributable to the IP, it would have been inconsistent with the arm's length principle to treat the RPEs

---

[16]    The Courts are:  Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") and the United States Bankruptcy Court for the District of Delaware (the "U.S. Court").

[17]    See Proposed Conclusions of Law § II.B.1(g).

differently on a sale of their jointly created IP and award to NNL any windfall amount that exceeded its relative contribution.

18.     The RPEs' understanding was also reflected, as one would expect, in communications with Nortel's outside counsel.  As Nortel's head of transfer pricing, NNL's James Gatley, explained to one lawyer, "[t]he future intangibles developed [under the RPS methodology] are beneficially owned" by the RPEs.[18]  At his deposition, Mr. Gatley explained what beneficial ownership of IP meant at Nortel, using what he called a hypothetical, but what are actually the facts of this case:  when R&D undertaken jointly in the United Kingdom and Canada gives rise to a patent registered in the name of NNL, the legal title "means nothing"; what is important is that every entity that helped develop that IP is "compensated properly," *i.e.*, that they obtain the benefits of ownership.[19]  Notably, the Canadian Debtors did not bring Mr. Gatley, or any other fact witness knowledgeable about the Nortel Group's transfer pricing, to give evidence at trial.

19.     The RPEs' course of dealing, including but not limited to the many years after the MRDA was signed, confirms that they had and retained beneficial ownership of the IP.  When IP was sold (such as in the $320 million UMTS sale to Alcatel), or otherwise monetized (such as through patent infringement litigation and settlement with Foundry), the Nortel Group allocated the proceeds based on joint beneficial ownership, and paid taxes on that basis.

---

[18]     J. Gatley Dep. Tr. 125:11–126:16, Nov. 7, 2013 (discussing TR21382).

[19]     J. Gatley Dep. Tr. 252:9–253:8, Nov. 7, 2013.

20.     When the RPEs negotiated with each other, such as in relation to Project Swift (described below), they acknowledged that together they beneficially owned the Group's IP.  Indeed, right through insolvency Nortel's senior executives acknowledged that the RPEs beneficially owned the Group's IP and were entitled to share in the proceeds of its sale on the same basis as NNL.

21.     In short, the entire record points only one way – to the parties' beneficial ownership of the Group's IP.

22.     Faced with a consistent, decade-long record of NNL and the rest of the Group representing to the tax authorities, auditors, the market, and each other that the RPEs beneficially owned the IP, the Canadian Debtors have but two responses, both easily dismissed.

23.     First, the Canadian Debtors claim that the only document that is relevant to the ownership of Nortel IP is the MRDA, arguing that it is a complete statement of all rights in connection with the IP, and that it grants 100% of ownership rights to NNL, subject only to limited licenses granted to the other RPEs.  For the reasons noted above and discussed in detail below, that is a fatally flawed reading of the MRDA.  The Canadian Debtors' approach ignores the MRDA's repeated references to the RPEs' beneficial ownership of the Nortel Group's IP, ignores the RPS methodology memorialized in the MRDA, which is premised on joint ownership, and ignores the prior ownership rights that the RPEs brought to the MRDA.  So extreme and unsupported is the Canadian Debtors' position that NNL's own John Doolittle, former vice-president of tax and NNL's postpetition chief financial officer, disavowed it, testifying that the legal title theory is

inconsistent with the way the Nortel Group operated.[20]  Like Mr. Gatley, the Canadian Debtors did not bring Mr. Doolittle to trial.

24.    The Canadian Debtors' argument overlooks the very purpose of the MRDA.  The MRDA does not address the sale of IP:  the opening sentence of the MRDA makes clear that it does no more than confirm and formalize the operating arrangements of the RPEs.  The Third Addendum to the MRDA (described below) confirms that the MRDA did not, and was never intended to, apply to the sale of a business.  The MRDA as a whole is perfectly consistent with (and can only be properly understood in light of) the RPEs having and retaining beneficial ownership that arose by operation of law.  The MRDA provides only for legal title, not ownership, to be vested in NNL.

25.    Second, the Canadian Debtors also attempt to renege on the submissions that the Nortel Group, led by NNL, repeatedly made, under penalty of perjury, to the tax authorities of Canada, the United States, the United Kingdom, and France regarding the RPEs' beneficial ownership of the Group's IP.  Unable to challenge the accuracy of these representations, the Canadian Debtors attempt to sideline them, claiming that they are irrelevant because they are mere tax representations, made in a "different language" to that of legal rights.  There is no such distinction in law to be made.  Taxpayers cannot create a separate reality for tax purposes.  In any event, Nortel made no such reservation when it dealt with the tax authorities, and it used the terms "ownership" and "beneficial ownership" in its legal agreements, including the MRDA and

---

[20]    J. Doolittle Dep. Tr. 149:24–150:14, Dec. 5, 2013.

two of its amendments.[21]   NNL and its successors cannot now disavow its solemn representations about who owned Nortel's IP.[22]

26.     Having determined that the RPEs had joint beneficial ownership of the Nortel Group's IP, one must next value the RPEs' proportional ownership interests.  The approach used should mirror the approach used by the parties for valuing their proportional interests when the Group was in business, *i.e.*, relative spending on the R&D that created the IP.  Because this case concerns the sale of all of the Nortel Group's IP – not income for one year, or dispositions of a specific subset of patents – valuation has to be based on the actual contributions to all of the IP that was actually sold.

27.     The Canadian Debtors have suggested that if the Courts were to adopt a contribution approach to allocation, they should measure the RPEs' respective contributions by looking only at R&D spending over a five-year period, from 2005 to 2009, instead of over the time in which the IP sold was actually invented.  Because Nortel shifted R&D spending to NNL for reasons of tax efficiency, the shorter and later the period over which R&D spending is measured, the greater the allocation of sale proceeds to the Canadian Debtors.

28.     There is no rational or evidentiary basis for allocating IP sale proceeds based on R&D spending over five years, much less the five years from 2005 to 2009.  The uncontested fact and expert evidence is that the most valuable IP sold by the Nortel Group was invented between 1991

---

[21]   TR21003, MRDA at 2, sched. A (Dec. 22, 2004), at NNC-NNL06001514/2, 18; TR21003, Second Addendum at 1, sched. A (Dec. 14, 2007), at NNC-NNL06001514/27, 30; TR21003, Third Addendum sched. A (Jan. 2009), at NNC-NNL06001514/4.

[22]   *See* Proposed Conclusions of Law § II.A.3(b)(ii).

and 2008.  Thus, measuring the RPEs' respective contributions by R&D spending from 2005 to 2009 starts far too late, because the vast majority of the IP sold by the Nortel Group was invented long before 2005.  Giving zero credit for the billions of R&D dollars spent in the 1990s and early 2000s that created the actual value realized in Nortel's asset sales would lead to an erroneous valuation of the RPEs' beneficial ownership of IP.

29.    Including R&D spending from 2009 also extends too far because the evidence – again uncontested – is that by 2009, when sales of the majority of the Lines of Business had been finalized, Nortel's R&D spending was simply for maintaining the portfolio, not creating new and valuable IP.  Thus, considering contributions from 2009 would give full credit to R&D spending during a year when the record shows no valuable IP was created.

30.    The U.S. Debtors' license approach rests on the same fundamental principles as the EMEA Debtors' contribution approach, namely that NNL held only legal title to the Group's IP and that all of the RPEs jointly held beneficial ownership of that IP.  The U.S. Debtors' approach only differs from the EMEA Debtors' approach with respect to how best to measure the value of that joint beneficial ownership.

31.    Under the U.S. Debtors' license approach, the RPEs would share the proceeds based on the expected future revenues to be generated from the licenses each held, rather than based on the RPEs' contributions to R&D.  Unlike the Canadian Debtors' legal title theory, the U.S. Debtors' license approach has a principled basis in the record because it reflects the RPEs' contributions to the Group's operating revenue.  If the Courts determine that the license approach should be applied in this case, however, the EMEA Debtors' alternative license approach should

be applied in order to properly value the parties' respective ownership interests, as described

below in Section IX of the Proposed Findings of Fact.

**II.   CUSTOMER-RELATED ASSETS ARE A DISTINCT ASSET CLASS THAT MUST BE TREATED SEPARATELY IN ORDER TO COMPENSATE ALL DEBTORS, INCLUDING NON-RPES, FOR VALUE TRANSFERRED IN THE BUSINESS SALES**

32.     After IP, Nortel's Customer-Related Assets is the most important asset class.  The EMEA

Debtors submit that Customer-Related Assets and residual value attributable to Goodwill should

be valued and allocated separately from IP.   It is uncontested that the most valuable IP was

saved for the Residual Patent Sale, and witness after witness confirmed at trial that the Line of

Business purchasers, while interested in Nortel's business IP, often had their own similar, if not

superior, technology, and were, at least in part, paying billions of dollars not for more IP that

they would not use, but for the chance to sell their own technology to Nortel's vast global

network of customers.

33.     The Canadian Debtors would have the Courts treat the more than $2 billion that the

purchasers paid for Nortel's Customer-Related Assets (along with Goodwill) as IP, which – they

say – means they get almost all of it.  This transparently self-serving position flies in the face of:

(i) the evidence that every purchaser of a major Line of Business treated IP and Customer-

Related Assets as separate and distinct assets, (ii) the fact that the EMEA Debtors' IP valuation

and allocation expert, James Malackowski, was able to review the Group's IP and reliably value

it separately from the Customer-Related Assets – a valuation which no other expert even

attempted, and (iii) Nortel's history of treating IP and Customer-Related Assets as separate asset

classes.

34.     Adopting the Canadian Debtors' approach would also deprive a substantial group of non-RPE Nortel debtors from receiving any allocation at all in respect of valuable Customer-Related Assets and Goodwill that they contributed to the Business Sales.   These entities have substantial creditors, largely pension creditors, and they owed a duty to those creditors to maximize the value obtained in the Business Sales.  They sold their distribution functions and transferred their sales forces to provide purchasers with a truly global reach.   Under the Canadian Debtors' theory, in exchange for the valuable assets those Debtors transferred to the purchasers, they will receive nothing, absolutely nothing, for their Customer-Related Assets.  That is unsupportable.

## III.     CONCLUSION

35.     Different asset classes are subject to different legal rights.  Each class must be analyzed separately in order to ensure that the assets owned by each selling entity are properly valued and allocated in accordance with those rights.  The EMEA Debtors submit that sale proceeds should be allocated by determining what classes of assets were conveyed in each sale; determining the value of each total asset class; and then allocating the proceeds from each asset class based on the rights of the various debtors to each asset class.  The Courts should find that the parties' respective rights are as outlined above and allocate the proceeds as follows[23]:

---

[23]     TR00030, Expert Report of Paul P. Huffard ¶ 11 (Apr. 11, 2014) [hereinafter "Huffard Report"].

## CONTRIBUTION APPROACH $ in millions

**Total Allocation by Contribution Approach:  Business Sale IP (Sale Specific) / Residual IP (1991-2006)**

|  | Canada | US | EMEA | Total |
|---|---|---|---|---|
| CDMA | 15.8% | 80.4% | 3.8% | 100.0% |
| Enterprise | 20.2% | 50.9% | 29.0% | 100.0% |
| MEN | 23.7% | 47.1% | 29.2% | 100.0% |
| CVAS | 29.2% | 41.9% | 28.8% | 100.0% |
| GSM | 23.6% | 66.3% | 10.1% | 100.0% |
| MSS | 13.1% | 42.6% | 44.3% | 100.0% |
| Layer 4-7 | 27.5% | 50.7% | 21.8% | 100.0% |
| Next Gen | 33.0% | 53.6% | 13.4% | 100.0% |
| Residual IP | 39.5% | 42.9% | 17.6% | 100.0% |
| **Total Allocation** | **31.9%** | **49.9%** | **18.2%** | **100.0%** |
| **Total Value** | **$ 2,320** | **$ 3,636** | **$ 1,325** | **$ 7,280** |

## PROPOSED FINDINGS OF FACT

### I.    BACKGROUND AND PROCEDURAL HISTORY

#### A.    Relevant Corporate Structure

36.    The Nortel Group was a global supplier of end-to-end networking products and solutions serving telecommunications carriers, service providers, enterprises, governments, and other users.[24]  The publicly traded parent company, NNC, operated through an international web of subsidiaries.[25]  The Canadian operating subsidiary, NNL, was the parent of the various other subsidiaries,[26] the most important of which were NNI, NNUK, NNSA, and NN Ireland.[27]

37.    The five RPEs were integrated companies that participated in and managed all key aspects of the Nortel Group's business, including the R&D that led to the creation of Nortel's technology, as well as sales, marketing, and distribution of Nortel products to customers.[28]  They were considered the entrepreneurs of the Nortel Group, taking on the financial responsibilities and risks, and therefore shared in profits and losses pursuant to the RPS methodology.[29]

38.    In addition to the five RPEs, the Nortel Group included Limited Risk Entities ("LREs") and Cost Plus Entities ("CPEs"), which performed narrow functions or fulfilled particular roles,

---

[24]    TR40715, NNC Annual Report for the Year Ended Dec. 31, 2007 (Form 10-K), at 1 (Feb. 27, 2008).

[25]    TR40715, NNC Annual Report for the Year Ended Dec. 31, 2007 (Form 10-K), at 1 (Feb. 27, 2008).

[26]    TR21539, Affidavit of John Doolittle ¶¶ 21(b), 26, Jan. 14, 2009 [hereinafter "Doolittle Aff."].

[27]    TR21539, Doolittle Aff. ¶¶ 21(a), 21(b), 23, 26.

[28]    TR22078, NNL & NNI Joint Request for U.S.-Canada Bilateral Advance Pricing Agreement/Arrangement 2007–2011 (with rollback to 2006), at 11–12 (Oct. 31, 2008) [hereinafter "NNL-NNI Joint APA Request"].

[29]    TR21407, Nortel Networks Functional Analysis for the Years Ended Dec. 31, 2000–2004, at 6, 93–95 (Nov. 30, 2004) [hereinafter "Functional Analysis"]; TR00030, Huffard Report app. 7 at 3–4.

such as the distribution, sales, and marketing of Nortel products within particular geographic areas, and did not carry out any R&D for the Nortel Group.[30]   The Nortel Group also included At Risk Entities ("AREs"), which were former joint ventures that conducted some R&D and therefore had a broader role than the LREs or CPEs.[31]   It was through the AREs, LREs, and CPEs, that the Nortel Group generated a significant portion of its sales.   The AREs also created and held IP in their own names.   The Courts must determine the entitlement to sale proceeds of the AREs, LREs, and CPEs, in addition to the entitlement of the RPEs.

### B.      Business and Operations

39.      From the 1990s onward, when the Nortel Group began creating the IP that was sold in the Business Sales and the Residual Patent Sale, R&D was carried out by the RPEs.[32]

40.      By the late 1990s the Nortel Group had – through growth and international acquisitions – become a multinational enterprise for which non-Canadian activity generated many times more revenue than activity in Canada.[33]   This remained true through insolvency.   In 2008, for example,

---

[30]   *See* TR22078, NNL-NNI Joint APA Request at 12.

[31]   *See* TR00030, Huffard Report, ¶¶ 26, 29, app. 7 at 3–4.

[32]   *See* TR32117, NNUK Transfer Pricing Report 19 (July 18, 2003); TR40253, Northern Telecom Limited Annual Report for the Year Ended Dec. 31, 1995 (Form 10-K), at 13 (Mar. 19, 1996).   NN Japan and NN Australia were also RPEs for a time, carrying out R&D, but ceased playing any such role before insolvency and have made no claims in that regard in this proceeding.   *See* TR00042, Report of Philip Green Regarding the Allocation of Recoveries Among Nortel Entities app. L at 1 (Feb. 28, 2014) [hereinafter "Green Report"]; TR00043, Rebuttal Report of Philip Green Regarding the Allocation of Recoveries Among Nortel Entities 8 n.9 (Feb. 28, 2014) [hereinafter "Green Rebuttal"].

[33]   *See* TR46952, NNC Annual Report for the Year Ended Dec. 31, 2001 (Form 10-K), at 6–7, 10–11, 13–14, 29, F-13–F-19 (Mar. 11, 2002).

the U.S. region accounted for 42.5% of Group revenues, the Europe, Middle East, and Africa ("EMEA") region accounted for 23.2%, and Canada accounted for only 6.7%.[34]

41.     For at least a decade before the insolvency filings, the Nortel Group operated as a "matrix organization" focused around its Lines of Business – categories of products and services offered globally by the Group.[35]  Key functions such as R&D, manufacturing, sales, and marketing were coordinated across the different legal entities and across geographic boundaries in order to serve the Lines of Business.[36]

### C.    The Insolvency Proceedings

42.     During the fall of 2008, the worldwide economic downturn put increasing pressure on Nortel's already tenuous financial condition.[37]  Ultimately, the company decided it was necessary to initiate insolvency proceedings, and in January 2009 various Nortel Group entities around the world filed for protection from creditors in their respective jurisdictions.[38]

43.     The Canadian Debtors filed for and obtained protection under the *Companies' Creditors Arrangement Act* (as amended, the "CCAA") before the Canadian Court, and Ernst & Young Inc. was appointed as the monitor of the Canadian Debtors (the "Monitor").

---

[34]     *See* TR40269, NNC Annual Report for the Year Ended Dec. 31, 2008 (Form 10-K), at 54 (Mar. 2, 2009) (with the rest of the revenue in 2008 coming from the Asia-Pacific (22.1%) and Central and Latin American (5.6%) regions; percentages do not sum to 100% due to rounding).

[35]     TR00001, Affidavit of Peter Currie ¶ 28, Apr. 11, 2014 [hereinafter "Currie Aff."].

[36]     TR00001, Currie Aff. ¶¶ 21–24.

[37]     *See* TR40269, NNC Annual Report for the Year Ended Dec. 31, 2008 (Form 10-K), at 1–2 (Mar. 2, 2009).

[38]     TR40269, NNC Annual Report for the Year Ended Dec. 31, 2008 (Form 10-K), at 2 (Mar. 2, 2009).

44.     The U.S. Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the U.S. Court.[39]

45.     The EMEA Debtors were granted administration orders under the *Insolvency Act 1986* by the High Court of Justice of England and Wales (the "English Court"), and individuals from Ernst & Young LLP were appointed as administrators of the EMEA Debtors (collectively, the "Joint Administrators").[40]

> **D.     The Business Sales**

46.     The Debtors explored a number of restructuring options during the early months of their insolvency proceedings, but they ultimately decided to sell off the Group's businesses and assets.[41]

47.     On June 9, 2009, various Nortel entities entered into the Interim Funding and Settlement Agreement (the "IFSA"), in which they agreed to cooperate in selling the Group's worldwide assets quickly in order to maximize sale proceeds for the benefit of creditors, while deferring the issue of how the sale proceeds should be allocated among the selling entities.[42]   The IFSA provided that sale proceeds were to be placed into escrow pending an agreement between the

---

[39]     Nortel Networks (CALA) Inc., one of the U.S. Debtors, subsequently filed a voluntary petition for relief on July 14, 2009.

[40]     Other core parties to the allocation proceedings include Nortel Networks UK Pension Trust Limited and the Board of the UK Pension Protection Fund, together the U.K. Pension Claimants (the "UKPC"), the Official Committee of Unsecured Creditors (the "Committee"), the CCC, an ad hoc group of bondholders (the "Bondholder Group"), and Wilmington Trust, National Association, the Bank of New York Mellon, and Law Debenture Trust Company of New York (collectively, the "Indenture Trustees").

[41]     TR00014, Affidavit of Paviter Binning ¶¶ 41–50, Apr. 10, 2014 [hereinafter "Binning Aff."].

[42]     TR21638, IFSA § 12 (June 9, 2009).

parties about how to allocate the proceeds or, failing such agreement, resolution of any dispute over allocation.[43]

48.    Between March 2009 and June 2011, the Debtors, acting under the supervision of the Courts, cooperated in successful sales of each of the Lines of Business and the Group's residual patent portfolio (described below).

49.    As part of the Business Sales, the Nortel Group sold multiple asset classes to the purchasers of the Lines of Business, including Net Tangible Assets, IP, Customer-Related Assets, and Goodwill.[44]  As set out further below, each of those asset classes must be separately valued and allocated.  Certain members of the Nortel Group that sold assets in the Business Sales did not convey assets in each class.  The Canadian Debtors seek to allocate the sale proceeds by ignoring the value of Customer-Related Assets and Goodwill, and ascribing to IP nearly the entire value of the assets transferred.  That would be wrong.  Several other parties, including in particular the EMEA LREs, transferred valuable rights in Customer-Related Assets and Goodwill as part of the Business Sales for which they must receive a proper allocation.

    E.    The Residual Patent Sale

50.    After the Lines of Business had been sold, Nortel was left with a "residual" patent portfolio consisting of patents that were either not used in any Line of Business, or shared across

---

[43]    TR21638, IFSA § 12(b).

[44]    TR00030, Huffard Report ¶¶ 58–59; TR00045, Thomas Britven, Nortel Networks Expert Report on Valuation and Other Issues Related to the Allocation of Sales Proceeds to the Nortel Debtor Groups ¶¶ 6.8, 6.12 (Jan. 24, 2014) [hereinafter "Britven Report"].

multiple businesses and licensed on a nonexclusive basis to one or more buyers of the Lines of Business.[45]   A total of 7,057 patents and patent applications remained in the residual patent portfolio following the Business Sales.[46]  The Residual Patent Sale consisted almost exclusively of IP,[47] which was sold to the Rockstar Consortium ("Rockstar") for $4.5 billion.[48]

51.    The Business Sales and the Residual Patent Sale collectively generated nearly $7.6 billion, $7.3 billion of which remains in escrow to be allocated between the Canadian Debtors, U.S. Debtors, and EMEA Debtors based on the relative value of their respective ownership interests in the assets sold.[49]

---

[45]    TR22107, Email from Gillian McColgan, NNI, to John Veschi, NNI, *et al.* (Jan. 12, 2010, 12:25 p.m.) (attaching spreadsheet categorizing residual patents as either "Shared" or "Not Used"); *see* TR48932, Overview [of Nortel Patents as Presented to Iceberg Purchasers], at NNI_ICEBERG_00196160 (describing patents divested in Business Sales and remaining residual patents with "[s]trict limits on licenses granted").

[46]    TR41471, Copy of Sortable Asset List with Assignee for Rockstar (Aug. 5, 2011) (listing Rockstar patents); *see also* TR50184, Motion for an Order Authorizing and Approving Sale of Residual Patent Portfolio ¶¶ 8–10, Apr. 4, 2011 [D.I. 5202].

[47]    TR00030, Huffard Report ¶ 59.

[48]    TR00030, Huffard Report app. 19 at 1.

[49]    *See* TR00030, Huffard Report ¶ 57, app. 2.  The asset sales generated an unadjusted base price of $7.790 billion, which includes various costs paid by the purchasers that are unrelated to the value of the Nortel Group's assets.  *See* TR00030, Huffard Report app. 2 ¶ 10 & n.21.  The allocation values reflected herein are based on the $7.592 billion total sale proceeds attributable to the value of the Group's Lines of Business and residual patent portfolio.  The escrow balance remaining to be allocated, which as of July 25, 2013 was $7.280 billion, differs from this value due to a combination of distributions to certain Nortel entities, transaction costs and fees, taxes, settlements, and accrued interest.  *See* TR00030, Huffard Report app. 2 ¶¶ 3, 6.  The escrow balance will continue to change over time due to accumulating interest and various contingencies, and therefore allocation percentages are included herein to reflect each entity's proportionate share and can be applied to the total funds in escrow available for allocation on the date that distributions are actually made.  *See* TR00030, Huffard Report app. 2 ¶¶ 3, 6 & n.4, n.21.

## II.    R&D AT NORTEL

52.    The globally integrated and interrelated manner in which the Nortel Group created IP means that it is impossible to determine which Nortel entity is actually responsible for inventing a particular IP asset.  All of the RPEs jointly contributed to the creation of the entire portfolio of the Group's IP.

### A.    Nortel's Globally Integrated and Interdependent R&D Function

53.    The primary driver of the Nortel Group's business success was its ability to create and exploit advanced telecommunications technology.[50]  Each of the RPEs – through R&D personnel employed by that entity and working in facilities it operated[51] – performed the R&D that produced the patents and other IP that were the most valuable assets of the Group.[52]  In the twenty years leading up to insolvency, the RPEs spent over $30 billion on R&D to jointly invent, develop, and enhance technology for the Group.[53]

54.    By the early 1990s – when the oldest IP sold in the Business Sales and Residual Patent Sale was created – the Nortel Group had already acquired or opened significant research facilities in Canada,[54] the United States,[55] and EMEA,[56] including the Harlow facility acquired

---

[50]    *See* TR21407, Functional Analysis at 7.

[51]    *See* TR22078, NNL-NNI Joint APA Request, app. A at 3; *see also, e.g.*, TR32117, NNUK Transfer Pricing Report 20 (July 18, 2003).

[52]    *See* TR21407, Functional Analysis at 27–28, 94.

[53]    TR00034, Rebuttal Report of James E. Malackowski 6 (Mar. 24, 2014) [hereinafter "Malackowski Rebuttal"].

[54]    *See* TR00004, Affidavit of Brian McFadden ¶ 16, Apr. 10, 2014 [hereinafter "McFadden Aff."]; TR43219.02, 2005 R&D Site Strategy Discussion, at 3 (Jan. 6, 2005).

from STC plc, and the Maidenhead facility operated in the United Kingdom through Bell Northern Research (which Nortel co-owned with Bell Canada).[57]  The Nortel Group's R&D was centrally coordinated and carried out with a high degree of collaboration among the companies in the Group.[58]

55.    R&D activities were integrated across the RPEs and principally organized around the Lines of Business.[59]  For any given Line of Business, R&D centers were typically located in multiple cities in multiple countries.[60]  According to Paviter Binning, NNL's former chief financial officer and a trial witness for the Canadian Debtors and the CCC, the "R&D

_____

(Footnote continued from previous page)

[55]    *See* TR43219.02, 2005 R&D Site Strategy Discussion, at 3 (Jan. 6, 2005).

[56]    *See* TR32117, NNUK Transfer Pricing Report 20 (July 18, 2003); TR00024, Affidavit of Peter Newcombe ¶¶ 13–14, 16–19, Apr. 11, 2014 [hereinafter "Newcombe Aff."].

[57]    *See* TR50286, History of Nortel, 1970 to 1999, at 3 (Apr. 22, 2014); TR40243, Northern Telecom Limited Annual Report for the Year Ended Dec. 31, 1984 (Form 10-K), at 4 (Feb. 28, 1985); TR44919, BNR-Harlow, U.K. (part of BNR-Europe), Telesis issue no. 92.

[58]    *See* TR21407, Functional Analysis at 19; TR22078, NNL-NNI Joint APA Request, app. B at 17 ("Nortel R&D activities are on a global scale cross Canada, U.S., Europe, and Asia regions.  On a highly coordinated and interdependent basis, R&D projects are structured and executed across the regions with products delivered to various lines of businesses.  Not one single R&D location or region is solely responsible for all project components that make up a product.").

[59]    *See* TR00005, Reply Affidavit of Brian McFadden ¶ 8, Apr. 25, 2014 [hereinafter "McFadden Reply Aff."] ("Nortel was organized along global product lines and, similarly, global R&D projects.  R&D was therefore organized around a particular project, not particular geographical locations or legal entities, and was managed on a global basis.").

[60]    *See, e.g.*, R. Horn Dep. Tr. 64:7–65:16, 69:5–11 (Optical), 66:9–67:13 (Carrier Networks), 83:22–83:24, 86:12–88:5, 88:19–24, 89:6–20, 91:4–93:6, 93:22–94:2, 94:4–96:15 (Enterprise), Sept. 24, 2013.

capabilities in any one specific country were not broad enough to support or develop the product offerings of any individual [L]ine of [B]usiness."[61]

56.    In its 2004 submissions to various tax authorities seeking approval of a new transfer pricing regime, Nortel described its R&D function as integrated across geographies, platforms, and technologies.  "Much of Nortel's R&D is interrelated, and one specific project may be developed based on older R&D projects or platforms."[62]  Even during the 2000s, when Nortel was developing "Centers of Excellence," R&D program plan execution was "coordinated among a virtual team that is made up of various groups, in various locations, under various VPs" as there was "no one central geographic region that supports all activities."[63]

57.    As NNL's Ernest Briard, the former chief financial officer of the chief technology officer's office, explained, R&D projects typically involved multiple regions, each with its own specialty area to contribute to the product.[64]   This regional expertise was respected and as a result none of the regions "took dominance over the other."[65]

---

[61]    TR00015, Reply Affidavit of Paviter Binning ¶ 7, Apr. 24, 2014 [hereinafter "Binning Reply Aff."].

[62]    TR21407, Functional Analysis at 24.

[63]    TR21407, Functional Analysis at 19.

[64]    E. Briard Dep. Tr. 28:23–29:8, 39:15–42:7, Sept. 26, 2013.

[65]    E. Briard Dep. Tr. 40:5–23, Sept. 26, 2013.

58.    In addition to collaborating on a project, engineers from one RPE might be seconded to another in order to contribute their specific expertise to a particular issue or set of issues.[66] Entire teams of researchers would also often engage in ad hoc "knowledge transfers" when one team's expertise was needed in other areas.[67]

59.    One prominent example in the trial record of the integrated nature of Nortel R&D is WTL, the Wireless Technologies Laboratories.  Andrew Jeffries, a trial witness for the UKPC and a member of the WTL team based at NNUK's R&D facility in Harlow, England, described the collaborative nature of the WTL group as follows:

> [T]he Harlow Team worked extensively and in a collaborative manner with WTL personnel in other Nortel R&D locations, such as Ottawa, Canada.  Technical experts at Nortel routinely shared work and co-invented patents with personnel in other countries. . . . WTL operated as a single group combining staff and expertise of the wireless teams at Ottawa, Harlow, and Richardson. . . . It was implicit in the effective operation of the WTL that projects and project teams were seamlessly integrated, with project teams spanning multiple sites drawing upon appropriate expertise as necessary.  Sub-teams within WTL were comprised of people from different locations because there were many different skills required to create a wireless product. . . . Due to the integrated nature of WTL, it was not uncommon that a patent would have a number of named inventors, some based in one location (e.g. Harlow) and others based in another location (e.g. Ottawa). . . . After all, part of Nortel's core values was that Nortel operated as one team.[68]

---

[66]    *See, e.g.*, TR00029, Affidavit of Geoffrey Stuart Hall ¶ 15, Apr. 10, 2014 [hereinafter "Hall Aff."] (discussing secondment to Ottawa while remaining an employee of NNUK).

[67]    TR00023, Affidavit of Simon Daniel Brueckheimer ¶ 42, Apr. 9 2014 [hereinafter "Brueckheimer Aff."].

[68]    TR00025, Affidavit of Andrew Jeffries ¶¶ 8, 19, 24–26, Mar. 25, 2015 [hereinafter "Jeffries Aff."].

60.    Research on wireless technology starting in the late 1990s formed the foundation for breakthroughs that have now been incorporated into the current 4G wireless standard.[69]  While Ottawa had a large role, Harlow's research regarding "smart antenna" and "MIMO" technology played an important role in this cutting-edge research.[70]

61.    Another example in the trial record is the CS2000 Call Server, which was a key part of the next generation of technology in carrier networks.[71]  Researchers at NNUK's Harlow and Maidenhead facilities developed foundational R&D and patents related to the CS2000 product line and its derivatives in the 1990s, and collaborated with and advised researchers in the United States and Canada on further development of this technology.[72]  Fundamental patents related to the CS2000 product line were sold to Rockstar in the Residual Patent Sale and are still valuable today.[73]

62.    In a case in which the parties have taken markedly divergent positions, it is striking how witness after witness, from each party, consistently testified as to the integrated nature of the Nortel Group's R&D function, both at deposition[74] and at trial.[75]

---

[69]    See Trial Day 3 Tr. 671:15–22, 691:13–19, May 14, 2014 (B. McFadden Cross).

[70]    Trial Day 3 Tr. 720:16–721:17, May 14, 2014 (B. McFadden Cross); Trial Day 7 Tr. 1661:12–1665:15, May 22, 2014 (A. Jeffries Direct).

[71]    TR00023, Brueckheimer Aff. ¶ 53.

[72]    TR00023, Brueckheimer Aff. ¶¶ 58–61.

[73]    Trial Day 7 Tr. 1570:3–1571:25, May 22, 2014 (S. Brueckheimer Direct).

[74]    See R. Horn Dep. Tr. 64:7–65:16, 66:9–67:13, 68:5–69:11, 82:22–83:24, 86:12–88:5, 88:19–24, 89:6–20, 125:16–127:16, Sept. 24, 2013; E. Briard Dep. Tr. 39:15–42:7, 45:10–13, 55:7–56:2, Sept. 26, 2013; N. Rees

(Footnote continued on next page)

63.     As a result of the integrated nature of Nortel's R&D, the Nortel Group's IP portfolio was the product of overlapping, interdependent, and indivisible contributions of the five RPEs that participated in R&D.  Any attempt to survey Nortel's IP portfolio and attribute the creation of individual patents to the work of individual inventors or RPEs would be "doomed to failure."[76]

64.     As a result, the evidence in the record does not provide a basis for the Courts to determine which RPEs created what IP for the purpose of allocating among the RPEs the value of the IP sold in the Business Sales and the Residual Patent Sale.[77]

---

(Footnote continued from previous page)

Dep. Tr. 67:17–69:6, Sept. 27, 2013; K. Fox Dep. Tr. 35:24–37:2, Oct. 3, 2013; W. Henderson Dep. Tr. 210:6–22, Oct. 4, 2013; M. Collins Dep. Tr. 47:13–48:19, Oct. 10, 2013; S. Schofield Dep. Tr. 186:20–23, Oct. 10, 2013; G. Mumford Dep. Tr. 97:12–24, 105:10–14, 108:15–109:7, 118:7–16, 120:11–121:4, 122:17–22, 124:23–125:3, Oct. 24, 2013; G. Richardson Dep. Tr. 81:10–82:13, 95:21–96:17, Oct. 28, 2013; G. McColgan Dep. Tr. 51:17–54:2, 82:15–83:5, Nov. 8, 2013; A. de Wilton Dep. Tr. 80:2–20, Nov. 20, 2013; P. Albert-Lebrun Dep. Tr. 195:3–21, Nov. 21, 2013.

[75]    *See* Trial Day 3 Tr. 597:4–598:14, May 14, 2014 (P. Currie Cross); Trial Day 3 Tr. 649:10–651:16, 660:6–662:24, 665:11–668:11, May 14, 2014 (B. McFadden Cross); Trial Day 7 Tr. 1566:7–18, 1567:4–25, 1569:3–1570:2, 1572:1–1574:15, May 22, 2014 (S. Brueckheimer Direct); Trial Day 7 Tr. 1661:12–1665:6, 1678:3–22, May 22, 2014 (A. Jeffries Direct and Cross); Trial Day 9 Tr. 1919:22–1922:10, May 28, 2014 (G. Hall Direct); Trial Day 6 Tr. 1315:1–1316:10, May 21, 2014 (M. Orlando Cross).

[76]    N. Rees Dep. Tr. 67:17–69:6, Sept. 27, 2013; *see also* TR00024, Newcombe Aff. ¶ 24 (describing indivisible enhancements to products as exemplary of matrix-like flow of innovation within the Group).

[77]    *See* TR21407, Functional Analysis at 30 ("[T]he efforts undertaken by R&D personnel in Canada are producing the greatest number of patent applications, followed by the U.S. and the U.K.  This appears to indicate that, perhaps, R&D efforts undertaken by Canada are more 'patentable'.  This may not be the case, however, and it is important to discuss why such an approach is likely incorrect.  Much of Nortel's R&D is interrelated, and one specific project may be developed based upon older R&D projects or platforms. For example, assume that the U.K. undertakes certain R&D that is not patented (e.g. possibly because it is not yet in a patentable form, or it would not meet the legal requirements to be patented). A year later, a portion of the information and intellectual property from the U.K.'s R&D is utilized by R&D personnel in Canada. Canada patents the results of its efforts. In this example, it is difficult to state that the patentable invention was purely the result of Canada's efforts."); *see also* TR00033, Expert Report of James E. Malackowski 39–40 (Mar. 24, 2014) [hereinafter "<u>Malackowski Report</u>"] ("Ideally, the contributions of the RPE's labs to the development of the patented technologies could be fully and accurately determined by interviewing all of the firm's R&D staff, and by reviewing all the documentation related to the firm's research (e.g. lab notebooks, invention

(Footnote continued on next page)

## B.     Types of R&D Activity at Nortel

65.     R&D activity at Nortel took many different forms.  The highest value R&D work was advanced research,[78] the goal of which was to produce "foundational patents" – *i.e.*, patents "that represent the inception of a new area of ideas, or ha[ve] influenced greatly a field of ideas."[79]  A second type of R&D was improving technology in existing products to extend their commercial life, satisfy standards in a new market, or serve the needs of a different customer.[80]  Finally, R&D could have "defensive" value in a competitor's field by creating an opportunity for Nortel to demand licensing royalties, or alternatively to deter infringement actions by competitors against Nortel products.[81]  Each of the RPEs engaged in advanced research, product development, and defensive patenting.[82]

---

(Footnote continued from previous page)

disclosures, meeting minutes, research presentations etc.). . . . This approach is not possible for Nortel's IP due to the size of the portfolio, the limitations on time and the availability of information. I do not have access to lab notebooks and R&D staff.  Moreover, I understand that R&D was organized across the Nortel Group and carried out in a highly coordinated and integrated manner across the various RPEs, making it even more difficult to separate out the distinct contributions of the various RPEs.").

[78]     *See* TR00032, Reply Affidavit of Angela Anderson ¶¶ 30, 32, Apr. 25, 2014 [hereinafter "Anderson Reply Aff."] (discussing development in the Harlow facility of foundational patents and high-quality inventions).

[79]     TR00023, Brueckheimer Aff. ¶ 29.

[80]     *See* TR00029, Hall Aff. ¶¶ 8, 12, 15; TR00025, Jeffries Aff. ¶¶ 21, 52–54.

[81]     TR00056, Expert Report of Catherine Tucker ¶¶ 77–81 (Feb. 28, 2014) [hereinafter "Tucker Report"]; *see also* TR00034, Malackowski Rebuttal 10–11; TR00025, Jeffries Aff. ¶ 22 ("Patent filings, and especially early patent filings, were very important to Nortel.  They enabled Nortel to be a 'player' within the industry because the patents could be traded against patents belonging to its competitors, sold to other companies, or licensed to other companies (particularly if those patents were embedded into standards).").

[82]     TR00024, Newcombe Aff. ¶ 20; TR00032, Anderson Reply Aff. ¶¶ 30, 32.

C.      **The Patent Registration Process**

66.     The Nortel Group had a defined process for determining which inventions warranted patent filings and the locations of those filings.  Inventions were evaluated based on potential value to the Group, and a percentage of the highest-rated inventions were filed in more than one jurisdiction.

1.      *Evaluation and TIC Score*

67.     The Nortel Group's patent filing procedures included an intricate series of reviews designed to ensure that only potentially valuable inventions were patented.[83]  Inventions were evaluated by patent committees and review boards made up of experts in various technological areas and across Lines of Business, chaired by the legal department.[84]  Only inventions that were rated highly for their technical, inventive, and commercial contributions to the Nortel Group – referred to as a "<u>TIC Score</u>" – would be approved for patent application filing.[85]

2.      *Patent Filing Process*

68.     Nortel's policy was to file all of its patent applications in the United States and "further file" only its most important and valuable patents – as determined by TIC Scores – in other jurisdictions.[86] The Group first filed patent applications in the United States for several reasons:

---

[83]    TR00032, Anderson Reply Aff. ¶¶ 15–17; *see also* Trial Day 10 Tr. 2172:24–2176:18, May 29, 2014 (A. Anderson Direct).

[84]    Trial Day 3 Tr. 658:22–659:11, May 14, 2014 (B. McFadden Cross); TR00029, Hall Aff. ¶¶ 74–76.

[85]    TR00032, Anderson Reply Aff. ¶¶ 15–18; *see also* Trial Day 10 Tr. 2172:24–2176:18, May 29, 2014 (A. Anderson Direct); TR00029, Hall Aff. ¶ 74.

[86]    TR00032, Anderson Reply Aff. ¶¶ 5, 21–23; TR31304, Email from Angela de Wilton, NNL, to Vipin Aggarwal, *et al.* (Dec. 12, 2000, 3:09 p.m.), attaching Foreign Filing Practice Note, at NNC-NNL06521385/1.

(i) the United States had a relativity quick filing system (typically three to five years), (ii) Nortel had good attorney coverage in the United States, (iii) it is relativity inexpensive to file and maintain U.S. patents, and (iv) the U.S. market is large and lucrative compared its filing costs.[87]

69.     Following the adoption of the RPS methodology in 2001, and the execution of the MRDA beginning in 2004, the Nortel Group's standard practice was to first file all patents in the United States and subsequently file the top 25–30% of patents in other jurisdictions.[88] Approximately 50% of these non-U.S. filings were recommended to be in Europe and China, a further 10% in Korea, and 5% in each of India, Japan, and Canada.[89]

70.     Thus, the patents that the Nortel Group filed outside of the United States were those with the highest value.[90]

### D.     The Patent Assignment Process

71.     The Nortel Group's policy required employee-inventors to assign legal title to their patents to NNL, regardless of which Nortel entity employed the inventor.  NNL held legal title to IP on behalf of the RPEs for sound reasons of administration.  These included coordinating the

---

[87]     *See* TR00032, Anderson Reply Aff. ¶¶ 19–20.

[88]     *See* Trial Day 17 Tr. 4262:1–4263:9, June 18, 2014 (J. Kinrich Cross); TR00032, Anderson Reply Aff. ¶¶ 19, 23; TR21447, Email from Bill Junkin, NNL, to Brianna Hinojosa-Flores, NNI, *et al.* (May 11, 2006, 2:31 p.m.).

[89]     TR21447, Email from Bill Junkin, NNL, to Brianna Hinojosa-Flores, NNI, *et al.* (May 11, 2006, 2:31 p.m.); *see also* A. de Wilton Dep. Tr. 63:8–25, 64:17–68:22, Nov. 20, 2013; Trial Day 10 Tr. 2180:11–2182:25, May 29, 2014 (A. Anderson Direct); TR31304, Email from Angela de Wilton, NNL, to Vipin Aggarwal, *et al.* (Dec. 12, 2000, 3:09 p.m.), attaching Foreign Filing Practice Note, at NNC-NNL06521385/1.

[90]     *See* Trial Day 11 Tr. 2597:1–10, May 30, 2014 (J. Malackowski Cross); Trial Day 3 Tr. 752:12–754:13, May 14, 2014 (A. de Wilton Cross); Trial Day 17 Tr. 4262:1–4263:2, June 18, 2014 (J. Kinrich Cross).

exploitation and protection of the IP, giving NNL standing to enter into license agreements with third parties, and giving NNL standing to sue third parties for infringement.[91]

### 1.    Assignment of Legal Title from Employee-Inventors to NNL

72.    As described below, the MRDA, which governed the RPEs' transfer pricing from 2004, states that "legal title to any and all NN Technology whether now in existence or acquired or developed pursuant to the terms of this Agreement shall be vested in NNL."[92]  The MRDA also required that the other RPEs "shall execute or cause to be executed such documents reasonably requested by NNL as may be necessary or desirable to give effect to, or perfect the foregoing."[93]

73.    In practice, the Nortel Group effectuated the provisions of the MRDA noted above via a corporate policy that required all employees, "as a condition of employment or contract for services, to assign to Nortel Networks all rights to Inventions."[94]

74.    Nortel employment agreements also contained language regarding this corporate policy: "I hereby assign to and waive in favor of the Employer all my rights in and to all inventions . . . which I may conceive, develop or reduce to practice during the period of my employment with

---

[91]    *See* T. Collins Dep. Tr. 94:3–96:7, 206:16–210:6, Nov. 15, 2013; *see also* Trial Day 3 Tr. 761:22–764:1, May 14, 2014 (A. de Wilton Cross).

[92]    TR21003, MRDA art. 4(a) (Dec. 22, 2004), at NNC-NNL06001514/6.

[93]    TR21003, MRDA art. 4(b) (Dec. 22, 2004), at NNC-NNL06001514/6.

[94]    *See, e.g.*, TR40126, Corporate Procedure No. 501.03 § 4.1 (Jan. 23, 2004); TR40131, Corporate Policy No. 200.18 § 4.1 (Apr. 20, 2007); *see also* TR00006, Affidavit of Angela de Wilton ¶¶ 8–12, Apr. 11, 2014 [hereinafter "de Wilton Aff."] ("all employees, whether employed by NNL or a subsidiary, were required to assign directly or indirectly to NNL any intellectual property"); T. Collins Dep. Tr. 40:10–41:20, Nov. 15, 2013 ("The assignment was always to [NNL] because [NNL] was always the entity that held legal title to all of the intellectual property assets of the Nortel Networks group of companies.").

the Employer."[95]   Article 18 of a typical NNUK agreement states that all IP arising in the course

of employment – including patents for inventions – will belong to "Nortel."[96]   "Nortel" is

defined in Article 1 of the agreement as NNUK.

75.     In addition to employment agreements, Nortel also had its inventors sign assignment

agreements with NNL as assignee.  These agreements dealt with the employees' interests in their

inventions and stated that the employee-inventors "do[] sell, assign and transfer unto the

Assignee . . . the entire right, title and interest in and to the invention . . . to have and to hold for

the sole and exclusive use and benefit of the Assignee."[97]   As further explained below, these

assignments could not transfer the employers' interests in their employees' inventions.[98]

2.     *The Nortel Group's Corporate Policy of Vesting Legal Title in
       NNL*

76.     Angela Anderson, the former head of IP for EMEA, testified that it was common and a

"best practice" to have all patent applications filed in the name of a parent company.[99]   She also

gave evidence that "[a]ll patent applications were generally filed in the name of Nortel Networks

Limited ("NNL") regardless of where the invention underlying that patent occurred.   My

---

[95]   *E.g.*, TR48820, Nortel Networks Employee Agreement ¶ 2 (June 11, 2006); *see also* TR48819, Nortel
Networks Employee Agreement ¶ 3 (Apr. 13, 2002) ("During my employment by Company, all inventions,
discoveries or improvements . . . which I develop shall be the sole property of Company and I hereby assign
any and all such inventions to Company . . . ."); TR21500, Employment Agreement between Adam Bryan and
NNUK art. 18 (Nov. 19, 2003).

[96]   TR21500, Employment Agreement between Adam Bryant and NNUK art. 18 (Nov. 19, 2003).

[97]   *See* TR11115, Assignment for Backhauling of Call Signaling for Multiple Protocols, at 1 (Oct. 31, 2000), at
NNC-NNL11756002/6.

[98]   *See* Proposed Conclusions of Law § II.B.2.

[99]   *See* Trial Day 10 Tr. 2178:15–2179:4, May 29, 2014 (A. Anderson Direct).

understanding is that this was done for historical reasons, administrative convenience and potentially for tax reasons (although I am not familiar with any details in that area)."[100]

77.    The assignments and registrations did not change ownership.  For example, in November 2001, Timothy Collins, NNL's senior counsel for Optical Networks and Global Operations, wrote regarding the modification of Nortel's transfer pricing arrangement, "Theoretically, each of the participants could continue to own the intellectual property it creates, but continuing to assign all intellectual property to Nortel Networks Limited may provide some administrative simplicity."[101]  In a memorandum circulated in December 2001, Mr. Collins reiterated that it was "expected" that NNL would hold legal title to IP.[102]  Slides Mr. Collins circulated soon thereafter "suggest maintaining NNL as IPR owner for administrative simplicity."[103]

78.    At his deposition, Walter Henderson, a senior tax attorney at NNI, discussed the important difference between legal title and beneficial ownership in the context of the slides circulated by Mr. Collins:

> Legal title is meant to be who is the owner of property in the sense of a registered name.  That's been my experience.  And can be things like patent, any kind of registered IP, or even land or anything else that has a legal title.  Beneficial ownership refers to who has the benefits and burdens of the property and the right to

---

[100]    TR00032, Anderson Reply Aff. ¶ 18; *see also* Trial Day 5 Tr. 1201:7–1202:8, May 20, 2014 (W. Henderson Cross).

[101]    TR11114, Email from Timothy Collins, NNL, to Nicholas DeRoma, NNL, *et al.* (Nov. 7, 2001, 6:49 p.m.).

[102]    TR22143, Modification of R&D Cost Sharing Arrangement (Dec. 3, 2001).

[103]    TR11065, Email from Timothy Collins, NNL, to Gilles Fortier, NNL, *et al.* (Dec. 12, 2001, 10:11 a.m.), attaching Residual Profit Split Arrangement (RPSA) Proposal – Legal Issues, at 1 (Dec. 12, 2001).

use the property and often goes to who paid the cost to develop the property, or acquire the property.[104]

### E.    IP Created by Nortel Entities that Were Not Parties to the MRDA

79.    It should be noted that not all of the Nortel Group's IP was owned by the RPEs.  As described above, AREs, including Nortel France SAS and Nortel Germany, were former joint ventures that conducted some R&D[105] and owned patents outright.[106]  Thus, the AREs held legal title to and beneficial ownership of certain IP that was conveyed in the asset sales.[107]

## III.    NORTEL'S IP ARRANGEMENTS PRIOR TO THE MRDA CONFIRM THE PARTIES' BENEFICIAL OWNERSHIP OF GROUP IP

80.    The Nortel Group's transfer pricing arrangements under the R&D Cost Sharing Agreements ("CSAs") and its conduct under the RPS methodology leading up to the execution of the MRDA confirm the RPEs' beneficial ownership of IP and that all RPEs, including NNL, were treated the same whether the Group was sharing operating costs or profits and losses.

### A.    The R&D Cost Sharing Agreements

81.    From as early as 1978 through 2000, the Nortel Group entered into a series of CSAs in connection with the transfer pricing of costs incurred in the performance of R&D.[108]  By 2000,

---

[104]    W. Henderson Dep. Tr. 289:20–290:6, Oct. 4, 2013.

[105]    *See* TR00030, Huffard Report ¶ 29.

[106]    *See* TR00030, Huffard Report ¶ 29.

[107]    *See* TR00030, Huffard Report ¶¶ 29–30; TR00033, Malackowski Report 45–47.

[108]    *See, e.g.*, TR21002, Amended Cost Sharing Agreement between Northern Telecom Limited and Nortel Telecom Inc. (Jan. 1, 1992) [hereinafter "NNI CSA"] (amending 1978 agreement and prior amendments thereto); *see also* Trial Day 3 Tr. 611:1–13, May 14, 2014 (C. Allen Cross).

NNL had entered into CSAs with Nortel entities in the United Kingdom, France, Ireland, the United States, Japan, and Australia.[109]   The CSAs were approved by several revenue authorities – *i.e.*, the Canada Customs and Revenue Agency, later the Canada Revenue Agency ("CRA"), and the Internal Revenue Service ("IRS") in the United States – through a series of APAs.[110]

### 1.   How the CSAs Worked

82.   Under the CSAs, each participant "shared in the costs of R&D performed globally in proportion to the economic benefit received by the participant in its geographic territory."[111] Each participant's share of the Group's R&D costs was based on its proportional share of the Group's operating income.[112]

83.   Although annual balancing payments were made in order to adjust the amount of R&D spending borne by each participant to reflect its relative share of Group revenues, each participant was otherwise allowed to keep 100% of the revenues it collected from the exploitation of Nortel's IP in its operating territory.[113]

---

[109]   *See* TR33067, Cost Sharing Agreement between Northern Telecom Limited and Nortel Limited (Jan. 1, 1995) [hereinafter "NNUK CSA"]; TR46945, Cost Sharing Agreement between NNL and NNSA (Jan. 1, 2000); TR45043, Termination of Amended Cost Sharing Agreement between NNL and NN Ireland (Dec. 1, 2001) (terminating CSA in effect since January 1, 1992); TR21002, NNI CSA; TR47186, Amended Cost Sharing Agreement between Northern Telecom Limited and Nortel Australia Pty. Limited (Oct. 1, 1992); TR45045, Termination of Amended Cost Sharing Agreement between NNL and Nortel Networks Japan (Jan. 1, 2001) (terminating CSA in effect since April 1, 1991).

[110]   *See* TR32117, NNUK Transfer Pricing Report 27 (July 18, 2003).

[111]   TR00035, Expert Report of Richard V.L. Cooper 13 (Jan. 24, 2014) [hereinafter "Cooper Allocation Report"]; *see also* Trial Day 12 Tr. 2807:3–16, June 2, 2014 (R. Cooper Cross).

[112]   *See, e.g.*, TR33067, NNUK CSA art. 3.

[113]   *See, e.g.*, TR33067, NNUK CSA art. 3.

2.    *IP Ownership Under the CSAs*

84.    NNL administered the patent portfolio on behalf of the Group, and for this purpose, legal title to all of Nortel's IP was "vested" in NNL under the CSAs.[114]   In return, each CSA participant was granted an unrestricted, exclusive license to all of Nortel's IP in its operating territory.[115]  This was consistent with the integrated way in which R&D was performed and with joint ownership of all IP.

85.    The CSAs made clear that the participants "wish[ed] to share the costs and risks of research and development services or activities <u>in return for interests in any NT Technology</u> that may be produced by such services or activities."[116]  The net result of these arrangements was that "[f]rom an economic standpoint, each R&D cost sharing participant could be considered to 'own' the NT technology as it related to its specific region."[117]

## B.    The Adoption of the Residual Profit Split Methodology

86.    In 2001, Nortel abandoned the CSAs and adopted the RPS methodology for allocating the profits and losses of the Group among the RPEs because:  (i) the APAs for the CSAs had expired

---

[114]    *See, e.g.*, TR33067, NNUK CSA art. 4; *see also* TR00016, Declaration of Walter T. Henderson, Jr. ¶¶ 23, 55, Apr. 11, 2014 [hereinafter "<u>Henderson Decl.</u>"].

[115]    *See, e.g.*, TR33067, NNUK CSA art. 5; *see also* TR00032, Anderson Reply Aff. ¶ 38.

[116]    *See, e.g.*, TR33067, NNUK CSA at 1 (emphasis added).

[117]    TR22123, Horst Frisch Inc., Economic Analysis of Nortel Networks' Intercompany Transactions 10 (Mar. 14, 2002) [hereinafter "<u>Horst Frisch Report</u>"].

and the revenue authorities had given notice that they would not be renewed,[118] (ii) the IRS and CRA had suggested that Nortel adopt the RPS methodology,[119] and (iii) Nortel personnel and professional advisors, including Horst Frisch Inc. ("Horst Frisch"), a leading firm in the field of transfer pricing, had determined that the RPS methodology would be the best method for Nortel's business.[120]

87.     Instead of ensuring that each entity's R&D costs matched its proportionate share of Group operating income (or loss), the RPS methodology allocated the Group's residual profit (or loss) after routine returns based on each RPE's contributions to the creation of IP, as measured by relative R&D spending.[121]

1.     *The RPS Methodology Was Chosen to Meet the Arm's Length Standard*

88.     As the RPEs stated in the MRDA, the RPS methodology was adopted as the most appropriate arm's length transfer pricing method for the Nortel Group.[122]

89.     The Organisation for Economic Cooperation and Development ("OECD") guidelines regarding transactions between entities under common control include the broad principle of the

---

[118]   *See* TR11058, Overview of Objectives of December 12, 2001 Presentation (Dec. 2, 2001); TR00016, Henderson Decl. ¶ 31 (discussing TR11058); Trial Day 5 Tr. 1174:19–1175:5, May 20, 2014 (W. Henderson Cross).

[119]   *See* TR21003, MRDA sched. A (Dec. 22, 2004), at NNC-NNL06001514/18 ("The current transfer pricing methodology is the residual profit split method ('RPSM') which was adopted by the Participants at the request of the tax authorities.").

[120]   *See* TR00016, Henderson Decl. ¶¶ 29, 32; TR22123, Horst Frisch Report 3.

[121]   *See* TR00016, Henderson Decl. ¶¶ 37–38.

[122]   *See* TR21003, MRDA sched. A (Dec. 22, 2004), at NNC-NNL06001514/18.

arm's length standard.[123]   The arm's length standard is fundamental with respect to the transfer pricing regulations of the jurisdictions relevant to the proceeding,[124] and the principles for applying it are relatively uniform from country to country.[125]

90.     The transfer pricing experts for each of the Debtors agreed that the arm's length standard dictates that the price negotiated between two related parties should reflect the price two unrelated parties would set under the same facts and circumstances.[126]

91.     The arm's length standard is necessary because entities under common control, referred to by revenue authorities as "controlled entities," do not negotiate their arrangements the way independent commercial parties do.[127]   The arm's length standard has been developed in order to determine the true taxable income of each entity within a multinational corporate group by determining how entities acting at arm's length would allocate income in comparable, open market transactions or relationships.[128]   The guiding principle under the arm's length standard is

---

[123]   Trial Day 11 Tr. 2634:18–2635:9, May 30, 2014 (R. Cooper Direct).

[124]   Trial Day 12 Tr. 2716:12–17, June 2, 2014 (R. Cooper Cross).

[125]   Trial Day 16 Tr. 3962:18–3963:5, June 17, 2014 (T. Reichert Cross); *see also* Trial Day 12 Tr. 2717:16–2717:19, June 2, 2014 (R. Cooper Cross) (arm's length principle applied similarly in jurisdictions relevant to the proceedings).

[126]   *See* Trial Day 21 Tr. 4986:10–17, June 24, 2014 (L. Eden Direct); *see also* Trial Day 16 Tr. 3938:15–19, June 17, 2014 (T. Reichert Cross) (understanding that "arm's length standard aims to mimic behavior of hard bargaining market actors acting with interest adverse to one another"); Trial Day 11 Tr. 2691:2–4, May 30, 2014 (R. Cooper Direct) ("Arm's length return is what would parties reasonably have agreed to if operating at arm's length.").

[127]   Trial Day 16 Tr. 3963:25–3964:19, 3965:12–18, June 17, 2014 (T. Reichert Cross).

[128]   *See* Trial Day 21 Tr. 4993:20–4994:12, June 24, 2014 (L. Eden Direct); *see also* Trial Day 16 Tr. 3966:7–24, June 17, 2014 (T. Reichert Cross);  Trial Day 11 Tr. 2636:11–2637:15, May 30, 2014 (R. Cooper Direct).

that each entity in a multinational enterprise must be rewarded for the functions it performs and value it contributes to the enterprise based on what would be expected in transactions between independent commercial parties.[129]  The arm's length standard prevents a parent company, like NNL, from stripping value out of its foreign subsidiaries in a manner that might be permissible in relation to a domestic subsidiary.

### 2. How the RPS Methodology Worked

92.    While the formula for calculating the split of residual profits under RPS methodology differed in certain respects between 2001 to 2005 and 2006 to 2008, at all times each RPE's portion of residual profit or loss was based on its historical R&D spending.  The RPEs shared residual profits or losses according to their contribution to the creation of IP, measured by relative R&D spending.  From 2001 to 2005, R&D spending was amortized on a 30% declining basis,[130] while from 2006 to 2008, it was measured based on R&D spending over the previous five years with a one-year gestation period.[131]

---

[129]    *See* Trial Day 16 Tr. 3965:19–3966:18, June 17, 2014 (T. Reichert Cross); Trial Day 11 Tr. 2636:11–20, May 30, 2014 (R. Cooper Direct); Trial Day 21 Tr. 4986:6–17, June 24, 2014 (L. Eden Direct).

[130]    *See* TR21003, MRDA sched. A (Dec. 22, 2004), at NNC-NNL06001514/19; TR00035, Cooper Allocation Report 21–22.

[131]    *See* TR21003, Third Addendum sched. A (Jan. 2009), at NNC-NNL06001514/49; TR00035, Cooper Allocation Report 21–22.

93. Under the RPS methodology there was no transfer in ownership of IP. As explained further below, the RPEs all jointly held beneficial ownership, as evidenced by their sharing of residual profit and loss in proportion to their historical R&D spending.[132]

### C. The Record Confirms that for the Years Prior to the MRDA, the RPEs Held Beneficial Ownership of the Group's IP According to Their Respective Contributions to R&D

94. From the Nortel Group's adoption of the RPS methodology in 2001 until late 2004 when the MRDA was executed, the RPEs operated pursuant to the RPS methodology without any written contract.[133]

95. Throughout this period, Nortel's statements, conduct, and operations confirmed that the RPEs had beneficial ownership of the Group's IP and were entitled to share in the proceeds of exploitation of that IP according to their respective contributions to R&D. The best evidence of the RPEs' rights is how they actually behaved. In this case, that behavior is consistent only with the position of the EMEA Debtors. Again and again, the Nortel Group confronted the question of who owned Nortel's IP, and the answer was the same every time: the RPEs owned it jointly in accordance with their relative contributions to its creation.

---

[132] *See* TR00027, Affidavit of Aylwin Kersey Stephens ¶ 20, Apr. 11, 2014 [hereinafter "Stephens Aff."] ("I had understood that the RPSM participants owned Nortel's intellectual property and were entitled to receive the economic benefits from exploiting it in proportion to their relative contributions to the creation of that intellectual property."); TR00022, Affidavit of Philippe Albert-Lebrun ¶ 20, Apr. 11, 2014 [hereinafter "Albert-Lebrun Aff."] ("As it was impractical to determine for each element of Nortel's IP which entity owned what 'percentage' of that item of IP, I understood the RPSM was instead designed to be based on the joint ownership of substantially all of Nortel's IP. . . . The fact that NNSA was an economic owner of Nortel's intellectual property was a critical factor for justifying to me that NNSA could legitimately participate in the RPSM in its own interests.").

[133] *See* Trial Day 9 Tr. 1848:3–20, May 28, 2014 (M. Weisz Direct); TR21003, MRDA at 1 (Dec. 22, 2004), at NNC-NNL06001514/1.

### 1.    *2002 APA Q&A Document*

96.    The Nortel Group determined, at least as early as 2002, the answer to the very question at the core of this case.  Specifically, it concluded that beneficial or economic ownership of IP, as measured by contribution to R&D, would dictate the allocation of proceeds of a sale of Nortel's IP.  In fact, it prepared to tell the tax authorities as much, following rigorous internal review and input from external advisors.

97.    In March 2002, Nortel filed requests with the CRA, the IRS, and U.K. Inland Revenue ("IR"), later HM Revenue & Customs ("HMRC"), seeking approval of an APA.[134]  To kick off the APA process, Nortel scheduled a joint meeting with the three tax authorities on June 19, 2002 to discuss its business and its APA request.[135]  In preparation for the kick-off meeting, Nortel engaged advisors from Deloitte & Touche LLP ("Deloitte"), KPMG LLP, Horst Frisch, and Sutherland Asbill & Brennan LLP ("Sutherland") to assist in anticipating questions the tax authorities might ask during the meeting and in formulating Nortel's best responses.[136]

---

[134]    *See* TR22122, Letter from Kriss Bush, NNL, to Jim Gauvreau, CRA (Mar. 14, 2002), at EY-NRTL-001412; TR22122, Letter from Kriss Bush, NNL, to Sean Foley, IRS (Mar. 14, 2002), at EY-NRTL-001405; TR22122, Letter from Kriss Bush, NNL, to Ian Wood, IR (Mar. 27, 2002), at EY-NRTL-001401.

[135]    *See* TR22014, Email from MaryAnne Pahapill, NNL, to Jerry Cohen, Sutherland, *et al.* (June 5, 2002, 1:32 p.m.) (circulating dates and logistics for APA meetings to Sutherland and Horst Frisch advisors); TR22126, Email from Kriss Bush, NNL, to Douglas Beatty, NNL, *et al.* (June 19, 2002, 8:45 p.m.) (discussing meeting).

[136]    *See* TR22045, Email from Joëlle Hall, KPMG LLP, to MaryAnne Pahapill, NNL, *et al.* (June 7, 2002, 8:21 p.m.) (attaching a list of potential questions that could be raised by the tax authorities at the APA kick-off meeting along with sample answers); TR22016, Email from Rob O'Connor, Deloitte, to MaryAnne Pahapill, NNL, *et al.* (June 13, 2002, 4:55 p.m.) (sending a memorandum of further potential questions and sample answers); M. Pahapill Dep. Tr. 163:11–16, 164:9–12, Oct. 3, 2013 (describing how several people contributed to the questions and answers, including Deloitte, KPMG LLP, and Horst Frisch, to ensure that Nortel made accurate representations to the tax authorities); TR22126, Email from Kriss Bush, NNL, to Douglas Beatty, NNL, *et al.* (June 19, 2002, 8:45 p.m.) ("Many, many people have contributed to getting us this far . . . .").

98.     Nortel's advisors drafted a list of potential questions and answers (the "Q&A Document"), which they circulated to a group of Nortel executives and advisors preparing for the kick-off meeting for their comments and approval.[137]  Predicting potential inquiries from the tax authorities and formulating proposed responses was a significant part of Nortel's preparation for the meeting.  Nortel and its advisors met at least twice before the kick-off meeting to practice and prepare for the discussions with the tax authorities.[138]  They devoted substantial time to considering and developing Nortel's answers to potential tax authority inquiries.[139]

99.     MaryAnne Pahapill (now MaryAnne Poland), NNL's regional head of tax for Canada who spearheaded preparations for the kick-off meeting with the tax authorities, testified at her deposition that Nortel sought the input of numerous employees and outside advisors on the Q&A Document because it was very important that Nortel's representations to the tax authorities contained within that document were accurate.[140]  She stated that she would not have taken the Q&A Document into the kick-off meeting without knowing it was accurate.[141]

---

[137]   TR22045, Email from Joëlle Hall, KPMG LLP, to MaryAnne Pahapill, NNL, *et al.* (June 7, 2002, 8:21 p.m.) (early draft Q&A Document); TR48756, Email from Bill Morgan, Horst Frisch, to Mark Weisz, NNI (Aug. 12, 2004, 12:48 p.m.) (explaining the final Q&A Document and stating that "this process involved, at that time, Horst Frisch, SAB, KPMG, D&T, and Andersen -- different questions were answered by different advisers").

[138]   *See* TR22014, Email from MaryAnne Pahapill, NNL, to Jerry Cohen, Sutherland, *et al.* (June 5, 2002, 1:32 p.m.) (listing dates for "APA Dry Run," "APA Pre-meeting," and "APA Meeting").

[139]   *See, e.g.*, TR22015, APA Kick-Off Meeting–Dry Run Suggested Agenda (June 10, 2002) (scheduling two hours of the six-hour meeting to discuss anticipated questions).

[140]   M. Pahapill Dep. Tr. 163:2–23, 164:9–12, Oct. 3, 2013.

[141]   M. Pahapill Dep. Tr. 164:2–7, Oct. 3, 2013.

100.    At his deposition, Kriss Bush, NNL's vice-president and head of taxation, who also participated in the kick-off meeting with the tax authorities, reiterated that any Nortel executive's statements to the tax authorities, including his own, would have been accurate.[142]

101.    After participating in a practice session with Nortel representatives and its advisors on June 10, 2002 to prepare for the kick-off meeting with the tax authorities, Deloitte's Rob O'Connor considered additional potential questions and proposed "the most defensible/best answers from Nortel's perspective in the long run."[143]

102.    One question Mr. O'Connor anticipated could come up with the tax authorities was how Nortel would account for the future sale of its IP.[144]  He proposed that Nortel be prepared to respond that proceeds from the sale of IP would be allocated based on economic ownership as reflected in the RPEs' respective contributions to R&D.[145]  On June 13, 2002, KPMG LLP's Mary Furlin circulated comments and suggestions on Mr. O'Connor's memorandum.[146]  She adopted wholesale Mr. O'Connor's answer to the question of how Nortel would account for the proceeds of a future sale of its IP.[147]

---

[142]    K. Bush Dep. Tr. 53:2–9, Nov. 11, 2013.

[143]    TR22016, Email from Rob O'Connor, Deloitte, to MaryAnne Pahapill, NNL, *et al.* (June 13, 2002, 4:55 p.m.).

[144]    TR22017, Memorandum from Rob O'Connor, Deloitte, to Nortel Files, at 2–3 (June 12, 2002).

[145]    TR22017, Memorandum from Rob O'Connor, Deloitte, to Nortel Files, at 2–3 (June 12, 2002).

[146]    TR22018, Email from Mary Furlin, KPMG LLP, to MaryAnne Pahapill, NNL, *et al.* (June 13, 2002, 7:42 p.m.).

[147]    TR22018, Email from Mary Furlin, KPMG LLP, to MaryAnne Pahapill, NNL, *et al.* (June 13, 2002, 7:42 p.m.), at 3.

103.    By June 17, 2002, Nortel and its advisors had finalized the list of potential questions and sample answers for the meeting with the tax authorities.[148]   In the final version of the Q&A Document, the answer to this important question remained unchanged.  Specifically, Nortel was prepared to represent to the tax authorities of the United States, United Kingdom, and Canada as follows:

> [Q:]  How does Nortel propose to account for any future sale of intellectual property developed prior to or during the term of the APA?  Which entities are considered the legal owner of IP and which are considered the economic owners?
>
> [A:]  Proceeds from the sale of IP will be allocated to residual profit split participants on the basis of their economic ownership of the IP – that is, on the basis of their share of total R&D capital stock in the year of sale.[149]

104.    Ms. Pahapill testified that Nortel representatives took this document into the meeting with the tax authorities on June 19, 2002 and were prepared to respond with the sample answers if the tax authorities raised the relevant issues.[150]

105.    The record does not reflect one way or the other whether this key question was in fact asked.  What the record does establish without doubt is that as early as 2002, Nortel was prepared to explain to the Canadian, U.S., and U.K. tax authorities that it planned to allocate the proceeds of future sales of its jointly created IP based on the RPEs' economic ownership of that IP, as measured by their respective contributions to R&D.

---

[148]   M. Pahapill Dep. Tr. 162:18–24, Oct. 3, 2013 ("Q.  So this document was the base of the questions and answers for the meeting to make sure that the Nortel team was all on the same page in this, correct?  . . . THE WITNESS:  It would appear so.").

[149]   TR22020, APA Kick Off Meeting: Potential Questions and Sample Answers, at 39 (June 17, 2002).

[150]   M. Pahapill Dep. Tr. 164:16–21, Oct. 3, 2013.

106.    Nortel continued to reference this document after the meeting and circulate it between its advisors as a reference leading up to the execution of the MRDA.[151]  For example, in 2004, Bill Morgan of Horst Frisch sent Mark Weisz, NNI's director of international tax and a trial witness for the U.S. Debtors, this document as a source for answers to questions Mr. Weisz had regarding IP ownership and Nortel's intercompany arrangements.[152]

### 2.    2002 Memo to Legal Counsel

107.    Also in 2002, Nortel confirmed to its outside legal counsel that the RPEs beneficially owned Nortel IP.  James Gatley, NNL's transfer pricing leader, wrote to Scott Wilkie, a transfer pricing lawyer at NNL's Canadian tax counsel, Osler Hoskin & Harcourt LLP ("Oslers"), seeking Mr. Wilkie's advice on the implications and structure of NNSA potentially exiting the RPS methodology (which ultimately never occurred).[153]  As part of his instructions to Mr. Wilkie, Mr. Gatley stated as a background fact that "the effect of the RPS model is that the future intangibles developed are beneficially owned" by the RPEs.[154]

108.    At his deposition, Mr. Gatley discussed economic and beneficial ownership from his perspective as NNL's transfer pricing leader:

---

[151]    *See* TR22019, Email from Gilles Fortier, NNL, to James Gatley, NNL (May 20, 2003, 5:27 p.m.) (circulating document); TR50625.01, Email from James Gatley, NNL, to Jerry Cohen, Sutherland (May 23, 2003, 1:30 p.m.) (same); TR48756, Email from Bill Morgan, Horst Frisch, to Mark Weisz, NNI (Aug. 12, 2004, 12:48 p.m.) (same).

[152]    TR48756, Email from Bill Morgan, Horst Frisch, to Mark Weisz, NNI (Aug. 12, 2004, 12:48 p.m.).

[153]    *See generally* TR21382, Memorandum from James Gatley, NNL, to Scott Wilkie, Oslers (Nov. 14, 2002).

[154]    TR21382, Memorandum from James Gatley, NNL, to Scott Wilkie, Oslers, at 1 (Nov. 14, 2002).

Q.  Can you explain to me what you understood the difference between legal and beneficial ownership is, as a transfer pricing tax person?

A.  . . . .  "Legal ownership" is something we are not really concerned with at all.  In fact, less than that:  I'm not concerned with legal ownership at all when it comes to transfer pricing analysis.  I don't care who owns the intangibles from a legal perspective or the patents.  I've never bothered to look those issues up.  Never asked the question.  If somebody told me, I wouldn't write it down.   That's how much I don't care about legal ownership.  "Economic ownership" is much different.  . . . .  And what that entails basically is -- try to -- try to explain this properly – basically trying to compensate parties, companies, in the intercompany transactions based on what would be considered fair given what they have contributed either financially or through their time.[155]

109.    Mr. Gatley went on to explain that the legal registration of the patents in NNL's name "means nothing," and what matters for transfer pricing is that "everybody who helped develop that intellectual property is compensated properly for their efforts through the transfer pricing model."[156]

110.    Mr. Gatley's testimony is not merely an abstract discussion of transfer pricing concepts. Walter Henderson, a senior tax attorney at NNI, testified that tax and transfer pricing arrangements must reflect substantive economic reality and that companies cannot make one set of arrangements for tax and transfer pricing purposes and then make another set of arrangements for another purpose.[157]

---

[155]    J. Gatley Dep. Tr. 250:15–252:7, Nov. 7, 2013.

[156]    J. Gatley Dep. Tr. 252:14–253:8, Nov. 7, 2013.

[157]    Trial Day 5 Tr. 1135:22–1137:1, May 20, 2014 (W. Henderson Cross).

### 3.    2003 Joint APA Response

111.    In September 2003, NNL, NNI, and NNUK prepared a joint response to questions posed by the Canadian, U.S., and U.K. tax authorities in connection with their APA request.[158]  In their response, they expressly referred to the RPEs jointly, not merely NNL, as the "owners of the intangible property."[159]

### 4.    2003 IP Migration Analysis

112.    In 2003, Nortel was considering transferring IP from NNUK and NNSA to NNL.  Such a transfer was only necessary if NNUK and NNSA owned the IP, which NNL now denies.  Nortel valued NNUK's and NNSA's interests in the IP based on their relative contributions to R&D, explaining, "Nortel IP value allocated to UK and France based on anticipated benefits from IP; used relative capitalized R&D for transfer pricing purposes since under RPS, forms basis of profit allocation."[160]  This transfer did not ultimately take place, and NNUK and NNSA continued to beneficially own these IP assets.[161]

### 5.    2004 Functional Analysis

113.    As Nortel was beginning to finalize the MRDA in 2004, it again explained to the tax authorities that the RPEs' beneficial ownership interests were commensurate with their relative contributions to R&D.

---

[158]   TR11169, APA Responses to Questions Posed by IR, IRS, and CRA, at 2 (Sept. 2003).

[159]   TR11169, APA Responses to Questions Posed by IR, IRS, and CRA, at 25 (Sept. 2003).

[160]   See TR21526, Email from Jason Swales, NNL, to Karina O, NNL, et al. (Oct. 1, 2003, 9:44 p.m.), attaching IP Migration:  IP Sale Analysis, at slide 4.

[161]   See TR00042, Green Report app. L at 2.

114.    Specifically, Nortel commissioned a "<u>Functional Analysis</u>" from Ernst & Young (Canada) for the tax authorities in the United States, United Kingdom, and Canada.[162]  The Functional Analysis emphasized that the RPEs each performed R&D for the Group and were "responsible for ongoing entrepreneurship and risk-taking functions with respect to the IP arising from their collective R&D efforts," and that therefore "[t]he allocation of the Company's profit or loss should be commensurate with its risks associated with the company's R&D."[163]

115.    Mr. Weisz, who was integrally involved in preparing the Functional Analysis, confirmed at his deposition that the RPEs were the risk takers in the Nortel Group who had economic rights to exploit the Group's IP and would expect to share in the proceeds of sale of that IP.[164]

116.    Philippe Albert-Lebrun, the financial controller for NNSA and a trial witness for the EMEA Debtors, further confirmed these principles at trial.[165]  Mr. Albert-Lebrun was initially concerned that the MRDA, which would confirm the implementation of the RPS methodology, was not in NNSA's best interests.[166] The reason he ultimately concluded that NNSA could agree to the MRDA was that "NNSA would retain a shared right to benefit from Nortel's IP in the

---

[162]    TR21407, Functional Analysis.

[163]    TR21407, Functional Analysis at 7, 48; *see also* TR21407, Letter from David J. Canale, Ernst & Young, to Thomas Ralph, IRS, at 2 (Nov. 30, 2004) ("Consistent with this and the functions performed and risks assumed, each [RPE] should share equitably in the residual profits and losses of Nortel.").

[164]    M. Weisz Dep. Tr. 113:8–114:17, Nov. 25, 2013.

[165]    *See* Trial Day 6 Tr. 1508:19–1509:2, 1509:17–1510:21, May 21, 2014 (P. Albert-Lebrun Cross) ("The [RPEs] were owning the entire IP, and that was their entrepreneurial investment, that they would bear the risk and the rewards.").

[166]    TR00022, Albert-Lebrun Aff. ¶¶ 16–18.

future," based on its contributions to R&D, and that it was "never suggested to [him] that NNSA

. . . was limited under the RPSM to sharing the profits and losses of the whole Group without any

potential future upside in the IP."[167]

### 6.    2004 Allocation of Foundry Settlement Proceeds

117.    When Nortel settled significant patent infringement litigation with a competitor, it shared

the proceeds of the settlement among the RPEs based on their respective contributions to R&D.

118.    In March 2001, NNL and NNI sued a Nortel competitor, Foundry Networks, Inc., in the

United States, alleging that Foundry infringed several Nortel patents.[168]    Nortel settled the

Foundry litigation in late 2004,[169] which required Foundry to pay Nortel $35 million in respect of

past infringement and prospective royalties.[170]    Nortel treated this settlement payment as royalty

income for tax purposes.[171]

---

[167]    TR00022, Albert-Lebrun Aff. ¶¶ 19–24; *see also* TR48763, NNSA Functional Analysis for the Years Ended Dec. 31, 2000–2004, at 6–7, 99–100; TR31120, Nortel Networks S.A. Transfer Pricing – Meeting with French Tax Authorities, at 19, 26 (Mar. 9, 2006) ("Sharing in profits allows NNSA to benefit from Nortel's global R&D efforts; RPS will benefit NNSA in the long term."); *cf.* C. Rogeau Dep. Tr. 55:14–56:9, Dec. 12, 2013 ("[W]e only agreed to terminate the licenses because we considered that we were entitled to a share of the proceeds.").

[168]    TR22084, Complaint, *Nortel Networks Inc. v. Foundry Networks, Inc.*, No. 01-10442DPW (D. Mass. Mar. 14, 2001) [hereinafter "Foundry Complaint"].

[169]    TR21167, Email from Louis Farr, NNI, to Laurie Krebs, NNI, *et al.* (Jan. 13, 2005, 12:13 p.m.), attaching Nortel Networks/Foundry Networks Confidential License Agreement (Oct. 25, 2004).

[170]    TR21167, Email from Louis Farr, NNI, to Laurie Krebs, NNI, *et al.* (Jan. 13, 2005, 12:13 p.m.), at NNC-NNL11029235/1.

[171]    TR21167, Email from Louis Farr, NNI, to Laurie Krebs, NNI, *et al.* (Jan. 13, 2005, 12:13 p.m.), at NNC-NNL11029235/1.

119.    Although NNL held legal title to the patents at issue in the Foundry litigation, NNL did not keep the $35 million proceeds from the Foundry settlement.  Instead, the RPEs shared the proceeds in proportion to their R&D contributions.[172]  This shared allocation of the settlement proceeds was consistent with representations regarding IP ownership that NNL made in its licensing agreement with Foundry.  NNL specified that "Nortel and its Subsidiaries own the US Patents" that were in dispute in that litigation.[173]

### D.    NNL Performed the Same Functions and Received the Same Benefits as the Other RPEs in Relation to IP

#### 1.    NNL Shared Profits and Losses As Did the Other RPEs

120.    The RPEs each shared in the Nortel Group's profits and losses under the RPS methodology as "Participants" under the MRDA.  In other words, the RPS methodology treated NNL the same as the other RPEs.  This point is undisputed and supported by witnesses at trial,[174] Nortel's representations to tax authorities,[175] and the MRDA itself.[176]

---

[172]    *See* TR41278, Foundry Journal Entry (Dec. 8, 2004) (allocation of settlement includes "regional split based on the Residual Profit Sharing (RPS) percentages provided by TAX").

[173]    TR21167, Nortel Networks/Foundry Networks Confidential License Agreement at 1 (first recital) (Oct. 25, 2004), at NNC-NNL11029237/1.

[174]    Trial Day 5 Tr. 1142:4–9, May 20, 2014 (W. Henderson Cross); Trial Day 11 Tr. 2683:20–2686:3, May 30, 2014 (R. Cooper Direct).

[175]    TR21407, Functional Analysis at 48, 94–95; TR22078, NNL-NNI Joint APA Request at 23; TR48622.02, NNL Transfer Pricing Report for the Taxation Year Ended Dec. 31, 2009, at 113–14 (Oct. 29, 2010).

[176]    TR21003, MRDA sched. A.

2.    *NNL Was Not Entitled to Receive – and Did Not Receive – Any Additional Return for Holding Legal Title to or Administering Nortel's IP*

121.    NNL did not receive any increased share of residual profits under the RPS methodology because it held legal title to and administered the Nortel Group's IP.  This was confirmed by fact witness testimony from John Doolittle, NNL's vice-president of tax and postpetition chief financial officer, Mr. Weisz, and Mr. Henderson.[177]

122.    The expert witnesses agreed.  According to Dr. Richard Cooper, a transfer pricing expert and trial witness for the EMEA Debtors, as well as Dr. Lorraine Eden, transfer pricing expert for the U.S. Debtors, NNL received no additional allocation of profits based on its holding legal title, as residual profit allocations came from the creation of IP.[178]

123.    NNL was responsible for registering Nortel's IP.[179]  As explained by Dr. Cooper, NNL's expenses for administering Nortel's IP were shared among the RPEs through the RPS methodology.[180]  Nortel also represented to the revenue authorities that NNL was entitled to receive a routine return for administrative functions it performed for the benefit of the Group.[181]

---

[177]    J. Doolittle Dep. Tr. 117:10–15, Dec. 5, 2013; M. Weisz Dep. Tr. 118:10–119:5, Nov. 25, 2013; Trial Day 5 Tr. 1141:15–1142:20, May 20, 2014 (W. Henderson Cross).

[178]    Trial Day 11 Tr. 2669:20–2670:8, May 30, 2014 (R. Cooper Direct); Trial Day 21 Tr. 5043:13–17, June 24, 2014 (L. Eden Cross).

[179]    Trial Day 6 Tr. 1281:6–1284:2, May 21, 2014 (M. Orlando Direct); TR22078, NNL-NNI Joint APA Request, app. A at 2, 4; TR48622.02, NNL Transfer Pricing Report for the Taxation Year Ended Dec. 31, 2009, at 39 (Oct. 29, 2010).

[180]    *See* Trial Day 11 Tr. 2669:2–2671:6, May 30, 2014 (R. Cooper Direct) (describing how NNL was compensated for its role as the administrator of the Group's IP through the RPS methodology).

However, NNL was not entitled to, and did not receive, any additional allocation of residual profit or loss on account of its administration of the Group's IP.

## IV.  THE MRDA DRAFTING HISTORY CONFIRMS THE RPES' BENEFICIAL OWNERSHIP OF GROUP IP

124.    The drafting history and terms of the MRDA, as well as the RPEs' conduct and course of performance under the MRDA (described below), confirm the RPEs' beneficial ownership of IP.

### A.    Background

125.    In 2004, the Nortel Group decided to document the RPS methodology in a written agreement, the MRDA, for at least two reasons.  First, for dealing with third parties, it was helpful to have a written document that addressed the RPS methodology, legal title, and licensing.[182]  In addition, the Group's outside legal advisors at Sutherland advised that having a written agreement might assist in pushing the APA negotiations with the IRS and CRA to a positive conclusion.[183]

126.    The MRDA contractualized the transfer pricing arrangements of the RPEs that had existed since 2001 in a manner that respected the RPEs' existing rights as required by the arm's

---

(Footnote continued from previous page)

[181]    *See* TR22078, NNL-NNI Joint APA Request at 44–48, 51 (discussing how NNL would have received a routine return for the administrative functions it performed for the benefit of the Group).

[182]    *See* TR11107, Email from Eric Jensen, NNI, to Arthur Fisher, NNI (May 26, 2004, 6:02 p.m.); *see also* TR45462, Email from James Gatley, NNL, to Eric Jensen, NNI, *et al.* (Feb. 6, 2004, 3:32 p.m.).

[183]    G. Sparagna Dep. Tr. 129:8–131:2, Dec. 10, 2013.

length standard.[184]   According to Mark Weisz, NNI's director of international tax and a trial witness for the U.S. Debtors, it was "prudent to get a document to reflect the economics of what has been transacting in our business for quite some time" as non-APA RPEs were subject to audit at any time.[185]

127.    Those involved with the drafting of the MRDA included:  Mr. Weisz, Giovanna Sparagna (a partner at Sutherland), Scott Wilkie (a transfer pricing lawyer at Oslers),  John Doolittle (NNL's vice-president of tax and postpetition chief financial officer), as well Ernst & Young U.S., Horst Frisch, and internal legal personnel.[186]

### B.    Legal Title and IP Ownership

128.    In an email sent to Mr. Doolittle, Mr. Weisz wrote that, through the MRDA, "[t]he beneficial ownership resides today with the RPS companies and this is what we will contractualize."[187]

129.    While the tax department was concerned with memorializing the beneficial ownership interests of the RPEs, the legal department was more focused on defining the relevant IP rights "from a licensing, litigation and defense perspective."[188]

---

[184]    Trial Day 9 Tr. 1848:3–7, May 28, 2014 (M. Weisz Direct).

[185]    Trial Day 9 Tr. 1848:12–20, May 28, 2014 (M. Weisz Direct).

[186]    Trial Day 9 Tr. 1847:3–23, May 28, 2014 (M. Weisz Direct).

[187]    TR45465, Email from Mark Weisz, NNI, to John Doolittle, NNL (Apr. 12, 2004, 9:52 a.m.); Trial Day 9 Tr. 1850:5–18, May 28, 2014 (M. Weisz Direct).

[188]    See TR11106, Email from Eric Jensen, NNI, to Mark Weisz, NNI, et al. (Apr. 12, 2004, 4:48 p.m).

130.    Critically, the drafters of the MRDA considered and rejected the very position now advanced by the Canadian Debtors.  During the drafting process, a reference to NNL holding "legal title and legal ownership" to NN Technology was included in a draft.[189]  In commenting on the draft, Mr. Wilkie noted that the inclusion of this language would have been contrary to the true relations of the RPEs:

> The philosophical concern that I have . . . is a stronger implication that NNL is the "real owner" of the IP and that the Participants derive their rights from NNL, as licensees, rather than as a consequence of having earned them in their own right as participants in the R&D program.[190]

131.    Consistent with Mr. Wilkie's concerns that ascribing "legal ownership" to NNL would not reflect the true rights of the RPEs, the reference to "legal ownership" was removed.  The final version of Article 4(a) of the MRDA vests only "legal title" in NNL.[191]

### C.    Finalizing and Executing the MRDA

132.    In December 2004, an audit of NNSA began in France and Mr. Weisz pushed to have the final MRDA signed by the end of the month.[192]  It was believed to be beneficial to have the

---

[189]    A draft circulated October 14, 2004 included the following Article 4(a): "Except as otherwise specifically agreed, legal title and legal ownership to any and all NN Technology acquired or developed as contemplated by this Agreement will be held solely by NNL." TR50579.02, Draft MRDA art. 4(a) (emphasis added).

[190]    TR11349, Email from Scott Wilkie, Oslers, to Mark Weisz, NNI, *et al.* (Oct. 18, 2004, 4:13 p.m.).

[191]    *See* TR21003, MRDA art. 4(a) (Dec. 22, 2004), at NNC-NNL06001514/6; Trial Day 9 Tr. 1914:11–1915:15, May 28, 2014 (M. Weisz Redirect).

[192]    TR31101, Email from Mark Weisz, NNI, to Giovanna Sparagna, Sutherland, *et al.* (Dec. 20, 2004, 2:30 p.m.).

Group's transfer pricing methodology reflected in a written agreement,[193] a fact that was later confirmed in the French tax authorities' assessment of the audit:

> No signed and dated contract evidencing the legal application of this new agreement was submitted to the audit department. Nor was any French-specific documentation, drawn up prior to the introduction of the new transfer pricing policy, submitted to the audit department. The documentation submitted to the audit department was drawn up for the purposes of the tax audit (presentation of May 31,2005 and functional analysis of the Nortel group).[194]

133.    Philippe Albert-Lebrun, the financial controller for NNSA and a trial witness for the EMEA Debtors, understood that the MRDA was being drafted in 2004 in part to alleviate the French tax authorities' concerns with the lack of written agreement outlining the Group's transfer pricing methodology.[195]

134.    In late 2004, Nortel finalized the MRDA, which was executed by the RPEs in 2004 and 2005.[196]  When circulating the final draft of the MRDA, Mr. Weisz wrote, "This agreement formalizes the operating arrangements which have been in effect and agreed to verbally since January 1, 2001 between the RPEs concerning IP legal ownership and beneficial ownership for

---

[193]    Trial Day 8 Tr. 1718:2–9, May 27, 2014 (K. Stephens Direct).

[194]    TR40499.08, Letter from P. Redon and M. Souloumiac, French tax authority, to NNSA, at 4 (Dec. 22, 2006).

[195]    TR00022, Albert-Lebrun Aff. ¶ 22.

[196]    TR41156.01, Email from Mark Weisz, NNI, to Rosanne Culina, NNL, *et al.* (Dec. 22, 2004, 2:38 p.m.); Trial Day 9 Tr. 1903:21–1904:15, May 28, 2014 (M. Weisz Recross).

tax purposes."[197]    Dated as of December 22, 2004, the MRDA was stated to be effective retroactively to January 1, 2001.[198]

## V.    THE RECORD FROM THE MRDA PERIOD CONFIRMS THAT THE PROCEEDS FROM EXPLOITING IP WERE SHARED ACCORDING TO THE RPES' RELATIVE CONTRIBUTIONS TO CREATING THE IP

135.    After the MRDA was fully signed in mid-2005, Nortel's statements, conduct, and operations confirmed that nothing had changed with respect to ownership.  The RPEs continued to beneficially own the IP and were entitled to share in the proceeds of the exploitation of that IP according to their respective contributions to R&D.

### A.    2006 NNSA Impairment Test

136.    The Nortel Group explicitly recognized NNSA's ownership of significant IP assets based on its contribution to R&D when, in 2006, it had to determine whether to write down the value of NNSA on Nortel's financial statements in light of ongoing losses.[199]  The company concluded that no such write-down was necessary because "NN SA participates in R&D and with the other Nortel R&D participants across the world owns a share in the IP that has been generated over years of R&D," and that ownership share of a "significant" IP asset had "real economical value."[200]

---

[197]    TR41156.01, Email from Mark Weisz, NNI, to Rosanne Culina, NNL, *et al.* (Dec. 22, 2004, 2:38 p.m.).

[198]    TR21003, MRDA at 1 (Dec. 22, 2004), at NNC-NNL06001514/1.

[199]    TR00022, Albert-Lebrun Aff. ¶ 29.

[200]    TR11206, Email from Tony Mcardle, EMEA, to Ryan Smith, NNI, *et al.* (Sept. 20, 2006, 10:53 a.m.); R. Smith Dep. Tr. 322:7–323:24, Oct. 22, 2013; *see also* TR00022, Albert-Lebrun Aff. ¶ 30.

B.      **2006–2008 Royalty Revenue Allocated Among RPEs**

137.    From at least 2006 onward, the RPEs shared revenue the Nortel Group earned from licensing its patents to third parties based on the RPEs' respective contributions to R&D. This revenue sharing was directly incorporated in the RPS calculations.[201]

138.    Kerry Stephens, a member of the EMEA tax department and trial witness for the EMEA Debtors, described how royalty revenues that Nortel received through the Foundry settlement and a license of its IP to Microsoft[202] were shared between the RPEs. To his knowledge, no one ever took the position that as legal title holder NNL should receive 100% of these royalty revenues.[203]  NNL now maintains that the other RPEs only held limited licenses that entitled them to nothing with respect to licensing to third parties.  The RPEs' own behavior is entirely to the contrary.

139.    By late 2009, when Global IP Law Group, LLC ("Global IP") was assessing the Group's patent portfolio, Nortel had entered into numerous strategic alliances with competitors by cross-licensing its technology to ███████████████████████████████████ among

---

[201]   *See* TR49191, Q4 2006 Post 2005 TPM, at tab "Operating Income Adjustments"; TR49193, Q4 2007 TP Calculation, at tab "RPS Participants"; TR49189, Final 2008 Q4 Transfer Pricing Adjustments, at tabs "RPS Participants," "10K Reconciliation," and "Input Documentation"; TR48622.02, NNL Transfer Pricing Report for the Taxation Year Ended Dec. 31, 2009, at 122 (Oct. 29, 2010) (noting that "royalty income received from licensing technology to third parties" is included in the RPS calculation).

[202]   *See* TR48676, Patent Cross License Agreement (July 17, 2006).

[203]   Trial Day 8 Tr. 1729:6–1730:23, May 27, 2014 (K. Stephens Direct).

others.[204]  Global IP concluded that "Nortel has a successful licensing history.  Nortel's previous efforts, while limited, have generated more than $157 million in revenue."[205]  These revenues were all shared via the RPS methodology, contrary to the Canadian Debtors' current position.

### C.    2006 UMTS Sale to Alcatel

140.    In late 2006, in connection with the most significant prepetition sale of a business in Nortel's history – the sale of the UMTS business to Alcatel – the Nortel Group recognized that the MRDA does not address, much less dictate, the allocation of sale proceeds attributable to IP. Instead, the RPEs recognized that their underlying economic and beneficial ownership interests should dictate the allocation, and they shared the sale proceeds according to their respective contributions to R&D.[206]

141.    Just as it had in its license agreement with Foundry, NNL represented to Alcatel that all of the RPEs owned the IP.  The agreement governing the Alcatel sale stated that all of the designated sellers, defined in the agreement to include NNL and its affiliates, owned the IP that was sold.[207]

---

[204]    TR22097, Global IP, Patent Portfolio Analysis Phase One, Ottawa Presentation, at 20–22 (Dec 16, 2009); TR43655, Global IP, Patent Portfolio Analysis Phase One, Board of Directors Presentation, at 9–10 (Jan. 29, 2010).

[205]    TR43655, Global IP, Patent Portfolio Analysis Phase One, Board of Directors Presentation, at 7, 31 (Jan 29, 2010).

[206]    M. Weisz Dep. Tr. 139:23–140:24, Nov. 25, 2013; TR00027, Stephens Aff. ¶ 48; TR21165, Memorandum from the Nortel Global Initiatives Group to the Project Osiris Files, at 2–3 (Feb. 15, 2007), at NNC-NNL06121235/2–3.

[207]    TR31585, Share and Asset Sale Agreement between Nortel and Alcatel Lucent Ex. 4.3 § 3.1 (Dec. 4, 2006), at NNC-NNL06026778/52.

142.    Pursuant to the sale agreement, Alcatel had the right – subject to Nortel's objection – to determine how the purchase price would be allocated to various classes of assets.[208]   Alcatel allocated the purchase price between four asset classes, which Nortel accepted:  tangible assets, customer relationships, IP, and a residual goodwill category.[209]   Nortel then had the discretion to allocate the proceeds attributable to each of these four asset classes among the various Nortel entities that owned the assets.[210]

143.    Nortel recognized that the MRDA did not address how to allocate the proceeds of a sale of IP and that the underlying economic and beneficial ownership interests of the RPEs should dictate the allocation.[211]   Nortel therefore considered various approaches and ultimately chose to allocate the sale proceeds attributable to IP according to the RPEs' respective contributions to R&D.[212]

---

[208]    TR31585, Share and Asset Sale Agreement between Nortel and Alcatel Lucent Ex. 2.2.7(i), (ii) (Dec. 4, 2006), at NNCNNL06026778/57–58; *see also* TR21165, Memorandum from the Nortel Global Initiatives Group to the Project Osiris Files, at 1 (Feb. 15, 2007), at NNC-NNL06121235/1 ("Alcatel had right to allocate intangible consideration over asset categories . . . ."); Trial Day 8 Tr. 1731:9–21, May 27, 2014 (K. Stephens Direct).

[209]    *See* TR00027, Stephens Aff. ¶ 27; TR21165, Memorandum from the Nortel Global Initiatives Group to the Project Osiris Files, at 1 (Feb. 15, 2007), at NNC-NNL06121235/1.

[210]    TR00027, Stephens Aff. ¶ 28 ("While the purchaser had the right to allocate the purchase price across the various asset classes, Nortel had the right to allocate the consideration by asset class to each selling entity within the Nortel Group as it deemed appropriate."); TR31560, Nortel/Alcatel Purchase Price Allocation Asset Allocation Statement (July 24, 2007) (allocating value across Nortel entities from fixed assets, inventory, customer relationship intangibles, IP, and goodwill).

[211]    M. Weisz Dep. Tr. 139:23–140:24, Nov. 25, 2013; TR00027, Stephens Aff. ¶ 48; TR21165, Memorandum from the Nortel Global Initiatives Group to the Project Osiris Files, at 2–3 (Feb. 15, 2007), at NNC-NNL06121235/2–3.

[212]    TR00027, Stephens Aff. ¶¶ 43–45.

144.    Specifically, Nortel used the 2006 RPS percentages calculated pursuant to the way the company measured R&D contributions at the time.[213]   Those calculations reflected the 30% declining balance method used under the MRDA between 2001 and 2005.[214]

145.    Shortly before the insolvency filings, the Third Addendum retroactively amended the calculation of R&D contributions to a straight five-year look-back effective as of January 1, 2006.[215]   Even though this effective date was before the Alcatel sale, the Alcatel allocation was not changed.   The precise formula under the MRDA was not and had never been binding except as to operating profits and losses; it was merely a convenient tool that was broadly consistent with the RPEs' underlying rights.   The Courts have now heard far more extensive evidence on the right measure of R&D contribution, which Nortel had not been required to consider in allocating the proceeds of the sale to Alcatel.

146.    Numerous Nortel employees who were substantially involved in the Alcatel transaction, including Rosanne Culina, NNL's leader of Canadian tax, Peter Look, NNL's global head of tax, Louis Farr, a tax lawyer at NNI, Michael Orlando, a member of international tax and transfer pricing at NNI and a trial witness for the U.S. Debtors, and Mr. Stephens, all agreed that

---

[213]    TR00027, Stephens Aff. ¶ 48 (stating that IP value "was allocated in accordance with the then-prevailing RPS percentages").

[214]    TR00035, Cooper Allocation Report 21–22.

[215]    TR21003, Third Addendum sched. A (Jan. 2009), at NNC-NNL06001514/49.

allocating the Alcatel proceeds attributable to IP based on the RPEs' contribution to R&D was the appropriate approach due to the RPEs' shared ownership of the IP.[216]

147.    Nortel gave serious consideration to the basis for its IP allocation approach and prepared summary materials to explain its approach to its auditors.  For example, Mr. Farr explained to Nortel's auditors that Nortel chose to allocate the value of the IP in accordance with the RPEs' underlying joint ownership of all of the Group's IP:

> The value for IPR was allocated using RPS percentages.  RPS determines how profits and losses are shared.  If UMTS access was not sold, all of the RPS members would share profits and losses associated with the business.  Since RPS determines the economic relationships between the parties, all rights associated with the IPR should be shared based on RPS percentages.  This is also consistent with Nortel's view that all Nortel IPR is indistinguishable such that all value should be shared among the RPS members.[217]

148.    Mr. Orlando and Mr. Stephens drafted a memorandum regarding the Alcatel sale which was sent to Nortel's auditors after it was approved by Mr. Look in which they stated, "While NNL generally is the legal owner of the technology, the [MRDA] determines the economic ownership of it and thus allocation of the consideration by proportionate R&D Capital Stock is appropriate."[218]

---

[216]    *See* R. Culina Dep. Tr. 67:13–68:5, Oct. 17, 2013; Trial Day 6 Tr. 1309:24–1311:7, May 21, 2014 (M. Orlando Cross); TR21160, Email from Louis Farr, NNI, to Timothy Pickering, Deloitte, *et al.* (Jan. 29, 2007, 2:25 p.m.); K. Stephens Dep. Tr. 56:10–57:21, 67:14–68:22, Nov. 7, 2013.

[217]    TR21160, Email from Louis Farr, NNI, to Timothy Pickering, Deloitte, *et al.* (Jan. 29, 2007, 2:25 p.m.).

[218]    TR21165, Memorandum from the Nortel Global Initiatives Group to the Project Osiris Files, at 2 (Feb. 15, 2007), at NNC-NNL06121235/2; Trial Day 6 Tr. 1305:2–1306:4, May 21, 2014 (M. Orlando Cross).

149.    As confirmed by Mr. Orlando, Mr. Weisz, and Peter Currie, the chief financial officer for NNC and NNL and a trial witness for the Canadian Debtors and CCC, this allocation of IP sale proceeds based on the RPEs' shared ownership of that IP was scrutinized and audited by Deloitte, it rolled up into each entity's financial statements and books and records, and it was the basis on which each entity paid taxes.[219]

### D.    2007 Project Swift

150.    In 2007, in a transaction known as Project Swift, Nortel and its outside consultants relied on the RPEs' shared ownership of the Group's IP when valuing certain NNL subsidiaries for the purpose of transferring shares in those subsidiaries to NNUK in partial satisfaction of an interest-free loan from NNUK to NNL.[220]

151.    On December 18, 2007, Ernst & Young U.K. provided a report known as the Project Eagle report, which assessed the value of the subsidiaries to be sold to NNUK on both a going-concern basis (assuming the solvency of the Nortel enterprise) and an insolvency basis (assuming a group-wide Nortel insolvency).[221]    The Project Eagle report explicitly recognized that NNUK and certain of the subsidiaries expected to be transferred to NNUK had beneficial ownership rights that entitled them to a share of the value of NN Technology:

> Whilst legal ownership of the NN Technology is with NNL, beneficial ownership is shared across various group companies as

---

[219]    Trial Day 6 Tr. 1311:8–17, May 21, 2014 (M. Orlando Cross); Trial Day 9 Tr. 1875:23–1877:2, May 28, 2014 (M. Weisz Cross); Trial Day 3 Tr. 574:23–589:14, May 14, 2014 (P. Currie Cross).

[220]    TR11123, Ernst & Young, Transaction Advisory Services:    Project Eagle (Dec. 18, 2007), at EMEAPROD2052831–32 [hereinafter "Project Eagle Report"].

[221]    TR11123, Project Eagle Report at EMEAPROD2052819.

outlined earlier.  Given the nature of the Group's operations, to properly exploit the NN Technology we believe would require not only rights to use the NN Technology but also the retained employee knowledge, know-how and infrastructure of the global network.  Hence we believe value for the NN Technology would be apportioned across the Group and for the purposes of this exercise, have apportioned as summarised above.[222]

152.    One of the report's key assumptions, which the conclusion above references, was that in an insolvency scenario, "[v]alue attributable to the NN Technology (treated as an asset realisation) is apportioned across the Group consistent with the intellectual property profit share agreement."[223]

### E.    2008 NNL-NNI Joint APA Request

153.    On October 31, 2008, NNL and NNI submitted a joint request to the IRS and CRA for a bilateral APA.[224]  In this document, NNL and NNI reiterated to the tax authorities that "[a]ll intellectual property ("IP") created from the investment in R&D by the [RPEs] is registered by NNL.  Each [RPE] maintains an economic ownership in the IP."[225]  Thus, on the eve of insolvency, NNL and NNI again confirmed to their respective tax authorities that the RPEs beneficially owned the Group's IP.

---

[222]    TR11123, Project Eagle Report at EMEAPROD2052861.

[223]    TR11123, Project Eagle Report at EMEAPROD2052828, EMEAPROD2052859.

[224]    TR22078, NNL-NNI Joint APA Request.

[225]    TR22078, NNL-NNI Joint APA Request, app. A at 4.

### F.    2008 KPN Settlement Costs

154.    When the Nortel Group incurred costs from settling patent infringement litigation with third parties, the RPEs shared the costs according to their respective contributions to R&D.

155.    In 2008, one of Nortel's Netherlands-based customers, KPN, sued Nortel's Netherlands-based subsidiary, NN BV, alleging that a series of Nortel products in EMEA infringed one of KPN's patents, and Nortel agreed to pay KPN $5 million to settle the claims.[226]

156.    Nortel was then faced with determining whether that settlement cost should be borne exclusively by NN BV (which was not a party to the MRDA and did not own any IP) or split between the EMEA RPEs.[227]    Nortel did not consider having NNL exclusively bear the costs.[228]

157.    At trial, Mr. Stephens explained how he suggested that the costs should be borne by all of the RPEs because "if they've taken the benefit of the IP, they must take the cost when it is breached."[229]    He testified that Nortel accepted his approach and that the KPN settlement costs were ultimately shared among the RPEs.[230]

---

[226]    TR32121, Email from Lisa Burke, EMEA, to Michael Orlando, NNI, *et al.* (July 10, 2008, 1:05 p.m.), at NNI_00668607; Trial Day 8 Tr. 1727:20–24, May 27, 2014 (K. Stephens Direct).

[227]    Trial Day 8 Tr. 1727:25–1728:6, May 27, 2014 (K. Stephens Direct); TR32121, Email from Lisa Burke, EMEA, to Michael Orlando, NNI, *et al.* (July 10, 2008, 1:05 p.m.), at NNI_00668607.

[228]    *See generally* TR32121, Email from Lisa Burke, EMEA, to Michael Orlando, NNI, *et al.* (July 10, 2008, 1:05 p.m.), at NNI_00668607; Trial Day 8 Tr. 1729:1–5, May 27, 2014 (K. Stephens Direct).

[229]    Trial Day 8 Tr. 1728:7–19, May 27, 2014 (K. Stephens Direct).

[230]    Trial Day 8 Tr. 1728:20–25, May 27, 2014 (K. Stephens Direct).

### G.      2008–2009 Opinions of Senior NNL Executive Peter Look

158.    In 2008 and 2009, both before and after the Nortel Group's insolvency filings, Mr. Look – as head of tax and the most knowledgeable senior Nortel executive on the subject – was repeatedly asked to explain which entities within the Nortel Group owned its IP.  At every turn, he confirmed that while NNL held legal title, the IP was beneficially owned by all of the RPEs, in accordance with their relative contributions to R&D.

159.    In December 2008, Mr. Look, who was one of the key actors as the Nortel Group prepared for bankruptcy, estimated that NNL only owned one third of Nortel's IP:  "When PwC did the goodwill valuation for Q3, it ran about $3 billion for total company.  After backing out the NNL share, that still leaves about $2 billion sitting outside Canada for total IP."[231]  Mr. Look discussed this email at his deposition and confirmed that "there were valuable IP rights outside of Canada" because "there were economic rights that were allocated out to the various RPS participants."[232]

160.    A week before filing for bankruptcy, when Nortel was considering an early sale of its Enterprise business, Mr. Look was asked to explain what approach he thought would be used to allocate the sale proceeds.[233]  He responded that the proceeds attributable to IP would be allocated according to the RPEs' respective contributions to R&D, which he estimated would

---

[231]    TR22139, Email from Peter Look, NNL, to Michael Orlando, NNI, *et al.* (Dec. 19, 2008, 11:47 p.m.), at NNC-NNL07112812/6.

[232]    P. Look Dep. Tr. 229:6–14, Nov. 12, 2013.

[233]    TR21537, Email from John Doolittle, NNL, to Paviter Binning, NNL, *et al.* (Jan. 7, 2009, 12:39 p.m.) ("Karina/Peter- extremely important to have your best guess on the approach that would be used here and if it is RPS what are the percentages.").

result in about 40% of the proceeds going to Canada and 40% going to the United States, leaving

20% for EMEA:

> Please note that we have a methodology embedded in the tenets of the Advanced Pricing Arrangement, and was used in UMTS sale, that allocates substantial portion of the gain to North America using the RPS percentages.
>
> . . . .
>
> - Remainder is debate over nature of intangibles, which we will advocate is intellectual property (as opposed to customer intangibles). The intellectual property portion has the highest likelihood of success of allocating under RPS percentages. This part will result in roughly 40% to Canada and 40% to US for tis [sic] layer.[234]

161. About two months after the Nortel Group filed for bankruptcy, Mr. Look wrote to

counsel for the EMEA Debtors to provide background information about the Enterprise business

and specifically noted that Nortel's IP was economically owned by all of the RPEs: "As a non-

manufacturing technology company, we do not have a lot of hard assets on the balance sheet, and

most of our asset value is in intangible assets, primarily intellectual property rights held

(economically) by the RPEs (Canada, US, UK, France, and Ireland)."[235]

### H.    2009 Allocation of Postpetition Sale Proceeds in Financial Statements

162. Allocating sale proceeds attributable to IP based on the RPEs' relative contributions to

R&D was such an obvious choice that the Monitor itself, as well as counsel, auditors, and NNL's

---

[234]    TR21537, Email from Peter Look, NNL, to Karina O, NNL, *et al.* (Jan. 7, 2009, 12:56 p.m.).

[235]    TR21020, Email from Peter Look, NNL, to Jim Sullivan, Herbert Smith, *et al.* (Mar. 1, 2009, 5:40 p.m.).

postpetition chief financial officer, agreed that this should be the allocation key used for the purpose of NNL's postpetition financial statements.

163.    Although the RPEs had reserved their rights regarding the ultimate allocation determination, NNL allocated the proceeds from the Business Sales for financial reporting purposes according to the RPEs' relative contributions to R&D.[236]  Notably, for the Residual Patent Sale, NNL did not allocate all of the proceeds to itself; instead, it again allocated the proceeds to all of the RPEs according to their relative contributions to R&D.[237]

164.    During his deposition, NNL's John Doolittle, former vice-president of tax who served as postpetition chief financial officer, explained that "there was a consistent view" shared by Mr. Doolittle, "the Monitor, legal counsel and the auditors" that the sale proceeds attributable to IP should be allocated according to contribution for financial reporting purposes.[238]  He further explained that NNL retaining all of the Residual Patent Sale proceeds would "not [be] consistent with [his] understanding of the way the company operated."[239]

---

[236]    *See* TR11264, Email from Michael Orlando, NNI, to David Chapman, *et al.* (Sept. 28, 2010, 12:55 p.m.), attaching draft purchase price allocation estimates for several of the business sales for financial reporting purposes only.

[237]    *See* TR45156.01, Email from Sadiq Naqvi, NNL, to Steve Chiechi, NNL, *et al.* (July 14, 2011, 11:48 a.m.); TR45156.02, Nortel Networks IP Sale High Level Estimate of Purchase Price Allocation (July 14, 2011).

[238]    J. Doolittle Dep. Tr. 201:8–202:7, Dec. 5, 2013.

[239]    J. Doolittle Dep. Tr. 149:24–150:14, Dec. 5, 2013.

### I.    2010 NNL Transfer Pricing Report

165.    After Nortel filed for bankruptcy, in late 2010, NNL confirmed in a transfer pricing

report it commissioned from Ernst & Young (Canada) covering the taxation year ending

December 31, 2009 that all of the RPEs, not just NNL, "are the primary owners of intangibles

developed by the Nortel Group and bear the risk of development."[240]

### VI.    THE RECORD ESTABLISHES THAT THE VALUE OF THE IP SOLD IN THE ASSET SALES WAS $5.3 BILLION

166.    IP was not the only asset class sold by the Debtors.   Customer-Related Assets were

another very significant asset class.  It is therefore necessary to value each asset class separately.

The largest asset class by value, IP, will be addressed first.

### A.    Mr. Malackowski Was the Only Expert Who Actually Valued the IP Sold

167.    James Malackowski, the IP valuation and allocation expert for the EMEA Debtors, was

the most credible of all the experts in these areas.  Mr. Malackowski used the well understood

and commonly practiced relief-from-royalty method to value the IP sold in the Nortel Group's

asset sales.[241]

168.    No other party challenged Mr. Malackowski on the basis of his capability or expertise.

Unlike expert witnesses from each of the other debtor groups, Mr. Malackowski was the only

---

[240]    TR48622.01, Email from Karen Salsbury, Ernst & Young LLP, to Michael Orlando, NNI, *et al.* (Oct. 29, 2010, 7:51 p.m.); TR48622.02, NNL Transfer Pricing Report for the Taxation Year Ended Dec. 31, 2009, at 1 (Oct. 29, 2010).

[241]    Trial Day 10 Tr. 2237:11–16, 2241:19–2242:17, May 29, 2014 (J. Malackowski Direct); DEM00011, Malackowski Slides at 5, 11–15; *see generally* TR00033, Malackowski Report; TR00034, Malackowski Rebuttal.

expert witness who offered an independent valuation of the IP divested in the Nortel Group's postpetition sales.

### B. Mr. Malackowski Valued the IP Transferred in the Business Sales

169.    Mr. Malackowski used the relief-from-royalty method to calculate the overall value of the IP sold in the Business Sales.  This included a defensive value component, which represents the value to the purchaser of acquiring the IP used in the Nortel business concerned,[242] and accounted for over 80% of the value of the IP sold in the Business Sales.[243]  It also included a synergistic component, which is the value to the purchaser from being able to add the IP acquired from Nortel to its existing portfolio.[244]

170.    Applying this valuation methodology, Mr. Malackowski determined that the total value of the IP sold in the Business Sales was $765 million, as summarized in the chart below.[245]  Mr. Malackowski's methodology and conclusions are reliable and persuasive.

---

[242]   Trial Day 10 Tr. 2242:2–7, May 29, 2014 (J. Malackowski Direct).

[243]   Trial Day 10 Tr. 2242:13–17, May 29, 2014 (J. Malackowski Direct).

[244]   Trial Day 10 Tr. 2242:8–12, May 29, 2014 (J. Malackowski Direct).

[245]   DEM00011, Malackowski Slides at 5.

| Valuation – Business Sales IP | |
| --- | --- |
| **Business Sale** | **Total IP Value** |
| | Millions USD |
| CDMA/LTE | $256.4 |
| Enterprise | $244.3 |
| MEN/Optical | $113.1 |
| CVAS | $79.9 |
| GSM/GSM-R | $49.2 |
| MSS | $4.5 |
| Layer 4-7 | $9.3 |
| Next-Gen | $8.5 |
| Total | $765.2 |

Source: Initial Expert Report of James E. Malackowski, Exhibit B.2.2                  5

171.    Rather than valuing the IP sold in the Business Sales directly, the CCC's allocation expert, Thomas Britven, relied on purchase price allocations ("PPAs") to estimate the percentage value attributable to IP.  He concluded on this basis that the IP sold in the Business Sales was worth $1,143 million.[246]   The difference of roughly $350 million from Mr. Malackowski's valuation is relatively small in the context of $7.5 billion in total sales proceeds.

### C.    Mr. Malackowski Valued the IP Transferred in the Residual Patent Sale

172.    Mr. Malackowski valued the IP sold in the Residual Patent Sale based on the fair market value of the patent portfolio, established by the $4.5 billion purchase price.[247]

---

[246]    TR00045, Britven Report ¶ 6.27, scheds. 2.1, 2.5.

[247]    Trial Day 10 Tr. 2263:18–23, May 29, 2014 (J. Malackowski Direct).

173.    Mr. Malackowski performed a separate valuation of patents that were owned by entities that were not parties to the MRDA.[248]  As described above, that value should be allocated directly to the owners of the IP, including the EMEA AREs.[249]

> **D.    Mr. Malackowski Used the Timeframe During Which the IP Was Created**

174.    Mr. Malackowski used the contribution approach to allocate the approximately $5.3 billion[250] of sale proceeds attributable to IP.

175.    In the absence of other detailed evidence such as lab notebooks, the RPEs' R&D spending is the best available measure of their contribution to the creation of IP.[251]  As discussed below, that R&D spending should be measured over a period of time – or "look-back period" – during which the IP sold in the Business Sales and the Residual Patent Sale was created.[252]  In general, Mr. Malackowski concluded that the starting point should be one year prior to the earliest relevant patent, based on evidence that it took at least one year for Nortel R&D spending

---

[248]   TR00033, Malackowski Report 45–47.

[249]   TR00033, Malackowski Report 45–47.

[250]   The sum of $765 million for the Business Sales IP and $4.5 billion for the Residual Patent Sale IP ($5.265 billion total).

[251]   Trial Day 10 Tr. 2336:13–2337:12, May 29, 2014 (J. Malackowski Direct).

[252]   Trial Day 10 Tr. 2277:16–2278:25, 2285:4–2286:15, May 29, 2014 (J. Malackowski Direct); DEM00011, Malackowski Slides at 18–20, 30, 31, 34, 35.

to culminate in a patented invention.[253]   The ending point should be the year before the last

relevant patent in the portfolio was registered.[254]

176.    Specifically, in the case of the Business Sales, the look-back period should begin one

year prior to the date of filing of the earliest patent sold in each Business Sale.[255]   The look-back

should stop at December 31, 2008 because 2008 is the last year in which Nortel meaningfully

contributed new IP to the Lines of Business and instead focused on maintaining existing IP.[256]

The chart below summarizes Mr. Malackowski's conclusions regarding the entitlements of the

EMEA, U.S., and Canadian Debtors to proceeds attributable to IP sold in the Business Sales[257]:

---

[253]   TR00033, Malackowski Report 6, 44; Trial Day 10 Tr. 2266:22–2267:18, May 29, 2014 (J. Malackowski Direct).

[254]   TR00033, Malackowski Report 6; Trial Day 10 Tr. 2272:6–2274:5, May 29, 2014 (J. Malackowski Direct).

[255]   Trial Day 10 Tr. 2266:22–2268:23, 2273:18–2274:13, May 29, 2014 (J. Malackowski Direct); DEM00011, Malackowski Slides at 19, 20.

[256]   Trial Day 10 Tr. 2272:6–2274:5, 2278:8–25, May 29, 2014 (J. Malackowski Direct).

[257]   DEM00011, Malackowski Slides at 24.



177.    In the case of the Residual Patent Sale, the look-back period should begin in 1991 because that is the year prior to the filing date of the first high-interest patent sold in the Residual Patent Sale.[258]  The look-back period should stop at December 31, 2006 because 2006 is the last year in which a high-interest patent in the residual patent portfolio was created.[259]  The high-interest patent designations used to determine these dates were derived from the work of Global IP.[260]    No party challenged Global IP's conclusions.    The chart below summarizes Mr.

---

[258]    Trial Day 10 Tr. 2281:13–18, May 29, 2014 (J. Malackowski Direct).

[259]    Trial Day 10 Tr. 2272:6–2274:5, 2278:8–25, 2281:13–18, May 29, 2014 (J. Malackowski Direct).

[260]    Trial Day 10 Tr. 2275:13–2277:3, May 29, 2014 (J. Malackowski Direct); DEM00011, Malackowski Slides at 32.

Malackowski's conclusions regarding the entitlements of the EMEA, U.S., and Canadian Debtors to proceeds from the Residual Patent Sale[261]:



178.    Mr. Malackowski's use of the contribution approach to allocate the sale proceeds attributable to IP is reliable, credible, and fully supported by the trial record. The chart below summarizes his conclusions regarding the relative entitlements of the EMEA, U.S., and Canadian Debtors to total proceeds attributable to IP sold in the Business Sales and the Residual Patent Sale[262]:

---

[261]    DEM00011, Malackowski Slides at 25.

[262]    DEM00011, Malackowski Slides at 9.



### E.    The Record Establishes that the Nortel Group's IP Had a Long Useful Life

179.    On the eve of insolvency, the Nortel Group adopted a five-year look-back period as the timeframe over which it measured the RPEs' relative contributions to R&D for the purpose of sharing annual profits and losses under the RPS methodology.   The fact and expert evidence presented at trial demonstrates, however, that the useful life of the Group's IP was significantly longer than five years.   As the Canadian Debtors' own expert admitted, if an asset is sold for value, it is *ipso facto* within its useful life,[263] and the vast majority of the IP that Nortel sold was more than five years old.   The majority of the high-interest and therefore high-value patents sold to Rockstar were created in the 1990s.   It would clearly be an error to adopt Nortel's five-year

---

[263]    Trial Day 16 Tr. 4006:15–4012:1, June 17, 2014 (T. Reichert Cross); *see also* TR40710, Tim Reichert, *On the Meaning of (Economic) Life:  An Overview and Proposed Method of Estimation*, at 6–7.

look-back period, which was used during a different time to allocate operating profits and losses, rather than capital realized from postpetition asset sales.[264]

180.    Mr. Malackowski's conclusions regarding the appropriate look-back periods to measure the R&D spending that contributed to the IP sold in the Business Sales and the Residual Patent Sale are amply supported by the trial record.

### 1.    Priority Dates of the Nortel Patents Sold

181.    The priority dates of the patents that were actually sold in the Business Sales and the Residual Patent Sale, *i.e.*, the effective filing dates of the patents,[265] are predominantly in the 1990s and prove that the patents have a long useful life.

182.    Based on his review of the Nortel Group's patent portfolio, Mr. Malackowski concluded that the patents sold by the Nortel Group have priority dates beginning in 1991.[266]    The overwhelming majority of the patents sold have priority dates before 2005 – *i.e.*, earlier than the five-year look-back period that was applied by Nortel under the RPS methodology and advocated by the Canadian Debtors, which is discussed below.[267]

---

[264]    Trial Day 11 Tr. 2676:20–2677:9, May 30, 2014 (R. Cooper Direct).

[265]    *See* TR00033, Malackowski Report 41 n.132.

[266]    *See* DEM00011, Malackowski Slides at 19; *see also* TR00033, Malackowski Report 41 & fig. 1.

[267]    *See* DEM00011, Malackowski Slides at 19; *see also* TR00033, Malackowski Report 41 & fig. 1.

183.    The patents sold in the Residual Patent Sale specifically were filed between 1992 and 2007.[268]  Of the most valuable patents sold in the Residual Patent Sale, the high-interest residual patents identified by Global IP, approximately 98% had priority dates earlier than 2005.[269]

184.    The priority dates of the Nortel Group's high-interest residual patents are consistent with the Group's collective R&D spending, which peaked in the late 1990s before trailing off after the "dot com" bust.[270]

185.    In short, the trial record demonstrates unequivocally that nearly all of the valuable patents sold in the Business Sales and the Residual Patent Sale were older than five years.  As Mr. Malackowski explained, "in order to properly allocate the value received from the sale of these assets, you have to take into account the effort that was extended during that period.  If you limited yourself to the last few years, you would have an inaccurate conclusion."[271]

### 2.    *Patent Maintenance*

186.    Mr. Malackowski's conclusions are reinforced by Nortel's own patent maintenance practices, which ensured that older patents sold were not obsolete and remained in the portfolio because of Nortel's conscious decision to pay the cost of maintaining them.

------

[268]    *See* TR00033, Malackowski Report 41 & fig. 1.

[269]    DEM00011, Malackowski Slides at 22; *see also* TR00033, Malackowski Report 41 & fig. 1.

[270]    TR11383, Malackowski Report Ex. R.2.2; TR00034, Malackowski Rebuttal 31, tbl. 7, 40, tbl. 12; DEM00011, Malackowski Slides at 35.

[271]    *See* Trial Day 10 Tr. 2277:16–2278:7, May 29, 2014 (J. Malackowski Direct).

187.    The Nortel Group was required to make periodic payments in order to maintain its older patents, which cost thousands of dollars per patent.[272]   As a consequence, the Nortel Group implemented an exhaustive "culling" process through which patents were allowed to expire if they were deemed no longer valuable enough to maintain.[273]   In a 2006 email, Nortel employees noted that they should be culling patents that had not proven to be commercially valuable or were no longer commercially valuable:  "[A]t 7.5 year renewal drop cases that have not proven commercially valuable yet and don't have clear potential for future commercial value; at 11.5 year renewal drop cases that do not have clear commercial value."[274]   NNL's Angela de Wilton, a member of the IP Law Group and a trial witness for the Canadian Debtors and the CCC, testified that this culling process ensured only valuable patents continued to be maintained.[275]

188.    By definition, the patents sold in the Business Sales and the Residual Patent Sale would have survived Nortel's culling process; they were periodically evaluated by the Nortel Group and – despite having been filed five, ten, fifteen years ago, or more – they were determined to be sufficiently valuable to warrant continued maintenance.[276]

---

[272]    *See* TR31318, Presentation, 2002 IPR Business Plan, Backup Slides at 8 (Feb. 2002).

[273]    Trial Day 10 Tr. 2184:18–2187:4, May 29, 2014 (A. Anderson Direct).

[274]    *See* TR21447, Email from Bill Junkin, NNL, to Brianna Hinojosa-Flores, NNI, *et al.*, May 11, 2006.

[275]    *See* Trial Day 3 Tr. 770:24–771:3, May 14, 2014 (A. de Wilton Cross).

[276]    *See* Trial Day 3 Tr. 771:4–11, May 14, 2014 (A. de Wilton Cross).

### 3.     Rockstar's Deployment of the Residual Patent Portfolio

189.     The age of the patents sold in the Residual Patent Sale that Rockstar is now exploiting is

further confirmation of Mr. Malackowski's look-back period.[277]    Specifically, Rockstar has

commenced infringement actions to enforce patents from Nortel's residual patent portfolio

against Google and other Android wireless phone makers, among others.[278]    For example,

Rockstar is currently litigating two of the patents that Nortel previously litigated against Foundry

in 2001.[279]    This is no surprise given that Mr. Malackowski determined that seven of the Foundry

patents were still considered very valuable patents – high-interest patents per Global IP's

designation – a full ten years later when they were sold to Rockstar.[280]

---

[277]    *See* TR40775, Joff Wild, *Star Man*, Intellectual Asset Management 63, 65–67 (July/Aug. 2013).

[278]    *See generally* TR50085, Complaint for Patent Infringement, *Rockstar Consortium US LP v. Google Inc.*, No. 2:13-cv-00893 (E.D. Tex. Oct. 31, 2013).

[279]    TR11383, Malackowski Report app. O (noting that Rockstar or its subsidiaries have asserted Patent No. 5,732,080 against Cisco Systems, Inc. and Patent No. 6,192,397 against Charter Communications Inc.).

[280]    *See* TR21167, Nortel Networks/Foundry Networks Confidential License Agreement attach. 1 (Oct. 25, 2004), at NNC-NNL11029237/14 (listing twelve Nortel patents at issue in litigation with Foundry); TR22113, Global IP Law Group, Issued Patents and Pending Patent Applications Asset List (Apr. 15, 2010) (listing the patents comprising the residual patent portfolio, including seven of the twelve patents at issue in the Foundry litigation, and specifically designating those seven as valuable patents:

190.    Rockstar has also sold portions of Nortel's residual patent portfolio to individual consortium members or to third parties such as Spherix Inc., who have also commenced infringement litigation to enforce those valuable patents.[281]

191.    The patents purchased in the Residual Patent Sale that Rockstar, Spherix, and others have chosen to enforce all predated 2005, with average priority dates going back to 1998.[282]

192.    Rockstar and others are currently litigating patents purchased in the Residual Patent Sale precisely because those patents – notwithstanding that 98% were filed before 2005 – still have substantial value and are therefore within their useful life.  Mr. Malackowski's look-back period for the Residual Patent Sale is the only approach that would capture the contributions that created this IP.

### 4.    Market Adoption Rate

193.    The long useful life of Nortel IP makes sense in light of the evidence concerning the time it takes for a new technology to be adopted by the relevant market.  This process alone is likely to extend beyond five years.  The markets for the critical – and therefore most valuable – technologies in which the Nortel Group held patents were still growing a decade or more after the average priority date for patents in any given field.[283]

----

[281]  TR50492, Press Release, Spherix Inc., Spherix Acquires Over 100 Patents and Patent Applications Portfolio from Rockstar Consortium (Jan. 6, 2014); see TR00034, Malackowski Rebuttal 32 tbl. 8; TR11383, Malackowski Report app. O.

[282]  TR00034, Malackowski Rebuttal 32 tbl. 8; DEM00011, Malackowski Slides at 30.

[283]  TR00034, Malackowski Rebuttal 29 fig. 6; DEM00011, Malackowski Slides at 31.

194.    For example, Brian McFadden, former chief technology officer of NNL, testified that an advanced technology, such as LTE, took "a little less than 10 years" to develop to the point where Nortel products could be based on that technology.[284]  Simon Brueckheimer, a telecommunications engineer at NNUK and a trial witness for the EMEA Debtors and the UKPC, testified to a similar timeline for advanced technology R&D, with MIMO technology being researched ten years before the first LTE trials were shipped and UMTS foundational research being done eight to ten years before UMTS was shipped.[285]

195.    Mr. Malackowski's look-back period is long enough to capture the R&D spending that contributed to the creation of patents that continue to generate value.  For the most critical of the Nortel Group's technologies, a five-year look-back period would assign zero value to the R&D spending that actually created the patents.

### 5.    Testimony of Fact Witnesses

196.    Mr. Malackowski's conclusions are also supported by the testimony of numerous fact witnesses, including the Canadian Debtors' witnesses.  For example, Clive Allen, NNL's former chief legal officer and a trial witness for the Canadian Debtors and CCC, testified that the useful life of Nortel's technology was "much longer" than five years, and technology NNL provided to NNI in the 1970s would still have been of use when he retired from Nortel in 1999 (though all patents before 1991 had of course expired by the time of sale).[286]  Timothy Collins, senior

---

[284]    Trial Day 3 Tr. 670:1–18, May 14, 2014 (B. McFadden Cross).

[285]    Trial Day 7 Tr. 1609:12–1610:13, May 22, 2014 (S. Brueckheimer Cross).

[286]    Trial Day 3 Tr. 628:2–12, May 14, 2014 (C. Allen Cross).

counsel at NNL, agreed that the useful life of a patent can be longer than five years and that "[r]esearch and development done in one year can be valuable hundreds of years later."[287]

197.    Engineers engaged in advanced research work also testified that the most valuable patents were useful for much longer than five years.  Mr. Brueckheimer testified that technology he personally developed and which was patented in 1994 and 1995 is still useful today.[288] Similarly, Andrew Jeffries, an NNUK engineer and trial witness for the UKPC, testified that a telecommunications patent filed in 2001 was part of an LTE product portfolio tested with Verizon in 2009.[289]

198.    If a five-year look-back were used here, it would exclude all contributions to the most valuable patents sold.  There is no principled reason to do so.  As will be explained below in the submissions on the law, all contributions toward the creation of jointly owned property must be considered in allocating the value of that property among its owners.  Only Mr. Malackowski's approach does so.

### 6.    Testimony of Other Experts

199.    Other experts supported Mr. Malackowski's conclusions regarding the useful life of Nortel IP and criticized the five-year look-back period adopted by Nortel in the Third Addendum and advocated by the Canadian Debtors.

---

[287]    T. Collins Dep. Tr. 130:12–14, 132:10–132:19 (Nov. 15, 2013).

[288]    Trial Day 7 Tr. 1571:10–17, May 22, 2014 (S. Brueckheimer Direct).

[289]    Trial Day 7 Tr. 1671:7–1673:1, May 22, 2014 (A. Jeffries Direct).

200.    The U.S. Debtors' expert, Dr. Catherine Tucker, agreed with Mr. Malackowski's analysis regarding the useful life of Nortel's patents and noted that it is consistent with the economics of an advanced technology company.[290]  Dr. Tucker testified that because companies like the Nortel Group rely on foundational patents as building blocks for future innovation, foundational patents created in the 1990s could still be relevant today.[291]

201.    Dr. Lorraine Eden, transfer pricing expert for the U.S. Debtors, also agreed that the useful life of the Nortel Group's IP was longer than five years and that any contribution-based approach would have to take account of that long useful life.[292]

202.    Dr. Richard Cooper, transfer pricing expert for the EMEA Debtors, also testified that the Group's IP had a useful life significantly longer than five years, saying that the five-year period was "inappropriate" and that when analyzing a major taxable event, such as the Business Sales and Residual Patent Sale, the tax authorities would look at the age of the IP sold to test whether that five-year period was accurate.[293]

### F.    The Record Cannot Support A Five-Year Look-Back Period

203.    Whereas Mr. Malackowski's conclusions regarding the useful life of Nortel IP are well supported by the trial record, the evidence in the record does not support the 30% amortization or

---

[290]    Trial Day 19 Tr. 4678:23–4679:25, June 20, 2014 (C. Tucker Direct); TR00056, Tucker Report ¶¶ 65 & n.56, 94 & n.108.

[291]    See Trial Day 19 Tr. 4678:9–22, June 20, 2014 (C. Tucker Direct); TR00056, Tucker Report ¶¶ 11–13, 63, 87.

[292]    Trial Day 21 Tr. 5039:12–5041:24, June 24, 2014 (L. Eden Cross).

[293]    Trial Day 11 Tr. 2660:10–2665:20, May 30, 2014 (R. Cooper Direct).

five-year look-back period that Nortel used to measure the RPEs' contributions to R&D spending while the Group was operating under the RPS methodology.

### 1.    The Nortel Group's Reasons for Adopting a Five-Year Look-Back

204.    When the Nortel Group estimated useful life in the context of adopting the RPS methodology, it was focused on the useful life of its products, rather than its patents.  For example, Nortel's APA submissions clearly discuss the useful life of its products, rather than its patents:  "The average product lifecycle for Nortel's three business segments is between four to six years. . . . [A]ny discussion of product useful life must consider when an individual product was originated, how to apportion the impact of successive improvements, and when the product was completely superseded."[294]

205.    This distinction is significant because the useful life of patents is markedly different from, and notably longer than, the useful life of products.  Nortel specifically noted this difference in its submissions to tax authorities:

> Generally, the patent life tends to be long, while the commercial life of the products incorporating the patented intellectual property tends to be relatively short without continuing investment in R&D. Continuing investment in R&D is essential in extending the commercial life of products throughout the term of the related patents.[295]

---

[294]    TR22078, NNL-NNI Joint APA Request at 11, 50 (emphasis added); *see also id.* app. B at 23–30 (describing "Product Development – Useful Life Analysis").

[295]    TR21407, Functional Analysis at 29.

206.    Christopher Cianciolo, an IP attorney employed by NNI, testified that a patent "that is part of a particular product could last longer than the useful life of a product" and that a particular patent could provide broader protection than for a single, isolated product.[296]    It is therefore not appropriate to rely on a look-back period related to product life when the inquiry before the Courts is when contributions toward the patents sold in the asset sales were made.

207.    Further, the record reflects that the five-year look-back period chosen by Nortel was also motivated in part by tax considerations and therefore should not be applied to the allocation of sale proceeds attributable to IP.[297]    Significant R&D tax credits reduced Nortel's effective tax rate in Canada and encouraged the Group to maximize accounting profits there.[298]    As Walter Henderson, a senior tax attorney at NNI, described:

> We anticipated that during the term of the APA, R&D increasingly would be performed by NNL, and NNL's proportion of R&D spending relative to the total spending of the group would increase. Therefore, using a higher amortization rate would result in a larger R&D capital stock balance for NNL – and thus a greater share of the residual profits – more quickly than would occur assuming a longer useful life, because the calculation of R&D capital stock would be weighted towards future, rather than historical, R&D spending.[299]

---

[296]    C. Cianciolo Dep. Tr. 120:11–121:20 (Oct. 15, 2013).

[297]    Trial Day 11 Tr. 2457:12–2458:5, May 30, 2014 (J. Malackowski Cross).

[298]    TR00016, Henderson Decl. ¶¶ 40–42.

[299]    TR00016, Henderson Decl. ¶ 52 (internal citation omitted).

208.    The Nortel Group therefore, in part, chose a higher amortization rate (*i.e.*, a shorter useful life and look-back period), in order to take advantage of these tax benefits.[300]  These types of considerations should not influence how the IP proceeds from the asset sales are allocated now.  Whatever reason was used by Nortel to justify its estimate of a five-year look-back period, this reason can only apply to the annual calculation that had to be performed in part, for audit purposes.  As Dr. Cooper confirmed, the five-year look-back is wholly unsuited to the realization of sale proceeds.  Instead, the entire history must be considered – a "deep dive" must be performed.[301]

>    2.    *Expert Witnesses for the Canadian, U.S., and EMEA Debtors All*
>           *Agree that the Courts Should Not Follow the Five-Year Look-Back*
>           *Period*

209.    As noted above, Dr. Eden and Dr. Tucker, experts for the U.S. Debtors, both agree with Mr. Malackowski that the useful life of Nortel IP is significantly longer than five years.  Dr. Timothy Reichert, transfer pricing expert for the Canadian Debtors, agreed that the Courts are not bound by Nortel's five-year look-back period and conducted his own analysis of what the look-back period should be.[302]  Dr. Reichert's analysis, quite incredibly, concluded that the useful life of Nortel IP was less than five years.  This conclusion and the flaws in his analysis, which contradict his prior scholarly work in this subject, are addressed below, but the critical admission is that Dr. Reichert, for the Canadian Debtors, appears not to believe that the Courts

---

[300]    TR00016, Henderson Decl. ¶¶ 51–53.

[301]    Trial Day 11 Tr. 2676:20–2677:9, May 30, 2014 (R. Cooper Direct).

[302]    *See* TR00049, Timothy Reichert, Evaluation and Economic Analysis:  The Nortel Network Group's Intercompany Transfer Pricing Arrangements 81 (Jan. 24, 2014) [hereinafter "Reichert Report"].

are bound to follow the five-year look-back period adopted by Nortel on the eve of bankruptcy. The assessment of useful life must be based on the evidence available, and the record demonstrates incontrovertibly that the useful life of Nortel IP is many times more than five years.

        3.     *The Canadian Experts' Opinions on the Useful Life of Nortel IP Are Not Reliable*

210.    Dr. Reichert relied on small Nortel Group surveys conducted more than a decade ago to conclude that even though Rockstar paid $4.5 billion for a portfolio consisting overwhelmingly of patents filed before 2005, the useful life of the Group's IP is three to four years.[303]  Dr. Reichert had no answer for the extensive evidence addressed above that most of the value of the portfolio resulted from older patents.  Dr. Reichert also conceded that the internal Nortel surveys on which he relied may be "impressionistic" and that employees who completed these surveys were instructed that it was "not necessary to spend time investigating or researching the topic."[304]  Dr. Reichert similarly relied on generic economic studies, rather than reviewing and analyzing the actual useful life of the IP actually sold in the Business Sales and Residual Patent Sale.[305]  Dr. Reichert's source data does not begin to compare to Mr. Malackowski's robust analysis of the actual assets sold in this case.

211.    Dr. Reichert's opinion is also not credible because it is based on the useful life of products, not patents.  Dr. Reichert conceded that the value of a patent right is very different

---

[303]   Trial Day 16 Tr. 3993:15–3994:13, June 17, 2014 (T. Reichert Cross).

[304]   Trial Day 16 Tr. 3994:13–3997:1, June 17, 2014 (T. Reichert Cross).

[305]   Trial Day 16 Tr. 3991:18–3992:21, June 17, 2014 (T. Reichert Cross).

from the useful life of a product,[306] and that the patents sold in the Business Sales and the Residual Patent Sale are within their useful life:  "[T]he IP, right, the property, the residual interests are *ipso facto* within their economic useful life.  That's a fair statement."[307]

212.    The fact that Nortel's IP has now been sold means that it is no longer necessary or appropriate to rely on an estimate of useful life in order to determine how to allocate proceeds attributable to the value of Nortel's IP.  This is because the sale of the IP provides <u>objective proof</u> that the useful or economic life of the IP is no less than the period from its date of creation to the date of the sale.  As Dr. Reichert has written, the "most objective" approach to determining useful life is by reference to "commercial transferability," *i.e.*, whether an independent party is willing to purchase the intangible.[308]  If an independent party is willing to purchase an intangible asset, the intangible is *ipso facto* still within its economic life because economic life does not come to an end until "a third party would be unwilling to pay for access to the intangible."[309]  Where actual, objective market data is available, the arm's length principle requires that it be utilized in allocating a Group's revenues.[310]  By definition, the useful life of Nortel IP therefore

---

[306]    Trial Day 16 Tr. 4006:4–14, June 17, 2014 (T. Reichert Cross).

[307]    Trial Day 16 Tr. 4010:2–4012:1, June 17, 2014 (T. Reichert Cross).

[308]    TR40710, Tim Reichert, *On the Meaning of (Economic) Life:  An Overview and Proposed Method of Estimation*, at 5–7.

[309]    TR40710, Tim Reichert, *On the Meaning of (Economic) Life:  An Overview and Proposed Method of Estimation*, at 5–7; *see also* T. Reichert Dep. Tr. 229:9–17 (Mar. 20, 2014).

[310]    *See* TR00037, Expert Report of Steven D. Felgran 7–8 (Jan. 24, 2014) ("The guiding principle of the selection of a transfer pricing method is reliability of the results, *i.e.*, whether the results of the transfer pricing method reflect the economic reality given the information <u>currently</u> available.  .  .  .  [I]n some cases, *ex post* adjustments are required.") (emphasis in original)).

extended back as far as 1991, the priority date of the oldest patent sold in the Residual Patent Sale or Business Sales.

213.    Philip Green and Mark Berenblut, two allocation experts for the Canadian Debtors, propose using a five-year look-back, but without any supporting analysis.  Mr. Green simply relied on the look-back period that Nortel employed under the RPS methodology, rather than analyzing the patents sold in the Business Sales and Residual Patent Sale to determine their useful life.[311]  He also admitted that his proposed five-year look-back period relates to products, not patents.[312]  As Dr. Tucker testified, Mr. Green's opinion is not credible because it focuses on short product lifecycles and ignores the far greater potential lifespan of the patents used in those products.[313]

214.    Mr. Berenblut similarly conceded that he did not analyze the useful life of the Nortel patents that were actually sold.[314]  Only Mr. Malackowski analyzed the useful life of the assets at issue here, and therefore his opinion should be adopted.

### G.    The Record Establishes that 2009 R&D Spending Did Not Create Saleable IP

215.    Regardless of whether the look-back period reaches back five years or encompasses the full value of the R&D contribution to the patents sold in the Business Sales and Residual Patent

---

[311]    Trial Day 13 Tr. 3245:8–16, June 5, 2014 (P. Green Cross).

[312]    Trial Day 13 Tr. 3303:6–3304:14, June 5, 2014 (P. Green Cross).

[313]    Trial Day 19 Tr. 4680:11–4681:5, June 20, 2014 (C. Tucker Direct).

[314]    Trial Day 15 Tr. 3733:22–3738:7, June 16, 2014 (M. Berenblut Cross).

Sale, it would not be appropriate to use R&D spending in 2009 as the end date for the look-back period.

216.    As Mr. Berenblut explained when describing the importance of choosing an appropriate valuation date, "[Y]ou have to know the valuation date in order for it to be meaningful.  Here we have a significant difference in the state of the world and the state of Nortel between 2008 and 2009 . . . ."[315]

217.    For all but two weeks in 2009, Nortel was in bankruptcy proceedings.  The bulk of its efforts in 2009 were focused on winding down and selling its Lines of Business, and by the end of 2009, Nortel's major Lines of Business had been divested and its remaining significant businesses were under contract to be sold.[316]  R&D continued in 2009, but it was concentrated on maintaining the patents and products Nortel still had, rather than inventing new technologies.[317]

218.    Thus, all of the relevant R&D spending that contributed to the development of the patents sold in the Business Sales and Residual Patent Sale occurred before 2009.  Including 2009 R&D spending in a look-back period would improperly skew the data and misrepresent the RPEs' relevant contributions.

---

[315]    Trial Day 15 Tr. 3787:20–3789:1, June 16, 2014 (M. Berenblut Redirect).

[316]    TR00010, Reply Affidavit of Sharon Hamilton ¶¶ 7–8, Apr. 25, 2014; DEM00011, Malackowski Slides at 18.

[317]    TR48622.02, NNL Transfer Pricing Report for the Taxation Year Ended Dec. 31, 2009, at 34, 43 (Oct. 29, 2010); Trial Day 10 Tr. 2272:6–2273:17, May 29, 2014 (J. Malackowski Direct); DEM00011, Malackowski Slides at 18.

219.     Mr. Malackowski appropriately removed all postpetition R&D spending from his analysis.[318]

220.     Mr. Green and Mr. Britven, however, used 2010 RPS percentages in their analyses, which take into account R&D spending over the five-year period between 2005 and 2009.[319] Instead, they should have applied 2009 RPS percentages, which take into account R&D spending between 2004 and 2008, to their five-year look-back periods.[320]   Using the 2010 RPS percentages instead of the 2009 RPS percentages increases NNL's allocation at the expense of the other parties and fails to accurately reflect the RPEs' contributions.

221.     No matter which look-back period is applied, the appropriate end date should be 2008.

## VII.    UNDER THE CONTRIBUTION APPROACH, THE COURTS SHOULD MEASURE THE PARTIES' RELATIVE CONTRIBUTIONS TO THE CREATION OF IP BASED ON ACTUAL R&D SPENDING

222.     Laureen Ryan, an expert for the U.S. Debtors and the Committee, contends that the EMEA Debtors' contribution approach should be modified to take into account not only the direct R&D spending that Mr. Malackowski considers, but also intercompany funding that

---

[318]   Trial Day 10 Tr. 2272:6–2274:5, May 29, 2014 (J. Malackowski Cross); DEM00011, Malackowski Slides at 17–19.

[319]   TR00042, Green Report app. J at 8; Trial Day 13 Tr. 3139:15–3140:16, June 5, 2014 (P. Green Direct); TR00045, Britven Report 12, sched. 8; Trial Day 14 Tr. 3455:11–3457:9, June 6, 2014 (T. Britven Cross); *see also* Trial Day 13 Tr. 3302:7–3303:5, June 5, 2014 (P. Green Cross).

[320]   *See* TR43476, 2009 Transfer Pricing Forecast as of Apr. 21, 2009; TR49389, 2009 Transfer Pricing Adjustments.

occurred through transfer pricing adjustments.[321]    Ms. Ryan's approach suffers from serious

flaws and cannot be adopted.[322]    A few of the more significant flaws are discussed below.

### A.    Ms. Ryan Fundamentally Misunderstands the Contribution Approach

223.    The contribution approach focuses on the inventive process and the performance of

R&D.    Direct R&D spending, although not a precise measure of inventive contribution, is

reflective of the types of activities that lead directly to the inventive process – *e.g.*, engineering

time and the related expenses that result in innovation – and comes as close to representing the

inventive process as is practicable in the circumstances of this case.[323]    R&D spending is

therefore the best proxy for measuring the contribution of the RPEs to the joint creation of the

Nortel Group's IP.

224.    In contrast, Ms. Ryan's adjustments take into account the funding of R&D, which is far

removed from the ultimate performance of R&D.    As Mr. Malackowski explained, the funding

of R&D is "disjointed from the actual innovation process" and is more a measure of profitability

than contribution to R&D.[324]

---

[321]    TR00055, Expert Report of Laureen M. Ryan 2 (Apr. 11, 2014) [hereinafter "Ryan Report"]; Trial Day 18 Tr. 4484:1–4485:8, June 19, 2014 (L. Ryan Direct).

[322]    Trial Day 10 Tr. 2334:17–2335:3, May 29, 2014 (J. Malackowski Direct).

[323]    Trial Day 10 Tr. 2335:5–12, 2336:13–2337:12, May 29, 2014 (J. Malackowski Direct); DEM00011, Malackowski Slides at 54.

[324]    Trial Day 10 Tr. 2338:5–18, May 29, 2014 (J. Malackowski Direct); Trial Day 11 Tr. 2565:3–2566:2, May 30, 2014 (J. Malackowski Cross); *see also* DEM00011, Malackowski Slides at 53–54.

225.    By conflating the funding of R&D with the performance of R&D, Ms. Ryan – who admitted at trial that there is a fundamental difference between "funding something" and "actually performing something"[325] – fundamentally misconstrues the contribution approach and fails to offer reliable guidance for the Courts regarding the RPEs' relative contributions to R&D.

226.    As Mr. Malackowski explained at trial, using unadjusted R&D spending to determine the contribution of the RPEs to the Nortel Group's IP is consistent with how the Group measured that same contribution (for profit sharing) prior to insolvency.[326] Ms. Ryan admitted as much,[327] and that Nortel used unadjusted R&D spending to allocate the proceeds from both the Alcatel sale and the Foundry settlement.[328] Ms. Ryan's adjustments are fundamentally inconsistent with the Nortel Group's prior treatment of R&D spending and should not be applied for the first time now.

### B.    Ms. Ryan Makes Significant Methodological Errors

227.    Ms. Ryan's analysis also contains major methodological errors that render her opinion unhelpful and unreliable. First, she credits NNI based on $5 billion of transfer pricing adjustments paid by NNI to NNL from 2001 through 2005, but fails to adjust her calculations to take into account the $2 billion settlement with the IRS and the CRA, in which the tax authorities determined that NNI had overpaid NNL in transfer pricing adjustments by $2 billion in that same

---

[325]    Trial Day 18 Tr. 4549:3–4550:11, June 19, 2014 (L. Ryan Cross).

[326]    *See* Trial Day 10 Tr. 2304:16–2306:13, May 29, 2014 (J. Malackowski Direct); Trial Day 11 Tr. 2560:15–22, May 30, 2014 (J. Malackowski Cross); DEM00011, Malackowski Slides at 34, 54.

[327]    Trial Day 18 Tr. 4566:4–23, June 19, 2014 (L. Ryan Cross).

[328]    Trial Day 18 Tr. 4563:7–12, 4565:20–24, June 19, 2014 (L. Ryan Cross).

period.[329]  The U.S. Debtors acknowledge that the $2 billion paid by NNI, now the subject of the settlement, was not a transfer pricing payment but a deemed dividend,[330] which even Ms. Ryan could not consider to be a funding contribution to R&D.  Furthermore, the $2 billion settlement resulted in a $2 billion allowed claim for the U.S. Debtors in the Canadian proceeding.[331]  To give the U.S. Debtors an allowed claim for $2 billion and give them credit for funding $2 billion of R&D would be double counting.[332]  Second, unlike Mr. Malackowski, Ms. Ryan fails to adjust her calculations to take into account the sale of Nortel's UMTS business to Alcatel.  Thus, Ms. Ryan's analysis double-counts again, by including R&D spending on the UMTS business for which the RPEs were already compensated in 2007 at the time of the Alcatel sale.[333]

### C.   Ms. Ryan Makes Unfounded Assumptions

228.   Nortel never captured or even estimated how much of the intercompany funding that occurred through transfer pricing adjustments was used for R&D funding, because that metric was irrelevant to its operations.[334]  Thus, Ms. Ryan needed to invent her own methodology to estimate the intercompany funding that was used for R&D.  To do so, she assumed that the RPEs used the transfer pricing adjustments for only two types of expenses:  R&D expenses (*i.e.*, the

---

[329]   Trial Day 18 Tr. 4538:25–4539:23, June 19, 2014 (L. Ryan Cross).

[330]   *See* Trial Day 2 Tr. 308:20–309:1, May 13, 2014 (J. Bromley Opening); *cf.* Trial Day 18 Tr. 4539:9–11, June 19, 2014 (L. Ryan Cross).

[331]   *See* Trial Day 2 Tr. 309:11–310:5, May 13, 2014 (J. Bromley Opening); DEM00003, U.S. Opening Slides at 194.

[332]   Trial Day 18 Tr. 4539:12–14, June 19, 2014 (L. Ryan Cross).

[333]   Trial Day 18 Tr. 4563:13–4565:16, June 19, 2014 (L. Ryan Cross).

[334]   *See* Trial Day 18 Tr. 4524:6–4525:6, June 19, 2014 (L. Ryan Cross).

direct R&D spending figures Mr. Malackowski used), and sales, general, and administrative ("SG&A") costs, and she pro-rated the intercompany funding between those two expenses.[335] That assumption is obviously incorrect because, as Ms. Ryan conceded, it ignores very significant additional costs incurred by the RPEs that they also could have, and in some cases must have, funded using the transfer pricing adjustments, including restructuring costs, costs of revenues, manufacturing, and distribution.[336]   Ms. Ryan's analysis thereby overestimates the intercompany funding by NNI that was used for R&D, rendering her conclusions unreliable.[337]

229.    Perhaps even more fundamentally, Ms. Ryan's approach assumes that all transfer pricing adjustments credited to NNUK were paid to NNUK.   In fact, the record shows that the vast majority of transfer pricing adjustments owed to NNUK in at least the 2001 to 2008 period were never paid, but rather were added to intercompany loan balances.[338]   If Ms. Ryan's analysis were correct, the Courts would have to conclude that the R&D that NNUK conducted was funded by payments it never received, an obviously unsupportable conclusion.

### D.    Ms. Ryan's Opinion Produces Absurd Results

230.    Ms. Ryan's focus on the funding of R&D rather than the inventive process produces absurd results and cannot be accepted.   Ms. Ryan applies a transfer pricing adjustment to NNUK for 2001 that was larger than NNUK's direct R&D spending in 2001, which results in a negative

---

[335]    Trial Day 18 Tr. 4525:12–4526:10, June 19, 2014 (L. Ryan Cross); DEM00022, Ryan Slides at 7.

[336]    Trial Day 18 Tr. 4526:11–4533:3, June 19, 2014 (L. Ryan Cross).

[337]    Trial Day 18 Tr. 4534:7–4535:14, June 19, 2014 (L. Ryan Cross).

[338]    *See* Trial Day 10 Tr. 2338:19–2339:3, May 29, 2014 (J. Malackowski Direct); Trial Day 18 Tr. 4557:6–4559:10, June 19, 2014 (L. Ryan Cross).

$8 million figure for NNUK's adjusted contribution to R&D in 2001.[339]  In effect, Ms. Ryan not only concludes that NNUK did not contribute to R&D that year, but also that NNUK actually had a negative effect on the Nortel Group's ability to create IP.  This conclusion negates the inventive work that Simon Brueckheimer and more than a thousand other researchers performed at NNUK in 2001.[340]  Such a result is absurd, fails to comport with how, as a matter of law, that inventive work led to beneficial ownership,[341] and undermines Ms. Ryan's entire analysis.

231.    For all of these reasons, Ms. Ryan's proposed adjustments to R&D spending are unreliable, and the contribution approach employed by Mr. Malackowski and Paul Huffard, valuation and allocation experts for the EMEA Debtors, should be adopted.

## VIII.   THE TESTIMONY OF THE CANADIAN EXPERTS IS UNRELIABLE

### A.    Testimony of Mr. Berenblut and Dr. Cox Is Not Persuasive and Does Not Assist the Courts

232.    The testimony of two of the allocation experts for the Canadian Debtors – Mark Berenblut and Dr. Alan Cox – fails to assist the Courts in determining the appropriate allocation of sale proceeds because it rests entirely on legal assumptions supplied by counsel, which, if proven false, would nullify their proposed methodology.  In fact, their assumptions are directly contradicted by the factual record.

---

[339]    Trial Day 18 Tr. 4554:1–4555:11, June 19, 2014 (L. Ryan Cross).

[340]    Trial Day 18 Tr. 4556:11–21, June 19, 2014 (L. Ryan Cross).

[341]    *See* Proposed Conclusions of Law § II.A.3(a).

233.    At trial, Mr. Berenblut explained that his opinion was informed by and based on assumptions and instructions from the Monitor's counsel regarding the legal interpretation of the MRDA.[342]  For example, Mr. Berenblut admitted that counsel for the Monitor instructed him to assume that NNL's legal title to Nortel IP equated with full ownership.[343]  This assumption was foundational to his opinion.[344]

234.    Mr. Berenblut and Dr. Cox were further advised to assume that pursuant to Article 14(a) of the MRDA, the U.S. and EMEA Debtors did not have the ability to transfer their interests in Nortel's IP.[345]  At his deposition, Dr. Cox explained that "[t]he ability to sell the IP did have a material impact on our methodology, yes, and our thinking."[346]  Mr. Berenblut admitted that if the U.S. and EMEA Debtors did have the ability to transfer their interests in the IP, the value and allocation would be affected and he would have to review his opinion.[347]

235.    Perhaps most telling is that Mr. Berenblut and Dr. Cox were instructed by counsel for the Canadian Debtors to assume that the scope of the U.S. and EMEA Debtors' license rights was

---

[342]    Trial Day 15 Tr. 3686:6–3687:8, June 16, 2014 (M. Berenblut Cross).

[343]    *See, e.g.*, Trial Day 15 Tr. 3689:16–3691:2, June 16, 2014 (M. Berenblut Cross); A. Cox Dep. Tr. 70:15–23, 89:3–13, Mar. 26, 2014; *see also* TR00047, Report of Mark L. Berenblut and Alan J. Cox ¶¶ 60–61 & n.56 (Jan. 24, 2014) [hereinafter "Berenblut & Cox Report"].

[344]    Trial Day 15 Tr. 3691:24–3692:21, June 16, 2014 (M. Berenblut Cross).

[345]    Trial Day 15 Tr. 3631:21–3632:6, June 16, 2014 (M. Berenblut Cross); A. Cox Dep. Tr. 89:17–90:8, Mar. 26, 2014; TR00047, Berenblut & Cox Report ¶ 61(b).

[346]    A. Cox Dep. Tr. 90:9–14, Mar. 26, 2014; *see also* A. Cox Dep. Tr. 67:17–68:15, Mar. 26, 2014; TR00047, Berenblut & Cox Report ¶ 62.

[347]    Trial Day 15 Tr. 3700:21–25, 3707:15–23, 3709:24–3710:6, June 16, 2014 (M. Berenblut Cross).

limited such that those entities were not entitled to an allocation from the proceeds of the Residual Patent Sale.[348]

236.    Each of these assumptions was material to Mr. Berenblut's and Dr. Cox's analysis, and because they are directly contradicted by the record, Mr. Berenblut's and Dr. Cox's reports and opinions are not credible.  As described above in Sections II through V of the Proposed Findings of Fact, every element of Nortel's conduct refuted the notion that only NNL owned the IP.  If Mr. Berenblut's and Dr. Cox's assumptions were correct, Nortel misrepresented matters to the tax authorities and gave the RPEs an allocation of Alcatel sale proceeds and licensing proceeds to which they were not entitled.  The more logical conclusion is that Nortel's conduct accurately reflected the RPEs' ownership rights, and the Canadian Debtors instructed their experts to make flawed assumptions.

237.    Mr. Berenblut and Dr. Cox therefore do nothing more than reiterate the Canadian Debtors' legal theory, and their opinions should be disregarded.

### B.      Testimony of Mr. Green is Not Persuasive and Does Not Assist the Courts

238.    The Canadian Debtors' other allocation expert, Philip Green, is equally unpersuasive because (i) he reaches beyond the scope of his expertise as a valuator to render a legal interpretation of the MRDA, (ii) his methodology is internally inconsistent and contradicts established valuation principles, and (iii) his assumptions and conclusions conflict with the factual record.

---

[348]    Trial Day 15 Tr. 3702:16–3703:6, June 16, 2014 (M. Berenblut Cross); A. Cox Dep. Tr. 61:2–62:11, Mar. 26, 2014; *see also* Trial Day 15 Tr. 3719:14–23, June 16, 2014 (M. Berenblut Cross).

### 1.    Opinion Based on Own Interpretation of the MRDA

239.    Mr. Green's opinion is based on his own interpretation of the MRDA.  He testified that the only assumption he made regarding the MRDA was that the agreement is still in effect – "the plain reading of the MRDA from a valuation perspective told me what the terms were that were important."[349]

240.    Mr. Green identified several key disputed interpretations of the MRDA that were significant to his analysis, including (i) NNL was the owner of the IP, (ii) the U.S. and EMEA Debtors held licenses that were limited in scope, (iii) the U.S. and EMEA Debtors held limited sublicense and enforcement rights, (iv) the licenses had limited transferability, and (v) the operating profits derived from using the licenses were required to be shared using the RPS methodology.[350]

241.    If any of Mr. Green's interpretations were incorrect, then he concedes that his primary analysis no longer applies.[351]  As described below, his understanding as to each of these issues is directly contradicted by the record.

242.    Recognizing the inherent problems in his methodology and conclusions, Mr. Green proposes alternative allocations in the event that his primary conclusions are rejected.[352]

---

[349]    Trial Day 13 Tr. 3178:8–3179:4, June 5, 2014 (P. Green Cross).

[350]    Trial Day 13 Tr. 3118:11–3120:6, June 6, 2014 (P. Green Direct); DEM00015, Green Slides at 11; *see also* Trial Day 14 Tr. 3341:15–3342:15, June 6, 2014 (P. Green Cross).

[351]    Trial Day 13 Tr. 3192:12–3193:5, 3219:24–3220:15, 3287:8–3288:17, June 5, 2014 (P. Green Cross); Trial Day 14 Tr. 3352:4–11, June 6, 2014 (P. Green Cross).

243.    Mr. Green's alternative allocations, however, merely make two adjustments to his primary approach:  (i) the value of the U.S. and EMEA IP rights transferred in the Business Sales is derived from the total proceeds rather than from a discounted cash flow analysis, and (ii) the U.S. and EMEA Debtors are entitled to a share of the proceeds of the Residual Patent Sale based on projections from the IP Co. models.[353]  Although each of these adjustments is appropriate and necessary, Mr. Green's alternative allocations otherwise suffer from all of the same fundamental flaws as are described below.

### 2.    Methodological Errors in Valuation and Allocation Approach

244.    Unlike Mr. Berenblut and Dr. Cox, Mr. Green actually performed a valuation analysis, but Mr. Green's analysis is methodologically unsound and at odds with the valuation principles on which he purports to rely.

245.    As described in more detail below, Mr. Green lumps the value of Customer-Related Assets with IP, which disproportionately increases the allocation to NNL and leads to the conclusion that all of the LREs – which sold valuable Customer-Related Assets, but not IP, as part of the Business Sales – would be left with no allocation at all and would therefore receive nothing for the valuable assets they transferred.  Each of the parties agrees that every Debtor should receive an allocation reflecting what it transferred as part of the Business Sales and the Residual Patent Sale.  Mr. Green also values in-place workforce using unreliable methods.

---

(Footnote continued from previous page)

[352]    Trial Day 13 Tr. 3146:14–3148:25, 3157:14–3160:22, 3163:3–3166:5, June 5, 2014 (P. Green Direct).

[353]    Trial Day 13 Tr. 3146:14–3147:15, 3163:3–3164:18, June 5, 2014 (P. Green Direct).

246.    Mr. Green adopts a value-in-use approach to value the U.S. and EMEA licenses based on his assumptions regarding the non-transferability of those interests, which disproportionately undervalues the allocations for the U.S. and EMEA Debtors.[354]

247.    Despite adopting an ownership approach to allocation, Mr. Green fails to allocate value to AREs, which, as described above in Section II.E of the Proposed Findings of Fact, were not parties to the MRDA and owned patents outright in their own names.[355]

248.    Despite purporting to apply the RPS methodology, Mr. Green fails to allocate routine returns to the non-RPEs (*i.e.*, the AREs, LREs, and CPEs), which disproportionately increases NNL's share of the proceeds.  He also fails to apply even his own theory consistently between the Canadian Debtors and the EMEA Debtors.[356]

249.    Mr. Green also uses 2010 RPS percentages in his analysis, which take into account R&D spending only between 2005 and 2009, despite the fact that the appropriate percentages to use under the RPS methodology's five-year look-back period to value assets sold in 2009 (*i.e.*, most of the major Business Sales) are the 2009 RPS percentages, which take into account R&D spending between 2004 and 2008.[357]  Using the 2010 RPS percentages instead of the 2009 RPS percentages increases NNL's allocation at the expense of the other parties.

---

[354]    Trial Day 13 Tr. 3213:12–3215:25, June 5, 2014 (P. Green Cross).

[355]    Trial Day 13 Tr. 3304:20–3316:20, June 5, 2014 (P. Green Cross).

[356]    Trial Day 13 Tr. 3237:18–3245:6, 3299:17–3302:5, June 5, 2014 (P. Green Cross).

[357]    Trial Day 13 Tr. 3302:7–3303:5, June 5, 2014 (P. Green Cross).

### 3. Opinion Not Tied to the Record

250.    Mr. Green's opinion is inconsistent with Nortel's (i) history of patent enforcement litigation and IP licensing, and sharing the resulting proceeds between the RPEs according to contributions to R&D, and (ii) representations to tax authorities regarding the ownership of its IP, and entitlement to proceeds from the sale of that IP, as described above in Sections III.C and V of the Proposed Findings of Fact.  Mr. Green was aware of and reviewed much of this key evidence, but he did not consider it relevant to his analysis.[358]

251.    For example, Mr. Green concluded that the Alcatel sale was not relevant to his analysis because Nortel's own allocation approach for the IP proceeds from that sale was a simplified approach that ignored the economic realities of the MRDA.[359]    Mr. Green's dismissive conclusions regarding the Alcatel transaction are completely contradicted by the record.  Not only did Nortel consider its own agreement and the propriety of its chosen allocation approach, but it defended this approach to its auditors and paid taxes on the basis of its allocation determination.[360]

252.    Mr. Green also uses the RPS methodology to artificially limit the value of the U.S. and EMEA IP interests by refusing to apply the same sharing mechanism to NNL's IP interest,

---

[358]    *See, e.g.*, Trial Day 13 Tr. 3267:8–3272:13, 3275:15–3278:9, 3281:18–3287:7, June 5, 2014 (P. Green Cross).

[359]    Trial Day 13 Tr. 3276:12–3278:9, June 5, 2014 (P. Green Cross).

[360]    *See* TR21165, Memorandum from the Nortel Global Initiatives Group to the Project Osiris Files, at 2 (Feb. 15, 2007), at NNC-NNL06121235/2; Trial Day 9 Tr. 1875:23–1877:2, May 28, 2014 (M. Weisz Cross).

despite there being no basis in the record for treating NNL differently than the other RPEs, as described above.

253.    Mr. Green relies on the "Shared" and "Not Used" designations, which the Nortel Group used to categorize its residual patents during the postpetition period only, as the basis for restricting the scope and value of the U.S. and EMEA licenses.[361]   However, the record is clear that this categorization had nothing to do with the MRDA or the way the Nortel Group operated prepetition.

254.    When the Nortel Group was determining which of its patents should be included in each Business Sale, it evaluated each patent in the Nortel portfolio to determine its relevance to the Line of Business being sold.[362]   John Veschi, NNI's chief IP officer who now works at Rockstar, explained that he developed a "predominant use" standard solely for this postpetition process.[363] If a patent's "predominant use" were in a particular Line of Business, it would be sold with the assets of that business.  The Group retained all patents that were "Shared" across multiple Lines of Business or "Not Used" by any Line of Business, and later sold this residual patent portfolio to Rockstar in the Residual Patent Sale.[364]

---

[361]   *See* Trial Day 13 Tr. 3150:1–3152:22, June 5, 2014 (P. Green Direct); DEM00015, Green Slides at 12, 18, 22, 23.

[362]   TR43650, Nortel's Patent Portfolio:  An Overview, at 3 (July 2010); G. McColgan Dep. Tr. 128:7–132:7, Nov. 8, 2013; J. Veschi Dep. Tr. 122:6–127:10, Nov. 7, 2013.

[363]   J. Veschi Dep. Tr. 122:6–127:10, Nov. 7, 2013.

[364]   G. McColgan Dep. Tr. 123:11–133:10, Nov. 8, 2013; TR22107, Email from Gillian McColgan, NNI, to John Veschi, NNI, *et al.* (Jan. 12, 2010, 12:25 p.m.) (attaching spreadsheet categorizing residual patents as either "Shared" or "Not Used"); *see* TR48932, Overview [of Nortel Patents as Presented to Iceberg Purchasers], at

(Footnote continued on next page)

255.    In prior sales of its IP, the Nortel Group had implemented a more restrictive "exclusive use" standard to determine how much of its IP should transfer to a purchaser.[365]   Mr. Veschi developed the "predominant use" standard for the specific circumstances of the postpetition asset sales in order to retain as much value within the Nortel Group as possible, while simultaneously enabling the Business Sales to move forward quickly and generate maximum proceeds.[366]   As Mr. Veschi explained at his deposition, the "predominant use" standard had nothing to do with the terms of the MRDA.[367]

256.    Further, due to the interrelated nature of the RPEs' R&D, Nortel never made a practice of mapping its patents to specific products during the prepetition period.[368]   Rather, the Group believed, and represented to third parties and tax authorities, that its pool of IP was indistinguishable.[369]

---

(Footnote continued from previous page)

NNI_ICEBERG_00196160 (describing patents divested in Business Sales and remaining residual patents with "[s]trict limits on licenses granted").

[365]   J. Veschi Dep. Tr. 123:23–125:16, Nov. 7, 2013.

[366]   J. Veschi Dep. Tr. 128:11–25, Nov. 7, 2013.

[367]   J. Veschi Dep. Tr. 286:22–287:11, Nov. 7, 2013.

[368]   *See* TR22111, Email from Gillian McColgan, NNI, to John Veschi, NNI, *et al.* (Nov. 1, 2010, 7:40 p.m.) ("we haven't ever made a practice of mapping our own products to our own patents").

[369]   TR21160, Email from Louis Farr, NNI, to Timothy Pickering, Deloitte, *et al.* (Jan. 29, 2007, 2:25 p.m.) (describing "Nortel's view that all Nortel IPR is indistinguishable such that all value should be shared among the RPS members").

257.    The fact that the "predominant use" standard was used solely in connection with the postpetition sales demonstrates that Mr. Green's interpretation of the scope of the U.S. and EMEA license rights is unfounded.

### C.    Testimony of Mr. Britven is Not Persuasive and Does Not Assist the Courts

258.    The CCC's allocation expert, Thomas Britven, is similarly unpersuasive due to (i) his reliance on legal assumptions as the foundation for his methodology, (ii) methodological errors, and (iii) inconsistencies with the factual record.

### 1.    *Opinion Based on Legal Assumptions from Counsel*

259.    Mr. Britven's ownership approach to allocation "is based upon an interpretation of the MRDA that [he] received from counsel, and those underlying assumptions are foundational to [his] analysis."[370]    Specifically, Mr. Britven's opinion is based on the assumptions that NNL owned the patents while the U.S. and EMEA Debtors only held limited licenses, the sublicense right was limited, and the MRDA was not transferable.[371]

260.    Mr. Britven acknowledged that these assumptions are similar to Mr. Green's interpretation of the MRDA.[372]    For the reasons discussed above in Sections II through V of the Proposed Findings of Fact, the evidence directly contradicts these assumptions.

---

[370]    Trial Day 14 Tr. 3370:18–23, June 6, 2014 (T. Britven Direct).

[371]    DEM00016, Britven Slides at 18.

[372]    Trial Day 14 Tr. 3467:4–17, June 6, 2014 (T. Britven Cross).

## 2. No Independent Valuation of IP

261.    Mr. Britven did not independently value the IP sold in the Business Sales or the Residual Patent Sale; instead, he relied on values assigned to the IP in three purchaser PPAs.[373]  Mr. Britven acknowledged that the internal PPAs prepared by the Nortel Group for financial reporting purposes following the Business Sales and Residual Patent Sale would be relevant evidence, but he did not review those documents and, at the time that he prepared his reports, he was not even aware that they existed.[374]

262.    After reviewing the Nortel Group's internal PPAs at trial, Mr. Britven conceded that the data he used in his calculations differed from Nortel's allocations.[375]

263.    Mr. Britven's reliance on third party data, rather than performing an independent valuation or relying on Nortel's own data, adds nothing that would assist the Courts in allocating sale proceeds.

## 3. Improper Reliance on Annual Impairment Test

264.    Mr. Britven used the purported value of the Lines of Business in the Nortel Group's hands as the starting point for determining the value of the surrendered licenses in the hands of the U.S. and EMEA Debtors.  He used a value of $988 million, which was derived from an internal Nortel working spreadsheet that Mr. Britven claimed was a 2008 fourth-quarter annual

---

[373]    Trial Day 14 Tr. 3385:1–11, June 6, 2014 (T. Britven Direct); Trial Day 14 Tr. 3459:15–3461:4, 3466:2–6, June 6, 2014 (T. Britven Cross).

[374]    Trial Day 14 Tr. 3507:5–20, June 6, 2014 (T. Britven Cross).

[375]    Trial Day 14 Tr. 3512:8–11, June 6, 2014 (T. Britven Cross).

impairment test ("AIT").[376]  He testified that he is not aware of any Nortel document other than the AIT that includes this $988 million figure.[377]  Mr. Britven admitted that the reliability of his calculation, and the reliability of his ultimate allocation to the U.S. and EMEA Debtors, is dependent on the accuracy of this $988 million figure.[378]

265.    The AIT, which was the starting point for Mr. Britven's value-in-use analysis, contains unreliable data, including discounted cash flow values calculated as of 2011 rather than December 31, 2008, zero value attributed to a business unit that was later part of the Enterprise sale, and valuations of several Lines of Business that were wildly inconsistent with the ultimate sale prices.[379]

266.    Mr. Britven admitted that internal memoranda and financial statements did not include data that matched this $988 million figure.  Specifically, this $988 million figure was never incorporated into Nortel's financial statements,[380] nor was it represented in a fourth-quarter memorandum sent to Nortel's auditors.[381]

267.    That this figure was not included in the fourth-quarter auditor memorandum is particularly telling.  Similar data that Nortel prepared in the third quarter of 2008 – which valued

---

[376]    Trial Day 14 Tr. 3422:3–7, June 6, 2014 (T. Britven Cross); DEM00016, Britven Slides at 16–17.

[377]    Trial Day 14 Tr. 3448:3–16, 3516:25–3517:8, June 6, 2014 (T. Britven Cross).

[378]    Trial Day 14 Tr. 3422:25–3425:7, June 6, 2014 (T. Britven Cross).

[379]    Trial Day 14 Tr. 3451:17–3455:10, 3544:16–3552:15, June 6, 2014 (T. Britven Cross).

[380]    Trial Day 14 Tr. 3422:12–24, June 6, 2014 (T. Britven Cross).

[381]    Trial Day 14 Tr. 3542:23–3552:15, June 6, 2014 (T. Britven Cross).

the Lines of Business at $6.933 billion rather than $988 million – was picked up in a third-quarter auditor memorandum and in Nortel's financial statements.[382]   Mr. Britven's fourth-quarter data was not comparably audited or finalized.

268.   Mr. Britven improperly relied on a single, unverified document as the basis for his valuation of the U.S. and EMEA license rights, and therefore his valuation and allocation is unreliable.   If the $6.933 billion figure were used in his calculations rather than $988 million, NNL would receive no IP allocation under Mr. Britven's approach.   As Mr. Britven himself volunteered at trial, if an approach produces an unreasonable result, one should question its validity.[383]

### 4.   Opinion Not Tied to the Record

269.   Mr. Britven's opinion is inconsistent with the facts of this case, specifically with Nortel's allocation based on historical R&D spending of IP sale proceeds in the Alcatel sale,[384] with Nortel's approach to sharing profits and losses under the RPS methodology, and with the Foundry litigation and Nortel's practice of sharing the costs and benefits of litigation and licensing according to contributions to R&D.[385]   Finally, Mr. Britven's assumptions and conclusions about IP ownership contradict the strong evidence in the record describing the beneficial ownership shared by the RPEs, as described above.

---

[382]   Trial Day 14 Tr. 3426:6–3431:5, June 6, 2014 (T. Britven Cross).

[383]   *See* Trial Day 14 Tr. 3538:14–24, June 6, 2014 (T. Britven Cross) ("[W]hen you get to unreasonable results, we obviously have to step back and say, what is transpiring here?").

[384]   Trial Day 14 Tr. 3529:25–3530:11, June 6, 2014 (T. Britven Cross).

[385]   Trial Day 14 Tr. 3530:15–3533:21, June 6, 2014 (T. Britven Cross).

## IX.    IF THE COURTS WERE TO ADOPT A LICENSE APPROACH, THE APPROACH EMPLOYED BY MR. MALACKOWSKI IS THE MOST RELIABLE

270.    If the Courts determine that a license approach is the appropriate allocation methodology, they should adopt Mr. Malackowski's alternative license approach because (i) Mr. Malackowski was a credible expert witness, and no party challenged Mr. Malackowski on the basis of his capability or expertise, and (ii) Mr. Malackowski was the only expert to independently value the IP sold in this case, which results in a more accurate allocation of value to the license holders.

### A.    Mr. Malackowski Valued the IP Transferred in the Business Sales

271.    In his alternative license approach, Mr. Malackowski used the relief-from-royalty method, discussed above in the context of the contribution approach, to value the IP sold in the Business Sales.[386]  Applying this valuation methodology, Mr. Malackowski determined that the total value of the IP sold in the Business Sales was $765 million.[387]

### B.    Mr. Malackowski Valued the IP Transferred in the Residual Patent Sale

272.    In order to allocate the Residual Patent Sale proceeds under an alternative license approach, Mr. Malackowski first determined the components of value within that sale by dividing the portfolio into the eight "franchises" designated by Global IP.[388]  To determine revenue by geography, Mr. Malackowski considered industry revenue from countries with at

---

[386]    TR00033, Malackowski Report 49; Trial Day 10 Tr. 2339:18–2340:6, May 29, 2014 (Malackowski Direct).

[387]    *See, e.g.*, DEM00011, Malackowski Slides at 5.

[388]    TR00033, Malackowski Report 31; Trial Day 10 Tr. 2340:23–2341:11, May 29, 2014 (J. Malackowski Direct).

least one high-interest patent in a given franchise, as based on Global IP's interest-level categorization of the residual patents.[389]

273.    Mr. Malackowski then estimated the size of the global market for each franchise from 2011 through the year of the average expiration date of the U.S. high-interest patents.[390]   He derived these global market sizes from various third-party forecasts, along with assumptions for growth rate and inflation.[391]   Mr. Malackowski then estimated the income achievable from licensing the residual patents in each franchise.[392]

274.    Mr. Malackowski's approach and conclusions are reasonable, consistent with the trial record, and credible.  He concluded on a valuation for the residual patents of $3.6 billion using conservative assumptions about revenue outside RPS jurisdictions and $5.3 billion using less conservative assumptions.[393]   The mid-point between the two figures is almost exactly the actual $4.5 billion purchase price.

---

[389]    TR00033, Malackowski Report 32–33.

[390]    TR00033, Malackowski Report 34; DEM00011, Malackowski Slides at 57.

[391]    TR00033, Malackowski Report 34–35; *see also* DEM00011, Malackowski Slides at 56.

[392]    TR00033, Malackowski Report 32.

[393]    DEM00011, Malackowski Slides at 52; TR00033, Malackowski Report 37–38 & tbl. 13.

275.    Because the final amount of the Residual Patent Sale valuation came to $3.6 billion, the percentage attributed to each RPE was then scaled from the $3.6 billion valuation and applied to the $4.5 billion purchase price, with relative entity shares remaining constant.[394]

### C.    Mr. Malackowski's Alternative License Approach to Allocating Value of IP

276.    Under Mr. Malackowski's alternative license approach, the RPEs' rights in Nortel IP are equal to the value of the exclusive licenses and nonexclusive licenses to Nortel IP.[395]   Using geographic projections from reputable third-party market research firms, Mr. Malackowski divided the net present value of both the Line of Business IP and the residual patents – *i.e.*, the total value of all the exclusive and nonexclusive licenses to Nortel IP – by the country in which the revenue that drove the value would be earned.[396]

277.    For the exclusive licenses, the RPEs received an allocation of the net present value of their exclusive geographic territory's share of global net present value.[397]

278.    For the nonexclusive licenses, Mr. Malackowski divided the sum value of rest-of-the-world IP into five equal parts – one for each of the five RPEs.  The equal-fifths division flows naturally from the nature of the nonexclusive licenses and is consistent with the approach taken

---

[394]   See TR00033, Malackowski Report 33; Trial Day 10 Tr. 2334:8–16, May 29, 2014 (J. Malackowski Direct).

[395]   TR00033, Malackowski Report 49.

[396]   TR00033, Malackowski Report 7, 49–52.

[397]   TR00033, Malackowski Report 7.

by Jeffrey Kinrich, valuation and allocation expert for the U.S. Debtors.[398]  Since each RPE had

a nonexclusive, sublicensable license in every non-RPE jurisdiction, the sum of these licenses

should equal the income obtainable through a single exclusive license.[399]  Additionally, each of

the RPEs, with its nonexclusive, sublicensable license, could have held up the postpetition sales

by refusing to relinquish these rights and inhibiting the sale of clean, enforceable, exclusive

rights to a buyer.[400]

279.    Accordingly, each RPE is entitled to one-fifth of the value of the licenses in the

nonexclusive jurisdictions.  The EMEA Debtors, with three RPEs, are thus entitled to three-fifths

of this value.

280.    When summed across the Business Sales by the RPEs, the licensed-based allocation of

the total Business Sale proceeds is as follows[401]:

---

[398]    TR00033, Malackowski Report 50; Trial Day 17 Tr. 4119:9–4120:3, June 18, 2014 (J. Kinrich Direct).

[399]    TR00033, Malackowski Report 51.

[400]    TR00033, Malackowski Report 51.

[401]    DEM00011, Malackowski Slides at 58.



281.    As noted above, the final Residual Patent Sale valuation of $3.6 billion is scaled so that each RPE receives the same percentage share applied to the final purchase price of $4.5 billion. After further adjustments for values attributable to the patents that were owned outright by certain Nortel entities, the allocation of the Residual Patent Sale under a license-based allocation approach is[402]:

---

[402]    DEM00011, Malackowski Slides at 59.





## X. NET TANGIBLE ASSETS SHOULD BE VALUED BASED ON NORTEL'S BOOKS AND RECORDS

282.    According to the asset sale agreements governing the Business Sales, Nortel sold various tangible assets to the Business Sale purchasers, including monetary assets, inventory, and fixed assets.[403]  The asset sale agreements also show that the purchasers assumed certain liabilities of the respective Lines of Business.[404]  For allocation purposes, these assumed liabilities are

---

[403]    The monetary assets sold to the purchasers primarily consisted of certain transferred accounts receivable and prepaid expenses.  Inventory consisted of raw materials, manufactured and purchased parts, work-in-progress, packaging, stores and supplies, related materials, and merchandise that the selling entities maintained as they continued to run their businesses as debtors in possession prior to the completion of the Business Sales.  Fixed assets consisted of physical plant machinery, equipment, and real estate.  TR00030, Huffard Report ¶ 62; *see also* Trial Day 9 Tr. 1959:4–14, May 28, 2014 (P. Huffard Direct).

[404]    The assumed liabilities included contractual liabilities, royalty liabilities, warranty provisions, accrued vacation, product defect provisions, and net deferred revenue.  TR00030, Huffard Report ¶ 63 & n.77.

thought of as a class of assets with a fixed, negative value, which is then netted against the value allocable to each entity out of the gross value of the assets transferred.[405]

283.    Because both tangible assets and assumed liabilities can be valued and allocated in the same fashion, they are appropriately considered as one asset class of Net Tangible Assets.[406]  Net Tangible Assets are valued based on their recorded book value and are allocated directly to the selling entity that held the assets and liabilities on its balance sheet.[407]  The appropriate source for the book value of the Net Tangible Assets is the fourth quarter 2009 financial statements of each Nortel selling entity.[408]  This represents the fair market value of that portion of the Business Sale proceeds attributable to Net Tangible Assets.[409]

## XI.    CUSTOMER-RELATED ASSETS AND GOODWILL ARE DISTINCT ASSET CLASSES THAT SHOULD BE VALUED BASED ON 2008 REVENUE

### A.    The Record Establishes that Customer-Related Assets Were a Distinct Asset Class that Should Be Valued Separately from IP

284.    The Customer-Related Assets transferred in the Business Sales are separately identifiable from the Group's IP assets, and they have significant value.

---

[405]    TR00030, Huffard Report ¶ 64; Trial Day 9 Tr. 1963:17–1964:2, May 28, 2014 (P. Huffard Direct).

[406]    TR00030, Huffard Report ¶ 65.

[407]    TR00030, Huffard Report ¶ 65; *see also* Trial Day 9 Tr. 1959:4–14, 1962:2–6, May 28, 2014 (P. Huffard Direct).

[408]    TR00030, Huffard Report ¶ 84.

[409]    *See* TR00030, Huffard Report ¶ 100.

285.    Nortel's customer relationships spanned the Lines of Business and geographic territories.[410]  Nortel had an extensive network through which it would service customers locally and transnationally in many significant markets, including Europe.[411]

286.    The purchasers who acquired Nortel's Lines of Business gained (i) customer contracts, including anticipated revenue from future opportunities presented by Nortel's existing customer relationships, (ii) sales, distribution, and customer-support infrastructures, and (iii) active employees who could continue to foster the existing customer relationships and preserve their value for the purchasers.[412]

287.    These Customer-Related Assets have significant value, and purchasers paid more in the Business Sales than they would have to just acquire the tangible assets and IP of the Lines of Business.[413]

### 1.    Nortel Executives Recognized the Group's Valuable Customer-Related Assets

288.    Numerous Nortel executives testified regarding the importance of customer relationships and a distribution network to Nortel, separate and apart from its technology.

---

[410]    TR00030, Huffard Report ¶ 73.

[411]    TR00030, Huffard Report ¶ 73.

[412]    TR00030, Huffard Report ¶¶ 69–75, app. 20 ¶ 1; *see also* Trial Day 9 Tr. 1969:21–1970:11, May 28, 2014 (P. Huffard Direct).

[413]    TR00030, Huffard Report ¶ 72.

289.    At trial, Peter Newcombe, EMEA's president of Carrier Networks and a trial witness for the EMEA Debtors and UKPC, discussed how customer relationships have "significant value" for a telecommunications supplier like Nortel because "[i]t's quite an investment to penetrate a specific account, particularly these larger customers."[414]

290.    John Roese, who led NNL's IP practice as chief technology officer, testified that customer relationships "are an extremely valued asset" separate and apart from IP, emphasizing that "[i]f no one knows who you are, great technology goes nowhere."[415]

291.    At his deposition, NNSA's Philippe Albert-Lebrun explained that NNSA had key customer relationships with the first and third largest telecommunications distributors in France – Orange and Bouyges Telecom.[416]  These relationships were "very important" to NNSA.[417]

292.    These relationships were not only important to NNSA; strong local customer relationships also had broader implications for the Nortel Group.  Stephen Pusey, EMEA sales president, testified that EMEA sales teams served both EMEA-only customers and global accounts.[418]

---

[414]    Trial Day 7 Tr. 1611:18–1612:14, May 22, 2014 (P. Newcombe Direct).

[415]    J. Roese Dep. Tr. 157:20–24, 158:13–17, Nov. 11, 2013.

[416]    P. Albert-Lebrun Dep. Tr. 46:20–48:15, Nov. 21, 2013.

[417]    P. Albert-Lebrun Dep. Tr. 48:16–18, Nov. 21, 2013.

[418]    S. Pusey Dep. Tr. 71:16–72:8, Nov. 18, 2013.

293.    Mr. Newcombe also explained the crossover between work done in various geographic regions and the cross-pollination of customer relationships:  "The customer relationships that were driven by Nortel's EMEA region often generated revenues in Nortel's other Regions, including North America.  This was the nature of Nortel's global business."[419]  For example, when Nortel's established North American customer MCI/WorldCom wanted to invest in a VoIP system in the EMEA region, Nortel's EMEA sales force won a bid for that work.[420]

294.    This type of cross-pollination happened in all directions throughout the Nortel Group. There is no evidence that any one debtor group had disproportionately more "prime" customer relationships in relation to its overall revenue.

## 2.    *Nortel's Treatment of Customer-Related Assets in the Alcatel Sale*

295.    Attributing value to Customer-Related Assets is consistent with the way Nortel allocated value in connection with prepetition asset sales, specifically the sale of its UMTS business to Alcatel.[421]

296.    Both Alcatel and Nortel attributed a meaningful portion of the UMTS sale price to a separate asset class of customer relationships.  Of the $293 million net purchase price for the UMTS business, $51.8 million was attributed to customer relationships.[422]

---

[419]    TR00024, Newcombe Aff. ¶ 42.

[420]    TR00024, Newcombe Aff. ¶ 48.

[421]    Trial Day 9 Tr. 1972:18–1973:25, May 28, 2014 (P. Huffard Direct).

[422]    TR47212.02, Nortel/Alcatel Purchase Price Allocation, Asset Allocation Statement (Dec. 29, 2006).

297.    The Nortel entities that held the primary relationships with various customers received an allocation from the proceeds of the Alcatel sale based on their proportionate share of 2006 revenues from the UMTS business.[423]

298.    Nortel's allocation of the UMTS sale proceeds, including this allocation based on a separate class of customer relationships, was audited by Deloitte.[424]

299.    Deloitte requested that Nortel explain why it chose to allocate the value of the customer relationships according to revenue rather than based on the way it allocated the value of the IP, *i.e.*, based on contribution to R&D.[425]  In response to Deloitte's request, Nortel explained that it did not consider customer relationships to be part of the value attributable to IP and that customer relationships were not governed by the MRDA: "Customer contracts (the basis for the Customer Relationship intangible), which are owned by the Nortel contracting party, are not considered technology and are thus outside the MRDA."[426]

---

[423]    TR21165, Memorandum from the Nortel Global Initiatives Group to Project Osiris Files, at 1 (Feb. 15, 2007), at NNC-NNL06121235/1; TR21160, Email from Louis Farr, NNI, to Timothy Pickering, Deloitte, *et al.* (Jan. 29, 2007, 2:25 p.m.); TR43287, Nortel Networks Sale of UMTS Access Business to Alcatel Lucent Allocation of Consideration, at EMEAPROD1305281; TR41171.01, Email from Kerry Stephens, EMEA, to Michael Orlando, NNI, *et al.* (Jan. 14, 2007, 9:57 a.m.).

[424]    TR44313, Memorandum from Ron A. Mulder, Deloitte, to Nortel 2006 Audit Files – Tax Provision/Transfer Pricing (Jan. 26, 2007); TR21160, Email from Timothy Pickering, Deloitte, to Louis Farr, NNI, *et al.* (Jan. 27, 2007, 11:06 a.m.), at BHG0137544; TR21160, Email from Louis Farr, NNI, to Timothy Pickering, Deloitte, *et al.* (Jan. 29, 2007, 2:25 p.m.), at BHG0137543.

[425]    *See* TR21165, Email from Michael Orlando, NNI, to Peter Look, NNL, *et al.* (Feb. 16, 2007, 2:40 p.m.).

[426]    TR21165, Memorandum from the Nortel Global Initiatives Group to Project Osiris Files, at 3 (Feb. 15, 2007), at NNC-NNL06121235/3.

300.    At trial, EMEA's Kerry Stephens reiterated the Nortel Group's conclusion that "customer contracts are not IP or technology" and explained that Nortel's auditors and the U.K. tax authorities signed off on Nortel's approach.[427]    The Canadian Debtors' approach in this proceeding is flatly inconsistent with Nortel's own past practice.

> 3.    *Nortel Highlighted the Value of the Group's Customer-Related Assets to Potential Purchasers of the Lines of Business*

301.    Nortel recognized that its customer relationships were very valuable to potential purchasers of its Lines of Business.[428]

302.    Mike Zafirovski, president and CEO of NNL, explained that "[o]bviously, customers [were] very important" when Nortel was selling its Lines of Business.[429]

303.    Mr. Newcombe echoed, "One of the key selling points of the business from the perspective of Nortel management was its customer relationships, accounts and contracts which underpinned revenues."[430]    In his view, "the technology in the MEN business constituted only one aspect of the value which was sold to Ciena.  Customer relationships, distribution channels and other assets constituted much of the rest of the value."[431]

---

[427]    *See* Trial Day 8 Tr. 1736:18–1738:19, May 27, 2014 (K. Stephens Direct).

[428]    Trial Day 9 Tr. 1972:18–1973:12, May 28, 2014 (P. Huffard Direct).

[429]    M. Zafirovski Dep. Tr. 118:4–14, Nov. 6, 2013.

[430]    TR00024, Newcombe Aff. ¶ 51.

[431]    TR00024, Newcombe Aff. ¶ 52.

304.    The U.S. Debtors even represented to the U.S. Court when they moved for approval of

the Business Sales that Nortel's Customer-Related Assets were a "significant aspect" of the

sales:

> A significant aspect of the value of the MEN Business is the
> established relationships the Debtors maintain with hundreds of
> customers with whom they have entered into the contracts at issue
> in the Sale Motion, in addition to other contracts related to the
> MEN Business but not at issue in the Sale Motion.   These
> Customer Contracts are of critical value not only to any
> prospective purchaser of the Customer Contracts but also to the
> Debtors' other businesses.[432]

305.    Nortel pitched potential purchasers regarding the value of its Customer-Related Assets.[433]

For the MEN sale, for example, Nortel prepared management presentations that specifically

identified and pitched Nortel's "enviable customer base," its "[i]nstalled base and customer

relationships," and its "premier customer opportunities."[434]

306.    Khush Dadyburjor, an employee in mergers and acquisitions at NNL, testified that

"customer assets would always have been an important element" in the Business Sales and that

---

[432]    TR50133, Declaration of George Riedel ¶ 17, Oct. 7, 2009 [D.I. 1627 Ex. B].

[433]    TR47251, CDMA Presentation to MatlinPatterson at 18–19 (July 7, 2009); TR40109, Next Generation Packet Core – Project Seville Information Memorandum at 5, 9–11 (July 31, 2009); TR48683.02, Met[r]o Ethernet Networks, Project Snow, Presentation to Ekberg at 10, 22 (Mar. 13, 2009); TR47260.02, Enterprise Solutions, Presentation to Narnia at 8–10 (Dec. 5, 2008); TR43850, Enterprise Solutions Project Equinox Management Presentation at 29, 85, 128 (Mar. 2009).

[434]    TR48945, Metro Ethernet Networks, Project Snow, Management Presentation at 6, 10, 11, 15, 22, 30 (Oct. 2009).

Nortel described the important and valuable customer relationships it had to offer to the potential purchasers.[435]

307.    At trial, Mr. Newcombe clarified that Nortel was not only offering potential purchasers the Group's technology; rather, a "key selling point[]" when Nortel pitched potential customers was its "incredibly valuable" Customer-Related Assets.[436]  He explained that Nortel collected customer-specific information to pitch to potential purchasers, including sales revenue and the quality of revenue generated from specific customers, and that "we even ended up having Q and A from various buyers that was probing around the level of customer intimacy you had, how well-embedded you were within that specific customer."[437]

308.    Roy Maclean, Enterprise operations leader at NNL, described how when Avaya purchased Nortel's Enterprise business, it essentially acquired a wealth of Customer-Related Assets:

> The cumulus that they got was really all of the -- so if you look at what the Enterprise Unit does, it sells to hundreds of thousands of businesses, that's really what it does. It's not that you're getting so much an account; you are getting, like, a plethora of accounts.  So, like, you have the largest market share in hotels so a lot of the hotels have it.  So you've got a lot of market segments.  What you also got is a lot of the channels and distribution, so the big ones that do that include things like Bell Canada, Verizon, Shared Technologies, BT in the U.K., that's kind of -- a lot of channel

---

[435]    K. Dadyburjor Dep. Tr. 94:18–96:5, Oct. 3, 2013.

[436]    Trial Day 7 Tr. 1653:14–1655:9, May 22, 2014 (P. Newcombe Cross); *see also* TR00024, Newcombe Aff. ¶ 52.

[437]    Trial Day 7 Tr. 1614:21–1615:12, May 22, 2014 (P. Newcombe Direct).

> distribution as well. . . . The other thing that they got that was of
> significance was the CS2100 business which in that business
> mostly it was just large customers that they got. These are
> excellent accounts to get. This is the Social Security Agency in the
> United States, this is Georgia Tech, this is Stanford, this is, like,
> the who's who. The President of the United State's [sic] phone is
> on a CS2100, the U.S. Senate runs on 2100. These are good
> accounts to have.[438]

309.    Mr. Newcombe explained how Ciena, recognizing the value of the Customer-Related

Assets it acquired from Nortel's MEN business, "made significant efforts" to retain Nortel's

customers.[439]    Additionally, in order to maintain continuity with customers and capitalize on

existing relationships, Nortel employees, including Mr. Newcombe, were transferred to the

purchasers of the Lines of Business.[440]

310.    Mr. Newcombe testified that he would estimate that the purchasers valued Nortel's IP

and Customer-Related Assets at about 50:50; one company who was only interested in the MEN

IP submitted a bid that was half the price of Ciena's winning bid.[441]

    4.    *Evidence from Fact Witnesses Demonstrates that Purchasers of the
        Lines of Business Bought Nortel's Customer Relationships in
        Order to Sell Nortel's Customers Non-Nortel Technology*

311.    At trial, NNL's Paviter Binning explained that purchasing a Nortel Line of Business gave

the purchaser the ability to cross-sell its own products and platforms to Nortel's customers.[442]

---

[438]    R. Maclean Dep. Tr. 22:3–23:11, Oct. 23, 2013.

[439]    Trial Day 7 Tr. 1615:20–1617:7, May 22, 2014 (P. Newcombe Direct); *see also* TR00024, Newcombe Aff. ¶ 53.

[440]    TR00030, Huffard Report ¶ 70; TR00024, Newcombe Aff. ¶ 11.

[441]    Trial Day 7 Tr. 1617:21–1618:16, May 22, 2014 (P. Newcombe Direct).

312.    Mr. Newcombe explained how Ericsson's motivation for purchasing the CDMA and GSM businesses was not to acquire the CDMA and GSM technology but rather was to acquire an installed customer base and established presence in the North American market to be able to cross-sell future generations of technology, specifically LTE, to Nortel's customers.[443]

### 5.    Purchasers' Treatment of Nortel's Customer-Related Assets

313.    The purchasers of the Lines of Business reported in their financial statements that they gained significant value from acquiring Nortel's Customer-Related Assets.   For example, Ericsson reported that its acquisition of Nortel's CDMA and LTE assets "significantly expand[ed] Ericsson's footprint in [the North American] market, particularly as operators in this region are emerging as early adopters of LTE technology."[444]

314.    Avaya reported, "The acquisition of NES expands Avaya's technology portfolio, enhances its customer base, broadens its indirect sales channel, and provides greater ability to compete globally."[445]

---

(Footnote continued from previous page)

[442]    Trial Day 5 Tr. 1119:8–11, May 20, 2014 (P. Binning Cross).

[443]    Trial Day 7 Tr. 1622:11–23, May 22, 2014 (P. Newcombe Direct).

[444]    TR40195, LM Ericsson Telephone Co., Annual Report for the Fiscal Year Ended Dec. 31, 2009 (Form 20-F), at 27 (Apr. 21, 2010); *see also* DEM00010, Huffard Slides at 14.

[445]    TR40193, Avaya Inc., Annual Report for the Fiscal Year Ended Sept. 30, 2010 (Form 10-K), at 32 (Dec. 7, 2010); DEM00010, Huffard Slides at 15.

315.    Ciena publicly commented, "We're experiencing strong customer reengagement from historical MEN customers and have already had a number of early successes with respect to cross-selling."[446]

316.    The purchasers consistently separated Customer-Related Assets from IP when they included PPAs on their financial statements to report the value of the assets they acquired by purchasing Nortel's Lines of Business.[447]

317.    Additionally, the purchasers took nonexclusive licenses to Nortel IP that was shared between multiple Lines of Business, which they would not have agreed to do if they were purchasing the Lines of Business solely or primarily for Nortel's IP.[448]

> 6.    *Mr. Huffard and Mr. Britven Agree that Customer-Related Assets Should Be Valued and Allocated Separately from IP*

318.    Paul Huffard, valuation and allocation expert for the EMEA Debtors, reviewed the record discussed above and relied on this evidence to conclude that Customer-Related Assets and IP are separately identifiable asset classes.[449]

319.    The CCC's own allocation expert, Thomas Britven, agrees that IP and Customer-Related Assets should be separately valued and allocated.[450]  Mr. Britven also criticizes Philip Green, the

---

[446]    DEM00010, Huffard Slides at 16.

[447]    *See* Trial Day 9 Tr. 1973:20–25, May 28, 2014 (P. Huffard Direct).

[448]    Trial Day 9 Tr. 1974:1–11, May 28, 2014 (P. Huffard Direct).

[449]    Trial Day 9 Tr. 1972:18–1974:11, May 28, 2014 (P. Huffard Direct).

[450]    *See* Trial Day 14 Tr. 3379:15–19, June 6, 2014 (T. Britven Direct); TR00045, Britven Report ¶ 6.7.

Canadian Debtors' allocation expert, for undervaluing the assets transferred by the U.S. and EMEA Debtors based on his failure to separate out Customer-Related Assets from IP:

> Q.  You disagree with the manner in which Mr. Green treats customer relationships, correct?
>
> A.  It is not my preferred way of doing it; that's correct.
>
> Q.  And if they are material and can be valued, IP, goodwill and customer relationships should be valued separately, which Mr. Green did not do; correct?
>
> A.  I think that's also correct.[451]

### B. The Record Establishes that Customer-Related Assets Should Be Valued, Along with Goodwill, as a Residual Class

320.    Relevant accounting standards, for example those cited by the experts for the Canadian Debtors, state that separate and identifiable asset classes should be recognized apart from goodwill.[452]    While it is possible to separately value Nortel's IP from its Customer-Related Assets, it is not possible to separate Nortel's Customer-Related Assets from Goodwill.

321.    Customer-Related Assets are difficult to value reliably as a standalone asset in bankruptcy because the source data and information necessary to conduct such a valuation are not available.[453]    Therefore, independent Customer-Related Asset valuation methodologies are

---

[451]    Trial Day 14 Tr. 3470:15–21, 3473:1–10, June 6, 2014 (T. Britven Cross); *see also* TR00046, Thomas Britven, Allocation of Sales Proceeds to the Nortel Debtor Groups, Rebuttal to Reports of Messrs. Kinrich, Zenkich, Malackowski, Huffard, Bazelon, Green, and Berenblut and Cox ¶ 9.2, Feb. 28, 2014.

[452]    *See, e.g.*, Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 141 ¶¶ 12, A19 (revised Dec. 2007) (cited in TR00042, Green Report 56); *see also* Trial Day 14 Tr. 3473:6–10, June 6, 2014 (T. Britven Cross).

[453]    TR00030, Huffard Report ¶ 94; TR00031, Huffard Rebuttal ¶ 77; Trial Day 9 Tr. 1969:10–20, May 28, 2014 (P. Huffard Direct).

neither appropriate nor feasible.[454]   Nor is it possible to separate the value of Nortel's in-place workforce from Goodwill.  As Mr. Green admits, "even though a workforce may have intangible value it is not separated from acquired goodwill in a purchase price allocation."[455]   This is because there is no readily available method to separately quantify the value a business was able to realize for its in-place workforce, given the qualitative and subjective nature of long employee tenure, specific training and skills, and relationships with customers, scientists, suppliers, etc.[456] This value is instead typically captured in Goodwill.[457]

322.    Customer-Related Assets and Goodwill share key characteristics, including the fact that they derive their value from the same source, *i.e.*, historical sales.  Therefore, it is reliable and appropriate to consider Customer-Related Assets and Goodwill, which includes the value of Nortel's in-place workforce, as a residual asset class.

323.    Goodwill represents all of the excess residual value from the sale of a group of assets after accounting for specifically identifiable tangible and intangible assets.[458]   The value of

---

[454]    *See* Trial Day 9 Tr. 2070:16–2073:8, May 28, 2014 (P. Huffard Cross).

[455]    TR00042, Green Report 52 n.204.

[456]    TR00031, Huffard Rebuttal ¶ 17; *see also* Trial Day 9 Tr. 1971:22–1972:17, May 28, 2014 (P. Huffard Direct).

[457]    TR00031, Huffard Rebuttal ¶ 17.

[458]    TR00030, Huffard Report ¶ 76 & n.81.

Goodwill transfers in a sale regardless of whether the seller had any Goodwill recorded on its balance sheet at the time of sale.[459]

324.    Mr. Huffard recognized a residual category of Customer-Related Assets and Goodwill in his analysis, which encompassed all of the residual value the Nortel Group transferred to the Business Sale purchasers that was too difficult or inappropriate to value separately, including the value of customer contracts, customer relationships, distribution networks, customer-support infrastructures, in-place workforce, trademarks, and business synergies.[460]    Mr. Britven also recognized a separate Goodwill asset class that encompassed in-place workforce, as well as synergies, economies of scale, and competitive advantages obtained by the purchasers.[461]

325.    Mr. Green, unlike Mr. Huffard and Mr. Britven, concluded that no Goodwill was transferred in the asset sales.[462]    He admitted that Goodwill is a residual asset class derived from transferring the value of separately identifiable tangible and intangible assets from the purchase price,[463] but he did not compute this value.    Despite claiming that no Goodwill transferred in the sales, Mr. Green allocated value to in-place workforce, which he admitted should not be recognized as separate from Goodwill under generally accepted accounting principles.[464]

---

[459]    TR00030, Huffard Report ¶ 76 n.81.

[460]    Trial Day 9 Tr. 1969:10–1972:17, May 28, 2014 (P. Huffard Direct).

[461]    TR00045, Britven Report ¶ 6.46.

[462]    Trial Day 13 Tr. 3290:25–3291:3, June 5, 2014 (P. Green Cross).

[463]    Trial Day 13 Tr. 3291:4–10, June 5, 2014 (P. Green Cross).

[464]    Trial Day 13 Tr. 3291:11–3292:9, June 5, 2014 (P. Green Cross).

326.    Mr. Green's failure to recognize a residual category of Goodwill resulted in him lumping that residual value in with IP.[465]    Goodwill, however, as recognized by Mr. Britven, is appropriately allocated to the owners of the underlying assets sold in each of the sales.[466]    By combining the residual value attributable to Goodwill with IP and then awarding the overwhelming majority of the combined value to NNL, Mr. Green would give the Canadian Debtors a windfall.

### C.    Mr. Huffard Valued Customer-Related Assets and Goodwill

327.    Mr. Huffard determined the value of the Customer-Related Assets and Goodwill by taking the values of the separately identifiable categories of Net Tangible Assets and IP and subtracting them from the purchase price.[467]    The residual balance is the value of the combined residual category of Customer-Related Assets and Goodwill.[468]

328.    The value of the residual category of Customer-Related Assets and Goodwill for each Business Sale is[469]:

---

[465]    Trial Day 13 Tr. 3292:17–21, June 5, 2014 (P. Green Cross).

[466]    Trial Day 13 Tr. 3293:12–3294:4, June 5, 2014 (P. Green Cross).

[467]    TR00030, Huffard Report ¶ 78.

[468]    TR00030, Huffard Report ¶¶ 78, 92; Trial Day 9 Tr. 1960:12–18, May 28, 2014 (P. Huffard Direct).

[469]    TR00030, Huffard Report ¶ 95.

| VALUE OF CUSTOMER-RELATED ASSETS & GOODWILL BY BUSINESS SALE | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | CDMA | Enter-prise | MEN | CVAS | GSM | MSS | Layer 4-7 | Next-Gen | Total |
| Customer-Related Assets & Goodwill | $ (millions) | 865 | 639 | 460 | 67 | 143 | 16 | 7 | – | 2,198 |
| | % (value) | 75.9 | 67.8 | 61.7 | 32.2 | 59.7 | 26.0 | 40.3 | – | 65.3 |
| Business Value | $ (millions) | 1,140 | 943 | 744 | 207 | 240 | 63 | 18 | 10 | 3,365 |

329.    Across all eight Business Sales, the value of the residual category of Customer-Related Assets and Goodwill is $2.198 billion.

330.    At trial, Mr. Huffard explained that the reason why this residual asset class represents a larger proportion of the proceeds from the Business Sales than IP (71% compared to 25% for IP) is because valuable IP was held back from the Business Sales and sold in the Residual Patent Sale:  "And the effect of taking that IP out of the individual business sales and putting it into the Rockstar deal was to really make Rockstar the IP sale, and the individual business sales were sales of businesses with the necessary IP to run them but not big piles of IP."[470]

331.    Mr. Malackowski's testimony confirms Mr. Huffard's opinion that the value of IP sold in the Business Sales was comparatively low because IP was held back for the Residual Patent Sale, and also noted that the Business Sales included older, second-generation technology, which was less likely to drive the purchase price.[471]

---

[470]    Trial Day 9 Tr. 1989:3–1991:14, May 28, 2014 (P. Huffard Direct); DEM00010, Huffard Slides at 20–21.

[471]    Trial Day 10 Tr. 2255:10–2256:12, 2262:18–2263:8, May 29, 2014 (J. Malackowski Direct).

332.    Considering the Business Sales and Residual Patent Sale together, the IP makes up 69% of the value of the combined asset sales, while Customer-Related Assets and Goodwill only constitute 29% of the total value.[472]

### D.    The Allocation of the Residual Asset Class of Customer-Related Assets and Goodwill

333.    Mr. Huffard allocated the residual category of Customer-Related Assets and Goodwill to each selling debtor according to its relative percentage of global historic revenue for the 2008 fiscal year.[473]

334.    Revenue is the preferred allocation metric over cash flows because cash flows are influenced by transfer pricing and intercompany arrangements that may not accurately reflect where economic value was created.[474]

335.    It is appropriate to use Nortel's own historic data, rather than third-party market data, because the value of Customer-Related Assets is driven by the nature of Nortel's business and its ability to create future revenue from the customer relationships and distribution network in place.[475]

---

[472]    Trial Day 9 Tr. 1989:3–20, May 28, 2014 (P. Huffard Direct); DEM00010, Huffard Slides at 20–21.

[473]    TR00030, Huffard Report ¶ 9; Trial Day 9 Tr. 1962:23–1963:1, May 28, 2014 (P. Huffard Direct).

[474]    TR00030, Huffard Report ¶ 116.

[475]    TR00030, Huffard Report ¶ 117.

336.    Revenue data from 2008 is the most representative allocation key, as older data may not accurately reflect anticipated cash flows that a purchaser would expect to see, and more recent data from 2009 may be unevenly influenced by Nortel's bankruptcy.[476]

337.    Fiscal year 2008 revenues are therefore the most reliable and appropriate historical data metric available.

338.    The following charts summarize the relative allocations to the EMEA, U.S., and Canadian Debtors, under the contribution approach and the license approach, in respect of IP, Customer-Related Assets, Goodwill, and Net Tangible Assets conveyed in the Business Sales and Residual Patent Sale.[477]   The EMEA Debtors' Proposed Conclusions of Law follow.

| CONTRIBUTION APPROACH | | | | $ in millions |
|---|---|---|---|---|
| Total Allocation by Contribution Approach:  Business Sale IP (Sale Specific) / Residual IP (1991-2006) | | | | |
| | Canada | US | EMEA | Total |
| CDMA | 15.8% | 80.4% | 3.8% | 100.0% |
| Enterprise | 20.2% | 50.9% | 29.0% | 100.0% |
| MEN | 23.7% | 47.1% | 29.2% | 100.0% |
| CVAS | 29.2% | 41.9% | 28.8% | 100.0% |
| GSM | 23.6% | 66.3% | 10.1% | 100.0% |
| MSS | 13.1% | 42.6% | 44.3% | 100.0% |
| Layer 4-7 | 27.5% | 50.7% | 21.8% | 100.0% |
| Next Gen | 33.0% | 53.6% | 13.4% | 100.0% |
| Residual IP | 39.5% | 42.9% | 17.6% | 100.0% |
| **Total Allocation** | **31.9%** | **49.9%** | **18.2%** | **100.0%** |
| **Total Value** | **$ 2,320** | **$ 3,636** | **$ 1,325** | **$ 7,280** |

---

[476]    TR00030, Huffard Report ¶ 118; Trial Day 9 Tr. 1963:2–16, May 28, 2014 (P. Huffard Direct).

[477]    TR00030, Huffard Report ¶¶ 125, 129.

## LICENSE APPROACH
$ in millions

**Total Allocation by License Approach**

|  | Canada | US | EMEA | Total |
|---|---|---|---|---|
| CDMA | 9.9% | 79.1% | 11.0% | 100.0% |
| Enterprise | 11.3% | 52.3% | 36.5% | 100.0% |
| MEN | 18.4% | 48.0% | 33.5% | 100.0% |
| CVAS | 12.1% | 47.4% | 40.5% | 100.0% |
| GSM | 9.9% | 55.7% | 34.4% | 100.0% |
| MSS | 10.5% | 40.6% | 48.9% | 100.0% |
| Layer 4-7 | 4.8% | 81.8% | 13.4% | 100.0% |
| Next Gen | 12.2% | 49.1% | 38.7% | 100.0% |
| Residual IP | 11.0% | 55.4% | 33.6% | 100.0% |
| **Total Allocation** | **11.5%** | **57.7%** | **30.9%** | **100.0%** |
| **Total Value** | **$ 836** | **$ 4,198** | **$ 2,247** | **$ 7,280** |

## PROPOSED CONCLUSIONS OF LAW

I.   **ALLOCATION OF THE SALE PROCEEDS SHOULD BE DETERMINED SEPARATELY FOR EACH CLASS OF ASSETS**

339.    All three debtor groups agree that each of the selling debtors is entitled to an allocation of the sale proceeds based on its proportional interest in the assets sold or rights relinquished in each sale transaction.[478]  It is also common ground between the EMEA Debtors and the Canadian Debtors that the different asset classes were owned in different proportions by the various selling debtors, and so each asset class must be considered separately for purposes of allocation.[479]  The allocation should therefore proceed in three steps:  (i) determine the appropriate asset classes, (ii) determine the value attributable to each asset class, and (iii) determine each selling debtor's entitlement with respect to each asset class.  This approach is consistent with the approach taken in Nortel's own prepetition transactions.[480]

340.    Under the Canadian Debtors' theory, the LREs, CPEs, and AREs sold their businesses and assets – including valuable Customer-Related Assets and Net Tangible Assets – but would be allocated only the notional book value of their Net Tangible Assets to represent the entire value of the assets that they transferred.  Should virtually the entire value of the sale proceeds be allocated to IP, as submitted by the Canadian Debtors, apart from the real injustice that would

---

[478]   *See* Pre-Trial Brief of the Monitor and Canadian Debtors – Allocation ¶ 72 (amended May 7, 2014); Joint Administrators' Prehearing Brief Regarding Allocation of the Proceeds of the Nortel Asset Sales ¶ 82  (May 2, 2014); Pre-Trial Brief of the U.S. Interests at 1–2 (amended May 9, 2014).

[479]   *See* Pre-Trial Brief of the Monitor and Canadian Debtors – Allocation ¶¶ 117, 131 (amended May 7, 2014); Joint Administrators' Prehearing Brief Regarding Allocation of the Proceeds of the Nortel Asset Sales ¶ 40 (May 2, 2014).

[480]   *See* Proposed Findings of Fact § V.C.

ensue for the other entities in the Group that beneficially owned IP, there would be an even more significant injustice to those entities that gave up their entire business in exchange for virtually nothing. This is another reason why the Canadian Debtors' suggestion that the Courts should proceed solely on the basis of purported IP rights under the MRDA cannot succeed. It is contrary to the position that every party has agreed – each selling entity should receive an allocation reflecting what it transferred in the Business Sales and Residual Patent Sale.

341.    As discussed above in Sections VI, X, and XI of the Proposed Findings of Fact, the record demonstrates that the relevant asset classes are Net Tangible Assets, IP, Customer-Related Assets, and Goodwill. The first two asset classes can and should be valued separately; the last two asset classes can and should be valued together as a residual. The evidence also supports attributing the sale proceeds to each of these categories as follows[481]:

---

[481]    DEM00010, Huffard Slides at 21.



342.    Turning to the third and final step, the parties' positions regarding the manner in which these asset classes should be allocated are summarized in the table below.    Given the overwhelming value of IP under any approach, the most significant difference among the parties concerns this third step.

| | | Allocation Approach | | |
| | | Canadian Debtors / CCC | U.S. Debtors | EMEA Debtors |
|---|---|---|---|---|
| Asset Class | Net Tangible Assets | **Green:** Book value / **Britven:** Book value net of liabilities | 2009 revenue | Book value net of liabilities |
| | IP | Value-in-use of licenses to EMEA/U.S., remainder to Canada | 2009 revenue | Historical contribution to R&D |
| | Customer-Related Assets | **Green:** Included in IP / **Britven:** Reduced RPS methodology | 2009 revenue | 2008 Revenue |
| | Goodwill | **Green:** Replacement cost of workforce transferred to EMEA/U.S., remainder to Canada / **Britven:** Proportionate share based on value of intangibles owned by each estate | 2009 revenue | 2008 Revenue |

## II.     IP SALE PROCEEDS SHOULD BE ALLOCATED IN PROPORTION TO THE RPES' BENEFICIAL OWNERSHIP

343.     In brief, beneficial ownership arises from inventive work.  The RPEs did the inventive work and therefore beneficially owned the IP.  Legal title is based on assignment, confirmed by registration.  Patents were generally assigned to and registered in NNL's name, which made it the legal title holder.  As the beneficial owners of Nortel's IP, each of the RPEs is entitled to share in the proceeds from the sale of the jointly created IP.

344.     Notwithstanding the Canadian Debtors' assertions, the MRDA reflects these basic truths. The RPEs never transferred their beneficial ownership to NNL.  In fact, the RPEs consistently recognized their joint beneficial ownership in allocating the economic benefits and burdens of ownership, whether that was ongoing profit or loss, proceeds of sale, or licensing income.  The MRDA was prepared in order to document, for revenue authorities, the manner in which the

RPEs shared operating profits and losses for taxation purposes, and to address various administrative issues.  It does not purport to address, and indeed expressly excludes, a formula for how the RPEs would allocate the proceeds that might be realized from a sale of jointly created IP.[482]

### A.    The RPEs, as Beneficial Owners, Are Entitled to Share in the IP Sale Proceeds

#### 1.    *Ontario Law Applies to Determining IP Ownership*

345.    Ontario law applies to determining issues related to ownership of Nortel group's IP. Because no party adduced evidence of foreign law on this point, the Canadian Court may presume that foreign law is consistent with Ontario law.[483]

346.    Under Delaware conflict of laws principles, the U.S. Court should also apply Ontario law.  As the ownership interests in this case arise from invention, not from contract, the Restatement (Second) of Conflict of Laws applies the law of the jurisdiction with the "most significant relationship" to the subject matter, which would here be Ontario as the center of coordination and administration of the Nortel Group.[484]  To the extent the MRDA must be considered, Ontario law applies because Delaware courts will apply the law of the jurisdiction

---

[482]    TR21003, Third Addendum sched. A (Jan. 2009), at NNC-NNL06001514/49 (excluding "gain/loss on the sale of business" from operating earnings/loss calculation).

[483]    *CPU Options, Inc. v. Milton,* [2006] O.J. No. 253 at paras. 21–22 (S.C.J.); *R.L.D. v. M.E.D.*, [2002] O.J. No. 3201 at paras. 21–22 (S.C.J.).

[484]    *E.g.*, Restatement (Second) of Conflict of Laws § 145 (torts), § 188 (contract), § 222 (property), § 291 (agency).

specified by the RPEs in a valid governing-law clause.[485]  The MRDA states, "[t]his Agreement shall be construed in accordance with and governed by the laws of the Province of Ontario, Canada."[486]

347.    Additionally, in cases involving multijurisdictional corporations, Delaware courts apply the "internal affairs doctrine," which "involves those matters which are peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders" and is "based on the recognition that only one State should have the authority to regulate a corporation's internal affairs because otherwise a corporation could be faced with conflicting demands."[487]  The internal affairs doctrine directs that the law of the state of incorporation of the parent entity governs the internal affairs of the corporation.[488]  Application of Ontario law also heeds fundamental choice-of-law considerations for "the protection of justified expectations," "certainty, predictability and uniformity of result," and "ease in the determination and application of the law to be applied."[489]

---

[485]    *See Hionis Int'l Enters., Inc. v. Tandy Corp.*, 867 F. Supp. 268, 271 (D. Del. 1994) ("[T]he parties' choice of law, as expressed in their agreement, will be upheld unless the state whose law would control in the absence of a choice has a materially greater interest in the subject matter." (citation omitted)).

[486]    TR21003, MRDA art. 14(f) (Dec. 22, 2004), at NNC-NNL06001514/13.

[487]    *In re Harnischfeger Indus., Inc.*, 293 B.R. 650, 660 (Bankr. D. Del. 2003) (applying internal affairs doctrine for issues involving intercompany funding ).

[488]    *McDermott Inc. v. Lewis*, 531 A.2d 206, 214–15 (Del. 1987); *see Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1081–82 (Del. 2011) (applying the law of the parent and not subsidiary corporation because "the authority to regulate a corporation's internal affairs should not rest with multiple jurisdictions").

[489]    Restatement (Second) of Conflict of Laws § 6; *see Liggett Grp. Inc. v. Affiliated FM Ins. Co.*, 788 A.2d 134, 137 (Del. Super. Ct. 2001) (applying one state's law across all claims in complex insurance coverage dispute

(Footnote continued on next page)

2.     *Beneficial Ownership Can Be Held by Someone Other than the Legal Title Holder*

348.    The law recognizes that ownership of property encompasses a bundle of rights, including the right to administer the property, to use the property, and to receive the proceeds from sales or other commercial exploitation.  The law recognizes that these rights can be divided and enjoyed by different parties, either by operation of law or by agreement.  To the extent ownership has been divided in this way, the holder of legal title to property is not entitled to enjoy all the benefits of ownership.

349.    The Nova Scotia Court of Appeal, in a commonly cited passage (including by the Supreme Court of Canada), has described the dichotomy between beneficial ownership on one hand, and legal title or nominal ownership on the other, in the following terms:

> In the modern sense of the phrase, a person is 'beneficially entitled' to property if he is the real or beneficial owner of it, even though it is in someone else's name as nominal owner. The nominal owner of the property, whether real property, choses in action or other personal property, has legal title to it.[490]

350.    The beneficial owner of property is the "real owner" even if the property is registered in the name of another.[491]  Therefore in *MacKeen Estate*, the court subjected heirs to estate tax even

---

(Footnote continued from previous page)

involving over one thousand tobacco-related lawsuits in the "interests of economy, ease of application, and uniformity of result").

[490]    *MacKeen Estate v. Nova Scotia*, [1978] C.T.C. 557 at para. 22 (C.A.); *see also Covert v. Nova Scotia (Minister of Finance)*, [1980] 2 S.C.R. 774 (applies the decision in *MacKeen Estate* on similar facts).

[491]    *MacKeen Estate v. Nova Scotia*, [1978] C.T.C. 557 at para. 22 (C.A.); *see also St. Onge v. Willowbay Investments Inc.*, [2010] O.J. No. 2480 at para. 22 (S.C.J.); Daphne A. Dukelow, *The Dictionary of Canadian Law*, 4th ed. (Toronto: Thomson Reuters, 2011) at 114 (defines "beneficial owner" as the "real owner of property even though it is in someone else's name").

though legal title to the inheritance was held by certain extra-provincial shell companies.  Since the heirs were the beneficial owners of the inherited property, they could be taxed on it.

351.    A person who holds legal title alone, by contrast, is merely the "nominal owner" of the property.[492]  Legal title "evidences apparent ownership but does not necessarily signify full and complete title or a beneficial interest."[493]  As the Canadian Debtors conceded in their opening submissions, legal title establishes ownership only absent indicia of separate beneficial ownership.[494]  As described in detail in the Proposed Findings of Fact, everything about the RPEs' conduct confirmed separate beneficial ownership.

352.    Since the beneficial owner of property is the "real owner," the beneficial owner is entitled to any proceeds from the disposition of that property.  Thus, in *Inland Kenworth Ltd. v. Fowler*,[495] the vendor of a truck subject to a conditional sales agreement could not keep the proceeds from the subsequent sale of the truck; the conditional sale purchaser was entitled to the proceeds because a purchaser becomes the beneficial owner upon entering the sale agreement.  As McLachlin J.A. (as she then was) held, while the vendor "had legal title to the truck under the

---

[492]    *MacKeen Estate v. Nova Scotia*, [1978] C.T.C. 557 at para. 22 (C.A.).

[493]    *Black's Law Dictionary*, 9th ed., *sub verbo* "title"; *see also Black's Law Dictionary*, 9th ed., *sub verbo* "owner":  a "legal owner" is one "recognized by law as the owner of something; esp., one who holds legal title to property for the benefit of another."

[494]    Trial Day 2 Tr. 418:7–9, May 13, 2014 (B. Zarnett Opening) ("And legal title, absent other terms that would suggest there is some beneficial ownership in someone else, is ownership.").

[495]    [1988] B.C.J. No. 241 (C.A.).

conditional sales agreement, it did not have beneficial ownership of the truck and hence was not entitled to take the proceeds of sale as its owner."[496]

### 3. The RPEs Were the Beneficial Owners of Nortel's IP.

(a) As the Employers of the Engineers Who Invented Nortel's IP, Each of the RPEs Was the Beneficial Owner of the IP Created

(i) All Attributes of Ownership, Legal and Beneficial, Are Initially Held by the Individual Inventor

353.    Ownership of an invention, including any associated patents, arises in the first instance from the individual inventor's inventive work.  The inventor owns the invention and any patents arising from it, holding not only legal title but all attributes of beneficial ownership.  As the Supreme Court of Canada has noted, "By his [patent] claims the inventor puts fences around the fields of his monopoly and warns the public against trespassing on the property."[497]  Put more prosaically, "The inventor (or inventors) is the first owner of a patent or application."[498] Ownership is therefore derived only through the inventor.

---

[496]    *Inland Kenworth Ltd. v. Fowler* [1988] B.C.J. No. 241 at p. 3 (C.A.).

[497]    *Free World Trust v. Éléctro Santé Inc.*, 2000 SCC 66 at para. 14 (citing *Minerals Separation North American Corp. v. Noranda Mines, Ltd.*, [1947] Ex. C.R. 306); s*ee also University of Toronto v. John N. Harbinson Ltd.*, [2005] O.J. No. 5437 at para. 29 (S.C.J.).

[498]    Roger T. Hughes, *Patent Legislation & Commentary*, 2014 ed. (Toronto: LexisNexis, 2014) at 14; *see also* David Vaver, *Intellectual Property Law*, 2nd ed. (Toronto: Irwin Law, 2011) at 366 ("[t]he inventor first owns the invention she made").  Canadian law also recognizes that there may be more than one inventor.  *See, e.g.*, *Apotex Inc. v. Wellcome Foundation Ltd.*, 2002 SCC 77 at paras. 96–102; *Sanofi-Aventis Canada Inc. v. Apotex Inc.*, 2009 FC 676 at para. 274**,** *aff'd* [2011] F.C.J. No. 1532 (C.A.), *leave to appeal to SCC refused* [2012] S.C.C.A. No. 19.

(ii)    An Employer Holds Beneficial Ownership of Inventions Created by Employees Hired to Invent

354.    While the inventor is generally the first owner of the invention and any associated patents and patent applications, the situation is different where the inventor was hired to invent.  In such circumstances, beneficial ownership of the invention, patents, and patent applications automatically vests in the employer as a matter of law.

355.    Canadian courts have affirmed this principle on a number of occasions.  For instance, in *C.I. Covington Fund v. White*,[499] the case turned on whether the inventor or his employer owned a patent.  The respondent, White, was the inventor of the patent.  He claimed that he owned the patent and had merely licensed it to Delta 3M Technologies Corporation ("Delta"), the company of which he was the president and chief executive officer.  A license agreement between White and Delta supported his position.  The applicant, Covington, had loaned money to Delta and taken a general security agreement over Delta's assets.  When Delta became insolvent, the key issue was which of Delta or White owned the patent.

356.    The court rejected White's argument.  Notwithstanding the license agreement and patent registrations listing White as owner of the patent, the court held that because White created the underlying inventions in his capacity as a Delta employee whose job was primarily to invent, "at

---

[499]    *C.I. Covington Fund Inc. v. White*, [2000] O.J. No. 4589 (S.C.J. (Commercial List)), *aff'd* [2001] O.J. No. 3918 (Div. Ct.).

common law, the employer – here, Delta – could assert that it was the beneficial owner of the patents because of the employment situation."[500]

357.    To similar effect is *Seanix Technology Inc. v. Ircha*.[501]  In that case, the defendant Ircha was hired by Seanix as a computer case designer.  Ircha determined that a case designed by a third party would not meet Seanix's needs, and on his own time at home he invented a superior design, which he patented.  The court held that because Ircha "was doing exactly what he had been hired to do," Seanix as his employer "is the beneficial owner of the invention and the patent rights to the device."[502]

---

[500]  *C.I. Covington Fund Inc. v. White*, [2000] O.J. No. 4589 paras. 38–39 (S.C.J. (Commercial List)), *aff'd* [2001] O.J. No. 3918 (Div. Ct.).  The common law in England is substantially the same as in Canada.  Where an employee creates an invention in the ordinary course of employment, and it was part of the employee's duty to create the invention, the invention belongs to the employer.  *Patchett v. Sterling Engineering Coy. Ltd.* (1955), 72 R.P.C. 50 (H.L.).  This has now been codified in section 39 of the *Patents Act 1977* (U.K.), c. 37.

[501]  [1998] B.C.J. No. 179 (S.C.).

[502]  *Seanix Technology Inc. v. Ircha*, [1998] B.C.J. No. 179 at paras 24, 27 (S.C.); *see also G.D. Searle & Co. v. Novopharm Ltd.*, [2007] F.C.J. No. 625 (C.A.), *leave to appeal to SCC refused* [2007] S.C.C.A. No. 340 at paras. 34, 39–40.

> (iii)    Because of the Integrated and Indivisible Nature of the R&D Process and the Resulting Portfolio of IP, Each of the RPEs Obtained a Beneficial Ownership Interest in the Entire Nortel IP Portfolio

358.    Where multiple inventors jointly create an invention, each of them holds joint ownership of the resulting IP.  If the joint inventors have different employers, the various employers jointly hold beneficial ownership of the invention and associated patent rights.[503]

359.    In the case at bar, the Nortel IP that was sold in both the Business Sales and Residual Patent Sale was the product of the inventive work of engineers employed by the various RPEs for the specific purpose of inventing.  As a matter of law, each of the RPEs therefore always beneficially owned Nortel's IP.  As a matter of fact, and as the evidence summarized above demonstrates,[504] Nortel's IP was created jointly through the cooperative efforts of all the RPEs.  Nortel consistently maintained that its IP was created by the joint efforts of the RPEs and that it was impossible to isolate their contributions to determine which RPEs created which invention or associated IP.  The RPEs therefore shared joint beneficial ownership of all of Nortel's indivisible pool of IP that was created through their joint efforts.[505]

360.    Finally, although the EMEA Debtors have demonstrated that, on the factual record of this case, the RPEs jointly created and owned the entire pool of Nortel IP, the same allocation result

---

[503]    Roger T. Hughes, *Patent Legislation & Commentary*, 2014 ed. (Toronto, LexisNexis, 2014) at 14 ("Where different inventors are employees of different organizations or have assigned their rights to different parties, this means that there may be several different owners, not always of one mind.").

[504]    *See* Proposed Findings of Fact § II.A.

[505]    This excludes a small number of patents invented and owned by Nortel entities that were not RPEs and therefore did not share in joint ownership of IP.  *See* Proposed Conclusions of Law § V.

must be reached if the Courts find that the RPEs only owned the specific inventive work they contributed to that pool.  Because it would not be possible to distinguish the EMEA Debtors' inventive work from the work of the other RPEs, the only way to value that work would still be on the basis of relative R&D spending, which is the precise metric applied by the parties themselves in determining their relative interests in the portfolio of IP. Since that is the RPEs' own common understanding of the value of their respective interests, how one describes that interest – as a share of all Nortel IP or as ownership of just the inventive work contributed by each RPE – is irrelevant to the allocation exercise.

> (b)     The RPEs All Agreed and Understood that Each of the RPEs Was a Beneficial Owner of the IP Created

361.    The RPEs' joint beneficial ownership is reflected and acknowledged in all of the Group's business arrangements concerning IP.  Even if such beneficial ownership had not arisen by operation of law, the business arrangements agreed to and entered into by the Group would provide independent and sufficient grounds for finding that the RPEs are the beneficial owners of Nortel's IP.  At all relevant times, the RPEs shared a common understanding and agreement that each of them would invest billions of dollars in a coordinated program of R&D and would, as a result, become joint beneficial owners of the resulting pool of IP.  This agreement is evident from the parties' conduct.

> (i)     The Nortel Group's Transfer Pricing Arrangements Reflected the RPEs' Common Understanding that They Jointly Held Beneficial Ownership in the IP They Created Together

362.    For example, from 2001 onward, the Nortel Group agreed to follow the RPS methodology to allocate residual profit and loss associated with use of Nortel's IP.  It is an explicit feature of the RPS methodology that the entities that are investing in R&D must be the

beneficial owners of the IP that results from their efforts.[506]   Revenue authorities would not permit the local RPEs to deduct their R&D expenses, or accept a share of residual losses associated with the exploitation of the IP, if their R&D efforts were expended to donate IP to another company or improve IP that belonged to someone else.  This is why the Nortel entities consistently represented to the tax authorities that, as part of its RPS methodology, the RPEs were the beneficial owners of Nortel's IP.[507]   Although the MRDA only addresses the implications of this joint beneficial ownership in relation to the sharing of operating profits and losses, it expressly confirms that (i) the Nortel entities adopted the "RPS methodology,"[508] a transfer pricing term of art which has an explicit and well-understood meaning in relation to beneficial ownership,[509] (ii) the RPEs were the beneficial owners of Nortel's IP, and (iii) this beneficial ownership interest preceded the adoption of the RPS methodology.[510]

363.   The terms of the agreement in this case are that in exchange for investing billions of dollars in a coordinated program of R&D designed to produce valuable technology, the RPEs would share beneficial ownership of the resulting IP in proportion to their R&D spending. Critically, this is not the subject matter of the MRDA; rather, it is one of the premises on which the MRDA was based.

---

[506]   *See* Trial Day 11 Tr. 2665:21–2667:8, May 30, 2014 (R. Cooper Direct); Trial Day 12 Tr. 2829:23–2830:9, June 2, 2014 (R. Cooper Redirect).

[507]   *See* Proposed Findings of Fact §§ III.C, V.E, V.I.

[508]   TR21003, MRDA sched. A (Dec. 22, 2004), at NNC-NNL06001514/18.

[509]   *See* Trial Day 11 Tr. 2665:21–2667:8, May 30, 2014 (R. Cooper Direct).

[510]   TR21003, MRDA at 2 (Dec. 22, 2004), at NNC-NNL06001514/2.

364.    As described above in Sections III, IV, and V of the Proposed Findings of Fact, all of the

RPEs' statements, and all of their conduct, were consistent with this agreement, both before and

after the MRDA was signed.  Whenever they were confronted with a situation not addressed in

the MRDA but involving a determination as to how to allocate the costs or benefits related to

Nortel's IP, they acted in accordance with an agreement that they held joint beneficial ownership

of Nortel's IP in proportion to their relative R&D spending.[511]

> (ii)    NNL Is Estopped from Denying Beneficial Ownership of
> the Other RPEs, Which It Consistently Acknowledged
> Before May 2013

365.    If the Courts do not find that the Nortel Group had agreed that the RPEs would hold joint

beneficial ownership of the IP that resulted from their R&D efforts, the Courts should

nevertheless hold that the Canadian Debtors are estopped from denying the other RPEs' rights to

share in the proceeds from the sales of the jointly created IP.  An estoppel arises in this case

because (i) NNL represented to the other RPEs that if they invested billions of dollars in a

coordinated program of IP they would be beneficial owners of the resulting IP, and (ii) the RPEs

acted in reliance on these representations when they indeed invested billions of dollars on R&D

during a period when the only results from exploiting the IP were the sharing of residual losses.

---

[511]    *See, e.g.*, TR22020, APA Kick Off Meeting: Potential Questions and Sample Answers, at 39 (June 17, 2002)
(Nortel proposed to allocate proceeds from the sale of IP to RPEs on basis of economic ownership of IP);
TR21382, Memorandum from James Gatley, NNL, to Scott Wilkie, Oslers, at 1 (Nov. 14, 2002) (James
Gatley, NNL's transfer pricing leader, represented to outside legal counsel that "the effect of the RPS model is
that the future intangibles developed are beneficially owned" by the RPEs); TR41278, Foundry Journal Entry
(Dec. 8, 2004) (RPEs shared the proceeds of Foundry settlement in proportion to their R&D contributions).

366.    The doctrine of estoppel has been described as "one of the most flexible and useful in the armoury of the law."[512]  The Supreme Court of Canada has adopted the following summary of the purpose of the doctrine:

> When the parties to a transaction proceed on the basis of an underlying assumption (either of fact or of law, and whether due to misrepresentation or mistake, makes no difference), on which they have conducted the dealings between them, neither of them will be allowed to go back on that assumption when it would be unfair or unjust to allow him to do so.[513]

367.    There are two principal forms of estoppel that apply here:  estoppel by convention and estoppel by representation.[514]  The essential ingredient for either form of estoppel is detrimental reliance on the part of the party raising the estoppel.[515]  In addition to detrimental reliance, estoppel by convention also requires a common assumption among the parties,[516] while estoppel by representation also requires a clear representation of fact by the estopped party.[517]  All elements of both versions of estoppel are met in this case, for the same reasons explained above.

368.    The common assumption or factual representation element is met by the conduct of the RPEs described above in Sections III, IV, and V of the Proposed Findings of Fact.  The explicit

---

[512]    *Amalgamated Investment & Property Co. Ltd. (In Liquidation) v. Texas Commerce International Bank Ltd.*, [1982] Q.B. 84 at 122 (C.A.); quoted in *Ryan v. Moore*, [2005] 2 S.C.R. 53 at para. 51.

[513]    *Amalgamated Investment & Property Co. Ltd. (In Liquidation) v. Texas Commerce International Bank Ltd.*, [1982] Q.B. 84 at 122 (C.A.); quoted in *Ryan v. Moore*, [2005] 2 S.C.R. 53 at para. 51.

[514]    *Ryan v. Moore*, [2005] 2 S.C.R. 53 at paras. 4–5.

[515]    *Ryan v. Moore*, [2005] 2 S.C.R. 53 at para. 68.

[516]    *Ryan v. Moore*, [2005] 2 S.C.R. 53 at para. 68.

[517]    *Bank of Montreal v. Glendale (Atlantic) Ltd.* (1977), 20 N.S.R. (2d) 216 at para. 90 (C.A.); *Bank Leu AG v. Gaming Lottery Corp.* (2003), 231 D.L.R. (4th) 251 at para. 60 (Ont. C.A.).

statements in the MRDA, Nortel's representations to tax authorities, and the division of the fruits of ownership in various transactions, all consistently demonstrated a common understanding based on repeated statements that the RPEs jointly held beneficial ownership of the IP.[518] Particularly significant here is the explicit statement, contained in the Q&A Document circulated widely within Nortel, that the RPEs would share the proceeds from any sale of the jointly created IP.[519]

369.    Detrimental reliance is equally straightforward.  Investing billions of dollars in R&D on the understanding that one would share proportionally in beneficial ownership of the resulting IP, but without receiving any such ownership, is nothing if not detrimental reliance.  The EMEA and U.S. Debtors spent billions of dollars on R&D over the years based on multiple representations that they were joint beneficial owners of the resulting IP.  It would do a great injustice to their creditors to suddenly erase that shared history, treat NNL as the sole beneficial owner, and award the Canadian Debtors the entire value of the IP minus paltry sums for limited make-use licenses.

370.    In the circumstances, the Canadian Debtors are estopped from denying the jointly held beneficial ownership of IP in proportion to R&D spending that the RPEs have all shared since at least 2001.  In the alternative, the EMEA Debtors are entitled to a proprietary estoppel as an established remedy for estoppel by representation because NNL encouraged the EMEA and U.S.

---

[518]    *See* Proposed Findings of Fact §§ III.C, IV, V.

[519]    *See* TR22020, APA Kick Off Meeting: Potential Questions and Sample Answers, at 39 (June 17, 2002).

Debtors to believe they had beneficial ownership of the IP on which they relied to their detriment in continuing to spend billions of dollars on R&D.[520]

> (iii)    A Resulting Trust Arises in Favor of Parties that Have Contributed to the Creation of an Asset Without Taking Legal Title

371.    As a final confirmation of the EMEA Debtors' approach, the RPEs were also entitled to beneficial ownership rights, by operation of law, under well-settled equitable principles.  In particular, a resulting trust arises by operation of law where more than one party jointly contributes to the creation or acquisition of property, but not all of them take title to the property. In these circumstances, courts will recognize beneficial ownership in proportion to contribution.

372.    Under Canadian law, the Supreme Court of Canada recently reaffirmed last year that when a party contributes financially to the acquisition of property, but does not take legal title, the presumption is that the party has a beneficial interest in the property in proportion to its contribution.   This is known as the presumption of resulting trust.[521]   Put another way, "contributions to the acquisition of a property, which were not reflected in the legal title, could nonetheless give rise to a property interest."[522]

---

[520]    *Classic Communications Ltd. v. Lascar* (1985), 51 O.R. (2d) 769 at paras. 32–33 (H.C.J.); *Zelmer v. Victor Projects Ltd.* (1997), 34 B.C.L.R. (3d) 125 at para. 48 (C.A.); *Flello v. Baird* (1999), 67 B.C.L.R. (3d) 293 (C.A.); Piers Feltham, Daniel Hochberg, & Tom Leech, eds., *The Law Relating to Estoppel by Representation*, 4th ed. (London: LexisNexis U.K., 2004) at 192; *Maritime Telegraph and Telephone Co. v. Chateau Lafleur Development Corp.* (2001), 199 N.S.R. (2d) 250 at paras. 38, 49 (C.A.); *Crabb v. Arun District Council*, [1975] 3 All E.R. 865 at 871 (C.A.).

[521]    *Nishi v. Rascal Trucking Ltd.*, 2013 SCC 33 at para. 1; *see also Kerr v. Baranow*, 2011 SCC 10 at para. 12; *Saylor v. Madsen Estate* (2005), 261 D.L.R. (4th) 597 at para. 14 (Ont. C.A.).

[522]    *Kerr v. Baranow*, 2011 SCC 10 at para. 2.

373.    This is nothing more than common sense.  Commercial parties do not contribute to the value of property held by another without any right to recover that value.  Indeed, under the arm's length principle imposed on the RPEs by the governments of the countries where they did business, the RPEs were not permitted to expend funds on R&D, and sustain annual operating losses, in relation to IP of which they were not the beneficial owners.  On the contrary, they had to receive an arm's length return.[523]  The licenses held by the <u>Licensed Participants</u>[524] did not give them an arm's length return and do not reflect the value of the contributions they made to the creation of Nortel's IP.  Indeed, NNL itself now claims that the licenses have little economic value, and none in respect of the Residual Patents.  Thus, the RPEs have at all relevant times held a beneficial interest in Nortel's IP under the doctrine of resulting trust.

374.    The party that holds legal title may seek to rebut the presumption of resulting trust by establishing that adequate consideration was provided for the contribution,[525] or that a gift was intended.[526]  The consideration must be adequate in light of the nature of the contribution and the entire contract; grossly insufficient consideration does not defeat the presumption of resulting trust.[527]  The allocation purported to be given by NNL in this case to the EMEA and U.S.

---

[523]    While the presumption of resulting trust does not necessarily apply to related parties, transfer pricing regulations required that the Nortel entities behave like arm's length parties with respect to intra-Group transactions.

[524]    Defined in the MRDA as "all Participants other than NNL."  TR21003, MRDA art. 1(e) (Dec. 22, 2004), at NNC-NNL06001514/3.

[525]    *Hamilton v. Hamilton*, [1996] O.J. No. 2634 at para. 34 (C.A.).

[526]    *Kerr v. Baranow*, 2011 SCC 10 at para. 19; *Hamilton v. Hamilton*, [1996] O.J. No. 2634 at para. 34.

[527]    *Reddin v. Mills*, [1995] B.C.J. No. 352 at para. 109 (S.C.); *Wong v. Wong-Koroluk*, [2009] B.C.J. No. 817 at para. 112 (S.C.).

Debtors is grossly insufficient.  If NNL had made its position clear at the time that the MRDA was executed, the directors of NNI, NNUK, NNSA, and NN Ireland could not, and would not, have entered into the MRDA – had they done so in those circumstances, they would knowingly have agreed that the companies of which they were directors should spend billions of dollars on R&D for negligible return (or none in respect of the residual patent portfolio), contrary to the best interests of those companies.

375.     Applying these principles, even if the RPEs somehow did not derive ownership from invention by their employees, one would reach the same result from the presumption of resulting trust.  Not only did the U.S. and EMEA Debtors contribute the inventive work of their employees, but they also contributed billions of dollars to R&D to create the IP at issue in this litigation.  The onus is on NNL to rebut the presumption of resulting trust.  NNL cannot rebut the presumption.

### B.     The EMEA and U.S. Debtors Did Not Transfer Their Beneficial Ownership Rights to NNL

376.     There is no dispute that NNL held legal title to almost all Nortel IP.  There should also be no dispute that the RPEs held, at least initially, joint beneficial ownership of the Nortel IP by virtue of the inventive work of their employees as well as the manner in which the Group ordered its affairs.   As noted above, the Canadian Debtors do not directly challenge the proposition that employers beneficially own patents arising from their employees' inventive work.  Indeed, their own Canadian law expert agrees that inventive work gives rise to ownership

in the employer of the inventor.[528]  Instead, the Canadian Debtors and CCC assert that whatever rights may have existed before the MRDA, they were swept aside and replaced by a comprehensive codification of rights in the MRDA and by assignments of individual patents to NNL.

377.    It bears repeating, as a preliminary matter, that the EMEA Debtors do not claim that the MRDA granted them beneficial ownership in the IP.  Rather, they had pre-existing rights that the MRDA respected and acknowledged, but did not limit or alter.  Simply, the MRDA was entered into based on the RPEs' pre-existing rights.  Therefore, the EMEA Debtors do not try to alter the terms of the MRDA to grant beneficial ownership; they simply note that the MRDA was not the beginning and end of the Nortel Group's commercial arrangements.  Therefore, the discussions below regarding parol evidence are only relevant to the narrow issue of interpreting the MRDA. They have no bearing on the EMEA Debtors' argument that beneficial ownership arose independent of the MRDA.

378.    The only issue for the Courts to decide therefore is whether, as the Canadian Debtors and CCC claim, the other RPEs transferred their beneficial ownership interests to NNL by agreeing in the MRDA that legal title to Nortel's IP would be vested in NNL, or by allowing their engineers to assign individual patents to NNL.  An examination of the MRDA and the assignments shows that no such transfer took place.  Both the clear and unambiguous language of the MRDA and the factual matrix in which it must be interpreted confirm that it was an agreement prepared for transfer pricing, administrative, and operational purposes, based on the

---

[528]    S. Burshstein Dep. Tr. 258:16–260:2, June 11, 2014.

fact that each RPE held a beneficial interest in the IP.  The MRDA expressly acknowledged, and did not alter, the RPEs' beneficial IP ownership, including their entitlement to the proceeds of a sale of IP.

       1.    *No Transfer of Beneficial Ownership Rights Occurred Pursuant to the MRDA*

379.    The relevant principles of contractual interpretation are not in dispute.  The Ontario Court of Appeal has repeatedly stated that a commercial contract is to be interpreted:

    (a) as a whole, in a manner that gives meaning to all of its terms and avoids an interpretation that would render one or more of its terms ineffective;

    (b) by determining the intention of the parties in accordance with the language they have used in the written document and based upon the "cardinal presumption" that they have intended what they have said;

    (c) with regard to objective evidence of the factual matrix underlying the negotiation of the contract, but without reference to the subjective intention of the parties; and (to the extent there is any ambiguity in the contract)

    (d) in a fashion that accords with sound commercial principles and good business sense, and that avoids a commercial absurdity.[529]

380.    In this case, all four of these principles support the same result.  With respect to the first two, the text of the MRDA explicitly vests only legal title to Nortel's IP in NNL, while repeatedly recognizing and affirming the RPEs' joint beneficial ownership.  Awarding legal and beneficial ownership to NNL would render numerous provisions of the MRDA ineffective or contradictory, and ignore the words the RPEs themselves chose.

---

[529]    *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205 at para. 24; *The Plan Group v. Bell Canada*, 2009 ONCA 548 at para. 37; *Williams-Sonoma Inc. v. Oxford Properties Group Inc.*, 2013 ONCA 441 at para. 27, fn 1.

381.    Turning to the third principle, the factual matrix in this case (as described above in the Proposed Findings of Fact) consistently supports the RPEs' joint beneficial ownership of IP. The Supreme Court of Canada has recently confirmed that "[t]he parol evidence rule does not apply to preclude evidence of the surrounding circumstances," and that courts must consider the "facts known or facts that reasonably ought to have been known to both parties at or before the date of contracting."[530]    Everything surrounding the negotiation and implementation of the MRDA confirmed that the five RPEs held joint beneficial ownership and were entitled to share in the proceeds from any sale of the jointly created IP.

382.    The MRDA must be read and interpreted in light of the factual matrix set out above in the Proposed Findings of Fact.  The rights that the parties had in the IP when they negotiated and entered into the MRDA is the most critical part of the factual matrix.

383.    Finally, if the Courts find (contrary to the EMEA Debtors' position) that the MRDA is ambiguous, then they are entitled to consider extrinsic evidence of subsequent conduct[531] or prior negotiations.[532]  Both categories of evidence support the EMEA Debtors' position in this case.

384.    Moreover, the Canadian Debtors' contrary position would result in a commercial absurdity and would violate the arm's length principle.  NNL's position is that the EMEA and U.S. Debtors created the majority of Nortel's IP (measured by either R&D or patent output), but

---

[530]    *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 60.

[531]    *Montreal Trust Co. of Canada v. Birmingham Lodge Ltd.* [1995] O.J. No. 1609 at para. 21 (C.A.) (citing S.M. Waddams, The Law of Contracts, 3d ed. (1993) at para. 323).

[532]    *York University v. Michael Markicevic*, 2013 ONSC 378 at para. 55 (S.C.J. (Commercial List)), quoting Geoff Hall, *Canadian Contractual Interpretation Law*, 2d ed. (Markham: LexisNexis, 2012) at s. 3.1.1.

NNL had an unfettered right to sell that IP at any time, without giving the other RPEs an opportunity to enjoy operating profits and without sharing the proceeds of the sale with them unless the IP was used in current Nortel "Products." This is commercially absurd.

385.    These principles will be expanded upon below.

(a)    Article 4 of the MRDA Vests Only Legal Title in NNL, Which Carries No Right to Proceeds from Sales of Jointly Created IP

386.    Article 4(a) of the MRDA states that "legal title to any and all NN Technology whether now in existence or acquired or developed pursuant to the terms of this Agreement shall be vested in NNL."[533] The Canadian Debtors argue that the effect of this provision was to transfer all ownership rights from the other RPEs to NNL, with the exception of any rights that were explicitly reserved to the other RPEs in the MRDA itself (*i.e.*, the right to share operating profits and losses under Article 3). The terms of Article 4(a), as well as the agreement as a whole and the factual matrix in which it was executed, refute this argument. The term "legal title" in Article 4(a) means exactly what it says and does not include beneficial ownership, which is addressed elsewhere.

387.    It is a fundamental principle of contractual interpretation that the parties must be assumed to have intended the meaning of the words they chose. "Legal title" has a specific legal meaning, and courts should respect the words chosen by the parties. Indeed, as noted above, "legal title" has been defined specifically in contradistinction to beneficial ownership.[534] The

---

[533]    TR21003, MRDA art. 4(a) (Dec. 22, 2004), at NNC-NNL06001514/6 (emphasis added).

[534]    *MacKeen Estate v. Nova Scotia*, [1978] C.T.C. 557 at para. 22 (C.A.).

MRDA confirms this distinction because it also uses the term "beneficial ownership" in the agreement – the parties knew the difference between the two terms.  To interpret the phrase "legal title" to include full beneficial ownership rights would ignore the "cardinal presumption"[535] of contract interpretation, i.e. that the RPEs "intended the legal consequences of their words."[536]

388.    At least one Canadian court has dealt with the meaning of "title," as distinct from "ownership," in a contract.  In *Francey v. Wawanesa Mutual Insurance Company*, the issue was whether the plaintiff had given up "title or ownership" of a vehicle, within the meaning of an exclusion clause in an insurance policy.[537]  The court adopted the following definition of "legal title" from *Black's Law Dictionary*, which is inconsistent with the interpretation now advanced by the Canadian Debtors:  "One cognizable or enforceable in a court of law, or one which is complete and perfect so far as regards the apparent right of ownership and possession, but which carries no beneficial interest in the property, another person being equitably entitled thereto."[538]

389.    By contrast, the definition of "ownership" in *Black's Law Dictionary*, which the court also adopted, is very different:  "Collection of rights to use and enjoy property, including right to transmit it to others . . . .  The complete dominion, title or proprietary right in a thing or claim.

---

[535]    *See Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205 at para. 24.

[536]    *See Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at para. 56.

[537]    1990 CarswellAlta 133 (Q.B.), *aff'd* (1991) 117 AR 318 (C.A.).

[538]    *Francey v. Wawanesa Mutual Insurance Company,* 1990 CarswellAlta 133 at para. 74 (Q.B.), *aff'd* (1991), 117 AR 318 (C.A.).

The entirety of the powers of use and disposal allowed by law."[539]   The MRDA explicitly distinguishes between legal title and beneficial ownership.  That distinction must be respected, and only the EMEA Debtors' theory does so.

390.    The factual matrix surrounding the MRDA confirms this interpretation.  The RPEs had moved to the RPS methodology to reflect their joint R&D efforts and the fact that each RPE was responsible for "ongoing entrepreneurship and risk-taking functions with rights to the IP."[540] The commercial reasons why Nortel chose to adopt a formal document vesting legal title in NNL are clear.  Legal title, absent assignment agreements for every single piece of IP, was held either by the inventor (if no assignment agreement has been executed) or by the RPEs that employed the inventor (in cases where an assignment had been executed in favour of the employer). Numerous witnesses described why it was desirable to vest legal title in one corporate entity so that it could be managed and administrated properly.[541]   NNL needed to be able to demonstrate legal ownership to the outside world in order to fulfill its acknowledged role as the administrator of Nortel's IP.  It needed legal title to license the IP to third parties, and in order to have standing to bring actions to enforce the Group's IP rights.  The MRDA accomplished this goal.  But there is no evidence in the MRDA or elsewhere that the parties intended to change their existing beneficial ownership rights.  There was no need to vest anything but legal title in NNL, and no agreement to do so.

---

[539]    *Francey v. Wawanesa Mutual Insurance Company*, 1990 CarswellAlta 133 at para. 73 (Q.B.), *aff'd* (1991), 117 AR 318 (C.A.).

[540]    TR21407, Functional Analysis at 7.

[541]    *See* Proposed Findings of Fact § II.D.

391.     The EMEA Debtors submit that the meaning of "legal title" is plain on its face, and conveyed legal title only and not beneficial ownership.  But, should the Courts find this term to be susceptible of other interpretations, *i.e.*, that it is ambiguous, all available extrinsic evidence shows that the EMEA Debtors' interpretation is correct.

392.     An ambiguity exists where, considering the contract as a whole and in light of the factual matrix, the phrase or provision in question is capable of bearing two or more reasonable interpretations.[542]  Where an ambiguity exists, the Courts may consider extrinsic evidence in determining the intent of the RPEs.[543]

393.     In this case there is an abundance of extrinsic evidence demonstrating that the vesting of legal title to IP in NNL did not give it full beneficial ownership rights.  This evidence is reviewed in detail in Section V of the Proposed Findings of Fact.  Most significant is the evidence of the RPEs' course of conduct subsequent to entering the MRDA.  Such evidence "may be helpful in showing what meaning the parties attached to the document after its execution, and this in turn may suggest that they took the same view at the earlier date."[544]  The relevance of such evidence is obvious; in many cases, "there is no better way of determining

---

[542]     *Hi-Tech Group Inc. v. Sears Canada Inc.*, [2001] O.J. No. 33 at para. 18 (C.A.); *Dumbrell v. The Regional Group of Companies Inc.*, 2007 ONCA 59 at para. 54; *Onex Corp. v. American Home Assurance Co.*, 2013 ONCA 117 at paras. 106–07.

[543]     *Onex Corp. v. American Home Assurance Co.*, 2013 ONCA 117 at para. 105.

[544]     *Montreal Trust Co. of Canada v. Birmingham Lodge Ltd.*, [1995] O.J. No. 1609 at para. 21 (C.A.) (citing S.M. Waddams, *The Law of Contracts*, 3rd ed. (1993) at para. 323).

what the parties intended than to look to what they did under it."[545]  In every conceivable way following execution of the MRDA, the RPEs behaved in a manner consistent only with joint beneficial ownership.

394.    As noted above, evidence of prior negotiations is admissible in the event of ambiguity. Such evidence is inadmissible for purposes of proving the RPEs' subjective intentions,[546] but is admissible for the limited purposes of helping to understand the genesis or purpose of the agreement:

> [T]he rule [against admitting evidence of prior negotiations] has an important exception: it does not extend to preclude the <u>admission of evidence of prior drafts and negotiations showing pertinent surrounding circumstances</u> other than the parties' subjective intentions. From the perspective of contractual interpretation, there would seem to be considerable logic to this exception. Contractual interpretation is fundamentally about finding the correct meaning by considering both the words the parties agreed upon and the context in which the words were used. <u>Prior drafts and evidence of negotiation may in some cases be quite helpful in setting the context for a final agreement and thereby assist in ascertaining meaning correctly</u>. As long as such evidence does not touch upon subjective intention, it is difficult to see such evidence as objectionable in principle.[547]

---

[545]    *Montreal Trust Co. of Canada v. Birmingham Lodge Ltd*., [1995] O.J. No. 1609 at para. 21 (citing *Bank of Montreal v. University of Saskatchewan* (1953), 9 W.W.R. (N.S.) 193 at 199 (Sask. Q.B.)).

[546]    *Primo Poloniato Grandchildren's Trust (Trustee of) v. Browne*, 2012 ONCA 862 at para. 71.

[547]    *York University v. Michael Markicevic*, 2013 ONSC 378 at para. 55 (S.C.J. (Commercial List)), quoting Geoff Hall, *Canadian Contractual Interpretation Law*, 2nd ed. (Markham: Lexis Nexis, 2012) at s 3.1.1 (emphases added).

395.    The Canadian Debtors were the first to introduce evidence at trial of prior negotiations, doing so in the cross-examination of Mark Weisz, NNI's director of international tax and a trial witness for the U.S. Debtors.[548]

396.    Here, the negotiating history of the MRDA affirms that "legal title" did not include full ownership rights.  As noted above in Section IV.B of the Proposed Findings of Fact, at one point in the drafting process, the drafters of the MRDA considered including language that would have expressly given NNL not only legal title but "legal ownership."[549]  This language was rejected because it did not reflect the intent of the parties in entering the MRDA.

> (b)    A Reading of the MRDA as a Whole Confirms that the RPEs Were the Beneficial Owners of Nortel's IP

397.    The fact that Article 4(a) of the MRDA vested only legal title in NNL, and did not transfer beneficial ownership, becomes even clearer when one examines the numerous other provisions of the MRDA that expressly confirm the beneficial ownership rights of the RPEs.

398.    At the outset, multiple recitals in the MRDA confirm the RPEs' status as beneficial owners.  The second recital recognizes the RPEs' "equitable and beneficial ownership of certain exclusive rights under NT Technology for a Specified Territory" under the CSAs, and the RPEs' intent that the Licensed Participants "continue . . . to hold and enjoy such rights."[550]  Recitals

---

[548]    *See* Trial Day 9 Tr. 1894:4–1895:22, May 28, 2014 (M. Weisz Cross).

[549]    A draft circulated October 14, 2004 included the following Article 4(a): "Except as otherwise specifically agreed, legal title and legal ownership to any and all NN Technology acquired or developed as contemplated by this Agreement will be held solely by NNL." TR50579.02, Draft MRDA art. 4(a) (emphasis added).

[550]    TR21003, MRDA at 2 (Dec. 22, 2004), at NNC-NNL06001514/2 (emphasis added).

cannot be used to change the operative provisions of an agreement, and the EMEA Debtors make no such suggestion.  As just described, the operative provisions vest only legal title in NNL.

399.    That being said, the recitals are not to be ignored either.  They are to be considered as part of the overall text in interpreting a contract.[551]  As a matter of practice, it is common for recitals to acknowledge the purpose of an agreement and the relevant background to the relationship between the parties.  Because the MRDA is not the source of the RPEs' beneficial ownership, it is entirely to be expected that the recitals to the MRDA acknowledge the RPEs' ownership rights which formed part of the background to, and provided the need for, the MRDA.

400.    The third recital states that "each Participant bears the full entrepreneurial risks and benefits for the Nortel Networks business."[552]  No limit is placed on the benefits to which the RPEs are entitled.  Entitlement to business benefits and exposure to commercial risks is the definition of beneficial ownership.  The right to enjoy the proceeds from the sale of the principal asset of the business, created through the joint efforts of all of the RPEs, must surely be considered one of the "benefits" an entrepreneur, and a beneficial owner, would enjoy.  Notably, no distinction is drawn between NNL and the other RPEs in terms of the relative risks and benefits, reflecting the joint beneficial ownership of the Nortel IP held by all five of the RPEs.

---

[551]  *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at paras. 57, 63; *SimEx Inc. v. IMAX Corp*. (2005), 11 B.L.R. (4th) 214 at para. 26 (Ont. C.A.); *Disera v. Liberty Development Corp.*, 2008 ONCA 34 at para. 20; *Midas Realty Corp. of Canada Inc. v. Galvic Investments Ltd.*, 2009 ONCA 84 at para. 8.

[552]  TR21003, MRDA at 2 (Dec. 22, 2004), at NNC-NNL06001514/2.  "Participants" under the MRDA were NNL, NNI, NNUK, NNSA, NN Australia, and NN Ireland.  TR21003, MRDA at 1–2 (Dec. 22, 2004), at NNC-NNL06001514/1–2.

401.    The sixth recital is also critical.  It links inventive contribution, the rights of an owner, the

RPS methodology, and the requirements of arm's length bargaining under transfer pricing

regulations:

> WHEREAS each Participant believes that it is appropriate that each Participant should benefit from its contribution to R&D activity commensurate with the value of its contribution to that R&D activity in the context of the manner in which the Nortel Networks business is conducted and that the residual profit split methodology (RPSM) is the best arm's length measure, in the circumstances of NNL and the Participants, of such contributions with reference to such benefits.[553]

402.    This recital mirrors the EMEA Debtors' case and is inconsistent with the positions

advanced by the Canadian Debtors.  All the EMEA Debtors ask is to "benefit from [their]

contribution to R&D activity commensurate with the value of [their] contribution," just as they

shared operating losses "commensurate with the value of [their] contribution."[554]  The recital

goes on to note that "in the context of the manner in which the Nortel Networks business is

conducted," the RPS methodology measures that contribution.[555]  Significantly, the RPS

methodology is defined in the MRDA to mean "the transfer pricing methodology which

establishes the fair market value of the compensation to be received by each Participant for its

R&D activity and shall have the meaning defined in Schedule A."[556]  Schedule A includes a

broad discussion of the principles underlying the RPS methodology, making it clear that it is not

---

[553]    TR21003, MRDA at 2 (Dec. 22, 2004), at NNC-NNL06001514/2.

[554]    *See* TR21003, MRDA at 2 (Dec. 22, 2004), at NNC-NNL06001514/2.

[555]    TR21003, MRDA at 2 (Dec. 22, 2004), at NNC-NNL06001514/2.

[556]    TR21003, MRDA art. 1(i) (Dec. 22, 2004), at NNC-NNL06001514/4.

limited to allocating operating profits and losses only: "Mathematically, the [RPS methodology] accords the Participants <u>all the upside</u> risk in the Nortel business as well as the downside risk."[557] Inasmuch as the proceeds from a sale of jointly created IP are plainly part of the "upside," it is impossible to read the MRDA as giving NNL the right to retain such proceeds rather than sharing with its fellow entrepreneurs.

403.   The operative provisions of the MRDA support the recitals.  Article 3 of the MRDA entitles the RPEs to a share of residual profit and losses from the Nortel business, which is an attribute of beneficial ownership.  The fact that the RPEs shared profits and losses under the RPS methodology is in itself evidence that they held a beneficial interest in the IP.  If NNL were the exclusive owner of Nortel's IP, there was no reason for it to share profits with the other RPEs. Likewise, there was no reason for the RPEs to share the ongoing losses suffered by the Nortel Group unless they beneficially owned the IP and could expect to benefit from it in the future. The licenses under the MRDA cannot explain the sharing of profit and loss because the RPEs were not entitled to retain the proceeds from exploiting those licenses.  The only way the RPEs received revenue was through the sharing of the global residual profits of the entire group under Article 3 of the MRDA.  The licenses had no bearing on profit or loss, and indeed were only in place to ensure that the RPEs could demonstrate to third parties that they had rights to use and sublicense the IP without those third parties having to investigate the underlying ownership.

404.   The Canadian Debtors argue that in return for the billions of dollars that the RPEs invested in R&D spending, Article 3 limits the entitlement of the U.S. and EMEA RPEs to a

---

[557]   TR21003, MRDA sched. A (Dec. 22, 2004), at NNC-NNL06001514/18 (emphasis added).

share of residual operating profits and losses based on the RPS methodology, and does not extend to the proceeds of any sale.  This is wrong for at least three reasons.

405.    First, prior to the MRDA, the parties held beneficial ownership of the IP.  The MRDA itself confirmed that beneficial ownership, and did not remove it via Article 3.[558]  The parties deliberately and explicitly transferred only legal title.  The contrast with Article 3, which does not purport to effect any transfer of beneficial ownership, could hardly be more stark.

406.    Second, the MRDA by its own terms applies only to the operating arrangements of Nortel, and so does not even purport to address proceeds of a sale, much less a sale on the bankruptcy of the whole group.[559]  This is confirmed by the Third Addendum to the MRDA, which expressly excluded the gain on the sale of the business from the profit split under Schedule A of the MRDA.[560]  The only clear implication of these clauses is that the parties did not intend to address the proceeds of a sale.

407.    Third, the MRDA expressly provides that the bargain under Article 3 is intended to be an arm's length one.[561]  Yet the Canadian Debtors' interpretation would violate the very arm's length principle embedded in that clause.  When the MRDA became effective retroactive to January 1, 2001, each of the RPEs had been operating for a number of years and had made

---

[558]    *See* Proposed Conclusions of Law § II.B.

[559]    TR21003, MRDA at 1 (Dec. 22, 2004), at NNC-NNL06001514/1 (agreement "confirm[s] and formaliz[es] the operating arrangements" of the Group).

[560]    TR21003, Third Addendum sched. A (Jan. 2009), at NNC-NNL06001514/49.

[561]    TR21003, MRDA at 2, sched. A (Dec. 22, 2004), at NNC-NNL06001514/2, 18.

significant contributions to Nortel IP.  Each of them continued to spend billions of dollars on IP over the ensuing decade.  The Canadian Debtors' argument is that everyone contributed to R&D, everyone bore losses via the RPS methodology, but only NNL is entitled to receive a return owing to beneficial ownership of the resulting IP.  No arm's length party would agree to such a lopsided deal.  Common sense tells that, though for good measure the Courts have heard very persuasive expert testimony on this point.[562]  The Canadian Debtors' interpretation of Article 3 would breach transfer pricing regulations and, as discussed in more detail below, it would also be commercially absurd.

408.    Perhaps most tellingly, the RPS methodology itself, attached as Schedule A to the MRDA, explicitly recognizes the RPEs' ownership.[563] Schedule A is the heart of the MRDA, as the RPS methodology set out therein was the entire impetus for drafting the agreement.

409.    In explaining the compensation provided by the RPS methodology, Schedule A (echoing the MRDA's third recital) states that "the Participants bear the full entrepreneurial risk of the Nortel business such as the risks attendant with the substantial and continuous development and ownership of the NN Technology."[564]  Compensation under the RPS methodology was not a payment for contract R&D services, a royalty for the license or other payment for use of the IP. The sharing of profits and losses was based on the RPEs' joint creation of IP, not their exercise

---

[562]    Trial Day 11 Tr. 2688:15–2691:8, May 30, 2014 (R. Cooper Direct).

[563]    On the need to consider schedules as part of reading the contract as a whole, see, *e.g.*, *Garnet Lane Developments Ltd. v. C.R. Investments Ltd.*, [1991] O.J. No. 511 (C.A.), affirming [1988] O.J. No. 735 (Dist. Ct.); *SimEx Inc. v. IMAX Corp.* (2005), 11 B.L.R. (4th) 214 at para. 37 (Ont. C.A.).

[564]    TR21003, MRDA sched. A (Dec. 22, 2004), at NNC-NNL06001514/18 (emphasis added).

of their license rights.    Critically, under the RPS methodology NNL received no extra compensation (and bore no additional burden) by virtue of holding legal title.[565]    It performed certain administrative functions for which it was paid a routine return, but economically it was treated the same as the other RPEs regarding R&D spending, and residual profit or loss.

410.    The Canadian Debtors have not explained, and cannot explain, why the RPS methodology – which was the entire purpose of the MRDA – explicitly recognizes that each of the Participants has a beneficial interest in the Nortel IP.    Nor have the Canadian Debtors explained why the MRDA Participants should share this "full entrepreneurial risk" (in terms of R&D costs and ongoing losses) if NNL alone were to enjoy the entrepreneurial benefit of proceeds of sale.

411.    Although Schedule A to the MRDA was amended twice, pursuant to the Second Addendum to the MRDA, dated December 14, 2007, and pursuant to the Third Addendum entered into on the eve of insolvency and made effective January 1, 2006, these amendments did not alter the language regarding the Participants' "ownership of the NN Technology," Participants bearing "the full entrepreneurial risk" of development of Nortel technology, or the Participants bearing "all the upside risk in the Nortel business as well as the downside risk."[566]

412.    At the same time as the Third Addendum was executed, the RPEs also executed a Memorandum of Understanding.    While the Memorandum of Understanding "create[d] no

---

[565]    *See* Proposed Findings of Fact § III.D.

[566]    *See* TR21003, Second Addendum sched. A (Dec. 14, 2007), at NNC-NNL06001514/30–31.

liability or obligation or rights among the parties hereto," it was an objective record of their shared understanding on the eve of insolvency,[567] and it is entirely consistent with the RPEs' joint beneficial ownership of the Nortel Group's IP.   The Memorandum of Understanding described the MRDA as follows:

> The 2004 Agreement also memorializes the agreements of NNL and the Licensed Participants as to the development and deployment of existing and future NN Technology and <u>ownership</u> of the NN Technology, with NNL holding <u>legal title</u> thereto.[568]

413.   In sum, throughout the MRDA, its various Addenda, and the Memorandum of Understanding, the RPEs explicitly and repeatedly distinguished between ownership on the one hand (jointly held by the RPEs), and legal title on the other (held exclusively by NNL).   A memorandum of understanding can be used as factual matrix evidence.   It shows what the parties' common belief was as to the meaning of a particular clause, and therefore assists in demonstrating objective intent (as opposed to subjective intent).   An analogue would be heads of terms – they are not binding, but do show what the parties were negotiating about and are admissible for this purpose.   It would do injustice to the words the RPEs chose to erase that distinction.

414.   The Supreme Court of Canada made a similar point in *Tercon Contractors Ltd. v. British Columbia (Minister of Transportation & Highways).*[569]   In that case, an exclusionary clause

---

[567]   *See* TR44436, Memorandum of Understanding at 1(Dec. 22, 2008).

[568]   TR44436, Memorandum of Understanding ¶ 3 (Dec. 22, 2008) (emphasis added).

[569]   2010 SCC 4.

precluded liability "as a result of participating in this RFP."[570]    The court rejected the interpretation of this clause to mean "as a result of submitting a proposal," because the very same contract later used the phrase "submitting a proposal" in a different context:

> If the phrases "participating in this RFP" and "submitting a Proposal" were intended to mean the same thing, it is hard to understand why different words were used in the same short clause to express this same idea.[571]

415.    The same is true of the RPEs' use of "legal title" and "beneficial ownership."    As referenced above, they do not mean the same thing, and the Courts should not erase a distinction the RPEs themselves drew.

416.    Notwithstanding the very straightforward meaning of "beneficial ownership," the Canadian Debtors claim that when the MRDA speaks of the RPEs' "beneficial ownership" of IP, it is using that term in a narrow, tax law sense that is somehow different from what it means in any other context.    In essence, the Canadian Debtors suggest that any references to "beneficial ownership" are just a label for the RPEs' license rights, and should not be understood as confirming that the RPEs had "real" ownership of the IP.

417.    This argument is simply wrong.    Tax law is not a distinct body of law to which different rules of interpretation apply.    Indeed, the MRDA is not merely a tax document – it is a transfer pricing agreement.    As such, the expert and fact witness evidence established that it was intended

---

[570]    *Tercon Contractors Ltd. v. British Columbia (Minister of Transportation & Highways)*, 2010 SCC 4 at para. 75.

[571]    *Tercon Contractors Ltd. v. British Columbia (Minister of Transportation & Highways)*, 2010 SCC 4 at para. 75; *see also Campbell River Indian Band v. Worley Parsons Canada Ltd.*, 2013 BCSC 1272 at para. 123.

to – indeed, required to – reflect the actual relationship between the RPEs. The MRDA states that the RPEs had beneficial ownership of the patents precisely because the RPEs had beneficial ownership of the patents. The parties to the MRDA did not and could not mean "beneficial ownership" in any sense other than its ordinary sense. The only logical explanation is the obvious one: the MRDA said what it meant, and meant what it said.

418.    The Canadian Debtors' argument is reminiscent of the argument advanced unsuccessfully by the taxpayers in *Gelber v. Canada (Minister of National Revenue).*[572] There the question was whether a corporation or its shareholders (the taxpayers) owned a condominium project before construction was completed. The corporation owned the project, but transferred ownership to the taxpayers upon completion. The taxpayers took the position that the corporation only had ownership for the purposes of protecting them from liability, and that in reality they personally owned the project at all relevant times. Accordingly, the taxpayers deducted certain expenses in computing their personal income. The Minister of National Revenue disallowed the deductions.

419.    The Tax Court of Canada upheld the disallowance:

> [O]ne cannot be not an owner of property for one purpose – for protection from personal liability during construction – and be an owner for another purpose – for tax purposes. In the same way a person cannot simultaneously inhale and exhale, a person cannot simultaneously own and not own a property. An owner of a property owns the property throughout the time he is owner, for good and for bad. A person must decide what is more important, protection from potential liability and have a corporation own the property during construction, or potential tax deductions and have

---

[572]    [1991] 2 C.T.C. 2319 (T.C.C.).

> oneself own the property during construction. The decision is to be made prior to construction.[573]

420.    The Canadian Debtors are similarly trying to have it both ways.  NNL acknowledged in the MRDA that the RPEs beneficially owned Nortel's IP.  The Nortel Group represented to the tax authorities that the RPEs had joint ownership of the patent portfolio.[574]  Yet now, when it is time to allocate the proceeds from the sale of the patents to the rightful owners, the Canadian Debtors take the position that the RPEs only "owned" the patents for tax purposes and that NNL was the true owner.

(c)    The "No Partnership" Clause Does Not Change the Meaning of the MRDA

421.    The Canadian Debtors contend that Article 13 of the MRDA somehow precludes the possibility that the RPEs jointly owned the Nortel IP.

422.    Article 13 of the MRDA provides as follows:

> The relationship of the Participants under this Agreement shall not constitute a partnership or joint venture for any purpose. In addition, no Participant is a fiduciary, an agent, a servant, or a subcontractor of any other Participant as a result of this Agreement, and no Participant has the right, power or authority, expressly or impliedly, to represent or bind any other Participant pursuant to and in performance of any acts under this Agreement, except as expressly authorized herein.[575]

---

[573]   *Gelber v. Canada (Minister of National Revenue)*, [1991] 2 C.T.C. 2319 at para. 31 (T.C.C.).

[574]   *See, e.g.*, TR11169, APA Responses to Questions Posed by IR, IRS, and CRA, at 25 (Sept. 2003); TR22078, NNL-NNI Joint APA Request, app. A at 4.

[575]   TR21003, MRDA art. 13 (Dec. 22, 2004), at NNC-NNL06001514/12.

423.    The Canadian Debtors mount a two-pronged argument based on this provision.  First, they argue that by disclaiming any partnership or joint venture, the MRDA confirms that the RPEs did not jointly own the IP.  Second, they argue that if NNL had legal title while the RPEs collectively had beneficial ownership, this would mean that NNL was a trustee and owed the RPEs fiduciary duties – which the Canadian Debtors say is directly contrary to Article 13.  Neither of these arguments has any merit.

424.    The fatal flaw in the first argument advanced by the Canadian Debtors is that joint ownership of property need not give rise to a partnership or joint venture.  To the contrary, the RPEs' joint ownership of the patents arose as a matter of law.[576]  That the RPEs beneficially owned the patent portfolio because their engineers created the inventions underlying the patents does not presuppose a partnership or joint venture among the RPEs.

425.    The Canadian Debtors' second argument regarding the disclaimer of fiduciary duties in Article 13 of the MRDA is similarly misguided.  First, the disclaimer is inapplicable in the circumstances.  Article 13 provides only that "no Participant is a fiduciary . . . <u>as a result of this Agreement</u>."[577]  Even if the division between legal title and beneficial ownership of the patents implied that there was a trust and therefore a fiduciary relationship, such a fiduciary relationship did not arise "as a result of" the MRDA.  To the extent that a fiduciary relationship arose, it arose as a result of the inventive work of the RPEs' engineers and the transfer of legal, but not beneficial, ownership to NNL.

---

[576]    *See* Proposed Conclusions of Law § II.A.3.

[577]    TR21003, MRDA art. 13 (Dec. 22, 2004), at NNC-NNL06001514/12 (emphasis added).

426.    Second, a division between legal title and beneficial ownership does not necessarily signify a fiduciary relationship.  Nor does the absence of a fiduciary relationship preclude a division between legal and beneficial ownership.  The Supreme Court of Canada has identified the types of relationships that are *per se* fiduciary in nature, and the separation of legal from beneficial ownership is not one of them.[578]  Unless a given relationship falls within one of the *per se* categories, the question of whether that relationship is fiduciary in nature is fact-specific based on four specific indicia.[579]  No party alleges that NNL met these criteria with respect to its legal title to Nortel IP.[580]

427.    The House of Lords explained why the separation of legal and beneficial ownership did not necessarily imply fiduciary duties in *Westdeutsche Landesbank Girozentrale v. Islington London Borough Council*.[581]  That case concerned an interest rate swap agreement between a bank and the borough council.  The bank had advanced money to the borough council pursuant to the agreement, which subsequently was found to be void.  All parties agreed that the borough council had to repay the principal amount; the dispute was whether the borough had to pay compound interest.  As a matter of English law, compound interest could not be awarded unless

---

[578]    *Professional Institute of the Public Service of Canada v. Canada (Attorney General)*, 2012 SCC 71 at para. 115.

[579]    *Professional Institute of the Public Service of Canada v. Canada (Attorney General)*, 2012 SCC 71 at paras. 113, 121–122.

[580]    The EMEA Debtors allege fiduciary duties owed to it by NNL as parent corporation in respect of certain claims, but not in respect of the shared ownership of IP.

[581]    [1996] A.C. 669 (HL).

the borough council owed fiduciary duties to the bank in relation to the money that was advanced.

428.    The bank's argument was the same as the one the Canadian Debtors now make – it retained the equitable interest in the money, and the separation of the legal from the equitable interest in property necessarily imports a trust.  Thus, the borough council must have held the money on trust for the bank and accordingly owed it fiduciary duties (and compound interest).

429.    The majority of the House of Lords rejected this approach.  As Lord Browne-Wilkinson stated in his judgment:

> There are many cases where B enjoys rights which, in equity, are enforceable against the legal owner, A, without A being a trustee, e.g. an equitable right to redeem a mortgage . . . Even in cases where the whole beneficial interest is vested in B and the bare legal interest is in A, A is not necessarily a trustee . . . .[582]

430.    Canadian law similarly recognizes a variety of circumstances in which legal title and beneficial ownership may be held separately, even in the absence of a trust relationship.  As mentioned above, a purchaser of a vehicle pursuant to a conditional sales agreement is the beneficial owner of the vehicle even though legal title remains with the seller.[583]  Similarly, the

---

[582]    *Westdeutsche Landesbank Girozentrale v. Islington London Borough Council* [1996] A.C. 669 at 706–707 (HL).

[583]    *Inland Kenworth Ltd. v. Fowler*, [1988] B.C.J. No. 241 (C.A.); *Andrews v. Canada*, [2007] T.C.J. No. 195 (T.C.C.); *QEW 427 Dodge Chrysler (1991) Inc. v. Ontario (Minister of Revenue)*, [2000] O.J. No. 2582 at para. 37 (S.C.J.), *aff'd* [2002] O.J. No. 1639 (Div. Ct.).

purchaser of real property is the beneficial owner of the property after executing the agreement of purchase and sale but before closing.[584]

> (d)     The Entire Agreement Clause Is Not Applicable Because the MRDA Does Not Address How to Allocate Proceeds from Sales of IP

431.    Article 14(d) of the MRDA provides that "[i]n respect to the subject matter hereof, this Agreement sets forth the entire agreement and understanding between the Participants."[585]   The Canadian Debtors argue that this precludes looking beyond the MRDA to determine the RPEs' ownership interests.   This confuses both the purpose of the MRDA and the proper role of entire agreement clauses.   As explained above, the ownership rights arise independent of the MRDA, are acknowledged by the MRDA, and are consistent with it.[586]   In any event, an entire agreement clause cannot prevent reviewing the factual matrix of a contract, which is mandatory when interpreting a contract.[587]

432.    By its terms, the integration/entire agreement clause only applies "in respect to the subject matter hereof."[588]   As described above, the subject matter of the MRDA is only "the operating arrangements of" the RPEs.[589]

---

[584]   *Peel Condominium Corp. No. 417 v. Tedley Homes*, [1997] O.J. No. 3541 at para. 24 (C.A.); *St. Onge v. Willowbay Investments Inc.*, [2010] O.J. No. 2480 at para. 22 (S.C.J.).

[585]   TR21003, MRDA art. 14(d) (Dec. 22, 2004), at NNC-NNL06001514/13.

[586]   *See* Proposed Findings of Fact §§ III, IV.

[587]   *See* Proposed Conclusions of Law § II.B.1.

[588]   TR21003, MRDA art. 14(d) (Dec. 22, 2004), at NNC-NNL06001514/13.

433.    With respect to the context of the MRDA itself, the "entire agreement" is consistent with the EMEA Debtors' position.  It vests legal title – and only legal title – in NNL, while acknowledging and compensating the RPEs' ownership in respect of ongoing profit and loss.

434.    The Nortel Group recognized that the MRDA does not address how to allocate the proceeds of a sale of IP and so did not apply the RPS methodology to allocate the proceeds of the Alcatel sale, which took place when the MRDA was in effect.[590]  Instead, the sale proceeds attributable to IP were allocated based on contribution to R&D.[591]

435.    Since the allocation of IP sale proceeds is not encompassed within the subject matter of the MRDA, the Courts may look outside the agreement to determine how to allocate the proceeds attributable to IP in Nortel's postpetition asset sales.  As explained above, the RPEs are the beneficial owners of Nortel's IP and as such are entitled to share the proceeds from sales of that IP.  The entire factual matrix demonstrates that this is the case.

436.    In addition to the "entire agreement" clause, the Canadian Debtors have also sought to dismiss the extensive evidence concerning Nortel's conduct based on a misapplication of the

---

(Footnote continued from previous page)

[589]    TR21003, MRDA at 1 (Dec. 22, 2004), at NNC-NNL06001514/1 (emphasis added).

[590]    *See* Trial Day 8 Tr. 1812:22–1813:14, May 27, 2014 (K. Stephens Redirect) ("The only point at which the MRDA had any influence was in the RPS ratio applied to the element of the sale proceeds which were for technology."); M. Weisz Dep. Tr. 139:23–140:24, Nov. 25, 2013; TR00027, Stephens Aff. ¶ 48; *see also* TR31585, Share and Asset Sale Agreement between Nortel and Alcatel Lucent (Dec. 4, 2006); TR47016, DSC Appraisal Assocs., Alcatel Valuation of Certain Assets of Nortel Networks' UMTS Business as of December 31, 2006, at 2 (Feb. 12, 2007), at NNI_00174645.

[591]    TR00027, Stephens Aff. ¶¶ 43–45, 48.

parol evidence rule. The parol evidence rule holds that "when the language of a written contract is clear and unambiguous, extrinsic evidence is not admissible to vary, qualify, add to, or subtract from, the words of the written contract."[592] This rule does not prevent the EMEA Debtors from relying on the evidence put forward in this case for two reasons.

437. First, the evidence is, as set out above and below, dealing with the factual matrix and surrounding circumstances. This evidence must be considered and an entire agreement clause does not change this fact. The Supreme Court of Canada recently confirmed that evidence of the circumstances in which a contract was signed is not parol evidence:

> The parol evidence rule does not apply to preclude evidence of the surrounding circumstances. Such evidence is consistent with the objectives of finality and certainty because it is used as an interpretive aid for determining the meaning of the written words chosen by the parties, not to change or overrule the meaning of those words. The surrounding circumstances are facts known or facts that reasonably ought to have been known to both parties at or before the date of contracting; therefore, the concern of unreliability does not arise.[593]

438. Second, none of the evidence that the EMEA Debtors rely upon is being tendered to contradict, vary, or add to the RPEs' agreement. Indeed, they rely on it as it supports their ownership of the IP. The MRDA was not the source of the RPEs' ownership rights. On the contrary, the MRDA and other evidence of conduct on which the EMEA Debtors rely merely confirm that the RPEs jointly owned the IP before the MRDA even existed. The MRDA is just another piece of evidence, not the source of the RPEs' rights. Thus, the EMEA Debtors do not

---

[592]   *Gutierrez v. Tropic International Ltd.*, [2002] O.J. No. 3079 at paras. 19–20 (C.A.).

[593]   *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 60.

rely on, for example, the Alcatel sale to interpret the MRDA.  Indeed, the evidence is that Nortel did not believe the MRDA applied to asset sales.[594]   Rather, the MRDA and Alcatel both independently confirm the pre-existing ownership rights already described.

> (e)    The Entire Factual Matrix Confirms that the RPEs Were the Beneficial Owners of Nortel's IP and Retained Their Right to Proceeds from Sales of the Jointly Created IP

439.    As the foregoing analysis demonstrates, the MRDA, by its terms, recognizes and does not somehow transfer the RPEs' beneficial ownership of the IP.  This is so even when the factual matrix is ignored, as the Canadian Debtors appear to be urging the Courts to do.  However, the factual matrix of the MRDA cannot be ignored.  Once it is considered, the EMEA Debtors' interpretation of the agreement becomes even more resoundingly correct and the Canadian Debtors' interpretation is rendered untenable.

440.    As directly referenced above, the Supreme Court of Canada has recently confirmed that courts must consider the factual matrix when interpreting a contract.[595]   Courts must adopt "a practical, common-sense approach not dominated by technical rules of construction," which requires considering "the surrounding circumstances known to the parties at the time of formation of the contract."[596]

---

[594]    *See* Proposed Findings of Fact § V.C.

[595]    *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 46.

[596]    *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 47.

441.    Similarly, the Ontario Court of Appeal has clarified in recent years that the need to refer to the factual matrix and the need to avoid a commercial absurdity are not optional, nor are they confined to cases of ambiguity.  They are mandatory in all cases:

> The court begins with the words of the contract and presumes that the parties intended what is written in the contract. In construing the intention behind a particular provision, the court must consider, among other things, the contract as a whole, the factual matrix underlying it, and the need to avoid commercial absurdity. But the court does not consider the subjective intention of the parties.[597]

442.    The factual matrix includes, at a minimum, "the genesis of the agreement, its purpose, and the commercial context in which the agreement was made."[598]  This encompasses the backgrounds, capabilities, and objectively determinable expectations of the RPEs.[599]  While what exactly will constitute the factual matrix cannot be precisely enumerated, the Ontario Court of Appeal (quoting the House of Lords) has defined the principles underlying the concept:

> While the task of interpretation must begin with the words of the document and their ordinary meaning, the general context that gave birth to the document or its "factual matrix" will also provide the court with useful assistance. In the famous passage in *Reardon Smith Line Ltd. v. Yngvar Hansen-Tangen*, [1976] 1 W.L.R. 989 at 995-96 (H.L.) Lord Wilberforce said this:
>
> > No contracts are made in a vacuum: there is always a setting in which they have to be placed. The

---

[597]  *McLean v. McLean*, 2013 ONCA 788 at para. 54 (emphasis added), *leave to appeal to SCC refused* [2014] S.C.C.A. No. 76; *see also Downey v. Ecore International Inc*., 2012 ONCA 480 at paras. 37–38; *Salah v. Timothy's Coffees of the World Inc*., 2010 ONCA 673 at para. 16.

[598]  *Dumbrell v. The Regional Group of Companies Inc*., 2007 ONCA 59 at para. 55; *Hi-Tech Group Inc. v. Sears Canada Inc*., [2001] O.J. No. 33 at paras. 23–24 (C.A.); *Onex Corp. v. American Home Assurance Co.*, 2013 ONCA 117 at paras. 102–105.

[599]  *Dumbrell v. The Regional Group of Companies Inc*., 2007 ONCA 59 at paras. 51–52.

> nature of what is legitimate to have regard to is usually described as "he surrounding circumstances" but this phrase is imprecise: it can be illustrated but hardly defined. In a commercial contract it is certainly right that the court should know the commercial purpose of the contract and this in turn presupposes knowledge of the genesis of the transaction, the background, the context, the market in which the parties are operating.

> The scope of the surrounding circumstances to be considered will vary from case to case but generally will encompass those factors which assist the court ". . . to search for an interpretation which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract." *Consolidated Bathurst Export Ltd. v. Mutual Boiler and Machinery Insurance Co.*, [1980] 1 S.C.R. 888 at 901.[600]

443.   Evidence of any rights and entitlements that the RPEs already had before entering into the MRDA falls squarely within the factual matrix, as recorded in the MRDA's recitals.  This is clear from the decision of the Ontario Court of Appeal in *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.*   That case involved a dispute between KFC and a franchisee concerning the proper interpretation of their agreement.   KFC took the position that under the agreement it had a continuing right to approve the franchisee's shareholders, and that it was entitled to terminate the agreement because a change in the franchisee's shareholders had occurred without KFC's consent.[601]

444.   The Ontario Court of Appeal rejected this interpretation.  It specifically considered the rights that the franchisees had before entering the agreement.   Under the previous agreement,

---

[600]   *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.* (1998), 114 O.A.C. 357 at paras. 25–26 (C.A.).

[601]   *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.* (1998), 114 O.A.C. 357 at paras. 5, 19–20, 24.

signed twenty years earlier, KFC had no such continuing right to approve the franchisee's shareholders.  This, the Court noted, was a "key fact" because it showed that interpreting the relevant provision as granting a one-time right to approve the shareholders, rather than a continuing right, was consistent with "the interpretive principle of what accords with sound commercial principles and good business sense."[602]

445.    The relevant evidence has been described earlier in these submissions.  However, by way of summary, the factual matrix surrounding the MRDA includes at least the following:

(a) The RPEs had spent billions of dollars creating valuable IP and intended to continue spending billions of dollars creating IP in the future.[603]

(b) The RPEs beneficially owned IP created by their employees.[604]

(c) The RPEs were aware that transfer pricing regulations required that any transfers of value between the RPEs be done on an arm's length basis.[605]

(d) The RPEs agreed to share residual profits via the RPS methodology from 2001 to 2004 in a manner consistent with joint ownership before entering into the MRDA.[606]

(e) The RPEs agreed to share the proceeds of the Foundry settlement in a manner consistent with joint ownership mere months before executing the MRDA.[607]

(f) The RPEs consistently represented to the tax authorities in Canada, the United States, and Europe that the RPEs jointly held beneficial ownership of Nortel's IP.[608]

---

[602]    *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.* (1998), 114 O.A.C. 357 at paras. 10, 32, 38.

[603]    *See* Proposed Findings of Fact § II.A.

[604]    *See* Proposed Conclusions of Law § II.A.3.

[605]    *See* Proposed Findings of Fact §§ III.B.1, IV.A; Proposed Conclusions of Law § II.B.1(b).

[606]    *See* Proposed Findings of Fact § III.

[607]    *See* Proposed Findings of Fact § III.C.6.

(g) While it is unclear if it was ever communicated to the tax authorities, Nortel even prepared an answer to the specific question raised in this case two years before entering into the MRDA, and stated that sale proceeds would be shared based on R&D contribution.[609]

(h) The RPEs retained an outside advisor to prepare a Functional Analysis that consistently and repeatedly recognized that the RPEs all jointly created and owned Nortel's IP.[610]

(i) The MRDA was entered into at the suggestion of Nortel's transfer pricing counsel, Sutherland, to document the RPEs' existing arrangements and justify the RPS methodology.[611]

446.    This factual matrix, taken as a whole, is consistent only with joint ownership.  If, as the Canadian Debtors argue, the MRDA transferred not just legal title but also beneficial ownership of IP created by the U.S. and EMEA Debtors to NNL, it would contradict everything the RPEs said and did.  The repeated references to beneficial ownership in the MRDA would be given no meaning. NNL would have gratuitously donated sums arising out of the Foundry settlement to the Licensed Participants, violating transfer pricing requirements.  All of the RPEs would have misrepresented to tax authorities around the world the true nature of the Nortel Group's business and the beneficial ownership of its IP.  If the Licensed Participants only held make/use licenses, the Group should have said so.  That they never did so proves that the Canadian Debtors' position should be rejected.

---

(Footnote continued from previous page)

[608]    *See* Proposed Findings of Fact §§ III.C, V.E.

[609]    *See* Proposed Findings of Fact § III.C.1.

[610]    *See* Proposed Findings of Fact § III.C.5.

[611]    *See* Proposed Findings of Fact § IV.A.

447.   Nor is the factual matrix completely consistent with the Licensed Participants holding their beneficial interests through territorial licenses, as the U.S. Debtors argue.   The MRDA refers to territorial licenses, and the RPEs historically enjoyed the benefit of those licenses under the CSA regime.[612]   However, the RPS methodology – which predated the MRDA – is inconsistent with the RPEs' beneficial interests in Nortel's IP being defined by territorial licenses.   Unlike the regime that prevailed under the CSAs, the RPEs under the MRDA did not earn profits based on their territorial revenue and therefore their licenses.   Instead, they earned it based on their contributions to the creation of IP through R&D.   In short, the licenses did not define the RPEs' beneficial interests under the MRDA.   The entitlement to RPS methodology payments under Article 3 is independent of the license granted under Article 5.

(f)     Construing the MRDA to Deprive the RPEs of Rights to IP Sale Proceeds Would Produce a Commercial Absurdity

448.   It is well-settled law in Ontario that a commercial contract must in all cases be interpreted "in a fashion that accords with sound commercial principles and good business sense, and that avoids a commercial absurdity."[613]   This is particularly important in the case of the MRDA, which was also governed by transfer pricing regulations and requirements that demanded that the agreement simulate an arm's length bargain.   Even if the RPEs had wanted to enter into an unequal bargain, they were not permitted to do so without violating transfer pricing regulations because it could improperly shift taxable income from one jurisdiction to another.   In any event, that clearly was not the intention of the RPEs in entering into the MRDA.

---

[612]   *See* Proposed Findings of Fact § III.A.2.

[613]   *Ventas, Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205 at para. 24(d).

449.    The Canadian Debtors' position is that the other RPEs agreed to spend billions of dollars collaborating to create a portfolio of IP that would be owned by NNL alone in exchange for a share of residual operating profits or losses, but not any proceeds that might be received upon a sale of the IP, in a context where NNL had an unfettered right to sell the IP and cease sharing profits at any time.  This is the epitome of commercial absurdity.

450.    The absurdity of the Canadian Debtors' position can be demonstrated with a hypothetical. Imagine the EMEA and U.S. Debtors together spend a billion dollars to create a ground-breaking technology and related patents that is unrelated to any current Nortel "Product" (and therefore falls outside the scope of the MRDA licenses as interpreted by the Canadian Debtors).  Before ever commercializing this technology, Nortel is approached by a company interested in this technology, which offers to buy it from Nortel for $5 billion.  On the Canadian Debtors' theory, NNL could sell the IP without requiring the consent of the parties that created it, and NNL would receive the entire $5 billion while the EMEA and U.S. Debtors would receive nothing.

451.    Of course, this hypothetical only varies in degree from the Residual Patent sale.  Despite the U.S. and EMEA Debtors having created thousands of the patents in question, and having spent billions of dollars of R&D to do so,[614] the Canadian Debtors would give them not one penny from the sale of the crown jewel of Nortel's asset sales.  If Nortel had chosen to license the Residual Patents instead of selling them, the RPEs would have shared the profits; but

---

[614]    *See* TR00033, Malackowski Report 16–17; TR00034, Malackowski Rebuttal 6, 40; TR11383, Malackowski Report Ex. R.2.2.

according to the Canadian Debtors' theory, by structuring the transaction as a sale, they get to keep everything. Such an interpretation must be rejected as commercially absurd.

(g)    Construing the MRDA to Deprive the RPEs of Rights to IP Sale Proceeds Would Violate the Arm's Length Principle

452. The arm's length standard is an objective test incorporated in the laws of all major commercial powers for determining how the income of a multinational enterprise should be allocated between companies within a corporate group for taxation purposes, *i.e.*, transfer pricing.[615] "Income" for this purpose includes any revenue received by the enterprise that could be subject to taxation, including proceeds from dispositions of assets.[616] Left to their own devices, companies within a corporate group will not allocate income the way independent commercial parties would; they will typically allocate income so as to minimize global taxes.[617] Thus, the purpose of the arm's length standard is to determine the "true taxable income" for each

---

[615]    TR00049, Reichert Report 16, n.10 ("[T]he arm's length standard is objective and rewards value creation. . . . The only large country that does not follow the arm's length principle is Brazil, except in the case of certain limited kinds of transactions."); TR11424, Lorraine Eden, *The Arm's Length Standard: Making it Work in a 21st Century World of Multinationals and Nation States*, *forthcoming in* Global Tax Justice 2, 5–7 (Thomas Pogge and Krishen Mehta eds.) (observing that the arm's length standard is a "core norm" for allocating corporate income and deductions among affiliated corporations, as part of an "extraordinary web" of international tax agreements that "had become strong enough by the 1990s to be characterized as an *international tax regime*." (italics in original, emphasis added).

[616]    *See* Trial Day 11 Tr. 2675:17–2676:13, May 30, 2014 (R. Cooper Direct) ("And the arm's-length principle calls for all income to be treated at arm's length, not just operating income.")

[617]    TR48812, Lorraine Eden, *Taxes, Transfer Pricing, and the Multinational Enterprise*, *in* The Oxford Handbook of International Business 601 (Alan Rugman ed., 2d ed. 2009) ("The arm's length standard asks the question: What price would the parties have negotiated if the entities had been unrelated? Since the firms *are* related, the answer to this question has to be hypothetical." (italics in original); TR00049, Reichert Report 13 ("[U]nlike market prices, transfer prices do not arise spontaneously as a result of bargaining and trade. That is, transfer prices do not arise naturally in the way that market prices do."); TR00049, Reichert Report 14 ("Because firms direct resources through chains of command, hierarchies and operating procedures, prices are usually not required within firms."); TR00062, Eden Report ¶ 15 ("As a general matter, a multi-national corporate group will typically adopt a transfer pricing policy that minimizes the overall tax burden on the group. . . .")

group company by allocating revenue in a manner comparable to the way independent commercial parties, bargaining at arm's length, would order their affairs.[618]    The guiding principle is that income must be distributed to each company in a manner that rewards value creation and gives it an "appropriate return" for the particular functions it performs or assets it contributes.[619]

453.    The best transfer pricing methodology for a group depends on the specific nature of the group's business.  For a group engaged in developing IP in multiple taxing jurisdictions, RPS methodology is particularly appropriate.[620]    Here, all four of the transfer pricing experts confirmed that the RPS methodology was the best method for Nortel from 2001 forward.[621]

454.    Under the RPS methodology, the functions performed by each company in a group are analyzed and classified as either "routine" or "non-routine."  Routine functions are functions that

---

[618]    TR00049, Reichert Report 16 ("The arm's length principle is a convention among governments that says that intercompany transactions should be priced in a manner that is consistent with the way in which similarly situated uncontrolled parties, bargaining at arm's length, would price the transactions."); TR00062, Eden Report ¶ 26) ("Under the arm's length standard, a transfer price is appropriate if it falls within the range of prices that two unrelated parties may reasonably negotiate for the same or similar product traded under the same or similar facts and circumstances to the related party transaction."); Trial Day 21 Tr. 5024:23–5025:2, June 24, 2014 (L. Eden Cross) ("true taxable income").

[619]    TR00049, Reichert Report 16 ("The arm's length principle is a convention among governments that says that intercompany transactions should be priced in a manner that is consistent with the way in which similarly situated uncontrolled parties, bargaining at arm's length, would price the transactions."); TR00062, Eden Report ¶ 26) ("Under the arm's length standard, a transfer price is appropriate if it falls within the range of prices that two unrelated parties may reasonably negotiate for the same or similar product traded under the same or similar facts and circumstances to the related party transaction.").

[620]    See S. Felgran Dep. Tr. 38:10–39:8 (Mar. 25, 2014).

[621]    See Trial Day 12 Tr. 2761:10–14, June 2, 2014 (R. Cooper Cross); Trial Day 16 Tr. 3967:15–19, June 17, 2014 (T. Reichert Cross); Trial Day 21 Tr. 5028:14–5029:19, June 24, 2014 (L. Eden Cross) (calling the RPS methodology the "least worst" option); TR00035, Cooper Allocation Report 22; TR00049, Reichert Report 28; TR00038, Rebuttal Expert Report of Steven D. Felgran 3–4 (Feb. 28, 2014) [hereinafter "Felgran Rebuttal"].

could be performed by comparable independent companies for a market rate of return, *i.e.*, that have an observable price in the open market.[622]  Entities performing such functions are rewarded with a fixed percentage return based on comparable market rates.  Non-routine functions are the "entrepreneurial" activities of the group, and the entities engaged in these functions assume the full risks and reward of the enterprise, *i.e.*, to share the residual profits and losses that will accrue after the routine functions have been compensated.[623]  An entity that performs both routine and non-routine functions should receive an appropriate return for each function.

455.    Nortel began following the RPS methodology in 2001, at the suggestion of revenue authorities, but operated without any written agreement until the MRDA was signed in late 2004. The MRDA was considered a "transfer pricing document," prepared to be presented to revenue authorities in order to show compliance with the arm's length standard.[624]  Indeed, the MRDA provided expressly for its own amendment if its terms were ever found not to comply with that standard.[625]  The MRDA confirmed that Nortel had adopted the RPS methodology, a term of art in the transfer pricing area, but did not purport to define that term in detail.[626]

---

[622]    TR00049, Reichert Report 20.

[623]    TR00049, Reichert Report 20–21.

[624]    *See* Trial Day 9 Tr. 1848:3–1848:7, May 28, 2014 (M. Weisz Direct); G. Sparagna Dep. Tr. 134:12–135:6, 233:11–233:15 (Dec. 10, 2013); Trial Day 12 Tr. 2781:18–2785:2, June 2, 2014 (R. Cooper Cross).

[625]    *See* TR21003, MRDA at 2, sched. A (Dec. 22, 2004), at NNC-NNL06001514/2, 18.

[626]    *See* TR21003, MRDA sched. A (Dec. 22, 2004), at NNC-NNL06001514/18 ("The purpose of this section is to provide a brief summary of Nortel's transfer pricing policy . . . .  The current transfer pricing methodology is the residual profit split method ('RPSM') which was adopted by the Participants at the request of the tax authorities as the most appropriate method for determining the arm's length compensation to each of the Participants for the R&D activity to be provided pursuant to the Master R&D Agreement.").

456.    At Nortel, the creation of IP through R&D was identified as the profit driver of the group, and the five RPEs that performed R&D were the entrepreneurial entities entitled to enjoy the full economic risks and rewards – both upside and downside – from that activity.    They were therefore considered the beneficial or "economic" owners of those intangibles in proportion to their relative contributions to creation.[627]

457.    The Canadian Debtors read the MRDA as giving NNL the exclusive right to the proceeds from the sale of the IP created through the joint R&D efforts of the RPEs.    This is not only incorrect as a matter of contract interpretation, it would also violate the arm's length standard, which is expressly referred to and adopted.[628]    Such an agreement would deprive the other RPEs of an arm's length return on their investment in R&D, while giving a windfall to NNL beyond what it was entitled to receive for the functions it performed.    Independent commercial parties would never agree to invest billions in R&D without a right to share in profits that might be earned through the sale of the resulting IP.[629]

458.    The commercial absurdity of the Canadian Debtors' argument is made plain by the fact that in reality the RPEs shared losses rather than profits.    If the Canadian Debtors are correct, the other RPEs would receive only a negligible share of sale proceeds in exchange for sharing in the Group's losses.    Such an outcome defies all commercial logic.

---

[627]    *See* Proposed Findings of Fact § III.C.5.

[628]    *See* TR21003, MRDA at 2, sched. A (Dec. 22, 2004), at NNC-NNL06001514/2, 18.

[629]    Trial Day 11 Tr. 2688:15–2689:24, May 30, 2014 (R. Cooper Direct); *see also* TR00035, Cooper Allocation Report 34.

459.    Dr. Reichert's attempt to demonstrate that the Canadian position would meet the arm's length standard is unrealistic and unpersuasive.  He can only support his argument with abstract, hypothetical calculations, rather than concrete examples of how rational, independent commercial entities would act under comparable circumstances, the basis of the arm's length standard.  The other three transfer pricing experts agree that to deny the non-NNL RPEs a right to share in the proceeds from a sale of the IP to which they contributed would violate the arm's length standard.[630]  Dr. Felgran said it well when he wrote:

> By definition, economic ownership covers an asset owner's claims to the residual asset value, either in its unlimited upside or downside.  Dr. Reichert's construct of a world where economic ownership of an asset comes to an abrupt end in certain circumstances short of the end of an asset, product or business life cycle is inconsistent with the concept of economic ownership. . . .
> In my opinion, such an arrangement would be economically irrational and paradoxical, cannot possibly be reconciled with arm's length principles, and is completely contrary to any agreement business professionals would make.[631]

460.    NNL performed two different functions in relation to Nortel's IP:  (i) legal title holder and administrator, and (ii) co-R&D investor and co-creator, together with the other four RPEs. NNL was entitled to different returns with respect to each of these roles.  As legal title holder and administrator, a non-entrepreneurial function, NNL was entitled to receive and did receive a routine return.  As an entrepreneur and co-investor in R&D, NNL was entitled to share in the profits and losses from exploiting the IP on the same basis as its co-entrepreneurs, the other

---

[630]    Trial Day 21 Tr. 5034:2–5034:25, June 24, 2014 (L. Eden Cross); Trial Day 11 Tr. 2688:15–2690:18, May 30, 2014 (R. Cooper Direct); Trial Day 12 Tr. 2858:6–2860:23, June 2, 2014 (S. Felgran Direct).

[631]    TR00038, Felgran Rebuttal ¶ 12.

RPEs.  The dollars invested by NNL in R&D were worth no more than the dollars invested by the other RPEs, and NNL is entitled to no greater return on its R&D investment than the others.[632]

461.    The OECD guidance makes it abundantly clear that the mere holding of legal title to an asset does not, in itself, provide any value to an enterprise and therefore does not entitle the holder to receive profits that would accrue to a beneficial owner.[633]  As stated in OECD guidance:

> [A] determination that a particular group member is the legal owner of intangibles does not, in and of itself, imply that the member has the right ultimately to retain any receipts that accrue in the first instance to that member as a result of its commercial right to exploit the intangible, nor does it imply that the legal owner is entitled to any income of the business after compensating other members of the [multinational enterprise] group for their functions performed, assets used, and risks assumed.[634]

462.    Acceptance of the Canadian Debtors' argument would effect a massive, uncompensated transfer of value from the other RPEs to NNL in violation of the arm's length principle.  Under the Canadian view, when the RPEs (i) transferred to NNL legal title to patents created by their employees, and (ii) spent billions of dollars maintaining and improving IP over which NNL had

---

[632]    *See* Proposed Findings of Fact § III.D.

[633]    TR50471, OECD, Revised Discussion Draft On Transfer Pricing Aspects Of Intangibles ¶ 73 (July 30, 2013) ("[F]or transfer pricing purposes, legal ownership of intangibles, by itself, does not confer any right ultimately to retain any return from exploiting the intangible that may initially accrue to the legal owner as a result of its legal or contractual right to exploit the intangible.").

[634]    TR50471, OECD, Revised Discussion Draft On Transfer Pricing Aspects Of Intangibles ¶ 74 (July 30, 2013); *see also* TR50471, OECD, Revised Discussion Draft On Transfer Pricing Aspects Of Intangibles ¶ 73 (July 30, 2013)("The return ultimately retained by the legal owner depends upon the contributions it makes to the anticipated value of the intangibles through its functions performed, assets used, and risks assumed, and upon the contributions to the anticipated value of intangibles made by other MNE group members through their functions performed, assets used, and risks assumed.").

legal title, they gave up the most fundamental attribute of beneficial ownership, *i.e.*, the right to the proceeds of sale.[635]  Such a transfer could only have been made if comparable value accrued to them in exchange.

463.    Application of the arm's length standard here is not a purely academic exercise.  As confirmed by the transfer pricing experts, the proceeds to be received by the various debtors as a result of this proceeding will be subject to the same principles of taxation that applied prior to Nortel's insolvency, *i.e.*, the arm's length standard.[636]  An allocation that was found not to meet the arm's length standard could have serious tax consequences for the debtors' estates, including (i) the imputation of taxes on the amount a local revenue authority believes should have been paid,[637] or (ii) the reopening of prior tax years in which the debtor deducted R&D expenses, and booked shared operating losses, based on the apparently mistaken representation that it was the beneficial owner of the IP in which it invested.

> ### 2. No Transfer of Beneficial Ownership Rights Occurred Pursuant to the Assignments of Individual Patents Signed by Their Inventor Employees

464.    The Canadian Debtors argue that the beneficial ownership rights of the other RPEs were transferred to NNL in cases where their inventor employees signed specific assignment forms

---

[635]    TR00038, Felgran Rebuttal ¶ 20 ("It makes no sense for an entity to voluntarily give away its IP in exchange for a transfer pricing arrangement whereby, if for some reason that global regime were terminated, its rights to share in the existing IP assets would also be eliminated.").

[636]    *See* Trial Day 12 Tr. 2866:21–2867:10, June 2, 2014 (S. Felgran Cross); Trial Day 11 Tr. 2677:10–17, May 30, 2014 (R. Cooper Direct).

[637]    *See* Trial Day 21 Tr. 5022:11–5023:21, June 24, 2014 (L. Eden Cross); TR00035, Cooper Allocation Report 34–35.

that assigned their rights to individual inventions to NNL.[638]  Assignments were only ever signed by employees when patent applications were prepared.  Although these assignments generally transferred the employees' entire right, title, and interest in their inventions to NNL,[639] they cannot have transferred beneficial ownership to NNL because the inventor employees did not hold beneficial ownership – their employers did.[640]  One cannot sell or assign what one does not have:  *nemo dat quod non habet*.[641]  If a purported assignor does not have beneficial ownership of IP, then by definition he or she cannot assign it.  Employees did not have beneficial ownership of the IP because it automatically vested in their employers, the RPEs.[642]  Regardless, the true purpose of the assignments was to assign the patent application, as evident from the fact that these assignments were not required except when patent applications were prepared.  The assignments were a necessary part of the application process to prove that the applicant (NNL) had the necessary rights and powers.

465.    Thus, in *Marchands Ro-Na Inc. v. Tefal S.A.*,[643] a trademark was expunged from the official register because it was granted to an entity that never used or intended to use it in

---

[638]  The record does not indicate with respect to what proportion of patents in the Nortel patent portfolio such assignments were signed.

[639]  *See, e.g.*, TR11115, Assignment for Backhauling of Call Signaling for Multiple Protocols at 1 (Oct. 31, 2000), at NNC-NNL11756002/6.

[640]  *See* Proposed Conclusions of Law § II.A.3(a)(ii).

[641]  Translated literally, "No one gives what he does not have."  *See, e.g. Ricco v. Ryan*, [2007] O.J. No. 4030 at para. 34 (S.C.J.).

[642]  *See* Proposed Conclusions of Law § II.A.3(a)(ii).

[643]  (1981), 14 B.L.R. 123 (F.C. (T.D.)).

Canada.  Although that entity subsequently purported to assign the trademark to a company that did use it properly, this could not cure the defect.  Because the assignor never validly held the trademark, the *nemo dat* rule applied:  there was nothing to assign, even to the party that would have been entitled to the trademark had it applied.[644]

466.    Similarly, whatever the RPEs' engineers assigned to NNL, it could not include beneficial ownership of the Nortel IP for the simple reason that the engineers did not have beneficial ownership.  As explained above, the RPEs beneficially owned the patents from the outset because they employed the engineers for the purpose of inventing.[645]

467.    Thus, in cases where assignments were executed by Nortel employees in favour of NNL, they merely transferred legal title to NNL.  Indeed, it is not disputed that NNL held legal title to the patents.  But as established above, legal title to property, without more, does not entitle the holder to the proceeds from the sale of that property in preference to the beneficial owner.[646]

## III.    THE RPES' RELATIVE BENEFICIAL OWNERSHIP RIGHTS SHOULD BE CALCULATED ACCORDING TO THEIR R&D SPENDING OVER THE PERIOD WHEN THE SALEABLE IP WAS CREATED, WHICH TERMINATED UPON INSOLVENCY

468.    Having determined that the RPEs are entitled to share in the proceeds attributable to the sale of Nortel's IP in proportion to the value they contributed to the creation of that IP, the next question is how the value of their relative contributions should be measured.  The RPS

---

[644]    *Marchands Ro-Na Inc. v. Tefal S.A.* (1981), 14 B.L.R. 123 at para. 7 (F.C. (T.D.)).

[645]    *See* Proposed Conclusions of Law § II.A.3(a)(ii).

[646]    *See* Proposed Conclusions of Law § II.B.1(a).

methodology adopted by the Nortel Group, its history of allocating sale proceeds, and resulting trust principles all dictate that relative contributions to IP be measured by the RPEs' actual R&D spending over the period when saleable IP was created.

469.    Dr. Cooper testified that revenue authorities would, in a situation such as the one before the Courts, expect the parties not to rely on a look-back period used on a year-to-year basis for allocating ongoing profits, but to test the available data to determine the correct look-back period.[647]   No party challenged Dr. Cooper's opinion.   This supports the conclusion that the RPEs' beneficial ownership rights should be calculated according to their R&D spending over the period when saleable IP was created.

470.    Only two experts purported to analyze the available data to determine the correct look-back period.  For the reasons described above in detail in Section VI.F of the Proposed Findings of Fact, Dr. Reichert's product-based (as opposed to patent-based) analysis was anything but robust; it was results-driven and produced conclusions that ran contrary to the record and to his own prior writings.  Mr. Malackowski's analysis, by contrast, was robust and reliable.

471.    The record establishes beyond question that the relevant period for the creation of the IP that was sold spanned from 1991 to 2008.  The evidence that Nortel's R&D over this entire period is relevant to the IP that was sold includes but is by no means limited to:

> (a) Mr. Malackowski's analysis of patent priority dates, *i.e.*, the effective filing dates, which established that patents sold in the Business Sales and the Residual Patent Sale between 2009 and 2011 were predominantly filed in the 1990s, and that the majority

---

[647]   Trial Day 11 Tr. 2676:20–2677:9, May 30, 2014 (R. Cooper Direct).

of the high-interest, and therefore high-value, patents sold to Rockstar in 2011 were created in the 1990s.

(b) Dr. Reichert's admission that if a patent is sold, it is *ipso facto* within its useful life, which establishes that IP generated in 1991 was within its useful life when sold between 2009 and 2011, and that using a different period would be erroneous.

(c) Nortel's patent maintenance program, by which obsolete patents were culled from the portfolio to avoid ongoing maintenance costs.

(d) Mr. Malackowski's analysis of the preeminent Nortel patents now being asserted in litigation by Rockstar and its successors, which found that the average priority date of patents being asserted is 1998.

(e) The fact and expert evidence that market adoption rates are sufficiently slow that markets for the critical – and therefore most valuable – technologies in which the Nortel Group held patents were still growing a decade or more after the average priority date for patents in any given field.

(f) The testimony of Nortel fact witnesses, such as Clive Allen, Brian McFadden, Simon Brueckheimer, and others.

(g) The testimony of all other experts qualified to opine on the matter:  Dr. Tucker, Dr. Eden, and Dr. Cooper.

472.   As described above in detail in Section VI.E of the Proposed Findings of Fact, the evidence in the record established that the relevant period for the creation of the IP that was sold in the Business Sales and the Residual Patent Sale spanned from 1991 to 2008.  The relative R&D spending for the EMEA, U.S., and Canadian Debtors during this period was as follows[648]:

---

[648]   DEM00011, Malackowski Slides at 17.



473.    Applying the above principles under the contribution approach, Mr. Malackowski's conclusions regarding the proper allocation of sale proceeds attributable to IP is summarized below[649]:

---

[649]    TR00033, Malackowski Report 54 tbl. 27.



## IV.    IN THE ALTERNATIVE, IP SALE PROCEEDS SHOULD BE ALLOCATED BASED ON THE VALUE OF THE RPES' LICENSE RIGHTS

474.    If the courts reject the contribution approach and instead find that allocation of the proceeds attributable to IP should be based on a valuation of the RPEs' license rights, the Courts should adopt Mr. Malackowski's approach to such valuation.

### A.    The Canadian Debtors' Narrow Interpretation of the License Is Not Consistent with the MRDA

475.    Article 5(a) grants the Licensed Participants an exclusive, perpetual, sublicensable royalty-free license, with two "arms":

(a) "rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology"; and

(b) "all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith."[650]

476.    The EMEA Debtors submit that the Canadian Debtors' interpretation – that the second arm merely modifies the first, and that the right to "patents" in the second arm is limited to their use in "Products" – must be rejected for at least three reasons.

477.    First, it renders the second arm meaningless, as the right to "patents, industrial designs and copyrights, and applications therefor" for the purpose of making Products is already contained in the first arm by the definition of NN Technology, which includes "patents, industrial designs, copyrights and applications thereof."[651]

478.    Second, the phrase "in connection therewith" in the second arm cannot refer back to the first arm, because the phrase "applications therefor" in the second arm clearly cannot be modifying the first arm; it refers back to "patents" and "copyrights," within the second arm.  It would be syntactically absurd for "applications therefor" to modify the second arm, but "in connection therewith" to subsequently refer back to the first arm.[652]

479.    Third, the Canadian Debtors' interpretation would result in a commercial absurdity. There is no dispute that the enforcement right under Article 4(e) is co-extensive with the license

---

[650]    TR21003, MRDA art. 5(a) (Dec. 22, 2004), at NNC-NNL06001514/6–7.

[651]    *See* TR21003, MRDA arts. 1(f), 5(a) (Dec. 22, 2004), at NNC-NNL06001514/3, 6–7; DEM00011, Malackowski Slides at 42–44.

[652]    *See* TR21003, MRDA art. 5(a) (Dec. 22, 2004), at NNC-NNL06001514/6–7; DEM00011, Malackowski Slides at 44.

grant.[653]  As a result, the Canadian Debtors' interpretation would mean that the RPEs only have the right to enforce against infringement by contracted third parties manufacturing Nortel "Products."  Of course, there is no need to enforce against one's own manufacturers; an enforcement right is necessary to deal with third-party infringers.  However, the Canadian Debtors' interpretation would give the Licensed Participants no ability to enforce against third parties.

480.    The Canadian Debtors argue that NNL's ownership of the IP was subject only to the Licensed Participants' limited and non-transferable licenses, but this argument about the non-transferability of the licenses is – as Mr. Green confirmed at trial after a homework break[654] – based on Article 14(a) of the MRDA.  The plain language of Article 14(a) addresses the conditions under which the MRDA may be assigned, not the transferability of the licenses granted under the MRDA.[655]  If Article 14(a) prohibits the transfer of licenses, logic dictates that it must also prohibit the transfer of NNL's legal title.

## B.    The Courts Should Adopt Mr. Malackowski's License Approach

481.    The Courts should adopt Mr. Malackowski's alternative license approach if they determine that a license approach is the appropriate allocation methodology.  Mr. Malackowski

---

[653]  *See* Trial Day 13 Tr. 3191:13–3192:11, June 5, 2014 (P. Green Cross); P. Green Dep. Tr. 42:12–16, Mar. 31, 2014; Trial Day 15 Tr. 3719:14–18, June 16, 2014 (M. Berenblut Cross); M. Berenblut Dep. Tr. 60:11–19, Mar. 26, 2014.

[654]  Trial Day 13 Tr. 3167:20–3168:14, 3213:19–3214:18, June 5, 2014 (P. Green Cross)

[655]  *See* TR21003, MRDA art. 14(a) (Dec. 22, 2004), at NNC-NNL06001514/12.

was a credible and reliable expert, and the only expert to independently value the largest and most valuable asset class at issue in this case.

482.    Using the relief-from-royalty method, discussed above, Mr. Malackowski determined that the total value of the IP sold in the Business Sales was $765 million.[656]

483.    In order to allocate the Residual Patent Sale proceeds under his alternative license approach, Mr. Malackowski performed a similar analysis so that the value could be distributed geographically.  The final valuation of the Residual Patent Sale came to $3.6 billion, so the percentages attributed to each of the RPEs were then scaled and applied to the $4.5 billion sale price, while each Debtor's relative share remained constant.[657]  As a robustness check in connection with this valuation, Mr. Malackowski considered both conservative assumptions about revenue outside the RPE jurisdictions, as well as less conservative assumptions, with the mid-point between those two alternatives approximating the actual $4.5 billion sale price.[658]

484.    He then allocated that value, based on the total value of all the exclusive and nonexclusive licenses to Nortel IP, by the country in which the revenue that drove the value would be earned.[659]  The following table summarizes Mr. Malackowski's allocation of value

---

[656]    See, e.g., DEM00011, Malackowski Slides at 4–5, 56; see also Trial Day 10 Tr. 2236:21–2237:23, 2339:18–2340:6, May 29, 2014 (Malackowski direct).

[657]    See TR00033, Malackowski Report 33; Trial Day 10 Tr. 2334:8–16, May 29, 2014 (J. Malackowski Direct).

[658]    DEM00011, Malackowski Slides at 52; TR00033, Malackowski Report 37–38 & tbl. 13.

[659]    TR00033, Malackowski Report 50.

attributable to IP sold in the Business Sales and Residual Patent Sale under his alternative license approach[660]:

| IP (License) | Canada | U.S. | EMEA | Total |
|---|---|---|---|---|
| Allocation (USD millions) | $595 | $2,827 | $1,843 | $5,265 |
| Percentage | 11.3% | 53.7% | 35.0% | 100% |

## V.   THE NORTEL AT-RISK ENTITIES THAT CREATED IP OUTSIDE THE MRDA ARE ENTITLED TO RECEIVE THE VALUE OF THEIR IP

485.   Not all of the IP that was conveyed to purchasers in the postpetition asset sales was the result of R&D efforts conducted by the RPEs under the MRDA.  As described above, AREs were former joint ventures that conducted some R&D and therefore had a broader role than the LREs or CPEs.[661]  Several AREs, including Nortel France SAS and Nortel Germany, conducted their own R&D and owned patents outright.[662]  Nortel's AREs held legal title to and beneficial ownership of certain Nortel IP that was conveyed to purchasers in the Nortel asset sales.[663] These AREs are therefore entitled to 100% of the value of those patents.

---

[660]   DEM00011, Malackowski Slides at 58, 59, 61.

[661]   *See* TR00030, Huffard Report app. 7 at 3–4.

[662]   *See* TR00030, Huffard Report ¶ 29.

[663]   *See* TR00030, Huffard Report ¶¶ 29–30; TR00033, Malackowski Report 45–47.

486.    Patents owned by the EMEA AREs, Nortel France SAS and Nortel Germany, were valued at $21.02 million by Mr. Malackowski.[664]

487.    Mr. Britven was the only other expert to value the ARE patents.[665]  His analysis was even more generous to the EMEA AREs than was Mr. Malackowski's:  He allocated $57 million of the Residual Patent Sale proceeds to EMEA based on its AREs' ownership of residual patents.[666]

488.    Mr. Malackowski performed a separate valuation of patents that were owned by entities that were not parties to the MRDA.[667]  That value should be allocated directly to the owners of the IP, including the EMEA AREs.[668]

## VI.    SALE PROCEEDS ATTRIBUTABLE TO CUSTOMER-RELATED ASSETS AND GOODWILL SHOULD BE ALLOCATED BASED ON 2008 REVENUE

489.    The record, detailed above in Section XI of the Proposed Findings of Fact, demonstrates clearly that the Customer-Related Assets transferred in the Business Sales are separately identifiable from the Group's IP assets, and they have significant value.  That evidence, much of which was usefully summarized by Mr. Huffard,  includes but is not limited to:

> (a) The testimony of Nortel executives about the value of Customer-Related Assets both to Nortel and to the purchasers of the Lines of Business, particularly Peter

---

[664]    *See* TR11383, Malackowski Report Ex. R.3.2.

[665]    TR00045, Britven Report ¶¶ 6.20, 6.21, 6.57, 6.58; Trial Day 14 Tr. 3462:18–25, June 6, 2014 (T. Britven Cross).

[666]    TR00045, Britven Report ¶ 6.65, tbl. 12.

[667]    TR00033, Malackowski Report 45–47.

[668]    TR00033, Malackowski Report 45–47.

Newcombe's testimony that one potential purchaser of the MEN business, which was not interested in IP, submitted a bid that was half the price of Ciena's winning bid.

(b) The emphasis that Nortel placed on the value of Customer-Related Assets when selling its Lines of Business, including representations to potential purchasers and to the Courts.

(c) That fact that every single purchaser of a Nortel Line of Business that filed a PPA allocated value to customers as a separate asset class.

(d) Nortel's adoption of this asset class in allocating the proceeds of the UMTS sale to Alcatel.

490.    Customer-Related Assets and Goodwill are a particularly important asset class in this case because they are the only material source of funds from the lockbox for many of the LREs, CPEs, and AREs.[669]  The value these selling debtors contributed in the Business Sales must be recognized, valued, and allocated to those entities.  These entities may not have been as significant as the RPEs to Nortel's rise and fall, but they are distinct legal entities with distinct creditor bases and they are entitled to compensation for what they gave up in the sales.

491.    Mr. Huffard's testimony demonstrated that (i) Customer-Related Assets and Goodwill share key characteristics and are appropriately valued together as a residual, based on the difference between the total sales price and the value of Net Tangible Assets and IP, and (ii) these assets are derived from historical sales and should be allocated in proportion to 2008

---

[669]    These entities were entitled to Net Tangible Assets but in many cases tangible assets were outweighed by liabilities. The AREs are also entitled to an allocation in respect of certain patents held by them, but the amounts in question are relatively small.

revenue. Thus the record demonstrates that the proceeds from these asset classes should be allocated to the Debtors as follows[670]:



VII.    **SALE PROCEEDS ATTRIBUTABLE TO TANGIBLE ASSETS SHOULD BE ALLOCATED BASED ON NORTEL'S BOOKS AND RECORDS**

492.    It is common ground between the Canadian Debtors and the EMEA Debtors that sale proceeds attributable to Net Tangible Assets should be allocated according to their recorded book value and are allocated directly to the selling entity that held the assets and liabilities on its balance sheet.[671]   The appropriate source for the book value of the Net Tangible Assets is the

---

[670]    TR00030, Huffard Report ¶ 119.

[671]    TR00030, Huffard Report ¶ 65; *see also* Trial Day 9 Tr. 1959:4–14, 1962:2–6, May 28, 2014 (P. Huffard Direct).

fourth quarter 2009 financial statements of each Nortel selling entity.[672]  This represents the fair market value of that portion of the Business Sale proceeds attributable to Net Tangible Assets, and results in an allocation of $39 million (33.1%) to the Canadian Debtors and $106 million (89.8%) to the U.S. Debtors, as well as a negative allocation of $27 million (-22.9%) netted against the total allocation to the EMEA Debtors.[673]


## VIII.   ALLOCATION CONCLUSIONS

### A.     Allocation to the Canadian, U.S., and EMEA Debtors

493.    For the reasons set forth above, the evidence presented at trial indicates that the Nortel asset sale proceeds should be allocated between the Canadian Debtors, the U.S. Debtors, and the EMEA Debtors under the contribution approach, as follows[674]:

| CONTRIBUTION APPROACH | | | $ in millions |
|---|---|---|---|
| Total Allocation by Contribution Approach: Business Sale IP (Sale Specific) / Residual IP (1991-2006) | | | |
| | Canada | US | EMEA | Total |
| CDMA | 15.8% | 80.4% | 3.8% | 100.0% |
| Enterprise | 20.2% | 50.9% | 29.0% | 100.0% |
| MEN | 23.7% | 47.1% | 29.2% | 100.0% |
| CVAS | 29.2% | 41.9% | 28.8% | 100.0% |
| GSM | 23.6% | 66.3% | 10.1% | 100.0% |
| MSS | 13.1% | 42.6% | 44.3% | 100.0% |
| Layer 4-7 | 27.5% | 50.7% | 21.8% | 100.0% |
| Next Gen | 33.0% | 53.6% | 13.4% | 100.0% |
| Residual IP | 39.5% | 42.9% | 17.6% | 100.0% |
| **Total Allocation** | **31.9%** | **49.9%** | **18.2%** | **100.0%** |
| **Total Value** | **$ 2,320** | **$ 3,636** | **$ 1,325** | **$ 7,280** |

---

[672]    TR00030, Huffard Report ¶ 84.

[673]    TR00030, Huffard Report ¶¶ 100, 101; DEM00010, Huffard Slides at 7.

[674]    TR00030, Huffard Report ¶ 125.

494.    As set forth above, the evidence presented at trial also indicates that a license approach may be used as an alternative method for allocating the Nortel asset sale proceeds between the Canadian Debtors, the U.S. Debtors, and the EMEA Debtors, as follows[675]:

| LICENSE APPROACH | | | | $ in millions |
|---|---|---|---|---|
| Total Allocation by License Approach | | | | |
| | Canada | US | EMEA | Total |
| CDMA | 9.9% | 79.1% | 11.0% | 100.0% |
| Enterprise | 11.3% | 52.3% | 36.5% | 100.0% |
| MEN | 18.4% | 48.0% | 33.5% | 100.0% |
| CVAS | 12.1% | 47.4% | 40.5% | 100.0% |
| GSM | 9.9% | 55.7% | 34.4% | 100.0% |
| MSS | 10.5% | 40.6% | 48.9% | 100.0% |
| Layer 4-7 | 4.8% | 81.8% | 13.4% | 100.0% |
| Next Gen | 12.2% | 49.1% | 38.7% | 100.0% |
| Residual IP | 11.0% | 55.4% | 33.6% | 100.0% |
| Total Allocation | 11.5% | 57.7% | 30.9% | 100.0% |
| Total Value | $ 836 | $ 4,198 | $ 2,247 | $ 7,280 |

### B.    Allocation to the Individual EMEA Entities

495.    By allocating Net Tangible Assets and the residual category of Customer-Related Assets and Goodwill according to which entities owned the relevant assets, Mr. Huffard allocates value to EMEA AREs, CPEs, and LREs, in addition to the RPEs.[676]

496.    These entities, as companies that did not conduct R&D, were not party to the MRDA, and – apart from two EMEA AREs – did not own any IP.  However, each ARE, CPE, and LRE did own valuable Customer-Related Assets, which represented the majority of the value they

---

[675]    TR00030, Huffard Report ¶ 129.

[676]    See TR00030, Huffard Report ¶¶ 28, 100, 118.

conveyed in the Business Sales.[677]   No party disputes that these entities were designated as "Sellers" in the relevant sale agreements.[678]   These entities are entitled to an allocation of Business Sale proceeds attributable to the important assets each conveyed.

497.    Although the EMEA Debtors have acted together to present their arguments in this proceeding, they are in fact individual entities, each of which is a party to these proceedings and each of which is entitled to a judgment stating its separate entitlement to an allocation from the asset sale proceeds.   The record demonstrates that the sum allocated to the EMEA Debtors as shown in the table above, should be allocated to the individual EMEA Debtors as follows[679]:

---

[677]   *See* TR00030, Huffard Report ¶¶ 101, 119, app. 7 at 3–4.

[678]   *See* TR00030, Huffard Report apps. 11–18 (providing details on the named "Sellers" in each of the Business Sales).

[679]   TR00030, Huffard Report app. 23.   Nortel Networks Oy transferred a small amount of assets in the Business Sales, which round to zero for the purposes of this chart.   *See* TR00030, Huffard Report app. 15 ¶ 7, app. 18 ¶ 6 (listing Nortel Networks Oy as a party to the asset sale agreements governing the Enterprise and MMS Business Sales).

## EMEA ENTITY ALLOCATIONS

$ in millions

Business IP/Residual Patent Method:    R&D Contribution (Sale Specific) / R&D Contribution- 1991-2006

| | CDMA | Enterprise | MEN | CVAS | GSM | MSS | Layer 4-7 | Next Gen | Residual IP | Total Allocation | Total Value |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **EMEA** | 3.8% | 29.0% | 29.2% | 28.8% | 10.1% | 44.3% | 21.8% | 13.4% | 17.6% | 18.2% | $ 1,325 |
| | | | | | | | | | | | |
| **Entities** | | | | | | | | | | | |
| Nortel (Austria) GmbH | – | 0.4% | 0.4% | 0.1% | 0.7% | 0.0% | 0.0% | – | – | 0.1% | 6 |
| Nortel N.V. | – | 0.5% | 1.3% | 0.7% | 0.8% | 1.2% | 0.1% | – | – | 0.2% | 15 |
| Nortel Czech Republic | – | 0.1% | 0.0% | 0.0% | 0.1% | 0.2% | 0.1% | – | – | 0.0% | 1 |
| Nortel Oy | – | – | – | – | – | 0.0% | – | – | – | 0.0% | 0 |
| Nortel Networks S.A. | 1.7% | 4.5% | 3.6% | 7.0% | 1.6% | 6.5% | 4.6% | 6.0% | 7.6% | 5.9% | 431 |
| Nortel France SAS | – | 0.3% | – | – | 0.1% | | 0.1% | – | 0.4% | 0.3% | 22 |
| Nortel GmbH | – | 3.0% | 0.6% | 1.3% | – | 3.5% | 1.9% | – | 0.0% | 0.5% | 34 |
| Nortel Hungary | – | 0.1% | – | | – | – | – | – | – | 0.0% | 1 |
| Nortel (Ireland) Ltd | 0.2% | 3.7% | 0.8% | 0.7% | 0.2% | 0.6% | 1.0% | 0.8% | 1.0% | 1.1% | 83 |
| Nortel S.p.A. | – | 1.1% | 0.5% | 1.9% | 0.1% | 1.0% | 0.0% | – | – | 0.2% | 15 |
| Nortel B.V. | – | 1.1% | 3.7% | 0.6% | 0.2% | 1.5% | 0.1% | – | – | 0.5% | 33 |
| Nortel Networks AS | – | 0.6% | – | – | – | 0.6% | – | – | – | 0.1% | 5 |
| Nortel Polska Sp. z.o.o. | – | 0.1% | 0.2% | 0.0% | 0.8% | – | 0.0% | – | – | 0.0% | 3 |
| Nortel Portugal S.A. | – | 0.2% | 0.0% | 0.1% | – | 0.5% | 0.0% | – | – | 0.0% | 2 |
| Nortel Romania SRL | – | 0.2% | | 0.0% | 0.2% | 1.9% | 0.0% | – | – | 0.0% | 3 |
| Nortel Slovensko, s.r.o. | – | 0.0% | – | 0.0% | 0.4% | 0.2% | – | – | – | 0.0% | 1 |
| Nortel Hispania, S.A. | – | 0.6% | 1.2% | 1.0% | – | 4.7% | – | – | – | 0.2% | 17 |
| Nortel AB | – | 0.7% | 1.1% | | – | 0.6% | – | – | – | 0.2% | 12 |
| Nortel AG | – | 1.1% | 0.8% | 0.7% | 0.1% | 0.3% | 0.0% | – | – | 0.2% | 15 |
| Nortel Networks UK Ltd | 1.9% | 10.1% | 15.0% | 14.7% | 4.7% | 21.2% | 14.0% | 6.5% | 8.6% | 8.5% | 619 |
| Nortel South Africa Ltd | – | 0.7% | – | – | – | – | – | – | – | 0.1% | 6 |
| **Total** | 3.8% | 29.0% | 29.2% | 28.8% | 10.1% | 44.3% | 21.8% | 13.4% | 17.6% | 18.2% | $ 1,325 |

498.    The Courts should enter judgment accordingly.

Dated:   Wilmington, Delaware       Respectfully submitted,
        August 7, 2014

YOUNG CONAWAY STARGATT & TAYLOR, LLP

_____/s/ Jaime Luton Chapman_____

Edwin J. Harron (No. 3396)
John T. Dorsey (No. 2988)
Jaime Luton Chapman (No. 4936)

Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel.:  302-571-6600
Fax:  302-571-1253

– and –

HUGHES HUBBARD & REED LLP

William R. Maguire (admitted *pro hac vice*)
Derek J.T. Adler (admitted *pro hac vice*)
Neil J. Oxford (admitted *pro hac vice*)

One Battery Park Plaza
New York, New York 10004
Tel.:  212-837-6000
Fax:  212-422-4726

*Counsel for the Joint Administrators*