Court File No. 09-CL-7950

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF NORTEL NETWORKS CORPORATION, NORTEL NETWORKS LIMITED, NORTEL NETWORKS GLOBAL CORPORATION, NORTEL NETWORKS INTERNATIONAL CORPORATION AND NORTEL NETWORKS TECHNOLOGY CORPORATION

APPLICATION UNDER PART IV OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED.

— and —

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>NORTEL NETWORKS INC., *et al.*,<br><br>Debtors. | Chapter 11<br>Case No. 09-10138 (KG)<br>(Jointly Administered) |

**<u>POST-TRIAL BRIEF OF THE US INTERESTS</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. vi

PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT ...................................1

    A.    The US Interests' Allocation Position .........................................................2

        1.    NNI Was the Most Valuable Nortel Entity......................................2

        2.    Equity Takes Last in Insolvency.....................................................4

        3.    NNI's Valuation Methodology .........................................................5

    B.    The Monitor's Allocation Theories Are Legally and Factually Unsupportable ...........6

        1.    The Monitor Misconstrues the Rights NNI Held Under the MRDA......................6

            a.    The Monitor's Interpretation for Purposes of This Litigation Is Contrary to the Words of the MRDA.................................................7

            b.    The Factual Matrix Evidence Supports NNI's Interpretation of the MRDA.....9

            c.    The Monitor's Interpretation of the MRDA Is Commercially Unreasonable..10

            d.    The Monitor's Interpretation Is Belied by the Nortel Group's Conduct as Well as the Monitor's Own Conduct .............................................11

        2.    NNL's Bare Legal Title to NN Technology Had No Value in the Licensed Participants' Exclusive Territories.........................................12

        3.    The Monitor's Position on the Transfer of Rights to NN Technology and the "Value in Use" Method Flowing Therefrom Is Incorrect ................................13

    C.    The EMEA Debtors' Contribution Theory Is Flawed .................................15

    D.    The RPSM – Not Advocated by Any Party – Is Not an Appropriate Approach to Allocation..................................................................16

    E.    Pro Rata/Substantive Consolidation Must Be Rejected.............................17

POINT I :  THE FRAMEWORK FOR ALLOCATION ........................................................18

    A.    The Touchstone for Allocation Is Fair Market Value.................................18

    B.    Fair Market Value Principles Are Consistent with the MRDA .................................20

    C.    Fair Market Value of the Assets NNI Sold or Relinquished in Connection with the Sales Must Go First to NNI's Creditors.................................20

POINT II :  THE PARTIES' RIGHTS UNDER THE MRDA.............................................21

    A.    Principles of Contract Interpretation.........................................................21

    B.    The MRDA Grants NNI All Valuable Rights to Nortel's Intellectual Property, Including Patents, in the US...............................................................24

        1.    The Licensed Participants Held Equitable and Beneficial Ownership of NN Technology in Their Territories.....................................................24

            a.    NNI Had the Exclusive Right to Exclude Others from Exploiting NN Technology in the US ...................................................26

          i.    Article 4(e) Clearly Sets Forth NNI's Exclusion Right............................27

          ii.   US Law Additionally Provides NNI with the Exclusion Right...............27

     b.  NNI Had the Exclusive Right to Exploit NN Technology in the US ..............28

     c.  NNI Had the Exclusive Right to Sublicense NN Technology in the US.........29

  2.  Additional Provisions of the MRDA Leave No Doubt as to the Nature and Extent of NNI's Rights .........................................................................................31

     a.  NNI's Confidentiality Obligation Under Article 6 Included an Exception for NNI's Exercise of Its Broad Sublicensing Rights......................................31

     b.  NNI's Indemnification Obligation in Article 7 Is Only Consistent  with Having the Broadest Possible Rights to NN Technology...............................31

     c.  The Insolvency and MRDA Termination Exit Mechanisms Also Confirm the Very Broad Rights NNI Had to NN Technology.......................................32

  3.  The Monitor's Argument Based on the Word "Products" Fails ............................33

  4.  The Monitor's Argument Based on Legal Title Fails............................................36

C.  The Factual Matrix of the MRDA Confirms that Each Licensed Participant Held All Valuable Rights to NN Technology in its Exclusive Territory .............................37

  1.  The MRDA Was a Tax-Driven Contract ................................................................39

     a.  A Principal Purpose of the MRDA Was to Memorialize the Licensed Participants' Economic Ownership of Nortel IP in the Exclusive Territories........................................................................................................40

     b.  The MRDA Was Intended to Continue the Licensed Participants' Exclusive, Beneficial Ownership of Nortel IP in Their Exclusive Territories Pursuant to the 1992 R&D CSA, the 1996 APA, and Applicable Transfer Pricing Regulations.........................................................47

     c.  Nortel Consistently Represented to Tax Authorities that Each Licensed Participant Under the MRDA Bore Entrepreneurial Risks and Owned NN Technology in Its Exclusive Territory ............................................................51

     d.  The Licensed Participants' Exclusive Licenses Were Necessary to Avoid Tax Liability from Permanent Establishment Status .....................................56

     e.  The Monitor Presented No Pertinent Factual Matrix Evidence.....................58

  2.  The Commercial Context.......................................................................................60

     a.  Historical Business Practices .........................................................................60

     b.  Custom and Practice Evidence.......................................................................62

     c.  The Monitor's Interpretation of the MRDA Is Inconsistent  with the Economics of the Nortel Enterprise ................................................................63

D.  Post-Petition Conduct of the Parties ..........................................................................66

  1.  The Estates' Joint Monetization of Nortel IP .......................................................66

2. The Monitor's Representations to the Courts About the Licensed Participants' Rights ................................................................................ 68

    a. The Monitor's Litigation Position Is Inconsistent with its Prior Understanding and Representations to the Courts and Creditors ................... 68

    b. The Monitor's Litigation Position Is Barred by the Doctrine of Estoppel by Convention ............................................................................... 73

**POINT III : THE US INTERESTS' ALLOCATION POSITION ........................................ 75**

A. NNI Was Nortel's Most Valuable Entity ................................................................. 76

1. NNI Generated an Overwhelming Share of the Integrated Entities' Revenues and Cash Flow ........................................................................ 77

2. NNI Provided Financial Support Needed to Ensure the Entire Nortel Group's Continued Operations ............................................................. 79

B. The US Interests' Valuation Analysis ................................................................... 81

1. Kinrich Applies the Most Accurate and Appropriate Valuation Methodology ................................................................................ 82

2. Value of Each Debtor's Assets Relinquished in the Patent Portfolio Sale ........... 83

    a. The US Was Nortel's Largest Market and Where It Concentrated Most of Its Patents ................................................................................ 83

    b. Kinrich's Discounted Cash Flow Analysis Accurately Sets Forth the Fair Market Value of Each Estate's Contribution to the Patent Portfolio Proceeds ............................................................................. 86

        i. The IPCo Model Provided Reliable Projections to Analyze the Relative Value a Buyer Would Expect from the Rights Conveyed by Each Estate .............................................................................. 86

        ii. Patent Portfolio Sale Valuation Result ................................................... 92

3. Value of Each Debtor's Assets Relinquished in the Business Line Sales ........... 93

    a. A Revenue Multiple-Based Income Approach to Valuation Is the Most Appropriate Valuation Methodology ................................................ 94

    b. Kinrich's Business Line Valuation Analysis ................................................... 96

    c. Business Line Valuation Result ................................................................... 98

4. US Interests' Final Allocation Results ............................................................. 99

**POINT IV : THE MONITOR'S PROPOSED ALLOCATION IMPROPERLY ATTEMPTS TO SHIFT VALUE FROM NNI AND THE EMEA DEBTORS TO NNL ................................................................................. 100**

A. The Monitor and Green's Conclusion that NNL Is Entitled to All of the Patent Portfolio Sale Proceeds Is Incorrect ................................................................. 102

1. Green's Primary Allocation Opinion Regarding the Patent Portfolio Sale Should Be Disregarded Because It Is Based on a Misreading of the MRDA ...... 102

iii

2.  Even Were the Monitor's Misreading of the MRDA Correct, the Monitor's Zero-Allocation Argument Would Still Fail Because the US and EMEA Debtors Relinquished Valuable Rights ............................................................. 104

B.  Green's Alternative Patent Portfolio Valuation Set Forth in His Rebuttal Report at Appendix P Is Based on His False Non-Transferability Assumption and Therefore Fails ............................................................................................... 107

1.  Green's Alternative Methodology ...................................................... 107

2.  Green's Erroneous Assumption on Non-Transferability ..................... 108

3.  Additional Flaws in Green's Alternative Patent Portfolio Valuation ................. 110

a.  Green Ignores that NNI and the EMEA IEs Could Have Generated the Full Value of the Sale Transaction Through Licensing ................................. 110

b.  Green Uses Incorrect Discount Rates for the Sale of the Patent Portfolio .... 111

c.  Green Applies the RPSM to His Results for NNI and EMEA, Ignoring that These Are Sale Proceeds ................................................. 112

C.  The Monitor Uses an Inconsistent Methodology to Limit Artificially the Value of the US and EMEA Debtors' Interests in the Business Line Sales and Improperly Transfer Their Value to the Canadian Debtors ..................................... 113

1.  Green Hides Over $1 Billion in Value in Use Remainder that He Summarily Allocates to NNL .............................................................. 113

2.  Green Admitted that His "Alternative Maximum Allocation" Theory Is Not Only Improperly Calculated but Also Methodologically Incorrect .................... 116

**POINT V :  ALL PARTIES AGREE THAT THE RPSM FORMULA SHOULD NOT BE USED TO ALLOCATE THE SALES PROCEEDS .................................... 118**

**POINT VI :  THE EMEA DEBTORS' CONTRIBUTION APPROACH IS INAPPROPRIATE FOR ALLOCATION AND FAILS TO PROPERLY MEASURE EACH IE'S ACTUAL CONTRIBUTION TO THE PATENT PORTFOLIO SOLD .................................................................................... 121**

A.  The Contribution Approach Fails to Allocate the Sales Proceeds Based on the Value Relinquished by Each Selling Debtor ........................................................ 122

B.  The Contribution Approach, Even if Adopted, Must Properly Measure the Economic Contribution of Each IE to the Creation of the IP that Was Sold ............. 123

1.  Contribution Must Measure Each IE's Funding of R&D at the Time of the Creation of the Specific Assets Sold .................................................... 124

2.  Contribution Must Measure Each IE's Complete R&D Funding ...................... 125

**POINT VII :  THE UKPC'S AND CCC'S PRO RATA DISTRIBUTION THEORY LACKS MERIT ............................................................................ 128**

A.  Pro Rata Distribution Theory Has No Legal Basis .................................. 129

1.  The Pro Rata Distribution Theory Would Allocate to NNI Less Than the Value of the Assets It Sold or Relinquished in the Sales ..................................... 129

2.   The Pro Rata Distribution Theory Seeks Unprecedented Global Substantive
Consolidation of the Nortel Debtors Without Legal Basis ...................................130

B.   Pro Rata Distribution Fails to Meet the Requirements of Plan Confirmation ...........131

C.   Pro Rata Distribution Theory Has No Factual Basis .................................................132

D.   Pro Rata Distribution Theory Cannot Be Implemented.............................................136

E.   Pro Rata Distribution Theory Would Disturb Reasonably Held Creditor
Expectations and Prejudice Creditors ......................................................................138

**CONCLUSION** .....................................................................................................................**140**

# TABLE OF AUTHORITIES

**Page(s)**

## Rules and Statutes

26 C.F.R. 1.6662-6 (d)(2)(iii)(A) ................................................................ 55

11 U.S.C. § 363 ............................................................................................128

11 U.S.C. § 541 ............................................................................................129

11 U.S.C. § 1129 ..........................................................................................129

11 U.S.C. § 1129(a)(8) .................................................................................131

11 U.S.C. § 1129(b)(2)(B)(ii) ...................................................................... 20

35 U.S.C. § 154(a)(1) ................................................................................... 26

35 U.S.C. § 271(a) ........................................................................................ 26

Bankruptcy & Insolvency Act (Canada), R.S.C., 1985, c. B-3, s. 96 ......... 19

Canada Business Corporations Act, R.S.C. 1985 c. C-44, s. 2(1) ............. 37

CCAA, RSC 1985, c. C-36 ...........................................................................131

Fed. R. Civ. P. 26(a)(2)(B) ...........................................................................136

Income Tax Act, R.S.C., 1985, c. 1 ..............................................................54-55

Patent Act (Canada), R.S.C., 1985 c. P-4 ....................................................26-27

## Cases

*Adtronics Signs Ltd. v Sicon Group*,
[2004] B.C.J. No. 1885 ................................................................................ 74

*Alberta Oil Sands Pipeline Ltd. v. Canadian Oil Sands Ltd*,
2012 ABQB 524 ........................................................................................... 74

*Alberts v. HCA Inc. (In re Greater Se. Cmty. Hosp. Corp. I)*,
No. 04-10366, 2008 WL 2037592 (Bankr. D. D.C. May 12, 2008) ........... 19

*Berckeley Investment Group, Ltd v. Colkitt*,
455 F.3d 195 (3d Cir. 2006) .........................................................................103

*Bowater Newfoundland Ltd. v. Newfoundland and Labrador Hydro*,
[1978] N.J. No. 14, 15 Nfld. & P.E.I.R. 301 (Can. Nfld. C.A.) ................. 22

*Broadcast Music, Inc. v. DMX Inc.*,
683 F.3d 32 (2d Cir. 2012)................................................................................ 19

*Casper v. SMG*,
389 F. Supp. 2d 618 (D.N.J. 2005) ...................................................................103

*Central Capital Corp., Re*,
(1995), 29 C.B.R. (3d) 33 (Can. Ont. C.J. (Gen. Div. – Commercial List)), *aff'd* (1996),
38 C.B.R. (3d) (Can. Ont. C.A.) ........................................................................ 20

*Computershare v. Crystallex*,
2011 ONSC 5748 (Newbould J.) ...................................................................37-38

*Consolidated-Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.*,
1979 CanLII 10 (SCC), [1980] 1 S.C.R. 888......................................................22

*CoreBrace LLC v. Star Seismic LLC*,
566 F.3d 1069 (Fed. Cir. 2009)........................................................................ 30

*Credit Suisse First Boston v. Owens Corning (In re Owens Corning)*,
419 F.3d 195 (3d Cir. 2005)..............................................................................133

*Crystallex (Re)*,
2012 ONCA 404 ...............................................................................................131

*Daubert v. Merrell Dow Pharm*,
509 U.S. 579 (1993)..........................................................................................136

*Downey v. Ecore International Inc.*,
2012 ONCA 480 ................................................................................................ 23

*Dumbrell v. Regional Group of Companies Inc.*,
[2007] O.J. No 298 (Can. Ont. C.A.).................................................................. 23

*Duncombe Estate, Re*
(1902) 3 O.L.R. 510,  O.W.R. 153 (Ont H.C.) .................................................... 35

*Eli Lilly & Co. v. Novopharm Ltd.*,
[1998] 2 S.C.R. 129 ......................................................................................26, 30-31

*Elliott v. Billings (Township) Board of Education*,
[1960] O.R. 583 (Can. Ont. C.A.)...................................................................... 23

*First Fed. Sav. Bank of Hegewisch v. United States*,
52 Fed. Cl. 774 (Fed. Cl. Ct. 2002)................................................................... 20

*Flintkote Co. v. Gen. Accident Assurance Co. of Can.*,
No. C 04-1827 MHP, 2009 WL 3568644 (N.D. Cal. Oct. 27, 2009) .......................... 22

*GRT v. Marathon GTF Technology, Ltd.*,
Civ. A. No. 5571-CS, 2011 WL 2682898 (July 11, 2011 Del. Ch. 2011)...................................24

*Hechinger Litig. Trust v. Bankboston Retail Finance, Inc. (In re Hechinger Inv. Co. of Delaware)*,
147 F. App'x 248 (3d Cir. 2005) ...........................................................................................20

*Henderson v. Minister of Nat'l Revenue*,
[1973], C.T.C. 636 (Can. Tax Ct.) ........................................................................................20

*Holston Invs., Inc. B.V.I. v. LanLogistics Corp.*,
677 F.3d 1068 (11th Cir. 2012) ............................................................................................20

*Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*,
289 F. Supp. 2d 493 (D. Del. 2003).....................................................................................136

*In re Bippert*,
311 B.R. 456 (Bankr. W.D. Tex. 2004) (Clark, J.).............................................................133

*In re Delaware & Hudson Ry. Co.*,
124 B.R. 169 (D. Del. 1991)...........................................................................................128-29

*In re Filene's Basement, LLC*,
No. 11013511 (KJC), 2014 WL 1713416 (Bankr. D. Del Apr. 29, 2014) .........................129

*In re G-I Holdings, Inc.*,
Nos. 13-3335, 13-3336, 2014 WL 2724129 (3d Cir. June 17, 2014) ....................................23

*In re General Motors Corp.*,
407 B.R. 463 (Bankr. S.D.N.Y. 2009) .................................................................................131

*In re Plassein Int'l Corp.*,
377 B.R. 126 (Bankr. D. Del. 2007) (Gross, J.)..............................................................22, 24

*Johnson v. Vanguard Mfg., Inc.*,
34 Fed. App'x 858 (3d Cir. 2002).........................................................................................136

*Kannankeril v. Terminix Int'l, Inc.*,
128 F.3d 802 (3d Cir. 1997)..................................................................................................136

*Kentucky Fried Chicken Canada v. Scott's Food Services Inc.*,
[1998] O.J. No. 4368 (Can. Ont. C.A.)............................................................................22, 23

*Law v. Siegel*,
134 S. Ct. 1188 (2014)..........................................................................................................131

*Leuthold v. Canadian Broadcasting Corp.*,
2012 FC 748 (Can. F.C.)........................................................................................................62

*Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.),*
281 B.R. 535 (Bankr. D. Del. 2002) ........................................................... 19

*Mahaffey, Re*
(1922), 52 O.L.R. 369 (Ont. H.C.) .............................................................. 35

*Marchand (Litig. Guardian of) v. Pub. Gen. Hosp. Soc'y of Chatham,*
[2000] O.J. No. 4428 ...................................................................................136

*Morrow v. Microsoft Corp.,*
499 F.3d 1332 .........................................................................................27, 28

*National Trust Co. v. Mead,*
[1990] 2 S.C.R. 410 (S.C.C.) ...................................................................... 22

*Nordetek Envtl., Inc. v. RDP Techs., Inc.,*
862 F. Supp. 2d 406 (E.D. Pa. 2012) .......................................................... 19

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun
Elec. Power Coop., Inc.),*
119 F.3d 349 (5th Cir. 1997) .....................................................................131

*Pleasant Summit Land Corp. v. C.I.R.,*
863 F.2d 263 (3d Cir. 1988).......................................................................... 19

*Pocklington Foods Inc. v. Alberta (Provincial Treasurer),*
(1998), 218 A.R. 59 (Can. Alta. Q.B.), aff'd (2000), 250 A.R. 188 (Can. Alta. C.A.) ...........19, 20

*PSINet Ltd., Re.,*
(2002), 33 C.B.R. (4th) 284. .......................................................................133

*PSINet Ltd., Re.,*
[2002] O.J. 1156 ..........................................................................................133

*R. v. Century 21 Ramos Realty Inc.,*
(1987), 32 C.C.C. (3d) 353 .........................................................................103

*R. v. Dunn,*
2013 ONSC 137 ........................................................................................... 77

*R. v. Mohan,*
[1994] 2 SCR 9 ............................................................................................136

*R.M. Smith, Inc. v. C.I.R.,*
591 F.2d 248 (3d Cir. 1979).......................................................................... 19

*Re Confederation Treasury Services Ltd.,*
(1995), 37 C.B.R. (3d) 237 (Can. Ont. Ct. J. (Gen. Div.), In Bank.).......................... 74

ix

*Re T. Eaton Co.*,
(1999), 14 C.B.R. (4th) 298 (Ont. S.C.J. ([Commercial List]) ...................................................... 74

*Ryan v. Sun Life Assurance Co. of Canada*,
[2005] N.S.J. No. 24, 249, 249 D.L.R. (4th) 628 (Can. N.S.C.A.) ................................................. 22

*Sattva Capital Corp. v. Creston Moly Corp.*,
2014 SCC 53 .................................................................................................... 10, 22, 23, 38

*Scanlon v. Castlepoint Development Corp.*,
[1992] O.J. No. 2692 (Can. Ont. C.A.) ........................................................................................ 22

*Shubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.)*,
348 B.R. 234 (Bankr. D. Del. 2005) ............................................................................................. 19

*SimEx Inc. v. IMAX Corp.*,
[2005] O.J. No. 5389 (Can. Ont. C.A.) ........................................................................................ 23

*Sistem v. Kyrgyz Republic*,
2012 ONSC 4983 (Newbould, J.) .................................................................................................. 25

*Slatky v. Amoco Oil Co.*,
830 F.2d 476 (3d Cir. 1987) ......................................................................................................... 19

*Standard Fed. Bank v. United States*,
No. 95-CV-478, 2002 WL 31947572 (Fed. Cl. Ct. Dec. 30, 2002) ............................................ 19

*Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc.*,
2013 ONSC 1300 (Newbould, J.) .................................................................................................. 62

*Syracuse Eng'g Co. v. Haight*,
110 F.2d 468 (2d Cir. 1940) .......................................................................................................... 19

*Tercon Contractors Ltd. v. British Columbia (Transportation and Highways)*,
[2010] 1 S.C.R. 69 ........................................................................................................................ 22

*The Canada Trust Co. v. Russell Browne et al.*,
[2012] ONCA 862 .............................................................................................. 23-24, 38

*Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)*,
(1998) 40 B.L.R. (2d) 1 (Ont. Ct. J., Gen. Div. [Commercial List]) ..................................... 62

*Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)*,
[1999] O.J. No. 3290 (Can. Ont. C.A.) ..................................................................................... 22

*United States v. 50 Acres of Land*,
469 U.S. 24 (1984) ........................................................................................................................ 19

*United States v. Cartwright,*
411 U.S. 546 (1973) .................................................................................................... 19

*Unique Broadband Systems, Inc. (Re)*
2014 ONCA 538 .................................................................................................... 22-23

*Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA,*
944 F.2d 870 (Fed. Cir.1991) ................................................................................ 27-28

*Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust,*
2007 ONCA 205 ......................................................................................................... 22

*Westdeutsche Landesbank Girozentrale v Islington LBC,*
[1996] AC 669 ............................................................................................................ 37

## <u>Other Authorities</u>

Brunsvold et al., *Drafting Patent License Agreements* (7th ed. 2012) at 84 ..................... 29

CRA Information Circular 87-2R (1999) ........................................................... 49-50

Douglas G. Baird & Anthony J. Casey, *No Exit? Withdrawal Rights and the Law of
Corporate Reorganizations*, 113 Colum. L. Rev. 1, 4-5 (2013) ......................................... 21

G. Hall, *Canadian Contractual Interpretation Law*, *supra* at 172-173 ..............................21-22, 74

J. Falconbridge & W. Traub, *Falconbridge On Mortgages* (Aurora: Canada Law Book,
5th ed. 2003) ..................................................................................................................... 37

Joel D. Kuntz & Robert J. Peroni, *U.S. International Taxation* (1991) ............................... 57

Roy Goode, *Principles of Corporate Insolvency Law* (4th ed. 2011) ............................... 20-21

Nortel Networks Inc. ("NNI") and certain of its affiliates, as debtors and debtors in possession (collectively, the "US Debtors"), and the Official Committee of Unsecured Creditors (together with the US Debtors, the "US Interests") submit this post-trial brief in support of their motion for the allocation of sale proceeds and for such other relief as the Courts deem just and proper and in opposition to the allocation positions submitted by the Monitor (Ernst & Young Canada ("E&Y Canada")) and the Canadian Debtors (Nortel Networks Corp. ("NNC"), Nortel Networks Ltd. ("NNL") and certain of their affiliates); the Canadian Creditors' Committee (the "CCC," and together with the Monitor and Canadian Debtors, the "Canadian Interests"); the Joint Administrators on behalf of the EMEA Debtors (Nortel Networks UK Limited ("NNUK"), Nortel Networks S.A. ("NNSA"), Nortel Networks Ireland ("NN Ireland") and certain of their affiliates); and the UK Pension Claimants ("UKPC").

## PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT

The three principal debtor groups[1] agree on the allocation issue presented to the Courts:

> *What portion of the purchase price paid in the bankruptcy sales was due to the transfer or surrender of assets by each selling debtor.*[2]

The fair market value of the assets sold is known:  it is the purchase price achieved as a result of the estates cooperatively selling the Nortel[3] multinational enterprise's operating

---

[1] The three principal debtor groups are the US Debtors, Canadian Debtors and EMEA Debtors.  A reference guide to other commonly used terms and abbreviations is attached as Appendix A to the US Interests' Proposed Findings of Fact ("PFOF") submitted herewith.

[2] TR50223 (US Interests' allocation position) at 1 ("Each Selling Debtor is entitled to receive the fair market value of the assets and rights it sold or relinquished in connection with the sale of Nortel's businesses and residual patent portfolio . . . ."); TR21283 (Monitor and Canadian Debtors' Allocation Position) Ex. A at 2-3 (stating that the proper question is "[w]hat portion of the proceeds realized in each transaction was due to the transfer of, or surrender by, the Canadian Debtors, EMEA Debtors or US Debtors, as the case may be, of property interests in the assets which were the subject matter of that transaction?"); TR40646 (EMEA Debtors' response to allocation positions) ¶ 9 ("The U.S. Debtors concede, correctly, that the Courts must 'first determine what each legally distinct Selling Debtor held prior to the sales, and second, determine the value of what that Selling Debtor sold or relinquished.'").

[3] References herein to "Nortel," the "Nortel Group" or the "Group" refer to all affiliated entities in the Nortel multinational enterprise.

1

business lines ("Business Lines") and remaining patent portfolio ("Patent Portfolio").[4]  The task, therefore, is to determine what proportion of the proceeds received in the Sales was due to each debtors' relinquishment of its assets and rights.

### A.    The US Interests' Allocation Position

The US Interests and their valuation expert apply generally accepted income-based valuation approaches to determine the value that each debtor estate contributed to the Sales. Based on this analysis, the allocation of the Sales proceeds should be as follows:

|  | Business Lines | | Patent Portfolio | | Total | |
|---|---|---|---|---|---|---|
|  | Value Relinquished ($ Billions) | Percent | Value Relinquished ($ Billions) | Percent | Value Relinquished ($ Billions) | Percent |
| **Canadian Debtors** | $0.34 | 11.9% | $0.43 | 9.7% | $0.77 | 10.6% |
| **EMEA Debtors** | $0.51 | 18.0% | $0.71 | 16.0% | $1.23 | 16.8% |
| **US Debtors** | $1.99 | 70.0% | $3.31 | 74.3% | $5.30 | 72.6% |
| **Total** | **$2.85** | **100.0%** | **$4.45** | **100.0%** | **$7.30** | **100.0%** |

### 1.    NNI Was the Most Valuable Nortel Entity

That NNI should be allocated the largest share of the proceeds from the Sales is consistent with the fact that NNI was the most valuable entity in the Nortel Group by a significant degree.  NNI drove the revenue and cash flow of the Nortel Group and served as its internal bank, funding the Group's operations worldwide.  Prior to insolvency, NNL's most valuable asset – indeed, the majority of its value – was its equity in NNI.  In insolvency, however, equity goes to the back of the line and takes last.

The following chart depicts, in simplified form, the corporate structure of the Nortel Group.

---

[4] The sales of the Business Lines ("Business Line Sales") and the Patent Portfolio ("Patent Portfolio Sale") are collectively referred to herein as the "Sales."



NNI, NNL, NNUK, NNSA and NN Ireland were referred to within the Nortel Group as the "Integrated Entities" ("IEs").[5]  The evidence at trial established that these entities undertook entrepreneurial risk, spending billions of dollars – largely funded by NNI – to engage in research and development ("R&D").  NNI had the exclusive right to operate in the United States, Nortel's most lucrative market.[6]

Pursuant to its rights under the Master R&D Agreement ("MRDA"), NNI was the only Nortel entity that could exploit Nortel's intellectual property – defined in the MRDA as "NN Technology" – in the US.  The vast majority of patents, including of Nortel's "high and highest interest" patents, were *only* registered, and therefore *only* had value, in the US, NNI's Exclusive Territory.  NNI had the right to exclude all others, including NNL, from using NN Technology in the US.  This structure is plain from the face of the MRDA and was deliberate for several reasons, including because the MRDA needed (i) to comply with transfer pricing regulations, (ii) to memorialize accurately the manner in which the parties had been operating prior to signing the MRDA and (iii) to maintain consistency with representations to tax authorities regarding ownership of intellectual property.  Additionally, this structure was designed to ensure that NNL

---

[5] NNUK, NNSA and NN Ireland are referred to herein as the "EMEA IEs."  The Master R&D Agreement refers to the IEs as the "Participants."

[6] The IEs' territories are referred to as "Exclusive Territories" in the Master R&D Agreement.  NNI's Exclusive Territory was defined to include the United States of America and Puerto Rico.

was not conducting any meaningful business in the US, which would have run the risk of

subjecting NNL to significant adverse tax consequences by, among other things, creating a

"permanent establishment" for NNL in the US.

As set forth in the chart below, based on its exclusive right to do business in the US, NNI

consistently accounted for more than 65% of the revenue and over 75% of the cash flow that was

generated by the five IEs.[7]

|  | Revenue | | | Cash Flow | | |
|---|---|---|---|---|---|---|
|  | 2009 | 5 Yr | 15 Yr | 2009 | 5 Yr | 15 Yr |
| **NNL** | 12% | 13% | 20% | 1% | 9% | 11% |
| **NNI** | **69%** | **66%** | **67%** | **88%** | **75%** | **81%** |
| **EMEA IEs** | 19% | 21% | 13% | 11% | 16% | 8% |

NNI was so valuable that NNL and its parent, NNC, caused NNI to guarantee their issuance of

billions of dollars of public debt, thereby choosing to subordinate NNL's (and its creditors')

access to NNI's assets in insolvency to the rights of the bondholders and NNI's other unsecured

creditors.

The evidence is clear that NNI was the most valuable Nortel Group entity and that it

transferred or relinquished the most valuable assets in the Sales.  The purchasers in the Sales

primarily paid for the future revenue and cash flow opportunities in the US.  Only NNI could and

did transfer this value in the Sales.

### 2.  Equity Takes Last in Insolvency

It is black-letter law that equity takes last in insolvency.  Indeed, it is key for the orderly

and predictable operation of the insolvency regimes that the rule be applied consistently in all

cases, including these cases.  There is nothing novel or unfair about this rule, nor is it unusual for

---

[7] "5 Yr" refers to the five years prior to the insolvency filings in these cases, while "15 Yr" refers to the fifteen years prior to those filings.

the operating subsidiary of a corporate parent – even a parent with operations of its own – to be worth significantly more than the parent or for the parent's net worth to be largely dependent on the value of the equity of its largest operating subsidiary.

The value of NNI's assets now belongs first to NNI's creditors and, only after satisfaction of those creditors' claims, to NNL. The Canadian Debtors created and sought to benefit from this corporate structure when it was in their interest to do so, and they must now abide by the consequences.

### 3.  NNI's Valuation Methodology

The fair market value of each Business Line and the Patent Portfolio is the price paid by the buyers: $2.85 billion for the collective Business Lines and approximately $4.5 billion for the Patent Portfolio. The US Interests' valuation expert, Jeffrey Kinrich, determined the fair market value of each selling debtor's relative contribution to the Sales using the income method, a well-established valuation methodology embraced by courts in the US and Canada and widely used by the financial community. In contrast to the Monitor's experts, Kinrich applied consistent methodologies to each MRDA party to determine allocation.

With respect to the Patent Portfolio sold to Rockstar Bidco ("Rockstar") for $4.5 billion, Kinrich applied the discounted cash flow ("DCF") method to value the assets relinquished by each selling debtor. There is no dispute among the parties' valuation experts that a DCF analysis is an appropriate and well-accepted example of the income method. Kinrich tested and confirmed the robustness of this model against additional metrics, including the geographic distribution of the patents' registration and the relevant market size of each IE's Exclusive Territory.

With respect to the Business Line Sales, Kinrich again used the income method, this time based on a gross revenue multiples analysis. As explained by Kinrich and supported by

5

extensive economic literature, the income method captures all tangible and intangible assets and is the most reliable method to value the Business Lines.  Economic literature teaches that using gross revenue multiples to value each selling debtor's contribution to the Sales, as Kinrich did with respect to the Business Lines valuation, is particularly appropriate where, as here, the business was routinely suffering losses or had erratic earnings year to year.  Kinrich also performed sensitivity analyses to test his valuation results, including looking to market-based revenue multiples, Nortel's internal revenue forecast, and expected market growth rates for the telecommunications equipment market by geography, all of which confirmed the reasonableness and validity of his valuation conclusions.

**B.**     **The Monitor's Allocation Theories Are Legally and Factually Unsupportable**

In contrast to the robust valuation conducted by Kinrich, the Monitor and its experts failed to perform any valuation with respect to the Patent Portfolio Sale and failed to value the transactions that actually occurred with respect to the Business Line Sales.  The Monitor bases its allocation theory on three fundamentally flawed assumptions:  (1) an incorrect interpretation of the MRDA; (2) the fallacy that legal title alone to the patents affords NNL special rights; and (3) the mistaken belief that NNI and the EMEA IEs could not transfer their rights to NN Technology in the Sales, even though they undeniably did so.

**1.   The Monitor Misconstrues the Rights NNI Held Under the MRDA**

According to the Monitor, the MRDA afforded NNI and the EMEA IEs no rights with respect to the Patent Portfolio.  Based on this fundamental misreading of the MRDA, unsupported by any evidence, the Monitor's lead valuation expert, Philip Green, simplistically concludes that NNL is entitled to all of the proceeds from the Patent Portfolio Sale and that NNI and the EMEA IEs are entitled to nothing.  Green conducts no valuation analysis to reach this result, instead relying on incorrect legal conclusions.

6

This position is inconsistent with the representations of the Monitor when urging the Courts to approve the Patent Portfolio Sale. In its public report recommending that Sale, the Monitor represented to the Courts that NNL's legal title in the Patent Portfolio was "subject to . . . intercompany licensing agreements with other Nortel legal entities around the world . . . in some cases on an exclusive basis."[8] These "other Nortel legal entities" were NNI, NNUK, NNSA and NNI Ireland. Now, the Monitor takes the opposite position. If the Monitor truly believed that its present position had legal merit, it would not have sat idly by while the US Court concluded that the Patent Portfolio Sale was in the best interests of the NNI estate and its creditors and that it would be a "four and a half billion dollar mistake" not to approve such Sale.[9]

The Monitor's interpretation of the MRDA is plainly wrong for at least four reasons: (1) it is contrary to the plain language of the MRDA; (2) it is contrary to the overwhelming factual matrix evidence; (3) it is contrary to commercial common sense; and (4) it is contrary to the parties' consistent course of dealing with one another and third parties, including the Monitor's own conduct and statements.

### a. The Monitor's Interpretation for Purposes of This Litigation Is Contrary to the Words of the MRDA

Under the MRDA, NNI and the EMEA IEs (the "Licensed Participants") held an exclusive, perpetual and royalty-free license ("Exclusive License") to exploit NN Technology in its Exclusive Territory, which for NNI was the US.[10] NNI also had the right to exclude others,

---

[8] *See* TR21282 (71st Report of the Monitor) ¶ 49; *see also* TR21281 (63rd Report of the Monitor ) ¶ 82 (requesting approval of stalking horse agreement for Patent Portfolio).

[9] TR21509 (Transcript of July 11, 2011 hearing regarding approval of the Patent Portfolio Sale) at 110:5-24 ("You know it's not every day that a . . . Judge has an opportunity to make a four and a half billion dollar mistake and that's what it would be were I not to approve the . . . sale on the terms set forth in the order that's before me. . . . [T]he terms are the highest and best available under the circumstances and are really quite extraordinary.").

[10] TR21003 (MRDA) at 41-42 (Art. 5(a)).

including NNL, from exploiting NN Technology in the US.[11]  The Exclusive License applied to all NN Technology, including the Patent Portfolio.  NNL could not transfer any valuable rights with respect to NN Technology in the US to anyone because it had no such rights to transfer.

The scope of the Exclusive License held by NNI was broad and was not limited solely to making, using or selling "Products" embodying NN Technology, as asserted by the Monitor.  To be sure, the Licensed Participants' rights "included" the exclusive right to make, use or sell Products embodying NN Technology in their respective Exclusive Territories.  This right alone had enormous value and, contrary to the Monitor's arguments, its value with respect to the Sales was not dependent on the manner in which the Licensed Participants exercised that right.  But the Licensed Participants' interest in NN Technology did not end there.  The MRDA expressly states that the Licensed Participants, including NNI, exclusively held in their territories, in perpetuity and on a royalty-free basis, all "rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith."[12]  The MRDA further provides that the Exclusive Licenses include the "right to sublicense" NN Technology; "rights to make, have made, use, lease, license, offer to sell and sell" existing or "proposed" Products using or embodying NN Technology "at any time"; *and* the right to assert actions in the US "to prevent infringement or misappropriation of NN Technology by others."[13]

Together, the rights granted to NNI and the other Licensed Participants under the MRDA – including the right to "practice the patent" by making, using and selling Products embodying NN Technology, the right to exclude others from practicing the patents *and* the right

---

[11] *Id.* at 41 (Art. 4(e)).
[12] *Id.* at 41-42 (Art. 5(a)).
[13] *Id.* at 4, 41-42 (Arts. 1(g), 4(e), 5(a)).

to sublicense – encompass all valuable rights in NN Technology. The nature and extent of the broad license rights held by the IEs is confirmed in the MRDA and its addenda, which expressly and repeatedly – over a period of years – recite the parties' overarching intent to have each Licensed Participant hold "equitable and beneficial ownership of NN Technology" in its Exclusive Territory.[14]

In short, the Licensed Participants, including NNI, surrendered (and therefore under the clear terms of the Interim Funding and Settlement Agreement ("IFSA") are deemed to have sold[15]) valuable rights set forth in the MRDA – indeed, all valuable rights with respect to NN Technology in their Exclusive Territories – for which they must receive a commensurate allocation.

### b. The Factual Matrix Evidence Supports NNI's Interpretation of the MRDA

The factual matrix surrounding the MRDA's creation overwhelmingly supports NNI's reading of the MRDA.

The facts and circumstances known to – indeed, shared by – the parties at the time of the creation of the MRDA and its four amendments establish the parties' objective common intent that the Licensed Participants' broad license rights amount to equitable and beneficial ownership of NN Technology in each Licensed Participant's Exclusive Territory.[16]

---

[14] *See id.* (MRDA) at 2 (Whereas Clauses); *see also id.* at 18, 27, 30, 48 (Sched. A, Add. to MRDA, Am. Sched. A, and 2d Am. to Sched. A).

[15] *See* TR12032 (IFSA) § 11(d) ("Where any Debtor enters into any Appropriate License Termination in accordance with the provisions of this Section 11, such Debtor shall be deemed to be a Selling Debtor and the proceeds of such Asset Sale shall be deemed to be Sale Proceeds, for the purposes of Sections 12.b. and 12.d. and Sections 12.b. and 12.d. shall apply accordingly."); *see also id.* § 11(a) (providing that the Licensed Participants agree to termination of their licenses "in consideration of a right to an allocation" of the proceeds of the Sales); PFOF § IV.A.1 ("The Interim Funding and Settlement Agreement").

[16] *See generally infra* Point II.C; PFOF § III ("Nortel's Transfer Pricing Regime and Intellectual Property Ownership").

- Every witness who testified on the subject agreed with this fundamental proposition, including NNL's former Vice President of Tax, John Doolittle, and Nortel's lead outside counsel responsible for drafting the MRDA, Giovanna Sparagna.  Numerous contemporaneous documents likewise attest to this.

- The relevant trial witnesses called to testify by NNI and the EMEA Debtors, including Mark Weisz, Michael Orlando, Walter Henderson and Kerry Stephens, all confirmed that the Monitor's reading of the MRDA is inconsistent with the facts, circumstances and objectives known to the parties when they created the MRDA.

- Even after receiving initial witness statements from Weisz, Orlando, Henderson and Stephens, the Monitor tellingly failed to call any witness at trial with knowledge of the MRDA or the facts and circumstances surrounding its creation.

- The evidence established that compelling transfer pricing and other tax considerations led the parties to provide full economic ownership of NN Technology to the Licensed Participants in their Exclusive Territories, which was achieved through broad licenses to and equitable and beneficial ownership of NN Technology.  This too was confirmed by every fact witness who testified on this subject, either live or by deposition.

- NNL and its advisors, including E&Y Canada – which worked closely with Nortel in its RPSM Advance Pricing Agreement ("APA") process for nearly a decade before it became the Monitor – prepared required documents for tax authorities representing that the Licensed Participants owned the NN Technology in their respective jurisdictions.

At trial, the Monitor offered no evidence to refute this consistent factual matrix, instead arguing that the Courts should ignore the factual matrix.  However, as the Supreme Court of Canada just reaffirmed last week, "a decision-maker must read the contract as a whole, giving the words used their ordinary and grammatical meaning, *consistent with the surrounding circumstances known to the parties at the time of formation of the contract*."[17]  The substantial evidence supporting NNI's reading of the MRDA and disproving the Monitor's reading cannot and should not be ignored.

### c.  The Monitor's Interpretation of the MRDA Is Commercially Unreasonable

The Monitor's reading of the MRDA would lead to commercially unreasonable results.

---

[17] *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 47 (emphasis added).

Parties acting at arm's length – which the MRDA was required by law for transfer pricing purposes to reflect – would not enter into an agreement providing that each party would spend billions of dollars jointly developing patents, but only one party would be entitled to all proceeds from the sale of those patents.  Further, as Dr. Catherine Tucker explained in her evidence, under the Monitor's interpretation of the Exclusive Licenses, the Licensed Participants would lack appropriate incentives to undertake speculative and expensive R&D for the next potential generation of products, even though such R&D is the lifeblood of any cutting edge technology company.

### d.  The Monitor's Interpretation Is Belied by the Nortel Group's Conduct as Well as the Monitor's Own Conduct

The Monitor's reading of the Exclusive Licenses is also contrary to the Nortel Group's consistent course of dealing and is demonstrably an after-the-fact litigation contrivance.  At all relevant times, both before and after the signing of the MRDA and its amendments, NNI exercised the full panoply of rights with respect to NN Technology in the US, including sublicensing and excluding others from using NN Technology.

The Monitor's own course of dealing after it took managerial control of the Canadian Debtors – including its development with the US and EMEA Debtors of IPCo, its statements to the Courts and creditors regarding the licenses and its conduct and statements with respect to the bankruptcy auctions – cannot be reconciled with the litigation position it now advances.  Even after E&Y Canada became the Monitor, Sean Kruger, a member of the Monitor's team on the Canadian Debtors' insolvency, helped prepare and approved a transfer pricing report for tax authorities confirming NNI's ownership of NN Technology in the US.

The Monitor's argument that a plain reading of the MRDA supports its litigation position also cannot be reconciled with Murray McDonald's admission that the Monitor did not even

come up with its reading of the MRDA licenses until early 2013, more than *four* years after the commencement of these proceedings and after the Patent Portfolio Sale and three mediations concerning allocation.  Throughout those years, the Monitor had access to the E&Y partners involved in Nortel's APA process, to NNL employees with first-hand knowledge of the MRDA, to the documents which establish that the Licensed Participants owned these valuable rights in their respective Exclusive Territories, and, of course, to the MRDA itself.  Notably, McDonald, who is the Monitor's principal representative and decision-maker, was not called to appear as a witness at trial to explain how it is that he only came upon the Monitor's litigation position after making numerous representations to the Courts and creditors that NNL's legal title was subject to the Exclusive Licenses.

### 2.  NNL's Bare Legal Title to NN Technology Had No Value in the Licensed Participants' Exclusive Territories.

NNL's legal title to NN Technology does not entitle it to an allocation of all of the proceeds of the Patent Portfolio, as the Monitor contends.  Legal title to a patent has no value if the holder of that title does not have any of the economic rights in the patent – i.e., the right to practice the patent, to exclude and to sublicense.  NNL's legal title under the MRDA was fully encumbered by the Exclusive Licenses in the Licensed Participants' territories from the moment such legal title was vested in NNL.

NNL held nothing of value with respect to NN Technology in the Licensed Participants' Exclusive Territories.  It could only transfer to Rockstar its exclusive rights to NN Technology in the comparatively small Canadian market and its non-exclusive rights to NN Technology – that it shared equally with NNI and the EMEA IEs – in the rest of the world outside of the Licensed Participants' Exclusive Territories.  Notably, the Monitor's expert, Dr. Alan Cox (the co-author of the Cox-Berenblut report), testified that if NNL had sold only its interest in the Patent

Portfolio, it would have received a "relatively small amount" at most and "possibly nothing."[18]

Clearly, then, the $4.5 billion Patent Portfolio Sale price was primarily due to the surrender of

the Licensed Participants' rights with respect to that Portfolio.

> **3.  The Monitor's Position on the Transfer of Rights to NN
> Technology and the "Value in Use" Method Flowing Therefrom Is
> Incorrect**

    The Monitor also wrongly claims that NNL could freely transfer its rights in NN

Technology, but that NNI and the other Licensed Participants could not do so.  This is incorrect,

and the Monitor's purported "value in use" approach to allocation that rests on this claim is thus

necessarily wrong.

    The Monitor's application of the value in use analysis has the effect of inflating NNL's

allocation while concealing the extent by which it does so.  On the Business Line Sales, the

Monitor and Green do not attempt to value what portion of the purchase price paid for the

Business Lines was due to the transfer or surrender of assets and rights by any of the sellers.

They instead purport to value – only for NNI and the EMEA IEs, but not for NNL – what they

might have been worth if not sold.  Thus, the Monitor and Green purport to allocate to NNI and

the EMEA IEs (but not to NNL) the discounted cash flow value that the Monitor and Green say

NNI and the EMEA IEs would have earned had the Business Lines not been sold, which value

Green understates by downwardly adjusting Nortel's cash flow projections.  After doing this

projection for NNI and the EMEA IEs, the Monitor and Green fail to perform any valuation with

respect to the intellectual property rights NNL contributed in the Business Line Sales, but instead

simply allocate to NNL the remainder of the purchase prices paid.

    The Monitor and Green fail to disclose that with respect to the Business Line Sales, had

---

[18] Cox Dep. 156:25-157:17.

they applied to NNL the same value in use methodology and distorted cash flow projections they used for NNI and the EMEA IEs, their allocation to NNL would be reduced by approximately $1 billion.  Moreover, applying their methodology consistently to all parties would leave this $1 billion unallocated to any selling debtor.  That the total "value in use" is so far from the fair market value of the Business Lines underscores either the inapplicability of this approach or Green's erroneous implementation of it, or both.  Further, the Monitor and Green simply "allocate" this $1 billion solely to NNL without basis.

On the Patent Portfolio Sale, in addition to the Monitor's primary and erroneous theory that NNL is entitled to all of the proceeds from that Sale, Green conducts an alternative analysis (which appears only in an appendix to his rebuttal report) that, as with his analysis of the Business Line Sales, again uses the value in use methodology for NNI and EMEA, but not for NNL.  Once again, by using this inapplicable method and applying it inconsistently, the Monitor and Green calculate an aggregate value in use that is even further from the undisputed fair market value of the Patent Portfolio – short by $1.8 to $4.1 billion, according to Green.  As with the Business Line Sales gap, they again simply allocate these billions to NNL for no good reason despite admitting they do not know to what that value is allegedly attributable.[19]

The Monitor's and Green's justification for this flows from one wholly unsupportable proposition:  that NNI's and the EMEA IEs' interest in NN Technology was non-transferable but NNL's interest was transferable.  The Monitor relies solely on Article 14(a) of the MRDA.  Article 14(a), however, does not support either the inconsistent treatment of the parties or the conclusion that NNI's interests were non-transferrable.

Article 14(a) is a general non-assignment provision that applies equally to all the MRDA

---

[19] *See* TR00043 (Green Rebuttal) at 19 (Green indicating that Rockstar paid "additional amounts for the Residual IP portfolio *on some other basis* than cash flows" (emphasis added)).

Participants.  It does not prohibit any of them from transferring rights to NN Technology, but only prohibits assignment of the MRDA *without consent*.[20]  Because there is no dispute that all parties *did* consent in writing to the Sales, Article 14(a) is irrelevant to the allocation dispute. Indeed, both of the Monitor's valuation experts who testified live at trial, Green and Mark Berenblut, admitted on cross-examination that their selection of a value in use approach to NNI and EMEA would be erroneous if, as is clearly the case, Article 14(a) did not prohibit these debtors from transferring their rights in NN Technology in the Sales.[21]

In sum, as set forth further herein and as established at trial, the Monitor's allocation theories are without merit and should be rejected.

### C.    The EMEA Debtors' Contribution Theory Is Flawed

While they agree with NNI's allocation position (with certain modifications) as an alternative theory, the EMEA Debtors argue as their principal allocation theory that allocation should be based on the selling debtors' contribution to the development of NN Technology. Among other problems, the contribution theory erroneously equates the cost of developing an asset with its value.

Notwithstanding this fundamental error, to the extent that the Courts accept the EMEA Debtors' contribution theory – which they should not do – the amounts allocated to the selling debtors must be adjusted to reflect properly the parties' actual contributions to the development of NN Technology, including using an appropriate useful life and accounting for the costs actually incurred by the parties in developing NN Technology.

---

[20] Additionally, while the Courts need not reach this point to recognize the baseless nature of the Monitor's non-transferability ploy, the fact that the MRDA cannot be assigned without consent does not mean that rights granted within it cannot be transferred.  And if it did, it would apply equally to all parties' rights in NN Technology, including NNL's rights.

[21] *See* Trial Tr. 3219:24-3220:8 (Green); *id.* 3700:17-25 (Berenblut).

### D.    The RPSM – Not Advocated by Any Party – Is Not an Appropriate Approach to Allocation

It is important to recognize that *no party* argued at trial that the RPSM formula set forth in Schedule A to the MRDA should govern allocation.  To the contrary, as the Monitor's experts acknowledge, the Schedule A formula is not a proper basis upon which to allocate the Sales proceeds.[22]

The MRDA could not be clearer that Schedule A does not apply to these Sales.  Further, the MRDA makes clear that the RPSM does not apply in the circumstances that are most closely analogous to those present here.  First, if a Licensed Participant became insolvent, the Licensed Participant was entitled under the MRDA to receive the fair market value of its Exclusive License, *not* the RPSM amount calculated pursuant to Schedule A to the MRDA.[23]  Second, upon termination of the MRDA (after which, as is the case here, there would no longer be any RPSM sharing obligations), the Licensed Participants would have a fully paid-up Exclusive License.[24]

Additionally, as Dr. Lorraine Eden explained, while transfer pricing considerations drove the rights to NN Technology created under the MRDA and led to RPSM payments when Nortel operated, the RPSM is not designed to value the assets owned by affiliated entities in a multinational enterprise.  As Eden further explained, the Schedule A formula used by Nortel would be a particularly poor proxy to value the assets that each selling debtor sold or relinquished in the Sales, ██████████████████████████████████████

████████████████████████████████████████████████████████

---

[22] *See, e.g.*, Trial Tr. 3202:4-9 (Green confirms that it is "appropriate not to run [the Patent Portfolio Sale proceeds] through the RPSM" because "[t]here was no operating businesses around it"); *id.* 4030:4-22 (Reichert testifies that "the exclusion [of gain/loss on the sale of a business] . . . is completely consistent with, in fact I think it's motivated by the fact that what the parties were carving up through the Nortel RPS arithmetic was residual profit").

[23] TR21003 (MRDA) at 4, 10, 27-29 (Arts. 1(j), 11).

[24] *Id.* at 9 (Art. 9(b)).

16

██████████████████████████████████████████

██████████████████████████████████████████ The

extensive evidence that NNL designed the RPSM formula to minimize the Nortel group's overall

tax burden and to transfer cash to NNL on a tax-efficient basis is yet another compelling reason

why application of that formula to allocation is not appropriate.

### E.    Pro Rata/Substantive Consolidation Must Be Rejected

Finally, the pro rata/substantive consolidation theory advanced by the CCC and UKPC

should be rejected out of hand.  There is no basis in law or fact for application of this theory,

which is in any event wholly unworkable.  The lack of merit to the pro rata/substantive

consolidation theory has been highlighted by the Canadian Court's previous approval of the US

Debtors' $2 billion claim against the Canadian Debtors.  The Canadian Court has approved

intercompany claims against NNL as part of the settlement of the EMEA Debtors' claims against

NNL, and the US Court has approved an administrative claim (already paid out in cash) as part

of the settlement of intercompany claims between the EMEA Debtors and NNI.  These allowed

and paid claims are antithetical to pro rata/substantive consolidation.

*       *       *

For the reasons presented at trial and set forth herein and in the US Interests' Proposed

Findings of Fact and Conclusions of Law submitted herewith, the US Interests' allocation

position should be accepted.

Alone among the allocation theories, the US Interests' allocation position is based on the

application of a widely-accepted valuation methodology to the manner in which the Nortel

Group actually arranged and conducted its business, to the Sales that actually occurred, and to

the assets transferred or relinquished by the selling debtors in the Sales.

17

## POINT I

## THE FRAMEWORK FOR ALLOCATION[25]

As noted, the Canadian, EMEA and US Debtors agree that the Courts must determine the value of the assets and rights each debtor transferred or relinquished in each of the Sales.  It is undisputed that the fair market value of the total assets sold in the Business Line and Patent Portfolio Sales is the price the buyers paid.[26]  Allocation should be based on the relative value of the assets each debtor transferred that generated the Sales proceeds received from the buyers.  As the Monitor put it, the allocation exercise requires a valuation of "[w]hat portion of the proceeds realized in each [Sale] transaction was due to the transfer [] or surrender" of each selling debtors' assets "which were the subject matter of that transaction."[27]

Two central principles should govern allocation.  First, the Courts should apply standard valuation methods that have been accepted consistently in legal proceedings in both Canada and the US, including insolvency proceedings.  Courts routinely value assets based on fair market value, and the income-based methods used by the US Interests are routinely accepted by courts in both venues.  Second, allocation must account for the fact that, in insolvency, equity takes last. The value of NNI's assets that it sold or surrendered in the Sales, and which generated most of the Sales proceeds now in escrow, must be allocated to NNI for distribution to its creditors first.

### A.    The Touchstone for Allocation Is Fair Market Value

To assess the value of what each selling debtor sold or relinquished, the touchstone must

---

[25] The relevant facts in support of the US Interests' argument are set forth herein and in the US Interests' Proposed Findings of Fact submitted herewith.

[26] *See, e.g.*, TR00042 (Green Report) at 14 ("All of the sales – both the Business Sales and the Residual IP Sale – occurred through the open market (and usually involved an auction process) in which bids were made by independent third parties. These bids were reviewed and, generally speaking, the highest or most advantageous bid was accepted. Thus, the net proceeds from each sale represents the 'fair market value' for the totality of the transferred assets at the time of the transaction, net of transaction and wind-down costs. Accordingly, the total fair market value of the assets sold by the Nortel Entities is known.").

[27] TR21283 (Monitor and Canadian Debtors' Allocation Position) ¶ 4.  *See also* TR00042 (Green Report) at 2 (quoting the Monitor's position as the appropriate allocation question to be answered).

be fair market value.[28]  Fair market value is the foundational valuation metric widely accepted in law and economics throughout the world.  *See United States v. Cartwright*, 411 U.S. 546, 550-51 (1973); *Pocklington Foods Inc. v. Alberta (Provincial Treasurer)* (1998), 218 A.R. 59, paras. 197, 354 (Can. Alta. Q.B.), *aff'd* (2000), 250 A.R. 188 (Can. Alta. C.A.) (explaining that "the most common value standard is fair market value").  Fair market value is the chosen standard of value in myriad contexts,[29] including insolvency proceedings.[30]  There are well-established methodologies to determine fair market value that are used every day by investment bankers, economists and valuation experts that are routinely accepted and analyzed by courts in all relevant jurisdictions.[31]  Only the US Interests use such methodologies to determine allocation,

---

[28] The fair market value of a business or asset is the highest amount that a reasonably well-informed purchaser would pay in arm's length negotiations in an open and unrestricted market.  *United States v. Cartwright*, 411 U.S. 546, 551 (1973); *Henderson v. Minister of Nat'l Revenue*, [1973], C.T.C. 636, at para. 21 (Can. Tax Ct.); *see also Slatky v. Amoco Oil Co.*, 830 F.2d 476, 484 (3d Cir. 1987) ("[Fair market value], by definition, is the highest price a willing buyer would pay[.]").

[29] Courts use fair market value to assess the value of a company in the merger and acquisition context.  *See, e.g.*, *Hechinger Litig. Trust v. Bankboston Retail Fin., Inc. (In re Hechinger Inv. Co. of Delaware)*, 147 F. App'x 248, 251 (3d Cir. 2005); *Holston Invs., Inc. B.V.I. v. LanLogistics Corp.*, 677 F.3d 1068, 1072 (11th Cir. 2012); *Standard Fed. Bank v. United States*, No. 95-CV-478, 2002 WL 31947572, at *1 (Fed. Cl. Ct. Dec. 30, 2002); *First Fed. Sav. Bank of Hegewisch v. United States*, 52 Fed. Cl. 774, 776 n.2 (Fed. Cl. Ct. 2002); *Pocklington Foods Inc. v. Alberta (Provincial Treasurer)* (1998), 218 A.R. 59, paras. 338-340 (Can. Alta. Q.B.) (explaining that fair market value is the main criterion to be utilized in establishing the fair value of shares under the various Canadian Business Corporation Acts).  Fair market value is also the standard used to value real and intellectual property.  *See, e.g.*, *United States v. 50 Acres of Land*, 469 U.S. 24, 25-26, 29 (1984); *Pleasant Summit Land Corp. v. C.I.R.*, 863 F.2d 263, 272 (3d Cir. 1988); *Broadcast Music, Inc. v. DMX Inc.*, 683 F.3d 32, 45 (2d Cir. 2012) (noting court's determination of reasonable copyright royalty rate is determined by the "fair market value of the music"); *R.M. Smith, Inc. v. C.I.R.*, 591 F.2d 248, 251 (3d Cir. 1979) (determining fair market value of patents following corporate liquidation).

[30] *See Syracuse Eng'g Co. v. Haight*, 110 F.2d 468, 471 (2d Cir. 1940) ("A proper regard for the interests of the bankrupt, as well as for the interests of his creditors, compels the conclusion that fair market price is the most equitable standard."); *see also Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.)*, 281 B.R. 535, 545-46 (Bankr. D. Del. 2002); *Alberts v. HCA Inc. (In re Greater Se. Cmty. Hosp. Corp. I)*, No. 04-10366, 2008 WL 2037592, at *8 (Bankr. D. D.C. May 12, 2008) (assessing fair market value of subsidiary hospital to determine whether transaction was fraudulent conveyance); Bankruptcy & Insolvency Act (Canada), R.S.C., 1985, c. B-3, s. 96 (requiring a trustee in bankruptcy to provide the court with "the fair market value of the property or services" at issue to enable the court to determine that a transfer at undervalue is void).

[31] *See, e.g.*, *Shubert v. Lucent Techs., Inc. (In re Winstar Commc'ns, Inc.)*, 348 B.R. 234, 274 (Bankr. D. Del. 2005) (market, income, and asset approaches, used to determine fair market value, are the "three standard approaches" to valuation); *Nordetek Envtl., Inc. v. RDP Techs., Inc.*, 862 F. Supp. 2d 406, 416 (E.D. Pa. 2012) (measurement of fair market value involves consideration of the market approach, income approach and asset-based approach in context of determining equity interest in corporation); *In re Greater Se. Cmty. Hosp. Corp. I*, 2008 WL 2037592, at *8 (citing Jay E. Fishman et al., *PPC's Guide to Business Valuations* ¶ 203.2; Shannon P. Pratt et al., *Valuing a*

as set forth in Point III below.

### B.    Fair Market Value Principles Are Consistent with the MRDA

Determining the fair market value of the assets each selling debtor transferred or relinquished in the Sales is also consistent with the MRDA.  Under Article 11, if a Licensed Participant exits from the MRDA due to insolvency, NNL is obligated to pay fair market value for the Exclusive License.[32]  Similarly, under Article 9(b), upon termination of the MRDA, "each Licensed Participant shall be deemed to have acquired a fully paid up license permitting it to continue to exercise the rights granted to it herein."[33]  Moreover, the MRDA explicitly provides that the RPSM transfer pricing formula does not apply to the sale of a line of business, which includes both the operating Business Lines and the proposed IPCo licensing service business line that the estates were jointly developing and then ultimately decided to sell in the Patent Portfolio Sale. [34]

### C.    Fair Market Value of the Assets NNI Sold or Relinquished in Connection with the Sales Must Go First to NNI's Creditors

It is a foundational principle of the insolvency regimes in the US and Canada that a debtor's assets must be made available to fully satisfy the creditors of that debtor before equity may recover.[35]  This principle must apply to all aspects of these insolvency proceedings,

---

*Business: The Analysis and Appraisal of Closely Held Companies*, at 45 (4th ed. 2000)) (applying the three basic methodologies to determine fair market value in fraudulent conveyance case); *Pocklington Foods Inc. v. Alberta (Provincial Treasurer)* (1998), 218 A.R. 59, para. 201 (Can. Alta. Q.B.) (there are three approaches for valuing a business:  asset base, income, and market).

[32] TR21003 (MRDA) at 4, 27, 29 (Arts. 1(j), 11(d)(iii)).

[33] *Id.* at 9 (Art. 9(b)).

[34] *Id.* at 48 (2d Am. to Sched. A).

[35] 11 U.S.C. § 1129(b)(2)(B)(ii); *Central Capital Corp., Re* (1995), 29 C.B.R. (3d) 33, para. 36 (Can. Ont. C.J. (Gen. Div. – Commercial List)), *aff'd* (1996), 38 C.B.R. (3d) (Can. Ont. C.A.); TR50470 (Standing Senate Committee on Banking Trade and Commerce, *Debtors and Creditors Sharing the Burden: A Review of the Bankruptcy and Insolvency Act and the Companies' Creditors Arrangement Act* (2003)) at l58-59 ("[Holders of equity] should be afforded lower ranking than secured and unsecured creditors, and the law – in the interests of fairness and predictability – should reflect both this lower priority for holders of equity and the notion that they will not participate in a restructuring or recover anything until all other creditors have been paid in full."); Roy Goode,

including to allocation.  Thus, in allocation, each selling debtor is entitled to the value of the assets it sold to distribute to its creditors.

## POINT II
## THE PARTIES' RIGHTS UNDER THE MRDA

The rights of each party to the Nortel Group's intellectual property are set out in the MRDA, which clearly grants NNI very broad license rights amounting to equitable and beneficial ownership of Nortel's intellectual property in the US.[36]  The Monitor's interpretation of the MRDA, upon which its allocation case depends, is that NNI had only a very limited license right to NN Technology, but that interpretation is defeated by the language of the MRDA and the factual matrix evidence.

### A.    Principles of Contract Interpretation

The MRDA is governed by Ontario law.[37]  However, the rules of contractual interpretation under Ontario law do not differ from Delaware law on contractual interpretation.[38]

The goal of contract interpretation is to give effect to the underlying objective intention of the contracting parties.  To determine the parties' intent, the court examines two related

---

*Principles of Corporate Insolvency Law* (4th ed. 2011), ¶ 1-04 ("[O]nly when creditors have been paid in full (which is rarely the case) do shareholders come in to participate in the surplus remaining.") (citation omitted).  To ensure this absolute priority scheme is followed, bankruptcy focuses "on legal entities, not on corporate groups."  *See* Douglas G. Baird & Anthony J. Casey, *No Exit?  Withdrawal Rights and the Law of Corporate Reorganizations*, 113 Colum. L. Rev. 1, 4-5 (2013).

[36] The MRDA also addresses, in Articles 2 and 3, the performance of "R&D Activity" in exchange for an RPSM payment calculated in accordance with Schedule A to the MRDA; however, the RPSM methodology is not germane to the allocation issue.  *See infra* Point V.

[37] TR21003 (MRDA) at 13 (Art. 14(f)).

[38] When construing a contract governed by Delaware law, "the objective intent of the parties" is "'a court's paramount consideration' in construing a contract."  *In re Plassein Int'l Corp.*, 377 B.R. 126, 135 (Bankr. D. Del. 2007) (Gross, J.) (mem. opinion) (internal quotations omitted).  "The Court must determine the parties' intention from the express language of the agreement and construe their intention from the entire agreement, giving effect to all of the provisions," and in so doing, a court may "consider not only the language in the contract but also the circumstances surrounding the making of the contract, the motives of the parties and the purposes which they sought to accomplish." *Id.* at 132-33, 135 (internal quotations omitted).  These principles are also applied under Ontario law, as discussed below.  *Cf. Flintkote Co. v. Gen. Accident Assurance Co. of Can.*, No. C 04-1827 MHP, 2009 WL 3568644, at *2 (N.D. Cal. Oct. 27, 2009) (noting that "there are no material differences" between the laws of Ontario and California in the interpretation of a contract and thus applying the law of California).

components:  (i) the words of the contract and (ii) their context.  G. R. Hall, *Canadian Contractual Interpretation*, 2nd ed. (Markham: LexisNexis Canada, 2012) at 9.  A court must interpret the contract in a manner "which, from the whole of the contract, would appear to promote or advance the true intent of the parties at the time of entry into the contract." *Consolidated-Bathurst Export Ltd. v. Mutual Boiler & Machinery Insurance Co.*, 1979 Can LII 10 (SCC), [1980] 1 S.C.R. 888 at paras 25-26.  The "interpretation of contracts has evolved towards a practical, common-sense approach not dominated by technical rules of construction. The overriding concern is to determine 'the intent of the parties and the scope of their understanding.'"  *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 47.[39]

This interpretation "must begin with the words of the document," "giv[ing] meaning to all of its terms and avoid[ing] an interpretation that would render one or more of its terms ineffective."  *Ventas Inc. v. Sunrise Senior Living Real Estate Investment Trust*, 2007 ONCA 205 at paras. 24, 45.[40]  Each contractual term must be read with the rest of the contract in order to avoid inconsistency and to comport with the contract's overall purpose.  *See, e.g.*, *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* [1999] O.J. No. 3290 at para. 9 (Can Ont. C.A.).[41]  "As stated by the House of Lords in *Mannai Investment Co. Ltd. v. Eagle Star Life*

---

[39] *See also Kentucky Fried Chicken Canada v. Scott's Food Services Inc.*, [1998] O.J. No. 4368, at para. 25 (C.A.). (noting that "[n]o contracts are made in a vacuum: there is always a setting in which they have to be placed. The nature of what is legitimate to have regard to is usually described as the 'surrounding circumstances'").

[40] *See also Elliott v. Billings (Township) Board of Education,* [1960] O.R. 583 at 587 (Can. Ont. C.A.); *National Trust Co. v. Mead*, [1990] 2 S.C.R. 410 (S.C.C.); *Scanlon v. Castlepoint Development Corp.*, [1992] O.J. No. 2692 (Can. Ont. C.A.).  *Accord In re G-I Holdings, Inc.*, __ F.3d __, Nos. 13-3335, 13-3336, 2014 WL 2724129, at *5 (3d Cir. June 17, 2014) ) (quoting *Sonitrol Holding Co. v. Marceau Investissements*, 607A.2d 1177, 1183 (Del. 1992)) (Under Delaware law, "[a] court should interpret the contract 'in such a way as to not render any of its provisions illusory or meaningless.'").

[41] *See also Tercon Contractors Ltd. v. British Columbia (Transportation and Highways)*, [2010] 1 S.C.R. 69 at para. 64.; *Bowater Newfoundland Ltd. v. Newfoundland and Labrador Hydro*, [1978] N.J. No. 14, 15 Nfld. & P.E.I.R. 301 at para. 28 (Can. Nfld. C.A.); *Ryan v. Sun Life Assurance Co. of Canada*, [2005] N.S.J. No. 24, 249 D.L.R. (4th) 628 at para. 26 (N.S.C.A.).  *Accord G-I Holdings,* __ F.3d __, 2014 WL 2724129 at **5, 6 (3d. Cir. June 17, 2014) (Under Delaware law, in interpreting a contract, a court must "give each provision and term effect, so as not to

*Assurance Co. Ltd.,* [1997] 2 W.L.R. 945, at p. 964 (H.L.), commercial contracts should be 'interpreted in the way in which a reasonable commercial person would construe them.'" *Unique Broadband Systems, Inc. (Re)* 2014 ONCA 538 at para 89. [42]

 Even if a contract is unambiguous, courts look to the "factual matrix" of the contract to determine the parties' intent. *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.*, [1998] O.J. No. 4368 at paras. 24-25 (Can. Ont. C.A.); *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53.[43] The scope of the factual matrix "will vary from case to case," but it will generally include any factors which assist the court in discerning the parties' intent, *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.*, [1998] O.J. No. 4368 at para. 26 (Can. Ont. C.A.), including "the genesis of the agreement, its purpose, and the commercial context in which the agreement was made." *The Canada Trust Co. v. Russell Browne et al.*, [2012] ONCA 862 at paras. 67-69; *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at para. 58. Courts may consider the custom of the industry as part of the factual matrix, and they should interpret a contract "so as to accord with sound commercial principles and good business sense, and avoid commercial absurdity." *Downey v. Ecore International Inc.*, 2012 ONCA 480 at para. 38 (quoting *Salah v. Timothy's Coffees of the World Inc.*, 2010 ONCA 673 at para. 16).[44]

 The factual matrix also includes communications with tax authorities or tax authority rulings that inform the meaning of a contract as well as communications among counsel and with

---

render any part of the contract mere surplusage," and "the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan.").

[42] *See also SimEx Inc. v. IMAX Corp.*, [2005] O.J. No. 5389, at para. 23 (Can. Ont. C.A.) (explaining that commercial reasonableness is a part of the factual matrix, and a court will not adopt an interpretation that is commercially absurd).

[43] *See also Dumbrell v. Regional Group of Companies Inc.*, [2007] O.J. No 298, at para. 54 (Can. Ont. C.A.) ("A consideration of the context in which the written agreement was made is an integral part of the interpretative process and is not something that is resorted to only where the words viewed in isolation suggest some ambiguity.").

[44] *Accord Plassein*, 377 B.R. at 135; *GRT v. Marathon GTF Technology, Ltd.*, Civ. A. No. 5571-CS, 2011 WL 2682898 at *10 (Del. Ch. July 11, 2011) (considering "the commercial realities and business context facing the parties at the time the [agreement] was negotiated and consummated" to construe unambiguous contract language).

financial advisors.  In *The Canada Trust Co. v. Russell Browne et al.*, [2012] ONCA 862 at paras. 21-23, 83-88, the Ontario Court of Appeal ruled that correspondence with the CRA regarding the potential adverse tax consequences of a proposed amendment to a contract, as well as a CRA advanced ruling on that subject, must be considered to discern the parties' intent.

**B.      The MRDA Grants NNI All Valuable Rights to Nortel's Intellectual Property, Including Patents, in the US**

The MRDA governs each IE's rights to patents, patent applications, and other intellectual property and intangible assets, which the MRDA defines collectively as "NN Technology."[45]  As the MRDA explains, each of the Participants "b[ore] the full entrepreneurial risks and benefits for the Nortel Networks business."[46]  Therefore, it was "the intent of [the parties] that the Licensed Participants" – not just NNL – hold and enjoy "equitable and beneficial ownership of certain exclusive rights" to Nortel's intellectual property.[47]  The MRDA thus establishes a structure whereby each Participant enjoyed substantially identical economic rights to NN Technology in its own Exclusive Territory, even though legal title to intellectual property would be centralized in one entity, NNL, which agreed to "administer" the MRDA.[48]

**1.   The Licensed Participants Held Equitable and Beneficial Ownership of NN Technology in Their Territories**

Articles 4 and 5 of the MRDA together provide the Licensed Participants with all valuable rights to NN Technology in their respective Exclusive Territories.  Pursuant to these provisions, each Licensed Participant's rights with respect to NN Technology in its respective Exclusive Territory include generally "all rights to patents, industrial designs (or equivalent) and

---

[45] TR21003 (MRDA) at 3 (Art. 1(f)).

[46] *Id.* at 2 (Whereas Clauses).

[47] *Id.*  As already noted, the MRDA defined NNI and the EMEA Participants – i.e., NNUK, NN Ireland, and NNSA – as the "Licensed Participants."  *See id.* at 3 (Art. 1(e)).

[48] *See id.* at 6 (Art. 4(a)) (noting that "legal title to any and all NN Technology . . . shall be vested in NNL" in consideration for the grant of exclusive licenses to the Licensed Participants); *id.* at 5 (Art. 3(d)) (providing that "NNL agrees to administer this Agreement").

copyrights, and applications therefor, and technical know-how as necessary or appropriate in connection therewith" and, in particular:

- the right to exclude others, including other Nortel Group entities, from using NN Technology;

- "rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology;" and

- the right to sublicense in respect of any and all of the NN Technology.[49]

These represent all of the valuable rights associated with NN Technology and reflect the parties' clearly expressed intent in the MRDA that NNI and the other Licensed Participants hold equitable and beneficial ownership of the NN Technology in their Exclusive Territories.

The recitals to the MRDA state that NNI "held and enjoyed equitable and beneficial ownership of certain exclusive rights under NT Technology for a Specified Territory" under the predecessor cost sharing agreement (for NNI, the "1992 R&D CSA") and that as of the effective date of the MRDA (January 1, 2001), they would continue "to hold and enjoy such rights."[50]  A separate recital in the Second Addendum to the MRDA expresses the parties' common understanding that this intent was achieved in the MRDA:  "each Participant holds and enjoys *equitable and beneficial ownership of NN Technology*."[51]  The recitals are guides to the interpretation of the MRDA.  The Supreme Court of Canada used recitals in that way in *Eli Lilly*,[52] as did Justice Newbould in *Sistem v. Kyrgyz Republic*.[53]  The recitals were also clearly very important to the parties, as they repeated and also revised them in the course of amending

---

[49] *Id.* at 41-42 (Arts. 5(a), 4(e)).

[50] *Id.* at 2 (Whereas Clauses).  Nortel's intellectual property was referred to as "NT Technology" in the final R&D CSAs.  This term was later changed to "NN Technology" in the MRDA to account for changes in the names of the key entities in the Nortel Group.

[51] *Id.* at 27 (Whereas Clauses to 2d Add.) (emphasis added).

[52] *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at para. 57 (referring to recital in determining whether a contract included a sublicense).

[53] *Sistem v. Kyrgyz Republic*, 2012 ONSC 4983 (Newbould, J.) at paras 25-26 (referring to recital to find that a party had an equitable interest in the property at issue).

the MRDA over the years, each time making it clear that the Licensed Participants had equitable and beneficial ownership of the NN Technology in their Exclusive Territories.

Similarly, Schedule A and its amended versions – clearly "operative" provisions of the contract – reiterate that "the Participants b[ore] the full entrepreneurial risk of the Nortel business such as the risks attendant with the substantial and continuous development and *ownership of the NN Technology*."[54]  In addition, the December 31, 2008 Memorandum of Understanding ("MOU") – which was drafted "to provide a record of" the Participants' "understandings" with respect to the MRDA and related agreements – confirms that the Licensed Participants enjoyed "ownership" of NN Technology.  The MOU explains that the MRDA "memorializes the agreements of NNL and the Licensed Participants as to the development and deployment of existing and future NN Technology and *ownership of the NN Technology*, *with NNL holding legal title* thereto."[55]

### a.  NNI Had the Exclusive Right to Exclude Others from Exploiting NN Technology in the US

The most fundamental right that accompanies a patent is the right to prevent others from making, using or selling the patented invention.  The US Patent Act provides that a patent consists of "the right to exclude others from making, using, offering for sale, or selling [an] invention throughout the United States."  35 U.S.C. § 154(a)(1).[56]  Likewise, a Canadian patent confers in Canada "the *exclusive* right, privilege and liberty of making, constructing and using

---

[54] TR21003 (MRDA) at 18, 30, 48 (Sched. A, Am. to Sched. A, and 2d Am. to Sched. A) (emphasis added).

[55] TR48944 (MOU) ¶ 3 (emphasis added).

[56] *See also* 35 U.S.C. § 271(a) (noting that a party infringes a patent if it "makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention"); 35 U.S.C. § 154(a)(1) ("Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States, and, if the invention is a process, of the right to exclude others from using, offering for sale or selling throughout the United States, or importing into the United States, products made by that process[.]").

the invention and selling it to others to be used, subject to adjudication in respect thereof before any court of competent jurisdiction." *Patent Act* (Canada), R.S.C., 1985 c. P-4 § 42 (emphasis added).  Patents are territorial, and a US patent excludes others from exploiting that patent in the US, while a Canadian patent has the same effect in Canada.

### i.  *Article 4(e) Clearly Sets Forth NNI's Exclusion Right*

The MRDA granted NNI the unfettered right to exclude anyone else from using or otherwise exploiting NN Technology, including patents, in the US.  Article 4(e) grants NNI "the right to assert actions and recover damages or other remedies in their respective Exclusive Territories for infringement or misappropriation of NN Technology by *others*" – whether those "others" are third parties or other Participants, including NNL.[57]  By Article 4(e)'s plain terms, there are no exceptions or limitations to NNI's exclusion right other than by territory.  The MRDA also provides that the Article 4(e) exclusion right would "survive notwithstanding the expiry of [the MRDA], or any termination of [the MRDA] for any cause whatsoever."[58]

### ii.  *US Law Additionally Provides NNI with the Exclusion Right*

NNI also enjoyed the right to exclude other parties from using Nortel patents in the US by virtue of US law.  Although the MRDA includes an Ontario choice of law provision, US patent law "govern[s] the creation and protection of patent rights, how rights can be transferred, and the parties entitled to assert those rights" in the US, including the question of "who has the right to bring suit" to enforce a patent, *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1336-37 (collecting cases), a critical fact given that the vast majority of the patents sold were registered in the US, often exclusively.  Under US patent law, where an agreement like the MRDA conveys "all substantial rights" in the licensed patents to the exclusive licensee, the licensee alone has the

---

[57] TR21003 (MRDA) at 41 (Art. 4(e)) (emphasis added).
[58] *Id.* at 9 (Art. 9(c)).

right to bring infringement suits, without joining the patentee.  *See, e.g., Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 873-76 (Fed. Cir.1991); *Morrow*, 499 F.3d at 1340.

Because NNI held the right to enforce all the NN Technology in the US – including the patents contained in the Patent Portfolio – and no other party was entitled to control or interfere with NNI's enforcement rights, no buyer of the Patent Portfolio would have purchased the patents unless NNI terminated those rights.  Absent such a termination, if a buyer of only NNL's bare legal title to patents had sought to exploit NN Technology in the US, NNI would have had the right and ability to prevent the buyer from doing so.

### b. *NNI Had the Exclusive Right to Exploit NN Technology in the US*

The corollary of NNI's right to exclude others from exploiting NN Technology in the US was that NNI, and NNI alone, *did* have the right to exploit NN Technology in the US.  Article 5(a) (as amended in the Third Addendum just prior to the commencement of the insolvency proceedings) provides:

> To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby:
>
> (i) continues to grant to each Licensed Participant an exclusive, royalty-free license, including the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology in and for the Exclusive Territory designated for that Licensed Participant, and all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith ("Exclusive License").[59]

NNI's right to exploit was thus broad, including "all rights to patents, industrial designs

---

[59] TR21003 (MRDA) at 41-42 (Art. 5(a)).

(or equivalent) and copyrights, and applications therefor, and technical know-how as necessary

or appropriate in connection therewith" in addition to "rights to make, have made, use, lease,

license, offer to sell, and sell Products using or embodying NN Technology in and for" the US.[60]

"Products" is broadly defined  to include:

> all products, software and services designed, developed,
> manufactured or marketed, or *proposed* to be designed, developed,
> manufactured or marketed, *at any time* by, or for, any of the
> Participants, and all components, parts, subassemblies, features,
> software associated with or incorporated in any of the foregoing,
> and all improvements, upgrades, updates, enhancements or other
> derivatives associated with or incorporated in any of the
> foregoing.[61]

In short, in addition to the right to exclude and to sublicense, each Licensed Participant

had the full and exclusive right to practice the patents in its Exclusive Territory at any time.

### c.  NNI Had the Exclusive Right to Sublicense NN Technology in the US

Article 5(a) also grants NNI the right to "sublicense" its license rights to other parties.[62]

Under both Canadian and US law, the right to sublicense enables a licensee to grant to

another party the ability to "stand in its shoes."  The effect of a sublicense is that the licensee

"transfers or licenses some or all of his or her rights to the sublicensee, which means that the

sublicence has similar incidents to the primary licence, including the right to exercise

independently certain rights enjoyed by the licensee pursuant to its licence."  *Eli Lilly & Co. v.*

*Novopharm Ltd.*, [1998] 2 S.C.R. 129 at para. 48 (quoting Leslie W. Melville, *Forms and*

*Agreements on Intellectual Property and International Licensing* (3rd ed. rev 1997) § 3.18).[63]

---

[60] *Id.* at 41-42 (Art. 5(a)).

[61] *Id.* at 4 (Art. 1(g)) (emphasis added).

[62] *Id.* at 41-42 (Art. 5(a)).

[63] *See also* Brunsvold et al., *Drafting Patent License Agreements* 84 (7th ed. 2012) (noting that under US law, a sublicense "permits the sublicensee to act independently of the licensee (subject to the terms of the sublicense agreement).  A sublicensee is in effect another licensee").

Thus, in addition to its rights to exploit NN Technology in the US and to exclude other parties from doing the same, NNI had the ability to transfer its license rights to third parties through a sublicense.

NNI's sublicense right was broader than the mere right to have a third party make products on NNI's behalf, as the Monitor contends.[64]  That more limited right – referred to as the "right to have made" – is distinct from a sublicense right under Canadian and US law.  *See, e.g.*, *CoreBrace LLC v. Star Seismic LLC*, 566 F.3d 1069, 1073 (Fed. Cir. 2009) ("A right to have made is *not* a sublicense, as the contractor who makes for the licensee does not receive a sublicense from the licensee.") (emphasis added); *Eli Lilly & Co. v. Novopharm Ltd.*, [1998] 2 S.C.R. 129 at paras. 75-76 (noting distinction between sublicense and "have made" right under license).

Recognizing this distinction, Article 5(a) of the MRDA grants each of these two rights separately.  The second clause of 5(a) grants the "rights to make, *have made*, use, lease, license, offer to sell, and sell."[65]  Thus, that clause explicitly grants a "have made" right that enabled NNI to have other companies make products using or embodying NN Technology *for NNI*.  In contrast, the first clause of Article 5(a) grants NNI the right to "sublicense," which necessarily means something else:  that NNI was permitted to sublicense to other parties the right to make, sell and offer to sell products using or embodying NN Technology *for themselves*.  As set forth further herein, that is precisely how the parties understood NNI's sublicensing right and intended it to operate, and how they in fact conducted their business.[66]

---

[64] *See, e.g.*, Monitor Pretrial Br. ¶ 111.

[65] TR21003 (MRDA) at 41-42 (Art. 5(a)) (emphasis added).

[66] *See infra* Point II.C.2.a.

## 2. Additional Provisions of the MRDA Leave No Doubt as to the Nature and Extent of NNI's Rights

In addition to Articles 4 and 5, the MRDA includes several provisions – including Articles 6, 7, 9 and 11 – that confirm the breadth of the Licensed Participants' Exclusive Licenses and their economic ownership of NN Technology in their respective Exclusive Territories. The Monitor's proposed construction is irreconcilable with these provisions.

### a. NNI's Confidentiality Obligation Under Article 6 Included an Exception for NNI's Exercise of Its Broad Sublicensing Rights

Article 6 of the MRDA provides confidentiality obligations that are drafted to be coextensive with the rights held by the Exclusive Licenses. Each Licensed Participant is obligated to "hold the NN Technology in confidence."[67] However, Participants are permitted to "communicate relevant portions of the NN Technology to suppliers," to "customers purchasing the Products," and to "*third persons licensing rights to use NN Technology*."[68] Thus, Article 6 permits disclosure to third party licensees distinct from customers and suppliers and without being limited to NN Technology being used in any particular Product. Accordingly, the Monitor's core premise that NNI's licensing rights were limited to customers and suppliers (i.e., those who buy or make Products for NNI) is simply wrong.

### b. NNI's Indemnification Obligation in Article 7 Is Only Consistent with Having the Broadest Possible Rights to NN Technology

Article 7(b) provides:

> Each Licensed Participant shall indemnify and hold harmless NNL from any and all claims and liabilities for damages, losses, expenses or costs (including counsel fees and expenses) arising in its Territory with respect to NN Technology.[69]

NNI is required to indemnify NNL "from any and all claims" arising in the US "with respect to

---

[67] TR21003 (MRDA) at 7 (Art. 6(a)).

[68] *Id.* at 7-8 (Arts. 6(d)(i)-(iii)) (emphasis added).

[69] *Id.* at 8 (Art. 7(b)).

NN Technology." NNL faces no risks associated with NN Technology in the US; instead, NNI bears all that risk. There is no limitation. NNI's obligation to indemnify NNL for "any and all claims" arising in the US with respect to NN Technology only makes sense if any such use in the US would and could have been *by* NNI (or its licensee), not NNL, and thus NNL is entitled to be held harmless without exception. It would be commercially unreasonable for NNI to provide such a broad indemnification *to* NNL for harm caused by *NNL's* use in the US, as the provision would require if NNL were permitted to exploit NN Technology in the US.

### c. *The Insolvency and MRDA Termination Exit Mechanisms Also Confirm the Very Broad Rights NNI Had to NN Technology*

The provisions addressing Participants' exit from the MRDA due to insolvency or the termination of the MRDA also reveal important aspects of the MRDA's structure and the broad nature of the rights held by the parties:

- Under Article 11, if a Participant exits from the MRDA due to insolvency, NNL is obligated to pay the exiting Participant the fair market value of the Exclusive License.[70]

- Under Article 9(b), upon termination of the MRDA, each Licensed Participant "shall be deemed to have acquired a fully paid up license permitting it to continue to exercise the rights granted to it herein, and, in particular, the rights granted to it in Article 5 as though this Agreement had continued."[71] The Licensed Participants' enforcement rights with respect to NN Technology continued beyond the termination of the MRDA, as did the Licensed Participants' indemnification and limited confidentiality obligations, discussed above, consistent with the Licensed Participants' equitable and beneficial ownership of NN Technology in the Exclusive Territories.[72]

Thus, in the two instances most closely analogous to what has occurred here – the insolvency of a Licensed Participant or the termination of the MRDA – the MRDA clearly provides that either the Licensed Participants must receive the fair market value for the Exclusive

---

[70] *Id.* at 4, 27, 29 (Arts. 1(j), 11(d)(iii)).

[71] *Id.* at 9 (Art. 9(b)).

[72] *Id.* at 9 (Art. 9(c)).

Licenses or those Exclusive Licenses are fully paid up and continue.

### 3.   The Monitor's Argument Based on the Word "Products" Fails

According to the Monitor, because Article 5(a) grants certain rights with respect to "Products," the Exclusive Licenses therefore only gave the Licensed Participants the right to make, use or sell the precise products that Nortel was already making or selling at the time of Business Line Sales.[73]  From this, the Monitor asserts that once the Business Lines were sold, the Licensed Participants' licenses became valueless because Nortel supposedly was no longer making, using or selling Products.  This is plainly an incorrect interpretation because, as described above, the MRDA provided NNI with *all* valuable rights to NN Technology in the US.  There are several additional reasons why the Monitor's argument fails.

<u>First</u>, the Monitor's argument ignores NNI's Article 4(e) exclusion right and Article 5(a)'s sublicense right (discussed separately in Point II.B.1 above), and the final clause of Article 5(a).  It is telling that the exclusion and sublicense rights are barely mentioned, if at all, in the Monitor's valuation expert reports.

As to the exclusion right, Article 4(e) does not refer to Products.  NNI's exclusion right at all times existed and was unlimited, even surviving the expiry or termination of the MRDA itself pursuant to Article 9(c).[74]  By the plain terms of Article 4(e), the exclusion right was in no way dependent on NNI using or proposing to use NN Technology in a Product.  Due to this exclusion right, only NNI, not NNL, had the right and ability to grant Rockstar the right to exploit the Nortel Group's patents in the US.  NNL could not have done so both because NNL held no such rights to transfer and because as long as NNI's exclusion right remained in place, NNI had the power under Article 4(e) to exclude.

---

[73] Monitor Pretrial Br. ¶ 108.

[74] *Id.* at 9 (Art. 9(c)).

The final clause of Article 5(a) states that the Exclusive Licenses include – in addition to the rights to exclude and to sublicense, as well as the Products-related practice rights – "*all* rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith."[75]  The Monitor contends that the "in connection therewith" language at the end of this final clause in Article 5(a) refers to the "Products" definition, such that this clause merely creates a right to "use certain Nortel IP as necessary or appropriate in connection with the making, using, or selling of 'Products.'"[76]  But this argument ignores the simplest and most obvious reading of the text:  that "in connection therewith" refers to the words "technical know-how" that directly precede it, such that the Exclusive Licenses include all technical know-how as necessary or appropriate for the exercise of their rights to patents, industrial designs, copyrights and applications.

The Monitor's contrary interpretation would render the final clause meaningless.  The "Products" clause *already* grants the "rights to make, have made, use, lease, license, offer to sell, and sell Products using or embodying NN Technology," which is defined to include "patents, industrial designs, copyrights and applications thereof," as well as "technical know-how," among other things.  That can be seen by highlighting the relevant language in Article 5(a) after expanding the defined terms for "Products" and "NN Technology":

> To the extent of its legal right to do so, and subject to the rights of relevant third parties, NNL hereby:
>
> (i) continues to grant to each Licensed Participant an exclusive, royalty-free license, including  the right to sublicense, which except as hereinafter provided shall be in perpetuity, rights to make, have made, use, lease, license, offer to sell, and sell [all products, software and services designed, developed, manufactured or marketed, or proposed to be designed,

---

[75] *Id.* at 41-42 (Art. 5(a)) (emphasis added).

[76] Monitor Pretrial Br. ¶ 109.

developed, manufactured or marketed, at any time by, or for, any of the Participants, and all components, parts, sub-assemblies, features, software associated with or incorporated in any of the foregoing, and all improvements, upgrades, updates, enhancements or other derivatives associated with or incorporated in any of the foregoing] using or embodying [any and all intangible assets including but not limited to **patents**, **industrial designs**, **copyrights** and **applications** thereof, derivative works, **technical know-how**, drawings, reports, practices, specifications, designs, software and other documentation or information produced or conceived as a result of research and development by, or for, any of the Participants, but excluding trade-marks and any associated goodwill] in and for the Exclusive Territory designated for that Licensed Participant, and all rights to **patents**, **industrial designs** (or equivalent) and **copyrights**, and **applications** therefor, and **technical know-how**, as necessary or appropriate in connection therewith ('Exclusive License').[77]

In its submissions to the Courts, the Monitor emphasizes the importance in contract interpretation of giving effect to every word, and making the agreement as a whole make sense.[78] Yet the Monitor's interpretation fails to give effect to the words of Article 5(a), thereby misconstruing it.

Second, the Monitor ignores the word "including" in Article 5(a), which is expansive, not limiting.[79]

Third, pursuant to the plain terms of Article 5(a) and the definition of "Products," the "rights to make, have made, use, lease, license, offer to sell, and sell" extended to any "products, software and services" that were "designed [or] developed" or even "proposed to be designed [or] developed" at "*any time*."[80]  This is consistent with the "perpetual" nature of the Exclusive Licenses generally and confirms that the value of NNI's rights to practice NN Technology was

---

[77] TR21003 (MRDA) at 3-4, 41-42 (Art. 5(a), incorporating Arts. 1(f), 1(g)) (emphasis added).

[78] *See, e.g.*, Monitor Pretrial Br. ¶ 77(a) (noting that a contract is to be interpreted "as a whole, in a manner that gives meaning to all of its terms and avoids an interpretation that would render one or more of its terms ineffective").

[79] *See Mahaffey, Re* (1922), 52 O.L.R. 369 (Ont. H.C.); *Duncombe Estate, Re*, 3 O.L.R. 510, 2 O.W.R. 153 (Ont H.C.).

[80] TR21003 (MRDA) at 4, 41-42 (Art. 5(a), 1(g)) (emphasis added).

not "limited to Nortel's ongoing operations," as the Monitor wrongly contends.[81]  The

exploitation "right" existed in perpetuity and lay exclusively with NNI in the US, and was not

limited by the manner in which it was exercised at any particular point in time.  As long as NNI

held the exclusive right to exploit NN Technology in the United States, NNL had no such right

and no ability to transfer that right to anyone else.  If a purchaser wanted to exploit NN

Technology in the United States, it would have to pay NNI for that right.

Fourth, contrary to the Monitor's argument, all NN Technology was in fact already

embodied in a Product.  The evidence demonstrates that NNI and the other Licensed Participants,

together with NNL, proposed to develop the "IPCo" business, in which Nortel would market

licenses to Nortel's Patent Portfolio to other companies in exchange for royalties.[82]  As a

"service" that was "proposed to be designed, developed, . . . or marketed," the IPCo business fell

comfortably within the definition of a "Product."[83]  The Monitor's valuation expert agrees that

all NN Technology not sold with the Business Lines that falls within the definition of a Product

is not valueless and accordingly must be compensated.[84]

### 4.  The Monitor's Argument Based on Legal Title Fails

The Monitor attempts to justify its interpretation of the MRDA – which would result in

NNL receiving the entire $4.5 billion of the Patent Portfolio sale proceeds – by arguing that NNL

was the "owner" of all Nortel patents because legal title to NN Technology was "vested in" NNL

---

[81] *See, e.g.*, Monitor Pretrial Br. ¶ 101 ("[T]he defined activity was limited to the manufacture and sale of 'Products' made by or for the Participants.  In other words, it was limited to Nortel's ongoing operations.").

[82] *See, e.g.*, TR00020 (Ray Decl.) ¶¶ 52, 54-62.

[83] The Monitor's expert in the field of licensing IP agrees that "the licensing of intellectual property and intellectual property rights" – which was the IPCo business model – can constitute a "service."  *See* Burshtein Dep. 187:7-15.

[84] *See* TR00042 (Green Report) at 54 ("If there had been no license rights under the MRDA, all of the proceeds related to the transfer of intellectual property from the Business Sales would be allocated to the Canadian Debtors.  However the termination of the license rights requires consideration of the value of the rights that were surrendered by the US Debtors and the EMEA Debtors related to facilitate the Business Sales.  Thus, the value allocated to the Canadian Debtors related to the IP transferred should be reduced by the value of the licenses surrendered by the US and EMEA Debtors.").

under Article 4(a).  However, the MRDA's only references to "ownership" state that the

Licensed Participants enjoyed "equitable and beneficial ownership" of NN Technology and that

*all* Participants had borne the risk that came from "substantial and continuous development and

ownership of the NN Technology."[85]  While NNL did hold legal title to NN Technology under

the MRDA, this title was encumbered by the Exclusive Licenses from the moment it was vested

in NNL, and those Exclusive Licenses granted to the Licensed Participants all valuable rights

associated with ownership of NN Technology in their Exclusive Territories.[86]

### C.    The Factual Matrix of the MRDA Confirms that Each Licensed Participant Held All Valuable Rights to NN Technology in its Exclusive Territory

As Justice Newbould stated in a recent decision, when interpreting a contract under

Ontario law, "[t]he plain meaning of the words is to be given effect, read harmoniously and in

the context of other provisions of the contract, *and in light of the factual matrix as a*

---

[85] *See* TR21003 (MRDA) at 2, 18, 27, 30, 48  (Whereas Clauses, Sched. A, Whereas Clauses to 2d Add., Am. to Sched. A and 2d Am. to Sched. A).  Significantly, as NNL's Angela DeWilton testified, when NN Technology was initially created by a Nortel employee, the inventor would assign that technology to its employer – such as NNI – who would in turn assign those rights to NNL.  Trial Tr. 741:12-742:11.  Likewise, the Monitor's expert, Sheldon Burshtein, admitted that before NNL was provided with legal title, "legal and beneficial title were in the hands of the [Licensed Participant]."  Burshtein Dep. 92:23-93:7, 99:11-15, 99:18-22, 99:25.

[86] In his opening argument, counsel for the Monitor referred to paragraphs 4(b), (c) and (d) to support its argument that legal title without economic rights or ownership somehow had superior value.  Trial Tr. 418:20-419:14.  However, these provisions are simply part of NNL's right, created under Article 3(d), to "administer" the MRDA.  There is no dispute that NNL was the operating parent company of the Nortel Group and that many, but by no means all, of the Group's administrative functions were headquartered in Canada.  As a result, it was convenient to vest legal title in NNL so NNL could perform certain administrative functions with respect to NN Technology.  Not one of the Monitor's three expert valuation witnesses, or any other expert, opined that any part of the purchase price paid in the Sales was "due to" the purchasers' acquisition of NNL's ability to perform these administrative functions.  The Monitor also relied on Article 13 to suggest that NNI could not have had equitable and beneficial ownership because that is only possible in a fiduciary relationship, which Article 13 disclaims.  Trial Tr. 425:2-24.  However, as Justice Newbould noted, *id.* 426:2-427:2, there are examples in law where legal title is separated from equitable and beneficial ownership without a fiduciary relationship, a legal mortgage being just one example.  *See, e.g.*, J. Falconbridge & W. Traub, *Falconbridge on mortgages*, 5th ed., looseleaf (Aurora: Canada Law Book, 2003) at para. 22:10; *Canada Business Corporations Act*, R.S.C. 1985 c. C-44, s. 2(1) ("'beneficial ownership' includes ownership through any trustee, legal representative, agent or mandatary, *or other intermediary*") (emphasis added); *Westdeutsche Landesbank Girozentrale v Islington LBC,* [1996] AC 669 at 707 ("Even in cases where the whole beneficial interest is vested in B and bare legal interest is in A, A is not necessarily a trustee").  Article 13 was included merely to avoid any inference that NNL had a "permanent establishment" in the US, which would have had adverse tax consequences.  *See, e.g.*, O Dep. 173:25-174:9 (noting that there was "concern" that "the system that the MRDA was putting in place would have created a partnership amongst the participants," and the way to "solve for that" was by "making it really clear in the agreement that it is not a partnership").

*whole*."[87]  The Ontario Court of Appeal also considered this issue and confirmed that "because words always take their meaning from their context, evidence of the circumstances surrounding the making of a contract has been regarded as admissible in *every* case."[88]

Very recently, the Supreme Court of Canada confirmed the need to take into account factual matrix evidence – evidence of the surrounding circumstances.  *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 53 at paras. 47 to 58.  The Supreme Court held that "[t]he meaning of words [in a contract] is often derived from a number of contextual factors, including the purpose of the agreement and the nature of the relationship created by the agreement."  *Id.* at para 48.  While "[t]he meaning of words is a matter of dictionaries and grammars[,] the meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean."  *Id.* (quoting *Investors Compensation Scheme Ltd. v. West Bromwich Building Society*, [1998] 1 All E.R. 98 at 115 (H.L.)).  Factual matrix evidence may not include the subjective intent of the parties, but otherwise can include "absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man."  *Sattva Capital Corp. v. Creston Moly Corp.*, 2014 SCC 533 at para. 58 (quoting *Investors Compensation Scheme Ltd. v. West Bromwich Building Society*, [1998] 1 All E.R. 98 at 114 (H.L.)).[89]

Consistent with the plain language of the MRDA, the evidence at trial regarding the

---

[87] *Computershare v. Crystallex*, 2011 ONSC 5748 at para 20 (Newbould, J.) (emphasis added).

[88] *The Canada Trust Co. v. Russell Browne et al.*, [2012] ONCA 862 at para. 67 (emphasis added).

[89] At trial, the Monitor asserted 48 deposition and exhibit objections after withdrawing more than 1,000 previously filed objections.  Trial Tr. 807:8-10.  The Courts stated that they would address the Monitor's remaining 48 objections after the trial was completed.  *Id.* 808:8-809:9.  Among other reasons, the US Interests believe all of the remaining objected-to evidence is admissible as factual matrix evidence as set forth above.  The US Interests further note that in addition to withdrawing all but 48 objections, the Monitor did not object to any trial testimony or witness declarations or affidavits, all of which have therefore already been admitted into evidence.  The Monitor has yet to file a pleading or otherwise explain why it believes these 48 deposition excerpts and exhibits are inadmissible, but in the event that the Monitor does so, the US Interests reserve the right to respond to the Monitor.

context for the MRDA further establishes that the MRDA gave the Licensed Participants economic ownership of NN Technology within their Exclusive Territories. The MRDA was created with this specific, common, expressed intent and this is how all of the MRDA parties at all pertinent times understood their rights. The Monitor's contrary position, an after the fact litigation contrivance, is contradicted by all of the evidence presented at trial. The pertinent evidence falls into the following categories:

- tax considerations, particularly transfer pricing regulations, of which the parties were keenly aware when creating the MRDA and that motivated the parties to provide economic ownership of NN Technology to each Licensed Participant in its Exclusive Territory and to make consistent representations of such ownership to tax authorities;

- the commercial context, including the parties' historical business practices in the MRDA period, custom and practice relating to licensing arrangements and the economics of the Nortel Group business model; and

- post-petition conduct, including the Monitor's conduct, further demonstrating the lack of merit to the Monitor's new-found litigation position and which estops the Monitor from arguing, among other things, that the Canadian Debtors are entitled to all of the proceeds from the Patent Portfolio Sale.

### 1.  The MRDA Was a Tax-Driven Contract

Witnesses consistently testified that the MRDA was a tax-driven document, designed to "contractualize" the Nortel Group's transfer pricing policy.[90] Michael Orlando, former Transfer Pricing Leader at NNI, stated in his testimony that the MRDA is "a tax document that underscores [Nortel's] transfer pricing policy."[91] The primary external counsel involved, and lead drafter of the MRDA, Giovanna Sparagna, testified that the MRDA is "primarily focused on transfer pricing," which is "part of tax law," and it is "primarily [a] tax law document[]."[92] The MRDA was drafted primarily by Nortel's tax team and external tax counsel because it needed to

---

[90] *See, e.g.*, Trial Tr. 1848:3-7 (Weisz) (testifying that the "purpose of [the MRDA] was to contractualize the arrangements that the participants had and had been ongoing for quite some time since 2001").
[91] *Id.* 1275:6-7.
[92] Sparagna Dep. 233:11-21.

comply with transfer pricing regulations so that Nortel could continue to enjoy the tax benefits of its transfer pricing regime.  As explained by Mark Weisz, the former Director of International Tax, "[t]he MRDA set forth the agreement among Nortel entities governing intercompany transactions for tax purposes and created ownership and licensing rights to Nortel technology created by the MRDA parties,"[93] and many tax team members, internal and external legal counsel, and economic advisers were involved in drafting the MRDA because it had to "reflect the economics of what ha[d] been transacting in [Nortel's] business for quite some time."[94]

The tax-driven nature of the MRDA, and the consequence of that – that each Licensed Participant held all valuable rights to NN Technology in its Exclusive Territory – is made clear not only by the plain language of the MRDA but also by examining evidence relating to the transfer pricing purpose of the MRDA, the MRDA's relationship to the prior transfer-pricing agreements, and related representations made to tax authorities.  In addition to transfer pricing considerations, it was also of paramount importance that NNL not do business in the US so as to avoid having "permanent establishment" status in the US.  This likewise animated the structure set forth in the MRDA, pursuant to which NNI, not NNL, had economic ownership of NN Technology in the US.  These matters are addressed below.

### a. A Principal Purpose of the MRDA Was to Memorialize the Licensed Participants' Economic Ownership of Nortel IP in the Exclusive Territories

The Participants needed to ensure that the MRDA granted to each of them beneficial ownership of NN Technology in their respective Exclusive Territories because that reflected the actual commercial relationship between the parties and the manner in which they operated, including during the CSA period and the four-year period after the expiration of the 1992 R&D

---

[93] TR00028 (Weisz Decl.) ¶ 9.
[94] Trial Tr. 1847:3-1849:10 (Weisz).

CSA in 2000 before the initial version of the MRDA was created and signed.  As the US

Interests' transfer pricing expert, Eden, explained, transfer pricing professionals and guidelines

focus on the "functions, assets and risks" of the parties to determine which entity owns an asset

from an economic perspective.[95]  Therefore, to satisfy the tax authorities, the Participants had to

ensure that the MRDA reflected the parties' actual functions, assets and risks within the Nortel

Group.  The MRDA contains a clear statement of this framework.  Schedule A states that all the

Participants "bear the full entrepreneurial risk of the Nortel business such as the risks attendant

with the substantial and continuous development and ownership of the NN Technology."[96]  The

MRDA addresses ownership rights to intellectual property by vesting "legal title" to NN

Technology in NNL "in consideration" for NNL granting the Exclusive Licenses to the Licensed

Participants,[97] such that they "enjoyed equitable and beneficial ownership" of NN Technology in

their respective territories, as stated in the recitals.[98]

Consistent with this language, every witness who testified at trial about the MRDA

confirmed that the factual context in which the MRDA was created led the parties to grant each

Participant equitable and beneficial ownership of that technology.[99]  Weisz testified that the

purpose of the MRDA was to "contractualize" the parties' pre-existing arrangement "that all the

Participants had full economic rights and benefits to exploit Nortel technology in the[ir] country

---

[95] *See, e.g.*, Trial Tr. 5042:9-5043:17; TR11412 (Eden Report) ¶¶ 64-68.  As EMEA's transfer pricing expert, Richard Cooper, noted, legal title by itself "has no value at all" under the OECD guidelines; rather, what matters in transfer pricing is economic ownership of the property that has been created.  Trial Tr. 2667:14-2669:1.

[96] TR21003 (MRDA) at 18, 30, 48 (Sched. A, Am. to Sched. A, 2d Am. to Sched. A).

[97] *Id.* at 6 (Art. 4(a)).  *See also* Burshtein Dep. 96:14-20, 96:23-97:11, 99:19-22, 99:25 (the Monitor's expert, Sheldon Burshtein, acknowledging that NNL only received legal title in consideration for granting the Exclusive Licenses and that without that exchange, NNL would not have had legal title to NN Technology created by NNI and the EMEA IEs).

[98] TR21003 (MRDA) at 2, 27 (Whereas Clauses, Whereas Clauses to 2d Add.).

[99] *See generally* PFOF § III.D.1 ("Rights to Intellectual Property Under the MRDA").

of incorporation."[100]    Likewise, Orlando testified that Nortel and its advisors understood the

Licensed Participants were "responsible for ongoing entrepreneurship and risk-taking functions

with respect to their ongoing IP activities," and as a result, they each "maintain[ed] an economic

ownership in the IP" that was formalized through the grant of Exclusive Licenses.[101]    And

according to Kerry Stephens, an NNUK tax officer responsible for transfer pricing, each

Participant enjoyed "ownership rights in the intellectual property arising as a result of the

contribution to [R&D] by those entities which were party to the MRDA."[102]    Upon cross-

examination by the Monitor, each of these witnesses testified that the MRDA was the sole legal

document that reflected the Participants' rights, and that the purpose of the MRDA was to

embody the Participants' rights as economic owners of Nortel technology.[103]

Another relevant transfer pricing witness was John Doolittle, a senior NNL officer and

Nortel's Vice President of Tax, who signed the MRDA on behalf of NNL.[104]    Doolittle was not

called by the Monitor to testify at trial; however, he acknowledged at his deposition that the

"objective in the MRDA was to accurately reflect the economic realities of how Nortel

operated."[105]    As such, Doolittle explained, the MRDA was designed to provide "each of the

---

[100] Trial Tr. 1848:3-1849:2; *see also* TR00028 (Weisz Decl.) ¶¶ 10, 12-14.

[101] Trial Tr. 1275:8-14, 1280:5-23, 1281:12-18; *see also* TR00019 (Orlando Decl.) ¶¶ 16, 23.

[102] TR00027 (Stephens Aff.) ¶ 15; *see also* Trial Tr. 1739:25-1740:19 (Stephens); Stephens Dep. 56:10-57:21 (Stephens' view of ownership of IP under the MRDA "was that it was economically owned, for which one might read beneficially owned, by the RPSM participants.").

[103] *See, e.g.*, Trial Tr. 1327:20-1328:13 (Orlando) (the MRDA is the "contractual source that [Orlando] [is] aware of" for NNI's rights to IP, and when he refers to NNI's "ownership," he is "referring to the contractual rights in the MRDA" and "the business reality" of Nortel); *id.* 1890:23-1891:6 (when asked if "there was no other legal document that was a source of any form of ownership related to Nortel's IP other than the MRDA," Weisz responded, "[t]hat would be correct, other than NNI was performing R&D.  And the idea was that for administrative purposes, NNL would be legal title, but the economic benefit would stay with the participants in their local countries"); *id.* 1780:25-1781:11 (Stephens) (acknowledging that the MRDA is "the embodiment of" the "economic ownership of intellectual property" enjoyed by the Licensed Participants).

[104] TR21003 (MRDA) at 14, 23, 42; Doolittle Dep. 106:13-18 (Doolittle explains that he "was head of the tax group when [the MRDA] was signed . . . and it was the agreement that documented the arrangement between the R&D participants, and so I was certainly involved in it.").

[105] Doolittle Dep. 107:9-13; *see also id.* 106:19-25 (the purpose of the MRDA was "to document the rights,

RPS participants beneficial ownership but not legal ownership to the technology," and that

beneficial ownership included the right of each IE "to exploit the Nortel technology in its

territory."[106]  Doolittle confirmed that there were no "exceptions to the exclusive right of the

[IEs] to the economic and beneficial ownership of Nortel technology within their respective

territories."[107]

      Sparagna gave similar testimony.[108]  According to Sparagna, the Participants were the

"entrepreneurs" of Nortel who bore "the upside risk" and "downside risk" of their R&D

investment, and the Licensed Participants were the "beneficial owners" of Nortel's IP in their

Exclusive Territories.[109]  Sparagna confirmed she structured the MRDA such that the Licensed

Participants had a "legal entitlement as beneficial owners of the technology."[110]  According to

Sparagna, under the MRDA, "the [L]icensed [P]articipants held equitable and beneficial

ownership in NN technology" through their "perpetual license."[111]  This license grant was

consistent with the distinction "between legal title and economic and beneficial ownership,"

which "look[s] at trying to place in the right jurisdiction the actual economic benefit so that it

can be taxed or not taxed appropriately."[112]  As Sparagna explained:

> Our strategy [in drafting the MRDA] was to have each RPS
> Participant be the exclusive beneficial owner of their respective
> geographic locations.  .  .  .  In form however, Nortel Canada is the
> formal legal owner of all worldwide registered intangibles.  We
> accomplished the transfer of all beneficial ownership of a specific

---

obligations, benefits of the parties that were participants to the R&D – parties that performed R&D that were participants to the agreement").

[106] *Id.* 94:24-95:3, 95:14-17.

[107] *Id.* 110:4-9, 110:11-12.

[108] Sparagna Dep. 24:6-15, 25:12-19, 26:6-24.  Sparagna was retained by Doolittle on behalf of NNC and its subsidiaries.  TR11338 at 3.

[109] Sparagna Dep. 83:16-85:14, 163:21-164:5, 245:14-25.

[110] *Id.* 151:17-21.

[111] *Id.* 163:21-164:5, 180:12-17.

[112] *Id.* 240:20-241:17.

geographic location to each RPS Participant by having Nortel Canada granting each of the RPS Participants an *exclusive* license in their respective specified Territories.[113]

Although claiming it considers the MRDA to be unambiguous, the Monitor ironically argued that the concept of "beneficial ownership" – a term used in the MRDA – is "a rabbit hole of different views expressed in different contexts at different times by different people."[114]  The Monitor is wrong:  witnesses have consistently and resoundingly rejected the Monitor's assertion and testified that beneficial ownership is no different in the tax context or economic reality.[115]  For instance, when counsel for the Monitor suggested in his examination of Sparagna that perhaps the parties to the MRDA considered a difference between "the concept of beneficial or economic ownership" for tax purposes as compared to license rights, Sparagna responded, "I think they were supposed to be one and the same here at this point."[116]  Stated another way, as Henderson put it, transfer pricing "needs to reflect economic reality."[117]  There is no evidence that any party with knowledge of the MRDA ever expressed a "different view" as to the meaning of "beneficial ownership" as the Monitor contends; all agreed that from any perspective, the Licensed Participants had full ownership of all valuable rights to NN Technology in the Exclusive Territories.

Despite the evidence, the Monitor contends that the MRDA's grant of legal title alone to

---

[113] TR21531 at 2 (emphasis in original).

[114] *See* Trial Tr. 456:8-19 (Monitor's opening statement).

[115] *See, e.g., id.* 1281:12-23 (Orlando) ("Economic ownership" has "the same meaning in [the] tax and business context."); *id.* 1855:15-22 (Weisz) ("[F]or tax purposes the beneficial ownership is what to me was important, because it drove really the contractual agreements . . . .  [B]eneficial ownership for tax purposes followed basically the economics that we have been applying to our profit split since 2001.").

[116] Sparagna Dep. 190:17-22, 190:24-191:2, 191:6-7.  When the Monitor's counsel then asked if "in terms of determining entitlements that a court, other than a tax court, might recognize, you would expect the parties to look to the terms of their legal agreement," Sparagna responded, "[w]ell, let me put it this way.  I would point to this grant of a license to defend their right to the perpetual – the perpetual use of that intangible."  *Id.* 191:8-11, 13-16.

[117] Trial Tr. 1136:6-14; *see also id.* 1866:18-22 (When asked if "it is important for the transfer pricing arrangements to reflect the actual way the business is being operated," Weisz responded: "Absolutely, yes.").

NNL entitles the Canadian Debtors to the entirety of the proceeds of the Patent Portfolio Sale

and most of the proceeds of the Business Line Sales, which they argue is consistent with NNL's

supposedly special role in the Nortel Group.[118]   Yet at trial, witnesses with firsthand knowledge

of the MRDA and its creation also uniformly refuted that contention:

- Stephens noted that nobody at Nortel ever suggested "that NNL, as the holder of legal title of the intellectual property, had a greater beneficial interest in the IP" than the Licensed Participants;[119]

- Weisz and Orlando each stated that the tax authorities were never told that NNL had any greater interest than NNI or the Licensed Participants in Nortel technology;[120] and

- Weisz and Orlando also each testified that legal title was placed in NNL merely for administrative simplicity.  Weisz testified that "IP legal ownership, for convenience, was with NNL," and Orlando confirmed that legal title was placed in NNL "for administrative convenience."[121]

This testimony accords with documentary evidence from the time period in which the 1992 R&D

CSA was terminated and the RPSM was adopted (as discussed below).  A 2001 memorandum

from in-house counsel at NNL explained that "for *administrative simplicity* it is expected that all

of Nortel's [IP] will continue to be owned by [NNL]."[122]

Contemporaneous documentary evidence also demonstrates that the drafters of the

MRDA did not intend to grant NNL a superior ownership interest than that enjoyed by the other

Participants, and they limited the language of the MRDA accordingly.  In an early draft of the

---

[118] Monitor Pretrial Br. ¶ 7.

[119] Trial Tr. 1740:13-19.

[120] *See* TR00019 (Orlando Decl.) ¶ 28 ("I am not aware of any instance in which Nortel or its advisors informed the tax authorities that if Nortel sold its patents, the proceeds from that sale would be recognized exclusively by NNL. That outcome would have been inconsistent with Nortel's representations to tax authorities. . . ."); TR00028 (Weisz Decl.) ¶ 16 (In all "communications with tax authorities, it was made clear that full economic ownership . . . of Nortel technology in each of the exclusive territories was held by the MRDA participant for that exclusive territory . . . .  NNL's legal title of the Nortel technology was virtually irrelevant. . . .").

[121] Trial Tr. 1333:17-20 (Orlando); *id.* 1855:14-15 (Weisz).

[122] TR22143 at 1.  *See also, e.g.*, TR11114 at 1 ("Theoretically, each of the participants could continue to own the intellectual property it creates, but continuing to assign all intellectual property to Nortel Networks Limited may provide some administrative simplicity."); TR11065 at 1, att. 1 (NNL attorney circulates presentation "[s]uggest[ing] maintaining NNL as IPR owner [under the planned RPS agreement] for administrative simplicity").

MRDA, Article 4(a) stated that "legal title *and legal ownership* to any and all NN Technology . . . will be held solely by NNL."[123]   However, Scott Wilkie –  a tax and transfer pricing partner at the Osler law firm, which was retained solely by NNL and NNC to provide advice to them with respect to the MRDA and other tax and transfer pricing matters[124] – reviewed this draft and commented:

> The philosophical concern that I have . . . is a stronger implication that NNL is the 'real owner' of the IP and that the Participants derive their rights from NNL, as licensees, rather than as a consequence of having earned them in their own right as participants in the R&D arrangements.   Among other things this colours the royalty free licence differently than under the 'former' arrangements.[125]

As counsel to NNL, Wilkie specifically criticized proposed language in Article 4(a) that, if used, would have granted "legal ownership" to NNL, arguing that the Exclusive Licenses merely served as a "mechani[sm] to document the benefit/rights that participants *had earned in their own right*."[126]   Ultimately, of course, the text of Article 4(a) was changed in a manner that resolved Wilkie's concerns and conformed with business reality; the final version dropped the reference to "legal ownership" and simply said that "legal title to any and all NN Technology . . . shall be vested in NNL."[127]

Other written communications among senior NNL officers demonstrate that, under the MRDA, NNL did not hold valuable rights to Nortel IP in the Licensed Participants' Exclusive Territories, as the Monitor now contends.   For example, in a 2005 email to Doolittle, Sparagna explained that NNL was only "the formal legal owner of all worldwide registered intangibles,"

---

[123] *See* TR11349 at att. 7 (emphasis added).

[124] *See* Wilkie Dep. 30:9-16, 48:8-14.  Unlike NNL, NNI and the EMEA IEs did not have separate legal representation with respect to the creation of the MRDA.

[125] TR11349 at 1.

[126] *Id.* at att. 7 (emphasis added).

[127] TR21003 (MRDA) at 6 (Art. 4(a)).

and that the MRDA transferred "all beneficial ownership of a specific geographic location" to each Licensed Participant by granting the Exclusive Licenses.[128]  Doolittle forwarded this message to Weisz, noting that under this structure, he "d[id] not think that Canada's IP is worth much!"[129]

Likewise, several years later, on the eve of bankruptcy in late 2008, Peter Look – Doolittle's successor as Vice President of Tax – explained to senior Nortel Group management that because of the rights held by the Licensed Participants, he estimated that approximately *two-thirds* of the value of the Nortel Group's IP resided in NNI and the EMEA IEs.[130]  Look warned that NNL would be required to purchase those rights at fair market value if the MRDA's termination provisions were triggered by insolvency filings – a problem that NNL solved with the Fourth Amendment to the MRDA, which stated that the MRDA did not automatically terminate upon insolvency.[131]

> ### b.  The MRDA Was Intended to Continue the Licensed Participants' Exclusive, Beneficial Ownership of Nortel IP in Their Exclusive Territories Pursuant to the 1992 R&D CSA, the 1996 APA, and Applicable Transfer Pricing Regulations

The MRDA was also intended to continue the Licensed Participants' equitable and beneficial ownership of NN Technology that existed under the final R&D CSAs, including the 1992 R&D CSA.[132]

The 1992 R&D CSA and other final R&D CSAs granted each Licensed Participant an

---

[128] TR21531 at 2.

[129] *Id.* at 1.

[130] TR22139 at 6.

[131] *See* TR21003 (MRDA) at 59-60 (4th Am. to MRDA).

[132] Although the 1992 R&D CSA applied only to NNI and NNL, the final R&D CSAs between NNL and the other Licensed Participants – including the 1995 NNL-NNUK R&D CSA and the 2000 NNL-NNSA R&D CSA – granted substantially identical rights to the Licensed Participants in their respective Exclusive Territories.  *See generally* PFOF § III.B.3 ("NNI and Other Cost Sharing Participants Gained Steadily Increasing Rights in Nortel IP as Their Businesses and the R&D CSAs Evolved").

"Exclusive Royalty-Free License to NT Technology" in its respective Exclusive Territory.[133] This license included a grant of "all rights to patents" and certain other intellectual property.[134] Further, each Licensed Participant held the rights to sublicense and to bring suit to enforce its rights to Nortel technology in its Exclusive Territory.[135]  Upon the expiration or termination of the CSA, each Licensed Participant acquired "a fully paid up license" permitting it to continue to exercise its rights in its Exclusive Territory, without being subject to any further cost sharing payments to NNL.[136]

As explained by Henderson, the primary draftsperson of the 1992 R&D CSA, the CSA was structured to provide each Participant "all the economic and beneficial rights . . . of the NT Technology within its territory" ███████████████████████████████████████

████████████████████████████[137]  Although dated as of 1992, the CSA was in fact not drafted and signed until after NNL and NNI, in 1996, reached APAs with these tax authorities regarding its cost sharing arrangements, and the CSA was required by tax authorities to be consistent with the agreements reached in the APAs.[138]

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

---

[133] TR21002 at 8 (Art. 5); TR31309 at 7-8 (Art. 5); TR46945 (Art. 5).  The 1992 R&D CSA and 1995 NNL-NNUK R&D CSA granted NNI and NNUK, respectively, an "exclusive royalty-free license, including the right to sublicense, which, except as hereinafter provided, shall be in perpetuity to make, have made, use, lease and sell Products embodying NT Technology in and for the [designated territory of the participant], and to all rights to patents, industrial designs (or equivalent) and copyrights, and applications therefor, and technical know-how, as necessary or appropriate in connection therewith."  TR21002 at 8 (Art. 5); TR31309 at 7-8 (Art. 5).  The 2000 NNL-NNSA R&D CSA granted a virtually identical license to NNSA.  TR46945 (Art. 5).

[134] TR21002 at 8 (Art. 5); TR31309 at 7 (Art. 5); TR46945 (Art. 5).

[135] TR21002 at 8, 9-10 (Arts. 5, 7); TR31309 at 7-8, 9 (Arts. 5, 7); TR46945 at 8, 10 (Arts. 5, 7).

[136] TR21002 at 10 (Art. 10); TR 31309 at 10 (Art. 10); TR46945 at 11 (Art. 10).

[137] *See* TR00016 (Henderson Decl.) ¶¶ 15, 21; Trial Tr. 1127:22-1128:7.

[138] TR00016 (Henderson Decl.) ¶ 15; *see also* Trial Tr. 1131:10-1132:5 (Henderson).

████████████████████████████████████████████████████

████████████████████████████████████████████  ██  ██

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████  █

████████████████████████████████ as Henderson explained, "NNI's perpetual and exclusive license" was not "limited in any way" in NNI's Exclusive Territory, and NNL "did not have any substantive economic or beneficial rights in the NT Technology in NNI's territory."[141]

Transfer pricing regulations enacted during this period confirm that this structure was necessary and appropriate. Beginning in 1997, the OECD Guidelines have explicitly stated that each party to a CSA must be "entitled to exploit its interest in the [CSA] separately as an *effective owner thereof* and not as a licensee."[142] If a CSA participant's "contribution entitles [that party] to obtain only a *right to use* intangible property . . . and the [party] does not also obtain a beneficial interest in the intangible property itself," then that contribution "would constitute a royalty for the use of intangible property."[143] As Eden explained, that royalty would be taxable, with the result that the parties cannot "enjoy the full benefits of the cost-sharing arrangement under the tax rules."[144]

CRA Information Circular 87-2R ("IC 87-2R"), issued in 1999, expressly affirms these

---

[139] TR46875 at 11 (emphasis added).

[140] *Id.* at 11. ████████████████████████. *See* TR50829 §§ 5.2(a), (c), (d), (e).

[141] TR00016 (Henderson Decl.) ¶ 23.

[142] TR40713 (1997 OECD Guidelines) ¶ 8.3 (emphasis added); TR11391 (2010 OECD Guidelines) ¶ 8.3 (emphasis added).

[143] TR40713 (1997 OECD Guidelines) ¶ 8.23 (emphasis added); TR11391 (2010 OECD Guidelines) ¶ 8.23 (emphasis added).

[144] Trial Tr. 5014:25-5015:5. Stephens acknowledged this concern in his testimony, stating that in order to avoid a withholding tax under the OECD guidelines, "it was necessary to give the [IEs] an ownership interest in the technology," "because if they didn't have an ownership interest, they must be paying a royalty." *Id.* 1750:6-13.

principles, stating "each participant in a [CSA] is not required to be a legal owner of [intangible] property, but each participant *must* enjoy substantially similar rights, benefits, and privileges as a legal owner (effective or beneficial ownership)."[145]  Although these OECD Guidelines and IC 87-2R were enacted shortly after Nortel's 1992 R&D CSA was drafted in 1996, the CSA was completely consistent with those provisions.

The Nortel Group's UK tax advisor, KPMG, clearly explained these principles to the UK tax authority in a 2003 report on Nortel's transfer pricing policies for the 1998 tax year.  KPMG noted that in a CSA, the parties must each "contribute to the development of the intangible, and as such share in its ownership."[146]  KPMG explained:

> Importantly when adopting a C.S.A., it is the responsibility of each participant of the R&D agreement to exploit that technology to its full advantage. That is, *all participants to the R&D C.S.A. are provided with the same opportunities – the opportunity to exploit all Nortel technology to as great an extent as possible within their respective geographic area.*[147]

After the 1992 R&D CSA terminated in 2000, Nortel's tax and transfer pricing team decided to switch from a cost sharing arrangement to the RPSM method for its transfer pricing.[148]  As Nortel's tax personnel prepared the MRDA, they were aware of the parties' rights under the CSA and Nortel's representations to tax authorities about those rights.  Indeed, in June 2004, Doolittle and Weisz asked for a compilation of all representations that Nortel and its

---

[145] TR50295 (IC 87-2R) ¶ 121 (emphasis added).  The Monitor's expert transfer pricing witness, Reichert, acknowledged in his reports that IC 87-2R "sets out the CRA's interpretation and administrative positions" regarding the transfer pricing provisions of the Income Tax Act (Canada), TR00049 (Reichert Report) at C-16, though he failed to cite paragraph 121 – or the OECD provisions noted above – anywhere in his reports.

[146] TR48969.03 at 25.  NNUK retained KPMG as a tax advisor in connection with transfer pricing issues with the UK revenue authority, and it was involved in drafting correspondence with that tax authority on behalf of Nortel. *See* Stephens Dep. 173:7-24, 254:16-17; Bush Dep. 49:20-24.

[147] TR48969.03 at 28 (emphasis added).

[148] *See, e.g.*, TR00016 (Henderson Decl.) ¶¶ 26-32.

advisors had made to tax authorities "related to IP ownership."[149]  This compilation showed that Nortel had already accurately represented to tax authorities that each of the Participants were the "owners of the intangible property" and that "[f]rom an[] economic standpoint, each [party to the CSA] could be considered to 'own' the NT Technology as it related to its specific region."[150] Nortel's tax team was determined to maintain these rights in the MRDA structure.  As Weisz testified, these rights were "intended to be carried over into the RPS model.  There were discussions about that.  *Any alteration to this raised issues of value being lost by a participant and whether a buyout payment would be necessary.*  And so for ease, it was determined that *the rights that existed in the R&D cost-sharing would continue to exist going forward.*"[151]

### c. Nortel Consistently Represented to Tax Authorities that Each Licensed Participant Under the MRDA Bore Entrepreneurial Risks and Owned NN Technology in Its Exclusive Territory

As with the 1992 R&D CSA, during the later (unsuccessful) APA process with respect to the adoption of the RPSM and creation of the MRDA, Nortel's transfer pricing personnel regularly interacted with the IRS, CRA, HMRC and other tax authorities.[152]  Throughout this process, they consistently represented to tax authorities that each Licensed Participant under the MRDA was the economic owner of Nortel IP in its Exclusive Territory.  Communications with tax authorities about the appropriateness of their tax arrangements are of particular relevance when discerning the intent of the parties to the MRDA.  In similar circumstances, the Ontario Court of Appeal has emphasized the relevance and importance of communications with tax authorities when interpreting a contract that, like the MRDA, was tax-driven.  For instance, in

---

[149] *See* TR21041 (June 2004 Email from V. Raimondo, Leader of Global Tax Accounting, to J. Doolittle, copying M. Weisz); Trial Tr. 1857:13-1858:9 (Weisz).

[150] TR21041 at att. 1, 8.

[151] Trial Tr. 1859:11-18 (emphasis added).

[152] "HMRC" refers to Her Majesty's Revenue and Customs, the UK taxing authority.  Prior to April 2005, the UK taxing authority was Inland Revenue.

*The Canada Trust Co. v. Russell Browne et al.*, [2012] ONCA 862, the Court of Appeal for Ontario considered the interpretation of a varied trust agreement. Among other things, the varied trust agreement needed to work from a tax perspective. *See id.* at paras. 21-25. The variation followed advice from Ernst & Young, discussions between the parties as to their understanding of the purpose and effect of the variation, correspondence with the CRA and an advance tax ruling and submissions to the court in connection with seeking approval of the variation. *Id.* at paras. 20-31. The Court of Appeal held that all that factual evidence was admissible, important factual matrix evidence; it set out "the genesis of the agreement, its purpose and the commercial context in which the agreement was made." *Id.* at paras. 67-70, 78-79, 83-88 (citations omitted).

The consistent record of the Nortel Group's representations to tax authorities is uncontroverted:

- Weisz explained in his testimony that the subject of economic ownership "wasn't an issue that was really in dispute," but when the topic arose, Nortel's tax personnel would explain that "beneficial ownership of the technology and [the right] to exploit the technologies were with the [Participants] in their local countries;"[153]

- Orlando stated that "Nortel repeatedly informed tax authorities that each of the [Participants] enjoyed economic and beneficial ownership of the IP in their respective territories;"[154] and

- Stephens testified that each Participant's "economic interest" in Nortel IP was "implicit in the various representations . . . made to the UK revenue authorities . . . ."[155]

These representations began at least in 2001[156] and continued until at least 2010, well after insolvency.[157] For example:

---

[153] Trial Tr. 1855:23-1857:2; *see also* TR00028 (Weisz Decl.) ¶ 17.

[154] TR00019 (Orlando Decl.) ¶ 27; *see also id.* ¶ 28.

[155] TR00027 (Stephens Aff.) ¶ 20; *see also* Sparagna Dep. 104:10-22 (Sparagna could not recall any instance where anyone represented to tax authorities that "the exclusive licenses were limited in any material fashion"); *id.* 243:17-24 (explaining that there was no "point in time when anyone from the [IP] group in legal or elsewhere in Nortel ever told [Sparagna] that representations inconsistent with their view of ownership of the [IP] were being made to any of the taxing authorities").

- In Nortel's 2002 application for an APA with the IRS, CRA and Inland Revenue, Horst Frisch – Nortel's economists hired to assist in its adoption of the RPSM – represented that under the R&D CSA, each Participant "could be considered to 'own' the [Nortel] technology as it related to its specific region."[158]  The same application made clear that the Participants would "continue to possess valuable intangible property" under the RPSM regime.[159]

- Similarly, in 2003, in response to questions posed by the IRS and CRA in connection with Nortel's APA applications, Nortel stated that the Participants were "owners of the intangible property."[160]

- In 2008, Nortel submitted a request to the CRA and IRS for an APA for the 2006-2011 period.  That request – which was prepared with the assistance of Ernst & Young[161] – represented to the tax authorities that all Nortel IP "is *registered* by NNL," but each Participant "maintains an *economic ownership* in the IP."[162]

The 2008 APA request illustrated the concept of economic ownership in a "Functional Activity Chart" listing various activities performed by the Participants, which were either "in support of local and extraterritorial revenues" and designated with an "X," or "in support of local revenues only" and designated with a "Y." [163]  The chart states that the Participants each had "Intellectual Property Economic Ownership" *locally*, i.e., in their respective Exclusive Territories.[164]  This applied equally to NNL, NNI and the other Licensed Participants.  Likewise,

---

[156] *See, e.g.*, TR31022 (Feb. 2001 Letter from I. Barton to A. Miller, HM Inspector of Taxes) at 2 (stating that "although Nortel Canada has legal ownership of Nortel's Intellectual Property, each participant [in the R&D CSA] has beneficial ownership, within their country of incorporation").

[157] *See infra* at 55.

[158] TR11055 at 10.  The IRS expressly noted this representation in a subsequent review of Nortel's tax liability.  *See* TR11343 (Sept. 2004 IRS Notice of Proposed Adjustment) at Alternative Position 1 (indicating understanding of the IRS that under the final R&D CSAs, "each of the cost share participants (CSPs) were treated as owning the technology created by all CSPs and were entitled to use that technology in their respective geographic markets"). As noted, Nortel had previously made a similar representation to Inland Revenue, with no limitation attached in any of these cases to the scope of the ownership rights.

[159] TR11055 at 30.

[160] TR21080 at 25.

[161] *See* Trial Tr. 1280:20-23, 1281:24-1282:9 (Orlando).

[162] TR22078 App. A at 4 (emphasis added).

[163] *Id.* App. A at 1-2.

[164] *Id.*

the chart explains that all Participants performed R&D in support of Nortel's global revenues.[165] NNL performed only *one* R&D-related activity distinct from the other IEs: "*Registration of Intellectual Property.*"[166]

| Activity | NNL | NNI | NNUK | NNSA | NN Ireland | NN Australia | LRE's |
|---|---|---|---|---|---|---|---|
| **Research, Design and Development** | | | | | | | |
| R&D | X | X | X | X | X | 1 | |
| Registration of Intellectual Property | X | | | | | | |
| Intellectual Property Economic Ownership | Y | Y | Y | Y | Y | 1 | |
| Product Development | X | X | X | X | X | | |
| Common Engineering | X | X | X | X | X | | |

In his trial testimony, Orlando – the Transfer Pricing Leader at the time this APA request was submitted – explained that "a lot of time" was spent preparing this chart following functional analysis interviews with the relevant personnel; that Ernst & Young Canada was involved in the preparation of the chart; and that it was approved by senior NNL management, including Look, the Vice President of Tax.[167]

Nortel also made similar statements in its "Transfer Pricing Reports" for NNL and NNI for calendar year 2009.  In 2010, after the Nortel Group's insolvency, these reports were prepared by Nortel Group tax personnel and representatives of the Monitor in order to comply with CRA and IRS regulations requiring documentation of companies' transfer pricing policies.[168]  The reports had to be truthful,[169] and they were prepared well before the Monitor

---

[165] *Id.*

[166] *Id.* App. A at 2 (emphasis added).

[167] Trial Tr. 1281:24-1282:9, 1283:13-20.

[168] *Id.* 1284:3-10, 1284:15-1285:13 (Orlando) (noting that the transfer pricing reports were prepared in 2010; that they were a "joint effort" by Orlando, his transfer pricing team "and Ernst & Young Canada," including Sean Kruger; and that "[r]eports like these" are "[r]equired by the tax authorities" in order "to document the company's transfer pricing policy").  The NNL Transfer Pricing Report was prepared "under the framework set out in subparagraphs 247(4)(a)(i) through (vi) of the Income Tax Act (Canada)," *see* TR48622.02 at 1, which provides for the avoidance of certain penalties if a taxpayer "makes or obtains . . . records or documents" describing its transfer pricing policies and provides them "to the Minister [of National Revenue] within 3 months after service . . . of a

created its present litigation position.[170]  The executive summaries of both Transfer Pricing

Reports explained that NNI, NNL and the other Participants were "the primary *owners* of

intangibles developed by the Nortel Group" and that they "bear the risk of [that]

development."[171]  Both reports also incorporated a version of the "Functional Activity Chart"

that was virtually identical to the one reproduced above and contained in the 2008 APA request,

which stated clearly that each of the Participants held "Intellectual Property Ownership" in its

respective jurisdiction.[172]  The Nortel tax team and Ernst & Young considered their reports to be

"final."[173]  The Monitor, having previously reviewed and approved this report for tax authorities,

now takes the opposite position for purposes of this litigation.

Nortel, its tax advisors and the Monitor (before it came up with its current litigation

position) were able to tell tax authorities that all of the IEs, including NNL and NNI, assumed

similar economic roles within the Nortel Group with respect to IP, consistent with their similar

ownership of that IP, because they had conducted functional analyses – detailed investigations

into the Nortel Group's business operations – to ensure that Nortel's transfer pricing

---

written request therefor."  Income Tax Act, R.S.C. 1985, c. 1, § 247(4).  The NNI Transfer Pricing Report was
prepared "for purposes of determining compliance with the reasonableness requirements of [IRC] § 1.6662-6(d),"
TR47221.02 at 1, which allows for the avoidance of certain penalties if a "taxpayer maintains sufficient
documentation" of a transfer pricing method and "provides that documentation to the Internal Revenue Service
within 30 days of a request for it in connection with an examination of the taxable year," 26 C.F.R. 1.6662-6
(d)(2)(iii)(A).

[169] Trial Tr. 1284:25-1285:7 (Orlando notes that if a transfer pricing report is "incorrect" or "doesn't necessarily
represent the business, the [taxpaying company] could . . . be subject to penalty").

[170] *See infra* Point II.D.2.  Notably, one of the members of the Monitor's team working on this was Sean Kruger.
Kruger is (and was at the time) an "advisor to . . . the Monitor" and filed an affidavit in this case stating he "ha[s]
been personally involved in Ernst & Young's role as the Monitor."  TR49893 ¶ 1.  Kruger attended several
depositions in these cases as a representative of the Monitor – including those of Peter Look, Kerry Stephens,
Rosanne Culina and others – and attended witness preparation sessions to assist the Monitor's counsel.  The US
Debtors demanded the deposition of Kruger, but the Monitor refused to produce him.  The Monitor also did not call
Kruger as a witness at trial, although he works for and thus is obviously fully available to the Monitor.

[171] TR48622.02 at 1 (emphasis added); TR47221.02 at 1 (emphasis added).

[172] TR48622.02 at 39; TR47221.02 at 37.

[173] Trial Tr. 1286:8-18 (Orlando).

arrangements conformed with actual business practices.[174]  In 2004, when Nortel's APA advisor,

Ernst & Young, submitted its functional analysis of the Nortel Group to the IRS, it summarized

the results to the IRS as follows:

> As fully integrated entities (performing R&D, manufacturing and distribution), each of the [Participants] *performs similar functions and assumes similar risks. . . .*
>
> The [Participants] were parties to the [R&D CSA] and historically developed valuable intangibles by incurring R&D expenses during the period the [R&D CSA] was in effect. *These entities are entitled to participate in the ongoing benefits from their historical IP and bear the risks associated with the continuing value of that IP.*
>
> The [Participants] *have maintained their IP activities and have agreed to continue participating in the future benefits of new IP* subsequent to the termination of the R&D CSA at December 31, 2000.   Accordingly, these entities are responsible for ongoing entrepreneurship and risk-taking functions with respect to the IP arising from their collective R&D efforts.[175]

Nortel made virtually identical statements in its 2008 APA Request, the 2009 Transfer Pricing

Reports and various other documents.[176]  As Orlando testified, these statements reflected the

Nortel tax team's "understanding of how the business operate[d]."[177]

### d.  The Licensed Participants' Exclusive Licenses Were Necessary to Avoid Tax Liability from Permanent Establishment Status

The Exclusive Licenses under the MRDA also addressed another important tax concern:

---

[174] As Orlando explained, Nortel's tax team, Ernst & Young Canada and other outside advisors would interview Nortel businesspersons about their roles and "how [they] interact with other organizations within Nortel," and these interviews would be compiled into a "broader functional analysis which tells a story about the company's operations."  *Id.* 1279:1-18.  These functional analyses were "required as part of the APA application" in order to "educate the tax authorities on how the business operates."  *Id.* 1278:8-19.

[175] TR11084 at 2 (emphasis added).

[176] *See, e.g.*, TR22708 (2008 APA Request) at 11 (The Participants "are responsible for ongoing entrepreneurship and risk-taking functions with respect to their ongoing IP activities" and "are fully integrated, meaning they perform all functions related to the customer fulfillment process including manufacturing support and distribution functions both inside and outside of their respective geographic markets."); TR47221.02 (2009 NNI Transfer Pricing Report) at 32 (making virtually identical representations); TR48622.02 (2009 NNL Transfer Pricing Report) at 34 (same); TR21080 (Sep. 2003 responses to questions posed by tax authorities) at 43 ("Each [Participant] performs the same basic functions, undertakes the same basic risks, and employs similar types of capital.").

[177] Trial Tr. 1280:20-23.

the risk that NNL would be found to have "permanent establishment" status in the US.  Under

many tax law and treaty regimes, including in the US, a corporate entity that directly conducts

business in another jurisdiction, including through direct sales or licensing to entities in that

jurisdiction, will be considered to have a nexus with that other jurisdiction under its laws and a

"permanent establishment" under relevant tax treaties, thus subjecting the seller to taxation in

that jurisdiction as if it were a domestic entity.[178]  Nortel tax personnel and outside advisors were

"mortified" about the risk that the IRS would deem NNL to have a permanent establishment in

the US, and they carefully sought to avoid this risk.[179]  As Weisz testified:

> [Nortel] had set up legal entities in countries all over the world.  It was very important for us to maintain the integrity of not subjecting various Nortel entities to audit.
>
> And so it was understood that if there was going to be a customer sale, the local Nortel entity would deal with the local customer point to point.  This prevented issues, such as permanent establishment; issues that certainly can force the filing or paying of additional taxes by a foreign entity into a local country.[180]

In 2001, David Burn, the then Vice President of Tax, who also signed the 1996 APA on

behalf of NNL, wrote a widely distributed memo that further emphasized this key point:

> [I]t is important to note that [NNL] should make all sales for deliveries to and services provided to Canadian customers and [NNI] must make all sales to US customers.  Any deviations must be brought to the attention of Taxation as this is a key issue between CCRA (formerly Revenue Canada) and the IRS (US Internal Revenue Service).[181]

Nortel's permanent establishment concern motivated the decision to provide NNI, and

only NNI, with full rights to exploit NN Technology in the US through the Exclusive Licenses.

---

[178] *See* Joel D. Kuntz & Robert J. Peroni, *U.S. International Taxation* ¶¶ A1.04, C1.01, C1.04 (Mar. 2014); TR50228 at 1293.

[179] TR22083 at 4.

[180] Trial Tr. 1868:10-25.

[181] TR32138 at att. 2.

As Nortel attorney Matthew Vella informed colleagues during discussions regarding the shift

from the 1992 NNI R&D CSA to the RPSM:

> My recollection from having worked on the original CSA, is that
> the real issue is whether or not we were going to create a taxable
> entity in the USA, besides NNI (it would be called NNL).  Back
> when I ran into this issue, and talked with our tax experts, *they
> seemed mortified at the prospect of creating a taxable entity in the
> USA called NNL (i.e., the Canadian parent)*.  Accordingly, the
> decision was made to make the license to IPRs in the USA
> exclusive to NNI.[182]

### e.  The Monitor Presented No Pertinent Factual Matrix Evidence

NNL employed a number of tax and transfer pricing personnel who were closely familiar

with the MRDA, including Doolittle, the former Vice President of Tax; Look, Doolittle's

successor as Vice President of Tax; and Karina O, a senior tax employee.  Nevertheless, the

Monitor did not bring a single one of these witnesses to testify at trial.  Nor did the Monitor bring

any of the many Ernst & Young employees who worked on Nortel's APA process over the years,

or Kruger, who worked on the 2009 Transfer Pricing Reports.

Doolittle, in particular, was a critical witness:  he was NNL's most senior tax person at

the time of the creation of the MRDA and signed the MRDA on NNL's behalf.  The Monitor

could have easily called him as a witness for trial, as he lives in the Toronto region.  The

Monitor's lead trial counsel (along with counsel for the CCC) represented and defended Doolittle

at his deposition, during which Doolittle provided the sworn testimony described above that

thoroughly contradicts the Monitor's and the CCC's position.  The Monitor's failure to call

Doolittle at trial, or any other witness with knowledge of the MRDA (many of whom also live in

the Toronto region and were likewise represented by counsel for the Monitor and/or the CCC at

---

[182] TR22083 at 4 (emphasis added).

deposition), speaks volumes.[183]

The only present or former Nortel employee called by the Monitor purportedly to discuss IP ownership and license rights under Nortel's transfer pricing agreements was Clive Allen, NNL's former Chief Legal Officer.  But Allen left the Nortel Group in 1999, prior to the beginning of the MRDA period and before the Nortel Group even decided to switch its transfer pricing methodology from a cost-sharing arrangement to an RPSM.[184]  Allen had no knowledge of the MRDA and was not involved in its creation.[185]  He had no involvement in transfer pricing at any time in his career at Nortel, and no person responsible for transfer pricing ever reported to him.[186]

Allen was "involved with the preparation and negotiation of the original [CSAs]" in the 1970s.[187]  However, this is irrelevant; the 1970s CSAs were dramatically different not only from the MRDA, but also the 1992 R&D CSAs that immediately preceded it; they granted significantly fewer rights to NNI, consistent with the fact that NNI was merely a start-up company in the 1970's.  As NNI grew in size and importance to the Nortel Group, and its "functions, assets and risks" grew accordingly, the CSAs and later the MRDA necessarily changed to reflect the actual operations of the Nortel Group.[188]  Allen confirmed that Nortel's CSAs "evolved" over time to grant NNI more rights in response to "changes in the business environment as well as the . . . structural environment" of Nortel.[189]  However, he did not

---

[183] Pursuant to the Trial Protocol, because the Canadian Debtors did not offer an affidavit from these witnesses, they could not be called at trial by any other party.  *See* Joint Tr. Protocol, Jan. 24, 2014, ECF. No. 12863-1 at 7, § C.1 ("No fact witness may testify who has not submitted an affidavit.").

[184] Trial Tr. 608:15-609:6, 618:2-7, 618:18-23 (Allen).

[185] *Id.* 609:12-23 (Allen).

[186] *Id.* 618:8-23 (Allen).

[187] *Id.* 611:1-21 (Allen).

[188] For details of NNI's changing role in the Nortel Group, see generally PFOF § II.C ("NNI's Role in the Nortel Group").  These facts are established by the documents cited therein and have not been contested at trial.

[189] Trial Tr. 614:17-615:9.

prepare these subsequent, more relevant CSAs, including the 1992 R&D CSA.  Rather, he relied upon his staff to handle those agreements.[190]

Critically, Allen testified that he was not involved in the 1996 APAs with the CRA and IRS, even though this was the foundation upon which the Nortel Group thereafter prepared the retroactive 1992 R&D CSA.[191]  In short, Allen had no knowledge about the MRDA and even his knowledge about the CSA arrangements was materially incomplete and related to a decades-old and superseded CSA.

## 2.  The Commercial Context

### a.  Historical Business Practices

The Nortel Group's business practices prior to its insolvency also reflect the Licensed Participants' rights to NN Technology in their respective Exclusive Territories.  For instance, NNI exercised its enforcement rights with respect to Nortel IP by suing third parties for infringement of Nortel Group patents in the US.[192]

Nortel recognized these enforcement rights even before the execution of the MRDA in 2004, when the Nortel Group's infringement suits routinely named NNI as a plaintiff and described NNI as an "exclusive licensee" of Nortel's US patents.  As Nortel's in-house counsel concluded with respect to a 2002 infringement suit against Kyocera Wireless, NNI had standing to "sue[] in its own name."[193]  NNL was added as a plaintiff merely for belt and suspenders

---

[190] *Id.* 611:1-21 (Allen).

[191] *Id.* 618:2-7 (Allen).

[192] In a 2007 patent infringement dispute with Vonage, which had challenged NNI's standing to bring infringement claims on its own, NNI asserted in a court filing: "Nortel Networks Inc. is the exclusive licensee of all United States patents legally owned by Nortel Networks Ltd and *possesses substantially all rights* with respect to those patents. As exclusive licensee Nortel Networks Inc. has standing to assert these patents against infringers such as Vonage." *See* TR50518 at 6 (emphasis added).  NNI had brought infringement claims against Vonage, as "the owner of all rights, title and interest in and to" the named patents and was "entitled to sue for past and future infringement."  *See* TR50516 ¶ 10.

[193] TR50593.01 (Nov. 14, 2002 email with subject "RE: Attorneys Eyes Only Documents") at 1.

purposes.[194]

In addition to its enforcement practices, the Nortel Group's sublicensing business practices also confirm the Licensed Participants' rights to NN Technology.  During (and prior to) the MRDA period, NNL entered into dozens of worldwide IP sublicenses "on behalf of itself and its Subsidiaries" (or using substantially similar language) because only the Licensed Participants, not NNL, had the right to sublicense Nortel IP in their respective Exclusive Territories.  As one of NNL's in-house IP attorneys explained:

> [M]ost licenses are granted by "Nortel Networks Limited acting on its own behalf and on behalf of its subsidiaries (collectively 'Nortel Networks')".   The theory is that in each of the relevant jurisdictions, the licenses were being granted by the subsidiary which is the exclusive licensee for that jurisdiction.  This has been the method of licensing used in Nortel for many years, and Tax appears to be comfortable with it.[195]

Nortel's tax personnel were comfortable with this approach to sublicensing because they "view[ed] this language as being broad enough so that NNL will be viewed as licensing the Canadian rights, NNI the U.S. rights, . . . etc,"  since each Participant had "the exclusive rights to license NNL's IPR within their respective regions" and this structure "avoid[ed] any cross-border IPR transfers which may trigger tax liability."[196]  The tax authorities insisted that each Participant retain sublicensing rights in its Exclusive Territory, as noted in the 1996 APA.[197]  Nortel specifically represented to tax authorities that the Licensed Participants took advantage of

---

[194] *See* TR22151 at 1; TR50593.01 at 1 (attorney Lynds indicates that prior to commencing the Kyocera lawsuit "we confirmed with Marv [Gittes, outside counsel for Nortel] in January, before we filed, that we are OK with respect to standing – i.e., NNI could have sued in its own name, but we named NNL (the usual practice) in any event as a co-plaintiff").

[195] TR22080 at 2; *see also id.* at 1 (email from NNL tax employee Karina O "agree[ing] with everything" said in the above quotation).

[196] TR22154 at 1.

[197] As previously noted, the 1996 APA between NNL and the CCRA explicitly stated that agreement was based upon the understanding that "benefit derived from the R&D Expenses is recognized . . . [in part] from the licensing of the technology resulting from the R&D Expenses  . . . within a defined geographical market by a Cost Sharing Participant."  TR46875 at 11 (emphasis added).

these rights.  For instance, in a September 2003 submission to the Canadian, US and UK tax authorities – which was provided to those tax authorities by Ernst & Young – Nortel stated that NNI, among other entities in the Nortel Group, "license[d] *its* proprietary technology to third parties."[198]

Of course, it made economic sense for NNI to have the right to sublicense in the US. Because NNL had no right to exploit NN Technology in the US, it plainly could not license that right to third parties and, therefore, unless NNI had that right in its Exclusive Territory, the Nortel Group would not be able to maximize profits from its patents.  Moreover, NNL needed to avoid creating a permanent establishment in the US and thus had compelling economic reasons not to have the right itself to license NN Technology to third parties in the US.  Accordingly, any construction of the MRDA that does not grant full sublicense rights in the US market to NNI would yield a commercially unreasonable result that would have been to the detriment of the entire Nortel Group.

### b.  *Custom and Practice Evidence*

Under Ontario law, the "custom of the industry" is considered "part of the factual matrix that must be looked at in interpreting [an] agreement."[199]  Such evidence may include expert testimony on an industry's custom and practice.[200]  Daniel Bereskin – the co-founder of a leading Canadian intellectual property firm, with over 50 years of experience advising clients on the licensing of intellectual property – reviewed the MRDA from an intellectual property custom and

---

[198] TR21080 at 38 (emphasis added).

[199] *Kentucky Fried Chicken Canada v. Scott's Food Services Inc.*, [1998] O.J. No. 4368 at paras 24-25 (Can. Ont. C.A.).

[200] *See, e.g.*, *Stetson Oil & Gas Ltd. v. Stifel Nicolaus Canada Inc.*, 2013 ONSC 1300 at paras. 61-62, 97, 101-07, 111-17 (Newbould, J.) (considering evidence from securities partner at Goodmans LLP as to how a reasonable market actor would interpret a standard contract clause); *Leuthold v. Canadian Broadcasting Corp.*, 2012 FC 748 at paras. 59, 61, 89-90 (Can. F.C.) (expert's knowledge of industry licensing practices is relevant to interpretation of license governed by laws of Ontario); *Toronto Dominion Bank v. Leigh Instruments Ltd. (Trustee of)* (1998), 40 B.L.R. (2d) 1 at para. 391 (Ont. Ct. J., Gen. Div. [Commercial List]) (relying on expert testimony providing "commercial context" of comfort letters).

practice perspective.[201]   Among other evidence, Bereskin stated that the "fundamental custom and practice of licensing [is] that the scope of a licensee's enforcement rights is coextensive with the scope of its license."[202]   He explained that because Article 4(e) of the MRDA gives each Licensed Participant an unrestricted right to enforce NN Technology within its Exclusive Territory, as a matter of custom and practice, the affirmative grant of license rights in Article 5 would be read to be coextensive and likewise unrestricted.[203]   Bereskin presented strong custom and practice evidence that the commercially relevant ownership is the equitable and beneficial ownership provided in the MRDA to the Licensed Participants, and not the bare legal title provided to NNL.[204]

The Monitor concedes that none of its experts "provide . . . a view as to custom and practice with respect to the MRDA."[205]

### c.   The Monitor's Interpretation of the MRDA Is Inconsistent with the Economics of the Nortel Enterprise

The Monitor's interpretation of the MRDA would also lead to commercially unreasonable results.

As Eden opined, the Monitor's interpretation would be inconsistent with the arm's length standard, which the MRDA was required to meet under transfer pricing regulations.  During the period in which Nortel's RPSM was in effect, the Licensed Participants made billions of dollars

---

[201] Bereskin Rebuttal ¶¶ 1, 9-15.

[202] *Id.* ¶ 35.

[203] *Id.*

[204] *Id.* ¶ 39 ("Critically relevant from a commercial point of view, the grant of such broad exclusive rights excludes NNL from directly or indirectly exploiting any of the rights in relation to the NN Technology in the geographical areas respectively assigned to the Licensed Participants, or conferring any portion of such right on any third party. The commercially relevant ownership, therefore, is the equitable and beneficial ownership.").

[205] Mot. To Strike Expert Reports and Testimony of Bereskin and Stratton ¶¶ 13, 16, 17, Apr. 11, 2014; *see also* Burshtein Dep. 100:19-25.

in R&D expenditures.[206]  The RPSM allocated billions of dollars of residual losses to the

Participants in proportion with these R&D expenditures, thereby "reflect[ing] the downside of

[the IEs'] risk-taking during the 2001-2008 period."[207]  For instance, NNI made $6.7 billion in

transfer pricing payments to NNL during that time.[208]  In contrast, the Patent Portfolio Sale

resulted in $4.5 billion in revenue, reflecting the "previously unrealized value of Nortel's R&D

efforts" and the potential "upside" of the IEs' risk-taking.[209]  However, the Monitor argues that

the MRDA gives all of this $4.5 billion "upside" to NNL alone.  As Eden explains, "[n]o firm in

an arm's length negotiation would have agreed to [an] arrangement" whereby all of the parties

bear firm-wide losses, but only one party "receive[s] the realized value of the [firm's] R&D

efforts."[210]  The EMEA Debtors' and UKPC's transfer pricing experts both agree with this

common sense point, testifying that they could not imagine any arm's length arrangement in

which one party could control and receive the entirety of the proceeds from the sale of jointly-

developed IP.[211]

Dr. Catherine Tucker, the US Interests' expert in the economics of high technology

organizations, likewise testified that the Monitor's interpretation of the MRDA is inconsistent

with the economics of the Nortel enterprise as a technology business for several additional

reasons:

---

[206] TR00063 (Eden Rebuttal) ¶ 47.

[207] Id. ¶ 49.

[208] Id. ¶ 48.

[209] Id. ¶¶ 32, 50.

[210] Id. at  ¶¶ 47-50; see also id. ¶ 51 (The Canadian Interests' interpretation of the MRDA "implies that NNI, NNSA, NNUK, and NN Ireland were willing to invest in R&D knowing that if the IP was not used by them to make or sell products, but rather the IP was sold by Nortel to a third party, they would not receive any return on their investment in R&D because all sale rights (and thus all profits from the sales of IP) belonged to NNL.  This would not be an arm's length relationship.").

[211] See Trial Tr. 2690:7-15 (Cooper "can't imagine under any circumstances that it would be remotely economically rational" to enter into such an arrangement); id. 2860:10-23 (Felgran "can't see any scenario in which two parties would agree" to this arrangement and notes that a tax authority would demand that the entity losing its rights receive "the fair market value of what it is I am giving up").

> From an economics perspective when you're considering two arm's length parties, what's always going to be important is the question of incentives.  In a high-tech firm whose lifeblood is R&D, such as Nortel, what's going to be particularly important are the incentives towards R&D, and in particular the idea that the *incentives should be directed towards forward-looking innovation.*[212]

As Tucker explained, unlike the cases of a dog bowl manufacturer or a fast food operation like McDonalds – to which the Monitor's transfer pricing expert, Dr. Timothy Reichert, sought to compare Nortel[213] – high-tech industries are "characterized by very short, brutal product cycles."[214]  A rational high-tech company must be focused on incentivizing innovation so that it profits from the next technologies that will be adopted in the marketplace.[215]  According to Tucker, "the best way we have [of] incentivizing this is to give entrepreneurial ownership of the risks and benefits associated with the R&D investments," which is precisely what the Licensed Participants enjoyed under the US Debtors' interpretation of the Exclusive Licenses.[216]  But under the Monitor's interpretation of the Exclusive Licenses, the "kind of incentives we would expect to see in an arm's length relationship between two corporate entities in a high-tech space" do not exist.[217]

In addition, Tucker testified that "the key concept" in ownership of intellectual property rights is the "right to exclude."[218]  Tucker explained that "from an economics perspective," it makes sense that the Participants were granted the right to exclude, since the Participants were the Nortel entities that conducted R&D and therefore should have enjoyed economic ownership

---

[212] *Id.* 4654:23-4655:8 (emphasis added).

[213] *Id.* 3849:17-3850:15.

[214] *Id.* 4659:22-4660:7.

[215] *Id.* 4663:4-15.

[216] *Id.* 4655:9-12, 4656:18-20.

[217] *Id.* 4691:10-15.

[218] *Id.* 4681:10-23.

over Nortel's intellectual property.[219]  The Monitor's proposed interpretation of the Exclusive

Licenses "ignores" the value associated with the Licensed Participants' right to exclude, even

though the purchasers of the Patent Portfolio demanded and paid for the termination of those

rights.[220]

### D.      Post-Petition Conduct of the Parties

The post-petition conduct of the parties to the MRDA is likewise wholly consistent with

each Licensed Participant holding all valuable rights to NN Technology in its Exclusive

Territory and with the parties' shared understanding of that fact.  The Monitor only departed

from this consistent course of conduct and shared understanding when it revealed its litigation

position after the Court approval of the Patent Portfolio Sale.

### 1.   The Estates' Joint Monetization of Nortel IP

Following the insolvency filings, the estates jointly retained Lazard and Global IP, and

together the estates, their advisors, and their creditor constituencies worked to determine the best

way to monetize their assets in the "best economic interests of [each estate's] creditors

generally."[221]  These efforts were led by a steering committee that included representatives of

each of the estates, as well as others, including the US Debtors' creditors and bondholders.[222]

The estates and the steering committee considered multiple options for the monetization of the

Nortel Group's IP, proposing to develop an IPCo business engaged in license marketing and

servicing and enforcement activities.[223]  As John Ray explained, the estates and their financial

advisors developed financial, real estate, staffing, compensation and tax models for the IPCo

---

[219] *Id.* 4683:5-16.

[220] *Id.* 4691:22-4692:7.

[221] *See* TR12032 (IFSA) § 12(e).

[222] Trial Tr. 1361:22-1363:5 (Ray) (describing the makeup and activities of the steering committee).

[223] In a September 2010 email to representatives of the various estates, Hamilton observed that the estates were considering multiple "options" for monetization of the Patent Portfolio, including IPCo.  TR50656 at 1.  *See also generally* PFOF § IV.C ("Nortel Considers Options for Monetizing Its Patent Portfolio").

business.  They "analyzed IPCo up and down and sideways," and continued seriously to consider the viable IPCo option into 2011.[224]

Ultimately, the estates decided to sell the NN Technology.  As Sharon Hamilton testified, each of the estates participated "equally" in the sale, and counsel for the US Debtors were "heavily involved" in both the negotiation of Google's stalking horse bid and the auction itself.[225]  As part of the Patent Portfolio Sale, each of the Licensed Participants terminated their Exclusive Licenses, and the License Termination Agreements and Asset Sale Agreement specified that the Licensed Participants were "Sellers" who "ha[d] a right to an allocation of a portion of the sale proceeds" as a result of those terminations.[226]  These agreements were consistent with the terms of the IFSA, which stated that the Licensed Participants would terminate their Exclusive Licenses "in consideration of a right to an allocation" of the sale proceeds and that such license termination would be deemed a sale.[227]

The Licensed Participants were entitled to participate fully in the monetization of Nortel's intellectual property during the post-petition period because those parties enjoyed broad license rights under the MRDA.  In August 2009, the Canadian Debtors' lead lawyer, Derrick Tay, made precisely this point in testimony before the Canadian House of Commons regarding the monetization process for Nortel's patents:

> There's one additional aspect that we need to understand . . ., in that while Nortel Canada owns those patents, licenses have been

---

[224] Trial Tr. 1363:6-1364:18, 1365:17-1366:23, 1368:17-22 (Ray).  The estates' continued interest in IPCo was so significant that "when [the estates] ultimately signed up the Google [stalking horse] bid, [Google] had a massive concern about our pulling the deal off the table and doing IPCo." *Id.* 1368:22-1369:9 (Ray).  *See also generally* PFOF § IV.3. ("Initial Post-Petition Consideration of IP Monetization Options") , § IV.C.4 ("The IP Monetization Evaluation Process"), § IV.C.5 ("The Comprehensive Vetting of the IPCo Model), IV.C.6 ("IPCo Was a Viable Option").

[225] Hamilton Dep. 99:24-104:15; Trial Tr. 934:19-935:5.

[226] TR22085 (Patent Portfolio Sale Asset Sale Agreement) at Preamble, § 1.1 (defining "Sellers"); TR21508 (Patent Portfolio Sale LTA) at Preamble, § 2.04.

[227] TR12032 (IFSA) §§ 11(a), (d).

granted worldwide to the other Nortel entities, and so Nortel is not in a position to simply deal with these patents.  Nortel Canada is not in a position to simply deal with this in complete disregard of the rest of the world and in complete disregard of the insolvency processes going on in the rest of the world, so it's an integrated issue.[228]

## 2. The Monitor's Representations to the Courts About the Licensed Participants' Rights

### a. The Monitor's Litigation Position Is Inconsistent with its Prior Understanding and Representations to the Courts and Creditors

The Monitor has a particular "duty of candour and transparency" that extends to both the Canadian and US Courts,[229] and the Monitor has insisted that it is aware of and has complied with those duties.[230]  Therefore, the Monitor's contemporaneous representations concerning the Licensed Participants' rights to Nortel technology are important, particularly when compared to its May 2013 litigation position.[231]

Prior to May 2013, the Monitor filed eighteen separate reports over the course of several years consistently representing that NNL's legal title to NN Technology was encumbered by the Exclusive Licenses granted to the Licensed Participants.[232]  For example, the Monitor made the following representations:

- January 2009 (pre-filing report):

---

[228] TR12004 at 21.

[229] Trial Tr. 943:3-4, 959:1-9.

[230] In her testimony, Hamilton agreed that the Monitor "has a duty of candour and transparency," "has to act fairly," and must "provide advice that balances the interests of all stakeholders."  Trial Tr. 943:3-7, 950:11-19.  The Monitor has "an obligation to be honest and straightforward with the US court," "not to mislead, not to play it close to the vest," "not give the US court one impression while harbouring the opposite intention," and not to "selectively try[] to induce the court to a particular result by ignoring relevant information available to the Monitor."  *Id.* 959:1-960:-6; *see also* Hamilton Dep. 57:23-58:2; McDonald Dep. 164:19-165:8.

[231] *See generally* PFOF § IV.F ("The Monitor's Post-Petition Conduct").

[232] *See* TR21278, TR40141, TR21279, TR50260, TR21280, TR40881, TR40621, TR49875, TR49876, TR49877, TR49878, TR49879, TR49880, TR49882, TR49883, TR21281, TR40718, TR21282(a).

"[Nortel's transfer pricing method] provides [the IEs] with exclusive rights within their geographic area and non-exclusive rights elsewhere to exploit the IP."[233]

- March and July 2009 (reports seeking approval of Business Line Sales):

  "[T]he Applicants have an interest in intellectual property of the [Business Line] which, in turn, is *subject to various intercompany licensing agreements with other Nortel legal entities around the world*, in some cases on an exclusive basis and in other cases, on a non-exclusive basis."[234]

- June 2011 (report seeking approval of the allocation protocol):

  "[T]he Canadian Debtors held (or hold) legal title to the intellectual property which underpinned Nortel's global businesses, *which intellectual property was and is licensed to its affiliates*, in some cases on an exclusive basis and in other cases on a non-exclusive basis."[235]

- April and July 2011 (reports seeking approval of the Patent Portfolio Sale):

  "NNL holds legal title to the Residual IP which, in turn, is *subject to various intercompany licensing agreements with other Nortel legal entities* around the world, in some cases on an exclusive basis and in other cases on a non-exclusive basis."[236]

Notably, many of these reports, including the April, June and July 2011 reports listed above, were filed *after* the Business Line Sales were completed, at which time the Monitor now asserts that NNI's and the EMEA Debtors' licenses were worthless.

Perhaps most significant are the Monitor's representations in connection with the US Court's approval of the Patent Portfolio Sale. After reviewing submissions by the Monitor and Canadian Debtors and conducting joint hearings with the Canadian Court in May and July 2011 that were attended by the US and Canadian counsel to the Monitor, the US Court concluded that

---

[233] TR21278 ¶ 43(b).

[234] TR45565 ¶ 14 (emphasis added); TR49834 ¶ 37 (emphasis added).

[235] TR50487 ¶ 14 (emphasis added).

[236] TR21281 ¶ 82 (emphasis added); TR21282 ¶ 49 (emphasis added). The Monitor's representations in its reports were echoed in NNC's contemporary public filings. For example, NNC's 2010 10-K, which was filed in March 2011, stated that "IP is generally owned by NNL and licensed to participating Nortel affiliates (i.e., NNI and certain EMEA Debtors) through exclusive and non-exclusive licenses." TR21541 at 5; *see also* TR40272 at 4; TR40270 at 10.

the terms of the Patent Portfolio Sale were the "highest and best available" to the US estate.[237]

Not once at the hearings or in its submissions did the Monitor inform the Courts that in its view,

NNI was about to surrender its remaining license rights under the MRDA for no consideration.

To the contrary, the Monitor's 63rd Report – submitted to both Courts in connection with the

April joint hearing – represented that "a sale of Residual IP was the best method of monetizing

the Residual IP for the benefit of [Nortel's] stakeholders."[238]   The same report recognized NNI's

license rights, stating: "NNL holds legal title to the Residual IP which, in turn, is subject to

various intercompany licensing agreements with other Nortel legal entities around the world, in

some cases on an exclusive basis and in other cases on a non-exclusive basis."[239]

Murray McDonald – the President of the Monitor and signatory of this report – did not

appear as a witness at trial to explain the report.   When asked at trial why the Monitor failed to

inform the Court that NNI would not receive any of the benefit of "monetizing the Residual IP,"

Hamilton, appearing in lieu of McDonald, responded that "[i]t was not the subject matter of the

motion" and the IFSA "provided that allocation would be dealt with at a later date," so the

Monitor's position was therefore irrelevant.[240]   That assertion cannot be correct.   Even the

possibility that the US Debtors would receive *none* of the proceeds of the Patent Portfolio Sale –

when it could have monetized its license rights in a number of other ways, including through

IPCo – would of course have been material to the US Court's determination that the Patent

Portfolio Sale was in the "best interest" of NNI and its creditors.[241]

---

[237] TR21509 (July 2011 hearing transcript) at 110:5-111:11; *see also* McDonald Dep. 137:12-144:20.

[238] TR49885 ¶ 15; *see also* TR50174 ¶ 5.

[239] TR49885 ¶ 82.

[240] Trial Tr. 970:23-971:10.

[241] When asked about representations in the Monitor's reports that NNL's legal title to IP was "subject to various intercompany license agreements with other Nortel entities . . . in some cases on an exclusive basis," Hamilton responded that these statements were not inconsistent with the Monitor's current position – rather, they simply failed to "discuss the value of that license," which was zero. *Id.* 965:4-14, 966:14-24.  This explanation is also untenable,

At his deposition, McDonald presented a different, but also problematic, explanation:

> Q: . . . And at some point in time you reached the conclusion that's reflected in your allocation position that those intercompany licenses had no value at the time of the Rockstar sale, correct?
>
> A. Correct.
>
> Q. When did you first reach that conclusion?
>
> A. Probably after the unsuccessful third mediation.[242]

The third mediation concluded in early 2013.  Therefore, according to McDonald, the Monitor did not consider or take the position that the Licensed Participants' licenses were worthless until shortly before the parties filed their allocation positions in May 2013 because it had not reached that conclusion until that time.  This explanation cannot be reconciled with the Monitor's position that its "conclusion" regarding the scope of the Exclusive Licenses is obvious from a plain reading of one paragraph and one definition in the MRDA, a document it had for years.

McDonald and Hamilton each stated that prior to the Patent Portfolio Sale, the Monitor never informed either the US Debtors or the EMEA Debtors that Nortel's patents were not subject to licenses.[243]  Of course, this would have been extremely pertinent information, because if NNI had no right to receive any of the proceeds of the Patent Portfolio Sale – the outcome that the Monitor now proposes – it would have made no sense for NNI to relinquish its licenses in the

---

as there would have been no reason for the Monitor to mention the licenses unless they had value.

[242] McDonald Dep. 145:17-146:2.

[243] Trial Tr. 960:17-961:14; *see also* McDonald Dep. 122:19-123:4 (Monitor first advised the other estates of its position that they were not entitled to proceeds from the Patent Portfolio Sale in May 2013).  In Hamilton's reply affidavit, she stated that in a May 2010 meeting with representatives of the US Debtors, McDonald advised that "NNL could take the position that it owns Nortel's IP and claim 100% of the sale proceeds on that basis." TR00010A (Hamilton Reply Aff.) ¶¶ 43-44.  Ray flatly denies that was said.  *See* Trial Tr. 1373:7-1374:7.  And according to McDonald at his deposition, there was no discussion of "the other estates' rights . . . based upon the exclusive and non-exclusive licenses" at that meeting.  McDonald Dep. 147:5-148:3.  Indeed, Hamilton herself testified that she was not aware of any communication to the other Nortel debtor estates or prospective bidders prior to the Patent Portfolio Sale that "the patents were not subject to licenses with the other Nortel participants in the MRDA."  Hamilton Dep. 126:23-127:10, 128:9-15.

Patent Portfolio Sale or agree to the sale at all.  Instead, to maximize recovery to the US estate

and its creditors with respect to the Patent Portfolio, NNI would have insisted on pursuing IPCo,

or a business model in which NNI made products for sale in the US, or indeed any other business

model that brought more value to the US estate than the Monitor's zero-allocation theory.  The

Monitor's current position is not correct, but had it made that position known earlier, the US

Debtors could have considered their options, including seeking a prior judicial declaration on this

issue before risking the surrender of billions of dollars in valuable license rights for nothing.[244]

It is obvious that NNI would not have obtained approval of the Patent Portfolio Sale from

the US Court in the face of NNL taking the position that NNI had no interest in the proceeds of

that transaction.  John Ray, the Principal Officer of the US Debtors, testified that if the US

Debtors had been told of the Monitor's position, "[he] certainly wouldn't have proceeded" with

the Sale.[245]  As Ray noted, at the time of the Patent Portfolio Sale, he testified to the US Court

that "the transaction was in the best interests of the US Estate," and he "couldn't have done that

if that was the position that the Monitor had taken."[246]  Ray further explained:

> [W]e were a seller.  We sold an asset.  We knew what the value of
> the transaction was.  We didn't think this was some sort of game.
> I'm a fiduciary.  The Monitor is a fiduciary.  We both had an
> obligation to negotiate in good faith over this.  And the concept
> that this was all some sort of trick and that we weren't going to get
> any value for the asset never entered my mind.[247]

Similarly, Alan Bloom, the NNUK Joint Administrator (and an Ernst & Young partner of

McDonald), testified in his deposition that "if [he] had ever imagined for one moment" that the

---

[244] *See, e.g.*, TR00020 (Ray Decl.) ¶ 71 (stating that if the Monitor had stated this position before the Patent
Portfolio Sale, "we would have insisted that the business lines be sold after the Patent Portfolio," "sought binding
judicial clarity before selling anything at all," "decided to restart NNI as an operating business," and/or "insisted on
the IPCo Business").

[245] Trial Tr. 1375:3-5.

[246] *Id.* 1375:5-10.

[247] *Id.* 1449:5-14.

Monitor and the Canadian Debtors would argue that the Licensed Participants' licenses had no value, NNUK would have refused to approve the Patent Portfolio Sale because it would not have been in the best interests of its creditors.[248]  Cosmé Rogeau, the Liquidator of NNSA, testified at his deposition that he represented to the French Commercial Court – whose approval was required for NNSA's participation in the Patent Portfolio Sale – that NNSA would be entitled to a share of the proceeds, and if he had known that the Monitor disagreed, he would have refused to approve the terms of the Patent Portfolio Sale.[249]

As noted, the Monitor – Ernst &Young Canada – is no stranger to the MRDA.  For years before Nortel's insolvency, Ernst & Young Canada served as one of Nortel's principal transfer pricing advisors, including on its APA requests and on the MRDA.  Likewise, the Monitor has had full access to NNL's personnel and records, and in order to fulfill its duty to oversee the Canadian Debtors' business and the Sales process, the Monitor would (or should) have asked these individuals – as well as the Ernst & Young Canada representatives – about their understanding of the licenses granted under the MRDA prior to the spring of 2013.  Thus, when McDonald testified that the Monitor did not conclude the Exclusive Licenses were worthless until early 2013, it is clear that this is a litigation-driven position with no basis in reality and not derived from the years of understanding of NNL's and the Monitor's own knowledgeable employees and the Participants' practice with respect to the MRDA.

### b.  *The Monitor's Litigation Position Is Barred by the Doctrine of Estoppel by Convention*

Independently, the Monitor is barred from its current litigation position by the doctrine of estoppel by convention.  As G.R. Hall explains in his text on Canadian contract interpretation

---

[248] Bloom Dep. 95:12-96:10.

[249] Rogeau Dep. 81:12-15, 81:17-21, 81:25-82:23.

law:

> Applied in the context of contractual meaning, estoppel by convention provides that if the parties to a contract have based their dealings on a shared assumption as to the proper interpretation of their contract and one party has relied upon that interpretation to its detriment, the other party will not be allowed to resile from the common assumption and seek enforcement of another meaning of the contract."[250]

*See also Alberta Oil Sands Pipeline Ltd. v. Canadian Oil Sands Ltd*, 2012 ABQB 524; *Adtronics Signs Ltd. v Sicon Group*, [2004] B.C.J. No. 1885.  Here, the parties clearly had "a shared assumption as to the proper interpretation of the contract" – it is reflected throughout the record, including of the insolvency proceedings themselves – and the Licensed Participants also clearly relied upon that understanding, as set out above in the uncontroverted evidence of Ray, Bloom and Rogeau.  The application of the equitable doctrine of estoppel by convention is particularly appropriate given the Monitor's role in CCAA proceedings.  The Monitor is required to account to the Court, to act independently and treat all parties reasonably and fairly, including creditors and the debtor; the Monitor must act and be seen to act without interest or bias, and should represent the facts to the Court in a dispassionate, non-adversarial manner.[251]  Seeking to abandon a common understanding of the rights of the parties to the MRDA to advance its extreme litigation position is contrary to the Monitor's role.

*       *       *

For all of the reasons set forth above and established at trial, it is clear that the MRDA provided the Licensed Participants all of the valuable rights with respect to NN Technology,

---

[250] G. Hall, *Canadian Contractual Interpretation Law* at 172-173.

[251] *See Re Confederation Treasury Services Ltd.* (1995), 37 C.B.R. (3d) 237 at para. 8 (Ont. Ct. J. (Gen. Div.), In Bank.), (citing Lloyd W. Houlden and Carl H. Morawetz, *Houlden and Morawetz, Bankruptcy Law in Canada*, 3rd ed. *(*Toronto:  Carswell, 1995) at pp. 1-61/2 on the principles underlying the role of trustees, which principles are also applicable to Monitors); *Re T. Eaton Co.* (1999), 14 C.B.R. (4th) 298 (Ont. S.C.J. (Ont. S.C.J. [Commercial List]) at para. 2.

74

including the Patent Portfolio sold to Rockstar, in their respective Exclusive Territories.

It is against this backdrop that we next discuss the US Interests' allocation methodology and position.

# POINT III
## THE US INTERESTS' ALLOCATION POSITION

NNI is entitled to most of the proceeds from the Patent Portfolio Sale and the Business Lines Sales. This result should not be surprising. As explained below, the evidence demonstrates that NNI was by far the most valuable entity in the Nortel Group; it was the Group's revenue and cash-flow driver and the source of funding for its worldwide operations. NNI was the most valuable Nortel entity and transferred or relinquished the most valuable assets in the post-petition Sales. While NNL was valuable prior to its insolvency, most of its value was derived from its equity ownership of NNI.

The fair market value of each Business Line and the Patent Portfolio is the price paid by the buyers: $4.5 billion for the Patent Portfolio and $2.85 billion for the collective Business Lines. NNI's valuation expert, Jeffrey Kinrich, determined the fair market value of each selling debtor's relative contribution to the Sales using, on a consistent basis, the income method, a well-established valuation methodology, explained in detail below and summarized as follows:

- Kinrich applied the DCF methodology to value the assets relinquished by each selling debtor in the Patent Portfolio Sale. Kinrich's cash flow projections were based on the IPCo model developed and adopted by the three principal debtor estates with their jointly-retained financial and legal advisors ("IPCo Model"). Kinrich tested and confirmed the robustness of this model against additional metrics, including the geographic distribution of the patents' registration and the relevant market size of each IE's Exclusive Territory.

- With respect to the Business Line Sales, Kinrich again used the income method, which captures all tangible and intangible assets and is the most reliable method to value the Business Lines. He also performed sensitivity analyses to test his valuation results, including looking to market-based revenue multiples, Nortel's internal revenue forecasts, and expected market growth rates for the telecommunications

75

equipment market by geography, all of which confirmed the reasonableness of his valuation conclusion.

The conclusion of Kinrich's valuation analyses is the US Interests' allocation position:

|  | Business Lines | | Patent Portfolio | |
|---|---|---|---|---|
|  | Value Relinquished ($ Billions) | Percent | Value Relinquished ($ Billions) | Percent |
| **Canadian Debtors** | $0.34 | 11.9% | $0.43 | 9.7% |
| **EMEA Debtors** | $0.51 | 18.0% | $0.71 | 16.0% |
| **US Debtors** | $1.99 | 70.0% | $3.31 | 74.3% |
| **Total** | **$2.85** | **100.0%** | **$4.45** | **100.0%** |

## A.    NNI Was Nortel's Most Valuable Entity

By any reasonable measure, NNI was the most valuable entity in the Nortel Group.  After its incorporation in 1971, NNI grew rapidly from a business that accounted for roughly $35 million in revenue in 1972 into one which generated nearly $1.5 billion ten years later, exceeding revenues generated for the Nortel Group in Canada.[252]  By 1985, NNI was generating $3.9 billion in annual revenue, amounting to 68% of the entire Nortel Group's total,[253] and NNI would remain the Nortel Group's most valuable entity until its insolvency 25 years later.[254]

NNI was the engine that drove the Nortel Group, generating far more revenue and cash flow than the other four Integrated Entities combined, controlling Nortel's most valuable customer relationships, performing a substantial portion of the Nortel's R&D, funding Nortel operations worldwide (including the research and development efforts of its parent, NNL), and guaranteeing most of Nortel's public debt.  As discussed in Point II above, NNI exclusively held all rights to Nortel's intellectual property in Nortel's most lucrative market – the US – and was

---

[252] TR50885 (Northern Electric Company listing statement for Toronto Stock Exchange) at 5; TR50875 (Northern Telecom Limited 1982 Annual Report) at 3.

[253] TR50878 (Northern Telecom Limited 1985 Annual Report) at 9; TR49841 (Northern Telecom Limited 1985 Form 10-K) at 9.

[254] *See, e.g.*, TR44477 (Northern Telecom 1995 Annual Report) at 28; TR49595 (2000 Annual Report) at 25.

the only entity that could transfer to a buyer the future revenue and cash-flow opportunities from the exploitation of that market.  It follows as a matter of logic, common sense and economics that NNI must be allocated most of the proceeds from the Sales.

### 1. NNI Generated an Overwhelming Share of the Integrated Entities' Revenues and Cash Flow

The US was by far Nortel's largest, most lucrative and most important market.  NNI generated the vast majority of the IEs' revenue and cash flow from its operations in the US market, where NNI alone operated and had the exclusive right to exploit Nortel's IP.  From 2001 to 2009, NNI generated 69.5% of the revenue (approximately $46 billion) and 75.9% of the cash flow generated by all of the IEs,[255] two metrics that represent the key drivers of the value of any business.[256]

NNI generated this revenue and cash flow for the Nortel Group through its relationships with Nortel's most important customers.[257]  NNI customer Verizon by itself accounted for more than 10% of the Nortel Group's global revenue in 2007, and two other NNI customers – Sprint Nextel and AT&T/SBC – each accounted for over 5%.[258]  These and NNI's other customer relationships, with their ability to generate revenue, were of particular importance to potential buyers of Nortel's lines of business.[259]

---

[255] *See* TR00051 (Kinrich Report) ¶ 54, Ex. 6; PFOF § II.C.3 ("NNI Earned Most of Nortel's Revenue").

[256] *See, e.g.*, Trial Tr. 4112:5-10 (Kinrich) (discussing TR50450 (Pratt & Niculita, *Valuing a Business*)).

[257] *See, e.g.*, TR12017 (Dec. 2006 General Purchase Agreement between Verizon and NNI); Rolston Dep. 145:15-146:6 (testifying that, as part of Nortel's strategy to best handle customer needs, the global account director for Verizon was based in the US); *see also* TR22075 at 4 ("Our legal entity structure is primarily country based and each of [Nortel's business] segments sell into these countries via the relevant legal entities."); Trial Tr. 700:5-18 (McFadden); Zafirovski Dep. 27:11-28:21, 86:6-86:25; *R. v. Dunn*, 2013 ONSC 137 para. 175.

[258] *See* TR22078 at App. C, p. 11; *see also* PFOF § II.C.2 ("NNI Had Nortel's Most Important Customer Relationships").

[259] *See* Trial Tr. 1653:23-1654:21 (Newcombe) (agreeing that "customer relationships and their ability to generate revenue" were "a key selling point" for potential buyers), *id.* 1655:24-1656:13 (Newcombe) (agreeing that in a majority of the Business Line Sales, purchasers were "looking to buy those blue-chip customer relationships").

The Nortel Group's recognition of the paramount importance of NNI's market was reflected in its practices regarding the filing of patents.  Nortel filed patent applications in the US for substantially all of the inventions that it sought to patent,[260] and 99% of the "high" and "highest" interest technologies ultimately included in the Patent Portfolio Sale were patented in the US, with 77% patented only in the US.[261]  In fact, 82% of the high interest and 66% of the highest interest technologies were patented (or had pending patent applications) *only* in the US.[262]  Nortel management recognized that the US:

> captures more of the market than any other single [patent] filing, hits the home base of more competitors and technology users than any other single filing and gives you predictable prosecution and enforceability at the lowest cost per market %.  Our US portfolio still carries the weight of our licensing and defence programs.[263]

It is for that reason that Angela Anderson, who served as chair of the Nortel Patent Practice Group,[264] testified that the US is the "market that all businesses are drawn to with dollar signs in their eyes."[265]  Former Director of IP Strategy Angela DeWilton agreed that the US was "the largest market," "not only for Nortel but for its competitors as well," and it was "fundamental to most global companies to have a strong US portfolio."[266]  In remarks he made before a panel in 1999, Clive Allen himself stated that but for the global expansion in which the US market was most significant, Nortel would have "died because [it] could not afford the R&D to be

---

[260] TR31304 (email forwarding December 2000 Foreign Filing Practice Note) attachment at 1 (setting guideline to "Keep filing all cases in US" and explaining reasons for guideline); *see also* PFOF § II.D.2 ("The Nortel Group's Patents and Patenting Practices").

[261] TR00051 (Kinrich Report) ¶ 132, Ex. 22; Trial Tr. 4123:23-4124:11 (Kinrich); *accord* DEM00019 (Kinrich Demonstratrives) at 14-15.

[262] TR00051 (Kinrich Report) ¶ 132.

[263] TR31304 (Foreign Filing Practice Note) at att. 1; *see also* Trial Tr. 2216:4-2217:7, 2180:14-2181:2 (Anderson) (US was a "huge market" for Nortel and the "best marketplace" that Nortel could access with a single patent filing).

[264] TR00032 (Anderson Aff.) ¶ 12.

[265] Anderson Dep. 157:21-158:4.

[266] Trial Tr. 752:25-755:25 (DeWilton).

competitive."[267]

## 2. NNI Provided Financial Support Needed to Ensure the Entire Nortel Group's Continued Operations

NNI's revenues and cash flow enabled it to conduct billions of dollars of R&D directly over the years at its own state-of-the-art research facilities employing thousands of engineers and R&D personnel and also to fund R&D performed by its parent NNL and other IEs.[268]  With the substantial revenue and cash it generated, NNI directly or indirectly funded over 60% of the Nortel Group's R&D activities in the two decades prior to the filing of these insolvency proceedings.[269]  In 2008, the final year before Nortel's insolvency filings, NNI continued to fund 63% of the Nortel Group's R&D.[270]

NNI also provided NNL with a revolving credit agreement of up to $2 billion to allow NNL to meet its working capital requirements pending receipt of transfer pricing payments.[271] Former Nortel Treasurer Michael McCorkle testified that "NNL did not normally have sufficient funds for the purpose of the [Canada Business Corporations Act] solvency test," and that "NNI was the largest portion" of the intercompany loan facilities that enabled NNL to pay dividends on its preferred shares.[272]

NNC and NNL also caused NNI to issue debt for the benefit of its Canadian parent and to provide essential guarantees in support of the issuance of billions of dollars of debt by NNC and

---

[267] TR21101 (Canada-United States Law Journal) at 416.

[268] *See* TR33056 at att. 5-10; TR21203 at 1-2; TR21205 at 5; TR21201A at 3-4; TR00020 (Ray Decl.) ¶¶ 12-13; *see also* PFOF § II.C.1 ("NNI Performed and Funded Extensive Research and Development").

[269] TR00055 (Ryan Rebuttal) at 3, Ex. D.1 at 2.

[270] TR00055 (Ryan Rebuttal) Ex. D.1 at 5; *see also* Trial Tr. 822:17-823:10 (McCorkle); McCorkle Dep. 114:6-14, 164:7-18, 173:19-21.

[271] *See* Stevenson Dep. 155:24-157:2 (discussing TR21067, an email indicating that "NNL's liquidity almost completely dependent on its available loan with NNI" and agreeing that in June 2005, "NNL was dependent on that funding from NNI in order to continue operating and [to] meet its needs"); *see also* PFOF § II.C.4 ("NNI Provided Essential Credit Support to the Nortel Group").

[272] Trial Tr. 823:18-824:4 (McCorkle).

NNL.  After Nortel regained access to capital markets in late 2005,[273] NNI entered into a one-year credit facility in February 2006 under which NNI borrowed $1.3 billion, the proceeds of which were used to pay off $1.275 billion in NNL bonds then approaching maturity.[274]  And from 2006-2008, NNI guaranteed more than $3.8 billion in total debt issued by NNL and NNC, hundreds of millions of dollars of which were used to pay former shareholders of NNC in settlement of securities claims arising from four financial restatements at the NNL/NNC level during the 2000-2005 fiscal year period and related investigations by the Ontario Securities Commission and US Securities and Exchange Commission.[275]

At the time of each of these financings, NNC's and NNL's credit ratings were below investment grade[276] and in the eight years prior to the Petition Date, NNL had generated just 13% of the IEs' aggregate revenue.[277]  Without NNI's guarantees, NNC and NNL could not have obtained funding on the same terms.  McCorkle testified that "J.P. Morgan and Citibank and others who arranged the [2006] loan told us that we would get much more better reception, be able to raise higher amounts and at lower interest rates with NNI's guarantee . . . [or] with NNI's involvement."[278]  Nortel CFO Peter Currie testified that "NNI needed to be involved" as a guarantor for NNL in order for NNL to receive favorable terms for its $1.150 billion offering in 2007.[279]  Paviter Binning, Currie's successor and Nortel's CFO from November 2007 to March 2010, agreed in his deposition that "creditors were looking for those guarantees because they

---

[273] *See* TR00001 (Currie Aff.) ¶ 8(a).

[274] Trial Tr. 550:8-14 (Currie); Currie Dep. 259:12-260:6; TR11003 (2005 NNC Form 10-K) at 102.

[275] *See* PFOF § II.C.4 ("NNI Provided Essential Credit Support to the Nortel Group").

[276] Until 2002, NNC and NNL (or their corporate predecessors in interest) were considered by Standard & Poor's ("S&P") and Moody's Investors Service ("Moody's") to be investment grade issuers.  From and after 2002, the S&P and Moody's credit ratings of NNC and NNL were below investment grade.  *See* TR40223 (2Q 2002 NNC Form 10-Q) at 35.

[277] *See* PFOF § II.C.4 ("NNI Provided Essential Credit Support to the Nortel Group").

[278] Trial Tr. 820:24-821:8 (McCorkle).

[279] *Id.* 549:3-23 (Currie); *see also* TR00001 (Currie Aff.) ¶ 90.

wanted to look at the assets of NNI as a support for lending to NNL" during his tenure.[280]

Today, in liquidation, NNI's liability for its guaranty of most of the more than $4 billion in bond debt issued by either NNL or NNC comprises a substantial amount of the creditor claims filed against it in its bankruptcy proceedings.[281]  Had the Canadian Debtors not saddled NNI with these guarantees, NNI would unquestionably be solvent today.  The direct and foreseeable consequence of the Canadian Debtors' decision to have NNI guarantee these debts is that, in insolvency, NNI's assets must be made available to pay off its creditors (including the bondholders to whom it has issued the guarantees) before NNI's equity holder, NNL, can recover.  The Monitor's allocation position in this case is a misguided attempt to reverse these priorities.[282]

### B.    The US Interests' Valuation Analysis

The parties agree that the central question before these Courts is "what portion of the [Sales] proceeds was due to the assets and rights relinquished by each of the debtor groups as part of the transaction[s]."[283]  Kinrich, the US Interests' valuation expert, accordingly focused his analysis on this question.  He selected the most appropriate valuation methods based on the facts and circumstances related to the joint, consensual Sales and applied them consistently to all of the estates.  Moreover, Kinrich validated the accuracy and reliability of each conclusion that

---

[280] Binning Dep. 149:19-150:16.

[281] *See* TR50124 (NNI Claims Register).

[282] NNL continued to require NNI's financial support after the Petition Date, with NNI providing nearly $350 million of funding under the IFSA and the December 23, 2009 Final Canadian Funding and Settlement Agreement ("FCFSA").  *See* TR12032 (IFSA) § 1; TR46910 (FCFSA) § 1.  Without the funding provided under these agreements, NNL and NNC would have run out of cash.  *See* TR12032 (IFSA) at 2 (noting NNL's liquidity constraints); TR46910 (FCFSA) at 2 (same); TR50143 (US Motion to Approve the FCFSA) ¶ 27; TR50210 (US Motion to Approve the IFSA) ¶¶ 15, 17; TR50051 (Canadian Motion to Approve the IFSA) ¶ (p); TR50052 (Canadian Motion to Approve the FCFSA) ¶ (k).

[283] Trial Tr. 4101:15-18 (Kinrich).  The Canadian Interests put forward the same question before the Courts.  *See id.* 413:21-25 (Monitor Opening Statement) (asserting that "the Canadian formulation of the question is similar to that of the US Debtors, which is that each selling debtor is entitled to receive the fair market value of the assets and rights it sold or relinquished"); *see also* DEM00015 (Green Demonstratives) at 3 ("Allocation Question").

he drew.  In what follows, we set out the methodology used by Kinrich and its application to the

Patent Portfolio and Business Line Sales.

### 1.  Kinrich Applies the Most Accurate and Appropriate Valuation Methodology

As Kinrich testified, the selection of the appropriate valuation methodology is

> based on the data and information available in any given factual circumstance, any given case, and based on the question being asked, the thing [he is] trying to answer, some methods prove more useful, more appropriate, more natural, and provide answers that make more sense than others do.[284]

Taking account of these particular circumstances and the rights and assets sold in each Sale,

Kinrich considered both the Business Line Sales and the Patent Portfolio Sale and ultimately

concluded that an income-based valuation method was most appropriate for both.  Kinrich's

decision to apply an income-based valuation methodology to both the Business Line Sales and

the Patent Portfolio Sale is consistent with generally accepted valuation literature.[285]

An income-based valuation method is also most appropriate given the facts relating to

Nortel's Sales because it "captures the value of all of the individual assets operating together,"

and both the Business Lines and Patent Portfolio were sold as complete businesses, for which

synergies existed between the individual assets that comprised the businesses.[286]  In an income-

based approach, the assets "are included in the value of the business as a whole," and as such a

---

[284] Trial Tr. 4109:24-4110:5 (Kinrich).

[285] For example, *Valuation of Intellectual Property and Intangible Assets* by Smith and Parr, a source cited by NNL's expert, Green, states that "[t]he income approach is best suited for the appraisal of the following:  *Contracts*; *Licenses* and royalty agreements; *Patents*, trademarks, and copyrights; Franchises; Securities; *Business enterprises*." TR50990 at 170 (emphasis added). Similarly, Shannon Pratt, a noted authority on asset valuation, states that "[o]ther technology-related, engineering-related, and marketing-related intangible assets are also likely candidates for an application of the income approach.  These intangible assets may include patents, proprietary technology or processes, trademarks and trade names, copyrights, and so forth.  TR50450 (Pratt & Niculita, *Valuing a Business*).
[286] Trial Tr. 4113:10-11 (Kinrich).

separate valuation of each individual asset is neither necessary nor best practice.[287]    Accordingly,

the Monitor's allegation that Kinrich's use of an income approach somehow failed to value the

specific rights and assets surrendered by each debtor estate is incorrect.

### 2. Value of Each Debtor's Assets Relinquished in the Patent Portfolio Sale

The analysis of what portion of the $4.5 billion in Patent Portfolio Sale proceeds received

was due to each estate's contribution of assets to the sale must focus on what the buyers would

pay for each debtor estate's rights.  As the Monitor's expert, Cox, acknowledged, purchasers

likely would have only paid "a relatively small amount" and "possibly nothing" for NNL's rights

alone in the Patent Portfolio.[288]    Most of the value in the Sales was from the Exclusive Licenses,

not bare legal title to Nortel's IP, and in particular from NNI's Exclusive License, the rights to

which were transferred to Rockstar through NNI's termination of the Exclusive License.[289]

#### a. The US Was Nortel's Largest Market and Where It Concentrated Most of Its Patents

The expert evidence at trial established that the economic value of a patent comes from

---

[287] *Id.* 4113:12-13 (Kinrich).  As Kinrich explained, applying an asset-based valuation methodology to businesses sold as going concerns, as advocated by the Monitor, is problematic and not well suited for the specific task at hand. This is because an asset-based valuation method "fails to capture the synergies that a business gets from the fact that all the various assets – the tangible assets, the intangible assets like patents or workforce in place or customer relationships or goodwill – all of the things operate together to generate the value of the business.  If you break it down, you fail to capture those synergies, or at least you don't do a good job of capturing the synergies.  So it is better to look at it as an operating whole, and that is what [Kinrich] chose to do [through an income approach]."  *Id.* 4111:1-11.

[288] Cox Dep. 156:24-257:17.

[289] It is thus not surprising that termination of the Exclusive Licenses was a condition precedent to the Patent Portfolio Sale; without such termination, the Sale would not have occurred.  *See* TR22085 (Rockstar Agreement) § 5.13(b) (requiring that "as of the Closing, the Sellers shall terminate all license rights granted under the Master R&D Agreement to the extent such license rights are under any of the Transferred Patents, Specified UK Patents or Undisclosed Patent Interests"); *see also* TR11173 ("Iceberg: Asset Sale Agreement Issues") at GIP_Nortel_00136190 ("Summary of Outcome of Business Call re: Project Iceberg" issues list from Google's counsel proposing that "the Asset Sale Agreement (and Sale Order) provide that (a) the MRDA will terminate at Closing, and (b) all other intercompany licenses will terminate at Closing, except to the extent required for continuity of supply of Seller's products and Sellers' services pursuant to retained contracts, and will terminate completely as soon thereafter as the related runoff business ceases").

the right to exploit, license and enforce that patent, not from merely holding title to the patent.[290]

That value is enhanced when an entity holds those rights exclusively.[291]  Indeed, a license

granting another entity exclusive rights to exploit a patent "can capture all of the economic

benefits associated with [the patent].  So the ability to license exclusively essentially captures all

of the economic value of the patent itself."[292]  In short, all value from a patent can be conveyed

through an exclusive license, as occurred here under the MRDA.[293]  As discussed in Point II, the

MRDA grants to NNI an Exclusive License to exploit Nortel's patents in the US, and, as such,

NNI alone held the exclusive right to convey the value in the Patent Portfolio arising from

exploiting the lucrative US market.[294]

As Kinrich explained, the exclusive ability to access and exploit the US market was of

particular value to the Nortel Group, as it would also be to any purchaser of the Patent Portfolio.

As already noted, the vast majority of Nortel's patents, and in particular its most valuable

patents, were registered in the US, often exclusively.[295]  The dramatic concentration of patent

filings in the US is particularly significant in assessing the value each estate contributed to the

Patent Portfolio Sale, because a patent filed in the US prevents infringement of the rights to that

---

[290] *See* Trial Tr. 4114:21-4115:12 (Kinrich).

[291] *See Id.* 4115:13-18 (Kinrich).

[292] *Id.* 4116:6-10 (Kinrich); *see also id.* 4115:24 – 4116:2.

[293] As Kinrich explained, an exclusive license's conveyance of "all of the economic value" includes any defensive value as well.  *See id.* 4116:18-4117:8.  Thus, any assertion that there is defensive value in the Patent Portfolio that is distinct from licensing value is unsupportable.

[294] *See* TR00051 (Kinrich Report) ¶ 68 ("To the extent a patent owner grants a party an exclusive license to all the rights granted under the patent, the licensee effectively holds all the economic rights to the patent that had previously belonged to the patent owner for the term of the license."); *see also* Trial Tr. 4119:2-8 (Kinrich testifying that "[i]f those rights exist, the ones [he] was asked to assume, then the holder of those rights has full economic beneficial ownership of the intellectual property in the territory where those rights exist.  There is no one – nothing else left to go to someone else within that territory").

[295] *See* TR00051 (Kinrich Report) at Exs. 21, 22; *accord* DEM00019 (Kinrich Demonstratives) at 13 ("Share of Patents by Jurisdiction"); *id.* at 14 ("Geographic Distribution of Nortel Technologies").

patent in the US only, and, as such, patents filed exclusively in the US could not be enforced in any other market.[296]

Kinrich described the importance of the large US market with the following testimony and chart:

> The market size is an additional factor that is influential in patent value. Assume for a minute that we have a patent that exists in the United States and, say, France; the same patent, same technology, same inventive idea. It is worth more in the United States than it is in France because the market for whatever is going to be made with that technology is larger in the United States because the United States is just a larger economic market for these technologies. So even if the patent counts were the same, even if every patent existed in every country, there would be more value in the United States, because the size of the market is larger.
>
> As you can see on the slide [reproduced below], adding up the various markets for the Nortel technologies shows that the United States is not only larger than any of the other individual integrated entities but is larger by far than the sum of the other integrated entities, which tells me that a very large portion of the total value of the portfolio resides in the United States.[297]

---

[296] *See, e.g.*, Trial Tr. 2208:16-19 (Angela Anderson, former head of Intellectual Property for EMEA, testifying: "Q. Now, a patent granted in the United States only gives rights for the United States, correct? A. Correct").

[297] Trial Tr. 4124:17-4125:13; *accord* DEM00019 (Kinrich Demonstratives) at 16 ("Market Size for Exclusive Territories"). *See also* Trial Tr. 555:2-8 (Peter Currie, former Chief Financial Officer of NNL, testifying that at least for the period 2005 to 2007, the United States was Nortel's largest market); *id.* 754:19-21 (Angela DeWilton, former NNL employee and Director of Intellectual Property in Nortel's IP Law Group, testifying that the United States is "a very significant market for many different products, but particularly for the telecom industry at the time I was there"); *cf. id.* 657:6-10 (Brian McFadden, former NNL employee and Chief Technology Officer, testifying: "Q. Canada wasn't going to be the major market for LTE technology? A. Canada was never the major market for all of our products because of the population size of Canada").

**Market Size for Exclusive Territories (in Billions)[298]**



Based on these factors, Kinrich reasonably and correctly concluded that "the locations of the patents, the protection of the technologies and the market size all suggest that a very large portion of the total value from the Nortel portfolio comes from protection in the United States."[299]

### b. *Kinrich's Discounted Cash Flow Analysis Accurately Sets Forth the Fair Market Value of Each Estate's Contribution to the Patent Portfolio Proceeds*

#### i. *The IPCo Model Provided Reliable Projections to Analyze the Relative Value a Buyer Would Expect from the Rights Conveyed by Each Estate*

Kinrich determined that the most accurate way to value what the sellers contributed to the Sale was the DCF valuation method.[300]  Consistent with the makeup of the Patent Portfolio, the DCF valuation performed by Kinrich makes clear that most of the value contributed in the Patent Portfolio Sale came from NNI.  The DCF method requires two inputs:  (1) projected future cash

---

[298] DEM00019 (Kinrich Demonstratives) at 16 ("Market Size for Exclusive Territories"); TR00051 (Kinrich Report) at 67 (Table 11 – End Product Market Size Estimates (2011 $ Billions)).
[299] Trial Tr. 4125:19-24 (Kinrich).
[300] Trial Tr. 4126:16-20 (Kinrich).

flows and (2) a discount rate that is applied to those cash flows to obtain a present value.[301]

Kinrich performed several valuation analyses to measure both of these inputs for use in his DCF

analysis, as set out below.

### A.  Cash flows

Kinrich used the IPCo cash flow Model jointly developed and accepted by the parties and

their external legal and financial advisors.  Nortel and its outside advisors had spent months, at

great expense, developing a business model – the IPCo Model – that forecast potential future

cash flows associated with the same patents in the Patent Portfolio that he was evaluating.[302]

Their expertise and incentive to create a reliable model gave Kinrich comfort that he could

reasonably rely on the IPCo Model.

In particular, the evidence upon which Kinrich relied established that the debtor estates

together formed a steering committee which met often to discuss the future of Nortel's Patent

Portfolio.[303]  The steering committee retained Global IP and Lazard, well-respected outside

valuation advisors, to evaluate and model the running of a licensing business using the patents

that made up the Patent Portfolio.[304]  Each of the estates (through their representatives on the

---

[301] *See id.* 4127:7-12 (Kinrich); *see also* TR00051 (Kinrich Report) ¶ 90.

[302] *See* PFOF § IV.C.3 ("Initial Post-Petition Consideration of IP Monetization Options"), § IV.C.4 ("The IP Monetization Evaluation Process").  As the Monitor's representative, Sharon Hamilton, described, "[t]he premise of IP Co. was that the Residual IP would be monetized by attempting to license various patents to technology companies that were suspected of infringing on them in exchange for the payment of royalties.  IP Co.'s licensing attempts would be backed by the threat of patent infringement litigation, and ultimately litigation if necessary." TR00009A (Hamilton Aff.) ¶ 73.

[303] *See* Trial Tr. 900:7-17 (Hamilton admitting that NNI and the EMEA IEs were involved in the creation of the IPCo business model); *id.* 911:16-20 (Hamilton testifying that the steering committee was made up of members of each debtor estate ); *id.* 1361:14-1362:18 (John Ray, the US Debtors' principal officer and a member of the steering committee, testifying about the debtors' joint steering committee and their frequent contact regarding the monetization of Nortel's IP); PFOF § IV.C.4 ("The IP Monetization Evaluation Process").

[304] *See* Trial Tr. 1362:21-1363:11 (Ray).   Ray explained that "[s]ome of the things that [the steering committee] did in terms of IPCo, we went out and looked at some of the other models that were out there, probably the best example of which was Qualcomm.  It was running an IP licensing company that had a litigation strategy.  We looked at a number of other models that were brought to our attention either publicly or through advisers.  We had our employees led by John Veschi look at real estate, look at how he would staff the project, the business, how we would compensate our employees.  And so we really were sort of in the ground formation of how we would

steering committee), Nortel IP employees, Global IP and Lazard invested substantial time, effort and expense in developing the IPCo business model that accurately reflected the relative cash flows that Nortel could have expected to receive from licensing the Patent Portfolio.[305]

In addition, Kinrich examined the scope of the IPCo Model, finding it to be a robust model covering the vast majority of potential licensing targets in each market[306] and capturing 95 percent of the territories in which Nortel had filed patents.[307]  Thus, the IPCo Model included those potential licensing targets that Lazard, Global IP, and Nortel judged would provide the most value to a potential licensing business.[308]

Further, Kinrich tested the inputs to the IPCo Model from which cash flows could be derived.  Based on his extensive expertise in patent portfolio valuation, he concluded that the royalty rates and markets that were built into the IPCo Model "made sense to [him], [were] consistent with what [he] already knew" based on his expertise regarding the rates and relevant

---

establish the business model, again either wholly opened by the estates or possibly with a third party."  *Id.* 1364:4-18.

[305] *See, e.g.*, *id.* 1419:4-11 (Ray); *id.* 4129:20-4131:18 (Kinrich); PFOF § IV.C.4. ("The IP Monetization Evaluation Process"), § IV.C.5 ("The Comprehensive Vetting of the IPCo Model").

[306] *See* Trial Tr. 4134:4-8 (Kinrich).

[307] *See id.* 4135:14-16 (Kinrich); *see also* DEM00019 (Kinrich Demonstratives) at 18 ("IPCo Model Captures 95% of Nortel Patents"); *id.* 4136:2-3 (Kinrich testifying that the 95% of territories IPCo captures comprised "the list of territories where value extraction was appropriate").  As Kinrich testified, Lazard had "considered expanding beyond the countries that are targeted already and concluded that was not appropriate," *id.* 4137:4-7, as the Model "covered the [countries] that are financially viable and worthy of consideration," *id.* 4241:21-22.

[308] The only alternative assessment of the Patent Portfolio's future cash flows that any party offered came in the form of proposed cash flows that Malackowski created for the purpose of this litigation.  Malackowski's proposed cash flows attribute 22 percent of the entire value of the Patent Portfolio to the five percent of patents in territories not represented in the IPCo Model, which not coincidentally are non-exclusive territories from which the EMEA entities are allocated 3/5 of the value according to Malackowski.  As Kinrich explained during his testimony, this cannot be correct as:

> 22 percent of the value shouldn't come from the last 5 percent of the patents.  You should get less than 5 percent of the value from those because those are the countries that have fewer patents on average.  You are going to get most of the value from the large markets where you have great patent protection.
>
> And so if you look at percentages, you should get more than 95 percent of the value from the first 95 percent of the patents and far less than 5 percent of the value from the last 5 percent of the patents.  It makes no sense to have 22 percent of the cash flows from that last 5 percent.

*Id.* 4137:8-21.

markets and "were reasonable."[309]  This was critical, as the relative contribution to the fair market value of the Patent Portfolio of each estate is reflected in the cash flows expected by the buyer of the Portfolio from each estate's relinquished assets.  Having confirmed the reliability and robustness of the IPCo Model, Kinrich used it to determine "how much the projected cash flows are across the territories" and then "divide[d] those cash flows up among the debtor entities."[310]

### B.  Discount rate

Having determined the Patent Portfolio's projected future cash flows, Kinrich next determined the appropriate discount rate to be applied for the $4.5 billion Patent Portfolio.  Knowing the present value of the Portfolio as well as the cash flows, Kinrich was able to derive the discount rate based on the "known actual fair market value of the portfolio."[311]  As Kinrich testified, this is the economically-accepted methodology for determining the discount rate when the present value of the asset (here, the Patent Portfolio) is already known:

> This is a very common methodology applied anytime the markets know the two things I know here:  Anytime the markets know what the market price of an asset is and what the expected cash flows of the asset are.  So, for example, a common place this is done every day is the bond market, where the bond is known to pay, say, $100 a year for X years, and at the end of that time the principal is

---

[309] *Id.* 4133:15-4134:3 (Kinrich).  Even though Kinrich had vetted the IPCo Model and determined that it was a robust and reliable model, he further examined the cash flow results that the model generated to ensure that they were reasonable.  He tested his results against various ways to run the model.  He "first considered the possibility that the royalty rates, and thereby the revenues, associated with IPCo should be higher or lower," *id.* 4156:22-25 (Kinrich); *see also* TR00051 (Kinrich Report) ¶ 101 n.139, and "also considered the possibility that the litigation strategies and thereby the cost structure might be different," Trial Tr. 4157:3-5.  Finally, Kinrich "considered the possibility that the revenue stream will continue longer." *Id.* 4157:16-17; *see also* TR00051 (Kinrich Report) ¶ 118 n.171.  Kinrich ran each of these sensitivities and determined that "making those changes does not have a material impact on the percentages attributable to each of the debtor groups."  Trial Tr. 4158:9-11.

[310] Trial Tr. 4138:15-20.  Because the IPCo Model was structured such that it could be run with the option to include or exclude potential revenues from China, Kinrich determined relative cash flows both with and without projected revenues from China.  *See id.* 4155:21-4156:3.  China was the only geography for which the IPCo Model had this option.  The inclusion of this toggle in the IPCo Model was a recognition by Nortel and its outside advisors of the uncertainty surrounding the strength of intellectual property protection in China and any attendant revenues that might result from licensing in the Chinese market.

[311] *Id.* 4140:18-21.

returned. . . . And the computation of the yield, which is the discount rate, is doing exactly what I have done here.[312]

Using the accepted discounted cash flow formula

$$\sum_{t=0}^{T} \frac{Cash\ Flows\ in\ Year\ t}{(1 + Discount\ Rate)^t} * (1 + Discount\ Rate)^{0.5}\ ^{313}$$

Kinrich calculated that the discount rate with China cash flows included was 15.7% and with China cash flows not included was 12.2%.[314]

Kinrich also conducted further analyses to confirm that a 12-16% discount rate was within the range of discount rates observable in the market.[315] First, he found that the median weighted average cost of capital ("WACC") for communications equipment companies – the companies from which a patent licensing business would obtain the majority of its royalties – ranged from 11.3% to 16.5%.[316] Second, he found that Lazard had studied the median cost of equity for publicly traded IP licensing companies (like IPCo) and determined it to be "around fifteen percent."[317] Kinrich noted that "cost of equity is higher than weighted average cost of capital . . . . [s]o if the cost of equity is around 15 percent, the discount rate that would apply to that would be something less than 15 percent."[318] Third, Kinrich examined the WACC for the Rockstar Consortium members because "auction theory, economic theory, says that the bidders compete with each other and bid up to approximately their cost of capital. . . . and they typically will not spend more than their cost of capital."[319] The Rockstar Consortium members' WACC

---

[312] *Id.* 4142:19-4143:8.

[313] *See* TR00051 (Kinrich Report) ¶ 118 n.171; *see also* DEM00019 (Kinrich Demonstratives) at 19.

[314] *See* TR00051 (Kinrich Report) ¶ 118; *see also* DEM00019 (Kinrich Demonstratives) at 19.

[315] *See* Trial Tr. 4143:15-4146:15.

[316] *Id.* 4143:18-4144:2; *see also* DEM00019 (Kinrich Demonstratives) at 20 ("Discount Rate Consistent With Relevant Market Data").

[317] Trial Tr. 4144:3-12; *see also* DEM00019 (Kinrich Demonstratives) at 20 ("Discount Rate Consistent With Relevant Market Data"); TR50777 ("Cost of Capital Backup Materials") at 3.

[318] Trial Tr. 4144:13-20.

[319] *Id.* 4145:8-11; *id.* 4145:23-25.

ranged from 8.3% to 15.7% in the year of the sale.[320]  That the discount rates Kinrich derived fell

within this range gave him "comfort that for [the buyers] this deal makes sense."[321]  In sum,

Kinrich determined that the discount rates derived from the actual purchase price paid comported

with discount rates one would expect to be reflected in the market for the Patent Portfolio and

this type of transaction.[322]

Kinrich also fully considered that Lazard provided various "illustrative" discount rates of

25-45% in some of its presentations regarding the IPCo Model.[323]  While not critical of Lazard

for selecting these illustrative discount rates at the time, Kinrich noted two key distinctions for

why the higher range of discount rates that Lazard set out was not borne out in the ultimate sale

price paid for the Patent Portfolio.  As he explained:

> At the time Lazard [put forward those illustrative discount rates],
> they were looking at what would be appropriate for Nortel to
> operate this business, and they did not know what the portfolio
> would sell for. We have the benefit of hindsight. We know that it
> sold for $4.5 billion. . . .  Lazard did not have the benefit of
> knowing the $4.5 billion when it used its illustrative rates.[324]

Moreover, the higher discount rate range was for Nortel running IPCo itself, rather than selling

the Patent Portfolio.  This distinction in determining the discount rate for the sale of the Patent

Portfolio as opposed to it being run by Nortel is significant:

> Nortel was a business that was a riskier business.  It was a troubled
> business.  It was losing money, didn't have the same access to
> capital that these participants did.  So if Nortel were trying to run
> the business, it would not be surprising that the Nortel valuation

---

[320] *See* DEM00019 (Kinrich Demonstratives) at 20 ("Discount Rate Consistent With Relevant Market Data").

[321] Trial Tr. 4146:2-3.

[322] *See id.* 4146:11-15.

[323] *See id.* 4146:23-25; *see also id.* 4147:18-25 (Kinrich noting that "nowhere in the Lazard analysis that [he] found at least do they conclude as to a discount rate.  They use it for illustrative purposes and do not say they know what their opinion would be.  But more importantly, we have the benefit of knowing the transaction.  That is of great influence to me").

[324] *Id.* 4147:3-17.  Kinrich expounded that a valuator should consider the additional information known through hindsight.  *See id.* 4148:1-11.

> would take those same cash flows, assign a higher discount rate to them, and thus a lower value.
>
> But the transaction that happened is the sale. . . . Essentially, this is consistent with a conclusion that selling the portfolio was worth more to Nortel than attempting to run the portfolio.[325]

Further, Kinrich considered the criticism by EMEA's and NNL's experts that a higher discount rate should be applied and determined that it was not only wrong but also irrelevant, as demonstrated by the application of Malackowski's discount rate methodology to the IPCo cash flows. Malackowski in his analysis used a 30% discount rate as opposed to the 15.7% discount rate applied by Kinrich.[326] This, however, yielded a present value of approximately one billion dollars less than the actual fair market value of the Portfolio.[327] To correct for this, Malackowski allocated the additional $1 billion to the selling debtors using the same relative distribution as he used for the portion of the sale price captured by his DCF methodology using his chosen discount rate. When Malackowski's discount rate methodology is applied to the IPCo projected cash flows, despite almost doubling the discount rate, it yields allocation values almost identical to Kinrich's allocation values.[328]

### ii.  Patent Portfolio Sale Valuation Result

Kinrich's analysis yielded a valuation of the rights and assets relinquished by each debtor

---

[325] *Id.* 4148:22-4149:14.

[326] Malackowski only considered a "China in" scenario.

[327] *See* TR00033 (Malackowski Report) at 33 (Table 10). Under Kinrich's method and discount rate, no such shortfall exists.

[328] *See* Trial Tr. 4149:15-4152:13 (Kinrich); *accord* DEM00019 (Kinrich Demonstratives) at 21 ("Addressing Malackowski's Discount Rate Critique"). In Green's alternative Patent Portfolio valuation set forth in Appendix P to his rebuttal expert report, he predominantly applies even higher discount rates than does Malakowski (ranging from 25 to 45 percent), yielding a present value between $1.8 and $4.1 billion *less* than the Portfolio's $4.5 billion fair market value. But unlike Malackowski, who recognized that any unallocated remainder must be allocated on a reasonable and principled basis among the selling debtors, as described more fully below (see Point IV), Green simply allocates *all* of this manufactured remainder to NNL. Green's unprincipled allocation makes clear that his criticism of Kinrich's discount rate has nothing to do with economics and everything to do with creating a high remainder that he can then allocate exclusively to NNL based on his flawed and inconsistently applied "value in use" methodology.

entity in the Patent Portfolio Sale, as represented in Table 14 of his expert report:[329]

**Table 14 - Patent Portfolio Valuation Results**[330]

|                  | $ Billions | Percentage |
|------------------|:----------:|:----------:|
| Canadian Debtors |   $0.43    |    9.7%    |
| EMEA Debtors     |   $0.71    |   16.0%    |
| US Debtors       |   $3.31    |   74.3%    |

### 3.   Value of Each Debtor's Assets Relinquished in the Business Line Sales

The sales of Nortel's eight Business Lines resulted in approximately $2.8 billion of

allocable sale proceeds.  All debtor entities consensually agreed to sell each business as a whole,

as operating businesses on a going concern basis.[331]  As Kinrich recognized, the debtor estates'

experts were charged with "valu[ing] the portion due to the contributions, the relinquishment of

---

[329] As part of his valuation, Kinrich considered what portion of the proceeds that Rockstar paid were due to the value it was anticipating from the Chinese market.  Because the IPCo Model included both a China "in" and China "out" option, Kinrich began by including the median amount of projected revenues from China.  Following his review of economic literature relating to patent rights and enforcement in China as well as the expert advice of Raymond Zenkich, who concluded that the market's perception at the time of the sale was that a buyer would pay little to nothing for the Chinese patents in the Portfolio, Kinrich made a small adjustment downward from the average of including or excluding revenues from China.  *See* Trial Tr. 4161:15-4162:17 (Kinrich).

[330] TR00051 (Kinrich Report) at 72 (Table 14).  Recognizing that the Patent Portfolio was, in fact, sold, Kinrich appropriately did not run his valuation results through the RPSM, which excludes gains and losses from the sale of a business.  *See* Trial Tr. 4171:1-10; *see also* PFOF § III.D.2 ("Allocation of Operating Profits Under the MRDA").  Counsel for the Monitor's cross-examination of Kinrich on this point revealed its fundamental misunderstanding of Kinrich's use of the IPCo Model:

> Q.  And I take it that even though you look at the future and in these forecast periods and assume the same set of license rights would continue, you give no effect to any sharing obligations that might arise under other provisions of the MRDA; correct?

> A.  That's correct.  I understand that the sharing provisions do not apply to sales proceeds.

> Q.  Leaving aside the question of sale proceeds and looking at revenues and cash flow and operating income that would be generated in the future, you do not take into account any RPSM sharing obligation that would apply to them; correct?

> A.  *I do not anticipate those revenues and cash flows into the future.  I anticipate sales proceeds.  The basis for apportionment is relative expected – relative projected, rather, values from IPCo or from the lines of business.  But that transaction is not one in which we anticipate that Nortel would continue to operate.  It is one in which the sale was made, and that is the context in which my appraisal was done.*

Trial Tr. 4302:7-4303:5 (emphasis added).  That the IPCo Model cash flows served as an input for Kinrich's DCF analysis does not change the proceeds from the sale into operating revenue.

[331] *See id.* 4172:2-5 (Kinrich recognizing that the sales of the Business Lines "were joint, consensual sales.  They were sold individually, and they were sales of operating businesses, businesses operating as a going concern"); *see also* TR00009A (Hamilton Aff.) ¶ 37 (recognizing that the Business Lines were sold in a "cooperative and coordinated fashion"); PFOF § IV.B ("The Sale of Nortel's Business Lines").

assets and rights associated with each of the debtor groups in conjunction with each of these line of business sales."[332]

> ### a.  A Revenue Multiple-Based Income Approach to Valuation Is the Most Appropriate Valuation Methodology

As Kinrich explained, an income-based valuation approach is the most appropriate valuation method when valuing businesses sold as going concerns:

> The income method captures all of the value.  It is the combination of the tangible assets – the computers and desks and pencils and whatever else – and the intangibles – the patent rights, the workforce, the customer relationships, goodwill – all operating together, all operating synergistically to create a company value.
>
> So you capture the full value of all of the tangible and intangible assets by using the income approach.  And the literature supports this.[333]

Indeed, the economic literature states that "[g]oing-concern value tends to be based largely – and sometimes entirely – on income and cash flow analyses."[334]

The income approach encompasses several different valuation methodologies, of which Kinrich determined that a multiple of revenues analysis, a widely-used valuation method, was most appropriate because "a gross revenue multiple would best measure the relative value contributed and relinquished by each of the debtor entities in conjunction with the sales."[335]  In contrast to the CCC's critique that "[t]here is no logical reason to suggest that the revenue recorded by NNI (or any other subsidiary) should serve as a proxy for its share of what was

---

[332] Trial Tr. 4172:8-12.

[333] *Id.* 4173:9-19.

[334] TR50450 (Pratt & Niculita, *Valuing a Business*) at 276.

[335] Trial Tr. 4174:21-24.

surrendered in the Sales,"[336] Kinrich set forth several compelling reasons why his was the most

appropriate methodology.

First, as both Kinrich and the economic literature establish, a revenue multiple approach

is particularly appropriate for troubled companies that have experienced losses:

> [G]ross revenue multiples are useful for companies with losses or
> erratic earnings.
>
> Nortel was a company in bankruptcy.  It was a company that
> experienced overall losses, and so profit margins were not a good
> forecast of what the future will hold, especially when a buyer is
> buying a business and presumably will transform it to be part of
> their business.
>
> . . . [R]evenue multiples are available even for the most troubled
> firms, and they are not as volatile as earnings multiples and thus
> less likely to be affected by year-to-year swings.
>
> That, again, is especially relevant to troubled businesses because
> the profit margin of a troubled business is often negative, but the
> value still exists in the fact that there are business relationships and
> future sales that a buyer can obtain.[337]

Second, Nortel's revenues served as a reliable valuation metric because they were already

broken down by country.  In contrast, the available profit forecasts did not divide profits by

country or provide further data for Kinrich to do so, and it was therefore impossible to use them

to determine the relative contribution of each of the territories.[338]  Third, using a revenue

---

[336] CCC Pretrial Br. ¶ 223.

[337] Trial Tr. 4175:3-23 (Kinrich); *see also* TR50451 (Shannon P. Pratt et al., *Valuing Small Businesses & Professional Practices* (3d ed. 1998)) at 340-41 (providing that "Gross Revenue Multiples May be Useful" for "Companies with Losses or Erratic Earnings"); TR50216 (Aswath Damodaran, *Investment Valuation* (2d ed. 2002)) at 543 ("[U]nlike earnings and book value ratios, which can become negative for many firms and thus not meaningful, revenue multiples are available even for the most troubled firms and for very young firms.  Thus, the potential for bias created by eliminating firms in the sample is far lower.  Second, unlike earnings and book value, which are heavily influenced by accounting decisions on depreciation, inventory, research and development (R&D), acquisition accounting, and extraordinary charges, revenue is relatively difficult to manipulate.  Third, revenue multiples are not as volatile as earnings multiples, and hence are less likely to be affected by year-to-year swings in the firm's fortune.  For instance, the price-earnings ratio of a cyclical firm changes much more than its price-sales ratios, because earnings are much more sensitive to economic changes than revenues are.").

[338] *See* Trial Tr. 4176:12-24 (Kinrich).

multiple approach has the benefit of taking account of relevant costs while not unjustly benefiting only the profitable entities, *i.e.*, NNI.[339]  Kinrich made clear that this is a fundamental reason that a revenue multiple approach is most appropriate here.  Kinrich explained that with this approach NNL did not get penalized for having higher R&D costs in proportion to its revenue:

> . . . [I]f I had actually used the actual profit margins for Canada, the United States and the EMEA entities, I would have found that 100 percent of the value is associated with the United States.  It was the only profitable entity.  That isn't fair, because the Canadian R&D effort as well as the US R&D effort contributes to the aggregate performance of Nortel.
>
> By using a revenue multiple, I essentially charge each of the entities a share, its proportional share of the R&D efforts and the overheads and the corporate management, thereby not penalizing an entity that provided that as a service or something like that to other parts of the organization, and not unfairly benefitting an organization, a part of the organization that doesn't spend money.  A revenue multiple essentially charges everyone their share of these kind of expenses.[340]

Kinrich further explained under cross-examination that the revenue multiple approach that he employed "recognizes that whoever obtains revenues has to pay their fair share of the full operating expenses, including any R&D."[341]  The Monitor's criticism that Kinrich "does not even consider how the revenues would translate into income" is therefore patently incorrect.[342]

### b.  Kinrich's Business Line Valuation Analysis

Using the revenue multiple approach,  Kinrich conducted two alternative valuations – the first treating revenues of IEs and non-IEs on an equivalent basis, and the second recognizing that

---

[339] *See id.* 4177:24-4178:1 (Kinrich) ("Q: . . . Does a revenue-multiple analysis take into consideration the costs?  A. Absolutely.").

[340] *Id.* 4178:21-4179:23.

[341] *Id.* 4322:11-13.

[342] Monitor Pretrial Br. ¶ 147.

non-IEs took on less risk and therefore may be worth less per dollar of revenue than the IEs.[343]

Under his first approach, Kinrich used Nortel's carve-out financial statements. These financial

statements showed revenue both by country and by Business Line on a stand-alone basis.[344]

Knowing the fair market value for each Business Line (the price paid) and the revenue for each

Business Line Sale based on the carve-out financials, Kinrich was able to compute the

appropriate revenue multiple that he then applied to reach his valuation conclusion.[345] Kinrich's

second approach involved a combination of income- and market-based methods to take account

of the different risk levels associated with IEs and non-IEs.[346] These alternative valuation

exercises yield similar, though not identical, results that Kinrich, believing both approaches had

equal merit, averaged.

     Kinrich did not stop there. He also analyzed whether the revenue figures that he was

considering were "a reasonable proxy for what was expected in the future."[347] To do so, Kinrich

tested his analysis in three different ways. <u>First</u>, Kinrich looked at Nortel forecasts of expected

future revenue broken down by Business Line.[348] <u>Second</u>, Kinrich considered GDP forecasts in

each of the debtor entities' territories.[349] <u>Third</u>, Kinrich "considered projections of

---

[343] *See* Trial Tr. 4181:3-25 (Kinrich).

[344] *See id.* 4183:4-7 (Kinrich); TR00051 (Kinrich Report) ¶ 38. Kinrich valued each of the Business Lines separately. TR00051 (Kinrich Report) ¶ 39.

[345] A traditional revenue multiple valuation generally involves analyzing revenues from comparable businesses. In this case, Kinrich had the "luxury," Trial Tr. 4177:8, of using the best comparables to the selling Business Lines – the actual *sold* Business Lines. In this way, Kinrich was able to use "a much stronger revenue multiple" than he otherwise might have. *Id.* 4177:17.

[346] Kinrich consulted Nortel's list of comparable companies and conducted his own research into comparable companies, confirming that Nortel's market-based revenue multiple was appropriate. *See* Trial Tr. 4189:3-4190:18. Kinrich then took the revenues from the non-IEs and multiplied them by the market-based revenue multiple to arrive at the value relinquished by the non-IEs. Kinrich divided the value that was left between the non-IEs' relinquished value and the fair market value of the Business Line Sales proportionately by the IEs' revenues. He then added the value relinquished by the non-IEs to the value relinquished by the IEs for each debtor group. Kinrich did this for each Business Line. *See* Trial Tr. 4189:3-4191:24; *accord* TR00051 (Kinrich Report) at Ex. 10.

[347] Trial Tr. 4185:16-18.

[348] *See id.* 4185:21-4186:1; *see also* TR00051 (Kinrich Report) at Ex. 16.

[349] *See* Trial Tr. 4186:2-7; *see also* TR00051 (Kinrich Report) at Ex. 19.

telecommunications equipment expenditures" because "[t]he more communications equipment that is expected to be spent, not for Nortel but in general, the more likely Nortel's business would grow in those territories."[350]  Each of these forecasts showed that Nortel's 2009 revenues are a sound representation of what Nortel could have expected in the future."[351]

### c.  Business Line Valuation Result

The results of Kinrich's Business Line valuation are included in Table 5 of his initial report and reproduced below:

**Table 5 – Line of Business Sales Valuation Summary**[352]

|  | Total Value Relinquished ($ Billions) | Percentage |
|---|---|---|
| Canadian Debtors | $0.34 | 11.9% |
| EMEA Debtors | $0.51 | 18.0% |
| US Debtors | $1.99 | 70.0% |
| **Total** | **$2.85** | **100%** |

Kinrich confirmed the reliability of these results through two further valuation analyses. Although Kinrich found revenue-based multiples to be a better measure of relative value contributed than profit-based measures, he tested his results against two such profit-based measures – gross margin and contribution margin – which "helped confirm that the revenue multiples were not inconsistent with what [he] would get from various profit calculations."[353] Using profit-based measures gave valuation figures "roughly similar" to Kinrich's revenue-based

---

[350] Trial Tr. 4186:8-13; *see also* TR00051 (Kinrich Report) at Ex. 20.

[351] *See* Trial Tr. 4188:24-4189:2.  As a further check on the appropriateness of the revenue figures that he obtained from Nortel's 2009 carve-out income statements, Kinrich examined prior years' revenues broken down by Business Line and determined that an average of those revenues is not significantly different from the results using 2009 revenues.  *See* TR00051 (Kinrich Report) at Ex. 15; *accord* DEM00019 (Kinrich Demonstratives) at 30 ("Revenue Sensitivity Analysis").

[352] TR00051 (Kinrich Report) at 30 (Table 5).

[353] Trial Tr. 4194:12-16.

conclusion.[354] Kinrich's conclusion therefore "made sense, it was reliable, it was consistent with expected profitability, it was consistent with expected future growth, and thus consistent with what you would get if you had the information required to run a discounted cash flow analysis. And so [he] felt confident that the results fairly reflect the value relinquished by the debtor groups."[355]

Given that the methodologies Kinrich employed were applied consistently across debtor entities and that he performed myriad sensitivities to ensure that these methodologies produced accurate and reliable results, Kinrich's conclusion that most of the value from the Business Line Sales should be attributed to NNI is both fully supported and completely consistent with the common sense fact that the buyers were most interested in acquiring the ability to conduct business in the geographic market from which they would be able to generate the most future cash flows and revenue, the US.

### 4.   US Interests' Final Allocation Results

The results of Kinrich's Patent Portfolio and Business Line valuation are included in Table 1 of his initial report and reproduced below:[356]

| | Business Lines | | Patent Portfolio | | Total | |
|---|---|---|---|---|---|---|
| | Value Relinquished ($ Billions) | Percent | Value Relinquished ($ Billions) | Percent | Value Relinquished ($ Billions) | Percent |
| **Canadian Debtors** | $0.34 | 11.9% | $0.43 | 9.7% | $0.77 | 10.6% |
| **EMEA Debtors** | $0.51 | 18.0% | $0.71 | 16.0% | $1.23 | 16.8% |
| **US Debtors** | $1.99 | 70.0% | $3.31 | 74.3% | $5.30 | 72.6% |
| **Total** | **$2.85** | **100.0%** | **$4.45** | **100.0%** | **$7.30** | **100.0%** |

---

[354] *Id.* 4194:8 (Kinrich); *see also* DEM00019 (Kinrich Demonstratives) at 37 ("Line of Business Valuation Sensitivities").

[355] Trial Tr. 4194:22-4195:5 (Kinrich).

[356] TR00051 (Kinrich Report) at 4 (Table 1).

**POINT IV**

**THE MONITOR'S PROPOSED ALLOCATION IMPROPERLY ATTEMPTS
TO SHIFT VALUE FROM NNI AND THE EMEA DEBTORS TO NNL**

The Monitor's proposed allocation is not based on the rights of the MRDA Participants, the sale transactions that occurred, the manner in which the Nortel Group operated and the MRDA Participants conducted themselves, or accepted and consistently-applied valuation theories. The Monitor's allocation position was primarily presented through the trial testimony and expert reports of Philip Green.[357] Green's testimony and reports are based on three false premises: that the MRDA only granted very circumscribed rights of limited to no value to the Licensed Participants; that NNL's bare legal title to NN Technology carried with it special, residual value; and that the Licensed Participants' license rights were non-transferable. For the reasons described herein and as shown at trial, each of these premises is wrong and, accordingly, the Monitor's valuation theories all fail. Indeed, the Monitor's experts readily concede that if *any* of the foregoing assumptions are wrong – let alone all of them – their methodology would not apply.

Green offers two alternative valuation theories with respect to the Patent Portfolio Sale and two alternative valuation theories with respect to the Business Line Sales. As to the Patent Portfolio Sale, Green's primary opinion is that NNL is entitled to all of the proceeds with respect to the Patent Portfolio sold to Rockstar. This is not even an expert opinion. Green devotes one and one-half pages in his opening expert report on this $4.5 billion issue and conducts no

---

[357] The Monitor also presented live testimony from Mark Berenblut (who co-authored an opening and rebuttal expert report with Dr. Alan Cox), in an apparent attempt to bolster Green's reports and testimony. Although Berenblut's and Cox's proposed methodology is "essentially the same" as Green's – and thus suffers from the same defects as Green's – unlike Green, Berenblut and Cox failed to quantify an allocation and did not do a valuation. Trial Tr. 3613:24-3614:2 (Berenblut). As Green acknowledged at trial, Cox and Berenblut "prepared analyses similar to mine except they didn't actually do the valuation part of it." *Id.* 3280:17-23; *see also* Cox Dep. 194:24-25 (acknowledging that Green "has done some calculations and we have not"). As set forth herein, Green, in fact, did not do an actual valuation either, although he purported to do so.

valuation analysis to reach his allocation opinion.[358]  It is nothing more than a conclusory

assertion that "if the Licensed Participants have no rights, they get no allocation."  Beyond that,

Green and the Monitor cannot even agree as to whether the scope of the Licensed Participants'

rights are based on his own interpretation of the MRDA or an assumption he was directed by the

Monitor to make.  In any event, the MRDA interpretation that serves as a foundation to Green's

opinion is wrong, and with it falls his primary allocation opinion.

In a mere footnote to his rebuttal report, Green proposes an alternative allocation with

respect to the Patent Portfolio, set forth in Appendix P to that rebuttal report.  Although there are

many reasons why this theory should be rejected, its principal failing is that it is based on an

inconsistently applied and inapplicable "value in use" methodology.  Green's value in use

methodology is premised entirely on the incorrect assumption that NNI's and the EMEA IEs'

license rights could not be transferred, even with consent.  This assumption is factually and

legally incorrect and based on a misreading of Article 14(a) of the MRDA.  Accordingly,

Green's Appendix P analysis likewise must be rejected.

As to the Business Line Sales, Green's primary allocation theory is also based on the

incorrect and inconsistently-applied value in use methodology (flowing from the same

unfounded assumption that NNL's rights under the MRDA were transferable and the other

Participants' rights were not).  For this reason and others set forth below, Green's primary

Business Line allocation theory must be rejected.  Green's alternative Business Line allocation

theory (which he calls the "Alternative Maximum" allocation) ignores that the RPSM does not

apply to the sale of a business – a fact Green himself elsewhere acknowledges – and is, by

---

[358] *See* TR00042 (Green Report) at 63-65.

Green's own admission, based on an assumption as to the manner in which the RPSM works that

is demonstrably incorrect.

These fatal flaws are discussed further below.

### A.    The Monitor and Green's Conclusion that NNL Is Entitled to All of the Patent Portfolio Sale Proceeds Is Incorrect

#### 1.    Green's Primary Allocation Opinion Regarding the Patent Portfolio Sale Should Be Disregarded Because It Is Based on a Misreading of the MRDA

Green's primary allocation theory is based on his acceptance of the Monitor's (or his

own) misreading of the MRDA, with no economic analysis.  Green accepts the Monitor's view

(or concludes on his own) that the Licensed Participants held only limited "make-use" rights to

NN Technology, and these rights ceased to have any value after the completion of the Business

Line Sales.  For the reasons already discussed in Point II above, the Monitor's (or Green's)

proposed reading of the MRDA is wrong and, for this reason alone, Green's primary allocation

must be rejected.

Green's opening expert report stated that his opinion that Patent Portfolio Sale patents

had "no value allocable to the U.S. or EMEA Debtors" was based on the assumption that he had

been asked to make,[359] although at trial he said he relied on his own reading of the MRDA.[360]  To

the extent Green purported to interpret the MRDA as he proclaimed at trial (even under the guise

of "reading" the document as valuator), it is an impermissible legal opinion that is not the proper

---

[359] TR00042 (Green Report) at 64.

[360] Trial Tr. 3177:2-9, 3178:23-3179:4.  The Monitor firmly disagreed with its expert, asserting in opening and representing in its motion to strike the expert reports that Green relied on assumptions given to him and he was not interpreting the MRDA.  *See id.* 459:13-20; Motion of the Monitor and Canadian Debtors for Entry of an Order Striking the Expert Reports and Testimony of Daniel R. Bereskin QC and Bruce W. Stratton, or in the Alternative Granting Leave to File the Expert Report of Sheldon Burshtein in Rebuttal to Reports of Daniel R. Bereskin QC and Bruce W. Stratton, Apr. 11, 2014, ¶ 17.

subject of expert testimony.[361]  As the Monitor itself argued in moving to strike EMEA's claims

experts' reports, experts may not interpret contracts.[362]  This is particularly the case because

Green does not base his reading on any economic analysis (his purported expertise).[363]

After wrongly concluding – whether based on assumptions from counsel (as the Monitor

twice represented) or his own "review" of the MRDA (as he testified) – that the Licensed

Participants had no rights in the Patent Portfolio, Green did not "go any further than that."[364]

Green testified that because he believed the Licensed Participants had no rights, "it was not

necessary [for him] to do any further valuation work."[365]  That is not an expert opinion, and his

testimony and reports should be given no weight.

Indeed, Green freely conceded that he did not attempt to value the rights with respect to

the exploitation of NN Technology in the US, although this is clearly what NNI owned and sold

to Rockstar.  At trial, Green testified that he did not "separately value what portion of the 4.5

billion from the [Patent Portfolio Sale] was due to the transfer . . . to Rockstar of all the rights

with respect to the NN [T]echnology in the United States."[366]

---

[361] *See Berckeley Investment Group, Ltd v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) (noting that although a court has discretion to admit expert testimony the "Court must ensure that an expert does not testify as to the governing law of the case" and striking certain opinions as to the legal effect of various SEC pronouncements as "improper legal opinions"); *Casper v. SMG*, 389 F. Supp. 2d 618, 621 (D.N.J. 2005) ("The rule prohibiting experts from providing their legal opinions or conclusions is 'so well established that it is often deemed a basic premise or assumption of evidence law- a kind of axiomatic principle.'") (quoting *In re Initial Public Offering Sec. Lit*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001)); *R. v. Century 21 Ramos Realty Inc.* (1987), 32 C.C.C. (3d) 353 (Ont. C.A.), RBOA (Ontario Court of Appeals refusing to admit expert evidence that opined on what constitutes "appropriation" because it was a question of law to be determined by the judge and holding that opinion on interpretation of domestic law is impermissible in Ontario).

[362] *See* Motion Regarding "Ultimate Issue" testimony contained in the EMEA Foreign Law Expert Reports – Experts Not Scheduled to Appear at Trial, Apr. 21, 2014, ¶ 13 ("Expert evidence is not necessary nor relevant on matters where it is open to the trier of fact to draw his or her own conclusions – applying the law . . . to the facts being the quintessential example of the Court's role.").

[363] *See* Green Dep. 23:4-6.

[364] *Id.* 209:8-210:19.

[365] *Id.* 207:22-208:25.

[366] Trial Tr. 3181:20-3182:11.

Because the Monitor and Green's primary allocation theory is based solely on an interpretation of the MRDA that is plainly wrong, as set forth in Point II above, the Courts should reject the Monitor's principal allocation theory.

### 2. Even Were the Monitor's Misreading of the MRDA Correct, the Monitor's Zero-Allocation Argument Would Still Fail Because the US and EMEA Debtors Relinquished Valuable Rights

Even under the Monitor's misreading of the MRDA, although the Courts need not reach these issues, there would still be no basis to forgo any valuation and instead allocate zero value to NNI and the EMEA IEs with respect to the Patent Portfolio Sale as Green did.

First, Green acknowledges that NNI, at a minimum, had the exclusive right to make and sell Products in the US. He agreed that NNL had "absolutely no right or ability to give any third party the right to make or sell products in the United States . . . It had licensed away that right."[367] Thus NNL could not transfer those rights to Rockstar; only NNI could.

The Monitor and Green therefore require the Courts to accept a second argument to allocate zero to NNI: that unless NNI was making or selling Products embodying NN Technology at the time of the Patent Portfolio Sale, it had lost its right to do so and contributed nothing of value in that sale. But this second proposition too is plainly wrong. The value of a right, including the amount a purchaser would pay to obtain a right, does not depend on whether the seller is exercising that right at any particular time, or ever. The right has value whether exercised or not, and to obtain that right a purchaser would have to pay for it. Moreover, as noted in Point II above, the MRDA could not be clearer that the right to use NN Technology to make or sell Products existed "at any time." The right to make or sell Products in the future was obviously not worth zero.

---

[367] *Id.* 3193:9-3194:18.

<u>Second</u>, Green in fact does recognize that the Licensed Participants had valuable rights with respect to NN Technology embodied in a Product and that they had to be compensated for their ongoing rights.[368]  To avoid valuing them, he erroneously claimed that NNI and the EMEA IEs were compensated for those rights in his Business Line Sales allocation.[369]  But, as Kinrich explained, this is not the way the transactions actually worked.[370]  With respect to many of the patents used in Products, the purchasers in the Business Line Sales only received non-exclusive, limited scope-of-use licenses to use NN Technology, and the Licensed Participants did not relinquish their Exclusive Licenses to the patents in the Business Line Sales.  As Kinrich explained:

> [W]hat was conveyed to the line of business purchasers were nonexclusive rights and were limited nonexclusive rights.
>
> The rights subject to those encumbrances to the line of business purchasers, the US and EMEA still retained those exclusive rights. They were conveyed through the sale of the patent portfolio. Those rights are worth something.  They were not conveyed in their entirety.  Only nonexclusive rights, to a limited set of them, were conveyed in the line of business sales. And so what is left has to be in the patent portfolio valuation.[371]

These are not controversial points.  Green himself recognized that the selling debtors granted nonexclusive licenses to the Business Line buyers.[372]  He also recognized, even under his

---

[368] *See* TR00042 (Green Report) at 54 ("If there had been no license rights under the MRDA, all of the proceeds related to the transfer of intellectual property from the Business Sales would be allocated to the Canadian Debtors. *However* the termination of the license rights requires consideration of the value of the rights that were surrendered by the US Debtors and EMEA Debtors related to facilitate the Business Sales.  Thus, the value allocated to the Canadian Debtors related to the IP transferred should be reduced by the value of the licenses surrendered by the US and EMEA Debtors." (emphasis added)).

[369] *Id.* at 64-65.

[370] *See* Trial Tr. 4164:4-4165:13.

[371] *Id.* 4165:1-13.  To be sure, some patents were sold in the Business Line sales, and license termination agreements were executed.  *See* PFOF § IV.B.1 ("Overview of the [Business Line] Sales"); Trial Tr. 3196:9-13 (Green testifying that there were some patents sold in the Business Line Sales and therefore not in the Patent Portfolio).  But the patents sold  in the Business Line Sales, of course, were not also sold in the Patent Portfolio Sale.

[372] Trial Tr. 3150:21-22 (Green testifying on direct that "there were nonexclusive licenses that were given to the [Business Line] buyers").

restrictive interpretation of the MRDA, that NNI and the EMEA IEs were granted Exclusive

Licenses with respect to NN Technology in their respective territories.[373]  Yet Green fails to

acknowledge that NNI and the EMEA IEs retained significant value through their licenses'

exclusivity until the closing of the Patent Portfolio Sale, including with respect to NN

Technology that even the Monitor and Green recognize was being used in a Product that Nortel

had been selling.  This is a clear error in Green's "analysis" and further demonstrates why the

Monitor's and Green's allocation of *nothing* to the Licensed Participants with respect to the

Patent Portfolio Sale cannot be correct.

Third, the Monitor's and Green's allocation position ignores the broad definition of

Products under the MRDA, which includes, among other things, "products, software and services

designed, developed, manufactured or marketed, or proposed to be designed, developed,

manufactured or marketed, at any time by, or for, any of the Participants."[374]  IPCo, as a

licensing service business that the Participants proposed to be developed and indeed were

actively developing, and which indisputably embodied the entirety of the Patent Portfolio sold to

Rockstar, fits comfortably within the plain meaning of a "service" and thus the definition of

"Product."[375]  Accordingly, the *entire* Patent Portfolio *was* within the meaning of the term

"Product" in the MRDA and thus, again, even under the Monitor's incorrect reading of the

MRDA, the Licensed Participants' allocation cannot be zero with respect to the termination and

transfer of their rights in that Patent Portfolio Sale to Rockstar, but rather should be the

---

[373] *Id.* 3193:9-14 ("Q. . . . Even under your reading and the Monitor's reading of the license rights, NNI had the exclusive right to make and sell products in the United States – right? – using NN [T]echnology?  A.  Using NN [T]echnology, yes, I think that's fair.  Under the MRDA, yes.").

[374] TR21003 (MRDA) at 4 (Art. 1(g)).

[375] *See* Bereskin Rebuttal ¶ 53 (noting that "the definition of Products in Article 1(g) of the MRDA is extremely broad. . . . Thus a licensed participant could have engaged in a patent licensing business which, under the custom and trade would be a service business, similar to that now engaged in by Rockstar, the purchaser of the Patent Portfolio").  The Monitor's expert agrees that "the licensing of intellectual property and intellectual property rights" can constitute a "service."  *See* Burshtein Dep. 187:7-15.

allocation set forth by Kinrich.  Further, as noted by Kinrich, and explained in more detail by Dr.

Terrence McGarty in his expert report, in addition to IPCo, NNI could have developed further

"products, software and services" with respect to technologies that comprised the Patent

Portfolio.[376]

In sum, while the Courts need not reach these issues because the Monitor's reading of the

MRDA is so clearly incorrect for the reasons set forth in Point II above, even under the

Monitor's incorrect reading, the Licensed Participants would be entitled to a substantial

allocation of the Patent Portfolio Sale proceeds, and certainly not zero.

**B.      Green's Alternative Patent Portfolio Valuation Set Forth in His Rebuttal
          Report at Appendix P Is Based on His False Non-Transferability Assumption
          and Therefore Fails**

Green's alternative valuation theory with respect to the Patent Portfolio Sale – based on a

misplaced value in use methodology – was nowhere mentioned in his initial expert report or even

in the text of his rebuttal report.  He instead relegated his alternative theory to a single footnote

to his rebuttal report, describing it in Appendix P to that report.  This alternative allocation

analysis fails because, among other reasons, it too is premised entirely on an incorrect reading of

the MRDA – this time, Article 14(a).

**1.   Green's Alternative Methodology**

Green's alternative analysis ignores the reality of the consensual sale of the Patent

Portfolio to Rockstar that actually occurred and instead limits NNI's and EMEA's allocation (but

not NNL's allocation) to the imagined scenario of what they purportedly could have earned from

their license rights if the sale had not occurred and the MRDA Participants had instead operated

---

[376] *See* Trial Tr. 4167:2-13 (Kinrich); McGarty Rebuttal at Section VII ("NNI Could Have Created Products Using Patents Comprising a Significant Portion of the Patent Portfolio").  And, as set forth in the Proposed Findings of Fact, all NN Technology was intended for a Product.  *See* PFOF § II.D.1 ("All Nortel R&D Was Intended to Produce Products and Sustain Innovation").

IPCo.  Green calls this a "value in use" analysis, and he applies it only to NNI and EMEA, but not to NNL.  These errors – ignoring the actual sale transaction and applying different methodologies to the Participants – are fatal to his approach.

Green purported to calculate projected cash flows from the operation of IPCo using a DCF method.  Because, as discussed in Point IV.B.3.b below, his calculations are rife with errors, he arrives at a value for the Patent Portfolio that is $1.8 to $4.1 billion *less* than the actual fair market value price Rockstar paid for the Patent Portfolio.[377]  So what does Green do in the face of this miscalculation?  He improperly allocates all of the remainder to NNL "as owner of the IP."[378]  While a methodology that calculates the value of these assets at billions of dollars less than what the parties all concede is their fair market value is obviously worthy of no consideration, Green has no principled basis for allocating the enormous differential to NNL since that ignores the actual rights of the parties under the MRDA.

## 2.  Green's Erroneous Assumption on Non-Transferability

The *only* reason Green offers for using his "value in use" method in the first place and allocating to NNL the billions of dollars that his calculation falls short of the fair market value is his erroneous misinterpretation of the MRDA as prohibiting the assignment of NNI and the EMEA IEs' rights to NN Technology but not NNL's.  Green concedes this.[379]  Notwithstanding

---

[377] TR00043 (Green Rebuttal) App. P at 1.

[378] *Id.* App. P at 1; *see also* TR00043 (Green Rebuttal) at 19 ("Any Value Paid by the Purchasers of the Residual IP Above and Beyond the Present Value of the IP Co. Cash Flows Belongs to the Owner of the Asset, NNL"); Trial Tr. 3247:5-20 ("Q.  Sure.  But just like in the business lines – I just want to be clear for the Courts – when you're valuing under Appendix P NNI and the EMEA Debtors' allocation, the question you're asking is what does NNI and the EMEA Debtors, based on some projections, what could they earn had they not sold the patents but ran IPCo; right?  That's what you've done?  A.  Assuming IPCo was a business that was run by Nortel, what would they have received; that's correct.  Q.  But that's not what you're doing for NNL.  Just [as] in the lines of business for NNL, you run NNI and EMEA as if it hadn't been sold, and then for NNL they just get the rest?  A.  That's right.").

[379] *See, e.g.*, TR00042 (Green Report) at 4 ("Because the licenses, by their terms, were not transferable, the appropriate method to value the licenses is to consider what income the relevant US and EMEA Debtors could have generated through their respective exploitation of the license rights if Nortel continued to operate the businesses with the MRDA continuing in effect.").

the importance that Green placed on this supposed non-transferability, at trial, when asked by Justice Newbould, Green was unable to identify the section of the MRDA upon which he relied for his non-transferability assumption until after taking a lunch break.[380]

Green eventually cited Article 14(a) but still could not substantiate his analysis. Article 14(a) provides that *no Participant* can assign the MRDA without consent from the other Participants.[381] Green conceded, as he must, that NNL was a Participant and that MRDA Article 14(a) applies to all Participants.[382] Thus, to the extent NNI and the EMEA IEs could not transfer their MRDA rights without NNL's consent, NNL likewise could not transfer its MRDA rights without NNI's and the EMEA IEs' consent, and Green's justification for valuing NNI's and the EMEA IEs' interests differently from NNL's fails. Even if NNI's and the EMEA IEs' transferability rights under Article 14(a) were different from NNL's – which Green conceded they were not – such restrictions only apply absent consent.

All of the estates did consent, in writing, to the Patent Portfolio Sale, and thus the condition precedent to assignability was plainly satisfied.[383] Indeed, NNI's and the EMEA IEs' agreement to terminate their licenses – which the parties agreed would be deemed a *sale* under the IFSA – was a condition precedent to the transaction.[384] As Kinrich aptly observed, "without transferring, they couldn't have gotten 4.5 billion. They only got it by agreeing jointly to enter

---

[380] *See* Trial Tr. 3122:5-3123:24; *id.* 3167:18-3168:15.

[381] TR21003 (MRDA) at 12 (Art. 14(a)).

[382] *See* Trial Tr. 3214:19- 3215:5.

[383] *See* TR22085 (Rockstar Agreement) at NNI_00825094; *id.* at NNI_00825100; *id.* at NNI_00925122 (defining "U.S. Sellers").

[384] *See* TR12032 (IFSA) § 12(e); TR22085 (Rockstar Agreement) § 5.13(b) (requiring that "as of the Closing, the Sellers shall terminate all license rights granted under the Master R&D Agreement to the extent such license rights are under any of the Transferred Patents, Specified UK Patents or Undisclosed Patent Interests"); *see also* TR11173 ("Iceberg: Asset Sale Agreement Issues") at GIP_Nortel_00136190 ("Summary of Outcome of Business Call re: Project Iceberg" issues list from Google's counsel proposing that "the Asset Sale Agreement (and Sale Order) provide that (a) the MRDA will terminate at Closing, and (b) all other intercompany licenses will terminate at Closing, except to the extent required for continuity of supply of Seller's products and Sellers' services pursuant to retained contracts, and will terminate completely as soon thereafter as the related runoff business ceases"); Riedel Dep. 138:9-139:5.

109

into the transaction. The value should be shared accordingly."[385]

Green testified on direct that when he wrote his expert report he somehow thought "that there had never been consent of the parties" so he "assumed that there had been no transfer, that there was no transferability."[386]  On cross-examination, Green conceded the obvious fact that the Patent Portfolio Sale was a joint, consensual transaction:

> Q.   And you know, don't you, that the Rockstar sale was a
>      consensual sale; right? EMEA, the US Debtors, NNL, all with
>      their free will and volition, agreed to do it; right?
>
> A.   That's correct.[387]

Green's Appendix P analysis thus fails in its entirety because it is based on an incorrect non-assignability assumption.

### 3.   Additional Flaws in Green's Alternative Patent Portfolio Valuation

Although these flaws need not be reached if the Courts reject Green's alternative allocation calculation because it is based on an erroneous belief that there was no consent to the Rockstar transaction and that NNL had transferability rights the Licensed Participants did not have, Green's Appendix P suffers from further serious flaws.

#### a.   Green Ignores that NNI and the EMEA IEs Could Have Generated the Full Value of the Sale Transaction Through Licensing

As Kinrich explained, Green's Appendix P limitation of the potential value available to the estates from licensing the Patent Portfolio to $458 million to $2.7 billion "doesn't make any sense from an economic perspective" because "[y]ou can capture *all* of the [$4.5 billion] value of a patent portfolio through licensing."[388]  That is, the acquisition by Rockstar of the Patent

---

[385] Trial Tr. 4170:20-25.

[386] *Id.* 3123:6-17; *see also id.* 3218:14-19 (Green again reiterating the "absence of consent, as far as [he] could tell").

[387] *Id.* 3205:17-21.

[388] *Id.* 4169:22-24 (emphasis added).

Portfolio is economically equivalent to Rockstar receiving an exclusive license to all the patents.

Kinrich put it this way:

> A simplistic example might be if, instead of selling to Rockstar, on Day One Rockstar picked up the phone and said, "We will pay you $4.5 billion. We want an exclusive license to all of your technology." That transaction is equivalent to what happened.
>
> So all of the value can be obtained through an IPCo-like structure. There is no such thing as "some other value." The value comes from the patent rights. There are no other rights being conveyed. So it has to total 4.5 billion. There is not this plug that he then first plugs and then associates with Canada.[389]

Green conceded this very example was correct.[390] Accordingly, Green's attempt to grant NNL $1.8 - $4.1 billion of the Patent Portfolio Sale proceeds based on the claim that these funds must be related to "some other" value other than what was available through licensing is meritless.

### b. Green Uses Incorrect Discount Rates for the Sale of the Patent Portfolio

Green's inflated discount rates have the effect of drastically increasing the value of the assets he claims NNL contributed to the Patent Portfolio Sale under his flawed Appendix P analysis. This is because the lower Green pushes down the value of what he claims Nortel could have earned operating IPCo through a high discount rate, the higher the differential between that value and the $4.5 billion paid for the Patent Portfolio, a differential that he then allocates solely to NNL under his demonstrably flawed value in use/non-assignability theories.[391] But, as set forth above in Point III, Green's discount rates make no sense in the context of the Sales that actually occurred. Green's use of Lazard's "illustrative" discount rates is wrong because: (a) we now know more information than Lazard did at the time, because we know the fair market value of the Patent Portfolio, which makes clear that the correct discount rate for the Patent Portfolio

---

[389] *Id.* 4169:24-4170:12.

[390] Green Dep. 257:22-259:16.

[391] Given Green's admission that Nortel could have earned the identical $4.5 billion by sublicensing the Patent Portfolio through IPCo, this position is particularly disingenuous.

Sale is far lower; (b) Green's discount rates are based on the perceived risks of Nortel running

IPCo – not what the discount rate would be for a sale of the Patent Portfolio – but the parties

chose to sell the Patent Portfolio instead of running IPCo precisely because they believed it

would generate more value; and (c) as set forth in Point III, Green's discount rates do not match

rates in the market in comparable transactions involving comparable companies.

### c.   Green Applies the RPSM to His Results for NNI and EMEA, Ignoring that These Are Sale Proceeds

Green also improperly applies the RPSM to the proceeds received from the sale of the

Patent Portfolio.  As the Monitor acknowledged in both its pre-trial briefing and in its opening

statement before the Courts, and throughout these proceedings, Schedule A of the MRDA is

explicit that the RPSM does not apply to gains from the sale of a business.[392]  Green was surely

aware of this and presumably agrees because he did not apply the RPSM either to the $4.5 billion

he allocates exclusively to NNL in his primary "analysis" or to the residual that he allocates to

NNL in his alternative Appendix P analysis.[393]

Further, Green's use of the RPSM to engage in his irrelevant calculation of what NNI and

the EMEA IEs might have earned had the Sale not occurred is deeply flawed because it

unreasonably assumes, based on no analysis by either himself or NNL's transfer pricing expert,

Reichert, that Nortel's RPSM transfer pricing policy and allocation key would have remained

exactly the same going forward.  Had Nortel opted to operate IPCo, there is no evidence that it

would have proposed, let alone that the tax authorities would have accepted, an RPSM for the

---

[392] *See* Monitor Pretrial Br. ¶ 156 ("the provisions of the MRDA relating to the RPSM expressly state that the methodology shall not apply to the sharing of proceeds from the sale of a business"); Trial Tr. 416:2-4 (Counsel for the Monitor asserting during opening statements that "the RPSM sharing mechanism [ ] applies under the MRDA to operating results *and not to sale proceeds*" (emphasis added)); TR21003 (MRDA) at 48 (2d Am. to Sched. A) ("The resulting operating earnings/loss is then further adjusted to deduct the following items not related to Nortel's operations: . . . gain/loss on the sale of business . . .").

[393] *See* Trial Tr. 3201:8-18, 3250:10-15.

restructured company.  Certainly, Nortel would not have been allowed to use its current RPSM

formula as, *inter alia*, the IPCo business would not have undertaken further R&D, the basis for

the existing allocation key.  A restructured Nortel based on IPCo would have had vastly different

functions, assets and risks and would accordingly require a very different transfer pricing

formula, and it would be sheer speculation to assume what that formula might have looked like.

That is one of the principal reasons the CRA in June 2009 told Nortel it could not conclude

Nortel's bilateral APA for the 2006-2010 tax years.  Specifically citing to the likelihood of

"Nortel's business operations [] experienc[ing] significant change following Nortel's" decision

to seek creditor protection and the "potential divestiture of key assets over the proposed term of

the [APA], represent[ing] significant change to Nortel's lines of business," the CRA noted there

can be no tax certainty for Nortel going forward.[394]  If in 2009 there was no basis to presume

Nortel's transfer pricing and tax policy through 2010, there certainly is no basis for Green to

assume Nortel's current RPSM formula would have continued in perpetuity for purposes of his

flawed value in use analysis.

    For these additional reasons, Green's Appendix P valuation should be rejected.

**C.**    **The Monitor Uses an Inconsistent Methodology to Limit Artificially the
Value of the US and EMEA Debtors' Interests in the Business Line Sales and
Improperly Transfer Their Value to the Canadian Debtors**

    **1.**    **Green Hides Over $1 Billion in Value in Use Remainder that He
Summarily Allocates to NNL**

    Green uses this same flawed non-transferability assumption in his allocation of the

Business Line Sales proceeds.  Once again, he applies a hypothetical, counterfactual scenario in

which the US and EMEA Debtors did not sell their assets but instead continued to operate the

businesses, creating a billion dollar shortfall from fair market value, which he then allocates to

---

[394] TR43792 (June 2009 Letter from P. Spice, CRA, to P. Look) at 1-2.

NNL on the erroneous belief that it had transferability rights the other Participants did not have.

Thus, Green does not value NNI's and the EMEA IEs' allocations based on what portion of the purchase price was "due to" the transfer or relinquishment of their assets and rights. Rather, he purports to value their allocations based on "the amount of cash flow that would result from the continued operation of the . . . business and what would actually be ultimately the end result, the operating profits, as adjusted by the residual profit-split methodology."[395]  This is Green's value in use method; the same one he uses for his Appendix P analysis.  And the only reason he uses this method is because he once more assumed – wrongly – that NNI's and the EMEA IEs' rights to NN Technology were not transferrable.  As with Appendix P, he does *not* apply the value in use analysis with respect to NNL, because he mistakenly believes that NNL's rights to assign are different under the MRDA than those for NNI and the EMEA IEs.  As Green himself described it, his method for determining NNL's allocation was "just a simple subtraction."[396]

As Kinrich correctly demonstrated  – and Green conceded at trial[397] – had Green consistently applied the same inapplicable value in use methodology to NNL that he applied to NNI and the EMEA IEs, NNL's allocation for the IP and customer relationships would be $387 million, rather than the $1.415 billion Green allocates to NNL for these assets.[398]

---

[395] Trial Tr. 3125:23-3126:3.

[396] *Id.* 3116:19-20.

[397] *See id.* 3229:13-3230:8.

[398] *See* DEM000019 (Kinrich Demonstratives) at 38 ("Critique of Green's Line of Business Valuation"); TR00052 (Kinrich Rebuttal) at 22 (Table 1).



After acknowledging that "the reason [he] use[s] this value-in-use analysis for the business sales . . . is because the licenses by their terms were not transferable,"[399] Green admitted at trial that if all parties in fact consented to the Business Line Sales then his non-transferability assumption would be incorrect and, therefore, his primary allocation for the Business Lines would have to be rejected:

> Q: So when you say in the absence of consent, I think this value-in-use analysis is the way to go, if there's consent, you don't use this value-in-use analysis and you don't treat NNI and EMEA any differently than you treat NNL; right?
>
> A: Well, no.  If there were consent – if this is the key term that is going to be changing – it's a different understanding.  The most that would ever be allocable would be the maximum allocation that's on page 62 of my report.[400]

---

[399] Trial Tr. 3208:20-25.

[400] *Id.* 3219:24-3220:8.  Of course, the Business Line Sales were consensual among all parties, as Green readily admitted.  *See id.* 3208:3-19.

Accordingly, by Green's own admissions at trial, his primary allocation theories cannot be adopted.[401]

### 2. Green Admitted that His "Alternative Maximum Allocation" Theory Is Not Only Improperly Calculated but Also Methodologically Incorrect

Although Green turned to his alternative allocation theory at trial when confronted with the incorrect assumptions underlying his primary theory, the fact is that in his initial expert report he conceded that his so-called alternative maximum allocation "approach is inappropriate."[402] The US Interests concur.

In his alternative maximum allocation approach, Green purports to calculate the intangible asset value for each debtor estate using Nortel's residual profit share percentages. As discussed in Point V below, the application of the RPSM to these sale proceeds is inappropriate, as even the Monitor and Green acknowledge.

Moreover, even were the RPSM applicable, Green does not apply it properly. The RPS calculation is a two-part calculation: routine returns and then residual profit.[403] But Green omits the calculation related to routine returns; instead, he makes the assumption that "normal/routine

---

[401] As Kinrich explained at length at trial, Green's implementation of his primary Business Line valuation analysis fails for several additional reasons, including:

- Green's selective and improper use of forecasts which have the effect of reducing the cash flow projections, inflating the gap between his calculations and fair market value, which he assigns to NNL;
- Green's decision to assume away for the US and EMEA Debtors any value attributable to goodwill or that would result from calculating a terminal value, instead allocating any such value to NNL;
- Green's application of the RPSM to the US and EMEA Debtors' value in use-based allocation, which is incorrect for many of the same reasons it was incorrect with respect to his Appendix P analysis.

*See id.* 4199:5-4205:5. These economically-improper valuation errors all inure to the benefit of NNL.

[402] TR00042 (Green Report) at 63.

[403] *See* PFOF § III.C.3 ("Mechanics of Nortel's RPSM").

returns are in approximately the same relative proportion as RPS percentages."[404]  Green

conceded at his deposition that if that assumption was false (as it is), "the fundamental

underlying construct of this analysis would probably – wouldn't be really correct."[405]

As Kinrich showed, that assumption *is* false.  Routine returns were never in the same

relative proportion as RPS percentages:

> [Green] states in his alternative max calculation, one of his assumptions was that what are called normal or routine returns are in approximately the same relative proportion as the RPS percentages.
>
> *Well, they are not.* I ran the calculation. Table 6 of my [Rebuttal] report shows that the routine returns give the Canadian Debtors far less and give the EMEA and US Debtors far more than the percentages associated with the residual profit split. If you make only that change and still keep his use of the RPSM, still run all the profits from the calculation through the RPS percentages but only make that change, you get the results shown at the bottom of the page, my Table 7.
>
> So even with just that simple correction, the numbers move quite substantially.[406]

Confronted with these facts at trial, Green confirmed that his assumption in fact fails.[407]

At bottom, Green's alternative maximum methodology is one that even he "do[es] not agree

with,"[408] and relies on an incorrect underlying assumption.  It should be disregarded.

The Monitor has never offered any proposed Business Line allocation to the Courts other

than these two unsupportable theories.

---

[404] TR00042 (Green Report) at 62.  *See also* Trial Tr. 3238:7-3239:12.

[405] Green Dep. 220:20-22 (Green).

[406] Trial Tr. 4205:19-4206:10 (emphasis added).

[407] *See id.* 3243:20-3244:1.

[408] TR00042 (Green Report) at 62.

## POINT V

## ALL PARTIES AGREE THAT THE RPSM FORMULA SHOULD
## NOT BE USED TO ALLOCATE THE SALES PROCEEDS

The one point upon which all parties agree is that the RPSM is not an appropriate method

to allocate the Sale Proceeds.  No party has advocated for an allocation based upon the RPSM

methodology set forth in Schedule A to the MRDA, and in fact, each party has expressly stated

that doing so would be inappropriate.  The Monitor stated in its pre-trial brief that "the

provisions of the MRDA relating to the RPSM expressly state that the methodology shall *not*

apply to the sharing of proceeds from the sale of a business" and this includes the sale of the

Patent Portfolio given that it does not propose to share any of those proceeds.[409]  The EMEA

Debtors agreed that the MRDA "govern[s] the annual operating profits that it addresses and

[does] not [ ] govern[] the proceeds that are allocated on a sale, which is the question directly

before the Courts."[410]  These statements are consistent with the clear intent of all the parties that

the MRDA not be used to allocate "gain/loss from the sale of a business," a provision that the

parties specifically amended in Schedule A of the MRDA at the end of 2008 (effective January

1, 2006) to codify.[411]  Using the RPSM is simply not an allocation method that any party agreed

to, or is seeking, for allocation of Sale proceeds in this insolvency.  Even if that were not the case

however, there are insurmountable problems with employing the RPSM method, and Nortel's

RPSM in particular, that highlight how ill-suited it is for the purpose of allocation.

As an initial matter, the RPSM does not value the assets each Debtor relinquished and

---

[409] Monitor Pretrial Br. ¶ 156 (emphasis in original); Trial Tr. 3201:8-18 (Green) (testifying that he did not apply the RPSM to NNL's Patent Portfolio Sale allocation).

[410] *Id.* 32:5-22 (EMEA opening statement).  The UKP has similarly rejected the RPSM as an appropriate method for allocation through the opinion of its transfer pricing expert.  *See, e.g.*, *id.* 2852:12-19 (Felgran).

[411] At trial, the Monitor's transfer pricing expert, Reichert, explained that the MRDA's provisions excluding business sale proceeds from the RPSM calculation is consistent with transfer pricing principle since such gains or losses are not considered part of the residual profit that the RPSM is intended to divide.  *Id.* 4030:4-22.  Eden also testified that this treatment was consistent with the fact that "extraordinary items" like the sale of a business are generally excluded from the operating profit allocated through an RPSM. *Id.* 4983:22-4985:12.

what portion of the proceeds received in the Sales was due to such relinquishments. Distinguishing the RPSM, the MRDA expressly provides that following an insolvency event, each Licensed Participant is entitled to be compensated for the fair market value of their license to NN Technology.  As Eden explained both in her expert reports and at trial, the RPSM does not value the assets and rights sold or surrendered by each selling debtor in the Sales, and thus, cannot answer the allocation question before the Courts.[412]

Further, allocation of profits and losses for purposes of transfer pricing is not the same as allocating sale proceeds in an insolvency.  As the Monitor's own expert, Reichert, explained, it is "absolutely true" that the "principles applicable to the allocation of sale proceeds of sale on an insolvency liquidation may be different than the principles which guide allocation of residual profits in a transfer pricing regime."[413]  Similarly, Eden and the UKPC's expert, Felgran, both testified that transfer pricing principles have been designed and evolved to address the proper allocation of taxable income among controlled operating entities, and have never been intended to address allocation of asset sales in an insolvency.[414]

Moreover, the evidence is uncontested that Nortel's RPSM was designed to transfer operating revenues to Canada to meet Nortel's twin goals of tax minimization and providing NNL with needed cash flow.[415]  Moving taxable income to NNL from NNI – commonly referred to as the "Cash to Canada" initiative at Nortel – was of paramount importance to Nortel because NNL's effective tax rate in Canada was much lower than NNI's effective tax rate in the US.[416]

---

[412] TR00062 (Eden Report) ¶¶ 15.B, 134-136; TR00063 (Eden Rebuttal) ¶¶ 1-6; Trial Tr. 4982:1-5003:24.

[413] *Id.* 4031:20-4032:1.

[414] *Id.* 4982:1-23 (Eden); *id.* 4983:22-4984:7 (Eden); *id.* 2852:12-2853:2 (Felgran).

[415] *See* PFOF § III.C.4 ("Nortel's RPSM Was Designed to Move Cash from NNI to NNL to Reduce the Nortel Group's Taxes").

[416] At the time the RPSM was being designed in 2002, the Nortel tax group observed that the effective tax rate for NNL in Canada would be 11% versus 37% for NNI in the US and 30% in the UK.  Trial Tr. 4989:7-4990:22 (Eden) (discussing TR22121, July 11, 2002 Nortel Global Tax Practice presentation, at 16).

As Nortel stated at a "Global Tax Town Hall" meeting in 2007, the "RPS method allocates more profit to Canada in the long term and takes advantage of Canada as a tax haven."[417]  This view is openly discussed throughout the documents of Look and Doolittle, the vice-presidents of tax for Nortel form 2002-2010, and the rest of Nortel's tax group, and was confirmed by Orlando and Henderson, as detailed in the US Interests' Proposed Findings of Fact.[418]  Henderson testified that Nortel was purposely aggressive in its stance and regarded the design of the RPSM as proposed in the APA as a negotiating "going-in" position with the expectation that the IRS would oppose, and the CRA would support.[419]  Consistent with these expectations, the MRDA contains several provisions expressly anticipating that the RPSM schedule would be amended depending on the result of the APA negotiation process.[420]

Likewise, Nortel used the RPSM to move cash needed by NNL to Canada in a tax efficient manner.[421]  As Doolittle stated in 2005 to senior colleagues in the treasury group:

> This is exactly the way we designed our transfer pricing i.e. take as much out of the US as we could. The problem seems to occur because the transfer pricing adjustments are not nearly enough to fund all of the costs in Canada like the debt and the company overall is draining cash.[422]

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████  The Monitor confirmed the settlement was based on transfer pricing adjustments, explaining to the Court that "after extensive discussion and review

---

[417] *See, e.g.*, TR21170 at 17; Trial Tr. 2889:12-2890:6 (Felgran).

[418] TR00016 (Henderson Decl.) ¶ 40; TR00019 (Orlando Decl.) ¶ 9; PFOF § III.C.4 ("Nortel's RPSM Was Designed to Move Cash from NNI to NNL to Reduce the Nortel Group's Taxes").

[419] TR00016 (Henderson Decl.) ¶¶ 34, 42, 50, 53.

[420] TR21003 (MRDA) at 5, 18, 27 (Art. 2(c), Sched. A, 2d. Add. to MRDA).

[421] Culina Dep. 163:14-164:25; Look Dep. 334:25-336; R. Smith Dep. 68:18-69:6, 69:13-70:18.

[422] TR21525 at 1 (Nov. 2005 Email from J. Doolittle to K. Stevenson, M. McCorkle); *see also* Culina Dep. 163:14-164:25.

of Nortel's transfer pricing structure, NNL and NNI have agreed that certain transfer pricing overpayments by NNI to NNL occurred during the 2001 to 2005 period and have agreed to a $2 billion intercompany adjustment to satisfy this overpayment."[423]  This constituted approximately 40% of transfer pricing payments made during this period.[424]  Accordingly, Nortel's RPSM percentages have little to do with the actual value or contribution of the different entities, and very much to do with a conscious decision to push as much money to Canada as Nortel believed (ultimately incorrectly) that the tax authorities would allow.

The underlying assets that generated the operating revenue and were ultimately surrendered by the parties in the Sales always remained the assets of the individual IEs until the time of the Sales.  It is those assets that were surrendered and bought in the Sales, not the parties' method for dividing operating revenue or losses when functioning as an operating multinational enterprise, and it is the value of those assets that must be allocated.

**POINT VI**

**THE EMEA DEBTORS' CONTRIBUTION APPROACH IS INAPPROPRIATE FOR ALLOCATION AND FAILS TO PROPERLY MEASURE EACH IE'S ACTUAL CONTRIBUTION TO THE PATENT PORTFOLIO SOLD**

In contrast to the fair market value approach presented by the US Interests, the EMEA Debtors advocate as their principal theory a cost-based "contribution approach," pursuant to which each of the IEs would be allocated a share of the Sales proceeds proportionate to the amount of its R&D spend toward the creation of the NN Technology sold in the Sales.[425]  This contribution approach is flawed because the amount spent on developing an asset is not an accurate measure of the *value* of the asset.

If the Courts are to consider the contribution approach (which they should not do),

---

[423] TR40594 (Monitor's Thirty-Fifth Report) ¶¶ 39-41.
[424] TR00063 (Eden Rebuttal) ¶ 78.
[425] *See* TR00033 (Malackowski Report) at 39-47; TR00030 (Huffard Report) at 46-48, 54-59.

however, two important points must be observed:  First, any measurement of "contribution" must necessarily reflect the entire period during which the assets sold were created.  Second, as the EMEA Debtors' own expert, Dr. Richard Cooper, acknowledged, under the CSA, the contribution approach must account for all of an IE's R&D funding.

A.    **The Contribution Approach Fails to Allocate the Sales Proceeds Based on the Value Relinquished by Each Selling Debtor**

The contribution approach is fundamentally divorced from the fair market value of the assets sold.  The amount spent to create an asset does not reflect how much it is worth.  The EMEA Debtors' own valuation expert, Paul Huffard, conceded that the contribution approach is not a valuation approach:

> Q: Whereas in the contribution approach, you're not valuing any rights that were contributed to the sale; you're doing an analysis based on somebody's sense of what is an equitable way to allocate the proceeds once received?
>
> A: I think that's fair.[426]

As Kinrich explained, a "[c]ontribution approach is not a way to determine fair market value. Costs incurred are not equal to fair market value, so you can't measure them through what is being termed a contribution approach."[427]

Nor is the contribution approach consistent with the IEs' rights under the MRDA.  As noted above, the MRDA provides that the Licensed Participants' "equitable and beneficial" ownership of NN Technology is reflected in their Exclusive Licenses and corresponding exclusion rights.  Upon insolvency, each Participant's ownership rights to NN Technology

---

[426] Trial Tr. 2050:4-18 (Huffard).

[427] *Id.* 4171:18-22 (Kinrich).  *See also* TR00052 (Kinrich Rebuttal) ¶¶ 116-119; TR00063 (Eden Rebuttal) ¶ 105 ("As I have explained in my Report and in section III of this rebuttal report, transfer pricing should not be used for the valuation of assets sold in a bankruptcy. This is because there is no reason why the value of an entity's intangible assets would be equal or directly proportional to the costs incurred by that entity in developing those intangibles, such that each IE's historical R&D spending is unlikely to approximate the value that should accrue to that entity when its assets and rights are sold."); Trial Tr. 4999:16-5001:7 (Eden) (testifying to same).

remain unchanged.  The measure of the value of those rights has nothing to do with how much R&D each IE has historically funded.

The existence of the RPSM does not support the use of a contribution approach.  In addition to setting forth the IEs' economic ownership interests in NN Technology, the MRDA creates a separate contractual obligation to share operating revenue as set forth in Schedule A, subject to approval of tax authorities and whatever adjustments those authorities might require.  But Schedule A clearly states that the proceeds of business sales are excluded, as the EMEA Debtors and all parties agree.[428]

### B.      The Contribution Approach, Even if Adopted, Must Properly Measure the Economic Contribution of Each IE to the Creation of the IP that Was Sold

Should the Courts decide not to allocate the Sales proceeds based on the fair market value each estate surrendered in the Sales, and instead consider a contribution approach, then two principles should govern the methodology.

---

[428] The EMEA Debtors rely heavily on two disparate pieces of evidence as indirect support for their argument that the Courts should allocate based on contribution:  the Alcatel sale in 2007 and draft 2002 APA talking points.  Neither overcomes – or even addresses – the fundamental flaws in the EMEA Debtors' proposal.

In the Alcatel transaction, after debating multiple viable allocation methods, Nortel's tax department ultimately elected to allocate the portion of the purchase price attributable to intellectual property based on the RPSM Schedule A percentages as it was viewed as a convenient and acceptable method.  Notably, Kerry Stephens, a former PwC tax partner turned "special projects" consultant for the tax group in NNUK, proposed an amendment to the MRDA that would require sale proceeds to be allocated through the RPSM formula, but Nortel did the opposite, amending the MRDA explicitly to exclude the gain or loss on business sales from the Schedule A formula.  *See supra* Point V.  Moreover, as Stephens noted in a contemporaneous email, Nortel did not consider the Alcatel allocation to be "precedential."  *See* TR44400 (Jan. 2009 Email from K. Stephens to D. Gregory of E&Y); Stephens Dep. Tr. 211:5-7 ("Inland Revenue never agreed it was a precedent.  We didn't put it to them as a precedent either.").

With regard to the document drafted in anticipation of a 2002 meeting with the tax authorities to "kick-off" the APA process, the sample talking points were not provided to the tax authorities, nor is there any mention in the documents memorializing this meeting that this question was asked or answered.  *See* TR43679 (June 2002 Summary of the APA Conference); TR44935 (Executive Summary of questions from the June 19, 2002 meeting).  As EMEA's counsel conceded:  "I think counsel is absolutely correct that there is nothing in the record that shows that that document was provided to the authorities or, indeed, that that specific answer was given or that that question was asked at the tripartite meeting.  I don't believe there is anything in the record that shows that that actually happened."  Trial Tr. 2155:14-2155:21.  Moreover, the sample talking points are inconsistent with what Nortel actually told tax authorities repeatedly about the relationship of IP rights within the Nortel Group.  *See supra* Point II.C.1.c.

### 1.  Contribution Must Measure Each IE's Funding of R&D at the Time of the Creation of the Specific Assets Sold

The EMEA Debtors and the US Interests agree that any measurement of contribution must use the appropriate R&D time frame relating to the IP sold in the Sales.[429]  As EMEA expert Cooper testified, "if you don't account for the full useful life of the R&D, then you may end up shortchanging some of the participants who paid for some of the older R&D."[430] Accordingly, EMEA expert Malackowski examined the year of creation of every patent sold to Rockstar – thus measuring its useful life – in order to determine the respective percentage contribution of each of the IEs toward the creation of each patent.  Pursuant to this analysis, which Tucker corroborated, the R&D for 99% of the high-interest patents sold in the Rockstar transaction occurred prior to the end of 2005.[431]  Indeed, the bulk of the value in the Sales was created through R&D funded "in the late [19]90's to early 2000s" – in other words, the years in which the 1992 R&D CSA was in place.[432]  Accordingly, as Cooper stated, because "the parties' proportion of R&D expense changed over time, [] it is important to look at what they actually paid during each time period."[433]

Malackowski's "Invention Date of High-Interest Patents" slide – which used the data Cooper cited in his report – underscores the importance of the R&D conducted and funded during the CSA years:  approximately 80% of the high interest patents sold in the Patent

---

[429] *See, e.g.*, Trial Tr. 2813:4-9 (Cooper).

[430] *Id.* 2112:2-6 (Cooper).

[431] *Id.* 2281:2-12 (Malackowski).  Similarly, a significant majority of the patents that were sold in the Business Line Sales (for example, 85% of the patents in the Enterprise Sale) were developed through R&D funded prior to 2006. *Id.* 2279:1-17 (Malackowski) (discussing DEM00011 at 20).

[432] *Id.* 2277:21-2278:5 (Malackowski) (discussing DEM00011 at 19).  Even the Monitor's expert, Reichert, conceded that the age of patents sold to Rockstar "tells us that the economic life [of the patents] was very long," *id.* 4009:13-17, because when you actually sell the IP, it is "ipso facto within [its] economic useful life," *id.* 4011:17-4012:1.

[433] *Id.* 2818:15-19.

Portfolio Sale were developed during this period:[434]



Accordingly, if the Courts apply any "contribution" theory, they should not use the R&D spend for the years 2006-2010 – during which only a small fraction of the Patent Portfolio sold to Rockstar was created and thus funded by any debtor's "contributions"[435] – but rather Malackowski's detailed calculations reflecting the year each patent was created and the amount contributed by each IE during that year.

### 2. Contribution Must Measure Each IE's Complete R&D Funding

Where the US Interests and the EMEA Debtors diverge is that the EMEA Debtors disregard the logical next step: the measurement of *all* the R&D each entity funded during the CSA period, net of reimbursements. According to Cooper, an entity has beneficial ownership "over the portion of the IP that an entity paid for. So if it paid for half of the R&D, then it had

---

[434] DEM00011 at 22; Trial Tr. 4511:24-4512:22 (Ryan); 2815:22-2819:5 (Cooper).

[435] *See id.* 2279:1-17 (Malackowski) (discussing DEM00011 at 20).

beneficial ownership of half the R&D."[436]  As Cooper explained:

> Q. And under the CSA, whatever R&D a participant pays for constitutes its economic ownership?
>
> A. I would agree.
>
> Q. And that could be money that an entity expends on R&D it conducts in its own territory; right?
>
> A. Yes.
>
> Q. And it could include R&D that an entity pays for to an independent contractor to do R&D for it?
>
> A. I would think so.
>
> Q. And it could include R&D that a counterparty to a CSA performs but for which the first entity received the benefit and thus makes a transfer pricing adjustment?
>
> A. Correct.
>
> Q. So basically, whoever pays for the R&D, regardless of whether they do it or not, would have the economic ownership for the resulting IP proportionate to the amount it paid?
>
> A. That's correct.[437]

Cooper's testimony makes clear that under the EMEA Debtors' contribution theory, a party's economic ownership of pre-2001 patents must include *all* the R&D transfer pricing adjustments made by that party under the R&D CSAs, as reflected in Nortel's books and records.[438]  This is because under the R&D CSAs, transfer pricing adjustments *are* directly and unequivocally R&D funding and thus R&D contribution; the whole point of a CSA is for the

---

[436] *Id.* 2808:25-2809:5 (Cooper).  The US Interests strongly disagree with this notion of economic ownership and related allocation espoused by the EMEA Debtors.  The below discussion, however, explains how to measure contribution if the Courts accept the EMEA Debtors' theory.

[437] *Id.* 2809:13-2810:9.

[438] Cooper agreed with Malackowski that to determine when R&D for a patent was funded, one should look to the R&D spending in the year before a patent filing because of the one-year lag between the funding of R&D and the filing of a patent.  *Id.* 2812:7-17 (Cooper).  Thus, all patents filed by Nortel through 2001 would have been based on funding provided between 1989 and 2000, namely under the R&D CSAs, not the MRDA.

parties to share costs through transfer pricing adjustments. Yet for the CSA period, Malackowski's contribution analysis accounted only for the R&D costs that each entity incurred by conducting R&D in its own Exclusive Territory.[439] This is inconsistent with what the EMEA Debtors' transfer pricing expert Cooper testified must be measured under the contribution approach. As Laureen Ryan – a forensic accountant with 25 years of experience in valuation and bankruptcy – explained, the impact of Malackowski's error is significant.[440]

For the CSA period, the transfer pricing worksheets clearly set forth, for each year and for each CSA Participant, both the amount of money directly spent by each entity for R&D conducted in its own territory ("<u>Direct R&D Spend</u>"), as well as the amount of R&D funding that each entity was either to pay or to receive through a transfer pricing adjustment.[441] Consistent with Cooper's methodology, using those worksheets, Ryan calculated each entity's actual contribution to R&D under the CSA based on its total R&D funding.[442]

During the period from 1989 through 2000, in addition to funding the R&D it performed in its own territory, NNI also directly funded $4.4 billion of R&D conducted by other entities through payments to NNL under the R&D CSA, accounting for 73% of Nortel's total R&D

---

[439] TR00033 (Malackowski Report) at 39; *see also* TR00030 (Huffard Report) ¶ 105.

[440] In adjusting Malackowski's calculation to account for total R&D funding, Ryan relied entirely on the same transfer pricing worksheets used by Malackowski. TR00055 (Ryan Rebuttal) at 2-3, 15-17; Trial Tr. 4484:1-4492:17 (Ryan) (same); *see also* TR00055 (Ryan Rebuttal) at Exs. D.1, D.2 (citing to transfer pricing worksheets); Trial Tr. 4494:19-4495:9; TR00033 (Malackowski Report) at 47 n.149 (citing to the same transfer pricing worksheets). She made no other changes to Malackowski and Huffard's methodology with respect to the $5.219 billion of proceeds that they attribute to intellectual property. *See* TR00055 (Ryan Rebuttal) at 4, 15-16; Trial Tr. 4482:19-4483:9, 4493:6-19, 4494:5-18 (Ryan). Ryan also flowed her modifications through the same model used by Huffard to reach her ultimate conclusion. *Id.* 4493:20-4494:4 (Ryan); TR00055 (Ryan Rebuttal) at Ex. C.

[441] *See, e.g.*, TR47129 at tab "Post Transfer Pricing Dec 31st" (Row 193, listing "R&D Expense," defined here as Direct R&D Spend; Row 483, listing the "Inc(Dec) in R&D Allocation," defined by Ryan as TP R&D); *see also* TR00055 (Ryan Rebuttal) at Exs. D.1, D.2 (citing to transfer pricing worksheets).

[442] Trial Tr. 4578:5-23 (Ryan); *see also, e.g.*, TR47129, Tab "Post Transfer Pricing Dec 31st" (Row 465, listing "Total R&D Allocation," defined here as Total R&D Funded). At trial, the cross-examination of Ryan focused on her adjustments for the MRDA period, largely due to the fact that unlike for the CSA period, the transfer pricing adjustments from 2001-2008 did not break out the amounts specifically allocable to R&D. *See* TR00055 (Ryan Rebuttal) at 15; Trial Tr. 4504:21-4505:21, 4524:6-4525:1 (Ryan). Ryan's calculations with respect to the CSA period (1989-2000), however, were entirely unchallenged by any party, either on cross-examination or through the testimony of any other expert witness.

contribution during that period.[443]  Once the EMEA Debtors' methodology is corrected to

account for each IE's full funding of R&D in just the CSA years, the corrected contribution

allocation is as follows:[444]

|  | EMEAs' Calculation | | Corrected for CSA Period[445] | |
|---|---|---|---|---|
| Canada | $ 2,318 | 31.8% | $1,821 | 25.0% |
| US | 3,637 | 50.0% | 4,436 | 60.9% |
| EMEA | 1,325 | 18.2% | 1,022 | 14.0% |
| Total | $7,280 | 100.0% | 7,280 | 100.0% |

## POINT VII

## THE UKPC'S AND CCC'S PRO RATA DISTRIBUTION THEORY LACKS MERIT

As the IFSA makes clear, in express consideration for entering into the Sales and

agreeing to terminate its Exclusive License, NNI negotiated for a right to receive an allocation of

the Sale Proceeds.[446]  The UKPC and members of the CCC never objected to the IFSA, yet now

ask the Courts to disregard it.  Irrespective of the parties' agreement, moreover, in a bankruptcy

sale, a debtor must obtain the highest and best price for its assets,[447] and proceeds from such

---

[443] TR00055 (Ryan Rebuttal) at 15.

[444] Trial Tr. 4512:23-4513:24 (Ryan) (explaining her calculations for adjustments to only the CSA Period); DEM00022 (Ryan Demonstrative Slides) at 9.  Ryan also offered opinions regarding NNI's contribution to Nortel's R&D during the MRDA period.  She disaggregated the MRDA transfer pricing adjustments to derive a reasonable approximation of the portion of those adjustments that could be attributed to R&D.  Trial Tr. 4498:4-4498:12, 4505:5-4505:11.  When each entity's indirect funding of R&D during the MRDA period (as well as the CSA period) was taken into account, Ryan concluded that the allocation should be 20.2% to Canada, 66.7% to the US, and 13.1% to EMEA.  TR00055 (Ryan Rebuttal) at 16.

If these amounts are adjusted to reflect NNI's $2 billion allowed claim against NNL, the allocation would be 13.0% to Canada, 64.0% to the U.S., and 23.0% to EMEA.  This adjustment is based entirely upon the transfer pricing worksheets that Ryan and Malackowski relied upon and that are part of the trial record.

[445] Trial Tr. 4512:23-4513:24 (Ryan) (explaining her calculations for adjustments to only the CSA Period); DEM00022 (Ryan Demonstratives) at 9.

[446] IFSA § 11(a) states that "[e]ach of the US Debtors and the EMEA Debtors hereby agrees to" terminate their respective licenses to intellectual property, "for the purpose of facilitating, and in consideration of a right to an allocation . . . to such Debtors of portions of the" sale proceeds.  TR12032 (IFSA) § 11(a).  Similarly, § 12(b) states that the Sales proceeds housed in the escrow account are for the "payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors."  *Id.* § 12(b).

[447] 11 U.S.C. § 363.  *See also In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (in determining whether there is a sound business purpose for an asset sale, a court may consider "the amount of proceeds to be

sales are marshaled for the benefit of the debtor's own creditors and stakeholders, to be

distributed in accordance with the applicable legal priorities for payment of such parties.[448]

There is no basis to allocate to NNI less than its fair market value. Yet, in requesting that

a large portion of NNI's assets go to NNL's and NNUK's creditors (such as the CCC's members

and UKPC), the UKPC and CCC seek precisely that. The arguments advanced in favor of pro

rata lack any legal or factual basis and should be rejected:

- <u>First</u>, any allocation theory that allocates to each Selling Debtor less than the fair market value of the assets it sold or relinquished, as the UKPC's and CCC's theory unquestionably does, is unsustainable under the law. The UKPC's and CCC's pro rata distribution theory – akin to global substantive consolidation of the Nortel Group – is unprecedented and lacks any legal basis.

- <u>Second</u>, the pro rata distribution theory is an improper *sub rosa* plan of distribution to the extent it determines ultimate creditor recoveries but fails to propose or meet the requirements of plan confirmation, which it indisputably does not do.

- <u>Third</u>, even were there legal support, there is no factual basis for application of the pro rata legal theory.

- <u>Fourth</u>, even if the UKPC and CCC could overcome these legal and factual obstacles, the theory they propose is impossible to implement and administer in this proceeding.

- <u>Finally</u>, the pro rata distribution theory would disturb reasonably held creditor expectations and would be detrimental to the functioning of capital markets.

### A.    Pro Rata Distribution Theory Has No Legal Basis

#### 1.  The Pro Rata Distribution Theory Would Allocate to NNI Less Than the Value of the Assets It Sold or Relinquished in the Sales

NNI owned rights and assets constituting a substantial portion of Nortel's Business Lines

and Patent Portfolio. The US Court approved the Sales of NNI's assets and rights as in the "best

---

obtained from the sale versus appraised values of the property"); *In re Filene's Basement, LLC*, No. 11013511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del Apr. 29, 2014) (the sale price must be "fair and reasonable" (internal quotations omitted)).

[448] *See* 11 U.S.C. §§ 541, 1129.

interests" of NNI and its creditors.[449]

While the selling debtors disagree as to the value of NNI's assets, there is no dispute that the allocation proposed by the UKPC and CCC falls well short of even the lowest value of what NNI sold or relinquished that is advocated by any party in these proceedings. The CCC's own expert, Britven, admits this.[450] Because the pro rata allocation theory *necessarily* deprives NNI of the fair market value of the assets it sold or relinquished, it cannot be adopted.

### 2. The Pro Rata Distribution Theory Seeks Unprecedented Global Substantive Consolidation of the Nortel Debtors Without Legal Basis

Separate from disregarding the principle of fair market value, to achieve the desired result of the UKPC and CCC – distribution of the Nortel Group's global assets to produce a *pro rata*, common dividend to all non-priority creditors – the Courts would have to:  (a) disregard Nortel entities' corporate separateness; (b) disregard the Courts' jurisdictional barriers; (c) consolidate assets and claims of multiple Nortel estates into a single, common pool; (d) make individual estate cash and assets available to all creditors worldwide; and (e) disregard or deem worthless guarantee and intercompany claims, contrary to legitimate expectations of Nortel creditors.  Such a single pool, common distribution, as the UKPC's expert Jay Westbrook recognized, would be similar in result to *cross-border global substantive consolidation* of the Nortel estates.[451]  The UKPC's pro rata experts Westbrook and Clark uniformly concede that "no such international rule" for cross-border substantive consolidation exists anywhere.[452]

---

[449] TR50196 at 9-10; *see also* TR21509 at 110:5-24.

[450] *See* Britven Dep. 274:10-23 (Britven concluded that the fair market value of the US Debtors' assets was more than $1 billion, but his application of the CCC's pro rata approach would allocate only $182 million to the US Debtors).  No parties' valuation of the fair market value of the US Debtors' assets sold or relinquished in the Sales was less than $1 billion.

[451] Westbrook Dep. 16:5-10; *see also* Clark Dep. 141:17-23.

[452] Westbrook Dep. 170:22-171:23, 37:13-38:4, 72:22-73:2; TR11436 (Clark & Westbrook Report) ¶ 22 n.33.

**B.        Pro Rata Distribution Fails to Meet the Requirements of Plan Confirmation**

Even were the Courts to accept the pro rata experts' explicit invitation to make new law,[453] adopting a pro rata distribution theory would violate the Bankruptcy Code and the CCAA as a *sub rosa* or *de facto* plan or plan of arrangement.  Specifically, a "pro rata distribution" theory would require the Courts to dictate creditor recoveries and compromise creditors' claims (including intercompany and guarantee claims) outside of the plan process in the US and Canada.  In the US, a settlement or transaction which effectively mandates the terms of a plan must meet the requirements of plan confirmation under Section 1129 of the US Bankruptcy Code.[454]

Similarly, under Canadian law, an agreement or transaction which deprives creditors of their rights, including rights to sue for and enforce judgments, must meet the voting and other requirements of a plan of arrangement or compromise.[455]  The Courts should reject the UKPC's and CCC's efforts to dictate creditor recoveries and undermine the legal and procedural protections of the Bankruptcy Code and the CCAA.[456]  Indeed, the pro rata distribution theory would entail the US Court determining recoveries for the creditors of the Canadian Debtors and the EMEA Debtors and the Canadian Court determining recoveries for the creditors of the US Debtors and the EMEA Debtors. There is no jurisdictional basis for this.

---

[453] TR11436 (Clark & Westbrook Report) ¶ 4; Clark Dep. 109:23-110:10; Westbrook Dep. 172:4-173:17.

[454] *See Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 354 (5th Cir. 1997) ("The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of a plan sub rosa in connection with a sale of assets.") (*quoting Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983)); *see also In re Gen. Motors Corp.*, 407 B.R. 463, 495 (Bankr. S.D.N.Y. 2009) (noting that a transaction amounts to a sub rosa plan "if [it] seeks to allocate or dictate the distribution of . . . proceeds among different classes of creditors.").

[455] *See Crystallex (Re)*, 2012 ONCA 404, [92] (quoting Newbould, J.).

[456] *See* 11 U.S.C. § 1129(a)(8); CCAA, RSC 1985, c. C-36, s.6(1); *see also Law v. Siegel*, 134 S. Ct. 1188, 1194 (2014) (noting that the Court is also prohibited from using its equitable powers under § 105(a) to "override explicit mandates of other sections of the Bankruptcy Code").

The UKPC and the CCC suggest that once funds are allocated to each estate, each is free to decide whether or not to distribute these funds on a pro rata basis.[457]  But this does not cure the defects in the UKPC's and CCC's theory for two reasons.  First, unless pro rata distribution is achieved through cross-border substantive consolidation – the domestic requirements for which the UKPC and CCC cannot even meet – there is no theory by which the Courts can allocate less than the fair market value of each estate's assets to that estate.  The UKPC and CCC cannot have it both ways.  Either the Courts must allocate based on fair market value or they must adhere to the legal requirements for a plan of reorganization (or arrangement or compromise) if they are to use the assets of one estate to satisfy another's creditors.

Second, if individual estates do not – perhaps cannot – distribute the funds to their creditors pro rata, then there exists no justification to use pro rata for allocation.  Either distributions to creditors will be made pro rata – rendering this a *sub rosa* plan – or they will not be, in which case the Courts ought not distribute funds to the estates pro rata.

### C.    Pro Rata Distribution Theory Has No Factual Basis

Even if the UKPC's and CCC's legal theories were tenable, they cannot meet their burden of proof – even by domestic standards – to consolidate the Nortel Group's assets across legal and jurisdictional boundaries in order to effectuate a pro rata distribution to all creditors worldwide.

In the US, a proponent of substantive consolidation must demonstrate that either "(i) prepetition [the debtors] disregarded separateness so significantly [that] their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) post-petition [the debtors'] assets and liabilities are so scrambled that separating them is prohibitive and hurts all

---

[457] *See, e.g.*, UKPC Pretrial Br. ¶ 63(c); Trial Tr. 489:11-22 (CCC Opening Argument).

creditors."[458]  Similarly, in Canada, the party seeking such a remedy would have to demonstrate the "intertwined" nature of the subject entities.[459]

As set forth in more detail in Section II.B of the US Interests' Proposed Findings of Fact, the evidence is overwhelming that the Nortel Group – both pre- and post-petition – respected corporate separateness:

- Individual Nortel debtors held themselves out to creditors as separate legal entities.

- Each significant subsidiary prepared separate financial statements.[460]

- Each Nortel entity had its own boards of directors and complied with local laws.[461]

- Each Nortel entity maintained separate books and records prior to insolvency.[462]

- Nortel respected corporate formalities in negotiating and documenting intercompany loans and transactions.[463]

- Nortel IEs operated as fully-functioning, independent subsidiaries with cash management functions that respected corporate formalities.[464]

- Post-petition, NNI, NN CALA and the other US Debtors have remained separate from each other and the other estates during the insolvency process.[465]

---

[458] *Credit Suisse First Boston v. Owens Corning (In re Owens Corning)*, 419 F.3d 195, 211 (3d Cir. 2005).  Former bankruptcy Judge Clark acknowledged the relevance of *Owens Corning* in analyzing the application of a pro rata distribution theory to Nortel.  *See* Clark Dep. 141:17-142:13.  During his days as a Judge, he also recognized that substantive consolidation should be invoked "sparingly," and described the burden on the moving party as "exacting."  *In re Bippert*, 311 B.R. 456, 464 (Bankr. W.D. Tex. 2004) (Clark, J.) (internal citation omitted); *see also PSINet Ltd., Re.*  (2002), 33 C.B.R. (4th) 284 at para. 2 (Ont. S.C.J.).

[459] *See PSINet Ltd., Re.*, [2002] O.J. 1156 ¶ 2 (S.C.J.) (sanctioning a plan of arrangement that consolidated Canadian applicants where the applicants essentially operated as a single unit and only one applicant had employees).

[460] TR00001 (Currie Aff.) ¶ 39; Binning Dep. 148:13-23; Freemantle Dep. 416:7-17.

[461] Trial Tr. 543:21-546:5 (Currie); TR00001 (Currie Aff.) ¶ 39; TR00014 (Binning Aff.) ¶¶ 8, 9; TR00020 (Ray Decl.) ¶¶ 16, 30; TR00013 (G. Davies Aff.) ¶¶ 14, 18.

[462] TR00007A-B (McCorkle Aff.) ¶ 16; TR00001 (Currie Aff.) ¶ 39; Trial Tr. 544:14-16 (Currie); *id.* 815:11-816:4 (McCorkle); Freemantle Dep. 204:6-15.

[463] TR00014 (Binning Aff.) ¶¶ 9, 35; TR00007A-B (McCorkle Aff.) ¶¶ 16, 20-21; TR00001 (Currie Aff.) ¶¶ 70, 75; Doolittle Dep. 40:15-41:04, 43:16-44:24; Trial Tr. 816:17-20 (McCorkle).

[464] TR22078 (2008 Joint APA Request) at 6 ("An Integrated Entity (IE) is an entity that performs all of the activities required to fulfill customer contracts and effectively orchestrate Nortel's value chain. Each IE performs the functions of R&D, manufacturing support, distribution and extraterritorial services to varying degrees in a very united and reliant manner."); Trial Tr. 553:19-555:8 (Currie); *id.* 816:5-8, 817:21-24 (McCorkle); TR00001 (Currie Aff.) ¶¶ 42-46, 70, 78; TR21322 (Corporate Procedure 303.37) (discussing Regional/Global Cash Pooling).

- As Murray McDonald testified, post-petition, the Monitor has successfully reconciled and balanced NNL's intercompany transactions because those transactions were well-documented and separately-executed; it has successfully administered post-petition agreements that required payments to specific entities, respecting the corporate form; and it has successfully discerned the ownership structure of entities involved in various post-petition sales.[466]

- Creditors sought guarantees from specific Nortel entities.

    o As Nortel's senior finance executives, including former CFOs Currie and Binning testified, NNI-specific guarantees were a critical term of Nortel bonds.[467]

    o US expert John McConnell, a finance professor and bond trading expert, testified that Nortel's bond prices reflected the value of the NNI guarantees.[468]

    o The UKPC negotiated for its own guarantees from specific Nortel entities, including NNL.[469]

    o Nortel's offering memoranda and prospectuses also informed potential investors that Nortel's subsidiaries are "separate and distinct legal entities" and that non-guarantor subsidiaries have "no obligation" to pay amounts due under the notes.[470]

    o McConnell testified that, from an economist's perspective, these statements to potential Nortel investors are "totally inconsistent" with the single-pool distribution theory.[471]

- In sum, as the Monitor acknowledged in its pleadings, "[t]he Nortel companies had separate and distinct existence.  Employees were employed by the specific company they worked for.  Trade creditors contracted with specific Nortel entities.  Bondholders invested with or lent to specific Nortel members of the Nortel Group. Where applicable, guarantees were negotiated from specific Nortel Group

---

[465] TR00020 (Ray Decl.) ¶¶ 42-43.  Indeed, NN CALA filed a voluntary petition for relief six months after NNI. *See* TR50727.

[466] McDonald Dep. 207:13-210:25, 211:13-213:23, 214:15-215:10, 216:12-217:4.

[467] TR00001 (Currie Aff.) ¶ 90; Trial Tr. 548:3-550:2 (Currie); *see also* Williams Dep. 197:22-200:2; Trial Tr. 1057:12-25 (Binning); *id.* 820:24-821:15 (McCorkle).

[468] TR00057 (McConnell Rebuttal) ¶¶ 53-56, Ex. 2, 3; Trial Tr. 4790:15-4795:21 (McConnell); DEM00024 at 5.

[469] TR41344 (Nov. 21, 2006 Guarantee); TR31169 (Dec. 21, 2007 Guarantee); TR48995 (June 2006 email from McCorkle to Stevenson and others re provision of NNL guarantee of NNUK pension deficit); Trial Tr. 821:16-21; 845:4-25 (McCorkle); TR00007A-B (McCorkle Aff.)  ¶ 58; Hern Dep. 84:21-85:6.

[470] TR40117 at 25; TR44615 at 10; TR40118 at 18; TR40180 at 5; TR44704 at 17; DEM00024 (McConnell Demonstratives) at 6; Trial Tr. 819:21-820:23 (McCorkle).

[471] *Id.* 4801:2-4802:16 (McConnell); *see also id.* 1056:20-1057:11; 1070:21-1071:8 (Binning) (testifying that creditors dealt with specific Nortel entities).

members.  The . . . *ex post facto* characterization of creditors dealing indiscriminately with members of the Nortel Group is entirely incorrect and unsubstantiated."[472]

Finally, both the US and Canadian Courts have recognized the Nortel debtors as separate and distinct corporate entities in cash management and interim-funding orders and by allowing more than $2 billion in intercompany claims in favor of NNI against NNL, without offset or reduction.[473]  The Canadian Court has approved intercompany claims against NNL as part of the settlement of the EMEA Debtors' claims against NNL, and the US Court has approved an administrative claim (already paid out in cash) as part of the settlement of intercompany claims between the EMEA Debtors and NNI.  These allowed and paid claims are antithetical to pro rata/substantive consolidation.

Against the overwhelming weight of this evidence, the UKPC and CCC point only to the unremarkable fact that Nortel operated what is known as a "matrix" organization, a common structure utilized by many of the world's most respected multinational enterprises, including GE, Cisco Systems and IBM.[474]  There is no authority to suggest that Nortel's commonplace organizational structure satisfies the exacting burden for even domestic substantive consolidation – never mind contested, cross-border substantive consolidation of the Nortel estates.  Tellingly, the UKPC's experts, Clark and Westbrook, who co-authored a report, propose to modify the standards, although they disagree fundamentally as to how.  While former Judge Clark disavowed the opinion that there should be a presumption of a "single pool" distribution in every multinational bankruptcy, Professor Westbrook affirmed that such a presumption should

---

[472] TR40711 (Response of the Monitor and Canadian Debtors' to the Opening Allocation Pleadings) ¶ 41.

[473] *See* TR50194; TR50048 ¶¶ 34-38; TR50146; TR50431 ¶ 8.

[474] Donovan Dep. 199:17-200:10 (describing companies to which Nortel looked to assist in the design of its matrix structure); *see also* Zafirovski Dep. 31:20-32:12; TR472223.01 at 41; TR00057 (McConnell Rebuttal) ¶ 65.

generally be applied.[475]  In addition, Clark questioned whether creditor expectations are a reliable measure upon which to base an allocation decision, whereas Westbrook believes that this is an important consideration for the courts.[476]  Westbrook refused to attend trial to testify in support of the report that he co-authored, and this alone should result in the joint Clark & Westbrook report being accorded no evidentiary weight.[477]

### D.    Pro Rata Distribution Theory Cannot Be Implemented

Even if the pro rata expert distribution theory was relevant to the allocation question or had any basis in the law, the experts propounding it failed to provide a reliable or workable methodology for its implementation.[478]  Clark and Westbrook are silent regarding the mechanics of actually implementing a pro rata distribution theory.[479]

The UKPC's other expert, Bazelon, admitted on cross-examination that a pro rata distribution cannot be implemented until the unknown point in time at which the claims process

---

[475] *Compare* Clark Dep. 114:11-115:7, 125:13-129:16, 130:12-130:18, 131:6-24, *with* Westbrook Dep. 19:18-22, 34:3-10.

[476] *Compare* Clark Dep. 86:22-88:14, 90:18-91:16, 152:17-153:24, *with* Westbrook Dep. 168:17-169:16, 183:20-184:14.

[477] The Clark and Westbrook report should be accorded no evidentiary weight for several additional grounds, including that their opinions rest on untested, unverified, and incomplete facts provided by counsel. *See* TR11436 (Clark & Westbrook Report) ¶¶ 2 n.3, 7, App. E; Westbrook Dep. 123:20-124:8, 140:3-141:5, 190:23-191:7, 191:9-192:22; Clark Dep. 45:13-46:5, 70:19-71:9, 71:14-72:3, 83:16-84:22.

[478] On April 21, 2014, the US Interests filed a pre-trial Motion to Strike the Expert Reports of the UK Pension Claimants and the Canadian Creditors Committee Advocating for a "Pro Rata Distribution" to Creditors ("Motion to Strike").  During the May 8, 2014 pre-trial hearing, the Courts dismissed this Motion to Strike without prejudice to renewing it at the end of trial. *See* Hrg. Tr. at 10:8-10, May 8, 2014.  The US Interests hereby renew their Motion to Strike and all of the arguments contained therein. *See, e.g.*, *Daubert v. Merrell Dow Pharm.*, Inc. 509 U.S. 579, 597 (1993) (expert testimony must be "relevant to the task at hand" and rest on a "reliable foundation"); *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997) (internal citation omitted) ("[T]he process or technique the expert used in formulating the opinion" must be reliable); *see also R. v. Mohan* [1994] 2 SCR 9 ¶¶ 17-24.

[479] Westbrook Dep. 216:21-25; Clark Dep. 50:13-52:16, 66:8-16.  Clark testified regarding a potential "synthetic distribution mechanism" which was neither set forth in his report nor discussed with the co-author of his report, Professor Westbrook.  Any testimony concerning this "synthetic distribution mechanism" should be given no evidentiary weight because these opinions are not contained in the Clark & Westbrook Report itself. *See Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 289 F. Supp. 2d 493, 499-500 (D. Del. 2003) (excluding expert testimony not contained in expert report); *Johnson v. Vanguard Mfg., Inc.*, 34 Fed. App'x 858, 859 (3d Cir. 2002) (same); *Marchand (Litig. Guardian of) v. Pub. Gen. Hosp. Soc'y of Chatham*, [2000] O.J. No. 4428 (ONCA), ¶ 38 (expert's report "must set out the expert's opinion, and the basis for that opinion" and "may not testify about matters that open up a new field not mentioned in the report"); *see also* Fed. R. Civ. P. 26(a)(2)(B).

has been finally concluded in each of 23 estates, any remaining assets in those estates have been liquidated, and all priority and administrative expenses in every estate have been finally determined and satisfied in cash.[480]  Such a process could take years, would involve the significant continued involvement of the US and Canadian Courts and would create additional incentives for litigation over the resolution of such various matters to the extent that each such ruling would be seen as a zero sum battle for each creditor's share of the Sale proceeds.  Britven attempted to ameliorate these issues by suggesting the Courts could estimate such additional claims or assets.[481]  Doing that on a joint basis of course would be its own complicated effort, embroiled with jurisdictional risks and limitations.

The various experts also cannot figure out how to treat guarantee claims and claims against multiple debtors, as well as whether intercompany claims should be honored.  Bazelon readily admitted his preference that intercompany claims and guarantee claims be disregarded and given no economic effect, even if already allowed by the Courts.[482]  They ultimately throw these enormous complexities back at the Courts by suggesting that all options can be accommodated without fully explaining how that can be or even how pro rata could still be maintained in the face of such claims.[483]

Britven avoids offering any opinions on how a pro rata distribution could be implemented.  He provides nothing more than an "illustrative" calculation of what pro rata

---

[480] Trial Tr. 3035:1-19, 3036:18-3039:2, 3045:1-3047:21, 3069:3-3071:13, 3073:21-3074:24 (Bazelon); TR50310 (10th Report of E&Y, dated Feb. 6, 2014) at 9; TR00041 (DEM00014) at 1, 4, 5.  Bazelon did not include any pro rata implementation mechanics in his expert report but attempted to do so at trial.  *See* Trial Tr. 2402:9-25, 2403:11-2406:13, 2409:5-2410:7.

[481] *See id.* 3372:2-9, 3502:25-3503:5.

[482] *Id.* 2953:14-2955:7 (Bazelon); *id.* 3054:7-12, 3058:15-18, 3076:2-3078:17.   Bazelon testified that there could be "a scenario with a guarantee holder where they get to participate once in the pro rata distribution in the guarantor estate and once in the pro rata distribution in the primary obligor's estate . . . they get to participate twice."  *Id.* 3059:5-11.  Yet, when asked how these guarantee holders are paid should that scenario allow them to recover more than 100 percent of their claim, Bazelon stated that he had no opinion about this and that "[t]here is a great deal of latitude for the courts as to how they want to effectuate payment."  *Id.* 3059:12-3060:16.

[483] *See id.* 2940:5-22 (Bazelon); *id.* 3560:22-3561:3 (Britven); Bazelon Dep. 78:18-79:9, 88:9-89:23.

recoveries would be if intercompany and guarantee claims were ignored, his distribution

methodology were adopted and all the untested assumptions he was provided by counsel

regarding claims turn out to be true.[484]

The experts' failure to offer a path for implementation should be seen for what it is –

their realization that any effort to put pen to paper to implement an actual pro rata model would

quickly prove unworkable and open up new and likely protracted litigation fronts.

### E.    Pro Rata Distribution Theory Would Disturb Reasonably Held Creditor Expectations and Prejudice Creditors

Application of the pro rata distribution theory will result in unjustified wealth transfers,

prejudicing creditors who bargained for specific rights and protections and held legitimate

expectations of recoveries.[485]  As Bazelon testified, pro rata distribution would result in the Sale

Proceeds associated with each Business Line becoming available for distribution to all debtor

entities regardless of whether a debtor sold assets in a particular sale.[486]  The practical effect of a

pro rata theory would be to move cash from one estate to another in contravention of law.[487]

Further, a pro rata distribution would allow for unequal treatment of similarly situated

creditor and debtor groups by unwinding the effect of Court-approved settlements and

intercompany claims.[488]  Worse yet, such prior settlements would be unwound on a selective and

unprincipled basis.  Under Bazelon's proposed implementation formula, creditor groups such as

the UKPC would be entitled to keep the proceeds from any previously court-approved

settlements (these proceeds would come "out of the system"), whereas settlements between

---

[484] TR00045 (Britven Report) at Sched. 6; Trial Tr. 3481:8-3484:4, 3397:12-25 (Britven); DEM00016 at 26, 35.

[485] TR00057 (McConnell Rebuttal) ¶ 67; Trial Tr. 4806:20-4807:9, 4868:3-4870:2 (McConnell); *id.* 3057:12-3058:18 (referencing TR00041 (DEM00014) at 3), 3073:3-20 (Bazelon).

[486] *Id.* 3054:13-3055:2.

[487] *Id.* 3074:25-3076:1 (Bazelon); TR00041 (DEM00014) at 5.

[488] Trial Tr. 3039:3-3044:21, 3072:1-3073:20 (Bazelon); TR00041 (DEM00014) at 4.

debtor groups would either by disregarded, if not already paid, or otherwise effectively thrown back into the pot by being accounted for as part of the worldwide assets subject to redistribution among the estates on a pro rata basis.[489]  Further, Bazelon acknowledged that the UKPC would potentially be able to participate in the pro rata distribution 20 times on account of their guarantee claims against the EMEA Debtors' estates, which would result in a recovery far in excess of similarly situated creditor groups and explains the basis for their vehement advocacy for an allocation method that spreads cash in as many estates as possible, without regard for the nature or value of assets each such debtor conveyed in the various Sales.[490]

On the other hand, the holders of Nortel's bonds reasonably expected that the guarantees given by NNI will be honored based on their contractual rights and the representations made to bondholders regarding their entitlement to get paid.[491]  The purchasers of the bonds provided much-needed capital to Nortel to fund its ongoing operations, and the cost of that capital included the guarantees.[492]  It would be detrimental to the functioning of capital markets, and would undermine confidence in capital markets, if the guarantees bargained-for and paid-for by the providers of capital were ignored by the Courts at the very time that those guarantees are needed.

No estate advocates pro rata distribution and, indeed, witnesses from all of them have testified that the Nortel Group respected corporate formalities.  Only two groups of creditors of certain Nortel estates, who have concluded that they would recover more if they dipped into asset pools belonging to others, advocate for this wealth transfer.  The UKPC's and CCC's pro rata

---

[489] Trial Tr. 3039:3-3044:21 (Bazelon).

[490] *Id.* 3055:3-3057:11.

[491] *See* PFOF § II.B.4 ("Nortel Bondholders Relied on the Corporate Separateness of the Nortel Entities").

[492] *See id.* § II.C.4 ("NNI Provided Essential Credit Support to the Nortel Group").

distribution theory, however, is legally unfounded, prejudicial to creditors and economically irrational.  The Courts should reject the pro rata distribution theory in its entirety.

## CONCLUSION

For the reasons presented at trial and set forth above and in the US Interests' Proposed Findings of Fact and Conclusions of Law submitted herewith, the US Interests respectfully submit that both Courts should enter orders allocating the proceeds from the Business Line Sales and the Patent Portfolio Sale in accordance with the chart set forth on page 2 of this brief.

Dated:  August 7, 2014
Wilmington, Delaware

TORYS LLP

Sheila Block
Andrew Gray
Scott Bomhof
79 Wellington St, Suite 3000
Box 270, TD Centre
Toronto, ON M5K 1N2
Telephone: (416)865-0040
Facsimile: (416) 865-7380

- and -

CLEARY GOTTLIEB STEEN & HAMILTON LLP

Howard S. Zelbo (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Jeffrey A. Rosenthal (admitted *pro hac vice*)
Lisa M. Schweitzer (admitted *pro hac vice*)
Neil P. Forrest (admitted *pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

- and -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


＿/s/ Ann C. Cordo＿＿＿＿＿＿＿＿＿＿
Derek C. Abbott (No. 3376)
Ann C. Cordo (No. 4817)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19801
Telephone:  (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors and Debtors in Possession*

- and -

AKIN GUMP STRAUSS HAUER & FELD LLP

Fred Hodara (admitted *pro hac vice*)
David Botter (admitted *pro hac vice*)
Abid Qureshi (admitted *pro hac vice*)
Robert Johnson (admitted *pro hac vice*)
Brad Kahn (admitted *pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

- and -

RICHARDS, LAYTON & FINGER, P.A.


＿/s/ Christopher M. Samis＿＿＿＿＿＿＿
Mark D. Collins (No. 2981)
Christopher M. Samis (No. 4909)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Counsel to the Official Committee of Unsecured Creditors*
*of Nortel Networks Inc., et al.*

141